IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


IN RE:                              )
                                    )  CA No. 01-12257-PBS
PHARMACEUTICAL INDUSTRY AVERAGE     )  CA No. 06-11337-PBS
WHOLESALE PRICE LITIGATION          )  Pages 1 - 57
                                    )




MOTION HEARING

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE




United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
January 19, 2010, 2:30 p.m.




LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 7200
Boston, MA  02210
(617)345-6787

1   A P P E A R A N C E S:

2

    FOR THE PLAINTIFFS:

3

4        GEORGE B. HENDERSON, ESQ. and JAMES J. FAUCI, ESQ.,
    Assistant United States Attorneys, Office of the United States
5   Attorney, United States District Court, Suite 9200,
    1 Courthouse Way, Boston, Massachusetts, 02210, for the United
6   States.

7        GARY L. AZORSKY, ESQ., Berger & Montague, PC,
    1622 Locus Street, Philadelphia, Pennsylvania, 19103, for
8   Ven-A-Care of the Florida Keys.

9

    FOR THE DEFENDANTS:

10

11       SARAH L. REID, ESQ., and MARISA A. LORENZO, ESQ.,
    Kelley, Drye & Warren, 101 Park Avenue, New York, New York,
    10178, appearing for Dey Pharmaceutical

12

13       MARTIN F. MURPHY, ESQ., Foley Hoag, LLP,
    Seaport West, 155 Seaport Boulevard, Boston, Massachusetts,
    02210-2600, for Dey Corporation.

14

15       HELEN E. WITT, ESQ. and JOHN W. REALE, ESQ.,
    Kirkland & Ellis, LLP, 300 North LaSalle Street, Chicago,
    Illinois, 60654, for Boehringer Ingelheim.

16

17

18

19

20

21

22

23

24

25

1        P R O C E E D I N G S

2        THE CLERK:  In Re:  Pharmaceutical Industry Average

3   Wholesale Price Litigation, Civil Action 01-12257 and 06-11337,

4   will now be heard before this Court.  Will counsel please

5   identify themselves for the record.

6        MR. HENDERSON:  George Henderson, Assistant U.S.

7   Attorney for the United States.

8        MR. FAUCI:  Jeff Fauci, Assistant U.S. Attorney for

9   the United States.

10        MR. AZORSKY:  Gary Azorsky representing Ven-A-Care of

11   the Florida Keys.

12        MS. REID:  Sarah Reid representing the Dey Corporation

13   from Kelley, Drye & Warren.

14        MS. LORENZO:  Marisa Lorenzo from Kelley, Drye &

15   Warren representing Dey.

16        MR. MURPHY:  Martin Murphy, also representing Dey,

17   your Honor.

18        MS. WITT:  Good afternoon, your Honor.  Helen Witt on

19   behalf of the Boehringer defendants.

20        MR. REALE:  Good afternoon, your Honor.  John Reale on

21   behalf of the Boehringer defendants as well.

22        THE COURT:  Okay.  As I understand it, I have

23   cross-motions for summary judgment.  Is that correct?

24        MR. HENDERSON:  Well, I think the parties'

25   understanding, your Honor, is that there are two motions before

1   the Court.  One is the government's motion to consolidate, and

2   the other is a motion by the Boehringer defendants for summary

3   judgment with respect to the liability of the parent companies,

4   essentially a corporate veil type issue.

5          THE COURT:  Did you let me know this is what you were

6   planning on focusing on?

7          MR. HENDERSON:  This is what your Honor scheduled.

8          MR. REALE:  Yes, your Honor, the parties filed a

9   jointly proposed schedule I think back in the second week of

10  December.

11         THE COURT:  I actually prepared on something else, but

12  I will listen.  So when are we doing the basic motions for

13  summary judgment?

14         MR. HENDERSON:  Well, we had initial arguments back in

15  October.

16         THE COURT:  But they were by no means done.  We had

17  the witness Duggan on stand.

18         MR. HENDERSON:  Correct.

19         THE COURT:  When is all that going to be finished?

20         MR. HENDERSON:  It hasn't been scheduled, your Honor.

21  Your Honor needs to schedule that.  We have Daubert hearings

22  coming up later this week and into the following week, but the

23  remaining arguments -- I think, yes, on the summary judgment --

24         THE COURT:  So today is just on the parent issue and

25  on consolidation?

1          MR. HENDERSON:  Yes.

2          THE COURT:  So I sat and read about all this other

3     stuff for another day.  All right.  Do I need a whole hearing

4     on parent/sub?  Haven't we gone there before?

5          MR. HENDERSON:  There was brief, very brief

6     abbreviated argument at the summary judgment arguments.

7          THE COURT:  Let's not just do that right now.  Let's

8     just start on the motion to consolidate.  I think I've ruled on

9     this in other contexts before, haven't I?

10          MS. WITT:  No, your Honor.  This is a very different

11     situation than any of the ones that have appeared before you in

12     the AWP case.  This has two prime elements:  One is a

13     traditional kind of piercing-the-corporate-veil theory, and the

14     other is direct liability claims asserted, we think too late,

15     but asserted in the papers against the parent companies and a

16     sibling company, as opposed to the companies whose products are

17     actually at issue.  But I would agree that the consolidation

18     motion from the point of view of the parties is the more

19     time-critical because of trial preparation needs than --

20          THE COURT:  When is the case scheduled for?

21          MS. WITT:  The 26th of April.

22          THE COURT:  All right, go ahead.

23          MR. HENDERSON:  I'll proceed, your Honor, on the

24     motion to consolidate.  If the Court wishes to get to the other

25     motion, Mr. Fauci is prepared to address that.

1      THE COURT:  Well, he's here.  You're up from

2   Washington?

3      MR. FAUCI:  No.  I'm in the U.S. Attorney's office.

4      THE COURT:  You're here?  Okay.

5      MR. HENDERSON:  So, your Honor, we've moved to

6   consolidate the Dey and the Roxane cases, and I want to spend a

7   little more time on the Medicare piece of this litigation

8   because I think it very strongly militates towards

9   consolidation, and in addition it represents well over

10  80 percent of the total damages in these two cases, at least

11  under the approach that we are taking.

12     THE COURT:  This is bench trial, right?

13     MR. HENDERSON:  Jury trial.

14     THE COURT:  Jury.

15     MR. HENDERSON:  Yes.  Now, the Medicare piece of the

16  case, as I said, over 80 percent of the damages are

17  concentrated in one drug, ipratropium bromide.  Both Dey and

18  Roxane marketed their individual versions of this.  They are

19  identical generic drugs essentially.  This ipratropium bromide

20  product was used in connection with durable medical equipment

21  and was covered by Medicare Part B.

22     When Roxane prepared to launch this drug in 1986, it

23  hired a former Dey consultant, who advised them on creating an

24  attractive spread and advised them how to market this product.

25  And in Roxane 's launch plan for the product, Roxane observed,

27cc2919-6074-4a5a-b5f8-984eaafed6f2

1    and I quote, "The single most significant factor that will

2    influence the success of this product is Dey Laboratories."

3    And that held to be true, as Dey ultimately, six months later

4    they launched their version of the drug, and the two companies

5    competed against one another.  Dey ultimately took over a

6    majority of the market share of this product.

7          In our summary judgment hearing back in October, we

8    argued to the Court about our so-called combined impact theory

9    of liability, joint and several liability for this drug.

10         THE COURT:  Right, and so let me just refresh my

11   recollection here.  Are you complete on the arguments on that?

12   I hadn't remembered we were done with it.

13         MR. HENDERSON:  Let me, because it is important, I

14   think, to our motion to consolidate --

15         THE COURT:  It's critical.

16         MR. HENDERSON:  I think it's very important.

17         THE COURT:  I mean, I can't rule on one without the

18   other, so, in your view, is the oral argument complete on that?

19         MR. HENDERSON:  I would like to refresh your Honor's

20   recollection of this issue and why it mandates consolidation.

21   We illustrated to your Honor how Medicare and these carriers

22   pay for this particular drug.

23         THE COURT:  Right.

24         MR. HENDERSON:  They have these arrays.

25         THE COURT:  Right.

1          MR. HENDERSON:  And they calculate the median.

2          THE COURT:  Right.

3          MR. HENDERSON:  And we pointed out that for many of

4     the arrays, up to a critical point in time, about midway

5     through our history, you can lower the Dey AWPs by even a

6     penny, and it changes the median, and it changes how much

7     Medicare paid.  And likewise you can look at Roxane

8     individually, and just a couple of pennies lowering their AWP,

9     it changes things.  Then there's a critical tipping point, and

10    we illustrated this in the Cigna arrays, where one new

11    manufacturer has a product whose AWP appears in the array, one

12    more product in the array, and from that point forward, you can

13    change any single manufacturer's AWPs down to a few cents.  You

14    can drastically lower the Dey AWPs, and it doesn't change the

15    median calculation, and likewise as to Roxane; but if you

16    lowered both of their products, even just by a couple of

17    pennies, it does affect the median.

