# EXHIBIT A

Case 1:01-cv-12257-PBS  Document 6866-2  Filed 01/27/10  Page 2 of 150
HIGHLY CONFIDENTIAL DEPOSITION OF LINNETTE SUN
CONDUCTED ON TUESDAY, JANUARY 19, 2010

1 (Pages 1 to 4)

**Page 1**

1    HIGHLY CONFIDENTIAL
2    UNITED STATES DISTRICT COURT
3    DISTRICT OF MASSACHUSETTS
4  In Re: Pharmaceutical Industry ) MDL No. 1456
5    Average Wholesale Price : Master File No.
6  Litigation        ) 1:01-CV-12257-PBS
7              ) Job Category Case
8              ) No. 1:08-CV-11200
9  * * * * * * * * * * * *:
10  UNITED STATES ex rel. LINNETTE :
11  SUN and GREG HAMILTON      :
12      Relators      :
13  v.          :
14  BAXTER HEMOGLOBIN THERAPEUTICS :
15  and BAXTER INTERNATIONAL, INC. :
16      Respondents    :
17      -----------
18    Deposition of LINNETTE SUN
19    Philadelphia, Pennsylvania
20    Tuesday, January 19, 2010
21      9:24 a.m.
22

**Page 2**

1  Job No.: 54-171709
2  Pages: 1 - 163
3
4    Deposition of Linnette Sun, held at the law
5  offices of:
6
7    MORGAN LEWIS & BOCKIUS LLP
8    1701 Market Street
9    Philadelphia, Pennsylvania  19103
10    (215) 963-5000
11
12
13    Pursuant to Notice, before Dawn M. Hart,
14  RPR/RMR and Notary Public in and for the State of
15  Maryland.
16
17
18
19
20
21
22

**Page 3**

1    A P P E A R A N C E S
2  ON BEHALF OF THE RELATORS:
3    LAUREN JOHN UDDEN, ESQUIRE
4    LAW OFFICE OF LAUREN J. UDDEN
5    15 West Carrillo Street
6    Suite 101 B
7    Santa Barbara, California  93101
8    (805) 879-7544
9
10  ON BEHALF OF THE RESPONDENTS BAXTER:
11    J. ANDREW JACKSON, ESQUIRE
12    RUCHI JAIN, ESQUIRE
13    DICKSTEIN SHAPIRO LLP
14    1825 Eye Street, Northwest
15    Washington, D.C.  20006-5403
16    (202) 420-2200
17
18  ALSO PRESENT:  Michael J. Bolton, Esquire, Baxter
19
20
21
22

**Page 4**

1      C O N T E N T S
2  EXAMINATION OF LINNETTE SUN      PAGE
3  By Mr. Jackson        6
4      E X H I B I T S
5    (Exhibits were attached.)
6  SUN DEPOSITION EXHIBITS      PAGE
7  Exhibit 1  Deposition Notice    11
8  Exhibit 2  Objections/Responses to Baxter's
9      First Set of Document Requests    26
10  Exhibit 3  Relators' Memorandum in Opposition
11      to Baxter Motion to Dismiss    28
12  Exhibit 4  Sun Declaration    33
13  Exhibit 5  Baxter Products W/AWP History
14      4/11/05      34
15  Exhibit 6  Plasma Fractions Market US 2001    38
16  Exhibit 7  Sun Performance Review    44
17  Exhibit 8  Sun Termination Letter 7/22/03    50
18  Exhibit 9  Sun Offer Letter 5/17/02    51
19  Exhibit 10  Complaint filed 7/2005    99
20  Exhibit 11  Hamilton Declaration    128
21
22

Case 1:01-cv-12257-PBS Document 6866-2 Filed 01/27/10 Page 3 of 150
HIGHLY CONFIDENTIAL DEPOSITION OF LINNETTE SUN
CONDUCTED ON TUESDAY, JANUARY 19, 2010

2 (Pages 5 to 8)

5

1   EXHIBITS CONTINUED
2   SUN DEPOSITION EXHIBITS          PAGE
3   Exhibit 12   Letter 4/22/05          142
4   Exhibit 13   AWP Summary              143
5   Exhibit 14   Draft Complaint          146

---

7

1   **A   Yes.**
2   Q    And if you ever have a situation where you
3   don't understand a question that I ask, please let me
4   know that because I will presume you've understood it
5   and we'll take your answer accordingly.  Do you
6   understand that?
7   **A   Yes.**
8   Q    Are you on any medication or other drugs
9   that might impair your ability to understand what I'm
10  saying and give an accurate, complete, and honest
11  answer?
12  **A   No, I don't have -- I'm not on any**
13  **medications.**
14  Q    Okay.
15  **A   I should be able to understand.**
16  Q    And I do require verbal responses, so
17  shaking your head up or down or to the side won't help
18  me, so I might ask you to either speak up or answer
19  more directly.  Do you understand that?
20  **A   Yes.**
21  MR. UDDEN:  And that's because the Reporter
22  can only take down basically verbal responses, so it's

---

6

1   PROCEEDINGS
2   LINNETTE SUN
3   having been duly sworn by agreement of counsel,
4   testified as follows:
5   EXAMINATION BY COUNSEL FOR THE RESPONDENTS BAXTER
6   BY MR. JACKSON:
7   Q    Please state your name for the record.
8   **A   Linnette Sun.**
9   Q    Ms. Sun, my name is Andy Jackson.  To my
10  right is Ruchi Jain.  To Ruchi's right is Michael
11  Bolton.  We represent Baxter in the matter of In Re
12  Pharmaceutical Industry Average Wholesale Price, the
13  matter that you filed that was then transferred to the
14  MDL in Boston.  Do you understand that?
15  **A   Uh-huh.**
16  Q    Have you ever been deposed before?
17  **A   No.**
18  Q    During the course of this deposition I'll be
19  asking you a series of questions.  Your counsel to
20  your left might object.  Unless he instructs you not
21  to answer a question, you go ahead and answer my
22  question.  Do you understand that?

---

8

1   important that we get a good record.
2   Q    The purpose of this deposition is limited to
3   jurisdictional issues in conjunction with the Motion
4   to Dismiss filed by Baxter.  Did you know that?
5   **A   Yes.**
6   Q    So we are limiting our questions today to
7   those jurisdictional issues, but we reserve the right
8   should the Complaint not be dismissed to take the
9   deposition on substantive issues.
10  MR. UDDEN:  (Nods head.)
11  Q    Also we'd like to designate this deposition
12  as highly confidential under the Protective Order
13  issued in the MDL 1456 that is subject to all matters
14  being litigated before Judge Saris.  Do you understand
15  that?
16  MR. UDDEN:  She's probably not familiar with
17  the Protective Order.  I can talk to her about it on a
18  break or something.
19  MR. JACKSON:  That's fine.  I just want to
20  make sure for the record, it's important that we
21  designate this early.
22

Case 1:01-cv-12257-PBS   Document 6866-2   Filed 01/27/10   Page 4 of 150
HIGHLY CONFIDENTIAL DEPOSITION OF LINNETTE SUN
CONDUCTED ON TUESDAY, JANUARY 19, 2010

3 (Pages 9 to 12)

9

1   BY MR. JACKSON:
2       Q   Do you have any questions of me?
3       A   I don't think so.
4       Q   Did you review any documents in preparation
5   for your deposition today?
6       A   Yes.
7       Q   What did you review?
8       A   What's filed with the Court, I think.  I
9   brought them with me.
10      Q   What document are you referring to?
11      A   (Handing.)
12          MR. UDDEN:  Yeah, you can just give him --
13          THE WITNESS:  The whole thing?
14          MR. UDDEN:  Part --
15      A   Yes, part of the deposition and this one.
16          (Handing.)
17      Q   So you're referring to the Memorandum in
18  Opposition to Baxter International, Inc.'s Motion to
19  Dismiss Relators' Complaint?
20      A   Uh-huh.
21      Q   Together with the Declaration that you
22  signed; is that correct?

10

1       A   Uh-huh.
2           MR. UDDEN:  And you have to say yes.
3       A   Okay.  Yes.
4       Q   Did you also review the Declaration of
5   Mr. Hamilton that was attached to this same document?
6       A   Today you mean?
7       Q   Yes.
8       A   Not today.
9       Q   In preparation for this deposition, did you
10  review Mr. Hamilton's Declaration?
11      A   I read that before, but not for -- to
12  prepare for this, no.
13      Q   But you have read it before?
14      A   Yeah.
15      Q   Did you review any other documents other
16  than that pleading with its Exhibits in preparation
17  for this deposition?
18      A   You have the documents.
19          MR. UDDEN:  He's asking you if there are any
20  other papers or documents of any kind that you
21  reviewed in preparation for the deposition.
22          THE WITNESS:  I don't think so, except you

11

1   know, a few additional documents I sent to you.
2       Q   Let me show you what's been marked as
3   Deposition Exhibit 1.
4           (Exhibit 1 was marked for identification and
5   was attached to the transcript.)
6   BY MR. JACKSON:
7       Q   Deposition Exhibit 1 is the Deposition
8   Notice served on you for today's deposition.  Have you
9   seen this document before?
10      A   Yes.
11      Q   Did you review it in advance of this
12  deposition?
13          MR. UDDEN:  In advance I guess means any
14  time before today?
15          MR. JACKSON:  Correct.
16      A   Review what kinds of things?
17      Q   This document.  Have you seen this before?
18          MR. UDDEN:  Review sometimes is a term
19  lawyers use.  Basically did you read --
20      A   What documents did I read?
21      Q   The document in front of you that is
22  Deposition Exhibit 1.

12

1       A   This one, (indicating).  Yes.
2       Q   You're appearing today in response to that
3   Deposition Exhibit 1, the Deposition Notice, correct?
4       A   Yes.
5       Q   Ms. Sun, did you talk with Mr. Hamilton in
6   advance, in preparation for today's deposition?
7       A   Yes, we had a conference call.
8           MR. UDDEN:  Yeah --
9       A   Not directly.
10          MR. UDDEN:  Yeah, I would object to any --
11  it -- the communication Ms. Sun is referring to is a
12  communication that included her lawyers, so --
13          MR. JACKSON:  Okay.
14          MR. UDDEN:  I think you're asking about any
15  separate conversation that you may have had with Mr.
16  Hamilton.
17      A   No, never.
18          MR. JACKSON:  Correct.
19      Q   So the only conversation you had with Mr.
20  Hamilton in preparation for this deposition included
21  your lawyer?
22      A   Yeah.

HIGHLY CONFIDENTIAL DEPOSITION OF LINNETTE SUN
CONDUCTED ON TUESDAY, JANUARY 19, 2010

4 (Pages 13 to 16)

13

1    Q   Okay.  When did you first meet Mr. Hamilton?
2    **A   When?  Quite a few years ago, I think.**
3    Q   Do you remember when you left, when you were
4  terminated from Baxter?  Do you remember what year
5  that was?
6    **A   I think on the latter half of 2003.**
7    Q   2003.  Had you met Mr. Hamilton prior to
8  leaving Baxter?
9    **A   No.**
10   Q   Okay.  Your Complaint was filed when, do you
11 remember, in this matter?
12   **A   Just approximately because it has been quite**
13 **a few years.**
14   Q   That's fine.  What do you remember?
15   **A   Probably sometime 2005.**
16   Q   When was the first time when you met Mr.
17 Hamilton between 2003 when you left Baxter and 2005
18 when you filed your Complaint in this matter?
19   **A   I can't remember exact dates, but I think**
20 **it's sometime in 2004.  I can't remember exactly.**
21   Q   Can you tell me how you came to meet Mr.
22 Hamilton?

14

1    **A   How I came to know him?  I heard of him**
2  **before even when I was working at Baxter.**
3    Q   How did you hear about him?
4    **A   Because he was quite an expert in the field.**
5    Q   Which field?
6    **A   Pharmaceutical pricing, particularly pricing**
7  **for recombinant products.**
8    Q   Okay.  So did you contact him directly the
9  first time you had communications?
10   **A   No.**
11   Q   Did he contact you?
12   **A   No.**
13   Q   How was the contact made between you and he?
14   **A   I guess I have to refer to my attorneys.**
15   MR. UDDEN:  (Nods head.)
16   Q   How was the contact made between you and he?
17   MR. UDDEN:  I think she's hesitating because
18 I think it was through her attorneys.
19   THE WITNESS:  Right.
20   MR. UDDEN:  And she's concerned about
21 privileged communications, but --
22   **A   Yeah.**

15

1    Q   I don't need to understand the substance of
2  the communications, what you said to your lawyer or
3  what you said -- or your lawyer said to you.
4    **A   Uh-huh.**
5    Q   But I need to know how is it you met Mr.
6  Hamilton for the first time, and then we're going to
7  talk about communications that you and he had --
8    **A   Uh-huh.**
9    Q   -- in the absence of lawyers.
10   **A   Uh-huh.  Okay.**
11   Q   Okay.  So how did you and he first meet?
12   **A   Through attorneys.**
13   Q   And what -- when was that?
14   **A   I can't remember exact date either.  So it's**
15 **sometime between, I think sometime 2004, 2005.**
16   Q   Your Amended Complaint in the matter was
17 filed on or about June 14, 2005.  Does that sound
18 about right?
19   **A   Yes.**
20   Q   So does that help you gauge when you first
21 met Mr. Hamilton?  Was it a month before the date of
22 your Complaint, was it a year before the date of your

16

1  Complaint?
2    **A   Definitely not the day before the Complaint.**
3  **I can't remember exact time again because it's been so**
4  **long.  At least quite a few months or even longer than**
5  **that.**
6    Q   And did you provide Mr. Hamilton information
7  regarding your employment at Baxter?
8    **A   No.**
9    Q   Why did you contact him then?
10   MR. UDDEN:  Well, again, I think it assumes
11 facts not in evidence, that she contacted him.
12   Q   Have you ever met in person with Mr.
13 Hamilton?
14   **A   Yes.**
15   Q   How many times?
16   **A   Two or three.**
17   MR. UDDEN:  Just give him your best
18 recollection.
19   **A   I think maybe two.**
20   Q   And did you give him any documents in either
21 of those meetings that were in your possession and
22 control?

Case 1:01-cv-12257-PBS Document 6866-2 Filed 01/27/10 Page 6 of 150
HIGHLY CONFIDENTIAL DEPOSITION OF LINNETTE SUN
CONDUCTED ON TUESDAY, JANUARY 19, 2010

5 (Pages 17 to 20)

17

1    A    No.
2    Q    Did he give you any documents?
3    A    No.
4    Q    And just for the record, you did not know
5    him while you were at Baxter; is that correct?
6    A    Uh-huh. Yes.
7    Q    And you had --
8         Yes?
9    A    Uh-huh.
10   Q    And you had not -- had no conversations with
11   him until after you left Baxter; is that correct?
12   A    Yes.
13   Q    How did you come to file a Complaint
14   together?
15   A    I don't quite understand your question.
16   What does that mean how?
17   Q    How. You worked at Baxter, correct?
18   A    Uh-huh.
19   Q    To your knowledge, Mr. Hamilton did not; is
20   that correct?
21   A    Yes.
22   Q    You did not meet him while you had worked at

18

1    Baxter, correct?
2    A    Yes.
3    Q    You did not meet him until sometime -- some
4    months before the Complaint was filed in 2005; is that
5    correct?
6    A    Yes.
7    Q    So my question is how is it that you and Mr.
8    Hamilton determined to file a Complaint together?
9         MR. UDDEN: And again, I would just, you
10   know, if you have any information you can provide that
11   is not the result of attorney/client communications,
12   you can give that. Otherwise just answer the best you
13   can.
14   A    I mean I didn't organize this, so --
15   Q    Who did?
16   A    It was just my Complaint. I mean, I don't
17   really know how to answer this question to tell the
18   truth.
19   Q    Why?
20   A    It's really between the attorney and us,
21   so --
22   Q    Do you and Mr. Hamilton have any agreements

19

1    in connection with the sharing of any payments or
2    judgments that might arise from this Complaint?
3    A    Again, I have to refer this to attorney. I
4    cannot really address this question.
5    Q    Do you know whether there is an agreement
6    between you and Mr. Hamilton to share some kind of
7    fees or judgment that might come out of this action?
8    A    I have to refer this to my attorney again.
9    Q    Is that because you know, or you do not
10   know?
11   A    Yes, I know.
12   Q    Okay. What's the answer?
13        MR. UDDEN: Well, again, I think the reason
14   she's referring to attorneys is because it would
15   involve privileged communications for her to answer
16   that question.
17        THE WITNESS: Yeah.
18        MR. JACKSON: Well, I disagree that an
19   agreement between one Relator and another Relator to
20   share fees, I disagree that that's privileged. Now if
21   you're instructing the witness not to answer that on
22   the basis of privilege, just let me know that, and

20

1    instruct her that, and we'll deal with that later.
2         MS. BOURKE: Maybe that will be the easiest
3    way for me to do that, then. I'll just instruct her
4    not to answer on the basis of privilege.
5    BY MR. JACKSON:
6    Q    Have you seen such a document between you
7    and Mr. Hamilton?
8    A    Yes.
9    Q    Can you tell me how long the document is?
10   A    I cannot remember really how long because
11   I've seen so many documents.
12   Q    Can you tell me how long it is? Is it two
13   pages, is it 22 pages?
14   A    Definitely not two or 24.
15   Q    Somewhere in between?
16   A    Yeah, I would think so.
17   Q    Did you execute such a document? Did you
18   sign such an agreement?
19   A    Yes.
20   Q    Do you remember when you signed that
21   agreement?
22   A    When?

Case 1:01-cv-12257-PBS Document 6866-2 Filed 01/27/10 Page 7 of 150
HIGHLY CONFIDENTIAL DEPOSITION OF LINNETTE SUN
CONDUCTED ON TUESDAY, JANUARY 19, 2010

6 (Pages 21 to 24)

21

1    Q    Yes, ma'am.
2    A    I can't remember.
3    Q    Close in time to the time you filed the
4    Complaint?
5    A    I cannot remember, really.
6    Q    Did Mr. Hamilton ever provide you any
7    documents prior to the date the Complaint was filed?
8    A    I don't remember any.
9    Q    Did you know Mr. Hamilton at all
10   professionally or privately before you met him for the
11   first time in 2004, 2005?
12   A    No.
13   Q    Did Mr. Hamilton contact you initially?  Did
14   he solicit your assistance with any case like we've
15   filed here?
16   A    I don't think so.
17   Q    But you don't know how the two of you came
18   to meet, save for through attorneys; is that correct?
19   A    I really have to understand this question
20   better.  Can you --
21   Q    Sure.  I'm trying to understand how you and
22   Mr. Hamilton first came to meet each other, and you

22

1    indicated that it was after you left Baxter?
2    A    Uh-huh.
3    Q    Is that correct?
4    A    Uh-huh.
5    Q    It was sometime before you filed the
6    Complaint in this matter; is that correct?
7    A    Yes.
8    Q    Sometime a few months before, correct?
9    A    I can't remember exact dates, really.
10   Q    And I think you indicated that you've only
11   met with him a couple of times; is that correct?
12   A    Uh-huh, (nods head).
13   Q    Yes?
14   A    Uh-huh.  Yes.
15       MR. UDDEN:  Yes.
16   Q    And while you were at Baxter from the 2002
17   to 2003 time period, that 13-month time period, you
18   and Mr. Hamilton had no communications; is that
19   correct?
20   A    Correct.
21   Q    Ms. Sun, when you left Baxter, did you
22   remove or retain any Baxter documents after you were

23

1    terminated?
2    A    Retain means intentionally or --
3    Q    Intentionally or accidentally.  Did you take
4    with you any Baxter documents?
5    A    I didn't take with me.  I didn't take with
6    me any document, but I had some documents at home
7    because working at home sometimes before.
8    Q    And what kind of documents did you have at
9    home?
10   A    Big binder with all the market research
11   findings, price research findings.
12   Q    Pricing research findings?
13   A    Yeah.
14   Q    What do you mean by pricing research
15   findings?
16   A    This was a document given to me by John Park
17   who was the Global Product Director, and he gave this
18   big binder to me and told me to guard it with my life.
19   He was joking, I hope.  He said it was extremely
20   confidential.  We use it for pricing and to see how
21   economy -- economic incentives or margins drive market
22   share.  I think that's the copy I had at home because

24

1    I worked and reviewed the documents before for my
2    pricing recommendations.
3    Q    Do you still have that document, that set of
4    documents?
5    A    Yes, I think so, but I give, give them to my
6    attorney.
7    Q    Do those documents relate in any way to the
8    pricing of Baxter products?
9    A    Yes.
10   Q    Do they relate in any way to AWP or list
11   price identified for --
12   A    Yes.
13   Q    Have you produced those documents?
14   A    What does that mean, produce?
15   Q    Have you given them to me either directly or
16   through your lawyer?
17   A    To you?  I think just, okay, the Declaration
18   you have, motion, whatever --
19   Q    Yes.
20   A    -- you already have the documents.
21   Q    Ms. Sun, were you aware that so far except
22   for this morning you've produced only two documents to

Case 1:01-cv-12257-PBS Document 6866-2 Filed 01/27/10 Page 8 of 150
HIGHLY CONFIDENTIAL DEPOSITION OF LINNETTE SUN
CONDUCTED ON TUESDAY, JANUARY 19, 2010

7 (Pages 25 to 28)

25

1 Baxter in the context of this litigation?
2   **A  Could you repeat?**
3   MR. JACKSON: Could you re-read that
4 sentence, please?
5   (Record read.)
6   **A  Yes.**
7   Q  That's it, just two documents.
8   **A  What does that mean, two documents? I give**
9 **you whole binder.**
10   MR. UDDEN: Well, again, you didn't give
11 them anything. You gave certain documents to your
12 attorney.
13   **A  To my attorneys.**
14   Q  And you believe --
15   MR. JACKSON: Have all those documents been
16 produced?
17   MR. UDDEN: You know, I'm not sure which
18 ones she's referring to so I really don't know. Mr.
19 Kleiman has been primarily handling the production of
20 documents, so --
21 BY MR. JACKSON:
22   Q  Ms. Sun, let me show you what's been marked

26

1 as Deposition Exhibit 2.
2   (Exhibit 2 was marked for identification and
3 was attached to the transcript.)
4 BY MR. JACKSON:
5   Q  Deposition Exhibit 2 are your Objections and
6 Responses to Baxter International, Inc.'s first set of
7 Requests for Production of Documents.
8   **A  Uh-huh.**
9   Q  Have you ever seen this document before?
10   **A  I think so.**
11   Q  Now, we were talking about a -- was it a
12 notebook of documents that you had in your possession,
13 the pricing documents that you mentioned?
14   **A  Yeah. I think as thick as what you have**
15 **there, (indicating). It's pretty thick.**
16   Q  For the record, you're referring to a
17 three-ring binder on the desk in front of me that's
18 approximately three inches thick?
19   **A  I wouldn't say whether it's two or three**
20 **inches, I don't know, but it's pretty thick.**
21   Q  Pretty thick, I understand. Were you aware
22 that that document or set of documents has not been

27

1 produced to us?
2   **A  Not to you yet? But --**
3   Q  Correct.
4   **A  But you talked about it in your Dismissal,**
5 **whatever, I think.**
6   MR. UDDEN: He's just asking you whether you
7 know if that's been produced to the attorneys for
8 Baxter or not. Do you know that?
9   **A  I don't know, but you referred in your --**
10   Q  Show me in -- you're now looking at your
11 Memorandum in Opposition to our Motion to Dismiss; is
12 that correct?
13   **A  (Reviewing.)**
14   THE WITNESS: This one is the right Mark,
15 right?
16   MR. UDDEN: Uh-huh.
17   **A  Yeah. You refer to like 16 (inaudible) copy**
18 **or something like that.**
19   MR. UDDEN: You're talking about in here?
20   THE WITNESS: Yeah, in here it says 16,
21 and --
22

28

1 BY MR. JACKSON:
2   Q  Ms. Sun, let me make this easier for you.
3   **A  Yeah.**
4   Q  Let me show you what's been marked as
5 Deposition Exhibit 3.
6   (Exhibit 3 was marked for identification and
7 was attached to the transcript.)
8   **A  Is this Exhibit 3?**
9 BY MR. JACKSON:
10   Q  Have you ever seen that document before, the
11 document that I just handed you, Deposition Exhibit 3?
12   **A  (Reviewing.)**
13   THE WITNESS: This is what's in here, right
14 (indicating)?
15   MR. UDDEN: Yeah.
16   **A  Yeah, I think so.**
17   Q  Deposition Exhibit 3 is the Memorandum in
18 Opposition to Baxter International, Inc.'s Motion to
19 Dismiss Relators' Complaint. Do you see that?
20   **A  This one, (indicating)?**
21   Q  Yes.
22   **A  Yes.**

Case 1:01-cv-12257-PBS Document 6866-2 Filed 01/27/10 Page 9 of 150
HIGHLY CONFIDENTIAL DEPOSITION OF LINNETTE SUN
CONDUCTED ON TUESDAY, JANUARY 19, 2010

8 (Pages 29 to 32)

29

1    Q   Now, is that the same document that you have
2  on the table in front of you that you brought with you
3  today?
4    A   I need to see.
5       (Reviewing.)
6       Yeah, uh-huh.
7    Q   You now seem to indicate that something in
8  that document is -- references the notebook of
9  documents.
10   A   Right.
11   Q   Can you find that for me in Deposition
12  Exhibit 3?
13   A   (Reviewing.)
14       Yeah, it's like news media reports.
15   Q   What page?
16   A   On Page 5.
17   Q   Okay.  So are you suggesting that your
18  notebook had news media reports in it?
19   A   It's not in news media reports.  It's
20  pricing research --
21   Q   Okay.
22   A   -- results.

30

1    Q   Who did the research, do you know?
2    A   An outside company.  I can't remember exact
3  name.
4    Q   Was it the Marketing Research Bureau report
5  that's referred to on Page 5 of Deposition Exhibit 3?
6    A   Unless I have the report I cannot tell exact
7  name of the company.
8    Q   Might it be a pricing report from a
9  consultant called Simon-Kucher?
10   A   Could be.
11   Q   You just don't remember?
12   A   There should be two in that case; one from
13  another company, one from Simon-Kucher.  Simon-Kucher
14  Baxter paid, according to John Park, a million to do
15  that, which was also wrong, I think.  I don't have
16  possession of that.
17   Q   Let's back up.  I'm trying to understand
18  what the documents are you're referring to that is
19  about a binder full of documents that you had in your
20  possession but that I don't believe has been produced
21  to us yet, okay?  I believe you testified that it was
22  some kind of pricing research?

31

1    A   Yes.
2    Q   Was it a single report?
3    A   Has multiple years.
4    Q   But was it a single report that has multiple
5  years?
6    A   Possibly.
7    Q   Is it a single report created by a single
8  third-party entity, not Baxter?
9    A   I don't know what kind of role Baxter played
10  in that.  Usually there should be project manager
11  working with the market research and there's some kind
12  of confidentiality agreement.  So I wouldn't come to
13  the conclusion like outside or inside who made it.
14   Q   But you don't know, is that correct, sitting
15  here today what that report contains?
16   A   I know what that report contains.
17   Q   What's it contain?
18   A   It contains pricing information, AWP,
19  contracting price, margins, margins related to market
20  share.
21   Q   What drugs?
22   A   Oh, blood products.

32

1    Q   Say that again.  I didn't understand your
2  answer.
3    A   Like most of the blood products.
4       MR. UDDEN:  Blood products.
5    A   Yeah, like Recombinate and plasma products
6  and, you know, the products Baxter Bioscience Division
7  is engaged in selling.
8       MR. JACKSON:  Okay.  Obviously we request a
9  copy of those documents and would like to keep the
10  deposition open if in fact those are documents we've
11  not previously seen.
12      MR. UDDEN:  I apologize.  I don't know what
13  the status of those are.
14  BY MR. JACKSON:
15   Q   Did you provide that document to your
16  lawyers, or to Mr. Hamilton?
17   A   To lawyers.
18   Q   And you provided those documents to Mr.
19  Kleiman; is that correct?
20   A   Yes.
21   Q   Do you remember when you provided those
22  documents to him?

HIGHLY CONFIDENTIAL DEPOSITION OF LINNETTE SUN
CONDUCTED ON TUESDAY, JANUARY 19, 2010

9 (Pages 33 to 36)

33

1     **A**   **Again, quite a few years now.**
2     Q   Show you what's been marked as Deposition
3 Exhibit 4.
4       (Exhibit 4 was marked for identification and
5 was attached to the transcript.)
6     **A**   **Yes.**
7 BY MR. JACKSON:
8     Q   Deposition Exhibit 4 is your Declaration
9 that you attached to the Opposition to the Motion to
10 Dismiss, correct?
11     **A**   **Yes.**
12     Q   Have you turn to Paragraph 10, please.
13     **A**   **(Complying.)**
14     Q   Paragraph 10, third or fourth sentence down
15 says, this document was only distributed within a very
16 limited group of people. Not everyone in the pricing
17 core group received it, but I was one of the
18 individuals who received it. John Park stressed how
19 confidential this document was. I have a copy of this
20 document.
21       Do you see that language?
22     **A**   **Yes.**

34

1     Q   Is that the same document you've been
2 referring to --
3     **A**   **Yes.**
4     Q   -- this binder of documents --
5     **A**   **Uh-huh.**
6     Q   -- that you gave to Mr. Kleiman?
7     **A**   **Uh-huh.**
8     Q   Thank you.
9       Let me show you what's been marked as
10 Deposition Exhibit 5.
11       (Exhibit 5 was marked for identification and
12 was attached to the transcript.)
13 BY MR. JACKSON:
14     Q   Ms. Sun, Deposition Exhibit 5 is a document
15 entitled Baxter Products W/AWP History 4/11/05. You
16 see that?
17     **A**   **Yes.**
18     Q   You ever seen this document before?
19     **A**   **I don't know whether it's a separate**
20 **document. I don't know whether it could be part of**
21 **the, you know, big binder I have. I cannot remember**
22 **every page.**

35

1     Q   I'm asking only if you recognize this
2 document in this form.
3     **A**   **In this form?**
4     Q   Yes.
5     **A**   **Really I can't remember because having so**
6 **many documents exchanged between my attorneys and me,**
7 **and I've seen so many Baxter documents before, so I**
8 **can't tell you exactly what I have seen, whether I**
9 **have seen it or not, but this kind of format, I'm**
10 **familiar with.**
11     Q   Did you create this document, do you
12 believe?
13     **A**   **I don't think so.**
14     Q   Do you have any idea where it came from?
15     **A**   **Could be a formulary decision, could be a**
16 **pricing document, could be in the contract. No.**
17     Q   Which contract?
18     **A**   **Like, you know, any companies can have a**
19 **product contract with a third party. It can -- it**
20 **could be an attachment, you know.**
21     Q   Ms. Sun, I understand, but it sounds to me
22 as though you're guessing right now.

36

1     **A**   **Not guessing. I'm just giving you what I**
2 **think this document could possibly be.**
3     Q   But you don't know what it is, nor do you
4 know where it came from; is that accurate?
5     **A**   **I don't think I don't know. I know it could**
6 **possibly come from these sources.**
7     Q   But you don't know where it came from?
8     **A**   **From this one, no, I don't know where it's**
9 **extracted from.**
10     Q   Were you aware that this document was one of
11 only two documents that were produced by your lawyers
12 to us in conjunction with the Document Request; were
13 you aware of that?
14     **A**   **No.**
15     Q   And let me have you flip through Deposition
16 Exhibit 5 again, please.
17     **A**   **Uh-huh.**
18     **(Complying.)**
19     **Yeah. This also could come from**
20 **reimbursement, reimbursement document issued by the,**
21 **you know, like pricing database, probably First Data**
22 **Bank to a wholesaler, to a pharmacy.**

Case 1:01-cv-12257-PBS Document 6866-2 Filed 01/27/10 Page 11 of 150
HIGHLY CONFIDENTIAL DEPOSITION OF EINNETTE SUN
CONDUCTED ON TUESDAY, JANUARY 19, 2010

10 (Pages 37 to 40)

37

1    Q    But you're -- again, you're -- that's
2  conjecture. You're guessing about where this document
3  came from, correct?
4         MR. UDDEN: He's talking about this actual
5  document --
6    Q    This actual document.
7         MR. UDDEN: -- not necessarily this type of
8  document.
9         THE WITNESS: Okay.
10         MR. UDDEN: Yeah.
11    **A    No.**
12    Q    Deposition Exhibit 5.
13    **A    No, I'm not so sure which source.**
14    Q    You don't know where this came from?
15    **A    Uh-huh.**
16    Q    But do you believe you drafted this
17  document? Is this something you ever remember
18  preparing?
19    **A    No, I didn't draft it.**
20    Q    Do you have any idea why it's dated April
21  11, 2005, nearly two years after you left Baxter?
22         MR. UDDEN: Referring to up here

38

1  (indicating).
2    **A    Yeah, could you repeat your question?**
3         MR. JACKSON: Can you read back the
4  question, please?
5         (Record read.)
6    **A    No.**
7    **(Exhibit 6 was marked for identification and**
8  **was attached to the transcript.)**
9  **BY MR. JACKSON:**
10    Q    Let me show you what's been marked as
11  Deposition Exhibit 6.
12    **A    Yeah, that's the big binder I was referring**
13  **to, I think.**
14    Q    Ms. Sun, Deposition Exhibit 6 is a document
15  entitled The Plasma Fractions Market in the United
16  States 2001.
17    **A    Uh-huh.**
18    Q    At the bottom it's dated 2002. The Bates
19  numbers for this document are GH 001527 through
20  GH 001744.
21    **A    Uh-huh.**
22    Q    Have you ever seen this before?

39

1    **A    Yes.**
2    Q    When did you first see this document that is
3  Deposition Exhibit 6?
4    **A    When I was pricing for the blockbuster at**
5  **Baxter.**
6    Q    The blockbuster?
7    **A    Yeah.**
8    Q    What's the blockbuster?
9    **A    Advate.**
10    Q    And we'll get to this --
11    **A    Uh-huh.**
12    Q    -- Ms. Sun, but in your Declaration at
13  Deposition Exhibit 4, in a variety of paragraphs, 5,
14  6, and 7, it seems your principal involvement during
15  your employment with Baxter was Advate; is that
16  correct?
17    **A    No.**
18    Q    No?
19    **A    Uh-huh.**
20    Q    That's what you said.
21    **A    No, I said my primary responsibility was**
22  **pricing, but for all Baxter products, pharmaceutical**

40

1  **products. Advate we were having -- it was the**
2  **priority for the division. They were -- that's why I**
3  **spent most of my time on pricing this product.**
4    Q    Thank you. All right. So let's get back to
5  Deposition Exhibit 6.
6         Now, is Deposition Exhibit 6 the binder of
7  documents that you identified earlier that you had not
8  produced so far to me today but you think this is the
9  document that you had in your files?
10    **A    Yes.**
11    Q    Is there anything more than this?
12    **A    I don't think so, but -- I can't read**
13  **through the whole pages right now to see if there's**
14  **any pages missing, but I don't think so. It's about**
15  **this thickness with the binder.**
16    Q    And is Deposition Exhibit 6 the document you
17  were referring to in Paragraph 10 of your Declaration
18  about this --
19    **A    Yes.**
20    Q    -- copy of the document you kept?
21    **A    Uh-huh.**
22    Q    Other than Deposition Exhibit 6, were there

HIGHLY CONFIDENTIAL DEPOSITION OF EINNETTE SUN
CONDUCTED ON TUESDAY, JANUARY 19, 2010

11 (Pages 41 to 44)

---

41

1  any other documents that you maintained when you left
2  Baxter?
3      **A  No.**
4      Q    And how did you come to have Deposition
5  Exhibit 6 again?
6      **A   John Park who was the lead of the core**
7  **pricing group, Product -- Global Product Director, he**
8  **gave this to me and told me to guard it with my life.**
9  **Very confidential.**
10     Q    Understood.  Did you ever provide the
11 document that is Deposition Exhibit 6 to Mr. Hamilton
12 in advance of filing your Complaint in the matter?
13     **A   Again, I can't remember, but I don't think**
14 **so.**
15     Q    Okay.  Ms. Sun, prior to the date that you
16 filed your Complaint in the matter, did you have any
17 meetings with Justice Department lawyers?
18     **A   Again, it has been so long ago, but I think**
19 **so.**
20     Q    Do you remember any of their names?
21     **A   I can't -- maybe Justin or something.**
22         MR. UDDEN:  You just give --

---

42

1      **A   Quite a few.**
2          MR. UDDEN:  Answer the question for --
3      **A   Quite a few.**
4      Q    Mr. Tice, was he one?
5      **A   What's his first name?**
6      Q    Michael.
7      **A   Yeah, the name sounds familiar to me, but**
8  **I'm not so sure whether he's a U.S. Attorney or not,**
9  **you know.**
10     Q    You used the word Justin?
11     **A   Yeah.**
12     Q    Do you remember the last name?
13     **A   No.**
14     Q    Dracott?
15     **A   Yeah.**
16     Q    Yes?
17     **A   I think so.**
18     Q    And in Colorado, or in Washington, D.C.?
19 Where did you talk with him?
20     **A   Colorado, I think.**
21     Q    And prior to the date you filed your
22 Complaint, did you also meet with any representatives

---

43

1  of any of the states that are identified in your
2  Complaint?
3      **A   Again, cannot remember whether it's prior or**
4  **after, but I did meet some State's Attorneys.**
5      Q    When did that occur?
6      **A   I can't remember, it's been so long now, you**
7  **know, but sometime around then.**
8      Q    But you can't be sure whether it was before
9  or after the Complaint was filed?
10     **A   Yeah, uh-huh.**
11     Q    Are there any other documents in your
12 possession that are responsive to the Document Request
13 served on you by Baxter other than the ones we've
14 mentioned today, that is Deposition Exhibit 5 and
15 Deposition Exhibit 6?
16     **A   And the few documents I give to you this**
17 **morning --**
18     Q    Oh, yes.
19     **A   -- related to my employment and specifically**
20 **told you what I did while I was at Baxter if you look**
21 **at the performance review.**
22     Q    Let me show you what's been marked as

---

44

1  Deposition Exhibit 7.
2          (Exhibit 7 was marked for identification and
3  was attached to the transcript.)
4  BY MR. JACKSON:
5      Q    Exhibit 7 is a document that was produced to
6  us this morning by your counsel.
7      **A   Uh-huh.**
8      Q    What is this document?
9      **A   Uh-huh.**
10     Q    What is this?
11     **A   This is my performance review.**
12     Q    For?
13         MR. UDDEN:  This is just part of it.
14     **A   Part of it.**
15         MR. UDDEN:  Because this is actually 15
16 pages, and this is 7 through 15.
17     **A   Yes, this is on the company's website, so --**
18     Q    So this came from the company's website?
19     **A   Yeah.**
20     Q    When did you print this?
21     **A   When?  After the performance review was**
22 **done, employees could print out copy for themselves.**

---

45

1  Q  Okay.  So this would have been sometime
2  before you left, then?
3  A  Yes.  I think there are two or three
4  performance reviews there.  Every six months we did a
5  performance review and tell you specifically what you
6  did at company.  And you could see I was engaged in
7  all those pricing, submission of price, economic
8  modeling, reimbursement both globally and in the U.S.
9  for Advate and other products.
10  Q  Show me where you're referring to that
11  describes that, your responsibilities.
12  A  If you look at Advate, the first one,
13  Advate, it's the blockbuster, largest product right
14  now for Baxter.  It's Advate reimbursement dossier.
15  That dossier would include all the pricing information
16  and how you justify the price and make submissions.
17  Q  For Advate?
18  A  For Advate.
19  Q  So that was your responsibility for the time
20  period January 2003 to December 31, 2003?
21  A  That's just one of them.
22  Q  Okay.  What are the other drugs?  I mean if

46

1  you look --
2  A  Then I also served on the Review Board.
3  Q  Where is that?
4  A  First sentence.  Complete reimbursement
5  dossier, serve on Review Board --
6  Q  Review Board --
7  A  -- pricing reimbursement.
8  Q  -- for what drugs?
9  A  For Advate.
10  Q  For Advate, okay.
11  A  Then you can also see the second objective
12  is also for Advate.  And --
13  Q  You're referring to Page 2 of 12 --
14  A  Right.
15  Q  -- of Deposition Exhibit 7?
16  A  And you can see Advate including billing
17  guide, which is the pricing billing guide; payor
18  notification letter, which is to the Medicare and
19  Medicaid, and all these other things, reimbursement
20  and the product launch.
21  Q  The product launch?
22  A  Yeah.

47

1  Q  Do you remember when Advate was launched?
2  A  I think right after I left.
3  Q  So Advate was not launched until after you
4  left Baxter?
5  A  Yeah.
6  Q  Correct?
7  A  Maybe around, right around there.  I can't
8  remember for sure.
9  Q  Do you remember when it received FDA
10  approval?
11  A  Approval -- approval was, I think probably a
12  few months before it was launched.
13  Q  And do you remember when the first sales of
14  Advate occurred?
15  A  Has to be in 2005.
16  Q  In 2005?
17  A  Yeah.
18  Q  So you had been gone from the company for
19  more than two years?
20  A  Yeah, but I set the price together with the
21  core pricing group.
22  Q  Understood.  Okay.  Can you go through the

48

1  rest of Deposition Exhibit 7 and explain to me your
2  other responsibilities?
3  A  Yeah.
4  MR. UDDEN:  Let him finish.
5  THE WITNESS:  I'm sorry.
6  A  And if you move on to the next one, still on
7  the same page, which also refers to Medicare
8  reimbursement, reimbursement product pricing
9  submissions and utilization.
10  Q  Which reimbursement product pricing
11  submissions did you work on?
12  A  Quite a few.
13  Q  Which?
14  A  Advate is one of them, ARALAST.  There are
15  couple of others, but I can't remember the name
16  exactly.  But Advate, ARALAST were the newer products,
17  so --
18  Q  Can you go to Page 3?
19  Is there anything on Page 3?
20  A  Yeah.  If you see Page 3, it says design/
21  conduct pricing assessment and price elasticity
22  analysis, which is one of the things, this big, this

Case 1:01-cv-12257-PBS Document 6866-2 Filed 01/27/10 Page 14 of 150
HIGHLY CONFIDENTIAL DEPOSITION OF LINNETTE SUN
CONDUCTED ON TUESDAY, JANUARY 19, 2010

13 (Pages 49 to 52)

49

1  report, pricing assessment, and there's Simon-Kucher
2  pricing research. In the U.S. we paid over million
3  dollars and also in Canada.
4      And then you can also see on the, this page
5  there's ARALAST. That's under the COPD product, I
6  think, and pricing recommendation.
7      Q  All right. Can I have you turn to Page 4?
8      A  Page 4.
9      Q  Page 4 looks to me as if it describes your
10  involvement with ARALAST pricing --
11      A  Yes.
12      Q  -- correct?
13      A  Uh-huh.
14      Q  Okay. Page 5?
15      A  Page 5, again, is ARALAST. Because ARALAST
16  happened to be before Advate, there were more actions
17  on this product.
18      Q  I noticed that the flu vaccine is mentioned
19  on Pages 5 --
20      A  Right.
21      Q  -- and 6. I'm looking at the top
22  right-hand --

50

1      A  Yeah. It's also big for Baxter at the time.
2      Q  Your lawsuit does not seek any damages
3  relating to flu vaccine; is that correct?
4      A  No, because flu vaccine is reimbursed in a
5  different way.
6      Q  Okay.
7      A  Okay, yeah.
8      Q  Show you what's been marked as Deposition
9  Exhibit 8.
10      (Exhibit 8 was marked for identification and
11  was attached to the transcript.)
12  BY MR. JACKSON:
13      Q  Deposition Exhibit 8 is a July 22, 2003
14  letter from Baxter to you. Deposition Exhibit 8 was
15  produced to us this morning for the first time.
16      A  Uh-huh.
17      Q  What is Deposition Exhibit 8?
18      A  This is, I would think it's a termination
19  letter and what kind of other benefits I can have
20  after that.
21      Q  Show you what's been marked as Deposition
22  Exhibit 9.

51

1      (Exhibit 9 was marked for identification and
2  was attached to the transcript.)
3  BY MR. JACKSON:
4      Q  Deposition Exhibit 9 is a May 17, 2002
5  letter from Baxter to Linnette Sun.
6      A  Uh-huh.
7      Q  This document was produced to us this
8  morning at approximately 9:30 for the first time.
9  What is this document, Deposition Exhibit 9?
10      A  This is an offer letter, and they offered me
11  the position of Director of Pharmaco-economics.
12      Q  Other than these three documents that you
13  produced this morning and the document that is
14  Deposition Exhibit 6, the pricing document you
15  referred to earlier, do you have any other Baxter
16  documents within your possession or control?
17      A  I don't seem so.
18      Q  Ms. Sun, let me back up a little bit. Can
19  you tell me about your education, please? Work
20  backwards from your highest degree back through your
21  entry-level college degree.
22      A  I'm actually an ABD, all but dissertation,

52

1  in communication/public policy from Annenberg School.
2      Q  From what?
3      A  Annenberg School, University of
4  Pennsylvania.
5      Q  So that means you've completed your Ph.D.
6  studies, but you haven't completed your thesis?
7      A  Right, yeah.
8      Q  Okay.
9      A  And then I also got a Master's degree from
10  the same program, I think in 1989.
11      Q  Okay.
12      A  And before that I received a degree in
13  communication from China, University of Shanghai, and
14  I came here on a full-price scholarship in 1986.
15      Q  1986?
16      A  Uh-huh.
17      Q  Have you ever been retained as an expert in
18  any case that relates to drug pricing?
19      A  Yes.
20      Q  What case is that?
21      A  I don't -- consulting, or case?
22      Q  Consulting, yes.

HIGHLY CONFIDENTIAL DEPOSITION OF LINNETTE SUN
CONDUCTED ON TUESDAY, JANUARY 19, 2010

14 (Pages 53 to 56)

53

1    A    Consulting, yes.
2    Q    How many times?
3    A    Quite a few times. I can't remember exact.
4    Q    Who has retained you?
5        THE WITNESS: Am I allowed? It's kind of
6   like a confidentiality.
7        MR. UDDEN: You're asking as a -- let's go
8   back because -- was your question as an expert, or as
9   a --
10   Q    Talking about expert.
11   A    Consultant?
12   Q    Well, both. Let's start with expert. Have
13  you ever been retained to be an expert witness in
14  connection with --
15   A    Can you define expert?
16       MR. UDDEN: First of all, you have to let
17  him finish his question, okay?
18   Q    An expert witness to testify in a lawsuit.
19   A    No.
20   Q    Have you ever been retained as a consultant
21  to assist in connection with any lawsuits?
22   A    No.

54

1    Q    Have you ever been retained by a company to
2   consult with them regarding matters of drug pricing?
3    A    Yes.
4    Q    Which companies?
5    A    I just -- I don't think I can release the
6   clients' names to you.
7    Q    Why not? We're the subject of a Protective
8   Order. This deposition is under a Protective Order.
9    A    But you're not going to --
10       MR. UDDEN: I think the concern she might
11  have -- and I don't know the companies she's talking
12  about -- is that she might have confidentiality
13  agreements with them as well.
14       THE WITNESS: Right.
15       MR. UDDEN: And regardless of whether this
16  is under Protective Order or not, I think she's
17  concerned that that --
18       THE WITNESS: Yeah.
19       MR. UDDEN: -- she might still not be able
20  to release that information here.
21   A    I just can't tell you. They're well-
22  established and very large companies like Baxter.

55

1    Q    Let me show -- can I have you refer back to
2   Deposition Exhibit 8, please?
3    A    Okay.
4    Q    Last page. It says employment agreement?
5    A    Uh-huh.
6    Q    During your employment with the company you
7   had access to confidential and proprietary
8   information. Do you see that?
9    A    Uh-huh.
10   Q    So is it true that you had similar kind of
11  proprietary information agreements and confidentiality
12  agreements with Baxter while you were an employee with
13  them?
14   A    Combination agreement?
15   Q    Confidentiality agreements such that you
16  could not release proprietary and --
17   A    With other companies you mean?
18   Q    No, with Baxter. While you worked at Baxter
19  did you have such agreements?
20   A    Yes, I think so. Every employee does,
21  right?
22   Q    Okay.

56

1    A    Uh-huh.
2    Q    And is it that kind of confidentiality
3   agreement that you're now concerned about when I asked
4   the questions about --
5    A    No.
6    Q    What's the difference?
7        MR. UDDEN: No, I think what he's asking you
8   is is it that kind of confidentiality agreement with
9   other companies that you're concerned about, the same
10  kind of agreement.
11   A    I don't think they are the same.
12   Q    What's the difference?
13   A    One is a consulting, the other is
14  employment.
15   Q    Okay. But as a consultant, you are not an
16  employee for these other companies, correct?
17   A    Correct.
18   Q    But you have a separate agreement regarding
19  confidentiality; is that true?
20   A    Yes.
21   Q    How many separate companies?
22   A    Again, I don't know.

**57**

1    MR. UDDEN: He's just asking for the number.
2    **A    Number?**
3    MR. UDDEN: Yeah.
4    **A    Three or four.**
5    Q    Did your consulting agreement with those
6    companies relate in any way to AWP, average wholesale
7    price?
8    **A    Probably.**
9    Q    Did any of those agreements relate to
10   setting prices for a particular drug?
11   **A    No.**
12   Q    Can you tell me generally what your
13   engagements -- those consulting agreements concerned?
14   **A    Just generally, right?**
15   Q    Yes, generally.
16   **A    Good cost-effectiveness models.**
17   Q    Cost-effectiveness models?
18   **A    Yes.**
19   Q    Can you explain to me what that means?
20   **A    Meaning you -- nowadays with cost changes in**
21   **health care systems, if you price a drug, you have to**
22   **make sure this drug is cost-effective, not just**

**58**

1    **efficacious. So that's a requirement by Government**
2    **payors, and particularly in the EU community.**
3    Q    Is most of your consulting related to drug
4    pricing in the EU?
5    **A    Most? Both, and U.S., uh-huh.**
6    Q    And in the time since you left Baxter, since
7    2003 forward, do you think there's been about three of
8    those types of consultancies that you've entered into
9    with other entities?
10   **A    Uh-huh.**
11   Q    Did any of those consultancies relate to
12   providing information to any of the drug pricing
13   compendia like Redbook, like First Data Bank?
14   **A    Do I -- you mean did I ever submit price**
15   **or --**
16   Q    Yes, did you ever submit any pricing to any
17   of those?
18   **A    No.**
19   Q    And in your consultancies -- now I'm not
20   talking about just Baxter -- in those post Baxter
21   consultancies, did you have any involvement in
22   submitting prices to those compendia?

**59**

1    **A    No.**
2    Q    Did any of your consultancies relate to the
3    calculation of average manufacturer pricing or best
4    pricing?
5    **A    No.**
6    Q    Do you know what AMP and BP are?
7    **A    Explain to me, maybe I --**
8    Q    Have you ever heard those phrases before,
9    average manufacturing price?
10   **A    Yes.**
11   Q    You heard that in what context?
12   **A    You mean before, or after?**
13   Q    Any time.
14   **A    Before I was at Baxter?**
15   Q    Yes.
16   **A    AWP, have I ever -- I mean --**
17   Q    No, I asked about AMP.
18   **A    Oh, yes.**
19   Q    Okay. What does AMP mean?
20   **A    I think average market price.**
21   Q    Do you know how that's used by drug
22   manufacturers?

**60**

1    **A    Yes.**
2    Q    Tell me.
3    **A    I don't know whether things have changed or**
4    **not. You know, there has to be quite a bit of history**
5    **to that price.**
6    Q    When you first came to understand what AMP
7    was --
8    **A    Uh-huh.**
9    Q    -- when was that?
10   **A    It was way before Baxter.**
11   Q    Okay. What was your understanding, what was
12   it used for?
13   **A    I think used to prevent inflated AWP to some**
14   **degree.**
15   Q    How?
16   **A    Because Government or certain payors wanted**
17   **to do a market survey to see what actual selling price**
18   **is.**
19   Q    And do you know whether AMP is, that
20   information is provided to any Government entity?
21   MR. UDDEN: Again, you're talking about by
22   any company?

HIGHLY CONFIDENTIAL DEPOSITION OF LINNETTE SUN
CONDUCTED ON TUESDAY, JANUARY 19, 2010

16 (Pages 61 to 64)

61

1    Q   We're starting at when you first learned of
2  AMP. I'm just trying to understand your knowledge.
3    A   When was it you mean?  When did I hear --
4    Q   Yeah, when did you first come to have this
5  knowledge?
6    A   Quite a few years before I joined Baxter.
7    Q   Where were you employed at the time?
8    A   I think J&J and Amgen.
9    Q   And you also mentioned that there was some
10  relationship between AMP and AWP?
11    A   Yes.
12    Q   What was that relationship?
13    A   Again, I have to understand what the
14  relationship means, but AWP, you know, it's average
15  wholesale price, right now looks like a suggested list
16  price, and that price I think mostly used by the
17  Government and payors, private payors to get a drug
18  reimbursed because some pharmaceutical companies try
19  to inflate AWP.  So there was something in place to
20  kind of survey to prevent such kind of inflation.  So
21  one of the approaches they took is to do a survey of
22  your market selling price and then decide this is

62

1  really your selling price, not the AWP.
2    Q   And were you involved in Baxter's efforts to
3  disclose AMP?
4    A   Disclose to whom?
5    Q   The Government.
6    A   No.
7    Q   Were you involved in Baxter's efforts to
8  calculate AMP while you were at Baxter?
9    A   Probably, I would say probably, depending
10  whether you submit that thing directly yourself or
11  whether you're in kind of a team effort to identify
12  those AMP or average selling price or whether you use
13  the information to set your list price.  If that kind
14  of effort, yes, I was involved.
15    Q   So you were involved in calculating Baxter's
16  AMP?
17    A   In assessing.  I wouldn't say calculating.
18  I didn't actually do the calculations myself.  But the
19  information was fed to the team who were making the
20  decision, and I was updated on those kind of --
21    Q   What decision are you referring to?
22    A   Setting up Advate price, price --

63

1    Q   Setting up the?
2    A   Blockbuster price, ARALAST price.
3    Q   Which is it; Advate, or ARALAST?
4    A   Both.
5    Q   Now, let's get back to my question.  This
6  is -- we're dealing with AMP, average manufacturing
7  price.
8    A   Uh-huh.
9    Q   Were you involved in calculating Baxter's
10  AMP's for any drug?
11    A   I don't know how you calculate AMP.  AMP is
12  basically a survey, so you don't calculate this AMP,
13  so --
14    Q   Who does?  Who is doing the survey?
15    A   The Government entities or some private
16  survey companies.  So Baxter is not supposed to
17  calculate the AMP.
18    Q   I'm sorry, could you repeat that?
19    A   I don't think any pharmaceutical company
20  should be calculating this AMP.
21    Q   Who do you think should be?
22    A   The Government.  That's to prevent -- checks

64

1  and balance, prevention of inflate AWP.  They didn't
2  trust the pharmaceutical companies.  That's why they
3  had this independent entity to survey the market
4  selling price.
5    Q   Who was that entity?
6    A   Could be -- vary every year depending where
7  the Government or payors contract.
8    Q   To your knowledge, what entities calculated
9  AMP that you're referring to?
10    A   I don't remember specific entity name but I
11  know it was independently done.
12    Q   So let's back up to your time at J&J.  Were
13  you involved in calculating AMP's for J&J?
14    A   Never calculate.  I was aware of that and
15  used that in pricing discussions.
16    Q   Let's move forward.  Amgen.  Were you
17  involved in calculating AMP while you were at Amgen?
18    A   We didn't calculate AMP.
19    Q   And when you were at Baxter, were you
20  involved in calculating AMP?
21    A   Nobody was calculating AMP.  I mean if they
22  do, that's not right.

Case 1:01-cv-12257-PBS Document 6866-2 Filed 01/27/10 Page 18 of 150
HIGHLY CONFIDENTIAL DEPOSITION OF EINNETTE SUN
CONDUCTED ON TUESDAY, JANUARY 19, 2010

17 (Pages 65 to 68)

65

1    Q   And you believe that it was some third party
2   that was calculating --
3    A   Yeah.
4    Q   But you don't know who that third party is?
5    A   No.
6    Q   Now, let's get back to the other term that I
7   used and that's best price or BP. Have you ever heard
8   that before?
9    A   Yes.
10    Q   When did you first hear of the word/phrase
11   best price?
12    A   Back in Merck time.
13    Q   Merck time?
14    A   Yes.
15    Q   Explain what best price is.
16    A   The best price is like, you know, Government
17   has this policy if you sell to any kind of a -- your
18   client, give them a discount, that discount, you
19   should use discount to rebate the Government.
20    Q   So what is best price used for in the
21   context of Federal Government reimbursement policy?
22    A   It should be lowest contracting price.

66

1    Q   How is that calculated? And let's start
2   back at J&J. How did J&J calculate best price?
3    A   Again, not calculating, you're supposed to
4   be honestly reporting to the Government this is your
5   best contracting price.
6    Q   Were you involved at J&J in the disclosure
7   of best price for J&J?
8    A   When you say involved, you know, any
9   pharmaceutical companies, it's always teamwork. No
10   individual, was just one person involved with
11   developing best price or reporting to the Government.
12   It's always a teamwork, so I was part of that.
13    Q   What input did you provide?
14    A   Again, J&J is almost 10 years ago now. I
15   can't remember exactly what my role was, but I do
16   believe we looked at the best price and tried to make
17   decisions.
18    Q   What decisions were you making about best
19   price while at J&J?
20    A   Pricing decisions, discounting decisions.
21    Q   How did that relate to best price for
22   Government reimbursement purposes?

67

1    A   It's all price. Best price is a price,
2   so -- price has many components to it.
3    Q   Were you involved at J&J in disclosing best
4   price to any entity, including the Federal Government?
5    A   I was at a strategic level.
6    Q   Let's move forward. At Amgen, same
7   questions, were you involved in calculating best
8   prices at Amgen?
9    A   Again, nobody is calculating. You're
10   supposed to be honestly reporting to the Government.
11    Q   Were you involved in reporting Amgen's best
12   price to the Government?
13    A   Again, reporting wouldn't be like one person
14   reporting to the Government, it's a team pricing group
15   responsibility. It's a group responsibility.
16    Q   Okay. Can you tell me what your
17   responsibility was as part of Amgen's broader
18   responsibility of reporting best price?
19    A   I cannot tell you the specific detail.
20   Again, I was under confidentiality agreement with my
21   prior employer. But I can tell you I was involved.
22    Q   I'm asking for the specifics of your

68

1   involvement. Are you not telling me specifics because
2   you remember them and have a confidentiality agreement
3   and won't tell me, or that you can't remember them?
4    A   Both. I cannot remember exactly. You know,
5   I could give you some specifics if I was not under
6   confidentiality agreement with them.
7    Q   Ms. Sun, are you going to refuse to answer
8   those questions because of your confidentiality
9   agreement with regard to Amgen?
10    A   Not refuse all of them. I can tell you
11   generally what I did, but relating to specifics, no.
12    Q   You're not going to?
13    A   Uh-huh.
14    Q   And that's because of your confidentiality
15   agreement?
16    A   Yeah.
17    Q   Do you have a confidentiality agreement in
18   your possession between you and Amgen?
19    A   No.
20    Q   So you don't know what the terms of that
21   are?
22    A   Right.

Case 1:01-cv-12257-PBS Document 6866-2 Filed 01/27/10 Page 19 of 150
HIGHLY CONFIDENTIAL DEPOSITION OF LINNETTE SUN
CONDUCTED ON TUESDAY, JANUARY 19, 2010

18 (Pages 69 to 72)

69

1 Q And you've not seen the Protective Order in
2 this case, correct?
3 A No.
4 Q Now, let's talk about Baxter, then. I want
5 to understand what your responsibilities were with AMP
6 at Baxter, calculating and disclosing AMP while you
7 were at Baxter for 13 months.
8 A Again, I don't think we were ever
9 calculating AMP.
10 Q Okay.
11 A All right. And it was a team effort.
12 Q Who was on the team?
13 A John Park --
14 Q John Park.
15 A -- Mike Bradley, Mike Baldridge, Nick
16 Poulios. There were also -- there was also a Europe
17 person, European, and I couldn't remember his name
18 now, and Alan who was the VP of John -- John Park
19 reporting to him.
20 Q What's his name?
21 A Alan, first name. I can't remember the last
22 name.

70

1 Q Spell it for me. I can't understand --
2 A Alan, A-L-A-N.
3 MR. UDDEN: Alan?
4 THE WITNESS: Yeah, but they call him AL/LON
5 for some -- he's European accent.
6 Q Got it.
7 A And there were occasionally two U.S.
8 marketing people to give us feedback on, you know, how
9 margins could sell in the field.
10 Q Who were they?
11 A One I think Jill, Jill Kademos (phonetic) or
12 something like that.
13 Q Spell that last name.
14 A I can't remember. Probably it's in my first
15 Complaint. And there's another, I think he's, he was
16 a gentleman, and -- is it Ken or something like this,
17 first name? He was Marketing Director then.
18 Q Can you describe for me what each of those
19 individual's responsibilities were in connection with
20 AMP calculations or disclosure?
21 A AMP you mean, not AWP, or price overall?
22 Q AMP.

71

1 A Nobody did AMP calculation. We got updates
2 from Michael Bradley. We had weekly meeting and he
3 was supposed to tell us that.
4 Q Tell you what the AMP was?
5 A Yeah.
6 Q So was it Mike Bradley who calculated AWP to
7 your knowledge?
8 A Possibly. But again, I don't think he was
9 the one who calculated. He should have managers
10 reporting to him who did those kind of specific jobs,
11 yeah.
12 Q But you personally weren't involved in those
13 calculations?
14 A No.
15 Q It was somebody who worked for Mike Bradley?
16 A Yes. And they would tell us, the core
17 pricing group.
18 Q Let's have the same conversation about best
19 price. Were you personally involved in calculating
20 best price for any Baxter drugs or therapies?
21 A I think, again, best price is similar to
22 AMP. It shouldn't be calculated. It should be

72

1 reporting to the Government, okay?
2 So I didn't report to the Government
3 directly. Mike Bradley was the core member of the
4 team and he would bring those things in for the team
5 to discuss. The team did have responsibility of all
6 U.S. and rest of world pricing.
7 Q But I'm trying to understand if you knew
8 what Mike Bradley or his organization did to come up
9 with the BP, or best price numbers.
10 A Yes, he would detail us that.
11 Q What did he say to you?
12 A I can't remember exactly, but I -- I told
13 him -- he told us, I think I still remember, he told
14 us about volume committed contracts. It was good for
15 three years and we were not afraid of losing market
16 share. There were enough margins for the home care
17 providers.
18 Q We'll get to volume committed contracts, but
19 do you believe there's something wrong with a volume
20 committed contract?
21 A Yes.
22 Q Why?

Case 1:01-cv-12257-PBS  Document 6866-2  Filed 01/27/10  Page 20 of 150
HIGHLY CONFIDENTIAL DEPOSITION OF EINNETTE SUN
CONDUCTED ON TUESDAY, JANUARY 19, 2010

19 (Pages 73 to 76)

73

1    A    Because I think Baxter was taking advantage
2  of this kind of, you know, calling it the volume
3  committed contracts, basically they were selling on
4  margins.  Even they tried to avoid the word AWP in the
5  contracts.  I even told them then it was wrong.
6    Q    What was wrong with a volume committed
7  contract?  Do you believe it's somehow impermissible
8  to give discounts to purchasers?
9    A    I think it's okay to give discounts.  It's
10  not okay to sell on your margins.  Like all those home
11  care providers, they know too well what the
12  reimbursement rates are.  And you give them volume
13  committed contracts, give them lower price so they can
14  see what the margin is there.  Baxter is too aware of
15  those things.
16    Q    So it's okay to sell based upon discounts;
17  you just told that, right?
18    A    Uh-huh.
19    Q    And isn't a volume committed contract a,
20  simply a discount?
21    A    No.
22    Q    Why not?

74

1    A    Because Baxter knew, even internally all
2  these meetings I attended to and the research we did,
3  there was always AWP there.  So in essence we were
4  trying to study this margin.  And if you talk to
5  anyone, even Michael Bradley, he would know margin is
6  the only thing that sells Baxter's products.
7    Q    Again, I'm trying to understand what's wrong
8  with a volume committed contract.  Your Complaint and
9  Declaration says you saw one.
10    A    Uh-huh.
11    Q    Is that your memory?
12    A    I can't remember exactly, but Bradley had a
13  presentation on that.
14    Q    What's the difference, then, between a
15  discount that's okay and a volume committed contract
16  that has discounts that's not okay?
17    A    First of all, I don't think you should
18  commit any home care to a volume.  You know, there are
19  only certain patients, you know.  How can you do a
20  volume?  You know, patient only needs to take so much
21  drug.
22    Q    Would it be possible for that home health

75

1  care company to look at its historical one year, two
2  year, three year, five year, determine how much drug
3  it might buy, and make an assessment?
4    A    But they shouldn't have any -- they
5  shouldn't have any -- you know, doctors are supposed
6  to write those scripts.  Home care just administer
7  those drugs.  So how they -- how can they commit to a
8  volume to, you know, make patients take drugs?
9    Q    Well --
10    A    They don't know what doctors are going to do
11  to -- you know, give, how much drug the patients will
12  use or whether the patients are going to switch to
13  different practices or whether there could be new
14  products, you know, other companies, you know.  So the
15  answer, I think it's kind of trying to, you know,
16  increase utilization that way.
17    Q    Is it possible --
18        MR. UDDEN:  I just -- I think we're getting
19  a little beyond jurisdictional issues here.  I'd just
20  make that comment.
21        MR. JACKSON:  No.  Part of your case is
22  theoretically about a volume committed contract.

76

1  BY MR. JACKSON:
2    Q    You said you weren't involved in calculating
3  BP, correct; that was Mike Bradley and his group?
4    A    Not calculating, reporting.
5    Q    You reported BP, you personally?
6    A    No.
7    Q    Okay.  Who did?
8    A    Michael Bradley's group.
9    Q    To whom?
10    A    To Medicare/Medicaid.
11    Q    Do you know that to be true?
12    A    Yes.
13    Q    How do you know that to be true?
14    A    Because I was involved in Medicaid
15  submissions, too.
16    Q    Okay.  Now, let's get back to VCC because
17  you've said in your Complaint that somehow something
18  is wrong with VCC, right?
19    A    Uh-huh.
20    Q    Let's get back to the conversation we were
21  having.  Would you agree with me based upon your
22  economics background that it would be perfectly

Case 1:01-cv-12257-PBS Document 6866-2 Filed 01/27/10 Page 21 of 150
HIGHLY CONFIDENTIAL DEPOSITION OF LINNETTE SUN
CONDUCTED ON TUESDAY, JANUARY 19, 2010

20 (Pages 77 to 80)

77

1 permissible for a home health care company to evaluate
2 its prior year usage of a particular drug?
3     A  No.
4     Q  That would not be appropriate, to look at
5 what its historical purchases are?
6     A  You mean perfectly all right?  I don't think
7 it's perfectly all right.  It depends on, you know,
8 what incentive, what the intention, you know, whether
9 or not they have the patients' interests in their
10 heart.
11     Q  Do you believe it would not be appropriate
12 for a home health care company to consider its
13 historical buying patterns before purchasing product?
14     A  You know, I can -- I wouldn't comment on
15 that.  It -- that's too complicated to say just yes or
16 no.  But I can tell you the volume committed contracts
17 even do not.  I mean they do not have the word AWP
18 there, but if you survey every single home care
19 company, they know what the reimbursement rates are
20 and they know what the margins are going to be,
21 whether or not they are going to profit.  There are
22 tons of articles on that.  Tons of home care

78

1 companies, you know, coming up in the last couple
2 of -- last several years because they saw this
3 economic incentive.  So I think, I still think, and I
4 thought, it was totally wrong to have that kind of
5 contracts.
6     Q  Can you point me to any Medicare or Medicaid
7 or other State regulations that say volume
8 committed contracts are impermissible?
9     A  I think if you know details and how Baxter
10 generated those home volume committed contracts they
11 would think it's wrong.
12     Q  Not my question.  I asked you are you aware
13 of any regulations, Federal or State, that specify
14 that volume committed contracts are improper or wrong?
15     A  You know, if you use AWP, it's wrong.
16     Q  That wasn't my question.
17        MR. JACKSON:  Can you read back my question,
18 please?
19        (Record read.)
20     A  I would -- I am not aware that -- whether or
21 not use the volume committed contracts, you know,
22 so --

79

1 BY MR. JACKSON:
2     Q  No, ma'am.  I asked -- again, my question to
3 you is based upon your experience.  Do you know of any
4 Federal or State regulation that specifies that a
5 volume committed contract is wrong or improper?
6     A  It's wrong if it's related to AWP.
7     Q  I asked you whether you were aware of any
8 regulations that said a volume committed contract was
9 wrong or improper.  If you know those regulations,
10 please tell me.
11     A  I don't think they would allow volume
12 committed contracts.  Baxter would just say contracts
13 probably.  If it's volume committed, probably it's
14 wrong.
15     Q  Ms. Sun, I asked you are you aware of any
16 regulations that would specify that VCC's, volume
17 committed contracts, are wrong or improper.  If you
18 know the regulation, please tell me.  If you don't,
19 then just tell me you don't know the regulation.  I'm
20 trying to understand if you are aware based upon your
21 own experience whether such a regulation or law or
22 rule exists.

80

1        MR. UDDEN:  In other words, he's not asking
2 you right now whether you think it's wrong or not.
3 He's asking you if you know of a specific regulation
4 that basically says it's wrong.
5        Is that correct?
6        MR. JACKSON:  Correct.
7     A  Just the term volume committed contracts?
8     Q  No, the use of volume committed contracts,
9 is that wrong or improper under a regulation?
10     A  I believe so.
11     Q  Okay.  What regulation?
12     A  I cannot cite specific law, but I know that
13 early on if you contract, even at Merck and J&J time,
14 you know, they had all these AWP and market share-
15 related lawsuits.  And it says if you contract based
16 on volume, shifting of market share, and that's wrong.
17     Q  Okay.  So how does a volume committed
18 contract relate to average wholesale price?
19     A  That's, again, a very long story, but --
20     Q  I'd like to hear it.
21     A  You'd like to hear?  Volume committed
22 contracts --

Case 1:01-cv-12257-PBS Document 6866-2 Filed 01/27/10 Page 22 of 150
HIGHLY CONFIDENTIAL DEPOSITION OF LINNETTE SUN
CONDUCTED ON TUESDAY, JANUARY 19, 2010

21 (Pages 81 to 84)

81

1    Q   Yes.
2    A   -- has the discounted price.  When you see
3  how the Government gets paid and how home care -- I'm
4  sorry, how home care gets paid and what their economic
5  incentive is, the lower the discount price, the higher
6  the AWP.  That's the -- their margin.  So the volume
7  committed contracts is basically what their --
8  economic incentive margins are what home cares are
9  looking at.
10       So you say, you know, you can commit to this
11  and then basically tell home care you are going to
12  make that much money if you buy our product at the
13  lower price and higher reimbursement rate.  Volume
14  committed contract has to be related to AWP.
15    Q   And how do volume committed contracts relate
16  to the calculation of best price?
17    A   In theory correctly you're supposed to get
18  the lowest price in your contracts and report that
19  price.  One cannot calculate AMP or calculate best
20  price because each contract has different volume.  So
21  you're not going to say, oh, I'm going to wait it out.
22  And you're supposed to get the lowest price of any

82

1  contract and report that way to the Government.
2    Q   Did Baxter do that?
3    A   (Shrugging shoulders.)
4    Q   You shrugged your shoulders.  Do you know
5  whether Baxter did it or not?
6    A   When you say calculating and when Michael
7  Bradley --
8       MR. UDDEN:  Talking about reporting now, I
9  think.
10    Q   I'm talking about reporting.
11    A   When you say calculating, when Michael
12  Bradley was talking about calculating, I thought it
13  was wrong.  I thought they should just report the
14  lowest price.
15    Q   And do you know whether they did?
16    A   I don't know.
17    Q   Do you know what Baxter reported for any
18  drug in terms of its best price to the Government?
19    A   I think so.
20    Q   What?
21    A   I can't remember exact number, but Bradley
22  told us what was the price then and that compared with

83

1  this market research report, this was much lower than
2  what he said at the meeting.
3    Q   Which drug are you referring to?
4    A   Recombinate --
5    Q   So have you --
6    A   -- many others, yeah.
7    Q   Well, which?
8       MR. UDDEN:  Many other drugs?
9    A   Many other drugs.
10    Q   Which, which drug did you see in terms of
11  reporting to the Federal Government of best price?
12    A   (Reviewing.)
13       I mean Recombinate is the largest product
14  and probably accounted for 60 percent of revenue.  I
15  think I can certainly remember that, and there are
16  plasma products.
17    Q   You're referring to Deposition Exhibit 6,
18  correct?  You're looking at that right now?
19    A   Yeah.  I think probably the products should
20  be there, but I can't find it.  It's such a big
21  binder.  But all bioscience pharmaceutical products.
22    Q   Were what?

84

1    A   It's like Recombinate is the No. 1 in the
2  time, and plasma products, there were quite a few of
3  them.
4    Q   All right.  So let's back up.  Let's talk
5  about each of the drugs that you're referring to,
6  okay?
7    A   Uh-huh.
8    Q   So we're talking about the reporting of best
9  price.
10    A   Uh-huh.
11    Q   Okay.  How many of those drugs were you
12  involved in reporting best price to the Federal
13  Government?
14    A   Again, I didn't report to the Government
15  directly.
16    Q   Okay.
17    A   Only Michael Bradley would update us on the
18  best selling price for U.S. products.  And when he
19  reported those -- updated the team on those prices and
20  I look at this market research report, I saw big
21  discrepancy.
22       And again, he was like you, talking about

Case 1:01-cv-12257-PBS  Document 6866-2  Filed 01/27/10  Page 23 of 150
HIGHLY CONFIDENTIAL DEPOSITION OF LINNETTE SUN
CONDUCTED ON TUESDAY, JANUARY 19, 2010

22 (Pages 85 to 88)

Page 85

1 calculating best price and AMP, and I even brought to
2 the team, I thought we were just reporting best price
3 or AMP, not calculating.
4    Q   So you don't know what the rules are in
5 terms of -- the Federal regulatory rules in terms of
6 how you calculate or report BP?
7       MR. UDDEN:  You've got to let him finish the
8 question, okay?
9    Q   Go ahead.
10      MR. JACKSON:  Can you read my question?
11      (Record read.)
12   A   You mean you were or --
13 BY MR. JACKSON:
14   Q   While you were at Baxter -- just trying to
15 understand your involvement in the calculation and
16 reporting of best price.
17   A   I was aware of the Federal rules.
18   Q   Okay.  Where are they?
19   A   Reporting the lowest price, contracted price
20 to the Government.  So when Baxter -- Mike Bradley
21 used the term --
22   Q   For which drugs?

Page 86

1    A   For Recombinate and some other plasma
2 products.
3    Q   Which ones?
4    A   I can't remember the name.
5    Q   And what was wrong with what Mr. Bradley had
6 reported to the Federal Government?
7    A   Because he used the same term as you,
8 calculating the best price, calculating the best price
9 and calculating AMP.
10   Q   So by your answer, do you mean that if there
11 was any kind of calculation relating to best price or
12 AMP that somehow what Baxter did was wrong?
13   A   Yeah.  It should -- they should be reporting
14 lowest contracting price.
15   Q   And give me the instances where you know
16 that Baxter did not report the lowest contracting
17 price.
18   A   Because he was talking about calculating.
19      MR. UDDEN:  But I think by instances you're
20 talking about drugs.  Which drugs, when, whatever.
21   Q   Specific instances where you believe that
22 Baxter somehow reported an inaccurate AMP or BP.

Page 87

1    A   For which product you mean?
2    Q   Any product that you have direct knowledge
3 of.
4    A   Recombinate and plasma products.
5    Q   Which plasma products?
6    A   I can't remember.  Again, it's been so long.
7 We had the No. 1 plasma product in the group of
8 class -- in the class then.
9       (Reviewing.)
10      I can't remember which products, plasma
11 products.  We had two, I think.  I think it starts
12 with N, but I can't remember the name of the products
13 now.
14   Q   And again, how is it you determined that
15 what Baxter did in reporting AMP and BP was incorrect?
16   A   Because I had lots of experience doing that
17 kind of work prior to coming to Baxter.  They hired me
18 because I was experienced in the field.
19   Q   But I'm sorry, I don't understand what your
20 evidence is that Baxter reported some kind of AMP --
21 bad or improper AMP or BP for Recombinate.  What's
22 your evidence?  Do you have a piece of paper?

Page 88

1    A   There should be meeting Minutes.  I don't
2 have a piece of paper for that thing.
3    Q   Do you know how it was wrong or improper?
4    A   Because Baxter -- Bradley used the term
5 calculating.
6    Q   So because Mr. Bradley used the term
7 calculate versus report --
8    A   Right.
9    Q   -- you believe Baxter did something wrong?
10   A   Not only that, because he calculated price.
11 For example, 75 cents, and I looked at this report
12 it's 65, so I thought it was wrong.
13   Q   All right.  So let's back up.
14      MR. JACKSON:  Can you read my question to
15 her before she said not only that.
16      (Record read.)
17 BY MR. JACKSON:
18   Q   Is that correct?
19   A   I have to -- I am kind of confused.  I still
20 need to understand this question a little bit more.
21   Q   Sure.  It seems to me that you're focusing
22 on Mr. Bradley's use of the word calculate --

89

1  A  Uh-huh.
2  Q  -- and that your supposition is that if Mr.
3  Bradley was calculating anything, his disclosure of
4  AMP or BP had to be wrong.  Is that your theory?
5  **A  No, no, it's more than that.**
6  Q  Okay.  So that has nothing to do with your
7  theory, Mr. Bradley's use of the word calculation or
8  calculate, that has nothing to do with this case?
9  **A  Has something to do with the case.  First of**
10  **all, he used the term wrong, calculating.**
11  Q  Okay.
12  **A  And second of all, I'm evidence-based.  I**
13  **don't want to say someone is wrong because he used the**
14  **wrong word, so I did go back to some numbers here and,**
15  **you know, compared to the number he was -- suggested**
16  **to the team.**
17  Q  So you're referring to Deposition Exhibit 6?
18  A  Uh-huh.
19  Q  And you believe that --
20  **A  Not only 6, there were also some other**
21  **documents at the time.**
22  Q  Do you remember what they were?

90

1  **A  Simon-Kucher is one of them.**
2  Q  So did you compare the information contained
3  in Deposition Exhibit 6 plus the Simon-Kucher --
4  A  Uh-huh.
5  Q  -- report, plus information that Michael
6  Bradley disclosed to the Federal or State
7  Government --
8  A  Uh-huh.
9  Q  -- and you made a determination that somehow
10  those disclosures were wrong?
11  A  Uh-huh.
12  MR. UDDEN:  Is that yes?  You --
13  Q  Is that a yes?
14  A  Yes.
15  Q  When did you do that?
16  **A  When did I?**
17  Q  Yes.
18  MR. UDDEN:  And do that, meaning when did
19  she --
20  **A  Report or --**
21  Q  Do this calculation.  You're --
22  MR. UDDEN:  Or make the --

91

1  Q  You're doing some kind of comparison --
2  **A  Yeah.**
3  Q  -- with what Mr. Bradley was doing with
4  Deposition Exhibit 6 and another report.
5  A  Uh-huh.
6  Q  Okay.
7  **A  When was that?**
8  Q  Yes, when was that?
9  **A  Usually right after the meeting, right.**
10  Q  How often did those meetings take place?
11  **A  I believe it's once a week, but sometimes**
12  **could be every other week.**
13  Q  And this exercise that you just described
14  that you undertook, was that for Recombinate?
15  **A  For Recombinate and sometimes for plasma**
16  **products as well.**
17  Q  But you just don't remember which plasma
18  products?
19  A  Yeah.
20  Q  Those are the only drugs that you undertook
21  your exercise; is that correct?
22  A  Uh-huh.

92

1  MR. UDDEN:  Yes?  You have to answer yes.
2  **A  Yes.  Okay.  Sorry.**
3  Q  You said something a minute ago when you
4  were referring to your time at J&J and Amgen, you
5  indicated you were aware of the AWP lawsuits at the
6  time, correct?
7  **A  Yes.**
8  Q  Let's get back to your employment.  When did
9  you work for J&J?
10  **A  I have to refer to my --**
11  **(Reviewing.)**
12  Q  Are you referring to your Declaration that
13  is Deposition Exhibit 4?
14  **A  Yeah.  I'm trying to check my employment**
15  **dates.**
16  MR. UDDEN:  Actually your Declaration is a
17  separate Exhibit.  Is that 4?
18  MR. JACKSON:  Exhibit 4.
19  MR. UDDEN:  If you look at 4, that's just
20  your Declaration.
21  THE WITNESS:  That's my Declaration here,
22  too.  I --

HIGHLY CONFIDENTIAL DEPOSITION OF EINNETTE SUN
CONDUCTED ON TUESDAY, JANUARY 19, 2010

24 (Pages 93 to 96)

---

93

1    Q    Let me have you actually look at Deposition
2  Exhibit 4 and let's work off that, okay?
3    A    All right.  Okay.
4         I then went to Johnson & Johnson for
5  approximately two years.  So I think -- no, I can just
6  give you estimates.  So I was at Merck for five years
7  and probably went to J&J 1998.
8    Q    Okay.  So while you were at J&J during the
9  period 1998 to 2000 --
10   A    Uh-huh.
11   Q    -- you were aware of the AWP lawsuits,
12 correct?
13   A    Yes.
14   Q    What did you know about the AWP lawsuits?
15   A    I can't give you -- I know a lot about AWP,
16 but I don't know how much I need to tell you.
17   Q    I need to know -- my question is based upon
18 what did you know or what did you learn about the
19 lawsuits while you were at J&J.
20   A    Uh-huh.
21   Q    Okay.
22   A    Uh-huh.  I know that in order to grab market

---

94

1  share, the pharmaceutical companies increased their
2  revenue.  They want to sell more products, they want
3  to increase utilization.  So what some of the
4  companies did was to inflate AWP and give some
5  providers discounts and make them aware of those kind
6  of money they can make by, you know, getting
7  reimbursement at higher rate but getting the products
8  at the lower rate.
9         So there were quite a few lawsuits, again,
10 that inflated AWP and market share -- sorry, lower
11 price to move market share.
12   Q    And while you were at J&J in this 1998 to
13 2000 time period, do you remember which companies had
14 been sued by that time?
15   A    I can't remember how many companies had been
16 sued, but there were quite a few.  Which specific
17 company I probably don't.
18   Q    By the way, during your time period at J&J,
19 what were you doing?  What was your --
20   A    Pricing.
21   Q    Give me a general description of what you
22 were doing.  Pricing is awfully broad.

---

95

1    A    Yeah, pricing is awfully broad, yeah, that's
2  right.  Pricing research, modeling, choice modeling,
3  elasticity exercise with Simon-Kucher sometimes -- I
4  would just give you an example -- discuss list price,
5  relate price to market share, prepare reimbursement
6  submissions, develop reimbursement -- pricing
7  reimbursement dossier.
8    Q    It was during this job, during the '98 to
9  2000 time frame when you first learned about the AWP
10 litigation that was then ongoing?
11   A    When did I learn about it?
12   Q    You said sometime during this time period
13 you were aware of the AWP cases.
14   A    Right, yeah.
15   Q    Okay.  Now, let's move to -- your next
16 assignment, or job was with Amgen?
17   A    Uh-huh.
18   Q    Correct?
19   A    Uh-huh.
20        MR. UDDEN:  Yes?
21   A    Yes.
22        THE WITNESS:  Hard to change habit.

---

96

1    Q    And what were your responsibilities at
2  Amgen?
3    A    I was hired to do pricing as well.
4    Q    How long were you at Amgen?
5    A    About two or three years -- two and a half
6  years.
7    Q    And I'm referring to Paragraph 4 of
8  Deposition Exhibit 4.
9    A    Right.  Yeah.
10   Q    So that's the time frame, kind of '99 to
11 2000 --
12   A    Right --
13   Q    -- while you were there?
14   A    -- '99 to 2002, right before I came to
15 Baxter.
16   Q    And were you doing the same kind of work at
17 Amgen as you had done at J&J?
18   A    Yes.
19   Q    And during that time period, were you also
20 aware of the AWP litigation that had been filed?
21   A    Yes.
22   Q    Do you remember any specific cases that you

---

HIGHLY CONFIDENTIAL DEPOSITION OF LINNETTE SUN
CONDUCTED ON TUESDAY, JANUARY 19, 2010

25 (Pages 97 to 100)

97

1  came to understand to -- that had been filed during
2  that time period?
3      A   Not filed during that time period, ongoing
4  AWP lawsuits.
5      Q   And how did you come to understand that
6  information?
7      A   I was trained to do -- to understand that.
8      Q   Were you doing independent research, or were
9  you simply aware of all the press articles about the
10  AWP; which was it?
11     A   I was aware of press articles, of course,
12  and I studied -- you know, I was sent or provided
13  documents on those regulations from the Government,
14  the company because I was responsible for pricing, so
15  I needed to be aware of those things.  And also to
16  went to conferences, training sessions company
17  sometimes provided, yeah.
18     Q   Okay.  And through all that process, you
19  were given the information about the then-existing AWP
20  litigation?
21     A   Yeah.  And I subscribe to those kinds of
22  journals.

98

1      Q   Like?
2      A   Pink Sheets.
3      Q   I don't know Pink Sheets.
4      A   Pink Sheets is pricing weekly kind of
5  journal we subscribe to.
6      Q   What other kind of journals or third-party
7  sources of material do you remember?
8      A   Sometimes Medicare/Medicaid send us some
9  documents as well.
10     Q   And then when you came to Baxter in the
11  Summer of 2002, did you continue to do the same kinds
12  of pricing that you've described earlier this morning?
13     A   Uh-huh.
14         MR. UDDEN:  Yes?
15     A   Yes.
16     Q   And did you continue to become aware of all
17  the AWP litigation that was then ongoing in that time
18  period?
19     A   Yes.
20         MR. JACKSON:  Let's go off the record.
21         (Discussion off the record.)
22         (Break taken at 10:59 a.m.)

99

1          (Back on the record at 11:10 a.m.)
2          (Exhibit 10 was marked for identification
3  and was attached to the transcript.)
4  BY MR. JACKSON:
5      Q   Ms. Sun, various times this morning when we
6  were talking about those things that you thought
7  Baxter had not done correctly you referred to
8  Deposition Exhibit 6, the Plasma Fractions Market,
9  Deposition Exhibit 6.
10     A   Okay.  Yes.
11     Q   Can you give me an example to show me
12  precisely how -- the data you looked at in here to
13  determine whether what Michael Bradley might have been
14  doing was somehow different or wrong based upon this
15  document which is Deposition Exhibit 6?
16     A   Okay.  That's really hard for me to turn to
17  the right page.
18         MR. UDDEN:  But you can take the time that
19  you need, so --
20     A   It's really hard.  It's such a big document.
21         (Reviewing.)
22         (Witness turning to counsel.)

100

1          (Reviewing.)
2          THE WITNESS:  This is plasma products, it's
3  not Recombinate.
4          (Reviewing.)
5      A   I have this one, Page 61.  If you see, if
6  you see Recombinate Factor VIII --
7          MR. UDDEN:  Okay.  Maybe you should use the
8  GH number.  It's --
9          THE WITNESS:  Yeah.
10         MR. UDDEN:  -- 1608.
11     A   Yeah, but probably not this one.  It would
12  be something very similar to this.  Otherwise I have
13  to go through the whole document.  And here, for
14  example, you see Recombinate --
15     Q   Point me to the page number on Deposition
16  Exhibit 6.
17     A   Page GH 001608.
18     Q   Look at 1608.
19     A   It's really not the right table, but I just
20  want to give you an example since I don't have to go
21  through page-by-page to find that.  For example, here
22  is under Recombinate Factor VIII --

Case 1:01-cv-12257-PBS Document 6866-2 Filed 01/27/10 Page 27 of 150
HIGHLY CONFIDENTIAL DEPOSITION OF LINNETTE SUN
CONDUCTED ON TUESDAY, JANUARY 19, 2010

26 (Pages 101 to 104)

101

1    Q    Again, which page are you referring to?
2    A    GH 001608.
3    Q    Of Exhibit 6, okay.
4    A    Uh-huh.  If you look at, you know, the
5 following products, price changes were observed.
6    Q    Okay.
7    A    And Recombinate Factor VIII, under that
8 there should be three or four products, and one of
9 them would be Baxter's.
10   Q    So you're referring to Recombinate Factor
11 VIII, right?
12   A    Factor VIII, right.  I couldn't find that
13 table right now, but I found it before.  It should be
14 here.  And under Recombinate, three products, major
15 products -- I think it's four now.  And under that --
16   Q    Which manufacturers?
17   A    By Bayer, one by Bayer, two by Baxter, and
18 there's another one, Helix -- I forget about which
19 company.
20   Q    So the data that you're referencing here on
21 Page GH 001608 --
22   A    It's like combined, obviously.

102

1    Q    -- is a price factor that combines four
2 manufacturers?
3    A    Right, exactly.  So you can see it's from 73
4 cents to 74 cents they're talking about price change.
5 But if you have separate --
6    Q    You're referencing a Factor IX now, not a --
7    A    I'm sorry, Factor VIII, 71 to 74 changes.
8    Q    Yes.
9    A    Then under that should be like four
10 products.  Then you can see Recombinate probably 71
11 cent or something like that.  Then Baxter, Michael
12 Bradley, Mike Bradley would refer to selling price of
13 75 cents instead of the lowest 71, for example.
14   Q    But this 71 was based upon an average of
15 multiple vendors?
16   A    Right.  That's why I'm trying to find a
17 separate table.
18   Q    Okay.  Thank you.  I would appreciate that.
19   A    Then -- so then you have to let me take a
20 little bit more time.
21       (Reviewing.)
22       I should have brought one I have at home

103

1 because I highlight every one and it has a kind of
2 sticker so it's easy for me to locate the pages right
3 now.
4       (Reviewing.)
5       There were also, I think, you know, like
6 different home care companies, the price they receive
7 in this binder, but I can't find it right now.  Like
8 for example, you know, Caremark, what kind of price
9 they receive from Baxter, but I don't see -- and how
10 it is related to market share, and what's the AWP for
11 that year.
12      So probably that was not what Mark gave to
13 you.  Is that the same thing he gave to you, this one?
14 Is it -- our attorney give it to you, or is that one
15 Baxter --
16   Q    This is -- Document 6 is one of two
17 documents prior to this morning that were produced to
18 us.  The other was Deposition Exhibit 5.
19   A    (Reviewing.)
20       I don't know whether it's the same thing or
21 not.
22   Q    Well, for the record, I'd like you to

104

1 produce any documents that you have that have not yet
2 been produced because you just reflected that you're
3 not sure Deposition Exhibit 6 is the binder of
4 documents that you believe that you had given to your
5 counsel.
6       MR. UDDEN:  Yeah, we'll follow-up.
7    A    Yeah.
8       MR. JACKSON:  I'll make that formal request.
9    A    Yeah.  I think I even folded the page like
10 that (indicating), say, look at AWP on this side,
11 market share on that side, you know.  And I'm going
12 back to California so I should have access for the
13 original document.
14      Yeah, so I don't think it's here.  It's not
15 product-specific, but I do have one.
16   Q    So you don't believe Deposition Exhibit 6 is
17 in fact the document that you referred to in your
18 Declaration in Paragraph 10?
19   A    Doesn't seem to be complete at least.
20   Q    All right.  So based upon looking at this
21 document now, Deposition Exhibit 6, you are unable to
22 give me an example of how information within

Case 1:01-cv-12257-PBS Document 6866-2 Filed 01/27/10 Page 28 of 150
HIGHLY CONFIDENTIAL DEPOSITION OF EINNETTE SUN
CONDUCTED ON TUESDAY, JANUARY 19, 2010

27 (Pages 105 to 108)

105
1  Deposition Exhibit 6 can be compared to Baxter data
2  and determine whether something is or isn't
3  impermissible, correct?  You can't give me an example
4  of that right now?
5      A   Right now, no, not from -- I mean, again, I
6  have like over 200 pages to go through.
7      Q   I understand.  But you're not able now to
8  give me --
9      A   Right.
10     Q   -- an example?
11     A   But I do believe I pointed out to my counsel
12 before.
13     Q   Let me have you look at this, Deposition
14 Exhibit 6, the second page, which is GH 001528.
15     A   (Complying.)
16     Q   I'm reading from the introduction, quote, in
17 2002 the Marketing Research Bureau, Inc. began an
18 extensive marketing research study to determine the
19 major changes that have affected the plasma products
20 market in the United States since the last report was
21 published in 2001.  The survey was part of an ongoing
22 research effort to provide comparable data in other

106
1  regions since the first report was completed in 1974,
2  closed quote.
3      Ms. Sun, were you given a copy of the 2001
4  version of this report that's referenced in Deposition
5  Exhibit 6?
6      A   So this is 2002.  You mean what I was given
7  2001?
8      Q   Yeah.  Were you given the prior report
9  that's referenced here?
10     A   No.  I wasn't even in the company.
11     MR. UDDEN:  Whether you were in the company
12 or not, they could have given you the report.
13     A   Yeah, that one was more historical.  Even if
14 you see here, it's historical.  2001 information was
15 there, too.  Like data from 1989, for example.
16     Q   So there's historical information in
17 Exhibit 6?
18     A   Yeah, right.
19     Q   Can you direct your attention to the last
20 sentence on that introduction.  It says, quote, the
21 following report was completed and delivered to
22 domestic and international subscribing clients in July

107
1  2002, closed quote.  Do you know how many entities
2  received a copy of this --
3      A   I don't know.  It was -- has to be very
4  limited.
5      Q   -- report?
6      Why does it have to be very limited?
7      A   Yeah, because the plasma product and the
8  Recombinate, that kind of blood products only few
9  companies are engaged in.
10     Q   Well --
11     A   And also every year, if you subscribe to
12 that, you know, you can give feedback and see how --
13 what products and what kind of data I wanted to be in
14 the report.
15     Q   So you're suggesting that you made a
16 specific request for specific information to be
17 included in --
18     A   Baxter could have, I didn't.
19     Q   Do you know whether that happened?
20     A   I don't because I would hardly believe, you
21 know, a company would have AWP and market share -- I
22 mean this company would do AWP and market share, all

108
1  those kinds of margins side-to-side on separate pages.
2      Q   I don't understand what you mean.
3      A   You know, by law it's wrong to relate AWP to
4  market share.  That's basically want to sell on the
5  spread.
6      Q   And you believe that information is
7  contained in this report?
8      A   Right.
9      Q   Can you show me where that is?
10     A   I can't find it right now, so that's why I
11 believe it must be in my original document to my
12 counsel.
13     Q   Now, do you know to whom this report was
14 sent?
15     A   The only one I know of is John Park.
16     Q   Okay.  I'm referring back now to the second
17 page of the document that says the report was
18 completed and delivered to domestic and international
19 subscribing clients.  Do you know who the subscribing
20 clients were of the Market Research Bureau report?
21     A   No.
22     Q   That is, do you know whether it's all the

HIGHLY CONFIDENTIAL DEPOSITION OF LINNETTE SUN
CONDUCTED ON TUESDAY, JANUARY 19, 2010

28 (Pages 109 to 112)

109

1  entities, for example, listed on Page GH 001536?
2      **A   No.**
3      Q   So you don't have any information
4  regarding --
5      **A   Competitors.**
6      Q   -- the scope or breadth of the production --
7      **A   Right.**
8      Q   -- or publication of this document?
9      **A   Right, uh-huh.**
10     Q   I show you what's been marked as Deposition
11 Exhibit 10.  Deposition Exhibit 10 is the Complaint
12 filed in the matter under seal in July 2005.  Have you
13 seen this document before?
14     **A   Yes.**
15     Q   We'll spend a great deal of time with this,
16 Ms. Sun.  I'm curious what parts of this document, if
17 any, did you draft?
18     **A   Did I draft?**
19     Q   Yes, ma'am.
20     **A   Draft mean writing?**
21     Q   Yes, ma'am.
22     **A   I don't think I wrote it.  I just told my**

110

1  **counsel what happened.**
2      Q   Okay.  Ma'am, I'm a little curious about
3  what happened.  If you turn, for example, to Paragraph
4  108 of Deposition Exhibit 10.
5      **A   108?  The last page --**
6      Q   It's -- try Page 30.
7      MR. UDDEN:  Yeah.
8      Q   Paragraph 108 on Page 30.
9      **A   Okay.  This paragraph, (indicating)?**
10     MR. UDDEN:  Yeah.
11     Q   So Paragraph 108 alleges that Baxter
12 violated Massachusetts general laws from, and I'm
13 quoting, from at least 1998 to the present by its
14 reporting of false pricing statements regarding its
15 products.  Do you see that?
16     **A   Yes.**
17     Q   So is it your belief that this Complaint
18 seeks damages from at least 1998 forward?
19     MR. UDDEN:  Again, I think -- just object to
20 the extent it calls for a legal conclusion on her
21 part, but you can answer as far as your understanding
22 goes.

111

1      Q   Answer the question.
2      **A   I have to understand the sentence?  So many**
3  **legal terms.**
4      Q   I refer you to Paragraph 108.
5      **A   Yeah.**
6      Q   And Paragraph 108 seeks damages from '98 to
7  the present.
8      **A   Uh-huh.**
9      Q   You see that?
10     **A   Yes.**
11     THE WITNESS:  And what's the law objection?
12     MR. UDDEN:  I put my objection on the
13 record, but you can still answer the question.
14     THE WITNESS:  What's your objection?
15     MR. UDDEN:  I just objected as calling for a
16 legal conclusion, but that doesn't mean that you can't
17 go ahead and answer the question.
18     **A   I think from --**
19     MR. UDDEN:  I put my objection on the
20 record.
21     **A   Yeah, I can't answer all of this, but I**
22 **think Recombinate is one of the big products.**

112

1      Q   That's not my question.  So the question is
2  are you seeking damages from 1998 to the present?
3      **A   Yes.**
4      Q   Now, let me have you turn to Deposition
5  Exhibit 3.
6      **A   Okay.**
7      Q   Let me refer you to Page 6 of 41 at the top.
8      **A   6 of 41, okay.**
9      Q   And in Deposition Exhibit 3, which is the
10 Relators' Memorandum in Opposition to Baxter
11 International, Inc.'s Motion to Dismiss Relators'
12 Complaint, there is the following sentence:  Quote,
13 because the scheme could not have -- could not even
14 have existed before the reporting mechanism changed in
15 2000, prior Complaints and articles discussing other
16 forms of AWP fraud disclose nothing at all and are
17 irrelevant, period, closed quote.
18     Ms. Sun, are you asserting that some
19 reporting mechanism changed in 2000 that would change
20 the basis of your Complaint?
21     MR. UDDEN:  Again, just object to the extent
22 it calls for a legal opinion/conclusion.  Subject to

Case 1:01-cv-12257-PBS Document 6866-2 Filed 01/27/10 Page 30 of 150
HIGHLY CONFIDENTIAL DEPOSITION OF LINNETTE SUN
CONDUCTED ON TUESDAY, JANUARY 19, 2010

29 (Pages 113 to 116)

113

1    that, you can answer the question.

2        Q    You can answer the question.

3        A    I still need to understand your question if
4    you don't mind.

5        Q    Your Complaint seeks damages starting in
6    1998.

7        A    Right.

8        Q    Your Opposition, which was filed very
9    recently which is Deposition Exhibit 3, says that no
10   scheme could even arise until 2000. Which is it?

11           MR. UDDEN: And just same objection, but you
12   can answer the question.

13       A    I think regarding this First Data Bank
14   thing, you know, there are quite a few things in the
15   Complaint.

16       Q    Okay.

17       A    One of them is the First Data Bank. But AWP
18   is just not -- is not just related to AWP, so that
19   could extend it to earlier time period. But
20   regarding -- on top of AWP there's a multiplier of .25
21   that only starts from 2000.

22       Q    So which is your claim? Does your claim

114

1    arise from this notion of First Data Bank and a
2    multiplier, or does your claim concern the general AWP
3    information that you referred to you knew about when
4    you were working at Bayer and you were working at
5    Amgen?

6            MR. UDDEN: Again, just same objection to
7    the extent it calls legal opinion/conclusion on her
8    part, but you can answer the question.

9        Q    Go ahead.

10       A    For First Data Bank it's certainly 2000,
11   starts with 2000, but not the general because Baxter
12   is in a very specific market. You know, has
13   middleman, home care, they can push market share.
14   That thing could extend from earlier time period.

15       Q    So the notion that, that AWP or spread could
16   be used to push market share, that's your complaint as
17   well?

18       A    Yeah.

19       Q    Can you explain to me this First Data Bank
20   thing that you're referring to when I referred you to
21   Exhibit 3?

22       A    Yeah. I've been working in pricing

115

1    reimbursement and reporting pricing to First Data Bank
2    for quite a long time. I mean even before I came to
3    Baxter. When we were trying to determine the price
4    for Advate, the new blockbuster, I connected with
5    First Data Bank and noticed there was a discrepancy
6    between the Redbook and First Data Bank, meaning, you
7    know, First Data Bank added another 25 percent on top
8    of Baxter's AWP price. And I knew First Data Bank was
9    referred -- was used by many Government payors and
10   private payors, so I brought that up to Baxter's core
11   pricing team and said -- saying, look, on top of very
12   inflated AWP price, First Data Bank was putting
13   another 25 percent on top of that making the margin
14   even bigger.

15       So it was -- I was really concerned.
16   Michael Bradley and other team members told -- their
17   kind of argument was First Data Bank was not used by
18   many payors. And so I contacted First Data Bank -- I
19   had all these E-mail, like a chain, but Baxter didn't
20   allow me to have any of those when I left. So I
21   contacted First Data Bank, the manager there, and he
22   wrote me -- I also had my consultant then, we both

116

1    consulted First Data Bank, and they send me an E-mail
2    saying at least 80 percent of Government payors and
3    private payors in the U.S. use First Data Bank as
4    their reimbursement rates, including VA.

5        So I forwarded that E-mail to John Park, if
6    I remember correctly, Nick Poulios, my supervisor, and
7    a consultant then, and they scheduled a meeting with
8    me and Larry Guiheen who was the President of the
9    Bioscience Division.

10       Q    You said you connected with someone at First
11   Data Bank?

12       A    Yes.

13       Q    Who did you connect with?

14       A    I can't remember the name now, but he was
15   the selling -- kind of like a manager, geographic
16   manager for the area.

17       Q    So it was a male, not a female?

18       A    Yeah, it's a male.

19       Q    And what, did you ask that person some kind
20   of questions?

21       A    Yes. I said -- you know, I can't remember
22   the exact E-mail, but basically trying to ask him, you

Case 1:01-cv-12257-PBS  Document 6866-2  Filed 01/27/10  Page 31 of 150
HIGHLY CONFIDENTIAL DEPOSITION OF LINNETTE SUN
CONDUCTED ON TUESDAY, JANUARY 19, 2010

30 (Pages 117 to 120)

117

1  know, if any Government payors or private payors are
2  using that database to refer to as a reimbursement
3  rate.
4      Q   Okay.  When did this communication take
5  place?
6      A   Again, I can't remember exactly date, it's
7  been so long.  It has to be between 2002 and 2003 when
8  we were setting the Advate price.
9          So Nick scheduled a meeting with me, him,
10  and Larry Guiheen, which was very high level because
11  he was almost kind of like the CEO of this division.
12  He brought me in and said he seems to be aware of the
13  problem and he said, but U.S. sales and marketing
14  didn't want you to investigate, to stay away from it.
15      Q   So when did you first come to understand
16  that First Data Bank was increasing prices by 25
17  percent?
18      A   A few months after I arrived at Baxter.  I
19  subscribed to First Data Bank, that database, and also
20  had the Redbook which was a print copy of AWP prices.
21      Q   So you compared --
22      A   The two.

118

1      Q   -- Redbook against --
2          MR. UDDEN:  You've got to let him finish
3  because otherwise when you see the record, it will be
4  very -- so try and let him finish the question before
5  you answer.
6      Q   So in order to do this evaluation, you
7  compared the data published in Redbook to the data
8  published by First Data Bank and you determined that
9  there's a 25 percent increase?
10      A   Uh-huh.
11      Q   Is that correct?
12      A   Yes.
13      Q   You also mentioned your consultant was
14  involved in this communication with First Data Bank?
15          Yes?
16      A   Yes.
17      Q   Who was that?
18          THE WITNESS:  Am I allowed to share that
19  information, or --
20      Q   Yes.
21          MR. UDDEN:  Who was the consultant working
22  for?

119

1      A   Deana Presbella (phonetic).
2      Q   Was she working for Baxter?
3      A   I don't know.  Maybe she's working for
4  Baxter now, I don't know.
5      Q   I just want to know the woman's name.
6      A   Deana Presbella.
7      Q   And who did she work for?
8      A   Worked for the pricing group particularly
9  reporting to me.
10      Q   Was she an individual consultant, or did she
11  work for another company?
12      A   She was an individual consultant.
13      Q   Okay.  And what did you rely upon her for,
14  what kind of information?
15      A   Modeling work, database management, you
16  know, some kind of a follow-up work she did for me.
17      Q   Were you aware that Baxter also contacted
18  First Data Bank and told them not to raise their price
19  by 25 percent?
20      A   That I don't know.
21      Q   You never heard that while you were there?
22      A   Uh-huh.

120

1      Q   If that were true, then, is Baxter at fault
2  at all under your theory as expressed in Exhibit 3?
3      A   I wouldn't make a comment on that because
4  that's really a judgment whether that's right or
5  wrong.
6      Q   But if that's true --
7      A   But the fact that I noticed it, there was a
8  huge discrepancy between the two databases.  And
9  payors used the First Data Bank more than the Redbook.
10  And also what Larry Guiheen told me, to stay away from
11  that.
12      Q   And what year was this again?
13      A   Either the end of 2002 or the beginning of
14  2003.
15      Q   And by that time there had been lots of AWP
16  lawsuits filed, correct?
17      A   Not particular to First Data Bank increase
18  another 25 AWP, there was none there.  It's very
19  unique to Baxter.
20      Q   Did First Data Bank not increase anyone
21  else's prices by 25 percent?
22      A   No, uh-huh.

**121**

1  Q   So it's just First Data Bank's actions that
2  are part of your -- that's what you're complaining --
3  **A   Not just.  You know, to provide spreads,**
4  **kind of economic incentives to home care providers to**
5  **increase market share is wrong to begin with.**
6  Q   So that's one argument, right?
7  **A   Yes.**
8  Q   You've said that creating spreads is wrong;
9  that's your position?
10  **A   Right.**
11  Q   But you knew about those lawsuits when you
12  were at Bayer, when you were at --
13  **A   They are different.  They're very different.**
14  Q   Why?
15  **A   I was talking to very different market**
16  **situations.**
17      THE WITNESS:  I don't know whether I should
18  elaborate on that, but --
19  Q   Yes, I'm asking you why.
20  **A   Okay.  For example, J&J, they have retail**
21  **markets so there's no middleman.  Home care is really**
22  **a middleman.  You know, usually if you have**

**122**

1  **cholesterol, doctor give you a script, you go to**
2  **retail pharmacy, you get your script, and retail**
3  **pharmacy get reimbursed from the insurance company,**
4  **okay?  They do have a little margin that is service**
5  **administration fee.**
6      **But it's not, not the same thing for**
7  **hemophilia patients.  They go to doctor, doctor give**
8  **them a script, but home care go and buy that script,**
9  **okay, and they get reimbursed.  So they buy at lower**
10  **price and get reimbursed at higher price.  So they get**
11  **much, much bigger kind of margin than the retail**
12  **pharmacists, okay, because they also relate to those**
13  **doctors they can, you know, make profits on those**
14  **patients and the reimbursement, but not the retail**
15  **market.  You go there, you know, the doctors -- the**
16  **providers actually don't get involved in reimbursement**
17  **so there's no incentive for doctor to write you a**
18  **script.**
19  Q   Were there any AWP cases that you're aware
20  of while at J&J or at Amgen where doctors actually
21  were paid a reimbursement for a particular drug?
22  **A   No.  It's a very unique situation for**

**123**

1  Baxter.
2  Q   How about, you mentioned -- in your
3  Complaint you referenced in fact the litigation
4  against TAP.  Do you remember that?
5  **A   Yes.**
6  Q   Okay.  And you said in your Complaint that
7  your understanding of the AWP was informed by what
8  happened in the TAP case.
9  **A   The TAP case has some kind of similarity but**
10  **not to that extent.**
11  Q   Why?  Why does it have a similarity?
12  **A   Because some doctors' office, very few of**
13  **them probably do, you know, buy the drug and get**
14  **reimbursement like Baxter situation.  But Baxter**
15  **almost hundred percent market is like that.  You know,**
16  **TAP, I think for some drugs, it may be administered in**
17  **the hospital and doctors can get the drug and give to**
18  **the patient and get reimbursed for.**
19  Q   Wasn't TAP a chemotherapy that was
20  reimbursed in the doctor's office?
21  **A   Not all the products.  If it's oral it's**
22  **not, and if it's retail drug it's not.**

**124**

1  Q   How about if it's an injection?
2  **A   Probably if it's an injection, but --**
3  Q   So that would be the same model, right?
4  **A   No.**
5  Q   Why?
6  **A   It's hospital.  It's home care.  It's**
7  **different.  Home care is almost served as a pharmacy,**
8  **not a hospital.**
9  Q   But again, the doctor's office, again, you
10  referenced the Lupon (phonetic) litigation in your
11  Complaint, right?
12  **A   I don't know.  I don't remember the**
13  **Complaint.  I don't really know.  I can't remember**
14  **now.  But when you talk about it may have some**
15  **similarity but I don't think it's exact.  Home care**
16  **situation is very unique to this market.  Hemophilia**
17  **patients.**
18  Q   Let's take a look at Deposition Exhibit 10.
19      In Paragraph 2 --
20  **A   Paragraph 2.**
21  Q   -- it says, Baxter controlled and published
22  AWP by misreporting the WAC.  Can you explain to me

HIGHLY CONFIDENTIAL DEPOSITION OF LINNETTE SUN
CONDUCTED ON TUESDAY, JANUARY 19, 2010

32 (Pages 125 to 128)

125

1   what that means?
2       A   Usually when you report to First Data Bank,
3   you are supposed to specify whether that's a WAC or
4   that's an AWP.  If it's a WAC, they put 25 percent on
5   top of that.  If it's AWP, they'll keep it as it is,
6   okay?  So there's a 20 (sic) percent kind of an
7   increase to generate this AWP.
8       And the -- Baxter obviously reported to the
9   First Data Bank as a list, you know, on its list.
10  It's neither WAC nor AWP, right?
11      Q   So did -- what is WAC?
12      A   WAC is weighted average -- oh, I can't
13  remember.  Maybe weighted average cost, or wholesale
14  average cost.  Wholesale average cost.
15      MR. UDDEN:  Here, (indicating).
16      A   Yeah, wholesale acquisition cost.
17      Q   So did Baxter report a wholesale acquisition
18  cost to First Data Bank?
19      A   No, they reported list obviously in the, in
20  the Declaration by Greg.
21      Q   So they did not report --
22      A   No, they reported list.  That's why First

126

1   Data Bank had fight with them because by law they're
2   supposed to add 25 percent on wholesale acquisition
3   cost reported by the company.
4       Q   Who's supposed to add 25 percent by law?
5       A   First Data Bank.
6       Q   According to what law?
7       A   There's a law, obviously.  I think early on
8   First Data Bank -- there's a document -- I don't
9   remember when I saw it -- saying, you know, beginning
10  from 2000, year 2000 First Data Bank is supposed to
11  keep -- to take the WAC from companies and add 25
12  percent to generate this AWP for reimbursement.
13      Q   And what document are you referring to?
14      A   No, it's not in here, but if you look at
15  Greg's deposition --
16      MR. UDDEN:  No, he's just asking you.  You
17  referred to a document.  If you can just describe the
18  document you're talking about.
19      That's what you're asking, right?
20      A   Yeah, I don't have the document here, but
21  based on the conversations and all of that with First
22  Data Bank.

127

1       Q   But you immediately, when I asked the
2   question, turned to -- or started to turn to Mr.
3   Hamilton's Declaration.
4       A   Yeah, that was -- there was one sentence
5   there, too.
6       Q   So there was something in Mr. Hamilton's
7   Declaration that was going to help you explain your
8   answer?
9       A   Yeah.  You want me to do that?
10      Q   Yeah, can you find that?
11      MR. UDDEN:  That's not in that document,
12  that's in --
13      A   In the memorandum, yeah.  This one,
14  Exhibit 3.
15      MR. UDDEN:  I think it's Exhibit 2
16  actually -- no, maybe Exhibit 3.
17      A   Yeah, Exhibit 3.  And it's, it's Page -- 29
18  is mine.
19      (Reviewing.)
20      No, this is all mine, not Greg.
21      Q   Let me show you what's been marked as
22  Deposition Exhibit 11.

128

1       (Exhibit 11 was marked for identification
2   and was attached to the transcript.)
3       A   Yeah, that's Greg, right.
4   BY MR. JACKSON:
5       Q   Deposition Exhibit 11 is a Declaration of
6   Greg Hamilton.  Have you seen that before?
7       A   Yes.
8       Q   So you were getting ready to reference --
9   you were just getting ready to answer my question
10  based upon Mr. Hamilton's Declaration.
11      A   Yeah.  There were other documents, and in
12  the conversation between me and First Data Bank as
13  well.  I don't have anything in writing.  I was at the
14  time doing research and investigation myself.
15      Q   And you're researching this issue yourself?
16      A   Yeah, like a discrepancy between First Data
17  Bank and the Redbook, okay?  And if you look at Page 2
18  on Greg's Declaration --
19      Q   You're referencing now Deposition
20  Exhibit 11?
21      A   Yes.  Page 2.
22      Q   Yes.

HIGHLY CONFIDENTIAL DEPOSITION OF LINNETTE SUN
CONDUCTED ON TUESDAY, JANUARY 19, 2010

33 (Pages 129 to 132)

---

129

1    A    Paragraph 8.
2    Q    Yes.
3    A    And you have here, somewhere in the middle,
4  she told me that Baxter sent a letter saying that list
5  price was $1.31 and they wanted the AWP reported as
6  $1.31, but First Data Bank couldn't do that.
7    Q    So your answer to me is based upon your
8  review of Mr. Hamilton's Declaration which is based
9  upon recitation of information that he was provided by
10  Kaye Morgan at First Data Bank, correct?
11    A    No.  I was aware of that even when I was
12  doing the investigation.
13    Q    And how did you become aware of that?
14  Someone at First Data Bank told you that?
15    A    Yes.
16    Q    Who?
17    A    A woman.  I don't remember the name now.
18    Q    How many different people did you talk to at
19  First Data Bank?
20    A    Two.
21    Q    A man and a woman?
22    A    At least two.

---

130

1         Man and woman.
2    Q    How many different times did you call them
3  as part of your investigation?
4    A    I can't remember exact how many times but I
5  think quite a few.  And Deana, my consultant, called
6  as well.  We were both upset about the situation.
7    Q    Does she still work for Baxter, do you know,
8  Deana?
9    A    I don't know.  No, I don't know.
10    Q    Have you spoken with her at all in
11  connection with this case?
12    A    I don't think so.
13    Q    And when did you first learn that Baxter
14  reported a list price?
15    A    When did I learn?
16    Q    Yes.
17    A    At the time of the investigation.
18    Q    So again, from your investigation and your
19  discussion with First Data Bank, that was the first
20  time you learned that Baxter had reported a list
21  price?
22    A    Yeah.

---

131

1    Q    Okay.
2    A    And the good news for Baxter then is we even
3  have a higher margin than our competitors because, you
4  know, it's 1.31 plus 25 percent, and the selling price
5  is 81 cents, for example.  And most of the home care
6  providers, they would refer, you know, they would look
7  at the -- they would print out actually those AWP
8  prices from First Data Bank.
9    Q    How do you know that?
10    A    The marketing people told me, and I knew
11  that for a fact because I've been doing pricing
12  research so long.
13    Q    Did you talk with someone at the home health
14  care companies?
15    A    No, I didn't.  But Julia, for example, she
16  was a product manager for ARALAST, and when -- I was
17  strongly against this kind of margin thing and said,
18  you know, people should really use the drug based on
19  clinical needs and clinical benefits.  She said,
20  Linnette, you don't know because you should see, they
21  posted all those things on the wall, and you should
22  really go to the field and see how they do those kinds

---

132

1  of things.  It's all economic incentive.
2    Q    Who was that that you were talking to?
3    A    Jill was one of them, Ken, like the two
4  Marketing Directors.
5    Q    Jill's last name, please?
6    A    Kademos?  I can't remember.
7         And Julia, again.
8    Q    Julia?
9    A    Julia, yeah.
10    Q    What's her last name?
11    A    I don't remember.
12    Q    Okay.  These are Baxter personnel?
13    A    These are Baxter.  If you ask them who the
14  product managers or directors at the time, they should
15  know.
16    Q    Now, in your discussions with First Data
17  Bank regarding this, which drugs did you talk to them
18  about?
19    A    I didn't talk to them -- I don't think I
20  talked any -- about any specific product because they
21  had this 25 percent jack-up for all products, so --
22    Q    First Data Bank did?

---

Case 1:01-cv-12257-PBS  Document 6866-2  Filed 01/27/10  Page 35 of 150
HIGHLY CONFIDENTIAL DEPOSITION OF LINNETTE SUN
CONDUCTED ON TUESDAY, JANUARY 19, 2010

34 (Pages 133 to 136)

133

1    A    Right.
2    Q    And was it just Baxter products, or all
3  products?
4    **A    Just Baxter products.**
5    Q    Okay.
6    **A    Yeah.  I have been in this industry for 10**
7  **years, worked for many products in the pricing**
8  **numerous times, and I have never seen this thing with**
9  **any other company.  I was also consultant to quite a**
10  **few companies, yeah.**
11    Q    And you had never seen --
12    **A    No.**
13    Q    -- First Data Bank mark up anyone else's --
14    **A    No.**
15    Q    And you don't remember who you spoke with at
16  First Data Bank?
17    **A    No.  It's been like seven years.**
18    Q    Have you turn to Paragraph 39 of Deposition
19  Exhibit 10.  It's on Page 14.
20    **A    (Complying.)**
21    Q    Paragraph 39 says, according to your
22  knowledge obtained by Relator Greg Hamilton, FDB

134

1  refused to accept Baxter's list price and instead
2  submitted a letter stating that their list price was
3  1.31 and they wanted their AWP to be described as
4  1.31.  Do you see that?
5    **A    Yes.**
6    Q    Have you had any conversations with Mr.
7  Hamilton about his conversation with First Data Bank?
8        MR. UDDEN:  And again, other than
9  conversations that would involve your lawyers.
10    **A    No.**
11    Q    Do you remember ever speaking with Kaye
12  Morgan at First Data Bank?
13    **A    I spoke with a woman, but I don't remember**
14  **the name.**
15    Q    Okay.  Have you turn to Paragraph 49.
16    **A    (Complying.)**
17    Q    You reference in Paragraph 51 and in 49 and
18  50 as well a volume committed contract.  Do you
19  remember which volume committed contract you were
20  referring to here?
21    **A    I can't remember the exact contract names.**
22  **I think they were like the top maybe six home care**

135

1  providers.
2    Q    Well, but in Paragraph 51 you refer to a
3  contract, only one such contract.
4    **A    No, no, it's more than one.**
5    Q    So the allegation here is wrong?
6    **A    It's like about these contracts.  Why there**
7  **was only one you said?**
8    Q    I'm referencing, Ms. Sun, Paragraph 51.
9    **A    Yeah, 50 --**
10    Q    The third sentence says, Ms. Sun had the
11  opportunity to see only one such contract which was
12  passed from hand to hand at a pricing meeting in April
13  2003.
14        MR. UDDEN:  He's asking about that
15  particular contract.
16    **A    An example.**
17    Q    I'm asking about that contract.
18        MR. UDDEN:  And what was the question again?
19    Q    Did you see only one contract that had a
20  VCC, only one?
21    **A    I can't remember.  You know, again, this is**
22  **in 2003, one of the meetings.  I had numerous**

136

1  **meetings, meetings back-to-back then.  You know, I**
2  **can't remember exactly what --**
3    Q    So you can't tell me now whether you saw one
4  or more than one?
5    **A    Yeah, I can't tell you.**
6    Q    Do you remember any particular company's
7  name with whom -- you saw?
8    **A    I don't know which one I saw, but Caremark**
9  **was one of the things that were mentioned, were**
10  **discussed.**
11    Q    What's Caremark?
12    **A    It's a home care name.**
13    Q    So do you believe you saw a contract with
14  Caremark, or you're just guessing right now?
15    **A    I'm not so sure.**
16        MR. JACKSON:  Let's go off the record.
17        (Discussion off the record.)
18        (Luncheon recess taken at 12:00 p.m.)
19        AFTERNOON SESSION (1:03 p.m.)
20  BY MR. JACKSON:
21    Q    Ms. Sun, can I have you turn to Page 13 of
22  the Complaint in this case which is Exhibit 10.

HIGHLY CONFIDENTIAL DEPOSITION OF LINNETTE SUN
CONDUCTED ON TUESDAY, JANUARY 19, 2010

35 (Pages 137 to 140)

---

137

1    A   (Complying.)
2        Page 13?
3    Q   Yes.
4        Paragraph 36 contains a great deal of
5    information regarding unit pricing, et cetera.  Do you
6    see that language in Paragraph 36?
7    A   Yes.
8    Q   Did you provide this information to the
9    Complaint?
10   A   I can't remember exactly, it's been so long,
11   but I'm well aware of this information.  I knew this
12   information for a fact.
13   Q   How did you find the pricing information
14   contained in Paragraph 36?  Where did you go to find
15   that information?
16   A   I guess the AWP, you can get it online.
17   Q   Okay.
18   A   You know, First Data Bank and Redbook, AWP
19   sometimes is published.
20   Q   You'll see the phrase, quote, Baxter has
21   reported to FDB that the WAC for Recombinate is 1.30
22   per unit, closed quote.  Do you see that?

---

138

1    A   Yes.
2    Q   Do you know where that data came from?
3    A   First Data Bank.
4    Q   So you believe that First Data Bank
5    published a WAC for Recombinate as a dollar-thirty?
6    A   Yes, and then added 25 percent on top of
7    that, so it became 1.62.
8    Q   So do you believe that you provided this
9    information, or did you take the 1.6250 and back out
10   the 25 percent?
11   A   I don't think it really matters.
12   Q   It does matter to me, Ms. Sun.  It matters
13   to me because I'm trying to determine where the
14   information came from.  So did you know this data --
15   A   Uh-huh.
16   Q   -- the $1.30, the $1.6250, the so-called
17   spread --
18   A   Uh-huh.
19   Q   -- the payments, did you provide this
20   information to the Complaint?
21   A   Yes, I did.
22   Q   Okay.

---

139

1    A   I think so.
2    Q   You think so, or you did?
3    A   I did.
4    Q   Okay.
5    A   (Shrugging shoulders.)
6    Q   And where did you get this information?
7    A   First Data Bank publishes 1.62.
8    Q   Okay.
9    A   That part.  I don't remember exactly whether
10   1.30 was in there or not.  You know, sometimes they
11   just publish AWP, not a WAC, so -- sometimes both.  So
12   it's been some time now.  I couldn't remember exactly.
13   But at the time provide this 1.30 it was always -- it
14   was also fresh in my mind because I just left the
15   company.  I know what they reported.  I know what they
16   reported.
17   Q   But you'd left the company nearly three
18   years before this, correct?
19   A   No, it's -- no, two, about two, yeah.  I --
20   sometimes I have very good memory because I'm doing
21   economics and pricing.
22   Q   Yeah, I understand.  Absolutely.

---

140

1    A   Yeah.
2    Q   I just wanted to make sure that you provided
3    this information, or if you didn't, I wanted to try to
4    understand where the information came from.
5    A   Uh-huh.
6    Q   Okay.  And did you also provide the
7    information contained in this paragraph about an
8    actual acquisition cost of 89 cents per unit?
9    A   I think I was part of that, but Greg was
10   also there.
11       THE WITNESS:  Right?
12   Q   Greg was also where?
13   A   Greg was also generating all those prices
14   with me.
15   Q   You think Greg may have had some input to
16   this paragraph?
17   A   Yeah, too.
18   Q   Do you know where he got his information?
19   A   I'm not so sure, but he's been in the field
20   for a long time, so --
21   Q   So it's possible that you and he
22   collaborated on the data that's contained in this

---

Case 1:01-cv-12257-PBS Document 6866-2 Filed 01/27/10 Page 37 of 150
HIGHLY CONFIDENTIAL DEPOSITION OF EINNETTE SUN
CONDUCTED ON TUESDAY, JANUARY 19, 2010

36 (Pages 141 to 144)

141

1  paragraph?
2     **A   I would say it's possible.**
3     Q   You just don't remember?
4     **A   I remember some, but not like for sure, like**
5  **a hundred percent.**
6     Q   How about in Paragraph 37 on the next page
7  of Exhibit 10, did you provide the data in that
8  paragraph regarding 85 percent (sic) of AWP or actual
9  acquisition cost?
10    **A   Uh-huh.**
11    Q   You remember that you provided this, or was
12 this collaborative as well?
13    **A   I'm not so sure whether Greg had some input**
14 **as well, but that was my information as well.**
15    Q   Let me have you turn to Paragraph 39 then.
16    **A   Uh-huh.**
17    Q   Paragraph 39 reads as follows:  According to
18 knowledge obtained by Relator Greg Hamilton, FDB
19 refused to accept Baxter's list price and instead
20 submitted a letter stating that their list price was
21 $1.31 and they wanted their AWP to be described as
22 $1.31, closed quote.  Do you see that?

142

1     **A   Yes.**
2     Q   Is it possible that $1.31 in the paragraphs
3  that we've been looking at or the $1.30 came from Mr.
4  Hamilton and not you?
5     **A   It should come from both of us, yeah,**
6  **because I was well aware of this information when I**
7  **was at Baxter.**
8     Q   Do you know why Paragraph 39 says that
9  according to information obtained by Hamilton and does
10 not mention your name?
11    **A   My 1.31 was already in Paragraph 36, so he**
12 **kind of confirmed what I said.**
13    Q   All right.  So you believe he confirmed
14 this --
15    **A   Yeah, I think so.**
16    Q   -- based upon talking with First Data Bank;
17 is that what you think?
18    **A   That's what I think, but I don't know**
19 **whether that's actually he did or --**
20    Q   Okay.  Thank you.
21       (Exhibit 12 was marked for identification
22 and was attached to the transcript.)

143

1  BY MR. JACKSON:
2     Q   Ms. Sun, let me show you two Exhibits,
3  Deposition 12 and Deposition 13.
4       (Exhibit 13 was marked for identification
5  and was attached to the transcript.)
6  BY MR. JACKSON:
7     Q   Let me first refer you to the letter that is
8  Deposition Exhibit 12.  You see that letter dated
9  April 22, 2005?
10    **A   Yes.**
11    Q   You ever seen this document before?
12    **A   (Reviewing.)**
13 **I really can't remember.  You know, that**
14 **happened in 2005.  I've seen so many documents since**
15 **the case was filed.**
16    Q   Can you look at Deposition Exhibit 13,
17 please?
18    **A   Uh-huh.**
19    Q   I'll represent to you, Ms. Sun, that
20 Deposition Exhibit 13 is Exhibit 1 referenced in
21 Deposition Exhibit 12, and was produced to us by Mr.
22 Kleiman.  Have you ever seen this document before,

144

1  Exhibit 13?
2     **A   I don't remember.**
3     Q   Do you remember creating this document?
4     **A   I've -- I think I've seen some of the**
5  **numbers, but I don't remember specifically the numbers**
6  **in this format.**
7     Q   Did you create this document?  Do you
8  believe that you created this document?
9     **A   I don't remember.**
10    Q   You'll note in Exhibit 12, Ms. Sun, this is
11 an April 22, 2005 letter from Mr. Kleiman to the
12 Attorney General and Michael Tice, who's an Assistant
13 United States Attorney in Denver.  Do you see that?
14    **A   Uh-huh.**
15    Q   The first sentence says, quote, I am pleased
16 to forward to you the Complaint along with this
17 statement disclosing all material evidence, period,
18 closed quote.  Do you see that?
19    **A   Yes.**
20    Q   Do you believe that by this time you had
21 provided the binder that you said you had and provided
22 to your lawyer but I don't believe we'd received?  Do

Case 1:01-cv-12257-PBS Document 6866-2 Filed 01/27/10 Page 38 of 150
HIGHLY CONFIDENTIAL DEPOSITION OF LINNETTE SUN
CONDUCTED ON TUESDAY, JANUARY 19, 2010

37 (Pages 145 to 148)

145

1 you believe you had provided that to Mr. Kleiman by
2 that time?
3    A  Again, don't remember.  It's not the
4 beginning of the, you know, the case, but I don't
5 know.  But it was provided sometime later, after the
6 Complaint.
7    Q  It was provided to Mr. Kleiman after the
8 Complaint?
9    A  Yeah, I think so.  Maybe at the Complaint.
10 I don't remember for sure, but it was some time ago.
11    Q  You'll see that the letter talks about all
12 material evidence and -- but includes only two
13 documents --
14    A  Yeah.
15    Q  -- the AWP summary that is Exhibit 13 and
16 then the Plasma Fractions Market document that we've
17 previously marked as Deposition Exhibit 6.  Do you see
18 that?
19    A  Yeah, I see that.
20       So it could be like I have forwarded to Mark
21 Kleiman.  Maybe he didn't share this, he didn't use
22 this as one of the supporting evidence.  I just don't

146

1 want to speculate on this what happened.
2    Q  Okay.  So to your knowledge, this is the
3 only supporting evidence that was provided to the U.S.
4 Attorney's Office?
5    A  I don't know because I didn't get -- I
6 wasn't engaged in any conversation with him --
7    Q  Okay.
8    A  -- or communication.
9    Q  Let me show you what's been marked as
10 Deposition Exhibit 14.
11       (Exhibit 14 was marked for identification
12 and was attached to the transcript.)
13    A  Okay.
14 BY MR. JACKSON:
15    Q  Deposition Exhibit 14 is a draft
16 Complaint --
17    A  Draft Complaint.
18    Q  -- with your name and Mr. Hamilton's name.
19    A  So this was after this Complaint, Exhibit
20 10?
21    Q  This was recently produced to us by Mr.
22 Kleiman.

147

1    Q  Have you ever seen this draft Complaint
2 before?
3    A  I may have, but I can't remember exactly
4 whether that's the draft I've seen.
5    Q  Did you draft this document?
6    A  Did I draft -- write?
7    Q  Yes, did you write it?
8    A  No.
9    Q  Again, Ms. Sun, I'll represent to you Mr.
10 Kleiman provided us this document on January 4, 2010.
11    A  So that's quite recent, then.
12    Q  Yes, it is.
13       Now, can I have you compare, please, the
14 Complaint in this matter, which is Exhibit 10 -- have
15 you pull that out --
16    A  Yes.
17    Q  -- and turn to Paragraphs 53 through 61.
18       MR. UDDEN:  Page 18.
19    A  22 -- so this is 18?
20       MR. UDDEN:  You're on Exhibit 10?
21       MR. JACKSON:  Page 10 of Exhibit 18.
22       MR. UDDEN:  Page 18 of Exhibit 10?

148

1       MR. JACKSON:  Page 18 of Exhibit 10,
2 correct.
3    A  Okay.
4       MR. UDDEN:  You have those?
5 BY MR. JACKSON:
6    Q  You see those allegations called Baxter's
7 conduct violated the Federal Medicaid Program's Rebate
8 and Best Price Reporting Requirements.  Do you see
9 that?
10    A  Yeah.
11    Q  Can I now have you turn to Page 22 of
12 Exhibit 14, the draft Complaint that I just showed
13 you.
14    A  22, okay.
15    Q  You will note that the Rebate and Best Price
16 Reporting Requirements of the Complaint are not in the
17 draft Complaint.  Do you see that?
18    A  I haven't read the whole thing, but I just
19 have to believe you.
20    Q  Well, feel free to take the time and compare
21 the two and see if you can find the rebate and best
22 price allegations in the draft Complaint.

Case 1:01-cv-12257-PBS Document 6866-2 Filed 01/27/10 Page 39 of 150
HIGHLY CONFIDENTIAL DEPOSITION OF LINNETTE SUN
CONDUCTED ON TUESDAY, JANUARY 19, 2010

38 (Pages 149 to 152)

149

1    A   Okay.
2        (Reviewing.)
3        Okay.
4    Q   Did you make a decision to add those
5 allegations to this Complaint, you personally?
6    A   You mean remove, or add?
7    Q   Add.  It wasn't in the draft, it was in the
8 Complaint that was filed.
9    A   Oh, this was like 2005, and this was like
10 2010.
11       MR. UDDEN:  No.
12   Q   Ms. Sun, Exhibit 14, which is the draft
13 Complaint just produced to us by your counsel --
14   A   Uh-huh.
15   Q   -- Mr. Kleiman, has a date on it of January
16 5, 2010.  That probably is when he printed it.  But he
17 has represented to us that that was a draft Complaint
18 that was prepared in advance of the Complaint that is
19 Exhibit 10.
20   A   Okay.  I see.  Now I understand.
21   Q   So now, referring to Exhibit 10, the rebate
22 and best price reporting allegations, did you make the

150

1 decision to add those allegations to this Complaint?
2    A   That was in 2005, right, the decision to add
3 that?
4    Q   When the Amended Complaint was filed.  It
5 was filed in 2005.
6    A   Yeah.  Again, I can't -- there have been
7 quite a few -- there were quite a few discussions
8 between me and the counsel.
9    Q   Okay.
10   A   So we discussed many things about, you know,
11 lots of information even after the Complaint.  So I
12 don't remember whether it was me who wanted to add
13 this or it was someone else.
14   Q   I see.  So you don't remember whether it was
15 you, or Mr. Hamilton, or somebody else?
16   A   Right, right.
17   Q   You just don't remember?
18   A   Right, I just don't remember.  I remember
19 all these discussions going back and forth between the
20 attorneys and me and Greg.
21   Q   Can I have you turn on Exhibit 14 to
22 Page 24?

151

1    A   (Complying.)
2        Okay.
3    Q   See the note in the bottom in bold that
4 says, how do we work in volume committed contracts as
5 a kickback?
6        MR. UDDEN:  You're -- 24, the next page.
7    Q   Page 24.
8        MR. UDDEN:  (Indicating.)
9    Q   You see that?
10   A   Uh-huh.
11   Q   Did you draft that?
12   A   You mean write, right?
13   Q   I mean write.
14   A   No.
15   Q   Do you know who did write that?
16   A   One of the counsels I would believe.
17   Q   But again, you believe that, do you know who
18 wrote that?
19       THE WITNESS:  Laurel or Mark?
20   A   I don't know which attorney.
21   Q   Now, on the same draft Complaint, if you
22 turn to Page 21.  Again, this is Exhibit 14.  You see

152

1 the language of Paragraph 48 it says, quote, Ms. Sun
2 is informed and believes and based thereon alleges
3 that.  Do you see that language?
4        MR. UDDEN:  Right here, (indicating).
5    A   Yes.
6    Q   That language was removed from the Complaint
7 that was eventually filed which is Exhibit 10.  Did
8 you remove that language, is informed and believes?
9    A   Did I remove the language?
10   Q   Yes, ma'am.
11   A   Personally?
12   Q   Yes, ma'am.
13   A   No.
14   Q   Did you express concern that you would not
15 be able to say that you had knowledge or belief
16 regarding volume committed contracts?
17   A   I don't remember doing so.
18   Q   Have you ever looked at the statutory cite
19 there, 42 US 1396r-8(C)?  You ever looked at that?
20   A   That U.S. statute?
21   Q   Yes.
22   A   I think -- I've seen lots of statutes, but I

Case 1:01-cv-12257-PBS   Document 6866-2   Filed 01/27/10   Page 40 of 150
HIGHLY CONFIDENTIAL DEPOSITION OF LINNETTE SUN
CONDUCTED ON TUESDAY, JANUARY 19, 2010

39 (Pages 153 to 156)

153

1  don't remember the number.
2     Q   Okay.  Do you have actual knowledge of the
3  information that Baxter reported to the Government
4  regarding products that are named in the Complaint,
5  particularly with regard to how AMP and BP is
6  calculated?
7     A   It's a pretty long sentence.  Can you
8  repeat?
9        MR. JACKSON:  Could you read that back?
10       (Record read.)
11       MR. UDDEN:  I just want to object to the
12  question as vague and ambiguous because you're talking
13  about reporting and then you're talking about
14  calculating.
15       So do you understand the question?
16    Q   Go ahead and answer the question.
17       MR. UDDEN:  If you can understand it.
18    A   I don't understand the question.  It's
19  confusing to me.
20    Q   Is it because you quarrel with the notion
21  that anything is calculated?
22    A   That's one of them.

154

1     Q   Okay.  What's the other reason you quarrel
2  with it?
3     A   Again, I don't fully understand the
4  sentence.
5     Q   Okay.  I'm trying to understand the breadth
6  of your knowledge --
7     A   Okay.
8     Q   -- regarding the information that Baxter
9  gave to Government agencies, particularly CMS -- do
10  you know what CMS stands for?
11    A   Yes, of course.
12    Q   What?
13    A   It's the Medicare, you know, payors, the
14  Government, how they do Medicare and Medicaid.  In
15  most cases it's the reimbursement.  It's the, you
16  know, central Government, biggest payor, the Medicare
17  program.
18    Q   So I'm trying to understand your direct
19  knowledge of the information that Baxter provided to
20  CMS regarding best price, okay?
21    A   Uh-huh.
22    Q   So what can you tell me about your actual

155

1  knowledge of what Baxter provided to CMS?
2     A   Again, like Michael Bradley would update the
3  core pricing group what was Baxter's AMP.  He
4  actually, if I have access to my E-mail.  Then he
5  actually circulated a document, AMP's for each
6  different states and each different plan.  I don't
7  actually calculate those things.  I don't believe they
8  should be calculated.  They should be surveyed and
9  reported to, the lowest price to the Government.
10    Q   And it should be surveyed by whom, a third
11  party?
12    A   Yeah, usually by a third party.
13    Q   And would that mean the Government, or
14  someone other than the Government?
15    A   Yeah, the Government contracts some
16  companies.  Michael Bradley should know that, know how
17  many major payors they would survey and how they
18  derive -- there's a formulary kind of published by
19  CMS.
20    Q   Again, I'm trying to understand what your
21  knowledge is, not what Michael Bradley's knowledge is,
22  okay?  So I'm trying to understand what you're basing

156

1  your allegations of the Complaint on.
2        It sounds as if Mr. Bradley circulated to
3  you documents relatively routinely that included data
4  regarding AMP and BP?
5     A   Yeah, right.
6     Q   Do you believe that that information that
7  Mr. Bradley circulated was wrongful or inaccurate in
8  any way?
9     A   Inaccurate.
10    Q   And how was it inaccurate?
11    A   Because I had all those -- I had access to
12  all the pricing information, you know, market
13  research, sales data we have, and I compared his sale
14  and AMP to market prices and they're higher.
15    Q   And the documents that you were using to
16  compare, is that in the notebook that I haven't yet
17  seen?
18    A   That's one of them.
19    Q   But you don't have any other documents in
20  your personal possession that would help me reengineer
21  the analysis that you undertook; is that correct?
22    A   I don't have anything in my personal

157

1  possession, but Simon-Kucher price information should
2  be helpful to you if you can get a copy from Baxter.
3      Q   Okay.
4          MR. JACKSON:  Let's go off the record for a
5  second.
6          (Discussion off the record.)
7          MR. JACKSON:  Ms. Sun, you've indicated that
8  there may have been documents that are in your
9  possession or your counsel's possession that we've not
10  yet received.  If in fact we need to get additional
11  documents, we might have to ask additional questions
12  that relate to jurisdiction.  So we are leaving this
13  deposition open on that basis, reserving our right, to
14  the extent you have not produced jurisdictional
15  documents, that we can ask you questions about those
16  documents.
17         Subject to that reservation of rights, I
18  have no further questions at this time.
19         MR. UDDEN:  I have no questions.
20         Go off the record for a moment.
21         (Discussion off the record.)
22         MR. JACKSON:  We should go on the record if

158

1  you want to correct something.
2          THE WITNESS:  I just want to give you
3  information.  This probably is not mine, it's Greg
4  (indicating).
5          MR. JACKSON:  Let's go ahead get back on the
6  record.
7          Ms. Sun, at the end of our discussion you
8  indicated, or you thought you might indicate you had
9  some more -- additional information and you're
10  pointing to Exhibit 6.  What is it you wanted to tell
11  me?
12         THE WITNESS:  What I want to tell you, after
13  I kind of review briefly on this, this probably is a
14  copy Greg Hamilton can purchase from like a more
15  pharmacy program.  But it was specific to Baxter, the
16  one specific to Baxter, the one I have I think have
17  more Baxter-related, more Baxter-needed information.
18         MR. JACKSON:  And again, you're going to get
19  that information, and we'll make a formal request.
20  Send the letter to you, or Mr. Kleiman?
21         MR. UDDEN:  Could you send it to both of us?
22         MR. JACKSON:  Sure, of course.

159

1          MR. UDDEN:  Great.
2          MR. JACKSON:  Anything else you need to
3  clear up or clarify about any of these Exhibits
4  besides Exhibit 6?
5          THE WITNESS:  That's the only thing I want
6  to clarify right now.
7          MR. JACKSON:  Okay.  Subject to the same
8  reservation, we can suspend this deposition.
9          (Signature having not been waived, the
10  examination of Linnett Sun was concluded at
11  1:31 p.m.)
12
13
14
15
16
17
18
19
20
21
22

160

1          ACKNOWLEDGMENT OF DEPONENT
2      I, Linnette Sun, do hereby acknowledge that I
3  have read and examined the foregoing testimony, and
4  the same is a true, correct and complete transcription
5  of the testimony given by me, and any corrections
6  appear on the attached Errata sheet signed by me.
7
8
9  _____      _____
10    (DATE)                   (SIGNATURE)
11
12
13
14
15
16
17
18
19
20
21
22

HIGHLY CONFIDENTIAL DEPOSITION OF LINNETTE SUN
CONDUCTED ON TUESDAY, JANUARY 19, 2010

41 (Pages 161 to 163)

161

1       CERTIFICATE OF SHORTHAND REPORTER/NOTARY PUBLIC

2           I, Dawn M. Hart, Registered Professional

3       Reporter, the officer before whom the foregoing

4       proceedings were taken, do hereby certify that the

5       foregoing transcript is a true and correct record of

6       the proceedings; that said proceedings were taken by

7       me stenographically and thereafter reduced to

8       typewriting under my supervision; and that I am

9       neither counsel for, related to, nor employed by any

10      of the parties to this case and have no interest,

11      financial or otherwise, in its outcome.

12          IN WITNESS WHEREOF, I have hereunto set my hand

13      and affixed my notarial seal this 19th day of January

14      2010.

15      My Commission Expires:

16      January 1, 2013

17

18

19      _____

20      NOTARY PUBLIC IN AND FOR THE

21      STATE OF MARYLAND

22

163

1               E R R A T A   S H E E T

2           IN RE:  Pharmaceutical Industry AWP Litigation

3       PAGE     LINE     CORRECTION AND REASON

4       ____    ____     _____

5       ____    ____     _____

6       ____    ____     _____

7       ____    ____     _____

8       ____    ____     _____

9       ____    ____     _____

10      ____    ____     _____

11      ____    ____     _____

12      ____    ____     _____

13      ____    ____     _____

14      ____    ____     _____

15      ____    ____     _____

16      ____    ____     _____

17      ____    ____     _____

18      ____    ____     _____

19      ____    ____     _____

20      ____    ____     _____

21      _____    _____

22         (Date)              (Signature)

162

1               E R R A T A   S H E E T

2           IN RE:  Pharmaceutical Industry AWP Litigation

3       PAGE     LINE     CORRECTION AND REASON

4       ____    ____     _____

5       ____    ____     _____

6       ____    ____     _____

7       ____    ____     _____

8       ____    ____     _____

9       ____    ____     _____

10      ____    ____     _____

11      ____    ____     _____

12      ____    ____     _____

13      ____    ____     _____

14      ____    ____     _____

15      ____    ____     _____

16      ____    ____     _____

17      ____    ____     _____

18      ____    ____     _____

19      ____    ____     _____

20      ____    ____     _____

21      _____    _____

22         (Date)              (Signature)

164

**A**

ABD 51:22
ability 7:9
able 7:15 54:19
  105:7 152:15
absence 15:9
Absolutely
  139:22
accent 70:5
accept 134:1
  141:19
access 55:7
  104:12 155:4
  156:11
accidentally 23:3
accounted 83:14
accurate 7:10
  36:4
acknowledge
  160:2
ACKNOWLE...
  160:1
acquisition
  125:16,17 126:2
  140:8 141:9
action 19:7
actions 49:16
  121:1
actual 37:4,6
  60:17 140:8
  141:8 153:2
  154:22
add 126:2,4,11
  149:4,6,7 150:1
  150:2,12
added 115:7
  138:6
additional 11:1
  157:10,11 158:9
address 19:4
administer 75:6
administered
  123:16
administration
  122:5
advance 11:11,13
  12:6 41:12
  149:18

advantage 73:1
Advate 39:9,15
  40:1 45:9,12,13
  45:14,17,18
  46:9,10,12,16
  47:1,3,14 48:14
  48:16 49:16
  62:22 63:3
  115:4 117:8
affixed 161:13
afraid 72:15
AFTERNOON
  136:19
agencies 154:9
ago 13:2 41:18
  66:14 92:3
  145:10
agree 76:21
agreement 6:3
  19:5,19 20:18
  20:21 31:12
  55:4,14 56:3,8
  56:10,18 57:5
  67:20 68:2,6,9
  68:15,17
agreements 18:22
  54:13 55:11,12
  55:15,19 57:9
  57:13
ahead 6:21 85:9
  111:17 114:9
  153:16 158:5
Alan 69:18,21
  70:2,3
allegation 135:5
allegations 148:6
  148:22 149:5,22
  150:1 156:1
alleges 110:11
  152:2
allow 79:11
  115:20
allowed 53:5
  118:18
AL/LON 70:4
ambiguous
  153:12
Amended 15:16

150:4
Amgen 61:8
  64:16,17 67:6,8
  68:9,18 92:4
  95:16 96:2,4,17
  114:5 122:20
Amgen's 67:11,17
AMP 59:6,17,19
  60:6,19 61:2,10
  62:3,8,12,16
  63:6,11,11,12
  63:17,20 64:9
  64:17,18,20,21
  69:5,6,9 70:20
  70:21,22 71:1,4
  71:22 81:19
  85:1,3 86:9,12
  86:22 87:15,20
  87:21 89:4
  153:5 155:3
  156:4,14
AMP's 63:10
  64:13 155:5
analysis 48:22
  156:21
ANDREW 3:11
Andy 6:9
Annenberg 52:1
  52:3
answer 6:21,21
  7:5,11,18 18:12
  18:17 19:12,15
  19:21 20:4 32:2
  42:2 68:7 75:15
  86:10 92:1
  110:21 111:1,13
  111:17,21 113:1
  113:2,12 114:8
  118:5 127:8
  128:9 129:7
  153:16
apologize 32:12
appear 160:6
appearing 12:2
appreciate 102:18
approaches 61:21
appropriate 77:4
  77:11

approval 47:10
  47:11,11
approximately
  13:12 26:18
  51:8 93:5
April 37:20
  135:12 143:9
  144:11
ARALAST 48:14
  48:16 49:5,10
  49:15,15 63:2,3
  131:16
area 116:16
argument 115:17
  121:6
arrived 117:18
articles 77:22
  97:9,11 112:15
asked 56:3 59:17
  78:12 79:2,7,15
  127:1
asking 6:19 10:19
  12:14 27:6 35:1
  53:7 56:7 57:1
  67:22 80:1,3
  121:19 126:16
  126:19 135:14
  135:17
asserting 112:18
assessing 62:17
assessment 48:21
  49:1 75:3
assignment 95:16
assist 53:21
assistance 21:14
Assistant 144:12
assumes 16:10
attached 4:5 10:5
  11:5 26:3 28:7
  33:5,9 34:12
  38:8 44:3 50:11
  51:2 99:3 128:2
  142:22 143:5
  146:12 160:6
attachment 35:20
attended 74:2
attention 106:19
attorney 18:20

19:3,8 24:6
  25:12 42:8
  103:14 144:12
  144:13 151:20
attorneys 14:14
  14:18 15:12
  19:14 21:18
  25:13 27:7 35:6
  43:4 150:20
Attorney's 146:4
attorney/client
  18:11
average 1:5 6:12
  57:6 59:3,9,20
  61:14 62:12
  63:6 80:18
  102:14 125:12
  125:13,14,14
avoid 73:4
aware 24:21
  26:21 36:10,13
  64:14 73:14
  78:12,20 79:7
  79:15,20 85:17
  92:5 93:11 94:5
  95:13 96:20
  97:9,11,15
  98:16 117:12
  119:17 122:19
  129:11,13
  137:11 142:6
awfully 94:22
  95:1
AWP 5:4 24:10
  31:18 57:6
  59:16 60:13
  61:10,14,19
  62:1 64:1 70:21
  71:6 73:4 74:3
  77:17 78:15
  79:6 80:14 81:6
  81:14 92:5
  93:11,14,15
  94:4,10 95:9,13
  96:20 97:4,10
  97:19 98:17
  103:10 104:10
  107:21,22 108:3

112:16 113:17
113:18,20 114:2
114:15 115:8,12
117:20 120:15
120:18 122:19
123:7 124:22
125:4,5,7,10
126:12 129:5
131:7 134:3
137:16,18
139:11 141:8,21
145:15 162:2
163:2
**A-L-A-N** 70:2
**a.m** 1:21 98:22
99:1

**B**

**B** 3:6 4:4 5:1
**back** 30:17 38:3
40:4 51:18,20
53:8 55:1 63:5
64:12 65:6,12
66:2 76:16,20
78:17 84:4
88:13 89:14
92:8 99:1
104:12 108:16
138:9 150:19
153:9 158:5
**background**
76:22
**backwards** 51:20
**back-to-back**
136:1
**bad** 87:21
**balance** 64:1
**Baldridge** 69:15
**Bank** 36:22 58:13
113:13,17 114:1
114:10,19 115:1
115:5,6,7,8,12
115:17,18,21
116:1,3,11
117:16,19 118:8
118:14 119:18
120:9,17,20
125:2,9,18

126:1,5,8,10,22
128:12,17 129:6
129:10,14,19
130:19 131:8
132:17,22
133:13,16 134:7
134:12 137:18
138:3,4 139:7
142:16
**Bank's** 121:1
**Barbara** 3:7
**based** 73:16 76:21
79:3,20 80:15
93:17 99:14
102:14 104:20
126:21 128:10
129:7,8 131:18
142:16 152:2
**basically** 7:22
11:19 63:12
73:3 80:4 81:7
81:11 108:4
116:22
**basing** 155:22
**basis** 19:22 20:4
112:20 157:13
**Bates** 38:18
**Baxter** 1:14,15
3:10,18 4:11,13
6:5,11 8:4 9:18
13:4,8,17 14:2
16:7 17:5,11,17
18:1 22:1,16,21
22:22 23:4 24:8
25:1 26:6 27:8
28:18 30:14
31:8,9 32:6
34:15 35:7
37:21 39:5,15
39:22 41:2
43:13,20 45:14
47:4 50:1,14
51:5,15 54:22
55:12,18,18
58:6,20,20
59:14 60:10
61:6 62:8 63:16
64:19 69:4,6,7

71:20 73:1,14
74:1 78:9 79:12
82:2,5,17 85:14
85:20 86:12,16
86:22 87:15,17
87:20 88:4,9
96:15 98:10
99:7 101:17
102:11 103:9,15
105:1 107:18
110:11 112:10
114:11 115:3,19
117:18 119:2,4
119:17 120:1,19
123:1,14,14
124:21 125:8,17
129:4 130:7,13
130:20 131:2
132:12,13 133:2
133:4 137:20
142:7 153:3
154:8,19 155:1
157:2 158:15,16
**Baxter's** 4:8 62:2
62:7,15 63:9
74:6 101:9
115:8,10 134:1
141:19 148:6
155:3
**Baxter-needed**
158:17
**Baxter-related**
158:17
**Bayer** 101:17,17
114:4 121:12
**began** 105:17
**beginning** 120:13
126:9 145:4
**BEHALF** 3:2,10
**belief** 110:17
152:15
**believe** 25:14
30:20,21 35:12
37:16 65:1
66:16 72:19
73:7 77:11
80:10 86:21
88:9 89:19

91:11 104:4,16
105:11 107:20
108:6,11 136:13
138:4,8 142:13
144:8,20,22
145:1 148:19
151:16,17 155:7
156:6
**believes** 152:2,8
**benefits** 50:19
131:19
**best** 16:17 18:12
59:3 65:7,11,15
65:16,20 66:2,5
66:7,11,16,18
66:21 67:1,3,7
67:11,18 71:18
71:20,21 72:9
81:16,19 82:18
83:11 84:8,12
84:18 85:1,2,16
86:8,8,11 148:8
148:15,21
149:22 154:20
**better** 21:20
**beyond** 76:19
**big** 23:10,18
34:21 38:12
48:22 50:1
83:20 84:20
99:20 111:22
**bigger** 115:14
122:11
**biggest** 154:16
**billing** 46:16,17
**binder** 23:10,18
25:9 26:17
30:19 34:4,21
38:12 40:6,15
83:21 103:7
104:3 144:21
**bioscience** 32:6
83:21 116:9
**bit** 51:18 60:4
88:20 102:20
**blockbuster** 39:4
39:6,8 45:13
63:2 115:4

**blood** 31:22 32:3
32:4 107:8
**Board** 46:2,5,6
**BOCKIUS** 2:7
**bold** 151:3
**Bolton** 3:18 6:11
**Boston** 6:14
**bottom** 38:18
151:3
**BOURKE** 20:2
**BP** 59:6 65:7 72:9
76:3,5 85:6
86:22 87:15,21
89:4 153:5
156:4
**Bradley** 69:15
71:2,6,15 72:3,8
74:5,12 76:3
82:7,12,21
84:17 85:20
86:5 88:4,6 89:3
90:6 91:3 99:13
102:12,12
115:16 155:2,16
156:2,7
**Bradley's** 76:8
88:22 89:7
155:21
**breadth** 109:6
154:5
**break** 8:18 98:22
**briefly** 158:13
**bring** 72:4
**broad** 94:22 95:1
**broader** 67:17
**brought** 9:9 29:2
85:1 102:22
115:10 117:12
**Bureau** 30:4
105:17 108:20
**buy** 75:3 81:12
122:8,9 123:13
**buying** 77:13

**C**

**C** 3:1 4:1 5:1 6:1
**calculate** 62:8
63:11,12,17

64:14,18 66:2
81:19,19 85:6
88:7,22 89:8
155:7
**calculated** 64:8
66:1 71:6,9,22
88:10 153:6,21
155:8
**calculating** 62:15
62:17 63:9,20
64:13,17,20,21
65:2 66:3 67:7,9
69:6,9 71:19
76:2,4 82:6,11
82:12 85:1,3
86:8,8,9,18 88:5
89:3,10 153:14
**calculation** 59:3
71:1 81:16
85:15 86:11
89:7 90:21
**calculations**
62:18 70:20
71:13
**California** 3:7
104:12
**call** 12:7 70:4
130:2
**called** 30:9 130:5
148:6
**calling** 73:2
111:15
**calls** 110:20
112:22 114:7
**Canada** 49:3
**can't** 13:19,20
15:14 16:3 21:2
22:9 30:2 35:5,8
40:12 41:13,21
43:6,8 47:7
48:15 53:3
54:21 66:15
68:3 69:21 70:1
70:14 72:12
74:12 82:21
83:20 86:4 87:6
87:10,12 93:15
94:15 103:7

105:3 108:10
111:16,21
116:14,21 117:6
124:13 125:12
130:4 132:6
134:21 135:21
136:2,3,5
137:10 143:13
147:3 150:6
**care** 57:21 72:16
73:11 74:18
75:1,6 77:1,12
77:18,22 81:3,4
81:11 103:6
114:13 121:4,21
122:8 124:6,7
124:15 131:5,14
134:22 136:12
**Caremark** 103:8
136:8,11,14
**cares** 81:8
**Carrillo** 3:5
**case** 1:7 21:14
30:12 52:18,20
52:21 69:2
75:21 89:8,9
123:8,9 130:11
136:22 143:15
145:4 161:10
**cases** 95:13 96:22
122:19 154:15
**Category** 1:7
**cent** 102:11
**central** 154:16
**cents** 88:11 102:4
102:4,13 131:5
140:8
**CEO** 117:11
**certain** 25:11
60:16 74:19
**certainly** 83:15
114:10
**CERTIFICATE**
161:1
**certify** 161:4
**cetera** 137:5
**chain** 115:19
**change** 95:22

102:4 112:19
**changed** 60:3
112:14,19
**changes** 57:20
101:5 102:7
105:19
**check** 92:14
**checks** 63:22
**chemotherapy**
123:19
**China** 52:13
**choice** 95:2
**cholesterol** 122:1
**circulated** 155:5
156:2,7
**cite** 80:12 152:18
**claim** 113:22,22
114:2
**clarify** 159:3,6
**class** 87:8,8
**clear** 159:3
**client** 65:18
**clients** 54:6
106:22 108:19
108:20
**clinical** 131:19,19
**Close** 21:3
**closed** 106:2
107:1 112:17
137:22 141:22
144:18
**CMS** 154:9,10,20
155:1,19
**collaborated**
140:22
**collaborative**
141:12
**college** 51:21
**Colorado** 42:18
42:20
**Combination**
55:14
**combined** 101:22
**combines** 102:1
**come** 17:13 19:7
31:12 36:6,19
41:4 61:4 72:8
97:5 117:15

142:5
**coming** 78:1
87:17
**comment** 75:20
77:14 120:3
**Commission**
161:15
**commit** 74:18
75:7 81:10
**committed** 72:14
72:18,20 73:3,6
73:13,19 74:8
74:15 75:22
77:16 78:8,10
78:14,21 79:5,8
79:12,13,17
80:7,8,17,21
81:7,14,15
134:18,19 151:4
152:16
**communication**
12:11,12 52:13
117:4 118:14
146:8
**communications**
14:9,21 15:2,7
18:11 19:15
22:18
**communication...**
52:1
**community** 58:2
**companies** 35:18
54:4,11,22
55:17 56:9,16
56:21 57:6
61:18 63:16
64:2 66:9 75:14
78:1 94:1,4,13
94:15 103:6
107:9 126:11
131:14 133:10
155:16
**company** 30:2,7
30:13 45:6
47:18 54:1 55:6
60:22 63:19
75:1 77:1,12,19
94:17 97:14,16

101:19 106:10
106:11 107:21
107:22 119:11
122:3 126:3
133:9 139:15,17
**company's** 44:17
44:18 136:6
**comparable**
105:22
**compare** 90:2
147:13 148:20
156:16
**compared** 82:22
89:15 105:1
117:21 118:7
156:13
**comparison** 91:1
**compendia** 58:13
58:22
**competitors**
109:5 131:3
**complaining**
121:2
**complaint** 4:19
5:5 8:8 9:19
13:10,18 15:16
15:22 16:1,2
17:13 18:4,8,16
19:2 21:4,7 22:6
28:19 41:12,16
42:22 43:2,9
70:15 74:8
76:17 109:11
110:17 112:12
112:20 113:5,15
114:16 123:3,6
124:11,13
136:22 137:9
138:20 144:16
145:6,8,9
146:16,17,19
147:1,14 148:12
148:16,17,22
149:5,8,13,17
149:18 150:1,4
150:11 151:21
152:6 153:4
156:1

Case 1:01-cv-12257-PBS   Document 6866-2   Filed 01/27/10   Page 46 of 150
HIGHLY CONFIDENTIAL DEPOSITION OF LINNETTE SUN
CONDUCTED ON TUESDAY, JANUARY 19, 2010

167

**Complaints**
112:15
**complete** 7:10
46:4 104:19
160:4
**completed** 52:5,6
106:1,21 108:18
**complicated**
77:15
**Complying** 33:13
36:18 105:15
133:20 134:16
137:1 151:1
**components** 67:2
**concern** 54:10
114:2 152:14
**concerned** 14:20
54:17 56:3,9
57:13 115:15
**concluded** 159:10
**conclusion** 31:13
110:20 111:16
**conduct** 48:21
148:7
**conference** 12:7
**conferences** 97:16
**confidential** 1:1
8:12 23:20
33:19 41:9 55:7
**confidentiality**
31:12 53:6
54:12 55:11,15
56:2,8,19 67:20
68:2,6,8,14,17
**confirmed** 142:12
142:13
**confused** 88:19
**confusing** 153:19
**conjecture** 37:2
**conjunction** 8:3
36:12
**connect** 116:13
**connected** 115:4
116:10
**connection** 19:1
53:14,21 70:19
130:11
**consider** 77:12

**consult** 54:2
**consultancies**
58:8,11,19,21
59:2
**consultant** 30:9
53:11,20 56:15
115:22 116:7
118:13,21
119:10,12 130:5
133:9
**consulted** 116:1
**consulting** 52:21
52:22 53:1
56:13 57:5,13
58:3
**contact** 14:8,11
14:13,16 16:9
21:13
**contacted** 16:11
115:18,21
119:17
**contain** 31:17
**contained** 90:2
108:7 137:14
140:7,22
**contains** 31:15,16
31:18 137:4
**context** 25:1
59:11 65:21
**continue** 98:11,16
**contract** 35:16,17
35:19 64:7
72:20 73:7,19
74:8,15 75:22
79:5,8 80:13,15
80:18 81:14,20
82:1 134:18,19
134:21 135:3,3
135:11,15,17,19
136:13
**contracted** 85:19
**contracting** 31:19
65:22 66:5
86:14,16
**contracts** 72:14
72:18 73:3,5,13
77:16 78:5,8,10
78:14,21 79:12

79:12,17 80:7,8
80:22 81:7,15
81:18 135:6
151:4 152:16
155:15
**control** 16:22
51:16
**controlled** 124:21
**conversation**
12:15,19 71:18
76:20 128:12
134:7 146:6
**conversations**
17:10 126:21
134:6,9
**COPD** 49:5
**copy** 23:22 27:17
32:9 33:19
40:20 44:22
106:3 107:2
117:20 157:2
158:14
**core** 33:17 41:6
47:21 71:16
72:3 115:10
155:3
**correct** 9:22
11:15 12:3,18
17:5,11,17,20
18:1,5 21:18
22:3,6,8,11,19
22:20 27:3,12
31:14 32:19
33:10 37:3
39:16 47:6
49:12 50:3
56:16,17 69:2
76:3 80:5,6
83:18 88:18
91:21 92:6
93:12 95:18
105:3 118:11
120:16 129:10
139:18 148:2
156:21 158:1
160:4 161:5
**CORRECTION**
162:3 163:3

**corrections** 160:5
**correctly** 81:17
99:7 116:6
**cost** 57:20 125:13
125:14,14,16,18
126:3 140:8
141:9
**cost-effective**
57:22
**cost-effectiveness**
57:16,17
**couldn't** 69:17
101:12 129:6
139:12
**counsel** 6:3,5,19
44:6 99:22
104:5 105:11
108:12 110:1
149:13 150:8
161:9
**counsels** 151:16
**counsel's** 157:9
**couple** 22:11
48:15 78:1
**course** 6:18 97:11
154:11 158:22
**Court** 1:2 9:8
**create** 35:11
144:7
**created** 31:7
144:8
**creating** 121:8
144:3
**curious** 109:16
110:2

---

**D**

**D** 5:1 6:1
**damages** 50:2
110:18 111:6
112:2 113:5
**data** 36:21 58:13
99:12 101:20
105:1,22 106:15
107:13 113:13
113:17 114:1,10
114:19 115:1,5
115:6,7,8,12,17

115:18,21 116:1
116:3,11 117:16
117:19 118:7,7
118:8,14 119:18
120:9,17,20
121:1 125:2,9
125:18 126:1,5
126:8,10,22
128:12,16 129:6
129:10,14,19
130:19 131:8
132:16,22
133:13,16 134:7
134:12 137:18
138:2,3,4,14
139:7 140:22
141:7 142:16
156:3,13
**database** 36:21
117:2,19 119:15
**databases** 120:8
**date** 15:14,21,22
21:7 41:15
42:21 117:6
149:15 160:10
162:22 163:22
**dated** 37:20 38:18
143:8
**dates** 13:19 22:9
92:15
**Dawn** 2:13 161:2
**day** 16:2 161:13
**deal** 20:1 109:15
137:4
**dealing** 63:6
**Deana** 119:1,6
130:5,8
**December** 45:20
**decide** 61:22
**decision** 35:15
62:20,21 149:4
150:1,2
**decisions** 66:17
66:18,20,20
**Declaration** 4:12
4:20 9:21 10:4
10:10 24:17
33:8 39:12

40:17 74:9
92:12,16,20,21
104:18 125:20
127:3,7 128:5
128:10,18 129:8
**define** 53:15
**Definitely** 16:2
20:14
**degree** 51:20,21
52:9,12 60:14
**delivered** 106:21
108:18
**Denver** 144:13
**Department**
41:17
**depending** 62:9
64:6
**depends** 77:7
**DEPONENT**
160:1
**deposed** 6:16
**deposition** 1:18
2:4 4:6,7 5:2
6:18 8:2,9,11
9:5,15 10:9,17
10:21 11:3,7,7,8
11:12,22 12:3,3
12:6,20 26:1,5
28:5,11,17
29:11 30:5
32:10 33:2,8
34:10,14 36:15
37:12 38:11,14
39:3,13 40:5,6
40:16,22 41:4
41:11 43:14,15
44:1 46:15 48:1
50:8,13,14,17
50:21 51:4,9,14
54:8 55:2 83:17
89:17 90:3 91:4
92:13 93:1 96:8
99:8,9,15
100:15 103:18
104:3,16,21
105:1,13 106:4
109:10,11 110:4
112:4,9 113:9

124:18 126:15
127:22 128:5,19
133:18 143:3,3
143:8,16,20,21
145:17 146:10
146:15 157:13
159:8
**derive** 155:18
**describe** 70:18
126:17
**described** 91:13
98:12 134:3
141:21
**describes** 45:11
49:9
**description** 94:21
**design** 48:20
**designate** 8:11,21
**desk** 26:17
**detail** 67:19 72:10
**details** 78:9
**determination**
90:9
**determine** 75:2
99:13 105:2,18
115:3 138:13
**determined** 18:8
87:14 118:8
**develop** 95:6
**developing** 66:11
**DICKSTEIN**
3:13
**didn't** 18:14 23:5
23:5 25:10 32:1
37:19 62:18
64:1,18 72:2
84:14 107:18
115:19 117:14
131:15 132:19
140:3 145:21,21
146:5
**difference** 56:6
56:12 74:14
**different** 50:5
75:13 81:20
99:14 103:6
121:13,13,15
124:7 129:18

130:2 155:6,6
**direct** 87:2
106:19 154:18
**directly** 7:19 12:9
14:8 24:15
62:10 72:3
84:15
**Director** 23:17
41:7 51:11
70:17
**directors** 132:4
132:14
**disagree** 19:18,20
**disclose** 62:3,4
112:16
**disclosed** 90:6
**disclosing** 67:3
69:6 144:17
**disclosure** 66:6
70:20 89:3
**disclosures** 90:10
**discount** 65:18,18
65:19 73:20
74:15 81:5
**discounted** 81:2
**discounting** 66:20
**discounts** 73:8,9
73:16 74:16
94:5
**discrepancy**
84:21 115:5
120:8 128:16
**discuss** 72:5 95:4
**discussed** 136:10
150:10
**discussing** 112:15
**discussion** 98:21
130:19 136:17
157:6,21 158:7
**discussions** 64:15
132:16 150:7,19
**Dismiss** 4:11 8:4
9:19 27:11
28:19 33:10
112:11
**Dismissal** 27:4
**dismissed** 8:8
**dissertation**

51:22
**distributed** 33:15
**DISTRICT** 1:2,3
**division** 32:6 40:2
116:9 117:11
**doctor** 122:1,7,7
122:17
**doctors** 75:5,10
122:13,15,20
123:12,17
**doctor's** 123:20
124:9
**document** 4:9
9:10 10:5 11:9
11:17,21 20:6,9
20:17 23:6,16
24:3 26:9,22
28:10,11 29:1,8
32:15 33:15,19
33:20 34:1,14
34:18,20 35:2
35:11,16 36:2
36:10,12,20
37:2,5,6,8,17
38:14,19 39:2
40:9,16,20
41:11 43:12
44:5,8 51:7,9,13
51:14 99:15,20
100:13 103:16
104:13,17,21
108:11,17 109:8
109:13,16 126:8
126:13,17,18,20
127:11 143:11
143:22 144:3,7
144:8 145:16
147:5,10 155:5
**documents** 9:4
10:15,18,20
11:1,20 16:20
17:2 20:11 21:7
22:22 23:4,6,8
24:1,4,7,13,20
24:22 25:7,8,11
25:15,20 26:7
26:12,13,22
29:9 30:18,19

32:9,10,18,22
34:4 35:6,7
36:11 40:7 41:1
43:11,16 51:12
51:16 89:21
97:13 98:9
103:17 104:1,4
128:11 143:14
145:13 156:3,15
156:19 157:8,11
157:15,16
**doesn't** 104:19
111:16
**doing** 63:14 87:16
91:1,3 94:19,22
96:16 97:8
99:14 128:14
129:12 131:11
139:20 152:17
**dollars** 49:3
**dollar-thirty**
138:5
**domestic** 106:22
108:18
**don't** 7:3,12 9:3
10:22 15:1
17:15 18:16
21:8,16,17
25:18 26:20
27:9 30:11,15
30:20 31:9,14
32:12 34:19,20
35:13 36:3,5,5,7
36:8 37:14
40:12,14 41:13
51:17 52:21
54:5,11 56:11
56:22 60:3
63:11,12,19
64:10 65:4
68:20 69:8 71:8
74:17 75:10
77:6 79:11,18
79:19 82:16
85:4 87:19 88:1
89:13 91:17
93:16 94:17
98:3 100:20

103:9,20 104:14
104:16 107:3,20
108:2 109:3,22
113:4 119:3,4
119:20 121:17
122:16 124:12
124:12,13,15
126:8,20 128:13
129:17 130:9,9
130:12 131:20
132:11,19
133:15 134:13
136:8 138:11
139:9 141:3
142:18 144:2,5
144:9,22 145:3
145:4,10,22
146:5 150:12,14
150:17,18
151:20 152:17
153:1,18 154:3
155:6,7 156:19
156:22
**dossier** 45:14,15
46:5 95:7
**Dracott** 42:14
**draft** 5:5 37:19
109:17,18,20
146:15,17 147:1
147:4,5,6
148:12,17,22
149:7,12,17
151:11,21
**drafted** 37:16
**drive** 23:21
**drug** 52:18 54:2
57:10,21,22
58:3,12 59:21
61:17 63:10
74:21 75:2,11
77:2 82:18 83:3
83:10 122:21
123:13,17,22
131:18
**drugs** 7:8 31:21
45:22 46:8
71:20 75:7,8
83:8,9 84:5,11

85:22 86:20,20
91:20 123:16
132:17
**duly** 6:3
**D.C** 3:15 42:18

———————
**E**
**E** 3:1,1 4:1,4 5:1,1
6:1,1 162:1,1,1
163:1,1,1
**earlier** 40:7 51:15
98:12 113:19
114:14
**early** 8:21 80:13
126:7
**easier** 28:2
**easiest** 20:2
**easy** 103:2
**economic** 23:21
45:7 78:3 81:4,8
121:4 132:1
**economics** 76:22
139:21
**economy** 23:21
**education** 51:19
**efficacious** 58:1
**effort** 62:11,14
69:11 105:22
**efforts** 62:2,7
**either** 7:18 15:14
16:20 24:15
120:13
**elaborate** 121:18
**elasticity** 48:21
95:3
**else's** 120:21
133:13
**employed** 61:7
161:9
**employee** 55:12
55:20 56:16
**employees** 44:22
**employer** 67:21
**employment** 16:7
39:15 43:19
55:4,6 56:14
92:8,14
**engaged** 32:7

45:6 107:9
146:6
**engagements**
57:13
**entered** 58:8
**entities** 58:9
63:15 64:8
107:1 109:1
**entitled** 34:15
38:15
**entity** 31:8 60:20
64:3,5,10 67:4
**entry-level** 51:21
**Errata** 160:6
**Esquire** 3:3,11,12
3:18
**essence** 74:3
**established** 54:22
**estimates** 93:6
**et** 137:5
**EU** 58:2,4
**Europe** 69:16
**European** 69:17
70:5
**evaluate** 77:1
**evaluation** 118:6
**eventually** 152:7
**evidence** 16:11
87:20,22 144:17
145:12,22 146:3
**evidence-based**
89:12
**ex** 1:10
**exact** 13:19 15:14
16:3 22:9 30:2,6
53:3 82:21
116:22 124:15
130:4 134:21
**exactly** 13:20
35:8 48:16
66:15 68:4
72:12 74:12
102:3 117:6
136:2 137:10
139:9,12 147:3
**examination** 4:2
6:5 159:10
**examined** 160:3

**example** 88:11
95:4 99:11
100:14,20,21
102:13 103:8
104:22 105:3,10
106:15 109:1
110:3 121:20
131:5,15 135:16
**exchanged** 35:6
**execute** 20:17
**exercise** 91:13,21
95:3
**Exhibit** 4:7,8,10
4:12,13,15,16
4:17,18,19,20
5:3,4,5 11:3,4,7
11:22 12:3 26:1
26:2,5 28:5,6,8
28:11,17 29:12
30:5 33:3,4,8
34:10,11,14
36:16 37:12
38:7,11,14 39:3
39:13 40:5,6,16
40:22 41:5,11
43:14,15 44:1,2
44:5 46:15 48:1
50:9,10,13,14
50:17,22 51:1,4
51:9,14 55:2
83:17 89:17
90:3 91:4 92:13
92:17,18 93:2
96:8 99:2,8,9,15
100:16 101:3
103:18 104:3,16
104:21 105:1,14
106:5,17 109:11
109:11 110:4
112:5,9 113:9
114:21 120:2
124:18 127:14
127:15,16,17,22
128:1,5,20
133:19 136:22
141:7 142:21
143:4,8,16,20
143:20,21 144:1

144:10 145:15
145:17 146:10
146:11,15,19
147:14,20,21,22
148:1,12 149:12
149:19,21
150:21 151:22
152:7 158:10
159:4
**Exhibits** 4:5,6 5:2
10:16 143:2
159:3
**existed** 112:14
**exists** 79:22
**experience** 79:3
79:21 87:16
**experienced**
87:18
**expert** 14:4 52:17
53:8,10,12,13
53:15,18
**Expires** 161:15
**explain** 48:1
57:19 59:7
65:15 114:19
124:22 127:7
**express** 152:14
**expressed** 120:2
**extend** 113:19
114:14
**extensive** 105:18
**extent** 110:20
112:21 114:7
123:10 157:14
**extracted** 36:9
**extremely** 23:19
**Eye** 3:14
**E-mail** 115:19
116:1,5,22
155:4

———————
**F**
**fact** 32:10 104:17
120:7 123:3
131:11 137:12
157:10
**factor** 100:6,22
101:7,10,12

HIGHLY CONFIDENTIAL DEPOSITION OF LINNETTE SUN
CONDUCTED ON TUESDAY, JANUARY 19, 2010

170

102:1,6,7
**facts** 16:11
**false** 110:14
**familiar** 8:16
  35:10 42:7
**far** 24:21 40:8
  110:21
**fault** 120:1
**FDA** 47:9
**FDB** 133:22
  137:21 141:18
**fed** 62:19
**Federal** 65:21
  67:4 78:13 79:4
  83:11 84:12
  85:5,17 86:6
  90:6 148:7
**fee** 122:5
**feedback** 70:8
  107:12
**feel** 148:20
**fees** 19:7,20
**female** 116:17
**field** 14:4,5 70:9
  87:18 131:22
  140:19
**fight** 126:1
**file** 1:5 17:13 18:8
**filed** 4:19 6:13 8:4
  9:8 13:10,18
  15:17 18:4 21:3
  21:7,15 22:5
  41:16 42:21
  43:9 96:20 97:1
  97:3 109:12
  113:8 120:16
  143:15 149:8
  150:4,5 152:7
**files** 40:9
**filing** 41:12
**financial** 161:11
**find** 29:11 83:20
  100:21 101:12
  102:16 103:7
  108:10 127:10
  137:13,14
  148:21
**findings** 23:11,11

23:12,15
**fine** 8:19 13:14
**finish** 48:4 53:17
  85:7 118:2,4
**first** 4:9 13:1,16
  14:9 15:6,11,20
  21:11,22 26:6
  36:21 39:2 42:5
  45:12 46:4
  47:13 50:15
  51:8 53:16
  58:13 60:6 61:1
  61:4 65:10
  69:21 70:14,17
  74:17 89:9 95:9
  106:1 113:13,17
  114:1,10,19
  115:1,5,6,7,8,12
  115:17,18,21
  116:1,3,10
  117:15,16,19
  118:8,14 119:18
  120:9,17,20
  121:1 125:2,9
  125:18,22 126:5
  126:8,10,21
  128:12,16 129:6
  129:10,14,19
  130:13,19,19
  131:8 132:16,22
  133:13,16 134:7
  134:12 137:18
  138:3,4 139:7
  142:16 143:7
  144:15
**five** 75:2 93:6
**flip** 36:15
**flu** 49:18 50:3,4
**focusing** 88:21
**folded** 104:9
**following** 101:5
  106:21 112:12
**follows** 6:4
  141:17
**follow-up** 104:6
  119:16
**foregoing** 160:3
  161:3,5

**forget** 101:18
**form** 35:2,3
**formal** 104:8
  158:19
**format** 35:9 144:6
**forms** 112:16
**formulary** 35:15
  155:18
**forth** 150:19
**forward** 58:7
  64:16 67:6
  110:18 144:16
**forwarded** 116:5
  145:20
**found** 101:13
**four** 57:4 101:8
  101:15 102:1,9
**fourth** 33:14
**Fractions** 4:15
  38:15 99:8
  145:16
**frame** 95:9 96:10
**fraud** 112:16
**free** 148:20
**fresh** 139:14
**front** 11:21 26:17
  29:2
**full** 30:19
**fully** 154:3
**full-price** 52:14
**further** 157:18

---

## G

**G** 6:1
**gauge** 15:20
**general** 94:21
  110:12 114:2,11
  144:12
**generally** 57:12
  57:14,15 68:11
**generate** 125:7
  126:12
**generated** 78:10
**generating**
  140:13
**gentleman** 70:16
**geographic**
  116:15

**getting** 75:18 94:6
  94:7 128:8,9
**GH** 38:19,20
  100:8,17 101:2
  101:21 105:14
  109:1
**give** 7:10 9:12
  16:17,20 17:2
  18:12 23:17
  24:5,5 25:8,10
  41:22 43:16
  65:18 68:5 70:8
  73:8,9,12,13
  75:11 86:15
  93:6,15 94:4,21
  95:4 99:11
  100:20 103:14
  104:22 105:3,8
  107:12 122:1,7
  123:17 158:2
**given** 23:16 24:15
  97:19 104:4
  106:3,6,8,12
  160:5
**giving** 36:1
**Global** 23:17 41:7
**globally** 45:8
**go** 6:21 47:22
  48:18 53:7 85:9
  89:14 98:20
  100:13,20 105:6
  111:17 114:9
  122:1,7,8,15
  131:22 136:16
  137:14 153:16
  157:4,20,22
  158:5
**goes** 110:22
**going** 15:6 54:9
  68:7,12 75:10
  75:12 77:20,21
  81:11,21,21
  104:11 127:7
  150:19 158:18
**good** 8:1 57:16
  72:14 131:2
  139:20
**Government** 58:1

60:16,20 61:17
  62:5 63:15,22
  64:7 65:16,19
  65:21 66:4,11
  66:22 67:4,10
  67:12,14 72:1,2
  81:3 82:1,18
  83:11 84:13,14
  85:20 86:6 90:7
  97:13 115:9
  116:2 117:1
  153:3 154:9,14
  154:16 155:9,13
  155:14,15
**grab** 93:22
**great** 109:15
  137:4 159:1
**Greg** 1:11 125:20
  127:20 128:3,6
  133:22 140:9,12
  140:13,15
  141:13,18
  150:20 158:3,14
**Greg's** 126:15
  128:18
**group** 33:16,17
  41:7 47:21
  67:14,15 71:17
  76:3,8 87:7
  119:8 155:3
**guard** 23:18 41:8
**guess** 11:13 14:14
  137:16
**guessing** 35:22
  36:1 37:2
  136:14
**guide** 46:17,17
**Guiheen** 116:8
  117:10 120:10

---

## H

**H** 4:4 5:1 162:1
  163:1
**habit** 95:22
**half** 13:6 96:5
**Hamilton** 1:11
  4:20 10:5 12:5
  12:16,20 13:1,7

HIGHLY CONFIDENTIAL DEPOSITION OF LINNETTE SUN
CONDUCTED ON TUESDAY, JANUARY 19, 2010

171

13:17,22 15:6
15:21 16:6,13
17:19 18:8,22
19:6 20:7 21:6,9
21:13,22 22:18
32:16 41:11
128:6 133:22
134:7 141:18
142:4,9 150:15
158:14
**Hamilton's** 10:10
127:3,6 128:10
129:8 146:18
**hand** 135:12,12
161:12
**handed** 28:11
**Handing** 9:11,16
**handling** 25:19
**happened** 49:16
107:19 110:1,3
123:8 143:14
146:1
**hard** 95:22 99:16
99:20
**Hart** 2:13 161:2
**haven't** 52:6
148:18 156:16
**head** 7:17 8:10
14:15 22:12
**health** 57:21
74:22 77:1,12
131:13
**hear** 14:3 61:3
65:10 80:20,21
**heard** 14:1 59:8
59:11 65:7
119:21
**heart** 77:10
**held** 2:4
**Helix** 101:18
**help** 7:17 15:20
127:7 156:20
**helpful** 157:2
**HEMOGLOBIN**
1:14
**hemophilia** 122:7
124:16
**hereunto** 161:12

**hesitating** 14:17
**he's** 10:19 27:6
37:4 42:8 56:7
57:1 70:5,15
80:1,3 126:16
135:14 140:19
**high** 117:10
**higher** 81:5,13
94:7 122:10
131:3 156:14
**highest** 51:20
**highlight** 103:1
**highly** 1:1 8:12
**hired** 87:17 96:3
**historical** 75:1
77:5,13 106:13
106:14,16
**history** 4:13
34:15 60:4
**home** 23:6,7,9,22
72:16 73:10
74:18,22 75:6
77:1,12,18,22
78:10 81:3,4,8
81:11 102:22
103:6 114:13
121:4,21 122:8
124:6,7,15
131:5,13 134:22
136:12
**honest** 7:10
**honestly** 66:4
67:10
**hope** 23:19
**hospital** 123:17
124:6,8
**huge** 120:8
**hundred** 123:15
141:5

———————
**I**
**idea** 35:14 37:20
**identification**
11:4 26:2 28:6
33:4 34:11 38:7
44:2 50:10 51:1
99:2 128:1
142:21 143:4

146:11
**identified** 24:11
40:7 43:1
**identify** 62:11
**immediately**
127:1
**impair** 7:9
**impermissible**
73:7 78:8 105:3
**important** 8:1,20
**improper** 78:14
79:5,9,17 80:9
87:21 88:3
**inaccurate** 86:22
156:7,9,10
**inaudible** 27:17
**incentive** 77:8
78:3 81:5,8
122:17 132:1
**incentives** 23:21
121:4
**inches** 26:18,20
**include** 45:15
**included** 12:12,20
107:17 156:3
**includes** 145:12
**including** 46:16
67:4 116:4
**incorrect** 87:15
**increase** 75:16
94:3 118:9
120:17,20 121:5
125:7
**increased** 94:1
**increasing** 117:16
**independent** 64:3
97:8
**independently**
64:11
**indicate** 29:7
158:8
**indicated** 22:1,10
92:5 157:7
158:8
**indicating** 12:1
26:15 28:14,20
38:1 104:10
110:9 125:15

151:8 152:4
158:4
**individual** 66:10
119:10,12
**individuals** 33:18
**individual's**
70:19
**industry** 1:4 6:12
133:6 162:2
163:2
**inflate** 61:19 64:1
94:4
**inflated** 60:13
94:10 115:12
**inflation** 61:20
**information** 16:6
18:10 31:18
45:15 54:20
55:8,11 58:12
60:20 62:13,19
90:2,5 97:6,19
104:22 106:14
106:16 107:16
108:6 109:3
114:3 118:19
119:14 129:9
137:5,8,11,12
137:13,15 138:9
138:14,20 139:6
140:3,4,7,18
141:14 142:6,9
150:11 153:3
154:8,19 156:6
156:12 157:1
158:3,9,17,19
**informed** 123:7
152:2,8
**initially** 21:13
**injection** 124:1,2
**input** 66:13
140:15 141:13
**inside** 31:13
**instances** 86:15
86:19,21
**instruct** 20:1,3
**instructing** 19:21
**instructs** 6:20
**insurance** 122:3

**intention** 77:8
**intentionally** 23:2
23:3
**interest** 161:10
**interests** 77:9
**internally** 74:1
**international**
1:15 9:18 26:6
28:18 106:22
108:18 112:11
**introduction**
105:16 106:20
**investigate**
117:14
**investigation**
128:14 129:12
130:3,17,18
**involve** 19:15
134:9
**involved** 62:2,7
62:14,15 63:9
64:13,17,20
66:6,8,10 67:3,7
67:11,21 71:12
71:19 76:2,14
84:12 118:14
122:16
**involvement**
39:14 49:10
58:21 68:1
85:15
**irrelevant** 112:17
**isn't** 73:19 105:2
**issue** 128:15
**issued** 8:13 36:20
**issues** 8:3,7,9
75:19
**it's** 7:22 8:20
13:20 15:14
16:3 18:20
26:15,19,20
29:14,19,19
34:19 36:8
37:20 38:18
40:14 43:3,6
45:13,14 50:1
50:18 53:5
61:14 66:9,12

67:1,14,15
70:14 73:7,9,9
73:16 75:15
77:7 78:11,15
79:6,6,13,13
80:2,4 83:20
84:1 87:6 88:12
89:5 91:11
99:20,20 100:2
100:8,19 101:15
101:22 102:3
103:2,20 104:14
104:14 106:14
108:3,22 110:6
114:10 116:18
117:6 120:18
121:1 122:6,22
123:21,21,22,22
124:1,2,6,6,6,15
125:4,5,10
126:14 127:15
127:17,17 131:4
132:1 133:17,19
135:4,6 136:12
137:10 139:12
139:19 140:21
141:2 145:3
153:7,18 154:13
154:15,15 158:3
**IX** 102:6
**I'd** 75:19 80:20
103:22
**I'll** 6:18 20:3
104:8 143:19
147:9
**I'm** 7:9,12 21:21
25:17 30:17
35:1,9 36:1
37:13 42:8 48:5
49:21 51:22
58:19 61:2
63:18 67:22
72:7 74:7 79:19
81:3,21 82:10
87:19 89:12
92:14 96:7
102:7,16 104:11
105:16 108:16

109:16 110:2,12
121:19 135:8,17
136:15 137:11
138:13 139:20
140:19 141:13
154:5,18 155:20
155:22
**I've** 20:11 35:7
114:22 131:11
143:14 144:4,4
147:4 152:22
_____

**J**

**J** 3:4,11,18
**Jackson** 3:11 4:3
6:6,9 8:19 9:1
11:6,15 12:13
12:18 19:18
20:5 25:3,15,21
26:4 28:1,9 32:8
32:14 33:7
34:13 38:3,9
44:4 50:12 51:3
75:21 76:1
78:17 79:1 80:6
85:10,13 88:14
88:17 92:18
98:20 99:4
104:8 128:4
136:16,20 143:1
143:6 146:14
147:21 148:1,5
153:9 157:4,7
157:22 158:5,18
158:22 159:2,7
**jack-up** 132:21
**Jain** 3:12 6:10
**January** 1:20
45:20 147:10
149:15 161:13
161:16
**Jill** 70:11,11
132:3
**Jill's** 132:5
**job** 1:7 2:1 95:8
95:16
**jobs** 71:10
**John** 3:3 23:16

30:14 33:18
41:6 69:13,14
69:18,18 108:15
116:5
**Johnson** 93:4,4
**joined** 61:6
**joking** 23:19
**journal** 98:5
**journals** 97:22
98:6
**Judge** 8:14
**judgment** 19:7
120:4
**judgments** 19:2
**Julia** 131:15
132:7,8,9
**July** 50:13 106:22
109:12
**June** 15:17
**jurisdiction**
157:12
**jurisdictional** 8:3
8:7 75:19
157:14
**Justice** 41:17
**justify** 45:16
**Justin** 41:21
42:10
**J&J** 61:8 64:12
64:13 66:2,2,6,7
66:14,19 67:3
80:13 92:4,9
93:7,8,19 94:12
94:18 96:17
121:20 122:20
_____

**K**

**Kademos** 70:11
132:6
**Kaye** 129:10
134:11
**keep** 32:9 125:5
126:11
**Ken** 70:16 132:3
**kept** 40:20
**kickback** 151:5
**kind** 10:20 19:6
23:8 30:22 31:9

31:11 35:9
50:19 53:5
55:10 56:2,8,10
61:20,20 62:11
62:13,20 65:17
71:10 73:2
75:15 78:4
86:11 87:17,20
88:19 91:1 94:5
96:10,16 98:4,6
103:1,8 107:8
107:13 115:17
116:15,19
117:11 119:14
119:16 121:4
122:11 123:9
125:6 131:17
142:12 155:18
158:13
**kinds** 11:16 97:21
98:11 108:1
131:22
**Kleiman** 25:19
32:19 34:6
143:22 144:11
145:1,7,21
146:22 147:10
149:15 158:20
**knew** 72:7 74:1
114:3 115:8
121:11 131:10
137:11
**know** 7:4 8:4 11:1
14:1 15:5 17:4
18:10,17 19:5,9
19:10,11,22
21:9,17 25:17
25:18 26:20
27:7,8,9 30:1
31:9,14,16 32:6
32:12 34:19,20
34:21 35:18,20
36:3,4,5,5,7,8
36:21 37:14
42:9 43:7 54:11
56:22 59:6,21
60:3,4,19 61:14
63:11 64:11

65:4,16 66:8
68:4,20 70:8
73:2,11 74:5,18
74:19,20 75:5,8
75:10,11,14,14
75:15 76:11,13
77:7,8,14,19,20
78:1,9,15,21
79:3,9,18,19
80:3,12,14
81:10 82:4,15
82:16,17 85:4
86:15 88:3
89:15 93:14,15
93:16,17,18,22
94:6 97:12 98:3
101:4 103:5,8
103:20 104:11
107:1,3,12,19
107:21 108:3,13
108:15,19,22
113:14 114:12
115:7 116:21
117:1 119:3,4,5
119:16,20 121:3
121:17,22
122:13,15
123:13,15
124:12,13 125:9
126:9 130:7,9,9
131:4,6,9,18,20
132:15 135:21
136:1,8 137:18
138:2,14 139:10
139:15,15
140:18 142:8,18
143:13 145:4,5
146:5 150:10
151:15,17,20
154:10,13,16
155:16,16
156:12
**knowledge** 17:19
61:2,5 64:8 71:7
87:2 133:22
141:18 146:2
152:15 153:2
154:6,19 155:1

155:21,21

## L

**language** 33:21
137:6 152:1,3,6
152:8,9
**large** 54:22
**largest** 45:13
83:13
**Larry** 116:8
117:10 120:10
**launch** 46:20,21
**launched** 47:1,3
47:12
**Laurel** 151:19
**LAUREN** 3:3,4
**law** 2:4 3:4 79:21
80:12 108:3
111:11 126:1,4
126:6,7
**laws** 110:12
**lawsuit** 50:2
53:18
**lawsuits** 53:21
80:15 92:5
93:11,14,19
94:9 97:4
120:16 121:11
**lawyer** 12:21 15:2
15:3 24:16
144:22
**lawyers** 11:19
12:12 15:9
32:16,17 36:11
41:17 134:9
**lead** 41:6
**learn** 93:18 95:11
130:13,15
**learned** 61:1 95:9
130:20
**leaving** 13:8
157:12
**left** 6:20 13:3,17
17:11 22:1,21
37:21 41:1 45:2
47:2,4 58:6
115:20 139:14
139:17

**legal** 110:20
111:3,16 112:22
114:7
**letter** 4:17,18 5:3
46:18 50:14,19
51:5,10 129:4
134:2 141:20
143:7,8 144:11
145:11 158:20
**let's** 30:17 40:4
53:7,12 63:5
64:12,16 65:6
66:1 67:6 69:4
71:18 76:16,20
84:4,4 88:13
92:8 93:2 95:15
98:20 124:18
136:16 157:4
158:5
**level** 67:5 117:10
**LEWIS** 2:7
**life** 23:18 41:8
**limited** 8:2 33:16
107:4,6
**limiting** 8:6
**LINE** 162:3 163:3
**Linnett** 159:10
**Linnette** 1:10,18
2:4 4:2 6:2,8
51:5 131:20
160:2
**list** 24:10 61:15
62:13 95:4
125:9,9,19,22
129:4 130:14,20
134:1,2 141:19
141:20
**listed** 109:1
**litigated** 8:14
**litigation** 1:6 25:1
95:10 96:20
97:20 98:17
123:3 124:10
162:2 163:2
**little** 51:18 75:19
88:20 102:20
110:2 122:4
**LLP** 2:7 3:13

**locate** 103:2
**long** 16:4 20:9,10
20:12 41:18
43:6 80:19 87:6
96:4 115:2
117:7 131:12
137:10 140:20
153:7
**longer** 16:4
**look** 43:20 45:12
46:1 75:1 77:4
84:20 92:19
93:1 100:18
101:4 104:10
105:13 115:11
124:18 126:14
128:17 131:6
143:16
**looked** 66:16
88:11 99:12
152:18,19
**looking** 27:10
49:21 81:9
83:18 104:20
142:3
**looks** 49:9 61:15
**losing** 72:15
**lot** 93:15
**lots** 87:16 120:15
150:11 152:22
**lower** 73:13 81:5
81:13 83:1 94:8
94:10 122:9
**lowest** 65:22
81:18,22 82:14
85:19 86:14,16
102:13 155:9
**Luncheon** 136:18
**Lupon** 124:10

## M

**M** 2:13 161:2
**maintained** 41:1
**major** 101:14
105:19 155:17
**making** 62:19
66:18 115:13
**male** 116:17,18

**man** 129:21 130:1
**management**
119:15
**manager** 31:10
115:21 116:15
116:16 131:16
**managers** 71:9
132:14
**manufacturer**
59:3
**manufacturers**
59:22 101:16
102:2
**manufacturing**
59:9 63:6
**margin** 73:14
74:4,5 81:6
115:13 122:4,11
131:3,17
**margins** 23:21
31:19,19 70:9
72:16 73:4,10
77:20 81:8
108:1
**mark** 27:14
103:12 133:13
145:20 151:19
**marked** 11:2,4
25:22 26:2 28:4
28:6 33:2,4 34:9
34:11 38:7,10
43:22 44:2 50:8
50:10,21 51:1
99:2 109:10
127:21 128:1
142:21 143:4
145:17 146:9,11
**market** 2:8 4:15
23:10,21 31:11
31:19 38:15
59:20 60:17
61:22 64:3
72:15 80:14,16
83:1 84:20
93:22 94:10,11
95:5 99:8
103:10 104:11
105:20 107:21

107:22 108:4,20
114:12,13,16
121:5,15 122:15
123:15 124:16
145:16 156:12
156:14
**marketing** 30:4
70:8,17 105:17
105:18 117:13
131:10 132:4
**markets** 121:21
**Maryland** 2:15
161:21
**Massachusetts**
1:3 110:12
**Master** 1:5
**Master's** 52:9
**material** 98:7
144:17 145:12
**matter** 6:11,13
13:11,18 15:16
22:6 41:12,16
109:12 138:12
147:14
**matters** 8:13 54:2
138:11,12
**may** 12:15 51:4
123:16 124:14
140:15 147:3
157:8
**ma'am** 21:1 79:2
109:19,21 110:2
152:10,12
**MDL** 1:4 6:14
8:13
**mean** 10:6 17:16
18:14,16 23:14
24:14 25:8
45:22 55:17
58:14 59:12,16
59:19 61:3
64:21 70:21
77:6,17 83:13
85:12 86:10
87:1 105:5
106:6 107:22
108:2 109:20
111:16 115:2

149:6 151:12,13
155:13
**meaning** 57:20
90:18 115:6
**means** 11:13 23:2
52:5 57:19
61:14 125:1
**mechanism**
112:14,19
**media** 29:14,18
29:19
**Medicaid** 46:19
76:14 78:6
148:7 154:14
**Medicare** 46:18
48:7 78:6
154:13,14,16
**Medicare/Medi...**
76:10 98:8
**medication** 7:8
**medications** 7:13
**meet** 13:1,21
15:11 17:22
18:3 21:18,22
42:22 43:4
**meeting** 71:2 83:2
88:1 91:9 116:7
117:9 135:12
**meetings** 16:21
41:17 74:2
91:10 135:22
136:1,1
**member** 72:3
**members** 115:16
**memorandum**
4:10 9:17 27:11
28:17 112:10
127:13
**memory** 74:11
139:20
**mention** 142:10
**mentioned** 26:13
43:14 49:18
61:9 118:13
123:2 136:9
**Merck** 65:12,13
80:13 93:6
**met** 13:7,16 15:5

15:21 16:12
21:10 22:11
**Michael** 3:18 6:10
42:6 71:2 74:5
76:8 82:6,11
84:17 90:5
99:13 102:11
115:16 144:12
155:2,16,21
**middle** 129:3
**middleman**
114:13 121:21
121:22
**Mike** 69:15,15
71:6,15 72:3,8
76:3 85:20
102:12
**million** 30:14
49:2
**mind** 113:4
139:14
**mine** 127:18,20
158:3
**minute** 92:3
**Minutes** 88:1
**misreporting**
124:22
**missing** 40:14
**model** 124:3
**modeling** 45:8
95:2,2 119:15
**models** 57:16,17
**moment** 157:20
**money** 81:12 94:6
**month** 15:21
**months** 16:4 18:4
22:8 45:4 47:12
69:7 117:18
**Morgan** 2:7
129:10 134:12
**morning** 24:22
43:17 44:6
50:15 51:8,13
98:12 99:5
103:17
**motion** 4:11 8:3
9:18 24:18
27:11 28:18

33:9 112:11
**move** 48:6 64:16
67:6 94:11
95:15
**multiple** 31:3,4
102:15
**multiplier** 113:20
114:2

_____

**N**

**N** 3:1 4:1,1 5:1,1
6:1 87:12
**name** 6:7,9 30:3,7
42:5,7,12 48:15
64:10 69:17,20
69:21,22 70:13
70:17 86:4
87:12 116:14
119:5 129:17
132:5,10 134:14
136:7,12 142:10
146:18,18
**named** 153:4
**names** 41:20 54:6
134:21
**nearly** 37:21
139:17
**necessarily** 37:7
**need** 15:1,5 29:4
88:20 93:16,17
99:19 113:3
157:10 159:2
**needed** 97:15
**needs** 74:20
131:19
**neither** 125:10
161:9
**never** 12:17 64:14
119:21 133:8,11
**new** 75:13 115:4
**newer** 48:16
**news** 29:14,18,19
131:2
**Nick** 69:15 116:6
117:9
**nods** 8:10 14:15
22:12
**Northwest** 3:14

**notarial** 161:13
**Notary** 2:14
161:20
**note** 144:10
148:15 151:3
**notebook** 26:12
29:8,18 156:16
**Notice** 2:13 4:7
11:8 12:3
**noticed** 49:18
115:5 120:7
**notification** 46:18
**notion** 114:1,15
153:20
**nowadays** 57:20
**number** 57:1,2
82:21 89:15
100:8,15 153:1
**numbers** 38:19
72:9 89:14
144:5,5
**numerous** 133:8
135:22

_____

**O**

**O** 4:1 5:1 6:1
**object** 6:20 12:10
110:19 112:21
153:11
**objected** 111:15
**objection** 111:11
111:12,14,19
113:11 114:6
**Objections** 26:5
**Objections/Res...**
4:8
**objective** 46:11
**observed** 101:5
**obtained** 133:22
141:18 142:9
**obviously** 32:8
101:22 125:8,19
126:7
**occasionally** 70:7
**occur** 43:5
**occurred** 47:14
**offer** 4:18 51:10
**offered** 51:10

**office** 3:4 123:12
123:20 124:9
146:4
**officer** 161:3
**offices** 2:5
**oh** 31:22 43:18
59:18 81:21
125:12 149:9
**okay** 7:10 10:3
12:13 13:1,10
14:8 15:10,11
19:12 24:17
29:17,21 30:21
32:8 37:9 41:15
45:1,22 46:10
47:22 49:14
50:6,7 52:8,11
53:17 55:3,22
56:15 59:19
60:11 67:16
69:10 72:1 73:9
73:10,16 74:15
74:16 76:7,16
80:11,17 84:6
84:11,16 85:8
85:18 89:6,11
91:6 92:2 93:2,3
93:8,21 95:15
97:18 99:10,16
100:7 101:3,6
102:18 108:16
110:2,9 112:6,8
113:16 117:4
119:13 121:20
122:4,9,12
123:6 125:6
128:17 131:1
132:12 133:5
134:15 137:17
138:22 139:4,8
140:6 142:20
146:2,7,13
148:3,14 149:1
149:3,20 150:9
151:2 153:2
154:1,5,7,20
155:22 157:3
159:7

Case 1:01-cv-12257-PBS   Document 6866-2   Filed 01/27/10   Page 54 of 150
HIGHLY CONFIDENTIAL DEPOSITION OF LINNETTE SUN
CONDUCTED ON TUESDAY, JANUARY 19, 2010

175

once 91:11
ones 25:18 43:13
  86:3
ongoing 95:10
  97:3 98:17
  105:21
online 137:16
open 32:10
  157:13
opinion/conclus...
  112:22 114:7
opportunity
  135:11
Opposition 4:10
  9:18 27:11
  28:18 33:9
  112:10 113:8
oral 123:21
order 8:12,17
  54:8,8,16 69:1
  93:22 118:6
organization 72:8
organize 18:14
original 104:13
  108:11
outcome 161:11
outside 30:2
  31:13
overall 70:21

**P**

P 3:1,1 6:1
page 4:2,6 5:2
  29:15,16 30:5
  34:22 46:13
  48:7,18,19,20
  49:4,7,8,9,14,15
  55:4 99:17
  100:5,15,17
  101:1,21 104:9
  105:14 108:17
  109:1 110:5,6,8
  112:7 127:17
  128:17,21
  133:19 136:21
  137:2 141:6
  147:18,21,22
  148:1,11 150:22

151:6,7,22
162:3 163:3
pages 2:2 20:13
  20:13 40:13,14
  44:16 49:19
  103:2 105:6
  108:1
page-by-page
  100:21
paid 30:14 49:2
  81:3,4 122:21
paper 87:22 88:2
papers 10:20
paragraph 33:12
  33:14 40:17
  96:7 104:18
  110:3,8,9,11
  111:4,6 124:19
  124:20 129:1
  133:18,21
  134:15,17 135:2
  135:8 137:4,6
  137:14 140:7,16
  141:1,6,8,15,17
  142:8,11 152:1
paragraphs 39:13
  142:2 147:17
Park 23:16 30:14
  33:18 41:6
  69:13,14,18
  108:15 116:5
part 9:14,15
  34:20 44:13,14
  66:12 67:17
  75:21 105:21
  110:21 114:8
  121:2 130:3
  139:9 140:9
particular 57:10
  77:2 120:17
  122:21 135:15
  136:6
particularly 14:6
  58:2 119:8
  153:5 154:9
parties 161:10
parts 109:16
party 35:19 65:1

65:4 155:11,12
passed 135:12
patient 74:20
  123:18
patients 74:19
  75:8,11,12 77:9
  122:7,14 124:17
patterns 77:13
payments 19:1
  138:19
payor 46:17
  154:16
payors 58:2 60:16
  61:17,17 64:7
  115:9,10,18
  116:2,3 117:1,1
  120:9 154:13
  155:17
Pennsylvania
  1:19 2:9 52:4
people 33:16 70:8
  129:18 131:10
  131:18
percent 83:14
  115:7,13 116:2
  117:17 118:9
  119:19 120:21
  123:15 125:4,6
  126:2,4,12
  131:4 132:21
  138:6,10 141:5
  141:8
perfectly 76:22
  77:6,7
performance 4:16
  43:21 44:11,21
  45:4,5
period 22:17,17
  45:20 93:9
  94:13,18 95:12
  96:19 97:2,3
  98:18 112:17
  113:19 114:14
  144:17
permissible 77:1
person 16:12
  66:10 67:13
  69:17 116:19

personal 156:20
  156:22
personally 71:12
  71:19 76:5
  149:5 152:11
personnel 132:12
pharmaceutical
  1:4 6:12 14:6
  39:22 61:18
  63:19 64:2 66:9
  83:21 94:1
  162:2 163:2
pharmacists
  122:12
Pharmaco-econ...
  51:11
pharmacy 36:22
  122:2,3 124:7
  158:15
Philadelphia 1:19
  2:9
phonetic 70:11
  119:1 124:10
phrase 137:20
phrases 59:8
Ph.D 52:5
piece 87:22 88:2
Pink 98:2,3,4
place 61:19 91:10
  117:5
plan 155:6
plasma 4:15 32:5
  38:15 83:16
  84:2 86:1 87:4,5
  87:7,10 91:15
  91:17 99:8
  100:2 105:19
  107:7 145:16
played 31:9
pleading 10:16
please 6:7 7:3
  25:4 33:12
  36:16 38:4
  51:19 55:2
  78:18 79:10,18
  132:5 143:17
  147:13
pleased 144:15

plus 90:3,5 131:4
point 78:6 100:15
pointed 105:11
pointing 158:10
policy 52:1 65:17
  65:21
position 51:11
  121:9
possession 16:21
  26:12 30:16,20
  43:12 51:16
  68:18 156:20
  157:1,9,9
possible 74:22
  75:17 140:21
  141:2 142:2
possibly 31:6 36:2
  36:6 71:8
post 58:20
posted 131:21
Poulios 69:16
  116:6
practices 75:13
precisely 99:12
preparation 9:4
  10:9,16,21 12:6
  12:20
prepare 10:12
  95:5
prepared 149:18
preparing 37:18
Presbella 119:1,6
present 3:18
  110:13 111:7
  112:2
presentation
  74:13
President 116:8
press 97:9,11
presume 7:4
pretty 26:15,20
  26:21 153:7
prevent 60:13
  61:20 63:22
prevention 64:1
previously 32:11
  145:17
price 1:5 6:12

Case 1:01-cv-12257-PBS Document 6866-2 Filed 01/27/10 Page 55 of 150
HIGHLY CONFIDENTIAL DEPOSITION OF LINNETTE SUN
CONDUCTED ON TUESDAY, JANUARY 19, 2010

176

23:11 24:11
31:19 45:7,16
47:20 48:21
57:7,21 58:14
59:9,20 60:5,17
61:15,16,16,22
62:1,12,13,22
62:22 63:2,2,7
64:4 65:7,11,15
65:16,20,22
66:2,5,7,11,16
66:19,21 67:1,1
67:1,2,4,12,18
70:21 71:19,20
71:21 72:9
73:13 80:18
81:2,5,13,16,18
81:19,20,22
82:14,18,22
83:11 84:9,12
84:18 85:1,2,16
85:19,19 86:8,8
86:11,14,17
88:10 94:11
95:4,5 101:5
102:1,4,12
103:6,8 115:3,8
115:12 117:8
119:18 122:10
122:10 129:5
130:14,21 131:4
134:1,2 141:19
141:20 148:8,15
148:22 149:22
154:20 155:9
157:1
**prices** 57:10
58:22 67:8
84:19 117:16,20
120:21 131:8
140:13 156:14
**pricing** 14:6,6
23:12,14,20
24:2,8 26:13
29:20 30:8,22
31:18 33:16
35:16 36:21
39:4,22 40:3

41:7 45:7,15
46:7,17 47:21
48:8,10,21 49:1
49:2,6,10 51:14
52:18 54:2 58:4
58:12,16 59:3,4
64:15 66:20
67:14 71:17
72:6 94:20,22
95:1,2,6 96:3
97:14 98:4,12
110:14 114:22
115:1,11 119:18
131:11 133:7
135:12 137:5,13
139:21 155:3
156:12
**primarily** 25:19
**primary** 39:21
**principal** 39:14
**print** 44:20,22
117:20 131:7
**printed** 149:16
**prior** 13:7 21:7
41:15 42:21
43:3 67:21 77:2
87:17 103:17
106:8 112:15
**priority** 40:2
**private** 61:17
63:15 115:10
116:3 117:1
**privately** 21:10
**privilege** 19:22
20:4
**privileged** 14:21
19:15,20
**probably** 8:16
13:15 36:21
47:11 57:8 62:9
62:9 70:14
79:13,13 83:14
83:19 93:7
94:17 100:11
102:10 103:12
123:13 124:2
149:16 158:3,13
**problem** 117:13

proceedings
161:4,6,6
**process** 97:18
**produce** 24:14
104:1
**produced** 24:13
24:22 25:16
27:1,7 30:20
36:11 40:8 44:5
50:15 51:7,13
103:17 104:2
143:21 146:21
149:13 157:14
**product** 23:17
35:19 40:3 41:7
41:7 45:13
46:20,21 48:8
48:10 49:5,17
77:13 81:12
83:13 87:1,2,7
107:7 131:16
132:14,20
**production** 25:19
26:7 109:6
**products** 4:13
14:7 24:8 31:22
32:3,4,5,6 34:15
39:22 40:1 45:9
48:16 74:6
75:14 83:16,19
83:21 84:2,18
86:2 87:4,5,10
87:11,12 91:16
91:18 94:2,7
100:2 101:5,8
101:14,15
102:10 105:19
107:8,13 110:15
111:22 123:21
132:21 133:2,3
133:4,7 153:4
**product-specific**
104:15
**Professional**
161:2
**professionally**
21:10
**profit** 77:21

**profits** 122:13
**program** 52:10
154:17 158:15
**Program's** 148:7
**project** 31:10
**proprietary** 55:7
55:11,16
**Protective** 8:12
8:17 54:7,8,16
69:1
**provide** 16:6
18:10 21:6
32:15 41:10
66:13 105:22
121:3 137:8
138:19 139:13
140:6 141:7
**provided** 32:18
32:21 60:20
97:12,17 129:9
138:8 140:2
141:11 144:21
144:21 145:1,5
145:7 146:3
147:10 154:19
155:1
**providers** 72:17
73:11 94:5
121:4 122:16
131:6 135:1
**providing** 58:12
**Public** 2:14 161:1
161:20
**publication** 109:8
**publish** 139:11
**published** 105:21
118:7,8 124:21
137:19 138:5
155:18
**publishes** 139:7
**pull** 147:15
**purchase** 158:14
**purchasers** 73:8
**purchases** 77:5
**purchasing** 77:13
**purpose** 8:2
**purposes** 66:22
**Pursuant** 2:13

**push** 114:13,16
**put** 111:12,19
125:4
**putting** 115:12
**p.m** 136:18,19
159:11

_____

**Q**

**quarrel** 153:20
154:1
**question** 6:21,22
7:3 17:15 18:7
18:17 19:4,16
21:19 38:2,4
42:2 53:8,17
63:5 78:12,16
78:17 79:2 85:8
85:10 88:14,20
93:17 111:1,13
111:17 112:1,1
113:1,2,3,12
114:8 118:4
127:2 128:9
135:18 153:12
153:15,16,18
**questions** 6:19
8:6 9:2 56:4
67:7 68:8
116:20 157:11
157:15,18,19
**quite** 13:2,12 14:4
16:4 17:15 33:1
42:1,3 48:12
53:3 60:4 61:6
84:2 94:9,16
113:14 115:2
130:5 133:9
147:11 150:7,7
**quote** 105:16
106:2,20 107:1
112:12,17
137:20,22
141:22 144:15
144:18 152:1
**quoting** 110:13

_____

**R**

**R** 3:1 6:1 162:1,1
163:1,1

Case 1:01-cv-12257-PBS  Document 6866-2  Filed 01/27/10  Page 56 of 150
HIGHLY CONFIDENTIAL DEPOSITION OF LINNETTE SUN
CONDUCTED ON TUESDAY, JANUARY 19, 2010

177

**raise** 119:18
**rate** 81:13 94:7,8
  117:3
**rates** 73:12 77:19
  116:4
**read** 10:11,13
  11:19,20 25:5
  38:3,5 40:12
  78:17,19 85:10
  85:11 88:14,16
  148:18 153:9,10
  160:3
**reading** 105:16
**reads** 141:17
**ready** 128:8,9
**really** 18:17,20
  19:4 20:10 21:5
  21:19 22:9
  25:18 35:5 62:1
  99:16,20 100:19
  115:15 120:4
  121:21 124:13
  131:18,22
  138:11 143:13
**reason** 19:13
  154:1 162:3
  163:3
**rebate** 65:19
  148:7,15,21
  149:21
**receive** 103:6,9
**received** 33:17,18
  47:9 52:12
  107:2 144:22
  157:10
**recess** 136:18
**recitation** 129:9
**recognize** 35:1
**recollection** 16:18
**recombinant** 14:7
**Recombinate**
  32:5 83:4,13
  84:1 86:1 87:4
  87:21 91:14,15
  100:3,6,14,22
  101:7,10,14
  102:10 107:8
  111:22 137:21

138:5
**recommendation**
  49:6
**recommendatio...**
  24:2
**record** 6:7 8:1,20
  17:4 25:5 26:16
  38:5 78:19
  85:11 88:16
  98:20,21 99:1
  103:22 111:13
  111:20 118:3
  136:16,17
  153:10 157:4,6
  157:20,21,22
  158:6 161:5
**Redbook** 58:13
  115:6 117:20
  118:1,7 120:9
  128:17 137:18
**reduced** 161:7
**reengineer**
  156:20
**refer** 14:14 19:3,8
  27:17 55:1
  92:10 102:12
  111:4 112:7
  117:2 131:6
  135:2 143:7
**reference** 128:8
  134:17
**referenced** 106:4
  106:9 123:3
  124:10 143:20
**references** 29:8
**referencing**
  101:20 102:6
  128:19 135:8
**referred** 27:9
  30:5 51:15 99:7
  104:17 114:3,20
  115:9 126:17
**referring** 9:10,17
  12:11 19:14
  25:18 26:16
  30:18 34:2
  37:22 38:12
  40:17 45:10

46:13 62:21
  64:9 83:3,17
  84:5 89:17 92:4
  92:12 96:7
  101:1,10 108:16
  114:20 126:13
  134:20 149:21
**refers** 48:7
**reflected** 104:2
**refuse** 68:7,10
**refused** 134:1
  141:19
**regard** 68:9 153:5
**regarding** 16:7
  54:2 56:18
  109:4 110:14
  113:13,20
  132:17 137:5
  141:8 152:16
  153:4 154:8,20
  156:4
**regardless** 54:15
**regions** 106:1
**Registered** 161:2
**regulation** 79:4
  79:18,19,21
  80:3,9,11
**regulations** 78:7
  78:13 79:8,9,16
  97:13
**regulatory** 85:5
**reimbursed** 50:4
  61:18 122:3,9
  122:10 123:18
  123:20
**reimbursement**
  36:20,20 45:8
  45:14 46:4,7,19
  48:8,8,10 65:21
  66:22 73:12
  77:19 81:13
  94:7 95:5,6,7
  115:1 116:4
  117:2 122:14,16
  122:21 123:14
  126:12 154:15
**rel** 1:10
**relate** 24:7,10

57:6,9 58:11
  59:2 66:21
  80:18 81:15
  95:5 108:3
  122:12 157:12
**related** 31:19
  43:19 58:3 79:6
  80:15 81:14
  103:10 113:18
  161:9
**relates** 52:18
**relating** 50:3
  68:11 86:11
**relationship**
  61:10,12,14
**relatively** 156:3
**Relator** 19:19,19
  133:22 141:18
**Relators** 1:12 3:2
  4:10 9:19 28:19
  112:10,11
**release** 54:5,20
  55:16
**rely** 119:13
**remember** 13:3,4
  13:11,14,19,20
  15:14 16:3
  20:10,20 21:2,5
  21:8 22:9 30:2
  30:11 32:21
  34:21 35:5
  37:17 41:13,20
  42:12 43:3,6
  47:1,8,9,13
  48:15 53:3
  64:10 66:15
  68:2,3,4 69:17
  69:21 70:14
  72:12,13 74:12
  82:21 83:15
  86:4 87:6,10,12
  89:22 91:17
  94:13,15 96:22
  98:7 116:6,14
  116:21 117:6
  123:4 124:12,13
  125:13 126:9
  129:17 130:4

132:6,11 133:15
  134:11,13,19,21
  135:21 136:2,6
  137:10 139:9,12
  141:3,4,11
  143:13 144:2,3
  144:5,9 145:3
  145:10 147:3
  150:12,14,17,18
  150:18 152:17
  153:1
**remove** 22:22
  149:6 152:8,9
**removed** 152:6
**repeat** 25:2 38:2
  63:18 153:8
**report** 30:4,6,8
  31:2,4,7,15,16
  49:1 72:2 81:18
  82:1,13 83:1
  84:14,20 85:6
  86:16 88:7,11
  90:5,20 91:4
  105:20 106:1,4
  106:8,12,21
  107:5,14 108:7
  108:13,17,20
  125:2,17,21
**reported** 76:5
  82:17 84:19
  86:6,22 87:20
  125:8,19,22
  126:3 129:5
  130:14,20
  137:21 139:15
  139:16 153:3
  155:9
**Reporter** 7:21
  161:3
**REPORTER/N...**
  161:1
**reporting** 66:4,11
  67:10,11,13,14
  67:18 69:19
  71:10 72:1 76:4
  82:8,10 83:11
  84:8,12 85:2,16
  85:19 86:13

87:15 110:14
112:14,19 115:1
119:9 148:8,16
149:22 153:13
**reports** 29:14,18
29:19
**represent** 6:11
143:19 147:9
**representatives**
42:22
**represented**
149:17
**request** 32:8
36:12 43:12
104:8 107:16
158:19
**Requests** 4:9 26:7
**require** 7:16
**requirement** 58:1
**Requirements**
148:8,16
**research** 23:10,11
23:12,14 29:20
30:1,4,22 31:11
49:2 74:2 83:1
84:20 95:2 97:8
105:17,18,22
108:20 128:14
131:12 156:13
**researching**
128:15
**reservation**
157:17 159:8
**reserve** 8:7
**reserving** 157:13
**Respondents** 1:16
3:10 6:5
**response** 12:2
**responses** 7:16,22
26:6
**responsibilities**
45:11 48:2 69:5
70:19 96:1
**responsibility**
39:21 45:19
67:15,15,17,18
72:5
**responsible** 97:14

**responsive** 43:12
**rest** 48:1 72:6
**result** 18:11
**results** 29:22
**retail** 121:20
122:2,2,11,14
123:22
**retain** 22:22 23:2
**retained** 52:17
53:4,13,20 54:1
**revenue** 83:14
94:2
**review** 4:16 9:4,7
10:4,10,15
11:11,16,18
43:21 44:11,21
45:5 46:2,5,6
129:8 158:13
**reviewed** 10:21
24:1
**Reviewing** 27:13
28:12 29:5,13
83:12 87:9
92:11 99:21
100:1,4 102:21
103:4,19 127:19
143:12 149:2
**reviews** 45:4
**re-read** 25:3
**right** 6:10,10 8:7
14:19 15:18
27:14,15 28:13
29:10 35:22
40:4,13 45:13
46:14 47:2,7
49:7,20 52:7
54:14 55:21
57:14 61:15
64:22 68:22
69:11 73:17
76:18 77:6,7
80:2 83:18 84:4
88:8,13 91:9,9
93:3 95:2,14
96:9,12,14
99:17 100:19
101:11,12,13
102:3,16 103:2

103:7 104:20
105:4,5,9
106:18 108:8,10
109:7,9 113:7
120:4 121:6,10
124:3,11 125:10
126:19 128:3
133:1 136:14
140:11 142:13
150:2,16,16,18
151:12 152:4
156:5 157:13
159:6
**rights** 157:17
**right-hand** 49:22
**role** 31:9 66:15
**routinely** 156:3
**RPR/RMR** 2:14
**Ruchi** 3:12 6:10
**Ruchi's** 6:10
**rule** 79:22
**rules** 85:4,5,17

────────

**S**
**s** 3:1 4:1,4 5:1 6:1
9:18 26:6 28:18
112:11 162:1
163:1
**sale** 156:13
**sales** 47:13
117:13 156:13
**Santa** 3:7
**Saris** 8:14
**save** 21:18
**saw** 74:9 78:2
84:20 126:9
136:3,7,8,13
**saying** 7:10
115:11 116:2
126:9 129:4
**says** 27:20 33:15
48:20 55:4 74:9
80:4,15 106:20
108:17 113:9
124:21 133:21
135:10 142:8
144:15 151:4
152:1

**scheduled** 116:7
117:9
**scheme** 112:13
113:10
**scholarship** 52:14
**School** 52:1,3
**scope** 109:6
**script** 122:1,2,8,8
122:18
**scripts** 75:6
**seal** 109:12
161:13
**second** 46:11
89:12 105:14
108:16 157:5
**see** 23:20 28:19
29:4 33:21
34:16 39:2
40:13 45:6
46:11,16 48:20
49:4 55:8 60:17
73:14 81:2
83:10 100:5,6
100:14 102:3,10
103:9 106:14
107:12 110:15
111:9 118:3
131:20,22 134:4
135:11,19 137:6
137:20,22
141:22 143:8
144:13,18
145:11,17,19
148:6,8,17,21
149:20 150:14
151:3,9,22
152:3
**seek** 50:2
**seeking** 112:2
**seeks** 110:18
111:6 113:5
**seen** 11:9,17 20:6
20:11 26:9
28:10 32:11
34:18 35:7,8,9
38:22 69:1
109:13 128:6
133:8,11 143:11

143:14,22 144:4
147:1,4 152:22
156:17
**sell** 65:17 70:9
73:10,16 94:2
108:4
**selling** 32:7 60:17
61:22 62:1,12
64:4 73:3 84:18
102:12 116:15
131:4
**sells** 74:6
**send** 98:8 116:1
158:20,21
**sent** 11:1 97:12
108:14 129:4
**sentence** 25:4
33:14 46:4
106:20 111:2
112:12 127:4
135:10 144:15
153:7 154:4
**separate** 12:15
34:19 56:18,21
92:17 102:5,17
108:1
**series** 6:19
**serve** 46:5
**served** 11:8 43:13
46:2 124:7
**service** 122:4
**SESSION** 136:19
**sessions** 97:16
**set** 4:9 24:3 26:6
26:22 47:20
62:13 161:12
**setting** 57:10
62:22 63:1
117:8
**seven** 133:17
**shaking** 7:17
**Shanghai** 52:13
**SHAPIRO** 3:13
**share** 19:6,20
23:22 31:20
72:16 80:14,16
94:1,10,11 95:5
103:10 104:11

107:21,22 108:4
114:13,16
118:18 121:5
145:21
**sharing** 19:1
**sheet** 160:6
**Sheets** 98:2,3,4
**she's** 8:16 14:17
20:14 19:14
25:18 54:11,16
119:3
**shifting** 80:16
**SHORTHAND**
161:1
**shoulders** 82:3,4
139:5
**shouldn't** 71:22
75:4,5
**show** 11:2 25:22
27:10 28:4 33:2
34:9 38:10
43:22 45:10
50:8,21 55:1
99:11 108:9
109:10 127:21
143:2 146:9
**showed** 148:12
**shrugged** 82:4
**Shrugging** 82:3
139:5
**sic** 125:6 141:8
**side** 7:17 104:10
104:11
**side-to-side** 108:1
**sign** 20:18
**Signature** 159:9
160:10 162:22
163:22
**signed** 9:22 20:20
160:6
**similar** 55:10
71:21 100:12
**similarity** 123:9
123:11 124:15
**Simon-Kucher**
30:9,13,13 49:1
90:1,3 95:3
157:1

**simply** 73:20 97:9
**single** 31:2,4,7,7
77:18
**sitting** 31:14
**situation** 7:2
122:22 123:14
124:16 130:6
**situations** 121:16
**six** 45:4 134:22
**solicit** 21:14
**somebody** 71:15
150:15
**sorry** 48:5 63:18
81:4 87:19 92:2
94:10 102:7
**sound** 15:17
**sounds** 35:21 42:7
156:2
**source** 37:13
**sources** 36:6 98:7
**so-called** 138:16
**speak** 7:18
**speaking** 134:11
**specific** 64:10
67:19 71:10
80:3,12 86:21
94:16 96:22
107:16,16
114:12 132:20
158:15,16
**specifically** 43:19
45:5 144:5
**specifics** 67:22
68:1,5,11
**specifies** 79:4
**specify** 78:13
79:16 125:3
**speculate** 146:1
**Spell** 70:1,13
**spend** 109:15
**spent** 40:3
**spoke** 133:15
134:13
**spoken** 130:10
**spread** 108:5
114:15 138:17
**spreads** 121:3,8
**stands** 154:10

**start** 53:12 66:1
**started** 127:2
**starting** 61:1
113:5
**starts** 87:11
113:21 114:11
**state** 2:14 6:7
78:7,13 79:4
90:6 161:21
**statement** 144:17
**statements**
110:14
**states** 1:2,10
38:16 43:1
105:20 144:13
155:6
**State's** 43:4
**stating** 134:2
141:20
**status** 32:13
**statute** 152:20
**statutes** 152:22
**statutory** 152:18
**stay** 117:14
120:10
**stenographically**
161:7
**sticker** 103:2
**story** 80:19
**strategic** 67:5
**Street** 2:8 3:5,14
**stressed** 33:18
**strongly** 131:17
**studied** 97:12
**studies** 52:6
**study** 74:4 105:18
**subject** 8:13 54:7
112:22 157:17
159:7
**submission** 45:7
**submissions**
45:16 48:9,11
76:15 95:6
**submit** 58:14,16
62:10
**submitted** 134:2
141:20
**submitting** 58:22

**subscribe** 97:21
98:5 107:11
**subscribed**
117:19
**subscribing**
106:22 108:19
108:19
**substance** 15:1
**substantive** 8:9
**sued** 94:14,16
**suggested** 61:15
89:15
**suggesting** 29:17
107:15
**Suite** 3:6
**summary** 5:4
145:15
**Summer** 98:11
**Sun** 1:11,18 2:4
4:2,6,12,16,17
4:18 5:2 6:2,8,9
12:5,11 22:21
24:21 25:22
28:2 34:14
35:21 38:14
39:12 41:15
51:5,18 68:7
79:15 99:5
106:3 109:16
112:18 135:8,10
136:21 138:12
143:2,19 144:10
147:9 149:12
152:1 157:7
158:7 159:10
160:2
**supervision** 161:8
**supervisor** 116:6
**supporting**
145:22 146:3
**supposed** 63:16
66:3 67:10 71:3
75:5 81:17,22
125:3 126:2,4
126:10
**supposition** 89:2
**sure** 8:20 21:21
25:17 37:13

42:8 43:8 47:8
57:22 88:21
104:3 136:15
140:2,19 141:4
141:13 145:10
158:22
**survey** 60:17
61:20,21 63:12
63:14,16 64:3
77:18 105:21
155:17
**surveyed** 155:8
155:10
**suspend** 159:8
**switch** 75:12
**sworn** 6:3
**systems** 57:21

---

**T**

**T** 4:1,1,4 5:1,1
162:1,1 163:1,1
**table** 29:2 100:19
101:13 102:17
**take** 7:5,22 8:8
23:3,5,5 74:20
75:8 91:10
99:18 102:19
117:4 124:18
126:11 138:9
148:20
**taken** 98:22
136:18 161:4,6
**talk** 8:17 12:5
15:7 42:19 69:4
74:4 84:4
124:14 129:18
131:13 132:17
132:19
**talked** 27:4
132:20
**talking** 26:11
27:19 37:4
53:10 54:11
58:20 60:21
82:8,10,12 84:8
84:22 86:18,20
99:6 102:4
121:15 126:18

Case 1:01-cv-12257-PBS   Document 6866-2   Filed 01/27/10   Page 59 of 150
HIGHLY CONFIDENTIAL DEPOSITION OF LINNETTE SUN
CONDUCTED ON TUESDAY, JANUARY 19, 2010

180

132:2 142:16
153:12,13
**talks** 145:11
**TAP** 123:4,8,9,16
123:19
**team** 62:11,19
67:14 69:11,12
72:4,4,5 84:19
85:2 89:16
115:11,16
**teamwork** 66:9
66:12
**tell** 13:21 18:17
20:9,12 30:6
35:8 45:5 51:19
54:21 57:12
60:2 67:16,19
67:21 68:3,10
71:3,4,16 77:16
79:10,18,19
81:11 93:16
136:3,5 154:22
158:10,12
**telling** 68:1
**term** 11:18 65:6
80:7 85:21 86:7
88:4,6 89:10
**terminated** 13:4
23:1
**termination** 4:17
50:18
**terms** 68:20 82:18
83:10 85:5,5
111:3
**testified** 6:4 30:21
**testify** 53:18
**testimony** 160:3,5
**Thank** 34:8 40:4
102:18 142:20
**that's** 7:21 8:19
13:14 19:20
23:22 25:7
26:17 27:7 30:5
37:1 38:12
39:20 40:2
45:21 49:5 58:1
59:21 63:22
64:2,22 65:7

68:14 74:15,16
77:15 80:16,19
81:6 92:19,21
95:1 96:10
99:16 102:16
106:4,9 108:4
108:10 112:1
114:16 120:4,4
120:6 121:2,6,9
125:3,4,22
126:19 127:11
127:12 128:3
140:22 142:18
142:19 147:4,11
153:22 156:18
159:5
**then-existing**
97:19
**theoretically**
75:22
**theory** 81:17 89:4
89:7 120:2
**THERAPEUTI...**
1:14
**therapies** 71:20
**thereon** 152:2
**there's** 31:11
40:13 49:1,5
58:7 70:15
72:19 101:18
106:16 113:20
118:9 121:21
122:17 125:6
126:7,8 155:18
**thesis** 52:6
**they'll** 125:5
**they're** 54:21
102:4 121:13
126:1 156:14
**thick** 26:14,15,18
26:20,21
**thickness** 40:15
**thing** 9:13 62:10
74:6 88:2
103:13,20
113:14 114:14
114:20 122:6
131:17 133:8

148:18 159:5
**things** 11:16
46:19 48:22
60:3 72:4 73:15
97:15 99:6
113:14 131:21
132:1 136:9
150:10 155:7
**think** 9:3,8 10:22
12:14 13:2,6,19
14:17,18 15:15
16:10,19 19:13
20:16 21:16
22:10 23:22
24:5,17 26:10
26:14 27:5
28:16 30:15
35:13 36:2,5
38:13 40:8,12
40:14 41:13,18
42:17,20 45:3
47:2,11 49:6
50:18 51:17
52:10 54:5,10
54:16 55:20
56:7,11 58:7
59:20 60:13
61:8,16 63:19
63:21 69:8
70:11,15 71:8
71:21 72:13
73:1,9 74:17
75:15,18 77:6
78:3,3,9,11
79:11 80:2 82:9
82:19 83:15,19
86:19 87:11,11
93:5 101:15
103:5 104:9,14
109:22 110:19
111:18,22
113:13 123:16
124:15 126:7
127:15 130:5,12
132:19 134:22
138:11 139:1,2
140:9,15 142:15
142:17,18 144:4

145:9 152:22
158:16
**third** 33:14 35:19
65:1,4 135:10
155:10,12
**third-party** 31:8
98:6
**thought** 78:4
82:12,13 85:2
88:12 99:6
158:8
**three** 16:16 26:18
26:19 45:3
51:12 57:4 58:7
72:15 75:2 96:5
101:8,14 139:17
**three-ring** 26:17
**Tice** 42:4 144:12
**time** 11:14 13:16
14:9 15:6 16:3
21:3,3,11 22:17
22:17 40:3
45:19 50:1,15
51:8 58:6 59:13
61:7 64:12
65:12,13 80:13
84:2 89:21 92:4
92:6 94:13,14
94:18 95:9,12
96:10,19 97:2,3
98:17 99:18
102:20 109:15
113:19 114:14
115:2 120:15
128:14 130:17
130:20 132:14
139:12,13
140:20 144:20
145:2,10 148:20
157:18
**times** 16:15 22:11
53:2,3 99:5
130:2,4 133:8
**today** 8:6 9:5 10:6
10:8 11:14 12:2
29:3 31:15 40:8
43:14
**today's** 11:8 12:6

**told** 23:18 41:8
43:20 72:12,13
72:13 73:5
82:22 109:22
115:16 119:18
120:10 129:4,14
131:10
**tons** 77:22,22
**top** 49:21 112:7
113:20 115:7,11
115:13 125:5
134:22 138:6
**totally** 78:4
**trained** 97:7
**training** 97:16
**transcript** 11:5
26:3 28:7 33:5
34:12 38:8 44:3
50:11 51:2 99:3
128:2 142:22
143:5 146:12
161:5
**transcription**
160:4
**transferred** 6:13
**tried** 66:16 73:4
**true** 55:10 56:19
76:11,13 120:1
120:6 160:4
161:5
**trust** 64:2
**truth** 18:18
**try** 61:18 110:6
118:4 140:3
**trying** 21:21
30:17 61:2 72:7
74:4,7 75:15
79:20 85:14
92:14 102:16
115:3 116:22
138:13 154:5,18
155:20,22
**Tuesday** 1:20
**turn** 33:12 49:7
99:16 110:3
112:4 127:2
133:18 134:15
136:21 141:15

HIGHLY CONFIDENTIAL DEPOSITION OF LINNETTE SUN
CONDUCTED ON TUESDAY, JANUARY 19, 2010

181

147:17 148:11
150:21 151:22
**turned** 127:2
**turning** 99:22
**two** 16:16,19
  20:12,14 21:17
  24:22 25:7,8
  26:19 30:12
  36:11 37:21
  45:3 47:19 70:7
  75:1 87:11 93:5
  96:5,5 101:17
  103:16 117:22
  120:8 129:20,22
  132:3 139:19,19
  143:2 145:12
  148:21
**type** 37:7
**types** 58:8
**typewriting** 161:8

_____
**U**

**U** 5:1
**UDDEN** 3:3,4
  7:21 8:10,16
  9:12,14 10:2,19
  11:13,18 12:8
  12:10,14 14:15
  14:17,20 16:10
  16:17 18:9
  19:13 22:15
  25:10,17 27:6
  27:16,19 28:15
  32:4,12 37:4,7
  37:10,22 41:22
  42:2 44:13,15
  48:4 53:7,16
  54:10,15,19
  56:7 57:1,3
  60:21 70:3
  75:18 80:1 82:8
  83:8 85:7 86:19
  90:12,18,22
  92:1,16,19
  95:20 98:14
  99:18 100:7,10
  104:6 106:11
  110:7,10,19

111:12,15,19
112:21 113:11
114:6 118:2,21
125:15 126:16
127:11,15 134:8
135:14,18
147:18,20,22
148:4 149:11
151:6,8 152:4
153:11,17
157:19 158:21
159:1
**uh-huh** 6:15 9:20
  10:1 15:4,8,10
  17:6,9,18 22:2,4
  22:12,14 26:8
  27:16 29:6 34:5
  34:7 36:17
  37:15 38:17,21
  39:11,19 40:21
  43:10 44:7,9
  49:13 50:16
  51:6 52:16 55:5
  55:9 56:1 58:5
  58:10 60:8 63:8
  68:13 73:18
  74:10 76:19
  84:7,10 89:1,18
  90:4,8,11 91:5
  91:22 93:10,20
  93:22 95:17,19
  98:13 101:4
  109:9 111:8
  118:10 119:22
  120:22 138:15
  138:18 140:5
  141:10,16
  143:18 144:14
  149:14 151:10
  154:21
**unable** 104:21
**understand** 6:14
  6:22 7:3,6,9,15
  7:19 8:14 15:1
  17:15 21:19,21
  26:21 30:17
  32:1 35:21 60:6
  61:2,13 69:5

70:1 72:7 74:7
79:20 85:15
87:19 88:20
97:1,5,7 105:7
108:2 111:2
113:3 117:15
139:22 140:4
149:20 153:15
153:17,18 154:3
154:5,18 155:20
155:22
**understanding**
  60:11 110:21
  123:7
**understood** 7:4
  41:10 47:22
**undertook** 91:14
  91:20 156:21
**unique** 120:19
  122:22 124:16
**unit** 137:5,22
  140:8
**United** 1:2,10
  38:15 105:20
  144:13
**University** 52:3
  52:13
**update** 84:17
  155:2
**updated** 62:20
  84:19
**updates** 71:1
**upset** 130:6
**usage** 77:2
**use** 11:19 23:20
  62:12 65:19
  75:12 78:15,21
  80:8 88:22 89:7
  100:7 116:3
  131:18 145:21
**usually** 31:10
  91:9 121:22
  125:2 155:12
**utilization** 48:9
  75:16 94:3
**U.S** 42:8 45:8
  49:2 58:5 70:7
  72:6 84:18

116:3 117:13
146:3 152:20

_____
**V**

**v** 1:13
**VA** 116:4
**vaccine** 49:18
  50:3,4
**vague** 153:12
**variety** 39:13
**various** 99:5
**vary** 64:6
**VCC** 76:16,18
  135:20
**VCC's** 79:16
**vendors** 102:15
**verbal** 7:16,22
**version** 106:4
**versus** 88:7
**VIII** 100:6,22
  101:7,11,12
  102:7
**violated** 110:12
  148:7
**volume** 72:14,18
  72:19 73:2,6,12
  73:19 74:8,15
  74:18,20 75:8
  75:22 77:16
  78:7,10,14,21
  79:5,8,11,13,16
  80:7,8,16,17,21
  81:6,13,15,20
  134:18,19 151:4
  152:16
**VP** 69:18

_____
**W**

**WAC** 124:22
  125:3,4,10,11
  125:12 126:11
  137:21 138:5
  139:11
**wait** 81:21
**waived** 159:9
**wall** 131:21
**want** 8:19 69:4
  89:13 94:2,2
  100:20 108:4

117:14 119:5
127:9 146:1
153:11 158:1,2
158:12 159:5
**wanted** 60:16
  107:13 129:5
  134:3 140:2,3
  141:21 150:12
  158:10
**Washington** 3:15
  42:18
**wasn't** 78:16
  106:10 123:19
  146:6 149:7
**way** 20:3 24:7,10
  50:5 57:6 60:10
  75:16 82:1
  94:18 156:8
**website** 44:17,18
**week** 91:11,12
**weekly** 71:2 98:4
**weighted** 125:12
  125:13
**went** 93:4,7 97:16
**weren't** 71:12
  76:2
**West** 3:5
**we'd** 8:11 144:22
**we'll** 7:5 20:1
  39:10 72:18
  104:6 109:15
  158:19
**we're** 15:6 54:7
  61:1 63:6 75:18
  84:8
**we've** 21:14 32:10
  43:13 142:3
  145:16 157:9
**what's** 9:8 11:2
  19:12 25:22
  28:4,13 31:17
  33:2 34:9 38:10
  39:8 42:5 43:22
  50:8,21 56:6,12
  69:20 74:7,14
  87:21 103:10
  109:10 111:11
  111:14 127:21

Case 1:01-cv-12257-PBS   Document 6866-2   Filed 01/27/10   Page 61 of 150
HIGHLY CONFIDENTIAL DEPOSITION OF LINNETTE SUN
CONDUCTED ON TUESDAY, JANUARY 19, 2010

182

132:10 136:11
146:9 154:1
**WHEROF**
161:12
**wholesale** 1:5
6:12 57:6 61:15
80:18 125:13,14
125:16,17 126:2
**wholesaler** 36:22
**who's** 126:4
144:12
**witness** 9:13
10:22 14:19
19:17,21 27:14
27:20 28:13
37:9 48:5 53:5
53:13,18 54:14
54:18 70:4
92:21 95:22
99:22 100:2,9
111:11,14
118:18 121:17
140:11 151:19
158:2,12 159:5
161:12
**woman** 129:17,21
130:1 134:13
**woman's** 119:5
**won't** 7:17 68:3
**word** 42:10 73:4
77:17 88:22
89:7,14
**words** 80:1
**word/phrase**
65:10
**work** 48:11 51:19
87:17 92:9 93:2
96:16 119:7,11
119:15,16 130:7
151:4
**worked** 17:17,22
24:1 55:18
71:15 119:8
133:7
**working** 14:2
23:7 31:11
114:4,4,22
118:21 119:2,3

**world** 72:6
**wouldn't** 26:19
31:12 62:17
67:13 77:14
120:3
**write** 75:6 122:17
147:6,7 151:12
151:13,15
**writing** 109:20
128:13
**wrong** 30:15
72:19 73:5,6
74:7 76:18 78:4
78:11,14,15
79:5,6,9,14,17
80:2,4,9,16
82:13 86:5,12
88:3,9,12 89:4
89:10,13,14
90:10 99:14
108:3 120:5
121:5,8 135:5
**wrongful** 156:7
**wrote** 109:22
115:22 151:18
**W/AWP** 4:13
34:15

**X**
**X** 4:4 5:1

**Y**
**yeah** 9:12 10:14
12:8,10,22
14:22 19:17
20:16 23:13
26:14 27:17,20
28:3,15,16 29:6
29:14 32:5
36:19 37:10
38:2,12 39:7
42:7,11,15
43:10 44:19
46:22 47:5,17
47:20 48:3,20
50:1,7 52:7
54:18 57:3 61:4
65:3 68:16 70:4
71:5,11 83:6,19

86:13 91:2,19
92:14 95:1,1,14
96:9 97:17,21
100:9,11 104:6
104:7,9,14
106:8,13,18
107:7 110:7,10
111:5,21 114:18
114:22 116:18
125:16 126:20
127:4,9,10,13
127:17 128:3,11
128:16 130:22
132:9 133:6,10
135:9 136:5
139:19,22 140:1
140:17 142:5,15
145:9,14,19
148:10 150:6
155:12,15 156:5
**year** 13:4 15:22
64:6 75:1,2,2,2
77:2 103:11
107:11 120:12
126:10
**years** 13:2,13
31:3,5 33:1
37:21 47:19
61:6 66:14
72:15 78:2 93:5
93:6 96:5,6
133:7,17 139:18
**you'd** 80:21
139:17
**You'll** 137:20
144:10 145:11
**you're** 9:17 12:2
12:14 19:21
26:16 27:10,19
30:18 35:22
37:1,1,2 45:10
46:13 53:7 54:9
56:3,9 60:21
62:11 64:9 66:3
67:9 68:12
81:17,21,22
83:17,18 84:5
86:19 88:21

89:17 90:21
91:1 101:10,20
102:6 104:2
105:7 107:15
114:20 121:2
122:19 126:18
126:19 128:15
128:19 136:14
147:20 151:6
153:12,13
155:22 158:9,18
**you've** 7:4 22:10
24:22 34:1 52:5
58:8 69:1 76:17
85:7 98:12
118:2 121:8
157:7

**$**
**$1.30** 138:16
142:3
**$1.31** 129:5,6
141:21,22 142:2
**$1.6250** 138:16

**0**
**001527** 38:19
**001528** 105:14
**001536** 109:1
**001608** 100:17
101:2,21
**001744** 38:20

**1**
**1** 2:2 4:7 11:3,4,7
11:22 12:3 84:1
87:7 143:20
161:16
**1.30** 137:21
139:10,13
**1.31** 131:4 134:3
134:4 142:11
**1.62** 138:7 139:7
**1.6250** 138:9
**1:01-CV-12257...**
1:6
**1:03** 136:19
**1:08-CV-11200**
1:8

**1:31** 159:11
**10** 4:19 33:12,14
40:17 66:14
99:2 104:18
109:11,11 110:4
124:18 133:6,19
136:22 141:7
146:20 147:14
147:20,21,22
148:1 149:19,21
152:7
**10:59** 98:22
**101** 3:6
**108** 110:4,5,8,11
111:4,6
**11** 4:7,20 37:21
127:22 128:1,5
128:20
**11:10** 99:1
**12** 5:3 46:13
142:21 143:3,8
143:21 144:10
**12:00** 136:18
**128** 4:20
**13** 5:4 69:7
136:21 137:2
143:3,4,16,20
144:1 145:15
**13-month** 22:17
**1396r-8(C)**
152:19
**14** 5:5 15:17
133:19 146:10
146:11,15
148:12 149:12
150:21 151:22
**142** 5:3
**143** 5:4
**1456** 1:4 8:13
**146** 5:5
**15** 3:5 44:15,16
**16** 27:17,20
**1608** 100:10,18
**163** 2:2
**17** 51:4
**1701** 2:8
**18** 147:18,19,21
147:22 148:1

HIGHLY CONFIDENTIAL DEPOSITION OF LINNETTE SUN
CONDUCTED ON TUESDAY, JANUARY 19, 2010

183

**1825** 3:14
**19** 1:20
**19th** 161:13
**19103** 2:9
**1974** 106:1
**1986** 52:14,15
**1989** 52:10
  106:15
**1998** 93:7,9 94:12
  110:13,18 112:2
  113:6

**2**

**2** 4:8 26:1,2,5
  46:13 124:19,20
  127:15 128:17
  128:21
**20** 125:6
**200** 105:6
**2000** 93:9 94:13
  95:9 96:11
  112:15,19
  113:10,21
  114:10,11
  126:10,10
**20006-5403** 3:15
**2001** 4:15 38:16
  105:21 106:3,7
  106:14
**2002** 22:16 38:18
  51:4 96:14
  98:11 105:17
  106:6 107:1
  117:7 120:13
**2003** 13:6,7,17
  22:17 45:20,20
  50:13 58:7
  117:7 120:14
  135:13,22
**2004** 13:20 15:15
  21:11
**2005** 13:15,17
  15:15,17 18:4
  21:11 37:21
  47:15,16 109:12
  143:9,14 144:11
  149:9 150:2,5
**2010** 1:20 147:10

  149:10,16
  161:14
**2013** 161:16
**202** 3:16
**21** 151:22
**215** 2:10
**22** 20:13 50:13
  143:9 144:11
  147:19 148:11
  148:14
**24** 20:14 150:22
  151:6,7
**25** 113:20 115:7
  115:13 117:16
  118:9 119:19
  120:18,21 125:4
  126:2,4,11
  131:4 132:21
  138:6,10
**26** 4:9
**28** 4:11
**29** 127:17

**3**

**3** 4:10 28:5,6,8,11
  28:17 29:12
  30:5 48:18,19
  48:20 112:5,9
  113:9 114:21
  120:2 127:14,16
  127:17
**30** 110:6,8
**31** 45:20
**33** 4:12
**34** 4:14
**36** 137:4,6,14
  142:11
**37** 141:6
**38** 4:15
**39** 133:18,21
  141:15,17 142:8

**4**

**4** 4:12 33:3,4,8
  39:13 49:7,8,9
  92:13,17,18,19
  93:2 96:7,8
  147:10
**4/11/05** 4:14

  34:15
**4/22/05** 5:3
**41** 112:7,8
**42** 152:19
**420-2200** 3:16
**44** 4:16
**48** 152:1
**49** 134:15,17

**5**

**5** 4:13 29:16 30:5
  34:10,11,14
  36:16 37:12
  39:13 43:14
  49:14,15,19
  103:18 149:16
**5/17/02** 4:18
**50** 4:17 134:18
  135:9
**51** 4:18 134:17
  135:2,8
**53** 147:17
**54-171709** 2:1

**6**

**6** 4:3,15 38:7,11
  38:14 39:3,14
  40:5,6,16,22
  41:5,11 43:15
  49:21 51:14
  83:17 89:17,20
  90:3 91:4 99:8,9
  99:15 100:16
  101:3 103:16
  104:3,16,21
  105:1,14 106:5
  106:17 112:7,8
  145:17 158:10
  159:4
**60** 83:14
**61** 100:5 147:17
**65** 88:12

**7**

**7** 4:16 39:14 44:1
  44:2,5,16 46:15
  48:1
**7/2005** 4:19
**7/22/03** 4:17

**71** 102:7,10,13,14
**73** 102:3
**74** 102:4,7
**75** 88:11 102:13

**8**

**8** 4:17 50:9,10,13
  50:14,17 55:2
  129:1
**80** 116:2
**805** 3:8
**81** 131:5
**85** 141:8
**879-7544** 3:8
**89** 140:8

**9**

**9** 4:18 50:22 51:1
  51:4,9
**9:24** 1:21
**9:30** 51:8
**93101** 3:7
**963-5000** 2:10
**98** 95:8 111:6
**99** 4:19 96:10,14

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| IN RE: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456<br>Master File No. 1:01-CV-12257-PBS<br>Sub-Category Case No. 1:08-CV-11200 |
| THIS DOCUMENT RELATES TO:<br>*United States ex rel. Linnette Sun and Greg Hamilton, Relators*<br>*v.*<br>*Baxter Hemoglobin Therapeutics and Baxter International Inc.* | Judge Patti B. Saris |

## NOTICE OF DEPOSITION OF RELATOR LINNETTE SUN

PLEASE TAKE NOTICE that pursuant to Rule 30 of the Federal Rules of Civil Procedure, Defendant Baxter International Inc., by its attorneys Dickstein Shapiro LLP, notices the deposition of Relator Linnette Sun on a date and time, and at a place, to be determined. The deposition will be recorded stenographically and will continue from day to day until completed.

October 19, 2009

**/s/ Ruchi Jain**
J. Andrew Jackson
Merle M. DeLancey
Tina D. Reynolds
Ruchi Jain
**DICKSTEIN SHAPIRO LLP**
1825 Eye Street NW
Washington, DC 20006
Telephone:  (202) 420-2200
Facsimile:  (202) 420-2201
*Admitted pro hac vice*

Peter E. Gelhaar (BBO #188310)
**DONNELLY, CONROY & GELHAAR, LLP**
One Beacon Street, 33rd Floor
Boston, MA 02108
Telephone:  (617) 720-2880
Facsimile:  (617) 720-3554

Counsel for Defendant Baxter International Inc.



EXHIBIT
1

## CERTIFICATE OF SERVICE

I, Ruchi Jain, hereby certify that on October 19, 2009, I caused a true and correct copy of the foregoing Notice of Deposition of Relator Linnette Sun to be served on all counsel of record by electronic service by sending a copy to Lexis/Nexis for posting and notification to all parties.

**/s/ Ruchi Jain**
Ruchi Jain
**DICKSTEIN SHAPIRO LLP**
1825 Eye Street NW
Washington, DC 20006
Telephone:  (202) 420-2200
Facsimile:  (202) 420-2201

DSMDB-2682666v02

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) MDL No. 1456<br>) Master File No. 1:01-CV-12257-PBS<br>) Sub-Category Case No. 1:08-CV-11200<br>)<br>) |
| | ) Judge Patti B. Saris |
| THIS DOCUMENT RELATES TO<br>*United States ex rel. Linnette Sun and Greg Hamilton, Relators*<br>*v.*<br>*Baxter Hemoglobin Therapeutics and Baxter International, Inc.* | )<br>)<br>)<br>)<br>)<br>)<br>) |

## OBJECTIONS AND RESPONSES OF RELATOR LINNETTE SUN TO BAXTER INTERNATIONAL INC.'S FIRST SET REQUESTS FOR PRODUCTION OF DOCUMENTS

Relator Linnette Sun, pursuant to Rule 34 of the Federal Rules of Civil Procedure objects and responds to Baxter International Inc.'s First Set of Requests For The Production of Documents To Linnette Sun, as follows:

The following general objections apply to each Request in Defendant's First Set of Requests For Production in addition to any objections that are addressed to particular Requests or subparts of particular Requests:

1.      Relator Linnette Sun (at times hereinafter referred to as "relator" or as 'responding party") objects to each and every Request to the extent it seeks information not relevant to the issues raised in this lawsuit and not reasonably calculated to lead to the discovery of admissible evidence as required by the Federal Rules of Civil Procedure.



2.      Relator objects to each and every Request herein insofar as it seeks the production of documents that are protected from disclosure by the attorney-client privilege or the attorney work-product immunity.

3.      Relator objects to each and every Request herein insofar as it is vague, ambiguous, overbroad, unduly burdensome or oppressive.

4.      Relator objects to each and every Request herein insofar as Defendant purports to alter Relator's obligations under the Federal Rules of Civil Procedure.  Relator will comply with the Federal Rules of Civil Procedure.

5.      Relator objects to each Request to the extent it seeks information not within the possession, custody or control of Relator.

6.      Relator objects to each and every Request herein insofar as it seeks to obtain the production of information or documents that are as readily available to Defendant and its counsel as to Relator.

7.      Plaintiff objects to each and every Request herein insofar as it seeks disclosure of personal and confidential information protected by Plaintiff's constitutional right of privacy.

8.      Nothing herein shall be construed as an admission or waiver by Plaintiff of: (a) her rights respecting admissibility, competency, relevance, privilege, materiality and authenticity of the information provided in the Responses, documents identified in the Responses or the subject matter thereof; (b) her objections due to vagueness, ambiguity or undue burden; and c ) her rights to object to the use of information provided in the Responses, documents identified in the responses or the subject matter contained therein during a subsequent proceeding, including the trial of this or any other action.

2

Relator hereby provides the following responses without prejudice to further discovery, reserving the right to present evidence of any subsequently discovered facts at the trial of this action.

Each of the following responses is rendered and based upon information in the possession of the responding party at the time of the preparation off these answers, after diligent inquiry. Discovery will continue as along as permitted by statute or stipulation of the parties, and the investigation of this responding party's attorneys and agents will continue to and throughout the trial of this action.  We therefore specifically reserve the right, at time of trial, to introduce any evidence from any source which may hereinafter be discovered and testimony from any witnesses whose identities may hereafter be discovered.

If any information has unintentionally been omitted from these responses, the responding party reserves the right to apply for relief so as to permit the insertion of the omitted data from these responses.

These introductory comments shall apply to each and every response given herein, and shall be incorporated by this reference as though fully set forth in each and every following response.

Relator raises the following objection to each and every discovery request, and incorporates this objection into each and every response: Discovery had been barred pending resolution of Baxter's motion to dismiss.  Baxter sought and received permission to take depositions of the relators based on Baxter's claimed need for jurisdictional discovery on the limited question of the Relators' qualifications as original sources. This discovery, including but

//

3

not limited to discovery into the files of Relators' counsel, exceeds the limited scope of discovery asked of and received from the Court.

## DOCUMENT REQUEST NO. 1

All documents and communications related to your efforts to comply with the required pre-filing disclosure of your allegations to the relevant federal and state government officials. *See* 31 U.S.C. § 3730(e)(4)(B); Cal. Gov't Code § 12652(d)(3)(B); Del. Code Ann. tit. 6, § 1206©; D.C. Code § 2-308.15(c)(2)(B); Fla. Stat. § 68.087(3); Haw. Rev. Stat. § 661-28; 740 Ill. Comp. Stat. 175/4(e)(4)(B); La. Rev. Stat. Ann. § 46:439.1(B)(2); Mass. Gen. Laws ch. 12, § 5(A); Nev. Rev. Stat. § 357.100(2)(b); N.M. Stat. § 27-14-10©; Tenn. Code Ann. § 71-5-183(e)(2)(B); Tex. Hum. Res. Code Ann. § 36.113(b); Va. Code Ann. § 8.01-216.8.

## OBJECTIONS AND RESPONSES TO REQUEST NO 1

Objection: Cotracon Commodity Trading Corp. v. Seaboard Surety, 189 F.R.D. 655, 665 (D. Kan. 1999): use of the omnibus phrase "relating to" rendered requests, overly broad and unduly burdensome on their face: discovery requests that essentially seek every document relating to a subject matter fail to describe the documents with particularity and place an undue burden of searching innumerable files to see what it can find to fit the defendant's definitions, instructions and categories.

Responding party identifies the following as kept in the files and records of the responding party, and the attorneys for the responding party, and objects to the production of same on the grounds of attorney-client privilege and work product doctrine:

        A.     All attorney notes, drafts and memoranda;

        B.     All attorney research;

4

C.      All attorney investigations;

D.      All correspondence and communications between attorney and client;

E.      All correspondence and communications between any counsel who is acting or who has acted on plaintiff's behalf;

F.      All materials reflecting items A through E, above.

Responding party will also submit a privilege log identifying the documents withheld on grounds of privilege. Responding party will make all such documents available to the court for an in camera review if necessary.

## DOCUMENT REQUEST NO. 2

All documents and communications related to your employment at Baxter, including:

a.      All documents and communications in your possession from Baxter's offices.

b.      All documents and communications related to Baxter drug and/or therapy prices, pricing decisions, and/or pricing strategy, including the pricing document in your possession referenced in Paragraph 10 of the Sun Declaration.

c.      All documents and communications related to the pricing of Baxter drugs and/or therapies, including the allegations related to Advate pricing in Paragraph 43 of the Complaint and Paragraphs 6-14 of the Sun Declaration.

## OBJECTIONS AND RESPONSES TO REQUEST NO 2

Objection: Cotracon Commodity Trading Corp. v. Seaboard Surety, 189 F.R.D. 655, 665 (D. Kan. 1999): use of the omnibus phrase "relating to" rendered requests, overly broad and unduly burdensome on their face: discovery requests that essentially seek every document relating to a

5

subject matter fail to describe the documents with particularity and place an undue burden of searching innumerable files to see what it can find to fit the defendant's definitions, instructions and categories.

Responding party identifies the following as kept in the files and records of the responding party, and the attorneys for the responding party, and objects to the production of same on the grounds of attorney-client privilege and work product doctrine:

      A.     All attorney notes, drafts and memoranda;

      B.     All attorney research;

      C.     All attorney investigations;

      D.     All correspondence and communications between attorney and client;

      E.     All correspondence and communications between any counsel who is acting or who has acted on plaintiff's behalf;

      F.     All materials reflecting items A through E, above.

Responding party identifies various documents, including emails that she sent or received, documents that she saw or had possession of during meetings, and volume committed contracts that she saw during her employment at Baxter. However, she was not permitted to retain any of those documents, and therefore none of them are within her possession or control. Those documents would be within the possession, custody and control of Baxter International, Inc.

**DOCUMENT REQUEST NO. 3**

All documents and communications relating to the allegation in Paragraph 2 of the Complaint that "Baxter controlled the published AWP by misreporting the WAC."

//

6

## OBJECTIONS AND RESPONSES TO REQUEST NO 3

Objection: <u>Cotracon Commodity Trading Corp. v. Seaboard Surety</u>, 189 F.R.D. 655, 665 (D. Kan. 1999): use of the omnibus phrase "relating to" rendered requests, overly broad and unduly burdensome on their face: discovery requests that essentially seek every document relating to a subject matter fail to describe the documents with particularity and place an undue burden of searching innumerable files to see what it can find to fit the defendant's definitions, instructions and categories.

Responding party identifies the following as kept in the files and records of the responding party, and the attorneys for the responding party, and objects to the production of same on the grounds of attorney-client privilege and work product doctrine:

      A.     All attorney notes, drafts and memoranda;

      B.     All attorney research;

      C.     All attorney investigations;

      D.     All correspondence and communications between attorney and client;

      E.     All correspondence and communications between any counsel who is acting or who has acted on plaintiff's behalf;

      F.     All materials reflecting items A through E, above.

Responding party identifies various documents, including emails that she sent or received, documents that she saw or had possession of during meetings, and volume committed contracts that she saw during her employment at Baxter. However, she was not permitted to retain any of those documents, and therefore none of them are within her possession or control. Those documents would be within the possession, custody and control of Baxter International, Inc.

## DOCUMENT REQUEST NO. 4

All documents and communications relating to the allegations in Paragraph 4 of the Complaint that "Baxter refused to report an accurate WAC" and instead reported an inflated "list sales price."

## OBJECTIONS AND RESPONSES TO REQUEST NO 4

Objection: <u>Cotracon Commodity Trading Corp. v. Seaboard Surety,</u> 189 F.R.D. 655, 665 (D. Kan. 1999): use of the omnibus phrase "relating to" rendered requests, overly broad and unduly burdensome on their face: discovery requests that essentially seek every document relating to a subject matter fail to describe the documents with particularity and place an undue burden of searching innumerable files to see what it can find to fit the defendant's definitions, instructions and categories.

Responding party identifies the following as kept in the files and records of the responding party, and the attorneys for the responding party, and objects to the production of same on the grounds of attorney-client privilege and work product doctrine:

   A. All attorney notes, drafts and memoranda;

   B. All attorney research;

   C. All attorney investigations;

   D. All correspondence and communications between attorney and client;

   E. All correspondence and communications between any counsel who is acting or who has acted on plaintiff's behalf;

   F. All materials reflecting items A through E, above.

Responding party identifies various documents, including emails that she sent or received,

8

documents that she saw or had possession of during meetings, and volume committed contracts that she saw during her employment at Baxter. However, she was not permitted to retain any of those documents, and therefore none of them are within her possession or control. Those documents would be within the possession, custody and control of Baxter International, Inc.

## DOCUMENT REQUEST NO. 5

All documents and communications relating to the allegations in Paragraph 5 of the Complaint that Baxter "manipulated the AWP" to "maximize its revenue" and that Baxter's spread was "larger than its competitors."

## OBJECTIONS AND RESPONSES TO REQUEST NO 5

Objection: <u>Cotracon Commodity Trading Corp. v. Seaboard Surety,</u> 189 F.R.D. 655, 665 (D. Kan. 1999): use of the omnibus phrase "relating to" rendered requests, overly broad and unduly burdensome on their face: discovery requests that essentially seek every document relating to a subject matter fail to describe the documents with particularity and place an undue burden of searching innumerable files to see what it can find to fit the defendant's definitions, instructions and categories.

Responding party identifies the following as kept in the files and records of the responding party, and the attorneys for the responding party, and objects to the production of same on the grounds of attorney-client privilege and work product doctrine:

        A.     All attorney notes, drafts and memoranda;

        B.     All attorney research;

        C.     All attorney investigations;

        D.     All correspondence and communications between attorney and client;

E.     All correspondence and communications between any counsel who is acting or who has acted on plaintiff's behalf;

F.     All materials reflecting items A through E, above.

Responding party identifies various documents, including emails that she sent or received, documents that she saw or had possession of during meetings, and volume committed contracts that she saw during her employment at Baxter. However, she was not permitted to retain any of those documents, and therefore none of them are within her possession or control. Those documents would be within the possession, custody and control of Baxter International, Inc.

## DOCUMENT REQUEST NO. 6

All documents and communications relating to the allegation in Paragraph 6 of the Complaint that Baxter "falsely reported WAC to inflate the AWP and the spread" and that Baxter therefore "deceived" state governments.

## OBJECTIONS AND RESPONSES TO REQUEST NO 6

Objection: <u>Cotracon Commodity Trading Corp. v. Seaboard Surety</u>, 189 F.R.D. 655, 665 (D. Kan. 1999): use of the omnibus phrase "relating to" rendered requests, overly broad and unduly burdensome on their face: discovery requests that essentially seek every document relating to a subject matter fail to describe the documents with particularity and place an undue burden of searching innumerable files to see what it can find to fit the defendant's definitions, instructions and categories.

Responding party identifies the following as kept in the files and records of the responding party, and the attorneys for the responding party, and objects to the production of same on the grounds of attorney-client privilege and work product doctrine:

    A.    All attorney notes, drafts and memoranda;

    B.    All attorney research;

    C.    All attorney investigations;

    D.    All correspondence and communications between attorney and client;

    E.    All correspondence and communications between any counsel who is acting or who has acted on plaintiff's behalf;

    F.    All materials reflecting items A through E, above.

Responding party identifies various documents, including emails that she sent or received, documents that she saw or had possession of during meetings, and volume committed contracts that she saw during her employment at Baxter.  However, she was not permitted to retain any of those documents, and therefore none of them are within her possession or control.  Those documents would be within the possession, custody and control of Baxter International, Inc.

**DOCUMENT REQUEST NO. 7**

All documents and communications relating to the allegations in Paragraphs 31 and 35 of the Complaint that Baxter reported to First DataBank that the biologics price for charge-back wholesalers was its WAC and that Baxter did so to "directly control and fabricate the AWP."

**OBJECTIONS AND RESPONSES TO REQUEST NO 7**

Objection: <u>Cotracon Commodity Trading Corp. v. Seaboard Surety</u>, 189 F.R.D. 655, 665 (D. Kan. 1999): use of the omnibus phrase "relating to" rendered requests, overly broad and unduly burdensome on their face: discovery requests that essentially seek every document relating to a subject matter fail to describe the documents with particularity and place an undue burden of

searching innumerable files to see what it can find to fit the defendant's definitions, instructions and categories.

Responding party identifies the following as kept in the files and records of the responding party, and the attorneys for the responding party, and objects to the production of same on the grounds of attorney-client privilege and work product doctrine:

      A.      All attorney notes, drafts and memoranda;

      B.      All attorney research;

      C.      All attorney investigations;

      D.      All correspondence and communications between attorney and client;

      E.      All correspondence and communications between any counsel who is acting or who has acted on plaintiff's behalf;

      F.      All materials reflecting items A through E, above.

Responding party identifies various documents, including emails that she sent or received, documents that she saw or had possession of during meetings, and volume committed contracts that she saw during her employment at Baxter. However, she was not permitted to retain any of those documents, and therefore none of them are within her possession or control. Those documents would be within the possession, custody and control of Baxter International, Inc.

**DOCUMENT REQUEST NO. 8**

All documents and communications relating to the allegation in Paragraph 32 of the Complaint that Baxter's false reporting "increased the profitability" of certain drugs to health care providers and pharmacies.

//

12

## OBJECTIONS AND RESPONSES TO REQUEST NO 8

Objection: <u>Cotracon Commodity Trading Corp. v. Seaboard Surety</u>, 189 F.R.D. 655, 665 (D. Kan. 1999): use of the omnibus phrase "relating to" rendered requests, overly broad and unduly burdensome on their face: discovery requests that essentially seek every document relating to a subject matter fail to describe the documents with particularity and place an undue burden of searching innumerable files to see what it can find to fit the defendant's definitions, instructions and categories.

Responding party identifies the following as kept in the files and records of the responding party, and the attorneys for the responding party, and objects to the production of same on the grounds of attorney-client privilege and work product doctrine:

        A.       All attorney notes, drafts and memoranda;

        B.       All attorney research;

        C.       All attorney investigations;

        D.       All correspondence and communications between attorney and client;

        E.       All correspondence and communications between any counsel who is acting or who has acted on plaintiff's behalf;

        F.       All materials reflecting items A through E, above.

Responding party identifies various documents, including emails that she sent or received, documents that she saw or had possession of during meetings, and volume committed contracts that she saw during her employment at Baxter. However, she was not permitted to retain any of those documents, and therefore none of them are within her possession or control. Those documents would be within the possession, custody and control of Baxter International, Inc.

## DOCUMENT REQUEST NO. 9

All documents and communications relating to the Recombinate pricing allegations in Paragraph 36 of the Complaint.

## OBJECTIONS AND RESPONSES TO REQUEST NO 9

Objection: <u>Cotracon Commodity Trading Corp. v. Seaboard Surety</u>, 189 F.R.D. 655, 665 (D. Kan. 1999): use of the omnibus phrase "relating to" rendered requests, overly broad and unduly burdensome on their face: discovery requests that essentially seek every document relating to a subject matter fail to describe the documents with particularity and place an undue burden of searching innumerable files to see what it can find to fit the defendant's definitions, instructions and categories.

Responding party identifies the following as kept in the files and records of the responding party, and the attorneys for the responding party, and objects to the production of same on the grounds of attorney-client privilege and work product doctrine:

      A.     All attorney notes, drafts and memoranda;

      B.     All attorney research;

      C.     All attorney investigations;

      D.     All correspondence and communications between attorney and client;

      E.     All correspondence and communications between any counsel who is acting or who has acted on plaintiff's behalf;

      F.     All materials reflecting items A through E, above.

Responding party identifies the Disclosure Statement submitted to the United States Government and the exhibits attached to the Disclosure Statement. Responding party is willing to

produce the exhibits to the Disclosure Statement. She is also willing to make the Disclosure Statement available to counsel for Baxter International, Inc. provided counsel agrees that making this Disclosure Statement available to them does not waive the joint prosecution privilege.

## DOCUMENT REQUEST NO. 10

All documents and communications relating to the allegations in Paragraph 38 of the Complaint that Mike Bradley told Ms. Sun that Baxter knowingly, repeatedly, and falsely reported a "list sales price" as its WAC to First DataBank, that Baxter expected to blame First DataBank, and that this practice was necessary to meet Baxter's sales targets.

## OBJECTIONS AND RESPONSES TO REQUEST NO 10

Objection: <u>Cotracon Commodity Trading Corp. v. Seaboard Surety</u>, 189 F.R.D. 655, 665 (D. Kan. 1999): use of the omnibus phrase "relating to" rendered requests, overly broad and unduly burdensome on their face: discovery requests that essentially seek every document relating to a subject matter fail to describe the documents with particularity and place an undue burden of searching innumerable files to see what it can find to fit the defendant's definitions, instructions and categories.

Responding party identifies the following as kept in the files and records of the responding party, and the attorneys for the responding party, and objects to the production of same on the grounds of attorney-client privilege and work product doctrine:

        A.     All attorney notes, drafts and memoranda;

        B.     All attorney research;

        C.     All attorney investigations;

        D.     All correspondence and communications between attorney and client;

E.      All correspondence and communications between any counsel who is acting or who has acted on plaintiff's behalf;

F.      All materials reflecting items A through E, above.

Responding party identifies various documents, including emails that she sent or received, documents that she saw or had possession of during meetings, and volume committed contracts that she saw during her employment at Baxter. However, she was not permitted to retain any of those documents, and therefore none of them are within her possession or control. Those documents would be within the possession, custody and control of Baxter International, Inc.

**DOCUMENT REQUEST NO. 11**

All documents and communications relating to the allegations in Paragraphs 39 and 40 of the Complaint that First DataBank "refused to accept" Baxter's price and threatened not to publish the information, and that Baxter "refused to provide any other number than 'list sales price'" to First DataBank.

**OBJECTIONS AND RESPONSES TO REQUEST NO 11**

Objection: <u>Cotracon Commodity Trading Corp. v. Seaboard Surety</u>, 189 F.R.D. 655, 665 (D. Kan. 1999): use of the omnibus phrase "relating to" rendered requests, overly broad and unduly burdensome on their face: discovery requests that essentially seek every document relating to a subject matter fail to describe the documents with particularity and place an undue burden of searching innumerable files to see what it can find to fit the defendant's definitions, instructions and categories.

//

Responding party identifies the following as kept in the files and records of the responding party, and the attorneys for the responding party, and objects to the production of same on the grounds of attorney-client privilege and work product doctrine:

      A.     All attorney notes, drafts and memoranda;

      B.     All attorney research;

      C.     All attorney investigations;

      D.     All correspondence and communications between attorney and client;

      E.     All correspondence and communications between any counsel who is acting or who has acted on plaintiff's behalf;

      F.     All materials reflecting items A through E, above.

Responding party identifies various documents, including emails that she sent or received, documents that she saw or had possession of during meetings, and volume committed contracts that she saw during her employment at Baxter. However, she was not permitted to retain any of those documents, and therefore none of them are within her possession or control. Those documents would be within the possession, custody and control of Baxter International, Inc.

## DOCUMENT REQUEST NO. 12

All documents and communications relating to the allegations in Paragraph 41 of the Complaint that Mike Bradley "acknowledged" to Ms. Sun that Baxter was reporting inflated AWPs for financial gain.

## OBJECTIONS AND RESPONSES TO REQUEST NO 12

Objection: <u>Cotracon Commodity Trading Corp. v. Seaboard Surety</u>, 189 F.R.D. 655, 665 (D. Kan. 1999): use of the omnibus phrase "relating to" rendered requests, overly broad and unduly

burdensome on their face: discovery requests that essentially seek every document relating to a subject matter fail to describe the documents with particularity and place an undue burden of searching innumerable files to see what it can find to fit the defendant's definitions, instructions and categories.

Responding party identifies the following as kept in the files and records of the responding party, and the attorneys for the responding party, and objects to the production of same on the grounds of attorney-client privilege and work product doctrine:

      A.     All attorney notes, drafts and memoranda;

      B.     All attorney research;

      C.     All attorney investigations;

      D.     All correspondence and communications between attorney and client;

      E.     All correspondence and communications between any counsel who is acting or who has acted on plaintiff's behalf;

      F.     All materials reflecting items A through E, above.

Responding party identifies various documents, including emails that she sent or received, documents that she saw or had possession of during meetings, and volume committed contracts that she saw during her employment at Baxter. However, she was not permitted to retain any of those documents, and therefore none of them are within her possession or control. Those documents would be within the possession, custody and control of Baxter International, Inc.

//

//

//

18

**DOCUMENT REQUEST NO. 13**

All documents and communications relating to the allegations in Paragraph 43 and 44 of the Complaint and Paragraph 15 of the Sun Declaration that Ms. Sun "voiced her concerns" regarding the published AWPs to John Park and Nick Poulios.

**OBJECTIONS AND RESPONSES TO REQUEST NO 13**

Objection: <u>Cotracon Commodity Trading Corp. v. Seaboard Surety</u>, 189 F.R.D. 655, 665 (D. Kan. 1999): use of the omnibus phrase "relating to" rendered requests, overly broad and unduly burdensome on their face: discovery requests that essentially seek every document relating to a subject matter fail to describe the documents with particularity and place an undue burden of searching innumerable files to see what it can find to fit the defendant's definitions, instructions and categories.

Responding party identifies the following as kept in the files and records of the responding party, and the attorneys for the responding party, and objects to the production of same on the grounds of attorney-client privilege and work product doctrine:

      A.     All attorney notes, drafts and memoranda;

      B.     All attorney research;

      C.     All attorney investigations;

      D.     All correspondence and communications between attorney and client;

      E.     All correspondence and communications between any counsel who is acting or who has acted on plaintiff's behalf;

      F.     All materials reflecting items A through E, above.

Responding party identifies various documents, including emails that she sent or received,

documents that she saw or had possession of during meetings, and volume committed contracts that she saw during her employment at Baxter.  However, she was not permitted to retain any of those documents, and therefore none of them are within her possession or control.  Those documents would be within the possession, custody and control of Baxter International, Inc.

## DOCUMENT REQUEST NO. 14

All documents and communications relating to the allegations in Paragraph 45 of the Complaint that Ms. Sun reported her concerns to Larry Guiheen and that Mr. Guiheen "forbade Ms. Sun from doing any further research" or contacting First DataBank.

## OBJECTIONS AND RESPONSES TO REQUEST NO 14

Objection: Cotracon Commodity Trading Corp. v. Seaboard Surety, 189 F.R.D. 655, 665 (D. Kan. 1999): use of the omnibus phrase "relating to" rendered requests, overly broad and unduly burdensome on their face: discovery requests that essentially seek every document relating to a subject matter fail to describe the documents with particularity and place an undue burden of searching innumerable files to see what it can find to fit the defendant's definitions, instructions and categories.

Responding party identifies the following as kept in the files and records of the responding party, and the attorneys for the responding party, and objects to the production of same on the grounds of attorney-client privilege and work product doctrine:

        A.     All attorney notes, drafts and memoranda;

        B.     All attorney research;

        C.     All attorney investigations;

        D.     All correspondence and communications between attorney and client;

      E.      All correspondence and communications between any counsel who is acting or who has acted on plaintiff's behalf;

      F.      All materials reflecting items A through E, above.

Responding party identifies various documents, including emails that she sent or received, documents that she saw or had possession of during meetings, and volume committed contracts that she saw during her employment at Baxter.  However, she was not permitted to retain any of those documents, and therefore none of them are within her possession or control.  Those documents would be within the possession, custody and control of Baxter International, Inc.

**DOCUMENT REQUEST NO. 15**

All documents and communications relating to the allegations in Paragraphs 46 and 63 of the Complaint that Nick Poulios "silenced" Ms. Sun at a pricing meeting and that Larry Guiheen and John Park commented that "Baxter Management would go to jail if the government ever discovered" material such as the margin analysis report.

**OBJECTIONS AND RESPONSES TO REQUEST NO 15**

Objection: <u>Cotracon Commodity Trading Corp. v. Seaboard Surety</u>, 189 F.R.D. 655, 665 (D. Kan. 1999): use of the omnibus phrase "relating to" rendered requests, overly broad and unduly burdensome on their face: discovery requests that essentially seek every document relating to a subject matter fail to describe the documents with particularity and place an undue burden of searching innumerable files to see what it can find to fit the defendant's definitions, instructions and categories.

//

21

Responding party identifies the following as kept in the files and records of the responding party, and the attorneys for the responding party, and objects to the production of same on the grounds of attorney-client privilege and work product doctrine:

A.  All attorney notes, drafts and memoranda;

B.  All attorney research;

C.  All attorney investigations;

D.  All correspondence and communications between attorney and client;

E.  All correspondence and communications between any counsel who is acting or who has acted on plaintiff's behalf;

F.  All materials reflecting items A through E, above.

Responding party identifies various documents, including emails that she sent or received, documents that she saw or had possession of during meetings, and volume committed contracts that she saw during her employment at Baxter.  However, she was not permitted to retain any of those documents, and therefore none of them are within her possession or control.  Those documents would be within the possession, custody and control of Baxter International, Inc.

**DOCUMENT REQUEST NO. 16**

All documents and communications relating to the allegation in Paragraph 48 of the Complaint that Baxter "engaged in similar falsification of WAC with respect to its other pharmaceutical, hematological, and biological products."

**OBJECTIONS AND RESPONSES TO REQUEST NO 16**

Objection: Cotracon Commodity Trading Corp. v. Seaboard Surety, 189 F.R.D. 655, 665 (D. Kan. 1999): use of the omnibus phrase "relating to" rendered requests, overly broad and unduly

22

burdensome on their face: discovery requests that essentially seek every document relating to a subject matter fail to describe the documents with particularity and place an undue burden of searching innumerable files to see what it can find to fit the defendant's definitions, instructions and categories.

Responding party identifies the following as kept in the files and records of the responding party, and the attorneys for the responding party, and objects to the production of same on the grounds of attorney-client privilege and work product doctrine:

        A.     All attorney notes, drafts and memoranda;

        B.     All attorney research;

        C.     All attorney investigations;

        D.     All correspondence and communications between attorney and client;

        E.     All correspondence and communications between any counsel who is acting or who has acted on plaintiff's behalf;

        F.     All materials reflecting items A through E, above.

Responding party identifies various documents, including emails that she sent or received, documents that she saw or had possession of during meetings, and volume committed contracts that she saw during her employment at Baxter.  However, she was not permitted to retain any of those documents, and therefore none of them are within her possession or control.  Those documents would be within the possession, custody and control of Baxter International, Inc.

**DOCUMENT REQUEST NO. 17**

All documents and communications relating to the Volume Committed Contracts allegations in Paragraphs 49-51 of the Complaint.

23

**OBJECTIONS AND RESPONSES TO REQUEST NO 17**

Responding party identifies the following as kept in the files and records of the responding party, and the attorneys for the responding party, and objects to the production of same on the grounds of attorney-client privilege and work product doctrine:

      A.    All attorney notes, drafts and memoranda;

      B.    All attorney research;

      C.    All attorney investigations;

      D.    All correspondence and communications between attorney and client;

      E.    All correspondence and communications between any counsel who is acting or who has acted on plaintiff's behalf;

      F.    All materials reflecting items A through E, above.

Responding party identifies various documents, including emails that she sent or received, documents that she saw or had possession of during meetings, and volume committed contracts that she saw during her employment at Baxter.  However, she was not permitted to retain any of those documents, and therefore none of them are within her possession or control.  Those documents would be within the possession, custody and control of Baxter International, Inc.

**DOCUMENT REQUEST NO. 18**

All documents and communications, including any complaints, pleadings, reports, and/or news articles, regarding Average Wholesale Price, Wholesale Acquisition Cost, Best Price, and/or pharmaceutical litigation, including the "extensive" materials regarding the TAP prosecution and AstraZeneca settlement referenced in Paragraph 64 of the Complaint.

//

24

**OBJECTIONS AND RESPONSES TO REQUEST NO 18**

Responding party identifies the following as kept in the files and records of the responding party, and the attorneys for the responding party, and objects to the production of same on the grounds of attorney-client privilege and work product doctrine:

      A.     All attorney notes, drafts and memoranda;

      B.     All attorney research;

      C.     All attorney investigations;

      D.     All correspondence and communications between attorney and client;

      E.     All correspondence and communications between any counsel who is acting or who has acted on plaintiff's behalf;

      F.     All materials reflecting items A through E, above.

Responding party identifies various documents, including emails that she sent or received, documents that she saw or had possession of during meetings, and volume committed contracts that she saw during her employment at Baxter.  However, she was not permitted to retain any of those documents, and therefore none of them are within her possession or control.  Those documents would be within the possession, custody and control of Baxter International, Inc.

**DOCUMENT REQUEST NO. 19**

All documents and communications relating to the Best Price allegations in Paragraph 85 of the Complaint and pp. 6-7 of the Memorandum in Opposition.

**OBJECTIONS AND RESPONSES TO REQUEST NO 19**

Objection: <u>Cotracon Commodity Trading Corp. v. Seaboard Surety</u>, 189 F.R.D. 655, 665 (D. Kan. 1999): use of the omnibus phrase "relating to" rendered requests, overly broad and unduly

25

burdensome on their face: discovery requests that essentially seek every document relating to a subject matter fail to describe the documents with particularity and place an undue burden of searching innumerable files to see what it can find to fit the defendant's definitions, instructions and categories.

Responding party identifies the following as kept in the files and records of the responding party, and the attorneys for the responding party, and objects to the production of same on the grounds of attorney-client privilege and work product doctrine:

> A.   All attorney notes, drafts and memoranda;
>
> B.   All attorney research;
>
> C.   All attorney investigations;
>
> D.   All correspondence and communications between attorney and client;
>
> E.   All correspondence and communications between any counsel who is acting or who has acted on plaintiff's behalf;
>
> F.   All materials reflecting items A through E, above.

The documents referenced at pp 6-7 of the relator's opposition were documents that were introduced into this dispute by Baxter International, Inc. and/or were exhibits to Baxter's motion. As such, the request that they be produced and/or reproduced is oppressive and burdensome.

## DOCUMENT REQUEST NO. 20

All documents and communications relating to the federal and state Anti-Kickback allegations on p. 20 of the Memorandum in Opposition.

//

//

## OBJECTIONS AND RESPONSES TO REQUEST NO 20

Objection: <u>Cotracon Commodity Trading Corp. v. Seaboard Surety</u>, 189 F.R.D. 655, 665 (D. Kan. 1999): use of the omnibus phrase "relating to" rendered requests, overly broad and unduly burdensome on their face: discovery requests that essentially seek every document relating to a subject matter fail to describe the documents with particularity and place an undue burden of searching innumerable files to see what it can find to fit the defendant's definitions, instructions and categories.

Responding party identifies the following as kept in the files and records of the responding party, and the attorneys for the responding party, and objects to the production of same on the grounds of attorney-client privilege and work product doctrine:

A.      All attorney notes, drafts and memoranda;

B.      All attorney research;

C.      All attorney investigations;

D.      All correspondence and communications between attorney and client;

E.      All correspondence and communications between any counsel who is acting or who has acted on plaintiff's behalf;

F.      All materials reflecting items A through E, above.

Responding party identifies various documents, including emails that she sent or received, documents that she saw or had possession of during meetings, and volume committed contracts that she saw during her employment at Baxter.  However, she was not permitted to retain any of those documents, and therefore none of them are within her possession or control.  Those documents would be within the possession, custody and control of Baxter International, Inc.

27

**DOCUMENT REQUEST NO. 21**

All documents and communications relating to the allegation in Paragraph 12 of the Sun Declaration that Baxter deliberately encouraged "overdosing" of patients by home health care agencies.

**OBJECTIONS AND RESPONSES TO REQUEST NO 21**

Objection: <u>Cotracon Commodity Trading Corp. v. Seaboard Surety</u>, 189 F.R.D. 655, 665 (D. Kan. 1999): use of the omnibus phrase "relating to" rendered requests, overly broad and unduly burdensome on their face: discovery requests that essentially seek every document relating to a subject matter fail to describe the documents with particularity and place an undue burden of searching innumerable files to see what it can find to fit the defendant's definitions, instructions and categories.

Responding party identifies the following as kept in the files and records of the responding party, and the attorneys for the responding party, and objects to the production of same on the grounds of attorney-client privilege and work product doctrine:

      A.     All attorney notes, drafts and memoranda;

      B.     All attorney research;

      C.     All attorney investigations;

      D.     All correspondence and communications between attorney and client;

      E.     All correspondence and communications between any counsel who is acting or who has acted on plaintiff's behalf;

      F.     All materials reflecting items A through E, above.

//

28

**DOCUMENT REQUEST NO. 22**

All documents and communications, including affidavits, declarations, statements, preparation materials, complaints, drafts, and/or notes, related to other pharmaceutical cases with which you have been involved.

**OBJECTIONS AND RESPONSES TO REQUEST NO 22**

Objection: <u>Cotracon Commodity Trading Corp. v. Seaboard Surety</u>, 189 F.R.D. 655, 665 (D. Kan. 1999): use of the omnibus phrase "relating to" rendered requests, overly broad and unduly burdensome on their face: discovery requests that essentially seek every document relating to a subject matter fail to describe the documents with particularity and place an undue burden of searching innumerable files to see what it can find to fit the defendant's definitions, instructions and categories.

Responding party identifies the following as kept in the files and records of the responding party, and the attorneys for the responding party, and objects to the production of same on the grounds of attorney-client privilege and work product doctrine:

      A.     All attorney notes, drafts and memoranda;

      B.     All attorney research;

      C.     All attorney investigations;

      D.     All correspondence and communications between attorney and client;

      E.     All correspondence and communications between any counsel who is acting or who has acted on plaintiff's behalf;

      F.     All materials reflecting items A through E, above.

//

Responding party identifies various documents, including emails that she sent or received, documents that she saw or had possession of during meetings, and volume committed contracts that she saw during her employment at Baxter. However, she was not permitted to retain any of those documents, and therefore none of them are within her possession or control. Those documents would be within the possession, custody and control of Baxter International, Inc.

## DOCUMENT REQUEST NO. 23

All documents and communications that demonstrate that you have direct and independent knowledge of the allegations in the Complaint.

## OBJECTIONS AND RESPONSES TO REQUEST NO 23

Responding party identifies the following as kept in the files and records of the responding party, and the attorneys for the responding party, and objects to the production of same on the grounds of attorney-client privilege and work product doctrine:

      A.    All attorney notes, drafts and memoranda;

      B.    All attorney research;

      C.    All attorney investigations;

      D.    All correspondence and communications between attorney and client;

      E.    All correspondence and communications between any counsel who is acting or who has acted on plaintiff's behalf;

      F.    All materials reflecting items A through E, above.

Responding party identifies various documents, including emails that she sent or received, documents that she saw or had possession of during meetings, and volume committed contracts that she saw during her employment at Baxter. However, she was not permitted to retain any of those

documents, and therefore none of them are within her possession or control. Those documents would be within the possession, custody and control of Baxter International, Inc.

## DOCUMENT REQUEST NO. 24

All documents and communications that demonstrate that you are the original source of the allegations in the Complaint.

## OBJECTIONS AND RESPONSES TO REQUEST NO 24

Responding party identifies the following as kept in the files and records of the responding party, and the attorneys for the responding party, and objects to the production of same on the grounds of attorney-client privilege and work product doctrine:

      A.     All attorney notes, drafts and memoranda;

      B.     All attorney research;

      C.     All attorney investigations;

      D.     All correspondence and communications between attorney and client;

      E.     All correspondence and communications between any counsel who is acting or who has acted on plaintiff's behalf;

      F.     All materials reflecting items A through E, above.

Responding party identifies various documents, including emails that she sent or received, documents that she saw or had possession of during meetings, and volume committed contracts that she saw during her employment at Baxter. However, she was not permitted to retain any of those documents, and therefore none of them are within her possession or control. Those documents would be within the possession, custody and control of Baxter International, Inc.

Respectfully submitted.


Respectfully submitted.

Dated: November 18, 2009

   /s/ Mark Allen Kleiman
Mark Allen Kleiman
2907 Stanford Avenue
Venice, California 90292
Telephone: (310) 306-8094

Lauren John Udden
15 West Carrillo Street
Suite 209
Santa Barbara, California 93101
Telephone: (805) 879-7544
Facsimile: (805) 560-0506

Counsel for Relators Linnette Sun and
Greg Hamilton

32

## CERTIFICATION OF SERVICE

I certify that on November 18, 2009, a true and correct copy of the foregoing **OBJECTIONS AND RESPONSES OF RELATOR LINNETTE SUN TO BAXTER INTERNATIONAL INC.'S FIRST SET REQUESTS FOR PRODUCTION OF DOCUMENTS** was served on below counsel of record by electronic service.

Merle Delancey
Ruchi Jain
Dickstein & Shapiro, LLP
1825 Eye Street, NW
Washington, DC 20006
202-420-2200
202-420-2201 (fax)
DeLanceyM@dicksteinshapiro.com
JainR@DicksteinShapiro.com

                     /s/ Pamela R. Savoie
                     Pamela R Savoieff

33

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| IN RE: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456<br>Master File No. 1:01-CV-12257-PBS<br>Sub-Category Case No. 1:08-CV-11200 |
| THIS DOCUMENT RELATES TO<br>*United States ex rel. Linnette Sun and Greg Hamilton, Relators*<br>*v.*<br>*Baxter Hemoglobin Therapeutics and Baxter International, Inc.* | Judge Patti B. Saris |

MEMORANDUM IN OPPOSITION TO BAXTER INTERNATIONAL INC.'S
MOTION TO DISMISS RELATORS' COMPLAINT



EXHIBIT
3

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................... iii

BACKGROUND ............................................................ 1

SUMMARY OF ARGUMENT .................................................. 2

ARGUMENT .............................................................. 2

1.   RELATORS' ALLEGATIONS CONCERNED AN ENTIRELY
     NEW SPECIES OF AWP FRAUD WHICH HAD NOT BEEN
     PUBLICLY DISCLOSED PRIOR TO THEIR COMPLAINT .................... 2

     A.   Allegations that Baxter Refused to Give WAC Information
          to First DataBank, Knowing that First DataBank Would Apply
          a Multiplier to Baxter's Claimed List Price, Were Altogether New .......... 3

          1.   Prior Complaints ......................................... 3

          2.   Prior Government Reports ................................. 4

          3.   Prior News Media Reports ................................. 5

     B.   Allegations that Baxter Concealed the Discounts Given With
          Volume Committed Contracts and Thereby Concealed the Best Price
          from CMS and Underpaid Rebates to the States Were Not Publicly
          Disclosed .................................................. 6

     C.   Even if Prior Suits or Government or News Media Reports Are
          Considered Public Disclosures, the Relators Are Original Sources .......... 7

          1.   Relators Have Direct and Independent Knowledge of
               Relevant Information .................................... 9

               A.   Linnette Sun Has Direct and Independent Knowledge
                    of Any Arguably Disclosed Allegations ................... 9

               B.   Greg Hamilton Has Direct and Independent Knowledge
                    of Any Arguably Disclosed Allegations .................. 10

i

        2.      Relators Furnished Information About Their Allegations to the Federal Government Well Before Filing Their Lawsuit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    D.     The Complaint Has Been Plead With Sufficient Particularity . . . . . . . . . . . . . 12

2.    RELATORS' STATE LAW CLAIMS SURVIVE FOR THE SAME REASON THAT THEIR FEDERAL CLAIMS SURVIVE . . . . . . . . . . . . . . . . . . . . . 16

3.    RELATORS CONCEDE THAT THE STATE LAW CLAIMS REGARDING ARKANSAS AND UTAH SHOULD BE DISMISSED . . . . . . . . . . . . . . . . . . . . . . . 17

4.    RELATORS AGREE THAT THE TEXAS AND NEVADA STATE CLAIMS SHOULD BE DISMISSED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

5.    THE CALIFORNIA, HAWAII, AND ILLINOIS CLAIMS SHOULD NOT BE DISMISSED BECAUSE RELATORS' ALLEGATIONS WERE NOT PART OF THE COVERED CONDUCT ENUMERATED BY THE SETTLEMENT AGREEMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

6.    RELATORS CONCEDE THAT THE STARK CLAIMS SHOULD BE DISMISSED, BUT REQUEST LEAVE TO AMEND TO ALLEGE THAT THE SAME CONDUCT COMPLAINED OF VIOLATES STATE AND/OR FEDERAL ANTI KICKBACK STATUTES . . . . . . . . . . . . . . . . . . . . . . . 19

7.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

DECLARATION OF MARK ALLEN KLEIMAN

DECLARATION OF LINETTE SUN

DECLARATION OF GREG HAMILTON

# TABLES OF AUTHORITIES

**Page**

## CASES

Al-Kidd v. Ashcroft,
___. F.3d, 2009 9WL 2836448 *21 (9th Cir. Sept. 4, 2009) ..................... 14

Ashcroft et al. v. Iqbal et al.,
129 S.Ct. 1937 (2009) .................................................. 13,14

Duxbury v. Ortho Biotech Products,
K.P. No. 08-1409, 2009 WL 3450716 (1stCir. Aug. 12, 2009) .............. 12,13,14

Foman v. Davis,
371 U.S. 178 (1962) ...................................................... 16

In re Pharmaceutical Industry AWP Litigation,
538 F.Supp.2d 367 ...................................................... 5,7,8

Shaw v. Digital Equipment Corp.,
129 S.Ct. 1937 (2009) .................................................... 13

United States ex rel Franklin v. Parke-Davis,
147 F. Supp.2d 39 (D. Mass 2001) ........................................ 13

United States ex rel Gagne v. City of Worcester,
565 F.3d 40 (1st Cir. 2009) .............................................. 14

United States ex rel Grubbs v. Kanneganti,
565 F.3d 180 (5th Cir. April 8, 2009) ..................................... 15

United States ex rel LeBlanc v. Raytheon Co.,
913 F.3d 17 (1st Cir. 1990) .............................................. 13

United Staes ex rel Lusby v. Ross-Royce Corp.,
570 F.3d 849 (9th Cir. June 30, 2009) ..................................... 14

United States ex rel Pentagen Technologies Int'l, Ltd. v. CACI Int'l Inc.,   No. 94 Civ. 2925,
1996 WL 11299, *8 (S.D.N.Y. Jan. 4, 1996) ................................. 5

<u>United States ex rel Rost v. Pfizer, Inc.</u>,
    507 F.3d 7209 (1st Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

<u>United States ex rel Yannacoupolous v. General Dynamic</u>,
    315 F.Supp.2d 939 (N.D. Ill. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

## **STATUTES**

<u>Anti Kickback Statute</u> § 42 U.S.C. 130a-7b(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6,20

<u>California Welfare & Institutions Code</u> § 14107.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6,20

<u>Fed. R. Civ. Proc.</u> 8(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

<u>Fed. R. Civ. Proc.</u> 9(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

<u>Fed. R. Civ. Proc.</u> 15(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

## BACKGROUND

In May of 2000 First DataBank entered into an agreement with the National Association of Medicaid Fraud Control Units to stop reporting average wholesale prices (AWPs) published by the manufacturers and to begin reporting actual market prices (and ultimately Wholesale Acquisition Cost) for a number of drug and biologic products, including a number of Baxter's biologic products. This set the stage for an entirely new species of AWP fraud. Instead of falsely reporting AWPs, Baxter, knowing that First DataBank was hamstrung, refused to report its WAC for Recombinate, and instead sent FDB a letter claiming a "list price" of $1.31 – knowing that FDB would multiply this by 125% , resulting in a reported AWP of $1.64.

Relator Linnette Sun, a Baxter pricing director, and Greg Hamilton, a business associate of Baxter's management each discovered pieces of this new scheme.

Because the scheme could not even have existed before the reporting mechanism changed in 2000, prior complaints and articles discussing other forms of AWP fraud disclose nothing at all and are irrelevant. Moreover, one of the largest selling biological products listed in the complaint, Advate, was not even approved by the FDA until July 28, 2003 and likewise could not have been the subject of earlier disclosures.

In early 2005, relators' counsel, discussed these allegations with an AUSA well-versed in AWP litigation who responded that he was quite interested in it, and agreed to read a draft complaint. sent him a draft complaint. The AUSA told me that he looked forward to working on the case.

1

## SUMMARY OF ARGUMENT

The Court has jurisdiction over these claims because this is an entirely new species of fraud which could not and did not exist until late 2000, and one of the key drugs involved was not even approved until 2003.  The relators were each well positioned to gain, and *did* gain direct and independent knowledge of the schemes, and shared them with the Government in January of 2005, nearly three months before they filed the case on April 22, 2005. Thus, even if the Court finds that there was a public disclosure of the allegations in relators' complaints, relators remain the original sources.

Finally, the complaint is sufficiently specific to meet the 9b requirements.


## ARGUMENT

1. ### RELATORS' ALLEGATIONS CONCERNED AN ENTIRELY NEW SPECIES OF AWP FRAUD WHICH HAD NOT BEEN PUBLICLY DISCLOSED PRIOR TO THEIR COMPLAINT.

Relators' allegations are based on Baxter's intentionally forcing First DataBank ("FDB") to misreport Baxter's prices for biological products by refusing to give FDB any WAC information.  This scheme was based on FDB's 2000 consent decree with the Department of Justice, and consequently could not have been publicly disclosed in any of the earlier filed complaints cited by Baxter.  Moreover, Relators' complaint includes allegations about Advate, a drug which did not even come on to the market until July 28, 2003, long after the "disclosures" Baxter claims to have found.

Baxter argues that this Court lacks jurisdiction because Relators' AWP, Best Price, and Volume Committed Contract allegations were publicly disclosed in litigation before Relators'

filed their Complaint.[1]  But Baxter's assertion is not supported by any substantive comparisons to Relators' Complaint.  Instead, Baxter chiefly relies on generic references to the Master Consolidated Class Action Complaint ("MCC") and the State of Nevada's Complaint.[2]

> A.  Allegations that Baxter Refused to Give WAC Information to First DataBank, Knowing that First DataBank Would Apply a Multiplier to Baxter's Claimed List Price, Were Altogether New.
>
> (1)  Prior Complaints

First, although Baxter claims that Relators' AWP allegations were publicly disclosed in "[n]o fewer than 38 AWP complaints," it manages to cite only a single phrase in the MCC.  "In the MCC, Plaintiffs specifically alleged that Baxter 'engaged in an ongoing deliberate scheme to inflate AWPs in order to increase the market share of its products.'"[3]  Other than this single sentence—and one general paragraph reference to the State of Nevada's complaint—Baxter concludes, without foundation, that all the other complaints make similar allegations.[4]  Despite reference to "38 AWP complaints" Baxter fails to cite any references to specific drugs, prices, contracts, AWP calculations, or any other substantive issue included in Relators' Complaint.  As stated in Relators' Complaint, "[p]rior to May of 2000 FDB's misreporting of price information was suspected or known by state Medicaid agencies.  However, in May of 2000 FDB entered into an agreement with the Department of Justice and various states to stop reporting AWPs

---

[1]  Defendants' Motion, pp. 5-6.

[2]  Defendants' Motion, p. 5.

[3]  Defendants' Motion, p. 5 (citing MCC ¶ 212).

[4]  Defendants' Motion, p. 5 ("All of the other prior complaints make similar allegations regarding AWP and/or WAC inflation.").

published by the manufacturers and to instead report them on the basis of market prices. FDB

subsequently based its reports on surveys of wholesalers."[5]

Unlike the complaints generically cited by Baxter, Relators' Complaint is based on

Baxter intentionally misstating its market prices–knowing that FDB would be required, under the

consent decree, to repeat these misstatements to governmental entities. "Baxter falsely reported

WAC by claiming it was reporting a 'list sales price.'"[6] "Medicaid, Medicare, and all other

systems which base reimbursement rates for drugs on the published AWP rely upon the accuracy

of the AWP, and, in turn, depend upon the honesty and accuracy of Baxter and other drug

manufacturers in reporting WAC to FDB."[7] Baxter fails to point out one single reference to this

type of fraud in any of the complaints that it cursorily cites.

       (2)    Prior Government Reports

Four of the Government reports listed originated long before the change in price

reporting was required by DOJ and the NAMFCU. One of them (Defendant's Exhibit J)

describes some of the changes in the reporting structure which enabled Baxter to commit the

fraud, but falls far short of even mentioning the scheme itself. Defendant's Exhibits K discusses

Baxter's pricing in the mid-1990s (Exhibit K, Attachment 7, pp. 33-36), long before this

fraudulent scheme was possible. Lastly, Exhibit L makes absolutely no mention of Baxter's

manipulation of the new strictures on price reporting. The government reports cited by Baxter

simply confirm Relators'

---

[5] Relators' Complaint ¶ 24.

[6] Relators' Complaint ¶ 38.

[7] Relators' Complaint ¶ 25.

4

point – no one in government had an inkling about this new fraud scheme until Relators brought

it to the Government's attention.

(3)   News Media Reports

First, none of the reports cited ever mention anything remotely like resembling Baxter's

scheme.  Second, the April 2000 Marketing Research Bureau report and the 1996 *Barron's*

article (Deft.'s Brief, p. 8) the both predate even the possible existence of the FDB-based

scheme.

Finally, the Marketing Research Bureau Report is not even a report from the "news

media".  This report costs $16,000 per year and has an industry-based circulation of only

approximately twenty copies, none of which go to public or university libraries.[8]  The

subscribers are manufacturers, a few specialty pharmacies, and a few 340d entities (e.g. Baxter,

Bayer Corp., Wyeth Pharmaceuticals . . . .).[9]

To be considered a public disclosure, the Court must first examine whether the MRB is in

fact disseminated to the public.  "[I]t is generally accepted that publicly available documents,

such as a complaint filed in conjunction with a civil lawsuit, qualify as public disclosures under

the statute."[10]   Unlike filed complaints or a newspaper article, the MRB is not available to "any

stranger to the fraud."[11]  At $16,000 per copy, industry insiders such as Baxter are the only

---

[8]  Hamilton Decla., ¶ 14.

[9]  Hamilton ¶ 14.

[10]  In re Pharmaceutical Industry AWP Litigation, 538 F. Supp. 2d 367, 376-77 (D. Mass.
2008).

[11]  See United States ex rel. Pentagen Technologies Int'l, Ltd. v. CACI Int'l Inc., No. 94
Civ. 2925, 1996 WL 11299, *8 (S.D.N.Y. Jan.4, 1996)

subscribers that can afford such a prohibitive cost. For similar reasons, courts held that foreign

news articles are not public disclosures because they are not accessible to the American public.[12]

Although many Americans speak foreign languages, few would be capable of spending $16,000

to access the MRB.

B.   Allegations that Baxter Concealed the Discounts Given With Volume Committed
Contracts and Thereby Concealed the Best Price from CMS and Underpaid
Rebates to the States Were Not Publicly Disclosed.

Baxter next argues that Relators' Best Price allegations, contained at ¶¶ 49-5, ¶¶ 53 - 60

of the Complaint, were publicly disclosed.[13] Yet again, Baxter fails to specifically point out

what was publicly disclosed. Rather, it makes generic allusions to the Nevada Complaint, the

Montana Complaint, and the County of Nassau Complaint.[14] Although Baxter claims that

Relators' allegations involving "Volume Committed Contracts" were publicly disclosed in the

---

[12]   See, e.g., United States ex rel. Yannacoupolous v. General Dynamic, 315 F. Supp. 2d
939, 949 (N.D. Ill. 2004) ("There is no public disclosure to the American public when
information is divulged in a foreign publication, especially if published in a foreign language. In
this case, publication in Greek-language news media did not publicly disclose information to the
American public.").

[13]   Defendants' Motion, p. 5 ("The Best Price allegations in Relators' Complaint ¶ ¶ 49-
51, 53-61, 85-88 (Count III), also were asserted in earlier lawsuits against Baxter.").

Defendant also argues that it was improper to plead Stark violations because it could not
be liable under the terms of the Stark Act. (Defendants' Motion, p. 22). This argument is
correct. However, it does not relieve Baxter of liability for concealing the discounts from CMS,
and thereby underpaying rebates to the states. Relators below discuss their request for leave to
amend their complaint to plead that the same facts establish violations of the Anti Kickback
Statute, §42 U.S.C. 1320a-7b(b) as well as cognate state statues, e.g., California Welfare &
Institutions Code §14107.2

[14]   Defendants' Motion, p. 5 ("The Nevada Complaint, for example, charged Baxter with
misrepresenting its Best Prices. Exhibit B ¶¶ 137-152. So, too, did other state Attorney General
and New York County lawsuits.") (citing Exhibits C and D).

MCC and Nassau County Complaint, those complaints never identify the drugs involved..[15] The

complaint, in contrast identifies two specific drugs. "In an April, 2003 meeting to discuss

pricing policy for Advate and Recombinate, Bradley declared that the U.S. marketing team was

not worried about losing market share to competitors because they had Volume Committed

Contracts for most of their products which would be in force for the next three years."[16]  Relator

discussed a specific contract, the meeting when it was discussed, and which employees were

present.  "The contract was read by Relator, Poulios, and John Park (Defendant's Global

Products Director)."[17]  In contrast, the Nassau County Complaint fails to give factual detail about

any Volume Committed Contract.  Rather, it only vaguely refers—in a single sentence—to

volume discounts.  "Manufacturers or wholesalers also offer purchasers rebates based on the

volume of products purchased not in a single sale but over a period of time."[18]

      C.      Even if Prior Suits or Government or News Media Reports Are
             Considered Public Disclosures, the Relators Are Original Sources.

Last year this Court made clear its analysis of the original source exception to the public

disclosure bar.  *In re Pharmaceutical Industry AWP Litigation*, 538 F. Supp. 2d 376, <u>supra</u>.  The

Court grounded its analysis in recognition that Congress was "[s]eeking the golden mean

---

[15] Defendants' Motion, pp. 5-6 ("Moreover, a number of the complaints refer to alleged improprieties concerning volume discounts, similar to the Best Price allegations related to 'Volume Committed Contracts' in Relators' Complaint ¶ 51.  See, e.g., MCC ¶ 165 (referring to 'volume discounts, rebates, off-invoice pricing, free goods,' etc.); (Nassau County Complaint) ¶¶ 95, 96 (discussing alleged improprieties associate with volume discounts, wholesaler chargebacks, and volume-based rebates).").

[16] Relators' Complaint ¶ 50.

[17] Relators' Complaint ¶ 50.

[18] Defendants' Motion, Exhibit D ¶ 96.

between adequate incentives for whistle-blowing insiders with genuinely valuable information and discouragement of opportunistic plaintiffs who have no significant information to contribute of their own." Direct knowledge is "firsthand knowledge of the alleged fraud" obtained through the relator's "own labor unmediated by anything else." *Id.*, at 384. Independent knowledge is knowledge independent of the public disclosure. *Id.* At 380.

Thus in *In re Pharmaceutical Industry AWP Litigation [U.S. ex rel West, et. al. v. Ortho-McNeil Pharmaceutical and Johnson & Johnson*) the Court first determined whether a public disclosure had occurred, and, if it had, then analyzed whether or not the relator's knowledge of the fraud was direct and independent. Applying this reasoning, the Court found that verbal statements from the relator's manager were sufficient to establish direct and independent knowledge. *Id.,* at 386 (being told to bribe a hospital with a cash payment). Notwithstanding the fact that "earlier lawsuits alleged a long-term industry-wide practice of providing various financial incentives", those industry-wide practices were not "adequate to set the government squarely on the trail of fraud" as compared with the Relator's allegations of "a very specific fraudulent scheme". *Id.*, at 387.

In essence, if the Relators here are able only to describe a previously disclosed pattern and practice, they are not original sources. If they have specific knowledge they derived on their own that can "set the government squarely on the trail" of specific schemes, they are original sources, even though the general class of scheme may have been previously disclosed. And so long as that knowledge is independent, it can be derived from the statements of others, such as managers. *Id.*, at 386.

8

1.     Relators Have Direct and Independent Knowledge of Relevant
       Information.

Applying these standards, each Relator independently interacted with an overlapping set

of Baxter pricing decision makers.  Each Relator learned of Baxter's schemes from such

communications.

A.     Linnette Sun Has Direct and Independent Knowledge of Any
       Arguably Disclosed Allegations

In 2002 Linnette Sun, an economist, was hired as Director of Medical Outcomes

Research and Economics.   Her primary responsibility was pricing a billion dollar biological

product, Advate.[19]  Even before her official start date, Sun participated in a meeting to secretly

discuss and decide upon the WAC and list price that Baxter would report to First DataBank.[20]

She heard the other pricing and sales executives state that the spread between AWP and actual

price to home health companies still had be manipulated in order to maintain or increase

Baxter's market share.[21]  Sun was also told by senior managers that even if patients were given

drug overdoses by home health companies seeking to fulfill their volume commitments, that the

overdoses could be achieved without "serious" side effects.[22]

In mid 2003 Sun attended a meeting where Larry Guiheen, President of Baxter

BioScience and other managers worked out a plan to artificially "set" the Average Wholesale

---

[19]  Sun Decla., ¶5.  Notwithstanding her title, she ahd not responsibility for medical
outcomes research.

[20]  Sun Decla., ¶¶6-7.

[21]  Sun Decla, ¶¶ 8-10, 16

[22]  Sun Decla, ¶12.

9

Price, but to disguise it in reports as the "list price". Guiheen ordered Sun and the other

participants to destroy all copies of an incriminating spreadsheet what was used by participants

during the meeting.[23]

When Sun discovered Baxter's misuse of "list price" reporting to First DataBank she

notified her supervisors, but was ordered by Guiheen to drop her research into this scheme.[24]

Linnette Sun has direct and independent knowledge of the deliberate misreporting to First

DataBank, the use of these reports to manipulate the spread, and of Baxter's knowledge that it

had to conceal from the government the discounts given to home health agencies.

> **B.**    Greg Hamilton Has Direct and Independent Knowledge of Any
> Arguably Disclosed Allegations

Baxter is being somewhat disingenuous in its brief when it claims that Hamilton "was

never employed by, nor had any association with Baxter." [25]  In fact, Hamilton had numerous

meetings with Larry Guiheen and Guiheen's supervisor, Peter O'Malley.  These meetings

focused on Baxter's pricing structure for the very biologicals at issue in this Complaint.[26]

Hamilton was invited to hold these discussions with Baxter because of his expertise in the

specialty pharmacy market and his knowledge of biologic products for hemophilia.[27]

---

[23] Sun, Decla ¶14.

[24] Sun Decla, ¶15.

[25] Defendant's Brief, p. 11.

[26] Hamilton Decla., ¶ 2.

[27] Hamilton Decla., ¶ 3.

Some of these discussions specifically concerned Baxter's pricing of Advate.[28]

Hamilton likewise learned of Baxter's "list price" scheme to manipulate First DataBank when an FDB manager called him up and asked his advice about this scheme.[29]  Baxter protests that this knowledge is somehow not "direct".  The fact remains that Hamilton learned enough about a specific fraudulent scheme to set the Government squarely on the trail of the fraud.

Greg Hamilton has direct and independent knowledge of the deliberate misreporting to First DataBank as a means of maintaining or enhancing the spread.  He also has direct and independent knowledge of Baxter's efforts to manipulate AWP for the benefit of home health companies.

    2.      Relators Furnished Information About Their Allegations to the Federal Government Well Before Filing Their Lawsuit

Nearly three months before filing, Relators, through their counsel, informed Assistant United States Attorney Michael Theis of the Relators' allegations.  Before taking his position as an AUSA in Colorado, Mr. Theis had been a Trial Attorney at the Department of Justice, where he had been primarily responsible for developing DOJ's liability theories for AWP cases. During a forty-minute conversation Kleiman apprised Theis of Baxter's effort to continue to manipulate AWP by refusing to report to FDB what its wholesale acquisition cost was, and Baxter's concealment of volume-based discounts.  Kleiman sent Theis a draft of the complaint and, after Theis had reviewed it, they had a second conversation before the suit was filed.[30]

Relators thus voluntarily disclosed their allegations to the Government well before the

---

[28]  Hamilton Decla., ¶ 6.

[29]  Hamilton Decla., ¶¶ 8-10.

[30]  Kleiman Decla., ¶¶ 1-3.

11

case was filed.

> D.     The Complaint Has Been Plead With Sufficient Particularity

Defendants argue that the Court should dismiss Relators' AWP and best price

claims under FED. R. CIV. PROC. 9(b) ("Rule 9(b)"), chiefly relying on the First Circuit's recent

opinion in Duxbury to support this argument.[31] But Defendants failed to mention that the

Duxbury parties entered a joint dismissal of the AWP and best price allegations (contained in

Count II) more than two years before the opinion was issued.[32] Thus, those allegations were not

before the First Circuit.

Discussing the district court's dismissal of these counts, the First Circuit stated that

"[h]aving established its subject matter jurisdiction, the court nevertheless dismissed the 1992

through 1998 kickback claims [Count I] because the Amended Complaint failed to plead the

claims with sufficient particularity under Rule 9(b). . . . As to Count III, the court dismissed the

claims concerning 'off-label' promoting because they were barred by the 'first-to-file' rule."

After the First Circuit reversed the district court and held that Duxbury's kickback claims were

sufficient under Rule 9(b), it limited its discussion of Rule 9(b) to the specific facts (i.e.

kickbacks) in the case, stating that "'[w]e decline to draft a litigation manual full of scenarios" of

what allegations would be sufficient for purposes of Rule 9(b).  Suffice it to say that we limit our

---

[31] Memorandum in Support of Baxter International Inc.'s Motion to Dismiss Relators'
Complaint, ("Defendants' Motion") p. 17 ("Relators' allegations concerning the Pricing
Schemes are grossly insufficient under Rule 9(b), and therefore Counts I and III must be
dismissed."), citing Duxbury v. Ortho Biotech Products, L.P., No. 08-1409, 2009 WL2450716
(1st Cir. Aug. 12, 2009).

[32] Duxbury, 2009 WL 2450716 *19, n.5 ("Count II of the Amended Complaint alleges
that OBP engaged in a scheme to publish a fraudulently inflated AWP for Procrit. On June 27,
2007, the parties jointly stipulated to the dismissal of this count.").

holding to the facts.'"[33] Duxbury is simply inapplicable to the AWP manipulation alleged in
Relators' Complaint.

This Court has explained that Rule 9(b) does not require Relators to plead evidence.
"The requirements of Rule 9(b), however, must be read in conjunction with Fed.R.Civ.P. 8(a),
which requests "a short and plain statement of the claim" for relief.  Thus, while Relator must
allege the circumstances of the fraud, he is not required to plead all of the evidence or facts
supporting it."[34]  "[I]n determining the adequacy of a complaint under that rule [Rule 9(b)], we
cannot hold plaintiffs to a standard that would effectively require them, pre-discovery, to plead
evidence."[35]

In Iqbal, the Supreme Court held that a complaint need only show that unlawful conduct
was facially plausible.[36]  The Court held that a "pleading that offers 'labels and conclusions' or
'a formulaic recitation of the elements of a cause of action' is insufficient."[37]  "In reviewing the
complaint in Iqbal, the Court noted that the complaint did not contain any factual allegations

---

[33] Duxbury, 2009 WL 2450716 *17 (citations omitted) (quoting United States ex rel.
LeBlanc v. Raytheon Co., 913 F.3d 17, 20 (1st Cir.1990)).

[34] United States ex rel. Franklin v. Parke-Davis, 147 F. Supp. 2d 39, 46-47 (D. Mass.
2001).

[35] Shaw v. Digital Equipment Corp., 82 F.3d 1194, 1225 (1st Cir. 1996), superseded by
Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4(b)(1)-(2).

[36] Ashcroft et al. v. Iqbal et al., 129 S.Ct. 1937, 1940 (2009) ("A claim has facial
plausibility when the pleaded factual content allows the court to draw the reasonable inference
that the defendant is liable for the misconduct alleged.").

[37] Id. at 1949.

claiming that Mueller or Ashcroft may have intentionally discriminated on the basis of race or religion."[38]

Here, unlike Iqbal's allegations, or even under the limited holding of Duxbury, Relators' Complaint is sufficient under Rule 9(b) because Relators do more than just "'suggest fraud was possible.'"[39] In reversing the district court, the First Circuit refused to require that relators plead specific instances of fraud to pass Rule 9(b). "In applying Rule 9(b), the district court held that the rule 'requires relators to 'provide details that *identify particular false claims* for payment that were submitted to the government.' This was error."[40] Under Duxbury, an FCA complaint is sufficient to pass Rule 9(b) without providing specific details of each false claim, especially where, as here, the claims are actually submitted by third parties, and not by the defendant.[41] And this more flexible standard[42] has been applied in two other recent circuit opinions.[43]

---

[38] Al-Kidd v. Ashcroft, __ F.3d __, 2009 WL 2836448 *21 (9th Cir. Sept. 4, 2009).

[39] Duxbury, 2009 WL 2450716 *15 (stating that "unlike in Rost, Duxbury does more than 'suggest fraud was possible.'").

[40] Duxbury, 2009 WL 2450716 *14 (emphasis in original).

[41] Duxbury, 2009 WL 2450716 *14 ("[W]e held that a relator could satisfy Rule 9(b) by providing "factual or statistical evidence to strengthen the inference of fraud beyond possibility' without necessarily providing details as to each false claim.") (quoting United States ex rel. Rost v. Pfizer, Inc., 507 F.3d 720, 733 (1st Cir.2007)).

[42] Duxbury, 2009 WL 2450716 *15 (holding that Duxbury's claims satisfy Rule 9(b) under this 'more flexible standard'") (quoting United States ex rel. Gagne v. City of Worcester, 565 F.3d 40, 46 (1st Cir.2009)).

[43] See e.g., United States ex rel. Lusby v. Rolls-Royce Corp., 570 F.3d 849, 854 (7th Cir. June 30, 2009) ("We don't think it essential for a relator to produce the invoices (and accompanying representations) at the outset of the suit. True, it is essential to show a false statement. But much knowledge is inferential-people are convicted beyond a reasonable doubt of conspiracy without a written contract to commit a future crime-and the inference that Lusby proposes is a plausible one. . . . To say that fraud has been pleaded with particularity is not to say

14

Relators' Complaint alleges factual details to infer that Baxter's illegal pricing schemes were more than merely possible.

In this case, Relators' Complaint alleges details and factual support of Baxter's fraudulent pricing schemes. The Complaint describes the market for drug products and lists specific drugs and biologics that Baxter manufactures. Complaint, ¶ 20. It describes, in detail, how Baxter's drugs and biologics are covered by Government programs. Complaint, ¶ 21. It covers how Baxter is supposed to calculate its pricing and chronicles Baxter's history of misreporting prices to First Data Bank ("FDB"). Complaint, ¶ ¶ 22-26. It alleges exactly how Baxter cherry picked its highest prices and then falsely reported them to FDB as its lowest prices. Complaint, ¶ ¶ 27-35. It details how Baxter misreported the price of Recombinate (Complaint, ¶ ¶ 36-42) and Advate, including how Baxter sold Advate for $0.99 per dose, but reported its "lowest price" as $1.60. Complaint, ¶ ¶ 43-46. Further, it discusses a specific contract that was illegal. Complaint, ¶ 51.[44] Finally, it identifies specific employees, including Sun's supervisors, that were put on notice about these illegal practices.

---

that it has been proved (nor is proof part of the pleading requirement)".); <u>United States ex rel. Grubbs v. Kanneganti</u>, 565 F.3d 180, 190 (5th Cir. April 8, 2009) ("[A] relator's complaint, if it cannot allege the details of an actually submitted false claim, may nevertheless survive by alleging particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted").

[44] Although Baxter refers to this contract in its motion, it fails to explain how such specific pleading places the Complaint outside the bounds of Rule 9(b). Defendants' Motion, p. 14.

Out of an abundance of caution, Relators ask that if the Court finds that the Complaint is insufficient under Rule 9(b), that they be given leave to amend.[45]

2. **RELATORS' STATE LAW CLAIMS SURVIVE FOR THE SAME REASON THAT THEIR FEDERAL CLAIMS SURVIVE**

Defendants argue that this Court should dismiss Relators' state law claims for various reasons, which are addressed more specifically below.  It should be noted at the outset, however, that Relators' state law claims survive for the same reasons that Relators' federal claims survive—namely that they are plead with sufficient particularity, they were not publicly disclosed, or the Relators are nonetheless original sources. As discussed, Relators' allegations are based on intentionally forcing First DataBank ("FDB") to breach its agreement with the Department of Justice and the National Association of Medicaid Fraud Control Units, representing the states. "Baxter falsely reported WAC by claiming it was reporting a 'list sales price.'"[46] "Medicaid, Medicare, and all other systems which base reimbursement rates for drugs on the published AWP rely upon the accuracy of the AWP, and, in turn, depend upon the honesty and accuracy of Baxter and other drug manufacturers in reporting WAC to FDB."[47] This scheme was not publicly disclosed in any of the sources cited by Baxter.  Moreover, Relators' Complaint alleges details and factual support of Baxter's fraudulent pricing schemes.[48]

---

[45] Fed. R. Civ. Proc. 15(a); *See, e.g.*, *Foman v. Davis*, 371 U.S. 178, 182 (1962) ("'Rule 15(a) declares that leave to amend 'shall be freely given when justice so requires'; this mandate is to be heeded.").

[46] Relators' Complaint ¶ 38.

[47] Relators' Complaint ¶ 25.

[48] Relators' Complaint, ¶ ¶ 20-51.

16

3.    **RELATORS CONCEDE THAT THE STATE LAW CLAIMS REGARDING ARKANSAS AND UTAH SHOULD BE DISMISSED.**

Defendants are correct. The Court should dismiss Counts XX and XXI (the Arkansas and Utah claims) because there is no private right of action under those statutes.[49] Relators agree that these counts should be dismissed.[50]

4.    **RELATORS AGREE THAT THE TEXAS AND NEVADA STATE CLAIMS SHOULD BE DISMISSED.**

Defendants are correct. The Court should dismiss Count XII of Relators' Complaint based on the June 2006 settlement with the State of Texas.[51] Relators have already executed a release as to Defendants' violations of the Texas False Claims Act and agree that this count should be dismissed.[52]

Defendants are also correct that the Court should dismiss Count XVI of Relators' Complaint based on the August 2008 settlement with the State of Nevada.[53] And, admittedly, the settlement includes a broad release related to commercial price reporting services, which arguably includes First Data Bank.

---

[49] Defendants' Motion, p. 20, ¶ II(B).

[50] Relators note for the record that this was never the subject of any meet and confer communications from Baxter, and that Relators would have readily conceded this point (and saved the Court time) had it been pointed out to them.

[51] Defendants' Motion, p. 20, ¶ II(C)(5).

[52] Relators note for the record that neither the Texas nor the Nevada settlements were ever the subject of any meet and confer communications from Baxter, and that Relators would have readily conceded this point (and saved the Court time) had it been pointed out to them.

[53] Defendants' Motion, p. 20, ¶ II(C)(4).

17

Unlike the other settlement agreements cited by Defendants (California, Hawaii, and Illinois), this settlement agreement explicitly details similar conduct as discussed in Relators' Complaint.  The agreement purports to release "claims regarding any drug price published by any commercial price reporting service, or provided by any Released Party to any such commercial price reporting service . . . ."[54]  The Nevada Complaint was executed at least five (5) months before the other settlement agreements.  Thus, had the parties intended that similar conduct be released in the California, Hawaii, and Illinois settlements, they would have included similar language.  But they failed to do so.  Relators agree that the Nevada count should be dismissed.

5.    **THE CALIFORNIA, HAWAII, AND ILLINOIS CLAIMS SHOULD NOT BE DISMISSED BECAUSE RELATORS' ALLEGATIONS WERE NOT PART OF THE COVERED CONDUCT ENUMERATED BY THE SETTLEMENT AGREEMENTS.**

Defendants argue that the Court should dismiss Count VIII, IX, and X of the Complaint based on settlements with the States of California, Hawaii, and Illinois, entered into between December, 2008 and March, 2009[55]  But Relators' allegations were not included in those settlements nor released by those states.

Defendants' settlement agreement with the State of California only applied to "covered conduct."  And that "covered conduct" does not include Defendants' intentionally lying to FDB about its market prices—knowing that FDB would submit those prices to governmental entities.[56]

---

[54]  See Exhibit T, p. 5 ¶4, attached to Defendants' Motion.

[55]  Defendants' Motion, p. 20, ¶ II(C).

[56]  See Exhibit Q ¶ C, attached to Defendants' Motion.

18

All other conduct was specifically excluded from the terms of the settlement agreement. "[S]pecifically reserved and excluded from the scope and terms of this Agreement, and from the scope and terms of the releases, as to any entity or person . . . are . . . [a]ny liability to the State of California for any conduct other than the Covered Conduct."[57]  Unlike the Nevada agreement, had the parties intended conduct similar to that alleged in Relators' Complaint be released in California, they would have included similar language.  But they failed to do so.

Similarly, Relators' allegations were not part of that settlement agreement and were not released by Hawaii.  That settlement agreement only applies to "covered conduct."[58]  And, again, the "covered conduct" does not include Defendants' intentionally lying to FDB about its market prices—knowing that FDB would submit those prices to governmental entities.[59]  All other conduct was specifically excluded from the terms of the settlement agreement.  "[T]he State specifically does not release any person or entity from . . . any liability for any conduct other than the Covered Conduct."[60]  Again, unlike the Nevada agreement, had the parties intended conduct similar to that alleged in Relators' Complaint be released in Hawaii, they would have included similar language.

Relators' allegations were likewise not part of the Illinois settlement and were not released by Illinois.  That settlement agreement only applies to "covered conduct."[61]  And, once

---

[57]  See Exhibit Q, p. 8 ¶15(f), attached to Defendants' Motion.

[58]  See Exhibit R ¶ D, attached to Defendants' Motion.

[59]  Relators' Complaint ¶ 25.

[60]  See Exhibit R ¶ 7, attached to Defendants' Motion.

[61]  See Exhibit S ¶ E, attached to Defendants' Motion.

19

again, the "covered conduct" does not include Defendants' intentionally lying to FDB about its market prices—knowing that FDB would submit those prices to governmental entities.[62] All other conduct was specifically excluded from the terms of the settlement agreement. "[T]he State specifically does not release any person or entity from . . . any liability for any conduct other than Covered Conduct."[63] Yet again, unlike the Nevada agreement, had the parties intended conduct similar to that alleged in Relators' Complaint be released in Illinois, they would have included similar language.

6.   **RELATORS CONCEDE THAT THE STARK CLAIMS SHOULD BE DISMISSED, BUT REQUEST LEAVE TO AMEND TO ALLEGE THAT THE SAME CONDUCT COMPLAINED OF VIOLATES STATE AND/OR FEDERAL ANTI KICKBACK STATUTES.**

Baxter points out correctly that it cannot be liable under the terms of the Stark Act. (Defendants' Motion, p. 22). This argument is correct. However, it does not relieve Baxter of liability for concealing the discounts from CMS, and thereby underpaying rebates to the states. Relators below discuss their request for leave to amend their complaint to plead that the same facts establish violations of the Anti Kickback Statute, §42 U.S.C. 1320a-7b(b) as well as cognate state statues, e.g., California Welfare & Institutions Code §14107.2 and Illinois Statutes Ch. 305, §5/8A-3.

7.   **CONCLUSION**

Relators have established that there are no bars to jurisdiction because the allegations in their complaint have not been publicly disclosed, and because in any event, they are the original

---

[62] Relators' Complaint ¶ 25.

[63] See Exhibit S ¶ 7, attached to Defendants' Motion.

sources of any disclosures.   Their claims have been set forth with sufficient specificity for 9b purposes.

Baxter's motion should be granted as to Counts II (the Stark Act claim), XII (Texas), XVI (Nevada), XX (Arkansas) and XXI (Utah).   The motion should be denied in all other respects, and Relators should be given leave to amend their Complaint to add allegations that Baxter's conduct violate the federal and cognate state Anti Kickback Statutes.

Dated: September 15, 2009            LAW OFFICES OF MARK ALLEN KLEIMAN


By:   /s/  Mark Allen Kleiman
        MARK ALLEN KLEIMAN
        California State Bar No. 115959
        2907 Stanford Avenue
        Venice, CA 90292
        310-306-8094
        310-306-8491 (fax)

21

## DECLARATION OF MARK ALLEN KLEIMAN

I, Mark Allen Kleiman, hereby declare as follows:

I am an attorney duly licensed to practice before all courts in the State of California and am

attorney of record for relators herein.  If called upon to do so I could and would testify competently to

the following based upon firsthand knowledge:

1.      Before filing the complaint in this action I had two conversations about the

allegations with Michael Theis while he was an Assistant United States in the United States Attorney's

Office for the District of Colorado.  Before taking this position Mr. Theis had been a Trial Attorney at

the Department of Justice, where he had been primarily responsible for developing DOJ's liability

theories for AWP cases.

2.      The first conversation took place on or about January 30, 2005, and lasted

approximately forty minutes.  During this conversation I described the allegations in the proposed

complaint, including the allegations that (a) Baxter's reporting was based on its prices to nonchargeback

wholesalers which comprise only a small percentage of its market for biological products; (b) Baxter's

deliberate refusal to report its WAC for Recombinate to First Databank, thus causing FDB to misreport

Baxter's AWP for this product, and that this was done with Baxter's full knowledge consent decree with

the Government, controlling Baxter's price reporting; and © use of Volume Committed contracting.  Mr.

Theis stated that he was quite interested in this information and that he would enjoy working on this

case.  Accordingly I sent Mr. Theis a draft of the complaint.

3.      On March 1, 2005 Mr. Theis told me that he had read the complaint and had

shared it with the Chief of the Civil Division.  I told him we would get it filed shortly.  He replied that he

looked forward to it, and to working with us.

I declare under penalty of perjury of the laws of the State of Kentucky that the foregoing is true

and correct.  Executed this fourteenth day of September, 2009, in Louisville, Kentucky.


/s/ Mark Kleiman
Mark Kleiman

2

I, Linnette Sun, hereby declare as follows:

1. I am one of the Relators in United States ex rel Sun et al. v. Baxter.  If called upon to

   do so, I could and would testify competently to the following based upon firsthand

   knowledge.

2. I started working in the pharmaceutical industry in 1992.  I was initially employed by

   Merck & Company.  I started as a business analyst and became a manager to work on

   health economics for the US Sales and Marketing Division.  I worked at Merck for

   approximately five years.

3. I then went to work for Johnson & Johnson as the Associate Director and Director of

   Health Economics, primarily responsible for pricing.  I held that position and those

   responsibilities for approximately two years.

4. I went to work for Amgen as an Associate Director of Health Economics with

   responsibility for pricing and reimbursement.  I eventually became the Associate

   Director of Pricing in the corporate pricing department.  I remained at Amgen from

   September, 1999 through June, 2002.

5. In June 2002 I was hired by Baxter International("Baxter") as the Director of Medical

   Outcomes Research and Economics.   On the company's internal website I was

   referred to as the "Senior Director" of Medical Outcomes Research and Economics.  I

   was hired to do global pricing(which included pricing in the United States as well as

   pricing for overseas markets), and the job description specifically included global

   pricing.  I did not do medical research.  My primary responsibility was pricing,

1

principally for a billion dollar product named Advate.  I also did pricing for other Baxter products as well.

6.  I was called by Nick Poulios, my immediate supervisor at Baxter,  to attend a meeting even before I officially started at the company. This was a  core pricing group meeting held at Baxter's Thousand Oaks, California facility.  The core pricing group consisted of the highest level of pricing personnel at Baxter.  The meeting was attended by approximately seven individuals, including John Park(Global Product Manager), Mr. Poulios (Senior Director of Medical Outcomes Research and Economics), Michael Baldridge (Director of Strategic Planning)  and Mike Bradley (Director or Senior Director of Health Economics)  The meeting included the Vice President of the global business unit which was responsible for Advate and a consultant from Simon Kucher, the most prestigious consulting firm in the world.

7.  The objective of this core pricing meeting was to secretly discuss and decide on a discount price and a list price to be reported to First Data Bank ("FDB") and Redbook.  The  pricing consultant from Simon Kucher presented a pricing project that performed a choice modeling to see if the discounted price and margin would improve the market share for Baxter.  John Park told me Simon Kucher was very expensive and Baxter paid one million dollars for this project.  This meeting lasted an entire day.

8.  Once my employment actually started, I was part of the task force for Advate pricing. As part of the task force, I was attended weekly core pricing meetings.  This core group included Mike Bradley, John Park,  Nick Poulios, Mike Baldridge and

2

someone at a director level from the European division of Baxter.  This group had
responsibility for pricing worldwide.

9.  These core group pricing meetings would on occasion be attended by United States
Marketing and Sales executives.   Those executives would stress the importance of a
high list price for payers to reimburse home health care companies and a low selling
price to those companies.  They kept telling us that as the front line managers they
knew too well that Baxter can only sell if they provide economic incentives to  these
home health care companies.

10. As I was hired to do pricing for Baxter, I had full and complete access to all of
Baxter's pricing documents.  A document was prepared annually which set forth all
of the competitive price information and market shares related to margins provided by
other pharmaceutical companies to  home health care companies for classes of blood
products which Baxter BioScience competed most,  along with pricing growth and
market share growth over the years. This document was only distributed within a very
limited group of people.  Not everyone in the pricing core group received it, but I was
one of the individuals who received it.  John Park stressed how confidential this
document was.  I have a copy of this document.  This document, along with the
pricing report developed by Simon Kucher, was used  by the core pricing group to
decide how much of a discount Baxter should give home health care companies in
order for Baxter to increase its market share.   I did show the document to Nick
Poulious, my immediate supervisor, and discussed with him the fact that the company
that did the research listed margin and AWP on separate pages so that Baxter could

3

use this information to decide on the most favorable margin it could provide while
still avoiding any legal problems in the event the government became aware of it.

11. Although Mike Bradley implemented all direct discounts for Baxter, the strategic
decision on discounts and the margins was made by the core pricing group. We(the
core pricing group) decided on the AWP and selling price. US Sales and Marketing
tactically decided which home health care companies would receive the most
discounts. I recall a core pricing group meeting at the backroom of the Westlake
Hilton in early 2003. Mr. Poulios , Mr. Bradley, Mr. Baldridge and I were at the
meeting. Mr. Park was absent as he was preparing for what was referred to as "price
war gaming." I wanted to bring my consultant to the meeting but was told by John
Park not to as the meeting was highly confidential. We discussed list prices (AWP)
and contract prices for the US launching of Advate. Mr. Bradley highlighted several
volume-committed contracts with major home health care companies to address
concerns that the launch of the new product Advate would decrease Baxter's market
share. He identified several major companies that had entered into these contracts
with Baxter, that these contracts were good for three years and that they guaranteed
certain discounts. Mr. Bradley told us home health care companies that did not buy
and sell Baxter's products would be penalized. He further informed us of the actual
discounts that Baxter was providing to these companies in these contracts and what
the volume commitments were.   Finally, Mr. Bradley stated that the volume
committed contracts would generate majority of company revenues.

12. I challenged the notion that home health care companies could commit to a certain
volume without adding additional patients. Assurances were given that these drugs

4

are safe and can be overdosed without serious side effects.   It was further explained that although some patients become drug resistant,  such patients may end up taking a large volume of Baxter products.

13. I stated at the meeting that these volume committed contracts are illegal,  as I believed, based on my extensive experience with pricing, and my awareness of AWP litigation.  Mr. Bradley said that Baxter would not get into legal trouble over these contracts because neither AWP nor margin was explicitly stated in these contracts, But in fact,  he indicated that the margins were what the home health care companies were looking for, Baxter knew and we all knew that every single home health care company was aware of the AWP for reimbursement and the resulting margins that they would receive from the contract prices.

14. In mid 2003 I attended a decision-making meeting with the pricing core group and Larry Guiheen, the President of Baxter BioScience.   The head of sales and marketing also attended via teleconference.   The core pricing group members presented certain data and their recommendations.  John Park, the global product director, and Peter Fan, his analysis manager,  developed a spread sheet which contained the discount price,  the AWP(which may be called  "list price" in the spread sheet) and the margin (or spread, or delta in the spread sheet). This group, including the upper management people in attendance,  voted at the meeting as to which selling price, list price and margin to offer to the home health care companies.  I voted for the lowest margin as I did not feel the higher margins were legal. The overall vote was for a much higher margin.  At the conclusion of the meeting, Mr. Guiheen directed the attendees at the

5

meeting to destroy all copies of this spread sheet,  stating that he felt that Baxter

could get in trouble over this spread sheet.

15. In my position I was one of the individuals involved in the decision as to what prices

were to be reported to First Databank.  The reporting of the list  price would set the

reimbursement price paid by government payers and private payers for the <u>home</u>

<u>health care</u> companies.  I performed research on this as part of my responsibility for

pricing,  I discovered some discrepancies in the prices listed for Baxter products

between First Databank and Redbook.  I therefore discovered that by using the word

list price,  twenty five percent would be added to this list price to calculate AWP.

This meant that both government and private payers would end up paying twenty five

percent more than the usual AWP.  I brought this to the attention of Mr. Poulios and

Mr. Park.  John Park responded by telling me and the other members of the core

pricing group that Redbook is the source that is primarily used for reimbursement.  I

then contacted First Databank.  First Databank responded by email advising that First

Databank was used by more than eighty percent of the payers in the United States,

including government payers such as Medicare, Medicaid and Veterans

Administration.  I sent the email on to Mr. Poulious and Mr.  Park. Mr.  Poulious

then scheduled a meeting on this issue with Mr. Guiheen.  Mr. Guiheen directed me

to not conduct any further investigation into this issue at the request of US Sales and

Marketing management.   He further stated that it may be a good thing for the <u>home</u>

<u>health care</u> companies and those companies were taking advantage of this larger

margin between the AWP and the selling price.  This was also good for Baxter as the

<u>home health</u> companies would be more likely to use Baxter products.  In other words,

6

Baxter could sell more as a result of this erroneous reporting. The larger the margin was between AWP and selling price, the greater the economic incentive was for home health care companies to buy Baxter products.

16. While I was at Baxter, I participated in all pricing meetings for all Baxer BioScience projects. One project we had included an offsite meeting at the Westlake Hilton Hotel for discounting and margin simulations, which were referred to as "war games." There were participants from all over the world, all of whom were at a management level. The meeting was chaired by John Park. There was a discussion at the meeting about how to inflate the reimbursement prices for Baxter products while lowering selling prices, which would result in higher sales to those providers with larger margins. US Sales and Marketing management concluded that only larger margins would generate higher sales and greater revenue.

17. After I expressed my concern and challenged this margin scheme developed and practiced by Baxter to increase its revenues by millions of dollars, Baxter terminated my employment.

18. Based on my position at Baxter, the information I had access to, the meetings I participated in, the decisions that I was involved in, the communications I had with First Databank and others outside of Baxter, and the research that I conducted, I had direct knowledge of the prices Baxter reported, and therefore had direct knowledge that Baxter reported and false and inflated AWPs, that generated more sales and revenue for Baxter at the expense of both government and private payer money.

7

09/14/2009 MON 11:25   FAX 484 595 8660 SHCB-156-COEshiro.com                    ☒002/002

I declare under penalty of perjury under the laws of the State of Pennsylvania of

America that the foregoing is true and correct. Executed this ___14___ th day of

September, 2009, at _Wayne_, _Pennsylvania_

Linnette Sun

8

I, Linnette Sun, hereby declare as follows:

1.  I am one of the Relators in United States ex rel Sun et al. v. Baxter.  If called upon to

    do so, I could and would testify competently to the following based upon firsthand

    knowledge.

2.  I started working in the pharmaceutical industry in 1992.  I was initially employed by

    Merck & Company.  I started as a business analyst and became a manager to work on

    health economics for the US Sales and Marketing Division.  I worked at Merck for

    approximately five years.

3.  I then went to work for Johnson & Johnson as the Associate Director and Director of

    Health Economics, primarily responsible for pricing.  I held that position and those

    responsibilities for approximately two years.

4.  I went to work for Amgen as an Associate Director of Health Economics with

    responsibility for pricing and reimbursement.  I eventually became the Associate

    Director of Pricing in the corporate pricing department.  I remained at Amgen from

    September, 1999 through June, 2002.

5.  In June 2002 I was hired by Baxter International("Baxter") as the Director of Medical

    Outcomes Research and Economics.  On the company's internal website I was

    referred to as the "Senior Director" of Medical Outcomes Research and Economics.  I

    was hired to do global pricing(which included pricing in the United States as well as

    pricing for overseas markets), and the job description specifically included global

    pricing.  I did not do medical research.  My primary responsibility was pricing,



principally for a billion dollar product named Advate.  I also did pricing for other Baxter products as well.

6. I was called by Nick Poulios, my immediate supervisor at Baxter, to attend a meeting even before I officially started at the company. This was a  core pricing group meeting held at Baxter's Thousand Oaks, California facility.  The core pricing group consisted of the highest level of pricing personnel at Baxter.  The meeting was attended by approximately seven individuals, including John Park(Global Product Manager), Mr. Poulios (Senior Director of Medical Outcomes Research and Economics), Michael Baldridge (Director of Strategic Planning)  and Mike Bradley (Director or Senior Director of Health Economics)  The meeting included the Vice President of the global business unit which was responsible for Advate and a consultant from Simon Kucher, the most prestigious consulting firm in the world.

7. The objective of this core pricing meeting was to secretly discuss and decide on a discount price and a list price to be reported to First Data Bank ("FDB") and Redbook.  The  pricing consultant from Simon Kucher presented a pricing project that performed a choice modeling to see if the discounted price and margin would improve the market share for Baxter. John Park told me Simon Kucher was very expensive and Baxter paid one million dollars for this project.  This meeting lasted an entire day.

8. Once my employment actually started, I was part of the task force for Advate pricing. As part of the task force, I was attended weekly core pricing meetings.  This core group included Mike Bradley, John Park,  Nick Poulios, Mike Baldridge and

someone at a director level from the European division of Baxter. This group had responsibility for pricing worldwide.

9. These core group pricing meetings would on occasion be attended by United States Marketing and Sales executives.  Those executives would stress the importance of a high list price for payers to reimburse <u>home health care</u> companies and a low selling price to those companies.  They kept telling us that as the front line managers they knew too well that Baxter can only sell if they provide economic incentives to  these <u>home health care</u> companies.

10. As I was hired to do pricing for Baxter, I had full and complete access to all of Baxter's pricing documents.  A document was prepared annually which set forth all of the competitive price information and market shares related to margins provided by other pharmaceutical companies to  <u>home health care</u> companies for classes of blood products which Baxter BioScience competed most,  along with pricing growth and market share growth over the years. This document was only distributed within a very limited group of people.  Not everyone in the pricing core group received it, but I was one of the individuals who received it.  John Park stressed how confidential this document was.  I have a copy of this document.  This document, along with the pricing report developed by Simon Kucher, was used  by the core pricing group to decide how much of a discount Baxter should give <u>home health care</u> companies in order for Baxter to increase its market share.   I did show the document to Nick Poulious, my immediate supervisor, and discussed with him the fact that the company that did the research listed margin and AWP on separate pages so that Baxter could

use this information to decide on the most favorable margin it could provide while

still avoiding any legal problems in the event the government became aware of it.

11. Although Mike Bradley implemented all direct discounts for Baxter, the strategic

decision on discounts and the margins was made by the core pricing group. We(the

core pricing group) decided on the AWP and selling price. US Sales and Marketing

tactically decided  which home health care companies would receive the most

discounts. I recall a core pricing group meeting at the backroom of the Westlake

Hilton in early 2003. Mr. Poulios , Mr. Bradley, Mr. Baldridge and I were at the

meeting. Mr. Park was absent as he was preparing for what was referred to as "price

war gaming." I wanted to bring my consultant to the meeting but was told by John

Park not to as the meeting was highly confidential. We discussed list prices (AWP)

and contract prices for the US launching of Advate. Mr. Bradley highlighted several

volume-committed contracts with major home health care companies to address

concerns that the launch of the new product Advate would decrease Baxter's market

share. He identified several major companies that had entered into these contracts

with Baxter, that these contracts were good for three years and that they guaranteed

certain discounts. Mr. Bradley told us home health care companies that did not buy

and sell Baxter's products would be penalized. He further informed us of the actual

discounts that Baxter was providing to these companies in these contracts and what

the volume commitments were.   Finally, Mr. Bradley stated that the volume

committed contracts would generate majority of company revenues.

12. I challenged the notion that home health care companies could commit to a certain

volume without adding additional patients. Assurances were given that these drugs

4

are safe and can be overdosed without serious side effects.    It was further explained that although some patients become drug resistant, such patients may end up taking a large volume of Baxter products.

13. I stated at the meeting that these volume committed contracts are illegal, as I believed, based on my extensive experience with pricing, and my awareness of AWP litigation. Mr. Bradley said that Baxter would not get into legal trouble over these contracts because neither AWP nor margin was explicitly stated in these contracts, But in fact, he indicated that the margins were what the home health care companies were looking for, Baxter knew and we all knew that every single home health care company was aware of the AWP for reimbursement and the resulting margins that they would receive from the contract prices.

14. In mid 2003 I attended a decision-making meeting with the pricing core group and Larry Guiheen, the President of Baxter BioScience.  The head of sales and marketing also attended via teleconference.   The core pricing group members presented certain data and their recommendations.  John Park, the global product director, and Peter Fan, his analysis manager,  developed a spread sheet which contained the discount price,  the AWP(which may be called  "list price" in the spread sheet) and the margin (or spread, or delta in the spread sheet).  This group, including the upper management people in attendance,  voted at the meeting as to which selling price, list price and margin to offer to the home health care companies.  I voted for the lowest margin as I did not feel the higher margins were legal.  The overall vote was for a much higher margin.  At the conclusion of the meeting, Mr. Guiheen directed the attendees at the

meeting to destroy all copies of this spread sheet, stating that he felt that Baxter could get in trouble over this spread sheet.

15. In my position I was one of the individuals involved in the decision as to what prices were to be reported to First Databank. The reporting of the list price would set the reimbursement price paid by government payers and private payers for the home health care companies. I performed research on this as part of my responsibility for pricing, I discovered some discrepancies in the prices listed for Baxter products between First Databank and Redbook. I therefore discovered that by using the word list price, twenty five percent would be added to this list price to calculate AWP. This meant that both government and private payers would end up paying twenty five percent more than the usual AWP. I brought this to the attention of Mr. Poulios and Mr. Park. John Park responded by telling me and the other members of the core pricing group that Redbook is the source that is primarily used for reimbursement. I then contacted First Databank. First Databank responded by email advising that First Databank was used by more than eighty percent of the payers in the United States, including government payers such as Medicare, Medicaid and Veterans Administration. I sent the email on to Mr. Poulious and Mr. Park. Mr. Poulious then scheduled a meeting on this issue with Mr. Guiheen. Mr. Guiheen directed me to not conduct any further investigation into this issue at the request of US Sales and Marketing management. He further stated that it may be a good thing for the home health care companies and those companies were taking advantage of this larger margin between the AWP and the selling price. This was also good for Baxter as the home health companies would be more likely to use Baxter products. In other words,

6

Baxter could sell more as a result of this erroneous reporting. The larger the margin was between AWP and selling price, the greater the economic incentive was for home health care companies to buy Baxter products.

16. While I was at Baxter, I participated in all pricing meetings for all Baxer BioScience projects. One project we had included an offsite meeting at the Westlake Hilton Hotel for discounting and margin simulations, which were referred to as "war games." There were participants from all over the world, all of whom were at a management level. The meeting was chaired by John Park. There was a discussion at the meeting about how to inflate the reimbursement prices for Baxter products while lowering selling prices, which would result in higher sales to those providers with larger margins. US Sales and Marketing management concluded that only larger margins would generate higher sales and greater revenue.

17. After I expressed my concern and challenged this margin scheme developed and practiced by Baxter to increase its revenues by millions of dollars, Baxter terminated my employment.

18. Based on my position at Baxter, the information I had access to, the meetings I participated in, the decisions that I was involved in, the communications I had with First Databank and others outside of Baxter, and the research that I conducted, I had direct knowledge of the prices Baxter reported, and therefore had direct knowledge that Baxter reported and false and inflated AWPs, that generated more sales and revenue for Baxter at the expense of both government and private payer money.

09/14/2009 MON 11:25  FAX 484 595 8660 SHCH-156-CO@shire.com                      @002/002

I declare under penalty of perjury under the laws of the State of Pennsylvania of
America that the foregoing is true and correct. Executed this ___14___th day of
September, 2009, at _Wayne_, _Pennsylvania_

_____
Linnette Sun

8

BAXTER PRODUCTS W/ AWP HISTORY
04.11.05

ADVATE

NDC Number NDC: Drug File SourceESI Drug File National Drug File Mail Order Drug
File(ABQ) Active Only SearchClear Drug Name Drug Name: Drug File SourceESI Drug
File National Drug File Mail Order Drug File(ABQ) Active Only SearchClear
Search Results DrugGroupDrug NameNDCStrengthPkg SizeSource
IndicatorStatusDrugIndex

Records: 1 - 4 of 4

1ADVATE 1,000 UNITS KIT0094429400310000001.000MULTIACTIVE0
2ADVATE 1,500 UNITS KIT0094429400415000001.000SINGLEACTIVE1
3ADVATE 250 UNIT KIT009442940012500001.000MULTIACTIVE2
4ADVATE 500 UNIT KIT009442940025000001.000MULTIACTIVE3

Drug DetailMedication:00944294003 ADVATE 1,000 UNITS KIT Formulary
Status:Formulary Formulary Policy:V/O - vol form/vol BBI Alternatives: Drug Class:01
CPC Indicator:Yes Category:

Gender Restriction: Age Minimum: Age Maximum: Maintenance Drug: Max Qty Retail:
Max Qty MO: Days Supply Retail: Days Supply MO: This is a summarization of limits
for this drug and does not contain all plan limitations.
For additional dispensing information view all Dispensing Limits.
To determine benefit specific limitations perform a Coverage Check.

Unit Dose:EA Strength:1000000 Package Size:1.000 Unit Dose Package:No
Repackaged:No DESI:No Dosage Form:INJ GPI:BRAND Source Indicator:MULTI-
SOURCE Status:ACTIVE Obsolete Date:12/31/9999 DEA Classification:

Manufacturing:BAXTER-HYLAND Therapy Class:000125000 HEMOSTATICS
Generic Code:000000596 FACTOR VIII (ANTIHEMOPHL FCTR)
OTC/Legend:FEDERAL LEGEND
AWP History:05/13/2004 $1.7500 08/25/2003 $1.8800

1



LS000001

RECOMBINATE

NDC Number NDC: Drug File SourceESI Drug File National Drug File Mail Order Drug File(ABQ) Active Only SearchClear Drug Name Drug Name: Drug File SourceESI Drug File National Drug File Mail Order Drug File(ABQ) Active Only SearchClear Search Results DrugGroupDrug NameNDCStrengthPkg SizeSource IndicatorStatusDrugIndex

Records: 1 - 3 of 3

1RECOMBINATE 220-400 UNIT VL009442938013100001.000MULTIACTIVE0
2RECOMBINATE 401-800 UNIT VL009442938026000001.000MULTIACTIVE1
3RECOMBINATE 801-1,240 UNITS VL009442938031020000l.000MULTIACTIVE2

Drug DetailMedication:00944293801 RECOMBINATE 220-400 UNIT VL Formulary Status:Formulary Formulary Policy:V/O - vol form/vol BBI Alternatives: Drug Class:01 CPC Indicator:Yes Category:

Gender Restriction: Age Minimum: Age Maximum: Maintenance Drug: Max Qty Retail: Max Qty MO: Days Supply Retail: Days Supply MO: This is a summarization of limits for this drug and does not contain all plan limitations.
For additional dispensing information view all Dispensing Limits.
To determine benefit specific limitations perform a Coverage Check.

Unit Dose:EA Strength:310000 Package Size:1.000 Unit Dose Package:No Repackaged:No DESI:No Dosage Form:INJ GPI:BRAND Source Indicator:MULTI-SOURCE Status:ACTIVE Obsolete Date:12/31/9999 DEA Classification:

Manufacturing:BAXTER-HYLAND Therapy Class:000125000 HEMOSTATICS Generic Code:000000596 FACTOR VIII (ANTIHEMOPHL FCTR) OTC/Legend:FEDERAL LEGEND
AWP History:06/26/2001 $1.6250 07/19/1998 $1.2800 09/07/1997 $1.2400

LS000002

BEBULIN

NDC Number NDC: Drug File SourceESI Drug File National Drug File Mail Order Drug File(ABQ) Active Only SearchClear Drug Name Drug Name: Drug File SourceESI Drug File National Drug File Mail Order Drug File(ABQ) Active Only SearchClear Search Results DrugGroupDrug NameNDCStrengthPkg SizeSource IndicatorStatusDrugIndex

Records: 1 - 1 of 1

1BEBULIN VH IMMUNO 200-1,200 UN641930244027000001.000SINGLEACTIVE0

Drug DetailMedication:64193024402 BEBULIN VH IMMUNO 200-1,200 UN Formulary Status:Formulary Formulary Policy:V/O - vol form/vol BBI Alternatives: Drug Class:01 CPC Indicator:Yes Category:

Gender Restriction: Age Minimum: Age Maximum: Maintenance Drug: Max Qty Retail: Max Qty MO: Days Supply Retail: Days Supply MO: This is a summarization of limits for this drug and does not contain all plan limitations.
For additional dispensing information view all Dispensing Limits.
To determine benefit specific limitations perform a Coverage Check.

Unit Dose:EA Strength:700000 Package Size:1.000 Unit Dose Package:No Repackaged:No DESI:No Dosage Form:INJ GPI:BRAND Source Indicator:SINGLE-SOURCE Status:ACTIVE Obsolete Date:12/31/9999 DEA Classification:

Manufacturing:BAXTER-HYLAND Therapy Class:000125000 HEMOSTATICS Generic Code:000000595 FACTOR IX COMPLEX (HUMAN) OTC/Legend:FEDERAL LEGEND
AWP History:01/15/2005 $0.9000 11/16/2001 $0.7250

LS000003

FEIBA

NDC Number NDC: Drug File SourceESI Drug File National Drug File Mail Order Drug
File(ABQ) Active Only SearchClear Drug Name Drug Name: Drug File SourceESI Drug
File National Drug File Mail Order Drug File(ABQ) Active Only SearchClear
Search Results DrugGroupDrug NameNDCStrengthPkg SizeSource
IndicatorStatusDrugIndex

Records: 1 - 2 of 2

1FEIBA VH IMMUNO 400-650 UNITS641930222034000001.000SINGLEACTIVE0
2FEIBA VH IMMUNO 651-1,200 UNIT641930222046000001.000SINGLEACTIVE1

Drug DetailMedication:64193022203 FEIBA VH IMMUNO 400-650 UNITS Formulary
Status:Formulary Formulary Policy:V/O - vol form/vol BBI Alternatives: Drug Class:01
CPC Indicator:No Category:

Gender Restriction: Age Minimum: Age Maximum: Maintenance Drug: Max Qty Retail:
Max Qty MO: Days Supply Retail: Days Supply MO: This is a summarization of limits
for this drug and does not contain all plan limitations.
For additional dispensing information view all Dispensing Limits.
To determine benefit specific limitations perform a Coverage Check.

Unit Dose:EA Strength:400000 Package Size:1.000 Unit Dose Package:No
Repackaged:No DESI:No Dosage Form:INJ GPI:BRAND Source Indicator:SINGLE-
SOURCE Status:ACTIVE Obsolete Date:12/31/9999 DEA Classification:

Manufacturing:BAXTER-HYLAND Therapy Class:000125000 HEMOSTATICS
Generic Code:000000600 ANTI-INHIBITOR COAGULANT COMP.
OTC/Legend:FEDERAL LEGEND
AWP History:01/17/2005 $1.9100

4

LS000004

HEMOFIL-M

NDC Number NDC: Drug File SourceESI Drug File National Drug File Mail Order Drug File(ABQ) Active Only SearchClear Drug Name Drug Name: Drug File SourceESI Drug File National Drug File Mail Order Drug File(ABQ) Active Only SearchClear Search Results DrugGroupDrug NameNDCStrengthPkg SizeSource IndicatorStatusDrugIndex

Records: 1 - 1 of 1

1HEMOFIL-M 200-1,500 UNITS VIAL009442935018500001.000SINGLEACTIVE0

Drug DetailMedication:00944293501 HEMOFIL-M 200-1,500 UNITS VIAL Formulary Status:Formulary Formulary Policy:V/O - vol form/vol BBI Alternatives: Drug Class:01 CPC Indicator:Yes Category:

Gender Restriction: Age Minimum: Age Maximum: Maintenance Drug: Max Qty Retail: Max Qty MO: Days Supply Retail: Days Supply MO: This is a summarization of limits for this drug and does not contain all plan limitations.
For additional dispensing information view all Dispensing Limits.
To determine benefit specific limitations perform a Coverage Check.

Unit Dose:EA Strength:850000 Package Size:1.000 Unit Dose Package:No Repackaged:No DESI:No Dosage Form:INJ GPI:BRAND Source Indicator:SINGLE-SOURCE Status:ACTIVE Obsolete Date:12/31/9999 DEA Classification:

Manufacturing:BAXTER-HYLAND Therapy Class:000125000 HEMOSTATICS Generic Code:000000596 FACTOR VIII (ANTIHEMOPHL FCTR) OTC/Legend:FEDERAL LEGEND AWP History:06/26/2001 $1.2250 09/07/1997 $0.9500 01/09/1992 $0.9000

LS000005

GAMMAGARD S/D 0.5 GM

NDC Number NDC: Drug File SourceESI Drug File National Drug File Mail Order Drug File(ABQ) Active Only SearchClear Drug Name Drug Name: Drug File SourceESI Drug File National Drug File Mail Order Drug File(ABQ) Active Only SearchClear Search Results DrugGroupDrug NameNDCStrengthPkg SizeSource IndicatorStatusDrugIndex

Records: 1 of 4

1GAMMAGARD S/D 0.5 GM VL W/ST009442620015000001.000SINGLEACTIVE0

Drug DetailMedication:00944262001 GAMMAGARD S/D 0.5 GM VL W/ST Formulary Status:Formulary Formulary Policy:V/O - vol form/vol BBI Alternatives: Drug Class:01 CPC Indicator:Yes Category:

Gender Restriction: Age Minimum: Age Maximum: Maintenance Drug: Max Qty Retail: Max Qty MO: Days Supply Retail: Days Supply MO: This is a summarization of limits for this drug and does not contain all plan limitations.
For additional dispensing information view all Dispensing Limits.
To determine benefit specific limitations perform a Coverage Check.

Unit Dose:EA Strength:500000 Package Size:1.000 Unit Dose Package:No Repackaged:No DESI:No Dosage Form:INJ GPI:BRAND Source Indicator:SINGLE-SOURCE Status:ACTIVE Obsolete Date:12/31/9999 DEA Classification:

Manufacturing:BAXTER-HYLAND Therapy Class:000100000 IMMUNOLOGICALS AND VACCINES Generic Code:000004186 IMMUNE GLOBULIN - IV OTC/Legend:FEDERAL LEGEND
AWP History:06/26/2001 $81.0000 07/19/1998 $64.8000 01/09/1996 $54.9200

6

LS000006

GAMMAGARD S/D 2.5 GM

NDC Number NDC: Drug File SourceESI Drug File National Drug File Mail Order Drug File(ABQ) Active Only SearchClear Drug Name Drug Name: Drug File SourceESI Drug File National Drug File Mail Order Drug File(ABQ) Active Only SearchClear Search Results DrugGroupDrug NameNDCStrengthPkg SizeSource IndicatorStatusDrugIndex

Records: 3 of 4

3GAMMAGARD S/D 2.5 GM VL W/ST0094426200225000001.000MULTIACTIVE2

Drug DetailMedication:00944262002 GAMMAGARD S/D 2.5 GM VL W/ST Formulary Status:Formulary Formulary Policy:V/O - vol form/vol BBI Alternatives: Drug Class:01 CPC Indicator:Yes Category:

Gender Restriction: Age Minimum: Age Maximum: Maintenance Drug: Max Qty Retail: Max Qty MO: Days Supply Retail: Days Supply MO: This is a summarization of limits for this drug and does not contain all plan limitations.
For additional dispensing information view all Dispensing Limits.
To determine benefit specific limitations perform a Coverage Check.

Unit Dose:EA Strength:2500000 Package Size:1.000 Unit Dose Package:No Repackaged:No DESI:No Dosage Form:INJ GPI:BRAND Source Indicator:MULTI-SOURCE Status:ACTIVE Obsolete Date:12/31/9999 DEA Classification:

Manufacturing:BAXTER-HYLAND Therapy Class:000100000 IMMUNOLOGICALS AND VACCINES Generic Code:000004186 IMMUNE GLOBULIN - IV OTC/Legend:FEDERAL LEGEND
AWP History:06/26/2001 $298.1250 07/19/1998 $217.5000 10/20/1996 $184.2500

7

LS000007

GAMMAGARD S/D 5 GM

NDC Number NDC: Drug File SourceESI Drug File National Drug File Mail Order Drug File(ABQ) Active Only SearchClear Drug Name Drug Name: Drug File SourceESI Drug File National Drug File Mail Order Drug File(ABQ) Active Only SearchClear Search Results DrugGroupDrug NameNDCStrengthPkg SizeSource IndicatorStatusDrugIndex

Records: 4 of 4

4GAMMAGARD S/D 5 GM VL W/SET0094426200350000001.000MULTIACTIVE3

Drug DetailMedication:00944262003 GAMMAGARD S/D 5 GM VL W/SET Formulary Status:Formulary Formulary Policy:V/O - vol form/vol BBI Alternatives: Drug Class:01 CPC Indicator:Yes Category:

Gender Restriction: Age Minimum: Age Maximum: Maintenance Drug: Max Qty Retail: Max Qty MO: Days Supply Retail: Days Supply MO: This is a summarization of limits for this drug and does not contain all plan limitations.
For additional dispensing information view all Dispensing Limits.
To determine benefit specific limitations perform a Coverage Check.

Unit Dose:EA Strength:5000000 Package Size:1.000 Unit Dose Package:No Repackaged:No DESI:No Dosage Form:INJ GPI:BRAND Source Indicator:MULTI-SOURCE Status:ACTIVE Obsolete Date:12/31/9999 DEA Classification:

Manufacturing:BAXTER-HYLAND Therapy Class:000100000 IMMUNOLOGICALS AND VACCINES Generic Code:000004186 IMMUNE GLOBULIN - IV OTC/Legend:FEDERAL LEGEND
AWP History:06/26/2001 $596.2500 07/19/1998 $435.0000 10/20/1996 $368.5000

LS000008

GAMMAGARD S/D 10 GM

NDC Number NDC: Drug File SourceESI Drug File National Drug File Mail Order Drug File(ABQ) Active Only SearchClear Drug Name Drug Name: Drug File SourceESI Drug File National Drug File Mail Order Drug File(ABQ) Active Only SearchClear Search Results DrugGroupDrug NameNDCStrengthPkg SizeSource IndicatorStatusDrugIndex

Records: 2 of 4

2GAMMAGARD S/D 10 GM VL W/ST0094426200410000001.000MULTIACTIVE1

Drug DetailMedication:00944262004 GAMMAGARD S/D 10 GM VL W/ST Formulary Status:Formulary Formulary Policy:V/O - vol form/vol BBI Alternatives: Drug Class:01 CPC Indicator:Yes Category:

Gender Restriction: Age Minimum: Age Maximum: Maintenance Drug: Max Qty Retail: Max Qty MO: Days Supply Retail: Days Supply MO: This is a summarization of limits for this drug and does not contain all plan limitations.
For additional dispensing information view all Dispensing Limits.
To determine benefit specific limitations perform a Coverage Check.

Unit Dose:EA Strength:10000000 Package Size:1.000 Unit Dose Package:No Repackaged:No DESI:No Dosage Form:INJ GPI:BRAND Source Indicator:MULTI-SOURCE Status:ACTIVE Obsolete Date:12/31/9999 DEA Classification:

Manufacturing:BAXTER-HYLAND Therapy Class:000100000 IMMUNOLOGICALS AND VACCINES Generic Code:000004186 IMMUNE GLOBULIN - IV OTC/Legend:FEDERAL LEGEND
AWP History:06/26/2001 $1,192.5000 07/19/1998 $870.0000 10/20/1996 $737.0000

9