FROM : ACCURATE LEGAL SERVICES   Case 1:01-cv-12257-PBS   Document 6866-5   FAX NO. :3285 49833   Filed 01/27/10   Jan. 17 2010 01:54PM P7   Page 1 of 90

Performance Review                                                                                    Page 1 of 12

all content for Baxter internal use only

# Performance Review

| 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|
| Employee Creates PMO's | Supervisor Discusses & Approves PMO's | Employee Writes Mid Year Review | Supervisor Writes, Discusses & Approves Review | Employee Writes Year End Review | Supervisor Writes, Discusses & Approves Review |

| OVERVIEW | FAQs | HELP | EXAMPLES |
|---|---|---|---|

## Employee Information

| Name: | Sun,Linnette |
|---|---|
| Title: | Sr Dir Clinical Affairs |
| Employee Number: | 103398 |
| Supervisor: | Poulios,Nick S |
| Performance Period: | Start: 01-Jan-2003    End: 31-Dec-2003 |

## Part I: Performance Objectives                                           EXAMPLES

Performance Objective (1 of 10)

**Mid-Year Assessment:** Select One          **Year End Assessment:** Select One

### Objective

Advate Reimbursement Dossier

Complete reimbursement dossier and serve on the review board
for country specific submission. The dossier submission is critical to obtain
reimbursement for the product. It is required in many EU countries and
Canada. However, US will use the information for coding applications and
formulary submissions.

### Employee Comments



EXHIBIT
7

Performance Review

## Supervisor Comments

Performance Objective (2 of 10)

**Mid-Year Assessment:** [Select One ▼]          **Year End Assessment:** [Select One ▼]

## Objective

Co-develop reimbursement tools for Advate, including billing guide, payer
notification letter, sample forms, letter of medical necessity, letter of appeal
etc. To reduce the number of denials, these tools are necessary in guiding
providers to sumbit claims and obtain reimbursement at the product launch

## Employee Comments

## Supervisor Comments

Performance Objective (3 of 10)

**Mid-Year Assessment:** [Select One ▼]          **Year End Assessment:** [Select One ▼]

## Objective

To make USPDI listing applications in order to support reimbursement and
product pricing submissions and utilization. One of the Medicare
reimbursement requirement is for the product to meet the definition of
biologicals and be listed in the USPDI compendia. This is to satify the
government requirement in or for the product to be used and reimbursed.

## Employee Comments

## Supervisor Comments

Performance Objective (4 of 10)

**Mid-Year Assessment:** Select One          **Year End Assessment:** Select One

## Objective

Design and conduct pricing assessment and price elasticity analysis. The objective is to develop an optimal acceptable price for ARALAST beased on the clinical profile, market and reimbursement environment. The ifnromation will be used to develp and support price recommendation for the product.

## Employee Comments

## Supervisor Comments

Performance Objective (5 of 10)

**Mid-Year Assessment:** Select One          **Year End Assessment:** Select One

## Objective

Case 1:01-cv-12257-PBS Document 6866-5 Filed 01/27/10 Page 4 of 90

Develop core document to support ARALAST pricing and reimbursement. Although no formal submission needed at the antional level in the US, we have received request from major customers to justify costs from clinical, economic and social perspectives.

## Employee Comments

## Supervisor Comments

Performance Objective (6 of 10)

**Mid-Year Assessment:** [Select One ▾]   **Year End Assessment:** [Select One ▾]

## Objective

Sumblt and obtain listing for ARALAST in the USPDI comendia. One of the Medicare reimbursement requirement is for the product to meet the definition of biologicals and be listed in the USPDI compendia. This is to satify the government requirement in or for the product to be used and reimbursed.

## Employee Comments

## Supervisor Comments

Performance Objective (7 of 10)

**Mid-Year Assessment:** [Select One ▼]    **Year End Assessment:** [Select One ▼]

## Objective

Develop reimbursement tools to support ARALAST launch. The tools will include pocket billing guide, sample forms and letters and connection to hotline.

## Employee Comments

## Supervisor Comments

Performance Objective (8 of 10)

**Mid-Year Assessment:** [Select One ▼]    **Year End Assessment:** [Select One ▼]

## Objective

Flu vaccine
Develop economic model to support EU government contracts and develop reimbursement dossier by the end of year to include the economic model.

## Employee Comments

FROM : ACCURATE DEVELOPMENT INC    Case 1:01-cv-12257-PBS  Document 6866-5  Filed 01/27/10  Page 6 of 90    FAX NO. : 3323732053    Jan. 17  2020  01:58PM  P12

Performance Review                                                                    Page 6 of 12

## Supervisor Comments

Performance Objective (9 of 10)

**Mid-Year Assessment:** [Select One ▼]        **Year End Assessment:** [Select One ▼]

## Objective

Develop CPT application for Flu vaccine. The project includes feasibility assessment, application planning and gather thought leader and organizational support. CPT code is critical in the US in order to obtain independent price and reimbursement. The revenue impact for such a code is substantial.

## Employee Comments

## Supervisor Comments

Performance Objective (10 of 10)

**Mid-Year Assessment:** [Select One ▼]        **Year End Assessment:** [Select One ▼]

## Objective

## Employee Comments

```
┌─────────────────────────────────────────────────────┐
│                                                       │
│                                                       │
│                                                       │
│                                                       │
│                                                       │
│                                                       │
│                                                       │
└─────────────────────────────────────────────────────┘
```

## Supervisor Comments

## Part II: Baxter Success Factors                      EXAMPLES

1. Shows Respect and Integrity: Demonstrates respect for all individuals; adheres to Baxter's Shared Values/ethics/business practices and environmental health and safety commitments; matches behavior, values, and words

Mid-Year Assessment: [Select One ▾]    Year End Assessment: [Select One ▾]

## Employee Comments

```
┌─────────────────────────────────────────────────────┐
│                                                       │
│                                                       │
│                                                       │
│                                                       │
│                                                       │
│                                                       │
│                                                       │
└─────────────────────────────────────────────────────┘
```

## Supervisor Comments

2. Communicates Effectively: Openly shares information; listens to and values feedback; shares opinions and feedback directly

Mid-Year Assessment: [Select One ▾]    Year End Assessment: [Select One ▾]

## Employee Comments

```
┌─────────────────────────────────────────────────────┐
│                                                       │
│                                                       │
│                                                       │
│                                                       │
│                                                       │
│                                                       │
│                                                       │
└─────────────────────────────────────────────────────┘
```

## Supervisor Comments

3. Promotes Teamwork: Works in a collaborative and inclusive fashion to bring out the best in everyone; demonstrates effective teamwork in and across divisions/functions/regions; constructively resolves conflict to achieve team goals

Mid-Year Assessment: [Select One ▼]          Year End Assessment: [Select One ▼]

## Employee Comments

## Supervisor Comments

4. Drives Innovation and Risk Taking: Takes and supports prudent risks; challenges the status-quo; demonstrates break-through thinking; continuously learns and develops; demonstrates courage of conviction

Mid-Year Assessment: [Select One ▼]          Year End Assessment: [Select One ▼]

## Employee Comments

## Supervisor Comments

5. Builds Customer Loyalty: Understands customer needs; applies innovative techniques to meet current and future customer requirements; continuously seeks better ways to meet customer needs

Mid-Year Assessment: [Select One ▼]          Year End Assessment: [Select One ▼]

## Employee Comments

## Supervisor Comments

6. Demonstrates Leadership: Builds an engaging and inspiring vision for the organization; sets clear strategic direction; establishes plans consistent with that direction; measures progress against plans

Mid-Year Assessment: [Select One ▼]    Year End Assessment: [Select One ▼]

## Employee Comments

## Supervisor Comments

7. Develops Talent: Continuously and enthusiastically develops the talents of self and others; motivates others to achieve high-performance and continuous learning

Mid-Year Assessment: [Select One ▼]    Year End Assessment: [Select One ▼]

## Employee Comments

## Supervisor Comments

8. Demonstrates Business Acumen and Market Focus: Displays broad perspective and sound judgment; demonstrates effective problem solving and decision making; sees and captures new market opportunities

Mid-Year Assessment: [Select One ▼]    Year End Assessment: [Select One ▼]

## Employee Comments

Baxter Healthcare Corporation
CA Human Resources
One Baxter Way
Suite 1A
Westlake Village, California 91362-3811
805.372.3000
Fax: 805.372.3122


BioScience

July 22, 2003

Linnette Sun
1539 Kwis Ave.
Hacienda Heights, CA 91745

Dear Linnette:

Effective July 25, 2003 your employment with Baxter Healthcare Corporation will terminate.  To assist you
in ensuring the proper and timely transfer/termination of Baxter benefits, I have listed some useful
information:

### Medical/Dental Plans
♦ If you were a participant in the medical and/or dental plans, your coverage automatically stops at
midnight of the last day of the month in which you terminate your employment with Baxter.  In
approximately 3-4 weeks you will receive a packet of benefits related information regarding COBRA
(continuation of benefits).  Once you receive the packet, you have the option to continue any of your
current benefit elections by paying a monthly premium.  COBRA coverage will begin the first of the
month following termination.  You have 60 days from the mail date on the packet to elect COBRA
coverage.  Please contact the BEBC through the Baxter Benefits Line at 1-800-254-3780 if you have
questions or do not receive the COBRA packet.

### Other Welfare Benefit Plans
♦ If you are currently enrolled in the Employee Basic Life, Employee Supplemental Life, Spouse
Supplemental Life, Child Supplemental Life, Personal Accident and/or the Long-Term Disability
Insurance plans, coverage ends on the last day of the month in which your employment ends.  You
may apply for conversion coverage by applying directly to CNA no later than 75 days after your
employment ends.  Contact the BEBC through the Baxter Benefits Line at 1-800-254-3780 to request
conversion forms.

### Change of Address
♦ If you have a change of address please call the BEBC through the Baxter Benefits Line at 1-800-254-
3780 with your correct address as soon as possible.  Several pieces of information, including your
COBRA forms and your W-2 form, will be forwarded to you by mail.

### Vacation
♦ You are receiving a final paycheck, and it includes a payout of any remaining vacation and personal
holidays.

### Employee Stock Purchase Plan
♦ If you currently are enrolled in the Baxter International Inc. Employee Stock Purchase Plan, your
subscription will end on the day your Baxter employment ends.  Any money remaining in your account
after your last paycheck is processed will be used to purchase stock at the next purchase date. This
stock will be placed in your account for you. Your shares will remain in your account until you decide to
sell them or certificate them.

There are a few situations that allow you an opportunity to purchase your remaining subscription after
you leave Baxter employment. If you are at least age 55 when you leave Baxter, or if your employ

**EXHIBIT**


Made from

1

ends due to Permanent and Total Disability, you will have three months from your termination date to buy out your remaining subscription. To sell uncertificated shares, inquire on dividend reinvestment, record of shares owned, issuance of certificates, transfers and change of address, contact Equiserve at 1-800-633-9394. For other questions regarding stock, contact the Employee Service Center at (877) 372-5465.

## Stock Options

♦ If you have been granted stock options and need information regarding them, please call UBS / Paine Webber at 1-800-958-8884. If your inquiry concerns the 2001 Global Stock Option Plan granted February 27th, please contact your local human resources representative.

## Pension

♦ If you are a vested participant in a pension benefit (generally, if you have five or more years of vesting service), pension estimates are automatically generated 3-4 weeks after your termination. Normal retirement age is 65, but you can commence benefits sooner. You are eligible for early retirement any time after you have 65 points, however your benefits are reduced by an early retirement factor if you choose to have payments start before you reach 85 points. If you have questions regarding pension, please contact the BEBC through the Baxter Benefits Line at 1-800-254-3780.

## Credit Union

♦ If you are currently a member of the Baxter Credit Union (BCU), you may continue membership for life. Contact them at 1-800-388-7000 if you need to make alternate arrangements for loans, cancel accounts, and/or notify them of an address change.

## Outstanding Advances/Loans

♦ If you currently have outstanding advances/loans with Baxter you must repay them by writing a personal check to: Baxter Healthcare Corporation. You must send the check to me and I will forward it on to the appropriate department. Examples of outstanding advances/loans are: Relocation Bonus, Payroll Advance.

## Educational Assistance Reimbursement

♦ If you have received reimbursement under the educational assistance plans within the past 12 months, you may be responsible for repaying such amounts to Baxter. Your Human Resources representative will inform you of any amounts that you may be required to repay.

## Reimbursement Accounts

♦ The Healthcare Reimbursement Account reimburses only eligible expenses incurred on or prior to your termination date. The Dependent Care Reimbursement Account reimburses eligible expenses incurred through the end of the plan year in which you terminate, up to the amount deducted from your pay at the time of termination. The deadline for submitting all reimbursements to SHPS is June 30th following the end of the plan year. You can obtain a reimbursement form from the Human Resources department or online at www.shps.net. To check on reimbursement status call SHPS through the Baxter Benefits Line at 1-800-254-3780.

## Incentive Investment Plan (IIP)

♦ If you have less than $3,500 in your IIP account, the balance will be paid out to you after six months, unless you withdraw it/roll it over on your own. If you have $3,500 or more in the IIP you can leave it in the account as long as the law permits, or you may elect to defer, rollover or receive a payout from your account. You can reach a CitiStreet customer service representative by calling the Baxter Benefits Line at 1-800-254-3780.

## Cellular Phone Contract

♦ If you are a business user leaving Baxter before your Verizon cell phone contract expires, you will have two choices related to your cell phone contract: 1) turn in your phone to Baxter and your contract will automatically be cancelled; or 2) choose to keep your phone and Verizon cellular service, but migrate your agreement to current "street" rates. As a non-Baxter employee, you will not be able to continue to receive the Baxter discounted rates.

## Employment Agreement

♦ During your employment with the Company, you have had access to confidential and proprietary information. The Company maintains a proprietary interest in all such confidential data. Accordingly, it is expected that you will not use or disclose to any entity or person, either directly or indirectly, this confidential information. In this regard, you will remain bound by the non-compete and confidentiality provisions of your employment agreement with the Company. You must return to the Company, on or before your last working day, all Company property, including proprietary information.

