# EXHIBIT B

**Page 1**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

IN RE:  PHARMACEUTICAL          )
INDUSTRY AVERAGE WHOLESALE      )
PRICE LITIGATION                ) MDL No. 1456
_____ )
                                ) Master File No.
THIS DOCUMENT RELATES TO:       ) 1:01-CV-12257-PBS
                                )
United States ex rel.           ) Sub-Category Case
Linnette Sun and Greg           ) No. 1:08-CV-11200
Hamilton, Relators              )
                                )
    v.                          )
                                )
Baxter Hemoglobin               )
Therapeutics and Baxter         )
International Inc.              )

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

    Deposition of GREG HAMILTON, taken before
MARGARET A. BACHNER, CSR, RMR, CRR, and Notary Public,
pursuant to the Federal Rules of Civil Procedure for
the United States District Courts pertaining to the
taking of depositions for the purpose of discovery, at
Suite 600, 300 North LaSalle Street, Chicago,
Illinois, on the 21st day of January, A.D. 2010, at
10:32 a.m.

**Page 2**

    There were present at the taking of this
deposition the following counsel:

    on behalf of the Relators;

    BY:  MARK ALLEN KLEIMAN, ESQUIRE
    2907 Stanford Avenue
    Venice, California  90292
    310-306-8094

    on behalf of Baxter Hemoglobin Therapeutics
and Baxter International Inc.;
    DICKSTEIN SHAPIRO LLP
    BY:  J. ANDREW JACKSON, ESQUIRE
         RUCHI JAIN, ESQUIRE
    1825 Eye Street, N.W.
    Washington, DC  20006-5403
    202-420-2200

    on behalf of Bayer Corporation.
    SIDLEY AUSTIN LLP
    BY:  ENJAMIN KEITH, ESQUIRE
    One South Dearborn Street
    Chicago, Illinois  60603
    312-853-7814

ALSO PRESENT:
    MR. MICHAEL BOLTON,
    In-House Counsel, Baxter International Inc.

**Page 3**

                  I N D E X
WITNESS                          EXAMINATION
GREG HAMILTON
    By Mr. Jackson                    5

               E X H I B I T S
DEPOSITION EXHIBIT           FOR IDENTIFICATION
Number 1 - Notice of Deposition of Relator      5
    Greg Hamilton

Number 2 - Pages from drugfraudsettlement.com   16
    re: Attorneys

Number 3 - Page from drugfraudsettlement.com    16
    re: Drug Expert Greg Hamilton, Sr.

Number 4 - Greg Hamilton curriculum vitae       29

Number 5 - Document entitled Baxter Products    30
    W/AWP History, GH000001-000009

Number 6 - Declaration of Greg Hamilton         35
Number 7 - Amended Complaint for Damages        37
Number 8 - Document entitled Hemophilia         46
    Resources of America, Inc.,
    GH000010-000022

Number 9 - Document entitled Express Scripts,   47
    Inc. First DataBank File Inquiry,
    GH000023-000046

Number 10 - Document entitled Baxter            49
    BioScience, Customer: Curascript,
    GH000047

Number 11 - RBC Capital Markets Document        54
    entitled "A Changing  Paradigm In
    Hemophilia," GH000048-000071

**Page 4**

               E X H I B I T S
DEPOSITION EXHIBIT           FOR IDENTIFICATION
Number 12 - U.S. News article entitled          56
    "Court: HMOs Can Be Made to
    Open Networks," GH000072-000074
Number 13 - Deposition of Patricia Kay          57
    Morgan, GH000126-000290

Number 14 - State of Texas Notice of Intention  58
    to Take Oral Depositions,
    GH000089-000125

Number 15 - Deposition Summary of Patricia Kay  59
    Morgan, GH000291-000320
Number 16 - Document entitled Global Market     61
    Research Hemophilia, GH000321-
    001495
Number 17 - Document entitled The Plasma        69
    Fractions Market in the United
    States, GH001527-001744
Number 18 - Summary of First DataBank           72
    Information on Selected Drugs,
    GH001526
Number 19 - Appointment Book excerpts,          77
    GH001497-001523

Number 20 - 4/22/05 letter from Kleiman to      86
    Gonzales and Theis, GH001525
Number 21 - Memorandum in Opposition to         98
    Baxter's Motion to Dismiss

Case 1:01-cv-12257-PBS   Document 6866-7   Filed 01/27/10   Page 3 of 104
HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

2 (Pages 5 to 8)

5

1          (The witness was duly sworn.)
2               GREG HAMILTON,
3  called as a witness herein, having been first duly
4  sworn, was examined and testified as follows:
5                EXAMINATION
6  BY MR. JACKSON:
7      Q.   Mr. Hamilton, my name is Andy Jackson.  To
8  my left is Ruchi Jain.  We represent Baxter in this
9  case.
10          (Deposition Exhibit Number 1 was
11          marked for identification.)
12          (Document tendered to the
13          witness.)
14  BY MR. JACKSON:
15      Q.   Let me show you what's been marked as
16  Deposition Exhibit 1.  Deposition Exhibit 1 is a
17  Notice of Deposition regarding you and this matter.
18          Have you seen that document before?
19      A.   I believe so.
20      Q.   You're appearing today pursuant to that
21  Deposition Notice?
22      A.   Yes.
23      Q.   Mr. Hamilton, I'm going to be asking a
24  series of questions today.  I need you to answer
25  aloud, no shaking head up or down or left to right so

6

1  we can make sure we get a full record.  Is that okay
2  with you?
3      A.   Yes.
4      Q.   And I presume you're not on any medication
5  or under any other kinds of drugs that would impair
6  your ability to understand my questions or your
7  ability to testify today.
8      MR. KLEIMAN:  There's no question pending.
9  BY MR. JACKSON:
10      Q.   You can answer the question.
11      A.   I understand.  I was waiting -- if you'd
12  like me to affirm your statement, yes, you're correct.
13      Q.   That's fine.  And you understand that there
14  may be times today when your counsel objects to my
15  question.  Unless you're instructed by your counsel to
16  answer, you go ahead and answer the question.
17          Do you understand that?
18      A.   Yes, I do.
19      Q.   Mr. Hamilton, did you review any documents
20  in preparation for your deposition?
21      A.   Yes, I did.
22      Q.   What documents did you review?
23      A.   I reviewed a rough version of Linnette
24  Sun's recent deposition.  I reviewed my Declaration.
25  And I quickly scanned our counsel's response to -- I

7

1  think it was like a response to a motion of yours.
2      Q.   So, the Relators' Opposition to our Motion
3  to Dismiss, you think that's what it was?
4      A.   I think that's what it was.
5      Q.   Okay.  Any other documents you reviewed in
6  preparation for your deposition?
7      A.   Not that I recall.
8      Q.   Did you speak with Miss Sun?
9      A.   No, I did not.
10      Q.   Sir, have you been deposed before?
11      A.   Yes, I have.
12      Q.   How many times?
13      A.   I believe three.
14      Q.   Can you briefly describe each of those
15  depositions, what case it was and what the subject
16  matter of the deposition was?
17      A.   Okay.  One was a civil fraud case involving
18  Vioxx.
19          The second was the Kentucky AWP case.
20          And the third was -- I believe it's a civil
21  case on product liability involving a hepatitis C
22  outbreak in Las Vegas.
23      Q.   When was the deposition regarding the Vioxx
24  matter?
25      A.   About a year and a half ago.

8

1      Q.   What was your role in that case?
2      A.   I was an expert witness.
3      Q.   For whom?
4      A.   For the plaintiff.
5      Q.   Who was the plaintiff?
6      A.   Henry Chapin -- or Channon.  Sorry.
7      Q.   And did your testimony in that case concern
8  AWP in any way; that is, average wholesale price?
9      A.   No, it did not.
10      Q.   How about average manufacturer price?
11      A.   No, it did not.
12      Q.   Best price?
13      A.   No, it did not.
14      Q.   And what was the gravamen?  What was the
15  principal matter at issue in the Vioxx case?
16      A.   I'm not sure -- are you talking about the
17  principal matter for the plaintiffs, his lawyers or my
18  role as the expert witness?
19      Q.   The plaintiff in the first instance.
20      A.   The plaintiff had damages as a result of
21  being infected with hepatitis C from -- at least they
22  were alleging that at this particular center.
23      Q.   And what was your role as the expert in
24  that case?
25      A.   My role was to describe and discuss the

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

3 (Pages 9 to 12)

9

1    **methods and operations of pharmaceutical marketing.**
2        Q.    And in the Kentucky AWP matter, I believe
3    you testified that your role there was as an expert?
4        **A.    Yes.**
5        Q.    What topic areas were you identified as a
6    potential expert for?
7        **A.    I'd have to go back and get -- if you want**
8    **exact details, but in general --**
9        Q.    In general.
10       **A.    In general it was pharmaceutical marketing,**
11   **pricing and specifically AWP.**
12       Q.    And when we use the phrase or the word
13   "AWP" or the letters "AWP," we'll understand it to
14   mean average wholesale price?
15       **A.    That is correct.**
16       Q.    And who were your retained in that
17   matter?
18       **A.    Chuck Barnhill.**
19       Q.    You were an expert for the plaintiffs in
20   that case?
21       **A.    That's correct.**
22       Q.    And was that a qui tam case, a False Claims
23   Act case?
24       **A.    No, I don't believe it was.  It was the**
25   **State of Kentucky versus several defendants.**

10

1        Q.    And then the civil case, the product
2    liability matter regarding hepatitis C, what was your
3    role in that case?
4        **A.    My role was as a -- an expert in**
5    **pharmaceutical marketing.**
6        Q.    Did that case have anything to do with AWP,
7    AMP or BP?
8        **A.    No, it did not.**
9        Q.    Have you ever testified at trial before?
10       **A.    No, I have not.**
11       Q.    Have you ever been accepted by a Court as
12   an expert witness?
13       **A.    I'm not sure.**
14       Q.    Have you ever testified during a trial?
15       **A.    No, I have not.**
16       Q.    Mr. Hamilton, were you aware that today's
17   deposition is limited to matters related to
18   jurisdictional issues, and that if the Motion to
19   Dismiss is denied in this case, there will be a
20   subsequent time when we will depose you regarding
21   substantive matters?  Were you aware of that?
22       **A.    I am aware to the extent that I understand**
23   **the legal jargon.**
24       Q.    Okay.  That's fine.  Have you ever been --
25   I'm sorry.

11

1        So, those are the only three cases you've
2    testified in; Vioxx, Kentucky AWP and the hepatitis C
3    case?
4        **A.    When you say "testified," if you're**
5    **referring to in court, I've already answered that I**
6    **have not testified in court.**
7        Q.    In deposition.
8        **A.    In deposition, yes.**
9        Q.    All right.  Are there any other court
10   matters that you have been retained as a testimonial
11   or consulting expert?
12       MR. KLEIMAN:  Objection.  Compound.
13   BY MR. JACKSON:
14       Q.    You can answer the question.
15       **A.    Okay.  But let me break it down.  You want**
16   **to know if there are any other cases ever in my entire**
17   **career that I've been retained in the capacity either**
18   **as an expert witness or as a consultant?**
19       Q.    Yes.
20       MR. KLEIMAN:  To the extent to which Mr. Hamilton
21   has been retained as an expert on cases that are under
22   seal, I'm going to instruct him not to answer.  As to
23   all other matters he can.
24   BY THE WITNESS:
25       **A.    In light of counsel's objection, much of my**

12

1    **work is in qui tam work.  And some of my cases I know**
2    **for certain are under federal seal.  These things come**
3    **in and out from under seal, so I just don't know if**
4    **some of them are still under seal or not under seal.**
5    **So, I think I'd have to err on the side of caution and**
6    **just say I can't give you that list.**
7    BY MR. JACKSON:
8        Q.    In how many cases total have you been
9    retained?
10       **A.    I don't have an exact number, but if you'd**
11   **like -- would you like a range, an estimate?**
12       Q.    That would be fine.
13       **A.    How about somewhere between 10 and 25?**
14       Q.    And you can't tell me which of those 10 to
15   25 cases are presently under seal or not?
16       **A.    Not at this moment.**
17       Q.    How many of those 10 to 25 cases relate to
18   the pharmaceutical industry?
19       **A.    All of them.**
20       Q.    How many of those cases are False Claims
21   Act cases, whether federal False Claims Act or state
22   False Claims Act?
23       **A.    Off the top of my head, and this is an**
24   **estimate, to the best of my recollection all but the**
25   **three that we discussed that I've given depositions**

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

4 (Pages 13 to 16)

---

13

1  for.
2       (Mr. Michael Bolton entered
3       the deposition proceedings.)
4  BY MR. JACKSON:
5       Q.  So, all are False Claims Act cases of
6  similar ilk?
7       A.  Except for the --
8       Q.  The first three you mentioned; the Vioxx,
9  the AWP and the civil matter?
10      A.  Correct.
11      MR. KLEIMAN:  Excuse me, Mr. Jackson.  Can you
12  identify who it is that has entered the room and is
13  sitting at the table?
14      MR. JACKSON:  Sure.  All the way at the end of
15  the table is Michael Bolton, who is a lawyer for
16  Baxter.
17      MR. KLEIMAN:  Thank you.
18  BY MR. JACKSON:
19      Q.  In how many of those cases have you been
20  retained by the plaintiffs or relators?
21      A.  All of them.
22      Q.  How many of those cases relate or refer to
23  pharmaceutical pricing?
24      A.  I don't have that off the top of my head.
25  I don't know.

---

14

1       Q.  More than half?
2       A.  Well, pricing's a broad subject.  So, in
3  the sense that -- you know, in any sense that I can
4  assign the word "pricing," I would say, yes, more than
5  half.
6       Q.  How many of those cases relate or involve
7  average wholesale price?
8       MR. KLEIMAN:  Objection.  Ambiguous.  Are we now
9  talking about as the denominator the more than half
10  that involve pricing, or is the denominator still the
11  universe of false claims cases?
12  BY MR. JACKSON:
13      Q.  You can answer the question.
14      A.  Well, first of all, I don't have that
15  statistic with me.  I haven't broken the cases down.
16      But again, of all the cases I have and have
17  ever worked on, if you're asking what percentage
18  are -- have some, if any, touched on AWP, I would
19  probably say at least half of them.
20      Q.  Have you ever been retained by your
21  counsel, Mr. Kleiman, before?
22      A.  Yes, I have.
23      Q.  In what case was that or cases?
24      A.  It was in -- help me out.  Mark, is that --
25       (Discussion off the record.)

---

15

1  BY THE WITNESS:
2       A.  It was in the case of Steinke versus Merck.
3  BY MR. JACKSON:
4       Q.  How much were you paid as a consultant or
5  expert in the Steinke case by Mr. Kleiman?
6       A.  Well, first of all, I don't know if it was
7  just -- it wasn't just by Mr. Kleiman.  I was retained
8  by Mr. Kleiman and Steve Cohen and BethAnne Yeager as
9  a group.  Actually, I think -- I don't remember which
10  group issued the checks.  But if you'd like a total of
11  how much I made from the entire case?
12      Q.  Yes, sir.
13      A.  About 115, 120 thousand dollars.
14      Q.  And what period of time did your retention
15  and work cover in that case?
16      A.  Again I can just give you an estimate.  I
17  think it was between 2005 and 2008.
18      Q.  You mentioned Mr. Cohen, Mr. Kleiman and
19  Ms. Yeager in your answer to that.  Are they members
20  of the same law firm?
21      A.  I don't think so.
22      Q.  Were you aware of the fact that those three
23  lawyers advertise under a website entitled
24  drugfraudsettlement.com?
25      A.  No, I've never seen that website.

---

16

1       (Deposition Exhibit Number 2 was
2       marked for identification.)
3       (Document tendered to the
4       witness.)
5  BY MR. JACKSON:
6       Q.  I'll show you what's been marked as Exhibit
7  Number 2.  We'll have to have copies made, but Mark,
8  this comes from the website.
9       Oh, do you have copies?
10      Have you ever seen that before?
11      A.  No, I haven't, not -- I mean, I don't
12  believe I've seen this.  There was a website --
13      MR. KLEIMAN:  You've answered the question.
14  BY MR. JACKSON:
15      Q.  You were about to make a comment about a
16  website.  What was the website you were about to refer
17  to?
18      A.  When the Merck case was settled, this group
19  of attorneys put together a website to explain the
20  case.  And I saw that particular site.
21       (Deposition Exhibit Number 3 was
22       marked for identification.)
23       (Document tendered to the
24       witness.)
25

---

17

BY MR. JACKSON:
Q. Let me show you what's been marked as Deposition Exhibit 3. Deposition Exhibit 3 is a page from that same website from which Deposition Exhibit 2 came. You are identified as the lawyers' drug expert. Have you ever seen that document before?
A. Yes, I have.
Q. Has Mr. Kleiman or any of the other two lawyers identified in Deposition Exhibit 2 retained you in connection with any other AWP cases?
A. Would you define "AWP cases"?
Q. I'll ask the question has Mr. Kleiman or any of the other two lawyers identified in Exhibit 2 retained you as an expert in connection with any other cases in which a pharmaceutical company is a defendant?
A. I don't know.
Q. You don't know whether you've been retained by those lawyers in any other matter?
A. I don't know if a pharmaceutical company is at this time a defendant in a case. In other words, a case may or may not have been filed, and I may not know whether that case has been filed or not.
As to whether or not I've been retained, my answer is no.

18

Q. Did any of those lawyers identified in Exhibit 2 -- they have not retained you in connection with any of the 10 to 25 other cases against the pharmaceutical industry that you identified earlier?
A. That's correct.
Q. Who were you retained by in the Strong versus Merck case?
A. Craig Steffans.
Q. What's that case about?
A. That case concerns the wrongful death of Mr. Steffans' client. Are you asking me what his claim is?
Q. Yes.
A. I believe his claim is called, and again I'm not a lawyer, but I think he called it civil fraud. And it has to do with the promotion of the drug, how the drug is promoted.
Q. Which drug?
A. Vioxx.
Q. Is that the same case that you mentioned earlier, the Vioxx case, when I asked you about the cases in which you've been deposed?
A. Yes.
Q. Same case. Did that Vioxx case concern Baxter in any way?

19

A. No.
Q. Do any of the other 10 to 25 cases that you've identified that you have been retained as a consultant or an expert concern Baxter?
MR. KLEIMAN: To the extent to which any of the cases are under seal I'm going to instruct Mr. Hamilton not to answer.
BY THE WITNESS:
A. There is one case that is not under seal. And it is one in which I've been deposed. And that is the hepatitis C case in Las Vegas.
BY MR. JACKSON:
Q. And that is the third of the cases that you mentioned earlier that you'd been deposed on?
A. Yes, it is.
Q. And what is the basis for which you're not testifying regarding these cases under seal?
A. Pardon me?
Q. Why are you not testifying or why are you not answering my questions regarding the cases that are under seal?
MR. KLEIMAN: Because I've instructed him not to.
BY THE WITNESS:
A. That's a good reason.
MR. JACKSON: I want to designate this case as

20

subject to the protective order issued under MDL Number 1456, and I will designate this as highly confidential.
BY MR. JACKSON:
Q. In light of the fact that a protective order has been entered in all these cases and this deposition is subject to that protective order, will you now answer my questions regarding those 10 to 25 cases under seal?
MR. KLEIMAN: No.
BY THE WITNESS:
A. No.
BY MR. JACKSON:
Q. Are you presently a plaintiff in any other case other than the case we're discussing today?
A. No.
Q. Have you ever before been a plaintiff in a lawsuit?
A. Yes.
Q. What was the subject matter of that lawsuit?
A. I think I had a small claims case, like, 20 years ago. I have a vague recollection of that.
Q. But other than the present case that you're being deposed about today, you have not been and are

21

1    not now a plaintiff in any other litigation?
2        A.   I'm really trying to think hard here.  I
3    had a -- I had a case where I was a plaintiff for a
4    period of time in a personal injury case.  Again, I
5    think that was another -- it might have been a small
6    claims case, too.  That's it.
7        Q.   You mentioned the Kentucky AWP case.  Did
8    any of your testimony in the Kentucky AWP case have
9    anything to do with Baxter?
10       A.   Not that I recall.
11       Q.   Were you provided any documents in
12    connection with that case that concerned or related to
13    Baxter?
14       A.   No.
15       Q.   And in the Strong versus Merck case, were
16    you provided any documents or information in
17    connection with that case that related to Baxter?
18       A.   No.
19       Q.   And in connection with the 10 to 25 other
20    pharmaceutical cases that remain under seal, have you
21    been provided any information with regard to any of
22    those cases that relate to Baxter?
23       A.   Not that I recall.
24       Q.   Mr. Hamilton, when did you first meet
25    Linnette Sun?

22

1        A.   I can only estimate that.  Probably
2    sometime around 2005, sometime around the time we
3    filed the Complaint.
4        Q.   How many times have you met with her in
5    person?
6        A.   I don't have an exact answer, but I would
7    say it's somewhere between one and three.
8        Q.   Has Ms. Sun ever provided you any documents
9    or information relating to Baxter?
10       A.   Nothing that I specifically recall.  She
11    has provided documents to our attorneys.  And I may
12    have had -- I may have had access to them, but I don't
13    recall ever looking at them.
14       Q.   Based upon that answer, do you remember
15    reviewing any documents in connection -- that you
16    might have received from Ms. Sun?
17       A.   No.
18       Q.   So, to your knowledge you have not reviewed
19    internal documents, internal Baxter documents that
20    were provided to you by Ms. Sun?
21       A.   Correct.
22       Q.   How did you come to meet Ms. Sun?
23       A.   I'm going to have to say that's a lawyer
24    thing.  It has everything to do with my attorneys.
25    And so, I think that's all under their privilege.

23

1        Q.   Your attorney didn't object, so you can
2    answer my question.
3            MR. KLEIMAN:  I want you to exclude from this any
4    discussions you have had with me or with Lauren Udden.
5    BY THE WITNESS:
6        A.   That excludes everything.
7    BY MR. JACKSON:
8        Q.   So, by your response do you mean that the
9    one to three times you met with Ms. Sun the lawyers
10    were always present?
11       A.   Yes, that is true.
12       Q.   And by that do you also mean that the
13    method or way by which you first met Miss Sun somehow
14    involved your lawyers?
15           MR. KLEIMAN:  You can answer that question to the
16    extent it does not involve a communication with me or
17    Mr. Udden.
18    BY THE WITNESS:
19       A.   But everything involves communication with
20    you and Mr. Udden.  So, therefore, I can't answer it.
21    BY MR. JACKSON:
22       Q.   Let me ask it a different way.
23           The first time you met Ms. Sun did you
24    contact her?
25       A.   No.

24

1        Q.   Did she contact you?
2        A.   No.
3        Q.   How about the other two times that you and
4    Ms. Sun have met personally; did you initiate the
5    communications?
6        A.   No, I did not.
7        Q.   Did Ms. Sun initiate the communications?
8        A.   No, she did not.
9        Q.   How many times have you and Ms. Sun spoken
10    on the telephone?
11       A.   Absent of attorneys?
12       Q.   Yes.
13       A.   Zero.
14       Q.   And just to make sure I understand your
15    answer, you had not met Ms. Sun until sometime in
16    2005, is that correct?
17       A.   Again I would be guessing.  It could have
18    been 2006 when I -- you say, "met."  I assume you mean
19    physically?
20       Q.   Yes, physically met.
21       A.   That could have been 2006.  I don't
22    remember.
23       Q.   Your first communication with Ms. Sun, was
24    that in person or by telephone?
25       A.   Again, any and all communication that I've

Case 1:01-cv-12257-PBS   Document 6866-7   Filed 01/27/10   Page 8 of 104
HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

7 (Pages 25 to 28)

25

1  had with Ms. Sun was with and through the attorneys.
2      MR. KLEIMAN: He's not asking you for content.
3  He's just asking whether it was in person or by phone.
4  That you can answer.
5  BY THE WITNESS:
6      A.  Oh, by phone.
7  BY MR. JACKSON:
8      Q.  And that first contact was around 2005?
9      A.  Approximately.
10     Q.  Okay. I'll represent to you, sir, that the
11 Amended Complaint in this matter was filed on or about
12 June 14, 2005. Using that date as a reference date,
13 does that help you date approximately when you and Ms.
14 Sun first had a communication?
15     A.  Not really.
16     Q.  Do you and Ms. Sun have any agreement to
17 share damages, fees or proceeds from this case?
18     A.  Yes, we do.
19     Q.  What are the terms of that agreement?
20     A.  By "terms" could you be more specific?
21     Q.  Tell me about the agreement between you and
22 Ms. Sun regarding the splitting of fees, et cetera.
23     A.  I can only give you the -- what I remember.
24     Q.  Okay.
25     A.  Because, you know, it's legal stuff. So, I

26

1  don't remember all the conditions and terms.
2      Q.  That's fine.
3      A.  The operative one that I remember is that
4  we are to split any relators' fees in a ratio of 80
5  percent for her and 20 percent for me.
6      Q.  And how is that ratio determined?
7      MR. KLEIMAN: You can testify about that to the
8  extent to which you're not revealing communications
9  you had with myself or Mr. Udden.
10 BY THE WITNESS:
11     A.  Again that means I can't answer.
12 BY MR. JACKSON:
13     Q.  Is that agreement in writing?
14     A.  Yes, it is.
15     MR. JACKSON: We'd like to get a copy of that
16 agreement. We can send you a Document Request, if
17 you'd prefer.
18     MR. KLEIMAN: I'd prefer.
19 BY MR. JACKSON:
20     Q.  Do you remember any of the other terms of
21 that agreement between you and Ms. Sun?
22     A.  No, I don't.
23     Q.  Do you have any other agreements in the 10
24 to 25 other matters that are under seal to share fees
25 with the relators?

27

1      A.  No, I don't.
2      Q.  Prior to filing this lawsuit, Mr. Hamilton,
3  in April of 2005 did you meet personally with any
4  representatives from the Justice Department regarding
5  the facts and circumstances of the Complaint?
6      A.  I don't know. I don't know in terms of the
7  dates. At some point in time we did meet with the --
8  some folks from the Justice Department. But I don't
9  recall if it was -- you know, what the dates were I
10 just don't know.
11     Q.  Who did you meet with?
12     A.  The one individual I remember was Justin
13 Draycott.
14     Q.  How many times did you meet with Mr.
15 Draycott in connection with this case?
16     A.  Just once, I believe.
17     Q.  Your Complaint in this matter makes claims
18 based upon the law of various other states. Are you
19 aware of that?
20     A.  Vaguely.
21     Q.  Okay. Prior to filing the Complaint did
22 you meet personally with representatives of any of the
23 states identified in your Complaint?
24     MR. KLEIMAN: Concerning this matter?
25 BY MR. JACKSON:

28

1      Q.  Concerning this matter.
2      A.  You know, I don't recall all of who -- you
3  know, who we met and when.
4      Q.  So, is the answer that yes, you did meet
5  with certain state representatives or that you did not
6  meet?
7      A.  The answer is I don't recall.
8      Q.  Okay. Mr. Hamilton, can you briefly
9  describe for me your work history?
10     A.  Sure. I started in the drug industry about
11 a year out of undergraduate school.
12     Q.  What year was that?
13     A.  Oh, this is painful. In 1973 I went to
14 work for Ross Laboratories, which is a division of
15 Abbott, as a sales rep. I worked for them in the
16 Chicago area for about 11 years.
17     Left there, went to work for Schering
18 Plough, also in Chicago, also as a sales rep. And
19 worked there for about two, two and a half years.
20     Left there. I went to Cutter Biological.
21 Cutter Biological was a wholly-owned subsidiary of
22 Bayer AG or Bayer Company. And I worked for the Bayer
23 Company from about '86 until 1999.
24     Is that the -- is that what you're looking
25 for or do you want --

Case 1:01-cv-12257-PBS Document 6866-7 Filed 01/27/10 Page 9 of 104
HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

8 (Pages 29 to 32)

29

1    Q.   Sure. Keep going. You're up to 1999.
2    A.   In '99 I left Bayer and became a
3  consultant. I worked at that point for basically two
4  companies. One was Bayer Corporation and the other
5  one was Express Scripts. Did that for about a year or
6  so.
7        Then I went to work for Express Scripts,
8  and I worked for them from 2001 until 2006.
9        From 2006 until today I have been an
10  independent consultant.
11           (Deposition Exhibit Number 4 was
12           marked for identification.)
13           (Document tendered to the
14           witness.)
15  BY MR. JACKSON:
16    Q.   Let me show you what's been marked as
17  Deposition Exhibit 4. Mr. Hamilton, have you ever
18  seen Deposition Exhibit 4 before?
19    A.   I believe I have.
20    Q.   I'll represent to you, sir, that that is an
21  exhibit that came from your deposition in the Kentucky
22  matter that you previously described.
23        Does that accurately reflect your work
24  history?
25    A.   Reasonably. Some of the dates I believe

30

1  are wrong. But it's -- it's an accurate
2  representation.
3    Q.   Have you ever worked for Baxter or any of
4  the -- either of the Baxter entities that are
5  identified as defendants in this case?
6    A.   No, I have not.
7    Q.   Have you ever consulted with Baxter or
8  either of the Baxter entities who are defendants in
9  this case?
10    MR. KLEIMAN: Objection. Ambiguous.
11  BY MR. JACKSON:
12    Q.   You can answer the question.
13    A.   I have not been paid as a consultant for
14  Baxter.
15           (Deposition Exhibit Number 5 was
16           marked for identification.)
17           (Document tendered to the
18           witness.)
19  BY MR. JACKSON:
20    Q.   I show you what's been marked as Deposition
21  Exhibit 5. Deposition Exhibit 5 is a document that at
22  the top left corner says "Baxter Products W/AWP
23  History." And under that it's "04.11.05."
24        Have you ever seen this document before?
25    A.   Yes, I have.

31

1    Q.   When did you first see this document?
2    A.   I don't recall.
3    Q.   What is this document?
4    A.   It appears to be a printout. It's a print
5  screen from First DataBank's information on AWPs.
6    Q.   How do you know this document came from
7  First DataBank?
8    A.   Well, I'm not certain that this document
9  came from First DataBank. But I do know that
10  documents like this come from First DataBank.
11    Q.   Okay. You will note at the bottom
12  right-hand corner there is a Bates number GH000001
13  through GH000009.
14        Do you see that?
15    A.   Yes, I do.
16    Q.   So, those documents were produced to us by
17  you. How did you come to have this document and,
18  therefore, produce it to Baxter in this litigation?
19    A.   If this is a document that I sent to my
20  attorneys, which I assume at this point that it is,
21  then it means it is a document that I printed off of
22  information from First DataBank.
23    Q.   How was it you were able to print
24  information off of First DataBank?
25    A.   I am a subscriber to First DataBank.

32

1    Q.   What do you mean by that, "a subscriber to
2  First DataBank"?
3    A.   It means I pay a fee and receive AWP and
4  product information from First DataBank.
5    Q.   When did you first become a subscriber to
6  First DataBank and, therefore, have access to this
7  information?
8    MR. KLEIMAN: Objection. Compound. It assumes
9  he didn't have access before he became a subscriber.
10    Go ahead and answer.
11  BY MR. JACKSON:
12    Q.   You can answer the question.
13    A.   I'll break the question up.
14        In response to when did I become a
15  subscriber, two or three years ago.
16    Q.   And that is you became a subscriber
17  personally versus through some company?
18    A.   Correct.
19    Q.   Now, did you have access to First DataBank
20  information prior to you personally becoming a
21  subscriber?
22    A.   Yes, I did.
23    Q.   How did you have that access?
24    A.   I had it directly and indirectly. I had
25  the access to it through Express Scripts.

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

9 (Pages 33 to 36)

---

33

1    Q.  So, while you were an employee at Express
2  Scripts?
3    A.  That is correct.
4    Q.  In that scenario who is the subscriber?  Is
5  it Express Scripts or is it Greg Hamilton?
6    A.  It would be Express Scripts.
7    Q.  Okay.  Now, prior to your time at Express
8  Scripts did you have access to information within the
9  First DataBank database?
10   A.  No.
11   Q.  So, based upon your earlier testimony what
12 date do you believe approximately you first gained
13 access to First DataBank information?
14   A.  Well, let me back up.  When you say "first
15 gained access," there's many ways to access a data
16 bank's information, firsthand or secondhand or third.
17   I mean, one way is the way I get it now,
18 which is I'm a subscriber.
19   Another way would be, like, when I was with
20 Express Scripts and I had access to their subscription
21 to First DataBank.
22   Prior to that I had -- again it depends how
23 you define this, but I had access to First DataBank's
24 information through other parties.
25   Q.  Like whom?

---

34

1    A.  Well, like customers.
2    Q.  Which customers?
3    A.  I don't recall which ones specifically, but
4  they certainly would have been -- there could have
5  been other manufacturers and GPOs, home care
6  companies.  They would all refer to AWP and
7  oftentimes, you know, pull out printouts of their
8  sheets, too, and say, "This is what Red Book's got.
9  This is what First DataBank has," that kind of stuff.
10   So, it wasn't that I was a subscriber, but
11 I was presented that data by other people.
12   Q.  When you received this First DataBank
13 information via third parties, when do you think that
14 process first began?
15   A.  I would guess somewhere around 1995.  I
16 also should note that we're talking about -- we're
17 talking in generalities about information; we're not
18 talking about specifics.
19   I also had direct contact with First
20 DataBank when I was with Bayer.  I was actually the
21 individual that submitted AWP information to First
22 DataBank.  So, I received requests from them along
23 with Medispan and Red Book as to, you know, what AWP
24 information we wanted published for several years.
25 So, I had direct contact back and forth on some

---

35

1  information about AWP with First DataBank.
2    Q.  Okay.  And I believe in your Declaration
3  that you filed in response to our Motion to Dismiss
4  you also identified communications you had with
5  representatives at First DataBank, including Kay
6  Morgan, correct?
7    A.  Yes.
8    Q.  And was it -- and it was, I believe from
9  your Declaration, that it was your communication with
10 Kay Morgan that formed the basis of the factual
11 allegations in various paragraphs of the Complaint,
12 correct?
13   A.  It formed -- it was the basis of some
14 information.  It wasn't everything.
15        (Deposition Exhibit Number 6 was
16         marked for identification.)
17        (Document tendered to the
18         witness.)
19 BY MR. JACKSON:
20   Q.  Let me show you what's been marked as
21 Deposition Exhibit 7.
22   Mr. Hamilton, I've just handed you
23 Deposition Exhibit 7.  Deposition Exhibit 7 is a
24 document entitled -- I'm sorry.  That should be 6.
25 Let's make sure we have the right number on that now.

