129.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Hawaii in connection with Baxter's fraudulent and illegal practices.

130.    Had the State of Hawaii known that Baxter was violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Baxter's fraudulent and illegal practices.

131.    As a result of Baxter's violations of Haw. Rev. Stat. § 661-21(a) the State of Hawaii has been damaged in an amount to be determined exclusive of interest.

132.    Relators Sun and Hamilton are private persons with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Haw. Rev. Stat. § 661-25(a) on behalf of himself and the State of Hawaii.

133.    This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Hawaii in the operation of its Medicaid program.

## COUNT X

### ILLINOIS WHISTLEBLOWER REWARD AND PROTECTION ACT

134.    Relators repeat and reallege each allegation contained in paragraphs 1 through 64 above as if fully set forth herein.

135.    This is a *qui tam* action brought by Linnette Sun, Greg Hamilton and the State of Illinois to recover treble damages and civil penalties under the Illinois Whistleblower Reward and Protection Act, 740 ILCS 175 *et seq.*

35

136.    740 ILCS 175/3(a) provides liability for any person who–

(1) knowingly presents, or causes to be presented, to an officer or employee of the State or a member of the Guard a false or fraudulent claim for payment or approval;

(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State;

(3) conspires to defraud the State by getting a false or fraudulent claim allowed or paid.

137.    Baxter violated 740 ILCS 175/3(a) and knowingly caused tens of thousands of false claims to be made, used and presented to the State of Illinois from at least 1998 to the present by its violation of federal and state law as described herein.

138.    The State of Illinois, by and through the Illinois Medicaid program and other state health care programs, and unaware of Baxter's fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

139.    Compliance with applicable Medicare, Medicaid and various other federal and state laws was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Illinois in connection with Baxter's fraudulent and illegal practices.

140.    Had the State of Illinois known that Baxter was violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Baxter's fraudulent and illegal practices.

141.    As a result of Baxter's violations of 740 ILCS 175/3(a), the State of Illinois has been damaged in an amount to be determined  exclusive of interest.

//

36

142.   Sun and Hamilton are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to 740 ILCS 175/3(b) on behalf of himself and the State of Illinois.

143.   This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Illinois in the operation of its Medicaid program.

## COUNT XI

### FLORIDA FALSE CLAIMS ACT

144.   Relators repeat and reallege each allegation contained in paragraphs 1 through 64 above as if fully set forth herein.

145.   This is a *qui tam* action brought by Linnette Sun, Greg Hamilton and the State of Florida to recover treble damages and civil penalties under the Florida False Claims Act, Fla. Stat. § 68.081 *et seq.*

146.   Fla. Stat. § 68.082(2) provides liability for any person who-

> (a) knowingly presents, or causes to be presented, to an officer or employee of an agency a false or fraudulent claim for payment or approval;

> (b) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by an agency;

> (c) conspires to submit a false claim to an agency or to deceive an agency for the purpose of getting a false or fraudulent claim allowed or paid.

//

37

147.    Baxter violated Fla. Stat. § 68.082(2) and knowingly caused tens of thousands of false claims to be made, used and presented to the State of Florida from at least 1998 to the present by its violation of federal and state laws.

148.    The State of Florida, by and through the Florida Medicaid program and other state healthcare programs, and unaware of Baxter's fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

149.    Compliance with applicable Medicare, Medicaid and various other federal and state laws was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Florida in connection with Baxter's fraudulent and illegal practices.

150.    Had the State of Florida known that Baxter was violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Baxter's fraudulent and illegal practices.

151.    As a result of Baxter's violations of Fla. Stat. § 68.082(2), the State of Florida has been damaged in an amount to be determined exclusive of interest.

152.    Relators Sun and Hamilton are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to Fla. Stat. § 68.083(2) on behalf of himself and the State of Florida.

153.    This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Florida in the operation of its Medicaid program.

//

//

38

## COUNT XII

### TEXAS FALSE CLAIMS ACT

154.    Relators repeat and reallege each allegation contained in paragraphs 1 through 64 above as if fully set forth herein.

155.    This is a *qui tam* action brought by Linnette Sun, Greg Hamilton and the State of Texas to recover double damages and civil penalties under V.T.C.A. Hum. Res. Code § 36.001 *et seq*.

156.    V.T.C.A. Hum. Res. Code § 36.002 provides liability for any person who-

> (1) knowingly or intentionally makes or causes to be made a false statement or misrepresentation of a material fact:
>
> > (a) on an application for a contract, benefit, or payment under the Medicaid program; or
> >
> > (b) that is intended to be used to determine its eligibility for a benefit or payment under the Medicaid program.
>
> (2) knowingly or intentionally concealing or failing to disclose an event:
>
> > (a) that the person knows affects the initial or continued right to a benefit or payment under the Medicaid program of:
> >
> > > (i) the person; or
> > >
> > > (ii) another person on whose behalf the person has applied for a benefit or payment or is receiving a benefit or payment; and
> >
> > (b) to permit a person to receive a benefit or payment that is not authorized or that is greater than the payment or benefit that is authorized;

39

> (4) knowingly or intentionally makes, causes to be made, induces, or seeks to induce the making of a false statement or misrepresentation of material fact concerning:
>
> > (b) information required to be provided by a federal or state law, rule, regulation, or provider agreement pertaining to the Medicaid program;

157.   Baxter violated V.T.C.A. Hum. Res. Code § 36.002 and knowingly caused tens of thousands of false claims to be made, used and presented to the State of Texas from at least 1998 to the present by its violation of federal and state laws, as described herein.

158.   The State of Texas, by and through the Texas Medicaid program and other state health care programs, and unaware of Baxter's fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

159.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Texas in connection with Baxter's fraudulent and illegal practices.

160.   Had the State of Texas known that Baxter was violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Baxter's fraudulent and illegal practices.

161.   As a result of Baxter's violations of V.T.C.A. Hum. Res. Code § 36.002, the State of Texas has been damaged in an amount to be determined  exclusive of interest.

162.   Relators Sun and Hamilton are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to V.T.C.A. Hum. Res. Code § 36.101 on behalf of himself and the State of Texas.

//

163.     This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Texas in the operation of its Medicaid program.

## COUNT XIII

### TENNESSEE FALSE CLAIMS ACT

164.     Relators repeat and reallege each allegation contained in paragraphs 1 through 64 above as if fully set forth herein.

165.     This is a *qui tam* action brought by Linnette Sun, Greg Hamilton and the State of Tennessee to recover treble damages and civil penalties under the Tennessee Medicaid False Claims Act, Tenn. Code  Ann. §§ 71-5-181 *et seq.*

166.     § 71-5-182(a)(1) provides liability for any person who-

> (A) presents, or causes to be presented to the state, a claim for payment under the Medicaid program knowing such claim is false or fraudulent;

> (B) makes or uses, or causes to be made or used, a record or statement to get a false or fraudulent claim under the Medicaid program paid for or approved by the state knowing such record or statement is false;

> (C) conspires to defraud the State by getting a claim allowed or paid under the Medicaid program knowing such claim is false or fraudulent.

167.     Baxter violated Tenn. Code Ann. § 71-5-182(a)(1) and knowingly caused tens of thousands of false claims to be made, used and presented to the State of Tennessee from at least 1998 to the present by its violation of federal and state laws as described herein.

//

41

168.   Baxter's violations of § 71-5-182 and various other federal and state laws caused false claims to be submitted for payment to the State of Tennessee.

169.   The State of Tennessee, by and through the Tennessee Medicaid program and other state health care programs, and unaware of Baxter's fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

170.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Tennessee in connection with Baxter's fraudulent and illegal practices.

171.   Had the State of Tennessee known that Baxter violated the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Baxter's fraudulent and illegal practices.

172.   As a result of Baxter's violations of Tenn. Code Ann. § 71-5-182(a)(1), the State of Tennessee has been damaged in an amount to be determined  exclusive of interest.

173.   Relators Sun and Hamilton are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to Tenn. Code Ann. § 71-5-183(a)(1) on behalf of himself and the State of Tennessee.

174.   This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Tennessee in the operation of its Medicaid program.

//

//

//

42

## COUNT XIV

### DELAWARE FALSE CLAIMS AND REPORTING ACT

175.    Relators repeat and reallege each allegation contained in paragraphs 1 through64 above as if fully set forth herein.

176.    This is a *qui tam* action brought by Linnette Sun, Greg Hamilton and the State of Delaware to recover treble damages and civil penalties under the Delaware False Claims and Reporting Act, Title 6, Chapter 12 of the Delaware Code.

177.    6 Del. C. § 1201(a) provides liability for any person who-

(1) knowingly presents, or causes to be presented, directly or indirectly, to an officer or employee of the Government a false or fraudulent claim for payment or approval;

(2) knowingly makes, uses, or causes to be made or used, directly or indirectly, a false record or statement to get a false or fraudulent claim paid or approved; or

(3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid.

178.    Baxter violated 6 Del. C. § 1201(a) and knowingly caused tens of thousands of false claims to be made, used and presented to the State of Delaware from at least 1998 to the present by its violation of federal and state laws, as described herein.

179.

180.    The State of Delaware, by and through the Delaware Medicaid program and other state health care programs, and unaware of Baxter's fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

181.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express

43

condition of payment of claims submitted to the State of Delaware in connection with Baxter's fraudulent and illegal practices.

182.    Had the State of Delaware known that Baxter was violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Baxter's fraudulent and illegal practices.

183.    As a result of Baxter's violations of 6 Del. C. § 1201(a), the State of Delaware has been damaged in an amount to be determined  exclusive of interest.

184.    Relators Sun and Hamilton are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to 6 Del. C. § 1203(b) on behalf of himself and the State of Delaware.

185.    This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Delaware in the operation of its Medicaid program.

## COUNT XV

### LOUISIANA MEDICAL ASSISTANCE PROGRAMS INTEGRITY LAW

186.    Relators repeat and reallege each allegation contained in paragraphs 1 through 64 above as if fully set forth herein.

187.    This is a *qui tam* action brought by Linnette Sun, Greg Hamilton, and the State of Louisiana to recover treble damages and civil penalties under the Louisiana Medical Assistance Programs Integrity Law,  La. Rev. Stat. Ann. § 437.1 *et seq.*

188.    La. Rev. Stat. Ann. § 438.3 provides-

44

(A) No person shall knowingly present or cause to be presented a false or fraudulent claim;

(B) No person shall knowingly engage in misrepresentation to obtain, or attempt to obtain, payment from medical assistance program funds;

(C) No person shall conspire to defraud, or attempt to defraud, the medical assistance programs through misrepresentation or by **obtaining, or attempting to obtain, payment for a false or fraudulent** claim;

189.    Baxter violated  La. Rev. Stat. Ann. §438.3 and knowingly caused tens of thousands of false claims to be made, used and presented to the State of Louisiana from at least 1998 to the present by its violation of federal and state laws as described herein.

190.    The State of Louisiana, by and through the Louisiana Medicaid program and other state health care programs, and unaware of Baxter's fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

191.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Louisiana in connection with Baxter's fraudulent and illegal practices.

192.    Had the State of Louisiana known that Baxter was violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Baxter's fraudulent and illegal practices.

193.    As a result of Baxter's violations of La. Rev. Stat. Ann. § 438.3 the State of Louisiana has been damaged in an amount to be determined  exclusive of interest.

//

//

194.    Relators Sun and Hamilton are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to La. Rev. Stat. Ann. §439.1(A) on behalf of himself and the State of Louisiana.

195.    This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Louisiana in the operation of its Medicaid program.

**COUNT XVI**

# NEVADA FALSE CLAIMS ACT

196.    Relators repeat and reallege each allegation contained in paragraphs 1 through 64 above as if fully set forth herein.

197.    This is a *qui tam* action brought by Linnette Sun, Greg Hamilton and the State of Nevada to recover treble damages and civil penalties under the Nevada False Claims Act, N.R.S. § 357.010, et. seq.

198.    N.R.S. § 357.040(1) provides liability for any person who-

(a) knowingly presents or causes to be presented a false claim for payment or approval;

(b) knowingly makes or uses, or causes to be made or used, a false record or statement to obtain payment or approval of a false claim;

(c) conspires to defraud by obtaining allowance or payment of a false claim;

(h) is a beneficiary of an inadvertent submission of a false claim and, after discovering the falsity of the claim, fails to disclose the falsity to the state or political subdivision within a reasonable time.

46

199.    In addition, N.R.S. § 422.560 prohibits the solicitation, acceptance or receipt of anything of value in connection with the provision of medical goods or services for which payment may be made in whole or in part under the Nevada Medicaid program.

200.    Baxter violated  N.R.S. § 357.040(1) and knowingly caused tens of thousands of false claims to be made, used and presented to the State of Nevada from at least 1998 to the present by its violation of federal and state laws as described herein.

201.    The State of Nevada, by and through the Nevada Medicaid program and other state health care programs, and unaware of Baxter's fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

202.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Nevada in connection with Baxter's fraudulent and illegal practices.

203.    Had the State of Nevada known that Baxter was violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Baxter's fraudulent and illegal practices.

204.    As a result of Baxter's violations of N.R.S. § 357.040(1) the State of Nevada has been damaged in an amount to be determined  exclusive of interest.

205.    Relators Sun and Hamilton are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to N.R.S. § 357.080(1) on behalf of himself and the State of Nevada.

//

//

47

206.    This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Nevada in the operation of its Medicaid program.

## COUNT XVII

### DISTRICT OF COLUMBIA PROCUREMENT REFORM AMENDMENT ACT

207.    Relators repeat and reallege each allegation contained in paragraphs 1 through 64 above as if fully set forth herein.

208.    This is a *qui tam* action brought by Linnette Sun, Greg Hamilton and the District of Columbia to recover treble damages and civil penalties under the District of Columbia Procurement Reform Amendment Act, D.C. Code § 2-308.13 *et seq.*

209.    D.C. Code § 2-308.14(a) provides liability for any person who-

(1) knowingly presents, or causes to be presented, to an officer or employee of the District a false claim for payment or approval;

(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false claim paid or approved by the District;

(3) conspires to defraud the District by getting a false claim allowed or paid by the District;

(8) is the beneficiary of an inadvertent submission of a false claim to the District, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the District.

210.    Baxter violated  D.C. Code § 2-308.14(a) and knowingly caused tens of thousands of false claims to be made, used and presented to the District of Columbia from at least 1998 to the present by its violation of federal and state laws as described herein.

48

211.   The District of Columbia, by and through the District of Columbia Medicaid

program and other state health care programs, and unaware of Baxter's fraudulent and illegal

practices, paid the claims submitted by health care providers and third party payers in connection

therewith.

212.   Compliance with applicable Medicare, Medicaid and the various other federal and

state laws cited herein was an implied, and upon information and belief, also an express

condition of payment of claims submitted to the District of Columbia in connection with

Baxter's fraudulent and illegal practices.

213.   Had the District of Columbia known that Baxter was violating the federal and

state laws cited herein, it would not have paid the claims submitted by health care providers and

third party payers in connection with Baxter's fraudulent and illegal practices.

214.   As a result of Baxter's violations of D.C. Code § 2-308.14(a) the District of

Columbia has been damaged in an amount to be determined  exclusive of interest.

215.   Relators Sun and Hamilton are private persons with direct and independent

knowledge of the allegations of this Complaint, who have brought this action pursuant to D.C.

Code § 2-308.15(b)  on behalf of himself and the District of Columbia.

216.   This Court is requested to accept pendant jurisdiction of this related state claim as

it is predicated upon the exact same facts as the federal claim, and merely asserts separate

damage to the District of Columbia in the operation of its Medicaid program.

//

//

//

//

## COUNT XVIII

### NEW MEXICO MEDICAID FALSE CLAIMS ACT

217.    Relators repeat and reallege each allegation contained in paragraphs 1 through 64 above as if fully set forth herein.

218.    This is a *qui tam* action brought by Linnette Sun, Greg Hamilton and the State of New Mexico for treble damages and penalties under (New Mexico's Medicaid False Claims Act*)*.

219.    (New Mexico's Medicaid False Claims Act*).*  provides liability for any person who

> (1) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

> (2) knowingly makes, uses, or causes to be made or used, a false record or statement to obtain payment or approval of a claim by the commonwealth or any political subdivision thereof;

> (3) conspires to defraud the commonwealth or any political subdivision thereof through the allowance or payment of a fraudulent claim;

> (4)  is a beneficiary of an inadvertent submission of a false claim to the common wealth or political subdivision thereof, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the commonwealth or political subdivision within a reasonable time after discovery of the false claim.

220.    Baxter violated New Mexico's Medicaid False Claims Act  and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of New Mexico from at least 1998 to the present by its reporting of false pricing statements regarding its products.

//

- 50

221.    The State of New Mexico, by and through the New Mexico Medicaid program and other state health care programs, and unaware of Baxter's fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

222.    Honest reporting of WAC data and provision of the best price to Medicaid was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of New Mexico.

223.    Had the State of New Mexico known that Baxter was violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Baxter's fraudulent and illegal practices.

224.    As a result of Baxter's violations of (New Mexico's Medicaid False Claims Act), the State of New Mexico has been damaged in an amount to be determined, exclusive of interest.

225.    Relators Sun and Hamilton are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to (New Mexico's Medicaid False Claims Act). on behalf of themselves and the State of New Mexico.

## COUNT XIX

### VIRGINIA FRAUD AGAINST TAXPAYERS ACT

226.    Relators repeat and reallege each allegation contained in paragraphs 1 through 64 above as if fully set forth herein.

227.    This is a *qui tam* action brought by Linnette Sun, Greg Hamilton and the State of Virginia for treble damages and penalties under Virginia Fraud Against Taxpayers Act, (Virginia Code Chapter 3,  Article 19.1 § 8.01 *et seq.)*

51

228.    (Virginia Code Chapter 3,  Article 19.1 § 8.01 *et seq.)*  provides liability for any

person who

> (1) knowingly presents, or causes to be presented, a
> false or fraudulent claim for payment or approval;
>
> (2) knowingly makes, uses, or causes to be made or used, a
> false record or statement to obtain payment or approval of a claim
> by the commonwealth or any political subdivision thereof;
>
> (3) conspires to defraud the commonwealth or any political
> subdivision thereof through the allowance or payment of a
> fraudulent claim;
>
> (4)  is a beneficiary of an inadvertent submission of a false
> claim to the common wealth or political subdivision thereof,
> subsequently discovers the falsity of the claim, and fails to disclose
> the false claim to the commonwealth or political subdivision
> within a reasonable time after discovery of the false claim.

229.    Baxter violated  (Virginia Code Chapter 3,  Article 19.1 § 8.01 *et seq.)*  and

knowingly caused hundreds of thousands of false claims to be made, used and presented to the

State of Virginia from at least 1998 to the present by its reporting of false pricing statements

regarding its products.

230.    The State of Virginia, by and through the Virginia Medicaid program and other

state health care programs, and unaware of Baxter's fraudulent and illegal practices, paid the

claims submitted by health care providers and third party payers in connection therewith.

231.    Honest reporting of WAC data and provision of the best price to Medicaid was an

implied, and upon information and belief, also an express condition of payment of claims

submitted to the State of Virginia.

//

//

232.    Had the State of Virginia known that Baxter was violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Baxter's fraudulent and illegal practices.

233.    As a result of Baxter's violations of (Virginia Code Chapter 3, Article 19.1 § 8.01 *et seq.)* , the State of Virginia has been damaged in an amount to be determined, exclusive of interest.

234.    Relators Sun and Hamilton are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to (Virginia Code Chapter 3, Article 19.1 § 8.01 *et seq.)* on behalf of themselves and the State of Virginia.

## COUNT XX

### UTAH FALSE CLAIMS ACT

235.    Relators repeat and reallege each allegation contained in paragraphs 1 through 64 above as if fully set forth herein

236.    This is a *qui tam* action brought by Linnette Sun, Greg Hamilton and the State of Utah for treble damages and penalties under Utah's False Claims Act, Utah Health Code Title 26 *et seq.*

237.    (Utah Health Code Title 26) provides liability for any person who

(1) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(2) knowingly makes, uses, or causes to be made or used, a false record or statement to obtain payment or approval of a claim by the commonwealth or any political subdivision thereof;

53

(3) conspires to defraud the commonwealth or any political subdivision thereof through the allowance or payment of a fraudulent claim;

(9) is a beneficiary of an inadvertent submission of a false claim to the common wealth or political subdivision thereof, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the commonwealth or political subdivision within a reasonable time after discovery of the false claim.

238.    Baxter violated (Utah Health Code Title 26) and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Utah from at least 1998 to the present by its reporting of false pricing statements regarding its products.

239.    The State of Utah, by and through the Utah Medicaid program and other state health care programs, and unaware of Baxter's fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

240.    Honest reporting of WAC data and provision of the best price to Medicaid was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Utah.

241.    Had the State of Utah known that Baxter was violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Baxter's fraudulent and illegal practices.

242.    As a result of Baxter's violations of (Utah Health Code Title 26) the State of Utah has been damaged in an amount to be determined, exclusive of interest.

243.    Relators Sun and Hamilton are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to (Utah Health Code Title 26) on behalf of themselves and the State of Utah.

54

## COUNT XXI

### ARKANSAS MEDICAID FRAUD FALSE CLAIMS ACT

244.     Relators repeat and reallege each allegation contained in paragraphs 1 through 64 above as if fully set forth herein

245.     This is a *qui tam* action brought by Linnette Sun, Greg Hamilton and the State of Arkansas for treble damages and penalties under Arkansas's Medicaid Fraud False Claims Act, (Arkansas Code *§20-77-901 et. Seq.*)

246.     (Arkansas Code *§20-77-901 et. Seq.*)   provides liability for any person who

(1) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(2) knowingly makes, uses, or causes to be made or used, a false record or statement to obtain payment or approval of a claim by the commonwealth or any political subdivision thereof;

(3) conspires to defraud the commonwealth or any political subdivision thereof through the allowance or payment of a fraudulent claim;

(9) is a beneficiary of an inadvertent submission of a false claim to the common wealth or political subdivision thereof, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the commonwealth or political subdivision within a reasonable time after discovery of the false claim.

247.     Baxter violated  (Arkansas Code *§20-77-901 et. Seq.*)   and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Arkansas from at least 1998 to the present by its reporting of false pricing statements regarding its products.

//

//

55

248.    The State of Arkansas, by and through the Arkansas Medicaid program and other state health care programs, and unaware of Baxter's fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

249.    Honest reporting of WAC data and provision of the best price to Medicaid was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Arkansas.

250.    Had the State of Arkansas known that Baxter was violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Baxter's fraudulent and illegal practices.

251.    As a result of Baxter's violations of (Arkansas Code *§20-77-901 et. Seq.*) the State of Arkansas has been damaged in an amount to be determined, exclusive of interest.

252.    Relators Sun and Hamilton are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to (Arkansas Code *§20-77-901 et. Seq.*) on behalf of themselves and the State of Arkansas.


## COUNT XXII

## DISCRIMINATION UNDER THE CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT

253.    Relator Linnette Sun repeats and repleads and incorporate by reference herein each and every one of the allegations contained in paragraphs 1-64, inclusive, as though fully set forth herein.

254.    At all relevant times herein, Baxter regularly employed five or more persons, bringing them within the provisions of California Government Code Section 12900 et seq.,

prohibiting employers or their agents from discriminating against employees on the basis of their sex, age, race/color, national origin/ancestry, marital status.

255.    Relator Linnette Sun filed charges of discrimination in employment with the California Department of Fair Employment and Housing ("DFEH"). The DFEH issued its right to sue letter authorizing this lawsuit on July 20, 2004, and relator Linnette Sun has timely filed this action within the prescribed period subsequent to the issuance of the right to sue letter. Relator Linnette Sun has therefore exhausted her administrative remedies and timely filed this action.

256.    This cause of action is brought under the California Fair Employment and Practices Act, Government Code Section 12940, including, but not limited to, subsections (a), (k), (m) and (n), which prohibits discrimination against a person in the terms, conditions or privileges of employment on the basis of a person's sex, age, race/color, national origin/ancestry, marital status, and which requires employers to take all reasonable steps necessary to prevent harassment and discrimination from occurring and the corresponding regulations of the California Fair Employment and Housing Commission.

257.    Relator Linnette Sun was subjected to discrimination by Baxter based on her sex, age, race/color, national origin/ancestry, and marital status.   This discriminatory conduct of Baxter constitutes an unlawful employment practice and unlawful discrimination in employment on account of sex, age, race/color, national origin/ancestry, marital status, in violation of California Government Code Section 12940.

258.    As a direct and proximate result of the discrimination by Baxter, Relator Linnette Sun has suffered and continues to suffer substantial losses in earnings and job benefits, and has suffered humiliation and extreme and severe mental anguish and emotional distress normally associated with discrimination.  Relator Linnette Sun is therefore entitled to general and compensatory damages in an amount to be proven at the time of trial.

259.    Baxter acting outrageously, and with acted willfully with fraud, oppression and malice and with a conscious disregard for Relator Linnette Sun's right to be free from discrimination, and with the intent, design and purpose of injuring her. This conduct was carried out by managerial employees of Baxter. Baxter authorized, condoned, and/or ratified the unlawful conduct by failing to take immediate and appropriate corrective action. By reason thereof, Relator Linnette Sun is entitled to punitive damages from Baxter in an amount appropriate to punish and make an example of Baxter.

## COUNT XXIII

## HARASSMENT UNDER THE CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT

260.    Relator Linnette Sun repeats and repleads and incorporate by reference herein each and every one of the allegations contained in paragraphs 1-64, inclusive, as though fully set forth herein.

