## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ ) | |
| IN RE PHARMACEUTICAL INDUSTRY ) | |
| AVERAGE WHOLESALE PRICE ) | MDL NO. 1456 |
| LITIGATION ) | Civil Action No. 01-12257-PBS |
| _____) | |
| ) | Hon. Patti B. Saris |
| THIS DOCUMENT RELATES TO ) | |
| CLASS 1 RESIDENTS OF THE ) | |
| DISTRICT OF COLUMBIA AND ) | |
| STATES OTHER THAN THE ) | |
| COMMONWEALTH OF ) | |
| MASSACHUSETTS ) | |
| _____) | |

## THE J&J DEFENDANTS' REPLY MEMORANDUM IN
## SUPPORT OF THEIR POST-REMAND MOTION FOR SUMMARY JUDGMENT
## AGAINST CLASS 1 RESIDENTS OF THE DISTRICT OF COLUMBIA AND
## STATES OTHER THAN THE COMMONWEALTH OF MASSACHUSETTS

## Table of Contents

**Page**

Table of Authorities ...................................................................................................... iii

Preliminary Statement .................................................................................................... 1

Plaintiffs' Portrait of the Disputed Facts .................................................................... 3

Argument ......................................................................................................................... 5

I.  Plaintiffs' Argument That Government Knowledge Should Not Be "Imputed" to Class 1 Is Misplaced ................................................................................ 5

II.  The Seventh Amendment Does Not Preclude Entry of Summary Judgment in Favor of the J&J Defendants ...................................................................... 10

III.  The J&J Defendants Are Entitled to Summary Judgment or Dismissal in All States ............................................................................................................ 12

  A.  No Class Actions Allowed  (South Carolina and Tennessee) ....................... 12

  B.  Uniquely Onerous Legal Standards  (Utah and Ohio) .................................. 12

  C.  Claims Under CALIFORNIA CIV. CODE § 1770 ............................................. 12

  D.  No Jury Trial  (Illinois, Nebraska, New Hampshire, CALIFORNIA CIV. CODE § 17200, and North Carolina) ........................................................ 12

  E.  States That Require Proof of Actual Injury  (Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Idaho, Illinois, Kansas, Maryland, Michigan, Missouri, Nebraska, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Dakota, Utah, Washington, Wisconsin, and Wyoming) .......................................................................... 13

  F.  States That Require Detrimental Reliance (Part 1)  (Arizona, Indiana, North Carolina, Pennsylvania, and Wyoming) ............................................. 14

  G.  States That Require Detrimental Reliance (Part 2)  (Maryland, Michigan, Minnesota, Oregon, South Dakota, and CALIFORNIA CIV. CODE § 17200) ....................................................................................... 15

  H.  Jurisdictions That Do Not Prohibit "Unfair" Conduct  (Arizona, Colorado, Delaware, District of Columbia, Indiana, Michigan, Minnesota, Nevada, New York, North Dakota, Oregon, Pennsylvania, South Dakota, and Utah) ..................................................... 16

I. States That Prohibit Unconscionable Conduct  (Arkansas, Florida, Idaho, Kansas, New Jersey, New Mexico, and Texas) .................... 16

J. States That Prohibit "Unfair" Conduct  (Connecticut, Florida, Hawaii, Illinois, Maryland, Missouri, Nebraska, New Hampshire, North Carolina, Oklahoma, Rhode Island, Vermont, Washington, West Virginia , Wisconsin, and Wyoming) ............................................................. 18

K. Jurisdictions That Require "Material Misrepresentations"  (California, Connecticut, District of Columbia, Hawaii, Illinois, Kansas, Maryland, New Jersey, New York, Pennsylvania, Texas, and Vermont) ....................................................................................................... 18

Conclusion ......................................................................................................................... 19

# Table of Authorities

**Page(s)**

C<small>ASES</small>

*Blue Cross Blue Shield of Mass. v. AstraZeneca Pharms. L.P.*,
 582 F.3d 156 (1st Cir. 2009) ...........................................................................11

*Bradburn Parent/Teacher Store, Inc. v. 3M (Minn. Mining & Mfg. Co.)*,
 No. Civ. A. 02-7676, 2004 WL 1146665 (E.D. Pa. May 19, 2004) ..........................9

*Bradford v. Vento*,
 48 S.W.3d 749 (Tex. 2001) ...............................................................................17

*Burbank Grease Servs., LLC v. Sokolowski*,
 693 N.W.2d 89 (Wis. Ct. App. 2005), *rev'd on other grounds*,
 717 N.W.2d 781 (Wis. 2006) ..............................................................................9

*Colaizzi v. Beck*,
 895 A.2d 36 (Pa. Super. Ct. 2006) .....................................................................19

*Galloza v. Foy*,
 389 F.3d 26 (1st Cir. 2004) .................................................................................3

*Group Health Plan, Inc. v. Philip Morris, Inc.*,
 621 N.W.2d 2 (Minn. 2001) ...............................................................................15

*In re Pharm. Indus. Average Wholesale Price Litig.*,
 460 F. Supp. 2d 277 (D. Mass. 2006) ..................................................................3

*In re Pharm. Indus. Average Wholesale Price Litig.*,
 491 F. Supp. 2d 20 (D. Mass. 2007) ........................................................... *passim*

*In re Pharm. Indus. Average Wholesale Price Litig.*,
 252 F.R.D. 83 (D. Mass. 2008) ..........................................................................15

*In re Nat'l Credit Mgmt. Group, L.L.C.*,
 21 F. Supp. 2d 424 (D.N.J. 1998) ......................................................................17

*In re Tobacco II Cases*,
 207 P.3d 20 (Cal. 2009) ....................................................................................16

