# Exhibit 62

*State of California ex rel. Ven-A-Care of the Florida Keys, Inc.  v. Abbott Laboratories, Inc., et al.*, **Master Civil Action No. 01-12257-PBS, Subcategory Case No. 06-11337**

Exhibit to the January 29, 2010 Declaration of Philip D. Robben in Support of Defendants' Joint Sur-Reply Brief in Opposition to Plaintiffs' Motion for Partial Summary Judgment

Case 1:01-cv-12257-PBS Document 6877-2 Filed 01/29/10 Page 2 of 6
CAMylan04092021

*C.M. Haddow and Associates*
2921 Mother Well Court
Herndon, Virginia 22071

# FAX MESSAGE

October 23, 1992

To:      Rod Jackson

From:    C. McClain Haddow

Re:      California Meeting

There is/are four (4) page(s) of copy following this transmittal sheet for delivery to the addressee.

If any problems with this transmission occur, please call (703) 471-5467 immediately.

Telecopier Number:    (703) 481-3682

HIGHLY CONFIDENTIAL                                                CAMylan04092021

# MEMORANDUM

October 19, 1992

To:      File

From:    C. McClain Haddow

Subject: Meeting with California Department of Health Services Staff

---

Meeting participants:

Industry:

   Martin Zeiger, Rugby-Darby/GPIA

   Rod Jackson, Mylan Laboratories

   C. McClain Haddow, Mylan Laboratories

California Department of Health Services:

   S. Kimberly Belshe', Deputy Secretary for Programs and Fiscal Affairs, Health and Welfare Agency

   John Rodriguez, Chief Deputy Director of Programs, Department of Health Services

   James Park, Assistant Secretary for Programs and Fiscal Affairs, Department of Health Services and Chief of Health Systems Financing Division.

Issues discussed:

Industry representatives provided a briefing to the California Department of Health Services staff on the adverse impacts of the proposed MediCal pharmaceutical rebate program which imposes a 5.5% rebate on MediCal purchases

HIGHLY CONFIDENTIAL                                         CAMylan04092022

- 2 -

on top of the 10% federal rebate already paid by generic drug manufacturers. The major points of this briefing were as follows:

* The OBRA '90 Medicaid rebate program which imposed a rebate on generic drugs was the product of a last-minute deal orchestrated by the Pharmaceutical Manufacturers Association (PMA). The basis for the imposition of rebates under the law resulted from exorbitant prices and excessive profits made by brand name companies -- not generic manufacturers. Generic drug manufacturers have an exemplary price performance in a hotly competitive marketplace which provided significant benefits to consumers. The profitability of the generic products of generic manufacturers are lower than average manufacturers profits because of the competitive prices for these products driven by market competition.

* Generic drug manufacturers generally market their products to distributors who, in turn, sell the products to pharmacists for retail sale. Profit margins are thin, and the imposition of rebates imposes an unfair disproportionate burden on generic companies. PMA companies simply pass on the rebate costs to their commercial customers by cost shifting to their patent protected product line where price increases are insulated from traditional competitive pressures.

* PMA companies have large detail forces who market brand name products directly to physicians, and these detail forces are able to establish a core group of loyal physicians who will prescribe PMA company products as "brand medically necessary" to avoid generic competition after the patent protection expires on brand name drugs. This procedure allows PMA companies to actually increase prices dramatically even after patent expiration when the competitive marketplace would normally dictate a lowering of prices from competition.

* The generic companies recognize the fiscal reality of the need for states to capture the Medicaid rebate revenues, but offered some options that would permit the states to exempt generic drugs from rebates while lowering outlays for reimbursement for MediCal for prescription drugs. These options would net the MediCal program more savings/revenue than the present MediCal rebate proposal.

HIGHLY CONFIDENTIAL                                      CAMylan04092023

- 3 -

1. Impose tighter MAC controls. Data was provided on the success of the State of Ohio in imposing MAC reimbursement limits that would provide substantial savings for the MediCal program. The specific examples of current MediCal reimbursement levels versus lower reimbursement for the same products under Ohio's MAC program documented the substantial savings potentially available by more effectively monitoring multiple source drug reimbursement levels.

    Ms. Belshe' instructed her staff to explore this option. Mr. Park indicated that under existing California statutes, changes in the MAC program required public hearings which could take as long as 18 months. Mr. Park promised to research this issue to fully respond to this issue.

2. Implement a requirement for pharmacists to document all "brand medically necessary" scrips. Documentation was provided which showed (1) that the overall percentage of "brand medically necessary scrips" should not exceed 5%, and (2) that both the national and California percentages were significantly above the 5% threshold. This program is modelled after the State of Maryland, where substantial savings were realized from implementing a regulation. An impact analysis of requiring pharmacist documentation on "brand medically necessary" scrips for MediCal was presented which documented that such a program -- with the goal of reducing the present 25% level of "brand medically necessary scrips" to below 5% -- would save California approximately $48.5 million per year.

    Mr. Rodriguez and Ms. Belshe' appeared to be genuinely interested in this approach, and asked questions that facilitated a broad discussion on the merits of using this approach. One objection raised by Mr. Rodriguez centered on the logistical impediments to requiring submission of the "brand medically necessary scrips" with the doctors directions when the movement in the claims processing sector has been to have totally "paperless claims."

\*   Generic drugs are already price controlled under the upper limits provided by HCFA. The addition of rebates creates an additional

HIGHLY CONFIDENTIAL                                                    CAMylan04092024

- 4 -

unfair burden which has significantly negatively impacted the generic industry. Prior to the meeting, the GPIA reports from the PRIME Institute and the Philadelphia School of Pharmacy had been sent to the California officials for review. These studies document the adverse impacts of the rebates on the generic industry, and the likely prospect that the federal rebates alone will reduce competition and drive prices up by forcing some generic competitors out of the marketplace. The imposition of California's added rebate will further compound this problem.

Mr. Park indicate that he had reviewed these studies and offered no disagreement or criticism of the data and conclusions contained therein.

* Information relating to pricing of brand name drugs after patent expiration was presented that documented that brand name companies insulate themselves from price competition in the marketplace. Pricing of generic products reflects a high sensitivity to competitive pricing in the marketplace to the significant advantage of purchasers, including MediCal. The added rebates do not impact brand name companies nearly as much as generic companies.

Ms. Belshe' indicated she would review her staff research in this matter and would welcome additional information we may wish to provide. Mr. Park indicated he would be the point person for contact, and Mr. Rodriguez invited us to submit additional written information to him for review.

Summary:

This meeting produced the foundation for discussion which may lead California to modify its present rebate approach. Whether this modification is manifest in a reduction of the rebate percentage, or a total exemption, or some blended compromise will largely depend on whether the political advisability of protecting vulnerable consumers will outweigh the immediate revenue priorities of the MediCal program.

A follow-up with California legislative leaders, combined with aggressive follow-up with these meeting participants should provide the platform for the change we are seeking.

HIGHLY CONFIDENTIAL                                          CAMylan04092025