# Exhibit 30

*State of California ex. rel. Ven-A-Care of the Florida Keys, Inc. v.*
*Abbott Laboratories, Inc., et al.*

Exhibit to the Declaration of Rita Hanscom in Support of Plaintiffs' Sur-Reply in
Opposition to Dey, Inc. and Dey, L.P.'s Motion for Partial Summary Judgment

CAUSE NO. GV002327

| | | |
|---|---|---|
| THE STATE OF TEXAS | ) | IN THE DISTRICT COURT |
| ex rel. | ) | |
|     VEN-A-CARE OF THE | ) | |
|     FLORIDA KEYS, INC. | ) | |
| | ) | |
|       Plaintiffs, | ) | |
| | ) | |
| VS. | ) | TRAVIS COUNTY, TEXAS |
| | ) | |
| DEY, INC.; ROXANE | ) | |
| LABORATORIES, INC. and | ) | |
| WARRICK PHARMACEUTICALS | ) | |
| CORPORATION, | ) | |
| | ) | |
|       Defendants. | ) | 53rd JUDICIAL DISTRICT |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
ORAL AND VIDEOTAPED DEPOSITION OF
CHARLES A. RICE
October 30, 2001
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF CHARLES A. RICE, produced

as a witness at the instance of the Plaintiffs and duly

sworn, was taken in the above-styled and numbered cause

on the 30th day of October 2001, from 9:06 a.m. to 5:02

p.m., before Randall N. Finch, CSR in and for the State

of Texas, reported by machine shorthand, at the offices

of Coudert Brothers, 600 Beach Street, Third Floor,

San Francisco, California 94109, pursuant to Notice,

the Texas Rules of Civil Procedure and the provisions

as previously set forth.

1      again I'm quoting from memory -- I believe in 1995

2      where one individual at Dey took it upon herself to

3      report an increasing WAC to a single data reporting

4      service.

5                      For reasons unbeknownst to us she did

6      not report it to all the data reporting services and we

7      can find no evidence that she reported it to any state.

8      That was discovered by Dey several -- well, several

9      months later, I believe six months later, at which time

10     it was corrected with the one data reporting service.

1:39P  11     Q.   Was that one data reporting service First Data

12     Bank?

13     A.   I -- it is called First Data Bank today.  I'm

14     not sure what it was called then.  It may have been

15     just called Blue Book --

16     Q.   Blue Book?

17     A.   -- at the time.  But yes, that's correct.

18     Q.   That's the data reporting agency that the

19     state Medicaid programs primarily look to for their

20     reimbursement information?

21     A.   I don't think so.  I think they look at all of

22     them, don't they?  I mean, there are -- there are at

23     least three that keep being referenced to us by the

24     individual states.

25     Q.   And those are?

1       A.   I believe one is called now Medi-Span and the

2  other I believe is the Red Book.

3       Q.   And the other is First Data Bank, formerly

4  Blue Book?

5       A.   I believe that's correct, sir, yes.

6       Q.   Based upon your understanding?

7       A.   Yes.

8       Q.   Okay.  That one instance you found of the one

9  person increasing certain Dey -- a WAC or certain WACs,

10  and reported to one data reporting service, was that

11  done to meet actions by competition?

12       A.   I actually can't say why it was done.  I

13  didn't ever speak to the individual.  The individual

14  left our employ a few months after this action was

15  taken.

1:40P  16       Q.   Who was the individual?

17       A.   The individual -- individual's name was

18  Ms. Helen Burnham, B-u-r-n-h-a-m.

19       Q.   Was she fired?

20       A.   I don't believe she was fired, no, sir.

21       Q.   Was she asked to leave?

22       A.   I don't believe so.

23       Q.   As the CEO of Dey, Incorporated, do you

24  believe it is proper for your employees to report

25  increases in WAC for the purposes of meeting action by

1    competition?

2         A.   No, sir.

3         Q.   Do you think it's proper for your employees to

4    increase Dey's reports of WAC to government

5    reimbursement authorities in order to increase the

6    spread and make Dey's product more likely to be

7    purchased by Medicaid providers?

8         A.   No, sir.

9         Q.   Now, I believe that -- I meant to cover this

10   before we got into the break.  When you were at McGaw

11   you had some responsibility for FDA compliance,

12   correct?

1:41P   13         A.   That's correct.

14        Q.   And I would assume that working for a company

15   like McGaw, they made sure that you had adequate

16   training and experience before giving you those

17   responsibilities, didn't they?

18        A.    In some cases, yes.

19        Q.   Did you ever have inadequate training or

20   experience to perform your responsibilities?

21        A.   No, sir.  What I was implying is some of the

22   training and experience that I required actually came

23   along with my college degree.  The basic science

24   aspects.

25        Q.   Did you have any responsibility for reviewing

1       or correcting or taking any action with respect to

2       labeling issues at McGaw?

3            A.    Directly, I don't believe so.  But I'm sure

4       that there were people underneath who were -- either

5       reported to people who reported to me or directly to me

6       who had that responsibility.

7            Q.    Were you familiar with the Code of Federal

8       Regulations and other requirements promulgated under

9       the Food and Drug Act relating to representations about

10      drug companies by their product -- about their

11      products?

1:42P   12           A.    In general, yes.

13           Q.    Did you ever study those issues -- those

14      areas?

15           A.    Some areas, yes, but others, no.

16           Q.    Whose responsibility is it to make sure that

17      information put out by a drug company about its product

18      is not misleading?

19           A.    Food and Drug Administration.

20           Q.    It's not the drug company's responsibility?

21           A.    Well, it's the drug company's responsibility

22      to comply with what the Food and Drug Administration

23      approves.

24           Q.    And as the chief executive officer of Dey, is

25      it your ultimate responsibility to make sure that

Page 123

1     information put out by Dey about its drug products is

2     truthful, accurate and complete?

3        A.   In general, yes.

4        Q.   Does that include information put out by Dey

5     Laboratories about its drug prices?

6        A.   With respect to the prices we're talking about

7     here, yes, sir.

