# Exhibit 32

*State of California ex. rel. Ven-A-Care of the Florida Keys, Inc. v.
Abbott Laboratories, Inc., et al.*

Exhibit to the Declaration of Rita Hanscom in Support of Plaintiffs' Sur-Reply in
Opposition to Dey, Inc. and Dey, L.P.'s Motion for Partial Summary Judgment

```
              UNITED STATES DISTRICT COURT

                DISTRICT OF MASSACHUSETTS

---------------------------------X

IN RE PHARMACEUTICAL INDUSTRY     )

AVERAGE WHOLESALE PRICE LITIGATION)

---------------------------------X Volume 1

THIS DOCUMENT RELATES TO:         ) MDL NO. 1456

The City of New York, et al.,     ) Civil Action

    V.                            ) No. 01-12257-PBS

Abbott Laboratories, et al.       )

---------------------------------X

THIS DOCUMENT RELATES TO:         )

State of California, ex rel.      )

Ven-A-Care v. Abbott Laboratories,)

Inc., et al., Case No.            )

03-cv-11226-PBS                   )

---------------------------------X

                  JULY 10, 2008

      DEPOSITION OF DEY, L.P. AND DEY, INC.

           BY PAMELA MARRS - VOLUME II


Reported By: WENDY L. VAN MEERBEKE, CSR No. 3676
```

1  followed and that -- that it was disclosed in
2  reports that AWP was not a real price, was not a
3  defined price from a legal standpoint.
4          MR. HENDERSON:
5     Q.   When you spoke to Mr. Mozak about this,
6  did -- when was that?
7     A.   It would have been prior to 2002.
8     Q.   And why do you say that?  Because he
9  was -- he was no longer employed by Dey after --
10    A.   Correct.
11    Q.   -- sometime in 2002?  So you spoke to
12 him while he was still employed by Dey?
13    A.   Yeah.  Most of my conversations with
14 Bob regarding these subjects were early on in the
15 litigation when I was just trying to understand
16 what -- what was going on.
17    Q.   Okay.  Did you ever speak to him -- let
18 me back up.
19         Did he tell you that he had read some
20 of -- any of the reports that are in Exhibit 33?
21    A.   Not that I recall.
22    Q.   Do you know whether he read any of the

1  reports that are in Exhibit 33?

2      A.   I know that -- again, back in the early

3  days of the -- of the litigation, our previous

4  attorneys, Coudert, brought to our attention a

5  lot of these -- this information that was known

6  in the '70s and '80s.  And what he specifically

7  read or didn't read I'm not sure, but I know that

8  there were conversations where that information

9  was relayed to him just as it was relayed to me.

10      Q.   Okay.  So is it your understanding that

11  Mr. Mozak's belief was informed in part by -- let

12  me -- let me ask a different question.

13      Is it your understanding that Mr.

14  Mozak's understanding about what was in

15  government reports was based on information

16  provided to him by counsel -- Dey counsel at that

17  time after litigation had commenced?

18      A.   No.

19      MS. GIULIANA:  Objection to the form.

20      THE WITNESS:  No.  What I know is that

21  at a minimum, you know, he heard about it from

22  counsel.  But being in charge of sales and

1  marketing, what he knew or didn't know about
2  these other reports prior to that time, I'm not
3  aware.  You'd have to ask him.
4          MR. HENDERSON:
5      Q.  Okay.
6      A.  He had a lot more industry knowledge
7  about these things than I did because he worked
8  in it every day, whereas I was, you know, over on
9  the accounting side.
10     Q.  Okay.  So just to be clear, you don't
11 know exactly -- do you know whether Mr. Mozak
12 read any of these reports?
13     A.  I -- as I sit here today, I can't, you
14 know, go back five years and recall what he did
15 or didn't, if I even knew what he did read or
16 didn't read.
17     Q.  So are you telling me you don't know?
18     A.  I don't know --
19         MS. GIULIANA:  Objection to the form.
20         THE WITNESS:  I don't know what
21 documents Mr. Mozak did or did not read.
22         MR. HENDERSON:

1    MR. HENDERSON:  It wasn't a question.
2 And I'll withdraw the comment.
3    THE WITNESS:  This is all very
4 complicated stuff.  And I've seen so many people,
5 you know, get confused.  I'm just trying to
6 clarify things.
7    MR. HENDERSON:
8    Q.  Fair enough.  It is complicated.
9    So I think you've said that, yes, it
10 has been Dey's belief that the United States
11 government approved of or acquiesced in Dey's
12 practice, as we discussed.  Who at Dey held that
13 belief?
14    MS. GIULIANA:  Objection to the form.
15    THE WITNESS:  Well, if it's really the
16 same people, it's Bob Mozak.  It's whoever else
17 had the knowledge from the attorneys of these
18 various government reports as well as -- and I
19 don't know other than Mozak to list names, quite
20 frankly.  I suspect Russ Johnston is probably
21 aware of all these government publications, but I
22 haven't specifically spoken with him about it, so

1  it's hard for me to name anyone other than Bob.

2          MR. HENDERSON:

3      Q.   And with regard to the time period when
4  Bob held that belief, do you have any information
5  -- I'm sorry.  Let me clarify the question.

6          As to the time period when Mr. Mozak
7  held this belief, can you inform me on that
8  subject?

9          MS. GIULIANA:  Objection to the form.

10         THE WITNESS:  It's my understanding
11 that there was never a time when Dey or Bob did
12 not believe that the government was aware of the
13 fact that AWP was a price set at the launch of a
14 product and it was an industry practice and it
15 didn't represent a real price.

16         MR. HENDERSON:

17     Q.   And how do you -- what's the basis for
18 that understanding?

19     A.   And I don't -- I don't have anything
20 specific to tell you other than -- you know, this
21 started ten years ago, obviously.  So I can't
22 cite a specific reference on that.

1   the topics covered.
2       Q.   I'm sorry.  Things that you had or had
3   not seen before?
4       A.   I had seen some of these before.  I
5   don't know when counsel first obtained them.
6       Q.   And were there some that you had not
7   seen before?
8       A.   Yes.
9       Q.   Is there anybody at Dey today who is
10  more knowledgeable than you about the content of
11  these reports in Exhibit 33?
12      A.   Not that I'm aware of.
13      Q.   Do you know if --
14          MS. GIULIANA:  Object to the form on
15  the last question.
16          MR. HENDERSON:
17      Q.   Other than -- is there any report in
18  Exhibit 33 that you have read in its entirety?
19          MS. GIULIANA:  Objection to the form.
20          THE WITNESS:  Probably not.  There's a
21  lot of detail in these reports, so I focused more
22  on the executive summary.  I'm trying to just see

1   if --

2           MR. HENDERSON:

3       Q.   Other than yourself, is there anybody
4   that you know of at Dey who has read any of these
5   reports?

6           MS. GIULIANA:  Objection to the form.

7           THE WITNESS:  I would be guessing.  I
8   know that some of these reports were brought to
9   our attention by the attorneys a long time ago in
10  connection with the litigation.  What I don't
11  know is specifically who might have seen them.

12          MR. HENDERSON:

13      Q.   And am I to conclude from that that you
14  don't know of anybody who actually read any of
15  these other than counsel?

16          MS. GIULIANA:  Objection to the form.

17          THE WITNESS:  I -- I can't say if
18  somebody did or didn't read them as I sit here
19  today.  I'd have to -- I'd have to talk to people
20  to find out.

21          MR. HENDERSON:

22      Q.   Okay.