```
                IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF MASSACHUSETTS


IN RE:                            )
                                  )  CA No. 01-12257-PBS
PHARMACEUTICAL INDUSTRY AVERAGE   )  CA No. 06-11337-PBS
WHOLESALE PRICE LITIGATION        )  Pages 1 - 58
                                  )




                  MOTION HEARING - DAY TWO

         BEFORE THE HONORABLE PATTI B. SARIS
              UNITED STATES DISTRICT JUDGE
```

```
                United States District Court
                1 Courthouse Way, Courtroom 19
                Boston, Massachusetts
                January 27, 2010, 10:00 a.m.
```

```
                   LEE A. MARZILLI
                OFFICIAL COURT REPORTER
             United States District Court
             1 Courthouse Way, Room 7200
                 Boston, MA  02210
                   (617)345-6787
```

1aa2a0be-d9dc-4b41-8bf4-4458e66a0b88

1    A P P E A R A N C E S:

2

     FOR THE PLAINTIFFS:

3

4        GEORGE B. HENDERSON, ESQ., Assistant United States
     Attorneys, Office of the United States Attorney, United States
5    District Court, Suite 9200, 1 Courthouse Way, Boston,
     Massachusetts, 02210, for the United States.

6

         MARK A. LAVINE, ESQ., Assistant United States Attorney,
7    Office of the United States Attorney, 99 NE 4th Street,
     Suite 300, Miami, Florida, 33132.

8

         JUSTIN DRAYCOTT, ESQ., United States Department of
9    Justice, Civil Division, P.O. Box 261, Washington, D.C., 20044.

10       JAMES J. BREEN, ESQ., The Breen Law Firm,
     3562 Old Milton Parkway, Alpharetta, Georgia, 30005, for the
11   Relator, Ven-A-Care of The Florida Keys.

12

     FOR THE DEFENDANTS:

13

14       SARAH L. REID, ESQ., and MARISA A. LORENZO, ESQ.,
     Kelley, Drye & Warren, 101 Park Avenue, New York, New York,
15   10178, appearing for Dey Pharmaceutical

16       MARTIN F. MURPHY, ESQ., Foley Hoag, LLP,
     Seaport West, 155 Seaport Boulevard, Boston, Massachusetts,
17   02210-2600, for Dey Corporation.

18       HELEN E. WITT, ESQ., JOHN W. REALE, ESQ., and
     ERIC GORTNER, ESQ., Kirkland & Ellis, LLP, 300 North LaSalle
19   Street, Chicago, Illinois, 60654, for Boehringer Ingelheim.

20       DAVID S. TORBORG, ESQ., Jones Day,
     51 Louisiana Avenue, N.W., Washington, D.C., 20081-2113,
21   for Abbott Laboratories.

22       JAMES R. DALY, ESQ., Jones Day, 77 West Wacker, Chicago,
     Illinois, 60601-1692, for Abbott Laboratories.

23

24

25

1                   P R O C E E D I N G S

2          THE CLERK:  In Re:  Pharmaceutical Industry Average

3  Wholesale Price Litigation, Civil Action 01-12257 and 06-11337,

4  will now be heard before this Court.  Will counsel please

5  identify themselves for the record.

6          MR. HENDERSON:  George Henderson, AUSA, for the United

7  States.

8          MR. LAVINE:  Mark Lavine from the U.S. Attorney's

9  office for the Southern District of Florida for the United

10  States.

11          MR. DRAYCOTT:  Justin Draycott, Civil Division,

12  Department of Justice.

13          MR. BREEN:  Jim Breen.  I represent the Relator,

14  Ven-A-Care of the Florida Keys.

15          MR. DALY:  Good morning, Judge.  Jim Daly for Abbott

16  Laboratories.

17          MR. TORBORG:  Good morning.  David Torborg for Abbott

18  Laboratories.

19          MR. GORTNER:  Good morning, your Honor.  Eric Gortner

20  for Boehringer Ingelheim and the Roxane defendants.

21          MR. REALE:  Your Honor, John Reale on behalf of

22  Boehringer Ingelheim and the Roxane defendants.

23          MS. REID:  Good morning, your Honor.  Sarah Reid on

24  behalf of the Dey defendants.

25          MS. LORENZO:  Good morning.  Marisa Lorenzo on behalf

1  of the Dey defendants.

2          THE COURT:  I know this is Mr. Daly's favorite topic,

3  so are you starting here?

4          MR. DALY:  Yes, your Honor.

5          THE COURT:  I thought so.  So how are we organizing

6  this?  Are you the only one arguing?

7          MR. DALY:  I don't know if the codefendants have

8  anything to add, your Honor.

9          THE COURT:  There was pretty similar arguments, right?

10          MR. GORTNER:  Yes, your Honor.  Roxane has a small

11  specific issue with respect to the NovaPlus Red Book CDs that

12  we may like to address at the end of the argument, but I

13  anticipate that the bulk of the argument that we join with will

14  be covered by Mr. Daly.

15          MS. REID:  And, again, we anticipate that we may have

16  a very short argument but that Mr. Daly will do the majority.

17          THE COURT:  Who's handling it for your team?

18          MR. DRAYCOTT:  That would be me, your Honor, Justin

19  Draycott.

20          THE COURT:  Okay, that's right, you've been working

21  with these documents for a while here?

22          MR. DRAYCOTT:  Indeed, indeed I have, your Honor.

23          THE COURT:  All right.  So, okay, Mr. Daly.

24          MR. DALY:  Good morning, your Honor.  Where this

25  motion comes from is, the problem arises because, in our view,

1    the Department of Justice essentially did not lift a finger to

2    preserve documents here from 1995 when this lawsuit was filed

3    until some things that look like document hold memoranda that

4    may have gone out in '04 in another case, not this case, and in

5    '06 and '07, the last two after the government intervened.  And

6    so what we have basically is an undisputed record that shows

7    that evidence has been destroyed.  Evidence has been destroyed

8    at the federal level within CMS, within OIG, within other

9    agencies of the federal government, through normal -- I mean,

10   not active destruction but, rather, through normal document

11   destruction processes.  Documents have been destroyed at the

12   state level in all of the state or in many of the state

13   Medicaid agencies and also with the carriers.  And we've seen

14   some of the carrier problems in the Daubert hearing in the

15   sense that we don't have arrays for the vast majority of --

16   actually, we only have arrays for 5 percent of the quarters,

17   and that is because the carriers were not asked to and did not

18   retain the arrays, even though the government is in contract

19   with them and accepted the subpoenas for them.  So what we have

20   is a situation with basically undisputed destruction of

21   documents, essentially undisputed prejudice to the defendants,

22   and really the question in my mind, and I think the question

23   for the Court, is what to do about it.

24          And to put it in context very quickly, Judge, I've

25   given Mr. Alba and the Court some exhibits that we've cited in

1    our briefs, and the one I want to spend a little bit of time on

2    just to put things in context is the Tab 3, which is the time

3    line, your Honor.  And, very quickly, in the cases filed in

4    June of 1995, beginning in February in '96, the federal

5    government begins its campaign of civil investigative demands

6    and subpoenas to Abbott and others.  They begin to gather

7    evidence throughout this time period.  In March of 1998, you

8    can see -- and this has been discussed in other contexts, but

9    Ven-A-Care discusses its various allegations in various

10   meetings with the National Association of Medicare Fraud Units.

11   September, '99, the Department of Justice, they're looking at

12   Abbott.  They come in and they meet with us, and they give us a

13   dog and pony show telling us that they believe we violated the

14   law, and, you know, ask us to settle all presuit.  And they

15   have all kinds of information, all kinds of documents that

16   they've gotten through their one-way discovery that they're

17   negotiating --

18            THE COURT:  So that's September to October, 1999?

19            MR. DALY:  Yes, your Honor, and --

20            THE COURT:  So let me just --

21            MR. DALY:  Sure.

22            THE COURT:  Assume for a minute I'm not going to rule

23   that the minute a relator files a complaint, that the

24   Department of Justice has any duty to do anything because they

25   have to have a duty of good-faith investigation, see if there's

1   any claim.  I mean, I personally see how many nuts file these

2   things, so there's got to be some reasonable investigatory

3   period before they have any duty to do anything.  But assume I

4   say that it can be a time before they actually file suit, okay,

5   so there's a spectrum, not right in the beginning, at some

6   point.

7           MR. DALY:  Yes, your Honor.

8           THE COURT:  So looking at this record, you've

9   represented that you basically were told you were going to be

10  sued in September-October, 1999.

11          MR. DALY:  That's right, Judge.

12          THE COURT:  So if I were to try and figure out a

13  reasonable point at which a duty to preserve started to kick

14  in, it surely wouldn't be 1995.  The government knows nothing

15  about the case at that point.

16          MR. DALY:  The standard, Judge, is when it's

17  reasonable to foresee that litigation will ensue.  And I think

18  the Court is following the correct analysis.  We've got to

19  pinpoint that.  I think it's at least by 1999.  If your Honor,

20  for example, goes to the very next exhibit, Exhibit 4, it keys

21  into this 1999 date.

