# EXHIBIT 6

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456 |
| THIS DOCUMENT RELATES TO: | CIVIL ACTION:  01-CV-12257-PBS |
| TRACK 2 SETTLEMENT | Judge Patti B. Saris |

**CLASS PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR**
**<u>FINAL APPROVAL OF THE TRACK TWO SETTLEMENT</u>**

# TABLE OF CONTENTS

**PAGE**

I.     INTRODUCTION ....................................................................................................1

II.    SUMMARY OF THE CASE .................................................................................1

    A.    Plaintiffs' Allegations ...............................................................................1

    B.    Plaintiffs' Prosecution of the Case............................................................2

    C.    Track Two Defendants' Response to the Litigation ..................................2

    D.    Brief Summary Of Settlement Negotiations ............................................2

III.   DESCRIPTION OF THE PROPOSED SETTLEMENT ....................................3

    A.    The Settlement Classes .............................................................................3

    B.    Total Settlement Amount and Allocation .................................................4

    C.    Notice to the Classes ................................................................................4

    D.    The Claims Process...................................................................................8

    E.    Calculation of Payments ........................................................................10

    F.    Attorneys' Fees and Expenses and Class Representative Compensation.............15

IV.   ARGUMENT ......................................................................................................15

    A.    The Court Should Certify the Proposed Class Pursuant to Rules 23(a) and 23(b)(3) for Purposes of Settlement.......................................................16

        1.    The requirements of Rule 23(a) have been satisfied.................................17

            a.    Numerosity.........................................................................17

            b.    Commonality and typicality...............................................18

            c.    Adequate representation......................................................20

        2.    The requirements of Rule 23(b)(3) have been satisfied............................22

            a.    Questions of law or fact common to Class Members predominate over any questions affecting only individual members......................................................................................22

          b.      A class action is superior to other available methods for the fair and efficient adjudication of this matter ................................. 23

V.      THE SETTLEMENT IS REASONABLE AND SHOULD BE APPROVED ................. 25

     A.      The Standard for Approval of Class Settlement:  A Presumption in Favor of Settlement ................................................................................................ 25

     B.      Factors to Consider When Determining the Fairness, Adequacy and Reasonableness of a Settlement ........................................................... 27

          1.      Comparison of proposed settlement with the likely result of litigation ................................................................................. 28

              a.      Risks of establishing liability ........................................ 29

              b.      Risks of proving damages ............................................. 29

              c.      Other risks of continuing the litigation ......................... 30

              d.      The amount recovered .................................................. 31

          2.      Stage of the litigation and the amount of discovery completed ................ 32

          3.      Quality of counsel ....................................................................... 33

          4.      Conduct of the negotiations:  the proposed Settlement is the result of arduous, arms-length negotiations conducted by highly experienced counsel ................................................................... 34

          5.      Prospects of the case, including risk, complexity, expense and duration ................................................................................... 35

          6.      Reaction of the Class ................................................................. 35

VI.     CONCLUSION ................................................................................................ 36

## TABLE OF AUTHORITIES

<u>PAGE</u>

### FEDERAL CASES

*In re "Agent Orange" Prods. Liab. Litig.*,
597 F. Supp. 740 (E.D.N.Y. 1984) ...........................................................................31, 34

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997).........................................................................................................15, 23

*Andrews v. Bechtel Power Corp.*,
780 F.2d 124 (1st Cir. 1985).........................................................................................17, 20

*In re Brand Name Prescription Drugs Antitrust Litig.*,
1994 U.S. Dist. LEXIS 16658 (N.D. Ill. Nov. 15, 1994) ..................................20

*Bussie v. Allmerica Fin., Corp.*,
50 F. Supp. 2d 59 (D. Mass. 1999) ..............................................................................33

*In re Cardizem CD Antitrust Litig.*,
200 F.R.D. 297 (E.D. Mich. 2001) ...............................................................................20

*In re Cendant Corp. Litig.*,
264 F.3d 201 (3d Cir. 2001).............................................................................................29

*City P'ship Co. v. Atlantic Acquisition Ltd. P'ship*,
100 F.3d 1041 (1st Cir. 1996)..........................................................................15, 25, 26, 34

*Collazo v. Calderon*,
212 F.R.D. 437 (D.P.R. 2002) .......................................................................................18

*In re Compact Disc Minimum Advertised Price Antitrust Litig.*,
216 F.R.D. 197 (D. Me. 2003)............................................................................... *passim*

*In re Corrugated Container Antitrust Litig.*,
643 F.2d 195 (5th Cir. 1981) ..........................................................................................32

*In re Crazy Eddie Sec. Litig.*,
824 F. Supp. 320 (E.D.N.Y. 1993) ...............................................................................31

*Denney v. Jenkens & Gilchrist*,
230 F.R.D. 317 (S.D.N.Y. 2005), *aff'd in part and vacated in part
on other grounds*, 443 F.3d 253 (2d Cir. 2006).........................................................20, 24

*Detroit v. Grinnell Corp.*,
495 F.2d 448 (2d Cir. 1974)..................................................................................31

*Donovan v. Estate of Fitzsimmons*,
778 F.2d 298 (7th Cir. 1985) ...............................................................................26

*Duhaime v. John Hancock Mut. Life Ins. Co.*,
177 F.R.D. 54 (D. Mass. 1997)..............................................................18, 20, 28, 32

*Duhaime v. John Hancock Mut. Life Ins. Co.*,
183 F.3d 1 (1st Cir. 1999)....................................................................................25

*Durrett v. Housing Auth. of Providence*,
896 F.2d 600 (1st Cir. 1990)................................................................................25

*E.E.O.C. v. Hiram Walker & Sons, Inc.*,
768 F.2d 884 (7th Cir. 1985) ...............................................................................25

*Eisenberg v. Gagnon*,
766 F.2d 770 (3d Cir. 1985)..................................................................................16

*In re Fleet/Norstar Sec. Litig.*,
935 F. Supp. 99 (D.R.I. 1996)...............................................................................27

*Flinn v. FMC Corp.*,
528 F.2d 1169 (4th Cir. 1975) ..............................................................................34

*In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
55 F.3d 768 (3d Cir. 1995)..............................................................................27, 32

*General Tel. Co. of the Southwest v. Falcon*,
457 U.S. 147 (1982)............................................................................................18

*George Lussier Enters. v. Subaru of New Eng. Inc.*,
2001 U.S. Dist. LEXIS 12054 (D.N.H. Aug. 3, 2001) ......................................19

*Girsh v. Jepson*,
521 F.2d 153 (3d Cir. 1975)..................................................................................27

*Giusti-Bravo v. United States Veterans Admin.*,
853 F. Supp. 34 (D.P.R. 1993)...................................................................... *passim*

*Greenspun v. Bogan*,
492 F.2d 375 (1st Cir. 1974).................................................................................28

*Hawkins ex rel. Hawkins v. Commissioner of N.H. HHS,*
    2004 U.S. Dist. LEXIS 807 (D.N.H. Jan. 23, 2004)..................................................*passim*

*Isby v. Bayh,*
    75 F.3d 1191 (7th Cir. 1996) ...........................................................................................25

*In re Linerboard Antitrust Litig.,*
    2004 U.S. Dist. LEXIS 10532 (E.D. Pa. June 2, 2004) ...................................................31

*In re Lorazepam & Clorazepate Antitrust Litig.,*
    202 F.R.D. 12 (D.D.C. 2001)...........................................................................................20

*In re Lucent Techs., Inc. Sec. Litig.,*
    307 F. Supp. 2d 633 (D.N.J. 2004) ..................................................................................29

*In re Lupron Mktg. & Sales Practices Litig.,*
    228 F.R.D. 75 (D. Mass. 2005)..........................................................................................20

*M. Berenson Co. v. Faneuil Hall Marketplace, Inc.,*
    671 F. Supp. 819 (D. Mass. 1987) ...............................................................................26, 27

*Mars Steel Corp. v. Continental Ill. Nat'l Bank & Trust Co.,*
    834 F.2d 677 (7th Cir. 1987) ...........................................................................................34

*Mathewson Corp. v. Allied Marine Indus., Inc.,*
    827 F.2d 850 (1st Cir. 1987)............................................................................................35

*McAdams v. Massachusetts Mut. Life Ins. Co.,*
    2002 U.S. Dist. LEXIS 9944 (D. Mass. May 15, 2002) , *aff'd*, 391 F.3d 287
    (1st Cir. 2004) ...........................................................................................................16, 17

*McCuin v. Secretary of Health & Human Servs.,*
    817 F.2d 161 (1st Cir. 1987)............................................................................................17

*McLaughlin v. Liberty Mut. Ins. Co.,*
    224 F.R.D. 304 (D. Mass. 2004).................................................................18, 19, 20, 22

*In re Michael Milken & Assocs. Sec. Litig.,*
    150 F.R.D. 46 (S.D.N.Y. 1993) .......................................................................................31

*Molski v. Gleich,*
    318 F.3d 937 (9th Cir. 2003) ...........................................................................................27

*Mowbray v. Waste Mgmt. Holdings, Inc.,*
    189 F.R.D. 194 (D. Mass. 1999), *aff'd*, 208 F.3d 288 (1st Cir. 2000)..............................22

*In re NASDAQ Market-Makers Antitrust Litig.*,
    169 F.R.D. 493 (S.D.N.Y. 1996) ........................................................22

*In re NASDAQ Market-Makers Antitrust Litig.*,
    187 F.R.D. 465 (S.D.N.Y. 1998) ........................................................29

*Patterson v. Stovall*,
    528 F.2d 108 (7th Cir. 1976) ..........................................................25

*Payne v. Goodyear Tire & Rubber Co.*,
    216 F.R.D. 21 (D. Mass. 2003)..................................................19, 23

*In re Pharm. Indus. Average Wholesale Price Litig.*,
    230 F.R.D. 61 (D. Mass. 2005)..................................2, 19, 23, 24

*In re Pharm. Indus. Average Wholesale Price Litig.*,
    233 F.R.D. 229 (D. Mass. 2006)..........................................................2

