# Exhibit 1
## (Part 1)

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc. v. Dey, Inc., et al.*,
Civil Action No. 05-11084-PBS

Exhibit to the Memorandum In Support of United States'
Motion To Exclude Certain Opinions
of W. David Bradford, PH.D

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

In re: PHARMACEUTICAL INDUSTRY AVERAGE
WHOLESALE PRICE LITIGATION

_____

|  |  |
|---|---|
|  | ) |
| UNITED STATES OF AMERICA ex rel. | ) |
| VEN-A-CARE OF FLORIDA KEYS, INC. | ) |
| Plaintiff | ) |
| v. | ) CIVIL ACTION |
|  | ) No. 05-11084-PBS |
| DEY, INC., et al | ) |
| Defendants | ) |

_____)

## EXPERT REPORT OF PROFESSOR W. DAVID BRADFORD, Ph.D.

### March 6, 2009

Contains highly confidential materials—subject to protective order

Expert Report of Professor W. David Bradford, Ph.D.

# Table of contents

A. Overview.........................................................................................................................1
    A.1. Qualifications..........................................................................................................1
    A.2. Assignment.............................................................................................................1
    A.3. Summary of opinions...............................................................................................2

B. The generic drug market...............................................................................................6
    B.1. Drugs at issue ........................................................................................................6
    B.2. Drug approval from molecule, to brand, to generic..................................................9
    B.3. Brand to generic utilization and the Hatch-Waxman Act........................................10
    B.4. Price changes after generic entry..........................................................................11
    B.5. Encouraging generic drug substitution ..................................................................14

C. Dey's pricing is driven by economic and institutional forces unrelated to the alleged fraud ............16
    C.1. Dey's WAC functions as a list price......................................................................16
    C.2. Averages do not appropriately summarize the range of Dey's prices.....................21
    C.3. Dey's WAC has a meaningful relationship with transaction prices ........................23
    C.4. Dey's use of WAC is consistent with widely available descriptions ........................29
    C.5. Economic literature confirms that list pricing with discounts is both ubiquitous and
        economically efficient .......................................................................................31
    C.6. Dey's AWP is treated as a requirement for market entry........................................38

D. Medicaid program......................................................................................................41
    D.1. Medicaid background and "equal access"..............................................................41
    D.2. Medicaid's payments to pharmacies are evaluated all-in ......................................51
    D.3. Historical experiences from states.........................................................................60
    D.4. Payment variation across state Medicaid program ................................................76

E. Medicare program .....................................................................................................104
    E.1. Medicare Part B background................................................................................104
    E.2. Role of home health care providers.....................................................................109
    E.3. Efforts to reduce the payment levels ...................................................................113
    E.4. Cross subsidy in Medicare payments ..................................................................117
    E.5. Plaintiff allegations are not applicable for Medicare payments .............................120

F. Damages and rebuttal ...............................................................................................122
    F.1. Review of Dr. Duggan's report.............................................................................122
    F.2. Review of Dr. Schondelmeyer's report ................................................................144
    F.3. Review of Dr. Marmor's report.............................................................................149

# List of figures

Figure 1: NDCs identified by the Plaintiffs.................................................................................................7
Figure 2: HCPCS identified by the Plaintiffs...............................................................................................8
Figure 3: Generic WAC for ipratropium bromide (0.02%) solution ............................................................13
Figure 4: Sales through indirect channels................................................................................................18
Figure 5: Percent off contract sales for Dey subject drugs .......................................................................19
Figure 6: Off contract sales for ipratropium bromide ...............................................................................20
Figure 7: WAC and acquisition cost for ipratropium bromide 0.02% solution............................................22
Figure 8: WAC, average AC and 95th percentile AC for ipratropium bromide 0.02% solution.............................24
Figure 9: DOJ-revised AWP, implied WAC and published WAC..................................................................26
Figure 10: WAC and average AC for cromolyn sodium solution ................................................................28
Figure 11: Brand and generic AWP for ipratropium bromide (0.02%) solution ..........................................39
Figure 12: Generic AWP/WAC ratios for drugs competing with the subject drugs - 1999........................................40
Figure 13: Pharmacy acquisition costs for ipratropium bromide in 2000...................................................48
Figure 14: Myers and Stauffer dispensing cost reports ............................................................................54
Figure 15: Grant Thornton dispensing costs .............................................................................................55
Figure 16: Myers and Stauffer acquisition costs .......................................................................................56
Figure 17: Kentucky dispensing costs and reimbursement ......................................................................72
Figure 18: Kentucky and Arkansas drug payment rates for generic drugs................................................73
Figure 19: Arkansas and Kentucky's modal payments ..............................................................................74
Figure 20: States primarily using AWP for drug payments........................................................................80
Figure 21: States primarily using WAC for drug payments .......................................................................81
Figure 22: Dispensing component payments by state ...............................................................................90
Figure 23: Unit reimbursement for ipratropium bromide 0.02% solution in 2000.....................................95
Figure 24: Medicaid reimbursement index for 26 subject NDCs in 2000 ..................................................97
Figure 25 : Overall Medicaid reimbursement index in 2000 .....................................................................99
Figure 26: Illinois Medicaid payment bases ...........................................................................................101
Figure 27: Payment bases for AWP states ..............................................................................................102
Figure 28: Medicaid payment bases for all states ...................................................................................103
Figure 29: Allowed reimbursement levels albuterol sulfate 0.083% solution HCPCS ...........................107
Figure 30: Allowed reimbursement levels cromolyn sodium solution HCPCS .........................................108
Figure 31: KQ allowable calculation.......................................................................................................112
Figure 32: Percent change in reimbursement levels ...............................................................................117
Figure 33: Payment for typical 30-day claim of cromolyn sodium ...........................................................118
Figure 34: Payment for typical 30-day claim of albuterol and ipratropium bromide compounded solution..........119
Figure 35: Dey net sales to wholesalers and indirect sales (in millions) ................................................126
Figure 36: Off contract sales of Dey subject drugs through wholesalers .................................................127
Figure 37: Prices reflected in Dey and wholesaler data for same transactions........................................128
Figure 38: Prices reflected in Dey and wholesaler data .........................................................................129
Figure 39: Marginal pharmacy margin under Dr. Duggan's alternate price ..............................................131
Figure 40: WAC, AMP and Dr. Duggan's prices for ipratropium bromide ................................................132
Figure 41: Adjustments to Dr. Duggan's difference calculations ............................................................134
Figure 42: Comparison of Dr. Duggan's results for additional states ......................................................136
Figure 43: Adjustments to Dr. Duggan's difference calculations for additional states .............................138
Figure 44: Errors in Dr. Duggan's albuterol sulfate difference calculations ($MM)..................................140
Figure 45: Errors in Dr. Duggan's ipratropium bromide difference calculations ($MM) ..........................141
Figure 46: Adjustments to Dr. Duggan's albuterol sulfate differences.....................................................142
Figure 47: Adjustments to Dr. Duggan's ipratropium bromide differences ($MM).................................143

Expert Report of Professor W. David Bradford, Ph.D.

# A. Overview

## A.1. Qualifications

1. I am presently employed at the University of Georgia, where I am the Busbee Chair of Public Policy and Professor in the Department of Public Administration and Policy. I have over 17 years of research experience in the area of health economics in general, much of which has focused on insurance, and the role of incentives and regulations on economic efficiency in particular. I have been principal investigator on 15 funded grants and projects. Several of these projects have focused on the functioning of various components of Medicaid, and involved working directly with Medicaid agency personnel in another state. As of this writing, I have published 45 articles in peer-reviewed publications, have another 30 reports and other publications, and serve as an Editor of the journal Health Economics Letters, and am an Associate Editor of the journal Health Economics. My curriculum vita is attached to this report in Appendix A.

## A.2. Assignment

2. I was retained to evaluate and provide expert opinion regarding the plaintiff allegations in this matter. Plaintiffs in this case allege that defendants Dey, Inc., Dey L.P., Inc., and Dey L.P. (collectively, "Dey"), a manufacturer of generic respiratory pharmaceuticals located in Napa California, caused Medicaid and Medicare to overpay for certain of its drugs as a result of allowing false and inflated Wholesale Acquisition Cost ("WAC") and Average Wholesale Prices ("AWP") to be published. Plaintiffs further allege that the published WAC and AWP were inflated as part of a scheme to enhance the generic drug manufacturer's market share by marketing the resulting spreads to providers.

3. I was also asked to evaluate the expert reports put forward by Dr. Mark Duggan, Dr. Steven Schondelmeyer, and Dr. Theodore Marmor on behalf of the plaintiffs. I am being compensated for my time in this matter at a rate of $525 per hour.

4. I have reviewed depositions, documents, and data produced in this litigation, as well as a variety of publicly available information. The materials I relied upon are cited throughout this report and listed in Appendix B. I reserve the right to update my analysis if additional information becomes available through discovery. In addition, I reserve the right to supplement or modify my opinions, if warranted, and to prepare additional supporting materials, such as summaries, graphical exhibits or charts.

---

Expert Report of Professor W. David Bradford, Ph.D.

## A.3. Summary of opinions

5.   In this report I demonstrate that published pricing for Dey's generic drugs was consistent with standard and widely understood industry practice and was not misleading. Medicare and Medicaid's payments for Dey's drugs were unrelated to the alleged conduct, and were consistent with the overall design goals of the Medicare and Medicaid programs. In fact, Medicare and Medicaid possessed ample and accurate information about the acquisition costs of the subject drugs, and chose to set payments as they did in part to assure access to pharmaceutical treatment for their enrollees and in part as a result of a political process. Examination of Plaintiffs' 'difference' calculations reveals that they are meaningless as a measure of damages and can be attributed in their entirety to factors unrelated to the alleged fraud.

6.   In section B of this report I review background related to Dey's subject products, which are all generic prescription drugs.

   ▪   I briefly review how generic drugs are brought to market and how modern generic prescription drug markets were created largely by an act of Congress designed to stimulate entry and price competition.

   ▪   Scholarly literature documents the success of this legislation in achieving these goals, but reveals something that was really no secret: generic entry in prescription drug markets lowers prices substantially.

   ▪   Payers (both private and public) were well aware of this and took steps to encourage pharmacies to substitute away from brand name drugs to cheaper generic alternatives where possible.

   ▪   Pharmacy-level economic considerations dictate, however, that certain levels of dollar margin on generics are necessary to encourage pharmacies' participation in payers' switching programs.

   ▪   A simple mathematical consequence of this is apparently large percentage "spreads" because generic drugs are so cheap.

   ▪   Generic switching programs are generally successful at saving payers money.

7.   In Section C of this report I discuss how Dey's sales and contracting rely heavily on its wholesale acquisition cost ("WAC"), which is a forward-looking price generally paid by wholesalers when purchasing product for inventory.

   ▪   The discount information required to calculate a contemporaneous "net" price cannot even be known at the time WAC is used in these transactions.

Expert Report of Professor W. David Bradford, Ph.D.

- Although many providers receive significant discounts off of Dey's WAC, a significant portion of Dey's product ultimately is sold at or above WAC, which means that it has practical significance as a list price.

- Nevertheless Dey's WAC generally tracks transaction prices partly because Dey has an economic incentive to minimize its prompt pay discounts to wholesalers, which are indexed to the WAC.

- Dey's use of WAC as an undiscounted list price is also consistent with widely-available descriptions.

- Economic literature confirms that list pricing with discounts is both ubiquitous and economically efficient; transparency can have unintended consequences.

- In fact, enforcement of regulations designed to enforce "real" list prices has largely been abandoned since it was observed to raise prices to consumers.

- Finally, Dey's AWP is treated as a requirement for market entry, and is not generally updated after product launch. Dey's AWP has no relationship to WAC after launch.

8. In Section D of this report I discuss the economics of Medicaid prescription drug programs and how they generally are driven by the requirement to guarantee access for Medicaid beneficiaries.

- Private pharmacies, in deciding whether to participate in a state's Medicaid network, focus on the all-in value of participation rather than on the component parts.

- On both a theoretical and practical level there is no special reason to perfectly align payments for particular components with their costs.

- Pharmacy cost studies (both independent and performed for state Medicaid programs) have long documented that a portion of the drug payment is not for the drug at all, but rather is a subsidy to cover a portion of the cost of dispensing.

- Dr. Schondelmeyer and others have highlighted the essential nature of these offsets. I examine historical information on two states' programs in greater depth (Arkansas and Kentucky).

- Despite having similarly detailed drug and dispensing costs studies from Myers and Stauffer, these states arrive at different payment outcomes; this appears due to political bargaining and economic influences.

Expert Report of Professor W. David Bradford, Ph.D.

- Significant variation in Medicaid payments for Dey's drugs across the US confirms that it likewise must be due to factors unconnected to Dey's published prices, which do not vary from state to state.

- In particular, the premium paid by those states that paid more than the minimum for Dey's drugs should not be considered as part of Plaintiffs' difference calculations.

- Examination of state Medicaid claim data also demonstrates that states paid for Dey's drugs based on a variety of methodologies unconnected to Dey's published prices.

9. Section E of this report discusses the economics of the Medicare Part B drug payment program as it pertains to the inhalant drugs that Dey produces.

- Home health providers are responsible for the large majority of Medicare claims for Dey's subject drugs because they typically supply the durable medical equipment (nebulizers), the training and support to use the equipment and drugs safely, and ship monthly supplies of the drug.

- Historically, Medicare's payment for this service was a flat $5.00, which was documented to be well below the actual cost of providing this service.

- Government studies specific to the drug classes at issue in this matter detail the extent to which Medicare's drug payments exceeded these pharmacies' acquisition costs and the shortfall in payment for services.

- Congress periodically revisited the amount of payment on inhalant drugs (including Dey's drugs) in light of these studies, but ultimately decided to leave payments largely unchanged until 2003 when it enacted the MMA.

- Under this legislation, drug payments starting in 2005 were reduced to levels based on average sales prices ("ASPs"), but service payments to home health providers were increased from $5 to over $57 in compensation. This event illustrates the extent to which Medicare drug payments built in an implicit service fee payment.

- CMS was already considering Dey's WAC in its FUL calculations for Medicaid. I examine what would result if Congress had elected to allow use of Dey's WAC (instead of AWP) for processing the pricing arrays that are used to calculate Medicare median multisource drug payments. It turns out that the resulting medians are the same as Dr. Duggan computes with his alternative prices; hence they provide little new information that was not already available with Dey's WAC.

---

Expert Report of Professor W. David Bradford, Ph.D.

10.   Finally, in Section F of this report I examine the reports and opinions of three of DOJ's five experts in this matter:

- My review of Dr. Duggan's report reveals numerous errors and inaccuracies that make his calculations unreliable. More importantly, Dr. Duggan's 'difference' calculations are simplistic mathematical calculations lacking economic rationale as damages. Adjusting Dr. Duggan's calculations for only a few of the basic economic considerations he ignores (after also correcting his computational errors) reduces his Medicare and Medicaid 'differences' to zero.

- As I highlight in several places throughout this report, Dr. Schondelmeyer raises several important concerns regarding the overall adequacy of pharmacy reimbursement. These concerns are directly relevant to the issues raised in this matter, and bear on whether one can interpret the difference calculations that Dr. Duggan has arrived at as damages. In fact, it appears that Dr. Schondelmeyer has expressed views that appear to directly contradict the validity of Dr. Duggan's 'difference' calculations as a meaningful basis for economic damage computations. Dr. Schondelmeyer has performed little analysis specific to the facts and issues in this matter, so his conclusions are not actually rooted in the facts of this case.

- Based on allegations in the Complaint, Dr. Marmor appears to argue that neither Medicare nor Medicaid could have acted to avoid harm. However, Dr. Marmor appears not to reference a single document or any material, including published prices, specific to Dey or to this matter. His opinion relies heavily on theoretical models of organizational behavior that also appear contradicted by fact. As I detail in several sections of this report, not only do Medicare and Medicaid have extensive information on drug acquisition costs, but it can be demonstrated that they frequently act specifically in light of it. Nevertheless, these organizations' policies are determined through a political process that factors in many considerations. The ultimate outcome may not resemble initial recommendations.

11.   For all of the reasons stated throughout this report, I find no economic rationale to support a finding of damage to either Medicaid or Medicare as a result of Plaintiffs' allegations. After careful review, I find the arguments and analyses of Plaintiffs' experts unconvincing.

Expert Report of Professor W. David Bradford, Ph.D.

# B. The generic drug market

12.  *Section overview*: In this section I will review the essential features of the generic drug market that are relevant to this matter. I will discuss the drug development process and the active role played by the government in fostering generic competition to lower drug expenditures. The price competition resulting from generic entry and the associated low cost of generic drugs relative to their brand equivalents is well known and has been carefully documented in the economics literature for many years.

## B.1. Drugs at issue

13.  *The specific Dey products at issue:* The 26 Dey products at issue are generic forms and dosages of three inhalable drugs used to treat respiratory conditions such as asthma, bronchitis, and Chronic Obstructive Pulmonary Disorder ("COPD").[1]

   ▪ Albuterol sulfate (inhaler, and solution) is the generic version of the brand name bronchodilator marketed by Schering as Proventil®

   ▪ Cromolyn sodium (solution) is the generic version of the brand name inhalable anti-inflammatory drug originally marketed by Aventis as Intal®

   ▪ Ipratropium bromide (solution) is the generic version of the brand name bronchial anti-spasmodic drug marketed by Boehringer Ingelheim as Atrovent®

14.  *Clinical indication for the products at issue:* All three drugs at issue are inhalation therapy drugs prescribed for treatment and management of acute and chronic pulmonary disorders.[2]

15.  *Dey's entry into the market for the products at issue*: Dey was the first generic manufacturer in the market for the albuterol sulfate[3] and cromolyn sodium drugs. Dey was the second generic manufacturer in the market for ipratropium bromide.

---

[1]  I use the National Drug Codes ("NDCs") assigned to these products as a basis for their identification. Fourteen NDCs were mentioned in the original complaint, and 12 additional NDCs have been subsequently added.

[2]  U.S. National Library of Medicine. "Ipratropium Bromide (ipratropium bromide) Solution [Dey]," February 2, 2007. dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?id=3233. See also U.S. National Library of Medicine. "Cromolyn Sodium (cromolyn sodium) Solution [DEY]," June, 2006. dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?id=752 and U.S. National Library of Medicine. "Albuterol Sulfate (albuterol sulfate) Solution [Dey]," May, 2006. dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?id=794.

[3]  Dey was the first generic manufacturer for albuterol sulfate 0.083% solution, not for the other forms: 0.5% solution and metered dose inhalers.

---

Expert Report of Professor W. David Bradford, Ph.D.

16. _Identifying the drugs at issue:_ All three drugs at issue are sold in solution form in vials and administered to the patient via a nebulizer.[4] These drugs are manufactured and sold by Dey under a number of National Drug Codes (NDCs). NDCs are 11-digit codes that uniquely identify the drug by manufacturer, active ingredient, and package size. When new manufacturers and package sizes are introduced, new NDCs must be assigned; these are often referred to as successor NDCs. Plaintiffs have identified 26 subject NDCs belonging to the three drugs manufactured by Dey as shown below in Figure 1. For each drug the different NDCs represent different package sizes.

**Figure 1: NDCs identified by the Plaintiffs**

| Drug name | Package details | Original NDC | Successor NDCs | |
|---|---|---|---|---|
| Albuterol | | | | |
|    0.083MG/ML Solution | 3mL, 25 units | 49502069703 | 49502069724 | |
|    0.083MG/ML Solution | 3mL, 60 units | 49502069760 | 49502069761 | |
|    0.083MG/ML Solution | 3mL, 30 units | 49502069733 | 49502069729 | |
|    0.083 MG/ML Solution | 3mL | 49502069730 | | |
|    5MG/ML Solution | 20mL, 1 unit | 49502019620 | | |
|    5MG/ML Solution | 20mL, 1 unit | 49502010501 | | |
|    90MCG Inhaler | 17GM with adapter | 49502030317 | 49502033317 | |
|    90MCG Inhaler refill | 17GM | 49502030327 | 49502033327 | |
| Cromolyn sodium | | | | |
|    20 MG/ML Solution | 2mL, 120 units | 49502068912 | | |
|    20 MG/ML Solution | 2mL, 60 units | 49502068902 | 49502068961 | |
| Ipratropium bromide | | | | |
|    0.5MG/2.5ML Solution | 2.5mL, 30 units | 49502068530 | | |
|    0.5MG/2.5ML Solution | 2.5mL, 60 units | 49502068560 | 49502068561 | 49502068562 |
|    0.5MG/2.5ML Solution | 2.5mL, 25 units | 49502068503 | 49502068524 | 49502068526 |
|    0.5MG/2.5ML Solution | 2.5mL, 30 units | 49502068533 | 49502068529 | 49502068531 |

Source: FDB data

17. _HCPCS codes appear in Medicare administrative data_: Medicare payments for drugs do not identify the specific NDC dispensed. Instead drug payments are made by Healthcare Common Procedure Coding System (HCPCS). The Centers for Medicare and Medicaid Services (CMS) defines HCPCS as:

> HCPCS coding system is a comprehensive, standardized system that classifies similar products that are medical in nature into categories for the purpose of efficient claims

---

[4]   One form of albuterol sulfate at issue is also sold in pressurized canister and administered via a metered dose inhaler.

Expert Report of Professor W. David Bradford, Ph.D.

processing. Products are classified based on similarities in function and whether the products exhibit significant therapeutic distinctions from other products.[5]

18. _Limits to Medicare administrative data for this matter_: As a consequence, claims for drug payments appearing in Medicare administrative data do not identify the manufacturer of the drug utilized. Plaintiffs have identified 14 different HCPCS codes related to the three drugs as shown in Figure 2 below. However, it will be important to note that, for example, the HCPCS code J7625 will be assigned in the Medicare administrative data to both the Dey 5MG/ML Albuterol and the Roxane 5MG/ML Albuterol. Thus, calculations using the Medicare claims (administrative) data need to take this into account.

### Figure 2: HCPCS identified by the Plaintiffs

| Drug name | HCPCS | Start quarter | End quarter |
|---|---|---|---|
| Albuterol 5MG/ML (0.5%) | | | |
|    Dey NDCs: | | | |
|       49502019620 | J7625 | 1993 Q4 | 1997 Q1 |
| | K0504 | 1997 Q2 | 1999 Q4 |
| | J7618 | 2000 Q1 | 2004 Q4 |
| Albuterol .83MG/ML (0.083%) | | | |
|    Dey NDCs: | | | |
|       49502069703 | J7620 | 1993 Q3 | 1997 Q1 |
|       49502069760 | K0505 | 1997 Q2 | 1999 Q4 |
|       49502069733 | J7619 | 2000 Q1 | 2004 Q4 |
| Cromolyn sodium 20MG/ML (2%) | | | |
|    Dey NDCs: | | | |
|       49502068902 | J7630 | 1993 Q3 | 1997 Q1 |
|       49502068912 | K0511 | 1997 Q2 | 1999 Q4 |
|       49502068961 | J7631 | 2000 Q1 | Current |
| Ipratropium bromide .5MG/2.5ML (0.02%) | | | |
|    Dey NDCs: | | | |
|       49502068503 | J7645 | 1993 Q3 | 1997 Q1 |
|       49502068560 | K0518 | 1997 Q2 | 1999 Q4 |
|       49502068533 | J7644 | 2000 Q1 | Current |

Source: CMS crosswalks and DME PDAC website

---

[5]   U.S. Health and Human Services, Centers for Medicare and Medicaid Services. "HCPCS General Information Overview." www.cms.hhs.gov/MedHCPCSGenInfo.

Expert Report of Professor W. David Bradford, Ph.D.

## B.2. Drug approval from molecule, to brand, to generic

19. In order to fully understand the generic drug market, one needs to begin by examining the brand drugs and the eventual introduction of the generics.

20. _How innovator drugs get to market_: The pharmaceutical industry is characterized by a high degree of innovation and government regulatory oversight. Regulatory oversight governs the development process from the discovery of a new chemical entity through release and marketing of actual approved pharmaceutical products. Broadly speaking, innovators in this industry seek to identify new chemical entities which have the potential of some active properties. Once these entities have been identified, patent applications are made, which begins a period of protection for the discoverer to be the sole source of providing products which are based on this entity. The chemical entity must then undergo specified phased trials, progressing through animal testing, limited human testing, and expanded human testing.[6] Once the product has successfully completed this three phase process, a New Drug Application (NDA) may be submitted to the Food and Drug Administration for approval.[7] If approved, the product may be widely distributed as a pharmaceutical for use in the community. While the drug is still in its patent protection period, it is referred to as a single-source drug, since only the patent holder, or its designee, may produce it. Only a small fraction of new chemical entities become marketable drugs, so the research and development costs for bringing a new drug to market are substantial (in the neighborhood of $1.1 billion in 2003, up from around $800 million in 1991).[8] Once marketed, these drugs are also often referred to as brands since they typically have a trademarked brand name.

21. _How generic products get to market_: Throughout the approval process, the patent protection term continues to elapse. Once the patent has expired, manufacturers other than the innovator are permitted to produce drugs which have the same chemical makeup of the original branded drug (following an abbreviated approval process from the FDA). Usually, these products are not assigned trademarked brand names, and are known by the compound technical name. Consequently, these follow-on drugs are referred to as "generics." For example, generic versions of the Schering brand product named Proventil © are referred to as albuterol sulfate.

---

6    U.S. Food and Drug Administration, Center for Drug Evaluation and Research. "The New Drug Development Process," March 16, 1998. www.fda.gov/CDER/HANDBOOK.

7    U.S. Food and Drug Administration, Center for Drug Evaluation and Research. "The New Drug Development Process," March 16, 1998. www.fda.gov/CDER/HANDBOOK/.

8    DiMasi, Joseph A., Ronald W. Hansen, and Henry G. Grabowski. "The Price of Innovation: New Estimates of Drug Development Costs." _Journal of Health Economics_ 22 (2003): 151–85.

Expert Report of Professor W. David Bradford, Ph.D.

## B.3. Brand to generic utilization and the Hatch-Waxman Act

22.  *Hatch-Waxman Act accelerated growth in generic market*: The current market for generic drugs in the United States was substantially shaped by an act of Congress in 1984, with the intent to stimulate competition and lower the cost of drugs. Prior to the 1984 Hatch-Waxman Act, generic drugs were required to undergo costly and time-consuming clinical trials before they were marketed, and their manufacturers generally had to wait until the originator's patent expired to begin this process. Generic drugs were slow to come to market during this period. The Hatch-Waxman Act allows the FDA to approve generic products without clinical trials as long as chemical equivalence to the reference brand drug has been demonstrated. The Act also contains a variety of provisions to encourage generic manufacturers to develop and launch their products before the expiration of the brand drug patent. As a result, there frequently are many manufacturers willing to enter with generic versions of popular drugs and compete with one another on price.

23.  *Congress recognized barriers to generic entry*: As early as the 1980s, expenditures on prescription drugs have been a focus of Congress' oversight of overall health care costs in the United States.[9] Congress recognized that increasing utilization of generic drugs could potentially help control rising U.S. health care costs by slowing the growth on expenditures for prescription drugs.[10] However, due to significant time and cost associated with clinical trials needed for FDA approval, generic manufacturers were not entering the market on a timely fashion. For example, in 1962, Congressional hearings found 150 off-patent drugs with no generic entry.[11]

24.  *Abbreviated New Drug Approval stimulated generic entry*: In 1984, Congress passed The Drug Price Competition and Patent Term Restoration Act – commonly known as the Hatch-Waxman Act. This Act contained several provisions that expedited entry of generic drugs into the market.[12] First, the FDA approval process was simplified for follow-on drugs by establishing an abbreviated new drug application (ANDA) process if the generic manufacturer can demonstrate that the new entrant is

---

[9]   U.S. Department of Health and Human Services, Office of the Inspector General. "Changes to the Medicaid Prescription Drug Program Could Save Millions," September 1984. See also U.S. Department of Health and Human Services, Office of the Inspector General. "Use of Average Wholesale Prices in Reimbursing Pharmacies," September 29, 1989, and U.S. General Accounting Office. "Programs to Control Prescription Drug Costs Under Medicaid and Medicare Could be Strengthened," December 31, 1980.

[10]   U.S. Congressional Budget Office. "How Increased Competition from Generic Drugs Has Affected Prices and Returns in the Pharmaceutical Industry," July 1998, xii–xiii.

[11]   Mossinghoff, Gerald J. "Overview of the Hatch-Waxman Act and Its Impact on the Drug Development Process." Food and Drug Law Journal 54 (1999): 187–94.

[12]   Drug Price Competition and Patent Term Restoration Act of 1984, Pub. L. No. 98-417, 98 Stat. 1585 (1984)

Expert Report of Professor W. David Bradford, Ph.D.

chemically equivalent to an existing approved drug.[13] The ANDA allowed the generic manufacturers to forgo full clinical trials as long as the chemical equivalence to the reference brand drug was demonstrated.[14] Second, the Hatch-Waxman Act allowed the generic manufacturers to begin the approval process sooner – even before the patent had expired.

25.   _Limited exclusivity for the first generic entrant_: Another provision in the Hatch-Waxman Act provides further incentives for generics to enter by providing for a potential 180-day exclusivity period for the first ANDA applicant to successfully challenge the brand patent. Because the first generic entrant also faces a risk of costly patent-related litigation from the brand manufacturer, it is possible that no generic manufacturer would want to be the first to enter the market without sufficient financial incentive. During the 180-day exclusivity period other ANDA applicants may not enter the market, and the first generic shares the market only with the brand. This exclusivity period provides financial incentives for manufacturers to bring generic products to the marketplace.[15]

26.   _Hatch-Waxman demonstrates Congress' interest in stimulating generic entry_: These carefully designed incentives show that the government was actively involved in promoting a robust generic entry.[16] In fact the CBO attributes increased competition in the pharmaceutical industry to the dramatic growth of the generic market that was spurred by the Hatch-Waxman Act. It further states that robust the generic industry has, "...played an important role in holding down national spending on prescription drugs from what otherwise would have been."[17] The CBO study goes on to say that another factor behind an increase in generic drug utilization is that "…Medicaid, and many private health insurance plans have actively promoted such generic substitution".[18]

## B.4. Price changes after generic entry

27.   _Economic literature finds generic entry lowers price_: The Hatch-Waxman Act was designed to expedite generic entry and thereby foster competition in the generic market. Economic theory

---

[13]   ANDA process is only applicable to small molecule drugs and not to biological compounds.

[14]   Drug Price Competition and Patent Term Restoration Act of 1984, Pub. L. No. 98-417, 98 Stat. 1585 (1984).

[15]   U.S. Department of Justice and Federal Trade Commission. "Improving Health Care: A Dose of Competition," July 2004, ch. 7, p. 7. The first ANDA would need a certification stating that patents covering the brand drugs were not infringed upon.

[16]   Mossinghoff, Gerald J. "Overview of the Hatch-Waxman Act and Its Impact on the Drug Development Process." Food and Drug Law Journal 54 (1999): 187–94.

[17]   U.S. Congressional Budget Office. "How Increased Competition from Generic Drugs Has Affected Prices and Returns in the Pharmaceutical Industry," July 1998, xi.

[18]   U.S. Congressional Budget Office. "How Increased Competition from Generic Drugs Has Affected Prices and Returns in the Pharmaceutical Industry," July 1998, ix.

---

Contains highly confidential materials—subject to protective order

Expert Report of Professor W. David Bradford, Ph.D.

suggests that the entry of generic manufacturers should lead to increased competition and as a result, prices should decline. This prediction has been confirmed by many studies that show rapid decline in prices after the generic entry. For example, Caves and Winston found that, "The entry of additional generic producers depresses the prices of existing generic producers much more severely than the price of the original innovator."[19] Grabowski and Vernon found that "Generic prices averaged 61% of the leader price during first month after entry, which declined to 46% one year after entry and 37% two years after entry."[20] Similarly, Frank and Salkever found that, "With each additional entrant there is a fall in the average price of a generic product of between 5.6% and 7.2%."[21] This study predicts significant declines in price in the presence of large number of competitors. These academic studies empirically confirm what is already well known: generic competition lowers prices significantly.[22]

28. _Government research finds generic entry lowers prices_: Government reports and studies also find that the generic market is characterized by intense competition and that prices fall as generic entry increases.[23] Several governmental studies quantify the extent of rapid and substantial price decline in the generics market. A 1998 CBO study finds that when "… 11 to 24 generic manufacturers are in the market, the generic retail price averages less than half of the brand-name price."[24]

29. _Published WACs for generics tended to track falling transaction prices_: Intense competition and the resulting rapid decline in price is not only widely understood, but also reflected in published WAC prices for Dey's subject drugs and others for generic drugs. While there is clearly significant variation in how WAC prices are set for generic drugs, many new manufacturers enter at lower WAC.[25] Figure 3 shows the WAC prices in the ipratropium bromide 0.02% solution market where first generic entry

---

[19]   Caves, Richard, Michael Whinston, and Mark Hurwitz. "Patent Expiration, Entry, and Competition in the U.S. Pharmaceutical Industry." _Brookings Papers on Economic Activity_, Microeconomics, 1991.

[20]   Grabowski, Henry and John Vernon. "Brand Loyalty, Entry, and Price Competition in Pharmaceuticals after the 1984 Drug Act." _Journal of Law and Economics_, Oct. 1992, 331–50.

[21]   Frank, Richard and David Salkever. "Generic Entry and the Pricing of Pharmaceuticals." _Journal of Economics and Management Strategy_, Spring 1997, 75-90.

[22]   I note that these studies appear to examine IMS health data.

[23]   U.S. Food and Drug Administration. "Generic Competition and Drug Prices," April 4, 2006. www.fda.gov/cder/ogd/generic_competition.htm. See also U.S. Congressional Budget Office. "How IncreasedCompetitionfrom Generic Drugs Has Affected Prices and Returns in the Pharmaceutical Industry," July 1998 and U.S. Centers for Medicare and Medicaid Services. "Health Care Industry Market Update," January 10, 2003.

[24]   U.S. Centers for Medicare and Medicaid Services. "Health Care Industry Market Update," January 10, 2003, 26. See also U.S. Food and Drug Administration. "Generic Competition and Drug Prices," April 4, 2006. http://www.fda.gov/cder/ogd/generic_competition.htm and U.S. Congressional Budget Office. "How Increased Competition from Generic Drugs Has Affected Prices and Returns in the Pharmaceutical Industry," July 1998, xii–xiii.

[25]   As I discuss in the next section, manufacturers face a variety of competing economic forces in the setting of WAC and this appears to result in different WAC setting policies. Nonetheless, many generic WAC prices show declines over time.

---

Expert Report of Professor W. David Bradford, Ph.D.

occurred in 1996 with a WAC slightly above $0.40.[26] By 2004, some of the published WACs had fallen below $0.10. During this entire time period, there is a general downward drift in the WAC price. In particular, Dey continually lowered its WAC to reflect lower actual transaction prices. In fact, Dey had the lowest published price in the ipratropium bromide 0.02% solution market for more than three years after it entered the market in 1997. State Medicaid agencies that relied on published WAC or FUL that relied on WAC directly benefitted from Dey's low published WAC.

**Figure 3: Generic WAC for ipratropium bromide (0.02%) solution**



Source: FDB data for GCN 21700
Dey NDCs: 49502068560, 49502068524, 49502068529, 49502068562, 49502068526, 49502068561, 49502068531, 49502068530, 49502068503, 49502068533

30.   *Rapidly falling generic prices were no secret:* The intense competition and rapid decline in price in the generic market is not only a matter of simple economic theory and empirical findings, but is also generally reflected in the WAC prices published by the manufacturers themselves.

---

[26]   Throughout this report, I will illustrate my discussions with figures for one drug. However, corresponding figures for other subject drugs can be found in the appendices.

Expert Report of Professor W. David Bradford, Ph.D.

## B.5. Encouraging generic drug substitution

31.  *Dollar margins on generics must equal those of brands before pharmacies have an incentive to switch*: Because of the dramatic savings that generic products are known to confer, payers, including Medicare and Medicaid, have put in place programs designed to encourage substitution of generic drugs for brand drugs. These programs necessarily involve a component designed to give providers an economic incentive to make these switches. Payers, even Medicare or Medicaid, cannot expect providers to appropriately substitute generic equivalents if they are forced to make less money in the process of switching patients to generic drugs. As a result, the dollar margins on generic drugs must at least match the dollar margins on brand drugs in order for providers to have the proper incentives to switch patients to generic drugs with lower costs.

32.  *Various methods encourage generic substitution*: Federal and state agencies have been actively encouraging utilization of generic drugs as a cost containment measure.[27] Towards this goal, many states Medicaid agencies have adopted drug formularies and mandatory generic substitution rules.[28] Some states have also chosen a higher dispensing fee for generic compared to brand to incentivize the switch.[29] State Medicaid agencies have acknowledged that they consider the financial incentives necessary at the provider pharmacy level to encourage the generic substitution.[30] Other state Medicaid agencies have provided financial incentives to the beneficiaries with a lower co-payment for generics compared to the brand.[31]

## B.5.1. Implication of low priced generics on "spread" and "margin"

33.  *Percentage margins are not necessarily meaningful*: As stated above, before a pharmacy will have the incentive to substitute a less expensive generic for a more expensive brand, the pharmacy must earn at least as large of a dollar margin on the generic as on the brand. A mathematical consequence of this is that percentage margins for generic drugs will be generally higher than those on brand-name drugs.

---

[27]  See, e.g., U.S. Congressional Budget Office. "How Increased Competition From Generic Drugs has Affected Prices and Returns in the Pharmaceutical Industry," July 1998.

[28]  See, e.g., U.S. Department of Health and Human Services, Office of the Inspector General. "Generic Drug Utilization in State Medicaid Programs," July 2006. See also U.S. Department of Health and Human Services, Office of the Inspector General. "State Strategies to Contain Medicaid Drug Costs," October 2003, 25.

[29]  The New York dispensing fee was $4.50 for brands and $5.50 for generics from 1/1/1995 to 7/31/1998 and $3.50 for brands and $4.50 for generics from 8/1/1998 to present. The North Carolina dispensing fee was $4.00 for generics and $5.60 for generics from 12/1/2001 through present. The Georgia dispensing fee was $4.63 for generics and $5.13 for generics from 4/1/2001 through 6/30/2005.

[30]  Deposition of Paul Jeffrey, Director of Pharmacy, MassHealth, June 14, 2007, at 182–83. See also Deposition of Suzette Bridges, Arkansas Medicaid Official, Dec. 10–11, at 432–33.

[31]  Deposition of Allen D. Chapman, former Colorado Medicaid pharmacy manager, Dec. 15, 2008, at 93–94.

---

Contains highly confidential materials—subject to protective order

Expert Report of Professor W. David Bradford, Ph.D.

The "percentage margin" is just the dollar margin divided by the product price. Since the dollar margin on generics must be the same as on branded drugs (to encourage substitution) but the actual generic prices are lower than branded prices, the percentage margin on generics will be higher. This is not reflective of pharmacist or manufacturer behavior, but is merely an algebraic relationship. Thus, arguments in this matter based upon percentage margins are misleading, and should be avoided. Percentage spread calculations likewise have no grounding as a measure of economic performance for generic drugs.

34. *A percentage margin example*: The average prescription payment for a brand albuterol sulfate in 2000 in Massachusetts was $135.40. Similarly the average prescription payment for a generic (Dey) albuterol sulfate in 2000 in Massachusetts was $21.50. For the brand prescription $13.50 reflects a 10% margin. If a payer wants the pharmacy to substitute a generic it will need to match the dollar margin on the brand. The same $13.50 reflects a 63% margin on the generic prescription. Furthermore, $13.50 reflects a 169% "spread" on the generic prescription. Thus dollar margins and spreads on generic prescription appear exaggerated when presented in percentage terms. More relevant comparison from the perspective of the generic substitution is the dollar margin between the brand and generic prescription. In the above example, switching to the generic drug results in a savings of $113 for Massachusetts Medicaid. To achieve that it must keep the pharmacy from losing revenue in the process.

35. *Ultimately, generic substitution lowers Medicaid and Medicare pharmacy costs*: Generic switching programs are successful at lowering Medicaid and Medicare expenditures. For example, in 1992 when no generic competition existed for Proventil (albuterol) 0.083% solution, Medicaid paid about $59.81 per prescription. By 2000, when generic competition for this drug was well established, average Medicaid spending per prescription fell to $31.55. In fact, the amount that Medicaid typically paid for the brand had continued to rise to $106.67 per prescription in 2000, while it typically paid $26.99 for Dey's generic. Some states, such as Maryland, paid as little as $12.33 for Dey's generic albuterol at this time.

Expert Report of Professor W. David Bradford, Ph.D.

# C. Dey's pricing is driven by economic and institutional forces unrelated to the alleged fraud

36.  *Review of Dey's WAC as an undiscounted list price*: In this section I review the institutional detail regarding Dey's transactions and pricing. I examine Dey's use of WAC as an undiscounted list price, and how for a variety of institutional and economic reasons Dey has a direct financial incentive not to arbitrarily raise its WAC as alleged. Dey's WAC functions as a list price; many buyers of Dey's products pay WAC or more for them and Dey's policy for adjusting its WAC causes it to reflect transaction prices reasonably well. Dey's use of WAC as a list price is consistent with the widely understood meaning of WAC.

37.  *Review of price dispersion problems with using average acquisition cost*: The dispersion in Dey's transaction prices is inconsistent with the use of average acquisition costs ("AC") as a basis for payments to pharmacies. Indeed, even a payment based on a 25% markup over average prices would result in a significant portion of pharmacies being paid less than cost for these drugs by Medicaid.

38.  *Review economics of list pricing*: I also review the literature and economics of list pricing. List pricing with selective discounts is a ubiquitous pricing method that is not unique to the pharmaceutical industry. The use of this type of pricing is an economically efficient response to market conditions and results in both lower average prices and greater output. Hence FTC has largely abandoned its efforts to enforce legal litmus tests because enforcing these rules actually tends to harm consumers.

39.  *Review of disconnect between Dey's WAC and AWP*: Dey's AWP is largely treated as a market entry requirement that is set once and rarely updated. Dey focuses its attention on the WAC in its transactions with intermediaries such as wholesalers. As a result of the steady updating that it performs on the WAC, over time there is no statistical relationship between WAC and AWP for Dey's subject drugs. This is not unusual for generic drugs, and is readily ascertainable from data such as that made available by the pricing compendia.

## C.1. Dey's WAC functions as a list price

40.  *Dey sells many drugs directly to providers*: Selective discounting to individual customers is a common feature of sales in pharmaceutical markets that contributes to lower overall pricing and greater economic efficiency. Dey, like most manufacturers of pharmaceutical products, sells its

Expert Report of Professor W. David Bradford, Ph.D.

products and manages its discounting through two primary channels – direct sales and indirect sales. Discounts on direct sales are negotiated by end customers with the manufacturer and product is shipped directly to the end customer with no intermediary involved. The typical direct purchaser is a large entity that does not require the services of a wholesaler. These can include large chain pharmacies (which have their own internal distribution systems), health systems, hospitals, other providers (such as physicians or home health agencies), and government entities (such as the Department of Defense and the Veterans' Administration). Purchases made by wholesalers and distributors for their inventories are also logged as direct sales.

41.   _Dey also negotiates contracts directly with providers who nonetheless use wholesalers_: Many of the units initially purchased by wholesalers under their direct contracts with the manufacturer subsequently will be sold to end customers that have "indirect" contracts. Indirect contract sales are negotiated by the end purchaser directly with the manufacturer, but product is shipped through a wholesaler that provides distribution services. A wide variety of entities use this arrangement. Typical examples include smaller chain and independent pharmacies that do not have internal distribution capabilities.[32] Historically, 49.3% of Dey's total sales are through the indirect channel.

---

[32]   Large chain pharmacies will frequently use this channel in the event of a supply disruption.

Expert Report of Professor W. David Bradford, Ph.D.

**Figure 4: Sales through indirect channels**

| Year | Total units sold | Total units sold in the indirect sales data | Percentage of units sold through the indirect channel |
|---|---|---|---|
| 1992 | 1,868,565 | 466,239 | 25.0% |
| 1993 | 4,086,212 | 1,173,109 | 28.7% |
| 1994 | 6,156,834 | 2,395,310 | 38.9% |
| 1995 | 7,973,607 | 3,544,315 | 44.5% |
| 1996 | 12,089,715 | 5,205,004 | 43.1% |
| 1997 | 16,553,068 | 8,207,796 | 49.6% |
| 1998 | 20,539,887 | 10,707,748 | 52.1% |
| 1999 | 22,962,121 | 12,969,739 | 56.5% |
| 2000 | 23,382,387 | 12,538,716 | 53.6% |
| 2001 | 21,583,874 | 11,847,153 | 54.9% |
| 2002 | 22,043,570 | 10,204,310 | 46.3% |
| 2003 | 15,681,704 | 5,458,909 | 34.8% |
| 2004 | 14,755,549 | 8,145,677 | 55.2% |
| 2005 | 13,581,329 | 7,539,280 | 55.5% |
| 2006 | 15,878,897 | 7,554,880 | 47.6% |
| 2007 | 4,353,321 | 2,260,905 | 51.9% |
| Grand total | 223,490,640 | 110,219,090 | 49.3% |

42. _Dey's WAC is price at which wholesalers take title of drugs_: The price at which wholesalers take title to Dey's products is the WAC: the invoice prices logged by wholesalers match the WAC published for Dey's drugs, and the cost of carrying this inventory until sold is also this price.[33] Wholesalers, like other direct customers, generally only receive an industry standard 2% of invoice price (WAC in this case) as an incentive for prompt payment – within 30 days.[34] Absent other pricing contracts, the wholesaler must sell Dey's products at roughly WAC or more.

43. _Chargeback also apply for many indirect sales_: In the event of a sale pursuant to an indirect contract with the manufacturer, the wholesaler will receive the discounted contract price from the customer (generally with some added markup as payment for its services). After the sale is made, the wholesaler receives payment from the manufacturer to cover the difference between the WAC it paid for the product and the discounted price it received from the customer. These payments are called chargebacks and are designed to allow the manufacturer to give special discounts to end customers

---

[33]   Deposition of Pam Marrs, Chief Financial Officer of Dey Pharmaceuticals, Aug. 19, 2004, at 8.

[34]   Deposition of Pam Marrs, Chief Financial Officer of Dey Pharmaceuticals, Aug. 19, 2004, at 208–209.

Expert Report of Professor W. David Bradford, Ph.D.

while taking advantage of the wholesalers' distribution systems. Absent a chargeback arrangement, the manufacturer would not be able to control which customers receive which discounts through wholesalers with the result that less discounting would occur.

44. _Many customers without contract purchase drugs from wholesalers at or above WAC_: Although discounted contract prices are a common feature of Dey's transactions, many buyers have no contract with the manufacturer. These purchasers generally buy their product from wholesalers, and get no special discounting. In fact, because the wholesaler has paid WAC 1-2% for its inventory, it must sell to off-contract customers at or above that price. In this sense Dey's WAC serves as an undiscounted list price – an advertised maximum price that buyers purchasing from Dey can expect to pay.

45. _A large percent of Dey historical sales are to off-contract providers_: Analysis of wholesaler transaction data from the two of the largest nationwide wholesalers – McKesson and Cardinal reveals that off contract sales account for a significant volume of Dey's transactions.[35] Figure 5 shows that the percentage of off-contract sales for all subject drugs has historically reached levels well above 30% of Dey's sales through wholesalers. This reflects the competitive dynamics of the market. For ipratropium bromide, Dey was the second generic manufacturer in the market. For the other two drugs, Dey was the first generic manufacturer to enter. As the market for these generic inhalation drugs matured by around 2000, with many manufacturers entering the market, undiscounted off-contract sales declined. Early on, however, Dey obviously faced less pressure to discount to its customers.

**Figure 5: Percent off contract sales for Dey subject drugs**

| Drug | Percent of sales off contract | | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 |
| Albuterol MDI | | 30% | 29% | 42% | 34% | 36% | 64% | 58% | 20% | | | |
| Albuterol 0.083% | 50% | 52% | 48% | 45% | 13% | 5% | 16% | 3% | 2% | 1% | 0% | 0% |
| Albuterol 5% | | 48% | 34% | 29% | 24% | 10% | 3% | 17% | 51% | 68% | | |
| Cromolyn sodium | 45% | 40% | 34% | 28% | 24% | 15% | 7% | 3% | 1% | 3% | 1% | 3% |
| Ipratropium bromide | | | | 40% | 34% | 21% | 11% | 6% | 2% | 2% | 1% | 1% | 1% |

---

[35] In the remainder of this report, unless otherwise noted, I refer to these data as "wholesaler data". McKesson and Cardinal wholesaler data were produced in this proceeding. Dr. Duggan primarily relies on Dey transaction data that was also produced in this matter. In section F where I review Dr. Duggan's analyses, I compare the two datasets and show that wholesaler transaction data provides a more complete picture of the prices paid by independent retail pharmacy providers.

Expert Report of Professor W. David Bradford, Ph.D.

46. _Many off-contract providers purchase at above-WAC prices_: The manufacturer has little visibility into the identities of off-contract buyers or the prices they pay (Dey only sees the sales as undiscounted sales at WAC to the wholesaler). These transactions are nevertheless economically important to Dey because of the disproportionate revenue they generate given that Dey receives full list price for them. An examination of Cardinal data suggests that virtually all types of customers make off-contract purchases, but independent drug stores and chain mass merchandisers like Kmart appear more likely to purchase this way than others. Wholesalers generally add a mark up to transactions with these customers. As Figure 6 below illustrates for the ipratropium bromide example, the prices paid to wholesalers by off-contract customers were above the WAC on average. Taken together, these data demonstrate that an economically significant fraction of Dey's sales through wholesalers were undiscounted list-price sales at the WAC. Those transactions resulted in end purchasers, such as independent pharmacies, generally paying at or above WAC.

**Figure 6: Off contract sales for ipratropium bromide**



NDC: 49502068503

47. _Dey has economic disincentives to "inflate" WAC_: Institutional constraints on Dey's WAC give it direct financial incentives not to "inflate" it as alleged. For example, because Dey's prompt payment

---

Expert Report of Professor W. David Bradford, Ph.D.

discounts are indexed to the WAC, there is a direct cost associated with raising it. The higher the WAC, the more Dey pays to the wholesaler. This is true even for transactions involving chargebacks - Dey continues to pay the wholesaler 2% of its WAC for prompt payment even if the end purchaser pays significantly less. If Dey were to "inflate" its WAC, the amount of money it would return to wholesalers in prompt pay discounts per unit would rise, even though revenue per unit would not. This would have a significant direct and negative impact on profits.[36] Additionally, since a significant fraction of buyers are paying an amount closely tied to WAC for Dey's products, raising the WAC would raise their prices and lower their demand. This would also directly impact Dey's profitability.

48.   *Stock-adjustment fees Dey must pay wholesalers also limits downward adjustments to WAC*: There is also at least one significant constraint on the downward movement of the WAC that might cause Dey to lower its WAC less frequently than it might otherwise. Namely, if it wants to lower the WAC, Dey has to pay the wholesaler a stock adjustment fee that re-prices the wholesaler's inventory of the product on hand at the new lower price. Large downward movements in WAC, particularly if poorly timed – i.e. when there is a significant amount of inventory at the wholesalers – can result in millions of dollars of adjustment fees to the wholesaler. If Dey did not perform this service, the wholesaler would not be able to sell its product without losing money at the new lower WAC. As a result of this factor, the timing of Dey's price changes could partly be driven by inventory levels of its products at wholesalers.

## C.2. Averages do not appropriately summarize the range of Dey's prices

49.   *There is significant transaction price dispersion for Dey products*: Contemporaneous prices paid by Dey's provider customers vary significantly. Figure 7, compares Dey's published WAC and quarterly weighted average cost for ipratropium bromide 0.02% (NDC 49502068503) against the transactional prices paid by providers in the retail classes of trade through the wholesalers. As Figure 7 illustrates, there is significant price dispersion throughout the time period. For example, while the quarterly weighted average unit price was $0.23 in the second quarter of 2000, transaction prices for this drug ranged from $0.084 to $0.37 while the WAC was $0.288. Roughly 47% of the transactions and 49% of sales were at prices above this average.

---

[36]   Moreover, since wholesalers pay WAC for their inventory, increasing the WAC would also serve to increase their financial carrying costs, which is a cost they would probably prefer the manufacturer not impose on them.

Expert Report of Professor W. David Bradford, Ph.D.

**Figure 7: WAC and acquisition cost for ipratropium bromide 0.02% solution**



NDC: 49502068503
Gray line represents FDB obsolete date

50. _Inflating average AC by 25% in difference calculation is incorrect since it sets price below costs for many providers :_ As a result of this typically large range of prices, with many pharmacies' costs well above average and the even above WAC, I find that Plaintiffs' 'difference' calculations based on average drug AC are not meaningful. This is because they clearly are not based on adequately paying providers for the drugs they purchase. As the example above illustrates, even when average AC is marked up by Dr. Duggan's uninformed 25% margin, Plaintiff's benchmark would still be only about $0.23. It cost some providers up to 59% more than that amount to acquire this drug so the average AC cannot be a realistic payment in any event – particularly in Plaintiffs' but-for world. In fact, over 9% of sales and 4.6% transactions are to providers with higher costs.

51. _Dey's price variation due to many factors ignored by Dr. Duggan_: The variation in Dey's transaction prices depends on a number of factors such as time on the market, whether the purchase was made under contract, and the volume of purchases.[37] It is also generally understood that drug acquisition

---

[37] This may be due to the greater (and more variable) leverage of many drug buyers to extract a good deal from generic manufacturers compared to the deal that can be struck with a brand drug manufacturer whose product may have few

Expert Report of Professor W. David Bradford, Ph.D.

costs vary by classes of trade.[38,39] Statistical analysis confirms that all of these factors contribute to the explanation of Dey's discounting, and these ultimately account for between 28% and 70% of total variation depending on the NDC.[40] This suggests that the relationship between these variables and discounts varies and is idiosyncratic.

52.   *Dr. Duggan's average acquisition cost-based pricing base would leave nearly half of providers and all marginal providers earning losses:* average acquisition cost cannot possibly serve as a reasonable basis for reimbursement for Dey's (or any manufacturer's) generic drugs as it would fail to even cover drug cost for a large fraction (perhaps even half) of providers. As I discuss below, this exercise completely ignores the very real obligation that state Medicaid agencies have to assure that sufficient pharmacies participate in their program to guarantee patient access. Medicare has a similar access constraint (involving home health providers in the case of Dey's subject drugs).[41] These fundamental obligations mean, without question, that "average" payments or "average" costs are irrelevant to Medicaid or Medicare's payment decisions. Such average AC based payments would guarantee abrogation of their responsibility to maintain access to care for their patients.[42]

## C.3. Dey's WAC has a meaningful relationship with transaction prices

53.   *Dey's WAC is related to several transaction price measures*: Although Dey's WAC technically functions as a list price, it empirically turns out to be highly related to a number of transactional pricing metrics and thus served as a reasonably reliable signal for underlying transaction prices. In Figure 8, I compare Dey's WAC against summary measures such as the average acquisition cost and the 95th percentile AC of retail providers. As noted in the analysis above, there are many providers whose costs are at or above Dey's WAC, this is corroborated by comparing the WAC and the 95th

---

competitive alternatives.

[38] Schondelmeyer, Steven W. and Marian V. Wrobel. "Medicaid and Medicare Drug Pricing: Strategy to Determine Market Prices," Abt Associates, Inc., August 30, 2004, 16–17.

[39] Plaintiff expert Dr. Duggan acknowledges the importance of appropriate classes of trade and documents the different amounts they pay. The classes of trade he focuses on are retail pharmacy and home health careproviders. See Expert Report of Mark G. Duggan at 24, United States ex rel. Ven-a-Care of the Florida Keys, Inc. v. Dey, Inc., No. 05-11084-PBS (D. Mass. Jan. 23, 2009).

[40] I compute the natural logarithm of the ratio of Dey's contract price to its WAC for each NDC, which yields an estimate of the WAC discount. I then regress this statistic on a variety of factors such as an index of time since launch (measured in quarters), time since last price change (measured in quarters), class of trade, quantity purchased over the current quarter, and a statistic indicating whether the customer had ever purchased under contract in the current period. All coefficients on this regression are generally statistically significant, which suggests they have predictive value for the WAC discount.

[41] Furthermore, as I note in my discussion below, simply covering providers' cost on the drug portion of payments is still insufficient given the generally insufficient payments made for their services.

[42] This is discussed in greater detail in the next chapter.

Expert Report of Professor W. David Bradford, Ph.D.

percentile AC.[43] In this case the two lines follow one another very closely with the 95th percentile AC generally falling above the WAC. In other words, the WAC provides a reasonably good signal for the costs of the top percentiles of providers. In his expert report Dr. Duggan considers the 95th percentile AC, but does not base his difference calculations on it. That would have been consistent with using the published WAC it turns out.

**Figure 8: WAC, average AC and 95th percentile AC for ipratropium bromide 0.02% solution**



54.   *The correlation between Dey's WAC and average AC measures is high*: The statistical correlation between these two aggregates and the WAC is high (close to one), from which I conclude they are clearly correlated.[44] However, I should reiterate that just because WAC and average AC track each

---

43   In section F, I discuss in greater depth the importance of such marginal providers in the context of Medicaid and Medicare.

44   After computing aggregates for the time periods between effective dates for Dey's WAC for each NDC, I compute a simple correlation matrix for all NDCs and effective periods pooled. The correlation between the 95th percentile AC and WAC is 0.99 and the correlation between average AC and WAC is 0.98. Computing this statistic separately for each the top three NDCs (49502069703, 49502068902, 49502068503) yields similar results with correlations ranging from 0.95 to 0.998.

Expert Report of Professor W. David Bradford, Ph.D.

other well does not imply that average AC+25% is a reasonable basis for calculating the differences as Dr. Duggan does.

55.   *States that use WAC for Medicaid payment had lower costs*: The utility of the WAC for accurately predicting acquisition costs is not an academic matter as several state Medicaid authorities based reimbursement on Dey's WAC. In fact, it turns out that states that based reimbursement on Dey's WAC enjoyed little additional benefit from using the DOJ-revised AWPs. Reimbursement continued to be lower when it was based on Dey's published WAC even when they adopted the DOJ-revised AWP estimates provided by the Department of Justice (DOJ) in 2001.

56.   *DOJ-revised AWPs are nearly identical to Dey's published WAC*: In 2000, DOJ conducted an investigation into wholesaler prices for 400 NDCs.[45] USDOJ provided the results of this investigation to First DataBank (FDB), which took these prices and "calculated new AWPs". FDB made these prices, which subsequently came to be known as DOJ's revised-AWP, available to all state Medicaid agencies.[46] In 2003, OIG conducted a study on the use of DOJ-revised AWPs by various Medicaid agencies in their pharmacy reimbursement programs. This study shows that many state Medicaid agencies adopted DOJ-revised AWPs for their reimbursement programs. At the same time, there were many other states that did not use this price. Two of Dey's highest selling subject NDCs, albuterol (49502069703) and cromolyn sodium (49502068902), were part of this DOJ investigation. By reversing the 25% markup that FDB applied to the DOJ estimates, an implied "WAC" results. As shown in Figure 9, the WAC implied by DOJ-revised AWPs for these two NDCs are virtually identical to the contemporaneous WAC published by Dey. In fact, the difference between the DOJ-revised AWPs and Dey's published WAC is less than 5%.

57.   *When WAC or DOJ-revised AWP are both options for payment, some states used Dey's WAC*: In Massachusetts, for example, Dey's WACs are used as a basis for drug payments, but the DOJ-revised AWP is also used as an alternative basis if it is lower. For Dey's drugs this state never used the DOJ-revised AWP as a payment basis because the WAC-based payments continued to be lower than those achieved using the DOJ-revised AWP. This simple experiment demonstrates that Dey's WAC provided reasonably good information about acquisition costs. Adopting the explicitly cost-based DOJ-revised AWP estimates yielded no better result than using Dey's WAC.

---

[45]   U.S. Department of Health and Human Services, Office of Inspector General. "Medicaid's Use of Revised Average Wholesale Prices," September 2001, 3.

[46]   U.S. Department of Health and Human Services, Office of Inspector General. "Medicaid's Use of Revised Average Wholesale Prices," September 2001, 1.

Expert Report of Professor W. David Bradford, Ph.D.



Figure 9: DOJ-revised AWP, implied WAC and published WAC

58. *WAC cannot equal average AC contemporaneously*: Although Dey's WAC is highly correlated with average AC, and is a reasonable measure of the prices paid by many providers, it does not and generally cannot contemporaneously equal the average AC. This is due to institutional constraints associated with the intended use of WAC and the information gathering requirements necessary compute an average AC.

59. *Dey cannot know the level of chargeback and prompt-pay discounts in advance when setting WAC*: WAC is primarily used by Dey to guide business between Dey and wholesalers as an invoice price for transactions that take place well in advance of any subsequent discounting – i.e. when the wholesaler builds its inventory, but before chargebacks are realized. Because chargebacks are only known after end sales transactions have occurred, discounted prices are not known until long after the transaction between manufacturer and wholesaler has been completed. As a result, some form of list or index price must be used to govern these types of transactions.[47] The financial importance of the WAC is

---

[47]  Moreover, because Dey's WAC sets a baseline for future discounting, it needs to be a forward-looking estimate of the highest price that the manufacturer is likely to want to charge its customers.

Expert Report of Professor W. David Bradford, Ph.D.

underscored by the sometimes significant money that changes hands in order to perform inventory adjustments when the WAC is changed.

60. *Time lag for collecting data to estimate averages*: One constraint on the reporting of an average AC is simply the time required to gather the requisite information on realized transaction prices. In a very practical sense this quarter's average transaction prices cannot be known until next quarter, and this year's average transaction prices cannot be known until next year. The practical computation of average ACs in a timely manner is made yet more difficult because chargebacks or rebates take additional time to reconcile.

61. *Rapid price changes in generics mean average AC from prior quarter would be inaccurate*: Making matters more difficult in the generic drug industry is the fact that transaction prices are constantly changing. Even if one were able to instantly and "accurately" compute and publish average AC from the closing quarter's transactions, that number may not match prevailing prices in the following quarter. In fact, given the rate at which generic drug prices sometimes change, the previous period's average prices could be consistently inaccurate as an estimate of this period's prices. Even though a reasonably calculated average price would be informative, it likely will not match the current transaction prices.

62. *Use of average AC in difference calculations unrealistic and unreasonable*: Plaintiffs' calculation of 'differences' using contemporaneous average prices amounts to 20-20 hindsight. It completely ignores the fact that such information would never have been available to any one; not even the wholesalers generating the information would have been able to generate these averages. Nevertheless, any real-world deviations from Plaintiffs' perfect hindsight results in 'differences' by their reckoning.

63. *Dey's WAC approximates lagged average AC*: A more realistic question that could be asked about Dey's WAC is whether it was an accurate depiction of backward-looking acquisition costs at the time it was updated. Figure 10 compares the average AC from the period immediately prior to each newly published WAC for cromolyn sodium. Although there is no business requirement that WAC do this, comparison reveals that Dey's WAC is generally in line with average acquisition costs prevailing during the previous period, and is sometimes even below previous average AC.

Expert Report of Professor W. David Bradford, Ph.D.



**Figure 10: WAC and average AC for cromolyn sodium solution**

NDC: 49502068902

64. *ASP calculation assumes lagged data*: Thematically, the above calculation is also quite similar to the real-world Average Sales Price ("ASP") that CMS calculates for its Medicare Part B drug payments. Required since 2005 as part of the "cost-plus" drug payment program implemented under the Medicare Modernization Act ("MMA") of 2003, every manufacturer is required to submit ASP information on a quarterly basis for each NDC covered under Medicare Part B.[48] The current ASP period is then calculated using NDC-level ASPs submitted in previous quarters by manufacturers, which are then aggregated to the HCPCS level to be used for Medicare payment in the current quarter.[49] However, because this calculation mixes data from multiple manufacturers for generic drugs, it is not directly comparable to Dey's WAC.

65. *Requiring WAC to match current average AC leads to perverse outcomes:* Although the timing issue associated with expecting WAC to match contemporaneous average AC is not insignificant, there is

---

[48]   Medicare Prescription Drug Improvement and Modernization Act of 2003, sec. 303(c)(2), §1847(a), 117 Stat. 2066 (2003).

[49]   U.S. Department of Health and Human Services, Office of the Inspector General. "Comparison of First-Quarter 2008 ASPs and AMPs," December 2008.

Expert Report of Professor W. David Bradford, Ph.D.

also a deeper problem associated with this expectation: it would cause the manufacturer's selective discounting program to fail and average prices would likely rise. If the wholesaler were to take title to Dey's drugs at the average AC, then in order for the selective discounting system to work the wholesaler would be in the strange situation of having to remit negative chargebacks to the manufacturer for purchases that occurred at above-average prices. This is because it receives more than it is supposed to retain from customers that pay above average prices.

66.   *Requiring WAC to match current average AC would also lead to higher prices*: Under the standard chargeback system, the wholesaler is highly motivated to implement the manufacturer's discount. Even for high-paying customers with modest discounts, the wholesaler stands to lose money if it does not request the chargeback. In a negative chargeback system, however, the wholesaler would have adverse incentives for reporting or remitting its negative chargebacks. The manufacturer would also have little leverage to prevent the wholesaler from undercutting the manufacturer's prices using the product it received at average AC prices. To prevent this likely outcome from eroding its revenue, the manufacturer would have to raise its average prices by reducing its selective discounting, which would lead to a general rise in average pricing. This illustrates that a true average price is the economically incorrect price measure to use in a system designed for selective discounting.

## C.4. Dey's use of WAC is consistent with widely available descriptions

67.   *WAC is defined as an undiscounted list price*: Dey's use of WAC as an undiscounted list price for its transactions is consistent with a variety of published descriptions, including the one that Congress ultimately adopted as part of the MMA.[50] As early as 1994, a GAO report mentions the undiscounted nature of the WAC:

> The WAC represents the factory price for most of the outpatient prescription drug market: the 55% of that market served by the wholesalers who do not receive discounts from manufacturers and the substantial share of the managed care market segment that also does not receive such discounts.[51]

68.   *Academics understood WAC to be undiscounted list price*: Referencing this same GAO report, economist Stuart Schweitzer, in his 1997 textbook on pharmaceutical economics, concurs with it

---

[50]   Medicare Prescription Drug Improvement and Modernization Act of 2003, sec. 303(c)(2), §1847(a), 117 Stat. 2066 (2003).

[51]   U.S. Government Accountability Office. "Prescription Drugs: Companies Typically Charge More in the United States than the United Kingdom," January 1994, 18–19.

Expert Report of Professor W. David Bradford, Ph.D.

regarding the information provided by the WAC.[52] Even Dr. Schondelmeyer concedes that by the early 2000s, WAC was commonly understood to be an undiscounted list price and a term of art.[53]

69.  *Dey clarified WAC as undiscounted list price directly to Medicaid administrators*: Although Dr. Schondelmeyer is vague about precisely when it became widespread knowledge that WAC was an undiscounted list price, Dey left nothing to doubt with the letters it sent to the Medicaid authorities regarding its WAC.[54] For example, in this letter dated August 10, 1999, Robert Mozak (Executive Vice President, Sales and Marketing, Dey) says:

> Dear Administrator:
>
> …As you know, WAC is referred to by data reporting services and government agencies as an "estimate," and Dey believes that WAC generally means the <u>invoice</u> price charged by a pharmaceutical manufacturer to drug wholesalers. As you also know, WAC does <u>not</u> include the net effect of discounts from invoice price (based on volume of purchases, speed of payment and other factors), rebates, chargebacks, administration fees, and other such cost adjustments which are well-known and commonplace in the pharmaceutical industry and can affect, to a greater or lesser degree, the actual "final" cost to each purchaser. These discounts may not be determined until some months after the date of invoice. Therefore, we remind you that <u>WAC may well not be representative of actual market costs to those entities which you are reimbursing under Medicaid.</u> [emphasis in original][55]

70.  *Medicare's creation of AMP implies WAC was understood to be undiscounted*: Some historical interpretations of WAC suggest it was intended and understood to reflect net prices including discounting passed through to end customers. Although this suggests there may have been a debate at one time over the meaning of WAC, the existence of a separately calculated Average Manufacturer Price ("AMP") indicates that the government has not considered WAC to be a measure of net prices for almost two decades. Established in 1990 as a submission requirement for all drugs covered under Medicaid, AMP explicitly includes discounts and rebates to providers, and represents a form of net price. If WAC was truly thought to convey discounted "net" prices, then the Federal Government could easily have foregone the considerable trouble of legislating and regulating a separately defined AMP to acquire this information. It could have simply used published WAC data. The likely

---

[52]  Schweitzer, Stuart O., Pharmaceutical Economics and Policy, Oxford: 1997, p. 11.

[53]  Expert Report of Stephen W. Schondelmeyer at 29–30, United States ex rel. Ven-a-Care of the Florida Keys, Inc. v. Dey, Inc., No. 05-11084-PBS (D. Mass. Jan. 29, 2009).

[54]  Expert Report of Stephen W. Schondelmeyer at 26, United States ex rel. Ven-a-Care of the Florida Keys, Inc. v. Dey, Inc., No. 05-11084-PBS (D. Mass. Jan. 29, 2009).

[55]  DL-0050553.

Expert Report of Professor W. David Bradford, Ph.D.

explanation for why it did not is simple: as early as 1990 the federal government understood that WAC did not include discounts – and, therefore, not a net price.

71.    *Pricing compendia understood WAC was undiscounted list price*: There is considerable other evidence reflecting the widespread understanding that WACs reported in pricing compendia are undiscounted list prices.[56] In addition, depositions of pricing compendia employees who publish the WAC confirm that it was commonly understood to be an undiscounted list price.[57]

## C.5. Economic literature confirms that list pricing with discounts is both ubiquitous and economically efficient

72.    *There is no economically necessary or typical relationship between list prices and underlying transaction prices:* In fact, as I discuss below, given a list price that is above cost, the economically efficient outcome (i.e. at lowest prices and greatest output) is zero sales at list. Legal litmus tests for "real" list prices that, e.g., require a certain fraction of sales to occur within a particular vicinity of list prices generally have the perverse effect of discouraging discounting. In fact, conditional on there being a list price, economic efficiency is best served if no customer pays list, but rather 100% of them pay a discount off of the list price. Indeed, the FTC long ago significantly curtailed its litigation of "violations" of consumer protection laws prohibiting false prices (such as substantial sales requirements) precisely because it was concerned that these enforcement activities effectively prohibited discounting list prices and raised average prices to consumers. According to Tim Muris, former head of the FTC:

> The inconsistency of a substantial sales requirement is most obvious when, as some states are arguing, it requires at least fifty percent of sales to occur at the reference price. Because economics teaches that consumers will purchase more when price falls, orders will be greater at the lower price. That, after all, is the reason for having a sale. If consumers buy "too much" when the price is low, the only way for a

---

[56]   U.S. Government Accountability Office. "Prescription Drugs: Companies Typically Charge More in the United States than the United Kingdom," January 1994, 18–20. See also U.S. Government Accountability Office. "Medicare, Payments for Covered Outpatient Drugs Exceed Providers' Cost," September 2001, 23; Medicare Prescription Drug Improvement and Modernization Act of 2003, sec. 303(c)(2), §1847(a), 117 Stat. 2066 (2003); U.S. Department of Health and Human Services, Office of Inspector General. "Cost Containment of Medicaid HIV/AIDS Drug Expenditures," July 2001, 29; U.S. Department of Health and Human Services, Office of Inspector General. "Medicaid Pharmacy –Actual Acquisition Cost of Generic Prescription Drugs Products," March 2002, 7; Gencarrelli, Dawn. "Average Wholesale Price for Prescription Drugs: Is There a More Appropriate Pricing Mechanism?" National Health Policy Forum, June 7, 2002, 15; and Kaiser Family Foundation. "Prescription Drug Trends – A Chartbook," July 2000, 87, 93.

[57]   Deposition of P. Kay Morgan, Manager Editorial Services for First DataBank, Aug. 27, 2007, at 84–86.

---

Expert Report of Professor W. David Bradford, Ph.D.

> merchant to comply is to have fewer sales, effectively increasing the price. Consumers can hardly afford such protection.[58]

73. _List prices are used in many industries, including pharmaceuticals_: List pricing with variable private discounts to individual customers is a dominant pricing method in the US and is not unique to either the pharmaceutical industry or to Dey. In the United States, it has become one of the most common mechanisms for facilitating business-to-business trade, and is also prevalent in many retail sectors.[59] By "list prices" economists refer to a situation where sellers post a public price at which they will guarantee to make an exchange, and then commonly provide discounts off of that price for customers based upon volume purchases, negotiations, advance purchase arrangements, and so forth. Thus, there will be a difference between the list price and the actual transaction price for some (if not all) customers. This practice of "list prices plus discounts" is common in the distribution of prescription pharmaceuticals in the United States. Other sectors of the economy utilizing the practice of list pricing with discounts include: hospitals, the physician services; hotels; new automobile sales; residential real estate; airlines; office supplies; and magazine subscriptions.

74. _List pricing is generally efficient relative to the alternatives_: It usually results in lower average prices than when a single price is used for all customers and industry output that is closer to the competitive level than would exist without private discounts. The question of why sellers might resort to list prices plus discounts has been discussed from a number of theoretical perspectives. Since the mid-1970s, economists have discussed a range of circumstances under which the "law of one price" might not hold. Uncertainty and imperfect information have long been known to result in multiple prices being charged in a market for the same good – even when there is no heterogeneity in the goods being sold. Generally, these discussions involve _inter_firm price dispersion – when each seller sets a single price for its product, but all sellers do not set the same price. List pricing plus discounts represents a different form of behavior known as _intra_firm price dispersion – when each seller sets multiple prices for its products.

75. _Intrafirm price dispersion generally increases welfare_: Intrafirm price dispersion, in and of itself, is also a well-studied practice. It is often held out as method to provoke firms that have market power to

---

[58] See, e.g., Muris, Timothy J. "Developments in Consumer Protection: Economics and Consumer Protection," _Antitrust Law Journal_, April 10, 1991.

[59] Thanassoulis, John. "List Prices, Bargaining and Resultant Productivity Diffusion Delay." _Oxford Department of Economics Discussion Paper Series_, No. 220, February 2005. See also Dana, James D., Jr. "Price Dispersion under Demand Uncertainty." _International Economic Review_ 42, no. 3 (2001): 649–70; Horowitz, Joel L. "The Role of the List Price in Housing Markets: Theory and an Econometric Model." _Journal of Applied Econometrics_ 7 (1992): 115–29; and Seidmann, Daniel J. "Transactions/List Pricing." _Econometrica_ 58, no. 3 (1990): 621–36.

---

Expert Report of Professor W. David Bradford, Ph.D.

offer lower average prices and greater supply. In general, sellers that have the power to set prices will offer too little of their product for sale, and thus fail to enhance social welfare as well as more competitive alternatives. When firms with price-setting power are able to sell their product at different prices to different customers, they move closer to a competitive market outcome from a welfare standpoint.[60] In these situations, prices will usually vary inversely with the responsiveness of customers to price (highly responsive customers pay less, less responsive customers pay more). This well-known result establishes the principle that allowing sellers to set multiple prices, in the face of market power, will often improve market outcomes.

76. *Transparent pricing does not necessarily lead to efficient outcomes:* Private discounting also allows sellers to offer lower prices to some customers at lower cost, i.e., without necessarily having to extend the same discounts to others. This allows sellers to be more aggressive in offering discounts, resulting in lower prices to more customers than would otherwise be the case. As has been known in the economic literature for some time, requiring private discounts to be made public would lead to higher average prices, lower overall production, and a loss to social welfare. Thus, requiring discounts off of list prices to be made public undermines the incentives for sellers to grant discounts, and thereby moves the market further away from competitive outcomes. This has not only been discussed in theoretical literature, but has also been demonstrated empirically.[61] Price transparency is counter-productive. Arguments that "transparent" pricing is necessary for efficient markets are not only wrong on their face (transparent prices are simply not "necessary") but are misguided in their effect (transparent prices can be harmful). This is established in the economics literature, and the FTC has generally responded by arguing against "transparency" laws where they have been proposed.[62]

77. What remains then, is to ask whether the specific mechanism of posting a published, and public, list price and then offering private, non-public, discounts can be expected to have the same effect of improving social welfare, as compared to single price-setting sellers examined in the literature. There are a number of specific reasons to assert that the answer is "Yes."

---

[60]  Prescott, Edward C. "Efficiency of the Natural Rate." *The Journal of Political Economy* 83, no. 6 (1975): 1229–1236.

[61]  For theoretical research see Danzon, Patricia M. and Adrian Towse. "Differential Pricing for Pharmaceuticals: Reconciling Access, R&D and Patents." *International Journal of Health Care Finance and Economics* 3 (2003): 183–205. For empirical research see Davis, Douglas D. and Charles A. Holt. "Conspiracies and Secret Discounts in Laboratory Markets." *The Economic Journal* 108, no. 448 (1998): 736–56. See also Scott Morton, Fiona. "The Strategic Response by Pharmaceutical Firms to the Medicaid Most-favored-Customer Rules." *RAND Journal of Economics* 28, no. 2 (1997): 269–90.

[62]  Muris, Timothy J. "Developments in Consumer Protection: Economics and Consumer Protection," Antitrust Law Journal, April 10, 1991.

Expert Report of Professor W. David Bradford, Ph.D.

78.   _Economic literature suggests many factors that might influence list price setting:_ Two effects are
      particularly noteworthy. First, a list price functions as a "reservation" price or a price ceiling– i.e. it is
      the price at which a seller guarantees an exchange, or the maximum price a customer would have to
      pay for a product from a particular supplier, though it may also do so at a lower level. This puts an
      upper limit on how high prices can rise in any negotiation, since the buyer could always demand the
      product at the posted price. A list price is thus used by a manufacturer as a signal to attract customers
      that otherwise might have to search around (or negotiate extensively) to obtain a similar deal from a
      competitor.[63] Thus, list prices are a form of advertising that overcomes search costs for many
      buyers.[64] Secondly, if there are search costs, some sellers can obtain higher prices from uninformed
      consumers by setting higher prices and transacting with those consumers who did not find a low
      price. Advertising list prices serves to "short-circuit" this inefficiency and keep high cost producers
      out of the market. The result is that the product is produced at lower average costs and sold at lower
      prices than would occur in a market with high search costs and no list prices. Again, list pricing (with
      private discounts) serves to mimic competitive outcomes, even when there is not a perfectly
      competitive market.

79.   _List price example:_ The residential real estate market is a good example of this effect. Houses are
      commonly sold below the listed price, but are rarely sold above that price (Horowitz, 1992). This
      aspect of list prices is advantageous to the buyer. When the market is characterized by uncertainty in
      the value of the product, customers will have to resort to search mechanisms to determine the price
      they should pay. By posting a list price / price ceiling, sellers reduce the range over which buyers
      must search. Buyers will still have to search, since they will wish to find the largest available
      discount; but they will know that any net price (list price minus discount) that is above the lowest list
      price is a sub-optimal result (from the buyer's perspective). This has the effect of lowering transaction
      costs (search costs) and improving the efficiency of the market.

80.   _Intrafirm variation in prices results in lower average prices to customers:_ Conceptually, when the
      sellers are uncertain about the nature or level of demand for their product, their best strategy is to set a
      menu of prices; that is, to establish different prices for different customers. When sellers face more
      competition, they will respond with greater levels of dispersion in prices. Since this increased

---

[63]   Low volume buyers whose search and negotiation costs are high compared to resulting savings will likely be attracted to
       this strategy.

[64]   This should have no impact on the ability of large volume buyers to negotiate competitive prices. In any event, the
       lowest list price theoretically serves as an upper limit on the discounted prices of all sellers, since that published list
       price is always an outside option in negotiation.

Contains highly confidential materials—subject to protective order

Expert Report of Professor W. David Bradford, Ph.D.

dispersion is aimed at increasing the chances that a customer will buy its product instead of a (new) competitor's, the dispersed prices tend to be lower. As a result, greater dispersion results in a lower average price. As the average price falls in a market, aggregate market sales will rise. Clearly, then, dispersion in prices benefits social welfare. This will be true even if there is no market power on the part of the seller. Thus, the result that intrafirm price dispersion improves welfare will hold in pharmaceutical markets characterized by both generic and branded products. [65]

81.   *Private discounts yield a positive outcome*: Given that price dispersion is a good thing, the question may arise: "Does posting a list price and then granting private discounts achieve the same positive outcome?" Again, the answer to this is yes. Certainly, a list price plus discounts achieves the intermediate goal of dispersed prices. Additionally, it turns out that having the discounts be secret is an essential aspect of achieving the welfare-enhancing market outcome. Making the discounts public imposes an opportunity cost on the seller for granting discounts. This is because when a seller grants a discount to one customer that becomes publicly known, then other customers will have greater bargaining power to demand a discount at least as good. Consequently, the seller will lose revenue not only from the customer given the discount initially, but also from subsequent customers.

82.   *List prices can forestall high-cost competitors*: The literature discussed above can be extended in a straightforward manner to demonstrate that posted list prices can serve to forestall entry of high-cost producers who supply products at higher prices to uninformed consumers. This is because the list prices, which are public, are reservation sale prices (prices at which a manufacturer guarantees an exchange) and thus serve as de facto price ceilings. When there are positive search costs, even high cost sellers can take advantage of the resulting price dispersion to sell some output to customers who have higher search costs, since these buyers may only sample a few sellers and randomly arrive at only the high cost ones. Low cost sellers can use list prices as a low-cost signal to relatively high search cost customers – essentially advertising to them that they do not have to pay more than the posted list price for the product in question. This will mean that high cost producers, who cannot profitably supply the product at or below the highest list price, will not be able to survive in the market. This keeps average cost lower in the market than it otherwise might, which is an additional impetus for efficiency (beyond those discussed above).

---

[65]   Dana, James D. Jr., "Equilibrium Price Dispersion under Demand Uncertainty: The Roles of Costly Capacity and Market Structure." *The RAND Journal of Economics* 30, no. 4 (1999): 632–60. See also Davis, Douglas D. and Charles A. Holt. "Conspiracies and Secret Discounts in Laboratory Markets." *The Economic Journal* 108, no. 448 (1998): 736–56.

Expert Report of Professor W. David Bradford, Ph.D.

83.  _Pricing compendia distribute information inexpensively_: Note that the publication of list prices in the major price compendia in the pharmaceutical industry is a particularly low-cost mechanism for disseminating price ceiling information. As a result, even customers such as individual providers and small pharmacies in rural areas, who might otherwise have high search costs for finding the best prices for pharmaceuticals, will be able to rule out high cost producers more readily.

84.  _Literature on price dispersion in the pharmaceutical industry_: Much of the discussion above is general in nature – applying just as well to the pharmaceutical industry as it does to any other of the many industries that rely on list prices with private discounts. There have been a few studies which investigate the impact of list pricing plus discounts in the pharmaceutical industry specifically. Danzon and Towse examine the role of differential pricing in the pharmaceutical industry.[66] While the bulk of their focus is on international pharmaceutical trading, they do examine the US industry specifically. They note that the US system is based on discounted list prices, which they assert generally mimic efficient "Ramsey" prices (which vary inversely with the responsiveness of customer demand to price). They further note that it is the confidentiality of the discounts which allows this efficient pricing to persist. Making price discounts public, they argue, will undermine the process by which more price-sensitive customers get larger discounts than less price-sensitive customers. In a similar vein, Grabowski and Vernon and Frank and Salkever document a pattern whereby brand drug manufacturers may offer discounts to managed care entities while they continue to raise list prices well after facing generic competition. This strategy turns out to be a reflection of their ability to continue charging top prices to brand-loyal customers even while they may be forced to offer significant discounts to managed care entities that otherwise might pick the generic.[67]

85.  _Transparency in the pharmaceutical industry_: Scott-Morton also examines how threats to the confidentiality of pricing discounts in the pharmaceutical industry have affected market outcomes.[68] In particular, she was concerned about the impact of the "most favored nation" requirement enacted by the Medicaid Drug Rebate Program in 1991. That policy shift required that manufactures reveal to CMS their best pricing for private customers, which then became the basis for rebates to Medicaid – the single largest payer in the US. This is a particularly strong form of transparency because not only

---

[66]  Danzon, Patricia M. and Adrian Towse. "Differential Pricing for Pharmaceuticals: Reconciling Access, R&D and Patents." _International Journal of Health Care Finance and Economics_ 3 (2003):183–205.

[67]  Frank, Richard and David Salkever. "Generic Entry and the Pricing of Pharmaceuticals." _Journal of Economics and Management Strategy_, Spring 1997, 75-90. See also Grabowski, Henry and John Vernon. "Brand Loyalty, Entry, and Price Competition in Pharmaceuticals after the 1984 Drug Act." _Journal of Law and Economics_, Oct. 1992, 331–50.

[68]  Scott Morton, Fiona. "The Strategic Response by Pharmaceutical Firms to the Medicaid Most-Favored-Customer Rules," _RAND Journal of Economics_ 28, no. 2 (1997): 269–90.

Expert Report of Professor W. David Bradford, Ph.D.

is the best price revealed to CMS, but it is used explicitly to lower Medicaid payments. Given the literature on list prices discussed above, one would expect average prices to rise as a result of this. Scott-Morton estimated that the price for branded drugs facing generic competition rose by 4%. The CBO documented an immediate reduction in the typical best price reported to the government, and concomitant rises in average prices for private payers in response to the OBRA best price regulation.[69] The CBO also found more recently that the rebate program continues to lead to higher average prices.[70]

86.   *Transactions at list do not occur for physician services:* The health care sector of the US economy is one in which list prices with discounts dominate, and few customers pay near list price. For example, Gruber and Rodriguez recently studied the relationship between list prices and actual transactions prices for physician services.[71] They suggest that nearly all insured customers pay less than the physician's list price, and study the payments for uninsured customers in particular detail. Using data presented in their tables and text, and assuming that all insurers negotiated discounts off of list, one can calculate that as few as 2.2% of patients pay list price for physician services.

87.   *It is most efficient if all transactions occur well below list price:* As should be clear from the discussion above, the mechanism of posting public list prices and then offering private discounts has many attractive, efficiency-enhancing traits. Further, it is a common practice in the health care industry. Given this, it follows directly that once list prices have been posted, social welfare is best served when actual transaction prices are dispersed below that level. Indeed, the best outcome from a social perspective would be if all transaction prices were at marginal cost and below the list price. Thus, efficiency would dictate – conditional on a list price above marginal cost – that no transaction should occur at list, and that all transactions be below that level. Threshold rules based on a requirement that large fractions of actual transactions at list price are, in the end, not only unsupported by economic theory, but actually counter-productive in precisely the way envisioned by Tim Muris.

---

[69]   U.S. Congressional Budget Office. "How The Medicaid Rebate On Prescription Drugs Affects Pricing In The Pharmaceutical Industry," January 1996, xii–xiv.

[70]   Congressional Budget Office, "The Rebate Medicaid Receives on Brand-Name Prescription Drugs," June 21, 2005.

[71]   Gruber, Jonathan and David Rodriguez. "How Much Uncompensated Care Do Doctors Provide?" *Journal of Health Economics* 26 (2007): 1151–1169.

Expert Report of Professor W. David Bradford, Ph.D.

## C.6. Dey's AWP is treated as a requirement for market entry

88. _Dey AWP tied to brand AWP at entry_: For Dey, AWP is a response to a one-time reporting requirement indirectly imposed on the industry by payers. All manufacturers must submit an AWP to publishers in order for their drugs to appear in industry compendia.[72] Dey was either the first or second manufacturer to obtain FDA approval to market its subject generic products. As a result, Dey's setting of AWP upon market entry is determined almost entirely by the level of the reference brand's AWP at that time.[73]

89. _Dey AWP set at between 10% and 15% below brand AWP at entry then unchanged:_ In order to have its product be considered a generic drug by pricing compendia, a generic manufacturer generally needs to set AWP at 10% or more below the brand AWP. For all three subject drugs, Dey set its AWP within 10% to 15% of the prevailing brand AWP when it entered. Once AWP is set for Dey's subject drugs, further adjustment essentially never occurs.[74] For example, as Figure 11 illustrates, Dey was the second generic manufacturer to enter the ipratropium bromide market in early 1997 with a 11% discount off the prevailing brand AWP.[75] Although subsequent entrants sometimes enter with higher prices, Dey never raises its AWP in response. In fact, one can plainly see that some manufacturers also enter with lower AWPs, and Dey continues to maintain its flat AWP. In fact, by 2000 generic AWPs ranged from $0.28 to $0.94 in 2000, which suggests that a variety of economic factors likely influence the setting of AWP across manufacturers with no single dominant strategy apparent in the data.

---

[72] Deposition of Todd Galles, former Group Manager, Dey, Feb. 28, 2006, at 156–57.

[73] When it is the first generic to market, Dey obtains 180 days of generic exclusivity under Hatch-Waxman Act rules, and thus its only competitor is the brand. Even when Dey is the second generic to market, the brand generally remains the reference competitor.

[74] The only exception in the FDB data is that Dey twice lowered its AWP for albuterol sulfate slightly: once in July 1992 and once in October 1993. Thereafter, AWP was not revised again.

[75] First DataBank data for GCN 21700.

Expert Report of Professor W. David Bradford, Ph.D.

**Figure 11: Brand and generic AWP for ipratropium bromide (0.02%) solution**



Source: FDB data for GCN 21700
Dey NDCs: 49502068526, 49502068503, 49502068524, 49502068530, 49502068529,
49502068562, 49502068560, 49502068561, 49502068533, 49502068531

90.  *After launch AWP and WAC have no relationship for Dey's drugs*: A natural consequence of Dey's
set-and-forget AWP policy combined with its pattern of lowering WAC as transaction prices fall is
that the WAC and AWP for its drugs (and for generic drugs in general) have no economically or
statistically meaningful relationship with one another because of the very different economic and
institutional forces driving them. This stands in stark contrast with the typical pattern for brand name
drugs. For example, as Figure 12 illustrates, the very lowest markup from WAC to AWP for generic
drugs is 25%, but ranges to well over 400%. Dey's drugs appear to be typical with neither the highest
nor the lowest markups in these segments. This clearly illustrates that little useful information about
the level of the WAC or transactional prices can generally be inferred from a generic drug's AWP
after its launch.

Expert Report of Professor W. David Bradford, Ph.D.

**Figure 12: Generic AWP/WAC ratios for drugs competing with the subject drugs - 1999**



91. *No relationship between AWP and WAC is easily observed*: This largely random relationship between WAC and AWP for generic drugs is straightforward to verify using easily accessible information such as the pricing databases provided by Medi-Span and First DataBank. This kind of information was widely available to payers through the publishers, and its implications were generally understood within the industry. This fact partly explains the extensive use of generic drug payment policies based on Maximum Allowable Cost ("MAC") rather than published prices by both private and public payers.

92. *Dr. Duggan inappropriately assumes AWP and WAC relationship*: One implication of these observations is that a significant fraction of what is identified as 'differences' in Plaintiff's calculations merely captures the economically uninformative difference between two widely available published benchmark values. In fact, examination of Dey's AWP and WAC in comparison with Plaintiffs' calculation of average AC reveals that over 86% of the 'AWP-spread' on Dey's drugs identified in the complaint is attributable to the published differences between AWP and WAC. For individual NDCs difference between AWP and WAC accounted for 77% to 97% of the 'AWP-spread'.

Expert Report of Professor W. David Bradford, Ph.D.

# D. Medicaid program

93.    _Goals of this section_: In this section, I will review the Medicaid program and its key provisions such as the "equal access" requirement. I will also highlight aspects of the Plaintiff expert reports that do not adequately consider these key provisions. I will explain that as a result of misrepresentation of the actual policy process for Medicaid, Plaintiff expert analyses are incomplete and flawed. Ultimately, Medicaid payments for Dey drugs are a result of state policy decisions that are dominated by political influences in each state and are not a result of the alleged conduct of Dey. I will review this process in detail for two states – Kentucky and Arkansas, and briefly demonstrate that similar processes were at work in others. Finally, I will review the variation in Medicaid drug payment rates across all states and show that many states were able to achieve low drug payment rates. Since states observed payment policies of each other, any payments above the level sustained by low-paying states cannot causally be linked to the actions of the manufacturers.

## D.1. Medicaid background and "equal access"

94.    _Origins of Medicaid_: The Medicaid program was created in 1965 as part of the Social Security Act and is designed to finance health services primarily for the low income, aged or disabled individuals.[76] Each state operates its Medicaid program separately under the oversight of the federal government. The federal government establishes certain minimum requirements regarding eligibility of individuals, services covered, and payments to providers that each individual state Medicaid plan must meet.[77] These requirements are communicated to the states via _State Medicaid Manuals_.[78] Within the broad federal requirements states have considerable flexibility in designing their state Medicaid plans.[79]

95.    _Source of Medicaid funding_: The Medicaid program is jointly funded by states and the federal government. The federal government pays for a share of each state's Medicaid program expenditures

---

[76]   U.S. Health and Human Services, Centers for Medicare and Medicaid Services. "Medicaid Program Technical Summary." www.cms.hhs.gov/MedicaidGenInfo/03_TechnicalSummary.asp.

[77]   U.S. Government Accountability Office. Report to the Committee on Finance, U.S. Senate, "Medicaid Financing: Federal Oversight Initiative is Consistent with Medicaid Payment Principles but Needs Greater Transparency," March 2007, 8–9.

[78]   U.S. Government Accountability Office. Report to the Committee on Finance, U.S. Senate, "Medicaid Financing: Federal Oversight Initiative is Consistent with Medicaid Payment Principles but Needs Greater Transparency," March 2007.

[79]   U.S. Government Accountability Office. "Spending Pressures Drive States Toward Program Reinvention," April 1995, 2.

Expert Report of Professor W. David Bradford, Ph.D.

which ranges from 50% to 83%.[80] The exact federal share for each state is determined by the Federal Medical Assistance Percentage (FMAP) by comparing the states' per capita income to the national average. The federal government pays a higher share of Medicaid costs in states with lower per capita incomes. Plaintiffs in this matter are seeking damages, if any, on behalf of the federal government for its share of Medicaid expenditures on subject drugs.[81]

96.    *Scope of Medicaid coverage*: Medicaid programs pay for a range of covered health services to eligible beneficiaries through participating providers. According to the federal regulations, state Medicaid programs are not required to provide prescription drug benefits. However, all state Medicaid programs cover prescription drugs that are generally provided by pharmacies. Traditionally, Medicaid has reimbursed the providers of the covered services to the eligible beneficiaries on a fee-for-service ("FFS") basis.[82] Increasingly, many state Medicaid programs are choosing to provide services through managed care programs.[83] It is my understanding that only the prescription drug benefits provided according to FFS are at issue in this matter.

97.    *Nomenclature*: The Center for Medicaid and Medicare Services ("CMS"), part of the Department of Health and Human Services ("HHS"), is the federal agency that oversees all the state Medicaid programs. CMS was formerly known as the Health Care Financing Administration (HCFA). At the state level, each state typically has a Medicaid agency within the health department of the state government. Exact names and organizational structure of the Medicaid agency and the health department varies from state to state. For example, state Medicaid agency in California is named Medi-Cal while the counterpart in Massachusetts is known as the MassHealth.[84] Medicaid programs in Tennessee and Georgia are known as TennCare and PeachCare, respectively. For simplicity, throughout this report I will generically refer to "state Medicaid agencies" instead of using the official names of each state's Medicaid program. Further, a major expansion of Medicaid-type coverage for children and youth was implemented in 1997 and is known as the State Children's Health Insurance

---

[80]   U.S. Health and Human Services, Centers for Medicare and Medicaid Services. "Medicaid Program Technical Summary." www.cms.hhs.gov/MedicaidGenInfo/03_TechnicalSummary.asp.

[81]   United States' First Amended Complaint at 22, United States ex rel. Ven-a-Care of the Florida Keys, Inc. v. Dey, Inc., No. 05-11084-PBS (D. Mass. Sept. 29, 2008).

[82]   U.S. Health and Human Services, Centers for Medicare and Medicaid Services. "Medicaid Program Technical Summary." www.cms.hhs.gov/MedicaidGenInfo/03_TechnicalSummary.asp.

[83]   Under managed care programs, state Medicaid programs generally contract with private health organizations to have them provide all covered services to eligible beneficiaries for a fixed annual cost. Arizona has been a leader in using managed care in its Medicaid program. States like Pennsylvania and Massachusetts are also increasingly using managed care in their Medicaid programs.

[84]   Massachusetts Department of Health Care Services. "MassHealth." www.mass.gov. Also see California Department of Health Care Services. "Medi-Cal." www.dhcs.ca.gov/services/medi-cal/Pages/default.aspx.

---

Expert Report of Professor W. David Bradford, Ph.D.

Program (SCHIP). Some states have managed this program by folding it into their Medicaid programs; others have established separate authorities. In this report, I will not distinguish between Medicaid and SCHIP. I will assume that any payments made for subject drugs through SCHIP are part of the respective state's Medicaid program.

98.    _Terms associated with pharmacy payment rules in Medicaid_: Each state Medicaid program must be approved by the CMS annually. Furthermore, any change to the state Medicaid program must be submitted to the CMS for review and approval using a mechanism known as a State Plan Amendment ("SPA").[85] Each state Medicaid program must also detail the rate and methods for calculating drug reimbursements to providers.[86] Exact drug reimbursement methodology differs from state to state and has also changed within states over time. The basic structure of the aggregate drug reimbursement methodology was set by HCFA to be the lower of:[87]

- Maximum Allowable Cost ("MAC"), plus a reasonable dispensing fee

- Estimated Acquisition Cost ("EAC"), plus a reasonable dispensing fee

- Usual and customary ("U&C") charges of the provider

99.    _Maximum Allowable Cost_: The first of the three price benchmarks established by HCFA, has evolved over time to include two components. Since 1987, CMS has established a federal maximum allowable cost for selected multi-source drugs that is known as the Federal Upper Limit ("FUL"). Additionally, many states have established state MACs that are usually lower than the FUL and may cover more multi-source drugs than the FUL. State MACs are set independently by each state. I will discuss the selected state MAC programs and the FUL program in Section D.4.

100.    _Usual and Customary Charges and "most favored nation" clauses_: The third reimbursement benchmark, U&C, refers to the amount billed by the provider to Medicaid. State Medicaid programs often have specific requirements related to what pharmacies can submit, which vary from state to state. Reimbursements are made at the U&C level if it is lower than the other two benchmarks. More recently some state Medicaid agencies have augmented their U&C definition to include a Most

---

[85]    U.S. Government Accountability Office. Report to the Committee on Finance, U.S. Senate. "Medicaid Financing: Federal Oversight Initiative is Consistent with Medicaid Payment Principles but NeedsGreaterTransparency," March 2007

[86]    U.S. Government Accountability Office. Report to the Committee on Finance, U.S. Senate. "Medicaid Financing: Federal Oversight Initiative is Consistent with Medicaid Payment Principles but NeedsGreaterTransparency," March 2007

[87]    State Plans for Medical Assistance, 42 C.F.R. § 1396a, (a)(30)(A)

Expert Report of Professor W. David Bradford, Ph.D.

Favored Nation ("MFN") provision.[88] These MFN clauses are designed to ensure that the state Medicaid agencies pay the lowest prices available for the drug through that provider. For example, in 1995, MassHealth adopted the definition of U&C as follows:

> The lowest price charged or accepted as payment for a given volume of drugs (legend or non-legend) by an eligible pharmacy provider to any purchaser or reimburser. If a provider can demonstrate to the appropriate governmental agency that a particular contract represents less than 1% of its total prescription revenue, the agency may eliminate that contract from consideration in determining the lowest price.[89]

101.    California, Louisiana and Alaska have also adopted similar MFN provisions in their U&C definitions.[90] Regardless of how exactly each state Medicaid agency defines U&C, drug manufacturers have no control over this charge.

102.    *Estimated Acquisition Cost*: CMS regulations broadly defines EAC as the price "generally and currently paid by providers … as determined by the program agency".[91] Thus CMS has left it up to the states to determine the precise methodology or benchmark to use for defining EAC. Most states have chosen to base their EAC on benchmarks published in nationally-available compendia (such as FDB) where available. Most states have defined EAC as a certain percentage discount off AWP, i.e. AWP – x%. Some states have chosen to define EAC as a certain percent over WAC, i.e. WAC + y%. Massachusetts, for example, began using WAC as early as 1989; by 2005 several other states were primarily using WAC as a benchmark to set the EAC. In addition, over time many states have incorporated both AWP and WAC into their payment formulae by defining EAC as the lower of (AWP – x%) or (WAC + y%).

103.    *Significant variation in EAC methods chosen by states*: There is significant variation in the choices made by different state Medicaid agencies in setting their EAC. I will discuss these variations in more detail in Section D.4. Here, I simply note that CMS leaves it up to the states to determine the precise level of EAC, and states have historically made different choices. In my opinion, these varying choices made by the state Medicaid agencies reflect the flexibility available to them as intended by the CMS and the political pressures that are unique to each state. This flexibility is especially pertinent when considering the access requirement that is part of the federal regulations.

---

[88]   The term "most favored nation" (MNF) has its origin in trade agreements between countries when the countries agree that each would automatically get the best trade terms offered to any other country.

[89]   MA012291.

[90]   For Georgia, see National Pharmaceutical Council, Pharmaceutical Benefits under State Pharmaceutical Assistance Programs, Reston, VA, State profiles for Georgia, 2002–2007. For Alaska, see Deposition of David Campana, State of Alaska Medicaid pharmacy program manager, Aug. 19, 2008, at 387–88. For Massachusetts, see MA012291.

[91]   72 Fed. Reg. 39,239 (July 17, 2007)

Expert Report of Professor W. David Bradford, Ph.D.

## D.1.1. Equal access requirement

104.  *Regulatory equal access requirement*: State Medicaid agency personnel attempt to balance two competing goals when making policy decisions: 1) achieve sufficient access to quality health care for the enrollees, and 2) administer the program within the budget constraints imposed by the state legislature.[92] As a practical matter, this means setting payments to providers that are low enough to be within budget, but high enough to induce the providers to participate. This latter consideration is succinctly expressed in Title 42 of the Code of Federal Regulations, which states: "The agency's payments must be sufficient to enlist enough providers so that services under the plan are available to recipients at least to the extent that those services are available to the general population."[93]

105.  *Medicaid largely uses private pharmacies, which must earn some profit*: In order to provide prescription drug coverage, which is optional for participation in Medicaid, all states have elected to use existing private pharmacies as a distribution network. This is an efficient choice as state Medicaid authorities would otherwise be required to set up their own distribution networks at far greater expense. However, in order for privately operated pharmacies to have an incentive to participate in its distribution network, Medicaid must provide payments sufficient to make such participation economically viable. Dr. Schondelmeyer describes this in his report analyzing a recent proposal to reduce Medicaid payments to pharmacies by 10% in California:

> If the total pharmacy payment does not cover the breakeven cost plus a reasonable net profit, a pharmacy may refuse to fill prescription to avoid sustaining a financial loss. The California statute mandating ten percent reduction in fee-for-service prescription payments will in many cases result in payments to pharmacies that are substantially below the breakeven cost and for may prescriptions the payment will not even cover the drug ingredient cost(see discussion below). The decision not to fill prescriptions at a loss (i.e., those prescriptions payments that do not cover breakeven cost plus a reasonable return on investment) would be an expected and prudent business decision by a pharmacy.[94]

106.  *State Medicaid agencies usually set one payment rule for all pharmacies*: State Medicaid pharmacy plans are standardized take-it or leave-it type contracts that afford no scope for negotiation or customization at the level of the individual pharmacy. Medicaid pharmacy plans will usually establish a single payment formula to meet the needs of all pharmacies, including the highest cost pharmacies,

---

[92]  Deposition of Mike Robinson, former Kentucky Medicaid Commissioner, Feb. 7, 2008, at 108. Also see Deposition of Suzette Bridges, Arkansas Medicaid Official, Dec. 10–11, at 307–308, 464–65 and Deposition of Dr. Paul Jeffrey, Director of Pharmacy at MassHealth, June 14, 2007, at 50.

[93]  Drugs: Aggregate upper limits of payment 42 C.F.R. § 447.331 (b) (1987)

[94]  Schondelmeyer, Stephen "Impact of the 10 Percent Fee-for-Service Payment Reductions on Medi-Cal Beneficiaries and Pharmacies," June 3, 2008, p. 17

Expert Report of Professor W. David Bradford, Ph.D.

in order to ensure that access requirements are met. In contrast, most private insurance companies individually negotiate contracts with pharmacies or chains in order to take advantage of the potential cost savings.

107. *Equal access rule implies the marginal pharmacy is the focus of policy*: The obligation that state Medicaid agencies have to ensure adequate provider participation with a single payment formula has implications for the drug payment rules. One implication is that payments cannot be set based upon the average (or median) cost structure for state pharmacies. While this may sound counter-intuitive, note that if payments are set to generate a normal profit at the median level of pharmacy costs this means that by definition that one half of the pharmacies will be receiving a return on investment below that associate with zero economic profits for their Medicaid line of business. Thus, half of the pharmacies will have positive disincentives to participate in Medicaid. Fifty percent participation by pharmacies in Medicaid would not be consistent with C.F.R. 42 447.204. As will be demonstrated in Section D.3, states have considered a 70% pharmacy participation rate unacceptably low – which means that they would consider the marginal pharmacy to be at least at the 70th percentile of cost. Consequently, when deciding upon the payment level that must be set, agency personnel will consider pharmacy costs at a higher than 50th percentile level. Thus, comparing Medicaid payment rates to the median or average private payment rates is inappropriate.

108. *Fallacy of comparing private third-party payers and Medicaid*: Because of the equal access obligation of the Medicaid program to its beneficiary population, certain potentially high cost pharmacies are more important to state Medicaid authorities than they might be to private insurance companies. For example, pharmacies in urban areas which serve a high percentage of low income households may be expensive to keep open, but could be vital to Medicaid from an access standpoint. While a private insurance company might tolerate the loss of some potential business as a result of such a pharmacy closing or exiting its network, Medicaid might not be able to tolerate such a loss in light of its requirement to provide access. Indeed, since private payers often manage health benefits administration for self-insured companies, which will often not have employees living near high-cost areas, those private payers may be completely indifferent to whether or not high cost pharmacies participate in their network.

109. *Letting high cost pharmacies exit network may cost Medicaid*: Compared to a private insurance company, Medicaid could suffer significant additional costs if it were to allow a pharmacy in an area with few alternatives to exit its network. For example, since requiring beneficiaries to travel substantial additional distance would be equivalent to imposing a high copayment, Medicaid may be

Expert Report of Professor W. David Bradford, Ph.D.

expected to cover travel costs for its beneficiary to acquire drugs, or it might need to cover additional delivery charges for more distant pharmacies. Also, if access to prescription drugs was made more difficult, patients would likely be less compliant with their prescriptions, resulting in a higher number of expensive emergency room visits and other acute care.

## D.1.2. Dr. Schondelmeyer's characterization of EAC is incomplete

110.   *Inappropriateness of equating EAC with average AC*: Dr. Schondelmeyer has cited a 1977 HHS document that states that EAC was intended to be "prices generally and currently paid by the provider."[95] Furthermore EAC "was supposed to be as close as possible to average AC." As the language makes clear EAC is not literally expected to equal average AC. In fact a proper interpretation of this definition in light of the equal access requirement discussed previously suggests that EAC could be significantly different from average AC in some instances. Further, as I will demonstrate in Section D.3 below, CMS rulings explicitly recognize that EAC need not be average AC and that EAC and the dispensing component must be considered as an inseparable whole, and it is the whole payment that is subject to an aggregate limit.

111.   *Dr. Schondelmeyer's definition of "generally and currently paid" rules out average AC as a measure of EAC:* In order to properly interpret the intended meaning of EAC one must define what is meant by the "prices generally and currently paid by the provider." Dr. Schondelmeyer has defined this phrase to mean that "any provider paid according to the payment policy should be able to procure drugs at the published payment amount".[96] In other words, before a price can be thought of as "generally and currently paid" Dr. Schondelmeyer argues that it must be a default price that every customer could demand. However, the average AC is, by definition, not such a price. The average AC is based upon the averages of all prices paid, including the discounts that different pharmacies and pharmacy chains are able to negotiate. Those discounts are not available to all customers. Thus, Dr. Schondelmeyer cannot assert that a simple average such as the average AC could represent EAC, if he holds to his own definition. Rather, it must be a price that is higher than the best discounted price, such as the WAC, since that is a price that all customers could demand to pay (even though many would not) and it is a price that for Dey many customers did pay.

---

[95]   Expert Report of Stephen W. Schondelmeyer at 31, United States ex rel. Ven-a-Care of the Florida Keys, Inc. v. Dey, Inc., No. 05-11084-PBS (D. Mass. Jan. 29, 2009).

[96]   Expert Report of Stephen W. Schondelmeyer at 34, United States ex rel. Ven-a-Care of the Florida Keys, Inc. v. Dey, Inc., No. 05-11084-PBS (D. Mass. Jan. 29, 2009).

Expert Report of Professor W. David Bradford, Ph.D.

112. *Average AC is well below acquisition cost for marginal pharmacy*: Figure 13 shows the acquisition cost of retail pharmacy providers for ipratropium bromide in 2000. The upwardly sloping curve reflects the variation in acquisition cost of providers sorted in order of their acquisition cost. In order to incentivize the marginal provider such as a 95th percentile provider to supply in the market, the payment level must be greater than or equal to the acquisition cost of that provider. It is, of course, nearly a truism that the average AC will lie substantially below the 95th percentile acquisition cost – which implies that it is nearly a truism that Medicaid agencies will not base their payments on the average AC. The relationship between the average AC and, say, the 50th percentile is further distorted, since the average AC will generally be below the median acquisition cost. This drives an even larger wedge between the average AC and the cost for the 95th percentile pharmacy. Figure 13 shows the empirical relationship between the acquisition cost of the 95th percentile provider and the average AC for ipratropium bromide in 2000.

**Figure 13: Pharmacy acquisition costs for ipratropium bromide in 2000**



Source: Wholesaler data

Expert Report of Professor W. David Bradford, Ph.D.

113.  *Marginal pharmacies need to earn at least minimal profit*: State Medicaid agencies consider additional factors besides acquisition cost of the marginal provider in setting payment rates. Like any business, the marginal provider must also earn a minimum profit margin to stay in operation. In Figure 13 above, the minimum profit margin requirement would shift the supply curve further upwards raising the payment level needed to induce marginal providers to participate in the Medicaid program.

114.  *EAC must be based on acquisition cost of marginal pharmacy*: Thus in my opinion, and by implication of Dr Schondelmeyer's own definitions, a starting place to evaluate the EAC set by different state Medicaid agencies is to consider the acquisition cost of the marginal provider. However, the drug payment rates ultimately set by different Medicaid programs are the result of policy choices that result from the interaction between various stakeholders. I will discuss this process for two states in Section D.3.

## D.1.3. Dr. Duggan does not consider or use EAC appropriately

115.  *Dr. Duggan incorrectly separates drug and dispensing components*: As I will explain in more detail below, it is a fundamental error to estimate differences in EAC and published benchmark values or list prices, since state Medicaid payment formulae involve intentional and often substantial cross-subsidization between the two components. However, the method Dr. Duggan employs to undertake his difference calculations follows this flawed methodology. Further, even assuming one can extract information from the two components individually (which I deny), Dr. Duggan mis-handles the ingredient component calculations as well. In the next several paragraphs I will explain the misuse of the ingredient component of the payment formulae; however, this discussion should not be taken as an endorsement of separating the two components for an analysis. I am considering them separately merely for expository purposes.

116.  *Dr. Duggan inappropriately replaces WAC with average AC*: As I discussed above, any simple comparison of the EAC and average AC without considering the acquisition cost of the marginal provider paints an incomplete and misleading picture. Nonetheless, Dr. Duggan has done precisely this in his difference calculations by replacing average AC in each transaction in place of the WAC. As I have already discussed, WAC is an undiscounted list price and thus does not equal average AC. Leaving that issue aside for the moment and the alleged inaccuracy of Dey's published WAC, I only point out the inherent flaws in calculating differences by using average AC.

Expert Report of Professor W. David Bradford, Ph.D.

117.   *Dr. Duggan incorrectly uses average AC:* The implications of using average AC as a proxy to set reimbursement rates can be seen in Figure 13. If the reimbursement rates or the EAC is set equal to average AC, only the providers with acquisition cost less than or equal to that level will recoup their actual ingredient cost. Even assuming the dispensing component covers actual dispensing cost (which is usually not true even on average, and certainly not true for the marginal pharmacy), the requirement that pharmacies earn at least a minimal profit means that fewer than 50% of the pharmacies would have an incentive to participate in Medicaid. Adding underpayments (on average) for dispensing components to the calculation will further exacerbate the problem. Thus, a difference calculation based on an ingredient component equal to average AC assumes state Medicaid agencies are willing to accept less than 50% pharmacy participation. This is not consistent with Medicaid agency correspondence and revealed behaviors.

118.   *Dr. Duggan dismisses marginal pharmacy calculations without explanation*: As discussed, one cannot determine the EAC needed to induce the desired coverage level by simply knowing or calculating the average AC.[97] One must necessarily estimate the acquisition cost of the marginal provider that the Medicaid agencies are trying to induce in the market to meet their desired coverage level. Such estimation can easily be done by calculating, for example, the 95th percentile acquisition cost. In fact Dr. Duggan does consider using the 95th percentile AC in his difference calculation but ultimately does not use it in the final analysis that he reports without any explanation. As discussed above, any discussion of EAC must start by considering the marginal pharmacy. Thus the AC of the marginal pharmacy such as the 95th percentile AC is a starting point for any plausible Medicaid drug payment analysis. I want to reiterate that determining the AC for the marginal pharmacy is only the starting point, and must ultimately be considered in conjunction with the dispensing payment.

119.   *Even if one accepted Dr. Duggan's EAC, differences are calculated over too many units*: As I demonstrated previously, if one naively imposed Dr. Duggan's "but-for" EAC, fewer than 50% of pharmacies would have an incentive to participate (perhaps many fewer). While each remaining pharmacy may "take up some slack" by increasing volume, it is undoubtedly the case that the end result would be that many fewer prescriptions would be filled. Dr. Duggan's calculations are based on estimating a difference between actual payments and his hypothetical (and flawed) EAC for each prescription filled; the total of his calculations is simply this difference added up across all

---

[97]   While average AC summarizes the supply curve, by itself it does not contain information on the slope and the shape of the supply curve. Thus average AC does not contain definitive information on the acquisition cost of the marginal provider. One can construct many different supply curves that produce the same average AC but have different acquisition cost for the marginal provider.

Expert Report of Professor W. David Bradford, Ph.D.

prescriptions filled. However, Dr. Duggan calculates his total differences assuming that the volume of prescriptions would have been exactly the same in his "but-for" world as in the real world. Dr. Duggan thus fails to adjust for the fact that his unit (per prescription) differences would be added up across many fewer actual units if his "but-for" world were imposed. Dr. Duggan's difference calculations ignore a basic economic principle that when the price is changed the quantity changes as well. Section F shows analyses using actual data which calculate the impact of Dr. Duggan's use of average AC on the marginal pharmacy provider. This analysis confirms that many marginal pharmacies would not be economically viable under Dr. Duggan's world using average AC. It is fundamentally flawed to calculate any differences by changing the price without considering its impact on the quantity.

## D.2. Medicaid's payments to pharmacies are evaluated all-in

### D.2.1. The provider's economic decision

120.  *Medicaid participation is "all or nothing" for pharmacies*: When a pharmacy evaluates whether or not to participate in a payment program such as Medicaid, it must review the economics of the program on an all-in basis. In other words, a pharmacy cannot choose which drugs it will dispense, or which Medicaid patients it will serve. Pharmacies may not (in most circumstances) bill the recipient for any difference between their charge and Medicaid reimbursement. Perhaps most importantly, it cannot separate the dispensing fees it receives from its drug payments. Thus it is the overall return on investment of the overall program that matters when considering whether or not a pharmacy will participate.

121.  *Return on investment is the metric used for participation decisions:* Pharmacies are generally for-profit enterprises that must invest financial capital in order to provide services. Before allocating any financial capital to a particular business line, the pharmacy must have an expectation that the return it receives on that investment will be (on a risk-adjusted basis) no lower than the return it would receive on some alternative investment. Thus, before a pharmacy will agree to participate in Medicaid, it must have an expectation that the Return on Investment (ROI) that it receives will not be lower than the ROI it would receive from some other activity such as expanding its private-pay business, or simply investing the money in some similarly risky investment. The practical implication is that a

Expert Report of Professor W. David Bradford, Ph.D.

pharmacy will not participate in Medicaid if it cannot achieve an ROI that is equivalent to other similarly risky investments.[98]

122. *Cross-subsidization between payment components is common*: One important implication of an all-in bargaining process is that there is no economic necessity that the components of payment (e.g., dispensing fees and drug payments) reflect their underlying costs. However, an important consequence of the economics in this situation is that any shortfall in one component must necessarily be made up by margins on other components. Multi-part payments where each component does not necessarily reflect underlying component costs are a very common phenomenon, and they certainly are not unique to pharmacy contracting. Anyone shopping via mail order or online has probably experienced the case of one seller offering "free" shipping while another charges separately for it. Frequently one finds that the seller with "free" shipping offers the product for a higher price and embeds the cost of shipping in its overall price. Sellers that charge separately for shipping often charge flat rates, or stepped rates that often exceed underlying costs.[99]

## D.2.2. Medicaid pharmacy payment formulae are not calibrated to reflect underlying component costs

123. *Invariant dispensing components of payment formulae indicate Medicaid does not attempt to reflect underlying costs accurately*: There is ample evidence that the negotiated payment rates built into state Medicaid plans are not intended to reflect the precise costs of dispensing and costs of acquiring drugs. Indeed, it has long been understood that dispensing fees paid by state Medicaid authorities were not sufficient to cover dispensing costs, and that additional margins were required on the drug portion of pharmacy payments in order to provide sufficient overall payment. For example, the dispensing fee component of many states' Medicaid reimbursement formulas frequently are held constant for years, or even lowered. In some of the states surveyed, such as Kentucky, Louisiana, and Wyoming, the dispensing fee was left entirely unchanged over a period of many years despite evidence of rising costs (see Figure 14). However, actual pharmacy costs generally increase over time due to rising wages and rents. If state policy makers actually expected the individual components of Medicaid reimbursement formulas to accurately reflect underlying costs, then they would have to update dispensing fees continually, certainly much more frequently than has historically occurred.

---

[98]   For comparison, a broad index of US stocks over most 20 year periods will generate around an 8% ROI per year.

[99]   It is easy to verify that actual shipping costs are tied to speed, distance, and weight, which some online retailers pass through transparently.

Expert Report of Professor W. David Bradford, Ph.D.

124.   _Early evidence demonstrates dispensing payment components are below costs_: As early as 1991, the Adams, Kreling, and Gondek nationwide study of pharmacy dispensing costs documented shortfalls in most state Medicaid programs' dispensing fee payments.[100] In the aggregate, this study found that Medicaid dispensing fees were less than 80% of the average dispensing cost.[101]

125.   _Evidence collected by State Medicaid agencies demonstrates dispensing payments are below costs_: Similarly, over a period spanning at least two decades, the accounting firm Myers and Stauffer has been contracted by various state Medicaid authorities to perform dispensing cost surveys. Figure 14 summarizes the results of these surveys. What these data show is that Myers and Stauffer has been reporting to state Medicaid authorities that their dispensing fee payments rarely cover the estimated cost of dispensing. The general pattern over time is of rising dispensing cost in every state surveyed, while fees typically fail to keep up even when they have been raised.

---

[100]   Adams, E. Kathleen, David H. Kreling and Kathleen Gondek. "State Medicaid Pharmacy Payments and Their Relation to Estimated Costs." _Health Care Financing Review_ 15, no. 3 (1994): 37.

[101]   Adams, E. Kathleen, David H. Kreling and Kathleen Gondek. "State Medicaid Pharmacy Payments and Their Relation to Estimated Costs." _Health Care Financing Review_ 15, no. 3 (1994): 37.

Expert Report of Professor W. David Bradford, Ph.D.

**Figure 14: Myers and Stauffer dispensing cost reports**

| State | Report year | Myers and Stauffer estimated dispensing costs | | State dispensing fee |
|---|---|---|---|---|
| | | Unweighted mean | Mean weighted by Medicaid volume | |
| Alaska | 1988 | $6.71 | $6.37 | unknown |
| Arkansas | 1989 | $4.31 | $4.30 | $4.39 + (.093)EAC |
| Arkansas | 1994 | $4.80 | $4.54 | $4.51 + (.103)EAC |
| Arkansas | 1998 | $5.23 | $4.94 | $4.51 + (.103)EAC |
| Arkansas | 2001 | $6.04 | $5.52 | $5.51 |
| California | 2002 | $9.15 | $8.69 | $4.05 |
| California | 2007 | $13.93 | $12.40 | $7.25 |
| Connecticut | 1987 | $3.83 | $3.63 | $3.55 plus $0.50 for generic |
| Indiana | 2005 | $9.53 | $8.26 | $4.90 |
| Indiana | 2007 | $15.36 | $9.84 | $4.90 |
| Kansas | 1992 | $5.35 | $4.82 | $3.75-6.10 |
| Kansas | 1993 | $6.12 | $5.22 | $3.85-6.97 |
| Kansas | 1997 | $5.95 | $5.43 | $4.82 (avg.) |
| Kansas | 1999 | $7.47 | $8.10 | $4.95 (avg.) |
| Kentucky | 1998 | $5.09 | $4.75 | $4.75 |
| Kentucky | 1999 | $5.17 | $4.68 | $4.75 |
| Kentucky | 2000 (Jun.) | $5.14 | $4.68 | $4.75 |
| Kentucky | 2000 (Dec.) | $5.80 | $5.14 | $4.75 |
| Kentucky | 2001 | $5.99 | $5.56 | $4.51 |
| Kentucky | 2003 | $8.13 | $6.05 | $4.51 |
| Louisiana | 1999 | $6.45 | $5.52 | $5.77 |
| Louisiana | 2007 | $9.63 | $8.72 | $5.77 |
| Minnesota | 2006 | $12.46 | $11.34 | $3.65 |
| Nevada | 2007 | $12.46 | $10.71 | $4.76 |
| Texas | 2002 | $9.12 | $6.58 | $5.27 |
| Wyoming | 1990 | $4.99 | $4.77 | $4.70 |
| Wyoming | 1999 | $5.53 | $5.34 | $4.70 |

Source: Myers and Stauffer, State reimbursement summaries as produced by the Plaintiffs.

126. _Recent national data reinforces the Myers and Stauffer findings_: The accounting firm Grant Thornton recently conducted a nationwide study to determine pharmacy dispensing costs by state.[102] Figure 15 shows the findings of this study along with the actual dispensing component payments made by each

---

[102] Grant Thornton LLP. "National Study to Determine the Cost of Dispensing Prescriptions in Community Retail Pharmacies," January 2007.

Expert Report of Professor W. David Bradford, Ph.D.

state Medicaid agency. This study shows that dispensing component payments were substantially lower than costs in essentially all states. Some states cover less than 30% of dispensing costs with their dispensing payment components. In the fifteen years between the Adams, et al., and the Grant Thornton studies, the percentage of dispensing costs covered by dispensing fees fell from approximately 80% to 46.5%. This pattern is broadly consistent with the Myers and Stauffer findings.

**Figure 15: Grant Thornton dispensing costs[103]**

| State | State dispensing fee ($) | Grant Thornton dispensing cost ($) | Cost covered by fee | State | State dispensing fee ($) | Grant Thornton dispensing cost ($) | Cost covered by fee |
|-------|--------------------------|-------------------------------------|---------------------|-------|--------------------------|-------------------------------------|---------------------|
| AK | 3.45-11.56 | - | N/A | MT | 2.00-4.86 | 11.43 | 17%-43% |
| AL | 5.40 | 8.76 | 62% | NC | 5.60 | 8.97 | 62% |
| AR | 5.51 | 9.20 | 60% | ND | 5.60 | - | N/A |
| CA | 7.25 | 12.25 | 59% | NE | 3.27-5.00 | 8.92 | 37%-56% |
| CO | 4.00 | 11.58 | 35% | NH | 1.75 | 9.38 | 19% |
| CT | 3.15 | 9.99 | 32% | NJ | 3.73 | 10.82 | 34% |
| DC | 4.50 | - | N/A | NM | 3.65 | 9.81 | 37% |
| DE | 3.65 | 11.01 | 33% | NV | 4.76 | 11.50 | 41% |
| FL | 4.23 | 9.60 | 44% | NY | 4.50 | 10.71 | 42% |
| GA | 4.63 | 9.41 | 49% | OH | 3.70 | 9.53 | 39% |
| HI | 4.67 | - | N/A | OK | 4.15 | 9.63 | 43% |
| IA | 4.39 | 8.90 | 49% | OR | 3.50 | 11.98 | 29% |
| ID | 4.94 | 11.61 | 43% | PA | 4.00 | 8.61 | 46% |
| IL | 4.60 | 9.88 | 47% | RI | 2.85 | 7.42 | 38% |
| IN | 4.90 | 9.58 | 51% | SC | 4.05 | 8.67 | 47% |
| KS | 3.40 | 10.16 | 33% | SD | 4.75 | 9.93 | 48% |
| KY | 5.00 | 9.56 | 52% | TN | 3.00 | - | N/A |
| LA | 5.77 | 8.81 | 65% | TX | 5.14 | 9.84 | 52% |
| MA | 3.00 | 9.06 | 33% | UT | 3.90 | 12.27 | 32% |
| MD | 3.69-7.25 | 9.33 | 40%-78% | VA | 4.00 | 8.32 | 48% |
| ME | 3.35 | - | N/A | VT | 4.25 | 9.67 | 44% |
| MI | 2.50 | 10.37 | 24% | WA | 4.24-5.25 | 11.54 | 37%-45% |
| MN | 3.65 | 10.09 | 36% | WI | 4.88 | 8.96 | 54% |
| MO | 4.84-9.66 | 8.94 | 54%-108% | WV | 5.30 | 9.61 | 55% |
| MS | 4.91 | 9.31 | 53% | WY | 5.00 | 11.64 | 43% |

Source: Myers and Stauffer, State reimbursement summaries as produced by the Plaintiffs and Grant Thornton LLP, "National Study to Determine the Cost of Dispensing Prescription in Community Retail Pharmacies".

---

[103]  Dispensing fee reported are for generic drugs.

---

Expert Report of Professor W. David Bradford, Ph.D.

127. _States knew their ingredient cost payment did not actually approximate average acquisition costs:_
Myers and Stauffer also frequently surveyed pharmacy drug acquisition costs for state Medicaid authorities, and offered detailed estimates of pharmacy acquisition costs. They generally express those acquisition costs as a percent discount off of AWP, in a nod to industry convention. Figure 16, shows the measured average acquisition cost findings of these studies for a variety of states. The overall acquisition cost estimates, some of which date from early in the period at issue, universally reveal average discounts off of AWP that noticeably exceed those that appear in the states' own Medicaid drug payment plans. The studies reveal even more striking information on generic drug discounts. As early as 1989, Arkansas learned that generic drugs cost on average less than 40% of AWP. By the early 2000's, states around the country learned that generic drugs cost on average less than 20% of AWP. This pattern is consistent with the general trend toward increased competition in the generic drug industry. Given that the states Medicaid agencies contracted for the studies, and cite then in state plan amendments, it is not credible that the state believed that their ingredient payment component actually approximated average acquisition costs.

**Figure 16: Myers and Stauffer acquisition costs**

| State | Report year | Average acquisition cost as % of AWP | | |
|---|---|---|---|---|
| | | All drugs | Non-MAC/FUL | MAC/FUL |
| Arkansas | 1989 | 86.2 | 82.12 | 39.63 |
| Arkansas | 2001 | 82.2 | 54[†] | 17.8 |
| California | 2002 | | 56.6[†] | 12.7 |
| California | 2007 | | 63.3[†] | 20.6 |
| Connecticut | 1987 | 89.0 | | |
| Idaho | 1998 | | 83.5 | 65 |
| Kansas | 1999 | 83* | | |
| Kentucky | 1998 | | 80.8 | 27.4 |
| Kentucky | 1999 | 82.9* | 69.5 | 37.6 |
| Kentucky | 2000 (Dec.) | 81.9* | 61.3 | 21.4 |
| Kentucky | 2000 (Jun.) | 82.0* | 63.4 | 22.9 |
| Kentucky | 2001 | 81.7* | 43.7 | 16 |
| Kentucky | 2003 | 79.4* | 55.3 | 15.2 |
| Louisiana | 1999 | 83* | 67.4 | 30.4 |
| Wyoming | 1990 | 84.3 | | |
| Wyoming | 1999 | 82.8* | | 26.4 |

* Brand only        † Report specifies non-MAC multi-source
Source: Myers and Stauffer, State reimbursement summaries as produced by the Plaintiffs

Contains highly confidential materials—subject to protective order

Expert Report of Professor W. David Bradford, Ph.D.

128. *CMS understood shortfall in dispensing cost payments are offset by ingredient cost payments*: What these studies make clear is that since there is a shortfall in the typical state's Medicaid dispensing payment component, it is necessary that ingredient payment components include an offsetting allowance. It is worth noting that the CMS authority generally was given copies of the Myers and Stauffer reports at the time that the states submitted their SPAs. CMS regularly approved these state plans despite their obvious disconnect from underlying costs.[104]

129. *Medicaid advisors assert that dispensing and ingredient components cannot be separated*: The interdependency between dispensing component payments and ingredient component payments is well recognized by various authorities. For example, the Myers and Stauffer dispensing and ingredient cost studies are often completed in tandem, and their recommendations caution that these two aspects of Medicaid payment be considered jointly. In a 2002 report to California Myers and Stauffer wrote:

> …the acquisition cost study findings indicate that for a "typical" prescription, a pharmacy's margin on ingredient reimbursement is approximately $10. These margins on ingredient cost must be considered in tandem with an analysis of pharmacy dispensing cost and dispensing fee reimbursement in order to fully evaluate the issue of the adequacy of Medi-Cal pharmacy reimbursement. In our separate report, Myers and Stauffer has incorporated the findings from this acquisition cost study into a more comprehensive analysis of Medi-Cal pharmacy reimbursement.[105]

A similar message was conveyed to South Carolina Medicaid by C.E. Reeder, a professor of pharmacy economics:

> It has been the case for a number of years that private and public drug cost reimbursement mechanisms have provided some "cushion" in purchasing discounts to offset less than adequate dispensing fees. If a higher discount rate is implemented, a corresponding increase in dispensing fee will be necessary to insure viability and sustainability of Medicaid providers in the marketplace and adequate access to pharmaceutical services for Medicaid recipients.[106]

130. *Medicaid personnel recognize that cross-subsidization occurs:* State Medicaid employees recognize that aggregate payments are a key determinant in a pharmacy's decision to participate in its

---

[104] CMS and the states also had access to a variety of other similar reports such as those by OIG in 1984, 1989, 1997, 2001, and 2002.

[105] Myers and Stauffer. "A Survey of Acquisition Costs of Pharmaceuticals in the State of California," June 2002, 5.

[106] Reeder, C. E. "Estimation of Average Dispensing Cost and Drug Acquisition Cost for the South Carolina Medicaid Drug Program: Final Report." Submitted to South Carolina Department of Health and Human Services, 399655, 2003, 38. SCDHHSS-Abbott-005315.

---

Expert Report of Professor W. David Bradford, Ph.D.

program.[107] The entities overseeing and advising state Medicaid programs also recognize the need to evaluate ingredient cost payments in conjunction with dispensing fees when assessing the adequacy of payments to pharmacies.[108] In addition, pharmacies recognized the interdependency between ingredient cost payments and dispensing fees, and evaluated the adequacy of the payments they received from Medicaid on an aggregate basis.[109]

131. Precisely because ingredient and dispensing costs must be considered together, some states have created minimum payment thresholds for pharmacy providers. When states instituted MAC amounts, they were careful that the unit reimbursement was high enough that total reimbursement did not fall below a certain threshold. For example, since June 1, 2005, the Illinois DHFS has had a policy that the total reimbursement for a generic prescription drug will not fall below $9.00:

> DHFS's current dispensing fee for generic drugs is $4.60, meaning that if the average prescription for a generic drug is 30 units (a typical once a day drug), DHFS will not set a per unit MAC for the ingredient cost for that drug that results in a ingredient cost reimbursement of less than $4.40 ($9.00-$4.60). In this example, if the average prescription for a particular generic drug is 30 units (a typical one a day drug), the per unit MAC for the ingredient cost of that drug will not be lower than $0.146 ($4.40/30 units).[110]

132. _Dr. Schondelmeyer acknowledges the importance of cross-subsidization_: Plaintiffs' expert, Dr. Schondelmeyer also recognizes the widespread shortfall in Medicaid dispensing fees and its economic implications for drug payments. He and his co-author Dr. Wrobel estimated in a 2004 report for CMS that the inflation-adjusted value of Medicaid dispensing fee payments to pharmacies actually fell by over 20% from 1992 to 2002. As Dr. Schondelmeyer quotes one of his study panel members: "If it weren't for the AWP spread, the pharmacies would be out of business."[111] In his expert report for this matter, Dr. Schondelmeyer quotes from a subsequent report he co-authored in 2005:

---

[107] Deposition of Dr. Paul Jeffrey, Director of Pharmacy at MassHealth, June 14, 2007, at 139.

[108] Helms, Robert B., Assistant Secretary for Planning and Evaluation, U.S. Department of Health and Human Services. "The Complicated History of Medicaid Regulations on Drug Reimbursement," September 28,1987. See HHC902 1083–1084. See also U.S. Department of Health and Human Services, Office of Inspector General. "Review of the Relationship Between Medicare Part D Reimbursement and Pharmacies' Drug Acquisition Costs," January 2008, 10.

[109] Deposition of Mike Robinson, former Kentucky Medicaid Commissioner, Feb. 7, 2008, at 108. Also see Deposition of Suzette Bridges, Arkansas Medicaid Official, Dec.10–11, at 307–308, 464–65 and Deposition of Dr. Paul Jeffrey, Director of Pharmacy at MassHealth, June 14, 2007, at 50.

[110] This example also illustrates one way that state MAC payments could be entirely divorced from published prices. Deposition of James Parker, Deputy Administrator of Medical Programs, Illinois Department ofHealthcare and Family Services Division of Medical Programs, Nov. 18, 2008, Exhibit Parker 010.

[111] Schondelmeyer, Steven W. and Marian V. Wrobel. "Medicaid and Medicare Drug Pricing: Strategy to Determine Market Prices," Abt Associates, Inc., August 30, 2004, 7.

---

Expert Report of Professor W. David Bradford, Ph.D.

> Stakeholders also agreed that, if the public sector did seek to improve the accuracy of its estimates of acquisition costs for use in Medicaid payment, then it would be absolutely essential to improve the accuracy of estimates of the cost of dispensing. Although many stakeholders acknowledged that current estimates of acquisition costs and the resulting drug product payment levels might be inflated, they also believed that current estimates of dispensing costs and Medicaid dispensing fees were too low. The combined effect of the two components of estimated cost (the drug product cost and the dispensing fee) is what ultimately determines payment and the financial performance of the retail pharmacy.[112]

133. Elsewhere Dr. Schondelmeyer has stated, "Therefore, reform of the drug product cost component of the payment system must be considered in association with reform of other components of the payment system."[113]

134. _Recent proposed changes to the FUL have not been implemented_: This assertion has been put to the test more recently as CMS has sought to implement the 2005 Deficit Reduction Act of 2005 ("DRA") final rules. These rules would set the federal upper limit ("FUL") payment for many generic drugs at 250% of the minimum AMP for competing generics. The OIG and the GAO have both issued reports documenting the significant decrease in drug payments to pharmacies that would result from this rule, and expressed concerns about the adequacy of these payments.[114] Dr. Schondelmeyer submitted an expert report on behalf of two major national pharmacy associations in their successful bid to block the implementation of the DRA rule. Dr. Schondelmeyer expressed the opinion that as many as 20% of pharmacies would go out of business if Medicaid implemented the final DRA rule.[115] In anticipation of this significant drop in drug payments, many states demonstrated the importance of the implicit dispensing fee component in their current drug payments by rushing to raise their explicit dispensing fees significantly. The CBO estimated that increased dispensing fees (to preserve the widespread participation of pharmacies in Medicaid) would mitigate the effects of the switch to the AMP.[116]

---

[112] Abt Associates, Inc. "Case Study of the Texas Vendor Drug Program's Approach to Estimating Drug Acquisition Costs: Final Report," September 26, 2005, 67.

[113] Schondelmeyer, Steven W. and Marian V. Wrobel. "Medicaid and Medicare Drug Pricing: Strategy to Determine Market Prices," Abt Associates, Inc., August 30, 2004, 7.

[114] U.S. Government Accountability Office. "Medicaid Outpatient Prescription Drugs: Estimated 2007 Federal Upper Limits for Reimbursement Compared with Retail Pharmacy Acquisition Costs," December 22, 2006, 4. Also see U.S. Congressional Budget Office. "Cost Estimate: S. 1932 Deficit Reduction Act of 2005," January 27, 2006, 37.

[115] Expert Report of Stephen W. Schondelmeyer at 8, United States ex rel. Ven-a-Care of the Florida Keys, Inc. v. Dey, Inc., No. 07-02017 (U.S.D.C. Nov. 13, 2007).

[116] Congressional Budget Office, "Cost Estimate: S. 1932, Deficit Reduction Act of 2005," January 27, 2006.

Expert Report of Professor W. David Bradford, Ph.D.

135.    _Significant portion of "difference" estimates are due to failure to account for cross-subsidy_: In summary, the margins that Medicaid programs around the country allow in their drug payments contain a significant cross-subsidy to cover their under payment for dispensing services. This additional margin is the economic equivalent of an implicit dispensing component. Plaintiffs' 'difference' calculations make no attempt to account for the implicit dispensing component present in the drug margins, and assume, incorrectly, that all margins provided by Medicaid on the drug portion of Medicaid pharmacy payments are the result of the alleged fraud. By comparing estimates of dispensing cost based on states-by-state studies with Medicaid dispensing payment components I have estimated that the average state dispensing component underpayment ranges from 19% to 65% in 2006. The underpayment is, of course, much higher for the marginal pharmacies which are the implicit targets of Medicaid payment policies. Accounting for this underpayment, I find that more than half of the Plaintiffs' 'difference' calculation is attributable to the implicit dispensing payment component of ingredient component margins.[117]

## D.3. Historical experiences from states

136.    _I will review two states to illustrate how payment rates are set:_ To evaluate the central allegations in this matter, it is necessary that we be familiar with how state Medicaid agencies have arrived at their drug payment formulae. Given that there are 56 separate Medicaid programs in the US and its territories, carefully studying all of them is not feasible. However, much can be learned by examining the experiences and history of a few states, and then assessing the degree to which these experiences were representative or held up by other states as exemplars. Two states in particular will be useful for this exercise: Arkansas and Kentucky.

137.    _Many influences are at work in payment policy setting:_ My review of these two Medicaid programs shows that payment policy is the result of a combination of economic, political and budgetary influences that result in a final rule which set Medicaid pharmacy payment at the levels states intended. I also find that the final drug payment rates were set by these two Medicaid agencies with the full knowledge of underlying drug costs. With similar underlying drug costs, these two states ended up with two different payment outcomes. The payment outcome alone does not necessarily reveal the underlying knowledge.

---

[117] This shortfall is calculated only for the 14 states that Dr. Duggan analyzed with claims data.

Expert Report of Professor W. David Bradford, Ph.D.

### D.3.1. Arkansas and Kentucky are well suited for review

138.   _Arkansas and Kentucky have four advantages for historical examination_: I will rely upon the history of Medicaid pharmaceutical rate setting in the Arkansas and Kentucky Medicaid programs to illuminate the range of experiences generally in the US since the mid-1990s. These two state Medicaid programs are well suited for review for several reasons as discussed below.

139.   _Both have long history of using Myers and Stauffer cost surveys:_ One of the central allegations in this matter is that but-for the AWP/WAC prices that were caused to be published by the manufacturers, the states would have known about the true underlying costs of the drugs. Often, however, states had information on actual acquisition and dispensing costs when they made their payment decisions. More than a dozen states contracted with the accounting firm of Myers and Stauffer to conduct surveys of acquisition and dispensing costs for pharmacies.[118] Arkansas and Kentucky contracted with Myers and Stauffer for many years. In Kentucky these studies were mandated by the legislature specifically to help states set the payment formula.[119] State Medicaid policy makers, in conjunction with the CMS cited and deliberately used the Myers and Stauffer data as part of the rate setting process.

140.   _Both have good records of the discussions between state Medicaid and CMS personnel:_ Documents available in this matter have preserved conversations between the Arkansas and Kentucky Medicaid agencies and HCFA / CMS. These conversations consist both of formal documents – largely in the form of SPAs and CMS responses – and in informal discussions – usually e-mails or memos – between personnel at the respective agencies. These conversations permit us to look inside the "black box" of policy making as agency personnel struggle to exercise the flexibility they have in setting policy. We will be able to see CMS guidance, using frank and unambiguous language. Using these documents, we will not be constrained to only inferring what beliefs are revealed (or consistent with) in policy making behavior, but rather will actually see beliefs and state of mind clearly expressed.

141.   _Both have informative records of the political dimensions of their decisions:_ Medicaid pharmacy payment decisions are made in a political framework, with various stakeholders influencing the outcome. The documentary evidence for Arkansas and Kentucky preserve records of this process. My review shows that the payment setting decisions for Arkansas, Kentucky, and other states were very much political decisions, and products of specific political influences.

---

[118]   Myers and Stauffer has submitted reports to Alaska, Arkansas, California, Connecticut, Idaho, Indiana, Kansas, Kentucky, Louisiana, Minnesota, Nevada, Oklahoma, Texas and Wyoming.

[119]   Commonwealth of Kentucky, S.B. 351, Chapter 561, Section 7, KRS 205.561, April 13, 1998.

Expert Report of Professor W. David Bradford, Ph.D.

142.  *Legal proceedings also document the process:* The 1991 findings of the HCFA Appellate Division with respect to a dispute with Arkansas over Medicaid pharmacy spending provides insight into HCFA's position with respect to ingredient and dispensing cost components of payment.

## D.3.2. Review of Arkansas Medicaid rate setting process

143.  *HCFA Appellate Division document provides background for Arkansas:* There is a particularly well-documented case history for Medicaid pharmacy payment decision-making in Arkansas from the late 1980s to early 1990s because of a dispute between the state agency and HCFA at the time over the state payment formula. This dispute resulted in Arkansas appealing HCFA's decision to disallow some expenditures. The history of the dispute and its central issues are preserved in the report of the Department of Health and Human Services Departmental Appeals Board, Appellate Division findings.[120] In this section I will draw heavily from this report to illustrate what Arkansas and HCFA knew about drug pricing in the state, and how they used that information.

### D.3.2.1. Information available to Arkansas about AWP

144.  *OIG report informs Arkansas about AWP:* Arkansas used an undiscounted AWP plus a dispensing fee as the basis for its pharmacy payment until at least the end of 1987. The HCFA Appellate Division notes, however, that it was well-understood that AWP was not representative of a wholesale (or any other) price. HCFA attempted to dissuade states from relying on undiscounted AWP in the mid-1970s, and in the preamble to its regulatory instructions from that period it "specifically reject[ed] the suggested use of the AWP, on the basis that it frequently produced an inflated figure".[121] HCFA further argued that in distributing the Office of Inspector General report on pharmaceutical prices to states in 1983 it was putting them on notice at that point not to rely on undiscounted AWP. As part of the dispute with Arkansas over these disallowed payments:

> HCFA said that the State should have known it could not pay AWP, in light of the OIG report (which state officials acknowledged having seen) and of the statements about the AWP HCFA had made. HCFA also cited the statement in the April 12, 1988 letter from HCFA that 'use of an unmodified AWP would make the amendment violate section 1902(a) (30) of the Act and implementing regulations at 42 C.F.R. 447.200.' HCFA Ex. H. HCFA argued that, although none of the various drug price surveys and pricing data were conclusive for Arkansas, 'they collectively show a

---

[120]  HHC024-0609–621.
[121]  HHC024-0611.

Expert Report of Professor W. David Bradford, Ph.D.

persuasive pattern that AWP is not the actual selling price of drugs anywhere such surveys were conducted.[122]

The Appellate Division report goes on to note that Arkansas Medicaid officials acknowledge the information in the OIG report, and signal that it became part of their payment policy decision-making process in subsequent state plan amendment proposals.[123]

145. *In 1988 Arkansas informs HCFA that acquisition cost averages AWP-13%:* In 1988 the state informed HCFA that it knew "that 'AWP is an artificially high basis for reimbursement.'[124] Arkansas further indicated that the state was entering into a bidding process for a pricing survey to determine the actual acquisition price and to modify the reimbursement structure accordingly."[125] After some administrative delays, Arkansas contracted with the accounting firm of Myers and Stauffer to assess the actual average ingredient cost and dispensing costs in the states. The report from Myers and Stauffer was delivered in June of 1989.[126] In a letter to HCFA dated May 1, 1990, the Deputy Director of Arkansas Medicaid indicated that the average acquisition cost at that time for pharmacies in Arkansas was approximately AWP – 13% for all drugs and AWP – 60% for generic drugs with MAC.[127]

### D.3.2.2. Arkansas' use of the cost information

146. *Arkansas expressed concern that average AC did not reflect marginal pharmacies' cost*: The decision process which follows is important. Arkansas officials did not simply take the AWP-13% average reported in the Myers and Stauffer report as their policy recommendation. Rather, there appears to have been a significant interaction with the provider community that resulted in two amendments to that base number. First, the state determined that at least 30% of the state pharmacies were paying more than AWP-13% as the ingredient cost, and that those pharmacies would drop out of participation in the Medicaid program if the AWP-13% rule were adopted.[128] Arkansas Medicaid officials believed that a 30% attrition rate was too high and that access for its enrollees would be

---

[122] HHC024-0615.

[123] HHC024-0617.

[124] HHC024-0612.

[125] HHC024-0612.

[126] Myers and Stauffer , Chartered Certified Public Accountants. "A Survey of Costs of Dispensing Prescriptions And Estimated Acquisition Cost in the State of Arkansas," June 1989.

[127] HHD283-0001.

[128] HHC024-0614.

---

Expert Report of Professor W. David Bradford, Ph.D.

restricted to an unacceptable degree.[129] This demonstrates that in the early 1990s the "marginal" pharmacy for Arkansas Medicaid was at least at the 70th percentile of cost – not the mean or median cost pharmacy.

147.     _HCFA recognizes that ingredient and dispensing cost components are inseparable_: The Appellate Division ultimately ruled that HCFA erred in considering the ingredient component payment changes in isolation from the dispensing component changes. When requesting a reduction in the ingredient component payment, the state also requested a simultaneous increase in the dispensing component of payment to $4.16 + .093*EAC. This, Arkansas asserted, must be done in conjunction with the changing ingredient component, since it was the aggregate payment that mattered for the pharmacies, not the individual components. In essence, argued Arkansas, the two components cannot be considered in isolation. At this point the HCFA Appellate Division determined that HCFA's position was in error because "HCFA applied the AWP minus 10.5%, without considering the other changes in the reimbursement method HCFA agreed to."[130] The Appellate Division further noted that:

> [I]t is not clear why HCFA applied part of the new methodology, but not all of it. The regulations on which HCFA relied for the disallowance establish aggregate upper limits on what the State can pay. The regulations use as that aggregate upper limit [_emphasis in original_] the lower of EAC 'plus reasonable dispensing fees' or usual and customary charges.[131]

Thus, it is clear that HCFA should not consider the ingredient component as separable from the dispensing component of a state's payment rule. To do so would violate not only the spirit, but the actual language of the regulation.

148.     _Dr. Duggan's difference method inappropriately separates ingredient and dispensing components_: This point highlights the flaw in Dr. Duggan's difference assessments. Essentially, Dr. Duggan's differences methodology takes exactly the approach condemned by the HCFA Appellate Division in it's ruling in the Arkansas dispute.[132] By isolating the payment component of state Medicaid policies for use in calculating his difference estimates, he ignores the inseparable linkage between the two, and directly goes against the explicit instructions that HCFA maintained in interpreting its own regulations. The results of his estimates are, therefore, meaningless.

---

[129] This confirms arguments made in section 4.B that pharmacy decisions are "all-or-nothing" and based on the rate of return on resources allocated to the Medicaid program, and with the point made in section 4.A that Medicaid officials consider the "marginal" pharmacy when setting policy.

[130] HHC024-0619.

[131] HHC024-0620.

[132] Expert Report of Mark G. Duggan at 23, United States ex rel. Ven-a-Care of the Florida Keys, Inc. v. Dey, Inc., No. 05-11084-PBS (D. Mass. Jan. 23, 2009).

Expert Report of Professor W. David Bradford, Ph.D.

### D.3.2.3. Political influences and outcome

149.   HCFA / CMS has deliberately approved Medicaid payment formulae where the ingredient component did not equal the actual acquisition cost for pharmacies: Arguments can be made that HCFA / CMS would never approve a state payment plan (amendment) where it knew the ingredient component of the payment formula resulted in a component payment higher than the average (or actual) acquisition cost. However, the Arkansas 1989 state plan amendment correspondence definitively proves the assertion that one can isolate the ingredient from dispensing components of payment is entirely false. In its letter to HCFA dated May 1, 1990, Arkansas notes that it's Myers and Stauffer survey found that average acquisition cost was AWP-13%.[133] Nonetheless, it requested a plan amendment at AWP-10.5% - citing the need to encourage adequate pharmacy participation. The discrepancy between the "true" estimates of acquisition cost and requested payment components are on the front page of the letter, separated by two lines. In a reply dated July 12, 1990, HCFA informs Arkansas that its proposed plan amendment has been approved.[134] The assertion that HCFA would never approve plans if the ingredient component were above average acquisition cost is proved false.

## D.3.3. Review of Kentucky Medicaid rate setting process

150.   *SPA are a primary source of information:* There are several sources of information that can be used to describe the history and pattern of knowledge, belief and decision-making for the Kentucky Medicaid pharmacy program. These include a set of reports from Myers and Stauffer, state plan amendment documentation, depositions from Kenneth Koch and Mike Robinson, and correspondence with CMS and the Kentucky Medicaid agency.

### D.3.3.1. Information available to Kentucky about AWP

151.   *Kentucky had early indications that undiscounted AWP was not a reflection of average ACs*: As with Arkansas, the specifics of the formula that Kentucky Medicaid has used to calculate the ingredient component for payment has changed over the past several decades – though Kentucky has stuck with an AWP-based methodology. Prior to 1985, KY Medicaid payment formula was simply the AWP for the drug dosage as listed in the FDB Blue Book plus a dispensing fee. Over the years, this approach has been modified. First, in late 1985, KY moved to a payment formula that was AWP-5% plus a dispensing fee, in response to the prompting of the Health Care Financing Administration. In late

---

[133] HHD283-0001.
[134] HHC010-0777

Expert Report of Professor W. David Bradford, Ph.D.

1990, the KY Medicaid program proposed decreasing the ingredient component to AWP-10%.[135] After opposition to this was expressed in policy meetings, the KY Medicaid program set the new payment formula at AWP-10% plus $4.75 dispensing fee (raising the latter component of the formula from the previous $3.25 level).[136]

152.   *Kentucky legislature requires regular cost surveys*: In 1998, the KY Medicaid program retained the accounting firm Myers and Stauffer to conduct surveys to assess actual ingredient costs and dispensing fees for pharmacies in the state. This was in response to a legislative mandate that such surveys be conducted regularly.[137] Subsequently, Myers and Stauffer has conducted similar surveys regularly, and submitted reports on the distribution of ingredient and dispensing costs to the state's Medicaid agency. These reports detail the difference between AWP and average ingredient costs for various classes of trade from approximately 1999 to 2003. In 2001, after receiving information generated by one of the Myers and Stauffer reports, the state reduced the dispensing fee component of its payment formula to $4.51.[138] In 2002 the formula was adjusted again to be AWP-12% plus a $3.51 dispensing fee plus a $1.00 copayment.

153.   *Kentucky Medicaid used other sources of information besides Myers and Stauffer*: The Kentucky Medicaid program has had a substantial body of evidence at its disposal for the entirety of the at-issue period with which to make payment decisions. As former Commissioner Mike Robinson testified, KY Medicaid used many sources of information in deciding on their payment formula:

> Q. With -- you mentioned the concern about harming recipients as being one of the considerations that went into the determination about the pharmaceutical reimbursement rates. Could you explain more of what that consideration meant?
>
> A. Well, to use the -- a pharmacy as an example, I mean, we have many small rural counties in -- in Kentucky. Some of those counties don't have more than one or two pharmacies that would provide, you know, access to a recipient. Therefore, if we tried to take the reimbursement too low, there's that possibility that a pharmacy would -- would either go out of business or no longer take Medicaid recipients. And that, in my opinion, would be harmful to those recipients in those communities.
>
> Q. Right. And that was -- that was a concern for the overall DMS program because you had an access requirement imposed by the federal government?

---

[135]   KYDMSPL1012218-1012220

[136]   Myers and Stauffer, "State Medicaid Summary: Kentucky." As produced by Plaintiffs.

[137]   Commonwealth of Kentucky, S.B. 351, Chapter 561, Section 7, KRS 205.561, April 13, 1998.

[138]   Myers and Stauffer. "State Reimbursement Summary: Kentucky." As produced by Plaintiffs in this matter.

Expert Report of Professor W. David Bradford, Ph.D.

A. It -- it's really -- almost every service that we provide, we have the same challenge. You know, we -- we can't make reimbursement for nursing homes so low that nursing homes go out of business or they -- they go completely private and they don't take our recipients. So, it -- it wasn't just a challenge with pharmacists as part of the provider network, but every single service that we provided had a provider network that we wanted to ensure.

Q. So -- so, DMS has to balance the considerations of efficiently providing Medicaid services and ensuring access to Medicaid services for recipients in every one of the areas that Medicaid provides, correct?

A. That's correct.

Q. And the considerations apply to the pharmacy area as well?

A. That's correct.

Q. And you were also mentioning fairness and reasonableness. And just elaborate more on what you meant by that.

A. Well, I think what I meant by that is, we -- we were confronted with a very difficult financial situation, and our approach was, was not to favor one provider network over another provider network. And the changes that we wanted to make, or we -- we did make, we thought were reasonable under the financial conditions that we found ourselves in, trying to kind of make our budget and also protecting the provider networks that were established.

Q. And in the pharmacy area, the fairness and reasonableness had to -- I mean, wasn't that basically balancing the need to reimburse pharmacists enough to incentivize them to participate in the program with the budget considerations that you were talking about before?

A. It -- it was a very fine balance in trying to accomplish both goals.

Q. Yeah. Now, how important was the [Myers and Stauffer] report, Exhibit 3, in making the decision about what reimbursement levels would be?

A. In -- in my opinion, it was just one piece of information to be considered.[139]

154.  The additional sources of information included the ingredient and dispensing cost decisions of other states (some of which did not rely on AWP for their ingredient payments), OIG reports, CBO reports, academic literature, and Kentucky-commissioned reports from Myers and Stauffer.

---

[139]  Deposition of Mike Robinson, former Kentucky Medicaid Commissioner, Feb. 7, 2008, at 106–109.

Expert Report of Professor W. David Bradford, Ph.D.

155.   _Kentucky Medicaid had information that acquisition costs were below AWP_: All of this information was sufficient for KY Medicaid to understand that AWP did not represent the actual transactions costs for retail pharmacies buying from manufactures or wholesalers. As early as 1984, the OIG published a report detailing that actual transaction prices were on average 16% below AWP (at a time when KY Medicaid was reimbursing at undiscounted AWP).[140] Even in the 1984 report, the OIG states that HCFA had been aware "for some time" that AWP did not reflect actual transactions prices, but rather was a list price from which commercial entities received discounts.[141] This evidence was apparently understood by the KY Medicaid program. Mr. Kenneth Koch states in recent testimony that with respect to AWP he:

> …always equated it to the sticker price on a car, that you don't pay the sticker price. You always pay a discount off that sticker price. And then it was a -- a -- a reference that was found in a nationally recognized -- one of two or three nationally recognized compendias that were put together. And so, AWP, for the most part, everyone was using the same AWP basis because they were all using a similar -- either a First DataBank or a Medi-Span file feed for their reference, and then discounts were made, contracts were made, around that.[142]

### D.3.3.2. Political influences and outcome

156.   _Former Medicaid Commissioner reports that the 2002 payment change required political effort_: Mike Robinson, former Kentucky Medicaid Commissioner described the process of changing the payment formula in 2002 to provide a lower ingredient component - moving from AWP-10% to AWP-12%:

> "Q. Now, after getting the report, there was no discussion, was there, of reducing the reimbursement to AWP minus 18.3 percent for brand drugs, was there?
>
> A. Let me answer the question in this way, in that many of the decisions that led up to the legislation in January of '02 were already in place and under consideration when I became commissioner. The fact that we did go from AWP minus 10 to AWP minus 12 tells me that there was some - some consideration of reducing the acquisition cost reimbursement.
>
> Q. Oh. So -- so, there was consideration of changing the reimbursement. But I guess what I'm trying to determine is: Did -- did the department consider reducing it by the magnitude of the difference between AWP and acquisition costs reflected in the Myers and Stauffer report?

---

[140]   U.S. Department of Health and Human Services, Office of the Inspector General. "Changes to the Medicaid Prescription Drug Program Could Save Millions," September 1984.

[141]   U.S. Department of Health and Human Services, Office of the Inspector General. "Changes to the Medicaid Prescription Drug Program Could Save Millions," September 1984.

[142]   Deposition of Kenneth Troy Koch, Kentucky Medicaid employee, March 5, 2008, at 150–51.

---

Contains highly confidential materials—subject to protective order

Expert Report of Professor W. David Bradford, Ph.D.

A. Not to my knowledge. And as I came on board, I don't recall a specific
conversation about that.

Q. I mean, the -- the change, as I understand it, was from AWP minus 10 percent to
AWP minus 12 percent.

A. Uh-huh.

Q. I mean, would -- would -- in your estimate, if the DMS had been proposing a -- a
reduction of AWP minus 14 percent, would that difference have made a -- caused
concern for Jan Gould and the other pharmacists in the -- in the state?

A. This is my opinion: I -- I -- I think it would have been very difficult to go beyond
the 12 percent for political reasons as a result of lobbying efforts by industry
representatives. And I only know that because of some of the occasions I had, as
commissioner, in trying to work through the -- the system, either through a regulatory
process or a legislative process, to make changes in the -- in the program.

Q. Sure. And you mentioned that there were other considerations than just the report
--

A. Right.

Q. -- that went into the decision making about pharmacy reimbursement in Kentucky.
When you say "political" -- were there considerations other than political
considerations?

A. I -- I can't speak for others, but in -- in my mind, we were looking at a -- a -- a
broad range of changes to the Medicaid program. As I indicated earlier, in the
background is this federal requirement that we protect or we make sure we have
access for our recipients. So, I think doing what is -- what is fair and reasonable was
also a consideration in the -- the grand scheme of the changes that we were making,
that this was -- you know, we didn't want to do anything to actually harm the
program or harm recipients in the process.[143]

157. *Correspondence and testimony illustrate political influences in payment setting*: The political process
for setting the final ingredient payment levels is clearly illustrated in a series of communications
between the Kentucky Medicaid agency, CMS, and providers and provider groups concerned about
pharmaceutical payment policy. For example, in 2002 the National Association of Chair Drug Stores
wrote to CMS asking it to disallow the Kentucky state plan amendment because of the proposed cuts
in ingredient payment to AWP-12%.[144] Around the same time, Mike Robinson, then the Kentucky

---

[143] Deposition of Mike Robinson, former Kentucky Medicaid Commissioner, Feb. 7, 2008, at 102–104.
[144] KY_DMS_00000000120573–574.

Expert Report of Professor W. David Bradford, Ph.D.

Medicaid Commissioner received a letter from Richard Sloane, a pharmacist in the state, arguing against the change on the basis of the burden it would place on his pharmacy.[145] Commissioner Robinson later recounted how his department received pressure regularly from the industry, which affected the outcomes of their payment decision processes:

> Q. But beyond that, in the governmental sector, you also need to be adept at navigating the waters of politics, correct?
>
> A. Correct.
>
> Q. In other words, when you're in any state government agency, you have to be very finely in tune with the various political constituencies who have a say in the functioning of your agency, correct?
>
> A. Absolutely.
>
> Q. You need to have a clear sense of what people's goals are, what their interests are, how much pressure they can bring to bear, correct?
>
> A. Correct.
>
> Q. And you have to be able to incorporate all of that into your decision making process, correct?
>
> A. Correct.[146]
>
> . . .
>
> "Q. Now, would you say, sir, that the pharmacists lobby in Kentucky over the years has been relatively strong? Relatively weak? How would you characterize their strength in political terms?
>
> A. I would categorize it as at least moderately strong.
>
> Q. And in terms of their political influence within DMS, would you say that the -- the political pressures that were acting upon you as commissioner were the same at DMS as you – as you had encountered at prior state agencies from the relevant constituencies there, or was DMS -- were the pressures at DMS a lot more pronounced?
>
> A. The pressures at DMS were much more pronounced.

---

[145] KY_DMS_00000000123045–123046.

[146] Deposition of Mike Robinson, former Kentucky Medicaid Commissioner, Feb. 7, 2008, at 284–85.

Expert Report of Professor W. David Bradford, Ph.D.

Q. Okay. And why was that, sir?

A. Well, I -- number one, you know, you got to -- to think about the dollars that, you know, DMS is responsible for. The time period that I was commissioner, we were spending approximately $3.9 to $4.1 billion. We had probably 35,000 or more providers in the system. They may not have all participated on a daily basis, but those are the numbers that we had in the system as providers. And so, when you're talking about huge sums of dollars, everybody has lobbying agents, everybody has a vested interest. Not that that is a -- a bad thing because people are in business to make a profit, to provide services, to make money, and when their – their livelihoods are -- are -- are facing challenges, then they have a tendency to react very strongly and to exercise their rights, as citizens and providers, to contact their representatives or to hire professionals to help make their case, so –

Q. And indeed, sir, there is -- there's nothing illegal or inappropriate about them doing so, is there?

A. Not at all. It's an important part of our -- of our system, of our governmental system.

Q. It's the way our political system is set up, correct?

A. Correct.[147]

158.   _Kentucky Medicaid payment policies were set in a deliberative manner_: When one observes KY Medicaid payment policies, it is important to recognize that these policies arise out of deliberate and informed decision making – decision making which, according to the testimony of former Commissioners Birdwhistell and Robinson (among others), is the result of political and economic considerations which seek to balance the interests of enrollee access, provider reasonable expectations of profit, and budgetary constraints.[148] The consistent evidence of the written information available before and throughout the at-issue period as well as the recollections of important state decision-makers is that KY Medicaid recognized that AWP was not reflective of actual transaction prices, that the transaction prices were lower than the ingredient cost component of the payment formula suggested, and that the combination of the ingredient cost and dispensing cost component of the formula was set in order to assure that even higher cost pharmacies in the state were able to earn some profit, and therefore have an incentive to participate in the program. These outcomes were driven in

---

[147]   Deposition of Mike Robinson, former Kentucky Medicaid Commissioner, Feb. 7, 2008, at. 287–89.
[148]   Deposition of Mark Birdwhistell, Former Kentucky Medicaid Official, June 10, 2008, pp. 55-56, 94-97, 117-121. See also Deposition of Mike Robinson, former Kentucky Medicaid Commissioner, Feb. 7, 2008, pp. 75-76.

Expert Report of Professor W. David Bradford, Ph.D.

part by evidence, such as the Myers and Stauffer reports, and in part by political negotiations with various stakeholders.

159.    *Fixed dispensing fee component does not reflect Myers and Stauffer estimates*: Medicaid dispensing fee components of the payment formula frequently are held constant for years at a time. Given that actual pharmacy costs generally rise over time, this implies that Medicaid agencies do not expect that the individual components of their payment formulas accurately reflect the underlying costs—otherwise they would need annual changes. The Commonwealth of Kentucky is an excellent case study for this point. Since 1998, Kentucky Medicaid has contracted with the accounting firm of Myers and Stauffer to conduct surveys to estimate actual dispensing costs. While the presentation varies from year to year, so that some imputation is necessary, Figure 17 presents three series: the Kentucky Medicaid nominal dispensing payment amount, the nominal dispensing costs from Myers and Stauffer for the median pharmacy, and the nominal dispensing cost for the 75th percentile pharmacy. Clearly, costs and payment dispensing components are not the same. This information was known, and contracted for, by the Kentucky Medicaid program.

**Figure 17: Kentucky dispensing costs and reimbursement**



Source: Myers and Stauffer, State reimbursement summaries as produced by the Plaintiffs

Expert Report of Professor W. David Bradford, Ph.D.

160. _The relatively constant dispensing fee suggests cross subsidization_: That KY Medicaid left the dispensing fee constant between 1997 and 2000 and then again kept it constant at $4.51 between 2001 and 2006 (when it was at $4.50) despite the fact that the actual costs of doing business rose significantly over that time (as evidenced by the Myers and Stauffer reports commissioned by KY) suggests that achieving an accurate dispensing fee component of the payment formula was not a goal – but rather that achieving an appropriate overall level of payment was.

## D.3.4. How Arkansas and Kentucky relate to each other

161. _Arkansas and Kentucky chose different payment rates:_ As my discussion above has shown, both Arkansas and Kentucky had detailed knowledge on actual drug costs. In fact, the Myers and Stauffer studies found similar actual drug prices for both the states. In 2001, Myers and Stauffer found that prices for drugs on average were AWP – 18% for both the states.[149] However, the two states chose different levels of payment rates as shown in Figure 18.

**Figure 18: Kentucky and Arkansas drug payment rates for generic drugs**

|  | Effective date | Reimbursement formula | Dispensing fee ($) |
|---|---|---|---|
| Kentucky | 7/1/1988 | AWP - 5% or Direct price | $3.25 |
| | 4/1/1991 | AWP - 5% or Direct price | $4.75 |
| | 7/1/1991 | AWP - 10% or Direct price | $4.75 |
| | 1/16/2001 | AWP - 10% | $4.51 |
| | 4/1/2002 | AWP - 12% | $4.51 |
| | 2/23/2005 | AWP - 14% | $5.00 |
| Arkansas | 8/1/1990 | AWP -10.5% | $4.16 + (0.093)EAC |
| | 7/1/1991 | AWP -10.5% | $4.51 + (0.103)EAC |
| | 7/1/1999 | AWP -10.5% | $5.51 |
| | 4/28/2000 | chain: AWP - 17.3% independent: AWP - 10.5% | $5.51 |
| | 5/8/2000 | AWP - 10.5% | $5.51 |
| | 3/1/2002 | AWP - 20% | $5.51 |

162. As a consequence of their differing payment rate choice, the two states achieved different payment levels. Kentucky paid almost twice as much as Arkansas for Dey's subject drugs in 2001.[150] Figure 19 shows the most common payment levels for selected years and NDCs. Arkansas achieved much lower

---

[149] Figure 16 provides further details on these Myers and Stauffer studies for Arkansas and Kentucky.

[150] Based on SDUD data analysis.

Expert Report of Professor W. David Bradford, Ph.D.

payments for subject drugs due to an aggressive state MAC policy. Thus, with the same underlying knowledge of actual drug prices two states chose and achieved significantly different drug payment levels.

**Figure 19: Arkansas and Kentucky's modal payments**

| NDC | State | 2000 | 2001 | 2002 | 2003 | 2004 |
|---|---|---|---|---|---|---|
| 49502068503 | Kentucky | 0.64 | 0.64 | 0.62 | 0.30 | 0.23 |
| | Arkansas | 0.41 | 0.41 | 0.24 | 0.24 | 0.23 |
| 49502068902 | Kentucky | 0.32 | 0.32 | 0.31 | 0.14 | 0.14 |
| | Arkansas | 0.29 | 0.29 | 0.16 | 0.16 | 0.16 |
| 49502069703 | Kentucky | 0.20 | 0.36 | 0.15 | 0.15 | 0.15 |
| | Arkansas | 0.20 | 0.11 | 0.11 | 0.11 | 0.11 |

## D.3.5. How Arkansas and Kentucky relate to other states

163. *Other states used Arkansas and Kentucky documentation for their decision processes*: There are two ways in which Arkansas and Kentucky serve as good illustrations of how states reached their payment formula decisions. First, other state Medicaid agencies apparently considered the Arkansas and Kentucky experiences as informative to their own decisions. In e-mail correspondence from Gary Duerr of the Idaho Medicaid agency to Maria Garza of CMS dated November 27, 2001, Mr. Duerr explains that the discount off of AWP that they selected in their state plan amendment was based in part on the reports from Arkansas and Kentucky.[151] Thus, other states - and CMS - considered the experiences of Arkansas and Kentucky as representative, and of value to other states' decision making.

164. Documentary evidence from other states suggests that the kinds of political influences evident in Arkansas and Kentucky were common: For example, the state of Washington set ingredient component higher than actual cost due to pharmacy pressure. On March 14, 2003, Ann Myers, the State Plan Coordinator from the state of Washington wrote to Kim Howell of CMS to explain the rationale behind Washington's requested state plan amendment to take ingredient payment to AWP – 14%.[152] In that letter Ms. Myers notes what the OIG report indicated Washington pharmacies were purchasing drugs at AWP-17.3%, and that the Governor of the state announced that as the new payment formula. However, in response pharmacy providers "threatened to abandon the Medical

---

[151] HHC-020-0946.

[152] HHC020-1194–1195

Expert Report of Professor W. David Bradford, Ph.D.

Assistance program." As a result, the legislature chose a 14% discount off of AWP in order to achieve "a balance between access and affordability." On May 5, 2003, in response to this information, CMS approved the Washington state plan amendment.

165.    *Oregon ingredient component is higher than actual cost due to pharmacy pressure:* On April 23, 2003, Lynn Read and administrator with the Oregon Office of Medicaid Assistance responded to inquiries from Larry Reed at CMS asking for explanation of Oregon's payment component in its state plan amendment of that year.[153] Ms. Read noted that Oregon had originally proposed a payment component at AWP-17%. In an earlier letter (February 11, 2003) Oregon reported that this decision was based on studies of the pharmacy industry by Oregon State University, the OIG documents on pharmacy pricing, and an audit performed by the Oregon Audits Division.[154] These sources indicated that discount off of AWP ranged as high as 61.2% for generic drugs. In the April 23 response, Ms. Read notes that the Oregon Department of Human Services held meetings with the Oregon State Pharmacy Association and representatives from large and small pharmacies.[155] At those meetings several pharmacies – including large chains – threatened to stop their participation in Medicaid. As negotiations ensued, after which the pharmacies agreed to continue participating in Medicaid if the state would propose AWP-15% (instead of AWP-17%) in its SPA. After receiving this explanation, CMS approved the SPA with an effective date of April 1, 2003.[156]

## D.3.6. Information available to other states and its implication

166.    *Knowledge about AWP has been widespread for many decades*: The detailed historical review of Arkansas and Kentucky illustrated the knowledge possessed by these states about the actual drug prices due to Myers and Stauffer studies. In Appendix E I review numerous public studies and reports that have documented differences between AWP and actual prices for decades. In Appendix E, I also review OBRA 1990 through which federal and state agencies had direct knowledge of the AMP.

167.    *States could look at the actions of each other*: Each state could examine what other states were doing with regard to payment. Given that there is only (by definition) one AMP per drug dosage/quantity/manufacturer, if a state observed another state reimbursing for less than they currently reimbursed, then that information could be used in rate setting. An e-mail exchange dated

---

[153] HHC020-0295–0296.
[154] HHC020-0345–346.
[155] HHC020-0295–0296.
[156] HHC020-0355.

Expert Report of Professor W. David Bradford, Ph.D.

March 16, 1998, between Michelle Schober and Marvin Hazelwood illustrates this point well.[157] In this e-mail exchange, the two discuss conversations between several states' Medicaid personnel to compare how each other are running their respective Medicaid programs. Specifically cited are conversations about attempts by Idaho, Texas, Illinois, Ohio, North Carolina, and Arkansas.[158] Mr. Hazelwood notes that Illinois attempted to move to a payment based on actual acquisition costs but was blocked by opposition from chain pharmacies in that state.[159] Significantly, beginning in 1995, the Massachusetts Medicaid Program established a most-favored-nation"-based MAC system for payment.[160] This system revealed transactions prices in Massachusetts which were observable.

168.    *States deliberately chose payment levels*: In summary: 1) states had information on actual costs from cost surveys; 2) states used cost survey data as part – but only part – of their payment decision; 3) states often reacted to overall budgetary pressures that were independent of the pharmaceutical industry; 4) states engaged in political negotiations to set payment; 5) as an outcome of these political negotiations, states did not intend to set each component of their pharmacy payment (ingredient and dispensing cost) at the actual levels, but cared about the aggregate; 6) further, states' behavior (particularly for the dispensing component) demonstrates that they were aware that they were not setting each component of payment "accurately". Therefore, payment policy is the result of a combination of economic, political, and budgetary influences, which results in a final rule that does not directly depend upon published drug prices. It is simply unreasonable to conclude that the levels of payment chosen by the states would have been different if pricing compendia had listed different published prices. While the payment formulas would certainly differ, that is immaterial. As my review illustrates, the net average dollar amount per prescription was determined based upon information on actual costs, state budgetary capacity, and – most importantly – political negotiations with stakeholders in the state.

## D.4. Payment variation across state Medicaid program

169.    *Variations in state payment rates represent deliberate decisions*: In this section, I will review the substantial variation across states in Medicaid drug payments. I will review considerable evidence that states were knowledgeable of these wide variations. A single set of prices published by the manufacturer cannot explain this variation. Thus in my opinion, a low paying state establishes a

---

[157] AWP-IL-00010143-44
[158] AWP-IL-00010143-44
[159] AWP-IL-00010143-44
[160] MA 012291.

Expert Report of Professor W. David Bradford, Ph.D.

payment threshold that was available to all states. As a result all payments above that threshold can be viewed as choices made by the individual states.

## D.4.1. Flexibility in payment choice available to states

170.   *Medicaid administered separately for each state, with flexibility*: As discussed in detail in Section D.1, the Medicaid program was created under the Social Security Act of 1965. This Act left the administration of Medicaid programs to the states. Federal regulations require that the state Medicaid agencies design their programs such that they provide access that is comparable to the population at large.[161] Within such broad guidelines and oversight of the federal government, states have substantial flexibility to design their Medicaid programs. In particular, it is up to the sate Medicaid agencies to set the drug payment rates: both the ingredient and dispensing component payments. Substantial flexibility at state level is underscored in a GAO report that states:

> "Medicaid is not 1, but 56 separate programs (including the 50 states, District of Columbia, Puerto Rico, and the US territories). Federal mandates call for common eligibility and benefit requirements, but states have discretion in how they implement their programs."[162]

171.   *States have great flexibility in determining their payment formulae*: For pharmaceutical payment methods, states have great flexibility in establishing each component of their payment formula and are monitored in terms of the aggregate payment level. That each component need not independently reflect the exact level of ingredient of dispensing cost is attested to by HCFA in a HCFA Appellate Division decision in a dispute between the state of Arkansas and HCFA, which states:

> [I]t is not clear why HCFA applied part of the new methodology, but not all of it. The regulations on which HCFA relied for the disallowance establish aggregate upper limits on what the State can pay. The regulations use as that aggregate upper limit [emphasis in original] the lower of EAC 'plus reasonable dispensing fees' or usual and customary charges.[163]

172.   *States must gather information*: Any change to state Medicaid programs needs to be approved by CMS through a SPA. State agencies must also "maintain and make available to HCFA, upon request, data, mathematical or statistical computations, comparisons, and any other pertinent records to

---

[161] Encouragement of Provider Participation, 42 C.F.R. § 447.204 (2002).

[162] U.S. Government Accountability Office. "Spending Pressures Drive States Toward Program Reinvention," April 1995, 2.

[163] HHC024-0620.

support its findings and assurances."[164] Some states have additional regulations which also require that agencies periodically survey pharmacy operations and that they set payment rates to reflect the survey results.[165] At the same time, state Medicaid agencies also have a direct incentive to control their Medicaid expenditures.

173.    _Medicaid policy making is deliberate_: This combination of flexibility within broad guidelines suggests that states ought to be actively involved in designing their individual state Medicaid programs and setting the payment rates. My research and review shows that to be the case.

## D.4.2. Payment choices across states

174.    _There is wide variation in payment bases_: Review of the Medicaid programs across states shows a wide variation in payment rates at any point in time. The first distinction is the choice of the benchmark value used by the state Medicaid agencies. Most states have chosen to use the AWP as the basis for reimbursement, while others have chosen to use WAC. Some states have gone back and forth between AWP and WAC. There is also significant variation in the use of alternate payment bases such as state MAC and DOJ-revised AWP. Some states have frequently revised the discounts off the benchmark price while other states rarely do so. I will highlight these variations in payment benchmark choices below.

### D.4.2.1. Use of AWP and WAC for drug payments

175.    _AWP is most commonly-used benchmark, though discounts vary_: During the time period at issue, most states have used AWP as their primary benchmark for pharmacy ingredient cost payments. Approximately forty states have used AWP as their basis for payments throughout. These states have used discounts off AWP ranging from 0% to 30% for generic multi-source drugs.[166] Figure 20 shows the states that use AWP as a benchmark for ingredient reimbursement and the level of discount for selected years 1995, 2000 and 2005. In 2005, discounts off AWP ranged from a low of 5% in Alaska to a high of 30% in West Virginia. Similar variation can be seen for prior years 1995 and 2000 as shown in Figure 20.

176.    _Ingredient component payments vary over time for many individual states_: Over time some states have routinely revised their drug component payment rates while others have not. This is evident in

---

[164]  52 Fed. Reg. 28658 (July 31,1987)

[165]  See, for example, Commonwealth of Kentucky, S.B. 351, Chapter 561, Section 7, KRS 205.561, April 13, 1998.

[166]  Some states use different levels of discount off AWP for single source brand drugs and multi-source generic drugs. Since the drugs at issue in this matter are all multi-source generics, discussion throughout this section is focused on the figures relevant to the multi-source generic drugs.

Expert Report of Professor W. David Bradford, Ph.D.

the "Medicaid State Reimbursement Methodology Summaries," prepared by the accounting firm Myers and Stauffer ("Myers and Stauffer state summaries"), which provides a history of each state's estimated acquisition cost, dispensing fee, and other pertinent information.[167] As illustrated in Figure 20, Alaska has maintained an AWP – 5% payment rate since 1995 (in fact, since 1990). Similarly, Hawaii, South Dakota, and North Dakota also have not revised their drug payment rates since 1995. On the other hand, West Virginia has revised its drug payment rate from AWP – 0% in 1995 to AWP – 30% in 2005. Similarly, Minnesota has used four different drug payment rates since 1995; payment rates were revised to AWP – 9%, AWP – 14%, AWP – 11% and AWP – 11.5% in 1995, 2003, 2004 and 2005 respectively.

177.    *Variation in discounts off AWP produced variations in ingredient payment components:* Figure 20 also shows the impact of these discount variations on the payment levels for ipratropium bromide. In 2005, in Kansas, the reimbursement level was $0.5151 per mL while Alaska's reimbursement level was $0.6703 per mL. In other words Alaska was reimbursing ipratropium bromide at a level 36% higher than West Virginia. This shows the wide variation in resulting ingredient component levels for just one drug; again, this variation is due to states' deliberate choices. The single AWP level published by Dey cannot explain this variation.

---

[167]  These reports were produced by Plaintiffs in this matter.

Expert Report of Professor W. David Bradford, Ph.D.

## Figure 20: States primarily using AWP for drug payments[168]

| State | Discount off AWP | | | Ipratropium reimbursement level | | | Percentage over lowest state, 2005 |
|---|---|---|---|---|---|---|---|
| | 1995 | 2000 | 2005 | 1995 | 2000 | 2005 | |
| CO | 10.00% | 10.00% | 35.00% | $0.6350 | $0.6350 | $0.4586 | 0% |
| KS | 10.00% | 10.00% | 27.00% | $0.6350 | $0.6350 | $0.5151 | 12% |
| IL | 10.00% | 12.00% | 25.00% | $0.6350 | $0.6209 | $0.5292 | 15% |
| MS | 10.00% | 10.00% | 25.00% | $0.6350 | $0.6350 | $0.5292 | 15% |
| AR | 10.50% | 10.50% | 20.00% | $0.6315 | $0.6315 | $0.5645 | 23% |
| IN | 10.00% | 10.00% | 20.00% | $0.6350 | $0.6350 | $0.5645 | 23% |
| CA | 5.00% | 5.00% | 17.00% | $0.6703 | $0.6703 | $0.5856 | 28% |
| NY | 10.00% | 10.00% | 16.50% | $0.6350 | $0.6350 | $0.5892 | 28% |
| NH | 10.00% | 12.00% | 16.00% | $0.6350 | $0.6209 | $0.5927 | 29% |
| MI | 10.00% | 15.10% | 15.10% | $0.6350 | $0.5991 | $0.5991 | 31% |
| LA | 10.50% | 16.50% | 15.00% | $0.6315 | $0.5892 | $0.5998 | 31% |
| MT | 10.00% | 10.00% | 15.00% | $0.6350 | $0.6350 | $0.5998 | 31% |
| NV | 10.00% | 10.00% | 15.00% | $0.6350 | $0.6350 | $0.5998 | 31% |
| OR | 11.00% | 11.00% | 15.00% | $0.6280 | $0.6280 | $0.5998 | 31% |
| UT | 12.00% | 12.00% | 15.00% | $0.6209 | $0.6209 | $0.5998 | 31% |
| NM | 10.50% | 12.50% | 14.00% | $0.6315 | $0.6174 | $0.6068 | 32% |
| DE | 5.61% | 12.90% | 14.00% | $0.6660 | $0.6146 | $0.6068 | 32% |
| WA | 11.00% | 11.00% | 14.00% | $0.6280 | $0.6280 | $0.6068 | 32% |
| KY | 10.00% | 10.00% | 14.00% | $0.6350 | $0.6350 | $0.6068 | 32% |
| ME | 5.00% | 10.00% | 13.00% | $0.6703 | $0.6350 | $0.6139 | 34% |
| TN | 8.00% | 13.00% | 13.00% | $0.6492 | $0.6139 | $0.6139 | 34% |
| WI | 10.00% | 10.00% | 13.00% | $0.6350 | $0.6350 | $0.6139 | 34% |
| NJ | 6.00% | 10.00% | 12.50% | $0.6633 | $0.6350 | $0.6174 | 35% |
| WV | 0.00% | 12.00% | 12.00% | $0.7056 | $0.6209 | $0.6209 | 35% |
| IA | 10.00% | 10.00% | 12.00% | $0.6350 | $0.6350 | $0.6209 | 35% |
| CT | 8.00% | 12.00% | 12.00% | $0.6492 | $0.6209 | $0.6209 | 35% |
| ID | 0.00% | 11.00% | 12.00% | $0.7056 | $0.6280 | $0.6209 | 35% |
| OK | 10.50% | 10.50% | 12.00% | $0.6315 | $0.6315 | $0.6209 | 35% |
| VT | 10.00% | 10.00% | 11.90% | $0.6350 | $0.6350 | $0.6216 | 36% |
| MN | 7.60% | 9.00% | 11.50% | $0.6520 | $0.6421 | $0.6245 | 36% |
| GA | 10.00% | 10.00% | 11.00% | $0.6350 | $0.6350 | $0.6280 | 37% |
| NE | 8.71% | 8.71% | 11.00% | $0.6441 | $0.6441 | $0.6280 | 37% |
| WY | 11.00% | 4.00% | 11.00% | $0.6280 | $0.6774 | $0.6280 | 37% |
| HI | 10.50% | 10.50% | 10.50% | $0.6315 | $0.6315 | $0.6315 | 38% |
| SD | 10.50% | 10.50% | 10.50% | $0.6315 | $0.6315 | $0.6315 | 38% |
| MO | 10.43% | 10.43% | 10.43% | $0.6320 | $0.6320 | $0.6320 | 38% |
| VA | 9.00% | 9.00% | 10.25% | $0.6421 | $0.6421 | $0.6333 | 38% |
| DC | 10.00% | 10.00% | 10.00% | $0.6350 | $0.6350 | $0.6350 | 38% |
| NC | 10.00% | 10.00% | 10.00% | $0.6350 | $0.6350 | $0.6350 | 38% |
| ND | 10.00% | 10.00% | 10.00% | $0.6350 | $0.6350 | $0.6350 | 38% |
| PA | 0.00% | 10.00% | 10.00% | $0.7056 | $0.6350 | $0.6350 | 38% |
| SC | 9.50% | 10.00% | 10.00% | $0.6386 | $0.6350 | $0.6350 | 38% |
| AK | 5.00% | 5.00% | 5.00% | $0.6703 | $0.6703 | $0.6703 | 46% |

---

[168] Figures reported are for generic drugs.

Expert Report of Professor W. David Bradford, Ph.D.

Source: Myers and Stauffer, State reimbursement summaries as produced by the Plaintiffs

178. _WAC is less-commonly used, and adjustments vary:_ Seven states have primarily used WAC as a benchmark for Medicaid drug payments. Massachusetts, one of the first states to use WAC-based reimbursements, has been using WAC since1989. Figure 21, shows all the states that have used WAC-based policy for significant periods. Since WAC is a measure of the undiscounted invoice price at which wholesalers take possession of drug products from manufacturers, states typically set WAC-based ingredient component payment levels at a certain percentage above WAC; this percentage ranges from 5 to 10%. Figure 21 also shows the resulting reimbursement level for ipratropium bromide 0.02% solution implied by the WAC-based ingredient component payment policies of these states.

**Figure 21: States primarily using WAC for drug payments**

| State | Addition to WAC | | | Implied ipratropium level | | | Percentage over lowest state |
|---|---|---|---|---|---|---|---|
| | 1995 | 2000 | 2005 | 1995 | 2000 | 2005 | |
| MA | 10.00% | 10.00% | 5.00% | | $0.3168 | $0.0756 | 0.00% |
| RI | 10.00% | 5.00% | 5.00% | | $0.3024 | $0.0756 | 0.00% |
| FL | 7.00% | 7.00% | 5.75% | | | $0.0761 | 0.71% |
| MD | 10.00% | 10.00% | 8.00% | | $0.3168 | $0.0778 | 2.86% |
| OH | | 11.00% | 9.00% | | $0.3197 | $0.0785 | 3.81% |
| AL | 9.20% | 9.20% | 9.20% | | $0.3145 | $0.0786 | 4.00% |
| TX | 12.00% | 12.00% | 12.00% | | $0.3226 | $0.0806 | 6.67% |

Source: Myers and Stauffer, State reimbursement summaries as produced by the Plaintiffs

179. _Ingredient component payments are lower for states adopting WAC-based methodology_: A simple comparison of reimbursement levels for ipratropium bromide for states using AWP-based reimbursements and WAC-based reimbursements shows the wide differences. In 2005, Alaska's reimbursement level for ipratropium bromide was $0.6703 per mL while Florida's reimbursement level was $0.0761 per mL. In other words, Alaska was reimbursing ipratropium bromide at a level more than 846% above Florida. This is not surprising because as I discussed in Section I, and as Plaintiff expert Dr Schondelmeyer also asserts, there is no predictable relationship between AWP and WAC for the generic drugs. [169, 170] Reimbursement levels for states using WAC-based policy also shows a decline over time that reflects Dey's generally falling WAC.

---

[169] Schondelmeyer, Steven W. and Marian V. Wrobel. "Medicaid and Medicare Drug Pricing: Strategy to Determine Market Prices," Abt Associates, Inc., August 30, 2004, 18.

Contains highly confidential materials—subject to protective order

Expert Report of Professor W. David Bradford, Ph.D.

180. _AWP states could have chosen to use WAC benchmarks and save money_: AWP-based reimbursements are simply higher than WAC-based reimbursements for generic drugs given what these prices reflect in the generic drug industry. Thus many states could have lowered their reimbursements by simply using a WAC-based reimbursement policy. This choice was available to all states and several states did choose to use WAC. Leaving aside the issue of whether Dey published accurate prices, it was within all state Medicaid agencies purview to choose a WAC-based policy like some states did. More recently many states have started using both AWP and WAC in determining the reimbursement levels. These states typically set their reimbursement levels at a lower of AWP minus a discount or WAC plus a margin. For most states with this lower of methodology, the effective payment rate for generic drugs in general and Dey drugs in particular are going to be based on the WAC. Thus any reimbursement above the WAC appears to be a matter of policy choice by the state Medicaid agencies.

181. _States occasionally choose to switch between AWP and WAC as a benchmark_: In addition to states that have based their reimbursements primarily on either AWP or WAC, several states have gone back and forth between using AWP and WAC. For example, Nebraska and Colorado employed a WAC-based reimbursement policy in the early 1990s and reverted back to AWP-based reimbursements later.[171] Florida has primarily used WAC-based policy, yet couple of years in 2000 and 2001 dropped the WAC-based reimbursements in favor of the AWP-based reimbursement.[172] On the other hand, states like Illinois and New Jersey that have primarily used AWP-based reimbursements employed WAC-based reimbursements for certain periods.[173]

182. _Dey's national benchmark values cannot explain observed state variation:_ Finally, the wide variation in actual ingredient component payment amounts observed in Figure 20 and Figure 21 are based on a single (each year) AWP and WAC published nationally for Dey's ipratropium bromide. It is logically inappropriate to assert that a single benchmark set by Dey could yield 50 different reimbursement component values, without states deliberately setting idiosyncratic formulae; one set of prices published by Dey cannot be causal of the wide variation in choices made by the states.

---

[170] Reimbursements based on AWP minus a discount and WAC plus a margin could be equivalent only if there is a stable relationship between AWP and WAC. This is generally true for the brand drugs but as I discussed in section I, is widely known to not hold for generic drugs.

[171] National Pharmaceutical Council. Pharmaceutical Benefits Under State Pharmaceutical Assistance Programs, Reston, VA, 1990–2007. Eighteen unnumbered volumes.

[172] National Pharmaceutical Council. Pharmaceutical Benefits Under State Pharmaceutical Assistance Programs, Reston, VA, 1990–2007. Eighteen unnumbered volumes.

[173] National Pharmaceutical Council. Pharmaceutical Benefits Under State Pharmaceutical Assistance Programs, Reston, VA, 1990–2007. Eighteen unnumbered volumes.

Expert Report of Professor W. David Bradford, Ph.D.

### D.4.3. Other Ingredient Component Payment Bases: DOJ Adjusted AWP

183.  *Some states used DOJ-revised AWP*: State Medicaid agencies have also made differing choices when it comes to adopting the DOJ-revised AWP for reimbursement purposes. As I discussed in Section I, DOJ calculated these revised AWPs and made them available to all state Medicaid agencies through First DataBank. However, at least 18 states chose not to use these lower prices that were recommended and made available to them.[174] Even among the 30 states that actually used these lower revised-AWPs for reimbursement purposes many expressed skepticism that they will lead to any long-term savings.[175]

### D.4.4. Other Ingredient Component Payment Bases: FUL- and MAC-based drug payments

184.  *FUL and MAC programs are alternative payment methodologies*: Medicaid payments for drugs with generic versions are subject to maximum payments. The maximum payment program run by CMS is known as the FUL. Most states have even more stringent maximum payment programs for generic drugs; these are called the State MAC programs. The purpose of these upper limits programs is to achieve savings by taking advantage of current market prices. As I discuss below, significant portions of the state Medicaid drug payments for the Dey subject drugs were not based on published prices. Instead, the payments based on the FUL and the state MAC accounted for almost 24% of payments for the states that produced claims data for this matter.

185.  *Plaintiff's theory is nonsensical for FUL and MAC-based payments*: The Plaintiff's theory of spread marketing simply makes no sense for drugs whose payments are based on FUL or state MAC amounts. First, it is essentially impossible to manipulate these bases in a predictable manner using published prices. Second, even if a manufacturer were able to successfully manipulate these bases, the result would affect all competitors equally and thus confer no special benefit to any competitor. As a result there is no economic justification, such as competition for market share, to support Plaintiffs' allegations. I will discuss the FUL and the state MAC programs below.

---

[174] U.S. Department of Health and Human Services, Office of the Inspector General. "Medicaid's Use of Revised Average Wholesale Prices," September 2001, 5.

[175] U.S. Department of Health and Human Services, Office of the Inspector General. "Medicaid's Use of Revised Average Wholesale Prices," September 2001, ii.

Expert Report of Professor W. David Bradford, Ph.D.

### D.4.4.1. The FUL program

186.   _Origin of FUL program_: The FUL program was created in 1987 in order to limit the amount which

Medicaid could reimburse for drugs then there are multiple available generic equivalents.[176] Among a

group of drug products, the upper payment limit is 150% of the lowest published price.[177] Details

about which drug products qualify for a FUL are explained by CMS:

> Until the passage of the OBRA 1990, FUL could be established only if all versions of
> a drug product had been classified as therapeutically equivalent (A-rated) by the FDA
> in its publication "Approved Drug Products with Therapeutic Equivalence
> Evaluations" and at least three suppliers were listed in the current editions of
> published national compendia. OBRA 1990 expanded that criteria and permitted the
> establishment of a FUL for a drug product if there are three (or more) versions of the
> product rated therapeutically equivalent (A-rated) regardless of the rating of other
> versions (B-rated) and at least three suppliers are listed in the current editions of
> published national compendia.[178]

187.   _CMS methodology is not always transparent when setting FULs_: A key provision in determining the

FUL program is that all published prices are considered. Thus, in the case of Dey, FUL program

ought to have utilized Dey's economically meaningful WAC. Although the statutory definition of

FUL appears transparently related to the minimum published price for a generic drug, its application

by CMS was not always transparent, which made it the study of several OIG studies. CMS officials

have testified that they take into account various considerations such as drug availability and access

that override the mechanical application of FUL.[179] Hence, OIG reports show that CMS did not

follow the regulatory guidelines in a predictable manner. For example, in a 2004 report the HHS OIG

concluded that CMS failed to add 90 qualified drug products to the FUL list in 2001.[180] Two drug

products at issue in this matter, albuterol 90 MCG inhaler and ipratropium bromide 0.02% solution

were among the drugs that could have been included on the list.[181] The OIG estimated that potential

Medicaid savings for those two products would have been $72.2 million.[182] In another 2004 report,

---

[176]   U.S. Health and Human Services, Centers for Medicare and Medicaid Services. "Federal Upper Limits."
www.cms.hhs.gov/Reimbursement/05_FederalUpperLimits.asp#TopOfPage.

[177]   U.S. Health and Human Services, Office of the Inspector General. "Omission of drugs from the Federal Upper Limit List
in 2001," February 2004, i.

[178]   U.S. Health and Human Services, Centers for Medicare and Medicaid Services. "Federal Upper Limits."
www.cms.hhs.gov/Reimbursement/05_FederalUpperLimits.asp#TopOfPage.

[179]   Deposition of Sue Gaston, Health Insurance Specialist, CMS, January 24, 2008, p. 273.

[180]   U.S. Health and Human Services, Office of the Inspector General. "Omission of Drugs from the Federal Upper Limit
List in 2001," February 2004, ii.

[181]   Albuterol 0.09mg inhaler was added to the FUL list on March 11, 2003, and ipratropium bromide 0.02% solution was
added on August 24, 2003.

[182]   U.S. Health and Human Services, Office of the Inspector General. "Omission of Drugs from the Federal Upper Limit

---

Expert Report of Professor W. David Bradford, Ph.D.

the OIG concluded that "Medicaid lost an estimated $167 million between 2001 and 2003 because qualified drugs were not added to the FUL list in a timely manner."[183] These reports illustrate that even OIG could not replicate CMS decisions.

### D.4.4.2. The state MAC programs

188.    _Origin of state MAC programs_: State MAC programs have been in existence since the 1970s. For example, a MAC program has been in place since 1976 in Maryland.[184] By the start of the dispute period, 22 states had MAC programs for generic drugs. The number of states with a MAC program has increased steadily during the period at issue, and by 2005 there were 44 states with a MAC program. By the end of the period at issue, all but 6 states had had a MAC program.

189.    _MAC programs exhibit significant heterogeneity_: There is substantial variation among state MAC programs. The programs vary in terms of how many therapeutically equivalent products are needed for a drug to qualify for the MAC list, how frequently prices are reviewed, whether the prices are created by a state agency or a subcontractor, and what price is used as a basis for the MAC. The price used as a basis for the MAC price differs greatly from state to state, often does not rely on published list prices, and is sometimes not publicly explained. Many reimbursement formulae, especially those used by subcontractors, are not available to the public.

190.    _MAC list construction may be by state or contractor_: Some states created their own MAC programs while others subcontracted the work to a vendor. First Health Services created MAC pricing lists Kentucky.[185] In Oregon, state MAC amounts were determined by First Health Services for many years, but they have recently switched to Electronic Data Systems (EDS).[186] EDS was also involved in claims data processing for Delaware.[187] The Illinois Department of Public Aid contracted with Myers and Stauffer to provide assistance in establishing and maintaining the MAC list.[188] Iowa,

---

List in 2001," February 2004, 7.

[183] U.S. Health and Human Services, Office of the Inspector General. "Addition of Qualified Drugs to the Medicaid Federal Upper Limit List," December 2004, iii.

[184] Sawyer, Darwin O. "Pharmaceutical Reimbursement and Drug Cost Control: The MAC Experience in Maryland." _Inquiry_ 20 (1983): 76–83.

[185] First Health Services Corporation, "Maximum Allowable Cost (MAC) List," Available at https://kentucky.fhsc.com/pharmacy/providers/mac.asp.

[186] Oregon Department of Human Services, Provider Services Unit. Notice regarding Pharmacy Benefit Manager Conversion, October 2008. www.oregon.gov/DHS/healthplan/notices_providers/2008/pmconversion.pdf.

[187] Deposition of Cynthia Denemark, pharmacy consultant with EDS, Dec. 9, 2008, at 31–32.

[188] Illinois Department of Healthcare and Family Services. "Informational Notice Re: State Maximum Allowable Cost Program for Multi-Source Prescription Drugs," February 10, 2005. www.hfs.illinois.gov/html/021405_pharmacy.html.

Expert Report of Professor W. David Bradford, Ph.D.

Wyoming, and Idaho also contracted with Myers and Stauffer.[189] Maine and West Virginia relied on GHS data management to create their MAC lists.[190] New Mexico used Mercer.[191] South Dakota Medicaid has contracted with SXC Health Solutions for MAC pricing since July 2008.[192]

191.   _Examples of MAC rate setting_: South Dakota uses the contractor SXC to develop its MAC payment schedule. Although it is not clear how SXC selects prices, their base list delivers a generic effective discount of AWP minus 58% to 62%."[193] Myers and Stauffer describes its algorithm for the Iowa MAC as follows:

> Reimbursement rates for the MAC program were computed by determining the average acquisition cost Iowa pharmacies pay for the brand and generic drugs of the same chemical composition, package size, dose, and form. The computed average acquisition cost was then multiplied by a factor to derive a single unit price applicable to all the brand and generic drug products of the same chemical composition, package size, dose, and form.[194]

In Pennsylvania, published prices are used to set the MAC. If the generic product is available from more than one manufacturer, the base price of 150% of the lowest acquisition cost for the generic product, but not less than 120% of the second lowest acquisition cost.[195] If the generic product is available from only one manufacturer, the base price is 120% of the acquisition cost for the generic product.[196] The Wisconsin MAC program has been in place since at least 1979, when Theodore Collins became pharmacist consultant to the Wisconsin Medicaid program.[197] Wisconsin uses the following criteria to determine if a drug is eligible for MAC pricing: Two or more A-rated therapeutically equivalent products must be available in the marketplace, and the MAC must result in

---

[189] Iowa Department of Human Services. "Welcome to the State MAC Web Site for Multi-Source Prescription Drugs." msiciowa.com/FAQ.htm.

[190] MaineCare memo to Pharmacy providers. "MaineCare Proposed MACs," July 16, 2004. http://mwpro.ghsinc.com/mwpro/mwsubscribe/index.php?what=showarchive&nId=58. Goold Health Systems. "West Virginia Medicaid: Preferred Drug List." www.wvmedicaidpdl.org.

[191] Mercer. "New Mexico Medical Assitance Division: Pharmacy MAC List," July 12, 2002. www.hsd.state.nm.us/mad/pdf_files/Regs/FINALPharmAssocPresentation7-12-02.pdf.

[192] Deposition of Larry Iversen, South Dakota Medicaid official, Dec.15, 2008, at 61–62.

[193] 2008 Consulting Contract between SXC Health Solutions and State of South Dakota for State Maximum Allowable Cost services with attachments. (Dey Ex. 911.)

[194] Iowa Department of Human Services. "Welcome to the State MAC Web Site for Multi-Source Prescription Drugs." msiciowa.com/FAQ.htm.

[195] 35 Pa. Bull. 4701–4802 (August 20, 2005) (Title 55 Public Welfare, Chapter 1121). www.pabulletin.com/secure/data/vol35/35-34/1561.html.

[196] 35 Pa. Bull. 4701–4802 (August 20, 2005) (Title 55 Public Welfare, Chapter 1121). www.pabulletin.com/secure/data/vol35/35-34/1561.html.

[197] Deposition of Theodore Collins, pharmacist consultant for Wisconsin Medicaid, Vol. I, Oct. 30, 2007, at 24–25.

Expert Report of Professor W. David Bradford, Ph.D.

savings for the Medicaid agency.[198] Since 1999, many different prices have been used to set MAC, including transaction prices from the wholesalers Cardinal, F Dohman, and McKesson, which have been available at various times since 1999.[199] Mr. Collins neither used AWP, nor WAC, to set the MAC prices.[200]

192. _Some states explicitly include pharmacy normal profit in MAC_: Some states explained that normal profit was considered when setting MACs. When asked whether Wyoming Medicaid considers normal profit margins for providers one of the factors in setting a state MAC for a drug, Wyoming Medicaid administrator Roxanne Homar said, "To some degree, yes. . . To ensure access to our clients. Otherwise they won't dispense the meds."[201]

193. _Some states use pharmacy invoice prices for MAC:_ Depositions of state Medicaid officials show that the several states, or their agents, use invoice prices rather than list prices when setting MAC reimbursement rates. In Arkansas, for example, when a generic equivalent becomes available for a brand, "…we'll review the generic products that are out there and try to obtain from pharmacies what they say that they pay for that product and then go from there to set the MAC."[202] In addition to the two aforementioned states, Maine, Maryland, Minnesota, New Mexico, Tennessee, and Texas also go about setting a MAC by surveying providers.[203] North Dakota was using the same upper limit list as private-payer Blue Cross Blue Shield.[204] Of the states that have subcontractors creating their MAC lists, most of the subcontractors also used invoice prices: Idaho (Myers and Stauffer), Indiana (Myers and Stauffer), Illinois (Myers and Stauffer), North Carolina (Mercer), and South Dakota (SXC Health Systems).[205]

---

[198] Deposition of Theodore Collins, pharmacist consultant for Wisconsin Medicaid, Vol. I, Oct. 30, 007, at 16–23, 53–54.

[199] Deposition of Theodore Collins, pharmacist consultant for Wisconsin Medicaid, Vol. I, Oct. 30, 2007, at 16–17, 61–64, 142.

[200] Deposition of Theodore Collins, pharmacist consultant for Wisconsin Medicaid, Vol. I, Oct. 30, 2007, at 160–161.

[201] Deposition of Roxanne Homar, Medicaid pharmacy program manager, Wyoming Medicaid, Dec. 2, 2008, at 225–27.

[202] Deposition of Suzette Bridges, Arkansas Medicaid Official, Dec. 10, 2008, at 65

[203] Deposition of Jude E. Walsh, Quality Director, Maine Medicaid, March 26, 2008, at 98. Deposition of Joseph L. Fine, former Director of pharmacy, State of Maryland, Dec. 9, 2008, at 203. Deposition of Cody Wiberg, former Pharmacy Program Manager, Minnesota Medicaid, March 14, 2008, at 69. Deposition of Harry Leo Sullivan, Director of Pharmacy Services, TennCare, March 12, 2008, at 106–109.

[204] Deposition of Brendan Joyce, North Dakota Department of Human Services, Administrator of Pharmacy Services, Dec. 12, 2008, at 138.

[205] Myers and Stauffer "Idaho: FAQ," December 16, 2004. http://www.mslcidaho.com/MAC_List/documents/FAQs.htm. Also see Myers and Stauffer. "Illinois: FAQ," August 8, 2005. http://www.mslcillinois.com; Deposition of Carl Shirley, Indiana Medicaid Official, Dec. 2, 2008, at 91–92; Deposition of Lisa Weeks, North Carolina Medicaid Official, Oct. 21, 2008, at 46, 265; Deposition of Larry Iverson, South Dakota Medicaid Official, Dec. 15, 2008, at 63, 98.

---

Expert Report of Professor W. David Bradford, Ph.D.

194.    _MAC rate rules vary_: States have differing rules about how many therapeutically equivalent products are needed in order for a drug product to qualify for the MAC list. New Mexico creates a MAC when at least one A-rated generic (as listed in the FDA Orange Book) is readily available to New Mexico pharmacists.[206] In Oregon, MACs are selected for multiple-source drug designations when a bioequivalent drug product is available from at least two wholesalers serving the state.[207] In Pennsylvania, the Department will set the State MAC provided that the generic product is available from at least two wholesalers at the MAC price.[208]

195.    _MAC programs updated relatively frequently_: The frequency with which states review MAC prices also varies. The Oregon MAC list is generated monthly.[209] California law requires the State Department of Health Services to update the MAIC list at least every two months.[210] The New Mexico state MAC list is updated at least quarterly with on-going adjustments due to pricing changes and availability issues; however, all drugs on the list are reviewed at a minimum of every six months.[211]

### D.4.4.3. Implication of FUL and state MACs

196.    _Political considerations are central in MAC policy_: Obviously, states are very actively involved in setting ingredient reimbursement rates for generic drug products. Since states have a great deal of latitude to select prices, they can balance their interest in cost savings with political considerations and incentives for pharmacists to dispense generic products. States have a great deal of knowledge about available prices, they set price ceilings to reimburse at levels they deem appropriate active, and they choose whether or not to rely on published prices.

197.    _Manufacturer manipulation of MAC and FUL is implausible_: In order for a manufacturer to be able to 'manipulate' the FUL and MAC payment mechanisms, their workings would have to be well understood. As I discussed above, although the statutory definition of FUL appears transparently

---

[206]  XVI N.M. Reg. (June 30, 2005) (New Mexico Administrative Code, 8.324.4.16).

[207]  Seoane Vazque, Enrique C, et al. "Alternatives for Reform of the Ohio Medicaid Pharmaceutical Program," Prepared for The Ohio Commission to Reform Medicaid, December 30, 2004. www.communitysolutions.com/images/upload/resources/OCRMAppPharm2.pdf.

[208]  35 Pa. Bull. 4701–4802 (August 20, 2005) (Title 55 Public Welfare, Chapter 1121). www.pabulletin.com/secure/data/vol35/35-34/1561.html.

[209]  Seoane Vazque, Enrique C, et al. "Alternatives for Reform of the Ohio Medicaid Pharmaceutical Program," Prepared for The Ohio Commission to Reform Medicaid, December 30, 2004. www.communitysolutions.com/images/upload/resources/OCRMAppPharm2.pdf.

[210]  California Assembly Bill 442, Chapter 1161, Approved by the Governor September 30, 2002, Available at www.leginfo.ca.gov/pub/01-02/bill/asm/ab_0401-0450/ab_442_bill_20020930_chaptered.html.

[211]  XVI N.M. Reg. (June 30, 2005) (New Mexico Administrative Code, 8.324.4.16).

Expert Report of Professor W. David Bradford, Ph.D.

related to minimum published price for a generic drug, its application by CMS was not at all transparent. Likewise, state MAC programs are based on a variety of idiosyncratic mechanisms, most of which are not public information. Depositions of state Medicaid officials reveal that many states relied directly on provider invoice information to determine MAC levels. As such these MAC programs would be difficult or impossible to 'manipulate' using published prices even if one understood their workings.

198.    *Manufacturers have little economic incentive to manipulate FUL*: Even if a manufacturer were able to affect FUL, it would yield no benefit because this policy pays precisely the same amount for all competing products within a generic drug category.[212] The economic motivation for this activity is even less appealing given that changing published prices is not generally costless – e.g. prompt payment rewards to wholesalers could be affected. Thus, if a manufacturer did somehow increase FUL rate, it would not itself receive additional direct revenue from the higher payment (that would go to the pharmacies), it would not plausibly gain a competitive advantage (payments to pharmacists on behalf of all equivalents would go up by the same amount), and it would often be obligates to pay higher prompt pay discounts to wholesalers, and so see its revenue fall.

## D.4.5. Dispensing payment components across states

199.    *Dispensing payment components vary across states, and are often stable within states:* As I discussed previously, Medicaid drug payment components cannot be viewed in isolation from dispensing costs. There is significant variation is dispensing payment components across states as well, as is evident in the Myers and Stauffer state summaries. States that use a differentiated dispensing payment component for brands and generics have set a higher dispensing payment component for generic drugs. While most states set a fixed dispensing component, some states have set variable dispensing components. Finally, it is noteworthy that for many states individually, the dispensing components are stable (and sometimes falling) over time, even though underlying dispensing costs are generally rising. Figure 22 shows dispensing component payments variation across states.

---

[212] Some states' MAC programs, like the FUL, also pay the same amount for all drugs within a generic drug product category.

Expert Report of Professor W. David Bradford, Ph.D.

**Figure 22: Dispensing component payments by state[213]**

| State | Dispensing fee | | | State | Dispensing fee | | |
|---|---|---|---|---|---|---|---|
| | 1995 | 2000 | 2005 | | 1995 | 2000 | 2005 |
| AK | 3.45-11.56 | 3.45-11.56 | 3.45-11.56 | MT | 2.00-4.08 | 2.00-4.20 | 2.00-4.70 |
| AL | 5.40 | 5.40 | 5.40 | NC | 5.60 | 5.60 | 5.60 |
| AR | 4.51-20 | 5.51 | 5.51 | ND | 4.25 | 4.60 | 5.60 |
| CA | 4.05 | 4.05 | 7.25 | NE | 2.84-5.05 | 2.84-5.05 | 3.27-5.00 |
| CO | 4.08 | 4.08 | 4.00 | NH | 4.15 | 2.50 | 1.75 |
| CT | 4.10 | 4.10 | 3.15 | NJ | 3.73 | 3.73 | 3.73 |
| DC | | 3.75 | 4.50 | NM | 4.00 | 4.00 | 3.65 |
| DE | 3.65 | 3.65 | 3.65 | NV | 4.64 | 4.76 | 4.76 |
| FL | 4.23 | 4.23 | 4.23 | NY | 5.50 | 4.50 | 4.50 |
| GA | up to $15 | 4.63 | 5.13 | OH | 3.50 | 3.70 | 3.70 |
| HI | 4.67 | 4.67 | 4.67 | OK | 5.10 | 4.15 | 4.15 |
| IA | 6.25 | 6.38 | 4.26 | OR | 3.91-4.28 | 3.91-4.28 | 3.50 |
| ID | 4.30 | 4.94 | 4.94 | PA | 3.50 | 4.00 | 4.00 |
| IL | 3.58-15.00 | 3.75-15.70 | 4.60 | RI | 2.85 | 2.85 | 2.85 |
| IN | 4.00 | 4.00 | 4.90 | SC | 4.05 | 4.05 | 4.05 |
| KS | 3.85-6.97 | 2.78-6.71 | 3.40 | SD | 4.75 | 4.75 | 4.75 |
| KY | 4.75 | 4.75 | 5.00 | TN | 3.91 | 2.50 | 2.50 |
| LA | 5.77 | 5.77 | 5.77 | TX | 4.55 | 5.27 | 5.14 |
| MA | 3.00 | 3.00 | 3.00 | UT | 3.90 | 3.90 | 3.90 |
| MD | 4.94-6.17 | 4.21-7.25 | 3.69-7.25 | VA | 4.40 | 4.25 | 3.75 |
| ME | 3.35 | 3.35 | 3.35 | VT | 4.25-7.50 | 4.25 | 4.25 |
| MI | 3.72 | 3.72 | 2.50 | WA | 3.65-4.50 | 3.98-4.92 | 4.20-5.20 |
| MN | 4.10 | 3.65 | 3.65 | WI | 4.69 | 4.88 | 4.88 |
| MO | 4.09 | 4.09 | 4.09-8.04 | WV | 2.75 | 3.90 | 3.90 |
| MS | 4.91 | 4.91 | 3.91 | WY | 4.70 | 4.70 | 5.00 |

Source: Myers and Stauffer, State reimbursement summaries as produced by the Plaintiffs

## D.4.6. Information on payment variation across states

200. *States were aware of what others were doing*: The wide variation in payment methodologies across the states that I discussed above raises several key questions. The first is whether this variation is a matter of policy choice by the states. The second is, whether states could have used the information apparent in the payments made by their neighbors. My research and review of various documents demonstrates that the state Medicaid agencies were generally knowledgeable about other states

---

[213]  Figures reported are for generic drugs.

Expert Report of Professor W. David Bradford, Ph.D.

payment rates and about the wide variation in reimbursement methodologies used across states. This suggests that the states that set high reimbursement levels did so as a matter of policy choice under the knowledge that other states were able to make drug payments at a lower level. Thus states that paid at the lowest levels set a public benchmark for higher-paying states to use. Consequently, a state that set its pharmaceutical payment formula above this "least-cost" benchmark did so as a matter of deliberate policy – largely driven by internal state political influences.

### D.4.6.1. Forums for information exchange across states

201.   _CMS requires states to demonstrate they have and use data_: Any payment rate change has to be approved by the CMS via a SPA. States frequently attach information (such as Myers and Stauffer studies) and commentary about the process used to arrive at their proposed SPA submissions. These submissions often illustrate the detailed underlying information upon which these submissions appear to rely.[214] In 2005 alone, 722 state plan amendments were submitted to the CMS.[215] CMS generally seeks the basis for payment rate revisions sought in the SPA.[216] CMS may seek additional clarifications via a Request for Additional Information (RAI) or more informally through emails and letters.[217]

202.   _As an example, Idaho demonstrates sophisticated knowledge_: In my review of documents produced in this matter, I came across several examples of communication between CMS and Idaho Medicaid regarding Idaho SPAs. In 1998, Idaho sought to change its drug payment component to (AWP – 11%). CMS regional administration inquired the basis for this change in an email to the state Medicaid official. In response, Idaho Medicaid officials cited the Myers and Stauffer study commissioned by the state that showed that average AC on average was (AWP – 16.5%) for Idaho.[218] Subsequently in 2001, Idaho sought to lower its payment rate again to (AWP – 12%). Again, CMS officials inquired about the basis for the revision. This time the Idaho state Medicaid official responded that it was due to direct order from the state governor. Additionally, the state official cited the Myers and Stauffer study commissioned by Arkansas and Kentucky and OIG reports as support for the revision.[219] These two episodes provide insight into the state plan amendment process. First,

---

[214]   HHC024-0620.

[215]   Not all SPAs are for payment rate changes.

[216]   Recordkeeping 42 C.F.R. § 447.332 (c) (1987)

[217]   Oregon Department of Human Services. "Oregon's Medicaid State Plan." www.oregon.gov/DHS/healthplan/tools_policy/stateplan.shtml.

[218]   HHC-020-1561

[219]   HHC-020-0946

Expert Report of Professor W. David Bradford, Ph.D.

they reveal the significant knowledge exchange that occurs informally between state and federal officials. Second, they show that state Medicaid officials are knowledgeable of the actual drug prices through Myers and Stauffer reports and OIG reports (among others). Third, they reveal that payment rates are affected by state budgetary considerations and not solely driven published prices as the Plaintiff allegations imply. Fourth, they reveal that state Medicaid officials keep abreast of the other states Medicaid plans and studies.

203.    *A second example from South Carolina*: Similarly illuminating exchange took place between CMS official and South Carolina Medicaid officials regarding its SPA to reduce drug payments to (AWP - 10%). Again, CMS official the basis for the revision and state Medicaid official pointed to data obtained from the neighboring states North Carolina, Georgia and Virginia as the basis for the SPA.[220]

204.    *Many established forums exist where state Medicaid personnel can get information*: The examples discussed here, and those discussed in Section D.3 above, illustrate that states are generally knowledgeable of other states Medicaid plans. In addition, there are many other forums for state Medicaid officials to learn about other states Medicaid plans. Following are the examples of groups and organizations for such knowledge exchange:

- *National Association of State Medicaid Directors* (NASMD) was formed in 1979.[221] This association actively gathers information across all state Medicaid agencies and produces comprehensive reports to the states.[222] NASMD documents show tabulations of drug payment policies across states.

- *National Council of State Legislators* (NCSL) actively keeps abreast the developments in different state Medicaid programs. An NCSL website provides a detailed list of changes to Medicaid programs by state including changes to drug payments.[223] In particular they are aware of the states that have low reimbursement policies based on WAC or aggressive MAC programs.[224]

---

[220] HHD-090-1687–1691

[221] National Association of State Medicaid Directors. "About NASMD." www.nasmd.org/about/about.asp.

[222] National Association of State Medicaid Directors. "State Perspectives on Emerging Medicaid Pharmacy Policies and Practices," November 2006. Also see National Association of State MedicaidDirectors. "2007StatePerspectives Medicaid Pharmacy Policies and Practices," November 2007.

[223] National Council of State Legislators. Recent Medicaid Pharmaceutical Laws and Policies." www.ncsl.org/programs/health/medicaidrx.htm.

[224] National Council of State Legislators. Recent Medicaid Pharmaceutical Laws and Policies."

---

205.  There are several Regional Organizations of state health Medicaid administrators that provide forums for knowledge exchange of state Medicaid plans. Some of these regional organizations are:

- Eastern Medicaid Pharmacy Administrators Association (EMPAA): was established in 1977 to "share and communicate ideas to improve their understanding of current Medicaid issues and possible solutions".[225]

- Western Medicaid Pharmacy Administrators Association (WMPAA)

- Southern Association of Medicaid Pharmacy Administrators (SAMPA)

- *Pharmacy Technical Advisory Group* (PTAG) was created as part of the OBRA 1990, PTAG roster includes CMS officials and state Medicaid officials. Among other issues PTAG meets to "..provide(s) information and technical assistance on issues involving cost containment of the pharmacy benefit."[226]

### D.4.6.2. AWP-x and WAC+y do not generally yield the same payment levels

206.  *Argument that discounting off AWP or adding to WAC yields same payment is inaccurate for generic drugs*: It is sometimes argued that states believed that an "AWP-x%" formula would be identical in expenditures to a "WAC+y%" formula, since they believed that there was a fixed relationship between AWP and WAC even in generic markets. A number of states had direct knowledge that this is incorrect. For example, Illinois has primarily used AWP to determine the drug payments. However, for the first two quarters of 2001, Illinois' drug payments were based on WAC.[227] Illinois Department of Public Aid fully expected the drug payments to be lower as a result: "As a result of these changes concerning drug reimbursement, the Department anticipates that annual expenditures will decrease by approximately $35 million."[228] Indeed, the payments for ipratropium bromide (NDC 49502.68503) declined form an average of $0.51 per mL in 2000 to $0.34 per mL in 2001 before increasing back to $0.41 per mL in 2002.[229] On the other hand, Florida has primarily used WAC for drug payments. However, in 2000 Florida based its drug payments on AWP. As a result the average payments for ipratropium bromide (NDC 49502.68503) increased from $0.31 per mL in 1999 to $0.41 per mL in

---

www.ncsl.org/programs/health/medicaidrx.htm.

[225] Eastern Medicaid Pharmacy Administrators Association. "About us." www.empaa.org/.

[226] Pharmacy Technical Advisory Group Roster, December 2, 2007.
www.nasmd.org/about/docs/Pharmacy_TAG_Roster_May2006.doc.

[227] Myers and Stauffer. "State Reimbursement Summary: Illinois." As produced by Plaintiffs in this matter.

[228] State of Illinois, 24 Illinois Register 18999, Illinois Administrative Code Citation: 89 Ill. Admin Code 140, December 29, 2000.

[229] Based on SDUD data analysis

Expert Report of Professor W. David Bradford, Ph.D.

2000.[230] This increase of more than 30% to the retail providers for dispensing Dey drugs is completely independent of prices published by Dey and purely a policy choice.

## D.4.7. Aggregate payment variation across states

207. _Section overview_: CMS requires each state Medicaid agency to provide the Medicaid pharmacy expenditures on a quarterly basis. This data is available from the CMS website and is known as the State Drug Utilization Data (SDUD). SDUD data provides expenditures, units, and number of claims at a NDC, quarter, and state level. SDUD is an aggregate level data that does not contain claims level information. Hence this data is inadequate for a claims level analysis for Dr. Duggan's difference calculations as I will discuss in Section F. But as Dr. Duggan states, "this aggregate data provides a useful overview of how Medicaid spending varied across products, time and states for the 26 NDCs listed in the Complaint during the time period of interest."[231] In the following sections, I will review the variation in payment levels across states as reflected in the SDUD data for the ipratropium bromide, NDCs at issue in this matter, and also for all the NDCs reimbursed by state Medicaid agencies. My review shows that the predictable variation is evident at individual drug level, at manufacturer level and in aggregate for all NDCs.

### D.4.7.1. Ipratropium bromide reimbursement variation across states

208. _Ingredient component payments for ipratropium bromide_: In Figure 20 and Figure 21 above, I showed the variation in implied ingredient payments for ipratropium bromide for states based upon their ingredient payment formulae. In the real world, however, states pay one of multiple bases at any one point in time, including AWP, WAC, the FUL, a state MAC, OIG prices, and so forth. Consequently, average real ingredient payments may differ, empirically, from the payment rules used for Figure 20 and Figure 21. Thus, Figure 23 shows the average actual ingredient payment level for ipratropium bromide 0.02% solution across all states for the year 2000. As the figure shows, Maryland was paying as low as $0.23 per mL and Hawaii was paying as much as $0.64 per mL for the same NDC. As expected, states that chose to use WAC as a benchmark for reimbursement are the lowest reimbursing states.

---

[230] Based on SDUD data analysis
[231] Expert Report of Mark G. Duggan at 27, United States ex rel. Ven-a-Care of the Florida Keys, Inc. v. Dey, Inc., No. 05-11084-PBS (D. Mass. Jan. 23, 2009).

Expert Report of Professor W. David Bradford, Ph.D.

**Figure 23: Unit reimbursement for ipratropium bromide 0.02% solution in 2000**



Source: CMS state utilization data

Expert Report of Professor W. David Bradford, Ph.D.

### D.4.7.2. Reimbursement variation for all 26 NDCs at issue

209. *Ingredient component reimbursements for subject NDCs*: The SDUD data can be used to compare the Medicaid reimbursement levels for all 26 subject NDCs in this matter across all states. In order to do such a comparison efficiently I have constructed a reimbursement index of the 26 NDCs for each state.[232] In order to calculate the reimbursement index, first I calculate the ingredient component payment for each NDC in each state for 2000. Then I divide each state ingredient component payment by the national average for that NDC. The resulting index provides a measure of relative component payment levels for each state for that NDC. A state with an index of 0.8 implies that the state's component payment level was 80% of the national average for that NDC. Then I average the indices for all 26 NDCs at issue in each state.[233] This provides an average index for each state. Again, a state with an index of 0.8 implies that the state's ingredient component payment level averaged for all NDCs was 80% of the national average.

---

[232] Dr Duggan constructs a similar index to compare prices paid by different classes of trade in the Dey transaction data. In an analogous fashion I am comparing the reimbursement rates of each state.

[233] Indices across NDCs are averaged by using the expenditure on each NDC as weights.

Expert Report of Professor W. David Bradford, Ph.D.

**Figure 24: Medicaid reimbursement index for 26 subject NDCs in 2000**



Source: CMS state utilization data

Expert Report of Professor W. David Bradford, Ph.D.

### D.4.7.3. Reimbursement variation for all NDCs reimbursed by Medicaid

210.   *Ingredient component reimbursements for all NDCs covered by states*: In order to evaluate the reimbursement level for all NDCs across states, I have constructed a reimbursement index for all covered NDCs similar to the one I discussed above for 26 NDCs at issue. Figure 25 shows the ingredient component payment index for all states in 2000. As expected, variation in reimbursement rate choices is reflected in actual variation in ingredient payment index. The overall ingredient payment index ranged from 0.84 for Massachusetts to 1.22 for Hawaii in 2000. In other words, Hawaii was reimbursing Medicaid pharmacy claims at a level 22% above the national average and 45% more than Massachusetts. Again, Dey, and for that matter any drug manufacturer publishes only one set of prices nationally which cannot explain this variation across the states.

Expert Report of Professor W. David Bradford, Ph.D.

**Figure 25 : Overall Medicaid reimbursement index in 2000**



Source: CMS state utilization data

---

Contains highly confidential materials—subject to protective order

Expert Report of Professor W. David Bradford, Ph.D.

211. _Dey's AWP and WAC not responsible for variation_: States that were paying more for these drugs could have, at any time, taken advantage of information that Dey made available and adopted the lower payment policies of other states; that they did not is a result of intervening political and economic factors. As a result, any ingredient component payment made by state Medicaid authorities that were above the minimum paid by Medicaid agencies across the United States cannot causally be linked to the actions of the manufacturer. Plaintiffs' 'difference' calculation simply assumes that states that elected higher reimbursement levels did so as a result of the allegations of this matter.

212. _States could have copied the example of low-payment states such as Massachusetts_ : Massachusetts based its payment level on a published price that was available to all states. HCFA recommended states use this WAC based drug payment policy in 1989. Every state could have chosen to use the same drug payment level irrespective of the issue of accuracy of the published prices. Thus a significant portion of payments appears to be a matter of state choice and unrelated to whether Dey published accurate prices. Thus, in my opinion Massachusetts payment methodology based on a published price can be seen as a threshold that was available to all.

## D.4.8. Claims-level payment variation across states

213. _Claims-level data needed to address basic Plaintiff complaint_: Claims-level data reveals additional sources of variation in drug payment levels across states. Approximately thirty state Medicaid agencies have produced claims-level data for their pharmacy drug payments. At any point in time, a state Medicaid agency's payment for drug claims can be based on several alternatives. State Medicaid agencies base drug payment not only on published AWP and WAC, but also on alternate criteria that are generally not directly related to Dey's published prices. As discussed above these include a variety of MAC payments, the FUL, DOJ-revised AWP, and billed charges. In addition, the basis of drug payment cannot even be determined for some portion of various states' Medicaid claims. I used an algorithm to determine the basis of payment for each claim. Appendix F discusses the details of the algorithm I use.

214. _Dr. Duggan is mistaken to include alternative payment bases in his difference calculations_: None of the alternative payment bases listed above is directly tied to published prices for Dey's drugs. Even if one grants the underlying assertion of liability for published AWP and WAC values (which, as I assert throughout this document, I do not), in order to correctly calculate the amount of Medicaid payment differences attributable to Dey AWP and WAC, one must exclude those payments based on methodologies other than AWP and WAC from the calculation. Dr. Duggan has not conducted such an analysis, could not do so with the data upon which he relies, and thus has inappropriately

Expert Report of Professor W. David Bradford, Ph.D.

calculated difference for all claims regardless of whether payments were related to Dey's published prices. If one does undertake a calculation of the sort Dr. Duggan relies upon, it is essential to carefully determine when the published price for Dey was used to make payments on a claim by claim basis.

215.   *For example, only about half of Illinois payments are based on published AWP*: My analysis of the Illinois claims data shows that only about half the claims were paid on the basis of Dey's published AWP. Other claims were paid on the basis of the FUL, state MAC, DOJ-revised AWP and billed charges as shown in Figure 26 below.

**Figure 26: Illinois Medicaid payment bases**

| Basis of payment | Ingredient cost percentage |
|------------------|---------------------------|
| Summary of claims | $21,642,770 |
| AWP adjusted | 32.1% |
| WAC adjusted | 1.8% |
| FUL | 17.3% |
| State MAC | 8.4% |
| DOJ-revised AWP | 7.6% |
| AWP observed | 20.5% |
| Billed charges | 11.0% |
| Other | 1.3% |

Source: Illinois State claims and FDB data

216.   *The percent of payments attributable to published AWP and WAC varies substantially*: Figure 27 illustrates the results of my analysis of the claims data produced in this matter for states that have primarily used AWP as their payment benchmark. As the Figure 27 shows there is wide variation in percentage claims paid on the basis of published AWP across states. For many states, less than half of the drug payments made for NDCs at issue in this matter were based directly on published WAC and AWP information. I provide the details of my payment basis analysis for all the states in Appendix F.

Contains highly confidential materials—subject to protective order

Expert Report of Professor W. David Bradford, Ph.D.

**Figure 27: Payment bases for AWP states**



Source: State claims and FDB data

217.   *Overall payment basis results:* Figure 27 above shows the wide variation of payment bases for state that primarily used AWP and produced claims data in this matter. Appendix F includes similar figure for states that primarily used WAC and produced claims data in this matter. In Figure 28 I have summarized the combined payment bases result for all states that produced claims data in this matter. Overall, less than half the drug payments were based in published prices for Dey drugs.

Expert Report of Professor W. David Bradford, Ph.D.

**Figure 28: Medicaid payment bases for all states**

| Basis of reimbursement | Ingredient cost percent |
|---|---|
| AWP adjusted | 32.8% |
| WAC adjusted | 10.4% |
| FUL | 15.5% |
| State MAC | 8.8% |
| DOJ-revised AWP | 2.5% |
| AWP observed | 7.6% |
| Delaware WAC | 0.1% |
| MAC observed | 2.1% |
| WAC observed | 0.6% |
| Billed charges | 10.2% |
| Other | 9.5% |

Source: State claims and FDB data

## D.4.9. In Summary - Dey's price cannot explain payment variation across states

218. _Section summary_: This section outlines a number of facts that together undermine Plaintiff's claims for Medicaid. First, the variation in payment levels chosen by the states needs to be considered against the fact that Dey only publishes only one set of prices nationwide; clearly Dey cannot be held responsible for 50 separate payment rates when it provides only one WAC per NDC. Second, many state Medicaid payments are based on methods unrelated to published AWP and WAC; Dey cannot be held responsible for those deliberate state decisions which are divorced from any action on Dey's part. Third, the variation in payment level across states can only be understood in a comprehensive context that considers all relevant factors; some of the relevant factors I have already discussed are: states with differing needs, equal access requirement, deliberate state cross-subsidy payment decisions, efficiencies produced by encouraging generic substitution, and powerful political influences at work idiosyncratically in each state's payment setting policy process. On this last point, academic studies have shown the influence of various other stakeholders in setting drug payment rates independent of the published prices. For example, Pracht and Moore have shown that payment rates are significantly influenced by the pharmacy associations.[234] Ultimately, Medicaid programs have many stakeholders and the payment levels are in the end a result of the interaction among all these stakeholders.

---

[234] Pracht, Etienne E. and William J. Moore. "Interest Groups and State Medicaid Drug Programs." _Journal of Health Politics, Policy and Law_ 28, no. 1 (2003): 9-39.

Expert Report of Professor W. David Bradford, Ph.D.

# E. Medicare program

219. In this section I will discuss the Medicare part B program. I highlight the reimbursement choices made over time, the efforts by CMS to adjust reimbursement levels, and the significant role played by the home health care agencies in the provision of inhalation therapy drugs through the Medicare Part B program. Finally I will discuss the significant cross-subsidy between the drug and dispensing payments.

## E.1. Medicare Part B background

220. _Origin of Medicare_: The Medicare program was created as part of the 1965 Social Security Act. Medicare is a medical insurance program financed by the federal government covering the population 65 and older and certain disabled individuals.[235] Before 2006, Medicare primarily covered the medical expenses related to inpatient hospital services for eligible beneficiaries under Medicare Part A. The prescription drug coverage prior to 2006 included drugs incident to physician services and those used with durable medical equipment (DME) under Medicare Part B.[236] The inhalation therapy subject drugs in the Medicare portion of this matter are all administered via a nebulizer which is classified as durable medical equipment and covered under Medicare Part B. Many of the individuals receiving coverage for Dey's drugs through Medicare Part B receive treatments through home health care services.

221. _Sources of funding_: Medicare Part A is paid for using employment taxes, while Medicare Part B is financed partially via employment taxes and partially via enrollee premiums. Medicare beneficiaries are responsible for a 20% copayment for the drugs reimbursed under Medicare Part B.[237] A third party insurance provider usually covers the copayment when the beneficiaries have supplemental insurance. In addition to the copayment, Medicare Part B also has an annual deductible per beneficiary. Thus on average, the federal government finances slightly less than 80% of the allowed amount for drugs covered under Medicare Part B.

[235] "Overview of Medicare Program – General Information" www.cms.hhs.gov/MedicareGenInfo/.

[236] U.S. Department of Health and Human Services, Office of the Inspector General. "Medicare Payments for Nebulizer Drugs," February 1996, 1. Some additional drugs specifically covered by the statute were also covered under Medicare Part B.

[237] U.S. Department of Health and Human Services, Office of the Inspector General. "Medicare Payments for Nebulizer Drugs," February 1996, 6.

Expert Report of Professor W. David Bradford, Ph.D.

## E.1.1. Medicare Part B payment level timeline

222.    *It is not possible to identify a specific multi-source drug / manufacturer using Medicare claims data*: Medicare drug payments are not made for individual NDCs. Similarly, payment levels are not determined solely on individual NDC prices. Instead, payment levels are set at the procedural, or HCPCS, level. Thus for multi-source drugs, CMS uses the published prices available to set the reimbursement level for all drugs included in the HCPCS. Many manufacturers' products may be included in any one HCPCS code.

223.    *CMS has chosen to rely on Red Book, rather than conduct its own surveys of prices*: CMS primarily used the AWP to calculate reimbursement levels for drugs under Medicare Part B during the relevant time period in this matter. Until 1998, Medicare Part B reimbursement allowed for multi-source drugs was the lower of:[238]

- Billed charge

- Estimated acquisition cost (EAC)

- Median of the national average wholesale price

According to the Medicare regulations, EAC was to be based on surveys of actual invoice prices paid by providers.[239] These surveys would have provided a basis of reimbursement independent of manufacturer published prices. In practice, the EAC component of Medicare Part B drug reimbursement allowable was never utilized.[240] Instead, AWP published in the Red Book was used to determine the median AWP among all the generic multi-source drugs relevant to the HCPCS.[241]

224.    *Changes to Part B ingredient payments*: In 1998, Medicare Part B ingredient payment levels were revised by an act of Congress to be the lower of AWP minus 5% of the median AWP of generic multi-source drugs and the billed charges.[242] Ingredient payment levels were revised further on

---

[238]   42 C.F.R. § 405.517 (1997)

[239]   56 Fed. Reg. 59,621 (Nov. 25, 1991).

[240]   Deposition of Robin Kreusch Stone, Manager Medicare fee-for-service pricing for Palmetto Government Benefits Administrators, Feb. 28–29, 2008, at 335–36.

[241]   Deposition of Cheryl Eiler, Business Systems Analyst, AdminaStar, Sept. 23, 2008, at 12–13.

[242]   Congress took this action in spite of information available from OIG that drug acquisition costs were significantly lower and recommendations from HCFA that lower payment rates be adopted. See Department of Health and Human Services, Office of Inspector General, "Medicaid Pharmacy –Actual Acquisition Cost of Prescription Drugs Products for Brand Name Drugs," April 1997. See also Department of Health and Human Services, Office of the Inspector General, "Medicaid Pharmacy: Actual Acquisition Cost of Prescription Drugs Products for Generic Prescription Drug Products," August 1997.

---

Expert Report of Professor W. David Bradford, Ph.D.

January 1, 1999 to the lower of the lowest brand AWP and generic median AWP.[243] On January 1, 2004 the discount off of AWP for ingredient payment was increased to 20% as part of the Medicare Prescription Drug, Improvement and Modernization Act ("MMA").[244] Finally, under the MMA, in 2005, Medicare Part B set the ingredient payment level at average sales price, ASP, plus 6%.

## E.1.2. Medicare Part B payment level implementation for DME drugs

225.  *Establishment of DMERCs*: Unlike Medicaid drug reimbursement programs run by state agencies, the Medicare program is administered by the federal agency CMS - formerly HCFA. Originally, CMS contracted with fiscal intermediaries to process drug claims submitted by providers for drugs covered under Medicare Part B. However, increased utilization of drugs used with durable medical equipment and the existence of unique provider groups led HCFA to create a system with separate fiscal intermediaries to process DME related claims in 1993.[245] HCFA created four regions, each with a separate fiscal intermediary. The regional fiscal intermediaries are referred to as Durable Medical Equipment Regional Carriers ("DMERCs").[246] These institutions are not the same carriers as those that handle other Medicare payments, e.g. for chemotherapy drugs.

226.  *DMERC pricing arrays*: Although payment policies for Medicare Part B are set at the Federal level, regional DMERCs had considerable latitude in implementing these policies. To determine the ingredient payment level, the DMERCs collected an AWP for all NDCs relevant to each HCPCS from pricing compendia. This list of NDCs and prices was commonly known as the pricing array.[247] Each DMERC compiled a pricing array for each HCPCS on a quarterly basis and calculated the median generic or lowest brand price to determine the allowed reimbursement level.[248] A review of

---

[243]  Medicare Payment Advisory Commission. "Report to the Congress: Variation and Innovation in Medicare," June 2003, Chapter 9, 153. www.medpac.gov/publications/congressional_reports/June03_Ch9.pdf.

[244]  CMS. "Pub. 100-04 Medicare Claims Processing, Transmittal 55," December 24, 2003. On January 1, 2004, discount off median AWP for most HCPCS was only increased to 15%. But for the selected HCPCS at issue, discount off AWP was set at 20%. HGS Administrators. "Medicare Report," March 1, 2004, 29.

[245]  U.S. Department of Health and Human Services, Office of the Inspector General. "Medicare Payments for Nebulizer Drugs," February 1996, 1.

[246]  U.S. Department of Health and Human Services, Office of the Inspector General "Medicare Payments for Nebulizer Drugs," February 1996, 1–2. Some reimbursements for inhalation therapy drugs also occurs through HCFA's regular carriers that administer hospital related claims. However, for the drugs at issue in this matter, this constitutes a very small proportion hence I will not discuss them in detail. I note that Dr. Duggan also only considers DMERC reimbursements in his difference calculations.

[247]  Deposition of Cheryl Eiler, Business Systems Analyst, AdminaStar, Sept. 23, 2008, 14–16. Also see Deposition of Robin Kreusch Stone, Manager, Medicare fee for service pricing for Palmetto Government Benefits Administrators, Feb. 28–29, 2008, at 273–77.

[248]  Deposition of Robin Kreusch Stone, Manager, Medicare fee for service pricing for Palmetto Government Benefits Administrators, Feb. 28–29, 2008, at 272.

Expert Report of Professor W. David Bradford, Ph.D.

the pricing arrays and the allowed ingredient payment levels across DMERCs reveals various inconsistencies that are independent of Dey's published prices.

### E.1.2.1. Variation in pricing arrays across DMERCs

227.    _Pricing arrays standardized in 1997_: In 1997 the four regional DMERCs began to coordinate with each other on the construction of the quarterly pricing arrays.[249] As a consequence, the allowed reimbursement level for each DMERC is consistent after 1997. However, prior 1997, there was considerable variation in the construction of pricing arrays across the DMERCs. Figure 29 below shows the allowed ingredient payment levels determined by each DMERC for the HCPCS related to albuterol sulfate 0.083% solution. Ingredient payment levels set by different DMERCs vary by as much as 15% in some quarters.

**Figure 29: Allowed reimbursement levels albuterol sulfate 0.083% solution HCPCS**



Source: DMERC claims data.

---

[249]  Deposition of Robin Kreusch Stone, Manager, Medicare fee for service pricing for Palmetto Government Benefits Administrators, Feb. 28–29, 2008, at 300–303.

Expert Report of Professor W. David Bradford, Ph.D.

### E.1.2.2. Numerous mistakes made in pricing arrays

228.  *Example of incorrect price elements used in cromolyn sodium array*: All four regional DMERCs
      miscalculated the unit price of Allscripts' brand drug, Intal, in the cromolyn sodium arrays for the
      period from 1999Q3 through 2002Q2.As a result, the allowable ingredient payment for this period
      was based on the lowest price brand drug instead of the median generic, which was in some quarters
      $0.13 lower than the median generic drug.[250] As the Figure 30 shows this mistake by the DMERCs
      resulted in a noticeable decrease in the allowed ingredient payment level over almost three years and
      across all four DMERCs. This is an example of variation in payment level independent of Dey's
      published price.

**Figure 30: Allowed reimbursement levels cromolyn sodium solution HCPCS**



Source: DMERC claims data.

229.  *Drugs incorrectly included in pricing arrays*: It is not clear how the DMERCs determined whether to
      include some NDCs and exclude others in constructing their pricing arrays. Cheryl Eiler, a Business
      Analyst at AdminaStar responsible for DME drug pricing, explained in deposition that she included

---

[250]  "DMERC Medication Pricing," Cigna Arrays K0511.xls, Tab 1999-4th, February 21, 2008, p. 1, as produced by the
       Plaintiffs.

Expert Report of Professor W. David Bradford, Ph.D.

all NDCs with the same drug description as the HCPCS in the array.[251] My review of the price compendium shows that there are generally more NDCs available in the market than those included in the DMERC pricing arrays. A closer look at the 1999Q2 Cigna array for albuterol sulfate 0.083% solution, K0505, shows that there are seventeen generic drugs and five brand drugs in the array.[252] However, according to the pricing compendia there are four to thirteen additional generic drugs with the same description and an effective AWP in 1999Q2.[253] At times DMERC pricing arrays included non-existent NDCs. For example, the region B DMERC ipratropium bromide pricing array for 2002Q3 through 2003Q3 includes six Dey NDCs while there were only three Dey NDCs in the market.[254]

230.    *Drugs incorrectly classified as brand or generic*: Three of the four DMERCs consistently included Roxane's generic drug NovaPlus as a brand. NovaPlus was included in the DMERC arrays from 2000Q3 to the end of the at-issue period. Only DMERC A categorized NovaPlus as a generic during this time period.

231.    *The DMERC pricing array process separates Dey's pricing decisions from Medicare payment levels*: The selected examples discussed above show various inconsistencies, inaccuracies, and decisions made by the DMERCs that impacted the allowed ingredient payment level. These errors and decisions are independent of Dey's published prices and illustrate that there is a break in the causal chain between Dey's published prices and the actual allowed ingredient payment levels determined by the DMERCs. It is not clear how the payments would have changed if only Dey had published a different AWP. Dr. Duggan fails to consider all these imperfections and decisions in his difference calculations. As such, Dr. Duggan's difference calculations methodology incorrectly attributes payments resulting from all these errors and decisions to Dey's published prices.

## E.2. Role of home health care providers

232.    *Home health providers major channel for delivering subject drugs*: Home health care providers play a large role in the provision of inhalation therapy drugs through the Medicare Part B program. In fact, at least eight of the top ten DMERC providers are home health care providers. These eight providers

---

[251]  Deposition of Cheryl Eiler, Business Systems Analyst, AdminaStar, Sept. 23, 2008, at 14–16.

[252]  AWQ020 CD#1\K0505.xls Tab:1999 – 2.

[253]  Analysis of FDB and Red Book prices for GCN 5039.

[254]  AWP033-1352, AWP038-0704, AWP033-1243, AWP038-1461, AWP033-1810, AWP033-1653, AWP033-1654, AWP033-2124.

Expert Report of Professor W. David Bradford, Ph.D.

accounted for 35% of total albuterol 0.083% DMERC allowed reimbursements between 1993 and 2003 and 45% of total ipratropium bromide DMERC allowed reimbursements.

233. _Delivering drugs is costly for home health providers_: Home health providers' economic decisions to participate in Medicare Part B are driven by the overall payment provided by Medicare for this service, which consists of the combined amount paid for drugs and services. The costs associated with providing home health care service for nebulizer drugs exceed those typical of providing standard pharmacy services. Inhalation therapy providers must purchase and deliver the equipment to the beneficiary, as well as, ensure that the beneficiary understands how to use and care for the nebulizer. Sometimes a home visit by a respiratory therapist is necessary to educate the patient.[255] Additional services provided by home health care providers include shipping drugs overnight, reminding beneficiaries to refill their prescriptions and operating 24-hour phone lines to answer beneficiary questions.[256]

234. _Home health care reduces excess costs to the system_: Home health care providers provide other valuable services to Medicare beneficiaries that maintain the health and improve the well-being of these beneficiaries; these services reduce the frequency of high-cost acute episodes. A GAO study cited that "once beneficiaries begin receiving inhalation therapy, they are likely to receive it for the remainder of their lives."[257] As a result of this extended use of inhalation drugs, patient compliance with inhalation drug therapy regimens is necessary to "reduc[e] the frequency of disease state exacerbations and unanticipated hospital visits."[258] The added services of home health providers, such as respiratory therapist home visits, monthly phone calls reminding beneficiaries to refill prescriptions and shipping necessary drugs overnight, help Medicare beneficiaries comply with therapy regimens and keep them out of the hospital. These measures are likely to result in savings over alternate treatments for the elderly population such as hospitals and skilled nursing facilities.

## E.2.1. Compounding of inhalation therapy and home health services

235. _Compounding drugs often required for home health patients_: In many instances, the provision of inhalation therapy solutions requires compounding of multiple drugs. A 2004 study on the cost of delivering inhalation drugs by Muse & Associates shows that 20.6% of inhalation drug claims by

---

[255] Muse & Associates. "The Cost of Delivering Inhalation Drug Services to Medicare Beneficiaries," August 2004, 4.

[256] U.S. Government Accountability Office. "Medicare - Appropriate Dispensing Fee Needed for Suppliers of Inhalation Therapy Drugs," October 2004, 3–4.

[257] U.S. Government Accountability Office. "Medicare - Appropriate Dispensing Fee Needed for Suppliers of Inhalation Therapy Drugs," October 2004, 4.

[258] Muse & Associates. "The Cost of Delivering Inhalation Drug Services to Medicare Beneficiaries," August 2004, 4.

Expert Report of Professor W. David Bradford, Ph.D.

Medicare beneficiaries require compounding.[259] An additional 2004 dispensing fee study by the GAO found that ten of the twelve inhalation drug suppliers surveyed compounded at least some of their Medicare prescriptions. When compounding is needed, it will generally be necessary for a provider to do so, rather than the patient. Compounding of drugs requires more sophisticated providers such as the home health care agencies and results in overall lower payments by Medicare.

236.   *Claims data only began indicating compounding in 1997*: Beginning in April 1997, CMS created modifier codes that indicated which inhalation drugs were combined into multi-drug unit doses and dispensed to the beneficiary in a single unit dose container. The three modifiers used to indicate if inhalation drugs are compounded are

- KO - only one drug was dispensed as a single drug unit dose,

- KP - the first drug dispensed in a multi-drug unit dose, and

- KQ - the second or subsequent drug dispensed in a multi-drug unit dose.

237.   *Compounded drugs have a non-linear pricing formula*: The second or subsequent drug is dispensed at a lower reimbursement level than the first or only drug. There are two methods to determine the allowable for drugs dispensed with the KQ modifier. For drugs with a concentrated form the KQ allowable is equal to the allowable of the concentrated form. For example, in Region C in the third quarter of 1999 the allowable amount per milligram for albuterol 0.083%, K0505, with the KO and KP modifier was $0.47, while the allowable for the KQ modifier was the same as the concentrated form of albuterol, K0504, $0.14. When a drug does not have a concentrated form, the allowable for the KQ modifier is determined by starting with the KO allowable and scaling the unit dose quantity up to the typical dosage, netting out the allowable for saline solution, and then scaling the dosage back to the unit dose. For example, to calculate the allowable for ipratropium bromide, K0518KQ, in the third quarter of 1999[260]:

---

[259]  Muse & Associates. "The Cost of Delivering Inhalation Drug Services to Medicare Beneficiaries," August 2004, 13.

[260]  AWQ028\nonPrivDATA\Item 1 Drug Files (Pricing information\1999 Drug files\K0000 7-1-99.zip\K0000 7-1-99.xls Tab: K0518 and AWQ037-005).

Expert Report of Professor W. David Bradford, Ph.D.

**Figure 31: KQ allowable calculation**

| Step description | Formula | Calculation |
|---|---|---|
| The allowable amount per unit dose, one milligram, for K0518KO is multiplied by the number of milligrams in a typical dosage | $3.52 x 0.5 mg | $1.76 |
| The allowable for saline solution is subtracted | $1.76 - $0.16 | $1.60 |
| The remaining amount is divided by the number of milligrams in a typical dosage | $1.60/0.5 mg | $3.20 |

Source: AWQ028\nonPrivDATA\Item 1 Drug Files (Pricing information\1999 Drug files\K0000 7-1-99.zip\K0000 7-1-99.xls Tab: K0518 and AWQ037-005) and AWQ037-0002 – AWQ0037-0003.

238. *The payment formula for compounded drugs yields lower payments than the two drugs separately*: CMS requires that "when two or more drugs are combined, the use of the KP and KQ modifiers should result in a combination that yields the lower cost to the beneficiary."[261] In addition to paying a lower payment for the drug with the KQ modifier and minimizing the claim total payment by requiring the drug with the higher total monthly payment amount to be reimbursed with the KQ modifier, CMS also only pays one dispensing fee for multiple drugs that are combined into a single unit dose container. However, the process of compounding drugs requires special equipment and handling by providers and takes additional time to prepare. For these providers, the additional costs associated with compounding included "maintenance of a sterile compounding room and increased pharmacist labor."[262]

## E.2.2. Cost of dispensing payments

239. *Before the MMA underpayments on dispensing were subsidized with ingredient payments*: Prior to reforms introduced under the MMA in 2005, the dispensing fee allowed for home health claims was $5.00. The 2004 GAO study on dispensing fees for Medicare found that the per patient cost of dispensing ranged from $7 to $204.[263] The suppliers surveyed for the study explained that they "received drug payments substantially higher than their acquisition costs. Suppliers indicated that they used these excess payments to offer services that benefited both beneficiaries and their physicians…" but were not required by Medicare.[264] The 2004 Muse & Associates study estimated

---

[261] Smith, Lisa K. "Respiratory's New Coding Headache." HME Today, May 4, 2002. www.hmetoday.com/issues/articles/2002-05_04.asp.

[262] U.S. Government Accountability Office. "Medicare - Appropriate Dispensing Fee Needed for Suppliers of Inhalation Therapy Drugs," October 2004, 9–10.

[263] U.S. Government Accountability Office. "Medicare - Appropriate Dispensing Fee Needed for Suppliers of Inhalation Therapy Drugs," October 2004, 5.

[264] U.S. Government Accountability Office. "Medicare - Appropriate Dispensing Fee Needed for Suppliers of Inhalation Therapy Drugs," October 2004, 4–5.

that the dispensing fee required to provide 2004 levels of service in 2005, under the ASP payment system, was $68.10 per HCPCS in a claim.[265]

240. *Medicare could not unilaterally reduce ingredient payments without raising dispensing payments*: As a result of these studies, policy makers were well informed that additional margins on drug ingredient payments had to be engineered into the system in order to incentivize home health agencies to provide service. It is simply not correct to assume, as Plaintiffs' experts do, that Medicare could have paid substantially less to home health providers for the subject drugs given the unrealistically low dispensing fees they received.

## E.3. Efforts to reduce the payment levels

241. *Medicare drug payments arise out of political process*: As with the Medicaid program, the level of pharmaceutical payments set by Medicare is the result of extensive national-level negotiations between groups representing the interests of patients, providers, and taxpayers. These negotiations balance the competing aims of achieving low cost and ensuring access to quality care for Medicare beneficiaries. There is no reason to expect that the outcome of such negotiations would result in ingredient payments that equal the actual ingredient cost of drugs – even if that information were known perfectly. In fact, during the time period in question payments were being set in a political process, even while studies, such as those performed by OIG, were available and provided detailed information about the cost of Dey's drugs to home health providers relative to AWP. Dey also furnished its WAC, which closely tracked its transaction prices.

242. *The federal government declined several opportunities to move away from AWP-based payments*: Between 1990 and 2005, several initiatives were taken to reduce Medicare Part B drug payment levels. These initiatives were taken as a direct result of government authorities' knowledge regarding the disparity between average AC and AWP. However, as I discuss below, the federal government decided not to implement these initiatives. Thus, in my opinion, the continued reliance on AWP for the Medicare Part B drug reimbursements was due to factors independent of the disparity between drug manufacturers' published AWP prices and average AC.

### E.3.1. Invoice surveys were not implemented in 1991

243. *HCFA did not gather actual data on invoice prices*: Medicare regulations provide EAC as an alternative reimbursement basis to AWP. EAC should be determined by surveys of invoice prices

---

[265] Muse & Associates. "The Cost of Delivering Inhalation Drug Services to Medicare Beneficiaries," August 2004, 13.

Expert Report of Professor W. David Bradford, Ph.D.

paid by providers.[266] However, in 1991 when one of the Medicare carriers attempted to survey provider invoice prices, HCFA promptly disallowed this effort by the carrier. As a result Medicare payments continued to be based on AWP.

## E.3.2. Use of average AC was rejected in Balanced Budget Act in 1997

244.   *Congress passed up opportunities in the 1997 BBA to move away from AWP*: The disparity between average AC and AWP was also recognized by President Clinton and the Secretary of Health and Human Services. In the process of crafting the 1997 Balanced Budget Act (BBA) an alternative to AWP was considered but eventually not adopted as described in a 2000 letter from Donna Shalala, Secretary of Health and Human Services, to the House of Representatives Commerce Committee.

245.   Indeed, the HHS Inspector General found payments based on average wholesale price data to be 11 to 900 percent greater than the prices available to the physician community. Therefore, in 1998, the President again proposed paying physicians their actual acquisition cost to 'ensure that doctors are reimbursed no more, and no less, than the price they themselves pay for the medicines they give Medicare patients.' However, no Congressional action was taken.[267]

## E.3.3. Congress stopped the use of 'inherent reasonableness' clause

246.   *In 1998 the DMERCs gathered sufficient information to bring their AWP-based payments in line with actual acquisition costs*: Fundamentally, assuming that payment methodologies are based on some benchmark, nothing prevents HCFA from setting ingredient payments very near average acquisition costs using AWP as the starting point; the only issue is picking a sufficiently large discount. The 1997 Balanced Budget Act included provisions that allowed the DMERCs to adjust reimbursement levels by up to 15% per year for unreasonably high or low Medicare reimbursements. This provision was known as the 'inherent reasonableness' clause. HCFA and the DMERCs could enforce the inherent reasonableness clause without formal rulemaking.[268] In 1998, in response to the inherent reasonableness clause, the DMERCs surveyed the prices paid by providers for several products, including albuterol sulfate, reimbursed under Medicare Part B.[269] As a result of the survey the internal

---

[266] 56 Fed. Reg. 59,621 (Nov. 25, 1991).

[267] Letter from Donna Shalala, Secretary, Department of Health and Human Services, to Tom Bliley, House of Representatives, Commerce Committee, May 31, 2000, 1–2.

[268] U.S. Government Accountability Office. "Use of "Inherent Reasonableness Process Generally Appropriate," July 2000, 10.

[269] U.S. Government Accountability Office. "Use of "Inherent Reasonableness Process Generally Appropriate," July 2000, 10.

Contains highly confidential materials—subject to protective order

Expert Report of Professor W. David Bradford, Ph.D.

medical director for region D recommended that an "… Inherent Reasonableness reduction of 15% in 1998 for albuterol sulfate 0.083% is clearly warranted and supportable".[270]

247.  _Congress prohibited the DMERCs from adjusting payments down to actual average acquisition costs_: However in 1999, Congress passed legislation prohibiting HCFA from using the inherent reasonableness clause until the GAO conducted a study to examine the HCFA's effort. Among the questions posed by Congress for the GAO study was the issue of access due to the proposed reduced reimbursement levels.[271]

248.  _Congress' and HCFA's behavior reveals that they did not intend to set ingredient payments near average AC_: The DMERCs' survey and the internal medical director's suggested reimbursement reduction illustrate that HCFA was aware the disparity between reimbursement levels and provider costs. HCFA had options available to reduce the reimbursement levels independent of the manufacturer published price. However, Congress intervened due to considerations unrelated to manufacturer published prices.

## E.3.4. Use of DOJ-revised AWP was disallowed in 2001

249.  _HCFA passed up another opportunity to lower payments in 2000 following a DOJ report_: Another attempt to reduce reimbursement levels for Medicare Part B drugs was made by HCFA in 2000. This attempt followed the publication of DOJ-revised AWP. Internal HCFA documents show that, following congressional inquiries, the agency initiated a process to use DOJ-revised AWP to set reimbursement levels.[272] The DOJ-revised AWP is lower than the manufacturer published AWP and HCFA determined that it had the legal authority to use these lower prices without rule making.[273] Furthermore, internal documents show that HCFA estimated that these lower prices would result in savings of roughly $650 million out of the total $1.8 billion in expenditures on drugs with a DOJ-revised AWP – as potential savings of just over 36%.[274] Agency documents further state that "While we believe that Medicare overpays for the drugs identified by DOJ, we must also assure continued

---

[270] U.S. Government Accountability Office. "Use of "Inherent Reasonableness Process Generally Appropriate," July 2000, 5.

[271] U.S. General Accounting Office. Report to the Chairman, Subcommittee on Health, Committee of Ways and Means, House of Representatives, "Use of "Inherent Reasonableness" Process Generally Appropriate," GAO/HEHS0-79, July 2000, 5.

[272] HHD809-0010.

[273] HHD809-0011.

[274] HHC902-0255.

Expert Report of Professor W. David Bradford, Ph.D.

beneficiary access to these drugs."[275] Eventually, HCFA decided not to adopt the lower DOJ-revised AWP in determining the reimbursement rates.[276] HCFA's consideration of the DOJ-revised AWP demonstrates yet again that HCFA was aware that Medicare drug reimbursements were higher than the provider drug cost. Despite having the authority and information needed to do so, HCFA decided not to lower reimbursements due to factors unrelated to Dey's published prices. Thus it is unclear that any other price published by Dey would have affected reimbursements.

### E.3.5.  CMS also considered the use of AMP

250.    _HCFA / CMS had the AMP and deliberately chose not to use it_: In Appendix E, I discus the OBRA 1990 that mandated the drug manufacturer to report AMP to HCFA. Internal documents show that HCFA was considering the use of AMP for Medicare reimbursement purposes. Deputy administrator of HCFA Michael Hash wrote:

> Submit legislation in September to set Medicare prices at Average Manufacturer Prices (AMP) plus a reasonable mark-up. We believe that instead of proposing to base Medicare payment on actual acquisition costs, we should propose AMP plus a reasonable mark-up instead. AMP is auditable and we currently have and use it in computing Medicaid drug rebates.[277]

Other internal documents from HCFA and CMS show internal discussions on the use of alternate methods to set drug reimbursement levels for the Medicare part B including the use of average AC for each provider.[278] In my opinion, the evidence discussed above shows that CMS was aware of the implication of using AWP for drug reimbursement. It had alternatives available to reduce reimbursements. However for various considerations independent of the manufacturer published prices, those alternatives were not used.

### E.3.6. Evidence of CMS decision making exonerates manufacturers

251.    _CMS ingredient payment setting was fully informed_: The episodes discussed above illustrate that the federal government and CMS were well aware of the disparity between actual and published prices. There were options available to lower drug payments that were not utilized. Ultimately, the drug payments were the result of policy considerations often driven by the Congress that are independent of the published prices.

---

[275] HHC902-0251.

[276] Deposition of Francis Donald Thompson, Senior Technical Advisor to the Hospital and Ambulatory Group, CMS, Sept. 30, 2008, at 142–48.

[277] HHC902-0257.

[278] HHD900-2121–HHD900-2128.

---

Contains highly confidential materials—subject to protective order

Expert Report of Professor W. David Bradford, Ph.D.

# E.4. Cross subsidy in Medicare payments

252.   *If dispensing fee components do not cover costs, additional margins must be included elsewhere*: As I described above, home health care providers used the ingredient reimbursement in excess of the ingredient cost to provide valuable services to Medicare beneficiaries. This breadth of services would not have been available to beneficiaries without the margin on drug costs that home health care providers received. Just as with Medicaid, if one wants to assure access it is necessary to consider if the total payment for providing pharmaceutical therapy covered the total cost instead of individually considering the drug and service components. Careful examination of MMA-induced changes in payments for treatments involving Dey's subject drugs illustrates the extent to which pre-MMA ingredient payments were known by the government to cross-subsidize dispensing payment shortfalls.

253.   *When ingredient payments were reduced, dispensing payments rose dramatically*: The reimbursement changes that occurred in 2005 as part of the Medicare Modernization Act provide clear evidence of the cross subsidy between drug reimbursement and dispensing cost. Under the MMA, drug reimbursements levels were reduced from AWP minus 20% to ASP plus 6%. This resulted in an average reduction in ingredient payments. For example, the change caused an 82% decrease in ingredient payments for albuterol. Simultaneously, the dispensing fee component for inhalation therapy drugs was increased from $5.00 to $57.00. This represents a 1,040% increase in the dispensing fee. The following table shows the percent change in reimbursement levels for all four subject drugs and the dispensing fee.

**Figure 32: Percent change in reimbursement levels**

| Drug | 2004Q4 KO/KP | 2005Q1 KO/KP | Percent change |
|------|------|------|------|
| Dispensing fee | $5 | $57 | 1,040% |
| Albuterol 5% | $0.65 | $0.35 | -46% |
| Albuterol 0.083% | $0.33 | $0.06 | -82% |
| Cromolyn sodium | $0.30 | $0.10 | -67% |
| Ipratropium bromide | $0.56 | $0.06 | -89% |

Source: Medicare Advisory Winter 2004 and Spring 2005.

254.   *Cross-subsidy for cromolyn in dollar margin terms*: A comparison of the dispensing payment and ingredient payment for the typical monthly claim of cromolyn sodium illustrates the cross subsidization that occurred prior to the enactment of the MMA in 2005. Prior to 2006 Medicare Part B only reimbursed claims for a 30 day supply, requiring patients to refill prescriptions monthly. Total payments for a typical 30-day supply of cromolyn sodium in 2004 included a $72 drug component

Expert Report of Professor W. David Bradford, Ph.D.

payment and a $5 dispensing fee for a total 30-day payment of $77. With the ASP-based reimbursement in 2005 the total reimbursement included a $24 drug component payment and a $57 dispensing payment for a total 30-day payment of $81. So, from 2005 to 2006 the total payment for 30 days of cromolyn sodium therapy was essentially unchanged (rising by $4, or 5.1%); the "weight" that each component of payment – ingredient and dispensing – essentially switched. In this example the role of the cross subsidy under the AWP reimbursement policy is clearly illustrated as a large portion of the drug component payment reduction was offset by the dispensing payment increase.

**Figure 33: Payment for typical 30-day claim of cromolyn sodium**



Source: Medicare Advisory Spring 2004 and Spring 2005.

255.    *Changes to the compounding payment rules were put in place with the introduction of ASP-based payment*: I discussed above drug compounding and the usage of modifiers in the context of inhalation drugs. The DMERC data indicates that the most common combination of inhalation drugs is albuterol sulfate and ipratropium bromide in a single unit dose. This drug combination is one of the two most frequently reimbursed claims in the DMERC data from 1998 through 2004. Prior to 2005, reimbursement for compounded solutions was claimed using the modifier codes. Total reimbursement for a typical monthly supply of the albuterol and ipratropium bromide solution in 2004 was $211.20

Expert Report of Professor W. David Bradford, Ph.D.

for both drugs and $5 for the dispensing fee, totaling $216.20. When the same claim with modifier codes was paid in 2005 under the ASP system with modifier codes the total payment would have declined to $94.80. However, in 2005, CMS introduced a new HCPCS, J7616, which specifically reimbursed for the compounded solution of albuterol sulfate and ipratropium bromide without the use of modifier codes. Under the ASP system the total reimbursement for a typical monthly supply for the compounded solution was $312 for the drug and $57 for dispensing fee, totaling $369. The introduction of a new HCPCS code for compounded solution resulted in increased utilization of this new HCPCS that mostly offset the decrease in utilization of the old HCPCS system using modifier codes.

**Figure 34: Payment for typical 30-day claim of albuterol and ipratropium bromide compounded solution**



Source: Medicare Advisory Spring 2004 and Spring 2005 and PSPS data.

256. *ASP switch involved many changes*: While the cromolyn sodium example highlighted above shows a clear offsetting of drug reimbursement and dispensing fee, other examples may not show similar exact off-set in from 2004 to 2005. However the second example of the introduction of a compounded solution HCPCS illustrates that a simple comparison of the change in reimbursement rates does not account for other changes made by CMS to the drug codes at issue in this matter.

---

Expert Report of Professor W. David Bradford, Ph.D.

257.   *ASP-based payment left total payment rate for inhalation drugs unchanged*: I have shown that it is necessary to account for changes in drug utilization and HCPCS codes to accurately illustrate the cross subsidization between the drug reimbursement and the dispensing fee. In addition to considering each subject drug individually, I find that the per unit allowed amount including both the drug reimbursement and dispensing fee of all inhalation therapy drugs reimbursed through the Medicare Part B is essentially the same between 2004 and 2005. This calculation across all inhalation therapy drugs accounts for changes in drug therapies and quantities. Such exercises suggest that substantially all of the difference between average AC and the median AWP-based drug reimbursement prior to 2005 was built into the system to provide cross-subsidization for underpayment on other costs and was therefore not the result of the alleged fraud.

## E.5. Plaintiff allegations are not applicable for Medicare payments

### E.5.1. All DMERC claims are not attributable to Dey drugs

258.   *At most, only a fraction of the claims plaintiffs assert can be connected to Dey sales*: Medicare drug payments based on HCPCS are not detailed enough to identify the manufacturer of a multi-source drug dispensed. This makes it impossible to determine from Medicare's claims whether a Dey product is the drug for which payment is being made. In Appendix H I provide an analysis that shows the share of DMERC expenditures that could potentially be attributed to Dey's sales. Dr. Duggan does not take this into account in his difference calculations.

259.   *The data suggests irregularities in sales for subject drugs in DMERC Region C*: The October 2001 OIG report titled, "Review of Payments for Inhalation Drugs made by Region C Durable Medical Equipment Regional Carrier", studied excessive payments for inhalation drugs in 1998. The OIG found that Region C accounted for 34.6% of Medicare fee for service beneficiaries but 56% of payments for inhalation drugs.[279] Inhalation drugs in Region C, HCPCS K0503 through K0528, accounted for $224 million in Medicare payments in 1998.[280] Of the $224 million across all inhalation drugs, subject HCPCS account for $173 million, or 77%, of total inhalation drug payments in Region C in 1998.

---

[279]  U.S. Office of the Inspector General. "Review of Payments for Inhalation Drugs Made by Region [C] Durable Medical Equipment Regional Carrier," October 2001, 2.

[280]  U.S. Office of the Inspector General. "Review of Payments for Inhalation Drugs Made by Region [C] Durable Medical Equipment Regional Carrier," October 2001, 1.

Expert Report of Professor W. David Bradford, Ph.D.

260.   *A large percent of sales may be insufficiently documented and should be excluded*: The OIG surveyed 100 beneficiaries in 1998 with paid claims for inhalation drugs and found that up to 60% of payments were either unallowable or not sufficiently documented to determine allowability.[281] It is impossible to disentangle which claims in the DMERC data were fraudulent. The defendants should not be held liable for costs associated with inappropriately dispensed drugs.

### E.5.2. Plaintiffs' theory of conduct lacks economic support

261.   *Median-based payment mechanism is difficult to affect*: The plaintiff claims that a manufacturer of a multisource drug could or would attempt to move market share for Medicare payments by manipulating AWP. Given that Medicare reimbursements for multisource drugs are based on the median of AWP, as long as a manufacturer's AWP falls below the median, changes in it (presuming it stays below the median) will have no impact on reimbursement at all. The only way to raise the median is to raise an AWP formerly below the median to above it, or to raise an AWP above the highest AWP listed. Clearly, this affords limited opportunities for manufacturers to unilaterally manipulate reimbursement. In any case, Dey appears to have rarely revised its AWP.

262.   *Even if Dey could have affected the median there is no competitive advantage from doing so*: Even supposing one could affect the Medicare median calculation using AWP, the result of doing so would be to change payment levels for all competing drugs, which affords no spread advantage to any particular manufacturer. Idiosyncratic variation and mistakes in DMERC median pricing arrays further weakens the connection between Dey's AWP and payments made by Medicare. Indeed some of the mistakes I have identified would be impossible to replicate, such as including nonexistent drug NDCs in the pricing array, or incorrectly translating units.

### E.5.3.  Congress could have required Medicare to use Dey's WAC

263.   *Dr. Duggan's calculations are essentially WAC-based which Congress chose not to use:* Congress could have made use of the WAC that Dey made available (as Medicaid typically did in its calculations of FUL), but instead it relied on AWP. Had Congress and Medicare chosen to use Dey's WAC, the resulting pricing array medians would largely be the same as the "but-for" medians Dr. Duggan calculated using average AC. Thus, Congress and Medicare had access to this "but-for" pricing scheme all along and chose not to use it.

---

[281]   U.S. Office of the Inspector General. "Review of Payments for Inhalation Drugs Made by Region [C] Durable Medical Equipment Regional Carrier," October 2001, 3.

Expert Report of Professor W. David Bradford, Ph.D.

# F. Damages and rebuttal

264. _I find no basis for damages and will rebut specific points in plaintiff's experts' reports_: For all of the reasons stated in previous sections, I find no economic rationale in support of damages for either Medicaid or Medicare as a result of the alleged fraud. Nonetheless, in this section I will review the expert reports put forward by Dr. Duggan and Dr. Schondelmeyer. My review of Dr. Duggan's report reveals numerous errors and inaccuracies that make his calculations unreliable. More importantly, Dr. Duggan's 'difference' calculations are simplistic mathematical calculations lacking economic rationale to be considered damages. In my review of Dr. Duggan's report I find that only a few adjustments to his calculated differences reduces his Medicare and Medicaid differences to zero. I have presented these baseline adjustments in this Section. However, there are many adjustments that can be made to Dr. Duggan's economically meaningless calculations. I present these additional adjustment scenarios in Appendix G and H.

265. Dr. Schondelmeyer's report discusses pharmaceutical pricing, Medicaid, and Medicare in general with very little reference to the facts in this matter. Thus his conclusions are unsubstantiated by any direct analysis or evidence. Dr. Marmor's report contains discussions that are even more remote from this matter and thus not germane to the plaintiff allegations specific to Dey.

## F.1. Review of Dr. Duggan's report

266. _Dr. Duggan calculates simple differences_: Dr. Duggan computes what he refers to as his 'difference' calculations, which are simply the difference between average prices observed in the Dey transactional data, and the amounts paid by Medicaid and Medicare for each subject drug. A comparison of Dr. Duggan's calculations with study information, such as provided by OIG studies, or by Myers and Stauffer, illustrates that his calculations provide little information that was not already available to Medicaid.

267. _Dr. Duggan's estimated differences disappear after correcting for only some of the errors in his methodology_: After accounting for only a few of the intervening factors that I have identified in this report, I find that all of Dr. Duggan's 'differences' can be attributed to factors unrelated to the conduct alleged in this matter. This underscores the fact that Dr. Duggan's 'difference' calculations are a simplistic mathematical calculation lacking in significant economic interpretation. None of the Plaintiffs' experts, including Dr. Duggan, have expressed an opinion supporting the use of these 'differences' as a basis for damage calculations. Furthermore, if they are intended to be interpreted as

Expert Report of Professor W. David Bradford, Ph.D.

damages in the usual way, these 'difference' calculations are fundamentally flawed because they are not based on a valid "but-for" methodology.

268.  _Dr. Duggan mischaracterizes what his "but for" world would be like_: Dr. Duggan's alternative payments violate the most basic construct of damage calculations: that all else be held equal but for the alleged conduct. For example, his proposed calculations imply that State Medicaid agencies could have paid rates that were significantly below overall cost for a significant fraction of its participating pharmacies. According to Dr. Schondelmeyer, payment rates well above these would result in over 20% of pharmacies going out of business. If this occurred, it would likely result in violations of federal regulations governing Medicaid access, and disrupt Medicaid care throughout the country. In other words much more than payments for drugs would change. These changes would not even be feasible for Medicaid, and this but-for world could not exist.

269.  _Dr. Duggan does not justify many of his key assumptions_: For the most part, Dr. Duggan does not discuss the rationale behind his calculations nor does he state what these differences are supposed to represent.[282] These difference calculations essentially amount to calculating changes in spending by Medicare and Medicaid if …"alternate prices had been used for Dey products AWP and WAC".[283] For example, in order to calculate his differences Dr. Duggan uses average pharmacy price calculated from the Dey's indirect data as an alternate price for WAC.[284] Nowhere in his report does Dr. Duggan discuss the appropriateness of his alternate price for WAC. In general, Dr. Duggan has described his calculations in detail, but fails to explain the rationale behind his calculations.

270.  _Dr. Duggan recognizes the existence of marginal pharmacies and dismisses them as a basis for his calculations without comment_: At various points Dr. Duggan maintains that he has made conservative choices. For example, Dr. Duggan maintains that "price paid by pharmacies to wholesalers in Dey's indirect data …. is a more conservative approach than using the average actual wholesaler price from Dey's direct data."[285] However, Dr. Duggan fails to discuss his rationale for using averages to begin with. Dr. Duggan also considers but does not choose to use 95th percentile price instead of average price. Choice of average over 95th percentile price, which is the more important and overriding choice, is clearly not a conservative one.

---

[282]  Deposition of Mark G. Duggan, Feb. 26, 2008, at 210.

[283]  Expert Report of Mark G. Duggan at 9, United States ex rel. Ven-a-Care of the Florida Keys, Inc. v. Dey, Inc., No. 05-11084-PBS (D. Mass. Jan. 23, 2009).

[284]  More precisely Dr. Duggan is using the average AC of retail pharmacies from Dey's indirect data.

[285]  Expert Report of Mark G. Duggan at 10, United States ex rel. Ven-a-Care of the Florida Keys, Inc. v. Dey, Inc., No. 05-11084-PBS (D. Mass. Jan. 23, 2009).

Expert Report of Professor W. David Bradford, Ph.D.

271. _There are many instances of unexplained assumptions in Dr. Duggan's calculations_: Dr. Duggan's difference calculations involve many similar choices and implicit assumptions that he fails to substantiate or even discuss. In this section, I will review Dr. Duggan's difference calculations in detail and highlight some of his choices and implicit assumptions behind his calculations. I will highlight some of the flaws behind his choices and implausibility of his implicit assumptions.

272. _Dr. Duggan uses a variety of data sources, which are often ill-suited to his purposes_: Dr. Duggan's difference calculations utilize three primary data sources: Dey transactional data, various forms of Medicaid expenditure data, and Medicare expenditure data. Dr. Duggan computes what he considers to be alternate price from the Dey transaction data. Then he applies these alternate prices in an ad hoc and arbitrary manner to the Medicaid and Medicare expenditure data to calculate his differences. I address Dr. Duggan's use of each of these data in the following sub-sections.

## F.1.1. Review of Dr. Duggan's use of Dey transactional data

273. _Dr. Duggan incorrectly assumes Dey's direct and indirect sales are equivalent_: Dr. Duggan analyzes Dey direct and indirect sales data before making the decision to utilize only the indirect data in his calculations of average AC. Dr. Duggan's discussion suggests that he considers the two sales data sources to be roughly equivalent. But the bases for Dr. Duggan's comparisons are flawed. Furthermore, Dr. Duggan's use of the indirect sales data to calculate average prices underestimates the prices paid by the final providers, ignoring mark-ups applied by wholesalers to the marginal provider. Wholesaler data provides a more complete picture of the prices paid by the final providers.

### F.1.1.1. Dr. Duggan's comparison of direct and indirect sales is flawed

274. _Dey's off-contract sales are made at or above WAC_: Dr. Duggan's comparison of direct and indirect sales is flawed in that it understates the relevant direct sales not pursuant to a chargeback contract, i.e. off-contract sales. Understatement of these direct sales is important in light of my discussion in Section C regarding off-contract sales. These off-contract sales are economically significant and occur at or above WAC. Dr. Duggan's overall comparison of direct and indirect sales also obscures an important time trend as I discuss below.

275. _Dr. Duggan asserts that there is only a 5.3% difference between direct and indirect transactions prices_: In his comparison of Dey's direct and indirect data, Dr. Duggan examines similar schedules for the two data sources, including total sales by NDC, by year and quarter, by class of trade, and

Expert Report of Professor W. David Bradford, Ph.D.

average prices to "all" and "pharmacy" classes of trade.[286] Dr. Duggan then directly compares net sales and average NDC-specific prices between direct sales to the wholesaler class of trade and all indirect sales. Dr. Duggan ultimately determines that there is only a 5.3% difference between net sales to wholesalers and net sales in the indirect data, stating further that this statistic would be even smaller "if one were to account for the inventory that these wholesalers held of Dey's Complaint products at the end of the study period."[287] Dr. Duggan also states that "the average NDC-specific end customer prices in Dey's indirect data are very similar to the average prices for the wholesaler class of trade in Dey's direct data."[288]

276.     *Dr. Duggan does not account for important ex-post expenditure adjustments*: For his comparison, Dr. Duggan excludes only returns from his calculation of net dollars in the direct sales data, leaving in shipping and pricing errors, credits, and rebates. None of these transaction types are represented in the indirect sales data and cause the relevant net dollars from the direct sales data to be understated.

277.     *Using units sold as basis for comparison implies an 11% difference between direct and indirect sales*: An alternative methodology would be to compare net units sold to wholesalers against net units sold in the indirect sales data. This comparison would more appropriately represent the percentage of sales to wholesalers made pursuant to a contract with the end customer. This comparison eliminates transaction types that do not have units associated with them, such as "Customer Cash Discounts", rebates, and WAC adjustments. It is unclear whether the dollars associated with these transactions are passed on to the end customer or not, and could skew the results inappropriately. There is still some ambiguity as to what transaction types are appropriate to include, so to be conservative I include all transaction types in calculating net units sold to the top five wholesalers, who account for over 90% of all sales to wholesalers. Even with this conservative measure, I calculate a 9.7% difference in net units sold to the wholesaler and that reflected in Dey's indirect data for the period from of 1992 to 2007. Excluding returns, as Dr. Duggan does in his calculations, raises this difference to 11%.

278.     *Dr. Duggan ignores clear time trends toward greater reliance on indirect sales*: Dr. Duggan's comparison also obscures an important time trend in the Dey sales data with regard to direct sales to wholesalers made pursuant to a contract agreement. Dr. Duggan calculates a difference of 5.3%

---

[286]  Dr. Duggan includes retail pharmacy, homecare pharmacy, and chain drug classes of trade in his definition of pharmacy customers. Expert Report of Mark G. Duggan at 20, United States ex rel. Ven-a-Care of the Florida Keys, Inc. v. Dey, Inc., No. 05-11084-PBS (D. Mass. Jan. 23, 2009).

[287]  Expert Report of Mark G. Duggan at 23, United States ex rel. Ven-a-Care of the Florida Keys, Inc. v. Dey, Inc., No. 05-11084-PBS (D. Mass. Jan. 23, 2009).

[288]  Expert Report of Mark G. Duggan at 23, United States ex rel. Ven-a-Care of the Florida Keys, Inc. v. Dey, Inc., No. 05-11084-PBS (D. Mass. Jan. 23, 2009).

Expert Report of Professor W. David Bradford, Ph.D.

between net sales to wholesalers and net sales in the indirect sales data for the period of 1992 through
2007. But an examination of year-by-year differences in net sales reveals large differences, with 13 of
the 16 years having an absolute difference greater than 10% as shown in Figure 35.

**Figure 35: Dey net sales to wholesalers and indirect sales (in millions)**

| Year | Net direct sales to wholesalers | Net indirect sales | % difference |
|------|------|------|------|
| 1992 | $11.03 | $6.88 | 37.7% |
| 1993 | $24.18 | $15.35 | 36.5% |
| 1994 | $38.87 | $29.85 | 23.2% |
| 1995 | $47.22 | $45.97 | 2.7% |
| 1996 | $71.04 | $59.29 | 16.5% |
| 1997 | $95.69 | $82.24 | 14.1% |
| 1998 | $129.12 | $108.15 | 16.2% |
| 1999 | $125.74 | $121.81 | 3.1% |
| 2000 | $117.92 | $102.18 | 13.3% |
| 2001 | $77.61 | $86.81 | -11.9% |
| 2002 | $73.03 | $64.46 | 11.7% |
| 2003 | $29.06 | $47.81 | -64.5% |
| 2004 | $22.26 | $33.27 | -49.5% |
| 2005 | $18.03 | $26.14 | -45.0% |
| 2006 | $24.11 | $24.66 | -2.3% |
| 2007 | $5.03 | $7.20 | -43.0% |
| Grand total | $909.95 | $862.07 | 5.3% |

Source: Dey direct sales data and Duggan indirect sales data summary sheet

## F.1.1.2. Dr. Duggan's flawed use of transaction data is confirmed by wholesaler data

279. _Wholesaler data is useful comparator to data Duggan uses_: I have examined available wholesaler
data to determine the percentage of sales made pursuant to a contract agreement between Dey and the
end customer. Drug wholesalers, such as Cardinal and McKesson, are companies that purchase drugs
from manufacturers and then sell them to the end customer. End customers for wholesalers can be
pharmacies, hospitals, mail order services, nursing homes, or any other entity that provides or
dispenses pharmaceutical products. The wholesaler data provided consists of transactional sales along
with customer information, which includes end customer class of trade, and an indicator regarding
whether a particular sale was made pursuant to a contract between the end customer and the
manufacturer.

Expert Report of Professor W. David Bradford, Ph.D.

280.    _Wholesaler data confirms trend toward reliance on contract sales_: In comparing contract sales versus off-contract sales through the wholesaler data I have found that the trend is consistent across all wholesalers, although Cardinal offers the best perspective due to its greater time coverage. I limited my analysis to sales to the "retail" class of trade.[289] The results are also consistent with my annual examination of the Dey data; a significant portion of sales earlier in the period are made off contract before gradually shifting to nearly all sales are made pursuant to a contract.

**Figure 36: Off contract sales of Dey subject drugs through wholesalers**

| Year | Percentage of total sales dollars associated with off contract sales | | |
|------|------|------|------|
|  | Cardinal | McKesson | Grand Total |
| 1995 | 46.9% |  | 46.9% |
| 1996 | 42.1% |  | 42.1% |
| 1997 | 40.5% |  | 40.5% |
| 1998 | 36.6% |  | 36.6% |
| 1999 | 17.8% |  | 17.8% |
| 2000 | 14.2% | 10.2% | 11.1% |
| 2001 | 19.0% | 12.7% | 14.2% |
| 2002 | 7.9% | 4.3% | 5.1% |
| 2003 | 1.2% | 3.1% | 2.2% |
| 2004 | 0.7% | 0.7% | 0.7% |
| 2005 | 0.3% | 0.8% | 0.5% |
| 2006 |  | 0.2% | 0.2% |
| Grand total | 20.1% | 7.0% | 12.6% |

### F.1.1.3. Wholesaler data provides a more complete measure of final providers acquisition cost

281.    _Wholesaler data demonstrates direct and indirect sales are not equivalent_: The comparison of on and off contract sales using both the Dey and wholesaler sales data reveals that a significant portion of sales were made off contract earlier in the period. Furthermore, comparing average prices provided by Dr. Duggan reveals that there can be a wide margin between the average price paid by final providers and the average price paid in the indirect sales data in a given quarter. These differences establish that the direct and indirect sales data are not equivalent, contrary to Dr. Duggan's suggestions.

---

[289] Here I define "retail" as "INDEPENDENT," "CHAIN PHARMACY," "CHAIN SUPERMARKET," "CHAIN MASS MERCHANDISER," "CHAIN MAIL ORDER," and "CHAIN WAREHOUSE" classes of trade in the Cardinal data and "RETAIL DRUG STORE," "DRUG CHAIN," "LARGE DRUG CHAIN," "GROCERY/DRUG COMBINATION," "GROCERY STORE," "RETAIL STORE – NON DRUG," "CHAIN WAREHOUSE," "MAIL ORDER FACILITY," "CLOSED PHARMACY," "MASS MERCHANDISER W/PHAR," and "MASS MERCHAND W/O PHAR."

Expert Report of Professor W. David Bradford, Ph.D.

282. *Wholesaler data reveals higher prices from fees on contract delivery not apparent in Dey data*:
Further examination of the wholesaler data reveals that many end customers don't even pay the
contract price listed in the Dey indirect sales data. Neil Warren, Vice President of Industry & Supplier
Relations at Cardinal Health stated in a deposition that "…there's a fee attached to the contract price
based on the customer contract with Cardinal."[290] The Cardinal sales data lists the unit contract price
and the unit price actually paid by the end customer. Over 90% Dey's indirect contract sales through
Cardinal can be matched to corresponding transactions in the Cardinal database. With some manual
translation, it's also possible to link end customers between the two databases. Figure 37 below
shows examples of transactions where the final provider paid a significantly higher price through the
wholesaler from what is reflected in the Dey data, even after taking chargebacks into account.

**Figure 37: Prices reflected in Dey and wholesaler data for same transactions**

| NDC | FDB WAC effective period | Customer | Dey contract price | Cardinal unit price | Percent mark-up |
|---|---|---|---|---|---|
| 49502069703 | 5/18/99 | CLOVERLY DRUGS, INC | $0.072 | $0.088 | 22.0% |
| 49502068503 | 4/1/03 | WAVERLY PROFESSIONAL PHARMACY | $0.100 | $0.136 | 35.8% |
| 49502068902 | 2/1/02 | THE HOME CENTER PHARMACY, INC. | $0.077 | $0.082 | 6.1% |
| 49502068503 | 2/1/00 | TIDEWATER PHARMACY | $0.120 | $0.136 | 13.2% |
| 49502069733 | 4/1/00 | MAGNOLIA SQUARE PHARMACY | $0.060 | $0.072 | 20.0% |
| 49502069703 | 2/1/01 | HAPPY HARRY'S #43 | $0.058 | $0.064 | 9.7% |
| 49502069703 | 2/1/02 | MCKAYS PHARMACY | $0.065 | $0.070 | 7.1% |
| 49502069760 | 1/1/99 | BROOKVILLE PHARMACY | $0.080 | $0.086 | 6.9% |
| 49502069703 | 5/18/99 | ENGLANDERS PHARMACY | $0.072 | $0.088 | 22.0% |
| 49502069703 | 5/18/99 | PRATT STREET PHARMACY INC | $0.111 | $0.118 | 5.6% |

283. *Markup over contract price is at least 1%:* I have examined the relationship between the contract
price and price actually paid by the final provider in the Cardinal sales data for retail contracts that
can be matched to the Dey data and found that for all but one NDC in the complaint the average
mark-up is at least 1%. Furthermore, mark-ups on non-contract sales are even higher. I have
compared the average price and 95th percentile price from the Dey data and the wholesaler data.

284. *Wholesaler data reveals higher average transaction prices than Dey data*: Figure 38 shows that the
average price paid by the final providers that is reflected in the wholesaler data is significantly higher
than those observed in the Dey data. More importantly the 95th percentile price paid by the final

---

[290] Deposition of Neil Warren, Cardinal Health, Sept. 9, 2008, at 100–101.

provider reflected in the wholesaler is significantly higher than those observed in the Dey data. As I have already discussed throughout this report, one of the central issue in this matter is the acquisition cost of the marginal provider. Thus one must start by looking at the 95th percentile acquisition cost. Furthermore one must look at the 95th percentile price of retail providers in the wholesaler data for a complete picture of the final prices paid by the marginal provider.

**Figure 38: Prices reflected in Dey and wholesaler data**



NDC: 49502068503

### F.1.1.4. Dr. Duggan's alternate prices are unsustainable

285.  *Contrary to Dr. Duggan's assertion the 95th percentile price is higher than the average weighted price times 1.25:* In his report, Dr. Duggan also examines the 95th percentile price from the Dey indirect data as a measure of alternative AWP. He ultimately decided against this metric, instead using 1.25 multiplied by the weighted average cost from the indirect data. In his deposition Dr. Duggan stated "125 percent of the average is typically quite close to the 95th percentile price."[291] I attempted to verify this statement using the wholesaler data for Dey drugs and found Dr. Duggan's

---

[291]  Deposition of Mark G. Duggan, Plaintiff Expert, Feb. 26 2009, at 96.

Expert Report of Professor W. David Bradford, Ph.D.

statement to be inaccurate. Over 35% of NDC, year, quarter observations and 21% of CMS reported expenditures are associated with periods when the 95th percentile price is greater than 1.25 multiplied by the weighted average price. Furthermore, these prices are not "quite close"; the weighted average difference is over 8% for quarters where the 95th percentile price is greater, and more than half of these observations have a difference of at least 5%[292].

286.   *Dr. Duggan's average prices do not account for pressures on marginal pharmacy:* As I discussed in Section D.1., averages in and of themselves do not convey any information about the underlying distribution of prices. Thus one cannot examine the prices paid by the marginal provider by any ad hoc mark-ups over the average. A starting place to examine the prices paid by the marginal provider is to examine the distribution of prices and consider a price such as the 95th percentile price.

287.   *Dr. Duggan's average prices would yield accounting losses for marginal pharmacies in all years for populous states*: I formally test the feasibility of Dr. Duggan's alternate prices by examining the marginal pharmacy's profit margins for Dey subject drugs under Dr. Duggan's alternate prices.[293] I examine quarterly costs and payments for both the drug and dispensing for California, Florida, New York, and Pennsylvania. I calculate payments to the pharmacy as the state-specific dispensing fee plus the drug payments, which in all four states was some discount off of AWP. To test the feasibility of Dr. Duggan's alternative prices I replace the AWP in these instances with Dr. Duggan's weighted average price to pharmacies from the Dey indirect data multiplied by 1.25. I calculate cost to the marginal pharmacy as the 95th percentile price from the wholesaler data plus a conservative measure of dispensing cost for these pharmacies.[294] Using Dr. Duggan's alternative prices I find that the marginal pharmacy would incur losses on subject drugs for all years and all states considered as shown in Figure 39.

---

[292]   I weight this average by CMS reported expenditures from the STUD files.

[293]   I measure cost to the marginal pharmacy by taking the 95th percentile price to customers in the "INDEPENDENT" class of trade in the Cardinal data.

[294]   I approximated dispensing cost using the 25th percentile dispensing cost provided by the Grant Thornton study. I extrapolate this statistic, listed for the third quarter of 2006, by using medical CPI data.

Expert Report of Professor W. David Bradford, Ph.D.

**Figure 39: Marginal pharmacy margin under Dr. Duggan's alternate price**

| Year | State | | | | |
|------|-------|---|---|---|---|
| | California | Florida | New York | Pennsylvania | Aggregate |
| 1996 | -15.3% | -12.4% | -15.6% | -17.1% | -15.0% |
| 1997 | -21.1% | -15.0% | -17.7% | -19.2% | -17.7% |
| 1998 | -14.8% | -16.3% | -15.8% | -16.4% | -15.7% |
| 1999 | -14.4% | -21.8% | -12.2% | -13.2% | -14.7% |
| 2000 | -19.6% | -24.5% | -14.8% | -23.6% | -19.8% |
| 2001 | -19.3% | -25.5% | -22.1% | -17.8% | -21.2% |
| 2002 | -22.7% | -27.5% | -19.8% | -20.4% | -22.6% |
| 2003 | -23.4% | -37.0% | -18.4% | -22.1% | -23.9% |
| 2004 | -25.6% | -35.2% | -20.2% | -26.8% | -26.0% |
| 2005 | -19.7% | -43.7% | -22.8% | -29.6% | -25.5% |
| 2006 | -21.8% | -42.6% | -27.1% | -48.0% | -27.8% |
| Grand total | **-20.1%** | **-23.7%** | **-17.4%** | **-19.9%** | **-19.9%** |

## F.1.1.5. Dr. Duggan's alternate prices provide no new information

288. *Dr. Duggan's "but for" prices have been known and have been rejected by Medicare and Medicaid*: Finally, the alternate prices that Dr. Duggan uses for his difference calculations provide no new information to the Medicaid and Medicare agencies regarding the actual prices. As I discuss in more detail in Appendix E, CMS had access to Average Manufacturer Price ("AMP") since 1990 as part OBRA. Both CMS and state Medicaid officials have testified that they were knowledgeable about the AMP prices.[295] Furthermore, as I discussed in Section E.2 CMS internally considered using the AMP for Medicare payments. The AMP prices reported by Dey to CMS are comparable to Dr. Duggan's average price as shown in Figure 40. Thus the Medicare and Medicaid agencies already has access to prices comparable to the alternate prices calculated by Dr. Duggan and chose not to utilize for drug payments.

---

[295]  See Appendix E.

Expert Report of Professor W. David Bradford, Ph.D.

**Figure 40: WAC, AMP and Dr. Duggan's prices for ipratropium bromide**



Source: FDB data, AMP data, and average pharmacy price as provided by the Plaintiff

## F.1.2. Dr. Duggan's Medicaid difference calculations

289. _Dr. Duggan uses limited state claims, SMRF/MAX and SDUD data_: Dr. Duggan relies upon several data sources for his Medicaid difference calculations. Dr. Duggan calculates his differences using the claims data produced by the state Medicaid agencies for 14 states.[296] For all other states Dr. Duggan uses the State Medicaid Research Files (SMRF) and Medicaid Analytic eXtract (MAX) data produced by the CMS where available. For the time periods without SMRF/MAX data, Dr. Duggan uses the State Drug Utilization Data (SDUD). Besides the 14 states, Medicaid claims data was produced by 16 other states that Dr. Duggan does not use in his difference calculations.

290. _Only state claims data adequate to correct Dr. Duggan's average price calculations_: Among the three Medicaid expenditure data sources used by Dr. Duggan, only the state Medicaid claims data provides the detailed information needed to determine the basis on which each claim was paid. Since

---

[296] Expert Report of Mark G. Duggan at Appendix, Table 27, United States ex rel. Ven-a-Care of the Florida Keys, Inc. v. Dey, Inc., No. 05-11084-PBS (D. Mass. Jan. 23, 2009). Even for these 14 states, claims data was not produced for the entire time period at issue. Dr. Duggan utilizes the SMRF/MAX and SDUD data for periods without claims data as discussed above.

Expert Report of Professor W. David Bradford, Ph.D.

the central allegation in this matter is that the Medicaid drug payments were based on inflated published prices, it is important to determine which claim were actually paid on the bases of the published prices. As I discussed in Section D.4, states rely on various other bases besides published prices for drug payments – especially generic drug payments. Thus it is important to do a proper payment basis analyses for each claim.

### F.1.2.1. Adjustments to Dr Duggan's 'difference calculations' for 14 states

291.  *Dr. Duggan makes at least four critical errors in his Medicaid calculations*: Dr. Duggan's Medicaid difference calculations for the 14 states where he utilizes the state claims data, are simplistic calculations that do not take into account numerous factors considered by the state Medicaid agencies in determining the drug payment rates. Adjusting Dr. Duggan's calculations for only few of these considerations results in all of the differences disappearing. Based on my detailed discussions throughout this report, I make the following four simple adjustments to Dr. Duggan's difference calculations:

- As I discussed in detail in C.4 drug payment rates across states vary substantially. Any state could have used a low drug payment rate similar to Massachusetts' based on Dey's economically-meaningful and publically-available WAC. Thus I have reduced drug payments above the Massachusetts payment rate as a matter of state choice and not causally related to Dey's published prices.

- State Medicaid agencies were knowledgeable about actual prices yet chose drug payment rates well above the average price levels. As I discussed in Section D1 state Medicaid agencies need to consider the costs to marginal providers that are not reflected in the average prices. Moreover, Dr. Duggan's calculation of alternate prices is inappropriate because Dey's indirect sales data do not fully reflect the final prices paid by retail pharmacy providers. Wholesaler data provides a more complete picture of the final prices paid by pharmacies – particularly independent pharmacies. Hence I use 95th percentile pharmacy prices calculated from wholesaler data as alternate price for WAC.

- Dr. Duggan has not analyzed whether or not the payments for each claim were actually based on the Dey published price. I have removed claims whose basis of payment cannot be determined from the difference calculations.

Expert Report of Professor W. David Bradford, Ph.D.

▪ Dr. Duggan has mechanically computed margins on drug payments while ignoring the significant implicit dispensing fee embedded in these payments. Hence, I have reduced the Dr. Duggan's drug payment differences by the amount of this implicit dispensing fee payment.

292. _Correcting three of the four errors in Dr. Duggan's methodology causes differences to disappear:_ Figure 41 shows the results of the adjustments discussed above. The first three adjustments results in Dr. Duggan's differences disappearing almost entirely. Finally, when one considers the dispensing fee shortfall in Medicaid drug payments, I find that there are no Medicaid overpayments for Dey subject drugs. These simple adjustments reveal the ad hoc and arbitrary nature of Dr. Duggan's difference calculations. The adjustments reported above confirm my opinion that Medicaid drug payments for the subject drugs were consistent with Medicaid's overall design and goals and there is no economic rationale to believe that there are damages for Medicaid due to Dey's published prices.

**Figure 41: Adjustments to Dr. Duggan's difference calculations**

| State | First quarter | Last quarter | Number of claims (k) | Total amount paid ($mm) | Duggan differences ($mm) | Adjusted differences ($mm) | Dispensing fee shortfall ($mm) | Positive differences |
|---|---|---|---|---|---|---|---|---|
| California | 1994 Q2 | 2007 Q3 | 1,180.3 | 56.4 | 29.3 | 1.4 | -5.0 | - |
| Florida | 1993 Q4 | 2005 Q4 | 1,035.0 | 38.1 | 14.6 | 0.9 | -3.9 | - |
| Georgia | 2000 Q4 | 2006 Q4 | 453.6 | 13.7 | 7.1 | 0.4 | -2.1 | - |
| Illinois | 1992 Q2 | 2006 Q4 | 865.4 | 24.3 | 9.8 | 0.3 | -3.5 | - |
| Kentucky | 1995 Q1 | 2005 Q1 | 450.2 | 21.2 | 11.8 | 0.3 | -1.7 | - |
| Louisiana | 1995 Q1 | 2007 Q3 | 487.2 | 22.3 | 11.6 | 0.3 | -1.9 | - |
| Massachusetts | 1996 Q3 | 2007 Q4 | 538.9 | 12.4 | 3.7 | 0.2 | -2.2 | - |
| Michigan | 2000 Q4 | 2007 Q2 | 289.5 | 5.6 | 2.7 | 0.2 | -1.3 | - |
| Missouri | 1994 Q1 | 2005 Q1 | 377.3 | 12.8 | 5.7 | 0.2 | -1.4 | - |
| New Jersey | 1992 Q2 | 2008 Q4 | 762.8 | 27.0 | 13.5 | 0.2 | -3.7 | - |
| New York | 1993 Q4 | 2007 Q2 | 1,536.3 | 66.2 | 21.3 | 0.5 | -6.0 | - |
| North Carolina | 2001 Q1 | 2007 Q1 | 309.2 | 7.6 | 3.4 | 0.2 | -1.4 | - |
| Pennsylvania | 1998 Q3 | 2006 Q4 | 599.8 | 17.9 | 11.1 | 0.3 | -2.5 | - |
| Virginia | 2000 Q3 | 2008 Q4 | 279.9 | 8.8 | 5.2 | 0.3 | -1.3 | - |
| Total | | | 9,165.4 | 334.4 | 150.6 | 5.8 | -37.9 | - |

Source: State claims data, FDB data, Medi-span data, Red Book and wholesaler data

293. _Sensitivity analyses of corrections to Dr. Duggan's difference estimates are in Appendix F_: Appendix F provides further details on the baseline adjustments to Dr. Duggan's calculations shown above in Figure 41. In Appendix F I also provide various sensitivities to the baseline adjustments. For

Expert Report of Professor W. David Bradford, Ph.D.

example, my baseline adjustment uses the contemporaneous 95th percentile price as an alternate for WAC. As I discussed previously, payment systems where the payment rate are only known ex-post are unlikely to be viable. Hence, even the ASP system used prices prevailing in two quarters prior for payments. Thus one can replace contemporaneous 95th percentile price with two-quarter-lagged 95th percentile price for WAC. Similarly a higher percentile price such as the 99th percentile can be used as an alternate for WAC. As Dr. Schondelmeyer has suggested any provider should be able to procure drugs at the Medicaid payment rates.

294.     *Could also correct for payments made on non-AWP or WAC basis:* In the baseline adjustments, I have only excluded claims for which the basis of payment cannot be determined. As I discussed in detail in Section D4, FUL, state MAC, and billed charge payment levels are not directly based on published prices and are not transparent enough for any manufacturer to be able to manipulate. Thus one can exclude all claims based on FUL, state MAC, and billed charges from Dr. Duggan's difference calculations. I show various alternate adjustments to Dr. Duggan's difference calculations in Appendix F. In every alternate adjustment scenario, Dr. Duggan's differences disappear.

295.     *Many other errors in Dr. Duggan's method detrimental to the defendant could be corrected as well*: It is also worth noting that adjustments to Dr. Duggan's calculations shown in Figure 41 and alternatives considered in Appendix F do not incorporate many other issues I have identified with Dr. Duggan's calculations throughout this report. For example, Dr. Duggan multiplies the average pharmacy price by 1.25 to arrive at his alternate price for AWP. As I discussed in detail previously, there is no standard relationship between AWP and WAC for the generic drugs. Thus Dr. Duggan's alternate price for AWP is unsubstantiated.

### F.1.2.2. Dr. Duggan's calculations for other states are unreliable

296.     *Dr. Duggan extends his 14 state analysis to other states without detailed data*: Discussion above for the 14 sates shows that there are no differences after appropriate adjustments to Dr. Duggan's calculations. As such, it is highly unlikely that there would be any differences for other states. Yet I have calculated adjusted differences for the additional 16 states that produced claims data in this matter that Dr. Duggan chose not to utilize. Additionally, Dr. Duggan's calculations based on SMRF/MAX data and SDUD are unreliable.

297.     *Claims data demonstrates 14 states analyzed by Dr. Duggan quite different from other states he extrapolated*: For the additional states, that produced the claims data I simply used the methodology used by Dr. Duggan for the first 14 states and compared the results. As the Figure 42 shows, Dr.

Expert Report of Professor W. David Bradford, Ph.D.

Duggan's calculations based on SMRF./MAX data and SDUD data produce differences that are more than 20% larger than the differences calculated from claims data using his own methodology.[297]

**Figure 42: Comparison of Dr. Duggan's results for additional states**

| State | Dr. Duggan's total Medicaid paid amount ($mm) | Dr. Duggan's federal differences ($mm) | Total Medicaid paid amount using claims data ($mm) | Federal differences using claims data ($mm) | Change in differences ($mm) | Change in differences (%) |
|---|---|---|---|---|---|---|
| AK | 1.9 | 0.5 | 2.1 | 0.5 | 0.0 | -4.81 |
| AL | 13.1 | 4.2 | 12.9 | 2.5 | 1.6 | 39.36 |
| AR | 6.6 | 2.2 | 6.4 | 1.8 | 0.4 | 16.43 |
| CT | 6.5 | 1.5 | 6.5 | 1.6 | -0.1 | -9.28 |
| DE | 2.8 | 0.6 | 2.5 | 0.3 | 0.2 | 43.25 |
| HI | 1.6 | 0.4 | 1.4 | 0.3 | 0.1 | 16.75 |
| ID | 3.2 | 1.0 | 3.4 | 1.0 | 0.0 | -0.29 |
| KS | 6.3 | 1.8 | 5.4 | 1.4 | 0.3 | 19.91 |
| MN | 7.9 | 1.7 | 7.4 | 1.6 | 0.1 | 7.11 |
| NE | 4.6 | 1.3 | 4.4 | 0.9 | 0.4 | 32.10 |
| NM | 2.5 | 0.7 | 2.1 | 0.5 | 0.2 | 25.09 |
| RI | 1.5 | 0.4 | 1.4 | 0.2 | 0.1 | 38.56 |
| SC | 7.5 | 2.3 | 6.1 | 1.9 | 0.5 | 19.42 |
| UT | 2.1 | 0.7 | 1.6 | 0.5 | 0.2 | 24.63 |
| WI | 9.6 | 2.6 | 8.2 | 2.0 | 0.5 | 20.63 |
| WY | 1.2 | 0.3 | 1.1 | 0.3 | 0.0 | 8.52 |
| Total | 78.9 | 22.1 | 73.1 | 17.5 | 4.5 | 20.51 |

Source: State claims data, and Dr. Duggan's work papers

298.   *Use of SMRF/MAX and STUD data unjustifiable*: Dr. Duggan justifies his use of SMRF/MAX data and SDUD data by suggesting that the average differences he calculated for 14 states can be applied in a straightforward manner to the remaining states.[298] Clearly, the above analysis contradicts Dr. Duggan's suggestion. The above comparison also shows that Dr. Duggan has not fully utilized all the important data produced in this matter and his ad hoc explanations for not doing so does not bear out upon close scrutiny. Thus Dr. Duggan's calculations are unreliable.

---

[297] Maine is excluded from this difference figure.

[298] Expert Report of Mark G. Duggan at 92, United States ex rel. Ven-a-Care of the Florida Keys, Inc. v. Dey, Inc., No. 05-11084-PBS (D. Mass. Jan. 23, 2009).

---

Expert Report of Professor W. David Bradford, Ph.D.

299.   *Dr. Duggan ignores many institutional details of state payment heterogeneity*: One of the suggestions made by Dr. Duggan in applying the average differences calculated from 14 states to the remaining states is that the proportion of AWP and WAC among the 14 states is comparable to that among the rest of the states.[299] This discussion crystallizes the unreliable and ad hoc nature of Dr. Duggan's analysis throughout his report. Dr. Duggan completely ignores the fact that states make payments based on many other bases besides the published prices. In fact as I already discussed in Section D.4 for many states, less than half the drug payments were based on the published price. More importantly, there is no consistency among states in their drug payment patterns. For example, some states make extensive use of state MACs for generic drug payments while others do not. Thus one cannot extrapolate from any subset of states to other states without examining each state's payments at a claims level.

300.   *SMRF/MAX and STUD data do not have information needed to correctly analyze payments*: Use of SMRF/MAX and SDUD data are inappropriate for any difference calculations because these data do not allow for a proper payment basis analysis. SDUD data is a summary level data by NDC and quarter and no claims level analysis can be done with this data. As I have discussed in section D.4 a close examination of data at claims level reveals many variances and idiosyncrasies in actual drug payments made by the Medicaid agencies. SDUD data cannot show these variances at the claims level. More importantly, Dr. Duggan's methodology sweeps all payments due to these variances and idiosyncrasies into his 'differences'.

301.   *SMRF/MAX data does not have essential drug payment basis data*: While the SMRF/MAX data shows claims level information, it does not include all the relevant fields needed to do a proper payment basis analysis. For example, the SMRF/MAX data only includes the total paid amount for the drug and dispensing fee together. Thus one cannot separate the drug payment amount in order to do a reliable payment basis analysis.[300] Since the central allegation in this matter is the inflated payments due to published prices, it is critical to determine the basis for payment for each claim. Thus at the most fundamental level, SMRF/MAX and SDUD data are inappropriate for the difference calculation methodology used by Dr. Duggan.

302.   *In states not examined by Dr. Duggan, correcting his mistakes also caused his differences to disappear*: For the additional 16 states that produced state claims data I calculated differences using

---

[299]   Expert Report of Mark G. Duggan at 92, United States ex rel. Ven-a-Care of the Florida Keys, Inc. v. Dey, Inc., No. 05-11084-PBS (D. Mass. Jan. 23, 2009).

[300]   In principle one could subtract the dispensing fee according to state policy to calculate the drug payment amount. However, state claims data shows that the actual dispensing fee paid is not equal to policy on many instances.

Expert Report of Professor W. David Bradford, Ph.D.

Dr. Duggan's methodology and made the same baseline adjustments that I applied to the 14 sates. As expected, these adjustments result in no differences as shown in Figure 43 below.

**Figure 43: Adjustments to Dr. Duggan's difference calculations for additional states**

| State | First quarter | Last quarter | Number of claims (k) | Total amount paid ($mm) | Adjusted differences ($mm) | Dispensing fee shortfall ($mm) | Positive differences |
|---|---|---|---|---|---|---|---|
| Alabama | 1993 Q1 | 2005 Q1 | 359.0 | 11.3 | 0.4 | -1.4 | - |
| Alaska | 1996 Q1 | 2006 Q4 | 47.1 | 1.9 | 0.0 | -0.2 | - |
| Arkansas | 2000 Q1 | 2008 Q1 | 97.9 | 3.2 | 0.1 | -0.4 | - |
| Connecticut | 1994 Q4 | 2004 Q2 | 150.7 | 6.4 | 0.1 | -0.6 | - |
| Delaware | 2003 Q1 | 2008 Q1 | 37.5 | 0.6 | 0.0 | -0.2 | - |
| Hawaii | 1993 Q1 | 2006 Q1 | 50.3 | 2.2 | 0.0 | -0.2 | - |
| Idaho | 1993 Q1 | 2005 Q4 | 77.6 | 3.0 | 0.1 | -0.3 | - |
| Kansas | 1993 Q4 | 2004 Q2 | 130.3 | 5.0 | 0.1 | -0.5 | - |
| Minnesota | 1999 Q1 | 2007 Q4 | 137.2 | 4.4 | 0.1 | -0.6 | - |
| Nebraska | 1999 Q1 | 2004 Q2 | 79.1 | 2.6 | 0.0 | -0.3 | - |
| New Mexico | 1992 Q3 | 2006 Q4 | 70.6 | 2.6 | 0.0 | -0.2 | - |
| Ohio | 2000 Q3 | 2005 Q4 | 748.0 | 22.6 | 0.7 | -3.3 | - |
| Rhode Island | 1994 Q4 | 2008 Q1 | 53.7 | 1.4 | 0.0 | -0.2 | - |
| South Carolina | 1993 Q1 | 2006 Q4 | 173.1 | 7.0 | 0.1 | -0.7 | - |
| Utah | 1998 Q1 | 2007 Q2 | 58.1 | 1.6 | 0.0 | -0.3 | - |
| Wisconsin | 1992 Q4 | 2005 Q4 | 286.7 | 9.5 | 0.1 | -1.1 | - |
| Wyoming | 1998 Q3 | 2004 Q2 | 15.9 | 0.7 | 0.0 | -0.1 | - |
| Total | | | 2572.8 | 86 | 1.8 | -10.6 | - |

Source: State claims data, FDB data, Medi-span data, Red Book and wholesaler data

## F.1.3. Dr. Duggan's Medicare calculations

303.   *Dr. Duggan's Medicare calculations have similar errors as his Medicaid calculations*: Dr. Duggan's difference calculations for the Medicare program are fraught with various errors and inaccuracies. Dr. Duggan's Medicare difference calculations do not take into account numerous factors considered by Medicare in determining the drug payment rates. Adjusting Dr. Duggan's calculations for only few of these considerations results in differences falling to nearly zero.

304.   *Dr. Duggan creates pricing arrays for Medicare*: The basic methodology employed by Dr. Duggan in calculating Medicare difference calculations is similar to the methodology he used in the Medicaid difference calculations. However, there is one additional step in the Medicare difference calculations: Dr. Duggan first replaces the Dey AWP in the DMERC pricing arrays with 125% of average

Expert Report of Professor W. David Bradford, Ph.D.

pharmacy price. He then computes an alternate allowable, resulting from the alternate Dey AWP, for each quarterly pricing array.

### F.1.3.1. Errors in Medicare difference calculations

305.   *Dr. Duggan makes substantial errors in calculating Medicare differences for albuterol*: Dr. Duggan has made several significant errors in the albuterol sulfate difference calculations presented in table 37 of his report. Correcting these errors essentially eliminates most of the $2.25 million of albuterol sulfate 0.083% solution differences.

306.   *Dr. Duggan incorrectly combines prices for two different concentrations of albuterol*: The first error arises from creating alternate pricing arrays for albuterol sulfate 0.083% solution and matching these arrays to DMERC claims for both albuterol sulfate 0.083% solution and albuterol sulfate 0.5% solution. When calculating differences for all four DMERCs, Dr. Duggan incorrectly matched the alternate allowable for albuterol sulfate 0.083% to both sets of drug claims in the quarters prior to the second quarter of 1997.[301] More than 20% of Dr. Duggan's calculated differences for albuterol sulfate are due to this error. Nevertheless, Dr. Duggan did calculate pricing arrays for albuterol sulfate 0.5% solution for Palmetto for quarters after the second quarter of 1997. However this generally did not result in the mismatching of array allowables to claims.

307.   *Dr. Duggan makes two mistakes for albuterol 0.083% prices*: In the Palmetto albuterol sulfate 0.083% solution array for the second quarter of 2001, Dr. Duggan makes two mistakes in calculating both the original and alternate allowable. First, Dr. Duggan calculates median based only on a subset of NDCs in the array. And second, he miscalculates the unit AWP for the Dey NDCs in the array. The unit miscalculation occurs when he converts the package size AWP into unit AWP he uses a package size of 25 for all three Dey NDCs even though the three Dey NDCs come in different package sizes. These two errors combined produce an artificial difference of more than $1 million which is inappropriately attributed to Dey.[302]

308.   *Dr. Duggan fills in prices in arrays where there is no underlying data using unsubstantiated assumptions*: Dr. Duggan has also attributed differences to Dey for albuterol sulfate even in quarters when Dey NDCs were not included in the DMERC arrays. In other words, the DMERC was not

---

[301]   Pricing arrays for albuterol sulfate 0.5% could be relevant in determining the allowed amount for albuterol 0.083% when it is dispensed as a secondary modifier code KQ. However this is not what Dr. Duggan has done. He incorrectly includes both pricing arrays for both forms even for KO and KP claims.

[302]   It is unclear if Dr. Duggan made these errors on his own or were made by his consultants while compiling this array. Either way, Dr. Duggan has performed unreliable calculations or has not performed a due diligence review of the data he relies upon.

Expert Report of Professor W. David Bradford, Ph.D.

relying on published prices for Dey drugs to determine the allowable, yet Dr. Duggan has managed to manufacture differences.[303] Similarly, in other instances Dr. Duggan has calculated differences where he does not have DMERC arrays and cannot determine the impact of Dey alternate prices in those arrays. Dr. Duggan has relied upon ad hoc extrapolations that he never discloses in his report or his work papers to produce unrealistic arrays and calculate differences. As I discussed in Section 5, the DMERC arrays are unpredictable due to various idiosyncrasies. Thus any reliance on assumed arrays, as opposed to actual arrays, is inappropriate.

309.   *After correcting Dr. Duggan's errors, differences for albuterol nearly vanish*: Figure 44 shows the cumulative result of correcting Dr. Duggan's various errors in the albuterol sulfate differences calculations, as discussed above. More than 88% of differences for albuterol sulfate are due to errors and thus Dr. Duggan's calculations are wholly unreliable.

**Figure 44: Errors in Dr. Duggan's albuterol sulfate difference calculations ($MM)**

| Reason | AdminaStar | Cigna | DMERCA | Palmetto | Total |
|---|---|---|---|---|---|
| Dr. Duggan's differences | $0.47 | $0.36 | $0.00 | $1.43 | $2.25 |
| Corrections: | | | | | |
|     Unit prices & median arrays are miscalculated | | | | $1.06 | $1.06 |
|     Pricing arrays for 0.083% albuterol sulfate mismatched to 5% albuterol sulfate claims | | $0.30 | | $0.19 | $0.48 |
|     Array median miscalculated | $0.28 | | | | $0.28 |
|     No actual array produced | $0.01 | $0.04 | $0.00 | $0.06 | $0.11 |
|     Dey NDCs not in array | | | | $0.05 | $0.05 |
| Total corrections | $0.29 | $0.34 | $0.00 | $1.36 | $1.99 |
| Remaining differences | $0.18 | $0.02 | $0.00 | $0.06 | $0.26 |

Source: Dr. Duggan's difference calculations analysis.

310.   **Dr. Duggan makes substantial errors in calculating Medicare differences for ipratropium**: Similarly, Dr. Duggan has also made several errors in his difference calculations for ipratropium bromide.[304] Again, Dr. Duggan's extrapolates pricing arrays for quarters where he does not have actual arrays. As I discussed above, this ad hoc approach is inappropriate. Other errors that were discussed for albuterol

---

[303] This scenario occurs in the fourth quarter of 2000 when Dr. Duggan creates an alternate price for J7620, an albuterol sulfate 0.083% solution HCPCS that is not active in this quarter. Because the array does not contain any Dey NDCs he sets the allowable to zero. When this allowable is matched to the claims data it matches the active HCPCS for albuterol sulfate 0.5% solution and since the alternate allowable has been changed to zero, the full value of every albuterol sulfate 0.5% solution claim reimbursement is included in Dr. Duggan's difference calculations.

[304] Dr. Duggan has calculated differences for ipratropium bromide under various scenarios in table 35 of his report. As I will discuss in the next section only his "Dey Only" scenarios is relevant in this matter. Thus my discussion here refers to that scenario.

Expert Report of Professor W. David Bradford, Ph.D.

sulfate differences also apply to ipratropium bromide differences as shown below in Figure 45. More than 20% of differences that Dr. Duggan calculates for ipratropium bromide are due to errors and thus his calculations are unreliable.

**Figure 45: Errors in Dr. Duggan's ipratropium bromide difference calculations ($MM)**

| Reason | AdminaStar | Cigna | DMERCA | Palmetto | Total |
|---|---|---|---|---|---|
| Dr. Duggan's differences | $19.57 | $35.04 | $29.91 | $128.83 | $213.36 |
| Corrections: | | | | | |
| No actual array produced | $7.48 | | $10.62 | $15.23 | $33.33 |
| Array median miscalculated | | | | $9.91 | $9.91 |
| Dey NDCs not in array | $0.08 | $0.00 | | $0.00 | $0.08 |
| Total corrections | $7.56 | $0.00 | $10.62 | $25.14 | $43.32 |
| Remaining differences | $12.01 | $35.04 | $19.29 | $103.69 | $170.03 |

Source: Dr. Duggan's difference calculations analysis.

### F.1.3.2. Adjustments to Medicare difference calculations

311.   _Combining Dey and Roxane data inappropriate, so I will examine the "Dey Only" calculations_: Dr. Duggan has presented five different scenarios for his Medicare difference calculations. In four of those scenarios, Dr. Duggan considers alternate prices for both Dey and Roxane without any justification. These four scenarios are not consistent with Plaintiffs' allegation in this matter. If Plaintiffs' allegation is that Dey marketed the spread to compete for market share then its alleged actions are independent of any other manufacturer. Thus any scenario under Plaintiffs' allegation that considers Dey's alternate prices with any other manufacturer is inappropriate. Hence in this section I will only review Dr. Duggan's 'Dey Only' scenario.

312.   _Dr. Duggan makes at least two substantial mistakes in the difference calculation methodology_: Similar to the Medicaid differences, Dr. Duggan's Medicare differences are simplistic calculations that do not take into account the numerous factors considered by Medicare in determining drug reimbursement rates. When I adjust Dr. Duggan's difference calculations to account for only a two of these considerations, I find that as a result there are no differences. Based on the reasons that I detail throughout this report, I make the following simple adjustments to Dr. Duggan's Medicare difference calculations:

▪   CMS determines the methodology for Medicare payment rates and had access to Dey's published WAC. It could have used the WAC to determine Medicare payment rates just as it does in determining the FUL. Thus I replace Dey's AWP with its WAC in the DMERC pricing arrays.

Expert Report of Professor W. David Bradford, Ph.D.

- Medicare was knowledgeable about the actual prices providers paid for the subject drugs, yet it chose drug payment rates well above average price levels. Medicare did this to cover the costs of marginal providers that are not reflected in average prices. Hence I use 95th percentile pharmacy prices calculated from the wholesaler data as an alternate price for Dey NDCs.

313. _After correcting Dr. Duggan's errors the Medicare differences almost vanish_: After making the corrections to Dr. Duggan's errors, as discussed in the previous section, I implement Dey's WAC and 95th percentile pharmacy prices as baseline adjustments. My results, in Figure 46 and Figure 47, show that these two baseline adjustments decrease Dr. Duggan's differences to nearly zero.

**Figure 46: Adjustments to Dr. Duggan's albuterol sulfate differences**

|  | AdminaStar | Cigna | DMERC-A | Palmetto | Total |
|---|---|---|---|---|---|
| Total Medicare paid amount | $310.68 | $260.05 | $109.16 | $680.48 | $1,360.38 |
|  |  |  |  |  |  |
| Dr. Duggan's difference calculations: |  |  |  |  |  |
| Paid amount for quarters with difference > 0 | $7.13 | $2.57 | $0.14 | $6.85 | $16.69 |
| With Dr. Duggan's alternate prices | $6.66 | $2.21 | $0.14 | $5.43 | $14.44 |
| Difference | $0.47 | $0.36 | $0.00 | $1.43 | $2.25 |
|  |  |  |  |  |  |
| Dr. Duggan's corrected differences |  |  |  |  |  |
| Paid amount for quarters with difference > 0 | $1.85 | $1.12 | $0.08 | $1.56 | $4.60 |
| With Dr. Duggan's alternate prices | $1.67 | $0.98 | $0.08 | $1.49 | $4.22 |
| Difference | $0.18 | $0.14 | $0.00 | $0.06 | $0.38 |
|  |  |  |  |  |  |
| Using public WAC: |  |  |  |  |  |
| Paid amount for quarters with difference > 0 | $1.67 | $0.98 | $0.08 | $1.49 | $4.22 |
| Paid amount with WAC | $1.67 | $0.98 | $0.08 | $1.49 | $4.22 |
| With Dr. Duggan's alternate prices | $1.67 | $0.98 | $0.08 | $1.49 | $4.22 |
| Positive difference | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
|  |  |  |  |  |  |
| Using public WAC and but-for WAC=95th AC |  |  |  |  |  |
| Paid amount for quarters with difference > 0 | $1.67 | $0.98 | $0.08 | $1.49 | $4.22 |
| Paid amount with WAC | $1.67 | $0.98 | $0.08 | $1.49 | $4.22 |
| With 95th AC as alternate price | $1.67 | $0.98 | $0.08 | $1.49 | $4.22 |
| Positive difference | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |

Source: DMERC claims, wholesaler, Dey chargeback, FDB, Medi-Span, and Red Book data.

Expert Report of Professor W. David Bradford, Ph.D.

**Figure 47: Adjustments to Dr. Duggan's ipratropium bromide differences ($MM)**

|  | AdminaStar | Cigna | DMERC-A | Palmetto | Total |
|---|---|---|---|---|---|
| Total Medicare paid amount | $391.39 | $357.61 | $214.34 | $1,075.88 | $2,039.22 |
| | | | | | |
| Dr. Duggan's difference calculations: | | | | | |
| Paid amount for quarters with difference > 0 | $77.68 | $155.58 | $93.81 | $481.31 | $808.38 |
| With Dr. Duggan's alternate prices | $58.11 | $120.53 | $63.90 | $352.46 | $595.01 |
| Difference | $19.57 | $35.04 | $29.91 | $128.83 | $213.36 |
| | | | | | |
| Dr. Duggan's corrected differences | | | | | |
| Paid amount for quarters with difference > 0 | $59.49 | $160.33 | $54.31 | $368.21 | $642.35 |
| With Dr. Duggan's alternate prices | $47.49 | $124.61 | $36.11 | $264.53 | $472.74 |
| Difference | $12.01 | $35.72 | $18.20 | $103.68 | $169.61 |
| | | | | | |
| Using public WAC: | | | | | |
| Paid amount for quarters with difference > 0 | $59.49 | $160.33 | $54.31 | $368.21 | $642.35 |
| Paid amount with WAC | $47.56 | $124.62 | $36.11 | $264.06 | $472.35 |
| With Dr. Duggan's alternate prices | $47.49 | $124.61 | $36.11 | $264.53 | $472.74 |
| Positive difference | $0.07 | $0.00 | $0.00 | $0.00 | $0.00 |
| | | | | | |
| Using public WAC and but-for WAC=95th AC | | | | | |
| Paid amount for quarters with difference > 0 | $59.49 | $160.33 | $54.31 | $368.21 | $642.35 |
| Paid amount with WAC | $47.56 | $124.62 | $36.11 | $264.06 | $472.35 |
| With 95th AC as alternate price | $47.86 | $125.36 | $36.11 | $265.31 | $474.63 |
| Positive difference | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |

Source: DMERC claims, wholesaler, Dey chargeback, FDB, Medi-Span, and Red Book data.

314.   *Appendix H provides further details on the baseline adjustments to Dr. Duggan's calculations*. In Appendix H I also provide various sensitivities to the baseline adjustments. For example, my baseline adjustment uses the contemporaneous 95th percentile price as an alternate for WAC. As I discussed in Section C, payment systems where the payment rate are only known ex-post are unlikely to be viable. Hence, even the ASP system used prices prevailing in two quarters prior for payments. Thus one can replace contemporaneous 95th percentile price with two-quarter-lagged 95th percentile price for WAC. Similarly a higher percentile price such as the 99th percentile can be used as an alternate for WAC. As Dr. Schondelmeyer has suggested any provider should be able to procure drugs at the Medicaid payment rates.

Expert Report of Professor W. David Bradford, Ph.D.

315.   _Dr. Duggan makes many other errors detrimental to the defendant_: In the baseline adjustments to Dr. Duggan's Medicare differences I have not incorporated many of the additional issues I have identified with Dr. Duggan's calculations throughout this report. For example, Medicare drug payments include substantial cross-subsidy for dispensing fee shortfall as I discussed previously. In Appendix H, I provide details on the dispensing-fee shortfall for the Medicare payments for Dey drugs. Similarly, I provide details on the estimation of the portion of subject drugs reimbursed by Medicare that could potentially be attributed to Dey NDCs. Finally, I also quantify the adjustments that could be made for various Medicare fraud issues identified by the government. As my discussion above shows, the baseline adjustments to Dr. Duggan's Medicare difference calculations result in his differences falling to nearly zero even before considering any additional adjustments.

## F.2.  Review of Dr. Schondelmeyer's report

316.   _Dr. Schondelmeyer's report itself rebuts Dr. Duggan_: As I have highlighted in several places throughout this report, Dr. Schondelmeyer raises several important concerns regarding the overall adequacy of pharmacy reimbursement. These concerns are directly relevant to the issues raised in this matter, and bear on whether one can interpret the difference calculations that Dr. Duggan has arrived at as damages. It appears that Dr. Schondelmeyer has performed little analysis specific to the facts and issues in this matter. In fact, Dr. Schondelmeyer has expressed views that appear to directly contradict the validity of Dr. Duggan's 'difference' calculations as a meaningful basis for economic damage computations.

317.   _Dr. Schondelmeyer has nonetheless not considered a number of important factors_: Among the important considerations that Dr. Schondelmeyer has not evaluated in this case (some of which he himself has highlighted) are the following:

- Dey's published prices fully conformed to the industry norms and Dr. Schondelmeyer's own definitions

- Medicare and Medicaid's need to maintain access by considering prices paid by marginal providers

- The implicit dispensing fee built into drug payments made by Medicare and Medicaid

- The political and economic balancing act between various stakeholders that demonstrably results in drug payment rates unrelated to known costs

- The sustainability of drug payments implicit in Dr. Duggan's 'difference' calculations

Expert Report of Professor W. David Bradford, Ph.D.

- The substantial information possessed by Medicaid and Medicare regarding the actual prices including actual prices for subject drugs – in particular those commissioned directly by state Medicaid agencies by organizations such as Myers and Stauffer

318.     _Dr. Schondelmeyer does not provide support for his conclusions:_ Although Dr. Schondelmeyer concludes that "…Dey reported inflated prices to the commercial drug price databases, … resulted in the Medicaid and Medicare programs paying more than they otherwise would have paid."[305] It is unclear how he arrives at this conclusion, and how it relates to the opinions he has expressed elsewhere on topics such as dispensing fee shortfalls and adequate payments to pharmacies.

## F.2.1. Understanding of AWP and WAC

319.     _Dr. Schondelmeyer unclear about history of WAC definition_: Dr. Schondelmeyer appears to currently define WAC as a "list price used for invoices between drug manufacturers and wholesalers . . . without adjustment for discounts, rebates, purchasing allowances, or other forms of economic consideration." As I discuss in Section C, Dey's WAC complied with this industry understanding. Various government reports and textbooks reveal that this understanding has been in place since at least the early 1990s. Dr. Schondelmeyer's other assertion that … "in the past decade WAC was a term that typically included adjustments for discounts, rebates, purchasing allowances or other forms of economic consideration" is imprecise and gives no clear timeline for when this understanding would have changed, and to whom it applied. As I highlight in Section C, WAC was necessarily undiscounted due to its role governing transactions between manufacturers and wholesalers due to the forward-looking nature of those arrangements.

320.     _Dr. Schondelmeyer does not provide evidence that Dey deviated from industry norms_: Similarly, Dr. Schondelmeyer provides no evidence or analysis to suggest that Dey's AWP did not conform to the well known industry norms. Definitions he give in this and previous reports state that AWP "… may be considerably higher (20 to 70 percent) than WAC for generic drugs" and that "…AWP does not generally have a relationship to the actual acquisition cost". A careful examination of AWP and the relationship between AWP and WAC in the generic industry shows that Dey's AWP and WAC appear to conform to Dr. Schondelmeyer's definitions. Thus, Dr. Schondelmeyer's assertion that

---

[305] Expert Report of Stephen W. Schondelmeyer at 103, United States ex rel. Ven-a-Care of the Florida Keys, Inc. v. Dey, Inc., No. 05-11084-PBS (D. Mass. Jan. 29, 2009), p. 103

Expert Report of Professor W. David Bradford, Ph.D.

"Dey reported prices to the commercial drug databases that were inflated in relation to actual prices"[306] is beside the point, and well understood.

## F.2.2. Dr Schondelmeyer does not consider many studies and reports on actual prices

321.    _Dr. Schondelmeyer cites reports that themselves conclude AWP was not actual price_: Numerous government studies and reports contradict Dr. Schondelmeyer's general assertion that "government studies was not sufficient to routinely determine that there were substantial differences the between published benchmark prices (AWP, DP, and WAC) and the actual invoice prices to pharmacies and other providers."[307] Throughout this report and in Appendix E in detail I have discussed the government studies showed that AWP was widely different from the actual prices in general and in particular for generic drugs. In fact, even the few government reports that Dr. Schondelmeyer has cited conclude about the scope of these findings and the accompanying recommendation to lower payment rates as early as 1997:

> The published AWPs that are currently being used by Medicare-contracted carriers to determine reimbursement bear little or no resemblance to actual wholesale prices that are available to the physician and supplier communities that bill for these drugs. …. We recommend that HCFA reexamine its Medicare drug reimbursement methodologies, with the goal of reducing payments as appropriate.[308]

322.    _Dr. Schondelmeyer fails to reference governmental empirical studies showing difference between published and transaction prices_: Furthermore, government reports specifically studied the actual prices for the subject drugs. In Appendix E I have summarized the numerous reports and their findings. Dr. Schondelmeyer's report does not reference many of these specific studies that showed wide differences between actual and published prices for albuterol sulfate and ipratropium bromide. These studies are especially pertinent for DMERC drug payments because of the large fraction of payments that were accounted for by inhalation drugs. Additionally in 2004, Medicare reduced the payments for these drugs to AWP – 20% while it reduced payments to other drugs only to AWP – 15%. This shows that government possessed detailed knowledge and could take targeted actions.

---

[306] Expert Report of Stephen W. Schondelmeyer at 103, United States ex rel. Ven-a-Care of the Florida Keys, Inc. v. Dey, Inc., No. 05-11084-PBS (D. Mass. Jan. 29, 2009).

[307] Expert Report of Stephen W. Schondelmeyer at 91, United States ex rel. Ven-a-Care of the Florida Keys, Inc. v. Dey, Inc., No. 05-11084-PBS (D. Mass. Jan. 29, 2009).

[308] U.S. Department of Health and Human Services, Office of the Inspector General. "Excessive Medicare Payments for Prescripton Drugs," December 1997, ii.

Expert Report of Professor W. David Bradford, Ph.D.

323. *Dr. Schondelmeyer ignores central role of Myers and Stauffer reports in state decision making*: Dr. Schondelmeyer's report does not reference the various Myers and Stauffer studies commissioned by various state Medicaid agencies. These studies provided direct evidence to the state Medicaid agencies on the wide disparity between actual and published prices. As I detail for Arkansas and Kentucky, states often use these reports as direct inputs for a policy process that results in the continued use of benchmarks like AWP despite very specific information on drug costs. Dr. Schondelmeyer's conclusion that Medicaid and Medicare agencies could not act on these information is belied by State Plan Amendments ("SPA"), MAC programs, and other active changes made by Medicaid agencies pursuant to these reports. Remaining disparity between the actual and published prices appears to be a matter of choice.

## F.2.3. Possession of AMP knowledge

324. *Dr. Schondelmeyer's assertions regarding private nature of AMP are in error*: Regarding the possession of AMP information by the CMS since 1990, Dr. Schondelmeyer states that the government could not use AMP for drug payment purposes for several reasons. Internal CMS documents reveal that the agency considered the use of AMP for Medicare drug payments as I discussed in E.2. Dr. Schondelmeyer's assertion also side-steps the issue that AMP provided direct knowledge of actual prices to both the federal and state officials. Contrary to Dr. Schondelmeyer's assertions, CMS and state Medicaid officials have testified that they could easily reverse engineer AMP from URA as I discuss in Appendix E. Thus the Medicare and Medicaid authorities were knowledgeable about actual prices directly through AMP.

325. *Dr. Schondelmeyer rejects idea of using average prices like those employed by Dr. Duggan*: Dr. Schondelmeyer raises an important issue regarding the feasibility of using unadjusted AMP for drug payments. He correctly points out that AMP would not reveal the underlying distribution of the prices paid by the providers.[309] As I point out in Section C, there is significant variability in prices paid by pharmacies for Dey's drugs. An contemporaneous average is inappropriate as a basis for drug payments to pharmacies because, of course, many pharmacies pay above the average. I have also established that Dr. Duggan's alternate price calculation is quantitatively similar to the AMP, and is similarly inappropriate as a basis for drug payments to pharmacies. Dr. Schondelmeyer's concern appears to raise important doubts about the validity of Dr. Duggan's alternate prices as an

---

[309] Expert Report of Stephen W. Schondelmeyer at 77, United States ex rel. Ven-a-Care of the Florida Keys, Inc. v. Dey, Inc., No. 05-11084-PBS (D. Mass. Jan. 29, 2009). I also note that this particular objection applies equally to AWP or WAC neither of which reveal anything about the underlying distribution of the actual prices.

Expert Report of Professor W. David Bradford, Ph.D.

economically feasible drug payment. Thus, in my adjustments to Dr. Duggan's difference calculations I have appropriately considered the 95th percentile price.

326. *Dr. Schondelmeyer rejects idea of using average prices constructed using method similar to Dr. Duggan:* Another objection raised by Dr. Schondelmeyer regarding AMP is that the providers would not know the payments they will receive prior to dispensing the drug.[310] This again stands in contrast to Dr. Duggan's use of contemporaneous averages as alternate prices. Thus in my adjustments to Dr. Duggan I have appropriately considered the lagged prices as alternate prices. These objections raised by Dr. Schondelmeyer regarding the potential use of AMP as basis for drug payments only tend to support the use of list price such as WAC as a payment basis.

## F.2.4. Dispensing fee shortfall and cross-subsidy

327. *Dr. Schondelmeyer recognizes reality of cross-subsidy in payment formulae*: Dr. Schondelmeyer cites his own previous study that acknowledges that many stakeholders believed that "Medicaid dispensing fees were too low".[311] Thus, as I highlight elsewhere in this report, Dr. Schondelmeyer has recognized that there are dispensing fee shortfalls built into Medicaid drug payments. These studies recognize that the ingredient payments make up some of the dispensing fee shortfall. In his 2004 study Dr. Schondelmeyer quotes "If it weren't for the AWP spread, the pharmacies would be out of business."[312]

328. *Dr. Schondelmeyer neglects to take cross-subsidy into account when forming his conclusions*: Nonetheless in his expert report in this matter Dr. Schondelmeyer insists that the states "expected to set their ingredient cost levels as close as possible to actual acquisition cost."[313] This stands in contrast to Dr. Schondelmeyer's conclusion elsewhere that "reform of the drug product cost component of the payment system must be considered in association with reform of other components of the payment system."[314] As I have discussed in detail in Section D.2 the Medicaid agencies consider overall payments and not necessarily focus on one component of the payment. In fact, Dr.

---

[310] Expert Report of Stephen W. Schondelmeyer at 78, United States ex rel. Ven-a-Care of the Florida Keys, Inc. v. Dey, Inc., No. 05-11084-PBS (D. Mass. Jan. 29, 2009)

[311] Expert report of Stephen W. Schondelmeyer at 81, United States ex rel. Ven-a-Care of the Florida Keys, Inc. v. Dey, Inc.. No. 05-11084-PBS (D. Mass. Jan. 29, 2009)

[312] Schondelmeyer, Steven W. and Marian V. Wrobel. "Medicaid and Medicare Drug Pricing: Strategy to Determine Market Prices," Abt Associates, Inc., August 30, 2004, 7.

[313] Expert Report of Stephen W. Schondelmeyer at 84, United States ex rel. Ven-a-Care of the Florida Keys, Inc. v. Dey, Inc., No. 05-11084-PBS (D. Mass. Jan. 29, 2009).

[314] Schondelmeyer, Steven W. and Marian V. Wrobel. "Medicaid and Medicare Drug Pricing: Strategy to Determine Market Prices," Abt Associates, Inc., August 30, 2004, 7.

Expert Report of Professor W. David Bradford, Ph.D.

Schondelmeyer says as much in his own words "…the combined effect of the two components of estimated cost (the drug product cost and the dispensing fee) is what ultimately determined payment and financial performance for the retail pharmacy."[315]

## F.2.5. Dr. Schondelmeyer's conclusions are unsubstantiated

329.   *Dr. Schondelmeyer's testimony in its entirety does not support the plaintiff's position*: In conclusion, Dr. Schondelmeyer's does not provide any analysis to show that Medicare and Medicaid drug payments would have been lower if Dey had published different prices. His assertion does not take into account the voluminous information that Medicaid and Medicare agencies possessed regarding the actual prices and yet chose not to lower drug payment rates. Dr. Schondelmeyer does not adequately take into account either Medicare or Medicaid's need to maintain access that includes marginal pharmacies or the cross-subsidy between drug and dispensing payments. Dr. Schondelmeyer does not analyze the interaction between various stakeholders that result in the determination of the drug payment rates. Dr. Schondelmeyer does not analyze if a lower drug payment would have been sustainable. Most importantly Dr. Schondelmeyer presents no analysis of Dey's prices to reach his conclusions. Thus Dr. Schondelmeyer's conclusion is unsupported by his report.

## F.3. Review of Dr. Marmor's report

330.   Dr. Theodore Marmor has put forward a four page Supplemental Expert Report in this matter that updates his original report put forward in the matter of US v Abbott.[316] Dr. Marmor states that his conclusions and opinions are based in part on his "review of materials specific to the Dey and Roxane case".[317] However, in his four page supplemental report Dr. Marmor does not cite or reference a single document or material specific to Dey. He presents no analysis of the published prices for Dey drugs which is a central issue in this matter. Based on this and my discussion below, I find that Dr. Marmor's report has very little, if any, relevance to the facts in this matter.

331.   Dr. Marmor has not presented any analysis of the actual and published prices for Dey drugs at issue. Nor has Dr. Marmor presented any analysis or discussion of the use and understanding of list pricing

---

[315]   Abt Associates, Inc. "Case Study of the Texas Vendor Drug Program's Approach to Estimating Drug Acquisition Costs: Final Report," September 26, 2005, 67.

[316]   Expert Report of Theodore Marmor at 86, United States ex rel. Ven-a-Care of the Florida Keys, Inc. v. Abbott Laboratories, Inc., No. 06-11337-PBS (D. Mass. June 20, 2008). Also see Supplemental Expert Report of Theodore Marmor, In re: Pharmaceutical Industry Average Wholesale Price Litigation, MDL No. 1456, CV No. 01-12257-PBS, January 21, 2009.

[317]   Supplemental Expert Report of Theodore Marmor, In re: Pharmaceutical Industry Average Wholesale Price Litigation, MDL No. 1456, CV No. 01-12257-PBS, January 21, 2009, p. 1.

Expert Report of Professor W. David Bradford, Ph.D.

in any industry. In his expert report, Dr. Marmor insinuates that some firms did made honest presentation of prices.[318] However, Dr. Marmor does not elaborate or define what those standards of presentations were and which firms did so. Thus, Dr. Marmor has not established any framework to evaluate and understand Dey's prices that are central to this matter. As I discussed in detail in Section C, published prices for Dey conformed to the industry standard. In particular, Dey's WAC was economically meaningful price that was related to the actual prices.

332.    In his original report Dr. Marmor concludes that various government studies only "reported gaps for some drugs between published prices and the prices available to some providers".[319] As I have discussed throughout this report, it was widely known that published prices and actual prices differed. In appendix E, I review numerous government studies that document the differences between actual and published prices in general and also in particular to drugs at issue. Furthermore, in his report Dr. Marmor does not address the specific Meyers and Stauffer studies commissioned by individual state Medicaid agencies that provided direct evidence of actual prices.

333.    The direct information on actual prices available to state Medicaid agencies was in instances reflected in the SPAs and revisions of payment rates. As I discussed in Section D, several states directly relied on the Myers and Stauffer surveys of actual prices to revise payment rates. These actions contradict Dr. Marmor's assertion that "state Medicaid officials …. could not act boldly on reports of minor or major instances of inflated prices".[320] As I discussed in detail in Section D, states could and did make payment revisions as deemed appropriate based on direct and accurate information.

334.    Dr. Marmor's suggestion that states could not act also stands in contrast to the wide payment variation across states that I discussed in Section D. Many states were able to achieve low payment rates through various means such as the aggressive MAC policies and the use of WAC for payments. Thus the lower payment rate for drugs was feasible and some states achieved it. As I have discussed throughout this report, ultimately the Medicaid payments are results of political influences involving many stakeholders. Dr. Marmor himself mentions the influence of provider lobby in setting drug payment rates.[321]

---

[318]  Expert Report of Theodore Marmor at 48, United States ex rel. Ven-a-Care of the Florida Keys, Inc. v. Abbott Laboratories, Inc., No. 06-11337-PBS (D. Mass. June 20, 2008).

[319]  Expert Report of Theodore Marmor at 50, United States ex rel. Ven-a-Care of the Florida Keys, Inc. v. Abbott Laboratories, Inc., No. 06-11337-PBS (D. Mass. June 20, 2008).

[320]  Expert Report of Theodore Marmor at 50, United States ex rel. Ven-a-Care of the Florida Keys, Inc. v. Abbott Laboratories, Inc., No. 06-11337-PBS (D. Mass. June 20, 2008).

[321]  Expert Report of Theodore Marmor at 26, United States ex rel. Ven-a-Care of the Florida Keys, Inc. v. Abbott

Expert Report of Professor W. David Bradford, Ph.D.

335. As I discussed in detail in Section E, drug payments through the Medicare program was also ultimately the result of interaction between various stakeholders and not due to the alleged conduct of Dey. In fact, the US Congress had a significant role in determining the payment rates for Medicare part B program. Dr. Marmor also discusses the role of the Congress.[322]

336. Dr. Marmor's report does not address many other issues central to this matter that I address throughout this report. For example, Dr. Marmor does not discuss the cross-subsidization between drug and dispensing payments. Nor does he discuss the beneficiary access concerns or the sustainability or feasibility of Dr. Duggan's alternate prices. In conclusion, I find that Dr. Marmor's report does not address any of the central issues in this matter and thus is not pertinent.

---

Laboratories, Inc., No. 06-11337-PBS (D. Mass. June 20, 2008).

[322] Expert Report of Theodore Marmor at 86, United States ex rel. Ven-a-Care of the Florida Keys, Inc. v. Abbott Laboratories, Inc., No. 06-11337-PBS (D. Mass. June 20, 2008).

---

Expert Report of Professor W. David Bradford, Ph.D.

_____          March 6, 2009
W. David Bradford, Ph.D.                                  Date
Busbee Chair in Public Policy, and Professor,
Department of Public Administration and Policy
University of Georgia