UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In re: PHARMACEUTICAL | ) | |
| INDUSTRY AVERAGE WHOLESALE | ) | |
| PRICE LITIGATION | ) | MDL No. 1456 |
| | ) | Master Case No. 01-12257-PBS |
| | ) | |
| THIS DOCUMENT RELATES TO: | ) | Subcategory Case No. 06-11337-PBS |
| | ) | |
| *United States of America ex rel. Ven-a-* | ) | |
| *Care of the Florida Keys, Inc., et al. v.* | ) | |
| *Dey, Inc., et al.,* Civil Action No. 05- | ) | |
| 11084-PBS | ) | |

**DECLARATION OF MARK G. DUGGAN, Ph.D
IN SUPPORT OF MOTION TO EXCLUDE
CERTAIN TESTIMONY OF W. DAVID BRADFORD, Ph.D**

I, Mark G. Duggan, hereby declare as follows:

1.      I am a Professor in the Department of Economics at the University of Maryland, College Park, Maryland.  I am presently on leave to work on national health care policy as the Senior Economist for health care on the White House Council of Economic Advisers.  My qualifications have previously been stated in my Declaration of Mark G. Duggan, Ph.D., In Support of the United States' Motion for Partial Summary Judgment and in Opposition to Defendants' Motions for Partial Summary Judgment.[1]

2.      On April 23, 2009, I provided a Rebuttal Report of Mark G. Duggan, Ph.D, in which I responded to various arguments set forth in the Expert Report of Professor W.

---

[1] This document is Exhibit 41 to the Declaration of George B. Henderson, II Submitting Common Exhibits in Support of Motions for Partial Summary Judgment (Master Dkt #6310-53, Subcategory #308-53).

David Bradford, Ph.D.  Attachment A is a true copy of my Rebuttal Report.  The Rebuttal Report correctly states my opinions, and the factual statements in it are true and correct to the best of my knowledge.

      3.     On January 19, 2010, I provided a short supplement to my expert report, in which I replied to, and pointed out errors in certain arguments presented in Professor Bradford's report.  Attachment B is a true copy of my January 19, 2010, supplement.  The supplement correctly states my opinions, and the factual statements in it are true and correct to the best of my knowledge.

      4.     In footnotes 7 and 8 to my January 19, 2010, supplement, I refer to several publications.  True and correct copies of these (or selected portions) are attached as Attachments C - E as follows[2]:

      C.     Region C DMERC Medicare Advisory, Spring 2006 (Palmetto), cover page and pp. 28-29;

      D.     LCD [Local Coverage Determination] for Nebulizers (L11499), Region A (2005) (see pp. 18-19); and

      E.     Spring 2005 Region C DMERC DMEPOS Supplier Manual (part 21 (see especially pp. 21.3 - 21.4)).

      I swear under the penalties of perjury that the forgoing statements are true and correct.

_____

Mark G. Duggan, Ph.D

Executed this ____9____ th day of February, 2010

_____

[2] Page numbers have been added to Attachment D.  The original was unpaginated.

# Attachment A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In re: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) | MDL No. 1456 Civil Action No. 01-12257-PBS |
| **THIS DOCUMENT RELATES TO:** | ) ) ) | Hon. Patti B. Saris |
| *United States of America, ex rel. Ven-a-Care of the Florida Keys, Inc. v. Dey, Inc.,et al.* CIVIL ACTION NO. 05-11084-PBS | ) ) ) ) ) | |

**REBUTTAL REPORT OF MARK G. DUGGAN, PH.D.**

**Introduction**

In this document I respond to the primary criticisms in Dr. Bradford's report of my January 23, 2009 report, which calculated the difference between what the federal government reimbursed for certain pharmaceutical products provided to Medicaid and Medicare recipients during the 1992 to 2008Q1 period and what the federal government would have reimbursed for the same products during the same period if prices reflective of the actual prices at which Dey L.P. (hereafter Dey) was transacting business had been used for the AWP and WAC of Dey Complaint products.

**Holding All Else Equal**

One of Dr. Bradford's criticisms of the analysis in my Dey report is that I hold other factors constant when determining the amount that the federal government would have paid if alternative AWPs and WACs had been used for Dey's products when adjudicating claims for the Medicare and Medicaid programs.[1] When estimating the causal effect of one variable on some other variable, it is common practice in applied microeconomics to hold other factors constant and to focus on the direct rather than the indirect effects.  For example, in my own previous research on Medicaid managed care that was published in the *Journal of Public Economics* (2004), I estimated the effect on Medicaid expenditures of shifting Medicaid recipients from fee-for-service into managed care while holding other factors constant. To do this, I utilized Medicaid claims and enrollment data to compare spending for the same person before and after they were shifted into Medicaid managed care, and estimated the extent to which average spending changed as a result.

---

[1] See, for example, Bradford report page 123; see also report of Lauren J. Stiroh, pages 43-44.

It is indeed possible that the shift from fee-for-service into managed care might have affected enrollment in the program, as some individuals might have decided to enroll in Medicaid or disenroll from Medicaid at different times as a result. This would of course induce a change in Medicaid spending that would not be captured by the analysis described above. Similarly, the state may have elected to change hospital or physician reimbursement if it had not move to Medicaid managed care. However, in this study and in many similar studies by myself and others specializing in applied microeconomic research, I held these other factors, which represented two of the many possible indirect effects of the policy change, constant.[2]

Of course the details of my 2004 study differ in certain respects from the application considered in my report. But once one opens up the possibility of indirect effects, as Dr. Bradford does in his own report, it is important to remember that many of the most plausible indirect effects would *increase* rather than reduce the damages summarized in my report. Additionally, estimates of the magnitude of each one of these indirect effects will in many cases be driven by the researcher's often untestable assumptions and his/her subjective judgments about which factors to allow to change.  For example, would pharmacies have reduced their purchases of Complaint products in response to the more truthful AWPs, and if so by how much? Would the more truthful reporting by Dey have caused its competitors to report more truthful prices? Would state Medicaid agencies have raised their dispensing fees in response to lower AWPs for 26 out of the 25,000 or so NDCs covered? By how much would they have raised these dispensing fees? How much would the federal government's FUL prices or state governments'

---

[2] Other examples of studies that aim to isolate the causal effect of one variable on one or more other variables by holding other factors constant abound in economics. See, for example, Evans and Snyder (2006) regarding the effect of income on mortality, Levitt (1997) for the effect of police on crime rates, Gruber and Poterba (1994) for the effect of tax incentives on health insurance coverage, Angrist and Evans (1998) for the effect of the number of children on maternal labor supply, and Card and Krueger (1994) for the effect of the minimum wage on employment. In these studies and many related ones, the authors focus on the direct effect of the variable of interest rather than the many possible indirect effects.

MAC prices have changed as a result of the alternative AWPs and WACs?[3] Would these lower AWPs and WACs have caused the federal government and state governments to implement their FUL and MAC prices sooner? Would Medicare utilization have increased because of the lower consumer co-pay on J-code products, and if so by how much?

All of these factors and many more become potentially relevant once one opens up the possibility that more truthful price reporting by Dey would have had indirect effects. The direct effects that I consider in my report, which hold other factors constant, are based on claims that were actually paid by the Medicaid and Medicare programs, and demonstrate a significant effect on federal expenditures, state expenditures, and out-of-pocket costs for Medicare recipients.

**Medicaid Utilization**

Dr. Bradford argues (on pages 50-51 of his report) that if Dey had reported prices that were more reflective of actual transaction prices for Complaint products, pharmacies would not have purchased Dey's products because it would not have been profitable for them to do so. However, Dr. Bradford does not offer credible empirical evidence to support the claim that this would have a material impact on my findings.  And indeed if this were true, then it would serve to increase rather than reduce the total value of DIFFERENCE, because the federal government would not have paid anything for those claims because they would not have been submitted.

Furthermore, if one were to consider the effect that alternative AWPs for Dey's Complaint products would have had on utilization for these products, it is instructive to consider a real-world example that to some extent mimics the AWP changes that I consider in my report. In 2000 and 2001, substantially lower AWPs were implemented for Abbott Complaint products described in my June 19, 2008 Abbott report. For example, the AWP for Abbott's Vancomycin

---

[3] In some instances, one might consider this a direct effect, but I do not examine this issue in my analysis.

653301 product fell by 77 percent, from $76.43 to $17.73, while similarly large AWP declines occurred for Abbott's other Complaint products, and there were no corresponding changes in dispensing fees. In the subsequent three years, little change was observed in the use of these same Abbott products. For example, the total number of prescriptions for Abbott's Complaint products actually increased by 5 percent from the fourth quarter of 1999 until the fourth quarter of 2003.[4] Thus even with this massive change in AWPs, there was not a correspondingly significant change in the utilization of these products, thus undermining the claim that utilization of Dey's Complaint products would have plummeted if they had reported more truthful AWPs.

**Medicaid Dispensing Fees**

A related point that Dr. Bradford makes on pages 52-59 of his report is that, if Dey had reported more truthful AWPs for Complaint products, the state Medicaid agencies would have adjusted their dispensing fees to offset the reduction in pharmacies' ingredient cost profits.  Once again, Dr. Bradford offers little credible evidence to support this claim. In considering the validity of this point, it is important to note that Dey's Complaint products accounted for less than 0.3 percent of Medicaid prescription drug spending in every year considered. Thus the effect on pharmacies' overall reimbursement would have been very small, undermining the claim that this would have necessitated across-the-board increases in pharmacy's dispensing fees.

---

[4] An examination of the utilization data does suggest a modest effect of the revised prices on utilization. More specifically, from 1999Q4 to 2000Q4, the number of prescriptions for Abbott's Complaint products increased from 94,777 to 105,034 after having risen steadily in the preceding years along with Abbott's AWPs. By 2003Q4, this had declined to 99,476, suggesting that the lower ingredient cost reimbursement did lead to a modest reduction in utilization of Abbott products below what it otherwise would have been. It is also worth noting that there may be a stronger response by pharmacies to changes in published AWPs when they are increasing than when they are declining, as once they have paid the fixed cost to establish a contract with Abbott they might stick with it. Indeed, asymmetric price responses have been reported for other sectors, such as the practice of retail gas outlets to raise prices more quickly in response to increases in the price of crude oil than to lower them when crude oil prices decline (Borenstein, Cameron, and Gilbert, 1997), which has been dubbed the "rockets and feathers" phenomenon.

It is once again instructive to consider the Abbott example cited above when considering this issue. An examination of the state-specific dispensing fees indicates that there was not a large increase after the change in Abbott and other firms' AWPs that occurred in 2000 and 2001 when states implemented the DOJ prices. More specifically, there were 33 states (excluding Ohio) that used the DOJ prices, with 19 holding their dispensing fees fixed at that time, 5 reducing their dispensing fees, and 9 increasing their dispensing fees. Among the fourteen that changed dispensing fees[5], the average change was actually less than zero (-$0.14), as the dispensing fee reductions for the 5 that reduced more than offset the effect of the 9 that increased. Additionally, this coincided with substantial price changes for hundreds more products with much greater Medicaid spending than is considered in my report.

Dr. Bradford however implies that one must instead consider an across the board change in price reporting for all of the approximately 25,000 pharmaceutical products currently being reimbursed by the Medicaid program when evaluating the appropriateness of the transaction-based AWPs for the 26 Complaint NDCs described in my report.[6] Of course, this would require knowledge of the spread between AWPs and actual transaction prices for all 25,000 of these products. And this would include not only generic products but also brand products, for which my previous research with Dr. Scott Morton in the Quarterly Journal of Economics (2006) on Medicaid drug reimbursement suggests that Medicaid's average AWP-based reimbursement amounts per prescription are a quite reliable guide to actual average prices. Given that brand products account for more than 80 percent of Medicaid drug spending, if one were to scale actual average prices by 1.25 for all pharmaceutical products' AWPs, it seems plausible that pharmacies would on average have higher ingredient cost reimbursement overall. Put simply, the

---

[5] It is worth noting that the timing of the dispensing fee change and the implementation of DOJ prices did not in all cases line up exactly, though I restrict to changes that occurred in 2000 and 2001.
[6] See also Stiroh report, page 44.

spreads that existed for Dey's Complaint products are unlikely to be representative of the spread for all pharmaceutical products.

In evaluating the merit of Dr. Bradford's claim, it is also instructive to consider the increase in the use of MAC and FUL prices by state Medicaid programs during the past decade. An examination of dispensing fees during the same time period provides no evidence to suggest that there was a sea change in dispensing fees that accompanied the reduction in ingredient cost reimbursement for generic products. In just five out of twenty-three cases when a state implemented a MAC program during the time period of interest did it also increase its dispensing fee around the same time, with an additional two states lowering their dispensing fee.[7] The average change in the dispensing fees among these twenty-three states was just nine cents, thus undermining the theory that significant changes in dispensing fees would have occurred if Dey had reported more accurate prices for its AWPs and WACs.

Additionally, it is very likely that the use of the alternative AWPs that I describe in my report would have substantially lowered the state MAC prices and/or the federal FUL prices in a similar fashion to the effect of more truthful AWPs on Medicare reimbursement. This would reduce reimbursement not only for Dey's products but for some of its competitors' products in the same drug group as well. As I mention in my report, this would almost certainly have led to a substantial increase in the total value of DIFFERENCE. However, Dr. Bradford omits any discussion of this plausible effect in his report.

---

[7] It is once again worth noting that the timing of the dispensing fee change and the implementation of SMAC prices did not in all cases line up exactly.

**Many Plausible Indirect Effects Raise Rather than Reduce DIFFERENCE**

In pointing to the possible indirect effects of the alternative AWPs that I calculate from Dey's transaction data, which are just 25 percent greater than actual average pharmacy prices rather than the 500 percent or 1000 percent greater as were those reported by Dey, Dr. Bradford points only to those indirect effects that would lower the total value of DIFFERENCE in my report, such as the increase in Medicaid dispensing fees. But as noted above, Dr. Bradford offers no empirical evidence to support his theory that utilization would have plummeted or that dispensing fees would have surged in response to more accurate published prices for Complaint products. Dr. Bradford also omits any consideration of those indirect effects that would lead to an increase in the value of DIFFERENCE, thus essentially cherry picking those indirect effects that go in the direction that is favorable to Dey.


**An Analogy to Medicaid Hospital Reimbursement**

In considering the criticism of the "all else equal" assumption that I make in my report, it is useful to consider an analogy. Suppose that a hospital could not profitably serve Medicaid patients at a state's current reimbursement rates. It could then contact the state Medicaid agency and relay this concern to government officials, with this possibly leading to an increase in hospital reimbursement.  Or it could choose to serve these Medicaid patients even though it would be unprofitable for them to do so, recognizing that Medicaid patients are on average unprofitable for hospitals, nursing homes, physicians, and many other health care providers as well (Gruber, 2003).  Or it could simply decide not to serve the Medicaid population. Alternatively, the hospital could decide to go an entirely different route by "upcoding" the Medicaid patients' diagnoses to more serious ones (thus boosting its revenues) or by reporting

Mark G. Duggan, Ph.D. Rebuttal Report – April 23, 2009                                    8

more services on the Medicaid claims than were actually performed. This might be motivated by a concern for Medicaid patients or simply by a desire to increase hospital profits.

If this hospital was caught in the act of upcoding or filing false claims, it might then be called upon to pay damages equal to the difference between the actual amount paid and the amount that would have been paid if it had not upcoded or submitted false claims. The hospital might then assert that if it had been truthful, it would not have been able to serve Medicaid patients, and thus utilization at this hospital would have been zero. Using Dey's argument, this would imply no damage to the government, as these patients would simply have been treated elsewhere and Medicaid revenues at the hospital would have been zero. Or this hospital might argue that if it had been truthful, it would have advocated strongly for higher reimbursement from the state Medicaid agency to make it more profitable for them to treat these patients. Using Dey's reasoning, the savings one would then estimate using the proper diagnoses (rather than the upcoded ones) or the correct number of claims for Medicaid patients would be misleading. But this is indeed extremely speculative, as it is unclear that such a reimbursement change would have occurred and the magnitude of this change would be impossible to estimate with any precision, as it would reflect the outcome of a negotiation between the hospital and the state Medicaid agency.

Unfortunately for this hospital and by analogy for Dey, none of these arguments change the fact that they could have been truthful (or less misleading) but elected not to be. The available evidence suggests that Dey aimed to use these extremely inaccurate and inflated AWPs to its financial advantage in an effort to improve the company's market position and thus its revenues. I am unaware of any evidence that Dey inflated its published prices out of a concern about access for Medicaid recipients.  And even if one assumes that the hospital in my analogy

or Dey in this case had altruistic motives to ensure access for Medicaid recipients, it does not appear to justify providing extremely inaccurate information to the government.

**Applying the Massachusetts Medicaid Algorithm to All States and to Medicare**

Dr. Bradford further argues that each state Medicaid agency had some latitude to choose its adjudication algorithm. He then points to the fact (on pages 181-182) that Massachusetts used WAC for its reimbursement whereas most other states did not. As I demonstrate in my report, the ratio of DIFFERENCE to total Medicaid spending in Massachusetts is much lower than in other states given that Dey's WACs are on average less inflated above actual prices than were its AWPs. Dr. Bradford states that every state could have used the Massachusetts algorithm, and then uses this same algorithm (rather than the one that each state was actually using) when calculating the effect of alternative WACs on each state's Medicaid reimbursement for Dey's Complaint products (Bradford report at pages 133-135).

The value of DIFFERENCE with even this one adjustment would inevitably be much lower in each state, but this assumption is clearly inappropriate.  State governments had the adjudication algorithms that they did, with most relying primarily on AWPs rather than WACs, and thus Dey's extremely inflated AWPs led to substantial damage to the federal government and to individual state governments. Indeed by Dr. Bradford's line of reasoning, if one state implemented a MAC that was less than Dey's transaction-based AWPs (125 percent of the average pharmacy indirect price), then the value of DIFFERENCE for this product would be zero in all states, because clearly other states could have made this same decision as well.

Dr. Bradford then uses this same line of reasoning for Medicare, which he argues could have used WAC prices rather than AWPs in the J-code arrays when determining the per-unit

allowed amounts. He then assumes this in his own empirical analyses, which for the reasons

mentioned above, is clearly inappropriate. Medicare used pharmaceutical products' AWPs when

calculating allowed amounts for J-code claims, and Dey's decision to provide extremely

inaccurate information for its AWPs led to significant damage to the government.

**Consideration of Cardinal Wholesaler Data**

Dr. Bradford also criticizes my use of Dey's indirect data, which captures sales by

wholesalers to pharmacies and other health care providers that have contracts with Dey. He

argues that, given that these wholesalers make some sales off-contract, the average prices and

other price statistics that I calculate are inaccurate because these transactions would not be

included.  He instead advocates the use of data from Cardinal, which according to Table 9 of my

report is the second largest wholesaler in Dey's indirect data, accounting for 20 percent of sales.

One limitation of this data is that it represents sales by just one wholesaler, and thus what

the calculation gains in capturing off-contract sales it could plausibly lose by happening to be a

high or low-priced wholesaler. Indeed, Dr. Bradford provides little evidence to suggest that

Cardinal's prices are representative of those at which other wholesalers sold Dey's Complaint

products. Nevertheless, my examination of this data indicates that the alternative NDC-quarter-

specific AWPs that I utilize, which are equal to 125 percent of the pharmacy-specific indirect

price, are on average substantially greater than the average price at which this one wholesaler

sold Complant products.  In other words, the actual average price at which Cardinal sold Dey's

Complaint products is on average lower than the alternative AWPs that I use in my empirical

analyses, which are equal to 125 percent of the average pharmacy indirect price.  This suggests

that if I had used Cardinal's average prices in my analyses as the alternative AWPs, my findings for the total damage to the federal government would have been higher.

Thus while it is true that prices for off-contract sales are on average somewhat higher than on-contract sales, there are not sufficiently many of these transactions nor is the price difference sufficiently large to have an appreciable effect on average wholesaler prices for Dey's Complaint products.  This is perhaps easiest to see by considering an example.  As I explain in my report, Dey's 49502069703 Albuterol Sulfate product accounts for more Medicaid sales than any other Complaint product. The average price for the pharmacy classes of trade in Dey's indirect data for this product from 1995Q2 to 2004Q3 was $6.22. Thus the alternative AWP that I use is on average $7.77, which is 25 percent greater than the actual average price. In comparison, the actual average price in the Cardinal data for pharmacy retailers was $6.55, which is substantially lower than the transaction-based AWP that I calculate. Both of these prices are almost 80 percent lower than the AWP of $30.25 that was in effect for this product during the same period. A similar pattern is present for the largest Ipratropium Bromide NDC, with an average price of $11.70 (thus an alternative AWP of $14.63) versus a Cardinal average of $12.09. These prices are on average approximately 73 percent lower than the AWP of $44 that was in effect for this product during the same period.

An additional point worth noting regarding this data is that Dey presumably did not have access to comprehensive information on wholesalers' off-contract prices.  In light of this, it is not obvious how these off-contract sales by wholesalers could have affected Dey's conduct in reporting its AWPs and WACs.

**Medicare Dispensing Fees**

Dr. Bradford also argues on pages 117-120 that dispensing fees would have increased for Medicare claims if the alternative AWPs had been used for Dey's Complaint products. As evidence for this, he points to the fact that the Medicare Modernization Act (MMA) changed reimbursement for inhalation products from 95 percent of the median AWP in 2003 to 106 percent of the average sales price (ASP) by 2005, and that CMS subsequently increased the dispensing fee from $5 to $57 for the first 30-day supply and $33 and $66 for subsequent 30-day and 90-day supplies, respectively.[8]

There are a number of significant problems with this approach, as one must incorporate other elements of the methodology that changed to accurately capture the effect of the revised method for determining Medicare allowed amounts. First, one must focus not just on the pharmacy classes of trade, which tend to have higher prices, when calculating average prices, but instead consider customers in all classes of trade. Second, one must change the scaling factor for the transaction-based average prices from 1.25 to 1.06. Third, one must use a dispensing fee that applies to all prescriptions that cover a 30-day or 90-day supply of inhalation drugs[9] instead of the $5 dispensing fee that was applicable to each prescription. And finally, one must assume that all firms (not only Dey) would have reported their average sales price accurately. [10] This would cause the median to fall substantially because all firms' reported prices would be adjusted. And then, it would be appropriate to assign responsibility according to each firm's market share.

---

[8] As discussed above, Dr. Bradford also assumes that Medicare should have used WACs instead of AWPs, and assumes that they did this in his analyses. But for the reasons cited above in the Massachusetts example, it is inappropriate to assume that the law was different than what was in effect.

[9] See 70 Fed. Reg. 70334 (November 21, 2005) (section 414.1001 (c)), and response to comment at 70 Fed. Reg. 70231 (rejecting comment proposing a per prescription fee).

[10] Under the MMA, the allowed amount is based on an average of the ASPs for the NDCs within the J-code. In changing the dispensing fee, CMS assumed that all pertinent manufacturers would report their ASPs accurately. See 70 Fed. Reg. 47488, 47549 (August 5, 2004).

An examination of the Medicare claims data for Ipratropium Bromide indicates that these adjustments, which would serve to increase the value of DIFFERENCE, would in all likelihood more than offset the effect of the revised dispensing fee on the total value of DIFFERENCE.  To shed light on this issue, it is useful to consider the following. Prior to the MMA, the average dispensing fee per claim for Medicare claims for Complaint J-codes was approximately $3.71 during the study period, which was lower than $5 because there were in many cases multiple claim line items associated with one dispensing fee.  For the purposes of this analysis, I assume that the average claim in this pre-2004 period covered 30 days.

To estimate the analogous dispensing fee per 30-day period in 2006, I assume that the average user had twelve 30-day prescriptions during the year, which would yield an average dispensing fee of $35.[11]  Of course, Medicare pays just 80 percent of the cost of the typical claim, and so the effective increase in the share of the per-claim dispensing fee was approximately $25 (80 percent of the difference between $35 and $4), which is substantially lower than the average per-claim value of DIFFERENCE in either of the combined Dey and Roxane scenarios.  If one applied this $25 increase to all 12.836 million claims, Medicare spending would have increased by approximately $321 million.

