# Exhibit B

Duggan, Ph.D., Mark G.                          July 14, 2008
                    Washington, DC

                                                        Page 1

              UNITED STATES DISTRICT COURT

            FOR THE DISTRICT OF MASSACHUSETTS

      - - - - - - - - - - - - - - -

      IN RE:  PHARMACEUTICAL       )  MDL NO. 1456

      INDUSTRY AVERAGE WHOLESALE   )  CIVIL ACTION

      PRICE LITIGATION             )  01-CV-12257-PBS

      THIS DOCUMENT RELATES TO     )

      U.S. ex rel. Ven-a-Care of   )  Judge Patti B. Saris

      the Florida Keys, Inc.       )

           v.                      )  Chief Magistrate

      Abbott Laboratories, Inc.,   )  Judge Marianne B.

      No. 06-CV-11337-PBS          )  Bowler

      - - - - - - - - - - - - - - -

                               Volume I


         Videotaped deposition of MARK G. DUGGAN PH.D.




                    Washington, D.C.

                    Monday, July 14, 2008

                    9:00 a.m.

Duggan, Ph.D., Mark G. - Vol. II                    July 15, 2008

1  parameters that I set out to determine.
2      Q.   And do you know how it is that you have
3  claims data from some state Medicaid programs but not
4  others?
5      A.   At my direction Steck Consulting and
6  Patrick Ormond with the -- I guess technically with
7  DOJ or the U.S. Attorney's Office in Boston -- at my
8  direction they initiated conversations with states for
9  the acquisition of data.  Whether they started with
10 Illinois or Florida or New York, I'm not sure exactly.
11 But they made inquiries to states.  If I recall
12 correctly there were cases -- perhaps one.  And I may
13 be misremembering here -- in which when they contacted
14 a state the data might not be available.
15      So, for example, suppose they contacted
16 Vermont and perhaps Vermont did not have data going
17 back to 2001 or earlier.  That's just an example.  I
18 don't recall that specifically.  And so at my
19 direction they initiated these calls and acquired as
20 much data as they could from states.  And I believe
21 that one factor influencing whether or not data was
22 obtained was just the availability of data, whether

1  the state Medicaid agency or its contractor had the
2  data.  That I believe was one factor.
3      Q.   If you would go back to the notes on 294
4  that are in front of you -- I'm sorry.  Exhibit 1101
5  at Bates number ending 294 --
6      A.   The same page, right?
7      Q.   The same page.  Under Ohio -- is that
8  "Ohio" under the 1?
9      A.   O-H.
10     Q.   What do the 1, 2 and 3 mean next to those?
11     A.   Next to Ohio?
12     Q.   Well, no.  I'm sorry.  Next to all these
13 states.  There's a 3 next to California and a 1 next
14 to Illinois and a 2 next to Texas.  Would you
15 translate that for me?
16     A.   It's hard for me to recall.  With just
17 Illinois at 1 I would think perhaps is was Medicaid
18 spending for the complaint products.  Florida and
19 Illinois are pretty close.  But with Texas a 2, it
20 could be -- I just don't recall.  It could be where
21 things stood in terms of, you know, what my
22 understanding was, conversations, perhaps the greatest

1  progress had been made with Illinois, next-most with
2  Texas.  I'm not sure.  That's one possible thing, but
3  I'm certainly not sure that's the case.
4      Q.   What did you write next to Ohio?
5      A.   "Get" -- something -- "soon."  And I can't
6  read -- "get stuff soon"?
7      Q.   What does the paren say?
8      A.   I believe that says "compound drugs."
9      Q.   And what does that mean?
10     A.   I would want to go back because this may --
11 Ohio may have a specific definition of this.  So I
12 would -- this was written 17 months ago and this is
13 something -- it could be this represents when multiple
14 drugs are combined.  But once again, I would want to
15 go back and look at -- there's a lot -- I would want
16 to go back and look at my full binders and so forth.
17 It's not something -- it's not a term for which the
18 definition crisply leaps to mind.
19     Q.   Was it your understanding that the NDCs at
20 issue in the case were compound drugs?
21         MR. LAVINE:  Object to form.
22     A.   I am not certain what my understanding was

1  at this point 17 months ago.
2      Q.   As of today do you have an understanding
3  whether the NDCs at issue in this case are compound
4  drugs?
5      A.   It is my understanding that in some cases
6  the NDCs in this case represent part or all of a
7  compound drug.  But once again, that's something that
8  I would -- that's a pretty specific issue and it's
9  something that I would want to go back to and drill
10 down on some more to do justice to that.
11     Q.   And there's a note to the right, upper
12 right-hand corner.  Could you read that for us?
13     A.   "How drug is reimbursed when compounding."
14 And then -- keep reading?
15     Q.   Yeah.
16     A.   Underneath that "Is AWP used." Underneath
17 that, "If not then how paid."
18     Q.   And as you sit here today, do you have a
19 guess of why you wrote that?
20         MR. LAVINE:  Object to form.
21     A.   It's just hard to recall.  Once again, it's
22 notes from 17 months ago.  So it is as I outline in my

a580633e-555e-4e70-82e5-a331182efa1e