```
                 IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MASSACHUSETTS


        IN RE:                       )
                                     )  MDL No. 1456
        PHARMACEUTICAL INDUSTRY AVERAGE  )  CA No. 01-12257-PBS
        WHOLESALE PRICE LITIGATION    )
                                     )


        This Document Relates to:    )
        UNITED STATES, EX REL LINNETTE SUN)
        AND GREG HAMILTON, Relators  )
                V.                   )  CA No. 08-11200-PBS
        BAXTER HEMOGLOBIN THERAPEUTICS and)  Pages 1 - 29
        BAXTER INTERNATIONAL, INC.   )
```

```
                       MOTION HEARING

           BEFORE THE HONORABLE PATTI B. SARIS
                UNITED STATES DISTRICT JUDGE
```

```
                    United States District Court
                    1 Courthouse Way, Courtroom 19
                    Boston, Massachusetts
                    February 9, 2010, 3:35 p.m.
```

```
                       LEE A. MARZILLI
                    OFFICIAL COURT REPORTER
                 United States District Court
                 1 Courthouse Way, Room 7200
                      Boston, MA  02210
                       (617)345-6787
```

1   A P P E A R A N C E S:

2

3       MARK ALLEN KLEIMAN, ESQ., Law Offices of Mark Allen
    Kleiman, 2907 Stanford Avenue, Venice, California, 90292,
    for the Plaintiffs.

4

5       J. ANDREW JACKSON, ESQ. and RUCHI JAIN, ESQ.,
    Dickstein Shapiro, LLP, 1825 Eye Street, N.W., Washington,
    D.C., 20006-5403, for Baxter International, Inc., for the
6   Defendants.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2          THE CLERK:  In Re:  Pharmaceutical Industry Average

3    Wholesale Price Litigation, Civil Action 01-12257 and 08-11200,

4    will now be heard before this Court.  Will counsel please

5    identify themselves for the record.

6          MR. KLEIMAN:  Good afternoon, your Honor.  Mark

7    Kleiman appearing on behalf of the relators.

8          MR. JACKSON:  Good afternoon, your Honor.  Andy

9    Jackson on behalf of Baxter, and my colleague to my left is

10   Ruchi Jain.

11         THE COURT:  Well, welcome to AWP world.  So have any

12   of you ever appeared in this litigation?  You have.

13         MR. JACKSON:  Yes.

14         MR. KLEIMAN:  I have not, your Honor.

15         THE COURT:  All right.  So I've been doing this case

16   for a decade, which gives me some knowledge, but, then, every

17   case is different and every drug is different.  So I thought

18   maybe what I can do is start off with plaintiff.  I've read the

19   back-and-forth and back-and-forth, so I just want to understand

20   a few things.  What have you agreed needs to be dismissed?

21         MR. KLEIMAN:  Your Honor, we've agreed that some of

22   the state claims that I refer to in our original reply brief

23   need to be dismissed.

24         THE COURT:  Which ones are those?

25         MR. KLEIMAN:  Well, if the Court will give me a

8c366209-1806-4a66-ae84-4219cc85ffdc

1    second, I will find them.

2            THE COURT:  Well, there were four that you agreed flat

3    out.

4            MR. KLEIMAN:  Yes.

5            THE COURT:  And I took notes.  Utah, Arkansas, Texas,

6    and Nevada, does that sound right to you where you just agreed

7    flat out they needed to be dismissed?

8            MR. KLEIMAN:  It does, your Honor.

9            THE COURT:  But then Baxter argues -- and I didn't

10   want to look up the law -- that with respect to every other

11   one, you had to have some sort of a precomplaint disclosure.

12   Did you agree to that?

13           MR. KLEIMAN:  No, we did not, your Honor.  Some of the

14   statutes require a precomplaint disclosure, and some of the

15   states, it's the AG's practice to waive it if disclosure has

16   been made to the federal government.

17           THE COURT:  Yes, but how am I going to know that?  And

18   I'm not doing the research in thirty states.  So which are the

19   ones you agree require precomplaint disclosures?  Have you done

20   that work yet?

21           MR. KLEIMAN:  I have not.  I do know that California

22   does require a precomplaint disclosure.

23           THE COURT:  So that gets dismissed.

24           MR. KLEIMAN:  Yes.

25           THE COURT:  So this is what I want you to give me

1    afterwards.  Either, because I'm not doing the work -- I mean,

2    I've done ten years of this -- either you agree that the state

3    claim must be dismissed, or you give me a brief on why it

4    shouldn't.  And not that they usually waive it.  Unless I have

5    the waiver, it's gone, okay?  So it can be without prejudice,

6    but it's gone unless -- and so I'm sort of assuming -- let me

7    ask Baxter this.  You had some eager young associate who

8    actually looked -- I'm looking at her probably -- who actually

9    looked up all these state laws.  Is that so?

