**Exhibit B**

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS


CITIZENS FOR CONSUMER, et al . CIVIL ACTION NO. 01-12257-PBS
     Plaintiffs         .
                   .
       V.           . BOSTON, MASSACHUSETTS
                   . AUGUST 20, 2008
ABBOTT LABORATORIES, et al  .
     Defendants         .
. . . . . . . . . . . . . . . .

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE MARIANNE B. BOWLER
UNITED STATES MAGISTRATE JUDGE


APPEARANCES:

For the United States:     Ana Maria Martinez, Esquire
                         Justin Dracut, Esquire
                         United States Attorney's
                         Office
                         99 N.E. 4th Street
                         Miami, FL 33132
                         305-961-9000
                         Ana.Maria.Martinez@usdoj.gov


For Ven-A-Care:         Ken Bresnick, Esquire


For Abbott Labs.:       Jason Winchester, Esquire
                         Jones Day
                         77 West Wacker Drive
                         Chicago, IL 60601-1692
                         312-782-3939


For Schering:           Kim Nemirow, Esquire
                         John T. Montgomery, Esquire
                         Ropes & Gray LLP
                         One International Place
                         Boston, MA 02110
                         617-951-7565
                         jmontgomery@ropesgray.com


For the City of New York and

```
     New York Counties:        Joanne M. Cicala, Esquire
                               Kirby McInerncy & Squire
                               830 3rd Ave.
                               10th Floor
                               New York, NY 10022
                               212-371-6600
                               jcicala@kmslaw.com
```

Court Reporter:

Proceedings recorded by digital sound recording, transcript produced by transcription service.

*MARYANN V. YOUNG*
**Certified Court Transcriber**
**Wrentham, MA  02093**
**(508) 384-2003**

1                               <u>**I N D E X**</u>

2    Proceedings                                            3

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1                    P R O C E E D I N G S

2        COURT CALLED INTO SESSION

3            THE CLERK:  The Honorable Marianne B. Bowler

4   presiding.  Today is August 20, 2008.  The case of Abbott

5   Laboratories, et al v. Citizens for Consume, et al, Civil

6   Action No. 01-12257 will now be heard.  Would counsel please

7   identify themselves for the record?

8            MS. MARTINEZ:  Ana Marie Martinez on behalf of the

9   United States.

10           THE COURT:  Thank you.

11           MR. DRACUT:  Justin Dracut on behalf of the United

12   States.

13           MR. BRESNICK:  Good morning.  Kenneth Bresnick on

14   behalf of Ven-A-Care.

15           THE COURT:  Thank you.

16           UNIDENTIFIED:  We're here on the next case, Your

17   Honor.

18           THE COURT:  All right.

19           MR. WINCHESTER:  Good morning, Your Honor, Jason

20   Winchester for Abbott Laboratories.

21           THE COURT:  Anyone else?

22        PAUSE

23           THE COURT:  All right.  Well, I think Mr. Duffy has

24   conferred with you.  We will take the motions in the order in

25   which they were filed.  So we have seven motions to be dealt

4

1   with today and the first is 4711, Abbott's motion for

2   preservation order.

3           MR. WINCHESTER:  Thank you, Your Honor.  Again, Jason

4   Winchester for Abbott.  I'll try to be brief; I know Your Honor

5   has a number of things to consider today.  This is our motion

6   seeking direction from the Court to the government both as to

7   the federal Medicare side and the state Medicaid side to

8   preserve documents that are relevant to this case responsive to

9   our document requests and also to force them to produce a

10  declaration and a witness to tell us what documents that were

11  responsive they know of have been destroyed during the 12 year

12  course of this litigation.

13          As we've set forth in our papers, Your Honor, this

14  case as the Court is probably aware was originally filed

15  against Abbott under seal in 1995.  At that point we would

16  surely contend the government was aware of a reasonable

17  anticipation of litigation against us and yet the record is

18  very clear they did absolutely nothing to preserve documents

19  that would be relevant to this case.  In 2000, another critical

20  juncture in the case, the defendants collectively, or a number

21  of them, presented a white paper to the government that said

22  here are all the reasons why we think you ought not intervene

23  in these cases we believe are under investigation, setting out

24  in great detail what the Court now understands to be our

25  government knowledge defense.  And that white paper was

5

1   followed up immediately with a specific request to the

2   government saying you know a number of arguments that are being

3   made.  We believe you're on notice that there's reasonable

4   anticipation of litigation.  Please tell your agencies they

5   need to be preserving documents.  Even in light of those

6   requests specifically made to the government they did nothing.

7           2006 they unsealed this case against Abbott.  Still

8   no order of preservation was issued by the government to make

9   sure that documents relevant to this case were not being

10  destroyed.  In fact, nothing came from them until January of

11  2007 when there was apparently some sort of directive issued

12  relating to this case, but to date they've refused to tell us

13  what it is.  They've claimed a privilege to keep everything in

14  the dark on whatever they've done with respect to any directive

15  to preserve evidence.

16          We've set out in our papers what the standard here is

17  for Your Honor to enforce an order of preservation.  And that

18  is, is there a reason first for the Court to be concerned about

19  documents being destroyed?  And our papers and the record we

20  think speak for themselves on the fact that we have an 11-year

21  under seal investigation where the government was able to

22  conduct its one-sided discovery against us while at the same

23  time allowing all of its relevant documents to be destroyed,

24  grant it, we believe over the course of all of those years.

25          And even as to what they've done today, first of all

6

1 they won't tell us what they've done.  They're hiding it under

2 privilege.  But we know whatever they're doing isn't

3 sufficient.  As recently as yesterday the designee for the

4 state of Alaska Medicaid that said I am the guy, I have all the

5 documents, testified he's not aware about any directive at all

6 to preserve documents.  And we have that same sort of testimony

7 from a number of other states, Louisiana, Indiana, Michigan,

8 all of whom have said, yes, I'm the person who has the

9 documents and I'm not aware of any request from the government

10 that we preserve them.  And so they're not.  So whatever

11 they're doing it isn't enough.

12           The second factor the Court should consider is, is

13 there a likelihood of irreparable harm to us absent some order

14 of preservation?  The Court had an opportunity to consider this

15 very issue really in the Nevada case stemming from the MDL when

16 the issue came up about is there a prejudice to the defendants

17 if documents that the state maintains that would show any

18 knowledge of the state for instance about a difference between

19 AWP and actual acquisition cost.  And Your Honor said of course

20 there is.  And that is absolutely true in this case as well.

21 We're seeing time and time again, not through anything

22 nefarious we don't believe but everybody we're left to talk to

23 about the allegations to the government's complaint from CMS

24 tells us, look, that's 10 plus years ago, I just don't remember

25 and I don't have my documents to be able to refresh myself.  So

7

1  it is very important, very prejudicial to us if these

2  documents continue to be destroyed.

3          And the final factor for the Court's consideration is

4  the overall capability of the government to preserve, and I

5  don't think there's even been an argument that they don't have

6  the ability to preserve documents.  So what we'd ask from the

7  Court is an order directing them both as to the federal side

8  which we think should include the Department of Justice and the

9  Department of Health and Human Services to maintain documents

10 that are potentially relevant to this case.  And an easy way to

11 do that would be documents potentially responsive to the RFP as

12 we've served.  And the further to direct them to give us a

13 declaration that says here are the potentially responsive

14 documents that we know of.  There may be none.  But let's set

15 the record straight, here's what we know of that we used to

16 have and we don't have anymore cause we didn't preserve it,

17 and give us a witness to come in and talk about that so that we

18 can get our arms around what we think has been a decade plus

19 pattern of destroying relevant documents.

20          THE COURT:  Government, why shouldn't I grant this

21 motion?

22          MS. MARTINEZ:  Yes, Your Honor.  Well, a large part--

23          THE COURT:  Yes, I should?

24          MS. MARTINEZ:  No, Your Honor.  A large part of what

25 my brother has said is just simply not the facts.  A large part

8

1   of what he said ignores a large amount of discovery that has

2   taken place by Abbott.

3          THE COURT:  But where's the harm in granting this

4   order?

5          MS. MARTINEZ:  Oh, well I should tell you that the

6   standard has not been met because the order is not necessary.

7   There already is a preservation order in the case.  As you know

8   there is a CMO No. 2 that when the parties acknowledged to

9   preserve and the United States, CMS in particular has

10  preserved.  Really, Your Honor, if you allow me the facts that

11  he has just stated are completely incorrect.

12         THE COURT:  Well, I'll hear you--

13         MS. MARTINEZ:  On--

14         THE COURT:  --while you're on your feet.

15         MS. MARTINEZ:  Yes.  First of all, the defendant

16  Abbott has taken extensive discovery precisely on the issue of

17  preservation and collection of documents.  So in large part the

18  defendant Abbott, colleagues of Mr. Winchester, are aware of

19  many of the facts that Mr. Winchester has not stated to the

20  Court.  First of all, CMS has preserved from the outset.  First

21  of all because CMS is an agency that just simply has very

22  strong retention policies.  It's a federal agency that keeps

23  documents and what we have found through discovery is that they

24  even kept more documents that even their disposition schedules

25  would say.  They kept all of their rule making records, all of

9

1   their rule making support records and basically virtually

2   everything.

3         They also went, since as early as 1992, way before

4   even the whistle blower case was filed and certainly way before

5   the United States intervened in this case in 2006, since 1992

6   CMS has been expending a large amount of money making sure that

7   all claims records for Medicare have been maintained, never

8   destroyed.  In addition to that, they had a policy, as part of

9   their retention policies they had a policy with respect to

10  their employees to print their electronic records and they

11  maintain them and then subsequent to that, Your Honor, the

12  parties in the MDL, as you know the MDL started before the

13  United States joined.  The defendants in the MDL including

14  defendant Abbott served subpoenas on the Medicare contractors

15  as well as on CMS in 2003 and 2004.

16        At that time in addition to the fact that we had

17  already preserved documents because it was our routine to

18  preserve documents and like I said we kept even more than what

19  our retention schedules would allow, we, in addition issued

20  preservation notices for Medicare carriers in 2003.  And in

21  early 2004 throughout CMS for all the documents that were

22  requested not just by defendant Abbott but by all the

23  defendants in the MDL and, Your Honor, the request for produce

24  that were ultimately issued by Abbott to us later when the

25  United States intervened, substantially overlapped with those

10

1   third party subpoenas that we had received back then.  So our

2   preservation notices that were specific as to the documents in

3   this case and which in large part we thought were largely

4   irrelevant but nonetheless we went through specific,

5   nonetheless we went through specific efforts to make sure that

6   all the employees were aware that they needed to preserve

7   exactly that.  We circulated--

8            THE COURT:  Well then granting this motion shouldn't

9   seem very burdensome to you.

10           MS. MARTINEZ:  Well, Your Honor, let me go on cause

11  there's different things that the motion requests.  But to make

12  sure that the Court is aware, we circulated the subpoenas at

13  that time along with our preservation notices to our Medicare

14  contractors as well.  So – and I'm just making the point that

15  the contention that we didn't issue preservation notices or

16  that we didn't preserve is just simply wrong and has been –

17  Abbott knows this from depositions that Abbott has taken of

18  Rule 30(b)(6) witnesses of our side on preservation and

19  collection issues.  I mean, they've actually taken nine

20  specific depositions just on these topics including electronic

21  records, including the carriers, the Medicare contractors and

22  even more cause every witness that they actually questioned

23  they ask on this topic.  They're after again, Your Honor, after

24  we unsealed, we again issued preservation notices again in

25  January, in April and again later and we circulated them to our

11

1   Medicare contractors as well as to CMS.

2          A lot of what the motion requests actually was

3   already done prior to the motion having been filed and had they

4   just called us because they've never met and conferred with us

5   on this issue.

6          THE COURT:  Well, can we narrow the scope of this

7   with a meet and confer?

8          MR. WINCHESTER:  I don't know whether we could, Your

9   Honor.  I think we have been back and forth on this over the

10  course of very many months obviously and, you know, Your Honor,

11  I think has hit the nail on the head.  There is no harm.  There

12  is no prejudice from ordering this and the notion that they say

13  we've had discovery on it is just not true.  They claim

14  privilege.  The one issue, the one directive that they claim to

15  have issued related to this case they claim privilege over.

16  They will not let us see what their direction has been to

17  anyone to preserve documents responsive to this case.  The idea

18  we've had discovery on it is not borne out by the records.

19         The idea that they've been preserving is also not

20  borne out by anybody we're talking to because they gave us an

21  interrogatory response that listed 28 human beings that

22  supposedly have knowledge relevant to this case on

23  reimbursement policy and they have preserved the electronic

24  documents for precisely one of them.  And the leaders of this

25  agency that we sat down and talked to, Tom Sculley (ph), Mr.

