# Exhibit 2

*United States of America ex rel. Ven-A-Care of the Florida Keys, Inc., et al.*
*v. Dey, Inc., et al.*, **Civil Action No. 05-11084-PBS**

**Exhibit to the March 12, 2010 Declaration of Neil Merkl in Support of**
**Dey Defendants' Motion *In Limine* to Exclude from Evidence the Reports and**
**Testimony of Theodore R. Marmor, Ph.D.**

Page 1

```
 1                UNITED STATES DISTRICT COURT

 2                DISTRICT OF MASSACHUSETTS

 3                    MDL NO. 1456

 4             CIVIL ACTION NO. 01-12257-PBS

 5    ---------------------------------------x

 6    In re:  PHARMACEUTICAL INDUSTRY

 7    AVERAGE WHOLESALE PRICE

 8    LITIGATION

 9    ---------------------------------------x

10    THIS DOCUMENT RELATED TO:

11    United States of America ex rel.

12    Ven-a-Care of the Florida Keys, Inc. v.

13    Boehringer Ingelheim Corp. et al.,

14    CIVIL ACTION NO. 07-10248-PBS

15    ---------------------------------------x

16                  VIDEOTAPED DEPOSITION OF:

17                  THEODORE R. MARMOR, Ph.D.

18                  Wednesday, February 11, 2009

19                     New York, New York

20

21    Reported in stenotype by:

22    Rich Germosen, CCR, CRCR, RPR, CRR, CLR
```

Page 15

```
 1        A.    No.

 2                    (Whereupon, multi-page document

 3    entitled Expert Report of Professor Theodore R.

 4    Marmor, Ph.D., not bearing Bates stamps, is

 5    received and marked as Exhibit Marmor 001 for

 6    Identification.)

 7                    (Whereupon, multi-page document

 8    entitled Supplemental Expert Report of Professor

 9    Theodore R. Marmor, Ph.D., not bearing Bates

10    stamps, is received and marked as Exhibit Marmor

11    002 for Identification.)

12    BY MR. BERLIN:

13        Q.    I've marked as Exhibits 1 and 2 your

14    report dated June 20th, 2008 and your supplemental

15    report dated January 30th, 2009 respectively.

16                    I saw during, before we were going you

17    were just flipping through that.

18                    Can you just verify for us that those

19    are, in fact, your two reports in this case?

20        A.    They are.

21        Q.    And I have attached to them the list of

22    materials considered and also your CV, is that
```

Marmor, Ph.D., Theodore R. - Vol. I                                              February 11, 2009
                                    New York, NY

Page 16

1    correct?

2        A.    The CV is correct.  Considered is a bit

3    broad.  These are the materials that were sent to

4    my office --

5        Q.    Okay.

6        A.    -- from which we extracted materials for

7    me to review.

8        Q.    And we'll get into this in more detail

9    later, but can you describe just generally how,

10   the process for taking the list that you receive

11   or the materials that you receive and extracting

12   the materials that you were going to review?

13       A.    In general it consisted of my working

14   with a team in New Haven and telling them what I

15   was interested in and asking them to extract that

16   from the rather large body of materials that was

17   passed on to us in the course of preparing for

18   this.

19       Q.    And do you have any sort of a document

20   noting what, in fact, you reviewed?

21       A.    I have a memory of and there are some I

22   can recall the highlights of the ones that I

Marmor, Ph.D., Theodore R. - Vol. I                                          February 11, 2009
New York, NY

Page 17

1   pulled out, the depositions, for example, and also

2   the state depositions of Medicaid officials, but I

3   looked at -- there was a huge amount of material

4   that came through.  So you'd have to show me a

5   particular document and I can tell you whether or

6   not I'd reviewed it.

7        Q.    And can you turn to your Exhibit 2.

8        A.    (Reviews.)

9        Q.    And you'll see right after the report in

10  that exhibit we have a list of state Medicaid

11  deposition list.

12       A.    Correct.

13       Q.    And these are documents that the

14  attorneys sent you after you completed your June

15  report, right?

16       A.    Correct.

17       Q.    And did you, in fact, review these

18  depositions?

19       A.    Not all of them.  I selected among them

20  to see how the states, state officials were

21  responding to the types of questions raised.

22       Q.    How did you decide which depositions to

Page 18

1    read?

2         A.    I asked my, my associates to look at the

3    deposition altogether and pick the ones that

4    seemed consistent with my report and the ones that

5    seemed in some at variance with my report.  I

6    wanted to see both sides.

7         Q.    Did your -- did you call them associates

8    or assistants?

9         A.    They're people who worked, have worked

10   with me for a long time.  They're, they're

11   officially -- one is the managing director of a

12   firm called the Crescent Group.

13        Q.    And that's John?

14        A.    That's John Pakutka.  And the other is

15   our full-time research assistant and that's Cory.

