# Exhibit 3

*United States of America ex rel. Ven-A-Care of the Florida Keys, Inc., et al.*
*v. Dey, Inc., et al*., Civil Action No. 05-11084-PBS

**Exhibit to the March 12, 2010 Declaration of Neil Merkl in Support of**
**Dey Defendants' Motion *In Limine* to Exclude from Evidence the Reports and**
**Testimony of Theodore R. Marmor, Ph.D.**

June 20, 2008

## UNITED STATES DISTRICT COURT DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION <br><br> **THIS DOCUMENT RELATES TO:** <br><br> *United States of America, ex rel. Ven-a-Care of the Florida Keys, Inc. v. Abbott Laboratories, Inc.,* <br> CIVIL ACTION NO. 06–CV-11337-PBS | MDL No. 1456 <br> Civil Action No. 01-12257-PBS <br><br> Hon. Patti B. Saris |

### Expert Report of Professor Theodore R. Marmor, PhD

#### I. Assignment

I have been asked to offer my opinion about the following questions posed by officials at the United States Department of Justice:

1. Does the historical record of Federal (and/or State) government policy on Medicare and Medicaid drug reimbursement support the proposition that the Federal Government (Congress, HHS, HCFA) approved of, or acquiesced in, Abbott's price-reporting conduct as alleged in the United States' Amended Complaint?

2. Explain whether and if so, how, my experience, training, and education in the fields of political science and public policy enable me to apply accepted and reliable principles or methods in my field to respond to this question. Describe those accepted and reliable principles and methods.

3. How do the following facts and information bear on my opinions about questions 1 and 2?

(1) Medicare and Medicaid's continued use of published prices (AWPs, WACs, Direct Prices);
(2) The record of Ven-A-Care's (VAC) communications with various persons within the Federal Government (Congress, HHS, HCFA) and States;
(3) Federal and State reports including those issued by the Office of the Inspector General (OIG) at HHS; and
(4) Federal, State, and Congressional investigations.



DEPOSITION EXHIBIT
Marmor 1
2/11/09
Rich Germosen, CSR, CSR-R, RPR, CRR

June 20, 2008

**II. Qualifications**

4. The attached curriculum vitae provides a detailed description of my educational, professional and scholarly background. Here, I will highlight only those aspects most relevant to my analysis of issues in this case.

5. I was educated at Harvard College and University and took my doctoral degree in American politics and history in 1966. My formal education includes a fellowship year at Wadham College, Oxford (in philosophy, politics and economics) and a post-doctoral fellowship at the Harvard School of Public Health in 1966.

6. I recently retired as Professor of Public Policy, Political Science and Management at Yale University, where I have taught since 1979. I have also been an adjunct professor at Yale Law School, where I have taught the course on health politics, policy, and law since 2002. My prior academic positions were at the Universities of Wisconsin, Minnesota, and Chicago. From 2007 on I will teach classes in policy analysis at Harvard's Kennedy School of Government.

7. My scholarship has concentrated on the study of public policy (both domestic and comparative), emphasizing over the past two decades disputed issues in health and health care. My book, The Politics of Medicare, has been continuously in print since 1970, with an expanded, second edition in 2000. I was the co-author, with Yale colleagues, of a book published in 1990 on America's Misunderstood Welfare State: Persistent Myths, Continuing Realities. Most recently, I published a set of essays entitled Fads, Fallacies and Foolishness in Medical Care Management and Policy (2007). For the period 1987-95, I was a fellow of the Canadian Institute for Advanced Research and, with others, edited and contributed to a book on Why Some People Are Healthy and

2

June 20, 2008

Others Not (1994).  Finally, my scholarly involvement in issues of health policy

was influenced by both my five years (1980-85) as the editor of the *Journal of Health*

*Politics, Policy and Law* and my role as director of Yale's post-doctoral program in health

policy and social science from 1993 to 2003.

      8. I have been a fellow of the Institute of Medicine for some time and was in the

early 1980s a founding member of the National Academy of Social Insurance.  I am on

the board of a number of health and public policy journals, as noted in my vita.  I have

listed in that vita the cases in which I have served as an expert witness during the past

four years. These cases have involved public awareness of asbestos, disputes about the

proper scope of Canadian national health insurance, and questions about the Medicare

statute's policy toward the financing of durable medical equipment.

      9. I have done research on--and taught about--a wide variety of policy

issues.  This has included analyses of the legislative origins of Medicare, the struggle

over what kind of outpatient drug benefit would be added to Medicare, and disputes over

why the Clinton health care reform proposal failed as reform.  I have studied regulatory

struggles among government actors, physicians, hospitals, pharmaceutical industry

manufacturers and other parties involved.  Quantitatively, I have been the author, co-

author or editor of eleven books and the author or co-author of over 150 articles in peer-

reviewed journals and other academic publications.  In that work, I have combined the

diverse disciplinary methods of history, political science and policy analysis to address

controversial descriptions, explanations, and evaluations of public policy developments

in the welfare state area generally and in health policy more specifically.  In doing so, I

have used the methods of political science in constructing accurate and adequate

June 20, 2008

descriptions of government policy-making and non-action.  I have relied upon models of

political analysis that clarify what policies are, why they emerge as they do (or not), and

what implications follow from the structure of American government and politics for the

prospects of continuity and change in established program practices.  I have employed

these models in my consulting to governments, corporations and not-for-profit

organizations.

10. I have also worked in government and in roles directly related to

governmental policymaking.  This started in 1966 when I was a special assistant to

Wilbur Cohen, then Undersecretary of the U.S. Department of Health, Education and

Welfare, during the first summer of the Medicare and Medicaid programs.  That

experience was important in my writing of the Medicare book previously noted.  I later

served as the principal consultant to the President's Commission on Income Maintenance

(1968-70) and a member of President Carter's Commission on an Agenda for the

1980s.  Between 1982-84, I was the principal social and health policy advisor to Walter

Mondale during his presidential campaign.

11. I have served as a consultant or advisor on health and other social welfare

issues to federal agencies, congressional committees, and state governments, and I have

testified before state legislatures and various committees of the United States Congress.  I

have been consulted by pharmaceutical firms about a variety of issues.  Schering Plough

hired my colleague Professor Jerry Mashaw and me to help interpret the meaning of the

Clinton health reform for its firm in 1993.  With Astra Zeneca, the task in 2003 was to

explain current and anticipated public policy changes in Canada and the United States to

its governmental affairs officials and to lead a conference on the subject in June of that

4

June 20, 2008

year.  Merck officials hired me in the mid-1990s to speak to their senior staff about the

likely shape of regulatory policy toward their industry.  In addition, I have testified on

behalf of Canadian public authorities (federal and provincial) in connection with

defending the provisions of the Canada Health Act of 1984.  This included testimony

before both New Brunswick and Quebec courts and, in the case of the latter, subsequent

constitutional litigation in the 2005 Chaoulli case.

### III. Compensation

12. For my work in this case, The Crescent Group is paid at a rate of $500/hour

(and at a lower hourly rate for supporting personnel). The clients to whom bills are sent

are the United States Department of Justice and the Relator.

### IV. Principles, Methods, and their Application (answers to questions 1 and 2)

13. To address the questions posed at the outset of this report, I will proceed as

follows.  First, I will offer my views about what constitutes and best explains the

policy history of Medicare and Medicaid generally.  I will in turn, and in more detail,

address the programmatic history of drug benefit reimbursement policies and

practices.  To describe and explain such policy developments over time requires selecting

among and employing appropriate analytic models.  The work of Graham Allison is here

fundamental; the question to which his framework of analysis speaks is most simply put:

"How should [one] try to understand the actions of ...government?" [1]

14. To understand the origins and evolution of government programs--like

Medicare and Medicaid--the analyst has to choose among or try to combine differing

---

[1] Allison, Graham T., Essence of Decision: Explaining the Cuban Missile Crisis, (New York: Harper Collins, 1971). Also, Allison, Graham T. and Zelikow, Philip, Essence of Decision: Explaining the Cuban Missile Crisis, 2nd Edition, (New York: Longman, 1999): viii.

