# Exhibit 9

*United States of America ex rel. Ven-A-Care of the Florida Keys, Inc., et al.*
*v. Dey, Inc., et al.*, **Civil Action No. 05-11084-PBS**

**Exhibit to the March 12, 2010 Declaration of Neil Merkl in Support of**
**Dey Defendants' Motion *In Limine* to Exclude from Evidence the Reports and**
**Testimony of Theodore R. Marmor, Ph.D.**

Page 274

```
 1                 UNITED STATES DISTRICT COURT

 2                  DISTRICT OF MASSACHUSETTS

 3                       MDL NO. 1456

 4                CIVIL ACTION NO. 01-12257-PBS

 5    ----------------------------------------x

 6    In re:  PHARMACEUTICAL INDUSTRY

 7    AVERAGE WHOLESALE PRICE

 8    LITIGATION

 9    ----------------------------------------x

10    THIS DOCUMENT RELATED TO:

11    United States of America ex rel.

12    Ven-a-Care of the Florida Keys, Inc. v.

13    Boehringer Ingelheim Corp. et al.,

14    CIVIL ACTION NO. 07-10248-PBS

15    ----------------------------------------x

16           CONTINUED VIDEOTAPED DEPOSITION OF:

17         THEODORE R. MARMOR, Ph.D. - VOLUME II

18              Thursday, February 12, 2009

19                   New York, New York

20

21    Reported in stenotype by:

22    Rich Germosen, CCR, CRCR, RPR, CRR, CLR
```

Page 432

```
 1        A.   This is my time line involvement with
 2   AWP litigation.
 3        Q.   Okay.
 4             So looking at Marmor 9 let me ask a
 5   couple of pecific questions, it looks like going
 6   back to September 2004 was your initial contact as
 7   you indicated.  It's about four and a half years
 8   ago you were initially contacted to potentially be
 9   involved in this litigation as an expert?
10        A.   Correct.
11        Q.   And then throughout that time at
12   intervals of several months it looks like you
13   continued to have meetings with Plaintiffs'
14   counsel or DOJ counsel involving it looks like a
15   variety of cases beginning with Missouri and then
16   Alabama and some other case, is that right?
17        A.   That's right except it's important to be
18   clear about when the serious research started.
19   The serious research didn't start until 2000,
20   really 2005 and really more 2006.
21        Q.   And the serious research was focusing on
22   the federal policy with respect to Medicaid
```

Marmor, Ph.D., Theodore R. - Vol. II

New York, NY

February 12, 2009

Page 446

1   Q.   And I'll represent to you that this is a
2   source log that was provided to us I believe by
3   the Breen law firm which reflected the documents
4   that were sent to you as part of your supplemental
5   report in the Dey and Roxane cases, is that
6   correct?
7   A.   That's my understanding.
8   Q.   And can you tell me which entity,
9   whether the Department of Justice or the Breen law
10  firm, who was sending you all the documents and
11  information that's included on this source log and
12  also on the Abbott source log which you may recall
13  was appended to Marmor Exhibit 1?
14  A.   Well, I think the -- let me go to the
15  last question first.
16  Q.   Sure.
17  A.   The materials consulted in the first
18  instance came from a wide variety of sources, the
19  first report of June.  The latter part that you've
20  just given me was sent to the office both by the
21  Department of Justice and the Breen law firm.  I
22  can't tell from this record what proportion -- I

Page 447

1  think the Breen law firm documentary sources are
2  very, very extensive and I didn't ask anybody to
3  keep track of who sent what, but the only two
4  sources that were available to me were the Breen
5  and the DOJ and we had talked about, I talked with
6  both sets of lawyers about providing after I had
7  already come to a report new material that was
8  more extensive than I could possibly review in the
9  short period of time between setting up the
10 deposition and now so that I could get my, my team
11 to go through it with a certain kind of
12 instruction and pick out some materials.  And I
13 actually, as I think I've said already, I asked
14 Jim Breen and others, you know, what were some of
15 the state depositions that were particularly
16 relevant to the disputes that my, my report took
17 into account.
18      Q.   And you are anticipating my question as
19 focusing on the source log that applies to the
20 supplemental report that you issued in the Dey and
21 Roxane cases which is marked as Marmor Exhibit 10.
22           Did you follow the same basic procedure

