# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) ) |
| | ) |
| THIS DOCUMENT RELATES TO: *United States of America ex rel. Ven-A-Care of the Florida Keys, Inc., et al. v. Boehringer Ingelheim Corporation, et al.,* Civil Action No. 07-10248-PBS | ) ) ) ) ) ) ) |

MDL No. 1456

Master File No. 01-CV-12257-PBS
Subcategory No. 06-CV-11337-PBS

Judge Patti B. Saris
Magistrate Judge Marianne B. Bowler

## MEMORANDUM IN SUPPORT OF THE ROXANE DEFENDANTS' MOTION *IN LIMINE* TO EXCLUDE CERTAIN EXPERT OPINIONS PROFFERED BY PLAINTIFFS' EXPERT MARK G. DUGGAN

Helen E. Witt, P.C.
Anne M. Sidrys, P.C.
Eric T. Gortner
John W. Reale
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, Illinois  60654
Telephone: (312) 862-2000
Facsimile:  (312) 862-2200

*Counsel for Defendants
Boehringer Ingelheim Corp.,
Boehringer Ingelheim Pharmaceuticals, Inc.,
Boehringer Ingelheim Roxane, Inc., and
Roxane Laboratories, Inc.*

Dated: March 12, 2010

# **TABLE OF CONTENTS**

Introduction ................................................................................................................1

Legal Standard ...........................................................................................................2

Argument ...................................................................................................................3

I.     Duggan's Calculation Of Medicare Differences Is Flawed. ...............................3

     A.     Overview Of Duggan's Medicare Methodology ........................................3

     B.     Duggan Assigns Differences For Quarters Where He Is Missing Arrays. ..............5

     C.     Duggan's Calculation Of Differences Based On The "Combined Conduct" Theory Is Flawed. ...............................................................8

          1.     Duggan's "combined conduct" differences are irrelevant. .........................9

          2.     Duggan's allocation of the "combined conduct" differences is flawed. ..............9

               a.     Duggan's relative market share approach ......................................9

               b.     Duggan's ratio approach .......................................................11

II.     Duggan's Calculation Of Medicaid Differences Is Flawed. ..............................12

     A.     Overview Of Duggan's Medicaid Methodology .....................................12

     B.     Duggan's Inter-State Extrapolation Methodology Is Flawed. .............................14

          1.     The sample Duggan uses to extrapolate from is flawed. ..........................14

          2.     Duggan does not account for the wide variation among states in reimbursement policies. ...............................................16

          3.     Duggan's methodology for extrapolating from his sample is also flawed. ..............18

          4.     Duggan's confidence intervals prove nothing. ...................................19

     C.     Duggan's Intra-State Extrapolation Methodology Is Flawed. .............................20

Conclusion ................................................................................................................20

# TABLE OF AUTHORITIES

**PAGE**

## Cases

*Albert v. Warner-Lambert Co.*,
   234 F. Supp. 2d 101 (D. Mass. 2002) ...................................................... 3, 8, 16

*Allgood v. Gen. Motors Corp.*,
   No. 02CV01077, 2006 WL 2669337 (S.D. Ind. Sept. 18, 2006)..................................... 15

*Chavez v. IBP, Inc.*,
   No. CV-01-5093-RHW, 2004 WL 5520002 (E.D. Wash. Dec. 08, 2004) ...................... 19

*Daubert v. Merrell Dow Pharm., Inc.*,
   509 U.S. 579 (1993).......................................................................... passim

*In re Air Crash Disaster at New Orleans, La.*,
   795 F.2d 1230 (5th Cir. 1986) ............................................................... 3

*Joy v. Bell Helicopter Textron, Inc.*,
   999 F.2d 549 (D.C. Cir. 1993) ............................................................... 3

*Kilpatrick v. Breg, Inc.*,
   No. 08-10052-CIV, 2009 WL 2058384 (S.D. Fla. June 25, 2009)................................... 14

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999)......................................................................... 2

*Rosen v. Ciba-Geigy Corp.*,
   78 F.3d 316 (7th Cir. 1996) ................................................................. 2

*Ruiz-Troche v. PepsiCola of P.R. Bottling Co.*,
   161 F.3d 77 (1st Cir. 1998)................................................................. 3

*United States ex rel. Clausen v. Lab. Corp. of Am., Inc.*,
   290 F.3d 1301 (11th Cir. 2002) ............................................................. 11

*United States ex rel. Ervin & Assocs., Inc. v. Hamilton Sec. Group, Inc.*,
   370 F. Supp. 2d 18 (D.D.C. 2005)........................................................... 2

*United States ex rel. Harrison v. Westinghouse Savannah River Co.*,
   352 F.3d 908 (4th Cir. 2003) ............................................................. 9, 11

*United States ex rel. Loughren v. UnumProvident Corp.*,
   604 F. Supp. 2d 259 (D. Mass. 2009) ................................................. 2, 3, 12, 16

ii

*United States v. Collyer Insulated Wire Co.,*
  94 F. Supp. 493 (D.R.I. 1950).................................................................................... 3, 15

*United States v. Rivera,*
  55 F.3d 703 ................................................................................................................ 11

*Univ. Computing Co. v. Mgmt. Sci. Am., Inc.,*
  810 F.2d 1395 (5th Cir. 1987) ................................................................................... 19

**Rules**

Fed. R. Evid. 702 ............................................................................................................. 2

L. R. 7.1(a)(2) .................................................................................................................. 2

**Regulations**

42 C.F.R. § 405.517 (1998) ............................................................................................. 4

## **INTRODUCTION**

The Department of Justice and Ven-A-Care (collectively "Plaintiffs") seek to introduce unreliable testimony from expert Mark G. Duggan to support damages claims totaling more than $1 billion.  Duggan arrives at his inflated figure by adding together what he contends are the "differences" between actual Medicare and Medicaid spending from 1996 through 2008 compared to what these programs "would have" reimbursed pharmacies and healthcare providers for Roxane's drugs using alternative prices created by Duggan.  His opinions and conclusions suffer from critical methodological flaws that result in overstatement of his calculated differences and render his testimony inadmissible under *Daubert* and its progeny.  *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

Duggan's proposed testimony regarding differences in Medicare spending suffers from several flaws.  Duggan (1) creates differences for quarters where he has no carrier arrays by unreliably replicating the differences from adjacent quarters, and (2) inflates his differences by simultaneously manipulating Roxane's and Dey's AWPs and then fails to adhere to any sound methodology when allocating the "combined effect" between the two companies.

