# Exhibit A
# Excerpts from Deposition Testimony of
# Mark G. Duggan

Exhibit to the March 12, 2010 Motion *In Limine* to Exclude Certain Expert Opinions Proffered
by Plaintiffs' Expert Dr. Mark G. Duggan

270

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - -x

IN RE:  PHARMACEUTICAL           :  MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE       :  CIVIL ACTION

PRICE LITIGATION                 :  01-CV-12257-PBS

THIS DOCUMENT RELATES TO:        :

U.S. ex rel. Ven-a-Care of       :  Hon.  Patti B. Saris

the Florida Keys, Inc.           :

        v.                       :

Dey, Inc., et al.                :

No. 05-11084-PBS                 :

- - - - - - - - - - - - - - -x

                    Washington, D.C.

                    Friday, February 27, 2009

                    VOLUME II


    Continued Videotaped Deposition of MARK G.

DUGGAN, Ph.D., a witness herein, called for

examination by counsel for Dey, Inc. in the

above-entitled matter, pursuant to notice, the

Duggan, Ph.D., Mark G. - Vol. II    CONFIDENTIAL                February 27, 2009
Washington, DC

33 (Pages 395 to 398)

395

1   Traveler's to West New York.
2       Q.   So you used CIGNA, Administar, Traveler's,
3   West New York, and Palmetto?
4       A.   That's correct.  And there is a sixth one
5   that is summarized in table 30 but as you can see
6   from the table on the left, bottom last quarter it
7   accounts for a minuscule share of the claims.
8       Q.   And which carrier is that, 17003?
9       A.   I don't, I don't recall the name of it.
10      Q.   Now, you explain how the Medicare
11  reimbursement proceeds and in each one of these, each
12  one of these carriers, in order to carry out the
13  reimbursement process, each one of them sets up an
14  array of drugs to look at to try to determine the
15  price that would be used in reimbursement, correct?
16      A.   It seems like a reasonable high level
17  summary of what is done.
18      Q.   And you obtained arrays for the periods
19  that you were looking at in connection with the, that
20  would contain the Dey drugs on the six codes that you
21  were looking at, correct?
22      A.   Can you please repeat that?

396

1           THE REPORTER:  "Question:  And you
2   obtained arrays for the periods that you were looking
3   at in connection with the, that would contain the Dey
4   drugs on the six codes that you were looking at,
5   correct?"
6           THE WITNESS:  So as I outline in my
7   report, at my direction, Myers and Stauffer produced
8   electronic versions of the arrays that were used by
9   the five carriers, five DMERCs during the time period
10  of interest.  And I -- so I used those, I examined
11  and use those arrays.
12          BY MR. ESCOBAR:
13      Q.   Okay.  And what you -- first you had the
14  array that reflected the information that led to the
15  reimbursement that had actually already happened,
16  right?
17      A.   That is correct.
18      Q.   And then using the electronic format, you
19  were able to create or replicate those arrays using
20  the new pricing that you came up with after analyzing
21  the Dey data and Roxane data?  Am I right?
22      A.   That is correct.  And just to be specific,

397

1   essentially, I replaced the AWPs for the Dey products
2   with 125 percent of the price, the pharmacy average
3   indirect price, and then do the same for the Roxane
4   products in some cases.  And this is -- I give
5   several examples of this in the report of sort of
6   what's involved.  There was quite a bit of
7   information, but I sort of telescoped in on some of
8   the important features of the arrays and summarized
9   it directly in the report.
10      Q.   And we'll go through that in a second, but
11  I take it that the -- on the arrays that you were
12  working with, the drugs that were, that composed the
13  array, you used the drugs that the particular carrier
14  had inserted into that array.  You didn't change the
15  list of drugs at all?
16      A.   That is in the vast majority of cases
17  true, but there are a couple of exceptions.
18      Q.   Is there -- is there an array where you
19  added a drug that was not in the array constructed by
20  the DMERC?
21      A.   Not that I recall.  No.
22      Q.   So in every, in every single array that

398

1   you use to come up with your analysis in Medicare,
2   the drugs that are in the array were the drugs
3   selected by that specific carrier, correct?
4       A.   Can you read that back?
5           THE REPORTER:  "Question:  So in every, in
6   every single array that you use to come up with your
7   analysis in Medicare, the drugs that are in the array
8   were the drugs selected by that specific carrier,
9   correct?"
10          THE WITNESS:  To the, to the best of my
11  recollection, that is accurate.  Trying to just grind
12  through, there are more than 100 arrays in effect
13  during this period, and so, but to the best of my
14  recollection, if I'm understanding the question
15  correctly, that is correct.
16          BY MR. ESCOBAR:
17      Q.   And you didn't take out any drugs that
18  were in an array as constructed by the DMERC, did
19  you?
20      A.   As I discuss in the report, and summarize
21  in table 35 of the report, there are some, so there
22  are a number of different scenarios that I consider

Duggan, Ph.D., Mark G. - Vol. II    CONFIDENTIAL                February 27, 2009
Washington, DC

35 (Pages 403 to 406)

403

1     Q.   Was the electronic array supposed to
2   reflect faithfully the exact products that had been
3   included by the carrier in the array that it
4   constructed?
5     A.   Can you repeat that?
6          THE REPORTER: "Question: Was the
7   electronic array supposed to reflect faithfully the
8   exact products that had been included by the carrier
9   in the array that it constructed?"
10         THE WITNESS: It is my understanding that
11  the electronic versions of the arrays accurately
12  portray the products that were used to determine
13  Medicare reimbursement amounts. And I should just
14  note that this is quite similar to some of what I had
15  done in my earlier Abbott report and the -- one
16  thing that I am able to do with the data, with the
17  Medicare data is to determine whether the amounts
18  being paid correspond to what one would expect given
19  what is observed in the electronic versions of the
20  arrays.
21         And so I certainly did, I certainly did
22  and people at Steck Consulting certainly did at my

404

1   direction quite a lot to confirm that.
2          (Exhibit Dey Duggan 007 was
3          marked for identification.)
4          BY MR. ESCOBAR:
5     Q.   Showing you what has been marked as
6   Exhibit 7. And this is a portion of one of the, this
7   is a portion of the CIGNA arrays so that we can go
8   through it and see if I can understand what, what you
9   did. Is this a product of the electronic arrays that
10  Myers and Stauffer created from the CIGNA documents?
11    A.   The information included in the top half
12  of the first page appears to consist of, appears to
13  be the original array used by -- does it say, where
14  does it say CIGNA? I guess it doesn't say CIGNA
15  anywhere, so of course, I don't have the array
16  memorized what --
17    Q.   It says CIGNA at the bottom right.
18    A.   Oh. Okay. So I see that this 2001
19  quarter three CIGNA it seems to be, it looks familiar
20  but whether it's identical to what's produced, it
21  certainly looks like what -- it looks familiar.
22    Q.   This was identical to what was produced

405

1   because it comes from what was produced.
2     A.   Okay. So I'm taking that, assuming then
3   that's what was produced. This is the Myers and
4   Stauffer original.
5     Q.   Why did you have Myers and Stauffer do
6   this work?
7     A.   Well, they -- at some level when I have to
8   go back to the Abbott report because they did the
9   same in the case of the Abbott report, so part of the
10  reason that I had them do it in this case was that
11  they had already developed and demonstrated
12  considerable expertise in carrying this out for the
13  Abbott report.
14         BY MR. ESCOBAR:
15    Q.   Now let's go to the first panel on page 1
16  is described as the original array per carrier array
17  documents. Do you see that?
18    A.   Yes.
19    Q.   Okay. And it relates to code J 7644,
20  right?
21    A.   That is correct.
22    Q.   And that's a code that covers ipratropium

406

1   bromide unit dose one milligram, correct?
2     A.   Yes.
3     Q.   And then the -- this is a column that says
4   price list drug name. Do you see that?
5     A.   Yes.
6     Q.   And the price, the price list drug names
7   are divided into a category that contains generics
8   and a category that contains brands, right?
9     A.   That products that are generic and
10  products that are brand based on this carrier so the,
11  I'm just trying to refresh here, so it appears the
12  first 12 products listed here are generics and the
13  next four products are treated by the DMERC as -- as
14  brands. But as I discuss in -- so --
15    Q.   Okay. So -- and it's the, it's the DMERC
16  that is the carrier CIGNA, somebody at the DMERC is
17  the one that decided what drugs would go into this
18  array and which drugs would be in the generic group
19  and which would be in the brand, correct?
20    A.   Who exactly made this decision -- it could
21  be. I know from my work in Abbott that there were
22  cases in which carriers shared information on arrays,

Duggan, Ph.D., Mark G. - Vol. II   CONFIDENTIAL                    February 27, 2009
Washington, DC

36 (Pages 407 to 410)

407

1    but clearly someone at CIGNA -- well, they selected,
2    went through and selected these products or decided
3    to use them based on -- I don't know exactly
4    decided this, but this array is the array that based
5    on my understanding was used by CIGNA.
6        Q.   Okay.  And do you know if this array
7    contained every manufacturer of an ipratropium
8    bromide unit dose?
9        A.   At this time, I'm not certain how many
10   manufacturers were making this, making ipratropium
11   bromide, so it is possible that there are other,
12   there are other manufacturers not included here.  I
13   just don't recall at this specific point in time,
14   2001 quarter three, how many, how many firms are
15   making ipratropium bromide.
16       Q.   And in your review of the, what the
17   carriers did, you saw that in some instances, one
18   carrier would have more manufacturers and more
19   products than the same, than another carrier would
20   have for the exact same J code, am I right?
21       A.   There was some variation across carriers
22   in certain quarters with respect to which products

408

1    were included and there was also some variation over
2    time within the same carrier with respect to which
3    products were included.
4        Q.   And do you know what, how it would be that
5    in some quarters within the same carrier, it would
6    have different product listed in the array?  Do you
7    know why that was?
8        A.   Why different carriers had --
9        Q.   No.  Start with the same carrier that in
10   different quarters may have different products listed
11   in the array for the same J code?
12       A.   What factors led specific carriers to add
13   or subtract particular products from the array, what
14   factors caused that was not the focus of my analysis
15   so it would be difficult for me to say more about
16   that without -- that's just wasn't the focus of my
17   analysis.
18       Q.   And did you read depositions of the people
19   who testified in this case from, who were
20   representatives of the various carriers to see how it
21   is they went about doing the arrays or anything
22   having to do with the reimbursement?

409

1        A.   There were a number of, there were some
2    depositions of individuals at the DMERCs.  I recall
3    skimming at least one of them, a woman from
4    Administar whose name I can't remember but there --
5    it certainly, there were, there was some testimony
6    but I didn't, that wasn't -- I didn't drill down on
7    that in the way that I did these other parts that
8    we've been discussing.
9        Q.   And adding or subtracting a product from
10   an array could potentially affect the median that
11   results from the array, is that right?
12       A.   Potentially, yes.
13       Q.   And do you know of any specific reason for
14   a carrier to make the judgment as to whether to add
15   or delete a product from an array?
16       A.   I'm sorry.  Can you repeat that, please?
17       THE REPORTER:  "Question:  And do you know
18   of any specific reason for a carrier to make the
19   judgment as to whether to add or delete a product
20   from an array?"
21       THE WITNESS:  It's not something that I
22   examined closely and no particular factor is leaping

410

1    to mind right now.  It seems plausible that one
2    factor would include whether the products were in the
3    Red Book and -- would be, seems plausibly one factor.
4    As for other factors, that's just not something that
5    I've studied.
6        BY MR. ESCOBAR:
7        Q.   Do you know whether there were any
8    products that were added or deleted based on what
9    their price was?
10       A.   I'm -- I don't recall that.  Learning of
11   that.
12       Q.   Now, did you look into that specifically?
13       MR. HENDERSON:  Added or deleted by the
14   carrier?
15       BY MR. ESCOBAR:
16       Q.   Right.  Because of the price.
17       A.   I, in my analysis, I utilized the arrays
18   that were, that the carriers employed, the DMERCs
19   employed in determining allowed amounts.  Why those
20   arrays changed over time or why they differed at a
21   point in time across carriers was not something that
22   I examined closely.

Duggan, Ph.D., Mark G. - Vol. II    CONFIDENTIAL                    February 27, 2009
Washington, DC

49 (Pages 459 to 462)

459

1    Q.   Ratio?
2    A.   Of, so just -- let's take a specific
3    quarter as an example.  So 1997, quarter one, it is
4    44012, the Roxane total divided by the sum of 44012
5    and 882, which is about 98 percent.
6    Q.   So it's just comparing the share as
7    between Roxane and Dey?
8    A.   Correct.
9    Q.   And it's leaving out any other companies
10   that may, that may be part of the other total?
11   A.   It -- right.  It doesn't include those,
12   those NDCs and the other total.
13   Q.   And who made the decision to do it that
14   way?
15   A.   That was, that was -- that was my
16   decision.
17   Q.   And other total, just to clarify, other
18   total on table 36 revised, what does that refer to?
19   A.   That reflects the total number of Medicaid
20   prescriptions for any Ipra product included in any of
21   the arrays by the DMERCs.  So for example, if we went
22   back to, we were talking about these Alpharma, for

460

1    example, Ipra products, they would be included in
2    that other total.
3    Q.   And would the brands that are in the
4    arrays be included in any of those, any other total
5    as well?
6    A.   My recollection is, certainly the, you can
7    see the three right most columns are these Nova
8    Plus products and those are definitely included in
9    the totals.  This Atavent product that we saw, I
10   don't recall specifically if that one is in there.
11   Q.   Now, this is, table 36 revised is you're
12   applying this to a Medicare, to your Medicare
13   analysis, but the percentages are derived by looking
14   at some Medicaid data, correct?
15   A.   That is correct.  This is Medicaid
16   reimbursed prescriptions by NDC and quarter.  That's
17   right.
18   Q.   Why were you using the Medicaid data to
19   come up with these percentages that you're applying
20   to your Medicare analysis?
21   A.   So the Medicare, as I discussed in my
22   report, the Medicare J code claims do not include,

461

1    the Medicare J code claims do not list which
2    ipratropium bromide product is -- is being transacted
3    in the prescription.  So this data represents the
4    sort of Medicaid market share for Dey and for Roxane
5    for this, for this ingredient, and it is basically an
6    estimate of the market share of Dey, Roxane and all
7    other firms using the Medicaid data.
8    Q.   And which specific Medicaid database was
9    looked at in order to come up with this?
10   A.   If I recall, it was the SDU data, the
11   state drug utilization data.
12   Q.   And it's -- and that was based on
13   prescriptions, right?
14   A.   That is correct as defined in SDU data.
15   Q.   Now, the revised tables obviously that's
16   something that you created after you had submitted
17   the Dey report, right?
18   A.   That is correct.
19   Q.   And is that because you were then working
20   on a Roxane report?  Is that how that came to be?
21   A.   That was part of the -- part of what led
22   to the creation of these tables.

