**Exhibit C**
**Excerpts from Corrected Statement of Undisputed Facts**
**Filed With Roxane Defendants' Motion for Summary**
**Judgment (Master Dkt. No. 6207, Subcategory Dkt. No. 261)**

Exhibit to the March 12, 2010 Motion *In Limine* to Exclude Certain Expert Opinions Proffered
by Plaintiffs' Expert Dr. Mark G. Duggan

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) ) | MDL No.1456<br><br>Master File No. 01-CV-12257-PBS<br>Subcategory No. 06-CV-11337-PBS |
| THIS DOCUMENT RELATES TO:<br>*United States of America ex rel. Ven-A-Care of the Florida Keys, Inc., et al. v. Boehringer Ingelheim Corporation, et al.*, Civil Action No. 07-10248-PBS | ) ) ) ) ) ) | Judge Patti B. Saris<br><br>Magistrate Judge Marianne B. Bowler<br><br>Master Docket No. 6207 |

### CORRECTED ROXANE LOCAL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Helen E. Witt, P.C.
Anne M. Sidrys, P.C.
Eric T. Gortner
John W. Reale
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL  60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel for Defendants
Boehringer Ingelheim Roxane, Inc., and
Roxane Laboratories, Inc.*

Dated: June 29, 2009

136.    Both prior to 1996 and thereafter, the brand-name product for ipratropium bromide was sold and marketed under the proprietary trade name "Atrovent."  (Tab 5, 12-12-08 C. Carr-Hall Dep. 244; Tab 152, Decl. C. King ¶ 18.)

137.    In accordance with industry practice, Roxane set the AWP for its new ipratropium bromide generic product at approximately 10% below the AWP of Atrovent.  (Tab 64, 11-28-05 Waterer Dep. 37; Tab 65, 5-9-07 Waterer Dep. 186-87; Tab 65, 5-11-07 Waterer Dep. 604.)

138.    In 1997, Dey Laboratories launched a competing generic product, also named after the generic chemical compound, "Ipratroprium (Bromide Inhalation Solution 0.02%.)" (Tab 36, 03-17-08 Lockwood Dep. 646-48; Tab 5, Carr-Hall Dep. Ex. 40 at BOEH01050028, "Dey Recognize the Difference" (Dey Marketing Flier).)  This product had a Dey label.  (*Id*.)

139.    From 2000 onward, numerous generic manufacturers entered the ipratropium bromide marketplace, including Alpharma, Zenith Goldline, and others.  (Tab 185, Roxane Ex. 118 at AWP033-434–AWP033-435, AWP033-0372–AWP033-373 (AdminaStar Federal pricing arrays); Tab 53, 12-2-08 Tawes Dep. 978.)  Like the Roxane and Dey products, all of these manufacturers named their generic products after the chemical compound name, "ipratropium bromide," and all carried the respective manufacturer or distributor label. (Tab 154, 2001 RedBook at 368.)

140.    In 1998, Roxane and Dey bid on a private-label contract to sell generic ipratropium bromide through Novation LLC, a large group-purchasing organization (GPO) that targets the hospital class of trade.  (Tab 155, RLI-AWP-00122465-470 at RLI-AWP 00122467, "Novation Agreement Launch Package, Confidential" (NovaPlus Ipratropium Agreement Launch Package); Tab 66, 12-12-08 C. Carr-Hall Dep. 236-237; Tab 5, 12-12-08 Waterer Dep. 116.)

141.    In order to facilitate the sale of lower-priced products to its member hospitals, Novation created a private label program—the "Products Lowered Utilizing Standardization" or "NovaPlus" label—which consists of over 300 generic products, all of which carry the private-label designation of "NovaPlus" to identify the supplier for Novation's hospital members.

(Tab 156, htttp://www.novationco.com/suppliers/novaplus.asp; Tab 157, http://www.novationco. com/programs/enhanced_savings.asp.)   As part of the NovaPlus program, Novation contracts with manufacturers of pharmaceuticals and medical equipment to supply products that will be sold exclusively to Novation GPO members at discounted prices under the "NovaPlus" label. (Tab 156, http://www.novationco.com/suppliers/novaplus.asp; Tab 157, http://www.novationco.c om/programs/enhanced_savings.asp.)

