# Exhibit E
# Excerpts from Abbott Daubert
# Hearing Transcript

Exhibit to the March 12, 2010 Motion *In Limine* to Exclude Certain Expert Opinions Proffered by Plaintiffs' Expert Dr. Mark G. Duggan

Page 1

```
           IN THE UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF MASSACHUSETTS

IN RE:                         )
                               ) CA No. 01-12257-PBS
PHARMACEUTICAL INDUSTRY AVERAGE) CA No. 06-11337-PBS
WHOLESALE PRICE LITIGATION     ) Pages 1 - 98
                               )


              DAUBERT HEARING - DAY ONE

          BEFORE THE HONORABLE PATTI B. SARIS
              UNITED STATES DISTRICT JUDGE




               United States District Court
               1 Courthouse Way, Courtroom 19
                   Boston, Massachusetts
                 December 10, 2009, 2:10 p.m.




                   LEE A. MARZILLI
                 OFFICIAL COURT REPORTER
                United States District Court
                1 Courthouse Way, Room 7200
                     Boston, MA 02210
                      (617)345-6787
```

Page 2

```
 1   A P P E A R A N C E S:
 2
        GEORGE B. HENDERSON, ESQ. and JAMES J. FAUCI, ESQ.,
 3   Assistant United States Attorneys, Office of the United States
     Attorney, United States District Court, Suite 9200,
 4   1 Courthouse Way, Boston, Massachusetts, 02210.
 5      MARK A. LAVINE, ESQ. and ANN ST. PETER-GRIFFITH, ESQ.,
     Assistant United States Attorneys, Office of the United States
 6   Attorney, 99 NE 4th Street, Suite 300, Miami, Florida, 33132.
 7      RENEE BROOKER, ESQ., United States Department of Justice,
     P.O. Box 14271, Washington, D.C., 20044.
 8
        JAMES J. BREEN, ESQ., The Breen Law Firm,
 9   3562 Old Milton Parkway, Alpharetta, Georgia, 30005.
10
     FOR THE DEFENDANTS:
11
        DAVID S. TORBORG, ESQ., Jones Day,
12   51 Louisiana Avenue, N.W., Washington, D.C., 20081-2113.
13      JAMES R. DALY, ESQ. and JASON G. WINCHESTER, ESQ.,
     Jones Day, 77 West Wacker, Chicago, Illinois, 60601-1692,
14   for Abbott Laboratories.
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1                       I N D E X
 2
     WITNESS              DIRECT   CROSS   REDIRECT   RECROSS
 3
 4   MARK G. DUGGAN
 5     By Mr. Lavine:       25
 6
     EXHIBITS               PAGE
 7
 8   1-For ID                66
 9
10
...
25
```

Page 4

```
 1                      P R O C E E D I N G S
 2      THE CLERK:  In Re:  Pharmaceutical Industry Average
 3   Wholesale Price Litigation, Civil Action 01-12257 and 06-11337,
 4   will now be heard before this Court.  Will counsel please
 5   identify themselves for the record.
 6      MR. HENDERSON:  George Henderson for the United
 7   States.
 8      MR. LAVINE:  Mark Lavine with the U.S. Attorney's
 9   office for the Southern District of Florida for the United
10   States.
11      MR. BREEN:  Jim Breen for the realtor Ven-A-Care of
12   the Florida Keys.
13      MS. ST. PETER-GRIFFITH:  Ann St. Peter-Griffith,
14   United States Attorney's Office, Southern District of Florida,
15   on behalf of the United States.
16      MR. FAUCI:  Jeff Fauci, U.S. Attorney's office in
17   Massachusetts.
18      MS. BROOKER:  Renee Brooker, U.S. Department of
19   Justice, Civil Division, Commercial Litigation Branch in
20   Washington.
21      THE COURT:  That's a mouthful.
22      MR. DALY:  Good afternoon, your Honor.  James R. Daly
23   on behalf of Abbott Laboratories.
24      MR. TORBORG:  David Torborg on behalf of Abbott
25   Laboratories.
```

