# Exhibit H
# Excerpts from Schondelmeyer, Perri, and Hartman Depositions

Exhibit to the March 12, 2010 Motion *In Limine* to Exclude Certain Expert Opinions Proffered by Plaintiffs' Expert Dr. Mark G. Duggan

374

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - -

| | | |
|---|---|---|
| IN RE:  PHARMACEUTICAL | ) | MDL NO. 1456 |
| INDUSTRY AVERAGE WHOLESALE | ) | CIVIL ACTION |
| PRICE LITIGATION | ) | 01-CV-12257-PBS |
| THIS DOCUMENT RELATES TO | ) | |
| U.S. ex rel. Ven-a-Care of | ) | Judge Patti B. Saris |
| the Florida Keys, Inc. | ) | |
| v. | ) | Chief Magistrate |
| Abbott Laboratories, Inc., | ) | Judge Marianne B. |
| No. 06-CV-11337-PBS | ) | Bowler |

- - - - - - - - - - - - - - - -

Videotaped deposition of STEPHEN W.

SCHONDELMEYER, PHARM.D., PH.D.

Volume II

Washington, D.C.

Thursday, February 26, 2009

9:00 a.m.

### Page 707

1  Q.  Right.
2  A.  And I had to simulate or model various
3  aspects of what those prices might be.  And we did
4  have various reports by -- I believe the OIG and I
5  believe something from CBO, a couple, that did report
6  aggregate estimates of what AMPs might be under this
7  model.  And so I had to model what that would be.
8      But yes, it was my belief that if you paid
9  pharmacies below their actual acquisition cost for
10 generics -- and that this would result in that -- that
11 it would have an effect on both providers and patients
12 and their access.
13 Q.  And the effect you I guess were concerned
14 about was pretty extreme, right?  As much as one-fifth
15 of the pharmacies could have left the system as a
16 consequence?
17     MS. BROOKER:  Objection, form.
18 Q.  You can refer to that if you like.
19 A.  Again, my report states what my conclusions
20 were.  So anything that I say here today is just a
21 recollection and a summary.  But I would ask that my
22 report be used as the basis for any statements I make.

### Page 708

1      But it's my recollection that a
2  nonsignificant -- greater than a nonsignificant number
3  of pharmacies would have been affected and could have
4  gone out of business because of these changes in the
5  Medicaid reimbursement.
6  Q.  And that that would then impair the access
7  necessary to keep enough pharmacies in the Medicaid
8  program?
9      MS. BROOKER:  Objection, form.
10 A.  Again, in this circumstance pharmacies
11 would have been paid below their actual acquisition
12 cost.
13 Q.  Yes.
14 A.  And that that could have affected the
15 viability of pharmacies, particularly in rural areas
16 or urban inner city areas with high Medicaid
17 utilization.
18 Q.  When you say it affected the viability, you
19 mean it could have put them out of business?  Could
20 have, not --
21 A.  Well, either it could have put them out of
22 business or it could have put them in a position where

### Page 709

1  they're losing money on all those so they decide not
2  to participate and they stay in business with private
3  business.  So it doesn't necessarily put them out of
4  business, but it puts them in a position where they
5  make a choice not to participate in the program.
6  Q.  Now, with this new FUL, what would the
7  dispensing fee have been?  Would it have continued to
8  be the same dispensing fee, the existed dispensing
9  fees?
10 A.  The Deficit Reduction Act did not address
11 what the dispensing fees would have been.
12 Q.  Okay.  So that's just an unknown?
13 A.  It's an unknown, yes.
14 Q.  Now, did you quantify in any way what the
15 variance was between the new AWP that they were
16 suggesting be used and the existing AWP under the DRA?
17 Was it within 10 percent, 20 percent?  Did you try and
18 figure that out at all?
19 A.  I don't understand when you say the new --
20 I'm not familiar with a new AWP under DRA.
21 Q.  I misspoke.  That's my problem.  I'm sorry.
22 The new AMP we're talking about that they were

