# Exhibit K
# *Variation in State Medicaid Drug Prices*, 2004 OIG Rpt. (OEI-05-02-00681)

Exhibit to the March 12, 2010 Motion *In Limine* to Exclude Certain Expert Opinions Proffered by Plaintiffs' Expert Dr. Mark G. Duggan

Department of Health and Human Services

OFFICE OF
INSPECTOR GENERAL

# VARIATION IN STATE MEDICAID DRUG PRICES



Inspector General

September 2004
OEI-05-02-00681

▶ E X E C U T I V E   S U M M A R Y

### OBJECTIVE

To assess the extent to which State Medicaid programs vary in pharmacy reimbursement for the same type of prescription.

### BACKGROUND

Medicaid prescription drug coverage is one of the most expensive and fastest growing health care expenditures. In fiscal year (FY) 2001, Medicaid expenditures on prescription drugs totaled approximately $20 billion, or 9 percent of the total Federal Medicaid budget. From 1997 to 2001, Federal Medicaid expenditures for prescription drugs grew at more than twice the rate of total Medicaid spending.

The Centers for Medicare & Medicaid Services (CMS) sets maximum drug reimbursement regulations and provides guidelines within the State Medicaid Manual to ensure that the Federal Government acts as a prudent buyer of drugs. Within these Federal parameters, each State determines its own pharmacy reimbursement formula(s).

To assess the variation in drug reimbursement prices across State Medicaid agencies, we requested reimbursement data from all States for FY 2001, based on national drug codes, the unique drug identifiers used by the Medicaid program. Our sample consists of 28 national drug codes (referred to as "28 drugs"). We also obtained contextual information about States' pharmacy reimbursement methodology for FY 2001. Our analysis is based on the 42 States that responded to our data request.

### FINDINGS

**The highest paying State's unit price ranged from 12 to 4,073 percent more per drug than the lowest paying State for the 28 drugs in our sample.** For each of the 28 drugs, we used as a benchmark the State that paid the lowest average annual unit price. The difference between the highest and lowest paying States ranged by drug from 12 to 4,073 percent.

On average, the highest paying State paid 477 percent more per drug than the lowest paying State for each of the 28 drugs in our sample. States' prices varied more for the 10 non-innovator

F I N D I N G S

**On average, the highest paying State paid approximately $200 more per package than the lowest paying State for the 28 drugs.**
To calculate the reimbursement price difference per package, we multiplied the unit price difference by the number of units per package. The highest paying State paid an average of $197 more than the lowest paying State per package for the 28 drugs in our sample. The price differences per package range from $6 for Combivent to $1,244 for Ranitidine HCl 1000. The median price difference was $65. Table B displays the top five drugs by absolute price differences per package between the lowest and highest paying States.

Table B. Drugs with the Greatest Absolute Price Difference per Package

| Drug | Lowest State's Price per Package | Highest State's Price per Package | Price Difference per Package |
|---|---|---|---|
| Ranitidine HCl 1000 | $51 | $1,295 | $1,244 |
| Atenolol | $17 | $704 | $687 |
| Prilosec | $3,221 | $3,876 | $654 |
| Ranitidine Tablets | $25 | $648 | $623 |
| Ranitidine HCl 500 | $27 | $648 | $621 |

Source: OIG National Survey, 2002

Absolute price difference per package is a product of both the level of variation across States and the cost of the drug. For example, Prilosec shows a difference of $654 between the highest and lowest paying States and is ranked third in the absolute dollar difference between the highest and lowest States. Because Prilosec is relatively expensive, this represents only a 20 percent difference in price. Conversely, Albuterol Sulfate, which is relatively inexpensive, demonstrates a much lower absolute price difference per package ($7), but this represents a 227 percent difference between the highest and lowest State prices.

**States' prices vary most for non-innovator multiple source drugs.**
Of the three drug categories, non-innovator multiple source drugs (generic drugs) demonstrated the widest percentage range of prices between the highest and lowest paying States. Price variation ranged from 20 to 4,073 percent for the 10 non-innovator multisource drugs in our sample. Innovator multisource drugs ranked second in percent differences between the highest and lowest States, and single source drugs demonstrated the least percent variation. The median variation among the 10 non-

F I N D I N G S

innovator multisource drugs was 374 percent, compared to 53 percent for the 8 innovator multisource drugs and 18 percent for the 10 single source drugs. Table C displays the range, average, and median percent differences in price for each of the three drug categories.

Table C. Percent Differences between High and Low States by Drug Category

| Drug Category | Range of Percent Price Differences | Average Percent Price Difference | Median Percent Price Difference |
|---|---|---|---|
| Single Source | 12-71% | 23% | 18% |
| Innovator Multisource | 33-227% | 102% | 53% |
| Non-innovator Multisource | 20-4073% | 1230% | 374% |

Source: OIG National Survey, 2002

This wide variation in reimbursement price for non-innovator multisource drugs is not limited to the difference between the highest and lowest of the 42 State prices. If we exclude the States with the highest and lowest prices from our analysis, the non-innovator multisource drugs still demonstrate the most variation in our sample, followed by the innovator multisource drugs, and then the single source drugs. The average difference between the State at the 25th percentile and the State at the 75th percentile (i.e., the interquartile range) was 63 percent for the 10 non-innovator multisource drugs. In contrast, the interquartile range for innovator multisource and single source drugs averaged 14 percent and 4 percent, respectively.

