# Exhibit 2

*United States of America ex rel. Ven-A-Care of the Florida Keys, Inc., et al. v. Dey, Inc., et al., Civil Action No. 05-11084-PBS*

**Exhibit to Opposition to United States' Motion to Exclude Certain Opinions of W. David Bradford**

Page 1

```
 1                IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF MASSACHUSETTS
 2

 3
     In Re:                          )
 4   PHARMACEUTICAL INDUSTRY         ) CA No. 01-12257-PBS
     AVERAGE WHOLESALE PRICE         ) MDL No. 1456
 5   LITIGATION                      ) Pages 8-1 - 8-175

 6

 7

 8                   BENCH TRIAL - DAY EIGHT

 9            BEFORE THE HONORABLE PATTI B. SARIS
                    UNITED STATES DISTRICT JUDGE
10

11

12

13
                              United States District Court
14                            1 Courthouse Way, Courtroom 19
                              Boston, Massachusetts
15                            November 20, 2006, 9:15 a.m.

16

17

18

19

20

21

22
                       LEE A. MARZILLI
23                  OFFICIAL COURT REPORTER
                   United States District Court
24                 1 Courthouse Way, Room 3205
                       Boston, MA  02210
25                      (617)345-6787
```

Page 10

1  pricing?
2  A.  I have.
3        MR. EDWARDS:  Your Honor, can we have an
4  understanding of what Mr. Sobol means by "work"?  Is he
5  talking about testifying in litigation, or is he talking
6  about research?
7        THE COURT:  You can ask him in cross.  You know, I
8  think there's no doubt, am I right, that he's qualified?
9        MR. SOBOL:  Yes.  I just want to make sure they
10  understand the depth of his qualifications, your Honor, just
11  briefly.
12  Q.  Just list for the Court, if you will, Dr. Hartman, the
13  names of the drugs that you can think of off the top of your
14  head on which you've prepared analyses regarding drug
15  pricing.
16  A.  I'm always bad at doing this.  I have worked in probably
17  ten to fifteen Hatch-Waxman matters, antitrust matters that
18  have related to the drugs Cardizem, Hytrin, Paxil, Remeron,
19  Lupron.  Can I look at my CV?
20  Q.  No, you cannot.  Drawing your attention to the matter of
21  In Re: Lupron that was pending in this court before
22  Judge Stearns, did you do work in that case?
23  A.  I did.
24  Q.  And what was the nature of your work there?
25  A.  The nature of my work was very much similar to the type

Page 11

1  of work that I've done here.  It was examining the impact of
2  the marketing, the fraudulent marketing scheme that had been
3  implemented by TAP Pharmaceuticals, and developing measures
4  and models to assess impact, classwide impact and measure
5  damages.
6  Q.  Slide 2, please.  Dr. Hartman, there are a series of
7  matters I'm going to be asking you questions about during
8  your direct testimony and --
9        MR. EDWARDS:  Your Honor, if I may, is Mr. Sobol
10  proffering the witness as an expert in this case?  And if so,
11  we obviously have an objection under Daubert to this witness
12  testifying.  I just want to make that clear for the record.
13        THE COURT:  It's clearly overruled on the basis of
14  qualifications.  Now, whether or not the model is a good
15  model, you can challenge that, but he's got the
16  qualifications.  So, I mean, you've got the standing Daubert
17  objection, but that's a different thing than whether he's
18  qualified, right?
19        MR. EDWARDS:  Yes, your Honor.  I just want to make
20  sure the record is clear on that.
21  Q.  Now, Dr. Hartman, there are a series of matters I'm
22  going to be asking you questions about during your direct
23  testimony.  First, I just briefly want to go over some
24  background items, but I don't want to belabor them because
25  we've gone into many of these things previously.  You've read

