# Exhibit 7

*United States of America ex rel. Ven-A-Care of the Florida Keys, Inc., et al. v. Dey, Inc., et al., Civil Action No. 05-11084-PBS*

**Exhibit to Opposition to United States' Motion to Exclude Certain Opinions of W. David Bradford**

Rosenstein, Stanley
Sacramento, CA
May 19, 2009

Page 1

```
 1              UNITED STATES DISTRICT COURT

 2                DISTRICT OF MASSACHUSETTS

 3       ------------------------------X

 4    IN RE PHARMACEUTICAL INDUSTRY

 5    AVERAGE WHOLESALE PRICE

 6    LITIGATION

 7       ------------------------------X  MDL No. 1456

 8    THIS DOCUMENT RELATES TO:      Civil Action:

 9    State of California, ex rel.    01-12257-PBS

10    Ven-A-Care v. Abbott

11    Laboratories, Inc., et al.,

12       ------------------------------X

13

14              TUESDAY, MAY 19, 2009

15                     --oOo--

16           VIDEOTAPED DEPOSITION OF

17              STANLEY ROSENSTEIN

18                     --oOo--

19

20    Ref. No. 6620

21    Reported By: CAROL NYGARD DROBNY, CSR No. 4018

22              Registered Merit Reporter
```

```
 1   notwithstanding the 5 percent reduction providers
 2   would still be making a profit over their
 3   acquisition costs; correct?
 4        A.   I believe so, yeah.
 5             That -- I haven't found the section, but
 6   it sounds correct.
 7        Q.   And your conclusion based on that was
 8   that the 5 percent reduction shouldn't have a
 9   detrimental impact on access; correct?
10        A.   That's correct.
11        Q.   And that's partly because the providers
12   were still able to make a profit at the prevailing
13   reimbursement rate?
14        A.   Again, you know, you're looking at this
15   from an overall programmatic standpoint and not on
16   each individual provider, but that's correct.
17             (Exhibit Rosenstein 014 was marked
18   for Identification.)
19   BY MR. GANDESHA:
20        Q.   You've been handed what's been marked as
21   Exhibit 14, which is a document that bears a title
22   "Fact Sheet for Medi-Cal Pharmacy Reimbursement
```

Rosenstein, Stanley
Sacramento, CA
May 19, 2009

Page 189

```
1    Proposal."
2         A.    Yeah.
3         Q.    Do you recall seeing this document
4    before today?
5         A.    Yeah.  I believe we prepared it.
6         Q.    By "we" you mean --
7         A.    The Department.
8         Q.    Were you -- directly involved in the
9    preparation of this document?
10        A.    I would have reviewed it, probably
11   edited it.
12        Q.    And this is a -- a facts sheet similar
13   to the facts sheet we saw earlier; correct?
14        A.    That's correct.
15        Q.    It would have been used in connection
16   with a proposal the Department would make to --
17   ultimately to the Legislature; is that correct?
18        A.    I believe this one lays out the -- the
19   compromise on the -- the budget change.
20              We would compromise to the -- close the
21   budget on this issue.
22        Q.    Okay.  When you say "this issue," what
```

```
 1   do you mean?
 2        A.   Drug -- drug -- pharmacy reimbursement,
 3   pharmacy pricing.
 4        Q.   And do you recall what -- what year this
 5   document would have been prepared?
 6        A.   I don't, but it was a year -- I mean,
 7   this is -- this is the document -- the proposal
 8   that was adopted that actually defines how we pay
 9   pharmacy today.
10             So -- I don't know -- I don't recall
11   which year that was, but --
12        Q.   It would have been around 2004?
13        A.   Yeah, I -- yeah.
14             It would have been -- well, yeah.
15             It WOULD have been.  It was several
16   years ago.
17             I don't recall which specific budget
18   year it was.
19        Q.   But this reflects the -- the prevailing
20   reimbursement formula?
21        A.   This is -- this was the -- the
22   compromise that we put forward, I believe for the
```

```
 1    Budget Conference Committee that was adopted, and
 2    I believe with the exception of ASP remains State
 3    law.  The ASP was revised later.
 4         Q.   Under -- well, it says under the second
 5    bullet point below "Background" it notes that
 6    "Independent studies and acknowledgements from
 7    pharmacists indicate that Medi-Cal's current
 8    reimbursement schedule, which pays pharmacists the
 9    Average Wholesale Price, 10 percent and $3.55
10    dispensing fee, for most prescriptions overpays
11    ingredient costs and underpays the dispensing
12    fee."
13              That's an accurate --
14         A.   Yes.
15         Q.   Okay.  It refers there to
16    "acknowledgements from pharmacists."
17              Can you elaborate on that what that
18    refers to?
19         A.   As we embarked upon this process and
20    brought it to conclusion, Dr. Gorospe basically
21    sat down with a large number of pharmacies and
22    went through what they were actually paying for
```

Page 192

1   drugs, and we invited in a number of the

2   pharmacies to come in and provide us with data,

3   and I think that's a conclusion that Dr. Gorospe

4   came away with from the people -- you know,

5   finally got to agreement and got to actual

6   pharmacy data in this process.

7       Q.   And that was in addition to the data

8   provided by independent studies that's referred to

9   here?

10      A.   Right.

11           And I -- I think the biggest reference

12  is, again, this report, Myers and Stauffer.

13           But, as I recall, we were -- seeking,

14  you know, what are you paying, what is the correct

15  reimbursement rate, and Dr. Gorospe sat down with

16  a number of pharmacies and went through that data.

17      Q.   And under "Ingredient Costs" about one -

18  - four bullet points down there's, again, a

19  reference to a May Revision, and it says "May

20  Revision proposed to reimburse pharmacies for both

21  brand and generics drugs for AWP-20 percent based

22  on information at the time."

