# Exhibit 3

*United States of America ex rel. Ven-A-Care of the Florida Keys, Inc.,
et al. v. Dey, Inc., et al.*, Civil Action No. 05-11084-PBS

**Exhibit to the Declaration of Marisa A. Lorenzo in Support of Dey's
Motion to Exclude the Opinions of Mark Duggan, Ph.D.**

Duggan, Ph.D., Mark G. - Vol. II               CONFIDENTIAL                February 27, 2009
                                               Washington, DC

Page 270

1              CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

2                    UNITED STATES DISTRICT COURT

3                  FOR THE DISTRICT OF MASSACHUSETTS

4        - - - - - - - - - - - - - - - -x

5        IN RE:  PHARMACEUTICAL          :   MDL NO. 1456

6        INDUSTRY AVERAGE WHOLESALE      :   CIVIL ACTION

7        PRICE LITIGATION                :   01-CV-12257-PBS

8        THIS DOCUMENT RELATES TO:       :

9        U.S. ex rel. Ven-a-Care of      :   Hon.  Patti B. Saris

10       the Florida Keys, Inc.          :

11            v.                         :

12       Dey, Inc., et al.               :

13       No. 05-11084-PBS                :

14       - - - - - - - - - - - - - - - -x

15                          Washington, D.C.

16                          Friday, February 27, 2009

17                          VOLUME II

18

19            Continued Videotaped Deposition of MARK G.

20       DUGGAN, Ph.D., a witness herein, called for

21       examination by counsel for Dey, Inc. in the

22       above-entitled matter, pursuant to notice, the

Duggan, Ph.D., Mark G. - Vol. II  CONFIDENTIAL  February 27, 2009
Washington, DC

Page 319

1  Q. Do you know whether you looked at the
2  materials that are referenced in that item?
3      A. So I do not have memorized, for example,
4  the Bates stamp and there is not much description
5  here, but I do recall reviewing one or more documents
6  by Jing Xing Technologies. I just -- I can't, as I
7  said, whether it's this, it's these Bates numbers, I
8  can't recall.
9      Q. What is the business of Jing Xing
10 Technologies?
11     A. As I said earlier, I don't recall the
12 specifics of what Jing Xing Technologies does, so I'm
13 not sure.
14     Q. Do you know why this particular item is in
15 the materials that were provided to you?
16     A. Once again, I -- as I said, I recall
17 reading, considering, know this was provided to me
18 more than a year ago. I recall considering a Jing
19 Xing document, but I just, I don't have -- I can't
20 pull up in my mind right now the specifics of, of the
21 document. If you show me the document, perhaps that
22 will help refresh my memory.

Page 320

1      Q. Now, going back to your report, you can
2  put aside the exhibit. Going back to your report,
3  who actually drafted the text of the report?
4      A. I did.
5      Q. Did anybody else write any of the text of
6  the report besides yourself?
7      A. As we've discussed, there were cases in
8  which Ian Dew or others at Steck Consulting provided
9  me with, for example, the table, which is included in
10 my report or when Myers and Stauffer, not --
11 StoneTurn provided me with a table that is included
12 in my report. As I do not recall an instance in
13 which I believe the entire, trying to remember,
14 trying to grind through all of the work I did on
15 this. I don't recall any instance in which just
16 leafing through it to try to churn up my memory, but
17 I don't recall any instance whether someone other
18 than myself, with the caveat that there is a lot that
19 goes into this report. But to the best of my
20 recollection, I drafted every paragraph.
21     Q. And this was -- the starting point for
22 creating the Dey report was to start with the Abbott

Page 321

1  report, right?
2      A. I certainly made use of the Abbott report.
3  And drafting my Dey report certainly made use of it.
4      Q. Well, when you say made use of it, you
5  actually took the text of the Abbott report and in
6  some places just replaced the word Abbott with the
7  word Dey, right?
8      A. There may be cases in which simply to
9  economize on typing, for example, if we go to the
10 section on Medicaid SDU data, that you know to some
11 extent the third main, it is -- my description there
12 is almost perfectly analogous to the description for
13 Abbott, except that, you know, once again, I don't
14 have the Abbott report in front of me.
15        But my goal here was to provide a summary
16 to the Court and other interested readers on this
17 data set and so time periods are different. The
18 products are different. The trends and the data are
19 different and so forth, but the sort of skeleton that
20 I took care to optimize in drafting my Abbott report,
21 I made use of here.
22     Q. And there are instances when you went

