# Exhibit 6

*United States of America ex rel. Ven-A-Care of the Florida Keys, Inc., et al. v. Dey, Inc., et al.*, **Civil Action No. 05-11084-PBS**

**Exhibit to the Declaration of Marisa A. Lorenzo in Support of Dey's Motion to Exclude the Opinions of Mark Duggan, Ph.D.**

Page 240

```
 1              UNITED STATES DISTRICT COURT
 2            FOR THE DISTRICT OF MASSACHUSETTS
 3    - - - - - - - - - - - - - - -
 4    IN RE:  PHARMACEUTICAL       )   MDL NO. 1456
 5    INDUSTRY AVERAGE WHOLESALE   )   CIVIL ACTION
 6    PRICE LITIGATION             )   01-CV-12257-PBS
 7                                 )
 8    THIS DOCUMENT RELATES TO     )
 9    U.S. ex rel. Ven-a-Care of   )   Judge Patti B. Saris
10    the Florida Keys, Inc.       )
11         v.                      )   Chief Magistrate
12    Abbott Laboratories, Inc.,   )   Judge Marianne B.
13    No. 06-CV-11337-PBS          )   Bowler
14    - - - - - - - - - - - - - - -
15
16       Videotaped deposition of MARK G. DUGGAN, PH.D.
17                       Volume II
18
19                      Washington, D.C.
20                   Tuesday, May 19, 2009
21                       9:30 a.m.
22
```

Page 297

1  this case and it is striking to me how big these
2  disparities are.
3        I understood even before coming on these
4  cases that there were in some cases discrepancies
5  between AWPs and actual prices.  Indeed I note
6  that in one of my own previous papers before I
7  even started on this work.  But this -- so I stand
8  by my statement that I'm not saying that Abbott
9  should have reported exactly X, but I think my
10 report sheds considerable light on if that spread,
11 that 15 to 1 spread, had been much smaller how
12 much different would spending for these programs
13 have been.
14     Q.   And I take it you've read the testimony
15 of numerous state officials who testified that
16 they would not be surprised at all by published
17 AWPs being several times higher than marketplace
18 prices for generic products in general --
19       MR. GOBENA:  Objection to form.
20     Q.   -- before you opined that the prices
21 were misleading --
22       MR. GOBENA:  Same objection.

Page 298

1     Q.   -- right?
2     A.   Once again, I have not done a full scale
3  analysis of what individuals at specific agencies
4  knew and how those views changed over time.
5  That's really not been the thrust of my analysis.
6  So I've conducted an analysis that sheds light on
7  how different spending for these programs would
8  have been if more accurate prices had been
9  reported.
10    Q.   So do you intend to tell the jury
11 without doing any fashion of research to see what
12 state and federal officials knew about published
13 AWPs that the prices reported by Abbott were
14 misleading?
15       MR. GOBENA:  Objection to form.
16    A.   It is very difficult for me to
17 anticipate what I'm going to say at trial.  It
18 seems plausible that will occur months from now.
19 I have done my best in this report to provide --
20 and the subsequent addendums and so forth -- to
21 provide the court and others with an interest in
22 this case with information on how Medicaid and

Page 299

1  Medicare spending would have changed if more
2  accurate AWPs had been reported.
3        I certainly would not be surprised if I
4  were to present something along the lines of
5  figure 2.  But it's just difficult to forecast
6  what I'll weigh in on at trial.  But the thrust of
7  my analysis is summarized in the report, the
8  rebuttal and the addendum, or whatever the January
9  one is called.
10    Q.   If Abbott actually did have sales at the
11 list prices that it reported, are you saying that
12 it should not have reported those list prices?
13    A.   Can you repeat the question?
14    Q.   If Abbott did have sales at the list
15 prices that it reported, are you opining that
16 Abbott should not have reported those list prices?
17       MR. GOBENA:  Object to form.
18    A.   When you say -- do you mean the average
19 wholesale prices that they reported?
20    Q.   Well, did Abbott report average
21 wholesale prices for these products?  Do you even
22 know?

Page 300

1    A.   It is -- I don't know all of the details
2  about the back and forth between Abbott and the
3  pricing compendia such as First Databank.  It is
4  the case that typically there was a -- the AWP was
5  25 percent greater than the WAC for most Abbott
6  products.  I can't remember if it was 20 or 25.
7  Let's say it's 25 percent.  So whether Abbott
8  reported the WAC and that was scaled, or reported
9  the AWP and that was scaled or reported both, that
10 hasn't been the focus of my analysis.
11       What I do know is these are the prices
12 that were published by the pricing compendia,
13 which are quite close to the WACs for the same
14 Abbott products and these are the prices that were
15 used by most state agencies and by the Medicare
16 program in adjudicating claims.
17    Q.   So it's your understanding that the
18 prices that Abbott reported which are the alleged
19 false statements that form the basis of this case
20 are the reporting of WACs --
21       MR. GOBENA:  Objection to form.
22    Q.   -- to the compendia?

