# Exhibit 7

*United States of America ex rel. Ven-A-Care of the Florida Keys, Inc.,
et al. v. Dey, Inc., et al.*, Civil Action No. 05-11084-PBS

**Exhibit to the Declaration of Marisa A. Lorenzo in Support of Dey's
Motion to Exclude the Opinions of Mark Duggan, Ph.D.**

Duggan, Ph.D., Mark G.                    CONFIDENTIAL                    February 26, 2009
                                          Washington, DC

Page 1

```
 1              UNITED STATES DISTRICT COURT

 2            FOR THE DISTRICT OF MASSACHUSETTS

 3   - - - - - - - - - - - - - - -x

 4   IN RE:  PHARMACEUTICAL         :   MDL NO. 1456

 5   INDUSTRY AVERAGE WHOLESALE     :   CIVIL ACTION

 6   PRICE LITIGATION               :   01-CV-12257-PBS

 7   THIS DOCUMENT RELATES TO:      :

 8   U.S. ex rel. Ven-a-Care of     :   Hon.  Patti B. Saris

 9   the Florida Keys, Inc.         :

10        v.                        :

11   Dey, Inc., et al.              :

12   No. 05-11084-PBS               :

13   - - - - - - - - - - - - - - -x

14                          Washington, D.C.

15                          Thursday, February 26, 2009

16                          VOLUME I

17               C O N F I D E N T I A L

18        Videotaped Deposition of MARK G. DUGGAN, Ph.D.,

19   a witness herein, called for examination by counsel

20   for Dey, Inc. in the above-entitled matter, pursuant

21   to notice, the witness being duly sworn by SUSAN L.

22   CIMINELLI, a Notary Public in and for the District of
```

Duggan, Ph.D., Mark G.                              CONFIDENTIAL                              February 26, 2009
                                                     Washington, DC

Page 110

1 some cases the price is above the average and some
2 will be below. And that's, you know, part of the
3 reason that I scaled these prices by 125 percent and
4 so just to think -- so, yes.
5       BY MR. ESCOBAR:
6   Q.  How many pharmacies -- pharmacies in the
7 country paid more than the average that you
8 calculated for any of the Dey drugs?
9       MS. THOMAS: Objection. Form.
10      THE WITNESS: That's not a number that I
11 calculated. And even if I had, it would be difficult
12 for me to produce it here in my mind right on the
13 fly. It is true that I did not use the average price
14 in these adjudication formulas. I used 125 percent
15 of that average, and the vast majority of pharmacies
16 paid less than that.
17      BY MR. ESCOBAR:
18  Q.  How do you know that? When you say the
19 vast majority of pharmacies, how do you know that?
20  A.  Let me back track a little bit.
21  Q.  Because you don't know, right?
22  A.  It is --

Page 111

1   Q.  How many -- how do you know that the vast
2 majority of pharmacies --
3       MR. HENDERSON: Mr. Escobar.
4       BY MR. ESCOBAR:
5   Q.  Paid less than that. That's what you
6 said. How do you know that?
7   A.  It is -- it is --
8   Q.  How do you know that?
9       MR. HENDERSON: Mr. Escobar, you have to
10 let him answer the question.
11      BY MR. ESCOBAR:
12  Q.  I'm not going to let him make speeches. I
13 want him to answer questions. He said this. How do
14 you know that the vast majority of pharmacies paid
15 less?
16  A.  On a weighting the data by the number of
17 transactions, it is true that 125 percent of the
18 average is typically quite close to the 95th
19 percentile price so -- but that, with the caveat --
20 so once again, this is a -- it is -- I should back
21 pedal a bit.
22  Q.  You should. A lot.

