# Exhibit 15

*United States of America ex rel. Ven-A-Care of the Florida Keys, Inc.,
et al. v. Dey, Inc., et al.*, Civil Action No. 05-11084-PBS

**Exhibit to the Declaration of Marisa A. Lorenzo in Support of Dey's
Motion to Exclude the Opinions of Mark Duggan, Ph.D.**

                                                                         Page 1

```
 1              UNITED STATES DISTRICT

 2          FOR THE DISTRICT OF MASSACHUSETTS

 3

 4    -----------------------------X

 5    IN RE: PHARMACEUTICAL        )  MDL NO. 1456

 6    INDUSTRY AVERAGE WHOLESALE   )  CIVIL ACTION

 7    PRICE LITIGATION             )  01-CV-12257-PBS

 8    THIS DOCUMENT RELATES TO     )

 9    U.S. ex rel. Ven-a-Care of   )

10    of the Florida Keys, Inc.    )

11         v.                      )  No.06-CV-11337-PBS

12    ABBOTT LABORATORIES, INC.,   )

13    -----------------------------X

14

15        (cross captions appear on following pages)

16

17           Deposition of HARRY LEO SULLIVAN

18                      Volume I

19                 Nashville, Tennessee

20              Tuesday, March 12, 2008

21                      9:05 a.m.

22
```

Sullivan, Harry Leo                                                                 March 12, 2008
                                          Nashville, TN

Page 238

1  been working with representatives of the state
2  Medicaid fraud control units on drug pricing
3  issues. Since early May, FDB had been reporting
4  to state Medicaid agencies, quote, AWPs, end
5  quote, for approximately 402 NDCs that are
6  different than the real AWP that is being
7  reported to, to your commercial customers.
8         Do you see that?
9      A.  Yes.
10     Q.  Did you believe that the AWPs that had
11 been developed through the Department of Justice
12 and the Medicaid fraud control units to be
13 different than the real AWP?
14     A.  For those products, yes.
15         Well, to be -- now I, I don't want to -
16 - I wouldn't say different than a real AWP. I
17 just thought, it was my understanding that's what
18 it is. You know, that's what AWP is now.
19     Q.  That's what it is what?
20     A.  That's what it is. If it's in First
21 DataBank, that's what it is, for those I guess
22 428 products.

Page 239

1      Q.  Whatever was in First DataBank was what
2  AWP was?
3      A.  Yes. I, I wasn't aware that you could
4  -- let me think about this.
5          I don't remember for sure that you --
6  that First DataBank had in their fields a DOJ
7  button, or whatever, that you could flick on or
8  off in the claims processing system, but whatever
9  the default was what -- we didn't touch it. We
10 left it just like it came into our system from
11 First DataBank through electronic transfer.
12     Q.  I would ask you to go to the next page
13 of the exhibit, second full paragraph, Mr. Wiberg
14 wrote: There is no doubt in my mind that NAMFCU,
15 all caps, is correct when it points out that the
16 spread between AWP and AAC is too large for many,
17 even most of these drugs. The question is, What
18 should be done about it? Almost everyone who is
19 familiar with the pharmacy reimbursement knows
20 that AWP, quote, ain't what's paid, end quote.
21         Do you see that?
22     A.  Yes.

Page 240

1      Q.  Do you know agree with Mr. Wiberg --
2      A.  Yes.
3      Q.  -- on that?
4      A.  The question, though, that, that
5  boggles my mind, and it did at this time when I
6  interacted with my peers, when they're wringing
7  their hands over issues like this, I'm just --
8  you know, I'm just curious why you don't get out
9  there, find out what the drugs cost, and set the
10 price yourself. You can always MAC things. You
11 can MAC a brand name drug if you want to. But go
12 ahead.
13     Q.  And then later on in the paragraph Mr.
14 Wiberg wrote, The spread between AAC and AWP is
15 taken into account when determining what to pay
16 for a dispensing fee. Do you see that?
17     A.  Yeah.
18     Q.  Do you agree with that?
19     A.  That's one way to do it.
20     Q.  Well, you testified earlier today that
21 when you set the dispensing fee in Tennessee, you
22 took into account the amount of profit that was

Page 241

1  being made by pharmacies on the ingredient side;
2  is that right?
3      A.  Well, that's what I'll -- that's what I
4  was hoping to convey was the dispensing fee in
5  and of itself is not compensation for what some
6  calculated cost to dispense, that the portion of
7  profit built into the ingredient cost is also a
8  factor in that.
9      Q.  The next, if we skip down to the next
10 paragraph, it starts with Some public. Do you
11 see that?
12     A.  What -- and this gets back to even like
13 the current debate with AMP. It doesn't make
14 sense to me if what your -- ultimately what
15 you're trying to do is save money, preserve
16 precious federal tax dollars, by all this work
17 OIG did.
18         And you want, and you want to go then
19 live by the strict letter of this new AWP, again
20 that's to make sure that we're not overpaying,
21 but you can, you can balance that over here with
22 the dispensing fee. Raise it up to whatever