# Exhibit 16

*United States of America ex rel. Ven-A-Care of the Florida Keys, Inc.,
et al. v. Dey, Inc., et al.*, Civil Action No. 05-11084-PBS

**Exhibit to the Declaration of Marisa A. Lorenzo in Support of Dey's
Motion to Exclude the Opinions of Mark Duggan, Ph.D.**

Wiberg, Cody                                                                                           March 14, 2008

Page 1

```
 1                UNITED STATES DISTRICT COURT

 2               FOR THE DISTRICT OF MASSACHUSETTS

 3   IN RE: PHARMACEUTICAL INDUSTRY    ) MDL NO. 1456

 4   AVERAGE WHOLESALE PRICE           )

 5   LITIGATION                        ) CIVIL ACTION:

 6                                     ) 01-CV-12257-PBS

 7                                     ) Judge Patti B. Saris

 8                                     ) Magistrate Judge

 9                                     ) Marianne B. Bowler

10   THIS DOCUMENT RELATES TO

11   U.S. ex rel. Ven-A-Care of the

12   Florida Keys,Inc., v.

13   Abbott Laboratories, Inc., et al.

14   No. 06-CV-11337-PBS

15   (Caption continues on next page.)

16   _____

17

18              VIDEOTAPED DEPOSITION OF

19                    CODY WIBERG

20              Taken March 14, 2008

21              Commencing at 9:13 a.m.

22
```

Wiberg, Cody  March 14, 2008

Page 166

1   prices.
2   Q. So what did you do?
3   A. Eventually, we stopped using these again.
4   Well, actually, the other -- the other thing that
5   happened is that providers did exactly what I
6   thought they would. Is they just used similar
7   products, or sometimes virtually identical products
8   that didn't happen to be one of those 476 NDCs, and
9   they started using those products, is -- is what
10  happened. And so for a lot of it, people just
11  stopped using it, so we didn't have to do much for
12  those drugs at all.
13      Eventually, we did stop using it and we took
14  it out of there, and I don't recall when that was.
15  It just sort of more or less gradually died.
16  Q. And to turn back to Exhibit 137, the language
17  that you were pointing to on the second page, just
18  for the record, am I reading it correctly, quote,
19  More importantly, in view of the Medicaid program's
20  legal obligation to reimburse true provider
21  acquisition costs, such an effort by the State to
22  ensure that payment is based on actual prices is

Page 167

1   mandatory."
2   A. Correct.
3   Q. Close quote. And that is not consistent with
4   your view, or your understanding, at least, of the
5   federal laws that govern your Medicaid program,
6   correct? I mean, you didn't think you were breaking
7   the way law the way you were doing it before.
8   A. No. No, I didn't think we were breaking the
9   law the way we were doing it before. I thought we
10  were doing what virtually every -- every other
11  public and third -- private third-party payer was
12  doing. Almost -- at that time most states used
13  AWP, some did use WAC. Most private states, private
14  third-party payers used AWP and then tried to
15  calculate as best you could a discount off to get
16  you close to actual acquisition cost. You realized
17  you probably wouldn't get all the way down to ac --
18  actual acquisition cost, which is why you keep the
19  dispensing fee artificially lower than what the
20  true cost of dispensing is, because you figure that
21  they're going to make some of the profit -- or not
22  the profit. They're going to recover some of their

Page 168

1   cost, and, yes, also make some of their profit. In
2   the combination of the whole -- the whole
3   combination of the reimbursement. So the dispensing
4   fee is lower than what it might be, because they're
5   making money on the ingredient side. Because of the
6   -- because of the lack of transparency, you're
7   probably never going to get down to -- you're not
8   going to be able to find that right discount off of
9   AWP for a wide range of drugs. We paid for 15,000
10  different drugs, and there's hundreds of thousands
11  of drugs in the database. But we paid, commonly,
12  for 15, 16,000 drugs. You're not going to be able
13  to -- drug by drug, be able to get that sort of
14  transparency.
15  Q. And even with that transparency, as long as
16  the formula is the same --
17  A. Uh-huh.
18  Q. -- for each of 15,000 drugs, a single
19  formula, by definition, is going to pay more than
20  acquisition cost, or less, or closer to acquisition
21  cost, drug by drug, for all drugs at all times.
22  A. That's correct.

Page 169

1   Q. And to go back to what you described earlier
2   on about a perfect world of reimbursement --
3   A. Uh-huh.
4   Q. In a perfect world of transparency, if AWPs
5   were actually an average of what providers were
6   paying, what would you expect would be the effect
7   that would have on the other aspects of the
8   Medicaid system?
9   A. Well, if AWP actually reflected the average
10  --
11  Q. An empirical average.
12  A. Yeah, an average of what most providers were
13  paying, actually paying, in terms of the pharmacy
14  side of things -- it's more complicated, I think,
15  on the physician facility side, because they also
16  get paid for office visits and things like that.
17  But on the pharmacy side, if the AWP, on average,
18  was what you would expect most providers to be
19  actually paying for the drug when they purchase it,
20  you would end up raising the dispensing fee, to a
21  certain extent. And to what extent you raise it
22  would depend -- depend on your policy

43 (Pages 166 to 169)