# Exhibit 17

*United States of America ex rel. Ven-A-Care of the Florida Keys, Inc.,
et al. v. Dey, Inc., et al.*, Civil Action No. 05-11084-PBS

**Exhibit to the Declaration of Marisa A. Lorenzo in Support of Dey's
Motion to Exclude the Opinions of Mark Duggan, Ph.D.**

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2                DISTRICT OF MASSACHUSETTS
 3     ------------------------------X
 4     IN RE PHARMACEUTICAL INDUSTRY
 5     AVERAGE WHOLESALE PRICE
 6     LITIGATION
 7     ------------------------------X  MDL No. 1456
 8     THIS DOCUMENT RELATES TO:       Civil Action:
 9     State of California, ex rel.    01-12257-PBS
10     Ven-A-Care v. Abbott
11     Laboratories, Inc., et al.,
12     ------------------------------X
13
14              TUESDAY, MAY 19, 2009
15                    --oOo--
16              VIDEOTAPED DEPOSITION OF
17                 STANLEY ROSENSTEIN
18                    --oOo--
19
20     Ref. No. 6620
21     Reported By:  CAROL NYGARD DROBNY, CSR No. 4018
22              Registered Merit Reporter
```

Rosenstein, Stanley
Sacramento, CA
May 19, 2009

Page 188

1  notwithstanding the 5 percent reduction providers
2  would still be making a profit over their
3  acquisition costs; correct?
4      A.   I believe so, yeah.
5           That -- I haven't found the section, but
6  it sounds correct.
7      Q.   And your conclusion based on that was
8  that the 5 percent reduction shouldn't have a
9  detrimental impact on access; correct?
10     A.   That's correct.
11     Q.   And that's partly because the providers
12 were still able to make a profit at the prevailing
13 reimbursement rate?
14     A.   Again, you know, you're looking at this
15 from an overall programmatic standpoint and not on
16 each individual provider, but that's correct.
17          (Exhibit Rosenstein 014 was marked
18 for Identification.)
19 BY MR. GANDESHA:
20     Q.   You've been handed what's been marked as
21 Exhibit 14, which is a document that bears a title
22 "Fact Sheet for Medi-Cal Pharmacy Reimbursement

Rosenstein, Stanley
Sacramento, CA
May 19, 2009

Page 189

1   Proposal."

2        A.   Yeah.

3        Q.   Do you recall seeing this document

4   before today?

5        A.   Yeah.  I believe we prepared it.

6        Q.   By "we" you mean --

7        A.   The Department.

8        Q.   Were you -- directly involved in the

9   preparation of this document?

10       A.   I would have reviewed it, probably

11  edited it.

12       Q.   And this is a -- a facts sheet similar

13  to the facts sheet we saw earlier; correct?

14       A.   That's correct.

15       Q.   It would have been used in connection

16  with a proposal the Department would make to --

17  ultimately to the Legislature; is that correct?

18       A.   I believe this one lays out the -- the

19  compromise on the -- the budget change.

20            We would compromise to the -- close the

21  budget on this issue.

22       Q.   Okay.  When you say "this issue," what

1   do you mean?
2       A.   Drug -- drug -- pharmacy reimbursement,
3   pharmacy pricing.
4       Q.   And do you recall what -- what year this
5   document would have been prepared?
6       A.   I don't, but it was a year -- I mean,
7   this is -- this is the document -- the proposal
8   that was adopted that actually defines how we pay
9   pharmacy today.
10           So -- I don't know -- I don't recall
11  which year that was, but --
12      Q.   It would have been around 2004?
13      A.   Yeah, I -- yeah.
14           It would have been -- well, yeah.
15           It WOULD have been.  It was several
16  years ago.
17           I don't recall which specific budget
18  year it was.
19      Q.   But this reflects the -- the prevailing
20  reimbursement formula?
21      A.   This is -- this was the -- the
22  compromise that we put forward, I believe for the

Page 191

1   Budget Conference Committee that was adopted, and
2   I believe with the exception of ASP remains State
3   law.  The ASP was revised later.
4       Q.  Under -- well, it says under the second
5   bullet point below "Background" it notes that
6   "Independent studies and acknowledgements from
7   pharmacists indicate that Medi-Cal's current
8   reimbursement schedule, which pays pharmacists the
9   Average Wholesale Price, 10 percent and $3.55
10  dispensing fee, for most prescriptions overpays
11  ingredient costs and underpays the dispensing
12  fee."
13          That's an accurate --
14      A.  Yes.
15      Q.  Okay.  It refers there to
16  "acknowledgements from pharmacists."
17          Can you elaborate on that what that
18  refers to?
19      A.  As we embarked upon this process and
20  brought it to conclusion, Dr. Gorospe basically
21  sat down with a large number of pharmacies and
22  went through what they were actually paying for

Rosenstein, Stanley  
Sacramento, CA  
May 19, 2009

Page 192

1  drugs, and we invited in a number of the
2  pharmacies to come in and provide us with data,
3  and I think that's a conclusion that Dr. Gorospe
4  came away with from the people -- you know,
5  finally got to agreement and got to actual
6  pharmacy data in this process.
7      Q.   And that was in addition to the data
8  provided by independent studies that's referred to
9  here?
10     A.   Right.
11          And I -- I think the biggest reference
12 is, again, this report, Myers and Stauffer.
13          But, as I recall, we were -- seeking,
14 you know, what are you paying, what is the correct
15 reimbursement rate, and Dr. Gorospe sat down with
16 a number of pharmacies and went through that data.
17     Q.   And under "Ingredient Costs" about one -
18 - four bullet points down there's, again, a
19 reference to a May Revision, and it says "May
20 Revision proposed to reimburse pharmacies for both
21 brand and generics drugs for AWP-20 percent based
22 on information at the time."

Rosenstein, Stanley
Sacramento, CA
May 19, 2009

Page 193

