# Exhibit A
# Part 1 of 3

Page 1

1               UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF MASSACHUSETTS

3    - - - - - - - - - - - - - - - - -

4    IN RE: PHARMACEUTICAL        )   MDL NO. 1456

5    INDUSTRY AVERAGE WHOLESALE   )   CIVIL ACTION

6    PRICE LITIGATION             )   01-CV-12257-PBS

7    THIS DOCUMENT RELATES TO     )

8    U.S. ex rel. Ven-a-Care of   )   Judge Patti B. Saris

9    the Florida Keys, Inc.       )

10        v.                      )   Chief Magistrate

11   Abbott Laboratories, Inc.,   )   Judge Marianne B.

12   No. 06-CV-11337-PBS          )   Bowler

13   - - - - - - - - - - - - - - - - -

14

15           Videotaped deposition of STEPHEN W.

16              SCHONDELMEYER, PHARM.D., PH.D.

17                        Volume I

18

19

20                         Washington, D.C.

21                         Wednesday, February 25, 2009

22                         9:00 a.m.

Schondelmeyer, Pharm.D., Ph.D., Stephen W.
Washington, DC
February 25, 2009

Page 70

1   A.   It was essentially the same parties that
2   hired me for that June 2008 report. It's a group of
3   pharmacists that are providers to the Medi-Cal
4   program.
5   Q.   What's the name of that group of
6   pharmacists?
7   A.   Again, I'd have to look it up. I don't
8   recall.
9   Q.   Did your report last week reach
10  substantially different conclusions than your report
11  in June of 2008 reached?
12  A.   Well, the situation and the facts were
13  different. So there are some differences. But I
14  think the same basic premises are present.
15  Q.   How did the facts differ?
16  A.   Well, both of these had issues with respect
17  to how the Medi-Cal program and the state of
18  California directed the Medi-Cal program to pay
19  providers for prescription drugs. And the case last
20  year involved the state budget directing the Medi-Cal
21  program to cut payments to providers by 10 percent
22  across the board and again, other things that are

Page 71

1   described thoroughly in that report.
2        The most recent case -- and it's my
3   understanding, again, I don't follow all the legal
4   side of it. I do the legal expert pharmaceutical
5   market analysis. My understanding is preliminary
6   injunction was issued or an injunction was issued that
7   stayed that action by the state and subsequent to that
8   the state of California legislature passed a budget
9   that involved a 5 percent cut in the payments to
10  providers across the board.
11       So it differed substantially by the
12  percentage of the cut. But it was, again, across the
13  board for all payments for pharmaceuticals under
14  Medi-Cal for outpatient services.
15  Q.   What was the context of your 2009 report,
16  the one that you filed just last week?
17  A.   I just described that.
18  Q.   What were you asked to opine about in the
19  report that you filed last week? What opinion were
20  you asked for?
21  A.   The opinion was what would be the impact on
22  providers being in this case pharmacies and/or

Page 72

1   physicians or those who are paid for prescription
2   drugs on an outpatient basis and what would the impact
3   be on Medi-Cal recipients and Medi-Cal of the budget
4   cut that had been legislated.
5   Q.   What did you conclude with respect to the 5
6   percent reduction in payments to providers under
7   Medi-Cal?
8   A.   Well, my conclusions are stated in detail
9   in that report. I wouldn't want to attempt to cite
10  for you all of that report here.
11  Q.   Can you characterize your conclusions in
12  any way?
13  A.   I could characterize it, but I would
14  qualify that you need to refer to the entire report to
15  understand the conclusions that I characterize. I
16  believe in that report I characterized that a cut
17  would in some cases result in paying the pharmacy
18  below their actual costs for the drug product and in
19  some cases below their actual cost of dispensing for
20  the drug product and that such behavior could or such
21  payment policy could result in pharmacies either
22  refusing to provide prescription drugs under the

Page 73

1   Medi-Cal program, certain prescription drugs, or to
2   participate in general, and changes in that could
3   affect access of patients in California to outpatient
4   prescription drugs.
5   Q.   Could you have rendered such an opinion in
6   this case?
7   A.   I wasn't asked to. Again -- I don't know
8   what you mean by such an opinion. Do you mean the
9   same conclusion? Probably not. They have different
10  facts.
11  Q.   Sure. I understand. You understand that
12  this case involves an allegation that payments to
13  providers and pharmacies were over that which was
14  intended by the Medicaid and Medicare program? Is
15  that a fair description of your understanding of the
16  case?
17       MS. BROOKER: Objection, form.
18       MR. COOK: Yeah. That is two questions.
19  Let me ask it better.
20       BY MR. COOK:
21  Q.   Is it your understanding of the case that
22  the government alleges that providers and pharmacies

19 (Pages 70 to 73)

Schondelmeyer, Pharm.D., Ph.D., Stephen W.
Washington, DC
February 25, 2009

### Page 118

1  but does describe what you assert did happen? "In
2  addition, the financial incentives created by this
3  profitability played a large and problematic role in
4  prescribing decisions, that is, prescribers responded
5  to these high margins by tending towards administering
6  more drugs and more expensive drugs than might be
7  medically necessary or optimal for the health of the
8  patient."
9      A.  You read a statement in paragraph 166 that
10 I believe to be true in the context of the rest of the
11 discussion presented in that paragraph and the rest of
12 my report. I don't think you can take the statement
13 in isolation, though.
14     Q.  But I am correct that you are stating what
15 did happen, not what might have happened, correct?
16         MR. BREEN: Objection, form.
17     A.  Take the statement at its face value.
18     Q.  Will you agree with me that the statement
19 asserts what did happen, not when might have happened?
20         MS. BROOKER: Objection, form.
21     A.  I think it encompasses both, things that
22 did happen and things that also might have happened.

### Page 119

1      Q.  You mentioned Medicaid and your report
2  relates to how Medicaid paid for various drugs,
3  correct?
4      A.  My report addresses Medicaid and the
5  payment for prescription drugs.
6      Q.  The estimated acquisition cost regulation
7  that governed how Medicaid programs set up their
8  payment formula. Would you agree with me that that
9  regulation didn't change at all between 1991 and 2001?
10     A.  I'm not sure I understand your question.
11 What reg -- can you show me what regulation you're
12 referring to?
13     Q.  Well, let me show you in your report the
14 regulation that you cite. It's on page 29, paragraph
15 52. You cite 42 C.F.R. Section 447.301, the October
16 1, 2001 edition of the Code of Federal Regulations.
17 Do you see that?
18     A.  I see that particular reference.
19     Q.  Is it your understanding that that
20 regulation as it existed in 2001 was the same
21 regulation between 1991 and 2001?
22     A.  I'd have to look back. There were a

### Page 120

1  variety of changes in the regulation that occurred.
2  But the definition of estimated acquisition cost to
3  the best of my knowledge did not change.
4      Q.  Over what period did the definition of
5  estimated acquisition cost remain the same?
6      A.  I believe that the stated explanation of
7  estimated acquisition cost has been substantially the
8  same since 1977 to the present in a broad sense. The
9  explanation I believe in paragraph 53 of page 30 in
10 Exhibit 1, I think we're still in, describes the
11 intended definition of estimated acquisition cost
12 dates as far back as 1977 as described in an HHS
13 document titled "Limitation on payment" -- probably an
14 "of" rather than an "or" -- "reimbursement for drugs:
15 Estimated acquisition cost."
16         It goes on to describe the intent of the
17 regulation was for each state to pay estimated
18 acquisition costs, which was to be a cost as close as
19 feasible to the price generally and currently paid by
20 providers. And that similar statement and policy has
21 been in effect since that time.
22     Q.  I'd like to turn your attention to

