# Exhibit A
# Part 3 of 3

Page 733

```
 1              UNITED STATES DISTRICT COURT

 2            FOR THE DISTRICT OF MASSACHUSETTS

 3    - - - - - - - - - - - - - - - -

 4    IN RE: PHARMACEUTICAL         )   MDL NO. 1456

 5    INDUSTRY AVERAGE WHOLESALE    )   CIVIL ACTION

 6    PRICE LITIGATION              )   01-CV-12257-PBS

 7    THIS DOCUMENT RELATES TO      )

 8    U.S. ex rel. Ven-a-Care of    )   Judge Patti B. Saris

 9    the Florida Keys, Inc.        )

10         v.                       )   Chief Magistrate

11    Abbott Laboratories, Inc.,    )   Judge Marianne B.

12    No. 06-CV-11337-PBS           )   Bowler

13    - - - - - - - - - - - - - - - -

14

15

16          Videotaped deposition of STEPHEN W.

17             SCHONDELMEYER, PHARM.D., PH.D.

18                     Volume III

19

20                   Washington, D.C.

21                Friday, February 27, 2009

22                      9:00 a.m.
```

Schondelmeyer, Pharm.D., Ph.D., Stephen W. - Vol. III
Washington, DC
February 27, 2009

Page 758

1  use that to have a specific meaning. And I wanted to
2  show the connection of the meaning that she has
3  ordered or stated to the terms that are commonly used
4  in the field.
5      Q.  Did you sit down and calculate the spread
6  between AWP and WAC and actual sales prices for the
7  Dey and Roxane and Abbott drugs in this case? Did you
8  do that calculation?
9      A.  No, I did not. I was not asked to do a
10 quantitative assessment.
11     Q.  Thank you.
12     A.  It wasn't needed for any of my opinions.
13     Q.  All right. You say in paragraph 160 of
14 your report -- that's on page 84 at the bottom -- "The
15 state Medicaid programs understood." Do you see that?
16 And then you continue to say that what you believe
17 they understood? Do you see that?
18     A.  I believe so, yes.
19     Q.  Okay. Now, if we were to start
20 alphabetically at Alabama could you identify for me
21 the person at the state that you know in fact
22 understood what you say here?

Page 759

1      A.  Well, first of all --
2      Q.  Can you answer my question?
3          MR. BREEN: Objection, form.
4      A.  Well, this is a statement that describes
5  state Medicaid programs collectively. I over time
6  have interacted with and presented at meetings of
7  state Medicaid pharmacy administrators a number of
8  times and do know many of those individuals. And have
9  had conversations with them over great amounts of
10 time. And that's the basis for that comment.
11         MR. MERKL: Move to strike the answer.
12         Read my question back, please.
13         (Whereupon, the requested portion was read
14 by the reporter.)
15         MR. BREEN: With all due respect to the
16 court reporter, I think his question included the
17 prefatory reference to the particular paragraph. If
18 you'll read the statement counsel made immediately
19 before the question, I'd appreciate it.
20         MR. COOK: It was a separate question and
21 answer, Jim, that you're thinking of.
22         MR. BREEN: The predicate "now" seems to

Page 760

1  indicate he was referencing his prior question. So
2  I'd like you to read the prior question where he
3  directs his attention to the actual paragraph.
4          (Whereupon, the requested portion was read
5  by the reporter.)
6          BY MR. MERKL:
7      Q.  Since that's all garbled up now, let's
8  start again. If you look at what you say in paragraph
9  160, do you see you attribute an understanding to
10 state Medicaid program officials? Do you see that?
11     A.  I see the first sentence saying some
12 Medicaid officials did become aware of.
13     Q.  Okay. Well, what can you tell me the
14 officials in Alabama became aware of?
15     A.  I can't tell you who the person is in
16 Alabama that's the pharmacy Medicaid official.
17     Q.  Alaska?
18     A.  I don't recall the one in Alaska. I do
19 know the officials in many of the states and have met
20 with and talked to broad groups of --
21     Q.  What did Arizona understand?
22         MS. BROOKER: Objection, form, let him

Page 761

1  finish his answer, please.
2      A.  Arizona for most of this time didn't even
3  have a Medicaid program.
4      Q.  Okay. Why don't you tell me the states
5  where you know the names of the officials that you can
6  tell me exactly what the officials understood about
7  the program.
8          MS. BROOKER: Objection, form.
9      A.  Over many years I've had conversations with
10 and meetings with and discussions with. Medicaid
11 officials such as Martha McNeil in Texas, Benny
12 Rideout in North Carolina, Jerry Wells of Florida.
13 Many others. I can't name all of them.
14     Q.  So you've told me you've spoken with
15 officials at Texas, Florida, North Carolina. Are
16 there any other states that you can identify for me?
17     A.  Those are just ones --
18         MS. BROOKER: Objection, form.
19     A.  Those are ones I can recall off the top of
20 my head. As I said, I've talked -- there are groups
21 of -- there's the Western Medicaid Pharmacy
22 Administrators Association and I've been invited

