# Exhibit B
# Part 2 of 3

is the degree to which the price used in payment is consistent for similar prescription claims. Based on Markets: Estimated acquisition costs are more likely to be accurate if they are based on actual transaction prices in the market (i.e., the average selling price). Market or actual prices can be contrasted both to list prices, set by manufacturers, and to administered prices, set by the government. This approach, however, requires transparency of transaction prices.

**Generally and Widely Available**

Any price list used by the Medicaid or Medicare program should reflect 'generally and widely available prices,' that is, any provider paid according to the payment policy should be able to procure drugs at the published payment amount. Estimated Separately by Class of Trade: Because actual acquisition costs vary by class of trade, the estimation methodology must take into account these differentials in order to generate drug product payments that are both accurate and reflect generally and widely available prices. For example, when a drug manufacturer sets lower prices for one class of trade (e.g., physicians) versus another class of trade (e.g., community pharmacies), the result is that the average of the prices across these two classes of trade will overpay the class with the lower price (physicians) and will under pay the class with the higher price (pharmacies). In addition to class of trade differences, drug product prices may differ for other reasons such as geographic or regional (urban versus rural) variations. A payment policy that does not account for different acquisition costs by class of trade, or other factors, may preclude certain providers from the market for reasons beyond their control. For providers within the same class of trade, the concept of 'generally and widely available prices' is appropriate and helpful to assure that a wide spectrum of physicians or pharmacies will be willing to participate in the program.

**Current and Up-to-Date**

An effective price list must be based on current prices that are updated regularly. Drug prices are set by drug manufacturers and can change whenever the manufacturer decides to adjust the price (usually an increase). Most manufacturers change drug product prices every 6 to 12 months with the average interval being about 10 to 11 months, however, some drug products may change their prices much more frequently. Claritin, for example, in the last three years before being switched to over-the-counter status raised its price every three months and had a cumulative annual price increase in 2002 of 21.2 percent. If provider payments for prescription drugs were being revised only once a year, a pharmacy would be losing as much as 20 percent on each Claritin prescription dispensed near the end of the year.

An effective payment policy should not set drug product payment amounts that consistently result in an underpayment due to delayed updates of prices. The drug product payment database needs to be electronically available using the standard electronic data interchange protocols in the prescription marketplace, and it needs to be updated on a virtual basis with a minimum of time delay (1 week or less) in updating price changes.

**Transparent and Accessible**

The price list and payment policy must be readily available to, and clearly understood by, market participants. Those covered by the payment policy should understand the source of data and how those data are translated into the payment policy. In addition, any price list to be used in payment for prescription drug products must be in an easily accessible and usable format. This format must be compatible with pharmacy and claims processor computer and software systems. Obviously, an electronic database is essential for both efficient publication and use. Pharmacy and physician providers must be able to easily confirm current payment at the time of prescribing, or dispensing, a prescription.

**Adequate Compensation to Providers and Pharmacies**

While the drug product component of the payment policy should be based on actual acquisition costs, the payment policy as a whole should adequately compensate providers for the storage, handling, dispensing, and administration of prescription drugs and for their professional services. This is essential to ensure that beneficiaries have access to quality care, without triggering perverse incentives. At present, the margins, or spreads, between drug product payment amount and actual acquisition cost may compensate providers (physicians and pharmacies) for deficiencies elsewhere in the payment system. If and when the method for estimating acquisition costs is altered, it may be desirable to reconsider the payment policy as a whole.

**Incentives for Pharmacies and Providers to Supply Drugs**

Any payment scheme creates financial incentives for providers. Ideally, these incentives foster quality and cost-effectiveness. Two main dimensions of provider incentives have already been discussed. First, adequate compensation gives providers incentives to participate in the program and supports beneficiary access. Second, payment based on actual acquisition costs creates neutral incentives for providers regarding the choice of drug therapy with the result that providers are more likely to focus on the choice of therapy that is optimal for the patient and economically efficient for the program.

**Incentives for Key Parties to Provide Data**

Pricing data will be needed from various levels in the market to determine appropriate payment amounts. If the program establishes fair, but not excessive prices, providers will be more likely to participate in good faith than if the program tries to implement below-market prices that overly squeeze the provider's margins. In addition, terms must be clearly defined so that firms understand what data they are expected to submit and so that analysts understand what data they have received.

Authority to conduct audits of drug manufacturers and of all provider types may provide some incentive for firms to participate in reasonable requests for data. Other incentives need to be identified and examined. If manufacturer data submission is chosen as a viable alternative, the drug firm can be asked to certify the data provided in a manner similar to that specified in the corporate integrity agreements (CIAs) developed by the Department of Justice for use by those drug firms that have settled fraud allegations related to Medicaid and Medicare drug pricing.

58. The options evaluated in our research study for estimating acquisition costs for drugs covered under Medicaid or Medicare included: (1) collecting primary data from manufacturers, (2) careful analysis and evaluation of list prices over time, (3) use of secondary invoice price data such as that collected by IMS Health, (4) survey of pharmaceutical wholesalers' prices, and (5) survey of pharmacies and other providers. Each of these options was evaluated by a panel of experts and was reviewed against the criteria mentioned above. The panel was composed of fifteen experts from various segments of the healthcare community in the United States, including physicians, chain drug stores, community pharmacies, other providers, state Medicaid agencies, drug wholesalers, database organizations, academia, and CMS.

59. The conclusion of this study to evaluate methods of estimating acquisition cost was as follows:

> There is no simple method of estimating acquisition costs. Based on our research and the comments of the Expert Panel, the authors recommend that CMS consider an approach to estimating acquisition costs that is based on collecting primary data from manufacturers. Members of the expert panel strongly favored this approach at the meeting and in their individual comments after the meeting.

> In particular, in addition to list prices, manufacturers would be asked to supply average selling prices by class of trade. These classes of trade might include independent pharmacies, chain warehouses, long term care pharmacies, physicians (direct sales), and hospitals. If these data are to be used as a basis for payment under Medicare Part D which begins in January of 2006, then prices to the mail order class of trade should also be collected. Manufacturers would also be asked to note other major provider types that might be purchasing on behalf of Medicaid and Medicare beneficiaries, to explain the situation, and to provide the associated average selling prices. All terms would be carefully defined including pricing terms, as well as discounts and rebates to be included and excluded, and the channels of distribution. Manufacturers would be required to certify that the prices supplied were true and accurate.

> The strengths of this approach are that it: (1) yields actual transaction prices, (2) incorporates all discounts and rebates, (3) incorporates class of trade differentials, (4) provides an efficient method (relative to a provider survey), and (5) represents a feasible approach to estimating actual acquisition cost. Similar methods are in place in the Medicaid rebate program and in the Texas Vendor Drug Program.

[Schondelmeyer, SW and Wrobel, MV, *Medicaid and Medicare Drug Pricing: Strategy to Determine Market Prices* (CMS Contract # 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, Task Order 1, August 30, 2004, p. 28].

60. Based on the findings of the expert panel, and the experience of the researchers and panel members, a recommendation was made that "CMS undertake a careful evaluation of the existing Texas Vendor Drug Program (VDP) and the price data that it collects." [Schondelmeyer and Wrobel, *Medicaid and Medicare Drug Pricing*, 2004, p. 29].  This recommendation was made because the Texas VDP approach to determining estimated acquisition cost was considered by the panel and the researchers to be "very similar to our recommended approach." CMS did fund the study to evaluate the Texas VDP approach to estimating drug acquisition costs and the findings of that study are reported in the next section.

