# Exhibit C

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In re: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) | MDL DOCKET NO. 1456 |
| | ) | Civil Action No. 01-12257-PBS |
| | ) | |
| THIS DOCUMENT RELATES TO: | ) | Hon. Patti B. Saris |
| *United States of America ex rel. Ven-A-Care of the Florida Keys, Inc., et al. v. Dey Inc., et al.,* Civil Action No. 05-11084-PBS | ) ) ) | |

| | | |
|---|---|---|
| In re: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) | MDL DOCKET NO. 1456 |
| | ) | Civil Action No. 07-10248-PBS |
| | ) | |
| THIS DOCUMENT RELATES TO: | ) | Hon. Patti B. Saris |
| *United States of America ex rel. Ven-A-Care of the Florida Keys, Inc., et al. v. Boehringer Ingelheim Corporation, et al. et al.,* Civil Action No. 05-11084-PBS | ) ) ) ) ) | Subcategory Case No: 06-11337-PBS |

| | | |
|---|---|---|
| In Re: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) | MDL DOCKET NO. 1456 Civil Action No. 06-CV-11337 Lead Case No. 01-CV-12257 |
| | ) | |
| THIS DOCUMENT RELATES TO: | ) | Judge Patti B. Saris |
| *U.S. ex rel. Ven-A-Care of the Florida Keys, Inc. v. Abbott Laboratories, Inc.* | ) ) | |

**REBUTTAL REPORT OF**

**STEPHEN W. SCHONDELMEYER, PHARM.D., PH.D.**

# REBUTTAL REPORT OF

# STEPHEN W. SCHONDELMEYER, PHARM.D., PH.D.

I.    AWP as a List Price or Benchmark Price ................................................................. 2

II.   Pricing of Generics at 10 Percent Below Brand AWP ........................................... 6

III.  States Attempted To Pay EAC Consistent with Federal Medicaid Policy ............ 7

IV.   Assertions About Government Policy and Cross-Subsidization ........................... 9

V.    Government Could Not Have Used Alternative Prices ......................................... 12

VI.   Court's Rejection of FULs Based on DRA-Defined AMP ................................... 22

VII.  Medicaid Rebates Should Not be an Offset ......................................................... 24

VIII. MMA Definition of WAC ..................................................................................... 25

IX.   DMERCs Included NovaPlus as Brand ............................................................... 26

X.    There Are Economic Incentives to Inflate Prices for Medicare Sales ............... 28

# REBUTTAL REPORT OF

## STEPHEN W. SCHONDELMEYER, PHARM.D., PH.D.

1. I have been asked to review and respond to some of the assertions in the defendants' expert reports. My rebuttal opinions herein are addressed only to those experts who made the specific points that I referenced and discussed. [Abbott, June 20, 2008; Dey and Roxane (BIPI), January 22, 2009.]

2. My opinions contained herein are based upon my review of documents referenced in my initial and rebuttal reports and the reports of defendants' experts, and based upon my experience and qualifications described in my previous reports.

3. For the reasons stated below and for reasons stated previously, I continue to hold the opinions stated in my initial Expert Reports (Abbott, June 20, 2008; Dey and Roxane (BIPI), January 22, 2009).

4. I may amend and update my opinions based upon additional information that may be provided to me, or that may become known to me by other appropriate means in the future.

## I.     AWP as a List Price or Benchmark Price

5. Several of the defense experts refer to AWP and sometimes WAC as a benchmark or list price, terms which they seem to use interchangeably.  In addition, these defense experts also imply that it is acceptable for manufacturers to set and report (to the drug price compendia) their list prices, benchmark prices, AWPs or WACs in a manner that has no meaning or relationship to any actual transaction price.

6.  For example, let's examine the testimony of Louis Rossiter when he was asked: "So as far as you're concerned, you knew of no regulation in your state or any other state that stops a drug company from saying its average wholesale price went from 50 to a hundred when in fact the prices went from 20 to 10, do you?"  Mr. Rossiter's response was: "That's correct, it's a list price,... So, yes, there is no limit to what they can report as a list price."  [Deposition of Louis Rossiter, *United States v. Abbott*, April 15, 2009, p.147, lines 1-18.]

7.  Although I use these same terms, list price and benchmark price, in my reports and testimony, I disagree with the assertions that list price and benchmark price are meaningless and can be anything that the manufacturer wants them to be, at least when the prices are reported to the pricing compendia for use by third parties in reimbursement systems.

8.  First, this case is related to payment for prescriptions under Medicaid.  The Medicaid drug program has had a consistently stated objective for its payment policy to be based on "estimated acquisition cost" (EAC).  Drug manufacturers were well aware of this intent with respect to the drug product payment under Medicaid since as far back as 1977.  The intent of the Medicaid program regarding drug product reimbursement is "to have each state's estimated acquisition cost as close as feasible to the price generally and currently paid by the provider."  Drug manufacturers were also on notice that Medicaid's expectation was that: "The states are, therefore, expected to set their ingredient cost levels as close as possible to actual acquisition cost." ["HHS Action Transmittal, HCFA-AT-77-113 (MMB), December 13, 1977. Subject: Title XIX, Social Security Act: Limitation on Payment or Reimbursement for Drugs: Estimated Acquisition Cost

(EAC)." as reproduced in National Pharmaceutical Council (NPC), *Pharmaceutical Benefits Under State Medical Assistance Programs*, 1983, p. 14.]

