# EXHIBIT A



29817985

Mar  1 2010
8:51PM

### UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) ) |
| THIS DOCUMENT RELATES TO:<br><br>   *The City of New York, et al.*<br>*v.*<br>   *Abbott Laboratories, et al.* | ) ) ) ) ) ) ) ) ) ) |

MDL No. 1456
Master File No. 01-12257-PBS
Subcategory Case No. 03-10643-PBS

Judge Patti B. Saris

Magistrate Judge Marianne Bowler

### PLAINTIFFS' THIRD REVISED NOTICE OF 30(b)(6) DEPOSITION OF SCHERING-PLOUGH CORPORATION, SCHERING CORPORATION, AND <u>WARRICK PHARMACEUTICALS CORPORATION</u>

PLEASE TAKE NOTICE that, pursuant to Rules 26 and 30 of the Federal Rules of Civil Procedure, plaintiffs, The City of New York, et al., will take the deposition, by oral examination, of a representative of Schering-Plough Corporation, Schering Corporation, and Warrick Pharmaceuticals Corporation (hereinafter "Schering Group") for purposes of the above-captioned action. The deposition shall commence at **9:30 a.m. EST, Tuesday, March 16, 2010**, continuing day to day until completed, at a mutually agreeable location in either New York or New Jersey.

This deposition will take place before a notary public, or any other officer authorized to administer oaths, and will be recorded by stenographic and visual means. The deposition is being taken for the purposes of discovery, for use at trial, and for such other purposes as permitted under the Federal Rules of Civil Procedure.

As used herein, the term "Subject Drugs" refers to Schering Group drugs and NDCs identified in Exhibit A attached hereto. Pursuant to CMO 33, the time period covered by the

topics identified in this Notice of Deposition is 1997 through 2005.  To the extent they are relevant, this notice incorporates by reference the definitions and rules of construction delineated in plaintiffs' First Request for Production of Documents to All Defendants, dated October 18, 2007.

Schering Group shall designate one or more officers, directors, managing agents or other representatives to testify on the behalf of Schering Group, and may set forth, for each representative, the matters to which that representative will testify.  The representative(s) shall testify under oath about the following topics:

1.     Schering Group's sales and/or joint venturing of the Subject Drugs, including but not limited to, sales strategies, sales staff training, sales meetings, competitive sales research, sales staff evaluations, and sales forecasts relating to the Subject Drugs.

2.     Schering Group's marketing and/or joint venturing of the Subject Drugs, including but not limited to, marketing decisions, plans, and strategies, market share research, product launches, and advertising relating to the Subject Drugs

3.     Schering Group's pricing decisions, pricing strategies, and pricing recommendations, including but not limited to, decisions, strategies, and recommendations regarding the price discounts, rebates, chargebacks, credits, inventory management agreements, and other forms of price reductions relating to the Subject Drugs.

4.     Identification and description of all contract prices, net prices, direct prices, discounts, rebates (commercial), chargebacks and other price concessions offered by Schering Group with respect to the sale of the Subject Drugs.

5.     The drugs on the Subject Drugs list, which were subject to contract pricing.

6.      Schering Group's contract prices and/or direct prices with wholesalers, retailers, physicians, clinics, outpatient pharmacies and/or buying groups for the Subject Drugs.

7.      Identification of Schering Group's customers who purchase or distribute the Subject Drugs, from and including 1997 through 2005, including, without limitation, wholesalers, specialty or general distributors, retailers (including but not limited to retail chains, Staff Model HMO pharmacies, PBM mail order and other mail order pharmacies), GPO's and direct purchasers.

8.      Schering Group's databases which contain information concerning sales transactions, contract pricing, direct pricing, net pricing, AWP pricing, WAC pricing, discounts, commercial rebates, chargebacks and/or other price concessions and/or monetary incentives of any nature relating to the Subject Drugs.

9.      Schering Group's setting of AWP, recommended/suggested AWP, and/or WAC prices for the Subject Drugs, and the reasons for setting those prices.

10.     Schering Group's posting and/or recording in its records the contract prices, net prices, discounts, chargebacks, rebates (commercial) and/or other price concessions relating to its sale of the Subject Drugs.

11.     Any communications regarding the Subject Drugs occurring between Schering Group and First DataBank, Red Book and/or Medispan (collectively the "Price Reporting Services"), including but not limited to price reporting, price verifications, price confirmations, and/or price approvals for any pricing information including, but not limited to, AWP, SWP, WAC or any WAC equivalent, and/or DP (collectively "Any Pricing Information") that Schering Group provided to the Price Reporting Services, and Schering Group's definitions of these pricing terms.

12.     Schering Group's definitions for Any Pricing Information including, but not limited to, AWP, SWP, WAC or any WAC equivalent, and/or DP, and the identification of any documents relating thereto.

13.     Schering Group's reason(s) for providing the Price Reporting Services Any Pricing Information including, but not limited to, AWP, SWP, WAC or any WAC equivalent, and/or DP.

14.     Schering Group's knowledge of the relationship between Any Pricing Information that Schering Group provided to the Price Reporting Services, and any such information published by the Price Reporting Services for the Subject Drugs.

15.     Schering Group's knowledge or understanding of how the Price Reporting Services used Any Pricing Information supplied by Schering Group including, but not limited to the transmission of that information to New York Medicaid.

16.     The action(s), if any, taken by Schering Group to stop, object to, or otherwise oppose the publication of the WAC or AWP by the Price Reporting Services for any of the Subject Drugs and the reason(s) for any such action.

17.     Schering Group's communications with customers defining or explaining the meaning or components of its various Pricing Information for prescription drugs.

18.     Schering Group's knowledge of wholesaler markups regarding the sale of Schering Group's prescription drugs.

19.     Whether Schering Group ever had the ability to determine the actual AWP for its drugs (i.e., the actual average prices charged by wholesalers to their customers for Schering Group's drugs), and, if so, whether Schering Group in fact determined such actual AWPs for its drugs.

4

20.     Schering Group's knowledge, whether direct or indirect, of the net prices paid by Medicaid healthcare providers to wholesalers, distributors, or to Schering Group directly for the Subject Drugs, from and including 1997 through 2005.

21.     Whether Schering Group ever communicated to the Price Reporting Services that the AWP that Schering Group provided to these entities was neither a price that was actually an average of wholesale prices, nor a price that was actually paid by retail and chain pharmacies, long-term care pharmacies, mail-order pharmacies, home health-care entities, or doctors for the Subject Drugs, and, if so, when such communications took place and of what such communications consisted.

22.     Whether Schering Group ever communicated to anyone in New York Medicaid that the AWP that Schering Group provided to the Price Reporting Services was neither a price that was actually an average of wholesale prices, nor a price that was actually paid by retail and chain pharmacies, long-term care pharmacies, mail-order pharmacies, home health-care entities, or doctors for the Subject Drugs, and, if so, when such communications took place and of what such communications consisted.

23.     Whether Schering Group ever communicated to the Price Reporting Services that the WAC that Schering Group provided to these entities was not the net price actually paid by wholesalers to Schering Group for the Subject Drugs, and, if so, when such communications took place and of what such communications consisted.

24.     Whether Schering Group ever communicated to New York Medicaid that the WAC that Schering Group provided to the Price Reporting Services was not the net price actually paid by wholesalers to Schering Group for the Subject Drugs, and, if so, when such communications took place and of what such communications consisted.

25.     Schering Group's communications and correspondence with New York Medicaid from and including 1997 through 2005.

26.     Whether Schering Group ever provided Any Pricing Information and/or average manufacturer's price (hereinafter "AMP") to New York Medicaid (apart from providing such information pursuant to plaintiffs' discovery requests in this case).

27.     Schering Group's understanding and belief regarding the confidentiality provisions of the Medicaid Rebate statute, 42 U.S.C. §1396r-8, as it pertains to AMP.

28.     Whether Schering Group contends that New York Medicaid were not prohibited by federal law from determining, and could have determined, the AMPs of the Subject Drugs based on the Unit Rebate Amount for such drugs provided to the State by the federal government pursuant to the Medicaid Rebate statute, 42 U.S.C. §1396r-8, *et seq*., and if so, all bases for such contention.

29.     Schering Group's methodologies for calculating AMP for its products sold during the period 1997 through 2005, including knowledge of the data and accounting methods used.

30.     Schering Group's policies and practices concerning the disclosures that providers (retail and chain pharmacies, long-term care pharmacies, mail-order pharmacies, home health-care entities, doctors, hospitals, clinics), wholesalers, and pharmacy benefit managers may make of Any Pricing Information they receive from Schering Group for the Subject Drugs.

31.     Schering Group's knowledge of whether First DataBank increased the AWPs for the Subject Drugs from WAC+20% to WAC+25% in or around 2001-2002 and the action(s), if any, taken by Schering Group in response including, but not limited to, any studies, analyses or white papers regarding this issue.

32.     To the extent Schering Group stopped providing Any Pricing Information to the Price Reporting Services for any of the Subject Drugs, identify such information and provide the reason(s) for doing so.

33.     The information and/or data that Schering Group has purchased, licensed, subscribed to, obtained, and/or reviewed from the Compendia or IMS relating to the Subject Drugs, including but not limited to pricing, market share, and services.

34.     Schering Group's knowledge of the relationship between the pricing information including, but not limited to, AWP, recommended/suggested AWP, SWP, WAC or any WAC equivalent, and/or DP

35.     The corporate history and organizational structure of Schering Group, including any current and/or former parent companies to Schering Group, any joint ventures involving Schering Group, any predecessor entities of Schering Group, and any subsidiaries held by Schering Group at any time.

36.     The formal corporate relationship between Schering-Plough Corporation and each of its subsidiaries Schering Corporation and Warrick Pharmaceuticals Corporation.

37.     The day-to-day reporting and approval relationships between each of the companies listed in paragraph 36.

38.     The Board of Directors of each of the companies listed in paragraph 36.

39.     The types of documents regularly exchanged between each of the companies listed in paragraph 36.

40.     The existence of documents reflecting or evidencing any policies or practices regarding Schering-Plough Corporation's (or its employees') approval of, or contribution to, pricing actions (including the setting of prices of whatsoever kind or the publication thereof)

taken by Schering-Plough Corporation's subsidiaries Schering Corporation and/or Warrick Pharmaceuticals Corporation.

41.     A description of which company pays the salary, bonuses, options, and/or any other forms of remuneration to the companies listed in paragraph 36.

42.     Direct communications between Schering Group (or Schering Group's counsel or representatives) and plaintiffs, the State of New York Medicaid agency, the State of New York Attorney General's Office, and/or counsel for plaintiffs.

43.     Whether Schering Group contends that any damages claimed by the New York Counties should be offset by the rebates paid by Schering Group to New York Medicaid under the federal Medicaid Rebates statute, 42 U.S.C. §1396r-8, *et seq.*, and, if so, the bases for such contention and the information or documents that support such contention.

44.     Schering Group's knowledge, belief, and/or understanding as to whether the rebates Schering Group paid to New York Medicaid for the Subject Drugs pursuant to the federal Medicaid Rebates statute, 42 U.S.C. §1396r-8, *et seq.*, would have been different had Schering Group reported, or First DataBank published, different AWPs for Schering Group's Subject Drugs.

45.     Schering Group's knowledge of New York Medicaid's laws, regulations, and rules, including Schering Group's knowledge of New York Medicaid's formula and methodology concerning reimbursement of claims by providers for prescriptions drugs.

46.     Schering Group's involvement in and/or knowledge of any civil settlements, criminal investigations, regulatory investigations or governmental investigations of any kind relating to the pricing, price reporting or marketing of Schering Group's prescription drugs, including, without limitation, Medicaid rebate or Best Price issues.

47.     The existence, location, format, possession and substantive content of documents, databases, email servers, information systems, and other records containing information responsive to any of plaintiffs' requests for production of documents and/or other discovery requests.

48.     Whether an index or other document exists (and the description and location of such document) that identifies the specific request(s) for production and the specific documents that respond to such requests.

49.     Schering Group's total U.S. sales of prescription drugs for each year from and including 1997 through 2005.

50.     Percentage of Schering Group's total sales of prescription drugs attributable to the Medicaid channel for each year form and including 1997 through 2005.

51.     Schering Group's code of conduct and/or compliance policies relating in any manner to the sale, marketing and/or price reporting of prescription drugs.

52.     Schering Group's knowledge of the 2003 OIG Guidance for Pharmaceutical Manufacturers.

53.     Schering Group's document and data retention policies and practices for documents and data created or dated from 1997 through 2005, including all steps taken by Schering Group to preserve documents potentially relevant to any claim or defense in this lawsuit.

54.     The factual basis of Schering Group's admissions and contentions in other legal actions since 1992 to which it has been a party which are contrary to its current position in this case that it has not made, marketed or sold any of the Subject Drugs (listed in Exhibit A attached hereto).  This topic will address (by way of example, and not limitation) the admissions made in

Defendant's Answer to the Amended Master Consolidated Class Action Complaint, Modified Per the Court's Instruction at the November 21, 2003 Hearing, filed in AWP MDL No 1456 on April 9, 2004, at paragraph 3, that Schering Group "manufactures certain drugs" and "reports pricing information for their medicines to pharmaceutical pricing industry pricing publications."

55.     What Schering Group (or anyone or any entity acting on Schering Group's behalf) has done to search for and produce information and documents responsive to plaintiffs' interrogatories, requests for production, requests for admission, and any other discovery requests, including the method, and scope of such search, any search terms employed, the identity of each person who participated in the search and production, and the general subject matters of the documents and information it has produced in this lawsuit to date.  This topic is designed to obtain an understanding of the nature and sources of the hundreds of thousands of pages of documents and data produced in this lawsuit to date, to the extent that they have been produced by Schering Group, and is not calculated to subject the witness to a detailed examination on the particular substance of the documents or data themselves, except as they pertain directly to other topics in this notice.

Dated: March 1, 2010

**KIRBY McINERNEY LLP**

By:     /s/    Joanne M. Cicala
        Joanne M. Cicala, Esq.
        James P. Carroll Jr., Esq.
        Kathryn B. Allen, Esq.
        Kirby McInerney LLP
        825 Third Avenue
        New York, New York 10022
        (212) 371-6600

        *Counsel for Plaintiffs*
        *The City of New York, et al.*

# Exhibit A

1.  All forms of Celestone Soluspan bearing an NDC, the first nine digits of which are 000850566;

2.  All forms of Clarinex bearing an NDC, the first nine digits of which are 000851280;

3.  All forms of Diprolene bearing an NDC, the first nine digits of which are 000850517;

4.  All forms of Diprolene bearing an NDC, the first nine digits of which are 000850575;

5.  All forms of Diprolene bearing an NDC, the first nine digits of which are 000850634;

6.  All forms of Diprosone bearing an NDC, the first nine digits of which are 000850853;

7.  All forms of Elocon bearing an NDC, the first nine digits of which are 000850370;

8.  All forms of Elocon bearing an NDC, the first nine digits of which are 000850567;

9.  All forms of Elocon bearing an NDC, the first nine digits of which are 000850854;

10. All forms of IMDUR bearing an NDC, the first nine digits of which are 000851153;

11. All forms of IMDUR bearing an NDC, the first nine digits of which are 000853306;

12. All forms of IMDUR bearing an NDC, the first nine digits of which are 000854110;

13. All forms of Intron A bearing an NDC, the first nine digits of which are 000850539;

14. All forms of Intron A bearing an NDC, the first nine digits of which are 000851110;

15. All forms of Intron A bearing an NDC, the first nine digits of which are 000851133;

16. All forms of Intron A bearing an NDC, the first nine digits of which are 000851168;

17. All forms of Intron A bearing an NDC, the first nine digits of which are 000851179;

18. All forms of Intron A bearing an NDC, the first nine digits of which are 000851235;

19. All forms of Intron A bearing an NDC, the first nine digits of which are 000851254;

20. All forms of K-Dur bearing an NDC, the first nine digits of which are 000850787;

21. All forms of Lotrimin bearing an NDC, the first nine digits of which are 000850613;

22. All forms of Lotrisone bearing an NDC, the first nine digits of which are 000850809;

23. All forms of Nitro-Dur bearing an NDC, the first nine digits of which are 000850819;

24. All forms of Nitro-Dur bearing an NDC, the first nine digits of which are 000853305;

25. All forms of Nitro-Dur bearing an NDC, the first nine digits of which are 000853310;

26. All forms of Nitro-Dur bearing an NDC, the first nine digits of which are 000853315;

27. All forms of Nitro-Dur bearing an NDC, the first nine digits of which are 000853320;

28. All forms of Nitro-Dur bearing an NDC, the first nine digits of which are 000853330;

29. All forms of Normodyne bearing an NDC, the first nine digits of which are 000850244;

30. All forms of Normodyne bearing an NDC, the first nine digits of which are 000850362;

31. All forms of Normodyne bearing an NDC, the first nine digits of which are 000850752;

32. All forms of Peg-Intron bearing an NDC, the first nine digits of which are 000851279;

33. All forms of Peg-Intron bearing an NDC, the first nine digits of which are 000851291;

34. All forms of Peg-Intron bearing an NDC, the first nine digits of which are 000851297;

35. All forms of Peg-Intron bearing an NDC, the first nine digits of which are 000851304;

36. All forms of Peg-Intron bearing an NDC, the first nine digits of which are 000851316;

37. All forms of Peg-Intron bearing an NDC, the first nine digits of which are 000851323;

38. All forms of Peg-Intron bearing an NDC, the first nine digits of which are 000851368;

39. All forms of Peg-Intron bearing an NDC, the first nine digits of which are 000851370;

40. All forms of Proventil bearing an NDC, the first nine digits of which are 000850208;

41. All forms of Proventil bearing an NDC, the first nine digits of which are 000850209;

42. All forms of Proventil bearing an NDC, the first nine digits of which are 000850315;

43. All forms of Proventil bearing an NDC, the first nine digits of which are 000850614;

44. All forms of Proventil bearing an NDC, the first nine digits of which are 000851132;

45. All forms of Rebetol bearing an NDC, the first nine digits of which are 000851194;

46. All forms of Rebetol bearing an NDC, the first nine digits of which are 000851327;

47. All forms of Rebetol bearing an NDC, the first nine digits of which are 000851351;

48. All forms of Rebetol bearing an NDC, the first nine digits of which are 000851385;

49. All forms of Rebetron bearing an NDC, the first nine digits of which are 000851258;

50. All forms of Temodar bearing an NDC, the first nine digits of which are 000851244;

51. All forms of Temodar bearing an NDC, the first nine digits of which are 000851248;

52. All forms of Temodar bearing an NDC, the first nine digits of which are 000851252;

53. All forms of Temodar bearing an NDC, the first nine digits of which are 000851259;

54. All forms of Theo-Dur bearing an NDC, the first nine digits of which are 000850487;

55. All forms of Theo-Dur bearing an NDC, the first nine digits of which are 000850584;

56. All forms of Theo-Dur bearing an NDC, the first nine digits of which are 000850806;

57. All forms of Theo-Dur bearing an NDC, the first nine digits of which are 000850933;

58. All forms of Trilafon bearing an NDC, the first nine digits of which are 000850012;

59. All forms of Vancenase bearing an NDC, the first nine digits of which are 000850649; and

60. All forms of Vanceril bearing an NDC, the first nine digits of which are 000850736.

## CERTIFICATE OF SERVICE

I, James Carroll, hereby certify that I caused a true and correct copy of the foregoing to be served upon all counsel of record via electronic service, pursuant to Case Management Order No. 2, by sending a copy to LexisNexis File & Serve for posting to all parties.

Dated: March 1, 2010

/s/   James Carroll
KIRBY McINERNEY LLP



29817997

Mar 1 2010
8:54PM

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) ) ) MDL No. 1456 Master File No. 01-12257-PBS Subcategory Case No. 03-10643-PBS |
| THIS DOCUMENT RELATES TO: *The City of New York, et al.* *v.* *Abbott Laboratories, et al.* | ) ) ) ) Judge Patti B. Saris ) ) Magistrate Judge Marianne Bowler ) ) ) |

### PLAINTIFFS' REVISED NOTICE OF 30(b)(6) DEPOSITION OF SCHERING-PLOUGH CORPORATION, SCHERING CORPORATION, AND <u>WARRICK PHARMACEUTICALS CORPORATION (TRANSACTIONAL DATA)</u>

PLEASE TAKE NOTICE that, pursuant to Rules 26 and 30 of the Federal Rules of Civil Procedure, plaintiffs, The City of New York, et al., will take the deposition, by oral examination, of a representative of Schering-Plough Corporation, Schering Corporation, and Warrick Pharmaceuticals Corporation (hereinafter "Schering Group") for purposes of the above-captioned action. The deposition shall commence at **9:30 a.m. EST, Thursday, March 18, 2010**, continuing day to day until completed, at a mutually agreeable location in either New York or New Jersey.

This deposition will take place before a notary public, or any other officer authorized to administer oaths, and will be recorded by stenographic and visual means. The deposition is being taken for the purposes of discovery, for use at trial, and for such other purposes as permitted under the Federal Rules of Civil Procedure.

As used herein, the term "Subject Drugs" refers to Schering Group drugs and NDCs identified and listed in Exhibit A, attached hereto. Pursuant to CMO 33, the time period covered

by the topics identified in this Notice of Deposition is 1997 through 2005.  To the extent they are relevant, this notice incorporates by reference the definitions and rules of construction delineated in plaintiffs' First Request for Production of Documents to All Defendants, dated October 18, 2007.

Schering Group shall designate one or more officers, directors, managing agents or other representatives to testify on the behalf of Schering Group, and may set forth, for each representative, the matters to which that representative will testify.  The representative(s) shall testify under oath about the following topics:

1.      Describe Schering Group's database(s) and/or any other form of data storage which contain information concerning sales transactions, contract pricing, direct pricing, net pricing, AWP pricing, WAC pricing, discounts, commercial rebates, chargebacks and/or other price concessions and/or monetary incentives of any nature relating to the Subject Drugs.

2.      Describe Schering Group's posting and/or recording in its records the contract prices, net prices, discounts, chargebacks, rebates (commercial) and/or other price concessions relating to its sale of the Subject Drugs.

3.      Describe the flow of transactional information from the point of intake through the business divisions within Schering Group that have access to transactional data and/or transactional information and/or any other related or derived information.

4.      Describe Schering Group's classes of trade and the coding used to denote those classes.

5.      Describe the system(s) used for contract administration.  The witness will also describe the database(s) and/or any other form of data storage that contain prices charged to any

customers including (1) contract customers; (2) non-contract customers; (3) direct customers; and (3) indirect customers.

6.      Describe Schering Group's system(s), database(s) and/or any other form of data storage that contain historical price information for contracting customers, non-contracting customers, classes of trade, or other groups or tiers of customers, including the fields maintained, coding that is used in the fields, and the data populating the fields.

7.      Describe Schering Group's database(s) and/or any other form of data storage that contain chargebacks.  The witness will describe how chargebacks are estimated, accrued and processed, including the fields that are populated and the coding used in those fields.  The witness will describe how chargeback estimation is calibrated.

8.      Describe Schering Group's database(s) and/or any other form of data storage that contain discounts, rebates, chargebacks, credits, inventory management agreements, and/or any other form of price reductions relating to the Subject Drugs.  The witness will also describe which business divisions generate, enter, and/or use discount information, including the application of discount information to calculations used by Schering Group to determine net revenues for specific products or product groups.

9.      Describe all other amounts and/or adjustments that might be added to or subtracted from the product price, whether such adjustments are made at the NDC, product group, or other level.  The witness will explain whether theses adjustments are made at the transaction level, and/or applied to a group of transactions, and/or applied in any other manner.

10.      Describe the system(s) used to calculate prices reported to the Centers for Medicare and Medicaid Services (formerly, Health Care Financing Administration) during the

period 1997 through 2005, including the location and description of the information and the business division using the system.

11.     Describe the database(s) and/or any other form of data storage used by Schering Group that contain prices reported to third-party price reporting services, including, but not limited to, First DataBank.

12.     Describe how the fields presented in the transactional data, produced by Schering Group to plaintiffs on March 26, 2006, were selected from the complete set of fields available in the original database(s).

13.     The existence, location, possession and substantive content of all transactional data, stored in any form including electronic and paper documents, which are responsive to any of plaintiffs' previously served requests for production.

14.     Schering Group's document and data retention policies for transactional data created or dated from and including 1997 through 2005.

Dated: March 1, 2010

                                        **KIRBY McINERNEY LLP**

                          By:       /s/    Joanne M. Cicala
                                    Joanne M. Cicala, Esq.
                                    James P. Carroll Jr., Esq.
                                    Kathryn B. Allen, Esq.
                                    Kirby McInerney LLP
                                    825 Third Avenue
                                    New York, New York 10022
                                    (212) 371-6600

                                    *Counsel for Plaintiffs*
                                    *The City of New York, et al.*

# Exhibit A

1.  All forms of Celestone Soluspan bearing an NDC, the first nine digits of which are 000850566;

2.  All forms of Clarinex bearing an NDC, the first nine digits of which are 000851280;

3.  All forms of Diprolene bearing an NDC, the first nine digits of which are 000850517;

4.  All forms of Diprolene bearing an NDC, the first nine digits of which are 000850575;

5.  All forms of Diprolene bearing an NDC, the first nine digits of which are 000850634;

6.  All forms of Diprosone bearing an NDC, the first nine digits of which are 000850853;

7.  All forms of Elocon bearing an NDC, the first nine digits of which are 000850370;

8.  All forms of Elocon bearing an NDC, the first nine digits of which are 000850567;

9.  All forms of Elocon bearing an NDC, the first nine digits of which are 000850854;

10. All forms of IMDUR bearing an NDC, the first nine digits of which are 000851153;

11. All forms of IMDUR bearing an NDC, the first nine digits of which are 000853306;

12. All forms of IMDUR bearing an NDC, the first nine digits of which are 000854110;

13. All forms of Intron A bearing an NDC, the first nine digits of which are 000850539;

14. All forms of Intron A bearing an NDC, the first nine digits of which are 000851110;

15. All forms of Intron A bearing an NDC, the first nine digits of which are 000851133;

16. All forms of Intron A bearing an NDC, the first nine digits of which are 000851168;

17. All forms of Intron A bearing an NDC, the first nine digits of which are 000851179;

18. All forms of Intron A bearing an NDC, the first nine digits of which are 000851235;

19. All forms of Intron A bearing an NDC, the first nine digits of which are 000851254;

20. All forms of K-Dur bearing an NDC, the first nine digits of which are 000850787;

21. All forms of Lotrimin bearing an NDC, the first nine digits of which are 000850613;

22. All forms of Lotrisone bearing an NDC, the first nine digits of which are 000850809;

23. All forms of Nitro-Dur bearing an NDC, the first nine digits of which are 000850819;

24. All forms of Nitro-Dur bearing an NDC, the first nine digits of which are 000853305;

25. All forms of Nitro-Dur bearing an NDC, the first nine digits of which are 000853310;

26. All forms of Nitro-Dur bearing an NDC, the first nine digits of which are 000853315;

27. All forms of Nitro-Dur bearing an NDC, the first nine digits of which are 000853320;

28. All forms of Nitro-Dur bearing an NDC, the first nine digits of which are 000853330;

29. All forms of Normodyne bearing an NDC, the first nine digits of which are 000850244;

30. All forms of Normodyne bearing an NDC, the first nine digits of which are 000850362;

31. All forms of Normodyne bearing an NDC, the first nine digits of which are 000850752;

32. All forms of Peg-Intron bearing an NDC, the first nine digits of which are 000851279;

33. All forms of Peg-Intron bearing an NDC, the first nine digits of which are 000851291;

34. All forms of Peg-Intron bearing an NDC, the first nine digits of which are 000851297;

35. All forms of Peg-Intron bearing an NDC, the first nine digits of which are 000851304;

36. All forms of Peg-Intron bearing an NDC, the first nine digits of which are 000851316;

37. All forms of Peg-Intron bearing an NDC, the first nine digits of which are 000851323;

38. All forms of Peg-Intron bearing an NDC, the first nine digits of which are 000851368;

39. All forms of Peg-Intron bearing an NDC, the first nine digits of which are 000851370;

40. All forms of Proventil bearing an NDC, the first nine digits of which are 000850208;

41. All forms of Proventil bearing an NDC, the first nine digits of which are 000850209;

42. All forms of Proventil bearing an NDC, the first nine digits of which are 000850315;

43. All forms of Proventil bearing an NDC, the first nine digits of which are 000850614;

44. All forms of Proventil bearing an NDC, the first nine digits of which are 000851132;

45. All forms of Rebetol bearing an NDC, the first nine digits of which are 000851194;

46. All forms of Rebetol bearing an NDC, the first nine digits of which are 000851327;

47. All forms of Rebetol bearing an NDC, the first nine digits of which are 000851351;

48. All forms of Rebetol bearing an NDC, the first nine digits of which are 000851385;

49. All forms of Rebetron bearing an NDC, the first nine digits of which are 000851258;

50. All forms of Temodar bearing an NDC, the first nine digits of which are 000851244;

51. All forms of Temodar bearing an NDC, the first nine digits of which are 000851248;

52. All forms of Temodar bearing an NDC, the first nine digits of which are 000851252;

53. All forms of Temodar bearing an NDC, the first nine digits of which are 000851259;

54. All forms of Theo-Dur bearing an NDC, the first nine digits of which are 000850487;

55. All forms of Theo-Dur bearing an NDC, the first nine digits of which are 000850584;

56. All forms of Theo-Dur bearing an NDC, the first nine digits of which are 000850806;

57. All forms of Theo-Dur bearing an NDC, the first nine digits of which are 000850933;

58. All forms of Trilafon bearing an NDC, the first nine digits of which are 000850012;

59. All forms of Vancenase bearing an NDC, the first nine digits of which are 000850649; and

60. All forms of Vanceril bearing an NDC, the first nine digits of which are 000850736.

## <u>CERTIFICATE OF SERVICE</u>

I, James Carroll, hereby certify that I caused a true and correct copy of the foregoing to be served upon all counsel of record via electronic service, pursuant to Case Management Order No. 2, by sending a copy to LexisNexis File & Serve for posting to all parties.

