IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS


IN RE:                          )   MDL No. 1456 and

AVERAGE WHOLESALE PRICE         )   C.A. No. 01-12257-PBS

PHARMACEUTICAL LITIGATION       )   Courtroom No. 19

                                )   1 Courthouse Way

                                    Boston, MA  02210


STATUS CONFERENCE

MARCH 26, 2010

10:10 A.M.


BEFORE THE HONORABLE PATTI B. SARIS

UNITED STATES DISTRICT JUDGE


VALERIE A. O'HARA

OFFICIAL COURT REPORTER

1   A P P E A R A N C E S:

2       United States Attorney's Office, by GEORGE B.
    HENDERSON, ASSISTANT UNITED STATES ATTORNEY, and JAMES J.
3   FAUCI, ASSISTANT UNITED STATES ATTORNEY, 1 Courthouse Way,
    Suite 9200, Boston, Massachusetts  02210, for the
4   United States, ex rel;

5       Foley Hoag LLP, by MARTIN F. MURPHY, ESQ., Seaport
    World Trade Center West, 155 Seaport Boulevard, Boston,
6   Massachusetts  02210-2600, for Mylan Pharmaceuticals, Inc.;

7       Kelley, Drye & Warren LLP, by WILLIAM A. ESCOBAR, ESQ.
    and SARAH L. REID, ATTORNEY, 101 Park Avenue, New York,
8   New York  10178; for Mylan Pharmaceuticals, Inc.;

9       Kirkland & Ellis LLP, by HELEN E. WITT, ATTORNEY,
    300 North LaSalle Street, Chicago, Illinois  60654, for
10  Roxane Laboratories, Inc.;

11  VIA TELEPHONE:

12      The Breen Law Firm, P.A., by JAMES J. BREEN, ESQ.,
    3562 Old Milton Parkway, Alpharetta, Georgia  30005,
13  for T. Mark.

14

15

16

17

18

19

20

21

22

23

24

25

<u>PROCEEDINGS</u>

1
2        THE CLERK:  All rise.  In re:  Average Wholesale
3  Price Pharmaceutical Litigation, Civil Action 01-12257 will
4  now be heard before this Court.  Would counsel please
5  identify themselves for the record.
6        MR. HENDERSON:  George Henderson for the United
7  States.
8        MR. FAUCI:  Jeff Fauci for the United States.
9        MS. WITT:  Helen Witt on behalf of the Roxane
10  Defendants.
11        MR. ESCOBAR:  Good morning, Bill Escobar on behalf
12  of Mylan Pharmaceuticals.
13        MS. REID:  Good morning, Sara Reid on behalf of
14  Mylan Pharmaceuticals.
15        MR. MURPHY:  And Martin Murphy.
16        MR. BREEN:  John Breen on the phone.
17        THE COURT:  I forgot about you.  You were like Oz
18  suddenly speaking behind the curtain.
19        MR. HENDERSON:  Yes, your Honor, we wanted this
20  status conference in part because of progress in
21  negotiations which I understand your Honor is aware of.
22        THE COURT:  Yes, I got a phone call from the
23  mediator, Mr. Green.
24        MR. HENDERSON:  Yes, and our critical issue now I
25  think is the scheduling for further proceedings, and I think

1    the issue, the top of the agenda for us is a new date for a

2    trial.

3             THE COURT:  Okay.

4             MR. HENDERSON:  The United States does wish to

5    have a continuance of the trial.  We've seen the response

6    that Day filed, and in our view, the current date is too

7    soon; September is too far.

8             THE COURT:  I've got a little post trial stress

9    disorder.  I was so swept in this trial in five weeks that

10   I'm just getting back to my normal calendar.  When is the

11   trial scheduled for?

12            MR. HENDERSON:  It's scheduled for April 26.  The

13   parties have been engaged in a flurry of pretrial

14   activities.  We have a motion to strike pending and such

15   that affects the ability of at least the United States to

16   prepare for a trial.  We also have the development with

17   Roxane which we believe really necessitates --

18            THE COURT:  That's public?

19            MS. WITT:  No, your Honor, we have, as has been

20   communicated to you, there are still a number of

21   contingencies that they have worked out which we are

22   confidentially --

23            THE COURT:  So they have a basic sense of it, you

24   know, I don't know the details myself, but there's a strong

25   potential for a settlement?

1          MS. WITT:  Correct.

2          MR. HENDERSON:  Correct.

3          MS. WITT:  Enough that we're confident that we

4    will not be in the trial that's contemplated.

