IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

IN RE: )
) CA No. 01-12257-PBS
PHARMACEUTICAL INDUSTRY AVERAGE ) CA No. 06-11337-PBS
WHOLESALE PRICE LITIGATION ) Pages 1 - 27
)

STATUS CONFERENCE

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE

United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
May 3, 2010, 3:43 p.m.

LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 7200
Boston, MA 02210
(617)345-6787

A P P E A R A N C E S:

GEORGE B. HENDERSON, ESQ., BARBARA HEALY SMITH, ESQ., and JAMES J. FAUCI, ESQ., Assistant United States Attorneys, Office of the United States Attorney, United States District Court, Suite 9200, 1 Courthouse Way, Boston, Massachusetts, 02210, for the United States.

SUSAN SCHNEIDER THOMAS, ESQ., Berger & Montague, PC, 1622 Locust Street, Philadelphia, Pennsylvania, 19103, for the Relator, Ven-A-Care of the Florida Keys.

JAMES J. BREEN, ESQ., The Breen Law Firm, 3562 Old Milton Parkway, Alpharetta, Georgia, 30005, for the Relator, Ven-A-Care of the Florida Keys.

WILLIAM A. ESCOBAR, ESQ. and SARAH L. REID, ESQ., Kelley, Drye & Warren, 101 Park Avenue, New York, New York, 10178, appearing for Dey Corporation.

MARTIN F. MURPHY, ESQ., Foley Hoag, LLP, Seaport West, 155 Seaport Boulevard, Boston, Massachusetts, 02210-2600, for Dey Corporation.

P R O C E E D I N G S

THE CLERK: In Re: Pharmaceutical Industry Average Wholesale Price Litigation, Civil Actions 01-12257 and 06-11337, will now be heard before this Court. Will counsel please identify themselves for the record.

MR. HENDERSON: George Henderson for the United States.

MR. BREEN: Jim Breen for the Relator, Ven-A-Care of the Florida Keys.

MR. FAUCI: Jeff Fauci for the United States.

MS. SMITH: Barbara Healy Smith for the United States.

MS. THOMAS: Susan Schneider Thomas for the Relator Ven-A-Care.

MR. ESCOBAR: Bill Escobar for Dey.

MR. DALY: Sarah Reid for Dey.

MR. MURPHY: Martin Murphy for Dey, your Honor. Good afternoon.

THE COURT: Thank you. When is this case scheduled for?

MR. HENDERSON: We have no trial date, your Honor. It was scheduled for April 26, but because of a settlement with Roxane --

THE COURT: Oh, right, you lost your spot in the pecking order. All right.

MR. HENDERSON: That's right, yes.

THE COURT: So, first of all, we need a new date today, and, second of all, we need to figure out what we're going to try.

MR. HENDERSON: Yes.

THE COURT: So I found the briefing very helpful on this point because I'm not going to try a three- or four-month trial. So basically I'm not even sure I'm willing to try a two-month trial without trying to prune it down. So at this point we can have some argument. I didn't accept the fact that there would be a Seventh Amendment problem. I'm going to try the Medicare case only with the two drugs. And now the issue is, I have now, unfortunately -- and I underscore "unfortunately" -- sat through two five-week trials. I have another week of the second one coming up, and in particular, on the civil side, it is deathly, deathly boring, to the point of juries falling asleep, to sit and listen to one videotape deposition after another. And so what I'd like to understand is why I need so many videotaped depositions if it's just a Medicare case, and whether or not we can get this down to two weeks a side, by which I mean 9:00-to-1:00 days, three and a half hours a day.

MR. HENDERSON: Your Honor, I have a chart that I think would be useful, and it basically summarizes the --

THE COURT: Yes, I saw it. That was in the materials you gave me.

MR. HENDERSON: No. Actually this is a more concise summary of both sides' listings.

THE COURT: Okay, I'm happy to take it.

MR. HENDERSON: I think it would be useful to get a sense of what both the United States and Dey -- I understand the figures for Dey that I've put down are close enough. I gave this to Dey before bringing it in, and the top half of it indicates the Medicare-only witnesses and exhibits. And you can see that the "expect to call" witnesses for both sides, eliminating about seven overlaps where the witnesses are the same, there are about thirty-eight witnesses.