18          And so our argument is, your Honor, that we show

19    clearly causation from the combined effects of the two

20    companies, and that the mere fact that one new manufacturer's

21    product has entered the market, under defendants' theory, they

22    say the government can recover nothing; even if we'd sued all

23    of the companies in this array and proven liability with

24    respect to each one of them, we could never recover a single

25    penny because you have to look at each one in isolation.

27cc2919-6074-4a5a-b5f8-984eaafed6f2

1          THE COURT:  Right, and we did talk about this last

2     time.

3          MR. HENDERSON:  Yes, so --

4          THE COURT:  Regardless of how I ruled, though, do you

5     still want consolidation?

6          MR. HENDERSON:  Yes.

7          THE COURT:  Because it's still some damages.

8          MR. HENDERSON:  Yes.  Oh, yes, even under our

9     conservative theory, your Honor, just the Medicare damages,

10    they're about 50 percent of the total.  The --

11         THE COURT:  So my ruling on that summary judgment

12    point, which for some reason -- it's true it was before

13    Christmas and I was champing at the bit for vacation -- I just

14    had remembered we weren't done with.

15         MR. HENDERSON:  Correct.

16         THE COURT:  So I don't remember, we still have a lot

17    of Duggan to do, right, and the defense expert on these arrays

18    and how much the damages really are?  So I don't need to rule

19    on this issue because whichever way I rule on this issue, you

20    wanted a consolidated trial, right?

21         MR. HENDERSON:  That's correct.  I think ruling on the

22    issue will help us out certainly at trial, but --

23         THE COURT:  For sure, but I'm just saying, you want it

24    no matter how I rule, so I don't have to rule on summary

25    judgment first, right?

1          MR. HENDERSON:  That's correct.

2          THE COURT:  And how many drugs are at issue between

3     the two companies?

4          MR. HENDERSON:  Drugs or NDCs?

5          THE COURT:  Drugs.

6          MR. HENDERSON:  For Dey, there are three categories of

7     drugs:  albuterol, and there are maybe three different versions

8     of albuterol, ipratropium bromide, and cromolyn sodium.

9          THE COURT:  Right.

10         MR. HENDERSON:  For Roxane, I think there are nine

11     different drugs?  Yes.

12         THE COURT:  So that would -- and I understand there

13     are multiple more NDCs.  Typically, though, you can understand

14     it by drug.

15         Let me ask you this:  That's the issue, which is would

16     a jury be able to keep all nine -- actually twelve or nine

17     drugs straight?

18         MR. HENDERSON:  Yes.  Now, we have suggested in our

19     reply in support of the motion to consolidate, your Honor, that

20     the Court phase the trials into two parts:  Start with the

21     Medicare piece because it is much simpler, and it commands, in

22     our view, over 80 percent of the damages, and then move on to

23     the Medicaid piece.  And our thinking is --

24         THE COURT:  Separate juries?

25         MR. HENDERSON:  The same jury.

1          THE COURT:  Yes, but the juries get furious, furious.

2     I mean, you know, I'm not going to --

3          MR. HENDERSON:  A reason we did that, your Honor, is

4     that if we tried the Medicare piece, which would be a lot

5     simpler and a lot shorter, because it commands so much of the

6     damages, I think the Medicaid piece would get resolved --

7          THE COURT:  Yes, but how long would the Medicare piece

8     take for two drug companies and all the drugs?

9          MR. HENDERSON:  I would say, in terms of the total

10    trial time, maybe half, a little bit more than half of the

11    total trial time.

12         THE COURT:  No, but tell me.  A month, two months, two

13    weeks?  What is it?

14         MR. HENDERSON:  I haven't thought about it in terms of

15    the Medicare.  I would say a month.

16         THE COURT:  For the government's case?

17         MR. HENDERSON:  No.

18         THE COURT:  For the whole thing?

19         MR. HENDERSON:  The whole thing.

20         THE COURT:  So one month if we just did what,

21    Medicare?

22         MR. HENDERSON:  If we just did Medicare.

23         THE COURT:  And what would it be -- and I understand

24    it's ball-parking -- what would it be if you added Medicaid?

25         MR. HENDERSON:  Another three to four weeks, and a lot

1    of that is my guessing of what the defense would do.

2         THE COURT:  So that's the problem.  You never find a

3    jury for two months, never.  I just did a three-week antitrust

4    trial, and it was hard enough.

5         MR. HENDERSON:  Well, if we tried them all together, I

6    think it would take up that full amount.

7         THE COURT:  Yes, it would.  If I bifurcate, it doesn't

8    help me.  Are there Beacon Theatres issues if I just did one

9    trial and then a second trial?

10        MR. HENDERSON:  I think we'd do the first trial, get a

11   judgment, and if the rest of the Medicaid piece didn't

12   immediately resolve --

13        THE COURT:  If you lose, does that mean you lose on

14   Medicaid?

15        MR. HENDERSON:  No, but it would sure push us toward a

16   quick settlement, your Honor.

17        THE COURT:  If you win, does that create collateral

18   estoppel on any issues?

19        MR. HENDERSON:  On some issues, yes, but not on all.

20        THE COURT:  I mean, I imagine we could knock out a

21   whole drug, for example, but if you just won on a sub-issue, I

22   don't know because there are different methodologies for

23   payment.  So I'm worrying, so I'm just wondering why I wouldn't

24   just have two completely separate trials rather than one --

25   you're nodding.  I'm not talking about between Dey and -- I

1   think it makes a lot of sense to have Dey and Roxane tried

2   together, but what I have a problem with is having nine drugs,

3   two defendants, two months.  Why wouldn't I have two

4   defendants, ipratropium bromide, Medicare?  Wouldn't that

5   settle it and be more concise?

6        MR. HENDERSON:  Yes.

7        THE COURT:  Just one drug, one statutory scheme, two

8   defendants, what would that be?

9        MR. HENDERSON:  That would be a much shorter and more

10  manageable trial.  Under our Medicare case, your Honor, we've

11  only alleged two drugs.  One is a small drug moneywise.  It's

12  albuterol.

13        THE COURT:  Do both sell it?

14        MR. HENDERSON:  No, only Dey, but it's just one drug,

15  and the evidence is relevant to ipratropium bromide because

16  it's 404 -- even if it was only ipratropium bromide, we'd use

17  the same evidence because it's part of the pattern and

18  practice.

19        THE COURT:  Yes, but against one defendant, so then I

20  have problems with whether it's overly prejudicial to the

21  other.  I don't know, I'd have to think about that.  I don't

22  know enough about the case yet.

23        All right, so that's April 28?  Is that when the day

24  of the thing is?

25        MR. HENDERSON:  April 26.

1            THE COURT:  April 26.  And you think it's one month?

2            MR. HENDERSON:  Yes.

3            THE COURT:  Okay, if I knocked it down to one drug,

4    two defendants, Medicare, it's a two- or three-week trial,

5    right?

6            MR. HENDERSON:  I think the government's case would

7    take about two weeks.

8            THE COURT:  All right, so maybe, say, two weeks for

9    each, one week per defendant or something.

10           Anyway, let me hear from you all.

11           MS. REID:  Your Honor, Sarah Reid on behalf of Dey.

12   Let me start from the beginning.  Mr. Henderson has suggested

13   that by trying Medicare, you will somehow resolve or the

14   parties would be able to resolve Medicaid, and in the case of

15   Dey, that is simply not so.

16           THE COURT:  Assume it's not true.  Suppose I just need

17   a manageable trial and I don't want to try ipratropium bromide

18   twice.  Why don't I just do two defendants, one drug, Medicare?

19           MS. REID:  Because, your Honor, if I may respectfully

20   suggest, a manageable trial would be to try Dey.  There are

21   only three drugs at issue.  They are all inhalation drugs.

22   They're albuterol --

23           THE COURT:  So how long would just Dey be?

24           MR. MURPHY:  Just Dey?  I would say --

25           THE COURT:  You say Medicare and Medicaid?

1          MS. REID:  Medicare and Medicaid, I think you're

2     looking at, realistically, four to six weeks.  And this is why,

3     your Honor --

4          THE COURT:  I'm going to do that twice?

5          MS. REID:  No.  No, because it's a very different

6     pattern of drugs.  Dey is a niche manufacturer.  It's

7     inhalation drugs, only inhalation drugs.  The time frame that

8     you're really focused on is the mid-1990s.  And then the

9     information, the knowledge that you're going to be hearing from

10    is identical on CMS, OIG reports.  All of that is common to

11    Medicaid and Medicare, as are the Dey witnesses.

12         THE COURT:  No, but I don't buy that for a second

13    because I've seen all this briefing about different levels of

14    knowledge for each Medicaid official.

15         MS. REID:  But the way, your Honor, I think

16    practically that's going to come in is through videotape clips

17    from the various depositions that have been taken.