## Monthly COBRA Costs (through 3/31/04)

|  | Employee Only | Employee +1 | Employee +2 or more |
|---|---|---|---|
| Medical |  |  |  |
| Point of Service (POS) | $238.92 | $477.83 | $836.25 |
| Preferred Provider Organization (PPO) | $251.67 | $503.33 | $880.92 |
| Baxter Catastrophic Option (BCO) | $38.08 | $76.17 | $133.25 |
| Kaiser | $166.69 | $333.38 | $583.41 |
| PacifiCare | $189.44 | $378.85 | $663.00 |
| Dental |  |  |  |
| Basic | $19.75 | $39.42 | $69.00 |
| Basic Plus | $28.08 | $56.08 | $98.17 |
| DMO | $20.42 | $42.67 | $54.92 |

If you have any questions or need further assistance, please don't hesitate to call me at (805) 372-3125. Good luck and best wishes with your new endeavors!

Sincerely,

Linda Lennartz
Human Resources Representative

3

Baxter Healthcare Corporation
550 North Brand Boulevard
Glendale, California 91203
818.956.3200
Fax: 818.550.4422



**Baxter**
BioScience

May 17, 2002

Linnette Sun
1726 Drumcliff Court
Westlake Village, CA 91361

Dear Linnette:

We are pleased to offer you the position of Director of Pharmacoeconomics, (master title –
Director of Clinical Programs) with Baxter BioScience. In this position you will report to Nick
Poulios. Your starting salary will be $150,000.00 annually and your start date is ~~June 10, 2002.~~
You will be classified as a regular, full-time, salaried exempt employee.          July 8, 2002

Your position is MICP (Management Incentive Compensation Plan) eligible. The MICP target
amount for your position is 20% of base salary. Your MICP participation for 2002 will be
prorated based on the number of months in the position and paid out 1st quarter 2003.

This position is also stock eligible, which are granted annually. Grant price will be equal to
Baxter's closing price on the date of the grant; the terms and conditions will include 100%
vesting on the third anniversary of the grant date and a 10-year exercise term, subject to your
continued employment with Baxter. We will recommend a grant to you of 3500 options if there
is a grant in September 2002.

Linnette, you will receive a $20,000.00 signing bonus in the first pay period after thirty (30) days
of your employment with Baxter. An additional bonus of $20,000.00 will be paid to you on
November 30, 2003. These bonuses will be included in your reportable income in the year of
payment and will be subject to regular taxes and withholdings.

You will be eligible for three weeks vacation per year, commencing on your start date. Vacation
for the year 2002 will be prorated from your start date. One of the three weeks is at the
discretion of management, and may not be used for carryover from year to year. The remaining
two weeks are eligible for carryover, as described in our vacation policy. You will be eligible
for three personal holidays per year, in addition to scheduled company holidays.

Benefits

Your eligibility for coverage under the Company's flexible benefits plan will begin on August 1,
2002. A packet of benefits information and enrollment procedures will be sent to you from the
Baxter Employee Benefit Center (BEBC). You must make benefits elections within 31 days of
your hire date. If you fail to make your elections during this time period, you will be
automatically enrolled in default coverage until the beginning of the next plan year, unless you
have a qualified change of status.

Baxter Healthcare offers a comprehensive benefits program. After one full month of
employment, you will be eligible to participate in Baxter's Flexible Benefits Program. The



**EXHIBIT**
9

# *Baxter*

*Page 2*

following benefits are available under the Flexible Benefits Program: medical benefits, prescription services, dental benefits, group universal life insurance, personal accident insurance and long-term disability insurance.

Benefits that you will be eligible for as of your hire date include Basic Employee Term Life Insurance, Business Travel Insurance, Educational Assistance and the Baxter Credit Union. You are eligible to enroll in the Employee Stock Purchase Plan at the beginning of each quarter.

You will be eligible for short-term disability ("STD") benefits after you have completed six months of employment. The STD plan also includes pre-existing conditions exclusions, which may apply.

You will be eligible to begin participation in the Baxter Incentive Investment Plan (IIP) 401k on the first of the month following one full month of employment. If you choose to participate in this plan, you will be eligible for Baxter matching contributions at that time.

If you have immediate questions about coverage, please call the Baxter Benefits Line at 1-800-254-3780 or your Human Resources Coordinator, Lily Wahl at (818) 550-4768.

Enclosed is a new hire packet. Please plan to meet with Susie Kessler, HR Manager at 8:30 a.m. on your start date, and **mail all completed and signed new hire documents in the envelope provided.**

## Conditions for Employment

Baxter Healthcare Corporation is an employment-at-will company. Therefore, this offer of employment should not be considered a promise of employment for any specific period of time. The employment relationship may be terminated by either party regardless of the length of employment, employment history or job performance.

Your employment is contingent upon passing a confidential drug screening. Arrangements are being made for you to take this test. Lily Wahl, Human Resources Coordinator at Baxter BioScience Brand facility will contact you. If you need to contact Lily directly, she can be reached at (818) 550-4768.

Your employment is also contingent upon the results of a background screen that will be conducted by Baxter or on behalf of Baxter. Enclosed, please find a **Release Form**. It is important that you complete all sections of the **Release and Supplemental Form** within 24 hours of your receipt of this letter and return it to Lily Wahl Human Resources Coordinator either by fax (818) 550-4549 or mail to 550 N. Brand Blvd., Glendale, CA 91203. Please know that failure to complete the **Release** in its entirety will delay the hiring process.

Additionally, this offer is contingent upon the completion of the I-9 Form and the provision of documentation that verifies your identification and right to work in the United States. Examples

FROM : ACCURATE DEVELOPMENT INC        FAX NO. : 6265745059        Jan. 17 2010 01:54PM  P3

# Baxter

*Page* 3

of identification are either a valid passport or a driver's license and Social Security card. Failure to have this information on the day that your employment begins may jeopardize your start date.

Employment Agreement

Since you have accepted a position of trust, which requires the maintenance of confidence, you will be required to sign the Company Employment Agreement on your first day of employment. Failure to do so will jeopardize your start date. A copy is enclosed for your review.

Ethics Manual

Enclosed is a copy of our Ethics Manual for you to read. Please sign and return the attached card located inside the manual on your first day of employment.

Linnette, we are confident that you will make a significant contribution to Baxter, and that your acceptance of this offer will provide excellent opportunities to enhance your career goals.

If you choose to accept this offer, please sign this original and return it to my attention. The other enclosed copy is for your files.

We look forward to having you join the Baxter BioScience team!

Sincerely,

Yassi V. Strouse
Director Human resources

cc: Nick Poulios

ACCEPTED BY: _____

DATE: 5/28/02

FROM :                        PHONE NO. : 303 937 892              Jun. 23 2005 11:58AM P3

FILED
U.S. DISTRICT COURT
DISTRICT OF COLORADO

2005 JUN 14  PM 12: 18

GREGORY C. LANGHAM
CLERK

BY _____ DEP. CLK

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLORADO

Civil Action No. 05-cv-00736 (PSF) (MJW)

[UNDER SEAL],

      Relators,

v.

[UNDER SEAL],

      Defendants.

---

## AMENDED COMPLAINT FOR DAMAGES UNDER THE FEDERAL AND VARIOUS STATE FALSE CLAIMS ACTS

---

### FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. §3730(b)(2)

MARK ALLEN KLEIMAN
California State Bar No. 115919
12400 Wilshire Blvd., Ste. 400
Los Angeles, CA 90025
310-442-4820
310-442-4830 (fax)

LAUREN JOHN UDDEN
California State Bar No. 83118
15 W. Carrillo Street, Suite 101B
Santa Barbara, California 93101
805-879-7544
805-962-0722 (fax)

ATTORNEYS FOR RELATORS



EXHIBIT
10

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLORADO

Civil Action No. **05-cv-00736 (PSF) (MJW)**

UNITED STATES OF AMERICA ex rel LINNETTE SUN and GREG HAMILTON, Relators,

STATE of ARKANSAS ex rel LINNETTE SUN and GREG HAMILTON, Relators,
STATE of CALIFORNIA ex rel LINNETTE SUN and GREG HAMILTON, Relators,
STATE of DELAWARE ex rel LINNETTE SUN and GREG HAMILTON, Relators,

DISTRICT of COLUMBIA ex rel LINNETTE SUN and GREG HAMILTON, Relators,
STATE of FLORIDA ex rel LINNETTE SUN and GREG HAMILTON, Relators,
STATE of HAWAII ex rel LINNETTE SUN and GREG HAMILTON, Relators,

STATE of ILLINOIS ex rel LINNETTE SUN and GREG HAMILTON, Relators,
STATE of LOUISIANA ex rel LINNETTE SUN and GREG HAMILTON, Relators,
COMMONWEALTH of MASSACHUSETTS ex rel Linnette Sun, and Greg Hamilton,
Relators,

STATE of NEW MEXICO ex rel LINNETTE SUN and GREG HAMILTON, Relators,
STATE of NEVADA ex rel LINNETTE SUN and GREG HAMILTON, Relators,
STATE of TENNESSEE ex rel LINNETTE SUN and GREG HAMILTON, Relators,

STATE of TEXAS ex rel LINNETTE SUN and GREG HAMILTON, Relators,
STATE of UTAH ex rel LINNETTE SUN and GREG HAMILTON, Relators,
STATE of VIRGINIA ex rel LINNETTE SUN and GREG HAMILTON, Relators,
v.

BAXTER HEMOGLOBIN THERAPEUTICS; BAXTER INTERNATIONAL, INC. and Does
1-100, whose true names are unknown

Defendants

---

## AMENDED COMPLAINT FOR DAMAGES UNDER THE FEDERAL AND VARIOUS STATE FALSE CLAIMS ACTS

---

## FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. §3730(b)(2)

Relators, LINNETTE SUN and GREG HAMILTON, bring this action under the False Claims Act, as amended, 31 U.S.C. §3729 et. seq., as well as various state statutes, allege as follows:

## INTRODUCTION

1.     This is a *qui tam* action brought by LINNETTE SUN and GREG HAMILTON on behalf of the United States and various States to recover penalties and damages arising from fraudulent and illegal practices of Baxter Hemoglobin Therapeutics, a division of Defendant Baxter International, Inc. (hereinafter "Baxter"). Baxter makes a variety of specialized pharmaceutical, hematological, and infusion products, known in the industry as "biologics." Government programs reimburse healthcare providers who purchase these products based upon the published or posted Average Wholesale Price ("AWP"). Manufacturers, such as Baxter, are to report an accurate Wholesale Acquisition Costs ("WAC") to the database that calculates and publishes the AWPs based upon the reported WAC, First DataBank. Inc. ("FDB").

2.     It is known throughout the industry and known to Baxter that FDB calculates this mark-up. Baxter controlled the published AWP by misreporting the WAC. Baxter provides to the States, directly and through submission of reports to drug pricing publishing services, what purports to be genuine pricing data for its products. This information is typically identified as the "Wholesale Acquisition Cost" ("WAC") and/or the "Average Wholesale Price" ("AWP") of particular products. Baxter intends the WAC to be understood by the state Medicaid agencies as the average price paid by a wholesaler to a manufacturer for a given product. Baxter intends the AWP to be understood by the state Medicaid agencies and other payors as the average

2

price charged by a drug wholesaler to its commercial customers for a given product.

3.      The drug pricing publishing services in turn compile, publish and distribute compendia of such pricing information for each defendant's products. The drug pricing publishing services purport not to investigate the accuracy of the information provided by the manufacturers, and disclaim responsibility for their accuracy.

4.      Baxter refused to report an accurate WAC.  The vast bulk of Baxter's products at issue here are distributed by a class of business called non-charge back wholesalers.  Instead, Baxter reported a "list sales price" which bore no relationship to the price charged in the marketplace to the actual wholesalers, but which was an inflated price charged to very few customers that distributed less than one percent of these products..

5.      Baxter thus manipulated the AWP, knowing that health care providers who were being reimbursed based on AWP were indifferent to the cost of purchasing the drug, but instead focused on the "spread"—as it is known in the industry—between the cost and the AWP-based reimbursement.  Because Baxter's spread was larger than competitors, its products were more attractive to these customers, and it could maximize its revenue.

6.      States rely upon FDB's published AWP to reimburse providers, and assume that the published AWP is a reasonable indicator of the price paid for the drug.  However, because Baxter falsely reported WAC to inflate the AWP and the spread, Baxter deceived the government, which then overpaid for the biologics at issue here.

//

## THE PARTIES

3

7.      Relator Linnette Sun is a citizen of the United States and a resident of the State of California.  She has been a pricing and reimbursement specialist for ten years, working for Merck, Johnson & Johnson, & Amgen.  She was then employed by Baxter as  Director of Medical Outcomes Research and Economics, and as such was a pricing specialist there for more than a year, June 24, 2002 – July 22, 2003.   After telling her superiors and others at Baxter that she strongly opposed Baxter's practices and thought them to be fraudulent, she was fired.

8.      Relator Greg Hamilton is a citizen of the United States and a resident of the State of Illinois.  He is currently Vice President of the Bleeding Disorders Program for CuraScript, a Division of Express Scripts, Inc.  He has over 30 years experience working in the pharmaceutical industry, including 13 years with Bayer.  He is known as a pricing and reimbursement specialist and had advised pharmaceutical companies on the pricing of products, including biologics.  He is aware of the pricing structure Baxter used, specifically, the correspondence between Baxter and FDB regarding Baxter's reporting of the improper WAC.  Mr. Hamilton has an MBA from Illinois Institute of Technology.

9.      Defendant Baxter International, Inc., Baxter Hemoglobin Therapeutics has its offices at 2545 Central Av., Suite FD1, in Boulder, Colorado and at One Baxter Parkway in Deerfield, Illinois.  It is a division of Baxter International, Inc., a Delaware corporation, which is a global pharmaceutical company doing business in this judicial district with its principal executive offices at One Baxter Parkway in Deerfield, Illinois.

//

## JURISDICTION AND VENUE

4

10.     This is a civil action arising under the laws of the United States, and specifically, 31U.S.C. §3730, the "False Claims Act." Therefore, this Court has jurisdiction over this action pursuant to 31 U.S.C. §3732 (a) and (b).  Supplemental jurisdiction for Counts 5-22 arises under 28 U.S.C. §§1367, since these claims are so related to the federal claims that they form part of the same case or controversy under Article III of the U.S. Constitution.

11.     Venue is proper in this district pursuant to 31 U.S.C. §3732 (a) because Defendant Baxter transacts business in this district.