---

36

1  That's actually Deposition Exhibit 6.  Thank you.
2    Have you seen this Declaration before?
3    A.  Yes, I have.
4    Q.  Did you draft this Declaration?
5    A.  I don't recall.
6    Q.  Do you remember when you first saw this
7  Declaration?
8    A.  Exactly, no.
9    Q.  Did you provide the facts that are
10 contained in this Declaration?
11   A.  Yes, I did.
12   Q.  Can I refer you to paragraph 8 of your
13 Declaration?  Do you see that?
14   A.  Yes, I do.
15   Q.  It says, "In addition to my direct
16 discussions with Baxter managers, I learned of
17 Baxter's pricing and some of the specific acts alleged
18 in paragraphs 36 through 40 of our Complaint while
19 trying to help Kay Morgan, Manager of Editorial
20 Services for First DataBank."
21   Do you see that?
22   A.  Mm-hmm.  Yes, I do.
23   Q.  So, let's go ahead and give you the
24 Complaint.
25

---

37

1 　　　　(Deposition Exhibit Number 7 was
2 　　　　marked for identification.)
3 　　　　(Document tendered to the
4 　　　　witness.)
5 BY MR. JACKSON:
6 　　Q.　I show you what's been marked as Deposition
7 Exhibit 7.  Do you recognize Deposition Exhibit 7?
8 　　**A.　Yes, I do.**
9 　　Q.　Can I have you turn to paragraph 36 of the
10 Complaint that is Deposition Exhibit 7?  Are you
11 there?
12 　　**A.　Yes, I am.**
13 　　Q.　It's on page 13 of the Complaint.
14 　　**A.　Yes, I am.**
15 　　Q.　All right.  So, what components of the
16 information contained in paragraph 36 of the Complaint
17 did you receive from Kay Morgan?
18 　　**A.　May I mark this document?**
19 　　Q.　Certainly.
20 　　**A.　(Indicating).**
21 　　Q.　Can you read the information in paragraph
22 36 that you gained from your discussion with Ms.
23 Morgan at First DataBank?
24 　　**A.　Yes.  In paragraph 36, the information that**
25 **I gained from Kay Morgan is as follows:  "Baxter has**

38

1 **reported to First DataBank that the WAC for**
2 **Recombinate is $1.30 per unit."**
3 　　Q.　Is that the only information in paragraph
4 36 that you gained from Kay Morgan?
5 　　**A.　Yes, it is.**
6 　　Q.　Okay.  Did you provide any of the other
7 information in paragraph 36?
8 　　**A.　Yes, I did.**
9 　　Q.　Which?
10 　　**A.　I provided all of the remaining information**
11 **in that paragraph.**
12 　　Q.　So, how did you determine the number
13 $1.6250?
14 　　**A.　I determined that because it was the**
15 **published AWP for Recombinate.**
16 　　Q.　Where did you get that information?
17 　　**A.　First DataBank.**
18 　　Q.　And when you say you got it from First
19 DataBank, how did you get it from First DataBank?
20 　　**A.　I don't recall at the time.  I mean, if I**
21 **want to make it easy for you, I could go home and pull**
22 **it up right now because First DataBank provides a**
23 **history of AWPs.**
24 　　Q.　So, I'm just trying to understand, sir, was
25 this figure $1.625, was that information that you

39

1 pulled up from First DataBank in and around the time
2 the Complaint was filed or sometime earlier?
3 　　**A.　I don't recall.**
4 　　Q.　Now, the next figure that I see that is new
5 is "Medicare pays 80 percent of that sum, or $1.235."
6 　　Do you see that?
7 　　**A.　Can you show me again where you're quoting**
8 **from?**
9 　　Q.　Sure, it's the sentence that begins, "Thus,
10 if the AWP for a drug is."
11 　　Do you see that?  It's the end of the
12 fourth line of paragraph 36.
13 　　**A.　Yes.**
14 　　Q.　You reference there the figure $1.548.
15 　　Do you see that?
16 　　**A.　Yes.**
17 　　Q.　Is that a number that you got from First
18 DataBank, or did you simply calculate that number?
19 　　**A.　That number does not come from First**
20 **DataBank.  That is a calculation.**
21 　　Q.　In the next sentence, which reads,
22 "Recombinate has been sold to providers for 89 cents
23 (or even less), making the spread, or the difference
24 between the actual acquisition cost of 89 cents and
25 the Medicare payment of $1.235 equals 0.345."

40

1 　　Do you see that?
2 　　**A.　Yes, I do.**
3 　　Q.　Did you provide the 89-cent sales price
4 there that is reflected in paragraph 36?
5 　　**A.　Yes, I did.**
6 　　Q.　How did you come to have that data?
7 　　**A.　Based on Baxter contracts with Express**
8 **Scripts.**
9 　　Q.　So, that was the price reflected in
10 contracts between Baxter and Express Scripts?
11 　　**A.　It was.  I can tell you that it was also**
12 **reflective of prices available to Express Scripts for**
13 **Baxter product through Cardinal Health.**
14 　　Q.　And how do you know that?
15 　　**A.　How do I know that?  I know that because I**
16 **had the pharmacy people at Express Scripts pull up the**
17 **contract price between Express Scripts and Cardinal**
18 **for Recombinate.  And they provided me with that**
19 **information.**
20 　　Q.　When did you do that?
21 　　**A.　Somewhere around that time period.  I don't**
22 **remember exactly when.**
23 　　Q.　Which time period?  About the time the
24 Complaint was filed?
25 　　**A.　Yes.**

41

1     Q.    Were you working for Express Scripts at the
2   time?
3     A.    Yes, I was.
4     Q.    And you -- would you read back his last
5   answer?
6           (Record read as requested.)
7   BY MR. JACKSON:
8     Q.    So, to make sure I understand your
9   testimony, is it your testimony that while you worked
10  at Express Scripts you asked someone at Express
11  Scripts to contact someone at Cardinal for this
12  information?
13    **A.    That is not correct.  When I -- would you**
14  **like me to try and explain?**
15    Q.    Yes, please.  Would you explain?
16    **A.    Sure.  While I was working at Express**
17  **Scripts I was in charge of a program of delivering**
18  **specialty products, hemophilia products, to patients.**
19  **Consequently, I needed to know and did know the prices**
20  **that we at Express Scripts were paying to purchase**
21  **those drugs.  And we had several routes to go through,**
22  **channels of distribution in which to buy them.**
23        **One of them was the Cardinal distribution**
24  **system, of which Express Scripts was a participant.**
25  **So, I was aware through my normal business of what the**

42

1   **prices were from Cardinal Health for all of the factor**
2   **products.**
3     Q.    All right.  Let me have you turn to
4   paragraph 37 of Deposition Exhibit 7, the Complaint.
5           Is there any information in paragraph 37
6   that you gained through your communication with Kay
7   Morgan identified in your Declaration?
8     **A.    No.**
9     Q.    Where did that information come from?
10    **A.    That information came from the CMS website.**
11    Q.    Okay.  Thank you.  Now let me direct your
12  attention to paragraph 38.
13          I'm sorry.  When did you access the CMS
14  website to gain the information that's contained in
15  paragraph 37?
16    **A.    I don't recall.**
17    Q.    Was it about the time of the date of the
18  Complaint?
19    **A.    Again, I don't recall.  But if you want me**
20  **to estimate, I would say it was somewhere around that**
21  **time.**
22    Q.    2005, for example, or 2004?
23    **A.    Again, I would guess 2004 or 2005.**
24    Q.    Okay.  Paragraph 38, did you provide any of
25  the factual information that's contained in paragraph

43

1   38 of the Complaint?
2     **A.    No.**
3     Q.    Let me refer you to paragraph 39 of the
4   Complaint, which is Deposition Exhibit 7.
5           Paragraph 39 begins with the following:
6   "According to knowledge obtained by relator Greg
7   Hamilton, FDB refused to accept Baxter's 'list sales
8   price,' and instead submitted a letter stating that
9   their list price was $1.31 and that they wanted their
10  AWP to be described as $1.31."
11          Do you see that?
12    **A.    Yes, I do.**
13    Q.    Did you provide that information to --
14    **A.    Yes, I did.**
15    Q.    And was that information provided to you by
16  Kay Morgan?
17    **A.    Yes, it was.**
18    Q.    How is it that you had a conversation with
19  Kay Morgan about Baxter?
20    **A.    Kay called me and asked if I had any idea**
21  **why Baxter would be submitting information that they**
22  **knew was in a format that was unacceptable.**
23    Q.    When did this communication take place?
24    **A.    I don't remember exactly.  I think it**
25  **was -- I'd have to go back and look at the dates.  I**

44

1   **just don't remember.  But it was -- it was, I believe,**
2   **within days of her having received the letter from**
3   **Baxter.**
4     Q.    Do you know why Kay Morgan called you?
5     **A.    I can only speculate.**
6     Q.    What do you think?
7     **A.    I mean, I don't know.**
8     Q.    She didn't tell you why she was calling
9   you?
10          MR. KLEIMAN:  Calls for speculation.
11          Go ahead.
12  BY THE WITNESS:
13    **A.    I'm just saying I can -- I can only guess.**
14  BY MR. JACKSON:
15    Q.    What's your guess?
16    **A.    My guess is that Kay believed I was a**
17  **knowledgeable person particularly about the plasma**
18  **industry and about the factor industry.  Kay and I had**
19  **had several conversations about AWPs, about the**
20  **industry.  I was introduced to her by her superiors.**
21        **There was some issue -- Express Scripts is**
22  **a large customer of First DataBank.  And I was at a**
23  **meeting with the Chief Operating Officer, Chief**
24  **Financial Officer, some folks like that from First**
25  **DataBank at Express Scripts, and I brought up some**

Case 1:01-cv-12257-PBS  Document 6866-7  Filed 01/27/10  Page 13 of 104
HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

12 (Pages 45 to 48)

45

1 issue, I don't know what it was, but I know that three
2 or four of us scurried off into a separate conference
3 room because they were concerned about it, and they
4 picked up the phone and called Kay Morgan.
5         And we got on a conference call, and we
6 discussed whatever that particular issue was, and they
7 asked her to work with me to resolve it.
8         From that time forward every so often we
9 would talk. I'd call her or she'd call me just about,
10 you know, things that were going on in the industry
11 and whatever else.
12        So, I think that when she received a letter
13 as she described from Baxter, that as she described
14 it, it said, "We'd like our AWP to be $1.31 and our
15 list price is $1.31," she was, like, "They know that I
16 can't accept AWPs anymore. They know that. I deal
17 with Baxter all the time."
18    Q.   She said that?
19    A.   Yes. And she said, "I know that they know
20 that, and they know I need a WAC, not this list price
21 thing. I need a WAC. So, why are they doing this?"
22        And she was calling me up, trying to get --
23 you know, trying to get an opinion as to why she was
24 receiving this type of communication from Baxter.
25    Q.   So, is all of the factual information

46

1 specified in or included in paragraph 39 information
2 that you gained from Kay Morgan?
3    A.   Yes.
4        (Deposition Exhibit Number 8 was
5        marked for identification.)
6        (Document tendered to the
7        witness.)
8 BY MR. JACKSON:
9    Q.   I show you what's been marked as Deposition
10 Exhibit 8. Deposition Exhibit 8 is a document
11 produced to Baxter by you.
12        Have you ever seen this document before?
13    A.   Yes.
14    Q.   What is this document?
15    A.   It's financial information about and
16 provided by a company called Hemophilia Resources of
17 America.
18    Q.   How did you come to acquire this document?
19    A.   While I was working at Express Scripts I
20 worked on a project that involved Hemophilia Resources
21 of America.
22    Q.   Who is or what is Hemophilia Resources of
23 America, Inc.?
24    A.   Hemophilia Resources of America, Inc. is
25 a -- no longer exists as such. It's been purchased by

47

1 Accredo. But it is a specialty pharmacy, otherwise
2 known as a home care company, in New Jersey.
3    Q.   Can I have you turn to the page that is
4 marked GH000014 of that exhibit? Do you see those
5 handwritten notes in the right-hand margin?
6    A.   Yes, I do.
7    Q.   Do you recognize that handwriting?
8    A.   No, I do not.
9    Q.   Is it your handwriting?
10    A.   It is not.
11    Q.   The format of pages GH14 and 15, the next
12 two pages, are different than the format before or
13 after. Do you know why?
14    A.   No.
15    Q.   Did you make use of this document in
16 creating or preparing the allegations of the Complaint
17 in this case?
18    A.   No.
19        (Deposition Exhibit Number 9 was
20        marked for identification.)
21        (Document tendered to the
22        witness.)
23 BY MR. JACKSON:
24    Q.   Let me show you what has been marked as
25 Deposition Exhibit 9. Deposition Exhibit 9 is a

48

1 document produced to Baxter by you.
2        Have you ever seen this document before?
3    A.   I'm gonna qualify this by saying -- my
4 answer is kind of yes. I guess I'm getting on the
5 legal side of this. You know, is this the exact
6 document?
7    Q.   This is the document that you produced to
8 us, okay?
9    A.   Right. Okay. Sure.
10    Q.   Okay. Now, where did you get this
11 document?
12    A.   This would be while I was at Express
13 Scripts. And it was printed off a screen from the --
14 at Express Scripts.
15    Q.   But this was in your possession and
16 control, and that's why you produced this?
17    A.   Yes.
18    Q.   Now, I presume since it says "Express
19 Scripts" at the top, Express Scripts was probably the
20 subscriber at the time. Is that your belief?
21    A.   It is my belief, yes.
22    Q.   When did you leave Express Scripts?
23    A.   Summer of 2006.
24    Q.   Now, was this document, Deposition Exhibit
25 9, used in preparing the Complaint in this matter?

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

13 (Pages 49 to 52)

49

1    MR. KLEIMAN:  Calls for speculation.
2         You can answer so far as you know.
3    BY THE WITNESS:
4         A.  My answer is I don't know.  I mean, I don't
5    recall if I used this specific document or not.
6    BY MR. JACKSON:
7         Q.  Okay.  Did you have any involvement in
8    drafting the Amended Complaint in this matter that is
9    Deposition Exhibit 7?
10        A.  By "involvement," if you mean I provided
11   information, then yes.
12        Q.  Thus my question about Deposition Exhibit
13   9.  Is there new information coming from Deposition
14   Exhibit 9 to your knowledge that was used in drafting
15   the Complaint in this matter to your knowledge?
16        A.  Again I don't know.
17              (Deposition Exhibit Number 10
18              was marked for identification.)
19              (Document tendered to the
20              witness.)
21   BY MR. JACKSON:
22        Q.  I show you what has been marked as
23   Deposition Exhibit 10.  Have you ever seen Deposition
24   Exhibit 10 before?
25        A.  Yes, I have.

50

1         Q.  What is this document?
2         A.  This is an Excel spreadsheet provided to me
3    by Baxter when again I was with Express Scripts.
4              If you notice, at the top it says,
5    "Curascript."  Curascript is a division of Express
6    Scripts.  It's a specialty pharmacy.  And this
7    spreadsheet reflects a contract that existed between
8    Baxter and Curascript for the purchase of Baxter
9    products.
10        Q.  How is it that -- did you take this
11   document with you when you left Express Scripts or
12   Curascript?
13        A.  Well, I had it in my possession.  I don't
14   know if that's the same as "took with."
15        Q.  Right.  Was it your practice to take
16   documents with you when you left an employer?
17        A.  It was my practice to work out of my home.
18   Particularly from '04 to '06 working for Express
19   Scripts I worked out of my home.  And as such, I had
20   various documents and working materials in my home.
21   This happened to be one of them.
22        Q.  Was this document used in providing input
23   to the Complaint in this matter?
24        A.  To some extent, yes.
25        Q.  How?

51

1         A.  This document was used to demonstrate that
2    Baxter did engage in rebate contracts.
3         Q.  Okay.  Is there anything wrong with
4    engaging in rebate contracts, a pharmaceutical company
5    having rebate contracts?
6         A.  Not at all.
7         Q.  So, again, how was paragraph 10 used in
8    conjunction with the Complaint, if you know?
9         MR. KLEIMAN:  Do you mean Exhibit 10?
10        MR. JACKSON:  Yes, I do.  I'm sorry.  Exhibit 10.
11   BY THE WITNESS:
12        A.  Oh, okay.  I can only repeat what I just --
13   my previous answer.  It was used to illustrate that
14   Baxter did indeed participate in rebate contracts.
15              I suppose I could go even one step further.
16   It also shows the manner in which Baxter calculated or
17   adjudicated these rebates, and that this was done,
18   obviously, on an Excel spreadsheet.  So, this is
19   separate and apart from the standard order entry
20   process, debit and credit inventory system that Baxter
21   would use and, therefore, separate and apart from its
22   Medicaid Administrative Program.
23        Q.  You've never worked for Baxter, correct?
24        A.  That is correct.
25        Q.  So, you don't know how this spreadsheet

52

1    that is Deposition Exhibit 10 interacts in any way
2    with Baxter's order entry process, do you?
3         A.  I know how the industry works.  And I don't
4    believe Baxter's order entry process is on an Excel
5    spreadsheet, especially when this Excel spreadsheet
6    was calculated incorrectly and I had to correct it.
7         Q.  I'm asking you do you know how -- do you
8    know how Baxter's order entry system works?
9         A.  Not specifically, no.
10        Q.  And do you know how Baxter's Excel
11   spreadsheet that you identified as Exhibit 10 works
12   with Baxter's order entry system?
13        A.  I do not know if it works with it or if
14   it -- how it works with it.  I don't even know if it
15   does work with it.
16        Q.  You have no knowledge of the internal
17   workings at Baxter vis-à-vis calculations of rebates
18   or pricing, correct?
19        A.  That is correct.
20              Let me correct that.  When you say
21   "calculations of rebates," do I have any knowledge of
22   how Baxter calculates rebates internally?  Well, the
23   fact that as a customer I get my rebate information
24   that comes off an Excel spreadsheet tells me I know
25   something about it in that it's Excel

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

14 (Pages 53 to 56)

53

1  spreadsheet-driven, and the fact that when I went
2  through this and recognized there were mistakes on it
3  and went back to the Baxter rep and said, "Hey, you've
4  got mistakes," as a matter of fact, they were in
5  Curascript's favor, "you've made some errors on here,"
6  he responded with, "Oh, yeah.  The guy running the
7  Excel spreadsheet made a mistake.  He moved a field
8  over.  I'll have him correct it," that tells me
9  something about how they're adjudicating their
10  rebates.
11      Q.   When you say "adjudicating rebates," what
12  do you mean by that?
13      A.   Well, calculating them.  As you can see, in
14  this particular situation different rebate tiers were
15  set up.  If the customer purchases a certain amount of
16  product, they get a certain rebate.  And if they hit a
17  certain goal, they get this rebate.  This is set up
18  prior to sales.
19           And then after the sales period, whether it
20  be a quarter or a year, Baxter sits down and looks at
21  what those sales were, compares them to the -- you
22  know, what was offered, and then calculates what
23  rebate is due and issues a check.
24      Q.   Is there anything wrong with that process
25  in your mind?

54

1      A.   Nothing at all.
2           (Deposition Exhibit Number 11 was
3           marked for identification.)
4           (Document tendered to the
5           witness.)
6  BY MR. JACKSON:
7      Q.   Let me show you what has been marked as
8  Deposition Exhibit 11.  Deposition Exhibit 11 is a
9  document produced by you to us.  At the top it says,
10  "RBC Capital Markets."  It's an article entitled, "The
11  Changing Paradigm In Hemophilia."
12           Do you see that?
13      A.   Yes, I do.
14      Q.   Have you seen this document before?
15      A.   Yes, I have.
16      Q.   When did you first see this document?
17      A.   I don't know.
18      Q.   At the top there is what appears to be a
19  fax number.  It says, "Algonquin."
20           Do you know what that is?
21      A.   No, I don't.
22      Q.   Do you have a fax number 847-960-7384?
23      A.   No, I don't.
24      Q.   Do you know how that mark got on the top of
25  this document that you produced to us?

55

1      MR. KLEIMAN:  Calls for speculation.
2  BY THE WITNESS:
3      A.   No, I don't.
4  BY MR. JACKSON:
5      Q.   If you go further into the document, go
6  back to page GH000064, at the top there's also a fax
7  mark, it appears, and it says, "Patient Services,
8  Inc."
9           Do you know who Patient Services, Inc. is?
10      A.   Yes, I do.
11      Q.   Who are they?
12      A.   Patient Services, Inc. is a non-profit
13  organization in Virginia.
14      Q.   And what do they do?
15      A.   They assist patients in reimbursement
16  issues.
17      Q.   Did you receive this document from Patient
18  Services, Inc.?
19      A.   I don't recall.
20      Q.   I'm sorry if you answered this question.
21  When did you first see this document?
22      A.   I don't recall.  I did answer that.  I just
23  don't remember.
24      Q.   Did this document have any bearing or did
25  you use this document in any way to draft the

56

1  Complaint?
2      A.   Again I don't recall.
3      Q.   Why did you produce this document to us?
4  Do you recall?
5      A.   I don't know why it was produced to you.
6  My best guess is I provided this to my attorneys as
7  background information about the hemophilia market.
8      Q.   If you refer back to the front page of this
9  document, there are certain clauses, et cetera, that
10  are underlined.
11           Are those your markings?
12      A.   I don't know.
13           (Deposition Exhibit Number 12 was
14           marked for identification.)
15           (Document tendered to the
16           witness.)
17  BY MR. JACKSON:
18      Q.   Let me show you what's been marked as
19  Deposition Exhibit 12.  Deposition Exhibit 12 is a
20  news article produced by you to Baxter in this matter.
21  It's a U.S. News article dated April 2, 2003.  It's
22  entitled "Court:  HMOs Can Be Made to Open Networks."
23           Do you see that?
24      A.   Yes, I do.
25      Q.   Have you ever seen this document before?

57

1    A.   I don't recall it.
2    Q.   Do you know what relevance this document
3  has to the Complaint in this matter?
4    A.   I would need to read it.  Do you want me to
5  take a minute and read it?
6    Q.   Well, I'm just curious have you read it
7  before?
8    A.   Again I don't recall.
9    Q.   Do you remember referring to this when you
10  provided input for the Complaint in this matter?
11    A.   I do not recall that.
12         (Deposition Exhibit Number 13 was
13         marked for identification.)
14         (Document tendered to the
15         witness.)
16  BY MR. JACKSON:
17    Q.   Sir, I'm handing you Deposition Exhibit 13.
18  Deposition Exhibit 13 is a Confidential Examination
19  Under Oath of Patricia Kay Morgan dated January 28,
20  2002.  This document has Bates numbers GH000126
21  through GH000290.
22         Have you ever seen this document before?
23    A.   I think so.
24    Q.   Under what circumstances have you seen this
25  document?

58

1    A.   I think I may have a copy of it.
2    Q.   You'll note this document is identified as
3  "Attorneys' Eyes Only."
4         Do you see that?
5    A.   Yes.
6    Q.   When did you first see this document?
7    A.   I have no idea.
8    Q.   How did you get this document?
9    A.   From my attorney.
10    Q.   Is there anything to your knowledge in this
11  deposition that relates to Baxter?
12    A.   I don't know.
13    Q.   And I'm sorry, sir.  You said you have or
14  have not read this document?
15    A.   I don't know.
16    Q.   Did any information in this document
17  have -- strike that.
18         Did you use any information coming from
19  this examination; that is, Deposition Exhibit 13, in
20  preparing or drafting the Complaint?
21    A.   No.
22         (Deposition Exhibit Number 14 was
23         marked for identification.)
24         (Document tendered to the
25         witness.)

59

1  BY MR. JACKSON:
2    Q.   I show you what's been marked Deposition
3  Exhibit 14.  Deposition Exhibit 14 is a State of Texas
4  Notice of Intention to Take Oral Depositions.  It's
5  Exhibit 371 to the deposition of Kay Morgan.  This
6  document was produced to us by you in this matter.
7         Have you ever seen this document before?
8    A.   I don't believe so.  I'm looking at it now,
9  but I don't recall ever seeing this before.
10    Q.   Do you recall reviewing this document in
11  preparation of providing input for the Complaint in
12  this matter?
13    A.   No, I do not recall that.
14    Q.   Let me have you turn to page GH000113 of
15  that exhibit, please.  There are markings on that
16  page.  Some text has been underlined.
17         Do you see that?
18    A.   Yes, I do.
19    Q.   Is that your underlining?
20    A.   I don't believe so, but I don't know.
21         (Deposition Exhibit Number 15 was
22         marked for identification.)
23         (Document tendered to the
24         witness.)
25

60

1  BY MR. JACKSON:
2    Q.   Let me show you what's been marked as
3  Deposition Exhibit 15.  Deposition Exhibit 15 is a
4  document entitled "Deposition Summary Patricia Kay
5  Morgan Taken 11/13/02."
6         Do you see that document?
7    A.   Yes, I do.
8    Q.   Have you ever seen this document before?
9    A.   Yes, I believe I have.
10    Q.   When did you first see this document?
11    A.   No idea.
12    Q.   Were you given -- how did you acquire a
13  copy of this document?
14    A.   It would have had to have been through my
15  attorneys.
16    Q.   Did you draft this summary or this
17  deposition summary?
18    A.   No.
19    Q.   When were you provided this document?
20    A.   I have no clue.
21    Q.   Do you remember whether you were provided
22  this document prior to the date that the Complaint was
23  filed in this case?
24    A.   Again I don't know.
25    Q.   Mr. Hamilton, have you signed up to the

61

1 terms of a protective order relating to the Texas
2 depositions, particularly as relates to Kay Morgan's
3 deposition?
4   **A.  I don't know.**
5   Q.  Again I find no mention of Baxter in this
6 document.  Did this document have -- did you review it
7 before drafting the Complaint in this matter?
8   **A.  The document you're talking about here is**
9 **this Exhibit 15?**
10   Q.  Yes, sir.
11   **A.  I don't even remember, you know, when I saw**
12 **it and when I've looked at it.  So, I would have to**
13 **tell you that it had nothing to do with me drafting**
14 **the Complaint.**
15   Q.  Okay.  I apologize for doing this.
16   **A.  To the tree.**
17   Q.  To the trees.
18       (Deposition Exhibit Number 16 was
19       marked for identification.)
20       (Document tendered to the
21       witness.)
22 BY MR. JACKSON:
23   Q.  I'm handing you what has been marked as
24 Deposition Exhibit 16.
25   MR. KLEIMAN:  Let the record reflect we're

62

1 grunting and groaning.
2 BY MR. JACKSON:
3   Q.  Deposition Exhibit 16 is a document
4 entitled "Survey on Hemophilia Care & Price Monitoring
5 in the United States."  The front cover of this
6 exhibit is called "Global Market Research Hemophilia."
7       Do you see that?
8   **A.  Yes.**
9   Q.  Have you ever seen this document before?
10   **A.  I -- just by the size of it I'd say no, but**
11 **I don't know.  Let me take a look and see what it says**
12 **inside.**
13       **Oh, this is a Market Research Bureau**
14 **report.  Sure.  I don't remember it being this big.**
15   Q.  When do you think you first saw this
16 document?
17   **A.  Oh, well, when you say "this document," are**
18 **you referring to, you know, what is titled "Wave 10,**
19 **April 2000" or are you talking about a Market Research**
20 **Bureau report of this nature?**
21   Q.  I'm talking specifically about this
22 document that is identified as GH000321 through
23 GH001495.
24   MR. KLEIMAN:  I'm going to object as ambiguous.
25 This contains multiple documents.

63

1 BY MR. JACKSON:
2   Q.  This was a single document produced to us
3 by you, sir.
4   **A.  I mean, I'm looking -- just so you know,**
5 **I'm looking at the Table of Contents on this, and it**
6 **says it goes up to page 85.  There's gotta be 500**
7 **pages here.**
8   Q.  I understand.
9   **A.  So, I'm saying I don't know what all is in**
10 **here.**
11   Q.  Again, Mr. Hamilton, this is a single file
12 that was produced to us by you.  And I'm just trying
13 to understand what this document is.
14   **A.  Okay.**
15   Q.  So, let's focus on --
16   **A.  I'm trying to do the same thing, by the**
17 **way.**
18   Q.  Sure.
19   **A.  I'm trying to figure out what this**
20 **document -- I mean, I'm very familiar with the Market**
21 **Research Bureau reports, okay?**
22   Q.  Let's start there.  What is the Market
23 Research Bureau?  What is it?
24   **A.  Market Research Bureau is a company owned**
25 **and operated by a man named Patrick Robert.  Patrick**

64

1 **is a former colleague of mine from Bayer Corporation.**
2 **He was in the Marketing Research Department.  He left**
3 **Bayer.**
4       **I forget what year he started this thing,**
5 **but he started his own company of market research to**
6 **provide information and data and research in an**
7 **area -- what's called an unaudited market, which, if**
8 **you're familiar with the plasma products at all, they**
9 **are what's called unaudited.**
10       **And if you look at the pills and tablets**
11 **side of the pharmaceutical industry, IMS does a great**
12 **job of telling everybody -- IMS Health, an**
13 **organization, does a great job of providing data to**
14 **the industry about, you know, what categories of drugs**
15 **were sold, how many were sold, you know, AWPs, all**
16 **that stuff.  They even provide all this sales**
17 **information by zip code.  They even provide stuff by**
18 **doctor.**
19       **The biologics world doesn't have that type**
20 **of a service.  And so, because that information was**
21 **missing, Patrick went out and founded his own company**
22 **to provide that information to those people in this**
23 **industry so they would have marketing information and**
24 **data they could use for all their products.  And**
25 **that's what he did.**

65

1    Q.    Do you remember citing to the Market
2 Research Bureau in your Complaint?
3    A.    I don't specifically recall, but I believe
4 it's in there.
5    Q.    Did you recently call the Market Research
6 Bureau in connection with this matter?
7    A.    Yes, I did.
8    Q.    Why did you call the Market Research
9 Bureau?
10    A.    I called Patrick Robert because I wanted to
11 find out, get some information from him.
12         Do you want to know what information I was
13 calling him for?
14    Q.    I do.
15    A.    I wanted to find out what he would charge
16 for some old reports and, you know, what he was
17 currently charging for reports. Let me think what
18 else I asked him.
19         I think I just confirmed with him it was --
20 I talked to both his assistant and to Patrick. I just
21 confirmed that their number of clients was small
22 scale.
23    Q.    Can I have you look back at your
24 Declaration, please?
25    A.    Can you tell me what number that is?

66

1         MR. KLEIMAN: It's 6.
2         THE WITNESS: Okay.
3 BY MR. JACKSON:
4    Q.    Can I refer you to paragraph 14?
5    A.    Yes.
6    Q.    Okay. In paragraph 14 you specify -- of
7 your Declaration you specify "On September 13, 2009 I
8 called the Market Research Bureau and spoke with Cindy
9 Lynn, Patrick Robert's secretary."
10         Did you just speak with Cindy Lynn, or did
11 you speak with Mr. Robert?
12    A.    On September 13th I spoke with Cindy Lynn.
13 Subsequently Patrick called me back. I don't know how
14 many days later it was, but at some point he called
15 back and we had further discussions about it.
16    Q.    All right. So, let's talk about your
17 conversation with Cindy Lynn.
18         What did you ask her?
19    A.    I asked her questions that generated these
20 answers. So, like I said just a minute ago off the
21 top of my head that I had called and I wanted to find
22 out what a subscription to this would cost.
23    Q.    So, is the subscription that you refer to
24 in paragraph 14 of your Declaration today's prices?
25    A.    Yes. That was the price she quoted me if

67

1 we wanted to buy the current report. And the rest of
2 that information that's in paragraph 14 were her
3 answers to my questions.
4    Q.    Okay. So, is it -- was it her answer that
5 there are presently 20 subscribers to Market Research
6 Bureau reports?
7    A.    Yes.
8    Q.    Did you ask her any questions about
9 previous or prior year Market Research Bureau reports?
10    A.    I asked her if they would be available.
11 She said yes.
12         I asked her, you know, about how much those
13 would cost, and she said, "You'll need to talk to
14 Patrick, and Patrick's out of the country at the
15 moment."
16    Q.    But your Declaration says that she told you
17 how much things would cost.
18    A.    She told me how much a single issue was.
19    Q.    That's today's issue?
20    A.    That's today's issue.
21    Q.    Not prior issues?
22    A.    Correct.
23    Q.    Okay. And did you ask her what her
24 subscribers were or what Market Research Bureau's
25 subscribers were in years past?

68

1    A.    I'm not sure I understand your question.
2    Q.    Sure. I thought you testified earlier that
3 the $16,000 price and the 20 subscribers referred to
4 present day data?
5    A.    That's correct.
6    Q.    So, my question to you, sir, is did you
7 also ask her about costs in 2002, for example, of
8 reports?
9    A.    No, I did not.
10    Q.    Or did you ask her about the number of
11 subscribers in 2002?
12    A.    No, I did not.
13    Q.    Now, let me refer you back to the Market
14 Research Bureau exhibit that is Exhibit 16.
15    A.    Can I put this away?
16    Q.    You probably ought to leave it right there.
17    A.    Okay.
18    Q.    You're referring back to -- can I have you
19 look to page GH000323?
20         Actually, maybe I'll make this easier. If
21 you pull out Deposition Exhibit 7, which is your
22 Complaint in this case, --
23    A.    Got it.
24    Q.    -- paragraph 29 refers to a 2001 Market
25 Research Bureau report called "The Plasma Fractions

Case 1:01-cv-12257-PBS  Document 6866-7  Filed 01/27/10  Page 19 of 104
HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

18 (Pages 69 to 72)

69

1  Market in the United States."
2       Do you see that?
3       A.  Yes, I do.
4       Q.  Did you make use of a 2001 Market Research
5  Bureau report in preparing your Complaint?
6       A.  Yes.  I might add I probably used several
7  years of the Market Research Bureau reports.  I don't
8  know exactly what years I've got at home, but --
9            (Deposition Exhibit Number 17 was
10            marked for identification.)
11            (Document tendered to the
12            witness.)
13  BY MR. JACKSON:
14       Q.  Let me show you what has been marked as
15  Deposition Exhibit 17.  Deposition Exhibit 17 is a
16  2001 Market Research Bureau report.
17       Do you see that?
18       A.  Yes, I do.
19       Q.  Is that the report that you referred to in
20  your Complaint?
21       A.  Yes, it is.
22       Q.  And I believe you also testified that you
23  may have reviewed other Market Research Bureau reports
24  in preparing the Complaint?
25       A.  Yes.

70

1       Q.  Would that include the Market Research
2  Bureau document that is Deposition Exhibit 16?
3       A.  It could.
4       Q.  You don't remember?
5       A.  I don't remember specifically which ones.
6  I mean, this one is dated April 2002 and the Market
7  Research Bureau reports typically provide historical
8  data, too.  So, at this moment exactly which piece of
9  information I pulled from which report I don't know.
10       Q.  Did you --
11       A.  But I can also -- let me offer you
12  something here.
13       No, never mind.  Go ahead.
14       Q.  How did you obtain Deposition Exhibits 16
15  and 17?
16       A.  I'm not sure.
17       Q.  Did Miss Sun give these to you?
18       A.  No.
19       Q.  If you look at the front page of Deposition
20  Exhibit 17, which is "The Plasma Fractions Market in
21  the United States 2001," it includes the following:
22  "The contents of this study represent our analysis of
23  information generally available to the public or
24  released by responsible individuals in the companies
25  mentioned."

71

1       Do you see that?
2       A.  Yes, I do.
3       Q.  So, is it your understanding that Market
4  Research Bureau takes public information, recompiles
5  it and uses that to create their report?
6       A.  No.
7       Q.  Isn't that what it says?
8       A.  It says, "analysis of information generally
9  available to the public or released by responsible
10  individuals in the companies mentioned."
11       And I believe, if I had to put a number on
12  it, probably 95 percent of the information contained
13  in the Market Research Bureau is not available to the
14  public.  It is this latter part "released by
15  responsible individuals in the companies mentioned."
16       Q.  But doesn't it --
17       A.  If it was available to the public, you
18  wouldn't need the report.
19       Q.  Couldn't it be that they are simply taking
20  public information from a variety of sources and
21  compiling it, putting it together to resell to the
22  general market?
23       A.  In this case, no, because let's remember
24  that the reason he formed this company was because
25  that information isn't available.