261.    At all relevant times herein, Baxter regularly employed five or more persons, bringing them within the provisions of California Government Code Section 12900 et seq., prohibiting employers or their agents from harassing employees on the basis of their sex, age, race/color, national origin/ancestry, marital status.

262.    Relator Linnette Sun filed charges of discrimination in employment with the California Department of Fair Employment and Housing ("DFEH"). The DFEH issued its right to sue letter authorizing this lawsuit on July 20, 2004, and relator Linnette Sun has timely filed this action within the prescribed period subsequent to the issuance of the right to sue letter. Relator Linnette Sun has therefore exhausted her administrative remedies and timely filed this action.

58

263.    This cause of action is brought under the California Fair Employment and Practices Act, Government Code Section 12940, including, but not limited to, subsections (j) and (k) which prohibits harassment of an employee on the basis of a person's sex, age, race/color, national origin/ancestry, marital status, and which requires employers to take all reasonable steps necessary to prevent harassment and discrimination from occurring and the corresponding regulations of the California Fair Employment and Housing Commission.

264.    Relator Linnette Sun was subjected to extreme, severe and pervasive harassment by Baxter based on her sex, age, race/color, national origin/ancestry, and marital status.   This harassment created an intimidating, oppressive, hostile, abusive and offensive work environment which interfered with the emotional well being of relator Linnette Sun and interfered with her ability to perform her work.

264.    As a direct and proximate result of the harassment by Baxter, Relator Linnette Sun has suffered and continues to suffer substantial losses in earnings and job benefits, and has suffered humiliation and extreme and severe mental anguish and emotional distress normally associated with n.  Relator Linnette Sun is therefore entitled to general and compensatory damages in an amount to be proven at the time of trial.

265    Baxter acting outrageously, and with acted willfully with fraud, oppression and malice and with a conscious disregard for Relator Linnette Sun's right to be free from discrimination, and with the intent, design and purpose of injuring her. This conduct was carried out by managerial employees of Baxter.  Baxter authorized, condoned, and/or ratified the unlawful conduct by failing to take immediate and appropriate corrective action.  By reason thereof, Relator Linnette Sun is entitled to punitive damages from Baxter in an amount appropriate to punish and make an example of Baxter.

**PRAYER FOR RELIEF**

**FIRST, SECOND, AND THIRD CAUSES OF ACTION**

1.    Judgement be ordered against the Defendant in an amount equal to three times the damages sustained by the United States as a result of Defendants' conduct;

2.    A civil penalty be assessed of not less than five thousand, five hundred dollars ($5,500.00) and not more than eleven thousand dollars ($11,000.00) for each violation of 31 U.S.C. § 3729;

//

3.    That Relators, as Qui Tam Plaintiffs, be awarded the maximum amount allowed pursuant to 31 U.S.C. §3730(d) and/or any other applicable provision of law;

4.    Attorneys' fees and costs according to proof;

**FOURTH CAUSE OF ACTION**

11.    General damages;

12.    Two times the amount of back pay;

13.    Interest upon said back pay;

14.    Special damages;

15.    Reinstatement with full seniority;

16.    Litigation expenses and reasonable attorneys' fees;

**FIFTH CAUSE OF ACTION**

17.    General damages;

18.    Two times the amount of back pay;

19.    Interest upon said back pay;

60

20.   Special damages;

21.   Exemplary damages;

22.   Reinstatement with full seniority;

23.   Litigation expenses and reasonable attorneys' fees;

## SIXTH CAUSE OF ACTION

24.   General damages;

25.   Back pay;

26.   Special damages;

27.   Exemplary damages;

28.   Reinstatement with full seniority;

23.   Litigation expenses;

## SEVENTH  CAUSE OF ACTION

To the STATE of MASSACHUSETTS:

24.   Three times the amount of actual damages which the STATE of Massachusetts
has sustained as a result of Baxter Laboratories' fraudulent and illegal practices;

25.   A civil penalty of not less than $5,000 and not more than $10,000 for each false
claim which Baxter Laboratories caused to be presented to the STATE of
Massachusetts;

26.   Prejudgment interest; and

27.   All costs incurred in bringing this action.

To RELATOR, Linnette Sun:

28.   The maximum amount allowed pursuant to  Mass. Gen. Laws Ann. 12 § 5(A)

and/or any applicable provision of law;

229. Reimbursement for reasonable expenses which Relator incurred in connection with this action; and

30. An award of reasonable attorneys' fees and costs.

## EIGHTH CAUSE OF ACTION

To the STATE of CALIFORNIA:

31. Three times the amount of actual damages which the STATE of California has sustained as a result of Baxter Laboratories' fraudulent and illegal practices;

//

32. A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Baxter Laboratories caused to be presented to the STATE of California;

33. Prejudgment interest; and

34. All costs incurred in bringing this action.

To RELATOR, Linnette Sun:

35. The maximum amount allowed pursuant to Cal. Gov't. Code § 12650 and/or any applicable provision of law;

36. Reimbursement for reasonable expenses which Relator incurred in connection with this action; and

37. An award of reasonable attorneys' fees and costs.

## NINTH CAUSE OF ACTION

To the STATE of HAWAII:

38. Three times the amount of actual damages which the STATE of Hawaii has

62

sustained as a result of Baxter Laboratories' fraudulent and illegal practices;

39.    A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Baxter Laboratories caused to be presented to the STATE of Hawaii;

40.    Prejudgment interest; and

41.    All costs incurred in bringing this action.

To RELATOR, Linnette Sun:

42.    The maximum amount allowed pursuant to Haw. Rev. Stat. § 661-21 and/or any applicable provision of law;

//

43.    Reimbursement for reasonable expenses which Relator incurred in connection with this action; and

44.    An award of reasonable attorneys' fees and costs.

<strong>TENTH CAUSE OF ACTION</strong>

To the STATE of ILLINOIS:

45.    Three times the amount of actual damages which the STATE of Illinois has sustained as a result of Baxter Laboratories' fraudulent and illegal practices;

46.    A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Baxter Laboratories caused to be presented to the STATE of Illinois;

47.    Prejudgment interest; and

48.    All costs incurred in bringing this action.

To RELATOR, Linnette Sun:

49.    The maximum amount allowed pursuant to 740 ILCS 175 and/or any applicable provision of law;

63 .

50.   Reimbursement for reasonable expenses which Relator incurred in connection with this action; and

51.   An award of reasonable attorneys' fees and costs.

### ELEVENTH CAUSE OF ACTION

To the STATE of FLORIDA:

52.   Three times the amount of actual damages which the STATE of Florida has sustained as a result of Baxter Laboratories' fraudulent and illegal practices;

53.   A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Baxter Laboratories caused to be presented to the STATE of Florida;

54.   Prejudgment interest; and

55.   All costs incurred in bringing this action.

To RELATOR, Linnette Sun:

56.   The maximum amount allowed pursuant to Fla. Stat. § 68.081 and/or any applicable provision of law;

57.   Reimbursement for reasonable expenses which Relator incurred in connection with this action; and

58.   An award of reasonable attorneys' fees and costs.

### TWELFTH CAUSE OF ACTION

To the STATE of TEXAS:

59.   Three times the amount of actual damages which the STATE of Texas has sustained as a result of Baxter Laboratories' fraudulent and illegal practices;

60.   A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Baxter Laboratories caused to be presented to the STATE of Texas;

64

61.   Prejudgment interest; and

62.   All costs incurred in bringing this action.

To RELATOR, Linnette Sun:

63.   The maximum amount allowed pursuant to Tex. Stat. §V.T.C.A. Hum. Res. Code § 36.001 and/or any applicable provision of law;

64.   Reimbursement for reasonable expenses which Relator incurred in connection with this action; and

65.   An award of reasonable attorneys' fees and costs.

//

### THIRTEENTH CAUSE OF ACTION

To the STATE of TENNESSEE:

66.   Three times the amount of actual damages which the STATE of Tennessee has sustained as a result of Baxter Laboratories' fraudulent and illegal practices;

67.   A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Baxter Laboratories caused to be presented to the STATE of Tennessee;

68.   Prejudgment interest; and

69.   All costs incurred in bringing this action.

To RELATOR, Linnette Sun:

70.   The maximum amount allowed pursuant to Tenn. Code  Ann. §§ 71-5-181  and/or any applicable provision of law;

71.   Reimbursement for reasonable expenses which Relator incurred in connection with this action; and

65

72.     An award of reasonable attorneys' fees and costs.

## FOURTEENTH CAUSE OF ACTION

To the STATE of DELAWARE:

73.     Three times the amount of actual damages which the STATE of Delaware has

        sustained as a result of Baxter Laboratories' fraudulent and illegal practices;

74.     A civil penalty of not less than $5,000 and not more than $10,000 for each false

        claim which Baxter Laboratories caused to be presented to the STATE of

        Delaware;

75.     Prejudgment interest; and

76.     All costs incurred in bringing this action.

To RELATOR, Linnette Sun:

77.     The maximum amount allowed pursuant to  Title 6, Chapter 12 of the Delaware

        Code and/or any applicable provision of law;

78.     Reimbursement for reasonable expenses which Relator incurred in connection

        with this action; and

79.     An award of reasonable attorneys' fees and costs.

## FIFTEENTH CAUSE OF ACTION

To the STATE of LOUISIANA:

80.     Three times the amount of actual damages which the STATE of Louisiana has

        sustained as a result of Baxter Laboratories' fraudulent and illegal practices;

81.     A civil penalty of not less than $5,000 and not more than $10,000 for each false

        claim which Baxter Laboratories caused to be presented to the STATE of

        Louisiana;

66

82.     Prejudgment interest; and

83.     All costs incurred in bringing this action.

To RELATOR, Linnette Sun:

84.     The maximum amount allowed pursuant to La. Rev. Stat. Ann. § 437.1 and/or any
        applicable provision of law;

85.     Reimbursement for reasonable expenses which Relator incurred in connection
        with this action; and

86.     An award of reasonable attorneys' fees and costs.

//

## SIXTEENTH CAUSE OF ACTION

To the STATE of NEVADA:

87.     Three times the amount of actual damages which the STATE of Nevada has
        sustained as a result of Baxter Laboratories' fraudulent and illegal practices;

88.     A civil penalty of not less than $5,000 and not more than $10,000 for each false
        claim which Baxter Laboratories caused to be presented to the STATE of Nevada;

89.     Prejudgment interest; and

90.     All costs incurred in bringing this action.

To RELATOR, Linnette Sun:

91.     The maximum amount allowed pursuant to N.R.S. § 357.010  and/or any
        applicable provision of law;

92.     Reimbursement for reasonable expenses which Relator incurred in connection
        with this action; and

67

93.   An award of reasonable attorneys' fees and costs.

## SEVENTEENTH CAUSE OF ACTION

To the DISTRICT OF COLUMBIA:

94.   Three times the amount of actual damages which the District of Columbia has
      sustained as a result of Baxter Laboratories' fraudulent and illegal practices;

95.   A civil penalty of not less than $5,000 and not more than $10,000 for each false
      claim which Baxter Laboratories caused to be presented to the District of
      Columbia;

96.   Prejudgment interest; and

97.   All costs incurred in bringing this action.

To RELATOR, Linnette Sun:

98.   The maximum amount allowed pursuant to D.C. Code § 2-308.13 and/or any
      applicable provision of law;

99.   Reimbursement for reasonable expenses which Relator incurred in connection
      with this action; and

100.  An award of reasonable attorneys' fees and costs.

## EIGHTEENTH CAUSE OF ACTION

To the STATE of NEW MEXICO:

101.  Three times the amount of actual damages which the District of Columbia has
      sustained as a result of Baxter Laboratories' fraudulent and illegal practices;

102.  A civil penalty of not less than $5,000 and not more than $10,000 for each false
      claim which Baxter Laboratories caused to be presented to the District of
      Columbia;

103. Prejudgment interest; and

104. All costs incurred in bringing this action.

To RELATOR, Linnette Sun:

105. The maximum amount allowed pursuant to D.C. Code § 2-308.13 and/or any applicable provision of law;

106. Reimbursement for reasonable expenses which Relator incurred in connection with this action; and

107. An award of reasonable attorneys' fees and costs.

//

//

## NINETEENTH CAUSE OF ACTION

To the STATE of VIRGINIA:

108. Three times the amount of actual damages which the District of Columbia has sustained as a result of Baxter Laboratories' fraudulent and illegal practices;

109. A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Baxter Laboratories caused to be presented to the District of Columbia;

110. Prejudgment interest; and

111. All costs incurred in bringing this action.

To RELATOR, Linnette Sun:

112. The maximum amount allowed pursuant to D.C. Code § 2-308.13 and/or any applicable provision of law;

113. Reimbursement for reasonable expenses which Relator incurred in connection

69

with this action; and

114.  An award of reasonable attorneys' fees and costs.

## TWENTIETH CAUSE OF ACTION

To the STATE of UTAH:

115.  Three times the amount of actual damages which the District of Columbia has sustained as a result of Baxter Laboratories' fraudulent and illegal practices;

116.  A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Baxter Laboratories caused to be presented to the District of Columbia;

117.  Prejudgment interest; and

118.  All costs incurred in bringing this action.

To RELATOR, Linnette Sun:

119.  The maximum amount allowed pursuant to D.C. Code § 2-308.13 and/or any applicable provision of law;

120.  Reimbursement for reasonable expenses which Relator incurred in connection with this action; and

121.  An award of reasonable attorneys' fees and costs.

## TWENTY-FIRST CAUSE OF ACTION

To the STATE of ARKANSAS:

122.  Three times the amount of actual damages which the District of Columbia has sustained as a result of Baxter Laboratories' fraudulent and illegal practices;

123.  A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Baxter Laboratories caused to be presented to the District of

70

Columbia;

124.   Prejudgment interest; and

125.   All costs incurred in bringing this action.

To RELATOR, Linnette Sun:

126.   The maximum amount allowed pursuant to D.C. Code § 2-308.13 and/or any applicable provision of law;

127.   Reimbursement for reasonable expenses which Relator incurred in connection with this action; and

128.   An award of reasonable attorneys' fees and costs.

//

## TWENTY-SECOND CAUSE OF ACTION

129.   General and compensatory damages, including damages for lost wages, earnings and benefits, and emotional distress, according to proof;

130.   Reasonable attorney fees according to law, including California Government Code Section 12965;

131.   Costs of suit and attorney fees as provided by law;

132.   Punitive damages according to proof; and

133.   Prejudgment interest.

## TWENTY-THIRD CAUSE OF ACTION

134.   General and compensatory damages, including damages for lost wages, earnings

71

and benefits, and emotional distress, according to proof;

135. Reasonable attorney fees according to law, including California Government Code Section 12965;

136. Costs of suit and attorney fees as provided by law;

137. Punitive damages according to proof; and

138. Prejudgment interest.

## FOR ALL CAUSES OF ACTION

139. Such other and further relief as the Court deems proper.

DATED: June 6, 2005                 LAW OFFICES OF MARK ALLEN KLEIMAN

By:   ___/s/_____

MARK ALLEN KLEIMAN
California State Bar No. 115919
12400 Wilshire Blvd., Ste. 400
Los Angeles, CA 90025
310-442-4820
310-442-4830 (fax)

DATED: June 6, 2005                 LAUREN JOHN UDDEN

By:   ___/s/_____

LAUREN JOHN UDDEN
California State Bar No. 83118
15 W. Carrillo Street, Suite 101B
Santa Barbara, California 93101
805-879-7544

72

805-962-0722 (fax)

ATTORNEYS FOR RELATOR

## DEMAND FOR JURY TRIAL

Relator hereby demands a jury trial.

DATED: June 6, 2005             LAW OFFICES OF MARK ALLEN KLEIMAN


By: _____/S/_____

          MARK ALLEN KLEIMAN
          California State Bar No. 115919
          12400 Wilshire Blvd., 4th Floor
          Los Angeles, CA 90025
          310-442-4820
          310-442-4830 (fax)


DATED: June 6, 2005             LAUREN JOHN UDDEN


By: _____/S/_____

          LAUREN JOHN UDDEN
          California State Bar No. 83118
          15 W. Carrillo Street, Suite 101B
          Santa Barbara, California 93101
          805-879-7544
          805-962-0722 (fax)


          ATTORNEYS FOR RELATOR

Hemophilia Resources of America, Inc

Gross Margin by product for Jan 1 - Aug 31, 2001

| Company | Brand | Product Type | Revenue | TOTAL REV | Cost | GM | GM% |
|---|---|---|---|---|---|---|---|
| Baxter | Autoplex T | VII & IX* | $ 178,531.20 | $ 178,531.20 | $ 115,665.00 | $ 62,866.20 | 35.21 |
| | Feiba VH | VII & IX* | $ 1,495,136.44 | $ 1,495,136.44 | $ 1,085,364.70 | $ 409,771.74 | 27.41 |
| | Hemophil M | VII | $ 5,652,158.70 | $ 5,652,158.70 | $ 3,495,683.80 | $ 2,156,474.90 | 38.15 |
| | Recombinate | VII | $ 16,509,604.32 | $ 16,509,604.32 | $ 12,060,059.48 | $ 4,449,544.84 | 26.95 |
| | Total | | $ 23,835,430.66 | $ 23,835,430.66 | $ 16,755,772.98 | $ 7,078,657.68 | |
| Aventis | Bioclate | VIII | $ 415,248.58 | $ 415,248.58 | $ 303,543.20 | $ 111,705.38 | 26.90 |
| | Helixate | VIII | $ 515,638.33 | $ 515,638.33 | $ 387,410.05 | $ 128,228.28 | 24.87 |
| | Helixate FS | VIII | $ 338,382.12 | $ 338,382.12 | $ 267,199.20 | $ 71,182.92 | 21.04 |
| | Humate P | VIII | $ 3,023,040.79 | $ 3,023,040.79 | $ 2,346,687.50 | $ 676,353.29 | 22.37 |
| | Monoclate P | VIII | $ 1,342,764.11 | $ 1,342,764.11 | $ 919,871.45 | $ 422,892.66 | 31.49 |
| | Mononine | IX | $ 481,478.06 | $ 481,478.06 | $ 386,524.00 | $ 94,954.06 | 19.72 |
| | Total | | $ 6,116,551.99 | $ 6,116,551.99 | $ 4,611,235.40 | $ 1,505,316.59 | |
| Genetics Institute | BeneFix | IX | $ 4,282,975.45 | $ 4,282,975.45 | $ 3,260,985.00 | $ 1,021,990.45 | 23.86 |
| | ReFacto | VIII | $ 891,854.71 | $ 891,854.71 | $ 648,013.20 | $ 243,841.51 | 27.34 |
| | Total | | $ 5,174,830.16 | $ 5,174,830.16 | $ 3,908,998.20 | $ 1,265,831.96 | |
| Novo Nordisk | NovoSeven | VIII & IX* | $ 4,874,289.60 | $ 4,874,289.60 | $ 3,195,936.00 | $ 1,678,353.60 | 34.43 |
| | Total | | $ 4,874,289.60 | $ 4,874,289.60 | $ 3,195,936.00 | $ 1,678,353.60 | |
| Bayer | Koate DVI | VIII | $ 115,365.24 | $ 115,365.24 | $ 68,718.50 | $ 46,646.74 | 40.43 |
| | Kogenate | VIII | $ 8,385.49 | $ 8,385.49 | $ 6,795.90 | $ 1,589.59 | 18.96 |
| | Kogenate FS | VIII | $ 26,613.63 | $ 26,613.63 | $ 24,509.70 | $ 2,103.93 | 7.91 |
| | Total | | $ 150,364.36 | $ 150,364.36 | $ 100,024.10 | $ 50,340.26 | |
| Alpha Therapeutics | Alphanate | VIII | $ 112,824.71 | $ 112,824.71 | $ 73,224.00 | $ 39,600.71 | 35.10 |
| | Alphanine SD | IX | $ 426,234.60 | $ 426,234.60 | $ 240,623.60 | $ 185,611.00 | 43.55 |
| | Total | | $ 539,059.31 | $ 539,059.31 | $ 313,847.60 | $ 225,211.71 | |

*WITH INHIBITORS

EXHIBIT
B

Hemophilia Resources of America
Gross Margin by product for 2000

| Company | Brand | Product Type | Revenue | Cost | GM | GM% |
|---|---|---|---|---|---|---|
| Baxter | Autoplex T | VIII & IX* | $ 94,921.20 | $ 53,064.00 | $ 41,857.20 | 44.10% |
| | Felba VH | VIII & IX* | $ 2,752,588.93 | $ 1,902,435.12 | $ 850,153.81 | 30.89% |
| | Hemophil M | VIII | $ 3,894,383.03 | $ 2,258,047.86 | $ 1,636,335.17 | 42.02% |
| | Recombinate | VIII | $ 19,991,730.70 | $ 14,181,489.81 | $ 5,810,240.89 | 29.06% |
| | Total | | $ 26,733,623.86 | $ 18,395,036.79 | $ 8,338,587.07 | |
| Aventis | Bioclate | VIII | $ 2,475,634.18 | $ 1,872,153.84 | $ 603,480.34 | 24.38% |
| | Helixate | VIII | $ 4,534,364.27 | $ 3,409,803.94 | $ 1,124,560.33 | 24.80% |
| | Humate P | VIII | $ 3,607,339.18 | $ 2,763,924.20 | $ 843,414.98 | 23.38% |
| | Monoclate P | VIII | $ 1,334,859.93 | $ 916,987.30 | $ 417,872.63 | 31.30% |
| | Mononine | IX | $ 741,756.87 | $ 579,305.00 | $ 162,451.87 | 21.90% |
| | Total | | $ 12,693,954.43 | $ 9,542,174.28 | $ 3,151,780.15 | |
| Genetics Institute | Benefix | IX | $ 6,283,316.34 | $ 4,653,300.60 | $ 1,630,015.74 | 25.94% |
| | Total | | $ 6,283,316.34 | $ 4,653,300.60 | $ 1,630,015.74 | |
| Novo Nordisk | NovoSeven | VIII & IX* | $ 4,368,520.80 | $ 2,846,016.00 | $ 1,522,504.80 | 34.85% |
| | Total | | $ 4,368,520.80 | $ 2,846,016.00 | $ 1,522,504.80 | |
| Bayer | Koate HP | VIII | $ 179,095.48 | $ 86,453.10 | $ 92,642.38 | 51.73% |
| | Kogenate | VIII | $ 991,015.58 | $ 750,487.20 | $ 240,528.38 | 24.27% |
| | Total | | $ 1,170,111.06 | $ 836,940.30 | $ 333,170.76 | |
| Alpha Therapeutics | Alphanate | VIII | $ 33,842.15 | $ 19,741.50 | $ 14,100.65 | 41.67% |
| | Alphanine SD | IX | $ 185,429.80 | $ 96,038.00 | $ 89,391.80 | 48.21% |
| | Total | | $ 219,271.95 | $ 115,779.50 | $ 103,492.45 | |
| Ipsen LTD. | Hyate C | VIII | $ 50,578.00 | $ 44,286.00 | $ 6,292.00 | 12.44% |
| | Total | | $ 50,578.00 | $ 44,286.00 | $ 6,292.00 | |

* WITH INHIBITORS

GH000011

Hemophilia Resources of America
Gross Margin by product for 1999

| Company | Brand | Product Type | Revenue | Cost | GM | GM% |
|---|---|---|---|---|---|---|
| Baxter | Autoplex T | VIII & IX * | $ 210,183.60 | $ 150,565.80 | $ 59,617.80 | 28.36% |
|  | Feiba VH | VIII & IX * | $ 2,850,790.61 | $ 2,060,781.96 | $ 790,008.65 | 27.71% |
|  | Hemophil M | VIII | $ 3,513,319.13 | $ 2,067,898.92 | $ 1,445,420.21 | 41.14% |
|  | Recombinate | VIII | $ 18,544,446.38 | $ 12,516,927.48 | $ 6,027,518.90 | 32.50% |
|  | Total | | $ 25,118,739.72 | $ 16,796,174.16 | $ 8,322,565.56 |  |
| Aventis | Bioclate | VIII | $ 1,470,682.83 | $ 1,017,615.76 | $ 453,067.07 | 30.81% |
|  | Helixate | VIII | $ 2,361,238.87 | $ 1,635,728.93 | $ 725,509.94 | 30.73% |
|  | Humate P | VIII | $ 1,353,837.43 | $ 1,042,362.00 | $ 311,475.43 | 23.01% |
|  | Monoclate P | VIII | $ 383,437.48 | $ 264,229.75 | $ 119,207.73 | 31.09% |
|  | Mononine | IX | $ 704,266.81 | $ 565,141.60 | $ 139,125.21 | 19.75% |
|  | Total | | $ 6,273,463.42 | $ 4,525,078.04 | $ 1,748,385.38 |  |
| Genetics Institute | Benefix | IX | $ 4,588,252.86 | $ 3,514,875.60 | $ 1,073,377.26 | 23.39% |
|  | Total | | $ 4,588,252.86 | $ 3,514,875.60 | $ 1,073,377.26 |  |
| Bayer | Koate DVI | VIII | $ 50,996.52 | $ 22,788.30 | $ 28,208.22 | 55.31% |
|  | Koate HP | VIII | $ 28,529.02 | $ 17,178.40 | $ 11,350.62 | 39.79% |
|  | Kogenate | VIII | $ 2,037,330.26 | $ 1,411,750.53 | $ 625,579.73 | 30.71% |
|  | Total | | $ 2,116,855.80 | $ 1,451,717.23 | $ 665,138.57 |  |
| Novo Nordisk | NovoSeven | VIII & IX * | $ 1,563,314.40 | $ 1,004,076.00 | $ 559,238.40 | 35.77% |
|  | Total | | $ 1,563,314.40 | $ 1,004,076.00 | $ 559,238.40 |  |
| Alpha Therapeutics | Alphanate | VIII | $ 302,450.02 | $ 199,861.10 | $ 102,588.92 | 33.92% |
|  | Alphanine SD | IX | $ 128,896.92 | $ 86,876.00 | $ 42,020.92 | 32.60% |
|  | Total | | $ 431,346.94 | $ 286,737.10 | $ 144,609.84 |  |
| Ipsen LTD. | Hyate C | VIII | $ 75,996.60 | $ 66,081.30 | $ 9,915.30 | 13.05% |
|  | Total | | $ 75,996.60 | $ 66,081.30 | $ 9,915.30 |  |