*In re Wiggins*,
 273 B.R. 839 (Bkrtcy. D. Idaho 2001) ................................................................17

*Incase Inc. v. Timex Corp.*,
 488 F.3d 46 (1st Cir. 2007) ...............................................................................10

*MacDonald v. Ortho Pharm. Corp.*,
   475 N.E.2d 65 (Mass. 1985) ............................................................................7

*Marcoux v. Shell Oil Prods. Co.*,
   524 F.3d 33 (1st Cir. 2008) ............................................................................10

*Nygaard v. Sioux Valley Hosps. & Health Sys.*,
   731 N.W.2d 184 (S.D. 2007) ..........................................................................15

*Shepley v. Johnson & Johnson*,
   582 F.3d 231 (1st Cir. 2009) ..........................................................................10

*State ex rel. Bryant v. R & A Inv. Co.*,
   985 S.W.2d 299 (Ark. 1999) ...........................................................................17

*Trent Partners and Assocs., Inc. v. Digital Equip. Corp.*,
   120 F. Supp. 2d 84 (D. Mass. 1999) .................................................................9

*U.S. v. 6 Fox St.*,
   480 F.3d 38 (1st Cir. 2007) ............................................................................10

*Wille v. Sw. Bell Tel. Co.*,
   549 P.2d 903 (Kan. 1976) ...............................................................................17


## STATUTES

CALIFORNIA CIV. CODE § 1770 ................................................................................12

CALIFORNIA CIV. CODE § 17200 ........................................................................12, 15

KAN. STAT. ANN. § 50-627(b)(2) ............................................................................17

TEX. BUS. & COM. CODE § 17.45(5) .......................................................................18

The J&J Defendants submit this reply memorandum of law in further support of their motion for summary judgment against Class 1 residents of the District of Columbia and states other than the Commonwealth of Massachusetts.

**Preliminary Statement**

After years of hard work by the parties and the Court, Plaintiffs now urge the Court to jettison the 30% liability and damages standard that Plaintiffs themselves advocated, that the Court adopted, and that the Court of Appeals affirmed. The Court should reject this invitation to change the rules in mid-stream. The proposed change is not supported by any expert's testimony and it would be fundamentally unfair to the J&J Defendants whose spreads were admittedly within the range the government expected when it set the Medicare reimbursement rate.

As the Court knows, there is a formulaic markup between WAC and AWP. Thus, there is always a "spread" between a drug's AWP and its average selling price. According to Dr. Berndt, this spread was "publicly known," "quite understandable," and "not the result of any sinister or nefarious conspiracies." Dkt. # 1384 (02/09/05 Berndt Rep.) ¶ 23.

The Court made allowances for this spread plus modest discounts in fashioning the standard for measuring liability and damages. The Court rejected the "legal conclusion," advanced by Plaintiffs' counsel, that there should be *per se* liability in Classes 1 and 2 for all drugs, regardless of the magnitude of the spread. *In re Pharm. Indus. Average Wholesale Price Litig.* ("*In re AWP*"), 491 F. Supp. 2d 20, 97 (D. Mass. 2007) (30% speed limit applies to Class 2); Exh. 2 (07/03/07 Hrg. Tr.) at 8:19-11:3 (30% speed limit applies to Class 1). Instead, the Court endorsed the more nuanced view, advanced by Plaintiffs' experts, that liability should attach only to drugs with "mega-spreads," *i.e.*, spreads substantially in excess of the 30% range

1

expected by industry and government.  *In re AWP*, 491 F. Supp. 2d at 92.  This standard was affirmed by the First Circuit in its *AstraZeneca* opinion, and it has since been endorsed by a number of State Attorneys General and by the Department of Justice.  *See, e.g.*, Dkt. # 6747 (12/08/09 Consent of the United States of America to the Settlement Between Ven-A-Care and Schering-Plough Corp. et al.).

Plaintiffs concede, as they must, that the spreads on Procrit and Remicade were within the 30% range that government officials understood and expected when they established the Medicare reimbursement rate.  Plaintiffs also concede that Dr. Hartman's 30% yardstick yields "$0 in damages" in Class 1.  *See* Pls.' Rule 56.1 Counter-Statement No. 16.  It follows that, for these two drugs, Class 1's co-payments were not "inflated."

Despite the Court's rulings, Plaintiffs contend that the 30% yardstick should not apply to Class 1.  They say "Class 1 is different," since consumers "did not know what AWP meant, let alone that J&J was inflating AWP."[1]  This argument is not new, and the Court has already rejected it.  There is no reason to revisit the issue now.  The fact that consumers were unaware of AWP, and therefore had no expectations one way or another concerning spreads, supports the J&J Defendants' argument that liability should be measured by what the government knew about AWP.  Plaintiffs' assertion that the J&J Defendants were "inflating" their AWPs is belied by the undisputed evidence, including Dr. Hartman's admission that spreads in the range of 30% were "untainted by the AWP scheme."  Dkt. # 3296 (11/01/06 Hartman Direct Testimony) ¶¶ 147-48.

---

[1] Plaintiffs' Combined Opposition to the J&J Defendants' Post-Remand Motions for Summary Judgment ("Pls.' Opp. Memo.") at 1.

Plaintiffs make three additional arguments. First, they say the government's knowledge concerning AWP should not be "imputed" to consumers. Pls.' Opp. Memo. at 14-18. Second, they argue that, in states where the relevant UDTPA provides for a jury trial, the liability and damages standards established in the Track 1 trial may be disregarded, because the jury has the right to devise its own standards. *Id.* at 19-24. Finally, without disputing the J&J Defendants' detailed, state-by-state analysis of each state's UDTPA, Plaintiffs argue that most Class 1 Plaintiffs have viable claims. *Id.* at 24-29.