8        Q.   Well, is there any prices that Dey Laboratory

9     would put out to outsiders that you do not believe that

10    you are ultimately responsible for ensuring are true,

11    accurate and complete as the CEO of Dey?

1:44P   12        A.   Again, in general, no.

13       Q.   Who under you is also responsible for making

14    sure that information put out by Dey about its prices

15    are true, accurate and complete?

16       A.   Sales and marketing staff.

17       Q.   Mr. Mozak?

18       A.   Yes, and the accounting staff who would report

19    on -- according to the HCFA rebate program or the CMMS

20    rebate program.

21       Q.   All right.

22            MR. BREEN:  What's the next one, 72?

23            (Exhibit 72 marked)

1:46P   24        Q.   (By Mr. Breen)  Let me show you what's been

25    marked as Exhibit 72.

Page 124

1        A.   Yes, sir, I see it.

2        Q.   Ever seen that before?

3        A.   Yes, I have.

4        Q.   Purports to be a memo dated 30 May 1995 from

5   Helen Burnham to sales and marketing with an attachment

6   to it --

7        A.   Yes, sir.

8        Q.   -- cc R.F. Mozak?

9        A.   Yes.

10       Q.   Now, in 1995, as I understand it, you were not

11  responsible for sales and marketing in a managerial

12  capacity?

13       A.   No, I was.

14       Q.   You were at that time?

15       A.   Yes.  It was only prior to the middle of 1992

16  that I was not.

17       Q.   Okay.  So Ms. Burnham I would assume then

18  indirectly reported to you?

19       A.    Indirectly through a circuitous route, yes,

20  sir.

21       Q.   Okay.  Now, when was the first time you saw

22  this document?

1:47P 23       A.   That I don't recall.

24       Q.   Did you see it at the time that it was created

25  by Ms. Burnham?

1        A.   No, sir, I don't believe so.

2                   MR. HUDSPETH:  Excuse me, may I just

3        interject.  I think you have attached to here something

4        that is not the attachment to the document as it

5        appears.  At least it's not in numerical sequence in

6        the production that was given by Dey.

7                   MR. BREEN:  Well, to make is easier, if

8        you want to remove that, Counsel, I have no objection

9        to it.

10                  MR. HUDSPETH:  Yes, so we are marking --

11       just so we are clear on the record, Exhibit 72 will now

12       consist of one page which is -- what is the first

13       page -- what has been previously referred to as Exhibit

14       72.  The second page is now removed.  So henceforth

15       when we speak of Exhibit 72 we're talking about a

16       one-page document.

17                  MR. BREEN:  That's fine.

18                  MR. ANDERSON:  Let's go off the record.

19                  VIDEOGRAPHER:  We're off the record at

20       1:48 p.m.

1:49P    21                  VIDEOGRAPHER:  Back on the record at

22       1:48 p.m.

23                  MR. BREEN:  Read my last question back

24       for my train of thought purposes.

25                  (Requested portion was read)

1        Q.    (By Mr. Breen)   I see some writing next to

2    Ms. Burnham's name and date which appears to say Helen.

3    Do you see that?

4        A.    Yes, sir, I see it.

5        Q.    Do you know if that is or is not Ms. Burnham's

6    writing?

7        A.    I don't know.   I can presume it is, but I

8    don't recognize her signature, sorry.

9        Q.    Okay.   On the bottom the preparer's initials

10   appear to be HB:MF.   Do you know who MF is?

11       A.    I'm trying to recall, but I don't know people

12   employed in the company at that time.   I suspect it was

13   a secretary.   I -- I don't know if Ms. Burnham actually

14   had a secretary --

15       Q.    Okay.

16       A.    -- but we could con -- you know, again, we

17   could consult our files to find out.

1:50P    18       Q.    The memorandum purports to be about Albuterol

19   WAC pricing.   Do you see that?

20       A.    Yes, do I.

21       Q.    Now, what was Ms. Burnham's responsibility in

22   May of 1995 at Dey -- at Dey?

23       A.    Ms. Burnham was Manager of Marketing.

24       Q.    And so she managed the entire marketing

25   department?

1        A.   Yes, at that time.

2        Q.   And if I understood your -- your testimony

3   earlier, the marketing department had responsibility at

4   that time for establishing prices of Dey's products?

5        A.   Marketing and sales.

6        Q.   And sales?

7        A.   Yes.

8        Q.   And sales and marketing is basically housed

9   under one roof, correct?

10       A.   That's correct.

11       Q.   So who at Dey was superior to Ms. Burnham with

12   respect to actual responsibility for setting prices?

13       A.   Mr. Mozak.

14       Q.   And you can see here that this memo was cc'd

15   to R.F. Mozak, correct?

16       A.   Yes, I see that.

17       Q.   Now, are you aware of any document or response

18   memorandum or e-mail or anything that exists whereby

19   Mr. Mozak took issue with anything that Ms. Burnham

20   says in this memo?

1:51P   21       A.   I'm not aware of that, no.

22       Q.   Have you ever had any discussion with

23   Mr. Mozak about Ms. Burnham's memo of May 30, 1995?

24       A.   I'm sure I have, yes, sir.

25       Q.   Can you recall any of those discussions that

1     may have taken place other than discussions that were

2     directly related to the efforts by your counsel in this

3     case?

4          A.   Pertaining to my discussions with Mr. Mozak?

5          Q.   Correct.

6          A.   I believe, if I remember correctly, the

7     discussions were as to the source, the timing, the

8     surrounding events, the inaccuracies of the memo itself

9     and what was subsequently done about this memo.

10         Q.   What did Mr. Mozak tell you?

11         A.   He told me that around this period of time we

12    had had discussions with our sales reps, and I believe

13    at the time it was the State of Florida concerning one

14    of our competitors reporting what appeared to us to be

15    an artificially high Wholesale Acquisition Cost to the

16    state for the purposes of Medicaid reimbursement.

17              Our customers in Florida had been

18    objecting to our continued sales calls and refusing to

19    buy our products because our WAC was so much lower than

20    our competitors'.  I believe at the time our sales rep

21    did contact the State of Florida and became

22    extraordinarily frustrated with the response or lack of

23    response.