22          THE COURT:  So can I just say, if I did think that --

23  there's not much case law in the First Circuit on it, so --

24          MR. DALY:  On the trigger date?  Right, Judge.

25          THE COURT:  Duty to preserve -- excuse me?

1          MR. DALY:  As to when it kicks in.

2          THE COURT:  Yes, or even what that duty is.  It's an

3    evolving issue, I think, as people focus more and more on

4    electronic discovery.  But let's say it's reasonable to foresee

5    litigation.  That seems like a fair enough test.  You would say

6    that that was by at least October, 1999.  And what drugs were

7    on the table at that point?

8          MR. DALY:  All of the drugs that are in suit here,

9    Judge.

10         THE COURT:  For Abbott?

11         MR. DALY:  For Abbott.

12         THE COURT:  So all of the Abbott drugs at that point

13   were in play, if you will?

14         MR. DALY:  Yes, Judge.  And just to make it perhaps

15   even clearer, if you just look at the next exhibit, Judge, it

16   is an excerpt from a letter from Mr. Lavine, the same

17   Mr. Lavine who's here representing the United States.  And this

18   is in response to arguments that we had made about why the

19   government shouldn't sue, and it's written to my partner, Dan

20   Reidy.  But what you see is Mr. Lavine responding to our

21   argument saying, "During the course of our investigation, we

22   have become aware of the assertion that the government had

23   knowledge that AWP is not indicative of providers' acquisition

24   costs," et cetera, et cetera, et cetera.  So way back in this

25   time period we are telling the government not only that we

1   didn't think that they should sue but what our defenses were.

2   So in terms of what the government understood the claims and

3   defenses to be, in this time period I think it's very clear

4   what is going on, and at this point I think the ball really

5   begins to roll.

6           If you look at the next exhibit, Judge, Exhibit 5,

7   you'll see that the government was also dealing not only with

8   Abbott but with a lot of other defendants during this

9   investigation period.  And all of the defendants wrote a white

10  paper to the government talking about, you know, various issues

11  and again trying to convince the government that they shouldn't

12  sue.  But those discussions appear to be breaking down, and

13  what this is is the letter written on behalf of defendants

14  where the defendants specifically ask, they say, "Finally, the

15  relator's memorandum states unequivocally that this matter is

16  headed for litigation."  So it's clear.  And we say --

17          THE COURT:  So that date would be August 4, 2000?

18          MR. DALY:  2000, but this is based on discussions that

19  have been going on for quite some time, and the defendants ask,

20  "Nevertheless, we ask that you take appropriate and immediate

21  steps to insure that your client agencies, including at a

22  minimum HHS, HCFA," which is now CMS, "the Medicare fraud

23  control units of the states, state Medicaid officials, and

24  single-payor agencies under the Department of Veterans Affairs,

25  maintain all documents that may be relevant to the subject

1   matter of the claims and defenses."

2          So not only is the federal government telling the

3   defendants what their claims are going to be, but the

4   defendants are responding and saying, "Look, you're going to do

5   what you're going to do.  We hope you don't do it, but please

6   preserve the documents."  Our defenses are going to be

7   contingent upon being able to get information about, you know,

8   what the government knew, what the government understood, what

9   the government acquiesced in, and whatever -- you know,

10  yesterday we were calling it knowledge plus, Judge -- what the

11  government knew and perhaps acquiesced in at the federal level

12  and also at the state.  So the defendants specifically ask.  We

13  can't do it.  There's been no intervention.  The thing is under

14  seal.  We have no power to do anything, so we say, "Please,

15  federal government, preserve the documents."  But they did

16  nothing.

17          If you go back to the --

18          THE COURT:  So if you were to win, though, you know,

19  your point that something should have happened, we could maybe

20  pick 1999 or 2000, but it would be only going forward from

21  there.  So, in other words, a lot of the documents that are

22  actually missing are in earlier timetables.  When you showed me

23  your great gray sea of missing documents on that chart, aren't

24  most of it -- a lot of it is before that time, right?

25          MR. DALY:  Well, a lot of it's before that time, but

1    the question being, Judge, let's take 1999, for example, if

2    that's the date you picked.  We don't know if in 1999 if they'd

3    asked the state Medicaid agencies, "Give me your claims data

4    going back to 1991," they might have had it.  So it's not the

5    date of the document; it's what they would have had on the date

6    that you feel they had a duty to preserve.

7            THE COURT:  Well, do I have anything in this record

8    about what they would have had if the demand had been made,

9    let's say, when you made the demand in August, 2000?

10           MR. DALY:  I think all we have is that when the

11   requests were made by the federal government and the states and

12   the defendants once the litigation had started, the data was

13   not available.  I don't know that particular dates of

14   destruction for that material --

15           THE COURT:  And the requests were made in 2004?  When

16   did the preservation start?

17           MR. DALY:  It was unsealed in 2006, Judge.

18           THE COURT:  Right, but your argument is that until it

19   was unsealed, there was no request -- I think there was an

20   earlier request, wasn't there, from the Department of Justice?

21   2004, right?

22           MR. DALY:  Judge, and I'm prepared to talk about that.

23   That's on the chronology too.

24           THE COURT:  Yes.

25           MR. DALY:  And if you look, we go from this 2000

1  letter where we ask them to preserve documents to 2004, and

2  what that is, that's a hold memo that the government sends out,

3  not in our case but in the class action that also your Honor

4  has as part of 1456.  Remember, the defendants there subpoenaed

5  the federal government for some documents, and in connection

6  with that -- only to CMS, by the way, not to OIG or any other

7  federal agencies or any states or any carriers -- the

8  government issued a hold memorandum, which we do not have.

9  We've asked for copies of it.  We have a redacted copy.  We

10  asked counsel for the government to bring it to court today.

11  We'd very much like to see what they actually asked anybody to

12  hold.  We don't know because they blacked it out.  So that's

13  the first thing.  We don't know what it is.  We do know that it

14  only went to CMS.

15          And so the next thing to happen is '04 to '07, '06 is

16  that the U.S. intervenes in March of 2006.  In November of 2006

17  on the chart there, in an interrogatory response, the

18  government says that "We instructed the state Medicaid agencies

19  to maintain and preserve documents."  No detail is given.  We

20  don't know if it was a letter.  We don't know if it was an

21  e-mail.  We don't know what they asked.  We don't know who it

22  went to.  We don't know anything.  We've asked again that that

23  communication be brought to court today.  I don't know whether

24  counsel has it or not, but we think it's important.  It's

25  important for a couple of reasons:  One, it's the first time

1    that the state agencies are asked to hold documents, and it's

2    also proof that the government can do it.  The government has

3    the authority to ask the states to hold these documents, and we

4    know that because they did it.

5           And then the next thing that happens is, the first

6    litigation hold is issued in 2007, and, again, that's a

7    document that we have the to/from, but the guts of it -- in

8    other words, what people were asked to hold -- has been

9    redacted, so we don't know exactly what anyone has been asked

10   to hold.

11          And so what you have, and if you look at the bottom of

12   the chart, Judge, what's going on here is that for eleven years

13   before this thing was unsealed, the government, according to

14   its own documents, according to its extensions that they filed

15   with the court in Florida seeking extension after extension,

16   eleven years' worth of extensions, what they told the judge

17   they were doing was having a nonstop agenda on drug pricing,

18   including meeting with states, aggressively pursuing settlement

19   discussions, creating an electronic database for storage and

20   review of thousands of documents.  They're using this time to

21   create documents the whole time, not preserving anything, and

22   then they also issue --

23          THE COURT:  What date was that on that they told the

24   judge that?

25          MR. DALY:  Judge, those are attached to our brief.  I

1    don't have the date handy.  It's all of their extension

2    requests that they made in front of Judge Gold.

3            THE COURT:  I see.

4            MR. DALY:  Because they were telling the judge why

5    they need more time.  And so while they're doing all this, the

6    states, you know, they have no idea what's going on, and

7    they're not being asked to and do not preserve any documents,

8    so all of this is gone.

9            So let me jump to a discussion of what's lost, and,

10   first of all -- and I think the Court asked a good question --

11   we can't tell what was lost, in other words.  And there's a lot

12   of case law on this generally, maybe not from the First

13   Circuit.  Like, Judge Bowler has written an opinion on it.

14   But, you know, we can't be saddled with having to tell you

15   what's lost and exactly when it was lost, and if something had

16   been done in 1999, would that document still have been there?

17   We don't know.  The problem is that if that burden were flipped

18   onto the defendants, you'd have a situation where the

19   defendants are in a catch-22.  You can't tell what's out there,

20   and so trying to force them to explain why it would be relevant

21   and what it is is something that the case law suggests is not

22   something that's appropriate to do.

23           So we have this great unknown of things that were out

24   there, that could have been out there, that we believe have

25   been out there, because when we've been able to do discovery --

1   and it's not every state, Judge, that doesn't have documents.

2   The litigating states, for example, have documents, and we've

3   been able to get documents from some of the states that we're

4   in litigation with because they've issued their own hold

5   memoranda and they have their own lawyers who are pursuing

6   claims.  Illinois, for example, has produced tens of thousands

7   of documents, and we have good evidence about what Illinois

8   knew and understood and acquiesced in and what their policies

9   are.  If you look at other states, Oklahoma produced ten

10  documents.  We gave them a document request and subpoena, and

11  it's a broad situation.  It's asking for all the things that

12  the Court would expect us to ask for:  What's your policy on

13  AWP?  What did you understand?  What about cross-subsidization?

14  Did you have a policy of X, Y, and Z, blah-blah-blah, going

15  back throughout the claim here?  Oklahoma has ten documents.