*In re Pharm. Indus. Average Wholesale Price Litig.*,
    263 F. Supp. 2d 172 (D. Mass. 2003) ....................................................2

*In re Pharm. Indus. Average Wholesale Price Litig.*,
    431 F. Supp. 2d 98 (D. Mass. 2006) ....................................................2

*In re Polymedica Corp. Secs. Litig.*,
    224 F.R.D. 27 (D. Mass. 2004), *vacated on other grounds*, 432 F.3d 1
    (1st Cir. 2005) ..........................................................................19

*In re Prudential Ins. Co. of Am. Sales Practices Litig.*,
    962 F. Supp. 450 (D.N.J. 1997), *aff'd*, 148 F.3d 283 (3d Cir. 1998)................25

*In re Prudential Secs., Ltd. P'ships Litig.*,
    1995 U.S. Dist. LEXIS 22103 (S.D.N.Y. Nov. 20, 1995) ................................31

*In re Relafen Antitrust Litig.*,
    218 F.R.D. 337 (D. Mass. 2003)........................................................17

*In re Relafen Antitrust Litig.*,
    221 F.R.D. 260 (D. Mass. 2004)........................................................20

*Ressler v. Jacobson*,
    822 F. Supp. 1551 (M.D. Fla. 1992) ..............................................28, 29

*Rodrigues v. Members Mortg. Co., Inc.*,
    226 F.R.D. 147 (D. Mass. 2005)..................................................18, 22

*Rolland v. Cellucci*,
191 F.R.D. 3 (D. Mass. 2000)...........................................................................27, 32, 33

*In re Screws Antitrust Litig.*,
91 F.R.D. 52 (D. Mass. 1981)..............................................................................22

*Smilow v. Southwestern Bell Mobile Sys.*,
323 F.3d 32 (1st Cir. 2003)...................................................................................17

*Sosna v. Iowa*,
419 U.S. 393 (1975)...............................................................................................20

*Stanton v. Boeing Co.*,
327 F.3d 938 (9th Cir. 2003) .................................................................................18

*In re Synthroid Mktg. Litig.*,
188 F.R.D. 295 (N.D. Ill. 1999).............................................................................20

*In re Terazosin Hydrochloride Antitrust Litig.*,
220 F.R.D. 672 (S.D. Fla. 2004)............................................................................20

*In re Union Carbide Corp. Consumer Prods. Business Sec. Litig.*,
718 F. Supp. 1099 (S.D.N.Y. 1989).......................................................................31

*United States v. DiBiase*,
45 F.3d 541 (1st Cir. 1995)....................................................................................35

*In re Warfarin Sodium Antitrust Litig.*,
212 F.R.D. 231 (D. Del. 2002), *aff'd*, 391 F.3d 516 (3d Cir. 2004)..................20

*In re Warfarin Sodium Antitrust Litig.*,
391 F.3d 516 (3d Cir. 2004)........................................................................30, 31, 35

*Waste Mgmt. Holdings, Inc. v. Mowbray*,
208 F.3d 288 (1st Cir. 2000)...........................................................................23, 24

## STATUTES

18 U.S.C. § 1964.............................................................................................................2

# I.      INTRODUCTION

Class Plaintiffs respectfully submit this Memorandum in support of Plaintiffs' Motion for Entry of an Order Granting Final Approval of the Track Two Settlement (the "Motion").  The Settlement encompassed by the Track Two Settlement Agreement and Release, as amended (the "Agreement"), provides for Track Two Defendants to pay a total of $125 million to settle the claims of all Consumer Class Members, all TPP Class Members, and the claims of all Independent Settling Health Plans ("ISHPs").  All court-awarded fees, costs and expenses, compensation to the named Class Representatives, and possible reversion amounts related to TPP Opt-Outs will be paid out of the total $125 million settlement amount.

As more fully set forth below, the Settlement and the Notice Plan are consumer friendly.  Class Plaintiffs are in the process of implementing unique aspects concerning notice to consumers in order to reach more consumers and enhance their ability to make claims.

Class Plaintiffs and Lead Counsel believe that the Settlement is fair, reasonable and adequate.  It has been reached after years of litigation and months of arm's-length, intensely fought negotiation conducted under the auspices of the Court-appointed mediator, Eric Green.  Accordingly, the Motion seeks final approval of the Settlement and certification of the Classes for settlement.  A Proposed Final Approval Order is attached as Exhibit A to this Motion.

# II.      SUMMARY OF THE CASE

## A.      Plaintiffs' Allegations

Plaintiffs allege that Track Two Defendants[1] implemented a fraudulent scheme used to manipulate and inflate the monetary spread between the AWP and the cost to doctors and other providers of their Class Drugs in violation of the Racketeer Influenced and Corrupt

---

[1] As used herein, all defined terms have the same meaning as defined in the Agreement.

Organizations Act, 18 U.S.C. § 1964 ("RICO"), and various state consumer protection laws, directly causing damage to Plaintiffs and the Class.[2]

## B.    Plaintiffs' Prosecution of the Case

Plaintiffs have aggressively prosecuted their claims since filing of the first complaint in 2001.  Numerous cases were consolidated before this Court by the Judicial Panel on Multi-District Litigation on April 30, 2002.  Plaintiffs overcame motions to dismiss and briefed and argued dozens of discovery motions and more than one motion for class certification.

In discovery, Plaintiffs reviewed, analyzed, coded and loaded into a database millions of pages of documents produced by all Defendants, including Track Two Defendants, the other defendants and third parties.  Plaintiffs also undertook a detailed analysis of transactional data for many of the Class Drugs, covering a period of time in excess of ten years.

## C.    Track Two Defendants' Response to the Litigation

Each Track Two Defendant has denied, and continues to deny, that it has committed any violation of law or any wrongdoing, and further denies that it has any liability with respect to any claims asserted in the Complaint.  Track Two Defendants each filed extensive motions to dismiss and vigorously opposed Plaintiffs' Motion for Class Certification of a litigation Class.  Not surprising, Track Two Defendants have indicated that if the case proceeds, they would continue to vigorously oppose Plaintiffs' claims through trial.

## D.    Brief Summary Of Settlement Negotiations

The Settlement was reached after many months of arm's-length, intensely fought negotiation sessions, most of which were conducted in person with the court appointed mediator,

---

[2] The Court is well aware of the extensive facts and claims alleged in this action.  *See In re Pharm. Indus. Average Wholesale Price Litig.*, 431 F. Supp. 2d 98 (D. Mass. 2006); *In re Pharm. Indus. Average Wholesale Price Litig.*, 233 F.R.D. 229 (D. Mass. 2006); *In re Pharm. Indus. Average Wholesale Price Litig.*, 230 F.R.D. 61 (D. Mass. 2005); *In re Pharm. Indus. Average Wholesale Price Litig.*, 263 F. Supp. 2d 172 (D. Mass. 2003).  Accordingly, we will not repeat all of those allegations here.

Eric Green.  After the global amount was reached with Track Two Defendants, separate counsel representing the TPPs, ISHPs, and consumers negotiated allocation of the $125 million in a separate round of hard fought negotiations.

### III.   DESCRIPTION OF THE PROPOSED SETTLEMENT

A.   **The Settlement Classes**

Consistent with the Court's January 30, 2006, Consolidated Order Re:  Motion for Class Certification, the proposed Settlement Classes are as follows:

> **Medicare Part B Co-Payment Class ("Class 1").**
> All natural persons in the United States who, from January 1, 1991 through January 1, 2005, made, or incurred an obligation to make, any portion of a Medicare Part B co-payment for a Class Drug manufactured, marketed, sold, or distributed by a Released Company.

> **Third-Party Payor MediGap Supplemental Insurance Class ("Class 2").**
> All TPPs in the United States who, from January 1, 1991 through January 1, 2005, made, or incurred an obligation to make, reimbursements for any portion of a Medicare Part B co-payment for a Class Drug manufactured, marketed, sold, or distributed by a Released Company.

> **Consumer and Third-Party Payor Class For Payments Made Outside the Medicare Context ("Class 3").**
> All natural persons in the United States who made, or incurred an obligation to make, a non-Medicare Part B payment for a Class Drug manufactured, marketed, sold, or distributed by a Released Company, and all TPPs in the United States who made, or incurred an obligation to make, non-Medicare Part B reimbursements for a Class Drug manufactured, marketed, sold, or distributed by a Released Company, during the period from January 1, 1991, through March 1, 2008.

001534-16  288942 V1

**B.      Total Settlement Amount and Allocation**

Track Two Defendants, collectively, have agreed to pay a total of $125 million to settle

the MDL Actions,[3] and all related claims of the Class Plaintiffs and the ISHP Group.  The $125

million is to be allocated as follows:

> (i) 17.5% or $21,863,888 will be allocated to satisfy the claims of Consumer Class
> Members in both Class 1 and Class 3.  Of this amount, $15,365,552 has been
> allocated to pay claims associated with certain Class Drugs designated as Class A
> drugs on Exhibit B to the Settlement Agreement.  These drugs (primarily single
> source drugs) are those that were the subject of active litigation as of the date of the
> parties reached a settlement.  The remaining amount of $6,493,335 will be available
> to make payments to consumers related to the remaining Class Drugs named in the
> MDL Complaints, designated as Class B drugs on Exhibit B to the Settlement
> Agreement (primarily multisource drugs).

> (ii) 82.5% or $103,136,112 will be allocated to satisfy the claims of TPP Class
> Members in both Class 2 and Class 3, as well as ISHP Group Members.  As in
> previous AWP MDL settlements involving the ISHP Group, this amount will be
> initially allocated 50/50 between TPP Class Members and ISHP Class Members.
> After all TPP Claims have been received and processed, and the ISHP Group
> provides its purchases to the Claims Administrator and these are audited by the
> Claims Administrator, there will be a true-up based on actual purchases between TPP
> Class Members and the ISHP Group such that each TPP Class Member and each
> member of the ISHP Group receive the same compensation on a dollar-for-dollar
> basis.