Now suppose that 106 percent of Dey's average sales price for all customers was used for adjudicating all claims. Ignoring for a moment the dispensing fee issue, this would lead to a much higher value of DIFFERENCE than is reported for any scenario in Table 35 of my original

---

[11] There are three sources of uncertainty with this comparison in dispensing fees in the pre-2004 period versus the post-MMA period. First, it seems plausible that many Medicare recipients would have filled 90-day prescriptions in the 2006 period, which would lead to a lower average dispensing fee per month during this period. Second, some users may not have filled the prescription in all twelve months, which would lead to a higher average dispensing fee in those months with a prescription. And finally, the typical prescription in the pre-2004 period may have been for a period of less or more than one month. To the extent that the prescriptions were on average less than a month in the pre-period, the per-month dispensing fee would have been even higher. It should also be noted that Medicare now pays just one dispensing fee for the applicable period regardless of the number of drugs dispensed. In contrast, before 2004, the dispensing fee was paid for each prescription.

report for the reasons outlined above. More specifically, the total value of DIFFERENCE would be $1.510 billion, as shown in Table A, which is more than $400 million greater than the total value of DIFFERENCE in the Dey and Roxane combined scenario that does not include Novaplus. This would more than offset the $321 million caused by the dispensing fee increase above. If one subtracts the $321 million from the $1.510 billion, the revised DIFFERENCE is $1.189 billion. Using Dey's market share of all Ipratropium Bromide Medicaid claims in each quarter, I calculate that Dey's share of this revised DIFFERENCE would be $642 million.[12] This is substantially greater than the $340 million Dey share of DIFFERENCE for the combined Dey and Roxane Novaplus scenario in the February 6, 2009 supplement to my initial Dey report that uses Dey's relative market shares and just 19 percent lower than Dey's $790 million share of the DIFFERENCE in the combined Dey and Roxane no-Novaplus scenario.[13]

One must of course also repeat this exercise for the Albuterol Sulfate J-code claims. Once again, the revised dispensing fee would increase expenditures by approximately $347 million ($25 multiplied by the 13.873 million Albuterol Sulfate claims). But the total value of DIFFERENCE using 106 percent of Dey's average sales price would increase from $2.251 million to $1.056 billion, as shown in Table B. This would once again much more than offset the effect of the increase in dispensing fees, and Dey's share of this total DIFFERENCE based on its market share of Albuterol Sulfate Medicaid claims would be $158 million.[14] Adding this to the $638 million calculated above, Dey's total DIFFERENCE of $796 million (which incorporates

---

[12] As shown in Table A, Dey's share of the $1.510 billion is $816 million. Its share of the $321 million is $174 million given its 54.1 percent share of all Ipratropium Bromide claims.

[13] In these latter two cases I use Dey's share of all Dey and Roxane claims rather than its overall share of all Ipratropium Bromide claims. When allocating responsibility in my original report, I applied Dey and Roxane's relative market shares because the total DIFFERENCE was a function of the inflated AWPs of only Dey and Roxane, to the exclusion of their competitors. However, when allocating responsibility under a methodology that considers the impact of all market participants, it is appropriate to apply Dey's share of the entire market, since all market participants share responsibility.

[14] As shown in Table B, Dey's share of the $1.056 billion is $248 million. Its share of the $347 million is $90 million given its 25.8 percent market share of Albuterol Sulfate claims.

the rise in dispensing fees) would be greater than any of the values that I calculate in the February 6, 2009 supplement to my report.

To sum up, if one applies Dr. Bradford's methodology by increasing the Medicare share of the dispensing fee by $25 per claim while reducing allowed amounts to 106 percent of the average sales price, the total value of DIFFERENCE would increase substantially. Put simply, the lower allowed amounts resulting from the 106 percent of the average sales price would more than offset the effect of the increase in dispensing fees, leading to a greater impact on Medicare spending. And this would of course also lead to substantially greater out-of-pocket expenditures for Medicare recipients, who bear 20 percent of the cost of these claims.

Despite the higher value of DIFFERENCE, for the same reasons that I outlined above regarding Dr. Bradford's application of the Massachusetts Medicaid algorithm to other states, it is not appropriate to change the adjudication methodology that the government used. During the time period considered, which includes through and including 2003Q4, the federal government did not use 106 percent of the average sales price and the higher dispensing fee but instead used the methodology that I utilize in my report.

**Within State Extrapolation**

For my Medicaid analyses, I utilized claims data from state Medicaid agencies for 14 states. These 14 states account for 63 percent of all claims for Dey's Complaint products.[15] The reason that these states account for such a large share of claims is that I utilized state claims data for the states with the largest number of claims, including California, Florida, and New York, but did not analyze the states with the smallest number of claims, such as Vermont, Wyoming, and the District of Columbia.

---

[15] As discussed in my report, I excluded Arizona, Ohio, and Texas from the analysis.

In certain periods for each of these 14 states, I did not have complete state claims data, and thus utilized either SMRF/MAX/MSIS claims data from CMS or aggregate SDUD data from CMS. More specifically, for 82.1 percent of the 10.78 million claims for these 14 states I used state Medicaid claims data, while I used SMRF/MAX/MSIS claims data for 8.9 percent, and aggregate SDUD data for an additional 9.0 percent. The advantage of using each state's own claims data when extrapolating to those NDC-quarters when I do not have state claims data is that these NDC-quarters will typically share the same adjudication methodology and provider characteristics as in the NDC-quarters for which I do have state claims data.  This is depicted graphically in Figure A, with the corresponding expenditure shares in Figure B.[16]

Dr. Bradford criticizes my analyses for these 14 states when I do not utilize state claims data as being unreliable. As I make clear in my report, my algorithm during those periods when I do not have state claims data is quite conservative, as I adjust if the spread between actual and reported prices is lower (thus reducing the DIFFERENCE) but do not adjust if the spread between actual and reported prices is higher.  For example, suppose that the ratio of DIFFERENCE to Medicaid spending is 0.5 for an NDC-quarter in 1995Q1 and that this is the first quarter for which I have claims data.  If the spread between the AWP and the actual average price is lower in 1994Q4 then I adjust this 0.5 ratio down accordingly. However, if the spread is higher, which would generally imply a ratio higher than 0.5, I do not scale this upward.

Nevertheless, to probe on the validity of Dr. Bradford's criticism, I took the following approach. For each state I pretended that the state Medicaid claims data started one year later and terminated one year earlier than they actually did.  I then utilized the SMRF/MAX/MSIS claims data if it was available and otherwise used the SDUD data to estimate the total value of

---

[16] The red area in the middle of the bars represents the amount of all claims or expenditures in each year that use a within-state extrapolation.

DIFFERENCE during these one-year periods. My findings indicate that the total value of DIFFERENCE across these 14 states is actually substantially *higher* when I use the state claims data then when I utilize these alternative sources of data.[17] It therefore appears that, if anything, the fact that I do not have complete Medicaid claims data for all 14 of these states serves to reduce rather than to increase the total value of DIFFERENCE.


**Across State Extrapolation**

Dr. Bradford criticizes my use of data for just 14 of the 48 states considered and the methodology that I use to estimate the total value of DIFFERENCE in the remaining 34 states. As mentioned above, these states account for a disproportionate share of all Medicaid claims for Complaint products (63 percent), as they include the large states such as New York and California while excluding states with relatively few claims such as Wyoming and Vermont. Additionally, my coverage with state claims data is most complete during those years with the highest number of Medicaid claims and Medicaid expenditures. This is depicted graphically in Figures A and B for Medicaid claims and expenditures, respectively.[18]

In considering the validity of the extrapolation, it is worth noting that the two groups of states share many common features.  All of the states reimburse for the same Dey Complaint drugs, and all of the states are subject to the same federal regulations. All of the states use published prices when adjudicating claims and the vast majority of the states use the AWP. The fraction of states in the two groups that use the WAC is similar and the scaling factors for these prices are on average similar between the two groups. All of the states in the two groups have a

---

[17] If I pretend that the state claims data starts one year later and finishes one year sooner for each state, the total value of the federal DIFFERENCE for these 14 states falls from $100.793 million to $96.484 million.
[18] The beige bars at the top represent the amount of claims or expenditures in the year for the 34 states.

"lower of" methodology except for New York, and all of them use the federal upper limit (FUL) prices that are published by the U.S. Department of Health and Human Services.

It is also important to remember that often in applied microeconomic research there is no data for those entities to which the extrapolation is being performed. However, in this setting I am utilizing multiple sources of detailed information regarding Medicaid claims for the Complaint products for those states to which I am extrapolating. Additionally, I do not extrapolate to any state or time period in which I do not have CMS claims data or SDUD data.

Furthermore, it is indeed common practice in applied microeconomic research to use data for a subset of the entire population when estimating the effect for the full population. For example, the seminal research on the effect of the unemployment insurance (UI) program, including work by Bruce Meyer that was published in *Econometrica* in 1990, utilized administrative UI data for just 12 states to estimate the effect of the UI program on trends in the national labor market. Additionally, research by Adams, Gruber, and Newhouse published in the *Journal of Human Resources* in 1997 examined the effect of physician fee changes in Tennessee while using Georgia as a control to shed light on the effect of Medicaid physician reimbursement on the treatment of Medicaid recipients. Additionally, it is common practice in applied microeconomic research to use data for a sample that may not be fully representative to estimate results for the U.S. as a whole. For example, recent work published by Jon Gruber and David Rodriguez in the *Journal of Health Economics* in 2007 utilizes data for a subset of physicians to estimate the amount of uncompensated care that physicians in the U.S. provide.

When considering the algorithm that I use in my analysis, it is important to emphasize that I use data for up to 14 states for more than one thousand NDC-quarter combinations when estimating the value of DIFFERENCE for these same NDC-quarter combinations in each of the

remaining states. My examination of the adjudication algorithms used by these states, their reimbursement per claim, and so forth indicates that they are indeed very similar to the 34 states. Indeed, the most striking disparity is that the state of New York had an adjudication algorithm that led to a much lower value of DIFFERENCE because it used the FUL regardless of the product's AWP. This will tend to pull down the per-claim value of DIFFERENCE for the 14 states that I consider and thus lead to a conservative estimate for the remaining 34.

It is worth noting that the 14 are not a random sample of the initial 48, but this is because I focused attention on the largest states to obtain the maximum amount of precision. Put simply, it is more important to the total value of DIFFERENCE to be as accurate as possible for the state of New York, with more than $64 million in Medicaid spending on Complaint products, than it is in the state of Vermont, which spent less than $1 million on these same products.

Nevertheless, it is instructive to consider how the total value of DIFFERENCE might have changed if I had utilized claims data for each of the remaining 34 states. To do this, I repeated the algorithm that I used for New York, California, and the other states for Wisconsin and South Carolina, two states with relatively high spending for which I did have state claims data.  In the case of Wisconsin, my findings indicate that the federal share of DIFFERENCE is $2.92 million, versus the $2.57 million estimated in my initial report. Similarly, for the state of South Carolina, my results indicate a total federal DIFFERENCE of $2.35 million, versus the $2.34 million in my initial report. These results provide strong support for the methodology that I used to estimate the total value of DIFFERENCE in the remaining 34 states.[19]

---

[19] These values differ from those reported by Dr. Bradford in his report because, in contrast to my analyses, he drops those claims on which the provider charged amount is paid and drops claims and SDUD data outside of the period with state claims data. He is therefore considering fewer claims and thus it is not surprising that his DIFFERENCE is lower than the one that I calculate.

**Medicare DMERC-Quarter Combinations with a Missing Array**

Dr. Bradford (in paragraph 308) also criticizes my analyses for Medicare because I do not have arrays for certain DMERC-quarter combinations, and thus interpolate the array from the ones in the quarters immediately before and after that quarter to estimate the array that was in effect. Specifically, I do not have array information for 9 of the 120 (7.5 percent) DMERC-year-quarter combinations that I consider for Ipratropium Bromide and for 17 of the 135 DMERC-year-quarter combinations for Albuterol Sulfate. An examination of the arrays reveals that this is appropriate because the arrays are quite stable over time, with every one of the arrays that I observe having at least two Dey products. Thus there is no basis for omitting damage calculations from those DMERC-quarter combinations in which no array is present because the available evidence indicates that Dey is always in the array.

In every case when I am missing an array, I take the conservative approach of using the adjacent array that would result in the lower value of DIFFERENCE. The most common approach in applied microeconomic research – to linearly interpolate when missing data for a certain time period – would lead to higher values of DIFFERENCE and thus to results that would be less favorable for Dey.  And an examination of the 8 gaps in the arrays indicates that the before and after arrays are the same in 3 cases and are very similar in the other 5 cases. Additionally, if I compare the allowed amount that I use in these 8 cases with the corresponding allowed amounts for the other DMERCs, it is generally higher which implies a lower value of DIFFERENCE. Put simply, my algorithm for those DMERC-quarter combinations in which I am missing an array is conservative and will lead to a total value of DIFFERENCE that is lower than would result if I had the arrays in every DMERC-quarter.

**Average versus 95th Percentile Prices**

On page 123 of his report, Dr. Bradford also criticizes my use of Dey's average prices, and instead proposes the use of 95th percentile prices.  In considering this issue, it is important to note that virtually all state Medicaid programs and the federal Medicare program use average price information. When the Medicare program switched to an ASP-based methodology in 2005, it continued to rely on average price information. Notably, when CMS issued regulations implementing the ASP methodology, it commented that "it is true for all payment systems based on averages that the payment amount may not equal a specific provider's cost for every service."[20]  Furthermore, the alternative AWPs that I calculate are equal to 125 percent of Dey's actual average NDC-quarter-specific prices to pharmacies for Complaint products.  As I demonstrate in Table 13B of my January 23, 2009 report that summarizes my Medicaid analyses for the state of New York, 125 percent of the average price leads to a lower value of DIFFERENCE than results when I instead utilize the 95th percentile price. Put simply, this scaled average price tends to exceed the 95th percentile price and is therefore more favorable to Dey.

**Revisions to Calculations for the no-NovaPlus Scenario**

In my original report, I removed the Roxane NovaPlus products from the generic portion of the DMERC-A arrays. I have determined that it is more appropriate to leave Roxane's NovaPlus products in the generic portion of the Medicare DMERC-A arrays and leave their prices unchanged in the no-NovaPlus combined scenario for Ipratropium Bromide. As a result of this, the combined value of DIFFERENCE declines from $1.103 billion to $1.093 billion. Dey's share of this DIFFERENCE, using its relative market share, falls as a result from $790 million to $782 million. This revision is summarized in the attached Tables 35rev and 38B-rev.

---

[20] 70 Fed Reg 70116, 70218 (November 21, 2005).

Mark G. Duggan, Ph.D.

April 23, 2009

## References

Kathleen Adams, Jonathan Gruber, and Joseph Newhouse (1997), "Physician Fee Policy and Medicaid Program Costs," *Journal of Human Resources*, 32(4), 611-634.

Joshua Angrist and William N. Evans (1998), "Children and Their Parents' Labor Supply: Evidence from Exogenous Variation in Family Size," *American Economic Review* 88, 789-712.

Severin Borenstein, Colin Cameron and Richard Gilbert (1997). "Do Gasoline Prices Respond Asymmetrically to Crude Oil Price Changes?" *Quarterly Journal of Economics*, 112(1), 1997.

David Card and Alan Krueger (1994) "Minimum Wages and Employment: A Case Study of the Fast Food Industry in New Jersey and Pennsylvania," *American Economic Review* 84.

Mark Duggan and Fiona Scott Morton (2006), "The Distortionary Effects of Government Procurement: Evidence for Medicaid Prescription Drug Purchasing." *Quarterly Journal of Economics*, 1-31.

Mark Duggan (2004), "Does Contracting Out Increase the Efficiency of Government Programs? Evidence from Medicaid HMOs," *Journal of Public Economics* 88, 2549-2572.

William N. Evans and Steven Snyder (2006), "The Impact of Income on Mortality: Evidence from the Social Security Notch," *Review of Economics and Statistics*, 88(3), 482-495.

Jonathan Gruber and David Rodriguez (2007), "How Much Uncompensated Care to Doctors Provide?" *Journal of Health Economics*, 26, p. 1151-1169.

Jonathan Gruber (2003), "Medicaid," in Robert Moffitt, ed., *Means Tested Transfer Programs in the U.S.* Chicago: University of Chicago Press, pp. 15-77.

Jonathan Gruber and Jim Poterba (1994), "Taxation and the Demand for Health Insurance: The Case of the Self-Employed," *Quarterly Journal of Economics* 109, 701-733.

Steven Levitt (1997), "Using Electoral Cycles in Police Hiring to Estimate the Effects of Police on Crime," *American Economic Review* 87(3), 270-290.

Bruce Meyer (1990), "Unemployment Insurance and Unemployment Spells," *Econometrica* 58, 757-782.



Figure A: Data Source by Year by Medicaid Claims



Figure B: Data Source by Year by Medicaid Spending

**Table A: Dey Ipratropium Bromide: DIFFERENCE by DMERC and YrQuart**

| YrQuart | Total Difference | | | | | Dey Share of Difference | | | |
|---|---|---|---|---|---|---|---|---|---|
| | AdminaStar | CIGNA | DMERC-A | Palmetto | Dey Mkt Share | AdminaStar | CIGNA | DMERC-A | Palmetto |
| 19951 | $79,110 | $0 | $0 | $0 | 0.0% | $0 | $0 | $0 | $0 |
| 19952 | $0 | $0 | $0 | $0 | 0.0% | $0 | $0 | $0 | $0 |
| 19953 | $0 | $0 | $0 | $0 | 0.0% | $0 | $0 | $0 | $0 |
| 19954 | $0 | $0 | $0 | $0 | 0.0% | $0 | $0 | $0 | $0 |
| 19961 | $0 | $0 | $0 | $124 | 0.0% | $0 | $0 | $0 | $0 |
| 19962 | $0 | $0 | $0 | $1,047 | 0.0% | $0 | $0 | $0 | $0 |
| 19963 | $0 | $1 | $0 | $41 | 0.0% | $0 | $0 | $0 | $0 |
| 19964 | $0 | $1 | $0 | $8 | 0.0% | $0 | $0 | $0 | $0 |
| 19971 | $0 | $1 | $0 | $0 | 1.3% | $0 | $0 | $0 | $0 |
| 19972 | $1,988,752 | $1,995,001 | $1,186,828 | $0 | 15.2% | $301,562 | $302,510 | $179,963 | $0 |
| 19973 | $2,473,686 | $2,476,049 | $1,428,516 | $6,252,373 | 23.2% | $574,040 | $574,589 | $331,500 | $1,450,917 |
| 19974 | $2,661,877 | $2,793,913 | $1,555,635 | $7,105,177 | 31.6% | $840,229 | $881,906 | $491,040 | $2,242,769 |
| 19981 | $220,723 | $512,284 | $1,649,617 | $8,864,897 | 37.5% | $82,817 | $192,213 | $618,949 | $3,326,176 |
| 19982 | $354,121 | $866,939 | $1,900,109 | $10,392,652 | 43.1% | $152,514 | $373,377 | $818,348 | $4,475,956 |
| 19983 | $4,047,112 | $4,228,397 | $2,119,649 | $12,045,139 | 45.9% | $1,856,429 | $1,939,585 | $972,293 | $5,525,160 |
| 19984 | $4,173,237 | $4,584,749 | $2,338,419 | $11,864,903 | 50.9% | $2,125,382 | $2,334,961 | $1,190,930 | $6,042,661 |
| 19991 | $4,460,185 | $4,621,340 | $2,482,564 | $12,632,754 | 55.0% | $2,454,365 | $2,543,045 | $1,366,113 | $6,951,592 |
| 19992 | $4,869,389 | $4,592,913 | $2,496,072 | $13,214,810 | 60.2% | $2,929,283 | $2,762,963 | $1,501,564 | $7,949,647 |
| 19993 | $5,096,909 | $4,556,481 | $2,416,120 | $15,114,876 | 63.4% | $3,231,166 | $2,888,564 | $1,531,690 | $9,582,020 |
| 19994 | $5,395,822 | $6,050,546 | $3,116,304 | $17,935,772 | 66.9% | $3,608,644 | $4,046,514 | $2,084,137 | $11,995,173 |
| 20001 | $5,640,358 | $6,511,581 | $3,609,683 | $20,054,522 | 69.2% | $3,903,436 | $4,506,369 | $2,498,097 | $13,878,824 |
| 20002 | $8,727,978 | $8,513,464 | $4,899,933 | $23,047,856 | 70.2% | $6,126,372 | $5,975,800 | $3,439,377 | $16,177,830 |
| 20003 | $9,386,208 | $8,684,168 | $5,070,216 | $23,958,308 | 69.4% | $6,511,736 | $6,024,692 | $3,517,492 | $16,621,214 |
| 20004 | $10,631,534 | $9,696,561 | $5,432,990 | $28,401,070 | 62.9% | $6,691,588 | $6,103,107 | $3,419,575 | $17,875,902 |
| 20011 | $11,672,168 | $10,017,447 | $6,254,167 | $33,009,464 | 59.7% | $6,968,581 | $5,980,671 | $3,733,897 | $19,707,490 |
| 20012 | $13,664,083 | $11,934,334 | $7,229,912 | $36,387,652 | 57.0% | $7,793,961 | $6,807,316 | $4,123,924 | $20,755,431 |
| 20013 | $14,426,649 | $12,405,929 | $7,682,866 | $38,549,276 | 55.5% | $8,013,114 | $6,890,729 | $4,267,358 | $21,411,746 |
| 20014 | $12,881,913 | $10,942,132 | $6,768,388 | $34,188,088 | 54.4% | $7,003,926 | $5,949,263 | $3,679,988 | $18,588,143 |
| 20021 | $13,258,610 | $14,283,848 | $8,767,096 | $45,093,060 | 53.2% | $7,046,968 | $7,591,883 | $4,659,722 | $23,967,017 |
| 20022 | $18,861,964 | $15,900,901 | $10,055,872 | $49,037,856 | 52.0% | $9,817,011 | $8,275,878 | $5,233,739 | $25,522,536 |
| 20023 | $19,889,436 | $16,843,900 | $10,602,920 | $51,935,576 | 50.3% | $10,005,349 | $8,473,297 | $5,333,782 | $26,126,108 |
| 20024 | $20,689,248 | $17,281,954 | $11,085,417 | $55,236,356 | 48.8% | $10,092,314 | $8,430,219 | $5,407,519 | $26,944,557 |
| 20031 | $19,921,720 | $16,666,387 | $10,549,307 | $53,178,204 | 48.4% | $9,635,879 | $8,061,316 | $5,102,564 | $25,721,611 |
| 20032 | $24,058,268 | $20,434,362 | $12,541,568 | $61,013,520 | 46.4% | $11,171,572 | $9,488,793 | $5,823,737 | $28,331,919 |
| 20033 | $25,535,792 | $21,433,326 | $13,298,797 | $61,989,604 | 50.4% | $12,859,435 | $10,793,496 | $6,697,071 | $31,217,018 |
| 20034 | $27,082,120 | $22,766,732 | $14,050,910 | $64,769,928 | 59.0% | $15,969,369 | $13,424,737 | $8,285,325 | $38,192,536 |
| Total | $292,148,972 | $261,595,638 | $160,589,870 | $795,274,913 | - | $157,767,041 | $141,617,792 | $86,309,695 | $430,581,952 |

The value for Other SDUD Utilization in 20004 has been linearly interpolated due to l kely error in SDUD data.

| | |
|---|---|
| **Dey Total** | $816,276,480 |
| **Total Difference** | $1,509,609,393 |