10             MR. JACKSON:  Yes, your Honor.

11             THE COURT:  She's nodding.  She was miserable.  She

12    did it.  So I am going to assume that there's at least some

13    research to back, is that true, for every state that was

14    mentioned?

15             MR. JACKSON:  Yes.  Yes, your Honor.

16             THE COURT:  So I'm going to likely dismiss all of

17    those state claims.  I just want to get through what's not a

18    problem.

19             MR. JACKSON:  Your Honor, I agree, and I was going to

20    tick through those very quickly.  We also have settled

21    California, Illinois, and Hawaii, in addition to those that the

22    relators have agreed we've settled and compromised.  So we

23    think for those states, that's a secondary reason why those

24    cases should be out.

25             THE COURT:  What I think probably makes the most sense

1    for me to do is just dismiss all the state claims without

2    prejudice, and you can bring them back if you get the waivers

3    or you -- well, if you get the waiver basically.

4            MR. KLEIMAN:  That will be cleaner, your Honor.

5            THE COURT:  Okay, all right, so we can just focus

6    on --

7            MR. JACKSON:  I had one more, your Honor, a quickie.

8            THE COURT:  All right, I'm sorry.

9            MR. JACKSON:  There was an agreement by the parties

10   that the Stark Act, Count II, should be dismissed for failure

11   to state a claim.  There's no standing for a relator to make

12   that claim.

13           THE COURT:  Yes, and let me just say this:  I will

14   dismiss that but without prejudice.  I know you don't want

15   leave to amend, but at least this is early in this baby's life.

16   So if they can amend it, I will let them amend it.  So I'm

17   dismissing the Stark claim.  I'm dismissing all state claims,

18   and all of these are without prejudice.

19           MR. JACKSON:  Your Honor, just --

20           THE COURT:  Let me just go through this because I

21   think -- now, there's only been one complaint, right?

22           MR. KLEIMAN:  Yes, your Honor.  These are the first.

23           THE COURT:  All right, so they're admitting that for

24   particularity purposes, two drugs have been pled with

25   particularity.  They're admitting that.  They have other

8c366209-1806-4a66-ae84-4219cc85ffdc

1   problems with it, but they, as I understand it, agree that

2   Recombinate and Advate have been pled with particularity, but

3   they say there are at least ten other drugs in there that are

4   just mentioned once.  And I didn't go through and actually read

5   them with each one in mind.  I read the beginning portion of

6   the complaint, but that does seem to be right.  So how do you

7   get past 9(b) on every single drug, other drug?

8           MR. KLEIMAN:  We would ask for leave to amend as to

9   the following drugs, for which we can provide the requested

10  information specifically, the stated average wholesale price

11  for the periods in question, the actual prices, and the amount

12  of the spread.  Those drugs, and because there are just six of

13  them, I'll mention them:  Bebulin, B-e-b-u-l-i-n, Feiba H,

14  F-e-i-b-a H, Hemophil M, H-e-m-o-p-h-i-l-M.  And we think we'll

15  be able to furnish the information for both Propelex,

16  P-r-o-p-e-l-e-x, and Propelex LT.

17          MR. JACKSON:  Your Honor, may I speak to that, please?

18          THE COURT:  Well, I'm just -- well, let me just say,

19  if it's only a question of whether they can plead the spread, I

20  will let them amend to plead the spread.  There's a bigger

21  issue, which is whether these people are original -- whether

22  they have been otherwise disclosed and whether these folks are

23  original sources, right?

24          MR. JACKSON:  Understood, your Honor, but I don't

25  believe they've pled Recombinate or Advate with adequate

1    specificity under Rule 9.

2           THE COURT:  You seem to say you did in one of the

3    multiple briefs I got on this issue.  You said, with the

4    exception of those two drugs, not a word has been said about

5    the other ones.

6           MR. JACKSON:  That much is true, not a word has been

7    said.  So all the rest of them that are in Paragraph 20 of the

8    complaint, nary another word is said about them.  I would ask

9    you to require or actually preclude them from amending their

10   complaint.  They filed a complaint.  They filed an amended

11   complaint.

12          THE COURT:  Oh, they've already filed an amended?  Am

13   I looking at the right thing?

14          MR. JACKSON:  They filed three pleadings now, and

15   we've deposed --

16          THE COURT:  Wait, wait.  They filed three complaints?

17          MR. KLEIMAN:  No, your Honor.

18          MR. JACKSON:  No, your Honor, no.  They filed a

19   complaint and an amended complaint.