12

1    Vladic (ph), all of whom have said their records when they

2    left the service were destroyed.  We have their IT person who

3    had sitting on her desk when this request came in, in 2000

4    please preserve documents.  She had Tom Sculley's laptop.  She

5    wiped it clean and put it back into service.  So the idea that

6    they've been preserving is not borne out.

7              MS. MARTINEZ:  Your Honor, if I may.  Our policy as

8    was indicated by the witness that I was present for the

9    deposition, Mr. Winchester was not, Maryann Bowen (ph), she

10   testified with respect to the specific electronic records of

11   the individuals that we identified in that interrogatory that

12   he just referred to and she explained that the policy of CMS

13   was to print the emails and that it was a very strong policy

14   because they had explained to the employees that the electronic

15   computers could fail at times so that when documents were

16   important they needed to be printed.  And of course they

17   printed them and we did produce them.

18             But, Your Honor, I know you're trying to focus--

19             THE COURT:  All right, here's what I'm going to do.

20   Since there has been no meet and confer I'm going to ask you to

21   take a recess on this motion right now.  Go out in the hallway;

22   see if you can narrow it at all.  I'll hear the next motion and

23   then I'll hear you after that.

24             MR. WINCHESTER:  Thank you, Judge.

25             THE COURT:  All right.  So we will move on to 4991

13

1  which is plaintiffs' motion to compel.

2       MR. CAVANAUGH:  Brian Cavanaugh on behalf of

3  defendant Boehringer Ingelheim Roxane.

4       MS. CICALA:  Good morning, Your Honor, Joanne Cicala

5  from Kirby McInerney on behalf of the City of New York and New

6  York Counties and MDL 1456.  With me is Aaron Hovan also from

7  Kirby McInerney.  Mr. Hovan will be handling this argument for

8  plaintiffs.

9       THE COURT:  All right.  I'll hear you.

10      MR. HOVAN:  Plaintiffs' motion concerns the fact that

11 defendants will not produce documents or data on those drugs

12 which were reimbursed on both AWP and FUL during the relevant

13 time period.  Plaintiffs' request, plaintiffs' motion, excuse

14 me, asks for production of documents and data for those drugs

15 reimbursed on AWP for only portions of the relevant time

16 period.  There's ample support for plaintiffs' position in CMO-

17 33, the operative case management order governing discovery,

18 paragraph four of the Court's July 30, 2007 order and

19 statements made by the Court and defense counsel on the July

20 26, 2007 oral argument on defendants motion to dismiss.

21      I'll briefly go into some background on New York's

22 reimbursement statute just to allow you to understand the

23 issue.  New York's Medicaid program reimburses based on FUL

24 when there's a FUL.  When there's not a FUL in effect, the

25 reimbursement is based on EAC which is the lower of AWP and

14

1    usual and customary.  The majority of the EAC based

2    reimbursement is made based on AWP minus a percentage which has

3    varied during the relevant time period.  This motion is solely

4    about those drugs that were reimbursed on AWP.  And we think

5    that the CMO, the July 30th order and the statements make it

6    very clear that drugs reimbursed based on AWP with a spread of

7    over 30% are subject to discovery and that's it.

8              THE COURT:  All right.  Why shouldn't I grant this

9    motion?

10             MR. CAVANAUGH:  Your Honor, I think we agree with the

11   counties on a couple of fundamental points.  The first is that

12   if one of the drugs at issue, and there are hundreds in this

13   particular case, one of the drugs at issue is subject to AWP

14   based reimbursement and only AWP based reimbursement during the

15   entire time period at issue and counties that alleged a spread

16   of 30% or greater for that drug discovery was to proceed.  And

17   we've produced our documents and data related to those drugs.

18             THE COURT:  So everything 30% plus.

19             MR. CAVANAUGH:  If reimbursement was solely based on

20   AWP.

21             We also are in fair agreement that reimbursement was

22   based solely on a federal upper limit.

23             THE COURT:  Okay, get to the disagreement.  That's

24   what I have to deal with.

25             MR. CAVANAUGH:  Sure.  The county's position is that

15

1  if there was a drug that was subject to a FUL that they should

2  be entitled to discovery for those weeks, days, months,

3  intermittent during that 1997 to 2005 time period where the

4  drug was not subject to a FUL but would have been reimbursed

5  based on AWP.  That's contrary to the Court's order and CMO-33

6  paragraph 5(b) simply says if the drug was subject to discovery

7  based on a FUL that discovery is stayed absent the targeted

8  drugs the parties were allowed to pick and there are nine of

9  them.  The order doesn't say anything about except for those

10 time periods where the FUL might have been suspended and

11 discontinued and reimbursement based on AWP.

12        Second, and the reason for that is the Court was

13 engaging in an effort to try to narrow this case to make it

14 more efficient and manageable both for the parties and for the

15 Court, and to allow this piecemeal discovery is real untenable.

16 It would require us to slice and dice data over that entire

17 time period and documents and what might turn out to be a

18 meaningless exercise.  We have FUL discovery on a large number

19 of drugs where there is no disagreement about how they were

20 reimbursed based on AWP, and we have targeted discovery based

21 on FUL.

22        Judge Saris allowed the counties an opportunity for

23 potential additional discovery down the line after the FUL

24 issues are decided and give the counties the opportunity to

25 present an expert affidavit where maybe some discovery on drugs

16

1   with spreads less than 30% would be allowed.  What the

2   counties are proposing is that we engage in some third

3   intermediate step where we're going to slice and dice all this

4   document and data to give them these little pieces.  And even

5   if the counties were correct, and we don't think they are in

6   their interpretation of Judge Saris' order, the problem we have

7   is if we were to identify, and they haven't done so, their

8   request is simply give us all the discovery and data and

9   documents you have on all the drugs listed in that exhibit to

10  the complaint.  They're only allowed discovery on, even under

11  their own theory, a small portion of that time.  They haven't

12  identified what time periods for what drugs they think they're

13  entitled to discovery for.

14          THE COURT:  All right, can we narrow it?

15          MR. HOVAN:  Yes, we can narrow it.

16          THE COURT:  Well once you--

17          MR. HOVAN:  And we offered to.  Production of the

18  data that counsel refers to is not difficult and we're more

19  than amendable to identifying the time periods and drugs at

20  issue.

21          MR. CAVANAUGH:  Okay.  That gets us to the second

22  half of Judge Saris' narrowing order, which is during those

23  time periods where reimbursements based on an AWP, they're only

24  entitled to proceed with discovery where the spread is alleged

25  to have been greater than 30%.  They've not provided that

17

1  information.  All they've provided is a time period that is

2  the whole 1997, 2005 including the period where FUL

3  reimbursement was in place.  We don't have any allegation

4  spread for those time periods that they say they're entitled to

5  discovery that would allow them to get past that second portion

6  of Judge Saris'--

7          THE COURT:  Well why haven't you provided that

8  information?

9          MR. HOVAN:  We provided an exhibit that was in

10  compliance with the judge's articulated particularity standard.

11  The standard called for a representative price and an AWP.  It

12  didn't speak of FUL.  What we provided was in a single time

13  period as defense counsel correctly notes an AAC, an average

14  acquisition cost, an AWP and a FUL.  We did not provide a

15  separate time period where there was an AAC and an AWP.  Again,

16  we are--

17          THE COURT:  And that's what you're looking for?

18          MR. CAVANAUGH:  I think that's what Judge Saris'

19  order requires if they're to proceed with discovery.  And to be

20  frank, Your Honor, this issue of getting piecemeal discovery

21  was never raised during the hearing and it's certainly not

22  addressed in the motion.  It wasn't until we received that

23  request we had any idea that the counties were going to be

24  seeking that kind of partial discovery for those drugs that are

25  clearly subject to a FUL.

18

1          THE COURT:  I think you have to provide that.

2          MR. HOVAN:  Providing the data is not an issue, Your

3    Honor, but I would like to tell you that it is not clear that

4    the issues were considered together.  There's a ruling that

5    clearly says drugs with AWP spreads of greater than 30% are in

6    the case and subject to discovery.  There's a separate

7    provision that lays out the expedited summary judgment

8    procedure for those drugs which are subject to FUL.  There's

9    nothing in any of the papers that considers the issue of drugs

10   which were subject to AWP during certain time periods and FUL

11   during other time periods.  But we are more than able and

12   willing to provide the data that counsel is describing.

13          MR. CAVANAUGH:  And we think it's not addressed in

14   the order because the orders clear on its face, and they're not

15   entitled to discovery on any drug subject to a FUL until the

16   FUL issues have been decided with the exception of those

17   designated FUL drugs.  And I quote from their memorandum page 2

18   where they say discovery is permitted for the time period of

19   1997 through 2005 on those NDC's in Exhibit B reimbursed based

20   on AWP where they've alleged a spread greater than 30%.  So

21   under their own theory they've got to make that special showing

22   even for those time periods where they think they're entitled

23   to discovery.  But, Your Honor, and really even if--

24          THE COURT:  How long will it take you to provide the

25   information?

19

1        MR. HOVAN:  We would ask for 10 days.

2        THE COURT:  All right.

3        MR. CAVANAUGH:  And I guess I would just say for the

4   record, Your Honor, that doesn't address our burden concern

5   which is this could be a completely meaningless exercise.  If

6   ultimately they prevail on the FUL issues, we're going to have

7   to give them FUL discovery on that entire time period.  To

8   force us to now go through data and parse it by days and weeks

9   and months and to go through a document and have to make a

10  decision of does this document relate to this week or this

11  month or this year, what about undated documents?  It's an

12  unnecessary exercise at this point.

13       MR. HOVAN:  And we would disagree.  We think that the

14  drugs that are subject to AWP reimbursement are very clearly in

15  the case and this is the AWP MDL and I have a hard time seeing

16  why production should not occur for those drugs.

17       MR. CAVANAUGH:  And to compare this to the class

18  trial which Judge Saris presided over, I mean in comparison to

19  13 or so drugs where we've provided discovery without question,

20  counties aren't here challenging it, on hundreds of NDC'S.  And

21  we're talking about another group which may be entitled to a

22  broader set of discovery down the line.  There's no reason to

23  do this now when we may have to repeat the exercise in several

24  months after Judge Saris addresses these issues.  I haven't

25  heard the county articulate any prejudice that they would

1    suffer by waiting some time period to get this discovery.

2              THE COURT:  Where's the prejudice?

3              MR. HOVAN:  The prejudice is just in the delay and in

4    the same way the defendants would have to slice and dice their

5    production we would have to do separate analysis of the data

6    that we could do all at once with one set of data.

7              THE COURT:  No.  Produce what you just identified

8    that you can produce within the 10 days and the motion is

9    denied at this time.  It can be renewed at a later date--

10             MR. CAVANAUGH:  Thank you, Your Honor.

11             THE COURT:  --but denied without prejudice at this

12   time.

13             MR. CAVANAUGH:  Thank you, Your Honor.

14             THE COURT:  All right.

15             MR. HOVAN:  Thank you, Your Honor.

16             THE COURT:  You're welcome.

17             Next is 5027.

18             MR. TOSCANO:  Good morning, Your Honor, I'm David

19   Toscano from Davis, Polk & Wardwell, on behalf of the

20   AstraZeneca defendants.

21             THE COURT:  All right.

22             MS. CICALA:  And once again, Your Honor, Joanne

23   Cicala for the city of New York and the New York Counties.

24             THE COURT:  I'll hear you.

25             MS. CICALA:  Thank you, Your Honor.  This particular

21

1  motion concerns plaintiffs' effort to receive complete

2  discovery on the drugs that have been designated as the FUL

3  drugs in this litigation.  Those drugs were designated in the

4  wake of the entry of CMO-33 which provided for an expedited

5  discovery process for a group of what turned out to be non

6  particular drugs that were subject to the FUL.

7          What the motion concerns is the fact that AstraZeneca

8  is alone among the defendants who manufactured the FUL

9  designated drugs.  In refusing to provide to plaintiffs data

10  relating to all NDC's for the drugs that have been identified

11  as FUL designated drugs, AstraZeneca has taken the position

12  that plaintiffs are not entitled to data for all NDC's

13  pertaining to these drugs.  Every other defendant involved in

14  this aspect of the litigation concerning the FUL summary

15  judgment project has produced data on every single NDC that

16  pertains to one of the FUL designated drugs at issue.  And

17  every other defendant has produced data on all those NDC's

18  whether those particular NDC's were identified otherwise in

19  plaintiff's complaint or not.  And that makes sense given the

20  nature of the FUL summary judgment project that is underway.

21          Given the manner in which the FULs were set by CMS

22  and given the essence of plaintiffs' activities on the FUL

23  drugs, it's essential for plaintiffs to be able to review all

24  of the sales and transactional data for all NDC's that may have

25  set the FUL.  And thus, plaintiffs must review the

22

1  transactional data for every single NDC related to a FUL

2  designated drug whether plaintiffs have pled a specific cause

3  pertaining to that NDC or not.  And it's for that very reason

4  that when Judge Saris entered CMO-33 she spoke not about

5  production of data and documents related to NDC's pertaining to

6  the FULs but rather data and documents pertaining to the FUL

7  drugs.  And as I stated, every other defendant involved in this

8  aspect of our case has acknowledged this and has provided

9  complete discovery.  AstraZeneca refuses too for reasons that

10  are set forth in our briefs and theirs.  I can rehearse those

11  again if the Court would find that helpful, but the short of it

12  is, Your Honor, we think these reasons are untenable.