16   And then at various times not necessarily in this

17   last round, but there was another postdoc of mine

18   David Boyum who had looked at materials.

19        Q.    What's Cory's last name?

20        A.    Deixler, D-e-i-x-l-e-r.

21        Q.    And what's David's last name?

22        A.    Boyum, B-o-y-u-m, but that goes back

Page 19

1    before this most recent round.

2         Q.   So looking through this list can you

3    tell me which are the ones that you actually did

4    review?

5         A.   I reviewed the Jerry Wells of Florida.

6    I reviewed, where is the Tennessee?  Is it --

7         Q.   Sullivan.

8         A.   Sullivan.  It's not under -- maybe that

9    came in a different patch, but I reviewed that.

10   The Wyoming, Roxanne Homar.

11             I looked at part of the California,

12   Gorospe, but that very, very -- I skimmed part of

13   that and I also looked at the Alaska, but that

14   must -- I don't see the Alaska one here.

15             MR. GORTNER:  It's about the fifth one

16   down, Campana.

17             MS. THOMAS:  Campana.

18        A.   Oh, that's right.  I thought that was

19   Arkansas, but I just misread it.

20   BY MR. BERLIN:

21        Q.   Any others that you, in fact --

22        A.   I saw, I mean I thumbed through a bunch

Marmor, Ph.D., Theodore R. - Vol. I                                    February 11, 2009
New York, NY

Page 20

1    of them, but those are the ones I read.

2        Q.   And you said that some were -- I'm going

3    to not use your exact words, but not on purpose

4    just because I don't remember them, some were

5    consistent with your opinion and some were less

6    consistent with your opinion?

7        A.   Not so much were.  I just -- that was

8    criteria.  Those were the criteria of selection.

9        Q.   So which did you consider to be

10   consistent?

11       A.   I thought the Wyoming one was reasonably

12   consistent with my understanding and I thought

13   that the Tennessee one -- oh, and there is also

14   Georgia.  I read the Georgia.

15       Q.   And just backing up, had your folks John

16   or Cory read all of them to make that

17   determination?

18       A.   They -- they looked -- they broke it up

19   and looked at those.  We also asked -- as I

20   remember I think I asked the attorneys or Jim

21   Breen the same question.

22       Q.   And did Mr. Breen express to you an

Page 21

1   opinion as to which depositions would be

2   considered consistent or which would be

3   inconsistent?

4        A.   I asked him the opposite.  I asked him

5   only the ones that were likely to present issues

6   for my understanding.  And that -- he recommended

7   the Georgia one and the Tennessee one.

8        Q.   And we just broke one of our Cardinal

9   rules.  I'll remind you to make sure that I finish

10  my question before you start even if you know

11  exactly where I'm going with it.

12       A.   Correct.

13       Q.   And he -- I'm sorry, Mr. Breen told you

14  which were, presented issues?

15       A.   I just said which, which ones would you

16  identify as having propositions and that seem at

17  odds with your report and he, he said you should -

18  - you might look at Georgia and Tennessee.

19       Q.   Did he give you any others besides those

20  two?

21       A.   I, I don't recall.

22       Q.   And when was this conversation with Mr.

Page 40

1    and education enable you to apply as you'd say

2    accepted and reliable principles or methods.

3            Is that an accurate summary?

4        A.    I think that's a fair summary.

5        Q.    Now, the United States has said that you

6    are a rebuttal expert.

7            Did you understand your role as being a

8    rebuttal expert?

9        A.    I have increasingly heard that

10   expression.  I do not recall at the outset that

11   that was the formulation.

12       Q.    I won't mark this if you'll take my word

13   for it, if you want to see it you're welcome to.

14           It's in front of the judge in our case,

15   Judge Saris the DOJ counsel said in his whole

16   report, and it's a rebuttal report, we don't know

17   whether we're ever going to need him ultimately.

18   He's certainly not part of our case-in-chief.

19           Is that your understanding of your role?

20       A.    My --

21           MS. THOMAS:  Objection.

22           Form.

Page 41

1      A.   It's my understanding of my role now.

2      Q.   Has that, has -- is it an issue where --

3  explain to me what your initial understanding was.

4      A.   That I would be a witness in this case.

5           MS. THOMAS:  Objection.

6      Q.   And now it's your understanding that you

7  may or may not be a witness in this case?

8      A.    No, it's my understanding that at least

9  my lawyer to the right made an observation before

10  Judge Saris about a decision at that time about

11  how I was to be regarded and that's my

12  understanding at the moment.

13     Q.   And do you have an understanding as to

14  what you are rebutting?

15     A.   I believe I do.

16     Q.   And what is that understanding?

17     A.   The claims made in Number 1, the first

18  question of whether or not the historical record

19  shows that there was acquiescence let alone

20  approval of the allegations in this case, in this

21  it's the Abbott case, but also in Dey and Roxane,

22  and whether or not these three, four bodies of

Page 42

1    data, the use of published prices as a basis, as

2    part of a basis of estimated acquisition cost or

3    whether the Ven-A-Care record of communication

4    with various governmental actors, OIG reports or

5    other investigations constitute evidence against

6    my conclusion or not.  So that's the -- I would

7    say my answers are in, are in rebuttal to

8    alternative proposition.