June 20, 2008

models of analysis.  As noted in the political science literature, one widely employed

approach is to treat the government of the United States (or nation or large collectivity) as

if policymaking were the choice of an individual selecting a course of action among

competing options according to clear purposes and evaluative criteria.  Looking at

Medicare and Medicaid through that particular analytic lens prompts this question: why

did American government *choose* a hospital and physician insurance program like

Medicare and a federal-state welfare program like Medicaid to finance the costs of

medical care in 1965?  As noted in my book on Medicare, thinking about a government

as a unitary, purposeful actor is not uncommon.[2]  The vocabulary of clear goals, rational

calculation, and choice in governmental decision-making can transform unwieldy

complexity into manageable packages.  The presumption of a rational, unitary actor has a

distinctive logic of explanation: "if a nation [or agency] performs an action of this sort, it

must have had a goal of this type."[3]

15. But such "simplification--like all simplifications--obscures as well as

reveals."[4]  The *unitary actor* approach--what Allison terms Model I--does not take into

account that American government is in fact quite complex.  What we call American

government is, from another interpretive standpoint, a varied and loose association of

large organizations with routines, standard operating procedures and subunits that can

have quite distinctive--often competing--understandings of their purposes and practices.

16. The second approach--called the *organizational process* model--is sharply

different.  This second model takes large scale government bodies and programs as the

units of analysis.  The explanatory presumption is that organizations change slowly, that

[2] Marmor, Theodore, <u>The Politics of Medicare,</u> (New York: Aldine De Gruyter, 1970, 1973, 2000): 64-67.
[3] <u>Essence of Decision: Explaining the Cuban Missile Crisis, 2nd Edition</u> (1999): 5.
[4] <u>Essence of Decision: Explaining the Cuban Missile Crisis, 2nd Edition</u> (1999): 3.

June 20, 2008

"the best prediction of what will happen at (time) t+1 is (what is happening at time) t." [5]

Accordingly, predictions proceed from the structure, programs, and past behavior of the organizations whose actions are the object of description, explanation, and evaluation. It is obvious that this second model emphasizes both path dependency and inertia. Most social scientists recognize "such collectivities do not behave like individuals. Organizations filter information in ways persons do not. They seek means to maintain themselves over time not characteristic of individual behavior." [6]

17. The explanatory implications of Model II are substantial. The "conjunction of the routine behavior of many individuals in organizational settings" explains "results in public policy" which cannot be accounted for by reference to the activities of dispersed individual parties or a unitary actor called the government. This second model is particularly relevant to analyses of governmental behavior in areas where the reliable performance of organizational routines and practices is crucial. [7]

18. Allison's third approach--Model III-- has come to be known, somewhat misleadingly, as *bureaucratic (or more recently, governmental) politics*. The question the third model addresses is not what best describes and explains the behavior of governmental organizations over time. Rather, its focus is why actions at any one time emerge from bargaining episodes among individual players in positions of differential authority, persuasiveness, and power. In such bargaining analyses, the issue is why actors in various roles within the government produced particular actions--the policy choices best understood as resultants. It emphasizes how these resultants emerge from

---

[5] Essence of Decision: Explaining the Cuban Missile Crisis, 2nd Edition (1999): 175.
[6] The Politics of Medicare: 68.
[7] An example would be the central importance of regular, reliable, and computer assisted reimbursement in both Medicaid and Medicare. State programs need to assure availability of drugs which in turn requires regular payment to pharmacies for tens of thousands of drugs and millions of individual transactions.

June 20, 2008

the exercise of skill, power, and advantage in contexts constrained by what various actors

regard as the rules of the game.

19. Each of these approaches--frameworks, models, or lenses as their expositor

Graham Allison writes--direct the analyst's attention differently. The first highlights the

costs and benefits of particular options and presumes that what the government selected

was a purposeful decision.  Equally, if and when any policy emerges, Model I provides a

rationalistic explanation of why that was so: a policy is understood as the

appropriate means to the results that followed.  But, such explanations may well be (and

often are) factually inaccurate.  Or, the result may have been an unintended consequence

of the policy decision, or largely accidental. Only historical investigation can show what

the policy aims and actions were, and were not.  As Allison has clearly explained,

> the shift from Model I to the Model II and Model III forms of analysis
> really involves a fundamental change in intellectual style.  From the basic
> conception of happenings as choices to be explained by reference to
> objectives (on analogy with the actions of individual human beings), we
> must move to a conception of happenings as events whose determinants
> are to be investigated according to the canons that have been developed by
> modern science...Model II and Model III summarize two bundles of
> categories and assumptions, and two distinctive logical patterns that
> provide useful emphatic shorthands in which governmental action can be
> explained and predicted. [8]

20. It is plain that the defendant's claim in this case is illustrative of the restrictive,

often misleading Model I mode of reasoning.  Consider the defendant's proposition about

what the United States government knew.   The "plaintiffs' attempt to characterize as

"fraudulent" or "unjust" [the] pharmaceutical industry pricing practices" is not justified.

After all, the defendants claim that," ...the United States Government not only *knew*

about [these practices] for decades, but indeed, *embraced* [them] to further its own

---

[8] <u>Essence of Decision: Explaining the Cuban Missile Crisis</u> (1971): 255.

June 20, 2008

agenda....[In addition], the Government has always controlled what and how Medicare and Medicaid will reimburse for drugs."[9] The premise from which this form of reasoning proceeds is as follows: if the government knew[10] the pricing practices of the pharmaceutical industry in general (and Abbott in particular), then its "failure" to change the AWP and related policies constituted governmental acquiescence--or even an embrace of these pricing practices.[11] The evidence highlighted by Model II and III accounts does not support this interpretation.

21. Applying the organizational process model (Model II) directly challenges such an interpretation about a unitary American government's mode of decision making. Rather, Model II accounts would proceed along the following interpretive lines. If the federal government already had a standard policy of paying for drugs that was regarded as reasonably satisfactory,[12] its dispersed organizations (Health Care Financing Agency-Center for Medicare and Medicaid Services (HCFA-CMS), the House Ways and Means Committee, the House Commerce Committee, the Senate Finance Committee, the Office of the Inspector General (OIG), the Government Accountability Office (GAO), et

---

[9] "Abbott Laboratories, Inc. Memorandum of Law In Support of Its Motion to Dismiss," 7 July 2007.

[10] In this case, for claims about "government" knowledge, see "Abbott Laboratories, Inc.'s Revised First Set of Requests for Admission." In the section "Requests for Admission Seeking Authentication of Documents," sixty-nine separate government documents show certain public officials--at dates ranging from 1968-2001--knowing something about this complex policy area.

[11] The research conducted for this case included searching for any evidence of governmental acquiescence or approval, including historical documentation of direct communications between Abbott and the United States government over the period of this case. My aim was to assess whether there was evidence of explicit approval or disapproval of the alleged conduct in question in this case. Nothing I reviewed indicated acquiescence. In fact, Abbott received numerous communications noting that its pricing behavior was under scrutiny. See, for examples, Civil Investigative Demand No. 95-125 issued by the Department of Justice in February, 1996, the HHS OIG subpoena in 1997, and other documents contained in the index of exhibits to "Plaintiffs' Response to Defendants' Motion to Quash Notice of Deposition of Miles D. White," 24 May 2007.

[12] "Reasonably satisfactory" is not a self-defining expression. The requirement of maintaining regular payments to pharmacies meant that state Medicaid and federal Medicare officials had, when available technically, to use computerized claims processing. That, in turn, required under the estimated acquisition cost regulation (EAC), timely submission of transaction prices. Since there was not an available, operational alternative to using the drug industry compendia as a source of price data, the use of reported AWP and WAC prices was the obvious recourse. Virtually every state did so.

June 20, 2008

al.) would be expected to maintain (or simply continue) that policy until and unless a large scale change in the political environment precipitated an overhaul in policy. Equally, a policy on which a state Medicaid program relied would be constrained by formal federal requirements, the expectations of state legislators about controlling administrative costs, and the calls for reliable payments to druggists that the state legislature would demand.