Page 458

```
 1       Q.   Was Mr. Breen a more long-term or
 2  continuous person that you had involvement with in
 3  terms of telling the story of --
 4       A.   No more so than Archibald and Barnhill
 5  and others.  They were -- or the Alabama lawyers,
 6  D. Miles, and, and I'm shocked that I can't
 7  remember.  Clint.
 8       Q.   Clint Carter?
 9       A.   Clint Carter, wonderful man.  So perhaps
10  you don't agree, but he's a wonderful man to have
11  a meal with.
12       Q.   Nothing in my expression was intended to
13  communicate that.  I was actually going to say
14  that he may also, could be characterized in an
15  admirable way as a voluble character as well?
16       A.   I couldn't agree with you more.  But you
17  see the picture.  The picture I'm giving you is of
18  a series of actors of whom Breen was one and I've
19  seen more of Breen in the context of this
20  litigation than I did when I was dealing, for
21  example, with Alabama or Missouri.
22       Q.   And is it fair to say that part of the
```

1  value that Mr. Breen and some of these other
2  attorneys may have brought to the table was that
3  your work in the nineteen-nineties on Medicare and
4  I believe you said words to the effect to this
5  yesterday, was not particularly focused on the
6  specific policy decisions regarding payment of
7  prescription drugs under Part B?
8      A.   That's a, that's a fair statement, but
9  the inference from it I think needs to be
10 qualified.
11           When I took on this assignment I then
12 took on the assignment to become knowledgeable and
13 expert comparably to the way I've been expert and
14 knowledgeable in the revisions of my Medicare book
15 in 2000.
16           So it's true that I was, I was hired to
17 pursue this topic and then I pursued it without I
18 think -- I just want to clarify the implication
19 that I learned from these people.  I actually did
20 a research job of an extensive sort of which they
21 played some role.
22      Q.   My question was more limited to

Page 460

1  understanding the background of your scholarship.
2            And I've had the opportunity to look
3  over a fair amount of your writings and what
4  struck me which I think is consistent with what
5  you had said in the Alabama deposition and perhaps
6  yesterday here was that you have particular
7  expertise on perhaps what might be more
8  characterized as macro issues, and focusing also
9  on issues like physician payments and hospital
10 payments, but the more narrow issue, if you will,
11 of prescription drug payment policy was not an
12 area of scholarship that you had fully delved into
13 until you began your work in these cases?
14      A.   I think that's very fair.
15           The only additional point I would make
16 is that I think I knew more about this industry
17 than I go on to say because I didn't do
18 scholarship, but I was on the board of the Center
19 for Drug Development for some years, and I was
20 acquiring information and understanding during
21 that period of time, it just didn't translate into
22 scholarship and it did not translate into a

Page 461

1   preoccupation with reimbursement was also in

2   connection with approval of new drugs and disputes

3   about whether the FDA should regulate differently.

4       Q.   And I understand.

5            My narrow question I guess is would it

6   be accurate to say that prior to your involvement

7   in this litigation at the time when you first were

8   approached in September 2004, you wouldn't have

9   presented yourself to your colleagues, for

10  instance, as an expert on Medicare's policy

11  decisions with respect to the reimbursement of

12  Part B drugs?

13      A.   I would not have represented myself

14  exactly as you said.  I would not have.

15      Q.   One other thing about your background I

16  wanted to touch on, Professor Marmor, was in your

17  Alabama testimony you had indicated as well that

18  you did not consider yourself to be an expert in

19  the pharmaceutical industry.  And that

20  pharmaceutical pricing was not something that you

21  had studied for forty years to contrast with your

22  experience with the Medicare program at a

Marmor, Ph.D., Theodore R. - Vol. II                                                February 12, 2009

New York, NY

Page 462

```
 1   different level.
 2             Do you recall that testimony?
 3        A.   I do.
 4        Q.   Generally?
 5             And is that still accurate, that you
 6   don't consider yourself to be an expert in the
 7   pharmaceutical industry?  And I can pull out that
 8   testimony if it's helpful.
 9        A.   No, no, I'm not denying the testimony.
10        Q.   Okay.
11        A.   I think it's only a question of what it
12   is that counts as being an expert in.
13             For purposes of giving expert opinions
14   in litigation, I would not have regarded myself as
15   an expert in the pharmaceutical industry, but if
16   the question were did I have a considerable
17   acquaintance with the pharmaceutical industry
18   dating from the late nineteen-eighties, there I
19   think the question, there my answer would be
20   somewhat different.  So I'm just distinguishing
21   slightly.
22             So, for example, when I was hired by
```