Similarly, Duggan's proposed testimony regarding differences in Medicaid spending is unreliable.  Most egregiously, he fabricates differences for 33 states by "extrapolating" from state claims data generated from a non-random, unrepresentative sample of 16 states.  Duggan uses this extrapolation method for these 33 states despite the fact that he had state claims data for an additional 15 of the 33 states.  He also ignores disparities in the reimbursement formulas used in the state Medicaid programs in performing this extrapolation, and when extrapolating differences for periods within states where he has no claims data.

At bottom, the methodologies that Duggan uses to compute his differences for many of the allegedly false Medicare and Medicaid claims at issue are neither consistent with accepted

standards nor reliable.  They should not be allowed to serve as the basis for a damages award, let alone treble damages, and should be excluded under *Daubert*.[1]

## LEGAL STANDARD

Plaintiffs have the burden of establishing the admissibility of Duggan's testimony. *United States ex rel. Loughren v. UnumProvident Corp.*, 604 F. Supp. 2d 259, 265 (D. Mass. 2009).  Expert testimony of a qualified witness is admissible only "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."  Fed. R. Evid. 702.  The objective of the *Daubert* inquiry is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999); *see also Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 318-19 (7th Cir. 1996) ("[T]he courtroom is not the place for scientific guesswork, even of the inspired sort.").  "The Court's vigilant exercise of [its] gate-keeper role is critical because of the latitude given to expert witnesses to express their opinions on matters about which they have no firsthand knowledge, and because an expert's testimony may be given greater weight by the jury due to the expert's background and approach." *Loughren*, 604 F. Supp. 2d at 265.

It is well-settled that "damages must be proven with reasonable certainty." *United States ex rel. Ervin & Assocs., Inc. v. Hamilton Sec. Group, Inc.*, 370 F. Supp. 2d 18, 55 (D.D.C. 2005).  Further, while methodology "is the 'central focus of a *Daubert* inquiry,' . . . the court 'may evaluate the data offered to support an expert's bottom-line opinions to determine if the data

---

[1]   Pursuant to Local Rule 7.1(a)(2), undersigned counsel conferred with opposing counsel.  Opposing counsel objects to the relief requested herein.

provides adequate support to mark the expert's testimony as reliable." *Loughren*, 604 F. Supp. 2d at 264 (quoting *Ruiz-Troche v. PepsiCola of P.R. Bottling Co.*, 161 F.3d 77, 81 (1st Cir. 1998)). Such concerns are amplified in the False Claims Act context where damages are trebled. *United States v. Collyer Insulated Wire Co.*, 94 F. Supp. 493, 499 (D.R.I. 1950) (damages in False Claims Act cases cannot be the subject of "speculation and guesswork"). *Daubert* and Federal Rule of Evidence 702 therefore require exclusion of expert damages testimony if the proposed opinion is based on unreliable assumptions or speculation. *See, e.g., Albert v. Warner-Lambert Co.*, 234 F. Supp. 2d 101, 103 (D. Mass. 2002) (excluding expert testimony on damages); *Joy v. Bell Helicopter Textron, Inc.*, 999 F.2d 549, 567-70 (D.C. Cir. 1993) (expert's damages calculation was inappropriate and speculative because it was not properly based on known facts); *In re Air Crash Disaster at New Orleans, La.*, 795 F.2d 1230, 1234-35 (5th Cir. 1986) (same).

## ARGUMENT

## I.   DUGGAN'S CALCULATION OF MEDICARE DIFFERENCES IS FLAWED.

### A.   Overview Of Duggan's Medicare Methodology

Duggan creates four different scenarios to determine the purported differences in spending by the Medicare program for Roxane's ipratropium bromide products based on the allowed amounts calculated by the Durable Medical Equipment Regional Carriers ("DMERCs"). (Ex. A, 3/5/09 Duggan Dep. 61-64; Ex. B, Duggan Rpt. 2-4)  In all four scenarios, he performs analyses using recreated arrays "compiled at [his] direction by Myers and Stauffer, which were based on the original DMERC prepared arrays."  (Ex. B, Duggan Rpt. 99; *see also* Ex. A, 2/27/09 Duggan Dep. 396; 3/5/09 Duggan Dep. 133-34)  In each scenario, he replaces Roxane's AWPs in the DMERC arrays with "125 percent of the products' average pharmacy indirect price in that same time period." (Ex. B, Duggan Rpt. 100; *see also* Ex. A, 3/5/09 Duggan Dep.  61-64) Duggan created the figures he used to replace Roxane's AWPs by averaging certain values in

Roxane's indirect transactional data and then adding a 25 percent markup.[2]  (Ex. A, 3/5/09 Duggan Dep. 46 ("I calculated transaction-based prices for the Roxane products at issue in the case and utilized those transaction-based prices in place of AWPs[.]");3/6/09 Duggan Dep. 253).