462

1    Q.   Now, if we go back to Exhibit 7, which is
2    the array that, the panels of the arrays that we were
3    looking at.
4    A.   Okay.
5    Q.   Now, in each instance where the array
6    calculations yielded what the allowable was or what
7    the amount that was computed by running through the
8    array, that would only be used for reimbursement
9    after comparing to the amount billed, right, by the
10   provider?
11   A.   That is correct.  And my recollection of
12   the Medicare analysis is that similar to the, to
13   Medicaid, a comparison is made between the amount
14   generated from the formula and the amount whether
15   it's called usual and customary or the charged amount
16   or the billed amount.  I don't remember, but that
17   comparison, the lesser of those two is typically
18   taken.
19   Q.   So it would always be the lesser of the
20   amount yielded by the analysis of the array which
21   would either be the median or the lower brand in the
22   instance we were looking at, and then comparing what

1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - -

| | | |
|---|---|---|
| IN RE:  PHARMACEUTICAL | ) | MDL NO. 1456 |
| INDUSTRY AVERAGE WHOLESALE | ) | CIVIL ACTION |
| PRICE LITIGATION | ) | 01-CV-12257-PBS |
| THIS DOCUMENT RELATES TO | ) | |
| United States of America ex | ) | Judge Patti B. Saris |
| rel. Ven-a-Care of the | ) | |
| Florida Keys, Inc., et al. | ) | |
|       v. | ) | |
| Boehringer Ingelheim Corp., | ) | Chief Magistrate |
| et al., Civil Action No. | ) | Judge Marianne B. |
| 07-CV-10248-PBS | ) | Bowler |

- - - - - - - - - - - - - - -


CONFIDENTIAL

Videotaped deposition of MARK G. DUGGAN, PH.D.

Volume I

Washington, D.C.

Thursday, March 5, 2009

9:00 a.m.

Duggan, Ph.D., Mark G.    CONFIDENTIAL                    March 5, 2009
                     Washington, DC

12  (Pages 42 to 45)

42

1      Q.  Do you understand, sir, that under rule
2  26 or under the rules that apply here that you are
3  required to provide us with a report that includes
4  the opinions that as of now you expect to provide
5  to the court and/or to a jury?
6          MS. THOMAS:  Objection.
7      A.  I guess I'm -- maybe I'm just
8  misunderstanding.
9      Q.  Maybe.
10     A.  This report summarizes the results from
11 my analysis of this issue, summarizes -- perhaps --
12 I'm just trying to be precise because these are --
13 this report summarizes my main findings for the
14 questions that I set out to answer.  So I am
15 certainly not deliberately hiding anything here.
16 This is -- these are my findings for the effect of
17 these alternative prices on the Medicaid and
18 Medicare programs.  And so these are the -- this
19 really provides an overview of my key findings.
20         And I certainly understand that my
21 report, the burden is on me in this report to -- or
22 in supplements to this report -- to summarize my

43

1  opinions and findings.  So I understand that.  I
2  just don't know what might evolve in the months
3  ahead, whether it's experts.  So --
4      Q.  Other than what might evolve in the
5  months ahead, this is an accurate statement of your
6  opinions as you sit here today, correct?
7      A.  Yes, with the caveat that I mentioned
8  earlier, that embedded in this are --
9      Q.  Underlying assumptions?
10     A.  Right.
11     Q.  Are you doing okay break-wise or could we
12 keep going?
13     A.  Sure.  We can take a break.
14     Q.  Whatever works best for you.
15         MS. SIDRYS:  Can we take a five minute
16 break?  Is that all right?
17         MR. HENDERSON:  Yes.
18         THE VIDEOGRAPHER:  Off the record at
19 10:26.
20         (Recess.)
21         THE VIDEOGRAPHER:  On the record at
22 10:40.

44

1          THE WITNESS:  Is it okay if I start out
2  with something that occurred to me at the break?
3  BY MS. SIDRYS:
4      Q.  Sure.
5      A.  Just as one example of something that's
6  not in my report but that it seems likely that I'm
7  going to revise.  Apparently Roxane sold off some
8  of these products to Elan.  And I was not aware of
9  that until earlier this week.  One of the counsel
10 understood me of that.  And so as a result of that
11 some of my Medicaid analyses are likely to change.
12     Q.  Right.
13     A.  And so I haven't yet drilled down on it.
14 But that's just one example of something.
15     Q.  Okay.
16     A.  And it didn't occur to me when you were
17 asking the question.  But it's an example of
18 something that it's hard to pick up on the fly.
19 And as I reflected on the break -- so in any case -
20 -
21     Q.  So that's something that's new that's
22 come to your attention that you will be likely

45

1  supplementing your report or your opinion with?
2      A.  It seems plausible.  That's right.
3      Q.  It's plausible.  Okay.  Fair enough.
4  Thanks for raising that.
5      A.  Right.
6      Q.  Okay.  And you understand you're still
7  under oath, right, sir?
8      A.  Oh, sure.  Absolutely.
9      Q.  What did you discuss during break with
10 counsel?  Did you discuss any of your prior
11 testimony this morning or?  Why don't you relate
12 that to me.
13     A.  I discussed the fact that still feel
14 pretty rattled from the commute in.
15     Q.  Okay.
16     A.  And that the commute in was very
17 stressful because I like to be on time.  And a
18 deposition alone is stressful and then compounding
19 it with the commute.  And so I sort of lamented
20 that to them.
21     Q.  Okay.
22     A.  That's the kind of thing that --

Duggan, Ph.D., Mark G.     CONFIDENTIAL                    March 5, 2009
                          Washington, DC

13  (Pages 46 to 49)

46

1    Q.  You didn't discuss the substance of your
2  testimony, correct?  Or did you?
3    A.  Well, I then asked about this issue, this
4  Elan issue, and whether it would be reasonable for
5  me to bring that up right after the break, because
6  I didn't know whether to mention that right after
7  the break.  So that's an example of, yeah,
8  something else, and the fact that I was cold.  So
9  anyway -- that's what leaps to mind right now.
10   Q.  I'm cold too, so -- okay.  Let's move on.
11 All right.  So I want to started talking at your
12 actual Medicaid and Medicare calculations and the
13 gut of your work.  Okay?
14   A.  Sure.
15   Q.  And I believe what you've said is that
16 you did calculations and looked at data sets and
17 ultimately came up with what you believed were
18 alternative Roxane AWPs and WACs, correct?
19   A.  I calculated transaction-based prices for
20 the Roxane products at issue in the case and
21 utilized those transaction-based prices in place of
22 AWPs and WACs in my analyses for the Medicaid and

47

1  Medicare programs.
2    Q.  Okay.  And in performing and coming up
3  with your differences for both Medicaid and
4  Medicare, you used a number of various data sets,
5  correct?
6    A.  Yes.
7    Q.  You used Roxane transactional data, for
8  instance?
9    A.  Yes.  And summaries of that data
10 constructed at my direction by the StoneTurn Group.
11   Q.  And you also used state claims data and
12 CMS data, correct?
13   A.  Correct.  In the case of Medicaid.  And
14 once again, just to be precise, for much of the
15 Medicaid and Medicare analyses Ian Dew and others
16 at Steck Consulting conducted analyses at my
17 direction.  I did some as well.  But they at my
18 direction did.  So when you say you, I'll just try,
19 rather than sort of -- there is -- I won't -- I'm
20 happy to try to differentiate if you would like
21 what specifically one did versus the other.  But
22 they did a number of analyses at my direction.

48

1    Q.  And when StoneTurn Group and I believe --
2    A.  Steck Consulting.
3    Q.  Okay.  StoneTurn, Steck and another was
4  Myers and Stauffer did some work for you, correct?
5    A.  Correct.
6    Q.  When those three groups performed
7  analysis or did work for you it was all under your
8  direction, correct?
9    A.  Yes.  They may have done other things
10 that weren't at my direction for -- but they
11 certainly -- to the extent that I make use of what
12 they did, that was at my direction.  So I don't
13 know everything that -- yeah.  So I think we're on
14 the same page.
15   Q.  I think so too.  Whatever analysis are in
16 your report and/or that you ultimately relied on
17 that were performed by these groups was done under
18 your direction, correct?
19   A.  That is correct.
20   Q.  Okay.  Did you review, scrutinize, what
21 they did so that you got to a certain comfort level
22 that it was reliable?

49

1    A.  Absolutely.
2    Q.  Okay.
3    A.  Just as one example, I worked with Myers
4  and Stauffer and Steck on my Abbott report and was
5  very impressed by their work in that case.  You
6  know, I try to assume -- I try to be skeptical of
7  everything and scrutinize.  And they did an
8  incredibly good job in that report.  And so they
9  have certainly earned my trust and respect.
10   Q.  Okay.  The same with the data.  Was it
11 important to you that the data, both the Roxane
12 data, the claims data, and I guess the DMERC data
13 was scrutinized and tested?
14   A.  It's certainly true that Ian Dew and
15 others at Steck Consulting carefully analyzed that
16 data at my direction.
17   Q.  And that was an important step for you, I
18 take it.  Correct?
19   A.  When you say that what do you mean by
20 that?
21   Q.  That the data itself was both accurate
22 and complete.

Duggan, Ph.D., Mark G.    CONFIDENTIAL                March 5, 2009
Washington, DC

14  (Pages 50 to 53)

---

50

1      MR. HENDERSON:  Objection.
2      A.  As an economist I know that virtually
3  every data set has quirks, limitations and so
4  forth.  So one of the things I've been trained to
5  do is given the limitations of any data set make
6  the most of it and to the extent possible
7  scrutinize it carefully.
8      Q.  And did you follow those procedures here?
9      A.  I -- in my analysis I endeavored to be
10  very careful, methodical, and demanded the same of
11  Steck and Myers and Stauffer and StoneTurn.
12      Q.  Was it important to you in coming up with
13  your various calculations to use the most accurate
14  data available to you?
15      A.  It depends on the situation.  In the vast
16  majority of cases that is true.
17      Q.  When would you not want to use the most
18  accurate data available to you?  Or when did you
19  not use the most accurate data available to you?
20      MS. THOMAS:  Objection.
21      A.  So one example of a reason would be if a
22  data set were quite incomplete, accurate during

---

51

1  certain time periods but quite incomplete for other
2  time periods.
3      Q.  Let's stop with that example.  That's a
4  good one.  So you may have a set of data that you
5  view as most accurate, but because it's incomplete
6  you would choose to use a different data set?
7      A.  Possibly.
8      Q.  Did you do that here?
9      A.  I want to go back and refresh my memory
10  on one thing.  So Indiana is one example of a state
11  where I had claims data from the state --
12      Q.  State claims data.
13      A.  -- and did not use it because of
14  something that was incomplete in that data.  So
15  that's one example.
16      Q.  Okay.
17      A.  There's many data sets, so it's hard for
18  me.
19      Q.  Let's again stick with that.  So in that
20  case you considered the states claim data as the
21  most accurate, but as an economist you decided that
22  because it was incomplete you should use an

---

52

1  alternative data set; is that correct?
2      A.  Correct.  That's -- yeah.
3      Q.  Okay.  Did you generally, either you or
4  these other three groups under your direction, go
5  through and perform that analysis generally with
6  the data; that is, to determine what data would be
7  the most appropriate to use in your various
8  analyses?
9      A.  Yes.  That was one of the factors that
10  was considered.  It was not the only one.
11      Q.  What other factor in choosing data?
12      A.  In the case of my Medicaid analyses I
13  basically examined state-specific claims data for
14  16 states.  And it is the case that for some of the
15  remaining states -- perhaps Wyoming, for example --
16  I don't recall if we have Wyoming, but perhaps
17  Wyoming I had state-specific claims data as well.
18  But as I detail in my report I use CMS, SMRF MAX
19  data in lieu of the state claims data.
20      So there's these 32 states that account
21  for about 30 percent of the Medicaid spending where
22  I utilize alternative data.  So there are -- some

---

53

1  of those 32 there are some cases where there were
2  some state claims data beyond just Indiana.
3      Q.  Okay.
4      A.  So Indiana is one of the 32.  And
5  basically as an economist I know from my research
6  that it is always possible to acquire and analyze
7  more data.  And one of the things that I've been
8  trained to do is to determine where optimally to
9  draw the line.  And so to come up with accurate
10  finding subject to constraints.
11      Q.  So as an economist I guess you made a
12  professional judgment call for some of those 32
13  states not to use state claims data, which I take
14  it is the most detailed or accurate data, and
15  instead to use other CMS data for those
16  calculations, correct?
17      A.  That's correct.
18      Q.  Let me ask -- you mentioned the three
19  groups working with you.  And I don't want to beat
20  that to death because I know you've been asked a
21  lot about those groups.  And we talked a little bit
22  about Myers and Stauffer, so I think that's fine.