142.    In early 1999, Roxane was awarded the NovaPlus contract by Novation and began to manufacture generic ipratropium bromide for sale exclusively to Novation's hospital members under the NovaPlus label.   (*Id.*; Tab 158, RLI-AWP-00122479–RLI-AWP-00122482 at RLI-AWP-00122479 (Novation, LLC Agreement Announcement).)   Like Roxane's and Dey's products, the Novation product was named after the generic chemical name, "Ipratropium Bromide Inhalation Solution 0.02%," but carried the "NovaPlus" label, rather than a Roxane label.   (Tab 151, RLI-AWP 00212508-09 (9-19-2000 Ltr. from J. Powers to S. Norvell); Tab 155, NovaPlus Ipratropium Agreement Launch Package at RLI-AWP 00122468; Tab 159, RLI-AWP-00008196 (April ' 99 New from Roxane).)

143.    Shortly before the product's launch in June 1999, Roxane sent out letters announcing the private-label agreement.   (*See, e.g*, Tab 158, Novation Agreement Announcement, RLI-AWP-00122479-82.)   These letters identified the new product as

"Ipratropium Bromide Inhalation Solution 0.02% with a NOVAPLUS® label" and "Ipratropium Bromide Inhalation Solution 0.02% (NovaPlus)." (Tab 158, Novation Agreement Announcement at RLI-AWP-00122479-82; Tab 159, April '99 New from Roxane at RLI-AWP 00008196).

144.    Roxane's letters also listed new Roxane NDCs for the product and the same AWPs for the NovaPlus labeled products that were used for Roxane's other generic ipratoprium bromide products.    (Tab 158, Novation LLC Agreement Announcement at RLI-AWP-00122479-82; Tab 159, April '99 New from Roxane at RLI-AWP 00008196).

145.    The AWPs for the Roxane and NovaPlus label ipratroprium bromide products were identical.  The following chart shows the AWPs for each of these products, which remained the same throughout the pertinent time period

| Package Size | Roxane ipratroprium bromide | NovaPlus ipratropium bromide |
|---|---|---|
| 25 | $44.06 | $44.06 |
| 30 | $52.87 | $52.87 |
| 60 | $105.74 | $105.74 |

(Tab 158, Novation LLC Agreement Announcement at RLI-AWP-00122479-82.)

146.    Roxane sold the NovaPlus label ipratropium bromide to Novation members at a contract price that was at or at times lower than the contract price for Roxane label ipratropium bromide.  (Tab 151, 9-19-2000 Ltr. from J. Powers to S. Norvell at RLI-AWP 00212508).)

147.    It was Roxane's understanding that NovaPlus was a generic pharmaceutical product.  (Tab 66, 12-12-08 Waterer Dep. 105)

148.    Novation also sent mailings to its members announcing it would "introduce Iptratropium Bromide into the NOVAPLUS™ line of products." (Tab 160, 4-6-99 S. Norvell Memo to Novation Authorized Distributors at RLI-AWP 00224752; Tab 161, 4-14-1999 S. Norvell Revised Memo to Novation Authorized Distributors at RLI-AWP 00122471-85.)

56

Another mailing announced the launch of "NOVAPLUS™ Ipratropium Bromide." (Tab 155, NovaPlus Ipratropium Bromide Agreement Launch Package at RLI-AWP 00122465-70.)

149. From June 1999 until May 2004, the NovaPlus label ipratropium bromide was sold exclusively to Novation members under the private-label agreement. (Tab 155, NovaPlus Ipratropium Bromide Agreement Launch Package at RLI-AWP 00122465-70; Tab 162, BOEH01522558, "The Multi-Source Gold Sheet, March 22, 2004" (March Gold Sheet); Tab 163, BOEH02953413, "The Multi-Source Gold Sheet, April 8, 2004" (April Gold Sheet); Tab 164, BOEH02953409, "The Multi-Source Gold Sheet, May 3, 2004" (May Gold Sheet).)

150. Roxane and Novation's Agreement was initially set to expire in January 2004. (Tab 155, NovaPlus Ipratropium Bromide Agreement Launch Package, RLI-AWP 00122465-70.) But due to lack of demand, the decision to discontinue NovaPlus ipratropium bromide was made in June 2003 and official notice was sent to Novation in July 2003. (Tab 165, BOEH04310697, 7-11-03 Ltr. from L. Paoletti to R. Day). The NovaPlus-label ipratropium bromide product was discontinued between March-May 2004. (Tab 162, March Gold Sheet at BOEH01522558; Tab 163, April Gold Sheet at BOEH02953413; Tab 164, May Gold Sheet at BOEH02953409.)

**B.    The Medicare Regulatory Framework For Hospital Reimbursements Under The Medicare Parts A and B.**

151. Drugs dispensed to Medicare beneficiaries during inpatient hospital stays are not paid for separately but are reimbursed along with procedures as part of a bundled package through diagnosis-related groups under Medicare Part A. *See* 42 U.S.C. § 1395ww(a)(4).