Page 33

1    So if I thought, well, you know, those 38, it's just
2    going to be true that they have much more aggressive MAC
3    programs in effect, I would have expected the opposite in a big
4    way.  But, you know, it's basically half the time:  24 more
5    often than not, 24 out of 44 cases, and 23 out of 44 when we
6    drop Ohio; the average amount paid is higher in the 38 than in
7    the 10, suggesting it's not true.  And you can -- I'm sure
8    there are examples, so --
9        THE COURT:  But on the other part, is the drop
10   dramatic?  In other words, you seem to think it all works out
11   in the wash.
12       THE WITNESS:  Washes out.
13       THE COURT:  Some term like that.  But if one's only
14   slightly higher -- if the majority is more likely the slightly
15   higher and then the remaining are dramatically lower, what do I
16   do with that?
17       THE WITNESS:  I don't have those numbers right here in
18   front of me, but what I can tell you is that those products,
19   those 24 out of 44, account for 75 percent of the spending.  So
20   the ones where the 38 appear to be -- you know, I don't want to
21   make a huge amount -- it's just they're on average quite
22   comparable.  If anything, it looks like, for more products and
23   for more Medicaid spending, the average amount paid per claim
24   is higher in the remaining 38.  And I hope that I'll get a
25   chance today to talk about some analyses that I've done in

Page 34

1    recent months going out of samples.  So let's go to some of
2    those 38 and see how they're --
3        THE COURT:  So but the big difference between the
4    state and CMS data is, you don't get the MACs spelled out and
5    you don't get the differences in dispensing fees fleshed out.
6    Is there anything else that's materially different between the
7    two data seats for our purposes?
8        THE WITNESS:  No.  Those are the key ones.
9        THE COURT:  Those are the two key ones?  And so if you
10   have just the CMS claims data and you don't have the state
11   data, that would be the question mark.  If you have the state
12   data, you could go back and double-check and find out?
13       THE WITNESS:  That's true, yes.
14       THE COURT:  So since we have the state data in 30, if
15   we had to, and I know it wouldn't be a joyful task, but if we
16   had to, you could at least analyze 20 more states along the
17   same lines that you've done for the ten?
18       THE WITNESS:  And fortunately, I don't know that 20
19   more is -- I think we're in the 20s as opposed to at 30, but
20   fortunately, for the 9 states within the 38 for which we had
21   the most data, I've since done some analysis.
22       THE COURT:  I see, so beyond the initial 10?
23       THE WITNESS:  That's right.
24       THE COURT:  I see.
25       THE WITNESS:  And so we can assess that.

Page 35

1        THE COURT:  All right.  I've stopped hijacking your
2    witness.  All right, go ahead.
3        MR. LAVINE:  Thank you, although I can tell that he
4    wants to continue with that exact point.
5    Q.  Describe a little more about the 9 that you were
6    discussing.
7        MR. DALY:  Your Honor, I'd like to interpose an
8    objection.  The situation is this:  Dr. Duggan has -- well, we
9    just got some new analysis that he did last Monday after
10   Thanksgiving.  He's already filed four expert reports.  He
11   filed an original, he filed a supplement, he filed a rebuttal.
12   He filed an affidavit in support of summary judgment.  This
13   hearing has been set for a couple months, and, you know, a week
14   before we're coming in here, we get some new apparently very
15   extensive examination that we've had some opportunity to look
16   at, but by no means the opportunity to dig in and find out what
17   it is that he did.
18       THE COURT:  Well, that objection is overruled.  If you
19   need a little extra time to have your expert look at it and
20   respond to it, of course I will allow that.
21       MR. DALY:  Thank you, Judge.
22   Q.  Sorry, go ahead, describe the analysis with respect to the
23   9 and the outcome of that.
24   A.  So basically I sort of -- the initial report, and there
25   was a subsequent revision to it, just that revised the numbers