### Page 710

1  formulating for this program that you explained that
2  you were examining, now, as I understand it you didn't
3  really have any data that used the new AMP because it
4  was brand-new, correct?
5      MS. BROOKER:  Objection, form.
6  A.  Well, I believe as I stated earlier there
7  wasn't complete AMP data reported.  The OIG and I
8  believe -- it may have been CBO -- another agency had
9  some numbers that they had from some source and
10 reported.  I did take that into consideration and
11 attempted to model it.  And then I took be what we
12 knew from AMP data that existed previously.  Again,
13 there was some -- while the AMP numbers in detail
14 aren't reported, there was just some aggregate
15 percentages related to AMP versus the AWP reported by
16 CBO in reports over time.
17     And so I took that along with also what I
18 knew from IMS data for various classes of trade and
19 the differences in -- which again isn't perfect
20 information, but it gives me some indications of
21 differences across classes of trade.  So I took each
22 of those factors and I believe in this case modeled

711

1  that to estimate what the impact might be.
2      Q.   So am I correct that in terms of reaching
3  your conclusion that the proposed AMP times 250 would
4  not work as a FUL, you used existing -- I guess a GAO
5  report that actually dealt with a DRA AMP, the
6  original DRA AMPs, right?
7          MS. BROOKER:  Objection, form.
8      Q.   You based it on that and an OIG report that
9  you then modeled?
10         MS. BROOKER:  Objection, form.
11     A.   Again, I've asked that you refer to the
12 report to confirm all this.  And I believe I've said
13 each time it was an OIG report, not a GAO report.
14     Q.   We're trying to find it, so --
15     A.   We could look.  I think it was referenced
16 in my report.
17     Q.   Yeah, I think it is too.
18     A.   This is not the form I submitted my report.
19 And the way Westlaw has done it has taken out what the
20 references referred to from a convenient format.  So
21 if I had my report in its original form I could tell
22 you where I got that.  I can't from this the way

712

1  Westlaw has reproduced it, the way you've given it to
2  me.  This is not my original report.  This is
3  somebody's reproduction of my report.
4          (Mr. Merkl hands a document to the
5  witness.)
6      A.   And what is this?
7      Q.   Is that one of the reports you based your
8  conclusions on under the DRA?
9          MR. BREEN:  Objection, form.  What did you
10 hand him?
11         MR. MERKL:  I'll tell you in a minute.  All
12 right?
13         MR. BREEN:  Well, before you ask him a
14 question you identify the document --
15         MR. MERKL:  No, I don't.
16         MR. BREEN:  -- to the witness.  All right.
17 I object to it.  I think you need to mark it if you're
18 going to hand it to the witness.
19         MR. MERKL:  Let me see the document.
20         BY MR. MERKL:
21     Q.   Can you tell me what that is?
22         MS. BROOKER:  Objection.

713

1      A.   This appears to be an Office of Inspector
2  General report entitled "Determining average
3  manufacturer price for prescription drugs under the
4  Deficit Reduction Act."  This is dated May 2006.  It
5  probably -- again, I don't recall.  We could tell by
6  looking at my references in my report.
7      Q.   Right.
8      A.   Either this report or one of a similar
9  nature is probably one that I referred to.  But I
10 can't verify that without an accurate copy of my
11 report, which I don't have at this point.
12         MR. MERKL:  Would you mark the document Dr.
13 Schondelmeyer has just handed me and identified as
14 number 5.
15         (Exhibit Dey Schondelmeyer 005
16          was marked for identification.)
17
18         BY MR. MERKL:
19     Q.   That report and the other one that you
20 based your modeling on --
21     A.   What do you mean by "that report"?
22     Q.   The report in front of you, Dr.

714

1  Schondelmeyer.  Number 5 there.  The other one.
2          MR. BREEN:  Mr. Merkl, I'd ask -- since you
3  appeared not to agree to this I'll make my request for
4  the record.  If you're going to hand the witness so
5  that I don't have to walk around on the camera and
6  look at what he's looking at, I'd appreciate you
7  letting me know what it is.  If you can't provide a
8  copy, I understand that.  Most of the stuff I can pull
9  up on the computer.  And that's all I was asking you
10 to do.
11         So I would appreciate knowing what the
12 witness is looking at when you hand it to him.  If
13 that's a problem, fine.  But that's my request.
14         MR. MERKL:  I just identified it.
15         MR. BREEN:  You did.  I realize that.
16         MR. MERKL:  All right.  So what's the
17 problem?
18         MR. BREEN:  The problem is I'd like to be
19 shown a document when the witness is shown a document.
20 That's all.  Thank you.
21         BY MR. MERKL:
22     Q.   Let's go back.  Do you recognize that one