In addition to demonstrating greater percent variation, multiple source drugs (both non-innovator and innovator) display a different pattern of price variation than single source drugs. When the 42 States' prices are ordered from low to high for each drug, prices for the single source drugs in our sample tend to increase at a more consistent rate from the lowest State price to the highest State price. In comparison, prices for multiple source drugs in our sample tend to increase more sharply from one State to the next for several States at the low and/or high ends of the price range. Prices for the States in the middle of the price range, on the other hand, increase more gradually from State to State. To illustrate these different patterns, Appendix D displays the price distributions for a single source and a multiple source drug.

# FINDINGS

Chart 2 below illustrates the extent to which the reimbursement prices of the 15 States with the same estimated acquisition cost formula are dispersed throughout the price distribution of all 42 States. Each of the 42 States' unit prices for Detrol (a single source drug) are arrayed from the lowest paying State to the highest. The unit prices of the States with an estimated acquisition cost of AWP minus 10 are indicated by a white square, and all other States' prices are indicated with a dark triangle. As shown, Pennsylvania has an estimated acquisition cost of AWP minus 10 percent and paid the sixth lowest unit price, while Nebraska has the same estimated acquisition cost, yet paid the highest price of the 42 States for this drug.[e]



**Chart 2. States' Unit Prices for Detrol**
Prices for States with EAC=AWP-10% are labeled & indicated with a white square.
All other States' prices indicated with a black triangle.

**States' differences in usual and customary charge also affect States' average reimbursement prices.**
CMS rules require States to reimburse pharmacies for drugs at the pharmacy's usual and customary charge to the public if this price is lower than the estimated acquisition cost, Federal upper limit, and State maximum allowable cost. However, as part of their effort to more closely approximate actual acquistion costs, States define the usual and customary charge differently. Definitions include the pharmacy's charge to the cash-paying customer or the pharmacy's charge to the patient group accounting for the largest number of non-Medicaid prescriptions. Many States exclude prices paid by

---

[e] No States had a maximum allowable cost for this drug in FY 2001.

F I N D I N G S

third-party payers from usual and customary charges, while a few require pharmacies to include prices they accept from third-party payers as usual and customary charges. Because usual and customary charges are based on the prices the individual pharmacy charges, these amounts can vary among pharmacies within the same State. Further, the extent to which States monitor and enforce pharmacies' billing of usual and customary charges is uncertain.

While it is difficult to measure the effect of differences in usual and customary charge definitions on States' average prices, their impact may be significant. One expert estimated that, nationally, roughly 25 percent of all Medicaid drug claims are paid at the usual and customary charge.[20] Additional evidence suggests that the frequency with which drugs are purchased at the usual and customary charge varies across States. Massachusetts analyzed its Medicaid drug claims for the month of July 2002 and found it paid 34 percent of all claims at the usual and customary charge.[21] In contrast, Vermont paid only 10 percent of its FY 2002 drug claims at the usual and customary charge.[22] Finally, Texas calculated its rate of claims paid at usual and customary charge to be 22 percent.[23]

**States' maximum allowable costs contribute to the price variation for multiple source drugs.**

States' maximum allowable costs offer another reason why States' reimbursement prices for multiple source drugs vary more than prices for single source drugs. States determine for which multiple source drugs, if any, to set maximum allowable costs. States that set maximum allowable costs may pay lower prices for these drugs than States that base reimbursement exclusively on estimated acquisition cost formulas and usual and customary charge. Twenty of the 42 States reported a maximum allowable cost for at least 1 drug in our sample. On average, the 20 States reported maximum allowable costs for 10 of the 18 multiple source drugs in our sample. For 8 of the 18 multiple source drugs in our sample, the lowest paying States set maximum allowable costs. The highest paying States had not set maximum allowable costs for any of the multiple source drugs.

States vary considerably in the maximum allowable cost prices they set for the same drug. For eight multiple source drugs, the highest reported maximum allowable cost was more than twice as expensive

F I N D I N G S

as the lowest maximum allowable cost. For example, in FY 2001, Oklahoma's maximum allowable cost for Ranitidine was almost $0.38 per pill, a price 371 percent higher than Washington's maximum allowable cost of $0.08 per pill for the same drug.[f]

Finally, while a State's maximum allowable cost generally acts as a ceiling price, States sometimes reimburse at prices above their maximum allowable cost for a particular pharmacy claim. A maximum allowable cost applies to a group of equivalent drugs (i.e., a brand name drug and its generic versions), and the maximum allowable cost amount is commonly based on the least expensive drug in the group. If a physician certifies that a specific drug within a maximum allowable cost group is medically necessary, then a State may reimburse a greater amount for that drug based on its estimated acquisition cost formula or usual and customary charge.

**Cost sharing requirements and coordination of third party coverage can also affect States' pharmacy reimbursement.**
Beyond drug reimbursement methodologies, differences in States' cost sharing requirements can affect the variation in States' pharmacy reimbursement. States may require "nominal" co-payments from beneficiaries that do not exceed $3 per prescription. For prescriptions with a cost sharing requirement, the State subtracts the amount of the beneficiary co-payment from its reimbursement to the pharmacy.

The potential impact of co-payments on States' average annual price per unit varies by drug. The maximum co-payment is $3 per prescription, so the effect on the unit price depends on the number of units per prescription. In our sample, units per prescription ranged from 4 units, for which a $3 co-payment reduces a State's unit price by $0.75/unit, up to 1,000 units, for which a $3 co-payment reduces a State's unit price by less than one penny ($0.003). These potential reductions in unit price can also be expressed as a percentage of the average unit price for each drug. Table J lists the absolute and percent reductions in unit price resulting from a $3 co-payment for a selection of drugs.

---

[f] Our sample includes three national drug codes for Ranitidine. These maximum allowable cost amounts are the same for all three.