Page 12

1  the testimony of Dr. Meredith Rosenthal?
2  A.  I have.
3  Q.  And in connection with that, she gave some testimony
4  regarding the background of Medicare Part B and the
5  reimbursement structure.  Did you review that?
6  A.  I did.
7  Q.  And you provided testimony too in your direct testimony
8  about that as well; is that fair to say?
9  A.  That's fair to say.
10  Q.  Okay, Slide 5, please.  In your direct testimony, you
11  provided the testimony that's set forth in Slide 5.  I have a
12  question for you.  Regarding Fact 1 -- i.e., that Medicare
13  reimbursement has historically been cost-based -- please
14  explain to the court what you meant by that.
15  A.  Well, as I reviewed, as one would --
16        THE COURT:  That doesn't come up on the slide.
17        MR. SOBOL:  Well, you've got in Tab --
18        THE WITNESS:  It does come up on mine.  It says the
19  paragraph number, your Honor, so maybe it's not quite coming
20  up on yours.
21        MR. SOBOL:  Fact 1, your Honor, the third line
22  down.
23        THE WITNESS:  It's Paragraph 19 in my direct
24  testimony.  Does that show at the bottom of your slide?
25        THE COURT:  All right, I've got the testimony.

Page 13

1        MR. EDWARDS:  Your Honor, objection.  No
2  foundation.
3        THE COURT:  Overruled.
4  Q.  Would you please describe to the Court what you meant by
5  Fact 1, the third line down, Medicare is generally originally
6  formally designed to be cost-based?
7  A.  Well, as I did a review of the regulations that drive a
8  major component of pricing and reimbursement in this market,
9  which is standard procedure, I reviewed the underlying
10  statutes in the Medicare, and found that much of the desires
11  in designing Medicare was to make Medicare cost-based.  And
12  there were efforts throughout that continued into the '90s
13  with the Resource-Based Relative Value Scale systems that
14  they tried to put in place, all of which were designed to
15  make Medicare as cost-based as it could be.
16  Q.  When you refer to the Resource-Based Revenue Value Scale
17  system, the RBRVS system, what is the significance of looking
18  at that system in relationship to this case?  It seems a
19  little bit esoteric at first.  Why do you refer to that in
20  connection with this case?
21  A.  Well, Medicare reimburses for tens of thousands of
22  procedures and drugs, and in the process of such
23  reimbursement, it's trying to set the reimbursement rates
24  appropriately.  So it will look -- say, in the 1990s, it
25  convened a group of people, experts from the American Medical

Page 14

1  Association, to look at the kinds of efforts that were
2  required in delivering physician services in the offices or
3  in a hospital, and it tried to set relative prices. If I
4  come in for an office visit for a flu shot, that is a certain
5  amount of effort on my part; and if I come in for some major
6  procedure in the office, that involves a greater effort. And
7  so this group of experts at Medicare and with the AMA tried
8  to set -- when it says resource-based, they tried to say:
9  Look, how much in terms of resources are required to provide
10 this procedure, this service? And let's balance, let's make
11 the ratio of those resources equal to the ratio of the
12 reimbursement that we allow, such that that leads to an
13 efficient allocation system as a matter of economics, and
14 you're not reimbursing for some CPT code, which is a
15 procedure code, at a much greater rate than is really
16 reflected in the resources that are used in that procedure.
17 So it was a way of trying to set the prices right.
18       THE COURT: For getting a shot?
19       THE WITNESS: For getting a shot, for something
20 that's more involved.
21       THE COURT: And you're saying doctors did this
22 jointly with CMS or HCFA?
23       THE WITNESS: CMS convened an expert panel with
24 AMA, people from the American Medical Association, to sort
25 this out, and they invested considerable time and effort to

Page 15

1  try and get this Resource-Based Relative Value Scale in place
2  so that what was reimbursed really reflected the effort that
3  was put in and they were fair reimbursements.
4        THE COURT: Now, when did this happen?
5        THE WITNESS: This occurred over the 1990s. It
6  started in the early 1990s.
7        THE COURT: And so when the doctors complained
8  bitterly, for example, that isn't a good enough payment or
9  high enough payment for some of these procedures, are those
10 the procedures that went through this RBRV process?
11       THE WITNESS: We'll call it the RBRV process,
12 right, just for ease. They tried to look at all procedures.
13 They tried to do as many as they could, and they included
14 those procedures. And as you can imagine, as Medicare is
15 trying to do any kind of effort to set reimbursements
16 correctly, there will be some complaints, and they try to get
17 this correct and work with the physicians to do so. That
18 doesn't mean that there weren't some physicians that said,
19 "Oh, that's really not the right amount," but Medicare did
20 its best working with the AMA to get these amounts correct.
21      Now, that again was in the '90s and carried through
22 the '90s. Some of the complaints that we're hearing about in
23 this matter are coming up very recently in terms of this
24 litigation where they're saying, you know, "Look, we can't,
25 we won't be reimbursed sufficiently if we don't get a