Page 193

1     A.    Yeah, that's correct.
2           We went through -- I believe we had a --
3     one set of proposals in January, I'm not positive,
4     and then we put in another proposal in May, and
5     the Legislature asked us to see what we could work
6     out to -- you know, with the -- with the
7     pharmacies to come with a -- a final pricing
8     mechanism, and after lots of consultation with the
9     pharmacies this was what we proposed, and -- you
10    know, and it was eventually adopted.
11    Q.    And it says -- the following bullet
12    point, the second sentence says "To continue with
13    an average AWP-20 percent reduction could affect
14    access to certain drugs and would
15    disproportionately affect pharmacies who
16    specialize in those drugs."
17          He's referring to critical drugs for
18    AIDS and mental health?
19    A.    That's correct.
20          When -- you know, again, you got a
21    pricing system that's looking at averages, and
22    what Dr. Gorospe determined was for the AIDS and

1    cancer drugs I believe that, you know,

2    manufacturers were paying AWP-17 or AWP-18

3    percent.

4            So the reimbursement for an AIDS drug

5    minus 20 percent would have underpaid them and

6    made those drugs probably unavailable.

7            So the general conclusion was that we

8    would go to 17 percent, because that was

9    adequately reimbursed for the expense of drugs,

10   and then, you know, the intent was to, again,

11   pursue average sales price for the generics to try

12   to address that they were cheaper.

13       Q.   So the -- the move to AWP-17 percent was

14   in full recognition that there were drugs that

15   were being reimbursed at a rate that was -- that

16   was below --

17           I'm sorry.

18           Let me -- let me start that again.

19           The move to AWP-17 percent was -- was

20   done in recognition that there were some drugs for

21   which the acquisition cost was below that?

22       A.   That's correct.

Rosenstein, Stanley  
Sacramento, CA  
May 19, 2009

Page 195

1    For brand names we knew that some
2    pharmacies were able to get to minus 18.  In
3    generics we knew it was lower.
4         Again, you've got to look at it in
5    combination with what we were trying to do with
6    the MAIC and the average sales price at that time.
7         Q.   But based on the -- the Myers and
8    Stauffer report at least the Department was aware
9    at this time that as an average generic drugs were
10   costing providers as an average AWP-43.4 percent
11   based on this document; correct?
12        MR. PAUL:  Objection to form.
13        THE WITNESS:  Yeah.
14        Where in the document are you pointing
15   to?
16   BY MR. GANDESHA:
17        Q.   Just the -- the first bullet point there
18   under "Ingredient Costs."
19        A.   Yes, that's what it says.
20        Q.   Now, the Department is also proposing
21   making a change to the dispensing fee at this
22   time; correct?

                                                                        Page 196

1    A.    That is correct.
2    Q.    What was that change?
3    A.    We were proposing to pay for all drugs
4    $7.25, and for people in nursing homes $8.00 for
5    the dispensing fee.
6    Q.    And before the -- the -- or at the time
7    of the proposal the prevailing dispensing fee was
8    $3.55?
9    A.    Well, it was the -- 4.05 minus the 50
10   cents.
11   Q.    And the -- if you look at the second
12   bullet point at the top of the second page of this
13   document, the last sentence says, "This dispensing
14   fee coupled with the AWP-17 percent rate for
15   ingredient costs should maintain access within the
16   program."
17         Is that -- is that accurate?
18   A.    That's correct.
19   Q.    So it was the view of the Department
20   that increasing the dispensing fee to $7.25 and
21   $8.00 for long-term care claims and reducing AWP
22   to AWP-17 percent would maintain access within the

Rosenstein, Stanley                                                May 19, 2009
Sacramento, CA

Page 197

```
 1   program?
 2        A.   That's right.
 3             As I said, we -- Dr. Gorospe did
 4   considerable review starting off with the Myers
 5   and Stauffer, and then sitting down, you know, for
 6   the first time with pharmacies and really
 7   understanding what they were paying for these
 8   drugs.
 9             And, as I mentioned, we pegged the minus
10   17 at the highest of what pharmacies were paying
11   for AIDS and cancer -- or AIDS drugs and
12   antipsychotics, so we picked the highest rather
13   than minus 18 to make sure we had access.
14        Q.   The Department was of the view that to
15   address access it had to take in to account both
16   the -- the AWP formula as well as the dispensing
17   fee?
18             MR. PAUL:  Objection to form.
19             THE WITNESS:  That's right.
20             There's two components to pricing.  You
21   need to compensate for the professional work as
22   well as for the ingredient cost.
```

Page 231

1                    SIGNATURE OF THE WITNESS

2

3

4

5                            --oOo--

6           Signed under penalty of perjury:

7

8

9           _____

10                    STANLEY ROSENSTEIN

11

12          _____

13                          Date

14

15

16

17

18

19

20

21

22

Page 232

1                         --oOo--

2          I, CAROL NYGARD DROBNY, a Certified Shorthand

3    Reporter of the State of California, duly authorized to

4    administer oaths, do hereby certify:

5          That I am a disinterested person herein; that

6    the Witness, STANLEY ROSENSTEIN, named in the foregoing

7    deposition was by me duly sworn to testify the truth,

8    the whole truth, and nothing but the truth; that the

9    deposition was reported in shorthand by me, CAROL NYGARD

10   DROBNY, a Certified Shorthand Reporter of the State of

11   California, and thereafter transcribed into typewriting.

12         That before completion of the deposition,

13   review of the transcript [ ] was [X] was not requested.

14   If requested, any changes made by the deponent (and

15   provided to the Reporter) during the period allowed are

16   appended hereto.

17         Dated:  May 21, 2009

18

19   _____

20         CAROL NYGARD DROBNY CSR #4018

21

22                        --oOo--