Page 322

1  into, into the text of the Abbott report and actually
2  searched for the word Abbott, found it, and replaced
3  it with the word Dey, isn't that right?
4      A. I think there were a couple of cases
5  because -- and whether that's because I cut and paste
6  a particular section or because as I was writing
7  this, I was -- you know, there have been times when I
8  refer to Dey as Roxane or Dey as Abbott just because
9  these three firms are sort of clinging around in my
10 mind, but -- but there are certainly cases, I did
11 similar search and replaces for Roxane because for a
12 while I was using two Ns instead of one.
13        So I think in the -- it could be that's
14 because of a cut and paste, for example, of a, of a
15 Section 5 or it could be that it's a, you know, just
16 a case in which while I was writing, I inserted
17 Abbott when I meant Dey, typed Abbott when I meant
18 Dey.
19     Q. Well, were there instances where you
20 searched for the word Abbott and found it and
21 replaced it with the word Dey?
22     A. I believe I did that. Once again,

14 (Pages 319 to 322)

Henderson Legal Services, Inc.

202-220-4158                                              www.hendersonlegalservices.com

Duggan, Ph.D., Mark G. - Vol. II                         CONFIDENTIAL                           February 27, 2009
                                                          Washington, DC

Page 323

1  whenever I, you know, do -- I know that in my work,
2  for example, on Medicare and my academic research on
3  Medicare, one of the things that I can recall doing
4  as I drafted one of my earlier papers is looking for
5  the word Medicaid and replacing it with Medicare when
6  appropriate, because, you know, that's another case
7  in which I -- so it's just a standard thing that I do
8  when I draft something and then I go through and try
9  to make what is written as accurate as possible.
10          (Exhibit Dey Duggan 005 was
11          marked for identification.)
12      BY MR. ESCOBAR:
13      Q.  I'm showing you what has been marked as
14  Exhibit 5, and the first page of Exhibit 5 has an
15  email from Ian Dew at Steck Consulting to Renee
16  Brooker, George Henderson, Mark Lavine and attached
17  to that is a -- some notes of what appear to be --
18  well, it says DOJ meeting notes.  It appears to be
19  January 12th and 13th, 2009 meeting notes.  Do you
20  see that?
21      A.  Yes.  I see that.
22      Q.  And have you seen these meeting notes

Page 324

1  before?
2      A.  Not that I recall.
3      Q.  Were you present at a meeting on January
4  12th and 13th with people from Steck and with DOJ?
5      A.  I don't recall that specific date.  How
6  long ago would that have been?  That would have been
7  six weeks ago.  It seems plausible, but I don't
8  recall if it was that exact date.
9      Q.  Well, do you recall if, forgetting the
10 exact date, do you recall that you had a two-day
11 meeting with people from DOJ and Steck to work on
12 your Dey report, or to discuss your Dey report?
13     A.  Yes.  I can't remember if it was one day
14 or two days.  I think it was two days but I'm not --
15 but I remember a meeting at DOJ to discuss the
16 report.
17     Q.  Who was present?
18     A.  Ian Dew, Renee Brooker, and some subset of
19 -- I don't -- some subset seems plausible of Susan
20 Thomas, Bunker Henderson, Mark Lavine, Jim Breen,
21 whether all four of them or three or two out of four,
22 I don't recall.  There were also -- I'll do my best

Page 325

1  to recall.
2          I believe for part of one of the days, two
3  or three individuals from StoneTurn were there.  And
4  I don't recall if Myers and Stauffer were -- was
5  there or whether they conferenced in or what.
6      Q.  Now, looking at the notes, do you see in
7  the section that's entitled -- or the first, the
8  first section says Abbott.  Do you see that?
9      A.  Yes.
10     Q.  And in the second item, it says, pull
11 together summaries of CHIP data for Professor Duggan.
12 Did you use any CHIP data in connection with your
13 analysis for the Dey report?
14     A.  I did not.  CHIP is, I believe, Abbott's
15 customer home infusion program, but that was an
16 Abbott specific bit of work.
17     Q.  And in the -- in the section entitled
18 search and replace like edits, are those -- these are
19 search and replaces in your draft Dey report as of
20 that time, is that correct?
21     A.  Yes.  They were cases in which for
22 example, I believe as some people looked over the