Page 357

1 it's appropriate.
2    Q.  Dr. Duggan, have you attempted to
3 quantify as a measure of damages in this case the
4 difference between what the government would have
5 paid and what it did pay had it known of the
6 alleged false or fraudulent nature of Abbott's
7 price reporting?
8         THE WITNESS:  Can you repeat that
9 question?
10        (Whereupon, the requested portion
11 was read by the reporter.)
12   A.  The government -- who in the government?
13 I guess I'm confused.
14 BY MR. TORBORG:
15   Q.  The federal government.
16   A.  The federal government employs millions
17 of individuals.  I mean, it's a broad --
18   Q.  People who administered the Medicare and
19 Medicaid programs?  Who did you think I was asking
20 about?
21   A.  I'm just --
22        MR. GOBENA:  He's asking for a

Page 358

1 clarification, Counsel.  He's entitled to do that.
2         THE WITNESS:  I'm a little bit
3 disoriented.  Can we go back to the initial
4 question?
5         (Whereupon, the requested portion
6 was read by the reporter.)
7    A.  Government knowledge really was, as I've
8 said several times now, was really not the focus
9 of my analysis, determining what individuals
10 within the government at CMS or in the Medicaid
11 agencies knew.  And I understand that that's an
12 issue that others, other experts, have focused on
13 in this case.  That's certainly not been the focus
14 of my work.
15 BY MR. TORBORG:
16   Q.  We talked about this before the break.
17 But one of your assumptions in this case is that
18 the Medicaid and Medicare programs would have used
19 lower prices of the type that you calculate in
20 your report, correct?
21        MR. GOBENA:  Objection to form.
22   A.  I assume Medicaid and Medicare would

Page 359

1 have used these alternative AWPs, correct.
2    Q.  It's an assumption of your report,
3 right?
4    A.  My analyses calculate, determine,
5 examine, what Medicare and Medicaid would have
6 paid if these alternative AWPs had been in effect.
7    Q.  And they were in fact used?
8    A.  And they were used in adjudicating
9 claims for both programs.
10        MR. TORBORG:  Mark this as Duggan
11 Rebuttal Exhibit 6.
12        (Exhibit Duggan Rebuttal 006 was
13 marked for identification.)
14 BY MR. TORBORG:
15   Q.  Dr. Duggan, if you would just take a
16 glance at this to the extent necessary to tell me
17 whether or not you've ever seen this document.  I
18 will just have a relatively few questions for you
19 on this.
20   A.  I don't recall this specific document.
21   Q.  I'd like to ask you to go to page 9 of
22 the document.  There's a section at the top of

Page 360

1 this report.  For the record, this is a 2002
2 document entitled "Performance audit: Cost
3 containment for state prescription drug
4 expenditures."  It's from the office of state
5 auditor, Claire McCaskill, June 28th 2002.  It
6 relates to the state of Missouri.
7         Missouri is one of the states that you
8 have claims data for, right?
9    A.  That is correct.
10   Q.  Which means that it is a state with
11 significant expenditures for the subject drugs,
12 correct?
13   A.  I don't remember the exact dollar
14 amount, but it was relatively high, higher than
15 certainly the average.
16   Q.  There's a section here on page 9 that's
17 titled "Lower reimbursement rates for home
18 infusion drugs not used."  It states "Missouri
19 continues to pay more than it should on home
20 infusion drugs because division officials have not
21 yet implemented more accurate drug prices.  In May
22 2000 the federal Department of Justice provided

Page 345

1  how spending would have changed.
2         And so my analysis calculates how --
3  this is sort of, once again, touching on this
4  knowledge of government officials issue.  And it's
5  really -- that just wasn't the focus of my
6  analysis.
7     Q.  Is it your understanding that what Dr.
8  Hughes is saying there -- just to try to
9  paraphrase just to move along -- is that he's
10 saying that your difference calculation assumption
11 that states would have used much lower prices in
12 calculating ingredient prices if they were
13 available?
14    A.  It assumes that state agencies would
15 have used the AWPs when adjudicating the claims,
16 the alternative AWPs.
17    Q.  And I think we covered this at length in
18 your prior deposition so I don't want to belabor
19 it here.  But you've agreed that whether states
20 would have used much lower prices in adjudicating
21 ingredient cost reimbursements is an assumption in
22 your report, correct?

Page 346

1     A.  My analyses assume that the alternative
2  AWPs that I calculate from Abbott's data would
3  have been used by state Medicaid programs in
4  adjudicating the claims.  That is correct.  In
5  some cases, however, they would not have been --
6  they would have been overwritten by things like
7  usual and customary, for example.  So --
8     Q.  And have you done anything more in your
9  work on this case to consider or test the
10 assumption that states would have used much lower
11 prices in calculating ingredient reimbursements?
12        THE WITNESS:  Can you read that back?
13        (Whereupon, the requested portion
14 was read by the reporter.)
15    A.  That is an -- so I -- since receiving
16 this report I have not examined this issue
17 further.  However, I examined it, considered it to
18 some extent earlier in my earlier report.
19 BY MR. TORBORG:
20    Q.  Okay.  You would agree with me that your
21 rebuttal report doesn't address the issue of
22 whether or not states would have used lower prices

Page 347

1  akin to the prices you calculate in calculating
2  ingredient reimbursements, correct?
3     A.  It to some extent addresses it in that
4  it discusses the events that followed the change
5  in AWPs that's apparent from figure 1 and figure 2
6  for Abbott products and that's summarized
7  elsewhere in the report and that were later used -
8  - and then one can see the decline in Medicaid
9  spending that followed that.
10    Q.  Can you show me where in your report you
11 address this question, in your rebuttal report?
12    A.  Well, in an indirect way I am addressing
13 it when I discuss the change to Abbott's AWPs that
14 happened in 2001.  And it is apparent from -- it's
15 my own table 11.  There was a sharp decline in
16 Medicaid spending that followed that.  So I
17 address it tangentially, but not head-on, perhaps.
18        THE WITNESS:  Is this --
19        MR. TORBORG:  Why don't we take a lunch
20 break.
21        THE WITNESS:  Okay.  Great.
22        THE VIDEOGRAPHER:  Off the record at

Page 348

1  12:37.
2         (Whereupon, at 12:37 p.m. a lunch
3  recess was taken.)