Page 112

1       MR. HENDERSON: I object, Mr. Escobar.
2 You're interrupting him again.
3       BY MR. ESCOBAR:
4   Q.  Right.
5   A.  I'm trying to summarize analysis that is
6 based on these large-scale data sets and it is the
7 case that some -- in some cases, pharmacies would pay
8 more than 125 percent of the average. It is -- I
9 don't recall the exact frequency, so I have not
10 calculated that number, but it tends to be the case
11 that some pharmacies pay above, some pharmacies pay
12 below.
13      And then when you scale it up by 125
14 percent, that shifts to many more pharmacies paying
15 below and some pharmacies paying above. And I would,
16 you know, I would need to drill down. That's not a
17 number that I have at my fingertips right now. There
18 is a lot of numbers in this report, as you see I
19 think 70 some odd tables. And so I'm trying to do
20 justice to this year and to the -- you know, the
21 complexity that underlies it.
22  Q.  Did you decide on 125 percent as the

Page 113

1 correct measure?
2   A.  It is --
3   Q.  Did you decide? I'm asking whether that
4 was a decision you made?
5       MS. THOMAS: Objection.
6       THE WITNESS: It is -- was the topic of
7 some conversation, but I certainly ultimately am the
8 one who decided to carry out the analyses as I did.
9 There was -- but there was certainly some discussion
10 of that issue.
11      BY MR. ESCOBAR:
12  Q.  Who suggested 25 percent, 125 percent?
13  A.  It is -- it is consistent with a scaling
14 factor that I used in my Abbott report.
15  Q.  Who suggested it?
16      MR. HENDERSON: Objection.
17      BY MR. ESCOBAR:
18  Q.  Who is calling for the name of somebody.
19 Who suggested it?
20  A.  I think this is, it is -- I -- I -- it is
21 -- no one said to me, do this. I sort of in my --
22 based on my familiarity with the data, what seemed

Henderson Legal Services, Inc.
202-220-4158                                                                                  www.hendersonlegalservices.com

Duggan, Ph.D., Mark G.   CONFIDENTIAL   February 26, 2009
Washington, DC

Page 114

1  like a conservative scaling factor to use. Could it
2  have been 126, could it have been 124? Possibly, you
3  know, in the same way that quarters -- economists
4  tend to use round time periods and so forth, it was
5  something that I have used in my Abbott report.
6      I -- so it is -- I certainly can't point
7  to someone and say, person X said, do this. I mean,
8  this is what I've been -- this is the -- consistent
9  with what I've been doing on, on the Abbott report
10 that preceded it. And it's -- but the algorithm that
11 I've defined -- that I've formulated that I have is
12 flexible.
13     So for example, as you can see in table
14 13-B, I sort of take the reader through how
15 alternative parameters such as the average, 125
16 percent of the average and so forth would vary
17 things. And I arrived at what I believe is a
18 conservative and appropriate scaling factor. Is it
19 obviously better than 1.2499 or 1.2501? My algorithm
20 is flexible, but I think, and so I'm transparent
21 about what I'm doing in my report.
22     Q.  **What are the names of the people that you**

Page 115

1  **had had discussions with about whether it should be**
2  **125 percent or something else?**
3      A.  There were some discussions with -- with
4  counsel. Was it Renee Brooker? Was it Bunker
5  Henderson? Jim Breen, Susan Thomas, Mark Lavine, I'm
6  not sure which of those. The typical conference
7  call, we had a number of conference calls and
8  typically two -- one, two, three of the people I just
9  mentioned might not be on the call, so it's just
10 difficult, many things were discussed.
11     And so it seems plausible to me that many
12 of those five were involved in the conversation, but
13 this is stretching back a long way because as I said,
14 this is the same scaling factor that I used in my
15 Abbott report which was in the works a long time
16 before this.
17     Q.  **At one point, you were using 130 percent,**
18 **right?**
19     A.  There was a short period during which the
20 -- Judge Saris issued a ruling talking about a 30
21 percent speed limit. And I -- I think it is
22 straightforward to -- so that it was partly

Page 116

1  considering that issue of whether to consider that,
2  that speed limit, speed limit in quotes that she
3  talked about.
4      Q.  **Is that an economics term?**
5      A.  No. No. It's not. And so -- but I -- I
6  -- but it wasn't the case that I had converged to
7  this is the right thing to do. It was, you know, it
8  was as one prepares, conducts research, it is often,
9  you know, the case that one converges to the
10 ultimate, the most appropriate, what they believe is
11 the most appropriate.
12     But it's, you know, as I said, my model is
13 quite transparent and straightforward and if one
14 wanted to use 100 percent of the average, you could
15 go through and calculate the aggregate difference, if
16 someone wanted to use 110 percent, 120, 130, it's
17 doable. And I -- I think, you know, I stand by
18 the -- this, which is consistent with what I've done
19 before.
20     Q.  **So sometimes, at some point in time, your**
21 **report was using 130 percent, right?**
22     MR. HENDERSON: Objection.