```
1        A.   Yeah, that's correct.
2             We went through -- I believe we had a --
3    one set of proposals in January, I'm not positive,
4    and then we put in another proposal in May, and
5    the Legislature asked us to see what we could work
6    out to -- you know, with the -- with the
7    pharmacies to come with a -- a final pricing
8    mechanism, and after lots of consultation with the
9    pharmacies this was what we proposed, and -- you
10   know, and it was eventually adopted.
11       Q.   And it says -- the following bullet
12   point, the second sentence says "To continue with
13   an average AWP-20 percent reduction could affect
14   access to certain drugs and would
15   disproportionately affect pharmacies who
16   specialize in those drugs."
17            He's referring to critical drugs for
18   AIDS and mental health?
19       A.   That's correct.
20            When -- you know, again, you got a
21   pricing system that's looking at averages, and
22   what Dr. Gorospe determined was for the AIDS and
```

Rosenstein, Stanley
Sacramento, CA
May 19, 2009

Page 194

1   cancer drugs I believe that, you know,
2   manufacturers were paying AWP-17 or AWP-18
3   percent.
4           So the reimbursement for an AIDS drug
5   minus 20 percent would have underpaid them and
6   made those drugs probably unavailable.
7           So the general conclusion was that we
8   would go to 17 percent, because that was
9   adequately reimbursed for the expense of drugs,
10  and then, you know, the intent was to, again,
11  pursue average sales price for the generics to try
12  to address that they were cheaper.
13      Q.   So the -- the move to AWP-17 percent was
14  in full recognition that there were drugs that
15  were being reimbursed at a rate that was -- that
16  was below --
17          I'm sorry.
18          Let me -- let me start that again.
19          The move to AWP-17 percent was -- was
20  done in recognition that there were some drugs for
21  which the acquisition cost was below that?
22      A.   That's correct.

```
 1          For brand names we knew that some
 2   pharmacies were able to get to minus 18.  In
 3   generics we knew it was lower.
 4          Again, you've got to look at it in
 5   combination with what we were trying to do with
 6   the MAIC and the average sales price at that time.
 7      Q.  But based on the -- the Myers and
 8   Stauffer report at least the Department was aware
 9   at this time that as an average generic drugs were
10   costing providers as an average AWP-43.4 percent
11   based on this document; correct?
12          MR. PAUL:  Objection to form.
13          THE WITNESS:  Yeah.
14          Where in the document are you pointing
15   to?
16   BY MR. GANDESHA:
17      Q.  Just the -- the first bullet point there
18   under "Ingredient Costs."
19      A.  Yes, that's what it says.
20      Q.  Now, the Department is also proposing
21   making a change to the dispensing fee at this
22   time; correct?
```

1    A.    That is correct.

2    Q.    What was that change?

3    A.    We were proposing to pay for all drugs

4    $7.25, and for people in nursing homes $8.00 for

5    the dispensing fee.

6    Q.    And before the -- the -- or at the time

7    of the proposal the prevailing dispensing fee was

8    $3.55?

9    A.    Well, it was the -- 4.05 minus the 50

10   cents.

11   Q.    And the -- if you look at the second

12   bullet point at the top of the second page of this

13   document, the last sentence says, "This dispensing

14   fee coupled with the AWP-17 percent rate for

15   ingredient costs should maintain access within the

16   program."

17         Is that -- is that accurate?

18   A.    That's correct.

19   Q.    So it was the view of the Department

20   that increasing the dispensing fee to $7.25 and

21   $8.00 for long-term care claims and reducing AWP

22   to AWP-17 percent would maintain access within the

Page 197

1  program?

2      A.   That's right.

3           As I said, we -- Dr. Gorospe did

4  considerable review starting off with the Myers

5  and Stauffer, and then sitting down, you know, for

6  the first time with pharmacies and really

7  understanding what they were paying for these

8  drugs.

9           And, as I mentioned, we pegged the minus

10 17 at the highest of what pharmacies were paying

11 for AIDS and cancer -- or AIDS drugs and

12 antipsychotics, so we picked the highest rather

13 than minus 18 to make sure we had access.

14     Q.   The Department was of the view that to

15 address access it had to take in to account both

16 the -- the AWP formula as well as the dispensing

17 fee?

18          MR. PAUL:  Objection to form.

19          THE WITNESS:  That's right.

20          There's two components to pricing.  You

21 need to compensate for the professional work as

22 well as for the ingredient cost.

Page 231

1  SIGNATURE OF THE WITNESS

2

3

4

5  --oOo--

6  Signed under penalty of perjury:

7

8

9  _____

10  STANLEY ROSENSTEIN

11

12  _____

13  Date

14

15

16

17

18

19

20

21

22

Rosenstein, Stanley  
Sacramento, CA  
May 19, 2009

Page 232

--oOo--

I, CAROL NYGARD DROBNY, a Certified Shorthand Reporter of the State of California, duly authorized to administer oaths, do hereby certify:

That I am a disinterested person herein; that the Witness, STANLEY ROSENSTEIN, named in the foregoing deposition was by me duly sworn to testify the truth, the whole truth, and nothing but the truth; that the deposition was reported in shorthand by me, CAROL NYGARD DROBNY, a Certified Shorthand Reporter of the State of California, and thereafter transcribed into typewriting.

That before completion of the deposition, review of the transcript [ ] was [X] was not requested. If requested, any changes made by the deponent (and provided to the Reporter) during the period allowed are appended hereto.

Dated: May 21, 2009

_____

CAROL NYGARD DROBNY CSR #4018

--oOo--