### Page 121

1  paragraph 52, the second sentence that bleeds over for
2  a couple words onto page 30. And I'll read it for the
3  record and we'll be put it up on the screen. "The
4  estimated acquisition cost was developed as a way to
5  simplify payment for prescriptions in a manner that
6  was consistent with the Medicaid program's intent to
7  pay the actual acquisition cost for a given
8  prescription drug or as close to the actual
9  acquisition cost as is feasible." Do you see that?
10     A.  I see that statement.
11     Q.  And on what do you base your opinion that
12 it was the Medicaid's program's intent to pay the
13 actual acquisition cost for a given prescription drug
14 or as close to the actual acquisition cost as is
15 feasible?
16     A.  That was from statements made by the
17 government in program memoranda, in final rules and
18 the other documents that I've cited later down in
19 paragraph 53 --
20     Q.  Could you point me to the --
21     A.  -- cite sources.
22         MS. BROOKER: I'm sorry. Dr.

Schondelmeyer, Pharm.D., Ph.D., Stephen W.
Washington, DC
February 25, 2009

Page 122

1  Schondelmeyer -- can you let him finish his answer
2  please, Chris?
3      Q.  Could you point me to the specific bases
4  for that understanding as reflected in your report?
5  And I suppose we can start with 42 C.F.R. Section
6  447.301, which you site just above that, right?
7      A.  I don't recall that.  If you go down to
8  paragraph 53 there is -- I think the third sentence in
9  paragraph 53.  It says "the HHS memo to state Medicaid
10 directors stated 'the intention of the final Medicaid
11 regulations on drug reimbursement is to have each
12 state's estimated acquisition cost as close as
13 feasible to the price generally and currently paid by
14 the provider.  The states are therefore expected to
15 set their ingredient cost levels as close as possible
16 to actual acquisition costs'" and that the reference
17 for that is cited as HHS action transmittal and it
18 gives a Bates number and dated December 13th 1977.
19     Q.  Keep your finger on that page but turn to
20 paragraph 228 on page 103 of your report in the
21 summary section.  The summary section summarizes the
22 opinions that you're expressing in this report,

Page 123

1  correct?
2      A.  It's a summary.  It certainly isn't all the
3  opinions, but it's a summary.
4      Q.  But it's fair to say that you picked out
5  the most important aspects of the preceding 102 pages
6  to include in your summary, right?
7          MS. BROOKER:  Objection, form.
8      A.  It's an overview of the conclusions.  The
9  report as a whole stands.
10     Q.  The very first sentence of your summary
11 reads "The Medicaid drug reimbursement system is based
12 upon the consistently stated intention of reimbursing
13 for drug products at their actual price, that is, a
14 price 'as close as feasible to the price generally and
15 currently paid by the provider,' a concept referred to
16 in the Medicaid program regulations and policies as
17 'estimated acquisition cost.'"  Did I read that
18 correctly?
19     A.  I believe you did.  I didn't follow every
20 word, but I believe it was correct.
21     Q.  The concept that you state in the very
22 first sentence of your summary is the same concept as

Page 124

1  you set forth for the first time in paragraph 52 of
2  your report talking about the Medicaid program's
3  intent, correct?
4      A.  I'd have to look back if that's the first
5  place I cited that.  I wouldn't want to say that's the
6  first place I cited that.
7      Q.  But you would agree with me that --
8      A.  Those are related.  I don't know what
9  you're asking.
10     Q.  I'm just trying to establish -- and maybe
11 we can get to it very quickly.  Would you agree with
12 me that your conclusion regarding the Medicaid
13 program's intent to pay actual acquisition cost for a
14 given drug or as close to the actual acquisition cost
15 as is feasible is an important basis for your ultimate
16 conclusions and opinions?
17         MR. BREEN:  Objection, form.
18     A.  I believe this statement reflects the
19 intention of the Medicaid program and what they
20 expected in terms of their reimbursement system and
21 how it was to operate and how payors, providers,
22 manufacturers and others were to interact with and

Page 125

1  facilitate the payment that accomplished that goal.
2      Q.  And when you conclude that Medicaid
3  programs paid too much for Abbott drugs between 1991
4  and 2001, or at least those in the complaint, it is
5  that intention by the Medicaid program against which
6  you are measuring the actual payment, correct?
7      A.  Well, I think this is an underlying
8  principle that states the government's expectation of
9  what estimated acquisition cost should accomplish.
10 Although there are other factors that influence it,
11 this is one component of that, but not everything.  As
12 I describe in detail in other parts of the report, the
13 payment under Medicaid is the lower of estimated
14 acquisition cost plus a dispensing fee, or the federal
15 upper limit plus a dispensing fee, or if the state has
16 state maximum allowable cost limits set plus a
17 dispensing fee, or the pharmacy's usual and customary
18 charge for a prescription.
19         And I think the reporting of inflated
20 prices to the price databases could influence other
21 aspects in addition to the estimated acquisition cost.
22 But this is one important component, yes.

Page 138

1 two sections is that the federal program expected
2 states to comply with that and that if states did not
3 those states would be viewed out of compliance with
4 the federal directives.
5   Q.   Again, we'll get to the Federal Government
6 in a minute. But I'm simply trying to find out
7 whether I need to ask you more questions about whether
8 or not you are purporting to give testimony about the
9 intent of the various state Medicaid programs. And so
10 I'll ask you directly again.
11      Are you giving testimony about what the
12 intent was of any of the various individual state
13 Medicaid programs?
14      MS. BROOKER: Objection, form.
15      MR. BREEN: Objection, form.
16   A.   To the best of my knowledge, states
17 intended to follow the federal directives so that they
18 could qualify for the federal cost sharing. That
19 following the federal directives included following
20 the statements that I've pointed you to that are in
21 paragraph 534. So in that context I do believe the
22 states intended to follow all of the directives from

Page 139

1 the federal government so that they would qualify for
2 the cost sharing. And I believe it was the federal
3 program's directive that they all were expected to set
4 their ingredient cost levels as close as possible to
5 actual acquisition cost as stated in the directive
6 memo that I pointed out to you.
7   Q.   Your testimony and your statements in the
8 report about the Medicaid program's intent, can you
9 tell me is that an opinion you're asserting, is that
10 an assumption that you've made, or is that a
11 conclusion that you've drawn from reviewing evidence,
12 or is it none of those?
13      MS. BROOKER: Objection, form.
14   A.   The information presented here, first of
15 all, is based upon the sources described which are
16 matters of public record. And I've reviewed the
17 public record with respect to this program and the
18 policy and the detailed ways in which it's
19 implemented. I've tracked and monitored and examined
20 in various ways evaluated, advised various Medicaid
21 programs in the federal government and Medicaid over
22 30 years. So this draws upon both what's stated in