Schondelmeyer, Pharm.D., Ph.D., Stephen W. - Vol. III
Washington, DC
February 27, 2009

Page 762

1 numbers of times to talk to that group which is a
2 meeting of just the state Medicaid pharmacy
3 consultants from each of the states in the western
4 half of the U.S. And then there's a southern pharmacy
5 administrators association. I met with that group on
6 several occasions and provided both presentations as
7 well as dialogues and discussions with the individuals
8 responsible for their pharmacy and Medicaid programs.
9     Q. **Well, what did the individual members of**
10 **those associations tell you about their understanding**
11 **about the Medicaid program? I want you to identify**
12 **them, please.**
13     MS. BROOKER: Objection, form.
14     A. This paragraph 160 based on both those
15 discussions and other information and experience with
16 Medicaid programs represents what I believe they
17 understood. That's what it says. I believe this to
18 be a true paragraph.
19     Q. **Martha McNeil is no longer employed by**
20 **Texas, is she?**
21     A. She has retired now. But she was
22 throughout I think probably most all of the time

Page 763

1 period of this case.
2     Q. **And who was the fellow in Florida you**
3 **mentioned?**
4     A. Jerry Wells.
5     Q. **He's no longer employed by Florida, is he?**
6     A. He may not be today, but he was I believe
7 through most of the time period in this case.
8     Q. **And North Carolina who was the individual?**
9     A. Benny Rideout.
10     Q. **Is she still there?**
11     A. I believe he has in the last couple years
12 retired also. But again was -- through most of the
13 time period of this case was at North Carolina.
14     Q. **Well, what time period was Martha McNeil in**
15 **Texas exactly?**
16     A. I don't know when she started and ended.
17 But she was there a long time. She was an institute
18 in the Texas Medicaid program.
19     Q. **For what time period exactly was Jerry**
20 **Wells in Florida?**
21     A. I don't know the exact time period. We
22 could document that. But he was there for a long

Page 764

1 period of time.
2     Q. **And what time period was Mr. Rideout in**
3 **North Carolina?**
4     A. I haven't memorized their curriculum vitae
5 or resume.
6     Q. **So other than those three individuals can**
7 **you identify any individuals from any state that told**
8 **you what their expectation was for Medicaid?**
9     MS. BROOKER: Objection, form.
10     A. There were numerous other state
11 representatives. I just can't remember all of the
12 names of them. Again, this is meetings over the last
13 20 years with these people.
14     Q. **So other than the three people you've just**
15 **named from Texas, Florida and North Carolina you**
16 **cannot today under oath identify for me any state**
17 **Medicaid official who told you what that state**
18 **Medicaid's programs expectation for the program were?**
19     MS. BROOKER: Objection, form.
20     A. I can today under oath say that I have met
21 with multiple many, many state Medicaid pharmacy
22 directors and had conversations that support this

Page 765

1 statement.
2     Q. **Okay. What are their names?**
3     A. And I've told you I can't remember their
4 specific names. But I could go back and check the
5 records of those meetings and who attended and
6 identify who they are. But I don't commit to memory
7 all of the audiences that I speak to as a presenter or
8 all of the people I meet with at professional meetings
9 over a 20-plus year time period.
10     Q. **Did you make any effort to determine**
11 **whether any of the Abbott, Roxane or Dey drugs in**
12 **these cases were subject to FULs?**
13     A. Again, that wasn't substantially critical
14 to any of the opinions I've offered here. So I did
15 not make that assessment.
16     Q. **So you did not do that?**
17     A. I did not, no.
18     Q. **In paragraph 145 of your report, please,**
19 **you say "Just knowing the URA for a drug product does**
20 **not mean that one knows the price any given pharmacy**
21 **paid." Do you see that?**
22     A. I see that, yes.