**D.  Case Study of the Texas Vendor Drug Program**

61. The Texas VDP (Medicaid) approach to estimating drug acquisition cost was the object of a study I conducted with colleagues at Abt Associates, Inc. on behalf of CMS in 2005.  [Wrobel, Schondelmeyer, et al., *Case Study of the Texas Vendor Drug Program*, 2005, p. 65].  A previous study had indicated that Texas VDP appeared to have a system for estimating acquisition cost that was very similar to the optimal system recommended by a panel of experts. [Schondelmeyer and Wrobel, *Medicaid and Medicare Drug Pricing*, 2004, p. 29].

62. The Texas Vendor Drug Program (Texas VDP) spent about $253 million on pharmaceuticals in 1991. By 2005, Texas VDP drug spending had grown nearly ten-fold to $2.475 billion. The annual rate of growth in drug spending for Texas VDP was at

double-digit rates for every year, but one, between 1991 and 2005. Texas served about 2.7 million Medicaid enrollees in 2003 and provided nearly 35 million prescriptions.

63. The Texas VDP approach to estimating acquisition cost based upon manufacturer reported drug prices that were current and generally available net prices paid by pharmacies in the market was considered to be the most practical method of estimating acquisition cost for purposes of determining appropriate reimbursement under a state Medicaid drug program. However, the Texas VDP reimbursement process depended upon drug manufacturers to report prices that reasonably represented the actual net prices currently and generally paid by providers in the marketplace. [Deposition of Martha McNeill, July 12, 2007, p. 45, lines 19 to 24].

64. State Medicaid programs, such as Texas, have tried various approaches to improve their ability to estimate the acquisition cost of prescription drugs. The effectiveness of these prescription payment methods, however, is dependent upon having relevant, accurate, and timely information on prices from manufacturers, suppliers, pharmacies, and providers. (e.g., see Brendan Joyce (ND), *U.S. ex rel. Ven-a-Care v. Abbott Lab, Inc.*, 06-11337-PBS, Dec. 12, 2008, p. 260; Roxanne Homar (WY), *U.S. ex rel. Ven-a-Care v. Abbott Lab, Inc.*, 06-11337-PBS, Dec. 3, 2008, p. 422; and J. Kevin Gorospe (CA), *U.S. ex rel. Ven-a-Care v. Abbott Lab, Inc.*, 06-11337-PBS, Dec. 3, 2008, p. 253.)

**E. Sources of Variation in Drug Prices**

65. Drug prices will typically vary over time. Other sources of variation at any specific point in time may be related to: (1) the type of purchaser (i.e., also referred to as

classes of trade), (2) the type of drug product, and (3) geographic variation.   Each of these potential sources of variation is addressed briefly.

## 1.   Class of Trade Variations in Drug Prices

66. The type of purchaser of a drug product may determine the price level that is available to that purchaser. The role of purchaser type was described in my 2004 report to CMS [Schondelmeyer and Wrobel, *Medicaid and Medicare Drug Pricing*, 2004, pp. 16-17] as follows:

> Nearly all drug manufacturers divide the channels of distribution into groups known as 'classes of trade'.  The 'classes of trade' at the broadest level are the groups identified on the pharmacy-provider level of the channels of distribution chart (Exhibit 4) including:  chain pharmacies, mass merchant pharmacies, food and drug pharmacies, independent pharmacies, mail order pharmacies, health plan and HMO (in-house) pharmacies, long term care pharmacies, hospital pharmacies, physicians and clinics, government facilities, and other settings.  The structural differences in actual prices charged to each of these 'classes of trade' can differ considerably and appear to be arbitrary and are usually unrelated to volume of drug product purchased.

> In most markets, when one buyer can purchase a product at a lower price than other purchasers, there is the potential for arbitrage.  That is, the buyer with access to the lower price is able to purchase the product at the low price and resell it, at a profit, to the party without access to the lower price.  This drives down the price differentials both directly (because the high-price buyers get lower prices) and indirectly (because manufacturers no longer gain from the differential pricing and hence desist from the practice).  This practice of arbitrage across classes of trade is explicitly prohibited by re-sale limitations established in the pharmaceutical marketplace by the Prescription Drug Marketing Act of 1988.

> Both the monopoly position of patent (or exclusivity) protected drug products and the prohibition on arbitrage enable drug firms to use 'discriminatory pricing', which seeks to maximize the price to each individual buyer or group of similarly situated buyers.  There are sometimes volume discounts within a class of trade, but volume does not usually explain the difference in price across classes of trade.  A physician purchasing drug product direct from the manufacturer will usually get one of the lowest prices in the market, especially for drug products administered in the physician's office, while independent and chain community pharmacies often pay the highest prices in the market.  This pattern occurs even when the chain pharmacy purchases far more volume (millions of dollars) nationally than an individual physician purchases in a year (i.e., hundreds or thousands of dollars).  Volume may get one physician a better price than another physician.  Volume, however, does not explain why a chain pharmacy pays a higher price, even though it purchases a substantially larger volume of a drug

product than an individual physician typically purchases. The structural barriers of monopoly position and statutory prohibitions on price arbitrage mean that the purchasers who get the lowest price in the market are not necessarily the most efficient purchasers in the market. Because class-of-trade differentials exist and are outside of the control of the purchaser, an accurate approach to estimating actual acquisition costs must take into account the class of trade pricing practices of drug firms. The practice of class of trade pricing is not usually disclosed directly by drug manufacturers and could experience change as the dynamics of the pharmaceutical marketplace evolve during the implementation and operation of the new Medicare outpatient drug benefit.

67. In summary, class of trade pricing operates based on structural criteria in the market and not necessarily efficiency-based criteria. In other words, the purchaser with the lowest purchase price may not be the purchaser with the largest volume of purchases. The 'class of trade' pricing practices are not usually disclosed by pharmaceutical companies.

## 2. Drug Product Type Variations in Drug Prices

68. The type of drug product with respect to patent status has an influence on drug product prices and relationships among various prices. The three major drug product types are: (1) brand name drug products with patent and/or other market exclusivity, sometimes referred to as single source (SS) drug products; (2) brand name drug products that have lost their patent and market exclusivity, also known as off-patent brands or innovator multiple source (IMS) drugs; and (3) off-patent generic drug products, also known as non-innovator multiple source (NMS) drug products.

69. The pricing patterns and relationships among prices may vary by type of drug product. Patented brand name, off-patent brand name, and generic drug products have different pricing patterns and these patterns are described in my 2004 report to CMS [Schondelmeyer and Wrobel, *Medicaid and Medicare Drug Pricing*, 2004, pp. 17-18] as follows:

The pricing patterns of brand name drug products and generic drug products can be quite different. For most brand name drug products that are still covered by patent or exclusivity terms, the price relationship between list prices (AWP and WAC) and actual transaction prices (actual acquisition cost or average selling price) for a given class of trade is reasonably predictable. That is, the WAC is equal to, or very close to (+ or − 5%) the actual acquisition cost for the community pharmacy class of trade and the AWP is typically 20 to 25 percent above the WAC or, alternatively, WAC is 16.67 or 20 percent below AWP. In such cases, a payment policy based on AWP (i.e., usually AWP minus a certain percent) may be relatively accurate. This pricing pattern holds for community pharmacy classes of trade (independents, chains, and food & drug stores), but not necessarily for other classes of trade (i.e., mail order pharmacies, HMOs and health plan pharmacies, long term care, physicians or clinics, hospitals, or state and federal facilities or programs). Some of these other classes of trade control the demand (i.e., prescribe or influence the drug prescribed) and are reimbursed by a third party based on a percent off of AWP or a percent above WAC. When these other providers can actually purchase the drug product from the manufacturer, and when the manufacturer deliberately creates a large and hidden spread between actual acquisition cost and the reimbursement amount, then the physician or other provider has a very strong financial incentive to prescribe their drug. This non-transparent spread leads to a financial incentive to prescribe more often and to prescribe higher-priced drugs over lower-priced drugs even when they are not necessarily the most cost-effective alternative. These financial incentives from the hidden spreads may be one factor contributing to the rapid growth of Medicare Part B drug program expenditures over the past four years.