9.   In addition, the drug manufacturers knew that the state Medicaid drug programs relied upon First DataBank for the AWP and/or WAC prices used in their payment formula.  In First DataBank's own newsletter, they reported that: "We deliver our prices to 43 of the state Medicaid programs, all of the major drug wholesalers, third party payors and pharmacies all across the country."  Also, drug manufacturers knew that the AWP and WAC prices reported by First DataBank were represented by First DataBank as follows: "Since AWP is the Standard in the industry you naturally want to use the most widespread AWP there is. First DataBank has that standard." ["National Drug Data File (NDDF), The Most Comprehensive Drug Database," First DataBank, *Monthly Interest*, March 1993, Vol. 8, No. 3, p.1.]

10. First DataBank over more than a decade has described AWP and WAC as list and benchmark prices that are "prices charged" or the "price at which a particular drug is sold."  [See First DataBank, *Monthly Interest*, September 1991; and Letter from Robert Hawley, Office of General Counsel, Hearst Publishing, to Michael Lembke of Alpha Therapeutic Corporation, May 30, 2002.]  These descriptions by First DataBank, when taken at the plain meaning of the language used, indicated prices actually "charged" or "price at which the drug was sold."  In 2000, First DataBank addressed the question: "What is AWP?" The response reported: "AWP (Average Wholesale Price) is an industry term that represents a benchmark wholesale price a wholesaler would charge a pharmacy for a particular product." ["Medicaid Reimbursement Pricing Issues," First DataBank, *Monthly Interest*, July, August 2000, Vol. 15, No. 6, p.1-3.]

11. I am aware of no regulation, or payer such as Medicaid, that requests, authorizes, or encourages a drug manufacturer to set and report a list price or benchmark price to the drug price compendia as an AWP or WAC that has no relationship to the prices actually charged in the market. In fact, Medicaid and First DataBank make it clear that the AWPs and WACs reported are to be used for Medicaid reimbursement and that Medicaid expected that reimbursement to be "as close as feasible to prices generally and currently paid by the provider."

12. The prices reported by drug manufacturers to drug price compendia have traditionally had a predictable relationship to actual market prices generally and currently paid by pharmacies in the marketplace, except for instances where a manufacturer for its own reasons chose to report prices with inflated relationships when compared to the actual prices that are generally and currently paid by pharmacies in the marketplace. This behavior of certain drug manufacturers has resulted in reported prices, such as AWP, WAC, and DP, and their relationship to actual prices generally and currently paid by pharmacies in the marketplace, becoming inflated progressively over time.

13. Drug manufacturers, including Abbott, Roxane, and Dey, were aware that state Medicaid programs intended to use the manufacturer reported prices to commercial price databases to estimate the prices "generally and currently paid by pharmacies" in the marketplace. This general intent of state Medicaid programs was published routinely in the annual volumes of the National Pharmaceutical Council's publication "Pharmaceutical Benefits Under State Medical Assistance Programs" (also referred to as the "NPC Medicaid Book"), and other places. Abbott and Roxane (through BIPI) have

been members of the National Pharmaceutical Council throughout the entire period at issue in this case.

## II.  Pricing of Generics at 10 Percent Below Brand AWP

14. The defendants' experts (i.e., Stiroh and Scott Morton) try to create the impression that generic drug products enter the market with an AWP that is 10% below the brand and then leave the price unchanged.  "Dey's practice is consistent with its understanding that industry practice was generally to "set" AWP at about 90 percent of the brand AWP for launch and generally not update it over time." [See Report of Lauren J. Stiroh, NERA, March 6, 2009, In re: Pharmaceutical Industry Average Wholesale Price Litigation, p. 16.]

15. First, there is no industry standard price behavior for first generic entrants into the market.  Prices for generic drug products are not regulated by the government.  The first generic drug product to enter the market does not necessarily, or routinely, enter at a price 10% below the brand.  In fact, it is not unusual for the first generic competitor to enter the market with a price that is approximately 20% to 25% below the brand-name price. [See "Just the Facts, Generic Rx Product Report," a supplement to Pharmacy Times, October 2000, at 15.]

16.  Dey's expert claims that: "On the advice of First DataBank, Dey sets its AWPs at approximately 90 percent of the comparable brand AWP at product launch." [See Report of Lauren J. Stiroh, NERA, March 6, 2009, In re: Pharmaceutical Industry Average Wholesale Price Litigation, p. 16.]  To the best of my knowledge, First DataBank does not have a consulting service that advises clients on pricing behavior. This comment is

quite unusual since First DataBank is not in the business of, and has no authority to, set the drug prices for manufacturers such as Dey, or any one else.

17. The suggestion that generic drug firms set their first generic AWP price and then never reduce the price is simply not accurate and certainly is not the industry standard.  In 2008, 10 of the top 23 generic drug manufacturers lowered the prices (WAC or AWP) of their leading generic drug products.  [Purvis L, Schondelmeyer S, Gross D, Rx Watchdog Report, Trends in Manufacturer Prices of Prescription Drugs Used by Medicare Beneficiaries, 2008 Year-End Update, AARP Public Policy Institute, # 2009-07, April 2009.]

18. I am not aware of any government policy or expectation that AWP should be set upon entry of a generic drug product and then not changed over time to reflect changes in actual transaction prices.