Dated: March 1, 2010

<u>/s/    James Carroll</u>
KIRBY McINERNEY LLP



29837400

Mar  2 2010
4:43PM

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) ) |
| | ) |
| THIS DOCUMENT RELATES TO: | ) ) |
| *State of Iowa* | ) ) |
| *v.* | ) ) |
| *Abbott Laboratories, et al.* | ) ) |

MDL No. 1456
Master File No. 01-12257-PBS
Subcategory Case No. 07-12141-PBS

Judge Patti B. Saris

## STATE OF IOWA'S NOTICE OF 30(b)(6) DEPOSITION OF SCHERING-PLOUGH CORPORATION, SCHERING CORPORATION, AND <u>WARRICK PHARMACEUTICALS CORPORATION</u>

PLEASE TAKE NOTICE that, pursuant to Rules 26 and 30 of the Federal Rules of Civil Procedure, plaintiff, State of Iowa, will take the deposition, by oral examination, of a representative of Schering-Plough Corporation, Schering Corporation, and Warrick Pharmaceuticals Corporation (hereinafter "Schering Group") for purposes of the above-captioned action. The deposition shall commence at **9:30 a.m. EST, Tuesday, March 16, 2010**, continuing day to day until completed, at a mutually agreeable location in either New York or New Jersey.

This deposition will take place before a notary public, or any other officer authorized to administer oaths, and will be recorded by stenographic and visual means. The deposition is being taken for the purposes of discovery, for use at trial, and for such other purposes as permitted under the Federal Rules of Civil Procedure.

As used herein, the term "At-Issue NDCs" refers to Schering Group drugs and NDCs identified in Exhibit A attached hereto. Pursuant to Iowa CMO, dated January 22, 2009, the time

period covered by the topics identified in this Notice of Deposition is 1992 through 2005. To the extent they are relevant, this notice incorporates by reference the definitions and rules of construction listed in plaintiff's Second Set of Interrogatories and Second Set of Requests for Production of Documents to All Defendants, dated March 1, 2010.

Schering Group shall designate one or more officers, directors, managing agents or other representatives to testify on the behalf of Schering Group, and may set forth, for each representative, the matters to which that representative will testify. The representative(s) shall testify under oath about the following topics:

1.      Schering Group's sales and/or joint venturing of the At-Issue NDCs, including but not limited to, sales strategies, sales staff training, sales meetings, competitive sales research, sales staff evaluations, and sales forecasts relating to the At-Issue NDCs.

2.      Schering Group's marketing and/or joint venturing of the At-Issue NDCs, including but not limited to, marketing decisions, plans, and strategies, market share research, product launches, and advertising relating to the At-Issue NDCs

3.      Schering Group's pricing decisions, pricing strategies, and pricing recommendations, including but not limited to, decisions, strategies, and recommendations regarding the price discounts, rebates, chargebacks, credits, inventory management agreements, and other forms of price reductions relating to the At-Issue NDCs.

4.      Identification and description of all contract prices, net prices, direct prices, discounts, rebates (commercial), chargebacks and other price concessions offered by Schering Group with respect to the sale of the At-Issue NDCs.

5.      The drugs on the At-Issue NDCs list, which were subject to contract pricing.

6.      Schering Group's contract prices and/or direct prices with wholesalers, retailers, physicians, clinics, outpatient pharmacies and/or buying groups for the At-Issue NDCs.

7.      Identification of Schering Group's customers who purchase or distribute the At-Issue NDCs, from and including 1992 through 2005, including, without limitation, wholesalers, specialty or general distributors, retailers (including but not limited to retail chains, Staff Model HMO pharmacies, PBM mail order and other mail order pharmacies), GPO's and direct purchasers.

8.      Schering Group's databases which contain information concerning sales transactions, contract pricing, direct pricing, net pricing, AWP pricing, WAC pricing, discounts, commercial rebates, chargebacks and/or other price concessions and/or monetary incentives of any nature relating to the At-Issue NDCs.

9.      Schering Group's setting of AWP, recommended/suggested AWP, and/or WAC prices for the At-Issue NDCs, and the reasons for setting those prices.

10.     Schering Group's posting and/or recording in its records the contract prices, net prices, discounts, chargebacks, rebates (commercial) and/or other price concessions relating to its sale of the At-Issue NDCs.

11.     Any communications regarding the At-Issue NDCs occurring between Schering Group and First DataBank, Red Book and/or Medispan (collectively the "Price Reporting Services"), including but not limited to price reporting, price verifications, price confirmations, and/or price approvals for any pricing information including, but not limited to, AWP, SWP, WAC or any WAC equivalent, and/or DP (collectively "Any Pricing Information") that Schering Group provided to the Price Reporting Services, and Schering Group's definitions of these pricing terms.

12.     Schering Group's definitions for Any Pricing Information including, but not limited to, AWP, SWP, WAC or any WAC equivalent, and/or DP, and the identification of any documents relating thereto.

13.     Schering Group's reason(s) for providing the Price Reporting Services Any Pricing Information including, but not limited to, AWP, SWP, WAC or any WAC equivalent, and/or DP.

14.     Schering Group's knowledge of the relationship between Any Pricing Information that Schering Group provided to the Price Reporting Services, and any such information published by the Price Reporting Services for the At-Issue NDCs.

15.     Schering Group's knowledge or understanding of how the Price Reporting Services used Any Pricing Information supplied by Schering Group including, but not limited to the transmission of that information to Iowa State Medicaid.

16.     The action(s), if any, taken by Schering Group to stop, object to, or otherwise oppose the publication of the WAC or AWP by the Price Reporting Services for any of the At-Issue NDCs and the reason(s) for any such action.

17.     Schering Group's communications with customers defining or explaining the meaning or components of its various Pricing Information for prescription drugs.

18.     Schering Group's knowledge of wholesaler markups regarding the sale of Schering Group's prescription drugs.

19.     Whether Schering Group ever had the ability to determine the actual AWP for its drugs (i.e., the actual average prices charged by wholesalers to their customers for Schering Group's drugs), and, if so, whether Schering Group in fact determined such actual AWPs for its drugs.

20.     Schering Group's knowledge, whether direct or indirect, of the net prices paid by Medicaid healthcare providers to wholesalers, distributors, or to Schering Group directly for the At-Issue NDCs, from and including 1992 through 2005.

21.     Whether Schering Group ever communicated to the Price Reporting Services that the AWP that Schering Group provided to these entities was neither a price that was actually an average of wholesale prices, nor a price that was actually paid by retail and chain pharmacies, long-term care pharmacies, mail-order pharmacies, home health-care entities, or doctors for the At-Issue NDCs, and, if so, when such communications took place and of what such communications consisted.

22.     Whether Schering Group ever communicated to anyone in Iowa State Medicaid that the AWP that Schering Group provided to the Price Reporting Services was neither a price that was actually an average of wholesale prices, nor a price that was actually paid by retail and chain pharmacies, long-term care pharmacies, mail-order pharmacies, home health-care entities, or doctors for the At-Issue NDCs, and, if so, when such communications took place and of what such communications consisted.

23.     Whether Schering Group ever communicated to the Price Reporting Services that the WAC that Schering Group provided to these entities was not the net price actually paid by wholesalers to Schering Group for the At-Issue NDCs, and, if so, when such communications took place and of what such communications consisted.

24.     Whether Schering Group ever communicated to Iowa State Medicaid that the WAC that Schering Group provided to the Price Reporting Services was not the net price actually paid by wholesalers to Schering Group for the At-Issue NDCs, and, if so, when such communications took place and of what such communications consisted.

25.     Schering Group's communications and correspondence with Iowa State Medicaid from and including 1992 through 2005.

26.     Whether Schering Group ever provided Any Pricing Information and/or average manufacturer's price (hereinafter "AMP") to Iowa State Medicaid (apart from providing such information pursuant to plaintiff's discovery requests in this case).

27.     Schering Group's understanding and belief regarding the confidentiality provisions of the Medicaid Rebate statute, 42 U.S.C. §1396r-8, as it pertains to AMP.

28.     Whether Schering Group contends that Iowa State Medicaid were not prohibited by federal law from determining, and could have determined, the AMPs of the At-Issue NDCs based on the Unit Rebate Amount for such drugs provided to the State by the federal government pursuant to the Medicaid Rebate statute, 42 U.S.C. §1396r-8, *et seq*., and if so, all bases for such contention.

29.     Schering Group's methodologies for calculating AMP for its products sold during the period 1992 through 2005, including knowledge of the data and accounting methods used.

30.     Schering Group's policies and practices concerning the disclosures that providers (retail and chain pharmacies, long-term care pharmacies, mail-order pharmacies, home health-care entities, doctors, hospitals, clinics), wholesalers, and pharmacy benefit managers may make of Any Pricing Information they receive from Schering Group for the At-Issue NDCs.

31.     Schering Group's knowledge of whether First DataBank increased the AWPs for the At-Issue NDCs from WAC+20% to WAC+25% in or around 2001-2002 and the action(s), if any, taken by Schering Group in response including, but not limited to, any studies, analyses or white papers regarding this issue.

32.     To the extent Schering Group stopped providing Any Pricing Information to the Price Reporting Services for any of the At-Issue NDCs, identify such information and provide the reason(s) for doing so.

33.     The information and/or data that Schering Group has purchased, licensed, subscribed to, obtained, and/or reviewed from the Compendia or IMS relating to the At-Issue NDCs, including but not limited to pricing, market share, and services.

34.     Schering Group's knowledge of the relationship between the pricing information including, but not limited to, AWP, recommended/suggested AWP, SWP, WAC or any WAC equivalent, and/or DP

35.     The corporate history and organizational structure of Schering Group, including any current and/or former parent companies to Schering Group, any joint ventures involving Schering Group, any predecessor entities of Schering Group, and any subsidiaries held by Schering Group at any time.

36.     The formal corporate relationship between Schering-Plough Corporation and each of its subsidiaries Schering Corporation and Warrick Pharmaceuticals Corporation.

37.     The day-to-day reporting and approval relationships between each of the companies listed in paragraph 36.

38.     The Board of Directors of each of the companies listed in paragraph 36.

39.     The types of documents regularly exchanged between each of the companies listed in paragraph 36.

40.     The existence of documents reflecting or evidencing any policies or practices regarding Schering-Plough Corporation's (or its employees') approval of, or contribution to, pricing actions (including the setting of prices of whatsoever kind or the publication thereof)

taken by Schering-Plough Corporation's subsidiaries Schering Corporation and/or Warrick Pharmaceuticals Corporation.

41.     A description of which company pays the salary, bonuses, options, and/or any other forms of remuneration to the companies listed in paragraph 36.

42.     Direct communications between Schering Group (or Schering Group's counsel or representatives) and the State of Iowa, Iowa State Medicaid, and/or counsel for plaintiff, including the Iowa Department of Justice Office of the Attorney General.

43.     Whether Schering Group contends that any damages claimed by the State of Iowa should be offset by the rebates paid by Schering Group to Iowa State Medicaid under the federal Medicaid Rebates statute, 42 U.S.C. §1396r-8, *et seq.*, and, if so, the bases for such contention and the information or documents that support such contention.

44.     Schering Group's knowledge, belief, and/or understanding as to whether the rebates Schering Group paid to Iowa State Medicaid's for the At-Issue NDCs pursuant to the federal Medicaid Rebates statute, 42 U.S.C. §1396r-8, *et seq.*, would have been different had Schering Group reported, or First DataBank published, different AWPs for Schering Group's At-Issue NDCs.

45.     Schering Group's knowledge of Iowa State Medicaid's laws, regulations, and rules, including Schering Group's knowledge of Iowa State Medicaid's formula and methodology concerning reimbursement of claims by providers for prescriptions drugs.

46.     Schering Group's involvement in and/or knowledge of any civil settlements, criminal investigations, regulatory investigations or governmental investigations of any kind relating to the pricing, price reporting or marketing of Schering Group's prescription drugs, including, without limitation, Medicaid rebate or Best Price issues.

47.     The existence, location, format, possession and substantive content of documents, databases, email servers, information systems, and other records containing information responsive to any of plaintiff's requests for production of documents and/or other discovery requests.

48.     Whether an index or other document exists (and the description and location of such document) that identifies the specific request(s) for production and the specific documents that respond to such requests.

49.     Schering Group's total U.S. sales of prescription drugs for each year from and including 1992 through 2005.

50.     Percentage of Schering Group's total sales of prescription drugs attributable to the Medicaid channel for each year form and including 1992 through 2005.

51.     Schering Group's code of conduct and/or compliance policies relating in any manner to the sale, marketing and/or price reporting of prescription drugs.

52.     Schering Group's knowledge of the 2003 OIG Guidance for Pharmaceutical Manufacturers.

53.     Schering Group's document and data retention policies and practices for documents and data created or dated from 1992 through 2005, including all steps taken by Schering Group to preserve documents potentially relevant to any claim or defense in this lawsuit.

54.     The factual basis of Schering Group's admissions and contentions in other legal actions since 1992 to which it has been a party which are contrary to its current position in this case that it has not made, marketed or sold any of the Subject Drugs (listed in Exhibit A attached hereto).  This topic will address (by way of example, and not limitation) the admissions made in

Defendant's Answer to the Amended Master Consolidated Class Action Complaint, Modified Per the Court's Instruction at the November 21, 2003 Hearing, filed in AWP MDL No 1456 on April 9, 2004, at paragraph 3, that Schering Group "manufactures certain drugs" and "reports pricing information for their medicines to pharmaceutical pricing industry pricing publications."

55.     What Schering Group (or anyone or any entity acting on Schering Group's behalf) has done to search for and produce information and documents responsive to plaintiff's interrogatories, requests for production, requests for admission, and any other discovery requests, including the method, and scope of such search, any search terms employed, the identity of each person who participated in the search and production, and the general subject matters of the documents and information it has produced in this lawsuit to date. This topic is designed to obtain an understanding of the nature and sources of the hundreds of thousands of pages of documents and data produced in this lawsuit to date, to the extent that they have been produced by Schering Group, and is not calculated to subject the witness to a detailed examination on the particular substance of the documents or data themselves, except as they pertain directly to other topics in this notice.

Dated: March 2, 2010

**KIRBY McINERNEY LLP**

By:     /s/    Joanne M. Cicala
        Joanne M. Cicala, Esq.
        James P. Carroll Jr., Esq.
        Kathryn B. Allen, Esq.
        825 Third Avenue
        New York, New York 10022
        (212) 371-6600

        *Counsel for the State of Iowa*

# Exhibit A

1. All forms of Celestone Soluspan bearing an NDC, the first nine digits of which are 000850566;

2. All forms of Clarinex bearing an NDC, the first nine digits of which are 000851280;

3. All forms of Diprolene bearing an NDC, the first nine digits of which are 000850517;

4. All forms of Diprolene bearing an NDC, the first nine digits of which are 000850575;

5. All forms of Diprolene bearing an NDC, the first nine digits of which are 000850634;

6. All forms of Elocon bearing an NDC, the first nine digits of which are 000850370;

7. All forms of Elocon bearing an NDC, the first nine digits of which are 000850567;

8. All forms of Elocon bearing an NDC, the first nine digits of which are 000850854;

9. All forms of IMDUR bearing an NDC, the first nine digits of which are 000851153;

10. All forms of IMDUR bearing an NDC, the first nine digits of which are 000853306;

11. All forms of IMDUR bearing an NDC, the first nine digits of which are 000854110;

12. All forms of Intron A bearing an NDC, the first nine digits of which are 000850539;

13. All forms of Intron A bearing an NDC, the first nine digits of which are 000851110;

14. All forms of Intron A bearing an NDC, the first nine digits of which are 000851133;

15. All forms of Intron A bearing an NDC, the first nine digits of which are 000851168;

16. All forms of Intron A bearing an NDC, the first nine digits of which are 000851179;

17. All forms of Intron A bearing an NDC, the first nine digits of which are 000851235;

18. All forms of Intron A bearing an NDC, the first nine digits of which are 000851254;

19. All forms of K-Dur bearing an NDC, the first nine digits of which are 000850787;

20. All forms of Lotrisone bearing an NDC, the first nine digits of which are 000850809;

21. All forms of Nitro-Dur bearing an NDC, the first nine digits of which are 000850819;

22. All forms of Nitro-Dur bearing an NDC, the first nine digits of which are 000853305;

23. All forms of Nitro-Dur bearing an NDC, the first nine digits of which are 000853310;

24. All forms of Nitro-Dur bearing an NDC, the first nine digits of which are 000853315;

25. All forms of Nitro-Dur bearing an NDC, the first nine digits of which are 000853320;

26. All forms of Nitro-Dur bearing an NDC, the first nine digits of which are 000853330;

27. All forms of Normodyne bearing an NDC, the first nine digits of which are 000850244;

28. All forms of Normodyne bearing an NDC, the first nine digits of which are 000850362;

29. All forms of Normodyne bearing an NDC, the first nine digits of which are 000850752;

30. All forms of Peg-Intron bearing an NDC, the first nine digits of which are 000851279;

31. All forms of Peg-Intron bearing an NDC, the first nine digits of which are 000851291;

32. All forms of Peg-Intron bearing an NDC, the first nine digits of which are 000851297;

33.   All forms of Peg-Intron bearing an NDC, the first nine digits of which are 000851304;

34.   All forms of Peg-Intron bearing an NDC, the first nine digits of which are 000851316;

35.   All forms of Peg-Intron bearing an NDC, the first nine digits of which are 000851323;

36.   All forms of Peg-Intron bearing an NDC, the first nine digits of which are 000851368;

37.   All forms of Peg-Intron bearing an NDC, the first nine digits of which are 000851370;

38.   All forms of Proventil bearing an NDC, the first nine digits of which are 000850208;

39.   All forms of Proventil bearing an NDC, the first nine digits of which are 000850209;

40.   All forms of Proventil bearing an NDC, the first nine digits of which are 000850315;

41.   All forms of Proventil bearing an NDC, the first nine digits of which are 000850614;

42.   All forms of Proventil bearing an NDC, the first nine digits of which are 000851132;

43.   All forms of Rebetol bearing an NDC, the first nine digits of which are 000851194;

44.   All forms of Rebetol bearing an NDC, the first nine digits of which are 000851327;

45.   All forms of Rebetol bearing an NDC, the first nine digits of which are 000851351;

46.   All forms of Rebetol bearing an NDC, the first nine digits of which are 000851385;

47.   All forms of Rebetron bearing an NDC, the first nine digits of which are 000851258;

48.   All forms of Temodar bearing an NDC, the first nine digits of which are 000851244;

49.   All forms of Temodar bearing an NDC, the first nine digits of which are 000851248;

50.   All forms of Temodar bearing an NDC, the first nine digits of which are 000851252;

51.   All forms of Temodar bearing an NDC, the first nine digits of which are 000851259; and

52.   All forms of Vanceril bearing an NDC, the first nine digits of which are 000850736.

## CERTIFICATE OF SERVICE

I, James Carroll, hereby certify that I caused a true and correct copy of the foregoing to be served upon all counsel of record via electronic service, pursuant to Case Management Order No. 2, by sending a copy to LexisNexis File & Serve for posting to all parties.

Dated: March 2, 2010

/s/     James Carroll
KIRBY McINERNEY LLP



LEXISNEXIS® FILE & SERVE
29837593
E-SERVICE
Mar 2 2010
4:46PM

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) ) |
| | MDL No. 1456 <br> Master File No. 01-12257-PBS <br> Subcategory Case No. 07-12141-PBS |
| THIS DOCUMENT RELATES TO: | ) ) ) |
| *State of Iowa* <br> *v.* <br> *Abbott Laboratories, et al.* | ) ) ) ) ) ) |
| | Judge Patti B. Saris <br><br> Magistrate Judge Marianne Bowler |

**STATE OF IOWA'S REVISED NOTICE OF 30(b)(6) DEPOSITION OF SCHERING-PLOUGH CORPORATION, SCHERING CORPORATION, AND WARRICK PHARMACEUTICALS CORPORATION (TRANSACTIONAL DATA)**

PLEASE TAKE NOTICE that, pursuant to Rules 26 and 30 of the Federal Rules of Civil Procedure, plaintiff, State of Iowa, will take the deposition, by oral examination, of a representative of Schering-Plough Corporation, Schering Corporation, and Warrick Pharmaceuticals Corporation (hereinafter "Schering Group") for purposes of the above-captioned action. The deposition shall commence at **9:30 a.m. EST, Thursday, March 18, 2010**, continuing day to day until completed, at a mutually agreeable location in either New York or New Jersey.

This deposition will take place before a notary public, or any other officer authorized to administer oaths, and will be recorded by stenographic and visual means. The deposition is being taken for the purposes of discovery, for use at trial, and for such other purposes as permitted under the Federal Rules of Civil Procedure.

As used herein, the term "At-Issue NDCs" refers to Schering Group drugs and NDCs identified in Exhibit A attached hereto. Pursuant to Iowa CMO, dated January 22, 2009, the time

period covered by the topics identified in this Notice of Deposition is 1992 through 2005.  To the extent they are relevant, this notice incorporates by reference the definitions and rules of construction listed in plaintiff's Second Set of Interrogatories and Second Set of Requests for Production of Documents to All Defendants, dated March 1, 2010.

Schering Group shall designate one or more officers, directors, managing agents or other representatives to testify on the behalf of Schering Group, and may set forth, for each representative, the matters to which that representative will testify.  The representative(s) shall testify under oath about the following topics:

1.     Describe Schering Group's database(s) and/or any other form of data storage which contain information concerning sales transactions, contract pricing, direct pricing, net pricing, AWP pricing, WAC pricing, discounts, commercial rebates, chargebacks and/or other price concessions and/or monetary incentives of any nature relating to the At-Issue NDCs.

2.     Describe Schering Group's posting and/or recording in its records the contract prices, net prices, discounts, chargebacks, rebates (commercial) and/or other price concessions relating to its sale of the At-Issue NDCs.

3.     Describe the flow of transactional information from the point of intake through the business divisions within Schering Group that have access to transactional data and/or transactional information and/or any other related or derived information.

4.     Describe Schering Group's classes of trade and the coding used to denote those classes.

5.     Describe the system(s) used for contract administration.  The witness will also describe the database(s) and/or any other form of data storage that contain prices charged to any

customers including (1) contract customers; (2) non-contract customers; (3) direct customers; and (3)  indirect customers.

6.      Describe Schering Group's system(s), database(s) and/or any other form of data storage that contain historical price information for contracting customers, non-contracting customers, classes of trade, or other groups or tiers of customers, including the fields maintained, coding that is used in the fields, and the data populating the fields.

7.      Describe Schering Group's database(s) and/or any other form of data storage that contain chargebacks.  The witness will describe how chargebacks are estimated, accrued and processed, including the fields that are populated and the coding used in those fields.  The witness will describe how chargeback estimation is calibrated.

8.      Describe Schering Group's database(s) and/or any other form of data storage that contain discounts, rebates, chargebacks, credits, inventory management agreements, and/or any other form of price reductions relating to the At-Issue NDCs.  The witness will also describe which business divisions generate, enter, and/or use discount information, including the application of discount information to calculations used by Schering Group to determine net revenues for specific products or product groups.

9.      Describe all other amounts and/or adjustments that might be added to or subtracted from the product price, whether such adjustments are made at the NDC, product group, or other level.  The witness will explain whether theses adjustments are made at the transaction level, and/or applied to a group of transactions, and/or applied in any other manner.

10.     Describe the system(s) used to calculate prices reported to the Centers for Medicare and Medicaid Services (formerly, Health Care Financing Administration) during the

period 1992 through 2005, including the location and description of the information and the business division using the system.

11.     Describe the database(s) and/or any other form of data storage used by Schering Group that contain prices reported to third-party price reporting services, including, but not limited to, First DataBank.

12.     Describe how the fields presented in the transactional data, produced by Schering Group to plaintiff, were selected from the complete set of fields available in the original database(s).

13.     The existence, location, possession and substantive content of all transactional data, stored in any form including electronic and paper documents, which are responsive to any of plaintiff's previously served requests for production.

14.     Schering Group's document and data retention policies for transactional data created or dated from and including 1992 through 2005.

Dated: March 2, 2010

**KIRBY McINERNEY LLP**

By:     /s/    Joanne M. Cicala
        Joanne M. Cicala, Esq.
        James P. Carroll Jr., Esq.
        Kathryn B. Allen, Esq.
        825 Third Avenue
        New York, New York 10022
        (212) 371-6600

        *Counsel for the State of Iowa*

## Exhibit A

1.  All forms of Celestone Soluspan bearing an NDC, the first nine digits of which are 000850566;

2.  All forms of Clarinex bearing an NDC, the first nine digits of which are 000851280;

3.  All forms of Diprolene bearing an NDC, the first nine digits of which are 000850517;

4.  All forms of Diprolene bearing an NDC, the first nine digits of which are 000850575;

5.  All forms of Diprolene bearing an NDC, the first nine digits of which are 000850634;

6.  All forms of Elocon bearing an NDC, the first nine digits of which are 000850370;

7.  All forms of Elocon bearing an NDC, the first nine digits of which are 000850567;

8.  All forms of Elocon bearing an NDC, the first nine digits of which are 000850854;

9.  All forms of IMDUR bearing an NDC, the first nine digits of which are 000851153;

10. All forms of IMDUR bearing an NDC, the first nine digits of which are 000853306;

11. All forms of IMDUR bearing an NDC, the first nine digits of which are 000854110;

12. All forms of Intron A bearing an NDC, the first nine digits of which are 000850539;

13. All forms of Intron A bearing an NDC, the first nine digits of which are 000851110;

14. All forms of Intron A bearing an NDC, the first nine digits of which are 000851133;

15. All forms of Intron A bearing an NDC, the first nine digits of which are 000851168;

16. All forms of Intron A bearing an NDC, the first nine digits of which are 000851179;

17. All forms of Intron A bearing an NDC, the first nine digits of which are 000851235;

18. All forms of Intron A bearing an NDC, the first nine digits of which are 000851254;

19. All forms of K-Dur bearing an NDC, the first nine digits of which are 000850787;

20. All forms of Lotrisone bearing an NDC, the first nine digits of which are 000850809;

21. All forms of Nitro-Dur bearing an NDC, the first nine digits of which are 000850819;

22. All forms of Nitro-Dur bearing an NDC, the first nine digits of which are 000853305;

23. All forms of Nitro-Dur bearing an NDC, the first nine digits of which are 000853310;

24. All forms of Nitro-Dur bearing an NDC, the first nine digits of which are 000853315;

25. All forms of Nitro-Dur bearing an NDC, the first nine digits of which are 000853320;

26. All forms of Nitro-Dur bearing an NDC, the first nine digits of which are 000853330;

27. All forms of Normodyne bearing an NDC, the first nine digits of which are 000850244;

28. All forms of Normodyne bearing an NDC, the first nine digits of which are 000850362;

29. All forms of Normodyne bearing an NDC, the first nine digits of which are 000850752;

30. All forms of Peg-Intron bearing an NDC, the first nine digits of which are 000851279;

31. All forms of Peg-Intron bearing an NDC, the first nine digits of which are 000851291;

32. All forms of Peg-Intron bearing an NDC, the first nine digits of which are 000851297;

33.   All forms of Peg-Intron bearing an NDC, the first nine digits of which are 000851304;

34.   All forms of Peg-Intron bearing an NDC, the first nine digits of which are 000851316;

35.   All forms of Peg-Intron bearing an NDC, the first nine digits of which are 000851323;

36.   All forms of Peg-Intron bearing an NDC, the first nine digits of which are 000851368;

37.   All forms of Peg-Intron bearing an NDC, the first nine digits of which are 000851370;

38.   All forms of Proventil bearing an NDC, the first nine digits of which are 000850208;

39.   All forms of Proventil bearing an NDC, the first nine digits of which are 000850209;

40.   All forms of Proventil bearing an NDC, the first nine digits of which are 000850315;

41.   All forms of Proventil bearing an NDC, the first nine digits of which are 000850614;

42.   All forms of Proventil bearing an NDC, the first nine digits of which are 000851132;

43.   All forms of Rebetol bearing an NDC, the first nine digits of which are 000851194;

44.   All forms of Rebetol bearing an NDC, the first nine digits of which are 000851327;

45.   All forms of Rebetol bearing an NDC, the first nine digits of which are 000851351;

46.   All forms of Rebetol bearing an NDC, the first nine digits of which are 000851385;

47.   All forms of Rebetron bearing an NDC, the first nine digits of which are 000851258;

48.   All forms of Temodar bearing an NDC, the first nine digits of which are 000851244;

49.   All forms of Temodar bearing an NDC, the first nine digits of which are 000851248;

50.   All forms of Temodar bearing an NDC, the first nine digits of which are 000851252;

51.   All forms of Temodar bearing an NDC, the first nine digits of which are 000851259; and

52.   All forms of Vanceril bearing an NDC, the first nine digits of which are 000850736.

## **CERTIFICATE OF SERVICE**

I, James Carroll, hereby certify that I caused a true and correct copy of the foregoing to be served upon all counsel of record via electronic service, pursuant to Case Management Order No. 2, by sending a copy to LexisNexis File & Serve for posting to all parties.