5          THE COURT:  The trial involving whom?

6          MR. HENDERSON:  Day.

7          THE COURT:  Just Day?

8          MR. HENDERSON:  But let me clarify, your Honor,

9    approvals have to be obtained, and in this instance, it's

10   not the usual sure bet that customarily comes with a

11   recommendation from staff counsel as to what will have to be

12   reviewed at a higher level.

13         THE COURT:  When will I know?

14         MR. HENDERSON:  I'm sorry.

15         THE COURT:  When will I know?

16         MR. HENDERSON:  We expect to conclude everything

17   in about 30 days.

18         THE COURT:  You'll know from Washington really?

19         MR. HENDERSON:  Yes.

20         THE COURT:  Within 30 days?

21         MR. HENDERSON:  Maybe 45.  It's hard to say.

22         THE COURT:  You want a continuance of the

23   April 26th trial?

24         MR. HENDERSON:  Correct.

25         THE COURT:  That's why Day -- you don't want that?

1              MR. MURPHY:  Your Honor, we are happy to

2     accommodate the government's request for the continuance

3     from the April 26th date.  The issue is that the trial

4     schedules of the other members of the core trial team that

5     will be trying this case, including at least one other case

6     in front of you that we folks will be trying, we can't find

7     an available spot for a trial until September 13th, so we'd

8     be happy to continue the matter, but the first date that's

9     available, and we can talk through the specifics, but the

10    first date that's available for us is September 13th.

11             THE COURT:  Let me tell you about my life.  So I

12    have next week off, but then after that, unless it changes

13    dramatically, I have a four- to five-week criminal trial,

14    Prosecutors John Capin and Stephanie Siegmann, defense

15    counsel, Paul Johnson, Don Stern and a couple of others,

16    four, all right, four defendants.  If that goes, which I'm

17    currently expecting it to go, it will be they tell me at

18    least four weeks, so let's -- and I am not, I lost my

19    February vacation.  I am not losing April vacation with my

20    kid, so I am taking April vacation off, or at least most of

21    it, and, also, it's hard to get a jury on school break for

22    Boston, Massachusetts, so that will likely bump your trial

23    anyway.

24             Let me put it right out there.  Then the most

25    patient people in the world have been Commonwealth vs. Mylan

1    which has really been bumped, and they are my first fall

2    civil case, and that is a Commonwealth of Massachusetts case

3    so they were scheduled before you, and they would be ahead

4    of you in the pecking order unless it will miraculously

5    settle which I was told the other day it would not.

6            So you are not going to be reached under any

7    theory unless, unless, I suppose, the criminal case

8    completely pled out and Mylan settled.  You're not going to

9    be reached anyway.  That's the stark reality.

10           So to add to that complication, I've got a sex

11   offender case which might be squeezed in there which only

12   would be a week, so that's my life, and I don't know if I'm

13   willing to say that it goes to September 13th.  When you say

14   everybody, does that mean six Day lawyers that I need to

15   schedule around everybody's life?

16           MR. MURPHY:  Your Honor, I think there are going

17   to be four core lawyers that will be trying this case, and

18   four of us are scheduled for other trials during the period

19   when the government wants to try the case.

20           THE COURT:  I'm just simply saying I'm not sure

21   I'm going to work around four people's schedules, but that

22   having been said, I don't know, I've got this other case

23   with your lawfirm, by the way, which is desperate for my

24   life called The Max-Planck vs. The Whitehead Institute.  For

25   some reason, I sent one of my Neurontin cases to Judge Young

1    because there was absolutely no way I could try it.

2          On the productivity side of it, I am really busy,

3    so I don't know where you're going to be tried is the

4    practical matter, and nothing settles a case like a firm

5    trial date.  I'm not willing to let you off the hook until

6    September.  I don't know what my trial life is.  I'd rather

7    see what happens with these other cases first, but if the

8    criminal case goes, which starts April 5th, and if then

9    Mylan follows as a practical matter, I wouldn't get to you

10   till at least June.

11         MR. ESCOBAR:  I'm one of the attorneys that will

12   be trying this Day case.  I am also scheduled to try cases

13   in June in Alabama and Hawaii that have been set for some

14   time.  We moved in both of those cases to change the date of

15   those trials in light of the fact that your Honor had set

16   the April 26th date.  The courts have refused to move those

17   dates.