THE COURT: Does that include depositions? Yes.

MR. HENDERSON: Yes, and that's an issue that I'd like to raise, your Honor. Dey has listed about fifty -- of their total sixty-three witnesses, about fifty of those are witnesses who they may call by deposition or live or may call by deposition, which means we've got fifty deposition designations that we don't --

THE COURT: Well, just practically speaking, A, there's not going to be enough time, and, B, if there's anything of the trial lawyer in you, I guarantee you that it is the least good form of advocacy that exists. The First Circuit will have a field day. They don't care if it's by deposition or alive. I guarantee you this jury will be asleep. I have been sitting on trial since January, and I've seen it happen.

MS. REID: Your Honor, if I may be heard for a moment, it would be very helpful if the government in their April 26 filings, which reduce the number of Medicare witnesses, would tell us who they've taken off the list because then we can further reduce --

THE COURT: Well, maybe. I'm just simply -- let's figure --

MS. REID: Because we understand your Honor's point. We want to bring it down as much as we can, but a lot of what we have left is --

THE COURT: I think if it's one drug, one defendant, this should be able to be done in a month, two weeks a side. Now, I'm guessing because no one's told me exactly who's coming on, what they're testifying to, and I think there should be a stipulation with to respect a lot of the documents. I don't think we need custodians of the records. I think there are going to have to be some efforts to prune even further. This is helpful. You've given me roughly the same estimates, right, four to six weeks and what a Medicare trial would look like with two drugs. Excuse me?

MR. HENDERSON: Two drugs, your Honor.

THE COURT: Right, right, ipratropium bromide.

MR. HENDERSON: Ipratropium bromide and albuterol sulfate.

THE COURT: Right. So I don't understand why we need

two drugs and one defendant. I was able to do multiple drugs and four defendants in a month on a bench trial in the general AWP case. I think people are going to have to just -- I don't have the time to sit and do a six-week trial, plus I have to tell you, it is unbelievably difficult to get a jury who will sit over the summer for sure.

So let's talk about realistically my trial schedule. You have lost your place in line essentially. I've got three criminal trials. I'm on a criminal trial which will finish at the tail end of next week, and I have to go to Washington for a week and a half or something like that, and then I've got three more criminal trials back to back. I have two civil trials ahead of you. I've got the Commonwealth v. Mylan, which is my number one guilt list trial because they've been waiting longer than you have, and then I have a question. It's two Foley Hoag cases actually. I'm not sure if Foley is involved, but Max-Planck and this one which are, you know they could flip a coin as to who gets me first, but they're both about the same length of trial, let's say a four-week kind of trial. So I could make an argument for each of them. Probably Max-Planck has a little more urgency to it, but I don't feel strongly about it.

MR. MURPHY: On that case, your Honor, my partners told me two weeks, for what it's worth.

THE COURT: Two weeks? All right, thank you. Oh,

that's useful.

All right, so assume for a minute --

MR. ESCOBAR: Your Honor, can I just address one thing that may help?

THE COURT: Yes.

MR. ESCOBAR: Since your Honor has decided that this will be a Medicare only --

THE COURT: It will be.

MR. ESCOBAR: Okay. We've been trying to get the government to negotiate settlement on Medicare only, both because your Honor indicated that that would be the case that would be tried when we were last here --

THE COURT: Right.

MR. ESCOBAR: -- and also because they've indicated that the Medicaid case, their view is that it would settle itself if we resolved Medicare. We don't disagree with the general concept, and what we would propose is that your Honor order a one-day mediation with Professor Green on the Medicare-only case.

THE COURT: I'm happy to do that, but it just won't delay the trial, so --

MR. ESCOBAR: I understand that, but I thought that would be useful to have at least in the mix.

THE COURT: So let me just ask you, how many actual live people do you know that you're going to call? Because I'm

trying to figure out, if I schedule over the summer, it wreaks havoc if I have a monthlong trial. It's hard to get because jurors are on vacation, and it's hard to get because people are on vacation, and you are all on vacation, so --

MR. HENDERSON: Live witnesses that we would call?