18         THE COURT:  Sure, and that takes forever.  I just had

19    a three-week antitrust trial.  It takes forever, and it's

20    deadly dull, okay; you know, like, I had snoozing jurors.  So

21    I'm not disagreeing.  Just why should I do that twice?  I'm

22    going to listen to the same thing from both defendants, the

23    exact same --

24         MS. REID:  Well, and I'm not -- I don't want to make

25    Roxane --

27cc2919-6074-4a5a-b5f8-984eaafed6f2

1    THE COURT:  Why not just have Medicare where I'm only

2    dealing with the CMS officials?

3    MS. REID:  Because Medicaid you're dealing with the

4    CMS officials too.  CMS has a Medicaid division.  CMS approves

5    every one of the state plan amendments.  The administrators

6    from CMS --

7    THE COURT:  But Medicare, all I have is the CMS,

8    that's all.  So I must have like what, three officials or

9    something?

10   MS. REID:  You're also going to have the administrators,

11   the various OIG reports which we'll have to go through twice

12   because that's going to be relevant to Medicaid and to

13   Medicare.  And the fact of the matter is that Roxane is a very

14   different company, and there are very different issues, and

15   they're very different drugs.

16   THE COURT:  Well, what if I just had ipratropium

17   bromide?

18   MS. REID:  Well, then you're in the situation --

19   THE COURT:  You don't want it because it would make it

20   sound like a conspiracy basically, right?  I mean, you don't

21   want it because the jury is going to say a pox on both your

22   houses.

23   MS. REID:  Your Honor, and there's also huge conflicts

24   between the companies.  They are direct competitors.  Nowhere

25   in the complaints -- and I don't think the government

1   disagrees -- is there any allegation of collusion, of any kind

2   of conspiracy.  There's no claim of conspiracy.

3         THE COURT:  Well, as I understand it, you're competing

4   with each other for the bigger spread.

5         MS. REID:  We're competing with each other --

6         THE COURT:  That's always been the motive as to why

7   the government's always claimed, so the issue is really not so

8   much -- that's why I'm agreeing with -- I don't think there's

9   prejudicial spillover, so why wouldn't I do it at the same

10   time?

11         MS. REID:  Because the problem in part is exactly

12   illustrated by what your Honor asked Mr. Henderson about

13   albuterol.  The documents from Dey on albuterol and cromolyn

14   are less helpful.  There are not those kinds of documents for

15   Dey on ipratropium.  The Roxane documents on ipratropium are,

16   from Dey's point of view, not helpful.  So combining this all

17   together with the inhalation drugs, you have Dey potentially,

18   you know, being prejudiced by the Roxane documents, and

19   Roxane --

20         THE COURT:  I see, so that's the gist of it.

21         MS. REID:  And then the other issue is these joint

22   scenarios where there is a direct conflict between two

23   different scenarios that the government is proposing, which

24   will put Dey --

25         THE COURT:  Why, why?

1          MS. REID:  Because under one scenario of their

2     $1.1 billion scenario for ipratropium, Dey is responsible,

3     according to them, for three-quarters of a billion dollars.

4     The other scenario, which is the $1.4 billion scenario, Roxane

5     is responsible for three-quarters of a billion, and Dey is

6     responsible for $340 million.  And that's a huge problem, your

7     Honor.  The expert -- I mean, the jury is going to be asked to

8     look at --

9          THE COURT:  Well, I would have to make a legal ruling,

10     so that issue will go away, right?

11          MS. REID:  And maybe -- but, your Honor, I mean, what

12     you're asking and what I guess I'm saying is it's not --

13          THE COURT:  The legal issue is extremely difficult,

14     but it would be a legal question, not a factual issue.  The

15     harder one you're asking me to think about is that you each may

16     have documents about you that would have prejudicial spillover

17     for the other.  That's really the legal question as to whether

18     or not that precludes trying the two of you together.  What

19     you're saying is, you have some lousy documents in your file,

20     she's got some lousy documents in her file, and neither of you

21     want to be tainted by the other one's lousy documents.

22          MS. REID:  There is also another issue --

23          THE COURT:  Do I have that --

24          MS. REID:  Yes, That you have exactly right, your

25     Honor.  The other point I would point out is that Dey and

1    Roxane have very different pricing practices.  Dey reported a

2    declining WAC, which is its actual wholesale price, not fully

3    discounted, but it was declining, it goes down over time, and

4    it was published.  Roxane had a different policy.  They did not

5    publish their WAC.  Each company had its own reasons for doing

6    it, but the jury is going to be asked to hear from each company

7    why they did particular pricing, why they published certain

8    pricing.  That is an issue which is a real issue of possible

9    confusion to the jury.

10        THE COURT:  So the two issues would be, one, possible

11   confusion between pricing practices.  With two I'm not as

12   worried about that, but the prejudicial spillover, let me ask

13   you about the prejudicial spillover.

14        MS. REID:  And I did have one more.

15        THE COURT:  Oh, I'm sorry, you had a third point?

16        MS. REID:  The third is the experts.  The experts are

17   different.  Neither Roxane or Dey attended each other's

18   depositions or their expert depositions because at that point

19   in time in fact discovery, there was no hint of moving to

20   consolidate at that point.  There's nothing in the complaints --

21        THE COURT:  Was there anything that you can point to

22   that's a problem?

23        MS. REID:  Yes.  The Dey expert has analyzed and done

24   certain kinds of analysis, particularly on the state claims

25   data, which the Roxane expert has not.

1          THE COURT:  But if I stick to Medicare, that's not a

2     problem.

3          MS. REID:  That will not be a problem in terms of

4     states claims data, that is true.  On the other hand, I think

5     the experts' positions are different, even on Medicare.  And

6     that there is an issue of having two different experts for

7     essentially the same class of drugs testifying, and the jury

8     basically thinking "Help," you know, whatever.  I mean, your

9     Honor, at the end of the day, from Dey's point of view, the

10    biggest prejudice that I worry about is that --

11         THE COURT:  What are the two of you saying that are

12    different between Dey and Roxane about the experts?

13         MS. REID:  We have --

14         THE COURT:  Skip the state.  I'm talking about only

15    Medicare.

16         MS. REID:  On Medicare, our expert is going to be

17    discussing issues on the arrays, and there are potentially --

18         THE COURT:  Isn't their expert going to say the same

19    thing?

20         MS. REID:  I don't, your Honor, actually know for sure

21    what Roxane's position will be --

22         THE COURT:  I'll get to Roxane.

23         MS. REID:  -- but I think that there is a very good

24    likelihood that the two companies will be in distinct

25    opposition as to whether or not the arrays are correctly

27cc2919-6074-4a5a-b5f8-984eaafed6f2

1  constructed, and the experts are going to be testifying as to

2  that.

3          THE COURT:  Well, have you actually looked at --

4          MS. WITT:  Your Honor, I can give you a few specific

5  examples, and I don't want to -- I don't think it's fair for

6  either of us to have to give too many examples --

7          THE COURT:  All right, if you don't want to be

8  consolidated, I'd give a few.

9          MS. WITT:  Well, I'll give you a couple that are very

10 important to us, and one has to do with this billion-dollar

11 issue of NovaPlus, and that is the question of causation on the

12 arrays.

13         THE COURT:  But that was argued, and that is something

14 I need to rule on.

15         MS. WITT:  Whether NovaPlus remains in the case,

16 clearly.

17         THE COURT:  Right.

18         MS. WITT:  But assuming that NovaPlus does remain in

19 the case, our causation argument is very clear that NovaPlus

20 should have been treated in the arrays as if it were a generic

21 product because in fact it was a generic product, and all

22 indicia were that it was a generic product, and that there was

23 no reason why some of the DMERCs but not all in some periods

24 but not others called it a brand name product, and they have

25 many hundreds of millions of dollars resulting from that.  Dey

1   has every incentive in the world to align with the government

2   on that point because they're not liable for the NovaPlus.

3         THE COURT:  You know, I frequently have situations in

4   the civil context where the parties point fingers at each

5   other.

6         MS. WITT:  Well, but those contexts, with all due

7   respect, your Honor, are not where there are treble damages at

8   issue or not where there are civil penalties at issue.

9         THE COURT:  Aren't I the -- who decides if they're

10  treble?  Me, right?

11        MS. WITT:  No.

12        THE COURT:  The jury decides if it's treble?

13        MS. WITT:  It's automatic in the statute under the

14  False Claims Act.

15        THE COURT:  It's an automatic trebling in the False

16  Claims?

17        MR. HENDERSON:  Yes, your Honor.

18        MS. WITT:  So there are issues here that relate to the

19  nature of the False Claims Act being a very different statute

20  than a negligence --

21        THE COURT:  I'm not so persuaded about the pointing

22  fingers at each other.  In the criminal context, it can be

23  determinative, but in the civil, it happens every day of the

24  week, cross-claims:  "It was his fault.  No, it was his fault."

25  That happens all the time.  If anything, it's -- you know,

1    remember that "LA Law" incident where both sides pointed at

2    each other, and the jury threw up its hands and simply

3    didn't --

4              MS. WITT:  Oh, we are both dating ourselves, but I do.

5              THE COURT:  Do you know what I'm talking about?  And

6    the jury came back no liability for both because the prosecutor

7    hadn't proved the case, who killed the baby.  So, I don't know,

8    it helps both ways.