## FEDERAL PROGRAMS HARMED BY DEFENDANTS'

## FRAUDULENT AND ILLEGAL PRACTICES

### MEDICARE AND MEDICAID

12.     HHS, through its subsidiary entities—first the Health Care Financing Administration (HCFA) and now the Center for Medicare and Medicaid Services (CMS) — administers the Medicare program, which is a system of health insurance for the aged (i.e., those over the age of 65 years) and disabled created under Title XVIII of the Social Security Act, 42 U.S.C. § 1395, *et seq.*  The Medicare program is comprised of two "Parts."  Part B of the Medicare program authorized payment for certain drugs when a Medicare beneficiary must either (a) have the drugs administered in a physician's office, or (b) use a Medicare-approved mechanical aid or device (known as durable medical equipment) in order to receive the drugs at home.  To assist in the administration of Medicare Part B, CMS contracts with Medicare carriers,

//

or insurance companies that provide a variety of services, including processing and paying Part B

5

claims and auditing cost reports.

13.     Through CMS, HHS also administers the Medicaid Program, which provides health care benefits for certain groups, including the poor and the disabled, and which is funded in part from federal funds and in part by the State where the facility is located. 42 U.S.C.A. § 1396 *et seq.* and each State's plan for medical assistance approved by the United States Secretary of Health and Human Services (the "Secretary") and adopted by each State. The United States participates in each State's Medicaid by providing a federal contribution to funding the program. Those contributions vary based upon each State's per capita income, and range fifty percent, in the case of Colorado, for example, to 77.08% for Mississippi.

## RAILROAD RETIREMENT MEDICARE PROGRAM

14.     The Railroad Retirement Medicare program, is authorized by the Railroad Retirement Act of 1974, 45 U.S.C. §§231 *et seq.*  It is administered through the United States Railroad Retirement Board, "RRB" and furnishes Medicare coverage to retired railroad employees.

## INDIAN HEALTH SERVICE

15.     The Indian Health Service is responsible for providing comprehensive health services to more than 1,400,000 Native Americans. It is administered by the Department of Health and Human Services pursuant to 42 U.S.C. § 2002, *et seq.*  The statute authorizes the Secretary to enter into contracts with independent providers to furnish health services to Native Americans whenever the Secretary determines that independent providers can better meet a population's need.

//

6

## FEDERAL EMPLOYEE HEALTH BENEFIT PLANS

16.    The Federal Employees Health Benefits Program (FEHBP) is administered by the Office of Personnel Management ("OPM") pursuant to 5 U.S.C. §§ 8901, *et seq.* and provides health care coverage to federal employees and their dependents.

### TRI-CARE

17.    The Tri-Care program, formerly CHAMPUS, is administered by the United States Department of Defense through its component agency, CHAMPUS, under the authority of 10 U.S.C. §§ 1071-1106, and provides for care in civilian facilities for members of the Uniformed Services and their dependents.

### VETERAN'S ADMINISTRATION

18.    Pursuant to 38 U.S.C.A. § 8126, and the regulations based thereon, and contracts the Veteran's administration had with manufacturers, drugs are furnished to the Veterans' Administration ("VA") by drug manufacturers.

### §340B PROGRAM

19.    In 1992 Congress enacted §340B of the Public Health Service Act. This law requires pharmaceutical manufacturers, including defendants herein, to provide a statutorily defined discount on outpatient drugs sold to institutions serving low-income communities, thereby allowing public hospitals, community health centers, and other entities to buy drugs for their patients at a reduced rate.

//

//

//

7

## BACKGROUND

20.     There are approximately 65,000 different drug products in the United States

market, including different doses of the same drug.  Baxter manufactures and/or distributes (and

thus sets the price) for the following drugs and biologics:

| Advate | Bebulin | HemophilM | Recombinate |
| Aralast | FeibaH | Propelex | |
| Albumin | Gammagard S/D | Propelex LT | |

Baxter's products are dispensed to patients by or through different types of medical providers

including, *inter alia*, physicians who administer drugs in an office, home infusion pharmacies,

retail pharmacies, and other medical providers.

21.     States routinely cover out-patient prescription drugs as part of their Medicaid

programs.  Most States reimburse providers for those drugs based upon a percentage of the AWP,

usually 85% of the AWP.  Medicare reimburse providers who furnish covered drugs to

beneficiaries the lower of the billed charge or 95% of the AWP pursuant to 42 CFR §405.17.

Baxter's biologics are covered by Medicaid, Medicare and other government programs.

22.     During all times material to this complaint, State Medicaid programs, and

numerous other public and private programs, obtained AWP pricing information directly from

FDB.  FDB is a wholly-owned subsidiary of the Hearst Corporation, which, among other things,

gathers prescription drug information, including pricing and AWP.  FDB publishes and

distributes this information as a database which is regularly maintained.

23.     Government and much commercial private reimbursement is based upon AWP

published by FDB.  However, there are several other pharmaceutical industry compendia that

periodically compile, publish and distribute AWPs in printed and electronic media.  These

8

compendia include the *Drug Topics Red Book* (the "*Red Book*"), the *Annual Director of Pharmaceuticals and Essential Director of Pharmaceuticals* (the "*Blue Book*"), and Medi-Span's *Master Drug Database (MediSpan)*.

24.     Prior to May of 2000 FDB's misreporting of price information was suspected or known by state Medicaid agencies.  However, in May of 2000 FDB entered into an agreement with the Department of Justice and various states to stop reporting AWPs published by the manufacturers and to instead report them on the basis of market prices.  FDB subsequently based its reports on surveys of wholesalers.  The states were thus lulled into a false sense of security about the integrity of subsequent AWP reporting.

25.     Medicaid, Medicare, and all other systems which base reimbursement rates for drugs on the published AWP rely upon the accuracy of the AWP, and, in turn, depend upon the honesty and accuracy of Baxter and other drug manufacturers in reporting WAC to FDB.  As noted above, for biologics, FDB posts AWP by multiplying the reported WAC by 1.25.  Manufacturers easily determine FDB's mark up by comparing the difference between the reported WAC and the published AWP, and are accordingly aware of what FDB's published AWP will be when they report WAC to FDB.

26.     Providers regularly submit claims for reimbursement seeking payment for Baxter's products from Medicare, Medicaid, and from other federal payors.  Manufacturers, including Baxter, were and are fully aware that these payors also rely on FDB's published reports of AWP to determine their reimbursement.

27.     All pharmaceutical products except biologics are normally distributed  through charge-back wholesalers.  These wholesalers are Bergen Brunswig Drug Company, McKesson Drug Company, Cardinal Health, AmeriSource Health Corporation.  However, manufacturers'

9

sales of biologics to charge-back wholesalers comprise less than 1% of the wholesale market for manufacturers of these specialized products.

28.     Instead, the vast majority of biologics, such as the products Defendants manufactured, were typically distributed to providers by non-charge back wholesalers. These wholesalers include, but are not limited to: Chapin Medical, FFF Enterprises, CT International, ActSys Medical Inc., Williams Medical, Davis Enterprises, Paragon Scientific Corp., ASD Specialty Healthcare, IDP, Inc., Blood Diagnostics Inc., National Specialty Services, Florida Infusion, National Hospital Specialties, Alpine Biologics, Atlantic Business Organization, Health Coalition, J-Mark Enterprise, BioCare, BioScience, Western Medical Services, Davis Enterprises, Biomed Plus, Genesis Bio-Pharmaceuticals, Acysis, Whitmire Distribution Corp., Adam Diagnostic Laboratories, Alternate Site Distributors, Besse Medical Supply, Bindley Western, Bio Test, Bryan Biologicals, Inc., Capital Wholesale Drug, Casad Surgical Pharmacy, Cummumed, Dakota Drug, Diagnostic Marketing Corp, F D Titus & Sons, Inc., F. Dohmen Co., First Choice Medical Inc., General Drug Company, General Inj. & Vaccines, Inc., H D Smith Wholesale, Henry Schein Corp., Henry Schein Surgical, Immucor, Inc., Int'l Med Supply, J E Gold & Co, Martin Surgical Supply, Medical Blood Services, Medical Mart Inc, Medsource Corp, Metro Medical Supply Inc., Micro Bio Medics, Morris and Dickson, Mullen & Haynes, National Hospital Specialties, NSS, Inc., Ohio Valley Clarksburg Inc., Organon Teknika Corp, Parks Inc., PSS, Quala Med Inc., R Weinstein Pharmaceutical, Roane Barker, Scientific Supply Company, Triad Medical Inc., Walsh-Lumpkin, Accord Clinical Labs, Alternate Site Distributors, Bellegrove Medical Supply, Bensons Surgical Supply Co., British Marketing Enterprises, Expert - Med Inc., Gas Medical, General Drug Company, Grove Way Medical Supply, Health Coalition, Physician Sales & Service, R Medical Supply, Summit Medical Supplies, Total Health Products, A. J. Buck & Sons Inc., Alternate Site Distributors, C F

10

Anderson Comp, Inc., Center Medical Supply, Central Supply, Emjay Medical Supplies Corp, Gamma Biologicals, Hawkeye Medical Supply, Interstate Blood Bank, Lake Erie Medical & Surgical, Medical Supply Corp of N.J., Paragon Scientific Corp., Ransdell Surgical Inc., Savoy Medical Supply Co., Shenandoah Medical Supply, Suncoast Surgical Supply, Tri State Physicians Supplies, United Medical Supply, Arizona Blood Services, Bio Care, Bio Med Plus, Blood Center of SE Wisconsin, Health Coalition, Inc., and Mediq Corporation.

29.     The true wholesalers which distribute the bulk of the biologics for Baxter as well as other manufacturers, are these non-charge back wholesalers.  This has been reported by the Marketing Research Bureau Inc. in its study, *The Plasma Fractions Market in the United States 2001*.  This study indicates that the first-tier of the non-charge back wholesalers distribute the overwhelming amount bulk of biologics, and that the remaining are sold directly to providers such as home health agencies or home health systems.

## DEFENDANTS' ILLEGAL SCHEMES

Baxter has used the following schemes to cause state Medicaid programs and other payors to pay false claims:

### WAC FALSIFICATION

30.     In the case of biologics, Baxter employed what is known in the pharmaceutical industry as "class of trade pricing."  Baxter sold the bulk of its biologics directly to providers. e.g., home health agencies and home health systems. Baxter offered the lowest prices to these providers, Baxter offered the next lowest prices to non-charge back wholesalers.  These sales, varying by product, comprise up to 40% of Baxter's total sales of the products.  At times, Baxter also offered its lowest prices to the non-charge back wholesalers as a marketing incentive.  to

11

move product. The charge-back wholesalers, to which Baxter charged the highest prices, comprise less than 1% of Baxter's sales for the biologicals..

31.     Although the charge-back wholesalers purchased less than 1% of the biologicals, Baxter reported to FDB that the high prices charged to this tiny market segment was its WAC. Baxter did this with the knowledge that FDB, would, in turn, use this information to calculate AWP, which would then be reported to state and federal health care programs described herein. Since the price charged to less than 1% of its market did not affect sales, Baxter could use it to manipulate the reimbursement system since the published AWP had no correlation to the price charged to the wholesalers that distributed nearly all of Baxter's biologicals.

32.     The effect of Baxter's false reporting was that Baxter illegally increased the profitability, or spread, of these drugs to health care providers and pharmacies, thus giving a financial incentive for their selection and use. That is, if the spread for Baxter's product is greater than the spread for competing products, the provider will profit more by using Baxter's product. The only way to increase the spread is to either reduce the acquisition cost to the provider, or to inflate the reported AWP Medicare and Medicaid rely upon.  Since lowering the sales price to providers would decrease Baxter's income, Baxter preferred instead to increase the spread by falsely inflating the AWP.  Consequently, since Baxter sells the biologicals to providers at considerably less than the reported AWP, there is a substantial spread between what Medicare and Medicaid and other payors will pay, and there is an exorbitant amount of profit the provider can make on the sale of the product.

33.     In fact, Baxter knew that the actual amounts charged to the non-charge back wholesalers distributors, as well as providers and others for their products, was not publicly available, because it was proprietary pricizng information.  Baxter kept this information highly

12

confidential and secret to maximize its ability to maintain market share by providing the greatest reimbursement spread to these customers.

34.     Baxter increased its revenue not only by gaining more market share by beating out competitors with a more attractive spread, but also by generating profit from increasing its sale price to the providers.  So long as the providers made a profit from purchasing Baxter's products greater than the profit offered by a competitor's spread, they would be willing pay more for the product.

35.     Baxter knew it could directly control and fabricate the AWP for their products by reporting to FDB the highest prices charged for the biologics, those charged to charge-back wholesalers.

36.     For example, Baxter has reported to FDB that the WAC for Recombinate is $1.30 per unit, and FDB has accordingly published an AWP of $1.6250 per unit. When a Medicare beneficiary receives a drug which is covered by Part B of Medicare, Medicare reimburses providers 80% of the allowable cost, which is 95% of the AWP.  Thus, if the AWP for a drug is $1.6250, the allowable cost is 95% of that, or $1.548, and Medicare pays 80% of that sum, or $1.235.  Recombinate has been sold to providers for $0.89 (or even less), making the spread, or the difference between the actual acquisition cost of $0.89 and the Medicare payment of $1.235 equals $0.345 In addition, there is a 20% copay of 30.8¢ per unit.  This nearly 65.3¢ per unit spread represents gross margin for the provider.  Since the average patient consume approximately 125,000 units per year, this is $81,625 in gross margin per patient per year to the provider.

//

//

13

37.     In the case of Medicaid reimbursement, at 85% of AWP, or $1.381 per unit, the difference between that and the actual acquisition cost of $0.89 is $0.491. The nearly 50-cent per unit spread is also gross margin for the provider.

38.     Baxter falsely reported WAC by claiming it was reporting a "list sales price." Baxter's Mike Bradley, was Senior Director of National Account Economics, and was responsible for pricing and reporting Baxter's pricing to various databases. In approximately October 2001, Bradley told Relator Linette Sun that Baxter has repeatedly falsely described its WAC to FDB by reporting a cost described as "list sale price.", knowing that FDB would apply a 125% multiplier to estimate AWP. Sun was informed that since this improved the spread between AWP and the prices actually charged to physicians or other providers, this allowed Baxter to acquire greater market share. Bradley further told her that Baxter had known of this for years, but that they expected to shift the blame to FDB. Baxter management was adamant that it could not hit its sales targets without these incentives to the providers.