72

1       Q.  Do you also see in that initial disclosure
2  the second sentence, "It does not contain information
3  provided in confidence by our clients"?
4       Do you see that?
5       A.  I do.
6       Q.  Now, how much of any of these Market
7  Research Bureau reports did you rely upon in preparing
8  the factual information contained in the Complaint?
9       A.  I don't know.
10            (Deposition Exhibit Number 18 was
11            marked for identification.)
12            (Document tendered to the
13            witness.)
14  BY MR. JACKSON:
15       Q.  Let me show you what's been marked as
16  Deposition Exhibit 18.
17       A.  I was going to say, if we're getting near a
18  point, I'd like to take a bathroom break when we get a
19  chance.
20       MR. JACKSON:  Sure.  Let's do that right now.
21            (Recess.)
22  BY MR. JACKSON:
23       Q.  Mr. Hamilton, let me show you what's been
24  marked as Deposition Exhibit 18.
25       Have you ever seen Deposition Exhibit 18

Case 1:01-cv-12257-PBS  Document 6866-7  Filed 01/27/10  Page 20 of 104
HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

19 (Pages 73 to 76)

73

1  before?
2      A.  I think so.
3      Q.  Can you explain to me what Deposition
4  Exhibit 18 is?
5      A.  Well, I can take my best guess.
6      Q.  Okay.
7      A.  I mean, obviously it's a -- you know, the
8  title is "Summary of First DataBank Information on
9  Selected Drugs."  And I believe what the --
10     Q.  Did you create this document?
11     A.  I personally didn't, but I may have
12  directed someone to create it.
13     Q.  And what was the purpose of creating this
14  document?
15     A.  Again if it's the document I'm thinking of,
16  you know, because this is a little bit out of context,
17  but as best I can guess, this looks like a comparison
18  sheet that I would have used -- let me try and put it
19  in context and explain.
20         When I was with Express Scripts, so this is
21  when I was a customer of Baxter's and all the other
22  factor manufacturers, I was responsible for
23  contracting with various health plans for fulfillment
24  of specialty prescriptions.
25         And one of the things that I did in the

74

1  contracting process was to -- you know, we -- we sold
2  the product at prices -- we billed the customer at
3  some discount off of AWP.
4      Q.  Who billed it?
5      A.  Express Scripts, or Curascript, a
6  subdivision of it.  So, we would bill some discount
7  off of AWP.
8         And, of course, we would footnote that the
9  AWP we used was that of First DataBank because there
10  are two other data banks you could be using.  So, you
11  wanted to specify, especially under a contract, which
12  data bank you're using.
13         And I also would add to the contracts, to
14  the footnotes, that if the AWP should change during
15  the contract period, that we reserved the right to
16  also change the rate, what we were charging.  And in
17  some circumstances I put together or had other people
18  for me put together things like this to show internal
19  customers and the people within Express Scripts what
20  was going on, and also people outside of Express
21  Scripts, the reason and the need for having that kind
22  of language in a contract because of the changes in
23  AWP that exist in the marketplace.
24         So, you wouldn't -- you know, if you locked
25  into a particular AWP minus such-and-such for a year

75

1  or two years and the AWP changed three times in that
2  period, that could have severe financial implications
3  on either party that's in the contract.
4         So, I believe this is a document that was
5  one of those produced just to show people the changes
6  in AWP.
7      Q.  So, do you believe you created this
8  document or had it created while you were at Express
9  Scripts?
10     A.  It looks like something that I would have
11  had done while I was at Express Scripts.
12     Q.  Did you rely upon or use this document in
13  preparing the Complaint in this matter?
14     A.  Not per se.
15     Q.  When you say "per se," that's a qualifier.
16     A.  Yeah, it is.  Not specifically.  I think
17  that one -- and I don't know how well it's spelled out
18  in the Complaint, but one of the issues with AWP, and
19  I assume you're unbelievably familiar with AWP at this
20  point, is that both prior to 2001 and after 2001 AWPs
21  could be changed in this industry sort of willy-nilly
22  at the manufacturer's whim depending on market
23  circumstances, whatever they wanted to do.  It was
24  very easy to initiate a change in AWP, and you could
25  make it whatever you wanted.

76

1         And because of that, it was necessary for
2  me in a contracting position to make sure that I
3  noted, hey, AWP's changed.  And I would say that --
4  again, I'm telling a customer I'm putting this
5  footnote in because they do change and they don't
6  necessarily make any sense when they change and they
7  may or may not affect the actual acquisition price.
8  Oftentimes they don't.  It's just the AWP changes.
9  So, this was done, I think, more as an educational
10  piece to explain why.
11         So, when you say was it relied upon, I
12  don't believe specifically, but the idea or the
13  concept is certainly part of it, is that AWPs, you
14  know, fluctuated with sort of the wind or, you know,
15  whatever a manufacturer felt they needed at that given
16  point in time.
17     Q.  So, why is that -- I'm sorry.
18         Is that document then relevant to the
19  allegations of the Complaint in this case?
20     A.  Again I'm saying it's not necessary to the
21  Complaint.
22     Q.  Was it used to make any allegations in the
23  Complaint?
24     A.  I don't believe so.  I hope -- Mark's
25  probably looking at me like, oh, just be quiet, but

Case 1:01-cv-12257-PBS Document 6866-7 Filed 01/27/10 Page 21 of 104
HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

20 (Pages 77 to 80)

Page 77

1  I'm trying to give you as much information, you know,
2  to make this easy for all of us to understand.
3      Q.  I appreciate that.
4      A.  So, if I talk too much, just tell me to
5  shut up.
6      MR. KLEIMAN:  How about you?  Do I get to tell
7  you?
8      THE WITNESS:  You don't get to tell me.
9          (Deposition Exhibit Number 19 was
10         marked for identification.)
11         (Document tendered to the
12         witness.)
13  BY MR. JACKSON:
14     Q.  All right.  Mr. Hamilton, I want to show
15  you what's been marked as Deposition Exhibit 19.
16  Deposition Exhibit 19 is a document produced to Baxter
17  by you.
18         Have you ever seen this document before?
19     A.  Yes, I have.
20     Q.  Can you explain what this collection of
21  pages are?
22     A.  Yeah.  These are photocopies of my
23  appointment books going back through the years.
24     Q.  Okay.  How far back do you have appointment
25  books?

Page 78

1      A.  I'm not sure exactly, but I'd say probably
2  1993.
3      Q.  Do you still have these original documents?
4      A.  Yes.
5      Q.  In your possession or in your counsel's
6  possession?
7      A.  In my possession.
8          Well, let me -- when you say "original
9  documents," I have the actual appointment books in my
10  possession.  I made photocopies of all these pages and
11  sent them to Mr. Kleiman, who has those in his
12  possession.
13     Q.  I understand.  I'm asking about the
14  originals because we may want to see the originals.
15  So, I'd ask you not to destroy or otherwise get rid of
16  the original documents.
17     A.  I'll keep the shoebox intact.
18     Q.  All right.  Let's look at the first page of
19  Deposition Exhibit 19.  The first page of Deposition
20  Exhibit 19, which appears to be a calendar date of
21  January 24, 2005, has the word "Baxter."
22         And then can you tell me what the word is
23  after that?
24     A.  Sure.  "Royal."
25     Q.  And what's after that?  There is some other

Page 79

1  notes or comments or marks.
2      A.  It looks like it says, "Plus?"
3          Oh, you want me to try to interpret that
4  for you in Greg hieroglyphics?
5      Q.  I would.
6      A.  That probably means meeting with Baxter,
7  Royal and possibly somebody else.
8      Q.  Okay.  And where were you meeting with
9  Royal on January 24th, 2005?
10     A.  I don't know.
11     Q.  Did you meet with them then?
12     A.  I can't say for certain.  Typically if
13  there's something like this in my appointment book and
14  the appointment is cancelled, it will be scratched
15  out.  So, I would say I probably did.
16     Q.  Do you remember what the subject of your
17  meeting was at that time?
18     A.  No.
19     Q.  All right.  Let's go to the next page,
20  GH001498.
21         Do you see that?
22     A.  Mm-hmm.
23     Q.  There is on that page what appears to be
24  the name "Royal Stuart."
25         Do you see that?

Page 80

1      A.  Mm-hmm.
2      Q.  What's the word after that?
3      A.  I don't know for certain, but if I had to
4  guess, it looks like "10 a.m."
5      Q.  What are the words below that?
6      A.  "Noon Steve."
7      Q.  Do you know what that means?
8      A.  That means I had a meeting at noon with
9  Steve.
10     Q.  Do you know who Steve is?
11     A.  No.
12     Q.  Did you meet with Royal Stuart on January
13  19th, 2005?
14     A.  Again, my appointment book says I had an
15  appointment with him.  That means I probably kept that
16  appointment.
17     Q.  What was the subject of the appointment; do
18  you know?
19     A.  Don't know.
20     Q.  If it occurred, do you remember what was
21  said during that appointment?
22     A.  No, I do not.
23     Q.  All right.  Can you please go to the next
24  page, GH001499?  Are you there?
25     A.  I'm there.

Case 1:01-cv-12257-PBS Document 6866-7 Filed 01/27/10 Page 22 of 104
HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

21 (Pages 81 to 84)

81

1    Q.   I see what appears to be "NHF 4-5-6."
2    Do you see that?
3    A.   Yes, I do.
4    Q.   Can you explain that to me?
5    A.   Yeah.  That means that I was in a meeting
6    in Dallas at the Hyatt.  It was the National
7    Hemophilia Foundation meeting, the 4th, 5th and 6th,
8    obviously, of November.
9    Q.   And what year was that?
10   A.   Good question.  '04.
11   Q.   I note on that same page something has been
12   blacked out or redacted.
13   Do you see that?
14   A.   Yes, I do.
15   Q.   Can you tell me why something was redacted
16   on that page?
17   A.   Specifically I can't.  Generally do you
18   want --
19   Q.   Sure.  Why generally are there redactions
20   throughout these pages?
21   A.   I would say that's probably some personal
22   notation, something that had nothing to do with Baxter
23   or this case.
24   Q.   Okay.  Can I have you turn to the next
25   page, GH001500?  Can you read what it says at the top

82

1    of that page?
2    A.   If you're referring to the part under
3    "Monday" where it says, "Baxter 1 p.m."?
4    Q.   Yes.
5    A.   Oh, yeah.  Okay.  This says, "Baxter 1 p.m.
6    North to Lake-Cook Road."
7    What that means is that I was meeting with
8    Baxter at their facility in Chicago.
9    Q.   Okay.  Who did you meet with that day?
10   A.   That particular day I can't say for
11   certain.  Typically if I was at Baxter's headquarters,
12   Pete O'Malley would have been there.  But it could
13   have been -- who else was with him I wouldn't know for
14   sure.
15   Q.   Do you have a specific memory what occurred
16   on that day, if that meeting actually occurred?
17   A.   Was that two questions?
18   Q.   I'll start over.
19   Do you remember having a specific meeting
20   on that day?
21   A.   I do not know if it actually occurred.  I
22   believe that's where you're going.  You want me to
23   say, right?
24   Q.   I'm just trying to assess --
25   A.   And I'm trying to answer you honestly,

83

1    okay?  I'm just trying to say if it's in the
2    appointment book and it's not scratched out, that
3    means I believe I had that meeting.  If you say to me,
4    "Are you absolutely certain that that meeting
5    occurred," well, no.
6    Q.   And I need to know what occurred at that
7    meeting.
8    A.   And my answer on that one is I don't know.
9    Q.   Can you turn to the next page, GH001501?
10   A.   Yes.
11   Q.   Can you read that for me on that calendar
12   date?
13   A.   Yes.  "Noon Jeff Beck Millennium Grill."
14   Q.   Who's Jeff Beck?
15   A.   Baxter rep.
16   Q.   Do you remember what you and Jeff Beck
17   discussed that day?
18   A.   No, I do not.
19   Q.   Mr. Hamilton, I'll make this a little
20   easier maybe.  Several of the pages of your calendar
21   pages here mention things like NHF.
22   What does NHF mean?
23   A.   National Hemophilia Foundation meeting.
24   Q.   Okay.  If I ask you what happened, for
25   example, at the National Hemophilia Foundation meeting

84

1    that is on GH001502, will you be able to tell me what
2    occurred during that meeting?
3    A.   Specifically, no.
4    Q.   And will you be able to tell me what
5    occurred at any of the meetings that are identified in
6    any of these calendar pages?
7    A.   There may be -- generally speaking the
8    answer is no.
9    There may be one or two where I would be
10   able to say -- for example, if you look at 1506,
11   Friday, August 16th, where it says, "Slides to
12   Baxter," okay?  And it was just 10 days before that we
13   have a -- I have a notation for a Baxter conference
14   call.
15   The slides going to Baxter would have been
16   my what I call PBM 101 slides.  This is where we were
17   discussing things about PBMs and what their
18   involvement in the specialty pharmaceutical market's
19   gonna be.  And I had a slide presentation that
20   described, you know, some just general stuff about how
21   PBMs operate.
22   So, again, we can go back and say that,
23   well, that means that probably Wednesday, February 5th
24   was a discussion about PBMs in the specialty pharmacy
25   market and how it applies to both IGIV and to

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

22 (Pages 85 to 88)

---

85

1  hemophilia products.
2        And the following one that says "Slides"
3  would have been I sent them the deck, the slide deck.
4        However, other than that -- let me help
5  you. Other than that, for these entries where it says
6  Baxter this, NHF that or whatever, it merely indicates
7  that I had a meeting scheduled with them. And I can't
8  say that it actually happened for certain. And what
9  the subject was I can't say for certain, either.
10       Does that help?
11  Q.  It does. Thank you.
12       Let's go to GH001502, "NHF."
13       Can you tell me what year this is?
14  A.  I have a notation at the top that says '03.
15  Q.  Okay. That handwritten note at the top is
16  your note?
17  A.  My handwriting, yes.
18  Q.  And was that created when you made the
19  copies of this?
20  A.  Yes. And I did that, obviously, because
21  this particular page of the appointment book didn't
22  have the year on it.
23  Q.  Okay. Where were you employed at the time?
24  A.  In 2003?
25  Q.  2003.

---

86

1  A.  I was an employee of Express Scripts.
2  That's when I was a customer of Baxter's.
3  Q.  Right.
4        (Deposition Exhibit Number 20 was
5         marked for identification.)
6        (Document tendered to the
7         witness.)
8  BY MR. JACKSON:
9  Q.  Mr. Hamilton, let me show you what's been
10  marked as Deposition Exhibit 20. Deposition Exhibit
11  20 is an April 22, 2005 letter from Mr. Kleiman to the
12  Attorney General and Michael Theis.
13       Do you see that?
14  A.  Yes, I do.
15  Q.  Have you ever seen this document before?
16  A.  I believe I have.
17  Q.  It says in the second -- I'm sorry -- in
18  the first sentence, "I am pleased to forward to you
19  the Complaint along with this statement disclosing all
20  material evidence. The immediately available evidence
21  is scant. Only one of the two relators, Ms. Linnette
22  Sun, was employed by Baxter, and her opposition to the
23  practices described herein led to Baxter firing her
24  and giving her no opportunity to preserve documentary
25  evidence. The other relator, Mr. Greg Hamilton,

---

87

1  developed his knowledge of Baxter's practices from his
2  intimate familiarity with the industry, but had no
3  opportunity to develop documentary evidence."
4        Do you see that?
5  A.  Yes, I do.
6  Q.  Does this help you remember whether you met
7  with Justice Department lawyers at any time prior to
8  the date the Complaint was filed?
9  A.  No, it doesn't.
10  Q.  Okay. And is the same -- is that your same
11  answer with regard to meeting with representatives of
12  the various states that are identified in your
13  Complaint?
14  A.  Yes.
15  Q.  It doesn't help you?
16  A.  No. I mean, if you're -- I'll try and
17  offer you some help on this to at least put it in
18  context.
19       In the course of my job working with
20  various qui tam lawyers, it's quite common for me to
21  meet with state and FUCU units and the DOJ people
22  and -- the National Association of Medicaid Fraud and
23  Control Units -- and to meet with them on behalf of
24  clients. So, I do that all the time.
25       So, when you say, well, go back a couple

---

88

1  years, and when did you meet with them, that's why I'm
2  going I don't know.
3        MR. JACKSON:  Okay. Let's go off the record.
4        (Discussion off the record.)
5        (Whereupon, at 12:48 p.m., the
6         deposition was recessed, to
7         reconvene at 1:30 p.m., this same
8         day, January 21, 2010.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Case 1:01-cv-12257-PBS  Document 6866-7  Filed 01/27/10  Page 24 of 104
HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

23 (Pages 89 to 92)

89

1          (Whereupon, the deposition
2     resumed at 1:36 p.m.)
3          GREG HAMILTON,
4  called as a witness herein, having been previously
5  duly sworn and having testified, was examined and
6  testified further as follows:
7          EXAMINATION (Resumed)
8  BY MR. JACKSON:
9     Q.   Mr. Hamilton, can I refer you back to
10  Deposition Exhibit 6, your Declaration, please?
11     A.   Yes.
12     Q.   In paragraph 2, the final sentence, you
13  refer to, "Those meetings specifically concerned the
14  pricing of several of the Baxter products discussed in
15  the Complaint."
16          Do you see that?
17     A.   Yes, I do.
18     Q.   What pricing were you referring to?
19     A.   The ones -- and again, pricing is a big
20  subject.  We had discussed -- let me read the
21  paragraph first.
22          (Short interruption.)
23  BY THE WITNESS:
24     A.   Again, "pricing" is kind of a big word.
25  So, when I refer to "pricing," I'm referring to the

90

1  price that Baxter was selling to me as a client.
2  BY MR. JACKSON:
3     Q.   At Express Scripts?
4     A.   That is correct.  So, of course, some of
5  the stuff would have been basically, you know,
6  contract negotiations.  Certainly part of -- you know,
7  with every price of what a customer or a manufacturer
8  sells their drug for there's also the accompanying AWP
9  that goes along with that.
10          In addition to that, we also discussed on
11  several occasions what's called PHS, otherwise known
12  as 340B pricing.
13     Q.   All right.  So, let's --I understand when
14  you refer to some of those communications referred to
15  the price to Express Scripts.  What was your
16  communication with Larry Guiheen or Peter O'Malley
17  regarding AWP?
18     A.   I actually -- I mean, I can't tell you any
19  specific time and exactly what we talked about.
20     Q.   Okay.  With regard to the PHS, the 340B
21  pricing, can you tell me what you discussed with these
22  gentlemen as you reference in paragraph 2?
23     A.   I can.  There was one particular time, and
24  I can't tell you what the date was, but it was one of
25  the meetings I had at Baxter headquarters.

91

1          Pete O'Malley had asked me to come out and
2  discuss contracting issues.  He brought into the room
3  people that he identified as Baxter contracting --
4  people who work in their Contracting Department.  And
5  he asked me to go through and explain to them how 340B
6  pricing worked, how it was calculated and
7  administered.  And I did that.
8     Q.   Now, is any of the information that took
9  place in that meeting regarding 340B the subject of
10  any of your claims in this Complaint that is Exhibit
11  7?
12     A.   No, not specifically.
13     Q.   In paragraph 4, the first sentence is the
14  following:  "While serving in those positions I
15  frequently met with Baxter's senior management to
16  discuss the market for hemophilia products."
17          Do you see that?
18     A.   Yes, I do.
19     Q.   Do you remember specific conversations you
20  had with senior management regarding hemophilia
21  product pricing?
22     A.   Well, --
23     Q.   I'm sorry.  The market for hemophilia.  You
24  don't say "pricing" there.  You say, "market."
25     A.   Yes.  There is one conversation that I do

92

1  remember very specifically.  I'll address the others
2  after I address this first one.
3          And that was -- it was when we met with
4  Larry Guiheen.  And this was -- oh, I'm going to guess
5  this was within six months of Advate's launch.  And I
6  met with Larry at some sort of a trade show.  It could
7  have been NHF.  But I do remember it was in an exhibit
8  hall.  I can picture where we were.
9          So, we were in an exhibit hall, and we were
10  talking about Advate.  I expressed to Larry that my
11  opinion that they had come out with, they'd launched
12  with too high of a premium for Advate over their other
13  product and the comparable products, the recombinant
14  products, and that they came out just too high and
15  they needed to drop that price.
16          And I felt that his uptake on conversions
17  from other factor products to Advate was being
18  inhibited by the extensive or excessive margin.  You
19  know, they were charging too much for it in comparison
20  to the other drugs.
21          And I remember suggesting, you know, if you
22  could just drop that 7 or 8 cents or whatever the
23  number was at the time, I think that you could reduce
24  the differential to where it's not a deal breaker for
25  insurance companies and people aren't gonna go, "Wait

93

1  a minute. 15 cents a unit times a couple hundred
2  thousand units a year, prove to me that Advate's that
3  much better," which, of course, would be a very
4  difficult thing to do because it's a conceptual issue.
5      So, I made that point, and I said, "If you
6  could get it down to where it's, you know, 5 cents, 6
7  cents, I don't think you'd have the push back and you
8  could convince the patients, you know, to recommend or
9  to ask their doctor for a switch and that they could
10  then get it through the insurance companies."
11      So, that was one very, very specific
12  discussion we had on pricing. It was of Advate.
13  Q.  Do you remember when Advate launched?
14  A.  Yeah. It was, like, spring of 2003, summer
15  of 2003, somewhere in there.
16  Q.  And when you say "launched," do you mean
17  actually can start making sales?
18  A.  Yeah. I forget the approval date, but we
19  can look that up. I think it was approved in, I don't
20  know, April, May, something like that. But there
21  wasn't a great delay from when it was approved to when
22  it was launched. It was probably, I don't know, two
23  months at the most.
24  Q.  Okay. And when you say -- this is my term,
25  my phrase, "uptake or uptick over its other products,"

94

1  did you mean the price that Baxter would sell to the
2  market over the price it would sell to the market for
3  Recombinate?
4  A.  Yes. The difference -- what I was trying
5  to point out was that the difference -- Recombinate
6  was selling for, let's say, 89 cents at the time. And
7  when they launched Advate, it came out as a buck 15
8  ballpark. And so, the difference between 89 cents and
9  $1.15 was just too great.
10  Q.  For what?
11  A.  For universal acceptance, for insurance
12  companies, for payers to say, "Yeah, it's worth it.
13  I'll pay that much more." Because if they're going to
14  pay an extra 20 cents a unit and patients are using
15  anywhere from a hundred thousand to a million units a
16  year, that turns out to be a lot of dollars. And it
17  got people's attention.
18      So, the difference was so great -- it's
19  kind of like pricing that's called the noticeable
20  difference curve. It was the same thing. It was so
21  noticeable that it got attention.
22      Had the number been smaller, it would have
23  passed through without people scrutinizing it and
24  more -- and patients would have been accepted and
25  insurance companies wouldn't have even probably given

95

1  it a second thought in terms of paying.
2      And so, therefore, they'd be able to
3  convert patients from current therapies, whether it be
4  theirs or someone else's, to Advate more rapidly than
5  what they were doing.
6  Q.  Okay. So, from your perspective you did
7  not believe that the market price of Advate, the new
8  therapy, that the delta was not justified by the
9  difference in the products?
10  A.  Yes. But let me say justified in the minds
11  of the people who were actually paying the bill, the
12  payers, okay? And the delta was so large that it got
13  their attention. And that was the key. First of all,
14  it got their attention. The delta was so large that
15  it jumped out, you know.
16      And all of a sudden the claims were bigger
17  than they were before and the dollar signs caught
18  their attention. That brought scrutiny to the
19  product. And that made people then question is this
20  new product worth that much more than what the other
21  one is?
22      And, of course, Baxter was standing up
23  straight and saying, "Recombinate's a very safe drug
24  and it treats Factor VIII." And they were saying all
25  these wonderful things about Recombinate. As a matter

96

1  of fact, they were saying the same thing about the
2  plasma products. Yeah, plasma products are perfectly
3  safe. Recombinate's perfectly safe.
4      Okay. Why do you want to spend 15, 20,
5  20-some cents more for another safe product? Does it
6  treat the bleed any better? Well, no. Well, then,
7  why this huge premium?
8      And that -- again, the delta was so big
9  that it was getting insurance companies', what I call
10  payers, attention, and it was inhibiting their
11  conversion rate.
12  Q.  Conversion rate, again just to understand,
13  you mean converting from some other form of factor up
14  to Advate?
15  A.  Let's not say "form" because then you get
16  into whether it's Factor VIII or Factor IX.
17  Q.  I don't mean that.
18  A.  I don't, either, but I just want to be
19  clear. From some competitor, let's say, including
20  themselves.
21  Q.  Got it. Switching from a previously used
22  product to Advate?
23  A.  Factor VIII product to Advate, yes.
24  Q.  Okay. I understand.
25      All right. In paragraph 4 the third line

Case 1:01-cv-12257-PBS Document 6866-7 Filed 01/27/10 Page 26 of 104
HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

25 (Pages 97 to 100)

97

1  up, fourth line up, it says, "I also made at least
2  three trips to Baxter's Deerfield, Illinois offices to
3  meet with Baxter managers to discuss pricing."
4        Now, you've already told me about the 340B
5  conversation. And that's kind of in the next several
6  sentences.
7        Do you remember what the other two meetings
8  were about?
9     A.  Not specifically, no.
10    Q.  Okay. If you turn to paragraph 6, you
11 reference it this paragraph 6 of your Declaration that
12 is Deposition Exhibit 6, you reference a meeting with
13 Larry Guiheen about Baxter's pricing of Advate.
14       Is this the conversation that you and I
15 just had about the moving -- what's a good way to
16 describe the conversation we had? A marketing issue?
17    A.  It's pricing and marketing.
18    Q.  Okay.
19    A.  And yes, that is the conversation I'm
20 referring to.
21    Q.  Okay. Got it.
22       In paragraph 7 you refer to your time at
23 Express Scripts and Curascript and you talk about how
24 you, quote, interacted with Baxter's pricing managers,
25 close quote.

98

1        Do you have any specific memory of pricing
2  conversations then?
3     A.  No.
4     Q.  And in the last sentence of paragraph 7 you
5  also reference, quote, numerous discussions with them
6  about pricing strategies.
7        Do you remember what the subject of those
8  pricing discussions were in paragraph 7?
9     A.  I do not remember specific discussions.
10       (Deposition Exhibit Number 21 was
11       marked for identification.)
12       (Document tendered to the
13       witness.)
14 BY MR. JACKSON:
15    Q.  Let me show you what's been marked as
16 Deposition Exhibit 21. Deposition Exhibit 21 is the
17 Memorandum in Opposition to Baxter International
18 Inc.'s Motion to Dismiss Relators' Complaint.
19       Do you see that?
20    A.  Yes, I do.
21    Q.  I have a generic question for you, sir. In
22 the Complaint --
23    A.  Is this a generic question coming from a
24 brand manufacturer?
25    Q.  -- there are repeated allegations, and I'll

99

1  give you an example, in which you and Miss Sun allege
2  that Baxter has violated certain provisions of the
3  various state laws and federal laws beginning in 1998.
4        Yet in Exhibit 21, page 2, you seem to say
5  that your Complaint is based upon events that first
6  occurred in 2000. Second sentence, paragraph 3, third
7  full paragraph: "This scheme was based on FDB's 2000
8  consent decree with the Department of Justice, and
9  consequently could not have been publicly disclosed in
10 any of the earlier filed Complaints cited by Baxter."
11       Do you see that?
12    A.  Yes, I do.
13    Q.  So, are you complaining about events that
14 occurred prior to 2000, or are you complaining about
15 events that occurred after this 2000 date?
16    A.  You know, you referenced the 1998 stuff.
17 It is in the sections -- and I just have to defer to
18 Mr. Kleiman on that because all that legal stuff was
19 his. I just put, you know, put in what I knew.
20    Q.  And all I want to understand is what you
21 believe. Mr. Kleiman and I will have lots of
22 conversations about these issues.
23       But when I look at the Complaint, I see
24 allegations that relate back prior to 2000. Yet in
25 your Opposition, which is Exhibit 21, it seems to

100

1  premise the allegations on something that occurred in
2  2000.
3        Which is it to your knowledge?
4     A.  Page 2 that I refer to says, "Relators'
5  allegations are based on Baxter's intentionally
6  forcing First DataBank (FDB) to misreport Baxter's
7  prices for biological products by refusing to give FDB
8  any WAC information."
9        A couple of things here. First of all,
10 yes, this aspect of the case was only 2000 going
11 forward, okay? Yes.
12       I would also say that when it says here,
13 "by refusing to give First DataBank any WAC
14 information," I think that's true, but I think that it
15 goes further into which WAC information they provide.
16 But in this case any WAC, I suppose, covers that.
17       I'm venturing off into the Law Department
18 here, but the part of the case that has to do with
19 First DataBank certainly is post-2000.
20    Q.  Okay. So, let's back up. Now, how did you
21 know -- strike that.
22       Didn't you previously tell me that you
23 learned about what Baxter was telling First DataBank
24 via your communication with Kay Morgan?
25    A.  Yes.

Case 1:01-cv-12257-PBS Document 6866-7 Filed 01/27/10 Page 27 of 104
HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

26 (Pages 101 to 104)

101

1    Q.   Okay.  Let's now turn to the Complaint,
2  which is Deposition Exhibit 7.  Paragraph 24 on page 9
3  includes the following language:  "Prior to May of
4  2000 FDB's misreporting of price information was
5  suspected or known by state Medicaid agencies."
6         Did you provide that information to the
7  Complaint?
8    A.   I did, but I may not have been the only
9  person that provided that.
10   Q.   I'm just interested in your knowledge and
11 information.
12        How did you know that?  How did you know
13 what state Medicaid agencies knew?
14   A.   Well, because I had personally dealt with
15 several state Medicaid agencies, both while I was at
16 Bayer and while I was at Express Scripts.  So, you
17 know, I had personally talked to and met with, you
18 know, the Texas Drug Vendor Program, Jerry Weiss down
19 in Florida and various other people who openly
20 discussed the fact that, you know, we know the AWPs
21 aren't right.
22   Q.   Now, in the next sentence of paragraph of
23 24 you refer to a "May 2000 FDB agreement with the
24 Justice Department."
25        Do you see that in the second sentence?

102

1    A.   Yes, I do.
2    Q.   What can you tell me about that May 2000
3  agreement between FDB and the Department of Justice?
4    A.   Well, I think that some of this comes out
5  of the case I was involved with with Bayer and that
6  the Department of Justice was looking for some sort of
7  a solution to the, quote, unquote, AWP problem.
8         And it was one thing to settle with a
9  company like Bayer retroactively, but one of the
10 issues was, you know, how do they resolve this problem
11 going forward.  And not just with Bayer, but with many
12 manufacturers.
13        And so, at the time the practice was, and I
14 can tell you, you know, as someone who did it, all
15 three data banks, Medispan, Red Book and First Data,
16 would request from the manufacturers their AWPs.
17 "What do you want your AWP to be?"
18        I would get a form, and it would have all
19 of our drugs on it and, you know, columns and rows,
20 and it would have your current AWP in there and then a
21 blank for what do you want it to be next time.
22        And this was how AWPs were done at that
23 time.  The manufacturer just picked their AWP.
24        Once it became an issue, this was, you
25 know, with the Unicare case and others, that AWPs --

103

1  that there was a problem with AWPs, and the DOJ was
2  looking for a way to contain, I guess would be the way
3  to put it, the problem.
4         So, because First DataBank was the data
5  bank that all the state Medicaid agencies used, the
6  DOJ went to First DataBank and said, "From now on you
7  are not to take AWP information from the
8  manufacturers.  You're just not to -- if they give it
9  to you, you don't accept it.  You don't publish what
10 they tell you to publish.  Here's how you're going to
11 calculate AWPs."
12        And they gave them a methodology that they
13 were to use from that point forward to calculate AWP.
14   Q.   What was that methodology?
15   A.   First DataBank was instructed to take the
16 WAC or wholesale acquisition cost, otherwise known as
17 wholesale selling price, from a manufacturer and then
18 to go to the -- to a group of wholesalers and do a
19 survey, survey the wholesalers as to what they would
20 mark this product up.  And they did it by labeler
21 code.
22        But anyway, they were to go to the
23 wholesalers and ask them to tell them what their
24 markup would be.  This is on not pass-through
25 contracts, but on what they would charge to a

104

1  retail-type customer, what markup hey would have for
2  that labeler code.
3         They were to then do a weighted average of
4  wholesalers.  And whatever that multiplier was, which
5  we all know now is typically 1.2 or 1.25, they would
6  then say that that is the multiplier for that labeler
7  code.  They would then take that multiplier and
8  multiply that times the WAC, and that would determine
9  the AWP.
10   Q.   Now, does your Complaint allege that Baxter
11 did not give a WAC to First DataBank?
12   A.   Yes.
13   Q.   And what did Baxter give to First DataBank?
14   A.   According to Kay Morgan, they received a
15 letter from Baxter stating that -- stating their list
16 price, and they called it list price, was $1.31 and
17 that they wanted an AWP also to be $1.31.
18   Q.   All right.  And then you've already talked
19 to me about your conversation with Kay Morgan, right?
20   A.   I believe we have, yes.
21   Q.   Okay.  Can I have you turn to page 17 of
22 the Complaint, Exhibit 7?  After paragraph 48 there is
23 bold and highlighted language, "Best Price And Stark
24 Violations."
25        The first sentence says -- I'm sorry.