* WITH INHIBITORS

GH000012

Hemophilia Resources of America
Gross Margin by product for 1998

| Company | Brand | Product Type | Revenue | Cost | GM | GM% |
|---|---|---|---|---|---|---|
| Baxter | Autoplex T | VIII & IX* | $ 204,416.10 | $ 133,928.70 | $ 70,487.40 | 34.48% |
| | Bebulin VH* | VIII & IX* | $ 11,860.00 | $ -4,752.00 | $ 7,128.00 | -60.00% |
| | Feiba VH | VIII & IX* | $ 2,128,393.26 | $ 1,484,189.64 | $ 644,203.62 | 30.27% |
| | Hemophil M | VIII | $ 2,751,687.11 | $ 1,583,823.18 | $ 1,167,863.93 | 42.44% |
| | Recombinate | VIII | $ 12,328,928.22 | $ 7,713,365.17 | $ 4,615,563.05 | 37.44% |
| | Total | | $ 17,425,304.69 | $ 10,920,058.69 | $ 6,505,246.00 | |
| Aventis | Bioclate | VIII | $ 1,226,897.54 | $ 812,051.30 | $ 414,846.24 | 33.81% |
| | Helixate | VIII | $ 2,161,779.36 | $ 1,395,521.48 | $ 766,257.88 | 35.45% |
| | Humate P | VIII | $ 741,855.31 | $ 625,174.80 | $ 116,680.51 | 15.73% |
| | Monoclate P | VIII | $ 870,787.13 | $ 580,616.48 | $ 290,170.65 | 33.32% |
| | Mononine | IX | $ 520,350.74 | $ 410,100.60 | $ 110,250.14 | 21.19% |
| | Total | | $ 5,521,670.08 | $ 3,823,464.66 | $ 1,698,205.42 | |
| Genetics Institute | Benefix | IX | $ 3,170,153.28 | $ 2,345,881.20 | $ 824,272.08 | 26.00% |
| | Total | | $ 3,170,153.28 | $ 2,345,881.20 | $ 824,272.08 | 26.00% |
| Bayer | Koate HP | VIII | $ 43,919.40 | $ 19,848.00 | $ 24,071.40 | 54.81% |
| | Kogenate | VIII | $ 1,642,774.66 | $ 984,160.80 | $ 658,613.86 | 40.09% |
| | Konyne 80 | IX | $ 72,410.00 | $ 46,208.00 | $ 26,202.00 | 36.19% |
| | Total | | $ 1,759,104.06 | $ 1,050,216.80 | $ 708,887.26 | |
| Alpha Therapeutics | Alphanate | VIII | $ 495,890.86 | $ 299,979.20 | $ 195,911.66 | 39.51% |
| | Alphanine SD | IX | $ 114,950.02 | $ 79,958.30 | $ 34,991.72 | 30.44% |
| | Profilnine SD | IX | $ 4,476.45 | $ 730.80 | $ 3,745.65 | 83.67% |
| | Total | | $ 615,317.33 | $ 380,668.30 | $ 234,649.03 | |
| Ipsen LTD. | Hyate C | VIII | $ 16,756.20 | $ 12,037.50 | $ 4,718.70 | 28.16% |
| | Total | | $ 16,756.20 | $ 12,037.50 | $ 4,718.70 | |

*WITH INHIBITORS

GH000013

I.B.7

| | | | | | |
|---|---|---|---|---|---|
| | | Inc | | | |
| | **Historical Price Increases** | | | | |

fron 95
↓

| | 1995 | 1998 | 1999 | 2000 | 2001 | Today |
|---|---|---|---|---|---|---|
| **Baxter** | | | | | | |
| Recombinate | 0.66 | 0.66 | 0.73 | 0.75 | 0.78 | 18.2% |
| Hemofil M | 0.53 | 0.50 | 0.52 | 0.51 | 0.51 | -3.8% |
| Feiba | 0.86 | | 0.86 | 0.86 | 0.89 | 0.92 | 7.0% |
| Bebulin | 0.25 | | 0.25 | 0.28 | 0.28 | 0.33 | 32.0% |
| AutoPlex | 0.80 | | 0.80 | 0.80 | 0.80 | 0.85 | 6.2% |
| Proplex T | 0.15 | | 0.15 | 0.15 | 0.15 | 0.21 | 40.0% |
| *Average* | *0.54* | *0.54* | *0.56* | *0.56* | *0.60* | *10.8%* |
| **Bayer** | | | | | | |
| Kogenate | 0.64 | | 0.64 | 0.81 | 0.81 | 0.81 | 26.6% |
| Kogenate FS | 0.64 | | 0.64 | 0.81 | 0.81 | 1.13 | 76.6% |
| Koate DVI | 0.31 | | 0.31 | 0.39 | 0.45 | 0.45 | 45.2% |
| Konyne 80 | 0.15 | | 0.20 | 0.24 | 0.30 | 0.30 | 100.0% |
| *Average* | *0.44* | *0.45* | *0.56* | *0.59* | *0.67* | *54.6%* |
| **Aventis** | | | | | | |
| Monoclate P | 0.58 | | 0.53 | 0.53 | 0.53 | 0.62 | 17.0% |
| Mononine | 0.78 | | 0.78 | 0.78 | 0.78 | 0.81 | 3.8% |
| Helixate | 0.64 | | 0.65 | 0.74 | 0.78 | 0.82 | 28.1% |
| Helixate FS | 0.64 | | 0.65 | 0.74 | 0.78 | 1.11 | 73.4% |
| Bioclate | 0.65 | | 0.72 | 0.78 | 0.78 | 0.82 | 26.2% |
| Humate P | 0.65 | | 0.65 | 0.65 | 0.65 | 0.75 | 15.4% |
| *Average* | *0.66* | *0.66* | *0.70* | *0.72* | *0.82* | *25.1%* |
| **Genetics Inst.** | | | | | | |
| Benefix | 0.78 | | 0.78 | 0.78 | 0.78 | 0.78 | 0.0% |
| Refacto | 0.78 | | | | | 0.84 | 7.7% |
| *Average* | *0.78* | *0.78* | *0.78* | *0.78* | *0.81* | *3.6%* |
| **Alpha** | | | | | | |
| Alphanate | 0.38 | | 0.40 | 0.42 | 0.45 | 0.45 | 18.4% |
| Alphanine SD | 0.55 | | 0.58 | 0.6 | 0.62 | 0.67 | 21.8% |
| Profilnine SD | 0.18 | | 0.19 | 0.35 | 0.35 | 0.35 | 94.4% |
| *Average* | *0.37* | *0.39* | *0.46* | *0.47* | *0.49* | *32.4%* |
| **Novo Nordisk** | | | | | | |
| NovoSeven | 0.81 | | 0.81 | 0.81 | 0.81 | 0.81 | 0.0% |

median
11.6

Sales Price
1 SD amount above Aw P
60.9 median

21.6 Median

21.8
B median

B.8

GH000014

Ξ.6.7

|  | | Inc | | | | |
|--|--|--|--|--|--|--|
| | | **Historical Price Increases** | | | | |
| | 1995 | 1998 | 1999 | 2000 | 2001 | Today |
| **Baxter** | | | | | | |
| Recombinate | 0.66 | 0.66 | 0.73 | 0.75 | 0.78 | 18.2% |
| Hemofil M | 0.53 | 0.50 | 0.52 | 0.51 | 0.51 | -3.8% |
| Feiba | 0.86 | 0.86 | 0.86 | 0.89 | 0.92 | 7.0% |
| Bebulin | 0.25 | 0.25 | 0.28 | 0.28 | 0.33 | 32.0% |
| AutoPlex | 0.80 | 0.80 | 0.80 | 0.80 | 0.85 | 6.2% |
| Proplex T | 0.15 | 0.15 | 0.15 | 0.15 | 0.21 | 40.0% |
| *Average* | *0.54* | *0.54* | *0.56* | *0.56* | *0.60* | *10.8%* |
| **Bayer** | | | | | | |
| Kogenate | 0.64 | 0.64 | 0.81 | 0.81 | 0.81 | 26.6% |
| Kogenate FS | 0.64 | 0.64 | 0.81 | 0.81 | 1.13 | 76.6% |
| Koate DVI | 0.31 | 0.31 | 0.39 | 0.45 | 0.45 | 45.2% |
| Konyne 80 | 0.15 | 0.20 | 0.24 | 0.30 | 0.30 | 100.0% |
| *Average* | *0.44* | *0.45* | *0.56* | *0.59* | *0.67* | *54.6%* |
| **Aventis** | | | | | | |
| Monoclate P | 0.58 | 0.53 | 0.53 | 0.53 | 0.62 | 17.0% |
| Mononine | 0.78 | 0.78 | 0.78 | 0.78 | 0.81 | 3.8% |
| Helixate | 0.64 | 0.65 | 0.74 | 0.78 | 0.82 | 28.1% |
| Helixate FS | 0.64 | 0.65 | 0.74 | 0.78 | 1.11 | 73.4% |
| Bioclate | 0.65 | 0.72 | 0.78 | 0.78 | 0.82 | 26.2% |
| Humate P | 0.65 | 0.65 | 0.65 | 0.65 | 0.75 | 15.4% |
| *Average* | *0.66* | *0.66* | *0.70* | *0.72* | *0.82* | *25.1%* |
| **Genetics Inst.** | | | | | | |
| Benefix | 0.78 | 0.78 | 0.78 | 0.78 | 0.78 | 0.0% |
| Refacto | 0.78 | | | | 0.84 | 7.7% |
| *Average* | *0.78* | *0.78* | *0.78* | *0.78* | *0.81* | *3.8%* |
| **Alpha** | | | | | | |
| Alphanate | 0.38 | 0.40 | 0.42 | 0.45 | 0.45 | 18.4% |
| Alphanine SD | 0.55 | 0.58 | 0.6 | 0.62 | 0.67 | 21.8% |
| Profilnine SD | 0.18 | 0.19 | 0.35 | 0.35 | 0.35 | 94.4% |
| *Average* | *0.37* | *0.39* | *0.46* | *0.47* | *0.49* | *32.4%* |
| **Novo Nordisk** | | | | | | |
| NovoSeven | 0.81 | 0.81 | 0.81 | 0.81 | 0.81 | 0.0% |

GH000015

**HRA**
**Location**
**Total Company**

| | | Qtr 1 | Apr-01 | May-01 | Jun-01 | Qtr 2 | Jul-01 | Aug-01 | Sep-01 | Qtr 3 | YTD |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 64 | 21 | 22 | 21 | 64 | 21 | 23 | 19 | 63 | |
| Revenue | | $ 14,181,354 | $ 4,336,680 | $ 5,525,933 | $ 5,665,088 | $ 15,529,681 | $ 4,900,741 | $ 5,988,543 | $ - | $ 10,789,284 | $ 40,500,320 |
| Units | | 13,894,563 | 4,277,577 | 5,551,448 | 5,542,251 | 15,471,276 | 4,790,820 | 5,996,809 | 0 | 10,787,629 | 40,153,468 |
| Rev/Unit | | $ 1.02 | $ 1.01 | $ 1.00 | $ 1.02 | $ 1.00 | $ 1.02 | $ 1.00 | #DIV/0! | $ 1.00 | $ 1.01 |
| COGS | | $ 10,083,538 | $ 3,010,844 | $ 3,882,823 | $ 4,051,452 | $ 10,945,119 | $ 3,411,059 | $ 4,335,763 | $ - | $ 7,747,822 | $ 28,776,479 |
| GM% | | 28.9% | 30.6% | 29.7% | 28.5% | 29.5% | 28.9% | 27.6% | #DIV/0! | 28.2% | 28.9% |
| **Total Clients** | | 1,776 | 604 | 613 | 606 | 1,823 | 520 | 621 | 0 | 1,241 | 5,640 |
| Active Clients | | 735 | 248 | 270 | 296 | 814 | 272 | 289 | 0 | 571 | 2,120 |
| % | | 41.4% | 41.1% | 44.0% | 48.8% | 44.7% | 43.9% | 46.1% | #DIV/0! | 46.0% | 43.8% |
| Prophy | | 299 | 98 | 101 | 101 | 300 | 96 | 104 | 0 | 200 | 799 |
| PRN | | 399 | 137 | 153 | 181 | 471 | 153 | 178 | 0 | 341 | 1,211 |
| Other | | 37 | 13 | 10 | 14 | 37 | 13 | 17 | 0 | 30 | 104 |
| **Orders** | | | | | | | | | | | |
| | Coag Orders | 910 | 388 | 532 | 524 | 1,444 | 428 | 485 | 0 | 913 | 3,267 |
| | Meds Only | 300 | 75 | 67 | 82 | 224 | 79 | 81 | 0 | 160 | 684 |
| | Anc Only | 163 | 41 | 42 | 77 | 160 | 48 | 63 | 0 | 111 | 434 |
| | Med & Anc only | 67 | 38 | 22 | 14 | 74 | 9 | 14 | 0 | 23 | 164 |
| Total Orders | | 1,440 | 542 | 663 | 697 | 1,902 | 564 | 643 | 0 | 1,207 | 4,549 |
| **Deliveries** | | | | | | | | | | | |
| | HRA | 986 | 330 | 352 | 375 | 1,057 | 312 | 354 | 0 | 666 | 2,709 |
| | Fed Ex | 451 | 211 | 310 | 321 | 842 | 253 | 289 | 0 | 542 | 1,835 |
| | Other | 3 | 1 | 1 | 1 | 3 | 0 | 0 | 0 | 0 | 6 |
| | Total | 1,440 | 542 | 663 | 697 | 1,902 | 565 | 643 | 0 | 1,208 | 4,550 |
| HRA % of Total | | 68.5% | 60.9% | 53.1% | 53.8% | 55.6% | 55.2% | 55.1% | #DIV/0! | 55.1% | 59.5% |
| **On Call** | | | | | | | | | | | |
| | # of Calls | 64 | 31 | 24 | 27 | 82 | 13 | 25 | 0 | 38 | 184 |
| | Deliveries | 10 | 2 | 2 | 0 | 4 | 1 | 6 | 0 | 7 | 21 |
| **Nursing Visits** | | | | | | | | | | | |
| | Prophy | 363 | 78 | 68 | 40 | 186 | 21 | 11 | 0 | 32 | 581 |
| | PRN | 158 | 80 | 129 | 121 | 330 | 68 | 58 | 0 | 126 | 614 |
| | Other | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Total | 521 | 158 | 197 | 161 | 516 | 89 | 69 | 0 | 158 | 1,185 |

GH000016

| Location Total Company | | Qtr 1 | Apr-01 | May-01 | Jun-01 | Qtr 2 | Jul-01 | Aug-01 | Sep-01 | Qtr 3 | YTD |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 64 | 21 | 22 | 21 | 64 | 21 | 23 | '19 | 63 | |
| Cash | Actual | $14,838,000 | $5,187,724 | $5,113,511 | $5,024,644 | $15,325,879 | $5,247,081 | $5,219,176 | $3,877,261 | $14,343,518 | $44,507,397 |
| | Budget | $14,687,000 | $4,544,000 | $4,745,000 | $5,087,000 | $14,376,000 | $5,128,000 | $5,782,000 | $4,843,000 | $15,733,000 | $44,795,000 |
| | % achievement | 101.0% | 114.2% | 107.8% | 98.8% | 106.6% | 102.3% | 90.6% | 80.1% | 91.2% | 99.4% |
| | DSO | | 52 | 51 | 53 | | 50 | 53 | | | |
| Pharmacy | RX filled | 3,463 | 1254 | 1479 | 1380 | 4,113 | 1301 | 1461 | 0 | 2762 | 10,278 |
| New Client Starts | Prophy | 5 | 0 | 0 | 1 | 1 | 2 | 1 | 0 | 3 | 9 |
| | PRN | 21 | 8 | 11 | 7 | 26 | 9 | 8 | 0 | 17 | 64 |
| | Other | 5 | 2 | 0 | 3 | 5 | 0 | 1 | 0 | 1 | 11 |
| | Consignment | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| | Total | 33 | 10 | 11 | 11 | 32 | 11 | 10 | 0 | 21 | 86 |
| Losses | | 11 | 5 | 1 | 2 | 8 | 2 | 5 | 0 | 7 | 26 |
| Inventory balance | Coag | | $2,961,612 | $2,857,096 | $4,013,761 | | $3,949,640 | $4,285,134 | $5,474,806 | | |
| | Meds | | $130,172 | $141,501 | $135,923 | | $137,501 | $140,746 | $245,576 | | |
| Revenue/Client | | $19,294 | $17,455 | $20,465 | $19,139 | $19,076 | $17,650 | $20,028 | #DIV/0! | $18,885 | $19,104 |
| COGS/Client | | $13,719 | $12,140 | $14,391 | $13,687 | $13,446 | $12,541 | $14,504 | #DIV/0! | $13,569 | $13,574 |
| Order/Client | | 1.96 | 2.19 | 2.48 | 2.35 | 2.34 | 2.07 | 2.15 | #DIV/0! | 2.11 | 2.15 |
| Rx/Client | | 4.63 | 5.06 | 5.48 | 4.66 | 5.05 | 4.78 | 4.89 | #DIV/0! | 4.84 | 4.85 |
| Rev/Day | | $ 221,554 | $ 205,603 | $ 251,179 | $ 265,766 | $ 242,651 | $ 228,607 | $ 260,371 | $ - | $ 171,258 | |

GH000017

| Location / Total Company | Qtr 1 | Apr-01 | May-01 | Jun-01 | Qtr 2 | Jul-01 | Aug-01 | Sep-01 | Qtr 3 | YTD |
|---|---|---|---|---|---|---|---|---|---|---|
| | 64 | 21 | 22 | 21 | 64 | 21 | 23 | 19 | 63 | |
| **Rev/Product:** | | | | | | | | | | |
| Alphanate | $ 93,120 | $ 1,958 | $ 4,020 | $ 15,433 | $ 21,411 | $ 9,302 | $ 82,113 | $ | $ 91,415 | $ 112,826 |
| Alphanine SD | $ 46,944 | $ 85,888 | $ 50,846 | $ 105,505 | $ 242,219 | $ 30,030 | $ 60,865 | | $ 90,895 | $ 426,234 |
| Autoplex T | $ 6,739 | | $ 17,028 | $ 30,384 | $ 54,151 | $ 24,077 | $ 53,939 | | $ 77,436 | $ 179,531 |
| BeneFix | $ 1,307,906 | $ 407,448 | $ 833,899 | $ 742,250 | $ 1,783,597 | $ 439,263 | $ 752,219 | | $ 1,191,472 | $ 4,247,025 |
| Bioclate | $ 355,097 | $ 503 | $ 503 | $ 1,093 | $ 1,595 | $ 1,303 | $ 602 | | $ 2,105 | $ 358,768 |
| Febla VH | $ 591,077 | $ 183,285 | $ 181,310 | $ 116,779 | $ 481,374 | $ 238,566 | $ 184,118 | | $ 422,684 | $ 1,495,135 |
| Helixate | $ 482,395 | $ 7,150 | | | $ 7,150 | $ 7,859 | $ 8,274 | | $ 16,133 | $ 515,538 |
| Helixate FS | $ 108,349 | $ 26,455 | $ 65,034 | $ 46,182 | $ 137,671 | $ 46,181 | $ 45,181 | | $ 16,362 | $ 338,382 |
| Hemofil M | $ 1,291,804 | $ 618,849 | $ 857,982 | $ 811,931 | $ 2,288,762 | $ 1,074,100 | $ 936,381 | | $ 2,010,481 | $ 5,575,566 |
| Humate P | $ 1,168,353 | $ 302,908 | $ 594,580 | $ 343,113 | $ 1,240,601 | $ 130,555 | $ 480,439 | | $ 610,994 | $ 3,019,859 |
| Koate DVI | $ 31,794 | $ 13,289 | $ 10,831 | $ 47,154 | | $ 7,154 | $ 28,574 | | $ 35,728 | $ 115,983 |
| Kogenate | $ 4,307 | | $ 1,699 | $ 997 | $ 2,686 | $ 1,193 | | | $ 1,193 | $ 8,386 |
| Kogenate FS | $ 26,614 | | | | | | | | | $ 26,614 |
| Monoclate P | $ 540,389 | $ 182,132 | $ 296,203 | $ 215,429 | $ 693,784 | $ 72,810 | $ 35,801 | | $ 108,611 | $ 1,342,784 |
| Mononine | $ 172,282 | $ 69,411 | $ 31,327 | $ 59,771 | $ 160,509 | $ 77,331 | $ 71,387 | | $ 143,718 | $ 481,479 |
| NovoSeven | $ 1,839,027 | $ 654,382 | $ 753,352 | $ 565,305 | $ 1,989,039 | $ 677,606 | $ 368,616 | | $ 1,046,282 | $ 4,874,288 |
| Recombinate | $ 5,916,821 | $ 1,684,251 | $ 1,650,900 | $ 2,477,908 | $ 6,013,059 | $ 1,825,809 | $ 2,705,823 | | $ 4,531,632 | $ 16,402,917 |
| ReFacto | $ 195,286 | $ 84,033 | $ 157,652 | $ 122,386 | $ 364,051 | $ 137,614 | $ 194,926 | | $ 332,540 | $ 891,857 |
| **Total** | $ 14,181,355 | $ 4,338,661 | $ 5,525,933 | $ 5,695,087 | $ 15,529,681 | $ 4,800,743 | $ 6,009,878 | | $ 10,810,621 | $ 40,412,031 |
| **Cost/Product:** | | | | | | | | | | |
| Alphanate | $ 52,552 | $ 1,125 | $ 2,700 | $ 9,607 | $ 13,432 | $ 6,064 | $ 53,708 | $ | $ 59,792 | $ 73,224 |
| Alphanine SD | 29,792 | 33,056 | 28,930 | -55,776 | -127,768 | -119,162 | -411,192 | | -60,384 | -240,924 |
| Autoplex T | | 4,898 | 10,860 | 30,400 | 36,155 | 15,504 | 34,221 | | 49,725 | 115,665 |
| BeneFix | 984,635 | 311,493 | 459,485 | 582,598 | 1,343,526 | 346,635 | 583,986 | | 932,622 | 3,260,383 |
| Bioclate | 258,700 | 411 | | 873 | 1,284 | 1,092 | 655 | | 1,747 | 261,731 |
| Febia VH | -401,505 | -131,863 | -104,470 | -121,413 | -357,746 | 183,309 | 142,302 | | 326,111 | 1,083,362 |
| Helixate | 369,917 | 5,399 | 5,623 | 37,146 | 5,399 | 6,300 | | | 74,292 | 387,410 |
| Helixate FS | 80,859 | 21,279 | 53,623 | 112,048 | 112,048 | 37,146 | 37,146 | | 74,292 | 267,199 |
| Hemofil M | 794,087 | 394,120 | 532,201 | 505,845 | 1,432,167 | 667,080 | 572,627 | | 1,239,707 | 3,465,961 |
| Humate P | 905,460 | 227,726 | 460,759 | 248,834 | 937,321 | 109,422 | 332,081 | | 501,503 | 2,344,284 |
| Koate DVI | 17,230 | 7,223 | 14,541 | 6,805 | 28,569 | 4,579 | 18,290 | | 22,869 | 68,718 |
| Kogenate | 3,500 | | 1,631 | 816 | 2,447 | 819 | | | 819 | 6,756 |
| Kogenate FS | 24,510 | | | | | | | | | 24,510 |
| Monoclate P | 355,197 | 119,393 | 196,668 | 153,271 | 469,332 | 57,289 | 28,083 | | 85,372 | 919,871 |
| Mononine | 135,797 | 55,282 | 25,954 | 50,000 | 131,237 | 63,460 | 56,059 | | 119,490 | 385,523 |
| NovoSeven | 1,194,588 | 428,632 | 501,552 | 371,304 | 1,301,508 | 454,896 | 228,944 | | 699,640 | 3,195,936 |
| Recombinate | 4,320,008 | 1,208,846 | 1,585,062 | 1,809,406 | 4,383,314 | 1,335,159 | 1,984,063 | | 3,320,262 | 12,023,664 |
| ReFacto | 144,931 | 60,677 | 114,431 | 87,353 | 281,661 | 100,061 | 141,182 | | 241,223 | 644,015 |
| **Total** | $ 10,083,540 | $ 3,010,643 | $ 3,882,821 | $ 4,051,450 | $ 10,945,115 | $ 3,411,058 | $ 4,338,763 | | $ 7,747,821 | $ 28,776,476 |