The J&J Defendants respond to these arguments below. Before doing so, however, they briefly address Plaintiffs' portrayal of "the facts."

### Plaintiffs' Portrait of the Disputed Facts

The J&J Defendants acknowledge that, in reviewing a motion for summary judgment, "the Court must view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *In re AWP*, 460 F. Supp. 2d 277, 284 (D. Mass. 2006) (quoting *Barbour v. Dynamics Research Corp.*, 63 F.3d 32, 36 (1st Cir. 1995)). Even so, the Court may not consider hearsay evidence, and it is not required to accept "conclusory allegations, improbable inferences, and unsupported speculation." *Galloza v. Foy*, 389 F.3d 26, 28 (1st Cir. 2004) (internal citation omitted).[2]

Plaintiffs' opposition papers, and their accompanying statement under Local Rule 56.1, portray the J&J Defendants' conduct in the worst light imaginable. The J&J Defendants dispute Plaintiffs' account of the facts, and while it is tempting to highlight the evidence that

---

[2] For example, because it is based on hearsay, the Court cannot consider Plaintiffs' description of the so-called "Ka-Ching" document which is referenced in a complaint filed in another case. *See* Pls.' Rule 56.1 Additional Statement No. 19. Nor is the Court required to accept Plaintiffs' speculative assertion that Ortho-Biotech did not raise Procrit's WAC in late 1997 because it wished to "conceal" Procrit's discounted price from the government, or that it decided to raise Procrit's WAC in early 1997 and early 1998 because it intended to counter the effect of the BBA. *See* Pls.' Rule 56.1 Counter-Statement No. 4.

contradicts Plaintiffs' account, the J&J Defendants will not do so in this reply brief, as there is nothing in Plaintiffs' account that the Court did not already hear and consider in the Track 1 trial. Indeed, as the J&J Defendants noted in their initial motion papers, the Court's 2007 liability decision largely adopted Plaintiffs' version of the disputed facts. Obviously, a jury's findings could parallel the Court's findings, or they could be more favorable to the J&J Defendants.

The fact that a jury could decide the ***disputed*** facts in either side's favor, however, is irrelevant to the instant motion because the ***dispositive*** facts favoring summary judgment are ***undisputed***. All of the facts necessary to grant the J&J Defendants' motion are admitted:

(1) Medicare beneficiaries were unfamiliar with AWP, they had no expectations concerning spreads, and they played no role in determining the Medicare reimbursement rate or the amount of their statutory co-payments. Pls.' Rule 56.1 Counter-Statements Nos. 10-14.

(2) The officials in Washington D.C. who set the Medicare reimbursement rate and the consumers' statutory co-payments expected that AWP would not exceed ASP by more than approximately 30%. Exh. 7 (11/20/06 Trial Tr., Hartman Testimony) at 118:19-21, 119:17-25, 120:1-19.

(3) The AWPs for Procrit and Remicade never exceeded ASP by more than approximately 30%. Pls.' Rule 56.1 Counter-Statements Nos. 6-9.

(4) AWP-based reimbursement "works well," *i.e.* it works as expected, provided a drug's AWP tracks its ASP and the "spread" does not exceed approximately 30%. Exh. 5 (11/27/06 Trial Tr., Rosenthal Testimony) at 71:10-13; *In re AWP*, 491 F. Supp. 2d at 56, 104.

(5) Dr. Hartman's formulaic method of measuring damages, which the Court adopted, yields "$0 in damages" for Class 1. Pls.' Rule 56.1 Counter-Statement No. 16.

Because these facts are not disputed, summary judgment in favor of the J&J Defendants is warranted. A jury could find liability and damages for Procrit and Remicade only if the Court were to discard the 30% speed limit for Class 1. It is too late for that. Class 1 has received or will receive millions of dollars in settlement payments for drugs with spreads that

substantially exceeded the 30% speed limit.  By the same token, Class 1 has no claim, and

suffered no injury, with respect to drugs with spreads that did not exceed the 30% speed limit.

## ARGUMENT

## I.   PLAINTIFFS' ARGUMENT THAT GOVERNMENT KNOWLEDGE SHOULD NOT BE "IMPUTED" TO CLASS 1 IS MISPLACED

Plaintiffs devote several pages of their opposition memorandum to the argument

that the government's understanding of spreads should not be "imputed" to consumers.  Plaintiffs

are attacking a straw man.  Although the J&J Defendants believe that the Court can and should

impute the government's knowledge of spreads to Medicare beneficiaries,[3] that is not the main

focus of their argument.  Rather, the J&J Defendants argue that summary judgment is warranted

because the government's understanding of AWP is the only understanding of AWP that matters

for purposes of assessing Class 1's claims.  This argument requires the Court to consider and

decide whose knowledge is relevant, but it does not require the Court to "impute" the

government's knowledge to Class 1.

As a matter of logic and common sense, the government's knowledge of AWP

should determine Class 1's claims because the government, not the consumer, selected AWP as

the Medicare reimbursement benchmark.  Because the government knew about and expected

30% spreads when it set the reimbursement rate, consumers who made co-payments for drugs

with spreads of 30% or less did not pay more for those drugs than the government anticipated

they would pay.  In short, Class 1 was not injured because it did not "overpay" for the J&J

Defendants' drugs.

---

[3] *See* The J&J Defendants' Memorandum in Support of their Post-Remand Motion for Summary Judgment Against Class 1 Residents of the District of Columbia and States Other than the Commonwealth of Massachusetts ("J&J Memo.") at 23.