24              That was communicated to the marketing

25    department, there were some follow-up phone calls, and

1      Ms. Burnham became extraordinarily frustrated with this

2      situation because she felt that Dey was at an extreme

3      disadvantage in this particular situation.

1:53P  4         Q.   Was that competitor Warrick?

5         A.   I don't recall at the time.  I think in 1995

6      we probably only had one other competitor and that was

7      Warrick.

8         Q.   Well, I'm a little confused, because --

9                   MR. HUDSPETH:  There's going to be an

10     objection to form.

11                  MR. BREEN:  Yeah, I --

12                  MR. HUDSPETH:  You know that, right?

13     You knew it was coming.

14                  MR. BREEN:  I'm going to take back "I'm

15     a little confused."

16                  MR. HUDSPETH:  Okay.  Good, that's a

17     good start.

18                  MR. BREEN:  Because everyone knows I'm

19     confused anyway, so...

20                  MR. MOORE:  Do you want us to stipulate?

21        Q.   (By Mr. Breen)  Was the disadvantage perceived

22     at Dey based upon the fact that Warrick had a higher

23     WAC or based upon the fact that Warrick had a greater

24     spread?

25        A.   I think in this particular case, Ms. Burnham

Page 130

1    at least perceived a disadvantage solely on the basis

2    of a higher WAC.

1:54P    3    Q.    How does a higher WAC create a disadvantage --

4    strike that.  How does a competitor such as Warrick

5    having a higher WAC than Dey for Albuterol put Dey at a

6    disadvantage unless the spread's greater?

7    A.    Depends on which spread you're talking about.

8    I'm -- again, we've talked, there are numerous spreads

9    in the marketplace.

10    Q.    Well, for the purpose of this question, let's

11    talk about the spread between the reimbursement amount

12    paid by Medicaid --

13    A.    Okay.

14    Q.    -- and the actual cost of the drug to the

15    Medicaid providers submitting the claim.  Let's talk

16    about that spread.  Okay?

17    A.    Okay.

18    Q.    All right.  Now, I'll ask the question again:

19    How did a higher WAC by Warrick put Dey at a

20    competitive disadvantage unless Warrick's product --

21    Albuterol product had a bigger spread?

22    A.    In effect it did not put Dey at a disadvantage

23    with that exception.

1:55P    24    Q.    So the problem --

25    A.    With respect to state Medicaid reimbursement.

1        Q.    With respect to state Medicaid reimbursement.

2    And this memo dated May 30, 1995 is about state

3    Medicaid reimbursement, correct?

4        A.    It appears be, yes.

5        Q.    So what, if anything, did Dey do to respond to

6    the fact that it believed it was at a competitive

7    disadvantage because Warrick's Albuterol had a bigger

8    spread for Medicaid reimbursement purposes?

9        A.    Outside of this particular anomaly event on

10   the part of Ms. Burnham, Dey did nothing.  Dey sold its

11   product at a competitive advantage to the product sold

12   by Warrick on its own merits, not on the basis of

13   reimbursement.

14             Warrick had a product which was in a

15   screw cap vial, which came with a tamper evident seal,

16   which many patients were complaining they couldn't

17   open.  Warrick's product contained a preservative; it

18   was not sterile.  Dey's product was sterile.  The

19   preservative contained in Warrick's product, through

20   some clinical studies performed outside of this

21   country, were shown to have safety disadvantages.

22             So Dey made use of all of those

23   differentiation points for its product.  We did not

24   promote the spread.

1:56P   25        Q.    So is it your testimony, Mr. Rice, that Dey

Page 132

1    did nothing to increase its spread for Albuterol

2    vis-a-vis Warrick's spread at or about the time of

3    Ms. Burnham's May 30, 1995 letter -- or memo?

4         A.   No, sir.  My testimony is that Mrs. Burnham

5    sent this letter out to our staff, apparently some of

6    our staff, and copied Mr. Mozak, and she also sent

7    apparently a representation of a different WAC to First

8    Data Bank -- at the time I believe it was Blue Book.

9              She did not send it to the State of

10   Florida or any other state to the best we can determine

11   in our documents; there are no documents indicating

12   that.  There were no comments from the state of "Why

13   are you increasing your Wholesale Acquisition Cost?"

14             She did not send it to Red Book, she did

15   not send it to Medi-Span.  We've covered those dates in

16   history.  The WAC prices remained exactly what Dey

17   printed on its invoices to wholesalers for that period

18   of time.

19        Q.   But if the Medicaid programs were relying upon

20   the prices reported by First Data Bank or Blue Book,

21   then they would have had the increased WAC prices

22   reported to them, correct?

1:57P  23        A.   I don't know if they did or not.  I'm not sure

24   how quickly Blue Book, First Data Bank, Red Book or

25   anyone makes a change to the price.

```
 1        Q.   Okay, I'm sorry --
 2        A.   And I'm not sure if the state relies solely on
 3   what's printed in Blue Book.
 4        Q.   I'm sorry.
 5             So when did Dey send a report to Blue
 6   Book or First Data Bank, advised them to not increase
 7   the WAC prices, or if they had already done so, to
 8   lower them back to the WAC prices in existence before
 9   Ms. Burnham's action in or about May of 1995?
10        A.   My understanding is the first that this was
11   discovered was about the five or six month period later
12   after Ms. Burnham wrote this letter.  And at that time
13   we sent a correction to Blue Book.  We have a copy of
14   the fax.  I believe it's been produced.
15        Q.   So you immediately brought the WAC
16   representations to Blue Book back in line with the WACs
17   before Ms. Burnham took this action?
18        A.   We brought -- we notified Blue Book of the
19   current WAC that Dey printed on its invoices at that
20   time.  I don't recall if that was the same as before
21   Mrs. Burnham printed this letter or if we had adjusted
22   the WAC again downward, as we customarily do.
23        Q.   Have you ever adjusted the WAC upward, truly
24   adjusted the WAC upward, as -- with respect to what
25   you're putting on invoices?
```

1:59P (line 23)

Page 134

1            MR. HUDSPETH:  Relevant drugs?

2            MR. BREEN:   For the relevant -- always

3    relevant drugs unless I say otherwise, and I'm going to

4    qualify my question with the exception of this anomaly

5    as you -- as you've indicated on Ms. Burnham's part in

6    May of 1995.

7        A.   To my knowledge, that has not -- we have not

8    found any evidence of that, nor would we condone it.