16  Some states had no documents for the time period because all of

17  that stuff has been destroyed.

18          So when the Court was looking at this yesterday and

19  talking about state by state, I want to spend a minute on that

20  because when we started the summary judgment process here, we

21  were operating under the assumption based on what we thought

22  the law was and some comments of the Court that government

23  knowledge or knowledge plus is in play, not only for scienter

24  but also for causation, and maybe falsity; and I think, at

25  least as to causation, I think the Court was talking about that

1   as a possibility yesterday as well.  So when we moved, we

2   didn't move on a state-by-state basis.  We didn't move on

3   government knowledge at all.  So when the defendants came in --

4           THE COURT:  Well, no, because you think there's a fact

5   dispute.

6           MR. DALY:  Right, but the government didn't move on a

7   state-by-state basis either.  Their motion is:  This evidence

8   of what states knew or understood, it doesn't matter, it's all

9   irrelevant.  It's the same argument that they've been making --

10          THE COURT:  Right, but I don't have to -- both sides

11  have taken polar extreme positions, and that's understandable.

12  I don't have to -- there is something in between.

13          MR. DALY:  There is something in between, Judge, but

14  the problem with some of these states is that we have zilch

15  from them.  We went out and took their depositions, deposition

16  after deposition, 30(b)(6) depositions.  And they'd bring in

17  people who had only been there a couple of years, and we'd ask

18  them about all these questions going back in time, and they had

19  no idea, they had no information, they were unprepared, there

20  were no documents.  This is deposition after deposition.

21          Now, there are a lot of states where we do have it,

22  and these are set forth in our papers, and I would recommend,

23  Judge, we have three appendices to our brief.  They're attached

24  to it.  It's A, B, and C.  And what they do is, they go through

25  a lot of the information.  There's a package of compiled

1   deposition testimony of 30(b)(6) witnesses from the state who

2   didn't know anything.  There's a compilation of witnesses from

3   the states who come in and say, "Sorry, we don't have any

4   documents.  I can't go back and recreate this.  I don't know

5   what our policy was.  That person is gone.  Did you talk to

6   anybody?  No."  They come in time after time after time in

7   these depositions and don't give us any information.  So when

8   the Court is thinking about what does this look like on a

9   state-by-state basis, I just wanted to say, A, we've got a lot

10  more information than eight states in our briefs about states

11  where the evidence we think is very strong about what the

12  policy is, but a lot of them we have nothing.

13          THE COURT:  Eight you've highlighted about.

14          MR. DALY:  Well, yes, that might just be some bullet

15  points in the briefs --

16          THE COURT:  I forget the number but --

17          MR. DALY:  There's many more in the briefs.  But there

18  are also many states -- and, really, the more documents that

19  they've produce, the more documents they happen to maintain,

20  the more we have to say about them because the Court knows as

21  well as anybody here does that it's one thing to depose an

22  individual when you have a document to sort of lock them in, it

23  might be their document, something that they have to respond

24  to, versus having no documents and having to ask people, "What

25  was the policy?"  They all say, "We don't know."

1          THE COURT:  So assume, which I'm not right now, that

2     I'm going to pick some point in time where there was some

3     obligation to preserve, but it's not going to be 1995, you're

4     asking me to essentially do what?

5          MR. DALY:  Judge, I think there ought to be -- well,

6     if you want to talk about remedy?

7          THE COURT:  Yes, let's assume I don't agree with you

8     it's 1995.

9          MR. DALY:  Okay.

10         THE COURT:  I guess the first hold is 2004.  I'm sure

11    the government is going to take the position that that's

12    enough.  But let's assume I pick, let's say, when you made the

13    demand, August 4, 2000, or 1999.  It probably wouldn't be

14    before then.  So then what?  You're not asking me to dismiss

15    the case, are you?

16         MR. DALY:  No, Judge.  I mean, I think that's an

17    option, but we're not asking for that.

18         THE COURT:  So what are you asking for?

19         MR. DALY:  Judge, in terms of a remedy, we think that

20    a couple of things would be appropriate.  First of all, I think

21    it goes to this issue of the Medicare and Medicaid claims data.

22    We do think this is a very serious problem.  We spent -- I'm

23    not going to go into detail at all.  We spent last week on the

24    Daubert hearing.  The gray areas on our charts -- and the

25    charts are in our book if you wanted to look at them again, but

1    the notion here is that had the government done something about

2    this back in 2000 or 1999 or earlier, there's a very good

3    chance that that information would be here.  The only reason

4    that it's not here is that they didn't do anything about it, so

5    the fact that --

6              THE COURT:  Can I press you on that a little bit?

7              MR. DALY:  Yes.

8              THE COURT:  Certainly that would be true if we were

9    talking about CMS data because that's the federal government,

10   but in fact it's been represented they mostly have that.  So

11   we're really talking about the carriers and potentially the

12   states.  So I've not really heard a serious argument that

13   there's a big hole in the federal data as opposed to the

14   carriers where there's a huge amount of --

15             MR. DALY:  Data, right.

16             THE COURT:  -- data.  So it's not a hundred percent

17   clear to me that they would have had the right to come in and

18   order the carriers to hold it.  In other words, I don't know

19   the answer to that.

20             MR. DALY:  Well, the carrier relationship with CMS,

21   Judge, is a contractual one.  I mean, they process the claims

22   for CMS.  That's their job.  They have a contractual

23   relationship.  When we wanted to take discovery from the

24   carriers, the government said, "No, no, no, you've got to work

25   through us.  We'll go get that."  So I don't think there's --

1          THE COURT:  So you think it's at least reasonably

2    within their control?

3          MR. DALY:  Right, really, no question from my

4    perspective.

5          THE COURT:  From the states, which are separate

6    sovereigns, that's a -- in some ways it's easier for the

7    government because there's a regulatory scheme and in some ways

8    harder simply because they're separate sovereigns.

9          MR. DALY:  With respect to the states, Judge, you

10   know, the Court knows as well as we do, I think, the Medicaid

11   program is a joint operation between the federal government and

12   the states.  The federal government --

13         THE COURT:  I don't know that the federal government

14   can order the states to do it.

15         MR. DALY:  Well, there is authority, and we cite it in

16   our brief, and I can find it for you in a minute, Judge, but

17   they do have the authority to demand that they retain records.

18   The federal government writes the checks here, so if the

19   federal government were to say, as they did --

20         THE COURT:  So your argument would be, even if it

21   wasn't the federal government's records, they had reasonable

22   control over the retention policies?

23         MR. DALY:  Yes, and we know that because they did it.

24   They say they did it in 2006, and this is the interrogatory

25   response, and we'd really like to know what they asked them to

1    do.  But sort of the proof is in the pudding on that one, Judge.

2    Not only could they but they did, and we asked them to do

3    this --

4         THE COURT:  So as a sanction, what you're really

5    asking me to do here is to in some ways, to the extent there is

6    a doubt about damages within time periods when this should have

7    been preserved, basically instead of precluding damages for

8    those times --

9         MR. DALY:  For those periods where they lack --

10         THE COURT:  So that's what you're really asking for?

11         MR. DALY:  Yes, Judge, where they don't have the

12   arrays which they could have gotten and the carriers could have

13   had had they acted, you know, six or seven or eight years

14   earlier, and the states where they don't have state-produced

15   claims data.

16         I do have one more important remedy that we do seek,

17   Judge, which I think is important and actually comes a little

18   bit out of yesterday's discussion.  I'm not sure where the

19   Court is going to come out.  We're talking about burden, who

20   has the burden on whether government knowledge plus, as the

21   Court called it yesterday, is something that goes to causation,

22   which is an element of the defense --

23         THE COURT:  My law clerk and I were actually

24   struggling with this.  Is it an affirmative defense that

25   negates liability, or is it a second thing that comes in

1    altogether?  It's doctrinally, actually, a curious concept.  I

2    actually was thinking about that again last night:  Does the

3    government prove up liability, and then you can defeat it

4    through an affirmative defense, or does essentially the

5    affirmative defense cut off causation or scienter?  I suppose

6    it depends.

7              MR. DALY:  Right.  And we also think, Judge, that it

8    also is a notion that goes to the element of the government's

9    case.  In other words, because it affects causation, not as an

10   affirmative defense against causation but as an element of

11   their claim, I'm not sure who ends up with the burden here.

12   But one of the things that the cases do in the world of burdens

13   is to say, look, when the evidence is not there, when you have

14   great swarths of evidence that is just simply gone and

15   unreachable, that it's perfectly appropriate to put the burden

16   on the party who engaged -- not engaged but allowed the

17   spoliation to occur.

18             THE COURT:  Well, thank you.  That's very useful.  I

19   get the gist.  So it's primarily at this point, anyway, a

20   damages sanction that you're seeking?