**C.      Notice to the Classes**

**1.      Third Party Payors**

Consistent with the Notice Plan attached as Exhibit G to the Settlement Agreement, TPP

Class Members in both Class 2 and Class 3 received direct mail notice of the Settlement, based

on a proprietary database maintained by the Claims Administrator for that purpose.  On or about

August 1, 2008, the Claims Administrator mailed the full TPP Notice to each of more than

41,000 TPPs in its proprietary database.  *See* Declaration of Eric Miller Regarding Mailing of

---

[3] The amount that each Track Two Defendant has agreed to contribute to the overall $125 million settlement
amount was negotiated separately amongst Track Two Defendants and, as a condition of settlement, remains
confidential.

Notice to Class Members ("Miller Decl.") at ¶ 4.  On or about August 2, 2008, the Claims

Administrator created an informational website (www.awptrack2settlement.com) where all Class

Members could access information about the Settlement and download all notice and claim

forms as well as key documents concerning the litigation.  *Id.* at ¶¶ 10,12.  In addition, a

Summary Notice directed toward TPP Class Members was published in various TPP trade

publications in early August, 2008, including *National Underwriter – Life and Health* as well as

*HR Magazine.  See* Declaration of Katherine Kinsella Regarding Notice to Class In the Track

Two Settlement ("Kinsella Decl."), at ¶ 24.

        As reported to the Court in connection with the status conference held on December 16,

2008, we discovered in November 2008 that the list of drugs included with the notice mailed to

TPPs in August 2008 was incomplete.  Plaintiffs sought and obtained the Court's permission to

send a curative letter to each TPP enclosing a complete list of the Class Drugs and providing

them with new deadlines to opt-out, file a claim, or lodge an objection to the Settlement.  Those

curative letters have now been sent to each TPP, and all TPPs have now been made aware that

the deadline for TPP claims, objections and requests for exclusion is now March 16, 2009.  To

date the Claims Administrator has received only 15 requests for exclusion from TPPs  and no

objections to the Settlement have been lodged by TPP Class Members.  Miller Decl. at ¶ 17.

        2.      **Class 1 Consumers**

        Consistent with the proposed Notice Plan, Class Counsel have been working with the

Centers for Medicare and Medicaid to obtain in electronic format the last known address,

payment information and dates of drug administration for all Medicare Part B beneficiaries who

were administered a Class Drug during the Class Period and who incurred a percentage co-

payment obligation under Medicare Part B.   Although full data has not yet been obtained from

CMS, Class Counsel anticipate that the Claims Administrator will have sufficient information to

mail the simple, one-page explanation of the settlement to each individual identified in the CMS data in the coming weeks – prior to the Fairness Hearing now scheduled for April 27, 2009. Included with that mailing will be a postage pre-paid reply card which will allow the potential class member to certify under penalties of perjury that he/she made percentage co-payments under Medicare Part B during the Class Period (as opposed to flat or no co-payments due to supplemental insurance).  Once it has received the Consumer Class Member's certification and reply card, the Claims Administrator will mail a full notice, geared specifically to each individual who replies.  Included with the Full Notice will be a printout of each of the Class Drugs that were administered to that particular Class Member along with dates of each administration as derived from the CMS data.

If they wish to participate in the Settlement, and the Class 1 consumer agrees with the personal drug purchase information provided pursuant to CMS data, he or she need do nothing more.  The Claims Administrator will calculate the claim based on the formula described below. If the Class 1 consumer disagrees with or has changes to the information provided, he or she will have an opportunity to make changes to the list of drugs and administrations, certify the information as true, and return it to the Claims Administrator.

This plan provides direct mail notice to every potential member of Class 1.  It also thereafter minimizes the burden of participation for the vast majority of members of Class 1 who will presumably rely on the CMS data for the calculation of their claim amount.

Class Counsel believe substantial progress will be made in perfecting notice to Class 1 members prior to the scheduled Fairness Hearing.  However, in the coming weeks as the remaining CMS data is obtained, Class Counsel anticipate the need to move for additional time

for Class 1 members to file objections and/or claims in order to ensure they have adequate time

to response to the postcard and evaluate the full notice and respond if necessary.

### 3.    Class 3 Consumers

In order to notify Class 3 Consumers of the existence of the Settlement, Class Counsel

employed both a national media campaign as well as an extensive direct mail campaign using

names and addresses of potential Class 3 members obtained from ISHP members.

As described in the Notice Plan and in the Kinsella Declaration, Kinsella/Novak

Communications ("Kinsella")  crafted a national media plan intended to target potential

Consumer Class Members.  The media campaign included placement of the consumer

publication notice in various national newspapers, general interest magazines and health related

publications.  Kinsella Decl. at ¶¶ 20-23.  In addition a television spot appeared on various cable-

television channels approximately 229 times, Kinsella Decl. at ¶ 19, and internet banner

advertising was also utilized to provide additional notice opportunities beyond the broad-

reaching print program to Class Members.  Kinsella Decl. at ¶¶ 25, 26.

A detailed Notice and Claim Form geared specifically toward consumers in Class 3 was

also mailed to any consumer who requested one by phone or on the settlement website.  To date,

over 10,000 Class 3 notice claim forms were mailed by request or downloaded from the

settlement website.  Miller Decl. at ¶¶ 14,15  Among other things, the Notice describes why the

Class Member received the Notice, what the lawsuit is about; advises that the recipient may be a

member of the Class; describes the terms and benefits of the Settlement; and gives instructions

for making a claim.

In addition to these efforts, Class Counsel also worked closely with Counsel for the ISHP

Group.  These insurers represent more than 60% of the covered lives in the United States.  At the

request of Class Counsel and pursuant to the Court's Order Related to Notice to Consumers of

Track Two Settlement [Dkt No. 5455], using National Drug Codes ("NDCs") associated with the Class Drugs, members of the ISHP Group provided the Claims Administrator with electronic data identifying over 1.7 million potential Class 3 consumers.  These were consumers who, according ISHP data, were responsible for a percentage co-payment for one or more of the Class Drugs.  The Claims Administrator then undertook a process of eliminating duplicate names and addresses from the data received and culled the list down to approximately 897,489 unique individual Class 3 members, each of whom received a full Class 3 notice with claim form. Miller Decl. at ¶ 19.

**D.     The Claims Process**

**1.     Class 1 Consumers**

As noted above, a simple, one-page explanation of the Settlement will soon be sent to each individual identified in the CMS data.  Included will be a postage pre-paid reply card which will allow the potential class member to certify under penalties of perjury that he/she made percentage co-payments during the Class Period under Medicare Part B (as opposed to flat or no co-payments due to supplemental insurance).  Individuals who reply will receive a full notice setting forth the amount of his or her claim.

If the Class 1 consumer wishes to participate in the Settlement and agrees with the list of Class Drugs provided pursuant to CMS data, he or she need do nothing more.  If any disagreements arise, or if changes to the drug administration information provided are necessary, the Class 1 member will have an opportunity to make changes to the list of drugs and administrations, certify the information as true, and return it to the Claims Administrator.

2.      **Class 3 Consumers**

In light of the difficulty many Consumer Class Members have in obtaining records evidencing their payment of a percentage co-payment for drugs, the Notice to consumers in Class 3 have been provided two options for receipt of a payment:

(1)      The Easy Refund Option.  A Class 3 consumer may choose this option and certify under pains of perjury that he/she made one or more percentage co-payments for one or more Class Drugs during the applicable Class Period outside of Medicare Part B.  The consumer will then be allocated a $35 payment from the Settlement.  Consumers need not provide any documentation or further evidence unless called for by the Claims Administrator as part of the normal audit process for all claims.

(2)      The Full Estimation Refund Option.  Under this option, a Class 3 consumer must provide an estimate of their total out-of-pocket expenditures during the Class Period for each Class Drug for which they seek reimbursement.  For each Class Drug for which they seek reimbursement they are also required to provide at least one form of documentary proof that they incurred a percentage co-payment obligation and sign under penalty of perjury that the information provided is true and accurate.

3.      **TPPs in Class 2 and Class 3**

In order to make a valid claim, TPP Class Members were required to submit the amount of purchases of each of the Class Drugs designated as Class A during the period of January 1, 2003 to December 31, 2003.  This period is substituted for claims associated with the full Class Period in recognition of the difficulty TPPs have in accessing claims data that is older and likely not kept electronically or on current electronic systems.  This "proxy period" will be used to

- 9 -

determine the payments made to each TPP Class Member.  TPP Class Members were also required to submit their claims only associated with the drugs designated as Class A.  This was done in recognition of the fact that each TPP will receive a proportionate share of the funds set aside for TPPs.  There is no reason to believe that the relative distribution of the purchases of all Class Drugs would be different than that of a subset of Class Drugs.  Therefore, in order to minimize the administrative burden on TPP Class Members, they need only provide purchases associated with those Class Drugs designated as Class A.

In order to validate their claim for payment, TPP Class Members with claimed purchases for Class A Drugs during the proxy period that exceed $300,000 in total were required to submit electronic claims documentation with their claim.  The form and data required to be submitted are delineated in the TPP Claim Form.  Those TPPs that claimed purchases of $300,000.00 or less were not required to submit electronic claims documentation with their claim but may be required to furnish such claims documentation upon request of the Claims Administrator.

E.     **Calculation of Payments**

1.     **Class 1 Consumers**

The Class 1 consumer's obligation under Medicare Part B for all Class Drugs during the Class Period, as evidenced in records from CMS, will be the basis of the consumer's claim.  For those Class Drugs designated as "Class A" on Exhibit B to the Agreement, the consumer's total obligation related to Class A Drugs during the "Heartland" damages period (December 31, 1997 – December 31, 2003) will be multiplied by a factor of three (3x).  This figure will be added to the consumer's total co-payment obligation for Class A Drugs outside the Heartland time period and to their payment obligations for Class Drugs designated as "Class B" on Exhibit B (without a multiplication factor).  The sum of these three figures will be the Class 1 consumer's "Total Recognized Claim" used for purposes of calculating the payment made to each Consumer

- 10 -

Settlement Class Member.