**Table B: Dey Albuterol: DIFFERENCE by DMERC and YrQuart**

| | Total Difference | | | | | Dey Share of Difference | | | |
|---|---|---|---|---|---|---|---|---|---|
| YrQuart | AdminaStar | CIGNA | DMERC-A | Palmetto | Dey Mkt Share | AdminaStar | CIGNA | DMERC-A | Palmetto |
| 19941 | $0 | $12,875 | $0 | $0 | 29.8% | $0 | $3,830 | $0 | $0 |
| 19942 | $0 | $16,982 | $0 | $0 | 28.9% | $0 | $4,906 | $0 | $0 |
| 19943 | $0 | $2,414,177 | $0 | $0 | 27.5% | $0 | $664,680 | $0 | $0 |
| 19944 | $0 | $3,389,074 | $0 | $0 | 27.3% | $0 | $924,620 | $0 | $0 |
| 19951 | $0 | $3,104,839 | $0 | $0 | 31.8% | $0 | $985,905 | $0 | $0 |
| 19952 | $0 | $3,983,998 | $0 | $0 | 34.4% | $0 | $1,372,374 | $0 | $0 |
| 19953 | $0 | $4,183,730 | $0 | $0 | 34.8% | $0 | $1,453,876 | $0 | $0 |
| 19954 | $0 | $4,139,075 | $0 | $0 | 32.7% | $0 | $1,352,907 | $0 | $0 |
| 19961 | $0 | $3,615,279 | $0 | $11,522,776 | 33.0% | $0 | $1,193,608 | $0 | $3,804,320 |
| 19962 | $4,198,004 | $3,371,962 | $0 | $13,143,492 | 32.9% | $1,383,109 | $1,110,954 | $0 | $4,330,364 |
| 19963 | $0 | $4,197,129 | $0 | $13,094,093 | 33.7% | $0 | $1,413,881 | $0 | $4,410,990 |
| 19964 | $0 | $4,349,810 | $0 | $13,473,855 | 31.8% | $0 | $1,381,186 | $0 | $4,278,325 |
| 19971 | $130,054 | $3,843,903 | $0 | $0 | 32.7% | $42,496 | $1,256,027 | $0 | $0 |
| 19972 | $5,009,598 | $4,615,202 | $0 | $0 | 34.6% | $1,731,198 | $1,594,904 | $0 | $0 |
| 19973 | $5,243,633 | $4,791,810 | $0 | $16,240,102 | 35.7% | $1,870,618 | $1,709,434 | $0 | $5,793,509 |
| 19974 | $5,139,692 | $4,909,080 | $0 | $17,181,780 | 29.9% | $1,535,283 | $1,466,397 | $0 | $5,132,390 |
| 19981 | $257,083 | $322,856 | $0 | $15,131,737 | 29.9% | $76,802 | $96,451 | $0 | $4,520,523 |
| 19982 | $306,803 | $424,934 | $0 | $17,530,796 | 29.6% | $90,848 | $125,827 | $0 | $5,191,055 |
| 19983 | $5,304,315 | $4,825,388 | $0 | $17,446,674 | 30.0% | $1,592,359 | $1,448,621 | $0 | $5,237,635 |
| 19984 | $5,401,680 | $4,828,914 | $0 | $17,312,740 | 28.8% | $1,554,560 | $1,389,722 | $0 | $4,982,467 |
| 19991 | $4,920,325 | $4,307,152 | $0 | $16,111,224 | 29.9% | $1,471,133 | $1,287,800 | $0 | $4,817,113 |
| 19992 | $5,405,359 | $4,139,327 | $0 | $18,102,384 | 32.7% | $1,765,401 | $1,351,913 | $0 | $5,912,276 |
| 19993 | $5,446,801 | $4,240,884 | $0 | $18,605,268 | 32.4% | $1,767,123 | $1,375,884 | $0 | $6,036,168 |
| 19994 | $6,435,491 | $5,242,907 | $3,412,171 | $21,204,630 | 29.8% | $1,914,884 | $1,560,030 | $1,015,293 | $6,309,449 |
| 20001 | $6,087,660 | $4,834,484 | $3,339,858 | $20,090,236 | 28.0% | $1,703,800 | $1,353,064 | $934,752 | $5,622,808 |
| 20002 | $7,757,441 | $5,806,813 | $3,991,087 | $24,823,684 | 28.9% | $2,243,582 | $1,679,427 | $1,154,289 | $7,179,425 |
| 20003 | $8,256,462 | $5,941,685 | $4,417,581 | $25,316,246 | 27.5% | $2,271,711 | $1,634,815 | $1,215,468 | $6,965,597 |
| 20004 | $9,160,792 | $6,232,662 | $4,604,996 | $26,567,436 | 25.1% | $2,303,354 | $1,567,117 | $1,157,862 | $6,680,014 |
| 20011 | $8,796,888 | $5,834,678 | $4,459,817 | $25,370,818 | 24.2% | $2,128,154 | $1,411,532 | $1,078,924 | $6,137,739 |
| 20012 | $10,909,808 | $7,183,612 | $5,426,955 | $29,395,284 | 25.2% | $2,747,508 | $1,809,109 | $1,366,715 | $7,402,860 |
| 20013 | $10,828,445 | $7,229,169 | $5,493,715 | $3,266,993 | 25.6% | $2,775,369 | $1,852,861 | $1,408,059 | $837,342 |
| 20014 | $10,808,172 | $7,823,233 | $5,617,325 | $3,527,117 | 21.7% | $2,341,882 | $1,695,114 | $1,217,145 | $764,245 |
| 20021 | $10,381,844 | $7,276,686 | $5,301,679 | $29,919,958 | 11.5% | $1,195,904 | $838,215 | $610,710 | $3,446,535 |
| 20022 | $11,941,738 | $8,390,299 | $6,240,207 | $35,901,092 | 25.1% | $2,999,183 | $2,107,235 | $1,567,236 | $9,016,606 |
| 20023 | $12,077,517 | $8,453,132 | $6,355,868 | $36,620,524 | 21.0% | $2,534,594 | $1,773,979 | $1,333,846 | $7,685,203 |
| 20024 | $12,785,782 | $8,667,881 | $6,674,757 | $38,295,640 | 6.8% | $868,951 | $589,089 | $453,632 | $2,602,661 |
| 20031 | $11,378,033 | $7,651,547 | $5,931,922 | $0 | 18.9% | $2,155,164 | $1,449,314 | $1,123,592 | $0 |
| 20032 | $14,987,028 | $9,806,930 | $7,347,829 | $0 | 7.4% | $1,114,698 | $729,415 | $546,513 | $0 |
| 20033 | $15,661,144 | $9,972,525 | $7,644,655 | $0 | 2.6% | $406,527 | $258,864 | $198,438 | $0 |
| 20034 | $16,534,270 | $10,611,251 | $8,114,018 | $0 | 7.6% | $1,263,081 | $810,611 | $619,843 | $0 |
| Total | $231,551,857 | $204,987,867 | $94,374,436 | $525,196,579 | - | $47,849,317 | $48,085,501 | $17,002,318 | $135,097,618 |

| | | |
|---|---|---|
| | **Dey Total** | **$248,034,753** |
| | **Total Difference** | **$1,056,110,739** |

**Table 35rev: Summary of Medicare DME Ipratropium Bromide Results**

*A. Roxanne Only - With Novaplus*

|  | Difference | Medicare Paid | Clms w/Diff>0 | Total Claims | Prov Payments |
|---|---|---|---|---|---|
| Palmetto | $609,636,482 | $1,075,878,401 | 6,083,763 | 6,590,245 | 586,521 |
| AdminaStar | $261,316,131 | $391,394,534 | 2,503,143 | 2,536,711 | 260,044 |
| CIGNA | $207,072,869 | $357,608,096 | 2,252,198 | 2,347,762 | 214,466 |
| DMERC-A | $91,421,554 | $214,339,752 | 1,335,160 | 1,361,541 | 137,793 |
| Total | $1,169,447,036 | $2,039,220,783 | 12,174,264 | 12,836,259 | 1,198,824 |
| Percentage | 57.35% | | | 94.84% | |

*B. Roxanne Only - No Novaplus*

|  | Difference | Medicare Paid | Clms w/Diff>0 | Total Claims | Prov Payments |
|---|---|---|---|---|---|
| Palmetto | $132,307,976 | $1,075,878,401 | 2,956,249 | 6,590,245 | 324,356 |
| AdminaStar | $29,097,631 | $391,394,534 | 571,389 | 2,536,711 | 86,598 |
| CIGNA | $42,956,873 | $357,608,096 | 981,300 | 2,347,762 | 106,196 |
| DMERC-A | $29,937,624 | $214,339,752 | 570,656 | 1,361,541 | 68,906 |
| Total | $234,300,104 | $2,039,220,783 | 5,079,594 | 12,836,259 | 586,056 |
| Percentage | 11.49% | | | 39.57% | |

*C. Dey Only*

|  | Difference | Medicare Paid | Clms w/Diff>0 | Total Claims | Prov Payments |
|---|---|---|---|---|---|
| Palmetto | $128,832,369 | $1,075,878,401 | 2,891,224 | 6,590,245 | 305,852 |
| AdminaStar | $19,567,739 | $391,394,534 | 472,716 | 2,536,711 | 70,405 |
| CIGNA | $35,043,368 | $357,608,096 | 974,779 | 2,347,762 | 104,070 |
| DMERC-A | $29,913,421 | $214,339,752 | 570,672 | 1,361,541 | 68,909 |
| Total | $213,356,897 | $2,039,220,783 | 4,909,391 | 12,836,259 | 549,236 |
| Percentage | 10.46% | | | 38.25% | |

*D. Dey and Roxanne - With Novaplus*

|  | Difference | Medicare Paid | Clms w/Diff>0 | Total Claims | Prov Payments |
|---|---|---|---|---|---|
| Palmetto | $741,161,688 | $1,075,878,401 | 6,530,490 | 6,590,245 | 616,826 |
| AdminaStar | $279,827,789 | $391,394,534 | 2,510,238 | 2,536,711 | 262,403 |
| CIGNA | $246,526,381 | $357,608,096 | 2,273,300 | 2,347,762 | 221,853 |
| DMERC-A | $148,887,315 | $214,339,752 | 1,344,218 | 1,361,541 | 140,834 |
| Total | $1,416,403,173 | $2,039,220,783 | 12,658,246 | 12,836,259 | 1,241,916 |
| Percentage | 69.46% | | | 98.61% | |

*E. Dey and Roxanne - No Novaplus*

|  | Difference | Medicare Paid | Clms w/Diff>0 | Total Claims | Prov Payments |
|---|---|---|---|---|---|
| Palmetto | $584,002,597 | $1,075,878,401 | 6,516,669 | 6,590,245 | 611,835 |
| AdminaStar | $190,140,045 | $391,394,534 | 2,298,945 | 2,536,711 | 242,015 |
| CIGNA | $200,039,184 | $357,608,096 | 2,263,029 | 2,347,762 | 218,254 |
| DMERC-A | $119,500,669 | $214,339,752 | 1,341,333 | 1,361,541 | 139,606 |
| Total | $1,093,682,495 | $2,039,220,783 | 12,419,976 | 12,836,259 | 1,211,710 |
| Percentage | 53.63% | | | 96.76% | |

## Table 38B-rev: Dey/Roxane Combined, No NovaPlus: Diffs by DMERC and YrQuart

| | Total Difference | | | | | Roxane Share of Difference | | | |
|---|---|---|---|---|---|---|---|---|---|
| YrQuart | AdminaStar | CIGNA | DMERC-A | Palmetto | Rox rel share | AdminaStar | CIGNA | DMERC-A | Palmetto |
| 19951 | $79,108 | $0 | $0 | $0 | 0.0% | $0 | $0 | $0 | $0 |
| 19961 | $0 | $0 | $0 | $124 | 0.0% | $0 | $0 | $0 | $0 |
| 19962 | $0 | $0 | $0 | $1,045 | 100.0% | $0 | $0 | $0 | $1,045 |
| 19963 | $0 | $0 | $0 | $41 | 100.0% | $0 | $0 | $0 | $41 |
| 19964 | $0 | $0 | $0 | $1,402,037 | 100.0% | $0 | $0 | $0 | $1,402,037 |
| 19971 | $0 | $0 | $0 | $1,858,709 | 98.0% | $0 | $0 | $0 | $1,822,193 |
| 19972 | $1,898,496 | $1,903,721 | $1,133,594 | $0 | 80.7% | $1,532,981 | $1,537,200 | $915,345 | $0 |
| 19973 | $2,315,717 | $2,316,293 | $1,209,763 | $5,854,096 | 72.6% | $1,681,042 | $1,681,460 | $878,199 | $4,249,647 |
| 19974 | $2,490,804 | $2,650,759 | $1,332,916 | $6,640,712 | 64.2% | $1,598,856 | $1,701,531 | $855,603 | $4,262,696 |
| 19981 | $174,611 | $408,424 | $1,421,551 | $7,645,394 | 58.8% | $102,729 | $240,289 | $836,345 | $4,498,037 |
| 19982 | $282,080 | $709,642 | $1,649,817 | $9,042,595 | 53.8% | $151,694 | $381,623 | $887,220 | $4,862,828 |
| 19983 | $3,398,839 | $3,526,310 | $1,806,756 | $10,140,264 | 51.4% | $1,748,130 | $1,813,692 | $929,272 | $5,215,457 |
| 19984 | $3,841,420 | $3,987,694 | $2,055,521 | $11,112,622 | 46.8% | $1,797,039 | $1,865,467 | $961,585 | $5,198,551 |
| 19991 | $4,056,716 | $4,120,050 | $2,232,750 | $11,846,519 | 43.0% | $1,745,209 | $1,772,456 | $960,535 | $5,096,402 |
| 19992 | $4,510,971 | $4,255,213 | $2,323,837 | $12,391,550 | 38.1% | $1,718,303 | $1,620,881 | $885,188 | $4,720,147 |
| 19993 | $5,219,941 | $4,669,854 | $2,478,162 | $15,489,749 | 34.9% | $1,822,345 | $1,630,303 | $865,157 | $5,407,661 |
| 19994 | $5,534,031 | $6,205,072 | $3,195,133 | $18,372,164 | 31.5% | $1,740,945 | $1,952,047 | $1,005,153 | $5,779,680 |
| 20001 | $5,783,608 | $6,445,448 | $3,574,239 | $19,855,934 | 29.4% | $1,697,914 | $1,892,213 | $1,049,302 | $5,829,177 |
| 20002 | $7,995,928 | $7,803,993 | $4,497,863 | $21,256,858 | 28.0% | $2,239,081 | $2,185,334 | $1,259,526 | $5,952,508 |
| 20003 | $6,707,183 | $8,449,123 | $4,935,459 | $23,322,684 | 28.2% | $1,892,926 | $2,384,544 | $1,392,904 | $6,582,216 |
| 20004 | $7,270,027 | $9,527,198 | $5,288,193 | $27,135,822 | 28.9% | $2,097,554 | $2,748,795 | $1,525,754 | $7,829,250 |
| 20011 | $7,519,841 | $8,637,414 | $5,901,864 | $28,493,044 | 27.1% | $2,039,063 | $2,342,102 | $1,600,336 | $7,726,110 |
| 20012 | $8,743,262 | $10,348,779 | $6,274,919 | $31,589,730 | 27.0% | $2,364,810 | $2,799,058 | $1,697,192 | $8,544,146 |
| 20013 | $9,235,948 | $10,815,116 | $6,704,073 | $33,645,772 | 26.0% | $2,400,121 | $2,810,495 | $1,742,169 | $8,743,435 |
| 20014 | $9,880,166 | $10,310,303 | $5,544,012 | $32,228,860 | 23.6% | $2,333,522 | $2,435,113 | $1,309,399 | $7,611,893 |
| 20021 | $9,568,797 | $10,284,037 | $5,498,875 | $32,596,950 | 23.6% | $2,257,939 | $2,426,710 | $1,297,564 | $7,691,867 |
| 20022 | $11,195,608 | $11,665,945 | $6,421,182 | $36,110,944 | 22.1% | $2,474,276 | $2,578,223 | $1,419,108 | $7,980,670 |
| 20023 | $13,847,179 | $12,217,928 | $6,695,414 | $37,821,656 | 23.5% | $3,253,674 | $2,870,849 | $1,573,223 | $8,886,962 |
| 20024 | $14,670,840 | $12,782,199 | $7,132,497 | $40,216,628 | 24.4% | $3,585,851 | $3,124,229 | $1,743,327 | $9,829,761 |
| 20031 | $13,725,362 | $11,913,023 | $6,561,198 | $38,145,224 | 24.4% | $3,351,582 | $2,909,029 | $1,602,172 | $9,314,644 |
| 20032 | $15,942,774 | $10,832,216 | $7,505,046 | $16,137,305 | 23.7% | $3,775,570 | $2,565,287 | $1,777,346 | $3,821,639 |
| 20033 | $48 | $11,262,167 | $7,837,128 | $19,396,134 | 20.7% | $10 | $2,332,841 | $1,623,379 | $4,017,707 |
| 20034 | $14,250,744 | $11,991,266 | $8,288,913 | $34,251,432 | 14.2% | $2,025,805 | $1,704,610 | $1,178,305 | $4,868,988 |
| Total | $190,140,046 | $200,039,185 | $119,500,669 | $584,002,598 | - | $53,428,974 | $56,306,384 | $33,770,607 | $167,747,396 |

| | |
|---|---|
| Roxane Total | $311,253,362 |
| Dey Total | $782,349,904 |
| Total Difference | $1,093,682,499 |

# Attachment B

January 19, 2010

Renée Brooker
Assistant Director
U.S. Department of Justice
Civil Division-Fraud Section
610 D Street, NW
Suite 9918
Washington, DC 20530

Re:    United States of America ex rel. Ven-a-Care of the Florida Keys, Inc. v. Dey, Inc., et al.,
       MDL 1456

Dear Ms. Brooker,

       This letter provides a brief supplement to my earlier discussions and specifically
addresses certain arguments made by Dr. David Bradford.

   A.  Dr. Bradford's "Dispensing Fee Shortfall"

       1.      In his report, Dr. Bradford argues, in essence, that state Medicaid agencies
purposefully paid inflated ingredient costs to "cross-subsidize" inadequate dispensing fees, and
that more than half of my "difference" calculation is attributable to this cross-subsidization. On
page 60 of his report, Dr. Bradford attempts to quantify a "dispensing fee shortfall," and in
Figure 41 (on page 134) and in even-numbered figures from 128 through 144 of Appendix G, he
reduces my damages calculations for 14 states by the amount of this "dispensing fee shortfall,"
among other adjustments.[1]  His discussion in paragraphs 126 and 135 (on pages 54-55 and 60,
respectively) implies (but does not state) that his shortfall calculation is based on data from a
2007 unpublished study by Grant Thornton which estimates average pharmacy dispensing costs
in 2006.  Later, in footnote 294 (on page 130), Dr. Bradford explains that he "extrapolates" from
the 2006 Grant Thornton cost estimates to earlier years using medical consumer price index data.
I note that in Appendix G there is no explanation of how the "dispensing fee shortfalls" shown in
that Appendix were calculated.

       2.      In my Rebuttal Report dated April 23, 2009, I explain why it is inappropriate to
speculate about what states might have done had Dey and other manufacturers reported truthful
pricing information.  I believe my reasoning is correct.  There is another reason, however, why
Dr. Bradford's calculation of "dispensing fee shortfalls" is improper.

       3.      I have reviewed the electronic files produced by Dr. Bradford and used to generate
his "dispensing fee shortfall" calculations, located in sub-folders of the folder named "Medicaid
dispensing fee shortfall."  The sub-folder named "Scripts" contains a Stata script named "01
Dispensing fee shortfall MA.do" which correctly calculates "dispensing fee shortfalls" for

---

[1] Dr. Bradford applies a similar quantification of "dispensing fee shortfall" to an additional 17 states in Figure 43 and
18 (with the addition of Maine) in the odd-numbered figures from 129 through 145 of Appendix G.

Massachusetts under Dr. Bradford's assumptions and saves these calculations in the Stata data file named "Individual dispensing fee shortfall calculations MA.dta" in the sub-folder named "Output."[2]

4.      In another Stata script named "create differences summary.do," produced in association with Bradford's Figure 41, the Massachusetts-only quarterly "dispensing fee shortfalls" contained in the Stata data file named "Individual dispensing fee shortfall calculations MA.dta" are applied to all claims in all states. The results of this script match the values listed in Figure 41. Similar Stata scripts apply the same Massachusetts-only quarterly "dispensing fee shortfalls" to all states in Figure 43 and in figures 128 through 145 of Appendix G. It is apparent from the Stata files described above that Dr. Bradford has calculated his "dispensing fee shortfall" by extrapolating from a sample of one state (Massachusetts) to 31 other states in Figures 41, 43 and Figures 128 through 145 of Appendix G.

5.      Although in appropriate circumstances extrapolation is an acceptable methodology, in this situation it is not. Dr. Bradford's extrapolation is inappropriate in that it makes two factual errors. First, it assumes that all states historically paid the same dispensing fees as Massachusetts. Second, it assumes that all states should have paid the same dispensing fees Massachusetts should have paid, as estimated by Grant Thornton. These assumptions are inconsistent with both the Myers and Stauffer methodologies as well as the Grant Thornton documents cited by Dr. Bradford. Additionally, Dr. Bradford applies the Massachusetts-only "dispensing fee shortfall" to every claim in all states, regardless of whether the payment for the original claim included a dispensing fee amount.

6.      According to Dr. Bradford's own analysis, Massachusetts in 2006 is clearly not representative of all other states for all years (1991 - 2006) with respect to the difference between the dispensing fee and dispensing costs. This is demonstrated in Figure 15 of Dr. Bradford's report (on page 55), where he states that Massachusetts paid a dispensing fee that was only 33% of the dispensing costs estimated by Grant Thornton, whereas all but seven other states had more generous dispensing fees and correspondingly lower shortfalls.

B.   Dr. Bradford's Opinions Regarding Medicare Payment

1.      My earlier reports address the shortcomings in Dr. Bradford's discussion of Medicare. It is appropriate to further point out that his discussion relating to the Medicare Prescription Drug, Improvement and Modernization Act of 2003, Pub. L. 108-173 (MMA) and the subsequent establishment of dispensing fees for inhalation therapy drugs is misleading. In describing the supposed Medicare cross-subsidy (on pages 117 and 118 and in Figure 33 of his report), Dr. Bradford claims to illustrate Medicare payments for cromolyn sodium. (The relevance of this is unclear, since I did not calculate Medicare damages for this drug.) In paragraph 257 on page 120, Dr. Bradford compares Medicare reimbursement for this drug, in

---

[2] A Stata script contains instructions that can be performed by Stata, a commercially available statistical analysis software program. A Stata data file contains data in the form of records and fields in a format suitable for use by Stata.

2004 versus 2005, to imply that after the MMA, Medicare intended to pay even more than it had paid before. It is clear, however, that neither 2004 nor 2005 is useful to such an analysis. The year 2004, shown in the left-hand bar of Figure 33, is not representative of pre-MMA Medicare reimbursement because the MMA became effective January 1, 2004, and, by law, reimbursement for inhalation therapy drugs for that year was pegged at 80 percent of AWP, for one year only, as an interim transition to the "average sales price"-based reimbursement that took effect January 1, 2005.[3] Before the MMA, Medicare paid at 95 percent of AWP, not 80 percent of AWP.[4] If one were to show Medicare payments before the MMA, when reimbursement was at 95 percent of AWP, the bar would be considerably higher.

2.      Dr. Bradford's illustration of post-MMA payments in 2005, with a high dispensing fee, is similarly misleading because that year was also a transition year. CMS established an interim dispensing fee of $57 for inhalation therapy drugs for 2005 only, based on a report prepared for and submitted by pharmacy lobbying organizations.[5] Later CMS concluded that this fee was excessive and reduced it to $57 for only the first 30-day supply,[6] and $33 for subsequent 60-day supplies and $66 for 90-day supplies (resulting in an overall average of about $35). A bar graph showing reimbursement in 2006 would show the typical 30-day payment to be considerably lower.

3.      Bradford repeats these mistakes when he attempts to show Medicare payments for compounded solutions of albuterol and ipratropium bromide (on pages 118-119 and in Figure 34). His Figure 34 purports to compare 2004 payments for a typical 30-day supply of the pharmacy-compounded solution of albuterol sulfate and ipratropium bromide with payments in 2005. The bar for 2005 is based on payment under a new HCPCS code, J7616, which was introduced effective January 1, 2005. Dr. Bradford's chart suggests that the government decided to increase reimbursement for the same pharmacy-compounded formulations. However, the HCPCS code J7616 (which was eliminated effective January 1, 2006[7]) had no application to pharmacy-compounded albuterol and ipratropium bromide drugs at issue in this case. As DMERC Medicare Advisories clearly advised, "Code J7616 . . . may only be used when these drugs are provided in combination by a manufacturer or repackager in a vial with a single NDC number. DuoNeb is one example of J7616. Despite the narrative description of the code, J7616 and J7617 must not be used for inhalation solutions of these drugs that are compounded by pharmacies."[8] In short, J7616 was applicable to DuoNeb, which, while it is a Dey product, it is

---

[3] Pub. L. 108-173 (§ 305(a)), 117 Stat 2066, 2238-2239, codified at 42 U.S.C. § 1395u(o)(1)(G).

[4] Balanced Budget Act of 1997 (BBA), Pub. L. 105-33, 111 Stat. 462-463 (1997) (effective January 1, 1998). Before that, Medicare paid at 100 percent of AWP. 56 Fed. Reg. 59502, 59621 (Nov. 25, 1991).

[5] 69 Fed. Reg. 47488, 47546-47550 (Aug. 5, 2004) (proposed rule); 69 Fed. Reg. 66236, 66425 (Nov. 15, 2004) (final rule).

[6] This has been described by a DME Medicare Administrative Contractor as a "once in a lifetime fee [which] only applies to beneficiaries who are using inhalation drugs for the first time as a Medicare beneficiary on or after 01/01/2006."

[7] See Region C DMERC Medicare Advisory, Spring 2006, at pp. 28-29. Code J7616 was replaced by J7620 which similarly applied to DuoNeb.

[8] LCD for Nebulizers (L11499), Region A (2005); Region A DMERC PSC Bulletin December 2004; Spring 2005 Region C DMERC DMEPOS Supplier Manual (pp. 21.3 - 21.4).

3

not one of the drugs alleged in the government's complaint. The 2005 Medicare payment for DuoNeb, which is compounded by Dey in the manufacturing process, is not in any way comparable to payment for pharmacy-compounded albuterol and ipratropium bromide. Dr. Bradford's comparison of payment for these very different drug formulations (pharmacy-compounded formulations versus DuoNeb) is unhelpful and misleading.