20          THE COURT:  Yes.

21          MR. JACKSON:  Okay.  Then they've now filed at least

22   three pleadings in connection with our motion to dismiss, and I

23   have deposed the relators.  And I know all the information they

24   have, and they don't have any information regarding any of

25   those drugs.  Now, we'll talk a little bit about Recombinate

8c366209-1806-4a66-ae84-4219cc85ffdc

1   and Advate, but as to the other drugs --

2          THE COURT:  You're saying that the original sources

3   don't have any information about them?

4          MR. JACKSON:  Yes, your Honor, that's exactly right.

5          THE COURT:  Well, that may be, that may be.  They can

6   plead until they're blue in the face if they don't meet the

7   subject matter jurisdiction test.  So let's get to that because

8   that's the hardest issue here.

9          So at least according to the affidavits, let me just

10  say this, you've contested some of what they've said, but it

11  strikes me that Sun and Hamilton are original source, at least

12  with respect to something.  It may not give them all ten drugs,

13  especially Sun, or Soon.  Is she Chinese?  Soon, Sun?

14         MR. JACKSON:  I pronounced it Sun in her deposition,

15  and she didn't object to that.

16         THE COURT:  All right, so she worked there and she has

17  information about it, so at least -- you kept demeaning it, but

18  at least with respect to Advate, she knows something about it.

19         MR. JACKSON:  Well, I'm happy to address that, your

20  Honor.

21         THE COURT:  Yes, I think now is the time because I

22  understand there is some interesting questions about the new

23  AWP, like the "new black" or something, you know, and the

24  new -- but the reality is, she was there.  She has certain

25  pricing information.  She accused them of fraud.  She claims

1    she was fired.  It's in an affidavit.  I don't know how that

2    doesn't make her an original source, at least with respect to

3    that drug.

4         MR. JACKSON:  Well, because, your Honor, when she was

5    deposed about her testimony, she had no information.  So she

6    may have at one point been involved with some pricing analysis

7    regarding Advate.  She mentioned two drugs, Advate and Aralast.

8    Aralast, she provided no information in the complaint.

9         THE COURT:  Wait.  Is that one of the drugs here?

10        MR. JACKSON:  It is one of the drugs, your Honor, but

11   we think that, too, showed up in Paragraph 20 with no further

12   allegations, no AWPs, no real prices, nothing.  So we think

13   that should be eliminated on 9(b).

14        Now when you move to what she said, I understand what

15   her affidavit said.  Her affidavit I believe was purposely

16   vague because when I asked her very direct questions, your

17   Honor, she has no information.

18        THE COURT:  I know, but on subject matter

19   jurisdiction, I'm not going to have an evidentiary hearing.

20   She says one thing; you say another.  I don't know how --  I

21   mean, eventually, as in Rockwell, at trial, if it's disproved,

22   I throw it out.  But at least for that drug, she says she knows

23   something.

24        MR. JACKSON:  Except she doesn't, and that's the

25   point.  I really, you know --

1        THE COURT:  You say she doesn't, but what evidence do

2   you have of that?

3        MR. JACKSON:  Her testimony.

4        THE COURT:  Do I have the whole deposition?

5        MR. JACKSON:  I believe we gave you everywhere in our

6   final pleading where she spoke to that drug, and she has no

7   memory or mention of any specificity.  So, Judge, in the face

8   of that contradictory evidence, I think you do have adequate

9   information here to say, okay, you look at the affidavit, and

10  it says she was involved in pricing.  And, your Honor, I agree

11  with you that the in-house employee who's in a pricing

12  organization is the typical maybe relator who might have direct

13  and independent knowledge under Rockwell.  This one doesn't.

14  So when tested, she had no such information.  I kept asking her

15  for documents that she --

16       THE COURT:  Can I just back up on Advate.  It wasn't

17  even in existence till 2003, so it couldn't have been disclosed

18  in public disclosures, right?

19       MR. JACKSON:  Advate is not the subject of the public

20  disclosures by name.  Now, your Honor, I do believe that it is

21  appropriate to dismiss Advate because it's no different --

22  technically it is.  It is --

23       THE COURT:  I've ruled in the past, and you're sort of

24  stuck with this, but I go drug by drug, company by company.

25       MR. JACKSON:  I understand.  I understand that, your

Page 12

1   Honor.

2           THE COURT:  Since it came in in 2003, as I understand

3   it, there is no public disclosure of Advate.

4           MR. JACKSON:  That's correct, your Honor.

5           THE COURT:  So in and of itself, isn't that enough?

6           MR. JACKSON:  Except she wasn't around when it was

7   sold, so --

8           THE COURT:  It's irrelevant if there's no public

9   disclosure, right?