13        AstraZeneca's position is preventing plaintiffs from

14  doing the work necessary to fully abet the FUL issue which

15  Judge Saris is deeply concerned about addressing properly as

16  are plaintiffs and defendants too I would suspect.  And so what

17  we're requesting by this motion is that AstraZeneca fulfill its

18  obligations under CMO-33 as all other defendants have done and

19  make immediate production of the data pertaining to all NDC's

20  related to the Albuterol product that is the designated FUL

21  drug.

22        THE COURT:  Well, why shouldn't I grant their motion?

23        MR. TOSCANO:  Your Honor, the dispute actually is a

24  little bit broader than that in that AstraZeneca is objecting

25  to producing data for any of the NDC's for Arm-A-Med albuterol

23

1    which is the AstraZeneca drug at issue because there is no

2    allegation of FUL fraud as to any of those NDC's.  The only

3    thing, the only exhibits that are shown in plaintiffs'

4    complaint say that FUL fraud is not pleaded against Arm-A-Med.

5    And in fact this motion to compel is highly irregular

6    procedurally in that first we got the motion to compel, then we

7    got the document requests relating to FUL fraud and then only

8    in their reply brief on the motion to compel did we get

9    specific allegations regarding Arm-A-Med.

10          I think there are two keys, two documents that are

11   key to denying their motion.  The first is Judge Saris' July

12   30, 2007 motion, order which I'm sure you're very familiar

13   with.  As to the expedited FUL discovery she specifically says

14   that plaintiffs must allege that defendants submitted false or

15   inflated published prices which if truthful would likely have

16   affected the FUL.  She goes on to say subsequently, plaintiffs

17   shall specifically make allegations with false published prices

18   on those 10 drugs there is a requirement of specific

19   allegations.  There are no specific allegations showing FUL

20   fraud in plaintiffs' papers until you get to their reply brief.

21          The second document that's key to denying their

22   motion is their reply brief.  On page two of their reply they

23   set forth the question at issue which is whether AstraZeneca's

24   alleged failures to report true prices to the publishing

25   compendia resulted in a false and inflated FUL.  And if you

24

1   look at Exhibit A to their reply brief you will see that the

2   specific allegations that they make relating to Arm-A-Med

3   establish that the Arm-A-Med prices and Arm-A-Med could not

4   have contributed to the establishment of the FUL and the reason

5   is as they allege, they allege an average actual acquisition

6   cost of $.69.  At the time the FUL was $.60.

7          The AAC was not only higher then two-thirds of the

8   FUL, which is what it would have to be - it would have to be

9   less than two-thirds of FUL to have an affect on the FUL.  Not

10  only is it higher than two-thirds of the FUL, it's higher than

11  the FUL itself.  Their own specific allegations which you don't

12  see until you get to the reply brief establish that Arm-A-Med

13  could not have caused an inflated FUL to be set.  Given that

14  lack of any connection between Arm-A-Med and their FUL fraud

15  theory there is no basis to seek discovery of Arm-A-Med.

16         THE COURT:  Where's the connection?

17         MS. CICALA:  Certainly, Your Honor.  The connection -

18  well, let's start here.  First of all, counsel is, has sort of

19  neatly fast forwarded to a summary judgment position here.  The

20  pricing data we have attached to our reply brief which

21  establishes once again as our Exhibit B does the unlawful

22  spread in connection with Arm-A-Med merely presents to the

23  Court to confirm the propriety of discovery as to AstraZeneca

24  for this particular drug.  What AstraZeneca's - here's the nub;

25  we don't yet have AstraZeneca's true prices for this drug

25

1  because they haven't produced the data to us.

2          We have no idea what those true prices will reveal.

3  We have no idea if those true prices will confirm what appears

4  to be fraudulent price reporting by AstraZeneca in respect to

5  this drug.  Nor do we have any idea if their true prices might

6  have impacted the FUL.  And I say this with knowledge now of

7  how CMS set the FUL which is, Your Honor, they looked at the

8  universe of published prices that were reported for all

9  defendants for the FUL drugs including the AWP.  So whatever

10  AstraZeneca's AWP was, whatever AstraZeneca reported as its AWP

11  is absolutely relevant because it was part of what CMS reviewed

12  when it considered the universe of published prices.

13          Plaintiffs are entitled to review AstraZeneca's

14  actual sales and transactional data to determine if the

15  reported prices by AstraZeneca were indeed accurate or not.  If

16  they were, there's no claim.  If they were not there may be a

17  claim.  The next step will be in the context of summary

18  judgment whether those reported, whether those true prices if

19  reported might have impacted the FUL.  That is a fact intensive

20  issue that will be explored on a FUL record.  To prevent

21  plaintiffs from access to the discovery that's needed to

22  develop that FUL record will prevent a FUL adjudication of this

23  critical issue.  And if counsel's representations prove to be

24  correct on a FUL record, then AstraZeneca indeed will face no

25  liability for its practices and their affect on the FUL.  But

26

1    we simply can't know that yet, we don't have the data.  And

2    there is indeed no prejudice to AstraZeneca in producing this

3    if all counsel has said is true.  Whereas to the contrary, if

4    plaintiff doesn't have this data it will not be able to present

5    Judge Saris with a FUL picture of the pricing data that CMS

6    should have been looking at when it established a FUL for this

7    particular drug.

8            MR. TOSCANO:  Your Honor--

9            THE COURT:  Two minutes.

10           MR. TOSCANO:  Your Honor, this is not a matter of

11   summary judgment.  This is a matter of fundamental failure to

12   plead and quite frankly of litigating backwards from a motion

13   to compel to allegations.  They have not come forward with the

14   allegations necessary and the – it's not a matter of my

15   representations.  We have put in publicly available data and we

16   have relied on plaintiffs own data that shows what the FUL is.

17   We're relying on their own allegations as to actual acquisition

18   cost.  If you take their allegations at face value there is no

19   relevance.  Even had AstraZeneca reported what plaintiffs

20   allege is the actual acquisition cost to CMS it would not have

21   affected the FUL.  There's no relevance to this discovery and

22   the motion should be denied.

23           THE COURT:  All right, I'll take it under advisement.

24   I'll give you a quick ruling, a margin ruling but I want to

25   give it just a little bit more thought.

27

1        MR. TOSCANO:  Thank you, Your Honor.

2        THE COURT:  All right, moving on to 5035.

3    PAUSE

4        THE COURT:  Do we have everyone?

5        UNIDENTIFIED:  Your Honor, I believe we would need

6   Mr. Winchester who is conferring.

7        THE COURT:  All right, and he's out in the hall?

8        UNIDENTIFIED:  He's conferring with the United

9   States, yes, Your Honor.

10       THE COURT:  Well, let's get – actually we can skip

11  over it and wait.

12       UNIDENTIFIED:  That's fine.  What about 5052?

13       MR. MONTGOMERY:  Good morning, Your Honor.

14       THE COURT:  Good morning.

15       MR. MONTGOMERY:  John Montgomery from Ropes & Gray

16  for the defendants in the New York counties case.  This is our

17  motion to compel the production of documents and the

18  depositions of three current or former employees of the New

19  York Department of Health.  While the plaintiffs here are the

20  New York counties, they profess to have no knowledge or control

21  over the administration of the reimbursement structure for the

22  program.  That's in the hands of the legislature and the

23  Department of Health.

24       What we are seeking here is discovery from the

25  Department of Health, the Medicaid administrator, of the sort,

28

1   Your Honor, that is so routine and so ingrained in these cases

2   that it's actually in our view embarrassing that you have two

3   or three inches of paper in front of you around an effort to

4   resist any discovery of the Department of Health.  The right to

5   discovery in these kinds of cases of the payor is so well

6   established that in the Ven-A-Care DOJ cases we went into the

7   list serve database and counted that there have been 54

8   depositions taken of current or former CMS or other federal

9   officials and those actions have been taken not only in the

10  cases pending in this court but in 20, by cross notice, in 20

11  state AG cases pending before Judge Saris and elsewhere.

12          Just last month in the DOJ cases Judge Saris ruled

13  from the bench, and I think there will eventually be a case

14  management order, that the DOJ cases implicate the interests of

15  all 50 states and that the plaintiffs, excuse me, the

16  defendants in those cases, just three companies, are entitled

17  to take at least two depositions in each of 50 states.  In the

18  Massachusetts, Montana and Nevada cases pending before Judge

19  Saris, as to each of which discovery is complete, there have

20  been dozens of depositions taken of state officials and of

21  course complete document discovery.

22          The question of the relevance of such discovery has

23  been raised by the plaintiffs here.  It's of course been raised

24  from time to time over the last seven years.  Such evidence is

25  plainly relevant to issues of intent to deceive to the

29

1    reasonableness of the reliance of state officials on prices

2    that were published for the drugs at issue relevant to issues

3    of causation and injury.  And then at various points in these

4    MDL proceedings over the years, Judge Saris has often commented

5    that at the very least whatever arguments might be made about

6    relevance to various elements of causes of actions this type of

7    discovery is plainly relevant to the statute of limitations

8    which as you know, Your Honor, has been an actively litigated

9    issue in a number of these cases and Judge Saris has rendered

10   decisions on the basis of statute of limitation.

11          Now, the essence of the New York counties and the

12   state's argument here is that they're somehow different than

13   everybody else, every payor in all of these cases.  And they're

14   different for a number of reasons.  They say that, gee, the

15   legislature set the rate, therefore, nothing that the

16   Department of Health as the Medicaid administrator knew or did

17   or communicated, either the legislature, the government, the

18   federal government, none of that could possibly be relevant.

19   To the extent that it's relevant they say you can just have

20   publicly available information and you have all of that anyway.

21          Now that argument has no merit and certainly that

22   argument was no impediment to the discovery of CMS and other

23   federal officials in the DOJ cases which involve not only

24   Medicaid but Medicare where the relevant rate was set by the

25   Congress of the United States.  But nevertheless, discovery of

30

1 those officials was not only relevant, Judge Saris has said

2 she was actively interested in hearing that evidence.

3 Certainly no impediment discovery to discovery in the states

4 that I've mentioned or no impediment last month when Judge

5 Saris said you could have discovery in all 50 states.  So there

6 just isn't a good faith argument, Your Honor, we submit that

7 could be made that discovery isn't not only permissible here

8 but actually required to permit the defendants to defend

9 themselves, to permit the Court to establish a complete record

10 on the basis of which they can decide these cases.

11         Now, there are other arguments that are made by the

12 counties in the state here regarding the purported significance

13 of a one-page decision rendered by a New York state court some

14 years ago in a state, in a case brought by the Attorney

15 General, then Attorney General Spitzer against Pharmacia.  That

16 case was decided on a basis which distinguishes it from any of

17 the cases at issue here because there are different causes of

18 action that are at play.  And in any event what the Court

19 decided in the so-called Pharmacia case was that in order for

20 the state to prevail the state had the burden of proof with

21 respect to all of the issues that might otherwise be the

22 subject of discovery and there was never, there was no need

23 therefore to prove anything with respect to the knowledge or

24 conduct of the state agency.  It was simply a matter as the

25 state had pled the case of what the legislature intended by

31

1   using the term AWP in the statute.  That is not the case in

2   these cases where the counties have pled among other things

3   common law fraud claims where plainly you have to show intent,

4   where plainly the reasonableness of the state's conduct is at

5   issue.

6          So the Pharmacia case just is of no significance

7   here.  Since that case was decided in any event other state

8   courts have taken a look at these issues.  They've all ruled

9   the state knowledge and conduct is relevant.  I can certainly

10  hand up these cases if they would be of interest to Your Honor.

11         The final argument that I can recall that's made here

12  is that there's some judicial estoppel that's at work here by

13  virtue of arguments that were made to Your Honor in the Montana

14  and Nevada cases related to the Pharmacia case.  I think if you

15  look at the papers, if you looked at the statements that were

16  made with respect to the Pharmacia case, you'll see that all

17  that occurred there was counsel simply distinguished the case.

18  There was no adoption of the case, no acceptance of its

19  reasoning and there's no inconsistent position being taken

20  here.

21         There's simply no reason, Your Honor, for you not to

22  grant this motion to compel.  Surely, if you do grant it we'll

23  have to have discussions with Ms. Cicala and her colleagues

24  about the document production, discussions of the sort that

25  we've had with many states regarding the scope of their

32

1  obligations.  We may have further disputes.  If we do, we know

2  where to find you.  But we do need guidance from the Court and

3  I think a clear directive that the New York counties and the

4  Department of Health in New York are no different than any

5  other payor release cases.