9         Q.   And is the proposition you understand

10   what has been described as the Defendant's

11   argument of government knowledge?

12        A.   That's -- I only know that to be one

13   aspect of what's alleged.  Lots of other things

14   that are alleged here in combination because there

15   are these what investigations mean, how to read

16   the OIG reports, how to draw inferences from an

17   investigation.  What inferences to draw from the

18   use of a particular basis for estimating

19   acquisition cost and the like.  It's a big record

20   and I want to be clear about that.  This was a

21   massive research job to get clear about these

22   matters and I want to be clear that that's what I

Page 43

```
1    set out to do.

2              MR. GOBENA:  One second, Eric.

3              Whoever is on the telephone, could you

4    put your phone on mute, please?

5         Q.   And as a rebuttal expert and not part of

6    the Plaintiffs' case-in-chief, and I just want to

7    -- you know, what I want up front is to really

8    understand the scope of your report and your

9    opinions because that will guide us over the next

10   few days as to areas that we need to ask you about

11   and areas that we don't need to ask you about.

12        A.   Fair enough.

13        Q.   And so that's why I'm trying to be very

14   careful and up front.

15             Are you expressing any expert opinion

16   whether or not Defendants' price reporting was, in

17   fact, false?

18        A.   Expert opinions.  Let me think for a

19   moment about that.  I don't think my role in this

20   case is to deal with the accuracy of that

21   proposition, but rather focused on whether or not

22   there was acquiescence and approval of the conduct
```

Page 44

1    that's alleged.

2        Q.    That's my understanding as well,

3    Professor.

4            So by asking these questions I'm not

5    implying that you should have something beyond

6    that.  I just want to be very clear.

7        A.    Well, I think maybe it would be helpful

8    if you -- if we just agreed that when I construed

9    my answers to these questions, I took them

10   narrowly.  I've done a lot of work on Medicare and

11   Medicaid that I'm not drawing upon here.  I was

12   asked to answer these questions and for this

13   purpose, for the purpose of the next three days I

14   really want to concentrate on what it is I'm

15   claiming about government policy, not lots of

16   other allegations about what I might have done if

17   I were a historian of fifty states or of the

18   conduct in detail of these three firms.

19       Q.    Fair enough.  Although the neat thing

20   about this process is that the conversation gets

21   to be about what I want to talk about rather than

22   what you want to talk about.

Page 45

1        A.    Counselor, I had no doubt that that was

2    the case, but I was trying -- since you've been

3    cordial, I've been trying to be cordial in

4    response to try to be clear and precise so that we

5    don't spend a lot of time --

6        Q.    I know, but you can see I'm smiling, so

7    you know I'm still being cordial, right?

8        A.    Absolutely I do.

9        Q.    The --

10       A.    And I think I can't see myself, but I

11   think I am too.

12       Q.    Only in your mind's eye.

13             Your opinion does not go to whether

14   Abbott or the other Defendants actually believed

15   that the government had acquiesced in their price

16   reporting?

17       A.    That's --

18             MS. THOMAS:  Objection.

19             Form.

20       A.    Yeah, that's a little trickier because

21   were it the case that there was acquiescence and

22   approval, there would be evidence of that in the

Page 46

1    record and that's what I didn't find.

2          In other words, for there to be a policy

3    of approval or acquiescence, there would have to

4    be authoritative statements to that effect and in

5    order for others to have relied upon that, there

6    would have to be evidence that they did so.

7          The reasoning in short, the mode of

8    reasoning that I'm applying here is one of what

9    facts would have to be the case for a body of

10   reasoning to lead to a conclusion.  There is a

11   reasoning process as well as a factual process.

12       Q.   And we're going to get into exactly what

13   your standard is and you've stated the

14   authoritative statements several times here and in

15   your report.

16       A.   (Indicating.)

17       Q.   But preliminarily let me ask you is your

18   standard for approval or acquiescence a political

19   science standard, an interpretation of the False

20   Claims Act case law or some other standard?

21       A.   It's a political science standard.

22       Q.   And do you have an understanding of the

Page 165

1      Q.   Do you read this as an acknowledgment by

2    these government officials that AWP meant what

3    Defendants in this case are claiming AWP meant?

4           MR. GOBENA:   Objection to form.

5      A.   I don't think so.  I think the -- what

6    she's saying here is that AWP does not work as an

7    effective instrument of getting to instrument and

8    acquisition cost and we don't have an actual

9    acquisition cost and I suspect this was part of

10    the case being developed from the executive branch

11    to try to get the Congress to agree to a different

12    method.

13      Q.   I promised you that we would get to your

14    standard.

15      A.   Okay.

16      Q.   So as a man of my word, Professor

17    Marmor, what is your standard for government

18    approval?