22. For the analyst employing the organizational model, then, it is not enough to note the presence of drug reimbursement problems, allegations of fraud, evidence of individual misdeeds, or public complaining by individual actors and agencies. This body of evidence does not establish either what reimbursement policy in fact was or whether the continuation of particular practices constituted acquiescence or approval. There are large analytical gaps in the reasoning here. On the one hand, there was the government's limited understanding of random and hidden price disparities during the relevant period. On the other hand, there was the drug industry's targeting lobbying, designed to alarm the congress and to convince members that reductions in reimbursement would make participation by pharmacies and physicians economically infeasible. Then there is the general lack of awareness of the extent of manipulation through inducements, affecting medical judgment. Finally, there is the drug industry's puzzling conclusion that the government's continuing use of reported prices constituted endorsement of these attributes of the reimbursement system. More direct, particular evidence of formal authoritative approval would be required, according to the organizational process model, to establish governmental acquiescence in the type of drug price reporting conduct

June 20, 2008

alleged in this case.  Nothing I have seen indicates that federal or state policymaking organizations did so.

23. By contrast, the model of governmental bargaining (Model III) would require even more detailed evidence to establish affirmative approval of the drug pricing practices at issue in this case.  Again, continuing practices that were recognized to reflect some overestimation of costs--instead of risking reimbursement below costs--is a far cry from endorsing the type of conduct alleged in this case. To substantiate acquiescence, informed officials in authoritative positions would have had to have decided--in a bargaining discussion about competing options--to change the regulatory standard and, over time, to acknowledge such a policy position repeatedly.  The historical record I have reviewed, as will be discussed below, is not consistent with that interpretation either.  In the historical narrative section of the report, I will illustrate the use of these descriptive and interpretive models in reviewing factual claims about the evolution of governmental reimbursement policy.

24. It is important to add to these methodological comments the following. These models are particularly relevant to understanding the structure and functioning of American government.  American government is comparatively very complex, a system of institutions sharing power and authority both at the national level and across state and local boundaries.  The chart below is a simplified sketch of the major institutions of American government concerned with healthcare policy.

June 20, 2008



The dispersion of policymaking authority is obvious in the case both of Medicare and Medicaid, though the institutions sharing in that complex decision making differ between the two programs.[13] What I want to emphasize here is that the dispersal of authority in the United States makes concerted, collective action more difficult than in a unitary state with parliamentary control, as in most modern democracies. That much I will also try to illustrate more fully in the course of the following historical portrait of policy evolution.

### V. Medicare and Medicaid: Program Purposes, Policies Adopted, Explanations

25. To understand the evolution of reimbursement policies in these two substantial programs of public financing of medical care requires attention to their origins. It is crucial, for instance, to appreciate how unexpected these 1965 reforms were in medical care financing. Formally known as Title XVIII and XIX of the Social

---

[13] Note that the Social Security Administration had responsibility for Medicare until 1977 while the HEW's Social and Rehabilitation Services administered Medicaid from 1966 until the creation of the Health Care Financing Administration (HCFA) in 1977. Thus, to speak about the "government" doing anything during this time period regarding drug reimbursement understates the dispersal of administrative authority over these programs.

June 20, 2008

Security Act, the combination of Medicare's Part B and Medicaid were last-minute and utterly surprising additions to the hospital financing plan that had been debated for some years. The Johnson Administration had proposed in January of 1965 a hospital insurance program for the elderly (what became Part A of Medicare). Former opponents supplemented that familiar proposal with physician insurance (Part B) and added Medicaid as a third "layer" to what came to be called a "three layer legislative cake."[14] The financing and regulation of the two Medicare parts dominated the debates between the innovative proposals of March 1965 and the enactment of Titles XVIII and XIX in June of that year. The Medicare titles were entirely new; the Medicaid structure began with an historical legacy. What did that mean for the assumptions about paying for hospital, medical, and drug expenses?

26. What we now call Medicaid built upon and substantially expanded the Kerr-Mills program of 1960, which had provided limited federal subsidies to the states to finance health care for the poor among America's elderly. Medicaid took that model of "welfare medicine" and added coverage for the "categorically needy": the blind, the disabled and children from poor families. [15]

27. The surprising enactment of Medicaid meant that its policies--reasoning from the organizational process model--reflected consequential legacies from early welfare

---

[14] The Politics of Medicare: 49-53, 60.
[15] The health status of America's poor--especially poor children--in the mid-1960's is hard to imagine today. Jonathan Engel's book chronicles a number of shocking reports of the era. One on children's health in rural Mississippi in the early 1960s found "in child after child...evidence of vitamin and mineral deficiencies; serious, untreated skin infections and ulcerations; eye and ear diseases, also unattended bone disease secondary to poor food intake, the prevalence of bacterial and parasitic disease...children afflicted with chronic diarrhea...leg and arm injuries and deformities." Another in Kentucky discovered that "children displayed skin ulcerations, tooth decay, open sores, boils, abscesses, impetigo, rat bites, and hookworm." And a House Ways and Means Committee investigation concluded "that half of all children in the United States under the age of fifteen had never been to a dentist." Engel, Jonathan, Poor People's Medicine (Durham: Duke University Press, 2006): 49, 74-75.

June 20, 2008

programs on the one hand and what HEW officials generally assumed were workable,

accepted policies toward reimbursement on the other.  Familiar organizational ways of

thinking, in other words, were central to what was proposed and acted upon.

28. This is crucial to note because the Medicare statute itself did not substantially

address the reimbursement of drugs at all.[16]  From 1965 to 2005, outpatient drug

expenses were not generally covered, though in the 1980s there was considerable

discussion of that fact.[17] On the other hand, Medicaid from the outset had a broader

benefit package, including paying for drugs.  Nonetheless, drug reimbursement received

little attention in the crowded period between the emergence of the three layer cake

proposal in March of 1965 and the enactment of Medicare and Medicaid in late June of

that year.  Drugs were not a major feature of medical care expenditures in 1965 and

correspondingly got little attention in this unexpected Medicaid innovation.[18]

29. Medicaid emerged where the Kerr-Mills program was thought to have

failed.  In 1962, when some 35 million Americans were living under the poverty

line, Kerr-Mills covered less than 150,000 of America's elderly poor, with most of its

expenditures in only five states.[19]  The remaining low-income Americans--if they did

receive needed care--depended upon physician, private hospital and pharmacist charity,

or free care in public hospitals.

30. At its most expansive, the Kerr-Mills program financed the medical care of

less than 200,000 citizens.  By 1967--only a year after enactment--Medicaid covered over

---

[16] From May, 1967 until February, 1969 a HEW Task Force on Prescription Drugs undertook a "comprehensive study of the problems of including the costs of prescription drugs under Medicare."  See Task Force on Prescription Drugs: Final Report, 7 February 1969.
[17] Oberlander, Jonathan, The Political Life of Medicare (Chicago: Univ. of Chicago Press, 2003): 60.
[18] Ibid at 46.  The detailed account of how Medicare's Part B and Medicaid got added to the original proposal of hospital insurance in 1965 is the subject of chapter five of The Politics of Medicare.
[19] Stevens, Rosemary, Welfare Medicine in America (New Brunswick: Transaction Publishers, 2004): 33.

14

June 20, 2008

7,000,000 Americans.  Its core benefits--the costs of which quickly became a concern--were payments to hospitals, nursing homes, and physicians.  Medicaid--like Medicare--set out to pay hospitals their "reasonable costs," proceeding from standard practices in the Blue Cross world of private hospital insurance.  In the case of physicians, Medicare's legislative language called for reimbursing "usual and customary" fees.[20]  For Medicaid, neither physician--nor prescription drug--reimbursement was legislatively specified.[21]  Prescription drugs, an optional benefit, were in the first years of the program a modest and largely unnoticed component of spending.

31. By comparison, there was considerable attention given to an acceptable general policy toward reimbursement issues in the struggle over Medicare's provisions.  In the hospital sector, the legislation reflected a carryover from the dominant mode of financing used by the Blue Cross plans at that time: reimbursement of what were thought to be "reasonable costs." The understanding then was that Medicare would democratize access to health insurance by mirroring for the elderly what was available to a large proportion of working Americans through employer-financed hospital insurance.  The legacy was cost-based reimbursement and the legislation promised precisely that.  In the case of physician payment, there was no established government or non-governmental model as dominant as Blue Cross in the hospital sector.  Blue Shield plans distinguished between indemnity payments for some insured and fee schedule reimbursement for low-income families.  For reasons outlined in The Politics of

---

[20] See The Politics of Medicare (2000): 89.
[21] Rosemary Stevens in Welfare Medicine in America at pg. 66 interprets the differing standards in the following way: "presumably 'reasonable cost'...would bear a direct relationship to the actual cost of services provided... For other services provided under Medicaid, states could, however, choose their own formulae and set their own payment schedules.  These alternatives could include the long welfare tradition of reimbursing at less than cost, in other words, expecting providers to donate out of charity."