After replacing the AWPs with his calculated values, Duggan then determines a new median of each DMERC array.[3]  (Ex. A, 3/5/09 Duggan Dep. 131-32; Ex. B, Duggan Rpt. 99-101)  He then compares his derived median to the median used by the DMERC for the same quarter and to the provider billed amount for the claim at issue.  (Ex. B, Duggan Rpt. 99-101)  If the re-created median is the lowest value of these three numbers, he assigns that median as the amount Medicare should have paid for the claim and calculates the "difference" between the median used by the DMERC and the new Duggan median.  (*Id.* at 102-3)  He then aggregates the "difference" for each claim across all claims paid by the DMERC in that quarter to arrive at his overall Medicare "difference" for the quarter.  (*Id.* at 104)

In one scenario, Duggan replaces the AWPs for three of Roxane's ipratropium bromide products in the DMERC arrays and calculates the difference.  (Ex. A, 3/5/09 Duggan Dep. 61-64; Ex. B, Duggan Rpt. 2-4)  He allocates the entire difference for all manufacturers' products in this scenario to Roxane.  (Ex. A, 3/5/09 Duggan Dep. 195)  In another scenario, he replaces the AWPs for six ipratropium bromide products—the same three as in his first scenario and three other "Novaplus ipratropium bromide" generic products that were sold via a private-label agreement between Roxane and Novation, LLC.  (*Id.* at 61-64; Ex. B, Duggan Rpt. 3-4; Ex. C,

---

[2]  "Indirect transactional data" refers to data that tracks sales of Roxane's drugs by Roxane's wholesale customers (such as Cardinal Health, McKesson, and Amerisource Bergen) to the pharmacy class of trade.  (Ex. A, 3/5/09 Duggan Dep. 76, 79-82)

[3]  From 1996 to 1998, Medicare reimbursed all prescriptions of a drug under a given Medicare billing code using the median of all generic forms of the drug; after 1998, Medicare considered brand forms of a drug in addition to the generic median by employing a formula that compared the lower of the generic median and the lowest-priced brand form of the drug.  *See* 42 C.F.R. § 405.517 (1998).

Roxane SOF ¶¶ 140-50, 228-29)[4]  In his last two "combined conduct" scenarios, he replaces Dey's AWPs in addition to Roxane's AWPs.  As Duggan observed, "when the AWPs of both firms' products are changed, the median and thus the per-unit allowed amount declines by substantially more in every case."  (Ex. B, Duggan Rpt. 103)  In one of his two "combined conduct" scenarios he replaces all six Roxane AWPs; in the other he does not replace the Novaplus AWPs.  (Ex. A, 3/5/09 Duggan Dep. 61-64; Ex. B, Duggan Rpt. 2-4)

### B.      Duggan Assigns Differences For Quarters Where He Is Missing Arrays.

The first flaw, common to all four of Duggan's Medicare scenarios, is that he calculates differences for quarters where he does not have arrays from the DMERCs.  (Ex. A, 3/5/09 Duggan Dep. 167-69)  As he explained his methodology for calculating differences for the missing quarters, "I basically consider the effect in the adjacent quarters and take the level that would minimize the difference." (*Id.* at 169)

Duggan's approach is problematic.  As a threshold matter, because he has no arrays for the missing quarters, he does not know whether Roxane's products were even used in those carrier arrays.  Indeed, he admitted that "there was some variation across carriers at a point in time, or within carriers over time, with respect to exactly which products were included."[5] (*Id.* at 132; *see also id.* at 151-52; 2/27/09 Duggan Dep. 407-08; Ex. B, Duggan Rpt. 97)  Thus, he has no basis for determining how much, if any, Medicare actually spent as a result of Roxane's

---

[4]   Citations to "Roxane SOF" refer to the statement of facts filed along with Roxane's summary judgment briefing.  (Dkt. No. 6207, Subcategory Dkt. No. 261)  For the Court's reference, excerpts from the statement of facts cited in this memorandum are contained in Ex. C to this brief.

[5]   As a result of updating arrays at different times using different sources, drugs were sometimes omitted from an array in one quarter and then reappeared in a later quarter.  (Ex. C, Roxane SOF ¶¶ 164-65)  The DMERCs noted in correspondence that they had issues "determining the correct forms of the drugs to pick up from RED BOOK," and asked HCFA to be "more specific in what items should be excluded and/or included in the calculation" to "eliminate the wide interpretations by different carriers." (*Id.* ¶¶ 168-71)

reported AWPs in those quarters, and should not be able to calculate *any* differences for those quarters.

Duggan is missing DMERC arrays for ipratropium bromide for 22 different quarters in the relevant period.  For six of these quarters—all of which are prior to the third quarter of 1997—he calculates no differences.  But for the other sixteen quarters, he calculates massive differences ranging from $25–$115 million, depending on the scenario:[6]

| DMERC | Quarter | Roxane Only | | Roxane and Dey | |
|---|---|---|---|---|---|
| | | No Novaplus | Novaplus | No Novaplus | Novaplus |
| Palmetto | 1997 Q4 | $ 3,217,703 | $ 3,217,703 | $ 6,640,712 | $ 6,640,712 |
| | 1999 Q1 | $ 1,820,020 | $ 1,820,020 | $ 11,846,519 | $ 11,846,519 |
| | 1999 Q2 | $ 1,909,467 | $ 1,909,467 | $ 12,391,550 | $ 12,391,550 |
| | 2002 Q4 | - | $ 52,983,644 | $ 40,216,628 | $ 52,983,644 |
| AdminaStar | 1997 Q4 | $ 1,229,973 | $ 1,229,973 | $ 2,490,804 | $ 2,490,804 |
| | 1999 Q4 | $ 3,656,023 | $ 3,656,023 | $ 5,534,031 | $ 5,534,031 |
| | 2000 Q1 | $ 3,825,921 | $ 3,825,921 | $ 5,783,608 | $ 5,783,608 |
| DMERC-A | 1997 Q2 | $ 579,919 | $ 579,919 | $ 1,133,594 | $ 1,133,594 |
| | 1997 Q3 | $ 601,938 | $ 601,938 | $ 1,209,763 | $ 1,209,763 |
| | 1997 Q4 | $ 674,006 | $ 674,006 | $ 1,332,916 | $ 1,332,916 |
| | 1998 Q1 | $ 716,152 | $ 716,152 | $ 1,421,551 | $ 1,421,551 |
| | 1998 Q2 | $ 806,560 | $ 806,560 | $ 1,649,817 | $ 1,649,817 |
| | 1998 Q3 | $ 867,301 | $ 867,301 | $ 1,806,756 | $ 1,806,756 |
| | 1998 Q4 | $ 999,594 | $ 999,594 | $ 2,055,521 | $ 2,055,521 |
| | 1999 Q2 | $ 1,156,277 | $ 1,156,277 | $ 2,323,837 | $ 2,323,837 |
| | 2000 Q4 | $ 3,175,608 | $ 3,175,608 | $ 5,288,193 | $ 5,288,193 |
| **Total** | | **$ 25,236,462** | **$ 78,220,106** | **$ 103,125,800** | **$ 115,892,816** |