---

Duggan, Ph.D., Mark G.      CONFIDENTIAL                    March 5, 2009
                           Washington, DC

15 (Pages 54 to 57)

54

1    StoneTurn Group, and I don't know if it's Professor
2    Platt or Dr. Platt or what his title is.  But did
3    you work directly with him?
4        A.  I certainly worked with individuals at
5    StoneTurn.  Not at their facility.  So I wasn't
6    physically in the same location that they were in.
7    But the person I spoke with most frequently about
8    the data was Eric Hines, Eric Hines who works under
9    -- it's my understanding.  I don't know exactly the
10   StoneTurn hierarchy, my understanding is that he
11   works under Simon Platt's direction.  And so I had
12   many conversations with Eric Hines about the Roxane
13   transaction data.
14       Q.  Okay.  Let me specifically ask you about
15   Mr. Platt.  I take it you know that he submitted a
16   report in this case against -- or in the Roxane
17   case.
18       A.  That's my understanding.
19       Q.  Have you ever spoken with Mr. Platt to
20   the best of your recollection?
21       A.  Yes, I have.
22       Q.  Did you speak with Mr. Platt before you

55

1    submitted your report which is Duggan Exhibit 1?
2        A.  Yes, I did.
3        Q.  You have?  And did you talk to --
4        MS. SIDRYS:  Again, it's Mr. Platt?
5        MR. HENDERSON:  Mr. Platt, I believe.
6        MS. SIDRYS:  Mr. Platt?
7    BY MS. SIDRYS:
8        Q.  -- specifically about issues or
9    information included in Duggan Exhibit 1?
10       A.  Somewhat, though once again, I spoke more
11   with Eric Hines.  And there is another person there
12   I spoke with.  Dawn I believe is her first name and
13   I can't remember her last name.  I can't remember
14   it, but I should know it.
15       Q.  What was the role of Mr. Platt with
16   respect to the information opinions included in
17   your report, Duggan Exhibit 1?  If that's not clear
18   I can rephrase.
19       A.  Mr. Platt and others working at his
20   direction?
21       Q.  Well, and let me be really clear here.
22   Because all I'm trying to figure out, sir, is --

56

1    and I understand Mr. Platt submitted a separate
2    report.  And I'm just curious whether that report
3    and what's included in there you rely on or use
4    anywhere in your report.  I truly just couldn't
5    figure that out.
6        A.  Sure.  So let me try and bring clarity.
7        Q.  Okay.
8        A.  I -- at my direction, StoneTurn,
9    individuals at StoneTurn -- and Simon Platt may
10   have done some of this work.  Eric Hines might have
11   done some of this work.  I don't remember the
12   breakdown of hours between those two.  But at my
13   direction they took the Roxane transaction data and
14   aggregated it to the NDC, customer, quarter, class
15   of trade, and there may be a fifth.
16       Q.  Okay.
17       A.  And here I'm just not remembering.  But
18   they aggregated the data.  In many cases the
19   aggregate was the same as the individual number
20   because there would just be one record for an NDC
21   for a specific customer in a quarter.  So in some
22   cases those aggregates were the same as the

57

1    transaction data.  They constructed these
2    aggregates for me, and we had some back and forth
3    about those aggregates and how to construct them
4    and so forth.
5        And I made use of those aggregates to
6    then myself calculate prices such as Roxane's
7    average price.
8        Q.  Mm-hmm.
9        A.  It's my understanding there might be
10   modest differences between exactly how I calculate
11   an average price and how -- in forming -- so one of
12   the things that I do in my analysis is calculate
13   various parameters from the price distribution.
14   Not just the average, but let's say the 95th
15   percentile.  And one of the things I do is drop
16   let's say certain observations.  For example, I
17   don't recall off the top of my head, but if there
18   was zero quantity for a customer in a quarter for
19   an NDC, I might drop in that instance.
20       So there might be modest deviations.  And
21   in fact a bunch of the back and forth between me --
22   between Eric Hines and myself -- reflected sort of

Duggan, Ph.D., Mark G.     CONFIDENTIAL                    March 5, 2009
                           Washington, DC

16  (Pages 58 to 61)

58

1    that issue, confirming that to the extent that
2    there were any differences they were modest.  They
3    might have 17.0 and I might have 17.1, for example.
4    And so, you know, some discussion of that.
5        Q.  The --
6        A.  But -- I'm sorry.  Go ahead.
7        Q.  The calculated average sales prices that
8    Mr. Platt comes up with in his report, did you use
9    those prices in your report?  That's what I'm
10   trying to figure out.
11       A.  I calculated them myself using their
12   aggregates that were defined in this way that would
13   lend themselves to -- like, he for example to the
14   best of my recollection didn't calculate a 95th
15   percentile.  And I would need these aggregates by
16   customer.  If I had just had total sales for an NDC
17   and total quantity for an NDC in a quarter, I
18   wouldn't be able to calculate a 95th percentile.
19   And that was one of the things I wanted to do,
20   which I did in my earlier reports as well, was to
21   get a sense of the heterogeneity in the data, how
22   much variation that was in the data.

59

1        Q.  So there may be differences between Mr.
2    Platt's calculated numbers and yours, or there
3    probably are?
4        A.  To the extent that there are -- it seems
5    plausible that there are, because I might have done
6    some things a tiny bit differently.  But I tried to
7    detail in my report exactly what I would have done.
8    But I relied on data they constructed.
9        Q.  And I followed that.  I understand your
10   reliance on StoneTurn.  And I am simply trying to
11   get to -- is there a separate report and if that
12   feeds into your report or if those numbers he
13   calculates feed into your report or not.
14       A.  I think to some extent yes, in the sense
15   that they utilized the same underlying transaction
16   data.  So there might be 10,000 transactions for a
17   given NDC in a given quarter.  Those get aggregated
18   when they provide it to me for a customer, quarter,
19   NDC, class of trade.  And so I don't want to
20   overstate.  I just think there are little quirks --
21       Q.  There are some overlap?  Is that fair?
22       A.  Yeah.  I think that's fair to say.

60

1        Q.  Did you read his report or I guess a
2    draft of his report before submitting or issuing
3    your expert report, Duggan Exhibit 1?
4        A.  I did not.
5        Q.  Okay.  Steck Consulting, very briefly,
6    can you just tell me what their role was?
7        A.  So they stored, processed, analyzed the
8    Medicaid and Medicare claims data.  That's one
9    example, stored and processed Medicaid and Medicare
10   claims data.  They are local.  They are here in
11   D.C.  And I actually went to their offices on many
12   occasions to meet with them, to analyze data and so
13   forth as well.
14       Q.  Okay.
15       A.  So -- but their focus -- they did other
16   things.  So once again, I -- but the primary --
17   their primary focus was the Medicaid and Medicare
18   claims data.
19       Q.  Okay.  Your report, Duggan Exhibit 1, did
20   you type this, draft this, yourself?
21       A.  Yes, with caveats.  So the actual Word
22   portion, the Microsoft Word portion, yes.  There

61

1    are some cases in which I cut and paste tables that
2    either StoneTurn or Steck constructed.  And so
3    because those -- you know, those are a part of my
4    report.  But in terms of the text from pages 1 to
5    130, that is all -- those are -- I typed that.
6        Q.  Okay.  Let's talk about Medicare a little
7    bit.  Let's see.  I'm not going to go directly to
8    your report.  But I think this starts around 96 of
9    your report.
10       A.  Okay.
11       Q.  Generally I think Medicare is covered --
12   again, in the text, is covered between 96 and 129.
13   Okay?  Now, with respect to Medicare you performed
14   -- and I think you referred to it earlier -- four
15   different analyses, right?
16       A.  Technically five, because I did a Dey-
17   only as well.  It's summarized in my table 39 or
18   whatever it is.  I can't remember the number.
19       Q.  Let's stick with the Roxane ones.
20       A.  Right.  I know.  Right.
21       Q.  I've got enough fish to fry here.  But
22   with respect to Roxane you did four different

Duggan, Ph.D., Mark G.    CONFIDENTIAL                    March 5, 2009
Washington, DC

17 (Pages 62 to 65)

62

1   analyses, correct?
2        A.   Four different scenarios --
3        Q.   Scenarios?
4        A.   -- with many analyses underlining them.
5        Q.   That's fair enough. Good clarification.
6        A.   I don't mean to be --
7        Q.   No. That's fine. That was a good -- I
8   was sloppy there. So if I'm paraphrasing this
9   right, the first one you did, you replaced the AWPs
10  for the Roxane ipratropium bromide products with
11  125 percent of the indirect price.
12       A.   Pharmacy average, yeah, indirect price.
13       Q.   Thanks.
14       A.   Yeah. Sure.
15       Q.   And at that point you didn't change the -
16  - you keep Dey out of it?
17       A.   Correct.
18       Q.   Okay. And then the second scenario is
19  that same changes to Roxane's ipratropium bromide
20  and then you also add in the Dey ipratropium
21  bromide NDCs, right?
22       A.   Correct. And --

63

1        Q.   And then --
2        A.   Okay.
3        Q.   I'm sorry?
4        A.   No. You go ahead.
5        Q.   The third one you replace three of the
6   six, Roxane ipratropium bromide products?
7        A.   The non-NovaPlus 8402 product codes.
8        Q.   8402?
9        A.   Yeah.
10       Q.   And you exclude Dey from that?
11       A.   Correct.
12       Q.   And then finally the fourth is you
13  replace three of the six Roxane ipratropium
14  bromide, again, excluding NovaPlus and you add in
15  Dey; is that correct?
16       A.   Correct.
17       Q.   And you come up with four different -- I
18  understand your hesitancy to use the word
19  "damages." So I'll stay away from that. You come
20  up with four different calculated differences; is
21  that right?
22       A.   That is correct. And basically the

64

1   difference is an aggregate of sort of for each
2   DMERC quarter combination there's a particular
3   array in effect. And so the analysis is sort of
4   claim by claim. And so there's -- I guess I go
5   through some examples of that in the report.
6        Q.   Let's get into that a little bit.
7   Actually, I want to come back to this damages
8   report because I know there's been a lot of back
9   and forth in these depositions as to whether you
10  have calculated damages or not. Is it your view
11  that the four numbers in these four scenarios that
12  you came up with with respect to Roxane are damages
13  that you expect to present to the court and/or to
14  the jury?
15       A.   These four sets of numbers -- because
16  it's not just dollars. It's numbers of claims and
17  so forth. So there are four sets of numbers. And
18  five, really, because to the extent that I do
19  Roxane-only I would do Dey-only as well. They
20  represent the difference between what Medicare paid
21  and what they would have paid if these alternative
22  transaction-based AWPs had been used.

65

1            It is my understanding that these numbers
2   -- in my view these numbers shed light on the
3   effect of Roxane's published AWPs on spending for
4   these programs, holding other factors constant. I
5   am using the terminology -- I understand that this
6   is a very important component, participants the
7   only component to damages.
8            But I've endeavored to utilize the
9   language that is -- that I have used in my own
10  research on Medicaid and Medicare, the kind of
11  analysis damages -- so I did my best to come up
12  with values for difference, number of claims and so
13  forth, that would be helpful to the court and
14  others with an interest in this case.
15           And so I certainly would expect to
16  provide numbers similar to those reported in, you
17  know, for example, table 37 or elsewhere in the
18  report to the court.
19       Q.   That's fair enough. Let's step back a
20  little bit. As part of your Ph.D. program and as
21  an economist do you have an understanding of what
22  an economic damage analysis is?