152. Beginning on July 1, 2000, drugs dispensed to Medicare beneficiaries during outpatient hospital visits to Hospital Outpatient Departments (OPDs), including hospital pharmacies, are reimbursed under Medicare Part B's Outpatient Prospective Payment System

164.   During the relevant period, the four DMERCs updated their pricing arrays at different times, and also selected prices from different Red Book sources that were not always consistent. (Tab 22, 8-26-08 Eiler Dep. 125-26, 135-36; Tab 30, Helton Dep. 108, 224-26, 237; Tab 50, 2-29-08 Stone Dep. 284-86.)   For example, sometimes one DMERC would receive a monthly update earlier than the other DMERCs, so they would use the update while the other DMERCs would use an outdated version.   (Tab 22, 8-26-08 Eiler Dep. 135-36; Tab 30, Helton Dep. 158-59.)

165.   The inconsistent use of different versions of Red Book sometimes resulted in drugs being omitted from a DMERC's array in one quarter and then reappearing in a later quarter. (Tab 23, 8-27-08 Eiler Dep. 280-86, 295-96.)

166.   The DMERCs varied widely in the sources of Red Book that they relied upon, with some DMERCs using the annual update, others consulting the monthly updates or quarterly electronic CDs, and others using both at times.   (Tab 22, 8-26-08 Eiler Dep. 47-48, 125-26, 133-34; Tab 24, 9-23-08 Eiler Dep. 481-82; Tab 30, Helton Dep. 44-45, 224-26; Tab 49, 2-29-08 Stone Dep. 113; Tab 50, 2-29-08 Stone Dep. 284-85; Tab 183, Decl. of C. King ¶¶ 7, 9; Tab 168, Roxane Ex. 42 at AWQ025-0876–AWQ025-0887 (12-1-99 Ltr. from R. Stone to C. Carpenter).)

167.   Each DMERC separately decided how to construct the arrays by reviewing the descriptions in the compendia, and by also consulting other external resources such as reference guides and medical directors that each DMERC had on staff and by exercising their judgment. (Tab 22, 8-26-08 Eiler Dep. 27, 48-49, 58-59, 119-20, 149, Tab 24, 9-23-08 Eiler Dep. 487-88; Tab 30, Helton Dep. 89, 160-61; Tab 49, 2-28-08 Stone Dep. 77-78, 86, Tab 50, 2-29-08 Stone

Dep. 275-76; Tab 53, 8-27-08 Eiler Dep. Roxane Ex. 41 at AWQ025-0722–AWQ025-0725 (Drug Pricing Procedure).)

168.     At times the narrative description of a drug in Red Book was not clear enough for the DMERCs to determine whether to include the drug in their pricing arrays, which meant that sometimes the DMERCs had to use their own judgment in making that determination.  (Tab 24, 9-23-08 Eiler Dep. 487.)

169.     As such, DMERCs did not consistently include all forms of a drug in their arrays. (Tab 22, 8-26-08 Eiler Dep. 48, 147-148, Tab 24, 9-23-08 Eiler Dep. 487-88; Tab 30, Helton Dep. 150-51; Tab 50, 2-29-08 Stone Dep. 298-299)

170.     The AdminaStar Federal DMERC acknowledged this divergence, stating that other DMERCs "did things a little different than we did."  (Tab 22, 8-26-08 Eiler Dep. 128.)

171.     The DMERCs noted in correspondence with HCFA that they had issues "determining the correct forms of the drugs to pickup from REDBOOK," and asked HCFA to make program memoranda "more specific in what items should be excluded and/or included in the calculation" in order to "help eliminate the wide interpretations by different carriers." (Tab 172, Roxane Ex. 51 at AWQ029-00327 (Uniform Drug Pricing Project); *see also* Tab 30, Helton Dep. 160-61.)

172.     Although the DMERCs at times contacted manufacturers to verify prices for durable medical equipment, they never contacted the manufacturers to verify the pricing for drugs listed in Red Book.  (Tab 22, 8-26-08 Eiler Dep. 73.)

173.     Because of the historic variance in payment rates across DMERCs for the same drugs, beginning in approximately 1997, continuing with the "Uniform Drug Pricing Project" in 1999, and again in 2001, the DMERCs consulted and shared information with each other to

Report at 11.)  He then placed the derived AWPs into electronic pricing arrays prepared based on the original DMERC arrays.  (Tab 166, Duggan Ex. 001, 02-06-09 Duggan Report 98-99.)