Page 36

1    a little bit, sort of I really tried in that initial report to
2    make it very clear where the big number, the 65 or, you know,
3    whatever the large number was, where they were coming from by
4    giving state-by-state summaries and in some cases multiple
5    summaries for each state.  And so it is straightforward to look
6    at the initial report and the subsequent revision, the table, a
7    couple of the tables, to see, what did my extrapolation
8    methodology predict for the state of, for example,
9    Pennsylvania?  What did it predict for the state of Virginia or
10   Texas and so forth?  Because these are states for which I had
11   state-produced claims data but did not -- they weren't included
12   in the original 10.  They were not in the original 10, but
13   these new 9, how does the extrapolation methodology fare?
14      So, for example, in the state of Pennsylvania, my
15   extrapolation methodology said 1.2 million, just rounding to
16   the nearest --
17       THE COURT:  The difference?
18       THE WITNESS:  Yes, the federal difference.  My
19   extrapolation methodology said 1.2 million.  And here I'm going
20   to round just to the nearest 100,000 so --
21       THE COURT:  Sure.
22       THE WITNESS:  And the amount doing a claim-by-claim
23   analysis -- that's apples to apples with the ones that I did
24   for the other 10 states -- 1.1.  So it was a little higher for
25   that one of the 38.

Page 37

1       For Virginia, 0.9 and 0.9.
2       For Texas -- and Texas actually is interesting because
3  that was one of the states that Abbott counsel criticized me a
4  lot for not including them in the original sample -- my
5  methodology yielded 0.9 million, and the claim-by-claim
6  analysis yielded 0.9 million, in fact slightly higher with the
7  claim-by-claim analysis.
8       MR. LAVINE: I'm sorry, Judge, I should have pointed
9  out these numbers are in the last page of Tab E.
10      THE WITNESS: They're in Tab E.
11      THE COURT: All right, give it --
12      MR. DALY: Thank you.
13      THE COURT: This is very useful, but you don't have
14 it, right?
15      MR. DALY: Right.
16      THE COURT: Is this what he got last Monday?
17      MR. LAVINE: Yes. The only materials contained in
18 here are copies of the materials already produced.
19      THE COURT: Do you have an extra one for my law clerk,
20 since you seem to have volumes back there?
21      MR. LAVINE: Sure.
22      THE WITNESS: So should I resume?
23      THE COURT: Yes.
24      THE WITNESS: So here you can see a detailed, the side
25 by side of each of the 9 states. And aggregating across the

Page 38

1  9 states, my methodology predicted a federal difference of
2  6.4 million, and the claim-by-claim analysis yielded a
3  difference of 6.0 million, off by 6 percent, approximately
4  6 percent.
5       I will concede that it was a little higher, that my
6  methodology was a little higher than, like, then the amount
7  that is sort of apples to apples with the amounts from those
8  original 10 states, and so I was curious about that, why is
9  that true? So I drilled down a little bit on those
10 9 states, and what I found was that in these 9 states, a little
11 more often -- so if you look between the 38 states and the
12 10 states, the frequency with which the two groups pay usual
13 and customary is almost identical. It's like 24 percent for
14 the first 10, 25 percent or 24 point something percent for the
15 other 38.
16      Why does the usual and customary share matter? Well,
17 the differences tend to be lower on claims where usual and
18 customary is paid, and I think it's best for me to give an
19 example. Suppose a formula suggests 60, but a provider charges
20 40, and my methodology says 15, okay, that if you use the
21 Abbott prices and you plug them into the Medicaid methodology,
22 you get 15, if the usual and customary were higher, then the
23 difference would be 60 minus 15, 45. But if the usual and
24 customary is getting paid, the difference is going to be
25 smaller, 25, a little bit smaller.

Page 39

1       And so it turns out that these 9 states pay usual and
2  customary somewhat more than the remaining 29. So part of the
3  reason that I'm off here at all -- I mean, I don't expect it to
4  be exact to the dollar, but part of the reason that I'm off a
5  little appears to be this, this difference between those 9 and
6  the overall 38. But I guess it's useful to know that those
7  remaining 29 look more like the original 10 than these 9, but
8  in any case, it's very much --
9       THE COURT: How do you know that?
10      THE WITNESS: In terms of this dimension of this usual
11 and customary.
12      THE WITNESS: How do you know the remaining -- in
13 other words, why wouldn't it make sense just to shift down your
14 extrapolation 6 percent in all the other --
15      THE WITNESS: Six percent across the board. So I
16 guess there would be a couple ways one could do this. One
17 could say, I'm going to shift down the extrapolation by
18 6 percent, or, alternatively, that instead of using 10, I'm
19 going to use 19 in predicting. So that would end up shifting
20 down the remaining by about 3 percent, if you do sort of a
21 back-of-the-envelope calculation.
22      But suppose even you did the 6 percent, you adjusted
23 down the remaining dollars by 6 percent. So here we're talking
24 about I'm off by about $400,000. If you revised down the
25 remaining amounts by 6 percent, the effect of that is less than