733

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - -

IN RE:  PHARMACEUTICAL           )   MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE       )   CIVIL ACTION

PRICE LITIGATION                 )   01-CV-12257-PBS

THIS DOCUMENT RELATES TO         )

U.S. ex rel. Ven-a-Care of       )   Judge Patti B. Saris

the Florida Keys, Inc.           )

     v.                          )   Chief Magistrate

Abbott Laboratories, Inc.,       )   Judge Marianne B.

No. 06-CV-11337-PBS              )   Bowler

- - - - - - - - - - - - - - - -


         Videotaped deposition of STEPHEN W.

             SCHONDELMEYER, PHARM.D., PH.D.

                     Volume III


                     Washington, D.C.

                     Friday, February 27, 2009

                     9:00 a.m.

790

1  customers?
2      Q.   People who purchase pharmaceutical
3  products.
4      A.   From the manufacturer or people -- the end
5  user.  Those are different types of customers.
6      Q.   Both.
7      A.   My answer may be different for both of
8  those.
9      Q.   Okay.  Well, answer to the best of your
10 ability.
11     A.   Okay.  If you could restate the question
12 I'll try to -- now that we've clarified customer.
13     Q.   With respect to generic drug products, as
14 someone who has studied pricing behavior in the
15 pharmaceutical industry for many years, is it your
16 experience that price competition within particular
17 drug markets increases as more and more manufacturers
18 enter into that market?
19         MS. BROOKER:  Objection, form.
20     A.   If we look at the manufacturer's prices,
21 actual selling prices, of drug products, the general
22 trend is that as more manufacturers are in a specific

791

1  generic drug market for a specific chemical entity
2  strength and dosage form, within that market as there
3  are more manufacturers in the market there tends to be
4  more competition that would lead to lower prices to
5  the purchaser who buys from the manufacturer.
6         You can't generalize that to say that the
7  end consumer necessarily gets lower prices and the
8  benefit of that because of reimbursement systems and
9  the types of information they have available to them
10 and the way those are influenced by other prices such
11 as list prices.
12     Q.   From listening to your testimony yesterday
13 it sounds as though part of your work outside of this
14 case has involved examining the pricing behavior of
15 generic drugs.  Is that fair to say?
16     A.   Generic and brand drugs and the
17 relationships.
18     Q.   And you've written a number of articles on
19 the pricing behavior of generic drugs after patent
20 expiration; is that true?
21     A.   I have examined the issue of prices of
22 brand and generic drugs after patent expiration.

792

1      Q.   And you've published articles on that
2  topic?
3      A.   Yes, I have.
4      Q.   And as one of your scholarly pursuits you
5  have analyzed the effect of generic price entry on
6  price competition; is that correct?
7      A.   That's an over-simplification, but yes.
8      Q.   And one of the ways in which you have
9  analyzed the effect of generic drug entry on the
10 market was to study the pricing of the originator's
11 drug prices and the prices of the multi-source drug
12 within that market; is that correct?
13     A.   Again, in a general sense that's true.
14 Again, there have been specific studies with specific
15 qualifications.
16     Q.   Sure.  And I didn't mean to suggest
17 otherwise.  Explain what you have done with respect to
18 that type of study.
19         MS. BROOKER:  Objection, form.
20     A.   I'm sorry.  Again, I didn't hear.
21     Q.   Explain the manner in which you've gone
22 about studying the effect of generic drug entry in the

793

1  context that we've just discussed.
2          MS. BROOKER:  Objection, form.
3      A.   I've done a number of studies, so I could
4  probably spend the rest of the day describing how I've
5  done all those.  I'll try to give you an overview,
6  which I think is what you're after.
7      Q.   Yes, sir.
8      A.   To the degree that one can, I've used a
9  database and had access to a database that someone
10 else purchased the data so that I could use it and
11 analyze it in this case from sources such as IMS
12 America.  Their databases are very expensive.  Often
13 unless they choose to provide it to academics it's
14 beyond the affordability of academics and for that
15 matter other normal users.  But I purchased IMS data
16 which is invoice level data from manufacturers or
17 wholesalers to the provider or pharmacy communities
18 and it shows invoice level prices.
19         It also tracks unit volume of sales over
20 time.  It tracks sales from manufacturer, wholesaler
21 to pharmacy.  IMS also has databases that track
22 pharmacy prescription sales to customers.  And I've