Page 16

1  cross-subsidy from a drug payment."
2        THE COURT: Right, and that seems to have some
3  merit because recently CMS did increase the amount of service
4  fees, right?
5        THE WITNESS: Well, CMS is now -- with the MMA, CMS
6  is now struggling with resetting what the right amount should
7  be, given that it has realized that the reimbursements for
8  pharmaceuticals have deviated considerably from what they
9  thought they were.
10       If we want to talk about it, just a brief
11 digression, their design for the AWP system in reimbursing
12 drugs was also an RBRV system related to relative AWPs. But
13 now that has changed with the MMA as they've observed the
14 deviations from what they thought the costs were for the
15 drugs, and so they're resetting that system now. And the
16 doctors are complaining. Some of the doctors that are
17 complaining were making a lot of money. Some of the
18 oncologists that were administering Lupron and, say, Zoladex,
19 were making a lot of money doing so. So of course they will
20 complain saying that "We need much more money now to
21 administer these drugs." And right now it seems to me an
22 unsettled question of whether the amounts that they're asking
23 for in reimbursement are correct or not correct, and CMS is
24 struggling with that issue as we speak.
25       MR. EDWARDS: Your Honor, for the record, may I

Page 17

1  just object to this line of testimony and move to strike it.
2  None of this was in the witness's expert report. At his
3  deposition, he said he wasn't an expert.
4        THE COURT: You know, overruled. I asked the
5  question.
6        MR. EDWARDS: I understand that, your Honor, but --
7        THE COURT: If you need some water, it's over
8  there.
9        THE WITNESS: I do. Thank you.
10 Q. Just to flag something that comes along much later in
11 your direct testimony, Dr. Hartman, did you during the
12 pendency of this trial, after hearing the questions from the
13 Court about how CMS has reacted to reimbursement structures,
14 attempt to undertake a sensitivity analysis to your damage
15 numbers based upon the new ASP system?
16 A. I did so, and some of that material has been included.
17 Q. Okay, we'll get to that later then. Drawing your
18 attention to the third fact on Slide 5, Dr. Hartman, where it
19 says that Fact Three is that "CMS rationally exhibited
20 inertia," what do you mean to the Court as to why it is it
21 was rational for CMS to not adopt or to change from the AWP
22 to the ASP system until the end of 2003?
23 A. Well, the AWP system for drug reimbursement also can be
24 thought of as an RBRV system, and I've developed that in
25 attachment C or perhaps D to my direct testimony. I forget

Page 18
1  right now. I think it's C-2. And so the initial setting of
2  the AWPs and the amounts that were going to be reimbursed off
3  of AWP were a 100 percent and then 95 percent, 85 percent.
4  These were ratios that reflected, as best CMS and HCFA could
5  tell, what would be a reasonable relationship between
6  reimbursement and what AWP was signaling. And obviously over
7  the duration of the '90s, a variety of studies were done that
8  started to inform CMS that there was divergence for some
9  drugs, and the extent of that divergence was unclear. And it
10 does not make sense when AWP informs -- the AWP system is a
11 leviathan -- it informs all the reimbursement throughout the
12 public and private sector -- that they could not change
13 different components of that without radically altering the
14 incentives that are built into an RBRV system. So they
15 responded with some inertia. They wanted to observe and be
16 fully informed before they were to totally change a system.
17 Q. Slide 6. I'd now like to just talk about one aspect of
18 incentives, Dr. Hartman. Of course, there's been testimony
19 in the case about incentives for brand-name single-source
20 drugs to have a wider spread from one to another. There's
21 been some testimony about that. I'm not going to get into
22 that. Instead I'd like to turn to something else, Slide 7.
23     There is testimony in your direct materials
24 regarding the strategic manipulation of the spread by
25 manufacturers of branded drugs -- and then, excuse me, I have