Page 326

1  report, instances where Abbott was written when I
2  clearly implied Dey.  Cases where I wrote carrier as
3  opposed to DMERC and so forth.  So there were some
4  cases in which that --
5      Q.  Item number six says Duggan search for AWP
6  and WAC and replace with published AWP and published
7  WAC.  Do you see that?
8      A.  Yes.  I see that.
9      Q.  What was the reason for making that
10 change?
11     A.  Just because I believe in writing it,
12 the -- perhaps in writing earlier drafts of it in
13 some cases, I neglected to include published AWP,
14 published, the word published before AWP.  This is --
15 so I think it was an omission and similar to the way
16 that I referred to it in my earlier reports, to the
17 best of my recollection.
18     Q.  When you used published AWP and published
19 WAC, you're referring to the numbers that appear in,
20 for example, First DataBank?
21     A.  Correct.  And Red Book and other pricing
22 compendia.  That's correct.

Duggan, Ph.D., Mark G. - Vol. II  CONFIDENTIAL  February 27, 2009
Washington, DC

Page 419

1 array?
2    A.  I haven't studied precisely how
3 individuals at Red Book arrive at the AWPs. Do they
4 obtain them from other pricing compendia? How
5 exactly do they obtain them. It seems reasonable
6 that with the, recognizing that there may be nuances,
7 Red Book may get them from somewhere else. For
8 example, one example of a nuance, but it -- the
9 assumption here is that the alternative AWPs that
10 I've calculated would be used in these arrays.
11    Q.  And the only way they could be used in the
12 arrays is if they appear in the Red Book, isn't that
13 right?
14    A.  I hesitate to speculate the only way that
15 something could happen seems -- as someone who, you
16 know, we saw earlier how I, in my analysis, utilized
17 data from multiple sources to arrive at, you know, to
18 sort of check against perhaps the person, a person at
19 CIGNA would have in front of them Red Book and First
20 DataBank.
21        And for example -- and if there was a
22 divergence typically use Red Book. But if there as a

Page 420

1 divergence drill down more. I'm not -- it's
2 difficult for me to speculate. This AWP from Red
3 Book is my understanding that in the majority of
4 cases, the vast majority of cases, the DMERCs obtain
5 their AWPs from the Red Book but there is always more
6 complexity to the world than can be summarized in,
7 you know, these short column headings.
8    Q.  But in the, in this array that we are
9 looking at, the revised array, Dey only, you're
10 making the assumption that the DMERC would have
11 looked at the Red Book, looked up the Dey and seen
12 the number 1151, isn't that right?
13    A.  I am assuming that they would have used
14 the, these -- that if Dey had reported alternative
15 AWPs and they had been published, they would have
16 been used by the DMERCs.
17        MR. ESCOBAR: Take a break.
18        THE VIDEOGRAPHER: The time is 2:23 p.m.
19 This completes tape number three. Number
20 two. Excuse me.
21        (Recess.)
22        THE VIDEOGRAPHER: The time is 2:38 p.m.

Page 421

1 This begins tape number three.
2        BY MR. ESCOBAR:
3    Q.  You still have Exhibit Number 7 in front
4 of you?
5    A.  I do.
6    Q.  And before we broke, we were looking at
7 the panel, the second panel on the first page of
8 Exhibit 7, and when your alternative AWPs for the Dey
9 products were assumed to flow into the array from Red
10 Book, you indicate here that the generic median
11 changed from what had been 3.52 to 2.70, is that
12 right?
13    A.  That is correct.
14    Q.  And the only thing that you had changed
15 for the array was the AWP for the three Dey products,
16 correct?
17    A.  That is correct.
18    Q.  So changing the AWP of one of the drugs
19 that are members of the array could change the
20 median, is that right?
21    A.  It could. Depends on the -- depends.
22    Q.  Now, there are three products from Roxane