Page 117

1      THE WITNESS: There was a time period, but
2  it was -- so just to be, you know, sort of clear,
3  there was -- was a time where some analyses were
4  conducted using 130 and -- but it -- so there was --
5  there was a period of time where that's true or for a
6  certain state.
7      BY MR. ESCOBAR:
8      Q.  **Okay. And then had it been your idea to**
9  **use 130 or had suggested that you use 130?**
10     A.  Once again, this was in the process of
11 creating my report, so this is not sort of in the
12 course of conducting analysis, one often does, you
13 know, what emerges in the ultimate, for example,
14 published paper may not be identical to what one
15 starts out with. One tries to get to what is the
16 best, most appropriate method. And so can you just
17 repeat the question, please?
18     THE REPORTER: "Question: And then had it
19 been your idea to use 130 or had suggested that you
20 use 130?"
21     MS. THOMAS: Do you want the beginning
22 part of your answer read back as well?

Duggan, Ph.D., Mark G.                                   CONFIDENTIAL                                   February 26, 2009
                                                         Washington, DC

Page 118

1      THE WITNESS: Sure.
2      THE REPORTER: "Answer: Once again, this
3  was in the process of creating my report, so this is
4  not sort of in the course of conducting analysis, one
5  often does -- you know, what emerges in the ultimate,
6  for example, published paper may not be identical to
7  what one starts out with. One tries to get to what
8  is the best, most appropriate method. And so can you
9  just repeat the question, please?"
10     THE WITNESS: Okay. And so part -- part I
11 had in response to, you know, in the course of the
12 analysis that I undertook, Ian Dew and others at
13 Steck Consulting would check in with me and
14 periodically. And I would meet with them in person
15 quite frequently to talk about the analyses that were
16 being done.
17     And I had learned of this, this statement
18 that Judge Saris had made. And so you know, once
19 again, I know from the outset as Steck embarked on
20 their analysis that nothing was final. The key thing
21 was for them to key the Medicaid claims data to get
22 their algorithm in shape and so forth, and that

Page 119

1  ultimately would -- would -- what would ultimately
2  emerge from the analysis would be determined later.
3      So it is -- the key thing for me was to
4  just get them rolling on these analyses, and it
5  wasn't -- one conversation. I mentioned 130 and then
6  upon reflecting on this and the sort of issues that I
7  had thought through in my Abbott report upon lots of
8  reflection, it seemed to me that it was for the same
9  reasons that I focused on 125 percent in the Abbott
10 report, it seemed like a reasonable and appropriate
11 thing to do. But if the court and others with an
12 interest in the case were to say that 130 percent was
13 what they were more interested in, my algorithm can
14 easily accommodate that.
15     As I said before, I'm not advocating that
16 Dey report exactly this. My report gives the
17 interested reader and the court a sense of how if we
18 use this particular price parameter, which, for the
19 reasons I've outlined, seems -- seems conservative
20 and reasonable, what -- what is the total difference
21 as I define it in the report.
22 Q.  So did I hear somewhere in there that you

Page 120

1  told Steck to use 130 percent?
2      MS. THOMAS: Objection.
3      THE WITNESS: I think that is true.
4      BY MR. ESCOBAR:
5  Q.  Okay.
6  A.  That at -- and you know, once again, there
7  were many conversations that transpire. And so my
8  main concern early on in the sort of analyses of the
9  Medicaid and the Medicare claims data was to get
10 them, get the sort of machinery set up so it was not
11 the case that I reflected long and hard, arrived at
12 130 and then you know it was -- it was -- it was
13 just, you know, in the process primarily of getting
14 things set up so that we could do the ultimate
15 analyses.
16 Q.  So 130 was not based on any economic
17 analysis that you did?
18 A.  That is, the 130 which is not what I
19 ultimately used, it was not based on -- no. It was
20 not based on economic analysis. It was -- no.
21 Q.  And the 125 is not based on economic
22 analysis either, is it?