Page 140

1 policy documents. It draws upon my experience in
2 working with Medicaid at the federal level and
3 Medicaid at state levels. And this represents an
4 opinion that I believe to be true based on all of
5 those factors.
6   Q.   I'll ask you a series of yes or no
7 questions and I'll ask if you can simply say yes, no,
8 or I can't answer it yes or no. The statement in
9 paragraph 52 regarding the Medicaid program's intent,
10 is that statement an assumption that you have made?
11      MR. BREEN: Objection, form.
12   A.   I believe this to be a true statement. I
13 can't answer that yes or no.
14   Q.   Have you assumed it to be true or do you
15 know it to be true?
16      MR. BREEN: Objection, form.
17   A.   I know this to be true.
18   Q.   Do you know this to be true based upon
19 personal knowledge or based upon people you've spoken
20 to and things you've read?
21   A.   All of the above.
22      MS. BROOKER: Chris, at an appropriate time

Page 141

1 can we take a break whenever you want?
2      MR. COOK: Yeah, let's take a break.
3      MS. BROOKER: You want to do it now?
4      MR. COOK: Yeah.
5      THE VIDEOGRAPHER: Off the record at 11:50.
6      (Recess.)
7      THE VIDEOGRAPHER: On the record at 12:03.
8      BY MR. COOK:
9   Q.   Dr. Schondelmeyer, I'd like to turn your
10 attention to paragraph 228 of your report. And this
11 is the first paragraph of your summary at the end of
12 your report. We already looked at the first sentence
13 of paragraph 228 and that is your statement about
14 Medicaid intending to reimburse for drug products at
15 their actual price. Do you see that?
16   A.   I see the paragraph 228.
17   Q.   Do you see that in the first sentence you
18 state, or you characterize Medicaid's "stated
19 intention of reimbursing for drug products at their
20 actual price"?
21   A.   Yes.
22   Q.   The second sentence relates to Medicare

Schondelmeyer, Pharm.D., Ph.D., Stephen W.  
Washington, DC
February 25, 2009

Page 158

1  MS. BROOKER: Objection, form.
2  A. I'm answering the question. I did use the
3  word just fine. And by that I meant accomplishing the
4  stated intent of the program. So I think ASP would
5  have moved closer toward accomplishing the stated
6  intent of the program to pay as close as feasible to
7  actual acquisition cost.
8  Q. So let's take Medicare. Medicare from 1998
9  through 2001 paid 95 percent of the AWP for Medicare
10 Part B administered drugs, correct?
11 A. In general, with exceptions as we've noted.
12 Q. What exceptions?
13 A. With exceptions? I'd have to go back and
14 look up the regulatory exceptions as I've told you
15 several times today I haven't memorized all of those.
16 Q. There's a regulatory exception to the
17 Medicare Part B payment formula between 1998 and 2001;
18 is that what you're telling me?
19 A. I don't recall specifically. There may be.
20 Often there were, over time, various minor drugs in
21 exceptions. In general it was 95 percent of AWP.
22 Q. Is it your testimony that the system would

Page 159

1  have worked just fine if Medicare Part B had paid 95
2  percent of ASP between '98 and 2001?
3  MS. BROOKER: Objection, form.
4  A. No. That's not my testimony at all. I
5  think the Congress moved toward 95 percent of AWP
6  because they realized that some payors were paying
7  less than AWP and realizing that they weren't getting
8  complete and accurate information from the
9  manufacturers that represented prices generally and
10 currently being paid, they made attempts in their
11 reimbursement system to adjust for that. But again,
12 they may not have even adopted the 95 percent of AWP
13 had the prices generally and currently being paid been
14 reported prior to that time. So that policy may not
15 have even been enacted by Congress.
16 Q. So what your telling me is that if
17 manufacturers had reported prices other than the
18 prices that they did report, a result might have been
19 a change in the system?
20 A. Not just other than. If they had reported
21 accurate prices that were verifiable and the market
22 recognized as prices generally and currently being

Page 160

1  paid, there might have been a different payment system
2  later, yes. Or they would have stayed with the same
3  payment system because they said our intent is to pay
4  the price actually generally and currently paid by
5  providers and if they had evidence that that's what
6  was being paid, the intent of the program would have
7  been accomplished.
8  Q. So are you moving away from your belief
9  that with accurate prices in the system and average
10 prices being published in Red Book the system would
11 have worked just fine?
12 MS. BROOKER: Objection, form.
13 A. I don't understand why you say moving away
14 from my belief. I'm saying that if the government
15 felt confident that accurate prices were being
16 reported they may not have changed their policy over
17 time. Changes in the policy occurred over time
18 because, as the government became aware that various
19 providers were paying different prices and there were
20 various reasons for those prices in the marketplace,
21 they attempted to make what corrections they could.
22 But they still didn't have accurate prices from

Page 161

1  manufacturers. Truthful prices.
2  Q. Can you tell me what the system would have
3  been if Red Book had been reporting empirical averages
4  of wholesale prices --
5  MS. BROOKER: Objection, form.
6  Q. -- between 1991 and 2001?
7  A. Well, you said empirical averages of
8  wholesale prices. I would qualify that because that
9  term doesn't have a specific meaning to me. If it was
10 actual prices currently and generally being paid I
11 could tell you. If it's wholesale prices by some
12 other definition, it may be a different conclusion.
13 Q. You're familiar with the definition that
14 Judge Saris gave to average wholesale price in this
15 case, correct?
16 MS. BROOKER: Objection, form.
17 A. I recall seeing her definition. I believe
18 I commented on it at some point.
19 Q. What do you understand Judge Saris'
20 definition of average wholesale price to be?
21 MS. BROOKER: Objection, form.
22 A. I believe -- again, we have to -- obviously

41 (Pages 158 to 161)

Page 162

1  I'm not going to attempt to overly restate her
2  position. But my understanding is that average
3  wholesale price has the plain meaning of an average
4  wholesale price. That was what she felt it was
5  intended to be. That isn't the prices reported.
6     Q.  Do you know where in your report you
7  describe Judge Saris' definition of average wholesale
8  price?
9     A.  I don't, but I could look.
10    Q.  Can you tell me whether the system would
11 have worked just fine if the average wholesale prices
12 reported in Red Book and other compendia had been
13 average wholesale price as defined by Judge Saris?
14        MS. BROOKER: Objection, form.
15    A.  I think back over time if the prices being
16 reported as average wholesale prices would have been
17 prices generally and currently paid in the market,
18 which I think is consistent with Judge Saris'
19 expectation, I think the payment system would have
20 been accomplishing its intent, which is what I meant
21 by just fine, that it accomplished its intent of
22 paying a price generally and currently paid that's as

Page 163

1  close as feasible to actual price.
2         MS. BROOKER: Paragraph 46.
3         MR. COOK: Thank-you.
4     Q.  Turn to paragraph 46. You refer in
5  paragraph 46 to Judge Saris having examined the
6  meaning of the term AWP in the Medicare context and
7  determined that the term to be given its plain meaning
8  in accordance with established principles of statutory
9  construction. Did I read that correctly?
10    A.  Actually, I haven't found that. This is
11 paragraph 46 of which document?
12    Q.  Paragraph 46 of your report in Exhibit 1.
13        MS. BROOKER: Not page.
14    Q.  Paragraph 46.
15    A.  I'm on paragraph 46.
16    Q.  The third sentence.
17    A.  Oh, I see, it's in the middle. Okay, I see
18 it now, yes.
19    Q.  All right what is your understanding of the
20 meaning of average wholesale price as defined by Judge
21 Saris?
22    A.  I answered that previously, and I state