Schondelmeyer, Pharm.D., Ph.D., Stephen W. - Vol. III
Washington, DC
February 27, 2009

Page 778

1  said. I did review them at the time of the report and
2  took those into appropriate consideration.
3      Q.   How about Abbott?
4      A.   The same. I don't recall specifically, but
5  I do believe there were e-mails with the price
6  reporting agencies and I did review those at the time
7  of the report and took those into appropriate
8  consideration.
9      Q.   So you could not tell me for instance then
10 what representations Dey has made over time to the
11 different price reporting agencies?
12         MS. BROOKER: Objection, form.
13     A.   I can't sitting here today. I did review
14 that at the time I prepared my report and took that
15 into appropriate consideration.
16     Q.   Can you tell me which price reporting
17 agencies Dey reported prices to and how often?
18         MS. BROOKER: Objection, form.
19     A.   Well, I know for example First Databank has
20 a process that once a year sends a comprehensive list
21 of NDCs listed to each manufacturer and asks them to
22 verify or provide any updates. I know also that

Page 779

1  typically manufacturers such as Dey when they have a
2  new product or a substantial price change initiate
3  communication with First Databank and the other price
4  databases so that their prices are listed and so that
5  it has the impact in the market.
6          They realize this is used for reimbursement
7  and if there are changes in your prices that aren't
8  reflected quickly in those price databases that you
9  hear back from your customers.
10     Q.   You're telling me what generally happens.
11 What I'm asking you is specifically can you tell me
12 what price reporting agencies Dey reported price to
13 and how often?
14         MR. BREEN: Objection, form.
15     Q.   Specifically can you tell me that?
16     A.   I recall reviewing some documents that
17 showed Dey reports. I did not analyze and feel like I
18 needed to analyze that to underlie any of the issues
19 in my report.
20     Q.   So you don't know who Dey reported WAC to
21 and how often Dey reported a WAC?
22         MS. BROOKER: Objection, form.

Page 780

1      A.   Sitting here today I can't tell you I
2  reviewed the documents that were disclosed and on my
3  file. I reviewed documents related to Dey's price
4  reporting to the price databases.
5      Q.   Well, was it necessary for you to review
6  the complete record of all Dey's price reporting from
7  1992 to 2005 in order for you to form the conclusions
8  in your report?
9      A.   I believe I provided sufficient description
10 of what the basis for my statements and conclusions
11 are.
12     Q.   So you did not do that?
13     A.   Did not do what?
14     Q.   You did not review a complete record of all
15 Dey's price reporting from 1992 to 2005 in order for
16 you to form the conclusions in your report?
17     A.   I did not feel it was necessary to review
18 each and every price reported by Dey and the detailed
19 actual prices by Dey. Again, the quantitative role
20 was the role of a different expert in this case and I
21 wasn't asked to evaluate this in a quantitative sense.
22     Q.   Well, did you review at least one price

Page 781

1  reported by Dey for each and every NDC number in this
2  case?
3      A.   I reviewed documents internally at Dey that
4  described their prices and described how they reported
5  their prices to the price databases for various
6  products and statements that showed that Dey realized
7  they weren't reporting actual acquisition or actual
8  prices generally and currently paid.
9      Q.   So other than the documents in your report
10 you did not review any Dey price reporting documents?
11         MS. BROOKER: Objection, form.
12     A.   I reviewed others. I did see some
13 documents that would have been Dey price reporting
14 that were in the disclosures that were provided.
15     Q.   Take a look at your Abt report for a
16 minute, the graphs we were looking at yesterday.
17     A.   Which Abt report?
18     Q.   Abbott 381. Take a look at the graphs we
19 were looking at yesterday.
20     A.   Which graphs are you referring to?
21     Q.   Page 6 maybe. Keep going. Next. There
22 you go.

13 (Pages 778 to 781)

Schondelmeyer, Pharm.D., Ph.D., Stephen W. - Vol. III                                February 27, 2009
Washington, DC

Page 822

1  these compendia originally when they were published
2  were published as an annual volume in a big, thick
3  book that people bought. But that was in the 1970s
4  and 80s. Now that we're in the computer age these
5  compendia exist in databases. And most users of these
6  compendia buy computer files. And many of the state
7  Medicaid programs, particularly, since most of them
8  base their reimbursement only on AWP, they only buy
9  the AWP file from the price compendia because they
10 don't rely upon, don't use WAC and don't say they're
11 going to use WAC.
12        So just having the AWP doesn't necessarily
13 mean that one has access to or has incurred the
14 financial cost to have access to WAC as well. And if
15 it's not specified as a part of their reimbursement
16 criteria they may not have a need for it.
17    Q.   **And if in 1996 Roxane reports a WAC and an**
18 **AWP to the compendia for ipratropium bromide, it is**
19 **informing the marketplace of the relationship between**
20 **those two prices, correct?**
21        MS. BROOKER: Objection, form.
22        MR. BREEN: Objection, form.