Once a brand name drug product loses its patent and market exclusivity, the brand name drug may face price competition from generic versions of the drug product. Usually the brand manufacturer does not compete on price with generics for the community pharmacy class of trade. This means that the AWP and WAC relationship to actual acquisition cost discussed earlier for brand name drugs still holds. However, brand manufacturers sometimes offer substantial discounts relative to WAC to certain classes of trade (i.e., hospitals, long term care, health plans, and physicians). This may keep the actual acquisition cost of the brand drug somewhat price competitive in non-community pharmacy settings, and particularly when the provider receives payments keyed to list prices may result in excessive financial incentives to prescribe or use the brand name rather than a generic equivalent.

Price competition begins when the market is entered by the first generic drug product that is a therapeutically equivalent version of a brand name drug product made by the drug firm that holds the original NDA for a given chemical entity. When two or more generic drug products enter the marketplace they typically compete on price with each other even though the brand name product usually does not compete on price. The first generic will typically enter the market at a list price (both AWP and WAC, if a WAC is reported) that is 10 to 30 percent below the originator brand price. Often the price competition among generic versions of a drug product will be reflected by one or two decreases in list prices (AWP and WAC) in the first six to twelve months after generic entry, but after that time it is rare to see generic list prices change and at some point in time the generic list prices for some drugs may even begin to rise again.

The relationship between list prices (AWP and WAC) is much less predictable for generic drugs than it is for brand name drugs. Some generic drug products will have AWPs that are the typical 20 to 25 percent above the WAC, but it is not unusual to see generic drug products with an AWP that is 50 to 100 percent, or more, above the WAC. Even more volatile is the relationship between the list prices (AWP or WAC) and actual acquisition cost for generics. Generic firms often discount their actual net price to the pharmacy to compete with other generics, but they do not always reflect these discounts in lower AWP or WAC list prices. Generic prices are also relatively volatile, because the market for generic drugs is effectively a commodity market. Thus, AWP-based payment policy is much less accurate for these drugs than it is for the branded drugs. Medicaid drug payment policy reflects the lower market prices for generic drugs by placing a FUL (a federal MAC or a state MAC) on many generic products.

## 3.  Geographic Variations in Drug Prices

70. The price of drugs may arguably vary by geographic region. However, for the most part, the purchase of prescription drugs from manufacturers and wholesalers functions primarily at a national market level. My research report to CMS [Schondelmeyer and Wrobel, *Medicaid and Medicare Drug Pricing*, 2004, pp. 18] discussed geographic variation as follows:

Geographical variations in the actual drug cost at the manufacturer level are not common. Once one has accounted for class of trade differentials, most drugs have the same list prices (AWP and WAC) regardless of where they are purchased or used. In the few cases where a specific drug may have prices that vary by region, the variation is often in response to certain third party payment methods (i.e., the Least Costly Alternative (LCA) method) of paying for therapeutic alternates under Medicare Part B by certain fiscal intermediaries.

In contrast to the general uniformity of prescription drug prices, the cost of professional services (i.e., physician fees or pharmacy fees) usually varies by geographic region. Both physician and pharmacy costs of providing the required services that accompany prescription drugs vary by geographic region due to differences in rent, salaries, general cost of living, insurance, and other factors. To the extent that the drug cost component of the payment policy is intended to also cover part, or all, of other costs associated with drug provision (e.g., storage and handling, or counseling and medication therapy management), there may be a need for this component to vary by region. Also, for the reasons above, changes in drug product payment policy may have different impacts upon providers and pharmacies across regions. These same factors may also vary across geographic locations (rural versus urban) within the same region.

### F.   Role of Commercial Drug Price Databases and Manufacturer Price Reporting

71. Drug information and price databases serve an essential role in the pharmaceutical marketplace. These databases facilitate, *inter alia*: (1) the identification and processing of prescription claims, (2) the screening for drug-drug, drug-disease, and drug-food interactions, (3) access to other safety and clinical information related to drug products, (5) pricing and payment for prescription drugs, and (6) determination of drugs available on the market and whether FDA-approved generics are available.

72. The role of these drug price databases was described in my 2004 report to CMS [Schondelmeyer and Wrobel, *Medicaid and Medicare Drug Pricing*, 2004, pp. 21-22] as follows:

> Three commercially available drug price databases track list prices of drug products in the U.S. market at the AWP and WAC levels. These databases are: (1) the Blue Book (First DataBank, Hearst Publishing Co., Palo Alto, CA); (2) MediSpan Master Drug Data Base and PriceChek PC (Facts & Comparisons, Wolters Kluwer Health, Inc., Indianapolis, IN); and (3) the Red Book (Thomson-Medical Economics, Montvale, NJ). Historically, each of these firms published a price list in printed format once a year with quarterly updates. Since the mid-1980s, however, the electronic version of these databases has been the primary format for price list publication. These databases are updated on a continuous (daily) basis. In addition to price data, these databases also contain or link to other databases that provide descriptive and clinical information on drug products including therapeutic class and uses, drug interactions, patent and regulatory status, therapeutic equivalence and generic alternatives, and many other useful data elements.
>
> The principal users of these drug price databases are pharmacies and third party programs. Pharmacies use the drug price and clinical information database on their in-store computers for pricing, filling prescriptions, drug interaction screening, and submission of third party prescription claims. Third party payers (public and private) use these databases to screen, adjudicate, and determine payment for covered prescriptions. Virtually every third party program (public or private), or its claims processor, use one of these drug price databases as the source for AWP, or WAC, values that serve as the basis for calculating the price that a pharmacy will be paid for each drug product based on the NDC number. This price information is then used according to the contractual pricing formula to pay the pharmacy for the prescriptions dispensed to eligible recipients. The vast majority (more than 40) of the state Medicaid programs use First DataBank's drug price information as the basis for prescription drug payments to pharmacists and other providers.

73. The various players in the pharmaceutical market (i.e., drug manufacturers, drug wholesalers, pharmacies, providers, and third party payers), including Roxane and Dey, recognize the role of drug price databases in the payment and reimbursement for prescriptions under third party programs including the Medicaid and Medicare programs.

74. Furthermore, these players in the pharmaceutical market, including the drug manufacturers and specifically Roxane and Dey, understand that the various types of price data reported by drug manufacturers, either directly or indirectly, to the drug price databases will result in setting the AWP, WAC, and/or DP for each specific drug product at the NDC (national drug code) level at any point in time.

75. Medicare Parts B and D and Medicaid pay millions of claims for pharmaceuticals each year and attempt to do so in a manner that will maximize the medical services and products that can be provided to beneficiaries based on the funds available to the programs.

76. Government policy makers and implementers with responsibility for large healthcare reimbursement programs (e.g., Medicare and Medicaid) need to rely upon readily available and current market information such as that supplied by drug manufacturers and drug price publishing services because of the large number of claims that make individual transaction prices impractical and inefficient to determine on a claim by claim basis. (e.g., see Brendan Joyce (ND), *U.S. ex rel. Ven-a-Care v. Abbott Lab, Inc.*, 06-11337-PBS, Dec. 12, 2008, pp. 241-242; Chapman, *U.S. ex rel. Ven-a-Care v. Abbott Lab, Inc.*, 06-11337-PBS, Dec. 2008, pp. 323-324.)

77. Pharmaceutical pricing conduct, in part, includes the setting of prices by drug manufacturers and the reporting of drug prices to commercial drug price publishers and

to state and federal pharmaceutical reimbursement programs such as Medicaid and Medicare.