III.     **States Attempted To Pay EAC Consistent with Federal Medicaid Policy**

19. Several of the defense experts, including Bradford, Stiroh and Scott Morton, have suggested that various State payment practices indicate that the State programs did not attempt to pay actual acquisition costs.

20. While Professor Fiona Scott Morton is correct when she points out that the federal Medicaid program did not *require* reimbursement at *Actual* Acquisition Cost (AAC), she fails to acknowledge that there was an explicit and consistent policy objective to set reimbursement at a level that closely approximated actual acquisition cost or the "price generally and currently paid by providers," as I noted in my report at paragraphs 50 to 54.

21. There is extensive evidence indicating that state officials understood, and attempted to implement, estimated acquisition cost (EAC) as the "price generally and

currently paid by providers" in a manner that was consistent with federal policy. [See, e.g., Deposition of Brendan Joyce, North Dakota Medicaid, December 12, 2008, pp. 244-248; see also, Deposition of Gary Cheloa, Nebraska Medicaid, December 3, 2008, pp. 350-353; Deposition of Jerry Dubberly, Georgia Medicaid, December 15, 2008, pp. 39-42; Deposition of James Parker, Illinois Medicaid, November18, 2008, pp. 32-33.]

22. Professor Bradford takes a statement from one of my reports to CMS out of context and draws a conclusion that greatly misrepresents the position that I hold on estimating acquisition cost. The statement in my report was "Any price list used by the Medicaid or Medicare program should reflect 'generally and widely available prices,' that is, any provider paid according to the payment policy should be able to procure drugs at the published payment amount." The discussion preceding this statement discussed average prices. The discussion following this statement in my report describes the class of trade pricing practices that occur in the pharmaceutical market and how certain classes of trade receive prices below the amount at which any pharmacy in another class of trade can buy that drug product. After seeing how the statement can be distorted by one attempting to do so, my point was that "Any price list used by the Medicaid or Medicare program should reflect 'generally and widely available prices,' that is, any (prudent) provider paid according to the payment policy should be able to procure drugs at the published payment amount."

23. In describing the attributes of a workable reimbursement policy, my panel and I identified a category that we termed "generally and widely available [prices]." In discussing that attribute, we discussed the need to have prices that were available to the class of trade that included providers who would be paid under the program. As the term

itself indicates, "widely available" does not mean available on a drug by drug basis to every provider, regardless of how inefficient or high cost. Indeed, my discussion of this statement refers to the need to assure that a "wide spectrum" of physicians or pharmacies would be willing to participate in the program, not each and every physician or pharmacist. Taken in context, and reflective of what I believe to be the case, my description of prices generally and widely available is not intended to mean the default (or highest) price that any customer could demand to pay. I clearly do not endorse that the highest price level is the price that the government programs should, or intended, to pay for all drugs reimbursed by the programs.

## IV.   Assertions About Government Policy and Cross-Subsidization

24. Several of the defense experts, including Rossiter, Bradford, Stiroh and Scott Morton, have suggested that various State payment practices indicate that State payment policies were a tradeoff between ensuring access to care and being fair to providers.

25. Defendants' experts have made various arguments about tradeoffs, or cross-subsidization, related to Medicaid drug payment policy. They have suggested that Medicaid payment policy takes into account tradeoffs between: (1) drug ingredient cost and dispensing fees; (2) drug ingredient costs and a desire to incentivize dispensing of generics; and (3) drug ingredient costs and a desire to incentivize pharmacy participation and beneficiary access. For example, Professor Scott Morton contends that dispensing fees are "historically insufficient" and that Medicaid "cross-subsidizes dispensing fees by allowing greater profits on ingredient costs." [Expert Report of Fiona Scott Morton, March 13, 2009, p. 10.]

26. I am unaware of any government policy that sanctions or encourages "cross-subsidization" by over-paying ingredient costs in order to make up for inadequate dispensing fees. In 1994, HCFA formally stated: "We would also clarify our policy that a dispensing fee determination must be separate and distinct from the EAC determination and unrelated to the cost of the drug product." [August 12, 1994, Memorandum from Sally Richardson, Director of HCFA's Medicaid Bureau, To All Associate Regional Administrators (HHC902-0878).] This same message was forwarded to state Medicaid agencies through their regional administrators. To my knowledge HCFA (or CMS) has not withdrawn this policy.

27. On the one hand, I do not take issue with Dr. Rossiter's claim that drug payment policies may at times lead to "trade-offs [that] are an inherent feature of state Mediciad policies." [Expert Report of Louis Rossiter, *United States v. Abbott*, March 6, 2009, p. 20.] On the other hand, I do not agree with the implication suggested by Dr, Rossiter and other experts that Medicaid officials left such trade-offs in the hands of the drug manufacturers.

28. From my experience working with Medicaid officials at both the federal and state levels, I understand that Medicaid officials considered the various objectives of the programs when they set reimbursement formulae. If evidence and experience demonstrated that payment adjustments were needed, the Medicaid program officials adapted their methodologies or developed alternative methods to address the concerns. However, to the best of my knowledge, nowhere in the statutes, regulations, rules or policies for Medicaid payment is there authorization, or even a mention of manufacturers

being asked to inflate their drug prices to "help" the programs achieve the tradeoffs that may be necessary to accomplish the programs' objectives.