Dated: March 2, 2010

/s/     James Carroll
KIRBY McINERNEY LLP

EXHIBIT B

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
                                  )
IN RE: PHARMACEUTICAL INDUSTRY    )
AVERAGE WHOLESALE PRICE           )
LITIGATION                        )
                                  )
THIS DOCUMENT RELATES TO:         )    MDL NO. 1456
                                  )    CIVIL ACTION NO.
City of New York et al v. Abbott  )    01-12257-PBS
Laboratories, et al.              )
Civ. Action No. 04-cv-06054, et al.  )
                                  )
```

<u>ORDER</u>

September 22, 2008

Saris, U.S.D.J.

The Court **DENIES** Plaintiffs' objections to August 20, 2008
ruling by Magistrate Judge Bowler granting Schering Corporation's
Motion for a Protective Order (Docket 5546). However, I modify
it as follows: Plaintiffs may conduct discovery with respect to
any branded drugs that have an AWP to AMP spread of over 30% for
the year. Plaintiffs may also depose Professor Addanki regarding
his calculations. While it may be better to have quarterly
calculations, the proposal to use an AWP to AMP spread makes
sense. Plaintiffs may submit an expert affidavit proposing
alternative expert calculations, but it should be transparent and
consistent in its methodology.

**S/PATTI B. SARIS**
United States District Judge

EXHIBIT C

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| ) | |
| ) | |
| IN RE PHARMACEUTICAL INDUSTRY ) | |
| AVERAGE WHOLESALE PRICE ) | MDL NO. 1456 |
| LITIGATION ) | |
| ) | Civil Action No. 01-12257-PBS |
| THIS DOCUMENT RELATES TO: ) | |
| *The City of New York v. Abbott* ) | |
| *Laboratories, Inc., et al.* ) | |
| S.D.N.Y. Case No. 04-CV-06054 ) | |
| *County of Albany v. Abbott Laboratories,* ) | |
| *Inc., et al.* ) | |
| N.D.N.Y. Case No. 05-CV-0425 ) | |
| *County of Allegany v. Abbott Laboratories,* ) | |
| *Inc., et al.* ) | |
| W.D.N.Y. Case No. 05-CV-0236 ) | |
| *County of Broome v. Abbott Laboratories,* ) | |
| *Inc., et al.* ) | |
| N.D.N.Y. Case No. 05-CV-0456 ) | |
| *County of Cattaraugus v. Abbott* ) | |
| *Laboratories, Inc., et al.* ) | |
| W.D.N.Y. Case No. 05-CV-0256 ) | |
| *County of Cayuga v. Abbott Laboratories,* ) | |
| *Inc., et al.* ) | |
| N.D.N.Y. Case No. 05-CV-0423 ) | |
| *County of Chautauqua v. Abbott* ) | |
| *Laboratories, Inc., et al.* ) | |
| W.D.N.Y. Case No. 05-CV-0214 ) | |
| *County of Chemung v. Abbott* ) | |
| *Laboratories, Inc., et al.* ) | |
| W.D.N.Y. Case No. 05-CV-6744 ) | |
| *County of Chenango v. Abbott* ) | |
| *Laboratories, Inc., et al.* ) | |
| N.D.N.Y. Case No. 05-CV-0354 ) | |
| *County of Columbia v. Abbott* ) | |
| *Laboratories, Inc., et al.* ) | |
| N.D.N.Y. Case No. 05-CV-0867 ) | |
| *County of Cortland v. Abbott Laboratories,* ) | |
| *Inc., et al.* ) | |
| N.D.N.Y. Case No. 05-CV-0881 ) | |
| *County of Dutchess v. Abbott Laboratories,* ) | |
| *Inc., et al.* ) | |

| | |
|---|---|
| S.D.N.Y. Case No. 05-CV-6458 | ) |
| *County of Essex v. Abbott Laboratories,* | ) |
| *Inc., et al.* | ) |
| N.D.N.Y. Case No. 05-CV-0878 | ) |
| *County of Fulton v. Abbott Laboratories,* | ) |
| *Inc., et al.* | ) |
| N.D.N.Y. Case No. 05-CV-0519 | ) |
| *County of Genesee v. Abbott Laboratories,* | ) |
| *Inc., et al.* | ) |
| W.D.N.Y. Case No. 05-CV-00267 | ) |
| *County of Greene v. Abbott Laboratories,* | ) |
| *Inc., et al.* | ) |
| N.D.N.Y. Case No. 05-CV-0474 | ) |
| *County of Herkimer v. Abbott* | ) |
| *Laboratories, Inc., et al.* | ) |
| N.D.N.Y. Case No. 05-CV-00415 | ) |
| *County of Jefferson v. Abbott Laboratories,* | ) |
| *Inc., et al.* | ) |
| N.D.N.Y. Case No. 05-CV-0715 | ) |
| *County of Lewis v. Abbott Laboratories,* | ) |
| *Inc., et al.* | ) |
| N.D.N.Y. Case No. 05-CV-0839 | ) |
| *County of Madison v. Abbott Laboratories,* | ) |
| *Inc., et al.* | ) |
| N.D.N.Y. Case No. 05-CV-00714 | ) |
| *County of Monroe v. Abbott Laboratories,* | ) |
| *Inc., et al.* | ) |
| W.D.N.Y. Case No. 05-CV-6148 | ) |
| *County of Nassau v. Abbott Laboratories,* | ) |
| *Inc., et al.* | ) |
| E.D.N.Y. Case No. 04-CV-05126 | ) |
| *County of Niagara v. Abbott Laboratories,* | ) |
| *Inc., et al.* | ) |
| W.D.N.Y. Case No. 05-CV-06296 | ) |
| *County of Oneida v. Abbott Laboratories,* | ) |
| *Inc., et al.* | ) |
| N.D.N.Y. Case No. 05-CV-0489 | ) |
| *County of Onondaga v. Abbott* | ) |
| *Laboratories, Inc., et al.* | ) |
| N.D.N.Y. Case No. 05-CV-0088 | ) |
| *County of Ontario v. Abbott Laboratories,* | ) |
| *Inc., et al.* | ) |
| W.D.N.Y. Case No. 05-CV-6373 | ) |
| *County of Orange v. Abbott Laboratories,* | ) |
| *Inc., et al.* | ) |
| S.D.N.Y. Case No. 07-CV-2777 | ) |

*County of Orleans v. Abbott Laboratories,* )
*Inc.; et al.* )
W.D.N.Y. Case No. 05-CV-6371 )
*County of Putnam v. Abbott Laboratories,* )
*Inc., et al.* )
S.D.N.Y. Case No. 05-CV-04740 )
*County of Rensselaer v. Abbott* )
*Laboratories, Inc., et al.* )
N.D.N.Y. Case No. 05-CV-00422 )
*County of Rockland v. Abbott* )
*Laboratories, Inc., et al.* )
S.D.N.Y. Case No. 03-CV-7055 )
*County of Schuyler v. Abbott Laboratories,* )
*Inc., et al.* )
W.D.N.Y. Case No. 05-CV-6387 )
*County of Seneca v. Abbott Laboratories,* )
*Inc., et al.* )
W.D.N.Y. Case No. 05-CV-6370 )
*County of St. Lawrence v. Abbott* )
*Laboratories, Inc., et al.* )
N.D.N.Y. Case No. 05-CV-0479 )
*County of Saratoga v. Abbott Laboratories,* )
*Inc., et al.* )
N.D.N.Y. Case No. 05-CV-0478 )
*County of Steuben v. Abbott Laboratories,* )
*Inc., et al.* )
W.D.N.Y. Case No. 05-CV-6223 )
*County of Suffolk v. Abbott Laboratories,* )
*Inc., et al.* )
E.D.N.Y. Case No. 03-CV-12257 )
*County of Tompkins v. Abbott* )
*Laboratories, Inc., et al.* )
N.D.N.Y. Case No. 05-CV-0397 )
*County of Ulster v. Abbott Laboratories,* )
*Inc., et al.* )
N.D.N.Y. Case No. 06-CV-0123 )
*County of Warren v. Abbott Laboratories,* )
*Inc., et al.* )
N.D.N.Y. Case No. 05-CV-0468 )
*County of Washington v. Abbott* )
*Laboratories, Inc., et al.* )
N.D.N.Y. Case No. 05-CV-0408 )
*County of Wayne v. Abbott Laboratories,* )
*Inc., et al.* )
W.D.N.Y. Case No. 05-CV-06138 )
*County of Westchester v. Abbott* )

Laboratories, Inc., et al.                    )
S.D.N.Y. Case No. 03-CV-6178                  )
County of Wyoming v. Abbott                   )
Laboratories, Inc., et al.                    )
W.D.N.Y. Case No. 05-CV-6379                  )
County of Yates v. Abbott Laboratories,       )
Inc., et al.                                  )
W.D.N.Y. Case No. 05-CV-06172                 )
                                              )
                                              )

# Affidavit of Sumanth Addanki

## February 21, 2008

# I.    Introduction

## A.    Qualifications and Assignment

1. I am an economist and a Senior Vice President at NERA Economic Consulting
   (NERA). I hold A.M and Ph.D. degrees in economics from Harvard University and
   have specialized in the study of industrial organization. I have published articles on
   industrial organization economics and have written articles on antitrust issues for the
   American Bar Association (ABA) and other like institutions. These institutions have
   also invited me to lecture and comment on the market impact of various marketing,
   pricing and intellectual property strategies employed by firms in general as well as
   specifically in the pharmaceutical industry. I have testified by invitation before the
   Federal Trade Commission (FTC) on the analysis of competition in high technology
   industries.

2. I have consulted on many antitrust, intellectual property and commercial damages
   cases involving different industries, including agriculture, airlines, computer hardware
   and software, electronic components, health care, newspaper, office products, oil and
   gas, tobacco, and tools and hardware among many others. In addition, I have consulted
   extensively in the pharmaceutical industry, analyzing the market impact of various
   pricing, marketing and intellectual property strategies; assessing the impact of mergers
   and acquisitions; studying the effect of suppressed or delayed generic competition; and
   assessing economic damages, among other assignments. I have previously worked on
   matters involving allegations of AWP manipulation.

1

3. Some of my consulting assignments have led to my being qualified as an expert economist in Federal courts and testifying in those courts as an expert in the economics of industrial organization. I have also testified on the appropriate analysis of pharmaceutical markets in proceedings before the FTC.

4. My curriculum vitae, which is appended to this report as Exhibit 1, includes a list of all my publications within the preceding ten years and my testimony as an expert at trial or in deposition within the preceding four years.

5. NERA is being compensated at my customary hourly rate of $650 for my services in this matter.

## B. Scope of the Engagement

6. Ropes & Gray, counsel for Schering Corporation ("Schering"), asked me to perform the following calculations and analyses. For the branded Schering prescription drugs at issue, for the years at issue in this matter in which the drug was not effectively obsolete:

- Calculate the difference, or "spread", between the AMP (Average Manufacturer Price) and the AWP (Average Wholesale Price) as a percentage of the AMP for each of the accused Schering products;

- Estimate the extent to which the products were sold by Schering at prices that were, on average, at or near their Wholesale Acquisition Cost (WAC).[1]

---

[1] For my purposes, I assume that products are effectively obsolete when they are declared to be obsolete or discontinued, or are being converted to over-the-counter products, or such events are imminent.

I was asked to assume that the relevant period was from January 1, 1997 to December 31, 2005. I discuss each of these assignments in the sections below and present my results in the accompanying exhibits.

### C. Information Relied Upon

7. This affidavit is based on my professional training and experience, including my experience working in other cases involving allegations of AWP manipulation. I also rely on my own prior research and my review and analysis of materials related to this and related lawsuits. My staff at NERA and I have reviewed various materials, including sales data for the products at issue, data from pricing compendia, public documents and court filings. A list of the materials relied upon in preparing this report is attached as Exhibit 2.

8. I reserve the right to supplement or revise my conclusions if additional information is provided to me or if additional research, reflection or the correction of inadvertent errors leads me to change my current opinions.

## II. AMP-Based "Spreads"

9. I have been asked to calculate the average difference, or "spread", between AWP and AMP for the accused products as a percentage of AMP by NDC.[2] The results of these calculations are shown in Exhibit 3. As is evident from Exhibit 3, most of these "spreads" are below 30 percent of AMP, and those that are not show no particular pattern and are, moreover, generally only modestly higher.

---

[2] Although the NDCs at issue have been identified at the 11-digit level, AMPs are reported to the Centers for Medicare & Medicaid Services at the 9-digit level. I was asked to calculate "spreads" at the 9-digit level.

3

## III.  Wholesale Acquisition Cost (WAC)

10. The WAC is effectively a "list price" in the branded pharmaceutical industry, and a substantial portion of Schering's sales of the branded pharmaceutical products at issue—over 85 percent—are actually made at or very near WAC, as shown in Exhibit 4. I have also performed this analysis by brand, and the results are reported in Exhibit 5. As the exhibit shows, many of the brands have over 90 percent of their sales made at or very near WAC. When these products are analyzed at the same level as the "AMP-based spreads" similar results obtain, as shown in Exhibit 6.

_____
Sumanth Addanki

2-21-08
_____
Date

4

EXHIBIT 1

# NERA
Economic Consulting

**Sumanth Addanki**
Senior Vice President

National Economic Research Associates, Inc.
50 Main Street
White Plains, New York 10606
+1 914 448 4000 Fax +1 914 448 4040
Direct dial: +1 914 448 4060
sumanth.addanki@nera.com
www.nera.com

# SUMANTH ADDANKI
## SENIOR VICE PRESIDENT

## Education

**Harvard University**
Ph.D., Economics, 1986
A.M., Economics, 1982

**Birla Institute of Technology and Science, India**
M.A. (Hons.), Economics, 1980

## Professional Experience

| | |
|---|---|
| | **NERA Economic Consulting** |
| 1986- | Senior Vice President (current position) |
| | |
| | **New York University, Robert F. Wagner Graduate School of Public Service** |
| 1997 | Adjunct Assistant Professor of Public and Health Administration |
| | |
| | **National Bureau of Economic Research Inc.** |
| 1981-1986 | Research Associate and Computer Manager |
| | |
| | **Harvard University** |
| 1981-1985 | Instructor in Economics, Teaching Fellow, and Assistant Head Tutor |
| | |
| | **National Council of Applied Economic Research, India** |
| 1980 | Research Associate |

## Testimony (2004 – 2008)

*Discover Financial Services*, et al. v. *Visa U.S.A. Inc.*, et al., U.S. District Court for the Southern District of New York, Civil Action No 04-CF-7844 (BSJ) (Deposition Testimony). December 6-7, 2007.

**MMC** Marsh & McLennan Companies

Sumanth Addanki

*State of Alabama v. Abbott Laboratories, Inc., et al.*, In the Circuit Court of Montgomery County, Alabama, CV-05-219 (Deposition Testimony). November 29-30, 2007.

*Dynax Corporation v. Chemguard, Inc.*, U.S. District Court for the Southern District of New York, Index: 06-CIV-5143 (CM)(ECF CASE) (Deposition Testimony).

*State of Colorado,* et al. *v. Warner Chilcott Holdings Company III, Ltd,* et al., U.S. District Court for the District of Columbia, Civil Action No 1:05CV02182 (CKK) (Deposition Testimony).

*Novartis Corporation, Novartis Pharmaceuticals Corporation, and Novartis International AG v. Teva Pharmaceuticals USA, Inc.*, U.S. District Court for the District of New Jersey, Civil Action Nos. 04-4473 and 06-1130 (HAA)(MF) (Deposition Testimony).

*In re Pharmaceutical Industry Average Wholesale Price Litigation (MDL 1456)*, U.S. District Court for the District of Massachusetts, Civil Action No. 01-12257-PBS.

*Briant Chun-Hoon and Carlo Guglielmino v. McKee Foods Corporation, a Tennessee Corporation; and Does 1 through 100, inclusive,* U.S. District Court for the Northern District of California, Case No. C05-00620 VRW (Deposition Testimony).

*XIOtech Corporation v. Compellent Technologies, Inc., Michael Markovich, Russell B. Taddiken, Scott A. Winslow, Kristofer M. Zuber,* District Court for the State of Minnesota, Fourth Judicial District, Court File No.: 04-5065 (Deposition Testimony).

*Medtronic Minimed, Inc., v. Smiths Medical MD, Inc.*, U. S. District Court for the District of Delaware, Civil Action No. 03-776-KAJ (Deposition Testimony).

## Papers and Publications (1998 – 2008)

"*Schering-Plough* and the Antitrust Analysis of Patent Settlement Agreements in Pharmaceutical Markets," *Antitrust Insights*, National Economic Research Associates, Inc., 2005.

"Market Definitions Using Econometrics: An Apparent Paradox Explained," *Antitrust Insights*, National Economic Research Associates, Inc., 2001.

"Presenting Complex Technical and Economic Evidence: Lessons From The Trenches," *Antitrust and Intellectual Property: The Crossroads,* American Bar Association, 2000.

"The Relevant Market in Intellectual Property Antitrust: An Economist's Overview," Practising Law Institute, Intellectual Property Antitrust, June 1998.

February 2008

## Exhibit 2

**Case Materials**

New York Counties v. Abbott Laboratories, Inc., et al., Revised First Amended Consolidated Complaint, filed October 5, 2007, with Exhibit B.

**Data**

Schering Sales Data.

Schering AMP Data ("AMPs_Sebizon_Normodyne.xls", "AWP_litigation_AMP_Data.xls", "extract MCR amp units_addl.xls", "MCR_AMP_Units.xls", "NY_Additional_NDCs_AMP_Data.xls", "NY_Additional_NDCs_AMP_Units_and_Pkgs.xls").

First DataBank Data.

Medispan Data.

Medicaid State Drug Utilization Data including "Definitions for State Drug Utilization Data Specifications", Centers for Medicare & Medicaid Services.

**Miscellaneous**

PRNewswire, "Schering-Plough Aims To Make CLARITIN® Premier Brand In OTC Category, Establish CLARINEX® As Premier Brand In Prescription Category," March 8, 2002.

Schering-Plough Corporation, Form 10-K, for the fiscal year ended December 31, 2001, Item 1.

Schering-Plough Corporation, Form 8-K, Exhibit 99.1, "Schering-Plough Reports Sales, Earnings For 2002 Third Quarter," October 24, 2002.

Exhibit 3

Percentage "Spreads"[1,2] between AWP and AMP
Branded Products Accused In New York Counties[3]
1997 - 2005

| Brand Name | 9-Digit NDC | Date Added to First DataBank | Date of First Gross Sales | Date of Last Gross Sales | 1997 % | 1998 % | 1999 % | 2000 % | 2001 % (Percent) | 2002 % | 2003 % | 2004 % | 2005 % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Celestone Soluspan | 000850566 | 01/01/82 | 01/01/91 | 09/30/07 | 25.0 | 25.6 | 25.4 | 30.3 | 24.3 | 24.6 | 30.6 | 31.1 | 28.4 |
| Claritin | 000850458 | 04/14/93 | 04/15/93 | 04/03/07 | 23.2 | 22.9 | 22.8 | 23.7 | 24.7 | | | | |
| Claritin | 000850612 | 10/15/96 | 10/14/96 | 04/23/01 | 23.4 | 22.7 | 22.7 | 23.2 | 24.8 | | | | |
| Claritin | 000851128 | 02/06/97 | 02/26/97 | 01/29/07 | 23.0 | 23.0 | 22.8 | 23.4 | 25.0 | | | | |
| Claritin-D | 000851223 | 05/25/99 | 04/20/99 | 04/03/07 | | | 23.4 | 23.2 | 25.2 | | | | |
| Claritin-D | 000850635 | 11/15/94 | 11/14/94 | 08/07/07 | | | | | | | | | |
| Diprolene | 000851233 | 12/07/98 | 12/01/98 | 09/27/07 | 26.8 | 26.3 | 26.5 | 27.4 | 28.1 | 29.3 | 31.9 | 40.8 | 37.3 |
| Diprolene | 000850517 | 03/19/87 | 01/01/91 | 09/27/07 | 25.7 | 25.5 | 24.4 | 26.4 | 27.1 | 27.6 | 34.8 | 63.1 | 32.5 |
| Diprolene | 000850575 | 08/07/83 | 01/01/91 | 12/20/06 | 27.4 | 27.7 | 27.7 | 28.5 | 29.9 | 32.2 | 33.2 | 29.3 | 29.5 |
| Diprolene | 000850634 | 12/05/91 | 12/01/91 | 09/27/07 | 22.9 | 22.7 | 22.8 | 23.5 | 24.2 | 24.1 | 29.4 | | |
| Elocon | 000850962 | 05/19/88 | 01/01/91 | 09/26/07 | 29.9 | 29.4 | 29.8 | 29.5 | 30.7 | 29.8 | 41.8 | 38.0 | 35.1 |
| Elocon | 000850285 | 07/02/87 | 01/01/91 | 09/30/07 | 29.9 | 29.2 | 29.8 | 29.5 | 30.7 | 32.6 | 36.2 | 36.9 | 35.8 |
| Elocon | 000850854 | 05/04/89 | 01/01/91 | 09/26/07 | 22.9 | 22.7 | 22.8 | 23.4 | 24.4 | 24.4 | 30.5 | 30.5 | 28.9 |
| Estinyl | 000850070 | 01/01/82 | 01/01/91 | 03/07/02 | 24.5 | 25.6 | 23.8 | 23.8 | 25.0 | 29.0 | | | |
| Eulexin | 000850525 | 02/09/89 | 01/01/91 | 04/03/07 | 23.2 | 22.8 | 23.0 | 24.5 | 25.4 | 27.9 | 32.1 | 27.7 | 34.2 |
| Imdur | 000851153 | 05/05/95 | 05/10/95 | 11/07/06 | 22.7 | 23.1 | 23.7 | 23.8 | 36.7 | 27.9 | 37.2 | 28.4 | 29.7 |
| Imdur | 000853306 | 12/26/95 | 10/09/96 | 12/20/06 | 22.8 | 22.9 | 22.7 | 25.0 | 48.2 | 25.7 | 33.7 | 29.7 | 29.5 |
| Imdur | 000850539 | 06/12/86 | 01/01/91 | 01/07/04 | 23.0 | 22.5 | 23.0 | 23.8 | 23.3 | 26.2 | 28.0 | | |
| Intron A | 000850571 | 12/01/88 | 01/01/91 | 09/28/07 | 19.9 | 24.4 | 23.3 | 25.5 | 23.8 | 26.0 | 28.2 | 30.1 | 29.6 |
| Intron A | 000850647 | 06/12/86 | 01/01/91 | 11/08/02 | 26.9 | 22.7 | 22.7 | 25.1 | 23.9 | 25.6 | 28.8 | 32.0 | 29.5 |
| Intron A | 000851110 | 03/04/91 | 03/04/91 | 09/26/07 | 22.6 | 83.3 | 82.2 | 25.2 | 22.9 | 25.5 | 28.3 | 30.3 | 29.5 |
| Intron A | 000851133 | 12/19/95 | 12/06/95 | 09/27/07 | 23.3 | 22.8 | 22.8 | 25.2 | 24.4 | 25.2 | 29.3 | 32.7 | 29.6 |
| Intron A | 000851168 | 02/04/97 | 02/04/97 | 09/27/07 | 22.6 | 22.6 | 22.6 | 25.3 | 24.2 | 22.6 | 28.6 | 30.2 | 29.5 |
| Intron A | 000851179 | 01/30/97 | 01/30/97 | 09/05/07 | 22.6 | 22.7 | 22.6 | 25.4 | 24.6 | 25.1 | 28.9 | 29.8 | 29.6 |
| Intron A | 000851191 | 01/30/97 | 01/30/97 | 12/12/02 | | 22.9 | 22.8 | 25.3 | 22.8 | 24.4 | 28.5 | 30.0 | 29.7 |
| Intron A | 000851235 | 07/14/98 | 07/07/98 | 09/27/07 | | 23.0 | 22.9 | 25.7 | 22.8 | 24.9 | 28.5 | 30.2 | 29.3 |
| Intron A | 000851242 | 07/14/98 | 07/07/98 | 09/27/07 | | | 22.7 | 25.0 | 24.3 | 24.5 | 23.9 | 31.3 | 30.0 |
| Intron A | 000851254 | 07/14/98 | 07/07/98 | 09/26/07 | | | 22.6 | 24.5 | 24.4 | 27.6 | 37.6 | 30.0 | 30.6 |
| K-Dur | 000850263 | 01/22/87 | 01/01/91 | 09/05/07 | 23.0 | | 22.8 | 24.5 | 24.7 | | | | |
| K-Dur | 000850787 | 01/22/87 | 01/01/91 | 09/03/07 | 23.5 | | 22.7 | 3.9 | 25.5 | | | | |
| Lotrimin | 000850182 | 01/01/82 | 01/01/91 | 12/11/02 | 12.8 | 14.0 | 4.8 | 56.8 | 4.1 | | | | |
| Lotrimin | 000850613 | 01/01/82 | 01/01/91 | 10/09/02 | 51.7 | 52.4 | 54.1 | | 42.7 | | | | |
| Lotrisone | 000850809 | 03/01/01 | 12/12/00 | 09/25/07 | 25.2 | 24.9 | 24.9 | 26.4 | 33.9 | 44.5 | 28.3 | 30.0 | 42.8 |
| Lotrisone | 000850924 | 07/01/04 | 10/14/97 | 09/27/07 | | | | | | | | | |
| Nasonex | 000851197 | 10/16/97 | 10/14/97 | 09/21/07 | 25.3 | 31.3 | 23.1 | 23.9 | 25.0 | 29.7 | 27.8 | 36.6 | 50.0 |
| Nitro-Dur | 000850819 | 03/51/94 | 02/23/94 | 09/28/07 | 267.4 | 37.3 | 26.0 | 26.3 | 33.9 | 31.5 | 30.5 | 75.5 | 60.3 |
| Nitro-Dur | 000853305 | 01/29/87 | 01/01/91 | 09/26/07 | 26.4 | 30.7 | 31.2 | 28.4 | 33.9 | 34.4 | 32.5 | 50.2 | 43.1 |
| Nitro-Dur | 000853310 | 01/29/87 | 01/01/91 | 09/27/07 | 26.3 | 30.5 | 26.7 | 27.9 | 31.5 | 34.0 | 31.2 | 61.6 | 96.1 |
| Nitro-Dur | 000853315 | 01/29/87 | 01/01/91 | 09/26/07 | 31.7 | 29.5 | 26.8 | 27.0 | 34.4 | 34.8 | 32.6 | 49.2 | 73.5 |
| Nitro-Dur | 000853320 | 01/29/87 | 01/01/91 | 09/27/07 | 38.1 | 30.4 | 26.2 | 29.3 | 31.5 | 32.5 | 31.2 | 45.1 | |
| Normodyne | 000853330 | 08/24/84 | 01/01/91 | 09/26/07 | | 37.3 | 30.3 | 35.1 | 31.8 | 32.7 | | | |
| Peg-Intron | 000850752 | 01/31/01 | 02/06/01 | 02/08/00 | | | 35.2 | | 27.7 | 27.3 | 30.6 | 32.0 | 32.3 |
| Peg-Intron | 000851279 | 01/31/01 | 02/06/00 | 09/28/07 | | | | | 22.7 | 27.1 | 29.7 | 31.3 | 31.3 |
| Peg-Intron | 000851291 | 02/02/04 | 02/11/04 | 09/26/07 | | | | | 22.6 | | 29.8 | 31.9 | 31.2 |
| Peg-Intron | 000851297 | 01/31/01 | 02/06/00 | 09/27/07 | | | | | 23.0 | 27.1 | 29.6 | 31.8 | 32.1 |
| Peg-Intron | 000851304 | 02/02/04 | 02/11/04 | 09/27/07 | | | | | | | | 31.7 | 31.1 |
| Peg-Intron | 000851316 | 02/02/04 | 02/11/04 | 12/30/05 | | | | | | | | 31.6 | 31.9 |
| Peg-Intron | 000851323 | 02/02/04 | 02/06/01 | 09/27/07 | | | | | 22.8 | 27.2 | 28.7 | 30.5 | 30.9 |
| Peg-Intron | 000851368 | 01/31/01 | 02/16/04 | 09/27/07 | | | | | | | | 31.8 | 31.3 |
| Peg-Intron | 000851370 | 02/02/04 | | 09/27/07 | | | | | | | | | |

Page 1 of 2

Exhibit 3

Percentage "Spreads"[1,2] between AWP and AMP
Branded Products Accused in New York Counties[3]
1997 - 2005

| Brand Name | 9-Digit NDC | Date Added to First DataBank | Date of First Gross Sales | Date of Last Gross Sales | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | (Percent) | | | | |
| (a) | (b) | (c) | (d) | (e) | (f) | (g) | (h) | (i) | (j) | (k) | (l) | (m) | (n) |
| Proventil | 000850296 | 01/01/82 | 01/02/97 | 03/30/00 | 23.1 | 23.2 | 23.4 | | | | | | |
| Proventil | 000850208 | 02/19/87 | 01/01/91 | 03/30/03 | 40.6 | 27.7 | 24.4 | 29.3 | 30.5 | 42.1 | | | |
| Proventil | 000850209 | 02/19/87 | 01/01/91 | 10/18/02 | 53.1 | 27.2 | 24.2 | 25.7 | 40.5 | 29.6 | | | |
| Proventil | 000850431 | 06/25/87 | 01/01/91 | 04/22/02 | 23.2 | 22.7 | 22.3 | 23.6 | 24.7 | | | | |
| Proventil | 000850614 | 01/01/82 | 01/01/91 | 09/27/07 | 27.5 | 23.9 | 23.6 | 23.6 | 23.4 | 29.7 | 28.5 | 29.3 | 31.6 |
| Proventil | 000851132 | 10/16/96 | 12/16/96 | 09/30/07 | 37.7 | 28.0 | 23.1 | 24.1 | 40.9 | 30.9 | 27.6 | 29.3 | 30.4 |
| Rebetron | 000851236 | 06/11/98 | 06/08/98 | 11/20/04 | | | 24.0 | 26.3 | 26.3 | 17.0 | 22.1 | 26.9 | |
| Rebetron | 000851241 | 06/11/98 | 06/08/98 | 05/08/03 | | | 26.7 | 28.2 | 28.7 | 27.4 | | | |
| Rebetron | 000851258 | 07/14/98 | 07/07/98 | 03/15/05 | | | 28.0 | 29.9 | 30.6 | 28.0 | 26.1 | 33.5 | |
| Temodar | 000851244 | 08/19/99 | 08/23/99 | 09/19/07 | | | | 22.8 | 24.5 | 30.2 | 28.2 | 31.0 | 29.1 |
| Temodar | 000851248 | 08/19/99 | 08/23/99 | 09/28/07 | | | | 22.8 | 24.5 | 30.3 | 28.4 | 29.9 | 29.1 |
| Temodar | 000851252 | 08/19/99 | 08/23/99 | 09/10/07 | | | | 22.8 | 24.5 | 29.6 | 28.4 | 30.2 | 29.5 |
| Temodar | 000851259 | 08/19/99 | 08/23/99 | 08/27/07 | | | | 22.9 | 24.4 | 29.6 | 28.5 | 30.2 | 29.0 |
| Theo-Dur | 000850584 | 12/22/87 | 01/01/91 | 02/17/02 | 43.4 | 32.8 | 34.8 | 34.0 | | | | | |
| Trilafon | 000850012 | 01/01/82 | 01/02/97 | 09/16/02 | 27.1 | 29.0 | 28.2 | 31.8 | 35.0 | | | | |
| Trilafon | 000850063 | 01/01/82 | 01/01/97 | 05/17/00 | 22.6 | 23.7 | 22.5 | | | | | | |
| Vancenase | 000850041 | 01/01/82 | 01/01/91 | 01/26/01 | 21.8 | 19.9 | 23.6 | | | | | | |
| Vancenase | 000851049 | 06/27/96 | 06/27/96 | 11/22/02 | 28.4 | 24.6 | 23.0 | 23.4 | 26.0 | | | | |
| Vanceril | 000850756 | 01/01/82 | 01/01/91 | 04/03/07 | 24.3 | 23.8 | 23.1 | 26.2 | 24.7 | 31.5 | | | |

Notes:  - FDB package sizes for certain NDCs of Proventil and Trilafon were replaced with package sizes derived using implied package sizes from Medispan.

[1] "Spread's" (AWP - AMP) / AMP, were calculated as the weighted average of "spreads", calculated at the 11-digit NDC level, across all accused NDCs within a 9-digit NDC. At the 11-digit NDC level, "spreads" were calculated separately for each period during the calendar year during which neither the AWP nor the AMP had changed. These "spreads" were then aggregated over the calendar year and across 11-digit NDCs using "Gross Sales Activity in the AMP-Related Classes of Trade" (see Note 4).

[2] A 9-digit NDC was considered to be effectively obsolete for a given quarter if its constituent 11-digit NDCs were all declared to be obsolete, discontinued, or converted to over-the-counter products, or if "Gross Sales Activity in the AMP-Related Classes of Trade" had fallen substantially (by 90 percent or more) in anticipation of such events. A 9-digit NDC was considered to be effectively obsolete for a given year if the first 11-digit NDC to be added to First DataBank (FDB) within the 9-digit NDC was added after June 30th of that year, there were gross sales for less than six months during that year, or the 9-digit NDC was effectively obsolete for at least three quarters of the year. Spreads were not calculated for years during which the 9-digit NDC was effectively obsolete for the reasons indicated in Exhibit 6.