18         THE COURT:  Good for them.  I wouldn't move it

19   either.  You don't know what's going to happen, and you work

20   around each other.

21         MR. ESCOBAR:  Your Honor --

22         THE COURT:  Why doesn't Day settle some of these?

23         MR. ESCOBAR:  The Alabama Mylan is a different

24   client.  They have settled, they have settled numerous cases

25   around the country.  Mylan has entertained settling.  A

1   share of all the cases have not settled.  I don't know if

2   they will settle, but at the moment I can't try a case that

3   begins in June here in this courtroom and be responsible

4   also for cases in June in two other states, so we're willing

5   to move this case.

6              THE COURT:  We've got to as a practical matter.

7              MR. ESCOBAR:  Beyond that in July, your Honor

8   mentioned Massachusetts Mylan.  The first one that you have

9   coming up involves Warwick.

10             THE COURT:  Right.

11             MR. ESCOBAR:  You also have scheduled for

12   July 19th in the same Massachusetts case the Mylan and Parke

13   defendants, and that case is currently set for July 19th, so

14   as we look at the schedule right now, there is no room for

15   us to move this case into the summer.  The earliest

16   possibility is September.

17             THE COURT:  Maybe.  I'm simply saying your other

18   case could get settled.  I'm just not willing to say yet

19   what I'm going to do as a practical matter.  You're off the

20   hook for the end of April.

21             MR. ESCOBAR:  The only other thing I raise on that

22   obviously settling the trial date keeps in some other

23   deadlines.

24             THE COURT:  I understand.  April 26th is off, it's

25   off because they can't -- they need some more time to

1     effectuate the settlement, and it's off because as a

2     practical matter, I'm just not going to get to it.  Now, so

3     I think I will know a lot better when I start seeing what

4     cases go when.  How long a trial is this?

5          MR. ESCOBAR:  Well, I think that's a question that

6     remains to be seen at the moment because it involves both 47

7     Medicaid programs, the entire Medicare program so I don't

8     see how this -- as you currently configured, I don't see how

9     this trial is less than six to eight weeks.

10          THE COURT:  I'm not going to try it for six or

11     eight weeks.  I had difficulty with this last case which was

12     Neurontin, which was a month.  We're going to have to do

13     some strict time limits.  I'm not ready for that.  When is

14     the pretrial conference in this case?

15          MR. ESCOBAR:  I think it was April 16th.

16          MS. REID:  It was April 16th.

17          THE COURT:  It makes sense to move that.  Does it

18     make sense, first of all, to find out who's in it?  Is there

19     no chance for settlement with Day?

20          MS. REID:  No, your Honor, that would not be

21     accurate.  We've been engaged with the government.  Our

22     latest profile last week we've been told to expect a

23     response from the government with respect we have made in

24     our view very substantial moves.  With the government there

25     is still a distance.

1          THE COURT:  So it's a possibility?

2          MS. REID:  This is a possibility.

3          THE COURT:  This may be a moot point.  Maybe we

4     should just come up with a status in a month.  Does that

5     make some sense?  We could use --

6          THE CLERK:  Final pretrial.

7          THE COURT:  Final pretrial as a status, start

8     really figuring out how long the trial's going to be and

9     witness lists, in other words, keep some of that on so I can

10    see how long this is going to be.  I mean, I need to have

11    some realistic sense about what this case is about and how

12    long it's going to be, and I will not give you eight weeks,

13    I guarantee you, guaranteed.

14         The Neurontin case which was unbelievably

15    complicated, five separate indications, it felt like I was

16    sitting here a long time.  I gave you 28 hours per side.

17    That's a long case.  I recently had an anti-trust case that

18    went a month.  You can do a lot in that period of time.

19         MR. HENDERSON:  We expect to bifurcate the

20    Medicare claims from the Medicaid claims so the Medicare

21    case would be much simpler.

22         THE COURT:  How long would that take?

23         MR. HENDERSON:  Three, maybe four weeks, maximum.

24         THE COURT:  So I don't save that much.

25         MR. HENDERSON:  I think it would be a substantial

1    savings.

2         THE COURT:  Anyway, three to four weeks sounds

3    better than eight weeks.  You can get a jury, they're not

4    happy, but you can get a jury for three to four weeks.

5    Eight weeks, it's brutal, and it's unfair to them.

6         MR. HENDERSON:  I think the idea of changing the

7    pretrial conference to a status conference would be fine.