THE COURT: Yes, how many live witnesses do you know of right now? Maybe you could list them.

MR. HENDERSON: Well, our list has fifteen live witnesses and nineteen --

THE COURT: I don't care about the deposition people. A, you're going to have to cut them anyway, but, B -- I mean, in other words, prune it back, but I don't have to deal with their vacation schedules, so --

MR. HENDERSON: Fifteen witnesses that we expect to call live.

THE COURT: How about, how many live people do you know of right now?

MR. HENDERSON: I'm not sure I understand the question.

THE COURT: For Dey, for Dey. I'm sorry.

MS. REID: Let me just look, your Honor. Your Honor, at this point there aren't going to be more than seven to ten live witnesses. It depends a lot, as I said, on who the government is calling live because my belief is, a large portion of Dey's case will go in through the government's

witnesses that they've called live. So we could give you a concrete number on the live witnesses if Mr. Henderson could just share the names of his witnesses, and then we can give you that in a matter of a week or two. I mean, it's --

THE COURT: I tend to take vacation the tail end of August, so one way of approaching this -- I don't know what your personal schedules are like -- is to start in July or August and jump over it and go into September. I could put you on on a rolling list in June and just, for all I know, Mylan could settle or Max-Planck could settle, or all these criminal cases could plead.

MR. DALY: Your Honor, at the moment I have another AWP trial that starts June 14.

THE COURT: It could settle, it could go away.

MR. ESCOBAR: So far it hasn't.

THE COURT: Well, let me just, if I could, there are so many lawyers on both sigh, I don't think I should operate off of people's vacation schedules necessarily because I don't think I would ever get a date.

MR. MURPHY: No, and we wouldn't ask you to operate off of vacation schedules, your Honor, but I think with respect to other trial commitments, in light of competing trial commitments, when we were last here, we suggested September 13 as a date when all the folks on the defense side were available. I think the government's objection was that it

seemed a long time away --

THE COURT: It does, and I don't want to lose the momentum for mediation.

MR. MURPHY: -- less time away. I don't think, your Honor, given the amount of work that's necessary in this case, that any of us are going to fall into a slumber if we --

THE COURT: But it's six months away is the thing, isn't it, or not quite at this point?

MR. MURPHY: It's May, so that's September. That's four months, your Honor.

THE COURT: Four months? Do you all agree?

MR. HENDERSON: We're ambivalent, your Honor. It does seem like a long way away.

THE COURT: What do we have on for September 13? I'm almost positive that Mylan and Max-Planck, one of them will go is the thing.

(Discussion between the Court and Clerk.)

THE COURT: I'll put it on September 13, and I'm going to order you to mediation in the interim. I'm limiting you to ten motions in limine apiece.

Let me put it this way: I am horrified -- and you can bring this back to the Max-Planck people on both sides -- I received forty motions in limine. I'm certainly not going to rule on them. At some point there are resource issues. So ten motions in limine without subparts apiece with normal

formatting. I'm about to reject all the motions in limine in Max-Planck and make people prioritize. Oh, and that doesn't even include the four Daubert motions. I'm not doing it, okay. I'm not doing it. So there needs to be a little bit of prioritization on what's a good use of my resources. So at least on this case, ten motions in limine apiece, September 13, and are there any Daubert motions that I don't -- what do I need to catch up with you to get today on the motions --

MR. HENDERSON: May I just for clarification? The limit on ten motions in limine, does that include or exclude Daubert motions?

THE COURT: Includes.

MR. HENDERSON: Okay. The government has an outstanding Daubert motion with regard to Dey's principal expert, Dr. Bradford. I think it raises important issues.

THE COURT: That's the extrapolation issue?

MR. HENDERSON: No.

THE COURT: No. This is the --

MR. HENDERSON: This is a number of issues. We start off with the fact that Dr. Bradford has calculated alternative scenarios based on the opinion that Medicare could have used WAC, and that Dey is not responsible for its AWPs --

THE COURT: Can I apologize profoundly? I don't know -- I've had so many Daubert hearings involving AWP cases. Is it Professor/Dr. Duggan? Is that still outstanding?

MR. HENDERSON: Yes.