9              MS. WITT:  Well, and let me just point out one other

10   thing, your Honor, and at the risk of -- we were going to put

11   this on the Elmo, but it doesn't show up very well, and I'm not

12   going to use all the slides that are here.

13             THE COURT:  Excuse me.  Is "LA Law" no longer on the

14   air?

15             MS. WITT:  Oh, it's been off for about fifteen years,

16   I think.  May I pass this up, your Honor?

17             THE COURT:  That's really sad.  All right.

18             MS. WITT:  I simply want to refer to some of the

19   allegations in the complaint because part of the reason that

20   this is a very different situation --

21             THE COURT:  I'll try and come up with a CSI reference

22   next time.

23             MS. WITT:  Part of the reason that this is a very

24   different situation now and that it's very prejudicial --

25   that's really what we're looking at, and the case law that's

1   cited in the briefs makes clear that the ultimate test has to

2   be the prejudice, that regardless of how efficient it might be

3   to do it otherwise, if there's prejudice to the defendants by

4   combining them, they shouldn't be combined.  And the reason

5   is --

6        THE COURT:  There's also -- there's got to be an issue

7   of judicial economy.  Now, it may be that it's just ultimately

8   more efficient just to try each person separately, and I'm

9   going to have to make that decision, which I will not do

10  rapidly because I'm going to finish up the summary judgment

11  first and then get to the issue of consolidation because until

12  I know how I'm coming out on the legal issues, I won't be able

13  to actually resolve the prejudice points.

14       MS. WITT:  Certainly there's the judicial efficiency

15  that has to be considered and witness efficiency and lawyer

16  efficiency as well.

17       THE COURT:  But what's horrifying to me, let me just

18  say this, horrifying, is how long would your case take if I

19  tried you from A through Z, Medicaid, Medicare, everything?

20       MS. WITT:  Well, with nine drugs --

21       THE COURT:  How long?

22       MS. WITT:  -- I think it has to be six weeks.  But the

23  Medicaid case will be five weeks if it's tried alone, so that

24  you'll then have a five-week trial and a six-week trial if

25  Medicare is done separately, which seems from our point of view

1    is not good.

2         THE COURT:  What's bad news for me is to sit and do

3    two six-week trials with ninety percent overlapping evidence.

4    That would be a problem for me.  So I'm trying to think, is

5    there a way --

6         MS. WITT:  And that would be the result if there was a

7    Medicare trial and two Medicaid trials because Ms. Reid is

8    absolutely right --

9         THE COURT:  That may be, that may be right.  I don't

10   see how I do Medicare, Medicaid, both defendants, all drugs.

11   That's just not going to happen, so I need to sit and parse

12   through what I could do.

13        MS. WITT:  But what is very different about this case

14   in terms of the prejudice, where we are from the civil cases

15   that your Honor was referencing right now is that all of this

16   comes up for the first time in the summary judgment briefing.

17   It is not anything that the parties were ever put on notice of

18   in the complaint.

19        THE COURT:  All what?  All what?

20        MS. WITT:  That there was going to be a claim that

21   would be a joint and several liability claim against each

22   defendant for not just their own market share but for the

23   entirety of the ipratropium market.  And the summary --

24        THE COURT:  I understand.  That's a fair legal point

25   I'm going to have to address.  I'm not even close.  It hasn't

27cc2919-6074-4a5a-b5f8-984eaafed6f2

1    even reached the top of the pile yet.  I'm still working on

2    FULs.  So that's next on our pile, and I just haven't started

3    ruling on it.  I actually thought, and I may be remembering

4    this incorrectly, that we weren't done with it, so I'm going to

5    have to get back to you all.

6         MS. WITT:  Well, the joint and several liability point

7    has not been briefed.  There is nothing -- it was briefed in

8    the summary judgment context as a damage theory but not as a

9    joint and several liability theory separate and apart from

10   theories that are pled in the complaint, which are only limited

11   to the marketing.

12        THE COURT:  I don't know, I'm not starting a whole new

13   round of briefing.  I've got piles in my room.  You've done

14   what you're going to do on the summary judgment.  We're not

15   doing another one.

16        MS. WITT:  Well, that's precisely our point, your

17   Honor.  We were not ever given an opportunity --

18        THE COURT:  Come on, we knew about -- no, no, no, no,

19   no, we knew about -- this has been briefed all fall, so that's

20   not a surprise issue, so I don't buy that.  But it is an

21   issue -- let me go back to you for a minute.  I'm struggling --

22   and I will not decide till I decide the motion for summary

23   judgment -- with what to do here because I am not -- it was

24   very difficult to impanel a three-week jury trial in an

25   antitrust matter.  To get a jury for two months is a killer,

27cc2919-6074-4a5a-b5f8-984eaafed6f2

1    just a killer, and I won't do that.  I'm going to take some

2    small subpart and try it.  Maybe it's just Dey/Medicare.  Maybe

3    it's just Roxane/Medicare.  Maybe it's both of them Medicare.

4    But for me to try all drugs, Medicare and Medicaid, it's too

5    hard.

6            MR. HENDERSON:  I agree.  I'd like to make two points,

7    your Honor.  One, the government notified both defendants

8    before we submitted our initial expert reports that we were

9    going to move to consolidate these cases.

10           THE COURT:  I'm not going to preclude you from moving

11   to consolidate.

12           MR. HENDERSON:  The other point I want to make, your

13   Honor, is that in the Medicare case, if our theory of combined

14   impact is going to go to the jury, I think we must -- we

15   will present evidence, even if we have separate trials, if we

16   go to trial only against Dey, we're going to present evidence

17   of Roxane's liability because, as I read your earlier ruling in

18   the Warrick case, it's not just the fact that their products

19   are in the arrays.  I think we have to prove the liability of

20   both defendants in order for that joint impact theory to

21   survive because if we don't, we're not going to be substituting

22   lower AWPs for the empty chair.

23           THE COURT:  So you're saying it's necessary to get

24   liability --

25           MR. HENDERSON:  Absolutely.

27cc2919-6074-4a5a-b5f8-984eaafed6f2

1        THE COURT:  -- but it's only if I rule your way on the

2    legal question.

3        MR. HENDERSON:  That's correct.

4        THE COURT:  So it's consistent, I need to rule on that

5    first --

6        MR. HENDERSON:  Yes, I think so.

7        THE COURT:  -- before I decide whether it needs to be

8    consolidated or not.

9        MR. HENDERSON:  And because it's necessary, there will

10   also be great potential for inconsistent verdicts if they're

11   separate trials.

12       THE COURT:  Tough luck for them, I mean, really, if --

13       MR. HENDERSON:  Well, it's to the prejudice of the

14   government.

15       THE COURT:  No.  No, no, no, no, because that happens

16   every day of the week:  You have codefendants in a criminal

17   case, somebody's acquitted, and someone's not.  That's not

18   inconsistent.  They're different juries, different issues.  The

19   legal question has got to be consistent across both, but that's

20   my decision, not a jury's decision.

21       MR. HENDERSON:  Can I elaborate?

22       THE COURT:  Well, why?

23       MR. HENDERSON:  Well, suppose we go to trial against

24   Dey, and we attempt to prove our combined impact theory, and

25   the jury finds that Roxane was not liable, and therefore we

1    can't use this combined impact theory.  So our damages are

2    going to be about $300 million lower, $400 million lower if

3    singles.  Then we go to trial against Roxane, and the jury

4    finds that Roxane is liable, which is inconsistent, but also

5    they find that Dey is liable as well, and therefore we have a

6    combined impact damages calculation --

7            THE COURT:  Right, but that's only if I rule that

8    there's joint and several.

9            MR. HENDERSON:  That's right, yes.  If your Honor

10   rejects our combined theory, then --

11           THE COURT:  Then you can do separate trials, right?

12           MR. HENDERSON:  Well, if your Honor rejects our

13   combined impact theory, you don't have to do separate trials.

14   I'm just saying --

15           THE COURT:  Well, no, I don't have to, but I'm just

16   saying, if I did separate trials, there would be no problem of

17   an inconsistent verdict.

18           MR. HENDERSON:  That's correct, that's correct.

19           THE COURT:  So that legal ruling is absolutely

20   essential.

21           MR. HENDERSON:  Yes, yes.

22           THE COURT:  So the two legal rulings I have to rule on

23   are that causation issue and NovaPlus.

24           MR. HENDERSON:  Well, I think -- I don't think your

25   Honor has to rule on NovaPlus because the result in terms of

27cc2919-6074-4a5a-b5f8-984eaafed6f2

1    consolidation is the same; i.e., if your Honor rejects our

2    combined impact theory -- no, I take that back.  Your Honor

3    does need to rule on the NovaPlus issue.