39.     According to knowledge obtained by Relator Greg Hamilton, FDB refused to accept Baxter's "list sales price," and instead submitted a letter stating that their list price was $1.31 and that they wanted their AWP to be described as $1.31. Baxter did this knowing that FDB would (as in fact it did) ask what the WAC was. Baxter had also informed FDB the amounts Baxter wanted FDB to publish as the list price and AWP. FDB again told Baxter it had to provide WAC, and that if it continued to refuse to provide WAC, FDB would have to consider the list price provided as the WAC. Again, Baxter refused to provide any other number than "list sales price," and also refused to denote the "list sales price" as WAC.

40.     FDB then used Baxter's "list sales price," and applied the 1.25 multiplier FDB obtained by researching the mark-up wholesalers applied.

14

41.     Shortly thereafter Ms. Sun reviewed the FDB materials and was surprised to see the greatly inflated AWP.  She promptly reported this to Nick Poulios who was, at the time, Baxter's Director of Medical Outcomes Research and Economics, who told her to bring this up at a meeting that was scheduled to discuss Baxter's pricing practices.  This meeting was attended by Bradley, Poulios, as well as Mike Baldridge, Director of Planning, and Jill Kadam, Director of National Accounts Marketing. Bradley again acknowledged his awareness of the problem and admitted that this actually became a better financial arrangement for Baxter since it increased reimbursement rates.  Bradley repeated that Baxter knew this all along, and that this benefitted Baxter.  Bradley also tried to convince Sun that FDB was a little used information source.

42.     After this meeting Ms. Sun contacted FDB directly and received an email from a sales manager who confirmed that FDB reports were purchased by the United States and by each State's government, and that the database was used by over 80% the insurance companies.

43.     In July, 2002, Ms. Sun learned of a pricing report for Advate prepared by Simon Kucher & Partners, an international marketing consulting firm.  Kucher & Partners recommended that to secure market share for Baxter had spent approximately $750,000 for a marketing study for this new product.  In order to secure market share Baxter decided to sell Advate for $0.99 per dose, but to report an AWP of $1.60.  Ms. Sun voiced her concern to Nick Poulios, John Park, and the VP of Global Marketing.  When she warned that Baxter could get into trouble John Park joked that it was all an "innocent" mistake.

44.     In approximately October, 2002, Ms. Sun again voiced her concerns to Nick Poulios, who told her that all Marketing Management had known of this for years and had no intention of correcting it because, if they got in trouble with the government, they could blame FDB.

15

45.  In April, 2003, Ms. Sun and Poulios informed Larry Guihinn, the President of Baxter BioScience of the inflated AWP and warned that this could get Baxter in trouble with the government. Guihinn stated that Bradley had told him that Ms. Sun was researching the report-reporting problem. Guihinn specifically forbade Ms. Sun from doing any further research, and specifically forbade Ms.. Sun or others from contacting FDB about this.

46.  In the Spring of 2003 the Global Marketing group had a pricing meeting (called a margin analysis meeting) to discuss new drug pricing for one of Baxter's products, Advate, Ms. Sun noticed that the spread was between three and five times greater on Baxter's products than it was in the industry in general. Ms. Sun warned Poulios, Bradley, and Product Director Regina O'Hara that the spread was too great, before she was silenced by Poulios. The meeting partic-ipants were given a written margin analysis writeup. After the participants indicated their pref-erences for how to set the WAC, the AWP, and the spread, the participants were ordered to de-stroy the margin analysis report. Guihinn and John Park. Baxter's Global Product Director, commented that Baxter Management would go to jail if the government ever discovered this material.

47.  In approximately July 2003, at a meeting with Baxter Human Resources person-nel and Baxter management, to review Ms. Sun's performance (called a Talent Review Meeting) Poulios told Sun that Jim Howard, a vice-president of North American marketing said that Ms. Sun should visit Baxter customers so that she would understand that sales depended on the spread..

//

//

//

16

48.     Based upon internal documents she studied while working at Baxter, and
discussions Ms. Sun had with pricing specialists and senior marketing executives, she learned
that Baxter has engaged in similar falsification of WAC with respect to its other pharmaceutical,
hematological, and biological products.

### BEST PRICE AND STARK VIOLATIONS

49.     Baxter had a marketing practice of offering "Volume Committed Contracts" to
institutional health care providers (such as hospitals, nursing homes, and home health agencies).

50.     The Volume Committed Contracts offered such providers discounts of between
50 – 90% off of the purchase price, depending upon the amount of market share the provider
could shift in Baxter's direction.  In an April, 2003 meeting to discuss pricing policy for Advate
and Recombinate, Bradley declared that the U.S. marketing team was not worried about losing
market share to competitors because they had Volume Committed Contracts for most of their
products which would be in force for the next three years.

51.     Baxter's policy was to be extremely secretive about these contracts because of
their illegal nature.  When Ms. Sun questioned Bradley about the legality of the Volume
Committed Contracts, Bradley replied that Baxter's legal department would clean up the
contracts' language, but that the use of the inducements contained in these contracts to control
market share would continue unabated.  Ms. Sun had the opportunity to see only one such
contract, which was passed from hand to hand at a pricing meeting in April 2003.  The contract
was read by Relator, Poulios, and John Park (Defendant's Global Products Director).  Bradley
then demanded the contract back.  Neither Ms. Sun nor any of the other executives were
permitted to keep a copy of this contract.

//

17

## STARK ACT VIOLATIONS

52.      The discounts Baxter offered to institutional providers under the Volume Committed Contracts also violated Stark II, 42 US. §1395nn which prohibits compensation arrangements such as Volume Committed Contracts between entities such as Baxter, which furnishes goods or services, and health care providers, which are in a position to order or refer patients for the receipt of such goods or services.

## BAXTER'S CONDUCT VIOLATED THE FEDERAL MEDICAID PROGRAM'S
## REBATE AND BEST PRICE REPORTING REQUIREMENT

53.      The Medicaid program, established by Title XIX of the Social Security Act, is a uniquely cooperative federal-state program that provides medical assistance to certain low income individuals. See 42 U.S.C. §§ 1396 - 1396v.

54.      Congress passed the Medicaid Best Prices Statute, 42 U.S.C. § 1396r-8, as part of the Omnibus Budget Reconciliation Act of 1990. Under that statute, a drug manufacturer must enter into a Rebate Agreement with the Secretary in order for federal matching funds to be made available for that manufacturer's covered outpatient drugs. 42 U.S.C. § 1396r-8(a)(1).

55.      The Rebate Agreement provides that the Secretary enters the agreement "on behalf of the Department of Health and Human Services and all States and the District of Columbia (except to the extent they have in force an Individual State Agreement)." (Rebate Agreement at Preamble.) Upon entering a Rebate Agreement with the Secretary, the manufacturer must pay a quarterly rebate directly to each participating state based on all of the manufacturer's drugs purchased by that state pursuant to its Medicaid plan during that quarter.

18

56.     For single source or innovator multiple source drugs, the rebate due on each unit

paid for under the state plan is the difference between the average manufacturer price ("AMP")[1]

and the manufacturer's best price, defined as the lowest price available from the manufacturer to

any private purchaser or governmental entity (with certain exclusions) within the United States,

or 15.1% of AMP, whichever is greater. 42 U.S.C. §1396r-8(c)(1), (2). For multiple source non-

innovator drugs, the rebate is 11% of AMP. 42 U.S.C. § 1396r-8(c)(3). Each state must agree to

cover all of the manufacturer's covered outpatient drugs unless the state complies with one of

several statutory provisions allowing it to exclude or restrict coverage. 42 U.S.C. §§

1396a(a)(54), 1396r-8(d). Any rebate amounts received by the state must be offset against the

state's Medicaid expenditures that quarter for purposes of calculating the matching federal

financial participation. 42 U.S.C. § 1396r-8(b)(1)(B).

57.     States may enter directly into Rebate Agreements with drug manufacturers as

authorized by the Secretary. 42 U.S.C. § 1396r-8(a)(1). To date, the Secretary has approved

supplemental drug Rebate Agreements in at least twenty states. States may also control their

Medicaid drug costs and coverage by establishing prior authorization programs, 42 U.S.C. §

1396r-8(d)(1)(A), or by creating drug formularies, 42 U.S.C. § 1396r-8(d)(1)(B)(iv).  Though not

part of the rebate statute, states are also permitted to set payment rates with respect to covered

drugs. See 42 U.S.C. § 1396(a)(30); 42 C.F.R. 447.331-447.333.

58.     Drug manufacturers are required under the rebate statute and agreement to

calculate and report their AMPs and best prices to the Secretary on a quarterly basis. 42 U.S.C. §

---

[1]  "The term 'average manufacturer price' means, with respect to a covered outpatient
drug of a manufacturer for a rebate period, the average price paid to the manufacturer for the drug
in the United States by wholesalers for drugs distributed to  the retail pharmacy class of trade,
after deducting customary prompt pay discounts." 42 U.S.C. § 1396r-8(k)(1).

19

1396r-8(b)(3)(A)(i); Rebate Agreement at § II(e). Any information provided by a manufacturer or wholesaler under the rebate statute is confidential and "shall not be disclosed by the Secretary or a State agency . . . except as the Secretary determines to be necessary to carry out this section." 42 U.S.C. § 1396r- 8(b)(3)(D); Rebate Agreement at § VII. States are required to

report their total Medicaid drug utilization to each manufacturer and the Secretary sixty days after the end of the rebate quarter.4 42 U.S.C. § 1396r-8(b)(2)(A). Using the manufacturer

pricing data, the Centers for Medicare & Medicaid Services ("CMS") computes the unit rebate amount ("URA") "to which the Medicaid utilization information may be applied by States in invoicing the Manufacturer for the rebate payment due." Rebate Agreement at § I(dd).

    59.    The Secretary may survey wholesalers and manufacturers to verify reported AMPs and best prices, 42 U.S.C. § 1396r-8(b)(3)(B), and may audit manufacturer calculations of AMP and best price, Rebate Agreement at § III(c). The Secretary may impose civil money penalties on manufacturers that either fail to timely report their pricing information or submit false information to the Secretary. 42 U.S.C. § 1396r-8(b)(3)(C ); Rebate Agreement at §§ III, IV. Section 1396r-8(b)(3)(C)(ii) also provides that any civil money penalties imposed under this subsection are "in addition to other penalties as may be prescribed by law." The Secretary may terminate the Rebate Agreement for either violations of the Rebate Agreement or for other good cause shown. 42 U.S.C. § 1396r-8(b)(4)(B)(i).   The statute further provides:

> Such termination shall not be effective earlier than 60 days after
> the date of notice of such termination. The Secretary shall provide,
> upon request, a manufacturer with a hearing concerning such a
> termination, but such hearing shall not delay the effective date of
> the termination.

//

//

Id. If there is a termination, the Secretary must notify the states, § 1396r-8(b)(4)(B)(iv), and the

Statute requires the Secretary to delay reinstatement of any terminated contract for one calendar

quarter absent good cause. 42 U.S.C. § 1396r-8(b)(4)(C).

60.     Rebate Agreements are effective only for one year, and "shall be automatically

renewed for a period of not less than one year unless terminated under subparagraph (B)." 42

U.S.C. § 1396r-8(b)(4)(A).

61.     While the Rebate Agreement does not address remedies for breach of contract, it

specifies that it shall be construed under federal common law, and states that nothing in it shall

be construed as a waiver of any legal right of the Secretary or the manufacturer under state or

federal law. Specifically, it provides that: "The Rebate Agreement shall be construed in

accordance with federal common law and ambiguities shall be interpreted in the manner which

best effectuates the statutory scheme."

## BAXTER KNEW IT'S CONDUCT WAS ILLEGAL

62.     Before she was silenced by her superior, Ms. Sun made clear to Baxter executives

Poulios, Bradley, O'Hara, Guihinn and others that Baxter should not use the spread as the

incentive for selling its products.  the spread was too great, that the prices reported upon which

AWP was calculat- ed should be reduced, and that the discounts offered by the Volume

Committed Contracts were illegal.

63.     Larry Guihinn, Baxter BioScience's President clearly understood the legal

ramifications of the misconduct alleged herein.  At a meeting to discuss the pricing of Advate in

the late spring or early summer of 2003, Guihinn warned that Baxter would get in trouble if the

21

government were ever to see the margin analysis memo analyzing Baxter's pricing for all of its pharmaceutical, hematological, and biological products.   Park promised Guihinn that the memorandum would not be attached to any emails, and that hard copies of the memorandum would be destroyed.   This meeting was attended by Michael Bald-rige, Baxter's Director of Planning, Bradley, Guihinn, Park , Poulios, and Ms. Sun, among others.

      64.     In July 2003, after the Advate Pricing Meeting, Ms. Sun gave the Park team extensive written materials on the government's prosecution of TAP for falsification of Lupron's AWP, and the $355 million False Claims Act settlement paid by AstraZeneca for Lupron's competing product, Zoladex.   Guihinn told Ms. Sun point blank, that "your job is to keep me out of jail."  When Poulios reported this to Park, Mike Baldridge, and Karen Chung (Associate Director of Medical Outcomes Research & Economics), Park, Baldridge, and Chung joked that they would not go to jail because they were ignorant of these practices.

## COUNT I

### SUBMISSION OF FALSE FEDERAL FALSE CLAIMS

### BY FALSIFYING PRICE INFORMATION

      65.     Relators repeat and reallege each allegation contained in paragraphs 1 through 64  above as if fully set forth herein.

      66.     This is a *qui tam* civil action brought by Linnette Sun, Greg Hamilton and the government of the United States to recover treble damages and civil penalties under 31 U.S.C. §3729(a) of the False Claims Act.

//

22

67.     Baxter violated 31 U.S.C. §3729(a) by conspiring, to present and by causing false claims to be present, used and then presented to the United States Government in connection with its fraudulent and illegal practices.

68.     The United States Government, by and through CMS, DHHS, RRB, OPM, and possibly other Federal agencies, and unaware of Baxter's fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

69.     Had the United States Government known that Baxter was violating federal laws, it would not have paid the claims submitted by health care providers and third party payers in connection with Baxter's fraudulent and illegal practices.

70.     As a result of Baxter's violations of 31 U.S.C. §3729(a), the United States has been damaged in an amount in the millions of dollars, exclusive of interest.