105

1    The first sentence, paragraph 49: "Baxter
2  had a marketing practice of offering 'Volume Committed
3  Contracts' to institutional healthcare providers (such
4  as hospitals, nursing homes and home health
5  agencies)."
6    Do you see that?
7  **A.  Yes, I do.**
8    Q.  Do you believe that there's something wrong
9  about volume committed contracts?
10  **A.  No.**
11  Q.  I'm sorry?
12  **A.  No.**
13  Q.  Okay.  Then is there -- what is Baxter's
14  practice regarding volume committed contracts that you
15  believe give rise to best price or Stark violations?
16  **A.  Well, first of all, let me say that this**
17  **section comes from Linnette Sun.**
18  Q.  Okay.
19  **A.  Maybe that's -- I've said enough.**
20  Q.  No, I'm just trying to understand.  It
21  appears that something's wrong with volume committed
22  contracts.  And you said you don't think that
23  anything's wrong with volume committed contracts.
24  **A.  That's correct.**
25  Q.  Okay.  Do you believe that Baxter -- that

106

1  as a result of volume committed contracts Baxter has
2  done something wrong, impermissible or illegal with
3  regard to best price?
4  **A.  I don't know.**
5  Q.  What is best price?  Do you know?
6  **A.  You want the version prior to 2007?**
7  Q.  I want whatever your definitions are.
8  **A.  Well, CMS published -- I'm sure you're**
9  **familiar with the Deficit Reduction Act's changes in**
10  **definitions on best price and ANP that was Published**
11  **in fall of 2007.  But this case is prior to that, so I**
12  **think we're looking at that definition of best price.**
13  **And best price is, I believe, defined in**
14  **the Social Security Act as the lowest price offered by**
15  **a manufacturer net of all rebates, terms and**
16  **conditions.**
17  Q.  Do you have any information that would
18  suggest that Baxter failed to calculate best price in
19  an appropriate way?
20  **A.  No, I do not.**
21  Q.  Do you believe that volume committed
22  contracts create Stark violations?
23  **A.  I don't know for sure what Stark violations**
24  **are.**
25  Q.  Did you have any input to the allegations

107

1  of this Complaint in connection with Stark violations?
2  **A.  Again I don't know what Stark violations**
3  **are, so I don't know if I had any input.**
4  Q.  If you look at paragraph 52, it says, "The
5  discounts Baxter offered to institutional providers
6  under the Volume Committed Contracts also violated
7  Stark II, 42 U.S. Section 1395nn which prohibits
8  compensation arrangements such as Volume Committed
9  Contracts between entities such as Baxter, which
10  furnishes goods or services, and healthcare providers,
11  which are in a position to order or refer patients for
12  the receipt of such goods or services."
13    Does that help you refresh your
14  recollection what the Stark act might or might not do?
15    MR. KLEIMAN:  Assumes facts not in evidence.
16  Go ahead.
17  BY THE WITNESS:
18  **A.  When you say "helps," it gives me a little**
19  **bit more information, but I still don't know.**
20  BY MR. JACKSON:
21  Q.  Okay.  And do you know anything about
22  Baxter's practices vis-a-vis volume committed
23  contracts?
24  **A.  No.**
25  Q.  In paragraph 58 of the Complaint that's

108

1  Deposition Exhibit 7 there are allegations that relate
2  to AMPs.  Do you know what an AMP is?
3  **A.  Sure.  Average manufacturer's price.**
4  Q.  Do you have any information regarding
5  Baxter's practices regarding calculating AMPs or BPs?
6  **A.  No, I do not.**
7  Q.  Do you believe that volume committed
8  contracts, the use of volume committed contracts
9  constitutes a violation of the Anti-Kickback Act?
10    MR. KLEIMAN:  Incomplete hypothetical.
11  BY MR. JACKSON:
12  Q.  You can answer the question.
13  **A.  I'm not -- I'm not well-versed enough on**
14  **anti-kickback to tell you whether it does or doesn't.**
15  BY MR. JACKSON:
16  Q.  Do you believe that a manufacturer who
17  provides discounts to a purchaser, that those
18  discounts are improper or illegal in any way?
19  **A.  Well, --**
20    MR. KLEIMAN:  Calls for a legal conclusion.
21  BY THE WITNESS:
22  **A.  Yeah, I think that's --**
23  BY MR. JACKSON:
24  Q.  Go ahead.
25  **A.  It's really vague.  I suppose it depends on**

Case 1:01-cv-12257-PBS   Document 6866-7   Filed 01/27/10   Page 29 of 104
HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

28 (Pages 109 to 112)



109

1  a whole flock of things in terms of what are the
2  discounts for.  I mean, I'll give you a discount if
3  you do something illegal, well, then, no, that's
4  illegal.
5      Q.   What about volume discounts?
6      A.   I don't see a problem with volume
7  discounts.
8      MR. JACKSON:  Let's go off the record.
9      (Discussion off the record.)
10     (Recess.)
11     MR. JACKSON:  I have no further questions for
12  this witness regarding the jurisdictional issues.
13     MR. KLEIMAN:  Thank you.  I've got nothing
14  further.
15         (Whereupon, the deposition was
16         concluded at 2:22 p.m., this day,
17         January 21, 2010.)
18
19
20
21
22
23
24
25

110

1  STATE OF ILLINOIS  )
              )
2  COUNTY OF GRUNDY  )
3      The within and foregoing deposition of the
4  aforementioned witness was taken before MARGARET A.
5  BACHNER, CSR and Notary Public, at the place, date and
6  time aforementioned.
7      There were present during the taking of the
8  deposition the previously named counsel.
9      The said witness was first duly sworn and
10  was then examined upon oral interrogatories; the
11  questions and answers were taken down in shorthand by
12  the undersigned, acting as stenographer and Notary
13  Public; and the within and foregoing is a true,
14  accurate and complete record of all of the questions
15  asked of and answers made by the aforementioned
16  witness, at the time and place hereinabove referred
17  to.
18      The signature of the witness was not
19  waived, and the deposition was submitted, pursuant to
20  Rules 30(e) and 32(d) of the Rules of Civil Procedure
21  for the United States District Court, to the deponent
22  per copy of the attached letter.
23
24
25

111

1      The undersigned is not interested in the
2  within case, nor of kin or counsel to any of the
3  parties.
4      Witness my official signature and seal as
5  Notary Public in and for Grundy County, Illinois, on
6  this 22nd day of January, A.D. 2010.
7
8
9      _____
       Margaret A. Bachner, CSR, RMR, CRR
10     Illinois CSR No. 84-1481
       Notary Public, Grundy County, Illinois
11     My Commission Expires June 22, 2010
       311 South Wacker Drive, Suite 300
12     Chicago, Illinois  60606
       Phone:  (312) 386-2000
13
14
15
16
17
18
19
20
21
22
23
24
25

112

1          UNITED STATES DISTRICT COURT
             DISTRICT OF MASSACHUSETTS
2
   IN RE:  PHARMACEUTICAL         )
3  INDUSTRY AVERAGE WHOLESALE     )
   PRICE LITIGATION          ) MDL No. 1456
4  _____ )
                   ) Master File No.
5  THIS DOCUMENT RELATES TO:     ) 1:01-CV-12257-PBS
                   )
6  United States ex rel.      ) Sub-Category Case
   Linnette Sun and Greg      ) No. 1:08-CV-11200
7  Hamilton, Relators      )
                   )
8      v.            )
                   )
9  Baxter Hemoglobin          )
   Therapeutics and Baxter      )
10 International Inc.       )
11     I, GREG HAMILTON, hereby certify that I have
12 read the foregoing transcript of my deposition given
13 at the time and place aforesaid, consisting of Pages 1
14 to 112, inclusive, and I do again subscribe and make
15 oath that the same is a true, correct, and complete
16 transcript of my deposition so given as aforesaid, and
17 includes changes, if any, made by me.
18
19     _____
            GREG HAMILTON
20
21 SUBSCRIBED AND SWORN TO before me this
22 _____ day of _____ 2010.
23
24 _____
       Notary Public
25

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

113

**A**

Abbott 28:15
ability 6:6,7
able 31:23 84:1,4
   84:10 95:2
Absent 24:11
absolutely 83:4
accept 43:7 45:16
   103:9
acceptance 94:11
accepted 10:11
   94:24
access 22:12 32:6
   32:9,19,23,25
   33:8,13,15,15
   33:20,23 42:13
accompanying
   90:8
Accredo 47:1
accurate 30:1
   110:14
accurately 29:23
acquire 46:18
   60:12
acquisition 39:24
   76:7 103:16
act 9:23 12:21,21
   12:22 13:5
   106:14 107:14
   108:9
acting 110:12
acts 36:17
actual 39:24 76:7
   78:9
Act's 106:9
add 69:6 74:13
addition 36:15
   90:10
address 92:1,2
adjudicated
   51:17
adjudicating 53:9
   53:11
administered
   91:7
Administrative
   51:22
Advate 92:10,12

92:17 93:12,13
   94:7 95:4,7
   96:14,22,23
   97:13
Advate's 92:5
   93:2
advertise 15:23
affect 76:7
affirm 6:12
aforementioned
   110:4,6,15
aforesaid 112:13
   112:16
AG 28:22
agencies 101:5,13
   101:15 103:5
   105:5
ago 7:25 20:23
   32:15 66:20
agreement 25:16
   25:19,21 26:13
   26:16,21 101:23
   102:3
agreements 26:23
ahead 6:16 32:10
   36:23 44:11
   70:13 107:16
   108:24
Algonquin 54:19
allegations 35:11
   47:16 76:19,22
   98:25 99:24
   100:1,5 106:25
   108:1
allege 99:1 104:10
alleged 36:17
alleging 8:22
ALLEN 2:4
aloud 5:25
ambiguous 14:8
   30:10 62:24
Amended 3:16
   25:11 49:8
America 3:17
   46:17,21,23,24
amount 53:15
AMP 10:7 108:2
AMPs 108:2,5

analysis 70:22
   71:8
ANDREW 2:11
Andy 5:7
ANP 106:10
answer 5:24 6:10
   6:16,16 11:14
   11:22 14:13
   15:19 17:25
   19:7 20:8 22:6
   22:14 23:2,15
   23:20 24:15
   25:4 26:11 28:4
   28:7 30:12
   32:10,12 41:5
   48:4 49:2,4
   51:13 55:22
   67:4 82:25 83:8
   84:8 87:11
   108:12
answered 11:5
   16:13 55:20
answering 19:20
answers 66:20
   67:3 110:11,15
anti-kickback
   108:9,14
anymore 45:16
anything's 105:23
anyway 103:22
apart 51:19,21
apologize 61:15
appearing 5:20
appears 31:4
   54:18 55:7
   78:20 79:23
   81:1 105:21
applies 84:25
appointment 4:16
   77:23,24 78:9
   79:13,14 80:14
   80:15,16,17,21
   83:2 85:21
appreciate 77:3
appropriate
   106:19
approval 93:18
approved 93:19

93:21
approximately
   25:9,13 33:12
April 27:3 56:21
   62:19 70:6
   86:11 93:20
area 28:16 64:7
areas 9:5
aren't 92:25
   101:21
arrangements
   107:8
article 4:3 54:10
   56:20,21
asked 18:21 41:10
   43:20 45:7
   65:18 66:19
   67:10,12 91:1,5
   110:15
asking 5:23 14:17
   18:11 25:2,3
   52:7 78:13
aspect 100:10
assess 82:24
assign 14:4
assist 55:15
assistant 65:20
Association 87:22
assume 24:18
   31:20 75:19
assumes 32:8
   107:15
attached 110:22
attention 42:12
   94:17,21 95:13
   95:14,18 96:10
attorney 23:1
   58:9 86:12
attorneys 3:10
   16:19 22:11,24
   24:11 25:1
   31:20 56:6 58:3
   60:15
August 84:11
AUSTIN 2:18
available 40:12
   67:10 70:23
   71:9,13,17,25

86:20
Avenue 2:5
average 1:4 8:8
   8:10 9:14 14:7
   104:3 108:3
   112:3
aware 10:16,21
   10:22 15:22
   27:19 41:25
AWP 7:19 8:8 9:2
   9:11,13,13 10:6
   11:2 13:9 14:18
   17:10,11 21:7,8
   32:3 34:6,21,23
   35:1 38:15
   39:10 43:10
   45:14 74:3,7,9
   74:14,23,25
   75:1,6,18,19,24
   76:8 90:8,17
   102:7,17,20,23
   103:7,13 104:9
   104:17
AWPs 31:5 38:23
   44:19 45:16
   64:15 75:20
   76:13 101:20
   102:16,22,25
   103:1,11
AWP's 76:3
A.D 1:20 111:6
a.m 1:21 80:4

**B**

B 3:6 4:1
Bachner 1:15
   110:5 111:9
back 9:7 33:14
   34:25 41:4
   43:25 53:3 55:6
   56:8 65:23
   66:13,15 68:13
   68:18 77:23,24
   84:22 87:25
   89:9 93:7 99:24
   100:20
background 56:7
ballpark 94:8

Case 1:01-cv-12257-PBS   Document 6866-7   Filed 01/27/10   Page 31 of 104
HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

114

bank 74:12 103:5
banks 74:10
  102:15
bank's 33:16
Barnhill 9:18
based 22:14 27:18
  33:11 40:7 99:5
  99:7 100:5
basically 29:3
  90:5
basis 19:16 35:10
  35:13
Bates 31:12 57:20
bathroom 72:18
Baxter 1:10,10
  2:8,9,24 3:13,21
  5:8 13:16 18:25
  19:4 21:9,13,17
  21:22 22:9,19
  30:3,4,7,8,14,22
  31:18 36:16
  37:25 40:7,10
  40:13 43:19,21
  44:3 45:13,17
  45:24 46:11
  48:1 50:3,8,8
  51:2,14,16,20
  51:23 52:17,22
  53:3,20 56:20
  58:11 61:5
  77:16 78:21
  79:6 81:22 82:3
  82:5,8 83:15
  84:12,13,15
  85:6 86:22,23
  89:14 90:1,25
  91:3 94:1 95:22
  97:3 98:17 99:2
  99:10 100:23
  104:10,13,15
  105:1,25 106:1
  106:18 107:5,9
  112:9,9
Baxter's 4:19
  36:17 43:7 52:2
  52:4,8,10,12
  73:21 82:11
  86:2 87:1 91:15

97:2,13,24
  100:5,6 105:13
  107:22 108:5
Bayer 2:17 28:22
  28:22,22 29:2,4
  34:20 64:1,3
  101:16 102:5,9
  102:11
bearing 55:24
Beck 83:13,14,16
becoming 32:20
began 34:14
beginning 99:3
begins 39:9 43:5
behalf 2:3,8,17
  87:23
belief 48:20,21
believe 5:19 7:13
  7:20 9:2,24
  16:12 18:14
  27:16 29:19,25
  33:12 35:2,8
  44:1 52:4 59:8
  59:20 60:9 65:3
  69:22 71:11
  73:9 75:4,7
  76:12,24 82:22
  83:3 86:16 95:7
  99:21 104:20
  105:8,15,25
  106:13,21 108:7
  108:16
believed 44:16
best 8:12 12:24
  56:6 73:5,17
  104:23 105:15
  106:3,5,10,12
  106:13,18
BethAnne 15:8
better 93:3 96:6
big 62:14 89:19
  89:24 96:8
bigger 95:16
bill 74:6 95:11
billed 74:2,4
biological 28:20
  28:21 100:7
biologics 64:19

BioScience 3:21
bit 73:16 107:19
blacked 81:12
blank 102:21
bleed 96:6
bold 104:23
Bolton 2:24 13:2
  13:15
book 4:16 34:23
  79:13 80:14
  83:2 85:21
  102:15
books 77:23,25
  78:9
Book's 34:8
bottom 31:11
BP 10:7
BPs 108:5
brand 98:24
break 11:15
  32:13 72:18
breaker 92:24
briefly 7:14 28:8
broad 14:2
broken 14:15
brought 44:25
  91:2 95:18
buck 94:7
Bureau 62:13,20
  63:21,23,24
  65:2,6,9 66:8
  67:6,9 68:14,25
  69:5,7,16,23
  70:2,7 71:4,13
  72:7
Bureau's 67:24
business 41:25
buy 41:22 67:1

_____

C

C 7:21 8:21 10:2
  11:2 19:11
calculate 39:18
  103:11,13
  106:18
calculated 51:16
  52:6 91:6
calculates 52:22

53:22
calculating 53:13
  108:5
calculation 39:20
calculations
  52:17,21
calendar 78:20
  83:11,20 84:6
California 2:6
call 45:5,9,9 65:5
  65:8 84:14,16
  96:9
called 5:3 18:14
  18:15 43:20
  44:4 45:4 46:16
  62:6 64:7,9
  65:10 66:8,13
  66:14,21 68:25
  89:4 90:11
  94:19 104:16
calling 44:8 45:22
  65:13
Calls 44:10 49:1
  55:1 108:20
cancelled 79:14
can't 12:6,14
  23:20 26:11
  45:16 79:12
  81:17 82:10
  85:7,9 90:18,24
capacity 11:17
Capital 3:23
  54:10
Cardinal 40:13
  40:17 41:11,23
  42:1
care 34:5 47:2
  62:4
career 11:17
case 1:7 5:9 7:15
  7:17,19,21 8:1,7
  8:15,24 9:20,22
  9:23 10:1,3,6,19
  11:3 14:23 15:2
  15:5,11,15
  16:18,20 17:21
  17:22,23 18:7,9
  18:10,20,21,24

18:24 19:9,11
  19:25 20:15,15
  20:22,24 21:3,4
  21:6,7,8,12,15
  21:17 25:17
  27:15 30:5,9
  47:17 60:23
  68:22 71:23
  76:19 81:23
  100:10,16,18
  102:5,25 106:11
  111:2 112:6
cases 11:1,16,21
  12:1,8,15,17,20
  12:21 13:5,19
  13:22 14:6,11
  14:15,16,23
  17:10,11,15
  18:3,22 19:2,6
  19:13,17,20
  20:6,9 21:20,22
categories 64:14
caught 95:17
caution 12:5
center 8:22
cents 39:22,24
  92:22 93:1,6,7
  94:6,8,14 96:5
certain 12:2 28:5
  31:8 53:15,16
  53:17 56:9
  79:12 80:3
  82:11 83:4 85:8
  85:9 99:2
certainly 34:4
  37:19 76:13
  90:6 100:19
certify 112:11
cetera 25:22 56:9
chance 72:19
change 74:14,16
  75:24 76:5,6
changed 75:1,21
  76:3
changes 74:22
  75:5 76:8 106:9
  112:17
Changing 3:23

54:11
channels 41:22
Channon 8:6
Chapin 8:6
charge 41:17
  65:15 103:25
charging 65:17
  74:16 92:19
check 53:23
checks 15:10
Chicago 1:19
  2:21 28:16,18
  82:8 111:12
Chief 44:23,23
Chuck 9:18
Cindy 66:8,10,12
  66:17
circumstances
  27:5 57:12
  74:17 75:23
cited 99:10
citing 65:1
civil 1:16 7:17,20
  10:1 13:9 18:15
  110:20
claim 18:12,14
claims 9:22 12:20
  12:21,22 13:5
  14:11 20:22
  21:6 27:17
  91:10 95:16
clauses 56:9
clear 96:19
client 18:11 90:1
clients 65:21 72:3
  87:24
close 97:25
clue 60:20
CMS 42:10,13
  106:8
code 64:17 103:21
  104:2,7
Cohen 15:8,18
colleague 64:1
collection 77:20
columns 102:19
come 12:2 22:22
  31:10,17 39:19

40:6 42:9 46:18
  91:1 92:11
comes 16:8 52:24
  102:4 105:17
coming 49:13
  58:18 98:23
comment 16:15
comments 79:1
Commission
  111:11
committed 105:2
  105:9,14,21,23
  106:1,21 107:6
  107:8,22 108:7
  108:8
common 87:20
communication
  23:16,19 24:23
  24:25 25:14
  35:9 42:6 43:23
  45:24 90:16
  100:24
communications
  24:5,7 26:8 35:4
  90:14
companies 29:4
  34:6 70:24
  71:10,15 92:25
  93:10 94:12,25
  96:9
company 17:15
  17:20 28:22,23
  32:17 46:16
  47:2 51:4 63:24
  64:5,21 71:24
  102:9
comparable
  92:13
compares 53:21
comparison 73:17
  92:19
compensation
  107:8
competitor 96:19
compiling 71:21
complaining
  99:13,14
Complaint 3:16

22:3 25:11 27:5
  27:17,21,23
  35:11 36:18,24
  37:10,13,16
  39:2 40:24 42:4
  42:18 43:1,4
  47:16 48:25
  49:8,15 50:23
  51:8 56:1 57:3
  57:10 58:20
  59:11 60:22
  61:7,14 65:2
  68:22 69:5,20
  69:24 72:8
  75:13,18 76:19
  76:21,23 86:19
  87:8,13 89:15
  91:10 98:18,22
  99:5,23 101:1,7
  104:10,22 107:1
  107:25
Complaints 99:10
complete 110:14
  112:15
components
  37:15
Compound 11:12
  32:8
concept 76:13
conceptual 93:4
concern 8:7 18:24
  19:4
concerned 21:12
  45:3 89:13
Concerning
  27:24 28:1
concerns 18:10
concluded 109:16
conclusion
  108:20
conditions 26:1
  106:16
conference 45:2,5
  84:13
confidence 72:3
confidential 1:12
  20:3 57:18
confirmed 65:19

65:21
conjunction 51:8
connection 17:10
  17:14 18:2
  21:12,17,19
  22:15 27:15
  65:6 107:1
consent 99:8
consequently
  41:19 99:9
consisting 112:13
constitutes 108:9
consultant 11:18
  15:4 19:4 29:3
  29:10 30:13
consulted 30:7
consulting 11:11
contact 23:24
  24:1 25:8 34:19
  34:25 41:11
contain 72:2
  103:2
contained 36:10
  37:16 42:14,25
  71:12 72:8
contains 62:25
content 25:2
contents 63:5
  70:22
context 73:16,19
  87:18
contract 40:17
  50:7 74:11,15
  74:22 75:3 90:6
contracting 73:23
  74:1 76:2 91:2,3
  91:4
contracts 40:7,10
  51:2,4,5,14
  74:13 103:25
  105:3,9,14,22
  105:23 106:1,22
  107:6,9,23
  108:8,8
control 48:16
  87:23
conversation
  43:18 66:17

91:25 97:5,14
  97:16,19 104:19
conversations
  44:19 91:19
  98:2 99:22
conversion 96:11
  96:12
conversions
  92:16
convert 95:3
converting 96:13
convince 93:8
copies 16:7,9
  85:19
copy 26:15 58:1
  60:13 110:22
corner 30:22
  31:12
Corporation 2:17
  29:4 64:1
correct 6:12 9:15
  9:21 13:10 18:5
  22:21 24:16
  32:18 33:3 35:6
  35:12 41:13
  51:23,24 52:6
  52:18,19,20
  53:8 67:22 68:5
  90:4 105:24
  112:15
cost 39:24 66:22
  67:13,17 103:16
costs 68:7
Couldn't 71:19
counsel 2:1,24
  6:14,15 14:21
  110:8 111:2
counsel's 6:25
  11:25 78:5
country 67:14
County 110:2
  111:5,10
couple 87:25 93:1
  100:9
course 74:8 87:19
  90:4 93:3 95:22
court 1:1 4:3
  10:11 11:5,6,9

56:22 110:21
112:1
**Courts** 1:17
**cover** 15:15 62:5
**covers** 100:16
**Craig** 18:8
**create** 71:5 73:10
73:12 106:22
**created** 75:7,8
85:18
**creating** 47:16
73:13
**credit** 51:20
**CRR** 1:15 111:9
**CSR** 1:15 110:5
111:9,10
**Curascript** 3:21
50:5,5,8,12 74:5
97:23
**Curascript's** 53:5
**curious** 57:6
**current** 67:1 95:3
102:20
**currently** 65:17
**curriculum** 3:12
**curve** 94:20
**customer** 3:21
44:22 52:23
53:15 73:21
74:2 76:4 86:2
90:7 104:1
**customers** 34:1,2
74:19
**Cutter** 28:20,21

**D**

**D** 3:1
**Dallas** 81:6
**damages** 3:16
8:20 25:17
**data** 33:15 34:11
40:6 64:6,13,24
68:4 70:8 74:10
74:12 102:15,15
103:4
**DataBank** 3:19
4:14 31:7,9,10
31:22,24,25

32:2,4,6,19 33:9
33:13,21 34:9
34:12,20,22
35:1,5 36:20
37:23 38:1,17
38:19,19,22
39:1,18,20
44:22,25 73:8
74:9 100:6,13
100:19,23 103:4
103:6,15 104:11
104:13
**DataBank's** 31:5
33:23
**database** 33:9
**date** 25:12,12,13
33:12 42:17
60:22 78:20
83:12 87:8
90:24 93:18
99:15 110:5
**dated** 56:21 57:19
70:6
**dates** 27:7,9
29:25 43:25
**day** 1:20 68:4
82:9,10,16,20
83:17 88:8
109:16 111:6
112:22
**days** 44:2 66:14
84:12
**DC** 2:14
**deal** 45:16 92:24
**dealt** 101:14
**Dearborn** 2:20
**death** 18:10
**debit** 51:20
**deck** 85:3,3
**Declaration** 3:15
6:24 35:2,9 36:2
36:4,7,10,13
42:7 65:24 66:7
66:24 67:16
89:10 97:11
**decree** 99:8
**Deerfield** 97:2
**defendant** 17:16

17:21
**defendants** 9:25
30:5,8
**defer** 99:17
**Deficit** 106:9
**define** 17:11
33:23
**defined** 106:13
**definition** 106:12
**definitions** 106:7
106:10
**delay** 93:21
**delivering** 41:17
**delta** 95:8,12,14
96:8
**demonstrate** 51:1
**denied** 10:19
**denominator** 14:9
14:10
**Department** 27:4
27:8 64:2 87:7
91:4 99:8
100:17 101:24
102:3,6
**depending** 75:22
**depends** 33:22
108:25
**deponent** 110:21
**depose** 10:20
**deposed** 7:10
18:22 19:10,14
20:25
**deposition** 1:14
2:1 3:7,8 4:2,5,8
5:10,16,16,17
5:21 6:20,24 7:6
7:16,23 10:17
11:7,8 13:3 16:1
16:21 17:3,3,4,9
20:7 29:11,17
29:18,21 30:15
30:20,21 35:15
35:21,23,23
36:1 37:1,6,7,10
42:4 43:4 46:4,9
46:10 47:19,25
47:25 48:24
49:9,12,13,17

49:23,23 52:1
54:2,8,8 56:13
56:19,19 57:12
57:17,18 58:11
58:19,22 59:2,3
59:5,21 60:3,3,4
60:17 61:3,18
61:24 62:3
68:21 69:9,15
69:15 70:2,14
70:19 72:10,16
72:24,25 73:3
77:9,15,16
78:19,19 86:4
86:10,10 88:6
89:1,10 97:12
98:10,16,16
101:2 108:1
109:15 110:3,8
110:19 112:12
112:16
**depositions** 1:18
4:7 7:15 12:25
59:4 61:2
**describe** 7:14
8:25 28:9 97:16
**described** 29:22
43:10 45:13,13
84:20 86:23
**designate** 19:25
20:2
**destroy** 78:15
**details** 9:8
**determine** 38:12
104:8
**determined** 26:6
38:14
**develop** 87:3
**developed** 87:1
**DICKSTEIN**
2:10
**didn't** 23:1 32:9
44:8 73:11
85:21 100:22
**difference** 39:23
94:4,5,8,18,20
95:9
**different** 23:22

47:12 53:14
**differential** 92:24
**difficult** 93:4
**direct** 34:19,25
36:15 42:11
**directed** 73:12
**directly** 32:24
**disclosed** 99:9
**disclosing** 86:19
**disclosure** 72:1
**discount** 74:3,6
109:2
**discounts** 107:5
108:17,18 109:2
109:5,7
**discovery** 1:18
**discuss** 8:25 91:2
91:16 97:3
**discussed** 12:25
45:6 83:17
89:14,20 90:10
90:21 101:20
**discussing** 20:15
84:17
**discussion** 14:25
37:22 84:24
88:4 93:12
109:9
**discussions** 23:4
36:16 66:15
98:5,8,9
**Dismiss** 4:19 7:3
10:19 35:3
98:18
**distribution**
41:22,23
**District** 1:1,2,17
110:21 112:1,1
**division** 28:14
50:5
**doctor** 64:18 93:9
**document** 1:6
3:13,17,19,21
3:23 4:10,12
5:12,18 16:3,23
17:6 26:16
29:13 30:17,21
30:24 31:1,3,6,8

31:17,19,21
35:17,24 37:3
37:18 46:6,10
46:12,14,18
47:15,21 48:1,2
48:6,7,11,24
49:5,19 50:1,11
50:22 51:1 54:4
54:9,14,16,25
55:5,17,21,24
55:25 56:3,9,15
56:25 57:2,14
57:20,22,25
58:2,6,8,14,16
58:24 59:6,7,10
59:23 60:4,6,8
60:10,13,19,22
61:6,6,8,20 62:3
62:9,16,17,22
63:2,13,20
69:11 70:2
72:12 73:10,14
73:15 75:4,8,12
76:18 77:11,16
77:18 86:6,15
98:12 112:5
**documentary**
86:24 87:3
**documents** 6:19
6:22 7:5 21:11
21:16 22:8,11
22:15,19,19
31:10,16 50:16
50:20 62:25
78:3,9,16
**doesn't** 64:19
71:16 87:9,15
108:14
**doing** 45:21 61:15
95:5
**DOJ** 87:21 103:1
103:6
**dollar** 95:17
**dollars** 15:13
94:16
**don't** 9:24 12:3
12:10 13:24,25
14:14 15:6,9,21

16:11 17:17,18
17:20 22:6,12
24:21 26:1,22
27:1,6,6,8,10
28:2,7 31:2 34:3
36:5 38:20 39:3
40:21 42:16,19
43:24 44:1,7
45:1 49:4,4,16
50:13 51:25
52:3,14 54:17
54:21,23 55:3
55:19,22,23
56:2,5,12 57:1,8
58:12,15 59:8,9
59:20,20 60:24
61:4,11 62:11
62:14 63:9 65:3
66:13 69:7 70:4
70:5,9 72:9
75:17 76:5,8,12
76:24 77:8
79:10 80:3,19
83:8 88:2 91:24
93:7,19,22
96:17,18 103:9
103:9 105:22
106:4,23 107:2
107:3,19 109:6
**draft** 36:4 55:25
60:16
**drafting** 49:8,14
58:20 61:7,13
**Draycott** 27:13
27:15
**Drive** 111:11
**drop** 92:15,22
**drug** 3:11 17:5
18:17,17,18
28:10 39:10
90:8 95:23
101:18
**drugfraudsettle...**
3:9,11 15:24
**drugs** 4:14 6:5
41:21 64:14
73:9 92:20
102:19

**due** 53:23
**duly** 5:1,3 89:5
110:9

————— E —————

**E** 3:1,6 4:1
**earlier** 18:4,21
19:14 33:11
39:2 68:2 99:10
**easier** 68:20
83:20
**easy** 38:21 75:24
77:2
**Editorial** 36:19
**educational** 76:9
**either** 11:17 30:4
30:8 75:3 85:9
96:18
**else's** 95:4
**employed** 85:23
86:22
**employee** 33:1
86:1
**employer** 50:16
**engage** 51:2
**engaging** 51:4
**ENJAMIN** 2:19
**entered** 13:2,12
20:6
**entire** 11:16
15:11
**entities** 30:4,8
107:9
**entitled** 3:13,17
3:19,21,23 4:3
4:10,12 15:23
35:24 54:10
56:22 60:4 62:4
**entries** 85:5
**entry** 51:19 52:2
52:4,8,12
**equals** 39:25
**err** 12:5
**errors** 53:5
**especially** 52:5
74:11
**ESQUIRE** 2:4,11
2:12,19

**estimate** 12:11,24
15:16 22:1
42:20
**et** 25:22 56:9
**events** 99:5,13,15
**everybody** 64:12
**evidence** 86:20,20
86:25 87:3
107:15
**ex** 1:7 112:6
**exact** 9:8 12:10
22:6 48:5
**exactly** 36:8
40:22 43:24
69:8 70:8 78:1
90:19
**examination** 3:2
5:5 57:18 58:19
89:7
**examined** 5:4
89:5 110:10
**example** 42:22
68:7 83:25
84:10 99:1
**Excel** 50:2 51:18
52:4,5,10,24,25
53:7
**excerpts** 4:16
**excessive** 92:18
**exclude** 23:3
**excludes** 23:6
**Excuse** 13:11
**exhibit** 3:7 4:2
5:10,16,16 16:1
16:6,21 17:3,3,4
17:9,13 18:2
29:11,17,18,21
30:15,21,21
35:15,21,23,23
36:1 37:1,7,7,10
42:4 43:4 46:4
46:10,10 47:4
47:19,25,25
48:24 49:9,12
49:14,17,23,24
51:9,10 52:1,11
54:2,8,8 56:13
56:19,19 57:12

57:17,18 58:19
58:22 59:3,3,5
59:15,21 60:3,3
61:9,18,24 62:3
62:6 68:14,14
68:21 69:9,15
69:15 70:2,20
72:10,16,24,25
73:4 77:9,15,16
78:19,20 86:4
86:10,10 89:10
91:10 92:7,9
97:12 98:10,16
98:16 99:4,25
101:2 104:22
108:1
**Exhibits** 70:14
**exist** 74:23
**existed** 50:7
**exists** 46:25
**expert** 3:11 8:2,18
8:23 9:3,6,19
10:4,12 11:11
11:18,21 15:5
17:5,14 19:4
**Expires** 111:11
**explain** 16:19
41:14,15 73:3
73:19 76:10
77:20 81:4 91:5
**Express** 3:19 29:5
29:7 32:25 33:1
33:5,6,7,20 40:7
40:10,12,16,17
41:1,10,10,16
41:20,24 44:21
44:25 46:19
48:12,14,18,19
48:22 50:3,5,11
50:18 73:20
74:5,19,20 75:8
75:11 86:1 90:3
90:15 97:23
101:16
**expressed** 92:10
**extensive** 92:18
**extent** 10:22
11:20 19:5

Case 1:01-cv-12257-PBS   Document 6866-7   Filed 01/27/10   Page 35 of 104
HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

118

23:16 26:8
50:24
**extra** 94:14
**Eye** 2:13
**Eyes** 58:3

**F**

**facility** 82:8
**fact** 15:22 20:5
52:23 53:1,4
96:1 101:20
**factor** 42:1 44:18
73:22 92:17
95:24 96:13,16
96:16,23
**facts** 27:5 36:9
107:15
**factual** 35:10
42:25 45:25
72:8
**failed** 106:18
**fall** 106:11
**false** 9:22 12:20
12:21,22 13:5
14:11
**familiar** 63:20
64:8 75:19
106:9
**familiarity** 87:2
**far** 49:2 77:24
**favor** 53:5
**fax** 54:19,22 55:6
**FDB** 43:7 100:6,7
101:23 102:3
**FDB's** 99:7 101:4
**February** 84:23
**federal** 1:16 12:2
12:21 99:3
**fee** 32:3
**fees** 25:17,22 26:4
26:24
**felt** 76:15 92:16
**field** 53:7
**figure** 38:25 39:4
39:14 63:19
**file** 1:5 3:19 63:11
112:4
**filed** 17:22,23

22:3 25:11 35:3
39:2 40:24
60:23 87:8
99:10
**filing** 27:2,21
**final** 89:12
**financial** 44:24
46:15 75:2
**find** 61:5 65:11
65:15 66:21
**fine** 6:13 10:24
12:12 26:2
**firing** 86:23
**firm** 15:20
**first** 3:19 4:14 5:3
8:19 13:8 14:14
15:6 21:24
23:13,23 24:23
25:8,14 31:1,5,7
31:9,10,22,24
31:25 32:2,4,5,6
32:19 33:9,12
33:13,14,21,23
34:9,12,14,19
34:21 35:1,5
36:6,20 37:23
38:1,17,18,19
38:22 39:1,17
39:19 44:22,24
54:16 55:21
58:6 60:10
62:15 73:8 74:9
78:18,19 86:18
89:21 91:13
92:2 95:13 99:5
100:6,9,13,19
100:23 102:15
103:4,6,15
104:11,13,25
105:1,16 110:9
**firsthand** 33:16
**flock** 109:1
**Florida** 101:19
**fluctuated** 76:14
**focus** 63:15
**folks** 27:8 44:24
**following** 2:1
43:5 70:21 85:2

91:14 101:3
**follows** 5:4 37:25
89:6
**footnote** 74:8
76:5
**footnotes** 74:14
**forcing** 100:6
**foregoing** 110:3
110:13 112:12
**forget** 64:4 93:18
**form** 96:13,15
102:18
**format** 43:22
47:11,12
**formed** 35:10,13
71:24
**former** 64:1
**forth** 34:25
**forward** 45:8
86:18 100:11
102:11 103:13
**Foundation** 81:7
83:23,25
**founded** 64:21
**four** 45:2
**fourth** 39:12 97:1
**Fractions** 4:12
68:25 70:20
**fraud** 7:17 18:16
87:22
**frequently** 91:15
**Friday** 84:11
**front** 56:8 62:5
70:19
**FUCU** 87:21
**fulfillment** 73:23
**full** 6:1 99:7
**furnishes** 107:10
**further** 51:15
55:5 66:15 89:6
100:15 109:11
109:14

**G**

**gain** 42:14
**gained** 33:12,15
37:22,25 38:4
42:6 46:2

**general** 9:8,9,10
71:22 84:20
86:12
**generalities** 34:17
**generally** 70:23
71:8 81:17,19
84:7
**generated** 66:19
**generic** 98:21,23
**gentlemen** 90:22
**getting** 48:4 72:17
96:9
**GH000001** 31:12
**GH000001-000...**
3:14
**GH000009** 31:13
**GH000010-000...**
3:18
**GH000014** 47:4
**GH000023-000...**
3:20
**GH000047** 3:22
**GH000048-000...**
3:24
**GH000064** 55:6
**Gh000072-0000...**
4:4
**GH000089-000...**
4:7
**GH000113** 59:14
**GH000126** 57:20
**GH000126-000...**
4:5
**GH000290** 57:21
**GH000291-000...**
4:9
**GH000321** 4:10
62:22
**GH000323** 68:19
**GH001495** 62:23
**GH001497-001...**
4:16
**GH001498** 79:20
**GH001499** 80:24
**GH001500** 81:25
**GH001501** 83:9
**GH001502** 84:1
85:12

**GH001525** 4:18
**GH001526** 4:15
**GH001527-001...**
4:13
**GH14** 47:11
**give** 12:6 15:16
25:23 36:23
70:17 77:1 99:1
100:7,13 103:8
104:11,13
105:15 109:2
**given** 12:25 60:12
76:15 94:25
112:12,16
**gives** 107:18
**giving** 86:24
**Global** 4:10 62:6
**go** 6:16 9:7 32:10
36:23 38:21
41:21 43:25
44:11 51:15
55:5,5 70:13
79:19 80:23
84:22 85:12
87:25 88:3 91:5
92:25 103:18,22
107:16 108:24
109:8
**goal** 53:17
**goes** 63:6 90:9
100:15
**going** 5:23 11:22
19:6 22:23 29:1
45:10 62:24
72:17 74:20
77:23 82:22
84:15 88:2 92:4
94:13 100:10
102:11 103:10
**gonna** 48:3 84:19
92:25
**Gonzales** 4:18
**good** 19:24 81:10
97:15
**goods** 107:10,12
**gotta** 63:6
**GPOs** 34:5
**gravamen** 8:14

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

119

**great** 64:11,13
93:21 94:9,18
**Greg** 1:7,14 3:3,8
3:11,12,15 5:2
33:5 43:6 79:4
86:25 89:3
112:6,11,19
**Grill** 83:13
**groaning** 62:1
**group** 15:9,10
16:18 103:18
**Grundy** 110:2
111:5,10
**grunting** 62:1
**guess** 34:15 42:23
44:13,15,16
48:4 56:6 73:5
73:17 80:4 92:4
103:2
**guessing** 24:17
**Guiheen** 90:16
92:4 97:13
**guy** 53:6

**H**
**H** 3:6 4:1
**half** 7:25 14:1,5,9
14:19 28:19
**hall** 92:8,9
**Hamilton** 1:8,14
3:3,8,11,12,15
5:2,7,23 6:19
10:16 11:20
19:7 21:24 27:2
28:8 29:17 33:5
35:22 43:7
60:25 63:11
72:23 77:14
83:19 86:9,25
89:3,9 112:7,11
112:19
**handed** 35:22
**handing** 57:17
61:23
**handwriting** 47:7
47:9 85:17
**handwritten** 47:5
85:15