GH000018

**Location**
**Total Company**

| United Product | 64 Qtr 1 | 21 Apr-01 | 22 May-01 | 21 Jun-01 | 64 Qtr 2 | 21 Jul-01 | 23 Aug-01 | 19 Sep-01 | 63 Qtr 3 | YTD |
|---|---|---|---|---|---|---|---|---|---|---|
| Alphanate | 94,060 | 2,500 | 6,000 | 21,350 | 28,850 | 13,520 | 115,350 | | 128,870 | 168,780 |
| Alphanate SD | 35,040 | 84,760 | 51,360 | 105,720 | 241,840 | 28,600 | 61,480 | | 90,080 | 425,980 |
| BeneFix | 5,760 | 12,900 | 24,000 | 24,000 | 42,660 | 18,240 | 40,260 | | 58,500 | 136,200 |
| Bioclate | 1,262,610 | 399,350 | 601,840 | 721,280 | 1,722,470 | 445,970 | 748,700 | | 1,195,670 | 4,180,750 |
| BeneFix | 331,756 | 527 | | 1,120 | 1,647 | 1,400 | 840 | | 2,240 | 335,643 |
| Feiba VH | 470,984 | 143,330 | 170,824 | 132,304 | 446,458 | 199,934 | 155,220 | | 355,154 | 1,272,596 |
| Helixate | 499,119 | 19,170 | 46,309 | 7,296 | 7,296 | 8,527 | 7,830 | | 16,357 | 522,772 |
| Helixate FS | 72,846 | 7,296 | 982,062 | 33,465 | 100,944 | 33,655 | 33,465 | | 66,930 | 240,722 |
| Hemofil M | 1,565,171 | 772,812 | 1,043,742 | 992,062 | 2,608,616 | 1,308,020 | 1,133,744 | | 2,441,764 | 6,815,551 |
| Humate P | 1,392,360 | 350,350 | 679,580 | 380,790 | 1,406,920 | 159,320 | 531,630 | | 684,950 | 3,484,130 |
| Koate | 38,400 | 16,050 | | 51,840 | 57,780 | 6,640 | 43,150 | | 43,150 | 139,330 |
| Kogenate | 4,358 | | 2,014 | 1,007 | 3,021 | 1,011 | | | 1,011 | 8,390 |
| Kogenate FS | 21,690 | | | | | | | | | 21,690 |
| Monoclate P | 688,995 | 226,270 | 370,345 | 270,090 | 865,705 | 95,525 | 45,295 | | 140,820 | 1,695,520 |
| Mononine | 174,150 | 70,875 | 33,275 | 63,500 | 167,780 | 79,545 | 70,330 | | 149,875 | 491,805 |
| NovoSeven | 1,474,800 | 529,200 | 619,000 | 458,400 | 1,606,800 | 551,600 | 302,400 | | 864,000 | 3,945,600 |
| Recombinate | 5,597,544 | 1,576,807 | 1,752,699 | 2,320,203 | 5,651,709 | 1,713,383 | 2,543,705 | | 4,257,088 | 15,506,341 |
| ReFacto | 170,680 | 71,520 | 134,370 | 103,590 | 309,880 | 119,120 | 168,050 | | 287,170 | 767,730 |
| **Total** | 13,894,563 | 4,277,577 | 5,551,448 | 5,642,251 | 15,471,276 | 4,790,820 | 5,996,809 | | 10,787,629 | 40,153,468 |

**Avg Rev/Unit**

| | 64 Qtr 1 | 21 Apr-01 | 22 May-01 | 21 Jun-01 | 64 Qtr 2 | 21 Jul-01 | 23 Aug-01 | 19 Sep-01 | 63 Qtr 3 | YTD |
|---|---|---|---|---|---|---|---|---|---|---|
| Alphanate | #DIV/0! | $0.78 | $0.67 | $0.72 | $0.72 | $0.69 | $0.69 | | $0.69 | $0.69 |
| Alphanate SD | $0.99 | $1.01 | $0.59 | $1.00 | $1.00 | $1.05 | $0.99 | | $1.01 | $1.00 |
| AutoPlex T | $1.17 | $1.17 | $1.32 | $1.27 | $1.27 | $1.32 | $1.33 | | $1.32 | $1.31 |
| BeneFix | $1.34 | $1.04 | $1.05 | $1.04 | $1.04 | $1.04 | $1.00 | | $1.00 | $1.00 |
| Bioclate | $1.04 | $1.02 | $1.03 | $1.03 | $1.04 | $0.98 | $0.95 | | $0.94 | $1.07 |
| Feiba VH | $1.07 | $0.95 | $1.06 | $0.98 | $0.97 | $0.83 | $0.95 | | $0.94 | $1.07 |
| Helixate | $1.25 | $1.28 | $1.00 | $0.88 | $1.08 | $1.19 | $1.19 | | $1.15 | $1.17 |
| Helixate FS | $0.99 | $0.98 | #DIV/0! | #DIV/0! | $0.88 | $1.19 | $1.16 | | $1.15 | $1.17 |
| Hemofil M | $1.49 | $1.38 | $1.35 | $1.38 | $1.36 | $1.38 | $1.06 | | $1.38 | $1.41 |
| Humate P | $0.83 | $0.80 | $0.82 | $0.82 | $0.81 | $0.82 | $0.83 | | $0.82 | $0.82 |
| Koate DVI | $0.84 | $0.86 | $0.88 | $0.90 | $0.88 | $0.85 | $0.83 | | $0.89 | $0.87 |
| Kogenate | $0.83 | $0.86 | $0.88 | $0.83 | $0.83 | $0.83 | $0.83 | | $0.83 | $0.83 |
| Kogenate FS | $0.99 | $0.94 | $0.94 | $0.98 | $0.96 | $1.18 | | | $1.18 | $1.13 |
| Monoclate P | $1.23 | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | | #DIV/0! | $1.23 |
| Mononine | $0.78 | $0.81 | $0.80 | $0.80 | $0.76 | $0.79 | $0.79 | | $0.77 | $0.79 |
| Monoclate | $0.89 | $0.98 | $0.94 | $0.94 | $0.95 | $0.97 | $1.02 | | $0.99 | $0.98 |
| Mononine | $0.99 | $0.98 | $1.06 | $0.94 | $0.96 | $1.21 | $1.02 | | $1.21 | $1.24 |
| NovoSeven | $1.25 | $1.26 | $1.23 | $1.23 | $1.24 | $1.21 | $1.06 | | $1.21 | $1.24 |
| Recombinate | $1.06 | $1.07 | $1.06 | $1.07 | $1.06 | $1.07 | $1.06 | | $1.06 | $1.05 |
| ReFacto | $1.14 | $1.17 | $1.17 | $1.16 | $1.17 | $1.16 | $1.16 | | $1.16 | $1.05 |
| **Total** | $1.02 | $1.01 | $1.00 | $1.00 | $1.00 | $1.00 | $1.00 | | $1.00 | $1.01 |

| Location Total Company | % Avg Gr Mgr/unit 64 Qtr 1 | 21 Apr-01 | 22 May-01 | 21 Jun-01 | 64 Qtr 2 | 21 Jul-01 | 23 Aug-01 | 19 Sep-01 | 63 Qtr 3 | YTD |
|---|---|---|---|---|---|---|---|---|---|---|
| Alphanate | 0.0% | 42.5% | 32.6% | 37.8% | 37.3% | 34.6% | 34.6% | #DIV/0! | 34.6% | 35.1% |
| Alphanine SD | 43.6% | 61.5% | 43.1% | 37.7% | 47.3% | 36.2% | 32.3% | | 33.6% | 43.3% |
| Autoplex T | 36.6% | 27.3% | 36.2% | 32.9% | 33.2% | 35.6% | 35.5% | | 35.6% | 34.2% |
| BeneFix | 24.7% | 23.6% | 25.9% | 24.2% | 24.7% | 20.6% | 22.4% | | 21.7% | 23.2% |
| Bioclate | 27.1% | 18.3% | 0.0% | 20.1% | 19.5% | 18.3% | 18.3% | | 17.0% | 27.0% |
| Febla VH | 32.1% | 28.1% | 42.4% | -4.0% | 25.7% | 18.2% | 18.3% | | 22.8% | 27.4% |
| Helixate | 24.9% | 24.5% | 0.0% | 0.0% | 24.5% | 23.2% | 22.4% | | 25.0% | 24.9% |
| Helixate FS | 25.4% | 19.6% | 17.5% | 19.6% | 18.6% | 30.0% | 30.0% | | 19.6% | 21.0% |
| Hemofil M | 38.5% | 38.3% | 38.0% | 37.7% | 37.4% | 19.6% | 19.6% | | 38.8% | 37.8% |
| Humate P | 22.5% | 24.8% | 22.5% | 27.5% | 24.4% | 37.9% | 38.8% | | 17.9% | 22.4% |
| Koate DVI | 45.7% | 45.6% | 39.2% | 36.0% | 40.3% | 16.2% | 18.4% | | 40.4% | 40.4% |
| Kogenate | 19.0% | 0.0% | 14.1% | 17.3% | 15.2% | 36.0% | 36.0% | | 36.0% | 19.0% |
| Kogenate FS | 7.9% | 0.0% | 0.0% | 0.0% | 0.0% | 31.3% | #DIV/0! | #DIV/0! | 31.3% | 7.9% |
| Monoclate P | 32.4% | 34.4% | 33.6% | 28.5% | 32.3% | 21.3% | 21.6% | #DIV/0! | 21.4% | 31.5% |
| Mononine | 21.2% | 20.4% | 17.2% | 16.3% | 18.2% | 17.9% | 21.5% | | 19.7% | 19.7% |
| NovoSeven | 35.0% | 35.5% | 33.9% | 34.3% | 34.6% | 32.9% | 33.6% | | 33.1% | 34.4% |
| Recombinate | 27.0% | 28.2% | 26.2% | 27.0% | 27.1% | 26.8% | 26.7% | | 26.7% | 26.7% |
| ReFacto | 25.8% | 28.6% | 27.4% | 28.6% | 28.1% | 27.3% | 27.6% | | 27.6% | 27.3% |
| Total | 28.9% | 30.6% | 29.7% | 28.5% | 29.5% | 28.9% | 27.6% | | 28.3% | 28.8% |

GH000020

Hemophilia Resources of America, Inc.
Total Number of Clients by Insurer
2000

| Insurer | Revenue | Cost | GM | GM % | Total # of Clients |
|---|---|---|---|---|---|
| 101 | 369,629.49 | 272,211.29 | 97418.2 | 26.36% | 8 |
| 102 | 12,036.00 | 7,956.00 | 4080 | 33.90% | 2 |
| 103 | 2,605,149.07 | 1,759,544.61 | 845604.46 | 32.46% | 26 |
| 104 | 1,792.00 | 1,036.00 | 756 | 42.19% | 1 |
| 106 | 254,212.32 | 175,683.69 | 78528.63 | 30.89% | 2 |
| 107 | 654,798.87 | 473,571.38 | 181227.49 | 27.68% | 6 |
| 108 | 193,035.00 | 153,223.80 | 39811.2 | 20.62% | 1 |
| 109 | 736,756.96 | 560,723.58 | 176033.38 | 23.89% | 11 |
| 111 | 7,603.92 | 4,768.56 | 2835.36 | 37.29% | 1 |
| 114 | 257,637.51 | 178,557.14 | 79080.37 | 30.69% | 3 |
| 116 | 940,232.00 | 727,871.63 | 212360.37 | 22.59% | 6 |
| 117 | 2,814,093.61 | 1,810,455.67 | 1003637.94 | 35.66% | 18 |
| 119 | 836,449.88 | 553,341.27 | 283108.61 | 33.85% | 16 |
| 122 | 32,205.60 | 21,345.03 | 10860.57 | 33.72% | 2 |
| 123 | 2,359.80 | 1,707.75 | 652.05 | 27.63% | 1 |
| 125 | 838,873.26 | 597,927.78 | 240945.48 | 28.72% | 4 |
| 126 | 62,423.86 | 38,596.94 | 23826.92 | 38.17% | 5 |
| 127 | 421,841.38 | 291,347.39 | 130493.99 | 30.93% | 3 |
| 128 | 97,982.30 | 62,557.84 | 35424.46 | 36.15% | 4 |
| 129 | 902,384.15 | 611,106.99 | 291277.16 | 32.28% | 12 |
| 130 | 29,629.50 | 19,891.20 | 9738/3 | 32.87% | 1 |
| 131 | 375,317.04 | 275,464.84 | 99852.2 | 26.60% | 4 |
| 132 | 216,607.24 | 140,611.88 | 75995.36 | 35.08% | 1 |
| 133 | 209,127.24 | 139,388.60 | 69738.64 | 33.35% | 5 |
| 134 | 210,225.03 | 143,329.35 | 66895.68 | 31.82% | 1 |
| 136 | 84,519.10 | 55,307.99 | 29211.11 | 34.56% | 3 |
| 140 | 238,582.00 | 160,134.00 | 78448 | 32.88% | 1 |
| 144 | 9,854,599.48 | 7,169,866.80 | 2684732.68 | 27.24% | 93 |
| 145 | 85,086.72 | 54,611.20 | 30475.52 | 35.82% | 2 |
| 148 | 8,433.00 | 6,207.22 | 2225.78 | 26.39% | 2 |
| 149 | 90,065.66 | 58,357.61 | 31708.05 | 35.21% | 2 |
| 151 | 55,916.50 | 33,523.00 | 22393.5 | 40.05% | 1 |
| 152 | 426,407.50 | 226,556.38 | 199851.12 | 46.87% | 2 |
| 153 | 13,845.66 | 9,443.84 | 4401.82 | 31.79% | 1 |
| 155 | 881,316.04 | 587,409.33 | 293906.71 | 33.35% | 10 |
| 156 | 66,664.96 | 38,534.46 | 28130.5 | 42.20% | 2 |
| 157 | 137,020.84 | 81,290.93 | 55729.91 | 40.67% | 4 |
| 158 | 8,019,449.31 | 5,927,290.37 | 2092158.94 | 26.09% | 49 |
| 159 | 22,012.20 | 13,464.00 | 8548.2 | 38.83% | 1 |
| 160 | 220,942.62 | 161,049.74 | 59892.88 | 27.11% | 3 |
| 161 | 221,396.82 | 154,289.77 | 67107.05 | 30.31% | 3 |
| 162 | 2,479,047.86 | 1,944,399.46 | 534648.4 | 21.57% | 23 |
| 163 | 17,611.00 | 12,037.80 | 5573.2 | 31.65% | 2 |
| 164 | 2,244,425.52 | 1,413,895.99 | 830529.53 | 37.00% | 25 |
| 165 | 1,333,721.39 | 1,166,771.76 | 166949.63 | 12.52% | 18 |
| 166 | 4,596.00 | 38,023.30 | -33427.3 | -727.31% | 7 |

GH000021

| | | | | | |
|---|---|---|---|---|---|
| 169 | 1,438,166.47 | 903,955.09 | 534211.38 | 37.15% | 21 |
| 173 | 90,897.96 | 75,698.51 | 15199.45 | 16.72% | 2 |
| 174 | 866,588.68 | 560,027.20 | 306561.48 | 35.38% | 9 |
| 176 | 1,308,046.43 | 898,637.45 | 409408.98 | 31.30% | 18 |
| 177 | 3,011.43 | 1,980.49 | 1030.94 | 34.23% | 2 |
| 178 | 167,637.22 | 102,033.70 | 65603.52 | 39.13% | 2 |
| 179 | 1,560,840.48 | 1,020,771.60 | 540068.88 | 34.60% | 3 |
| 180 | 91,517.00 | 56,755.44 | 34761.56 | 37.98% | 1 |
| 181 | 147,219.40 | 89,767.20 | 57452.2 | 39.02% | 4 |
| 182 | 1,249.28 | 722.24 | 527.04 | 42.19% | 1 |
| 183 | 69,968.64 | 42,004.20 | 27964.44 | 39.97% | 1 |
| 184 | 125,194.96 | 94,187.04 | 31007.92 | 24.77% | 3 |
| 186 | 3,408.00 | 2,769.00 | 639 | 18.75% | 1 |
| 187 | 294,602.65 | 215,917.57 | 78685.08 | 26.71% | 21 |
| 188 | 236,291.71 | 154,328.41 | 81963.3 | 34.69% | 2 |
| 189 | 504,659.34 | 365,274.54 | 139384.8 | 27.62% | 5 |
| 191 | 140,518.40 | 80,460.40 | 60058 | 42.74% | 1 |
| 192 | 93,027.92 | 53,242.54 | 39785.38 | 42.77% | 3 |
| 193 | 1,099,243.60 | 723,495.39 | 375748.21 | 34.18% | 20 |
| 195 | 1,291,404.55 | 877,072.30 | 414332.25 | 32.08% | 8 |
| 196 | 489,035.49 | 333,920.72 | 155114.77 | 31.72% | 6 |
| 197 | 88,951.65 | 61,064.25 | 27887.4 | 31.35% | 1 |
| 198 | 45,347.94 | 31,551.30 | 13796.64 | 30.42% | 1 |
| 199 | 37,191.50 | 22,677.58 | 14513.92 | 39.02% | 2 |
| 200 | 73,972.40 | 54,301.20 | 19671.2 | 26.59% | 1 |
| 201 | 75,088.69 | 44,163.34 | 30925.35 | 41.19% | 3 |
| 202 | 410,084.24 | 301,793.04 | 108291.2 | 26.41% | 3 |
| 203 | 1,397.76 | 819.00 | 578.76 | 41.41% | 1 |
| 204 | 6,612.30 | 4,621.50 | 1990.8 | 30.11% | 1 |
| 205 | 624.64 | 361.12 | 263.52 | 42.19% | 1 |
| 206 | 0.00 | 145,695.33 | -145695.33 | 0.00% | 4 |
| 207 | 59,597.44 | 41,662.10 | 17935.34 | 30.09% | 1 |
| 208 | 8,860.00 | 5,528.64 | 3331.36 | 37.60% | 1 |
| 209 | 13,952.00 | 8,175.00 | 5777 | 41.41% | 1 |
| 210 | 17,575.00 | 9,250.00 | 8325 | 47.37% | 1 |
| 210 | 24,071.68 | 14,104.50 | 9967.18 | 41.41% | 1 |
| 212 | 67,017.68 | 43,855.71 | 23161.97 | 34.56% | 2 |
| 213 | 183,705.60 | 107,215.00 | 76490.6 | 41.64% | 1 |
| 214 | 224,338.12 | 140,243.67 | 84094.45 | 37.49% | 1 |
| 215 | 10,272.00 | 6,548.40 | 3723.6 | 36.25% | 1 |
| 216 | 13,680.00 | 8,892.00 | 4788 | 35.00% | 1 |
| 217 | 68,392.80 | 45,208.80 | 23184 | 33.90% | 1 |
| 218 | 25,052.00 | 17,430.00 | 7622 | 30.42% | 4 |
| 219 | 4,010.00 | 2,606.50 | 1403.5 | 35.00% | 1 |
| 220 | 4,384.60 | 2,916.00 | 1468.8 | 33.50% | 1 |
| 221 | 400,343.98 | 293,363.40 | 106980.58 | 26.72% | 6 |
| 222 | 44,259.39 | 31,779.90 | 12479.49 | 28.20% | 1 |
| | 51,519,376.43 | 36,433,533.47 | 15085842.96 | 29.28% | |

GH000022

DA15  I                        EXPRESS SCRIPTS, INC.                    05/14/2002
                               FIRST DATABANK FILE INQUIRY

NDC            00026037250          BRAND NAME KOGENATE FS
MANUF/DISTRB   BAYER BIOLOGIC      LABEL NAME KOGENATE FS 1000IU VIAL
GENERIC CODE   25130               GENERIC NAME ANTIHEMOPHILIC FACTOR, HUM REC
         SEQ.  6345          ADDITIONAL DESC W/SUCROSE,2.5ML
DOSAGE FORM    VIAL      GCRT2    IV    DOSE CD EA  DRUG STRENGTH   1000U(+/-)
    ESI B/G    2     GI  1 PACKAGE SIZE           1.000  O-D IND   0
FDB GPI 2 GMI 2 GNI 2 GSI 4 REPACK 0 NDCFI 1    INNOV 1
    GPI-14    851000102140 DESCRIPTION *MISC. HEMATOLOGICAL*
AWPUNITCOST     1.4100 HCFAMAC     0.0000  BLP      1.3867 DIR      0.0000
       EFF   11/17/2000 . EFF              EFF 02/05/2001  EFF
    WAC COST   0.0000
    CATEGORY
               0    DRUG CLASS     F    DEA  0          DESI
AHFS THERAP.  201216    TOP 200    000              ORANGE BOOK    ZB
FDB MAINT IND 0    REPLACE NDC             PREVIOUS NDC
DURATION          ADULT  0    PEDIATRIC    0          GERIATRIC     0
MIN ADULT DLY DOSE          0.000 MINIMUM UNIT        FM USER   DA510BU
MAX ADULT DLY DOSE          0.000 MAXIMUM UNIT        FM DATE   04/19/2002
    OBSOLETE DATE                 3RD PARTY RESTR 0    FM TIME   21:14:43

             F6=DA16  F10=REFRESH  F11=RETURN  F12=MENU

*same as of 8.14.02*

EXHIBIT
9
Hamilton

GH000023

DA15  I                         EXPRESS SCRIPTS, INC.                    05/21/2003
                              FIRST DATABANK FILE INQUIRY

NDC           00169706001            BRAND NAME NOVOSEVEN
MANUF/DISTRB  NOVO NORDISK           LABEL NAME NOVOSEVEN 1200MCG VIAL
GENERIC CODE  23381                  GENERIC NAME FACTOR VIIA,RECOMB (BHK CELLS)
       SEQ.  27548          ADDITIONAL DESC
DOSAGE FORM  VIAL        GCRT2     IV    DOSE CD EA  DRUG STRENGTH  1200MCG
    ESI B/G   2    GI  2 PACKAGE SIZE           1.000   U-D IND    0
     GMI 2    GNI  2   GSI 2   GPI 2   REPACK 0   NDCFI 1   INNOV 1
    GPI-14   85100026202120 DESCRIPTION *MISC. HEMATOLOGICAL*
AWPUNITCOST       1.4800 HCFAMAC      0.0000 BLP       0.0000 DIR        0.0000
       EFF   03/28/2003    EFF             EFF             EFF
   WAC COST      1.1800
  CATEGORY   03/28/2003
              0   DRUG CLASS    F    DEA 0        DESI
AHFS THERAP. 201216    TOP 200   000            ORANGE BOOK    ZB
FDB MAINT IND 0  REPLACE NDC              PREVIOUS NDC
DURATION      ADULT   0    PEDIATRIC   0            GERIATRIC      0
MIN ADULT DLY DOSE       0.000 MINIMUM UNIT                  FM USER   DA510BU
MAX ADULT DLY DOSE       0.000 MAXIMUM UNIT                  FM DATE   03/28/2003
       OBSOLETE DATE           3RD PARTY RESTR 0             FM TIME   20:01:34

              F6=DA16  F10=REFRESH  F11=RETURN  F12=MENU

GH000024

```
DA15  I                        EXPRESS SCRIPTS, INC.              02/05/2003
                             FIRST DATABANK FILE INQUIRY

NDC            00169706001           BRAND NAME NOVOSEVEN
MANUF/DISTRB   NOVO NORDISK          LABEL NAME NOVOSEVEN 1200MCG VIAL
GENERIC CODE   23381                 GENERIC NAME FACTOR VIIA,RECOMB(BHK CELLS)
       SEQ.    27548           ADDITIONAL DESC
DOSAGE FORM    VIAL        GCRT2      IV     DOSE CD EA  DRUG STRENGTH  1200MCG
    ESI B/G    2      GI  2 PACKAGE SIZE              1.000   U-D IND   0
       GMI 2    GNI 2     GSI 2    GPI 2     REPACK 0    NDCFI 1  INNOV 1
    GPI-14     85100026202120 DESCRIPTION *MISC. HEMATOLOGICAL*
AWPUNITCOST       1.0600 HCFAMAC        0.0000  BLP        0.0000 DIR       0.0000
       EFF    01/06/2003    EFF               EFF               EFF
   WAC COST      0.8500
   CATEGORY    01/06/2003
              0      DRUG CLASS     F    DEA  0        DESI
AHFS THERAP.  201216     TOP 200   000              ORANGE BOOK    ZB
FDB MAINT IND 0  REPLACE NDC                    PREVIOUS NDC
DURATION      ADULT   0      PEDIATRIC    0          GERIATRIC    0
MIN ADULT DLY DOSE        0.000 MINIMUM UNIT          FM USER  DA510BU
MAX ADULT DLY DOSE        0.000 MAXIMUM UNIT          FM DATE  01/31/2003
       OBSOLETE DATE             3RD PARTY RESTR 0    FM TIME  20:01:37

           F6=DA16   F10=REFRESH   F11=RETURN   F12=MENU
```

Fill Date  January 21, 2003

GH000025

DA15 · I                        EXPRESS SCRIPTS, INC.                        02/05/2003
                            FIRST DATABANK FILE INQUIRY

NDC              00169706101              BRAND NAME NOVOSEVEN
MANUF/DISTRB  NOVO NORDISK               LABEL NAME NOVOSEVEN 2400MCG VIAL
GENERIC CODE  23382                  GENERIC NAME FACTOR VIIA,RECOMB(BHK CELLS)
        SEQ.  27549           ADDITIONAL DESC LYOPHLLIZED,SUV
DOSAGE FORM   VIAL        GCRT2    IV    DOSE CD EA  DRUG STRENGTH  2400MCG
     ESI B/G  2     GI  2 PACKAGE SIZE            1.000   U-D IND   0
        GMI 2   GNI 2    GSI 2   GPI 2   REPACK 0    NDCFI 1   INNOV 1
    GPI-14   85100026202130 DESCRIPTION *MISC. HEMATOLOGICAL*
AWPUNITCOST       1 0600 HCFAMAC        0.0000  BLP       0.0000 DIR        0.0000
        EFF  01/06/2003     EFF                 EFF              EFF
    WAC COST     0 8500
    CATEGORY  01/06/2003
             0   DRUG CLASS      F    DEA  0        DESI
AHFS THERAP. 201216     TOP 200   000               ORANGE BOOK     ZB
FDB MAINT IND 0   REPLACE NDC            PREVIOUS NDC
DURATION       ADULT   0      PEDIATRIC    0           GERIATRIC    0
MIN ADULT DLY DOSE        0.000 MINIMUM UNIT           FM USER  DA510BU
MAX ADULT DLY DOSE        0.000 MAXIMUM UNIT           FM DATE  01/30/2003
        OBSOLETE DATE           3RD PARTY RESTR 0      FM TIME  20:01:34