What consumers themselves knew or did not know about AWP is irrelevant, because (unlike Class 3) they did not make any of the decisions that determined the amount of their co-payments.  Those decisions were made by the government.  The government set the reimbursement rate, and the government determined that the consumers' co-payment would be 20% of the allowed amount.  Thus, the government's expectation concerning AWP was the only expectation that mattered.  What consumers expected—or did not expect—had no effect on the amount they were required to pay.[4]

Plaintiffs respond by quoting the Court's statement that "government knowledge" does not "exonerate defendants."  Pls.' Opp. Memo. at 2 (quoting *In re AWP*, 491 F. Supp. 2d at 94).  Plaintiffs take this statement completely out of context.  The Court was referring to defendants' argument that there should be no liability once the government learned about "mega-spreads."  *In re AWP*, 491 F. Supp. 2d at 94-95.  The Court rejected this argument because it found that, after learning of "mega-spreads," the government was not able to respond quickly or effectively to fix the problem.  *Id.*  This finding has no bearing on the J&J Defendants' argument that, because of government knowledge, there should no liability for spreads of 30% or less.

In their opening brief, the J&J Defendants referred the Court to the "learned intermediary doctrine," a legal principle that originated in products liability law.  They did so because they thought it provided a useful analogy that helped to elucidate their argument about the primacy of government knowledge.  Plaintiffs respond that the analogy does not support imputing government knowledge to Class 1 and, in any event, that the learned intermediary doctrine should not be extended "beyond its specific definition."  Pls.' Opp. Memo. at 16.

---

[4] Plaintiffs offer no response to the J&J Defendants' argument that if liability were to be assessed based on what consumers expected, then manufacturers could be held liable under the current ASP-based reimbursement system, since consumers may be unaware that physicians currently receive a 6% spread over the average selling price.

Plaintiffs' criticisms of the learned intermediary analogy are misplaced. The learned intermediary doctrine holds that a manufacturer's failure to provide a direct warning to the consumer about the risks associated with taking a prescription medicine should not be considered the legal cause of the consumer's injury, because, as a matter of law, the physician's informed decision to prescribe the drug is a "superseding cause" of the injury. *MacDonald v. Ortho Pharm. Corp.*, 475 N.E.2d 65, 68 (Mass. 1985). The identical logic applies in this case. The government's informed decision to use AWP, with the understanding and expectation that spreads were in the range of approximately 30%, may be considered a "superseding cause" of the consumer's alleged overpayment for drugs with spreads of 30% or less. Of course, the same would not be true for drugs with spreads in excess of 30%, because, for those drugs, the actual spread was higher than the expected spread.

Plaintiffs also criticize the analogy on the grounds that physicians can protect their patients by making informed prescribing decisions, whereas the government was helpless to protect Medicare beneficiaries because it could not "move quickly or effectively to fix the problem." Pls.' Opp. Memo. at 16 (quoting *In re AWP*, 491 F. Supp. 2d at 31). This argument again takes the Court's language out of context. The Court was referring to the government's inability to respond quickly and effectively to information about "mega-spreads" that began to emerge in the mid-1990's. *In re AWP*, 491 F. Supp. 2d at 40. The Court's comments had nothing to do with the type of routine spreads at issue here, which were known to the government "throughout the class period." *Id.*; *see also* Exh. 7 (11/20/06 Trial Tr.) at 118:19-21 (testimony by Dr. Hartman that "[t]he government has set reimbursement rates that reflect an understanding that is comparable to what I would say is – in my yardsticks.").

Finally, Plaintiffs argue that the learned intermediary analogy is inapt because it wrongly implies that the "overpayments made by Class 1 were attributable to the Medicare program," when in fact they were "attributable to the J&J Defendants."  Pls.' Opp. Memo. at 16. Plaintiffs are missing the point, which is that there were no "overpayments" for Procrit and Remicade.

Class 1 can only be said to have "overpaid" for drugs if the government's reimbursement rate as applied to those drugs was higher than the government intended.  The Court has already determined, based on Plaintiffs' admissions, that the reimbursement system worked as the government intended when the manufacturer's spread was approximately 30% or less.  *See* Exh. 6 (11/21/06 Trial Tr.) at 120:17-23 (30% yardstick generally reflected what "payors either understood or just basically took for granted").  The spreads on Procrit and Remicade were within this range.  For these drugs, the reimbursement system worked as the government intended.  Consumers did not "overpay."

After exhausting their attack on the learned intermediary analogy, Plaintiffs devote a scant two paragraphs attempting to refute the J&J Defendants' core argument that the government's understanding of AWP is determinative of Class 1's claims.  Pls.' Opp. Memo. at 17-18.  Plaintiffs admit that consumers knew nothing about AWP, and that they had no idea what AWP meant.  *Id.*  They nevertheless make a conclusory allegation that consumer expectations are relevant, because consumers may have assumed that their co-payments "would not be unlawfully or fraudulently inflated," and that their doctors would not decide which drug to prescribe based on profitability.  *Id.*

Even if Plaintiffs are right about what consumers assumed (and they may not be), summary judgment would still be appropriate because neither of the assumptions that Plaintiffs

identify could have had any effect on the amount of the consumers' co-payments.  Moreover, it is simply not true that consumer co-payments for Procrit and Remicade were "inflated." According to Dr. Hartman's analysis, which the Court adopted, the consumer's co-payment is "inflated" only where the manufacturer established a "secret mega-spread" in excess of the expected industry markup.  *In re AWP*, 491 F. Supp. 2d at 95.  For all other drugs, including Procrit and Remicade, the consumer's co-payment was not inflated, because the spreads were "within well established industry expectations (i.e., the Hartman 30 percent 'speed limit')."  *Id.*