9    So my answer would be no, we have not done it.

10       Q.   (By Mr. Breen)  Well, why -- my question has

11   to do with increasing WAC price representations based

12   upon actual increases of WAC on invoices.  Has that

13   ever happened?

14       A.   I'm not sure I understand you, sir.  Could you

15   rephrase?

16       Q.   Okay.  As I understand from your testimony,

17   Dey's WAC for the relevant drugs is supposed to be the

18   actual WAC price that appears on invoices you give to

19   your wholesalers, correct?

2:00P   20       A.   It's not supposed to be; it is.

21       Q.   Right.  So have you ever increased the WAC

22   price for any of the relevant drugs, to your knowledge,

23   that appears on the wholesaler's invoice?

24            MR. MOORE:  Object to form.

25            THE WITNESS:  The way I understand your

1    question, sir, to my knowledge we have not.

2         Q.   (By Mr. Breen)  Okay.  So if -- let's make

3    sure we understand the -- you understand the question

4    so I can understand the answer and I'll try to address

5    counsel's objection to form.

6              Has the WAC price -- and again my

7    questions here are with the exception of Ms. Burnham's

8    memo --

9         A.   Okay.

10        Q.   -- okay?  With the exception of that

11   circumstance.

12        A.   Understood.

13        Q.   Have the WAC prices that Dey Laboratories

14   charge for its Albuterol to its wholesaler customers

15   ever gone up?

16        A.   To my knowledge, no, with one exception.  You

17   said Albuterol products, but you really mean relevant

18   drugs.  Is that correct?

2:01P  19        Q.   Well, to make sure that we're not missing

20   anything, since we're talking about Albuterol, let's

21   talk about any of your Albuterol products for the

22   purposes of this question.

23        A.   I believe there has been an increase in the

24   WAC price of one Albuterol product, which is the

25   metered dose inhaler, which we do not produce

FREDERICKS-CARROLL REPORTING (512) 477-9911 (713) 572-8897

1     ourselves.

2          Q.    That's a 17 gram inhaler?

3          A.    I believe that's correct, sir.

4          Q.    Manufactured by Glaxo?

5          A.    No.  Manufactured by Armstrong.

6          Q.    Was it manufactured by Glaxo at any time in

7     the past?

8          A.    Yes.

9          Q.    Okay.

10          A.    But you asked for changes in WAC upward.

11          Q.    I did.

12          A.    That did not happen with any Glaxo product to

13     my knowledge.

14          Q.    I did.  I appreciate that.  Okay.  Has -- with

15     the exception -- has Dey Laboratories ever increased

16     any of its WAC prices for Ipratropium Bromide?

17          A.    To my knowledge, no.

18          Q.    Has Dey Laboratories ever increased any of its

19     WAC prices for Cromolyn?

20          A.    Again, to my knowledge, no.

21          Q.    Now, with respect to the metered dose --

22     metered dose inhaler 17 gram manufactured by Armstrong

23     for Dey, why did you increase the WAC price for that?

2:02P    24          A.    There was a situation unfortunately in the

25     market where one major competitor was forced to -- was

FREDERICKS-CARROLL REPORTING (512) 477-9911 (713) 572-8897

Page 137

1        forced to remove their products from the market, which

2        immediately resulted in a massive shortage of that

3        particular product.  Dey, and all of its competitors to

4        our knowledge, were shorthanded -- were basically all

5        on back order.

6                    Dey has a contractual relationship with

7        its manufacturing supplier which limits us to a certain

8        quantity.  Above that quantity we don't get the same

9        price.  In fact, there's a severe premium placed on any

10        quantities above a certain minimum and a certain

11        maximum.  Therefore we had no choice, since our price

12        increased, but to pass the increase on to the market.

13        And so we did.

14        Q.    So the laws of supply and demand basically

15        caused that price to go up.  Is that accurate?

16        A.    That's correct.

17        Q.    Okay.  How about the price of the metered dose

18        inhaler 17 gram manufactured by Armstrong, sold by Dey,

19        that was charged to purchasers buying pursuant to

20        chargeback arrangements.  Did it go up?

2:03P   21        A.    I don't know the answer to that, sir.

22        Q.    Well, wouldn't the laws of supply and demand

23        have the same effect upon those prices?

24        A.    It depends if there is a contract in force and

25        the contract has a term.  It must run the term unless

Page 138

1    it's amended by both parties, usually mutual consent of

2    both parties.  And I don't know that level of detail on

3    our -- our process, sir.

4         Q.   So is it possible, say, sitting here today

5    whether any of those contracts may have run out, been

6    renegotiated or by the time that happened the prices

7    may have been back in line.  Is that basically it?

8         A.   Again, I don't know.

9         Q.   Did the -- did the WAC for that metered dose

10   inhaler manufactured by Armstrong, sold by Dey, ever go

11   back down?

12        A.   I don't know the answer to that.

13        Q.   Does the shortage still exist?

14        A.   I don't know the answer to that, either.

15        Q.   Who was the innovator of that 17 gram metered

16   dose inhaler for Albuterol?

17        A.    There are actually two innovators.  One is

18   known now as Glaxo Smith Kline, then Glaxo, and also

19   Schering-Plough.  Two separate brand names, my

20   understanding is two separate marketing authorizations

21   from the FDA.

2:04P   22        Q.   Did Dey sell Glaxo's MDI 17 gram Albuterol

23   pursuant to an NDA -- or pursuant to an ANDA?

24        A.   Dey did not sell Glaxo's product pursuant to

25   an ANDA.  Dey sold Glaxo's products -- product -- a

1    similar product to that of Glaxo Wellcome at the time,

2    pursuant to the existing NDA held by Glaxo Wellcome.