21             MR. DALY:  Yes, Judge.  And then also, and that would

22   follow up, keeping with my second point, if appropriate, there

23   might be an adverse inference jury instruction that might be

24   appropriate, depending on --

25             THE COURT:  Well, I won't get there yet.  Okay, thank

Page 23

1    you.

2              MR. DALY:  Thank you, Judge.

3              THE COURT:  Okay, you've lived and died these

4    arguments now.

5              MR. DRAYCOTT:  That is true, and knowledge of what has

6    been produced and what is in this record leads to a conclusion

7    that there is absolutely nothing that has been destroyed.

8    Mr. --

9              THE COURT:  We know the carrier records, the arrays

10   aren't there.

11             MR. DRAYCOTT:  But, your Honor, they haven't been

12   destroyed.

13             THE COURT:  Well, where are they?

14             MR. DRAYCOTT:  If there's an array that defendants

15   want to have, it's because if there's missing documents at this

16   point --

17             THE COURT:  Well, we know there are.  That's what the

18   expert said.  That's why we need to talk about extrapolation.

19             MR. DRAYCOTT:  No, your Honor.  There may be documents

20   which have not been produced, the carriers' archived materials.

21   From the earliest point in this case, the United States

22   recognized that there was going to be a burden of production

23   here, and there's been an enormous burden across all the

24   discovery requests that have been made.

25             THE COURT:  Wait a minute, wait a minute.

1        MR. DRAYCOTT:  And the defendants knew at a very

2  earlier time --

3        THE COURT:  You're saying these documents actually

4  exist?

5        MR. DRAYCOTT:  There could be carrier arrays out

6  there --

7        THE COURT:  No, no, no.  You must know this.  Did you

8  go out and call the carriers, "Do they exist?" because I don't

9  want to play this game with the extrapolation if the documents

10  are out there.

11        MR. DRAYCOTT:  What I'm telling your Honor is, there

12  are materials, including arrays, for which a search was never

13  done based on the burden, and that's been known to the

14  defendants in this case from the outset of this litigation.  So

15  there is material.  There is carrier arrays that could be in

16  archived carrier material for which no search was undertaken,

17  and the government made very clear that it was not going to

18  incur the burden, and it was not going to direct the carriers

19  to look for certain classes of material.

20        THE COURT:  All right, let's go backwards because

21  we're starting in the middle here.  You actually didn't

22  disagree so much in your briefs as to what the standard was.

23  What's the standard for when you have a duty to preserve

24  documents?

25        MR. DRAYCOTT:  Certainly, your Honor, when litigation

1    is reasonably foreseeable, there's --

2          THE COURT:  All right, you agree with the standard,

3    when litigation is reasonably foreseeable.  So when do you

4    think litigation was reasonably foreseeable?

5          MR. DRAYCOTT:  Your Honor, we have not addressed that

6    issue because the main reason being that there is no point at

7    which documents weren't being preserved.  There is never a

8    point where documents were being destroyed.

9          THE COURT:  Excuse me.  I want to understand this.

10   I'll get to that in a minute.  At what point do you think

11   litigation was reasonably foreseeable?  Would 1999 or 2000 be

12   the period of time?

13         MR. DRAYCOTT:  Certainly in 2004 there was direction

14   from the Department of Justice in this MDL to preserve.

15         THE COURT:  Right, so you're at 2004, at least.  It

16   struck me in reading some of these that it was reasonably

17   foreseeable in either 1999 or 2000.

18         MR. DRAYCOTT:  Certainly with respect to these

19   defendants.

20         THE COURT:  Yes.  Oh, that's what I'm talking about.

21         MR. DRAYCOTT:  So in 2004.

22         THE COURT:  Right.  Now, I'm saying in 1999 or 2000,

23   it looked reasonably foreseeable.

24         MR. DRAYCOTT:  I think --

25         THE COURT:  You were meeting with them.  Mr. Lavine, I

1  guess, was meeting with them.  They were saying it looks

2  foreseeable.  The relator was saying it looks foreseeable.

3        MR. DRAYCOTT:  I wouldn't say it was seen as

4  foreseeable.  I would more say that it was possible.  Certainly

5  we were aware of potential claims.  Whether or not we'd end up

6  in litigation -- I mean, but there were a lot of other

7  defendants in these qui tams for which we were also having

8  discussions with.

9        THE COURT:  Excuse me.  Maybe.  I'm now talking about

10  these guys, okay.  So it's possible that for others, it was an

11  outlier.  For these people, is it disputed factually that it

12  wasn't reasonably foreseeable in 2000, 1999, 2000?

13        MR. DRAYCOTT:  If I can have the Court's indulgence.

14  Because that predates my involvement in the case, I'm going to

15  consult with my colleague very briefly?

16        THE COURT:  Yes.  I mean, it was noticeable from your

17  brief that I didn't get a response to that contention.

18        (Discussion off the record between government

19  counsel.)

20        MR. DRAYCOTT:  It would be difficult to conclude that

21  it was reasonably foreseeable in 2000.  Certainly we hadn't

22  advised them that we were going to sue.  We advised them of the

23  pendency of potential claims.  But if you're asking me to

24  concede that it was reasonably foreseeable in 2000, it's hard

25  for me to conclude that it was based on this record.  But I

1   would -- for the record, I would -- what I can go is to the

2   2004 date and reasonably foreseeable --

3        THE COURT:  Well, do you say it was reasonably

4   foreseeable in 2004?

5        MR. DRAYCOTT:  The point at which it becomes

6   reasonably foreseeable is when we actually have the authority

7   to sue and --

8        THE COURT:  No, no, I'm not accepting that as a date,

9   okay, because I've had this running beef with the Department of

10  Justice, a running beef with them, not just about this case,

11  believe me, many cases that it goes on and on and on.  At some

12  point short of suing, it becomes reasonably foreseeable.

13       MR. DRAYCOTT:  For the purposes of this motion, I'll

14  concede to you 2004.

15       THE COURT:  Okay.  All right, so I don't know where

16  I'm going to pick, but let's even pick 2004.  I'm not going to

17  take 1995.  I think that's crazy.  I see so many nutty relator

18  cases.  You can't say, just because a relator files one of

19  these things, it's reasonably foreseeable.  Okay, so you've got

20  to shift through it, triage it.  So at some point, and given

21  resource issues at the Department of Justice, you know, it's

22  fairly two or three years to investigate one of these things --

23       MR. DRAYCOTT:  I absolutely understand your Honor's

24  interest.  Can I just be clear.  My only pushback is because

25  our focus so much is that there was never destruction.

 1         THE COURT:  Okay, let me get to that.  So let's assume

 2    I pick 2004, I pick your date, what's the -- and I'm just

 3    asking.  There's almost no case law on this, okay, a couple of

 4    unpublished District Court cases.  You know, there's very

 5    little out there and no First Circuit standards, so I'm sort of

 6    curious.  So what does the Department of Justice view its

 7    obligation, let's say 2004, once it thinks that it's reasonably

 8    foreseeable?

 9         MR. DRAYCOTT:  It would be to suspend any destruction

10    of potentially relevant material that would occur absent a

11    litigation hold directive.

12         THE COURT:  And do you agree with Mr. Daly that in the

13    context of this case, that would extend to the state

14    governments?

15         MR. DRAYCOTT:  No, absolutely not, your Honor.

16         THE COURT:  Even when you're seeking your Medicaid

17    share?

18         MR. DRAYCOTT:  Correct.

19         THE COURT:  Why?

20         MR. DRAYCOTT:  Because we just don't view ourselves as

21    having authority over another sovereign to do that.  We can

22    make a request, and what we've done certainly in 2006 was, a

23    request was made by the Department of Justice and a suggestion,

24    but neither the Department of Justice nor the agency views

25    itself as having the authority to direct states to preserve

1aa2a0be-d9dc-4b41-8bf4-4458e66a0b88

1   evidence.

2           THE COURT:  So do you have a copy of what you actually

3   did with the states?  Did you do whatever you do in 2004 with

4   the states?

5           MR. DRAYCOTT:  Okay, let me back up.  I want to answer

6   your Honor's questions.  Certainly I have the copy of a letter

7   from Mr. Henderson in addition to another individual in 2006

8   requesting states to preserve.  But your Honor should also

9   understand that the reason there's not much of a record on this

10  is, the issue of the federal government's obligation to the

11  states really wasn't a subject of discovery or an issue that

12  was pursued by the defendants really until very late in the day

13  when the issue of spoliation came up.

14          THE COURT:  I'm just trying to understand it.

15          MR. DRAYCOTT:  Right, and that's why --

16          THE COURT:  I want to understand what the Department

17  of Justice did here.  At what point did they ask the courts to

18  hold onto its claims data?