### 2. Class 3 Consumers

The amount to which a Class 3 consumer will be entitled will be determined based upon the consumer's election between the Easy Refund and the Full Estimation Refund options. If a Class 3 consumer elects the Easy Refund, and the consumer's claim is accepted by the Claims Administrator, the "Total Recognized Claim" for purposes of calculating the payment made to that consumer will be equal to $35.00.

If a Class 3 consumer elects the Full Estimation Refund, the consumer's claim will be based upon his/her estimation of their out-of-pocket expenditures for each Class Drug, as supported by at least one piece of documentary evidence per drug. As for the Class 1 consumers who do not elect the Easy Refund option, the Class 3 consumer's estimated out-of-pocket expenses for Class A drugs will be multiplied by a factor of three (3x) for payments made during the Heartland damages period and added to the consumer's estimated out-of-pocket expenses for Class A Drugs outside of the Heartland period and to their expenses for Class B drugs (without a multiplication factor). The sum of these three figures will constitute the Class 3 consumer's "Total Recognized Claim" for purposes of calculating the payment made to each Consumer Settlement Class Member.

If the sum of all valid Total Recognized Claims for all Consumer Settlement Class Members exceeds the amount of the Settlement Funds allocated to satisfy Consumer Settlement Class Member claims, all consumer claims will be reduced proportionately.

### 3. TPPs and the ISHP Group

In recognition of the fact that the claims of all TPP Settlement Class Members and ISHP Group Members for all Class Drugs would certainly exceed the total amount of funds allocated to satisfy the claims of TPP Settlement Class Members and ISHP Group Members under the

Settlement Agreement, each TPP Settlement Class Member or ISHP Group Member will be paid

a pro-rata portion of the Settlement Amount allocated to TPP Settlement Class Members and the

ISHP Group.  TPP Settlement Class Members and ISHP Group Members were required to

submit the total amount of purchases during the period of January 1, 2003 to December 31, 2003,

of all drugs listed as Class A drugs on Exhibit B to the Agreement.  This figure, if properly

supported by the claimant and accepted by the Claims Administrator, will be the TPP Settlement

Class Member's or ISHP Group Member's "Total Recognized Claim" used for purposes of

calculating the pro-rata payment made to each TPP Settlement Class Member and ISHP Group

Member.

    **4.**       **ISHP Group Initial Payment and True-Up Between TPPs and the ISHP Group**

Shortly after preliminary approval of the Settlement, the ISHP Group was paid an initial

$25.5 million.  The remaining funds available to pay ISHP claims will not be paid to ISHPs until

a "true-up" occurs between the ISHP Group and TPP Settlement Class Members.  In exchange

for receipt of this initial payment the ISHPs have fully release their claims against the Track Two

Defendants.  Because they are separately represented and are not class members, the ISHP Group

can provide a release to the Track Two Defendants without the need for Court approval or the

time involved in providing notice.  In return, the Agreement provides for an expedited payment

of some portion of the monies that the ISHP Group would ultimately be entitled to from the

Settlement.

The $25.5 million initial payment was derived by making certain very conservative

assumptions about the size of the ISHP Group claims as compared to those of TPP Settlement

Class Members.  First, before any monies were paid by the Track Two Defendants, the ISHPs

demonstrated to the satisfaction of the parties that they insure 60% or more of the "covered

lives" (those individuals with private health insurance) in the United States.  In the experience of Class Counsel, this measure has been an effective proxy for the amount of relative claims by the ISHP Group in similar drug settlements.  Despite having demonstrated coverage of 60% of the covered lives in the United States, the ISHP Group were, in the aggregate, initially allocated only 50% of the total funds allocated to all TPPs.  Second, certain robust assumptions were made about the amount of attorneys' fees and costs that would be applied to the amounts ultimately available to be distributed to the ISHP Group and subtracted from the 50% allocation.  Finally, in determining the initial payment amount, only 75% of the net allocation was paid out to the ISHP Group as part of the initial payment, leaving the remainder to be subject to the true-up between the ISHP Group and TPP Settlement Class Members.

The true-up formula is a simple one.  Each TPP Settlement Class Member and ISHP Group member individual claim will be calculated in exactly the same manner, as a percentage of all TPP related claims.  The amount of funds paid to the ISHP Group after all claims have been calculated by the Claims Administrator will account for the $25.5 million initial payment.  Essentially, the $25.5 million will be subtracted from what the ISHP Group is ultimately entitled to, and they will be paid the balance of what they are entitled to at the end of the TPP claims and auditing process.

### 5.        Reversion to Track Two Defendants

Once all claims of all TPPs, including TPP Class Members and the ISHP Group, have been received and audited by the Claims Administrator, the Track Two Defendants will be entitled to a refund of a percentage of the $103 million set aside for TPP claims as a result of any valid TPP Opt-Outs from the Class.  The amount of the refund is meant to approximate the amount of funds the TPP Opt-Out(s) would have been entitled to under the claims process, free of any reduction for attorneys' fees or costs of notice or administration.  Presumably any TPP

Opt-Out may seek to separately negotiate with, or litigate their claims against, the Track Two Defendants.

The percentage of the $103 million refunded to Track Two Defendants will be equal to the percentage of purchases by TPP Opt-Outs compared to the claimed purchases of all TPPs, including the ISHP Group, that have submitted claims documentation to the Claims Administrator.  For example, if TPP Opt-Outs represent purchases that are 2% of the purchases of the sum of all TPP purchases, including TPP Class purchases, ISHP Group purchases and TPP Opt-Out purchases, Track Two Defendants will receive 2% of $103 million in refund or approximately $2,060,000.  There is no provision for a refund to Track Two Defendants resulting from valid Consumer Opt-Outs.

As part of their request for exclusion, TPP Opt-Outs were requested to provide the Claims Administrator the amount of their purchases of the Class A Covered Drugs during the relevant time period.  This information is not required in order for a TPP to validly opt-out of the Class but it is requested in order to make the calculation of the refund to the Track Two Defendants and the "true-up" of TPP/ISHP claims easier.  In the event insufficient information is provided by TPP Opt-Outs, the parties have agreed to cooperate and use other available information to estimate the purchases of TPP Opt-Outs.

The Settlement Agreement also provides that 33% of any monies refunded to Track Two Defendants be maintained by the Track Two Defendants for up to two years in order to satisfy any claim for attorneys' fees, costs or expenses by Class Counsel or the Class.  The Track Two Defendants are required to notify Lead Class Counsel of the existence of any settlement with a TPP Opt-Out, and Lead Class Counsel will submit a motion to the Court seeking costs and expenses be paid out of monies set aside for that purpose.

**F.**     **Attorneys' Fees and Expenses and Class Representative Compensation**

Class Plaintiffs' Counsel have herewith filed a fee petition (the "Fee Petition") for an award of fees, reimbursement of costs and expenses, and reimbursement to appropriate Class Representatives.  Understanding that the award of attorneys' fees is a matter committed to the sole discretion of the Court, the Track Two Defendants do not object to Class Counsel's request for a combined award of fees and expenses of 30% of the total settlement amount.  This award, if granted by the Court, is to be paid from the total settlement amount of $125 million.  The Settlement Agreement also provides for compensation to the named representatives for the time associated with their work in this case, to be approved by the Court.

Class Counsel have also reached an agreement with members of the ISHP Group and ISHP Group Counsel concerning attorneys' fees.  ISHP counsel have agreed not to seek a separate fee award from the settlement fund but instead agreed to receive a percentage of the amount Class Counsel is awarded in fees.

## IV.     ARGUMENT

A class action cannot be compromised or settled without the approval of the Court.  Fed. R. Civ. P. 23(e).  Prior to addressing the adequacy of a proposed Settlement, the Court must determine whether the plaintiff class, as agreed to by the parties, may be certified for purposes of the Settlement.  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613 (1997); *Hawkins ex rel. Hawkins v. Commissioner of N.H. HHS*, 2004 U.S. Dist. LEXIS 807, at *2 (D.N.H. Jan. 23, 2004).  Further, the decision to approve or reject a proposed settlement is committed to the Court's sound discretion.  *City P'ship Co. v. Atlantic Acquisition Ltd. P'ship*, 100 F.3d 1041, 1043-44 (1st Cir. 1996).  Class actions have long been recognized by the courts as an essential tool for adjudication of cases involving multiple claims that are susceptible of similar factual and/or legal inquiries, and for which individual recovery might be too modest to warrant

prosecution of the case on an individual basis. To that end, when analyzing a motion to certify, "district courts in this circuit have frequently recognized that 'Rule 23(a) should be liberally construed in order not to undermine the policies underlying the class action rule.'" *McAdams v. Massachusetts Mut. Life Ins. Co.*, 2002 U.S. Dist. LEXIS 9944, at *7 (D. Mass. May 15, 2002) (quoting *Lessard v. Metropolitan Life Ins. Co.*, 103 F.R.D. 608, 610 (D. Me. 1984)), *aff'd*, 391 F.3d 287 (1st Cir. 2004). Consistent with this rule, "when a court is in doubt as to whether to certify a class action, it should err in favor of allowing a class." *McAdams*, 2002 U.S. Dist. LEXIS, at *8 (quoting *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 303 (E.D. Mich. 2001)); *see also Eisenberg v. Gagnon*, 766 F.2d 770, 785 (3d Cir. 1985) ("The interests of justice require that in a doubtful case[,] any error, if there is to be one, should be committed in favor of allowing a class action.").

Certification of the Settlement Class is appropriate in this case because the requirements of Rule 23(a) and Rule 23(b) are satisfied.