C. "Accounting Losses" to Pharmacies

1. Dr. Bradford criticizes me for not considering a "but for" world in which marginal pharmacies would lose money if they were reimbursed at the levels suggested by my alternative AWPs (in paragraph 13 on page 7 of his Rebuttal Report). Dr. Bradford calculates "accounting losses" that he argues "marginal pharmacies" would experience if my alternative AWPs were used as the basis for reimbursement for the subject Dey drugs (see paragraph 287 and Figure 39 on pages 130-131).

2 Dr. Bradford's "accounting losses" argument is inconsistent with the arguments appearing elsewhere in his report and rebuttal, that it is necessary to consider what would happen if all manufacturers reports truthful AWPs. He calculates "accounting losses" for only the Dey drugs that are the subject of the government's complaint (on pages 130-131), without regard to pharmacy income from other drugs. Yet, as he alludes to elsewhere, the subject Dey drugs are inexpensive, especially compared to brand drugs, and therefore a spread between AAC and AWP generates smaller dollar margins, whereas the spread on an expensive brand drug generates a much larger dollar margin (on pages 14-15). The great majority of states use the same reimbursement methodology for both brand and generic drugs. As I observed in my Rebuttal Report, brand drugs account for a large majority of Medicaid prescription drug spending, and if one were to scale actual average prices by 1.25 for all pharmaceutical products' AWPs, it is plausible that pharmacies would on average have higher ingredient cost reimbursement overall. It is virtually certain that marginal pharmacies would not experience the "accounting losses" described by Dr. Bradford.

D. Dey and Roxane, Ipratropium Bromide

1. In the discussion of my January 23, 2009, report concerning Medicare and ipratropium bromide, I explained how replacing the Dey and Roxane products' AWPs in an array will cause the median to fall substantially more than occurs if one replaces only the Dey AWPs (see e.g., pages 113 and 128). I explained that the combined DIFFERENCE more accurately captures the loss to the Medicare program resulting from inflated AWPs of both Dey and Roxane. To further illustrate why it is appropriate to consider the impacts of both companies' AWPs in combination, it is useful to consider the CIGNA arrays for 2001 Q3 and 2001 Q4 (setting aside for the moment the effect of Roxane's NovaPlus products) (Copies of these arrays are attached). In the 2001 Q3 array, reducing Dey's AWPs by even a few cents changes the median. The same is true with respect to the Roxane AWPs. Changing the AWPs of both companies' products changes the median even more.

4

2.      In the 2001 Q4 array, however, the situation is markedly different.  This array is the same as the 2001 Q3 array, with the notable exception being that one new product, manufactured by Apotex Corp., is included in the array.  Thus, in contrast to the 2001 Q3 array, due to the addition of the Apotex AWP, in the 2001 Q4 array the median is not affected by changing the AWP of any single manufacturer. Instead, given the nature of the median statistic, the value of the Apotex AWP and the number and values of other AWPs in the array, the median is changed only by changing the AWPs of two or more manufacturers.

3.      If one replaces the AWPs of both Dey's products and Roxane's generic products, the median is reduced considerably, which clearly demonstrates that Medicare would have paid less if both Dey and Roxane had reported lower AWPs.  If one were to consider only the impacts of the Dey and Roxane AWPs in isolation from one another, the loss to the Medicare program would not be captured.  It would not be logical to conclude that, due to the addition of just one new (and possibly inflated) AWP to the array, the United States is unable to recover for losses that have plainly been proven.


In addition to the above, my report in this case should be considered supplemented by my letter to you dated November 30, 2009 (including the supplements referenced in that letter), as well as my Declarations dated July 23, 2009, and September 21, 2009 and my deposition testimony given in this case.  Also, I reserve the right to update or supplement my analysis if additional information becomes available, and to prepare additional summaries, graphical materials, or charts to use at trial.


Sincerely,

Mark G. Duggan, Ph.D.

5

Cigna Ipratropium Bromide Medicare Array (2011-Q)

ORIGINAL ARRAY (Per Carrier Array Documents)

DMERC Medication Pricing

| CODE | DESCRIPTION | UNIT DOSAGE | PRICE LIST DRUG NAME | LISTED PACKAGING | NDC NUMBER | AWP FROM RED BOOK | RED BOOK DATE | PAGE NUMBER | UNITS PER PACKAGING | COST/UNIT DOSAGE | DATE LAST UPDATED | UPDATED BY |
|------|-------------|-------------|----------------------|------------------|------------|-------------------|---------------|-------------|---------------------|------------------|-------------------|------------|
| J7644 | Ipratropium Bromide | 1 mg | Dey | .02%, 2.5ml 25s | 49502-0685-03 | $ 44.10 | Apr-01 | CD | 12.5 | $ 3.53 | 6/15/2001 | CH |
| | Unit dose | | Dey | .02%, 2.5ml 30s | 49502-0685-33 | $ 52.80 | Apr-01 | CD | 15 | $ 3.52 | 6/15/2001 | CH |
| | | | Dey | .02%, 2.5ml 60s | 49502-0685-60 | $ 105.60 | Apr-01 | CD | 30 | $ 3.52 | 6/15/2001 | CH |
| | | | Roxane | .02%, 2.5ml 25s | 00054-8402-11 | $ 44.06 | Apr-01 | CD | 12.5 | $ 3.52 | 6/15/2001 | CH |
| | | | Roxane | .02%, 2.5ml 30s | 00054-8402-13 | $ 52.87 | Apr-01 | CD | 15 | $ 3.52 | 6/15/2001 | CH |
| | | | Roxane | .02%, 2.5ml 60s | 00054-8402-21 | $ 105.74 | Apr-01 | CD | 30 | $ 3.52 | 6/15/2001 | CH |
| | | | Alpharma USPD | .02%, 2.5ml 25s | 00472-0751-23 | $ 56.50 | Apr-01 | CD | 12.5 | $ 4.52 | 6/15/2001 | CH |
| | | | Alpharma USPD | .02%, 2.5ml 30s | 00472-0751-30 | $ 67.80 | Apr-01 | CD | 15 | $ 4.52 | 6/15/2001 | CH |
| | | | Alpharma USPD | .02%, 2.5ml 60s | 00472-0751-60 | $ 118.80 | Apr-01 | CD | 30 | $ 3.96 | 6/15/2001 | CH |
| | | | Phys Total Care | .02%, 2.5ml 25s | 54868-4082-01 | $ 23.54 | Apr-01 | CD | 12.5 | $ 1.88 | 6/15/2001 | CH |
| | | | Phys Total Care | .02%, 2.5ml 60s | 54868-4082-00 | $ 42.25 | Apr-01 | CD | 30 | $ 1.41 | 6/15/2001 | CH |
| | | | Allscripts | .02%, 2.5ml 25s | 54569-4910-00 | $ 18.62 | Apr-01 | CD | 12.5 | $ 1.49 | 6/15/2001 | CH |
| | Generic Median = | | $ 3.52 | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | Atrovent | | | | | | | | | |
| | | | (Boehr Ingelheim) | .02%, 2.5ml 25s | 00597-0080-62 | $ 68.90 | Jun-01 | 20 | 12.5 | $ 5.51 | 6/15/2001 | CH |
| | | | Ipratropium Bromide NovaPlus | | | | | | | | | |
| | | | (Roxane) | .02%, 2.5ml 25s | 00054-8404-11 | $ 44.06 | Apr-01 | CD | 12.5 | $ 3.52 | 6/15/2001 | CH |
| | | | (Roxane) | .02%, 2.5ml 30s | 00054-8404-13 | $ 52.87 | Apr-01 | CD | 15 | $ 3.52 | 6/15/2001 | CH |
| | | | (Roxane) | .02%, 2.5ml 60s | 00054-8404-21 | $ 105.74 | Apr-01 | CD | 30 | $ 3.52 | 6/15/2001 | CH |
| | | | | | | | | | | | | |
| | Lowest Brand = | | $ 3.52 | | | | | | | | | |
| | | | | | | | | | | | | |
| | Allowable = | | $ 3.52 | Updated through June 2001 Red Book updates | | | | | | | | |
| | | | | | | | | | | | | |
| | Allowable less 5% = | | $ 3.34 | | | | | | | | | |

| | | |
|---|---|---|
| KO & KP | $ | 3.52 |
| UD(gm) x | | 0.5 |
| = | | 1.76 |
| J7051 - | | 0.22 |
| = | | 1.54 |
| UD(gm) - | | 0.5 |
| KQ | $ | 3.08 |

J7644KQ LESS 5% = $  2.93

Compumed(Atrovent) product removed from array per October 1999 CD item deactivated 6/8/99

Cigna Ipratropium Bromide Medicare Array (PDF file)

ORIGINAL ARRAY (Per Carrier Array Documents)

### DMERC Medication Pricing

| CODE | DESCRIPTION | UNIT DOSAGE | PRICE LIST DRUG NAME | LISTED PACKAGING | NDC NUMBER | AWP FROM RED BOOK | RED BOOK DATE | PAGE NUMBER | UNITS PER PACKAGING | COST/UNIT DOSAGE | DATE LAST UPDATED | UPDATED BY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| J7644 | Ipratropium Bromide | 1 mg | Allscripts | .02%, 2.5ml 25s | 54569-4910-00 | $ 18.62 | Jul-01 | CD | 12.5 | $ 1.49 | 9/10/2001 | CH |
| | Unit dose | | Alpharma USPD | .02%, 2.5ml 25s | 00472-0751-23 | $ 56.50 | Jul-01 | CD | 12.5 | $ 4.52 | 9/10/2001 | CH |
| | | | Alpharma USPD | .02%, 2.5ml 30s | 00472-0751-30 | $ 67.80 | Jul-01 | CD | 15 | $ 4.52 | 9/10/2001 | CH |
| | | | Alpharma USPD | .02%, 2.5ml 60s | 00472-0751-60 | $ 118.80 | Jul-01 | CD | 30 | $ 3.96 | 9/10/2001 | CH |
| | | | Apotex Corp. | .02%, 2.5ml 25s | 60505-0806-01 | $ 56.00 | Jul-01 | CD | 12.5 | $ 4.48 | 9/10/2001 | CH |
| | | | Dey | .02%, 2.5ml 25s | 49502-0685-03 | $ 44.10 | Jul-01 | CD | 12.5 | $ 3.53 | 9/10/2001 | CH |
| | | | Dey | .02%, 2.5ml 30s | 49502-0685-33 | $ 52.80 | Jul-01 | CD | 15 | $ 3.52 | 9/10/2001 | CH |
| | | | Dey | .02%, 2.5ml 60s | 49502-0685-60 | $ 105.60 | Jul-01 | CD | 30 | $ 3.52 | 9/10/2001 | CH |
| | | | Phys Total Care | .02%, 2.5ml 25s | 54868-4082-01 | $ 23.54 | Jul-01 | CD | 12.5 | $ 1.88 | 9/10/2001 | CH |
| | | | Phys Total Care | .02%, 2.5ml 60s | 54868-4082-00 | $ 42.25 | Jul-01 | CD | 30 | $ 1.41 | 9/10/2001 | CH |
| | | | Roxane | .02%, 2.5ml 25s | 00054-8402-11 | $ 44.06 | Jul-01 | CD | 12.5 | $ 3.52 | 9/10/2001 | CH |
| | | | Roxane | .02%, 2.5ml 30s | 00054-8402-13 | $ 52.87 | Jul-01 | CD | 15 | $ 3.52 | 9/10/2001 | CH |
| | | | Roxane | .02%, 2.5ml 60s | 00054-8402-21 | $ 105.74 | Jul-01 | CD | 30 | $ 3.52 | 9/10/2001 | CH |
| | Generic Median = | $ 3.52 | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | Atrovent | | | | | | | | | |
| | | | (Boehr Ingelheim) | .02%, 2.5ml 25s | 00597-0080-62 | $ 68.90 | Jul-01 | CD | 12.5 | $ 5.51 | 9/10/2001 | CH |
| | | | Ipratropium Bromide NovaPlus | | | | | | | | | |
| | | | (Roxane) | .02%, 2.5ml 25s | 00054-8404-11 | $ 44.06 | Jul-01 | CD | 12.5 | $ 3.52 | 9/10/2001 | CH |
| | | | (Roxane) | .02%, 2.5ml 30s | 00054-8404-13 | $ 52.87 | Jul-01 | CD | 15 | $ 3.52 | 9/10/2001 | CH |
| | | | (Roxane) | .02%, 2.5ml 60s | 00054-8404-21 | $ 105.74 | Jul-01 | CD | 30 | $ 3.52 | 9/10/2001 | CH |
| | | | | | | | | | | | | |
| | Lowest Brand = | $ 3.52 | | | | | | | | | | |
| | | | | | | | | | | | | |
| | Allowable = | $ 3.52 | Updated through September 2001 Red Book updates | | | | | | | | | |
| | | | | | | | | | | | | |
| | Allowable less 5% = | $ 3.34 | | | | | | | | | | |

| | | |
|---|---|---|
| KO & KP | $ | 3.52 |
| UD(gm) x | | 0.5 |
| = | | 1.76 |
| J7051 - | | 0.22 |
| = | | 1.54 |
| UD(gm) - | | 0.5 |
| KQ | $ | 3.08 |

J7644KQ LESS 5% = $ 2.93

Compumed(Atrovent) product removed from array per October 1999 CD item deactivated 6/8/99

# Attachment C



# Region C DMERC
# MEDICARE ADVISORY

Spring 2006

Issue 56
Page 2006-1

Alabama

Arkansas

Colorado

Florida

Georgia

Kentucky

Louisiana

Mississippi

New Mexico

North Carolina

Oklahoma

Puerto Rico

South Carolina

Tennessee

Texas

Virgin Islands

## CMS Awards Jurisdiction C DME MAC Contract to Palmetto GBA

On January 6, 2006, the Centers for Medicare & Medicaid Services (CMS) issued a news release regarding its selection of Palmetto GBA as the contractor to administer the Durable Medical Equipment Medicare Administrative Contractor (DME MAC) workload for Jurisdiction C. Jurisdiction lines were redrawn as well; Jurisdiction C now includes Virginia and West Virginia and no longer includes Kentucky. Kentucky will be transitioned to DME MAC Jurisdiction B, administered

continued on page 2

## CMS Awards TrustSolutions, LLC the DME Benefit Integrity Work for Region C

The Centers for Medicare & Medicaid Services (CMS) has awarded anti-fraud, medical review, and data analysis work for the Medicare durable medical equipment (DME) benefit for the states in DME Region C to TrustSolutions, LLC (TrustSolutions). This jurisdiction currently includes Alabama, Arkansas, Colorado, Florida, Georgia, Kentucky, Louisiana, Mississippi, New Mexico, North Carolina, Oklahoma, South Carolina, Tennessee, Texas, Puerto Rico and the Virgin Islands.

continued on page 2



**Breaking News: Transitions and Updates**

**Spring 2006 Workshop Series**
*see page 13*

## New ADR and ADMC Address:

TrustSolutions DME Processing Center
9090 Junction Drive
Suite 9
Annapolis Junction, MD 20701

*see inside cover for more information*



**Palmetto GBA**



## Get an Overview of this Advisory

Region C DMERC will offer an online workshop to provide clarification on the articles in this Spring 2006 Region C *DMERC Medicare Advisory*. The course will be offered on March 16 at 10:00 a.m. and on April 12 at 3:00 p.m. EST. For online workshop registration and attendance instructions, see "Online Learning Events - How to Register" on page 80 of this Advisory. The course name for these workshops is "DMERC Spring 2006 Advisory."

*The information provided in this Advisory was current as of March 1, 2006. Any changes or new information superceding the information in this Advisory are provided in articles with publication dates after March 1, 2006 posted at www.PalmettoGBA.com/dme.*

# Transport Chairs and Rollabout Chairs

Transport chairs (E1037-E1039) and rollabout chairs (E1031) are considered to be mobility assistive equipment and are therefore subject to the national policy as defined in Pub. 100-03 *Medicare National Coverage Determinations Manual*, Section 280.3. In general, patients who qualify for these devices would be those who are not able to use a cane or walker for ambulation, who are unable to self-propel a manual wheelchair, who are unable to operate a POV or power wheelchair, and who have a caregiver who is willing and able to operate the transport/rollabout chair.

# Nebulizer Drugs: Albuterol and Ipratropium

Effective for claims with dates of service on or after January 1, 2006, a new HCPCS code has been established for manufactured combination unit dose preparations of albuterol and ipratropium (e.g., DuoNeb):

**J7620** Albuterol, up to 2.5 mg, and ipratropium bromide, up to 0.5 mg, non-compounded inhalation solution, administered through DME

Using this new HCPCS code, 1 vial = 1 unit of service. The KO, KP, and KQ modifiers are not used with this HCPCS code.

HCPCS code J7616 (albuterol, up to 5 mg, and ipratropium bromide, up to 1 mg, compounded inhalation solution, administered through DME) is discontinued for claims with dates of service on or after January 1, 2006. For this HCPCS code, two vials = one unit of service.

When albuterol and ipratropium are compounded in a single unit dose vial by a pharmacist, J7613 (albuterol unit dose preparation) and J7644 (ipratropium unit dose preparation) must be used with modifiers KP and KQ. The following is a repeat of instructions on the correct use of the KP and KQ modifiers with these drugs which was published in the Region C *DMERC Medicare Advisory* in Autumn 2005.The drug fees have been updated using the revised amounts for dates of service October to December 2005.

The medical policy on Nebulizers provides coding guidelines for the proper billing of nebulizer drugs using modifiers KP and KQ. When a compounded multiple drug unit dose formulation is dispensed, modifier KP is used with one drug, and modifier KQ is used with the other drug(s). According to the policy, in these situations, modifiers KP and KQ must be added to the appropriate drug HCPCS codes in such a manner that it results in the lowest Medicare allowance.

In order to determine the correct use of modifiers KP and KQ, suppliers must do more than look at the Medicare fee for each drug. They must also take into account the number of milligrams of each drug in the unit dose vial. It is also important to note that the Medicare fee for drugs can change every quarter and suppliers must recalculate the values each time there is a change to determine the correct modifier placement. Quarterly updates to drug fees are posted on the Fee Schedules and Pricing page of the Region C DMERC Web site at www.PalmettoGBA.com/dme/fees.

The following is an example of the calculation for a unit dose formulation of albuterol (J7613) and ipratropium (J7644) for claims with dates of service from October 1, 2005 through December 31, 2005. For these drugs, the fees per milligram during that time are:

For the typical unit dose preparation of 2.5 mg of albuterol (which is contained in 3.0 mg of albuterol sulfate) and 0.5 mg of ipratropium:

|  | KP | KQ |
|---|---|---|
| **J7613** | $0.064 | $0.099 |
| **J7644** | $0.165 | $0.090 |

If J7613KP and J7644KQ were used, the fee would be $0.205 for one vial.

J7613KP $0.064 × 2.5 = $0.160
J7644KQ $0.090 × 0.5 =  0.045
$0.205

If J7613KQ and J7644KP were used, the fee would be $0.33 for one vial:

J7613KQ $0.099 × 2.5 = $0.2475
J7644KP $0.165 × 0.5 =  0.0825
$0.3300

**This bulletin should be shared with all health care practitioners and managerial members of the provider/supplier staff.**

## Nebulizer Drugs: Albuterol and Ipratropium, cont.

Therefore, for these two drugs at the stated doses and the stated fees, the correct billing would be J7613KP and J7644KQ for dates of service from October 1, 2005 to December 31, 2005.

The importance of recalculating each quarter is highlighted by the fact that because of the changing fees for HCPCS codes J7613 and J7644, the correct use of modifiers for the albuterol 2.5/ipratropium 0.5 combination is:

· For dates of service 1/1/05 to 3/31/05: J7613KP and J7644KQ
· For dates of service 4/1/05 to 6/30/05: J7613KQ and J7644KP

· For dates of service 7/1/05 to 9/30/05: J7613KP and J7644KQ
· For dates of service 10/1/05 to 12/31/05: J7613KP and J7644KQ

The Medicare allowed charge is determined by multiplying the fee for the correct code/modifier combination times the units of service and then rounding to the nearest whole cent.

For additional details on coverage criteria, coding guidelines, and documentation requirements, refer to the Nebulizers LCD and Policy Article in the Region C DMERC *DMEPOS Supplier Manual*.

## Nebulizer Drugs: Budesonide, Formoterol

Effective for claims with dates of service on or after January 1, 2006, the following new HCPCS code has been established for unit dose inhalation solutions of budesonide that are compounded by a pharmacist:

**J7627** Budesonide, powder, compounded for inhalation solution, administered through DME, unit dose form, up to 0.5 mg

For this HCPCS code, 1 vial = 1 unit of service as long as each vial contains less than or equal to 0.5 mg.

HCPCS code J7626 has been revised to indicate that for dates of service on or after January 1, 2006 it may only be used for manufactured unit dose preparations of budesonide (e.g., Pulmicort). The revised narrative description is:

**J7626** Budesonide inhalation solution, non-

compounded, administered through DME, unit dose form, up to 0.5 mg

For this HCPCS code, 1 vial = 1 unit of service regardless of whether the 0.25 mg vial or the 0.5 mg vial is dispensed. This unit of service is unchanged in 2006 from what it was in 2005.

Effective for claims with dates of service on or after January 1, 2006, the following new HCPCS code has been established for unit dose inhalation solutions of formoterol:

**J7640** Formoterol, inhalation solution administered through DME, unit dose form, 12 micrograms

The appropriate modifier—KO, KP, and KQ—must be used with this code. Refer to the Nebulizers Policy Article for general instructions on the appropriate use of these modifiers.

## 2006 1st Quarter Average Sales Price (ASP) Update

Listed below are the 2006 1st Quarter ASP fees provided by the Centers for Medicare and Medicaid Services (CMS). Revisions from the previous quarter are reflected in bold text. Fees are effective January 1, 2006 for services rendered on or after January 1, 2006 through March 31, 2006.