10          MR. JACKSON:  Well, no, I think it is, your Honor, and

11  this is precisely what I was going to.  So you've got someone

12  who purports to be a relator, who purports to have inside

13  information.

14          THE COURT:  No, but can we back up because I started

15  off unfortunately on her because Advate, you only need to be an

16  original source if it had been publicly disclosed; but since

17  there's no public disclosure of Advate anywhere, you don't need

18  the original source rule.

19          MR. JACKSON:  That's correct, your Honor.

20          THE COURT:  Then why would I dismiss it?

21          MR. JACKSON:  Because she hasn't pled it.  She hasn't

22  plea adequately under all --

23          THE COURT:  So that's your 9(b) argument, Advate.

24  When all is said and done, Advate turns into a 9(b) argument.

25          MR. JACKSON:  It is 9(b) plus, and the reason it's

1  "plus," Judge, is because I deposed her, and if you have a

2  chance to read those deposition sections, she starts out in her

3  declaration by saying, "Boy, I knew all about pricing," yet

4  doesn't.  So you are confronted with the issue of a relator who

5  says, "I've got inside information," but doesn't.

6          THE COURT:  This is a motion to dismiss --

7          MR. JACKSON:  It is, your Honor.

8          THE COURT:  -- for lack of subject matter

9  jurisdiction.  So I think Advate is in.  I have problems with a

10  lot of the other drugs, as I've made clear.

11          MR. JACKSON:  I understand.

12          THE COURT:  So, as I understand it, is she asserting

13  that she's an original source with all drugs?

14          MR. JACKSON:  She does, your Honor, but in deposition

15  she admitted to knowing about two.

16          THE COURT:  And the other one was the one you say

17  wasn't mentioned for 9(b) purposes.

18          MR. JACKSON:  Aralast and Advate, we've moved to

19  dismiss both on 9(b).  When asked at her deposition to fill in

20  the blanks regarding those two drugs, she could not.

21          THE COURT:  And in her deposition, does she claim any

22  knowledge with respect to the other ten drugs or so?

23          MR. JACKSON:  No specific knowledge whatsoever, your

24  Honor.

25          THE COURT:  Does Hamilton claim any knowledge with

1    respect to the other ten drugs?

2         MR. JACKSON:  Hamilton's knowledge is entirely

3    derivative, a telephone conversation with Kay Morgan at First

4    Databank, whom I think you've probably seen in this courtroom

5    maybe.  He never worked for Baxter.  The sole basis for his

6    allegations relate to one drug, Recombinate.  All of the

7    information that he received regarding that drug came from a

8    telephone conversation with Kay Morgan, a First Databank

9    representative, so --

10        THE COURT:  Is that the only drug he pretends -- not

11   pretends -- he says he has information as to?

12        MR. JACKSON:  Correct, your Honor.

13        THE COURT:  All right, so what really that legal

14   question boils down to is whether or not information from

15   another person is enough to be direct information.

16        MR. JACKSON:  Correct.

17        THE COURT:  But before I even get there, was

18   Recombinate expressly in any other complaint?

19        MR. JACKSON:  Yes.

20        THE COURT:  Which one?

21        MR. JACKSON:  The MCC, the Nevada complaint.

22        THE COURT:  Okay.  Okay, so Recombinate is only saved

23   if Hamilton is an original source?

24        MR. JACKSON:  Correct.

25        THE COURT:  Okay.  But he says he doesn't know

1    anything about all these other drugs?

2            MR. JACKSON:  Nothing.

3            THE COURT:  Okay.

4            MR. JACKSON:  Now --

5            THE COURT:  Okay, thank you.  As I understand it, I've

6    often had this problem with what's direct and independent

7    knowledge.  I know what "independent" means.  It means not

8    based on a public disclosure.  It's a whole lot less clear to

9    me what "direct" means.  You're taking the position it's got to

10   be non-hearsay.

11           MR. JACKSON:  Well, it's more than that, your Honor.

12   The First Circuit, and I forget which of the cases, recently

13   kind of had three little snippets on it.  It has to be direct.

14   It can't be derivative.  It can't be through a secondary source

15   or an "intermediary source" I believe is the language from the

16   First Circuit.  In fact it was in the West decision:

17   "Firsthand knowledge of the alleged fraud obtained through the

18   relator's own labor unmediated by anything else."  And Hamilton

19   could not be clearer or more direct that this all came from Kay

20   Morgan.

21           THE COURT:  But I'm not sure that's barred by that

22   language you just read.  I find that very difficult myself;

23   like, essentially, if you didn't perceive it with your eyes but

24   you heard it with your ears, somebody who was involved in it

25   telling you about it, I'm not sure whether that's direct.  It's

1    not so clear to me whether or not that's an admission that, you

2    know, would be admissible, whether that makes it direct.  But,

3    anyway, I know the legal question, so it's very narrow and

4    refined, so thank you.