6          THE COURT:  Well, you want the documents first before

7  the depositions obviously.

8          MR. MONTGOMERY:  We want the documents first and then

9  we want the three depositions.

10          Thank you, You Honor.

11          THE COURT:  All right.

12          MS. CICALA:  Yes, Your Honor, Joanne Cicala once

13  again.  Also let me introduce, please, Shoshana Asnice (ph)

14  from the New York Attorney General's office who's joined – the

15  New York AG's office as you know has joined in plaintiffs cross

16  motion to quash and Ms. Asnice may address certain aspects of

17  this argument.

18          MS. ASNICE:  Good morning, Your Honor.  It's still

19  morning.

20          THE COURT:  Good morning.

21          MS. CICALA:  Responding if I may to defense counsel

22  on all of his points, New York is different, Your Honor, in the

23  manner in which the reimbursement formula is set, and defense

24  counsel themselves recog--

25          THE COURT:  Why shouldn't these three people be

33

1    deposed?

2            MS. CICALA:  Two are former employees, Your Honor,

3    long retired.  The subjects on which defendants seek to depose

4    them are overly broad and terribly burdensome, some of them not

5    in dispute in this case.  We think at bottom, Your Honor,

6    defendants' motion was entirely premature.  The discovery

7    requests, the subpoenas issued by defendants seek information

8    that is overly broad in numerous material ways.  First of all,

9    the subpoenas seek information dating back to 1978.  That is

10   far beyond the scope of permitted discovery in this case?

11           THE COURT:  Why do we have to go back so far?  Can we

12   limit that?

13           MR. MONTGOMERY:  Your Honor, there's one reason.  It

14   is because the rate at issue which was adopted by or set by the

15   legislature in 1994 was the same rate that had been in place

16   for some years under a consent decree negotiated by the

17   Department of Health with the pharmacists in the state of New

18   York.  It is the knowledge of those negotiations and the

19   conduct under that consent decree effectively then adopted by

20   the legislature going forward that's the, of interest to us.

21   It is vitally relevant.  We certainly recognize that that is a

22   long way, an unusually long way to go back.  That's the reason

23   we are not looking to turn the Department of Health inside out

24   with respect to this discovery but rather to focus on what

25   occurred between the pharmacists and the state and that's the

34

1   reason that we need to go back.

2          THE COURT:  Well, then it would seem to me if that is

3   the case you can narrow it.

4          MR. MONTGOMERY:  I don't think there would be any

5   difficulty narrowing the pre-1995 discovery.  We are interested

6   in the--

7          MS. CICALA:  1997.

8          MR. MONTGOMERY:  Conduct - excuse me, 1997.  We are

9   interested in the conduct of that litigation.  We are of course

10  interested in the knowledge and understanding of the state

11  officials who negotiated with the pharmacists.  We certainly

12  know what they did but we don't know what they understood.

13         THE COURT:  Well, I think as to anything between `78

14  and `95 it has to be very much narrowed.

15         MS. CICALA:  Your Honor, if I may, it's 1997.  I do

16  want the record to be very clear.  It's not 1995.  The

17  operative discovery time period in this case is 1997 through

18  2005.

19         THE COURT:  Okay.

20         MR. MONTGOMERY:  Right, but--

21         MS. CICALA:  On this--

22         THE COURT:  So `78 to `97.

23         MS. CICALA:  On this particular point, Your Honor, as

24  evidenced by defendants own papers, the public record

25  concerning what was understood and litigated between the

35

1    pharmacists and the state is ample, is rich.  Defendants can

2    make whatever arguments they seek to make regarding New York's

3    choices, the legislative choices, their knowledge and

4    understanding of prices based on this extremely ample record.

5    We – and this is a point that plaintiff and the New York AG

6    made to defendants prior to the filing of this motion.  Ms.

7    Nemirow's affidavit confirms the extensive, exhaustive record

8    already at defendants' disposal from which they are entitled to

9    make all the arguments that they can muster regarding

10   government knowledge.

11            THE COURT:  Well--

12            MS. CICALA:  It is difficult to imagine what further

13   discovery reaching this far back in time would elicit.

14   Moreover, as counsel acknowledges the reimbursement formula

15   that was put in place in `94 was set by the legislature, and

16   the legislature makes plain it's seeking to reimburse at

17   estimated acquisition cost and it's doing so by setting up a

18   structure of AWP minus a percentage.  Defendants again are free

19   to make whatever arguments they wish to make based on those

20   legislative choices and the information that's publicly

21   available leading up to that point in time.  There's simply

22   nothing more to be learned about those early years and the

23   recollections of anyone involved will certainly be dim and the

24   burden is extremely highly consider--

25            THE COURT:  Well, that's an assumption on your part.

36

1          MS. CICALA:  Fair enough, Your Honor, fair enough.

2   But the burden--

3          THE COURT:  One person at a time.

4          MS. ASNICE:  Sorry, Your Honor.

5          THE COURT:  Mr. Montgomery?

6          MR. MONTGOMERY:  Your Honor, though I would like not

7   to be called upon to prove what I'm about to say because it

8   would be burdensome for the Court, the record of every single

9   case in which we have done discovery of payors belies what Ms.

10  Cicala just told you.  There are lots of publicly available

11  documents from which we can draw inferences and we can make

12  arguments, but it is only from the actual documents and the

13  testimony of witnesses that we have been able to establish that

14  state officials actually understood this terminology.  They

15  actually understood that they were paying at a rate that

16  substantially exceeded the actual acquisition cost of these

17  drugs; that they did so purposely in order to secure a network

18  of participants, providers for their Medicaid program, that

19  they did so knowingly.  That kind of evidence not to mention

20  evidence of the communications they had with other principle

21  actors like the governor's office, like the legislature, those

22  are substantially important matters for us to inquire into and

23  we can't get there by drawing inferences from publicly

24  available information.

25          MS. CICALA:  On that point, Your Honor, it's for that

37

1   reason that defendants subpoenaed and took two days worth of

2   deposition testimony from the Pharmacists Society.  He was one

3   of the litigants in the case that counsel's referred to.  And

4   the testimony from the Pharmacists Society established what the

5   pharmacists had said to the state and what the state had said

6   in response.  So again, we've already been done this road.

7   We've heard from the pharmacists themselves directly what was

8   communicated to the state.  And then the state's understanding

9   is reflected in the state's affidavits, in the context of the

10  litigation, and the other publicly available record.

11          THE COURT:  Well, I'm going to ask you also to step

12  out, meet and confer and see – my inclination is to allow some

13  discovery on the `78 to `97 period and to allow the

14  depositions.  But I would like you to narrow the scope of the

15  document request for that period.

16          MR. MONTGOMERY:  And, Your Honor, they have--

17          THE COURT:  And I'm sure going back to `78, I'm sure

18  a lot of it's not in electronic form and may be harder to track

19  down, but I'm going to ask you if you can to at least agree to

20  certain categories and, if not, I'll decide for you but it's

21  always better when you can decide together.

22          MR. MONTGOMERY:  And, Your Honor, with respect to `97

23  forward they've also denied us any discovery with respect to

24  that period.

25          MS. CICALA:  And there, Your Honor, the documents

38

1   sought by defendants' subpoena fall into categories that can

2   be, that are undisputed, publicly available, resolvable by

3   stipulation, widely overbroad.  For example, defendants--

4          THE COURT:  Well anything that's publicly available

5   I'm not going to ask you to produce.  I mean that's--

6          MS. CICALA:  There are many document requests, Your

7   Honor, such as request for information concerning the Epic

8   program and the AMPS that were provided to Epic.  It's

9   burdensome for the state to produce responsive documents on

10  that subject.  We, plaintiffs, understand why defendants want

11  these materials.  These are issues that can be stipulated to.

12  There's been--

13         THE COURT:  Well, then--

14         MS. CICALA:  And we have offered--

15         THE COURT:  Okay--

16         MS. CICALA:  --we've offered this, Your Honor.

17         THE COURT:  Then draw up the stipulations and if your

18  brother agrees, fine, and if not you may have to produce

19  something.

20         MS. CICALA:  We would be very appreciative of the

21  opportunity to address many of their document requests in that

22  manner, Your Honor, rather than burdening the state.

23         THE COURT:  Okay.  Take a break, go out and see what

24  you can come up with to limit this, but be aware that my

25  inclination is to allow some production and to allow the

39

1   depositions.

2          MS. CICALA:  Thank you, Your Honor.

3          MS. ASNICE:  Your Honor, may I have a moment just

4   with respect to the depositions that were the subject of the

5   three subpoenas.  Two are former employees with the Department

6   of Health and one is a current employee.  In the meet and

7   confer process, which you were not made aware of, we did have

8   the two former employees review, as well as the current

9   employee, review the subpoenas.  Two, the two former employees,

10  one of whom I believe left the department before 1997 have no

11  recollection of these issues at all and that was in--

12         THE COURT:  And do you have that in affidavit form?

13         MS. ASNICE:  I can provide that in affidavit form.

14  It was a subject of a meet and confer.  So with respect to the

15  three that they've selected, they selected them for very

16  specific reasons.  At least two of them will be able to provide

17  an affidavit that they just have any knowledge that, and they

18  certainly have no documents with respect to any of these

19  subject areas, and so we'll certainly address that in this

20  further meet and confer process.

21         THE COURT:  All right, all right.  So discuss that.

22         MS. ASNICE:  Thank you, Your Honor.

23         THE COURT:  I'd hope the commissioner has some

24  memory.

25         All right, moving on to 5092.

40

1          MS. CICALA:  This involves us as well, Your Honor.

2   Should we - what perhaps--

3          THE COURT:  All right, what about 5296?

4          MR. MONTGOMERY:  That's a motion for a protective

5   order, Your Honor.  I'm arguing that as well and--

6          MS. CICALA:  We're involved in--

7          THE COURT:  Okay.  Well let's--

8          MR. MONTGOMERY:  But perhaps--

9          MS. CICALA:  May I may a suggestion.

10          MR. MONTGOMERY:  Maybe we--

11          THE COURT:  Do we have other team members?

12          MR. MONTGOMERY:  Yeah.  If they have other staff I'll

13   confer and they can continue.

14          THE COURT:  All right, fine.

15          MS. ASNIS:  I believe, Your Honor, though that a

16   representative of the counties is necessary for this meet and

17   confer for purposes of the stipulations that may or may not be

18   required are satisfactory.

19          MS. CICALA:  I agree.  Aaron Hovan can participate.

20   I--

21          THE COURT:  Okay, we'll take a 20 minute break.  I'll

22   be back at 12:20.

23          MS. CICALA:  Thank you, Your Honor.

24          MS. ASNIS:  Thank you, Your Honor.

25          MR. MONTGOMERY:  Thank you.

41

1                                RECESS

2              THE COURT:  Do we have a report?

3              MR. MONTGOMERY:  Your Honor, we conferred as you

4    suggested and subject to correction let me try to state where I

5    think we came out.  First, that it will be assumed or presumed

6    without prejudice to the state's right to raise the issue later

7    that this discovery is relevant.  That the state will make a

8    production of relevant documents to us as soon as reasonably

9    practical recognizing that there, you know, there is no easy

10   way to do this and that the state has resource limitations.

11   That after that good faith production that we will be permitted

12   to depose Mr. Butt in his capacity as both commissioner and as

13   a 30(b)(6) witness on all of the topics that we have

14   designated.  That the state and the counties will offer to us

15   proposed stipulations to limit the necessity to produce

16   documents that they consider to be particularly burdensome.

17   That we will meet and confer with respect to those

18   stipulations.  That we will defer the depositions of the other

19   two deponents until such time as we've had an actual chance to

20   review the documents.  It's certainly the defendants view that-

21   -

22             THE COURT:  What about affidavits from them?  Do you

23   want affidavits from them?

24             MR. MONTGOMERY:  Well, we would certainly like to

25   see, we would like a representation as to what the state has

42

1    done.  We do not find the assertion that they don't remember

2    any of the topics to be sufficient.  We think that after we get

3    the documents if there's a particularly rich record that we're

4    entitled to try to refresh their recollections.  But we are

5    agreed I think that we can defer until after we've seen the

6    documents and after the state has told us more about what we

7    can or cannot expect from those two witnesses.

8            We have agreed that--

9            THE COURT:  Do you want the commissioner before you

10   get documents?

11           MR. MONTGOMERY:  No.

12           THE COURT:  No.

13           MR. MONTGOMERY:  After.

14           THE COURT:  After, okay.

15           MR. MONTGOMERY:  We've agreed, you know, if it's

16   acceptable to Your Honor that the state and the counties will

17   file a report within 60 days with regard to their progress.

18   And though we didn't discuss this, we would request that the

19   Court set a further hearing at some point shortly after the

20   expiration of that 60-day period so that we're not unduly

21   delayed here.  If we don't--

22           THE COURT:  Do you want to pick a date now?

23           MR. MONTGOMERY:  If we don't - we would, Your Honor.

24   And if we don't need it of course we're not going to come in

25   and burden Your Honor.