19      A.   The standard I would hold is that an

20    authoritative actor in the United States

21    Government like the head of HCFA or the secretary

22    of HHS or in a congressional statutory revision or

Page 166

1    in a regulation that goes through a conventional

2    process of submission, commentary and final rule

3    making, that that would be one form of

4    acknowledgment leading to a claim that is

5    supportable that the government had acquiesced in

6    a particular state of affairs or approved of it.

7            The second standard would be that others

8    whose behavior was to be affected by the rule in

9    question or the formal standard in question would

10   have been expected to know and if they had a

11   disagreement with it would have been expected to

12   dispute or to try to have changed and if and only

13   if that effort to have it changed, have it changed

14   to their or adjusted to their approval on the part

15   of the interest group with agreement by the

16   authoritative official would I say that the

17   government acquiesced in a certain alleged conduct

18   and/or approved of it.  It would require explicit

19   acknowledgment by formally endowed actors in the

20   U.S. Government's hierarchy.

21        Q.   In what form -- are you done with your

22   answer?

Page 167

1     A.   That's, that's how I would begin to

2   approach this, yes.

3     Q.   Well, I want to make sure I have your

4   full answer.

5     A.   That's the major elements.  If there is

6   something unclear about that, I can, I can speak

7   more fully.

8     Q.   Do both of those elements need to be

9   present?

10    A.   For the question of government approval

11  it's the government's actions that have to be

12  documented.

13    Q.   In what form can the explicit

14  acknowledgment take place?

15    A.   Well, acknowledgment, you could

16  acknowledge that there is conduct that you're

17  critical of.  That's being done right here, but

18  acknowledgment of conduct that you're critical of

19  is not the same thing as acquiescing in it or

20  approving it.

21    Q.   Well, I just was going back to what you

22  said explicit acknowledgment.  So going back to

Page 168

1    what you said is the first part authoritative

2    actor in the U.S. Government.

3         A.   Yes.

4         Q.   That's one form of acknowledgment what -

5    - and you said an authoritative statement.

6              What are examples of an authoritative

7    statement?

8         A.   A memorandum to the secretary of HHS

9    that says we are unable to -- we are unable to

10   find out the extent of inflation of AWP prices in

11   our program.  And since we can't find that out,

12   that we agree that we might as well just stick

13   with it.  And we've communicated that, that might

14   go on to say and we've communicated that to, to

15   the OIG which has been a persistent critic of this

16   conduct.

17        Q.   Is the communication to the OIG

18   necessary?

19        A.   No.

20        Q.   What are other examples of authoritative

21   statements that would qualify in your analysis for

22   approval?

Page 169

1      A.    A statement by the, by let's say the

2    secretary of HHS that acknowledge the problem,

3    claimed that there was no remedy that could

4    generate agreement in that they were going to

5    desist from seeking new ways of getting at this

6    problem, different ways.

7      Q.    Could you give me a few more examples,

8    please?

9      A.    Well, there are almost, I mean you can

10   imagine many of them.  A memorandum of the

11   secretary to the president of the United States.

12   A memorandum to the bureau of the budget and now

13   called OMB.  A letter to the relevant committee

14   chairman reviewing the Medicaid and Medicare

15   programs.  Acknowledging the problem and agreeing

16   that this is a satisfactory state of affairs as

17   far as they're concerned and that this is, this is

18   acknowledgment of acquiescence and possibly

19   approval.  There are many, many, many ways in

20   which an authoritative actor could signal that

21   rather than this being a problem, this was a state

22   of affairs which was acceptable to the U.S.

Marmor, Ph.D., Theodore R. - Vol. I                                    February 11, 2009
New York, NY

Page 170

```
1   Government as opposed to criticized by various

2   parts, but without an agreed-upon remedy.

3        Q.   So the statement itself could be in

4   various forms, is that correct?  I'm not saying

5   that to limit it.  I'm just saying that there can

6   be memos.  There can be letters.  There can be

7   various forms.

8            Do they need to be written?

9        A.   I would say if they're not written they

10  need to be repeated.  Otherwise they're just a

11  judgment at any one time.

12       Q.   How many times would they need to be

13  repeated if they're not written in order to

14  qualify as an approval?

15       A.   It would be --

16           MS. THOMAS:  Objection.

17           Form.

18       A.   Yeah, it would -- I actually don't -- I

19  don't think there is any quantitative.  You would

20  have to get -- you would have to supply the

21  context in which the authoritative act is being

22  described made it plain to themselves and to the
```

Page 171

1    world that an area that had been so disputed was

2    now going to be acknowledged to be acceptable if

3    not approved.  And everything in the record that I

4    looked at fell short of that.  I came across no

5    example in federal policy of people sanctioning

6    that state of affairs.  I found many, many

7    instances of people being critical, but not

8    finding a way that was able to do what I call the

9    three Ps, put together the context in which a big

10   change was possible.

11       Q.   And we'll certainly get to the

12   application of your standard.  I just want to

13   spend a little bit more time understanding the

14   standard itself.

15            So we just discussed the form of the

16   statement.  And what is -- what is determinative

17   of whether it is an authoritative statement?