June 20, 2008

<u>Medicare</u>[22] simply carrying over the Blue Shield model was rejected legislatively. Instead, the 1965 Congress enacted a standard of "reasonable charges" – i.e., charges based on what was described as "usual and customary" fees.

32. The history of disputes about what "reasonable charges" meant in practice is not the focus here. But one should note that this payment standard for physicians mirrored the hospital reimbursement policy – i.e., paying what hospital care costs generally or what physicians typically charged their insured patients. This perspective--paying actual costs or market prices--carried over to the pharmaceutical area, but with far less legislative and executive attention. For Medicaid, whose reform was the most unexpected, the presumption was that the program offered financial support to hospitals, doctors, and druggists who otherwise were asked to provide charity care, services, and goods to poor people unable to pay (in full or at all) for their medical care needs. To the extent Medicaid payments subsidized a set of beneficiaries with more expanded financing than they enjoyed before, the program was thought to benefit both poor patients and their medical care providers.

33. It is important, however, to recall that the late 1960s context for both Medicare and Medicaid quickly became one of intense concern about medical inflation. A key focus of concern was the cost-based reimbursement policies with which both programs began.

34. The principles of cost-based and charge-based reimbursement were not accidental. Interest groups representing health provider groups had lobbied for such a model. They were intent that Medicare and Medicaid would finance, not regulate, the

---

[22] <u>The Politics of Medicare</u> (2000): 89. The legislation borrowed instead from the commercial insurance practice of the time in the reasonable charge standard, with Aetna's plan for federal employees as the particular source.

June 20, 2008

prices of medical care.  However odd that might seem in 2008, when the federal role in shaping the economics of medical care is so significant, no such presumption prevailed in the 1960s.  Indeed, the Pharmaceutical Manufacturers Association had argued in 1965 congressional testimony against any federal action that "would be tantamount to price setting…and a denial of normal market mechanisms."[23]

35. In Medicaid, a combination of higher than expected enrollment and greater than expected expenditures per beneficiary caused severe budget pressures and heightened political attention.  Amendments to the Social Security Act in 1967 limited program enrollment growth; it also empowered the Secretary of Health, Education, and Welfare to use "methods and procedures to safeguard against payments in excess of reasonable charges for drugs consistent with efficiency, economy, and quality of care."[24]  This tension between budget pressures and service aims was to be a recurrent theme in Medicaid's and Medicare's history.  The aim of helping disadvantaged populations gain access to care clashes with budgetary constraints on enrollment, and payment demands by providers of care.

36. Today, Medicaid is the largest government program in most if not all states, and one of the largest federal programs.  More than fifty million citizens benefit; a third of U.S. births and half of nursing home expenditures are paid for by Medicaid.[25]  There has been a slight shift in the composition of the covered low income population away from adults, and toward children and the disabled. (See Exhibit 1).

---

[23] "Statement of Austin Smith, MD, President, Pharmaceutical Manufacturers Association (PMA)," U.S. Senate Committee on Finance, 13 May 1965, 760.
[24] "Reimbursement of Drug Cost: Medical Assistance Program," Federal Register, 27 November 1974: 41480.
[25] Iglehart, John, "The Dilemma of Medicaid" New England Journal of Medicine, 348:21 (22 May 2003), 2140-2148.

June 20, 2008

EXHIBIT 1 Distribution Of Medicaid Payments By Eligibility Group, Fiscal Years 1978 And 1998



SOURCE: Form 2082 data: Now the Centers for Medicare and Medicaid Services, or CMS.

NOTES: The percentage attributed to the 1978 Blind category excludes 33.4 billion in payments as well for long term care
costs for disabled Medicaid adults whose diagnoses are unknown, which in percentage terms account for 2.5% of total
outlays. 5.7 billion on behalf of 2.7 million persons unknown whose diagnoses are unknown. Percentages are computed by
100 because of rounding. Payments remaining unattributed to certain payments to...

Bruce C. Vladeck,
Where The Action Really Is: Medicaid And The Disabled,
Health Affairs, Vol 22, Issue 1, 90-100

**HEALTH
AFFAIRS**

Copyright ©2003 by Project HOPE, all rights reserved.

37. As noted, Medicaid spending on pharmaceuticals began as modest
outlays. But, over time, drug spending increased well beyond general inflation, as the
charts below show. Drugs now constitute a very substantial portion of Medicaid
expenditures.[26]



Medicaid Prescription Drug Spending 1966-2003

_____

[26] With the implementation of the Medicare Modernization Act of 2003--a development after the time
period of this case--about half of such drug expenditures were shifted to the Medicare program.

June 20, 2008



Medicaid Drug Spending as a Percentage of Total Medicaid Spending

Sources: (Drug Spending) 1966 Comptroller General Memo; 1967-1974 US House of Representatives Report; 1975-1989 HCFA Medicaid Source Book; 1990-1998 HCFA 2082 Reports; 1999-2003 MSIS Reports. (Total Spending) Medicaid Financial Management Reports, CMS -64 and predecessors

    38. As the next chart demonstrates, Medicare spending increased very sharply in

the 1990's, but more so under Part B than Part A.  Part A's drug expenditures are those

generated during a hospital stay and are not separately reimbursed by Medicare.  That

means the cost of the drugs prescribed is what the hospitals negotiate separately.  Part B,

by contrast, reports its budget outlays for drugs: the drug bills paid by Medicare directly

to doctors and pharmacies subject to the program's drug reimbursement policy.  It is

notable that the drug expenditures for Part A were relatively obscured during this time

period, compared to the substantial and visible increases in Part B outlays for drugs.

June 20, 2008

### Medicare Spending



Source: CMS Office of the Actuary

### Medicare Pt. B Drug Spending



Source: CMS Office of the Actuary

39. A separate question is whether Medicare and Medicaid expenditures have produced good value for the money spent. Have they improved the public's health as well as cushioning the financial impact of sickness and injury? The data available

June 20, 2008

suggest a positive answer.  Improvements in life expectancy and reductions in infant

mortality have taken place during the life of these programs.  The correlations do not

settle the case for causality, but they support the causal presumption.



US Male Life Expectancy at Birth (1960-2001)

Source: OECD Health Data, 2003



U.S. Infant Mortality

Source: OECD Health Data, 2004

June 20, 2008

**V. Medicaid Drug Pricing Policy and Politics**

40. The history of Medicaid prescription drug policy and politics had, until quite recently, received relatively little scholarly attention. Rosemary Stevens' 1974 case study of Medicaid, *Welfare Medicine in America*, mentions some conflicts over drug policy, but makes no mention of reimbursement conflicts. Jonathan Engel's more recent and comprehensive program history, *Poor People's Medicine,* (2006), barely touches on the topic of prescription drugs. What was important to governmental officials--and the pharmaceutical industry--did not play an important role in the journalistic or scholarly commentary about Medicaid.

41. As a result, one has to put together a historical understanding from quite varied sources: government agency rule making and reports, congressional hearing transcripts, the journal articles of stakeholder groups, and scant newspaper coverage. The implication is that the story of Medicaid's reimbursement policy is complicated, with different actors holding substantially different ideas about what was taking place, let alone what was desirable. To understand what stakeholders were doing over time one has to investigate what they said, what they claimed, what they thought they knew, what confused them, and what options for action they in fact had.

42. With this approach in mind, I turn to the policy history as reflected in the available historical record and organized through the conceptual lenses of Models II and III.

**A. 1967-84**

43. The States--continuing Kerr-Mills practices--were given wide discretion in how they reimbursed drugs in their Medicaid programs during the period from 1967 to

22

June 20, 2008

1974.[27] The federal Department of Health, Education and Welfare (HEW), while paying from 50 to 83% of Medicaid expenditures, delegated drug payment policy to the states. During that period, as the data show, there were very rapid increases in drug expenditures. Because the baseline drug expenditures were comparatively small, the total drug outlays appeared modest by comparison with hospital and physician expenditures.