In calculating differences for the quarters with missing arrays, Duggan does not rely on any reliable economics or statistical methodology.  Rather, he simply takes the difference from an adjacent quarter, and assumes the allowed amount in the missing quarter would be no higher

---

[6]   The "Roxane and Dey" figures in the chart below are compiled from Duggan's Table 39A and Table 39Brev (attached as part of Ex. B).  The "Roxane Only" figures are compiled from charts contained in Duggan's source logs for the Novaplus and non-Novaplus scenarios.

than that amount: "Q. . . . . By using the higher of the previous quarter and the later quarter, you are assuming that the quarter for which you are substituting wouldn't have been higher than either of those numbers?  A. That's correct."  (Ex. A, 3/5/09 Duggan Dep. 172)

Because of the wide variability of the DMERCs' arrays, Duggan's assumption is unreasonable.  For example, in his Roxane-only scenario, utilizing arrays Myers & Stauffer recreated from the actual arrays for the Palmetto DMERC, Duggan calculates a new median amount of $0.71 for the first and third quarters of 2003.  (*Id.* at 173-74)  He also computes a new median amount of $3.34 for the second quarter of 2003.  (*Id.*)  Had Palmetto's actual array for the second quarter of 2003 been missing, Duggan would have applied his methodology for missing arrays (*i.e.*, he would have reviewed his calculated new medians for the adjacent quarters), and used $0.71 as the allowed amount for that quarter—a much lower number than the $3.34 he computed using the true array for the same quarter. (*Id.*)  When asked about this flaw, Duggan deflected the question and *admitted* that this could have occurred in other periods: "This is an interesting quarter in the sense that it deviates from the adjacent Palmetto quarters.  It's the one quarter after . . . Palmetto does not use NovaPlus as a brand in the array.  That is one example I suspect . . .  my sense from working with this kind of data . . . [is that] *this could have happened in a case*, although I think this time period is very different from the earlier time period to which we're comparing." (*Id.* (emphasis added))

Further, Duggan does not even consistently follow the process of choosing an adjacent quarter's price for all missing quarters.  For example, he has no arrays for DMERC-A for any quarter before the third quarter of *1999*, yet he calculates differences for DMERC-A from mid-1997 through mid-1999 based on arrays that were compiled by the AdminaStar Federal DMERC.

(Ex. D, Myers & Stauffer Arrays Used By Duggan for DMERC-A (noting "DMERC RegB" in lower right corner of arrays))

In short, Duggan is calculating differences for the quarters with missing arrays based on hypothetical arrays of his own creation. And, as he testified before this Court in the Abbott case, where he has no carrier arrays to reference in his hypothetical, he just assumes that patterns hold true. (Ex. E, 12/10/09 Hr'g Tr. 83) Examples like those cited above demonstrate that this assumption is wrong. As this Court noted, Duggan is "making far more subjective judgments with respect [to] the arrays . . . . And there's no way to test it." (*Id.* at 88-89) In fact, motivated by this Court's concern, the DOJ has since abandoned Duggan's calculation of differences for quarters where he is missing arrays in the Abbott case.[7] (Case No. 01-12257-PBS, Dkt. No. 6897) Similarly in this case, speculation is an improper basis for Duggan's calculation of massive differences for these quarters under *Daubert*, and he should not be allowed to testify about or present damages for those quarters. *See, e.g.*, *Albert*, 234 F. Supp. 2d at 103.

## C. Duggan's Calculation Of Differences Based On The "Combined Conduct" Theory Is Flawed.

Duggan's two "combined conduct" scenarios—in which he simultaneously replaces Roxane's and Dey's AWPs—suffer from several additional flaws. First, Duggan's "combined conduct" scenarios are irrelevant and unhelpful to the trier of fact because there is no legal basis under the False Claims Act for calculating the "combined conduct" differences he seeks to present to the jury.[8] Second, his allocations of the combined differences suffer from methodological flaws.

---

[7] As reflected in the table on page 6 above, if Duggan drops these quarters from his difference calculations, it would reduce single damages in the Roxane-only, no-Novaplus scenario by over $25.2 million.

[8] Duggan fails to limit his opinions on "differences" to those caused by the alleged false statements at issue— Roxane's AWPs. Under the False Claims Act, damages are measured by determining what "amount of money

### 1.   Duggan's "combined conduct" differences are irrelevant.

Roxane has filed a separate motion *in limine* addressing Plaintiffs' theory that they may recover damages based on "combined conduct" by simultaneously manipulating Roxane's and Dey's AWPs.  (Dkt. Nos. 6969, 6970, Subcategory Dkt. Nos. 716, 717)  For the reasons outlined in that brief, Duggan should be precluded from testifying about the "combined conduct" differences he calculates in two of his scenarios because they are irrelevant, prejudicial, and unlikely to assist the trier of fact.