Duggan, Ph.D., Mark G.     CONFIDENTIAL              March 5, 2009
                      Washington, DC

74

1  I focused only on that product.
2      Q.  That's what I'm getting at.  There is
3  another drug, azathioprine.  Did you do any
4  analysis or form any opinions with respect to that
5  drug?
6      A.  For Medicare, no.  And to the extent that
7  it's - - I may have done some within Medicaid.  But
8  for Medicare, no.
9      Q.  Now, you mentioned earlier that in --
10     A.  Can I just caveat that with one thing?
11     Q.  Sure.
12     A.  I summarized it.  So that can cross the
13  hurdle of -- just in terms of the spending on it.
14  So for example in my tables like table 36, table
15  35, and so forth, I summarize spending on those J-
16  codes.  But I don't conduct an analysis akin to
17  what I do for ipra for those two J- codes.
18     Q.  35.  Can you just show me what J-codes
19  you're talking about with respect to azathioprine?
20     A.  I believe those -- now, I don't have the
21  -- it was my understanding that K0119.  I may be
22  misremembering, because this was not something that

75

1  I focused on.  But my recollection is that the
2  bottom two J-codes, those are not ipratropium
3  bromide -- it's hard enough for me to pronounce
4  that one without --
5      Q.  Okay.  And you believe those are the
6  azathioprine J-codes?
7      A.  But I -- I think so, but I'm not a
8  hundred percent sure.
9      Q.  In any event, you didn't do --
10     A.  I didn't do an analysis like with the
11  arrays and so forth.
12     Q.  You didn't come up with differences for
13  azathioprine, correct?
14     A.  That's correct.  That's right.  That's
15  right.
16     Q.  Okay.  You mentioned earlier that in
17  coming up with your alternative prices you used
18  Roxane's indirect transactional data, right?
19     A.  That is correct.  With the alternative --
20  yeah, that's right.
21     Q.  And you used the indirect transaction
22  data both to calculate your revised AWP and WAC,

76

1  correct?
2      A.  Correct.  Can I just take one second to
3  look at something in my report?
4      Q.  Sure.
5      A.  (Reading).  I was just looking at my
6  Florida analysis where for the WAC I do both the
7  direct wholesaler and the indirect pharmacy average
8  just to sort of get a sense.  One of the -- as I
9  outline in my report, I begin by using from the
10  direct data wholesaler's average net price of
11  acquiring the products as the alternative WAC.  But
12  one point that I make is that many of these
13  purchases will subsequently be sold to hospitals,
14  for example, which tend to have lower prices than
15  pharmacies.
16         And so I take what -- I did the same
17  thing in both Abbott and Dey.  I take the more
18  conservative approach of looking at the
19  transactions from the wholesalers that are for the
20  pharmacies.  Those prices are going to tend to be
21  higher than for all customers.  And so as you can
22  see on pages 41 and 42 of my report, I first use

77

1  the direct data to calculate the alternative WAC
2  and get a -- and from that I arrive at a value of
3  difference.
4         But then I replace that with the indirect
5  pharmacy, arriving at a lower value of difference
6  for -- primarily for this reason that I outline
7  that -- just to take a simple example, suppose that
8  wholesalers acquire on average for 100, sell to
9  hospitals for 90 and to pharmacies at 110.  I'm
10  using 110 as opposed to 100 in my analysis of what
11  pharmacies are paying and in a sense dropping
12  hospitals.
13         And that turns out to be actually a big
14  deal for certain products because of the disparity
15  between hospital -- for example, hospital prices
16  and pharmacy prices.
17     Q.  The numbers that you actually ended up
18  using in your calculations to derive a difference
19  were based on Roxane indirect transactional data,
20  correct?
21     A.  Most of them.  But I do provide some
22  numbers using the direct data as well.  I just want

Henderson Legal Services, Inc.

Duggan, Ph.D., Mark G.    CONFIDENTIAL                March 5, 2009
                          Washington, DC

21 (Pages 78 to 81)

78

1  to be clear.  So the ones that I summarize let's
2  say in that big table at the end, these are all
3  using the alternative WAC, this pharmacy indirect
4  average.
5      Q.  Okay.
6      A.  And as I show for Florida, and I believe
7  this would be true in other cases as well, using
8  the average direct price, the net price at which
9  wholesalers acquire, would result in higher values
10 of difference.  But this is an example of a place
11 where I believe that I'm being conservative and
12 telescoping in on the pharmacies as opposed to
13 allowing the hospitals to sort of have this effects
14 on pulling down prices.
15     Q.  Let me just ask you this just so I'm sure
16 I understand.  Page 2 of your report --
17     A.  Yeah.  This's all, yeah, indirect.
18     Q.  That's what I'm really trying to find out
19 is your total difference for Medicaid, it says
20 $68.957 million.  The component of that that
21 relates to any WAC states you're using based on
22 indirect data; is that right?

79

1      A.  Yeah.  Ultimately that's what I use.
2      Q.  That's really all I'm trying to get at
3  there.
4      A.  I didn't mean to bring up the --
5      Q.  No.  That's fine.
6          What was your process of deciding to use
7  Roxane transactional data to come up with your
8  alternative price versus, say -- and I know this
9  was discussed in a prior dep, but versus, say,
10 wholesaler data, like Cardinal Health?
11     A.  Well, it -- the indirect data -- Roxane's
12 indirect data -- it is my understanding that
13 Roxane's indirect data summarizes transactions made
14 through wholesalers that many, most, all of which
15 had a contract with Roxane of some type.
16     Q.  That's actually a good point that I
17 wanted to clear up.  The indirect sales data that
18 you use includes Roxane's contract sales and it
19 does not include Roxane's off-contract sales,
20 correct?
21     MR. HENDERSON:  Objection.
22     A.  It is my understanding that that is for

80

1  the most part true, though I don't rule out that
2  Roxane had access to other data and included it.
3  And I should note that in doing this I did sort of
4  consider these alternative prices, for example, by
5  comparing averages from Roxane's indirect data with
6  averages from Cardinal Health, for example.  And
7  they were in a similar ballpark.
8          However -- and similarly the -- it is my
9  understanding that the vast majority of shelf
10 cartons for these products that were sold to
11 wholesalers ultimately do appear in the indirect
12 data.  So it is not the case, for example, that
13 they sell a million shelf cartons to wholesalers
14 and then 10,000 appear in the indirect data, just
15 as an example.
16     Q.  Now, my understanding was that Roxane's
17 indirect sales data included contract customers and
18 customers -- to be clear, customers participating
19 in the wholesaler source program -- and did not
20 include off-contract sales.  Is your understanding
21 different?
22     MR. HENDERSON:  Objection.

81

1      MS. THOMAS:  Objection.
2      A.  I just -- once again, it is -- I don't
3  recall a statement that -- or I don't recall
4  reading that Roxane -- I don't want to make -- I'm
5  just saying that it is possible to me that Roxane
6  includes some.  But even -- let's suppose that I
7  take what you said as true.  And it seems plausible
8  that it's true.  Having looked at the data myself
9  it is the case direct sales to wholesalers, the
10 vast majority of those shelf cartons do appear in
11 the direct data.
12         There may be cases.  There may be
13 discrepancies, for example, partly because of
14 inventory.  By the end of the time period
15 wholesalers would have some inventory.  So one
16 would not expect a one for one correspondence.  But
17 the vast majority of the products are ultimately
18 being sold.  And moreover, it appears that there is
19 -- it is not a perfect correlation, but if one
20 looks at let's say Cardinal Health prices just as
21 one example and the prices for Roxane's indirect
22 data on average, the level and trend in them is

Duggan, Ph.D., Mark G.    CONFIDENTIAL                March 5, 2009
Washington, DC

22 (Pages 82 to 85)

82

1    somewhat -- there's some differences.
2         They're not identical, because at some
3    level Cardinal just represents a subset of or
4    McKesson or AmeriSource or whoever, represents just
5    a subset of the customers.  So in terms of a big
6    picture it is my sense from examining the data that
7    one gets a much better big picture from Roxane's
8    indirect data than from telescoping in on one
9    direct wholesaler.
10        MS. SIDRYS:  Okay.  Why don't we take a
11   break.  The tape is about to run out.  Do you want
12   to take a five minute break?
13        THE WITNESS:  Sure.
14        THE VIDEOGRAPHER:  Off the record.  This
15   is the end of tape 1.  Off the record at 11:35.
16        (Recess.)
17        THE VIDEOGRAPHER:  This is the beginning
18   of tape 2 in the deposition of Dr. Duggan.  On the
19   record at 11:49.
20   BY MS. SIDRYS:
21       Q.  Okay.  Professor Duggan, two things I
22   want to follow up on that we were talking about

83

1    previously before break.  We talked for a second
2    about Roxane's indirect transaction data and
3    whether or not it included off- contract sales.  Do
4    you recall that discussion we were having?
5        A.  Yes, I do.
6        Q.  And have you seen any evidence showing
7    that such data did include off-contract sales?  And
8    if so can you point me to it?
9        A.  Not that I recall.
10       Q.  Okay.
11       A.  I'm just not ruling it out.
12       Q.  You're not aware of any as you sit here?
13       A.  That's right.
14       Q.  Cardinal Health data or wholesaler data
15   we talked briefly about.  And you mentioned that
16   you did consider at least using that data; is that
17   correct?
18       A.  I considered that data.  And it was my
19   decision to instead use the Roxane indirect data.
20       Q.  Did you at any point -- you or anyone
21   under your direction -- calculate alternative
22   prices using any wholesaler data?

84

1        A.  So yes.  Just one example, I recall
2    discussing with Ian Dew at Steck Consulting -- I
3    believe it was Cardinal data.  And so Cardinal is,
4    just to refresh my memory here for one second --
5        Q.  I think it's tab 8.
6        A.  Right.
7            Cardinal is the second largest wholesaler
8    in terms of sales at contract in Roxane's data.
9    But it's -- there are many wholesalers in this
10   data.  So I recall specifically talking with him
11   about the three ipratropium bromide NDCs and there
12   being a -- you know, the patterns that are being
13   identified.  I certainly don't have it memorized
14   what the numbers were, but there weren't wide
15   disparities between -- in the levels for the trends
16   of the prices.
17       Q.  Your recollection is that you had -- is
18   his name Drew?
19       A.  Mr. Dew.
20       Q.  That you had Mr. Dew come up with
21   alternative AWP and WAC prices using Cardinal
22   Health data?

85

1        A.  Maybe -- I'm sorry if I wasn't clear.
2        Q.  Okay.
3        A.  What I asked -- what I recall discussing
4    with him -- and obviously a lot of analysis went
5    into this.  But one of the things I can
6    specifically recall right here as we sit here
7    discussing with him was average prices in the
8    Cardinal data and how that corresponded to average
9    prices from Roxane's indirect data and there being
10   -- once again, for the reason I outlined earlier in
11   my judgment Roxane's indirect data is the most
12   appropriate data set to use for the analyses that I
13   did, as was true for Dey and Abbott before.  But I
14   sort of thought about this issue of let's look at a
15   specific wholesaler.
16           No data set is perfect.  But my sense by
17   having data for all, you know, dozens and dozens of
18   wholesalers in the indirect data as opposed to data
19   for just one wholesaler, perhaps Cardinal for
20   whatever reason charges higher prices than its
21   competitors or lower prices or -- you know.  So
22   there's -- I recognize that there are pluses and

Duggan, Ph.D., Mark G.     CONFIDENTIAL                    March 5, 2009
                           Washington, DC

34  (Pages 130 to 133)

130

1      Q.  Let me stop you there for a second.  And
2  I should have asked you earlier.  How did you
3  arrive at that time frame of 1996 to 2003?
4      A.  Well, ipratropium bromide came into
5  effect in -- that's really -- if you look in the
6  data I don't think there was much reimbursement for
7  that J-code.  I can just as a --
8      Q.  And that's fair enough.  I just wanted
9  generally.
10     A.  Yeah.
11     Q.  That's fine.  What about ending in 2003?
12     A.  That was based on the instructions from
13  counsel very early on.
14     Q.  Okay.  Fair enough.  Why don't you move
15  ahead.  Sorry to interrupt you.
16     A.  Sure.
17         At any period of time during the period
18  of interest there were four DMERCs, Palmetto,
19  AdminaStar, Cigna and DMERC A, which was either
20  Travelers or West New York, depending on the time
21  period.  Each one of these DMERCs administered
22  claims for Medicare recipients and in processing

131

1  those claims they used arrays to arrive at an
2  allowed amount per unit.  In general the
3  methodology for the early part of the time period
4  consisted exclusively of taking the median of a set
5  of generic products that relate to the J-code.
6         So in the case of ipratropium bromide
7  early on they had two NDCs from Dey and two from
8  Roxane -- typically, I mean -- and then later three
9  apiece in these arrays and in some cases -- in most
10  cases there were generic products made by other
11  firms as well.
12     Q.  Can I stop you there and ask you a
13  question about the example you just gave?
14     A.  Sure.
15     Q.  If there's an even number like in your
16  example of J-codes in the arrays, so four --
17     A.  Right.
18     Q.  -- am I right that to arrive at the
19  median you take -- basically you throw out the
20  highest and the lowest and then the two --
21     A.  Take the average of the other two.
22     Q.  Of the middle two.  And if it was an odd

132

1  number you would just take out the middle number,
2  correct?
3      A.  Right.  Or five it would be the third
4  one.  Yeah.
5      Q.  All right.  Thanks.
6      A.  Sure.
7         So each DMERC used arrays with several
8  products -- and the number of products generally
9  increased over time -- to arrive at a generic
10  median.  And there was some variation across
11  carriers at a point in time, or within carriers
12  over time, with respect to exactly which products
13  were included.
14         So just -- I think it's helpful to me to
15  refer to an example of --
16     Q.  Well, can I ask you a first question
17  before you go to your example?
18     A.  Sure.
19     Q.  Do you know whether the AWPs that were
20  included in the arrays by the DMERCs were taken
21  from Red Book?
22     A.  It is my understanding that in most cases

133

1  the AWPs were obtained from the Red Book --
2      Q.  Okay.
3      A.  -- although recognizing that it's a --
4  there may have been deviations from that.  But my
5  understanding is that --
6      Q.  Generally that is the case?
7      A.  That's my understanding.
8      Q.  And is that understanding based on --
9  what? Testimony or what?
10     A.  Based on my discussion with officials at
11  Myers and Stauffer, based on my examination of some
12  Red Book prices for earlier J-codes.  I don't know
13  if I did this for ipra as well, but for earlier J-
14  codes.  I remember doing it for sodium chloride,
15  looking at the Red Book and then at the array and
16  there being a correspondence.
17     Q.  Did you for Roxane's AWPs that the DMERCs
18  included in the arrays, did you match those or
19  confirm that they were taken from the Red Book?
20     A.  I personally did not.  I understand that
21  Myers and Stauffer produced electronic versions of
22  these arrays.  And the headings in many of these

Duggan, Ph.D., Mark G.    CONFIDENTIAL                    March 5, 2009
Washington, DC

35 (Pages 134 to 137)