227.   In calculating what the federal government would have reimbursed under Medicare for ipratropium bromide, Duggan used the DMERCs' arrays without studying or attempting to check the DMERCs' prices against the compendia, correcting for inconsistencies, or scrutinizing the DMERCs' process for creating the pricing arrays.  (Tab 18, 3-5-09 Duggan Dep. 132-34, 146-49, 152, 166.)

228.   Dr. Duggan presented four independent damages models.   (Tab 18, 3-5-09 Duggan Dep. 61-64.)  One model calculated damages based on replacing prices for only the Roxane label ipratropium bromide and excluding the NovaPlus label ipratropium bromide products. (referred hereinafter as the "No-NovaPlus model")   (Tab 18, 3-5-09 Duggan Dep. 61-64; Tab 166, Duggan Ex. 001, 02-06-09 Duggan Report 3B.).   A second model replaced prices for both the Roxane label and NovaPlus label ipratropium bromide NDCs.  (hereinafter the "NovaPlus model")   (Tab 166, Duggan Ex. 001, 02-06-09 Duggan Report 3A; Tab 18, 3-5-09 Duggan Dep. 61-64.)  The last two models calculated damages based on changing prices for Dey ipratropium bromide products in addition to the Roxane drugs. (Tab 18, 3-5-09 Duggan Dep. 61-64.)[1]

229.   In the No-NovaPlus model, Dr. Duggan replaced Roxane's AWPs in the arrays with a "revised AWP" to determine whether Medicare spending would be affected.  (Tab 18, 3-5-09 Duggan Dep. 140-41; Tab 166, Duggan Ex. 001, 02-06-09 Duggan Report 98-99.)  Dr.

---

[1]   The two damages models that improperly incorporate Dey's independent published AWPs in calculating Roxane's damages are not the subject of this motion, except to the extent that one model incorporates the DMERCs' misclassification of NovaPlus as a brand.

Duggan calculated damages whenever replacing Roxane's prices affected the median of the generic array.  (Tab 18, 3-5-09 Duggan Dep. 140-41.)

230.    Dr. Duggan evaluated the electronic pricing array and lined up the prices. (Tab 18, 3-5-09 Duggan Dep. 131-32.)  If there was an odd number of prices, he determined the median by disregarding the highest and lowest prices and taking the middle price.  (Tab 18, 3-5-09 Duggan Dep. 131-32.)  If there was an even number of prices, Dr. Duggan disregarded the highest and lowest prices and averaged the middle two prices.  (Tab 18, 3-5-09 Duggan Dep. 131-32.)

231.    Under the No-NovaPlus model, substituting Roxane's revised AWPs has no effect on the median later on in the relevant period for most of the DMERCs.    (Tab 20, 5-18-09 Duggan, Dep. 184.)

232.    For example, in the No-NovaPlus model, Dr. Duggan explained that the Palmetto DMERC's allowed amount was unaffected after the third quarter of 2001 when replacing Roxane's published AWPs with his derived AWPs.  (Tab 166, Duggan Ex. 001, 02-06-09 Duggan Report 104; Tab 188, D. Williams Aff. at ¶ 11.)

233.    Similarly, under Dr. Duggan's analysis, replacing Roxane's AWP with a revised AWP did not affect the median of the DMERC-A arrays after the third quarter of 2001. (Tab 188, D. Williams Aff. at ¶ 11.)

234.    Under Dr. Duggan's analysis, replacing Roxane's AWP with a revised AWP also did not affect the median of the Cigna arrays after the third quarter of 2001  (*Id*.)

235.    And under Dr. Duggan's analysis, replacing Roxane's AWP with a revised AWP did not affect the median of the AdminaStar arrays after the second quarter of 2000.  (*Id*. at 10.)

Azathioprine, Diclofenac Sodium, Furosemide, Hydromorphone, ipratropium bromide, Oramorph SR, Roxanol, Roxicodone, and Sodium Polystyrene Sulfonate.  (Tab 166, Duggan Ex. 001, 02-06-09 Duggan Report 9; Tab 137, FAC Ex. A.)