Page 40

1  a million. So taken together, it is I think about 1.3 million.
2  It's 0.4 and 0.9 would be the adjustment. So if one were to
3  apply the 6 percent across the board to the remaining 29
4  states, it would lower it by about -- the overall difference
5  from -- and let me just see if I have the --
6       THE COURT: Well, would that be a reliable
7  methodology, to take the 6 percent and apply it across the
8  other states?
9       THE WITNESS: Part of the reason that I drilled down
10 in the way that I did was to see, are these 9 -- it looks like
11 these 9, you know, paid the usual and customary a bit more
12 often than the remaining 29, who actually pay usual and
13 customary less often than the remaining 10. So I still think a
14 more accurate estimate of the total difference for those
15 remaining 38 would be the other number, but it's not -- it
16 wouldn't be -- it would be --
17      THE COURT: Well, would there be a way of going into
18 these other states and seeing whether their usual and customary
19 reflects these additional 9?
20      THE WITNESS: Right, so I think I've actually done --
21      THE COURT: You've done that.
22      THE WITNESS: Yes. So the usual and customary for
23 these 9, the statistic that I recall right here is about
24 27 percent of the time they're paying usual and customary,
25 versus about 24 percent for the first 10, versus less than

Page 81

1    THE WITNESS: These carriers, the Wisconsin Physicians
2    where I have the data versus the carriers where I don't have
3    the data, it is clear -- and you can imagine there was a
4    considerable amount of work that went into figuring out, is
5    this an Abbott, are these Abbott AWPs or not? And, you know,
6    there are some cases, some example here or there where in the
7    same quarter an Abbott product had the same AWP as another
8    product, but that's going to happen in both data sets. I can
9    tell you from having looked at dozens and dozens of arrays that
10   Abbott AWPs are often the median. And so --
11       THE COURT: You said a quarter of the time, right?
12       THE WITNESS: A quarter of the time, that's right.
13   And so I basically take the results for those initial carriers
14   and scale them -- so rather than taking that difference ratio
15   for the initial group of carriers, I scale it down by
16   approximately a third.
17       THE COURT: Where did you get that?
18       THE WITNESS: Or a fourth. It's basically it
19   represents the --
20       THE COURT: Where are we?
21       THE WITNESS: We're in the neighborhood of Page 124 of
22   the report.
23       THE COURT: That's the first --
24       MR. LAVINE: Tab B.
25       THE COURT: All right.

Page 82

1        THE WITNESS: So in Equations 10 and 11 on Page 125,
2    I'm describing here basically how I'm calculating the
3    difference for J-Code J and Carrier K over the period of
4    interest. So I apologize, I don't want to forget the equation.
5    So just the big picture --
6        THE COURT: Others are probably more astute right now.
7    I'm counting on my law clerk who wasn't sitting through this
8    trial this morning. So just in plain English, you've got a
9    quarter that are the same.
10       THE WITNESS: Yes.
11       THE COURT: So you can extrapolate across the
12   carriers.
13       THE WITNESS: Right. A quarter in my sample have
14   Abbott AWPs. A sixth or less -- I'm getting the numbers
15   confused, but less for the other sample. So I've got a sample;
16   there's a population. For the other carriers where I don't
17   have arrays, they have Abbott AWPs less frequently.
18       THE COURT: So it's only a sixth of the ones you don't
19   have the data for are actually compensating at what the Abbott
20   one is?
21       THE WITNESS: Exactly. And I should note that for
22   every time that an Abbott AWP is the median, there are more
23   than two where they're above the median and affected. Do you
24   see? So it's not like by knowing -- it's not like only in one
25   in four cases is Abbott affecting the median. There are a heck