794

1  used both data sets at various times to examine within
2  a given defined market -- which again typically for
3  this case would be a molecule, at least at a molecule
4  level.  For example, ipratropium bromide in all of the
5  various dosage forms.
6       And in some cases, depending on the
7  question being asked, the market is more appropriately
8  defined as a specific molecule, dosage form and
9  strength that would compete with or be a therapeutic
10 alternative to or a trade-off or also be rated by FDA
11 as an exact therapeutic equivalent of alternative
12 products within that group.
13      And so I obtained the unit volume data, the
14 total invoice level sales data and from that you
15 compute a price per unit.  And you track the price per
16 unit over time versus the volume of units sold over
17 time.  And in various studies we've also analyzed the
18 number of marketers of the product in the market at
19 various points in time.
20      So that's the types of studies that I've
21 done.
22      Q.   And when did you first gain access to

795

1  invoice level data through IMS America?  What year?
2       A.   I don't remember.  I'd interacted with IMS
3  over a number of years.  I probably had access to some
4  back in the 1980s.  Again, the invoice level data we
5  had, though, was kind of what we called top line
6  invoice.  It often -- often what was reported on
7  invoices was the WAC for a product and it didn't
8  necessarily include discounts and certainly in most
9  cases that I'm aware of doesn't include rebates.
10      So there are severe limitations to the data
11 from IMS and it's extremely expensive to obtain.
12      Q.   I take it it's fair to say that you
13 wouldn't just look at an originator's drug prices to
14 understand how generic competition has impacted the
15 market for a particular drug product; is that fair to
16 say?
17      A.   Well, I look at all products that are in
18 the defined market depending on the question we're
19 addressing.
20      Q.   Right.  And so if you wanted to understand
21 how the market for a particular drug product worked
22 you wouldn't look solely at the data attributable to

796

1  the originator; you'd also want to look at other
2  competitors within that market, generic competitors?
3       A.   Again, it depends on the question we're
4  asking.  A market could be defined broader or more
5  narrowly for specific questions.  So sometimes there
6  are other products you need to include.  But sometimes
7  there is a market that's very narrowly defined to one
8  or two products, one or two NDCs.  Again, it depends
9  on the question we're addressing.
10      Q.   And I don't want to put words in your
11 mouth.  But I take it you think overall the market
12 benefits by lower prices?
13           MS. BROOKER:  Objection, form.
14      A.   I think when lower prices occur the market
15 can benefit.  But as I said earlier, purchasers of
16 products from generic manufacturers, even if those
17 purchasers pay lower prices doesn't necessarily mean
18 that those lower prices benefit the end payor, whether
19 it be the cash pay consumer or the employer private
20 health plan or Medicare or Medicaid.  It doesn't
21 necessarily benefit that end consumer depending on the
22 reimbursement system and the prices reported that

797

1  influence that reimbursement system.
2       Q.   Now, is it true that as competition within
3  a particular drug market -- let's focus on within a
4  particular GCN -- decreases that prices tend to rise?
5           MS. BROOKER:  Objection, form.
6       A.   Again, I can't answer that with that
7  limited amount of information.
8       Q.   If for a particular drug product there is
9  only an originator and a generic manufacturer
10 manufacturing a drug, would you expect the prices
11 within that market to be higher or lower if there were
12 more generic competitors?
13           MR. BREEN:  Objection, form.
14      A.   That's a different question than you asked
15 me before.  But you want me to answer this one now?
16      Q.   Yes, sir.
17           THE WITNESS:  If you'll read it back, I'll
18 try to --
19           (Whereupon, the requested portion was read
20 by the reporter.)
21           BY MR. REALE:
22      Q.   And when I asked that question -- let me

                                                                     358

                    UNITED STATES DISTRICT COURT

                 FOR THE DISTRICT OF MASSACHUSETTS

    In re:  PHARMACEUTICAL INDUSTRY      )

    AVERAGE WHOLESALE PRICE              ) MDL No. 1456

    LITIGATION                           )

    _____ ) Civil Action No.

                                         ) 01-12257-PBS

    THIS DOCUMENT RELATES TO:            )

    United States of America, ex rel.    )

    Ven-A-Care of the Florida Keys,      )

    Inc., v. Abbott Laboratories, Inc.,  )

    CIVIL ACTION NO. 06-CV-11337-PBS     )


                       VIDEOTAPE DEPOSITION OF

                      MATTHEW PERRI, III, Ph.D.