Page 19
1  to skip that. Slide 8.
2  A. But if I --
3  Q. No, you cannot offer anything. I'm sorry. I'm trying
4  to move this along as quickly as I can.
5     THE COURT: Yes, but in doing so, are the slides
6  here?
7     MR. SOBOL: Yes. The slides are at Tab 3, your
8  Honor, I believe. No, Tab 2.
9     THE COURT: I see, so I just move through mine.
10    MR. SOBOL: Yes, if you want to move through that,
11 your Honor, and right now we're at Slide 8 in the bottom
12 right-hand corner along that band.
13    THE COURT: Okay.
14    MR. SOBOL: Okay?
15    THE COURT: Yes.
16 Q. In your direct materials, Dr. Hartman, you provide some
17 testimony regarding the manipulation of the spread by generic
18 multi-source specialty drug companies. Do you recall that?
19 A. I do.
20 Q. Okay. Now, taking off from something that we left off
21 the other day, I take it that at some point you've given
22 testimony about a Nash equilibrium or a tacit conspiracy,
23 it's been referred to in this case, where the AWPs tend to
24 gravitate towards one another for generic drugs. You've
25 testified about that, correct?

Page 20
1  A. Correct.
2  Q. Now, given the fact that the reimbursements are based on
3  the median of those AWPs, please describe to the Court why
4  you still provide testimony that there can be manipulation of
5  the spread between the median and the ASPs for generic
6  manufacturers.
7  A. Well, there can always be manipulation of the spread
8  with the dropping of the ASP, given the way information flows
9  in this market or does not flow to the ultimate end payors,
10 or the third-party payors. But the issue about the AWP
11 itself is that under Medicare reimbursement, it is the median
12 that is used for reimbursement for that group of drugs.
13     Now, any single drug manufacturer cannot easily
14 affect the median itself, but what one observes as you look
15 at generic entry or generic launch in self-administered
16 drugs, in Hatch-Waxman cases, and in one of the drugs that's
17 subject to this litigation, is that many generic firms, when
18 they launch, they're essentially selling a commodity, and the
19 ASP is going to fall.
20     So what do they set their AWP at? What is the
21 signal for that? Normally what you see in a lot of cases is
22 that they set their AWP fairly close, sometimes a little bit
23 above, sometimes, usually 5 to 15 percent below; and then you
24 find a clustering of the other generics setting their AWPs at
25 about the same level. And that's what we certainly find,

Page 21
1  say, with albuterol in this matter. So that while any single
2  manufacturer can't affect the median, a group that behaves
3  and sets their AWP in a consistent way where it's clustering
4  a little bit below the AWP of the branded drug, which is
5  again what we observe and I've shown charts in my direct
6  testimony, you're seeing that clustering, and you're seeing
7  the notion of, with that Nash equilibrium, keeping the AWP
8  fairly close to the branded AWP and fairly high relative to
9  what the ASP turns out to be.
10 Q. Will you go to Slide 12. Here you have provided
11 testimony that once that dispersion then is set, that the
12 generic manufacturers compete among themselves on spread
13 through the reduction of ASPs. What do you mean by that?
14 A. Once a median is set for reimbursement, that's what any
15 generic manufacturer will be reimbursed through Medicare
16 through the J-Codes. And then if a particular manufacturer
17 is trying to take market share, they will offer lower prices
18 to a specialty pharmacy, they will offer lower prices to a
19 physician, whomever is distributing that drug, because that's
20 the incentive, the spread between that median which is fixed,
21 and then they can lower their ASP.
22     And there are two blades to this scissors of the
23 spread. There's the AWP and the ASP. And so they are using
24 one blade, the ASP, once that median is set. And if you do
25 look at, I think it's Figure 2, or it could be 1-B or 1-D in