Page 422

1 that in this particular array you didn't change,
2 although you do in a later array, right?
3    A.  That is correct.
4    Q.  And then there are three products from
5 Alpharma USPD, right?
6    A.  Right.
7    Q.  And now, the Alpharma AWPs are higher than
8 the AWPs for the same corresponding Dey drugs, right?
9    A.  Correct.
10    Q.  And would that suggest to you that
11 Alpharma -- strike that. You -- you did not have and
12 don't have any Alpharma transactional data to be able
13 to do the same analysis for Alpharma that you did for
14 Dey, right?
15    A.  I do not have direct and indirect
16 transaction data for Alpharma like I do for Dey.
17    Q.  And looking, just looking at the numbers
18 for Alpharma and the fact that it is a generic
19 company here competing with Roxane and Dey, does it
20 suggest to you that if you had the transactional data
21 for Alpharma, and you did the same type of analysis
22 that you did for Dey, that you would have come up

Duggan, Ph.D., Mark G. - Vol. II  CONFIDENTIAL  February 27, 2009
Washington, DC

Page 431

1  A. Okay.
2  Q. Okay?
3  A. Yeah.
4  Q. All right. Now, in your second panel,
5  you -- the Dey AWP changes because you've come up
6  with your own formula to substitute as to how to
7  calculate the AWP, right?
8  A. I have, as I specify in the report, in
9  this array, I have replaced the AWP with 125 percent
10 of the pharmacy average indirect price.
11 Q. Okay. But all the other generics are,
12 their AWP is still the product of the formula that we
13 discussed a moment ago, right?
14    MR. HENDERSON: Objection.
15    THE WITNESS: Given what you asked me to
16 assume, that it is sales divided by a thousand times
17 .9, okay.
18    BY MR. ESCOBAR:
19 Q. All right. So now the second median, the
20 median in your second panel is the result of AWPs
21 being calculated by two different methodologies,
22 right?

Page 432

1  A. I'm -- I'm --
2     MR. HENDERSON: Objection.
3     THE WITNESS: So there is a lot that's
4  going into these assumptions. Someone told these
5  five different firms this is what you should do.
6  They all did it. These are the prices that emerged
7  from it. With all those assumptions, which I have --
8  I mean, they are a -- I don't know why we are making
9  those assumptions. But with all those assumptions,
10 then for the nine products that are not Dey, they
11 would be using the first methodology that you laid
12 out. Assuming that they are all doing the same
13 thing, what they have, what they should do, and Dey's
14 average, Dey's AWP is arrived at using
15 transaction-based average.
16    So I guess given your assumption, by
17 definition -- so the assumption sort of yields the
18 answer. There is, assume one methodology is the
19 same. But the methodology is different than the one
20 I'm employing. So by definition, there are two. So
21 I -- it's just, it's a strain for me as an economist
22 making an assumption that -- yeah -- by definition

Page 433

1  there are two methodologies.
2  Q. Okay. Now, to figure out the median that
3  would be generated in the second panel for AWPs
4  calculated using your methodology, you would have to
5  go into the transactional data of all the members of
6  the array and determine how the AWPs would look like
7  using your methodology, right?
8     MR. HENDERSON: Objection.
9     THE WITNESS: I don't agree. I think that
10 my methodology is very specific about what it does,
11 which is holding other factors constant, and revising
12 the Dey AWPs as I describe, determine how Medicaid,
13 Medicare spending would have changed. This, by the
14 way, I should note, here we are looking at on
15 ipratropium bromide array.
16    As I discuss in my report, I do the same
17 for the Albuterol Sulfate arrays. Consistent method
18 which for the reasons I outline in my report,
19 typically has no effect on the median in those cases.
20 This -- the -- the methodology that I am applying
21 provides, sheds light on how Medicare spending would
22 have changed if Dey had these alternative AWPs and