Page 121

1  A.  As I, as I sort of specify in the -- as
2  I've tried to specify here, I'm not -- what my report
3  set out to do was to show how the difference, the
4  total Medicaid and Medicare spending would change as
5  a function of these alternative prices.
6      There are an infinite number of possible
7  statistics that one could use. I focused on a number
8  of them in the initial analyses that I believe are
9  informative. The average price. The 95th percentile
10 price, 125 percent of the average which is ensuring
11 that in the vast majority of cases, the Medicaid
12 adjudication algorithm would not reimburse below this
13 average cost, even with their AWP discounts. 125
14 percent of the average customer pharmacy unweighted
15 and so forth. So I produce a number of different
16 statistics to be transparent. This table 13-B could
17 have gone on for dozens of pages, but the 125 percent
18 was selected with an eye to this, this issue of the
19 Medicaid pharmacy AWP discounts.
20 Q.  But the 125 is not the result of some
21 economic analysis that led you to 125, is it?
22     MS. THOMAS: Objection.

Henderson Legal Services, Inc.
202-220-4158                                                                                    www.hendersonlegalservices.com

Duggan, Ph.D., Mark G.      CONFIDENTIAL      February 26, 2009
Washington, DC

Page 122

1  MR. HENDERSON: Objection.
2  THE WITNESS: Well, I believe the analysis
3  that I just described of the state of adjudication
4  algorithms isn't, I would call that an analysis that
5  has been undertaken.
6  BY MR. ESCOBAR:
7  Q. So -- and do you know of any state that --
8  whose reimbursement methodology indicated that the
9  reimbursement would be done on AWP plus 25 percent?
10  MR. HENDERSON: Objection. AWP minus 25
11  percent.
12  BY MR. ESCOBAR:
13  Q. No. Plus 25 percent. That's what he is
14  doing.
15  A. No. The -- most of the states used AWP
16  minus 5, minus 10 percent. So my alternative AWP
17  when replacing, would lead to something typically
18  that is greater than the average, average price. So
19  in that 10 percent, for example, in a state that's
20  AWP minus 10, the price that would be used in
21  adjudicating the claim would be 112.5 percent of the
22  average price.

Page 123

1  Q. So --
2  A. In an AWP minus 20, it would be 100
3  percent.
4  Q. So under your methodology, what Dey --
5  what Dey would do if they were using your methodology
6  is come up with the average price and then add 25
7  percent and then send that into the publication?
8  MR. HENDERSON: Objection.
9  THE WITNESS: Could you restate that
10  question?
11  THE REPORTER: "Question: So under your
12  methodology, what Dey -- what Dey would do if they
13  were using your methodology is come up with the
14  average price and then add 25 percent and then send
15  that into the publication?"
16  THE WITNESS: My analysis sheds light on
17  how Medicaid and Medicare reimbursement would have
18  changed if these alternative prices have been -- have
19  been used. Dey could have reported their average
20  price. They could have reported, you know, other --
21  they could have done many things.
22  They could have reported prices that were

Page 124

1  more reflective. I have selected one here also
2  trying to give the interested reader a sense of how
3  this varies, how my findings vary as a function of
4  the parameter selected. Had Dey, you know, done
5  something closer to what I described, reported prices
6  that are closer to actual prices, then spending would
7  have fallen. And so that -- I mean, it is -- that is
8  true for the most part. There are exceptions. New
9  York with the FUL and so forth.
10  What I'm -- I'm -- so it, I think it -- I
11  think we've kind of treaded this ground already, but
12  maybe -- maybe I'm just missing something.
13  BY MR. ESCOBAR:
14  Q. But in any event, in order to get to the
15  number, to the amounts that Medicaid or Medicare
16  would have paid, that is based on those programs
17  receiving the average price that you calculated plus
18  25 percent, an increase that you determined, right?
19  A. Had those programs received AWPs as I
20  calculate in my report, 125 percent of the average
21  pharmacy indirect with the other specifications in
22  the report, my results shed light on how spending for