Page 164

1  here what that is. That it has the plain meaning in
2  accordance with established principles of statutory
3  construction. That is that it's an average of the
4  wholesale prices, meaning -- and price meaning an
5  actual price being paid in the market, a transaction
6  price, not a list or a fictitious price.
7     Q.  If the average wholesale prices used by the
8  Medicare and the Medicaid programs between 1991 and
9  2001 had universally fit Judge Saris' definition, are
10 you able to testify that those programs would have
11 continued as they were and simply paid less money?
12        MS. BROOKER: Objection, form.
13    A.  Well, if they used those prices and the
14 prices reported by the manufacturers that created the
15 databases that Medicare and Medicaid relied upon had
16 been prices generally and currently paid in the market
17 that were as close as feasible to actual acquisition
18 cost, I believe with respect to at least drug product
19 cost payment that the payment process by Medicare and
20 Medicaid wouldn't have changed in ways that it did and
21 would have resulted in lower payments for those drugs.
22    Q.  Only on the drug ingredient cost portion

Page 165

1  though, correct?
2     A.  Well, that's the only part that we're
3  evaluating here. This isn't about other aspects.
4     Q.  You don't consider what effect that might
5  have had on the dispensing fee component of the
6  payment?
7         MS. BROOKER: Objection, form.
8     A.  That's a separate consideration and that
9  could be evaluated.
10    Q.  So you haven't considered in any way what
11 the effect of lowering drug ingredient cost would have
12 on dispensing fees in the Medicare and Medicaid
13 programs?
14        MR. BREEN: Objection, form.
15    A.  Not in the context of this case.
16    Q.  So you're coming here to testify about
17 lowering the drug ingredient cost for Medicare and
18 Medicaid between 1991 and 2001, and you're not in any
19 way considering what impact that might have had on the
20 dispensing fee? Do I have that correct?
21        MS. BROOKER: Objection, form.
22    A.  I have considered that. I don't think one

Schondelmeyer, Pharm.D., Ph.D., Stephen W.  
Washington, DC  
February 25, 2009

Page 186

1  did.
2  Q. And so Myers and Stauffer did a report for
3  that commission with respect to dispensing costs and
4  acquisition costs? Do I have that correct?
5  A. For the Minnesota Medicaid program with
6  direction from the commission.
7  Q. Did Myers and Stauffer reach any
8  conclusions about what it cost home infusion
9  pharmacies to dispense products in Minnesota?
10  A. I believe they just reported descriptive
11  information on that and didn't address specific
12  conclusions. It wasn't the main purpose of the
13  report.
14  Q. Did Myers and Stauffer quantify the
15  difference in the cost of dispensing for home IV
16  pharmacies as opposed to retail pharmacies in that
17  report?
18  A. Again, I believe they reported
19  descriptively that. But again, it wasn't the main
20  focus of the report, so --
21  Q. What was the description that Myers and
22  Stauffer provided when comparing the cost to dispense

Page 187

1  between home IV pharmacies and retail pharmacies in
2  that report?
3  A. Well, I don't recall the specifics. But in
4  general the home IV pharmacies did have a higher cost
5  of dispensing than the typical retail community
6  pharmacies. But I don't recall the detail or the
7  specific quantity.
8  Q. Did the commission that you chaired result
9  in any changes in the manner in which Minnesota
10  Medicaid paid for pharmaceutical products?
11  A. The commission primarily addressed issues
12  subsequent to the Deficit Reduction Act that was
13  passed and certain provisions of that were actually
14  put on hold due to an injunction. And so most of the
15  issues we addressed became moot because of that
16  injunction.
17  Q. If the injunction had not been issued what
18  did the commission recommend that Minnesota Medicaid
19  do in light of the Deficit Reduction Act?
20  A. Oh, I'd have to look back. It's been a
21  while since I've done that. I have to look back at
22  the detail of that report.

Page 188

1  Q. Can you characterize it in any way
2  whatsoever?
3  A. Well, the commission was looking at the
4  impact on providers of cutting their payments for
5  ingredient costs below the actual acquisition cost,
6  which is a different circumstance than what we're
7  describing here where pharmacies got paid above the
8  actual acquisition cost. So we looked at and just
9  comment upon that it wouldn't be reasonable for
10  businesses since pharmacies in home -- in this case
11  pharmacies was the primary focus -- and providers to
12  the Medicaid program are private businesses. It
13  wouldn't be reasonable for them to operate at below
14  cost in the marketplace.
15        And if indeed the Deficit Reduction Act
16  resulted in payments that were below cost for certain
17  products that those pharmacies may either not dispense
18  those products or may drop out of the Medicaid
19  program.
20  Q. So in this particular commission you
21  compared the ingredient cost before the DRA to the
22  ingredient cost after the DRA without looking at the

Page 189

1  adequacy of the dispensing fee; do I have that
2  correct?
3  A. We attempted to model what the ingredient
4  cost would be after the DRA since it hadn't been
5  implemented and it involved average manufacturer's
6  prices being reported by manufacturers under a new
7  definition than the one that existed previously for
8  which nobody had ever seen data. So we tried to model
9  what those prices might look like from other data and
10  tried to identify what the impact would be on product
11  costs, and that if in fact it resulted in a product
12  cost below what pharmacies actually paid that the
13  primary providers in the Medicaid program, if it
14  resulted in a product cost below what pharmacies
15  actually paid, we commented that that would affect
16  access.
17  Q. Who is Cody Wiberg?
18  A. Cody Wiberg is a pharmacist in Minnesota.
19  He currently is the executive director of the
20  Minnesota board of pharmacy.
21  Q. What was his prior position?
22  A. Prior to that he was a pharmacy program

48 (Pages 186 to 189)

Schondelmeyer, Pharm.D., Ph.D., Stephen W.  
Washington, DC  
February 25, 2009

Page 190

1  manager of some type within the Medicaid program in
2  Minnesota.
3     Q.   And when was he the pharmacy administrator
4  for Minnesota Medicaid?
5     A.   He wasn't the administrator. He was a
6  manager. Not the principal administrator. I don't
7  recall when he finished. From the late '90s until
8  sometime maybe four or five years later. He was not
9  in that position when I chaired the commission we're
10 talking about.
11    Q.   Are you aware that Minnesota Medicaid has
12 MACs, M-A-Cs, established for a number of the products
13 that it reimbursed during the time period 1991 to
14 2001?
15    A.   Yes, I am.
16    Q.   How did Minnesota Medicaid set those MAC
17 prices?
18    A.   That's somewhat of a mystery perhaps
19 sometimes, although they had a procedure defined and
20 they would check with some pharmacists in the state to
21 identify. But not on a very systematic basis. It was
22 kind of a network of friends which -- you know, it

Page 191

1  wasn't as systematic as other states I've seen
2  perhaps.
3     Q.   Is it your testimony as an expert that
4  Minnesota Medicaid intended to set MAC prices as close
5  as possible to the actual acquisition cost for
6  pharmacies of those products that they were MAC'ing?
7     A.   I think MAC prices are one part of an
8  overall reimbursement formula. And there are a
9  variety of factors that go into setting MAC prices. I
10 think MAC prices are intended to set an upper limit on
11 the payment for prescription drugs in the Medicaid
12 program. And MAC prices first of all are used in
13 products that are generics that have therapeutic
14 equivalents and not only multiple purchasers but
15 multiple manufacturers selling therapeutically
16 equivalent products and there may be different prices
17 across those different manufacturers.
18        And so in setting the MAC rate, this upper
19 limit for payment. It's not the criteria -- they
20 don't pay MAC automatically. It's one of a criteria
21 of several other things in a lower-of criteria. But
22 it's setting the upper limit. I believe that