Page 823

1    A.   If they are reporting those one could
2  examine that relationship. Again, that doesn't tell
3  you about the relationship to actual transaction
4  prices. That's a different issue.
5    Q.   **You didn't review all of the marketing**
6  **materials with respect to the drug families at issue**
7  **in the government's case against Roxane?**
8        MR. BREEN: Objection, form.
9    A.   I'm sorry. Is that a question?
10   Q.   Yes. Is that true?
11   A.   I believe that was a statement the first
12 time.
13   Q.   **Well, I'm asking it as a question. You**
14 **didn't review all of the marketing materials**
15 **associated with the drugs at issue in the government's**
16 **case against Roxane, true?**
17   A.   I did not review all marketing documents in
18 the case. I did review the ones that as best I could
19 tell dealt with prices and reimbursement related
20 issues. Another expert was asked to address the
21 marketing issues. I wasn't asked to address the broad
22 marketing general issues. I was aware that another

Page 824

1  expert was performing that analysis.
2    Q.   And other than the deposition of
3  Ms. Water -- well, let me start again.
4        How many deposition transcripts did you
5  review in which Ms. Water gave a deposition? How many
6  days of deposition transcripts did you review?
7    A.   I don't recall. I'd have to look back in
8  the documents and the records. Again, I don't commit
9  things like that to memory. I have plenty of things
10 to read and remember and track.
11   Q.   **In the 40 to 70 hours that it took you to**
12 **prepare for the testimony you would give today, did**
13 **you review any of Ms. Water's transcripts?**
14   A.   No, I did not.
15   Q.   And you also stated that you reviewed
16 somebody --
17   A.   May I clarify? That's in the time
18 preparing for today's deposition. Not in the time
19 preparing my report prior to that time, which was also
20 preparation for this deposition. I did review that
21 prior to the time of preparing my report and took into
22 account what was there.

Page 825

1    Q.   And how did you review Ms. Water's
2  transcript? What criteria did you use? Did you
3  review the transcript from front to finish?
4        MS. BROOKER: Objection, form.
5    A.   I did kind of a skim read and looked for
6  issues with respect to pricing or reimbursement.
7    Q.   And what criteria would you use to
8  determine issues related to pricing or reimbursement
9  with respect to the review of Ms. Water's transcript?
10   A.   Finding the term reimbursement, price,
11 finding a dollar sign, issues like that.
12   Q.   So you looked for the word "price" in
13 Ms. Water's transcript, a dollar sign?
14   A.   That's one approach, yes.
15   Q.   A dollar sign?
16   A.   Right. That would indicate a price usually
17 unless it was her salary or something. I don't recall
18 her reporting that. But dollar signs would be a good
19 clue of price related information.
20   Q.   Anything else?
21   A.   I said the word "reimbursement." AWP, WAC,
22 list price, you know, there are other terms and

24 (Pages 822 to 825)

Schondelmeyer, Pharm.D., Ph.D., Stephen W. - Vol. III
Washington, DC
February 27, 2009

Page 926

1    A.  It depends on if you count that in
2  dispensing cost -- usually isn't -- cost of dispensing
3  doesn't include profit. Dispensing fee might. You
4  stated it as dispensing cost component, rather than
5  dispensing fee component.
6    Q.  Thank you for that correction. So Medicaid
7  drug payment policy incorporates an ingredient cost
8  component, a dispensing fee component and a reasonable
9  profit?
10       MR. BREEN: Objection, form.
11   A.  That's a consideration in it. But you have
12  to realize there's also the usual and customary charge
13  which is a single charge that those are melded
14  together. So there are different -- there's a lower
15  of criteria and there are a number of steps. There's
16  not a singular formula. It's a multiple-staged
17  formula.
18   Q.  And putting aside the usual and customary
19  charge submitted by a pharmacy, one component of
20  Medicaid drug payment policy is this idea of a
21  dispensing fee, correct?
22   A.  One component is a dispensing fee.

Page 927

1    Q.  And putting aside, again, the usual and
2  customary charge, the other component represents the
3  ingredient cost?
4    A.  You mean the drug product ingredient cost?
5    Q.  Yes.
6    A.  That is another component, yes.
7    Q.  And it is your testimony that it is
8  appropriate for Medicaid programs to include a profit
9  component somewhere within this calculus of dispensing
10  fee and ingredient cost reimbursement, correct?
11       MS. BROOKER: Objection, form.
12   A.  Again, I don't recall if I address that --
13  I don't believe that was in my report specifically. I
14  didn't address the other components. I was addressing
15  the drug ingredient cost component is all that I think
16  I was asked to do and encompassed in my report. I do
17  think there is Medicaid policy that says the
18  dispensing fee component should take into
19  consideration the cost and overhead costs of the
20  pharmacy as well as a reasonable profit.
21   Q.  So Medicaid policy should include a
22  reasonable profit to providers, correct?