78. Most state Medicaid Programs rely on drug price and cost information published by price publishing services such as Hearst Corporation's First DataBank—also known as Blue Book.  Similarly, prior to 2005, Medicare relied upon drug price and cost information from the price publishing services.  The prices published by price publishing services such as First DataBank's Blue Book or Thompson Publishing's Red Book are based upon price data reported by the drug's manufacturer.

79. Having manufacturers report prices that bear no set, or established, or predictable relationship to prices actually charged would obviously not allow a rational judgment to be made about the amount of reimbursement and would result in some prescription payments providing excessive profit to the provider while other prescription payments may not be adequate to cover all real costs.  From the policy perspective of the Medicaid program, such an impact would be inconsistent across drug products, subject to the whims and financial benefit of the drug manufacturers or providers, and would encourage the tainting of professional judgment of physicians and pharmacists by profit incentives that are beyond the government's knowledge or control.  From the perspective of establishing reimbursement policies so as to incentivize pharmacists or providers to dispense lower-cost generics rather than higher-cost brands, it is extremely important that the system has available accurate, timely and comprehensive price information.[12]  If reported prices do not meet these criteria, the program cannot evaluate whether it is in

---

[12] Schondelmeyer, SW and Wrobel, MV, *Medicaid and Medicare Drug Pricing: Strategy to Determine Market Prices,* CMS Contract # 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, Task Order 1, August 30, 2004, p. 28.

fact incentivizing providers to dispense generics, or whether any such incentive is in an amount that the program deems appropriate.

The paragraph immediately above was read to Roxanne Homar, State of Wyoming, Department of Health and she was asked if she had any reaction to the statement. Her response was, "I couldn't agree with it more. I think it's stated very accurately as to the way I would feel." (Deposition of Roxanne Homar (WY), *U.S. ex rel. Ven-A-Care v. Abbott Lab., Inc.*, December 3, 2008, p. 435; see also, Brendan Joyce (ND), *U.S. ex rel. Ven-a-Care v. Abbott Lab, Inc.*, 06-11337-PBS, Dec. 12, 2008, pp. 275-276.)

80. To the best of my knowledge and experience from working with Medicaid and Medicare drug programs, there is no policy objective within Medicaid or Medicare that relies upon, or is furthered by, pharmaceutical manufacturers reporting prices that bear no rational or predictable relationship to the prices actually charged in the marketplace. (e.g., see Deposition of Roxanne Homar (WY), *U.S. ex rel. Ven-A-Care v. Abbott Lab., Inc.*, December 3, 2008, p. 438-439; Brendan Joyce (ND), *U.S. ex rel. Ven-a-Care v. Abbott Lab, Inc.*, 06-11337-PBS, Dec. 12, 2008, pp. 273-276; and Kevin Gorospe (CA), *U.S. ex rel. Ven-a-Care v. Abbott Lab, Inc.*, 06-11337-PBS, Dec. 3, 2008, p. 300.) To the contrary, Medicaid and Medicare currently and historically have relied upon manufacturers' reporting of prices that do reflect the "prices generally and currently paid by providers" in the marketplace.

Again, the paragraph immediately above (without the citations to depositions) was read to Roxanne Homar, State of Wyoming, Department of Health and she was asked if she had any reaction to the statement. Her response was, "I would agree 100 percent."

(Deposition of Roxanne Homar, *U.S. ex rel. Ven-A-Care v. Dey et al.*, December 3, 2008, p. 436.)

## G. Roxane's Price Reporting Conduct and Impact on Medicaid and Medicare

81. Roxane had knowledge of the Medicare and Medicaid reimbursement systems, the importance of published prices, and the role the manufacturers played in setting the published prices such as AWP that served as the basis for the reimbursement system of third party payers including Medicaid and Medicare.  For example, a memo from Mark Schaffer (a Roxane employee) provided a sales team with a detailed 13-page Reimbursement Background treatise.  (Memo from Mark Shaffer to Palliative Care Sales Team, Boehringer Ingelheim, Roxane Laboratories, RE: Reimbursement Background, dated September 8, 2000, Shaffer Exhibit 22, RLI-AWP-00083482-95).

82. The players in the pharmaceutical market, including drug manufacturers such as Roxane, understand that the prices (AWP, WAC, and/or DP) published by the drug price databases will be used in a formulaic process to set the payment to pharmacies and other providers for dispensing each specific drug product at the NDC level to a patient in a given third party program, including state Medicaid programs.  Comments by a Roxane employee (Judy Waterer) in an e-mail state, "Realize that AWP and/or WAC has absolutely nothing to do with selling price for generics.   It's just put there for reimbursement purposes."  (e-mail from Judy Waterer, Roxane (U.S.) to Dale Baird, Boehringer Ingelheim (U.S.), Re: IVAX albuterol and Cromolyn sodium UDV, dated February 17, 2000, Paoletti 07570).

83. The players in the pharmaceutical market, and Roxane in particular, also understood that, prior to 2005, Medicare used published prices as a basis for setting the

payment to physicians and other providers.  As noted in an internal e-mail, "Medicare reimburses 80% of the allowable rate, which is AWP – 15% (approximately)." (e-mail from Dawn Gordon, Boehringer Ingelheim (U.S.) to Elizabeth Garafalo, Boehringer Ingelheim (U.S.), Re: Combivent UDV, dated April 6, 2000, Paoletti 17638-9; see also e-mail from James Rowenhorst, Boehringer Ingelheim, to Elizabeth Garofalo, Boehringer Ingelheim, RE: Medicare Reimbursement of Combivent UDV, dated April 12, 2000, ROX TX-16237-8).

84. Roxane employees knew that the AWP and WAC prices they established and reported to the price databases were substantially different from the "actual net selling price."  For example, a memo from Judy Waterer listing the AWP and WAC prices for ipratroprium products states, "As a reminder… These are published prices only.  The AWP and WAC have little relation to the actual net selling price after chargebacks, discounts, rebates, etc.  We are currently matching offers from Dey, in order to keep our business, in the $13 range (for 25 vials)."  The AWP prices ($20.50 to $49.20) stated in this memo are substantially above the acknowledged selling price of $13.  (Memo from Judy Waterer, Roxane, to Christopher Grinton, Boehringer Ingelheim, RE: BII GmbH enquiry, Ipratroprium Bromide Pricing – Medispan 9/30/98, dated October 02, 1998, Waterer Exhibit 51, ROX-6062-3).

85. Roxane knew how its reported prices such as AWP and its actual prices affected the purchasing decisions and profitability of providers and pharmacies.  Specifically, the cover memo to a Reimbursement Background treatise provided at a sales team launch meeting states, "Knowledge of pharmaceutical reimbursement practices, especially how they may affect pharmacist acceptance for Roxicodone 15mg and 30mg tablets, will play

an important part in your successful stocking of these new strengths in your retail accounts after the launch meeting." (Memo from Mark Shaffer to Palliative Care Sales Team, Boehringer Ingelheim, Roxane Laboratories, RE: Reimbursement Background, dated September 8, 2000, Shaffer Exhibit 22, RLI-AWP-00083482).

86. Roxane controlled, and used its control over, published prices to manipulate the reimbursement systems of Medicare and Medicaid in order to create a financial inducement for its customers to purchase its drug products, resulting in the Medicare and Medicaid programs paying more than they would otherwise have had to pay. One example in particular is the setting of prices for Roxicodone. The prices for Roxicodone (15mg and 30mg tablets) were set by Roxane "at levels favorable to the average for the oxycodone class of equivalent number of 5mg tablets… The bottom line message for the sales representative is that if you drive the Rx into the pharmacy, you will not have to be concerned that an Rx for 15mg or 30mg tablets will be substituted with multiple (lower cost generic versions of the) 5mg tablets." (Memo from Mark Shaffer to Palliative Care Sales Team, Boehringer Ingelheim, Roxane Laboratories, RE: Reimbursement Background, dated September 8, 2000, Shaffer Exhibit 22, RLI-AWP-00083489). In another drug product's (ipratroprium UDV) launch plan, the pricing strategy of Roxane included a substantial spread between AWP and WAC and a further spread between WAC and actual selling price. When explaining the rationale for this pricing, the launch plan states "Again, this is done through enticing the accounts with an increased spread between WAC and AWP." (Memo from Mark S. Pope to Tom Via, Re: Product Launch (Ipratroprium UDV's), dated April 9, 1996, ROX-4606-24).