29. Even if a Medicaid official wanted, rightly or wrongly, to take into account the difference in Medicaid ingredient cost allowance and actual acquisition cost as a trade off to other factors, he or she would not possess the information necessary to make such a tradeoff because Medicaid officials do not know the actual prices or range of prices charged by a manufacturer in the market. [See Expert Report of Schondelmeyer, January 22, 2009, at paragraph 154.] To the contrary, the only way for programs to achieve their desired objectives is for them to be given accurate, timely and reliable information about prices.

30. To the extent that any state saw a need to pay additional dispensing or administration fees for infusion drugs, such a determination was within the state's policy making discretion, but was not intended to be left to, or even co-opted by manufacturers, based on a system of reporting inflated prices for these drugs. Notably, states that saw a need to pay additional infusion dispensing fees did so as they considered it appropriate and affordable. For example, at some point during the relevant period, at least 9 states have had an increased infusion fee and at least 16 states have paid a higher compounding fee. In addition, at least 16 states pay a higher unit dose (or long term care) dispensing fee.

31. Likewise, to the extent that any state saw a need to pay an additional dispensing fee as an incentive to the pharmacies to dispense generic drug products such a determination was within the state's policy making discretion, but was not intended to be left to, or even co-opted by manufacturers, based on a system of reporting inflated prices

for these drugs. Notably, states that saw a need to pay additional generic dispensing fees as an incentive did so as they considered it appropriate and affordable. For example, at least 9 states have paid a higher generic incentive fee at some time during the relevant period.

32. Regardless of whether or not states viewed their estimated acquisition cost method within federal guidelines as a tradeoff for, or cross-subsidization of, other factors, the states did not rely upon nor expect the drug manufacturers to set unknown prices with high spreads to cross-subsidize. As a matter of policy, the states would not design a payment system that delegates the amount of payment to providers to be at the discretion of the drug manufacturers. Even if states did, or desired to, cross-subsidize other factors, the states would have needed complete, accurate, and timely price information from the drug manufacturers. The drug manufacturers did not provide the state Medicaid programs with complete, accurate, and timely price information and their reporting of inflated prices that were not transparent to the public programs did not serve government policy objectives effectively.

## V.    Government Could Not Have Used Alternative Prices

33. At various points, several of the defense experts refer to the availability of alternative price information that States, or the federal government, arguably had available but did not utilize for reimbursement purposes. [e.g., Stiroh (ASPs, WACs, AMPs); Scott Morton (AMPs, DOJ AWPs), Bradford (WACs); Young (IMS data, FSS prices, 340B prices, AMPs, Myers & Stauffer surveys).] At times the programs seem to be criticized for not using these alternative prices (e.g., WACs, DOJ AWPs, AMPs, ASPs, FSS prices, 340B prices, or IMS prices) as the basis for their reimbursement

system and at other times the Medicaid and Medicare programs are criticized for not using these alternative prices as an indication of the unrepresentative nature of the reported AWPs and WACs.

34. Based upon my knowledge and experience with pharmaceutical pricing and reimbursement issues, there are a number of reasons why each of these alternative prices would not have worked appropriately or efficiently as the basis for reimbursement in Medicaid or Medicare, as will be discussed below.

35. More fundamentally, however, these alternative prices do not have any bearing on the fact that the defendant drug companies reported AWPs and WACs for the Complaint NDCs that they knew were not even close, in most cases, to their actual prices. The drug companies reported these inflated AWPs and WACs with the knowledge that such inflated prices would influence the payment for prescription drugs under Medicaid and Medicare.

36. The defendants routinely kept themselves informed of the actual reimbursement methodologies of the Medicaid and Medicare programs and they knew quite precisely what prices were being relied upon by those programs to determine their reimbursements to purchasers of defendants' drug products. In fact, most of the defendants were sponsors of an annual publication published by the National Pharmaceutical Council that provided detailed information on drug reimbursement, expenditures, and use by state Medicaid programs. [See National Pharmaceutical Council (NPC), *Pharmaceutical Benefits Under State Medical Assistance Programs*, annual volumes from 1965 to 2008.] Defendants had contemporaneous information available to them that made clear that neither Medicare nor any of the Medicaid programs used FSS prices, 340B prices, IMS data, AMPs, ASPs, or

Myers & Stauffer survey prices to determine EACs.   Furthermore, defendants had contemporaneous information available to them that clearly informed them that Medicare did not rely upon published WACs and that only a handful of State Medicaid programs used WACs in the 90's, with several more states using WAC later in the decade and into the 2000's.

37. The critical conclusion to be drawn is that defendants knew that their reported AWPs (or Abbott's list prices that were formulaically recalculated into published AWPs) were being used by the government programs (i.e., Medicaid and Medicare) and were dictating payment amounts for tens of millions of dollars in government payments for prescriptions.   Nothing about the possible availability of these alternative prices to the government programs changes this fundamental reality.

38. With regard to the ostensible insight provided by these alternative price sources into the (misleading) nature of published prices, I again do not agree with any suggestion that this has any bearing on the evaluation of defendants' AWPs or WACs and their role in influencing Medicare and Medicaid drug payments.   Furthermore, given the mechanical way in which published AWPs and sometimes WACs were obtained by government programs and loaded into their computer systems for reimbursement purposes, it is not realistic to conclude that the alternative price databases provided understandable or comprehensive insight into the nature of published prices.