[3] "Branded Products Accused in New York Counties" include all Schering products listed in Exhibit B to Revised First Amended Consolidated Complaint, with the exception of Gyne-Lotrimin NDCs 0008506904 and 0008508711, for which sales data were not available.

[4] "Gross Sales Activity in the AMP-Related Classes of Trade" is defined as Total Gross Sales Activity, limited to the following classes of trade: 111, 121, 122, 123, 171, 172, 341, and 346. Total Gross Sales Activity is defined as direct sales with non-missing credit codes and contract sales from the indirect sales data. Gross sales exclude non-US transactions and transactions with either non-positive revenue or quantity.

Sources:
- Schering Sales Data.
- Medispan Data.
- First DataBank Data.
- Exhibit B to Revised First Amended Consolidated Complaint ("City_of_NY_and_New_York_Counties_Exhibit_B.xls").
- Schering AMP Data.
- PRNewswire, "Schering-Plough Aims To Make CLARITIN® Premier Brand In OTC Category; Establish CLARINEX® As Premier Brand In Prescription Category," March 8, 2002.
- Schering-Plough Corporation, Form 10-K, for the final year ended December 31, 2001, Item 1.
- Schering-Plough Corporation, Form 8-K, Exhibit 99.1, "Schering-Plough Reports Sales, Earnings For 2002 Third Quarter," October 24, 2002.

Default

**Exhibit 4**

**Distribution of Schering Sales by Discount Percentage**

**Branded Products Accused in New York Counties [1]**

**1997 - 2005**

| Average Price as a Percent of Prevailing WAC | | | |
| --- | --- | --- | --- |
| Greater Than | Less Than or Equal To | Percent of Sales | Cumulative Percent of Sales |
| (Percent) | (Percent) | | (Percent) |
| (a) | (b) | (c) | (d) |
| 100 | | 0.34 % | 0.34 % |
| 99 | 100 | 0.07 | 0.41 |
| 98 | 99 | 0.21 | 0.62 |
| 97 | 98 | 53.51 | 54.14 |
| 96 | 97 | 20.40 | 74.54 |
| 95 | 96 | 10.97 | 85.51 |
| 94 | 95 | 4.83 | 90.33 |
| 93 | 94 | 1.60 | 91.94 |
| 92 | 93 | 1.05 | 92.98 |
| 91 | 92 | 1.41 | 94.40 |
| 90 | 91 | 0.57 | 94.96 |
| 85 | 90 | 1.33 | 96.29 |
| 80 | 85 | 0.78 | 97.08 |
| | 80 | 2.92 | 100.00 |

Notes: - Sales exclude non-US and non-sales transactions, and do not include rebates found in the rebates files.
- Further reductions for prompt payment of 2 percent were applied to direct sales.
- Total Sales were $28,822,447,176.41. If net revenue for a particular NDC and customer number for the prevailing WAC period was negative (-$266,533,297.54 total) or if the revenue or quantity before chargebacks or price paid were missing or otherwise non-positive ($5,756,677.95 total), or if the WAC was not available ($804,596,173.94 total), it was dropped.
- Wholesale entries from the chargebacks data without corresponding wholesale entries in the sales data were excluded (-$161,637,794.73 total).
- Wholesale entries from the chargebacks data were matched with wholesale entries in the sales data by prevailing WAC period.
- Price is calculated by customer, as identified by customer number and, for a small number of customer numbers that appear in multiple classes of trade, by customer number and class of trade.
- WAC values were retrieved from FDB by NDC as the prevailing WAC on the date of the sales transaction.
- FDB package sizes for certain NDCs of Proventil and Trilafon were replaced with package sizes derived using implied package sizes from Medispan.
- Ratios of average price to WAC were annualized to the customer and 11-digit NDC level, weighting by Gross Sales Activity in quantity. Gross Sales Activity was calculated as total sales by customer for blank-credit-code transactions in the Direct Sales data and end customer Contract Sales in the Indirect Sales, excluding non-US and non-positive revenue or quantity transactions, by calendar year and prevailing WAC period. The distribution of sales by discount percentage was then calculated by the weighted adjusted prevailing period revenue.
- The time period used for calculating both average prices and Gross Sales Activity was restricted to the relevant period, 1997 through 2005.
- A 9-digit NDC was considered to be effectively obsolete in a quarter if its constituent 11-digit NDCs were declared to be obsolete, discontinued, or converted to over-the-counter products.

[1] The table includes all branded Schering products listed in Exhibit B of the Revised First Amended Consolidated Complaint, except for Gyne-Lotrimin, for which Sales Data were not availiable.

Sources: - Schering Sales Data.
- First DataBank Data.
- Medispan Data.
- Schering AMP Data.
- Exhibit B to Revised First Amended Consolidated Complaint ("City_of_NY_and_New_York_Counties_Revised_Exhibit_B.xls")
- PRNewswire, "Schering-Plough Aims To Make CLARITIN® Premier Brand In OTC Category, Establish CLARINEX® As Premier Brand In Prescription Category," March 8, 2002.
- Schering-Plough Corporation, Form 10-K, for the fiscal year ended December 31, 2001, Item 1.
- Schering-Plough Corporation, Form 8-K, Exhibit 99.1, "Schering-Plough Reports Sales, Earnings For 2002 Third Quarter," October 24, 2002.

Default

**Exhibit 5**
**Percent of Schering Sales Made at Discounts**
**No Greater Than 5% Off the Prevailing FDB WAC**
**Branded Products Accused in New York Counties** [1]
**1997 - 2005**

| Brand | Percent of Sales within 5% of WAC | Share of New York Medicaid Reimbursement for Accused Schering Drugs |
|---|---|---|
| (a) | (b) | (c) |
| Celestone Soluspan | 14.8  % | 0.0  % |
| Claritin | 94.8 | 25.5 |
| Claritin-D | 95.6 | 9.2 |
| Diprolene | 92.4 | 1.7 |
| Elocon | 92.0 | 5.0 |
| Estinyl | 92.4 | 0.0 |
| Eulexin | 63.1 | 0.8 |
| Imdur | 93.3 | 2.5 |
| Intron A | 72.9 | 1.8 |
| K-Dur | 87.3 | 2.8 |
| Lotrimin | 62.9 | 0.1 |
| Lotrisone | 87.2 | 9.5 |
| Nasonex | 91.9 | 11.2 |
| Nitro-Dur | 54.0 | 2.1 |
| Normodyne | 76.2 | 0.3 |
| Peg-Intron | 82.9 | 9.1 |
| Permitil | 41.4 | 0.0 |
| Proventil | 78.8 | 6.8 |
| Rebetron | 58.1 | 5.1 |
| Temodar | 91.5 | 2.2 |
| Theo-Dur | 67.9 | 0.1 |
| Trilafon | 41.2 | 0.0 |
| Vancenase | 82.2 | 1.3 |
| Vanceril | 74.1 | 2.9 |

Notes: - Sales exclude non-US and non-sales transactions, and do not include rebates found in the rebates files.
- Further reductions for prompt payment of 2 percent were applied to direct sales.
- Total Sales were $28,822,447,176.41. If net revenue for a particular NDC and customer number
  for the prevailing WAC period was negative (-$266,533,297.54 total) or if the revenue or quantity
  before chargebacks or price paid were missing or otherwise non-positive ($5,756,677.95 total),
  or if the WAC was not available ($804,596,173.94 total), it was dropped.
- Wholesale entries from the chargebacks data without corresponding wholesale entries in the
  sales data were excluded (-$161,637,794.73 total).
- Wholesale entries from the chargebacks data were matched with wholesale entries in the
  sales data by prevailing WAC period.
- Price is calculated by customer, as identified by customer number and, for a small number of
  customer numbers that appear in multiple classes of trade, by customer number and class of trade.
- WAC values were retrieved from FDB by NDC as the prevailing WAC on the date of
  the sales transaction.
- FDB package sizes for certain NDCs of Proventil and Trilafon were replaced with package sizes
  derived using implied package sizes from Medispan.
- Ratios of average price to WAC were annualized to the customer and 11-digit NDC level, weighting by Gross

**Percent of Schering Sales Made at Discounts**
**No Greater Than 5% Off the Prevailing FDB WAC**
**Branded Products Accused in New York Counties** [1]
**1997 - 2005**

Sales Activity in quantity. Gross Sales Activity was calculated as total sales by customer for blank-credit-code transactions in the Direct Sales data and end customer Contract Sales in the Indirect Sales, excluding non-US and non-positive revenue or quantity transactions, by calendar year and prevailing WAC period. Sales within 5 percent of WAC were then calculated by the weighted adjusted prevailing period revenue.

- The time period used for calculating both average prices and Gross Sales Activity was restricted to the relevant period, 1997 through 2005.
- A 9-digit NDC was considered to be effectively obsolete in a quarter if its constituent 11-digit NDCs were declared to be obsolete, discontinued, or converted to over-the-counter products.
- New York Medicaid reimbursement reflects the total amount the State reimbursed to pharmacists for the drug. This total is not reduced or affected by Medicaid rebates paid to the state. This amount represents both the Federal and State reimbursement and is inclusive of dispensing fees.

[1] The table includes all branded Schering products listed in Exhibit B of the Revised First Amended Consolidated Complaint, except for Gyne-Lotrimin, for which Sales Data were not availiable.

Sources: - Schering Sales Data.
- First DataBank Data.
- Medispan Data.
- Schering AMP Data.
- Medicaid State Drug Utilization Data including "Definitions for State Drug Utilization Data Specifications", Centers for Medicare & Medicaid Services.
- Exhibit B to Revised First Amended Consolidated Complaint ("City_of_NY_and_New_York_Counties_ Revised_Exhibit_B.xls")
- PRNewswire, "Schering-Plough Aims To Make CLARITIN® Premier Brand In OTC Category, Establish CLARINEX® As Premier Brand In Prescription Category," March 8, 2002.
- Schering-Plough Corporation, Form 10-K, for the fiscal year ended December 31, 2001, Item 1.
- Schering-Plough Corporation, Form 8-K, Exhibit 99.1, "Schering-Plough Reports Sales, Earnings For 2002 Third Quarter," October 24, 2002.

**Exhibit 6**

**Percent of Schering Sales Made at Discounts**
**No Greater Than 5% Off the Prevailing FDB WAC**
**Branded Products Accused in New York Counties[1]**
**1997 - 2005**

| Brand | 9-Digit NDC | Date Added to FDB | Date of First Sale | Date of Last Sale | Year 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| (a) | (b) | (c) | (d) | (e) | (f) | (g) | (h) | (i) | (j) | (k) | (l) | (m) | (n) |
| Celestone Soluspan | 000850566 | 1/1/1982 | 1/1/1991 | 9/30/2007 | 15.0 % | 13.6 % | 21.0 % | 9.7 % | 30.6 % | 28.6 % | 20.3 % | 43.7 % | 91.4 % |
| Claritin | 000850458 | 4/14/1993 | 4/15/1993 | 4/3/2007 | 95.0 | 95.1 | 95.5 | 93.7 | 91.2 | | | | |
| Claritin | 000850612 | 10/15/1996 | 10/14/1996 | 4/23/2007 | 96.6 | 96.2 | 96.9 | 95.3 | 92.6 | | | | |
| Claritin | 000851128 | 2/6/1997 | 2/24/1997 | 1/29/2007 | 99.1 | 97.2 | 97.9 | 95.6 | 95.6 | | | | |
| Claritin | 000851223 | 5/25/1999 | 4/20/1999 | 4/3/2007 | | | 97.9 | 95.8 | 95.9 | | | | |
| Claritin-D | 000850635 | 11/15/1994 | 11/14/1994 | 8/7/2007 | 97.6 | 95.9 | 97.5 | 97.6 | 66.2 | 75.7 | 82.1 | 57.9 | 87.3 |
| Claritin-D | 000851123 | 12/7/1998 | 1/31/2004 | 1/31/2004 | | | | 96.2 | 65.9 | 76.9 | 53.8 | 56.6 | 96.7 |
| Diprolene | 000850517 | 3/9/1987 | 1/1/1991 | 9/27/2007 | 92.3 | 93.9 | 93.4 | 91.8 | 93.2 | 86.9 | 67.5 | 86.9 | 96.8 |
| Diprolene | 000850575 | 8/7/1983 | 1/1/1991 | 9/27/2007 | 89.5 | 91.4 | 90.4 | 92.8 | 93.2 | 81.3 | 88.0 | 85.5 | 96.1 |
| Diprolene | 000850634 | 12/5/1991 | 12/1/1991 | 12/20/2006 | 93.9 | 95.3 | 95.0 | 94.2 | 94.0 | 42.9 | 38.6 | 93.5 | 93.5 |
| Diprolene | 000850962 | 5/19/1988 | 1/1/1991 | 9/27/2007 | 94.2 | 94.3 | 94.3 | 93.1 | 93.6 | 97.7 | 78.5 | 97.1 | 97.9 |
| Elocon | 000850570 | 7/2/1987 | 1/1/1991 | 9/26/2007 | 94.2 | 95.3 | 94.9 | 95.0 | 95.2 | | | | |
| Elocon | 000850567 | 7/2/1987 | 1/1/1991 | 9/30/2007 | 93.9 | 96.0 | 95.5 | 95.6 | 95.4 | | | 97.1 | 97.1 |
| Elocon | 000850854 | 5/4/1989 | 1/1/1991 | 9/26/2007 | 96.3 | 97.1 | 96.8 | 96.5 | 96.5 | | | | |
| Elocon | 000850870 | 1/1/1982 | 1/1/1991 | 3/7/2002 | 94.6 | 93.6 | 93.7 | 91.4 | 82.2 | | | | 83.0 |
| Estinyl | 000850523 | 2/9/1989 | 1/1/1991 | 4/3/2007 | 68.8 | 70.2 | 67.1 | 63.6 | 48.6 | 36.5 | 33.4 | 71.7 | 80.5 |
| Eulexin | 000851153 | 5/5/1995 | 5/10/1995 | 11/7/2006 | 97.4 | 97.2 | 94.8 | 66.7 | 82.0 | 85.6 | 84.4 | 93.9 | 75.5 |
| Eulexin | 000853306 | 12/26/1995 | 1/9/1996 | 12/20/2006 | 95.3 | 95.7 | 94.4 | 79.7 | 90.3 | 91.6 | 89.9 | 81.6 | |
| Imdur | 000850285 | 6/12/1986 | 1/1/1991 | 1/7/2004 | 48.6 | 63.7 | 56.5 | 48.7 | 50.3 | 71.9 | 69.7 | 76.3 | 83.0 |
| Imdur | 000850539 | 12/1/1988 | 1/1/1991 | 9/27/2007 | 69.0 | 68.6 | 62.1 | 63.8 | 63.9 | 75.7 | 54.5 | 66.4 | 80.5 |
| Intron A | 000850571 | 6/12/1986 | 1/1/1991 | 9/28/2007 | 59.7 | 57.5 | 50.4 | 35.4 | 38.4 | 58.9 | 64.1 | 79.8 | 86.7 |
| Intron A | 000850647 | 1/3/1991 | 3/4/1991 | 11/8/2002 | 88.6 | 96.7 | 94.9 | 53.5 | 63.4 | 75.1 | 64.4 | 75.4 | 86.3 |
| Intron A | 000851110 | 12/19/1995 | 12/6/1995 | 9/26/2005 | 74.5 | 77.3 | 69.4 | 59.9 | 45.6 | 71.6 | 64.4 | 88.7 | 84.9 |
| Intron A | 000851133 | 1/30/1997 | 2/4/1997 | 9/27/2007 | 71.5 | 77.2 | 76.4 | 60.3 | 54.1 | 78.5 | 60.4 | 76.0 | 81.2 |
| Intron A | 000851168 | 1/30/1997 | 1/1/1991 | 9/27/2007 | 81.1 | 74.0 | 80.8 | 68.7 | 59.8 | 79.6 | 63.4 | | |
| Intron A | 000851179 | 1/30/1997 | 2/3/1997 | 9/5/2007 | 82.5 | 86.0 | 78.3 | 59.8 | 55.8 | 76.0 | 67.6 | 81.8 | 88.0 |
| Intron A | 000851191 | 1/30/1997 | 2/3/1997 | 12/11/2002 | 90.6 | 81.4 | 83.9 | 54.7 | 69.7 | 85.0 | 79.6 | 85.5 | 89.1 |
| Intron A | 000851235 | 7/14/1998 | 7/7/1998 | 9/27/2007 | | | 89.3 | 65.1 | 78.4 | 83.5 | 81.2 | 88.7 | 90.8 |
| Intron A | 000851242 | 7/14/1998 | 7/7/1998 | 9/27/2007 | | | 89.2 | 77.9 | 79.9 | 88.3 | 75.8 | 86.7 | 97.4 |
| Intron A | 000851254 | 7/14/1998 | 7/7/1998 | 9/26/2007 | | | 87.1 | 76.7 | 74.5 | 33.9 | 72.5 | 81.9 | 95.1 |
| K-Dur | 000850263 | 1/22/1987 | 1/1/1991 | 9/5/2007 | 83.8 | 87.7 | 90.2 | 81.7 | 70.1 | 38.3 | 85.8 | 88.7 | |
| K-Dur | 000850787 | 1/22/1987 | 1/1/1991 | 9/5/2007 | 89.0 | 91.3 | 90.0 | 86.2 | 72.7 | 33.9 | 72.5 | 81.9 | |
| Lotrimin | 000850182 | 1/1/1982 | 1/1/1982 | 12/11/2002 | 73.1 | 67.4 | 71.7 | 85.5 | 68.1 | | | | |
| Lotrimin | 000850613 | 1/1/1982 | 1/1/1991 | 10/9/2002 | 42.3 | 47.2 | 79.4 | 66.3 | 78.2 | | | | |
| Lotrimin | 000850809 | 1/3/2001 | 1/1/1991 | 9/25/2007 | | | | 77.4 | 46.6 | 33.9 | 84.9 | 80.0 | 83.5 |
| Lotrisone | 000850924 | 7/1/1984 | 12/12/2000 | 9/27/2007 | 89.5 | 89.9 | 88.0 | 86.4 | 91.7 | 94.3 | 94.6 | 94.8 | 95.6 |
| Nasonex | 000851197 | 10/16/1997 | 1/1/1991 | 3/21/2007 | 88.0 | 83.8 | 92.4 | 87.6 | 75.3 | 91.2 | 79.9 | 74.5 | 76.1 |
| Nitro-Dur | 000850819 | 3/31/1994 | 3/22/1994 | 9/28/2007 | 64.4 | 64.0 | 77.0 | 79.6 | 51.1 | 87.0 | 70.6 | 30.8 | |
| Nitro-Dur | 000853305 | 1/29/1987 | 1/1/1991 | 9/27/2007 | 62.6 | 56.9 | 52.7 | 61.1 | 53.5 | 61.0 | 69.9 | 35.5 | 77.9 |
| Nitro-Dur | 000853310 | 1/29/1987 | 1/1/1991 | 9/26/2007 | 63.6 | 58.1 | 55.0 | 57.3 | 50.2 | 56.1 | 82.8 | 50.9 | 87.7 |
| Nitro-Dur | 000853315 | 1/29/1987 | 1/29/1987 | 9/27/2007 | | | 59.1 | 60.5 | | 63.5 | | | |

Exhibit 6
Percent of Schering Sales Made at Discounts
No Greater Than 5% Off the Prevailing FDB WAC
Branded Products Accused in New York Counties [1]
1997 - 2005

| Brand | 9-Digit NDC | Date Added to FDB | Date of First Sale | Date of Last Sale | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| (a) | (b) | (c) | (d) | (e) | (f) | (g) | (h) | (i) | (j) | (k) | (l) | (m) | (n) |
| Nitro-Dur | 000853320 | 1/29/1987 | 1/1/1991 | 9/27/2007 | 57.7 | 54.2 | 58.0 | 54.5 | 49.9 | 62.6 | 73.7 | 27.9 | 73.7 |
| Nitro-Dur | 000853330 | 1/29/1987 | 1/1/1991 | 9/26/2007 | 62.4 | 56.4 | 56.3 | 59.0 | 51.0 | 68.6 | 85.4 | 44.9 | 76.5 |
| Normodyne | 000850752 | 8/24/1984 | 1/1/1991 | 2/8/2002 | 77.1 | 85.4 | 63.2 | 74.8 | 72.3 | | | | |
| Peg-Intron | 000851279 | 1/31/2001 | 2/6/2001 | 9/28/2007 | | | | | 96.7 | 93.9 | 65.6 | 59.5 | 58.2 |
| Peg-Intron | 000851291 | 1/31/2001 | 2/6/2001 | 9/26/2007 | | | | | 96.4 | 95.5 | 77.5 | 67.5 | 72.3 |
| Peg-Intron | 000851297 | 2/2/2004 | 2/10/2004 | 9/27/2007 | | | | | | | | 78.7 | 78.6 |
| Peg-Intron | 000851304 | 1/31/2001 | 2/6/2001 | 9/27/2007 | | | | | 97.4 | 94.2 | 67.4 | 83.1 | 65.2 |
| Peg-Intron | 000851316 | 2/2/2004 | 2/10/2004 | 9/27/2007 | | | | | | | | 83.1 | 81.2 |
| Peg-Intron | 000851323 | 2/2/2004 | 2/10/2004 | 12/30/2005 | | | | | | | | 84.2 | 79.7 |
| Peg-Intron | 000851368 | 1/31/2001 | 2/6/2001 | 9/27/2007 | | | | | 97.0 | 95.6 | 76.3 | 75.3 | 81.5 |
| Peg-Intron | 000851370 | 2/2/2004 | 2/16/2004 | 9/27/2007 | | | | | | | | 76.4 | 75.0 |
| Permitil | 000850296 | 1/1/1982 | 1/22/1997 | 3/30/2003 | 38.0 | 50.0 | 50.5 | 43.4 | 78.1 | 17.0 | 82.5 | | |
| Proventil | 000850288 | 2/19/1987 | 1/1/1991 | 10/18/2002 | 24.1 | 48.9 | 30.5 | 86.7 | 75.7 | 98.4 | | | |
| Proventil | 000850209 | 2/19/1987 | 1/1/1991 | 3/30/2003 | 38.8 | 79.3 | 76.6 | 93.4 | 91.0 | 67.8 | | | |
| Proventil | 000850431 | 6/25/1987 | 1/1/1991 | 4/22/2002 | 93.4 | 93.7 | 94.0 | 88.0 | 89.4 | 95.1 | | | |
| Proventil | 000850614 | 1/1/1982 | 1/1/1991 | 9/27/2007 | 67.5 | 77.8 | 91.2 | 87.9 | 88.0 | 51.0 | 92.8 | 85.1 | 89.1 |
| Proventil | 000851132 | 10/16/1996 | 12/16/1996 | 9/30/2007 | 83.1 | 80.7 | 87.2 | 76.1 | 51.0 | 59.2 | 57.3 | 99.2 | 99.0 |
| Rebetron | 000851236 | 6/11/1998 | 6/8/1998 | 11/30/2004 | | | 83.6 | 70.6 | 41.5 | 52.5 | | 64.6 | |
| Rebetron | 000851241 | 6/11/1998 | 6/8/1998 | 5/8/2003 | | | 89.3 | 73.7 | 50.1 | 43.6 | | | |
| Rebetron | 000851258 | 7/14/1998 | 7/7/1998 | 3/15/2005 | | | 86.3 | 97.0 | 42.0 | | 36.4 | 51.6 | |
| Temodar | 000851244 | 8/19/1999 | 8/23/1999 | 9/19/2007 | | | | 97.5 | 93.8 | 87.9 | 86.5 | 83.6 | 92.3 |
| Temodar | 000851248 | 8/19/1999 | 8/23/1999 | 9/28/2007 | | | | 95.5 | 94.8 | 93.0 | 87.7 | 90.6 | 92.4 |
| Temodar | 000851251 | 8/19/1999 | 8/23/1999 | 9/10/2007 | | | | 96.5 | 92.0 | 90.2 | 82.9 | 87.7 | 95.6 |
| Temodar | 000851259 | 8/19/1999 | 8/23/1999 | 8/27/2007 | | | | | 92.7 | 91.7 | 92.1 | 87.9 | 93.0 |
| Theo-Dur | 000850584 | 1/22/1987 | 1/1/1991 | 2/13/2002 | 52.0 | 78.2 | 75.6 | 70.7 | 67.9 | | | | |
| Trilafon | 000850012 | 1/1/1982 | 1/22/1997 | 9/16/2002 | 26.7 | 37.4 | 63.1 | 74.9 | | | | | |
| Trilafon | 000850263 | 1/1/1982 | 1/1/1997 | 5/17/2000 | 33.7 | 52.3 | 58.5 | | | | | | |
| Vancenase | 000850041 | 1/1/1982 | 1/1/1991 | 1/26/2001 | 38.7 | 44.0 | 41.6 | | | | | | |
| Vancenase | 000851049 | 6/27/1996 | 6/27/1996 | 11/22/2002 | 60.2 | 83.4 | 91.8 | 90.9 | 58.3 | 47.5 | | | |
| Vanceril | 000850736 | 1/1/1982 | 1/1/1991 | 4/3/2007 | 77.4 | 79.8 | 77.2 | 72.0 | 61.6 | | | | |

Notes: - Sales exclude non-US and non-sales transactions, and do not include rebates found in the rebates files.
- Further reductions for prompt payment of 2 percent were applied to direct sales.
- Total Sales were $28,822,447,176.41. If net revenue for a particular NDC and customer number for the prevailing WAC period was negative (-$266,533,297.54 total) or if the revenue or quantity before chargebacks or price paid were missing or otherwise non-positive ($5,756,677.95 total), or if the WAC was not available ($804,596,173.94 total), it was dropped.
- Wholesale entries from the chargebacks data without corresponding wholesale entries in the sales data were excluded (-$361,637,794.73 total).
- Wholesale entries from the chargebacks data were matched with wholesale entries in the

Exhibit 6
Percent of Schering Sales Made at Discounts
No Greater Than 5% Off the Prevailing FDB WAC
Branded Products Accused in New York Counties [1]
1997 - 2005

| | | Date Added to | Date of First Sale | Date of Last Sale | | Year | | | | | | | | |
| Brand | 9-Digit NDC | FDB | | | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| (a) | (b) | (c) | (d) | (e) | (f) | (g) | (h) | (i) | (j) | (k) | (l) | (m) | (n) |

- sales data by prevailing WAC period.
- Price is calculated by customer, as identified by customer number and, for a small number of customer numbers that appear in multiple classes of trade, by customer number and class of trade.
- WAC values were retrieved from FDB by NDC as the prevailing WAC on the date of the sales transaction.
- FDB package sizes for certain NDCs of Proventil and Trilafon were replaced with package sizes derived using implied package sizes from Medispan.
- Ratios of average price to WAC were annualized to the customer and 11-digit NDC level, weighting by Gross Sales Activity in quantity. Gross Sales Activity was calculated as total sales by customer for blank-credit-code transactions in the Direct Sales data and end customer Contract Sales in the Indirect Sales, excluding non-US and non-positive revenue or quantity transactions, by calendar year and prevailing WAC period. Sales within 5 percent of WAC were then calculated by the weighted adjusted prevailing period revenue.
- The time period used for calculating both average prices and Gross Sales Activity was restricted to the relevant period, 1997 through 2005.
- A 9-digit NDC was considered to be effectively obsolete for a given quarter if its constituent 11-digit NDCs were all declared to be obsolete, discontinued, or converted to over-the-counter products. A 9-digit NDC was considered to we effectively obsolete for a given year if the first 11-digit NDC to be added to FDB within the 9-digit NDC was added after June 30th of that year, there were gross sales for less than six months during that year, or the 9-digit NDC was effectively obsolete for at least three quarters of the year. The percent of sales made at discounts no greater than 5 percent off the prevailing WAC was not calculated for years during which the 9-digit NDC was effectively obsolete or if there was no corresponding percentage "spread" between AWP and AMP.

[1] The table includes all branded Schering products listed in Exhibit B of the Revised First Amended Consolidated Complaint, except for Cyto-Lotrimin, for which Sales Data were not available.

Sources: - Schering Sales Data.
- First DataBank Data.
- Medispan Data.
- Schering AMP Data.
- Exhibit B to Revised First Amended Consolidated Complaint ("City_of_NY_and_New_York_Counties_Revised_Exhibit_B.xls")
- PRNewswire, "Schering-Plough Aims To Make CLARITIN® Premier Brand In OTC Category; Establish CLARINEX® As Premier Brand In Prescription Category," March 8, 2002.
- Schering-Plough Corporation, Form 10-K, for the fiscal year ended December 31, 2001, Item 1.
- Schering-Plough Corporation, Form 8-K, Exhibit 99.1, "Schering-Plough Reports Sales, Earnings For 2002 Third Quarter," October 24, 2002.

# EXHIBIT D

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In re: | ) | MDL No. 1456 |
| | ) | Civil Action No. 01-12257-PBS |
| PHARMACEUTICAL INDUSTRY | ) | Subcategory No. 06-11337 |
| AVERAGE WHOLESALE PRICE | ) | |
| LITIGATION | ) | |
| | ) | Hon. Patti B. Saris |
| _____ | ) | |
| | ) | |
| **THIS DOCUMENT RELATES TO:** | ) | |
| *United States ex rel Ven-A-Care of the* | ) | |
| *Florida Keys, Inc. v. Schering Corporation,* | ) | |
| *Schering-Plough Corporation and* | ) | |
| *Warrick Pharmaceuticals Corporation* | ) | |
| Civil Action No. 09-CV-10547 | ) | |
| | | |
| *United States ex rel Ven-A-Care of the* | ) | |
| *Florida Keys, Inc. v. Schering Corporation,* | ) | |
| *Schering-Plough Corporation and* | ) | |
| *Warrick Pharmaceuticals Corporation* | ) | |
| Civil Action No. 00-10698 | ) | |

# Affidavit of Sumanth Addanki

## August 6, 2009

# I.     Introduction

## A.     Qualifications and Assignment

1.  I am an economist and a Senior Vice President at NERA Economic Consulting

    (NERA).  I hold A.M and Ph.D. degrees in economics from Harvard University and

    have specialized in the study of industrial organization.  I have published articles on

    industrial organization economics and have written articles on antitrust issues for the

    American Bar Association (ABA) and other like institutions.  These institutions have

    also invited me to lecture and comment on the market impact of various marketing,

    pricing and intellectual property strategies employed by firms in general as well as

    specifically in the pharmaceutical industry.  I have testified by invitation before the

    Federal Trade Commission (FTC) on the analysis of competition in high technology

    industries.

2.  I have consulted on many antitrust, intellectual property and commercial damages

    cases involving different industries, including agriculture, airlines, computer hardware

    and software, electronic components, health care, newspaper, office products, oil and

    gas, tobacco, and tools and hardware among many others.  In addition, I have consulted

    extensively in the pharmaceutical industry, analyzing the market impact of various

    pricing, marketing and intellectual property strategies; assessing the impact of mergers

    and acquisitions; studying the effect of suppressed or delayed generic competition; and

    assessing economic damages, among other assignments.  I have previously worked on

    matters involving allegations of AWP manipulation.

3.  Some of my consulting assignments have led to my being qualified as an expert

    economist in Federal courts and testifying in those courts as an expert in the economics

of industrial organization.  I have also testified on the appropriate analysis of pharmaceutical markets in proceedings before the FTC.

4. My curriculum vitae, which is appended to this report as Exhibit 1, includes a list of all my publications within the preceding ten years and my testimony as an expert at trial or in deposition within the preceding four years.

5. NERA is being compensated at my customary hourly rate of $695 for my services in this matter.

**B.     Scope of the Engagement**

6. Ropes & Gray, counsel for Schering Corporation ("Schering"), asked me to perform the following calculations and analyses.  For the branded Schering prescription drugs at issue, for the years at issue in this matter in which the drug was not effectively obsolete:

   ▪ Calculate the difference, or "spread", between the AMP (Average Manufacturer Price) and the AWP (Average Wholesale Price) as a percentage of the AMP for each of the accused Schering products;

   ▪ Estimate the extent to which the products were sold by Schering at prices that were, on average, at or near their Wholesale Acquisition Cost (WAC).[1]

7. I initially performed the calculations requested and provided the results to Ropes & Gray, who incorporated them into a Powerpoint presentation provided to the Department of Justice (DOJ) and this court in February 2008. I subsequently performed similar calculations for the branded Schering drugs named in the action brought by various New York counties in this court. In performing the latter calculations, I used

---