8    It's three weeks away.  I'm not sure we'd have final

9    approvals at that time.

10         THE COURT:  But you'd know a lot more?

11         MR. HENDERSON:  But I think we'd know a lot

12    more.

13         THE COURT:  We'll keep that date on, a final

14    pretrial, and you'll get a sense better.

15         MS. REID:  Your Honor, I just want to raise

16    because of the order entered off of the final pretrial, all

17    of the trial deadlines run from that, and I'm thinking from

18    what Mr. Henderson --

19         THE COURT:  Why don't I stay all those deadlines

20    until we come up with the new date with the following

21    exception, I want you to come up with realistic witnesses

22    with how long you're going to need for each, one, two

23    scenarios, one, if it was just Medicare, I would have to

24    deal with the bifurcation.  Would you be in favor of

25    bifurcation?

1          MS. REID:  No, we would oppose it.

2          THE COURT:  One with bifurcation and one without

3    bifurcation.  If there's a three-week, I might want to

4    squeeze it in.

5          MR. HENDERSON:  Can I raise something on that

6    issue?  We filed a motion to Day's exhibit list which is

7    over 7,400 exhibits long, and, in addition, their deposition

8    designations where they have 132 witnesses.

9          THE COURT:  Yes.  We're going to cut that.

10          MR. HENDERSON:  We can't prepare.

11          THE COURT:  No, you can't.  That's ridiculous.

12          MR. HENDERSON:  For the depositions, I counted --

13          THE COURT: I don't know about the depositions, I'm

14    not going to let 7,000 exhibits go into a jury.

15          MR. ESCOBAR:  Your Honor, this is the exhibits

16    that we have to designate in advance of the trial.  If

17    they're not designated, we don't get them for trial.

18          THE COURT:  I need you to cut it down to a

19    realistic list.

20          MR. ESCOBAR:  I understand.  We've had

21    conversations that would protect both interests.  Let me

22    point out, your Honor, there are 47 state cases.  We have

23    designated an average of 31 documents per state.

24          THE COURT:  Let me you tell you the more you talk,

25    the more it's going to be bifurcated.  If we're at that

1    point, it will be a bifurcated trial.  It's in your interest

2    to make it doable.  All I'm saying is 7,000 documents are

3    not going into a jury room.

4              MR. ESCOBAR:  I haven't said that's what they

5    would do.  We would give them a list that preserves our

6    rights to use a subset of the documents.

7              THE COURT:  You can't do a long list.  It would be

8    impossible to respond to it.  I had the largest case in the

9    world.  How many exhibits did we have?

10             THE CLERK:  Too many.  Three times those

11   binders.

12             THE COURT:  Three times those binders, and that

13   wasn't close to 7,000 documents, so it would be like having

14   the jury from Rapunzel going through and never finish.

15             MR. ESCOBAR:  As I said, your Honor, the witness

16   list is to preserve our right to use a subset of the

17   documents.  If they're not on the list --

18             THE COURT:  We're past preserved, we're going to

19   be what does the trial look like, and if it looks like that,

20   I'm going to do Medicare first.  Why don't you do a separate

21   list that's just about Medicare, and if there are that many

22   documents, you think about a summary document.

23             MR. ESCOBAR:  We've had discussions about exactly

24   that.  Now we will oppose to bifurcate, and we'll file a

25   response.

1          THE COURT:  I will grant it if we're talking about

2     7,000 documents.  If you come up with something manageable I

3     can do in a month with a manageable number of witnesses and

4     a managed number of documents, I prefer trying it once; if

5     it's unmanageable, that's what I have to do.

6          MR. ESCOBAR:  We'll do our best.  This is driven

7     by the case they have brought.

8          THE COURT:  I understand your problem, but my

9     problem, I do not have the resources or the time, and I

10    don't want to try to get a jury for at least eight weeks

11    with 7,000 documents, so it's got to be doable, it's got to

12    be manageable.

13         MR. ESCOBAR:  Nobody can disagree with that, your

14    Honor.

15         THE COURT:  It's got to be feasible, and in the

16    meantime though, I don't know when we're going to try this.

17    It is stayed from April 26th so that we'll use that pretrial

18    date as a date where you're going to give me a reasonable

19    number of documents and witnesses and two alternatives, one

20    is just the Medicare case and just the Medicaid case and one

21    would be a combined case.

22         Let me ask you this, how many documents have you

23    designated?

24         MR. HENDERSON:  For both cases Day and Roxane, we

25    designated approximately 900.