THE COURT: For Medicare?

MR. HENDERSON: Yes. That was an Abbott motion.

MR. ESCOBAR: We filed one with respect to Dr. Duggan in this case, both on his Medicare and Medicaid opinions.

THE COURT: So that's already been filed and briefed?

MR. ESCOBAR: That's correct. I think the briefing has concluded on that one. There's also --

THE COURT: So the one that you're referring to, maybe I sound brain dead, but have I had a Daubert hearing on it yet?

MR. HENDERSON: No.

THE COURT: Not Bradford, so I need a hearing on Bradford.

MR. ESCOBAR: Yes.

THE COURT: So that would be a good thing to schedule today, right, a hearing on Bradford?

MR. ESCOBAR: And Duggan.

THE COURT: No, not Duggan. Haven't I already heard Duggan's?

MR. ESCOBAR: You heard them in the Abbott case.

THE COURT: I'm not going to sit and redo it.

MS. REID: But it's different.

MR. ESCOBAR: It's a different motion, your Honor.

THE COURT: Oh, I thought you said you --

MR. ESCOBAR: A different expert report, a different

motion, it's an entirely different --

THE COURT: Is it the same extrapolation?

MR. ESCOBAR: The extrapolation is one part of it, but there are several grounds on --

THE COURT: I'll read it before I decide whether to have a hearing because I had four days' worth of hearings on that. I mean, Duggan, a huge piece of it he's -- I don't know if the right word is "abandoned," but certainly the government is not pressing with the Medicaid -- is it the Medicaid piece? What was he not pressing?

MR. BREEN: Part of the Medicare damages, your Honor.

THE COURT: All right, but I don't have to worry about that for the Medicare, but there's still some outstanding -- I don't have to worry about what he abandoned. It doesn't affect. Medicare is still outstanding. With respect to extrapolation, I will not hold a new hearing on that if it's the exact same issue, but you're telling me there are some new issues.

MR. ESCOBAR: That's correct, your Honor.

THE COURT: I don't know, I'll read it first. Bradford I haven't heard anything on, so let me just read it first. Nowadays everyone is filing Daubert on everything. Before I schedule a hearing, I will read both motions. So that's Duggan and Bradford. Are there any other Daubert motions?

MS. REID: I just want to point out, Bradford has one final briefing which will be short and which should be filed this week, so when you're --

THE COURT: Well, what are we up to?

MS. REID: This will be our surreply, which the government has consented to.

THE COURT: All right, I like surreplies. Just nothing more, it stops, no more briefing.

MS. REID: So the briefing should be complete on that by the end of this week.

THE COURT: Now, what are the issues?

MS. REID: With Professor Bradford? Professor Bradford is our expert on the generic industry. He also has Medicare opinions as well as Medicaid opinions. Given your Honor's ruling, I assume the Medicaid opinions will not be at issue for --

THE COURT: What's the big -- maybe I'll just turn to them. What's your big challenge at this point?

MR. HENDERSON: There are a couple of pieces to the Medicare opinions. One is, Dr. Bradford opines that the history of government knowledge exonerates manufacturers, including Dey, for responsibility with respect to AWPs; and he calculates alternative damages approach, assuming that Medicare could have used WAC instead of AWP. That's one issue.

THE COURT: So that's not really Daubert?

MR. HENDERSON: Well, it's more of a legal issue, your Honor, and you should read the brief, the briefs.

THE COURT: I promise, I will read the briefs, but that's not really Daubert. Daubert for me, I hold evidentiary hearings when I don't understand what the heck you're talking about, like the statistical issues with Duggan where someone just has to teach me, you know, I just don't understand it. This I may not need one, right?

MR. HENDERSON: Possibly. You'll have to read the briefs, your Honor. The other issues focus largely on the dispensing fee, after the Medicare Modernization Act the increase in dispensing fee. And Dr. Bradford basically says that Medicare intended to cross-subsidize, and that increased dispensing fee that occurred after the reforms, after the time period that's at issue here, is the amount of reduction essentially that should be --

THE COURT: It's like a proxy for what the subsidy is? Is that the gist of it?