4            THE COURT:  You know, the last antitrust trial I just

5    had involved Novation, where they did call other things

6    NovaPlus.

7            MR. HENDERSON:  Yes.

8            THE COURT:  That's what they do, it just so happens.

9            MR. HENDERSON:  Yes, there are other NovaPlus drugs

10   out there, so --

11           THE COURT:  I mean, that's essentially Novation's

12   brand and not the drug company's brand.  Is that --

13           MR. HENDERSON:  Well, it's licensed to manufacturers.

14           THE COURT:  I don't know whether that counts one way

15   or another when you think about it.  It is a brand; it's just

16   the GPO's brand.

17           MR. HENDERSON:  Yes, it's a registered trademark.

18           THE COURT:  For Novation.

19           MR. HENDERSON:  Mr. Fauci is an expert on this

20   particular piece.  Would you like to hear argument on why

21   NovaPlus is properly considered a brand?

22           THE COURT:  No, but I'm just saying, it is a brand.

23           MR. HENDERSON:  Yes.

24           THE COURT:  It's just the GPOs's brand.

25           MR. HENDERSON:  Well, it's a registered trademark that

1   both Roxane and Novation agree to.  There's a formal agreement,

2   and they --

3           THE COURT:  Novation sells its products.  They

4   re-brand it.

5           MR. HENDERSON:  Yes.

6           THE COURT:  So I don't know whether that qualifies

7   under the regulation or not.  I'm just simply saying, I now

8   understand what NovaPlus is.  It's not Roxane's brand name;

9   it's Novation's brand name.  Now, maybe that still qualifies

10  under the regulation or not, but unless there's evidence that

11  Roxane also uses the brand name itself, it turns out that

12  it's -- I had sharps containers -- I mean, it turns out that

13  Novation is the largest GPO, right?

14          MR. FAUCI:  Yes, that's right, your Honor.

15          THE COURT:  And they re-brand their stuff, whether

16  it's medical devices or drugs --

17          MR. FAUCI:  The brand is owned by Novation, there's no

18  dispute in that.  We submit that under the regulation, that

19  plainly still qualifies as a brand.

20          THE COURT:  Right, that's a legal argument, just it's

21  not their brand, it's Novation's brand.

22          MR. FAUCI:  Novation owns the trademark to the brand,

23  yes.

24          THE COURT:  It's Novation's brand.

25          MR. FAUCI:  Well, it's Novation's brand, but Roxane

27cc2919-6074-4a5a-b5f8-984eaafed6f2

1    sent the products out under the NovaPlus label, understood.

2          THE COURT:  I don't know who did the actual labeling

3    for the packaging, but I'm saying it's not -- Roxane doesn't go

4    into the marketplace as NovaPlus, right?

5          MR. FAUCI:  No.

6          THE COURT:  Right, okay.  So it's a legal question as

7    to whether or not that's enough to be branded under the

8    regulation.  It's a pretty straightforward legal question, but

9    the answer is "I don't know" because it's not reached the top

10   of my pile yet.  Okay.

11         MS. WITT:  And, in any case, it's not the brand name

12   for ipratropium bromide.  It's like CVS acetaminophen; it's not

13   a brand name for that particular drug.  As you point out, it

14   relates to Novation's, not to the drug.

15         THE COURT:  Just your luck, it helps you and hurts you

16   that I just had this antitrust trial.  It hurts you in the

17   sense, I need a discrete issue that a jury can try in a

18   discrete period of time; and six weeks, eight weeks is a long

19   time to use up my resources in sitting for two trials that are

20   substantially the same.  And it's also an issue of, what can

21   the jury understand?  And the second thing is, I happened to

22   learn about Novation at great length, so --

23         MS. WITT:  I just wanted to follow up on two very

24   brief things that Mr. Henderson said.

25         THE COURT:  Yes, go ahead.

27cc2919-6074-4a5a-b5f8-984eaafed6f2

1        MS. WITT:  And one at the risk of pointing out

2   something else that there actually has not been briefing on.

3   The briefing was on the causation issue relating to the joint

4   impact theory, but there has not been any briefing on joint and

5   several liability.

6        THE COURT:  And there won't be.  I'm done with the

7   briefing.  I have rooms filled with briefing.  We are now going

8   through -- I feel like Rumpelstiltskin going through the piles

9   of gold.  I mean, I am just now getting through FUL piles of

10  briefing.  I will soon have the Mylan piles of briefing.  I

11  have the Neurontin piles of briefing.  If you haven't briefed

12  it, it's too late.  I'm not saying there may not be time for a

13  motion in limine later on, but for summary judgment, it's done,

14  and I will reject any pleadings.  We're done.  So --

15       MS. WITT:  And the last thing I would just point out,

16  and it's in the briefs, is that with respect to a combined

17  trial, for all the reasons that Ms. Reid talked about with

18  respect to prejudice, the criminal issues that you talked

19  about, this comes from the criminal case; but we have proposed

20  that if you were to do a combined trial of the two defendants,

21  because of the differences that they have in the way they do

22  business, we'd propose two separate juries.  The two juries

23  would all hear the common information, but the Roxane jury

24  would not hear all the evidence of the bad documents related to

25  Dey.  They would not hear all the evidence of what Mark Pope

1   did when he was a Dey employee, which Mr. Henderson made front

2   and center of his argument this morning simply because --

3            THE COURT:  That's actually an interesting -- you

4   know, you'd get -- what do we have, fourteen seats up there or

5   sixteen seats?  We can have eight jurors for each and have them

6   sit there and hear different evidence.  I did that once in

7   superior court.  It was sort of complicated, but it's doable.

8            MS. WITT:  But I want to make clear, our preference is

9   still separate trials, but we believe that there is no way

10  without severe prejudice to have one jury decide these issues,

11  given the differences that there are between these companies

12  and the prejudice, the spillover effect that there's no

13  practical way to solve in a combined trial.

14           THE COURT:  That's an interesting concept.  Thank you.

15           MS. REID:  Your Honor, if I may just briefly, I mean,

16  I just want to reiterate.  I understand the need for

17  manageability, but I think that the easiest and the most direct

18  is to take it company by company and have a jury -- you know,

19  you'll never hear from Dey again if it's Dey.  It will be over,

20  it will be done with.

21           THE COURT:  What do you say to his -- if I rule his

22  way on the joint and several, or whatever you want to call the

23  theory, are you willing to waive any arguments about

24  inconsistent verdicts?

25           MS. REID:  Your Honor, that's a very interesting

27cc2919-6074-4a5a-b5f8-984eaafed6f2

1    question because not only is he going to have to prove, I

2    think -- if that's really what his position is, then he'd

3    better do it for the whole array because --

4         THE COURT:  No, no, hear my question.  No, you do not

5    have to sue every single tort-feasor.  You can pick your

6    tort-feasors.  But his most compelling point is, if I rule his

7    way on the legal question, there is a grave risk of inconsistent

8    verdicts or collateral estoppel effects against the plaintiffs.

9    And I haven't thought it all through -- he clearly has -- but

10   unless you're willing to waive it, if I rule his way, it almost

11   necessitates a joint trial.

12        MS. REID:  If I could step back --

13        THE COURT:  Maybe you haven't thought it all through

14   that way.

15        MS. REID:  As a lawyer, when one hears the word

16   "waiver" and you haven't thought about it all the way through,

17   I'm not in a position at this point to tell your Honor.

18        THE COURT:  Sure.

19        MS. REID:  But I will say this:  Interestingly, Dey is

20   being sued for albuterol.  You had, as your Honor knows,

21   Warrick and the Warrick damages, the damage model that your

22   Honor came up with on moving the median.  There is no claim in

23   this case that Warrick has anything to do with Dey.  There is

24   not going to be any proof about albuterol --

25        THE COURT:  Excuse me.  That was a different lawyer.

1    It was the class case.  It was the tail at the end, and,

2    frankly, I don't think the lawyers gave it enough thought.  So

3    I can't estop the government from making the argument.

4           MS. REID:  What I'm saying is that in this case, your

5    Honor, their damage claims against Dey for albuterol are based

6    on Dey alone moving the median, which leads to a relatively

7    very modest amount of damages.  They have no --

8           THE COURT:  $300 million.

9           MS. REID:  $300,000.

10          THE COURT:  What?

11          MS. REID:  $300,000 on albuterol.

12          THE COURT:  $300,000?  I thought it was $300 million.

13          MS. REID:  That's ipratropium.  Cromolyn they have no

14   damages because Dey can never move the median, and it's only on

15   ipratropium of the three that we have the joint impact theory.

16          THE COURT:  Sure.

17          MS. REID:  And --

18          THE COURT:  Well, that's why I was proposing that sub-

19   category, the two of you, ipratropium, and Medicare.

20          MS. REID:  Again, with all due respect, I think it is

21   a simpler thing for a jury to hear Dey and Dey's inhalation

22   drugs as opposed to Roxane --

23          THE COURT:  Let me put it this way:  I am not going to

24   rule on this until I rule on the legal theory, but if I let

25   them win, unless there's a waiver, there is a serious issue --

1    you need to think it through too, but of, you know, who wants

2    to waive?  As you say, every lawyer in the room's hair goes up:

3    "Why should I waive anything?"  I mean, your whole instinct is

4    against waiving anything when this much money is involved, but

5    why isn't his argument correct?