71.     Relators Sun and Hamilton are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to §3730(b) on behalf of themselves and the United States Government.

## COUNT II

### VIOLATION OF THE FALSE CLAIMS ACT THROUGH STARK ACT VIOLATIONS

72.     Relators repeat and reallege each allegation contained in paragraphs 1 through 64 above as though fully set forth herein.

//

//

23

73.     This is a *qui tam* civil action brought by Linnette Sun, Greg Hamilton

and the government of the United States to recover treble damages and civil penalties under 31

U.S.C. §3729(a) of the False Claims Act.

74.     Baxter violated 31 U.S.C. §3729(a) by conspiring, to present and by causing false

claims to be present, used and then presented to the United States Government in connection

with its fraudulent and illegal practices.

75.     The Stark Act II, 42 U.S.C.. §1395nn (a)(1), a civil penalty provision, provides

that if a Physician has a financial relationship with an entity,

> (A) the physician may not make a referral to the entity for the
> furnishing of designated health services for which payment
> otherwise may be made under this subchapter, and the entity may
> not present or cause to be presented a claim under this subchapter
> or bill to any individual, third party payor, or other entity for
> designated health services  furnished pursuant to a referral
> prohibited under subparagraph (A).

U.S.C.A. §1395nn(a)(1).

76.     The term "financial relationship" under the Stark Act includes compensation

arrangements between a physician and an entity. *See* 42 U.S.C.A. §1395nn (a)(2)(B).

77.     The term "designated health services" under the Stark Act includes clinical

laboratory services, outpatient prescription drugs, and inpatient and outpatient hospital services.

*See* 42 U.S.C.A. §1395nn (h)(6).

78.     Baxter violated 42 U.S.C.A. §1395nn(a) when it knowingly and willfully entered

into arrangements in which providers were offered discounts based on their ability to move

market share within their institutions, pursuant to Volume Committed Contracts.

24

79.     Although "safe harbor" regulations exist to protect certain relatively innocuous and even beneficial commercial arrangements, no such provision protects the discounts made by Baxter pursuant to its fraudulent schemes. The discounts by Baxter in this case were made for the sole purpose of increasing Baxter's profits at the expense of patients, it's competitors, and the federal and state governments. Baxter targeted those providers based on the volume and value of referrals they could make.

80.     38 U.S.C.A. § 8126, and the regulations based thereon, and contracts signed with Baxter by the federal programs listed herein below require that when drug manufacturers furnish their prescription products to Federal agencies, such as the Veterans' Administration, Public Health Service, including the Indian Health Service, and the Department of Defense, they must furnish them at the "best price."

81.     Had the United States Government known that Baxter was violating federal laws, including the Anti-Kickback provisions, the Stark Act, and the best pricing requirements, it would not have paid the claims submitted by health care providers and third party payers in connection with Baxter's fraudulent and illegal practices.

82.     As a result of Baxter's violations of 31 U.S.C. §3729(a), the United States Government has been damaged in an amount in the millions of dollars, exclusive of interest.

83.     Relators Sun and Hamilton are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to §3730(b) on behalf of themselves and the United States Government. As a result of Baxter's violations of 31 U.S.C. §3729(a), the United States Government has been damaged in an amount in the millions of dollars, exclusive of interest.

25

## COUNT III

**VIOLATION OF THE FALSE CLAIMS ACT THROUGH BEST PRICE VIOLATIONS**

84.     Relators repeat and reallege each allegation contained in paragraphs 1 through 64 above as though fully set forth herein.

85.     In engaging in the fraudulent and illegal practices cited herein, including but not limited to the false reporting of WAC, and the "Volume Committed Contracts," Baxter knowingly failed and refused to furnish its products to the Federal agencies at the best price, in violation of 38 U.S.C.A. § 8126, as these same discounts and rebates were not passed on to the Federal agencies.

86.     Compliance with applicable Medicare, Medicaid, best pricing requirements, and various other federal and state laws was an implied, and upon information and belief, also an express condition of payment of claims submitted to the United States Government by health care providers and third party payers in connection with Baxter's fraudulent and illegal practices.

87.     As a result of Baxter's violations of 31 U.S.C. §3729(a), the United States has been damaged in an amount in the millions of dollars, exclusive of interest.

88.     Relators Sun and Hamilton are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to §3730(b) on behalf of themselves and the United States Government. As a result of Baxter's violations of 31 U.S.C. §3729(a), the United States Government has been damaged in an amount in the millions of dollars, exclusive of interest.

//

//

26

## COUNT IV

### RETALIATION IN VIOLATION OF 31 U.S.C. §3730(h)

89.     Relator Linnette Sun repeats and repleads and incorporate by reference hereineach and every one of the allegations contained in paragraphs 1-64, inclusive, as though fully set forth herein.

90.     Ms. Sun was retaliated against and fired from her employment at Baxter in direct retaliation for her efforts to investigate the false claims described hereinabove, her efforts to develop information which would be used in the prosecution of a false claims action, and her resistance to the submission of false claims.  Defendant sued herein carried out these acts in violation of 31 U.S.C. §3730(h).

91.     As a direct, foreseeable, and legal result of said wrongful acts by Defendant, Ms. Sun has suffered and will continue to suffer substantial losses in earnings and other employment benefits, along with other incidental and consequential damages and losses, all in an amount to be proven at time of trial.

92.     As a further direct, foreseeable, and legal result of said wrongful acts of Defendant sued herein, Ms. Sun has suffered and will continue to suffer mental pain and anguish, all other damage in an amount to be proven at time of trial.

93.     As a further direct, foreseeable, and legal result of said wrongful acts by said Defendant, Ms. Sun has incurred attorneys' fees and other consequential damages in an amount to be determined, for which Ms. Sun claims a sum to be established according to proof.

//

//

27

## COUNT V

## RETALIATION IN VIOLATION OF CALIFORNIA GOVERNMENT CODE §12653

94.     Relator Linnette Sun repeats and repleads and incorporate by reference herein each and every one of the allegations contained in paragraphs 1-64, inclusive, as though fully set forth herein.

95.     Ms. Sun was retaliated against and fired from her employment at Baxter in direct retaliation for her efforts to investigate the false claims described hereinabove, her efforts to develop information which would be used in the prosecution of a false claims action, and her resistance to the submission of false claims to the State of California. Defendant sued herein carried out these acts in violation of California Government Code §12653.

96.     As a direct, foreseeable, and legal result of said wrongful acts by Defendant, Ms. Sun has suffered and will continue to suffer substantial losses in earnings and other employment benefits, along with other incidental and consequential damages and losses, all in an amount to be proven at time of trial.

97.     As a further direct, foreseeable, and legal result of said wrongful acts of Defendant sued herein, Ms. Sun has suffered and will continue to suffer mental pain and anguish, all other damage in an amount to be proven at time of trial.

98.     As a further direct, foreseeable, and legal result of said wrongful acts by said Defendant, Ms. Sun has incurred attorneys' fees and other consequential damages in an amount to be determined, for which Ms. Sun claims a sum to be established according to proof.

//

//

28

99.     The aforesaid acts were carried out maliciously and in conscious disregard of Ms. Sun's rights. As such, Defendants should be held liable for exemplary damages in sums sufficient to punish siad Defendants, and to deter future similar misconduct.

**COUNT VI**

**RETALIATION IN VIOLATION OF CALIFORNIA PUBLIC POLICY**

100.     Relator Linnette Sun repeats and repleads and incorporate by reference herein each and every one of the allegations contained in paragraphs 1-64, inclusive, as though fully set forth herein.

101.     Ms. Sun worked for Defendant in Santa Barbara, California. She was retaliated against and fired from her employment at Baxter in direct retaliation for her efforts to investigate the false claims described hereinabove, which are violations of state and federal laws. Defendant sued herein fired Ms. Sun in violation of California's public policy.

102.     As a direct, foreseeable, and legal result of said wrongful acts by Defendant, Ms. Sun has suffered and will continue to suffer substantial losses in earnings and other employment benefits, along with other incidental and consequential damages and losses, all in an amount to be proven at time of trial.

103.     As a further direct, foreseeable, and legal result of said wrongful acts of Defendant sued herein, Ms. Sun has suffered and will continue to suffer mental pain and anguish, all other damage in an amount to be proven at time of trial.

//

//

29

104.    As a further direct, foreseeable, and legal result of said wrongful acts by said

Defendant, Ms. Sun has incurred attorneys' fees and other consequential damages in an amount to

be determined, for which Ms. Sun claims a sum to be established according to proof.

## COUNT VII

### MASSACHUSETTS FALSE CLAIMS ACT

105.    Relators repeat and reallege each allegation contained in paragraphs 1 through 64

above as if fully set forth herein.

106.    This is a *qui tam* action brought by Linnette Sun, Greg Hamilton and the

Commonwealth of Massachusetts for treble damages and penalties under Massachusetts False

Claims Act, Mass. Gen. Laws Ann. 12 § 5(A) *et seq.*

107.    Mass. Gen. Laws Ann. 12 § 5B provides liability for any person who

knowingly presents, or causes to be presented, a false or fraudulent claim for payment or

approval;  (2) knowingly makes, uses, or causes to be made or used, a false record or statement to

obtain payment or approval of a claim by the commonwealth or any political subdivision thereof;

(3) conspires to defraud the Commonwealth or any political subdivision thereof through the

allowance or payment of a fraudulent claim;  is a beneficiary of an inadvertent submission of a

false claim to the common wealth or political subdivision thereof, subsequently discovers the

falsity of the claim, and fails to disclose the false claim to the commonwealth or political

subdivision within a reasonable time after discovery of the false claim.

108.    Baxter violated Mass. Gen. Laws Ann. 12 § 5B and knowingly caused hundreds

of thousands of false claims to be made, used and presented to the Commonwealth of

30

Massachusetts from at least 1998 to the present by its reporting of false pricing statements regarding its products.

109.    The Commonwealth of Massachusetts, by and through the Massachusetts Medicaid program and other state health care programs, and unaware of Baxter's fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

110.    Honest reporting of WAC data and provision of the best price to Medicaid was an implied, and upon information and belief, also an express condition of payment of claims submitted to the Commonwealth of Massachusetts.

111.    Had the Commonwealth of Massachusetts known that Baxter was violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Baxter's fraudulent and illegal practices.

112.    As a result of Baxter's violations of Mass. Gen. Laws Ann. 12 § 5B, the Commonwealth of Massachusetts has been damaged in an amount to be determined, exclusive of interest.

113.    Relators Sun and Hamilton are a private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to Mass. Gen. Laws Ann. 12 § 5(c)(2) on behalf of himself and the Commonwealth of Massachusetts.

//

//

//

//

31

## COUNT VIII

### VIOLATION OF THE CALIFORNIA FALSE CLAIMS ACT

114.    Relators repeat and reallege each allegation contained in paragraphs 1 through 64

above as if fully set forth herein.

115.    This is a *qui tam* action brought by Linnette Sun, Greg Hamilton and the STATE

of California to recover treble damages and civil penalties under the California False Claims Act,

Cal. Gov't. Code  § 12650 *et seq.*

116.    Cal. Gov't Code § 12651(a) provides liability for any person who-

> (1) knowingly presents, or causes to be presented, to an officer or
> employee of the state or of any political division thereof, a false
> claim for payment or approval;

> (2) knowingly makes, uses, or causes to be made or used a false
> record or statement to get a false claim paid or approved by the
> state or by any political subdivision;

> (3) conspires to defraud the state or any political subdivision by
> getting a false claim allowed or paid by the state or by any political
> subdivision.

> (8) is a beneficiary of an inadvertent submission of a false claim to
> the state or a political subdivision, subsequently discovers the
> falsity of the claim, and fails to disclose the false claim to the state
> or the political subdivision within a reasonable time after discovery
> of the false claim.

117.    Baxter violated California laws by knowingly allowing tens of thousands of false

claims to be submitted and presented to the State of California from at least 1998 to the present

by its reporting of false pricing statements regarding its products.

//

32

118.     The State of California, by and through the California Medicaid program and other state health care programs, and unaware of Baxter's fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

119.     Honest reporting of WAC data and provision of the best price to Medi-Cal was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of California in connection with Baxter's fraudulent and illegal practices.

120.     Had the State of California known that Baxter was violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Baxter's fraudulent and illegal practices.

121.     As a result of Baxter's violations of Cal. Gov't Code §12651(a), the State of California has been damaged in an amount to be determined  exclusive of interest.

122.     Relators Sun and Hamilton are persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to Cal. Gov't Code § 12652(c) on behalf of himself and the State of California.

123.     This Court is requested to accept pendant jurisdiction over this related state claim as it is predicated upon the same exact facts as the federal claim, and merely asserts separate damages to the State of California in the operation of its Medicaid program.

//

//

//

//

33

## COUNT IX

### HAWAII FALSE CLAIMS ACT

124.    Relators repeat and reallege each allegation contained in paragraphs 1 through 64 above as if fully set forth herein.

125.    This is a *qui tam* action brought by Linnette Sun, Greg Hamilton and the State of Hawaii to recover treble damages and civil penalties under the Hawaii False Claims Act, Haw. Rev. Stat. § 661-21 *et seq*.

126.    Haw. Rev. Stat. § 661-21(a) provides liability for any person who-

(1) knowingly presents, or causes to be presented, to an officer  or employee of the state a false or fraudulent claim for payment or approval;

(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state;

(3) conspires to defraud the state by getting a false or fraudulent claim allowed or paid; or

(8) is a beneficiary of an inadvertent submission of a false claim to the State, who subsequently discovers the falsity of the claim, and fails to disclose the false claim to the State within a reasonable time after discovery of the false claim.

127.    Baxter violated  Haw. Rev. Stat. §661-21(a) and knowingly caused tens of thousands of false claims to be made, used and presented to the State of Hawaii from at least 1998 to the present by its violation of federal and state laws.

128.    The State of Hawaii, by and through the Hawaii Medicaid program and other state health care programs, and unaware of Baxter's fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

34

129.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Hawaii in connection with Baxter's fraudulent and illegal practices.

130.    Had the State of Hawaii known that Baxter was violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Baxter's fraudulent and illegal practices.

131.    As a result of Baxter's violations of Haw. Rev. Stat. § 661-21(a) the State of Hawaii has been damaged in an amount to be determined  exclusive of interest.