**happened** 50:21
83:24 85:8
**hard** 21:2
**haven't** 14:15
16:11
**head** 5:25 12:23
13:24 66:21
**headquarters**
82:11 90:25
**health** 40:13 42:1
64:12 73:23
105:4
**healthcare** 105:3
107:10
**help** 14:24 25:13
36:19 85:4,10
87:6,15,17
107:13
**helps** 107:18
**Hemoglobin** 1:10
2:8 112:9
**hemophilia** 3:17
3:24 4:10 41:18
46:16,20,22,24
54:11 56:7 62:4
62:6 81:7 83:23
83:25 85:1
91:16,20,23
**Henry** 8:6
**hepatitis** 7:21
8:21 10:2 11:2
19:11
**hereinabove**
110:16
**Here's** 103:10
**hey** 53:3 76:3
104:1
**He's** 25:2,3
**hieroglyphics**
79:4
**high** 92:12,14
**highlighted**
104:23
**highly** 1:12 20:2
**historical** 70:7
**history** 3:14 28:9
29:24 30:23
38:23

**hit** 53:16
**HMOs** 4:3 56:22
**home** 34:5 38:21
47:2 50:17,19
50:20 69:8
105:4
**homes** 105:4
**honestly** 82:25
**hope** 76:24
**hospitals** 105:4
**huge** 96:7
**hundred** 93:1
94:15
**Hyatt** 81:6
**hypothetical**
108:10

**I**
**idea** 43:20 58:7
60:11 76:12
**identification** 3:7
4:2 5:11 16:2,22
29:12 30:16
35:16 37:2 46:5
47:20 49:18
54:3 56:14
57:13 58:23
59:22 61:19
69:10 72:11
77:10 86:5
98:11
**identified** 9:5
17:5,9,13 18:1,4
19:3 27:23 30:5
35:4 42:7 52:11
58:2 62:22 84:5
87:12 91:3
**identify** 13:12
**IGIV** 84:25
**II** 107:7
**ilk** 13:6
**illegal** 106:2
108:18 109:3,4
**Illinois** 1:20 2:21
97:2 110:1
111:5,10,10,12
**illustrate** 51:13
**immediately**

86:20
**impair** 6:5
**impermissible**
106:2
**implications** 75:2
**improper** 108:18
**IMS** 64:11,12
**include** 70:1
**included** 46:1
**includes** 70:21
101:3 112:17
**including** 35:5
96:19
**inclusive** 112:14
**Incomplete**
108:10
**incorrectly** 52:6
**independent**
29:10
**indicates** 85:6
**Indicating** 37:20
**indirectly** 32:24
**individual** 27:12
34:21
**individuals** 70:24
71:10,15
**industry** 1:4
12:18 18:4
28:10 44:18,18
44:20 45:10
52:3 64:11,14
64:23 75:21
87:2 112:3
**infected** 8:21
**information** 4:14
21:16,21 22:9
31:5,22,24 32:4
32:7,20 33:8,13
33:16,24 34:13
34:17,21,24
35:1,14 37:16
37:21,24 38:3,7
38:10,16,25
40:19 41:12
42:5,9,10,14,25
43:13,15,21
45:25 46:1,15
49:11,13 52:23

56:7 58:16,18
64:6,17,20,22
64:23 65:11,12
67:2 70:9,23
71:4,8,12,20,25
72:2,8 73:8 77:1
91:8 100:8,14
100:15 101:4,6
101:11 103:7
106:17 107:19
108:4
**inhibited** 92:18
**inhibiting** 96:10
**initial** 72:1
**initiate** 24:4,7
75:24
**injury** 21:4
**input** 50:22 57:10
59:11 106:25
107:3
**Inquiry** 3:19
**inside** 62:12
**instance** 8:19
**institutional**
105:3 107:5
**instruct** 11:22
19:6
**instructed** 6:15
19:22 103:15
**insurance** 92:25
93:10 94:11,25
96:9
**intact** 78:17
**Intention** 4:6 59:4
**intentionally**
100:5
**interacted** 97:24
**interacts** 52:1
**interested** 101:10
111:1
**internal** 22:19,19
52:16 74:18
**internally** 52:22
**International**
1:11 2:9,24
98:17 112:10
**interpret** 79:3
**interrogatories**

110:10
**interruption** 89:22
**intimate** 87:2
**introduced** 44:20
**inventory** 51:20
**involve** 14:6,10 23:16
**involved** 23:14 46:20 102:5
**involvement** 49:7 49:10 84:18
**involves** 23:19
**involving** 7:17,21
**In-House** 2:24
**isn't** 71:7,25
**issue** 8:15 44:21 45:1,6 67:18,19 67:20 93:4 97:16 102:24
**issued** 15:10 20:1
**issues** 10:18 53:23 55:16 67:21 75:18 91:2 99:22 102:10 109:12
**it's** 7:20 22:7 25:25 30:1,1,23 31:4 37:13 39:9 39:11 46:15,25 50:6 52:25 54:10 56:21,21 59:4 65:4 66:1 73:7,15 75:17 76:8,20 83:1,2 87:20 92:24 93:4,6 94:12,18 96:16 97:17 108:25
**IX** 96:16
**I'd** 9:7 12:5 26:18 43:25 45:9 62:10 72:18 78:1,15
**I'll** 16:6 17:12 25:10 29:20 32:13 53:8 68:20 78:17

82:18 83:19 87:16 92:1 94:13 98:25 109:2
**I'm** 5:23 8:16 10:13,25 11:22 18:15 19:6 21:2 22:23 31:8 33:18 35:24 38:24 42:13 44:13 48:3,4 51:10 52:7 55:20 57:6,17 58:13 59:8 61:23 62:21,24 63:4,5,9,12,16 63:19,20 68:1 70:16 73:15 76:4,4,17,20 77:1 78:1,13 80:25 82:24,25 83:1 86:17 88:1 89:25 91:23 92:4 97:19 100:17 101:10 104:25 105:11 105:20 106:8 108:13,13
**I've** 11:5,17 12:25 15:25 16:12 17:24 19:10,22 24:25 35:22 61:12 69:8 105:19 109:13

**J**

**J** 2:11
**Jackson** 2:11 3:4 5:6,7,14 6:9 11:13 12:7 13:4 13:11,14,18 14:12 15:3 16:5 16:14 17:1 19:12,25 20:4 20:13 23:7,21 25:7 26:12,15 26:19 27:25 29:15 30:11,19

32:11 35:19 37:5 41:7 44:14 46:8 47:23 49:6 49:21 51:10 54:6 55:4 56:17 57:16 59:1 60:1 61:22 62:2 63:1 66:3 69:13 72:14,20,22 77:13 86:8 88:3 89:8 90:2 98:14 107:20 108:11 108:15,23 109:8 109:11
**Jain** 2:12 5:8
**January** 1:20 57:19 78:21 79:9 80:12 88:8 109:17 111:6
**jargon** 10:23
**Jeff** 83:13,14,16
**Jerry** 101:18
**Jersey** 47:2
**job** 64:12,13 87:19
**jumped** 95:15
**June** 25:12 111:11
**jurisdictional** 10:18 109:12
**Justice** 27:4,8 87:7 99:8 101:24 102:3,6
**justified** 95:8,10
**Justin** 27:12

**K**

**Kay** 4:5,8 35:5,10 36:19 37:17,25 38:4 42:6 43:16 43:19,20 44:4 44:16,18 45:4 46:2 57:19 59:5 60:4 61:2 100:24 104:14 104:19
**keep** 29:1 78:17
**KEITH** 2:19

**Kentucky** 7:19 9:2,25 11:2 21:7 21:8 29:21
**kept** 80:15
**key** 95:13
**kin** 111:2
**kind** 34:9 48:4 74:21 89:24 94:19 97:5
**kinds** 6:5
**Kleiman** 2:4 4:17 6:8 11:12,20 13:11,17 14:8 14:21 15:5,7,8 15:18 16:13 17:8,12 19:5,22 20:10 23:3,15 25:2 26:7,18 27:24 30:10 32:8 44:10 49:1 51:9 55:1 61:25 62:24 66:1 77:6 78:11 86:11 99:18,21 107:15 108:10,20 109:13
**knew** 43:22 99:19 101:13
**know** 11:16 12:1 12:3 13:25 14:3 15:6 17:17,18 17:20,23 25:25 27:6,6,9,10 28:2 28:3 31:6,9 34:7 34:23 40:14,15 40:15 41:19,19 44:4,7 45:1,1,10 45:15,16,19,19 45:20,23 47:13 48:5 49:2,4,16 50:14 51:8,25 52:3,7,8,10,13 52:14,24 53:22 54:17,20,24 55:9 56:5,12 57:2 58:12,15 59:20 60:24 61:4,11 62:11

62:18 63:4,9 64:14,15 65:12 65:16 66:13 67:12 69:8 70:9 72:9 73:7,16 74:1,24 75:17 76:14,14 77:1 79:10 80:3,7,10 80:18,19 82:13 82:21 83:6,8 84:20 88:2 90:5 90:6 92:19,21 93:6,8,20,22 95:15 99:16,19 100:21 101:12 101:12,17,18,20 101:20 102:10 102:14,19,25 104:5 106:4,5 106:23 107:2,3 107:19,21 108:2
**knowledge** 22:18 43:6 49:14,15 52:16,21 58:10 87:1 100:3 101:10
**knowledgeable** 44:17
**known** 47:2 90:11 101:5 103:16

**L**

**labeler** 103:20 104:2,6
**Laboratories** 28:14
**Lake-Cook** 82:6
**language** 74:22 101:3 104:23
**large** 44:22 95:12 95:14
**Larry** 90:16 92:4 92:6,10 97:13
**Las** 7:22 19:11
**LaSalle** 1:19
**launch** 92:5
**launched** 92:11 93:13,16,22

**Lauren** 23:4
**law** 15:20 27:18
  100:17
**laws** 99:3,3
**lawsuit** 20:18,21
  27:2
**lawyer** 13:15
  18:15 22:23
**lawyers** 8:17
  15:23 17:5,9,13
  17:19 18:1 23:9
  23:14 87:7,20
**learned** 36:16
  100:23
**leave** 48:22 68:16
**led** 86:23
**left** 5:8,25 28:17
  28:20 29:2
  30:22 50:11,16
  64:2
**legal** 10:23 25:25
  48:5 99:18
  108:20
**letter** 4:17 43:8
  44:2 45:12
  86:11 104:15
  110:22
**letters** 9:13
**let's** 35:25 36:23
  63:15,22 66:16
  71:23 72:20
  78:18 79:19
  85:12 88:3
  90:13 94:6
  96:15,19 100:20
  101:1 109:8
**liability** 7:21 10:2
**light** 11:25 20:5
**limited** 10:17
**line** 39:12 96:25
  97:1
**Linnette** 1:7 6:23
  21:25 86:21
  105:17 112:6
**list** 12:6 43:7,9
  45:15,20 104:15
  104:16
**litigation** 1:4 21:1

  31:18 112:3
**little** 73:16 83:19
  107:18
**LLP** 2:10,18
**locked** 74:24
**longer** 46:25
**look** 43:25 62:11
  64:10 65:23
  68:19 70:19
  78:18 84:10
  93:19 99:23
  107:4
**looked** 61:12
**looking** 22:13
  28:24 59:8 63:4
  63:5 76:25
  102:6 103:2
  106:12
**looks** 53:20 73:17
  75:10 79:2 80:4
**lot** 94:16
**lots** 99:21
**lowest** 106:14
**Lynn** 66:9,10,12
  66:17

---

**M**
**making** 39:23
  93:17
**man** 63:25
**management**
  91:15,20
**Manager** 36:19
**managers** 36:16
  97:3,24
**manner** 51:16
**manufacturer**
  8:10 76:15 90:7
  98:24 102:23
  103:17 106:15
  108:16
**manufacturers**
  34:5 73:22
  102:12,16 103:8
**manufacturer's**
  75:22 108:3
**Margaret** 1:15
  110:4 111:9

**margin** 47:5
  92:18
**mark** 2:4 14:24
  16:7 37:18
  54:24 55:7
  103:20
**marked** 5:11,15
  16:2,6,22 17:2
  29:12,16 30:16
  30:20 35:16,20
  37:2,6 46:5,9
  47:4,20,24
  49:18,22 54:3,7
  56:14,18 57:13
  58:23 59:2,22
  60:2 61:19,23
  69:10,14 72:11
  72:15,24 77:10
  77:15 86:5,10
  98:11,15
**market** 4:10,12
  56:7 62:6,13,19
  63:20,22,24
  64:5,7 65:1,5,8
  66:8 67:5,9,24
  68:13,24 69:1,4
  69:7,16,23 70:1
  70:6,20 71:3,13
  71:22 72:6
  75:22 84:25
  91:16,23,24
  94:2,2 95:7
**marketing** 9:1,10
  10:5 64:2,23
  97:16,17 105:2
**marketplace**
  74:23
**Markets** 3:23
  54:10
**market's** 84:18
**markings** 56:11
  59:15
**marks** 79:1
**markup** 103:24
  104:1
**Mark's** 76:24
**MASSACHUS...**
  1:2 112:1

**Master** 1:5 112:4
**material** 86:20
**materials** 50:20
**matter** 5:17 7:16
  7:24 8:15,17 9:2
  9:17 10:2 13:9
  17:19 20:20
  25:11 27:17,24
  28:1 29:22
  48:25 49:8,15
  50:23 53:4
  56:20 57:3,10
  59:6,12 61:7
  65:6 75:13
  95:25
**matters** 10:17,21
  11:10,23 26:24
**may** 6:14 17:22
  17:22,22 22:11
  22:12 37:18
  58:1 69:23
  73:11 76:7,7
  78:14 84:7,9
  93:20 101:3,8
  101:23 102:2
**MDL** 1:4 20:1
  112:3
**mean** 9:14 16:11
  23:8,12 24:18
  32:1 33:17
  38:20 44:7 49:4
  49:10 51:9
  53:12 63:4,20
  70:6 73:7 83:22
  87:16 90:18
  93:16 94:1
  96:13,17 109:2
**means** 26:11
  31:21 32:3 79:6
  80:7,8,15 81:5
  82:7 83:3 84:23
**Medicaid** 51:22
  87:22 101:5,13
  101:15 103:5
**Medicare** 39:5,25
**medication** 6:4
**Medispan** 34:23
  102:15

**meet** 21:24 22:22
  27:3,7,11,14,22
  28:4,6 79:11
  80:12 82:9
  87:21,23 88:1
  97:3
**meeting** 44:23
  79:6,8,17 80:8
  81:5,7 82:7,16
  82:19 83:3,4,7
  83:23,25 84:2
  85:7 87:11 91:9
  97:12
**meetings** 84:5
  89:13 90:25
  97:7
**members** 15:19
**Memorandum**
  4:19 98:17
**memory** 82:15
  98:1
**mention** 61:5
  83:21
**mentioned** 13:8
  15:18 18:20
  19:14 21:7
  70:25 71:10,15
**Merck** 15:2 16:18
  18:7 21:15
**merely** 85:6
**met** 22:4 23:9,13
  23:23 24:4,15
  24:18,20 28:3
  87:6 91:15 92:3
  92:6 101:17
**method** 23:13
**methodology**
  103:12,14
**methods** 9:1
**Michael** 2:24 13:2
  13:15 86:12
**Millennium**
  83:13
**million** 94:15
**mind** 53:25 70:13
**minds** 95:10
**mine** 64:1
**minus** 74:25

Case 1:01-cv-12257-PBS Document 6866-7 Filed 01/27/10 Page 39 of 104
HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

122

minute 57:5
  66:20 93:1
misreport 100:6
misreporting
  101:4
missing 64:21
mistake 53:7
mistakes 53:2,4
Mm-hmm 36:22
  79:22 80:1
moment 12:16
  67:15 70:8
Monday 82:3
Monitoring 62:4
months 92:5
  93:23
Morgan 4:5,9
  35:6,10 36:19
  37:17,23,25
  38:4 42:7 43:16
  43:19 44:4 45:4
  46:2 57:19 59:5
  60:5 100:24
  104:14,19
Morgan's 61:2
motion 4:19 7:1,2
  10:18 35:3
  98:18
moved 53:7
moving 97:15
multiple 62:25
multiplier 104:4
  104:6,7
multiply 104:8

N

N 3:1
name 5:7 79:24
named 63:25
  110:8
National 81:6
  83:23,25 87:22
nature 62:20
near 72:17
necessarily 76:6
necessary 76:1,20
need 5:24 45:20
  45:21 57:4

67:13 71:18
  74:21 83:6
needed 41:19
  76:15 92:15
negotiations 90:6
net 106:15
Networks 4:4
  56:22
never 15:25 51:23
  70:13
new 39:4 47:2
  49:13 95:7,20
news 4:3 56:20,21
NHF 81:1 83:21
  83:22 85:6,12
  92:7
non-profit 55:12
noon 80:6,8 83:13
normal 41:25
North 1:19 82:6
Notary 1:15
  110:5,12 111:5
  111:10 112:24
notation 81:22
  84:13 85:14
note 31:11 34:16
  58:2 81:11
  85:15,16
noted 76:3
notes 47:5 79:1
notice 3:8 4:6
  5:17,21 50:4
  59:4
noticeable 94:19
  94:21
November 81:8
number 3:8,9,11
  3:12,13,15,16
  3:17,19,21,23
  4:3,5,6,8,10,12
  4:14,16,17,19
  5:10 12:10 16:1
  16:7,21 20:2
  29:11 30:15
  31:12 35:15,25
  37:1 38:12
  39:17,18,19
  46:4 47:19

49:17 54:2,19
  54:22 56:13
  57:12 58:22
  59:21 61:18
  65:21,25 68:10
  69:9 71:11
  72:10 77:9 86:4
  92:23 94:22
  98:10
numbers 57:20
numerous 98:5
nursing 105:4
N.W 2:13

O

oath 57:19 112:15
object 23:1 62:24
objection 11:12
  11:25 14:8
  30:10 32:8
objects 6:14
obtain 70:14
obtained 43:6
obviously 51:18
  73:7 81:8 85:20
occasions 90:11
occurred 80:20
  82:15,16,21
  83:5,6 84:2,5
  99:6,14,15
  100:1
offer 70:11 87:17
offered 53:22
  106:14 107:5
offering 105:2
Officer 44:23,24
offices 97:2
official 111:4
oftentimes 34:7
  76:8
oh 16:9 25:6
  28:13 51:12
  53:6 62:13,17
  76:25 79:3 82:5
  92:4
okay 6:1 7:5,17
  10:24 11:15
  25:10,24 27:21

28:8 31:11 33:7
  35:2 38:6 42:11
  42:24 48:8,9,10
  49:7 51:3,12
  61:15 63:14,21
  66:2,6 67:4,23
  68:17 73:6
  77:24 79:8
  81:24 82:5,9
  83:1,24 84:12
  85:15,23 87:10
  88:3 90:20
  93:24 95:6,12
  96:4,24 97:10
  97:18,21 100:11
  100:20 101:1
  104:21 105:13
  105:18,25
  107:21
old 65:16
once 27:16 102:24
ones 34:3 70:5
  89:19
Open 4:4 56:22
openly 101:19
operate 84:21
operated 63:25
Operating 44:23
operations 9:1
operative 26:3
opinion 45:23
  92:11
opportunity
  86:24 87:3
opposition 4:19
  7:2 86:22 98:17
  99:25
oral 4:7 59:4
  110:10
order 1:12 20:1,6
  20:7 51:19 52:2
  52:4,8,12 61:1
  107:11
organization
  55:13 64:13
original 78:3,8,16
  originals 78:14,14
ought 68:16

outbreak 7:22
outside 74:20
owned 63:24
O'Malley 82:12
  90:16 91:1

P

page 3:11 17:3
  37:13 47:3 55:6
  56:8 59:14,16
  63:6 68:19
  70:19 78:18,19
  79:19,23 80:24
  81:11,16,25
  82:1 83:9 85:21
  99:4 100:4
  101:2 104:21
pages 3:9 47:11
  47:12 63:7
  77:21 78:10
  81:20 83:20,21
  84:6 112:13
paid 15:4 30:13
painful 28:13
Paradigm 3:23
  54:11
paragraph 36:12
  37:9,16,21,24
  38:3,7,11 39:12
  40:4 42:4,5,12
  42:15,24,25
  43:3,5 46:1 51:7
  66:4,6,24 67:2
  68:24 89:12,21
  90:22 91:13
  96:25 97:10,11
  97:22 98:4,8
  99:6,7 101:2,22
  104:22 105:1
  107:4,25
paragraphs 35:11
  36:18
Pardon 19:18
part 71:14 76:13
  82:2 90:6
  100:18
participant 41:24
participate 51:14

Case 1:01-cv-12257-PBS Document 6866-7 Filed 01/27/10 Page 40 of 104
HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

123

**particular** 8:22
  16:20 45:6
  53:14 74:25
  82:10 85:21
  90:23
**particularly**
  44:17 50:18
  61:2
**parties** 33:24
  34:13 111:3
**party** 75:3
**passed** 94:23
**pass-through**
  103:24
**Patient** 55:7,9,12
  55:17
**patients** 41:18
  55:15 93:8
  94:14,24 95:3
  107:11
**Patricia** 4:5,8
  57:19 60:4
**Patrick** 63:25,25
  64:21 65:10,20
  66:9,13 67:14
**Patrick's** 67:14
**pay** 32:3 94:13,14
**payers** 94:12
  95:12 96:10
**paying** 41:20 95:1
  95:11
**payment** 39:25
**pays** 39:5
**PBM** 84:16
**PBMs** 84:17,21
  84:24
**pending** 6:8
**people** 34:11
  40:16 64:22
  74:17,19,20
  75:5 87:21 91:3
  91:4 92:25
  94:23 95:11,19
  101:19
**people's** 94:17
**percent** 26:5,5
  39:5 71:12
**percentage** 14:17

**perfectly** 96:2,3
**period** 15:14 21:4
  40:21,23 53:19
  74:15 75:2
**person** 22:5 24:24
  25:3 44:17
  101:9
**personal** 21:4
  81:21
**personally** 24:4
  27:3,22 32:17
  32:20 73:11
  101:14,17
**perspective** 95:6
**pertaining** 1:17
**Pete** 82:12 91:1
**Peter** 90:16
**pharmaceutical**
  1:3 9:1,10 10:5
  12:18 13:23
  17:15,20 18:4
  21:20 51:4
  64:11 84:18
  112:2
**pharmacy** 40:16
  47:1 50:6 84:24
**phone** 25:3,6 45:4
  111:12
**photocopies**
  77:22 78:10
**phrase** 9:12 93:25
**PHS** 90:11,20
**physically** 24:19
  24:20
**picked** 45:4
  102:23
**picture** 92:8
**piece** 70:8 76:10
**pills** 64:10
**place** 43:23 91:9
  110:5,16 112:13
**plaintiff** 8:4,5,19
  8:20 20:14,17
  21:1,3
**plaintiffs** 8:17
  9:19 13:20
**plans** 73:23
**plasma** 4:12

44:17 64:8
  68:25 70:20
  96:2,2
**please** 41:15
  59:15 65:24
  80:23 89:10
**pleased** 86:18
**Plough** 28:18
**Plus** 79:2
**point** 27:7 29:3
  31:20 66:14
  72:18 75:20
  76:16 93:5 94:5
  103:13
**position** 76:2
  107:11
**positions** 91:14
**possession** 48:15
  50:13 78:5,6,7
  78:10,12
**possibly** 79:7
**post-2000** 100:19
**potential** 9:6
**practice** 50:15,17
  102:13 105:2,14
**practices** 86:23
  87:1 107:22
  108:5
**prefer** 26:17,18
**premise** 100:1
**premium** 92:12
  96:7
**preparation** 6:20
  7:6 59:11
**preparing** 47:16
  48:25 58:20
  69:5,24 72:7
  75:13
**prescriptions**
  73:24
**present** 2:1,23
  20:24 23:10
  68:4 110:7
**presentation**
  84:19
**presented** 34:11
**presently** 12:15
  20:14 67:5

**preserve** 86:24
**presume** 6:4
  48:18
**previous** 51:13
  67:9
**previously** 29:22
  89:4 96:21
  100:22 110:8
**price** 1:4 8:8,10
  8:12 9:14 14:7
  40:3,9,17 43:8,9
  45:15,20 62:4
  66:25 68:3 76:7
  90:1,7,15 92:15
  94:1,2 95:7
  101:4 103:17
  104:16,16,23
  105:15 106:3,5
  106:10,12,13,14
  106:18 108:3
  112:3
**prices** 40:12
  41:19 42:1
  66:24 72:2
  100:7
**pricing** 9:11
  13:23 14:4,10
  36:17 52:18
  89:14,18,19,24
  89:25 90:12,21
  91:6,21,24
  93:12 94:19
  97:3,13,17,24
  98:1,6,8
**pricing's** 14:2
**principal** 8:15,17
**print** 31:4,23
**printed** 31:21
  48:13
**printout** 31:4
**printouts** 34:7
**prior** 27:2,21
  32:20 33:7,22
  53:18 60:22
  67:9,21 75:20
  87:7 99:14,24
  101:3 106:6,11
**privilege** 22:25

**probably** 14:19
  22:1 48:19
  68:16 69:6
  71:12 76:25
  78:1 79:6,15
  80:15 81:21
  84:23 93:22
  94:25
**problem** 102:7,10
  103:1,3 109:6
**Procedure** 1:16
  110:20
**proceedings** 13:3
**proceeds** 25:17
**process** 34:14
  51:20 52:2,4
  53:24 74:1
**produce** 31:18
  56:3
**produced** 31:16
  46:11 48:1,7,16
  54:9,25 56:5,20
  59:6 63:2,12
  75:5 77:16
**product** 7:21 10:1
  32:4 40:13
  53:16 74:2
  91:21 92:13
  95:19,20 96:5
  96:22,23 103:20
**products** 3:13
  30:22 41:18,18
  42:2 50:9 64:8
  64:24 85:1
  89:14 91:16
  92:13,14,17
  93:25 95:9 96:2
  96:2 100:7
**program** 41:17
  51:22 101:18
**prohibits** 107:7
**project** 46:20
**promoted** 18:17
**promotion** 18:16
**protective** 1:12
  20:1,5,7 61:1
**prove** 93:2
**provide** 36:9 38:6

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

124

40:3 42:24
43:13 64:6,16
64:17,22 70:7
100:15 101:6
**provided** 21:11
21:16,21 22:8
22:11,20 38:10
40:18 43:15
46:16 49:10
50:2 56:6 57:10
60:19,21 72:3
101:9
**providers** 39:22
105:3 107:5,10
**provides** 38:22
108:17
**providing** 50:22
59:11 64:13
**provisions** 99:2
**public** 1:15 70:23
71:4,9,14,17,20
110:5,13 111:5
111:10 112:24
**publicly** 99:9
**publish** 103:9,10
**published** 34:24
38:15 106:8,10
**pull** 34:7 38:21
40:16 68:21
**pulled** 39:1 70:9
**purchase** 41:20
50:8
**purchased** 46:25
**purchaser** 108:17
**purchases** 53:15
**purpose** 1:18
73:13
**pursuant** 1:12,16
5:20 110:19
**push** 93:7
**put** 16:19 68:15
71:11 73:18
74:17,18 87:17
99:19,19 103:3
**putting** 71:21
76:4
**p.m** 82:3,5 88:5,7
89:2 109:16

**Q**

**qualifier** 75:15
**qualify** 48:3
**quarter** 53:20
**question** 6:8,10
6:15,16 11:14
14:13 16:13
17:12 23:2,15
30:12 32:12,13
49:12 55:20
68:1,6 81:10
95:19 98:21,23
108:12
**questions** 5:24
6:6 19:20 20:8
66:19 67:3,8
82:17 109:11
110:11,14
**qui** 9:22 12:1
87:20
**quickly** 6:25
**quiet** 76:25
**quite** 87:20
**quote** 97:24,25
98:5 102:7
**quoted** 66:25
**quoting** 39:7

**R**

**range** 12:11
**rapidly** 95:4
**rate** 74:16 96:11
96:12
**ratio** 26:4,6
**RBC** 3:23 54:10
**read** 37:21 41:4,6
57:4,5,6 58:14
81:25 83:11
89:20 112:12
**reads** 39:21
**really** 21:2 25:15
108:25
**reason** 19:24
71:24 74:21
**Reasonably** 29:25
**rebate** 51:2,4,5,14
52:23 53:14,16
53:17,23

**rebates** 51:17
52:17,21,22
53:10,11 106:15
**recall** 7:7 21:10
21:23 22:10,13
27:9 28:2,7 31:2
34:3 36:5 38:20
39:3 42:16,19
49:5 55:19,22
56:2,4 57:1,8,11
59:9,10,13 65:3
**receipt** 107:12
**receive** 32:3
37:17 55:17
**received** 22:16
34:12,22 44:2
45:12 104:14
**receiving** 45:24
**Recess** 72:21
109:10
**recessed** 88:6
**recognize** 37:7
47:7
**recognized** 53:2
**recollection** 12:24
20:23 107:14
**recombinant**
92:13
**Recombinate**
38:2,15 39:22
40:18 94:3,5
95:25
**Recombinate's**
95:23 96:3
**recommend** 93:8
**recompiles** 71:4
**reconvene** 88:7
**record** 6:1 14:25
41:6 61:25 88:3
88:4 109:8,9
110:14
**Red** 34:8,23
102:15
**redacted** 81:12,15
**redactions** 81:19
**reduce** 92:23
**Reduction** 106:9
**refer** 13:22 16:16

34:6 36:12 43:3
56:8 66:4,23
68:13 89:9,13
89:25 90:14
97:22 100:4
101:23 107:11
**reference** 25:12
39:14 90:22
97:11,12 98:5
**referenced** 99:16
**referred** 68:3
69:19 90:14
110:16
**referring** 11:5
57:9 62:18
68:18 82:2
89:18,25 97:20
**refers** 68:24
**reflect** 29:23
61:25
**reflected** 40:4,9
**reflective** 40:12
**reflects** 50:7
**refresh** 107:13
**refused** 43:7
**refusing** 100:7,13
**regard** 21:21
87:11 90:20
106:3
**regarding** 5:17
7:23 10:2,20
19:17,20 20:8
25:22 27:4
90:17 91:9,20
105:14 108:4,5
109:12
**reimbursement**
55:15
**rel** 1:7 112:6
**relate** 12:17 13:22
14:6 21:22
99:24 108:1
**related** 10:17
21:12,17
**relates** 1:6 58:11
61:2 112:5
**relating** 22:9 61:1
**relator** 3:8 43:6

86:25
**relators** 1:8 2:3
7:2 13:20 26:4
26:25 86:21
98:18 100:4
112:7
**released** 70:24
71:9,14
**relevance** 57:2
**relevant** 76:18
**relied** 76:11
**rely** 72:7 75:12
**remain** 21:20
**remaining** 38:10
**remember** 15:9
22:14 24:22
25:23 26:1,3,20
27:12 36:6
40:22 43:24
44:1 55:23 57:9
60:21 61:11
62:14 65:1 70:4
70:5 71:23
79:16 80:20
82:19 83:16
87:6 91:19 92:1
92:7,21 93:13
97:7 98:7,9
**rep** 28:15,18 53:3
83:15
**repeat** 51:12
**repeated** 98:25
**report** 62:14,20
67:1 68:25 69:5
69:16,19 70:9
71:5,18
**reported** 38:1
**reports** 63:21
65:16,17 67:6,9
68:8 69:7,23
70:7 72:7
**represent** 5:8
25:10 29:20
70:22
**representation**
30:2
**representatives**
27:4,22 28:5

Case 1:01-cv-12257-PBS   Document 6866-7   Filed 01/27/10   Page 42 of 104
HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

125

35:5 87:11
**request** 26:16
    102:16
**requested** 41:6
**requests** 34:22
**research** 4:10
    62:6,13,19
    63:21,23,24
    64:2,5,6 65:2,5
    65:8 66:8 67:5,9
    67:24 68:14,25
    69:4,7,16,23
    70:1,7 71:4,13
    72:7
**resell** 71:21
**reserved** 74:15
**resolve** 45:7
    102:10
**Resources** 3:17
    46:16,20,22,24
**responded** 53:6
**response** 6:25 7:1
    23:8 32:14 35:3
**responsible** 70:24
    71:9,15 73:22
**rest** 67:1
**result** 8:20 106:1
**resumed** 89:2,7
**retail-type** 104:1
**retained** 9:16
    11:10,17,21
    12:9 13:20
    14:20 15:7 17:9
    17:14,18,24
    18:2,6 19:3
**retention** 15:14
**retroactively**
    102:9
**revealing** 26:8
**review** 6:19,22
    61:6
**reviewed** 6:23,24
    7:5 22:18 69:23
**reviewing** 22:15
    59:10
**rid** 78:15
**right** 5:25 11:9
    35:25 37:15

38:22 42:3 48:9
    50:15 66:16
    68:16 72:20
    74:15 77:14
    78:18 79:19
    80:23 82:23
    86:3 90:13
    96:25 101:21
    104:18,19
**right-hand** 31:12
    47:5
**rise** 105:15
**RMR** 1:15 111:9
**Road** 82:6
**Robert** 63:25
    65:10 66:11
**Robert's** 66:9
**role** 8:1,18,23,25
    9:3 10:3,4
**room** 13:12 45:3
    91:2
**Ross** 28:14
**rough** 6:23
**routes** 41:21
**rows** 102:19
**Royal** 78:24 79:7
    79:9,24 80:12
**Ruchi** 2:12 5:8
**Rules** 1:16 110:20
    110:20
**running** 53:6

_____

**S**
**s** 3:6 4:1 98:18
**safe** 95:23 96:3,3
    96:5
**sales** 28:15,18
    40:3 43:7 53:18
    53:19,21 64:16
    93:17
**saw** 16:20 36:6
    61:11 62:15
**saying** 44:13 48:3
    63:9 76:20
    95:23,24 96:1
**says** 30:22 36:15
    48:18 50:4 54:9
    54:19 55:7

62:11 63:6
    67:16 71:7,8
    79:2 80:14
    81:25 82:3,5
    84:11 85:2,5,14
    86:17 97:1
    100:4,12 104:25
    107:4
**scale** 65:22
**scanned** 6:25
**scant** 86:21
**scenario** 33:4
**scheduled** 85:7
**scheme** 99:7
**Schering** 28:17
**school** 28:11
**scratched** 79:14
    83:2
**screen** 31:5 48:13
**Scripts** 3:19 29:5
    29:7 32:25 33:2
    33:5,6,8,20 40:8
    40:10,12,16,17
    41:1,10,11,17
    41:20,24 44:21
    44:25 46:19
    48:13,14,19,19
    48:22 50:3,6,11
    50:19 73:20
    74:5,19,21 75:9
    75:11 86:1 90:3
    90:15 97:23
    101:16
**scrutinizing**
    94:23
**scrutiny** 95:18
**scurried** 45:2
**se** 75:14,15
**seal** 11:22 12:2,3
    12:4,4,15 19:6,9
    19:17,21 20:9
    21:20 26:24
    111:4
**second** 7:19 72:2
    86:17 95:1 99:6
    101:25
**secondhand**
    33:16

**secretary** 66:9
**section** 105:17
    107:7
**sections** 99:17
**Security** 106:14
**see** 31:1,14 36:13
    36:21 39:4,6,11
    39:15 40:1
    43:11 47:4
    53:13 54:12,16
    55:21 56:23
    58:4,6 59:17
    60:6,10 62:7,11
    69:2,17 71:1
    72:1,4 78:14
    79:21,25 81:1,2
    81:13 86:13
    87:4 89:16
    91:17 98:19
    99:11,23 101:25
    105:6 109:6
**seeing** 59:9
**seen** 5:18 15:25
    16:10,12 17:6
    29:18 30:24
    36:2 46:12 48:2
    49:23 54:14
    56:25 57:22,24
    59:7 60:8 62:9
    72:25 77:18
    86:15
**Selected** 4:14
    73:9
**sell** 94:1,2
**selling** 90:1 94:6
    103:17
**sells** 90:8
**send** 26:16
**senior** 91:15,20
**sense** 14:3,3 76:6
**sent** 31:19 78:11
    85:3
**sentence** 39:9,21
    72:2 86:18
    89:12 91:13
    98:4 99:6
    101:22,25
    104:25 105:1