              F6=DA16  F10=REFRESH  F11=RETURN  F12=MENU

GH000026

```
DA15  I                    EXPRESS SCRIPTS, INC.              02/05/2003
                          FIRST DATABANK FILE INQUIRY

NDC            00169706201           BRAND NAME NOVOSEVEN
MANUF/DISTRB   NOVO NORDISK          LABEL NAME NOVOSEVEN 4800MCG VIAL
GENERIC CODE   23383                 GENERIC NAME FACTOR VIIA,RECOMB(BHK CELLS)
        SEQ.   27550           ADDITIONAL DESC
DOSAGE FORM    VIAL       GCRT2    IV    DOSE CD EA   DRUG STRENGTH  4800MCG
    ESI B/G  2    GI  2 PACKAGE SIZE           1.000   U-D IND   0
       GMI 2    GNI 2    GSI 2   GPI 2   REPACK 0   NDCFI 1    INNOV 1
    GPI-14     85100026202140 DESCRIPTION *MISC. HEMATOLOGICAL*
AWPUNITCOST       1.0600 HCFAMAC      0.0000  BLP      0.0000 DIR      0.0000
       EFF   01/06/2003   EFF              EFF              EFF
  WAC COST      0.8500
  CATEGORY   01/06/2003

            0    DRUG CLASS    F    DEA  0        DESI
AHFS THERAP. 201216    TOP 200   000              ORANGE BOOK   ZB
FDB MAINT IND 0   REPLACE NDC           PREVIOUS NDC
DURATION         ADULT   0     PEDIATRIC    0        GERIATRIC    0
MIN ADULT DLY DOSE        0.000 MINIMUM UNIT         FM USER   DA510BU
MAX ADULT DLY DOSE        0.000 MAXIMUM UNIT         FM DATE   01/30/2003
      OBSOLETE DATE              3RD PARTY RESTR 0   FM TIME   20:01:34

            F6=DA16   F10=REFRESH  F11=RETURN   F12=MENU
```

GH000027

```
DA15  I                         EXPRESS SCRIPTS, INC.                    05/14/2002
                               FIRST DATABANK FILE INQUIRY

NDC              00026060135            BRAND NAME PROLASTIN
MANUF/DISTRB     BAYER BIOLOGIC         LABEL NAME PROLASTIN 1000MG VIAL
GENERIC CODE     47571                  GENERIC NAME ALPHA-1-PROTEINASE INHIBITOR
         SEQ.    11700          ADDITIONAL DESC W/DILUENT, 30ML
DOSAGE FORM      VIAL       GCRT2    IV    DOSE CD EA  DRUG STRENGTH  1000MG
    ESI B/G      2      GI  2 PACKAGE SIZE          1.000  U-D IND   0
FDB GPI 2 GMI  2 GN  2 GSI 2 REPACK 0 NDCFI 1    INNOV 1
    GPI-14       45100010101920 DESCRIPTION *MISC. RESPIRATORY*
AWPUNITCOST       0.2200 HCFAMAC       0.0000  BLP        0.0000 DIR        0.0000
/       EFF      07/01/1998     EFF                EFF           EFF
    WAC COST       0.0000
    CATEGORY     10/04/1999
                 0     DRUG CLASS     F    DEA  0         DESI
 AHFS THERAP.  920000    TOP 200   000                ORANGE BOOK    ZB
FDB MAINT IND  0   REPLACE NDC               PREVIOUS NDC 00192060135
DURATION           ADULT   0    PEDIATRIC    0          GERIATRIC    0
MIN ADULT DLY DOSE          0.000 MINIMUM UNIT           FM USER   DA510BU
MAX ADULT DLY DOSE          0.000 MAXIMUM UNIT           FM DATE   04/19/2002
    OBSOLETE DATE                 3RD PARTY RESTR 0      FM TIME   21:14:43

                 F6=DA16  F10=REFRESH  F11=RETURN  F12=MENU
```

SAME as of 8.14.02

GH000028

```
DA15  I                      EXPRESS SCRIPTS, INC.                 08/29/2002
                            FIRST DATABANK FILE INQUIRY

NDC            00026060135          BRAND NAME PROLASTIN
MANUF/DISTRB   BAYER BIOLOGIC       LABEL NAME PROLASTIN 1000MG VIAL
GENERIC CODE   47571                GENERIC NAME ALPHA-1-PROTEINASE INHIBITOR
      SEQ.  11700          ADDITIONAL DESC W/DILUENT, 30ML
DOSAGE FORM    VIAL     GCRT2    IV   DOSE CD EA  DRUG STRENGTH  1000MG
   ESI B/G    2   GI  2 PACKAGE SIZE         1.000  U-D IND   0
       GMI 2    GNI 2   GSI 2   GPI 2   REPACK 0   NDCFI 1  INNOV 1
    GPI-14    45100010101920 DESCRIPTION *MISC. RESPIRATORY*
AWPUNITCOST     0.2800 HCFAMAC     0.0000  BLP      0.0000 DIR        0.0000
        EFF   08/19/2002    EFF                EFF            EFF
   WAC COST    0.2200
   CATEGORY   08/19/2002
              0   DRUG CLASS    F    DEA  0        DESI
AHFS THERAP.  920000    TOP 200   000          ORANGE BOOK    ZB
FDB MAINT IND 0  REPLACE NDC            PREVIOUS NDC 00192060135
DURATION        ADULT   0   PEDIATRIC     0          GERIATRIC     0
MIN ADULT DLY DOSE      0.000 MINIMUM UNIT           FM USER   DA510BU
MAX ADULT DLY DOSE      0.000 MAXIMUM UNIT           FM DATE   08/27/2002
       OBSOLETE DATE          3RD PARTY RESTR 0      FM TIME   20:00:25

            F6=DA16   F10=REFRESH   F11=RETURN   F12=MENU
```

GH000029

```
DA15  I                      EXPRESS SCRIPTS, INC.                    11/21/2002
                          FIRST DATABANK FILE INQUIRY

NDC           00053813004          BRAND NAME HELIXATE FS
MANUF/DISTRB  AVENTIS BEHRING      LABEL NAME HELIXATE FS 1000IU VIAL
GENERIC CODE  25130               GENERIC NAME ANTIHEMOPHILIC FACTOR, HUM REC
       SEQ.   6345            ADDITIONAL DESC W/SUCROSE,2.5ML
DOSAGE FORM   KIT       GCRT2    IV    DOSE CD EA  DRUG STRENGTH  1000(+/-)U
     ESI B/G  2     GI  1 PACKAGE SIZE            1.000   U-D IND   0
        GMI 2   GNI 2   GSI 2   GPI 2   REPACK 0   NDCFI 1  INNOV 0
     GPI-14    85100010206440 DESCRIPTION *MISC. HEMATOLOGICAL*
AWPUNITCOST       1.6300 HCFAMAC     0.0000  BLP      1.2775 DIR      0.0000
        EFF   11/07/2002      EFF              EFF 08/29/2002  EFF
   WAC COST      1.3000
   CATEGORY   11/07/2002
            0   DRUG CLASS      F    DEA  0       DESI
  AHFS THERAP. 201216    TOP 200   000            ORANGE BOOK    ZB
FDB MAINT IND 0  REPLACE NDC              PREVIOUS NDC
DURATION      ADULT   0.     PEDIATRIC    0        GERIATRIC    0
MIN ADULT DLY DOSE          0.000 MINIMUM UNIT              FM USER  DA510BU
MAX ADULT DLY DOSE          0.000 MAXIMUM UNIT              FM DATE  11/14/2002
     OBSOLETE DATE              3RD PARTY RESTR 0            FM TIME  20:00:54

          F6=DA16  F10=REFRESH  F11=RETURN  F12=MENU
```

GH000030

```
DA15  I                      EXPRESS SCRIPTS, INC.                    11/21/2002
                            FIRST DATABANK FILE INQUIRY

 NDC             00026037250        BRAND NAME KOGENATE FS
 MANUF/DISTRB    BAYER BIOLOGIC     LABEL NAME KOGENATE FS 1000IU VIAL
 GENERIC CODE    25130              GENERIC NAME ANTIHEMOPHILIC FACTOR, HUM REC
      SEQ.  6346           ADDITIONAL DESC W/SUCROSE,2.5ML
 DOSAGE FORM    KIT         GCRT2    IV    DOSE CD EA  DRUG STRENGTH  1000(+/-)U
    ESI B/G   2    GI  1 PACKAGE SIZE            1.000   U-D IND   0
      GMI 2    GNI 2   GSI 2   GPI 2   REPACK 0   NDCFI 1   INNOV 1
    GPI-14   85100010206440 DESCRIPTION *MISC. HEMATOLOGICAL*
 AWPUNITCOST      2.0300 HCFAMAC      0.0000  BLP      1.2775 DIR       0.0000
      EFF  08/19/2002   EFF                  EFF 08/29/2002  EFF
    WAC COST      1.6200
    CATEGORY    08/19/2002
            0  DRUG CLASS     F   DEA  0        DESI
 AHFS THERAP. 201216    TOP 200   000              ORANGE BOOK    ZB
 FDB MAINT IND 0  REPLACE NDC           PREVIOUS NDC
 DURATION        ADULT   0   PEDIATRIC   0              GERIATRIC   0
 MIN ADULT DLY DOSE         0.000 MINIMUM UNIT          FM USER  DA510BU
 MAX ADULT DLY DOSE         0.000 MAXIMUM UNIT          FM DATE  10/24/2002
      OBSOLETE DATE              3RD PARTY RESTR 0      FM TIME  20:01:14

             F6=DA16  F10=REFRESH  F11=RETURN  F12=MENU
```

GH000031

```
DA15  I                    EXPRESS SCRIPTS, INC.              11/21/2002
                          FIRST DATABANK FILE INQUIRY

NDC            00944293803          BRAND NAME RECOMBINATE
MANUF/DISTRB   HYLAND LABS.         LABEL NAME RECOMBINATE 801-1240AHFU VL
GENERIC CODE   25124                GENERIC NAME ANTIHEMOPHILIC FACTOR, HUM REC
       SEQ.    18740          ADDITIONAL DESC 801-1240 RANGE
DOSAGE FORM    VIAL      GCRT2    IV    DOSE CD EA  DRUG STRENGTH  1020(+/-)U
   ESI B/G     2     GI  1 PACKAGE SIZE          1.000   U-D IND    0
       GMI 2     GNI 2   GSI 2   GPI 2   REPACK 0   NDCFI 1    INNOV 1
   GPI-14    85100010202135 DESCRIPTION *MISC. HEMATOLOGICAL*
AWPUNITCOST       1.6250 HCFAMAC      0.0000  BLP       0.0000 DIR      0.0000
       EFF    06/14/2001      EFF               EFF               .EFF
   WAC COST       1.3000
   CATEGORY    06/14/2001
               0    DRUG CLASS    F   DEA  0        DESI
AHFS THERAP. 201216    TOP 200   000               ORANGE BOOK   ZB
FDB MAINT IND 0   REPLACE NDC              PREVIOUS NDC
DURATION          ADULT   0    PEDIATRIC    0            GERIATRIC    0
MIN ADULT DLY DOSE         0.000 MINIMUM UNIT           FM USER   DA510BU
MAX ADULT DLY DOSE         0.000 MAXIMUM UNIT           FM DATE   10/24/2002
       OBSOLETE DATE             3RD PARTY RESTR 0      FM TIME   20:01:14

              F6=DA16   F10=REFRESH   F11=RETURN   F12=MENU
```

GH000032

```
DA15  I                        EXPRESS SCRIPTS, INC.                    05/30/2002
                             FIRST DATABANK FILE INQUIRY

NDC            00944262002              BRAND NAME GAMMAGARD S/D
MANUF/DISTRB  HYLAND LABS.              LABEL NAME GAMMAGARD S/D 2.5GM VL W/ST
GENERIC CODE  43704                   GENERIC NAME IMMU GLOBULIN,GAMMA (IGG)
     SEQ.      9640              ADDITIONAL DESC SOLVENT DETERGENT
DOSAGE FORM   VIAL       GCRT2    IV    DOSE CD EA  DRUG STRENGTH  2.5G
    ESI B/G    2    GI  1 PACKAGE SIZE            1.000    U-D IND   0
        GMI 2    GNI 2    GSI 2   GPI 2   REPACK 0   NDCFI 1  INNOV 1
    GPI-14     19100020102115 DESCRIPTION *PASSIVE IMMUNIZING AGENTS*
AWPUNITCOST     298.1250 HCFAMAC       0.0000  BLP       0.0000 DIR       0.0000
     EFF      06/14/2001    EFF          EFF 04/25/2002  EFF
  WAC COST     238.5000    EFF
  CATEGORY    06/14/2001
              0   DRUG CLASS     F    DEA  0        DESI
 AHFS THERAP. 800400    TOP 200   000              ORANGE BOOK    ZB
FDB MAINT IND 0   REPLACE NDC              PREVIOUS NDC
DURATION            ADULT   0   PEDIATRIC    0           GERIATRIC    0
MIN ADULT DLY DOSE        0.000 MINIMUM UNIT            FM USER  DA510BU
MAX ADULT DLY DOSE        0.000 MAXIMUM UNIT            FM DATE  04/26/2002
     OBSOLETE DATE              3RD PARTY RESTR 0       FM TIME  20:01:59

              F6=DA16  F10=REFRESH  F11=RETURN  F12=MENU
```

GH000033

```
DA15  I                      EXPRESS SCRIPTS, INC.                    05/30/2002
                           FIRST DATABANK FILE INQUIRY

NDC             00053748602        BRAND NAME GAMMAR-P I.V.
MANUF/DISTRB  CENTEON               LABEL NAME GAMMAR-P I.V. 2.5GM VIAL
GENERIC CODE  43704              GENERIC NAME IMMU GLOBULIN,GAMMA (IGG)
       SEQ.   9660             ADDITIONAL DESC P/F,SDV,W/DILUENT
DOSAGE FORM   VIAL        GCRT2     IV    DOSE CD EA  DRUG STRENGTH  2.5G
    ESI B/G   2   GI  1 PACKAGE SIZE              1.000  U-D IND   0
       GMI 2    GNI 2    GSI 2   GPI 1   REPACK 0   NDCFI 1  INNOV 0
   GPI-14    19100020102115 DESCRIPTION *PASSIVE IMMUNIZING AGENTS*
AWPUNITCOST    162.5000 HCFAMAC      0.0000  BLP      0.0000 DIR      0.0000
       EFF   02/15/1998    EFF              EFF 04/25/2002  EFF
   WAC COST   130.0000
   CATEGORY   02/15/1998
           0   DRUG CLASS      F    DEA  0             DESI
 AHFS THERAP. 800400    TOP 200  000                 ORANGE BOOK    ZB
FDB MAINT IND 0  REPLACE NDC            PREVIOUS NDC
DURATION        ADULT   0     PEDIATRIC    0          GERIATRIC   0
MIN ADULT DLY DOSE        0.000 MINIMUM UNIT          FM USER  DA510BU
MAX ADULT DLY DOSE        0.000 MAXIMUM UNIT          FM DATE  04/26/2002
       OBSOLETE DATE            3RD PARTY RESTR 0     FM TIME  20:01:59

            F6=DA16  F10=REFRESH  F11=RETURN  F12=MENU
```

GH000034

```
DA15  I                      EXPRESS SCRIPTS, INC.                01/22/2003
                            FIRST DATABANK FILE INQUIRY

NDC            00169706001        BRAND NAME NOVOSEVEN
MANUF/DISTRB   NOVO NORDISK       LABEL NAME NOVOSEVEN 1200MCG VIAL
GENERIC CODE   23381              GENERIC NAME FACTOR VIIA,RECOMB (BHK CELLS)
     SEQ.      27548              ADDITIONAL DESC
DOSAGE FORM    VIAL      GCRT2    IV    DOSE CD EA  DRUG STRENGTH  1200MCG
    ESI B/G    2     GI  2 PACKAGE SIZE          1.000  U-D IND   0
       GMI 2   GNI 2    GSI 2    GPI 2   REPACK 0   NDCFI 1   INNOV 1
    GPI-14   85100026202120 DESCRIPTION *MISC. HEMATOLOGICAL*
AWPUNITCOST        1.8400 BCFAMAC      0.0000  BLP      0.0000 DIR      0.0000
       EFF   01/06/2003      EFF             EFF             EFF
  WAC COST        1.4700
  CATEGORY   01/06/2003

               0   DRUG CLASS     F   DEA  0          DESI
AHFS THERAP. 201216     TOP 200  000                 ORANGE BOOK   ZB
FDB MAINT IND 0   REPLACE NDC            PREVIOUS NDC
DURATION         ADULT   0        PEDIATRIC    0       GERIATRIC    0
MIN ADULT DLY DOSE       0.000 MINIMUM UNIT           FM USER   DA510BU
MAX ADULT DLY DOSE       0.000 MAXIMUM UNIT           FM DATE   01/10/2003
       OBSOLETE DATE              3RD PARTY RESTR 0    FM TIME   20:01:40

          F6=DA16  F10=REFRESH  F11=RETURN  F12=MENU
```

GH000035

```
DA15  I                    EXPRESS SCRIPTS, INC.                   01/22/2003
                         FIRST DATABANK FILE INQUIRY

NDC           00169706101         BRAND NAME NOVOSEVEN
MANUF/DISTRB  NOVO NORDISK        LABEL NAME NOVOSEVEN 2400MCG VIAL
GENERIC CODE  23382               GENERIC NAME FACTOR VIIA,RECOMB(BHK CELLS)
      SEQ.    27549          ADDITIONAL DESC LYOPHLLIZED,SUV
DOSAGE FORM   VIAL       GCRT2    IV    DOSE CD EA  DRUG STRENGTH  2400MCG
   ESI B/G    2     GI 2 PACKAGE SIZE            1.000   U-D IND    0
      GMI 2   GNI 2    GSI 2    GPI 2   REPACK 0   NDCFI 1   INNOV 1
   GPI-14     85100026202130 DESCRIPTION *MISC. HEMATOLOGICAL*
AWPUNITCOST        1.8400 HCFAMAC      0.0000  BLP       0.0000 DIR       0.0000
      EFF     01/06/2003      EFF                EFF          EFF
   WAC COST       1.4700
  CATEGORY    01/06/2003
              0    DRUG CLASS    F    DEA  0       DESI
AHFS THERAP.  201216    TOP 200  000              ORANGE BOOK   ZB
FDB MAINT IND 0  REPLACE NDC            PREVIOUS NDC
DURATION         ADULT   0    PEDIATRIC     0           GERIATRIC    0
MIN ADULT DLY DOSE        0.000 MINIMUM UNIT           FM USER  DA510BU
MAX ADULT DLY DOSE        0.000 MAXIMUM UNIT           FM DATE  01/07/2003
   OBSOLETE DATE              3RD PARTY RESTR 0        FM TIME  20:00:49

              F6=DA16  F10=REFRESH  F11=RETURN  F12=MENU
```

GH000036

```
DA15  I                         EXPRESS SCRIPTS, INC.                      01/22/2003
                              FIRST DATABANK FILE INQUIRY

NDC            00169706201          BRAND NAME NOVOSEVEN
MANUF/DISTRB   NOVO NORDISK         LABEL NAME NOVOSEVEN 4800MCG VIAL
GENERIC CODE   23383              GENERIC NAME FACTOR VIIA,RECOMB(BHK CELLS)
       SEQ.    27550             ADDITIONAL DESC
DOSAGE FORM    VIAL       GCRT2     IV     DOSE CD EA  DRUG STRENGTH  4800MCG
     ESI B/G   2    GI  2 PACKAGE SIZE            1.000   U-D IND   0
       GMI 2     GNI 2   GSI 2    GPI 2   REPACK 0   NDCFI 1  INNOV 1
     GPI-14     85100026202140 DESCRIPTION *MISC. HEMATOLOGICAL*
AWPUNITCOST        1.8400 HCFAMAC      0.0000  BLP        0.0000 DIR       0.0000
       EFF     01/06/2003     EFF               EFF               EFF
   WAC COST      1.4700
   CATEGORY    01/06/2003
              0    DRUG CLASS    F    DEA  0         DESI
 AHFS THERAP. 201215     TOP 200   000             ORANGE BOOK    ZB
FDB MAINT IND 0   REPLACE NDC            PREVIOUS NDC
DURATION        ADULT   0     PEDIATRIC    0            GERIATRIC    0
MIN ADULT DLY DOSE       0.000 MINIMUM UNIT           FM USER   DA510BU
MAX ADULT DLY DOSE       0.000 MAXIMUM UNIT           FM DATE   01/07/2003
     OBSOLETE DATE               3RD PARTY RESTR 0     FM TIME   20:00:49

           F6=DA16  F10=REFRESH  F11=RETURN  F12=MENU
```

GH000037

```
DA15  I                        EXPRESS SCRIPTS, INC.                    07/07/2003
                            FIRST DATABANK FILE INQUIRY

NDC          00026064812          BRAND NAME GAMIMUNE N
MANUF/DISTRB BAYER BIOLOGIC       LABEL NAME GAMIMUNE N 10% VIAL
GENERIC CODE 43709                GENERIC NAME IMMU GLOBULIN,GAMMA (IGG)
        SEQ. 19103            ADDITIONAL DESC 1GM,SOLVNT/DETERGE
DOSAGE FORM  VIAL      GCRT2    IV    DOSE CD ML  DRUG STRENGTH  10%
   ESI B/G   2    GI  1 PACKAGE SIZE          10.000   U-D IND   0
     GMI 2    GNI 2   GSI 2   GPI 1   REPACK 0   NDCFI 1   INNOV 1
   GPI-14   19100020102210 DESCRIPTION *PASSIVE IMMUNIZING AGENTS*
AWPUNITCOST     10.1250 HCFAMAC      0.0000  BLP      0.0000 DIR       0.0000
        EFF  08/19/2002      EFF                EFF             EFF
   WAC COST    8.1000
   CATEGORY  08/19/2002
              0   DRUG CLASS     F    DEA  0       DESI
AHFS THERAP. 800400     TOP 200   000           ORANGE BOOK   ZB
FDB MAINT IND 0   REPLACE NDC              PREVIOUS NDC
DURATION         ADULT   0    PEDIATRIC    0          GERIATRIC   0
MIN ADULT DLY DOSE         0.000 MINIMUM UNIT        FM USER  DA110BU
MAX ADULT DLY DOSE         0.000 MAXIMUM UNIT        FM DATE  01/22/2003
      OBSOLETE DATE             3RD PARTY RESTR 0    FM TIME  20:25:03

          F6=DA16  F10=REFRESH  F11=RETURN  F12=MENU
```

GH000038

```
DA15  I                      EXPRESS SCRIPTS, INC.              05/14/2002
                           FIRST DATABANK FILE INQUIRY

NDC            00026064812          BRAND NAME GAMIMUNE N
MANUF/DISTRB   BAYER BIOLOGIC       LABEL NAME GAMIMUNE N 10% VIAL
GENERIC CODE   43709               GENERIC NAME IMMU GLOBULIN,GAMMA (IGG)
       SEQ.    19108         ADDITIONAL DESC 1GM,SOLVNT/DETERGE
DOSAGE FORM    VIAL       GCRT2     IV    DOSE CD ML  DRUG STRENGTH  10%
    ESI B/G    2    GI  1 PACKAGE SIZE         10.000  U-D IND    0
FDB GPI 2 GMI  2 GNI 2 GSI 4 REPACK 0 NDCFI 1     INNOV 1
   GPI-14      191000201022I0 DESCRIPTION *PASSIVE IMMUNIZING AGENTS*
AWPUNITCOST       9.0000 HCFAMAC      0.0000  BLP      0.0000 DIR        0.0000
       EFF     02/01/1997    EFF             EFF              EFF
 WAC COST        0.0000
   CATEGORY     10/04/1999
               0   DRUG CLASS    F   DEA  0       DESI
AHFS THERAP.   800400   TOP 200   000           ORANGE BOOK    ZB
FDB MAINT IND 0  REPLACE NDC                PREVIOUS NDC
DURATION         ADULT   0  PEDIATRIC     0       GERIATRIC     0
MIN ADULT DLY DOSE        0.000 MINIMUM UNIT            FM USER  DA510BU
MAX ADULT DLY DOSE        0.000 MAXIMUM UNIT            FM DATE  04/19/2002
   OBSOLETE DATE                3RD PARTY RESTR 0       FM TIME  21:14:43

              F6=DA16   F10=REFRESH  F11=RETURN  F12=MENU
```

same as of 8.14

GH000039

```
DA15  I                    EXPRESS SCRIPTS, INC.                   07/07/2003
                          FIRST DATABANK FILE INQUIRY

NDC            00026087250        BRAND NAME KOGENATE FS
MANUF/DISTRB   BAYER BIOLOGIC     LABEL NAME KOGENATE FS 1000IU VIAL
GENERIC CODE   25130              GENERIC NAME ANTIHEMOPHILIC FACTOR, HUM REC
       SEQ.    6345               ADDITIONAL DESC W/SUCROSE,2.5ML
DOSAGE FORM    KIT      GCRT2    IV    DOSE CD EA  DRUG STRENGTH 1000(+/-)U
    ESI B/G    2    GI  1 PACKAGE SIZE              1.000  U-D IND   0
       GMI 2     GNI 2    GSI 2   GPI 2   REPACK 0   NDCFI 1   INNOV 1
    GPI-14     85100010206440 DESCRIPTION *MISC. HEMATOLOGICAL*
AWPUNITCOST       2.0800 HCFAMAC      0.0000  BLP      0.0000 DIR      0.0000
       EFF    08/19/2002   EFF            EFF 01/30/2003  EFF
  WAC COST       1.6200
  CATEGORY    08/19/2002
               0   DRUG CLASS    F   DEA  0        DESI
 AHFS THERAP. 201216    TOP 200   000            ORANGE BOOK    ZB
FDB MAINT IND 0   REPLACE NDC             PREVIOUS NDC
DURATION          ADULT  0   PEDIATRIC    0        GERIATRIC   0
MIN ADULT DLY DOSE          0.000 MINIMUM UNIT     FM USER   DA510BU
MAX ADULT DLY DOSE          0.000 MAXIMUM UNIT     FM DATE   01/31/2003
     OBSOLETE DATE              3RD PARTY RESTR 0  FM TIME   20:01:37

             F6=DA16  F10=REFRESH  F11=RETURN  F12=MENU
```