Plaintiffs' final point is that the J&J Defendants should be liable because they allegedly "sought to hide" their real prices from the government.  Pls.' Opp. Memo. at 18. Notably, Plaintiffs cite no case law suggesting that it is illegal for a seller to keep its contract prices secret, let alone that it is unlawful for a seller to *attempt* to keep its prices secret.[5]

In any event, Plaintiffs' argument fails because they admit that the government always knew about spreads in the range of 30%.  Thus, even if it were true that the J&J Defendants "sought to hide" their prices from the government, they did not succeed.  The great majority of Procrit's spreads were "less than 25%," and Remicade's 30% spread was "published by the industry compendia" and was not "secret or deceptive."  *In re AWP*, 491 F. Supp. 2d at 56, 104.

---

[5] Courts routinely accord trade secret protection to confidential prices.  *See*, *e.g.*, *Burbank Grease Servs., LLC v. Sokolowski*, 693 N.W.2d 89, 96 (Wis. Ct. App. 2005) (pricing information can qualify for trade secret protection if, among other factors, there was a contract restricting customers from disclosing prices), *rev'd on other grounds*, 717 N.W.2d 781 (Wis. 2006); *Bradburn Parent/Teacher Store, Inc. v. 3M (Minn. Mining & Mfg. Co.)*, No. Civ. A. 02-7676, 2004 WL 1146665, at *3 (E.D. Pa. May 19, 2004) (granting defendant's motion to seal, in part because "[defendant's] customer lists and the prices [defendant] charges to individual customers are entitled to confidential treatment"); *Trent Partners and Assocs., Inc. v. Digital Equip. Corp.*, 120 F. Supp. 2d 84, 111 (D. Mass. 1999) ("In Maryland, [p]ricing information and marketing strategy are protectable [sic] as . . . trade secrets." (alterations in original) (internal quotation marks omitted)).

## II.   THE SEVENTH AMENDMENT DOES NOT PRECLUDE ENTRY OF SUMMARY JUDGMENT IN FAVOR OF THE J&J DEFENDANTS

Plaintiffs contend that the Court cannot enter summary judgment because the Seventh Amendment mandates that disputed issues of fact must be decided by a jury.  Pls.' Opp. Memo. at 19-20.  Plaintiffs are only half right; juries decide disputed issues of fact, but that does not preclude summary judgment where, as here, the ***material*** facts are undisputed.  *See U.S. v. 6 Fox St.*, 480 F.3d 38, 42 (1st Cir. 2007) (summary judgment appropriate where the disputed facts are not "material"); *see also id.* ("[T]he nonmoving party must produce 'hard evidence of a material factual dispute' to survive a summary judgment motion.") (quoting *Griggs-Ryan v. Smith*, 904 F.2d 112, 115 (1st Cir. 1990)).  In fact, the First Circuit has already stated that the Court may enter summary judgment in this case in response to a properly-framed motion for summary judgment.  *Shepley v. Johnson & Johnson*, 582 F.3d 231, 237 (1st Cir. 2009).

Plaintiffs assert that a jury would be free to disregard the Court's liability analysis and impose liability based on factors of its own choosing.  Pls.' Opp. Memo. at 21.  This assertion, for which Plaintiffs provide no case support, is incorrect.  Juries do not have unbounded discretion to determine liability or damages based on any factors they choose. *Marcoux v. Shell Oil Prods. Co.*, 524 F.3d 33, 53 (1st Cir. 2008) ("[A] jury is not free to pull figures out of a hat . . . .").  Moreover, "the boundaries of what may qualify for consideration as a [Chapter] 93A violation is a question of law."  *Incase Inc. v. Timex Corp.*, 488 F.3d 46, 57 (1st Cir. 2007).[6]

---

[6] Plaintiffs' argument that a jury could evaluate liability according to unspecified factors of its own choosing appears to be limited to the "unfairness" prong of Ch. 93A as opposed to the "deception" prong. Pls.' Opp. Memo. at 21 (arguing that "[t]he Court analyzed three factors in determining whether J&J's conduct *was 'unfair'* under Chapter 93A" and that "the jury could consider different factors, or weight the factors the Court used differently.") (emphasis added).  Thus, even if Plaintiffs' analysis of the jury's prerogatives were correct, which it is not, that analysis would not apply in the fourteen states whose statutes prohibit deception but not unfairness. *See* J&J Memo. at 24.

The legal boundaries for assessing liability in this case were established by the Court in its June 2007 decision. The Court identified three factors, the "most important" being "the extent and duration of the spreads" as measured against Dr. Hartman's 30% yardstick. *In re AWP*, 491 F. Supp. 2d at 101-02. This analysis was affirmed by the Court of Appeals in its *AstraZeneca* decision. *Blue Cross Blue Shield of Mass. v. AstraZeneca Pharms. L.P.*, 582 F.3d 156, 186 (1st Cir. 2009).[7]

Plaintiffs next argue that a jury's "damages" determination would be "entitled to great deference" on appeal. Pls.' Opp. Memo. at 21. They concede, however, that Dr. Hartman's damages methodology, which the Court adopted, results in "$0 in damages" for Class 1. Pls.' Rule 56.1 Counter-Statement No. 16. As a result , they are forced to take the position that a jury could reject Dr. Hartman's methodology in favor of some unspecified "theory of its own." Pls.' Opp. Memo. at 21.[8]

Not surprisingly, Plaintiffs provide no support for their assertion that a jury is free to make up a damages methodology at odds with the damages methodology endorsed by their own expert and adopted by the Court. But even if a jury could, in theory, make up its own damages methodology, Plaintiffs would not benefit in this particular case unless the Court were to rule that the 30% yardstick does not apply to Class 1. If the yardstick is applied, damages are measured by calculating the difference between the actual amount paid and the amount that would have been paid based on a "but for" spread of 30%. *In re AWP*, 491 F. Supp. 2d at 109

---

[7] Although the Court's analysis was based on Ch. 93A, Plaintiffs do not argue that any other state's UDTPA requires the application of different factors. Indeed, they could not make such an argument consistent with their position that the state UDTPAs are sufficiently similar that consumer claims can be tried together as part of a single, nationwide class.