3         Q.   Now, you said it was a similar product.

4         A.   Mm-hmm.

5         Q.   The fact of the matter is it was the same

6    product made by the same company and the same

7    manufacturing facility.   Is that correct?

8         A.   It was a similar product made by the same

9    manufacturing company in the same manufacturing

10   facility.

11        Q.   When you marketed the MDI 17 gram Albuterol

12   inhaler, in your marketing materials did you say it was

13   a similar product, or did you say it was the

14   innovator's product?

2:05P   15      A.   We said it was manufactured by the innovator.

16   I believe that's verbatim from our marketing materials.

17        Q.   Did you make any effort whatsoever to advise

18   the market that it was only a similar product, not the

19   identical product manufactured by the innovator?

20        A.   Well, I think by the terms manufactured by the

21   innovator that's self-evident.

22        Q.   Self-evident that it's only similar?

23        A.   Well, otherwise we would have said it is the

24   innovator product, which we didn't say.   It was

25   manufactured by the innovator.

1        Q.   Well, if it's only similar with the exception

2   of Dey's label on the product, what was the difference?

3        A.   Well, we purchased active ingredient.  The

4   active ingredient varies batch to batch.

5        Q.   But it -- who was actually manufacturing the

6   batch?

7        A.   Glaxo Wellcome.

8        Q.   So did the batch-to-batch variances for the

9   MDI 17 gram inhaler sold by Dey differ in any way,

10  shape or form from the batch-to-batch differences of

11  the MDI 17 gram inhaler manufactured and sold by Glaxo?

2:06P   12   A.   I wasn't involved in testing.  I actually

13  don't know.  I would presume they're similar, but

14  again, I -- I can't say that they didn't differ.  They

15  were tested to meet the same specifications under the

16  New Drug Application.

17       Q.   Aside from these batch-to-batch potential

18  differences, let me ask -- strike that.  Let me ask

19  this question:  You've worked in quality assurance and

20  FDA compliance.  If there was any difference, lack of

21  true similarity, between the MDI 17 gram inhaler

22  manufactured by Glaxo and sold by Dey, and the MDI 17

23  gram inhaler Albuterol manufactured by Glaxo and sold

24  by Glaxo, if there was any significant dissimilarity,

25  would you have sold the product and said it was the

Page 141

1   same as the innovator's?

2:07P   2   A.   I would not have sold the product unless I had

3   had approval from the Food and Drug Administration.

4   Q.   And did the approval from the Food and Drug

5   Administration allow you to sell a 17 gram MDI inhaler

6   that was substantially dissimilar from Glaxo's?

7   A.   No, I had some -- no such authorization to do

8   so.

9   Q.   So it was substantially the same as Glaxo's,

10   correct?

11   A.   Which I said, it's similar.  We are talking

12   semantics.  Maybe -- maybe I've mischaracterized.  My

13   apologies.

14   Q.   Well, they are semantics and I don't mean

15   that -- I don't mean that in a negative way but they're

16   important semantics.  If there were any real

17   differences between your MDI inhaler and Glaxo's, I

18   would like to know about it.

19   A.   I am not aware of any "real" differences; the

20   two products were slated to be bioequivalent to one

21   another.

22   Q.   Did you pay the Medicaid rebate on the MDI

23   inhaler as an innovator drug?

24   A.   I am not aware of how we paid Medicaid rebate

25   on the product.

1    Q.   Who would be?

2    A.   Ms. Marrs.

3    Q.   Excuse me?

4    A.   Ms. Marrs.

5    Q.   And she's working -- she reports directly to

6    you, correct?

2:08P  7    A.   That's correct.

8    Q.   Do you know whether or not you are supposed to

9    pay the Medicaid rebate on the MDI inhaler as an

10   innovator drug or as a multisource noninnovative drug?

11   A.   I don't know.

12   Q.   When you were doing FDA compliance at McGaw,

13   did you actually sit down and read the pertinent

14   federal regulations?

15   A.   On some cases, yes.

16   Q.   Whose job is it to actually sit down and read

17   the pertinent Medicaid statutes and regulations

18   applicable to Dey's reporting of prices?

19   A.   It's a combination of individuals, but

20   principally legal counsel.

21   Q.   If Dey has reported an inaccurate or improper

22   price for state Medicaid purposes, is it your position

23   that you did so on the advice of legal counsel?

2:10P  24   A.   Mr. Breen, Dey reports AWP and Dey reports WAC

25   to the states.  That is what we have done historically,

1      it is what we do today.  That is our understanding of

2      what the states want.  If the states want something

3      else and put it in a statute and clarify it so that we

4      all understand, then we'll report something else.

5                     MR. BREEN:  Would you please read back

6      my last question for this witness.

7                     (Requested portion was read)

8                     MR. BREEN:  If you would like to take a

9      break, I know counsel is conferring.  We could do that

10     right now.

11                    MR. HUDSPETH:  Yeah.  Why don't we do

12     that.  We'll see what...

13                    VIDEOGRAPHER:  We're off the record at

14     2:10 p.m.

15                    (Recess from 2:10 to 2:31 p.m.)

16                    VIDEOGRAPHER:  We're back on the record

17     at 2:31 p.m.

18         Q.   (By Mr. Breen)  We just read the question back

19     before we came back on the record.

20         A.   Okay.  As I understand the question, if -- is

21     there -- or is Dey relying on advice of legal counsel

22     in the event price is reported incorrectly?

23         Q.   Correct.

24         A.   Is that -- in general.  Dey relies on legal

25     counsel for a lot of things, which we won't discuss,

1    obviously, as -- for reasons you've already brought up.

2    If Dey reports something that's inaccurate or

3    erroneous, it's Dey's responsibility.

4         Q.   Okay.  That's fair.  So who at Dey, aside from

5    outside legal counsel -- and let me just lay some

6    groundwork here so I know where I'm going.  Do you have

7    an in-house counsel?