19          MR. DRAYCOTT:  The states?

20          THE COURT:  And documents?

21          MR. DRAYCOTT:  And, again, what I'm trying to be is

22  very accurate.  Certainly it was done in 2006.  Now, prior to

23  that time, certainly the Department of Justice was working with

24  state Medicaid fraud control units, state Attorney Generals'

25  offices.  Those would have been many times telephone

1   conversations.  There was some coordination.  And so I can't

2   represent to you, because I don't know, everything that

3   happened in the context of that relationship, which goes back

4   certainly prior to 2006.  So I don't want to say affirmatively

5   to your Honor that absolutely nothing was done, you know, in

6   these conversations or meetings between various members of the

7   Department of Justice and states.  But in terms of the record

8   that's before you now, the only thing that I can put in front

9   of you and point to is going to be a 2006 request from

10  officials of the Department of Justice, but I'm not -- what I

11  want to be careful about saying is, I'm not suggesting to you

12  that that's the only thing that happened --

13          THE COURT:  All right, so that's what I've got in this

14  record, and that's where it's sticking, so --

15          MR. DRAYCOTT:  That's what you've got in this record.

16          THE COURT:  So but you would say you did not have the

17  authority to put a litigation hold on the state records?

18          MR. DRAYCOTT:  Correct, your Honor.

19          THE COURT:  All right.  And what about the carriers?

20          MR. DRAYCOTT:  Well, the carriers were certainly

21  covered by the directives that went out in 2004 and at other

22  times, but, again, the carriers --

23          THE COURT:  What went out in 2004, a letter to the

24  carriers?

25          MR. DRAYCOTT:  Well, that's a matter that's in the

1    record now.  I'd need to go back and go through the various

2    directives, but, again, the carriers are required to archive

3    their material.

4            THE COURT:  Forever?

5            MR. DRAYCOTT:  Virtually, yes.  There are specific

6    archival requirements, which is where the burden comes in.

7            THE COURT:  All right, so it's clear that the state

8    data is missing, right?  Now, you'd say it's not your fault,

9    but --

10           MR. DRAYCOTT:  Well, no, I don't know in terms of

11   missing --

12           THE COURT:  Well, I was told by Dr. Duggan that he

13   didn't have state claims data going back to a certain period of

14   time.

15           MR. DRAYCOTT:  But there's two issues there, your

16   Honor.  One is, do the states have it, or has it been obtained

17   in this litigation?  And the first thing I'd say to your Honor,

18   the state of the data to a large extent is reflective of the

19   litigation strategy by defendants.  The idea that they would

20   actually, the state data would be acquired --

21           THE COURT:  I thought they said in 30(b)(6)

22   depositions they asked, and people couldn't find any documents

23   or data, and I thought Duggan told me the data wasn't there.

24           MR. DRAYCOTT:  The data has certainly not been

25   available to Dr. Duggan.  The question is, why is that?

1        THE COURT:  Well, tell me flat out, is it there?

2        MR. DRAYCOTT:  I think we don't know what the full

3    extent of the state data is, certainly where it's been

4    subpoenaed and states have complied, and that occurred fairly

5    late in this litigation --

6        THE COURT:  Well, have states been subpoenaed, and

7    they say, "We don't have it anymore"?

8        MR. DRAYCOTT:  I think a number of states have.  I'm

9    not sure that every state has been subpoenaed, but it's been an

10   issue.  This is a --

11       THE COURT:  Well, can you put into the record which

12   ones where it was actually subpoenaed and they don't have it

13   and which ones we don't know?

14       MR. DRAYCOTT:  Largely, a lot of the subpoenas that

15   were issued were actually issued by defendants, which is the

16   direction that your Honor gave.

17       THE COURT:  All right, so if I told the defendants to

18   disclose to me what subpoenas they sent out --

19       MR. DRAYCOTT:  And what the level of compliance is, I

20   think that's a fair question.

21       THE COURT:  And I can say that if they didn't get any

22   back, I can reasonably infer it doesn't exist, short of the

23   states committing fraud.

24       MR. DRAYCOTT:  Well, I think, again, if this was the

25   critical data that defendants now assert that it is, they

1aa2a0be-d9dc-4b41-8bf4-4458e66a0b88

1    should have been pursuing this data at a much earlier time in

2    this litigation, should have been --

3            THE COURT:  Excuse me.  You know what?  I don't want

4    to play games on this.  If they subpoenaed the documents and

5    the states said they didn't have it, the claims data, which we

6    all know existed, wouldn't it be reasonable for me to infer

7    that they don't have it anymore because they say they don't

8    have it?

9            MR. DRAYCOTT:  I promise you, your Honor, that I'm not

10   trying to play games with you, but --

11           THE COURT:  Why isn't that true?

12           MR. DRAYCOTT:  But if a state asserts objections to

13   the subpoena based on burden, then I'm not sure, frankly, your

14   Honor, that conclusion would be fair.

15           THE COURT:  Fine, but if they say they don't have

16   it --

17           MR. DRAYCOTT:  Then I would agree, your Honor.

18           THE COURT:  -- then they don't have it.

19           MR. DRAYCOTT:  I would agree.  If they say -- if the

20   response to the subpoena is not that we're not going to produce

21   it or it's too burdensome but simply we have nothing to produce

22   to you, then I would agree with you.

23           THE COURT:  All right.  So, now, what if -- are you

24   saying -- and maybe if you don't know now, I want you to go

25   look.  What I have to go through with Dr. Duggan is unfortunate

1    because it would be so much easier if I actually had the claims

2    data like I do for Illinois.  So you're saying you all didn't

3    go back and ask the states if they had it going back?

4           MR. DRAYCOTT:  I think that's initially correct, that

5    we were looking at relying on federal data as a damage model.

6    Now, there's been a shift in that, but, again --

7           THE COURT:  Excuse me.  Did you go out and ask all the

8    states for their data, claims data in the context of putting

9    together damages or a defense on the government knowledge

10   thing, I suppose?

11          MR. DRAYCOTT:  Can I have the Court's indulgence for

12   one second?

13          THE COURT:  Yes.

14          MR. DRAYCOTT:  Your Honor, if I can just take one

15   quick break, which is, I have been less immersed in the claims

16   data issue, if I can ask Mr. Henderson to address this issue --

17          THE COURT:  Sure.  And if you don't know, fine.  It's

18   a huge piece of litigation.  I'll let you supplement.  I just

19   need to know the facts.

20          MR. DRAYCOTT:  I think I can get the answer from

21   Mr. Henderson.

22          THE COURT:  Yes, Mr. Henderson, do you ask the states

23   for the data going back to 1991 or whenever it is you're

24   seeking damages?

25          MR. HENDERSON:  No subpoena was issued to any state.

1    We --

2              THE COURT:  By you?

3              MR. HENDERSON:  By the federal government.

4              THE COURT:  All right, by the federal government.

5              MR. HENDERSON:  No subpoenas.  Requests were made on a

6    prioritization basis focusing on states with the highest

7    spending, in accordance with Dr. Duggan's recommendations.

8    Those were requests only.  A number of states said, "We've got

9    stuff that's archived that's inaccessible because it's in a

10   different format, and we're not going to produce it," or that

11   it was -- some states refused.  Some states said, "No, we're

12   just not going to produce it, period."  Some states, "We'll

13   give you what's readily available," and some --

14             THE COURT:  Did anyone tell you it was destroyed?

15             MR. HENDERSON:  Not that I recall.

16             THE COURT:  Okay, so, to the best of your memory --

17   and if you want, you can go back and review your notes after

18   this hearing -- no state said to you that they don't exist

19   anymore?

20             MR. HENDERSON:  I just don't recall, your Honor.  I

21   couldn't make that representation.  So I don't know.

22             THE COURT:  As you stand here right now, do you

23   remember any state telling you it was destroyed?

24             MR. HENDERSON:  I am aware now that for a state that

25   we didn't request information, that they don't have it.  So I

1    can't say that all of that data out there exists.  I, frankly,

2    suspect there's some states, at least some states where some

3    data going back to 1991 has been destroyed.

4         THE COURT:  But you don't know as you stand here?

5         MR. HENDERSON:  But I don't know.  I can't -- I know

6    the state of Mississippi, for example, recently came to us and

7    asked us for help getting CMS data because they did not have

8    historic claims data, but that wasn't a state that we

9    approached.

10        THE COURT:  So for every state you approached, they

11   had the data going back to 1991?

12        MR. HENDERSON:  No.  Well, they didn't produce that

13   data.

14        THE COURT:  But I'm just trying to say, did they have

15   it, and then they said, "Hey, jump in a lake.  We're not going

16   into our archives for this"?

17        MR. HENDERSON:  We didn't record -- I can't say.  I

18   don't know.

19        THE COURT:  Okay, so the state of the record is --

20        MR. HENDERSON:  A lot of our --

21        THE COURT:  Excuse me.  The state of the record is,

22   you don't know.  You know that you asked certain states and --

23        MR. HENDERSON:  The process --

24        THE COURT:  Excuse me.  You asked certain states.  You

25   got certain data.  Sometimes the state refused.  Sometimes they

1   said it was archived.  Maybe some states like Mississippi said

2   that they've been destroyed, that you basically have no record

3   state by state as to what the responses were.

4          MR. HENDERSON:  We don't have a reliable record, your

5   Honor.

6          THE COURT:  Well, I will ask you to go back through

7   your files and see if you can reconstruct.  If you can, you

8   can.  If you can't, that's the state of the record.

9          Okay, so when you say -- your basic defense to this

10  is, "Well, maybe we had to preserve in 2004, or maybe we had to

11  preserve in 2000, but the reason this fails is, they haven't

12  proven that any documents were actually destroyed"?