## A.   The Court Should Certify the Proposed Class Pursuant to Rules 23(a) and 23(b)(3) for Purposes of Settlement

The parties filed their Joint Motion for Preliminary Approval of the Settlement on March 7, 2008. Subsequently, the parties filed amendments to the Settlement Agreement which consisted of revised exhibits to the Settlement Agreement on April 4, 2008. In an Order dated July 2, 2008, this Court preliminarily approved the Settlement Agreement and preliminarily certified three classes as set forth in Section IIIA *supra*. Order Granting Preliminary Approval of the Track Two Settlement, Directing Notice to the Class and Scheduling Fairness Hearing (Dkt. No. 5426) ("Prelim. Approval Order") at 2-3. Excluded from the Classes were "(1) the Released Companies; (2) their respective past, present, and future officers, directors, managers, employees, agents, sales representatives, and liability insurers; and (3) all hospitals, clinics

- 16 -

physicians, or physician practice groups, or other health care providers or group of providers, that purchased drugs manufactured, marketed, sold or distributed by a Released Company . . ." Prelim. Approval Order at 3.  In addition, the Classes excluded "all natural persons who only paid flat co-payments, and not any percentage co-payments for Class Drugs as well as all federal, state and local governmental entities . . . and the Independent Settling Health Plans."  *Id.*

## 1. The requirements of Rule 23(a) have been satisfied

Rule 23(a) of the Federal Rules of Civil Procedure requires a party seeking class certification to satisfy four prerequisites:  (i) numerosity; (ii) commonality; (iii) typicality; and (iv) adequacy of representation.  *Smilow v. Southwestern Bell Mobile Sys.*, 323 F.3d 32, 38 (1st Cir. 2003) (citing *Amchem*, 521 U.S. at 613).  In this case, all four requirements of Rule 23(a) have been met.

### a. Numerosity

Numerosity requires that the class include so many members that joinder would be impracticable.  Fed. R. Civ. P. 23(a)(1).  Although there is no magic number of Class Members that will qualify for class certification, numerosity "is not a difficult burden to satisfy." *McAdams*, 2002 U.S. Dist. LEXIS 9944, at *9 (quoting *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 303 (E.D. Mich. 2001)).  Courts have generally found groups of more than forty to satisfy the numerosity requirement.  *Id.* at *10; *see also In re Relafen Antitrust Litig.*, 218 F.R.D. 337, 342 (D. Mass. 2003) (broadly drawn class definition "suggests that members of the class, once identified, will be 'so numerous and widely dispersed that joinder . . . is impracticable'"). Precise quantification of Class Members is not necessary, and a court may make common sense assumptions to support a finding of numerosity.  *McCuin v. Secretary of Health & Human Servs.*, 817 F.2d 161, 167 (1st Cir. 1987); *see also Andrews v. Bechtel Power Corp.*, 780 F.2d 124, 131-32 (1st Cir. 1985) (court can consider economy, geographic dispersion and ability of

- 17 -

individual members to bring suit); Alba Conte & Herbert Newberg, 6 NEWBERG ON CLASS ACTIONS ("NEWBERG") § 18:2-18:4 (4th ed. 2002).

In this case, the numerosity requirement is not in doubt.  Notice was mailed to over 42,000 TPP Class Members, almost one million Class 3 Members, and it is anticipated that the initial notice will be mailed to millions of Medicare beneficiaries nationwide, a large subset of which are Class 1 Members.  A class of this size makes joinder of all members impracticable.

### b.      Commonality and typicality

The commonality requirement is met if "there are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  Typicality, on the other hand, requires that the claims of the named plaintiffs be typical of the claims of the class.  Fed. R. Civ. P. (23)(a)(3).  Often, the requirements of Rule 23(a)(2) and (3) are considered together.  *See General Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147, 157 n.13 (1982); *Rodrigues v. Members Mortg. Co., Inc.*, 226 F.R.D. 147, 151 (D. Mass. 2005).  The crux of both requirements is to ensure that "maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence."  *Falcon*, 457 U.S. at 158 n.13.

To satisfy the commonality requirement, the named plaintiffs' claims must share at least one common question of law or fact with the class' claims.  *See*, *e.g.*, *McLaughlin v. Liberty Mut. Ins. Co.*, 224 F.R.D. 304, 309 (D. Mass. 2004) (While requiring that "questions of law or fact be shared by the prospective class," Rule 23(a)(2) does not require that "every question be common."); *Stanton v. Boeing Co.*, 327 F.3d 938, 953 (9th Cir. 2003); *Collazo v. Calderon*, 212 F.R.D. 437, 442 (D.P.R. 2002).  The "commonality" requirement of Rule 23(a)(2) "is a 'low hurdle' easily surmounted."  *Duhaime v. John Hancock Mut. Life Ins. Co.*, 177 F.R.D. 54, 63 (D. Mass. 1997) (citations omitted).  It requires only that there be a single question of law or fact

that is common to all class members.  *George Lussier Enters. v. Subaru of New Eng. Inc.*, 2001
U.S. Dist. LEXIS 12054, at *11 (D.N.H. Aug. 3, 2001).  The commonality requirement "does
not require that class members' claims be identical."  *Payne v. Goodyear Tire & Rubber Co.*, 216
F.R.D. 21, 25 (D. Mass. 2003) (quoting *Mack v. Suffolk Cty.*, 191 F.R.D. 16, 23 (D. Mass.
2000)).

With respect to typicality, "[t]he central inquiry in determining whether a proposed class
has typicality is 'whether the class representatives' claims have the same essential characteristics
as the claims of the other members of the class.'"  *In re Polymedica Corp. Secs. Litig.*, 224
F.R.D. 27, 36 (D. Mass. 2004) (quoting *In re Amerifirst Secs. Litig.*, 139 F.R.D. 423, 428 (S.D.
Fla. 1991)), *vacated on other grounds*, 432 F.3d 1 (1st Cir. 2005); *McLaughlin*, 224 F.R.D. at
310; *see also* 1 NEWBERG § 3.13 (the typicality requirement is usually met "when it is alleged
that the same unlawful conduct was directed at or affected both the named Plaintiffs and the class
sought to be represented").  Furthermore, the plaintiff does not need to show "substantial identity
between [his] claims and those of absent class members," but only that "[his] claims arise from
the same course of conduct that gave rise to the claims of the absent members."  *In re
Polymedica*, 224 F.R.D. at 36 (quoting *Priest v. Zayre Corp.*, 118 F.R.D. 552, 555 (D. Mass.
1988) (internal quotation marks omitted)); *see Payne*, 216 F.R.D. at 26 (typicality requires "the
same essential characteristics" among claims).

Both commonality and typicality are present here.  As the Court has already ruled in
certifying litigation classes in this case, "there are numerous common factual issues:  whether the
AWPs and/or WACs for the AWPIDs were misrepresented, whether that misrepresentation was
intentional, whether it was done with a fraudulent intent, and whether it proximately caused harm
to consumers."  *In re AWP*, 230 F.R.D. at 78.  As to typicality, Plaintiffs' claims arise out of the

- 19 -

same course of conduct and are based on the same legal theories as those of the absent Class Members.  Plaintiffs and Class Members were all harmed by the alleged unlawful scheme of each of the Track Two Defendants.  Accordingly, the named Plaintiffs' interests are not only "typical" of the absent Class Members, they are identical and easily satisfy Rule 23(a)(3).[4]

### c.  Adequate representation

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class."  This inquiry is satisfied if:  (i) the plaintiff's counsel is qualified, experienced, and able to prosecute the action on behalf of the class vigorously, and (ii) the interests of the representative parties do not conflict with the interests of any class members. *Sosna v. Iowa*, 419 U.S. 393, 403 (1975); *McLaughlin*, 224 F.R.D. at 310, *Andrews*, 780 F.2d at 130; *Hawkins*, 2004 U.S. Dist. LEXIS 807, at *10; *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 216 F.R.D. 197 (D. Me. 2003).  It is well established that "in complex litigations . . . a plaintiff need not have expert knowledge of all aspects of the case to qualify as a class representative, and a great deal of reliance upon the expertise of counsel is to be expected." *Denney v. Jenkens & Gilchrist*, 230 F.R.D. 317, 327 (S.D.N.Y. 2005) (quoting *In re AM Int'l*

---

[4] Various other courts have certified nationwide classes in drug pricing cases involving schemes not dissimilar to those alleged in this case.  *See In re Lupron® Mktg. & Sales Practices Litig.*, 228 F.R.D. 75 (D. Mass. 2005); *In re Relafen Antitrust Litig.*, 221 F.R.D. 260, 288 (D. Mass. 2004) (certifying class of persons and entities who "purchased" a drug); *In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 248 (D. Del. 2002) ("Several other courts have recently certified nationwide or multi-state classes under federal and state laws in actions alleging overpayment for prescription drugs."), *aff'd*, 391 F.3d 516 (3d Cir. 2004); *In re Lorazepam & Clorazepate Antitrust Litig.*, 202 F.R.D. 12 (D.D.C. 2001) (conspiracy to prevent competition and raise price of drugs); *In re Synthroid Mktg. Litig.*, 188 F.R.D. 295 (N.D. Ill. 1999) (drug manufacturer alleged to have suppressed information in order to protect generic drug competition); *In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672, 703 (S.D. Fla. 2004) (certifying class of persons and entities who "paid" all or part of the purchase price for a drug); *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 332 (E.D. Mich. 2001) (class of "purchasers" of Cardizem); *In re Brand Name Prescription Drugs Antitrust Litig.*, 1994 U.S. Dist. LEXIS 16658, at *3-4 (N.D. Ill. Nov. 15, 1994) (class of "purchasers" of "brand name prescription drugs").  Indeed, Courts in this District have approved closely analogous classes in a variety of circumstances.  *See, e.g.*, *Duhaime*, 177 F.R.D. at 54 (class was ascertainable because it was defined to include persons who purchased life insurance policies from one time period through another).

*Inc., Secs. Litig.*, 108 F.R.D. 190, 196-97 (S.D.N.Y. 1985)), *aff'd in part and vacated in part on other ground*s, 443 F.3d 253 (2d Cir. 2006).