**Note:** Effective January 13, 2006 the ASP allowance for code J7620 changed form $2.048 to $1.024. The days, units, times should reflect 1 for each vial of drug supplied.

| HCPCS CODE | HCPCS Code Per Unit Dosage | 1st Qtr Payment Limit | HCPCS CODE | HCPCS Code Per Unit Dosage | 1st Qtr Payment Limit | HCPCS CODE | HCPCS Code Per Unit Dosage | 1st Qtr Payment Limit |
|---|---|---|---|---|---|---|---|---|
| **J0133** | **5 mg** | **0.470** | J7518 | 180 mg | **2.167** | J7636KQ | 1 mg | **0.119** |
| J0285 | 50 mg | 10.280 | J7520 | 1 mg | **6.922** | J7637 | 1 mg | **0.102** |
| J0287 | 10 mg | 21.850 | J7525 | 5 mg | **136.920** | J7638KO | 1 mg | **0.121** |
| J0288 | 10 mg | 15.200 | J7608KO | 1 gram | **2.596** | J7638KP | 1 mg | **0.121** |
| J0289 | 10 mg | 35.800 | J7608KP | 1 gram | **2.596** | J7638KQ | 1 mg | **0.102** |
| **J0882** | **1 mcg** | **2.989** | J7608KQ | 1 gram | **2.465** | J7639KO | 1 mg | **18.647** |
| **J0886** | **1000 units** | **9.570** | J7611 | 1 mg | **0.077** | J7639KP | 1 mg | **18.647** |
| J0895 | 500 mg | 15.630 | J7612 | 0.5 mg | **0.987** | J7639KQ | 1 mg | **18.626** |
| J1170 | 4 mg | 1.490 | J7613KO | 1 mg | **0.060** | J7641KO | 1 mg | **INVOICE** |
| J1250 | 250 mg | 4.740 | J7613KP | 1 mg | **0.060** | J7641KP | 1 mg | **INVOICE** |
| **J1265** | **40 mg** | **0.620** | J7613KQ | 1 mg | **0.077** | J7641KQ | 1 mg | **INVOICE** |
| J1325 | 0.5 mg | 12.640 | J7614KO | 0.5 mg | **1.338** | J7642 | 1 mg | **1.186** |
| J1455 | 1000 mg | 13.070 | J7614KP | 0.5 mg | **1.338** | J7643KO | 1 mg | **1.186** |
| **J1566** | **500 mg** | **22.222** | J7614KQ | 0.5 mg | **0.987** | J7643KP | 1 mg | **1.186** |
| **J1567** | **500 mg** | **28.361** | J7616 | Deleted Code | | J7643KQ | 1 mg | **1.186** |
| J1570 | 500 mg | 35.250 | **J7620** | **1 vial** | **1.024** | J7644KO | 1 mg | **0.227** |
| J1644AX | 1000 units | **0.210** | J7622KO | 1 mg | **INVOICE** | J7644KP | 1 mg | **0.227** |
| J1815 | 5 units | **0.239** | J7622KP | 1 mg | **INVOICE** | J7644KQ | 1 mg | **0.120** |
| J1817 | 50 units | 2.800 | J7622KQ | 1 mg | INVOICE | J7648 | 1 mg | INVOICE |
| J2175 | 100 mg | 0.560 | J7624KO | 1 mg | **INVOICE** | J7649KO | 1 mg | **INVOICE** |
| J2260 | 5 mg | 51.580 | J7624KP | 1 mg | **INVOICE** | J7649KP | 1 mg | **INVOICE** |
| J2270 | 10 mg | 0.710 | J7624KQ | 1 mg | INVOICE | J7649KQ | 1 mg | INVOICE |
| J2271 | 100 mg | 11.070 | J7626KO | 1 unit | **4.408** | J7658 | 1 mg | INVOICE |
| J2275 | 10 mg | 4.390 | J7626KP | 1 unit | **4.408** | J7659KO | 1 mg | INVOICE |
| J2545 | 300 mg | **43.565** | J7626KQ | 1 unit | INVOICE | J7659KP | 1 mg | INVOICE |
| J2920 | 40 mg | **1.917** | **J7627KO** | **1 unit** | **INVOICE** | J7659KQ | 1 mg | INVOICE |
| J2930 | 125 mg | **2.503** | **J7627KP** | **1 unit** | **INVOICE** | J7668 | 10 mg | **INVOICE** |
| J3010 | 0.1 mg | 0.700 | **J7627KQ** | **1 unit** | **INVOICE** | J7669KO | 10 mg | **0.232** |
| **J3285** | **1 mg** | **61.750** | J7628 | 1 mg | INVOICE | J7669KP | 10 mg | **0.232** |
| J7051 | Deleted Code | | J7629KO | 1 mg | INVOICE | J7669KQ | 10 mg | **INVOICE** |
| J7500 | 50 mg | **0.133** | J7629KP | 1 mg | INVOICE | J7680 | 1 mg | **INVOICE** |
| J7501 | 100 mg | **49.306** | J7629KQ | 1 mg | INVOICE | J7681KO | 1 mg | **INVOICE** |
| J7502 | 100 mg | **3.475** | J7631KO | 10 mg | **0.063** | J7681KP | 1 mg | **INVOICE** |
| J7506 | 5 mg | **0.217** | J7631KP | 10 mg | **0.063** | J7681KQ | 1 mg | **INVOICE** |
| J7507 | 1 mg | **3.452** | J7631KQ | 10 mg | **0.034** | J7682KO | 300 mg | **52.456** |
| J7509 | 4 mg | **0.085** | J7633 | 0.25 mg | **INVOICE** | J7682KP | 300 mg | **52.456** |
| J7510 | 5 mg | 0.073 | J7635 | 1 mg | **0.119** | J7682KQ | 300 mg | INVOICE |
| J7515 | 25 mg | **0.942** | J7636KO | 1 mg | **0.119** | J7683 | 1 mg | INVOICE |
| J7517 | 250 mg | **2.531** | J7636KP | 1 mg | **0.119** | J7684KO | 1 mg | INVOICE |

# 2006 HCPCS Update, cont.

**Nebulizers**
*Added HCPCS Codes*

| HCPCS Code | Narrative |
|---|---|
| A4218 | Sterile saline or water, metered dose dispenser, 10 ml |
| G0333 | Pharmacy dispensing fee for inhalation drug(s): initial 30-day supply as a beneficiary |
| J7620 | Albuterol, up to 2.5 mg and ipratropium bromide, up to 0.5 mg, non-compounded inhalation solution, administered through DME |
| J7627 | Budesonide, powder, compounded for inhalation solution, administered through DME, unit dose form, up to 0.5 mg |
| J7640 | Formoterol, inhalation solution administered through DME, unit dose form, 12 micrograms |
| Q0513 | Pharmacy dispensing fee for inhalation drug(s): per 30 days |
| Q0514 | Pharmacy dispensing fee for inhalation drug(s): per 90 days |

*Narrative Changes*

| HCPCS Code | Old Narrative | New Narrative |
|---|---|---|
| A4216 | Sterile water/saline, 10 ml | Sterile water, saline and/or dextrose (diluent), 10 ml |
| J7626 | Budesonide inhalation solution, administered through DME, unit dose form, 0.25 to 0.50 mg | Budesonide inhalation solution, non-compounded, administered through DME, unit dose form, up to 0.5 mg |

*Discontinued HCPCS Codes*

| HCPCS Code | Narrative | Crosswalk to Code |
|---|---|---|
| G0371 | Pharmacy dispensing fee for inhalation drug(s): per 30 days | Q0513 |
| G0374 | Pharmacy dispensing fee for inhalation drug(s): per 90 days | Q0514 |
| J7051 | Sterile saline or water, up to 5 cc | A4216 with changes |
| J7616 | Albuterol, up to 5 mg and ipratropium bromide, up to 1 mg, compounded inhalation solution, administered through DME | J7620 with changes |

**Negative Pressure Wound Therapy**
*Narrative Change*

| HCPCS Code | Old Narrative | New Narrative |
|---|---|---|
| A6550 | Dressing set for negative pressure wound therapy electrical pump, stationary or portable, each | Wound care set, for negative pressure wound therapy electrical pump, includes all supplies and accessories |

*Discontinued HCPCS Code*

| HCPCS Code | Narrative | Crosswalk to Code |
|---|---|---|
| A6551 | Canister set for negative pressure wound therapy electrical pump, stationary or portable, each | A7000 or A7001 |

# Attachment D

**LCD for Nebulizers (L11499)**

| Contractor Information |
|---|
| **Contractor Name** |
| Tricenturion |
| **Contractor Number** |
| 77011 |
| **Contractor Type** |
| DMERC |

| LCD Information |
|---|
| **LCD Database ID Number** |
| L11499 |

**LCD Title**

Nebulizers

**Contractor's Determination Number**

NEB20051001

**AMA CPT / ADA CDT Copyright Statement**

CPT codes, descriptions and other data only are copyright 2004 American Medical Association (or such other date of publication of CPT). All Rights Reserved. Applicable FARS/DFARS Clauses Apply. Current Dental Terminology, (CDT) (including procedure codes, nomenclature, descriptors and other data contained therein) is copyright by the American Dental Association. © 2002, 2004 American Dental Association. All rights reserved. Applicable FARS/DFARS apply.

**CMS National Coverage Policy**

CMS Manual System, Pub. 100-3, Medicare National Coverage Determinations Manual, Chapter 1, Section 280.1

**Primary Geographic Jurisdiction**

Connecticut
Delaware
Massachusetts
Maine
New Hampshire
New Jersey
New York - Entire State
Pennsylvania
Rhode Island
Vermont

**Oversight Region**

Region III

**CMS Consortium**

Northeast

**DMERC Region LCD Covers**

Region A

**Original Determination Effective Date**

For services performed on or after 04/01/1997

**Original Determination Ending Date**

**Revision Effective Date**

For services performed on or after 10/01/2005

**Revision Ending Date**

**Indications and Limitations of Coverage and/or Medical Necessity**

For any item to be covered by Medicare, it must 1) be eligible for a defined Medicare benefit category, 2) be reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member, and 3) meet all other applicable Medicare statutory and regulatory requirements. For the items addressed in this medical policy, the criteria for "reasonable and necessary" are defined by the following indications and limitations of coverage and/or medical necessity.

For an item to be covered by Medicare, a written signed and dated order must be received by the supplier before a claim is submitted to the DMERC. If the supplier bills for an item addressed in this policy without first receiving the completed order, the item will be denied as not medically necessary.

A small volume nebulizer (A7003, A7004, A7005) and related compressor (E0570, E0571) are covered when:

a) It is medically necessary to administer beta-adrenergics, anticholinergics, corticosteroids, and cromolyn for the management of obstructive pulmonary disease (ICD-9 diagnosis codes 491.0 - 508.9), or

b) It is medically necessary to administer gentamicin, tobramycin, amikacin, or dornase alfa to a patient with cystic fibrosis (ICD-9 diagnosis code 277.02) or

c) It is medically necessary to administer tobramycin to a patient with brochiectasis (ICD-9 diagnosis code 494.0, 494.1, 748.61, 011.50-011.56) or

d) It is medically necessary to administer pentamidine to patients with HIV (ICD-9 diagnosis code 042), pneumocystosis (ICD-9 diagnosis code 136.3), and complications of organ transplants (ICD-9 diagnosis codes 996.80-996.89), or

e) It is medically necessary to administer mucolytics (other than dornase alpha) for persistent thick or tenacious pulmonary secretions (ICD-9 diagnosis codes 480.0-508.9, and 786.4).

Use of inhalation drugs, other than those listed above, will be denied as not medically necessary.

If none of the drugs used with a nebulizer are covered, the nebulizer and its accessories/supplies will be denied as not medically necessary.

A large volume nebulizer (A7017), related compressor (E0565 or E0572), and water or saline (A4217 or A7018) are covered when it is medically necessary to deliver humidity to a patient with thick, tenacious secretions, who has cystic fibrosis (ICD-9 diagnosis code 277.02), bronchiectasis (ICD-9 diagnosis code 494.0, 494.1, 011.50-011.56 or 748.61), a tracheostomy (ICD-9 diagnosis code V44.0 or V55.0), a tracheobronchial stent (ICD-9 diagnosis code 519.1). Combination code E0585 will be covered for the same indications.

An E0565 or E0572 compressor and filtered nebulizer (A7006) are also covered when it is medically necessary to administer pentamidine to patients with HIV (ICD-9 diagnosis code 042), pneumocystosis (ICD-9 diagnosis code 136.3) and complications of organ transplants (ICD-9 diagnosis codes 996.80-996.89).

Because there is no proven medical benefit to nebulizing particles to diameters smaller than achievable with a pneumatic model, when a small volume ultrasonic nebulizer (E0574) is ordered, it will be reimbursed at the least costly alternative of a pneumatic compressor (E0570).

Similarly, a large volume ultrasonic nebulizer (E0575) offers no proven clinical advantage over a pneumatic compressor. However, since code E0575 is in a different payment category than pneumatic compressors, payment for a least costly alternate cannot be made. Therefore, when an E0575 nebulizer is provided, it will be denied as not medically necessary as will any related accessories and supplies.

A battery powered compressor (E0571) is rarely medically necessary. If this compressor is provided without accompanying documentation which justifies its medical necessity, and the coverage criteria for code E0570 are met, payment will be based on the allowance for the least costly medically acceptable alternative, E0570.

A controlled dose inhalation drug delivery system K0730 is covered when it is medically necessary to deliver iloprost (Q4080) for patients with pulmonary artery hypertension (ICD-9 diagnosis codes: 416.0 or 416.8) who meet the following criteria:

Iloprost Q4080 is covered when both of the criteria 1 and 2 are met:

1) The pulmonary hypertension is not secondary to pulmonary venous hypertension (e.g., left sided atrial or ventricular disease, left sided valvular heart disease, etc) or disorders of the respiratory system (e.g., chronic obstructive pulmonary disease, interstitial lung disease, obstructive sleep apnea or other sleep disordered breathing, alveolar hypoventilation disorders, etc.), and

2) The patient has primary pulmonary hypertension or pulmonary hypertension which is secondary to one of the following conditions: connective tissue disease, thromboembolic disease of the pulmonary arteries, human immunodeficiency virus (HIV) infection, cirrhosis, diet drugs, congenital left to right shunts, etc. If these conditions are present, the following criteria (a-d) must be met:

a) The pulmonary hypertension has progressed despite maximal medical and/or surgical treatment of the identified condition; and

b) The mean pulmonary artery pressure is greater than 25 mm Hg at rest or greater than 30 mm Hg with exertion; and

c) The patient has significant symptoms from the pulmonary hypertension (i.e., severe dyspnea on exertion, and either fatigability, angina, or syncope); and

d) Treatment with oral calcium channel blocking agents has been tried and failed, or has been considered and ruled out.

If the above criteria are not met, the controlled dose inhalation drug delivery system (K0730) and the iloprost (Q4080) will be denied as not medically necessary.

If K0730 is used to administer any nebulizer drug other than iloprost and the coverage criteria for E0570 are met, payment will be based on the allowance for the least costly medically appropriate alternative, E0570.

Other uses of compressors/generators will be considered individually on a case by case basis, to determine their medical necessity.

ACCESSORIES:

Accessories are separately payable if the related aerosol compressor and the individual accessories are medically necessary. The following table lists the compressor/generator, which is related to the accessories described. Other compressor/generator/accessory combinations are considered medically unnecessary.

Compressor/Generator **(Related Accessories)**
E0565 **(A4619, A7006, A7010, A7011, A7012, A7013, A7014, A7015, A7017, A7525, E1372)**
E0570 **(A7003, A7004, A7005, A7006, A7013, A7015, A7525)**
E0571 **(A7003, A7004, A7005, A7006, A7013, A7015, A7525)**
E0572 **(A7006, A7014)**
E0574 **(A7014, A7016)**
E0585 **(A4619, A7006, A7010, A7011, A7012, A7013, A7014, A7015, A7525)**
K0730 **(A7005)**

This array of accessories represents all possible combinations but it may not be appropriate to bill any or all of them for one device.

The following table lists the usual maximum frequency of replacement for accessories. Claims for more than the usual maximum replacement amount must be supported by documentation in the patient's medical record, which must be available to the DMERC upon request.

Accessory **(Usual maximum replacement)**
A4619 **(One/month)**
A7003 **(Two/month)**
A7004 **(Two/month (in addition to A7003))**
A7005 **(One/6 months)**
A7005 **(One/3 months only with K0730)**
A7006 **(One/month )**
A7010 **(One unit (100 ft.)/ 2 months)**
A7011 **(One/year)**
A7012 **(Two/month)**
A7013 **(Two/month)**
A7014 **(One/3 months)**
A7015 **(One/month)**
A7016 **(Two/year)**

A7017 **(One/3 years)**
A7525 **(One/month)**
E1372 **(One/3 years)**

INHALATION DRUGS AND SOLUTIONS:

The following table represents the maximum milligrams/month of inhalation drugs that would be reasonably billed for each nebulized drug.

Acetylcysteine: **(up to 74 grams/month)**
Albuterol: **(up to 465 mg/month)**
Atropine: **(up to 186 mg/month)**
Bitolterol: **(up to 434 mg/month)**
Cromolyn sodium: **(up to 2480 mg/month (248 units/month))**
Dornase alpha: **(up to 78 mg/month)**
Glycopyrrolate: **(up to 75 mg/month)**
Ipratropium bromide: **(up to 93 mg/month)**
Isoetharine: **(up to 930 mg/month)**
Isoproterenol: **(up to 450 mg/month)**
Levalbuterol: **(up to 232.5 mg/month (465 units/month))**
Metaproterenol: **(up to 2800 mg/month (280 units/month))**
Pentamidine: **(up to 300 mg/month)**
Terbutaline: **(up to 186 mg/month)**
Sterile saline or water, up to 5cc/unit (J7051): **(up to 186 units/month)**
Distilled water, sterile water, or sterile saline in large volume nebulizer: **(up to 18 liters/month)**

Claims for more than these amounts of drugs will be denied as not medically necessary unless accompanied by documentation, which justifies a larger amount in the individual case. Therefore, claims for more than the usual maximum milligrams must be supported by documentation in the patient's medical record which must be available to the DMERC upon request.

The pharmacist is responsible for assessing how much inhalation solution a patient is actually using. Considering this information, the pharmacist is responsible for assuring that the patient has used almost all of his/her supply on hand prior to dispensing a new supply.

When a "concentrated form" of an inhalation drug is dispensed, separate saline solution (J7051 OR J7699 [metered dose]) used to dilute it will be separately reimbursed. Saline dispensed for the dilution of concentrated nebulizer drugs must be billed on the same claim as the drug(s) being diluted. If the unit dose form of the drug is dispensed, separate saline solution (J7051 or J7699 [metered dose]), will be denied as not medically necessary. Water or saline in 500 or 1000 ml quantities (A4217 or A7018) are not appropriate for use by patients to dilute inhalation drugs and will therefore be denied as not medically necessary if used for this purpose. These codes are only medically necessary when used in a large volume nebulizer (A7017 or E0585).

Albuterol, levalbuterol, bitolterol, epinephrine, isoetharine, isoproterenol, metaproterenol, and terbutaline are all bronchodilators with beta-adrenergic stimulatory effect. It would rarely be medically necessary for a patient to be using more than one of these at a time. The use of more than one of these drugs at the same time will be denied as not medically necessary without documentation within the patient's medical records supporting the medical necessity.

Ipratropium bromide, atropine, and glycopyrrolate are all anticholinergics. It would rarely be medically necessary for a patient to be using any more than one of these at a time. The use of more than one of these drugs at the same time will be denied as not medically necessary without documentation within the patient's medical records supporting the medical necessity.

Charges for the drugs, diluent, and dispensing fees may only be billed by the entity that actually dispenses the drug to the Medicare beneficiary and that entity must be permitted under all applicable federal, state, and local laws and regulations to dispense drugs. Only entities licensed in

the state where they are physically located may bill the DMERC for nebulizer drugs. Physicians may bill the DMERC for drugs if all of the following conditions are met: the physician is 1) enrolled as a DMEPOS supplier with the National Supplier Clearinghouse, and 2) dispensing the drug(s) to the Medicare beneficiary, and 3) authorized by the State to dispense drugs as part of the physician's license. Claims submitted by entities not licensed to dispense drugs will be denied for lack of medical necessity.

**Coverage Topic**

Durable Medical Equipment
Prescription Drugs
Nebulizer

## Coding Information

**Type of Bill Code**

**Revenue Codes**

**CPT/HCPCS Codes**

**The appearance of a code in this section does not necessarily indicate coverage.**

**HCPCS MODIFIERS:**

**EY - No physician or other licensed health care providr order for this item or service**
**KO - Single drug unit dose formulation.**
**KP - First drug of a multiple drug unit dose formulation.**
**KQ - Second or subsequent drug of a multiple drug unit dose formulation.**
**KX –Specified required documentation on file.**

**EQUIPMENT**

| | |
|---|---|
| E0565 | COMPRESSOR, AIR POWER SOURCE FOR EQUIPMENT WHICH IS NOT SELF- CONTAINED OR CYLINDER DRIVEN |
| E0570 | NEBULIZER, WITH COMPRESSOR |
| E0571 | AEROSOL COMPRESSOR, BATTERY POWERED, FOR USE WITH SMALL VOLUME NEBULIZER |
| E0572 | AEROSOL COMPRESSOR, ADJUSTABLE PRESSURE, LIGHT DUTY FOR INTERMITTENT USE |
| E0574 | ULTRASONIC/ELECTRONIC AEROSOL GENERATOR WITH SMALL VOLUME NEBULIZER |
| E0575 | NEBULIZER, ULTRASONIC, LARGE VOLUME |
| E0585 | NEBULIZER, WITH COMPRESSOR AND HEATER |
| K0730 | CONTROLLED DOSE INHALATION DRUG DELIVERY SYSTEM |

**ACCESSORIES**

| | |
|---|---|
| A4619 | FACE TENT |
| A7003 | ADMINISTRATION SET, WITH SMALL VOLUME NONFILTERED PNEUMATIC NEBULIZER, DISPOSABLE |
| A7004 | SMALL VOLUME NONFILTERED PNEUMATIC NEBULIZER, DISPOSABLE |
| A7005 | ADMINISTRATION SET, WITH SMALL VOLUME NONFILTERED PNEUMATIC NEBULIZER, NON-DISPOSABLE |
| A7006 | ADMINISTRATION SET, WITH SMALL VOLUME FILTERED PNEUMATIC NEBULIZER |
| A7007 | LARGE VOLUME NEBULIZER, DISPOSABLE, UNFILLED, USED WITH AEROSOL COMPRESSOR |
| A7008 | LARGE VOLUME NEBULIZER, DISPOSABLE, PREFILLED, USED WITH AEROSOL COMPRESSOR |
| A7009 | RESERVOIR BOTTLE, NON-DISPOSABLE, USED WITH LARGE VOLUME ULTRASONIC NEBULIZER |
| A7010 | CORRUGATED TUBING, DISPOSABLE, USED WITH LARGE VOLUME NEBULIZER, 100 FEET |
| A7011 | CORRUGATED TUBING, NON-DISPOSABLE, USED WITH LARGE VOLUME NEBULIZER, 10 FEET |
| A7012 | WATER COLLECTION DEVICE, USED WITH LARGE VOLUME NEBULIZER |
| A7013 | FILTER, DISPOSABLE, USED WITH AEROSOL COMPRESSOR |
| A7014 | FILTER, NONDISPOSABLE, USED WITH AEROSOL COMPRESSOR OR ULTRASONIC GENERATOR |
| A7015 | AEROSOL MASK, USED WITH DME NEBULIZER |
| A7016 | DOME AND MOUTHPIECE, USED WITH SMALL VOLUME ULTRASONIC NEBULIZER |
| A7017 | NEBULIZER, DURABLE, GLASS OR AUTOCLAVABLE PLASTIC, BOTTLE TYPE, NOT USED WITH OXYGEN |
| A7525 | TRACHEOSTOMY MASK, EACH |
| E0580 | NEBULIZER, DURABLE, GLASS OR AUTOCLAVABLE PLASTIC, BOTTLE TYPE, FOR USE WITH REGULATOR OR FLOWMETER |
| E1372 | IMMERSION EXTERNAL HEATER FOR NEBULIZER |

## INHALATION DRUGS

| | |
|---|---|
| A4217 | STERILE WATER/SALINE, 500 ML |
| A7018 | WATER, DISTILLED, USED WITH LARGE VOLUME NEBULIZER, 1000 ML |
| G0371 | PHARMACY DISPENSING FEE FOR INHALATION DRUG(S); PER 30 DAYS |
| G0374 | PHARMACY DISPENSING FEE FOR INHALATION DRUG(S); PER 90 DAYS |
| J2545 | PENTAMIDINE ISETHIONATE, INHALATION SOLUTION, PER 300 MG, ADMINISTERED THROUGH A DME |
| J7051 | STERILE SALINE OR WATER, UP TO 5 CC |
| J7608 | ACETYLCYSTEINE, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER GRAM |
| J7611 | ALBUTEROL, INHALATION SOLUTION, ADMINISTERED THROUGH DME, CONCENTRATED |

FORM, 1 MG

J7612   LEVALBUTEROL, INHALATION SOLUTION, ADMINISTERED THROUGH DME, CONCENTRATED FORM, 0.5 MG

J7613   ALBUTEROL, INHALATION SOLUTION, ADMINISTERED THROUGH DME, UNIT DOSE, 1 MG

J7614   LEVALBUTEROL, INHALATION SOLUTION, ADMINISTERED THROUGH DME, UNIT DOSE, 0.5 MG

J7616   ALBUTEROL, UP TO 5 MG AND IPRATROPIUM BROMIDE, UP TO 1 MG, COMPOUNDED INHALATION SOLUTION, ADMINISTERED THROUGH DME

J7622   BECLOMETHASONE, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM

J7624   BETAMETHASONE, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM

J7626   BUDESONIDE INHALATION SOLUTION, ADMINISTERED THROUGH DME, UNIT DOSE FORM, 0.25 TO 0.50 MG

J7628   BITOLTEROL MESYLATE, INHALATION SOLUTION ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM

J7629   BITOLTEROL MESYLATE, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM

J7631   CROMOLYN SODIUM, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER 10 MILLIGRAMS

J7633   BUDESONIDE, INHALATION SOLUTION ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER 0.25 MILLIGRAM

J7635   ATROPINE, INHALATION SOLUTION ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM

J7636   ATROPINE, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM

J7637   DEXAMETHASONE, INHALATION SOLUTION ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM

J7638   DEXAMETHASONE, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM

J7639   DORNASE ALPHA, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM

J7641   FLUNISOLIDE, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE, PER MILLIGRAM

J7642   GLYCOPYRROLATE, INHALATION SOLUTION ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM

J7643   GLYCOPYRROLATE, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM

J7644   IPRATROPIUM BROMIDE, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM

J7648   ISOETHARINE HCL, INHALATION SOLUTION ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM

| J7649 | ISOETHARINE HCL, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| --- | --- |
| J7658 | ISOPROTERENOL HCL, INHALATION SOLUTION ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
| J7659 | ISOPROTERENOL HCL, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7668 | METAPROTERENOL SULFATE, INHALATION SOLUTION ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER 10 MILLIGRAMS |
| J7669 | METAPROTERENOL SULFATE, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER 10 MILLIGRAMS |
| J7680 | TERBUTALINE SULFATE, INHALATION SOLUTION ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
| J7681 | TERBUTALINE SULFATE, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7682 | TOBRAMYCIN, UNIT DOSE FORM, 300 MG, INHALATION SOLUTION, ADMINISTERED THROUGH DME |
| J7683 | TRIAMCINOLONE, INHALATION SOLUTION ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
| J7684 | TRIAMCINOLONE, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7699 | NOC DRUGS, INHALATION SOLUTION ADMINISTERED THROUGH DME |
| Q4080 | ILOPROST, INHALATION SOLUTION, ADMINISTERED THROUGH DME, 20 MCG |

**ICD-9 Codes that Support Medical Necessity**

**The presence of an ICD-9 code listed in this section is not sufficient by itself to assure coverage. Refer to the section on "Indications and Limitations of Coverage and/or Medical Necessity" for other coverage criteria and payment information.**