5            Now, let me get to you for a minute.

6            MR. KLEIMAN:  Thank you, your Honor.

7            THE COURT:  These people don't know anything about

8    anything other than these three drugs, right?

9            MR. KLEIMAN:  That is not right.

10           THE COURT:  Okay.  Now, just understand, I've taken

11   this, just the fact that it's drug by drug, company by company;

12   so if you know there's a fraud for Activate, it does not

13   necessarily make you an original source for these other twelve,

14   whatever, ten drugs.

15           MR. KLEIMAN:  I agree, your Honor, and I recognize

16   that.  There's the threshold question of whether or not any of

17   the cases that were filed before this one had anything at all

18   to do with the fraud that is alleged here; specifically, that

19   knowing that First DataBank's hands were tied with respect to

20   how it would have to handle WAC information, First Databank

21   took --

22           THE COURT:  I know you're trying to claim there's a

23   new kind of AWP fraud, but as I read it -- I've been dealing

24   with these kind of claims for ten years:  What is WAC?  How

25   does it differ from direct price?  How does it differ from list

1   price?  What are you marking up by 1.25? -- it's not so new.

2   So let me just ask this question.  I mean, in a way, you both

3   suffer a little bit from my having done so many of these.

4        So is every single one of the other drugs mentioned in

5   some complaint?  Your answer is "yes"?

6        MR. JACKSON:  It is.

7        THE COURT:  Other than Activate and Recombinate?

8        MR. JACKSON:  Recombinate is also mentioned in other

9   complaints.  The only two drugs that are not mentioned in

10  preexisting complaints are Advate and Aralast.

11       THE COURT:  All right, so the question that I have is,

12  assume for a minute --

13       MR. JACKSON:  Your Honor, I apologize.  And Feiba.

14       THE COURT:  Feiba.  So if I find that there is no new

15  AWP fraud with respect to First Databank, which has been in my

16  cross-hairs now for a decade -- it's been all over these

17  pleadings, in this case, the McKesson case, for anyone who is

18  unfortunate enough to have to follow this litigation -- the

19  question is, that typically was what I'd call the AWP/WAC

20  fraud, which is a spread.  Are all of those -- you've also pled

21  what other kinds of fraud?  Was there --

22       MR. KLEIMAN:  Well, there's --

23       THE COURT:  You're hoping to plead best prices or

24  something?

25       MR. KLEIMAN:  Yes, although having looked at the

1    Nevada complaint, we're prepared to return to your Honor's

2    first question.  We're prepared to concede that the best price

3    allegations need to go as well.  The --

4          THE COURT:  So at the end of the day, you may be

5    left -- I'm just trying to think.  Intellectually speaking, I

6    may not need to get into the issue of what's original source or

7    not.

8          MR. KLEIMAN:  Well, I think with Recombinate the issue

9    is unavoidable, your Honor.

10         THE COURT:  Because it had been mentioned, but he

11   says -- so Recombinate is the one where you would say, "All

12   right, we concede for purposes of this argument it was

13   mentioned.  We think it's a new AWP fraud, but even if you

14   disagree with us, Judge, Hamilton is an original source," is

15   that right?

16         MR. KLEIMAN:  Yes, because of his discussions with Kay

17   Morgan.  If I may point out one further thing parenthetically

18   but one that I think is important.  In one of the early

19   decisions in the class action litigation, this Court had to

20   deal with sort of the obverse of that issue because the

21   defendants were objecting, and this is 307 F. Supp. 2nd, your

22   2004 decision on this.

23         THE COURT:  307 F. Supp. --

24         MR. KLEIMAN:  F. Supp. 2nd at 196.  Because in that

25   case, the plaintiffs for the putative class were relying on

1   surveys the Court found that had been conducted by unnamed

2   publishers showing that there was what they believed to be a

3   spread and improper pricing.  The Court found that the surveys

4   the plaintiffs were relying on had all been undertaken before

5   1992, and the reason that was important to the Court is that

6   the allegations in the complaint all concerned behavior that

7   had begun in 1991.  And just as a 1992 survey is not going to

8   support allegations about what had happened after that, we're

9   in a situation where a single remark made in earlier complaints

10  prior to 2000, or at least prior to May of 2000, can't really

11  support an effective bar of public disclosure because we're

12  talking about a different set of conduct.  And I would ask the

13  Court to, when it looks at this issue, look at that with --

14          THE COURT:  Which drug are we talking about now?

15  Which drug?

16          MR. KLEIMAN:  Recombinate.

17          THE COURT:  So it's only Recombinate?

18          MR. KLEIMAN:  Yes, your Honor.

19          THE COURT:  You're saying because there was only one

20  comment about it in one complaint?