43

1    THE COURT:  Do you have a date that works for you.

2  We'll see what we can do with our schedule.

3      PAUSE

4    MS. CICALA:  Your Honor, perhaps early in the second

5  week of November.  And for the report, Your Honor, at the end

6  of October.  Not 60 days from today but by October 31st if

7  that's--

8    MR. MONTGOMERY:  The 30th of October for the report.

9    MS. CICALA:  We're good.

10    MR. MONTGOMERY:  That's a Thursday.  And that

11  whatever Your Honor wishes to give us shortly thereafter.

12    THE COURT:  Mr. Duffy?

13    THE CLERK:  Okay, early in the second week of

14  November?

15    MS. CICALA:  If possible.

16    THE CLERK:  The second week of November starts on the

17  10th.

18    THE COURT:  I think the 10th and the 11th are the

19  Judicial Conference.

20    THE CLERK:  Okay.

21    THE COURT:  So.

22    THE CLERK:  The 10th I believe is the observance of

23  the Veteran's Day holiday which is on the 11th.

24    THE COURT:  Didn't we go back to celebrating that one

25  on the real day I think Mr. Duffy?  You're a Veteran, you

44

1    should know that.

2              THE CLERK:  The 12th is a good day.

3              THE COURT:  Sure, the 12th.

4         MS. CICALA:  Very good.

5              THE COURT:  I just want to be sure the Judicial

6    Conference doesn't--

7              THE CLERK:  Is it two days or three days?

8              THE COURT:  It's usually, it breaks at noon on the

9    third day so I would say Thursday instead.

10             THE CLERK:  Okay, Thursday the 13th.

11        MS. CICALA:  Very good.

12             THE COURT:  Do you prefer the morning or the

13   afternoon for travel purposes?

14        MS. ASNICE:  The morning, Your Honor, for plaintiff.

15             THE COURT:  All right, so 10 a.m.  All right, so that

16   takes--

17        MS. ASNICE:  If I may, Your Honor, I would just like

18   to state that plaintiffs do not agree that "this discovery is

19   relevant."  We agree that some of the discovery sought may be

20   relevant.

21             THE COURT:  Well somehow I knew that.

22        MS. ASNICE:  I just want to be clear.  Thank you.

23        MR. MONTGOMERY:  And we simply wanted to establish,

24   Your Honor, the umbrella under which the state ought to be

25   considering the scope of the documents that they're going to

45

1   search for and to produce to us.

2        THE COURT:  All right.

3      PAUSE

4        THE COURT:  All right, so that's 5052.  So where are

5   we on 5092.

6        MS. NEMIROW:  Yes, Your Honor, Kim Nemirow on behalf

7   of the defendant in the support of our motion to compel the

8   Medicaid claims data.

9        THE COURT:  All right.

10       MS. NEMIROW:  Plaintiffs contend in their papers and

11  in the status report filed in court at the end of June that the

12  motion to compel the claims data is moot, that they have

13  produced some amount of claims data.  However, the claims data

14  produced is inadequate.  It doesn't contain extremely important

15  fields such as the usual and customary or billed amount or the

16  dispensing fee, all of which are used to determine whether a

17  particular claim, a Medicaid claim, was reimbursed on the basis

18  of AWP, on the basis of usually and customary or possibly the

19  FUL or - which as the plaintiffs have recognized is their

20  burden to show that a particular claim was reimbursed on AWP in

21  order to recover it.

22       Recognizing the inadequacies in the data, the New

23  York Department of Health, through the plaintiffs, offered to

24  reportedly "reverse engineer a base of payment field."  They

25  made this offer in their sur-reply papers on April 2nd and

46

1  produced the data to defendants on May 9th.  The data when it

2  was received on May 9th was exactly the same as the, virtually

3  the same as the data previously been produced except it

4  contained a single column, a single field that indicate basis

5  of payment that listed either AWP or U&C without logarithm,

6  algorithm or any computation at all to show exactly how they

7  created this reverse engineer basis of payment or what went

8  into it or, you know, what the usually and customary or bill

9  charge was.  None of the, or even, you know, a letter

10 explaining what they did.

11      You know, again, after some back and forth the New

12 York, you know, back and forth in which the defendants, you

13 know, explained that we cannot possibly know how the New York

14 Department of Health went about reverse engineering the data or

15 whether it's reliable, whether the basis of payment listed in

16 this field is usual and customary as the New York Department of

17 Health purports.  Recognizing this the New York DOH offered a

18 30(b)(6) witness to be deposed.  This deposition will go ahead

19 on September 3rd and 4th, and we suspect that in addition to

20 explaining the way the data was reverse engineer that this

21 deposition will lead to the discovery that plaintiffs have not

22 produced all of the available claims data.

23      Defendants believe this based on – for two primary

24 reasons.  First, in the Abbott DOJ case, which is part of MDL

25 pending before this court, the plaintiffs or I'm sorry, the

47

1   government recently served defendant Abbott with their expert

2   reports by Professor Dr. Mark Duggan.  Mark Duggan's report and

3   accompanying materials relied upon by Dr. Duggan was not marked

4   confidential and so all the defendants in this case had access

5   to it.  And in that report Dr. Duggan analyzed the New York

6   Medicaid claims.  They'd actually attached the claims data

7   itself including the fields in the data.  Now the fields IN the

8   data on the data dictionary accompanying it were extremely

9   illustrative and they showed numerous fields that were not

10  produced to the defendants in this action, including one titled

11  claim charged and described in the description as "amount

12  billed by the provider for each individual service."

13          While we don't know for sure at this point it sounds

14  reasonable to us that this is the billed amount or the usual

15  and customary and defendants expect that the deposition on

16  September 3rd and 4th will explain more about the data that is

17  available and available within the New York Department of

18  Health.  And accordingly defendants respectfully request that

19  the Court defer its ruling on the motion to compel the claims

20  data until after the depositions on September 3rd and 4th and

21  perhaps allow the parties to submit a brief statement, say 10

22  days or a week after the depositions notifying the Court

23  whether the motion still needs to be decided by the Court or

24  whether it is at that time moot.

25          MS. CICALA:  Your Honor, plaintiffs have no objection

48

1   to the procedure Ms. Nemirow just outlined.  We've done

2   everything possible to produce data.  The Department of Health

3   undertook the reverse engineering.  We've got--

4            THE COURT:  All right.  Then we don't have to deal

5   with it but we do have to get it off the six month list, so I

6   would say withdraw it without prejudice at this time--

7            MS. NEMIROW:  Very good.

8            THE COURT:  --to re-file it after the deposition.

9            MS. CICALA:  Thank you, Your Honor.

10           MS. NEMIROW:  Thank you.

11           THE COURT:  All right.  That takes us to 5297.

12           MR. MONTGOMERY:  Your Honor, this is Schering

13  Corporation's motion for a protective order with respect to

14  discovery sought by the counties regarding the brand of drugs

15  manufactured by Schering that are listed in the attachment to

16  the amended complaint which defines the scope of the drugs at

17  issue.  This is another motion, Your Honor, that's governed by

18  prior rulings made by Judge Saris and in particular Judge Saris

19  has endeavored in the last year or so to limit the crushing

20  burden of this case on both the Court and on the parties.  And

21  in one particular she has done so in a way that precludes

22  discovery sought by the counties, not for all time but simply

23  deferred to a later point in time.

24           There was reference earlier in an Abbott motion that

25  you heard to the so-called 30% threshold for spreads.  Judge

49

1    Saris has made it clear that there should be no discovery

2    immediately with respect to any drugs in this case or frankly

3    any other case pending before her that do not have spreads that

4    exceed 30% on a consistent basis over time.  And even if there

5    are spreads exceeding 30% if you look at the decision following

6    the MDL trial, if a majority and particularity as in our case

7    the vast majority of the sales of the drugs are at or near the

8    list price, there ought for that separate reason to be no

9    immediate discovery.

10          Now in this particular case the judge first

11   articulated this discovery screen, if you will, and charged the

12   plaintiffs if they wished to have a different spread measure

13   that they needed to come forward with expert testimony.  And

14   they needed to have in order to proceed an approach to

15   calculation of the spread which Judge Saris articulated as a

16   weighted average or typical price for each drug calculated on a

17   reasonable good faith basis.  And if any plaintiff wished to

18   know what might qualify as a good faith basis, one would need

19   only to look at Judge Saris' very lengthy opinion following the

20   MDL trial in which it's clear that in order to qualify you have

21   to have a calculation which looks at the drug over the entire

22   liability period so that you're not including in the liability

23   analysis what Judge Saris called anomalous results.  So if you

24   have a dozen years and you have one year or two years or even

25   three years in which there is a slight spread or increase above

50

1   the 30%, well, Judge Saris characterized that as anomalous,

2   not sufficient to satisfy her liability test.

3           So in this particular case the plaintiffs have been

4   struggling, I'm not sure that's the right word, but they

5   certainly have been in an iterative effort to try to articulate

6   their spread theory.  Their first two efforts were dismissed by

7   Judge Saris.  Their third effort was not dismissed outright,

8   but she made it clear that the effort to allege a spread based

9   upon a 30% spread that existed for one day or a spread that was

10  calculated on the basis of a single transaction just wasn't

11  going to cut it.  Again, if you look at the MDL decision you

12  see we're looking at this over periods of time.

13          So that led to her order that I, the CMO-33 that I

14  just quoted to you and what did they do in response to that

15  order?  They still articulated or calculated spreads on the

16  basis of sometimes a single day, sometimes a week, sometimes

17  even as much as quarter.  They did some recalculation in

18  response to our motion where they actually went up as long as

19  10 months.  Again, if you look at the MDL trial record no such

20  calculation is sufficient to provide a basis for proceeding

21  with discovery in light of the judge's clear determination that

22  there is a significant reason to think that under these

23  circumstances there's no liability.

24          Now what we did in response to their effort to

25  calculate the spreads on what we would call a cherry picked

1  basis is that we submitted an expert affidavit, Your Honor.

2  Expert of Mr. Addanki.  Our expert from Europe.  He testified

3  in the MDL trial.  You can certainly see in the MDL decision

4  that Judge Saris found him credible.  There was no liability

5  found against Schering on the basis of the analysis done by Dr.

6  Addanki.

7          And we would have thought that in order to proceed

8  with discovery now as opposed to simply deferring it that the

9  plaintiffs would come forward with an expert affidavit in

10  response.  Instead, what they've given you is simply

11  representations of counsel.  They've given you exhibits

12  attached to their briefs which purport to be based on some

13  analysis.  The analysis isn't explained.  There's no

14  underlying calculations.  There's no explanation for those

15  calculations and we haven't been able to exactly replicate it.

16          The most critical point however is that none of what

17  the plaintiffs have done provides a multi-year analysis of

18  spreads over the alleged liability period.  And even though

19  they're cherry picking a week, you know, a month, a quarter,

20  two or three quarters, they want discovery for eight years with

21  respect to every single one of these drugs.  But if you look at

22  the Addanki affidavit, what you see is that every single one of

23  our drugs has an average spread which is below 30% across the

24  liability period.  There are some drugs that for, you know,

25  several periods have spreads that exceed 30%, but they're no

52

1  different than the spreads that Judge Saris found anomalous

2  after the MDL trial.  And so we think it's plain under Judge

3  Saris' rulings that we're entitled to the benefit of the

4  deferral mechanism that she put in place.

5         To put it the way I think Mr. Cavanaugh did and you,

6  Your Honor, did in connection with an earlier motion, what is

7  the prejudice?  You know in discussing this deferral mechanism

8  Judge Saris made it very clear that if the dispute over the

9  scope of this discovery came up early in the case, there really

10 would be no practical basis on which we actually could avoid

11 discovery.  But we're seven years into an enormously

12 complicated and burdensome exercise.  And in those

13 circumstances Judge Saris has reversed the usual burden.  The

14 burden to be borne by the plaintiffs hasn't been met and this

15 discovery should be deferred.  After all what's the prejudice.

16 Thank you.

17         THE COURT:  All right, I'll hear from you.

18         MS. CICALA:  Thank you.  Your Honor, with all respect

19 defense counsel is attempting here to reargue the motion to

20 dismiss that Schering lost.  And he's attempting to circumvent

21 the clear directives of CMO-33 which provide that plaintiff is

22 entitled to discovery where plaintiffs have alleged a spread of

23 greater than 30% for the subject drugs.  We're in the discovery

24 phase of this case.  We're not at the summary judgment phase.

25         His proffer from Addanki is entirely inappropriate

53

1   with all respect and plaintiffs vigorously disagree with Mr.