18       A.   The expression, the degree to which the

19   expression is known and the degree to which the

20   expression is by an official charged with

21   responsibility for the program in question.

22       Q.   And it has to do both -- and I guess --

Page 172

1    let me ask the question in a more open way.

2            What does the content of the statement

3    need to be in order to qualify as approval?

4        A.   It needs to fill the ordinary definition

5    or meaning of the word approval.  This is okay.

6    There are many, many synonyms of that expression

7    including I approve of this.

8        Q.   So for the content part, the expression

9    that this is okay, you're relying on the ordinary

10   meaning of that word as opposed to some specific

11   political science standard?

12       A.   I don't think the political science

13   standard would go to any kind of special

14   definition.  It would go to an understanding of

15   whose judgment would constitute authoritative

16   approval and I've tried to give you an answer to

17   that.

18       Q.   And so the content in terms of

19   expressing an approval could -- there is no

20   specific prescription, it could be expressed in

21   different ways?

22       A.   Political science doesn't spend much

Page 173

1    time telling political figures and governmental

2    figures how to express their thoughts.  It would

3    have to be -- it would satisfy the criteria that I

4    mentioned.

5            It would have to count as an ordinary

6    understanding of what a major official said was

7    the case, indicate approval of the case, or at

8    least the willingness to accept it as not

9    requiring intervention at the moment.  And those

10   combinations of things would constitute the

11   context of which you could infer that there was

12   governmental approval by an appropriate actor as

13   opposed to one or another person in one or another

14   part of the government.

15       Q.   In your report you referred to formal

16   authoritative approval and explicit approval.

17            Are those synonomous or do those terms

18   mean anything different than one another?

19       A.   Formal is the degree to which it's

20   expressed in a way that someone else can find out

21   about it that it's not hidden.  And explicit is

22   that it does not confusingly communicate

Page 174

1    acquiescence or approval.  I meant explicit in a

2    sense of clear.

3        Q.   Is there a political science standard to

4    determine whether a communication is sufficiently

5    explicit to constitute approval, or is that

6    something more that is your judgment?

7        A.   I don't think it's -- I don't think it's

8    quite as open-ended as you suggest of either my

9    judgment or explicit as used in a single way.

10            Explicit is contrasted with implicit and

11   there are rules for or the conventions for

12   understanding whether or not it's clear enough to

13   be called explicit.  At the boundary there is some

14   gray area probably.

15       Q.   Well, how do you determine whether that

16   gray area -- how would someone applying your

17   standard determine whether something that is in

18   the gray area is approval or not approval?

19       A.   By discussion of the terms used by the

20   actors in question and an investigation of what

21   interpreters of political language and the meaning

22   of the language at that time in the context of

Page 175

```
 1   that period could have been expected to interpret

 2   that as a meaning.

 3        Q.    And for purposes of this case who, who

 4   are the authoritative actors?

 5        A.    I think the one answer to that question

 6   would be the secretary of HHS.  The president of

 7   the United States in a communication to other

 8   governmental actors in a form that's available for

 9   public inspection, and possibly alone the

10   administrator of HCFA if that administrator was in

11   a context where the administrator was speaking

12   authoritatively to another actor like a hearing of

13   the relevant finance committee of the Congress.

14   Those are some of the ways in which I would answer

15   that.

16        Q.    Well, any other actors whom you would

17   consider to be authoritative in this context?

18        A.    Well, there are others who have

19   authority.  I mean if, for example, the general

20   counsel made a determination, that would certainly

21   bear on this, but then the question is was the

22   general counsel's view shared by the head of the
```

Page 176

1    program or the secretary of the department?  Or

2    was it an idiosyncratic commentary or not?

3         Q.    And could you continue your list of --

4         A.    You can just go right down the

5    hierarchy.

6         Q.    Well, I'd like you to do that then.

7         A.    Well, you could imagine people in charge

8    of particular bureaus or divisions within HHS or

9    within HCFA might, might in a formal document to

10   one of the states, might have, I just didn't see

11   it.

12        Q.    Who else?

13        A.    Oh, I think the number of people who

14   might claim to have an official position that's

15   relevant is very large, but I think I would

16   restrict myself in matters like this to high

17   ranking officials in an official capacity

18   communicating with another governmental official

19   in a public way that was explicit about approval

20   and acquiescence and that's about the end of what

21   I can say about who.

22        Q.    And that -- the list you just gave is on

Page 177

1   the federal side.

2            Who are authoritative actors on the

3   state side?

4            MR. GOBENA:   Objection to form.

5       A.   Well, the one I would -- the most

6   authoritative actor would be the head of the

7   Medicaid program for this purpose.

8       Q.   Any others?

9       A.   Well, there are lots of people who have

10  authority for various tasks but for this purpose -

11  -

12      Q.   Well, I'm sorry, Professor.  Let me

13  clarify the question.

14           I'm specifically asking for the context

15  that we're dealing with in this case.