44. In 1975, however, the issue of drug price inflation did come onto the policy agenda. HEW Secretary Casper Weinberger proposed federal regulations that prompted an outcry from the pharmaceutical industry. His initial proposal was to limit reimbursement for prescription drugs to their actual acquisition cost (AAC), plus a dispensing fee.[28] For generic (multi-source) drugs, the Secretary suggested a Maximum Allowable Cost (MAC) basis for reimbursement. Both of these proposals proved controversial.

45. First, commentators argued that governments did not have the technical capacity to determine actual acquisition costs on a timely and accurate basis. Secretary Weinberger, accepting this constraint and opposed to government price-setting on the model of most other developed nations, substituted estimated acquisition cost (EAC) for AAC.[29] This decision is unusual in comparative terms. Most industrial democracies

---

[27] It took over two years for any federal regulations to be developed in this area. HEW used an interim policy for drug reimbursement of "actual acquisition cost" ("Reasonable Charges: Notice of Interim Policies and Requirements," Federal Register, 16 July 1968: 10233-4), but after a comment period settled upon a policy of "cost as defined by a state agency plus a dispensing fee." ("Final Rule: Administration of Medical Assistance Programs: Reasonable Charges," Federal Register, 25 January 1969: 1243-1245).

[28] "Maximum Allowable Cost (MAC) for Drugs, Notice of Proposed Rulemaking," Federal Register, 15 November 1974 and 27 November 1974.

[29] "Final Rule - Limitations on Payment or Reimbursement for Drugs," Federal Register, 31 July 1975 and 15 August 1975. A vital aspect of Weinberger's alternative was an attempt to increase the capacity of states to acquire accurate data on market prices so close estimations of AAC could be derived.

June 20, 2008

engage in bargaining with the pharmaceutical industry about what they are willing to pay for drugs rather than relying on market prices reported by the industry. [30]

46. Weinberger maintained the original MAC provisions[31] despite opposition from the drug industry. (The final manifestation of that opposition came in the form of a lawsuit, which the plaintiffs lost.[32]) This began the complicated history of the government estimating what it cost pharmacies to buy drugs.

47. The HEW standard for payment of drugs was to be the lowest of three options: MAC plus a dispensing fee, the EAC plus a dispensing fee, or a pharmacy's usual and customary charge (UCC). This federal policy was not formally amended until 1987. As a result, federal policy during the period 1975 to 1987 sought to reimburse drugs on the basis of the pharmacy's (or chain's) cost of acquiring drugs, plus a separate dispensing fee.[33]

---

[30] Jacobzone, Stephane, "Pharmaceutical Policies in OECD Countries," Four Country Conference: Pharmaceutical Policies in the US, Canada, Germany and The Netherlands, July 2000.

[31] A Pharmaceutical Reimbursement Board was created within HCFA to identify the multiple source drugs for which significant federal funds were spent and then to develop a MAC for each. The Board set the MAC at the "lowest unit price" at which the drug was generally available. In 1987, this was changed to "150% of the published price for the least costly therapeutic equivalent."

[32] "Pharmaceutical Industry Sues HEW on Government Drug Price-Setting Program," PMA Newsletter, 27 October 1975: 3.

[33] These dispensing fees had some obvious justification. When filling prescriptions, pharmacy businesses incur costs beyond the price of the drug itself. These include expenses such as pharmacist and other employee wages, utilities, rent and overhead. Dispensing fees are paid when pharmacists are reimbursed on an EAC or MAC basis. It has not applied to funding drug costs on a UCC basis, where the cost of dispensing is built into the charge to the paying customer. From the perspective of academic policy analysis, however, there is no single, accepted, correct way to compute actual dispensing costs. There are contested questions that attend this task: the allocation of overhead, for example, how to deal with negative and positive externalities, and the computation of an enterprise's average as opposed to marginal costs. This means that there is an irreducible uncertainty about what counts as the right dispensing fee. On the other hand, what pharmacists are willing to accept from other payers--rather than declining the business--is one basis for calculating an appropriate level of payment.

The Medicaid program has never agreed to finance excess reimbursement for ingredient costs in order to make up for any shortfall in dispensing fees. The documentary record shows clearly that separate provisions were designed and implemented for each type of expense reimbursement. Both components were to be reimbursed independently of one another.

The policy for Medicare has been analogous. Significant efforts have been made to reimburse providers for their cost of administration for "incident to" drugs. No "cross-subsidy" policy ever existed.

June 20, 2008

48. The processes by which the overall payment policy emerged made clear what was not done.  Weinberger noted the "number of comments [contending] that the policy amounted to 'price-fixing' or interfered with 'free enterprise.' "  He made plain his support for using market prices rather than governmental market power to set prices at which HEW would reimburse pharmacies.  He "disagreed" with the claim that HEW was setting prices.  The regulation, Weinberger asserted, "does not control marketplace activity, but rather takes advantage of the varying drug prices which are established by and exist within the marketplace…upper limits …will continue to be determined by marketplace activities."[34]

49. The decision to refrain from any sort of government "price setting," was important.  Relying instead on what were claimed to be market prices in setting governmental reimbursement produced serious problems.  States had but two major sources of information for estimating drug prices: the data provided by HEW and the annual Red and Blue Book "compendia."  The HEW relied upon drug price information from the presumed market leader, IMS Health.  IMS data, it turned out, overstated actual drug acquisition costs.  By 1984, the Office of the Inspector General (OIG) recommended against using their pricing data.  The 1984 report also suggested that the prices reported in the Red and Blue Book compendia were, for the drugs studied, in excess of actual acquisition prices.[35]

---

[34] "Final Rule - Limitations on Payment or Reimbursement for Drugs," Federal Register, 31 July 1975: 32289.
[35] "Title XIX of the Social Security Act, Limitation on Payment or Reimbursement for Drugs," HHS OIG Report, 1 September 1984.  I am aware of the historical disputes about how the expression AWP was employed.  It was part of the rhetorical record, with different actors claiming to have a unique understanding of the practice--as opposed to the dictionary definition of the words, or plain, ordinary meaning.  The historical record does not show evidence of any government statute, regulation, or official pronouncement stipulating a distinctive--i.e. different from the dictionary-- meaning of "average wholesale price."

June 20, 2008

## B. 1984-90

50. The 1984 OIG report touched off political debate among those attentive to pharmaceutical issues and generated considerable confusion. The consequent dispute-- and the confusion generated--undercut the OIG's weight and authority. Interest groups, especially retailers, barraged Congress with studies and testimony. They reiterated the same theme. Discounts from AWP prices might be available to some, the trade association contended, but not all, retailers. Critics also challenged the methods the OIG study used, including doubts about the generality of their findings. Some federal legislators defended AWP reimbursement itself, which made changes in formal policy more difficult. In 1985, the National Association of Retail Druggists President claimed publicly a lobbying victory for continuation of the AWP basis for reimbursement.[36] One phase of the political bargaining story was over. An effort to change the AWP standard was defeated -- and with the explicit support of pharmacy and drug manufacturing trade associations.

---

There has been considerable attention to the margins wholesalers charged over time. E. Berndt, for example, observes that as the drug wholesale industry consolidated over time, margins that once approximated 20 or 25% fell to 3 or 4%. (See "Report of Independent Expert Professor Ernst Berndt to Judge Patti B. Saris," United States District Court District of Massachusetts, 9 February 2005). This report of industry practices does not, however, settle who knew what, when and where about those practices. This is especially noteworthy in a context where pricing data was treated as confidential. In the historical record, I found little, if any, recognition by HCFA or CMS officials of the changes in wholesaler margins.

Manufacturers continued to report and pricing compendia continued to publish an historical markup that no longer existed. I cannot conclude whether this was "understandable...and not the result of any sinister or nefarious conspiracies" – as concluded by Berndt. But, one thing is clear: the customers of the manufacturers and wholesalers reaped the benefit of the practice, while Medicare and Medicaid bore the cost. (There was indeed some evidence of industry collaboration on pricing matters during the period. See "Ruling in Price-Fixing Case Provides a Look at Drug Industry," New York Times, 14 April 1996).

[36] The NARD President called attention to the group effort to block legislative change: "Just as a coalition approach worked wonders in foiling the fed's attempt to eliminate AWP as a basis for Medicaid reimbursement," he warned, "unfair pricing will also require a coalition...NARD has talked with the National Association of Chain Drug Stores, the PMA, and the National Wholesale Druggists' Association. They are all 'supportive' of the idea in l985." ("NARD leaders reveal alliance against differential pricing," Drug Topics, 18 November 1985: 68-69).