### 2.   Duggan's allocation of the "combined conduct" differences is flawed.

After calculating differences based on simultaneously replacing both Roxane's and Dey's AWPs, Duggan proposes two ways to divide the "combined conduct" differences—neither of which passes muster under *Daubert*'s standards.

### a.   Duggan's relative market share approach

Under one of his allocation approaches, Duggan divides the differences by using "relative market share" based on his analysis of state Medicaid utilization data.  Duggan first analyzes the Medicaid utilization of Roxane's and Dey's ipratropium bromide products in order to compute each company's share of the market for Medicaid prescriptions for each quarter at issue, which he then uses as a proxy for each company's share of the Medicare market.  (Ex. A, 2/27/09 Duggan Dep. 460-61)  Duggan has no methodologically sound basis for using his Medicaid utilization market share calculation instead of reliable, pre-existing market share data compiled by third parties such as IMS Health, which has been used by CMS/HCFA, as well as several experts—including DOJ experts—in the AWP litigation.  (Ex. F, July 2002 CMS Report,

---

the government paid *by reason of the false statement* above what it would have paid absent the false statement." *United States ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908, 922 (4th Cir. 2003) (emphasis added).  Because Duggan fails to conform his opinions to that requirement of the False Claims Act, the Roxane Defendants are filing a separate motion *in limine* seeking to bar such testimony and opinions.

*Assessment of Medicare Prescription Drug Prices*, at 3-14 (CMS report utilizing IMS data);
Ex. G, 1994 HCFA Report, *State Medicaid Pharmacy Payments and their Relation to Estimated
Costs*, published in Health Care Financing Review (HCFA report utilizing IMS data); Ex. H,
2/26/09 Schondelmeyer Dep. 710 (testifying he used IMS pricing data to formulate certain
opinions offered in this case); 2/27/09 Schondelmeyer Dep. 793-94 (same); 2/20/09 Perri Dep.
615-16 (testifying IMS data can be used to project the percentage of Medicare or Medicaid
prescriptions for certain payors); 5/1/09 Perri Dep. 18-20 (explaining that IMS tracks market
share data); *see also* 10/8/04 Hartman Dep. 395-96 (testifying that IMS data confirmed his
opinions on drug prices))

   Even more problematic, Duggan assumes—in contravention to established fact—that
Roxane and Dey occupy 100% of the Medicare reimbursement market and adjusts his Medicaid
market shares by dividing Roxane's Medicaid market share by the sum of Roxane's and Dey's
Medicaid market share.  (Ex. A, 3/5/09 Duggan Dep. 204-5; 5/18/09 Duggan Dep. 174-75, 192)
For example, for the last quarter of 2003, he divides Roxane's Medicaid market share of 9.8% by
the sum of 9.8% and Dey's Medicaid market share of 59%.  (Ex. B, Duggan Rpt. Tables 38,
39Brev.)  This calculation results in 14.2%, which Duggan assigns as Roxane's "relative market
share" for the quarter (Dey is assigned an 85.8% relative market share).  (*Id.*)  Similarly, in 1997
when Roxane's Medicaid market share was 65.1% and Dey's share was 1.3%, Duggan assigns
Roxane a 98% "relative market share."  (*Id.*)  Thus, through mathematical gymnastics and
selective litigation, Duggan manufactures a "relative market share" for Roxane that exceeds its
calculated Medicaid market share in ***every quarter*** of the damages period.  (*Id.*)  In other words,
by manipulating his calculated Medicaid market share, Duggan *increases* the relative shares for
both Roxane and Dey throughout the entire period by assigning them with proportions of the

"combined conduct" that total 100 percent, thus far exceeding their individual Medicaid market shares.  This approach is problematic because it fails to isolate the alleged false claims caused by Roxane's (or Dey's) AWPs and instead assigns damages even for claims that were not made based on these manufacturers' allegedly fraudulent conduct.  *See United States v. Rivera*, 55 F.3d 703, 709 (1st Cir. 1995) ("[T]he statute attaches liability, not to the underlying fraudulent activity or to the government's wrongful payment, but to the 'claim for payment.'").

### b.    Duggan's ratio approach

Duggan's second approach for allocating his "combined conduct" differences fares no better under the *Daubert* standards.  Duggan next proposes comparing the differences he calculated using his "Roxane-only" and "Dey-only" scenarios to the overall "combined" difference and then using this ratio to allocate the damages.  (Ex. B, Duggan Rpt. 123-24)  This approach also suffers from critical flaws.  First, for the same reasons that Duggan's relative market share approach is unsound—*i.e.*, because it erroneously assumes that Roxane and Dey occupy 100% of the Medicare reimbursement market—the ratio approach is likewise flawed.  Second, the ratio approach is further flawed because Duggan makes no attempt to ascertain Roxane's or Dey's respective share of the purported false claims, but instead chooses to divide the differences between them based on his calculation of their individual differences.  Because there is no evidence of any correlation between Duggan's calculated individual differences for Roxane and Dey and the number of Medicare claims paid for each company's ipratropium bromide products, Duggan's ratio approach ignores the *sine qua non* of the False Claims Act and is fundamentally flawed.  *See, e.g.*, *Rivera*, 55 F.3d at 709; *United States ex rel. Clausen v. Lab. Corp. of Am., Inc.*, 290 F.3d 1301, 1311 (11th Cir. 2002) (holding that a false claim is the *sine qua non* under the False Claims Act); *see also Harrison*, 352 F.3d at 92 ("[A] central question in

False Claims Act cases is whether the defendant ever presented a 'false or fraudulent claim' to the government.").

In short, because neither of Duggan's proposed allocations are the product of sound methodology, nor do they lead to reliable results, they are inadmissible. *Loughren*, 604 F. Supp. 2d at 265.