---

134

1  arrays, if I recall, said AWP from Red Book or Red
2  Book AWP.  But I can't recall if they checked
3  quarter by quarter, NDC by NDC.
4      Q.  Okay.  You don't recall giving Myers and
5  Stauffer, for instance, an instruction to check the
6  Roxane AWPs reported in the arrays against the
7  reported --
8      A.  Those in the Red Book?
9      Q.  Those reported in the Red Book, yeah.
10     A.  Not right now.  But I had -- it seems
11 plausible that I did, but I just can't recall for
12 sure right new.
13     Q.  Would that be something important to you,
14 whether or not such an analysis or test was done by
15 Myers and Stauffer to verify that the prices in the
16 arrays matched with the Red Book's?
17     A.  It depends.
18     Q.  Well, was it important to you?
19     A.  I think that my analysis basically
20 assumes that had Roxane reported AWPs and the
21 pricing compendia used them, they would have been -
22 - with, you know, certain exceptions.  But they

---

135

1  would have been utilized by the DMERCs and the
2  Medicaid agencies.
3      Q.  Okay.
4      A.  So it seems like -- I guess I would just
5  need to think a bit more about it.  I know that in
6  some cases, for example, the Red Book, the
7  published Red Book, might drop a product.  It just
8  may by error.  So there are -- inevitably there's
9  scope for discrepancies between what's in the Red
10 Book.  But nothing -- I don't recall instructing
11 them to go through quarter by quarter, NDC by NDC,
12 to reconcile the AWPs in Red Book, electronic or
13 published paper version.
14     But as I said, it -- it's my
15 understanding that those are reflective of Red Book
16 prices, Red Book AWPs.
17     Q.  I think you just said that one of your
18 assumptions was that Roxane reported its -- the
19 AWPs to Red Book which then in turn were used by
20 DMERCs in its arrays.  Was that an important
21 assumption in your analysis?
22     A.  No.  What I meant to say, if I didn't say

---

136

1  it quite right, was that my assumption is that had
2  Roxane reported these alternative AWPs that I
3  calculate, the First Databank and/or Red Book would
4  have published them and they would have in most
5  cases been used by the DMERCs or the Medicaid
6  agencies.  There are cases where they wouldn't be
7  used.
8      Q.  Okay.
9      A.  For example, New York federal upper
10 limits and so forth, but --
11     Q.  I follow you.  And that was one of the
12 underlying assumptions of your analysis, correct?
13     A.  That's kind of, yeah, embedded in the
14 analysis, right.
15     Q.  Okay.  Let's go back to the DMERCs and
16 their calculations of the arrays.
17     A.  So yeah.  I was still --
18     Q.  Jump back to where you were?  That would
19 be great.
20     A.  So the set of products in a certain
21 group, set of NDCs in a certain group, are
22 typically considered in the generic portion of the

---

137

1  array.  And the -- a calculation is made of the
2  median of those prices.  Now, there are some
3  exceptions that Myers and Stauffer at my direction
4  tried to incorporate.  I recall one array, for
5  example, they were listed in the array but they
6  were not considered in the median calculation.  I
7  don't remember which NDC and which -- but there are
8  little nuances to this that with more than a
9  hundred arrays inevitably are going to arise.
10     Q.  When you notice things like the example
11 that you just mentioned, that there were -- I think
12 you said NDCs that were listed in the array but not
13 part of the median analysis -- did I rephrase that
14 right?
15     A.  Yes.
16     Q.  Did you attempt to correct that or
17 attempt to reconcile that or just leave it be and
18 move on?
19     A.  I did what I considered to be most
20 appropriate at the -- it depends.  It depended.
21 The example I gave, I stuck with that because it
22 was clear -- I think there were six products in the

---

Duggan, Ph.D., Mark G.    CONFIDENTIAL                March 5, 2009
                          Washington, DC

39 (Pages 150 to 153)

150

1  amount of sales. So I don't think it's -- I think
2  that -- once again, I haven't studied all the
3  factors. But I wouldn't be surprised that that was
4  one of the factors, the frequency with how these
5  products are being used in the marketplace, that
6  was considered.
7      Q. Did you ask counsel if there were written
8  guidelines or procedures that the DMERCs were
9  required to follow in constructing their arrays?
10 That you recall, sir.
11     A. When you say in constructing the arrays,
12 just so I understand, when they, A, determined
13 which products to include, and B, determined where
14 to put them?
15     Q. Exactly.
16     A. I do not recall asking for information on
17 that specific issue.
18     Q. If those guidelines existed is that
19 something that you would want to review in
20 performing your analysis with respect to Medicare
21 in calculating the Medicare differences?
22     A. My -- in my analysis I basically endeavor

151

1  with this exception and a few others elsewhere in
2  the report to determine how spending would have
3  changed if -- holding other factors constant. And
4  so for the question that I set out to answer, I
5  think that it's -- I don't think that would be
6  necessary.
7      Q. Okay.
8      A. I always like to learn. But it's -- for
9  the purposes of any analysis the DMERCs did what
10 they did. Based on what they did Medicare spending
11 would have been changed as I go through in the
12 report.
13     Q. Okay. You noted probably about 15
14 minutes ago and in your report that there were
15 variations in what DMERCs did. If you want to turn
16 to page 97 of your report that's where you discuss
17 it. And you note in the last sentence -- and I
18 think it's what you referred to in your testimony
19 earlier -- that "The NDCs that are included in an
20 array for a specific HCPCS code vary within the
21 same DMERC over time and occasionally vary across
22 DMERCs at a point in time." Do you see that?

152

1      A. Yes.
2      Q. And did you -- when you were adjusting
3  the arrays and coming up with your analysis, did
4  you notice such variations among the DMERCs and
5  within the DMERCs?
6      A. I did. So for example, DMERC A was sort
7  of unique in that they did not treat NovaPlus as a
8  brand. And similarly, the trend was -- over time
9  was modest increase in the number of generic
10 products that were included in the arrays. So I
11 certainly -- I can't recall -- there were more than
12 a hundred arrays that I consider here. But just
13 generally the sort of high level first cut there's
14 certainly -- there is some variation at a point in
15 time and within a carryover time. And which one is
16 greater I'm not sure.
17     Q. Okay. Did you attempt when you were
18 recreating the arrays and coming up with your
19 alternative prices to correct for inconsistencies
20 amongst DMERCs and amongst periods of time within
21 the same DMERC?
22     A. No, because based on my previous

153

1  experience with J-code analysis and this -- it was
2  not a surprise to me that there was variation
3  across carriers or within carriers over time. So -
4  - but I did -- at some level I corrected for that
5  inconsistency to some extent when I do these no-
6  NovaPlus scenarios.
7      Q. And again, in footnote 82 you referred to
8  a few corrections you made, right?
9      A. Yes. That's right.
10     Q. Okay. Let's pull out a few arrays --
11     A. Okay.
12     Q. -- just for sport.
13         MS. SIDRYS: This will be 3 and 4. Let's
14 just get them marked so we speed up a little.
15         (Exhibit Duggan 003 and Exhibit Duggan
16 004 were marked for identification.)
17         MR. HENDERSON: I'm sorry. What exhibit
18 is this?
19         MS. SIDRYS: We're on 3 and 4. I think
20 AdminaStar is 3 and Cigna is 4.
21 BY MS. SIDRYS:
22     Q. Professor, why don't you take a look at

Duggan, Ph.D., Mark G.    CONFIDENTIAL                    March 5, 2009
                          Washington, DC

43  (Pages 166 to 169)

166

1  those NDCs out before performing your calculations,
2  correct?
3      A.  I used the arrays that they used.  Yeah.
4      Q.  And similarly you didn't add in -- if
5  AdminaStar had certain NDCs that were included in
6  its array, you didn't adjust Cigna's array and add
7  those NDCs in?
8      A.  No.
9      Q.  Right.
10      THE WITNESS:  I don't know if we're at a
11  natural -- two minutes on the tape.
12      MS. SIDRYS:  We can take a break.  That's
13  okay.
14      THE VIDEOGRAPHER:  Off the record at
15  2:48.
16      (Recess.)
17      (Exhibit Duggan 005 was marked for
18  identification.)
19      THE VIDEOGRAPHER:  This is the beginning
20  of tape 3 in the deposition of Dr. Mark Duggan.  On
21  the record at 3:05.
22  BY MS. SIDRYS:

167

1      Q.  Professor, we've handed you what has been
2  marked as Duggan Exhibit 5, which is the Palmetto
3  pricing array.  You have that document in front of
4  you?
5      A.  I do.
6      Q.  Before we get to it, what I want to talk
7  about specifically with this array and just
8  generally is what you did when there were missing
9  arrays.  So before we jump to this, can you explain
10  when there were missing arrays from the various
11  DMERCs how you handled it in your analysis?
12  Missing periods, I guess I should say.  That's more
13  accurate.
14      A.  Right.
15      So if we look down the right here on the
16  first page, you see there's a gap -- I'm going to
17  first focus on the second gap, or later gap.  I'll
18  come back to an earlier gap.  So there's a gap from
19  2000 quarter 3 to 2001 quarter 1 in the sense that
20  there's a 2000 quarter 4 missing there.  In that
21  case if one then goes to -- it's useful to go to an
22  example.

168

1      If you then go to the subsequent arrays,
2  the arrays themselves as opposed to just the
3  summaries of the arrays on subsequent pages, you
4  see that there was an array in effect in 2000
5  quarter 3 with nine NDCs and a later one with
6  twelve NDCs.  And so --
7      Q.  Can I stop you just for a second so we're
8  matching pages and we know what you're talking
9  about?
10      A.  Sure.
11      Q.  The way I follow, on this document let's
12  go to around page 5 or 6 of that which I think
13  shows those nice little summaries that you have
14  done.
15      A.  Okay.
16      Q.  I did notice on that sheet some min/max,
17  pre/post, which I think is explaining what you're
18  doing with your missing arrays.
19      A.  Yes.
20      Q.  So maybe you can use that to explain it
21  to me.
22      A.  That might be more --

169

1      MR. HENDERSON:  Looking at page 5 of 52
2  as identified in the lower left-hand corner?
3      MS. SIDRYS:  Yeah.
4      A.  All right.  So basically, you can see
5  from this sheet, which is about page 5 -- yeah,
6  page 5 of 52 -- that in -- let's start with 1997,
7  quarter 4.
8  BY MS. SIDRYS:
9      Q.  Okay.
10      A.  There is -- Myers and Stauffer was unable
11  to locate the specific document that specified
12  here's the array that we used in 1997 quarter 4.
13  But they were able to find the analogous document
14  for 1997 quarter 3 and 1998 quarter 1.  What you
15  can see from this is that the -- basically I take
16  in the alternative scenario, like the alternative
17  Dey-only, Roxane-only and Dey and Roxane combined
18  scenarios, I basically consider the effect in
19  adjacent quarters and take the level that would
20  minimize the total difference.
21      So a standard approach in economics when
22  data is missing would be to linearly interpolate.

Duggan, Ph.D., Mark G.      CONFIDENTIAL                    March 5, 2009
Washington, DC

44  (Pages 170 to 173)

170

1   Suppose a price in quarter 1 is 8 and in quarter 3
2   is 10 and you don't have quarter 2.  You say it's 9
3   in quarter 2 to interpolate it.  Here I am taking
4   the adjacent price -- instead of taking an average
5   of the two prices I'm taking the adjacent price
6   that will result in a lower value of different,
7   being conservative.
8        And here I'm basically saying that I will
9   assume that the array that was in effect was
10  whichever array will result in a lower amount paid
11  -- I mean a higher amount paid -- under the
12  alternative result scenarios.  So as you can see
13  from the 1998 quarter 1 in let's say the Roxane-
14  only scenario, spending would be 2.50, the allowed
15  amount.
16      Q.  Where are you?  I'm sorry.
17      A.  Once again, I'm on page 5, in the second
18  to last column.
19      Q.  Quarter 1, 1998.
20      A.  Yeah.  So 2.50 '98 quarter 1 versus 2.70
21  in '97 quarter 3.  And basically what I would do in
22  this case, I would use the higher of those two

171

1   amounts resulting in a lower overall difference.
2        Similarly, if one goes down to 1998
3   quarter 4 to 1999 quarter 3 you see there are two
4   quarters there in which the array information was
5   missing.  And so rather than taking the average,
6   once again, I take the maximum allowed amount in
7   the two scenarios.  And so rather than saying -- so
8   you can see that in the Roxane-only scenario the
9   allowed amount is 3.06 in '98 quarter 4.  It's 99.5
10  in quarter 3.  So rather than just linearly
11  interpolating I take what I consider to be the
12  quite conservative approach of using the 3.06 in
13  both of those quarters.
14       So that is the -- so basically I take the
15  maximum allowed amount from the adjacent quarters
16  when the data are missing with some caveats.  Like
17  there are some cases where I just drop in certain
18  cases.  But to the extent that -- but in these
19  examples, if I recall -- and I would want to --
20  what I did here was -- and what, you know, Ian Dew
21  did at my direction at Steck -- was to use the
22  adjacent one that would result in a higher amount

172

1   paid.
2        Q.  You mentioned that sometimes you would
3   drop it.  Did you generally where you were missing
4   arrays for certain quarters still come up with a
5   difference amount?
6        A.  Yeah.  In this example in 1999 quarter 1
7   for example I would be coming one a difference that
8   would be in my judgment generally lower than the
9   true difference if that array document had been
10  located.
11       Q.  And you are -- by using the higher of the
12  --
13       A.  Allowed amount.  So I'm lowering the
14  difference.
15       Q.  No.  My question was different.
16       By using the higher of the previous
17  quarter and the later quarter, you are assuming
18  that the quarter for which you are substituting
19  wouldn't have been higher than either of those
20  numbers?
21       A.  That's correct.
22       Q.  Okay.  And I noticed cases where that