> **B.     Description Of Datasets Utilized By The Government.**

260.    When calculating Medicaid damages, Dr. Duggan utilizes five different datasets relating to the Medicaid Subject Drugs.  (Tab 166, Duggan Ex. 001, 02-06-09 Duggan Report 25-30, Tables 29 and 31A-B)

261.    The first dataset utilized by Dr. Duggan comprises State Medicaid claims data that was produced by the following sixteen State Medicaid programs to the United States (hereinafter, the "State Medicaid Claims Data"): California, Florida, Georgia, Illinois, Kentucky, Louisiana, Massachusetts, Michigan, Missouri, New Jersey, New York, North Carolina, Pennsylvania, Texas, Virginia and Wisconsin.  Collectively, these sixteen States are referred to as the "Sixteen State Sample."   (Tab 166, Duggan Ex. 001, 02-06-09 Duggan Report, Table 29)

262.    Dr. Duggan has access to Medicaid claims data for an additional fifteen States that was produced to the United States ("Additional State Medicaid Claims Data"): Alaska, Arkansas, Connecticut, Delaware, Hawaii, Idaho, Iowa, Kansas, Minnesota, Nebraska, New Mexico, Rhode Island, South Carolina, Utah and Wyoming.  Dr. Duggan did not use, however, the Additional State Medicaid Claims Data in connection with his calculation of alleged Medicaid damages.  (Tab 188, D. Williams Aff. ¶ 2.)  The Government failed to obtain and produce State Medicaid Claims Data from the other eighteen State Medicaid programs at issue in this lawsuit.

263.    State Medicaid Claims Data and Additional State Medicaid Claims Data vary slightly by States but they typically include the following information for each claim paid by a State Medicaid program:  date of service; actual paid amount; NDC; actual billed amount;

professional or dispensing fee; copayment amount; third party payment; ingredient cost; provider ID; a field indicating if a State maximum allowable cost ("MAC") or federal upper limit ("FUL") was used to determine the reimbursement amount for the claim, as well as the unit price for that MAC or FUL for each claim; and, data concerning the basis of payment for a particular claim (*e.g.*, whether a claim was paid on an AWP or WAC).  (Tab 188, D. Williams Aff. ¶ 3.)

264.    The second dataset utilized by Dr. Duggan consists of State Medicaid Research Files ("SMRF" data) that was produced by CMS for the time period 1991 through 1998.  (Tab 166, Duggan Ex. 001, 02-06-09 Duggan Report 28-30, Tables 29 and 31A-B)

265.    The third dataset utilized by Dr. Duggan consists of Medicaid Analytic eXtract General Information ("MAX" data) that was produced by CMS for the time period 1999 through 2004 (collectively, "SMRF-MAX" datasets).  (Tab 166, Duggan Ex. 001, 02-06-09 Duggan Report 28-30, Tables 29 and 31A-B)

266.    The fourth dataset utilized by Dr. Duggan consists of Medicaid Statistical Information Statistics ("MSIS" data) that was produced by CMS for the time period 1999 through 2005.  (Tab 166, Duggan Ex. 001, 02-06-09 Duggan Report 28, n.13)

267.    Although the SMRF-MAX and MSIS datasets vary, they each typically include the following information for each claim paid by a State Medicaid program: date of service; paid amount rounded to the nearest dollar; NDC; quantity; billed amount rounded to the nearest dollar; third party payment; and, provider ID.   (Tab 188, D. Williams Aff. ¶ 5.)   The SMRF-MAX and MSIS datasets, unlike the State Medicaid Claims Data and Additional State Medicaid Claims Data, do ***not*** provide the following information for each claim: the specific amount actually paid on the claim; the specific amount actually billed by the provider; dispensing fee; copayment amount; and, a field indicating whether a claim was paid on a MAC

or FUL.  (*Id.*)  Thus, these datasets do not contain the data required to calculate the basis of payment for a claim. (*Id.*)

268.    The fifth dataset utilized by Dr. Duggan consists of State Drug Utilization Data ("SDUD") that was produced by CMS for the time period 1991 through 2008.  (Tab 166, Duggan Report at 25-28, Tables 29 and 31A-B)  SDUD provides only aggregated, or summary, claim information on a State-specific, NDC-quarter level.  (*Id.*)  SDUD typically includes the following information for each State:  NDC-quarter; quantity; total number of units reimbursed by the State Medicaid program; total number of prescriptions for the NDC; and the total dollar amount paid by the State Medicaid Program for that NDC during the given quarter.  (Tab 188, D. Williams Aff. ¶ 6.)  SDUD does ***not*** include the following information: the specific amount actually paid on the claim; the specific amount actually billed by the provider; dispensing fee; copayment amount; a field indicating whether claims were paid on a MAC or FUL.  (*Id.*)  Therefore, SDUD does not contain the data required to calculate the basis of payment for a claim. (*Id.*)  Collectively, the SDUD, SMRF-MAX and MSIS datasets are referred to as the "CMS Datasets."