Page 83

1    of a lot of cases where they're above the median, but this is
2    just a measure of the intensity.
3        THE COURT: So a sixth don't -- only a sixth are AWP
4    of the other --
5        THE WITNESS: Of Abbott, yes.
6        THE COURT: Of the other five-sixths, how do you
7    figure out whether Abbott matters?
8        THE WITNESS: Right, so the assumption, the
9    identifying assumption here is that the pattern that holds
10   within the arrays for which I have information, so for every
11   one time -- I don't have this number right here in my head, but
12   suppose that for every one time that an Abbott AWP is the
13   allowed amount, there are two where they -- two different
14   claims where they're not the allowed amount, but they affect --
15   but affect -- changing their AWP affects the reimbursement
16   amount.
17       THE COURT: They're higher than the array.
18       THE WITNESS: They're higher than the median, right.
19       THE COURT: So you're just assuming that that's gong
20   to be the same --
21       THE WITNESS: That pattern holds for the remaining --
22       THE COURT: That the pattern holds. And how do you
23   test that to see if it's true?
24       MR. LAVINE: Can I just slip in one question?
25       MR. DALY: No.

Page 84

1        MR. LAVINE: It will help.
2    Q.  Where you did have the arrays, how often was there an
3    Abbott product, an Abbott AWP?
4    A.  The vast, vast majority of the cases when, for these
5    sodium chloride and these vanco J-Codes, when there is an
6    array, an Abbott product is in there, so the vast, vast
7    majority of cases. And it is true, I mean, one can see from an
8    examination of -- if one looks at Table 43, so this is also
9    after Tab 1 --
10   Q.  The next-to-the-last exhibit for that tab.
11       THE COURT: All right.
12   A.  So for Connecticut General, you see the first line there
13   summarizes the results of the analyses for the J-Code quarters
14   where I have array information. I have data for the whole
15   eleven years, but for Connecticut General, there are about
16   540,000 claims in that last five-year period in which
17   the -- 540,000 claims, okay, for the five J-Codes that I'm
18   considering that are listed in the title of the table.
19       Now, of those, if you look one column to the left, you see
20   about 470,000 claims in which paid amount would fall if
21   Abbott's AWPs were replaced by 125 percent of the average
22   pharmacy. So that's 86 percent of claims where there's
23   differences greater than zero, okay.
24       Now, going back to that 24 percent, now, remember, the 24
25   isn't Connecticut General specific, but suppose it was. So

Page 85

1  24 percent of the time Abbott's AWP is the median, okay; and in
2  essentially all of those 24 percent of cases, moving their AWP
3  is going to lower the allowed amount because the AWP always
4  falls when you use the transaction-based price.
5       THE COURT:  So you extrapolated that percentage.
6       THE WITNESS:  Exactly.  So basically I say 24, and
7  let's say there's another 62 percent, so that's about two and a
8  half claims where Abbott is above the median but not the median
9  for every one.  And the methodology, basically the assumption
10 underlying the methodology is that that pattern holds in the
11 remaining carriers, and it is --
12      THE COURT:  How did you test that?  Like, you could
13 test the last one.
14      THE WITNESS:  This, for example, with pulling in this
15 new Medicaid data, it is --
16      THE COURT:  How do you know if that's right, there are
17 consistent patterns across the carriers?
18      THE WITNESS:  Well, it is worth noting that the
19 carriers are basically operating under the same CMS guidelines
20 throughout this period, and it is true there's variation across
21 the carriers.
22      THE COURT:  There was some OIG report that talked
23 about it, right?  Or was that in a different context?
24      THE WITNESS:  It may have been.  Yes, maybe my mind is
25 getting tired now too.