                              VOLUME II

                              Jones Day

                     1420 Peachtree Street, N.E.

                              Suite 800

                       Atlanta, Georgia  30309


                     Taken on February 20, 2009

**611**

1    A.  Thank you.
2        Yes.
3        MR. AZORSKY:  Objection to form.
4    BY MS. REID:
5    Q.  Okay.  And I think the majority, vast
6    majority of the documents cited in your report
7    are also from that time frame?
8        MR. FAUCI:  Objection to form.
9    A.  I think that's the case.
10   BY MS. REID:
11   Q.  And you were not asked to look at and
12   did not look at whether any of the marketing
13   behaviors that you identified had any impact on
14   Dey's revenues or its market share?
15       MR. FAUCI:  Objection to form.
16   A.  I -- I was not asked to evaluate that.
17       However, I will tell you that in some
18   of the documents reference was made to the
19   increases in market share or increases in sales
20   that were associated with some of the -- the
21   marketing behaviors that were identified.
22   BY MS. REID:

**612**

1    Q.  Okay.
2    A.  And that was a -- a qualitative
3    assessment, I think, on the part of a salesperson
4    or a Dey -- a Dey executive.
5    Q.  And when you say qualitative, that's
6    opposed to a quantitative assessment by actually
7    looking at the revenue figures?
8    A.  At the transactional level --
9    Q.  At the transactional level?
10   A.  -- that you've been describing?
11       Yes, that would be different.
12   Q.  And you weren't asked to actually look
13   and see whether the revenues did increase and for
14   which products they increased or decreased?
15   A.  No.
16   Q.  You did not look at why sales were made
17   in particular instances; is that correct?
18       MR. FAUCI:  Objection to the form.
19   A.  I think -- I think my task really was
20   to examine the what was going on, not so much the
21   why.
22   BY MS. REID:

**613**

1    Q.  Okay.
2    A.  However -- yeah, that's...
3    Q.  So you are not able to attribute sales
4    resulting, for example, from the ease of
5    administration of a particular drug versus sales
6    resulting from superior packaging versus sales
7    resulting from lower cost versus sales resulting
8    from marketing the spread as you define it?
9        MR. FAUCI:  Objection to form.
10   A.  Other than the -- the statements made
11   by sales reps and others at Dey that the spreads
12   were important to the customers and that's what
13   was being evaluated by the customers as -- as
14   criteria for making the purchase, no.
15   BY MS. REID:
16   Q.  And -- and this is something we haven't
17   gone into and I should have earlier and just --
18   just for clarity sake.
19       A wholesaler -- when Dey sells to a
20   wholesaler, they sell a certain amount of
21   product, correct?  Whatever -- whatever the
22   contract calls for?

**614**

1    A.  Yes.
2    Q.  Dey does not know and the
3    pharmaceutical manufacturer doesn't know who the
4    wholesaler ultimately is going to sell it to?
5        MR. AZORSKY:  Objection to form.
6        MR. FAUCI:  Objection to form.
7    A.  I think that would be true in certain
8    cases, but not in others.  The -- the couple of
9    examples that come to mind quickly are the -- the
10   contracts that Dey had with Wal-Mart and CVS
11   which were through wholesalers.
12   BY MS. REID:
13   Q.  Right.  If -- if -- we'll take it in
14   two steps.
15       If Dey is selling to a wholesaler
16   directly and not to a GPO or not to a Wal-Mart,
17   then, they don't know who the wholesaler is going
18   to ultimately be selling the product to, correct?
19       MR. FAUCI:  Objection.
20       MR. AZORSKY:  To the form.
21   A.  Accepting customers on contract today
22   who Dey was distributing through a particular