Page 434

1  other factors had remained constant. And then later
2  on, as I can see from the next page of this exhibit
3  you've handed me, the Roxane prices are also revised
4  as discussed, and Dey and Roxane in contrast to
5  Alpharma and the other two pharmacists, Total Care,
6  and AllScripts are being sued by the United States.
7  The other firms are not.
8  Q. Does the fact that a company is being sued
9  or not weigh into your methodology?
10 A. My methodology examines for Dey initially
11 what is the effect of the alternative AWPs holding
12 other factors constant. So given what I set out to
13 answer, I -- it, holding these other factors
14 constant, it provides very useful guide to how
15 Medicare spending would have changed and then Roxane
16 has added to the analysis. I did not --
17 Q. Okay. So in the second panel, you look at
18 one of the, you look at three of the products, just
19 the Dey products, apply your methodology, change
20 their AWP and that yields a new and lower generic
21 median of 270, right?
22 A. That is correct.

Page 435

1  Q. And then you then go and apply your
2  methodology to another product on top of the Dey one
3  and that is the three Roxane generic products, right?
4  A. You mean on the next page?
5  Q. Yes.
6  A. Bottom part.
7  Q. Yes. On the -- yes. On the next panel
8  where it says Roxane only. I'm sorry. On the second
9  panel.
10 A. Dey and Roxane?
11 Q. Right.
12 A. Yes. In -- among the 12 generic products
13 in that array, the AWPs for the three Dey products
14 and the three Roxane products have been replaced by
15 the alternative AWPs we've been discussing, right.
16 Q. So when you change just -- when you just
17 apply your methodology to the Dey transactional data,
18 that leads to a new median of 2.70. When you then
19 apply your methodology to one of the other members of
20 the array, the Roxane generic products, that changes
21 the generic median again to 1.18, right?
22 A. That -- that is correct. The median falls

Page 436

1  so when the AWPs for six products, as opposed to just
2  three products are changed, the median in this
3  particular case falls by more.
4  Q. And what this would tell you is if you
5  went and looked at the three Alpharma products and
6  applied your methodology to their transactional data
7  and similarly changed the AWPs, the median would
8  change once again, right?
9  A. It doesn't tell me that.
10 Q. Well, the data shows that when you change
11 Dey and then the median changes, when you change
12 Roxane on top of having changed Dey, the median
13 changes again, so just on that data, it would suggest
14 to you that if you went and changed Alpharma, the
15 median could change one more time, right?
16     MS. THOMAS: Objection.
17     THE WITNESS: It is possible, but it
18 wouldn't necessarily. I mean, as we can see here the
19 generic median is $1.18. And if there, if for
20 example, Alpharma's prices are 25, 30 percent higher
21 than Dey's, it would not change the generic median.
22     BY MR. ESCOBAR:

Page 437

1  Q. What if it was 25 or 30 percent lower?
2  A. Well, by giving the distribution of prices
3  here, it is straightforward. You know, I guess I can
4  try to do the head math here on the fly. If -- there
5  -- suppose they were all 60 cents instead of below --
6  then I suppose the median would fall a bit more to 88
7  or 89 cents, a bit more.
8       If the median is basically defined when
9  there are 12 numbers in a distribution, the median is
10 going to be defined as the midpoint of the sixth and
11 seventh highest prices. So by definition, if you
12 move the three prices above the median, revise them
13 with prices that are below the median, by definition
14 the median is going to change.
15 Q. And the -- I guess the bottom line is you
16 don't know what the effect would be of looking at the
17 Alpharma transactional data and applying your
18 methodology? You don't know what the impact of that
19 would be on the median?
20 A. I have not looked at, I have not examined
21 Alpharma transaction data for, for this -- for this
22 analysis. And as I said, I can tell you by, just by

Page 438

1  the properties of the median how -- by how much
2  lower, how much lower their prices would have to be
3  to result in a change in that median. But I haven't
4  -- I have not incorporated Al -- I haven't
5  incorporated the Alpharma data in this array and
6  similarly in the case of the Albuterol arrays, I
7  didn't as well.
8  Q. And you didn't -- you didn't do any
9  analysis of the other two generics' position or
10 something like that, Total Care and AllScripts,
11 right?
12 A. Their transaction data?
13 Q. Right.
14 A. I have not examined transaction data for
15 those two firms.
16 Q. So there is no way to know today what the
17 median would look like if you had analyzed the
18 transactional data of all the companies that are
19 listed in the generic section of the array and done
20 the same analysis that you did for Dey and Roxane?
21 Would you agree with that?
22 A. Can you repeat that?