Page 125

1  those claims would have changed.
2  And so there are many things. I guess
3  that's -- that's what the analysis sets out to do and
4  so there are many, I guess I'm just confused about
5  what it -- had those prices been reported, my
6  analysis sheds light on how spending for those claims
7  would have changed.
8  Q. So if the company, if Dey was to hire you
9  today and say to you, listen, we want you to
10  calculate the AWP exactly the way you do in this
11  report, and to send in to the publications exactly
12  the number that is the alternative AWP that had been
13  used for reimbursement would have led to lower
14  payment. We want you to just change our whole system
15  of doing it, so it's exactly what you propose in your
16  report. Are you with me so far?
17  A. Sure.
18  MS. THOMAS: Objection.
19  BY MR. ESCOBAR:
20  Q. Okay. We -- and if you showed up at Dey's
21  office in Napa and started working on this, what you
22  would send to the publication to First DataBank is a

Page 146

1  once again, assuming I did not mislabel this, which I
2  don't think I did, it's unscaled, 100 percent, not
3  125.
4      Q.  And in figure 2B, the average that you
5  have there scaled up by 125 is the number that would
6  become the alternative AWP for this particular NDC
7  number, correct?
8      A.  That is correct. I'm just trying to think
9  of -- there may be a nuance or two, but for an
10 approximation, that's correct.
11     Q.  Because when you looked at the various
12 data sets you decided that the number that you would
13 use as the alternative AWP would be a number derived
14 from Dey's indirect transaction data set as opposed
15 to the direct transaction data set, correct?
16     A.  That's correct. Sales to the wholesalers,
17 wholesaler class of trade and here once again, I'm
18 telescoping in on the pharmacy classes of trade as
19 opposed to considering all class of trade
20 simultaneously.
21     Q.  Now, did you also as you were doing this
22 work that's in your report, did you also have access

Page 147

1  to any data sets from any of the major wholesalers
2  that would reflect the average prices for the same
3  NDC numbers that the wholesalers on average per
4  quarter were selling to their customers?
5      A.  It's my understanding that others at Steck
6  are in possession of some of that kind of data.
7      Q.  And what, what specifically are you aware
8  of that they have in their possession?
9      A.  If I recall, they have some transaction
10 data from McKesson. What else do they have? Do they
11 have it, and perhaps Cardinal as well, but I'm --
12 that there is, so it's my understanding that they
13 have some transaction data from McKesson and I
14 believe also Cardinal.
15     Q.  How about from any of the other
16 wholesalers?
17     A.  Not that I am aware of, but, but I just
18 don't recall.
19     Q.  And did you ever directly access yourself
20 any of the data sets from McKesson or Cardinal?
21     A.  For these, for this analysis?
22     Q.  Yes.

Page 148

1      A.  I do not recall myself analyzing that data
2  for the purposes of this report.
3      Q.  And are you aware that from the Cardinal
4  and McKesson data, for example, one can look at the
5  average prices that they were selling to their
6  customers for the NDCs that you were looking at?
7      A.  It seems plausible, but I hesitate to
8  speculate having, you know, having not discussed the
9  data more at length whether for example, it includes,
10 would include the same transactions or there are
11 differences, I just, I know from working with data
12 that, you know, the devil is in the details of it.
13     Q.  Well, did you have any interest at all in
14 seeing how your average, your pharmacy average that
15 appears, for example, on figure 2B, how that would
16 compare to an average derived from the McKesson or
17 Cardinal data?
18     A.  That was not something that I considered
19 to be necessary for my analysis.
20     Q.  Well, assume for a moment that the, that
21 somebody did that analysis. That is they took the
22 McKesson, Cardinal data and plotted out the average

Page 149

1  McKesson and Cardinal price to their customers for
2  the exact same NDC, same quarters, everything else
3  being the same, and plotted it out and showed that
4  that was at all points higher than your average.
5  Would that raise any issues for you at all?
6      A.  I would want to know more about it before
7  I speculate and whether it would raise any issues for
8  me. Of course, that's just, if we look at one of the
9  tables in my report, summarizes the -- there are many
10 different wholesalers in the Dey transaction data.
11 Cardinal and McKesson are two of the bigger ones but
12 they are by no means the only ones.
13         And so there is that issue. There is the
14 issue of, does the McKesson and Cardinal data report
15 comparable information. Just having not drilled down
16 on that data, it's, it is -- it would be, it would be
17 hard for me to speculate. So it just I would want to
18 know more.
19     Q.  So if you saw, for example, let's say if
20 we plotted out the Cardinal McKesson data and it was
21 at all points higher than your average, okay, just
22 assume that?