Page 192

1  Minnesota and other states when they set MAC rates
2  want to set a maximum allowable cost for a given
3  generic product taking into account the prices across
4  different manufacturers and across different providers
5  for the same manufacturer as well as across different
6  providers for different manufacturers to represent and
7  identify an upper limit such that pharmacies in the
8  state could generally and currently purchase products
9  at that price, but not the lowest possible price.
10    Q.   Was it your understanding that in setting
11 MACs the Minnesota Medicaid program intentionally
12 created a spread between actual acquisition cost and
13 the MAC?
14    A.   I'm aware that MAC programs sometimes would
15 identify the lowest price and multiply it times a
16 multiplier -- for example, 150 percent -- so that it
17 would create a range to assure that most pharmacies
18 could generally and currently purchase products at
19 that price.
20        MR. COOK: Could you read the question
21 back, please?
22        (Whereupon, the requested portion was read

Page 193

1  by the reporter.)
2        BY MR. COOK:
3     Q.   Can you answer that question yes or no?
4        MS. BROOKER: Objection, form.
5     A.   I would have to ask what you mean by
6  spread. I defined it as I intended. And that was it
7  multiplied 150 percent times the lowest price they
8  found. It creates a type of spread. But it was with
9  the intention of setting a price such that they could
10 reasonably expect that pharmacies could generally and
11 currently purchase the product at or below that price.
12       If you have a different meaning of spread
13 or a different context and want to clarify that, I'd
14 be glad to try to address it.
15    Q.   Was it your understanding that in paying
16 the ingredient cost portion of its drug reimbursement
17 in the 1990s the Minnesota Medicaid program intended
18 to pay a dollar amount greater than actual acquisition
19 cost?
20    A.   For dispensing fees or for ingredient cost
21 or --
22       MR. COOK: Could you read the question

49 (Pages 190 to 193)

Schondelmeyer, Pharm.D., Ph.D., Stephen W.  
Washington, DC
February 25, 2009

Page 194

1  again?
2      (Whereupon, the requested portion was read
3  by the reporter.)
4      A.   Again, with generics there are different
5  providers in the marketplace.  And I think they
6  intended to pay greater than the lowest price in the
7  market at times.  What the Medicaid program intended
8  within the scope of their state plan beyond that I
9  think is a matter of evaluation in terms of the state
10 plan and the federal regulations.
11     BY MR. COOK:
12     Q.   Is it your understanding that the Medicaid
13 program in Minnesota in the 1990s intended to pay the
14 pharmacies approximately 8 to $10 more than their
15 actual acquisition cost in setting their ingredient
16 cost?
17     A.   There may be Medicaid programs -- Cody may
18 have made such a comment.  Cody sometimes expressed
19 views and opinions that weren't necessarily the
20 official opinion of the state Medicaid program.
21     MR. COOK:  Could you read my question
22 again?

Page 195

1      (Whereupon, the requested portion was read
2  by the reporter.)
3      A.   I've seen no written document stating that
4  from the state of Minnesota Medicaid program.  I've
5  seen no statute or policy advocating that from the
6  state of Minnesota.  You know, given official sources
7  that I would normally look at and rely upon, I've seen
8  no evidence of that.
9      BY MR. COOK:
10     Q.   Have you read Cody Wiberg's deposition in
11 this case?
12     A.   I did read his deposition.
13     Q.   So when I asked you that question and you
14 said you had seen no evidence of it you didn't bother
15 listing off the testimony of the pharmacy
16 administrator in Minnesota, right?
17     MS. BROOKER:  Objection, form.
18     A.   I listed off the sources that I would refer
19 to to see what the policy of Minnesota Medicaid is.
20 In general, while Cody had some role over policy that
21 was not to the best of my understanding within the
22 scope of his authority to make such a policy.

Page 196

1      Q.   Is it your testimony that you are ascribing
2  an intent to Minnesota Medicaid different than Mr.
3  Wiberg ascribed to it?
4      MS. BROOKER:  Objection.
5      A.   I haven't offered an opinion on what
6  Minnesota Medicaid's intent per se was.  You've
7  offered to me what Cody Wiberg's opinion was on that.
8  And my comment is that I don't see in Minnesota
9  documents statements that support that.
10     Q.   Did Minnesota Medicaid intend to pay more
11 than acquisition cost in the ingredient cost portion
12 of their drug reimbursement between 1990 and 2001?
13     MR. BREEN:  Objection, form.
14     A.   I've seen no document from the state of
15 Minnesota saying that they intended to do that.  I did
16 read the deposition of Cody Wiberg and see what he
17 said as an individual.  But in working with Medicaid
18 programs in general and with the state of Minnesota,
19 I'm not aware of any document that says that that was
20 their intent, an official document that holds the
21 weight of policy.
22     MR. COOK:  Could you read my question back,

Page 197

1  please?
2      (Whereupon, the requested portion was read
3  by the reporter.)
4      MS. BROOKER:  Objection, asked and
5  answered.
6      BY MR. COOK:
7      Q.   Can you answer that question yes or no?
8      MR. BREEN:  Objection, form.
9      A.   I can't answer that yes or no.  I can
10 answer it with a qualification, as I've done.
11     Q.   So on page 29 of your report you can opine
12 on the Medicaid program's intent to pay actual
13 acquisition cost, but to be real clear you are unable
14 to opine on what the intent was of the Medicaid
15 program in Minnesota, correct?
16     MS. BROOKER:  Objection.
17     MR. BREEN:  Objection, form.
18     A.   No.  That's not correct.  I think the
19 statement on -- if you'll permit me to go there.  The
20 statement on page 29, paragraph 52 that you're
21 referring to is again the one that I said is the
22 federal Medicaid's intent.  And as I pointed out on

50 (Pages 194 to 197)

Schondelmeyer, Pharm.D., Ph.D., Stephen W.  
Washington, DC  
February 25, 2009

Page 198

1  paragraph 53 on the next page, that that's the
2  expectation of the federal program that the states
3  will set their ingredient cost levels as close as
4  possible to actual acquisition cost. And I believe
5  that that is the intent of the Medicaid program in
6  Minnesota as well.
7       And I have not seen official documents from
8  the state in writing that suggest otherwise,
9  notwithstanding the comments in deposition of Cody
10 Wiberg. But that isn't an official document or
11 doesn't hold the weight of policy.
12   Q. **Earlier on today when you were describing**
13 **how it was that you can testify what Medicaid expected**
14 **and what Medicaid intended, you referred to**
15 **conversations you had had with officials at various**
16 **Medicaid and Medicare programs. Do you recall that**
17 **testimony?**
18   A. I recall something to that effect. I don't
19 know if it was exactly that term.
20   Q. **So now you're no longer willing to rely**
21 **upon conversations with officials at Medicare and**
22 **Medicaid in determining what Medicare and Medicaid**