Page 928

1        MS. BROOKER: Objection, form.
2    A.  It should take into account the
3  consideration of a reasonable profit as a part of the
4  dispensing fee. But again, that's -- I'm not aware of
5  anything in my report that addresses that or that
6  would be changed based on that policy. This is not
7  related to a line of questioning that I can pin down
8  to my report in particular.
9    Q.  You agree that some state Medicaid agencies
10  have deliberately established the ingredient cost
11  payment levels which offer a margin relative to the
12  acquisition cost of drugs, correct?
13       MS. BROOKER: Objection, form.
14   A.  That's a very complex question that's not
15  easy to answer. I think there may be a small
16  component of the ingredient cost payment that some
17  states realize might have a margin. But I'm fairly
18  confident that the states don't know the real margin
19  between the reimbursement that they create based off
20  of an AWP minus or a WAC plus and the actual
21  ingredient costs based on the price generally and
22  currently charged by providers in the market because

Page 929

1  they do not know the price generally and currently
2  paid by providers in the market on an actual basis.
3        And so they have no basis for making a
4  rational conscious policy decision about such a margin
5  if they chose to do so.
6    Q.  You agree that a state's decision to
7  establish an ingredient cost payment within the
8  Medicaid program which provides a margin relative to
9  acquisition cost of the drug is appropriate, correct?
10       MS. BROOKER: Objection, form.
11   A.  Again, I can't answer that as a simple yes
12  or no, correct or incorrect answer. If they comply
13  with all the other regulations and the in the
14  aggregate the result equals the amount that the
15  estimated acquisition cost being clearly defined as
16  the price generally and currently paid by providers
17  plus a reasonable dispensing fee, it may be possible.
18  But there's that standard that it's always measured
19  against in terms of a benchmark. So they can't do
20  that in separation from that standard.
21   Q.  So state Medicaid programs can provide a
22  margin relative to the acquisition cost of a drug in

Schondelmeyer, Pharm.D., Ph.D., Stephen W. - Vol. III
Washington, DC
February 27, 2009

### Page 1062

1  A.  I have that Exhibit 5.
2  Q.  Now, you state -- why don't you turn to
3  page 12. I'm going to ask you a question about a
4  sentence that appears on that page. You agree that
5  adequate compensation to a pharmacy includes a return
6  on investment for that pharmacy, correct?
7  A.  Some form of reasonable profit or return on
8  investment. And that could be defined by either of
9  those methods we defined earlier or others. But some
10 recognition that the pharmacy is a private business,
11 not a non-profit business.
12 Q.  Right. So it's not enough that the
13 pharmacy is just going to receive a penny more than
14 its costs; it also must receive a reasonable return on
15 investment as you defined that term earlier in your
16 testimony, correct?
17     MS. BROOKER: Objection.
18 A.  Well, again --
19     THE WITNESS: Read me the question, because
20 I want to make sure I understand the context in what
21 you've asked.
22     (Whereupon, the requested portion was read

### Page 1063

1  by the reporter.)
2  A.  Are we talking in terms of Medicaid and
3  Medicaid's obligation or the pharmacy and the pharmacy
4  owner's decision as a business person? Because those
5  would be different perspectives here.
6     BY MR. REALE:
7  Q.  In the context of determining an adequate
8  compensation so that beneficiaries have access to
9  quality care, it's your testimony that pharmacies
10 should receive a reasonable return on investment,
11 correct?
12     MS. BROOKER: Objection, form.
13 A.  Again, I'm not sure that I address that in
14 my report in this case. But from the California case
15 in this section you're talking about, on the one hand
16 I don't think Medicaid is obligated to pay either a
17 profit or a reasonable return on investment in all
18 cases to all pharmacies regardless of what their cost
19 structure is.
20     But if a pharmacy is fairly efficient
21 compared to other pharmacies I think to the degree
22 that pharmacies are paid or compensated below an

### Page 1064

1  amount at which sufficient pharmacies to provide
2  access to Medicaid beneficiaries -- to the degree that
3  they're paid below an amount sufficient to encourage
4  pharmacies to continue providing prescriptions to
5  Medicaid patients, then that might be a factor that
6  Medicaid would consider.
7     From a pharmacy provider's perspective each
8  one would probably tell you I should get a return on
9  investment or a profit for each prescription. And I
10 agree with both perspectives from the position in
11 which each party sits.
12 Q.  And it your belief that Medicaid intends to
13 provide either a profit or a reasonable return on
14 investment to pharmacies that participate in the
15 Medicaid program?
16     MS. BROOKER: Objection, form.
17 A.  Again, I don't think I can answer it that
18 way. I think Medicaid intends to assure access and
19 would consider and provide sufficient profit or return
20 on investment only to the degree to which it begins to
21 affect access for beneficiaries.
22 Q.  You've testified on several points that