87. Roxane perceived the need to raise AWPs and WACs, even though actual selling prices were decreasing due to competition, in order to "compete with Dey in the Market." (e-mail from James Rowenhorst, Boehringer Ingelheim, to Elizabeth Garofalo, Boehringer Ingelheim, RE: Combivent UDV Spreadsheet, dated June 6, 2000, ROX TX-16255-6).  The memo states, "It is my recommendation, based on the reimbursement mechanisms in the retail, hospital, and home health sectors, that we focus on a higher AWP and WAC and develop discount and rebate initiatives that will keep us compete (sic) with Dey in this market."  Ironically, the e-mail has attached to it a Wall Street Journal article titled "Medicare Plans Major Overhaul, Targets Massive Overpayments." (McGinley, Laurie and Cloud, David S., "Medicare Plans Major Overhaul, Targets Massive Overpayments," *Wall Street Journal*, date not on article, attached to e-mail from James Rowenhorst, Boehringer Ingelheim, to Elizabeth Garofalo, Boehringer Ingelheim, RE: Combivent UDV Spreadsheet, dated June 6, 2000, ROX TX-16255-6).

88. Roxane set its AWPs and WACs for its generic drug products based on the competing brand price rather than based on its expected or actual generic selling prices. The Product Launch Plan for Ipratroprium UDV described how the pricing was set: "Pricing of the IBUDV will follow traditional parameters of a generic product. Specifically, AWP will be brand less 10%, or $44.06 for the 25 count package; WAC will be AWP less 40%; or $26.44 for the 25 count package.  This type of price structure is used for a generic launch is (sic) to create an attractive spread between WAC and AWP." (Memo from Mark S. Pope to Tom Via, Re: Product Launch (Ipratroprium UDV's), dated April 9, 1996, ROX-4606-24).  The plan goes on to explain that the competitive

price is expected to be about $18.75 to $20.00 per 25 count package ($.75-$.80 per vial), instead of the reported $44.06 AWP or the reported $26.44 WAC.

89. I am aware that when Roxane decided for its internal business reasons to lower many of its WAC prices, it stopped reporting WACs to the pricing compendia, frustrating the efforts of the states and other payers that had incorporated WAC prices into their reimbursement formulae in order to attain lower reimbursement.  In a letter to First DataBank, a Roxane employee (Lesli Paoletti) wrote, "Accurate WAC pricing will not be furnished, as it is company policy not to publish this information."  (Letter from Lesli Paoletti, Roxane, to Ms. Terri Factora, First DataBank, dated October 20, 1999, ROX TX-00861.)

**H. Dey's Price Reporting Conduct and Impact on Medicaid and Medicare**

90. Dey used pricing strategies that set high AWPs and WACs and, at the same time, created a large spread between the actual selling prices and the amounts that would be paid by third party programs, including Medicare and Medicaid.  In a memo describing that "this pricing strategy will be followed by Dey sales people," the objectives of the albuterol pricing strategy included the following: "TO SEEK THE HIGHEST PRICES POSSIBLE IN RETAIL, HOMECARE AND HOSPITAL SEGMENTS." "TO MAXIMIZE DEY PROFITABILITY" and "TO PROVIDE INCENTIVE TO RETAIL / CHAIN PROVIDERS TO USE DEY'S ALBUTEROL UD BY INCREASING THE SPREAD ON MEDICARE / MEDICAID REIMBURSEMENTS."  (Memo from Robert F. Mozak, Dey, to Pam Marrs, *et al.* , Dey, RE: Albuterol Pricing Strategies, dated February 24, 1992, DL-TX-0090851).  These same three objectives, *inter alia*, were reiterated for a different drug product (Cromolyn Sodium Nebulizer Solution 20mg/2ml)

two years later in 1994. (CROMOLYN SODIUM NEBULIZER SOLUTION 20mg/2ml ABRIDGED MARKETING PLAN, prepared by Robert Ellis, January 1, 1994, DL-TX-0090967-1005, see particularly, DL-TX-0091002.)

91. Dey marketing executives knew how Medicare reimbursement worked, the role of increased spreads or "margins," and that they were selling drug products (i.e., Cromolyn Sodium Nebulizer Solution 20mg/2ml) substantially below the Medicare reimbursement rate. The basis for this finding comes from the Marketing Plan for Cromolyn Sodium Nebulizer Solution 20mg/2ml (December 15, 1993). (CROMOLYN SODIUM NEBULIZER SOLUTION 20mg/2ml MARKETING PLAN, prepared by Robert Ellis, December 15, 1993, DL-TX-0091006-1005, see particularly, DL-TX-0091008, -1031, -1056.) The Introduction to the marketing plan explains, "Homecare Pharmacies work in conjunction with DME dealers and Medicare reimbursement…However, lower priced generic cromolyn from Dey will increase the margins and help to mature this distribution channel into larger sales volume." (DL-TX-0091008.) A later section of the Cromolyn Marketing Plan provides projected sales revenues for the Homecare Pharmacy Market. These sales projections are based on a Dey "estimated selling price" for cromolyn of $0.45/unit in 1994 and $0.40/unit in 1995 while at the same time the HCFA (Medicare) reimbursement rate is footnoted to have been $0.74 per unit of cromolyn. (DL-TX-0091031.) Finally, the Marketing Plan has a proposed pricing document near the back of the plan that explains the "SPREAD TO HOMECARE PHARMACISTS – BASED ON DIRECT PRICES." This section goes on to show an "AWP" of "$0.74," "REIMBURSEMENT AT 80% OF AWP" of "$0.59," "DIRECT COSTS" of "$0.48," and a "SPREAD" of "$0.11 [per unit]." (DL-TX-0091056.)

92. Dey was aware that the reporting of prices such as AWP to the price databases such as First DataBank, MediSpan, and Red Book was critical to selling its drug products to pharmacies and to having those drug products reimbursed by third parties, including Medicare and Medicaid.  (See description of importance of price databases to Medicaid reimbursement as pleaded by Dey, L.P. in Complaint for Injunctive Relief, Damages and Other Relief, *Dey, L.P. v. First DataBank, Inc.*, California Superior Court, Case No. 26-21019, ¶¶ 26-39.)  Also, the New Product Launch Plan for Albuterol Sulfate Inhalation Solution 0.083% 3 mL included the following: "Strategy: ensure early reimbursement for Dey-Lute Albuterol through rapid notification to pharmacy reference (price) data bases. Tactic: Faxes sent to Drug Topics Red Book, First Data Bank and Price Alert, Facts & Comparisons and Medi-Span on day after approval."  (Dey Laboratories, Inc., New Product Marketing Plan, Albuterol Sulfate Inhalation Solution 0.083% 3 mL, Helen Burnham, February, 1992, DEY-FLA-0026265-308).