39. There were substantial variations of actual prices compared to reported prices (i.e., AWP and WAC) for the Complaint drugs.   The reported prices appeared to bear little, if any, predictable relationship to actual prices, even within a drug type or for a given manufacturer's entire set of drugs or over time.

40. In addition, the comparison of AWPs and WACs to other alternative prices would be difficult to accomplish or track in a consistent and ongoing fashion, particularly for small Medicaid departments with tens of thousands of covered drug products, thousands of providers, hundreds of drug manufacturers, and only a few Medicaid drug program employees.

41. Finally, there are a variety of reasons why each of the alternative price sources mentioned by defense experts would not work as a basis for setting reimbursement amounts for Medicaid or Medicare prescriptions.

42. Medicaid and Medicare are faced with the need to determine estimated acquisition cost (EAC) in order to operate and pay for claims under their respective drug programs. The intent of EAC under Medicaid has consistently been that drug product reimbursement is "to have each state's estimated acquisition cost as close as feasible to the price generally and currently paid by the provider." ["HHS Action Transmittal, HCFA-AT-77-113 (MMB), December 13, 1977. Subject: Title XIX, Social Security Act: Limitation on Payment or Reimbursement for Drugs: Estimated Acquisition Cost (EAC)." as reproduced in National Pharmaceutical Council (NPC), *Pharmaceutical Benefits Under State Medical Assistance Programs*, 1983, p. 14.]

43. CMS commissioned a study on "Medicaid and Medicare Drug Pricing: Strategy to Determine Market Prices." Along with a colleague at Abt Associates, Inc., I was the co-principal investigator for that research project. One aspect of that project was to conduct a focus panel of industry stakeholders and to develop criteria that would be essential for estimating acquisition costs in a manner that could serve as the basis for a reimbursement system for all drug products on the market. The criteria essential for

estimating acquisition costs for purposes of reimbursement by Medicaid or Medicare were as follows: (1) *accurate and reliable* information on actual acquisition costs; (2) *generally and widely available* price to any prudent provider; (3) *current and up-to-date* prices that are updated on a timely basis; (4) *transparent and accessible* prices to providers before they engage in providing prescription drugs and related services; (5) *adequate compensation to providers and pharmacies* for the drug product component and all related dispensing and administrative services; (6) *incentives for pharmacies and providers to supply drugs* to program beneficiaries should be present to assure that beneficiaries have access to pharmacies and providers; and (7) *incentives for key parties to provide data* to the drug price compendial databases or to public and private third party programs.  One additional criteria implicit in the discussion of criteria in the CMS report is that a price source that is going to be used for setting reimbursement under public or private third party programs must also be *comprehensive*, that is, all or virtually all drug products would need to have price information of the same type available so that a formulaic reimbursement approach could be implemented.  Each of these criteria is discussed in more detail in the report to CMS.   [Schondelmeyer, SW and Wrobel, MV, Medicaid and Medicare Drug Pricing: Strategy to Determine Market Prices, CMS Contract # 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, Task Order 1, August 30, 2004, pp. 9-13.]

44. Each of the alternative price sources suggested by the defendants' experts can be evaluated against these criteria for 'estimating acquisition costs in a manner that could serve as the basis for a reimbursement system for all drug products on the market.' Those criteria are summarized here:

(1) *accurate and reliable*;
(2) *generally and widely available*;

(3) *current and up-to-date*;
(4) *transparent and accessible*;
(5) *adequate compensation to providers and pharmacies*;
(6) *incentives for pharmacies and providers to supply drugs*;
(7) *incentives for key parties to provide data*; and
(8) *comprehensive*.

The alternative price sources mentioned by one or more defense experts included: WACs, DOJ AWPs, AMPs, ASPs, FSS prices, 340B prices, or IMS prices. Each of these alternative price sources falls short of the type of pricing information needed to operate a reimbursement system for a public or private third party program.

45. <u>Wholesale Acquisition Cost (WAC)</u> is a price that was intended by Medicaid to reflect actual prices, but has become distorted because drug manufacturers have not reported actual transaction prices, especially for generic drug products. In addition, not all drug products (at the NDC level) report a WAC. Estimates are that only 70% to 75% of drug products (NDCs) have a published WAC. While there are state Medicaid programs that use WAC as one of the bases for its reimbursement system, all of these programs also use AWP as a necessary component of their 'lower of' price calculation to fill in the holes for those times when there is no WAC. WAC fails on the *accurate and reliable* criteria, although this could be corrected if drug manufacturers reported WACs that were accurate and reliable measures of prices actually charged, Second, WAC fails on two related criteria (i.e., *adequate compensation to providers and pharmacies* and *incentives for pharmacies and providers to supply drugs*) because even if WAC is corrected to become *accurate and reliable* it fails without some form of correction for the level of market where payment is being made. That is, WAC is the price from manufacturer to wholesaler and a reimbursement system is paying the pharmacy (or other

provider) for an estimate of the actual acquisition cost from wholesaler to pharmacy. Paying the pharmacy at wholesale prices that are below the pharmacies actual acquisition cost provides neither *adequate compensation* nor an *incentive to supply drugs* to Medicaid beneficiaries. At a minimum, some form of correction for the operating costs and profit of wholesalers would need to be made. Finally, WAC fails on the *comprehensive* criteria. As noted earlier, WAC prices are not available for all drug products (NDCs) so that an additional price source would be necessary to supplement actual or estimated actual prices for those NDC without a WAC.