[1] For my purposes, I assume that products are effectively obsolete when they are declared to be obsolete or discontinued, or are being converted to over-the-counter products, or such events are imminent.

the same methodology that I had employed in connection with my DOJ analysis, with some refinements. My methodology for the New York calculations was fully described in the deposition that I gave in connection with that matter on November 20, 2008.

8. Ropes & Gray has asked me to update my DOJ calculations incorporating the refinements that I used in my New York analyses. I was also asked to assume that the relevant period was 1997 to 2003. The attached exhibits reflect my updated calculations. As is evident from the exhibits, the refinements that I have made to my methodology do not result in material changes; the results shown in the attached exhibits are virtually identical to the results that I initially reported to Ropes & Gray.

## C. Information Relied Upon

9. This affidavit is based on my professional training and experience, including my experience working in other cases involving allegations of AWP manipulation. I also rely on my own prior research and my review and analysis of materials related to this and related lawsuits. My staff at NERA and I have reviewed various materials, including sales data for the products at issue, data from pricing compendia, public documents and court filings. A list of the materials relied upon in preparing this report is attached as Exhibit 2.

10. I reserve the right to supplement or revise my conclusions if additional information is provided to me or if additional research, reflection or the correction of inadvertent errors leads me to change my current opinions.

## II. AMP-Based "Spreads"

11. I was asked to calculate the average difference, or "spread", between AWP and AMP for the accused products as a percentage of AMP by NDC.[2] The results of these calculations are shown in Exhibit 3. As is evident from Exhibit 3, most of these "spreads" are below 30 percent of AMP, and those that are not show no particular pattern and are, moreover, generally only modestly higher.

## III. Wholesale Acquisition Cost (WAC)

12. The WAC is effectively a "list price" in the branded pharmaceutical industry, and a substantial portion of Schering's sales of the branded pharmaceutical products at issue—over 85 percent—are actually made at or very near WAC, as shown in Exhibit 4. I have also performed this analysis by brand, and the results are reported in Exhibit 5. As the exhibit shows, many of the brands have over 90 percent of their sales made at or very near WAC. When these products are analyzed at the same level as the "AMP-based spreads" similar results obtain, as shown in Exhibit 6.

_____

Sumanth Addanki

8-6-09
_____

Date

---

[2] Although the NDCs at issue have been identified at the 11-digit level, AMPs are reported to the Centers for Medicare & Medicaid Services at the 9-digit level. I was asked to calculate "spreads" at the 9-digit level.

# NERA
Economic Consulting

**Sumanth Addanki**
Senior Vice President

National Economic Research Associates, Inc.
50 Main Street
White Plains, New York 10606
+1 914 448 4000 Fax +1 914 448 4040
Direct dial: +1 914 448 4060
sumanth.addanki@nera.com
www.nera.com

# SUMANTH ADDANKI
## SENIOR VICE PRESIDENT

## Education

**Harvard University**
Ph.D., Economics, 1986

**Birla Institute of Technology and Science, India**
M.A. (Hons.), Economics, 1980

## Professional Experience

**NERA Economic Consulting**
1986-    Senior Vice President (current position)

**New York University, Robert F. Wagner Graduate School of Public Service**
1997    Adjunct Assistant Professor of Public and Health Administration

**National Bureau of Economic Research Inc.**
1981-1986    Research Associate and Computer Manager

**Harvard University**
1981-1985    Instructor in Economics, Teaching Fellow, and Assistant Head Tutor

**National Council of Applied Economic Research, India**
1980    Research Associate

## Honors and Professional Activities

Associate Editor, *Antitrust Magazine*, 2001 - 2002

Vice Chair, Economics Committee at Antitrust Section of ABA, 1999 - 2000

Danforth Center Award for Excellence in Teaching, Harvard University, 1983


Marsh & McLennan Companies

Sumanth Addanki

## Testimony (2005 – 2009)

*In re Pharmaceutical Industry Average Wholesale Price Litigation: The City of New York, et al. v. Abbott Laboratories, Inc., et al.* United States District Court for the District of Massachusetts, MDL No. 1456, CA No. 01-12257-PBS, July 8, 2009.

*Mitsubishi Chemical Corporation, Mitubishi Tanabe Pharma Corporation, Encysive Pharmaceuticals Inc., Glaxo Group Limited, SmithKline Beecham plc, and SmithKline Beecham Corp., d/b/a GlaxoSmithKline v. Barr Laboratories, Inc. and Pliva-Hrvatska d.o.o.*, United States District Court for the Southern District of New York, CA No. 07 CV 11614 (Deposition Testimony) June 18, 19, 2009.

*In re Pharmaceutical Industry Average Wholesale Price Litigation:  The City of New York v. Abbott Laboratories, Inc., et al.*, United States District Court for the District of Massachusetts, MDL No. 1456, CA No. 01-12257-PBS (Deposition Testimony) November 2008 and April 2009

*State of Missouri, ex rel. Jeremiah W. (Jay) Nixon, Attorney General and Missouri Department of Social Services, Division of Medical Services v. Dey, Inc., et al and Warrick Pharmaceuticals Corporation, Schering-Plough Corporation, Schering Corporation,* In the Circuit Court of the City of St. Louis State of Missouri, Case No. 054-1216 Division: 2.  October 2008

*State of Wisconsin v. Amgen, Inc., Abbott Laboratories, AstraZeneca Pharmaceuticals, LP, AstraZeneca, LP, Aventis Pharmaceuticals, Inc. Baxter Healthcare Corporation, Ben Venue Laboratories, Inc.  et al.,* The Circuit Court for Dane County in the State of Wisconsin, Case No. 04-CV-1709 (Deposition Testimony) May 2008

*The Commonwealth of Massachusetts v. Mylan Laboratories, Inc. IVAX Corporation, Warrick Pharmaceutical Corporation, Watson Pharmaceuticals, Inc. Schein Pharmaceutical, Inc., Teva Pharmaceuticals USA, Inc., PAR Pharmaceutical, Inc., Purepac Pharmaceutical Co, and Roxane Laboratories, Inc.,*  U.S. District for the District of Massachusetts, Civil Action No. 03-11865-PBS (Deposition Testimony).  April 2008

*Discover Financial Services,* et al. v. *Visa U.S.A. Inc.,* et al., U.S. District Court for the Southern District of New York, Civil Action No 04-CF-7844 (BSJ) (Deposition Testimony). December 2007.

*State of Alabama v. Abbott Laboratories, Inc., et al.*, In the Circuit Court of Montgomery County, Alabama, CV-05-219 (Deposition Testimony).  November 2007.

*Dynax Corporation v. Chemguard, Inc.*, U.S. District Court for the Southern District of New York, Index:  06-CIV-5143 (CM)(ECF CASE) (Deposition Testimony).  June 2007

*State of Colorado,* et al. *v. Warner Chilcott Holdings Company III, Ltd,* et al., U.S. District Court for the District of Columbia, Civil Action No 1:05CV02182 (CKK) (Deposition Testimony).  August 2007

Sumanth Addanki

*Novartis Corporation, Novartis Pharmaceuticals Corporation, and Novartis International AG v. Teva Pharmaceuticals USA, Inc.*, U.S. District Court for the District of New Jersey, Civil Action Nos. 04-4473 and 06-1130 (HAA)(MF) (Deposition Testimony). February 2007

*In re Pharmaceutical Industry Average Wholesale Price Litigation (MDL 1456)*, U.S. District Court for the District of Massachusetts, Civil Action No. 01-12257-PBS. December 2006

*Briant Chun-Hoon and Carlo Guglielmino v. McKee Foods Corporation, a Tennessee Corporation; and Does 1 through 100, inclusive,* U.S. District Court for the Northern District of California, Case No. C05-00620 VRW (Deposition Testimony). March 2006

*XIOtech Corporation v. Compellent Technologies, Inc., Michael Markovich, Russell B. Taddiken, Scott A. Winslow, Kristofer M. Zuber,* District Court for the State of Minnesota, Fourth Judicial District, Court File No.: 04-5065 (Deposition Testimony). March 2006

*Medtronic Minimed, Inc., v. Smiths Medical MD, Inc.,* U. S. District Court for the District of Delaware, Civil Action No. 03-776-KAJ (Deposition Testimony). February 2006

## Papers and Publications (1999 – 2009)

"Patent Settlement Agreements" with Alan J. Daskin, Chapter 85, Volume 3, in *Issues in Competition Law and Policy*, published by American Bar Association, Section of Antitrust Law, August, 2008.

"Who Defines the Relevant Market—The Core Customer or Marginal One?" with Alan Daskin, *Antitrust Insights*, National Economic Research Associates, Inc., Summer 2008.

"*Schering-Plough* and the Antitrust Analysis of Patent Settlement Agreements in Pharmaceutical Markets," *Antitrust Insights*, National Economic Research Associates, Inc., 2005 and published in Economics of Antitrust: Complex Issues in a Dynamic Economy, Chapter 4, May 2007.

"Economists Lend Insight Into Antitrust Risk,"*IFLR (International Financial Law Review), Mergers and Acquisitions* 2004, 2004.

"Market Definitions Using Econometrics: An Apparent Paradox Explained," *Antitrust Insights*, National Economic Research Associates, Inc., 2001.

"Presenting Complex Technical and Economic Evidence: Lessons From The Trenches," *Antitrust and Intellectual Property:  The Crossroads,* American Bar Association, 2000.

July 2009

# Exhibit 2

**Case Materials**

United States ex rel Ven-A-Care of the Florida Keys, Inc. v. Schering Corporation, Schering-Plough Corporation and Warrick Pharmaceuticals Corporation, Civil Action No. 09-CV-10547, The Parties' Joint Motion for a Scheduling Conference, June 26, 2009, and Exhibit A.

**Data**

"DOJ NDCs.xls"

First DataBank Data.

Medicaid State Drug Utilization Data including "Definitions for State Drug Utilization Data Specifications", Centers for Medicare & Medicaid Services.

Medispan Data.

Schering AMP Data.

Schering Sales Data.

**Miscellaneous**

PRNewswire, "Schering-Plough Aims To Make CLARITIN® Premier Brand In OTC Category, Establish CLARINEX® As Premier Brand In Prescription Category," March 8, 2002.

Schering-Plough Corporation, Form 8-K, Exhibit 99.1, "Schering-Plough Reports Sales, Earnings For 2002 Third Quarter," October 24, 2002.

Schering-Plough Corporation, Form 10-K, for the fiscal year ended December 31, 2001, Item 1.

**Exhibit 3**

**Percentage "Spreads"[1,2] between AWP and AMP**

**Accused Branded Products[3]**

**1997 - 2003**

| Brand Name | 9-Digit NDC | Date Added to First DataBank | Date of First Gross Sales | Date of Last Gross Sales | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | (Percent) | | | |
| (a) | (b) | (c) | (d) | (e) | (f) | (g) | (h) | (i) | (j) | (k) | (l) |
| Cedax | 000850691 | 01/08/96 | 01/19/96 | 02/17/00 | 22.7 % | 23.1 % | 22.6 % | % | % | % | % |
| Cedax | 000850777 | 01/08/96 | 01/19/96 | 02/22/00 | 25.1 | 26.2 | 25.2 | | | | |
| Cedax | 000850834 | 01/27/97 | 02/18/97 | 01/19/00 | 25.7 | 27.4 | 27.3 | | | | |
| Celestone Soluspan | 000850011 | 01/01/82 | 01/01/91 | 11/27/01 | 22.2 | 22.8 | 19.9 | 10.8 | 23.2 | | |
| Celestone Soluspan | 000850566 | 01/01/82 | 01/01/91 | 09/30/07 | 25.0 | 25.6 | 25.4 | 30.3 | 24.3 | 24.6 | 30.6 |
| Celestone Soluspan | 000850942 | 01/01/82 | 01/01/91 | 09/26/07 | 22.8 | 23.5 | 22.0 | 20.7 | 26.0 | 24.9 | 28.7 |
| Clarinex | 000851264 | 12/26/01 | 01/02/02 | 09/30/07 | | | | | | 24.3 | 28.3 |
| Clarinex | 000851280 | 05/21/03 | 05/21/03 | 08/02/07 | | | | | | | 31.2 |
| Clarinex | 000851334 | 12/22/04 | 01/11/05 | 09/26/07 | | | | | | | |
| Claritin | 000850458 | 04/14/93 | 04/15/93 | 04/03/07 | 23.2 | 22.9 | 22.8 | 23.7 | 24.7 | | |
| Claritin | 000850612 | 10/15/96 | 10/14/96 | 04/23/01 | 23.4 | 22.8 | | | | | |
| Claritin | 000851128 | 02/06/97 | 02/24/97 | 01/29/07 | 23.0 | 22.7 | 22.7 | 23.2 | 24.8 | | |
| Claritin | 000851223 | 05/25/99 | 04/20/99 | 04/03/07 | | | 22.7 | 23.4 | 25.0 | | |
| Claritin D | 000850635 | 11/15/94 | 11/14/94 | 08/07/07 | 23.4 | 23.0 | 22.8 | 23.2 | 25.4 | | |
| Claritin D | 000850640 | 08/27/96 | 08/26/96 | 09/24/99 | 23.0 | 22.9 | | | | | |
| Claritin D | 000851233 | 12/07/98 | 12/01/98 | 01/31/04 | | | 22.6 | 23.2 | 25.2 | | |
| Diprolene | 000850517 | 03/19/87 | 01/01/91 | 09/27/07 | 26.8 | 26.3 | 26.5 | 27.4 | 28.1 | 29.3 | 31.9 |
| Diprolene | 000850575 | 08/07/83 | 01/01/91 | 09/27/07 | 25.7 | 25.5 | 24.4 | 26.4 | 27.1 | 27.6 | 34.8 |
| Diprolene | 000850634 | 12/05/91 | 12/01/91 | 12/20/06 | 27.4 | 27.7 | 27.7 | 28.5 | 29.9 | 32.2 | 33.2 |
| Diprolene | 000850962 | 05/19/88 | 01/01/91 | 09/27/07 | 22.9 | 22.7 | 22.8 | 23.5 | 24.2 | 24.1 | 29.4 |
| Diprosone | 000850475 | 01/01/82 | 01/01/91 | 04/12/00 | 21.0 | 22.5 | 22.9 | | | | |
| Diprosone | 000850853 | 01/01/82 | 01/01/91 | 12/06/01 | 28.4 | 34.6 | 31.8 | 33.2 | 6.0 | | |
| Elocon | 000850370 | 07/02/87 | 01/01/91 | 09/26/07 | 29.5 | 29.2 | 29.4 | 29.9 | 31.8 | 29.8 | 41.8 |
| Elocon | 000850567 | 07/02/87 | 01/01/91 | 09/30/07 | 29.9 | 29.4 | 29.8 | 29.5 | 30.7 | 32.4 | 36.2 |
| Elocon | 000850854 | 05/04/89 | 01/01/91 | 09/26/07 | 22.9 | 22.7 | 22.8 | 23.4 | 24.4 | 24.4 | 32.1 |
| Eulexin | 000850525 | 02/09/89 | 01/01/91 | 04/03/07 | 23.2 | 22.8 | 23.0 | 24.5 | 25.4 | | |
| Foradil | 000851401 | 06/25/03 | 03/11/03 | 09/29/07 | | | | | | | 28.6 |
| Foradil | 000851402 | 07/16/03 | 06/02/03 | 09/30/07 | | | | | | | |
| Fulvicin | 000850496 | 01/01/82 | 01/01/91 | 10/24/02 | 24.6 | 23.4 | 22.5 | 23.2 | 24.7 | | |
| IMDUR | 000851153 | 05/05/95 | 05/10/95 | 11/07/06 | 22.9 | 23.2 | 23.9 | 29.7 | 37.3 | 28.7 | 33.9 |
| IMDUR | 000853306 | 12/26/95 | 01/09/96 | 12/20/06 | 23.1 | 23.3 | 25.7 | 37.1 | 50.0 | 28.9 | 28.7 |
| IMDUR | 000854110 | 08/30/93 | 09/07/93 | 12/20/06 | 23.3 | 23.2 | 26.6 | 37.2 | 53.8 | 30.3 | 29.1 |
| Intron A | 000850120 | 06/12/86 | 01/01/91 | 07/11/03 | 22.9 | 23.2 | 22.6 | 25.4 | 24.0 | 22.6 | |
| Intron A | 000850285 | 06/12/86 | 01/01/91 | 01/07/04 | 22.8 | 22.8 | 22.7 | 24.9 | 23.3 | 22.6 | |
| Intron A | 000850539 | 12/01/88 | 01/01/91 | 09/27/07 | 23.0 | 22.5 | 22.6 | 25.0 | 23.8 | 25.7 | 28.0 |
| Intron A | 000850571 | 06/12/86 | 01/01/91 | 09/28/07 | 27.5 | 24.4 | 23.3 | 25.5 | 23.9 | 26.2 | 28.2 |
| Intron A | 000850647 | 06/12/86 | 01/01/91 | 11/08/02 | 25.4 | 22.6 | 23.0 | 25.1 | 22.9 | | |
| Intron A | 000850689 | 08/10/92 | 07/27/92 | 06/24/96 | | | | | | | |
| Intron A | 000850769 | 05/18/93 | 05/19/93 | 11/21/97 | | | | | | | |
| Intron A | 000850923 | 05/18/93 | 05/19/93 | 01/13/98 | | | | | | | |

**Exhibit 3**

**Percentage "Spreads"[1,2] between AWP and AMP**

**Accused Branded Products[3]**

**1997 - 2003**

| Brand Name | 9-Digit NDC | Date Added to First DataBank | Date of First Gross Sales | Date of Last Gross Sales | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | (Percent) | | | |
| (a) | (b) | (c) | (d) | (e) | (f) | (g) | (h) | (i) | (j) | (k) | (l) |
| Intron A | 000850953 | 01/27/95 | 01/30/95 | 08/19/97 | | | | | | | |
| Intron A | 000851110 | 12/19/95 | 12/06/95 | 09/26/07 | 22.6 | 22.7 | 22.7 | 25.2 | 24.4 | 26.0 | 28.8 |
| Intron A | 000851133 | 01/30/97 | 02/04/97 | 09/27/07 | 23.3 | 83.3 | 82.2 | 25.2 | 24.2 | 25.6 | 28.3 |
| Intron A | 000851168 | 01/30/97 | 02/04/97 | 09/27/07 | 22.6 | 22.8 | 22.8 | 25.2 | 24.6 | 25.5 | 29.3 |
| Intron A | 000851179 | 01/30/97 | 02/03/97 | 09/05/07 | 22.4 | 22.6 | 22.6 | 25.3 | 23.7 | 25.2 | 28.6 |
| Intron A | 000851184 | 01/30/97 | 07/22/96 | 03/20/03 | 22.6 | 22.8 | 22.9 | 25.5 | 24.3 | 22.9 | |
| Intron A | 000851191 | 01/30/97 | 02/03/97 | 12/12/02 | 22.6 | 22.7 | 22.6 | 25.4 | 22.8 | 22.6 | |
| Intron A | 000851235 | 07/14/98 | 07/07/98 | 09/27/07 | | | 22.8 | 25.3 | 24.3 | 25.1 | 28.9 |
| Intron A | 000851242 | 07/14/98 | 07/07/98 | 09/27/07 | | | 22.9 | 25.7 | 24.4 | 24.4 | 28.5 |
| Intron A | 000851254 | 07/14/98 | 07/07/98 | 09/26/07 | | | 22.7 | 25.0 | 24.7 | 24.9 | 28.5 |
| K-Dur | 000850263 | 01/22/87 | 01/01/91 | 09/05/07 | 23.0 | 22.9 | 22.6 | 24.5 | 25.5 | 24.5 | 23.9 |
| K-Dur | 000850787 | 01/22/87 | 01/01/91 | 09/05/07 | 23.5 | 23.0 | 22.9 | 24.5 | 25.5 | 27.6 | 37.6 |
| Lotrimin | 000850182 | 01/01/82 | 01/01/91 | 08/14/03 | 27.2 | 25.7 | 22.6 | 23.7 | 26.8 | | |
| Lotrimin | 000850613 | 01/01/82 | 01/01/91 | 10/09/03 | 24.2 | 24.3 | 30.8 | 28.8 | 20.5 | | |
| Lotrimin | 000850707 | 04/29/84 | 01/01/91 | 02/03/04 | 22.8 | 22.9 | 22.7 | 24.3 | 25.4 | | |
| Lotrisone | 000850809 | 01/03/01 | 12/12/00 | 09/25/07 | | | | | 33.9 | 44.5 | 28.3 |
| Lotrisone | 000850924 | 07/01/84 | 01/01/91 | 09/27/07 | 25.2 | 24.9 | 24.9 | 26.4 | | | |
| Nasonex | 000851197 | 10/16/97 | 10/14/97 | 03/21/07 | | | 23.1 | 23.9 | 25.0 | 29.7 | 27.8 |
| Nasonex | 000851288 | 12/17/04 | 12/20/04 | 09/30/07 | | | | | | | |
| Nitro-Dur | 000850819 | 03/31/94 | 03/22/94 | 09/28/07 | 25.3 | 31.3 | 26.0 | 26.3 | 29.8 | 31.5 | 30.5 |
| Nitro-Dur | 000853305 | 01/29/87 | 01/01/91 | 09/27/07 | 267.4 | 37.3 | 31.2 | 28.4 | 33.9 | 34.4 | 32.5 |
| Nitro-Dur | 000853310 | 01/29/87 | 01/01/91 | 09/26/07 | 26.5 | 30.7 | 26.7 | 27.7 | 31.5 | 34.0 | 31.2 |
| Nitro-Dur | 000853315 | 01/29/87 | 01/01/91 | 09/27/07 | 26.4 | 30.5 | 26.8 | 27.9 | 34.4 | 34.8 | 32.6 |
| Nitro-Dur | 000853320 | 01/29/87 | 01/01/91 | 09/27/07 | 26.3 | 29.5 | 26.2 | 27.0 | 31.5 | 32.5 | 31.2 |
| Nitro-Dur | 000853330 | 01/29/87 | 01/01/91 | 09/26/07 | 31.7 | 30.4 | 30.3 | 29.3 | 31.8 | 32.7 | 30.6 |
| Normodyne | 000850244 | 05/30/85 | 01/01/91 | 02/20/02 | 24.1 | 24.9 | 24.6 | 25.4 | 111.6 | | |
| Normodyne | 000850362 | 01/12/89 | 01/01/91 | 05/15/03 | 135.4 | 158.6 | 92.4 | 74.1 | 59.4 | 30.7 | |
| Normodyne | 000850438 | 08/24/84 | 01/01/91 | 02/27/02 | 23.5 | 23.6 | 23.0 | 23.4 | 20.5 | | |
| Normodyne | 000850752 | 08/24/84 | 01/01/91 | 02/08/02 | 24.4 | 24.3 | 23.7 | 24.7 | 22.9 | | |
| Peg Intron | 000851279 | 01/31/01 | 02/06/01 | 09/28/07 | | | | | 22.7 | 27.3 | 29.7 |
| Peg Intron | 000851291 | 01/31/01 | 02/06/01 | 09/26/07 | | | | | 22.6 | 27.1 | 29.8 |
| Peg Intron | 000851297 | 02/02/04 | 02/10/04 | 09/27/07 | | | | | | | |
| Peg Intron | 000851304 | 01/31/01 | 02/06/01 | 09/27/07 | | | | | 23.0 | 27.1 | 29.6 |
| Peg Intron | 000851368 | 02/02/04 | 02/10/04 | 09/27/07 | | | | | | | |
| Peg Intron | 000851368 | 01/31/01 | 02/06/01 | 09/27/07 | | | | | 22.8 | 27.2 | 28.7 |
| Peg Intron | 000851370 | 02/02/04 | 02/16/04 | 09/28/07 | | | | | | | |
| Proventil | 000850208 | 02/19/87 | 01/01/91 | 03/30/03 | 40.6 | 27.7 | 24.4 | 29.3 | 30.5 | 42.1 | |
| Proventil | 000850209 | 02/19/87 | 01/01/91 | 10/18/02 | 53.1 | 27.2 | 24.2 | 25.7 | 40.5 | 29.6 | |
| Proventil | 000850252 | 01/01/82 | 01/01/91 | 01/03/01 | 21.6 | 19.9 | 22.1 | 7.4 | | | |
| Proventil | 000850315 | 09/12/85 | 01/01/91 | 06/12/01 | 71.5 | 16.1 | 19.0 | 25.9 | | | |

**Exhibit 3**

**Percentage "Spreads"[1,2] between AWP and AMP**

**Accused Branded Products[3]**

**1997 - 2003**

| Brand Name | 9-Digit NDC | Date Added to First DataBank | Date of First Gross Sales | Date of Last Gross Sales | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| (a) | (b) | (c) | (d) | (e) | (f) | (g) | (h) | (i) | (j) | (k) | (l) |
| Proventil | 000850431 | 06/25/87 | 01/01/91 | 08/07/07 | 23.8 | 23.3 | 23.0 | 24.2 | 25.2 | | |
| Proventil | 000850573 | 01/01/82 | 01/01/91 | 11/06/01 | 21.3 | 23.1 | 21.8 | 14.0 | 25.8 | | |
| Proventil | 000850614 | 01/01/82 | 01/01/91 | 09/27/07 | 26.4 | 22.9 | 22.8 | 24.1 | 23.4 | 29.7 | 28.5 |
| Proventil | 000851132 | 10/16/96 | 12/16/96 | 09/30/07 | 37.7 | 28.0 | 23.1 | 23.9 | 40.9 | 30.9 | 27.6 |
| Proventil | 000851806 | 10/01/02 | 10/04/02 | 09/25/07 | | | | | | | 28.2 |
| Rebetol | 000851194 | 10/04/01 | 10/08/01 | 09/25/07 | | | | | | 29.1 | 31.5 |
| Rebetol | 000851327 | 10/04/01 | 10/11/01 | 09/20/07 | | | | | | 29.7 | 31.8 |
| Rebetol | 000851351 | 10/04/01 | 10/08/01 | 09/25/07 | | | | | | 29.4 | 32.9 |
| Rebetol | 000851385 | 10/04/01 | 10/08/01 | 09/25/07 | | | | | | 29.3 | 33.9 |
| Rebetron | 000851236 | 06/11/98 | 06/08/98 | 11/30/04 | | | 23.0 | 24.4 | 24.8 | 16.0 | 20.9 |
| Rebetron | 000851241 | 06/11/98 | 06/08/98 | 05/08/03 | | | 23.1 | 24.9 | 25.8 | 24.5 | |
| Rebetron | 000851258 | 07/14/98 | 07/07/98 | 03/15/05 | | | 23.1 | 25.1 | 26.1 | 22.8 | 21.4 |
| Sebizon | 000850600 | 01/01/82 | 01/01/91 | 10/16/00 | 22.4 | 22.6 | 22.9 | 21.9 | | | |
| Solganal | 000850460 | 01/01/82 | 01/01/91 | 10/02/02 | 23.0 | 22.7 | 22.9 | 22.7 | 24.4 | | |
| Temodar | 000851244 | 08/19/99 | 08/23/99 | 09/19/07 | | | | 22.8 | 24.5 | 30.2 | 28.2 |
| Temodar | 000851248 | 08/19/99 | 08/23/99 | 09/28/07 | | | | 22.8 | 24.5 | 30.3 | 28.4 |
| Temodar | 000851252 | 08/19/99 | 08/23/99 | 09/10/07 | | | | 22.8 | 24.5 | 29.6 | 28.4 |
| Temodar | 000851259 | 08/19/99 | 08/23/99 | 08/27/07 | | | | 22.9 | 24.4 | 29.6 | 28.5 |
| Theo-Dur | 000850381 | 01/22/87 | 01/01/91 | 05/14/96 | | | | | | | |
| Theo-Dur | 000850487 | 01/22/87 | 01/01/91 | 10/16/00 | 55.6 | 32.6 | 23.4 | 24.9 | | | |
| Theo-Dur | 000850584 | 01/22/87 | 01/01/91 | 04/22/02 | 33.0 | 23.2 | 23.9 | 22.7 | | | |
| Theo-Dur | 000850620 | 01/22/87 | 01/01/91 | 07/06/95 | | | | | | | |
| Theo-Dur | 000850806 | 08/06/87 | 01/01/91 | 03/08/02 | 30.6 | 23.0 | 23.2 | 20.5 | | | |
| Theo-Dur | 000850875 | 01/29/87 | 01/01/91 | 02/14/96 | | | | | | | |
| Theo-Dur | 000850928 | 01/22/87 | 01/01/91 | 12/06/95 | | | | | | | |
| Theo-Dur | 000850933 | 01/22/87 | 01/01/91 | 03/08/02 | 35.1 | 24.0 | 24.4 | 26.9 | | | |
| Trinalin | 000850703 | 01/01/82 | 01/01/91 | 09/24/03 | 22.8 | 22.6 | 22.5 | 22.5 | 24.9 | 23.1 | |
| Vancenase | 000850041 | 01/01/82 | 01/01/91 | 01/26/01 | 25.4 | 27.0 | 24.1 | | | | |
| Vancenase | 000850259 | 12/17/87 | 01/01/91 | 09/22/98 | | | | | | | |
| Vancenase | 000850649 | 07/20/92 | 07/01/92 | 11/06/02 | 25.3 | 23.7 | 23.0 | 27.4 | 32.7 | | |
| Vancenase | 000851049 | 06/27/96 | 06/27/96 | 11/22/02 | 28.4 | 24.6 | 23.0 | 23.4 | 26.0 | | |
| Vanceril | 000850736 | 01/01/82 | 01/01/91 | 04/03/07 | 24.3 | 23.8 | 23.1 | 26.2 | 24.7 | 31.5 | |
| Vanceril | 000851112 | 12/26/96 | 12/27/96 | 05/02/03 | 24.6 | 23.8 | 23.8 | | | | |

Notes:  - FDB package sizes for certain NDCs of Proventil and Vanceril were replaced with package sizes derived using implied package sizes from Medispan.

[1] "Spreads", (AWP - AMP) / AMP, were calculated as the weighted average of "spreads", calculated at the 11-digit NDC level, across all accused NDCs within a 9-digit NDC.  At the 11-digit NDC level, "spreads" were calculated separately for each period during the calendar year during which neither the AWP nor the AMP had changed.  These "spreads" were then aggregated over the calendar year and across 11-digit NDC "Gross Sales Activityin the AMP-Related Classes of Trade" (see Note 4).

**Exhibit 3**

**Percentage "Spreads"[1,2] between AWP and AMP**

**Accused Branded Products[3]**

**1997 - 2003**

| Brand Name | 9-Digit NDC | Date Added to First DataBank | Date of First Gross Sales | Date of Last Gross Sales | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | ------(Percent)------ | | | | | | |
| (a) | (b) | (c) | (d) | (e) | (f) | (g) | (h) | (i) | (j) | (k) | (l) |

[2] A 9-digit NDC was considered to be effectively obsolete for a given quarter if its constituent 11-digit NDCs were all declared to be obsolete, discontinued, or converted to over-the-counter products, or if "Gross Sales Activity in the AMP-Related Classes of Trade" had fallen substantially (by 90 percent or more) in anticipation of such events. A 9-digit NDC was considered to be effectively obsolete for a given year if the first 11-digit NDC to be added to First DataBank (FDB) within the 9-digit NDC was added after June 30th of that year, there were gross sales for less than six months during that year, or the 9-digit NDC was effectively obsolete for at least three quarters of the year. Spreads were not calculated for years during which the 9-digit NDC was effectively obsolete or where the percent of sales at or near WAC was not calculated for the reasons indicated in Exhibit 6.

[3] "Accused Branded Products" include all Schering products on NDC list "DOJ NDCs.xls".

[4] "Gross Sales Activity in the AMP-Related Classes of Trade" is defined as Total Gross Sales Activity, limited to the following classes of trade: 111, 121, 122, 123, 171, 172, 341, and 346. Total Gross Sales Activity is defined as direct sales with non-missing credit codes and contract sales from the indirect sales data. Gross sales exclude non-US transactions and transactions with either non-positive revenue or quantity.

Sources:  - "DOJ NDCs.xls".
- First DataBank Data.
- Medispan Data.
- PRNewswire, "Schering-Plough Aims To Make CLARITIN® Premier Brand In OTC Category, Establish CLARINEX® As Premier Brand In Prescription Category," March 8, 2002.
- Schering AMP Data.
- Schering Sales Data.
- Schering-Plough Corporation, Form 8-K, Exhibit 99.1, "Schering-Plough Reports Sales, Earnings For 2002 Third Quarter," October 24, 2002.
- Schering-Plough Corporation, Form 10-K, for the fiscal year ended December 31, 2001, Item 1.

**Exhibit 4**
**Distribution of Schering Sales by Discount Percentage**
**Accused Branded Products[1]**
**1997 - 2003**

| Average Price as a Percent of Prevailing WAC | | | |
|---|---|---|---|
| Greater Than | Less Than or Equal To | Percent of Sales | Cumulative Percent of Sales |
| ------------(Percent)------------ | | ----------------(Percent)---------------- | |
| (a) | (b) | (c) | (d) |
| 100 | | 0.17 % | 0.17 % |
| 99 | 100 | 0.01 | 0.18 |
| 98 | 99 | 0.25 | 0.43 |
| 97 | 98 | 53.34 | 53.77 |
| 96 | 97 | 19.14 | 72.91 |
| 95 | 96 | 12.48 | 85.39 |
| 94 | 95 | 3.87 | 89.26 |
| 93 | 94 | 1.89 | 91.15 |
| 92 | 93 | 0.96 | 92.11 |
| 91 | 92 | 1.77 | 93.88 |
| 90 | 91 | 0.75 | 94.63 |
| 85 | 90 | 1.52 | 96.15 |
| 80 | 85 | 0.90 | 97.05 |
| | 80 | 2.95 | 100.00 |

Notes:  - Sales exclude non-US and non-sales transactions, and do not include rebates found in the rebates files.
   - Further reductions for prompt payment of 2 percent were applied to direct sales.
   - Total Sales were $32,192,886,846.25. If net revenue for a particular NDC and customer number
     for the prevailing WAC period was negative (-$329,743,869.00 total) or if the revenue or quantity
     before chargebacks or price paid were missing or otherwise non-positive ($7,109,459.73 total),
     or if the WAC was not available ($1,009,418,721.80 total), it was dropped.
   - Wholesale entries from the chargebacks data without corresponding wholesale entries in the