1          THE COURT:  So it's huge under any theory?

2          MR. HENDERSON:  It's a big case.

3          THE COURT:  So how am I going to try it in a way

4     that's manageable to a jury?

5          MR. HENDERSON:  Our proposal to bifurcate.

6          THE COURT:  Medicare would do what?

7          MR. HENDERSON:  Medicare is 80 percent of the

8     case, and it's one program, one governmental entity rather

9     than 47 governmental entities.

10          THE COURT:  Would that come down dramatically in

11     terms of the number of documents and that sort of thing?

12          MR. HENDERSON:  Yes, definitely.

13          MR. ESCOBAR:  With one exception, there is

14     overlap, there is a scienter issue that's obviously at the

15     heart of their case, and CMS is one agency that runs both

16     programs, so there is some overlap between Medicare and

17     Medicaid.

18          THE COURT:  I'm not going to impute to Idaho to

19     CMS.

20          MR. ESCOBAR:  This is talking about the MCS at CMS

21     which runs both programs.

22          THE COURT:  That's fair enough, yes.  I mean, it's

23     got to cut back on the number of employees if you're not

24     doing every Medicare program in the country, right?

25          MR. ESCOBAR:  Mr. Henderson has said in this Court

1    today 80 percent of the case is Medicare, and we don't

2    disagree that.

3            THE COURT:  Why doesn't it make sense to try

4    Medicare first then?

5            MR. ESCOBAR:  If we find reasonable ways to allow

6    us to bring in Medicare evidence that is relevant to a

7    Medicaid case, that may be a way to do it.  I'm not saying

8    you can't do it.

9            THE COURT:  Be thinking real creatively about it,

10   it may be we can't try it until September 13th just based on

11   my schedules.

12           MR. HENDERSON:  There's one more.

13           THE COURT:  Mr. Murphy can juggle between his

14   case, which is more important, you can juggle within the

15   government.  You all know the cases that I'm sort of

16   struggling to fit in, so...

17           MR. HENDERSON:  Just one more item if I could grab

18   your Honor's attention, Day designated deposition testimony

19   for about 132 witnesses.  Over half of those are depositions

20   that were not noticed in our case and we never attended many

21   of them.  We don't have -- we've never seen the depositions,

22   and our view is that if it wasn't in our case, if we weren't

23   cross-noticed, we did not attend, it's not admissible.

24           THE COURT:  I thought we dealt with this early on

25   in discovery.

1          MR. HENDERSON:  Our concern is having current

2     designated testimony as to that group of witnesses, it's a

3     big chunk of time and effort, and if we could get some sort

4     of ruling on this, that would save a lot of time.

5          MR. ESCOBAR:  Your Honor.

6          THE COURT:  Aren't the Medicare agencies --

7          MR. HENDERSON:  These were taken in the MDL and

8     other state cases.

9          THE COURT:  I thought we agreed everything for one

10     was admissible for everybody so long as there was a

11     reasonable opportunity to cross.

12          MR. HENDERSON:  We had no opportunity.

13          THE COURT:  Who crossed?

14          MR. HENDERSON:  For the most part nobody did

15     because in a state case, your Honor, the state knows the

16     witness can attend the trial and will attend the trial, so

17     we never cross-examined.  We've never in these other cases,

18     never had an opportunity to ask them.

19          THE COURT:  Were you noticed?  Were the

20     depositions noticed?  Did you know they were happening?

21          MR. HENDERSON:  No.

22          MR. ESCOBAR:  Your Honor, first of all, this is

23     the first I've heard of this supposed motion.  If he wants

24     to make a motion, we'll respond to it.  These are

25     depositions that were taken in the Medicaid cases that

1    had -- that are being litigated by the states.  Now the

2    state is litigating those cases on behalf of both the state

3    and the federal government because they're seeking the

4    entire amount in those cases.  They represent the interest

5    of the entire Medicaid program.  State lawyers were present

6    at each one of those depositions, had an opportunity to ask

7    questions.

8              THE COURT:  Have you moved yet?

9              MR. HENDERSON:  No, I haven't, your Honor.

10             THE COURT:  You need to because they've got a

11   decent argument.  I'm not going to have everybody go out and

12   spend the money to do separate depositions on every Medicaid

13   official.  We all knew this is an expense.  Now, if there

14   are certain depositions like you feel you want to do some,

15   if you can't get them here, I don't know why you couldn't

16   get them here.