MR. HENDERSON: That's essentially it, so --

THE COURT: That's not -- that's been their position since the day they walked into court with the position that this was all one big political question because there was a decision. But, I mean, that's not a surprise issue. I mean, that's their issue.

MR. HENDERSON: No, it's not surprising.

THE COURT: Cross-subsidization has been it from day one.

MR. HENDERSON: We challenge it, though.

THE COURT: Maybe, but it's not a Daubert issue because Daubert is, you don't believe there's a reasonable factual basis for something, you know. So it doesn't sound factually complex. They have a subsidy, and they're claiming it's a legal issue, whether or not it's an appropriate proxy.

MR. HENDERSON: It's both. It's legal and factual.

THE COURT: Maybe, but I don't know that I need a hearing on it. It sounds like I can understand it, as opposed to, with all due respect to the statisticians, I found that really hard, so --

MR. HENDERSON: There's enough detail in his report, so that if your Honor has difficulty understanding it, you may want a Daubert hearing.

THE COURT: Okay, so I'm not scheduling a hearing right now on those two. So those are the two Daubert motions that have been filed?

MR. HENDERSON: Well, there are a couple of others as well filed by Dey. They've challenged Dr. Schondelmeyer, who's one of our expert witnesses, and Professor Marmor.

THE COURT: Say it again.

MR. HENDERSON: Marmor, M-a-r-m-o-r.

THE COURT: Well, why don't we do this then: Why

don't I set a day for us to argue those and talk about them, but not have it be evidentiary unless I think I need it.

MR. ESCOBAR: That's fine, your Honor.

THE COURT: That way I focus it, you'll explain it to me, and if I throw up my hands as I do every once in a while and say, "I have no idea what you're talking about," then I'll hold an evidentiary hearing.

MR. ESCOBAR: That's fine, your Honor.

THE COURT: It was really helpful with Dr. Duggan and with the -- and I forget who Abbott's statistician was.

MR. BREEN: Hughes on the other side, your Honor.

THE COURT: It was very helpful. So what's a good afternoon for us to use? Robert, just I think we'll probably need at least a couple of hours anyway.

(Discussion off the record between the Court and Clerk.)

THE COURT: Does July 8 destroy anyone's vacation for the afternoon, or July 7 for that matter? Does July 7 or 8 destroy anyone's -- that's the week of July 4.

MR. HENDERSON: Not on the government's side, your Honor.

THE COURT: So let's just --

MS. REID: That's okay.

MR. ESCOBAR: That's okay with us.

THE COURT: Let's just take July 7 in the afternoon.

MR. ESCOBAR: That's fine, your Honor.

THE COURT: I think we have a probation something, so maybe 2:30 in the afternoon and just do argument on it. And in the meantime, when do you want to go to mediation?

MR. HENDERSON: Well, the government is flexible. I will say that we do not support the idea of a Medicare-only mediation because, in our view, the Medicare piece is appropriate for resolving the whole case, and we're just not likely to want to just resolve the Medicare piece and leave for trial the massive Medicaid --

THE COURT: Well, are you open to doing a global resolution?

MR. ESCOBAR: Well, your Honor, I think we now have a Medicare case. The only place where they seem to oppose bifurcation is in negotiating, trying to negotiate a settlement agreement.

THE COURT: Well, can I say, I think I'll send you for mediation for all things, and if you can settle the Medicare piece of it, then you can settle the Medicare piece of it.

MR. ESCOBAR: And on scheduling, I think, you know, we could just schedule it as soon as Professor Green is available and --

THE COURT: Call Professor Green and just get in there in the month of May or June. And if you can settle just the Medicare piece, I would hope that you could do that. I will

tell you, though, on the Medicaid piece, I am not authorizing discovery. Discovery is closed. So on all these depositions, if there wasn't an adequate incentive to cross-examine, then it may not qualify under the rules.

MR. HENDERSON: The devil's in the details.

THE COURT: If there wasn't an adequate opportunity to cross-examine, then you may be stuck. I mean, I'm not reopening. Everyone should have seen this issue coming. If there was no cross, I don't know what I'm -- I'm just not reopening it all. It's been a long time coming. So --

MR. HENDERSON: If I can address one last issue, your Honor?