6            MS. REID:  Well, your Honor, I mean, respectfully, I

7    think you need to let me think about it --

8            THE COURT:  Sure.

9            MS. REID:  -- and you think about it further and look

10   at the briefing.  On the summary judgment, your Honor, where we

11   left it in October was --

12           THE COURT:  Yes, I would be -- thank you.

13           MS. REID:  -- the plaintiffs had concluded, the

14   government's motions for summary judgment had been argued.

15           THE COURT:  Right.

16           MS. REID:  And the defendants' argument limited

17   cross- -- well, actually our motions for partial summary

18   judgment had not been argued.

19           THE COURT:  And I actually thought that was what we

20   were hearing today, so my fault.  How long ago was this agenda

21   set?  You said in early December?

22           MS. REID:  December.

23           THE COURT:  I think what really this highlights is

24   probably we should all have a conference call with Mr. Alba

25   prior to entering in this because that's actually what I

1    thought was being argued today were the cross-motions.  So no

2    one's fault, probably mine, but you've got to understand

3    with -- how many docket entries are we up to?

4            MS. REID:  A gazillion.

5            MR. HENDERSON:  Close to 7,000.

6            THE COURT:  Close to 7,000.  Short of us scrubbing

7    them, I won't remember.  I have, as you know, at least seven or

8    eight of these, not to mention related cases like Mylan or

9    McKesson, not to mention the Neurontin.  I won't remember, so

10   this is a reminder to me to make sure Mr. Alba talks to you, a

11   reminder to you to make a call as to what's on the agenda at

12   any given point.  But, anyway, I didn't prepare.  I knew motion

13   to consolidate might be on there, so I'm not as surprised

14   there.  I totally forgot about the Roxane parent thing.

15           MS. REID:  Your Honor, I would just add, although as

16   you have probably observed, my strong preference is not to go

17   this route, but to the extent there is some form of

18   consolidation, I would definitely join with Ms. Witt's request

19   for two juries because I think without that, the prejudice

20   issue is --

21           THE COURT:  I do have to think about that.  What do

22   you think on the prejudicial spillover?  That's the one thing

23   that's sort of holding he me, which is, you know, if you have

24   really lousy documents on albuterol, let's say, and you say

25   it's a 404(b) -- I do that routinely in a criminal case.  I

27cc2919-6074-4a5a-b5f8-984eaafed6f2

1    say, well, only consider that against one defendant and not the

2    other.  But if there are too many, is there prejudicial spill-

3    over?  I mean, do you have a lot of them?

4           MR. HENDERSON:  On only ipratropium bromide?  Yes,

5    there's a fair amount of that coming from the albuterol piece.

6    And if we do Medicare only, we do want to, although the damages

7    for albuterol are small, we do want to try that together.

8           THE COURT:  Right, I'm just saying, why wouldn't there

9    be some prejudicial spillover on Roxane?

10          MR. HENDERSON:  I'm sure the Court could issue

11   instructions that would prevent that.

12          THE COURT:  If we were talking about one document, you

13   know -- what do you have for Roxane that would hurt Dey?  Isn't

14   there that document if Dey gets into --

15          MR. HENDERSON:  On both sides, your Honor, the

16   evidence of intent, a large piece of it, a fair amount of it

17   comes from other drugs because they were marketing and

18   developing their basic marketing strategy in the earlier times

19   and on other drugs.  So our best evidence, for example, in

20   Roxane, some of our best evidence relates to Asathioprine and

21   Furosamide; and likewise for Dey, some of our best evidence is

22   albuterol.  And we think that's relevant to showing intent

23   because --

24          THE COURT:  Sure, it's definitely relevant.  I mean,

25   you know, I always have to weigh it under 403.  It's relevant,

27cc2919-6074-4a5a-b5f8-984eaafed6f2

1   does the prejudice outweigh the -- I mean, my guess is some of

2   it would come in, but I haven't really thought about it.  The

3   issue is whether or not if you have 50 documents on albuterol,

4   and also with theirs, whether or not I can cure it by saying,

5   "Only consider this against one and not the other."  But I

6   think the suggestion for separate juries might work some of it.

7            MR. HENDERSON:  It would not work if our combined

8   theory is to be allowed to go to a jury --

9            THE COURT:  Fair enough.

10           MR. HENDERSON:  -- because there's just no way the

11   juries could avoid that inconsistency.

12           THE COURT:  Fair, fair, fair, fair.  I have to think

13   about it.  It's a very good argument and a good issue.  But can

14   we go on to the parent/sub thing?

15           MS. WITT:  I'd just like to address one thing related

16   to the joint impact theory and the risk of inconsistent

17   verdicts, your Honor, because I do believe that there is not

18   such a huge risk related to there.  There are risks, if there

19   were two separate trials, of collateral estoppel issues, but

20   they would relate to different kinds of issues.  There could

21   certainly be collateral estoppel effects with respect to the

22   government's information and policy-making decisions relating

23   to ipratropium, for instance, but that kind of collateral

24   estoppel is not something you should --

25           THE COURT:  You mean the government knowledge defense?

1          MS. WITT:  Something along those lines, correct.

2          THE COURT:  But suppose on the core liability issues

3     they find that Dey was guilty and Roxane wasn't, and I ruled

4     their way on the legal issue, but they actually don't award

5     damages on that because they find you weren't liable, wouldn't

6     you be arguing to me with banners waiving that therefore you

7     shouldn't be on the hook for your trial for the joint liability

8     theory?  Or maybe for anything, maybe even for anything?

9          MS. WITT:  Well, your Honor, again, we're all sort of

10    falling into the negligence trap of thinking of this as a

11    traditional kind of joint and several liability case, which it

12    is not at all.  It is absolutely possible that a jury could

13    look at the evidence relating to Roxane and say, "We don't find

14    the requisite intent," or, "We don't find the requisite

15    falsity," or, "We don't find some other element of the claim,"

16    and come out a different way against Dey or vice versa.

17          THE COURT:  So you're willing to waive.  I mean --

18          MS. WITT:  I don't know exactly what the question --

19          THE COURT:  Ah, I hear the back-pedal.  Think about

20    it, think about it.

21          MS. WITT:  If the jury came back and said that Dey is

22    not liable for a False Claims Act violation, I have a hard

23    time, quite frankly, understanding what the argument would be

24    that that means that Roxane is not liable under the

25    jurisprudence of the False Claims Act.  I'm not going to say

Page 42

1   that if there is such an argument, I'm waiving it, but I don't

2   see what it is, and it's not been articulated.

3            THE COURT:  Suppose I buy their theory of joint

4   liability, but I tell the jury that both have to be guilty, and

5   they don't accept that, they don't find there's enough evidence

6   to find you guilty, so they only go on -- what would be the

7   right words, the narrower liability theory against Dey.

8            MS. WITT:  Well, that would have to be in a combined

9   trial.  They couldn't --

10           THE COURT:  Well, that's what he's saying.

11           MS. WITT:  But the argument that they've articulated

12  for joint and several liability is only half related to the

13  liability of both because if the -- you don't have to show

14  that, for instance, an absent --

15           THE COURT:  I may have just lost you there.

16           MS. WITT:  There are manufacturers that won't be in

17  the case.

18           THE COURT:  That's irrelevant.  I mean, actually, I

19  don't know if it's irrelevant, but they have the right to

20  choose tort-feasors, so unless you -- they don't have to prove

21  everybody is guilty.

22           MS. WITT:  No, I understand that, but my point is, if

23  the government chose to show with an absent defendant, who I

24  agree they didn't have to sue, but if they chose to show and

25  had the evidence to say to the jury, "And Goldline's AWP was X,

27cc2919-6074-4a5a-b5f8-984eaafed6f2

1    and their acquisition cost that we've gotten from the AMPs that

2    we have was Y, so we can show you that that number was false,"

3    that's not proving Goldline's liability.  That's showing a

4    simple fact.  They don't have to show liability.

5              THE COURT:  Right, right.

6              MS. WITT:  And the idea that Mr. Henderson would have

7    to prove liability against an absent party in a trial of either

8    one of us is just wrong.  And he's not articulated the basis on

9    which he'd actually have to prove liability as opposed to

10   proving the fact that the AWP in the array was not the same as

11   what they claim it should have been.  That's what his theory is

12   based on.

13             THE COURT:  So then you're willing to waive, I mean,

14   any argument later on on collateral estoppel against the

15   plaintiffs, if you went second, for example?

16             MS. WITT:  I'm certainly not willing to waive

17   collateral estoppel issues that relate to government knowledge.

18   I'm certainly not willing to --

19             THE COURT:  Fair enough, but I'm not sure I would --

20             MS. WITT:  And I'm not willing to say that liability

21   has been proven against Roxane in a different case.

22             THE COURT:  If I were to put a separate jury

23   interrogatory to Dey -- let's say they went first -- on

24   government knowledge, it would not estop you.