132.    Relators Sun and Hamilton are private persons with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Haw. Rev. Stat. § 661-25(a) on behalf of himself and the State of Hawaii.

133.    This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Hawaii in the operation of its Medicaid program.


## COUNT X

### ILLINOIS WHISTLEBLOWER REWARD AND PROTECTION ACT

134.    Relators repeat and reallege each allegation contained in paragraphs 1 through 64 above as if fully set forth herein.

135.    This is a *qui tam* action brought by Linnette Sun, Greg Hamilton and the State of Illinois to recover  treble damages and civil penalties under the Illinois Whistleblower Reward and Protection Act, 740 ILCS 175 *et seq.*

136.    740 ILCS 175/3(a) provides liability for any person who-

> (1) knowingly presents, or causes to be presented, to an officer or employee of the State or a member of the Guard a false or fraudulent claim for payment or approval;

> (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State;

> (3) conspires to defraud the State by getting a false or fraudulent claim allowed or paid.

137.    Baxter violated 740 ILCS 175/3(a) and knowingly caused tens of thousands of false claims to be made, used and presented to the State of Illinois from at least 1998 to the present by its violation of federal and state law as described herein.

138.    The State of Illinois, by and through the Illinois Medicaid program and other state health care programs, and unaware of Baxter's fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

139.    Compliance with applicable Medicare, Medicaid and various other federal and state laws was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Illinois in connection with Baxter's fraudulent and illegal practices.

140.    Had the State of Illinois known that Baxter was violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Baxter's fraudulent and illegal practices.

141.    As a result of Baxter's violations of 740 ILCS 175/3(a), the State of Illinois has been damaged in an amount to be determined  exclusive of interest.

//

36

142.    Sun and Hamilton are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to 740 ILCS 175/3(b) on behalf of himself and the State of Illinois.

143.    This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Illinois in the operation of its Medicaid program.

## COUNT XI

### FLORIDA FALSE CLAIMS ACT

144.    Relators repeat and reallege each allegation contained in paragraphs 1 through 64 above as if fully set forth herein.

145.    This is a *qui tam* action brought by Linnette Sun, Greg Hamilton and the State of Florida to recover treble damages and civil penalties under the Florida False Claims Act, Fla. Stat. § 68.081 *et seq.*

146.    Fla. Stat. § 68.082(2) provides liability for any person who-

>    (a) knowingly presents, or causes to be presented, to an officer or employee of an agency a false or fraudulent claim for payment or approval;

>    (b) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by an agency;

>    (c) conspires to submit a false claim to an agency or to deceive an agency for the purpose of getting a false or fraudulent claim allowed or paid.

//

37

147.    Baxter violated Fla. Stat. § 68.082(2) and knowingly caused tens of thousands of false claims to be made, used and presented to the State of Florida from at least 1998 to the present by its violation of federal and state laws.

148.    The State of Florida, by and through the Florida Medicaid program and other state healthcare programs, and unaware of Baxter's fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

149.    Compliance with applicable Medicare, Medicaid and various other federal and state laws was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Florida in connection with Baxter's fraudulent and illegal practices.

150.    Had the State of Florida known that Baxter was violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Baxter's fraudulent and illegal practices.

151.    As a result of Baxter's violations of Fla. Stat. § 68.082(2), the State of Florida has been damaged in an amount to be determined  exclusive of interest.

152.    Relators Sun and Hamilton are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to Fla. Stat. § 68.083(2) on behalf of himself and the State of Florida.

153.    This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Florida in the operation of its Medicaid program.

//

//

38

## COUNT XII

### TEXAS FALSE CLAIMS ACT

154.    Relators repeat and reallege each allegation contained in paragraphs 1 through

64 above as if fully set forth herein.

155.    This is a *qui tam* action brought by Linnette Sun, Greg Hamilton and the State of

Texas to recover double damages and civil penalties under V.T.C.A. Hum. Res. Code § 36.001 *et*

*seq.*

156.    V.T.C.A. Hum. Res. Code § 36.002 provides liability for any person who-

   (1) knowingly or intentionally makes or causes to be made a false
   statement or misrepresentation of a material fact:

        (a) on an application for a contract, benefit, or
        payment under the Medicaid program; or

        (b) that is intended to be used to determine its
        eligibility for a benefit or payment under the
        Medicaid program.

   (2) knowingly or intentionally concealing or failing to disclose an
   event:

        (a) that the person knows affects the initial or
        continued right to a benefit or payment under the
        Medicaid program of:

             (i) the person; or

             (ii) another person on whose behalf
             the person has applied for a benefit
             or payment or is receiving a benefit
             or payment; and

        (b) to permit a person to receive a benefit or
        payment that is not authorized or that is greater than
        the payment or benefit that is authorized;

39

(4) knowingly or intentionally makes, causes to be made, induces, or seeks to induce the making of a false statement or misrepresentation of material fact concerning:

(b) information required to be provided by a federal or state law, rule, regulation, or provider agreement pertaining to the Medicaid program;

157.     Baxter violated V.T.C.A. Hum. Res. Code § 36.002 and knowingly caused tens of thousands of false claims to be made, used and presented to the State of Texas from at least 1998 to the present by its violation of federal and state laws, as described herein.

158.     The State of Texas, by and through the Texas Medicaid program and other state health care programs, and unaware of Baxter's fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

159.     Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Texas in connection with Baxter's fraudulent and illegal practices.

160.     Had the State of Texas known that Baxter was violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Baxter's fraudulent and illegal practices.

161.     As a result of Baxter's violations of V.T.C.A. Hum. Res. Code § 36.002, the State of Texas has been damaged in an amount to be determined  exclusive of interest.

162.     Relators Sun and Hamilton are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to V.T.C.A. Hum. Res. Code § 36.101 on behalf of himself and the State of Texas.

//

40

163.    This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Texas in the operation of its Medicaid program.

## COUNT XIII

### TENNESSEE FALSE CLAIMS ACT

164.    Relators repeat and reallege each allegation contained in paragraphs 1 through 64 above as if fully set forth herein.

165.    This is a *qui tam* action brought by Linnette Sun, Greg Hamilton and the State of Tennessee to recover treble damages and civil penalties under the Tennessee Medicaid False Claims Act, Tenn. Code Ann. §§ 71-5-181 *et seq.*

166.    § 71-5-182(a)(1) provides liability for any person who-

> (A) presents, or causes to be presented to the state, a claim for payment under the Medicaid program knowing such claim is false or fraudulent;

> (B) makes or uses, or causes to be made or used, a record or statement to get a false or fraudulent claim under the Medicaid program paid for or approved by the state knowing such record or statement is false;

> (C) conspires to defraud the State by getting a claim allowed or paid under the Medicaid program knowing such claim is false or fraudulent.

167.    Baxter violated Tenn. Code Ann. § 71-5-182(a)(1) and knowingly caused tens of thousands of false claims to be made, used and presented to the State of Tennessee from at least 1998 to the present by its violation of federal and state laws as described herein.

//

41

168.    Baxter's violations of § 71-5-182 and various other federal and state laws caused false claims to be submitted for payment to the State of Tennessee.

169.    The State of Tennessee, by and through the Tennessee Medicaid program and other state health care programs, and unaware of Baxter's fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

170.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Tennessee in connection with Baxter's fraudulent and illegal practices.

171.    Had the State of Tennessee known that Baxter violated the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Baxter's fraudulent and illegal practices.

172.    As a result of Baxter's violations of Tenn. Code Ann. § 71-5-182(a)(1), the State of Tennessee has been damaged in an amount to be determined  exclusive of interest.

173.    Relators Sun and Hamilton are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to Tenn. Code Ann. § 71-5-183(a)(1) on behalf of himself and the State of Tennessee.

174.    This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Tennessee in the operation of its Medicaid program.

//

//

//

42

## COUNT XIV

## DELAWARE FALSE CLAIMS AND REPORTING ACT

175.    Relators repeat and reallege each allegation contained in paragraphs 1 through64

above as if fully set forth herein.

176.    This is a *qui tam* action brought by Linnette Sun, Greg Hamilton and the State of

Delaware to recover treble damages and civil penalties under the Delaware False Claims and

Reporting Act, Title 6, Chapter 12 of the Delaware Code.

177.    6 Del. C. § 1201(a) provides liability for any person who-

> (1) knowingly presents, or causes to be presented, directly or
> indirectly, to an officer or employee of the Government a false or
> fraudulent claim for payment or approval;

> (2) knowingly makes, uses, or causes to be made or used, directly
> or indirectly, a false record or statement to get a false or fraudulent
> claim paid or approved; or

> (3) conspires to defraud the Government by getting a false or
> fraudulent claim allowed or paid.

178.    Baxter violated 6 Del. C. § 1201(a) and knowingly caused tens of thousands of

false claims to be made, used and presented to the State of Delaware from at least 1998 to the

present by its violation of federal and state laws, as described herein.

179.

180.    The State of Delaware, by and through the Delaware Medicaid program and other

state health care programs, and unaware of Baxter's fraudulent and illegal practices, paid the

claims submitted by health care providers and third party payers in connection therewith.

181.    Compliance with applicable Medicare, Medicaid and the various other federal and

state laws cited herein was an implied, and upon information and belief, also an express

43

condition of payment of claims submitted to the State of Delaware in connection with Baxter's fraudulent and illegal practices.

182.   Had the State of Delaware known that Baxter was violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Baxter's fraudulent and illegal practices.

183.   As a result of Baxter's violations of 6 Del. C. § 1201(a), the State of Delaware has been damaged in an amount to be determined exclusive of interest.

184.   Relators Sun and Hamilton are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to 6 Del. C. § 1203(b) on behalf of himself and the State of Delaware.

185.   This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Delaware in the operation of its Medicaid program.

## COUNT XV

### LOUISIANA MEDICAL ASSISTANCE PROGRAMS INTEGRITY LAW

186.   Relators repeat and reallege each allegation contained in paragraphs 1 through 64 above as if fully set forth herein.

187.   This is a *qui tam* action brought by Linnette Sun, Greg Hamilton, and the State of Louisiana to recover treble damages and civil penalties under the Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. § 437.1 *et seq.*

188.   La. Rev. Stat. Ann. § 438.3 provides-

44

(A) No person shall knowingly present or cause to be presented a false or fraudulent claim;

(B) No person shall knowingly engage in misrepresentation to obtain, or attempt to obtain, payment from medical assistance program funds;

(C) No person shall conspire to defraud, or attempt to defraud, the medical assistance programs through misrepresentation or by obtaining, or attempting to obtain, payment for a false or fraudulent claim;

189.    Baxter violated  La. Rev. Stat. Ann. §438.3 and knowingly caused tens of thousands of false claims to be made, used and presented to the State of Louisiana from at least 1998 to the present by its violation of federal and state laws as described herein.

190.    The State of Louisiana, by and through the Louisiana Medicaid program and other state health care programs, and unaware of Baxter's fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

191.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Louisiana in connection with Baxter's fraudulent and illegal practices.

192.    Had the State of Louisiana known that Baxter was violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Baxter's fraudulent and illegal practices.

193.    As a result of Baxter's violations of La. Rev. Stat. Ann. § 438.3 the State of Louisiana has been damaged in an amount to be determined  exclusive of interest.

//

//

45

194.   Relators Sun and Hamilton are private persons with direct and independent
knowledge of the allegations of this Complaint, who have brought this action pursuant to La.
Rev. Stat. Ann. §439.1(A) on behalf of himself and the State of Louisiana.

195.   This Court is requested to accept pendant jurisdiction of this related state claim as
it is predicated upon the exact same facts as the federal claim, and merely asserts separate
damage to the State of Louisiana in the operation of its Medicaid program.

## COUNT XVI

### NEVADA FALSE CLAIMS ACT

196.   Relators repeat and reallege each allegation contained in paragraphs 1 through
64 above as if fully set forth herein.

197.   This is a *qui tam* action brought by Linnette Sun, Greg Hamilton and the State of
Nevada to recover treble damages and civil penalties under the Nevada False Claims Act, N.R.S.
§ 357.010, et. seq.

198.   N.R.S. § 357.040(1) provides liability for any person who-

> (a) knowingly presents or causes to be presented a false claim for
> payment or approval;
>
> (b) knowingly makes or uses, or causes to be made or used, a false
> record or statement to obtain payment or approval of a false claim;
>
> (c) conspires to defraud by obtaining allowance or payment of a
> false claim;
>
> (h) is a beneficiary of an inadvertent submission of a false claim
> and, after discovering the falsity of the claim, fails to disclose the
> falsity to the state or political subdivision within a reasonable time.

46

199.   In addition, N.R.S. § 422.560 prohibits the solicitation, acceptance or receipt of anything of value in connection with the provision of medical goods or services for which payment may be made in whole or in part under the Nevada Medicaid program.

200.   Baxter violated N.R.S. § 357.040(1) and knowingly caused tens of thousands of false claims to be made, used and presented to the State of Nevada from at least 1998 to the present by its violation of federal and state laws as described herein.

201.   The State of Nevada, by and through the Nevada Medicaid program and other state health care programs, and unaware of Baxter's fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

202.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Nevada in connection with Baxter's fraudulent and illegal practices.

203.   Had the State of Nevada known that Baxter was violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Baxter's fraudulent and illegal practices.

204.   As a result of Baxter's violations of N.R.S. § 357.040(1) the State of Nevada has been damaged in an amount to be determined exclusive of interest.

205.   Relators Sun and Hamilton are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to N.R.S. § 357.080(1) on behalf of himself and the State of Nevada.

//

//

47

206.     This Court is requested to accept pendant jurisdiction of this related state claim as

it is predicated upon the exact same facts as the federal claim, and merely asserts separate

damage to the State of Nevada in the operation of its Medicaid program.


## COUNT XVII

## DISTRICT OF COLUMBIA PROCUREMENT REFORM AMENDMENT ACT

207.     Relators repeat and reallege each allegation contained in paragraphs 1 through

64 above as if fully set forth herein.