**sentences** 97:6
**separate** 45:2
    51:19,21
**September** 66:7
    66:12
**series** 5:24
**service** 64:20
**services** 36:20
    55:7,9,12,18
    107:10,12
**serving** 91:14
**set** 53:15,17
**settle** 102:8
**settled** 16:18
**severe** 75:2
**shaking** 5:25
**SHAPIRO** 2:10
**share** 25:17 26:24
**sheet** 73:18
**sheets** 34:8
**she'd** 45:9
**shoebox** 78:17
**Short** 89:22
**shorthand** 110:11
**show** 5:15 16:6
    17:2 29:16
    30:20 35:20
    37:6 39:7 46:9
    47:24 49:22
    54:7 56:18 59:2
    60:2 69:14
    72:15,23 74:18
    75:5 77:14 86:9
    92:6 98:15
**shows** 51:16
**shut** 77:5
**side** 12:5 48:5
    64:11
**SIDLEY** 2:18
**signature** 110:18
    111:4
**signed** 60:25
**signs** 95:17
**similar** 13:6
**simply** 39:18
    71:19
**single** 63:2,11
    67:18

126

sir 7:10 15:12
  25:10 29:20
  38:24 57:17
  58:13 61:10
  63:3 68:6 98:21
site 16:20
sits 53:20
sitting 13:13
situation 53:14
six 92:5
size 62:10
slide 84:19 85:3
slides 84:11,15,16
  85:2
small 20:22 21:5
  65:21
smaller 94:22
Social 106:14
sold 39:22 64:15
  64:15 74:1
solution 102:7
somebody 79:7
something's
  105:21
sorry 8:6 10:25
  35:24 42:13
  51:10 55:20
  58:13 76:17
  86:17 91:23
  104:25 105:11
sort 75:21 76:14
  92:6 102:6
sources 71:20
South 2:20
  111:11
speak 7:8 66:10
  66:11
speaking 84:7
specialty 41:18
  47:1 50:6 73:24
  84:18,24
specific 25:20
  36:17 49:5
  82:15,19 90:19
  91:19 93:11
  98:1,9
specifically 9:11
  22:10 34:3 52:9

62:21 65:3 70:5
  75:16 76:12
  81:17 84:3
  89:13 91:12
  92:1 97:9
specifics 34:18
specified 46:1
specify 66:6,7
  74:11
speculate 44:5
speculation 44:10
  49:1 55:1
spelled 75:17
spend 96:4
split 26:4
splitting 25:22
spoke 66:8,12
spoken 24:9
spread 39:23
spreadsheet 50:2
  50:7 51:18,25
  52:5,5,11,24
  53:7
spreadsheet-dri...
  53:1
spring 93:14
Sr 3:11
standard 51:19
standing 95:22
Stanford 2:5
Stark 104:23
  105:15 106:22
  106:23 107:1,2
  107:7,14
start 63:22 82:18
  93:17
started 28:10
  64:4,5
state 4:6 9:25
  12:21 28:5 59:3
  87:21 99:3
  101:5,13,15
  103:5 110:1
statement 6:12
  86:19
states 1:1,7,17
  4:13 27:18,23
  62:5 69:1 70:21

87:12 110:21
  112:1,6
stating 43:8
  104:15,15
statistic 14:15
Steffans 18:8,11
Steinke 15:2,5
stenographer
  110:12
step 51:15
Steve 15:8 80:6,9
  80:10
straight 95:23
strategies 98:6
Street 1:19 2:13
  2:20
strike 58:17
  100:21
Strong 18:6 21:15
Stuart 79:24
  80:12
study 70:22
stuff 25:25 34:9
  64:16,17 84:20
  90:5 99:16,18
subdivision 74:6
subject 7:15 14:2
  20:1,7,20 79:16
  80:17 85:9
  89:20 91:9 98:7
submitted 34:21
  43:8 110:19
submitting 43:21
subscribe 112:14
SUBSCRIBED
  112:21
subscriber 31:25
  32:1,5,9,15,16
  32:21 33:4,18
  34:10 48:20
subscribers 67:5
  67:24,25 68:3
  68:11
subscription
  33:20 66:22,23
subsequent 10:20
Subsequently
  66:13

subsidiary 28:21
substantive 10:21
Sub-Category 1:7
  112:6
such-and-such
  74:25
sudden 95:16
suggest 106:18
suggesting 92:21
Suite 1:19 111:11
sum 39:5
summary 4:8,14
  60:4,16,17 73:8
summer 48:23
  93:14
Sun 1:7 7:8 21:25
  22:8,16,20,22
  23:9,13,23 24:4
  24:7,9,15,23
  25:1,14,16,22
  26:21 70:17
  86:22 99:1
  105:17 112:6
Sun's 6:24
superiors 44:20
suppose 51:15
  100:16 108:25
sure 6:1 8:16
  10:13 13:14
  24:14 28:10
  29:1 35:25 39:9
  41:8,16 48:9
  62:14 63:18
  68:1,2 70:16
  72:20 76:2 78:1
  78:24 81:19
  82:14 106:8,23
  108:3
survey 62:4
  103:19,19
suspected 101:5
switch 93:9
Switching 96:21
sworn 5:1,4 89:5
  110:9 112:21
system 41:24
  51:20 52:8,12

**T**

T 3:6 4:1
table 13:13,15
  63:5
tablets 64:10
take 4:7 43:23
  50:10,15 57:5
  59:4 62:11
  72:18 73:5
  103:7,15 104:7
taken 1:14 60:5
  110:4,11
takes 71:4
talk 45:9 66:16
  67:13 77:4
  97:23
talked 65:20
  90:19 101:17
  104:18
talking 8:16 14:9
  34:16,17,18
  61:8 62:19,21
  92:10
tam 9:22 12:1
  87:20
telephone 24:10
  24:24
tell 12:14 25:21
  40:11 44:8
  61:13 65:25
  77:4,6,8 78:22
  81:15 84:1,4
  85:13 90:18,21
  90:24 100:22
  102:2,14 103:10
  103:23 108:14
telling 64:12 76:4
  100:23
tells 52:24 53:8
tendered 5:12
  16:3,23 29:13
  30:17 35:17
  37:3 46:6 47:21
  49:19 54:4
  56:15 57:14
  58:24 59:23
  61:20 69:11
  72:12 77:11

86:6 98:12
**term** 93:24
**terms** 25:19,20
  26:1,20 27:6
  61:1 95:1
  106:15 109:1
**testified** 5:4 9:3
  10:9,14 11:2,4,6
  68:2 69:22 89:5
  89:6
**testify** 6:7 26:7
**testifying** 19:17
  19:19
**testimonial** 11:10
**testimony** 8:7
  21:8 33:11 41:9
  41:9
**Texas** 4:6 59:3
  61:1 101:18
**text** 59:16
**Thank** 13:17 36:1
  42:11 85:11
  109:13
**that's** 6:13 7:3,4
  9:21 10:24 18:5
  19:24 21:6
  22:23,25 26:2
  36:1 42:14,25
  48:16 50:14
  64:25 67:2,19
  67:20 68:5 75:3
  75:15 81:21
  82:22 86:2 88:1
  94:19 97:5
  100:14 105:19
  105:24 107:25
  108:22 109:3
**theirs** 95:4
**Theis** 4:18 86:12
**Therapeutics**
  1:10 2:8 112:9
**therapies** 95:3
**therapy** 95:8
**there's** 6:8 33:15
  55:6 63:6 79:13
  90:8 105:8
**they'd** 92:11 95:2
**they're** 53:9

94:13
**thing** 22:24 45:21
  63:16 64:4 93:4
  94:20 96:1
  102:8
**things** 12:2 45:10
  67:17 73:25
  74:18 83:21
  84:17 95:25
  100:9 109:1
**think** 7:1,3,4 12:5
  15:9,17,21
  18:15 20:22
  21:2,5 22:25
  34:13 43:24
  44:6 45:12
  57:23 58:1
  62:15 65:17,19
  73:2 75:16 76:9
  92:23 93:7,19
  100:14,14 102:4
  105:22 106:12
  108:22
**thinking** 73:15
**third** 7:20 19:13
  33:16 34:13
  96:25 99:6
**thought** 68:2 95:1
**thousand** 15:13
  93:2 94:15
**three** 7:13 11:1
  12:25 13:8
  15:22 22:7 23:9
  32:15 45:1 75:1
  97:2 102:15
**tiers** 53:14
**time** 10:20 15:14
  17:21 21:4 22:2
  23:23 27:7 33:7
  38:20 39:1
  40:21,23,23
  41:2 42:17,21
  45:8,17 48:20
  76:16 79:17
  85:23 87:7,24
  90:19,23 92:23
  94:6 97:22
  102:13,21,23

110:6,16 112:13
**times** 6:14 7:12
  22:4 23:9 24:3,9
  27:14 75:1 93:1
  104:8
**title** 73:8
**titled** 62:18
**today** 5:20,24 6:7
  6:14 20:15,25
  29:9
**today's** 10:16
  66:24 67:19,20
**told** 67:16,18 97:4
**top** 12:23 13:24
  30:22 48:19
  50:4 54:9,18,24
  55:6 66:21
  81:25 85:14,15
**topic** 9:5
**total** 12:8 15:10
**touched** 14:18
**trade** 92:6
**transcript** 112:12
  112:16
**treat** 96:6
**treats** 95:24
**tree** 61:16
**trees** 61:17
**trial** 10:9,14
**trips** 97:2
**true** 23:11 100:14
  110:13 112:15
**try** 41:14 73:18
  79:3 87:16
**trying** 21:2 36:19
  38:24 45:22,23
  63:12,16,19
  77:1 82:24,25
  83:1 94:4
  105:20
**turn** 37:9 42:3
  47:3 59:14
  81:24 83:9
  97:10 101:1
  104:21
**turns** 94:16
**two** 17:8,13 24:3
  28:19,19 29:3

32:15 47:12
  74:10 75:1
  82:17 84:9
  86:21 93:22
  97:7
**type** 45:24 64:19
**typically** 70:7
  79:12 82:11
  104:5

| U |
|---|
**Udden** 23:4,17,20
  26:9
**unacceptable**
  43:22
**unaudited** 64:7,9
**unbelievably**
  75:19
**undergraduate**
  28:11
**underlined** 56:10
  59:16
**underlining**
  59:19
**undersigned**
  110:12 111:1
**understand** 6:6
  6:11,13,17 9:13
  10:22 24:14
  38:24 41:8 63:8
  63:13 68:1 77:2
  78:13 90:13
  96:12,24 99:20
  105:20
**understanding**
  71:3
**Unicare** 102:25
**unit** 38:2 93:1
  94:14
**United** 1:1,7,17
  4:12 62:5 69:1
  70:21 110:21
  112:1,6
**units** 87:21,23
  93:2 94:15
**universal** 94:11
**universe** 14:11
**unquote** 102:7

**uptake** 92:16
  93:25
**uptick** 93:25
**use** 9:12 47:15
  51:21 55:25
  58:18 64:24
  69:4 75:12
  103:13 108:8
**uses** 71:5
**U.S** 4:3 56:21
  107:7

| V |
|---|
**v** 1:9 112:8
**vague** 20:23
  108:25
**Vaguely** 27:20
**variety** 71:20
**various** 27:18
  35:11 50:20
  73:23 87:12,20
  99:3 101:19
**Vegas** 7:22 19:11
**Vendor** 101:18
**Venice** 2:6
**venturing** 100:17
**version** 6:23
  106:6
**versus** 9:25 15:2
  18:7 21:15
  32:17
**VIII** 95:24 96:16
  96:23
**violated** 99:2
  107:6
**violation** 108:9
**violations** 104:24
  105:15 106:22
  106:23 107:1,2
**Vioxx** 7:18,23
  8:15 11:2 13:8
  18:19,21,24
**Virginia** 55:13
**vis-a-vis** 107:22
**vis-à-vis** 52:17
**vitae** 3:12
**volume** 105:2,9
  105:14,21,23

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

128

| | | | | |
|---|---|---|---|---|
| 106:1,21 107:6 | 108:13 | 109:12 110:4,9 | 74:25 81:9 | **06** 50:18 |
| 107:8,22 108:7 | **went** 28:13,17,20 | 110:16,18 111:4 | 85:13,22 93:2 | |
| 108:8 109:5,6 | 29:7 53:1,3 | **wonderful** 95:25 | 94:16 | **1** |
| | 64:21 103:6 | **word** 9:12 14:4 | **years** 20:23 28:16 | **1** 3:8 5:10,16,16 |
| **W** | **We'd** 26:15 45:14 | 78:21,22 80:2 | 28:19 32:15 | 82:3,5 112:13 |
| **WAC** 38:1 45:20 | **we'll** 9:13 16:7 | 89:24 | 34:24 67:25 | **1.2** 104:5 |
| 45:21 100:8,13 | **we're** 20:15 34:16 | **words** 17:21 80:5 | 69:7,8 75:1 | **1.25** 104:5 |
| 100:15,16 | 34:16,17 61:25 | **work** 12:1,1 | 77:23 88:1 | **1:01-CV-12257...** |
| 103:16 104:8,11 | 72:17 106:12 | 15:15 28:9,14 | **you'd** 6:11 12:10 | 1:6 112:5 |
| **Wacker** 111:11 | **what's** 5:15 16:6 | 28:17 29:7,23 | 15:10 19:14 | **1:08-CV-11200** |
| **Wait** 92:25 | 17:2 18:9 29:16 | 45:7 50:17 | 26:17 93:7 | 1:7 112:6 |
| **waiting** 6:11 | 30:20 35:20 | 52:15 91:4 | **You'll** 58:2 67:13 | **1:30** 88:7 |
| **waived** 110:19 | 37:6 44:15 46:9 | **worked** 14:17 | **you're** 5:20 6:4 | **1:36** 89:2 |
| **want** 9:7 11:15 | 56:18 59:2 60:2 | 28:15,19,22 | 6:12,15 11:4 | **10** 3:21 12:13,14 |
| 19:25 23:3 | 64:7,9 72:15,23 | 29:3,8 30:3 41:9 | 14:17 19:16 | 12:17 18:3 19:2 |
| 28:25 38:21 | 77:15 78:25 | 46:20 50:19 | 20:24 26:8 | 20:8 21:19 |
| 42:19 57:4 | 80:2 86:9 90:11 | 51:23 91:6 | 28:24 29:1 39:7 | 26:23 49:17,23 |
| 65:12 77:14 | 97:15 98:15 | **working** 41:1,16 | 61:8 64:8 68:18 | 49:24 51:7,9,10 |
| 78:14 79:3 | **whim** 75:22 | 46:19 50:18,20 | 74:12 75:19 | 52:1,11 62:18 |
| 81:18 82:22 | **wholesale** 1:4 8:8 | 87:19 | 82:2,22 87:16 | 80:4 84:12 |
| 96:4,18 99:20 | 9:14 14:7 | **workings** 52:17 | 103:8,10 106:8 | **10:32** 1:21 |
| 102:17,21 106:6 | 103:16,17 112:3 | **works** 52:3,8,11 | **you've** 11:1 16:13 | **101** 84:16 |
| 106:7 | **wholesalers** | 52:13,14 | 17:18 18:22 | **11** 3:23 28:16 |
| **wanted** 34:24 | 103:18,19,23 | **world** 64:19 | 19:3 51:23 53:3 | 54:2,8,8 |
| 43:9 65:10,15 | 104:4 | **worth** 94:12 | 53:5 97:4 | **11/13/02** 60:5 |
| 66:21 67:1 | **wholly-owned** | 95:20 | 104:18 | **112** 112:14 |
| 74:11 75:23,25 | 28:21 | **wouldn't** 71:18 | | **115** 15:13 |
| 104:17 | **Who's** 83:14 | 74:24 82:13 | **Z** | **12** 4:3 56:13,19 |
| **Washington** 2:14 | **willy-nilly** 75:21 | 94:25 | **Zero** 24:13 | 56:19 |
| **wasn't** 15:7 34:10 | **wind** 76:14 | **writing** 26:13 | **zip** 64:17 | **12:48** 88:5 |
| 35:14 93:21 | **witness** 3:2 5:1,3 | **wrong** 30:1 51:3 | | **120** 15:13 |
| **Wave** 62:18 | 5:13 8:2,18 | 53:24 105:8,21 | **$** | **13** 4:5 37:13 |
| **way** 8:8 13:14 | 10:12 11:18,24 | 105:23 106:2 | **$1.15** 94:9 | 57:12,17,18 |
| 18:25 23:13,22 | 15:1 16:4,24 | **wrongful** 18:10 | **$1.235** 39:5,25 | 58:19 66:7 |
| 33:17,17,19 | 19:8,23 20:11 | **W/AWP** 3:14 | **$1.30** 38:2 | **13th** 66:12 |
| 52:1 55:25 | 23:5,18 25:5 | 30:22 | **$1.31** 43:9,10 | **1395nn** 107:7 |
| 63:17 97:15 | 26:10 29:14 | | 45:14,15 104:16 | **14** 4:6 25:12 |
| 103:2,1 106:19 | 30:18 35:18 | **X** | 104:17 | 58:22 59:3,3 |
| 108:18 | 37:4 44:12 46:7 | **X** 3:1,6 4:1 | **$1.548** 39:14 | 66:4,6,24 67:2 |
| **ways** 33:15 | 47:22 49:3,20 | | **$1.625** 38:25 | **1456** 1:4 20:2 |
| **website** 15:23,25 | 51:11 54:5 55:2 | **Y** | **$1.6250** 38:13 | 112:3 |
| 16:8,12,16,16 | 56:16 57:15 | **Yeager** 15:8,19 | **$16,000** 68:3 | **15** 4:8 47:11 |
| 16:19 17:4 | 58:25 59:24 | **yeah** 53:6 75:16 | | 59:21 60:3,3 |
| 42:10,14 | 61:21 66:2 | 77:22 81:5 82:5 | **0** | 61:9 93:1 94:7 |
| **Wednesday** 84:23 | 69:12 72:13 | 93:14,18 94:12 | **0.345** 39:25 | 96:4 |
| **weighted** 104:3 | 77:8,12 86:7 | 96:2 108:22 | **001495** 4:11 | **1506** 84:10 |
| **Weiss** 101:18 | 89:4,23 98:13 | **year** 7:25 28:11 | **03** 85:14 | **16** 3:9,11 4:10 |
| **well-versed** | 107:17 108:21 | 28:12 29:5 | **04** 50:18 81:10 | 61:18,24 62:3 |
| | | 53:20 64:4 67:9 | **04.11.05** 30:23 | |

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY - 800-292-4789
HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

68:14 70:2,14
**16th** 84:11
**17** 4:12 69:9,15
69:15 70:15,20
104:21
**18** 4:14 72:10,16
72:24,25 73:4
**1825** 2:13
**19** 4:16 77:9,15
77:16 78:19,20
**19th** 80:13
**1973** 28:13
**1993** 78:2
**1995** 34:15
**1998** 99:3,16
**1999** 28:23 29:1

**2**

**2** 3:9 16:1,7 17:4
17:9,13 18:2
56:21 89:12
90:22 99:4
100:4
**2:22** 109:16
**20** 4:17 20:22
26:5 67:5 68:3
86:4,10,11
94:14 96:4
**20-some** 96:5
**2000** 62:19 99:6,7
99:14,15,24
100:2,10 101:4
101:23 102:2
**20006-5403** 2:14
**2001** 29:8 68:24
69:4,16 70:21
75:20,20
**2002** 57:20 68:7
68:11 70:6
**2003** 56:21 85:24
85:25 93:14,15
**2004** 42:22,23
**2005** 15:17 22:2
24:16 25:8,12
27:3 42:22,23
78:21 79:9
80:13 86:11
**2006** 24:18,21

29:8,9 48:23
**2007** 106:6,11
**2008** 15:17
**2009** 66:7
**2010** 1:20 88:8
109:17 111:6,11
112:22
**202-420-2200**
2:15
**21** 4:19 88:8
98:10,16,16
99:4,25 109:17
**21st** 1:20
**22** 86:11 111:11
**22nd** 111:6
**24** 78:21 101:2,23
**24th** 79:9
**25** 12:13,15,17
18:3 19:2 20:8
21:19 26:24
**28** 57:19
**29** 3:12 68:24
**2907** 2:5

**3**

**3** 3:11 16:21 17:3
17:3 99:6
**30** 3:13
**30(e)** 110:20
**300** 1:19 111:11
**310-306-8094** 2:7
**311** 111:11
**312** 111:12
**312-853-7814**
2:22
**32(d)** 110:20
**340B** 90:12,20
91:5,9 97:4
**35** 3:15
**36** 36:18 37:9,16
37:22,24 38:4,7
39:12 40:4
**37** 3:16 42:4,5,15
**371** 59:5
**38** 42:12,24 43:1
**386-2000** 111:12
**39** 43:3,5 46:1

**4**

**4** 3:12 29:11,17
29:18 91:13
96:25
**4th** 81:7
**4-5-6** 81:1
**4/22/05** 4:17
**40** 36:18
**42** 107:7
**46** 3:17
**47** 3:19
**48** 104:22
**49** 3:21 105:1

**5**

**5** 3:4,8,13 30:15
30:21,21 93:6
**5th** 81:7 84:23
**500** 63:6
**52** 107:4
**54** 3:23
**56** 4:3
**57** 4:5
**58** 4:6 107:25
**59** 4:8

**6**

**6** 3:15 35:15,24
36:1 66:1 89:10
93:6 97:10,11
97:12
**6th** 81:7
**600** 1:19
**60603** 2:21
**60606** 111:12
**61** 4:10
**69** 4:12

**7**

**7** 3:16 35:21,23
35:23 37:1,7,7
37:10 42:4 43:4
49:9 68:21
91:11 92:22
97:22 98:4,8
101:2 104:22
108:1
**72** 4:14
**77** 4:16

**8**

**8** 3:17 36:12 46:4
46:10,10 92:22
**80** 26:4 39:5
**84-1481** 111:10
**847-960-7384**
54:22
**85** 63:6
**86** 4:17 28:23
**89** 39:22,24 94:6
94:8
**89-cent** 40:3

**9**

**9** 3:19 47:19,25
47:25 48:25
49:13,14 101:2
**90292** 2:6
**95** 71:12
**98** 4:19
**99** 29:2

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| IN RE: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) ) |
|  | MDL No. 1456 Master File No. 1:01-CV-12257-PBS Sub-Category Case No. 1:08-CV-11200 |
|  |  |
| THIS DOCUMENT RELATES TO: *United States ex rel. Linnette Sun and Greg Hamilton, Relators* *v.* *Baxter Hemoglobin Therapeutics and Baxter International Inc.* | ) ) ) ) ) ) ) ) ) ) ) |
|  | Judge Patti B. Saris |

## NOTICE OF DEPOSITION OF RELATOR GREG HAMILTON

PLEASE TAKE NOTICE that pursuant to Rule 30 of the Federal Rules of Civil Procedure, Defendant Baxter International Inc., by its attorneys Dickstein Shapiro LLP, notices the deposition of Relator Greg Hamilton on a date and time, and at a place, to be determined. The deposition will be recorded stenographically and will continue from day to day until completed.



EXHIBIT
1
Hamilton

DSMDB-2682872v02

October 19, 2009

**/s/ Ruchi Jain**
J. Andrew Jackson
Merle M. DeLancey
Tina D. Reynolds
Ruchi Jain
**DICKSTEIN SHAPIRO LLP**
1825 Eye Street NW
Washington, DC 20006
Telephone:  (202) 420-2200
Facsimile:  (202) 420-2201
*Admitted pro hac vice*

Peter E. Gelhaar (BBO #188310)
**DONNELLY, CONROY & GELHAAR, LLP**
One Beacon Street, 33rd Floor
Boston, MA 02108
Telephone:  (617) 720-2880
Facsimile:  (617) 720-3554

Counsel for Defendant Baxter International Inc.

DSMDB-2682872v02

<u>**CERTIFICATE OF SERVICE**</u>

I, Ruchi Jain, hereby certify that on October 19, 2009, I caused a true and correct

copy of the foregoing Notice of Deposition of Relator Greg Hamilton to be served on all counsel

of record by electronic service by sending a copy to Lexis/Nexis for posting and notification to

all parties.

<div style="margin-left:50%">

/s/ **Ruchi Jain**
Ruchi Jain
**DICKSTEIN SHAPIRO LLP**
1825 Eye Street NW
Washington, DC 20006
Telephone:  (202) 420-2200
Facsimile:  (202) 420-2201

</div>

DSMDB-2682872v02

**Merck Pays $400 Million In National Medicaid Fraud Settlement;**
**New Investigation Model Ends Seven-Year *Qui Tam* Whistleblower Cas**

| Home | Medicaid & The States | The Case | The Drugs | Whistleblowers | News & Info | Taxpa |
|---|---|---|---|---|---|---|



High-Resolution Photo

## Steven Cohen

Steven H. Cohen has been practicing law in Chicago for more than 25 yea
whistleblowers in *qui tam* cases since 1995. In 2001, he founded the Cohe
where he has dedicated his practice to representing whistleblower clients
brought under federal and state false claims laws.

Steve has investigated and prosecuted dozens of sealed and unsealed *qui*
behalf of physicians, nurses, compliance officers, billing coordinators, sale
managers and senior company officers in cases spanning the spectrum of
other government programs fraud and abuse. He has hands-on expertise v
federal False Claims Act and state whistleblower/*qui tam* laws. Through hi
practice, Steve has developed close working relationships with U.S. Depar
lawyers, and prosecutors in United States Attorneys Offices and States' A
Offices throughout the country.

Steve is currently lead Relator's counsel in State of Illinois *ex rel* Groesche
University of Chicago Hospitals, in which the State of Illinois has joined in p
University of Chicago Hospitals in a first-of-its-kind Medicaid fraud case re
treatment of critically ill babies admitted to the hospital's neonatal intensive

In 2000, Steve was retained by Dean Steinke to investigate Merck & Co., Inc.'s ("Merck") marketing practices
their most popular drugs including Zocor® and Vioxx®. That investigation led to the filing of the two cases, Unit
Steinke v. Merck and Nevada *ex rel* Steinke v. Merck. Steve was co-lead counsel for the Relator during the co
seven-year investigation conducted by the federal Government and the States' Medicaid Fraud Unit team. In th
Steve worked with the Nevada Attorney General and his co-counsel to obtain a landmark ruling interpreting the
Rebate Act's Best Price provisions. As a result of the closely coordinated work of federal and state prosecutor
counsel, Merck agreed to pay more than $400 million, $399 million plus interest calculated from April 2007, to
Government and the states to settle the allegations in these cases.

As a co-founder of the Whistleblower Action Network, Steve and an alliance of lawyers investigate and prosec
lawsuits on behalf of whistleblowers. Today, Steve and other affiliated Whistleblower Action Network attorneys
in numerous pending investigations and cases throughout the country.

Steve is an adjunct faculty member at Northwestern Law School in Chicago where he teaches clinical trial advc
on the faculty of the National Institute of Trial Advocacy (NITA). He also speaks about fraud and abuse issues
professional groups.



## Mark Kleiman

Mark Kleiman represents whistleblowers across the country. Cases he ha
one, have recovered more than $500 million for the federal and state Gove

The former executive director of a national consumer health group, Kleima
FDA advisory panel and on the boards of state licensing agencies and nati
organizations. He has been a consultant to the U.S. Department of Health
Services, the American Public Health Association, and the American Canc

Kleiman has lectured at Columbia University, UCLA, and the University of M

EXHIBIT

2

Hamilton



School of Law, and has taught seminars for the American Bar Association
Health Lawyers Association. He has also discussed health care fraud as a
Television network's MacNeil/Lehrer News Hour.

As an experienced trial lawyer, Kleiman has represented doctors, nurses,
other whistleblowers in health care, as well as engineers and others in the
construction, banking, and education industries. He has prosecuted fraud o
companies, hospitals, nursing home chains, and medical groups, as well as military contractors and vocational

Kleiman has also served as a government-appointed Special Master in cooperation with the California Departm
and the Los Angeles County District Attorney's Office during investigations of fraudulent medical-legal activities

### Education

Kleiman is a cum laude graduate of the Southwestern University School of Law and holds a Master's in Public
the University of California at Los Angeles. He has published in the Health Care Fraud & Abuse Newsletter, Ad
Term Care, the Community Mental Health Journal, the Bulletin of the Joint Center for Political Studies, and the
Behavioral Science.



High-Resolution Photo

## BethAnne Yeager

BethAnne Yeager has been involved in *qui tam* litigation since 2004, workir
Kleiman and the Cohen Law Group on a wide variety of cases under the fe
Act ("FCA") and state false claims laws. A member of *qui tam* litigation ba
Against Fraud, and part of the Whistleblower Action Network, she has bee
in the investigation and prosecution of the Nevada and Eastern District of F
against Merck since 2004.

Yeager also is a counsel to relators in Illinois *ex rel.* Raymer and Grosche
Chicago Hospital, an unsealed *qui tam* action brought under the Illinois Wh
and Recovery Act ("IWRPA") in which the State of Illinois is prosecuting th
alleged false claims against Illinois Medicaid. She also has represented pla
retaliation cases brought under the anti-retaliation provisions of the FCA.

Yeager practiced in California since she was graduated from Cornell Law
member of the Wisconsin bar, she clerked for the Hon. Justice N. Patrick (
Wisconsin Supreme Court for the 2000-2001 term. Before and after her cl
"Women and the Law" during summer sessions at the University of Wiscor

Prior to *qui tam* litigation, Yeager practiced in the areas of employment dis
rights, and consumer fraud for more than 15 years. Her employment discrimination work includes representing
landmark decision from the Wisconsin Supreme Court that reversed a finding of immunity for the University of \

Among highlights of her legal career is a consumer fraud action for which she was named a finalist, with Kleima
Trial Lawyer of the Year Award by Trial Lawyers for Public Justice. Yeager also served as co-counsel in the fi
harassment trial in Marin County, California, resulting in the highest award against the State at the time for suc

---

Contact PRforLAW, LLC | Legal Notices and Disclaimers

© Copyright 2008 PRforLAW. LLC. All rights reserved. This Web site and any of its pages may not be
electronically stored or deep linked without written permission from us. In the case of material we have re
with permission, contact the copyright holder of that document/work. Inactive links represent expected d
yet received.

**Merck Pays $400 Million In National Medicaid Fraud Settlement;**
**New Investigation Model Ends Seven-Year *Qui Tam* Whistleblower Cas**

| Home | Medicaid & The States | The Case | The Drugs | Whistleblowers | News & Info | Taxpa |
|------|----------------------|----------|-----------|----------------|-------------|-------|



### Drug Expert Greg Hamilton, Sr.

Greg Hamilton, our drug marketing expert in this case, has 31 years of exp
specialty pharmacy, pharmaceutical and biotech expert, which includes ma
business development, and government contracting. He also is a subject m
regarding product reimbursement, Medicaid/Medicare implications and gov
contracting.

With an MBA in Marketing and Finance and a Bachelor of Science in Busir
Science, Hamilton has 20 years of experience as a pharmaceutical, nutritic
account executive for major drug manufacturers.

For one drug manufacturer Hamilton served as Associate Manager and the
Contract Sales and Federal Affairs, positions in which he was responsible
submission of AMP and Best Price data.

As a Senior Product Manager, Hamilton authored the business settlement
Medicaid Fraud allegations over alleged manipulation of Average Wholesale Prices. The agreement with Medic
U.S. Department of Justice provided financial and business practice elements, which permitted the manufactur
participant in Medicaid, PHS (340b), and the Federal Supply Schedule.

Most recently, Hamilton served as the Vice President for the Bleeding Disorders Programs of a special pharma
national pharmacy benefit management company. Hamilton created a hemophilia program within the division, w
years, generated $25 million in revenue.

Previously, as a Senior Director of Strategic Sales for parent company he developed product launch programs
companies, including channels and methods of distribution, pricing, packaging, reimbursement and promotion.

Hamilton received his Bachelor's Degree from Western Michigan University and his Master's from Illinois Institu
Stuart School of Management, Chicago.

Greg Hamilton's Resume

---

Contact PRforLAW, LLC | Legal Notices and Disclaimers

© Copyright 2008 PRforLAW. LLC. All rights reserved. This Web site and any of its pages may not be
electronically stored or deep linked without written permission from us. In the case of material we have re
with permission, contact the copyright holder of that document/work. Inactive links represent expected d
yet received.



EXHIBIT
3
Hcm, 1 502

**Greg Hamilton**

2880 Waterfront Ave
Algonquin, IL 60102
hjtennis27@aol.com
(773) 351-0005

## Specialty Pharmacy Expert • Thirty-one years Pharmaceutical Experience

## Executive Summary

Innovative specialty pharmacy, Pharmaceutical, and Biotech expert with proven track record and quantifiable achievements.  Experience in marketing, sales, business development, and government contracting.   Earned MBA in Marketing and Finance and a Bachelor of Science in Business and Political Science.

## Executive Highlights

As Vice President of Bleeding Disorders Programs, created Hemophilia Program that grew to over 120 patients and more than $25M a year in revenue. This program utilized an entirely new sales method while introducing the PBM and its clients to Hemophilia care and service.

As Senior Director of Strategic Sales, introduced a consulting service to ESI/SDS and its customers.  In conjunction with promoting SDS's services to the BioTech and Pharmaceutical industries increased revenue and value by providing clients with product launch stratigies/tacticts covering pricing, packaging, promotion, reimbursement, and channels of distribution. These consulting agreements resulted in thousands of dollars in revenue and three exclusive distribution programs.

As Senior Product Manager, created the Bayer Direct Program.  This program saved the lives of over 200 patients who were not able to procure their prescribed medication due to inefficient distribution channels.  Bayer Direct involved Bayer distributing their Orphan Drug, Prolastin, directly to patient via a dedicated specialty pharmacy (operated under contact by Express Scripts).

As Senior Product Manager, authored the business settlement resolving a Medicaid Fraud lawsuit over alleged manipulation of AWP's. This agreement with the Medicaid States and the DOJ provided both financial and business practice elements, which allowed Bayer to continue to participate in Medicaid, PHS (340b), and Federal Supply Schedule.

As Senior Product Manager, developed and implemented contracting and pricing strategies for both pharmaceutical and biological products. These measures generated over $20MM annually.

EXHIBIT
4
Hamilton

EXHIBIT
HAMILTON 1
4.23.09    DK

1

2880 Waterfront Ave
Algonquin, IL 60102
hjtennis27@aol.com
(773) 351-0005

# Greg Hamilton

## Career Development

### CuraScript Pharmacy
**Vice President - Bleeding Disorders Programs**                     2004 – 2006
Speciality Pharmacy division of Express Scripts.
  * Created a hemophilia program within the specialty pharmacy business unit Cura-script.
  * Grew program to $25M in revenue in under three years
  * Developed program strategic direction, pricing and management.
  * Negotiated supplier agreements with National Plasma producers

## Express Scripts, Inc.
### Specialty Distribution Services
**Senior Director Strategic Sales**                     2000 – 2003
Pharmacy Benefit Management (PBM) Fortune 100 company.
  * Expanded Specialty Distribution Services into bio-tech drugs.
  * Developed product launch programs for biotech companies.  Programs provided all aspects of launch including channels and methods of distribution, pricing, packaging, reimbursement and promotion.
  * Subject matter expert regarding product reimbursement, Medicaid/Medicare implications and government contracting.

### Independent Consultant
**Principle**                     1999 – 2000
Provided consulting services to Bayer and Express Scripts.
  * Generated $500M of incremental revenue between Bayer and Express Scripts through the implementation and operationalization the Bayer Direct Program.
  * Developed new pricing strategies for numerous Bayer products.
  * Produced target list of potential bio-tech customers for Express Scripts.

### Bayer A.G.
**Senior Product Manager**                     1998 – 2000
Created Bayer Direct, an integrated distribution business model for Prolastin.
  * This revolutionary new business saved over 200 patient lives and generated $14M of incremental profit per year.
  * Overall pricing & channels of distribution for all Biological Products.
  * Review all Medicaid and Medicare pricing issues.
  * Primary business expert liaison in-house and external (Sidley and Austin) in government suit alleging AWP based Medicaid Fraud.

**Manager, Marketing Research**                     1996 - 1997
  * Primary research on both Biological & Pharmaceutical products.

2

**Greg Hamilton**

2880 Waterfront Ave
Algonquin, IL 60102
hjtennis27@aol.com
(773) 351-0005

    ◆ Provide marketing/sales with recommendations on pricing, channels of
distribution, and promotional issues.

### Manager Contract Sales and Federal Affairs      1995 - 1996

    ◆ FSS negotiations with National Acquisition Center for both biologics and
pharmaceuticals
    ◆ Monitor public and private reimbursement for biological products and recommend
pricing/marketing.
    ◆ Review all Medicaid rebates and issues for Biological Products.
    ◆ Provide marketing/sales with recommendations on pricing, channels of
distribution, and promotional issues.