GH000040

```
DA15  I                          EXPRESS SCRIPTS, INC.                    07/01/2003
                                FIRST DATABANK FILE INQUIRY

NDC              00026037250         BRAND NAME KOGENATE FS
MANUF/DISTRB     BAYER BIOLOGIC      LABEL NAME KOGENATE FS 1000IU VIAL
GENERIC CODE     25130               GENERIC NAME ANTIHEMOPHILIC FACTOR, HUM REC
       SEQ.      6345           ADDITIONAL DESC W/SUCROSE,2.5ML
DOSAGE FORM   KIT           GCRT2    IV    DOSE CD EA  DRUG STRENGTH  1000(+/-)U
    ESI B/G   2      GI  1 PACKAGE SIZE              1.000    U-D IND   0
       GMI 2     GNI 2    GSI 2    GPI 2    REPACK 0   NDCFI 1   INNOV 1
    GPI-14    85100010206440 DESCRIPTION *MISC. HEMATOLOGICAL*
AWPUNITCOST        2.0300 HCFAMAC       0.0000   BLP       0.0000 DIR       0.0000
       EFF   08/19/2002      EFF              EFF 01/30/2003 EFF
   WAC COST       1.6200
   CATEGORY   08/19/2002
              0   DRUG CLASS      F   DEA 0         DESI
AHFS THERAP. 201216     TOP 200. 000                 ORANGE BOOK    ZB
FDB MAINT IND 0   REPLACE NDC                PREVIOUS NDC
DURATION          ADULT  0      PEDIATRIC   0             GERIATRIC    0
MIN ADULT DLY DOSE         0.000 MINIMUM UNIT            FM USER  DA510BU
MAX ADULT DLY DOSE         0.000 MAXIMUM UNIT            FM DATE  01/31/2003
       OBSOLETE DATE              3RD PARTY RESTR 0      FM TIME  20:01:37

              F6=DA16   F10=REFRESH  F11=RETURN  F12=MENU
```

GH000041

<u>DA15</u>  I                          EXPRESS SCRIPTS, INC.                    10/06/2003
                              FIRST DATABANK FILE INQUIRY

NDC              00026063504              BRAND NAME BAYGAM
MANUF/DISTRB     BAYER BIOLOGIC           LABEL NAME BAYGAM VIAL
GENERIC CODE     43715                    GENERIC NAME IMMU GLOBULIN,GAMMA (IGG)
        SEQ.     9666              ADDITIONAL DESC
DOSAGE FORM      VIAL        GCRT2     IM    DOSE CD ML  DRUG STRENGTH
     ESI B/G    2    GI  1 PACKAGE SIZE                2.000    U-D IND    0
       GMI 2    GNI 2   GSI 2    GPI 2    REPACK 0    NDCFI 1  INNOV 1
     GPI-14     19100020002200 DESCRIPTION *PASSIVE IMMUNIZING AGENTS*
AWPUNITCOST        15.9400 HCFAMAC       0.0000  BLP      0.0000 DIR       0.0000
       EFF     04/01/2003     EFF              EFF 11/07/1990  EFF
   WAC COST       12.7500
   CATEGORY    04/01/2003
                 0   DRUG CLASS     F    DEA 0        DESI
 AHFS THERAP. 800400    TOP 200  000              ORANGE BOOK    ZB
FDB MAINT IND 0  REPLACE NDC              PREVIOUS NDC
DURATION        ADULT   0    PEDIATRIC    0          GERIATRIC     0
MIN ADULT DLY DOSE         0.000 MINIMUM UNIT        FM USER  DA510BU
MAX ADULT DLY DOSE         0.000 MAXIMUM UNIT        FM DATE  04/16/2003
        OBSOLETE DATE           3RD PARTY RESTR 0    FM TIME  20:01:24

            F6=DA16  F10=REFRESH  F11=RETURN  F12=MENU

GH000042

```
DA15  I                      EXPRESS SCRIPTS, INC.                  09/03/2003
                          FIRST DATABANK FILE INQUIRY

NDC           00944058101            BRAND NAME PROPLEX T
MANUF/DISTRB  HYLAND LABS.           LABEL NAME PROPLEX T 300-1200U VIAL
GENERIC CODE  25143                 GENERIC NAME FACTOR IX COMPLEX (HUMAN
         SEQ. 6362              ADDITIONAL DESC 30ML VIAL
DOSAGE FORM   VIAL      GCRT2    IV     DOSE CD EA  DRUG STRENGTH 750 (+/-)U
     ESI B/G  2   GI  2 PACKAGE SIZE              1.000   U-D IND  0
        GMI 2   GNI 2   GSI 2   GPI 2   REPACK 0   NDCFI 1   INNOV 1
     GPI-14    85100030002170 DESCRIPTION *MISC. HEMATOLOGICAL*
AWPUNITCOST       0.4375 HCFAMAC       0.0000  BLP       0.0000 DIR       0.0000
        EFF   06/14/2001      EFF                EFF              EFF
   WAC COST      0.3500
   CATEGORY   06/14/2001
              0   DRUG CLASS      F    DEA  0        DESI
 AHFS THERAP. 201216      TOP 200    000           ORANGE BOOK    ZB
FDB MAINT IND 0   REPLACE NDC              PREVIOUS NDC
DURATION         ADULT   0   PEDIATRIC    0              GERIATRIC    0
MIN ADULT DLY DOSE       0.000 MINIMUM UNIT              FM USER   DA110BU
MAX ADULT DLY DOSE       0.000 MAXIMUM UNIT              FM DATE   01/22/2003
     OBSOLETE DATE            3RD PARTY RESTR 0          FM TIME   20:26:31

              F6=DA16  F10=REFRESH  F11=RETURN  F12=MENU
```

GH000043

```
DA15   I                      EXPRESS SCRIPTS, INC.                    01/30/2004
                           FIRST DATABANK FILE INQUIRY

NDC            00053720102        BRAND NAME ZEMAIRA
MANUF/DISTRB   AVENTIS BEHRING    LABEL NAME ZEMAIRA 1000MG VIAL
GENERIC CODE   47571             GENERIC NAME ALPHA-1-PROTEINASE INHIBITOR
      SEQ.   11700         ADDITIONAL DESC W/DILUENT, 20ML
DOSAGE FORM   VIAL       GCRT2     IV     DOSE CD EA  DRUG STRENGTH  1000MG
     ESI B/G    1    GI   1 PACKAGE SIZE          1.000   U-D IND   0
       GMI 2    GNI 2    GSI 1   GPI 1   REPACK 0   NDCFI 1   INNOV 0
    GPI-14    451000I0102120 DESCRIPTION *MISC. RESPIRATORY*
AWPUNITCOST     0.5B00 HCFAMAC     0.0000  BLP      0.0000 DIR        0.0000
     EFF    08/18/2003     EFF             EFF             EFF
  WAC COST     0.4200
  CATEGORY   08/18/2003
              0   DRUG CLASS     F    DEA  0         DESI
AHFS THERAP. 920000    TOP 200   000              ORANGE BOOK    ZB
FDB MAINT IND 0    REPLACE NDC           PREVIOUS NDC
DURATION         ADULT  0    PEDIATRIC    0         GERIATRIC      0
MIN ADULT DLY DOSE       0.000 MINIMUM UNIT         FM USER   DA510BU
MAX ADULT DLY DOSE       0.000 MAXIMUM UNIT         FM DATE   01/23/2004
    OBSOLETE DATE            3RD PARTY RESTR 0       FM TIME   20:00:21

              F6=DA16  F10=REFRESH  F11=RETURN  F12=MENU
```

GH000044

```
DA15  I                        EXPRESS SCRIPTS, INC.                | 01/30/2004
                               FIRST DATABANK FILE INQUIRY

NDC            00026060135         BRAND NAME PROLASTIN
MANUF/DISTRB   BAYER BIOLOGIC      LABEL NAME PROLASTIN 1000MG VIAL
GENERIC CODE   47571               GENERIC NAME ALPHA-1-PROTEINASE INHIBITOR
       SEQ.    11700          ADDITIONAL DESC W/DILUENT, 30ML
DOSAGE FORM    VIAL       GCRT2      IV    DOSE CD EA  DRUG STRENGTH   1000MG
    ESI B/G    2    GI  1 PACKAGE SIZE               1.000   U-D IND   0
       GMI 2   GNI 2    GSI 2   GPI 1   REPACK 0   NDCFI 1   INNOV 1
    GPI-14     4510061 0101920 DESCRIPTION *MISC. RESPIRATORY*
AWPUNITCOST        0 3100 HCFAMAC       0.0000  BLP       0.0000 DIR       0.0000
       EFF     12/29/2003   EFF               EFF               EFF
   WAC COST       0.2500
   CATEGORY    12/29/2003
               0   DRUG CLASS      F    DEA  0         DESI
 AHFS THERAP.  920000      TOP 200   000            ORANGE BOOK   ZB
FDB MAINT IND 0   REPLACE NDC            PREVIOUS NDC 00192060135
DURATION       ADULT   0    PEDIATRIC    0               GERIATRIC    0
MIN ADULT DLY DOSE         0.000 MINIMUM UNIT              FM USER  DA510BU
MAX ADULT DLY DOSE         0.000 MAXIMUM UNIT              FM DATE  01/23/2004
       OBSOLETE DATE            3RD PARTY RESTR 0          FM TIME  20:00:21

              F6=DA16  F10=REFRESH  F11=RETURN  F12=MENU
```

GH000045

DA15  I                          EXPRESS SCRIPTS, INC.                    01/30/2004
                                FIRST DATABANK FILE INQUIRY

NDC              49669580002            BRAND NAME ARALAST
MANUF/DISTRB     BAXTER                 LABEL NAME ARALAST 1000MG VIAL
GENERIC CODE     47571                  GENERIC NAME ALPHA-1-PROTEINASE INHIBITOR
       SEQ.      11700           ADDITIONAL DESC W/DILUENT,50ML VIA
DOSAGE FORM      VIAL        GCRT2      IV      DOSE CD EA   DRUG STRENGTH  1000MG
    ESI B/G      2     GI  1 PACKAGE SIZE              1.000   U-D IND     0
      GMI 2      GNI 2   GSI 2    GPI 2    REPACK 0   NDCFI 3   INNOV 0
    GPI-14       45100AN0101920 DESCRIPTION *MISC. RESPIRATORY*
AWPUNITCOST        0.5100 HCFAMAC       0.0000  BLP        0.0000 DIR       0.0000
      EFF        05/15/2003     EFF              EFF            . EFF
   WAC COST       0.4100
   CATEGORY      05/15/2003
                 0    DRUG CLASS     F    DEA  0         DESI
AHFS THERAP.     920000     TOP 200    000              ORANGE BOOK    ZB
FDB MAINT IND  0    REPLACE NDC              PREVIOUS NDC
DURATION            ADULT   0    PEDIATRIC     0             GERIATRIC     0
MIN ADULT DLY DOSE         0.000 MINIMUM UNIT               FM USER   DA510BU
MAX ADULT DLY DOSE         0.000 MAXIMUM UNIT               FM DATE   01/23/2004
      OBSOLETE DATE              3RD PARTY RESTR 0          FM TIME   20:00:21

             F6=DA16  F10=REFRESH  F11=RETURN  F12=MENU

GH000046

G H000047

**CUSTOMER: Cerescript**

Purchase Projections (Units)
Please see projections in blue cells.

| | FY2004 | Q2 | Q3 | Q4 | Total Units | | Q1 Rebate $ | Q2 Rebate $ | Q3 Rebate $ | Q4 Rebate $ | Total Rebate $ |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Advate | 1,216,128 | 1,162,652 | 0 | 0 | 2,407,780 | | 33,728 | 29,065 | | (2,339) | 60,156 |
| Recombinate | 2,176,284 | 886,759 | 0 | 0 | 3,296,042 | | 65,269 | 29,683 | | (2,339) | 94,961 |
| rFVIII Total | 3,621,412 | 2,051,410 | 0 | 0 | 5,672,822 | | | | | | |
| Hemofil - XI | 535,435 | 36,371 | 0 | 0 | 371,915 | | 16,672 | 11,766 | (7,430) | (7,430) | 17,480 |
| | | | | | Total Rebate | | $115,669 | $53,334 | ($7,430) | ($7,430) | $19,077 | $142,107 |

| Total Units | Target | Growth | 4% of Growth | Growth Rebate | |
|---|---|---|---|---|---|
| 2,607,780 | 8,035,000 | -5,327,220 | -213,089 | Total Rebate | FALSE |

**2006 Quarterly Rebate Unit Tiers**
**Total rFVIII**

**Q1 Rebate Tiers**

| Unit Range | Advate | Recombinate |
|---|---|---|
| 2,800,000 | $0.030 | $0.030 |
| 1,600,000 | 47,193,000 | $0.025 |
| 960,000 | 1,790,050 | $0.020 |
| 0 | 960,000 | $0.020 |

**Q2 Rebate Tier2**

| Unit Range | Advate | Recombinate |
|---|---|---|
| 9,000,000 | 75,948,000 | $0.040 | $0.050 |
| 3,615,000 | 9,780,000 | $0.025 | $0.030 |
| 1,500,000 | 3,674,000 | $0.010 | $0.010 |
| 0 | 1,900,000 | $0.000 | $0.000 |

**Q3 Rebate Tiers**

| Unit Range | Advate | Recombinate |
|---|---|---|
| 14,800,000 | 114,895,000 | $0.030 | $0.030 |
| 5,550,000 | 14,788,000 | $0.025 | $0.025 |
| 2,050,000 | 5,549,000 | $0.020 | $0.020 |
| 0 | 2,050,000 | $0.000 | $0.000 |

**Q4 Rebate Tiers**

| Unit Range | Advate | Recombinate |
|---|---|---|
| 20,000,000 | 154,898,000 | $0.030 | $0.030 |
| 7,500,000 | 19,949,000 | $0.025 | $0.025 |
| 4,050,000 | 7,499,000 | $0.020 | $0.020 |
| 0 | 4,000,000 | $0.000 | $0.000 |

**Total Hemofil-M AHF**

**Q1 Rebate Tiers**

| Unit Range | Rebate |
|---|---|
| 500,000 | 1,495,000 | $0.070 |
| 500,000 | 999,000 | $0.060 |
| 300,000 | 469,000 | $0.050 |
| 130,000 | 295,000 | $0.040 |
| 115,000 | 149,000 | $0.020 |
| 0 | 115,000 | $0.000 |

**Q2 Rebate Tiers**

| Unit Range | Rebate |
|---|---|
| 1,800,000 | 2,999,000 | $0.070 |
| 1,400,000 | 1,799,000 | $0.060 |
| 500,000 | 1,062,000 | $0.050 |
| 300,000 | 980,000 | $0.040 |
| 230,000 | 239,000 | $0.020 |
| 0 | 230,000 | $0.000 |

**Q3 Rebate Tiers**

| Unit Range | Rebate |
|---|---|
| 2,500,000 | 7,499,000 | $0.070 |
| 1,800,000 | 2,499,000 | $0.060 |
| 850,000 | 2,199,000 | $0.050 |
| 450,000 | 999,000 | $0.040 |
| 345,000 | 449,000 | $0.020 |
| 0 | 345,000 | $0.000 |

**Q4 Rebate Tiers**

| Unit Range | Rebate |
|---|---|
| 3,800,000 | 3,999,000 | $0.070 |
| 2,200,000 | 3,499,000 | $0.060 |
| 1,200,000 | 2,199,000 | $0.050 |
| 600,000 | 1,199,000 | $0.040 |
| 461,000 | 599,000 | $0.020 |
| 0 | 460,000 | $0.000 |



EXHIBIT
10
hamilton



# RBC Capital Markets

Steve Hamill, CFA
(612) 313-1247
steve.hamill@rbccm.com

William Quirk (Associate)
(612) 313-1218
william.quirk@rbccm.com

**January 24, 2003**

This report is priced as of
January 17, 2003.

All values in U.S. dollars unless
otherwise noted.

**For pertinent disclosure,
please see page 23.**

# A Changing Paradigm In Hemophilia

## Executive Summary

Limited availability of treatment for the 60,000 worldwide hemophiliacs has traditionally resulted in a simple competitive paradigm: produce as much as you can and ship it as quickly as possible while trying to avoid production problems. In our opinion, this is about to change with the dramatic increase in capacity expected to begin in mid-2003. Consequently, we believe the big three manufacturers (Baxter, Bayer, and Wyeth) are in the process of introducing traditional pharmaceutical marketing for recombinant Factor VIII. Given the paradigm shift that could follow, we have detailed several key competitive issues.

**Prophylaxis Usage And Patient Aging Likely Drivers Of Demand:** With the most recent product shortage becoming a fading memory, we believe the likely short-term growth drivers of increased usage for recombinant Factor VIII will be the continued adoption of prophylaxis as the "gold standard" for treating newly diagnosed severe hemophiliacs. Longer term, we believe the aging of the very young hemophilia community will emerge as the key growth driver.

**Relationships With Distribution Channel And End Users Are Key, In Our Opinion:** We believe that competitors' missteps combined with Baxter's clean history in this market has given Baxter the strongest brand image, within both the distribution channel and the hemophilia community. Looking ahead, we believe this could further buoy Baxter's competitive position with these important groups.

**Safety Concerns Diminishing, But Perception Drives Upstream Product Focus:** With the tragic history of hemophilia as an ever-present reminder, we believe that the community's desire for ever-safer products will continue to be a key driver for conversion to recombinant products and contribute to upstream transition to newer third-generation therapies. We think Baxter will likely be the most immediate beneficiary, because of its substantial time-to-market advantage.

**Market Dynamics Offer Insight Into Future Pricing Discussion, In Our Opinion:** We believe the threat of weaker pricing accompanying increases in supply are overblown given that the recombinant Factor VIII market resembles an oligopoly (high barriers to entry, few competitors, low substitution risk). In fact, with the current pricing and reimbursement structure, we believe that Baxter may have a good opportunity to actually raise prices for its next-generation therapy.

**Conclusion—Baxter Appears To Be In An Enviable Position:** With the market for recombinant hemophilia treatment heading into a new dynamic period, we believe that Baxter's reputable history, strong brand image, new product offering, and favorable pricing position bodes well for future success and potential market share gains.

**Valuation:** We reiterate our Outperform rating with an Average Risk qualifier on BAX shares. Historically, BAX shares have traded at 13x-30x 12-month forward EPS. Our price target of $36 is based on a 16 multiple to our fiscal 2003 EPS estimate of $2.24, a 30% discount to Baxter's five-year historical average and in line with Baxter's large-cap medical supplies peers.

**Risk Qualifier:** Our estimates for Baxter rely on our assumptions for stable pricing trends and modest increase in demand for recombinant Factor VIII. In the event that pricing weakens or if demand does not ramp as we have anticipated, sales of rFVIII may fall short of our projections and BAX shares may not reach our price target.

EXHIBIT
11
Hamilton

GH000048

05/06/2008  16:13    8479607384          ALGONQUIN SERVICES INC          PAGE  03/28
                                                                          PAGE  03

A Changing Paradigm In Hemophilia                                January 24, 2003

## Table Of Contents

Hemophilia Overview..............................................................................3
What Is Hemophilia?.............................................................................3
Treatment Overview.............................................................................4
Factor VIII Replacement Therapy ........................................................4
How Is Factor VIII Dosed? ...................................................................5
Inhibitor Development...........................................................................6
Availability Of Treatment .....................................................................7
Tragic History, Brighter Future.............................................................7
Looking Ahead: What Drives Demand For Recombinant Factor VIII.........11
Our Expectations For Future Demand.................................................12
Our Expectations For Future Recombinant Supply .............................14
Baxter ................................................................................................14
Market Outlook: The Emergence Of Competition.............................17
Competitive Keys................................................................................17
Definitions Of Rating Categories .......................................................23
Disclosures ........................................................................................23

2 Steve Hamill

RBC Capital Markets   BH000049

PAGE  04/28
05/06/2008  16:13    8479607384          ALGONQUIN          PAGE  04
                                   HEALTH SERVICES INC

January 24, 2003                                    A Changing Paradigm In Hemophilia

# Hemophilia Overview

### What Is Hemophilia?

### The Clotting Cascade

Hemophilia is a relatively rare genetic disorder that slows or prevents blood from clotting following cellular injury. Affecting roughly one in 5,000 males (and to a far lesser degree, females), hemophilia is a degenerative condition and is often life threatening without regular treatment. Even with regular treatment, frequent joint bleeds can lead to significant disabilities, causing some hemophiliacs to undergo invasive joint replacement surgery by their late 20s/early 30s. Originally believed to have been passed through the royal families of Europe, hemophilia is also known to spontaneously appear in nearly all demographic populations.

The clotting cascade involves the sequential activation of several "Factor" proteins, with Factor VIII signaling Factor X. Factor X protein signals the production of Thrombin and finally Fibrin, a protein that works in concert with platelets to form a permanent blood clot at the site of cell injury. In "Primary Hemophilia" or "Hemophilia A" patients (the focus of this report), the body's natural production of Factor VIII is reduced and may be completely absent. Consequently, patients with severe hemophilia (roughly 55% of the hemophilia population) must infuse with clotting agents to control bleeding episodes or utilize prophylaxis to prevent future bleeds.

Exhibit 1: The Clotting Cascade



Source: Biological Sciences, Santa Barbara City College

Hemophilia can be stratified into three categories—mild, moderate, and severe—based on the amount of circulating Factor VIII in the patient's plasma. Patients with mild hemophilia have Factor VIII levels of 5%-50% that of healthy subjects and represent roughly 25% of the population. Moderate hemophilia is characterized by circulating Factor VIII levels of 1%-4%, affecting approximately 20% of the disease



05/05/2008  16:13   8479687384          ALGONQUIN        PAGE  05/28
                                        PATENT SERVICES INC   PAGE  05

population (3,500 patients in the United States). As previously mentioned, we believe that severe hemophiliacs represent about 55% of the disease population or roughly 9,500 patients in the United States. Patients with severe hemophilia have less than 1% of circulating Factor VIII in their blood plasma. Worldwide, we believe that hemophilia affects approximately 61,500 people (source: U.S. Census Data and RBC Capital Markets estimates).

## Treatment Overview

### Factor VIII Replacement Therapy

Primary treatment for hemophilia requires patients to periodically self-infuse with Factor VIII replacement therapy. The amount of Factor VIII infused is based on two parameters: the patient's weight and the required target of circulating clotting factor. In other words, as the patient ages (and gains weight), a concomitant increase in dosing is required to maintain similar levels of circulating factor. For example, two patients (100 lbs and 150 lbs) requiring a 5% increase in Factor VIII would need to dose approximately 390 and 580 international units, respectively. Presently, there are two primary types of Factor VIII therapy available: plasma-based and recombinant.

### Plasma-Based Factor VIII

Developed for mass consumption in the 1970s, plasma-based Factor VIII (pFVIII) is derived from human plasma through a process called fractionation. For reference, human plasma is pooled from many donors (e.g., 5,000-50,000 units) and can be separated (or fractionated) into over 30 products including pFVIII. Because pFVIII is derived from human plasma, manufacturers utilize pathogen inactivation processes to decrease the threat of transmitting viruses, such as HIV and hepatitis C (HCV), bacteria, or parasites. That said, there still exists the threat of transmitting pathogens that survive the inactivation process. For example, several cases of HCV transmission have occurred over the past decade with pFVIII. Consequently, many patients prefer to use alternative clotting agents such as recombinant Factor VIII due to the lower perceived risk.

### Recombinant Factor VIII

Developed in response to viral transmission from pFVIII, recombinant Factor VIII (rFVIII) was first introduced by **Baxter International, Inc.** (NYSE: BAX; Outperform: $30.35: Average Risk) in 1992 with **Bayer** (NYSE: BAY; Not Rated; $21.12) following about a year later. As the name suggests, rFVIII is not derived from human plasma; rather it is manufactured from Chinese hamster ovary cells grown in large fermenters. Like other recombinant proteins, rFVIII is difficult to manufacture and includes literally hundreds of quality checks that follow each batch from start to finish. While pFVIII has a dubious history (covered in greater detail later in this report), rFVIII has a perfect record, with no cases of viral transmission in over 4 billion cumulative doses. That being said, rFVIII carries a theoretical risk for infection, albeit slight, because all current formulations use some human albumin (another plasma derivative) during the manufacturing process. We would point out, however, that no viruses have been transmitted to a recipient in 53 years of dosing with albumin.