[8] The damages calculations listed on page 23 of Pls.' Opp. Memo. are hugely inflated because they are based on the damages allegedly suffered "nationally" by all three classes combined, not just Class 1.

(describing damages calculation).  That method yields "$0 in damages" for Procrit and

Remicade, because their actual spreads were equal to or less than the "but for" spread of 30%.

Thus, unless the Court throws out the 30% yardstick for Class 1, a jury could not award more

than "$0 in damages."

## III.   THE J&J DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT OR DISMISSAL IN ALL STATES

### A.   No Class Actions Allowed (South Carolina and Tennessee)

Plaintiffs concede that the citizens of South Carolina and Tennessee must be

dismissed from Class 1 because their UDTPAs do not permit class actions.  Pls.' Opp. Memo. at

24 n.11.

### B.   Uniquely Onerous Legal Standards (Utah and Ohio)

Plaintiffs concede that summary judgment must be entered against the citizens of

Utah and Ohio because their UDTPAs contain uniquely onerous requirements that Plaintiffs

cannot satisfy.  *Id.*

### C.   Claims Under CALIFORNIA CIV. CODE § 1770

Plaintiffs concede that summary judgment must be entered on claims brought

pursuant to CALIFORNIA CIV. CODE § 1770 because the Court has already ruled that the conduct

at issue in this case is not prohibited by that statute.  *Id.*

### D.   No Jury Trial (Illinois, Nebraska, New Hampshire, CALIFORNIA CIV. CODE § 17200, and North Carolina)

Plaintiffs concede that the UDTPAs of these states either do not provide for a jury

trial or, in the case of North Carolina, require the court itself to determine whether a defendant's

acts were deceptive or unfair.  *Id.* at 25.  Plaintiffs' sole argument against summary judgment in

these non-jury states is that government knowledge cannot be imputed to Class 1.  *Id.*  Even if

that argument were correct, it would not defeat summary judgment in non-jury states.  First, as

noted above, the Court does not need to impute government knowledge to consumers in order to

grant the J&J Defendants' motion.  More important, the Court has already ruled that the J&J

Defendants' conduct was not deceptive or unfair.  In states where there is no right to a jury, there

is no conceivable reason why the Court should schedule time on its trial calendar for a second

bench trial to rehear evidence it has already considered.  Thus, summary judgment should be

granted in all non-jury states, including Massachusetts.

   E.    **States That Require Proof of Actual Injury
          (Arizona, Arkansas, California, Colorado, Connecticut, Delaware,
          Florida, Idaho, Illinois, Kansas, Maryland, Michigan, Missouri,
          Nebraska, New Jersey, New Mexico, New York, North Carolina,
          Oklahoma, Oregon, Pennsylvania, Rhode Island, South Dakota, Utah,
          Washington, Wisconsin, and Wyoming)**

          Plaintiffs concede that most UDTPAs require the plaintiff to prove that the

defendant's conduct resulted in a cognizable loss.  Pls.' Opp. Memo. at 24.  Plaintiffs

nevertheless argue that summary judgment is inappropriate in jury states because in those states

the jury is entitled to decide whether the plaintiff suffered a "loss."  *Id.*  They claim summary

judgment is also inappropriate in non-jury states because government knowledge cannot be

imputed to Class 1.  *Id.* at 24-25.  Neither of these arguments is sufficient to defeat summary

judgment in this case.

          Plaintiffs' jury argument is inapplicable to this case because Plaintiffs do not

identify any type of "loss" that a jury could properly consider other than "$0 in damages" based

on the 30% yardstick.  As for non-jury states, Plaintiffs' argument that government knowledge

may not be imputed to Class 1 is besides the point.  The two issues have nothing to do with one

another.  Whatever the Court concludes about whether government knowledge should be imputed to consumers, Class 1 sustained "$0 in damages."

If Plaintiffs believed that Class 1 suffered a form of cognizable "loss" other than damages, they were obliged to submit evidence of it in response to the J&J Defendants' motion for summary judgment.  Their failure to do so is fatal in those states that require plaintiffs to prove that the defendant's conduct resulted in a cognizable loss.

### F.   States That Require Detrimental Reliance (Part 1)
   (Arizona, Indiana, North Carolina, Pennsylvania, and Wyoming)

Plaintiffs concede that the UDTPAs of these five states require a showing of detrimental reliance.  *Id.*  Nevertheless, Plaintiffs say detrimental reliance is satisfied because consumers had the choice of paying based on "inflated AWPs or not taking Procrit or Remicade at all."  *Id.* at 26.  As with several of Plaintiffs' other arguments, this argument is not supported by citations to any case law or evidence.

In any event, the argument that consumers relied on AWP because they could have forgone treatment in lieu of making "inflated" co-payments makes little sense.  First, the spreads on Procrit and Remicade were not "inflated," because they did not exceed 30%.  Second, in the real world, patients never faced the choice that Plaintiffs hypothesize.  Medicare beneficiaries knew nothing about AWP or how their co-payments were calculated.  Thus, they had no occasion to consider whether to forgo treatment on the grounds that their co-payments were "inflated."  As a practical matter, they did not "rely" on AWP for any purpose.