8         A.   Not at this time, no.

2:32P    9         Q.   Okay.  Did you have an in-house counsel during

10   any time in the last five years?

11        A.   No.

12        Q.   So you always relied upon outside counsel for

13   advice regarding the Medicaid requirements that you

14   testified about earlier?

15        A.   That's accurate, yes, sir.

16        Q.   To the extent you relied upon counsel's

17   advice.  Correct?

18        A.   Yes, sir.

19        Q.   And is that counsel the Coudert Brothers?

20        A.   In part, yes.

21        Q.   Okay.  And who else provided legal counsel to

22   Dey in that area?

23        A.   We have at times used individual private

24   counsel.  We have used or sought counsel from Fulbright

25   & Jaworski in Washington, D.C.  I believe also Arnold &

1    Porter.  I believe that's it.  I don't recall any other

2    law firms we've used in this regard.

3        Q.   Okay.  Now, is it anybody's responsibility at

4    Dey -- and when I say at Dey, I'm not talking about

5    your outside legal counsel.  I'm talking about your

6    company -- to be familiar with the statutory and

7    regulatory requirements of the Texas Medicaid program

8    with respect to drug manufacturers' prices?

2:34P    9        A.   There is today, yes.

10        Q.   Who is that?

11        A.   That would be Mr. Russell Johnston and also

12    Mr. Mozak.

13        Q.   Okay.  And when did they become responsible

14    for being aware of the requirements statutorily and

15    regulation-wise of the Texas Medicaid program with

16    respect to drug company price reporting?

17        A.   I would say since this litigation has been

18    commenced.

19        Q.   And nobody at Dey had that responsibility

20    before the litigation was commenced?

21        A.   Implied responsibility in general, yes, but

22    also deferring to legal counsel.  Because as you know,

23    many of the regulations are quite tedious to

24    understand.

25        Q.   Well, do you know what estimated acquisition

Page 146

1    cost is?

2:35P   2        A.   I've seen the term.

3        Q.   When was the first time you can recall seeing

4    that term or hearing that term?

5        A.   I -- I would have to guess in the mid-'90s

6    somewhere.

7        Q.   Okay.

8        A.   Around that time period.

9        Q.   And in the mid-'90s when you first became

10   cognizant of the term estimated acquisition cost, do

11   you recall what context it was in?

12       A.   I don't, sir.  Sorry.

13       Q.   Did it involve the Medicaid programs?

14       A.   I don't recall.

15       Q.   Are you aware that the state Medicaid programs

16   in reimbursing for prescription drugs including Dey's

17   prescription drugs, attempt to estimate the acquisition

18   cost of the provider submitting claims?

19                    MR. MOORE:  Form.

20                    MR. HUDSPETH:  Objection as to form.

21                    THE WITNESS:  No, sir, I am not.

22       Q.   (By Mr. Breen)  Have you ever been aware of --

23   well, strike that.

2:36P  24                    MR. MOORE:  Go ahead.

25                    MR. BREEN:  I'll figure it out.

1           MR. MOORE:  If I could quit making these

2     objections.

3           Q.   (By Mr. Breen)  Have you ever inquired as to

4     the mechanism that state Medicaid programs follow in

5     paying claims for your drugs?

6           A.   Not that I can recall, excluding maybe in

7     discussions with counsel which we've already agreed are

8     privileged.  But I don't recall any other -- I have not

9     made any inquiries outside of Dey or with customers

10    regarding that, no.

11          Q.   Do you know if anybody else in your company

12    has ever made the effort to determine how it is that

13    state Medicaid programs reimburse for Dey's drugs?

2:37P  14          A.   I -- I don't know.  I have almost a thousand

15    employees.  I don't know that.

16          Q.   Well, how about Ms. Helen Burnham.  Do you

17    know if she ever made an effort to inquire as to how

18    state Medicaid programs reimburse for drugs?

19          A.   I don't know.

20          Q.   You testified earlier that you felt or Dey

21    felt it was disadvantaged because Warrick was reporting

22    artificially inflated WAC prices for state Medicaid

23    reimbursement purposes.  Is that correct?

24          A.   Actually, I believe --

25               MR. MOORE:  Object to form.

1          THE WITNESS:  I believe what I said is

2     that Warrick's reported WAC was higher than Dey's.

3     Yes, I did say that.

4          Q.   (By Mr. Breen)  Well, why did Dey feel there

5     was anything wrong with Warrick reporting a higher WAC

6     than Dey?

7          A.   Because our customers were complaining that

8     they really wanted to use our product, but they were

9     prohibited from doing so.

10         Q.   By who?

11         A.   Apparently by themselves.

12         Q.   They were prohibiting themselves from doing

13    so?

2:38P    14         A.   Apparently.

15         Q.   Okay.  Did you inquire as to why your

16    customers felt they were prohibited -- they somehow

17    prohibited themselves from buying your product?

18         A.   Well, a customer would -- I did not inquire,

19    no.

20         Q.   Did anybody inquire?

21         A.   I believe our sales rep in the area in this

22    particular case did, and they reported because the WAC

23    is higher, therefore they got a higher reimbursement.

24    That's my understanding.  Again, I wasn't personally

25    involved in those discussions.

Page 149

1      Q.   What -- I mean, I -- I gathered from your

2   earlier testimony and certainly from Ms. Burnham's memo

3   that Dey believed in or about May 30, 1995, that there

4   was something wrong or unfair about Warrick reporting a

5   higher WAC than Dey.  Is that correct?

6      A.   No, not necessarily.  We believed there was a

7   difference and we didn't understand why the state

8   wouldn't prefer Dey's product, since it would result in

9   savings to the state.  This is in the case of Florida.

2:39P   10      Q.   What do you mean by refer Dey's product?

11            MR. HUDSPETH:  Prefer.

12            THE WITNESS:  Prefer.

13      Q.   (By Mr. Breen)  Oh, prefer.  What do you mean

14   by prefer Dey's products?

15      A.   Because Dey's WAC -- reported WAC was lower,

16   therefore the state would be paying less in

17   reimbursement, in our view.  That's my understanding of

18   the situation as it existed at that period of time in

19   1995.