13         MR. DRAYCOTT:  I think that's a key point to our

14  defense.  It's absolutely right, your Honor.  And while

15  Mr. Daly said that was undisputed, it's vigorously disputed,

16  and in fact what --

17         THE COURT:  Well, we know Mississippi is, at the very

18  least, right?

19         MR. DRAYCOTT:  Well, let me back up.  I think it's

20  helpful what your Honor is now doing to sort of categorize what

21  the spoliation motions pertain to, and I think the state

22  information is in a very distinct category, and our principal

23  defense would be that there is -- that where the custody and

24  control of that information is with the sovereign state, that

25  the preservation obligation goes no further than the production

1    obligation.  And when your Honor directed at an early point in

2    this case for defendants, if they wanted that information, to

3    subpoena it from the states, it's because your Honor recognized

4    that it wasn't a production obligation that extended to us.

5              THE COURT:  Now, with respect to the carriers --

6              MR. DRAYCOTT:  The carriers, okay, again, I think it's

7    helpful to focus on that --

8              THE COURT:  I'm doing this in the weeds.  So what

9    about the carriers?  Did you send a preservation letter to the

10   carriers?

11             MR. DRAYCOTT:  Yes, we did, your Honor, but --

12             THE COURT:  When?

13             MR. DRAYCOTT:  And again I'm going to have to

14   supplement on that, or at a break I can probably get you when

15   the carriers would have obtained --

16             THE COURT:  We're going to finish this because we're

17   almost done, right?

18             MR. DRAYCOTT:  That's right.  No, it's going to be

19   readily accessible.  I don't have it off the top of my head,

20   your Honor.

21             THE COURT:  So in the 2004 time framework?

22             MR. DRAYCOTT:  Yes, I think that's correct.

23             THE COURT:  All right, so you sent a letter to the

24   carriers to preserve?

25             MR. DRAYCOTT:  That's correct.

1          THE COURT:  Going back to the beginning, 1991?

2          MR. DRAYCOTT:  Again, I'm going to have to go look for

3     that.  There's been a lot of preservation directives that have

4     been issued via CMS, so I've got to focus on the one to the

5     carriers.  I can get your Honor that.

6          THE COURT:  To your knowledge, nothing has been

7     destroyed going back to 1991?  You just haven't gone after it?

8          MR. DRAYCOTT:  That's exactly right.

9          THE COURT:  Because you feel like you can just rely on

10    this extrapolation?

11         MR. DRAYCOTT:  Well, we've gotten some information.

12    We went to one carrier, and we -- and I think this was

13    described by Dr. Duggan where the arrays were from one carrier.

14    I think that's correct.

15         THE COURT:  So let me ask you this:  If I end up

16    concluding that there's not enough to extrapolate for certain

17    periods of time, are you going to go back to these carriers and

18    get these documents?

19         MR. DRAYCOTT:  No.  I mean, I think we've, if you

20    will, we've made our bed, and we have to lie on it.  But I

21    think, your Honor, you're right in looking at it as a Daubert

22    or an expert issue, if a jury were to conclude that we don't --

23    that Dr. Duggan didn't have enough information to make the

24    extrapolations, but we contest the idea that it should be

25    resolved as a spoliation issue when throughout this

1    litigation --

2              THE COURT:  In your view, it still exists?

3              MR. DRAYCOTT:  It may very well still exist, your

4    Honor.

5              THE COURT:  All right, let me jump over here then.

6              MR. DRAYCOTT:  We did not incur that burden, and we

7    did not put the carriers to that burden, nor did --

8              THE COURT:  Nor did they move to compel.

9              MR. DRAYCOTT:  Nor did defendants with full knowledge

10   of what was not being searched compel us to do that.

11             THE COURT:  So you're saying, "Yes, we have a duty to

12   preserve.  We think the date is 2004, no earlier than 2004, but

13   none of that matters because the data for the most part still

14   exists"?

15             MR. DRAYCOTT:  It may well.  We've certainly not

16   undertaken to --

17             THE COURT:  They haven't shown it's been destroyed.

18             MR. DRAYCOTT:  Correct, your Honor.

19             THE COURT:  Okay.  What do I do with that?  Have you

20   subpoenaed the carriers?

21             MR. DALY:  We were told we couldn't.  They wanted us

22   to work through them, so they told --

23             THE COURT:  Excuse me, excuse me, excuse me.  I have

24   been doing this case ad nauseam for nine years.  I'm always

25   here.  I took one week at Christmas, okay?  When you were angry

1    because of the deliberative process privilege, you got my full

2    attention, and I personally went through the documents.  So you

3    are very effective in getting my attention.  So if you thought

4    they were being improper, why didn't you move to compel?

5              MR. DALY:  We were told this is all there was, Judge.

6              THE COURT:  Excuse me.  Now I've got a disputed issue

7    of fact between attorneys.  Let me just ask point-blank:  Have

8    you subpoenaed the carriers?

9              MR. DALY:  I'll let Mr. Torborg handle this.

10             MR. TORBORG:  We issued a document to us, and we

11   actually talked -- I talked with Justin, I believe, or maybe it

12   was Andy Martinez, I can't remember --

13             THE COURT:  I'm just not hearing you.

14             MR. TORBORG:  I was the one who was in charge of that.

15   We were told, work through us for the carriers.  There is

16   correspondence back and forth between Justin and I that talked

17   about this where I specifically said, "You'd better be

18   producing to us all the arrays that you're going to rely upon

19   in this case."

20             THE COURT:  Well, they didn't.

21             MR. TORBORG:  I never heard anything about we're not

22   going to go --

23             THE COURT:  -- to their detriment, if I throw out

24   parts that were Daubert, but they've done that.  Have they ever

25   said that they're destroyed?

Page 42

1        MR. TORBORG:  They have never said -- I believe what

2    was said is, "You have all we have."

3        THE COURT:  Well, that may be true.

4        MR. TORBORG:  And --

5        THE COURT:  But they never --

6        MR. TORBORG:  We were never told, "We're not going to

7    bother going to these other carriers."  They told us to work

8    through them.  They didn't want us to work through the

9    carriers.

10        THE COURT:  I don't have the record to show they're

11   destroyed at this point.  Now, what about the states?

12        MS. REID:  Your Honor?

13        THE COURT:  Now, maybe I'll let you subpoena them to

14   trial or before trial, I mean, if we could get there, but I

15   just don't have that record.  What about the states?  I believe

16   Mr. Daly said something along the lines that in certain

17   30(b)(6) depositions, the states said that some of the

18   documents were no longer there?  Is that true for some of the

19   states?

20        MR. DALY:  Certainly, Judge, in terms of both

21   documents, e-mails, correspondence, and then I'll let

22   Mr. Torborg and Ms. Reid talk about --

23        THE COURT:  Well, he's essentially got two defenses to

24   that.  One is, "We don't have the authority to instruct the

25   states.  We can at best request."  And the second is, "And, in

1   any event, there's no proof that this data is destroyed," as

2   opposed to archived, warehoused, or the states just saying "Too

3   big a burden, we're not doing it."

4        MR. TORBORG:  There is 30(b)(6) testimony where

5   defendants asked the state officials, "Did you set, for

6   example, a MAC on this drug, and how did you get to that?"  And

7   they say, "I don't have the data to tell you that."  How is it

8   that if it's not --

9        THE COURT:  Okay, so they said that they don't have

10   the data because they didn't bother looking for it, and it's in

11   an archived warehouse, or because it's been destroyed?

12        MR. TORBORG:  I believe they said, "We don't have the

13   data."  That's what we were told.

14        THE COURT:  So you need to give -- I mean, if it's

15   been destroyed, that's different from the person sitting there

16   doesn't have the data, it's sitting in a warehouse, like

17   Indiana Jones, you know, some big thing with the boxes, you

18   know.

19        MS. REID:  Your Honor?

20        THE COURT:  Yes, do you have any --

21        MS. REID:  Well, if I could just mention because Dey,

22   again, very similar to Mr. Torborg, Dey requested the Medicaid

23   claims data because we wanted our expert to analyze it at the

24   states claims level.  I worked with Ms. Oberembt at the

25   Department of Justice.  For a period of time of the discovery,

Page 44

1    a year, a year and a half, she kept producing what data that

2    was coming in and said to work with her.  At some point in the

3    fall before the discovery cutoff, she advised, perhaps around

4    September, there was no more data coming that CMS would be

5    producing.  At that point we had received some states' claims

6    data, though not complete, for some 32 of the states.  They

7    were not complete.

8            THE COURT:  No, but --

9            MS. REID:  But then, I want your Honor to understand,

10   we then subpoenaed claims data for 38 states.  We ultimately

11   received data from 13.

12           THE COURT:  Wait, wait.  State by state?

13           MS. REID:  State by state.  We issued subpoenas.

14           THE COURT:  Okay.

15           MS. REID:  And, you know, I can go through, if you

16   want to know, what was produced by the DOJ, what states

17   responded to the subpoena, what was complete, what was

18   incomplete about that claims data.

19           THE COURT:  The ones that were incomplete, for

20   example, did they say it's because it's overly broad and

21   burdensome, or did they say it's because it's been destroyed

22   pursuant to a document retention policy?