Class Counsel include some of the most qualified and experienced lawyers in the United States in the successful prosecution of class actions.  These firms have vigorously pursued the rights of the Class Members in this case for over seven years, conducted discovery, prepared countless filings and memoranda in this action, tried and prevailed on Class 2/3 Massachusetts claims against certain Track One Defendants, and have engaged in extensive settlement negotiations with the Track Two Defendants.  Further, the Track Two Defendants and their counsel continue to stand ready, willing and able to devote the resources necessary to litigate this case vigorously and to see it through to the best possible resolution, if the Settlement is not approved.  This Court has repeatedly found that Class Counsel were adequate.[5]

Neither the Plaintiffs nor Class Counsel have any interests that are antagonistic to those of the Class Members who now stand to benefit from the Settlement.  The central issues in this case – the existence, unlawfulness and effect of each of the Track Two Defendants' alleged scheme to improperly manipulate the AWP of the Class Drugs – are common to the claims of Plaintiffs and the other members of the Class.  The representative Plaintiffs, like each absent Class Member, have a strong interest in proving the alleged scheme, establishing its unlawfulness, and demonstrating how the Class was affected by the illegal conduct.  Named Plaintiffs have submitted to discovery and worked with counsel for the protection of the Class.

---

[5] The Court has found counsel adequate when issuing its original class certification opinion; issuing its class certification order; preliminarily approving the proposed GSK settlement; granting preliminary and final approval to the AstraZeneca Proposed Class 1 Settlement;  approving the final GSK settlement; and preliminarily approving this Track Two Settlement.  The resumes of the Class Counsel whose approval is sought, Hagens Berman Sobol Shapiro LLP, Spector, Roseman & Kodroff, P.C., Wexler Wallace LLP, and Hoffman & Edelson, have been previously submitted to the Court but will be provided again upon request.

There is no conflict between the Plaintiffs and the Class Members, and Plaintiffs satisfy the requirements of Rule 23(a)(4).

>   **2.      The requirements of Rule 23(b)(3) have been satisfied**

In addition to having satisfied the prerequisites of Rule 23(a), the Class also satisfies those of Rule 23(b)(3), namely, (i) questions of law or fact common to Class Members predominate over any questions affecting only individual members, and (ii) the class action is superior to other available methods for the fair and efficient adjudication of this matter. *McLaughlin*, 224 F.R.D. at 311; *Rodrigues*, 226 F.R.D. at 152; *In re Compact Disc*, 216 F.R.D. at 204; *Mowbray v. Waste Mgmt. Holdings, Inc.*, 189 F.R.D. 194, 196-97 (D. Mass. 1999), *aff'd*, 208 F.3d 288 (1st Cir. 2000); *In re Screws Antitrust Litig.*, 91 F.R.D. 52, 55 (D. Mass. 1981).

In this case, all the specific and general issues – Defendants' liability under RICO and various state consumer protection acts; the formation and fulfillment of the scheme; liability evidence showing improper promotion of the spread and its effect on the Class; aggregate damages to the Class as a whole – are common, uniform, and applicable to all Class Members. Adjudication of Plaintiffs' and Class Members' claims can be done most efficiently as a class action.  A class action is the superior method of adjudicating the nearly identical claims of the many Class Members in this case because it reduces variations and inconsistencies in the adjudication of similar claims, effectively utilizes judicial resources and economically allows for the adjudication of many claims involving an identical complex scheme and legal theory.

>   **a.      Questions of law or fact common to Class Members predominate over any questions affecting only individual members**

The Rule 23(b) predominance inquiry is satisfied "unless it is clear that individual issues will overwhelm the common questions and render the class action valueless."  *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 517 (S.D.N.Y. 1996).  This inquiry, however,

does not require "uniformity of claims across the entire class." *Payne*, 216 F.R.D. at 26 (citing *Amchem*, 521 U.S. at 623-25). In determining whether common questions of law or fact predominate, the Court should determine if the various claims of the Plaintiffs are sufficiently cohesive to justify treating them all in one, single judicial forum. *See Amchem*, 521 U.S. at 625 ("Predominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws."); *see Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 296 (1st Cir. 2000) ("single, central issue" as to the defendant's conduct vis-à-vis class members can satisfy predominance requirement even when other elements of the claim require individualized proof).

Individual issues in this case will not overwhelm the common questions of law or fact because the central question is whether the Track Two Defendants illegally manipulated the published AWP for their Class Drugs and improperly marketed the spread. There is no doubt that the Plaintiffs would present common evidence regarding the existence and scope of the alleged scheme at any trial of this matter, much as was done in the Massachusetts Class 2 and 3 trial. Moreover, in the litigation context, the Court has already found that common factual issues predominate:

> Here, common factual issues predominate since a typical consumer by statute simply pays a percentage of AWP as a co-pay. There is therefore no separate factual issue regarding the knowledge and reliance of each class member.

*In re AWP*, 230 F.R.D. at 82. The Court also found that common legal issues predominated via the application of the consumer protection laws of the many states. *Id.* at 85.

### b. A class action is superior to other available methods for the fair and efficient adjudication of this matter

With respect to the superiority requirement, a court considers: (i) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (ii) the

- 23 -

extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (iii) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (iv) the difficulties likely to be encountered in the management of a class action.  Fed. R. Civ. P. 23(b)(3).  As to the last of these factors, where a Court is "[c]onfronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, for the proposal is that there be no trial."  *Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d at 298 (citing *Amchem*, 521 U.S. at 620); *Denney*, 230 F.R.D. at 326.

Analyzing the three remaining factors under the superiority requirement, it is clear that a class action would provide the fairest and most efficient method of adjudication.  First, Class Members who are elderly Medicare beneficiaries or individual consumers have losses too small to pursue through individual cases, even though those losses are significant to them.  The large size of the Class, the relatively small potential recovery of each individual Class Member, the complexity of the litigation, the cost of the litigation and similar issues all make a class action the superior method of adjudicating the claims of Class Members.  The interests of Class Members in individually controlling the prosecution of separate claims are outweighed by the efficiency of the class mechanism.  It would be a waste of judicial and the parties' resources to require thousands of separate prosecutions.  Such an approach would necessarily risk inconsistent adjudications establishing varying standards for identical conduct.  As the Court has already recognized, "[w]ith respect to Medicare Part B consumer patients making co-payments, it is cost effective to focus the litigation in one forum, and one case will promote a uniformity of results appropriate for a nationwide reimbursement program."  *In re AWP*, 230 F.R.D. at 85.

## V.     THE SETTLEMENT IS REASONABLE AND SHOULD BE APPROVED

### A.     The Standard for Approval of Class Settlement:  A Presumption in Favor of Settlement

In determining whether to approve a settlement, the First Circuit, as required by Rule

23(e)(1)(C), has held that "[a] district court can approve a class action settlement only if it is fair,

adequate and reasonable."  *City P'ship Co.*, 100 F.3d at 1043.  The Court must undertake a

detailed assessment of the terms of the Settlement, the interests of the Class Members as well as

any third parties that might be affected by the settlement, and the circumstances of the litigation

and the proposed settlement.  *See Duhaime v. John Hancock Mut. Life Ins. Co.*, 183 F.3d 1, 2, 7

(1st Cir. 1999); *Durrett v. Housing Auth. of Providence*, 896 F.2d 600, 604 (1st Cir. 1990);

*Hawkins*, 2004 U.S. Dist. LEXIS 807, at *14.

The First Circuit has provided great deference to trial courts and has "refrain[ed] from

intervening unless there is found to be an abuse of discretion."  *City P'ship Co.*, 100 F.3d at

1043-44; *Durrett*, 896 F.2d at 603.  A court reviewing a settlement "is not to decide whose

assertions are correct, but merely to ascertain whether the district court clearly abused its

discretion in approving the settlement."  *City P'ship Co.*, 100 F.3d at 1043-44.[6]

In this Circuit, a presumption in favor of settlement is to be found "[w]hen sufficient

discovery has been provided and the parties have bargained at arms-length."  *City P'ship Co.*,

---

[6] Also, as a general rule, courts will not substitute their own thoughts for the parties' business judgment in arriving at a settlement.  *Patterson v. Stovall*, 528 F.2d 108, 114 (7th Cir. 1976).  Accordingly, the Court is not called upon to determine whether the Settlement reached by the parties is the best possible deal, nor whether Class Members will receive as much from a settlement as they might have recovered from victory at trial.  *See Giusti-Bravo v. United States Veterans Admin.*, 853 F. Supp. 34, 36 (D.P.R. 1993) (In evaluating proposed class action settlement, "courts are required to make an inquiry to determine whether the proposal, taken as a whole, is fair, adequate, reasonable and in the best interests of all those who will be affected by it."); *In re Compact Disc*, 216 F.R.D. at 211 (Judge notes that "[a]s supervising judge [he is] not to prejudge the merits of the case...and [is not] to second-guess the settlement, [but is] only to determine if the parties' conclusion is reasonable."); *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F. Supp. 450, 534 (D.N.J. 1997), *aff'd*, 148 F.3d 283 (3d Cir. 1998); *E.E.O.C. v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 889 (7th Cir. 1985).  Courts challenged with evaluating a proposed class action settlement recognize that the "essence of settlement is compromise" and will not represent a total win for either side.  *Isby v. Bayh*, 75 F.3d 1191, 1200 (7th Cir. 1996) (quoting *Armstrong v. Board of Sch. Dir.*, 616 F.2d 305, 315 (7th Cir. 1980)).

100 F.3d at 1043; *In re Compact Disc*, 216 F.R.D. at 207; *M. Berenson Co. v. Faneuil Hall Marketplace, Inc*., 671 F. Supp. 819, 822 (D. Mass. 1987); *see also* NEWBERG § 11.41 at 453. And the law has long favored settlement of litigation.  This is particularly true in class actions and other complex cases where substantial resources can be conserved by avoiding the time, cost and rigors of prolonged litigation.  In addition, there is an overriding public interest in favor of settlement of complex class action suits, especially where the substantive issues of the case "reflect a broad public interest in the rights to be vindicated or the social or economic policies to be established."  *See*, *e.g.*, *Donovan v. Estate of Fitzsimmons*, 778 F.2d 298, 307 (7th Cir. 1985). By supporting the settlement of complex, class action disputes, the judicial system can help minimize litigation expenses on both sides, reduce the strain on scarce judicial resources, and avoid the risk of trial to both parties.  MANUAL FOR COMPLEX LITIGATION, §§ 23, 30.4 (3d ed. 1995).