**For HCPCS codes A4619, E0565, E0572:**

011.50 - 011.56

| 042 | HUMAN IMMUNODEFICIENCY VIRUS (HIV) DISEASE |
| --- | --- |
| 136.3 | PNEUMOCYSTOSIS |
| 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |
| 494.0 | BRONCHIECTASIS WITHOUT ACUTE EXACERBATION |
| 494.1 | BRONCHIECTASIS WITH ACUTE EXACERBATION |
| 519.1 | OTHER DISEASES OF TRACHEA AND BRONCHUS NOT ELSEWHERE CLASSIFIED |
| 748.61 | CONGENITAL BRONCHIECTASIS |

996.80 - 996.89

| V44.0 | TRACHEOSTOMY STATUS |
| V55.0 | ATTENTION TO TRACHEOSTOMY |

**For HCPCS codes A7013, A7014, A7015, A7525:**

011.50 - 011.56

| 042 | HUMAN IMMUNODEFICIENCY VIRUS (HIV) DISEASE |
| 136.3 | PNEUMOCYSTOSIS |
| 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |

480.0 - 508.9

| 519.1 | OTHER DISEASES OF TRACHEA AND BRONCHUS NOT ELSEWHERE CLASSIFIED |
| 748.61 | CONGENITAL BRONCHIECTASIS |
| 786.4 | ABNORMAL SPUTUM |

996.80 - 996.89

| V44.0 | TRACHEOSTOMY STATUS |
| V55.0 | ATTENTION TO TRACHEOSTOMY |

**For HCPCS codes A7003, A7004, A7005, E0570, E0571, E0574:**

011.50 - 011.56

| 042 | HUMAN IMMUNODEFICIENCY VIRUS (HIV) DISEASE |
| 136.3 | PNEUMOCYSTOSIS |
| 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |

480.0 - 508.9

| 786.4 | ABNORMAL SPUTUM |

996.80 - 996.89

**For HCPCS codes A7006, J2545:**

| 042 | HUMAN IMMUNODEFICIENCY VIRUS (HIV) DISEASE |
| 136.3 | PNEUMOCYSTOSIS |

996.80 - 996.89

**For HCPCS codes A4217, A7010, A7011, A7012, A7017, A7018, E0585, E1372:**

011.50 - 011.56

| 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |
| 494.0 | BRONCHIECTASIS WITHOUT ACUTE EXACERBATION |
| 494.1 | BRONCHIECTASIS WITH ACUTE EXACERBATION |
| 519.1 | OTHER DISEASES OF TRACHEA AND BRONCHUS NOT ELSEWHERE CLASSIFIED |
| 748.61 | CONGENITAL BRONCHIECTASIS |
| V44.0 | TRACHEOSTOMY STATUS |

| | |
|---|---|
| V55.0 | ATTENTION TO TRACHEOSTOMY |

**For HCPCS code J7051:**

| | |
|---|---|
| 042 | HUMAN IMMUNODEFICIENCY VIRUS (HIV) DISEASE |
| 136.3 | PNEUMOCYSTOSIS |
| 491.0 - 508.9 | |
| 996.80 - 996.89 | |

**For HCPCS codes J7608:**

| | |
|---|---|
| 480.0 - 508.9 | |
| 786.4 | ABNORMAL SPUTUM |

**For HCPCS codes J7611, J7612, J7613, J7614, J7616, J7622, J7624, J7626, J7628, J7629, J7631, J7633, J7635, J7636, J7637, J7638, J7641, J7642, J7643, J7644, J7648, J7649, J7658, J7659, J7668, J7669, J7680, J7681, J7683, J7684:**

| | |
|---|---|
| 491.0 - 508.9 | |

**For HCPCS code J7639:**

| | |
|---|---|
| 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |

**For HCPCS code J7682:**

| | |
|---|---|
| 011.50 - 011.56 | |
| 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |
| 494.0 | BRONCHIECTASIS WITHOUT ACUTE EXACERBATION |
| 494.1 | BRONCHIECTASIS WITH ACUTE EXACERBATION |
| 748.61 | CONGENITAL BRONCHIECTASIS |

**For HCPCS codes K0730, Q4080**

| | |
|---|---|
| 416.0 | PRIMARY PULMONARY HYPERTENSION |
| 416.8 | OTHER CHRONIC PULMONARY HEART DISEASES |

**Diagnoses that Support Medical Necessity**

Refer to the previous section for the specific HCPCS code indicated. For all other HCPCS codes listed in the policy refer to the section on "Indications and Limitations of Coverage and/or Medical Necessity" for other criteria and payment information.

**ICD-9 Codes that DO NOT Support Medical Necessity**

**For the specific HCPCS codes indicated above, all ICD-9 codes that are not specifieied in the previous section.**

**For HCPCS codes A7009 and E0575, all ICD-9 codes.**

**For all other HCPCS codes, ICD-9 codes are not specified.**

**ICD-9 Codes that DO NOT Support Medical Necessity Asterisk Explanation**

**Diagnoses that DO NOT Support Medical Necessity**

For the specific HCPCS codes indicated above, all diagnoses that are not specified in the previous section.

For HCPCS codes A7009 and E0575, all diagnoses.

For all other HCPCS codes, diagnoses are not specified.

## General Information

**Documentation Requirements**

Section 1833(e) of the Social Security Act precludes payment to any provider of services unless "there has been furnished such information as may be necessary in order to determine the amounts due such provider" (42 U.S.C. section 13951(e)). It is expected that the patient's medical records will reflect the need for the care provided. The patient's medical records include the physician's office records, hospital records, nursing home records, home health agency records, records from other healthcare professionals and test reports. This documentation must be available to the DMERC upon request.

An order for each item billed must be signed and dated by the treating physician, kept on file by the supplier, and made available to the DMERC upon request. Items billed to the DMERC before a signed and dated order has been received by the supplier must be submitted with an EY modifier added to each affected HCPCS code.

The order for any drug must clearly specify the type of solution to be dispensed to the patient and the administration instructions for that solution. The type of solution is described by a combination of (a) the name of the drug and the concentration of the drug in the dispensed solution and the volume of solution in each container, or (b) the name of the drug and the number of milligrams/grams of drug in the dispensed solution and the volume of solution in that container. Examples of (a) would be: albuterol 0.083% 3 ml; or albuterol 0.5% 20 ml; or cromolyn 20 mg/2 ml. Examples of (b) would be: albuterol 1.25 mg in 3 ml saline; or albuterol 2.5 mg and cromolyn 20 mg in 3 ml saline. Administration instructions must specify the amount of solution and frequency of use. Examples would be: 3 ml qid and prn - max 6 doses/24 hr.; or one ampule q 4 hr prn; or 0.5 ml diluted with saline to 3.0 ml tid and prn. A new order is required if there is a change in the type of solution dispensed or the administration instructions. For all inhalation drugs, a new order is required at least every 12 months even if the prescription has not changed.

An ICD-9 code describing the condition which necessitates nebulizer therapy must be included on each claim for equipment, accessories, and/or drugs.

If all the coverage criteria described in the Indications and Limitations of Coverage section have been met for K0730 and/or Q4080 a KX modifier must be added to the code(s).

Situations which the medical record must specifically address include:

1) When billing for quantities of supplies greater than those described in the policy as the usual maximum amounts, there must be clear documentation in the patient's medical records corroborating the medical necessity of the current use.

2) If more than one beta-adrenergic or more than one anticholinergic inhalation drug is billed during the same month, there must be clear documentation in the patient's medical records corroborating the medical necessity of this current use.

When code E1399 is billed for miscellaneous equipment or accessories, the claim must be accompanied by a clear description of the item including the manufacturer, the model name/number if applicable, and the medical necessity of the item for that patient. When Not Otherwise Classified (NOC) drug code J7699 is billed for miscellaneous inhalation drugs, the claim must be accompanied by the detailed order information described above, a clear statement of the number of ampules/bottles of solution dispensed, and documentation of the medical necessity of the drug for that patient.

Refer to the Supplier Manual for more information on documentation requirements.


**Appendices**


**Utilization Guidelines**

Refer to Indications and Limitations of Coverage and/or Medical Necessity.


**Sources of Information and Basis for Decision**

Reserved for future use.


**Advisory Committee Meeting Notes**


**Start Date of Comment Period**


**End Date of Comment Period**


**Start Date of Notice Period**

12/01/1996


**Revision History Number**

NEB008


**Revision History Explanation**

Revision Effective Date: 10/01/2005
HCPCS CODES & MODIFIERS:
Added codes: K0730 and Q4080 and KX modifier
INDICATIONS AND LIMITATIONS OF COVERAGE AND/OR MEDICAL NECESSITY:
Added criterion for K0730 and Q4080
ICD-9 CODES THAT SUPPORT MEDICAL NECESSITY:
Added diagnoses codes 416.0, 416.8, necessary for codes K0730 and Q4080
DOCUMENTATION REQUIREMENTS:
Added KX modifier requirement for K0730 and Q4080.

Revision Effective Date: 04/01/2005
LMRP converted to LCD and Policy Article
HCPCS CODES & MODIFIERS:
Added Codes: J7611, J7612, J7613, J7614, J7616, G0371, G0374
Deleted Codes: J7618, J7619, J7621, E0590
INDICATIONS AND LIMITATIONS OF MEDICAL NECESSITY:
Tobramycin coverage expanded.

Revision Effective Date: 04/01/2004
HCPCS CODES AND MODIFIERS:
Added: A4217, A7525, J7621
Deleted: A4621, A7019, A7020
INDICATIONS AND LIMITATIONS:
Added references to new HCPCS codes.
CODING GUIDELINES:
Added references to new HCPCS codes.
Clarified use of J7699.
Added billing guidelines for J7621.
Removed billing guidelines for A4323.
Added correct coding guidelines for compounded albuterol and ipratropium.
Added instructions for billing metered dose sterile saline products.

Revision effective date: 04/01/2003
HCPCS CODES AND MODIFIERS:
Added: EY modifier, J7633
Revised: E0574, J7626
INDICATIONS AND LIMITATIONS OF COVERAGE:
Added standard language concerning coverage of items without an order.
Added standard language concerning the medical necessity for use of a greater quantity and combinations of usually contraindicated drugs requirement.
Removed language about physician documenting having considered use of an MDI prior to prescribing a nebulizer. Added pneumocystosis and complications of organ transplants as coverage criteria for E0565 or E0572 compressor used with filtered nebulizer (A7006).
Removed specific coverage criteria for dornase alpha, other than its being used for treatment of cystic fibrosis. Removed grandfathering language for aerosol compressors and small and large volume ultrasonic generators.
CODING GUIDELINES:
Added: Instructions on how to bill J7626 0.5mg as one unit of service.
Added definitions of equipment and inhalations drugs to this section of policy.
DOCUMENTATION REQUIREMENTS:
Added: Standard language concerning use of EY modifier for items without an order; standard language regarding excess quantity utilization;
Listed specific codes in which extra documentation should be attached to claim via hardcopy or narrative field

The revision dates listed below are the dates the revisions were published and not necessarily the effective dates for the revisions.

04/01/2002 - Expansion of coverage for large volume
nebulizers with saline or water for use with Tracheobronchial stents (519.1). Expansion of indications for use of pentamidine with added ICD-9 codes. Expansion of indications for use of mucolytics with added ICD-9 codes. New HCPCS E codes replace K codes. New HCPCS codes for inhaled corticosteroids. Revision of HCPCS code for albuterol to include levalbuterol and its proper billing unit.

04/01/2000 – Several K codes crosswalked to A codes or J codes. Added "reasonable and necessary" language in Coverage and Payment Rules section. Revised all references of previous K

codes.

06/01/1997 – Removed E0575 information in Documentation section. K0171 removed from covered codes for small volume nebulizer in Coverage and Payment Rules section. K0171 is not medically necessary for the administration of medications other than pentamidine.

03/01/1997 – Refer to article entitled "Nebulizer Policy Update" in the March 1997 DMERC Dialogue for a detailed report of the revision.


**Last Reviewed On**



**Related Documents**
**Article(s)**
A24944 - Nebulizers - Policy Article - Effective October 2005


**LCD Attachments**

There are no attachments for this LCD

**Article for Nebulizers - Policy Article - Effective October 2005 (A24944)**

## Contractor Information

**Contractor Name**

Tricenturion

**Contractor Number**

77011

**Contractor Type**

DMERC

## Article Information

**Article Database ID Number**

A24944

**Article Type**

Article

**Key Article**

Yes

**Article Title**

Nebulizers - Policy Article - Effective October 2005

**Primary Geographic Jurisdiction**

Connecticut
Delaware
Massachusetts
Maine
New Hampshire
New Jersey
New York - Entire State
Pennsylvania
Rhode Island
Vermont

**DMERC Region Article Covers**

Region A

**Original Article Effective Date**

04/01/2005

**Article Revision Effective Date**

10/01/2005

**Article Text**

**NON-MEDICAL NECESSITY COVERAGE AND PAYMENT RULES**

A large volume pneumatic nebulizer (E0580) and water or saline (A4217 or A7018) are not separately payable and should not be separately billed when used for patients with rented home oxygen equipment.

If a large volume nebulizer, related compressor/generator, and water or saline are used predominantly to provide room humidification it will be denied as noncovered.

Disposable large volume nebulizers (A7007 and A7008) are noncovered under the DME benefit because they are convenience items. A non-disposable unfilled nebulizer (A7017 or E0585) filled with water or saline (A4217 or A7018) by the patient/caregiver is an acceptable alternative.

Kits and concentrates for use in cleaning respiratory equipment will be denied as noncovered.

A 30-day dispensing fee (G0371) or a 90-day dispensing fee (G0374) will be paid in addition to payment for the drugs(s). The dispensing fee must be billed on the same claim as the dispensing inhalation drug(s) or it will be denied as incorrect billing.

Medicare will not pay for a separate fee for the compounding of inhalation drug(s).

**CODING GUIDELINES**

EQUIPMENT

In this policy, the actual equipment (i.e., electrical device) will generally be referred to as either a compressor (when nebulization of liquid is achieved by means of air flow) or as a generator (when nebulization of liquid is achieved by means of ultrasonic vibrations). The term nebulizer is generally used for the actual chamber in which the nebulization of liquid occurs and is an accessory to the equipment. The nebulizer is attached to an aerosol compressor or an ultrasonic generator in order to achieve a functioning delivery system for aerosol therapy.

Code E0565 describes an aerosol compressor, which can be set for pressures above 30 psi at a flow of 6-8 L/m and is capable of continuous operation.

A nebulizer with compressor (E0570) is an aerosol compressor, which delivers a fixed, low pressure and is used with a small volume nebulizer. It is only AC powered.

A portable compressor (E0571) is an aerosol compressor, which delivers a fixed, low pressure and is used with a small volume nebulizer. It must have battery or DC power capability and may have an AC power option.

A light duty adjustable pressure compressor (E0572) is a pneumatic aerosol compressor which can be set for pressures above 30 psi at a flow of 6-8 L/m, but is capable only of intermittent operation.

Code E0574 describes an ultrasonic/electronic generator used with a small volume chamber for medication delivery, which is capable only of intermittent operation.

Code E0575 describes a large volume ultrasonic nebulizer system which is used for medication and humidification delivery, and which is capable of continuous operation.

Code K0730 describes a controlled dose inhalation drug delivery sytem. Aerosol is delivered in pulses during the inspiration. The duration of each pulse is adapted according to the breathing pattern.

ACCESSORIES

Code A7003, A7005, and A7006 include the lid, jar, baffles, tubing, T-piece and mouthpiece. In

addition, code A7006 includes a filter.

Code A7004 includes only the lid, jar and baffles.

Code A7012 describes a device to collect water condensation, which is placed in line with the corrugated tubing, used with a large volume nebulizer.

Code E0585 is used when a heavy-duty aerosol compressor (E0565), durable bottle type large volume nebulizer (A7017), and immersion heater (E1372) are provided at the same time. If all three items are not provided initially, the separate codes for the components would be used for billing. Code A7017 is billed for a durable, bottle type nebulizer when it is used with a E0572 compressor or a separately billed E0565 compressor. Code A7017 would not be separately billed when an E0585 system was also being billed. Code E0580 (Nebulizer, durable, glass or autoclavable plastic, bottle type, for use with regulator or flow meter) describes the same piece of equipment as A7017, but should only be billed when this type of nebulizer is used with a beneficiary-owned oxygen system.

INHALATION DRUGS

The following instructions apply to claims billed using J codes. When claims are billed in NCPDP format using NDC numbers, different instructions may apply. Refer to the NCPDP Companion Document available through the CMS website.

Unit dose form of an inhalation drug or a combination of drugs is one in which the medication is dispensed to a patient (1) in a bottle/vial/ampule which contains the dose usually used for a single inhalation treatment, and (2) in a concentration which is dilute enough that it may be administered to a patient without adding any separate diluent.

Concentrated form of a drug used for inhalation is one in which the drug is dispensed to a patient in a concentration which requires that a separate diluent (usually saline) be added to the nebulizer when the drug is administered to a patient.

The coding of a unit dose form or a concentrated form of an inhalation drug is determined by the formulation of the drug as it is dispensed to the patient. For example, if a pharmacist takes a concentrated form of a single inhalation drug (e.g., 0.5% albuterol) and dilutes it to a ready-to-use concentration (e.g., 0.083% albuterol), which is then dispensed to the patient in a single-dose bottles/vials/ampules, the inhalation solution is billed as the unit dose form not the concentrated form.

The billing unit for inhalation drug codes varies. Suppliers must be sure that they use the correct billing unit or the code when calculating the number of units of service to enter on the claim,. The following is guidance on a few codes where errors are commonly seen:

- Code J7616 is used for manufactured combinations of albuterol and ipratropium (DuoNeb) and other similar products which contain 3.0 mg of albuterol sulfate (which is 2.5 mg of albuterol base) and 0.5 mg of ipratropium bromide in each unit dose vial. For these products, 1 unit of service of J7616 equals 2 unit dose vials.

- For code J7626 (budesonide, unit dose) bill one unit of service for each vial dispensed, regardless of whether a 0.25 mg vial or a 0.5 mg vial is dispensed.

The concentration of the drug in the dispensed solution can be converted to mg or gm as follows: A solution with a labeled concentration of 1% has ten (10) mg of drug in each milliliter (ml) of solution. Therefore, a 0.083% standard formulation albuterol solution has 0.83 mg of standard formulation albuterol in each ml of solution. Since albuterol 0.083% solution typically comes in a 3 ml vial/ampule, each vial/ampule contains 2.5mg of albuterol (3X.83 equals 2.5). If a pharmacist provides 120 ampules of 0.83% albuterol solution each containing 3 ml, the billed units of service

would be 300 (2.5 X120) units (1 unit equals 1 mg) of code J7613KO.

Pharmacists should note that the correct concentration figure must be used to determine the number of mg of drug dispensed. For example, if a pharmacist takes 0.5 ml of a concentrated 0.5% albuterol solution and dilutes it with 2.5 ml of saline to give a 3 ml unit dose solution which is dispensed to the patient, each vial contains 2.5 mg of albuterol (0.5 mg x 5.0 mg/ml equals 2.4 mg), not 15 mg (3 x 5.0).

Code J7616 may only be used when albuterol or ipratropium are provided in combination by a manufacturer or repackager in a vial with a single NDC number. DuoNeb is one example. Despite the narrative description of the code, J7616 must not be used for compounded inhalation solutions of these drugs. For compounded combination unit dose preparations and for situation in which these drugs are provided in separate unit dose vials, supplier should bill using code J7613 for albuterol, and J7644 for ipratropium with the appropriate modifier – KO, KP or KQ.

J7617 (Levalbuterol, up to 2.5 mg and Ipratropium bromide, up to 1 mg compounded inhalation solution, administered through DME) will be invalid for claims submission to the DMERC

When there is a single drug in a unit dose container, the KO modifier is added to the unit form code.

Except for code J7616 when two or more drugs are combined and dispensed to the patient in the same unit dose container, each of the drugs is billed using its unit dose form code. The KP modifier is added to only one of the unit dose form codes and the KQ modifier is added to the other unit dose code(s). When two or more drugs are combined, the use of the KP and KQ modifiers should result in a combination that yields the lowest Medicare allowance. There should be no separate billing for the saline diluent.

Whenever a unit dose form code is billed, it must have either a KO, KP or KQ modifier. (Exception: The KO, KP and KQ modifiers should not be used with code J7616 .) If a unit dose code does not have one of these modifiers, it will be denied as an invalid code. The KO, KP, and KQ modifiers are not used with the concentrated form codes.

When a drug is provided in a concentration which is dilute enough that it may be administered to the patient without adding any separate diluent and is dispensed in a multidose container, use J7699.

J7699 is used for metered dose sterile saline products that are used to dilute the concentrated form of inhalation drugs.

Code J7699 is also used for an inhalation drug administered by a nebulizer , which does not have a valid specific code. If two or more drugs are combined in the same unit dose container, bill specific codes when possible and the J7699 only for individual drugs which do not have a specific code. Claims for drugs that are incorrectly coded J7699 instead of the appropriate codes will be denied for invalid coding.

The dispensing fee covers all nebulizer drugs during the 30 days (G0371) or the 90 days (G0374) after the date of service of the dispensing fee – regardless of the number of drugs dispensed or the number of dispensing dates during that time, or the number of suppliers. If the dispensing fee is billed sooner than the interval specified by the last covered dispensing fee, it will be denied as not separately payable. For example, a 90 day fee (G0374 on 1/30/05 is covered and there is a subsequent claim for a 30 day fee (G0371) on 2/3/05; the dispensing fee on 2/3/05 will be denied as not separately payable.

Both a G0371 and a G0374 dispensing fee are not covered on the same date of service. If a supplier dispenses a 90 day supply of one drug and a 30 day supply of another drug on the same day, code G0374 (90 day fee) must be billed.

A dispensing fee is not separately billable or payable for saline, whether used as a diluent or for humidification therapy.

Suppliers should contact the Statistical Analysis Durable Medical Equipment Regional Carrier (SADMERC) for guidance on the correct coding of these items.

## Coverage Topic

Durable Medical Equipment
Prescription Drugs
Nebulizer

## Coding Information

**No Coding Information has been entered in this section of the article.**

## Other Information

### Revision History Explanation

Revision Effective Date: 10/01/2005
CODING GUIDELINES:
Added definition of K0730
Deleted KP/KQ modifier instructions for albuterol/ipratropium and albuterol/cromolyn.
Updated revised instructions regarding dispensing fee

Effective Date 04/01/2005
LMRP converted to LCD and Policy Article
NON-MEDICAL NECESSITY COVERAGE AND PAYMENT RULES
Added coverage statements relating to dispensing fees and compounding fees.
CODING GUIDELINES
Added statement about claims filed in NCPDP format.
Updated HCPCS codes. Added guidelines for dispensing fee for 30 and 90 days

### Related Documents

**LCD(s)**
L11499 - Nebulizers

# Attachment E

Alabama

Arkansas

Colorado

Florida

Georgia

Kentucky

Louisiana

Mississippi

New Mexico

North Carolina

Oklahoma

Puerto Rico

South Carolina

Tennessee

Texas

Virgin Islands

# SPRING

# 2005

# Region C DMERC
# *DMEPOS Supplier Manual*

**NOTE:** Should you have landed here as a result of
a search engine (or other) link, be advised that
these files contain material that is copyrighted by the
American Medical Association. You are forbidden to
download the files unless you read, agree to, and
abide by the provisions of the copyright statement.
Read the copyright statement now and you will be
linked back to here.

# Palmetto GBA



# Medicare
# Region C DMERC
## *DMEPOS Supplier Manual*



SPRING 2005

Greetings to Medicare Region C Suppliers of Durable Medical Equipment, Prosthetics, Orthotics and Supplies (DMEPOS).

Enclosed is a completely revised, up-to-date Region C *DMEPOS Supplier Manual*. It contains all of the current Medicare guidelines and medical policies from your durable medical equipment regional carrier (DMERC), Palmetto GBA.

We hope this new manual is easy for you to use. Each medical policy has its own chapter, and the page numbering is quite simple to follow. The three main manual sections contain relevant chapters of important topics affecting your Medicare services and billing.

This revised manual will surely become your main billing reference for Medicare claims, but please do not throw away your old supplier manual! Keep it as a reference tool because billing guidelines often depend on the date(s) of service. You will be glad to have a reference for those occasional questions concerning older claims and billing instructions.

When you receive future Region C *DMEPOS Supplier Manual* revisions, please save this CD to use as a reference tool for older claims and dates of service.

The information provided in this manual was current as of March 1, 2005. Any changes or new information superceding the information in this manual are provided in articles with publication dates after March 1, 2005 posted at www.PalmettoGBA.com under Providers/DMERC.