21          MR. KLEIMAN:  Yes, your Honor.

22          THE COURT:  Is that the argument?

23          MR. KLEIMAN:  At least in one complaint that was

24  unsealed as of the time --

25          THE COURT:  And that was which one, the Nevada one?

1          MR. KLEIMAN:  Yes, that was in the Nevada complaint.

2          THE COURT:  But it doesn't matter, right, if he's an

3     original source?

4          MR. KLEIMAN:  I agree, it doesn't matter if he's an

5     original source.  I just wanted to address the threshold

6     question.

7          THE COURT:  I think I've got to say it's barred, don't

8     I, because if there's a public disclosure in litigation, unless

9     he's an original source?

10         MR. KLEIMAN:  Well, the question is, what is barred?

11    If what is barred is a fraudulent scheme that is alleged before

12    this new scheme could have come into being, is it barred as

13    to --

14         THE COURT:  But that's only assuming it's a new

15    scheme.

16         MR. KLEIMAN:  That's right.

17         THE COURT:  That somehow this First DataBank situation

18    renders it a new scheme, right?

19         MR. KLEIMAN:  That's right.

20         THE COURT:  So could you explain that more to me, why

21    it's suddenly a new scheme?  Since 2001 when the master

22    complaint was filed, they've been alleging that First DataBank

23    was publishing false prices.

24         MR. KLEIMAN:  Yes.

25         THE COURT:  And so your issue with 2000, the

1  Department of Justice, predates that.

2       MR. KLEIMAN:  It does predate that, but there's a

3  difference in the false prices and what was getting reported,

4  and this goes directly to what Hamilton learned, acknowledgedly

5  via hearsay from Kay Morgan.

6       What was happening was this, and this is where his

7  knowledge and Sun's knowledge dovetail:  What First DataBank

8  complained to and asked Hamilton about was why Baxter was only

9  saying to First DataBank, "We're not giving you our WAC, we're

10  not giving you any WAC information, we're just telling you our

11  list price is X."  This was something new.  It's one thing for

12  a drug company to falsely represent to First DataBank or

13  Red Book or anyone else, "Our AWP is $1.31," as an example.

14  It's another for them to say, "Our list price is X, $1.31.

15  That's all we're telling you about our list price because we

16  know that you're going to take that $1.31, multiply it by 1.25,

17  and calculate our AWP based on that because that's what you

18  have to do under this new consent decree."

19       So what we believe --

20       THE COURT:  But does that excuse -- I understand that

21  that's a fraud if you give them a list price that you know is

22  going to be used to turn into AWP.  No quarrel there.  I've

23  been doing that for ten years.  My concern is, that's what the

24  first case was about.  So if it actually mentioned false

25  reporting to First DataBank, which was then transformed, either

1   directly AWP or it was transformed from WAC into AWP, wasn't

2   that what the first case was about?

3          MR. KLEIMAN:  That was the origin of this, yes.

4   That's the genesis of this.  What's different in our case, and

5   the question for the Court is going to be whether it's

6   different enough -- we think it is, Baxter thinks it's not --

7   is whether --

8          THE COURT:  And what did Hamilton know about it?

9   Hamilton gets it from this Kay woman is what you're saying.

10          MR. KLEIMAN:  Correct.

11          THE COURT:  He finds out that they knowingly gave a

12   false list price, knowing that First DataBank would multiply it

13   by 1.25?

14          MR. KLEIMAN:  Yes.

15          THE COURT:  That's the gist of what you're saying is

16   the fraud?

17          MR. KLEIMAN:  Yes, it is.

18          THE COURT:  So --

19          MR. KLEIMAN:  And it is all derivative.  My colleague

20   is correct.  Everything he knows about that came from his

21   conversations with Kay Morgan with First DataBank.

22          THE COURT:  And have you found any cases which deal

23   with that issue, sort of as a borderline issue, which is, it's

24   not your own company, you haven't seen it yourself, you haven't

25   gotten the information yourself, but you're getting it from a

1   conversation with someone who is actually the perpetrator, or

2   at least has themselves firsthand information?  It's right in

3   the gray area.