2   Addanki's conclusions in any event.  I mean plaintiff

3   calculates AWP and AMP spread as set forth in the exhibit in

4   our reply.  Plaintiff reveals, plaintiff has put before the

5   Court examples of multiple quarters for every drug at issue

6   where the AMP to AWP spread is greater than what professor

7   Addanki puts forward and confirms the drugs that plaintiffs

8   have identified are properly in this case for purposes of

9   discovery.

10          Judge Saris has never ruled in the New York case as

11  to what period of time a spread need be pled for.  And

12  certainly Judge Saris could have done so.  She could have

13  imposed any sort of timeframe on plaintiffs and plaintiffs

14  would have either satisfied that timeframe or not.  Instead,

15  Judge Saris simply required a good faith allegation of spread

16  based on the typical price or a weighted average and that is

17  what plaintiffs have submitted.

18          And contrary to what defense counsel would have this

19  Court believe plaintiffs time periods of spreads are not cherry

20  picked nor are they particularly brief.  Many of them exceed

21  multiple quarters up to a year and so forth.  So there's simply

22  no support for the argument that these are isolated examples of

23  spread and, moreover, there's nothing from Judge Saris that

24  directed plaintiffs to plead spreads for a particular point,

25  for a particular duration.  So plaintiffs have entirely

54

1    satisfied the 9(b) requirements of Judge Saris.

2            Now, if defense counsel feels that we have not the

3    context for that is not in this Court on a discovery motion but

4    rather before Judge Saris in connection with the former motions

5    to dismiss or moot looking forward in the context of a summary

6    judgment motion.  The comments regarding what was found in the

7    MDL trial are entirely improper here.  As defense counsel have

8    acknowledged on this particular point, Your Honor, the classes

9    of trade that were considered there in the context of the

10   Schering spreads as defense counsel has admitted were different

11   classes of trade than those that are relevant for the instant

12   proceeding.  They did not concern the pharmacy providers that

13   are at issue in the New York case for Medicaid purposes.  And

14   it's those classes of trade that plaintiffs have referred to

15   their true prices when plaintiffs plead their spreads.  So

16   while there's much to be learned for all involved in these

17   litigations from the findings of fact from the class trial, the

18   spreads at issue there simply concern different classes of

19   trade and therefore cannot be used to foreclose plaintiffs in

20   this litigation in a Medicaid context from proceeding with

21   obtaining discovery from Schering when plaintiffs have

22   satisfied 9(b).

23           Now, it is also false that our analysis and the basis

24   for our spread calculations have not been explained to

25   defendants.  That is patently untrue, Your Honor.  We have

55

1  supplied defendants with all of the underlying data supporting

2  our spread calculations and we have supplied them with

3  iterations of how those spreads were calculated.  If counsel

4  wants further clarification or has questions, all they need to

5  do is ask and we will supply it.  We've never been asked for

6  further information on those details from counsel.  This is the

7  first I've heard that they don't understand what we've done.

8  We've supplied it to them, Your Honor.  So that is an absolute

9  misstatement.

10      It is also a misstatement to suggest this case has

11  been pending for seven years.  It has not.  The first amended

12  consolidated complaint was filed in 2005.  The first county

13  case was filed in 2003.  Last, Your Honor, it is inaccurate to

14  say this case has been dismissed.  That's entirely untrue.  We

15  have thrice survived motions to dismiss in this action.  So I

16  don't want there to be a misimpression in the Court as to the

17  status of this case.

18      In terms of prejudice, Your Honor, if plaintiff is

19  prevented in the context of a discovery motion from obtaining

20  discovery that Judge Saris has already ruled we are entitled to

21  and has memorialized in CMO-33, plaintiffs are severely

22  prejudiced because they cannot prosecute their case against

23  Schering Plough.  So there's tremendous prejudice in that

24  regard.  The counties are anxious for the resolution of these

25  cases.  We are looking forward to having them transferred back

56

1    to the district courts in New York for trial in 2009 and early

2    2010.  And the only way for us to get to that point is for us

3    to move through this discovery to which we are entitled.

4           In sum, Your Honor, counsel's argument is entirely

5    improper in this forum.  It is a circumvention of the Court's

6    CMO-33 order and Judge Saris' rulings on the motion to dismiss.

7    It is a misrepresentation of the durations of the spread in our

8    exhibits.  It is a misrepresentation of the 9(b) requirements

9    that were placed upon plaintiffs and the fact that we have

10   satisfied those for these Schering drugs.

11          So with that, Your Honor, I'll sit down.  Thank you.

12          MR. MONTGOMERY:  Your Honor, I have heard nothing

13   from Ms. Cicala about how the alleged spreads with respect to

14   the Schering drugs comply with Judge Saris' order in CMO-33.

15   They do not and we are here based on expert testimony

16   challenging whether those alleged spreads are based on a

17   weighted average or typical price.  They are not.  They cannot

18   be because of course they've cherry picked the periods.  You

19   can just look at the attachments and you can see the periods

20   that they have cherry picked.  That is why as I said earlier it

21   was incumbent upon Ms. Cicala to come forward and create a

22   record, a record that was considerably more robust than

23   representations of counsel.

24          When I suggested that that record hadn't been

25   created, I was talking about the record before Your Honor.  It

57

1    remains the case that we don't FUL understand what Ms. Cicala

2    has done.  There are numerous technical problems that we have

3    with what Ms. Cicala has done, but we would suggest that we

4    don't bear the burden of making a further submission to show

5    how many errors her submission is infected by because she's

6    never done anything more than just make representations.  And

7    what Judge Saris did is to impose a burden on her.  That burden

8    can't be met by simply saying I've done this in good faith.

9    It's just not good enough.  There was some substance in that

10   order.

11          As to classes of trade, what we did in the affidavit

12   submitted by Dr. Addanki is not to import the MDL calculations

13   of spread but to base it on the so-called average

14   manufacturer's price which is the only available common basis

15   for assessing the price at which manufacturers are selling

16   Medicaid eligible drugs to wholesalers.  It is a price defined

17   by Congress and that we have been submitting to both the

18   federal government and in the case of New York to New York

19   since 1991.  We picked AMP because it was conservative and

20   happened to be the only price that was objectively available

21   and was historically available to us to calculate the spreads.

22   Again, they haven't come forward with any better measure other

23   than, you know, whatever measure Ms. Cicala is using to

24   underlie her own calculations.  It's just not good enough.  And

25   again, what we're talking about here is deferral and the

58

1    absence of prejudice.

2            MS. CICALA:  May I, Your Honor?

3            THE COURT:  Briefly, briefly.

4            MS. CICALA:  Thank you, Your Honor.  First of all,

5    the statement by defense counsel that AMP is the best measure

6    of spread which he just made contradicts the statements that

7    Schering has in their motion papers that the best measure of

8    spread would be using the providers actual acquisition costs.

9    And that's precisely what plaintiffs used when calculating

10   their spreads in their exhibit to the complaint.  They selected

11   the relevant classes of trade of pharmacy providers in New York

12   and they calculated actual average acquisition costs to those

13   classes of trade for calculating the spread.  That was our

14   methodology.  We've identified for defendants numerous times

15   the methodology, what data we used.  We've given them the data.

16   We've explained how we calculated our spreads.

17           So we have a contradiction here.  On the one hand

18   we're hearing AMP is the better proxy.  The papers say AMP is

19   not a good proxy and instead the proxy should be providers

20   cost.  Providers cost are what we used to satisfy the Court's

21   pleading standard.  Now, even if we don't use providers cost

22   and we use AMPs we come to a different conclusion then

23   Professor Addanki.  It's set forth in Exhibit C to our reply.

24   We do an AMP to AWP spread calculation and we see for the

25   Schering drugs at issue on this motion spreads in excess of 30%

59

1   for periods of up to three years, 36 quarters of time.  Now,

2   is defense counsel's position that even that is not sufficient

3   to satisfy Judge Saris' standards, I suspect defense counsel

4   could not make that argument.

5           Exhibit C, Your Honor, takes defense counsels'

6   proposition of comparing AMP to AWP and it shows how it plays

7   out when that calculation is done and it confirms that we have

8   a, I'm sorry, nine years not three years period of time, 36

9   months.  It confirms the propriety of plaintiffs obtaining

10  discovery on these subject drugs.

11          Last, Your Honor, I would just refer again to

12  paragraph 2(b) of CMO-33 in which the court directed that

13  plaintiffs shall allege a weighted average or typical price for

14  each drug calculated on a reasonable good faith basis

15  consistent with the court's July 30, 2007 order and prior

16  opinion.  That is precisely what plaintiffs have done using the

17  relevant classes of trade.  Over periods of time we have

18  calculated weighted averages and we've supplied that

19  methodology to defendants.

20          Last, Your Honor, in light of plaintiffs'

21  satisfaction of 9(b), and in light of the fact that plaintiffs

22  have supplied defendants with their methodology and all of the

23  underlining data supporting their spread calculations, the

24  burden does shift to defendant if they disagree with what

25  plaintiffs have set forth to identify the particular areas that

60

1  are apparently inaccurate or improper.  Defense counsel cannot

2  prevail on this motion given the impact on plaintiffs' ability

3  to prosecute their case with anecdotal comments that things are

4  inaccurate.  Let's hear where they're inaccurate and why and

5  let's address it.  It's not plaintiffs' desire to be

6  inaccurate.  We've done all we can to inform defendants of our

7  methodology and until this moment we've heard of no such

8  challenge to the accuracy of our calculations.  Thank you, Your

9  Honor.

10          THE COURT:  Two--

11          MR. MONTGOMERY:  Well--

12          THE COURT:  Two seconds now.

13          MR. MONTGOMERY:  Your Honor, I don't want to repeat

14  myself.  Let me just mention one more point that I should have

15  made clear, Your Honor.  In this safe harbor and discovery

16  deferral is arising in other cases.  It arose in the Iowa

17  Attorney General case.  Ms. Cicala is counsel in that case.

18  The case was the subject just yesterday of a decision by Judge

19  Saris on a motion to dismiss in which she reaffirmed that

20  absent compliance with the standard and the CMO-33 no discovery

21  until later with respect to drugs that aren't consistently

22  above 30%.

23          To understand the consistency point, as I said you

24  look at the MDL decision and at the argument on the motion to

25  dismiss in the Iowa case which occurred on June 26, 2008 and

61

1    you can see at places like page 32, and I think it's 42 to 47,

2    if I'm thinking of the right pages, where Judge Saris takes on

3    specifically the question of the adequacy of just the kind of

4    calculation that Ms. Cicala without the benefit of expert

5    testimony is trying to rely on here and rejects it.  It simply

6    says, you know, an analysis based on a quarter or several

7    quarters just is inadequate.  Discovery, she orders from the

8    bench, deferred.

9            THE COURT:  All right.  I'm going to break for the

10   noon recess and we'll resume at two o'clock.

11           MR. MONTGOMERY:  And do you want us back at two

12   o'clock, Your Honor?

13           THE COURT:  Well, I hope I'm not going to be up here

14   by myself.

15           MR. MONTGOMERY:  Well what I mean is--

16           MS. CICALA:  If we're through--

17           THE COURT:  Those who have no matters before the

18   court may be excused certainly.

19           MR. MONTGOMERY:  Right.  In other words we're

20   finished with the matters that we have--

21           THE COURT:  We've dealt with already.

22           MR. MONTGOMERY:  Okay.  Thank you.

23           MS. CICALA:  Thank you, Your Honor.

24                           RECESS

25           THE CLERK:  Resuming on the record, Abbott

62

1  Laboratories, et al v. Citizens for Consume, et al, Civil

2  Action No. 01-12257.

3        THE COURRT:  All right.  I'll hear you on or I have a

4  ruling to make on 5296 which was Mr. Montgomery's motion.  All

5  right.

6        MR. MONTGOMERY:  Yes, Your Honor.

7        THE COURT:  96, 97 was the memo.  So as to, 5296 is

8  allowed given the insufficient showing of compliance with Judge

9  Saris' July 30, `07 order.  And I will do quick margin orders

10  on all of these motions so there will be something on the

11  record.

12        Now going back to 5027, which is the third matter

13  that dealt with, plaintiffs' motion to compel, again, directing

14  your attention to the July 30th `07 order which is for the

15  record Docket Entry 4540, I'd like the plaintiff to identify

16  exactly where you have to quote the order made, and I quote

17  now, "allegations with false published prices on" the Albuterol

18  product at issue.

19        MS. CICALA:  Would you like us to respond to that

20  now, Your Honor?

21        THE COURT:  Well, do you want to do it now or do you

22  want to do it in writing?  Ideally, I'd like to have it right

23  now because I'd like to make a ruling.

24    PAUSE

25        MS. CICALA:  We'll pull the briefs back up, Your

63

1    Honor, and we'd be happy to do it.

2              THE COURT:  Okay.  Why don't you take a minute and in

3    the meantime I'll listen to what the result of the meet and

4    confer was on 4711.