16      A.   Well, insofar as the question would be

17  one of acquiescence and approval by the Federal

18  Government, I've answered it.

19           Insofar as it would be, there would be a

20  question of whether or not a state official was

21  making a formal announcement of a different view

22  of how to proceed as some did, for example, in

Page 178

1    Louisiana and Oklahoma, that would be a position

2    within the decision making process that would

3    raise the question of whether or not there was

4    approval and acquiescence, and to the extent it

5    was raised as a judgment for the HCFA to decide,

6    HCFA's decision about that would constitute if

7    there was proposed to acquiesce in the conduct.

8    HCFA's decision might, might explicitly address

9    that or not.

10       Q.   Now, in your analysis you applied

11   Professor Allison's different models to look at

12   how the government acted in this, in this context?

13       A.   I used models that Graham Allison had

14   summarized, but the models are actually in some

15   ways taken from other people.

16       Q.   From where did you get the standard to

17   determine whether there is approval or

18   acquiescence?

19       A.   I think the answer here is that the

20   three modes of analysis would give slightly

21   different answers to that question.

22       Q.   Could you explain that further?

Page 179

1          A.     Well, the third model would emphasize

2     the explicit discussion about acquiescence and

3     approval by the major officials involved in drug

4     reimbursement policy in the U.S.  Federal

5     Government with some attention to state officials.

6               The second model would emphasize the

7     degree to which approving or acquiescing language

8     was built into or incorporated in the advice given

9     to states about how they should pay for

10    prescription drugs and generic drugs.

11              And the third would treat the U.S.

12    Government as if it were a person and ask the

13    question of when did the U.S. Government decide

14    that there was approval or acquiescence, or did

15    it, and treat that as evidence found in one place

16    would be evidence of something called the U.S.

17    Government's position as if it were a person.

18              And so that, the point about that is

19    these three somewhat different glances, lenses on

20    observations raise interpretation questions, and

21    so there are a lot of further questions about why

22    would you accept one and not the other, accept

Page 180

1    them slightly different and which is more

2    persuasive in the light of other evidence and

3    other grounds for reasoning to whether or not

4    there was acquiescence and approval.  That's the

5    whole point that they give you three different

6    portraits of related matters, but not identical

7    matters.

8         Q.    So in this case could you find approval

9    or acquiescence under Model I?

10        A.    You could find assertions of that by

11   backward reasoning from inaction, and some people

12   do that.

13            The U.S. Government did not change the

14   method of payment, therefore, a person who did not

15   change the method of payment must have acquiesced

16   in it by backward reasoning.  It is one possible

17   interpretation.  I just think it's wrong.

18            Now, can I stop for just a minute and

19   get some water?

20        Q.    Yes, of course.

21            THE VIDEOGRAPHER:  Going off the record.

22            The time is 2:26 p.m.

Page 181

```
 1                 (Whereupon, a short recess is

 2    taken.)

 3              THE VIDEOGRAPHER:  Stand by, please.

 4              We're back on the record.

 5              The time is 2:26 p.m.

 6              THE WITNESS:  No, it's fine.  Nothing

 7    else.  Thanks.

 8              Thank you.

 9              MS. THOMAS:  You're welcome.

10       A.   You talk about models and I get dry.

11    BY MR. BERLIN:

12       Q.   Could, could approval -- in this case

13    could approval or acquiescence be found under

14    Model II?

15       A.   You might, there might have been

16    evidence consistent and supportive of that

17    interpretation if we found in the standard advice

18    giving that claim repeated again and again and

19    built into the understanding between the Federal

20    Government and the states or within the Federal

21    Government.  It just doesn't happen to be true.

22       Q.   Oh, okay.
```

Marmor, Ph.D., Theodore R. - Vol. I                                    February 11, 2009
                                New York, NY

                                                                      Page 182

1           And you're answering a question that I

2    intend to ask, but let me, let me rephrase and be

3    more specific.

4           My question right now is given the facts

5    that you found, could a political scientist find

6    approval or acquiescence applying Model II to

7    those facts?

8        A.   Could?  A bad one could, but one using

9    the standard interpretation I believe it would be

10   the case would come to the overall judgment that

11   the record does not support that interpretation,

12   but in principle it could be the case that there

13   would be enough of in the regulatory or in the

14   guidance language promulgated in the advice given

15   to the states on a regular basis that you should

16   take as simply a matter of non-concern some gaps

17   between the AWP and the transaction prices that

18   have been found.

19       Q.   Which model --

20       A.   Those facts --

21       Q.   I'm sorry.

22       A.   -- in order to come to that conclusion

Marmor, Ph.D., Theodore R. - Vol. I                                    February 11, 2009
New York, NY

Page 183

1   you'd have to have supporting evidence that that,

2   those facts were there.

3        Q.   Which model do you, in fact, apply to

4   reach your conclusion?

5        A.   A combination of Models II and III

6   depending on the particular question I'm trying to

7   answer.

8        Q.   Well, in this case, are you saying that

9   you applied both in this case?