June 20, 2008

51. At the same time, drug inflation continued undiminished. In the Congress there was optimism among some legislators that the availability of generic drugs would dampen inflation in this industry. In 1984, legislation--the Drug Price Competition and Patent Restoration Act--promised faster access to cheaper drugs.[37] The MAC program had been very disappointing, producing only twelve approved generic drugs in a decade. The new law on generics, many hoped, would generate savings for Medicaid. This was one policy development; there were others as well.[38]

52. To achieve savings required Medicaid to approve payment for generic drugs at a faster pace than before. Policy changes were required. And in 1986, ten years after the implementation of the Weinberger regulations, there was indeed a new set of proposals for reimbursing drugs under Medicaid. The Secretary of the Department of Health and Human Services (HHS) offered three reform options.[39] Each encouraged greater use of generic drugs to reduce Medicaid's program expenditures. All suggested streamlining the process of qualifying generic drugs for program reimbursement. One option, the Pharmacist Incentive Program, called for financial incentives to pharmacists to substitute generic for brand drugs. A second, the Competitive Incentive Program, would have required pharmacists to give Medicaid price discounts from actual retail prices. But it would have allowed pharmacists to make--or lose--money from brand and generic drug sales.

---

[37] "Law Enacted to Spur Generic Drug Market," New York Times, 25 September 1984: Sec B5.

[38] Another development, to be discussed later, was what came to be called the whistleblower statute of 1986 and related programs to address alleged waste and fraud in governmental payments for goods and services.

[39] "Proposed Rule: Medicare and Medicaid Programs; Limits on Payments for Drugs," Federal Register, 19 August 1986 and 18 September 1986.

27

June 20, 2008

53. In the end, however, HHS officials did not go ahead with any of these options. Intense objections by state governments, pharmacists, and drug manufacturers played a role.[40] The result was that certain problems were once again highlighted, but overall drug reimbursement policy was not substantially changed.[41]

54. In the end, the HHS Secretary ended the MAC program and created an upper limit (FUL) on federal payments for two classes: multi-source and other drugs.[42] For multi-source drugs, reimbursement was 150% of the lowest published price of the least expensive generic supplier. For single-source--called "other"--drugs, the final rule emphasized that "[T]he upper limit for other drugs...retains the EAC limits as the upper limit standard that state agencies must meet." But the rule was to be applied "on an aggregate rather than on a prescription specific basis." [43] The standard for payment of drugs remained the lowest of three options: MAC (now called the FUL) plus a dispensing fee, the EAC plus a dispensing fee, or a pharmacy's usual and customary charge (UCC). But other changes were forthcoming.

---

[40] "Final Rule: Medicare and Medicaid Programs; Limits on Payments for Drugs", <u>Federal Register</u>, 31 July 1987: 28650.

[41] It should be noted that there were changes in the process of generic drug approval for Medicaid reimbursement. My point here is that the fundamental basis of reimbursement was reviewed, but not authoritatively altered. In addition, I found no evidence of a changed policy towards cross-subsidizing pharmacists. In short, the claim that in the 1980s the federal government's Medicaid officials accepted that pharmacists should be cross-subsidized by inflating acquisition costs is without empirical foundation. Indeed, HHS rejected proposals to have pharmacists increase revenues from sources other than the dispensing fees. This does not deny that pharmacy interests regularly promoted increased revenue, wherever it could be found. That is expected from interest groups in American politics.

[42] "Final Rule: Medicare and Medicaid Programs; Limits on Payments for Drugs," <u>Federal Register</u>, 31 July 1987: 28650-53.

[43] Ibid at 28653. Some have suggested the "in the aggregate" language in this regulation changed the policy to one in which the sum of ingredient cost and dispensing cost would be considered as the standard for payment. By this reasoning, it was legitimate to pay higher than estimated ingredient costs if lower than cost payments were made for dispensing fees. I have seen no evidence that such a policy was ever implemented or that such criteria were used for evaluation. In fact, after 1987, the OIG and GAO continued to judge program performance by looking at the gap between estimated and actual ingredient acquisition costs, not any gap between the sums of the two components.

28

June 20, 2008

55. By 1989, HCFA had addressed some problems with AWP reimbursement. Federal policy, for instance, had rejected undiscounted AWP as a basis for estimating the acquisition costs of drugs for Medicaid. Federal officials made this explicit in a number of ways, including instructions by regional administrators to state Medicaid officials. A handful of states responded by moving to a wholesale acquisition cost (WAC) "plus" basis. Most states--despite their inability to determine actual market prices--chose to discount from reported AWPs. They did so at varying levels and in varying ways, but always subject to the fear of losing federal matching funds. HCFA approved most of these altered state plans, with some disputed practices ending up in the courts.[44]

56. Continued inflation in drug prices meant difficult choices for states. Some states tried quite different strategies to constrain drug inflation. All were of limited success, as prior charts have illustrated. Given budget pressures and constitutional limits on deficit financing, the continuing medical inflation meant that states had to restrict Medicaid eligibility, reduce the number of prescriptions, and/or increase patient cost sharing for drugs.

57. There was, in short, no absence of governmental efforts to cope with drug inflation. A number of states, as noted, explored different strategies for coping with drug inflation in the late 1980s. Some, for example, tried using formularies for certain classes of drugs, taking their cues from pharmacy benefit managers.[45] That instrument, then and now, is regarded by many observers as the most powerful cost control tool against drug inflation. As noted in a 1989 NY Times article, "The State and private health plans

---

[44] An exception was when a state tried to use undiscounted AWP as the method of estimating drug ingredient acquisition cost.
[45] Freudenheim, Milt, "Cutting the Cost of Medicaid Drugs," New York Times, 30 Jan. 1990.

June 20, 2008

[threatened] to drop some products from their lists of drugs approved for reimbursement."[46]

58. Another strategy was to use competitive bidding. Ultimately, thirty-seven states tried putting drug contracts out for competitive bid. But almost all had their negotiating efforts "blocked" by drug companies unwilling to provide bids.[47] One state, Kansas, eventually succeeded in obtaining a 30% price reduction but for only one drug. This outcome illustrates a continuing feature of the policy struggle over drug reimbursement. The drug industry on the one hand resisted any type of governmental price-setting for drugs. This in turn contributed to steady inflation in Medicaid pharmaceutical expenditures. On the other hand, the drug industry employed political, legal and economic strategies continuously to thwart efforts to address that inflation with different policies. This combination of defense and offense against stronger alternatives is a major, underlying theme of this report. This strategy was repeated even more vigorously in the 1990s. At no time, however, did the industry fully inform the government of its real prices for reimbursement purposes. Nor did it make clear through lobbying that it was promoting a system in which reported prices had no relationship to actual prices and generated questionable influence on medical judgment.

**C. 1990-2001: Following three developmental channels**

59. The explanation for the rapid increase of Medicaid's and Medicare's drug expenditures in the 1990s requires attention to developments that were at the time largely shrouded in secrecy, misrepresentation and contested investigative claims of wrongdoing.

---

[46] Freudenheim, Milt, "Price Revolt Spreading on Prescription Drugs," New York Times, 14 November 1989.
[47] "Skyrocketing Prescription Drug Prices," US Congressional Hearings and Majority Staff Report, 16 November 1989 and 1 January 1990.

June 20, 2008

60. To make sense of this involves separate discussion of three streams of political and organizational activity. The first is the working out of the OBRA legislative bargain, a channel of action marked by a four year moratorium on reduction of Medicaid drug payment levels, a partial implementation of what I will term budgetary relief through rebates, and heightened attention by the HHS Inspector General's office over the decade to a variety of state experiences in reimbursing selected drugs.