## II. DUGGAN'S CALCULATION OF MEDICAID DIFFERENCES IS FLAWED.

### A. Overview Of Duggan's Medicaid Methodology

Duggan utilized several different sets of data to calculate differences for the Medicaid program. (Ex. C, Roxane SOF ¶ 260) As Duggan acknowledges, the best and only comprehensive set of data is state claims data: transaction-level data compiled by each state's Medicaid agency that lists for each claim (1) the amount paid, (2) the dispensing fee paid, and (3) whether the claim was paid based on AWP, WAC, state MAC, FUL, U&C, or some other basis. (Ex. C, Roxane SOF ¶¶ 263, 267-68; *see also* Ex. A, 3/5/09 Duggan Dep. 51 (acknowledging that state claims data was most accurate data, but nevertheless explaining that he used alternative datasets)) He had this data available for 31 states. (Ex. C, Roxane SOF ¶¶ 261-62) The other datasets are aggregate and do not reflect the dispensing fee or actual amount paid per claim or the payment basis for the claim. (*Id.* ¶¶ 267-68) Duggan, however, used comprehensive state claims data for only 16 states and then extrapolated differences for the other 33 states—15 states for which he reviewed but chose not to use state claims data, and another 18 states for which he did not have claims data. (Ex. A, 3/5/09 Duggan Dep. 53 (noting he used other CMS data for these states rather than the most accurate state claims dataset); *see also* Ex. C, Roxane SOF ¶¶ 261-62)

In addition, while Duggan used state claims data for sixteen states, for each of those states he was missing data for certain quarters. For those quarters, he relied on less complete,

aggregate data.  For example, Duggan used state claims data for North Carolina.  But because he had no state claims data for North Carolina from before 2000 or after 2007, in reality he used state claims data for only 25 of the 48 quarters for which he calculates Medicaid differences for North Carolina.  (Ex. B, Duggan Report, Table 29) Similarly, Georgia produced claims data only for 25 of the 48 quarters.  (*Id.*) In fact, Duggan does not use state claims data for the entire period for **any** of the sixteen states in his sample.  (*Id.*; Ex. C, Roxane SOF ¶ 287)

In order to calculate differences for the sixteen states in his sample, Duggan reviewed each NDC and replaced Roxane's AWP or WAC with his alternative AWP or WAC.  (Ex. C, Roxane SOF ¶ 281)  He then calculated whether the state's actual payment on a given claim exceeded his but-for payment calculated using his alternative prices.  (*Id.* at ¶¶ 285-86)  If the state's actual payment for the claim exceeded his calculation, the overage was added to his difference figure.  (Ex. B, Duggan Rpt. 34)

Duggan then used the instances where he calculated a difference for the sixteen states in his sample to extrapolate to the remaining states.  (Ex. C, Roxane SOF ¶ 291)  To compute a difference for the remaining 33 states, Duggan used his sixteen-state sample to derive a "difference ratio" for each quarter.  (Duggan Report 94-95)  The difference ratio is simply the average of how much the sample states allegedly overpaid in a given quarter, divided by those states' Medicaid expenditures for that quarter.  (*Id.* at 37, 94-95)  Duggan weighted each state for which he had data equally in calculating this ratio.  (*Id.*)

Duggan also extrapolated within his sixteen-state sample for periods where he had no data for the sample states.  To cover missing quarters within a state, Duggan multiplied the fraction by which the state overpaid for the nearest quarter where he had actual claims data by the state's total expenditures for the missing quarter (taken from aggregate figures obtained from

CMS).  (*Id.* at 37-38)  He then assigned the resulting figure as the dollar difference that the state overpaid during that period.  (*Id.*)

## B.     Duggan's Inter-State Extrapolation Methodology Is Flawed.

Duggan's extrapolation from a sample of only 16 states to 33 different states where he reviewed no data lacks any indicia of reliability and is flawed in numerous ways.   *First*, Duggan's methodology is flawed because he relies on an unrepresentative, non-random sample as his foundation.  *Second*, he ignores wide variation in both his sample states and the states he is extrapolating to.   *Third*, he fails to adhere to sound methodology when extrapolating from his sample.  For these reasons, the Court should exclude Duggan's Medicaid difference calculations of $20.3 million for the 33 states for which he reviewed no data.

### 1.     The sample Duggan uses to extrapolate from is flawed.

As an initial matter, while Duggan purports to use state claims data from sixteen states to extrapolate to the remaining states, in reality ***most of the time*** he uses fewer than sixteen states. In fact, in only 15 of the 48 quarters at issue does Duggan actually use claims data from all sixteen states.  (Ex. B, Duggan Rpt., Table 29) In some quarters he uses significantly fewer states.   For example, in the last quarter of 2007, Duggan uses data from *only two* states (Massachusetts and Missouri) to extrapolate to 33 others.  (*Id.*; Ex. C, Roxane SOF ¶ 292)  This example is hardly atypical: for the third quarter of 2007, he uses only four states; for the first quarter of 2007, he uses only eight; and for the third quarter of 1996, he uses ten states. (Ex. B, Duggan Rpt., Table 29) Extrapolating from such a small number of states to a large number of states make his extrapolations unreliable.  *Kilpatrick v. Breg, Inc.*, No. 08-10052-CIV, 2009 WL 2058384, at *5-*6 (S.D. Fla. June 25, 2009) (excluding expert's extrapolation methodology under Rule 702 and *Daubert* because expert made no findings as to "whether it [was] statistically meaningful to extrapolate from the relatively small sample size.").