173

1   wasn't the case.  Did you as well and try to adjust
2   for that?
3        A.  What do you have in mind specifically?
4        Q.  Turn a few pages back.  Now that Bunker
5   is giving me page numbers, page 8 of 52.  I notice
6   several, but here's an example.  Let's go to
7   Roxane- only and let's look at 2000, quarter 2.
8        A.  2000 quarter 2?
9        Q.  2003.  I'm sorry.  Quarter 2.
10       In that case and looking at the J-code
11  7644 KO/KP, what I noticed is that the price is
12  3.34 whereas the quarter before is 0.71 and the
13  quarter after is 0.71.  So under your analysis if
14  that array had been missing you would have put in
15  0.71 and put a much lower number in than actually
16  was the case.
17       A.  Yeah.  This is an interesting quarter in
18  the sense that it deviates from the adjacent
19  Palmetto quarters.  It's the one quarter after I
20  believe it's 2001 quarter 1 or so when Palmetto
21  does not use NovaPlus as a brand in the array.
22  That is one example I suspect one could -- my sense

Duggan, Ph.D., Mark G.    CONFIDENTIAL                    March 5, 2009
Washington, DC

45 (Pages 174 to 177)

174

1     from working with this kind of data and, you know,
2     from examining more than a hundred arrays, is that
3     there may in some cases be -- this could have
4     happened in a case, although I think this time
5     period is very different from the earlier time
6     period to which we're comparing.  But I think that
7     any example of that would be much more than offset
8     by the conservative of taking a max of the two.
9          So for this the coverage of the arrays
10    was quite considerable here.  Not every quarter,
11    not literally every quarter, was included.  But the
12    majority certainly were.
13         Q.  Okay.  So based on your judgment, your
14    expert opinion, you decided the method you used,
15    which was taking the higher of the prior quarter or
16    the previous quarter, was a fair estimate of
17    extrapolation for the missing array?
18         MR. HENDERSON:  Objection.
19         A.  In making that judgment, there were a
20    number of things that I considered.  For example, I
21    could explore in the claims data whether the
22    allowed amounts would have ruled out the use of

175

1     those adjacent arrays.  So there are some things
2     that I did to drill down on this issue.  But I --
3     one -- the overall -- based on my familiarity with
4     these arrays, what these carriers were doing, I
5     feel very comfortable with that approach.
6          And to the extent it deviates I think it
7     will deviate low on difference rather than high on
8     difference relative to what would obtain if every
9     document in every quarter had been located.
10         Q.  Did you perform an alternative analysis
11    just excluding those arrays for which you were
12    missing data?
13         A.  I did not.
14         Q.  And one final question on this, which is
15    actually just more an informative question.  The
16    fourth page, which doesn't have a page number --
17    and I notice this summary -- what's called tab
18    description in front of most of these arrays.  Can
19    you just tell me what this is, or what this is
20    describing here?
21         A.  My recollection is this is output from
22    one specific Excel worksheet that summarizes what

176

1     is included on subsequent worksheets within the
2     same Excel file.  And so for example on tab -- the
3     Excel worksheet that's three sheets later than this
4     one has the array for '97 quarter 3.
5          Q.  So my number 3 here to number 23, are
6     those missing arrays or no?
7          A.  No, no, no.  Those are arrays for which -
8     -
9          Q.  For which you do have data?
10         A.  Correct.
11         Q.  So whatever is missing between 3 and 23
12    consecutively would be my way to identify what
13    arrays were missing?  Is that accurate?
14         A.  Correct.
15         Q.  Okay.  We're finished with that document.
16         A.  That's if this is -- I obviously don't
17    have memorized are these are the right 21.  But
18    that looks plausible to me.
19         Q.  Professor --
20         MS. SIDRYS:  Can we go off the record for
21    one second?
22         THE VIDEOGRAPHER:  Off the record at

177

1     3:20.
2          (Recess.)
3          THE VIDEOGRAPHER:  On the record at 3:21.
4     BY MS. SIDRYS:
5          Q.  Professor, we've talked pretty much
6     already about NovaPlus.  I just want to ask you a
7     few final questions about it.
8          A.  Okay.
9          Q.  You mentioned several times that DMERC A
10    included NovaPlus ipratropium bromide as a generic.
11    Do you recall that?
12         A.  Mm-hmm.
13         Q.  And did it do that consistently
14    throughout the entire relevant time period, do you
15    know?
16         A.  I don't have the comparable summary here.
17    But as I look to the -- I think the very last --
18    second-to- last page of my report --
19         Q.  Of your exhibits?
20         A.  Second to last -- table 39A.  So page 195
21    of 196.
22         Q.  Okay.  A-ha.

Duggan, Ph.D., Mark G.      CONFIDENTIAL                    March 5, 2009
                            Washington, DC

50  (Pages 194 to 197)

194

1    A.  Sure.
2    Q.  Well, basically how you did the
3  allocation between Dey and Roxane is what I want to
4  talk about.  If you would turn to page 123, 124 of
5  your report --
6    A.  And I realized that in looking this over
7  that I had meant to have like Dey total and Roxane
8  total at the bottom.  I refer to it in any case.
9  But when I created the print area I -- anyway.  So
10  --
11    Q.  You mean on the tables?
12    A.  I think I say something like in the
13  bottom two rows of the table, and those two rows
14  aren't in what's printed on this document.  That's
15  my mistake.
16    Q.  Okay.  Let's see if we can move quickly
17  through this.  Maybe the easiest way, you know you
18  talk about in your narrative at 123 and 124, but
19  also you said it forth in your tables 37 -- well,
20  let's talk about 37.
21    A.  Okay.
22    Q.  I just want to clear up that I am

195

1  understanding what you are doing.
2    A.  Sure.
3    Q.  I think this is the easy one.  In the
4  Roxane- only scenario the entire difference you
5  attribute to Roxane, fair?
6    A.  That reflects the effect on Medicare
7  spending if I had replaced the Roxane -- all six
8  Roxane products' AWPs as I detail in my report and
9  taken it through claim by claim.  So both the 8402s
10  non-NovaPlus and the NovaPlus, that is, the total
11  difference.  So nothing -- no changes to Dey AWPs
12  there.
13    Q.  And again, on table 37 what you have as
14  scenario 1, which is Roxane-only with NovaPlus and
15  scenario 2, which is Roxane-only no NovaPlus, your
16  calculated difference of 1.1 billion --
17    A.  1.169.  Yup.
18    Q.  And the 234 million, those differences
19  you attribute 100 percent to Roxane, correct?
20    A.  I'm basically here -- I'm not advocating
21  -- I sort of talk about in my report this issue of
22  the combined scenario being -- so the -- I do the

196

1  two Roxane-only scenarios and the Dey-only
2  scenario.  But for the reasons I outline -- I talk
3  about this a bit -- if I can just refresh, because
4  I think it would help me to -- so I have -- can I
5  just read a couple sentences from my report?  Is
6  that okay?
7    Q.  Sure.  Why don't you point me where you
8  are.
9    A.  126.  The middle of 126.  "As these two
10  examples illustrate, depending on the prices of
11  other firms' products in the array, the sum of the
12  Roxane- only and Dey-only effects could lead to a
13  zero difference or to a difference that is as much
14  as twice as large as the combined value of
15  difference.  But the combined difference more
16  accurately captures the effect of using alternative
17  AWPs for the two firms' products with prices that
18  are more reflective of actual transaction prices."
19      So I just want to clarify that to the
20  extent that I am sort of nudging the reader towards
21  one or two or three or four or five of these five
22  scenarios, it is -- the Roxane-only and the Dey-

197

1  only scenarios reflect the effect on Medicare
2  spending for just replacing those firms' prices.
3  But I think the combined scenarios for the reasons
4  that I just read and detail more in the report, is
5  -- I go through some examples, basically, in the
6  report about why if -- you know, considering the
7  two firms in isolation some peculiar things can
8  emerge, you can get zero difference, you can get
9  twice difference.
10      So here -- but in any case, it is true
11  that those first two scenarios that you just
12  pointed to, those difference numbers are entirely
13  driven by changes in the AWPs of Roxane products.
14    Q.  There were other manufacturers of
15  ipratropium bromide during the relevant time frame,
16  correct?
17    A.  Correct.
18    Q.  And you did not consider -- in your
19  analysis, you do not alter those manufacturers'
20  average wholesale prices and come up with
21  differences for them, correct?
22    A.  That is correct.  Though, if I can, I

Duggan, Ph.D., Mark G.     CONFIDENTIAL                    March 5, 2009
                           Washington, DC

52  (Pages 202 to 205)

202

1  based on their --
2      A.  Contribution.
3      Q.  -- relative differences as set forth on
4  table 37?
5      A.  Yeah.
6      Q.  Let's talk for a second about table 38
7  and 39, which I think you do refer to in your
8  report, at least with respect to table 39, that
9  another way of allocating the difference is by
10 looking at relative market share?
11     A.  Correct.
12     Q.  Which is table 39, I think.  Right?
13     A.  Correct.  39A and 39B.  And there's a big
14 difference between those two.
15     Q.  Now, on page -- on table 38 -- are you
16 there or do you need the Bates number?
17     A.  I'm with you.
18     Q.  Table 38 shows that Roxane's market share
19 -- total market share is 24.5 percent.  Do you see
20 that?
21     A.  Yeah.  Over the --
22     Q.  Over the time frame?

203

1      A.  The average -- yeah.  Over the total time
2  period.
3      Q.  And Roxane's market share dropped
4  significantly from -- really throughout, but from
5  1997 it's 61.5 percent Roxane --
6      A.  Mm-hmm.
7      Q.  -- for quarter 3 and it drops all the way
8  in quarter 4 of 2003 to 9.8 percent.  Do you see
9  that?
10     A.  I definitely see that.
11     Q.  It also appears that there's more
12 manufacturers that come into play in later years.
13 Is that accurate?
14     A.  Right.  I can't recall which one, but
15 yeah.
16     Q.  And let's -- for example, for the 1997
17 quarter 3 --
18     A.  Mm-hmm.  Yeah.  Something exits
19 essentially.  I don't remember what the other
20 product is.  And then something else enters in
21 around 2000.
22     Q.  It looks like in 1993 quarter 3 --

204

1      A.  1997 quarter 3?
2      Q.  Yeah.  1997 quarter 3, Roxane and Dey are
3  making up 84 percent roughly --
4      A.  Yeah, mm-hmm.
5      Q.  -- of the market.  And by 2003 quarter 4
6  Roxane and Dey are making up approximately --
7      A.  70 percent, 69 percent.
8      Q.  Yeah, roughly.  70 percent.  So there's
9  other manufacturers of ipratropium bromide that are
10 in play sometime after 2000.  You're right.
11     A.  Yeah.
12     Q.  Did you do an analysis -- skip the
13 relatively market share for a while.  Did you run
14 the different calculations using the market share
15 numbers included on tab 38?  For instance, Roxane's
16 share, that column, starting at zero percent going
17 all the way to 9.8 percent, did you multiply that
18 by Roxane's differences in the Dey and Roxane
19 scenarios and attribute that to them?
20     A.  No.  I used a slightly different -- I
21 used the Roxane relative share.
22     Q.  Right.  And we'll come to that in a

205

1  second.
2      A.  Yeah.
3      Q.  But did you also do an alternative
4  analysis just using the market share data that is
5  on 38 strictly?
6      A.  I did not.
7      Q.  And the relative market share numbers,
8  which I believe are reflected on 39A and 39B?
9      A.  Yup.
10     Q.  Those you do use and you come up with an
11 alternative number, right?
12     A.  That's right.  That's right.  And the
13 thing about those two tables is that, as you can
14 see -- so in the shaded regions -- and I shaded
15 this just so that the reader could see where --
16 when this happens -- in those shaded regions I take
17 the approach of when NovaPlus is the -- is treated
18 as a brand in the array all of the difference is
19 going to Roxane there.  Okay?
20         So I did not -- I mean, one could.  One
21 could have basically scaled those numbers down.
22 But in those cases you can see from that, whereas

Duggan, Ph.D., Mark G.     CONFIDENTIAL                     March 5, 2009
                           Washington, DC

53  (Pages 206 to 209)

206

1   in table 39B in the no-NovaPlus scenario that's not
2   the case.  And so you can see if you sum up across
3   the bottom of that, you know, it's a very big
4   difference.
5       Q.  Big difference?
6       A.  Yeah.
7       Q.  So if you sum up in your Dey Roxane
8   combined no- NovaPlus scenario, which is 39B, if
9   you add up the bottom the total is approximately
10  313 million attributed to Roxane based on relative
11  market share versus the 577 million you attribute
12  to it using your alternative analysis of --
13      A.  The -- yeah --
14      Q.  -- the 37?
15      A.  -- the different effects.  That's exactly
16  right.
17      Q.  So 250 and some million dollar
18  difference? 260 and some million dollar difference?
19      A.  Right.
20      Q.  Are you at a time for a break?
21      A.  This would be great.  Sure.
22          THE VIDEOGRAPHER:  Off the record at

207

1   4:01.
2           (Recess.)
3           THE VIDEOGRAPHER:  On the record at 4:15.
4   BY MS. SIDRYS:
5       Q.  Okay.  Professor, I'd like to switch
6   gears now and move to your Medicaid analysis.
7   Okay?
8       A.  Okay.
9       Q.  And again, for sake of efficiency the
10  alternative AWP and WACs that you calculate for
11  Medicaid is the same formula and used the same data
12  as you do for Medicare; is that correct?
13          THE WITNESS:  I'm sorry.  Can you just
14  read that back?
15          (Whereupon, the requested portion
16  was read by the reporter.)
17      A.  Yeah.  I used the same data and method to
18  calculate the alternative AWPs.  WACs.  Yeah.  I
19  don't use WACs with Medicare.
20  BY MS. SIDRYS:
21      Q.  Right.  Claims data.  I want to talk a
22  little bit about for your analysis the various

208

1   types of data that you used for your Medicaid
2   analysis.
3       A.  Mm-hmm.
4       Q.  And I have had the benefit of reading
5   some of your prior dep.  So I'd try to at least
6   summarize some of what you said there and correct
7   me if I'm wrong.  The state level claims data is
8   the most full-some data?  Is that accurate?  It
9   includes the most detail?
10      A.  That is typically true, though there are
11  exceptions.  Like, for example, the Indiana
12  exception and so forth.  So each state's -- you
13  know, which variables are included and so forth
14  differs a bit.  And so CMS sort of -- so, yeah.  I
15  -- in the 16 states that I focus on initially I
16  primarily use the state claims data.
17      Q.  And typically with the exception of
18  Indiana and a few others, the state claims data
19  includes the most detail; is that accurate?
20      A.  True, although the MAX data and the SMRF
21  data, it has quite a bit of information in it as
22  well.  So the SMRF MAX data is individual level.