### C.    Dr. Duggan Did Not Determine Whether State Medicaid Programs Complied With Their CMS-Approved Regulatory Formulae When Paying Medicaid Claims.

269.    Dr. Duggan did not determine whether CMS approved the Medicaid reimbursement formulas utilized by the State Medicaid Programs in the payment of claims. Duggan testified that "I did not examine whether the adjudication methods were approved by CMS." (*Id.*)

270.    State Medicaid programs do not always adhere to their CMS-approved regulatory formulae when paying Medicaid claims.  For example, in Florida, an erroneous computer programming change caused the State Medicaid program to unintentionally remove its

136-37)  From 1998 onwards, Roxane did not supply WAC prices to the drug pricing compendia for its generic drugs, including azathioprine, diclofenac sodium, furosemide, hydromorphone, ipratropium bromide, and sodium polystyrene sulfonate.  (Tab 65, 5-11-07 Waterer Dep. 666-69)  Removing claims for these NDCs after 1998Q1 reduces alleged damages from $258,983 to $53,147.  (Tab 188, D. Williams Aff. ¶ 18.)

278.    Generic drugs often are subject to FULs, as well as the State maximum allowable cost ("State MAC") prices developed by State Medicaid programs.  (*See, e.g.*, Tab 139, Ex. 139, DOJ Supp. Response to Interrogatory No. 7 at 9; Tab 204, *Generic Drug Cost Containment in Medicaid: Lessons from Five State Maximum Allowable Cost (MAC) Programs*, at 4 ("According to the National Pharmaceutical Council, 30 States had MAC lists in 2001; since then, a number of States have created new MAC lists")); Tab 205, *Medicaid Prescription Reimbursement Information by State – Quarter Ending March 2009* (45 State Medicaid programs have established MAC programs))  Except for New York, Dr. Duggan did not determine whether FUL prices applied to the Medicaid claims at issue.  (Tab 19, 3-6-09 Duggan Dep. 289, 290-91)

279.    Many State Medicaid programs do not base their MAC prices on published prices. (*See, e.g.*, *California, ex rel. Ven-A-Care of the Florida Keys, Inc., v. Abbott Laboratories, Inc*., 478 F.Supp.2d 164, 180 (D. Mass 2007) (finding California MAIC program was not based on published benchmarks such as AWP or WAC); (Tab 68, 3-14-08 Wiberg Dep. 64-66) (Minnesota's MACs are based on actual acquisition costs provided by a group of pharmacies); (Tab 17, 12-15-08 Dubberly Dep. 67-68, 207; 306-307) (MACs determined by pharmacy benefit managers); (Tab 29, 11-24-08 Hautea-Wimpee Dep. 105-10)  (Tab 206, AWP-IL-00025984) ("Generally, pharmacists in attendance seemed to understand the methodology used to establish

State MAC rates [in Illinois], which is based upon actual acquisition costs obtained from providers.") (Tab 207, AWP-IL-00001108) (Tab 2, 12-10-08 Bridges Dep. 65, 244-251) (Tab 3, 12-11-08 Bridges Dep. 474-480) (Tab 47, 3-28-08 Sharp Dep. 62-66, 140, 250-51) (Tab 61, 3-26-08, J. Walsh Dep. 98) (Tab 25, 12-9-08 Fine Dep. 151-52, 201-204) (Tab 35, 3-25-08 Kenyon Dep. 37-40) (Tab 6, 12-2-08 Cheloha Dep. 128-132; 164-65) (Tab 13, 10-30-07 Collins Dep. 72-77) (Tab 208, DHCF Current Policy, Brand Medically Necessary and Medicaid Maximum Allowable Cost at 2) (Tab 209, Texas Health and Human Services Commission, Vendor Drug Program, Pharmacy Provider Handbook, March 1, 2006) (Tab 210, OIG Oct. 2003, "State Strategies to Contain Medicaid Drug Costs," at 13 (OEI-05-02-00680).  Dr. Duggan did not determine whether MAC prices applied to any of the Medicaid claims at issue.  (Tab 19, 3-6-09 Duggan Dep. 289, 290-91)

### E. The Calculation Of Alleged Damages Based On Actual State Medicaid Claims Data Within The Sixteen State Sample.

280.    Dr. Duggan calculates alleged Medicaid damages for his Sixteen State Sample where State Medicaid Claims Data is available to him.  (Tab 166, Duggan Ex. 001, 02-06-09 Duggan Report 30-93, Table 29)   Dr. Duggan does not attempt to calculate damages on a claim-by-claim, State-by-State, basis.  (Tab 166, Duggan Ex. 001, 02-06-09 Duggan Report 93-96)