Page 86

1       MR. LAVINE:  That was a Medicaid issue.
2       THE COURT:  That was Medicaid?
3       THE WITNESS:  So the identifying assumption of this
4  methodology is -- now, it's worth noting that this isn't
5  information for just four or five carriers.  This is
6  information for -- actually, as you can see here listed, there
7  are several.
8       THE COURT:  So you average the pattern?
9       THE WITNESS:  Yes, I averaged the pattern across the
10 time periods because it bounces around a fair amount from one
11 period to the next.  Things bounce with the Medicare somewhat
12 more than with the Medicaid where it's all driven by the Abbott
13 AWP.  So essentially the methodology aggregates the information
14 from dozens of arrays.  Now, it does it product by product, so
15 J-Code by J-Code, but it aggregates the information because,
16 for example, vanco tends to have a bigger difference because
17 its disparity from the other ones tends to be larger than for
18 sodium chloride.  So it basically aggregates that information
19 across many, many arrays, and essentially aggregates the
20 information across those many, many arrays and uses, leverages
21 all the information -- in the case of Connecticut General,
22 540,000 claims, a million claims for Wisconsin physician and so
23 forth -- to estimate for the remaining claims.
24      Now, I should also note that in doing this, recall,
25 there are a whole number of things that I'm excluding from

Page 87

1  this.  For example, those six J-Codes initially, I don't
2  extrapolate to them.
3       THE COURT:  How many carriers did you have full data
4  for?
5       THE WITNESS:  Full data for?  Well, for the entire
6  eleven-year period?
7       THE COURT:  I guess I asked that incorrectly.  So
8  let's assume -- how many carriers are there all together?
9       THE WITNESS:  There are -- well, it depends to some
10 extent on how you count them because there are multiple -- if
11 you go back -- and I apologize for continuing to push your
12 Honor from one table to another, but -- so if one goes to
13 Table 35, this provides information.  And do you have
14 highlighted in yellow?
15      THE COURT:  Yes.
16      THE WITNESS:  So highlighted in yellow are the
17 carriers for which I have array information, and in white are
18 the ones for which I do not have array information.
19      THE COURT:  So you probably have slightly less than
20 half?
21      THE WITNESS:  Slightly less than half, that's right,
22 in terms of -- I'm just going to go to -- slightly less than
23 half, that's right.
24 Q.  Are some of the carriers listed multiple times?
25 A.  That's right.  So Connecticut General you can see is

Page 88

1  listed in both the -- maybe that's the 7th line and the 8th
2  line.  So there are some of the carrier numbers, like one
3  carrier, the Connecticut General arrays are used for
4  Carrier 54-40, for Carrier 55-35, and so forth.  So this
5  overstates -- if you think about -- it depends on -- think
6  about the carriers in terms of their numbers, if this is the
7  right figure, if you think about it in terms of --
8       THE COURT:  So if in any quarter you had too few
9  carriers that you had data for, did you say, "I don't have
10 enough to know a pattern"?
11      THE WITNESS:  So it's certainly true that I dropped
12 claims where the data did not suggest it would be appropriate
13 to extrapolate, so certainly for those six J-Codes we talked
14 about, but also extrapolating back in time, I -- so if we go
15 back to the Table 43, you'll see that, for example, for
16 Connecticut General, I only went back to early '95 because my
17 scrutiny of the data for Connecticut General in the first four
18 years of the period suggested to me -- I didn't see enough
19 Abbott AWPs then, so I didn't extrapolate back during that
20 period.  And similarly, for those remaining carriers, I ignored
21 the first part of the data set because, once again, the Abbott
22 AWPs were less common in '91, '92 and so forth because I don't
23 have arrays in '91 and '92.
24      THE COURT:  It sounds like you're making far more
25 subjective judgments with respect the arrays than you really

Page 89

1  would of the Medicaid. In other words, what's enough to be a
2  pattern, what isn't? Do I have enough data, don't I? And
3  there's no way to test it.
4       THE WITNESS: Well, I think it's useful to sort of see
5  how the difference-to-spending ratio differs between my sample
6  and the population to which I'm extrapolating. So, first, in
7  terms of the across-carrier extrapolation, so for those carrier
8  J-Code quarter combinations where I have the array, if one
9  looks there, the ratio of difference to spending is about
10 29 percent. Okay, it's lower than for Medicaid because of this
11 thing we were talking about that went -- the median doesn't
12 move as much as the AWP moves. So about 29 percent.
13      For those carriers to which I'm extrapolating, it's
14 less than half that amount, so it's like 14 percent because I'm
15 accounting -- I'm sort of scaling down by even more than our
16 discussion a little while ago suggested to account for this
17 difference in the data.
18      THE COURT: So if you have, guesstimate here, a
19 hundred carriers here?
20      THE WITNESS: Ninety, I think there are.
21      THE COURT: Ninety, all right, ninety. If you had
22 eighty carriers, you'd be able to see a pattern and
23 extrapolate. But what if you only had five carrier arrays?
24 Did you just sort of say, "I can't do that"? Am I understanding
25 this wrong?