**615**

1  wholesaler?
2  BY MS. REID:
3      Q.  Right.
4      A.  I think that a customer, a pharmacy
5  perhaps, that had been using another company's
6  product that had a shortage could -- could order
7  from a wholesaler that Dey wouldn't -- wouldn't
8  necessarily know about that purchase.
9      Q.  And let's turn to your Wal-Mart
10 example.  Dey wouldn't know what percentage of
11 customers at Wal-Mart are going to be reimbursed
12 by Medicare or Medicaid, correct?
13     A.  I don't think Wal-Mart does any
14 Medicare, to my knowledge.
15     Q.  Okay.  Well, in that case maybe they
16 would know that there's no Medicare.
17     A.  But they would certainly have an
18 expectation of the -- of the likely percentage of
19 Medicaid prescriptions that Wal-Mart was filling.
20     Q.  And why is that?
21     A.  From the IMS data, from customer
22 interactions with -- as -- interactions with

**616**

1  Wal-Mart as a customer.
2      Q.  Is there any way that a pharmaceutical
3  manufacturer ultimately can project -- not
4  project -- can know what mode of payment is going
5  to be associated with the dispensing of a
6  particular prescription?
7      A.  I know that IMS data does have that
8  capability.
9      Q.  Well, IMS data reports what has
10 occurred, correct?
11     A.  It's retrospective.
12     Q.  It's retrospective?
13     A.  It can be very current retrospective
14 data, but it is retrospective.  And I believe
15 they call that the exponent dataset where they're
16 looking at what's happening right now in the
17 marketplace.
18     Q.  Now, in your review of the documents in
19 this case, did you look at IMS data in connection
20 with the -- forming your opinions?
21     A.  No.
22     Q.  Did you look at the various classes of

**617**

1  trade other than what you've described in terms
2  of seeing exhibits that had information in that
3  regard for certain discrete periods of time?
4      MR. AZORSKY:  Objection to form.
5      A.  No.
6  BY MS. REID:
7      Q.  So you did not make -- review, in
8  essence, history of the progression of class of
9  trade for Dey, at Dey, from the period 1992 to
10 date?
11     MR. AZORSKY:  Objection to form.
12     MR. FAUCI:  Objection to form.
13     A.  With -- with the exception of -- of a
14 -- my knowledge that one or two, possibly three
15 particular classes of trade became more important
16 to Dey since 1992, no.
17 BY MS. REID:
18     Q.  And I believe that -- well, stop and go
19 back.
20     And at this point in time -- after the
21 period of 2002, do you have any evidence
22 contained in your report that supports the -- a

**618**

1  finding that Dey is marketing the spread?
2      A.  Based --
3      Q.  On any of these drugs?
4      A.  Based on the documents I reviewed, I
5  did not discern any change in Dey's behavior with
6  regard to their price reporting.
7      Q.  But if the documents you reviewed
8  essentially stopped around 1999 to 2000, do you
9  have any basis to know whether Dey has continued
10 in the same manner that you describe in the
11 mid-1990s?
12     A.  I guess, I'm not -- I don't -- I don't
13 know for sure that I don't have documents that
14 went beyond that period of time.  So if you -- if
15 you're suggesting that those documents don't go
16 beyond that period of time, then I'll accept that
17 representation.  And if that's the case, then I
18 would not have a basis to say what is happening.
19     Q.  And indeed you have not seen documents
20 concerning the shift in marketing focus for Dey
21 from generic to branded drugs which began in the
22 late 1990s?

1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

IN RE:  PHARMACEUTICAL INDUSTRY )MDL NO. 1456

AVERAGE WHOLESALE PRICE         )

LITIGATION                      )CIVIL ACTION:

THIS DOCUMENT RELATES TO        )01-CV-12257-PBS

U.S. ex rel. Ven-A-Care of the  )Judge Patti B. Saris

Florida Keys, Inc. v. Abbott    )Chief Magistrate

Laboratories, Inc.,             )Judge Marianne B. Bowler

No. 07-CV-11618-PBS             )CONFIDENTIAL

VIDEOTAPED DEPOSITION OF MATTHEW PERRI, III, Ph.D.