| Duggan, Ph.D., Mark G. - Vol. II | CONFIDENTIAL<br>Washington, DC | February 27, 2009 |
|---|---|---|

Page 471

1  products such as most prominently ipratropium bromide
2  and Albuterol Sulfate, though I have not studied all
3  of the factors that were included in that
4  legislation. There were many changes. Having done
5  work on Part D myself, I know that there were a
6  number of changes in that legislation. Drug discount
7  cards and so forth. So those were two of what I
8  believe were many changes in the program.
9      Q. And in your -- in your analysis that you
10 did here in the Dey report on the Medicare section,
11 you assumed that when you use the average price, in
12 place of the published AWP that the dispensing fee of
13 $5 would remain in place and it wouldn't go up,
14 correct?
15     MS. THOMAS: Objection.
16     THE WITNESS: Just to clarify, I used 125
17 percent of the average pharmacy price, which for the
18 reasons that I mentioned earlier, that average
19 pharmacy price tends to exceed the average price for
20 all customers, but it is true that in the analysis
21 that I held other factors constant. So the AWP using
22 the alternative AWPs for the Dey products, how would

Page 472

1  the allowed amount have changed and how would
2  Medicare reimbursement have changed. And so that is,
3  that should be clear from -- hopefully that's clear
4  from my report.
5      BY MR. ESCOBAR:
6      Q. Well, I didn't see anything in the report
7  about the $5 dispensing fee that I recall. So my
8  question is are you assuming that when you changed
9  the AWPs, that the dispensing fee that would be paid
10 to the provider would be $5 and not something higher?
11     A. That is -- my analysis holds other
12 factors, including that dispensing fee, constant.
13     Q. And did you consider whether in light of
14 the change that you were making to the AWP whether
15 you should look into whether the dispensing fee
16 should be changed also? Did you just look into that
17 at all?
18     A. Certainly considered dispensing fee
19 issued. These strike me that the 2003 and before
20 period is a different period in many respects in
21 terms of Medicare policy from the 2005 and after
22 period. It -- and the -- my understanding is that

Page 473

1  the 57 dispensing fee was further studied -- further
2  analysis was conducted of that. Whether it was by
3  CMS, OIG. I'm not sure who all the parties are who
4  are involved.
5      But the -- the analysis that I conducted
6  holds that fixed and I -- I -- for the reasons I've
7  outlined, I believe that is a reasonable thing to
8  focus on, the first order of fact of the Dey AWPs.
9  Can we do anything about the temperature in here?
10 It's warming up again. It's 77. It seems to -- if
11 there is any -- I apologize for interrupting.
12     Q. Looking at Exhibit 7?
13     A. I appreciate it. Thank you.
14     Q. In Exhibit 7 in the brand section of the
15 array, there is a reference to --
16     A. Exhibit 7. I'm sorry. I've got Exhibit
17 8. Okay. Exhibit 7.
18     Q. There is a reference to a, another brand,
19 correct, the Boehringer Ingelheim entry there, do you
20 see that?
21     A. I do.
22     MR. HENDERSON: First page, second page or

Page 474

1  both?
2      BY MR. ESCOBAR:
3      Q. I think it appears on all of them.
4      A. It's in all four of the arrays.
5      Q. And did -- I take it you didn't do any
6  analysis of the transactional data of that brand, the
7  Boehringer brand to determine whether or not the AWP
8  of that brand should be changed?
9      A. The -- should be -- I guess I would
10 just -- I wouldn't use the phrase should be. I did
11 not examine transaction data for that, for that
12 specific product, for example, to calculate prices,
13 so for that specific product, I did not.
14     Q. And would that be true if we looked at, if
15 we sat here and looked at every single array and went
16 through every drug in either the generic section or
17 the brand section that -- that was a drug from a
18 company that's not in litigation and from which you
19 did not receive transactional data, you did not
20 review whether their AWPs should be changed at all,
21 is that right?
22     MS. THOMAS: Objection.

52 (Pages 471 to 474)