Duggan, Ph.D., Mark G.    CONFIDENTIAL    February 26, 2009
Washington, DC

Page 150

1   A.   What is it? When you say you plot out it?
2   The Cardinal McKesson data.
3   Q.   **That is the average price on a quarterly**
4   **basis that McKesson and Cardinal sell to their**
5   **customers.**
6   A.   For this product.
7   Q.   **For this exact NDC, same period of time,**
8   **and that plotted out was higher than your average**
9   **number that you have on figure 2B. Just assume that**
10  **that's what the data produced. Would that indicate**
11  **to you anything about your average that you should**
12  **reconsider?**
13  A.   As a trained economist, I've learned that
14  it's always prudent to be open to the acquisition of
15  additional information. Whether there would be many
16  factors to consider is -- these are two of many
17  wholesalers so there is that issue. I'm not sure if
18  the, how the McKesson and Cardinal data, how exactly
19  the variables are coded in the data. I think it
20  would, I would hesitate to speculate. It could be
21  that for whatever reason, McKesson and Cardinal tend
22  to charge slightly higher prices than their

Page 151

1   counterparts or there could be something else.
2   But I'm always open to the -- but at the
3   same time, this -- the prices that I report here are
4   I believe a more complete picture of the market for
5   this product in the sense that it focuses not just on
6   two of the 80 plus wholesalers summarized in table 8
7   or 9, I can't remember the number, but for all of
8   them simultaneously. So it would, it's -- I think
9   there is, you know, I would want to see it before
10  speculating.
11  Q.   **But if you saw it, you would think about**
12  **it, wouldn't you?**
13  MR. HENDERSON: Objection.
14  BY MR. ESCOBAR:
15  Q.   **Or you would just ignore it? Which one?**
16  MR. HENDERSON: Objection.
17  THE WITNESS: I -- it -- it depends. As I
18  said, I'm open to the consideration of additional
19  information. Just seeing a figure without more
20  explanation, background explanation, that alone
21  wouldn't -- you know, I would just, I would want to
22  understand what, what, just as I in my report have

Page 152

1   endeavored to be transparent about what exactly I've
2   done, you know, correspondingly, I would be always
3   interested in learning more about data. I like
4   working with data. I think -- I think the -- in this
5   -- in this case, I think that this is a very useful
6   piece of information. The average price considering
7   all of the indirect data, all of Dey's indirect data
8   simultaneously as opposed to just a subset.
9   BY MR. ESCOBAR:
10  Q.   **What would be more accurate to give you a**
11  **better more accurate picture if your objective was to**
12  **try to find out the average price paid by pharmacists**
13  **to acquire the Dey drugs? Would the better data set**
14  **be the average price from the wholesalers or the**
15  **average -- from the wholesalers to their customers,**
16  **or the average price that they, that they the company**
17  **received?**
18  A.   I would -- I think it is -- it is my
19  understanding that the Dey indirect transaction data
20  provides very useful information about all of their
21  transactions through wholesalers, and whether there
22  are some problems with Dey's data that might cause

Page 153

1   one to instead focus on a subset of data from some
2   other source, it would be hard for me to speculate,
3   but I use this Dey data in part because it -- it
4   summarized all of the Dey indirect transactions, so
5   -- as I said, I'm -- I'm, I'm open to the
6   consideration of almost anything in my research and
7   in this report.
8   Q.   **And in the, in the little box on the right**
9   **of Exhibit 2B, it says referring to the numbers you**
10  **calculated, it says PH average. What does that stand**
11  **for?**
12  A.   Pharmacy average.
13  Q.   **And that's meant to represent the average**
14  **price paid by pharmacies as you calculated it for**
15  **this particular ^ ipatroprium NDC number, is that**
16  **right?**
17  A.   That is correct. And I specify in the, in
18  the report which classes of trade I'm considering
19  there.
20  Q.   **Would you agree with the statement that**
21  **the average price received by the manufacturer is not**
22  **the same as the average price paid by a pharmacy?**

39 (Pages 150 to 153)