Page 199

1  **intended? Do I have that correct?**
2       MS. BROOKER: Objection, form.
3   A. No, you don't have it correct. I do take
4  into account comments of officials. But I also
5  compare those against the official documents and the
6  official statutes, regulations and policies issued by
7  federal Medicaid and state plans of state Medicaid
8  programs, and I give those more weight than the
9  comment of an individual that's not backed up by those
10 documents.
11   Q. **So in reviewing statements and sworn**
12 **testimony in preparation for your testimony today you**
13 **weighed the various testimony and decided which was**
14 **more credible and which was less credible? Do I have**
15 **that correct?**
16      MS. BROOKER: Objection, form.
17   A. I would phrase it more that I identified
18 what are the statutes, regulations, written policies
19 of the federal and state Medicaid programs. And then
20 when I read depositions or comments of various
21 individuals I compared them, weighed them, against the
22 official formal written policies and documents. And

Page 200

1  when I have a difference between those I do give
2  deference to the official formal written policies
3  versus the comment of an individual. Yes, I do give
4  deference to official policies.
5    Q. **Are you offering an opinion on the meaning**
6  **of federal statutes and regulations that you reviewed**
7  **in preparation for your testimony here today?**
8    A. I don't understand what you mean.
9    Q. **Well, you're telling me that when you**
10 **testify or give an opinion about what Medicaid**
11 **intended you're basing that upon regulations and**
12 **official documents from the Medicaid program; do I**
13 **have that correct?**
14   A. On --
15      MS. BROOKER: Objection, form. Sorry. Go
16 ahead.
17   A. I'm basing it on written statutes,
18 regulations, policy memorandum and other documents and
19 I've quoted in here sources that I am relying upon
20 that are official documents and have consistently
21 reported this same information over time.
22   Q. **What expertise do you have to interpret for**

Page 201

1  **this jury statutes, regulations and official**
2  **documents?**
3    A. Well, I don't do so as a lawyer in the
4  legal sense. However, my master's degree is in public
5  administration and public policy from Ohio State
6  University. And that master's program, the core of
7  that was based on three major courses. One was the
8  policy formulation. One was policy implementation.
9  And one was policy evaluation.
10      And as a part of that master's program in
11 addition to the methods of each of those processes we
12 had to pick a particular piece of legislation and do a
13 complete legislative history and documentation and
14 interpretation of what were the factors involved in
15 the formulation of that policy, what were the factors
16 involved in implementation of that policy and what
17 were the factors involved in evaluation of that
18 policy, and to what degree did the reasons it was
19 brought about and the ways it was implemented have
20 concurrence with what actually occurred at the end.
21      I looked at -- I believe it was Public Law
22 93641, which was -- I believe that was a health

Page 290

1  an understanding of how it was that Medicare Part B
2  paid for the drugs listed in Exhibit 547 when they
3  were administered to a Medicaid beneficiary on an
4  outpatient basis between 1992 and 1998?
5       A.  I've read this and it does refer to the
6  lower of the estimated acquisition cost or the
7  national average wholesale price of the drug. The
8  estimated acquisition cost it describes in the
9  regulation is to be determined based on surveys of
10 actual invoice prices paid for the drug.
11      Q.  My question to you is what percentage of
12 the claims submitted to Medicare Part B for drugs in
13 this case between 1992 and 1997 were paid based upon
14 estimated acquisition cost and what percentage were
15 paid based upon the national average wholesale price?
16      A.  I don't know that specifically. One could
17 assess that. With a data set of claims that were paid
18 and with a data set that had the historical prices in
19 the national average wholesale price database, you
20 could assess which ones were paid at that national
21 average wholesale price or ones that were paid on a
22 different basis. So one could assess that and that is

Page 291

1  measurable. I wasn't asked to do damages or estimate
2  the quantity or a value of claims paid on a specific
3  basis.
4       Q.  Were claims paid by Medicare Part B based
5  upon the national average wholesale price between 1992
6  and 1997?
7       A.  I believe there are and would have been
8  some based on this approach.
9       Q.  Were claims paid by Medicare Part B between
10 1992 and 1998 based upon the estimated acquisition
11 cost as described in this regulation?
12      A.  They may or may not have been. It's my
13 understanding that the carriers that were to implement
14 this had some difficulty in doing invoice surveys and
15 even invoices may or may not have reported prices
16 actually, you know, currently and generally being paid
17 by providers. Sometimes invoices carry a list price,
18 i.e. the average wholesale price or the wholesale
19 acquisition cost, which isn't necessarily the price
20 generally and currently being paid. It's kind of a
21 list price even on the invoice and then sometimes
22 there are off invoice discounts.

Page 292

1       Earlier I referred to IMS does -- is a data
2  collection service that largely collects information
3  from pharmacies, hospitals, wholesalers and then
4  provides information back to pharmaceutical companies,
5  used for market intelligence, including pricing
6  issues. But the invoice data they collect is invoice
7  data before discounts are taken. And so it isn't
8  always a reflection of the prices actually generally
9  and currently being paid in the market.
10      MR. BREEN: Chris, are we at a point where
11 we can take a break?
12      MR. COOK: That would be a great idea.
13      MR. BREEN: Are you done with this section?
14      MR. COOK: We can come back to it. This is
15 a good place for a break.
16      THE VIDEOGRAPHER: Off the record at 4:02.
17      (Recess.)
18      (Exhibit Abbott Schondelmeyer 004 and
19      Exhibit Abbott Schondelmeyer 005
20      were marked for identification.)
21      THE VIDEOGRAPHER: On the record at 4:13.
22      BY MR. COOK:

Page 293

1       Q.  Mr. Schondelmeyer, I will hand you what
2  I've asked the court reporter to mark as Exhibits 4
3  and Exhibit 5. And while you look at those, for the
4  record, Exhibit 4 is a June 2002 report by Myers and
5  Stauffer entitled "Study of Medi-Cal pharmacy
6  reimbursement." Exhibit 5 is a report prepared by you
7  dated June 2008 entitled "Impact of 10 percent fee for
8  service payment reductions on Medi-Cal beneficiaries
9  and pharmacies."
10      Now, turning your attention first back to
11 Exhibit 3 -- and we'll be looking at Exhibits 3, 4 and
12 5 in conjunction -- Exhibit 3 is the December 2007
13 Myers and Stauffer report on a survey of dispensing
14 and acquisition costs of pharmaceuticals in the state
15 of California. And if you turn where we were before
16 on pages 6 and 7 of Exhibit 3, we were in the process
17 of summarizing the conclusions of Myers and Stauffer
18 in this December 2007 report.
19      Now, starting with the section entitled
20 "dispensing cost," would you agree with me that Myers
21 and Stauffer concluded the state-wide average or mean
22 cost of dispensing weighted by Medi-Cal volume was

Schondelmeyer, Pharm.D., Ph.D., Stephen W.          February 25, 2009
Washington, DC

Page 294

1  $10.81 per prescription?
2      A.    That's on page 6? Is that the one you're
3  referring to?
4      Q.    Yes, sir. The bolded language under
5  dispensing cost.
6      A.    What you've said is a close paraphrase of
7  what their conclusion appears to be.
8      Q.    And you've incorporated that conclusion
9  into reports that you've prepared, including
10 specifically Exhibit 5, the June 3, 2008 report,
11 correct?
12     A.    I discuss that conclusion and address
13 comments and criticisms of their method and
14 alternative conclusions.
15     Q.    Do you have any reason to believe that the
16 $10.81 per prescription cost that Myers and Stauffer
17 found in December 2007 overstated the cost to dispense
18 pharmaceuticals in California?
19     A.    Well, I believe it's an average or a mean
20 cost of dispensing as they defined weighted on
21 Medi-Cal volume. It may overstate for some specific
22 pharmacies their cost of dispensing. I believe there