### Page 1065

1  you've worked with pharmacies quite a bit over the
2  years. Is that fair to say?
3  A.  I have some. And with the government as
4  well.
5  Q.  And you understand pharmacies' margins
6  based on your experience, margins between cost and
7  profit?
8     MS. BROOKER: Objection, form.
9  A.  Are you talking about gross margins, net
10 margins?
11 Q.  Sure.
12 A.  All of the above?
13 Q.  Yes.
14 A.  Okay. I believe I understand that in
15 general.
16 Q.  And you're familiar with pharmacies'
17 economic motivations as those have been expressed to
18 you in your work over the years?
19     MS. BROOKER: Objection, form.
20 A.  I believe I am. There are a variety of
21 contexts and circumstances that can affect those.
22 Q.  As a general proposition you've come to

Schondelmeyer, Pharm.D., Ph.D., Stephen W. - Vol. IV                                May 21, 2009
Washington, DC

Page 1090

```
 1                UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF MASSACHUSETTS
 3      - - - - - - - - - - - - - - - -
 4      IN RE: PHARMACEUTICAL          )  MDL NO. 1456
 5      INDUSTRY AVERAGE WHOLESALE     )  CIVIL ACTION
 6      PRICE LITIGATION               )  01-CV-12257-PBS
 7      THIS DOCUMENT RELATES TO       )
 8      U.S. ex rel. Ven-a-Care of     )  Judge Patti B. Saris
 9      the Florida Keys, Inc.         )
10           v.                        )  Chief Magistrate
11      Abbott Laboratories, Inc.,     )  Judge Marianne B.
12      No. 06-CV-11337-PBS            )  Bowler
13      (caption continues)            )
14      - - - - - - - - - - - - - - - -
15
16              Videotaped deposition of
17        STEPHEN W. SCHONDELMEYER, PHARM.D., PH.D.
18                      Volume IV
19
20                   Washington, D.C.
21                Thursday, May 21, 2009
22                      9:00 a.m.
```

Page 1255

1  without knowing it for each and every individual
2  drug and adding it up.
3      Q.  You keep referring to it in the
4  disjunctive: "Or in the aggregate." Is it your
5  testimony that when the Medicaid program, when
6  CMS, applies its regulations to a state plan
7  amendment it either determines that the standards
8  you just described apply or in the aggregate it's
9  no more than some amount? Is that it?
10     A.  I don't understand your indefinite
11  pronoun "it."
12     Q.  Is that a fair description of how the
13  standard's CMS applies in determining whether to
14  approve a state plan amendment?
15     A.  Well, there are many factors they review
16  in approving a state plan amendment.
17     Q.  Where are those set forth?
18     A.  Where are what?
19     Q.  Where are the factors that CMS considers
20  in approving a state plan amendment with respect
21  to Medicaid drug reimbursement set forth?
22     A.  They're in statutes and regulations.

Page 1256

1      Q.  All right. Show me in your report where
2  you describe to the jury what those statutes and
3  regulations are with respect to CMS approving a
4  state plan with respect to the payment for drugs?
5      A.  I don't understand what you're getting
6  at.
7      Q.  You purport to describe what the intent
8  of the Medicaid program is in both your report and
9  your rebuttal report, correct?
10     A.  I do report what their stated intent is,
11  yes.
12     Q.  And you would agree with me that the
13  best evidence of what the Medicaid program's
14  intent is is what the Medicaid program -- that is,
15  the Department of Health and Human Services --
16  says in published regulations and in preambles to
17  the published regulations, right?
18         THE WITNESS:  Can you read back? I
19  think I got lost in his.
20         (Whereupon, the requested portion
21  was read by the reporter.)
22     A.  I believe that's useful evidence.