93. Dey set the AWP and WAC for its drug products and knew well the effect that these reported and published prices had on sales to pharmacies.  Dey also knew well the role that these reported and published prices (i.e., AWP and WAC) served in the third party reimbursement process, including the impact on Medicaid and Medicare reimbursement.  Dey prepared a "Reimbursement Comparison Worksheet" and trained its sales representatives on its use during product launch and other sales meetings.  For example, a memo to sales and account managers announcing the launch of a new product, albuterol sulfate inhalation solution 0.5%, 20 mL, states, "In this launch manual you will find a copy of the presentation you saw recently at your sales meeting, including the launch plan, market overview, sales direction, our pricing matrix, terms, literature, a

training module and copies of all announcement mailings.  In addition, we included the "Multidose to Unit-dose Conversion" reprint and worksheet, and the "Retail Profit Gain" worksheet. [also known as the Reimbursement Comparison Worksheet] You used both successfully last year."   (Dey Albuterol Multidose!!!!, Launch Manual, March 1996, Memo from Todd Galles to Territory Account Managers, Inside Sales Representatives, National Account Managers, Re: New Product Announcement: Dey Albuterol Sulfate Inhalation Solution 0.5%, 20 mL, dated March 4, 1996, DL-TX-0092786-813).

94. Dey set its actual selling prices to wholesalers substantially below its reported prices (i.e., AWP and WAC).  In the Marketing Launch Plan for Albuterol Inhalation Aerosol, 17g (MDI) there is a price list for this new MDI version of albuterol (Dey). This price list clearly states the price per unit to each specific class of trade (set of buyers) as a percent off of AWP or other defined benchmark prices.  For example, the "Wholesaler" direct price is to be "Proventil [the Schering brand] less 19%;" the price to "warehouse chains" is to be "AWP – 35%;" the price to a "Generic Distributor" is to be "15% Below Wholesalers); and the price to a "Mail Order" is to be "AWP – 36%."  In other words, the actual price to buyers in each of these classes of trade were substantially below (i.e., 19 percent to 36 percent or more) the manufacturer-reported AWP price. (MARKETING LAUNCH PLAN, Albuterol Inhalation Aerosol, 17g (MDI), DEY Laboratories, MDI PRICING, included in the document dated November 1995 and prepared by Todd Galles, DL-TX-0093357.)

95. Dey took actions to "increase reimbursement spread" for their cromolyn drug product.  In a memo RE: CROMOLYN SALES UPDATE, the memo describes, "After five months of marketing of Cromolyn, Marketing has conducted extensive analyses to

determine the sales status of Cromolyn to date."  In response to that analysis, program adjustments were recommended including: "Price modifications have been implemented in all retail buying groups, generic distributors, and some chain accounts.  This will increase reimbursement spread.  We should be more aggressive on discounting the 120's."   (Memo from Robert F. Mozak, Dey, to Charles Rice, CEO, Dey, RE: CROMOLYN SALES UPDATE, dated September 28, 1994, DL-TX-0161590-607.)

96. Not only did Dey set and increase the spread amounts for its drug products, Dey also knew the impact of these spreads upon the purchase decisions of its customers.  In a monthly report from Dey's CEO (Charles Rice) to his European superior, Rice reported, "Due to the less favorable spread below AWP and market pricing on Cromolyn, we are facing price reductions on this new product to stimulate movement in the last quarter." (Memo from Charles Rice, CEO, Dey, to Jean-Pierre Termier (European corporate headquarters), RE: MONTHLY REPORT – AUGUST 1994.UPDATE, dated September 28, 1994, DL-TX-0162493-495.)

97. Dey knew that Medicare was a driving factor in the reimbursement for some of its drug products (e.g., ipratroprium).  For example, the Launch Manual for Ipratroprium Bromide describes its "Target Markets" as follows: "67% of COPD patients (8-10 million people) are between the ages of 65-84 and are ambulatory, requiring continuous treatment that is often given in the home.  Medicare will be a driving factor in this population segment, and as HHC [Home Health Care] works in conjunction with DME dealers and Medicare reimbursement, this will be a strong channel for ipratroprium solution."  (IPRATROPRIUM BROMIDE, LAUNCH MANUAL, Fall 1996, Dey, DL-TX-0076144-202; see especially, DL-TX-0076161.)

98. Dey went so far as to develop a "REIMBURSEMENT COMPARISON WORKSHEET" and to link employee compensation to incentives for presenting this Reimbursement Comparison Worksheet to key customers.   Several versions of the Reimbursement Comparison Worksheet were produced by Dey.   (DEY-BO-0240246, DEY-BO-0239333, and DEY-BO-0239338).   Dey issued a memo to its sales personnel addressing "Retail Questions."   This memo begins by instructing: "Discuss and ask the pharmacist what his reimbursement is on our product.  Determine if your state reimburses for saline.  If not, this store is losing out and would prefer to us[e] (sic) UD [unit dose] where they would be reimbursed for the full item."   The memo goes on to explain, "It would benefit the pharmacist to get reimbursed for UD which carries a higher reimbursement amount the MD [multi dose]."   Finally, the memo concludes, "Get the pharmacist to work with you to fill out the reimbursement comparison worksheet.  You will need to know how your state reimburses the pharmacist.  He can tell you.  Some states reimburse according to AWP others use WAC pricing.  You also need to know if the pharmacy is a member of any Retail Buying Groups to get his Dey price.  Once all this information is obtained you can begin to fill out the worksheet to see what his profits comparison would be."   ("Retail Questions" on Dey letterhead with "Reimbursement Comparison Worksheet," "Albuterol Multi Dose Worksheet," and "Albuterol Unit Dose Worksheet,"  DL-TX-0090869-74.)

99. The role of the incentive plan in compensation of sales personnel was described in a series of memos in 1995.  (Memo from Bruce Tipton to Managed Care Team, RE: ATTACHED INCENTIVE INFORMATION, dated April 5, 1995, DEY-LABS-0282782-786.)   These memos describe that: "The remaining 30% [of your incentive]

(part B) is based on your goal attainment including: (1) Presentation of at least one AWP reimbursement proposal to convert multidose to Dey unit dose albuterol to a bonafide account. (2) Presentation of at least one Cromolyn conversion program to a qualified major retail chain drug customer."   Later memos further specify that at least one presentation of each type per quarter is required to receive the incentive compensation.

## I.   Impact of Roxane and Dey Conduct on Medicaid and Medicare

100.   Pharmaceutical manufacturers are generally well aware of the reimbursement policies and systems of major payers, specifically including Medicare and Medicaid. Evidence in this case showing that Roxane and Dey were aware of Medicare and Medicaid reimbursement policies is totally consistent with my general understanding of the industry over the last 30 years.  For example, pharmaceutical manufacturers know that they must report prices to the pricing compendia in order to have their drug products be saleable in the marketplace due to reimbursement practices.   Pharmaceutical manufacturers know that the prices they report to the pricing compendia will be used by third party payers, including government third party payers, to set the amount at which the health care providers will be reimbursed for drugs that are dispensed.

101.   Roxane and Dey have reported inflated prices to the commercial price databases used by the state Medicaid programs that were not reasonably or fairly indicative of the "prices generally and currently paid" in the marketplace, during the period covered by the Complaint. These inflated price reports have caused the state Medicaid drug programs to pay inflated reimbursement amounts for the drug products specified in the Complaint.

102.    The difference between Roxane's and Dey's inflated price representations to the commercial drug price databases and the actual net cost to pharmacies and providers created a substantial "spread." Consequently, the state Medicaid drug program substantially overestimated the acquisition cost of the drugs to providers and, as a result, paid more than they intended, or an unknown amount in excess of the amount they intended, to pay these providers.

103.    Based on the extensive sales of drug products through contracts with provider-customers, pharmaceutical companies, including Roxane and Dey, are intimately familiar with the prices that the customers pay for the company's drug products.   Even if the sale to the customer is delivered through a wholesaler, the contract price has typically been negotiated in advance between the manufacturer and the customer, thus the actual contract price is fully known to the manufacturer.   In the case of Roxane and Dey, Roxane and Dey would also have been aware of the actual net prices in situations where the company utilized a direct sales model, that is, contracts that resulted in direct sales to a provider.