46. The <u>DOJ AWPs</u> were a set of prices circulated by DOJ, that included, among others, a number of Abbott drug products. These prices were perhaps *accurate and reliable* at the time they were developed, but there was no provision for updating these DOJ AWPs over time so that now these prices are no longer *current and up-to-date*. The DOJ AWPs have an interesting history, in which quite a few states attempted to utilize those prices only to often be stymied by the fact that it was not easy to plug those prices into the existing AWP formulae that applied discounts to Medicaid prescriptions and there was concern that the prices would not be updated or maintained, or even that utilization would switch to other generic drugs that did not have these prices applied. Medicare suspended use of those prices pending an evaluation of overall reimbursement levels, which ultimately crystallized into the extensive changes in reimbursement set out in the MMA of 2003.

47. The DOJ AWPs fail in a major way on the *comprehensive* criteria. Establishment of a reimbursement system that utilized a unique formula and set of data for each of the

more than 800 drug manufacturers would be extremely cumbersome and prohibitively complex as an administrative burden and cost.

48. The Medicaid AMPs, as I explained in my initial report, were not made available to the State programs and there were statutory and regulatory restrictions on their use for any purpose other than the Medicaid Drug Rebate Program. Consequently, the Medicaid AMPs fail, *inter alia*, because they are not *transparent and accessible*. Why would providers, as prudent business persons, agree to provide prescriptions to Medicaid beneficiaries for an unknown amount of payment that is secret and can not be disclosed? No reasonable business person would agree to participate in Medicaid under such circumstances. Given that the actual payment amounts to pharmacies (and other providers) would be unknown and could not be assessed to determine impact on the business, the Medicaid AMPs fail on two related criteria (i.e., *adequate compensation to providers and pharmacies* and *incentives for pharmacies and providers to supply drugs*).

49. ASPs are a price measure defined by the MMA for use in the Medicare Part B program. ASPs did not even exist until they were defined and created by the MMA. There are only about 5,500 drug products (at the NDC level) that have a reported ASP. These 5,500 drug products are mostly injectable and other high cost specialty medications that are provided primarily through clinics, physicians' offices, and specialized ambulatory care settings. The entire Medicaid program includes somewhere between 10,000 and 50,000 NDCs indicating that there are ASPs for only about 5% to 10% of the drug products covered by a Medicaid drug program. ASP therefore fails to meet the *comprehensive* criteria for a reimbursement price system.

50. The ASPs that are reported are a weighted average of the NDCs at the HCPCS code level (e.g., J-codes) for drug products, as used under Medicare Part B, that can be used to administer a specific drug, dosage form and dose.  The prescription claims data for Medicaid drug programs is submitted at the NDC level and does not use the HCPCS coding scheme found under Medicare Part B.  In addition, ASP is only reported for a limited set of drug products for providers who are eligible to provide Part B drugs to Medicare beneficiaries.  The providers under Part B are not representative of all providers in Medicaid and therefore the ASPs would not be representative of drug product prices available to retail pharmacies in general. This situation results from class of trade discriminatory pricing behavior among the pharmaceutical companies.

51. ASPs fail the two criteria related to *adequate compensation* and an *incentive to supply drugs* to Medicaid beneficiaries.   ASPs, like WAC, are the price from manufacturer to wholesaler and a reimbursement system is intended to pay the pharmacy (or other provider) for an estimate of the actual acquisition cost from wholesaler to pharmacy.  Paying the pharmacy at manufacturer to wholesale prices that are below the pharmacy's actual acquisition cost provides neither *adequate compensation* nor an *incentive to supply drugs* to Medicaid beneficiaries.

*52.* ASPs fail on at least three criteria (i.e., *generally and widely available*, *adequate compensation to providers and pharmacies* and *incentives for pharmacies and providers to supply drugs*).

53. FSS prices and 340B prices are special legislated prices that are made available to government facilities (FSS, the Federal Supply Schedule) or to facilities serving government subsidized patients (i.e., Federally Qualified Health Clinics, FQHCs). These

prices are set based on statutory and regulatory mandates as well as some direct negotiation on behalf of the government programs. Neither Federal Supply Schedule (FSS) nor 340B prices are pertinent to Medicare or Medicaid reimbursement since they are not prices made transparent to either pharmacies or other providers in those programs. Also, pharmacies and other providers can not usually purchase drug products at the FSS or 340B government prices, therefore, these prices will provide for neither *adequate compensation* nor an *incentive to supply drugs* to Medicaid beneficiaries.

54. In general, the <u>FSS</u> and <u>340B prices</u> fail the criteria for prices that can serve as a reimbursement system for public or private third party drug programs. FSS and 340B prices fail, at least, four criteria in that they are *transparent and accessible, generally and widely available, adequate compensation to providers and pharmacies*, and *incentives for pharmacies and providers to supply drugs*.

55. <u>IMS invoice prices</u> are prices from invoices between manufacturers or wholesalers and the pharmacy or other provider. IMS invoice prices have many of the features identified in the desired criteria for a reimbursement price database. The major failure of IMS invoice prices, however, is their lack of transparency and accessibility. IMS derives its revenue primarily from sale of its data to pharmaceutical companies with annual subscription rates to the complete database running in the millions of dollars a year per firm. IMS is not oriented toward serving third party payers or pharmacies with a database that would be necessary for operating a reimbursement system and does not have any database product that would easily serve this market. To use the database for drug product prices a Medicaid or third party payer as well as a pharmacy or provider would have to have one or more programmers adapting the database to the claims

payment and dispensing system, but this cost would be prohibitive for most Medicaid programs, many third party programs, not to mention the prohibitive cost for nearly all pharmacies and providers. IMS prices fail the criteria for a reimbursement pricing system because of prohibitive cost and lack of convenience in using the database.