     sales data were excluded (-$177,850,185.07 total).
   - Wholesale entries from the chargebacks data were matched with wholesale entries in the
     sales data by prevailing WAC period.
   - Price is calculated by customer, as identified by customer number and, for a small number of
     customer numbers that appear in multiple classes of trade, by customer number and class of trade.
   - WAC values were retrieved from FDB by NDC as the prevailing WAC on the date of
     the sales transaction.
   - FDB package sizes for certain NDCs of Proventil and Vanceril were replaced with package sizes
     derived using implied package sizes from Medispan.
   - Ratios of average price to WAC were annualized to the customer and 11-digit NDC level, weighting by Gross
     Sales Activity in quantity.  Gross Sales Activity was calculated as total sales by customer for blank-credit-code
     transactions in the Direct Sales data and end customer Contract Sales in the Indirect Sales, excluding non-US
     and non-positive revenue or quantity transactions, by calendar year and prevailing WAC period.  The
     distribution of sales by discount percentage was then calculated by the weighted adjusted prevailing period revenue.
   - The time period used for calculating both average prices and Gross Sales Activity was restricted to the
     relevant period, 1997 through 2003.
   - A 9-digit NDC was considered to be effectively obsolete in a quarter if its constituent 11-digit NDCs were
     declared to be obsolete, discontinued, or converted to over-the-counter products.

[1] The table includes all branded Schering products on NDC list "DOJ NDCs.xls".

Sources:  - "DOJ NDCs.xls".
   - First DataBank Data.
   - Medispan Data.
   - PRNewswire, "Schering-Plough Aims To Make CLARITIN® Premier Brand In OTC Category, Establish
     CLARINEX® As Premier Brand In Prescription Category," March 8, 2002.
   - Schering AMP Data.
   - Schering Sales Data.
   - Schering-Plough Corporation, Form 8-K, Exhibit 99.1, "Schering-Plough Reports Sales, Earnings For 2002
     Third Quarter," October 24, 2002.
   - Schering-Plough Corporation, Form 10-K, for the fiscal year ended December 31, 2001, Item 1.

**Exhibit 5**
**Percent of Schering Sales Made at Discounts**
**No Greater Than 5% Off the Prevailing FDB WAC**
**Accused Branded Products[1]**
**1997 - 2003**

| Brand | Percent of Sales within 5% of WAC | Share of National Medicaid Reimbursement for Accused Schering Drugs |
|---|---|---|
| (a) | (b) | (c) |
| Cedax | 97.1 % | 0.6 % |
| Celestone Soluspan | 12.1 | 0.3 |
| Clarinex | 95.6 | 6.4 |
| Claritin | 94.6 | 20.1 |
| Claritin D | 95.9 | 6.3 |
| Diprolene | 92.4 | 2.4 |
| Diprosone | 86.2 | 0.0 |
| Elocon | 94.2 | 5.5 |
| Eulexin | 63.0 | 0.6 |
| Foradil | 74.4 | 0.4 |
| Fulvicin | 85.5 | 0.0 |
| IMDUR | 90.3 | 2.8 |
| Intron A | 74.9 | 2.1 |
| K-Dur | 87.3 | 6.1 |
| Lotrimin | 71.2 | 0.1 |
| Lotrisone | 87.0 | 6.6 |
| Nasonex | 91.8 | 6.0 |
| Nitro-Dur | 54.1 | 7.7 |
| Normodyne | 84.6 | 0.3 |
| Peg Intron | 87.5 | 6.0 |
| Proventil | 79.7 | 4.8 |
| Rebetol | 67.1 | 6.5 |
| Rebetron | 61.0 | 3.7 |
| Sebizon | 99.2 | 0.0 |
| Solganal | 80.7 | 0.0 |
| Temodar | 93.0 | 0.7 |
| Theo-Dur | 65.4 | 0.2 |
| Trinalin | 95.4 | 0.1 |
| Vancenase | 77.0 | 1.9 |
| Vanceril | 78.7 | 1.9 |

Notes:  - Sales exclude non-US and non-sales transactions, and do not include rebates found in the rebates files.
 - Further reductions for prompt payment of 2 percent were applied to direct sales.
 - Total Sales were $32,192,886,846.25. If net revenue for a particular NDC and customer number
   for the prevailing WAC period was negative (-$329,743,869.00 total) or if the revenue or quantity
   before chargebacks or price paid were missing or otherwise non-positive ($7,109,459.73 total),
   or if the WAC was not available ($1,009,418,721.80 total), it was dropped.
 - Wholesale entries from the chargebacks data without corresponding wholesale entries in the
   sales data were excluded (-$177,850,185.07 total).
 - Wholesale entries from the chargebacks data were matched with wholesale entries in the
   sales data by prevailing WAC period.
 - Price is calculated by customer, as identified by customer number and, for a small number of
   customer numbers that appear in multiple classes of trade, by customer number and class of trade.

## Percent of Schering Sales Made at Discounts
## No Greater Than 5% Off the Prevailing FDB WAC
## Accused Branded Products[1]
### 1997 - 2003

- WAC values were retrieved from FDB by NDC as the prevailing WAC on the date of
  the sales transaction.
- FDB package sizes for certain NDCs of Proventil and Vanceril were replaced with package sizes
  derived using implied package sizes from Medispan.
- Ratios of average price to WAC were annualized to the customer and 11-digit NDC level, weighting by Gross
  Sales Activity in quantity.  Gross Sales Activity was calculated as total sales by customer for blank-credit-code
  transactions in the Direct Sales data and end customer Contract Sales in the Indirect Sales, excluding non-US
  and non-positive revenue or quantity transactions, by calendar year and prevailing WAC period.  Sales within
  5 percent of WAC were then calculated by the weighted adjusted prevailing period revenue.
- The time period used for calculating both average prices and Gross Sales Activity was restricted to the
  relevant period, 1997 through 2003.
- A 9-digit NDC was considered to be effectively obsolete in a quarter if its constituent 11-digit NDCs were
  declared to be obsolete, discontinued, or converted to over-the-counter products.
- National Medicaid reimbursement reflects the total amount the State reimbursed to pharmacists for the drug.
  This total is not reduced or affected by Medicaid rebates paid to the state. This amount represents both the
  Federal and State reimbursement and is inclusive of dispensing fees.


[1] The table includes all branded Schering products on NDC list "DOJ NDCs.xls".

Sources:  - "DOJ NDCs.xls".
- First DataBank Data.
- Medicaid State Drug Utilization Data including "Definitions for State Drug Utilization Data Specifications",
  Centers for Medicare & Medicaid Services.
- Medispan Data.
- PRNewswire, "Schering-Plough Aims To Make CLARITIN® Premier Brand In OTC Category, Establish
  CLARINEX® As Premier Brand In Prescription Category," March 8, 2002.
- Schering AMP Data.
- Schering Sales Data.
- Schering-Plough Corporation, Form 8-K, Exhibit 99.1, "Schering-Plough Reports Sales, Earnings For 2002
  Third Quarter," October 24, 2002.
- Schering-Plough Corporation, Form 10-K, for the fiscal year ended December 31, 2001, Item 1.

**Exhibit 6**
**Percent of Schering Sales Made at Discounts**
**No Greater Than 5% Off the Prevailing FDB WAC**
**Accused Branded Products[1]**
**1997 - 2003**

| Brand | 9-Digit NDC | Date Added to FDB | Date of First Sale | Date of Last Sale | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| (a) | (b) | (c) | (d) | (e) | (f) | (g) | (h) | (i) | (j) | (k) | (l) |
| Cedax | 000850691 | 1/8/1996 | 1/19/1996 | 2/17/2000 | 99.8 % | 97.1 % | 92.2 % | % | % | % | % |
| Cedax | 000850777 | 1/8/1996 | 1/19/1996 | 2/22/2000 | 99.9 | 99.4 | 96.9 | | | | |
| Cedax | 000850834 | 1/27/1997 | 2/18/1997 | 1/19/2000 | 99.4 | 87.2 | 94.4 | | | | |
| Celestone Soluspan | 000850011 | 1/1/1982 | 1/1/1991 | 11/27/2001 | 98.1 | 98.8 | 97.4 | 97.9 | 99.1 | | |
| Celestone Soluspan | 000850566 | 1/1/1982 | 1/1/1991 | 9/30/2007 | 15.0 | 13.6 | 21.0 | 9.7 | 30.6 | 28.6 | 20.2 |
| Celestone Soluspan | 000850942 | 1/1/1982 | 1/1/1991 | 9/26/2007 | 89.0 | 97.4 | 96.2 | 95.8 | 95.1 | 96.1 | 84.8 |
| Clarinex | 000851264 | 12/26/2001 | 1/2/2002 | 9/30/2007 | | | | | | 95.7 | 95.4 |
| Clarinex | 000851280 | 5/21/2003 | 5/21/2003 | 8/2/2007 | | | | | | | 87.1 |
| Clarinex | 000851334 | 12/22/2004 | 1/11/2005 | 9/26/2007 | | | | | | | |
| Claritin | 000850458 | 4/14/1993 | 4/15/1993 | 4/3/2007 | 94.8 | 95.0 | 95.2 | 93.3 | 90.7 | | |
| Claritin | 000850612 | 10/15/1996 | 10/14/1996 | 4/23/2001 | 96.6 | 96.2 | | | | | |
| Claritin | 000851128 | 2/6/1997 | 2/24/1997 | 1/29/2007 | 99.1 | 97.2 | 93.9 | 91.7 | 92.6 | | |
| Claritin | 000851223 | 5/25/1999 | 4/20/1999 | 4/3/2007 | | | 96.9 | 95.3 | 95.7 | | |
| Claritin D | 000850635 | 11/15/1994 | 11/14/1994 | 8/7/2007 | 97.6 | 95.9 | 97.9 | 95.8 | 65.5 | | |
| Claritin D | 000850640 | 8/27/1996 | 8/26/1996 | 9/24/1999 | 98.3 | 96.7 | | | | | |
| Claritin D | 000851233 | 12/7/1998 | 12/1/1998 | 1/31/2004 | | | 97.4 | 97.5 | 65.7 | | |
| Diprolene | 000850517 | 3/19/1987 | 1/1/1991 | 9/27/2007 | 92.3 | 93.9 | 93.4 | 93.3 | 91.8 | 75.7 | 82.1 |
| Diprolene | 000850575 | 8/7/1983 | 1/1/1991 | 9/27/2007 | 89.5 | 91.4 | 90.4 | 92.8 | 93.2 | 76.9 | 53.8 |
| Diprolene | 000850634 | 12/5/1991 | 12/1/1991 | 12/20/2006 | 93.8 | 95.3 | 95.0 | 94.2 | 94.0 | 42.9 | 67.5 |
| Diprolene | 000850962 | 5/19/1988 | 1/1/1991 | 9/27/2007 | 94.2 | 94.3 | 94.3 | 93.1 | 93.6 | 86.9 | 88.0 |
| Diprosone | 000850475 | 1/1/1982 | 1/1/1991 | 4/12/2000 | 79.4 | 79.7 | 81.3 | | | | |
| Diprosone | 000850853 | 1/1/1982 | 1/1/1991 | 12/6/2001 | 86.5 | 81.8 | 79.8 | 94.9 | 96.4 | | |
| Elocon | 000850370 | 7/2/1987 | 1/1/1991 | 9/26/2007 | 94.2 | 95.3 | 94.9 | 95.0 | 95.2 | 81.3 | 38.6 |
| Elocon | 000850567 | 7/2/1987 | 1/1/1991 | 9/30/2007 | 93.9 | 96.0 | 95.5 | 95.6 | 95.4 | 69.8 | 78.1 |
| Elocon | 000850854 | 5/4/1989 | 1/1/1991 | 9/26/2007 | 96.3 | 97.1 | 96.8 | 96.5 | 96.5 | 97.7 | 46.1 |
| Eulexin | 000850525 | 2/9/1989 | 1/1/1991 | 4/3/2007 | 68.8 | 70.2 | 67.1 | 63.6 | 48.6 | | |
| Foradil | 000851401 | 6/25/2003 | 3/11/2003 | 9/29/2007 | | | | | | | 74.6 |
| Foradil | 000851402 | 7/16/2003 | 6/2/2003 | 9/30/2007 | | | | | | | |
| Fulvicin | 000850496 | 1/1/1982 | 1/1/1991 | 10/24/2002 | 88.3 | 89.0 | 86.6 | 81.4 | 74.5 | | |
| IMDUR | 000851153 | 5/5/1995 | 5/10/1995 | 11/7/2006 | 97.0 | 96.7 | 94.1 | 65.9 | 78.1 | 83.3 | 82.7 |
| IMDUR | 000853306 | 12/26/1995 | 1/9/1996 | 12/20/2006 | 94.4 | 94.5 | 92.3 | 65.5 | 78.8 | 85.2 | 87.0 |
| IMDUR | 000854110 | 8/30/1993 | 9/7/1993 | 12/20/2006 | 91.5 | 94.4 | 87.7 | 63.9 | 69.8 | 80.4 | 87.5 |
| Intron A | 000850120 | 6/12/1986 | 1/1/1991 | 7/11/2003 | 80.2 | 73.5 | 63.6 | 38.8 | 36.6 | 59.7 | |
| Intron A | 000850285 | 6/12/1986 | 1/1/1991 | 1/7/2004 | 48.6 | 63.7 | 56.5 | 48.7 | 46.5 | 69.0 | |
| Intron A | 000850539 | 12/1/1988 | 1/1/1991 | 9/27/2007 | 69.0 | 68.6 | 62.1 | 63.8 | 63.9 | 75.7 | 72.6 |

**Exhibit 6**
**Percent of Schering Sales Made at Discounts**
**No Greater Than 5% Off the Prevailing FDB WAC**
**Accused Branded Products[1]**
**1997 - 2003**

| Brand | 9-Digit NDC | Date Added to FDB | Date of First Sale | Date of Last Sale | Year 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| (a) | (b) | (c) | (d) | (e) | (f) | (g) | (h) | (i) | (j) | (k) | (l) |
| Intron A | 000850571 | 6/12/1986 | 1/1/1991 | 9/28/2007 | 60.3 | 57.5 | 50.4 | 35.4 | 38.4 | 58.9 | 54.5 |
| Intron A | 000850647 | 6/12/1986 | 1/1/1991 | 11/8/2002 | 78.9 | 79.3 | 79.9 | 53.5 | 63.4 | | |
| Intron A | 000850689 | 8/10/1992 | 7/27/1992 | 6/24/1996 | | | | | | | |
| Intron A | 000850769 | 5/18/1993 | 5/19/1993 | 11/21/1997 | | | | | | | |
| Intron A | 000850923 | 5/18/1993 | 5/19/1993 | 1/13/1998 | | | | | | | |
| Intron A | 000850953 | 1/27/1995 | 1/30/1995 | 8/19/1997 | | | | | | | |
| Intron A | 000851110 | 12/19/1995 | 12/6/1995 | 9/26/2007 | 74.5 | 77.3 | 69.4 | 59.9 | 45.6 | 75.1 | 62.8 |
| Intron A | 000851133 | 1/30/1997 | 2/4/1997 | 9/27/2007 | 71.5 | 77.2 | 76.4 | 60.3 | 54.1 | 71.6 | 64.5 |
| Intron A | 000851168 | 1/30/1997 | 2/4/1997 | 9/27/2007 | 81.1 | 74.0 | 80.8 | 68.7 | 59.8 | 78.5 | 60.1 |
| Intron A | 000851179 | 1/30/1997 | 2/3/1997 | 9/5/2007 | 78.2 | 76.7 | 70.7 | 54.7 | 55.8 | 79.6 | 63.4 |
| Intron A | 000851184 | 1/30/1997 | 7/22/1996 | 3/20/2003 | 90.3 | 87.6 | 82.8 | 49.4 | 61.9 | 83.4 | |
| Intron A | 000851191 | 1/30/1997 | 2/3/1997 | 12/12/2002 | 89.6 | 81.8 | 82.6 | 65.0 | 69.7 | 76.0 | |
| Intron A | 000851235 | 7/14/1998 | 7/7/1998 | 9/27/2007 | | | 89.3 | 77.9 | 78.4 | 85.0 | 67.6 |
| Intron A | 000851242 | 7/14/1998 | 7/7/1998 | 9/27/2007 | | | 89.2 | 76.7 | 79.9 | 83.5 | 79.6 |
| Intron A | 000851254 | 7/14/1998 | 7/7/1998 | 9/26/2007 | | | 87.1 | 81.7 | 74.5 | 88.3 | 81.4 |
| K-Dur | 000850263 | 1/22/1987 | 1/1/1991 | 9/5/2007 | 83.8 | 87.7 | 90.2 | 86.2 | 70.1 | 38.3 | 85.9 |
| K-Dur | 000850787 | 1/22/1987 | 1/1/1991 | 9/5/2007 | 89.0 | 91.3 | 90.0 | 85.5 | 72.7 | 33.9 | 72.5 |
| Lotrimin | 000850182 | 1/1/1982 | 1/1/1991 | 8/14/2003 | 68.3 | 65.9 | 61.5 | 57.6 | 54.4 | | |
| Lotrimin | 000850613 | 1/1/1982 | 1/1/1991 | 10/9/2003 | 62.7 | 71.2 | 81.9 | 90.8 | 87.3 | | |
| Lotrimin | 000850707 | 4/29/1984 | 1/1/1991 | 2/3/2004 | 77.8 | 74.4 | 76.4 | 75.0 | 71.4 | | |
| Lotrisone | 000850809 | 1/3/2001 | 12/12/2000 | 9/25/2007 | | | | | 46.6 | 94.3 | 84.9 |
| Lotrisone | 000850924 | 7/1/1984 | 1/1/1991 | 9/27/2007 | 89.5 | 89.9 | 88.0 | 86.4 | | | |
| Nasonex | 000851197 | 10/16/1997 | 10/14/1997 | 3/21/2007 | | | 92.4 | 87.6 | 91.7 | 91.2 | 94.5 |
| Nasonex | 000851288 | 12/17/2004 | 12/20/2004 | 9/30/2007 | | | | | | | |
| Nitro-Dur | 000850819 | 3/31/1994 | 3/22/1994 | 9/28/2007 | 88.0 | 83.8 | 77.0 | 79.6 | 75.3 | 87.0 | 79.8 |
| Nitro-Dur | 000853305 | 1/29/1987 | 1/1/1991 | 9/27/2007 | 64.4 | 64.0 | 52.7 | 61.1 | 51.1 | 61.0 | 70.5 |
| Nitro-Dur | 000853310 | 1/29/1987 | 1/1/1991 | 9/26/2007 | 62.6 | 56.9 | 55.0 | 57.3 | 53.5 | 56.1 | 69.7 |
| Nitro-Dur | 000853315 | 1/29/1987 | 1/1/1991 | 9/27/2007 | 63.6 | 58.1 | 59.1 | 60.5 | 50.2 | 63.5 | 82.8 |
| Nitro-Dur | 000853320 | 1/29/1987 | 1/1/1991 | 9/27/2007 | 57.7 | 54.2 | 58.0 | 54.5 | 49.9 | 62.6 | 73.7 |
| Nitro-Dur | 000853330 | 1/29/1987 | 1/1/1991 | 9/26/2007 | 62.4 | 56.4 | 56.3 | 59.0 | 51.0 | 68.6 | 85.4 |
| Normodyne | 000850244 | 5/30/1985 | 1/1/1991 | 2/20/2002 | 95.3 | 94.5 | 86.0 | 84.7 | 88.4 | | |
| Normodyne | 000850362 | 1/12/1989 | 1/1/1991 | 5/15/2003 | 6.1 | 8.8 | 4.7 | 12.5 | 16.2 | 8.5 | |
| Normodyne | 000850438 | 8/24/1984 | 1/1/1991 | 2/27/2002 | 95.2 | 95.3 | 84.1 | 92.3 | 79.6 | | |
| Normodyne | 000850752 | 8/24/1984 | 1/1/1991 | 2/8/2002 | 92.9 | 94.0 | 83.2 | 82.5 | 65.3 | | |
| Peg Intron | 000851279 | 1/31/2001 | 2/6/2001 | 9/28/2007 | | | | | 96.7 | 93.9 | 67.1 |

**Exhibit 6**
**Percent of Schering Sales Made at Discounts**
**No Greater Than 5% Off the Prevailing FDB WAC**
**Accused Branded Products[1]**
**1997 - 2003**

| | | | | | Year | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Brand | 9-Digit NDC | Date Added to FDB | Date of First Sale | Date of Last Sale | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 |
| (a) | (b) | (c) | (d) | (e) | (f) | (g) | (h) | (i) | (j) | (k) | (l) |
| Peg Intron | 000851291 | 1/31/2001 | 2/6/2001 | 9/26/2007 | | | | | 96.4 | 95.5 | 78.5 |
| Peg Intron | 000851297 | 2/2/2004 | 2/10/2004 | 9/27/2007 | | | | | | | |
| Peg Intron | 000851304 | 1/31/2001 | 2/6/2001 | 9/27/2007 | | | | | 97.4 | 94.2 | 67.8 |
| Peg Intron | 000851316 | 2/2/2004 | 2/10/2004 | 9/27/2007 | | | | | | | |
| Peg Intron | 000851368 | 1/31/2001 | 2/6/2001 | 9/27/2007 | | | | | 97.0 | 95.6 | 76.7 |
| Peg Intron | 000851370 | 2/2/2004 | 2/16/2004 | 9/28/2007 | | | | | | | |
| Proventil | 000850208 | 2/19/1987 | 1/1/1991 | 3/30/2003 | 24.1 | 48.9 | 30.5 | 43.4 | 78.1 | 17.0 | |
| Proventil | 000850209 | 2/19/1987 | 1/1/1991 | 10/18/2004 | 38.8 | 79.3 | 76.6 | 86.7 | 75.7 | 98.4 | |
| Proventil | 000850252 | 1/1/1982 | 1/1/1991 | 1/3/2001 | 97.7 | 97.6 | 98.3 | 95.6 | | | |
| Proventil | 000850315 | 9/12/1985 | 1/1/1991 | 6/12/2001 | 33.8 | 46.9 | 67.1 | 70.5 | | | |
| Proventil | 000850431 | 6/25/1987 | 1/1/1991 | 8/7/2007 | 89.0 | 92.1 | 92.7 | 91.0 | 87.4 | | |
| Proventil | 000850573 | 1/1/1982 | 1/1/1991 | 11/6/2001 | 97.4 | 97.2 | 97.1 | 96.2 | 58.2 | | |
| Proventil | 000850614 | 1/1/1982 | 1/1/1991 | 9/27/2007 | 69.5 | 80.9 | 91.5 | 88.0 | 89.4 | 67.8 | 82.4 |
| Proventil | 000851132 | 10/16/1996 | 12/16/1996 | 9/30/2007 | 83.1 | 80.7 | 87.2 | 87.9 | 51.0 | 95.1 | 92.8 |
| Proventil | 000851806 | 10/1/2002 | 10/4/2002 | 9/25/2007 | | | | | | | 96.2 |
| Rebetol | 000851194 | 10/4/2001 | 10/8/2001 | 9/25/2007 | | | | | | 84.2 | 59.0 |
| Rebetol | 000851327 | 10/4/2001 | 10/11/2001 | 9/20/2007 | | | | | | 79.7 | 71.1 |
| Rebetol | 000851351 | 10/4/2001 | 10/8/2001 | 9/25/2007 | | | | | | 75.8 | 51.7 |
| Rebetol | 000851385 | 10/4/2001 | 10/8/2001 | 9/25/2007 | | | | | | 88.8 | 51.2 |
| Rebetron | 000851236 | 6/11/1998 | 6/8/1998 | 11/30/2004 | | | 83.7 | 75.7 | 41.6 | 59.8 | 59.6 |
| Rebetron | 000851241 | 6/11/1998 | 6/8/1998 | 5/8/2003 | | | 89.1 | 71.9 | 48.6 | 60.7 | |
| Rebetron | 000851258 | 7/14/1998 | 7/7/1998 | 3/15/2005 | | | 86.6 | 75.6 | 46.3 | 50.3 | 41.2 |
| Sebizon | 000850600 | 1/1/1991 | 1/1/1991 | 10/16/2000 | 98.8 | 99.2 | 99.8 | 99.2 | | | |
| Solganal | 000850460 | 1/1/1982 | 1/1/1991 | 10/2/2002 | 83.1 | 77.7 | 86.2 | 84.9 | 78.2 | | |
| Temodar | 000851244 | 8/19/1999 | 8/23/1999 | 9/19/2007 | | | | 97.0 | 93.8 | 87.9 | 86.5 |
| Temodar | 000851248 | 8/19/1999 | 8/23/1999 | 9/28/2007 | | | | 97.5 | 94.8 | 93.0 | 88.0 |
| Temodar | 000851252 | 8/19/1999 | 8/23/1999 | 9/10/2007 | | | | 95.5 | 92.0 | 90.2 | 82.9 |
| Temodar | 000851259 | 8/19/1999 | 8/23/1999 | 8/27/2007 | | | | 96.5 | 92.7 | 91.7 | 92.1 |
| Theo-Dur | 000850381 | 1/22/1987 | 1/1/1991 | 5/14/1996 | | | | | | | |
| Theo-Dur | 000850487 | 1/22/1987 | 1/1/1991 | 10/16/2000 | 69.8 | 74.0 | 83.7 | 91.2 | | | |
| Theo-Dur | 000850584 | 1/22/1987 | 1/1/1991 | 4/22/2002 | 38.3 | 81.5 | 82.1 | 81.2 | | | |
| Theo-Dur | 000850620 | 1/22/1987 | 1/1/1991 | 7/6/1995 | | | | | | | |
| Theo-Dur | 000850806 | 8/6/1987 | 1/1/1991 | 3/8/2002 | 92.6 | 93.7 | 92.5 | 91.7 | | | |
| Theo-Dur | 000850875 | 1/29/1987 | 1/1/1991 | 2/14/1996 | | | | | | | |
| Theo-Dur | 000850928 | 1/22/1987 | 1/1/1991 | 12/6/1995 | | | | | | | |

**Exhibit 6**
**Percent of Schering Sales Made at Discounts**
**No Greater Than 5% Off the Prevailing FDB WAC**
**Accused Branded Products[1]**
**1997 - 2003**

| Brand | 9-Digit NDC | Date Added to FDB | Date of First Sale | Date of Last Sale | Year 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| (a) | (b) | (c) | (d) | (e) | (f) | (g) | (h) | (i) | (j) | (k) | (l) |
| Theo-Dur | 000850933 | 1/22/1987 | 1/1/1991 | 3/8/2002 | 39.0 | 76.4 | 76.5 | 81.3 | | | |
| Trinalin | 000850703 | 1/1/1982 | 1/1/1991 | 9/24/2003 | 95.7 | 96.2 | 96.4 | 95.4 | 88.9 | 90.5 | |
| Vancenase | 000850041 | 1/1/1982 | 1/1/1991 | 1/26/2001 | 40.3 | 43.4 | 41.7 | | | | |
| Vancenase | 000850259 | 12/17/1987 | 1/1/1991 | 9/22/1998 | | | | | | | |
| Vancenase | 000850649 | 7/20/1992 | 7/1/1992 | 11/6/2002 | 65.2 | 64.2 | 71.1 | 67.2 | 52.6 | | |
| Vancenase | 000851049 | 6/27/1996 | 6/27/1996 | 11/22/2002 | 60.2 | 83.4 | 91.8 | 90.9 | 58.3 | | |
| Vanceril | 000850736 | 1/1/1982 | 1/1/1991 | 4/3/2007 | 77.4 | 79.8 | 77.2 | 72.0 | 61.6 | 49.4 | |
| Vanceril | 000851112 | 12/26/1996 | 12/27/1996 | 5/2/2003 | 93.3 | 90.9 | 84.4 | | | | |

Notes: - Sales exclude non-US and non-sales transactions, and do not include rebates found in the rebates files.
   - Further reductions for prompt payment of 2 percent were applied to direct sales.
   - Total Sales were $32,192,886,846.25. If net revenue for a particular NDC and customer number
     for the prevailing WAC period was negative (-$329,743,869.00 total) or if the revenue or quantity
     before chargebacks or price paid were missing or otherwise non-positive ($7,109,459.73 total),
     or if the WAC was not available ($1,009,418,721.80 total), it was dropped.
   - Wholesale entries from the chargebacks data without corresponding wholesale entries in the
     sales data were excluded (-$177,850,185.07 total).
   - Wholesale entries from the chargebacks data were matched with wholesale entries in the
     sales data by prevailing WAC period.
   - Price is calculated by customer, as identified by customer number and, for a small number of
     customer numbers that appear in multiple classes of trade, by customer number and class of trade.
   - WAC values were retrieved from FDB by NDC as the prevailing WAC on the date of
     the sales transaction.
   - FDB package sizes for certain NDCs of Proventil and Vanceril were replaced with package sizes
     derived using implied package sizes from Medispan.
   - Ratios of average price to WAC were annualized to the customer and 11-digit NDC level, weighting by Gross
     Sales Activity in quantity.  Gross Sales Activity was calculated as total sales by customer for blank-credit-code
     transactions in the Direct Sales data and end customer Contract Sales in the Indirect Sales, excluding non-US
     and non-positive revenue or quantity transactions, by calendar year and prevailing WAC period.  Sales within
     5 percent of WAC were then calculated by the weighted adjusted prevailing period revenue.
   - The time period used for calculating both average prices and Gross Sales Activity was restricted to the
     relevant period, 1997 through 2003.
   - A 9-digit NDC was considered to be effectively obsolete for a given quarter if its constituent 11-digit NDCs were
     all declared to be obsolete, discontinued, or converted to over-the-counter products.  A 9-digit NDC was

**Exhibit 6**
**Percent of Schering Sales Made at Discounts**
**No Greater Than 5% Off the Prevailing FDB WAC**
**Accused Branded Products[1]**
**1997 - 2003**

| | | | | | | | | Year | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Brand | 9-Digit NDC | Date Added to FDB | Date of First Sale | Date of Last Sale | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 |
| (a) | (b) | (c) | (d) | (e) | (f) | (g) | (h) | (i) | (j) | (k) | (l) |

considered to be effectively obsolete for a given year if the first 11-digit NDC to be added to FDB within the
9-digit NDC was added after June 30th of that year, there were gross sales for less than six months during
that year, or the 9-digit NDC was effectively obsolete for at least three quarters of the year.  The percent of sales
made at discounts no greater than 5 percent off the prevailing WAC was not calculated for years during which the
9-digit NDC was effectively obsolete or if there was no corresponding percentage "spread" between AWP and AMP.

[1] The table includes all branded Schering products on NDC list "DOJ NDCs.xls".

Sources:  - "DOJ NDCs.xls".
- First DataBank Data.
- Medispan Data.
- PRNewswire, "Schering-Plough Aims To Make CLARITIN® Premier Brand In OTC Category, Establish
  CLARINEX® As Premier Brand In Prescription Category," March 8, 2002.
- Schering AMP Data.
- Schering Sales Data.
- Schering-Plough Corporation, Form 8-K, Exhibit 99.1, "Schering-Plough Reports Sales, Earnings For 2002
  Third Quarter," October 24, 2002.
- Schering-Plough Corporation, Form 10-K, for the fiscal year ended December 31, 2001, Item 1.

# EXHIBIT E



ROPES & GRAY LLP
ONE INTERNATIONAL PLACE
BOSTON, MA 02110-2624
WWW.ROPESGRAY.COM



22144330

Oct 27 2008
8:15PM

October 27, 2008

John T. Montgomery
617-951-7565
617-235-0077 fax
john.montgomery@ropesgray.com

**BY E-MAIL AND U.S. MAIL**

Joanne M. Cicala, Esq.
Kirby McInerney LLP
101 College Street
Dripping Springs, TX 78620

Re:   *In re Pharmaceutical Industry Average Wholesale Pricing Litigation*, MDL No. 1456

Dear Joanne:

In response to your October 23, 2008 letter, I confess to being confused by Plaintiffs' continued reliance on Exhibit C.  Exhibit C was previously presented to Magistrate Judge Bowler, who considered and rejected it, and granted Schering a protective order with regard to discovery on its brand drugs.  On September 22, 2008, as you know, Judge Saris overruled your objections to Magistrate Judge Bowler's ruling and largely continued the protective order that she had granted. In doing so, Judge Saris credited Dr. Addanki's AWP to AMP "spreads" and provided for only very limited discovery with regard to Schering's brand drugs, specifically in those few instances when Dr. Addanki's calculations revealed "an AWP to AMP spread of over 30% for the year."  Schering has already produced most of the "sales and transaction data" for these limited number of periods and is producing today under a separate cover, in a single data set, all of the Schering sales and AMP data relied upon by Dr. Addanki in preparing his February 21, 2008 affidavit.  *See* SP-MNYCC 0000002 through 0000004 and SP-MNYCC 0030981 through 0030982.  In the event that Plaintiffs want to seek broader discovery related to the Schering-brand drugs, Judge Saris' September 22, 2008 Order requires them to "submit an expert affidavit proposing alternative expert calculations" that are "transparent" and "consistent" in their methodology.  *See* 9/22/08 Order. Schering will not provide any additional discovery as to its brand drugs until Plaintiffs first satisfy the requirements that Judge Saris' Order imposes.  If you wish, we would be glad to discuss our position with you at your convenience.

Very truly yours,

John T. Montgomery  KBN

ROPES & GRAY LLP

Joanne M. Cicala, Esq.                    - 2 -                    October 27, 2008


cc:    All Counsel of Record via LexisNexis File & Serve

11354345_1.DOC

EXHIBIT F

1

IN THE CIRCUIT COURT OF
MONTGOMERY COUNTY, ALABAMA


STATE OF ALABAMA,          )
        Plaintiff,         )
                           )
VS.                        )      NO. CV-2005-0219-PR
                           )
ABBOTT LABORATORIES,       )
INC., et al,               )
        Defendants.        )



*******************************************************


IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
IN AND FOR THE COUNTY OF MARICOPA


ROBERT J. SWANSTON,              )      NO. CV 2022-004988
individually and on behalf       )
of himself and all others        )
similarly situated,              )
        Plaintiff,               )      (Assigned to the
                                 )      Honorable Janet
VS.                              )      Barton)
                                 )
TAP PHARMACEUTICAL PRODUCTS,     )
INC.; et al.,                    )
        Defendants.              )



*******************************************************

ORAL AND VIDEOTAPED DEPOSITION OF

HARVEY J. WEINTRAUB

September 18, 2006

Volume 1

*******************************************************

2