17             MR. HENDERSON:  Well, we do need your Honor's

18   authorization to issue subpoenas.  We filed a motion for

19   leave.

20             THE COURT:  Won't the states cooperate with you?

21             MR. HENDERSON:  We need subpoenas, no, your Honor,

22   we need subpoenas.

23             THE COURT:  Maybe they will give you a subpoena or

24   you can agree to a telephone interview to do some cross, I'd

25   allow to you do some follow-up or we would take depositions

1    as is, and I would let you to fly to each of those locations

2    and cross-examine for trial.  There are solutions here, but

3    to start from scratch on each Medicaid, official is crazy,

4    and if I've learned one thing, every Medicaid program is a

5    little bit different so you got to hear from these people,

6    and I hate to harass them to do a completely separate

7    deposition.  It would take an eternity, and, B, I'd subpoena

8    them.  It would be your expense flying all these people,

9    putting them up.

10              MR. HENDERSON:  Well, we have to do something.

11              THE COURT:  Well, maybe.  Maybe.  I'm not

12   disagreeing, I'm just simply saying the purpose of a

13   multi-district litigation is this kind of thing where you

14   can conserve resources so I'm not going to allow brand new

15   depositions, and I'm not going to prejudice them.  We need

16   to hear from the Medicaid officials in every state.

17              MR. HENDERSON:  That's right.  We have not heard

18   from them.

19              THE COURT:  Meet them and cross-examine them or

20   subpoena them in.  I assume they're telling the truth,

21   they're our Medicaid officials.

22              MR. HENDERSON:  Many of them before we filed

23   suit.

24              THE COURT:  Are they lies?

25              MR. HENDERSON:  They're incomplete.

1          THE COURT:  Then, fine, complete them.

2          MR. HENDERSON:  We're going to have to reopen

3    discovery to do it.

4          THE COURT:  No.

5          MR. HENDERSON:  Or we call them in as witnesses.

6          THE COURT:  Well, you call them in as witnesses.

7          MR. HENDERSON:  We'll have to do that because

8    these are situations time after time where the state knows

9    that the person is available for trial and they don't ask

10   any questions, no questions whatsoever and we have a

11   completely one-sided transcript.

12         THE COURT:  Fine.  Make another one.  Subpoena

13   them in.  Fine.

14         MR. HENDERSON:  That's what we'll have to do, then

15   the trial will take months and months and months.

16         THE COURT:  That's why I'm just going to do

17   Medicare, you're all talking me right into it, you're

18   talking me right into it.  That may happen, but you need to

19   file your motion.  I can't rule on the abstract on the whole

20   thing.

21         MR. HENDERSON:  Right.

22         THE COURT:  How long since there's an indefinite?

23   Based on my schedule, you better start looking at them and

24   see who you need.

25         MR. HENDERSON:  Yes, absolutely.

1          THE COURT:  How many depositions of these Medicaid

2     officials are there?

3          MR. HENDERSON:  Day has designated 132 overall.

4     That includes some federal officials, so I don't know how

5     many of those are state.  My guess is about two-thirds.

6          THE COURT:  Start reading them.

7          MR. HENDERSON:  They probably have 100.

8          THE COURT:  Start reading.  See what you need, see

9     what you can live with and what you need.  It's a big case.

10          MR. HENDERSON:  Yes.

11          THE COURT:  This is all impetus on both sides.

12     The way I'm leaning without seeing your submissions, it

13     would have to be a Medicare case as a practical matter.  If

14     you need new discovery, if that's the easiest way, either

15     start taking the deposition or who you need the subpoenas

16     for.

17          MR. HENDERSON:  I would remind your Honor about a

18     year ago your Honor said that the defendants could take one

19     30(b)(6) deposition and one 30(b)(6) per state.

20          THE COURT:  Right.

21          MR. HENDERSON:  We took lots of depositions, we're

22     not complaining about that.

23          THE COURT:  Excuse me, if there are people with

24     relevant knowledge, I'm going to limit the hours they can

25     use, so at this point, I want you to all listen.  You're not

1    going to put in 134 depositions, I can tell you, the jury

2    falls asleep.  The jury hates it.  You can make the appeal

3    record.  I've seen it in one major anti-trust, it's just the

4    depositions kill you.  I have to like put coffee in them

5    just to keep them awake, so at some level it's

6    self-limiting, and, plus, I'm going to put an hour limit.