THE COURT: Yes.

MR. HENDERSON: I think, in light of the Medicare-only trial that will be scheduled, the United States will serve revised witness and exhibit lists that focus --

THE COURT: When?

MR. HENDERSON: I guess we'd like a week. Within a week we can do that.

THE COURT: Fine.

MR. HENDERSON: There is one issue. Both sides, much more on the part of Dey than on the United States, have listed depositions that the parties may present. And the rule, Federal Rule of Civil Procedure 26, does not allow for "may present" depositions. It does for exhibits and for live

witnesses, but for depositions it says "expect to present," period. Dey's list has fifty depositions that they may use.

THE COURT: Right. All right, this is going to make it really easy for you. So two weeks a side. So that essentially is Medicare only, two weeks a side. So that's basically ten days. That's 35 hours a side. Do I have that right, ten days? Well, no. But then -- is that 70 hours? But I need a certain number of days on the house, if you will. I need a day to impanel and do openings and a day to close and a couple of days for jury instructions, so why don't we just say -- so 30 hours apiece, why don't we just say, 30 hours apiece. And by necessity, that's going to require you to cut it back.

MR. HENDERSON: Well, I guess my --

THE COURT: So you shall give me the witnesses you will call and the depositions you will use, given the 30-hour parameter.

MR. HENDERSON: Exactly.

THE COURT: And the same with you, and the exhibits you will introduce is how we'll do it.

MR. MURPHY: Maybe if we could get a date for a final pretrial as well?

THE COURT: Yes, that's a great idea.

THE CLERK: When?

THE COURT: Right after Labor Day, I think, and then

you'll back up with a pretrial order.

(Discussion off the record between the Court and Clerk.)

THE CLERK: That will be Wednesday, the 8th, at 3:00 o'clock.

MR. BREEN: September 8?

THE CLERK: September 8, yes.

THE COURT: To the extent there are Jewish holidays, I would tend not to do the --

THE CLERK: That's the Thursday and Friday.

THE COURT: Of which week?

THE CLERK: Of the 9 and 10th.

THE COURT: So it's the Wednesday before that?

THE CLERK: That's right.

THE COURT: And then when is Yom Kippur?

THE CLERK: I think it's on a weekend, Judge.

THE COURT: Oh, al right, so that won't be an issue.

MR. HENDERSON: And one final thing, your Honor. The United States some time ago filed a motion for leave to serve subpoenas on out-of-state witnesses under the False Claims Act for trial witnesses. It wasn't opposed by Dey. I have a proposed order so we can get our live witnesses into Boston.

THE COURT: Okay.

MR. HENDERSON: May I approach?

MR. MURPHY: We assent, your Honor, and the way the

order is written, it would apply to either side, so Dey could also subpoena witnesses.

THE COURT: Well, who pays?

MR. HENDERSON: A good question. We certainly pay for the witnesses we call.

THE COURT: And you pay for the witnesses you call.

MS. REID: Right.

THE COURT: So what does "pay" mean?

MR. HENDERSON: Travel and per diem.

THE COURT: And hotel room?

MR. HENDERSON: That's included, yes.

THE COURT: And so you'll pay for yours.

MS. REID: Yes.

MR. HENDERSON: You might jot that down.

(Laughter.)

THE COURT: I say "at each party's own expense," by which I mean you reimburse the person. I will try to accommodate everybody's schedule. It's civil. It doesn't really matter. We'll take people out of order. Are we flying people in from distances or just Washington?

MR. HENDERSON: No. Lots of witnesses from California, Florida.

THE COURT: Been there, done that. Another possibility is, we have video conferencing, which might be more convenient for people. It's not as boring as a deposition

because actually people are interacting, and I've done it in a couple of civil trials really successfully, and it might be cheaper for everybody to do that. It's just a thought. Would anyone have an objection, now that you're sitting here thinking about it? Good, so let's just say that is an agreement. Anybody who wants to do that can do that. We have the technology for it; we'll do it.

MR. HENDERSON: Okay.

THE COURT: So one-month trial. Robert will send out a pretrial order on the scheduling of it. We need to address Daubert.