25             MS. WITT:  Correct, but if the government lost and

1    that jury said, "Yes, the government knew," they would be

2    collaterally estopped against me, yes.  That is one of the --

3         THE COURT:  Maybe or maybe not because -- maybe on

4    ipratropium bromide but maybe not the other drugs, so --

5         MS. WITT:  That's our only Medicare drug, so --

6         THE COURT:  Is that right?  That's useful to know.

7    Thank you.

8         MS. REID:  Your Honor?

9         THE COURT:  You know what, at this point I've got it,

10   and I'm not ruling until I get through my summary judgment

11   motion because that strikes me as essential to how I think

12   about this case, absolutely essential to how I think about it.

13   But since I won't know -- would I flip a coin as to who went

14   first? -- you should probably both be gearing up.

15        MS. REID:  On everything, your Honor?

16        THE COURT:  Because my experience is, actually, my

17   experience is that many of them come right up to trial and then

18   settle, and so I'd want the next one ready to go because I will

19   have blocked off a huge amount of time.  So I'll get to

20   settlement off the record when we're done with this.  I would

21   like to get to the parent/sub issue, unless you want to just

22   rest on the papers.

23        MS. REID:  And that is Ms. Witt's.

24        THE COURT:  That's Roxane, isn't it?

25        MS. REID:  Yes.  The only point I wanted to say, and

1  just real quickly, is that Mr. Henderson I think has said that

2  even in a limited trial, if it were combined, he's going to be

3  referring to other drugs as proof of intent.  So the model of

4  Medicare ipratropium, if the best evidence is Furosamide and

5  Roxane's side, you're back into the whole all the drugs again

6  and --

7            THE COURT:  I know, but just take a criminal trial,

8  which I'm not saying this is.  It happens every day of the week

9  that there are certain things that come in against one

10  defendant and another against another.  And so sometimes that's

11  unduly prejudicial and sometimes it's not, but it's something

12  you have to weigh, but it's not a slam-dunk for you.

13            MS. REID:  No, no, I'm just -- I think my point is

14  simply I don't know how efficient that's going to be.  If in

15  the end we have a trial where in order to prove the intent you

16  have to bring in all the surrounding drugs, even though the

17  trial is centered on one drug --

18            THE COURT:  Well, I've only heard -- I don't know.

19            MS. REID:  -- then we're back to the length of trial

20  you didn't want.

21            THE COURT:  Well, I'll have to figure it out, but I

22  guaranty you I'm not figuring it out until I figure out the

23  motion for summary judgment.

24            MS. REID:  Thank you very much, your Honor.

25            THE COURT:  And I'm getting worried about when I'm

1  going to do the cross-motion, which is sort of what I thought I

2  was prepping for today.  So let me just, do you want to do the

3  parent/sub for a few minutes since you're here?

4         MS. WITT:  Your Honor, I frankly think -- and I

5  understand, I don't want to completely rest on the papers, but

6  it is a half-an-hour argument, if your Honor has a chance to

7  read the papers at some point in the future, and it's not a

8  time-critical issue, so my proposal would be that --

9         THE COURT:  Why does it matter?  What are the two main

10  arguments?

11         MS. WITT:  There are two separate theories of

12  liability and two separate corporations that are also involved.

13  There is Boehringer Ingelheim Pharmaceuticals, Inc., which we

14  call BIPI in the papers, B-I-P-I, and there is Boehringer

15  Ingelheim Corporation, which we call BIC, B-I-C, in the papers.

16         THE COURT:  Haven't I ruled on this in one of the many

17  cases?  You don't think so?

18         MS. WITT:  Certainly not while I've been representing

19  Boehringer companies, and I'm not aware of any --

20         THE COURT:  In the New York county cases or in --

21         MS. WITT:  In the very early AWP cases --

22         THE COURT:  Early AWP?

23         MS. WITT:  -- you ruled on an issue in the Nevada and

24  Montana situation where the plaintiff tried to name, I believe

25  it was Boehringer Ingelheim Pharmaceuticals as a defendant, but

1    the drugs that were named in the complaint were actually

2    related to Roxane, and you said BIPI can't be a defendant with

3    Roxane drugs, but the plaintiff never amended to name Roxane.

4              THE COURT:  I see.

5              MS. WITT:  So that all you decided was, you have to

6    have the drugs for that defendant.

7              THE COURT:  So who should be the defendant here?

8              MS. WITT:  The defendant is Roxane, Boehringer

9    Ingelheim Roxane, Inc. or Roxane Laboratories.  It's the

10   entity --

11             THE COURT:  Are you good for it?  I mean, are you a

12   deep enough pocket?

13             MS. WITT:  It depends on what the number is.  It

14   depends on what the trebling is.  It depends on whether

15   NovaPlus is in the case.  It depends on the joint impact

16   theory.  So I can't say as an absolute matter because --

17             THE COURT:  Well, let's say you win on NovaPlus and

18   you win on joint impact, are you good for it?

19             MS. WITT:  Yes, I think we are good for it.

20             THE COURT:  How much money is that?

21             MS. WITT:  Oh, I think that's, like, 30 some million

22   on the single --

23             THE COURT:  And how much is the top end that you're

24   exposed to?

25             MS. WITT:  $4.5 billion.

1        THE COURT:  I got the difference.  So why do I even

2    have to decide this now?  I mean, why don't I decide what the

3    legal liability is.  And you don't need them in the case if

4    it's the lower number, right?

5        MR. FAUCI:  We're not sure of that, your Honor.  We

6    think the -- the Roxane-only Medicare, there's no joint impact.

7    Their Medicare damages we calculate are $234 million.  Trebled,

8    that's $700 million.

9        THE COURT:  That's with NovaPlus in it?

10        MR. FAUCI:  No.  We think that's our most conservative

11    Medicare theory.

12        THE COURT:  All right, so with those dollars, are you

13    good for it, Roxane?

14        MS. WITT:  I don't know off the top of my head what

15    the ultimate is.  But let me also point out, your Honor, there

16    is a direct liability issue here too, which is also part of the

17    motion.  It's not just Dey.

18        THE COURT:  I understand, but, you know, can I just

19    say, it's easy for you.  You're teams of lawyers.  I get one

20    extra law clerk, and he leaves me.  So I don't have time to go

21    through every interesting legal question unless it matters.

22        MS. WITT:  And that's why my suggestion is, we wait

23    until there's resolution of these other issues, especially with

24    respect to the trial, and then we do a half-an-hour argument on

25    this, if it's necessary, because --

1          THE COURT:  Does that make sense to you?

2          MR. FAUCI:  That's fine for us, your Honor.  We think

3    this matters from a settlement perspective.  We have grave

4    concerns about whether Roxane could satisfy an $800 million

5    verdict or a $700 million verdict, and so from our perspective,

6    clarification on this issue --

7          THE COURT:  Well, haven't you done discovery into

8    this?

9          MR. FAUCI:  We have, and we have concerns --

10          THE COURT:  All right, and because you have concerns

11    at your low end?

12          MR. FAUCI:  Well, our low end, as I said, for the

13    Medicare damages is $234 million.

14          THE COURT:  Is that treble?

15          MR. FAUCI:  No.  That's single.

16          THE COURT:  Is your low end.  And that's --

17          MR. FAUCI:  And that's not even including Medicaid.

18          THE COURT:  Okay.  So if you trebled it, you have some

19    concerns about whether Roxane could cover a $600 million

20    verdict?  Is that the issue?  And that doesn't pick up

21    Medicaid, so it may be worth it.  That's what you're saying.

22          MR. FAUCI:  We think it is.  We think that we feel

23    comfortable on this issue.  We'd love to brief the Court on it

24    if it's something --

25          THE COURT:  You've already briefed it, haven't you?

Page 50

1          MR. FAUCI:  To argue to the Court --

2          THE COURT:  Well, let's do this.  It's my fault, but I

3     hadn't understood that this was on.  I should probably read it

4     first because that makes oral argument much more useful.

5     You're all up here, but you're going to be up here again

6     because I need to hear the cross-motions.  When are we going to

7     do that?

8          MR. HENDERSON:  From the government's perspective, at

9     your Honor's convenience.

10         THE COURT:  When is Dr. Duggan coming back?

11         MR. HENDERSON:  I think he's coming back Friday, this

12    Friday.

13         THE COURT:  Okay.

14         MR. HENDERSON:  And then Tuesday the following week.

15    But, of course, that's the Abbott case, which is mostly -- the

16    U.S. Attorney's office from the Southern District of Florida is

17    doing the work on the Daubert motions.

18         THE COURT:  So you all aren't up here for that?  I get

19    a little lost as to who's pressing what issues.  So when can we

20    do your cross-motions?

21         MS. REID:  Your Honor, when you have time, at your

22    convenience we will do them.

23         THE COURT:  I'm here now.  My trial this week, the

24    civil rights case settled, so I'm here in the mornings.