208.     This is a *qui tam* action brought by Linnette Sun, Greg Hamilton and the District

of Columbia to recover treble damages and civil penalties under the District of

Columbia Procurement Reform Amendment Act, D.C. Code § 2-308.13 *et seq.*

209.     D.C. Code § 2-308.14(a) provides liability for any person who-

(1) knowingly presents, or causes to be presented, to an officer  or
employee of the District a false claim for payment or approval;

(2) knowingly makes, uses, or causes to be made or used, a false
record or statement to get a false claim paid or approved by the
District;

(3) conspires to defraud the District by getting a false claim
allowed or paid by the District;

(8) is the beneficiary of an inadvertent submission of a false claim
to the District, subsequently discovers the falsity of the claim, and
fails to disclose the false claim to the District.

210.     Baxter violated  D.C. Code § 2-308.14(a) and knowingly caused tens of thousands

of false claims to be made, used and presented to the District of Columbia from at least 1998 to

the present by its violation of federal and state laws as described herein.

48

211. The District of Columbia, by and through the District of Columbia Medicaid program and other state health care programs, and unaware of Baxter's fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

212. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the District of Columbia in connection with Baxter's fraudulent and illegal practices.

213. Had the District of Columbia known that Baxter was violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Baxter's fraudulent and illegal practices.

214. As a result of Baxter's violations of D.C. Code § 2-308.14(a) the District of Columbia has been damaged in an amount to be determined  exclusive of interest.

215. Relators Sun and Hamilton are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to D.C. Code § 2-308.15(b)  on behalf of himself and the District of Columbia.

216. This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the District of Columbia in the operation of its Medicaid program.

//

//

//

//

49

## COUNT XVIII

### NEW MEXICO MEDICAID FALSE CLAIMS ACT

217.    Relators repeat and reallege each allegation contained in paragraphs 1 through

64 above as if fully set forth herein.

218.    This is a *qui tam* action brought by Linnette Sun, Greg Hamilton and the State of

New Mexico for treble damages and penalties under (New Mexico's Medicaid False Claims

Act*)*.

219.    (New Mexico's Medicaid False Claims Act*)*.  provides liability for any person

who

> (1) knowingly presents, or causes to be presented, a false or
> fraudulent claim for payment or approval;

> (2) knowingly makes, uses, or causes to be made or used, a false
> record or statement to obtain payment or approval of a claim by the
> commonwealth or any political subdivision thereof;

> (3) conspires to defraud the commonwealth or any political
> subdivision thereof through the allowance or payment of a
> fraudulent claim;

> (4) is a beneficiary of an inadvertent submission of a false claim to
> the common wealth or political subdivision thereof, subsequently
> discovers the falsity of the claim, and fails to disclose the false
> claim to the commonwealth or political subdivision within a
> reasonable time after discovery of the false claim.

220.    Baxter violated New Mexico's Medicaid False Claims Act  and knowingly

caused hundreds of thousands of false claims to be made, used and presented to the State of New

Mexico from at least 1998 to the present by its reporting of false pricing statements regarding its

products.

//

50

221.     The State of New Mexico, by and through the New Mexico Medicaid program and other state health care programs, and unaware of Baxter's fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

222.     Honest reporting of WAC data and provision of the best price to Medicaid was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of New Mexico.

223.     Had the State of New Mexico known that Baxter was violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Baxter's fraudulent and illegal practices.

224.     As a result of Baxter's violations of (New Mexico's Medicaid False Claims Act), the State of New Mexico has been damaged in an amount to be determined, exclusive of interest.

225.     Relators Sun and Hamilton are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to (New Mexico's Medicaid False Claims Act). on behalf of themselves and the State of New Mexico.


## COUNT XIX

### VIRGINIA FRAUD AGAINST TAXPAYERS ACT

226.     Relators repeat and reallege each allegation contained in paragraphs 1 through 64 above as if fully set forth herein.

227.     This is a *qui tam* action brought by Linnette Sun, Greg Hamilton and the State of Virginia for treble damages and penalties under Virginia Fraud Against Taxpayers Act, (Virginia Code Chapter 3,  Article 19.1 § 8.01 *et seq.)*

228. (Virginia Code Chapter 3, Article 19.1 § 8.01 *et seq.*) provides liability for any

person who

> (1) knowingly presents, or causes to be presented, a
> false or fraudulent claim for payment or approval;

> (2) knowingly makes, uses, or causes to be made or used, a
> false record or statement to obtain payment or approval of a claim
> by the commonwealth or any political subdivision thereof;

> (3) conspires to defraud the commonwealth or any political
> subdivision thereof through the allowance or payment of a
> fraudulent claim;

> (4) is a beneficiary of an inadvertent submission of a false
> claim to the common wealth or political subdivision thereof,
> subsequently discovers the falsity of the claim, and fails to disclose
> the false claim to the commonwealth or political subdivision
> within a reasonable time after discovery of the false claim.

229. Baxter violated (Virginia Code Chapter 3, Article 19.1 § 8.01 *et seq.*) and

knowingly caused hundreds of thousands of false claims to be made, used and presented to the

State of Virginia from at least 1998 to the present by its reporting of false pricing statements

regarding its products.

230. The State of Virginia, by and through the Virginia Medicaid program and other

state health care programs, and unaware of Baxter's fraudulent and illegal practices, paid the

claims submitted by health care providers and third party payers in connection therewith.

231. Honest reporting of WAC data and provision of the best price to Medicaid was an

implied, and upon information and belief, also an express condition of payment of claims

submitted to the State of Virginia.

//

//

52

232.    Had the State of Virginia known that Baxter was violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Baxter's fraudulent and illegal practices.

233.    As a result of Baxter's violations of (Virginia Code Chapter 3, Article 19.1 § 8.01 *et seq.)*, the State of Virginia has been damaged in an amount to be determined, exclusive of interest.

234.    Relators Sun and Hamilton are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to (Virginia Code Chapter 3, Article 19.1 § 8.01 *et seq.)* on behalf of themselves and the State of Virginia.

## COUNT XX

### UTAH FALSE CLAIMS ACT

235.    Relators repeat and reallege each allegation contained in paragraphs 1 through 64 above as if fully set forth herein

236.    This is a *qui tam* action brought by Linnette Sun, Greg Hamilton and the State of Utah for treble damages and penalties under Utah's False Claims Act, Utah Health Code Title 26 *et seq.*

237.    (Utah Health Code Title 26) provides liability for any person who

(1) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(2) knowingly makes, uses, or causes to be made or used, a false record or statement to obtain payment or approval of a claim by the commonwealth or any political subdivision thereof;

53

>(3) conspires to defraud the commonwealth or any political
>subdivision thereof through the allowance or payment of a
>fraudulent claim;
>
>(9) is a beneficiary of an inadvertent submission of a false claim to
>the common wealth or political subdivision thereof, subsequently
>discovers the falsity of the claim, and fails to disclose the false
>claim to the commonwealth or political subdivision within a
>reasonable time after discovery of the false claim.

238.     Baxter violated (Utah Health Code Title 26) and knowingly caused hundreds
of thousands of false claims to be made, used and presented to the State of Utah from at least
1998 to the present by its reporting of false pricing statements regarding its products.

239.     The State of Utah, by and through the Utah Medicaid program and other state
health care programs, and unaware of Baxter's fraudulent and illegal practices, paid the claims
submitted by health care providers and third party payers in connection therewith.

240.     Honest reporting of WAC data and provision of the best price to Medicaid was an
implied, and upon information and belief, also an express condition of payment of claims
submitted to the State of Utah.

241.     Had the State of Utah known that Baxter was violating the federal and
state laws cited herein, it would not have paid the claims submitted by health care providers and
third party payers in connection with Baxter's fraudulent and illegal practices.

242.     As a result of Baxter's violations of (Utah Health Code Title 26) the State of
Utah has been damaged in an amount to be determined, exclusive of interest.

243.     Relators Sun and Hamilton are private persons with direct and independent
knowledge of the allegations of this Complaint, who have brought this action pursuant to (Utah
Health Code Title 26) on behalf of themselves and the State of Utah.

## COUNT XXI

### ARKANSAS MEDICAID FRAUD FALSE CLAIMS ACT

244. Relators repeat and reallege each allegation contained in paragraphs 1 through 64 above as if fully set forth herein

245. This is a *qui tam* action brought by Linnette Sun, Greg Hamilton and the State of Arkansas for treble damages and penalties under Arkansas's Medicaid Fraud False Claims Act, (Arkansas Code *§20-77-901 et. Seq.)*

246. (Arkansas Code *§20-77-901 et. Seq.)* provides liability for any person who

> (1) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

> (2) knowingly makes, uses, or causes to be made or used, a false record or statement to obtain payment or approval of a claim by the commonwealth or any political subdivision thereof;

> (3) conspires to defraud the commonwealth or any political subdivision thereof through the allowance or payment of a fraudulent claim;

> (9) is a beneficiary of an inadvertent submission of a false claim to the common wealth or political subdivision thereof, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the commonwealth or political subdivision within a reasonable time after discovery of the false claim.

247. Baxter violated (Arkansas Code *§20-77-901 et. Seq.)* and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Arkansas from at least 1998 to the present by its reporting of false pricing statements regarding its products.

//

//

55

248. The State of Arkansas, by and through the Arkansas Medicaid program and other state health care programs, and unaware of Baxter's fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

249. Honest reporting of WAC data and provision of the best price to Medicaid was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Arkansas.

250. Had the State of Arkansas known that Baxter was violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Baxter's fraudulent and illegal practices.

251. As a result of Baxter's violations of (Arkansas Code *§20-77-901 et. Seq.)* the State of Arkansas has been damaged in an amount to be determined, exclusive of interest.

252. Relators Sun and Hamilton are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to (Arkansas Code *§20-77-901 et. Seq.)* on behalf of themselves and the State of Arkansas.

## COUNT XXII

## DISCRIMINATION UNDER THE CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT

253. Relator Linnette Sun repeats and repleads and incorporate by reference herein each and every one of the allegations contained in paragraphs 1-64, inclusive, as though fully set forth herein.

254. At all relevant times herein, Baxter regularly employed five or more persons, bringing them within the provisions of California Government Code Section 12900 et seq.,

prohibiting employers or their agents from discriminating against employees on the basis of their sex, age, race/color, national origin/ancestry, marital status.

255.    Relator Linnette Sun filed charges of discrimination in employment with the California Department of Fair Employment and Housing ("DFEH"). The DFEH issued its right to sue letter authorizing this lawsuit on July 20, 2004, and relator Linnette Sun has timely filed this action within the prescribed period subsequent to the issuance of the right to sue letter. Relator Linnette Sun has therefore exhausted her administrative remedies and timely filed this action.

256.    This cause of action is brought under the California Fair Employment and Practices Act, Government Code Section 12940, including, but not limited to, subsections (a), (k), (m) and (n), which prohibits discrimination against a person in the terms, conditions or privileges of employment on the basis of a person's sex, age, race/color, national origin/ancestry, marital status, and which requires employers to take all reasonable steps necessary to prevent harassment and discrimination from occurring and the corresponding regulations of the California Fair Employment and Housing Commission.

257.    Relator Linnette Sun was subjected to discrimination by Baxter based on her sex, age, race/color, national origin/ancestry, and marital status. This discriminatory conduct of Baxter constitutes an unlawful employment practice and unlawful discrimination in employment on account of sex, age, race/color, national origin/ancestry, marital status, in violation of California Government Code Section 12940.

258.    As a direct and proximate result of the discrimination by Baxter, Relator Linnette Sun has suffered and continues to suffer substantial losses in earnings and job benefits, and has suffered humiliation and extreme and severe mental anguish and emotional distress normally associated with discrimination. Relator Linnette Sun is therefore entitled to general and compensatory damages in an amount to be proven at the time of trial.

57

259.    Baxter acting outrageously, and with acted willfully with fraud, oppression and malice and with a conscious disregard for Relator Linnette Sun's right to be free from discrimination, and with the intent, design and purpose of injuring her. This conduct was carried out by managerial employees of Baxter. Baxter authorized, condoned, and/or ratified the unlawful conduct by failing to take immediate and appropriate corrective action. By reason thereof, Relator Linnette Sun is entitled to punitive damages from Baxter in an amount appropriate to punish and make an example of Baxter.

### COUNT XXIII

## HARASSMENT UNDER THE CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT

260.    Relator Linnette Sun repeats and repleads and incorporate by reference herein each and every one of the allegations contained in paragraphs 1-64, inclusive, as though fully set forth herein.

261.    At all relevant times herein, Baxter regularly employed five or more persons, bringing them within the provisions of California Government Code Section 12900 et seq., prohibiting employers or their agents from harassing employees on the basis of their sex, age, race/color, national origin/ancestry, marital status.

262.    Relator Linnette Sun filed charges of discrimination in employment with the California Department of Fair Employment and Housing ("DFEH"). The DFEH issued its right to sue letter authorizing this lawsuit on July 20, 2004, and relator Linnette Sun has timely filed this action within the prescribed period subsequent to the issuance of the right to sue letter. Relator Linnette Sun has therefore exhausted her administrative remedies and timely filed this action.

58

263.    This cause of action is brought under the California Fair Employment and Practices Act, Government Code Section 12940, including, but not limited to, subsections (j) and (k) which prohibits harassment of an employee on the basis of a person's sex, age, race/color, national origin/ancestry, marital status, and which requires employers to take all reasonable steps necessary to prevent harassment and discrimination from occurring and the corresponding regulations of the California Fair Employment and Housing Commission.

264.    Relator Linnette Sun was subjected to extreme, severe and pervasive harassment by Baxter based on her sex, age, race/color, national origin/ancestry, and marital status. This harassment created an intimidating, oppressive, hostile, abusive and offensive work environment which interfered with the emotional well being of relator Linnette Sun and interfered with her ability to perform her work.

264.    As a direct and proximate result of the harassment by Baxter, Relator Linnette Sun has suffered and continues to suffer substantial losses in earnings and job benefits, and has suffered humiliation and extreme and severe mental anguish and emotional distress normally associated with n. Relator Linnette Sun is therefore entitled to general and compensatory damages in an amount to be proven at the time of trial.

265    Baxter acting outrageously, and with acted willfully with fraud, oppression and malice and with a conscious disregard for Relator Linnette Sun's right to be free from discrimination, and with the intent, design and purpose of injuring her. This conduct was carried out by managerial employees of Baxter. Baxter authorized, condoned, and/or ratified the unlawful conduct by failing to take immediate and appropriate corrective action. By reason thereof, Relator Linnette Sun is entitled to punitive damages from Baxter in an amount appropriate to punish and make an example of Baxter.