### Associate Manager Contract Sales and Federal Affairs      1997 - 1998

    ◆ Calculation and Submission of AMP & Best Price.
    ◆ Calculation and Submission of Non-FAMP.
    ◆ FSS negotiations with National Acquisition Center.
    ◆ Profitability Analysis by Channels of Distribution.
    ◆ Projection / Evaluation of Marketing Incentives.

### Account Executive      1973 - 1993

Pharmaceutical, Nutritional, and Biological account executive for Abbott (ten years),
Schering Plough (three years) and Cutter/Miles/Bayer (seven years).

## EDUCATION

**Illinois Institute of Technology – 1978**
Stuart School of Management, Chicago, IL
**Master of Business Administration**– Marketing & Finance

**Western Michigan University - 1972**
Kalamazoo, MI
**Bachelor of Science in Business and Political Science**

BAXTER PRODUCTS W/ AWP HISTORY
04.11.05

ADVATE

NDC Number NDC: Drug File SourceESI Drug File National Drug File Mail Order Drug File(ABQ) Active Only SearchClear Drug Name Drug Name: Drug File SourceESI Drug File National Drug File Mail Order Drug File(ABQ) Active Only SearchClear Search Results DrugGroupDrug NameNDCStrengthPkg SizeSource IndicatorStatusDrugIndex

Records: 1 - 4 of 4

1ADVATE 1,000 UNITS KIT0094429400310000001.000MULTIACTIVE0
2ADVATE 1,500 UNITS KIT0094429400415000001.000SINGLEACTIVE1
3ADVATE 250 UNIT KIT0094429400125000001.000MULTIACTIVE2
4ADVATE 500 UNIT KIT0094429400250000001.000MULTIACTIVE3

Drug DetailMedication:00944294003 ADVATE 1,000 UNITS KIT Formulary Status:Formulary Formulary Policy:V/O - vol form/vol BBI Alternatives: Drug Class:01 CPC Indicator:Yes Category:

Gender Restriction: Age Minimum: Age Maximum: Maintenance Drug: Max Qty Retail: Max Qty MO: Days Supply Retail: Days Supply MO: This is a summarization of limits for this drug and does not contain all plan limitations.
For additional dispensing information view all Dispensing Limits.
To determine benefit specific limitations perform a Coverage Check.

Unit Dose:EA Strength:1000000 Package Size:1.000 Unit Dose Package:No Repackaged:No DESI:No Dosage Form:INJ GPI:BRAND Source Indicator:MULTI-SOURCE Status:ACTIVE Obsolete Date:12/31/9999 DEA Classification:

Manufacturing:BAXTER-HYLAND Therapy Class:000125000 HEMOSTATICS Generic Code:000000596 FACTOR VIII (ANTIHEMOPHL FCTR) OTC/Legend:FEDERAL LEGEND
AWP History:05/13/2004 $1.7500 08/25/2003 $1.8800

1



EXHIBIT
5
Hamilton

GH000001

RECOMBINATE

NDC Number NDC: Drug File SourceESI Drug File National Drug File Mail Order Drug File(ABQ) Active Only SearchClear Drug Name Drug Name: Drug File SourceESI Drug File National Drug File Mail Order Drug File(ABQ) Active Only SearchClear Search Results DrugGroupDrug NameNDCStrengthPkg SizeSource IndicatorStatusDrugIndex

Records: 1 - 3 of 3

1RECOMBINATE 220-400 UNIT VL009442938013100001.000MULTIACTIVE0
2RECOMBINATE 401-800 UNIT VL009442938026000001.000MULTIACTIVE1
3RECOMBINATE 801-1,240 UNITS VL0094429380310200001.000MULTIACTIVE2

Drug DetailMedication:00944293801 RECOMBINATE 220-400 UNIT VL Formulary Status:Formulary Formulary Policy:V/O - vol form/vol BBI Alternatives: Drug Class:01 CPC Indicator:Yes Category:

Gender Restriction: Age Minimum: Age Maximum: Maintenance Drug: Max Qty Retail: Max Qty MO: Days Supply Retail: Days Supply MO: This is a summarization of limits for this drug and does not contain all plan limitations.
For additional dispensing information view all Dispensing Limits.
To determine benefit specific limitations perform a Coverage Check.

Unit Dose:EA Strength:310000 Package Size:1.000 Unit Dose Package:No Repackaged:No DESI:No Dosage Form:INJ GPI:BRAND Source Indicator:MULTI-SOURCE Status:ACTIVE Obsolete Date:12/31/9999 DEA Classification:

Manufacturing:BAXTER-HYLAND Therapy Class:000125000 HEMOSTATICS Generic Code:000000596 FACTOR VIII (ANTIHEMOPHL FCTR)
OTC/Legend:FEDERAL LEGEND
AWP History:06/26/2001 $1.6250 07/19/1998 $1.2800 09/07/1997 $1.2400

2

GH000002

BEBULIN

NDC Number NDC: Drug File SourceESI Drug File National Drug File Mail Order Drug File(ABQ) Active Only SearchClear Drug Name Drug Name: Drug File SourceESI Drug File National Drug File Mail Order Drug File(ABQ) Active Only SearchClear Search Results DrugGroupDrug NameNDCStrengthPkg SizeSource IndicatorStatusDrugIndex

Records: 1 - 1 of 1

1BEBULIN VH IMMUNO 200-1,200 UN641930244027000001.000SINGLEACTIVE0

Drug DetailMedication:64193024402 BEBULIN VH IMMUNO 200-1,200 UN Formulary Status:Formulary Formulary Policy:V/O - vol form/vol BBI Alternatives: Drug Class:01 CPC Indicator:Yes Category:

Gender Restriction: Age Minimum: Age Maximum: Maintenance Drug: Max Qty Retail:

Max Qty MO: Days Supply Retail: Days Supply MO: This is a summarization of limits for this drug and does not contain all plan limitations.
For additional dispensing information view all Dispensing Limits.
To determine benefit specific limitations perform a Coverage Check.

Unit Dose:EA Strength:700000 Package Size:1.000 Unit Dose Package:No Repackaged:No DESI:No Dosage Form:INJ GPI:BRAND Source Indicator:SINGLE-SOURCE Status:ACTIVE Obsolete Date:12/31/9999 DEA Classification:

Manufacturing:BAXTER-HYLAND Therapy Class:000125000 HEMOSTATICS Generic Code:000000595 FACTOR IX COMPLEX (HUMAN) OTC/Legend:FEDERAL LEGEND
AWP History:01/15/2005 $0.9000 11/16/2001 $0.7250

3

GH000003

FEIBA

NDC Number NDC: Drug File SourceESI Drug File National Drug File Mail Order Drug File(ABQ) Active Only SearchClear Drug Name Drug Name: Drug File SourceESI Drug File National Drug File Mail Order Drug File(ABQ) Active Only SearchClear Search Results DrugGroupDrug NameNDCStrengthPkg SizeSource IndicatorStatusDrugIndex

Records: 1 - 2 of 2

1FEIBA VH IMMUNO 400-650 UNITS641930222034000001.000SINGLEACTIVE0
2FEIBA VH IMMUNO 651-1,200 UNIT641930222046000001.000SINGLEACTIVE1

Drug DetailMedication:64193022203 FEIBA VH IMMUNO 400-650 UNITS Formulary Status:Formulary Formulary Policy:V/O - vol form/vol BBI Alternatives: Drug Class:01 CPC Indicator:No Category:

Gender Restriction: Age Minimum: Age Maximum: Maintenance Drug: Max Qty Retail: Max Qty MO: Days Supply Retail: Days Supply MO: This is a summarization of limits for this drug and does not contain all plan limitations.
For additional dispensing information view all Dispensing Limits.
To determine benefit specific limitations perform a Coverage Check.

Unit Dose:EA Strength:400000 Package Size:1.000 Unit Dose Package:No Repackaged:No DESI:No Dosage Form:INJ GPI:BRAND Source Indicator:SINGLE-SOURCE Status:ACTIVE Obsolete Date:12/31/9999 DEA Classification:

Manufacturing:BAXTER-HYLAND Therapy Class:000125000 HEMOSTATICS Generic Code:000000600 ANTI-INHIBITOR COAGULANT COMP.
OTC/Legend:FEDERAL LEGEND
AWP History:01/17/2005 $1.9100

GH000004

HEMOFIL-M

NDC Number NDC: Drug File SourceESI Drug File National Drug File Mail Order Drug File(ABQ) Active Only SearchClear Drug Name Drug Name: Drug File SourceESI Drug File National Drug File Mail Order Drug File(ABQ) Active Only SearchClear Search Results DrugGroupDrug NameNDCStrengthPkg SizeSource IndicatorStatusDrugIndex

Records: 1 - 1 of 1

1HEMOFIL-M 200-1,500 UNITS VIAL009442935018500001.000SINGLEACTIVE0

Drug DetailMedication:00944293501 HEMOFIL-M 200-1,500 UNITS VIAL Formulary Status:Formulary Formulary Policy:V/O - vol form/vol BBI Alternatives: Drug Class:01 CPC Indicator:Yes Category:

Gender Restriction: Age Minimum: Age Maximum: Maintenance Drug: Max Qty Retail: Max Qty MO: Days Supply Retail: Days Supply MO: This is a summarization of limits for this drug and does not contain all plan limitations.
For additional dispensing information view all Dispensing Limits.
To determine benefit specific limitations perform a Coverage Check.

Unit Dose:EA Strength:850000 Package Size:1.000 Unit Dose Package:No Repackaged:No DESI:No Dosage Form:INJ GPI:BRAND Source Indicator:SINGLE-SOURCE Status:ACTIVE Obsolete Date:12/31/9999 DEA Classification:

Manufacturing:BAXTER-HYLAND Therapy Class:000125000 HEMOSTATICS Generic Code:000000596 FACTOR VIII (ANTIHEMOPHL FCTR) OTC/Legend:FEDERAL LEGEND AWP History:06/26/2001 $1.2250 09/07/1997 $0.9500 01/09/1992 $0.9000

GH000005

GAMMAGARD S/D 0.5 GM

NDC Number NDC: Drug File SourceESI Drug File National Drug File Mail Order Drug File(ABQ) Active Only SearchClear Drug Name Drug Name: Drug File SourceESI Drug File National Drug File Mail Order Drug File(ABQ) Active Only SearchClear Search Results DrugGroupDrug NameNDCStrengthPkg SizeSource IndicatorStatusDrugIndex

Records: 1 of 4

1GAMMAGARD S/D 0.5 GM VL W/ST009442620015000001.000SINGLEACTIVE0

Drug DetailMedication:00944262001 GAMMAGARD S/D 0.5 GM VL W/ST Formulary Status;Formulary Formulary Policy;V/O - vol form/vol BBI Alternatives; Drug Class;01 CPC Indicator:Yes Category:

Gender Restriction: Age Minimum: Age Maximum: Maintenance Drug: Max Qty Retail: Max Qty MO: Days Supply Retail: Days Supply MO: This is a summarization of limits for this drug and does not contain all plan limitations.
For additional dispensing information view all Dispensing Limits.
To determine benefit specific limitations perform a Coverage Check.

Unit Dose:EA Strength:500000 Package Size:1.000 Unit Dose Package:No Repackaged:No DESI:No Dosage Form:INJ GPI:BRAND Source Indicator:SINGLE-SOURCE Status:ACTIVE Obsolete Date:12/31/9999 DEA Classification:

Manufacturing:BAXTER-HYLAND Therapy Class:000100000 IMMUNOLOGICALS AND VACCINES Generic Code:000004186 IMMUNE GLOBULIN - IV OTC/Legend:FEDERAL LEGEND
AWP History:06/26/2001 $81.0000 07/19/1998 $64.8000 01/09/1996 $54.9200

6

GH000006

GAMMAGARD S/D 2.5 GM

NDC Number NDC: Drug File SourceESI Drug File National Drug File Mail Order Drug File(ABQ) Active Only SearchClear Drug Name Drug Name: Drug File SourceESI Drug File National Drug File Mail Order Drug File(ABQ) Active Only SearchClear Search Results DrugGroupDrug NameNDCStrengthPkg SizeSource IndicatorStatusDrugIndex

Records: 3 of 4

3GAMMAGARD S/D 2.5 GM VL W/ST0094426200225000001.000MULTIACTIVE2

Drug DetailMedication:00944262002 GAMMAGARD S/D 2.5 GM VL W/ST Formulary Status:Formulary Formulary Policy:V/O - vol form/vol BBI Alternatives: Drug Class:01 CPC Indicator:Yes Category:

Gender Restriction: Age Minimum: Age Maximum: Maintenance Drug: Max Qty Retail: Max Qty MO: Days Supply Retail: Days Supply MO: This is a summarization of limits for this drug and does not contain all plan limitations.
For additional dispensing information view all Dispensing Limits.
To determine benefit specific limitations perform a Coverage Check.

Unit Dose:EA Strength:2500000 Package Size:1.000 Unit Dose Package:No Repackaged:No DESI:No Dosage Form:INJ GPI:BRAND Source Indicator:MULTI-SOURCE Status:ACTIVE Obsolete Date:12/31/9999 DEA Classification:

Manufacturing:BAXTER-HYLAND Therapy Class:000100000 IMMUNOLOGICALS AND VACCINES Generic Code:000004186 IMMUNE GLOBULIN - IV OTC/Legend:FEDERAL LEGEND
AWP History:06/26/2001 $298.1250 07/19/1998 $217.5000 10/20/1996 $184.2500

GH000007

GAMMAGARD S/D 5 GM

NDC Number NDC: Drug File SourceESI Drug File National Drug File Mail Order Drug File(ABQ) Active Only SearchClear Drug Name Drug Name: Drug File SourceESI Drug File National Drug File Mail Order Drug File(ABQ) Active Only SearchClear Search Results DrugGroupDrug NameNDCStrengthPkg SizeSource IndicatorStatusDrugIndex

Records: 4 of 4

4GAMMAGARD S/D 5 GM VL W/SET0094426200350000001.000MULTIACTIVE3

Drug DetailMedication:00944262003 GAMMAGARD S/D 5 GM VL W/SET Formulary Status:Formulary Formulary Policy:V/O - vol form/vol BBI Alternatives: Drug Class:01 CPC Indicator:Yes Category:

Gender Restriction: Age Minimum: Age Maximum: Maintenance Drug: Max Qty Retail: Max Qty MO: Days Supply Retail: Days Supply MO: This is a summarization of limits for this drug and does not contain all plan limitations.
For additional dispensing information view all Dispensing Limits.
To determine benefit specific limitations perform a Coverage Check.

Unit Dose:EA Strength:5000000 Package Size:1.000 Unit Dose Package:No Repackaged:No DESI:No Dosage Form:INJ GPI:BRAND Source Indicator:MULTI-SOURCE Status:ACTIVE Obsolete Date:12/31/9999 DEA Classification:

Manufacturing:BAXTER-HYLAND Therapy Class:000100000 IMMUNOLOGICALS AND VACCINES Generic Code:000004186 IMMUNE GLOBULIN - IV OTC/Legend:FEDERAL LEGEND
AWP History:06/26/2001 $596.2500 07/19/1998 $435.0000 10/20/1996 $368.5000

GH000008

GAMMAGARD S/D 10 GM

NDC Number NDC: Drug File SourceESI Drug File National Drug File Mail Order Drug File(ABQ) Active Only SearchClear Drug Name Drug Name: Drug File SourceESI Drug File National Drug File Mail Order Drug File(ABQ) Active Only SearchClear Search Results DrugGroupDrug NameNDCStrengthPkg SizeSource IndicatorStatusDrugIndex

Records: 2 of 4

2GAMMAGARD S/D 10 GM VL W/ST00944262004100000001.000MULTIACTIVE1

Drug DetailMedication:00944262004 GAMMAGARD S/D 10 GM VL W/ST Formulary Status:Formulary Formulary Policy:V/O - vol form/vol BBI Alternatives: Drug Class:01 CPC Indicator:Yes Category:

Gender Restriction: Age Minimum: Age Maximum: Maintenance Drug: Max Qty Retail: Max Qty MO: Days Supply Retail: Days Supply MO: This is a summarization of limits for this drug and does not contain all plan limitations.
For additional dispensing information view all Dispensing Limits.
To determine benefit specific limitations perform a Coverage Check.

Unit Dose:EA Strength:10000000 Package Size:1.000 Unit Dose Package:No Repackaged:No DESI:No Dosage Form:INJ GPI:BRAND Source Indicator:MULTI-SOURCE Status:ACTIVE Obsolete Date:12/31/9999 DEA Classification:

Manufacturing:BAXTER-HYLAND Therapy Class:000100000 IMMUNOLOGICALS AND VACCINES Generic Code:000004186 IMMUNE GLOBULIN - IV OTC/Legend:FEDERAL LEGEND
AWP History:06/26/2001 $1,192.5000 07/19/1998 $870.0000 10/20/1996 $737.0000

GH000009

## DECLARATION OF GREG HAMILTON

I, Greg Hamilton, hereby declare as follows:

1. I am one of the Relators in United States ex rel Sun et al. v. Baxter. If called upon to do so, I could and would testify competently to the following based upon firsthand knowledge.

2. I have worked for pharmaceutical manufacturers and pharmacy benefit managers for over twenty years. During this time I have had extensive contact with Baxter's senior staff as a customer, a colleague and as a competitor. This contact has included numerous meetings Guiheen (the President of Baxter BioScience who is referred to in ¶45 of the Complaint) as well as his superior, Peter O'Malley. Those meetings specifically concerned the pricing of several of the Baxter products discussed in this Complaint.

3. From 2001 – 2004 I was the Senior Director of Strategic Sales and Planning at Specialty Distribution Services for Express Scripts, the Pharmacy Benefit Manager. From 2004 – 2006 I was the Vice-President of the Curascript Bleeding Disorder Program. (CuraScript is an operating division of Express Scripts.)

4. While serving in these positions I frequently met with Baxter's senior management to discuss the market for hemophilia products. Because the market for hemophilia products is extremely lucrative, national hemophilia meetings were typically attended by the leadership from concerned pharmaceutical companies and PBMs. At these conferences I would hold scheduled meetings with Larry Guiheen, who was then Baxter's Vice-President for North America, as well has his boss, Peter O'Malley. I also made at least three trips to Baxter's Deerfield, Illinois, offices to meet with Baxter managers to discuss pricing. At least one of those meetings took place at the request of Peter O'Malley, who was either Baxter's President of North American operations, or vice President of Sales. O'Malley asked me to meet with Baxter's contracting



EXHIBIT
36
Hamilton

staff and describe how to price products for Government customers, and how pricing for the 340B program operates.

5.  I had at least three such meetings with Baxter to discuss pricing in barely a year – August 8, 2002, February 3, 2003, and September 26, 2003.

6.  During one such meeting I had a long discussion with Larry Guiheen about Baxter's pricing of Advate (Baxter's version of Recombinant Factor VIII.)  Within a few months of this meeting Baxter changed its price for Advate to within a penny of what I had recommended.

7.  In addition to being a major customer of Baxter's through my work with Express Scripts and Curascript, I also interacted with Baxter's pricing managers as a competitor of Baxter's when I worked for Bayer.  While working for Bayer, I served with Baxter executive Peter O'Malley on the Plasma Protein and Therapeutics Association's Reimbursement Committee, and Drug Recall Committee, and had numerous discussions with him about pricing strategies.

8.  In addition to my direct discussions with Baxter managers, I learned of Baxter's pricing and some of the specific acts alleged in ¶¶ 36-40 of our complaint while trying to help Kay Morgan, Manager of Editorial Services for First Data Bank. In May or early June of 2001 Kay Morgan called and asked my opinion about why Baxter was refusing to provide its WAC for Recombinate.  She told me that Baxter sent a letter saying that their list price was $1.31 and they wanted their AWP reported as $1.31.  She told me that when she asked Baxter for the WAC,  Baxter merely repeated that the list price for Recombinate was $1.31 and that they wanted the AWP reported as $1.31.  Morgan told me that FDB was so mad that they threatened not to publish any information at all.

2

9.    Morgan told me that she, her boss, and the FDB legal department wrote a letter to Baxter threatening that FDB would refuse to publish the AWP information.

10.    Morgan asked me what I thought Baxter was trying to accomplish by this.  I told her that I thought Baxter's goal was to establish an AWP was attractive to the distributors, but to still be able to deny to the hemophilia community that it was Baxter's fault for the high AWP, and to blame FDB.

11.    Throughout my years in the industry I was able to achieve a high level of understanding of Baxter's pricing structure from direct discussions with Baxter's senior management, as well as through the information given me by FDB.

12.    The Market Research Bureau's PLASMA FRACTIONS MARKET IN THE US report is an annual publication for the Plasma industry. This industry is a classic oligopoly consisting of less than 7 manufacturers.

13.    The Market Research Bureau was founded and is operated by Patrick Robert, a former Bayer employee and colleague. He left Bayer and created MRB in the mid 90's to provide the Plasma industry with a much needed data source. The standard source for the drug industry is IMS Health, however they do not audit/cover plasma products.

14.    On September 13, 2009 I called The Market Research Bureau and spoke with Cindy Lynn, Patrick Robert's secretary. She told me that a single issue of this publication costs $16,000, and that there are fewer than 20 subscribers, including manufacturers, a few specialty pharmacies, and a few 340d entities. She also told me that they do not sell or give any of their reports to university libraries or public libraries.

3

I declare under penalty of perjury under the laws of the state of Illinois that the

foregoing is true and correct.  Executed this 15th day of September, 2009, at Algonquin, Illinois.


        /s/ Greg Hamilon
        Greg Hamilton

4

## CERTIFICATE OF SERVICE

I hereby certify that I, Mark Kleiman, an attorney, caused a true and correct copy of the foregoing, **MEMORANDUM IN OPPOSITION TO BAXTER INTERNATIONAL INC.'S MOTION TO DISMISS RELATORS' COMPLAINT**, to be delivered to all counsel of record by electronic service on September 15, 2009, for the posting and notification to all parties.


By:   /s/  Mark Allen Kleiman
　　　　　　MARK ALLEN KLEIMAN
　　　　　　California State Bar No. 115959
　　　　　　2907 Stanford Avenue
　　　　　　Venice, CA 90292
　　　　　　310-306-8094
　　　　　　310-306-8491 (fax)

Received Fax :        Jun 23 2005 10:03AM    ~Fax Station :  MARK.KLEIMAN              P. 3

FROM :                          PHONE NO. : 303 837 892            Jun. 23 2005 11:58AM P3

FILED
U.S. DISTRICT COURT
DISTRICT OF COLORADO

2005 JUN 14  PM 12: 18

GREGORY C. LANGHAM
CLERK

BY_____DEP. CLK

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLORADO

Civil Action No. 05-cv-00736 (PSF) (MJW)

[UNDER SEAL],

      Relators,

v.

[UNDER SEAL],

      Defendants.

---

## AMENDED COMPLAINT FOR DAMAGES UNDER THE FEDERAL AND VARIOUS STATE FALSE CLAIMS ACTS

---

### FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. §3730(b)(2)

MARK ALLEN KLEIMAN                    LAUREN JOHN UDDEN
California State Bar No. 115919       California State Bar No. 83118
12400 Wilshire Blvd., Ste. 400       15 W. Carrillo Street, Suite 101B
Los Angeles, CA 90025                Santa Barbara, California 93101
310-442-4820                         805-879-7544
310-442-4830 (fax)                   805-962-0722 (fax)

ATTORNEYS FOR RELATORS



EXHIBIT

7

Hamilton

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLORADO

Civil Action No. **05-cv-00736 (PSF) (MJW)**

UNITED STATES OF AMERICA ex rel LINNETTE SUN and GREG HAMILTON, Relators,

STATE of ARKANSAS ex rel LINNETTE SUN and GREG HAMILTON, Relators,
STATE of CALIFORNIA ex rel LINNETTE SUN and GREG HAMILTON, Relators,
STATE of DELAWARE ex rel LINNETTE SUN and GREG HAMILTON, Relators,

DISTRICT of COLUMBIA ex rel LINNETTE SUN and GREG HAMILTON, Relators,
STATE of FLORIDA ex rel LINNETTE SUN and GREG HAMILTON, Relators,
STATE of HAWAII ex rel LINNETTE SUN and GREG HAMILTON, Relators,

STATE of ILLINOIS ex rel LINNETTE SUN and GREG HAMILTON, Relators,
STATE of LOUISIANA ex rel LINNETTE SUN and GREG HAMILTON, Relators,
COMMONWEALTH of MASSACHUSETTS ex rel Linnette Sun, and Greg Hamilton, Relators,

STATE of NEW MEXICO ex rel LINNETTE SUN and GREG HAMILTON, Relators,
STATE of NEVADA ex rel LINNETTE SUN and GREG HAMILTON, Relators,
STATE of TENNESSEE ex rel LINNETTE SUN and GREG HAMILTON, Relators,

STATE of TEXAS ex rel LINNETTE SUN and GREG HAMILTON, Relators,

STATE of UTAH ex rel LINNETTE SUN and GREG HAMILTON, Relators,
STATE of VIRGINIA ex rel LINNETTE SUN and GREG HAMILTON, Relators,
v.

BAXTER HEMOGLOBIN THERAPEUTICS; BAXTER INTERNATIONAL, INC. and Does
1-100, whose true names are unknown

Defendants

---

## AMENDED COMPLAINT FOR DAMAGES UNDER THE FEDERAL
## AND VARIOUS STATE FALSE CLAIMS ACTS

---

## FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. §3730(b)(2)

Relators, LINNETTE SUN and GREG HAMILTON, bring this action under the False Claims

Act, as amended, 31 U.S.C. §3729 et. seq., as well as various state statutes, allege as follows:

## INTRODUCTION

1.      This is a *qui tam* action brought by LINNETTE SUN and GREG HAMILTON

on behalf of the United States and various States to recover penalties and damages arising from

fraudulent and illegal practices of Baxter Hemoglobin Therapeutics, a division of Defendant

Baxter International, Inc. (hereinafter "Baxter"). Baxter makes a variety of specialized

pharmaceutical, hematological, and infusion products, known in the industry as "biologics."

Government programs reimburse healthcare providers who purchase these products based upon

the published or posted Average Wholesale Price ("AWP"). Manufacturers, such as Baxter, are

to report an accurate Wholesale Acquisition Costs ("WAC") to the database that calculates and

publishes the AWPs based upon the reported WAC, First DataBank. Inc. ("FDB").

2.      It is known throughout the industry and known to Baxter that FDB calculates

this mark-up.   Baxter controlled the published AWP by misreporting the WAC.   Baxter

provides to the States, directly and through submission of reports to drug pricing publishing

services, what purports to be genuine pricing data for its products. This information is typically

identified as the "Wholesale Acquisition Cost" ("WAC") and/or the "Average Wholesale Price"

("AWP") of particular products. Baxter intends the WAC to be understood by the state Medicaid

agencies as the average price paid by a wholesaler to a manufacturer for a given product. Baxter

intends the AWP to be understood by the state Medicaid agencies and other payors as the average

2

price charged by a drug wholesaler to its commercial customers for a given product.

3.      The drug pricing publishing services in turn compile, publish and distribute compendia of such pricing information for each defendant's products. The drug pricing publishing services purport not to investigate the accuracy of the information provided by the manufacturers, and disclaim responsibility for their accuracy.

4.      Baxter refused to report an accurate WAC.  The vast bulk of Baxter's products at issue here are distributed by a class of business called non-charge back wholesalers.  Instead, Baxter reported a "list sales price" which bore no relationship to the price charged in the marketplace to the actual wholesalers, but which was an inflated price charged to very few customers that distributed less than one percent of these products..

5.      Baxter thus manipulated the AWP, knowing that health care providers who were being reimbursed based on AWP were indifferent to the cost of purchasing the drug, but instead focused on the "spread"—as it is known in the industry—between the cost and the AWP-based reimbursement.  Because Baxter's spread was larger than competitors, its products were more attractive to these customers, and it could maximize its revenue.

6.      States rely upon FDB's published AWP to reimburse providers, and assume that the published AWP is a reasonable indicator of the price paid for the drug.  However, because Baxter falsely reported WAC to inflate the AWP and the spread, Baxter deceived the government, which then overpaid for the biologics at issue here.

//

## THE PARTIES

3

7.     Relator Linnette Sun is a citizen of the United States and a resident of the State of California. She has been a pricing and reimbursement specialist for ten years, working for Merck, Johnson & Johnson, & Amgen. She was then employed by Baxter as Director of Medical Outcomes Research and Economics, and as such was a pricing specialist there for more than a year, June 24, 2002 – July 22, 2003. After telling her superiors and others at Baxter that she strongly opposed Baxter's practices and thought them to be fraudulent, she was fired.

8.     Relator Greg Hamilton is a citizen of the United States and a resident of the State of Illinois. He is currently Vice President of the Bleeding Disorders Program for CuraScript, a Division of Express Scripts, Inc. He has over 30 years experience working in the pharmaceutical industry, including 13 years with Bayer. He is known as a pricing and reimbursement specialist and had advised pharmaceutical companies on the pricing of products, including biologics. He is aware of the pricing structure Baxter used, specifically, the correspondence between Baxter and FDB regarding Baxter's reporting of the improper WAC. Mr. Hamilton has an MBA from Illinois Institute of Technology.

9.     Defendant Baxter International, Inc., Baxter Hemoglobin Therapeutics has its offices at 2545 Central Av., Suite FD1, in Boulder, Colorado and at One Baxter Parkway in Deerfield, Illinois. It is a division of Baxter International, Inc., a Delaware corporation, which is a global pharmaceutical company doing business in this judicial district with its principal executive offices at One Baxter Parkway in Deerfield, Illinois.

//

## JURISDICTION AND VENUE

4

10.    This is a civil action arising under the laws of the United States, and specifically,

31U.S.C. §3730, the "False Claims Act." Therefore, this Court has jurisdiction over this action

pursuant to 31 U.S.C. §3732 (a) and (b). Supplemental jurisdiction for Counts 5-22 arises under

28 U.S.C. §§1367, since these claims are so related to the federal claims that they form part of

the same case or controversy under Article III of the U.S. Constitution.

11.    Venue is proper in this district pursuant to 31 U.S.C. §3732 (a) because Defendant

Baxter transacts business in this district.

## FEDERAL PROGRAMS HARMED BY DEFENDANTS'

## FRAUDULENT AND ILLEGAL PRACTICES

### MEDICARE AND MEDICAID

12.    HHS, through its subsidiary entities—first the Health Care Financing

Administration (HCFA) and now the Center for Medicare and Medicaid Services (CMS) —

administers the Medicare program, which is a system of health insurance for the aged (i.e., those

over the age of 65 years) and disabled created under Title XVIII of the Social Security Act, 42

U.S.C. § 1395, *et seq.* The Medicare program is comprised of two "Parts." Part B of the

Medicare program authorized payment for certain drugs when a Medicare beneficiary must either

(a) have the drugs administered in a physician's office, or (b) use a Medicare-approved

mechanical aid or device (known as durable medical equipment) in order to receive the drugs at

home. To assist in the administration of Medicare Part B, CMS contracts with Medicare carriers,

//

or insurance companies that provide a variety of services, including processing and paying Part B

5

claims and auditing cost reports.

13.     Through CMS, HHS also administers the Medicaid Program, which provides

health care benefits for certain groups, including the poor and the disabled, and which is funded

in part from federal funds and in part by the State where the facility is located.  42 U.S.C.A. §

1396 *et seq.*  and each State's plan for medical assistance approved by the United States

Secretary of Health and Human Services (the "Secretary") and adopted by each State.  The

United States participates in each State's Medicaid by providing a federal contribution to funding

the program.  Those contributions vary based upon each State's per capita income, and range

fifty percent, in the case of Colorado, for example, to 77.08% for Mississippi.

<u>                                RAILROAD RETIREMENT MEDICARE PROGRAM</u>

14.     The Railroad Retirement Medicare program, is authorized by the Railroad

Retirement Act of 1974, 45 U.S.C. §§231 *et seq.*  It is administered through the United States

Railroad  Retirement Board, "RRB" and furnishes Medicare coverage to retired railroad

employees.

<center>**INDIAN HEALTH SERVICE**</center>

15.     The Indian Health Service is responsible for providing comprehensive health

services to more than 1,400,000 Native Americans.  It is administered by the Department of

Health and Human Services pursuant to 42 U.S.C. § 2002, *et seq.*  The statute authorizes the

Secretary to enter into contracts with independent providers to furnish health services to Native

Americans whenever the Secretary determines that independent providers can better meet a

population's need.

//

<center>6</center>

## FEDERAL EMPLOYEE HEALTH BENEFIT PLANS

16.     The Federal Employees Health Benefits Program (FEHBP) is administered by the

Office of Personnel Management ("OPM") pursuant to 5 U.S.C. §§ 8901, *et seq.* and provides

health care coverage to federal employees and their dependents.

### TRI-CARE

17.     The Tri-Care program, formerly CHAMPUS, is administered by the United States

Department of Defense through its component agency, CHAMPUS, under the authority of 10

U.S.C. §§ 1071-1106, and provides for care in civilian facilities for members of the Uniformed

Services and their dependents.

## VETERAN'S ADMINISTRATION

18.     Pursuant to 38 U.S.C.A. § 8126, and the regulations based thereon, and contracts

the Veteran's administration had with manufacturers, drugs are furnished to the Veterans'

Administration ("VA") by drug manufacturers.

### §340B PROGRAM

19.     In 1992 Congress enacted §340B of the Public Health Service Act.  This law

requires pharmaceutical manufacturers, including defendants herein, to provide a statutorily

defined discount on outpatient drugs sold to institutions serving low-income communities,

thereby allowing public hospitals, community health centers, and other entities to buy drugs for

their patients at a reduced rate.

//

//

//

7

## BACKGROUND

20.    There are approximately 65,000 different drug products in the United States

market, including different doses of the same drug.  Baxter manufactures and/or distributes (and

thus sets the price) for the following drugs and biologics:

| | | | |
|---|---|---|---|
| Advate | Bebulin | HemophilM | Recombinate |
| Aralast | FeibaH | Propelex | |
| Albumin | Gammagard S/D | Propelex LT | |

Baxter's products are dispensed to patients by or through different types of medical providers

including, *inter alia*, physicians who administer drugs in an office, home infusion pharmacies,

retail pharmacies, and other medical providers.

21.    States routinely cover out-patient prescription drugs as part of their Medicaid

programs.  Most States reimburse providers for those drugs based upon a percentage of the AWP,

usually 85% of the AWP.  Medicare reimburse providers who furnish covered drugs to

beneficiaries the lower of the billed charge or 95% of the AWP pursuant to 42 CFR §405.17.

Baxter's biologics are covered by Medicaid, Medicare and other government programs.

22.    During all times material to this complaint, State Medicaid programs, and

numerous other public and private programs, obtained AWP pricing information directly from

FDB.  FDB is a wholly-owned subsidiary of the Hearst Corporation, which, among other things,

gathers prescription drug information, including pricing and AWP.  FDB publishes and

distributes this information as a database which is regularly maintained.

23.    Government and much commercial private reimbursement is based upon AWP

published by FDB.   However, there are several other pharmaceutical industry compendia that

periodically compile, publish and distribute AWPs in printed and electronic media.  These

compendia include the *Drug Topics Red Book* (the "*Red Book*"), the *Annual Director of Pharmaceuticals and Essential Director of Pharmaceuticals* (the "*Blue Book*"), and Medi-Span's *Master Drug Database (MediSpan)*.

24.     Prior to May of 2000 FDB's misreporting of price information was suspected or known by state Medicaid agencies.  However, in May of 2000 FDB entered into an agreement with the Department of Justice and various states to stop reporting AWPs published by the manufacturers and to instead report them on the basis of market prices.  FDB subsequently based its reports on surveys of wholesalers.  The states were thus lulled into a false sense of security about the integrity of subsequent AWP reporting.

25.     Medicaid, Medicare, and all other systems which base reimbursement rates for drugs on the published AWP rely upon the accuracy of the AWP, and, in turn, depend upon the honesty and accuracy of Baxter and other drug manufacturers in reporting WAC to FDB.  As noted above, for biologics, FDB posts AWP by multiplying the reported WAC by 1.25. Manufacturers easily determine FDB's mark up by comparing the difference between the reported WAC and the published AWP, and are accordingly aware of what FDB's published AWP will be when they report WAC to FDB.