Recombinant FVIII is a very unstable protein, with a half-life of roughly 12-15 hours in vitro, compared with about 16-18 hours for pFVIII. In order to reach even this 12-hour half-life, manufacturers add human albumin to stabilize the recombinant molecule. Presently, market-leader Baxter employs albumin during the formulation



GH000051

PAGE  06/28
PAGE  06

05/06/2008  16:13    8479607384              ALGONQUIN

(i.e., in the fermenter) and purification stage (i.e., fill and finish) in its so called "first-generation" product, *Recombinate*. For Bayer's *Kogenate FS* and Wyeth's (NYSE: WYE; Not Rated) *Refacto* products, albumin is only used in the fermenter. These products are commonly referred to as "second generation." Currently, all three manufacturers are working on third-generation products, which are anticipated to be completely free of human products. It is worth noting that Baxter's recombinant antihaemophilic Factor VIII protein-free method product (*rAHF-PFM*) is solidly in the lead, with FDA and CE Mark approvals anticipated for the second half of 2003. We believe that Wyeth has completed its clinical trials and would anticipate a Biologics License Application (BLA) filing in the first half of 2003, with approval roughly 12-18 months afterwards. We understand that Bayer is still in earlier development, with a third-generation product likely sometime after 2004

## How Is Factor VIII Dosed?

### On Demand

On-demand dosing refers to the treatment of bleeding episodes using a bolus of Factor VIII with the goal of achieving thrombus. Given that severe hemophiliacs may have as many as 52 bleeds per year, severe patients using an "on-demand" regimen equates to approximately once-per-week dosing. As hemophiliacs age, greater awareness of their condition and preparation for activities that might lead to bleeds typically increases. Consequently, the frequency of dosing tends to decline as patients age into their late teens/early 20s (but not necessarily the quantity of Factor VIII infused). Thus, while "on-demand" dosing may be adequate for older hemophiliacs, dosing once per week may not be the most optimal therapy for hemophiliacs under the age of 18 due to the greater frequency of joint bleeds that can eventually lead to joint reconstructive surgery. Separately, since moderate and mild hemophiliacs do not bleed as often as the severes (5-20 times per year), on-demand therapy tends to be the most commonly prescribed regimen for these patient groups. We estimate that over 90% of the worldwide hemophilia population receiving treatment doses "on demand."

### Primary Prophylaxis (Prophylaxis)

Prophylaxis or "prophy" dosing is a preventative regimen designed to minimize the number of bleeding episodes by keeping circulating factor levels greater than or equal to 2%. This modality is more commonly used in the severe population due to the high number of joint bleeds. Prophy dosing usually involves every-other-day or three-times-per-week dosing. Based on conversations we had with several parents of young hemophiliacs, we believe that the number of bleeds in highly compliant patients is dramatically reduced once they started dosing their sons prophylactically. This is significant, in our view, as by age 6, future indications of permanent joint damage from frequent joint bleeds may already be present. Thus, it should come as little surprise that prophy dosing is a popular and growing therapy for younger hemophiliacs. In fact, we estimate that roughly 37%-40% of severe domestic patients under the age of 21 utilize prophylaxis, and we have heard anecdotal evidence that the prevalence may be modestly higher. While the benefits of prophy dosing are well documented, the time commitment, patient compliance (particularly challenging in young children), and cost are important variables and thus can impact the ultimate penetration rate, in our opinion.

### Secondary Prophylaxis

Call it a halfway point between prophy and on-demand dosing, secondary prophylaxis dosing usually involves utilizing prophylaxis to target joint bleeds at specific points in time. Secondary prophy tends to be a short-term preventative.


RBC
Capital
Markets

A Changing Paradigm In Hemophilia                                    January 24, 2003

measure in which the patient is at an increased risk of developing a joint bleed
(during a sports season, for example).

**Exhibit 2: Use Of rFVIII For Different Hemophilia Levels**



Source: Baxter International, Inc. and RBC Capital Markets estimates

## Inhibitor Development

As many as 20%-30% of hemophiliacs will develop some measure of immune
response to Factor VIII treatment. Referred to as "inhibitors," the degree of immune
response is measured using the Bethesda Unit screen (BU). There is an established
connection between higher-titer inhibitor development (≥ 10 BUs) and the frequency
of dosing. Thus, the most vulnerable population, severe hemophiliacs, are also at the
greatest risk for developing high-titer inhibitors. Based on several conversations and
clinical evidence to date, we believe that roughly 10%-15% of severe hemophiliacs
may develop high-titer inhibitors. In these cases, we believe that the immune
response effectively negates the clotting benefits from Factor VIII, putting the patient
at a significant risk for serious bleeds.

The easiest approach to overcoming an inhibitor is for the patient to switch Factor
VIII products, although we would note that the success rate with this strategy is low.
Other strategies for overcoming inhibitors include: high or continuous dosing of
Factor VIII with or without an added immunosuppressive agent; high doses of
porcine-derived Factor VIII (Factor from swine plasma); or Factor VII (*NovoSeven*,
**Novo Nordisk**, *FEIBA*, Baxter or *Autoplex*, Nabi). High or continuous dosing of
Factor VIII is generally regarded as "first-line" therapy to overcome inhibitors.
However, from a logistics point of view, the patient will require either an IV bag or a
significant number of repeated injections—both of which could dramatically impact
the patient's quality of life. Porcine Factor VIII is another alternative, although we
would note that safety concerns persist about potential disease transmission and
patient reactivity. Lastly, dosing with Factor VII bypasses the traditional clotting
cascade and directly activates Factor X, leading to clot formation. The drawback with
Factor VII is the cost, which we believe can be 2x-4x that of recombinant Factor VIII
and often must be used on an ongoing basis to control future bleeds.

6 Steve Hamill



GH000053

05/06/2008  16:13   8479607384         ALGONQUIN
                                      PATENT SERVICES INC       PAGE   08/28
                                                                PAGE   08

January 24, 2003                                     A Changing Paradigm In Hemophilia

## Availability Of Treatment

### Tragic History, Brighter Future

### A Brief History Of Hemophilia In The United States

In order to truly understand hemophilia, we believe that knowledge of the tragic history of this disease is helpful. As the following will detail, hemophilia is currently a disease of the young, with few surviving older patients, but that is expected to change in future decades.

The first big advance in the treatment of hemophilia came in the 1970s when pFVIII was developed for global consumption; prior to that, limited amounts of cryoprecipitate were considered the most common treatment modality. Since pFVIII is made by combining up to 50,000 units of plasma, the potential for disease transmission is extremely high without an effective method of removing harmful pathogens. Consequently, as HIV became more prevalent in the early 1980s, the HIV and HCV virus quickly permeated pFVIII products. By the late 1980s, methods for removing HIV from pFVIII were in place, but in the meantime, nearly 95% of the U.S. hemophilia population contracted HIV and effectively all patients were exposed to HCV. Tragically, over 6,000 American hemophiliacs and their close relatives have perished as a result of complications from AIDS and over 2,000 are currently HIV+, according to the National Hemophilia Foundation (NHF). Even today, the NHF estimates that 70% of the total hemophilia population have been exposed to HCV or hepatitis B (HBV).

In addition to the devastating history of hemophilia treatment, the community has been beset with several shortages of Factor VIII product. The most recent occurred in 2001 when Bayer was in the process of transitioning its manufacturing plant to produce its current product, *Kogenate FS*. The time of the transition corresponded with an FDA inspection, at which the FDA cited several deficiencies. This led to a nearly year-long slowdown on releasing product. In addition, the slowdown compounded the ongoing supply constraints for recombinant product (since its introduction, demand for rFVIII has surpassed supply). Given the preference for rFVIII, particularly for younger hemophiliacs who had used nothing but recombinant and thus had escaped viral exposure, many members of the older community (usually HIV and/or HCV positive) volunteered to revert back to pFVIII. By late 2001, Bayer had resolved most of the FDA issues and was able to resume increased production. (As a note, Bayer is also the sole supplier for Aventis's *Helixate FS*. Aventis does not manufacture a recombinant hemophilia drug; it does, however, distribute private labeled Bayer products.)

### Why We Think Another Shortage Is Unlikely

While Bayer was addressing shortfalls in its manufacturing processes, competitors Baxter and Wyeth were moving ahead to increase production on their own. As a result, we believe that by the time Bayer fully reentered the market in first quarter 2002, global production of rFVIII was actually ahead of pre-shortage levels (470 million units in first quarter 2002 vs. 430 million units in fourth quarter 2000).



PAGE  09/28
05/06/2008  16:13   8479607384   ALGONQUIN
PATIENT SERVICES INC   PAGE  09



A Changing Paradigm In Hemophilia                                    January 24, 2003

Exhibit 3: Historical Capacity For Recombinant Factor VIII



Recombinant Factor VIII

Source: Company reports and RBC Capital Markets estimates

Looking ahead, we believe that the "big three" manufacturers have committed sufficient resources toward capacity expansion such that shortages of recombinant product like the one in 2001 will become far fewer, or short of another manufacturer slowdown, a thing of the past. As evidence, we estimate that the annualized capacity required to reach our fiscal 2005 recombinant demand estimate (3.4 billion units) will be available by late 2003. In other words, it would appear that for the first time since the introduction of recombinant products in 1992, industry supply already has begun to outstrip demand. Moreover, it appears that Baxter has learned a lesson from Bayer's travails and is taking a different tact to its upcoming third-generation (rAHF-PFM) launch. Baxter will continue to manufacture its first-generation *Recombinate* at its Thousand Oaks, California, facility and produce *rAHF-PFM* at its new Neuchatel, Switzerland, facility, thus "diversifying the risk" of complications at either plant.

### What Does The Distribution Channel Look Like?

Treatment of hemophilia is a reflection of the commitment and vigilance of the underlying patient base. Patients usually self-infuse at home but will visit their local treatment center for checkups. Patients purchase clotting products from the manufacturers through a largely cottage industry of home pharmacies, many employees of which have a direct connection to the condition themselves—either diagnosed with hemophilia or having family members who are afflicted. Consequently, we believe that the level of attention paid to the patient from the distribution source is almost unrivaled by any other chronic condition.

As mentioned, the home pharmacy network is relatively fragmented with corporate home pharmacies controlling less than 40% of the market (up from roughly 25% just a few years ago), with the remainder held by several smaller independent companies. Anecdotally, we understand that some home pharmacies may have as few as 10-20 patients. We believe that the smaller pharmacies can survive because of two key metrics. First, the rate of patient turnover tends to be very low given the ample customer service provided to the community. Second, the economics (i.e., spread) between what the pharmacies pay for Factor and what they can bill insurance is we believe clearly attractive enough right now to support this system.

RBC Capital Markets   GH000055

January 24, 2003                                    A Changing Paradigm In Hemophilia

Presently, we estimate that the acquisition cost for recombinant Factor products
ranges from $0.77 to around $1.05, with reimbursement ranging between $1.26 to
$2.03 depending on payor source and type of product infused. Reimbursement is
typically based on a modest discount (0%-20%) to the Average Wholesalers Price
(AWP), a function of manufacturer's estimated cost to manufacture, distribution cost,
and a payment for ancillary services for the pharmacy (similar to the home oxygen
market). Interestingly, we believe that manufacturers can influence AWP thus
potentially providing an incentive (i.e., increasing the spread) on their product for the
pharmacies. Theoretically, the incentive can entice the home pharmacies to
encourage product-specific use among their clientele, particularly among newly
diagnosed patients. Given that a severe hemophiliac can easily go through $100,000
of Factor VIII annually (based on acquisition cost), a single new patient can provide
an annuity-like windfall for the home pharmacy. It should then come as little surprise
that the home pharmacy market has undergone considerable consolidation over the
past few years, and assuming that the spreads remain within their historical ranges,
we anticipate this trend will continue.

### Difference In Cost Between pFVIII And rFVIII

Important to the treatment decision-making process is the rather dramatic difference
in price between pFVIII and rFVIII. Manufacturers charge roughly $0.30-$0.60 per
international unit for pFVIII versus $0.77-$1.05 for rFVIII. In our opinion, the
dramatic difference in price between the two has less to do with the cost to
manufacture than it does the implied "safety premium" associated with the rFVIII
products given the tragic history of treatment. Thus, while we do not believe the
market for Factor is completely inelastic, we would argue that the manufacturers
enjoy considerable leverage in making pricing decisions. That said, we believe that
patient anxiety over paying for treatment can be a significant issue, particularly with
regard to rFVIII and the use of prophylaxis.

### Lifetime Caps And Backup Options For Patients

Given the high cost for treatment of hemophilia, particularly for patients with the
severe form of the condition, we believe that the issue of reimbursement/payment for
Factor VIII products should not be overlooked. Presently, hemophiliacs have several
options to pay for their medication. The majority of patients' treatment is covered by
private payers, with Medicare, Medicaid, and other nonprofit programs paying for
the remaining 40%-50% of patients, by our estimates.

In our view, the cycle of paying for Factor VIII treatment is multi-stage, potentially
incorporating several different payors over the patient's lifetime. Patients with
traditional indemnity plans (10% of those on private insurance or roughly 850-1,000
patients in the United States), may be subject to lifetime caps (usually $1 million).
Coverage under Medicare, Medicaid, HMOs, and PPOs is not subject to lifetime
caps. Patients with traditional indemnity plans run the very real risk of exhausting
their spending caps by the time they reach their teens. At this point, we believe that
the patient's caregivers can sometimes get the caps waived, change workplaces
(thereby changing plans), purchase supplemental insurance, or, depending on income
level, move to either Medicaid or some variation of quasi-government assistance
program. Fortunately for the community, we believe that all patients have several
"fallback" organizations to approach for treatment, although this does appear to vary
considerably between different states. According to our sources, the process for
obtaining treatment in older or disabled hemophiliacs is much less arduous with
Medicare covering the cost of Factor VIII. The key take-away, in our view, is that
very few hemophiliacs actually go without treatment, but that the process of
obtaining coverage is a cause for significant patient anxiety and family stress.


RBC
Capital
Markets

Steve Ha@H090056

05/06/2008  16:13    8479607384                    ALGONQUIN
                                                   PATIENT SERVICES INC

A Changing Paradigm In Hemophilia                              January 24, 2003

As an example of the high cost of treatment, the **Exhibit 4** depicts "John Doe," a young patient diagnosed with severe hemophilia shortly after birth. For the purposes of this discussion, we have outlined two cost-of-therapy scenarios. The first assumes that John Doe doses on demand; the second scenario assumes that when John turns two, he moves to prophylaxis dosing. For simplicity, we have assumed that John Doe uses Baxter's *Recombinate* for his treatment and that there are no other ancillary medical costs (such as hospitalization) included in the calculation.

Exhibit 4: Cost Of Recombinant Therapy—"John Doe"



Source: RBC Capital Markets estimates

Based on the graphical results and assuming a $1 million insurance cap (traditional indemnity plan), we estimate that John Doe could exhaust his insurance coverage by the time he reaches 16 using an on-demand regimen. By comparison, using prophylaxis after age two, we estimate that John Doe could reach his cap by age 12. Clearly, paying for treatment can be a serious issue for some patients.

10 Steve Hamill


GH000057

January 24, 2003                                                  A Changing Paradigm In Hemophilia

## Looking Ahead: What Drives Demand For Recombinant Factor VIII

### Short Term: Prophylaxis Is The Likely Candidate

With Bayer's production problems behind them, the hemophilia community's supply of rFVIII appears to have come in line with demand over the past nine months. In addition, based on our channel checks, we believe that two events driving short-term demand for rFVIII have, by-and-large, already taken place. Specifically, we understand that most individuals who switched to pFVIII during the recent shortage have transitioned back to rFVIII and that the majority of elective surgeries that were delayed in 2001 have been completed. What's left to drive demand?

Over the short term (1-3 years), we think an accelerated move toward using prophylaxis as the "gold standard" for treating new and younger hemophiliacs will emerge to be the principle driver of demand for recombinant Factor VIII. In addition, we think this will be complemented by the continuing, albeit at a slower pace than in recent years, transition from pFVIII to rFVIII in the developed markets. We estimate that in the developed countries (United States, Europe, and Japan) roughly 22%-26% of the severe hemophilia population is dosing prophylactically. However, in the hemophilia population under the age of 21, we believe the percentage of severe hemophiliacs dosing prophylactically is closer to 40%. While part of the difference can be explained with the different needs of the different age groups, nevertheless, the difference is startling and, we think, indicative of a changing paradigm for dosing in the younger population. As further evidence, we believe that several key medical thought leaders, such as the Mayo Clinic, are using prophylaxis as the de-facto gold standard for treatment of new severe hemophiliacs. In our opinion, we think that the penetration rate of prophylaxis in the severe population (developed countries) could grow from its current levels to around 30%-35% by 2005 and to 38%-43% by 2009.

### Longer Term: Driven By The Aging Population And Market Expansion

Longer term, (3-10 years), we believe that several catalysts, including the aging hemophilia population and increased use of prophy by adult patients, will likely contribute to rFVIII growth, with market expansion into lesser-developed geographies driving increased usage of pFVIII.

As previously mentioned, dosing of rFVIII is directly proportional to the percentage increase in circulating Factor VIII desired combined with the patient's weight. For example, two patients both requiring a 20% increase in Factor VIII, but one weighing 50 lbs vs. another weighing 150 lbs would require roughly 250 IUs vs. 680 IUs, respectively—nearly a 3x difference. Clearly, the accompanying increase in demand can be quite dramatic as the population ages. We think this is particularly relevant in light of the young age of the worldwide hemophilia population. We estimate that the average age of a hemophilia patient in the United States is 22.2, vs. 35.3 for the general population (2000 Census Data). As a reminder, this is principally the tragic result of the high mortality rate among the hemophilia population in the 1980s-1990s. With the advent of widespread rFVIII availability, we believe that over the course of the next decade, the average age of developed world hemophiliacs will increase significantly, leading to increased (gross) usage of rFVIII.

05/06/2008  16:13   8479607384   ALGONQUIN SERVICES INC   PAGE  13/28
PAGE   13

Exhibit 5: Average Age Vs. Prophylaxis Usage



Source: Centers for Disease Control (CDC) and RBC Capital Markets estimates

## Our Expectations For Future Demand

### Growth Of Prophylaxis

Presently, we believe that prophylaxis usage in the total hemophilia population in the United States, EU/Japan, and the rest of the world (ROW) is approximately 12%, 13%, and 3%, respectively. Based on our assumptions of increasing adoption as the regimen of choice in the developed world for young severe hemophiliacs, we think the use of prophylaxis in these three geographies could grow to 18%, 23%, and 5%, respectively by 2005. By 2009, we expect the rates for the U.S. and EU/Japan to be virtually equal at 22% and 23%, respectively, with penetration in ROW to be roughly 7%. These translate into a "prophy" patient population growing from roughly 5,400 patients now to over 11,500 patients by 2009, for a compounded growth rate of approximately 11.5%, vs. a growth rate of 2.5% for the overall hemophilia population.

### Demand Assumptions For 2003-2005

Currently, we estimate that worldwide demand for Factor VIII (fiscal 2002) is approximately 3.5 billion units, with recombinant usage accounting for roughly 56%. Specifically in the United States, we estimate that total demand in 2002 was roughly 1.18 billion units, with total demand in EU/Japan and ROW estimated at 1.77 billion units and 0.6 billion units, respectively. Refer to Exhibit 6 for our assumptions of recombinant usage and recombinant penetration for hemophilia treatment by region.



GH000059

PAGE  14/28

05/06/2008  16:13    8479607384           ALGONQUIN
                                          PATENT SERVICES INC           PAGE   14

January 24, 2003                                    A Changing Paradigm In Hemophilia

Exhibit 6: Total Factor Usage And Recombinant Penetration By Geography

| Units in 000,000's | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|---|---|---|
| U.S. Usage | 1,184.2 | 1,282.7 | 1,348.9 | 1,500.8 | 1,562.4 | 1,632.6 | 1,680.9 | 1,708.7 |
| Recombinant % | 68% | 74% | 86% | 91% | 91% | 92% | 93% | 94% |
| EU/Japan Usage | 1,763.4 | 1,900.8 | 1,974.6 | 2,035.4 | 2,120.3 | 2,170.4 | 2,244.6 | 2,275.4 |
| Recombinant % | 62% | 71% | 85% | 90% | 91% | 92% | 93% | 94% |
| ROW Usage | 594.1 | 684.3 | 1,003.8 | 1,303.4 | 1,418.1 | 1,505.8 | 1,589.7 | 1,692.8 |
| Recombinant % | 11% | 13% | 15% | 18% | 23% | 26% | 29% | 31% |
| WW Usage | 3,541.7 | 3,867.8 | 4,327.2 | 4,839.8 | 5,120.8 | 5,298.8 | 5,515.2 | 5,674.9 |
| Recombinant % | 55% | 62% | 69% | 71% | 72% | 73% | 75% | 76% |

Source: RBC Capital Markets estimates and industry sources

In our view, the greatest opportunity for recombinant growth is in the ROW population, which includes many developed countries that have publicly stated their desire to move their entire hemophilia population to recombinant product, such as Canada and Australia. We would note, however, that this population also includes many "third world" nations where ability to pay for recombinant product is greatly diminished and thus we anticipate little-to-no penetration in these areas.

With respect to the market size, we estimate that the total market for recombinant Factor VIII in 2002 was $1.6-$1.7 billion. By 2005, we anticipate this market could grow roughly 20% per year to $2.8 billion. Refer to **Exhibits 7 and 8** for graphical depictions of the various components of growth in the recombinant market.

Exhibit 7: Recombinant Demand In Three Geographies, 1993-2009



Source: RBC Capital Markets estimates, CDC, Census Data, and other industry sources



05/06/2008  16:13   8479607384          ALGONQUIN                    PAGE  15/28
                                        PATIENT  SERVICES  INC       PAGE  15

A Changing Paradigm In Hemophilia

January 24, 2003

Exhibit 8: Where Does Total Factor VIII Demand Originate?



Source: RBC Capital Markets estimates, CDC, Census Data, and other industry sources

# Our Expectations For Future Recombinant Supply

### Baxter

Baxter currently handles all of the "fill and finish" for *Recombinate* at its Thousand Oaks, California, facility. Baxter sources bulk product both from its internal reactors at Thousand Oaks (estimated 960 million units in 2002) in addition to bulk product purchased through an agreement with Wyeth's **Genetics Institute** (approximately 285 million units in 2002). Under the agreement with Genetics Institute, Baxter will continue to receive bulk product from Wyeth's Andover, Massachusetts, facility through 2006, but the aggregate volume will likely decline as the date draws near. In October, Baxter disclosed that shipments from Wyeth for late 2002 were less than expected due to lower-than-expected yields at Wyeth's Andover facility. We estimate that this will modestly temper recombinant growth over the near term, but that by the second half of 2003, any shortfall will likely be more than offset by the opening of Baxter's new facility.

Baxter is also in the final process of reaching FDA and EU approval for its new facility in Neuchatel, Switzerland, that will be dedicated towards its next-generation *rAHF-PFM* product. In 2003, we anticipate that Baxter could release 750 million units from Neuchatel (stockpiling of 300-310 million units plus six months of production yielding 440-450 million units, assuming a mid-2003 approval). We would note that our capacity expectations only include two of its five reactors at Neuchatel for Factor VIII production through 2006, with the other three reactors employed for other recombinant proteins such as alpha-1 antitrypsin. Certainly, one or more of these reactors could be utilized for rFVIII production if demand exceeds our expectations. See **Exhibit 9** for our capacity estimates for Baxter.

---

14 Steve Hamill


RBC
Capital  GH000061
Markets

05/06/2008  16:13   8479607384        ALGONQUIN                  PAGE  16/28
04/22/2003  12:29   804/445488        PATIENT SERVICES INC       PAGE  16

January 24, 2003                                    A Changing Paradigm In Hemophilia

Exhibit 9: Baxter's Recombinant Capacity



Source: Company reports and RBC Capital Markets estimates

## Bayer

As previously mentioned, Bayer has recently emerged from production problems. However, with production for fiscal 2002 estimated at roughly 400 million units, Bayer's annual capacity is still lagging its fiscal 2000 levels, pegged at closer to a 500 million unit run-rate. Bayer recently announced the addition of six new fermenters at its Berkeley, California, facility, which we believe are already in production.

With respect to capacity utilization, Bayer's story is dramatically different than Baxter. While Baxter is currently selling nearly all of its production, we believe that Bayer has not fully recovered those patients who moved to a competing product during the shortage. Consequently, we estimate (fourth quarter 2002) that Bayer's utilization rate is only about 94%. See **Exhibit 10** for our capacity estimates for Bayer.

## Wyeth

Wyeth's Genetics Institute was an original developer of rFVIII and subsequently licensed bulk product to Baxter's Hyland division. As previously mentioned, Wyeth produces roughly 300-325 million (bulk) units, which are shipped to Baxter. Although the contract calls for a gradual easing of shipments to Baxter, we do not believe that Wyeth is using the excess capacity to produce first-generation product for its own reps to sell. Rather, Wyeth utilizes two facilities, one in St. Louis, Missouri, and the second in Stockholm, Sweden, for second-generation (Refacto) bulk product. Wyeth uses its Stockholm and Madrid facilities for fill and finish. As a result, Wyeth must ship bulk *Refacto* for domestic consumption from St. Louis to Stockholm for fill and finish and then back to the United States for distribution. Given the obvious logistical headache, management indicated that they intend to file for complete FDA approval (i.e., start-to-finish manufacturing) for their St. Louis plant in first quarter 2003, with approval anticipated in late 2003. In addition, we understand that Wyeth has selected its St. Louis facility for initial production of its third-generation product (Albumin-Free or AF), which will be included in its BLA filing, anticipated for the first half of 2003.