The Medicare officials who acted on their behalf arguably did "rely" on AWP in setting the co-payment amount, but, in the case of Procrit and Remicade, that reliance was not detrimental to the Medicare program or to the program's beneficiaries.  Plaintiffs admit that

14

government officials expected spreads within the range of 30%.  Since the spreads on Procrit and Remicade conformed to the government's expectations, there was no detrimental reliance.

### G. States That Require Detrimental Reliance (Part 2) (Maryland, Michigan, Minnesota, Oregon, South Dakota, and CALIFORNIA CIV. CODE § 17200)

Plaintiffs deny that these six states require proof of detrimental reliance, but their analysis of the law in these states is flawed.  The Court has already ruled that three of these states—Maryland, Oregon and South Dakota—require proof of detrimental reliance.  *See In re AWP*, 252 F.R.D. 83, 97-99 & n.12 (D. Mass. 2008).  The Court has also ruled that plaintiffs in Michigan must prove that reliance would have been reasonable.  *Id.* at 98 n.16.  Since Plaintiffs concede that consumers knew nothing about AWP, they cannot establish that consumer reliance on AWP would have been reasonable.

Plaintiffs assert that Oregon and Maryland do not require detrimental reliance in omission cases.  However, the Court has already ruled that "[t]his is not an omissions case."  *Id.* at 100.  As for South Dakota, Plaintiffs merely say that the federal court got it wrong in the *Union Carbide* case when it held that the statute required proof of detrimental reliance.  Pls.' Opp. Memo. at 27.  In fact, the court's ruling was correct.  For private causes of action, South Dakota requires plaintiffs to prove reliance.  *See Nygaard v. Sioux Valley Hosps. & Health Sys.*, 731 N.W.2d 184, 196-197 & n.13 (S.D. 2007) (private cause of action requires proof of causation and reliance).

Plaintiffs argue that Minnesota only requires proof of causation, not reliance.  *Id.* However, the Minnesota Supreme Court has held that "reliance" is an element of proving causation.  *See Group Health Plan, Inc. v. Philip Morris, Inc.*, 621 N.W.2d 2, 13-14 (Minn. 2001) (proof of causation requires proof of reliance).

Finally, with respect to claims brought under CALIFORNIA CIV. CODE § 17200, Plaintiffs overlook the fact that the California Supreme Court recently held that a class may not be certified unless the class representative can prove actual reliance.  *In re Tobacco II Cases*, 207 P.3d 20, 40-41 (Cal. 2009).  The two class representatives in this case cannot prove actual reliance because they admit they were unfamiliar with AWP.  Thus, the Court should either grant summary judgment or dismiss California's citizens from Class 1.

### H. Jurisdictions That Do Not Prohibit "Unfair" Conduct (Arizona, Colorado, Delaware, District of Columbia, Indiana, Michigan, Minnesota, Nevada, New York, North Dakota, Oregon, Pennsylvania, South Dakota, and Utah)

These fourteen jurisdictions prohibit deceptive conduct, but they do not prohibit "unfair" or "unconscionable" conduct.  J&J Memo. at 24-25.  Plaintiffs do not deny that consumers themselves were not deceived by AWP.  Nor do Plaintiffs deny that the government was not deceived by spreads in the range of 30%.  Thus, in the case of Procrit and Remicade, neither Class 1 nor the government was deceived.  Summary judgment is warranted in states where the statute only applies to conduct that is alleged to be deceptive.

Plaintiffs do not respond to this argument other than to repeat once more their contention that government knowledge "cannot be imputed to Class 1."  Pls.' Opp. Memo. at 28.  Plaintiffs miss the point, which is that no one was deceived.

### I. States That Prohibit Unconscionable Conduct (Arkansas, Florida, Idaho, Kansas, New Jersey, New Mexico, and Texas)

Seven states prohibit conduct that is "unconscionable."  As the J&J Defendants noted in their initial brief, the test for whether conduct is unconscionable is onerous and specific.  J&J Memo. at 28-29.  It requires conduct significantly different in character from the conduct at issue here.

16

Plaintiffs do not take issue with the J&J Defendants' description of the legal test for unconscionability. Rather, they respond that summary judgment should be denied because the Court "has never made findings regarding whether J&J's conduct was unconscionable." Pls.' Opp. Memo. at 28. This response is insufficient. "Unconscionable" conduct typically involves a predatory transaction where the seller knowingly exploits the buyer's physical or mental disabilities in order to extract terms that are excessively one-sided in favor of the seller and of no material benefit to the buyer. J&J Memo. at 28-29. That is a far cry from the conduct at issue in this case, where the J&J Defendants are accused of following industry practice by not including discounts and rebates in AWP, and of telling doctors that their reimbursement payments would be greater than the amount they paid to acquire the drugs. Although the Court considered this conduct to be "troubling," it is nothing like the type of conduct that Courts have considered "unconscionable" under state law.[9]