20      Q.   And how did you come to that conclusion

21   without having any knowledge whatsoever of how the

22   state Medicaid programs reimburse for your products?

23      A.   Maybe it was a superficial conclusion.

24   It's -- you asked what we concluded.  I'm telling you.

25      Q.   And your company, Dey Laboratories, concluded

1    that without any knowledge whatsoever about -- about

2    how state Medicaid programs pay for your products.  Is

3    that your testimony?

4         A.   I don't think I understand your question.

5         Q.   Is it your testimony that Dey concluded that

6    the state should prefer -- Medicaid program should

7    prefer Dey's product over Warrick's because Dey had a

8    lower WAC, yet Dey had no knowledge whatsoever about

9    what -- about how state Medicaid programs reimburse for

10   your products.  Is that your testimony?

2:40P   11              MR. MOORE:  Objection; form.

12              THE WITNESS:  I think you're

13   misconstruing two questions.  You asked earlier with

14   respect to your phrase, "Dey had no knowledge of how

15   the state reimbursed," you asked me about the

16   mechanisms by which reimbursement was made.  I'm

17   presuming you mean the mechanism by which a provider

18   would apply for reimbursement.  I have no knowledge of

19   that.  I don't know how that's done.  I don't know who

20   does it, how often or under what form.  That's what I

21   thought you were referring to.

22        Q.   (By Mr. Breen)  Well, maybe -- then my

23   question was unclear and I appreciate your -- your

24   correcting me with that.

25              Did Dey Laboratories or Dey, Inc. ever

1    have any knowledge as to how state Medicaid programs

2    determine how much they'll pay in reimbursement for

3    Dey's products?

4         A.   In the specific case we're discussing relative

5    to the state of Florida, we were informed that Florida

6    uses WAC to set its reimbursement.  Now, we can

7    conclude from that whatever we want, that it's the

8    basis and some other things are added on or subtracted,

9    but basically WAC was used to set reimbursement.  Our

10   customers were telling us the reimbursement for a

11   competitor's product was more profitable for them than

12   for our product.  And that's what led us to the

13   conclusion.

2:42P 14         Q.   Did anybody from Dey ever represent to the

15   state of Texas Medicaid program that Warrick was

16   reporting artificially high WACs?

17        A.   I don't know that.

18        Q.   Have you ever heard that?

19        A.   I can't say that I have.

20        Q.   Have you ever heard or are you aware of any

21   communications by anybody working for or on behalf of

22   Dey with the State of Texas Medicaid program relating

23   to how Warrick was reporting prices for competing

24   products?

25        A.   Yes, I am aware of that in the State of Texas.

FREDERICKS-CARROLL REPORTING (512) 477-9911 (713) 572-8897

Page 152

1     Q.   What are you aware of in that regard?

2     A.   I'm aware of discussions purportedly -- again,

3     third-party reporting to me that one of our -- I

4     believe at the time a key account manager, a KAM, key

5     account manager at Dey, did have discussions with

6     representatives from state Medicaid regarding Warrick

7     and Dey's reporting of WAC.

2:43P    8     Q.   Do you know who that KAM was?

9     A.   Yes, sir.  It was Mr. Chris Gurchiek.

10     Q.   Chris Gurchiek?

11     A.   Yes, G-u-r-c-h -- don't hold me to this --

12     i-e-c-k, I believe.

13     Q.   Now, Mr. Gurchiek, was he the one that told

14     you about this?

15     A.   No, I don't believe he told me directly.  I

16     believe I heard about it sometime after the fact

17     through someone in the sales and marketing department.

18     Q.   And who was that person in the sales and

19     marketing department?

20     A.   I don't recall.

21     Q.   And what was it that Mr. Gurchiek told the

22     state's Medicaid programs based upon what was related

23     to you?

24          MR. HUDSPETH:  Objection.

25     Q.   (By Mr. Breen)  Let me -- let me change that

Page 153

1    question.  What was related to you about what

2    Mr. Gurchiek told the state Medicaid programs?

2:44P    3        A.    What was related to me is similar to what I

4    just described for you and that occurred in the state

5    of Florida, that there was the belief that the -- the

6    WAC that was reported by Warrick to the State of Texas

7    was significantly higher than that for Dey and it put

8    Dey in a competitive disadvantage, and that the state

9    should be aware of that because customers were telling

10    us they couldn't offer our products because of the loss

11    in profit.

12        Q.    Well, you've testified earlier that the only

13    reason why Dey would have been at a competitive

14    disadvantage would have been if Warrick's spread

15    arising from Medicaid reimbursement was greater than

16    Dey's spread.  Correct?

17                    MR. MOORE:  Objection; form.

18                    MR. HUDSPETH:  Objection to form.

19                    THE WITNESS:  I don't believe that's

20    what I testified, sir.  I think I said the

21    reimbursement for Warrick's product, because of

22    reporting a higher WAC, would be greater.  Therefore,

23    the profit for the customer would proportionally be

24    greater.

25        Q.    (By Mr. Breen)  But how would the profit be

1    greater just because the WAC was higher?

2:45P    2    A.   Well, it's dependent upon the fact if the

3    state Medicaid agency actually uses WAC to set its

4    reimbursement, whether it's actually WAC or a

5    derivative of WAC or some hyphenation of WAC.

6    Q.   All right.  Well, let's break this down.

7    Let's assume that the state uses WAC to set its

8    reimbursement.  How is a higher WAC -- well, let me

9    state it this way.  Strike that.  How does a higher WAC

10   create greater profit for the customer?

11   A.   I think it's quite simple.  If the state

12   reimburses for a product on an individual product

13   basis, and not a collected group for all products in

14   the same category --

15   Q.   Right.

16   A.   -- all products that are bioequivalent to one

17   another.  As long as the state individually reimburses

18   based on a reported WAC, and the customer buys at

19   whatever market price, the difference can be more

20   profitable to the customer.  And the difference would

21   be enhanced if the WAC were higher, if the state is

22   using WAC to set its reimbursement rate.