23           MS. REID:  What realistically happened is, the states

24   said, "We'll produce what we have," and they produced it for

25   those states that did produce.  There were some states that

1    moved and objected, and the subpoenas were quashed.

2         THE COURT:  I just am not sure I've got a destruction

3    case yet, if one exists at all.  Maybe there's one or two

4    states where in a 30(b)(6) they said that they destroyed them

5    and they don't exist anymore.  I'd have to see that.  I do

6    think that there may be some document retention requirements in

7    the earlier, like, earlier than 2004, but I'm just not -- I'm

8    hearing uncertainty in the record as to whether things were

9    actually destroyed.

10        MS. REID:  Your Honor, I think that the point that

11   Mr. Torborg alluded to is, particularly on the state MAC

12   programs, that data is just gone.  I mean, for whatever reason,

13   it's not there for many of these programs.  The states' claim

14   data, they gave what they could.  Dey actually paid for the

15   cost of the copying and production for what we could get.  But

16   the reality is, you know, I think it's gone.  I think that if

17   there had been a litigation hold put in place back when people

18   knew that these lawsuits were indeed likely to be brought --

19   and I respectfully submit Dey is in the same situation as

20   Abbott with the white paper in 2000 -- that this data would

21   have been preserved.

22        THE COURT:  Well, I forget, there are various

23   complaints, right, along the way?  When did you get sued?

24        MS. REID:  The qui tam against us was '97, and then we

25   were part of the white paper that Mr. Daly has already

1    described.

2             THE COURT:  You were part of the white paper.

3             MS. REID:  Yes, and I will sit down.

4             MR. DRAYCOTT:  A couple of points just for

5    clarification.

6             THE COURT:  Let me ask you this:  It sounds like you

7    certainly agree that you had some obligation with respect to

8    the carriers.  It was probably earlier than 2004, which is the

9    duty to retain.  But what you're saying is, you think it still

10   exists.  Well, it may be some colossal misunderstanding here.

11            MR. DRAYCOTT:  That's right, your Honor, but I want to

12   be clear.  We did, and just so there's no confusion, we did --

13   and Mr. Torborg is right about one thing, which is that we

14   undertook an obligation to produce on behalf of the carriers,

15   and the carriers were certainly directed to search.  But at the

16   earliest point in this litigation, when a 30(b)(6) deposition

17   was taken of the carrier which was specifically directed at

18   looking at what search they did, the testimony from the

19   30(b)(6) deponent was that they weren't required to go to their

20   archives; and that, you know, is a significant issue.  And

21   there's been other carrier testimony where the deponents have

22   testified simply they don't know -- when there were questions

23   specifically about the arrays, they simply hadn't looked for

24   that material in the archives.  So that was early 2007.  In

25   other words, years ago there was a clear indication that while

Page 47

1   we had undertaken a production obligation on behalf of the

2   Medicare carriers, we made it very clear as to what burdens we

3   weren't going to impose on those carriers.  And not only did

4   we state it --

5           THE COURT:  Where is that in my record?  Truthfully,

6   this was briefed in a way that it almost is irrelevant to the

7   issues.  I know there's a -- factually --

8           MR. DRAYCOTT:  That's because the government's

9   argument principally with respect to things like the arrays, if

10  there's been any prejudice from the lack of evidence, whatever

11  its source --

12          THE COURT:  Your real argument is, "Yes, we have it,

13  but they didn't move to compel."

14          MR. DRAYCOTT:  Our evidence is that if there is any

15  prejudice from a lack of information from the carriers such as

16  arrays, that that's been a prejudice to the United States,

17  because we have directed our experts to use the information

18  that was available because it's been laid out very clearly.

19          THE COURT:  Right.  So they're saying they think that

20  most of it exists.  Is that right?

21          MR. DRAYCOTT:  Your Honor, I certainly am not going to

22  say that I can tell you what's in carrier archives.  I can't

23  make that representation to your Honor.  What I am saying to

24  you is that in the context of the expert reports, that we --

25          THE COURT:  All right, can I --

1          MR. DRAYCOTT:  And with respect to what's been

2     destroyed, we would say that they haven't met their burden of

3     demonstrating that there has been actual destruction through

4     spoliation, as opposed to the information not being

5     available --

6          THE COURT:  So you think this is more properly

7     resolved as a discovery dispute.

8          MR. DRAYCOTT:  Well, what I said in the briefs, your

9     Honor, is absolutely, with respect to the claims data, with

10    respect to the claims data, and I would also include the

11    carrier arrays, that that should be resolved in the context of

12    the expert's testimony.  And, again, I think Dr. Duggan --

13         THE COURT:  Do you agree they're entitled to that?

14         MR. DRAYCOTT:  They were entitled to at least try to

15    contest our burdensomeness argument three years ago --

16         THE COURT:  So and it was your understanding that it

17    didn't exist at all?  Is that what --

18         MR. DALY:  Yes, that's what we understood, Judge, I

19    mean, when we said "Give us the arrays" and they give us

20    partial arrays, you know, a few quarters.  You know, Michigan,

21    they give five quarters of eight over ten years.

22         THE COURT:  Well, they're now saying -- I don't think

23    I have the evidentiary basis to say that they've been

24    destroyed, these arrays, or, for that matter, with the states.

25    Where I'm a little caught is if this was based on some colossal

1    misunderstanding --

2         MR. DRAYCOTT:  Your Honor, with respect to

3    understanding, the deposition of First Coast Service Options,

4    in response to a question from Abbott counsel regarding whether

5    there were arrays from 1991 to 1994, the carrier deponent said,

6    "I'm not saying there aren't any, but they were possibly in

7    storage.  We didn't pull everything out of storage."  So they

8    were told that there may be arrays in storage that they weren't

9    looking for by a carrier deponent.  And that was just one

10   deposition.  So it was clear that -- I mean, the arrays, what

11   arrays we had was absolutely patent from what we were

12   producing, and there's no really dispute or misunderstanding.

13   And that was what Dr. Duggan was relying on.  Certainly the

14   first report that we issued I think was 2008 with respect to

15   Abbott by Dr. Duggan.

16        So the method -- what's been abundantly transparent

17   is, first of all, what our productions have been, what we are

18   producing, what our expert's relying on.  So this has been out

19   there, and we have made it very clear that there is certain

20   areas where the burden of production is the reason we're not

21   going to look for that data, and we have to live with the

22   consequence of that with respect to Dr. Duggan's --

23        THE COURT:  All right, so they're saying there's no

24   evidence it's been destroyed.

25        MR. DALY:  Well, even what Mr. Draycott just said, I

1  mean, that doesn't say that it's not destroyed.  The person

2  doesn't know.  We understood that --

3         THE COURT:  No, no, no, no, I'm not going to find

4  there's a spoliation issue if it's not destroyed.  I don't have

5  any idea if it's destroyed.  It's not been produced.  That's

6  what's happened.  So I don't know whether it should have been

7  produced or wasn't produced.  Maybe you can subpoena it all to

8  trial.

9         MR. DALY:  In terms of the claims data, it's either

10  gone, destroyed, or they -- what we're hearing today is -- when

11  we had the Duggan hearing, Dr. Duggan is telling us, "Well, you

12  know, I didn't have the stuff.  That's all that was available.

13  That's why I had to do all this extrapolation."

14         THE COURT:  Right.

15         MR. DALY:  Now we're hearing that the government

16  apparently chose to go with a snippet, 5 percent of the --

17         THE COURT:  That may be, and it may come back to bite

18  them.  I am simply saying it's not a spoliation issue.

19         MR. DALY:  But I do want to make one point, Judge.

20  There's more to it than the claims data here.  What happened

21  here is, the spoliation is of e-mails, of documents, of files,

22  of everything.  We in our briefs, for example, in their

23  response to interrogatories, "Give us people with knowledge

24  about policy within CMS," they gave us thirty-three people.

25  Twenty-eight of them were former employees.  Twenty-seven of

1    the twenty-eight we deposed, and all of their e-mails had been

2    destroyed.  So they made no attempt --

3            THE COURT:  Okay, okay, excuse me.  So I deny the

4    spoliation with respect to damages at this point because I

5    don't have evidence that there's been spoliation.  Now I did

6    see in the attachments Mr. Daly gave me that starting in the

7    tail end of 1999, 2000, at least at the federal -- is it the

8    federal level where there's a "Destroy every e-mail after 180

9    days"?

10           MR. DRAYCOTT:  No.  Your Honor, that was an e-mail

11   from a New York state official --

12           THE COURT:  All right, New York.

13           MR. DRAYCOTT:  -- who didn't for a minute say destroy

14   everything.  And what New York did, and the witness testified

15   to this, is they produced over 25 boxes of documents.  And this

16   was in 2006 when he sent the e-mail, he said, you know, "Let's

17   learn --"

18           THE COURT:  No, no, no, I think I'm thinking about

19   something else.  Hold on.  "CMS's document retention policy

20   routinely destroyed documents," dated January 29, 1999.  "This

21   is an early warning that on February 12, 1999, Getco will begin

22   deleting e-mail messages older than 180 days."  It's probably a

23   pretty standard one, so --

24           MR. DRAYCOTT:  But, again, I think it's good to try to

25   get these materials in categories.  The policy of the agency

1   was, e-mails are to be printed out as a record of the agency.