These concerns apply with particular force in a case such as this, where thousands of consumers and Third-Party Payors throughout the country were subject to allegedly deceptive and unfair practices in connection with the marketing and sale of the Class Drugs.  Individual litigation would clog the courts of this and many other states; would take years to resolve; and, given the relatively modest amount of damages suffered by each individual consumer, would likely be available only to those wealthy and sophisticated enough to retain their own lawyers. The proposed Settlement is the best and only vehicle to assure that all Class Members, regardless of their means, receive the relief to which they are entitled in a prompt and efficient manner.

This Settlement was the result of intense litigation and arms-length negotiations between counsel.  The litigation was hard fought and the negotiations were lengthy and detailed.  There

was no collusion, and all the negotiations were conducted at arm's-length.  Therefore, the
Settlement should be presumed to be fair.

**B.      Factors to Consider When Determining the Fairness, Adequacy and Reasonableness
of a Settlement**

There is no single test in the First Circuit for determining whether a proposed class action
settlement is fair.  As one court has explained, "[t]he fairness determination is not based on a
single inflexible litmus test, but, instead, reflects [the court's] studied review of a wide variety of
factors bearing on the central question of whether the settlement is reasonable in light of the
uncertainty of litigation."  *Rolland v. Cellucci*, 191 F.R.D. 3, 8 (D. Mass. 2000).

Other Circuits generally have considered "the negotiating process by which the
settlement was reached and the substantive fairness of the terms of the settlement compared to
the result likely to be reached at trial."  *In re Compact Disc*, 216 F.R.D. at 206.  Among the
factors that other courts have employed are the following:

(1)      comparison of the proposed settlement with the likely result of litigation;

(2)      stage of the litigation and the amount of discovery completed;

(3)      quality of counsel;

(4)      conduct of the negotiations; and

(5)      prospects of the case, including risk, complexity, expense and duration.

*In re Compact Disc*, 216 F.R.D. at 206.[7] Applying these six factors to the proposed Settlement in
this case clearly indicates that the Settlement is more than adequate and should be approved.

---

[7] *See also Molski v. Gleich*, 318 F.3d 937, 953 (9th Cir. 2003); *In re Fleet/Norstar Sec. Litig.*, 935 F. Supp. 99,
105 (D.R.I. 1996); *In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 785(3d Cir. 1995); *Giusti-Bravo*, 853 F. Supp. at 36; *M. Berenson Co.*, 671 F. Supp. at 822-23; *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir.
1975).

1.      **Comparison of proposed settlement with the likely result of litigation**

This factor involves the question of "how the value of the settlement compares to the relief the plaintiffs might recover after a successful trial and appeal, discounted for risk, delay and expense." *In re Compact Disc*, 216 F.R.D. at 207; *Giusti-Bravo*, 853 F. Supp. at 36 (noting that if settlement were rejected, "plaintiffs could very well face a long and winding road toward trial and almost insurmountable obstacles in attempting to obtain a more comprehensive relief than the one provided"); MANUAL FOR COMPLEX LITIGATION (FOURTH) § 13 (4th ed. 2004) ("The high stakes in complex cases increase the incentive to avoid the risk of trial, and the burgeoning cost of pretrial activity places a premium on settling early in litigation.").

In making this assessment, a court is cautioned not to "decide the merits of the case or resolve unsettled legal questions." *Giusti-Bravo*, 853 F. Supp. at 36; *Greenspun v. Bogan*, 492 F.2d 375, 381 (1st Cir. 1974) (district court should not "engage in a trial of the merits, for the purpose of settlement is precisely to avoid such a trial"); *Ressler v. Jacobson*, 822 F. Supp. 1551, 1553 (M.D. Fla. 1992) (courts should limit inquiry to "whether the possible rewards of continued litigation with its risks and costs are outweighed by the benefits of the settlement"). Also, the court "cannot, and should not, use as a benchmark the highest award that could be made to the plaintiff after full and successful litigation of the claim. Nor should the court consider cases of particular individual class members to determine whether each and every member of the class receives the fullest possible compensation." *Duhaime*, 177 F.R.D. at 68.

As part of their settlement negotiations, and the ultimate decision to accept the Settlement, Plaintiffs analyzed various risks of continuing litigation. These included risks related to establishing liability at trial and risks relating to the amount of damages that could be recovered at trial. A consideration of all the various risk factors and potential recovery reveals that the Settlement is more than adequate.

### a.    Risks of establishing liability

Plaintiffs recognize that they faced substantial risks in establishing their case at trial. While the Court in a bench trial had ruled against various Track One Defendants, a jury could very well rule differently.[8]  Plaintiffs knew they would face difficulty in presenting their case concerning the Track Two Defendants to a jury in a streamlined, easily comprehensible fashion given the complexity of the subject matter and the number of drugs involved – even if claims against Track Two Defendants were grouped together for purposes of trial into a smaller number of Defendants.  While Plaintiffs knew they would present strong evidence on the issues, there was always the risk that the jury would accept, or at least be confused by, various Track Two Defendants' numerous defenses.

### b.    Risks of proving damages

A substantial risk of establishing damages at trial was a battle of experts between Plaintiffs' experts, who would opine that, but-for the improper marketing conduct of each Track Two Defendant, Plaintiffs would have paid considerably less for the Class Drugs, and defense experts, who would opine that that the spreads associated with Class Drugs were not outside industry expectations.  "In the 'battle of experts,' it is impossible to predict with any certainty which arguments would find favor with the jury." *Ressler v. Jacobson*, 822 F. Supp. at 1554; *see also In re Cendant Corp. Litig.*, 264 F.3d 201, 239 (3d Cir. 2001) (recognizing risks associated with jury being confronted with competing damage expert opinions) and *In re Lucent Techs., Inc. Sec. Litig.*, 307 F. Supp. 2d 633, 646 (D.N.J. 2004) ("The outcome of such battles is never predictable, and the Court recognizes the very real possibility that a jury could be swayed by

---

[8] As the court in *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465 (S.D.N.Y. 1998) recognized, "[i]t is known from past experience that no matter how confident one may be in the outcome of litigation, such confidence is often misplaced."  *Id*. at 475 (citation omitted).

defense experts, who would seek to minimize the Class Members' losses or to show that the losses were attributable to factors other than the alleged [misconduct]").

Class Counsel are also mindful of the Court's Class 2 and 3 trial ruling that limit damages to the time period 1998 through 2002.  Such a ruling with respect to claims against Track Two Defendants would deprive Class Members of compensation for other time periods.  In contrast, the Settlement opens claims to Class Members who were administered Class Drugs outside of this time period (although at reduced rates of compensation compared to those in the "Heartland" time period).

<strong>c.      Other risks of continuing the litigation</strong>

Another important factor considered by the Plaintiffs in evaluating the reasonableness of the Settlement was the value to Class Members of receiving payment as soon as possible, as opposed to litigating through trial and the almost certain appeals.  Many of the Consumer Class Members are elderly and ill, and the prospect of an increased payment years in the future is of little value to them.  Of course, any victory at trial would be subject to many months of appeals to the First Circuit and the Supreme Court.  *See In re Warfarin Sodium Antitrust Litig.,* 391 F.3d 516, 536 (3d Cir. 2004) ("[I]t was inevitable that post-trial motions and appeals would not only further prolong the litigation but also reduce the value of any recovery to the class.").

Because of the uncertainty surrounding the outcome of this litigation, approval of this Settlement will afford the entire Class "the quickest, surest remedy to their claims."  The Settlement will provide Class Members with "benefits fully commensurate with any results reasonably attainable after protracted litigation."  *Giusti-Bravo,* 853 F. Supp. at 38.  Weighing all of the risks the Plaintiffs faced, the Settlement is reasonable.

### d. The amount recovered

Many courts have cautioned that the overall percentage of recovery by itself is not telling; what must be considered are the risks of proceeding towards trial. The court in *In re Union Carbide Corp. Consumer Prods. Business Sec. Litig.*, 718 F. Supp. 1099 (S.D.N.Y. 1989), recognized that "[t]he dollar amount of the settlement by itself is not decisive in the fairness determination . . . Dollar amounts are judged not in comparison with the possible recovery in the best of all possible worlds, but rather in light of the strengths and weaknesses of plaintiffs' case." *Id.* at 1103. Other Courts have approved settlements which provide only a small percentage of the recovery sought. *See In re Michael Milken & Assocs. Sec. Litig.*, 150 F.R.D. 46, 64-65 (S.D.N.Y. 1993); *In re "Agent Orange" Prods. Liab. Litig.*, 597 F. Supp. 740, 762 (E.D.N.Y. 1984); *Detroit v. Grinnell Corp.*, 495 F.2d 448, 455 n.2 (2d Cir. 1974) ("[T]here is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery.").

Many other courts have approved settlements providing a recovery of 10-12% of potential damages where substantial risks exist. *See In re Linerboard Antitrust Litig.*, 2004 U.S. Dist. LEXIS 10532, at *15-17 (E.D. Pa. June 2, 2004). Similarly, in *Warfarin*, the Third Circuit noted that "typical recoveries in securities class actions range from 1.6% to 14%." *Warfarin*, 391 F.3d at 539 (citing *Cendant*, 264 F.3d at 241); *see also In re Prudential Secs., Ltd. P'ships Litig.*, 1995 U.S. Dist. LEXIS 22103 (S.D.N.Y. Nov. 20, 1995) (approving of settlement of 1.6 - 5% of claimed damages) and *In re Crazy Eddie Sec. Litig.*, 824 F. Supp. 320 (E.D.N.Y. 1993) (approving settlement of 6-10% of damages).

The recovery obtained here is a substantial amount of the aggregate Class damage and, on an individual claims-made basis, well <u>exceeds</u> the damages incurred by claiming Class Members. Coming on the heels of the Track One Class 2 and 3 trial, Plaintiffs were very well

acquainted with the prospective strengths and risks of the case against various Track Two

Defendants.  Notwithstanding these risks, with which the Court is also well acquainted, Plaintiffs

were able to garner a Settlement Amount of $125,000,000.