## MANUAL REVISION CHART

| SECTION | REPLACE & SAVE THESE PAGES | INSERT NEW PAGES (SPRING 2005) |
|---|---|---|
| Cover | WINTER 2004 | SPRING 2005 |
| Cover letter | WINTER 2004 | SPRING 2005 |
| Replacement Chart | WINTER 2004 | SPRING 2005 |
| Table of Contents | Table of Contents | Table of Contents |
| Chapter 5 - Claims Filing | 5.5 - 5.6, 5.21 | 5.5 - 5.6, 5.21 |
| Chapter 10 - Claim Payment | 10.1, 10.16 | 10.1, 10.16 |
| Chapter 12 - Medicare Secondary Payer | 12.4 - 12.6, 12.10 - 12.11, 12.14 | 12.4 - 12.6, 12.10 - 12.11, 12.14 |
| Chapter 13 - Multifunctional Team and Supplier Education | 13.2 - 13.4 | 13.2 - 13.4 |
| Chapter 14 - Appeals | 14.1 - 14.6 | 14.1 - 14.6 |
| Chapter 21 - Nebulizers | 21.1 - 21.16 | 21.1 - 21.20 |
| Chapter 24 - Commodes | 24.4 - 24.5 | 24.4 - 24.5 |
| Chapter 25 -Manual Wheelchair Base | 25.1 - 25.6 | 25.1 - 25.8 |
| Chapter 26 - Motorized/Power Wheelchair Base | 26.1 - 26.5 | 26.1 - 26.7 |
| Chapter 27 - Wheelchair Options and Accessories | 27.1 - 27.27 | 27.1 - 27.25 |
| Chapter 35 - Suction Pumps | 35.1 - 35.5 | 35.1 - 35.6 |
| Chapter 36 - External Infusion Pumps | 36.1 - 36.18 | 36.1 - 36.17 |
| Chapter 50 - Urological Supplies | 50.1 - 50.15 | 50.1 - 50.17 |
| Chapter 51 - Ankle-Foot/Knee-Ankle-Foot Orthotics | 51.1 - 51.21 | 51.1 - 51.20 |
| Chapter 53 - Lower Limb Prostheses | 53.1 - 53.18 | 53.1 - 53.23 |
| Chapter 56 - Facial Prostheses | 56.1 - 56.6 | 56.1 - 56.8 |
| Chapter 57 - Ostomy Supplies | 57.1 - 57.11 | 57.1 - 57.15 |
| Chapter 62 - Enteral Nutrition | 62.1 - 62.8 | 62.1 - 62.11 |
| Chapter 64 - Immunosuppressive Drugs | 64.1 - 64.8 | 64.1 - 64.9 |
| Chapter 65 - Oral Anticancer Drugs | 65.1 - 65.7 | 65.1 - 65.8 |
| Chapter 66 - Oral Antiemtic Drugs | 66.1 - 66.6 | 66.1 - 66.9 |
| Chapter 67 - High Frequency Chest Wall Oscillation | 67.1 - 67.3 | 67.1 - 67.5 |
| Chapter 71 - Wheelchair Seating | 71.1 - 71.23 | 71.1 - 71.22 |
| Chapter 72 - Wheelchair Seating | 72.1 - 72.7 | 72.1 - 72.6 |

# TABLE OF CONTENTS

## PART I: GENERAL INFORMATION

1: Beneficiary Eligibility and Supplier Responsibility .....1.1
2: Jurisdiction .............................................................2.1
3: National Supplier Clearinghouse ............................3.1
4: Statistical Analysis DMERC ..................................4.1
5: Claims Filing ........................................................5.1
6: Documentation Requirements ...............................6.1
7: Advance Beneficiary Notice ..................................7.1
8: Durable Medical Equipment ..................................8.1
9: Pricing .................................................................9.1

10: Claim Payment...................................................10.1
11: Medicare Assignment Agreement .......................11.1
12: Medicare as Secondary Payer ...........................12.1
13: Multifunctional Teams and Supplier Education ....13.1
14: Appeals Process................................................14.1
15: Fraud and Abuse...............................................15.1
16: Regionalization of Medical Policy.......................16.1
17: Internet Web Sites ............................................17.1

## PART II: MEDICAL POLICIES

18: Medical Policy...................................................18.1
19: Oxygen .............................................................19.1
20: Intrapulmonary Purcussive Ventilation Device
    (IPV) ................................................................20.1
21: Nebulizers .........................................................21.1
22: Canes and Crutches ..........................................22.1
23: Walkers .............................................................23.1
24: Commodes .........................................................24.1
25: Manual Wheelchair Base ....................................25.1
26: Motorized/Power Wheelchair Base......................26.1
27: Wheelchair Options/Accessories.........................27.1
28: Power Operated Vehicles (POVs) ........................28.1
29: Seat Lift Mechanisms ........................................29.1
30: Patient Lifts .......................................................30.1
31: Hospital Beds and Accessories...........................31.1
32: Pressure Reducing Support Surfaces, Group 1 ....32.1
33: Pressure Reducing Support Surfaces, Group 2 ....33.1
34: Pressure Reducing Support Surfaces, Group 3 ....34.1
35: Suction Pumps...................................................35.1
36: External Infusion Pumps.....................................36.1
37: Pneumatic Compression Devices (used for
    Lymphedema) ...................................................37.1
38: Home Blood Glucose Monitors ............................38.1
39: Continuous Positive Airway Pressure System
    (CPAP)..............................................................39.1
40: Respiratory Assist Device (RAD) ........................40.1
41: Transcutaneous Electrical Nerve Stimulators
    (TENS) ..............................................................41.1
42: Osteogenesis Stimulators ..................................42.1
43: Cold Therapy .....................................................43.1
44: Speech Generating Devices ...............................44.1

45: Home Dialysis Supplies and Equipment .............45.1
46: Epoetin Alpha (EPO) .........................................46.1
47: Eye Prosthesis ..................................................47.1
48: Refractive Lenses ..............................................48.1
49: External Breast Prostheses ................................49.1
50: Urological Supplies ...........................................50.1
51: Ankle-Foot/Knee-Ankle-Foot Orthotics................51.1
52: Spinal Orthoses, TLSO and LSO.........................52.1
53: Lower Limb Prostheses ......................................53.1
54: Therapeutic Shoes for Diabetics.........................54.1
55: Orthopedic Footwear .........................................55.1
56: Facial Prostheses ..............................................56.1
57: Ostomy Supplies ...............................................57.1
58: Surgical Dressings .............................................58.1
59: Negative Pressure Wound Therapy (NPWT) ........59.1
60: Tracheostomy Care Supplies..............................60.1
61: General Parenteral/Enteral Nutrition Therapy
    Information........................................................61.1
62: Enteral Nutrition ...............................................62.1
63: Parenteral Nutrition ...........................................63.1
64: Immunosuppressive Drugs..................................64.1
65: Oral Anticancer Drugs........................................65.1
66: Oral Antiemetic Drugs........................................66.1
67: High Frequency Chest Wall Oscillation Devices ...67.1
68: Mechanical In-Exsufflation Devices ....................68.1
69: Infrared Heating Pad Systems ............................69.1
70: Automatic External Defibrillators ........................70.1
71: Wheelchair Seating............................................71.1
72: Cervical Traction Devices ..................................72.1

## PART III: APPENDICES

73: Modifiers............................................................73.1
74: Certificates of Medical Necessity .......................74.1
75: Addresses & Telephone Numbers.......................75.1

A:  Master HCPCS List ...........................................A.1
B: Non-covered List.................................................B.1
Index ......................................................................Index 1

Pages Omitted

**NEBULIZER - POLICY ARTICLE**

| CONTRACTOR INFORMATION | |
|---|---|
| **Contractor Name** | Palmetto GBA |
| **Contractor Number** | 00885 |
| **Contractor Type** | DMERC |
| **ARTICLE INFORMATION** | |
| **Article Database ID Number** | A24623 |
| **Article Type** | Article |
| **Key Article** | Yes |
| **Article Title** | Nebulizers - Policy Article - Effective April 2005 |
| **Primary Geographic Jurisdiction** | AL, AR, CO, FL, GA, KY, LA, MS, NC, NM, OK, PR, SC, TN, TX, VI |
| **DMERC Region Article Covers** | Region C |
| **Original Article Effective Date** | 04/01/2005 |
| **Article Revision Effective Date** | |
| **Article Text** | **NON-MEDICAL NECESSITY COVERAGE AND PAYMENT RULES**<br><br>A large volume pneumatic nebulizer (E0580) and water or saline (A4217 or A7018) are not separately payable and should not be separately billed when used for patients with rented home oxygen equipment.<br><br>If a large volume nebulizer, related compressor/generator, and water or saline are used predominantly to provide room humidification it will be denied as noncovered.<br><br>Disposable large volume nebulizers (A7007 and A7008) are noncovered under the DME benefit because they are convenience items. A non-disposable unfilled nebulizer (A7017 or E0585) filled with water or saline (A4217 or A7018) by the patient/caregiver is an acceptable alternative.<br><br>Kits and concentrates for use in cleaning respiratory equipment will be denied as noncovered.<br><br>A 30-day dispensing fee (G0371) or a 90-day dispensing fee (G0374) will be paid in addition to payment for the drugs(s). The dispensing fee must be billed on the same claim as the dispensing inhalation drug(s) or it will be denied as incorrect billing.<br><br>Medicare will not pay for a separate fee for the compounding of inhalation drug(s).<br><br>**CODING GUIDELINES**<br><br>EQUIPMENT<br><br>In this policy, the actual equipment (i.e., electrical device) will generally be referred to as either a compressor (when nebulization of liquid is achieved by means of air flow) or as a generator (when nebulization of liquid is achieved by means of ultrasonic vibrations). The term nebulizer |

NEBULIZERS

is generally used for the actual chamber in which the nebulization of liquid occurs and is an accessory to the equipment. The nebulizer is attached to an aerosol compressor or an ultrasonic generator in order to achieve a functioning delivery system for aerosol therapy.

Code E0565 describes an aerosol compressor, which can be set for pressures above 30 psi at a flow of 6-8 L/m and is capable of continuous operation.

A nebulizer with compressor (E0570) is an aerosol compressor, which delivers a fixed, low pressure and is used with a small volume nebulizer. It is only AC powered.

A portable compressor (E0571) is an aerosol compressor, which delivers a fixed, low pressure and is used with a small volume nebulizer. It must have battery or DC power capability and may have an AC power option.

A light duty adjustable pressure compressor (E0572) is a pneumatic aerosol compressor which can be set for pressures above 30 psi at a flow of 6-8 L/m, but is capable only of intermittent operation.

Code E0574 describes an ultrasonic/electronic generator used with a small volume chamber for medication delivery, which is capable only of intermittent operation.

Code E0575 describes a large volume ultrasonic nebulizer system which is used for medication and humidification delivery, and which is capable of continuous operation.

ACCESSORIES

Code A7003, A7005, and A7006 include the lid, jar, baffles, tubing, T-piece and mouthpiece. In addition, code A7006 includes a filter.

Code A7004 includes only the lid, jar and baffles.

Code A7012 describes a device to collect water condensation, which is placed in line with the corrugated tubing, used with a large volume nebulizer.

Code E0585 is used when a heavy-duty aerosol compressor (E0565), durable bottle type large volume nebulizer (A7017), and immersion heater (E1372) are provided at the same time. If all three items are not provided initially, the separate codes for the components would be used for billing. Code A7017 is billed for a durable, bottle type nebulizer when it is used with a E0572 compressor or a separately billed E0565 compressor. Code A7017 would not be separately billed when an E0585 system was also being billed. Code E0580 (Nebulizer, durable, glass or autoclavable plastic, bottle type, for use with regulator or flow meter) describes the same piece of equipment as A7017, but should only be billed when this type of nebulizer is used with a beneficiary-owned oxygen system.

INHALATION DRUGS

The following instructions apply to claims billed using J codes. When claims are billed in NCPDP format using NDC numbers, different instructions may apply. Refer to the NCPDP Companion Document available through the CMS website.

Unit dose form of an inhalation drug or a combination of drugs is one in which the medication is dispensed to a patient (1) in a bottle/vial/ampule which contains the dose usually used for a single inhalation treatment, and (2) in a concentration which is dilute enough that it may be administered to a patient without adding any separate diluent.

Concentrated form of a drug used for inhalation is one in which the drug is dispensed to a patient in a concentration which requires that a separate diluent (usually saline) be added to the nebulizer when the drug is administered to a patient.

The coding of a unit dose form or a concentrated form of an inhalation drug is determined by the formulation of the drug as it is dispensed to the patient. For example, if a pharmacist takes a concentrated form of a single inhalation drug (e.g., 0.5% albuterol) and dilutes it to a ready-to-use concentration (e.g., 0.083% albuterol), which is then dispensed to the patient in a single-dose bottles/vials/ampules, the inhalation solution is billed as the unit dose form not the concentrated form.

The billing unit for inhalation drug codes varies. Suppliers must be sure that they use the correct billing unit or the code when calculating the number of units of service to enter on the claim,. The following is guidance on a few codes where errors are commonly seen:

- Code J7616 is used for manufactured combinations of albuterol and ipratropium (DuoNeb) and other similar products which contain 3.0 mg of albuterol sulfate (which is 2.5 mg of albuterol base) and 0.5 mg of ipratropium bromide in each unit dose vial. For these products, 1 unit of service of J7616 equals 2 unit dose vials.

- For code J7626 (budesonide, unit dose) bill one unit of service for each vial dispensed, regardless of whether a 0.25 mg vial or a 0.5 mg vial is dispensed.

The concentration of the drug in the dispensed solution can be converted to mg or gm as follows: A solution with a labeled concentration of 1% has ten (10) mg of drug in each milliliter (ml) of solution. Therefore, a 0.083% standard formulation albuterol solution has 0.83 mg of standard formulation albuterol in each ml of solution. Since albuterol 0.083% solution typically comes in a 3 ml vial/ampule, each vial/ampule contains 2.5mg of albuterol (3X.83 equals 2.5). If a pharmacist provides 120 ampules of 0.83% albuterol solution each containing 3 ml, the billed units of service would be 300 (2.5 X120) units (1 unit equals 1 mg) of code J7613KO.

Pharmacists should note that the correct concentration figure must be used to determine the number of mg of drug dispensed. For example, if a pharmacist takes 0.5 ml of a concentrated 0.5% albuterol solution and dilutes it with 2.5 ml of saline to give a 3 ml unit dose solution which is dispensed to the patient, each vial contains 2.5 mg of albuterol (0.5 mg x

5.0 mg/ml equals 2.4 mg), not 15 mg (3 x 5.0).

Code J7616 may only be used when albuterol or ipratropium are provided in combination by a manufacturer or repackager in a vial with a single NDC number. DuoNeb is one example. Despite the narrative description of the code, J7616 must not be used for compounded inhalation solutions of these drugs. For compounded combination unit dose preparations and for situation in which these drugs are provided in separate unit dose vials, supplier should bill using code J7613 for albuterol, and J7644 for ipratropium with the appropriate modifier – KO, KP or KQ.

J7617 (Levalbuterol, up to 2.5 mg and Ipratropium bromide, up to 1 mg compounded inhalation solution, administered through DME) will be invalid for claims submission to the DMERC

When there is a single drug in a unit dose container, the KO modifier is added to the unit form code.

Except for code J7616 when two or more drugs are combined and dispensed to the patient in the same unit dose container, each of the drugs is billed using its unit dose form code. The KP modifier is added to only one of the unit dose form codes and the KQ modifier is added to the other unit dose code(s). When two or more drugs are combined, the use of the KP and KQ modifiers should result in a combination that yields the lowest Medicare allowance.

Whenever a unit dose form code is billed, it must have either a KO, KP or KQ modifier. (Exception: The KO, KP and KQ modifiers should not be used with code J7616 .) If a unit dose code does not have one of these modifiers, it will be denied as an invalid code. The KO, KP, and KQ modifiers are not used with the concentrated form codes.

When billing unit dose solutions which combine two or more drugs in a single container, (except J7616), each drug must be listed on a separate claim line. For example, if a pharmacist compound 120 ampules of a solution containing a combination of 2.5 mg of albuterol (in the form of 3.0 mg of albuterol sulfate) and 0.5 mg of ipratropium in ach 3 ml ampule, the pharmacist would bill J7613KQ 300 units for the albuterol (2.5 x 120 doses equals 300) (1 unit equals 1 mg) and J7644 60 units for the ipratropium (0.5 mg x 120 doses equals 60) (1 unit equals 1 mg). (Reversing the KP and KQ modifiers would result in a higher Medicare allowance.) As another example, if a pharmacist provides 120 ampules of a solution containing a combination of 2.5 mg of albuterol and 20 mg of cromolyn in each 3 ml ampule, the pharmacist would bill J7613KQ 300 units for the albuterol (1 mg x 120 doses equal 120) (1 unit equals 1 mg) and J7631KP (unit dose cromolyn) 240 units (20 mg/amp) divided by 10 mg/unit x 120 equals 240) (1 unit equals 10 mg) for the cromolyn. There should be no separate billing for the saline diluent.

When a drug is provided in a concentration which is dilute enough that it may be administered to the patient without adding any separate diluent and is dispensed in a multidose container, use J7699.

J7699 is used for metered dose sterile saline products that are used to

| | dilute the concentrated form of inhalation drugs.

Code J7699 is also used for an inhalation drug administered by a nebulizer , which does not have a valid specific code. If two or more drugs are combined in the same unit dose container, bill specific codes when possible and the J7699 only for individual drugs which do not have a specific code. Claims for drugs that are incorrectly coded J7699 instead of the appropriate codes will be denied for invalid coding.

The dispensing fee covers all nebulizer drugs provided by the same supplier during the 30 days (G0371) or the 90 days (G0374) after the date of service of the dispensing fee – regardless of the number of drugs dispensed or the number of dispensing dates during that time. If the dispensing fee is billed sooner than the interval specified by the last covered dispensing fee, it will be denied as not separately payable. For example, a 90 day fee (G0374 on 1/30/05 is covered and there is a subsequent claim for a 30 day fee (G0371) on 2/3/05; the dispensing fee on 2/3/05 will be denied as not separately payable.

Both a G0371 and a G0374 dispensing fee are not covered on the same date of service. If a supplier dispenses a 90 day supply of one drug and a 30 day supply of another drug on the same day, code G0374 (90 day fee) must be billed.

A dispensing fee is not separately billable or payable for saline, whether used as a diluent or for humidification therapy.

Suppliers should contact the Statistical Analysis Durable Medical Equipment Regional Carrier (SADMERC) for guidance on the correct coding of these items. |
|---|---|
| **Coverage Topic** | Durable Medical Equipment<br>Prescription Drugs |

## CODING INFORMATION

No Coding Information has been entered in this section of the article.

## OTHER INFORMATION

| **Revision History Explanation** | Effective Date 04/01/2005<br>LMRP converted to LCD and Policy Article<br>NON-MEDICAL NECESSITY COVERAGE AND PAYMENT RULES<br>Added coverage statements relating to dispensing fees and compounding fees.<br>CODING GUIDELINES<br>Added statement about claims filed in NCPDP format.<br>Updated HCPCS codes. Added guidelines for dispensing fee for 30 and 90 days. |
|---|---|
| **Related Documents** | **LCD(s)**<br>L5007 - Nebulizers |

**NEBULIZERS**

**NEBULIZERS LCD**

| CONTRACTOR INFORMATION | |
|---|---|
| **Contractor Name** | Palmetto GBA |
| **Contractor Number** | 00885 |
| **Contractor Type** | DMERC |
| **LCD INFORMATION** | |
| **LCD Database ID Number** | L5007 |
| **LCD Title** | Nebulizers |
| **Contractor's Determination Number** | NEB.0405 |
| **AMA CPT/ADA CDT Copyright Statement** | CPT codes, descriptions and other data only are copyright 2004 American Medical Association (or such other date of publication of CPT). All Rights Reserved. Applicable FARS/DFARS Clauses Apply. Current Dental Terminology, (CDT) (including procedure codes, nomenclature, descriptors and other data contained therein) is copyright by the American Dental Association. © 2002, 2004 American Dental Association. All rights reserved. Applicable FARS/DFARS apply. |
| **CMS National Coverage Policy** | CMS Manual System, Pub. 100-3, Medicare National Coverage Determinations Manual, Chapter 1, Section 280.1 |
| **Primary Geographic Jurisdiction** | AL, AR, CO, FL, GA, KY, LA, MS, NC, NM, OK, PR, SC, TN, TX, VI |
| **Oversight Region** | Region VI |
| **CMS Consortium** | Southern |
| **DMERC Region Article Covers** | Region C |
| **Original Determination Effective Date** | For services performed on or after 04/01/1997 |
| **Original Determination Ending Date** | |
| **Revision Effective Date** | For services performed on or after 04/01/2005 |
| **Revision Ending Date** | |
| **Indications and Limitations of Coverage and/or Medical Necessity** | For any item to be covered by Medicare, it must 1) be eligible for a defined Medicare benefit category, 2) be reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member, and 3) meet all other applicable Medicare statutory and regulatory requirements. For the items addressed in this medical policy, the criteria for "reasonable and necessary" are defined by the following indications and limitations of coverage and/or medical necessity.

For an item to be covered by Medicare, a written signed and dated order must be received by the supplier before a claim is submitted to the DMERC. If the supplier bills for an item addressed in this policy without first receiving the completed order, the item will be denied as not medically necessary.

A small volume nebulizer (A7003, A7004, A7005) and related compressor (E0570, E0571) are covered when:

a) It is medically necessary to administer beta-adrenergics, anticholinergics, corticosteroids, and cromolyn for the management of obstructive pulmonary disease (ICD-9 diagnosis codes 491.0 - 508.9, or |

b) It is medically necessary to administer gentamicin, tobramycin, amikacin, or dornase alpha to a patient with cystic fibrosis (ICD-9 diagnosis code 277.02) or

c) It is medically necessary to administer tobramycin to a patient with brochiectasis (ICD-9 diagnosis code 494.0, 494.1, 748.61, 011.50-011.56) or

d) It is medically necessary to administer pentamidine to patients with HIV (ICD-9 diagnosis code 042), pneumocystosis (ICD-9 diagnosis code 136.3), and complications of organ transplants (ICD-9 diagnosis codes 996.80-996.89), or

e) It is medically necessary to administer mucolytics (other than dornase alpha) for persistent thick or tenacious pulmonary secretions (ICD-9 diagnosis codes 480.0-508.9, 786.4).

Use of inhalation drugs, other than those listed above, will be denied as not medically necessary.

If none of the drugs used with a nebulizer are covered, the nebulizer and its accessories/supplies will be denied as not medically necessary.

A large volume nebulizer (A7017), related compressor (E0565 or E0572), and water or saline (A4217or A7018) are covered when it is medically necessary to deliver humidity to a patient with thick, tenacious secretions, who has cystic fibrosis (ICD-9 diagnosis code 277.02), bronchiectasis (ICD-9 diagnosis code 494.0, 494.1, 011.50-011.56 or 748.61), a tracheostomy (ICD-9 diagnosis code V44.0 or V55.0), a tracheobronchial stent (ICD-9 diagnosis code 519.1). Combination code E0585 will be covered for the same indications.

An E0565 or E0572 compressor and filtered nebulizer (A7006) are also covered when it is medically necessary to administer pentamidine to patients with HIV (ICD-9 diagnosis code 042), pneumocystosis (ICD-9 diagnosis code 136.3) and complications of organ transplants (ICD-9 diagnosis codes 996.80-996.89).

Because there is no proven medical benefit to nebulizing particles to diameters smaller than achievable with a pneumatic model, when a small volume ultrasonic nebulizer (E0574) is ordered, it will be reimbursed at the least costly alternative of a pneumatic compressor (E0570).

Similarly, a large volume ultrasonic nebulizer (E0575) offers no proven clinical advantage over a pneumatic compressor. However, since code E0575 is in a different payment category than pneumatic compressors, payment for a least costly alternate cannot be made. Therefore, when an E0575 nebulizer is provided, it will be denied as not medically necessary as will any related accessories and supplies.

A battery-powered compressor (E0571) is rarely medically necessary. If this compressor is provided without accompanying documentation, which justifies its medical necessity, and the coverage criteria for code

E0570 are met, payment will be based on the allowance for the least costly medically acceptable alternative, E0570.

Other uses of compressors/generators will be considered individually on a case-by-case basis, to determine their medical necessity.

ACCESSORIES:

Accessories are separately payable if the related aerosol compressor and the individual accessories are medically necessary. The following table lists the compressor/generator, which is related to the accessories described. Other compressor/generator/accessory combinations are considered medically unnecessary.

| Compressor/Generator | Related Accessories |
|---|---|
| E0565 | **A4619, A7006, A7010, A7011, A7012, A7013, A7014, A7015, A7017, A7525, E1372** |
| E0570 | **A7003, A7004, A7005, A7006, A7013, A7015, A7525** |
| E0571 | **A7003, A7004, A7005, A7006, A7013, A7015, A7525** |
| E0572 | **A7006, A7014** |
| E0574 | **A7014, A7016** |
| E0585 | **A4619, A7006, A7010, A7011, A7012, A7013, A7014, A7015, A7525** |

This array of accessories represents all possible combinations but it may not be appropriate to bill any or all of them for one device.