4          MR. KLEIMAN:  It is acknowledgedly in a gray area, and

5   there are some cases in which the government has intervened

6   where it's not been an issue, and nobody's taken a shot at the

7   relator afterwards.  There are a series of cases called Health

8   Outcomes Technologies.  I'll furnish counsel and the Court with

9   the cites tomorrow morning.  But the issue regarding the

10  standing of the relator, which was a third-party data-mining

11  enterprise, as original source was not litigated in those

12  cases.  There is a case out of the Eleventh Circuit recently, I

13  think two or three years ago, that goes exactly the other way,

14  and it's U.S., Ex Rel Brickman v. Business Loan Center.

15         THE COURT:  So this is a separate issue.  That's when

16  you get it out of that expensive publication, right, whether

17  that's direct knowledge?

18         MR. KLEIMAN:  Yes.

19         THE COURT:  See, now, that strikes me as easier for

20  their side than actually talking to someone who admitted to a

21  fraud or admitted to knowing about a fraud or participating in

22  a fraud.  That's a different thing.

23         MR. JACKSON:  But that's not what happened, your

24  Honor.

25         THE COURT:  I thought Kay said --

1          MR. JACKSON:  All right, so Kay Morgan works for First

2     DataBank.

3          THE COURT:  Right.

4          MR. JACKSON:  And according to Mr. Hamilton's

5     testimony, she called him and said, "Jeez, why would Baxter do

6     X, Y, or Z?"  And they had a conversation.

7          THE COURT:  Yes, so she's --

8          MR. JACKSON:  But I think under this Court's O'Keefe

9     decision --

10          THE COURT:  Yes, but wait, wait.  But she then

11     publishes it.  Isn't she an aider and abetter of a fraud?

12          MR. JACKSON:  Well, I'm sure she would say "no"

13     because we would say there's no fraud.

14          THE COURT:  I mean, under their theory, I understand

15     that, but under their theory, Baxter reports a price that is

16     not a true list price under any definition.  Less than one

17     percent of the people pay it.  It's not an average.  It's under

18     any theory a phony list price.  Baxter knows that it's a phony

19     list price.  First DataBank is concerned because they know now

20     it's a phony list price, but nonetheless they multiply it by

21     1.25, and then use that as the basis for a rate of payment for

22     the federal government and the Medicaid.  So let's assume that

23     for a minute:  She knowingly publishes a price she knows to be

24     false, not she personally but the company does.  So is that

25     firsthand -- I mean, it's pretty close to firsthand

1    information.  Why not?

2              MR. JACKSON:  I don't think so, your Honor.

3              THE COURT:  Why?

4              MR. JACKSON:  Take a look at the O'Keefe decision.

5              THE COURT:  Isn't that mine?

6              MR. JACKSON:  Yes.

7              THE COURT:  Wasn't that that guy who was the

8    transportation specialist going -- the railway in the South and

9    he goes -- there were public --

10             MR. JACKSON:  He's doing his own research.

11             THE COURT:  He's doing his own personal research.  But

12   that's different from actually having someone say to you, "I

13   know that we're publishing phony prices."

14             MR. JACKSON:  Well, that's not what was said in our --

15             THE COURT:  I'll go look at it, but it's a pretty

16   different fact scenario.

17             MR. JACKSON:  And I would also direct your attention

18   to the Woonsocket case out of the First Circuit.

19             THE COURT:  What happened there?

20             MR. JACKSON:  That's where the First Circuit said a

21   relator who goes and does research from -- you know, he wasn't

22   direct, he wasn't the classic relator, insider working on

23   pricing -- that's not good enough.  And that makes sense,

24   Judge.  Remember, this is a very special, narrow exception to

25   normal standing law, and I believe Congress intended only those

1    insiders with direct information, as discussed in Rockwell, are

2    the kind of people that fit within the definition of relator,

3    and --

4              THE COURT:  Well, but in a way it's begging the

5    question, what's direct?  I find it difficult, so I don't

6    pretend to have the answer.  At one extreme, it's the insider

7    like Ms. Sun who was actually there looking at the pricing and

8    involved in the pricing.  The other extreme is my gentleman in

9    the O'Keefe case who was a public gadfly who went about doing

10   proactively his own research in public files and that sort of

11   thing.  And then we have something in between where he's

12   actually spoken to someone who divulged inside information

13   about the fraud, but he doesn't know it firsthand.  I mean,

14   that's sort of the in-between one.

15             MR. JACKSON:  And she's not part of Baxter either.

16             THE COURT:  Well, she knows what prices she's getting

17   from them.

18             MR. JACKSON:  Theoretically she knows what prices, so

19   I think it's even a step removed, your Honor.

20             THE COURT:  But I'm just saying, somewhere in that

21   spectrum in between, and I've got to figure out how close it

22   gets.  I don't think you have to meet the hearsay Rules of

23   Evidence necessarily to be direct.

24             MR. JACKSON:  Again, your Honor, it seems to me, based

25   upon the cases that have dealt with the issue, that it is this

1    derivative intervening event, and that's the intervening event,

2    someone else between Baxter and Mr. Hamilton.