5              MS. CICALA:  Thank you, Your Honor.

6              THE COURT:  Okay.

7              MR. WINCHESTER:  Thank you, Judge.  On 4711, Jason

8    Winchester, again, for Abbott Laboratories.  We appreciate Your

9    Honor's indulgence in letting us talk this through.  I think we

10   have made some progress after some good discussions with the

11   government and there are still a couple of things that we think

12   warrant some further discussion before we would put them to the

13   Court.

14             Specifically, we have basically two types of relief

15   we've asked Your Honor for; one, a preservation directive, and

16   one, a declaration of what does the government know has been

17   lost.

18             On the first component, the preservation directive as

19   to the federal Medicare side, I think the government is willing

20   to state that the directive we're asking Your Honor to make

21   they have done.  There is still an active dispute between us

22   which is the subject of another motion pending before the Court

23   as to whether we would be entitled to FUL and unredacted copies

24   of the preservation directives that we talked about this

25   morning.  But at least on the federal Medicare side I think

64

1   they're willing to say the direction they have made across HSS

2   is the one we've asked for and so that may well as to that side

3   of the issue obviate the need for any further proceeding before

4   the Court.

5          As to the preservation issue though there is one live

6   question that we want to talk with the government about

7   further.  We think our motion extends to preservation

8   directives with respect to the state Medicaid programs as well.

9   They're not really prepared I think to address that issue FUL

10  now so perhaps we can talk about it further and if we need to

11  bring it back before the Court at the next--

12         THE COURT:  Well can we withdraw--

13         MR. WINCHESTER:  --hearing--

14         THE COURT:  --this motion without prejudice to renew

15  to--

16         MR. WINCHESTER:  Your Honor, I guess--

17         THE COURT:  --get it off the docket?

18         MR. WINCHESTER:  I guess our – we'll handle it in

19  whatever fashion Your Honor would like.  I know our preference

20  would be I think since there are a number of other pending

21  motions before the Court you may be likely to set another

22  hearing sometime soon.  If we--

23         THE COURT:  I know but I have to report all these

24  motions that are not ruled upon.

25         MR. WINCHESTEER:  Yeah, and, you know, obviously,

65

1   Your Honor, you can manage your docket as you need to.  We're

2   happy to proceed in whatever way you'd like.  The only question

3   is just going to the back of the line.

4          THE COURT:  Withdrawn without prejudice to renew.

5          MR. WINCHESTER:  Okay.

6          THE COURT:  And you can renew it forthwith if you're

7   not satisfied with what you have as the result of your meet,

8   further meet and confer--

9          MR. WINCHESTER:  That's fine, Judge.

10         THE COURT:  --and then I'll give you a prompt

11  hearing.

12         All right, so I think you can be excused.  And I just

13  remain then to hear from counsel on this other matter.

14         MR. WINCHESTER:  Yes.  And this one is 5035, Your

15  Honor, the--

16         THE COURT:  5035 is not on the list though?

17     PAUSE

18         MR. WINCHESTER:  This is the--

19         THE COURT:  Oh, sorry, okay, No. 4.  Okay, just a

20  second.

21         MR. WINCHESTER:  Did you want to wrap up the other

22  matter before you hear from us, Judge?

23         THE COURT:  No, you're on your feet.  Go ahead.

24         MR. WINCHESTER:  Okay, got it.  Your Honor, this

25  motion 5035 is our, Abbott's motion to compel against Ven-A-

66

1  Care to respond to four specific interrogatories.  We have set

2  forth the meat of those interrogatories in our brief before the

3  Court at pages two and three.  And so the Court knows, these

4  interrogatories are literally we took exact quotes from their

5  complaint, factual allegations that they've made before the

6  Court, plopped them into interrogatories and said provide your

7  factual bases for these factual allegations you made against

8  Abbott.  And as to three of the four, there doesn't seem to be

9  any real joined dispute.  They've effectively said we will

10  answer those if you'll just drop the fourth one.  And we're not

11  going to do that, but we think they should have to answer them

12  all, and really as to three of them, which would be No.'s 22,

13  23 and 26, there's been effectively no reason from Ven-A-Care

14  as to why they shouldn't have to answer those and we ask Your

15  Honor to direct them to do it.

16       The real meat of the dispute concerns interrogatory

17  No. 20.  And as we've set forth in our papers Ven-A-Care

18  alleged, and this is a quote, that it has "direct and

19  independent knowledge of the information and is the original

20  source of the information on which the allegations are based

21  without the meaning of 31 U.S.C. Section 3730."  And we asked

22  them what is your factual basis for that statement.  And as

23  Your Honor knows from having dealt with these False Claims Act

24  cases this original source question is vital to the court

25  subject matter jurisdiction cause the law says if there's a

67

1    public disclosure of this information and the complaints based

2    on that and they're not the original source then the Court has

3    no subject matter jurisdiction.  The case goes away entirely.

4    And so we are certainly entitled to know from them what is the

5    factual basis of this allegation.

6         Judge Saris has addressed this question of original

7    source and made very clear in a related action in the MDL that

8    the Relator bears the burden of this jurisdictional question.

9    Ven-A-Care is the Relator.  They have the burden on this.  This

10   is a decision Judge Saris rendered February 19, 2008 in a

11   related MDL matter of *West v. Ortho McNeil* 06-C-12299.

12        So in any event our request to them is simply give us

13   the facts on which you're telling the Court over and over and

14   over again in your complaints that you are the original source

15   of the allegations against Abbott.  And they've refused on two

16   grounds.  The first is they say, well, those specific

17   allegations you reference "were in our four complaints under

18   seal but that allegation is not repeated again in what is now

19   the operative complaint, the government's complaint and

20   intervention."  And without being flip our response to that is,

21   so.

22        These are factual allegations that they made and

23   unless they're willing to say that the absence of the

24   allegation on original source in the current complaint an

25   intervention is purposeful.  In other words, they no longer

68

1   contend that they are the original source and I don't hear

2   them saying that, then we're entitled to information about it.

3   And it's immaterial whether it is currently in a complaint or

4   not.  Even had they never made a representation about it ever

5   we would be entitled to ask them in a case like this where the

6   law requires them to be original source, do you contend you are

7   and if so, what's the basis.  And now we don't have to get to

8   the first step because they have contended over and over again

9   we are the original source.

10          The second argument they make is sort of an ordering

11  argument, and that is to suggest that they ought not have to

12  give us discovery to back up their allegations of original

13  source until we come forward as the defendant and say here are

14  specific public disclosures.  And they point to the fact, which

15  is true, ultimately when Judge Saris considers this issue on

16  summary judgment the analytical framework says first the Court

17  considers in deciding whether there's subject matter

18  jurisdiction has there been a public disclosure and, if so, is

19  the Relator the original source.  But those two inquiries are

20  taken up at the same time.  They're taken up on summary

21  judgment at the same time or in a motion to dismiss at the same

22  time.  So the notion that we would go forward, have summary

23  judgment on public disclosure and then reopen discovery on

24  original source is not sensible.  It's certainly nothing we

25  think that Judge Saris would want, and obviously there is no

69

1   order under the rules to discovery.

2           THE COURT:  It's amazing how everyone can read Judge

3   Saris' mind.

4           MR. WINCHESTER:  Well, on this one, Judge, we're

5   going to go out on a limb and suggest that she would not want

6   to do that and in past juris prudence in the *West* and *Ortho*

7   *McNeil* case that we cited to the Court she did take up both of

8   these questions at the same time and all of the law we cited in

9   our papers says that is the way that it is taken up.  Both of

10  these questions are two sides of the same coin.  The court's

11  consider them together and we certainly don't think that there

12  is any justification for going forward denying us the discovery

13  on an issue that as a matter of law they bear the burden on as

14  the plaintiff.  To deny us the discovery we think is wrong.

15  We'd ask they be ordered to respond in FUL to all of our

16  interrogatories.

17          THE COURT:  All right.  Why shouldn't I grant this

18  motion?

19          MR. BRESNICK:  Your Honor, first of all, as to

20  Interrogatories 22, 23 and 26 which counsel has said there is

21  no issue to, Ven-A-Care contends that those interrogatories

22  seek irrelevant information, and I should back up first.  In

23  the meet and confer, the initial meet and confer Ven-A-Care

24  agreed to reconsider its objections to those interrogatories.

25  It proceeded to reconsider those objections and offered a

70

1   compromise to Abbott which was essentially that Abbott remove

2   from the interrogatories the word contention which, and Ven-A-

3   Care believes the contention interrogatories to a party that is

4   not primarily prosecuting the case are improper.  But we

5   offered to answer the question of the factual basis for our

6   allegations.  There was no linkage to counsel says that if –

7   that we offered that if they dropped their interrogatory 20 and

8   no such linkage was made.

9           Exhibit C to our memo in an opposition to have its

10  motion is the letter that was sent from counsel for Ven-A-Care

11  to counsel for Abbott.  We offered to answer, to provide them

12  with the factual basis for those allegations and they refused

13  that offer as to the three interrogatories 22, 23 and 26.  We

14  did not drop our objection that those were irrelevant.  We

15  still suggest that they are relevant and we don't see why

16  Abbott should be rewarded for its intransigence now by having

17  the Court order us to answer those interrogatories which in any

18  case they are contention interrogatories.  They're normally

19  used to gain admissions and narrow the issues for trial.  Here

20  they would do no such thing because the issues at play in trial

21  will of course be the issues in the government's amended, the

22  United States amended complaint not Abbott's keytan pleadings

23  which preceded the government's intervention.  Those are not

24  operative complaints in this case and it is simply unduly

25  burdensome on Relator to have to answer interrogatories as to

71

1    those which are, which will be irrelevant.

2          Turning to Interrogatory 20, which is the original

3    source question, I confess that I have not had the benefit of

4    reading Judge Saris' decision in *West*, the case my brother

5    cited, I will say that our position, Ven-A-Care's position is

6    simply that the interrogatory is overly broad and unduly

7    burdensome.  It seeks us to - it requests Ven-A-Care to

8    identify facts making it the original source for basically

9    every allegation in each, not only in Ven-A-Care's original

10   Keytan complaint but then each of the four amended Keytan

11   complaints, none of which as I stated are operative in any

12   event.

13         Abbott has not alleged any public disclosure which

14   would make the original source exception relevant.  And we

15   have, in the meet and confer we suggested to Abbott that if

16   they simply identified any public disclosure on the relevant

17   claims which we would then provide them with facts supporting

18   our contention that we were the original source.  We disagree

19   with Abbott that the burden lies with the Relator.  I think

20   that the cases cited in our brief make clear that the initial

21   burden is with the defendant to allege public disclosure and to

22   show to the Court's satisfaction that there was a public

23   disclosure.  Here Abbott has not even alleged any public

24   disclosure and Ven-A-Care suggests it is completely overly

25   broad, overbroad and unduly burdensome for us to have to make

72

1    its showing without Abbott even making the allegation.

2          THE COURT:  Brief response?

3          MR. WINCHESTER:  Yes, Judge.  As to the first three,

4    22, 23, 26, the issue is if they'd like to call them

5    allegations rather than contentions and answer them how about

6    it.

7          THE COURT:  All right.

8          MR. BRESNICK:  Your Honor--

9          MR. WINCHESTER:  Give us the factual basis for those

10   three.  I mean this seems to be an issue of semantics and if--

11         THE COURT:  All right--

12         MR. WINCHESTER:  --we can get an answer—

13         THE COURT:  --you withdraw the word contention.

14         MR. WINCHESTER:  Okay.  All allegations, give us the

15   factual basis of the allegations, it sounds like they'll answer

16   them.  That is fine with us.

17         MR. BRESNICK:  Your Honor, I would say two things in

18   response.  One, we offered that compromise in November of 2007

19   and it was rejected.  Since that time Abbott has had among

20   other discovery they have deposed each and every employee of

21   Ven-A-Care, as far as I know, at the relevant time period and

22   depose them as to these very questions.  I would suggest that

23   it is now a burden on Ven-A-Care to answer these

24   interrogatories at this late date.

25         THE COURT:  The motion is allowed as to 22, 23 and 26

73

1   with the word contention being removed from the request.

2          MR. BRESNICK:  Could we request 60 days to provide

3   those answers?

4          MR. WINCHESTER:  Your Honor, I guess I would ask as

5   quickly as they reasonably can provide the answers that they do

6   so.

7          MR. BRESNICK:  We're happy to do that.

8          THE COURT:  In less than 60.

9          MR. BRESNICK:  I was told, Your Honor, that it would

10  require 60 days.

11         THE COURT:  Forty-five.

12         MR. WINCHESTER:  As to--

13         THE COURT:  Okay, now let's go to 20.

14         MR. WINCHESTER:  As to 20, Your Honor, this position

15  that the interrogatory is overly burdensome and overly broad

16  it's a quote from their complaint and they made it again and

17  again and again.  It is not possible that it could be overly

18  broad to ask them to say here is the factual basis on which I

19  make this allegation and I made it again and again and again.