10       A.   I checked one against the other.  That

11  is I didn't find, I didn't find the evidence in

12  the regular communications between the officials

13  of the U.S. Government and the states of

14  acquiescence.  And two, when I looked into

15  particular dialogues between the Congress and

16  HCFA, I found no evidence of, on the part of HCFA

17  and on the part of many of the Congress people who

18  were involved of acquiescing in the inflation that

19  was reported.  Quite the opposite.

20       Q.   And so your testimony is that you

21  applied, do you mind if we call them the Allison

22  models or how --

Page 184

1      A.   You can.  I use them as Models I, II and

2    III.

3      Q.   Okay.

4      A.   Because they reflect, in turn, very,

5    very identifiable modes of analysis and Allison

6    systematized the grouping of them and gave them

7    names which are highly misleading like the

8    rational actor and the organizational process and

9    bureaucratic politics and since I don't find those

10   particularly helpful, I've used Models I, II and

11   III, organizational analysis, unitary actor and

12   micro politics.

13     Q.   So you applied these models to determine

14   whether approval or acquiescence had taken place?

15     A.   That's close, but the real answer is

16   that I use those models in coming to my

17   description in my accounting for what I find about

18   the government, and I check one against the other.

19          I ask questions in the characteristic

20   form.  I pose questions in the characteristic in

21   somewhat different form of all three.  And I then

22   ask myself as Graham himself did in the Cuban

Page 185

```
 1   missile crisis, and I did in my own book on the

 2   Politics of Medicare, what's illuminated by one

 3   model or another with respect to the question at

 4   hand?

 5        Q.   Is there scholarly work in your field as

 6   to the standard for determining whether government

 7   approval has occurred?

 8        A.   I don't think there is a -- I think

 9   there is plenty of standards available for

10   answering the question is it the case that the

11   government did or did not do in an authoritative

12   way a particular act, but I don't think the word

13   approval has a political science stipulated

14   definition that is used.  It's -- the reasoning is

15   from ordinary language and ordinary accepted

16   conventions of describing who is in an

17   authoritative position.  That's the combination.

18        Q.   Let me see if I get it right and then

19   you can correct me as you want.

20             You're using the models to analyze what

21   took place.  There is some political science

22   standard as to who is authoritative in different
```

Page 186

1    contexts and you're applying the plain meaning of

2    approval to determine whether there has been

3    approval in this context by one of those

4    authoritative persons?

5           A.    Not quite, but close.

6           Q.    Thank you.  Why don't you make it quite.

7           A.    The word approval is, is not what's

8    idiosyncratic.  What's idiosyncratic is whether or

9    not approval or acquiescence is given in such a

10   way that it's recognizable as the decision of an

11   authoritative actor publicly communicated.  So

12   it's not -- it's -- the description of who the

13   particular authoritative actress with who are

14   relevant would be more of a Model III account.

15          The question of whether the department

16   or the agency had a standard body of guidance

17   would not be so much the product of a particular

18   individual.  It would be embodied in the standard

19   guidance.

20          Q.    Well, you discussed the components, the

21   various components to determine whether there is

22   approval, whether it's an authoritative actor,

Page 187

1   whether there is an authoritative statement, and

2   whether that statement sufficiently expresses

3   approval, is that right?

4        A.   Those are the elements.  Those are some

5   of the elements, yes.

6        Q.   Are there more elements than that?

7        A.   Depending on whether or not you were

8   using a Model II account.  If you're using a Model

9   II account you would ask to see whether or not

10  that is embodied in guidance given routinely to

11  the actors in the state.  In the states.  Because

12  the question asked under Model II is what is it

13  that the government's actions consisted with

14  respect to this.  It's not who said what to whom,

15  when, where and why.  It's what is the -- what's

16  the operation of the U.S. Government with respect

17  to this question and the guidance would be the

18  standard expression of guidance approval, not

19  approval, whatever it happens to be.

20            Whereas the second, the other model, the

21  third model would ask how is it that it came to be

22  known at any one moment in time that there was

Page 188

1    approval and you would then need to know who gave

2    the approval, in what form, was it public, was it

3    agreed to in a way that it could be relied upon as

4    the official statement of the relevant

5    authorities.  It's a slightly different question

6    and a slightly different formulation and that's

7    the point of the models.

8        Q.   But in terms of the actual content

9    putting aside by whom or the mechanism of the

10   communication, in other words, the actor or the

11   type of statement, whether that, the content is is

12   there approval?

13       A.   Oh, if the question is is there

14   acquiescence or is there approval, there have to

15   be, there would have to be evidence of one of the

16   two types, either the description of coming to

17   that decision authoritatively or embodying that

18   understanding in routine communications between

19   authoritative sources and those whose conduct is

20   to be guided by those authoritative sources.

21            So the answer to the second one is

22   routine guidance from the Feds to the states.  The

Page 189

1    other one would be decisional details of

2    challenging, challenging the understanding adhered

3    to that there was not acceptance of this.  In

4    fact, there was endless efforts to try to change

5    the state of affairs.