61. The second channel differs substantially in origins and mode of activity. The elimination of "waste, fraud, and abuse"[48] had by the 1990's become a preoccupation in federal health programs. (See appendix one for a chronology of government anti-fraud laws relevant to this channel). The False Claims Act Amendment of 1986 increased the financial incentives for what are called "whistle blowers" to report alleged misconduct among firms whose products and services receive governmental funds. This development drew upon a different congressional source of authority (the Judiciary committees, not the Budget committees). Equally important, the Department of Justice (DOJ) and State Attorneys General became more important actors. That meant federal courts would be involved, but also state courts. And, even before DOJ's involvement, there were other developments in the legal arena: namely, federal statutes against kickbacks and provider self-referrals. This legalization of concern about provider misconduct expanded the channels through which public action took place. The rules of the legal world had important implications for how evidence would be uncovered

---

[48] Marmor, T. and Mashaw, J., "Conceptualizing, Estimating and Reforming Fraud, Waste and Abuse in Health Care Spending," Yale Journal on Regulation, 11 (1994) 1-35. It is revealing that after a serious review of the literature in 1993-94, the authors (including this expert) did not identify pricing fraud as a major area of fiscal concern or legal interest. Since the article was directed at what was known at the time, this bears on the degree to which it was known the actual pricing behavior deviated from what was reported.

June 20, 2008

(slowly), what evidence would be permissible to introduce, and what counted as the definition of impermissible conduct. The role of a whistleblower--Ven-A-Care (VAC)-- in promoting attention about drug reimbursement practices to congressional, DOJ, HHS, and state agencies is important in its own right. It also is a link to Medicare and Medicaid's place in drug reimbursement disputes in the 1990s.

62. The third channel, the involvement of Medicare in disputes about drug reimbursement, is complicated, both connected to Medicaid developments and separate as well. For most of Medicare's history, drug reimbursement was not, as noted, a major concern. Indeed, prior to 2005, outpatient prescription drugs were, in the main, not insured for Medicare beneficiaries. (Drugs delivered in the hospital or skilled nursing home (SNF) setting were insured through Medicare Part A, but not separately budgeted, as explained earlier). The only directly budgeted drug reimbursement was for services provided "incident to" physician care under Part B. By 1992, such payments totaled over $600 million. But that sum constituted only one half of one percent of all Medicare expenditures, and about $1/10^{th}$ of what Medicaid spent on drugs.

63. The way by which Medicare slowly addressed drug reimbursement had much to do with its relatively small role in the program's budget--and, accordingly, the greater attention to claims of fraud in the larger items of that budget: hospital and physician reimbursement. A combination of medical inflation, fiscal pressures caused by the budget deficits of the 1980s, and the recession of the early 1990s led some policymakers to focus on the Medicare program as well. And, by later in the 1990s, Medicare was to play a more prominent role in these disputes.

32

June 20, 2008

### i. OBRA 90: Saving Money by Paying "Best Prices" for Medicaid Drugs?

64. By 1990, Medicaid's payments for drugs were under public attack. The U.S.

economy neared recession. Congressional hearings, led by Senator David Pryor (D, AR),

drew press attention both to the fiscal impact of annual drug inflation and to the

unwillingness of drug firms to cooperate with competitive bidding in Medicaid. He

"introduced legislation…to help states control spiraling drug costs by negotiating prices

with manufacturers."[49] The Bush Administration of 1990--prompted both by this

legislative proposal and difficult fiscal circumstances--developed an alternative reform

model. Their proposal--a so-called "best price" rebate plan--was based on a program the

Merck Company had developed. The Merck model sought first and foremost to block a

state formulary option and government price controls on drugs. On the other hand, it

implied that rebates could reduce Medicaid's net drug expenditures while leaving in place

the market price, EAC reimbursement system. In short, the plan offered a tradeoff:

protection of firms from the economic restraints of government formularies in exchange

for budget relief through rebates.[50]

65. In the end congressional negotiations produced a complex legislative result.

The Omnibus Budget Reconciliation Act of 1990 (OBRA 90) was the formal legislative

---

[49] In 1989, the members of the Senate Special Committee on Aging heard testimony by Gerald Mossinghoff, President of the Pharmaceutical Manufacturers' Association, indicating that "average wholesale price is not determined by our companies. It's determined in part by surveys done of our companies." ("Skyrocketing Prescription Drug Prices," Hearings before the Special Committee on Aging, U.S. Senate, 18 July 1989: 157). Members of Congress did not hear from PMA that AWPs would be raised to create the spreads designed to foster competitive advantage. There is irony in this omission. On the one hand, there is the longstanding PMA position against government "price-setting" and in favor of competition, which in theory, would hold prices down. On the other hand is the reality that the competitive strategies employed by some PMA members over time to gain market share led to the increasing prices borne by public payers.

[50] For evidence of the extent to which the Merck program and eventual OBRA 1990 deal were seen as a trade of rebates for open formularies, see "Merck is Offering to Cut Drug Costs of Medicaid Uses," New York Times, 21 April 1990; "PMA Board Approves Medicaid Rebate Plan", PMA Newsletter, 1 October, 1990 and "Medicaid Best-Price Drug Plan Written into Budget Summit Agreement", PMA Newsletter, 8 October, 1990.

June 20, 2008

product, of which the drug payment policy changes were but one part.  OBRA 90 was essentially a bargain: side payments (rebates) by manufacturers to state and federal governments on all drugs if states give up the use of formularies as cost control instruments.   Rebates were--and are--proportional payments paid on the basis of a reported "best price" or average manufacturing price (AMP).  AMP and "best price" were to be confidential prices reported by drug companies only to the HCFA/CMS Office with responsibility for administration of rebates.[51]  State governments did not have access to these prices.[52]  In short, whether drug firms reported AWP or WAC accurately did not make any fiscal difference to what was owed in rebates. This understanding of rebates illustrated the degree to which the OBRA legislation was about high drug prices and governmental budgetary relief[53] rather than the price reporting practices of drug firms or reform of drug reimbursement policy.

66. The impact of this bargain, however, differed substantially from what reformers expected.  Some firms in the industry quickly raised their "best prices."[54]  Drug firms invented new product forms to get around OBRA prohibitions against inflation in established products.[55]   The scale of this policy failure to contain drug inflation is

---

[51] OBRA 90 defined the original rebate formulas.  For single source and innovator-generic drugs, the rebate is the greater of 15.1 percent of the AMP or the full difference between the AMP and best price available in the market place. Rebates for generic drugs were initially a flat 10 percent of the AMP, and increased to 11 percent after 1993.

[52] Manufacturers are supposed to pay states a Unit Rebate Amount (URA) for each of their drugs based on the application of the appropriate formula.

[53] Pear, Robert, "The Struggle in Congress; Most in US Will Feel Effect of Shift in Spending Priorities," New York Times, 28 October 1990.

[54] Consider a NY Times report: "But a lobbyist for the drug industry, who would speak only on the condition of anonymity, said 'We are surprised that Senator Pryor is surprised.  I don't know what else he would have expected.  It's logical that companies would re-examine their prices if Congress passes a law saying that Medicaid, which accounts for 10 percent of our revenues, must get the best price given to any pharmaceutical customer in the country.'" (Pear, Robert, "Medicaid is Denied Discounted Drugs Despite a New Law," New York Times 18 February 1991).

[55] Scott-Morton, Fiona, Duggan, Mark, The Effect of Medicaid Regulations on Drug Product Introductions and Pharmaceutical Prices, 5 April 2004, at pg. 2 (Introduction) & pg. 2 (Conclusions).

34

June 20, 2008

noteworthy.  In the decade from 1990 to 2000, Medicaid drug spending jumped from $5

to $20 billion, and increased almost threefold on an inflation-adjusted per beneficiary

basis.  One effect of the high rate of drug inflation was a sharp increase in the number of

reports in the late 1990's by the Office of the Inspector General in HHS.  This is outlined

in appendix 3.[56]



Medicaid Drug Benefit Cost Per Beneficiary in Real Terms

Sources: Yearly data - 1966 Comptroller General Memo; 1967-1974 US House of Representatives Report; 1975-1989 HCFA Medicaid Source Book; 1990-1998 HCFA 2082 Reports; 1999-2003 MSIS Reports; Data converted from nominal to real 2003 dollars using the bureau of labor statistics conversion calculator.

## ii. The False Claims Story: How a Whistleblower Campaign Contributed to Congressional Demands for Policy Change in Drug Reimbursement

67. In the 1990s, the officials of a home infusion provider, VAC, conducted a

campaign to reveal what they regarded as fraudulent conduct in price reporting by

_____

[56] The OIG reports over this period focused on the gap between estimated and actual drug acquisition costs. Eleven OIG reports in 1996-97 focused on Medicaid's drug payment experience in a sample of states.  Two others in 1997 and 2001 focused on similar issues in Medicare outpatient drug reimbursement.