14

Duggan's use of a small sample population is compounded by the fact that he does not use reasonable methodology in selecting the states for his sample.  In stark contrast to generally accepted statistical sampling standards, Duggan extrapolates differences to 33 states from an unrepresentative sample of claims data from the states with the highest Medicaid expenditures.  As he admits, "I selected the largest states initially to focus on because they are going to have the largest impact on that aggregate U.S. number.  So for example it is not an accident that I picked California, New York, Florida . . . rather than Wyoming, Vermont and Washington D.C." (Ex. A, 3/5/09 Duggan Dep. 215)  By definition, these 16 highest-expenditure states do not constitute a random sample; further, by virtue of the fact that they are the 16 highest-spending states, they are not representative of the larger group of 49 states for which he calculates differences.  *See Allgood v. Gen. Motors Corp.*, No. 02CV01077, 2006 WL 2669337, at *11 (S.D. Ind. Sept. 18, 2006) (rejecting expert sample that was not "appropriately representative of the larger entity or population being measured"); *Collyer Insulated Wire Co.*, 94 F. Supp. at 498-99 (refusing to allow extrapolation of results from one set of contracts to another set where plaintiff could not establish one was appropriately representative of the other).  Duggan also never explains why he stopped at these sixteen states and deliberately ignored actual, transaction-level data he had for another fifteen states.  (*Id.* at 214-15)

Not only is Duggan's sampling approach not representative, but his selection of data from only 16 out of 31 states for which he had data is also inconsistent with the random sampling approach suggested in the Reference Manual on Scientific Evidence.  He did not draw his sample from "the population [of] the whole class of units that are of interest" such that any given claim had a "known, nonzero probability of being chosen."  *See* David H. Kaye & David A. Freedman, *Reference Guide on Statistics*, in REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 90, 100 (Fed.

Judicial Ctr. 2d ed. 2000).   Unlike in *Loughren* where the expert at least purported to follow some methodology ("cohort sampling"), and yet was still excluded by this Court, there is no evidence that Duggan employed any "sampling" methodology at all.  *Compare Loughren*, 604 F. Supp. 2d at 261.   Instead, he appears to have selected a purely results-oriented "sample of convenience." *Id.* at 266.

Duggan's sample selection is also contrary to protocols CMS has developed for Medicare Carriers that use "statistical sampling in their reviews to calculate and project overpayment amounts to be recovered by recoupment, offset or otherwise." (Ex. I at 6 (CMS Manual System, Pub. 100-08, Medicare Program Integrity, Transmittal 114, *Change in Statistical Sampling Instructions*, at 3.10.2); *see also id.* at 16 (Program Memorandum (Carriers), Transmittal B-03-022, *Use of Statistical Sampling for Overpayment Estimation When Performing Administrative Reviews of Part B Claims*))   CMS's protocols would have required Duggan to ensure that the population he is studying had a "known probability of selection" for his sample, (*Id.* at 8-9, 17), or that his "universe and sampling frame . . . [included] all relevant claims for the period under review." (*Id.* at 10, 18)  That is clearly not true here where only claims from 16 states had any chance of being included in Duggan's "sample."   Similarly, he did not use any sampling technique recognized by CMS—*i.e.*, simple random sampling, systematic sampling, stratified sampling, or cluster sampling. (*Id.* at 19-20)

### 2.   Duggan does not account for the wide variation among states in reimbursement policies.

Duggan's unscientific approach to sampling is further defective because he extrapolates from his sample to states with widely divergent reimbursement policies.  *See Albert*, 234 F. Supp. 2d at 106 n.7 ("[T]here is no basis whatsoever for an extrapolation from the nursing home market to the hospital market").   Implicit in Duggan's extrapolation methodology is the

assumption that his alternative prices will have the same impact on Medicaid spending in the 33 states he extrapolates to as they do on the 16 states in the sample he extrapolates from. For this assumption to prove correct, the 33 states for which he extrapolates differences would need to focus on the same factors to establish drug payment levels as the states in Duggan's sample. That assumption is false given wide variation in Medicaid reimbursement policies both within Duggan's 16-state sample, and across the 33 states for which he extrapolates.

Duggan ignores the details of state Medicaid regulations and conducts only visceral review of basic adjudication formulas to establish comparability between the states. He argues that the sample group of 16 states and the group of 33 states are "quite similar" because 2 out of the 16 states in his sample reimbursed ingredient cost based on WAC, while 4 out of the 33 extrapolated states paid based on WAC. (Ex. B, Duggan Rpt. 94) Thus, Duggan argues that his sample is fair because about 1 of 8 states in each group paid based on WAC. (*Id.*) Given disparities in state reimbursement formulas, his example is misleading. In the sample group of 16 states, in 1997 Florida paid at WAC+7% and Massachusetts at WAC+10%. (Ex. J, National Phamaceutical Council Compilation of State Medicaid Formulas, at 3) In the extrapolated group of 33 states, Alabama paid at WAC+9.2%, Maryland at WAC+10%, and Rhode Island at WAC+5%. (*Id.*) Furthermore, Colorado paid at the lesser or AWP-10% or WAC+18%, and Texas the lesser of AWP-10.49% or WAC+12%. (*Id.*) Thus, his oversimplification that 1 of 8 states in each group paid at WAC fails to measure the actual variance among the groups, and fails to take account of states with alternative reimbursement based on WAC.

Duggan's approach also fails to account for the prevalence of FULs and MACs on the Subject Drugs in the various states, as well as the levels of those payment bases. (Ex. C, Roxane SOF ¶¶ 278-79) If a state has a MAC in place (like Arkansas and Minnesota, for instance), then

the payments per claim tend to be dramatically lower than those in states that based their payments on compendia prices, making it even more difficult to extrapolate reliable differences for MAC states. Yet Duggan admits that he made no effort to determine which states established MACs for the Subject Drugs, or to compare the relative prevalence of state MACs between his sample and the states he extrapolates to.[9] (*Id.* ¶ 279)

Duggan's error is apparent from his subsequent calculation of differences for an additional nine states. In an effort to salvage his extrapolation methodology, after his deposition in this case he calculated differences for 9 of the 33 states where he had initially used extrapolation. (Ex. L, 11/30/09 Duggan Ltr. to Brooker) Rather than validate his methodology, these subsequent calculations prove the unreliability of his extrapolation. Duggan's new calculation of differences for these nine states show that his extrapolations overstated the overall difference for these states by almost 6%—most likely due to the fact that these states paid claims based on U&Cs or MACs more frequently than the states in his sample.[10] (*Id.*)