209

1       Q.  From what I understand, the SMRF MAX data
2   does not break out dispensing fee from ingredient
3   cost.  Is that correct?
4       A.  To the best of my recollection, that's
5   true.  To the best of my recollection that's true.
6       Q.  So sticking with the state claims data
7   for a second, the data includes the date service
8   began and completed, correct?
9       A.  Yes.
10      Q.  The paid amount?
11      A.  I should just note on the date service
12  began and completed, typically they just give the
13  date they dispensed the prescription.  They don't
14  necessarily -- there are exceptions, but they don't
15  necessarily have a date for how long the list
16  covered the person.
17      Q.  Going back, it includes the paid amount,
18  correct?
19      A.  Yeah.
20      Q.  It includes the NDC?
21      A.  Yes.
22      Q.  It includes the billed amount?

Duggan, Ph.D., Mark G.    CONFIDENTIAL              March 5, 2009
                          Washington, DC

54  (Pages 210 to 213)

210

1      A.  Right.  Or the usual and customary,
2  depending on the state.  They call it different
3  things from one state to another.  Charged amount,
4  billed amount, usual and customary.
5      Q.  Well, that's a good point.  It includes
6  the payment bases, the claims data or the state
7  claims data?
8      A.  Typically, yes, it includes the
9  components.
10     Q.  And there is indicator fields in the
11 state claims data of whether or not the state MAC
12 or the FUL would be used to determine the
13 reimbursement amount?
14     A.  In some cases, yes.  Not always.
15     Q.  What states was that the not provided in
16 of the 16 that you looked at?
17     A.  Well the -- I'll give you -- so one
18 example, New York does tell if a FUL is provided, a
19 FUL is utilized, in calculating the ingredient
20 cost.  And New York is different from most states
21 in the sense that that FUL, even if it exceeded --
22 ingredient cost that results from the FUL, even if

211

1  it exceeds the ingredient cost that would result
2  from the AWP, it is used.  But that is not
3  typically true.
4          I don't recall which states exactly had
5  the FUL and MAC indicator.  So there was some
6  variation.  Some states had that indicator.  Some
7  did not.
8      Q.  Did you find it was generally the case
9  that it was included in the 16 states that you
10 looked at?
11     A.  I think more often than not it was not.
12 So -- but I would need to -- you know, for the --
13 as I sort of point out in my analysis, to the
14 extent that a MAC is used or a FUL is used in a
15 state like -- you know, in an alternative state
16 other than like let's say New York, if it fell
17 below the FUL or the MAC it would -- the AWP would
18 be used.
19         So New York was somewhat -- so for the
20 purposes of my algorithm it is whether -- the
21 alternative AWPs would be used in place of the FUL
22 and the MAC if true.

212

1      Q.  Let's take New York off the table for a
2  second.
3      A.  Okay.
4      Q.  What I'm really trying to find out is for
5  state claims data if typically there is an
6  indicator field for if a state MAC or state FUL is
7  used to determine the reimbursement amount.  And my
8  understanding is there was, but if I'm wrong
9  correct me.
10     A.  It's certainly true in a number of
11 states.  And I don't -- of the 16 -- I just don't
12 have that number.  I shouldn't speculate because I
13 just don't have that number in my head right now.
14 But it's provided in some states.  I think there
15 are some states where it is not.  And what the
16 breakdown is of the 16 I just don't know off the
17 top of my head.
18     Q.  The dispensing fee is identified in the
19 state claims data, correct?
20     A.  Typically, yes.
21     Q.  How did you come up with using 16 states
22 for your difference calculation and extrapolating

213

1  the others?
2      A.  So these 16 states account for about 70
3  percent of the prescriptions for the 35 products at
4  issue in the case.
5      Q.  70 percent of the prescriptions?
6      A.  68 percent, I believe.  We can look.  I
7  can go to table -- so 67 percent.  8 million
8  claims, table 29, for the 16.  7.98 million versus
9  3.96 million.  So slightly more than two-thirds of
10 the prescriptions.
11     Q.  Where are you looking at?
12     A.  I'm sorry.  Table 29.  So if we go down
13 to the bottom.
14     Q.  Yes.
15     A.  You see the subtotal for the first 16
16 states, the number of claims.
17     Q.  Okay.
18     A.  The 7.89 million for those 16.  And for
19 the remaining 3 it's 3.96 million.  And so those
20 first 16 constitute a bit more than two-thirds of
21 the total claims.
22     Q.  Okay.  And that was relevant?

Duggan, Ph.D., Mark G.    CONFIDENTIAL    March 5, 2009
Washington, DC

55 (Pages 214 to 217)

214

1    A.  They're a third of the states and they're
2    two- thirds of the claims.  So they're on average,
3    in terms of the number of claims, they're about
4    four times as high in terms of number of claims per
5    state as the other places.
6    Q.  Was that relevant to you in deciding to
7    pick 16 versus 12 versus 18?
8    A.  No.  I'm just saying -- I just want to
9    point out that these 16 are generally the large
10   states.  And so as an economist from my previous
11   research, as I sort of alluded to earlier, it is
12   always possible to acquire more data and so forth.
13   But part of what I've been trained to do is to
14   determine where it is -- where it's appropriate to
15   draw the line.
16       And so these -- and so it was my decision
17   to stop after 16 states and to use the experience
18   from those 16 states to estimate the value of
19   difference and so forth in the remaining 32.
20   Q.  How as an economist did you determine 16
21   states versus --
22   A.  17 or 15?

215

1    Q.  Yes.  Or 20.
2    A.  In this -- in my analysis I focused -- I
3    set out to determine how Medicaid spending in the
4    U.S. would have changed if the alternative AWPs
5    that we've been talking about had been used in
6    adjudicating the claims.  I selected the largest
7    states initially to focus on because they are going
8    to have the largest impact on that aggregate U.S.
9    number.
10       So for example it is not an accident that
11   I picked California, New York, Florida, before --
12   rather than Wyoming, Vermont and Washington, D.C.
13   Because in converging to a result for the entire
14   U.S. those states are going to be the biggest
15   contributors to that.  And then I basically --
16   given my findings for these states 35 products --
17   about how many quarters? 50 quarters, 16 states,
18   basically about tens of thousands of NDCs state
19   quarter combinations.
20       I used that information to then estimate
21   for the remaining states, many of which I did not
22   have the claims data for, what the difference would

216

1    have been there.  And so I use an algorithm that is
2    -- that I define in detail in my report to estimate
3    this.  But it is often the case in economics that
4    one doesn't acquire data for every state to learn
5    something about a program as a whole.
6        Just as one example, the Seminole
7    literature, the Seminole papers on the unemployment
8    insurance program, used administrative data for a
9    subset of states to learn something about the U.S.
10   unemployment insurance program as a whole.  So this
11   is -- and many of those papers use six, seven,
12   eight states.  So it is -- there's a trade- off.
13       It's not -- once again, it's not a black
14   and white world where -- it was my sense that 16
15   states, 70 percent of claims, 67 percent of claims,
16   you know, 15,000 -- I'm just trying to calculate
17   here.  50 or 60 quarters, 35 products, 16 states,
18   the number of sort of NDC quarter state
19   combinations that I'm using, an enormous amount of
20   information that would provide a reliable estimate
21   of the corresponding difference in the remaining 32
22   states.

217

1    Q.  You state in your report that these 16
2    states constitute or account for approximately 71
3    percent of total Medicaid spending.
4    A.  Mm-hmm.
5    Q.  My question is in deciding that 16 was
6    where, as you said, you were going to draw the
7    line, was it relevant to you that this was 71
8    percent of spending and I think you said 68 percent
9    of claims, or was there some percentage that you
10   had to get to that you felt comfortable with then
11   extrapolating your specific testing to the
12   remaining states?
13   A.  So there's a lot in that question.  From
14   the outset when I was first engaged on these cases
15   I -- given my sense of Medicaid programs in the
16   U.S. and pharmaceutical reimbursement, from the
17   outset my -- before drilling down on the issue my
18   goal was to acquire state claims data for the
19   majority of claims in the U.S.  And I pushed that
20   further as I learned a bit about the -- that there
21   was some heterogeneity across the states.
22       And based on, you know, my experience

247

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - -

IN RE: PHARMACEUTICAL          )  MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE     )  CIVIL ACTION

PRICE LITIGATION               )  01-CV-12257-PBS

THIS DOCUMENT RELATES TO       )

United States of America ex )  Judge Patti B. Saris

rel. Ven-a-Care of the         )

Florida Keys, Inc., et al.   )

        v.                     )

Boehringer Ingelheim Corp.,  )  Chief Magistrate

et al., Civil Action No.       )  Judge Marianne B.

07-CV-10248-PBS                )  Bowler

- - - - - - - - - - - - - - -


CONFIDENTIAL

Videotaped deposition of MARK G. DUGGAN, PH.D.

Volume II

Washington, D.C.

Friday, March 6, 2009

9:30 a.m.

Duggan, Ph.D., Mark G. - Vol. II   CONFIDENTIAL                    March 6, 2009
Washington, DC

252

1          P R O C E E D I N G S
2               (9:35 a.m.)
3
4          THE VIDEOGRAPHER:  Today's date is March
5    6th, 2009.  This is day two in the deposition of
6    Dr. Mark Duggan.  The witness has previously been
7    sworn in.  This deposition commences at 9:35.  You
8    may proceed.
9
10   Whereupon,
11          MARK G. DUGGAN, PH.D.,
12   called as a Witness, having been previously duly
13   sworn by Jonathan Wonnell, a Notary Public in and
14   for the District of Columbia, was further examined
15   and testified as follows.
16
17   EXAMINATION RESUMED BY COUNSEL FOR ROXANE
18   LABORATORIES AND BOEHRINGER INGELHEIM
19   BY MS. SIDRYS:
20       Q.  Good morning, Professor Duggan.
21       A.  Good morning.
22       Q.  You understand that you're still under

253

1    oath today?
2        A.  I do understand that.
3        Q.  I have a few follow-up questions from
4    yesterday that I want to come back to.  Your
5    alternative AWP price that you calculated, you
6    replaced with 125 percent or used a 25 percent
7    markup.  Can you explain how you came up with that
8    25 percent?
9        A.  I introduced this margin between actual
10   average prices and the prices that I used, this 25
11   percent margin, with an eye toward the -- one of
12   the factors that I considered in using 125 as
13   opposed to a different -- 100 percent or 150
14   percent or what have you -- was that if you look
15   over the time period of interest in this case, a
16   number of state Medicaid programs and the federal
17   Medicare program later employed adjudication
18   methodologies that used AWP minus a certain
19   amount.
20          At some level the most natural price at
21   first blush without sort of drilling down and
22   thinking about the complexities, would be the

254

1    actual average price.  That's actually the first
2    price that I use in -- I think California is the
3    first state where I go through several alternative
4    calculations.  However, I -- and that is, in my
5    judgment, not an entirely unreasonable thing to
6    do.
7          However, in the interests of being
8    conservative, recognizing that many states employ
9    formulas that reimburse AWP minus 5 percent, AWP
10   minus 10 percent, and so forth, this 25 percent
11   cushion, this 25 percent markup over the actual
12   average price had resulted in the ingredient cost
13   being in virtually every case -- the ingredient
14   cost reimbursement in virtually every case greater
15   than the actual average price.  So that was sort
16   of one of the factors that I considered.
17          I didn't -- my goal in the analysis was
18   to determine to what extent Medicare and Medicaid
19   would have paid less if prices that were more
20   reflective of actual transaction prices had been
21   used as the AWPs and the WACs.
22       Q.  Where did the actual 25 percent come

255

1    from?  That's what I'm trying to figure out, is why
2    is it 25 percent versus 30 versus 15?  How did you
3    derive the 25 percent?
4        A.  As I said yesterday, it is -- there is
5    nothing magical about 25 percent.  It is -- you
6    know, it's not like that is obviously superior to
7    24 or 26, just going on either side.  It is,
8    however, the case that if one examines the
9    Medicaid adjudication algorithms to this factor
10   that I just introduced, had I let's say used 105
11   percent -- had I let's say used 105 percent, there
12   would have been a significant number of cases in
13   which reimbursement would have fallen below actual
14   average price.
15          And so -- not to say that's necessarily
16   -- so that was sort of one of the factors why 125
17   as opposed to 110, let's say.  Why 125 as opposed
18   to higher numbers, you know, here I -- as I
19   mentioned, I introduced this cushion so that in
20   virtually every case the ingredient cost will be
21   at or above -- ingredient cost reimbursement will
22   be at or above actual average prices.