281.    Dr. Duggan's calculation purportedly reflects the difference between the amounts actually paid by State Medicaid programs for the Medicaid Subject Drugs and the amounts that Dr. Duggan purports should have been paid, if the State Medicaid programs used his "Revised AWPs" or "Revised WACs" as a basis of payment.  (Tab 166, Duggan Ex. 001, 02-06-09 Duggan Report 30-93)

claims he analyzed in that State) because the amount paid on these claims exceeded the amount billed by the provider.  (Tab 166, Duggan Ex. 001, 02-06-09 Duggan Report 65)   Under Georgia's governing Medicaid regulations which utilized a "lower of" reimbursement methodology, the Medicaid payment on a drug claim should never have been greater than the provider's billed charge.  (*See, e.g.*, Tabs 211-216, J. Dubberly 12-15-08 Dep. Exs. 7-12; Tab 217, HHC008-0012)  Dr. Duggan also eliminates thousands of claims from his Medicaid difference calculations when the dispensing fee was inconsistent with the State Medicaid reimbursement policy.  (*See, e.g.*, Tab 166, Duggan Ex. 001. 02-06-09 Duggan Report 80)  For example, when analyzing the State Medicaid Claims Data for Michigan, Dr. Duggan drops 22,314 claims "with an unsupported dispensing fee."  (*Id.*)

285.   After dropping the various invalid claims described above, for the remaining claims Dr. Duggan calculates what the State Medicaid program purportedly would have paid on a particular claim if his "Revised AWPs" or "Revised WACs" had been utilized.  (Tab 166, Duggan Ex. 001, 02-06-09 Duggan Report 9-11)

286.   To determine what a State Medicaid program purportedly would have paid on a Medicaid claim, Dr. Duggan first adds a twenty-five percent markup to his "Revised WAC," if the State utilizes "AWP" in its definition of Estimated Acquisition Cost ("EAC").  (Tab 166, Duggan Ex. 001, 02-06-09 Duggan Report 10)  If the State utilizes WAC, however, Dr. Duggan does not add a twenty-five percent markup to his "Revised WAC."  (Tab 166, Duggan Ex. 001, 02-06-09 Duggan Report 41-42)  Next, Dr. Duggan inputs the "Revised AWP" (or "Revised WAC") into the State's EAC formula.  (*See e.g.*, Tab 166, Duggan Ex. 001, 02-06-09 Duggan Report 31-32)  Dr. Duggan inserts his "Revised AWP" (or WAC) into the State reimbursement

formula to arrive at an adjusted payment amount, which he uses as the basis for his alleged damages calculation.  (*Id.*)

F.      **Intrastate Extrapolations To CMS Datasets Within The Sixteen State Sample To Estimate Alleged Damages.**

287.     Within the Sixteen State Sample, there are a number of quarters where State Medicaid Claims Data is lacking or incomplete.  (Tab 166, Duggan Ex. 001, 02-06-09 Duggan Report Table 29)  In fact, Dr. Duggan does not possess complete State Medicaid Claims Data for any of the States within the Sixteen State Sample.  (*Id.*)

288.     Because Dr. Duggan does not possess complete State Medicaid Claims Data for any State within his Sixteen State Sample, he cannot calculate "damages" on a claim-by-claim basis for every quarter for each of the Medicaid Subject Drugs.  Instead, Dr. Duggan performs an intrastate extrapolation (utilizing one of the other CMS Datasets) to estimate alleged damages for those quarters where State Medicaid Claims Data is lacking.  (*See e.g.,* Tab 166, Duggan Ex. 001, 02-06-09 Duggan Report 30-93, Table 29)

289.     In particular, Dr. Duggan lacks State Medicaid Claims Data for the following quarters: California (2007Q4 through 2008Q1); Florida (2006Q1-2008Q1); New York (2007Q3-2008Q1); Pennsylvania (1996Q3-1998Q2 and 2007Q2-2008Q1); Missouri (1996Q3-1997Q4); Illinois (2007Q1-2008Q1); Massachusetts (2008Q1); Texas (2006Q1-2008Q1); Georgia (1996Q3-2000Q3 and 2007Q1-2007Q4); North Carolina (1999Q1-2000Q4) and (1996Q3-1998Q4), (2007Q2-2008Q4); New Jersey (2007Q1-2008Q1); Michigan (1996Q3-2000Q3 and 2007Q3-2008Q1); Louisiana (2002Q1-2002Q2 and 2007Q4-2008Q1); Kentucky (2005Q2-2008Q1); Wisconsin (2006Q1-2008Q1) and Virginia (2007Q1-2008Q1).  (Tab 166, Duggan Ex. 001, 02-06-09 Duggan Report Table 29)  Dr. Duggan applies an intrastate extrapolation for each NDC and in each quarter during the relevant period

for which he lacks State Medicaid Claims Data.  (Tab 166, Duggan Ex. 001, 02-06-09 Duggan Report Table 29)