Page 90

1       THE WITNESS: No, no, you're understanding it
2  correctly. So I am essentially in this case aggregating
3  information from multiple arrays for the same carrier. So the
4  carriers definitely change. So Wisconsin Physician moved from
5  having five products to seven products, added in new products,
6  so they're changing all the time. So just as with Medicaid,
7  the notion that it's 10 states only, that's not the way that I
8  would phrase it because these arrays are constantly -- are
9  being updated quite a lot over the time period. So the
10 information that is included in the arrays, there's a lot of --
11 there are many, many arrays. I don't have the number off the
12 top of my head here, but there are dozens and dozens of arrays
13 that I'm using to calculate this difference-to-spending ratio.
14 And, you know, like I said, there's big variation within a
15 carrier. And then I'm using the information for those arrays
16 to extrapolate to this other group, which I recognize is, you
17 know, having drilled down on it, they are somewhat different.
18 And so this is, it's a harder -- I'll concede it's a harder
19 exercise just because of the specifics of it. We're talking
20 about arrays and so forth. But the carriers were all operating
21 under sort of similar guidelines; and to the extent that they
22 do differ somewhat, I'm really penalizing, I'm really cutting
23 down that difference-to-spending ratio, whereas with
24 Medicaid --
25      THE COURT: Is there any evidence that CMS actually

Page 91

1  went and surveyed and regulated the carriers? You say they're
2  all under the CMS, and my impression from other litigation --
3  I've been doing this now for a decade -- is that CMS actually
4  didn't do very much to survey the carriers, right? I mean,
5  they may have kept track of the data, but they weren't policing
6  them. Is that wrong? Do we have evidence to the contrary?
7       THE WITNESS: That's probably not my best --
8       THE COURT: All right. But I'm just saying, you keep
9  saying they were supervised by the same group. They were like
10 lone wolves, weren't they, each one doing their own thing?
11      THE WITNESS: Well, I think that there's some sense in
12 which carriers look to one another to some extent.
13      THE COURT: Well, do you have evidence of that?
14      THE WITNESS: There are some cases where certain
15 carriers that I analyzed eventually piggybacked on Wisconsin
16 Physician Services, for example, so there is some evidence of
17 this. But I will concede, there's no question, this was a
18 harder exercise. And because of the -- I mean, I tried through
19 a number of channels to be very conservative here; drop six
20 products from the analysis, don't go back in time all the way
21 to 1991 because there's not enough Abbott products, you know,
22 really scale down the difference going from my sample to the
23 other group because it's clear that the Abbott AWP is being
24 used less frequently there. And this, in my professional
25 judgment, using all of my experience as an economist -- and,

Page 92

1  you know, I will admit this is a hard -- this is not --
2       THE COURT: This is a harder nut.
3       THE WITNESS: This is a harder nut to crack.
4       THE COURT: So if I were concerned about the whole
5  thing you did, would at least the one quarter that are Abbott
6  that are right at the median, would that be a subset that you
7  felt confident with?
8       THE WITNESS: Absolutely, I mean, I think that at some
9  level it seems plausible -- so I think it's 1.3 million
10 claims in this other group of carriers that have an Abbott AWP
11 as the allowed amount. And I'm sure that one can find an
12 example where in one of those NDC quarter combinations, both
13 Abbott and Baxter had 10.03, like, there's a little bit of
14 that, but it's certainly not the dominant thing going on,
15 having looked myself at these arrays. But, absolutely, those
16 are -- it is clear what's going on.
17      THE COURT: So for the one quarter where Abbott's was
18 right at the J-Code, you would say it was an extremely accurate
19 methodology, I think. With the others, you're saying you're
20 doing the best you can, the most conservative you can with the
21 data you have?
22      THE WITNESS: Absolutely. And it is my professional
23 judgment that if I had perfect array data for all eleven
24 products for all of these carriers over this entire period, the
25 difference that would emerge from that analysis with perfect