Taken on Behalf of the Defendant

DATE TAKEN:        May 1, 2009

TIME:              8:30 a.m. - 4:35 p.m.

PLACE:             Hyatt Regency Airport

                   9300 Airport Boulevard

                   Yeager Conference Room

                   Suite 1066

                   Orlando, Florida


Stenographically Reported by:

Karen S. Rhine, FPR

**Page 18**

1  A. In the day-to-day business Abbott sales
2  personnel would interact with customers. Those
3  customers would be providing information to Abbott about
4  other manufacturers who wish to sell product to them and
5  that information could be fed back to the pricing, to
6  the brand managers, to the contract folks and could be
7  considered in developing a contract to the extent that
8  Abbott wanted to meet or beat a price like that that was
9  learned from either the marketplace or directly from
10 customers.
11     Q. Do you see or do you know of evidence of how
12 Abbott tracked these competitive forces that you
13 described?
14     A. I know that Abbott tracked customers through
15 their sales force via feedback from the sales personnel.
16 And Abbott monitored prices in the marketplace through a
17 variety of means including the pricing compendia. I
18 would need to check my notes to make sure, but I believe
19 Abbott also utilized IMS data as well.
20     Q. Could you describe for the jury what IMS data
21 is?
22     A. IMS is a commercial firm that specializes in

**Page 19**

1  data for the pharmaceutical industry including tracking,
2  product sales, prescriptions written by physicians,
3  market share and issues that would be related to a
4  product's competitive position in the marketplace.
5      Q. To your knowledge does IMS data contain
6  information about sales price of the pharmaceuticals in
7  the marketplace?
8      A. I don't know. I do know that market share data
9  is present. I don't know if it's on sales dollars. It
10 would seem more likely that it would be on volumes.
11 That data is gathered from prescription claims.
12     If it was dollar data, it probably would be claims
13 data which would be claims paid rather than prices
14 charged.
15     Q. And, Dr. Perri, did you investigate the
16 historical reasons why Abbott started to discount below
17 its list prices and WACs for the Erys?
18     A. I believe that information came to light
19 through my reading, yes.
20     Q. Could you explain to us the historical reasons
21 why Abbott began discounting its Erys below list prices?
22     A. Abbott's Erythromycin products are I think it's

**Page 20**

1  safe to say world famous. The Ery products are
2  well-known to pharmacy practitioners and well-respected
3  and for a time these products enjoyed a lot of
4  exclusivity in the marketplace.
5      When generic competition entered the market, Abbott
6  thinking correctly that they were an efficient
7  manufacturer, decided to enter the generic marketplace
8  as well and be able to produce the product efficiently
9  at a lower cost and capture the market share that would
10 have been lost to generic competition.
11     So through that process of monitoring the
12 marketplace, understanding that there were going to be
13 shifts between manufacturers as patent protection
14 expired over the years, Abbott made the choice to become
15 a competitor in the generic marketplace.
16     Q. And what documents are you relying on or what
17 evidence are you relying on for that testimony you've
18 just given?
19     MR. ANDERSON: Objection. Form.
20     MR. BERLIN: What's the objection?
21     MR. ANDERSON: It's too vague. It's too broad.
22 He can give you some examples, but to have him

**Page 21**

1  recite all of it is not fair. It's too much of a
2  memory test.
3      MR. BERLIN: Okay.
4  BY MR. BERLIN:
5      Q. Go ahead. You can answer the question as best
6  you can.
7      THE WITNESS: Could you read back the question
8  for me, please?
9      (Question read.)
10     THE WITNESS: Generally speaking, the
11 deposition testimony where these issues were
12 discussed, for example, by Mr. Fiske.
13 BY MR. BERLIN:
14     Q. Do you know when, and I'm not going to ask you
15 to list it by A, B, C, but do you know when each NDC or
16 class of NDCs started having discounting below list
17 price?
18     A. Not NDC by NDC, no I don't.
19     Q. Are you able to answer the question more
20 generally than NDC by NDC?
21     A. I am familiar with the base deal pricing and
22 those documents began in '94 or '95 I believe. I'm

```
                                                              321

           THE UNITED STATES DISTRICT COURT

        FOR THE DISTRICT OF MASSACHUSETTS
          MDL DOCKET NO. 01CV12257-PBS
*****************************

IN RE:  PHARMACEUTICAL
INDUSTRY AVERAGE WHOLESALE
PRICE LITIGATION

*****************************

THIS DOCUMENT RELATES TO:

ALL ACTIONS

*****************************

              C O N F I D E N T I A L

                       VOLUME: II
          CONTINUED DEPOSITION of RAYMOND S.
HARTMAN, Ph.D., a witness called on behalf

of the Defendants pursuant to the Federal

Rules of Civil Procedure, before Judith
McGovern Williams, Certified Shorthand
Reporter, Registered Professional

Reporter, Certified Realtime Reporter, and

Notary Public in and for the Commonwealth

of Massachusetts, at the offices of Ropes

& Gray, One International Place, Boston,

Massachusetts  02110, on Friday,

October 8, 2004, commencing at 9:36 a.m.
```