Page 295

1  were pharmacies with cost of dispensing that appeared
2  to be as low as 4 or $5 and some with costs of
3  dispensing that went up to 50 or $60.
4      Q.    But you would consider the Myers and
5  Stauffer survey and analysis to be accurate, correct?
6      A.    No. I didn't say that. I said I wrote an
7  analysis and critique of their methods and alternative
8  conclusions based on that critique. I believe they
9  provided useful information, but it's not completely
10 accurate.
11     Q.    What inaccuracies specifically can you
12 identify in the Myers and Stauffer conclusion about
13 the cost to dispense drugs in California?
14     A.    I can't off the top of my head. I could
15 refer you to the report that I produced in the
16 California Exhibit 5.
17     Q.    The --
18     A.    And there we specify the criticisms. It
19 lists the criticisms I have and gives a detailed list
20 with footnotes about those criticisms.
21     Q.    Did any of your criticisms suggest that the
22 $10.81 cost to dispense found by Myers and Stauffer

Page 296

1  was too high?
2      A.    Not as an average. But again, for
3  individual pharmacies it may be.
4      Q.    And in fact your criticisms as you had
5  expressed in June 2008 suggested that if anything the
6  Myers and Stauffer cost of dispensing was too low,
7  correct?
8      A.    As an average.
9      Q.    Yes.
10     A.    But not for all pharmacies in California.
11     Q.    You suggested that perhaps Myers and
12 Stauffer's cost of dispensing was too low as an
13 average, correct?
14     A.    As an average or median or mean, yes.
15     Q.    Now, Myers and Stauffer also determined
16 what the average cost to acquire drugs was for
17 pharmacies in California in 2007, at least for the
18 thousand or so single-source drugs that they surveyed,
19 correct?
20     A.    They have an acquisition cost estimate, if
21 that's what you mean by acquired drugs.
22     Q.    And the acquisition cost estimate I think

Page 297

1  we already determined for single-source drugs was 79
2  percent of average wholesale price, correct?
3      A.    The average average acquisition cost was
4  that. Again, it's an average of averages for -- an
5  average of the invoices for an NDC and an average of
6  the averages across all those NDCs.
7      Q.    And of the multiple-source drugs that Myers
8  and Stauffer surveyed they determined that on average
9  those multiple-source drugs were acquired at 63.6
10 percent of the average wholesale price?
11     A.    That's what's represented in their
12 conclusions. That's their average given their
13 methodology.
14     Q.    Do you have any reason to believe that
15 Myers and Stauffer's average acquisition cost
16 calculations are inaccurate?
17     A.    I think there are issues one could raise
18 about their methods. I think it's a useful number
19 given the qualifications of how they did it. But
20 again, it's an average. It's not a number that one
21 could use in a reimbursement system.
22     Q.    And Myers and Stauffer concluded that for

Schondelmeyer, Pharm.D., Ph.D., Stephen W.
Washington, DC
February 25, 2009

Page 330

1  would result in patients who do not receive the care
2  that they need and will end up seeking alternative
3  sources of care that may be less effective, more
4  costly or both, right?
5      A.   Based on the payments that are below the
6  actual cost to the pharmacy and providing medications,
7  yes.
8      Q.   And you did that by calculating whether the
9  revised payment with the 10 percent reduction would be
10 below the pharmacy's total cost of dispensing the
11 prescription, correct?
12     A.   I did compare to their total cost of
13 dispensing, their cost of dispensing plus their
14 acquisition costs. And the total payment was below
15 their total cost of acquiring the product and cost of
16 dispensing.
17     Q.   And if you turn to page romanette 2 -- it's
18 the fourth page of the report, but it has romanette 2
19 on the bottom and it's in the executive summary -- and
20 looking at the second paragraph of the executive
21 summary page romanette 2, for the record, it reads "If
22 the payment method sets the prescription payment

Page 331

1  amount below the actual cost for either drug product
2  cost, cost of dispensing and related additional costs,
3  or both, then problems with Medicare beneficiary
4  access to pharmacy services will occur."
5           That is a true statement, isn't it?
6      A.   I don't see where you're at in the
7  document.
8      Q.   Certainly. Romanette 2.
9      A.   I'm on that page. Oh. No. I'm on page 4,
10 I guess. That's why. Yes. I see that.
11     Q.   Is that a true statement?
12     A.   I believe the statement to be true, yes.
13     Q.   And where you use Medicare did you mean
14 Medicaid?
15     A.   It may well be -- I probably should have
16 used Medi-Cal, I think. And I think my word processor
17 may have flipped that automatically.
18     Q.   But regardless of whether it's Medicare,
19 Medicaid or Medi-Cal, that notion is accurate across
20 all federal health programs, correct?
21         MS. BROOKER: Objection, form.
22     A.   Yes and no. First of all, this refers to

Page 332

1  paying below actual cost for various components and it
2  refers to the policymaker having information that
3  allows them to accurately determine what's below
4  actual cost and having information that would allow
5  them to have a policy that could be used on a broader
6  reimbursement basis over time.
7      Q.   This statement, this true statement, one
8  sentence true statement, doesn't say anything at all
9  about the value of or the quality of data that the
10 provider has, correct?
11         MS. BROOKER: Objection, form.
12     A.   This is a one sentence true statement that
13 is encompassed by an entire report that gives the
14 context under which that statement has truth. And I
15 would say that the entire context of this document is
16 necessary and you can't just take that statement by
17 itself out of context.
18     Q.   But you would agree with me as a general
19 matter if the payment method that a healthcare program
20 sets for prescription payments results in an amount
21 that is below the cost of dispensing and related
22 additional costs taken together plus the drug cost

Page 333

1  then you will see problems with access to pharmacy
2  services?
3          MS. BROOKER: Objection, form.
4      A.   I believe if pharmacies are paid below
5  their cost for product and dispensing in aggregate
6  over time in a program, they may choose not to
7  participate in that program. I'm not aware, though,
8  that Medicaid or Medicare policy either advocate
9  paying pharmacies below their actual cost of
10 dispensing or actual cost of ingredients.
11         So I don't believe that either Medicare or
12 Medicaid in general have policies that intend to pay
13 pharmacies below their actual cost.
14     Q.   And then if you turn to page romanette 3,
15 the very first paragraph, you define what a reasonable
16 pharmacy payment consists of. And you say that it "is
17 a payment that covers the drug ingredient cost plus
18 the cost of dispensing plus a reasonable net profit."
19 Is that an accurate statement of what a reasonable
20 pharmacy payment is?
21     A.   In the context of the entire report and how
22 I describe that, it is. That's from the perspective

Schondelmeyer, Pharm.D., Ph.D., Stephen W.  
Washington, DC  
February 25, 2009

Page 334

1  of the pharmacy as a provider and as a person
2  operating a private business. It's a reasonable
3  statement from that perspective, yes.
4      Q.  And in attempting to calculate what the
5  cost is to dispense drugs for purposes of this June
6  2008 study you relied upon Myers and Stauffer's
7  December 2007 report that we reviewed and that was
8  marked as Exhibit 3, correct?
9      A.  I examined that and used information from
10 that as well as other studies that I also used and
11 relied upon, studies conducted by the National
12 Association of Chain Drug Stores, National Community
13 Pharmacist's Association. So I didn't rely solely
14 upon them. I did incorporate the information. I
15 critiqued and commented on its appropriate use.
16     Q.  If you look on page romanette 5, the last
17 paragraph on this page, you refer to a cost of
18 dispensing study that was recently performed in
19 California for the Department of Health Services.
20 There's no citation there, but you'll agree with me
21 that that was the Myers and Stauffer report that you
22 were referring to, right?