Page 1257

1         BY MR. COOK:
2      Q.  Where else would you look to determine
3  what Medicaid's intent is other than the
4  regulations and the official statements in the
5  Federal Register of the Department of Health and
6  Human Services?
7      A.  That's useful information. I think one,
8  I have not done this. But one could depose or ask
9  questions of officials that were in place at
10  various points in time. I believe that's been
11  done in this case.
12     Q.  Have you read those deposition
13  transcripts?
14     A.  I've read through some of them, but not
15  extensively. I did not have them available before
16  I wrote my report certainly.
17     Q.  Why not?
18     A.  Depositions of all of the parties? I
19  believe some of the state Medicaid people were
20  deposed after I wrote my report.
21     Q.  Well, I'm talking about CMS now. I'm
22  talking about the Department of Health and Human

Page 1258

1  Services Centers for Medicare and Medicaid
2  Services. There was testimony taken from current
3  and former officials with CMS, correct?
4      A.  There was some, yes.
5      Q.  There was testimony taken from the
6  administrator of HCFA at various relevant times,
7  including Bruce Vladek and Nancy Anne Min DeParle,
8  correct?
9      A.  Yes.
10     Q.  Did you undertake to read all of the
11  testimony relevant to your opinion from officials
12  from CMS?
13     A.  I'm not sure that I've read all of their
14  testimony, no.
15     Q.  Did you read all of the regulations
16  relevant to the payment for drugs under Medicaid?
17  That is, federal regulations.
18     A.  Substantially. I wouldn't say all, but
19  substantially.
20     Q.  Did you read all and consider all of the
21  Federal Register notices of rulemaking describing
22  the promulgation of rules relating to the payment

Schondelmeyer, Pharm.D., Ph.D., Stephen W. - Vol. V                                                          May 22, 2009
Washington, DC

Page 1479

```
 1              UNITED STATES DISTRICT COURT
 2            FOR THE DISTRICT OF MASSACHUSETTS
 3   - - - - - - - - - - - - - - - -
 4   IN RE: PHARMACEUTICAL         )   MDL NO. 1456
 5   INDUSTRY AVERAGE WHOLESALE    )   CIVIL ACTION
 6   PRICE LITIGATION              )   01-CV-12257-PBS
 7   THIS DOCUMENT RELATES TO      )
 8   U.S. ex rel. Ven-a-Care of    )   Judge Patti B. Saris
 9   the Florida Keys, Inc.        )
10        v.                       )   Chief Magistrate
11   Abbott Laboratories, Inc.,    )   Judge Marianne B.
12   No. 06-CV-11337-PBS           )   Bowler
13   (caption continues)           )
14   - - - - - - - - - - - - - - - -
15
16          Videotaped deposition of STEPHEN W.
17             SCHONDELMEYER, PHARM.D., PH.D.
18                       Volume V
19
20                     Washington, D.C.
21                 Friday, May 22, 2009
22                      9:00 a.m.
```

Schondelmeyer, Pharm.D., Ph.D., Stephen W. - Vol. V

Washington, DC

May 22, 2009

Page 1684

1 flipped through it and looked for various
2 sections. I don't recall a specific strategy of
3 what I read or how.
4     Q. What sections were you looking for when
5 you flipped through?
6     A. I didn't have a specific objective. I
7 looked at it briefly.
8     Q. Did you have the complete transcript
9 available for all three days?
10     A. I believe I did, yes.
11     Q. Did you have the exhibits?
12     A. The exhibits. Not that I know of.
13     Q. And yesterday you said something about
14 you had a clarification or a question about some
15 testimony you gave concerning marketing
16 documents?
17     A. Yeah. I recall from our deposition a
18 question about what I had asked for from the
19 lawyers and I had asked for marketing documents
20 related to pricing type information, not
21 necessarily all marketing documents.
22     Q. Right. So am I correct that at your

Page 1685

1 deposition in the first session you testified
2 that you asked for all marketing documents but
3 that on reviewing your testimony and further
4 reflection you realized you did not ask for all
5 the marketing documents?
6     A. I don't recall exactly what I had
7 testified at the earlier deposition. But I felt
8 there was some degree of -- a lack of clarity
9 about what I had asked for.
10     Q. All right. Well, why don't you clarify
11 it now. As it concerns Dey anyway, when you were
12 preparing your report did you ask your lawyers to
13 give you all the Dey marketing documents?
14     A. No. I don't believe so.
15     Q. Which marketing documents did you ask
16 your lawyers to give you?
17     MS. ST. PETER-GRIFFITH: Object to the
18 form.
19     Q. I'm sorry. Which marketing documents
20 did you ask the lawyers for the government and
21 Ven-A-Care to give you?
22     A. As best I recall -- and again, that was