104.    Roxane and Dey had information readily available, at the time that they reported inflated price information to the commercial price databases, which would have enabled them to report price information which fairly and reasonably represented the prices generally and currently paid in the marketplace, had they chosen to use this information.   The information available to Roxane and Dey was the exact type of information that it used when making pricing and other business decisions in the ordinary course of its business. (NAM KAR CONFIDENTIAL PRICING, 11/16/98 Revision, Roxane  Laboratories,  Inc.,  RLI-AWP-00293893-904;  Roxane  Laboratories,  Inc.  –

Contract Pricing Template, Effective 05/23/02, TXEX00880-885; Dey, L.P., Average Price – Shelf Carton, December 2000, DL-TX-0078119-121; Dey, L.P., Average Price – eaches, December 2000, DL-TX-0078122-124; Dey Laboratories, Bid Reports: July/August, 1995 and Year-to-Date, DL-TX-0079904-913.)

105.   I am aware that Roxane and Dey have responded to the United States' complaint, in part, in their answers by stating that any and all actions taken by Roxane and Dey were taken in good faith and in accordance with established industry practice, and/or complied with statutes and regulations. (Dey Answer, Affirmative Defense 7, 8, 13, and 14 and Roxane Answer, 17th Affirmative Defense)   Even if true, this price reporting would be contrary to the public interest as historically reflected in Medicaid program policy, principles, statutes, and regulations routinely reported in various places including the NPC Medicaid Book, well-known to both Roxane and Dey, on an annual basis from 1965 to the present.

106.   I am aware that Dey prepared, at one point in time, two letters that were circulated with an "Inter Office" memo, but it was not clear if these letters were ever distributed to anyone, and if so, to whom and when.  (Internal Memo from Todd Galles (Dey) to Russ Johnston (Dey), re: New 105-01 Albuterol Multidose Medicaid letters, dated August 10, 1999, DEY077-3599-3601.)  As the cover memo notes, "[t]here are two letters: one for the states requiring WAC pricing; they get the letter with both WAC and AWP prices listed, and the second letter for the other states that base reimbursement off AWP; they get the letter that lists only AWP.  There are 9 states that I know of that require WAC notification.  All others need only the AWP."  The two letters attached

serve to announce the introduction of one new drug product (Dey's albuterol sulfate inhalation solution, NDC # 49502-105-01).

107.    The "WAC and AWP letter" provides the "AWP per Unit" and the "WAC per Unit" prices for this new NDC.  The letter goes on to describe that, "WAC generally means the <u>invoice</u> price charged by a pharmaceutical manufacturer to drug wholesalers." The letter goes on to explain that because of discounts, rebates, chargebacks, administration fees and other such adjustments "that <u>WAC may well not be representative of actual market costs</u>…"  Nowhere in the letter does Dey state what the actual cost is for this new NDC.  In addition, the letter does not state the relationship of the AWP or WAC, on average or otherwise, to the actual market cost.  Also, the letter addresses only the one new drug product (albuterol sulfate inhalation solution, NDC # 49502-105-01).

108.    The "AWP letter" provides the "AWP per Unit" for this one new drug product (NDC # 49502-105-01) and does not mention the "WAC per Unit" price for the new NDC.  The letter goes on to describe that, "the Average Wholesale Price (or "AWP") per unit listed above does not represent actual wholesale prices which will be charged or paid for this product."  Nowhere in the letter does Dey state what the actual cost is for this new NDC.  In addition, the letter does not state the relationship of the AWP, on average or otherwise, to the actual market cost.  Also, the letter addresses only the one new drug product (albuterol sulfate inhalation solution, NDC # 49502-105-01).

109.    Based on my experience and understanding of the Medicaid reimbursement system and state Medicaid program operations, there is nothing in this letter that would have enabled a State Medicaid agency to reimburse for the Dey product based on the

"price generally and currently paid."  While Dey notes in the letter that the AWP and WAC, or in the other letter that the AWP alone, are not actual market prices, Dey's letter did not provide prices that are "generally and currently paid" in the market.  Also, there is no indication that Dey provided the drug price databases with the prices that are "generally and currently paid" in the market.  There is nothing in this letter that would have changed the prices in the computerized commercial drug price databases known to be used by the state Medicaid drug programs.  The reimbursement system is structured to use computerized price databases (i.e., First DataBank, MediSpan, or Red Book) with manufacturer-reported prices that are applied using a known formula to establish the reimbursement for an individual prescription.  This system is not dependent upon, nor does it provide a means for *ad hoc* information for individual drug products to be input and used as a basis for reimbursement.  Even if the system could accommodate an *ad hoc* price edit for an individual NDC, there was no information in Dey's letter (i.e., either version) that could have been input as the "price generally and currently being paid."

110.   State Medicaid programs are usually sparsely staffed with the employee(s) having a responsibility for a wide range of issues, initiatives and systems such as pricing and reimbursement, drug utilization review, drug rebates, state preferred drug list development and maintenance, and other issues.  This sparse staff, which may sometimes be only one person, does not have the time to review all drug product prices on a routine basis in addition to their other job responsibilities.  State Medicaid drug programs pay for somewhere between 8,000 and 60,000 different drug products (NDCs).  It simply is not feasible to monitor and manually update these prices on a monthly or even an annual basis.  In light of the limited staffing and the relative lack of usefulness for the

information in this letter, I am not surprised that various State Medicaid pharmacy program personnel testified that they did not remember the letters, did not find them helpful, or filed them "in the round file." (e.g., see Ayuni Hautea-Wimpee (WA), *U.S. ex rel. Ven-a-Care v. Abbott Lab, Inc.*, 06-11337-PBS, Nov. 24, 2008, pp. 149-150; James Parker (IL), *U.S. ex rel. Ven-a-Care v. Abbott Lab, Inc.*, 06-11337-PBS, Nov. 18, 2008, p. 71; Brendan Joyce (ND), *U.S. ex rel. Ven-a-Care v. Abbott Lab, Inc.*, 06-11337-PBS, Dec. 12, 2008, pp. 254-258; Roxanne Homar (WY), *U.S. ex rel. Ven-a-Care v. Abbott Lab, Inc.*, 06-11337-PBS, Dec. 3, 2008, p. 444; and Suzette Bridges (AR), *U.S. ex rel. Ven-a-Care v. Abbott Lab, Inc.*, 06-11337-PBS, Dec. 11, 2008 (Vol. 2), pp. 531-539.)

111.    A small number of State Medicaid prescription programs used WAC as one of several factors in their typical "lower of" prescription reimbursement formula. The Dey internal memo (Internal Memo from Todd Galles (Dey) to Russ Johnston (Dey), re: New 105-01 Albuterol Multidose Medicaid letters, dated August 10, 1999, DEY077-3599-3601.) indicated that about 9 states used WAC as their primary basis for reimbursement. For those states that did not use WAC in their reimbursement formula, any change in WAC over time would likely not have affected the payments for prescriptions in those states. Also, State Medicaid programs not using WAC in their reimbursement process may not have even purchased the WAC data from their drug price database supplier, since this would have constituted an additional and unnecessary cost to Medicaid. Given the relatively sparse staffing of State Medicaid programs, it was not common for, and not practically possible for, state employees to "eyeball" or review the drug pricing data for all 8,000 to 60,000 drug products (NDCs) routinely paid for by the State Medicaid program.

112.    Manufacturers developing innovative brand name drugs and pharmaceuticals are traditionally protected by patents and permitted to set prices in the United States that are typically higher than the prices the same manufacturers charge for the same innovative drug abroad.  Once the patent or other market exclusivity protection expires, however, the drug can become subject to generic competition that creates market conditions that cause the price of the drug, or its generic equivalents, to fall.  As a result, consumers and others paying for the drug, including state Medicaid drug programs as well as Medicare, should benefit from healthy price competition that should lead to lower prices.  The deceptive conduct by Roxane and Dey, as alleged by the plaintiffs, conceals the lower prices resulting from healthy market conditions from payers such as state Medicaid drug programs and Medicare.