56. Additionally, it is unclear which Myers & Stauffer surveys Mr. Young believes states should have used or by which they could have been alerted. For most states, however, Myers & Stauffer only collected prices in sporadic surveys of pharmacies and thus this price data was not available on a regular and updated basis. Also, those surveys were expensive to commission. Myers & Stauffer price surveys fail the criteria for a reimbursement pricing system because they are not *current and up-to-date*; *transparent and accessible*; or *comprehensive*.

57. In summary, all of the alternative pricing systems mentioned by defendants' experts have fatal flaws that would prohibit their use as the basis for a reimbursement pricing system. Each alternative pricing source has one or more major and fatal flaws.

## VI.    Court's Rejection of FULs Based on DRA-Defined AMP

58. Defendants' experts argue that Professor Duggan's alternative prices are too low when compared to DRA AMP x 250%. [Expert Report of Darrell L. Williams, Ph.D., March 6, 2009, p. 21.; see, Expert Report of Fiona Scott Morton, March 13, 2009, p. 12; see, Expert Report of Lauren Stiroh, March 6, 2009, pp. 25-28, 42-44; and, see also, Expert Report of James W. Hughes, March 6, 2009, pp. 38-39.]

59. First, the average acquisition prices used by Professor Duggan were for individual NDCs for specific drug products from actual company records and the DRA AMPs that have been set aside under a preliminary injunction were for the lowest price across all

generically equivalent NDCs.   Second, the average acquisition prices calculated by Professor Duggan were for the traditional retail classes of trade while the DRA AMP calculations included prices based on an entirely different definition of retail pharmacy that includes virtually all classes of trades.   In summary, the Duggan prices differed from the DRA AMPs in two major substantive ways including: (1) Duggan used individual NDC prices while DRA AMP used the lowest price in a set of generic equivalent prices, and (2) Duggan used prices from the traditional retail classes of trade while DRA AMP used prices from virtually all classes of trade. These differences result in prices for Duggan and DRA AMP that simply are not comparable.   Both Dr. Williams and Professor Scott Morton fail to mention these fundamental differences and do not appear to have taken them into account in their attempt to dismiss the calculations of Professor Duggan.

60. As discussed previously, DRA AMPs were defined by the Deficit Reduction Act of 2005 (DRA) and a subsequent final rule specified a new definition for AMP that was to be used for purposes of setting FFP (federal MACs) limits for certain generic drug products under the Medicaid drug program.   [Medicaid Program; Prescription drugs; Final Rule. Federal Register, Vol. 72, No. 136, July 17, 2007, pp. 39142-39245] These new DRA AMPs were to be collected for all drugs (at the HCPCS code level) covered by Medicaid and the DRA AMPs were to be published on a public website.   However, the DRA AMPs as defined by CMS in the final rule on July 17, 2007 are substantially different from the AMPs under the Medicaid Drug Rebate program, as described elsewhere.

61. The primary concern in the objection to the DRA AMPs as a basis for setting Medicaid FULs for generic drugs was that the method of computing the FUL would have resulted in a payment that was, in many cases, below the actual acquisition cost of prudent pharmacies. [Expert Report of Stephen W. Schondelmeyer, *NACDS & NCPA v U.S Dept. of Health & Human Services et al.*, U.S. District Court for District of Columbia, Case No. 1:07-cv-02017, November 13, 2007.] Since Professor Duggan has based his calculations on actual prices paid by pharmacies in the traditional retail class of trade (as properly defined), there is not the same concern that his calculated price for a given NDC will be below the actual price for the prudent pharmacy.

## VII.     Medicaid Rebates Should Not be an Offset

62. Roxane's expert, Dr. Darrell Williams, contends that Professor Duggan's damages calculations are incorrect because he fails to net out the Medicaid rebates from his differences. [Expert Report of Darrell Williams, March 13, 2009, pp. 32-33.] This criticism lacks merit because the amount of Medicaid rebates paid on the Roxane complaint drugs would not have been reduced even if Roxane had reported accurate AWPs and WACs to be used in the reimbursement of Medicaid prescriptions.

63. Even if Roxane would have reported actual AWPs and WACs and these figures had been used to determine the payment amount of Medicaid prescriptions for Roxane's drug products provided to Medicaid beneficiaries, the rebate amounts paid by Roxane to the Medicaid program would not have been any different.

64. The rebate amounts due to the Medicaid program were based on a percentage of the manufacturer reported average manufacturer price (AMP). Since a shift from reporting of inflated AWPs and WACs to reporting of actual AWPs and WACs would

not have had any effect on the AMP (actual prices for Roxane drug products), this same shift would not have had any effect on the amount of rebates paid by Roxane.

65. Additionally, the Medicaid drug rebate program was intended to recover monies from manufacturers, without impacting provider reimbursement.   Prof. Duggan's 'difference' calculations properly pertain to differences in the amount of provider reimbursement that the programs would have paid had Roxane accurately reported its drug prices.