```
 1              UNITED STATES DISTRICT COURT
                    DISTRICT OF ARIZONA
 2
   THE STATE OF ARIZONA      ) Cause No. 2:06-cv-00045-ROS
 3 ex rel. TERRY GODDARD,    )
          Plaintiff,         )
 4                           )
   VS.                       )
 5                           )
   ABBOTT LABORATORIES;      )
 6 et al.,                   )
          Defendants.        )
 7

 8 ********************************************************

 9
     IN THE CIRCUIT COURT OF PULASKI COUNTY, ARKANSAS
10                   FIFTH DIVISION

11
   STATE OF ARKANSAS,            )
12                               )
   VS.                           )  CASE NO. CIV 2004-634
13                               )
   WARRICK PHARMACEUTICALS       )
14 CORPORATION; SCHERING-PLOUGH  )
   CORPORATION; and SCHERING     )
15 CORPORATION.                  )

16
   ********************************************************
17

18 DOCKET NO. X07-CV-03-0083296S (CLD)

19 STATE OF CONNECTICUT      ) SUPERIOR COURT
                             ) COMPLEX LITIGATION DOCKET
20                           ) AT TOLLAND
   VS.                       )
21                           )
   DEY INC., ET AL           )
22                           )

23
   ********************************************************
24

25
```

3

```
 1  IN THE COURT OF THE SECOND JUDICIAL CIRCUIT IN AND FOR
                  LEON COUNTY, FLORIDA
 2
    THE STATE OF FLORIDA          )
 3  Ex rel.                       )
                                  )
 4     VEN-A-CARE OF THE          )    CIVIL ACTION NO.
       FLORIDA KEYS, INC.,        )    98-3032A
 5     et al.,                    )
               Plaintiffs,        )
 6                                )
    VS.                           )
 7                                )
    BOEHRINGER INGELHEIM          )
 8  CORPORATION; DEY, INC.; DEY,  )
    L.P.; et al.,                 )
 9        Defendants.             )

10  *****************************************************

11          IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF HAWAI'I
12

13  STATE OF HAWAI'I,             ) CIVIL NO. 06-00437
            Plaintiff,            ) DAE/BMK
14                                )
    VS.                           )
15                                )
    ABBOTT LABORATORIES INC.;     )
16  ALPHARMA USPD, INC.; et al.,  )
            Defendants.           )
17
    *****************************************************
18

        IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
19         COUNTY DEPARTMENT, CHANCERY DIVISION

20
    THE PEOPLE OF THE STATE OF    )
21  ILLINOIS,                     )
            Plaintiff,            )
22                                )
    VS.                           ) Case No. 05 CH 02474
23                                )
    ABBOTT LABORATORIES, et al.,  )
24        Defendants.             )

25  *****************************************************
```

4

```
 1                   COMMONWEALTH OF KENTUCKY
                      FRANKLIN CIRCUIT COURT
 2                         DIVISION TWO


 3
                   CIVIL ACTION NO. 03-CI-1135
 4
   COMMONWEALTH OF KENTUCKY        )
 5 ex rel. GREGORY D. STUMBO,      )
   ATTORNEY GENERAL,               )
 6         Plaintiff,              )
   VS.                             )
 7                                 )
   WARRICK PHARMACEUTICALS         )
 8 CORP., et al.,                  )
           Defendants.            )
 9
   ********************************************************
10
               UNITED STATES DISTRICT COURT
11          FOR THE DISTRICT OF MASSACHUSETTS


12
   THE COMMONWEALTH OF            )
13 MASSACHUSETTS,                 )
           Plaintiff,            )
14                                )
   VS.                            ) Case No. 03-CV-11865-PBX
15                                )
   MYLAN LABORATORIES,            )
16 INC., et al.,                  )
           Defendants.           )
17
   ********************************************************
18
               UNITED STATES DISTRICT COURT
19              DISTRICT OF MASSACHUSETTS


20
   IN RE PHARMACEUTICAL        ) MDL No. 1456
21 INDUSTRY AVERAGE            ) Civil Action No. 01-12257-PBS
   WHOLESALE PRICE             ) Judge Patti B. Saris
22 LITIGATION                  ) Magistrate Judge
                                )     Marianne B. Bowler
23

24 ********************************************************

25
```

5

```
 1   IN THE CHANCERY COURT OF THE FIRST JUDICIAL DISTRICT
                OF HINDS COUNTY, MISSISSIPPI
 2

 3  STATE OF MISSISSIPPI,      )
            Plaintiff,         )
 4                             )
    VS.                        ) CIVIL ACTION NO:  G2005-2021
 5                             )
    ABBOTT LABORATORIES,       )
 6  INC., et al.,              )
            Defendant.         )
 7

 8  ********************************************************

 9      IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS
                   STATE OF MISSOURI
10

11  STATE OF MISSOURI, ex rel.     )
    JEREMIAH W. (JAY) NIXON,       )
12  Attorney General,              )
                                   )
13  AND                            )
                                   )    Case No:  054-1216
14  MISSOURI DEPARTMENT OF         )
    SOCIAL SERVICES, DIVISION OF   )
15  MEDICAL SERVICES,              )    Division No. 31
            Plaintiff,             )
16                                 )
    VS.                            )
17                                 )
    DEY, INC., DEY, L.P., MERCK    )
18  KGaA, et al.,                  )
            Defendant.             )
19

20  ********************************************************

21

22

23

24

25
```

6

1                              SUPERIOR COURT OF NEW JERSEY
                               UNION COUNTY
2                              LAW DIVISION
                               DOCKET NO.:  UNN-L-2329-04
3
  CLIFFSIDE NURSING HOME, INC.,        )
4 on behalf of itself and all          )
  other similarly situated, as         )
5 defined herein,                      )
          Plaintiffs,                  )
6                                      )          Civil Action
  VS.                                  )
7                                      )
  DEY, INC., WARRICK                   )
8 PHARMACEUTICALS CORPORATION,         )
  et al.,                              )
9         Defendants.                  )

10 ****************************************************

11                             SUPERIOR COURT OF NEW JERSEY
                               MONMOUTH COUNTY
12                             LAW DIVISION
                               DOCKET NO.:  MON-L-3136-06
13
  INTERNATIONAL UNION OF        )
14 OPERATING ENGINEERS,         )
  LOCAL 68 WELFARE FUND,        )     Civil Action
15        Plaintiffs,           )
                                )
16 VS.                          )
                                )
17 ASTRAZENECA, PLC, et al.,    )
          Defendant.            )
18
   ****************************************************
19
   STATE OF NEW YORK
20 SUPREME COURT : COUNTY OF ERIE

21

   THE COUNTY OF ERIE,          )
22         Plaintiff,           )
                                )
23 VS.                          )     Index No. 12005-2439
                                )
24 ABBOTT LABORATORIES,         )
   INC. ET AL.,                 )
25         Defendants.          )

7

1  STATE OF NEW YORK
   SUPREME COURT                    COUNTY OF OSWEGO
2

3  THE COUNTY OF OSWEGO,      )
            Plaintiff,        )
4                             )
      -against-               )      Index No. 06-0697
5                             )
   ABBOTT LABORATORIES,       )
6  INC., AGOURON              )
   PHARMACEUTICALS, INC.,     )
7  ET AL.,                    )
            Defendants.       )
8

9  *****************************************************

10 STATE OF NEW YORK
   SUPREME COURT                    COUNTY OF SCHENECTADY
11

12 THE COUNTY OF OSWEGO,      )
            Plaintiff,        )
13                            )
      -against-               )      Index No. 2006-886
14                            )
   ABBOTT LABORATORIES,       )
15 INC., AGOURON              )
   PHARMACEUTICALS, INC.,     )
16 ET AL.,                    )
            Defendants.       )
17
   *****************************************************
18
                   COUNTY OF COMMON PLEAS
19                 HAMILTON COUNTY, OHIO

20
   STATE OF OHIO,            )  Case No. A0402047
21         Plaintiff,        )
                             )  Judge Myers
22     -vs-                  )
                             )
23 DEY, INC., et al.,        )
            Defendant.       )
24

25

8

```
 1          IN THE COMMONWEALTH COURT OF PENNSYLVANIA

 2
   COMMONWEALTH OF PENNSYLVANIA    )
 3 by Thomas W. Corbett, Jr.,      )
   in his capacity as Attorney     )
 4 General of the Commonwealth     )
   of Pennsylvania,                )  No. 212 MD 2004
 5         Plaintiff,              )
                                   )
 6 VS.                             )
                                   )
 7 TAP PHARMACEUTICAL PRODUCTS,    )
   INC., et al.,                   )
 8         Defendant.              )

 9
   ******************************************************
10

11 STATE OF SOUTH CAROLINA  IN THE COURT OF COMMON PLEAS

12 COUNTY OF RICHLAND         FOR THE FIFTH JUDICIAL CIRCUIT

13 STATE OF SOUTH CAROLINA,        )
   and HENRY D. McMASTER,          )
14 In His Official Capacity as     )
   Attorney General for the        )   Civil Action No.
15 State of South Carolina,        )   06-CP-40-4390
           Plaintiff,             )
16                                 )
   VS.                             )
17                                 )
   WARRICK PHARMACEUTICALS         )
18 CORPORATION, SCHERING-PLOUGH    )
   CORPORATION, and SCHERING       )
19 CORPORATION,                    )
           Defendants.            )
20
21 ******************************************************

22

23

24

25
```

9

```
 1  STATE OF SOUTH CAROLINA   IN THE COURT OF COMMON PLEAS

 2  COUNTY OF RICHLAND          FOR THE FIFTH JUDICIAL CIRCUIT

 3  STATE OF SOUTH CAROLINA,        )
    and HENRY D. McMASTER,          )
 4  In His Official Capacity as     )
    Attorney General for the        )    Civil Action No.
 5  State of South Carolina,        )    06-CP-40-4399
          Plaintiff,               )
 6                                  )
    VS.                             )
 7                                  )
    WARRICK PHARMACEUTICALS         )
 8  CORPORATION, SCHERING-PLOUGH    )
    CORPORATION, and SCHERING       )
 9  CORPORATION,                    )
          Defendants.              )
10

11  ********************************************************

12  STATE OF WISCONSIN     CIRCUIT COURT          DANE COUNTY
                              BRANCH 7
13

14  STATE OF WISCONSIN,        )
          Plaintiff,          )
15                            )
    VS.                        )         Case NO. 04-CV-1709
16                            )
    AMGEN, INC., et al.,       )
17        Defendants.          )

18  ********************************************************

19

20

21

22

23

24

25
```

10

1         On the 18th day of September, 2006,

2 between the hours of 9:09 a.m. and 1:40 p.m., at the

3 Hamilton Park Hotel and Conference Center, Ashton

4 Springfield Conference Room, 175 Park Avenue, Florham

5 Park, New Jersey, before me, CYNTHIA VOHLKEN, a

6 Certified Shorthand Reporter for the State of Texas,

7 appeared HARVEY J. WEINTRAUB, who, being by me first

8 duly sworn, gave an oral deposition at the instance of

9 the Defendants Schering Corporation, Schering-Plough

10 Corporation and Warrick Pharmaceuticals Corporation in

11 said cause, pursuant to the Rules of Civil Procedure

12 and Federal Rules of Civil Procedure.

13

14

15

16

17

18

19

20

21

22

23

24

25

11

1                 A P P E A R A N C E S

2  FOR THE PLAINTIFF THE STATE OF ALABAMA:

3          MR. ROGER L. BATES
           Hand Arendall L.L.C.
4          1200 Park Place Tower
           2001 Park Place North
5          Birmingham, Alabama   35203
           (205) 324-4400
6

7  FOR THE PLAINTIFFS ALABAMA, MISSOURI, SOUTH CAROLINA
   and HAWAI'I:
8
           MR. CLINT CARTER
9          MR. W. DANIEL "DEE" MILES, III
           (By Electronic Means)
10         Beasley, Allen, Crow, Methvin, Portis
                 & Miles, P.C.
11         272 Commerce Street
           Montgomery, Alabama   36103-4160
12         (334) 269-2343

13
   FOR THE PLAINTIFF THE STATE OF ARKANSAS:
14
           MR. BRADFORD J. PHELPS
15         (By Telephonic Means)
           Assistant Attorney General
16         Office of Attorney General Mike Beebe
           Antitrust Division
17         323 Center Street, Suite 1100
           Little Rock, Arkansas   72201
18         (501) 682-3625

19
   FOR THE PLAINTIFF THE STATE OF CALIFORNIA:
20
           MR. NICHOLAS PAUL
21         Supervising Deputy Attorney General
           MR. TIMOTHY C. FOOTE
22         Deputy Attorney General
           Civil Prosecutions Unit
23         BMFEA
           110 West A Street, Suite 1100
24         San Diego, California   92186
           (619) 688-6099
25

12

```
 1                APPEARANCES (CONTINUED)

 2  FOR THE PLAINTIFFS STATE OF CONNECTICUT and the MDL
    CLASS PLAINTIFFS in MASSACHUSETTS:
 3
            MR. HUGH E. McNEELY
 4          Hagens Berman Sobol Shapiro LLP
            One Main Street, Fourth Floor
 5          Cambridge, Massachusetts  02142
            (617) 482-3700
 6
     FOR THE PLAINTIFF THE STATE OF FLORIDA:
 7
            MR. JOSHUA R. HELLER
 8          Assistant Attorney General
            Office of the Attorney General
 9          Medicaid Fraud Control Unit
            PL-01, The Capitol
10          Tallahassee, Florida  32311
            (850) 414-3600
11
     FOR THE PLAINTIFF VEN-A-CARE OF THE FLORIDA KEYS:
12
            MR. JARRETT ANDERSON
13          Attorney at Law
            2411 Hartford Road
14          Austin, Texas  78703

15  FOR THE PLAINTIFFS WISCONSIN, ILLINOIS, KENTUCKY,
    HAWAI'I, MISSISSIPPI, CITY OF NEW YORK AND COUNTIES OF
16  NEW YORK REPRESENTED BY KIRBY MCINERNEY & SQUIRE:

17          MR. MICHAEL WINGET-HERNANDEZ
            Winget-Hernandez, LLC
18          3112 Windsor Road, No. 228
            Austin, Texas 78703
19          (512) 474-4095

20  FOR THE PLAINTIFF THE COMMONWEALTH OF MASSACHUSETTS:

21          MR. RICHARD C. HEIDLAGE
            MS. COLLEEN A. McCARTHY
22          Assistant Attorneys General
            The Commonwealth of Massachusetts
23          Office of the Attorney General
            Medicaid Fraud Control Unit
24          One Ashburton Place, Room 1813
            Boston, Massachusetts  02108-1598
25          (617) 727-2200
```

13

1                    APPEARANCES (CONTINUED)

2  FOR THE PLAINTIFF THE STATE OF MISSOURI:

3          MR. REX M. BURLISON
           Chief Counsel for Eastern District
4          MS. JAN ADAMS
           Assistant Attorney General
5          Missouri Attorney General's Office
           Medicaid Fraud Control Unit
6          720 Olive Street, Suite 2150
           St. Louis, Missouri  63101
7          (314) 340-4764

8  FOR THE PLAINTIFFS THE CITY OF NEW YORK and VARIOUS
   NEW YORK COUNTIES:
9
           MR. JAMES P. CARROLL, JR.
10         Kirby McInerney & Squire
           830 3rd Avenue, 10th Floor
11         New York, New York   10022
           (212) 371-6600
12
   FOR THE PLAINTIFFS ERIE COUNTY, SCHENECTADY COUNTY AND
13 OSWEGO COUNTY:

14         MR. DANIEL C. BURKE
           Weitz & Luxenberg, P.C.
15         180 Maiden Lane
           New York, New York  10038
16         (212) 558-5811

17 FOR THE PLAINTIFF THE STATE OF OHIO:

18         MR. ROBERT HEUCK, II,
           Waite, Schneider, Bayless & Chesley
19         1513 Fourth & Vine Tower
           One West Fourth Street
20         Cincinnati, Ohio  45202

21 FOR THE PLAINTIFF THE COMMONWEALTH OF PENNSYLVANIA:

22         MR. JOSEPH L. RODA
           RodaNast, P.C.
23         801 Estelle Drive
           Lancaster, Pennsylvania  17601
24         (717) 892-3000

25

14

1                    APPEARANCES (CONTINUED)

2  FOR THE PLAINTIFF SOUTH CAROLINA ATTORNEY GENERAL:

3          MR. WILLIAM E. HOPKINS, JR.
           McCutchen Blanton Johnson & Barnette, LLP
4          1414 Lady Street
           Columbia, South Carolina  29201
5          (803) 799-9791

6
   FOR THE PLAINTIFF SOUTH CAROLINA:
7
           MR. W. JONATHAN HARLING
8          (Not Present)
           Mike Kelly Law Group, LLC
9          500 Taylor Street
           Columbia, South Carolina  29202
10         (803) 726-0123

11
   FOR THE DEFENDANTS SCHERING CORPORATION,
12 SCHERING-PLOUGH CORPORATION and WARRICK
   PHARMACEUTICALS CORPORATION:
13
           MR. C. MICHAEL MOORE
14         MR. JOHN P. McDONALD
           Locke Liddell & Sapp, LLP
15         2200 Ross Avenue, Suite 2200
           Dallas, Texas  75201-6776
16         (214) 740-8000

17         -and-

18         MR. BRIEN T. O'CONNOR
           Ropes & Gray LLP
19         One International Place
           Boston, Massachusetts  02110-2624
20         (617) 951-7000

21         -and-

22         MS. MARGUERITE S. WILLIS
           (By Telephonic Means)
23         Nexsen Pruet, LLC
           1441 Main Street
24         Columbia, South Carolina  29201
           (803) 771-8900
25

15

1                    APPEARANCES (CONTINUED)

2  FOR THE DEFENDANT DEY, INC.:

3          MR. PHILIP D. ROBBEN
           Kelley Drye & Warren LLP
4          101 Park Avenue
           New York, New York  10178
5          (212) 808-7800

6

   FOR THE DEFENDANT PAR PHARMACEUTICAL INC. AND PAR
7  PHARMACEUTICAL COMPANIES, INC.:

8          MR. PAUL K. DUEFFERT
           (By Telephonic Means)
9          Williams & Connolly LLP
           725 12th Street, N.W.
10         Washington, DC  2005
           (202) 434-5097
11

12 ALSO PRESENT:

13         Dr. John Lockwood, Ven-A-Care
           Ms. Peggy Forrest, The Breen Law Firm
14         Mr. Brian Bobbitt, Videographer
           Ms. Angie Smith, Court Reporter
15         Mr. Ricky Acker, Videographer

16
                      *-*-*-*-*-*
17

18

19

20

21

22

23

24

25

16

1                            INDEX

2
    Appearances................................... 11
3
    HARVEY J. WEINTRAUB
4       Examination by Mr. Moore................. 46
        Examination by Mr. Anderson............. 178
5
    Signature and Changes........................ 213
6   Reporter's Certificate....................... 215

7
    VIDEOTAPE NUMBER
8
        1 ................................... 18
9       2 ................................... 105
        3 ................................... 148
10

11                          EXHIBITS

12  NO.  DESCRIPTION                              PAGE

13  1   ........................................ 65
        Affidavit of Harvey J. Weintraub; May 4,
14      2006 Letter from Barry R. Zitomer, M.D.,
        Re:  Harvey Weintraub
15  2   ........................................ 66
        Personal Data of Harvey J. Weintraub
16      (WP00002144A-2146A) Confidential
    3   ........................................ 151
17      October 12, 1993 Letter from Harvey
        Weintraub to Beth Rader & Ed Edlestein,
18      Pharm D, PriceAlert, First DataBank,
        Subject:  Change the AWP for Albuterol
19      Sulfate Solution, 0.083% (FDB 001621)
        (TX-D&W - 012308)
20  4   ........................................ 155
        July 16, 2002 Letter from Harvey Weintraub
21      to Kay Morgan, First DataBank, Subject:
        Highest WAC Prices for Albuterol Sulfate
22      Solution (FDB-AWP 04170) Highly
        Confidential
23  5   ........................................ 159
        February 23, 1995 Letter from Harvey
24      Weintraub to Martha McNeil, Subject:
        Increase in Price for the Albuterol
25      Solution 0.5% mL (WP00001562A) Confidential

17

```
 1 NO.  DESCRIPTION                                    PAGE

 2 6  ........................................  163
      September 22, 1995 Letter from Harvey
 3    Weintraub to Martha McNeil, Subject:
      Increase in Price for the Albuterol
 4    Sulfate, USP Solution for Inhalation
      0.5% 20 mL (WP00001609A) Confidential
 5 7  ........................................  168
      Chart of the 17gm Inhaler, Years 1996 to
 6    2002, pricing per company; Excerpts from
      1999 RedBook, 2000 RedBook, 1996 RedBook,
 7    1998 RedBook, 2001 RedBook, 2001 RedBook
    8  ........................................  187
 8    June 4, 1993 Memo from R.M. Loughlin to
      Attendees, Subject:  Warrick
 9    Pharmaceuticals/Albuterol Launch
      (SP 0012851-12854) Confidential
10 9  ........................................  197
      Dated Issued: 11/29/93, Rx Product
11    Introduction/Change Notice, Trade Name:
      Albuterol Inhalation Aerosol - Warrick
12    (WP00001515A) Confidential
   10  ........................................  202
13    Consulting Agreement as of January 1, 1994
      between Schering Corporation and M&H
14    Associates (WP00017230A-17239A)
      Confidential, Attorneys Eyes Only
15