7    Twenty-eight hours a side brings you roughly to four to five

8    weeks, and it seems a fair way to handle it.  If it's just a

9    Medicare case and it may be the government, you said it's 80

10   percent of your damages?

11           MR. HENDERSON:  Correct.

12           THE COURT:  What are your damages you're looking

13   for against Day?

14           MR. HENDERSON:  I believe the 340 million

15   singles.

16           THE COURT:  And does that include Medicaid and

17   Medicare?

18           MR. HENDERSON:  I think so.

19           THE COURT:  So 80 percent of that?

20           MR. HENDERSON:  Yes.

21           THE COURT:  So, as a practical matter, if you won

22   that you might be able to settle the remaining percent?

23           MR. HENDERSON:  I would think so.

24           THE COURT:  Does that sound right?

25           MR. ESCOBAR:  That's correct.

1          THE COURT:  And if you lost that?

2          MR. HENDERSON:  We'd be very inclined toward

3    settlement.

4          THE COURT:  Why don't I do that, doesn't that make

5    sense instead of gallivanting all over the country, why

6    doesn't that make sense?

7          MR. ESCOBAR:  Your Honor, as I said, there's a

8    certain overlap between the programs.  We will work trying

9    to figure out how to present the separate case, but I want

10   to see his motion, and I think we have to respond at the

11   moment we're inclined to oppose it.

12         THE COURT:  Sure.

13         MR. ESCOBAR:  I understand your Honor's

14   analysis.

15         THE COURT:  It makes sense.  I'd love to see if

16   Day isn't going to settle, when will you all know?

17         MR. ESCOBAR:  Your Honor, the nature of these

18   discussions because of the layers of people that have to

19   look at it on both sides, it's somewhat time consuming.

20   We've been in discussions now for several weeks so I really

21   don't know.  We're waiting to hear from the Government.

22         THE COURT:  If I give Commonwealth vs. Mylan and

23   Shearer a trial, wouldn't it make sense to stick this in the

24   July 19th slot?

25         MR. ESCOBAR:  That's certainly a possibility if

1   you move.

2           THE COURT:  In other words, I will have a read

3   from a jury on a few pieces, I have some juggling that I can

4   do.

5           MR. ESCOBAR:  Yes, you can control the July 19th

6   that's at issue for us.

7           THE COURT:  And you're the holdup, right?

8           MR. ESCOBAR:  Either we are or you are.

9           THE COURT:  One of us is the holdup on that.  In

10  other words, and if I can squeeze Commonwealth vs. Shearer

11  Warwick in and there's a read from a jury, maybe some of

12  your other cases would settle, so I've got some playing

13  room.

14          MR. FAUCI:  I'm expecting my baby to be born July

15  30th, just July would be very hard on me.

16          THE COURT:  Congratulations.  How many team

17  members would be trying from my end?

18          MR. HENDERSON:  Myself, Mr. Fauci, Ms. Oberembt

19  from the Department of Justice would be the core team and we

20  also have Barbara Smith.

21          THE COURT:  I'll keep that in mind.  It may be

22  that you're going to be out for two weeks, you'll be there

23  and then out.

24          MR. FAUCI:  Understood.

25          THE COURT:  You got to be there for at least a

1    week, two weeks.

2              MR. FAUCI:  Thank you.

3              THE COURT:  So good.  So this is very useful.

4    Thank you for making the efforts to try and settle.  I hope

5    that works.  If not though is it a joint trial if we do

6    Medicare with both Roxane and Day?

7              MR. HENDERSON:  I'm sorry, if the settlement is

8    not approved?

9              THE COURT:  Yes.

10             MR. HENDERSON:  Yes.

11             THE COURT:  It's joint?

12             MS. WITT:  Well, your Honor, there's motions that

13   are pending.  We oppose those motions that are pending.

14   They have not been ruled on.

15             THE COURT:  What if I did Medicare?

16             MS. REID:  There's the same thing.

17             THE COURT:  So hopefully I wouldn't have to rule

18   on it?

19             MR. REID:  Right.

20             THE COURT:  We'd go from there.  We should be a

21   lot closer to that on the status date.

22             MR. HENDERSON:  Yes.

23             THE COURT:  I'm figuring that out.

24             THE COURT:  So, good, so I will see you on the

25   16th; is that the date?

1          THE CLERK:  Yes.

2          THE COURT:  We'll start talking in greater depths.

3    Can you give me all these memos and stuff like two or three

4    days beforehand, say three days beforehand?