MR. MURPHY: And just in terms of the pretrial order, your Honor, the one thing that might not be in there that I understand, because we've already provided names of witnesses and exhibits, we think the government should go next and start the process by telling us who they would call.

THE COURT: They just said they're going to do it in a week. They just promised. I hope that's right.

MR. HENDERSON: Yes.

THE COURT: Now, let me just ask you the one horrible question, which is, if Max-Planck settles, and if Mylan settles, and if my criminal cases plead, how much would I be destroying your lives to bring you in in June?

MR. ESCOBAR: Well, your Honor, as I said, I have a trial on June 14.

THE COURT: Maybe. We all know how it goes.

MR. ESCOBAR: That's true, that's true, but at the moment I have to assume it goes. The other thing is, you have a second Mylan trial that I'm in on July 19. I don't know if that's still on the schedule or not.

THE COURT: It's definitely still there.

MR. ESCOBAR: Okay.

THE COURT: But I'm hoping that whatever happens to the first one settles the rest. So, I mean, as a practical matter, I've got a really big problem because I have so many backed-up trials. And Max-Planck is, like, desperate for my time, as is Commonwealth v. Mylan, and they're just at this point ahead of you in the pecking order. So I don't know exactly when I'm going to get them in because, as I said, I have three backed-up criminal trials which swear to me they're not going to plead, so --

MR. MURPHY: For me, your Honor, the week of June 21, I know the case is going to go. It's a case where the whole focus is on a lawyer's conduct. I'm representing the lawyer, so it would be a big deal if that were interfered with, not for my personal life but for his.

THE COURT: Well, personal life is okay too. I'm not going to make anyone miss a wedding or a graduation or a mother's 80th birthday. I'm just not going to do it. But let me just say this: I've got a lot of lawyers here. For just a

day, two people can carry it or for a couple of days. I mean, I can't sort of sacrifice the whole thing on that. And I'd be more than happy to let you out for a day or two if you have a personal commitment. But I'm unlikely to be here the end of August, but let's say I start clearing up in the summer, I hate to let that beautiful space go for naught, so don't -- I mean, I may call you up and say, "Any chance?"

MR. HENDERSON: That's fine with the United States.

THE COURT: All right. That's it, right?

MR. HENDERSON: Yes. I think we've covered everything.

MR. BREEN: Your Honor, my daughter's getting married the 28th of August, so I've got to make sure that week before that I'm available. Your vacation is --

THE COURT: I'm moving my baby into college, so I'm going to be there as well, so --

MR. BREEN: It didn't sound like any of these dates were getting around there, but I just wanted to make sure, when you said the end of August, it was about that time, so thanks.

THE COURT: All right. Just as long as you all commit to never telling him I said that, so --

MR. BREEN: It's pretty safe with --

THE COURT: Okay, great. So I think the way we have it is, within the next six weeks you're going to try to go in and see Eric Green. I've got a date in July for the Daubert

hearing. That's what I owe you one way or another is a response on that. You owe me a good-faith mediation on all the issues, Medicaid and Medicare, and then if not, I see you in September. Basically everybody's on board with this?

MS. REID: Yes, your Honor.

MR. HENDERSON: Yes. Thank you, your Honor.

MR. ESCOBAR: Thank you, your Honor.

THE COURT: Fine, all right.

THE CLERK: Court is in recess.

(Adjourned, 4:16 p.m.)

C E R T I F I C A T E

UNITED STATES DISTRICT COURT )
DISTRICT OF MASSACHUSETTS ) ss.
CITY OF BOSTON )

I, Lee A. Marzilli, Official Federal Court Reporter, do hereby certify that the foregoing transcript, Pages 1 through 27 inclusive, was recorded by me stenographically at the time and place aforesaid in Civil Action Nos. 01-12257-PBS and 06-11337-PBS, In Re: Pharmaceutical Industry Average Wholesale Price Litigation, and thereafter by me reduced to typewriting and is a true and accurate record of the proceedings.

In witness whereof I have hereunto set my hand this 5th day of May, 2010.

/s/ Lee A. Marzilli

LEE A. MARZILLI, CRR
OFFICIAL FEDERAL COURT REPORTER