25         MR. HENDERSON:  We've pretty much prepared our oral

1   arguments because we thought they'd be argued before, so I

2   think the lawyers --

3          THE COURT:  Well, let me ask you this.  Duggan -- I'm

4   free now because my trial settled and the other one continued,

5   so do you want to do it in the morning?

6          MR. HENDERSON:  This Thursday?

7          THE COURT:  I'm free for the week.

8          MR. HENDERSON:  Friday?

9          THE COURT:  Friday morning.

10          MR. HENDERSON:  That's fine with me.

11          THE COURT:  Do you want to call the Abbott people and

12   Duggan and see if they can make it?

13          MR. HENDERSON:  Well, Professor Duggan doesn't have to

14   be here for the summary judgment.

15          THE COURT:  No, right, right.  I'm just saying, we

16   could do his evidentiary hearing, and instead of spanning you

17   from Friday into Tuesday, I can give you a full day on Friday.

18          MR. HENDERSON:  On summary judgment?

19          THE COURT:  I'm now talking the Daubert hearing on the

20   extrapolation.

21          MR. HENDERSON:  Oh.

22          THE COURT:  And then we can use Tuesday to do this

23   because these folks come in from out of town, don't you all?

24          MS. REID:  Yes, your Honor.

25          THE COURT:  So, I mean, I don't want to have them

27cc2919-6074-4a5a-b5f8-984eaafed6f2

Page 52

1    sitting around on a Friday.  Where are you all in from?  You're

2    from Washington, New York?

3              MS. WITT:  Chicago.

4              THE COURT:  Chicago.

5              MS. REID:  New York.

6              THE COURT:  And New York.  What's easier for you?

7    When do we have, Robert, Tuesday afternoon?

8              THE CLERK:  Next Tuesday we have the Daubert hearing,

9    this Friday and next Tuesday.

10             THE COURT:  Okay, so one thing to try to organize with

11   Robert is the following:  I suddenly have time because

12   everything went away, the civil rights trial, the criminal

13   trial, gone, and so I have mornings.  I am totally free.  I'd

14   like to get them all argued, just get this out of here.  So one

15   possibility is to get the Daubert matter completed on Friday,

16   morning and afternoon.  We don't have anything else in the

17   morning, right, at this point?

18             THE CLERK:  No.

19             THE COURT:  Okay, perfect.  And then we could do the

20   cross-motions for summary judgment on all the remaining issues

21   on Monday.

22             THE CLERK:  Tuesday, the 26th.

23             MR. HENDERSON:  Tuesday is my recollection also.

24             THE CLERK:  The 26th.

25             THE COURT:  Oh, that's when we bumped it over to?

1         MS. REID:  Yes.

2         THE COURT:  For that matter, though, it could be

3    Monday.  Basically I'm free, which is lovely, and then I start

4    trial again that following -- I think it's February 1, and then

5    I'm on trial a lot.

6         MR. HENDERSON:  I would have to check with Dr. Duggan

7    about being able to --

8         THE COURT:  I understand, he's running the healthcare

9    woes of the world, which, given today's election, who knows if

10   it will still be relevant.  But assuming for a minute he's

11   available --

12        MR. HENDERSON:  Yes, good idea.

13        THE COURT:  Is he in Washington worrying about this

14   stuff now?  So if we can get him in here, that would be

15   fabulous.

16        MS. WITT:  Your Honor, I could be here any day next

17   week except Monday when I have a mediation in Federal Court.

18        THE COURT:  Well, maybe Tuesday.  So I'm going to go

19   off the record and have you all work with Robert to come up

20   with dates just to finish up these arguments.

21        (Discussion off the record.)

22        THE COURT:  So let's just try for Friday if we can

23   get -- I don't need Duggan here, okay?  So --

24        MR. HENDERSON:  Okay.

25        THE COURT:  Okay.

27cc2919-6074-4a5a-b5f8-984eaafed6f2

1          MR. HENDERSON:  So Friday anyway.

2          THE COURT:  Friday, and then maybe we can use Tuesday

3     for cross-motions.

4          MR. HENDERSON:  Yes.

5          THE COURT:  Okay.  Anything else?

6          MR. FAUCI:  If I may, your Honor, I mean, if you

7     prefer to hear the BIPI motions on Tuesday, we can.  Ms. Witt

8     has indicated that she thinks her presentation is going to be a

9     half an hour.  Ours will be twenty minutes.  We have a lot on

10    the plate on Tuesday.  If you think it makes sense to hear

11    argument on this today while we're all here --

12         THE COURT:  I haven't read it is the big problem.  And

13    it's my fault.  I just thought we were doing the cross-motions.

14         So is there anything left on Abbott's cross?  Does

15    Abbott have any pending motions for summary judgment?

16         MR. HENDERSON:  Yes, they too are in the mix, so

17    potentially they would be included on Tuesday.  They don't have

18    a trial date, so --

19         THE COURT:  Well, what about spoliation?

20         MR. HENDERSON:  That needs to be -- we haven't

21    scheduled that yet.

22         THE COURT:  Isn't everybody arguing spoliation?

23         MR. HENDERSON:  Yes.

24         THE COURT:  So that needs to be argued too.

25         MR. HENDERSON:  Correct, and their big BIPI motions.

1        THE COURT:  So why don't you come up with a proposed

2    schedule and file it with me as to how long it's going to take

3    and what's going to be on the agenda.  I've read the spoliation

4    ones.  I've read the basic cross-motions.  I'm less familiar

5    with the False Claims Act claims.

6        MR. HENDERSON:  Does your Honor have thoughts about

7    how much time for this whole mix, spoliation, how much time --

8        THE COURT:  No.

9        MR. HENDERSON:  -- you would have available?

10        THE COURT:  No, but I'm thinking of fifteen minutes a

11    side for each argument, for each issue.  If you persuaded me

12    otherwise, half an hour a side for each issue, and then the

13    defendants can divvy it up.  But how many issues are there?

14    There's spoliation.  There's -- what do you call it?

15        MS. REID:  There's one more motion, which I don't know

16    if your Honor would consider as part of --

17        THE COURT:  There's spoliation, there's False Claims

18    Act, right?  There's the parent/sub --

19        MS. REID:  And there's a motion to dismiss Ven-A-Care

20    on the grounds of the lack of jurisdiction.

21        THE COURT:  Right, isn't that the False Claims -- and

22    then I guess there are statute of limitations issues.

23        MR. HENDERSON:  No.

24        THE COURT:  No?  Well, someone called it a statute of

25    limitations problem.

Page 56

1              MR. HENDERSON:  I don't think so.

2              THE COURT:  No?  Maybe I'm thinking relation back?

3              MS. REID:  Yes, you're thinking of the relation back

4      issue, which we argued in October, your Honor.

5              THE COURT:  We don't need reargued, right?

6              MS. REID:  No.

7              THE COURT:  So maybe if you put together an agenda.

8      If it's a half an hour a side per issue, that's three hours.

9      That's doable.

10             MR. HENDERSON:  Per motion?

11             THE COURT:  Well, I don't know.

12             MR. HENDERSON:  Per issue, some of these motions have

13     multiple issues, so --

14             THE COURT:  You'd have to talk about it, but just to

15     get it done in a morning.  Don't forget, you have it on the

16     piece of paper, so I don't need argument on it as well.

17             MR. HENDERSON:  Shall we count on Tuesday to deal with

18     all of these?

19             THE COURT:  If we can.

20             MR. HENDERSON:  If we can?  Okay.

21             THE COURT:  Are we still free Tuesday morning?

22             THE CLERK:  Yes.  We have morning and afternoon, if

23     you want.

24             THE COURT:  Okay, and then we'll try and finish the

25     whole rest of the Daubert on Friday.

1           MR. HENDERSON:  Yes.

2           THE COURT:  And if we finish the oral argument, what

3      I'd like to do is try and rule on this stuff so that I can make

4      an intelligent decision on the motion to consolidate.  I've

5      just been holding off because we hadn't finished all the

6      arguments, and I need to do that.

7           Now, can we go off the record for a minute.

8           (Discussion off the record.)

9           (Adjourned, 3:41 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

27cc2919-6074-4a5a-b5f8-984eaafed6f2

1                    C E R T I F I C A T E

2

3

    UNITED STATES DISTRICT COURT )
4   DISTRICT OF MASSACHUSETTS     ) ss.
    CITY OF BOSTON                )
5

6

7          I, Lee A. Marzilli, Official Federal Court Reporter,

8   do hereby certify that the foregoing transcript, Pages 1

9   through 57 inclusive, was recorded by me stenographically at

10  the time and place aforesaid in Civil Action Nos. 01-12257-PBS

11  and 06-11337-PBS, In Re:  Pharmaceutical Industry Average

12  Wholesale Price Litigation, and thereafter by me reduced to

13  typewriting and is a true and accurate record of the

14  proceedings.

15      In witness whereof I have hereunto set my hand this 23rd

16  day of January, 2010.

17

18

19

20

21          /s/ Lee A. Marzilli
            _____
22          LEE A. MARZILLI, CRR
            OFFICIAL FEDERAL COURT REPORTER
23

24

25