59

## PRAYER FOR RELIEF

### FIRST, SECOND, AND THIRD CAUSES OF ACTION

1. Judgement be ordered against the Defendant in an amount equal to three times the damages sustained by the United States as a result of Defendants' conduct;

2. A civil penalty be assessed of not less than five thousand, five hundred dollars ($5,500.00) and not more than eleven thousand dollars ($11,000.00) for each violation of 31 U.S.C. § 3729;

//

3. That Relators, as Qui Tam Plaintiffs, be awarded the maximum amount allowed pursuant to 31 U.S.C. §3730(d) and/or any other applicable provision of law;

4. Attorneys' fees and costs according to proof;

### FOURTH CAUSE OF ACTION

11. General damages;

12. Two times the amount of back pay;

13. Interest upon said back pay;

14. Special damages;

15. Reinstatement with full seniority;

16. Litigation expenses and reasonable attorneys' fees;

### FIFTH CAUSE OF ACTION

17. General damages;

18. Two times the amount of back pay;

19. Interest upon said back pay;

60

20.   Special damages;

21.   Exemplary damages;

22.   Reinstatement with full seniority;

23.   Litigation expenses and reasonable attorneys' fees;

### SIXTH CAUSE OF ACTION

24.   General damages;

25.   Back pay;

26.   Special damages;

27.   Exemplary damages;

28.   Reinstatement with full seniority;

23.   Litigation expenses;

### SEVENTH CAUSE OF ACTION

To the STATE of MASSACHUSETTS:

24.   Three times the amount of actual damages which the STATE of Massachusetts has sustained as a result of Baxter Laboratories' fraudulent and illegal practices;

25.   A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Baxter Laboratories caused to be presented to the STATE of Massachusetts;

26.   Prejudgment interest; and

27.   All costs incurred in bringing this action.

To RELATOR, Linnette Sun:

28.   The maximum amount allowed pursuant to Mass. Gen. Laws Ann. 12 § 5(A)

61

and/or any applicable provision of law;

229.    Reimbursement for reasonable expenses which Relator incurred in connection with this action; and

30.    An award of reasonable attorneys' fees and costs.

## EIGHTH CAUSE OF ACTION

To the STATE of CALIFORNIA:

31.    Three times the amount of actual damages which the STATE of California has sustained as a result of Baxter Laboratories' fraudulent and illegal practices;

//

32.    A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Baxter Laboratories caused to be presented to the STATE of California;

33.    Prejudgment interest; and

34.    All costs incurred in bringing this action.

To RELATOR, Linnette Sun:

35.    The maximum amount allowed pursuant to Cal. Gov't. Code § 12650 and/or any applicable provision of law;

36.    Reimbursement for reasonable expenses which Relator incurred in connection with this action; and

37.    An award of reasonable attorneys' fees and costs.

## NINTH CAUSE OF ACTION

To the STATE of HAWAII:

38.    Three times the amount of actual damages which the STATE of Hawaii has

sustained as a result of Baxter Laboratories' fraudulent and illegal practices;

39.   A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Baxter Laboratories caused to be presented to the STATE of Hawaii;

40.   Prejudgment interest; and

41.   All costs incurred in bringing this action.

To RELATOR, Linnette Sun:

42.   The maximum amount allowed pursuant to Haw. Rev. Stat. § 661-21 and/or any applicable provision of law;

//

43.   Reimbursement for reasonable expenses which Relator incurred in connection with this action; and

44.   An award of reasonable attorneys' fees and costs.

### TENTH CAUSE OF ACTION

To the STATE of ILLINOIS:

45.   Three times the amount of actual damages which the STATE of Illinois has sustained as a result of Baxter Laboratories' fraudulent and illegal practices;

46.   A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Baxter Laboratories caused to be presented to the STATE of Illinois;

47.   Prejudgment interest; and

48.   All costs incurred in bringing this action.

To RELATOR, Linnette Sun:

49.   The maximum amount allowed pursuant to 740 ILCS 175 and/or any applicable provision of law;

50. Reimbursement for reasonable expenses which Relator incurred in connection with this action; and

51. An award of reasonable attorneys' fees and costs.

### ELEVENTH CAUSE OF ACTION

To the STATE of FLORIDA:

52. Three times the amount of actual damages which the STATE of Florida has sustained as a result of Baxter Laboratories' fraudulent and illegal practices;

53. A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Baxter Laboratories caused to be presented to the STATE of Florida;

54. Prejudgment interest; and

55. All costs incurred in bringing this action.

To RELATOR, Linnette Sun:

56. The maximum amount allowed pursuant to Fla. Stat. § 68.081 and/or any applicable provision of law;

57. Reimbursement for reasonable expenses which Relator incurred in connection with this action; and

58. An award of reasonable attorneys' fees and costs.

### TWELFTH CAUSE OF ACTION

To the STATE of TEXAS:

59. Three times the amount of actual damages which the STATE of Texas has sustained as a result of Baxter Laboratories' fraudulent and illegal practices;

60. A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Baxter Laboratories caused to be presented to the STATE of Texas;

64

61.   Prejudgment interest; and

62.   All costs incurred in bringing this action.

To RELATOR, Linnette Sun:

63.   The maximum amount allowed pursuant to Tex. Stat. §V.T.C.A. Hum. Res. Code
      § 36.001 and/or any applicable provision of law;

64.   Reimbursement for reasonable expenses which Relator incurred in connection
      with this action; and

65.   An award of reasonable attorneys' fees and costs.

//

## THIRTEENTH CAUSE OF ACTION

To the STATE of TENNESSEE:

66.   Three times the amount of actual damages which the STATE of Tennessee has
      sustained as a result of Baxter Laboratories' fraudulent and illegal practices;

67.   A civil penalty of not less than $5,000 and not more than $10,000 for each false
      claim which Baxter Laboratories caused to be presented to the STATE of
      Tennessee;

68.   Prejudgment interest; and

69.   All costs incurred in bringing this action.

To RELATOR, Linnette Sun:

70.   The maximum amount allowed pursuant to Tenn. Code Ann. §§ 71-5-181 and/or
      any applicable provision of law;

71.   Reimbursement for reasonable expenses which Relator incurred in connection
      with this action; and

72.   An award of reasonable attorneys' fees and costs.

## FOURTEENTH CAUSE OF ACTION

To the STATE of DELAWARE:

73.   Three times the amount of actual damages which the STATE of Delaware has
      sustained as a result of Baxter Laboratories' fraudulent and illegal practices;

74.   A civil penalty of not less than $5,000 and not more than $10,000 for each false
      claim which Baxter Laboratories caused to be presented to the STATE of
      Delaware;

75.   Prejudgment interest; and

76.   All costs incurred in bringing this action.

To RELATOR, Linnette Sun:

77.   The maximum amount allowed pursuant to  Title 6, Chapter 12 of the Delaware
      Code and/or any applicable provision of law;

78.   Reimbursement for reasonable expenses which Relator incurred in connection
      with this action; and

79.   An award of reasonable attorneys' fees and costs.

## FIFTEENTH CAUSE OF ACTION

To the STATE of LOUISIANA:

80.   Three times the amount of actual damages which the STATE of Louisiana has
      sustained as a result of Baxter Laboratories' fraudulent and illegal practices;

81.   A civil penalty of not less than $5,000 and not more than $10,000 for each false
      claim which Baxter Laboratories caused to be presented to the STATE of
      Louisiana;

66

82.    Prejudgment interest; and

83.    All costs incurred in bringing this action.

To RELATOR, Linnette Sun:

84.    The maximum amount allowed pursuant to La. Rev. Stat. Ann. § 437.1 and/or any
applicable provision of law;

85.    Reimbursement for reasonable expenses which Relator incurred in connection
with this action; and

86.    An award of reasonable attorneys' fees and costs.

//


## SIXTEENTH CAUSE OF ACTION

To the STATE of NEVADA:

87.    Three times the amount of actual damages which the STATE of Nevada has
sustained as a result of Baxter Laboratories' fraudulent and illegal practices;

88.    A civil penalty of not less than $5,000 and not more than $10,000 for each false
claim which Baxter Laboratories caused to be presented to the STATE of Nevada;

89.    Prejudgment interest; and

90.    All costs incurred in bringing this action.

To RELATOR, Linnette Sun:

91.    The maximum amount allowed pursuant to N.R.S. § 357.010  and/or any
applicable provision of law;

92.    Reimbursement for reasonable expenses which Relator incurred in connection
with this action; and

67

93.    An award of reasonable attorneys' fees and costs.

## SEVENTEENTH CAUSE OF ACTION

To the DISTRICT OF COLUMBIA:

94.    Three times the amount of actual damages which the District of Columbia has
sustained as a result of Baxter Laboratories' fraudulent and illegal practices;

95.    A civil penalty of not less than $5,000 and not more than $10,000 for each false
claim which Baxter Laboratories caused to be presented to the District of
Columbia;

96.    Prejudgment interest; and

97.    All costs incurred in bringing this action.

To RELATOR, Linnette Sun:

98.    The maximum amount allowed pursuant to D.C. Code § 2-308.13 and/or any
applicable provision of law;

99.    Reimbursement for reasonable expenses which Relator incurred in connection
with this action; and

100.    An award of reasonable attorneys' fees and costs.

## EIGHTEENTH CAUSE OF ACTION

To the STATE of NEW MEXICO:

101.    Three times the amount of actual damages which the District of Columbia has
sustained as a result of Baxter Laboratories' fraudulent and illegal practices;

102.    A civil penalty of not less than $5,000 and not more than $10,000 for each false
claim which Baxter Laboratories caused to be presented to the District of
Columbia;

68

103.   Prejudgment interest; and

104.   All costs incurred in bringing this action.

To RELATOR, Linnette Sun:

105.   The maximum amount allowed pursuant to D.C. Code § 2-308.13 and/or any
       applicable provision of law;

106.   Reimbursement for reasonable expenses which Relator incurred in connection
       with this action; and

107.   An award of reasonable attorneys' fees and costs.

//

//

## NINETEENTH CAUSE OF ACTION

To the STATE of VIRGINIA:

108.   Three times the amount of actual damages which the District of Columbia has
       sustained as a result of Baxter Laboratories' fraudulent and illegal practices;

109.   A civil penalty of not less than $5,000 and not more than $10,000 for each false
       claim which Baxter Laboratories caused to be presented to the District of
       Columbia;

110.   Prejudgment interest; and

111.   All costs incurred in bringing this action.

To RELATOR, Linnette Sun:

112.   The maximum amount allowed pursuant to D.C. Code § 2-308.13 and/or any
       applicable provision of law;

113.   Reimbursement for reasonable expenses which Relator incurred in connection

69

with this action; and

114.    An award of reasonable attorneys' fees and costs.

## TWENTIETH CAUSE OF ACTION

To the STATE of UTAH:

115.    Three times the amount of actual damages which the District of Columbia has
sustained as a result of Baxter Laboratories' fraudulent and illegal practices;

116.    A civil penalty of not less than $5,000 and not more than $10,000 for each false
claim which Baxter Laboratories caused to be presented to the District of
Columbia;

117.    Prejudgment interest; and

118.    All costs incurred in bringing this action.

To RELATOR, Linnette Sun:

119.    The maximum amount allowed pursuant to D.C. Code § 2-308.13 and/or any
applicable provision of law;

120.    Reimbursement for reasonable expenses which Relator incurred in connection
with this action; and

121.    An award of reasonable attorneys' fees and costs.

## TWENTY-FIRST CAUSE OF ACTION

To the STATE of ARKANSAS:

122.    Three times the amount of actual damages which the District of Columbia has
sustained as a result of Baxter Laboratories' fraudulent and illegal practices;

123.    A civil penalty of not less than $5,000 and not more than $10,000 for each false
claim which Baxter Laboratories caused to be presented to the District of

Columbia;

124.   Prejudgment interest; and

125.   All costs incurred in bringing this action.

To RELATOR, Linnette Sun:

126.   The maximum amount allowed pursuant to D.C. Code § 2-308.13 and/or any
applicable provision of law;

127.   Reimbursement for reasonable expenses which Relator incurred in connection
with this action; and

128.   An award of reasonable attorneys' fees and costs.

//

## TWENTY-SECOND CAUSE OF ACTION

129.   General and compensatory damages, including damages for lost wages, earnings
and benefits, and emotional distress, according to proof;

130.   Reasonable attorney fees according to law, including California Government Code
Section 12965;

131.   Costs of suit and attorney fees as provided by law;

132.   Punitive damages according to proof; and

133.   Prejudgment interest.

## TWENTY-THIRD CAUSE OF ACTION

134.   General and compensatory damages, including damages for lost wages, earnings

71

and benefits, and emotional distress, according to proof;

135.   Reasonable attorney fees according to law, including California Government Code Section 12965;

136.   Costs of suit and attorney fees as provided by law;

137.   Punitive damages according to proof; and

138.   Prejudgment interest.


## FOR ALL CAUSES OF ACTION

139.   Such other and further relief as the Court deems proper.

DATED: June 6, 2005                LAW OFFICES OF MARK ALLEN KLEIMAN


By: _____

MARK ALLEN KLEIMAN
California State Bar No. 115919
12400 Wilshire Blvd., Ste. 400
Los Angeles, CA 90025
310-442-4820
310-442-4830 (fax)


DATED: June 6, 2005                LAUREN JOHN UDDEN


By: _____

LAUREN JOHN UDDEN
California State Bar No. 83118
15 W. Carrillo Street, Suite 101B
Santa Barbara, California 93101
805-879-7544

72

805-962-0722 (fax)

ATTORNEYS FOR RELATOR

## DEMAND FOR JURY TRIAL

Relator hereby demands a jury trial.

DATED: June 6, 2005              LAW OFFICES OF MARK ALLEN KLEIMAN

By: ___/S/_____
              MARK ALLEN KLEIMAN
              California State Bar No. 115919
              12400 Wilshire Blvd., 4th Floor
              Los Angeles, CA 90025
              310-442-4820
              310-442-4830 (fax)

DATED: June 6, 2005              LAUREN JOHN UDDEN

By: ___/S/_____
              LAUREN JOHN UDDEN
              California State Bar No. 83118
              15 W. Carrillo Street, Suite 101B
              Santa Barbara, California 93101
              805-879-7544
              805-962-0722 (fax)

              ATTORNEYS FOR RELATOR