26.     Providers regularly submit claims for reimbursement seeking payment for Baxter's products from Medicare, Medicaid, and from other federal payors.  Manufacturers, including Baxter, were and are fully aware that these payors also rely on FDB's published reports of AWP to determine their reimbursement.

27.     All pharmaceutical products except biologics are normally distributed through charge-back wholesalers.  These wholesalers are Bergen Brunswig Drug Company, McKesson Drug Company, Cardinal Health, AmeriSource Health Corporation. However, manufacturers'

9

sales of biologics to charge-back wholesalers comprise less than 1% of the wholesale market for manufacturers of these specialized products.

28. Instead, the vast majority of biologics, such as the products Defendants manufactured, were typically distributed to providers by non-charge back wholesalers. These wholesalers include, but are not limited to: Chapin Medical, FFF Enterprises, CT International, ActSys Medical Inc., Williams Medical, Davis Enterprises, Paragon Scientific Corp., ASD Specialty Healthcare, IDP, Inc., Blood Diagnostics Inc., National Specialty Services, Florida Infusion, National Hospital Specialties, Alpine Biologics, Atlantic Business Organization, Health Coalition, J-Mark Enterprise, BioCare, BioScience, Western Medical Services, Davis Enterprises, Biomed Plus, Genesis Bio-Pharmaceuticals, Acysis, Whitmire Distribution Corp., Adam Diagnostic Laboratories, Alternate Site Distributors, Besse Medical Supply, Bindley Western, Bio Test, Bryan Biologicals, Inc., Capital Wholesale Drug, Casad Surgical Pharmacy, Cummumed, Dakota Drug, Diagnostic Marketing Corp, F D Titus & Sons, Inc., F. Dohmen Co., First Choice Medical Inc., General Drug Company, General Inj. & Vaccines, Inc., H D Smith Wholesale, Henry Schein Corp., Henry Schein Surgical, Immucor, Inc., Int'l Med Supply, J E Gold & Co, Martin Surgical Supply, Medical Blood Services, Medical Mart Inc, Medsource Corp, Metro Medical Supply Inc., Micro Bio Medics, Morris and Dickson, Mullen & Haynes, National Hospital Specialties, NSS, Inc., Ohio Valley Clarksburg Inc., Organon Teknika Corp, Parks Inc., PSS, Quala Med Inc., R Weinstein Pharmaceutical, Roane Barker, Scientific Supply Company, Triad Medical Inc., Walsh-Lumpkin, Accord Clinical Labs, Alternate Site Distributors, Bellegrove Medical Supply, Bensons Surgical Supply Co., British Marketing Enterprises, Expert - Med Inc., Gas Medical, General Drug Company, Grove Way Medical Supply, Health Coalition, Physician Sales & Service, R Medical Supply, Summit Medical Supplies, Total Health Products, A. J. Buck & Sons Inc., Alternate Site Distributors, C F

10

Anderson Comp, Inc., Center Medical Supply, Central Supply, Emjay Medical Supplies Corp, Gamma Biologicals, Hawkeye Medical Supply, Interstate Blood Bank, Lake Erie Medical & Surgical, Medical Supply Corp of N.J., Paragon Scientific Corp., Ransdell Surgical Inc., Savoy Medical Supply Co., Shenandoah Medical Supply, Suncoast Surgical Supply, Tri State Physicians Supplies, United Medical Supply, Arizona Blood Services, Bio Care, Bio Med Plus, Blood Center of SE Wisconsin, Health Coalition, Inc., and Mediq Corporation.

29.    The true wholesalers which distribute the bulk of the biologics for Baxter.as well as other manufacturers, are these non-charge back wholesalers.  This has been reported by the Marketing Research Bureau Inc. in its study, *The Plasma Fractions Market in the United States 2001*.  This study indicates that the first-tier of the non-charge back wholesalers distribute the overwhelming amount bulk of biologics, and that the remaining are sold directly to providers such as home health agencies or home health systems.

## DEFENDANTS' ILLEGAL SCHEMES

Baxter has used the following schemes to cause state Medicaid programs and other payors to pay false claims:

### WAC FALSIFICATION

30.    In the case of biologics, Baxter employed what is known in the pharmaceutical industry as "class of trade pricing."  Baxter sold the bulk of its biologics directly to providers. e.g., home health agencies and home health systems. Baxter offered the lowest prices to these providers,  Baxter offered the next lowest prices to non-charge back wholesalers.  These sales, varying by product, comprise up to 40% of Baxter's total sales of the products.  At times, Baxter also offered its lowest prices to the non-charge back wholesalers as a marketing incentive.  to

11

move product. The charge-back wholesalers, to which Baxter charged the highest prices, comprise less than 1% of Baxter's sales for the biologicals..

31.     Although the charge-back wholesalers purchased less than 1% of the biologicals, Baxter reported to FDB that the high prices charged to this tiny market segment was its WAC. Baxter did this with the knowledge that FDB, would, in turn, use this information to calculate AWP, which would then be reported to state and federal health care programs described herein. Since the price charged to less than 1% of its market did not affect sales, Baxter could use it to manipulate the reimbursement system since the published AWP had no correlation to the price charged to the wholesalers that distributed nearly all of Baxter's biologicals.

32.     The effect of Baxter's false reporting was that Baxter illegally increased the profitability, or spread, of these drugs to health care providers and pharmacies, thus giving a financial incentive for their selection and use. That is, if the spread for Baxter's product is greater than the spread for competing products, the provider will profit more by using Baxter's product. The only way to increase the spread is to either reduce the acquisition cost to the provider, or to inflate the reported AWP Medicare and Medicaid rely upon. Since lowering the sales price to providers would decrease Baxter's income, Baxter preferred instead to increase the spread by falsely inflating the AWP. Consequently, since Baxter sells the biologicals to providers at considerably less than the reported AWP, there is a substantial spread between what Medicare and Medicaid and other payors will pay, and there is an exorbitant amount of profit the provider can make on the sale of the product.

33.     In fact, Baxter knew that the actual amounts charged to the non-charge back wholesalers distributors, as well as providers and others for their products, was not publicly available, because it was proprietary pricizng information. Baxter kept this information highly

12

confidential and secret to maximize its ability to maintain market share by providing the greatest reimbursement spread to these customers.

34.    Baxter increased its revenue not only by gaining more market share by beating out competitors with a more attractive spread, but also by generating profit from increasing its sale price to the providers. So long as the providers made a profit from purchasing Baxter's products greater than the profit offered by a competitor's spread, they would be willing pay more for the product.

35.    Baxter knew it could directly control and fabricate the AWP for their products by reporting to FDB the highest prices charged for the biologics, those charged to charge-back wholesalers.

36.    For example, Baxter has reported to FDB that the WAC for Recombinate is $1.30 per unit, and FDB has accordingly published an AWP of $1.6250 per unit. When a Medicare beneficiary receives a drug which is covered by Part B of Medicare, Medicare reimburses providers 80% of the allowable cost, which is 95% of the AWP. Thus, if the AWP for a drug is $1.6250, the allowable cost is 95% of that, or $1.548, and Medicare pays 80% of that sum, or $1.235. Recombinate has been sold to providers for $0.89 (or even less), making the spread, or the difference between the actual acquisition cost of $0.89 and the Medicare payment of $1.235 equals $0.345 In addition, there is a 20% copay of 30.8¢ per unit. This nearly 65.3¢ per unit spread represents gross margin for the provider. Since the average patient consume approximately 125,000 units per year, this is $81,625 in gross margin per patient per year to the provider.

//

//

13

37.     In the case of Medicaid reimbursement, at 85% of AWP, or $1.381 per unit, the difference between that and the actual acquisition cost of $0.89 is $0.491. The nearly 50-cent per unit spread is also gross margin for the provider.

38.     Baxter falsely reported WAC by claiming it was reporting a "list sales price." Baxter's Mike Bradley, was Senior Director of National Account Economics, and was responsible for pricing and reporting Baxter's pricing to various databases. In approximately October 2001, Bradley told Relator Linette Sun that Baxter has repeatedly falsely described its WAC to FDB by reporting a cost described as "list sale price.", knowing that FDB would apply a 125% multiplier to estimate AWP. Sun was informed that since this improved the spread between AWP and the prices actually charged to physicians or other providers, this allowed Baxter to acquire greater market share. Bradley further told her that Baxter had known of this for years, but that they expected to shift the blame to FDB. Baxter management was adamant that it could not hit its sales targets without these incentives to the providers.

39.     According to knowledge obtained by Relator Greg Hamilton, FDB refused to accept Baxter's "list sales price," and instead submitted a letter stating that their list price was $1.31 and that they wanted their AWP to be described as $1.31. Baxter did this knowing that FDB would (as in fact it did) ask what the WAC was. Baxter had also informed FDB the amounts Baxter wanted FDB to publish as the list price and AWP. FDB again told Baxter it had to provide WAC, and that if it continued to refuse to provide WAC, FDB would have to consider the list price provided as the WAC. Again, Baxter refused to provide any other number than "list sales price," and also refused to denote the "list sales price" as WAC.

40.     FDB then used Baxter's "list sales price," and applied the 1.25 multiplier FDB obtained by researching the mark-up wholesalers applied.

14

41.     Shortly thereafter Ms. Sun reviewed the FDB materials and was surprised to see the greatly inflated AWP. She promptly reported this to Nick Poulios who was, at the time, Baxter's Director of Medical Outcomes Research and Economics, who told her to bring this up at a meeting that was scheduled to discuss Baxter's pricing practices. This meeting was attended by Bradley, Poulios, as well as Mike Baldridge, Director of Planning, and Jill Kadam, Director of National Accounts Marketing. Bradley again acknowledged his awareness of the problem and admitted that this actually became a better financial arrangement for Baxter since it increased reimbursement rates. Bradley repeated that Baxter knew this all along, and that this benefitted Baxter. Bradley also tried to convince Sun that FDB was a little used information source.

42.     After this meeting Ms. Sun contacted FDB directly and received an email from a sales manager who confirmed that FDB reports were purchased by the United States and by each State's government, and that the database was used by over 80% the insurance companies.

43.     In July, 2002, Ms. Sun learned of a pricing report for Advate prepared by Simon Kucher & Partners, an international marketing consulting firm. Kucher & Partners recommended that to secure market share for Baxter had spent approximately $750,000 for a marketing study for this new product. In order to secure market share Baxter decided to sell Advate for $0.99 per dose, but to report an AWP of $1.60. Ms. Sun voiced her concern to Nick Poulios, John Park, and the VP of Global Marketing. When she warned that Baxter could get into trouble John Park joked that it was all an "innocent" mistake.

44.     In approximately October, 2002, Ms. Sun again voiced her concerns to Nick Poulios, who told her that all Marketing Management had known of this for years and had no intention of correcting it because, if they got in trouble with the government, they could blame FDB.

15

45. .   In April, 2003, Ms. Sun and Poulios informed Larry Guihinn, the President of

Baxter BioScience of the inflated AWP and warned that this could get Baxter in trouble with the

government.  Guihinn stated that Bradley had told him that Ms. Sun was researching the report-

reporting problem.  Guihinn specifically forbade Ms. Sun from doing any further research, and

specifically forbade Ms.. Sun or others from contacting FDB about this.

46.     In the Spring of 2003 the Global Marketing group had a pricing meeting (called a

margin analysis meeting) to discuss new drug pricing for one of Baxter's products, Advate,  Ms.

Sun noticed that the spread was between three and five times greater on Baxter's products than it

was in the industry in general.  Ms. Sun warned Poulios, Bradley, and Product Director Regina

O'Hara that the spread was too great, before she was silenced by Poulios.  The meeting partic-

ipants were given a written margin analysis writeup.  After the participants indicated their pref-

erences for how to set the WAC, the AWP, and the spread, the participants were ordered to de-

stroy the margin analysis report.  Guihinn and John Park. Baxter's Global Product Director,

commented that Baxter Management would go to jail if the government ever discovered this

material.

47.     In approximately July 2003, at a meeting with Baxter Human Resources person-

nel and Baxter management, to review Ms. Sun's performance (called a Talent Review Meeting)

Poulios told Sun that Jim Howard, a vice-president of North American marketing said that Ms.

Sun should visit Baxter customers so that she would understand that sales depended on the

spread..

//

//

//

16

48.     Based upon internal documents she studied while working at Baxter, and

discussions Ms. Sun had with pricing specialists and senior marketing executives, she learned

that Baxter has engaged in similar falsification of WAC with respect to its other pharmaceutical,

hematological, and biological products.

## BEST PRICE AND STARK VIOLATIONS

49.     Baxter had a marketing practice of offering "Volume Committed Contracts" to

institutional health care providers (such as hospitals, nursing homes, and home health agencies).

50.     The Volume Committed Contracts offered such providers discounts of between

50 – 90% off of the purchase price, depending upon the amount of market share the provider

could shift in Baxter's direction.  In an April, 2003 meeting to discuss pricing policy for Advate

and Recombinate, Bradley declared that the U.S. marketing team was not worried about losing

market share to competitors because they had Volume Committed Contracts for most of their

products which would be in force for the next three years.

51.     Baxter's policy was to be extremely secretive about these contracts because of

their illegal nature.  When Ms. Sun questioned Bradley about the legality of the Volume

Committed Contracts, Bradley replied that Baxter's legal department would clean up the

contracts' language, but that the use of the inducements contained in these contracts to control

market share would continue unabated.  Ms. Sun had the opportunity to see only one such

contract, which was passed from hand to hand at a pricing meeting in April 2003.  The contract

was read by Relator, Poulios, and John Park (Defendant's Global Products Director).  Bradley

then demanded the contract back.  Neither Ms. Sun nor any of the other executives were

permitted to keep a copy of this contract.

//

## STARK ACT VIOLATIONS

52.     The discounts Baxter offered to institutional providers under the Volume

Committed Contracts also violated Stark II, 42 US. §1395nn which prohibits compensation

arrangements such as Volume Committed Contracts between entities such as Baxter, which

furnishes goods or services, and health care providers, which are in a position to order or refer

patients for the receipt of such goods or services.

## BAXTER'S CONDUCT VIOLATED THE FEDERAL MEDICAID PROGRAM'S

## REBATE AND BEST PRICE REPORTING REQUIREMENT

53.     The Medicaid program, established by Title XIX of the Social Security Act, is a

uniquely cooperative federal-state program that provides medical assistance to certain low

income individuals. See 42 U.S.C. §§ 1396 - 1396v.

54.     Congress passed the Medicaid Best Prices Statute, 42 U.S.C. § 1396r-8, as part of

the Omnibus Budget Reconciliation Act of 1990. Under that statute, a drug manufacturer must

enter into a Rebate Agreement with the Secretary in order for federal matching funds to be made

available for that manufacturer's covered outpatient drugs. 42 U.S.C. § 1396r-8(a)(1).

55.     The Rebate Agreement provides that the Secretary enters the agreement "on

behalf of the Department of Health and Human Services and all States and the District of

Columbia (except to the extent they have in force an Individual State Agreement)." (Rebate

Agreement at Preamble.) Upon entering a Rebate Agreement with the Secretary, the

manufacturer must pay a quarterly rebate directly to each participating state based on all of the

manufacturer's drugs purchased by that state pursuant to its Medicaid plan during that quarter.

18

56.     For single source or innovator multiple source drugs, the rebate due on each unit paid for under the state plan is the difference between the average manufacturer price ("AMP")[1] and the manufacturer's best price, defined as the lowest price available from the manufacturer to any private purchaser or governmental entity (with certain exclusions) within the United States, or 15.1% of AMP, whichever is greater. 42 U.S.C. §1396r-8(c)(1), (2). For multiple source non-innovator drugs, the rebate is 11% of AMP. 42 U.S.C. § 1396r-8(c)(3). Each state must agree to cover all of the manufacturer's covered outpatient drugs unless the state complies with one of several statutory provisions allowing it to exclude or restrict coverage. 42 U.S.C. §§ 1396a(a)(54), 1396r-8(d). Any rebate amounts received by the state must be offset against the state's Medicaid expenditures that quarter for purposes of calculating the matching federal financial participation. 42 U.S.C. § 1396r-8(b)(1)(B).

57.     States may enter directly into Rebate Agreements with drug manufacturers as authorized by the Secretary. 42 U.S.C. § 1396r-8(a)(1). To date, the Secretary has approved supplemental drug Rebate Agreements in at least twenty states. States may also control their Medicaid drug costs and coverage by establishing prior authorization programs, 42 U.S.C. § 1396r-8(d)(1)(A), or by creating drug formularies, 42 U.S.C. § 1396r-8(d)(1)(B)(iv). Though not part of the rebate statute, states are also permitted to set payment rates with respect to covered drugs. See 42 U.S.C. § 1396(a)(30); 42 C.F.R. 447.331-447.333.

58.     Drug manufacturers are required under the rebate statute and agreement to calculate and report their AMPs and best prices to the Secretary on a quarterly basis. 42 U.S.C. §

---

[1] "The term 'average manufacturer price' means, with respect to a covered outpatient drug of a manufacturer for a rebate period, the average price paid to the manufacturer for the drug in the United States by wholesalers for drugs distributed to the retail pharmacy class of trade, after deducting customary prompt pay discounts." 42 U.S.C. § 1396r-8(k)(1).

1396r-8(b)(3)(A)(i); Rebate Agreement at § II(e). Any information provided by a manufacturer or wholesaler under the rebate statute is confidential and "shall not be disclosed by the Secretary or a State agency . . . except as the Secretary determines to be necessary to carry out this section." 42 U.S.C. § 1396r- 8(b)(3)(D); Rebate Agreement at § VII. States are required to

report their total Medicaid drug utilization to each manufacturer and the Secretary sixty days after the end of the rebate quarter.4 42 U.S.C. § 1396r-8(b)(2)(A). Using the manufacturer

pricing data, the Centers for Medicare & Medicaid Services ("CMS") computes the unit rebate amount ("URA") "to which the Medicaid utilization information may be applied by States in invoicing the Manufacturer for the rebate payment due." Rebate Agreement at § I(dd).

59.    The Secretary may survey wholesalers and manufacturers to verify reported

AMPs and best prices, 42 U.S.C. § 1396r-8(b)(3)(B), and may audit manufacturer calculations of AMP and best price, Rebate Agreement at § III(c). The Secretary may impose civil money penalties on manufacturers that either fail to timely report their pricing information or submit false information to the Secretary. 42 U.S.C. § 1396r-8(b)(3)(C ); Rebate Agreement at §§ III, IV. Section 1396r-8(b)(3)(C)(ii) also provides that any civil money penalties imposed under this

subsection are "in addition to other penalties as may be prescribed by law." The Secretary may terminate the Rebate Agreement for either violations of the Rebate Agreement or for other good cause shown. 42 U.S.C. § 1396r-8(b)(4)(B)(i).   The statute further provides:

> Such termination shall not be effective earlier than 60 days after
> the date of notice of such termination. The Secretary shall provide,
> upon request, a manufacturer with a hearing concerning such a
> termination, but such hearing shall not delay the effective date of
> the termination.

//

//

20

_Id_. If there is a termination, the Secretary must notify the states, § 1396r-8(b)(4)(B)(iv), and the Statute requires the Secretary to delay reinstatement of any terminated contract for one calendar quarter absent good cause. 42 U.S.C. § 1396r-8(b)(4)(C).

60.    Rebate Agreements are effective only for one year, and "shall be automatically renewed for a period of not less than one year unless terminated under subparagraph (B)." 42 U.S.C. § 1396r-8(b)(4)(A).

61.    While the Rebate Agreement does not address remedies for breach of contract, it specifies that it shall be construed under federal common law, and states that nothing in it shall be construed as a waiver of any legal right of the Secretary or the manufacturer under state or federal law. Specifically, it provides that: "The Rebate Agreement shall be construed in accordance with federal common law and ambiguities shall be interpreted in the manner which best effectuates the statutory scheme."

## BAXTER KNEW IT'S CONDUCT WAS ILLEGAL

62.    Before she was silenced by her superior, Ms. Sun made clear to Baxter executives Poulios, Bradley, O'Hara, Guihinn and others that Baxter should not use the spread as the incentive for selling its products.  the spread was too great, that the prices reported upon which AWP was calculat- ed should be reduced, and that the discounts offered by the Volume Committed Contracts were illegal.

63.    Larry Guihinn, Baxter BioScience's President clearly understood the legal ramifications of the misconduct alleged herein.  At a meeting to discuss the pricing of Advate in the late spring or early summer of 2003, Guihinn warned that Baxter would get in trouble if the

government were ever to see the margin analysis memo analyzing Baxter's pricing for all of its pharmaceutical, hematological, and biological products.   Park promised Guihinn that the memorandum would not be attached to any emails, and that hard copies of the memorandum would be destroyed.  This meeting was attended by Michael Bald-rige, Baxter's Director of Planning, Bradley, Guihinn, Park , Poulios, and Ms. Sun, among others.

64.    In July 2003, after the Advate Pricing Meeting, Ms. Sun gave the Park team extensive written materials on the government's prosecution of  TAP for falsification of Lupron's AWP, and the $355 million False Claims Act settlement paid by AstraZeneca for Lupron's competing product, Zoladex.  Guihinn told Ms. Sun point blank, that "your job is to keep me out of jail."  When Poulios reported this to Park, Mike Baldridge, and Karen Chung (Associate Director of Medical Outcomes Research & Economics), Park, Baldridge, and Chung joked that they would not go to jail because they were ignorant of these practices.

<div align="center">

## COUNT I

### SUBMISSION OF FALSE FEDERAL FALSE CLAIMS

### BY FALSIFYING PRICE INFORMATION

</div>

65.    Relators repeat and reallege each allegation contained in paragraphs 1 through 64  above as if fully set forth herein.

66.    This is a *qui tam* civil action brought by Linnette Sun, Greg Hamilton and the government of the United States to recover treble damages and civil penalties under 31 U.S.C. §3729(a) of the False Claims Act.

//

67.     Baxter violated 31 U.S.C. §3729(a) by conspiring, to present and by causing false claims to be present, used and then presented to the United States Government in connection with its fraudulent and illegal practices.

68.     The United States Government, by and through CMS, DHHS, RRB, OPM, and possibly other Federal agencies, and unaware of Baxter's fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

69.     Had the United States Government known that Baxter was violating federal laws, it would not have paid the claims submitted by health care providers and third party payers in connection with Baxter's fraudulent and illegal practices.

70.     As a result of Baxter's violations of 31 U.S.C. §3729(a), the United States has been damaged in an amount in the millions of dollars, exclusive of interest.

71.     Relators Sun and Hamilton are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to §3730(b) on behalf of themselves and the United States Government.

## COUNT II

**VIOLATION OF THE FALSE CLAIMS ACT THROUGH STARK ACT VIOLATIONS**

72.     Relators repeat and reallege each allegation contained in paragraphs 1 through 64 above as though fully set forth herein.

//

//

23

73.     This is a *qui tam* civil action brought by Linnette Sun, Greg Hamilton

and the government of the United States to recover treble damages and civil penalties under 31

U.S.C. §3729(a) of the False Claims Act.

74.     Baxter violated 31 U.S.C. §3729(a) by conspiring, to present and by causing false

claims to be present, used and then presented to the United States Government in connection

with its fraudulent and illegal practices.

75.     The Stark Act II, 42 U.S.C.. §1395nn (a)(1), a civil penalty provision, provides

that if a Physician has a financial relationship with an entity,

> (A) the physician may not make a referral to the entity for the
> furnishing of designated health services for which payment
> otherwise may be made under this subchapter, and the entity may
> not present or cause to be presented a claim under this subchapter
> or bill to any individual, third party payor, or other entity for
> designated health services  furnished pursuant to a referral
> prohibited under subparagraph (A).

U.S.C.A. §1395nn(a)(1).

76.     The term "financial relationship" under the Stark Act includes compensation

arrangements between a physician and an entity.  *See* 42 U.S.C.A. §1395nn (a)(2)(B).

77.     The term "designated health services" under the Stark Act includes clinical

laboratory services, outpatient prescription drugs, and inpatient and outpatient hospital services.

*See* 42 U.S.C.A. §1395nn (h)(6).

78.     Baxter violated 42 U.S.C.A. §1395nn(a) when it knowingly and willfully entered

into arrangements in which providers were offered discounts based on their ability to move

market share within their institutions, pursuant to Volume Committed Contracts.

24

79.     Although "safe harbor" regulations exist to protect certain relatively innocuous and even beneficial commercial arrangements, no such provision protects the discounts made by Baxter pursuant to its fraudulent schemes.  The discounts by Baxter in this case were made for the sole purpose of increasing Baxter's profits at the expense of patients, it's competitors, and the federal and state governments.  Baxter targeted those providers based on the volume and value of referrals they could make.

80.     38 U.S.C.A. § 8126, and the regulations based thereon, and contracts signed with Baxter by the federal programs listed herein below require that when drug manufacturers furnish their prescription products to Federal agencies, such as the Veterans' Administration, Public Health Service, including the Indian Health Service, and the Department of Defense, they must furnish them at the "best price."

81.     Had the United States Government known that Baxter was violating federal laws, including the Anti-Kickback provisions, the Stark Act, and the best pricing requirements, it would not have paid the claims submitted by health care providers and third party payers in connection with Baxter's fraudulent and illegal practices.

82.     As a result of Baxter's violations of 31 U.S.C. §3729(a), the United States Government has been damaged in an amount in the millions of dollars, exclusive of interest.

83.     Relators Sun and Hamilton are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to §3730(b) on behalf of themselves and the United States Government. As a result of Baxter's violations of 31 U.S.C. §3729(a), the United States Government has been damaged in an amount in the millions of dollars, exclusive of interest.

## COUNT III

**VIOLATION OF THE FALSE CLAIMS ACT THROUGH BEST PRICE VIOLATIONS**

84.     Relators repeat and reallege each allegation contained in paragraphs 1 through 64 above as though fully set forth herein.

85.     In engaging in the fraudulent and illegal practices cited herein, including but not limited to the false reporting of WAC, and the "Volume Committed Contracts," Baxter knowingly failed and refused to furnish its products to the Federal agencies at the best price, in violation of 38 U.S.C.A. § 8126, as these same discounts and rebates were not passed on to the Federal agencies.

86.     Compliance with applicable Medicare, Medicaid, best pricing requirements, and various other federal and state laws was an implied, and upon information and belief, also an express condition of payment of claims submitted to the United States Government by health care providers and third party payers in connection with Baxter's fraudulent and illegal practices.

87.     As a result of Baxter's violations of 31 U.S.C. §3729(a), the United States has been damaged in an amount in the millions of dollars, exclusive of interest.

88.     Relators Sun and Hamilton are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to §3730(b) on behalf of themselves and the United States Government. As a result of Baxter's violations of 31 U.S.C. §3729(a), the United States Government has been damaged in an amount in the millions of dollars, exclusive of interest.

//

//

26

## COUNT IV

### RETALIATION IN VIOLATION OF 31 U.S.C. §3730(h)

89.     Relator Linnette Sun repeats and repleads and incorporate by reference hereineach and every one of the allegations contained in paragraphs 1-64, inclusive, as though fully set forth herein.

90.     Ms. Sun was retaliated against and fired from her employment at Baxter in direct retaliation for her efforts to investigate the false claims described hereinabove, her efforts to develop information which would be used in the prosecution of a false claims action, and her resistance to the submission of false claims.  Defendant sued herein carried out these acts in violation of 31 U.S.C. §3730(h).

91.     As a direct, foreseeable, and legal result of said wrongful acts by Defendant, Ms. Sun has suffered and will continue to suffer substantial losses in earnings and other employment benefits, along with other incidental and consequential damages and losses, all in an amount to be proven at time of trial.

92.     As a further direct, foreseeable, and legal result of said wrongful acts of Defendant sued herein, Ms. Sun has suffered and will continue to suffer mental pain and anguish, all other damage in an amount to be proven at time of trial.

93.     As a further direct, foreseeable, and legal result of said wrongful acts by said Defendant, Ms. Sun has incurred attorneys' fees and other consequential damages in an amount to be determined, for which Ms. Sun claims a sum to be established according to proof.

//

//

27

## COUNT V

### RETALIATION IN VIOLATION OF CALIFORNIA GOVERNMENT CODE §12653

94.    Relator Linnette Sun repeats and repleads and incorporate by reference herein each and every one of the allegations contained in paragraphs 1-64, inclusive, as though fully set forth herein.

95.    Ms. Sun was retaliated against and fired from her employment at Baxter in direct retaliation for her efforts to investigate the false claims described hereinabove, her efforts to develop information which would be used in the prosecution of a false claims action, and her resistance to the submission of false claims to the State of California.  Defendant sued herein carried out these acts in violation of California Government Code §12653.

96.    As a direct, foreseeable, and legal result of said wrongful acts by Defendant, Ms. Sun has suffered and will continue to suffer substantial losses in earnings and other employment benefits, along with other incidental and consequential damages and losses, all in an amount to be proven at time of trial.

97.    As a further direct, foreseeable, and legal result of said wrongful acts of Defendant sued herein, Ms. Sun has suffered and will continue to suffer mental pain and anguish, all other damage in an amount to be proven at time of trial.

98.    As a further direct, foreseeable, and legal result of said wrongful acts by said Defendant, Ms. Sun has incurred attorneys' fees and other consequential damages in an amount to be determined, for which Ms. Sun claims a sum to be established according to proof.

//

//

28

99.     The aforesaid acts were carried out maliciously and in conscious disregard of Ms.

Sun's rights.  As such, Defendants should be held liable for exemplary damages in sums

sufficient to punish siad Defendants, and to deter future similar misconduct.

<div align="center">

**COUNT VI**

</div>

<div align="center">

**RETALIATION IN VIOLATION OF CALIFORNIA PUBLIC POLICY**

</div>

100.     Relator Linnette Sun repeats and repleads and incorporate by reference herein

each and every one of the allegations contained in paragraphs 1-64, inclusive, as though fully set

forth herein.

101.     Ms. Sun worked for Defendant in Santa Barbara, California.  She was retaliated

against and fired from her employment at Baxter in direct retaliation for her efforts to investigate

the false claims described hereinabove, which are violations of state and federal laws.  Defendant

sued herein fired Ms. Sun in violation of California's public policy.

102.     As a direct, foreseeable, and legal result of said wrongful acts by Defendant, Ms.

Sun has suffered and will continue to suffer substantial losses in earnings and other employment

benefits, along with other incidental and consequential damages and losses, all in an amount to

be proven at time of trial.

103.     As a further direct, foreseeable, and legal result of said wrongful acts of

Defendant sued herein, Ms. Sun has suffered and will continue to suffer mental pain and anguish,

all other damage in an amount to be proven at time of trial.

//

//

<div align="center">

29

</div>

104.    As a further direct, foreseeable, and legal result of said wrongful acts by said

Defendant, Ms. Sun has incurred attorneys' fees and other consequential damages in an amount to

be determined, for which Ms. Sun claims a sum to be established according to proof.

<div align="center">

**COUNT VII**

**MASSACHUSETTS FALSE CLAIMS ACT**

</div>

105.    Relators repeat and reallege each allegation contained in paragraphs 1 through 64

above as if fully set forth herein.

106.    This is a *qui tam* action brought by Linnette Sun, Greg Hamilton and the

Commonwealth of Massachusetts for treble damages and penalties under Massachusetts False

Claims Act, Mass. Gen. Laws Ann. 12 § 5(A) *et seq.*

107.    Mass. Gen. Laws Ann. 12 § 5B provides liability for any person who

knowingly presents, or causes to be presented, a false or fraudulent claim for payment or

approval;  (2) knowingly makes, uses, or causes to be made or used, a false record or statement to

obtain payment or approval of a claim by the commonwealth or any political subdivision thereof;

(3) conspires to defraud the Commonwealth or any political subdivision thereof through the

allowance or payment of a fraudulent claim;  is a beneficiary of an inadvertent submission of a

false claim to the common wealth or political subdivision thereof, subsequently discovers the

falsity of the claim, and fails to disclose the false claim to the commonwealth or political

subdivision within a reasonable time after discovery of the false claim.

108.    Baxter violated Mass. Gen. Laws Ann. 12 § 5B and knowingly caused hundreds

of thousands of false claims to be made, used and presented to the Commonwealth of

<div align="center">30</div>

Massachusetts from at least 1998 to the present by its reporting of false pricing statements regarding its products.

109.   The Commonwealth of Massachusetts, by and through the Massachusetts Medicaid program and other state health care programs, and unaware of Baxter's fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

110.   Honest reporting of WAC data and provision of the best price to Medicaid was an implied, and upon information and belief, also an express condition of payment of claims submitted to the Commonwealth of Massachusetts.

111.   Had the Commonwealth of Massachusetts known that Baxter was violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Baxter's fraudulent and illegal practices.

112.   As a result of Baxter's violations of Mass. Gen. Laws Ann. 12 § 5B, the Commonwealth of Massachusetts has been damaged in an amount to be determined, exclusive of interest.

113.   Relators Sun and Hamilton are a private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to Mass. Gen. Laws Ann. 12 § 5(c)(2) on behalf of himself and the Commonwealth of Massachusetts.

//

//

//

//

## COUNT VIII

### VIOLATION OF THE CALIFORNIA FALSE CLAIMS ACT

114.    Relators repeat and reallege each allegation contained in paragraphs 1 through 64 above as if fully set forth herein.

115.    This is a *qui tam* action brought by Linnette Sun, Greg Hamilton and the STATE of California to recover treble damages and civil penalties under the California False Claims Act, Cal. Gov't. Code § 12650 *et seq.*

116.    Cal. Gov't Code § 12651(a) provides liability for any person who-

    (1) knowingly presents, or causes to be presented, to an officer or employee of the state or of any political division thereof, a false claim for payment or approval;

    (2) knowingly makes, uses, or causes to be made or used a false record or statement to get a false claim paid or approved by the state or by any political subdivision;

    (3) conspires to defraud the state or any political subdivision by getting a false claim allowed or paid by the state or by any political subdivision.

    (8) is a beneficiary of an inadvertent submission of a false claim to the state or a political subdivision, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the state or the political subdivision within a reasonable time after discovery of the false claim.

117.    Baxter violated California laws by knowingly allowing tens of thousands of false claims to be submitted and presented to the State of California from at least 1998 to the present by its reporting of false pricing statements regarding its products.

//

32

118.    The State of California, by and through the California Medicaid program and other state health care programs, and unaware of Baxter's fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

119.    Honest reporting of WAC data and provision of the best price to Medi-Cal was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of California in connection with Baxter's fraudulent and illegal practices.

120.    Had the State of California known that Baxter was violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Baxter's fraudulent and illegal practices.

121.    As a result of Baxter's violations of Cal. Gov't Code §12651(a), the State of California has been damaged in an amount to be determined  exclusive of interest.

122.    Relators Sun and Hamilton are persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to Cal. Gov't Code § 12652(c) on behalf of himself and the State of California.

123.    This Court is requested to accept pendant jurisdiction over this related state claim as it is predicated upon the same exact facts as the federal claim, and merely asserts separate damages to the State of California in the operation of its Medicaid program.

//

//

//

//

33

## COUNT IX

### HAWAII FALSE CLAIMS ACT

124.    Relators repeat and reallege each allegation contained in paragraphs 1 through 64 above as if fully set forth herein.

125.    This is a *qui tam* action brought by Linnette Sun, Greg Hamilton and the State of Hawaii to recover treble damages and civil penalties under the Hawaii False Claims Act, Haw. Rev. Stat. § 661-21 *et seq.*

126.    Haw. Rev. Stat. § 661-21(a) provides liability for any person who-

> (1) knowingly presents, or causes to be presented, to an officer or employee of the state a false or fraudulent claim for payment or approval;

> (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state;

> (3) conspires to defraud the state by getting a false or fraudulent claim allowed or paid; or

> (8) is a beneficiary of an inadvertent submission of a false claim to the State, who subsequently discovers the falsity of the claim, and fails to disclose the false claim to the State within a reasonable time after discovery of the false claim.

127.    Baxter violated Haw. Rev. Stat. §661-21(a) and knowingly caused tens of thousands of false claims to be made, used and presented to the State of Hawaii from at least 1998 to the present by its violation of federal and state laws.

128.    The State of Hawaii, by and through the Hawaii Medicaid program and other state health care programs, and unaware of Baxter's fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

34