05/06/2008   16:13    8479607384    ALGONQUIN    PAGE   17/28
PATIENT SERVICES INC    PAGE   17

A Changing Paradigm In Hemophilia                                January 24, 2003

Management has guided finished peak production levels for *Refacto* in the range of 200 million units at Stockholm and 400 million units at St. Louis. Moreover, guidance for total peak capacity run-rate after full conversion to the third-generation product is 1.2-1.8 billion units. We estimate that the transition from *Refacto* to *AF* will likely require 12-24 months (depending on timing of the Stockholm filing and patient transition), and thus we have adjusted our capacity estimates accordingly. See Exhibit 10 for our capacity estimates for Wyeth.

**Total Supply**

In total, we anticipate that the global supply of recombinant FVIII will rise sharply over the next several years as the companies' earlier investment in plant expansions come to fruition. Refer to Exhibit 10 for our total unit capacity estimates through 2009.

Exhibit 10: Worldwide Recombinant Capacity Estimates 2002-2009E



Note: Aventis' capacity is included in Bayer's capacity
Source: Company reports and RBC Capital Markets estimates



CH000063

05/06/2008   16:13   8479607304   ALGONQUIN PATIENT SERVICES INC   PAGE   18/28

January 24, 2003                                    A Changing Paradigm In Hemophilia

## Market Outlook: The Emergence Of Competition

Until recently, competition for rFVIII appeared to be a very simple story: produce as much as you can and ship it as quickly as possible while trying to avoid production problems. With the return of Bayer plus the addition of new (and planned) capacity by Wyeth and Baxter, the competitive situation has become far more dynamic. We would argue that the forward outlook for the recombinant Factor VIII market will likely begin to resemble traditional pharmaceuticals.

Accordingly, we believe that the "big three" manufacturers are already ramping up their marketing programs, sales reps, and other ancillary services for what could be a dynamic marketplace in 2003 and beyond. For reference, we have outlined several components that we think will likely be particularly relevant to the future of the recombinant Factor VIII market.

Exhibit 11: Recombinant Supply Vs. Demand 1993-2009E



Source: Company reports and RBC Capital Markets estimates

## Competitive Keys

### Relationship With Hemophilia Community

Despite Bayer's recent return to full production, we think that the hemophilia community may still hold some ill will following the original *Kogenate FS* launch. For reference, when Bayer first received approval for *Kogenate FS*, it pushed through a significant price increase, which many in the hemophilia community we spoke with considered "gouging." The AWP for *Kogenate FS* was established at roughly $1.41, up from $1.18 for its first-generation *Kogenate*. In addition, in December 2000, Bayer announced that a FDA inspection, which transpired at the time of its manufacturing conversion to the *FS* product, uncovered significant production irregularities. These irregularities eventually caused Bayer to restrict the release of product for almost all of 2001. This had the effect of creating an industrywide shortage, limiting patients' treatment options and undermining confidence in Bayer's ability to deliver on its promises. In our opinion, both events significantly soured Bayer's reputation in the hemophilia community and, when compared with the recent


**RBC**
**Capital**
**Markets**

Steve Hamill 17                    CH000064

05/06/2008  16:13      8479607384              ALGONQUIN                    PAGE  19/28
04/22/2003  12:29      6047445488         PATIENT SERVICES INC

A Changing Paradigm In Hemophilia                                    January 24, 2003

history of both Baxter and Wyeth's consistent production efforts, we believe that Bayer's reputation remains a strategic disadvantage.

**Relationship With Distribution Channel**

In addition to the manufacturing snafu and the alleged "price gouging" that transpired with the *Kogenate FS* launch. Bayer also attempted (unsuccessfully) to cut the home pharmacies out of the distribution channel. In the period leading up to the *Kogenate FS* launch. Bayer announced that it would only be available through its Web site (www.bayerdirect.com). Patients, the NHF, and home pharmacies sent over 500 letters decrying the practice. Bayer eventually capitulated and began releasing product to the home pharmacies. Consequently, Bayer's relationship with the home pharmacies has also been strained.

In order to make amends with the home pharmacies. Bayer successfully pushed through an AWP increase of nearly 80% to $2.03 from $1.41 near the end of third quarter 2002. At the same time, Bayer also lowered its acquisition price to $1.03 from roughly $1.10, increasing the spread to the pharmacies considerably. As a reminder, the pharmacies' gross profit is the difference between their acquisition cost for Factor products and the reimbursement levels (usually a modest discount to AWP). We would note that our checks suggest reimbursement levels for *Kogenate FS* are far below this AWP, perhaps closer to $1.70. Thus, while we believe Bayer is clearly taking steps to improve its relations with the home pharmacies, the actual margin benefit on *Kogenate FS* for the home pharmacies may be well below the level implied by the new AWP.

While Bayer is at a modest disadvantage with wholesalers due to its past policies and high prices, we believe that Wyeth also has some short-term marketing obstacles to overcome. Specifically, patients taking *Refacto* must use a multiple-stage chromatography assay to monitor their circulating Factor VIII levels rather than the traditional single-stage assay. This is a marketing issue in the near term, in our opinion, because any treatment center that wished to place its patients on Wyeth's *Refacto* would also be required to implement the higher-priced chromatography assay (roughly 3x as much as the single-stage assay). During the shortage, the demand for any rFVIII product was great enough for nearly every treatment center to overlook the time commitment to a second assay. We believe that many of the larger treatment centers likely implemented the new technology during this period. However, now that the community finds itself with several treatment options, having to add a second assay could make it more difficult for Wyeth to penetrate new treatment centers. Wyeth management has indicated that its third-generation product is being designed for use with the traditional single-stage assay, which will likely mitigate any short-term marketing disadvantage. We estimate that Wyeth's *AF* (albumin-free) product could gain U.S. approval as early as mid-2004.

18 Steve Hamill

RBC
Capital
Markets
HXXX000065.

Case 1:01-cv-12257-PBS   Document 6866-8   Filed 01/27/10   Page 97 of 104

05/06/2008  16:13    8479607384         ALGONQUIN                    PAGE  20/28
04/22/2003  12:29    0047445408         PATIENT SERVICES  INC

**Exhibit 12: AWP, Acquisition Costs, And Spreads For Recombinant Factor VIII**

|  | Average Manufacturer's Price | Average Wholesalers Price | Maximum Wholesaler Margin |
|---|---|---|---|
| Aventis | $1.10 | $1.38 | $0.28 |
| Baxter | $0.83 | $1.33 | $0.50 |
| Bayer Pre-3Q02 | $1.09 | $1.41 | $0.32 |
| Bayer Post-3Q02 | $1.03 | $2.03 | $1.00 |
| Wyeth | $0.87 | $1.36 | $0.49 |

Source: Industry sources

In the context of Bayer and Wyeth, Baxter has seemingly few near-term or historical issues that would put them at a disadvantage with the wholesalers. As a comparison, Baxter has traditionally offered the most attractive margins to the home pharmacies for rFVIII due to its low cost structure, and it has not made any attempt to cut out the home pharmacies. In fact, we believe that Baxter pushed through its own AWP increase following Bayer's *Kogenate FS* launch (to $1.33 from roughly $1.05-$1.10), while only modestly increasing acquisition cost, netting a higher margin to the pharmacies. In addition, during the same period, Baxter resigned from gouging customers and has never had a production issue with *Recombinate* or with its plasma derivatives. Rather, Baxter was able to ease the shortage created by Bayer's production problems by increasing production yields during 2001.

Thus, taking everything into consideration, we believe that Baxter will still maintain a brand advantage with the distribution channel, although Bayer's status is improving and Wyeth should come out from under the assay overhang with its next-generation product.

## Safety Profile

With respect to safety, we believe that two standards exist: the first is perceptual risk, and the second is actual risk. As previously noted, the long and tortured history of hemophilia treatment has, in our opinion, left the community with a hypersensitive perception of product safety. While isolated cases of HCV transmission have been documented in plasma-based Factor VIII products, the safety profile for these products has been dramatically improved in the decades following the HIV crisis. Moreover, no known cases of viral transmission have occurred since the introduction of recombinant Factor VIII, despite the fact that human albumin is still used in all four recombinant Factor products currently available. Nevertheless, the hemophilia community has made it clear that elimination of all human albumin from rFVIII is desirable (NHF – Medical and Scientific Advisory Council recommendation #135, updated November 2002).

The second-generation products from Bayer (*Kogenate FS*) and Wyeth (*Refacto*), launched in 2000 and 1999, respectively, both use much less albumin in manufacturing and thus have a "perceptual" advantage to first-generation *Recombinate*. However, the majority of hemophiliacs worldwide continue to use *Recombinate* (first-generation, 56%-plus market share) due to the risk of inhibitor development from switching products, Bayer's shortage, and Wyeth's slow capacity ramp. Moreover, we believe that the recent production increases by both Wyeth and Bayer have not cut into Baxter's patient base, suggesting that the safety premium associated with the second-generation product may not be very high. As confirmation, several of our channel checks indicated that physicians do not appear to have strong opinions on one brand versus another.


RBC
Capital
Markets

Steve Hamill 19
GH000066

We believe the third-generation products offer a much more tangible safety benefit than the second-generation products do because the former use absolutely no human proteins in the manufacturing process—thus offering an entirely synthetic treatment option. As evidence, we point to the fact that Wyeth plans to gradually phase out *Refacto* once its third-generation recombinant product (*AF*) is approved. In addition, Baxter's r*AHF-PFM* pivotal trial results studying 111 previously treated patients found that only one subject developed a low-titer inhibitor (2.0 BUs), suggesting that the risk for inhibitor development from switching between Baxter products is quite low. Exhibit 13 details current development efforts by Baxter, Bayer, and Wyeth with regard to their respective third-generation product development.

Exhibit 13: Third-Generation Recombinant Factor VIII Development Status



Source: Respective company reports and RBC Capital Markets estimates

## Current Market Share

Outside of recent share shifts stemming from Bayer's slowdown, we believe that hemophilia patients prefer to stay with a single efficacious Factor product rather than risk inhibitor development by moving between products. It would then appear that the biggest source of competition going forward pertains to attracting newly diagnosed patients and patients converting from on-demand dosing to prophy. A brief review of the advertising literature (90%-plus featuring adolescent hemophiliacs) seems to confirm that suspicion.

Thus, we believe that the market share advantage favors Baxter given its market-leading share of 56%, strong brand, and impending approval for its first new recombinant product in a decade. Exhibit 14 depicts our estimates for current and future market share for recombinant Factor VIII.

Exhibit 14: Recombinant Factor VIII Market Share 2000-2009E



Source: Respective company reports and RBC Capital Markets estimates

20 Steve Hamill

RBC Capital Markets

HI000067

05/06/2008  16:13     8479607384                    ALGONQUIN                              PAGE  22/28
04/22/2003  12:29     8047445406                    PATIENT SERVICES INC                    PAGE  22

January 24, 2003                                                      A Changing Paradigm In Hemophilia

### Pricing

With Bayer's recent price reduction (end of third quarter 2002), investors may be asking questions about "softness" in recombinant Factor VIII pricing. While these questions are clearly legitimate given the changing dynamics of this market, we think that this risk is considerably smaller than investors have been led to believe. In terms of cost to the pharmacies, Baxter is the cheapest supplier, roughly 24% less than Bayer and 5% less than Wyeth (see **Exhibit 12**). This is significant for the home pharmacies because the cost of Factor is their highest expense item; thus carrying lower-cost inventory should result in lower capital exposure. From the reimbursement side, *Recombinate's* AWP has increased considerably (to $1.33 from about $1.10 previously), which suggests that Baxter also is working to improve the margin spread for its home pharmacy partners. In fact, given the spread advantage that Baxter enjoys relative to Wyeth, there may be room in the short-term to move *Recombinate* pricing closer to *Refacto* prices without sacrificing significant home pharmacies' margin.

While Baxter appears to be well positioned in the current pricing environment, we think that Bayer actually is the most at risk, despite raising its AWP and lowering price. With respect to Bayer's AWP increase, historically, all manufacturers tend to push for their own AWP increases to stay competitive; therefore it would not be a surprise if Aventis and Wyeth were pursing their own AWP increases. With respect to Bayer, we believe it is compiling data to immediately pursue an AWP increase once its new product, rAHF-PFM, is approved, estimated in mid-2003. What this means from a competitive standpoint is that AWP advantages tend to be more of a short-term phenomenon than a long-term competitive advantage.

Adding another chink in Bayer's competitive positioning relative to price is the recent (December 5, 2002) pronouncement by CMS calling for "single drug pricing" on recombinant Factor VIII products. We understand that CMS will reimburse the home pharmacies a maximum of $1.26 per unit of rFVIII regardless of brand for all Medicare patients (10% of the disease population). This new schedule began January 1, 2003, and will be updated on a quarterly basis. It is not yet clear whether third-generation products will also fall under this specific reimbursement cap. Under this new program, we believe that Baxter is the best positioned because it is the lowest-cost provider, with Bayer the most expensive and thus the most vulnerable. Moreover, based on our channel checks, we understand that state budgets for hemophilia treatment (Medicaid among others) may be coming under pressure in certain states due to growing budget deficits, which could increase the relative attractiveness of Medicare for eligible patients in these locations.

The final component of our discussion of forward rFVIII prices relates to the nature of the competitive dynamic between manufacturers. With a potentially large bolus of rFVIII supply anticipated to come on-line beginning in 2003, investors have rightly questioned how Aventis, Baxter, Bayer, and Wyeth will handle the new competitive setting. We believe the recombinant Factor VIII market is similar to proprietary pharmaceuticals with significant barriers to entry (FDA among others), high levels of capital investment, low patient turnover (due to the risk for inhibitor development), few industry participants, and large sales forces. The market for recombinant Factor VIII has operated much like a pharmaceutical oligopoly in the past and, in our view, is poised to continue operating as such going forward. Consequently, we do not expect the recombinant market to suffer the price destabilization recently observed in the plasma derivatives market, which has few barriers to entry and is highly fragmented with many small, single product participants.

**RBC
Capital
Markets**

GH000068
Steve Hamill 21

05/06/2008  16:13  8479607384                      ALGONQUIN                    PAGE  23/28
04/22/2008  12:29  8017445400              PATIENT SERVICES INC                 PAGE  23

A Changing Paradigm In Hemophilia                                          January 24, 2003

### Conclusion

Given our perception of Bayer's weakened state and Wyeth's marketing disadvantage (albeit temporary), Baxter seemingly emerges with the most compelling rFVIII competitive position going forward. Moreover, we believe that Baxter arguably has substantial room to actually raise prices with the launch of *rAHF-PFM* given its low-cost producer position. Our estimates for Baxter's recombinant Factor VIII business are summarized in Exhibit 15.

Exhibit 15: Estimates for Baxter's Recombinant Factor VIII

| Recombinant Factor VIII Estimates | FY02 | 1Q03 | 2Q03 | 3Q03 | 4Q03 | FY03 | FY04 |
|---|---|---|---|---|---|---|---|
| Revenue ($millions) | 999 | 245 | 252 | 312 | 353 | 1,163 | 1,535 |
| YoY Growth | 24% | 6% | 2% | 23% | 33% | 16% | 32% |
| Market Share | 60% | 55% | 52% | 59% | 63% | 58% | 62% |
| Price/Unit | $0.78 | $0.76 | $0.76 | $0.80 | $0.80 | $0.78 | $0.80 |
| Capacity Utilization | 100% | 100% | 100% | 84% | 69% | 80% | 78% |
| rAHF-PFM % of Unit Mix | 0% | 0% | 0% | 21% | 32% | 14% | 39% |

Source: RBC Capital Markets estimates

**What If We're Wrong (Positive Scenario):** Presently we are estimating that Baxter utilizes 80% and 78% of its capacity in 2003 and 2004, yielding $1.2 billion and $1.5 billion in revenue, respectively. Under a scenario in which Baxter utilizes 100% of its capacity, our recombinant revenue rises to $1.6 billion in 2003 and $2.0 billion in 2004. The EPS impact would be a positive $0.13 in 2003 and $0.13 in 2004. In order for this scenario to play out, we believe that a greater-than-expected increase in prophylaxis dosing would have to take place.

**What If We're Wrong (Negative Scenario):** If our estimates for rFVIII pricing do not hold following the launch of *rAHF-PFM* and prices decline by ~15%, our revenue would decline to $1.1 billion in 2003 and $1.3 billion in 2004. The EPS impact would be a negative $0.03 in 2003 and $0.06 in 2004. In order for this scenario to play out, we believe that at least two of the hemophilia manufacturers would have to react to their overcapacity issues by entering a price war. Given the market dynamics (particularly the reluctance of patients to change products), we believe that the likelihood of this scenario is low.

22 Steve Hamill

RBC
Capital
Markets
H000069

05/06/2008  16:13     8479687384                    ALGONQUIN                        PAGE  24/28
04/22/2003  12:29     8047445408              PATIENT SERVICES INC                  PAGE  24

January 24, 2003                                                    A Changing Paradigm In Hemophilia

## Definitions Of Rating Categories

An analyst's "sector" is the universe of companies for which the analyst provides research coverage. Accordingly, the rating assigned to a particular stock represents the analyst's view of how that stock will perform over the next 12 months relative to the analyst's sector, but does not attempt to provide the analyst's view of how the stock will perform relative to: (i) all companies that may actually exist in the company's sector, or (ii) any broader market index.

**Ratings:**

**Top Pick (TP):** Represents analyst's best ideas in Outperform category; expected to significantly outperform sector over 12 months; provides best risk-reward ratio; approximately 10% of analyst's recommendations.

**Outperform (O):** Expected to materially outperform sector average over 12 months.

**Sector Perform (SP):** Returns expected to be in line with sector average over 12 months.

**Underperform (U):** Returns expected to be materially below sector average over 12 months.

**Risk Qualifiers:**

**Average Risk (Avg):** Volatility and risk expected to be comparable to sector; average revenue and earnings predictability; no significant cash flow/financing concerns over coming 12-24 months; and/or fairly liquid.

**Above Average Risk (AA):** Volatility and risk expected to be above sector; below average revenue and earnings predictability; may not be suitable for a significant class of individual equity investors; may have negative cash flow; and/or low market cap or float.

**Speculative (Spec):** Risk consistent with venture capital; low public float; potential balance sheet concerns; and/or risk of being delisted.

References to a Recommended List in the recommendation history chart may include one or more recommended lists or model portfolios maintained by a member company of RBC Capital Markets or one of its affiliates. RBC Capital Markets recommended lists include the Strategy Focus List and the Fundamental Equity Weightings (FEW) portfolios. RBC Dain Rauscher Inc. recommended lists include the Western Region Focus List (1), the Model Utility Portfolio (2), and the Prime Opportunity List (3) (formerly called the Private Client Selects). Private Client Prime Portfolio (4), a former list called Private Client Portfolio (5), and the Prime Income List (6). RL On: Date a security was placed on a recommended list; RL Off: Date a security was removed from a recommended list.

Our Research Ratings Legend can be viewed at
http://www.rbccmresearch.com/researchratings.

## Disclosures

This report is priced as of 01/17/03.

The author is employed by RBC Dain Rauscher Inc., a securities broker-dealer with principal offices located in Minnesota, USA.

The author(s) of this report has received (or will receive) compensation based in part upon the investment banking revenues of RBC Capital Markets (including RBC Dain Rauscher, RBC Dominion Securities Inc., and RBC Dominion Securities Corp. or their affiliates).



Steve Hamill 23

GH000070

05/06/2008  16:13      8479607384              ALGONQUIN                    PAGE   25/28
04/22/2003  12:20      8047445400         PATENT SERVICES INC              PAGE   25

A Changing Paradigm In Hemophilia                                      January 24, 2003



| | RBC Capital Markets | | | Distribution of Ratings, Firmwide | |
|---|---|---|---|---|---|
| | | | | IB Serv./Past 12 Mos. | |
| Rating | Count | Percent | Count | Percent |
| BUY [TP/O] | 366 | 48.67 | 89 | 24.32 |
| HOLD [SP] | 307 | 40.82 | 38 | 12.38 |
| SELL [U] | 75 | 9.97 | 9 | 12.00 |

RBC Capital Markets
H000071

05/06/2008  16:13    8479607384                      ALGONQUIN                        PAGE  26/28
04/22/2003  12:29    8047445488                PATIENT SERVICES  INC                  PAGE  26
04/02/2003  23:57

Court: HMOs Can Be Made to Open Networks - EarthLink - U.S. News                          Page 1 of 2




EarthLink.net   |   Web Mail  |  Biz Center  |  My Account  |  Support

Start Page  1  2  News  Finance  Entertainment  Sports  Shopping

NEWS                                                     powered by Google

**Explore News**

- News Main
- Top News
- Business News
- Technology News
- Entertainment News
- Health & Lifestyle News
- Sports News
- U.S. News
- International News
- General News
- Political News
- Strange News
- News from the Source

**Weather**

weather.com

City or Zip

San Marino, CA
63° - Fair

**Weather Resources**

- Snowfall Forecast
- Aches & Pains
- Events Planner
- Daily Traveler
- Cold & Flu
- Interstate Forecast
- Home & Garden
- Health
- Golfer's Forecast
- Is Your Flight on Time?
- Outdoors

**Sports Scores**

Today's Games - from
ESPN.com

NHL  Avalanche   10:30
         at          PM

U.S. News - April 2, 2003

## Court: HMOs Can Be Made to Open Networks

April 2, 2003 09:44 PM EST

WASHINGTON - The Supreme Court ruled Wednesday that states can pass laws forcing HMOs to open their networks to more health care providers, giving patients broader choices of doctors and hospitals but potentially boosting costs.

The unanimous ruling was a setback for the managed care industry, which argued that closed networks lower health care costs because providers agree to accept lower fees in return for a guaranteed stream of patients.

The decision also gives states more freedom to regulate insurance companies, another in a line of decisions from the court expanding states' rights.

About half the states have passed "any willing provider" laws in the past decade in response to complaints that HMOs and insurance companies sometimes block people from seeing the doctors of their choice.

The laws require managed care networks or insurance companies to accept out-of-network health care providers - physicians, pharmacists, nurse practitioners or specialists. In return, the providers must agree to the insurer's reimbursement rates and contract terms.

The court ruled on a challenge to Kentucky's laws, considered the broadest in the country. The Bush administration had sided with Kentucky.

"It's a message to states that you can have consumer protection laws," Kentucky Insurance Commissioner Janie Miller said.

Donald Young, president of the Health Insurance Association of America, said the laws "are one more instance of government unnecessarily interfering in private relationships between doctors and health plans."

Industry lawyers had told the court that the laws increase administrative costs, make it harder for HMOs to monitor

http://start.earthlink.net/newsarticle?cat=6&aid=D7Q5KNE80 story                    04/02/2003



EXHIBIT
12
Hamilton

GH000072

05/06/2008  16:13      8479687304
04/22/2003  12:29      8047445408          ALGONQUIN                    PAGE  27/28
04/02/2003  23:57                          PATIENT SERVICES INC          PAGE  03
                                                                        Page 2 of 3

Court: HMOs Can Be Made to Open Networks - EarthLink - U.S. News



Yesterday's Games - from
ESPN.com

MLB   Yankees   10
      at
      Blue Jays   1      FINAL

Market Update





ET - If your job's taking a toll on your
nerves lately, you're not alone. The
weak labor market has forced many
employees to stay put in positions
they'd otherwise flee due to
oppressive work...
More

Resources

EarthLink Remote Access
EarthLink Home
Networking
EarthLink Email by Phone
EarthLink 800 Access

quality and jeopardize deals that health plans have made
with providers.

Karen Ignagni, president of the American Association of
Health Plans, which represents more than 1,000 health
maintenance organizations and other plans, said the
Kentucky laws drove up patients' health care premiums. In
court filings, justices were told that in states with willing
provider laws, studies found 15 percent increases.

It's been nearly a decade since the Kentucky laws were
passed, she noted. "Now the discussions in states are
different. It's about costs and access and balancing the
two," Ignagni said.

The Kentucky statutes were challenged by a group of
HMOs and an industry trade association. The case turned
on whether the laws regulate insurance, which states are
allowed to police, or regulate employee benefits, an area
reserved for Congress.

Justice Antonin Scalia wrote in the ruling that Kentucky
residents may no longer "seek insurance from a closed
network of health-care providers in exchange for a lower
premium."

The justices said nothing about any willing provider laws'
potential benefits to patients, or whether they believe the
statutes work as intended.

"The jury's still out as to whether the laws are good, bad or
indifferent," said Steven Goldblatt, a Georgetown
University professor. "That will continue to play out in the
states. They will continue to make the determination of
how it works."

Timothy Jost, a health law professor at Washington and
Lee University, said he does not expect a rush of states to
copy Kentucky's laws.

"The states have been losing their momentum in the past
few years. All of these things cost money, and it depends
on how much you want to pay," Jost said.

Richard Shaw, with the insurance rating agency A.M. Best
Co., said he does not expect the ruling to financially hurt
HMOs. He said most have expanded their provider
networks anyway, in response to consumer demand.

The Kentucky challenge is one of two major health care
cases at the court this year. The justices will rule soon on
the other, from Maine, that asks whether states can force
drug companies to lower prices for the working poor,
retirees and others who do not receive health coverage or
drug benefits through their jobs.

http://start.earthlink.net/newsarticle?cat=6&aid=D7Q5KNE80  story                    04/02/2003

GH000073