---

[9] *See, e.g.*, *State ex rel. Bryant v. R & A Inv. Co.*, 985 S.W.2d 299, 303 (Ark. 1999) ("[C]ontinuous and flagrant violations of the constitutional prohibition against usury are unconscionable practices."); *In re Wiggins*, 273 B.R. 839, 866-68 (Bkrtcy. D. Idaho 2001) (a 75-page contract to purchase mentally disabled annuitant's annuity that contained numerous substantive waivers and omitted crucial information was excessively one-sided and, therefore, unconscionable, but the discount rate was not "grossly excessive" and, therefore, was not unconscionable); KAN. STAT. ANN. § 50-627(b)(2) (defining one type of unconscionability to be where "the price grossly exceeded the price at which similar property or services were readily obtainable in similar transactions by similar consumers"); *Wille v. Sw. Bell Tel. Co.*, 549 P.2d 903, 906-07 (Kan. 1976) (identifying ten factors to consider in determining unconscionability: "(1) The use of printed form or boilerplate contracts drawn skillfully by the party in the strongest economic position . . . ; (2) a significant cost-price disparity or excessive price; (3) a denial of basic rights and remedies to a buyer of consumer good; (4) the inclusion of penalty clauses; (5) the circumstances surrounding the execution of the contract, including its commercial setting, its purpose and actual effect; (6) the hiding of clauses which are disadvantageous to one party in a mass of fine print trivia or in places which are inconspicuous to the party signing the contract; (7) phrasing clauses in language that is incomprehensible to a layman or that divert his attention from the problems raised by them or the rights given up through them; (8) an overall imbalance in the obligations and rights imposed by the bargain; (9) exploitation of the underprivileged, unsophisticated, uneducated and the illiterate; and (10) inequality of bargaining or economic power") (internal citations omitted); *In re Nat'l Credit Mgmt. Group, L.L.C.*, 21 F. Supp. 2d 424, 450 (D.N.J. 1998) (company's practice of debiting checking accounts of consumers who declined its credit services and automatically deducting $9.95 postage and handling charge without disclosure was unconscionable); *Bradford v. Vento*, 48 S.W.3d 749, 760 (Tex. 2001) ("The [Texas] DTPA defines an 'unconscionable action or course of action' as 'an act or practice, which . . . takes

(footnote continues)

**J.      States That Prohibit "Unfair" Conduct
         (Connecticut, Florida, Hawaii, Illinois, Maryland, Missouri,
         Nebraska, New Hampshire, North Carolina, Oklahoma, Rhode
         Island, Vermont, Washington, West Virginia , Wisconsin, and
         Wyoming)**

These sixteen states prohibit "unfair" conduct.  The Court has already found that the J&J Defendants' conduct was not "unfair" under the liberal standards embodied in Section 9 of Ch. 93A.  Plaintiffs do not argue that this same conduct should be viewed more harshly under the unfairness standards of other states.

More important, Plaintiffs do not deny that the marketing activity that troubled the court did not result in damages to Class 1.  "Marketing the spread," for example, had no effect on the amount of the consumer's co-payment.  Conduct that does not result in higher co-payments cannot support a claim for damages.

**K.      Jurisdictions That Require "Material Misrepresentations"
         (California, Connecticut, District of Columbia, Hawaii, Illinois,
         Kansas, Maryland, New Jersey, New York, Pennsylvania, Texas, and
         Vermont)**

Where a manufacturer's spreads are within the range that payors understood and expected, the manufacturer cannot be said to have made a "material misrepresentation" concerning its AWPs.  According to Dr. Rosenthal, such AWPs are not "misrepresentations" at all, because, in her opinion, AWPs should "track" ASP, but "not certainly [be] equal."  Exh. 5 (11/27/06 Trial Tr.) at 71:10-13.

Plaintiffs' only response is that "materiality" is a jury question.  Pls.' Opp. Memo. at 29.  This may be true in general, but here Plaintiffs' experts have conceded that spreads of

---

advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree.'") (quoting TEX. BUS. & COM. CODE § 17.45(5)).

approximately 30% or less are not misleading.  Procrit and Remicade pass this test.  The J&J Defendants did not "materially misrepresent" their AWPs.[10]

## <u>Conclusion</u>

Plaintiffs admit that the government understood that there was a formulaic relationship between WAC and AWP, and that it expected spreads in the range of approximately 30%.  Plaintiffs also admit that consumers never heard of AWP, and that they had no expectations one way or another concerning the existence or size of spreads.

Given these admissions, the critical question on this motion is whether liability and damages for Class 1 should be determined based on what the government knew and expected when it set the Medicare reimbursement rate, or what consumers understood and expected when they made statutory co-payments.  This is a legal issue that can and should be decided on summary judgment.  Since the relevant reimbursement decisions were made by the government, rather than by consumers, it follows that the government's expectations should determine whether a manufacturer's AWPs are deceptive or unfair under state law.

---

[10] In a footnote, Plaintiffs argue that materiality is not required by *Colaizzi v. Beck*, 895 A.2d 36, 39-40 (Pa. Super. Ct. 2006), as that case supposedly required materiality only for common law fraud claims, and not for claims brought pursuant to Pennsylvania's UDTPA.  Pls.' Opp. Memo. at 29, n.15.  Plaintiffs are wrong.  The court in that case held that, in order to establish liability under the "catch all" provision of the UDTPA applicable to this case, "a plaintiff must prove all of the elements of common-law fraud," including materiality.  *Colaizzi v. Beck*, 895 A.2d at 39-40 (internal citations omitted).

Dated:  January 29, 2010

/s/ Andrew D. Schau
_____

Andrew D. Schau
Adeel A. Mangi
Elizabeth Shofner
Michael Jacobsohn
**PATTERSON BELKNAP WEBB & TYLER LLP**
1133 Avenue of the Americas
New York, New York  10036-6710
(212) 336-2000

*Attorneys for the J&J Defendants*

20

## CERTIFICATE OF SERVICE

I certify that on January 29, 2010 a true and correct copy of the foregoing was delivered via electronic service to all counsel of record pursuant to Case Management Order No. 2.

/s/ Andrew D. Schau
Andrew D. Schau