2:46P    23   Q.   Well, you indicated something about market

24   prices.  What do market prices have to do with WAC?

25   A.   Market prices are WAC in some cases.

1      Q.   Okay.  So if the market price for a product

2   purchased from Warrick is higher than the market price

3   of the same product purchased from Dey, how does that

4   put Dey at a competitive disadvantage?

5      A.   Depends on the market price from Warrick.

6      Q.   Well, you just testified that the market price

7   from Warrick, which is WAC, was higher than Dey's.

8                    MR. MOORE:  Objection; form.

9                    MR. HUDSPETH:  Objection; form.

10                    THE WITNESS:  What I said was the market

11   price can be WAC.  I didn't say all market prices were

12   WAC.  I don't know what Warrick's market prices are.  I

13   can't tell you that.  Sorry.  I don't know.

14      Q.   (By Mr. Breen) I mean, you testified earlier

15   about the law of supply and demand, how it led to an

16   increase in the market price, the WAC, for the metered

17   dose inhaler, 17 gram, because of lack of supply.

18   Correct?

2:47P   19                    MR. PIERCE:  Objection; form.

20                    THE WITNESS:  The combination of lack of

21   supply and increasing cost for us, the manufacturer or

22   the supplier.

23      Q.   (By Mr. Breen) Okay.  So the price went up.

24   Correct?

25      A.   That's correct.

1    Q.   So if the price went up to your customers, is

2    it your testimony because the market price was higher,

3    they made more money?

4    A.   I don't know that in that scenario.  It could

5    be different.

6    Q.   So what was it about the Warrick scenario

7    where Warrick had a higher WAC that meant their higher

8    price caused the customer to make more money on

9    Medicaid reimbursement?

10              MR. MOORE:  Objection; form.

11              THE WITNESS:  I've already testified,

12   I've already told you my answer to that.  If the state

13   sets its reimbursement at or around WAC, and every

14   product is reimbursed based on what's reported as WAC,

15   then the reimbursements will be different.

16   Q.   (By Mr. Breen)  And so will the market prices.

17   Correct?

18   A.   Potentially.  Or the market price could be the

19   same.

20   Q.   Same as what?

21   A.   For competing products.

22   Q.   So is Dey's WAC not Dey's market price?

23   A.   Dey's WAC is among Dey's market prices.

2:48P    24   Q.   Who pays WAC for Dey's product after deducting

25   all discounts, chargebacks and rebates?

1      A.    I can't tell you that.  I'll have to consult

2    our records.

3      Q.    Does anybody pay WAC for Dey's products after

4    deducting all rebates and chargebacks?

5      A.    In some cases, yes.

6      Q.    Is it your testimony that chain pharmacies pay

7    an amount at or higher than WAC after deducting all

8    rebates and chargebacks for Dey's products?

9      A.    No.  No, I never testified to that.

10      Q.    Do chain pharmacies pay a price at or higher

11    than WAC after deducting all rebates and chargebacks?

12            MR. HUDSPETH:  All right.  Now, let's

13    not shout.  We can tone this down.

14            THE WITNESS:  I don't know that.  You'd

15    have to consult all the records at Dey.  We've provided

16    most of that to you already, I think.

17      Q.    (By Mr. Breen)  As chief executive officer of

18    Dey, Incorporated, are you testifying that you don't

19    know whether chain warehouses pay prices that are at or

20    above WAC after deducting all discounts and rebates and

21    other price reductions?  Is that your testimony?

22      A.    That's a very broad question.  I don't know

23    the price paid by every chain warehouse today.  I

24    couldn't tell you the price a chain warehouse pays for

25    any individual product of Dey.

Page 158

2:49P     1        Q.    That's not my question.  I don't want to know

          2     the precise prices they're paying.

          3        A.    Well, you asked me if I was testifying that

          4     the prices paid were at a certain rate.  If I don't

          5     know even an individual price, how could I give you a

          6     collective price?  I don't know.

          7        Q.    So it's -- is it your testimony that you don't

          8     have any information available to you right now that

          9     you're aware of sitting here today, that would let you

         10     answer the question as to whether chain warehouses

         11     pay -- or chain pharmacies pay an amount at or above

         12     WAC for Dey's products?

         13                  MR. HUDSPETH:  Objection to form.

         14                  THE WITNESS:  I can't -- I have nothing

         15     in front of me that indicates that whatsoever.

         16        Q.    (By Mr. Breen)  Okay.  So without consulting

         17     your records, you don't know whether chain pharmacies

         18     pay an amount at or above WAC for your products?

         19        A.    I can't tell you.  I don't know.

         20        Q.    Do you know whether Apria pays an amount at or

         21     above WAC for Dey's products after deducting all

         22     rebates, chargebacks and other reductions in price?

2:50P    23        A.    No, sir, I don't.

         24        Q.    Do you know whether Homedco paid or pays a

         25     price equal to or exceeding WAC for Dey's products

1    after deducting all chargebacks, rebates and other

2    reductions in price?

3        A.   Well, sitting here today, it's my

4    understanding Homedco no longer exists.  If they do,

5    I'm not aware of it.  I'm not aware of the history of

6    Homedco's pricing.

7        Q.   You actually met with Homedco one time, didn't

8    you, personally?

9        A.   I met with them a number of times, been -- I

10    have been to their facilities.  They have been to ours.

11        Q.   Did Dey Laboratory or Dey, Incorporated reduce

12    the ultimate cost to Homedco for Dey's products by

13    providing Homedco with samples?

14        A.   I don't recall that.  Again, we'd have to

15    consult the records.

16               MR. BREEN:  Let's mark this as the next

17    one.  I apologize I only have one copy.

18               MR. WINTER:  73.

19               (Exhibit 73 marked)

20               MR. FLECKMAN:  Could we just identify

21    that?

2:52P  22               MR. BREEN:  Purports to be a -- portions

23    of a letter from Patrick Johnson, director of -- to

24    Patrick Johnson, director of materials management of

25    Homedco, dated 16 September 1993.  It's a two-page