2   A hard copy is made, and indeed from the production and the

3   litigation in this case, we concede that that is a policy that

4   was adhered to and e-mails going back decades -- well,

5   certainly back into the '90s -- well, I shouldn't say that.

6   Certainly we've gotten e-mails been produced.  So with respect

7   to the hard drive, there was an issue about preservation of

8   hard drives.  There was a policy that ultimately those are

9   ultimately erased, but the direction is that you print out and

10  preserve the material on the hard drive.

11              THE COURT:  I see.

12              So, listen, this is what I'm going to do:  I'm denying

13  the motion on spoliation.  I don't have any evidence that

14  things are actually destroyed that were relevant.  If that

15  should come up as we hit trial, certainly I'll have to deal

16  with it.  If, for example, you subpoena stuff to trial and it

17  isn't there, I may have to readdress the issue, but at least

18  right now, I don't have evidence that it's gone as opposed to

19  in a warehouse, or I don't have a recalcitrant state.  I don't

20  know what happened.

21              MR. DALY:  I understand what you're saying with

22  respect to the claims data, Judge, but we do have a lot to say

23  about e-mails and documents, both at the state and federal

24  level.  I mean, twenty-seven of twenty-eight people's documents

25  were destroyed.  Tom Scully left the government, and we have

Page 53

1    evidence that's in the slides as well where at the direction of

2    CMS attorneys, his hard drive was destroyed.  Here's a guy who

3    was at the head of Medicare --

4          THE COURT:  Well, maybe you get an adverse inference

5    at trial, I don't know, but at this point I don't know enough

6    about why it matters.  Like, Scully we know to death.  I mean,

7    we've got so much on Scully.  The least problematic were the

8    federal files because we have so much on that.  I don't know

9    enough about individual state files, as you say.

10         MR. DALY:  Well, we have cataloged a lot of this in

11   the papers, Judge.

12         THE COURT:  But I don't even know what a remedy would

13   be.  In other words, the remedy I was thinking of possibly was

14   the extrapolation issue, but we don't even know that they're

15   destroyed, so I don't know what remedy you want at this point.

16   I don't know what I would say.

17         MR. DALY:  Well, I think the first step is a finding

18   of spoliation with respect to those issues, is the first step

19   in the analysis, and I don't think there's any question about

20   it.  Mr. Draycott --

21         THE COURT:  I'd be speculating about prejudice.  I

22   just would be speculating.  I know what the prejudice is on the

23   damage data.  That I could have figured out.  That's what I

24   came in here thinking about, actually, because that's where the

25   focus of so much of this has been.  I don't know what the

1  damage would be.  Let's assume they should have issued some

2  sort of order in 2000, and if they had, maybe the states would

3  have complied, and maybe they wouldn't.  I don't know what was

4  produced and what wasn't.  I'd be guessing.  I have no idea

5  what to do.

6         MR. DALY:  We would like to at least have what they

7  say that they directed the states to do.  You asked

8  Mr. Draycott about that.  I don't think he answered the

9  question.

10        THE COURT:  Do you have the letter that you sent out

11 to the states in 2004 or 2006?

12        MR. DRAYCOTT:  Well, certainly the letter from the

13 Department of Justice was 2006.  But, your Honor, my

14 understanding is that our whole argument is, that was way too

15 late anyway, so I'm not sure where the letter gets them.

16        THE COURT:  Well, give it to them.

17        MR. DRAYCOTT:  Okay.

18        THE COURT:  Okay?  Give it to them, whatever you sent

19 to the states.  And then if there's any information when

20 Mr. Henderson goes through his files, to the extent they exist,

21 or any of the members of your team do, that you know certain

22 data was destroyed, let me know, because right now it's too

23 speculative.  I have no idea what I'm talking about.  I mean, I

24 don't even have clean evidence from you as to what I'm talking

25 about.  I may backdate it in terms of the duty to preserve if

1   in fact -- I'm not going back to 1995.  Maybe I'd go to when

2   you demanded it in 2000.  Maybe I'd go to late 1999.  I'm not

3   sure that matters.  I don't know.

4         You say that you can't force the states.  That may

5   well be true.  To the extent there's something in -- but I

6   don't even know what the underlying facts are.  I feel like I'm

7   swimming upstream here a little bit.  They say that some data

8   was destroyed.  It's intuitive that some data was destroyed,

9   but I don't know if it's data that mattered.

10        So at this point it's denied without prejudice.

11  You'll see where we come back from, and in the meantime, you

12  have to make certain decisions about whether you want to

13  subpoena the stuff to trial.

14        MR. DALY:  I will, Judge.  The other thing in terms of

15  a remedy in terms of thinking about the future, though, would

16  be what I was talking about in terms of the inference and the

17  burden.  I mean, we do have -- in terms of what we said in the

18  brief, Judge, there's a lot of stuff from the states:

19  testimony, lack of documents, lack of e-mails, and from the

20  federal government, lack of e-mails, bad memories because they

21  don't have their own documents that would have refreshed their

22  recollection and allowed them to testify to the things that we

23  wanted to find out from them.  That kind of spoliation, that

24  kind of delay in getting holds out, even within the federal

25  government, let alone the states, I think entitles us to

1   perhaps either a burden-shifting, or, as the Court has already

2   observed, perhaps some kind of adverse inference situation.

3          THE COURT:  If I find out things have been destroyed.

4   I'm not even there yet.  So I don't know if things have been

5   destroyed, when they were destroyed, or why it matters.  So

6   that may be something we would brief in the context of a motion

7   in limine or something, you know, like -- because I think

8   this -- I've read so much briefing and I've read it over the

9   course of a couple of weeks, so excuse me, but much of the

10  briefing was not on point to this.  So it's without prejudice,

11  and I'll deal with it in a motion in limine as to what I say

12  about it, all right, so far.

13         So you give him the letter.  You check and see if you

14  know what's been destroyed.  At least I'll know what has been

15  destroyed to the extent the government knows about it.  Maybe

16  you'd go back through and try and figure out what has been

17  destroyed.

18         MR. DRAYCOTT:  Just with respect to the states?

19         THE COURT:  Well --

20         MR. DRAYCOTT:  Communications, if any, between Mr. --

21         MR. HENDERSON:  As I understand your Honor's

22  instructions, you want to know what our records indicate, what

23  we can reconstruct as to state claims data and whether or not

24  it was destroyed, if we have knowledge of destruction of states

25  claims data.

Page 57

1          THE COURT:  Yes.  And I guess you're going to have to

2     figure out what to do about these -- I'm not reopening

3     discovery because motions to compel could have been filed and

4     that sort of thing, but that doesn't prevent them from

5     subpoenaing it at trial.  So that's a pretty -- you may prefer

6     to deal with the blank spaces.  I don't know.  Right now the

7     Daubert, though, is only on what I have.  I'm not reopening the

8     record on that.

9          MR. REALE:  Your Honor, just one small point.

10    Depending on how our trial shapes up, if it's a Medicare or

11    Medicaid only, assuming for a minute that there is a Medicaid

12    component, what we'd ask for, if we're going to subpoena the

13    states for this data for a Medicaid trial, that we have in

14    advance not just a model letter but the actual letter that went

15    out to each state so that can be part of our discussion.

16         THE COURT:  Yes, absolutely.

17         MR. REALE:  Thank you, your Honor.

18         THE COURT:  Absolutely.  That would be fine.  Thank

19    you.

20         MS. REID:  Your Honor, I'm sorry, but is it possible

21    to get the 2004 whatever that hold is that they rely on --

22         THE COURT:  Yes.  Just give them copies of whatever

23    you sent out to people, 2004, 2006.  Whatever you mailed to the

24    states or the carriers give to them.

25         MR. DRAYCOTT:  The states or carriers, okay, your

1    Honor.

2            THE COURT:  The states or carriers.

3            MS. REID:  And CMS?

4            THE COURT:  Yes, sure.  The holds, the holds.  Okay.

5            MS. REID:  Thank you, your Honor.

6            THE CLERK:  Court is in recess.

7            (Adjourned, 11:15 a.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1               C E R T I F I C A T E

2

3

   UNITED STATES DISTRICT COURT )
4  DISTRICT OF MASSACHUSETTS    ) ss.
   CITY OF BOSTON               )
5

6

7          I, Lee A. Marzilli, Official Federal Court Reporter,

8  do hereby certify that the foregoing transcript, Pages 1

9  through 58 inclusive, was recorded by me stenographically at

10 the time and place aforesaid in Civil Action Nos. 01-12257-PBS

11 and 06-11337-PBS, In Re:  Pharmaceutical Industry Average

12 Wholesale Price Litigation, and thereafter by me reduced to

13 typewriting and is a true and accurate record of the

14 proceedings.

15     In witness whereof I have hereunto set my hand this ^ day

16 of 31st day of January, 2010.

17

18

19

20

21          /s/ Lee A. Marzilli
           _____
22          LEE A. MARZILLI, CRR
            OFFICIAL FEDERAL COURT REPORTER
23

24

25