But, more importantly, the recovery is even greater when evaluated at the level of each

individual Consumer Class Member.  The Settlement was structured so that all Consumer Class

Members making claims would receive at least their out-of-pocket expenses.  For out-of-pocket

expenditures on Class A drugs during the so-called "Heartland" damages period, Consumer

Class Members will be paid three times (3x) those expenditures.  Concerned with the consumer

payouts and claims rates in prior cases, Class Counsel, in consultation with the Court, crafted this

distribution plan in order to create an incentive to submit claims.

In sum, the amount recovered militates heavily in favor of approving the Settlement.

### 2.    Stage of the litigation and the amount of discovery completed

The Court is also required to evaluate whether the amount of evidence obtained through

discovery is sufficient to determine the settlement's adequacy.  *Giusti-Bravo*, 853 F. Supp. at 38

(finding that although it is probable substantial discovery still remains, the amount of discovery

already conducted was sufficient to permit "an accurate assessment of each party's chances at

trial"); *Rolland*, 191 F.R.D. at 8 (finding discovery to be sufficient given that the parties had a

voluminous amount of information at the time as well as the advice and reports of their experts).[9]

In addition, courts have taken into consideration the stage of litigation at which settlement is

reached "because it indicates how fully the district court and counsel are able to evaluate the

merits of plaintiffs' claims."  *Duhaime*, 177 F.R.D. at 67 (citing *Armstrong v. Board of Sch. Dir.*,

616 F.2d 305, 325 (7th Cir. 1980)); *In re GMC*, 55 F.3d at 783 (trial court should consider

---

[9] Settlements have been supported with far less discovery.  *See, e.g.*, *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 211 (5th Cir. 1981) (where no formal discovery was taken, access to other information such as indictments, documents produced to Grand Jury and leadings was deemed adequate).

whether counsel participating in the settlement negotiations "had access to sufficient information to appreciate the merits of the class's case").

Sufficient discovery has been conducted in this matter against the Track Two Defendants to allow Class Counsel to fairly investigate the pertinent legal and factual issues. The parties exchanged written discovery, conducted hundreds of depositions, and obtained extensive discovery from third-party sources such as other pending litigation, trade associations, physicians and the federal government. Defendants produced millions of documents, and Class Counsel spent more than four years reviewing said documents, organizing documents for use, creating an electronic database and making determinations on utilization of important documents, additional discovery and general assistance in the litigation of this matter. Trial was held on two Classes with respect to the Track One Defendants, and trial is close for Class 1 against other Track One Defendants. In sum, Class Counsel were fully aware of the value of the Class claims as they related to Track Two Defendants before the case was settled.

### 3.      Quality of counsel

As stated above, "[w]hen the parties' attorneys are experienced and knowledgeable about the facts and claims, their representations to the court that the settlement provides class relief which is fair, reasonable and adequate should be given significant weight." *Rolland*, 191 F.R.D. at 10; *Bussie v. Allmerica Fin., Corp.*, 50 F. Supp. 2d 59, 77 (D. Mass. 1999). With respect to the quality of counsel, the Court has looked at a variety of factors, including "the length of their involvement in the litigation, their competence, and their experience in this particular type of litigation." *Giusti-Bravo*, 853 F. Supp. at 40. This Court has already repeatedly found that Class Counsel are qualified to represent the Class. Class Counsel have been involved in this case from the beginning, having created and filed the original Class Action Complaint in this Court, even

prior to the creation of an MDL.  As detailed in the previously-submitted resumes of Class

Counsel, the firms have been appointed lead counsel in numerous class actions.

> **4.      Conduct of the negotiations:  the proposed Settlement is the result of arduous, arms-length negotiations conducted by highly experienced counsel**

There is a presumption of correctness attached to a Class settlement reached in arms-

length negotiations between experienced, capable counsel.  *City P'ship Co.*, 100 F.3d at 1043;

*see also Hawkins*, 2004 U.S. Dist. LEXIS 807, at *15; *Flinn v. FMC Corp.*, 528 F.2d 1169, 1173

(4th Cir. 1975) ("While the opinion and recommendation of experienced counsel is not to be

blindly followed by the trial court, such opinion should be given weight in evaluating the

proposed settlement."); *see also* NEWBERG § 11.41 at 87-89.

The United States Court of Appeals for the Seventh Circuit, in approving a class action

settlement, noted that "[r]ather than attempt to prescribe the modalities of negotiation, the district

judge permissibly focused on the end result of the negotiation. . . .  The proof of the pudding was

indeed in the eating."  *Mars Steel Corp. v. Continental Ill. Nat'l Bank & Trust Co.*, 834 F.2d 677,

684 (7th Cir. 1987); *see also In re "Agent Orange"*, 597 F. Supp. at 762 (most important

concern for the court in reviewing a settlement of a class action is the strength of the plaintiffs'

case if it were fully litigated).

In the instant action, the parties actively engaged in many rounds of negotiations, for

many months.  The parties negotiated arduously and at arms-length with the Court-appointed

Mediator, Eric Green.  The negotiations involved submissions of proposals, counter-proposals,

evaluation of all discovery and factual arguments.  The parties have worked long and hard to

reach a resolution of this matter, and Plaintiffs submit it is fair, appropriate, and in the best

interests of the Class Members.

5.      **Prospects of the case, including risk, complexity, expense and duration**

The last factor outlined in *Compact Disc* captures the "prudential policy favoring settlement as a preferred alternative to costly, time-consuming litigation."  *Mathewson Corp. v. Allied Marine Indus., Inc.*, 827 F.2d 850, 852 (1st Cir. 1987); *United States v. DiBiase*, 45 F.3d 541, 546 (1st Cir. 1995) ("[S]ettlements reduce excessive litigation expenses and transaction costs."); MANUAL FOR COMPLEX LITIGATION (FOURTH) § 13.22 (4th ed. 2004) ("One of the major incentives to settle is to avoid the cost and burden of further discovery.").  Without question, in a "complex class action involving prolonged litigation" such as this, "settlements are strongly favored by the courts because they represent the easiest, and quickest, way of disposing of the case."  *Giusti-Bravo*, 853 F. Supp. at 35-36.[10]

It has been a substantial undertaking for the Plaintiffs and their counsel to prosecute this case.  If this case proceeded further, significant additional resources would have been expended by Class Counsel at trial and beyond, as likely each of the Track Two Defendants would have appealed any adverse judgment.  It is reasonable to assume that, absent settlement, a final result would not be reached for several more years.

6.      **Reaction of the Class**

Some courts also consider the reaction of the Class and opposition to the settlement. *Hawkins*, 2004 U.S. Dist. LEXIS 807, at *15 (citing *In re General Motors Corp. Pick-Up Truck Fuel Tank*, 55 F.3d 768, 785 (3d Cir. 1995)).  To date there have been 15 TPP Opt-Outs, a very small number considering the over 40,000 notices that went out to TPPs nationwide.  To date,

---

[10] In the *Warfarin Sodium Antitrust Litig.*, the Court stated "[w]e agree with the District Court's conclusion that this factor favors settlement because continuing litigation through trial would have required additional discovery, extensive pretrial motions addressing complex factual and legal questions, and ultimately a complicated, lengthy trial.  Moreover, it was inevitable that post-trial motions and appeals would not only further prolong the litigation but also reduce the value of any recovery to the class. In a class action of this magnitude . . . the time and expense leading up to trial would have been significant."  *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d at 536.

although the date for the filing of requests for exclusions has not passed, no Consumer Opt-Out

requests have been received.  To date, although Mr. Haviland has filed a letter with the Court

expressing his intention, or that of his clients, to object to the Settlement, there has been only a

single formal objection submitted to the Court by Ms. Patricia Weatherly.

## VI.    CONCLUSION

The Settlement here is the result of hard fought litigation and negotiation.  The

Settlement provides an excellent result.  The Court should certify the Settlement Class and grant

final approval to the Settlement Agreement.

DATED:  March 2, 2009                        By____ **/s/ Steve W. Berman**_____
                                                Thomas M. Sobol (BBO#471770)
                                                Edward Notargiacomo (BBO#567636)
                                             Hagens Berman Sobol Shapiro LLP
                                             One Main Street, 4th Floor
                                             Cambridge, MA  02142
                                             Telephone: (617) 482-3700
                                             Facsimile: (617) 482-3003

                                             **LIAISON COUNSEL**

                                             Steve W. Berman
                                             Sean R. Matt
                                             Hagens Berman Sobol Shapiro LLP
                                             1301 Fifth Avenue, Suite 2900
                                             Seattle, WA  98101
                                             Telephone: (206) 623-7292
                                             Facsimile: (206) 623-0594

                                             Jeffrey Kodroff
                                             Spector, Roseman & Kodroff, P.C.
                                             1818 Market Street, Suite 2500
                                             Philadelphia, PA  19103
                                             Telephone: (215) 496-0300
                                             Facsimile: (215) 496-6611

Kenneth A. Wexler
Jennifer Fountain Connolly
Wexler Wallace LLP
55 W. Monroe, Suite 3300
Chicago, IL  60603
Telephone: (312) 346-2222
Facsimile: (312) 346-0022

Marc H. Edelson
Hoffman & Edelson
45 West Court Street
Doylestown, PA  18901
Telephone: (215) 230-8043
Facsimile: (215) 230-8735

**CLASS COUNSEL**

001534-16  288942 V1

## CERTIFICATE OF SERVICE BY LEXISNEXIS FILE & SERVE
Docket No. MDL 1456

I, Steve W. Berman, hereby certify that I am one of plaintiffs' attorneys and that, on March 2, 2009, I caused copies of **CLASS COUNSEL'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR FINAL APPROVAL OF THE TRACK TWO SETTLEMENT** to be served on all counsel of record by causing same to be posted electronically via LEXIS-Nexis File & Serve.

 **/s/ Steve W. Berman**
Steve W. Berman