The following table lists the usual maximum frequency of replacement for accessories. Claims for more than the usual maximum replacement amount must be supported by documentation in the patient's medical record, which must be available to the DMERC upon request.

| Accessory | Usual maximum replacement |
|---|---|
| A4619 | **One/month** |
| A7003 | **Two/month** |
| A7004 | **Two/month (in addition to A7003)** |
| A7005 | **One/6 months** |
| A7006 | **One/month** |
| A7010 | **One unit (100 ft.)/ 2 months** |
| A7011 | **One/year** |
| A7012 | **Two/month** |
| A7013 | **Two/month** |
| A7014 | **One/3 months** |
| A7015 | **One/month** |
| A7016 | **Two/year** |
| A7017 | **One/3 years** |
| A7525 | **One/month** |
| E1372 | **One/3 years** |

INHALATION DRUGS AND SOLUTIONS:

The following table represents the maximum milligrams/month of inhalation drugs that would be reasonably billed for each nebulizer drug.

Acetylcysteine: **(up to 74 grams/month)**
Albuterol: **(up to 465 mg/month)**
Atropine: **(up to 186 mg/month)**
Bitolterol: **(up to 434 mg/month)**
Cromolyn sodium: **(up to 2480 mg/month (248 units/month))**
Dornase alpha: **(up to 78 mg/month)**
Glycopyrrolate: **(up to 75 mg/month)**
Ipratropium bromide: **(up to 93 mg/month)**
Isoetharine: **(up to 930 mg/month)**
Isoproterenol: **(up to 450 mg/month)**
Levalbuterol: **(up to 232.5 mg/month (465 units/month))**
Metaproterenol: **(up to 2800 mg/month (280 units/month))**
Pentamidine: **(up to 300 mg/month**
Terbutaline: **(up to 186 mg/month)**
Sterile saline or water, up to 5cc/unit (J7051): **(up to 186 units/month)**
Distilled water, sterile water, or sterile saline in large volume nebulizer: **(up to 18 liters/month)**

Claims for more than these amounts of drugs will be denied as not medically necessary unless accompanied by documentation, which justifies a larger amount in the individual case. Therefore, claims for more than the usual maximum milligrams must be supported by documentation in the patient's medical record which must be available to the DMERC upon request.

The pharmacist is responsible for assessing how much inhalation solution a patient is actually using. Considering this information, the pharmacist is responsible for assuring that the patient has used almost all of his/her supply on hand prior to dispensing a new supply.

When a "concentrated form" of an inhalation drug is dispensed, separate saline solution (J7051 or J7699 [metered dose]) used to dilute it will be separately reimbursed. Saline dispensed for the dilution of concentrated nebulizer drugs must be billed on the same claim as the drug(s) being diluted. If the unit dose form of the drug is dispensed, separate saline solution (J7051 or J7699 [metered dose]), will be denied as not medically necessary. Water or saline in 500 or 1000 ml quantities (A4217 or A7018) are not appropriate for use by patients to dilute inhalation drugs and will therefore be denied as not medically necessary if used for this purpose. These codes are only medically necessary when used in a large volume nebulizer (A7017 or E0585).

Albuterol, levalbuterol, bitolterol, epinephrine, isoetharine, isoproterenol, metaproterenol, and terbutaline are all bronchodilators with beta-adrenergic stimulatory effect. It would rarely be medically necessary for a patient to be using more than one of these at a time. The use of more than one of these drugs at the same time will be denied as not medically necessary without documentation within the patient's medical records supporting the medical necessity.

**NEBULIZERS**

|  |  |
|---|---|
|  | Ipratropium bromide, atropine, and glycopyrrolate are all anticholinergics. It would rarely be medically necessary for a patient to be using any more than one of these at a time. The use of more than one of these drugs at the same time will be denied as not medically necessary without documentation within the patient's medical records supporting the medical necessity.

Charges for the drugs, diluent, and dispensing fees may only be billed by the entity that actually dispenses the drug to the Medicare beneficiary and that entity must be permitted under all applicable federal, state, and local laws and regulations to dispense drugs. Only entities licensed in the state where they are physically located may bill the DMERC for nebulizer drugs. Physicians may bill the DMERC for drugs if all of the following conditions are met: the physician is 1) enrolled as a DMEPOS supplier with the National Supplier Clearinghouse, and 2) dispensing the drug(s) to the Medicare beneficiary, and 3) authorized by the State to dispense drugs as part of the physician's license. Claims submitted by entities not licensed to dispense drugs will be denied for lack of medical necessity. |
| **Coverage Topic** | Durable Medical Equipment<br>Prescription Drugs |
| **CODING INFORMATION** | |
| **Type of Bill Code** | |
| **Revenue Codes** | |
| **CPT/HCPCS Codes** | **The appearance of a code in this section does not necessarily indicate coverage.**

**HCPCS MODIFIERS:**

**EY - No physician or other licensed health care providr order for this item or service**
**KO - Single drug unit dose formulation.**
**KP - First drug of a multiple drug unit dose formulation**
**KQ - Second or subsequent drug of a multiple drug unit dose formulation.**

**HCPCS CODES:**

**EQUIPMENT**

E0565  COMPRESSOR, AIR POWER SOURCE FOR EQUIPMENT WHICH IS NOT SELF- CONTAINED OR CYLINDER DRIVEN

E0570  NEBULIZER, WITH COMPRESSOR

E0571  AEROSOL COMPRESSOR, BATTERY POWERED, FOR USE WITH SMALL VOLUME NEBULIZER

E0572  AEROSOL COMPRESSOR, ADJUSTABLE PRESSURE, LIGHT DUTY FOR INTERMITTENT USE

E0574  ULTRASONIC/ELECTRONIC AEROSOL GENERATOR WITH SMALL VOLUME NEBULIZER |

WITH SMALL VOLUME NEBULIZER

E0575   NEBULIZER, ULTRASONIC, LARGE VOLUME

E0585   NEBULIZER, WITH COMPRESSOR AND HEATER

**ACCESSORIES**

A4619   FACE TENT

A7003   ADMINISTRATION SET, WITH SMALL VOLUME NONFILTERED PNEUMATIC NEBULIZER, DISPOSABLE

A7004   SMALL VOLUME NONFILTERED PNEUMATIC NEBULIZER, DISPOSABLE

A7005   ADMINISTRATION SET, WITH SMALL VOLUME NONFILTERED PNEUMATIC NEBULIZER, NON-DISPOSABLE

A7006   ADMINISTRATION SET, WITH SMALL VOLUME FILTERED PNEUMATIC NEBULIZER

A7007   LARGE VOLUME NEBULIZER, DISPOSABLE, UNFILLED, USED WITH AEROSOL COMPRESSOR

A7008   LARGE VOLUME NEBULIZER, DISPOSABLE, PREFILLED, USED WITH AEROSOL COMPRESSOR

A7009   RESERVOIR BOTTLE, NON-DISPOSABLE, USED WITH LARGE VOLUME ULTRASONIC NEBULIZER

A7010   CORRUGATED TUBING, DISPOSABLE, USED WITH LARGE VOLUME NEBULIZER, 100 FEET

A7011   CORRUGATED TUBING, NON-DISPOSABLE, USED WITH LARGE VOLUME NEBULIZER, 10 FEET

A7012   WATER COLLECTION DEVICE, USED WITH LARGE VOLUME NEBULIZER

A7013   FILTER, DISPOSABLE, USED WITH AEROSOL COMPRESSOR

A7014   FILTER, NONDISPOSABLE, USED WITH AEROSOL COMPRESSOR OR ULTRASONIC GENERATOR

A7015   AEROSOL MASK, USED WITH DME NEBULIZER

A7016   DOME AND MOUTHPIECE, USED WITH SMALL VOLUME ULTRASONIC NEBULIZER

A7017   NEBULIZER, DURABLE, GLASS OR AUTOCLAVABLE PLASTIC, BOTTLE TYPE, NOT USED WITH OXYGEN

A7525   TRACHEOSTOMY MASK, EACH

E0580   NEBULIZER, DURABLE, GLASS OR AUTOCLAVABLE PLASTIC, BOTTLE TYPE, FOR USE WITH REGULATOR OR FLOWMETER

E1372   IMMERSION EXTERNAL HEATER FOR NEBULIZER

**INHALATION DRUGS**

A4217   STERILE WATER/SALINE, 500 ML

A7018   WATER, DISTILLED, USED WITH LARGE VOLUME
NEBULIZER, 1000 ML

G0371   PHARMACY DISPENSING FEE FOR INHALATION
DRUG(S); PER 30 DAYS

G0374   PHARMACY DISPENSING FEE FOR INHALATION
DRUG(S); PER 90 DAYS

J2545   PENTAMIDINE ISETHIONATE, INHALATION
SOLUTION, PER 300 MG, ADMINISTERED THROUGH A
DME

J7051   STERILE SALINE OR WATER, UP TO 5 CC

J7608   ACETYLCYSTEINE, INHALATION SOLUTION
ADMINISTERED THROUGH DME, UNIT DOSE FORM,
PER GRAM

J7611   ALBUTEROL, INHALATION SOLUTION,
ADMINISTERED THROUGH DME, CONCENTRATED
FORM, 1 MG

J7612   LEVALBUTEROL, INHALATION SOLUTION,
ADMINISTERED THROUGH DME, CONCENTRATED
FORM, 0.5 MG

J7613   ALBUTEROL, INHALATION SOLUTION,
ADMINISTERED THROUGH DME, UNIT DOSE, 1 MG

J7614   LEVALBUTEROL, INHALATION SOLUTION,
ADMINISTERED THROUGH DME, UNIT DOSE, 0.5 MG

J7616   ALBUTEROL, UP TO 5 MG AND IPRATROPIUM
BROMIDE, UP TO 1 MG, COMPOUNDED INHALATION
SOLUTION, ADMINISTERED THROUGH DME

J7622   BECLOMETHASONE, INHALATION SOLUTION
ADMINISTERED THROUGH DME, UNIT DOSE FORM,
PER MILLIGRAM

J7624   BETAMETHASONE, INHALATION SOLUTION
ADMINISTERED THROUGH DME, UNIT DOSE FORM,
PER MILLIGRAM

J7626   BUDESONIDE INHALATION SOLUTION,
ADMINISTERED THROUGH DME, UNIT DOSE FORM,
0.25 TO 0.50 MG

J7628   BITOLTEROL MESYLATE, INHALATION SOLUTION
ADMINISTERED THROUGH DME, CONCENTRATED
FORM, PER MILLIGRAM

J7629   BITOLTEROL MESYLATE, INHALATION SOLUTION
ADMINISTERED THROUGH DME, UNIT DOSE FORM,
PER MILLIGRAM

| | |
|---|---|
| J7631 | CROMOLYN SODIUM, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER 10 MILLIGRAMS |
| J7633 | BUDESONIDE, INHALATION SOLUTION ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER 0.25 MILLIGRAM |
| J7635 | ATROPINE, INHALATION SOLUTION ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
| J7636 | ATROPINE, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7637 | DEXAMETHASONE, INHALATION SOLUTION ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
| J7638 | DEXAMETHASONE, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7639 | DORNASE ALPHA, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7641 | FLUNISOLIDE, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE, PER MILLIGRAM |
| J7642 | GLYCOPYRROLATE, INHALATION SOLUTION ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
| J7643 | GLYCOPYRROLATE, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7644 | IPRATROPIUM BROMIDE, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7648 | ISOETHARINE HCL, INHALATION SOLUTION ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
| J7649 | ISOETHARINE HCL, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7658 | ISOPROTERENOL HCL, INHALATION SOLUTION ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
| J7659 | ISOPROTERENOL HCL, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |

| | |
|---|---|
| | J7668   METAPROTERENOL SULFATE, INHALATION SOLUTION ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER 10 MILLIGRAMS |
| | J7669   METAPROTERENOL SULFATE, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER 10 MILLIGRAMS |
| | J7680   TERBUTALINE SULFATE, INHALATION SOLUTION ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
| | J7681   TERBUTALINE SULFATE, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| | J7682   TOBRAMYCIN, UNIT DOSE FORM, 300 MG, INHALATION SOLUTION, ADMINISTERED THROUGH DME |
| | J7683   TRIAMCINOLONE, INHALATION SOLUTION ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
| | J7684   TRIAMCINOLONE, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| | J7699   NOC DRUGS, INHALATION SOLUTION ADMINISTERED THROUGH DME |
| **ICD-9 Codes that Support Medical Necessity** | **The presence of an ICD-9 code listed in this section is not sufficient by itself to assure coverage. Refer to the section on "Indications and Limitations of Coverage and/or Medical Necessity" for other coverage criteria and payment information.**<br><br>**For HCPCS codes A4619, E0565, E0572:**<br><br>011.50 - 011.56<br><br>042      HUMAN IMMUNODEFICIENCY VIRUS (HIV) DISEASE<br><br>136.3    PNEUMOCYSTOSIS<br><br>277.00   CYSTIC FIBROSIS WITHOUT MECONIUM ILEUS<br><br>494.0    BRONCHIECTASIS WITHOUT ACUTE EXACERBATION<br><br>494.1    BRONCHIECTASIS WITH ACUTE EXACERBATION<br><br>519.1    OTHER DISEASES OF TRACHEA AND BRONCHUS NOT ELSEWHERE CLASSIFIED |

| 748.61 | CONGENITAL BRONCHIECTASIS |
|---|---|
| 996.80 - 996.89 | |
| V44.0 | TRACHEOSTOMY STATUS |
| V55.0 | ATTENTION TO TRACHEOSTOMY |

**For HCPCS codes A7013, A7014, A7015, A7525:**

| 011.50 - 011.56 | |
|---|---|
| 042 | HUMAN IMMUNODEFICIENCY VIRUS (HIV) DISEASE |
| 136.3 | PNEUMOCYSTOSIS |
| 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |
| 480.0 - 508.9 | |
| 519.1 | OTHER DISEASES OF TRACHEA AND BRONCHUS NOT ELSEWHERE CLASSIFIED |
| 748.61 | CONGENITAL BRONCHIECTASIS |
| 786.4 | ABNORMAL SPUTUM |
| 996.80 - 996.89 | |
| V44.0 | TRACHEOSTOMY STATUS |
| V55.0 | ATTENTION TO TRACHEOSTOMY |

**For HCPCS codes A7003, A7004, A7005, E0570, E0571, E0574:**

| 011.50 - 011.56 | |
|---|---|
| 042 | HUMAN IMMUNODEFICIENCY VIRUS (HIV) DISEASE |
| 136.3 | PNEUMOCYSTOSIS |
| 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |
| 480.0 - 508.9 | |
| 748.61 | CONGENITAL BRONCHIECTASIS |
| 786.4 | ABNORMAL SPUTUM |
| 996.80 - 996.89 | |

**For HCPCS codes A7006, J2545:**

| | | |
|---|---|---|
| 042 | HUMAN IMMUNODEFICIENCY VIRUS (HIV) DISEASE | |
| 136.3 | PNEUMOCYSTOSIS | |
| 996.80 - 996.89 | | |

**For HCPCS codes A4217, A7010, A7011, A7012, A7017, A7018, E0585, E1372:**

| | | |
|---|---|---|
| 011.50 - 011.56 | | |
| 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS | |
| 494.0 | BRONCHIECTASIS WITHOUT ACUTE EXACERBATION | |
| 494.1 | BRONCHIECTASIS WITH ACUTE EXACERBATION | |
| 519.1 | OTHER DISEASES OF TRACHEA AND BRONCHUS NOT ELSEWHERE CLASSIFIED | |
| 748.61 | CONGENITAL BRONCHIECTASIS | |
| V44.0 | TRACHEOSTOMY STATUS | |
| V55.0 | ATTENTION TO TRACHEOSTOMY | |

**For HCPCS code J7051:**

| | | |
|---|---|---|
| 042 | HUMAN IMMUNODEFICIENCY VIRUS (HIV) DISEASE | |
| 136.3 | PNEUMOCYSTOSIS | |
| 491.0 - 508.9 | | |
| 996.80 - 996.89 | | |

**For HCPCS codes J7608:**

| | | |
|---|---|---|
| 480.0 - 508.9 | | |
| 786.4 | ABNORMAL SPUTUM | |

**For HCPCS codes J7611, J7612, J7613, J7614, J7616, J7622, J7624, J7626, J7628, J7629, J7631, J7633, J7635, J7636, J7637, J7638, J7641, J7642, J7643, J7644, J7648, J7649, J7658, J7659, J7668, J7669, J7680, J7681, J7683, J7684:**

| | | |
|---|---|---|
| 491.0 - 508.9 | | |

**For HCPCS code J7639:**

| | | |
|---|---|---|
| 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS | |

**For HCPCS code J7682**

| | | |
|---|---|---|
| | 011.50 - 011.56 | |
| | 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |
| | 494.0 | BRONCHIECTASIS WITHOUT ACUTE EXACERBATION |
| | 494.1 | BRONCHIECTASIS WITH ACUTE EXACERBATION |
| | 748.61 | CONGENITAL BRONCHIECTASIS |
| **Diagnoses that Support Medical Necessity** | Refer to the previous section for the specific HCPCS code indicated. For all other HCPCS codes listed in the policy refer to the section on "Indications and Limitations of Coverage and/or Medical Necessity" for other criteria and payment information. | |
| **ICD-9 Codes that DO NOT Support Medical Necessity** | **For the specific HCPCS codes indicated above, all ICD-9 codes that are not specified in the previous section.**<br><br>**For HCPCS codes A7009 and E0575, all ICD-9 codes.**<br><br>**For all other HCPCS codes, ICD-9 codes are not specified.** | |
| **ICD-9 Codes that DO NOT Support Medical Necessity Asterisk Explanation** | | |
| **Diagnoses that DO NOT Support Medical Necessity** | For the specific HCPCS codes indicated above, all diagnoses that are not specified in the previous section.<br><br>For HCPCS codes A7009 and E0575, all diagnoses.<br><br>For all other HCPCS codes, diagnoses are not specified. | |
| **GENERAL INFORMATION** | | |
| **Documentation Requirements** | Section 1833(e) of the Social Security Act precludes payment to any provider of services unless "there has been furnished such information as may be necessary in order to determine the amounts due such provider" (42 U.S.C. section 13951(e)). It is expected that the patient's medical records will reflect the need for the care provided. The patient's medical records include the physician's office records, hospital records, nursing home records, home health agency records, records from other healthcare professionals and test reports. This documentation must be available to the DMERC upon request.<br><br>An order for each item billed must be signed and dated by the treating physician, kept on file by the supplier, and made available to the DMERC upon request. Items billed to the DMERC before a signed and dated order has been received by the supplier must be submitted with an EY modifier added to each affected HCPCS code.<br><br>The order for any drug must clearly specify the type of solution to be dispensed to the patient and the administration instructions for that solution. The type of solution is described by a combination of (a) the name of the drug and the concentration of the drug in the dispensed solution and the volume of solution in each container, or (b) the name of | |

|  | the drug and the number of milligrams/grams of drug in the dispensed solution and the volume of solution in that container. Examples of (a) would be: albuterol 0.083% 3 ml; or albuterol 0.5% 20 ml; or cromolyn 20 mg/2 ml. Examples of (b) would be: albuterol 1.25 mg in 3 ml saline; or albuterol 2.5 mg and cromolyn 20 mg in 3 ml saline. Administration instructions must specify the amount of solution and frequency of use. Examples would be: 3 ml qid and prn - max 6 doses/24 hr.; or one ampule q 4 hr prn; or 0.5 ml diluted with saline to 3.0 ml tid and prn. A new order is required if there is a change in the type of solution dispensed or the administration instructions. For all inhalation drugs, a new order is required at least every 12 months even if the prescription has not changed.<br><br>An ICD-9 code describing the condition which necessitates nebulizer therapy must be included on each claim for equipment, accessories, and/or drugs.<br><br>Situations which the medical record must specifically address include:<br><br>1) When billing for quantities of supplies greater than those described in the policy as the usual maximum amounts, there must be clear documentation in the patient's medical records corroborating the medical necessity of the current use.<br><br>2) If more than one beta-adrenergic or more than one anticholinergic inhalation drug is billed during the same month, there must be clear documentation in the patient's medical records corroborating the medical necessity of this current use.<br><br>When code E1399 is billed for miscellaneous equipment or accessories, the claim must be accompanied by a clear description of the item including the manufacturer, the model name/number if applicable, and the medical necessity of the item for that patient. When Not Otherwise Classified (NOC) drug code J7699 is billed for miscellaneous inhalation drugs, the claim must be accompanied by the detailed order information described above, a clear statement of the number of ampules/bottles of solution dispensed, and documentation of the medical necessity of the drug for that patient.<br><br>Refer to the Supplier Manual for more information on documentation requirements. |
|---|---|
| **Appendices** | |
| **Utilization Guidelines** | Refer to Indications and Limitations of Coverage and/or Medical Necessity. |
| **Sources of Information and Basis for Decision** | Reserved for future use. |
| **Advisory Committee Meeting Notes** | |
| **Start Date of Comment Period** | |
| **End Date of Comment Period** | |
| **Start Date of Notice Period** | 12/01/1996 |
| **Revision History Number** | NEB.003 |

| Revision History Explanation | Revision Effective Date: 04/01/2005<br>LMRP converted to LCD and Policy Article<br>HCPCS CODES & MODIFIERS:<br>Added Codes: J7611, J7612, J7613, J7614, J7616, G0371, G0374<br>Deleted Codes: J7618, J7619, J7621, E0590<br>INDICATIONS AND LIMITATIONS OF MEDICAL NECESSITY:<br>Tobramycin coverage expanded.<br><br><br>Revision Effective Date: 04/01/2004<br>HCPCS CODES AND MODIFIERS:<br>Added: A4217, A7525, J7621<br>Deleted: A4621, A7019, A7020<br>INDICATIONS AND LIMITATIONS:<br>Added references to new HCPCS codes.<br>CODING GUIDELINES:<br>Added references to new HCPCS codes.<br>Clarified use of J7699.<br>Added billing guidelines for J7621.<br>Removed billing guidelines for A4323.<br>Added correct coding guidelines for compounded albuterol and ipratropium.<br>Added instructions for billing metered dose sterile saline products.<br><br><br>Revision effective date: 04/01/2003<br>HCPCS CODES AND MODIFIERS:<br>Added: EY modifier, J7633<br>Revised: E0574, J7626<br>INDICATIONS AND LIMITATIONS OF COVERAGE:<br>Added standard language concerning coverage of items without an order.<br>Added standard language concerning the medical necessity for use of a greater quantity and combinations of usually contraindicated drugs requirement.<br>Removed language about physician documenting having considered use of an MDI prior to prescribing a nebulizer. Added pneumocystosis and complications of organ transplants as coverage criteria for E0565 or E0572 compressor used with filtered nebulizer (A7006).<br>Removed specific coverage criteria for dornase alpha, other than its being used for treatment of cystic fibrosis. Removed grandfathering language for aerosol compressors and small and large volume ultrasonic generators.<br>CODING GUIDELINES:<br>Added: Instructions on how to bill J7626 0.5mg as one unit of service.<br>Added definitions of equipment and inhalations drugs to this section of policy.<br>DOCUMENTATION REQUIREMENTS:<br>Added: Standard language concerning use of EY modifier for items without an order; standard language regarding excess quantity utilization;<br>Listed specific codes in which extra documentation should be attached to claim via hardcopy or narrative field<br><br>The revision dates listed below are the dates the revisions were |

| | |
|---|---|
| | published and not necessarily the effective dates for the revisions.<br><br>04/01/2002 - Expansion of coverage for large volume nebulizers with saline or water for use with Tracheobronchial stents (519.1). Expansion of indications for use of pentamidine with added ICD-9 codes. Expansion of indications for use of mucolytics with added ICD-9 codes. New HCPCS E codes replace K codes. New HCPCS codes for inhaled corticosteroids. Revision of HCPCS code for albuterol to include levalbuterol and its proper billing unit.<br><br>04/01/2000 – Several K codes crosswalked to A codes or J codes. Added "reasonable and necessary" language in Coverage and Payment Rules section. Revised all references of previous K codes.<br><br>06/01/1997 – Removed E0575 information in Documentation section. K0171 removed from covered codes for small volume nebulizer in Coverage and Payment Rules section. K0171 is not medically necessary for the administration of medications other than pentamidine.<br><br>03/01/1997 – Refer to article entitled "Nebulizer Policy Update" in the March 1997 DMERC Dialogue for a detailed report of the revision. |
| **Last Reviewed On** | |
| **Related Documents** | **Article(s)**<br>A24623 - Nebulizers - Policy Article - Effective April 2005 |
| **LCD Attachments** | There are no attachments for this LCD |

Pages Omitted