3            THE COURT:  I find it hard.

4            So let me just summarize where we are at this point,

5    okay?  I find these things like Sudoku puzzles.

6            MR. JACKSON:  I hate them, so I don't know how to

7    pronounce them.

8            THE COURT:  Actually, I think they're good for

9    keeping -- don't they say it keeps your mind alive?  So we're

10   dismissing all states without prejudice, gone; dismissing all

11   drugs for which there are not specific allegations.  So that

12   essentially means, that leaves us with, the only specific

13   allegations are Advate and Recombinate, right?

14           MR. KLEIMAN:  Yes.

15           THE COURT:  With respect --

16           MR. JACKSON:  -ish, your Honor.  I don't think it's

17   adequate, but --

18           THE COURT:  -ish, okay, all right, I understand.  I'm

19   not saying you're conceding it, but at least we all agree that

20   with respect to the others, nothing is said, so they're all

21   dismissed without prejudice.

22           With respect to Advate, it was not, by concession,

23   reported in any of the earlier complaints or public news

24   reports, and so therefore the original source rule is

25   irrelevant, and likely 9(b) suffices, so likely there's going

Page 28

1    to be a complaint that's continuing on Advate.

2           Recombinate is wide open.  That's the one I need to

3    decide because that hinges -- there was a disclosure in the --

4    what did you tell me it was in?

5           MR. JACKSON:  It was in the MCC, your Honor.

6           THE COURT:  In the MCC.

7           MR. JACKSON:  As well as the Nevada.

8           THE COURT:  Nevada, or "Nevahda" as we say around

9    here.  So the only out for the plaintiffs, unless there's a new

10   AWP, the only out is whether or not Hamilton qualifies as an

11   original source, and I'm going to have to do some research on

12   really where in the spectrum one becomes direct.

13          Stark is out without prejudice, so that's Count 2.

14   The best prices are gone, right?

15          MR. KLEIMAN:  Right.

16          THE COURT:  With prejudice.

17          MR. KLEIMAN:  Right.

18          THE COURT:  Does this make sense?  So I've got one

19   thing to get back to you on.  And so while we're all here,

20   since Advate is likely to go forward, and that right now is the

21   only one I am at least relatively certain will go forward, the

22   question is, have you got a proposed discovery schedule for

23   Advate?

24          MR. KLEIMAN:  We don't, your Honor, although we could

25   certainly confer and get the Court one by next week.

1        THE COURT:  Why don't you just do that so you don't

2   have to come back here.

3        MR. JACKSON:  That's fine, great.

4        THE COURT:  Let me go off the record for a minute.

5        (Discussion off the record.)

6        THE COURT:  Thank you very much.  So the one open

7   piece here is Recombinate and the direct issue for us.

8        MR. JACKSON:  Well, obviously, your Honor, I'd like

9   you to go back and look at the 9(b) arguments.

10       THE COURT:  I will, but that's a little harder for you

11  because they actually mention prices and specifics and that

12  sort of thing.  On the other hand, with the other drugs, there

13  was nothing.  So thank you.  I hope I don't see you again, but

14  should I -- I'm sure I will -- you know, build in a regular

15  dispositive motion.  Whether it's summary judgment or motion to

16  dismiss I'll leave to you.  But otherwise I think we're at the

17  point where we sort of know where the rough points are, and if

18  you can't settle it, then I'll have to rule.  That would be

19  great.  Okay, thank you.

20       MR. KLEIMAN:  Thank you.

21       MR. JACKSON:  Thank you, your Honor.

22       (Adjourned, 4:18 p.m.)

23

24

25

1                    C E R T I F I C A T E

2

3

    UNITED STATES DISTRICT COURT )
4   DISTRICT OF MASSACHUSETTS    ) ss.
    CITY OF BOSTON               )
5

6

7           I, Lee A. Marzilli, Official Federal Court Reporter,

8   do hereby certify that the foregoing transcript, Pages 1

9   through 29 inclusive, was recorded by me stenographically at

10  the time and place aforesaid in Civil Action No. 01-12257-PBS,

11  In Re:  Pharmaceutical Industry Average Wholesale Price

12  Litigation, and thereafter by me reduced to typewriting and is

13  a true and accurate record of the proceedings.

14      In witness whereof I have hereunto set my hand this 7th

15  day of March, 2010.

16

17

18

19

20          /s/ Lee A. Marzilli

            _____
21          LEE A. MARZILLI, CRR
            OFFICIAL FEDERAL COURT REPORTER
22

23

24

25