20  It is important.  The case law is absolutely clear, they bear

21  the burden in establishing subject matter jurisdiction and this

22  original source is a key to that, Judge.  So we're just asking

23  them to say what the factual basis is of their contentions and

24  back it up.  As the plaintiff we don't think it's right--

25         THE COURT:  What about the word contention?

74

1          MR. WINCHESTER:  Allegation.

2          THE COURT:  Okay.

3          MR. WINCHESTER:  The factual basis of that allegation

4    that they are the original source of the claims to the

5    government.  And one thing that I would add, Your Honor, is you

6    may remember in July of `07, you may not given the flurry of

7    things that you had to deal with, we came before the Court and

8    we argued that we should get production from the government and

9    from the Relator of what's called a Relator statement, the

10   document that Ven-A-Care gave the government back in 1995 when

11   it submitted the complaint that includes we think a very good

12   record of what facts about Abbott Ven-A-Care was able to

13   provide to the government that ultimately led to the government

14   to intervene in this case.  And the government and Ven-A-Care

15   responded and said, whoa, we shouldn't do that because that

16   Relator statement is not just facts it's also attorney

17   argument.  It's work product.  We said, fine, redact the work

18   product, redact the attorney stuff.  We just want the facts.

19   And the government said, and this is page 30 of the transcript

20   of that day, they are obviously entitled to the facts but they

21   should get them in some other fashion, through routine

22   discovery.  Well that's what we're trying to do in these

23   interrogatories, is get at those facts.  And we think that if

24   they don't want to answer them, we clearly think they should,

25   but Your Honor may want as well to revisit the question of

75

1    whether we should get at least a redacted copy of the

2    Relator's statement because they said we're entitled to the

3    facts and now they don't want to give them to us.

4              THE COURT:  What's your position on 20?

5              MR. BRESNICK:  Your Honor, our position on 20 remains

6    that for us to answer that interrogatory Abbott should be

7    required to make allegations as to what public disclosure it

8    claims there were.

9              THE COURT:  No, I'll allow it to 20 as well.  All

10   right, that takes us back now to the first motion which was

11   4711.  The result of your meet and confer.

12             MS. MARTINEZ:  Your Honor, I believe we just

13   discussed that and it was withdrawn without prejudice.

14             THE COURT:  Sorry.  Sorry.  Okay, so remaining is,

15   Mr. Duffy?

16             THE CLERK:  27.

17             THE COURT:  5027, sorry.  My notes are – I have a lot

18   of scribbles.  5027.  Yeah, withdrawn without prejudice, yes.

19   So on 5027?

20        PAUSE

21             THE COURT:  Again, other counsel can be excused if

22   there's nothing else relevant to you.  All right.

23             MS. CICALA:  Your Honor, if I may, just to refresh on

24   what the pleading requirement was for plaintiff and then I'll

25   point you to the specific details that you asked for.  During

76

1   the oral, during the court's hearing on July 26, 2007, Judge

2   Saris wrote or stated I'm limiting you to 30% and it's a good

3   faith, whether it's a median or average or typical through some

4   publication excluding pennies or no fliers median maybe makes

5   sense but whatever you want to use that's in good faith.

6   That's the basis for our 30% spread had to be pled in good

7   faith.  And Judge Saris' order thereafter provided that

8   plaintiff shall allege a weighted average or typical price for

9   each drug calculated on a reasonable good faith basis

10  consistent with this Court's prior opinions.

11      And then in CMO-33 the Judge once again ruled that

12  plaintiff shall allege a weighted average or typical price for

13  each drug calculated on a reasonable good faith basis.  And

14  that is what the plaintiffs have done with regard to all the

15  drugs in Exhibit B to the first amended consolidated complaint

16  including the Albuterol Arm-A-Med product that is at issue as

17  one of the FUL designated drugs.

18          With regard to the FUL designated drugs, if I may

19  refer to CMO-33 paragraph five where the Court provided for

20  specific procedures for targeted discovery on drugs subject to

21  federal upper limits.  The Court provided that on or before

22  October 1, 2007 the parties would each as a group identify five

23  drugs by chemical name for a total of 10 drugs.  Those would be

24  the designated FUL drugs.  There was overlap in the parties'

25  selection so we ended up with nine drugs.  One of them was the

77

1    Albuterol product.  At no time until this filing of their

2    motion did AstraZeneca object to its inclusion in the selection

3    of its Albuterol product as one of the designated FUL drugs.

4    CMO-33 thereafter provides for discovery on the FUL drugs

5    without reference in any way to the specific allegations in

6    plaintiffs' Exhibit B without imposing any additional pleading

7    requirement on plaintiff in order for plaintiffs to obtain the

8    necessary discovery.

9            Having said all of that, in the first amended

10   consolidated compliant at paragraph 280, plaintiffs allege

11   pricing fraud against AstraZeneca for all of its subject drugs

12   including the Albuterol product.  And in Exhibit B to the first

13   amended consolidated complaint plaintiff specifically pled a

14   fraudulent spread of 160% for the Arm-A-Med Albuterol 0.83

15   milligram milliliter product.  This spread was based on a

16   typical price meaning a good faith in satisfaction of CMO-33 in

17   the Court's prior rulings on particularity.

18           To reiterate prior statement, there was no time limit

19   or duration set by Judge Saris.  I'll note for the record that

20   in the Iowa motion to dismiss ruling issued yesterday, Judge

21   Saris again endorsed plaintiffs approached pleadings spreads

22   and again did not provide for a time period with relation to

23   those spreads.  In our papers in support of the motion to

24   compel as it concerns AstraZeneca, we provided the Court

25   illustrative examples of other spread calculations for this

78

1   AstraZeneca drug confirming the information in our Exhibit B

2   was done in good faith in satisfaction of the court's order.

3   And for all these reasons, Your Honor, and given Judge Saris'

4   interest in having a FUL record before her when it comes to the

5   FUL focused discovery we request that the Court grant our

6   motion to obtain discovery from AstraZeneca on all NDC's

7   pertaining to this Albuterol 83 milligram product.

8          MR. TOSCANO:  Your Honor, since this motion has been

9   brought it's been a moving target for us.  And the target has

10  once again moved because well up until this point the motion

11  has been focused on expedited FUL discovery.  For the first

12  time we start hearing about AWP allegations and 30% spread.

13  This is not about discovery in terms of AWP allegations and if

14  the plaintiffs now want to take the position it is then there's

15  an additional relevant fact which is that the total utilization

16  for Arm-A-Med in this GCN is 22, is less than $22,000.  So if

17  we're talking about AWP this is a complete waste of everybody's

18  time.  We're fighting over something that is not going to – and

19  that's not the alleged overcharge.  That's the total

20  utilization.  There's not going to be recovery that even

21  approximates the amount of time that goes into litigating this.

22         What we started out talking about was FUL fraud.  And

23  the reason it's different is because regardless of utilization

24  of AstraZeneca's drug, if AstraZeneca actually did have some

25  impact on setting the FUL, then it wouldn't matter that there's

79

1  a small amount of utilization which was why I have not raised

2  that fact before.  But now that they've shifted the target

3  again that becomes the central piece.  Going back to what this

4  motion originally was about which is FUL fraud, if you look at

5  Exhibit B to the first amended consolidated complaint you will

6  see that not only is the spread that or the dates at issue a

7  single day, January 1, 1997, but if you look in the column that

8  says FUL it says none.  There is no FUL on Arm-A-Med, on

9  Albuterol, Albuterol GCN at issue at that time.

10          Plaintiffs say that AstraZeneca never objected to our

11  inclusion of Arm-A-Med as a target drug.  The reason we never

12  objected is we never realized that our drug was at issue.  If

13  we look at Exhibit B it says FUL, none.  We didn't think they

14  were pursuing FUL fraud claims against our drug.  We had no

15  reason to believe so.  All of the prior exhibits that we

16  received had a column that said FUL and it either said yes or

17  there was a dash.  For Arm-A-Med there was a dash.  Or we got

18  an exhibit informally served by plaintiffs, it didn't even list

19  Arm-A-Med for FUL fraud.  The reason we didn't object at that

20  time we were not on notice that our drug was at issue.

21          The requirement that they plead is not only set forth

22  in CMO-33 which specifically says it has to be relevant, but

23  it's also set forth in the July 30th order which says plaintiffs

24  must allege that the defendant submitted false or inflated

25  published prices which if truthful would likely inflate, I'm

80

1  sorry, would likely have affected the FUL.  There has to be an

2  affect.  They have now come forward with an average, an actual

3  average acquisition cost.  It's greater than the FUL.  Even if

4  their allegations are right, their informal allegations that we

5  saw for the first time in a reply brief are correct, the

6  AstraZeneca pricing, reporting of pricing could not have

7  affected the FUL.  This drug is irrelevant to plaintiffs' FUL

8  fraud claims.  And as to their AWP claims it's not worth

9  pursuing.  It's $22,000 of total concession.

10         THE COURT:  Two minutes.

11         MS. CICALA:  Your Honor, there's no moving target

12  here.  I was asked to identify our fraudulent spread

13  allegations in the pleading and that's just--

14         THE COURT:  Well are we talking about $22,000?

15         MS. CICALA:  We are talking about a FUL claim and the

16  utilization dollars are irrelevant because if AstraZeneca's

17  pricing infected the setting of the FUL then AstraZeneca could

18  face liability for all reimbursements based on FUL for this

19  particular product.  So New York's utilization of this

20  particular NDC is irrelevant to the FUL analysis.

21         If AstraZeneca, just to reiterate, if AstraZeneca's

22  pricing affected the FUL setting process, and it may have, we

23  don't know because we don't have the data, every other

24  defendant has given us the data because Judge Saris' CMO-33

25  says we get the data for all NDC's relating to the FUL

81

1   designated drugs.  CMO-33 most definitely does not say you get

2   the data for the FUL designated drugs if you've pled FUL fraud

3   for that specific NDC.  That's not what Judge Saris ruled and

4   that makes sense because the way the FUL is set is through a

5   review by CMS of all the NDC's for that particular drug.

6   Discovery on all NDC's is needed in order to develop a record

7   of the entire FUL scheme.

8           Now AstraZeneca stands alone in refusing to make this

9   production.  The $22,000 argument is an entire red herring

10  given the impact that AstraZeneca's false prices may have had

11  on New York's $86 million of expenditures in this particular

12  drug.  AstraZeneca could face liability in respect of $86

13  million of expenditures not 22,000 as they may wish it to be.

14  Thank you.

15          THE COURT:  All right, I'll take it under advisement.

16  I'll give you a pretty quick ruling.

17          MR. TOSCANO:  Thank you.

18          THE COURT:  All right, I think that--

19          MR. WINCHESTER:  Judge, can I raise one more

20  housekeeping matter in the Abbott case?

21          THE COURT:  Yes.  Do we have opposing counsel still

22  here or?

23          MR. WINCHESTER:  They're still here.

24          THE COURT:  Yeah.

25          MR. WINCHESTER:  Yeah.  And the question we have was,

82

1  Judge, among the many things we've asked Your Honor to do one

2  of them is to review a couple of submissions the government has

3  made for your in-camera review of their deliberative process

4  privilege documents.  And I was asked frankly to inquire of

5  Your Honor whether you had any thoughts about a schedule in

6  terms of your review on those?

7          MR. DRACUT:  Just to alert Your Honor, the subject of

8  the deliberative process review came before Judge Saris on July

9  24, that is just last month, in the context of Abbott's request

10 that Judge Saris' holdings be subject to interlocutory appeal.

11 At that hearing the judge then asked, Judge Saris asked the

12 government for additional information about allegations in the

13 complaint and we provided that submission to the Court.  And

14 we're also going to be providing Judge Saris further

15 information about privilege documents and the nature of the

16 information that has been withheld and we expect to do that

17 within the next two to four weeks.  And we would expect the

18 Judge, Judge Saris to then rule on and the--

19         THE COURT:  So I think it's best left with her at

20 this point.

21         MR. DRACUT:  Well, certainly to the extent that Your

22 Honor were to consider the in-camera submissions that we've

23 already done, it would I think be helpful, I'd respectfully

24 submit it would be helpful, Your Honor, to have Judge Saris'

25 latest thinking about this privilege--

83

1          THE COURT:  Yeah, I will wait.

2          MR. DRACUT:  --which will be articulated in the

3    context of the--

4          THE COURT:  So I will wait.  All right, I think that

5    takes care of it.

6    //

7    //

8    //

9    //

10   //

11   //

12   //

13   //

14   //

15   //

16   //

17   //

18   //

19   //

20   //

21   //

22   //

23   //

24   //

25   //

84

1                    CERTIFICATION

2        I, Maryann V. Young, court approved transcriber, certify

3   that the foregoing is a correct transcript from the official

4   digital sound recording of the proceedings in the

5   above-entitled matter.

6

7   /s/ Maryann V. Young                August 27, 2008

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                        *MARYANN V. YOUNG*
                    **Certified Court Transcriber**
                        **(508) 384-2003**