6         Q.   So in this case if there were what you

7    would consider to be an authoritative memorandum

8    from the secretary of the Health and Human

9    Services perhaps to the administrator of HCFA,

10   that you would -- you would say that it is an

11   administrative, it is an authoritative statement

12   by an authoritative person and you're trying to

13   determine whether it expresses approval or not, is

14   there anywhere within political science

15   scholarship that you could turn to determine

16   whether it's approval, or is that just based on

17   the common understanding of what approval means?

18        A.   Well, approval is not the only word.

19   You've also -- there is also the same question

20   about acquiescence.

21        Q.   I know, but I'm asking --

22        A.   About approval?

Page 190

```
 1        Q.    Yeah.

 2        A.    I think there I would rely generally on

 3   ordinary language interpretation of the word

 4   approval but for some grounds for thinking it was

 5   being used in an idiosyncratic sense.

 6        Q.    What is your standard for government

 7   acquiescence?

 8        A.    Well, it's a less vigorous form of the

 9   general category of approval or going along with

10   something.  It's acceptance of the status quo

11   without, without the premise or without the

12   premise that it should be changed at least for

13   now.

14        Q.    Does that also need to be an

15   authoritative statement by an authoritative actor

16   or is that --

17        A.    Depends upon, it depends upon the use

18   someone wants to put to the claim of acquiescence.

19   If the claim is that there was acquiescence in the

20   U.S. Government, you need evidence that there was.

21        Q.    Well, describe to me how is

22   acquiescence, for your standard, how is the
```

Page 191

1   standard for approval different than the standard

2   for acquiescence or vice versa, how is the

3   standard for --

4        A.   Well, I think the standard, the standard

5   of approval is more, is more vigorous than the

6   standard of acquiescence.  Acquiescence is to

7   accept as okay.  Approval is to say it is

8   positive.

9        Q.   So could one, could one find government

10  acquiescence without an authoritative statement?

11       A.   I don't believe so if you're using -- if

12  acquiescence is relevant to someone's relying on

13  the government's acquiescence.

14              (Whereupon, two-page document

15  entitled Acquiescence, not bearing Bates stamps,

16  is received and marked as Exhibit Marmor 006 for

17  Identification.)

18  BY MR. BERLIN:

19       Q.   I've marked as Marmor Exhibit 6 a

20  printout of definitions of acquiescence from

21  dictionary.com.

22       A.   Oh.

Page 202

1    process really rather than the writing out of an

2    explicit standard for something like when would we

3    know that there was acquiescence.  You'd say when

4    would we know when there is acquiescence is when

5    you provide a context where this behavior would be

6    interpreted by other knowledgeable persons as

7    signifying X, Y or Z whatever it happens to be.

8    So it's a standard of hypotheses and a hypothesis

9    testing on the basis of other parties looking at

10   the same context.

11        Q.   Do you know of any scholarly work

12   describing methods for determining where you would

13   find acquiescence or where you would not?

14        A.   Well, I think, I think the political

15   science scholarship is loaded with contextual

16   accounts of why one meaning of a term is more

17   plausible in that context than another, many,

18   many.

19           Not -- but with respect to the word

20   acquiescence, I don't think I've seen, that I can

21   think of as we sit here, think of a particular

22   dispute about acquiescence that led to a detailed

Marmor, Ph.D., Theodore R. - Vol. I                                    February 11, 2009
New York, NY

Page 203

```
 1   investigation to try to establish.  There have

 2   been, but I just can't remember them.

 3        Q.   So when you were looking at this

 4   conduct, at conducting your analysis in this case,

 5   were you relying on any political science work to

 6   guide you in determining whether there was

 7   acquiescence or not?

 8        A.   Yes, I was.

 9        Q.   What?

10        A.   I was relying there on the standards of

11   Model III to provide a description of the setting

12   of the persons whose conduct was allegedly

13   acquiescing in order to provide the premises for

14   judging whether or not they were acquiescing when

15   they were in a situation where non-action took

16   place.  So the background that I've been referring

17   to here about DeParle, I could have said the same

18   thing about other HHS and HCFA officials looking

19   for ways to change the methodology of paying for

20   prescription drugs, that provides a context of

21   criticism of the status quo rather than general

22   approval of the status quo and thereby non-action
```

Page 204

1   more plausibly interpreted as acquiescence as

2   opposed to non-action.

3       Q.   But those models, Model III in

4   particular provides you with a method for

5   examining the historical record, right?

6       A.   No, it provides me a method for

7   describing an accounting for actions by in this

8   case organizational actors in the U.S. Government.

9       Q.   It doesn't speak specifically to

10  acquiescence though, right?

11      A.   No, it's a method by which I am trying

12  to present, or I'm trying to come to a judgment

13  about the question of whether acquiescence is a

14  sensible interpretation of the behavior in

15  question.

16      Q.   And, you know, you said that you needed

17  something more than just tacit or silent assent

18  here because there was an inability to get

19  agreement on change?

20      A.   The inability to get agreement on change

21  is one of those facts which is in the background

22  to set the context for interpreting the non-change