35

June 20, 2008

manufacturers for use by Medicare and Medicaid.[57]  VAC--assisted by lawyers operating

under the provisions of the False Claims Act--reported their understanding of the

marketing practices and actual drug prices of certain drug manufacturers to a wide variety

of federal and state officials.  They made extended presentations to state attorneys

general, officials at HCFA, the HHS OIG, state Medicaid Fraud Control Units, the US

DOJ and Congressional investigators.  (See Appendix 2 for a chronology of their efforts.)

They emphasized the creation and marketing by some drug firms of very large spreads

between acquisition costs and published prices for Medicare and Medicaid drugs.

68. VAC's presentations would become a major stimulus to congressional

scrutiny of the pharmaceutical industry's pricing practices.  Without their participation,

the course of drug reimbursement policy might well have been very different. The

campaign had these highlights. Between the initial allegations in the early 1990s and the

more public testimony in 2001, VAC officials and their lawyers made a large number of

presentations, adjusting length and focus to make their claims more understandable and

to prompt, through revelations of what they regarded as blameworthy, changes in drug

company reporting practices and marketing behavior.  Over that decade, they were

largely successful in transforming governmental understanding from what had been

disputes about the extent of the gap between reported and actual acquisition prices into

comprehension of outrageous and deliberate misrepresentation of drug transaction prices

to Medicaid and Medicare and its fiscal intermediaries.

---

[57] VAC was a home infusion provider in Florida that brought a qui tam suit against National Medical Care (NMC) in the early 1990s.  Their principal officers alleged violations under the Stark anti-fraud statute. Eight years later, in 2000, NMC (by then a unit of Fresenius) settled with the United States for $486M.  At that time, the settlement was "the largest case of its kind." (Steinhauer, Jennifer, "Justice Dept. Finds Success Chasing Health Care Fraud," New York Times 23 January 2001).

June 20, 2008

69. A revealing illustration of their influence was the conversion of leading congressional actors to their point of view.  The Commerce Committee began its investigation of Medicare drug payments in 1999.[58]  Within a year Committee Chairman Congressman Thomas Bliley (R-VA) was sufficiently concerned about VAC's representations to share information on his findings through sharply worded letters to Clinton Administration officials.[59]  These emphasized the "setting and marketing of the spread" and worrisome "impact of the spread on utilization decisions."  Bliley transmitted similar sentiments to pharmaceutical companies.[60]  (It is noteworthy that democratic Congressman, F. Pete Stark--the most experienced health policy figure on the House Ways and Means Committee--also wrote a letter with similar charges to the CEO of Abbott, which was one of the firms under investigation by Congress).[61]  The process of converting congressional actors into agents of policy change was, with bipartisan support, well on its way.

---

[58] VAC officials were subpoenaed and then questioned privately by committee investigators in September, 2000.  A press conference and document release followed. See "Deposition of Zachary Bentley," United States District Court, District of Massachusetts, In Re: Pharmaceutical Industry Average Wholesale Price Litigation, 15 May 2007: 141.
    USA Today reported on the growing concern of congressional investigators, and noted that "some of the documents…come from a whistleblower, Ven-A-Care pharmacy." (Appleby, Julie, "Drugmakers Accused of 'Unethical' Pricing," USA Today, 27 September 2000).
[59] Representative Tom Bliley Personal Communication to HCFA Administrator Nancy-Ann Min DeParle, 25 September 2000 PHRMA_AWP 020179.  The Congressman reports at page 5: "a review of utilization patterns strongly suggests the use of vancomycin, the antibiotic of last resort in treating otherwise deadly bacterial infections, may have dramatically increased as a result of the excessive Medicare spreads effectively created by Abbott Laboratories.  Many experts believe that, as a result of such types of over-utilization, new vancomycin-resistant bacteria recently have emerged as a growing public health risk."
[60] Representative Tom Bliley Personal Communication to Dey Pharmaceuticals, 4 May 2000 PHRMA_AWP 020214. The Congressman argues on page 2, "I would find it hard to believe that when AWP was adopted as the benchmark for Medicare reimbursements, Congress intended to allow drug manufacturers to charge Medicare whatever they wanted, or permit the use of Medicare dollars to incentivize the use of particular drugs or increase sales or market share…it is imperative that those who provide these services insure that prices being paid by Medicare reflect actual market-based prices, consistent with the intent of Federal Law."
[61] See Congressman Stark's letter to Abbott CEO Miles White, 31 October 2000 (ABT-DOJ 0187889-95).

June 20, 2008

70. The story became more publicly prominent in September of 2001 at a congressional hearing entitled "Medicare Drug Reimbursements: A Broken System for Patients and Taxpayers." There was testimony by representatives of the GAO, HHS OIG, trade associations, CMS Administrator Tom Scully and VAC Chief Executive Officer Zachary Bentley. The hearing was, according to members of the committee, the "culmination of years of investigation and audit work performed by the subcommittee staff and members of the first panel."[62]

71. The claims VAC made were summarized by Mr. Bentley. "It became apparent to us," he asserted, "that many drug manufacturers reported truthful prices, while others falsely inflated their price reports so that their targeted customers-- oncologists, urologists, home care companies, ESRD providers, DME companies, and others--would be induced by the resulting windfall profits to order their drugs."[63] The public record of the hearing contained dozens of industry documents received from VAC that illustrated price manipulation and undeniable marketing of "the spread."

72. At the hearing juncture, CMS Administrator Scully agreed with this critical diagnosis. He discussed the regulatory history of Medicare payment policy and concluded that a legislative solution to the problem was necessary. He suggested average manufacturer price and average sales price as possible remedies. In his written testimony, Mr. Scully [64] accepted that "by offering physicians and providers deep discounts compared to the price they could bill Medicare, the drug manufacturers are able

---

[62] "Medicare Drug Reimbursements: A Broken System for Patients and Taxpayers," Joint Hearing before the Subcommittee on Health and the Subcommittee on Oversight and Investigations, 21 September 2001.
[63] Ibid at pg. 48.
[64] Scully's views as Medicare's administrator were in sharp contrast to his behavior as a lobbyist in the 1990s. In that role he had pressed for the continuation of the AWP basis of reimbursement, knowing at the earlier time the gap between prices reported and paid. Deposition of Thomas A. Scully, 15 May 2007: 266-267.

June 20, 2008

to use the profit margins to manipulate physicians and providers to use their products for Medicare beneficiaries."[65]

73. VAC's revelations provided congressional officials with a clearer understanding of the realities of drug firm pricing practices than they had previously. The VAC campaign was not, it is plain from the historical record, the only reform development in this period. The DOJ initiated its own investigation, understandably unwilling to accept allegations from others as the sole basis for intervention. That would not only take time, but also provide a different channel of governmental action from the mid-1990s on. Moreover, the DOJ investigation separated HCFA leaders' concerns about the gaps between actual and estimated drug acquisition costs from the broader charges at issue for the DOJ.[66] Accordingly, the report now turns to a brief review of the policy disputes and developments in the Medicare channel.

### iii. Medicare, Drug Inflation, and Developments in the 1990s

74. As noted earlier, Medicare had from the outset faced serious budgetary problems from continuing inflation in medical prices and consequent increases in program expenditures. The role of drugs in that inflationary development would, in the 1990s, become a more substantial object of concern. The processes by which Medicare came to different policies towards drug reimbursement after 2003 are complicated, requiring attention to what might seem like unrelated developments. That requires

---

[65] "Medicare Drug Reimbursements: A Broken System for Patients and Taxpayers," Joint Hearing before the Subcommittee on Health and Subcommittee on Oversight and Investigations, 21 September 2001: 88.
[66] HCFA Administrator Bruce Vladeck "was advised that these issues (the VAC claims) were under investigation." (Deposition of Bruce C. Vladeck, 21 June 2007: 488). His successor, Nancy-Ann DeParle, stated "it was my understanding that the Justice Department officials were involved in investigating those claims." (Deposition of Nancy-Ann DeParle, 18 May 2007: 234-5). Both Vladeck and DeParle treated the question of fraud investigation as a DOJ responsibility. This is precisely what Model II analysis would anticipate.