### 3. Duggan's methodology for extrapolating from his sample is also flawed.

In addition to extrapolating from a poor sample and inappropriately using extrapolation with respect to unrepresentative datasets, Duggan's inter-state extrapolation methodology is flawed because he utilizes a "difference ratio" he calculates by weighting the individual

---

[9]   For this reason, Duggan's approach is clearly deficient based on data compiled by the OIG. (Ex. K, *Variation in State Medicaid Drug Prices*, 2004 OIG Rpt. (OEI-05-02-00681). Using 2001 data, OIG found in 2004 that states' payment amounts varied considerably: "On average, the highest paying State paid 477 percent more per drug than the lowest paying State for each of the 28 drugs in our sample." (*Id.* at ii)  OIG found greater variation in reimbursements for generic drugs, with the median variation of 374%. (*Id.* at 9-10) OIG believed this variability was due to differences in state MAC policies, as well as disparities in definitions of "usual and customary charge" and the frequency with which drugs were reimbursed at U&C. (*Id.* at 19-21)

[10]   Duggan calculated differences for these nine states of $5.3 million using claims data versus $5.6 million using extrapolation. In testifying before this Court in the Abbott case, he discussed his similar re-analysis of Abbott data and explained that the calculations using actual data were lower because he had underestimated the extent to which the additional states paid based on usual and customary charges. (Ex. E, 12/10/09 Hr'g Tr. 35-38)

"difference ratios" for each of his sample states equally.  (Ex. B, Duggan Rpt. 94-95)  Duggan assumes that the "difference ratio" by which his sample states overpaid—in some quarters as few as two states—is the *exact* ratio by which every one of the other 33 states overpaid, despite each of those states administering its Medicaid program in a completely individualized manner. (Ex. J)  Not only is this assumption unfounded, but this method is inconsistent with Duggan's decision to focus only on high-expenditure states in his sample.

### 4.    Duggan's confidence intervals prove nothing.

Duggan recently attempted to prove his extrapolation methodology reliable by offering 90% and 95% confidence intervals.  (Ex. M, 2/5/10 Duggan Ltr. to Brooker) The intervals, however, say nothing about *whether* his method is appropriate.   First, confidence intervals assume that Duggan used random sampling, which he admitted he did not.  *See* REFERENCE GUIDE TO STATISTICS, 119-21.  As stated in the Reference Guide to Statistics, standard errors and confidence intervals simply do "not address problems inherent in using convenience samples rather than random samples." *Id.* at 121.  Second, Duggan's confidence intervals are themselves based on an assumption about the validity of the extrapolation and merely account for variability within the dataset.  *See Univ. Computing Co. v. Mgmt. Sci. Am., Inc.*, 810 F.2d 1395, 1399 (5th Cir. 1987) ("Tests of statistical significance and confidence intervals *always* presuppose a sample and a universe from which the sample is drawn.") (emphasis in original) (citation omitted).  Thus, any attempts to extrapolate from his sample could have an unacceptably high rate of error, or contain unquantifiable biases. *Id.*  Because Duggan failed to use proper statistical procedures, it is impossible to calculate his analyses' rate of error. *See Chavez v. IBP, Inc.*, No. CV-01-5093-RHW, 2004 WL 5520002, at *9 (E.D. Wash. Dec. 08, 2004) (noting that "[b]y failing to engage in probability sampling . . . [expert] could not know his study's rate of error.").

### C.     Duggan's Intra-State Extrapolation Methodology Is Flawed.

In addition to his extrapolation across states, Duggan's calculations employing intra-state extrapolation are also inadequate substitutes for analyzing claims data.  Duggan's intra-state extrapolation methodology is defective because he does not evaluate how the various factors influencing how a particular state paid for Medicaid drugs changed over time.  For instance, if a state changes its reimbursement policy by switching to a different formula, implementing a MAC, or paying more frequently based on a U&C, the ratio of claims with a "difference" greater than zero would also change, as would the payment bases for those claims.  For example, Florida paid based on WAC+7% until 1999, then the lower of AWP-11.5%, Direct Price+7%, or WAC+7% until 2000, and finally AWP-13.25% after 2000.   (Ex. J at 5-7)   Yet Duggan conducted no analysis of whether any of his sixteen states changed their reimbursement policies over time or how these changes would affect his extrapolated differences.   The Court should exclude the $3.5 million difference calculated for periods within the sixteen state sample that are based solely on extrapolation rather than review of any actual data.  (Ex. C, Roxane SOF ¶ 294)

### CONCLUSION

For all the foregoing reasons, this Court should grant the Roxane Defendants' Motion *in limine* to exclude expert opinions offered by Plaintiff's expert Mark G. Duggan.

Dated:  March 12, 2010

Respectfully submitted,


   /s/ Eric T. Gortner
Helen E. Witt, P.C.
Anne M. Sidrys, P.C.
Eric T. Gortner
John W. Reale
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, Illinois  60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200

*Counsel for Defendants*
*Boehringer Ingelheim Corp.,*
*Boehringer Ingelheim Pharmaceuticals, Inc.,*
*Boehringer Ingelheim Roxane, Inc., and*
*Roxane Laboratories, Inc.*

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing was delivered to all counsel of record by electronic service pursuant to Paragraph 11 of Case Management Order No. 2, by posting on March 12, 2010, a copy on LexisNexis File and Serve as notification to all parties.

## REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 7.1(D), the Roxane Defendants request oral argument on the issues raised in this Motion, which they believe will assist the Court in deciding this motion.

/s/ Eric T. Gortner
Eric T. Gortner