Duggan, Ph.D., Mark G.    CONFIDENTIAL              May 18, 2009
Washington, DC

1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - -x

IN RE:  PHARMACEUTICAL        :  MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE    :  CIVIL ACTION

PRICE LITIGATION              :  01-CV-12257-PBS

THIS DOCUMENT RELATES TO      :  Subcategory No.

U.S. ex rel. Ven-a-Care of    :  06-CV-11337-PBS

The Florida Keys, Inc.        :  Judge Patti B. Saris

       v.                     :

Boehringer Ingelheim          :

Corporation, et al., Civil    :

Action No. 07-10248-PBS       :  Chief Magistrate

No. 06-CV-11337-PBS           :  Judge Marianne B.

- - - - - - - - - - - - - -x   Bowler

                    CONFIDENTIAL

                    Washington, D.C.

                    Monday, May 18, 2009

Duggan, Ph.D., Mark G.     CONFIDENTIAL                May 18, 2009
Washington, DC

44 (Pages 170 to 173)

170

1   scenario and the -- so in any case, it's -- I've
2   provided both the no Nova Plus scenario and the
3   scenario with Nova Plus, because I think that would
4   be an issue deserving of further study.
5        Q.   The no Nova Plus scenario is one -- one
6   way to think about dealing with the potential mistake
7   with respect to Nova Plus?
8        A.   That's correct.  I just -- I guess I just
9   don't want to assert that that's the only way because
10  it's a bit of a tricky -- correcting a mistake that,
11  the effect of how it's corrected would have a big,
12  could have a big impact.  So I -- but it's one way
13  and so I'm using your phrase, that one way.
14       Q.   I just want to see if -- strike that.  My
15  question is whether we can agree or whether it's your
16  opinion that the mistake should be corrected in some
17  fashion.  I'm not asking particularly what you think
18  the correction necessarily would be?
19       A.   Right.
20       Q.   But rather that the mistake should be
21  corrected as the misclassification of the Roxane
22  ipratropium bromide was corrected in the analyses.

171

1        MR. HENDERSON:  Objection.  I don't
2   understand the question.
3        THE WITNESS:  I guess I would just say
4   that it would be as new information was provided or
5   if information -- the -- I guess it is -- I think
6   it's a -- it would be potentially a topic deserving
7   of more study.  And it seems plausible that if Nova
8   Plus were indeed a generic it seems plausible that
9   some correction would be reasonable.
10       BY MR. GORTNER:
11       Q.   You provided one instance in your no Nova
12  Plus scenario?
13       A.   Right.
14       Q.   Is that right?
15       A.   That's right.
16       Q.   Do you remember reading any testimony from
17  any individual who worked for these DMERCs regarding
18  classification of Nova Plus as a brand or a generic?
19       A.   I believe there was someone at Administar
20  and I cannot remember her, I think it was a woman at
21  Administar.  But I considered it.  I certainly didn't
22  read it cover to cover.  And I just wonder if at some

172

1   point, we could get a three or four-minute break for
2   a rest room break.
3        Q.   Sure.  Want to do it right now?
4        A.   Yes.
5        THE VIDEOGRAPHER:  Off the record at 2:16.
6        (Recess.)
7        THE VIDEOGRAPHER:  On the record at 2:24.
8        BY MR. GORTNER:
9        Q.   Professor Duggan, I apologize.  You
10  mentioned during the break that there was something
11  you wanted to add.
12       A.   Right.  I just -- so Mr. Henderson did
13  remind me of something.  It's hard for me to remember
14  all of the specific details of these analyses.  We
15  are drilling down to a pretty specific level, but
16  part of the rationale for reintroducing the --
17  retaining the Nova Plus NDCs in the generic arrays
18  was instead of as sort of mentioned, I did in the
19  first report, pretending the products weren't even
20  included anywhere in the array, but instead, assuming
21  no liability for the Nova Plus NDCs, and thus not
22  revising their AWPs.

173

1        So in other words, just leaving them
2   wherever they were, but not revising their AWPs at
3   all.  I just wanted to make that -- I had forgotten
4   and Mr. Henderson reminded me.
5        Q.   Now, going back to your no Nova Plus
6   versus Nova Plus scenarios, did you conduct any other
7   analyses that you did not include in your report to
8   address for the potential mistake of the DMERCs
9   misclassifying Nova Plus as a brand product?
10       A.   Not that I recall.  These were the two
11  main ones were the no Nova Plus scenario that I
12  describe and the with Nova Plus scenario that I
13  described.
14       Q.   Okay.  Those are the two?
15       A.   Those are the two.
16       Q.   We are talking over each other.  I'm sorry
17  about that.  Let's try that again.  So the no Nova
18  Plus model would be the model that would address the
19  potential mistake that we just talked about?
20       A.   Yes.
21       MR. HENDERSON:  Objection.
22       THE WITNESS:  But, as I did say, it is --

Duggan, Ph.D., Mark G.    CONFIDENTIAL                    May 18, 2009
                          Washington, DC

45 (Pages 174 to 177)

174

1    those are the two that I did, and I suppose one
2    could -- those were the two that I -- that I did, and
3    the no Nova Plus one that I did in which I didn't
4    change any of the Nova Plus products' AWPs, and left
5    the other things the same.  That was the approach
6    that I took.
7         BY MR. GORTNER:
8         Q.   Now, in discussing the Nova Plus scenario,
9    one of the factors that you raised was this notion of
10   Roxane's market share declining over the period at
11   which you were assigning 100 percent of the Nova Plus
12   damages to Roxane?  Do you remember that?
13        A.   I do.
14        Q.   Can you explain further what reservation
15   or concern or issue you have with respect to the
16   notion of assigning a hundred percent of these large
17   damages in the face of Roxane's market share
18   declining at the same time?
19        A.   In the -- in the scenario in which I leave
20   **Nova Plus AWPs unchanged, I attribute difference to**
21   **Roxane in each quarter according to its share of Dey**
22   **plus Roxane Medicaid prescriptions.  The primary**

175

1    **reservation that I had with assigning 100 percent to**
2    **Roxane in these latter periods was that it was being**
3    **driven by three products with almost no utilization.**
4    **And that would be less problematic if**
5    **Roxane's relative share had gone in the opposite**
6    **direction that it went, instead of falling from 100**
7    **to 14, had risen from 14 to 100 over time.  But**
8    **instead, its market share did decline substantially.**
9    **And so with -- it seems plausible that one in five**
10   **prescriptions during this period were for Roxane**
11   **products, let's say 2002, 2003, and yet they would**
12   **be, you know, about four in four out of Dey plus**
13   **Roxane, yet they would be getting 100 percent of the**
14   **difference.**
15        **So at some level, there is sort of two**
16   **issues.  There is the impact of the NDCs on the**
17   **allowed amount, and then whatever difference emerges**
18   **from that, there is allocating that difference among**
19   **the -- among the firms.  And in my no Nova Plus**
20   **scenario, I allocate that according to Roxane's**
21   **relative share of the market.  And thus later in the**
22   **period, even though difference is relatively high,**

176

1    **Roxane's total -- Roxane's share of it is quite a bit**
2    **lower.**
3         **So it is, if we look, for example, at a --**
4    **I don't know if I have this in my -- if -- so let's**
5    **just take as an example the fourth quarter of 2002**
6    **when there is about 75 million in difference in the**
7    **no Nova Plus scenario.  It's probably even higher in**
8    **the Nova Plus scenario.  Let's say it's 100 million.**
9    **To allocate all 100 million to Roxane when they have**
10   **24 percent at some level seems inappropriate to me.**
11        Q.   As an economist, it seems inappropriate,
12   you said?
13        **A.   Yes.  As an economist, it would seem**
14   **inappropriate.  But there is this issue of causation.**
15   **What did Nova Plus's AWPs do to the allowed amount?**
16   **So it's a -- it is a tricky issue.  And I mean, as I**
17   **mentioned earlier, I went through all this extra work**
18   **in the no Nova Plus scenario because I was uneasy**
19   **about allocating 100 percent to Roxane.**
20        Q.   Can you explain why it's inappropriate to
21   allocate it all to Roxane?
22        MR. HENDERSON:  Objection.

177

1         THE WITNESS:  You know, once again, I
2    think this is -- to some extent, there is a legal
3    issue in here, which I'm not a lawyer.  This issue
4    of, you know, the issue of whether the no -- I think
5    it's partially a legal issue, this issue of whether
6    the no Nova Plus or the Nova Plus scenario is the
7    more appropriate one.
8         But speaking as an economist, if Roxane --
9    if the combined impact of Roxane and Dey's behavior
10   is to increase Medicare spending by 100 million, and
11   Dey has three times as many prescriptions as Roxane
12   during that period, then it seems at some level --
13   and I'm qualifying this, because there are these
14   other factors -- appropriate to me to allocate the
15   difference according to each firm's market share.
16   You know, its relative market share, you know,
17   cutting against, I guess, the other firm, Dey would
18   argue, well, it wouldn't have -- like that -- this --
19   that the -- in these scenarios, in the combined
20   scenario, with Nova Plus, it is the Nova Plus AWPs
21   that drive the allowed amount.
22        And so if one had the view, and I think

190

1    Q.   I apologize, Professor, finish.
2    A.   The median is falling by much less than
3  Roxane's AWP.  And in, I think, the majority of DMERC
4  quarter combinations late in the period, Roxane only
5  no Nova Plus, they are getting zero.  So they are
6  basically, in a sense, I think that if one wants to
7  use market share, one has to then incorporate the
8  behavior of two or more firms.
9         And so in these Dey and Roxane scenarios,
10  I've analyzed how big is the difference if they both
11  had produced alternative AWPs, and then we allocate
12  that combined difference according to each firm's
13  market share.  As you can see, the sum of the Roxane
14  only no Nova Plus and the Dey only is much lower than
15  the Dey and Roxane combined scenario.
16        So -- and this is -- gets to my point that
17  these scenarios with Roxane only are much more
18  favorable.  Essentially the no Nova Plus is much more
19  favorable to Roxane than the Dey and Roxane combined
20  scenario, even though -- so the combined one is
21  bigger.  It's interesting.  Roxane and Dey have a
22  comparable sort of only effect.  234 and 213 million.

191

1         But when you do the combined and allocate
2  according to each market share, Roxane's share is, I
3  think, like 311.  So theirs goes up by about, I don't
4  know, 70 some odd millions dollars.  Dey's goes up
5  enormously because they are penalized there for
6  having the much larger market share in that scenario.
7  But I think -- it's kind of an either -- I don't -- I
8  took care to provide several scenarios that I thought
9  would be of assistance to the Court and others
10  interested in the case.
11    Q.   Let me see if I can -- if I can ask a
12  question that may be answered in a yes or no fashion.
13    A.   I'm sorry.  I'm trying.
14    Q.   The question here is, at no point in these
15  analyses in your report did you allocate
16  responsibility for your difference calculations based
17  on Roxane's actual market share in the marketplace.
18  Is that -- can you answer that yes or no?
19    A.   In the Roxane only scenario?
20    Q.   Uh-huh.
21    A.   Right.  That did not make use of the
22  Roxane market shares.  That's correct.

192

1    Q.   And in the Dey and Roxane scenario, you
2  don't apply Roxane's market share considering all
3  competitors.  You assume that Dey and Roxane are the
4  entire marketplace, is that right?
5    MR. HENDERSON:  Objection.
6    THE WITNESS:  It's -- I think it is -- I
7  allocate the difference to each according to its
8  relative share.  If -- to use the full market share,
9  their share of all Ipra prescriptions, as I sort of
10  discuss in my April 23rd report, one can do the
11  combined difference for everybody, if all of the
12  firms had reported accurate AWPs.  And I think then
13  the difference is like 1.5 million -- billion.  And
14  then one can allocate that difference as a function
15  of each firm's share of all firms.
16        But for the -- for the Dey and Roxane,
17  when we are considering the behavior of Dey and
18  Roxane, Dey had a certain effect, 1.1 billion.  300
19  million of that goes to Roxane, 800 million of that
20  goes to Dey, given their relative market shares.  If
21  we did all firms, we would have 1.5 billion, and I
22  think it would still be about 300 million and 8 or

193

1  900 million.  It would be about the same in those two
2  scenarios.
3         So it is -- it is the -- using their share
4  of the full market would necessitate changing the
5  AWPs in my -- in this framework would necessitate
6  revising the AWPs of all firms' products in the
7  arrays.
8    BY MR. GORTNER:
9    Q.   And just to be clear, you didn't do that
10  analysis, you didn't have at your fingertips the
11  transactional data of all the firms that were selling
12  ipratropium bromide in this time period or calculated
13  revised AWPs for those firms, did you?
14    A.   I did not.  For illustrative purposes, I
15  assumed that the price would be 106 percent of -- I
16  did compare Dey and Roxane prices for Ipra, which
17  were very, very, very similar for -- when you compare
18  apples to apples, the 25s, the 30s and the 60s.
19        But I basically -- this wasn't one of the
20  scenarios that I did in my initial report, but just
21  so that the Court and others with an interest in the
22  case could gauge the potential magnitude of doing