290.    Dr. Duggan applies an intrastate extrapolation to one of the four different CMS Datasets.  (*Id.*)  This intrastate extrapolation is based only on State Medicaid Claims Data from the actual State in which such data is missing.  For example, Dr. Duggan does not perform an intrastate extrapolation to a quarter where he lacks State Medicaid Claims Data in Virginia using data related to the payment of Kentucky Medicaid claims.

> **G.    Interstate Extrapolations To CMS Datasets For The Remaining Thirty-Three State Medicaid Programs To Estimate Alleged Damages.**

291.    Dr. Duggan uses an interstate extrapolation to estimate "damages" for the remaining thirty-three State Medicaid programs in which he does not utilize State Medicaid Claims Data.  (Tab 166, Duggan Ex. 001, 02-06-09 Duggan Report 93-96)  In particular, Dr. Duggan applies an interstate extrapolation for each NDC and in each quarter during the relevant period for the thirty-three State Medicaid programs that are not included in the Sixteen State Sample.  (Tab 166, Duggan Ex. 001, 02-06-09 Duggan Report 93-96, Tables 31A-B)  Thus, none of the damages Dr. Duggan estimates for these thirty-three State Medicaid programs is based on a claim-by-claim determination.  (Tab 166, Duggan Ex. 001, 02-06-09 Duggan Report 93-96; *see also* Tab 218, *Questions by Chairman Tom Coburn for Daniel R. Levinson, Inspector General,* U.S. Department of Health and Human Services (April 28, 2006), available at

http://coburn.senate.gov/oversight/index.cfm`FuseAction=Hearings.Home&ContentRecord_id=4

7a389df-7e9c-9af9-765c-d9f650ad0d43&Issue_id=

292.    Similar to intrastate extrapolation, Dr. Duggan applies an interstate extrapolation to one of the four different CMS Datasets.  (Tab 166, Duggan Ex. 001, 02-06-09 Duggan Report 93-69)  As part of his interstate extrapolation, Dr. Duggan identifies for each NDC and quarter,

the number of States within the Sixteen State Sample in which he possesses State Medicaid Claims. (Tab 166, Duggan Ex. 001, 02-06-09 Duggan Report 94). In some NDC-quarters Dr. Duggan has State Medicaid Claims Data for far fewer than all of the States comprising the Sixteen State Sample. (Tab 188, D. Williams Aff. ¶ 17.) For example in 2007Q4 for NDC 0054-4297-31, only two States within the Sixteen State Sample have State Medicaid Claims Data. (*Id.*) For this NDC and in this quarter, Dr. Duggan utilizes State Medicaid Claims Data from just two States to extrapolate to thirty-three other State Medicaid programs. (*Id.*)

293.   Unlike intrastate extrapolation, however, Dr. Duggan's interstate extrapolation is based on State Medicaid Claims Data from different State Medicaid programs. In other words, by way of example, for NDC 0054-4297-31 in the third quarter of 2007, Dr. Duggan performs an interstate extrapolation to estimate damages in Rhode Island by relying on data related to the payment of claims in the California, Louisiana, Massachusetts and Missouri State Medicaid programs.

**H.     The Total Amount Of Alleged Medicaid Damages Based On Interstate And Intrastate Extrapolations To CMS Datasets.**

294.   Dr. Duggan calculates over $3.5 million in alleged Medicaid damages based on the intrastate extrapolations he performs within his Sixteen State Sample. (Tab 219, Duggan Ex 007, Duggan Rebuttal Report, Table 29 Revised)

295.   Dr. Duggan calculates an additional $20.3 million in alleged Medicaid damages based on the interstate extrapolation he performs for the other 33 State Medicaid programs that are not included in the Sixteen State Sample. (*Id.*)

296.   Overall, Dr. Duggan calculates over $23.8 million in alleged Medicaid damages based upon intrastate and interstate extrapolations to CMS Datasets. (*Id.*)

93