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only   October 8, 2004
Volume II                    Boston, MA

20 (Pages 394 to 397)

394

1   30 percent"? What is the basis for that?
2   A.  In the work that I have done over the last
3       decade with respect to this industry, both
4       publicly-available data and data that has
5       been subject to seal, I have been able to
6       review, and this summarizes the
7       information that I have found from both of
8       those sources.
9   Q.  Well, there is -- this particular
10      statement in your report is not footnoted.
11      Can you identify the specific sources from
12      which you derive that information?
13  A.  I certainly can't identify the cases from
14      whence I have observed that, the matters
15      of litigation in which I have submitted
16      testimony.
17  Q.  Why is that?
18  A.  Well, they are subject to seal.
19          Now the judge in the Terazosin
20      matter and in Cipro have issued their own
21      opinions. I don't know whether that makes
22      the other damage analyses I have done -- I

395

1       don't know if that makes them public or
2       not. It is my understanding that that --
3       that that is all subject to seal.
4           I have looked at data for 10, 15
5       drugs in Hatch-Waxman matters and a
6       variety of cases where there have been
7       generic launches, and I have gotten real
8       manufacturer data over the past 10 years.
9       I have also looked at publicly-available
10      information. I mean your Barron's article
11      that you put in front of me yesterday said
12      the same thing. So I could go to that 60
13      to 90 percent in the Barron's article and
14      the IMS data, which I could buy -- you or
15      I could buy -- and will show you that the
16      reimbursement rates that they are talking
17      about have not fallen 60 to 90 percent.
18          So it is confirmed by popular
19      press. It is confirmed by IMS. It is
20      confirmed by data from manufacturers, you
21      know, from their own sales data.
22  Q.  You're not able to be more specific than

396

1       that?
2           MR. SOBOL: Well, I will say
3       that if the defendant manufacturers will
4       waive the confidentiality restrictions on
5       their data from the other cases, including
6       your clients, we could consider disclosure
7       of it, but, you know, many of the
8       defendants here, as counsel know, were
9       defendants in the multiple matters that
10      Dr. Hartman has just now testified about,
11      and if they would be willing to, you know,
12      assent to the release of the information,
13      then we can also deal with the co-lead
14      counsel for those other cases and make it
15      available to you. BMS in particular has
16      provided significant information about a
17      drug in which Dr. Hartman's testimony is
18      germane.
19      BY MR. EDWARDS:
20  Q.  If Dr. Schondelmeyer is of the opinion
21      that the pharmacy business is highly
22      competitive and margins are thin, would

397

1       you defer to him in that regard?
2   A.  No.
3   Q.  You would disagree with him?
4   A.  I wouldn't defer to him. I would have to
5       look at whatever analysis he has done. It
6       runs counter to my understanding.
7       Dr. Schondelmeyer is an expert in his area
8       of pharmacology. To the extent that he is
9       an economist and to the extent that his
10      notion of being very competitive and what
11      the particular margins he is looking at,
12      you know, I just don't know what he is
13      basing it on. I would have to review
14      that. You know, what he -- he could have
15      said that in some context. I have seen
16      two duopolists that are pricing at almost
17      at monopolist price, and say, "Jesus, is
18      this really a competitive industry?" I
19      would have to see the context and
20      understand what he is basing that on.
21  Q.  Is the PBM business competitive?
22          MR. SOBOL: Objection to the