Page 335

1      A.  Yes. And you're actually in the executive
2  summary and if you look at the full report it does
3  recognize and cite that. But again, it doesn't rely
4  solely upon that. This is reporting their findings
5  from their study.
6      Q.  But then you take the findings from that
7  study and adjust them to 2008 dollars in order to
8  support the opinions that you express here, correct?
9      A.  I used their numbers. Since their numbers
10 were lower than other studies that I think perhaps are
11 more accurate, I felt it was a conservative number.
12 And I did -- yes, pharmacies' costs, just like other
13 costs of businesses, do change over time. And I did
14 adjust them using an inflation method that Myers and
15 Stauffer themselves used to calculate their average
16 across different businesses that had different fiscal
17 years.
18     Q.  And you concluded that 95 percent of
19 California pharmacies have a cost to dispense that's
20 greater than the $7.25 dispensing fee that Medi-Cal
21 currently is providing to pharmacies, correct?
22     A.  95 percent have an average cost of

Page 336

1  dispensing that's greater than the Medi-Cal dispensing
2  fee.
3      Q.  Why do you use inflation adjusted dollars?
4  I mean, why don't you use just current dollars?
5      A.  Well, again, Myers and Stauffer themselves
6  used it. And as I commented earlier, various
7  businesses have changes in their prices other time and
8  the cost of doing business. Pharmacists' salaries
9  have gone up. Rents have gone up. I don't know.
10 Maybe they've gone down now -- I don't know -- in the
11 last six months. But costs do change over time. And
12 Myers and Stauffer in that particular instance
13 outlined what I thought was a reasonable method for
14 adjusting.
15         In fact the data they collected on cost of
16 dispensing from pharmacies was from pharmacies that
17 had a variety of different fiscal years in terms of
18 their business or tax records. And Myers and Stauffer
19 had to adjust those to be in a common time period
20 rather than a different time period. I used the same
21 method they used to adjust those to a common time
22 period to adjust them moving forward over time as

Page 337

1  well.
2      Q.  So when you compare prices from one year to
3  the next, do you typically use inflation adjusted
4  dollars?
5      A.  It depends on for what purpose we're
6  comparing them. But if you're going to set a
7  reimbursement rate based on an attempt to estimate
8  actual cost of dispensing or actual acquisition cost,
9  one would want to use -- if you didn't have actual
10 cost or a new survey in each time period, which would
11 be costly and perhaps not so feasible in all cases,
12 then you need a method to make an adjustment for the
13 time change in cost that might occur.
14     Q.  If you would turn to page 8, please.
15     A.  Regular 8?
16     Q.  Yes, sir. Regular 8. In the third full
17 paragraph leading into the block quote, beginning with
18 "the total," you write "The total amount of fee for
19 service payments to a pharmacy for a prescription must
20 be taken into account including both the actual drug
21 product cost payment and the reasonable dispensing fee
22 payment." Why must you take into account the total

85 (Pages 334 to 337)

Schondelmeyer, Pharm.D., Ph.D., Stephen W.  
Washington, DC  
February 25, 2009

Page 338

1  fee for service payments to a pharmacy for a
2  prescription, including the actual drug product cost
3  payment and the reasonable dispensing fee payment?
4      A.   Well, both will influence the business
5  decision a pharmacy makes as to whether or not to
6  accept or participate in a third party program.
7  That's different than determining what the obligation
8  of the payor is to do and what they choose to do given
9  information that they know.  In the paragraph just
10 before that I do state what the CMS policy is with
11 respect to estimated acquisition cost and that it
12 clearly states that estimated acquisition cost is
13 meant to be as close as feasible to the price
14 generally and currently paid by a provider and that
15 the states are therefore expected to set their
16 ingredient cost levels at that rate.
17     Q.   And then in the paragraph after the block
18 quote, the second sentence, you write "At the same
19 time that Medicaid payment policy is implemented to
20 assure" --
21     A.   I'm sorry.  Where is it?
22     Q.   I'm sorry.  Page 8.  Last paragraph.  It's

Page 339

1  on the screen here.
2      A.   Oh, you skipped the first sentence of that
3  paragraph.
4      Q.   Yes, sir.  The second sentence after the
5  footnote 27.  Well, let's start with the first
6  sentence.  You state "Payment of the actual drug
7  ingredient cost via an estimated acquisition cost for
8  a drug product is 'the appropriate conceptual basis
9  for the payment policy,'" correct?
10     A.   That's the statement, yes.
11     Q.   And that's the notion that you've been
12 asserting in your report in this case and in your
13 testimony here today, correct?
14     A.   I believe that's an appropriate notion,
15 yes.
16     Q.   In this particular report, however, you go
17 on and state in addition "At the same time that
18 Medicaid payment policy is implemented to assure
19 actual cost payment for the drug product, it is
20 essential that the payment for the cost of dispensing,
21 the pharmacy's overhead and profit and other costs
22 also be adjusted to assure that actual costs and

Page 340

1  expenses are paid."  Do you see that?
2      A.   I see that, yes.
3      Q.   It's that additional consideration stated
4  in that sentence that you did not undertake in your
5  analysis for this case, correct?
6          MS. BROOKER:  Objection, form.
7      A.   I was not asked to undertake that analysis
8  and it doesn't -- isn't necessary for any of the
9  opinions that I've adopted in this case.  And this is
10 in a different circumstance.  This is with respect to
11 what is the impact on the providers and the behavior
12 of the providers.  It's a different circumstance.
13     Q.   And you weren't asked to determine what the
14 payment would have been to providers between 1991 and
15 2001 to see their drug payments cut in the manner that
16 Dr. Duggan suggests, did you?
17         MS. BROOKER:  Objection, form.
18     A.   Well, I wasn't asked to do the damages
19 analysis.  Dr. Duggan was.  I do realize that it's not
20 as simple as just if you cut the payment on drug
21 ingredient cost you have to raise the cost of
22 dispensing because the pharmacies for generic

Page 341

1  products, which is what we're talking about here, the
2  pharmacies may have actually used a different generic
3  product in the first place.
4          So I don't think you can directly connect
5  those two in the way that I've done in this report and
6  the way that is necessary for this report.  I think
7  they're very different issues and I don't think you
8  can make that connection.  And certainly a connection
9  of that type wasn't necessary to underpin any of the
10 opinions that I've offered in this case.
11     Q.   This report didn't address the impact of
12 using the cost or the payment to pharmacies that
13 dispense these products?
14     A.   What do you mean by "this report"?
15     Q.   I'm sorry.  Your June 2008 report in
16 California did not address what the impact would be on
17 pharmacies that dispense generic products?
18     A.   My June 2008 --
19         MS. BROOKER:  Objection, form.
20     A.   My June 2008 report does address impact on
21 providers.  The report for the U.S. versus Abbott case
22 I was not asked to and didn't address the impact on