Page 1686

1 some time ago -- I would have asked for documents
2 related to pricing or marketing documents with
3 pricing strategies or information in them.
4     Q. Was there a reason why you didn't ask
5 to see all the documents?
6     A. There was another expert who actually
7 had as his scope of responsibility looking at all
8 the marketing behavior. Matthew Perri. And so I
9 wasn't asked to redo his work or duplicate that
10 work.
11     Q. And I'm correct then that in terms of
12 making the cut in terms of what documents on
13 marketing issues you did look at, the lawyers
14 decided which documents to give you, right?
15     MS. ST. PETER-GRIFFITH: Object to the
16 form.
17     A. I asked for the broad categories and
18 someone made a determination of what documents
19 those represented. I did not attempt to and have
20 not reviewed all documents presented in this
21 case.
22     Q. No. I understand that. You've

Page 1687

1 explained to me you did not read all marketing
2 documents, let alone all the documents in the
3 case, right?
4     A. For any purpose, selecting, let alone
5 reviewing them in detail.
6     Q. Right. So you didn't look at them all.
7 All right? Someone selected some marketing
8 documents for you to review, right?
9     A. Documents related to pricing or
10 marketing documents that were related to prices.
11     Q. Right. And those selections were made
12 by the lawyers, right?
13     A. I don't know who actually did it. But
14 it was --
15     Q. Okay.
16     A. -- represented to me.
17     Q. The lawyers handed you the documents;
18 whether the lawyers or someone acting at their
19 behest selected the documents you don't know?
20     A. The set of documents were provided to
21 me based upon my request.
22     Q. And that request was what exactly? What

Schondelmeyer, Pharm.D., Ph.D., Stephen W. - Vol. V        May 22, 2009
Washington, DC

Page 1688

1  did you say to give you?
2      A.  I believe I've stated that several
3  times.
4      Q.  Well, yeah.  The first time you said
5  give me all the documents.  Now you're telling me
6  that that might be an error.  I'm just asking you
7  what is your clarification?  If you didn't ask
8  for all of the documents what documents did you
9  ask for?
10     A.  As I've said several times today,
11 documents related to pricing or marketing
12 documents related to pricing.
13     Q.  Well, how can you be sure that you got
14 all the relevant documents related to pricing if
15 you didn't get all?
16     A.  I can't be absolutely certain I got all
17 the relevant documents.  I believe that I got
18 documents that are sufficient to put forward the
19 opinions that I have in this case and those
20 opinions are sufficiently documented with the
21 documents I reviewed.
22     Q.  But you don't know -- you don't really

Page 1689

1  know if you saw all the relevant documents
2  because you ultimately relied on counsel to
3  select them?
4          MS. ST. PETER-GRIFFITH:  Object to the
5  form.
6      A.  I feel confident with the opinions I
7  put forward based on the documents I've reviewed.
8          MR. MERKL:  Read my question back
9  again.
10         (Whereupon, the requested portion was
11 read by the reporter.)
12         BY MR. MERKL:
13     Q.  True?
14         MS. ST. PETER-GRIFFITH:  Same
15 objection.
16     A.  I made a request for certain documents
17 as I described to you of counsel.  I was provided
18 a set of documents and I assumed that they had
19 faithfully provided that information as
20 requested.
21     Q.  Right.  So you're assuming that counsel
22 gave you everything that was necessary?

Page 1690

1      A.  Within the scope of what I asked for,
2  yes, I am.
3      Q.  And when you say you -- did you say to
4  them, well, just give me some marketing and
5  pricing documents?  What did you say?
6      A.  I believe I've stated that several
7  times this afternoon.  I asked for documents
8  related to pricing and marketing documents
9  related to pricing.
10     Q.  Right.  Well, what criteria did you
11 give them to select the documents, if any?  You
12 didn't ask for all.  So you must have given them
13 some criteria, right?
14     A.  Specifically what I just described.
15     Q.  All you said just now from what I
16 understand, you said give me some pricing and
17 marketing documents.  Right?
18     A.  No.  That's a mischaracterization.  I
19 didn't say give me some marketing and pricing
20 documents.
21     Q.  Okay.
22     A.  I said give me documents that address

Page 1691

1  pricing or marketing documents that are related
2  to pricing.
3      Q.  Okay.
4      A.  I didn't say some.  I didn't qualify it
5  or limit it.
6      Q.  Did you ask for all of them?
7      A.  I stated it as I just described.
8      Q.  But you didn't ask for all?
9          MS. ST. PETER-GRIFFITH:  Object to the
10 form.
11     A.  I stated it exactly as I just described
12 as best I know.
13     Q.  What did you do to make sure that you
14 got all the documents that related to pricing and
15 marketing?
16         MS. ST. PETER-GRIFFITH:  Object to the
17 form.
18     A.  Again, I can't be a hundred percent
19 sure because I have not reviewed all of the
20 thousands upon thousands of documents in this
21 case.  I made that request of the lawyers and
22 asked if these were the documents that they felt