113.    In summary, Roxane and Dey clearly understood the role of drug price databases and the role of reported and published prices (i.e., AWP, WAC, and/or DP) in the payment for prescriptions by third party programs, including Medicare and Medicaid. Roxane and Dey actively monitored, and in most cases actually set, and reported to the drug price compendia (i.e., Blue Book, MediSpan, and Red Book) the AWP that was published for Roxane's and Dey's drug products.

## VI. THE MEDICAID DRUG PROGRAM

114.    The Medicaid drug program dates back to 1965 when the U.S. Congress created Medicare and Medicaid out of the varying state programs to provide health care to the aged and indigent, respectively. Prescription drug coverage is an optional service in Medicaid, but virtually all states offer a prescription drug benefit. The Medicaid program

is jointly funded by federal and state resources based on a cost sharing formula, with various federal shares across the states ranging from 50% to 75% of total drug program costs. Both Medicaid and Medicare now have prescription drug benefits that serve, respectively, the indigent and the elderly and disabled.   The public financing for prescription drug coverage of these populations has provided increased access for many persons who could not otherwise afford necessary drug therapy.   Drug manufacturers have benefited from this increased coverage and market expansion through increased drug sales financed by public programs such as Medicaid and Medicare.

115.   Medicaid expenditures are usually one of the largest items in the state's budget. In addition, Medicaid expenditures have been one of the fastest growing components of the state budget and Medicaid drug expenditures have been one of the fastest growing pieces of Medicaid.   For these reasons, among others, state Medicaid agencies attempt to use state resources as wisely and efficiently as is possible given the resources available.

My experience in working with state Medicaid programs over the years has been that the state agencies do their best to estimate actual acquisition costs for covered drug products. Efficient and appropriate use of Medicaid drug program resources enables the state government to accomplish other policy objectives such as ensuring increased access to care, coverage of more beneficiaries, encouragement of lower cost generic drug products, incentives for utilization of least costly alternatives for treatment, and minimization of program administrative costs.   Medicaid drug program resources can be used more efficiently and appropriately with drug price information that is reliable, accurate, comprehensive, and timely.   Staff of the state Medicaid agencies, in carrying out their

responsibilities, attempt to do their best to estimate the actual acquisition cost of drug products in the market given the resources available. [Deposition of Martha McNeill, July 12, 2007, p. 39, lines 15 to 20; p. 27, line 24 to p. 28, line 5]. The ability of state Medicaid programs to implement their chosen policy objectives and to manage resources efficiently is negatively impacted by the provision of inflated price information by drug manufacturers, including Roxane and Dey. (e.g., see Brendan Joyce (ND), *U.S. ex rel. Ven-a-Care v. Abbott Lab, Inc.*, 06-11337-PBS, Dec. 12, 2008, pp. 241-244.)

116.    Overall, Medicaid drug expenditures accounted for 12.1% of total outpatient drug expenditures in the U.S. in 1996, and reached a high proportion in 2004 at 15.3% of total outpatient drug expenditures. The number of Medicaid prescriptions represented 11.6% of all outpatient prescriptions in 1996 and grew to their highest share in 2004 at 13.6%. [NACDS, *The Chain Pharmacy Industry Profile*, annual editions from 1998 to 2005. Data was from IMS Market View, as reported in Novartis Pharmacy Benefit Report for 1996 to 2001 and from NDC Health (a health care information company) from 2002 to 2006].

117.    Medicaid outpatient prescription drug expenditures in the U.S. were $4.4 billion in 1990 and they had nearly doubled in six years (1996) to $8.7 billion. In the next nine years (1996 to 2005), Medicaid outpatient prescription expenditures nearly quadrupled to $32.1 billion. [NACDS, *The Chain Pharmacy Industry Profile*, annual editions from 1998 to 2005. Data was from IMS Market View, as reported in Novartis Pharmacy Benefit Report for 1996 to 2001 and from NDC Health (a health care information company) from 2002 to 2006].

118.    The growth of Medicaid drug spending was at double-digit rates for most of the period from 1990 to 2005. [NPC, *Pharmaceutical Benefits*, annual editions from 1990 to 2005/2006].

119.    At the national level, the Medicaid drug expenditures grew 221% from 1992 to 2002 (in constant dollars). Total drug expenditures were broken down into several contributing components: number of drug recipients, drug utilization (prescriptions per person per year), manufacturer drug product cost and pharmacy fees.  Over the decade from 1992 to 2002, the number of drug recipients decreased about 6% and drug utilization increased 46.8%.  The average payment per prescription grew more than 107%, with the manufacturer drug product cost increasing 137% and the pharmacist's fee declining 20%, in constant dollars. [Schondelmeyer and Wrobel, *Medicaid and Medicare Drug Pricing*, 2004, pp. 4-5].

## A. Medicaid Drug Reimbursement

120.    The state Medicaid programs reimburse for covered pharmaceutical products through various formulas that are designed to estimate the acquisition cost of the drug product to the provider submitting the claim for reimbursement.  Medicaid programs, then, determine the amount to pay on a specific claim for prescription pharmaceuticals by setting an amount intended to compensate the provider for the estimated acquisition cost of the drug product plus an additional amount, also set by the applicable Medicaid reimbursement method, to compensate the provider for profit and overhead related to the cost of dispensing prescriptions and counseling patients.

121.    Provider and pharmacy payments for prescription drugs are set using similar basic payment formulae set by federal statutes and regulations and applied in all states.

Individual states may, then, modify or add other factors in the payment process with the approval of the federal agency, CMS.   The basic parameters of the reimbursement formula are described in the paragraph below, which is quoted from the NPC Medicaid Book [NPC, *Pharmaceutical Benefits*, 1993, p. 15].

> **History:** Federal Medicaid regulations dictate the method for reimbursing prescription drugs. Reimbursement is made on a retrospective, fee-for-service basis with payments limited to the lower of the pharmacy's usual and customary charge or the estimated acquisition cost of the drug product plus an established dispensing fee to cover the pharmacy's overhead and profit. (Some states have experimented with enrolling Medicaid eligibles in Health Maintenance Organizations under capitated payment contracts.) In 1976, utilizing the authority to set an upper limit for services available under Medicaid programs as provided under Section 1902(a)(30)(A) of the Social Security Act, the Health Care Financing Administration (HCFA), HHS implemented drug reimbursement rules at 45 CFR Part 19 pertaining to upper payment limits for Medicaid and other programs. Specifically, these regulations provided that the amount the Department recognized for drug reimbursement or payment purposes was not to exceed the lowest of:
> - the maximum allowable cost (MAC) of the drug as established by HCFA's pharmaceutical reimbursement board for certain multisource drugs (generic drugs), plus a reasonable dispensing fee;
> - the estimated acquisition cost (EAC) of the drug (the price generally and currently paid by providers for a particular drug in the package size most frequently purchased by providers), as determined by the program agency, plus a reasonable dispensing fee; or
> - the providers' usual and customary charge to the public for the drug.

122.   Importantly, note that the payment to the provider is the "lower of" the various prices including: (1) the pharmacy's usual and customary charge for the prescription; (2) the estimated acquisition cost (e.g., AWP −X%) for the drug product plus a dispensing fee; or (3) the federal upper limit (FUL), or state maximum allowable cost (SMAC), for certain generic drug products plus a dispensing fee.

123.   State Medicaid programs have to file a State Plan with CMS under Title XIX of the Social Security Act.  This State Plan sets the state's method with respect to how the state Medicaid program will be operated consistent with the federal statutes and