## VIII. MMA Definition of WAC

66. The definition of wholesale acquisition cost (WAC) incorporated in the statutory language of the MMA is very limited in its application.  WAC as defined in the MMA is applied only to the context of payment under the Medicare program, and payment based on WAC may be made only in three situations: (1) For single-source drugs, payment at WAC + 6% may be made when the weighted average WAC for the applicable HCPCS code is lower than the weighted average ASP [42 U.S.C. § 1395w-3a(b)(4).]; (2) The Secretary is authorized to use WAC to determine the payment amount for the first quarter of a drug's sales, when there is no history of actual sales prices [42 U.S.C. § 1395w-3a(c)(4).]; and (3) In the event of a public health emergency "in which there is a documented inability to access drugs and biologicals, and a concomitant increase in the price of a drug or biological which is not reflected in the manufacturer's average sales price for one or more quarters," and then only until the price and availability of the drug has stabilized and is reflected in the manufacturer's ASP.  [42 U.S.C. § 1395w-3a(e).]

67. The WAC as defined in the MMA has no role in the payment for prescriptions in the Medicaid drug program.  Furthermore, the definition of WAC in the MMA does not

replace or necessarily characterize the definition of WAC that has been used in the pharmaceutical market over time or previously in either Medicare or Medicaid.

## IX.    DMERCs Included NovaPlus as Brand

68. Roxane's defense expert opines that NovaPlus Ipratroprium Bromide "should be excluded from Dr. Duggan's calculations." [Expert Report of Darrell L. Williams, March 13, 2009, pp. 13-14.] Dr. Williams lists a number of reasons he thinks that NovaPlus is not a brand drug product such as the NovaPlus product looked and acted like a generic drug and, therefore, it was a generic drug.   He also notes that NovaPlus Ipratroprium Bromide was not subject to patent protection, there were other competitor generic products, and it was priced like a generic. Unfortunately, the factors mentioned by Dr. Williams have no bearing on the definition of a brand drug product for purposes of calculating the AWP to be used for "payment for drugs and biologicals that are not paid on a cost or prospective payment basis." [CFR 42, IV, 405.517.]

69. The definition of "brand" in the regulations plainly states that the term "brand product" as used in § 405.517(c) "is defined as a product that is marketed under a labeled name that is other than the generic chemical name of the drug or biological." [See 63 Fed Reg. 58814, 58849-50, October 1998.] In adopting this final rule, CMS specifically considered and rejected more restrictive definitions of what constitutes a brand stating: "Our definition of 'brand' is any product that is marketed under a name other than the generic chemical name of the drug.  If a manufacturer chooses to market its product under a proprietary name rather than the generic chemical name of the drug, we believe this is a brand.  We do not limit the definition of 'brand' to the innovator company product or any product manufactured under a direct license from the innovator.

Furthermore, we believe that it is an unreasonable administrative burden to require our contractors to determine which of the thousands of AWPs they must look up, to also determine which of those are innovator drugs or licensed by the innovator company." [See 63 Fed Reg. 58814, 58849-50, October 1998.]

70. The Federal Register makes clear that a product is a 'brand' if it is "marketed under a labeled name that is other than the generic chemical name of the drug or biological."   Roxane's product announcements consistently distinguish between Roxane's own, "Roxane label" Ipratropium Bromide product and the "NovaPlus label" Ipratropium Bromide products.  [See e.g., May 1999 Letter to Wholesalers (BOEH01127177); September 19, 2000 Letter (RLI-AWP-00213199).]  NovaPlus Ipratroprium Bromide is clearly more than a generic name and therefore constitutes a brand drug product in the present context. Roxane was aware that First DataBank classified products as a brand based, at least in part, on whether the product had a trademarked name.  [See 3/16/2000 email (BOEH03386999) ("Since we first spoke about the brand vs. generic designation, I have discovered that there are actually 2 codes used by First Data Bank.   There is a brand code, which differentiates products by names (brand name, trademarked name, or generic name), and there is also a multisource code, which differentiates products by availability (originator, multisource, no other competition, and one other code)"; see also 10/29/2001 Brand v. Generic Standby Statement (BOEH03021150) ("Some may define a 'brand' to mean the product with the highest AWP, some may define a 'brand' to be a 'sole source' product, some may even go by reference product designation, presence of trademarked name, etc.").]

71. Given the CMS definition of "brand" for this specific purpose, NovaPlus Ipratroprium Bromide is a brand drug product.

**X.      There Are Economic Incentives to Inflate Prices for Medicare Sales**

72. Defendants experts argue that there is no economic incentive for drug companies to create or maintain spreads for Medicare because of the J-Code payment system. These experts ignore a fundamental pattern of pharmacy purchasing patterns, specifically, the tendency to avoid stocking more than one (or two) versions of a generic drug. Because of this tendency to avoid multiple versions of a generic drug, a pharmacy may chose the generic drug in stock based on incentives under Medicaid or other third party programs which constitute a larger share of the pharmacy's business.   Consequently, such a pharmacy is likely to be stocking and dispensing generic version of the drug with inflated prices even under Medicare. Notably, all three defendants have internal documents referring to spreads in connection with garnering Medicare sales.

73. Additionally, certain generic drug products are in one or product J-codes where AWP spreads can be an inducement.

Dated: _____

_____
STEPHEN W. SCHONDELMEYER, PHARM.D., PH.D.