16

17

18

19

20

21

22

23

24

25
```

18

1                    THE VIDEOGRAPHER:   Stand by.   We are on

2   the record September 18th, 2006.   The time is 9:09

3   a.m.   This is the beginning of Tape 1.

4                    Would the court reporter please swear in

5   the witness.

6                    (At this time the witness was sworn)

7                    MR. MOORE:   Before we get started, could

8   we get announcements on the record, please?   Let's

9   just start here and go around the table.

10                    MR. McDONALD:   John McDonald for

11   Warrick, Schering and Schering-Plough.

12                    MR. MOORE:   Mike Moore for Warrick,

13   Schering and Schering-Plough.

14                    MR. O'CONNOR:   Brien O'Connor for

15   Warrick, Schering and Schering-Plough.

16                    MR. HEUCK:   Bob Heuck for the State of

17   Ohio.

18                    MR. BATES:   Roger Bates, the State of

19   Alabama.

20                    MR. BURLISON:   Rex Burlison, State of

21   Missouri.

22                    MS. ADAMS:   Jan Adams, State of

23   Missouri.

24                    MR. WINGET-HERNANDEZ:   Michael

25   Winget-Hernandez, the States of Wisconsin, Illinois,

19

1 Kentucky, Mississippi, the City of New York and New

2 York counties represented by Kirby McInerney & Squire.

3           DR. LOCKWOOD:  John Lockwood.  I'm with

4 Ven-A-Care of the Florida Keys and I'm not an

5 attorney.

6           MS. FORREST:  Peggy Forrest, paralegal

7 for The Breen Law Firm.

8           MR. ANDERSON:  Jarrett Anderson for

9 Ven-A-Care.

10          MS. McCARTHY:  Colleen McCarthy from the

11 Massachusetts Attorney General's Office.

12          MR. HEIDLAGE:  Richard Heidlage,

13 Massachusetts Attorney General's Office.

14          MR. FOOTE:  Tim Foote, California's

15 Attorney General's Office.

16          MR. McNEELY:  Hugh McNeely, Hagens

17 Berman Sobol Shapiro.  I represent the State of

18 Connecticut and those -- and also those MDL plaintiffs

19 in Massachusetts.

20          MR. CARROLL:  James Carroll, Kirby

21 McInerney & Squire for the City of New York and the

22 various New York counties that we represent.

23          MR. HELLER:  Joshua Heller, Florida

24 Attorney General's Office.

25          MR. ROBBEN:  Philip Robben, Kelly Drye &

20

1  Warren.  Representing Dey, Inc.

2                MR. BURKE:  Daniel Burke from Weitz &

3  Luxenberg, representing Erie County, Schenectady

4  County and Oswego County.

5                MR. PAUL:  Nicholas Paul, the California

6  Attorney General's Office.

7                MR. MOORE:  How about on the phone?

8  Yeah, how about on the phone.

9                (Discussion off the record)

10                MR. MOORE:  Let's go off the record and

11  let's see who's on the phone.

12                THE VIDEOGRAPHER:  Off the record at

13  9:11 a.m.

14                (Discussion off the record)

15                THE VIDEOGRAPHER:  Stand by.  The time

16  is 9:14 a.m.  We are back on the record.

17                THE REPORTER:  We're back on the record.

18  Could you please announce yourselves on the phone?

19                MR. PHELPS:  Hi.  This is Brad Phelps

20  from the Arkansas Attorney General's Office.

21                MS. WILLIS:  Good morning.  This is

22  Marguerite Willis representing Warrick with the law

23  firm of Nexsen Pruet in Columbia, South Carolina.

24                MR. McDONALD:  Anybody else on the

25  phone?

21

1          MR. MOORE:  Okay.

2          MR. DRESCHER:  This is Patryk Drescher

3 with Ropes & Gray, but I can -- I was calling in to

4 set up the call, but I can jump off.

5          MR. McDONALD:  Okay.  Great.  Thank you,

6 Patryk.

7          MR. DRESCHER:  Okay.

8          MR. MOORE:  Okay.  I guess that's

9 everybody.  The witness has been sworn and we need to

10 discuss a couple of things before we start the

11 deposition.

12          I've at least got an agreement with some

13 here that statements that people would like to make,

14 me included, about this deposition can be made this

15 afternoon after 1:00 when Mr. Weintraub leaves and I'm

16 willing to agree that all of those can be stipulated

17 as if made before the deposition started or even

18 inserted in the transcript before the deposition.  So

19 I think there's many here who are willing to do that.

20 There may be some who are not and we'll just have to

21 see where we are.

22          The second thing is we are going to

23 reserve all objections until time of trial in all of

24 these matters except as to the form of the question or

25 the responsiveness of the answer and, of course,

22

1 privilege issues.  And we are agreeable, and I assume

2 you would be, that -- that -- that one objection is

3 good for all.  And so the first person who makes a

4 form objection, everybody doesn't have to jump in and

5 in a chorus of "object to form."  It's going to be

6 good for everybody to kind of take good advantage of

7 the time that we have here.

8            What else, Michael?

9            MR. WINGET-HERNANDEZ:  Just those

10 "objection, form" or "objection, leading" will

11 preserve the -- we agree that that will preserve the

12 objection for all cases.

13            MR. MOORE:  That's fine.

14            MR. ANDERSON:  The court reporter has

15 asked that I make a comment and that is when you place

16 an objection, identify yourself by last name.  So, for

17 instance, I would say "Anderson, objection, form," so

18 that they can make the proper record.

19            And I'm agreeable to have the

20 stipulations talked through this afternoon, but I do

21 want them placed at the front of the transcript.

22            MR. MOORE:  I have no objection to

23 placing all of the counsel discussion that takes place

24 this afternoon or, for that matter, any afternoon of a

25 deposition day at the beginning of the deposition.  We

23

1 are just doing this not to unduly take up

2 Mr. Weintraub's time while he's here.

3            MR. WINGET-HERNANDEZ:  I agree on behalf

4 of my clients as well.

5            MR. MOORE:  Does anybody disagree with

6 that?

7            MR. HEUCK:  Mr. Moore, this is Bob Heuck

8 representing the State of Ohio.  I don't disagree with

9 that and I think that's a very good agreement.

10 However, be sure that there is no argument that any

11 portion of this deposition proceeded without notice of

12 our position, I just want to briefly indicate that

13 we're not waiving any objections to this proceeding or

14 the defendants' document production and we're not

15 agreeing to the amount of time that's been offered

16 here as being adequate.

17            And I want to make clear that in our

18 view, from the Ohio perspective, this is strictly a

19 discovery deposition and that it's not a proper trial

20 deposition because there has not been an opportunity

21 to take a discovery deposition prior to this direct

22 examination.

23            MR. MOORE:  Okay.

24            MR. HEUCK:  And I'll reserve additional

25 comment until after Mr. Weintraub has departed.

24

1              MR. MOORE:  Thank you.  Does anybody

2 else feel like they need to say anything at this point

3 or can they wait until this afternoon?

4              All right.  The other stipulation I was

5 going to --

6              MR. BURLISON:  Excuse me.

7              MR. MOORE:  Yes.

8              MR. BURLISON:  Were you going to put on

9 the record about the use of the prior depositions?

10              MR. MOORE:  I was just about to.  Yeah.

11              The other stipulation that my clients

12 are willing -- they are going to make and we've made

13 in other jurisdictions is that Mr. Weintraub has been

14 deposed numerous times over the last four years or so,

15 almost nine deposition days of testimony and we are

16 willing to stipulate, and we have stipulated

17 elsewhere, that that testimony can be used in any of

18 those cases, Missouri, for example, as if those

19 depositions were taken in that case.

20              Now, we reserve all other objections,

21 you know, to the testimony that might -- might be, but

22 we won't object on the basis that the deposition was

23 not taken in the case.

24              And as I told Michael Winget-Hernandez

25 before the deposition started, Mr. Weintraub has been

25

1 asked a lot questions.  If someone asks him a question

2 that he's been asked before, I do not intend to -- to

3 try to stop that.  Okay.  That's just a decision

4 people have to make.  But he has been asked a lot of

5 questions and based on this stipulation that testimony

6 can be used.  So I would just hope with the limited

7 time we have that we could keep that to a minimum, but

8 that's the stipulation we're making.

9           MR. WINGET-HERNANDEZ:  We'll reserve

10 whatever discussion on that point for a later time.

11           MR. MOORE:  Okay.  Does anyone else need

12 to say anything before we start?

13           MR. McDONALD:  Jarrett.

14           MR. ANDERSON:  I think Michael is the

15 one with the big speech.

16           MR. WINGET-HERNANDEZ:  Well, I don't

17 have a big speech.  I just wanted to do a little bit

18 of housekeeping.

19           First of all, I neglected to say that

20 I'm appearing on behalf of Hawai'i and I would like

21 the record to reflect that.

22           Secondly, I haven't received any

23 response, substantive response, to my request of

24 September the 11th concerning production of prices for

25 Warrick drugs.  My letters, I think, speak for

26

1 themselves.  However, I will say that I anticipated by

2 this time that we would have a comprehensive listing

3 of Warrick AWP and net direct prices for the NDC

4 numbers that I've provided you through Ropes & Gray

5 and my position is that it's not possible for us to

6 meaningful cross-examine the witness on the question

7 of Warrick's price decisions without access to those

8 prices as they are kept in the normal, ordinary course

9 of business and that it will be impossible for us to

10 adjourn the deposition without having had a reasonable

11 time to review those prices and to confront

12 Mr. Weintraub with his decisions related to them.

13               That's all I had to say on the record

14 right now.

15               MR. HEUCK:  Yeah.  I had a few things

16 earlier that I said I just would like to add.  That we

17 continue to object to the defendants' document

18 production in this case as to Ohio because the

19 documents we received were far in excess of what we

20 requested and it was really just an undifferentiated

21 mass of documents which doesn't comply with the Ohio

22 Rules of Civil Procedure which require identification

23 of the documents to the individual document requests.

24 That makes it very difficult for us to participate

25 meaningfully in this deposition.  We are,

27

1 nevertheless, here, but we are not waiving any

2 objections to the way the documents were produced in

3 this case.  I just want to make that clear.

4              And I think that -- I think my other

5 points were covered earlier.

6              MR. WINGET-HERNANDEZ:  I think it bears

7 repeating, in case there is any ambiguity, that the

8 objections that were made by one counsel are good as

9 to -- by one counsel for his clients are good as to

10 the rest of the plaintiffs.

11             And, of course, we adopt those

12 objections as well.

13             MR. ANDERSON:  For Ven-A-Care it's my

14 understanding that we've also requested those prices

15 in formal discovery requests that have been pending

16 for quite some time regarding the price file and have

17 not received the electronic form of that data.

18             And, additionally, we have cross-noticed

19 this deposition in conjunction with the State of

20 Florida and, of course, reserve our right to complete

21 our cross-examination, although I'm hopeful that that

22 can be completed.  Certainly there's a lot of

23 information to cover with Mr. Weintraub given the

24 direct and also just given his significant involvement

25 with the company.

28

1          MR. RODA:  Joe Roda for Pennsylvania.

2          We join in the objection voiced earlier

3 that there has been no opportunity for a discovery

4 deposition of Mr. Weintraub before taking his trial

5 deposition.

6          Also, I would like to note that while he

7 was still here I raised the question before he left of

8 whether, notwithstanding the prior notice of this for

9 adjournment at 1:00, we could ask Mr. Weintraub

10 whether he felt up to continuing, be it for another

11 half hour or hour, or whatever, in the interest

12 possibly of shortening the week or at least allowing

13 us within the week to get through his deposition.  He

14 seemed to me, and I defer to the observations of

15 others, to be going still strong when we ended at

16 1 o'clock today.  He did not appear to be fatiguing or

17 really in any kind of straits, stressed or otherwise.

18 I would renew that request for the days that follow

19 this week.  We have a lot to cover with a lot of

20 people asking questions.  It seems to me there is at

21 this point a significant chance we are not going to

22 complete his deposition this week under the current

23 schedule.

24          MR. WINGET-HERNANDEZ:  I seem to recall

25 that there was some indication that we were going to

29

1 leave whether Mr. Weintraub could go after 1 o'clock

2 up to him.  I may be mistaken, but I think --

3            MR. MOORE:  You are mistaken.

4            MR. WINGET-HERNANDEZ:  Very well.

5            MR. MOORE:  Okay.

6            MR. McNEELY:  Excuse me.  I have a

7 question.  Mike, I have not seen the -- did you

8 renotice the deposition?  I haven't -- I've gotten, I

9 believe, the third notice where you stated all the --

10 at least the objections that are on the record.  Has

11 this deposition been renoticed with this site?

12            MR. MOORE:  It has been renoticed with

13 this site.

14            MR. McNEELY:  Does it also include the

15 ongoing -- the objections on the record that haven't

16 been resolved by the courts yet?

17            MR. MOORE:  You know, we'd have to pull

18 them out, Hugh, and look at them.  I don't know.  I

19 mean, what's been filed has been filed.  I would be

20 happy to pull those out and look at them.  I didn't do

21 them, so I'm not really sure.  I don't want to

22 misstate something, so I don't know.

23            MR. McNEELY:  On behalf of the State of

24 Connecticut we have a continuing objection of this

25 going forward because there has not been a commission

30

1 issued from the State of Connecticut relative to the

2 defendants' request or prayer for a commission being

3 issued.

4          Also, relative to the MDL classes and

5 states that we represent, and that's the Hagens Berman

6 Sobol Shapiro firm, there are also ongoing objections

7 filed on the record and those -- to the extent that I

8 need to say anything more, those objections are

9 ongoing, also, with regard to all of the plaintiffs

10 that we represent.  We have entered into no agreements

11 for time limitations relative to our

12 cross-examination.

13          MR. BATES:  Roger Bates for the State of

14 Alabama.

15          I just want to make sure that we are

16 clear, while I adopt the objections that have been

17 raised earlier and don't need to restate those, I want

18 to make sure I understood.  At the beginning of the

19 deposition today it was announced that the prior

20 depositions of Mr. Weintraub would be and could be

21 used in the various state litigations without

22 objections being raised that they were not actually

23 taken in those cases as I understood it.  Does that

24 same apply here?  That is, that should Jarrett and

25 Michael take such an outstanding deposition that I

31

1 don't need to ask any questions, it would be as though

2 I were taking it for specific purposes of the Alabama

3 litigation?

4            MR. MOORE:  Yes.

5            MR. O'CONNOR:  Yes.

6            MR. BATES:  Thank you.

7            MR. MOORE:  I was going to respond.

8 Anybody else want to make a statement?

9            MR. HEIDLAGE:  Yes.  This is Richard

10 Heidlage for the Commonwealth of Massachusetts.

11            Just for the record, we adopt the

12 objections made by the other parties.  I'm not going

13 to restate them here.

14            But I would also say that it is our

15 position that the discovery that has occurred with

16 regard to the pending case of the Commonwealth versus

17 Mylan, that in that discovery that the responses are

18 not consistent with the federal rules.  We do not

19 waive our rights to discovery.  We do not waive our

20 right to have the discovery in a form that we can use

21 it before we actually take Mr. Weintraub's deposition.

22 That means that we are not waiving -- by appearing

23 here we will do what we can, but we are not waiving

24 our right to separately notice Mr. Weintraub for

25 deposition or to have him designated for deposition.

32

1 We also do not waive our rights to cross-examine him

2 on any matter regardless of what anyone else does

3 here.

4           I would just say for the record that we

5 believe that it was improper for Warrick to notice the

6 deposition in our case and then drop several million

7 records and documents on us undifferentiated, not

8 specific to the request that we made for documents, in

9 essence, making it impossible for us to review the

10 documents effectively and prepare effectively for this

11 deposition and for the cross-examination.  Therefore,

12 we will cross-examine to the extent that we can, but

13 we are not waiving our rights to reopen the deposition

14 and reconvene in order to -- to continue the

15 cross-examination based upon the records which we

16 eventually do receive or are able to review.

17           MR. FOOTE:  Tim Foote, California.

18           We adopt the same objections as

19 Mr. Heidlage and the objections that Jarrett brought

20 out with Ven-A-Care.

21           MR. HELLER:  Josh Heller, State of

22 Florida.

23           We do adopt the objections of our

24 co-plaintiffs or of the other plaintiffs that are

25 present.

33

1            MR. BURKE:  Dan Burke on behalf of Erie

2 County, Oswego County and Schenectady County.

3            We adopt all reservations and rights and

4 objections previously voiced by counsel today.

5            MR. HOPKINS:  Bill Hopkins for South

6 Carolina.

7            Same objections.

8            MR. HEUCK:  Just since I went -- was one

9 of the first ones to go, I guess I can come back and

10 adopt the objections that were made after I -- just so

11 there is no suggestion otherwise.

12            MR. MOORE:  Now, we've got to stop

13 somewhere.

14            MR. ANDERSON:  We're all adopted.

15            MR. HEIDLAGE:  The endless circle.

16            MR. BURLISON:  That was our agreement to

17 begin with.

18            MR. HEUCK:  Yeah.  That's the agreement.

19            MR. MOORE:  Certainly fine with me.

20            MR. WINGET-HERNANDEZ:  Also, would you

21 address, since you're going to make a statement, the

22 30(b)(6) notice?

23            MR. MOORE:  Uh-huh.

24            MR. WINGET-HERNANDEZ:  Thank you.

25            MR. MOORE:  Mike Moore on behalf of

34

1 Warrick and Schering.

2            It's our -- it's our position that

3 Mr. Weintraub has been deposed in AWP -- various AWP

4 litigations for nine days prior to today.  Deposed by

5 counsel who -- some of whom are here today who had

6 every incentive to cross-examine him and ask him the

7 same questions in some instances over and over again.

8 We've made him available for another week, albeit

9 we're limiting it until 1 o'clock due to

10 Mr. Weintraub's health.  Mr. Weintraub does have

11 Parkinson's disease.  He is 77 years old.  No one

12 knows what his availability is going to be in the

13 future, therefore, we felt that it was only prudent

14 and proper to notice him in as many cases as we could

15 for this deposition since we had people asking for his

16 deposition.  We thought that was the logical and right

17 thing to do and invite everybody to the party and let

18 them ask their questions.

19            It's going to be our position, and I

20 want to make it very clear, that at 1 o'clock on

21 Friday afternoon is going to be the end of the Harvey

22 Weintraub deposition and we will not produce

23 Mr. Weintraub again voluntarily for deposition after

24 that point.  We would ask all counsel present here

25 today to cooperate and confer with each other over

35

1  allocation of time.  Mr. Weintraub has been deposed at

2  length on subjects and to the extent that it's -- you

3  know, as I said earlier today, I'm not going to object

4  to anybody asking him questions he's been asked

5  before, but I just frankly don't understand that as a

6  rational use of time.  So I would ask everybody to

7  cooperate, give everybody a chance to at least ask

8  their case specific, state specific questions.  I was

9  able to conduct his direct examination in less time

10 than I thought I would, passed him today, and I just

11 ask everybody to work together and try to do that.

12 All I can do is ask.  I can't make anybody do

13 anything, but our position will be Friday at 1 o'clock

14 the deposition of Harvey Weintraub will be concluded.

15 I understand people -- everyone has made it clear they

16 have different views, but I'm stating my views.

17              As far as the document production,

18 the -- there have been -- one of the first times, you

19 know, I've been accused of having produced too many

20 documents.  We did produce a lot of documents out of

21 an abundance of caution, but the main core of the

22 Harvey Weintraub documents have been out there for

23 years, literally, four years.  Two cases have

24 proceeded to trial based on Weintraub's -- the

25 Weintraub record.  We tried the West Virginia case

36

1 with the Weintraub records and we almost got to

2 trial -- we were actually in the pretrial stage in

3 Texas and discovery was concluded.  So I wanted to

4 point that out to everybody.

5                Michael, I will go over the corporate --

6 the 30(b)(6) notices with you here today.  We are

7 prepared to designate Mr. Weintraub on a good number

8 of those items, not all of them, of course, and I'll

9 be happy to tell you which ones those are.

10                Let me see.  As far as him staying after

11 1 o'clock, it's been our assessment in working with

12 Mr. Weintraub that he really does tire in the

13 afternoon and we've -- he asked us for half days and

14 we're going to -- we're going to honor his request in

15 that regard.

16                As I said before, if someone is right in

17 the middle of something and I thought we were at a

18 breaking point, if someone is right in the middle of

19 something and we have to go a few minutes over, I'm

20 going to -- you know, I'm not going to quarrel with

21 that.

22                Hugh, I'm not going to address all the

23 stuff relating to Connecticut and the MDL, mostly

24 because I'm not all that terribly familiar with it,

25 except to say that your positions have been stated in

37

1 e-mails and letters and everything else and we

2 understand you're not waiving any of those positions,

3 is that --

4          MR. McNEELY:  That's correct.

5          MR. MOORE:  Nor are we.  We took the

6 position that the judge in Connecticut overruled your

7 objections.  There's disagreement about the state of

8 the record and we understand -- we'll just agree to

9 disagree on that.  Is that okay?

10          MR. McNEELY:  Oh, absolutely.

11          MR. MOORE:  All right.  I think that's

12 all I have.

13          Anybody else want to say something

14 or you want to go to the 30(b)(6)?

15          MR. RODA:  Let me just state, if I

16 could, Joe Roda again for Pennsylvania.  I would ask

17 that there be no communications by defense counsel

18 with Mr. Weintraub from the time we adjourn until the

19 time that we pick up.  Differing courts may have

20 differing rules on that.  I know that there are judges

21 in courts who prohibit communication while a witness

22 is under cross-examination with a witness.

23          Secondly, I would respond to the point

24 that we all should finish here within two and a half

25 days.  The direct testimony here was presented and

38

1 will presumably be presented in each case intact as it

2 was asked here.  To suggest that we on

3 cross-examination should do a splicing from one

4 deposition in one case to another deposition in

5 another case does not allow for as effective of

6 cross-examination to be played in the jury -- before

7 the jury in each of our cases as you will have on your

8 direct examination.  I think it is apples to oranges

9 and is an unfair limitation on the plaintiffs in their

10 respective cases.

11          I also would point out that had we been

12 at trial, at least under Pennsylvania's rules, and I

13 presume the rules of many states, there would have

14 been advance notice required of those exhibits to be

15 used in the case in chief by Schering and Warrick in

16 their case so that those of us preparing to

17 cross-examine would have had the opportunity.  To my

18 knowledge there was no such advance notice of the

19 exhibits that were used in the examination of

20 Mr. Weintraub.  Thus I think constituting another

21 reason why we may need more time to do it.

22          We will all endeavor to do our best, but

23 I don't see how any of us can guarantee that -- with

24 the importance of each of our cases that we will all

25 get this done in two and a half business days.

39

1             MR. MOORE:  All right.  Well, let me
2 respond to those points.
3             On the cross-examination point, I don't
4 know.  Sometimes I found spliced cross-examination is
5 effective.  I mean, Mr. Weintraub has been asked about
6 all these exhibits and we just -- you and I just
7 disagree on that point.
8             On the communication with Mr. Weintraub,
9 we have been advised, and I know South Carolina
10 counsel is here, that under -- South Carolina has very
11 strict rules about not communicating with the witness
12 during the deposition.  Certainly we have nothing like
13 that in Texas, but our view was was that we would
14 comply with what we thought was the most stringent
15 jurisdiction.  So we have no intention.  We are going
16 to comply with the South Carolina rule.  If there is
17 something more stringent than the South Carolina rule,
18 speak now or forever hold your peace, but it's a
19 pretty stringent rule that says we're not supposed to
20 talk to him once he's sworn in.  And so since we're
21 taking this deposition for purposes of also South
22 Carolina, obviously reserving your position, that's
23 what we are going to do with Mr. Weintraub.  So that's
24 what we intend to do.  That ought to solve that
25 problem, at least part of the problem.

40

1                 MR. RODA:  Thank you.

2                 MR. HELLER:  Michael, just so I

3  understand.  You're saying the substance of the South

4  Carolina rule is that during recesses and as well as

5  overnight breaks --

6                 MR. MOORE:  Yes.

7                 MR. HELLER:  -- that there is no

8  substantive communication with the witness?

9                 MR. MOORE:  Yeah.  There are some

10  exceptions to the rule, which I don't know have come

11  into play yet or not, but that's certainly my

12  understanding is that after he's sworn in we don't

13  have communications with him on breaks or overnight or

14  anything else and we intend to abide by that.

15                 Thanks, everybody.  See you in the

16  morning.

17                 MR. WINGET-HERNANDEZ:  30(b)(6), please.

18                 MR. MOORE:  Oh, 30(b)(6).  I'm sorry.

19  Hang on a second.

20                 All right.  With respect to the -- on

21  the 30(b)(6) notices that we have and are aware of,

22  first let me address Wisconsin's.  There are six

23  categories.  One and two we find pretty overbroad and

24  ambiguous and really can't designate him on either one

25  of those because it refers to pricing to retail

1 pharmacy and that's a huge universe, so we don't feel

2 comfortable designating him on pricing to retail

3 pharmacy.   Three and four, which has to do with

4 communications between Warrick and First DataBank, we

5 will designate him on three and four.   Okay.   We

6 cannot designate him on five and six of the Wisconsin

7 notice because he had nothing to do with reporting AMP

8 prices to HCFA or CMS or whoever.

9                 On the Mississippi notice --

10                 MR. WINGET-HERNANDEZ:   Before you go

11 on --

12                 MR. MOORE:   Yeah.

13                 MR. WINGET-HERNANDEZ:   -- on Wisconsin,

14 let me just state for the record that our position is

15 that -- through Ropes & Gray that Mr. Weintraub had

16 been designated for all purposes and when he was

17 designated there was no distinction made between the

18 topics of the notice.   So I think that for present I'm

19 not waiving any objection to your limitations of the

20 designation.

21                 MR. MOORE:   Okay.   Well, I went back and

22 talked to the people at Ropes & Gray and I think they

23 have a different view of it, but perhaps -- I wasn't

24 in on those conversations, so I can't address it.   I

25 can just tell you what we're prepared to do here

42

1 today.

2          MR. WINGET-HERNANDEZ:  I understand.

3          MR. MOORE:  I think it would be faster

4 just to say on the Mississippi 30(b)(6), let me just

5 give you the numbers of the ones that we will

6 designate him and then just assume that the other ones

7 we do not.

8          MR. WINGET-HERNANDEZ:  Very well.

9          MR. MOORE:  All right.  One; two only as

10 to AWP, not the other pricing; three; four; five; six;

11 seven; eight; 10; 12 and 13.  That's Mississippi.

12          MR. WINGET-HERNANDEZ:  Before you go

13 on --

14          MR. MOORE:  Yeah.

15          MR. WINGET-HERNANDEZ:  -- regarding

16 Mississippi, Mississippi is not here today for

17 purposes of taking this 30(b)(6) deposition, but

18 rather just responding and appearing at your

19 invitation to cross-examine Mr. Weintraub in your

20 preservation deposition and -- and we have no prior

21 notice that you had any intention of designating

22 Mr. Weintraub for the Mississippi 30(b)(6) deposition,

23 but we can -- we may be able to work that out between

24 now and the time that I begin my examination of him.

25          MR. MOORE:  Well, Michael, I find that a

43

1  little strange to hear in light of the fact that

2  pleadings were filed in Mississippi to get an

3  additional 10-days' extension on answering the

4  complaint because a Mississippi trial team was

5  involved in preparing for Mr. Weintraub's deposition.

6  And those are papers filed in Mississippi.  So I don't

7  know how you square that filing with the Court and

8  what you just said, but I don't think they square up

9  too well.  And I will say we're here.  You-all have

10  represented to the Court in Mississippi that you need

11  additional time to do this and so we expect you to do

12  it and our position will be that if you don't do it,

13  this was your chance and you should have taken it.

14          MR. WINGET-HERNANDEZ:  Well, I

15  appreciate that, but we got the same million documents

16  or more from you in Mississippi that everybody else

17  did.

18          MR. MOORE:  Okay.

19          MR. WINGET-HERNANDEZ:  So we've had the

20  same issues responding to your deposition without

21  reference to the 30(b)(6).

22          MR. MOORE:  All right.  Well, we stated

23  our position.

24          MR. WINGET-HERNANDEZ:  I think we just

25  disagree.

44

1              MR. MOORE:  Yeah, we do.

2              On Alabama we -- these are the ones we

3 can designate him on.  One, two, three, four, five,

4 six, seven, nine, 10.  That's it.  All these subject

5 to previously filed objections in all jurisdictions.

6              And on the pricing information, I think,

7 is the one thing I didn't -- didn't -- we feel like,

8 you know, more than adequate pricing information has

9 been produced to depose Mr. Weintraub.  He's been

10 deposed at length already on these issues and I think

11 we pointed out to you, or the lawyers from Ropes

12 pointed out to you all of the pricing information that

13 has been produced.  So we just have a very fundamental

14 disagreement on that as well, as we said in our

15 letter.

16              MR. WINGET-HERNANDEZ:  Right.  I'm going

17 to just stand by my correspondence and I don't think

18 that I -- that I specifically sent that to you.  I

19 think I sent it to Steven, but I'm assuming that you

20 have access to it or have already seen it, so I'm not

21 going to repeat it here.

22              MR. MOORE:  Yeah.  That's fine.

23              MR. ANDERSON:  Well, Mike, I don't want

24 to argue about it, but --

25              MR. MOORE:  I really don't either.

45

1              MR. ANDERSON:  I know.

2              MR. MOORE:  I really don't want to argue

3 about it.

4              MR. ANDERSON:  But let me just make sure

5 I understand.

6              MR. MOORE:  Well, you're about to argue

7 about it.

8              MR. ANDERSON:  No, I may not be.  Are

9 you-all saying -- when you say you think sufficient

10 production has already occurred, are you talking about

11 a WARPRICE daily extraction or a master price file

12 data extraction?  That's all I'm asking.  Are you

13 talking about that?

14             MR. MOORE:  Jarrett, it is our -- under

15 the circumstances of this deposition, which is a

16 77-year-old man with Parkinson's disease who could go

17 downhill on us at any time, more than adequate pricing

18 information has been produced --

19             MR. ANDERSON:  Okay.

20             MR. MOORE:  -- over the course of five

21 years and nine days of deposition and two trials to

22 take a final deposition of Harvey Weintraub.  So

23 without getting down in a level that you want me to

24 get down into, that's the position of my clients.

25 Okay?