5          MR. HENDERSON:  Your Honor, I'm not exactly sure

6    what you're referring to.

7          THE COURT:  I'm referring to memos what is a

8    Medicare vs. Medicare and Medicaid trial so we can actually

9    give you a firm date and I can make a decision as to who's

10   in and who's out.  I think that would be incredibly

11   helpful.

12         MR. HENDERSON:  A week before the status

13   conference?

14         THE COURT:  Yes.  I'm asking Mr. Murphy, to do the

15   Max-Planck case, how long a trial is that?  That's one thing

16   I don't know.

17         MR. MURPHY:  I can certainly do that, your

18   Honor.

19         THE COURT:  That might be useful because

20   potentially we have two weeks, we could do two and two in

21   June.

22         MR. MURPHY:  If I could be back, where would you

23   be thinking about putting that one?

24         THE COURT:  I'm trying to figure with Mr. Alba how

25   long that will take, whether that's all of June.

1          MR. MURPHY:  Okay.

2          THE COURT:  Because I'm out a fair amount at some

3     point.  I have a budget committee meeting, in May I've got

4     various judicial conferences, and so I only have -- I lose

5     about a week and a half in May and about a week in July just

6     on court stuff, not even mentioning vacation, so I'll

7     probably take my own vacation towards the end of August, so

8     just I don't know what your personal vacations are like, but

9     I tend to take the middle two or the last two weeks in

10    August.

11         MS. REID:  Your Honor, is it possible I'm thinking

12    that we're out March 26th and April 16th is not very far

13    away.  Is it possible that we could do this on the 26th of

14    April which would have been the day the trial was supposed

15    to start and go through what the trial would look like and

16    we could submit everything the week before?  Is that any

17    hope at all on your schedule?  It would give us all a little

18    more time to go through this.  It would make it a better

19    product for you.

20         THE COURT:  I don't have strong feelings about

21    it.

22         MS. WITT:  I think that date would be safer to

23    make sure we'd have a definitive on the settlement.

24         THE COURT:  The problem, I have time on the 16th.

25    On the afternoon on April 26th, I'll be busy all morning and

1    all afternoon.  If you can find another part of the

2    calendar, all power to you.  I don't have a principal

3    objection, but, don't forget, if these other trials go, I'm

4    swamped.  I don't suppose anybody wants to consent to a

5    Magistrate Judge?  They're so involved, at this point,

6    Judge Bowler?

7            MR. HENDERSON:  I'd be happy with a bench trial,

8    your Honor, before your Honor.

9            THE COURT:  But that's still the time commitment.

10   You might think about it because Judge Bowler knows this

11   case inside and out, right, or Judge --

12           MR. MURPHY:  We can certainly discuss it.  I guess

13   feeling the magnitude and the damage claim --

14           THE COURT:  It's huge.

15           MR. MURPHY:  We probably need an Article 3 Judge

16   for it.

17           THE COURT:  And we need a jury, right?

18           MR. MURPHY:  We need a jury.

19           THE COURT:  It was very powerful, it's a sense of

20   a community, and it's also a way to communicate with your

21   perspective clients, this is how a jury saw it.  I think

22   that's a good thing.

23           MS. WITT:  The request does not apply to Roxane.

24   We'd prefer not to break up the witness lists.  I think the

25   government and we are confident that we'd prefer not to

1   spend additional money on tasks like that.

2           MR. HENDERSON:  Thank you, your Honor.

3           THE COURT:  Thank you.  Have a wonderful weekend

4   in the snow.

5           THE CLERK:  Court is in recess.

6           (Whereupon, the hearing was suspended at

7   11:10 a.m.)

8                       C E R T I F I C A T E

9   UNITED STATES DISTRICT COURT )

10  DISTRICT OF MASSACHUSETTS     )

11  CITY OF BOSTON                )

12

13           I, Valerie A. O'Hara, Registered Professional

14  Reporter, do hereby certify that the foregoing transcript

15  was recorded by me stenographically at the time and place

16  aforesaid in No. 01-12257-PBS, In Re:  Average Wholesale

17  Price Litigation and thereafter by me reduced to typewriting

18  and is a true and accurate record of the proceedings.

19                       /S/ VALERIE A. O'HARA

20                       _____

21                       VALERIE A. O'HARA

22                       REGISTERED PROFESSIONAL REPORTER

23                       DATED MARCH 31, 2010

24

25