# Exhibit A

March 6, 2009

# Report of Lauren J. Stiroh
In connection with *In re Pharmaceutical Industry Average Wholesale Price Litigation*



**NERA**
Economic Consulting

**Contains Highly Confidential Materials – Subject to Protective Order**

# Contents

Contents...........................................................................................................................ii

I.     Introduction..........................................................................................................1
       A. Qualifications ...............................................................................................1
       B. Assignment ...................................................................................................1
       C. Documents Relied Upon...............................................................................1
       D. The Nature of the Action ..............................................................................1
       E. Summary of Opinions....................................................................................3

II.    Background Information......................................................................................5
       A. Dey ...............................................................................................................6
       B. Products at Issue............................................................................................7
       C. Drug Reimbursement under Medicaid and Medicare ....................................9
          1. Medicaid ..................................................................................................10
             a.  Medicaid Reimbursement ...................................................................10
             b.  Funding for Medicaid .........................................................................12
          2. Medicare ..................................................................................................13

III.   Dey's Conduct Is Consistent with Competitive Behavior ................................14
       A. Competition in the Generic Drug Industry ..................................................14
       B. Dey's WACs Are Economically Meaningful Reflections of Transaction Prices ............16

IV.    There Is No Reason for Dey to Have Believed that Anyone Was Deceived by its
       Pricing Practices...............................................................................................18
       A. There Is Abundant Public Information about the Nature of AWPs as Benchmarks and
          WACs as Undiscounted List Prices ............................................................18
       B. Dey Communicated Directly with Medicaid Regarding the Nature of its Reported
          AWPs and WACs.........................................................................................21
       C. Other Information Provided by Dey to CMS and other Government Agencies..............23

V.     There Is No Reason for Dey to Have Believed that its Reporting Practices Affected
       Medicare and Medicaid Reimbursement Policies.............................................24
       A. Medicare and Medicaid Reimbursement Policies Are Designed to Ensure Access to
          Covered Pharmaceuticals.............................................................................25
       B. There Were Alternative Reimbursement Bases Available to Medicare and Medicaid.....30
          1. Dey's WACs ...........................................................................................30
          2. Revised AWP Prices................................................................................31
          3. IMS .........................................................................................................32
          4. Myers and Stauffer ..................................................................................33

VI.    Rebuttal to Plaintiffs' Expert Reports ..............................................................34
       A. Perri Report .................................................................................................35
       B. Schondelmeyer Report ................................................................................38
          1. Overview of Dr. Schondelmeyer's Opinions .........................................38

**Contains Highly Confidential Materials – Subject to Protective Order**

2.  Dr. Schondelmeyer's Opinions Do Not Apply to Dey or the Drugs at Issue in this Case ........................................................................................................... 39

3.  Dr. Schondelmeyer Does Not Present Any Evidence of Fraud ................................. 40

4.  Dr. Schondelmeyer's Opinion that Medicaid and Medicare Payments were Inflated is Not Supported ........................................................................................ 42

C.  Platt Report ............................................................................................................. 43

D.  Duggan Report ......................................................................................................... 43

E.  Marmor Report ......................................................................................................... 44

**Contains Highly Confidential Materials – Subject to Protective Order**

# I.     Introduction

## A.     Qualifications

My name is Lauren J. Stiroh.  I am an economist and Senior Vice President of NERA Economic Consulting.  NERA was founded in 1961 and provides research and analysis in the field of applied microeconomics, including the economics of competition, regulation and finance.  A substantial portion of NERA's consulting work, as well as my own work, is in the determination of economic damages.

I have provided economic consulting services and testimony in a number of damages cases and have testified at trial and in depositions regarding a variety of business practices.  These include, for example, commercial disputes, business interference, breach of contract, allegations of monopolization, price predation, unlawful tie-ins, price discrimination, abuse of market power, and patent infringement.  I have experience with damages issues in a number of industries including pharmaceuticals, biotechnology, medical devices, advertising and promotion, consumer products, agricultural products, industrial chemicals, and semiconductors.

I received my B.A. in economics from the University of Western Ontario in 1990, my M.A. from the University of British Columbia in 1991 and my Ph.D. from Harvard University in 1996.  My *curriculum vitae*, which includes a list of my prior expert testimony and consulting experience, is appended to this report as **Exhibit 1**.  NERA is being compensated at my usual rate of $575 per hour.

## B.     Assignment

I have been asked by counsel for Dey, Inc., Dey L.P., Inc., and Dey L.P. (collectively "Dey") to review and comment upon the plaintiffs' theory of liability and, as relevant, the expert reports of Mark G. Duggan, Theodore R. Marmor, Matthew Perri, III, Simon D. Platt, and Stephen W. Schondelmeyer.   In particular, I have been asked to evaluate the plaintiffs' theory considering the economic realities of the pharmaceutical industry and Dey's conduct as a participant in this industry.

## C.     Documents Relied Upon

In preparing this report, I, and economists working under my direction, have reviewed the plaintiffs' experts' reports, documents and data referenced therein, additional documents and deposition testimony produced in connection with this case, and other publicly available documents.  The opinions expressed in this report are also based on my training and experience as an economist.  A complete list of the sources of information and materials that I considered in forming my opinions is presented in **Exhibit 2.**

## D.     The Nature of the Action

On September 28, 2008, the United States Department of Justice, on behalf of the United States, and Ven-A-Care, ("plaintiffs") filed an amended complaint ("Complaint") against Dey to

**Contains Highly Confidential Materials – Subject to Protective Order**

"recover losses sustained by the Medicare and Medicaid programs as a result of the sustained efforts…to defraud these programs."[1]  The plaintiffs claim that Dey knowingly reported inflated prices to pricing compendia and these allegedly "fraudulent representations" caused the Medicare and Medicaid programs to pay "excessive reimbursement" for the products at issue.[2]  According to the Complaint, this conduct began on December 31, 1992 and continued through 2004 for Medicare and continues to the present for Medicaid.[3]  Based on the calculations of Dr. Duggan, plaintiffs' make no claims for damages for Medicare after 2003.[4]

The plaintiffs allege that Dey knowingly reported false and inflated Average Wholesale Prices ("AWPs") and Wholesale Acquisition Costs ("WACs") to the pricing compendia and that the published AWPs for Dey's products bore "little or no relationship" to prices that Dey's customers paid for its pharmaceutical products.[5]  The plaintiffs claim that Dey controlled the "spread" between the reported AWP and the prices paid by providers for Dey's drugs by reporting "inflated" prices to the compendia while at the same time decreasing its prices to wholesalers and providers.[6]  According to the Complaint, Dey's actions were allegedly part of a fraudulent scheme designed to cause "the Medicare and Medicaid programs to pay excessive reimbursement to Dey's customers."[7]

I understand that Dey maintains that it believed that Medicaid and Medicare were aware from public information and direct representation from Dey that Dey's reported AWPs were set at launch and generally did not subsequently change, its WACs were invoice prices to wholesalers prior to any discounts, and its transaction prices were not fraudulently concealed.[8]  In addition, Dey maintains that its reported WACs do bear a meaningful relationship to its net discounted prices, and at a minimum, reveal how its transaction prices were changing over time.[9]  Moreover, as a condition of participating in the Medicaid program, pursuant to the Rebate Agreement, Dey reported Average Manufacturer Prices ("AMPs") to the Center for Medicaid and Medicare Services ("CMS").[10]  CMS used these prices to determine unit rebate amounts due the state

---

[1] United States' First Amended Complaint, In re: Pharmaceutical Industry Average Wholesale Price Litigation, September 29, 2008 ("United States' First Amended Complaint"), p. 1.

[2] United States' First Amended Complaint, ¶¶ 3, 50.

[3] United States' First Amended Complaint, ¶¶ 35, 50.

[4] Expert Report of Dr. Mark G. Duggan, January 23, 2009 ("Duggan Report"), p. 4.  In deposition, he stated that "[t]his was deemed the time period of interest for the Dey Medicare J codes" and that his best recollection is that "it was related to the changes associated with the Medicare Modernization Act which later culminated in Part D."  (Deposition of Dr. Mark Duggan, February 27, 2009, pp. 389-90).

[5] United States' First Amended Complaint, ¶¶ 55, 58.

[6] United States First Amended Complaint, ¶ 55.

[7] United States First Amended Complaint, ¶ 3.

[8] Deposition of Pamela Marrs, CFO at Dey, July 10, 2008 ("Marrs Deposition, 7-10-08"), Exhibit 32, Defendants Dey, Inc., Dey L.P. Inc., and Dey, L.P's Responses and Objections to Plaintiffs' First Set of Interrogatories to Defendants Dey, Inc., Dey L.P., Inc. and Dey L.P. ("Dey's Responses and Objections to First Set of Interrogatories"),  pp. 8-18, 21-23.

[9] Dey's Responses and Objections to First Set of Interrogatories, pp. 8, 10-11.

[10] I understand that these AMPs are subject to audit by the Secretary and revision for up to three years.

**Contains Highly Confidential Materials – Subject to Protective Order**

Medicaid agencies, and the amount of the rebate was formulaically related to Dey's average selling prices. Thus, Dey maintains that CMS was aware of both the nature of the publicly reported prices and the average transaction prices as measured by the AMP.

## E.     Summary of Opinions

Based on my analysis of this matter to date, I have reached the following opinions:

1.   Dey's conduct is consistent with competitive behavior in the generic pharmaceutical industry. Throughout the alleged damage period Dey lowered the prices it charged its customers. The increasing "spread" between AWP and Dey's average transaction prices that forms the basis of plaintiffs' damage claim occurred as a result of ordinary price competition for generic drugs. Moreover, Dey's declining transaction prices were reflected in its published WACs and the AMPs reported to CMS.

2.   Dey's WAC is an invoice price to wholesalers. Dey's WACs are undiscounted prices that appear on Dey's wholesalers' invoices. Even after accounting for price adjustments, more than 70 percent of Dey's sales to wholesalers are within 5 percent of WAC. Dey's WACs are meaningfully related to its average transaction prices. Discounts and rebates are proportionally tied to WAC. Dey regularly updates its reported WACs, keeping them consistent with underlying transaction price trends.

3.   CMS had direct information regarding Dey's average transaction prices. As a condition of participating in the Medicaid programs, Dey entered into a Rebate Agreement and reported its AMPs to CMS. CMS used this pricing information to calculate federal rebates for state Medicaid programs. Each state received a unit rebate amount for its purchases of Dey's Abbreviated New Drug Application ("ANDA") drugs calculated as a fixed share of the AMP (this share was 10 percent from 1991 to 1993 and 11 percent from 1994 to the present). Thus, each state that received a rebate for purchases of Dey's ANDA drugs received information that revealed Dey's discounted pricing structure. In addition, beginning in 2005, Dey also reported its ASPs to CMS. I understand that, to date, only one state has incorporated these ASPs in setting its reimbursement formulas.

4.   Given the information available in the market, there is no reason for any participant in this market to think that Medicare or Medicaid would be or was deceived by its pricing practices. Throughout the alleged damage period, there was abundant public information about the nature of AWP as an industry benchmark and WAC as an undiscounted list price. There were also publicly available and government sponsored studies of "spreads" between AWP or WAC and average transaction prices, including discounts. Dey communicated directly with state Medicaid agencies explaining that its published AWPs did not represent actual wholesale prices and WACs did not reflect any discounts or rebates commonly granted to wholesalers. Moreover, alternative price measures were available as a basis for determining reimbursement amounts. In spite of Dey's direct communication, the availability of other pricing statistics, and Department of Health and Human Services' ("DHHS") direct warnings against using AWP to estimate acquisition costs, many state Medicaid agencies continue to use AWP in their reimbursement calculations, with the approval of the Federal government.

**Contains Highly Confidential Materials – Subject to Protective Order**

5.  There is no reason for Dey to have believed that Medicaid or Medicare reimbursement amounts were "inflated" as a result of Dey's pricing practices.  Medicare and Medicaid's reimbursement policies were based on a wider array of factors than just the pharmacies' acquisition cost of those drugs.  In particular, Medicare and Medicaid reimbursement policies are designed to ensure access to covered drugs and therefore must guarantee a sufficient return to the pharmacy to ensure adequate participation.  Thus, it is reasonable for Dey to believe that Medicaid and Medicare intended some "spread" in their reimbursement amounts. In addition, any increase in "spread" between Dey's AWPs and transaction prices was signaled by the increase in "spread" between Dey's AWPs and WACs, but most state Medicaid agencies did not reduce reimbursement to match estimates of average acquisition cost to providers, as that would not ensure adequate access.  Moreover, studies of dispensing cost for drugs sold by Dey found that if reimbursement for the ingredient cost was reduced, dispensing fees would have to be increased by almost an offsetting amount.  In addition, the majority of Dey's drugs at issue was subject to a FUL or MAC and therefore not necessarily reimbursed based on Dey's AWP.  Similarly, under Medicare, reimbursement is not necessarily based on Dey's AWP.  Plaintiffs' damage expert, Dr. Duggan, finds that reimbursement amounts for some Medicare DME claims (based on median AWPs for specific HCPCS codes) would not have changed even if Dey had reported average pharmacy prices with a 25 percent markup in place of AWPs.  For all of these reasons, it is reasonable for Dey to have understood that its reported AWPs and WACs did not cause Medicaid and Medicare to pay unintended reimbursement amounts.

6.  Prior to 2005, Medicare reimbursement used AWP as a result of Congressional action, not because Dey misled Medicare as to the nature of its AWPs.  In 1997, and again in 1998, the Clinton Administration proposed changing Medicare reimbursement to reflect Actual Acquisition Costs ("AAC"), but the proposals were rejected by Congress.  Congress instead mandated reimbursement at 95 percent of the lesser of the median generic AWP within each Medicare code or the lowest brand AWP.  In 1999 and 2000 the Clinton Administration proposed changing Medicare reimbursement to 83 percent of AWP, but these proposals were also rejected by Congress.

7.  There were alternative reimbursement bases available to Medicare and Medicaid, if reimbursement closer to actual acquisition costs were the only goal.  In particular, Dey reported its WACs to the same pricing compendia reporting AWPs and updated its WACs regularly.  Dey's WACs bore an economically meaningful relationship to its average transaction prices and reflected the degree to which the "spread" between AWP and average transaction price was changing.  While some states had converted to a WAC-based reimbursement schedule as early as 1992, by 2006, only 10 states had taken advantage of this pricing signal.  CMS continues to approve state plans using AWP as a basis of reimbursement, in spite of the availability of other pricing signals.  Other potential reimbursement bases include the prices reported in the Federal Supply Schedule and prices reflected in IMS data, both of which are publicly available.

8.  The plaintiffs' experts do not present any evidence that Dey believed that Medicare or Medicaid was deceived by its conduct.  There is no basis in any of their reports to suggest

**Contains Highly Confidential Materials – Subject to Protective Order**

that Dey misled the agencies about the nature of its AWPs or WACs or that Dey believed the agencies to be misled by these prices.

9. The plaintiffs' experts' methodology is incomplete and unreliable. They present no cogent theory of harm. They opine, variously, that Dey could have calculated a net average transaction price by class of trade and reported these prices to the pricing compendia, but they do not even consider how such a change would have affected competitive conditions in the industry or how industry participants would have reacted. They do not evaluate how Medicare and Medicaid's total reimbursement would have changed in such a "but-for" world, nor do they evaluate whether the alternative reimbursement methodology would have been successful at meeting CMS's other goals such as ensuring access. Plaintiffs' experts fail to explain why CMS would allegedly have used a lower reported AWP when it did not use the WAC that was reported by Dey. They fail to take account of information showing that dispensing fees would have to be increased if ingredient cost reimbursement were reduced. And, they do not evaluate whether Medicaid or Medicare's total reimbursement amounts would have been any different, if at all, had pharmaceutical companies reported average transaction prices to the pricing compendia.

The remainder of the report is organized as follows. Section II provides background information on the parties, the conduct at issue, and Medicaid and Medicare reimbursement methods. Section III evaluates Dey's actions in the context of a competitive market environment. Section IV evaluates whether there is any reason for Dey to believe that Medicaid and Medicare were misled by its actions. Section V discusses whether Dey had any reason to believe its reporting practices affected Medicare and Medicaid reimbursement policies and describes the alternative reimbursement bases available to Medicare and Medicaid. Finally, Section VI summarizes my response to the opinions set forth in the reports of plaintiffs' experts.

The opinions and discussion set forth in this report are based on my analysis of this matter to date. I reserve the right to revise my opinions if additional information is provided to me. In particular, I understand that plaintiffs' data expert, Mr. Platt, will not be available for deposition until after I have filed this report. Therefore, I reserve the right to comment on his method and opinions after I have had an opportunity to review his deposition testimony.

## II.    Background Information

The information in this section is intended to summarize factual information to provide context to the opinions that follow in later sections.

**Contains Highly Confidential Materials – Subject to Protective Order**

## A.    Dey

Dey was founded in 1978 and is based in Napa, California.[11]  Dey is engaged in the
"development, manufacturing and marketing of prescription drugs used to treat selected
respiratory diseases and allergies."[12]

Over half (54.4 percent) of Dey's pharmaceutical products at issue were shipped to wholesalers,
who act as an intermediary for Dey's contract sales or who have purchased the product for resale
to pharmacies and other providers.[13]  The majority of these shipments were Dey's contract sales.
Dey negotiates contract prices with pharmacies, group purchasing organizations, hospitals, and
other providers.  These contract prices reflect discounts off of WAC.[14]  Dey's contract customers
can obtain their Dey products from wholesalers at the contract price.  Wholesalers may charge a
fee or upcharge to cover the costs associated with their services.[15]  Wholesalers submit a
chargeback to Dey to account for the difference between the providers' contract price and the
invoice price at which the wholesaler acquired the product.[16]  Wholesalers acquire products from
Dey at WAC, which is Dey's invoice price.[17]  Wholesalers resell the products to their customers
at prices negotiated by the wholesaler and the provider.  Wholesalers may receive a discount off
of WAC in exchange for prompt payment.[18]  Wholesalers, therefore, make their profits through a
combination of upcharges to pharmacies and other customers, discounts from the pharmaceutical
companies, and profits on sales.

Dey reports both its AWP and WAC for each drug at issue to various pricing compendia,
including the Red Book, Medispan and First DataBank.  I understand that it is Dey's general
practice to set the AWP for its drugs at approximately 90 percent of the branded drug AWP

---

[11] Dey's website found at www.Dey.com ("Dey's website"), accessed on March 2, 2009.

[12] Deposition of Pamela Marrs, CFO at Dey, March 10, 2005 ("Marrs Deposition, 3-10-05") Dey, Inc., Ten-Year
Plan, Revision #4, November 7, 2001, Exhibit 23 ("Dey Ten-Year Plan"), DL-TX-0162253 in DL-TX-0162251-
62.

[13] This figure represents direct shipments in shelf cartons and includes rebates, returns, ship price errors, and other
credits.  Dey also sells directly to pharmacies and other classes of trade.

[14] In some cases, these discounts are calculated as a percentage of the WAC price.  Discounts that are set relative to
the WAC price include: prompt pay and volume discounts.

[15] Deposition of Saul Factor, Senior Vice President of Generics at McKesson, June 20, 2008 ("Factor Deposition, 6-
20-2008"), p. 168.  ("Q: So you've purchased the drug at – the generic at WAC, you're given a price to sell the
drug to the customer, and you receive a chargeback for selling the drug less than your WAC cost.  How does
McKesson make money in that transaction?  A:  We receive an administrative fee.")

[16] Factor Deposition, 6-20-2008, p. 166.  ("When we sell the product to the customer, we will bill back the
manufacturer for the difference between the WAC price and that contract price.")

[17] Deposition of Pamela Marrs, May 15, 2008 ("Marrs Deposition, 5-15-2008, pp. 144-45.  ("A: The WAC that's
reported is the invoice price to the customer – to the wholesaler.")  See for example, **Appendix A**, which
contains invoices to wholesalers from January 4, 1994.  The unit prices on these invoices for the drugs at issue
are Dey's prevailing WACs for those drugs.  See also, Deposition of Robert Mozak, former Executive Vice
President of Sales and Marketing, 11-1-2001 ("Mozak Deposition, 11-1-2001"), p. 117.  ("A:  Our wholesalers
are charged, on their invoices, WAC.")

[18] Dey offers its wholesalers a 2 percent prompt pay/cash discount.  See Marrs Deposition, 5-15-2008, p. 284 and
Mozak Deposition, 11-1-2001, p. 73.

**Contains Highly Confidential Materials – Subject to Protective Order**

when the drug is launched and then to leave the AWP unchanged.[19]  In contrast, Dey regularly updates its WACs as necessary to keep the contract prices from falling too far below the WAC price.[20]

## B.    Products at Issue

Dey manufactures three generic drug products that are at issue in this case: albuterol, cromolyn sodium, and ipratropium bromide.

Albuterol is a commonly prescribed medication for asthma patients.  It is used to help prevent wheezing, difficulty in breathing and tightness in the chest that can be caused by lung diseases such as asthma and helps open the air passages in the lungs to make breathing easier.[21]  Branded albuterol products include Ventolin, Proair, and Proventil.[22]  Dey's unit dose albuterol product was first approved in 1992.[23]  Currently, there are at least 12 other companies that market generic versions of albuterol.[24]

Cromolyn sodium is used to help treat patients with asthma and patients who have difficulty breathing during exercise, and it helps prevent the release of substances that cause inflammation in the air passages of the lungs.[25]  Dey's first cromolyn sodium product was approved in 1994.[26]  Branded cromolyn products included Intal.[27]  Currently, there are at least 7 companies that offer generic versions of cromolyn sodium.[28]  Dey no longer manufactures a cromolyn sodium product.

---

[19] Dey's Responses and Objections to First Set of Interrogatories, p. 8.

[20] See, for example, Dey's Responses and Objections to First Set of Interrogatories, pp. 8 and 28.  See also, Deposition of Robert Mozak, April 30, 2002 ("Mozak Deposition, 4-30-2002"), pp. 370-73.  ("[A]s the contract price came down, the amount of the chargeback grew, so we lowered the – the WAC price so that the chargeback would also be reduced.")

[21] National Library of Medicine and National Institute of Health website at www.nlm.nih.gov/medlineplus/druginfo/meds/a607004.html.

[22] Ventolin is manufactured by GlaxoSmithKline.  See www.gsk.com.  Proventil is manufactured by Schering.  See www.schering-plough.com.  Proair is manufactured by Teva.  See www.proairhfa.com/AboutProAirHfa.aspx.

[23] See www.fda.gov/cder for application number and 2008 FDA Orange Book for date of entry.

[24] The number of generic companies is estimated using www.fda.gov/cder.  Not all generics offer the same inhalation doses.

[25] National Library of Medicine and National Institute of Health website at www.nlm.nih.gov/medlineplus/druginfo/meds/a601042.html.

[26] See www.fda.gov/cder for application number and 2008 FDA Orange Book for date of entry.

[27] See FDA Approved Drug Products at www.fda.gov/cder.  Intal was a King Pharmaceuticals product.  (See King Pharmaceutical's website at www.kingpharm.com).  King Pharmaceuticals discontinued the manufacturing of its Intal Nebulizer Solution as of May 30, 2008.  (See King Pharmaceuticals Letter to Healthcare Professional, May 30, 2008, http://www.fda.gov/cder/drug/shortages/intaldhcp_2008.pdf).

[28] See www.fda.gov/cder.

**Contains Highly Confidential Materials – Subject to Protective Order**

Ipratropium bromide is used to prevent wheezing, difficulty breathing and chest tightness and is also used as a prescription for chronic bronchitis and emphysema.[29]  Dey launched its first ipratropium bromide product in early 1997.[30]  At that time, there were two competitors on the market: Boehringer Ingelheim, which was manufacturing the brand version Atrovent, and Boehringer's subsidiary, Roxane, which launched a generic version in June 1996.[31]  Currently, there are at least 9 other companies that offer generic versions of ipratropium bromide.[32]

**Table 1** below lists the Dey drugs at issue in this case, the National Drug Code ("NDC")[33] for each product, the date the product was first shipped, the last shipment date, and the total number of cartons sold that each product accounts for in Dey's sales.[34]

---

[29] National Library of Medicine and National Institute of Health website at www.nlm.nih.gov/medlineplus/druginfo/meds/a601063.html.

[30] See FDA Approved Drug Products for date of entry found at fda.gov.cder.

[31] Deposition of Robert Mozak, 4-30-2002, Ipratropium Bromide Launch Manual, Exhibit 229, DL-TX 0076158-60 in DL-TX 0076144-202.

[32] See www.fda.gov/cder.

[33] The FDA established an NDC classification system for prescription drugs.  Each manufactured drug has its own product number.  The NDC is a specific 11-digit, 3-segment number that is unique to each manufacturer, product, and package size for medications recognized by the FDA.  The first five numbers indicate the labeler code, followed by a 4 digit product code and 2 digit package size code.  The FDA website describes the NDC as a 10-digit code in which the first five numbers (which indicate the labeler code) are followed by a 3-digit product code and a 2-digit package code.  However, it states that a zero can be added at the beginning of the product code to make it a 4-digit code.  The NDCs on the table show the 11-digit codes for the drugs at issue.  See www.fda.gov/cder/ndc.

[34] Sources for this table are: Dey's sales and transaction data, Dey's chargeback data, and Dey's wholesaler activity data (for initial shipment date) and "Lot Expirations Albuterol Ipratropium and Cromolyn.xls" for last shipment date.  Data on units sold are direct sales according to Mr. Platt's data.  I understand that Albuterol MDI Refill, NDC 49502033327 was never shipped.

**Contains Highly Confidential Materials – Subject to Protective Order**

Table 1
Drugs at Issue
By NDC
1992 to 2007

| Drug/Dosage | NDC | First Shipment Date | Last Shipment Date | Mr. Platt's Count of Total Shelf Cartons Sold | |
|---|---|---|---|---|---|
| | | | | | -(Percent)- |
| | (a) | (b) | (c) | (d) | (e) |
| **Albuterol** | | | | | |
| Albuterol Sulfate UD, 0.083% inhalation solution, (25s) | 49502069703 | Q1 1992 | Q2 2004 | 67,969,204 | 30.20 % |
| Albuterol Sulfate UD, 0.083% inhalation solution, (60s) | 49502069760 | Q2 1992 | Q3 2004 | 30,469,017 | 13.54 |
| Albuterol Sulfate UD, 0.083% inhalation solution, (30s) | 49502069733 | Q4 1993 | Q1 2004 | 4,875,584 | 2.17 |
| Albuterol Sulfate MD Inhalation Solution 0.5%, 20 mL | 49502019620 | Q1 1996 | Q1 2000 | 5,649,064 | 2.51 |
| Albuterol Inhalation Aerosol Metered-Dose Inhaler, 17g | 49502030317 | Q1 1996 | Q2 2000 | 11,796,100 | 5.24 |
| Albuterol Inhalation Aerosol MDI Refill, 17g | 49502030327 | Q4 1996 | Q2 2000 | 319,104 | 0.14 |
| Albuterol Sulfate MD Inhalation Solution 0.5% (Sterile) 20 mL | 49502010501 | Q2 1999 | Q3 2003 | 4,694,773 | 2.09 |
| Albuterol Inhalation Aerosol Metered-Dose Inhaler, 17g | 49502033317 | Q1 2000 | Q1 2003 | 6,180,345 | 2.75 |
| Albuterol Sulfate UD, 0.083% inhalation solution, (25s) | 49502069724 | Q1 2004 | -- | 20,719,053 | 9.21 |
| Albuterol Sulfate UD, 0.083% inhalation solution, (30s) | 49502069729 | Q1 2004 | -- | 2,292,534 | 1.02 |
| Albuterol Sulfate UD, 0.083% inhalation solution, (60s) | 49502069761 | Q1 2004 | -- | 7,250,892 | 3.22 |
| Albuterol Sulfate Inhalation Solution Single-PakTM, 0.083%, (30s) | 49502069730 | Q1 2005 | -- | 282,726 | 0.13 |
| Albuterol Inhalation Aerosol MDI Refill, 17g | 49502033327 | -- | -- | -- | -- |
| **Total Albuterol Shelf Cartons Sold** | | | | **162,498,396** | **72.21 %** |
| **Cromolyn Sodium** | | | | | |
| Cromolyn Sodium UD Inhalation Solution 20 mg/2 mL, (60s) | 49502068902 | Q1 1994 | Q3 2004 | 6,666,297 | 2.96 % |
| Cromolyn Sodium UD Inhalation Solution 20 mg/2 mL, (120s) | 49502068912 | Q2 1994 | Q1 2004 | 2,628,835 | 1.17 |
| Cromolyn Sodium UD Inhalation Solution 20 mg/2 mL, (60s) | 49502068961 | Q1 2004 | Q1 2008 | 283,824 | 0.13 |
| **Total Cromolyn Sodium Shelf Cartons Sold** | | | | **9,578,956** | **4.26 %** |
| **Ipratropium Bromide** | | | | | |
| Ipratropium Bromide Inhalation Solution 0.02%, (25s) | 49502068503 | Q1 1997 | Q1 2004 | 26,997,216 | 12.00 % |
| Ipratropium Bromide Inhalation Solution 0.02%, (60s) | 49502068560 | Q1 1997 | Q2 2004 | 10,315,014 | 4.58 |
| Ipratropium Bromide Inhalation Solution 0.02%, (30s) | 49502068533 | Q3 1997 | Q1 2004 | 2,028,817 | 0.90 |
| Ipratropium Bromide Inhalation Solution 0.02%, (30s) | 49502068529 | Q1 2004 | Q3 2005 | 627,132 | 0.28 |
| Ipratropium Bromide Inhalation Solution 0.02%, (25s) | 49502068524 | Q1 2004 | Q2 2006 | 5,856,122 | 2.60 |
| Ipratropium Bromide Inhalation Solution 0.02%, (60s) | 49502068561 | Q1 2004 | Q3 2008 | 1,670,100 | 0.74 |
| Ipratropium Bromide Inhalation Solution 0.02%, Single-PakTM, (30s) | 49502068530 | Q1 2005 | -- | 314,412 | 0.14 |
| Ipratropium Bromide Inhalation Solution 0.02%, (30s) | 49502068531 | Q2 2005 | -- | 707,388 | 0.31 |
| Ipratropium Bromide Inhalation Solution 0.02%, (60s) | 49502068562 | Q2 2005 | -- | 2,187,130 | 0.97 |
| Ipratropium Bromide Inhalation Solution 0.02%, 2.5 mL, (25s) | 49502068526 | Q2 2006 | -- | 2,266,294 | 1.01 |
| **Total Ipratropium Bromide Shelf Cartons Sold** | | | | **52,969,630** | **23.54 %** |
| **Total Shelf Cartons Sold** | | | | **225,046,982** | **100.00 %** |

## C.     Drug Reimbursement under Medicaid and Medicare

The Centers for Medicare & Medicaid Services ("CMS") is the federal agency responsible for administering Medicaid and Medicare.[35]  Medicaid and Medicare are federal programs that provide benefits to the elderly and low income individuals.  Medicaid and Medicare reimburse providers who participate in these programs for providing medically necessary pharmaceutical products to eligible program beneficiaries.

---

[35] CMS was known as the Health Care Financing Administration ("HCFA") until 2001.  See Program Memorandum AB-01-133, Re: Interim Instructions – Document and Correspondence Name Transition from Health Care Financing Administration (HCFA) to Centers for Medicare & Medicaid Services (CMS), September 24, 2001. ("A June 14, 2001 press release announced that the name of the Health Care Financing Administration (HCFA) was changed to the Centers for Medicare & Medicaid Services (CMS).")

**Contains Highly Confidential Materials – Subject to Protective Order**

## 1. Medicaid

Medicaid was signed into law in 1965 as part of Title XIX of the Social Security Act and is a federal program in which states participate in providing health benefits to low-income and disabled individuals.[36]  Medicaid services and benefits in any state may include hospital care, physician services, laboratory tests, prescription drugs, dental care, and other long-term medical services.[37]

### a. Medicaid Reimbursement

Each state Medicaid agency sets its own guidelines regarding reimbursement.[38]  As shown on **Exhibit 3**, ingredient reimbursement formulas vary from state to state, and have varied over time within states.[39]  Each state also includes a state-specific dispensing fee in their reimbursement methodology.[40]  Therefore, in total, a pharmacist receives the drug ingredient reimbursement amount and the dispensing fee as a "combined amount" when being reimbursed for dispensing covered drugs.

In 1991, CMS developed the Federal Upper Limit program ("FUL") to help states better manage drug reimbursement costs.[41]  Generally, for a FUL to be established, there must be at least three

---

[36] Department of Health and Human Services' 2008 Actuarial Report on the Financial Outlook for Medicaid ("2008 Actuarial Report"), p. 2.  See also United States' First Amended Complaint, ¶ 17.

[37] 2008 Actuarial Report, p. 2.

[38] See CMS website found at www.cms.hhs.gov, accessed on March 3, 2009 ("CMS website").  See also, annual reports produced by the National Pharmaceutical council which give a description of each state's Medicaid drug program.  Each state's reimbursement methodology and changes to the state's reimbursement methodology are first submitted to CMS for approval.  See Deposition of Thomas Scully, former Administrator at CMS, May 15, 2007 "(Scully Deposition, 5-15-2007"), p. 201.  (Q. Do you have an understanding that CMS and the federal government has the right to approve or disapprove whatever reimbursement level a state may set up for its Medicaid program?  A: Yes.  Q: Go ahead.   A: They do, but in practice over the years if the state pays reasonably, Medicaid approves it. So…unless the state has an egregious reimbursement policy, it's generally approved.")

[39] The data on **Exhibit 3** come from the National Pharmaceutical Council and display only one element of Medicaid reimbursement.  See also Deposition of Thomas Scully, July 13, 2007 ("Scully Deposition, 7-13-2007"), p. 586.  ("Different states had different purchasing agreements, obviously different dispensing fees, different mixes…different prices…different formularies.")

[40] See CMS website, "Medicaid Prescription Reimbursement Information by State – Quarter Ending December 2008."

[41] In 1976, the Health Care Financing Administration established parameters for drug reimbursement policies that included setting a maximum allowable cost ("MAC").  The MAC was established to set an upper limit on multiple source drugs in state Medicaid programs.  See National Pharmaceutical Council's Pharmaceutical Benefits Under State Medical Assistance Programs, September 1994, p. 14.  In 1987, the FUL was introduced as part of federal regulations; however, until 1991, a FUL could only be established if all drugs were therapeutically equivalent and there were at least three suppliers in the compendia.  In 1991, this changed to three or more therapeutically equivalent drugs, regardless of other ratings according to the FDA.  (See CMS website).  I understand that the FUL program is an extension of this MAC program.  The Deficit Reduction Act of 2005 proposed that a FUL be set at 250 percent of the lowest AMP in a drug category, but this has not yet been

**Contains Highly Confidential Materials – Subject to Protective Order**

therapeutically equivalent drugs.[42]  According to federal regulations, a FUL is calculated as 150 percent of the lowest published price for any of the therapeutically equivalent drugs in the category.[43]  However, CMS exercises discretion in setting the FUL.[44]

In addition to FULs, states also have State Maximum Allowable Cost (SMAC) programs. SMACs, which are used for multi-source drugs, typically contain more drugs than the FUL list and assign lower prices than the FUL.[45]  I understand that each state has different methods for establishing a SMAC.[46]  As of December 2008, 45 states have established SMAC programs to help reduce the cost of drug reimbursement.[47]

This means that for Dey drugs subject to a FUL or a SMAC, Medicaid reimbursement may not be based on the AWPs and WACs reported for Dey's specific products.  All but three of the

---

implemented.  (See Deficit Reduction Act of 2005, P.S.1932-52).  See also Deposition of Gail Sexton, Health Insurance Specialist at CMS, May 20, 2008 ("Sexton Deposition"), pp. 47-49.   (Q: So it [is] fair then to assume that the DRA methodology, the 250 percent of AMP, hasn't been implemented as of today?  A: Correct.  We have not published any federal upper limit prices under that methodology.")

[42] 42 C.F.R. § 447.332, October 4, 2006.

[43] 42 C.F.R. § 447.332, October 4, 2006.

[44] According to deposition testimony, CMS generally looks to ensure that there are at least two A-rated drugs in the FDA's Orange Book, or, if there is a B-rated drug, three A-rated drugs when establishing a FUL.  See, for example, Sexton Deposition, p. 56. ("Q: [O]nce you determined if there were two As or if there was a B, three As, then you needed to determine whether there were three suppliers from the compendia.  Is that correct?  A: Correct.")  When asked why CMS would decline to set a FUL when the FUL was equal to an AWP, Ms. Gaston responded that the "the purpose of setting the FUL price is to try to set reasonable reimbursement.  And that would kind of counter what the states were doing with their other reimbursement methodology."  (Gaston Deposition, 3-19-2008, pp. 456-57).  See also, Gaston Deposition, 3-19-2008, pp. 458-59: "Q:  So in terms of a basis of calculation, the price on which the FUL was based, AWP was irrelevant?  A:  We wouldn't have used AWP…Setting a FUL using the AWP wouldn't achieve the cost savings, where if they did it with their own methodology, a percentage off of AWP, they would be achieving savings.")  In addition, CMS personnel look to see whether pharmacies have access to the lowest priced drug and ensure that the established FUL price represents a reasonable price at which pharmacies can purchase the particular drug product.  If the drug is not available, then CMS will look at the next lowest price.  In some cases, CMS will decline to set a FUL for that specific drug if drugs are not likely to be available at the FUL price or there will not be a cost savings to states by establishing a FUL.  See Gaston Deposition, 3-19-2008, p. 451.  ("Q: So what we see in Exhibit 6 is another situation in which, exercising its discretion, CMS chose to set a FUL not based on the lowest published price but based on the next lowest published price because that's what was reasonable to do in terms of ensuring access, correct?  A: Correct.").  See also Gaston Deposition, 3-19-2008, pp. 443-45.  ("A: [W]e wanted to make sure that the FUL price that's set is a reasonable price and that we'll be assured the availability of the drug.  So we went up to the next lowest price.  Q:  And when you say reasonable, what do you mean in that context?  A: That we feel that the pharmacies will be able to purchase this drug at the FUL price.").

[45] Richard G. Abramson, Catherine A. Harrington, Raad Missmar, Susan P. Li, and Daniel N. Mendelson, "Generic Drug Cost Containment in Medicaid: Lessons from Five State Maximum Allowable Cost (MAC) Programs," Submitted to CMS on July 19, 2003 ("Abramson et al 2003"): p. 3.

[46] I understand that different states have different calculations when establishing SMACs.  According to Abramson et al, 2003, states have flexibility in establishing SMAC prices, and  "rarely assign MAC prices that are higher than FUL prices," and in the majority of cases "approach drugs on the FUL list either by defaulting to FUL prices or by setting lower prices."  (Abramson et al 2003, footnote 2).

[47] CMS website, "Medicaid Prescription Reimbursement Information by State – Quarter Ending December 2008."

**Contains Highly Confidential Materials – Subject to Protective Order**

NDCs at issue in this case were subject to a FUL at some point during the alleged damage period (see **Exhibit 4**).[48]

### b.  Funding for Medicaid

Funding for the Medicaid program is shared by both the Federal government and the state at a rate that depends on the Federal Medical Assistance Percentage ("FMAP").[49]  As part of the Omnibus Budget Reconciliation Act of 1990 ("OBRA '90"), the Medicaid system introduced a rebate program in which drug manufacturers pay rebates to state Medicaid agencies, offsetting a portion of the costs of the programs.  Under OBRA '90, a drug manufacturer has to enter into a rebate agreement with CMS to have its drugs reimbursed under Medicaid.[50]  Under these agreements, drug manufacturers are required to submit an AMP to the CMS (or the HCFA at the time) within 30 days after the end of each calendar quarter for each drug in the program.[51]

The rebate for generic drugs is calculated as 11 percent of the AMP.[52]  In addition, some states have entered into supplemental rebate agreements with manufacturers which require manufacturers to submit their AMPs to the state and pay an additional amount beyond what the manufacturers are already required to pay under the OBRA '90 rebate agreement.[53]

---

[48] First DataBank data and Medispan data.  Two of the NDCs not covered by a FUL were for the same product and package size of cromolyn sodium, but sold over different periods.  The third NDC was also a cromolyn sodium product.  All of the albuterol and ipratropium bromide NDCs at issue were subject to a FUL at some point during the period at issue.

[49] See 2008 Actuarial Report, p. 2, which states that the FMAP "is calculated annually for each State based on a statutory formula that takes into account State per capita income."

[50] See, for example, Signed Rebate Agreement between Dey and the Secretary of Health and Human Services, Dey Exhibit 23, signed February 28, 1991 ("Dey's Rebate Agreement").  The Rebate Agreement states "If you choose to participate in this program, State Medicaid programs are required to cover your drugs…If you choose not to participate, States cannot receive Federal Medicaid funding for your drugs." (Rebate Agreement, p. 1).  See also Deposition of Bruce Vladeck, former administrator at HCFA, May 4, 2007, p. 241.  See also Scully Deposition, 7-13-2007, p. 615.

[51] Dey's Rebate Agreement, p. 1. See also Dey's Rebate Agreement, Enclosure A.  ("AMP includes cash discounts allowed and all other price reductions (other than rebates under section 1927 of the Act), which reduce the actual price paid. It is calculated as a weighted average of prices for all the Manufacturer's package sizes for each Covered Outpatient Drug sold by the Manufacturer during that quarter. Specifically, it is calculated as Net Sales divided by numbers of units sold, excluding free goods (i.e. drugs or any other items given away, but not contingent on any purchase requirements). For Bundled Sales, the allocation of the discount is made proportionately to the dollar value of the units of each drug sold under the bundled arrangement. The Average Manufacturer Price for a quarter must be adjusted by the Manufacturer if cumulative discounts or other arrangements subsequently adjust the prices actually realized.")

[52] CMS website.  See also Dey's Rebate Agreement, pp. 2-3, which shows that for years 1991 to 1993, the rebate for non-innovator drugs was 10 percent of the AMP.  Starting in 1994, the rebate for non-innovator drugs was increased to 11 percent of the AMP.  The Unit Rebate Amount for innovator drugs is currently calculated as the greater of 15.1 percent of the AMP or AMP minus the best price (see CMS website).  In 1992, the URA was calculated as the greater of 12.5 percent of the AMP or AMP minus best price but was capped at 50 percent of the AMP.  (See Dey's Rebate Agreement, pp. 2-3).

[53] Scully Deposition, 7-13-2007, pp. 667-68.  See also, Texas Government Code – § 531.070, Supplemental Rebates, which states that "[i]n negotiating terms for a supplemental rebate, the commission shall use the

**Contains Highly Confidential Materials – Subject to Protective Order**

### 2.  Medicare

The Medicare system was first implemented in 1966 as part of Title XVIII of the Social Security Act.  It is a health insurance program for people over the age of 65, people with certain disabilities, or people with End-Stage Renal Disease.  Medicare Part A, also known as hospital insurance, helps cover inpatient care in hospitals.  Medicare Part B, also known as medical insurance, helps cover doctors' services and outpatient care, and includes coverage for durable medical equipment and specific drug products.[54]

Medicare reimburses using a 5-digit alphanumeric code, the Healthcare Common Procedural Coding System ("HCPCS").[55]  Unlike NDC codes, the HCPCS are not unique to product size, packaging or dose.  A single HCPCS code can encompass more than one NDC, and therefore may include the products of different generic manufacturers selling similar multi-source drugs.[56]

From 1992 to 1997, the Medicare ingredient reimbursement formula was the lower of 1) the billed charge from the provider, or 2) the lower of the Estimated Acquisition Cost ("EAC") or the median AWP of all of the generic forms of the products in the relevant code.[57]  In 1998, Congress changed the reimbursement formula to 95 percent of the median AWP for drugs within a single code.[58]  From 1999 to 2003, Medicare reimbursed Part B covered drugs at 95 percent of the lower of the median published AWP for the generic drugs in the code or the AWP of the least expensive brand-name drug.[59]  In 2004, Medicare reimbursed at a percentage of the AWP that depended on the type and use of the drug.  In the case of the drugs at issue in this case, the reimbursement rate was 80 percent.[60]  Throughout the period at issue, Medicare would only use the AWP basis if it were lower than the provider billed charge.

Under the Medicare Modernization Act of 2003 ("MMA of 2003"), Medicare began requiring pharmaceutical companies to report an Average Sales Price to Medicare (the "Medicare ASP").  In 2005, Medicare began reimbursing providers for the ingredient cost based on a markup (106 percent) over the Medicare ASP.[61]  This reimbursement policy is still used by Medicare today.

---

average manufacturer price (AMP), as defined in Section 1396r-8(k) (1) of the Omnibus Budget Reconciliation Act of 1990, as the cost basis for the product."

[54] Earl Dirk Hoffman, Barbara S. Klees & Catherine A. Curtis, "Brief Summaries of Medicare & Medicaid," as of November 1, 2008 ("Brief Summaries of Medicare & Medicaid"), p. 6, found at CMS website.  See also United States' First Amended Complaint, ¶ 25.

[55] For description of HCPCS codes see the CMS website, Healthcare Common Procedure Coding System (HCPCS) Level II Coding Procedures, p. 1.

[56] Berndt Report, ¶ 193-95. See also, CMS website, Healthcare Common Procedure Coding System (HCPCS) Level II Coding Procedures, pp. 2-3.

[57] 42 C.F.R. § 405.517, November 1991.

[58] Balanced Budget Act of 1997.

[59] See 42 C.F.R. § 405.517, October 1999 and 42 C.F.R. § 405.517, October 2003.

[60] See Federal Register, Vol. 69, no. 4, § 414.707, January 7, 2004.

[61] See Medicare Modernization Act of 2003.

**Contains Highly Confidential Materials – Subject to Protective Order**

It is my understanding that Medicare and Medicaid's reimbursement formulas are intended to ensure access of covered pharmaceutical products to Medicare and Medicaid patients throughout the United States.[62]

## III.   Dey's Conduct Is Consistent with Competitive Behavior

## A.   Competition in the Generic Drug Industry

Generic drug manufacturers offer pharmaceutical products that are pharmaceutically equivalent to branded products.  To be considered a generic equivalent to the brand drug and substitutable for the brand under generic substitution laws, the generic pharmaceutical product must have the same active ingredient, dosage strength and form, and route of administration as the equivalent brand drug, and be approved by the FDA.[63]

Perhaps the most important factor distinguishing generic products from the brand is the lower price at which generics are typically sold.[64]  The first generic manufacturer typically enters the market at a lower price than the branded drug.  Because of generic substitution laws that are now in place in many states, the first available generic product is able to capture a substantial share of the brand's sales from the time that the generic enters the market.[65]  However, as more and more generics enter the market, the first generic loses this regulation-endowed competitive edge and must compete on price with other generics.  Thus, while the brand price may remain the same or even increase in the face of generic competition, the price of each generic alternative typically falls as more generic companies enter the market.[66]

---

[62] 42 U.S.C. § 1396a(3)(A), "State Plans for Medical Assistance," states that a state Medicaid program payments must be "sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area."  See also, CMS website, CMS Strategic Action Plan 2006-2009, October 16, 2006, p. 11. ("The DRA requires CMS to ensure that Medicare and Medicaid beneficiaries continue to have access to high-quality medical care in the most appropriate setting.")

[63] See for example, 2008 FDA Orange Book, p. vi.

[64] Other product features may be marketed as well.  For example, when marketing its unit-dose inhaler, Dey promotes such product advantages as: improved and easy to open packaging, no cross contamination, sterile and preservative free vials, and clear plastic containers which allows the customer to see the contents.  See Deposition of William Hill, former District Sales Manager at Dey, November 11, 2008, Exhibit 3, "Dey Laboratories, Inc. New Product Marketing Plan: Albuterol Sulfate Inhalation Solution 0.083% 3 mL," DEY077-0360-62 in DEY077-324-367.

[65] An OIG Report noted that as of July 2006, 41 state Medicaid programs had mandatory generic substitution.  See Department of Health and Human Services, Office of Inspector General, "Generic Drug Utilization in State Medicaid Programs," July 2006, OEI-05-05-00360, p. 2.  See also, The National Pharmaceutical Council: Pharmaceutical Benefits Under State Medical Assistance Programs, 2007, p. 4-50.  Thirteen states have mandatory generic substitution laws.  See 2008 National Association of Boards of Pharmacy: Survey of Pharmacy Law, p. 62, found at http://www.sjfc.edu/pharmacy/DIC/2008SurveyofPharmacyLaw.pdf.  An additional 36 states have "permissive" generic substitution laws.

[66] See David Reiffen and Michael R. Ward, "Generic Drug Industry Dynamics," *The Review of Economics and Statistics*, 87 (1): p. 37. ("We find that generic drug prices fall with increasing number of competitors.")  See also Richard G. Frank and David S. Salkever, "Generic Entry and the Pricing of Pharmaceuticals," *Journal of*

**Contains Highly Confidential Materials – Subject to Protective Order**

Dey's Conduct Is Consistent with Competitive Behavior

Dey's pricing behavior reflects the competitive environment in which it competes. Typically, the prices of Dey's products fall over time as Dey is forced to match or beat its competitors' prices to maintain or win sales.[67] The results of plaintiffs' experts' analyses support this conclusion: according to Mr. Platt, over the period studied, Dey's average transaction prices for its albuterol products fell by 60.2 percent, its average transaction prices for its ipratropium bromide products fell by 76.0 percent and its average transaction prices for its cromolyn products fell by 61.4 percent.[68]

It is this ordinary price competition that causes the observed increase between AWP and average transaction price that plaintiffs' experts refer to as the increasing spread. Contrary to the plaintiffs' position, though, this "spread" was not concealed from CMS, but rather it was revealed by the decline in Dey's AMP, its WAC relative to its AWP, other information transmitted to CMS by Dey, and the economics of the market.

---

*Economics & Management Strategy*, 6 (Spring 1997): pp. 83, 89. ("[I]ncreased competition from generics is not accompanied by lower prices for brand-name drugs. We found no evidence of brand-name price reductions being associated with entry by generic producers. In fact, the evidence we did uncover is consistent with small price rises being tied to expanded competition.") See also Henry G. Grabowski and John M. Vernon, "Brand Loyalty, Entry, and Price Competition in Pharmaceuticals After the 1984 Drug Act," *Journal of Law & Economics*, 35 (October 1992): pp. 335-36. ("[I]n generic prices, there is a strong downward price dynamic over time… generic prices fell to 78 percent of their initial value at the end of the first year after entry and 65 percent at the end of the second year.")

[67] See for example, Rice Deposition, 11-7-2002, Sales Commentary, July 1994, Exhibit 347, DL-TX 84801. Mr. Rice writes that "[t]he market is heating up on unit-dose Albuterol, with Warrick aggressively targeting major homecare pharmacy accounts at $.35 per dose. So far we have heard of no conversion; however, we will be lowering our prices to the major accounts to prevent any second thoughts." See also Rice Deposition, 3-24-03, Exhibit 826, Memo from Charles Rice to Jean-Pierre Termier, Re: Monthly Report – August 1994, September 2, 1994, DL-TX-0162493 in DL-TX-0162493-5. The memo states that "[p]ricing pressures are mounting on Albuterol due to Warrick activities in retail and homecare market segments. We have no choice but to reduce pricing." See also Mozak Deposition, 11-6-2002, Exhibit 345, Sales Commentary, April 1998, DL-TX 82805 in Dl-TX 82805-06. ("Albuterol MDl continues its pricing decline due to competitive pressures.") See also Sales Commentary, March 1998, DL-TX 82769 in DL-TX 82769-80. "Dey's products continue to experience price erosion in the marketplace." See also Sales Commentary, May 2000, DL-TX 81270 in DL-TX 81269-332. A discussion on ipratropium bromide sates that "[p]rice erosion continues with more competition for this product, while we attempt to maintain market share to the extent possible." See also Sales Commentary, September 2003, DEY050006512 in DEY050006512-69. This commentary states that "[p]rices have declined more rapidly in 2003 than expected due to competitive conditions. However, Dey retained a source program position at one of the major wholesalers and secured agreement for new warehouse position with one of the leading national chain drugstores in September."

[68] Average sales prices are calculated using the net sales and shelf cartons information in Mr. Platt's Summary 5. Reductions in price were calculated by comparing the ASPs by NDC for the first four quarters and the last four quarters for which the product was available. For drug products which were sold for four or fewer quarters, the first quarter and last quarter were considered. Quarters for which net sales or shelf cartons were less than or equal to zero were dropped. The reductions in ASPs were then weighted by Mr. Platt's estimates of shelf carton shipments by NDC within drug category.

**Contains Highly Confidential Materials – Subject to Protective Order**

## B.    Dey's WACs Are Economically Meaningful Reflections of Transaction Prices

Dey's WAC is an undiscounted invoice price to wholesalers used by Dey in its transactions. There are a number of references over time to WAC as an undiscounted list price; however, there apparently was not a definition in the Medicare and Medicaid statutes or regulations until the MMA of 2003, when WAC was statutorily recognized as an undiscounted list price.[69]

AWP is essentially a benchmark price.  Generic companies typically set their AWP in reference to the brand AWP.  Dey's practice is consistent with its understanding that industry practice was generally to "set" AWP at about 90 percent of the brand AWP for launch and generally not update it over time.[70]  On the advice of First DataBank, Dey sets its AWPs at approximately 90 percent of the comparable brand AWP at product launch.[71]

For branded drugs there is a fairly well-established relationship between AWP and WAC, where AWP is roughly 20 to 25 percent above the WAC.[72]  However, that is not the case for generic drugs.[73]  Many drug companies do not publish WACs.[74]  Those that do publish WACs may use them differently from each other and the competing brands.

---

[69] Medicare Modernization Act of 2003, p. 177.  ("The term 'wholesale acquisition cost' means, with respect to a drug or biological, the manufacturer's list price for the drug or biological to wholesalers or direct purchasers in the United States, not including prompt pay or other discounts, rebates or reductions in price.")

[70] Dey's Responses and Objections to First Set of Interrogatories, p. 8.  According to Patricia Kay Morgan, there was a "perception in the industry" that a generic drug had to be priced at least 10 percent less than the brand price.  See Deposition of Patricia Kay Morgan, former Manager of Editorial Services at First DataBank, November 30, 2007 ("Morgan Deposition"), p. 21.

[71] Deposition of Robert Mozak, March 13, 2003 ("Mozak Deposition, 3-13-2003"), p. 731.  ("I believe in establishing a…price for a new generic, we followed essentially the same guidelines that we were advised by First DataBank, which was to set the AWP at approximately…the area of ten percent below the branded product.")  See also Dey's Responses and Objections to First Set of Interrogatories, p. 8.

[72] See, for example, Findings of Fact and Conclusions of Law In Re: Pharmaceutical Industry Average Wholesale Price Litigation, June 21, 2007, M.D.L. No. 1456.  ("Historically there was an industry-wide formulaic 20 or 25 percent markup between WAC and AWP.")  Dr. Schondelmeyer agrees that the AWP is "typically" 20 to 25 percent above the WAC for brand name drugs.  See Stephen W. Schondelmeyer and Marian V. Wrobel, "Medicaid and Medicare Drug Pricing: Strategy to Determine Market Prices," August 30, 2004, pp. 14-15. See also, Report of Independent Expert Ernst R. Berndt, February 9, 2005, In Re: Pharmaceutical Industry Average Wholesale Price Litigation, United States District Court, M.D.L. No. 1456 ("Berndt Report").  Mr. Berndt notes that for single source drugs, manufacturers appear to be "locked in" to the practice of a 20 to 25 percent spread between AWP and WAC.  (p. 21).

[73] Berndt Report, pp. 26-27. ("The relationship between AWP, WAC and actual acquisition prices for generic self-administered drugs is considerably more complex, therefore, than that for single source branded drugs."

[74] See, for example, Department of Health and Human Services, Office of Inspector General, "Medicaid Drug Price Comparisons: Average Manufacturer Price to Published Prices," June 2005, OEI-05-05-00240, p. ii.  ("We compared AMP to AWP for 24,101 NDCs and AMP to WAC for 19,475 NDCs (4,626 NDCs had an AWP but no WAC value).")

**Contains Highly Confidential Materials – Subject to Protective Order**

Plaintiffs and their experts argue that Dey's reported WACs are falsely inflated and are not an accurate reflection of actual prices paid in the market for Dey's products.[75]  In my opinion, that is incorrect.  Dey's WACs are undiscounted invoice prices to its wholesalers.[76]  **Exhibit 5** appended to this report shows the distribution of the prices that appear on Dey's invoices to wholesalers relative to WAC.  Approximately 90 percent of Dey's shipments to wholesalers are at WAC.  Even after accounting for price adjustments, the majority of Dey's sales to wholesalers are within five percent of WAC.  **Exhibit 6** shows the distribution of Dey's sales to wholesalers relative to the prevailing WAC at the time of the sale, after price adjustments.  As can be seen from the table, more than 70 percent of Dey's sales are within 5 percent of its prevailing WAC price.

Moreover, Dey updates its WACs in a manner that directly reflects underlying pricing activity.[77]  Because Dey updates its WACs as market forces drive its prices down, Dey's WACs follow the same trends as its AMPs, and thus are meaningful reflections of general sales prices.  **Figures 1A** through **1K** show Dey's WACs relative to its AWPs and AMPs.  As can be seen from the charts, Dey's declining WACs reflect its average pricing activity.  Because Dey's WACs are undiscounted list prices (and, thus, the highest price that any Dey customer would expect to pay), its average transaction prices are, as expected, below its WACs.  This does not mean, however, that Dey's WACs are not "true" prices.

Dey's use of WACs as its invoice prices and practice of updating them make Dey's WACs economically meaningful reflections of average transaction prices.  In reporting and updating its WACs to the pricing compendia, Dey signaled trends in its average pricing activity.  The visible "spread" between Dey's AWP and its WAC reflected the "spread" between Dey's AWP and its average transaction price.

---

[75] See, for example, Report of Matthew Perri III, January 21, 2009, ("Perri Report"), p. 35.

[76] Mozak Deposition, 11-1-2001, p. 68.  (Q: Mr. Mozak, what is invoice price?  A: Invoice price is the price we have on the invoices that we send to our wholesalers.  Q: And for you wholesaler customers, is invoice price always going to be WAC?  Your WAC?  A: Yes.")  See also Dey's Responses and Objections to First Set of Interrogatories, p. 8.  Dey's WAC is a list price.  List prices are frequently discounted.  They mark the starting point for a negotiation and, thus, may be thought of as the highest price one is likely to see paid for a product.

[77] Mozak Deposition, 4-30-2002, pp. 372-73.  ("[A]s the contract price came down, the amount of the chargeback grew, so we lowered the – the WAC price so that the chargeback would also be reduced.")  See also, Marrs Deposition, 5-15-2008, pp. 136-137.  ("Q: So in addition to reporting an AWP Dey reports a WAC price; correct?  A: That's correct.  We send them information on WAC as it changes.  Q: And in fact, historically Dey has reduced its WAC prices on their generic drugs from time-to-time; correct?  A: Correct.  As the price of the marketplace has come down we've also reduced our reported WAC.")

**Contains Highly Confidential Materials – Subject to Protective Order**

## IV.    There Is No Reason for Dey to Have Believed that Anyone Was Deceived by its Pricing Practices

### A.    There Is Abundant Public Information about the Nature of AWPs as Benchmarks and WACs as Undiscounted List Prices

Plaintiffs allege that Dey reported "falsely inflated WAC prices" to various pricing compendia to "create a spread in states that relied on WAC prices as a basis for Medicaid reimbursement."[78] Plaintiffs do not define what constitutes a "false" or a "falsely inflated" WAC and do not indicate how, or even if, Dey's WACs meet the conditions for "falseness."  As just explained, Dey's WACs were not "falsely inflated."  Dey's WACs were used as invoice prices and, in fact, meaningfully reflected Dey's average pricing activity.  Dey's practice is generally consistent with the definition of WAC in the MMA of 2003, which defined the WAC as "the manufacturer's list price for the drug…to wholesalers or direct purchasers in the United States, not including prompt pay or other discounts, rebates or reductions in price, for the most recent month for which the information is available, as reported in wholesale price guides…."[79]

To date, AWP has not been defined in any statute.  In its 2005 report, the Office of Inspector General ("OIG") stated that the "AWP is not defined in law or regulation, and fails to account for the discounts available to payers."[80]  However, throughout the period at issue there has been abundant public information revealing that reported AWPs do not reflect discounted acquisition costs, as they do not include discounts generally available in the market.  A 1968 U.S. Task Force report wrote that:

> Normally, the *Red Book* and *Blue Book* listings quote the maximum price to the retailer, whether he buys from a wholesaler or directly from the manufacturer.  However, *Red Book* and *Blue Book* do not reflect the actual manufacturers' prices to wholesalers and retailers, which are determined by the amounts of various kinds of discounts.  Nor do these publications always reflect the prices in the most recent editions of each company's product catalog.[81]

In 1975, the Federal Register noted that:

> The Secretary disagrees, however, that average wholesale price should be used as the basis for 'actual acquisition cost' determinations.  Average wholesale price is not currently determined by surveying drug marketing transactions (i.e., by determining the actual price a pharmacist pays to a manufacturer or wholesaler for a particular product),

---

[78] United States' First Amended Complaint, ¶ 58.

[79] Medicare Modernization Act of 2003.

[80] Department of Health and Human Services, Office of Inspector General, "Medicaid Drug Price Comparison: Average Sales Price to Average Wholesale Price," June 2005, OEI-03-05-00200, p. i.

[81] Task Force on Prescription Drugs: The Drug Makers and the Drug Distributors", U.S. Department of Health, Education, and Welfare, December 1968, p. 31.

**Contains Highly Confidential Materials – Subject to Protective Order**

There Is No Reason for Dey to Have Believed that Anyone Was Deceived by its Pricing
Practices

and thus published wholesale prices often are not closely related to the drug prices
actually charge to, and paid by, providers.[82]

There have been numerous other reports since 1975 indicating that AWP is not an average
transaction price.  Governmental agencies have written reports acknowledging that AWP does
not reflect pharmacy acquisition cost and that the Medicaid and Medicare reimbursement
policies should have a greater discount off the AWP.[83]  For example, in a memorandum written
in 1989, the OIG stated that "[w]e continue to believe that AWP is not a reliable price to be used
as a basis for making reimbursements for either Medicaid or Medicare programs.  When AWP is
used, we believe it should be discounted."[84]  A 1997 report noted that "there is a significant
difference between pharmacy acquisition cost and AWP."[85]  In a 2002 report, OIG wrote that it
"consistently found that the published average wholesale prices currently used by Medicare to
establish reimbursement amounts [bore] little or no resemblance to actual wholesale prices that
[were] available to suppliers and large government purchasers."[86]  Even plaintiffs' damages
expert, Dr. Duggan, referred to AWP as a "standard industry list price" in a 2006 academic
article.[87]

Public reports and academic articles have also been written about WAC not representing average
acquisition costs.  A 1997 textbook noted that "research studies do not even agree on the use of a
common measure of wholesale price."[88]  The author noted that neither of the two most frequently

---

[82] Federal Register, July 31, 1975, Vol. 40, No. 148, 45 C.F.R. 19, p. 32293.

[83] Department of Health and Human Services, Office of Inspector General, "Changes to the Medicaid Prescription
Drug Program Could Save Millions", September 1984.  See also Department of Health and Human Services,
Office of Inspector General, "A Comparison of Albuterol Sulfate Prices", June 1996, OEI-03-94-00392 ("A
Comparison of Albuterol Sulfate Prices").  See also Department of Health and Human Services, Office of
Inspector General, "Medicare Reimbursement of Albuterol", June 2000, OEI-03-00-00311("Medicare
Reimbursement of Albuterol").

[84] Department of Health and Human Services, Office of Inspector General,  "Management Advisory Report – The
Use of Average Wholesale Prices in Reimbursing Pharmacies Participating in Medicaid and the Medicare
Catastrophic Coverage Act Prescription Drug Program," September 29, 1989, p. 7.  As **Exhibit 3** discussed
above shows, some states continued to use an undiscounted AWP as its drug ingredient cost, through the mid
1990s.  Moreover, Medicare continued to use an undiscounted median AWP for its reimbursement policy until
1998.

[85] Department of Health and Human Services, Office of Inspector General, "Medicaid Pharmacy – Actual
Acquisition Cost of Generic Prescription Drug Products," August 1997, A-06-97-00011, p. 5.

[86] Department of Health and Human Services, Office of Inspector General, "Excessive Medicare Reimbursement for
Albuterol", March 2002, OEI-03-01-00410, pp. iii, 12.  Some of these reports specifically addressed the drugs at
issue.  See A Comparison of Albuterol Sulfate Prices.  See also Medicare Reimbursement of Albuterol.  See
also Department of Health and Human Services, Office of Inspector General, "Update: Excessive Medicare
Reimbursement for Albuterol", January 2004, OEI-03-03-00510.  See also Department of Health and Human
Services,  Office of Inspector General, "Excessive Medicare Reimbursement for Ipratropium Bromide", March
2002, OEI-03-01-00411.  See also Department of Health and Human Services, Office of Inspector General,
"Update: Excessive Medicare Reimbursement for Ipratropium Bromide", January 2004, OEI-03-03-00520.

[87] Mark Duggan and Fiona M. Scott Morton, "The Distortionary Effects of Government Procurement: Evidence
from Medicaid Prescription Drug Purchasing," *Quarterly Journal of Economics,* 121 (February 2006): p. 4.

[88] Stuart O. Schweitzer, *Pharmaceutical Economics and Policy* (New York: Oxford University Press, 1997)
("Schweitzer 1997"), p. 11.

**Contains Highly Confidential Materials – Subject to Protective Order**

There Is No Reason for Dey to Have Believed that Anyone Was Deceived by its Pricing Practices

used prices (WAC and AWP) "captures actual transaction prices, including discounts and rebates."[89]  A 2002 Massachusetts report noted that:

> WAC is theoretically the manufacturer's charge to the wholesaler to purchase the drug, but it does not reflect any rebates, discounts, promotional bonuses, or credits for prompt payment.  The WAC is not, therefore, the actual cost of purchasing the drug – it is a prescription drug equivalent of a 'catalogue' price.[90]

Medicaid and Medicare officials were aware of the nature of AWP as it is used in the industry.  David Tawes, Director of the Medicare and Medicaid Drug Pricing Unit, stated that people in the industry knew AWPs were not based on wholesale prices.[91]  Cody Wiberg, Pharmacy Program Manager at Minnesota's Department of Human Services from 1999 to 2005, stated that Minnesota assumed the AWP for most drugs "would not reflect actual acquisition cost."[92]  Paula Avarista, Chief of Pharmacy at Rhode Island Department of Human Services, said that she had understood since 1990, the AWP was higher than the actual acquisition cost.[93]  Mr. Gorospe, Chief of Medi-Cal Pharmacy Policy at the Department of Health Care Services in California, stated that he understood that the reimbursement amount used by California (AWP- five percent) did not "accurately reflect" acquisition costs.[94]

Finally, Dey's own marketing material to its customers referenced AWP as a benchmark price not reflective of transaction prices.  As early as 1994, Dey's marketing material to its customers stated that "[a]verage wholesale prices do not reflect the actual cost to the pharmacy or the

---

[89] Schweitzer 1997, p. 11.

[90] Commonwealth of Massachusetts Executive Office of Health and Human Services, Report to the General Court Reimbursement for Prescribed Drugs, October 3, 2002 ("Report to the General Court"), p. 3.

[91] Deposition of David Tawes, April 25, 2007 ("Tawes Deposition, 4-25-2007"), pp. 481-482.  ("A: I'm not sure that I knew the exact definition that the industry would use.  However, I believe that the industry obviously knew that AWPs were not based on – on wholesale prices; that it was simply a – a price for their products that they wanted to list in compendia.")

[92] Deposition of Cody Wiberg, March 14, 2008 ("Wiberg Deposition"), p. 375.  ("Q:  I mean, you didn't rely upon them [AWPs] in the sense that you relied upon the AWPs as a – an accurate reflection of the actual acquisition cost in the marketplace, for example?  A: No.  No.  Q:  In fact, you relied upon them as not being an accurate representation of the – the cost of the marketplace, correct?  A:  We assumed there would be at least some drugs where the AWP would not reflect – most drugs would not reflect the actual acquisition cost.")

[93] Deposition of Paula Avarista, December 4, 2008 ("Avarista Deposition"), pp. 120-21.  ("Q: And in 1990 is that when you had some understanding that AWP was the manufacturer's suggested price, which generally is higher than the actual cost of the drug paid by the pharmacy?  A: Right.  That's when the understanding was that it was not in line any longer with the purchase price… Q: Did you have an understanding from 1990 on, that the average wholesale price was higher than the actual acquisition cost?  A: Yes.")

[94] Deposition of J. Kevin Gorospe, September 22, 2008, p. 496.  ("Q: And so late nineties, you understood AWP minus 5 percent didn't reflect acquisition costs for brands?  A: That is correct.  Q: And for – for multi-source drugs as well – AWP minus 5 percent did not accurately reflect acquisition costs?  A: That is correct.  Q: Did you have an understanding that AWP minus 5 percent was less accurate for generics than it was for brands?  A: Yes.  And that would be because of [sic] generics are available at a steeper discount off of AWP in your experience.  A: Yes.") (Objections omitted)

**Contains Highly Confidential Materials – Subject to Protective Order**

There Is No Reason for Dey to Have Believed that Anyone Was Deceived by its Pricing Practices

customer."[95]  These letters were sent out as part of product announcements to homecare pharmacies, retail generic distributors, wholesalers, chain drug stores.[96]

There is, therefore, no basis to assert or conclude that Dey believed that Medicaid and Medicare were, or even could be, misled by the nature of its pricing practices.  Even if Dey had attempted to keep its own pricing practices "secret," the general knowledge that AWPs did not reflect transaction prices was well known in the industry.  Moreover, there is no evidence that Dey did attempt to conceal its practices with respect to reported prices or the nature of its reported prices. To the contrary, as discussed below, Dey directly communicated the nature of its reported prices to the state Medicaid agencies.

## B.    Dey Communicated Directly with Medicaid Regarding the Nature of its Reported AWPs and WACs

In addition to the abundant public information about the nature of AWPs as benchmark prices and WACs as undiscounted list prices, the facts that Dey's AWPs did not represent actual wholesale prices and its WACs were undiscounted list prices were directly communicated to state Medicaid administrators and repeatedly reaffirmed on many occasions over the period at issue.  At least since January 1999, every time that Dey updated the WAC for one of its products, Dey sent letters to state Medicaid officials in which it reaffirmed that Dey's WACs were undiscounted invoice prices to drug wholesalers.[97]  In addition, these letters stated that state Medicaid officials should contact Dey if they need any additional information.[98]  According to Mr. Galles, former Group Product Manager at Dey, after sending out one such letter in August of

---

[95] See, for example. Dey's product introduction letters to homecare pharmacies, wholesalers, retail generic, and chain drug stores, Deposition of Charles Rice, former CEO at Dey, October 30, 2001, Exhibit 81, Letter to Customer, May 1994 ("Letters to Customers"), TX-D 0969-73.  See also, Deposition of Todd Galles, former Group Product Manager at Dey, 2-6-2003 ("Galles Deposition 2-6-2003"), Exhibit 465 "New Product Announcement: DEY Albuterol Sulfate Inhalation Solution 0.5%, 20 mL", March 1996 ("Albuterol Sulfate Inhalation New Product Announcement"), DL-TX 0076258-62 in DL-TX 0076226-89.  See also, Albuterol Inhalation Aerosol 17g (MDI) Marketing Launch Plan, November 1995 ("Albuterol Inhalation Aerosol 17g Marketing Plan"), DL-TX-0093369-73 in DL-TX-0093357-88.

[96] See Letters to Customers, TX-D 0969-73, Albuterol Sulfate Inhalation New Product Announcement, Dl-TX 0076258-62 and Albuterol Inhalation 17g Marketing Plan, DL-TX-0093369-73.

[97] See, for example, Letter from R. Mozak to a State Medicaid Administrator, January 4, 1999, Deposition of Pamela Marrs, November 14, 2007 ("Marrs Deposition 11-14-07"), Exhibit 26, DEY-WI-0104541 "Dey believes that WAC generally means the actual invoice price charged by a pharmaceutical manufacturer to its drug wholesalers.  As you also know, WAC does not include the net effect of discounts from invoice price…rebates, chargebacks, administration fees and other such cost adjustments which are well-known and commonplace in the pharmaceutical industry…Therefore, we remind you that WAC may well not be representative of actual market costs to those entities which you are reimbursing under Medicaid" (emphasis in original).  See also Letter from R. Mozak to a State Medicaid Administrator, July 18, 2000 ("State Medicaid Letter, July 18, 2000"), DEY-BO0018893 in DEY-BO0018892-98.  See also Deposition of Todd Galles, former Group Product Manager at Dey, March 1, 2006 ("Galles Deposition, 3-1-2006"), Letter to State Medicaid Administrator, August 10, 1999 Exhibit 272 ("State Medicaid Letter, August 10, 1999") DL-0050553.

[98] See, for example, Galles Deposition 3-1-2006, Exhibit 272, State Medicaid Letter, August 10, 1999, DL-0050553.

**Contains Highly Confidential Materials – Subject to Protective Order**

There Is No Reason for Dey to Have Believed that Anyone Was Deceived by its Pricing Practices

1999, no state Medicaid officials contacted him regarding Dey's WAC prices or demand that Dey report its discounted price.[99]

Similarly, Dey continually reaffirmed the nature of its AWPs as benchmarks set only at the launch of a new product. Pamela Marrs, CFO at Dey, stated that from at least 1999, notifications were sent to reporting agencies that clearly established that the AWP was not a transaction price.[100] As stated above, it was Dey's general practice to report an AWP for its drugs only at launch and then leave them unchanged. On the rare occasions when it did change its AWPs, Dey communicated those changes directly to Medicaid and re-affirmed the nature of it AWPs as benchmarks, consistent with industry practices.[101]

For example, an August 10, 1999 letter from Dey to State Medicaid Administrators regarding an NDC change for albuterol sulfate inhalation solution 0.5% contains the following language:

> Further, as you also know, the Average Wholesale Price (or "AWP") per unit listed above does <u>not</u> represent actual wholesale prices which will be charged or paid for this product. It is Dey's practice to set an AWP before a product is first sold and not subsequently to change that figure. We understand that this is consistent with industry practice and is understood by state and federal Medicaid regulators.[102]

In fact, Dey made clear in its letter from Robert Mozak to Martha McNeill at the Texas Department of Health that Dey expected that its "explanatory language" that WAC excluded discounts would come as "no surprise" to the agency.[103]

---

[99] Galles Deposition, 3-1-2006, pp. 410-11. ("Q: Did any employee of a state Medicaid office call you after they received this letter and demand that Dey report a different WAC?  A: No.  Q: Did any employee of a state Medicaid office contact you after they received this letter and demand that you report a different AWP?  A: No. Q: Did any employee of a state Medicaid office contact you after you sent this letter and demand that you report a fully discounted price?  A: No.")

[100] Marrs Deposition, 5-15-2008, p. 138. ("A: …on the notifications to the reporting agency it was clearly set forth since 1999 that…AWP was not a real price.")

[101] See, for example, State Medicaid Letter, July 18, 2000. The products listed with an AWP change are not the products at issue.

[102] State Medicaid Letter, August 10, 1999.

[103] Mozak Deposition, 4-30-2002, Letter from Robert F. Mozak of Dey to Martha McNeill of the Texas Department of Health, July 16, 2001, Exhibit 238. In his letter, Mr. Mozak wrote that "there can be no doubt in this industry that WAC represents the undiscounted list price used on invoices to wholesalers.  For example, one of the reporting services you use, Medi-Span, as early as 1995 in its published reports described WAC as 'the estimated cost to the wholesaler by the drug manufacturer…Actual values can vary from these estimated values as wholesalers experience discounts…'" Mr. Mozak continued "We have even included explanatory language on Dey's filings with your agency for over a year now, yet we have had no prior communications from your agency about this, as this explanatory language should come as no surprise to your agency."

**Contains Highly Confidential Materials – Subject to Protective Order**

There Is No Reason for Dey to Have Believed that Anyone Was Deceived by its Pricing Practices

## C.    Other Information Provided by Dey to CMS and other Government Agencies

Dey currently provides two measures of its average sales prices to the government:  the Medicaid Average Manufacturer Price (AMP) and the Medicare ASP.  Dey's AMPs and ASPs were reported directly to CMS.  Therefore, CMS had direct information on Dey's average transaction prices.

As noted, CMS used AMPs to calculate federal rebates for state Medicaid programs.  Each state received a unit rebate amount for its purchases of Dey's drugs.  For all but four of Dey's NDCs, the unit rebate amount is calculated as fixed share of the AMP.[104]  Therefore, each state that received a rebate for purchases of Dey's drugs received information that revealed Dey's discounted pricing structure for the majority of its products.

As discussed above, beginning in 2005, the Medicare system changed its reimbursement policy to ASP plus six percent.  Thus, beginning in 2005, Dey also reported its ASPs to Medicare.  I understand that, with the exception of North Carolina, no state Medicaid agency has opted to use Medicare ASP in their reimbursement.[105]  While other states have changed their reimbursement methodologies since 2005, none of the other states changed their reimbursement policies to use Medicare ASPs.  Even though Dey's WACs were published in the compendia and its average transaction prices were reported directly to CMS, many states continue to reimburse on the basis of AWP.

In addition, the government, through the Department of Veterans Affairs and the Department of Defense, negotiates Federal Supply Schedule (FSS) prices for federal purchases of pharmaceuticals.[106]  The FSS prices are not confidential and recent prices are reported by the US Department of Veterans Affairs on their web site.[107]

---

[104] The following NDCs have New Drug Applications ("NDAs") and their URAs are not calculated as a simple fixed share of AMP:  49502030317, 49502030327, 49502033317, and 4950233327.  The remaining NDCs at issue are ANDA drugs.

[105] I understand that for physician administered drugs, North Carolina's drug ingredient cost reimbursement is Medicare ASP + 6.7% plus a dispensing fee (Medicaid Prescription Reimbursement Information by State – Quarter Ending December 2008).

[106] United States General Accounting Office, Report to Congressional Requesters, "DOD AND VA PHARMACY: Progress and Remaining Challenges in Jointly Buying and Mailing Out Drugs," May 2001, GAO-01-588, pp. 9-10 ("Purchasing vehicle:  FSS for pharmaceuticals.  Description:  VA negotiates multiple award contracts with drug companies to set prices available to all federal purchasers. FSS prices are intended to be no more than the prices manufacturers charge their most-favored nonfederal customers under comparable terms and conditions. Under federal law, drug manufacturers must list their brand name drugs on the FSS to receive reimbursement for drugs covered by Medicaid.  Discount:  About 50 to 58 percent lower than average wholesale price. [Footnote b: Average wholesale price is what a manufacturer suggests wholesalers charge pharmacies. Typically less than the retail price, average wholesale price is referred to as a sticker price because it is not the actual price that large purchasers normally pay.  For example, in a 1997 study of prices paid by retail pharmacies in 11 states, the average acquisition price was 18.3 percent below average wholesale price (Office of the Inspector General, Medicaid Pharmacy—Actual Acquisition Cost of Prescription Drug Products for Brand Name Drugs (Washington, D.C.: Health and Human Services, Apr. 1997).  Discounts for health maintenance organizations and other large purchasers can be even greater.  Sources: "Prescription Drugs: Expanding Access to Federal

**Contains Highly Confidential Materials – Subject to Protective Order**

There Is No Reason for Dey to Have Believed that its Reporting Practices Affected
Medicare and Medicaid Reimbursement Policies

The FSS contains prices at which federal buyers are able to purchase pharmaceuticals. FSS
prices for generic drugs are negotiated based on contract price and term information for most-
favored customers, which is requested from and provided by Dey.[108]  The FSS prices are very
similar to the available AMP data in the production for Dey.  Both the AMPs and FSS prices are
known or knowable to CMS.  Moreover, both reflect the very prices that plaintiffs, through their
experts, appear to believe should have been reported to the pricing compendia.  **Figures 2A**
through **2K** compare Dey's AMPs, and FSS prices to the prices computed by plaintiffs' experts
for Dey's products.  As can be seen from the figures, the price measures that plaintiffs allege
were kept from them are similar to the publicly available FSS prices and directly reported AMPs.

The requests for AMP and Medicare ASP send clear signals to Dey and other market participants
that the government understood that AWP and WAC were not averages of transactions data.
Had the government believed that the AWP or WAC was an average discounted price, there
would be no need to request "duplicate" pricing information from the drug companies.
Moreover, in providing the AMPs, Medicare ASPs, and other price information requested in the
negotiation of FSS, it would be economically irrational for Dey to have believed it would have
been able to deceive the government that AWPs were transaction prices and that its WACs were
anything other than undiscounted invoice prices.

## V.    There Is No Reason for Dey to Have Believed that its Reporting Practices Affected Medicare and Medicaid Reimbursement Policies

As I have described, there was abundant information on the nature of AWPs as benchmarks and
WAC as undiscounted list prices.  The general level of discounting was also widely documented,
and Dey provided further information about its practices and pricing to CMS and other state and
federal agencies.  The absence of any significant asymmetry in information is further
demonstrated by the numerous alternative bases for reimbursement that were available to CMS
but for which Medicaid and Medicare revealed a persistent preference to set aside.  The
persistent use of AWP and WAC by Medicare and Medicaid in setting their Estimated
Acquisition Costs (EACs), and foregoing a number of alternative bases that would have reduced
ingredient costs, is explained by the need on the part of these agencies to ensure access for the
beneficiaries.

Moreover, the existence of FULs and state MACs in Medicaid and the Medicare median
methodology, all of which yield a common level of reimbursement for covered drugs, prevent

---

Prices Could Cause Other Price Changes," (GAO/HEHS-00-118, August 7, 2000) and GAO analysis of DOD
and VA information.]")

[107] See, e.g., US Department of Veterans Affairs web site, http://www.pbm.va.gov/DrugPharmaceuticalPrices.aspx.

[108] US Department of Veteran Affairs, "VA Federal Supply Schedules:  Catalog 2004" ("Product and/or service
pricing as well as other terms/conditions negotiated for an FSS contract are based upon an offeror's commercial
practices. The negotiation process begins with an evaluation (price analysis) of an offeror's most favored
commercial customer (MFC) prices and related terms and conditions.")  For branded products, the FSS also
involves additional information being provided by manufacturers in the form of the Non-Federal Average
Manufacturer's Price (Non-FAMP).

**Contains Highly Confidential Materials – Subject to Protective Order**

There Is No Reason for Dey to Have Believed that its Reporting Practices Affected
Medicare and Medicaid Reimbursement Policies

any competitive advantage from manipulation of the level of reimbursement, as all reimbursed drugs would experience the same increase. All this being the case, there is no reason for anyone participating in the market, particularly Dey, to have anticipated that Medicare and Medicaid were not paying at the level they intended to meet their diverse goals.

## A. Medicare and Medicaid Reimbursement Policies Are Designed to Ensure Access to Covered Pharmaceuticals

Pharmacy participation in the Medicare and Medicaid programs is voluntary. To ensure that pharmacies participate in these programs, federal law requires that states' Medicaid payments are "sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area."[109]

Pharmacies evaluate whether or not to participate in Medicaid and Medicare based on the costs and benefits associated with their participation. Janet Rehnquist, former Inspector General of DHHS, stated in congressional testimony in 2002 that "[p]hysicians and suppliers should be fairly reimbursed and at levels that ensure that the drugs are accessible. If reimbursement is set too low, some beneficiaries may not be able to obtain needed prescription drugs."[110] All else being equal, reductions in the level of reimbursement can make it unprofitable for pharmacies to continue to participate and provide access to pharmaceutical products for beneficiaries. Many such issues involving state Medicaid programs and pharmacy reimbursement have arisen over the course of the period studied.[111] Plaintiff's expert, Dr. Schondelmeyer, opined in connection with a lawsuit over the 250 percent AMP rule, that "the loss of 20% of all retail pharmacies would not be unexpected from payment cuts of the magnitude that will result from the final rule."[112] In deposition, Dr. Schondelmeyer also stated that pharmacies that would have the most

---

[109] 42 U.S.C. § 1396(a)(3)(A). See also Dey's Responses and Objections to First Set of Interrogatories, pp. 30-31.

[110] Testimony of Janet Rehnquist, March 14, 2002, Department of Health and Human Services.

[111] See, e.g., Kaiser Daily Health Policy Report, "Medicaid | Brooks Pharmacy, Walgreens Join CVS in Ending Participation in Massachusetts' Medicaid Program," July 31, 2002 ("Following CVS Corp.'s lead, drugstore chains Brooks Pharmacy and Walgreen Co., as well as some other "independent operators," on July 30 announced that they will no longer participate in Massachusetts' Medicaid program, the *AP/Providence Journal* reports (Peter, *AP/Providence Journal*, 7/31). The announcements follow a reduction in Medicaid payments to pharmacies from 10% above the wholesale cost to 2% below wholesale that was approved on July 29 by acting Gov. Jane Swift (R) as part of the state's budget. The pharmacy payment cuts are expected to save about $60 million a year, the Boston Globe reports (Mohl, *Boston Globe*, 7/31). The three chains, which run 555 of the state's 1,014 pharmacies, fill 60% of prescriptions for Medicaid beneficiaries. CVS itself fills about one-third of prescriptions for the state's beneficiaries (Heldt Powell, *Boston Herald*, 7/31). ... The Times reports some large pharmacy chains, including Bartell Drug, Safeway, Fred Meyer and Rite Aid, have not yet decided whether to discontinue their participation in the program, but many independent and smaller chain pharmacies have said that the cuts will not be financially feasible for them (*Seattle Times*, 7/29).")

[112] "Expert Report of Stephen W. Schondelmeyer, Pharm.D., Ph.D. in connection with *National Association of Chain Drug Stores and National Community Pharmacists Association v. United States Department of Health and Human Services, et al.*, November 7, 2007, "Schondelmeyer NACDS Report," ¶ 31.

**Contains Highly Confidential Materials – Subject to Protective Order**

There Is No Reason for Dey to Have Believed that its Reporting Practices Affected
Medicare and Medicaid Reimbursement Policies

difficulty under this rule would be those in "rural or inner city urban areas that had the highest
Medicaid need and utilization."[113]

News articles written throughout the period of study voiced concerns that pharmacies would
have to drop Medicaid/Medicare patients or even close as a result of cuts in Medicaid or
Medicare reimbursement. A 1992 news article reported that pharmacists "envisioned economic
disaster" following proposed plans from New York's former governor, Mario Cuomo to reduce
state Medicaid reimbursement.[114] A 2002 article stated that pharmacists threatened to cut off
Medicaid patients because of cuts in reimbursement fees that pharmacists get for brand and
generic drugs. The article noted that Rite Aid would assess the cuts on a "store-by-store basis"
and that "people in rural areas will be hit hardest."[115] In 2003, a Wisconsin paper reported that
"25% of pharmacies would stop filling prescription for patients enrolled in public assistance
programs" if the state reduced payments for prescriptions filled through these programs.[116] In
2004, the *Tennessean* reported that cuts to the amount that doctors would be reimbursed by
Medicare for chemotherapy drugs "could limit access."[117] A 2005 article reported that
"changing the drug reimbursement formula to the Average Manufacturer's Price would mean
pharmacists losing money for every Medicaid prescription they dispense" and that "pharmacies
dropping out of Medicaid would reduce access to care for needy patients."[118]

Medicaid officials have also expressed concern about keeping reimbursement at a sufficient level
so as to ensure access to covered products. Michael Sharp, Director of Pharmacy at Indiana
Family and Social Services Administration, stated that there has to be a certain level of profit,
"otherwise you do not have access to services."[119] Moreover, Medicaid officials have expressed

---

[113] Deposition of Dr. Stephen Schondelmeyer, February 26, 2009 ("Schondelmeyer Deposition"), pp. 704-05.

[114] Robert D. McFadden, "Coumo Puts Off Medicaid Cut After Pleas from Pharmacists," *The New York Times*,
February 16, 1992. The article states that Empire State Pharmaceutical Society, which represents 1,000 stores
said that "pharmacists wanted the cut limited to 5 percent and other concessions, including a rise in dispensing
fees for each prescription to $4.05 from $2.60."

[115] Rebecca Cook,, "Pharmacists Threaten to Cut Off Medicaid Patients," *The Columbian*, July 31, 2002.

[116] Joe Manning, "Pharmacies say budget cut would cost millions," *The Milwaukee Journal Sentinel*, March 10,
2003.

[117] Sameh Fahmy, "Some fear Medicare cuts in chemo funding will harm patients," *The Tennessean*, August 16,
2004.

[118] "US Medicaid pharmacy cuts 'a prescription for disaster,'" *Pharma Marketletter*, October 17, 2005.

[119] Deposition of Michael Sharp, March 28, 2008, pp. 74-75. ("Q: And what does Indiana Medicaid do to encourage
providers to participate in the Medicaid program? …A: it's a balancing act to ensure that, you know, your
reimbursement levels are enough to keep providers enrolled in the program. Otherwise you cannot – you have
enough providers to deliver the care that's required for your Medicaid population.") See also Deposition of
Harry Leo Sullivan, former Director of Pharmacy Services at TennCare, March 12, 2008 ("Sullivan
Deposition"), pp. 162-63. ("I think you try to, you try to keep reimbursement levels to the point that come as
close as possible within budget limitations of putting the provider in a position where they're profitable,) Later
Mr. Sullivan stated that there was a concern that if reimbursement levels got too low, they might "lose
participation." (Sullivan Deposition, p. 163). Mr. Sullivan, also noted that "you want to entice [pharmacies] to
participate, and you want to entice the best, get the quality, and assure access to care." Sullivan Deposition, p.
162. On January 1, 1994, TennCare replaced the traditional Medicaid program. TennCare is a government
operated health insurance program designed for low-income individuals and others whose health or employment
status makes it difficult for them to access private insurance. Most participants are those eligible for Medicaid.

**Contains Highly Confidential Materials – Subject to Protective Order**

There Is No Reason for Dey to Have Believed that its Reporting Practices Affected
Medicare and Medicaid Reimbursement Policies

the importance of both the ingredient cost and the dispensing fees.  Cody Wiberg noted one concern from going to AAC is that "some pharmacies might drop out of Medicaid" if they did not make an adjustment on the dispensing fee side.[120]  Mr. Wiberg also stated that pharmacies' profit margin is built into the ingredient cost to make up for low dispensing fees.[121]  Benny Ridout, former Medicaid Pharmacy Director at North Carolina Department of Health and Human Services said that even in the 1980s, pharmacy directors felt that if they took off of one side of the reimbursement, they would have to "put some on the other side to help so the pharmacists could make it."[122]

The importance of maintaining access when setting reimbursement policies is reflected in the discussions surrounding the proposed change to the manner in which CMS sets the FULs for Medicaid.  The Deficit Reduction Act of 2005 ("DRA") proposed setting FULs at 250 percent of the lowest AMP among the therapeutic equivalents.[123]  However, studies conducted by the OIG and GAO indicated that the resulting reduction in reimbursement would have been too low to cover many pharmacies' cost to acquire the product.[124]  The National Association of Chain Drug

---

(See National Pharmaceutical Council's Pharmaceutical Benefits Under State Medical Assistance Programs, 2007, Tennessee-1).

[120] Wiberg Deposition, pp. 362-63.  ("Q: If instead of knocking two-and-a-half percent off the ingredient cost, if the Minnesota Medicaid Program had gone to actual acquisition cost on the ingredient cost, without making any other changes in the system, would you expect there to be a different result in terms of pharmacies closing or not participating in the program?  A: …That was my concern…  Is if we went to Actual Acquisition Cost, and did not make an adjustment on the dispensing fee side, that, in fact, some pharmacies might choose to drop out of Medicaid .  Or if they were in an area of the state that – where a large percentage of their patients were Medicaid patients, that they, in fact, the might – might go out of business.  That was a concern.")

[121] Wiberg Deposition, p. 185.  (Q: And you advised those legislators that pharmacies had a profit margin built into the ingredient cost of the reimbursement formula that made up for the fact that the dispensing fee was not sufficient to cover costs plus a profit, correct?  A: That would be correct.")

[122] Deposition of Benny Ridout, December 5, 2008, p. 142.  ("Q: Was it your experience in the '80s that efforts to reduce estimated acquisition cost would result in pressures to increase dispensing fees?  A: It was always the feeling, I think, of pharmacy directors, those states that had a fee that was lower than what it cost to fill a prescription, that if they took anything off one side, they would have to put some on the other side to help so the pharmacists could make it.  So if you got the actual acquisition cost on one side, and your fee didn't cover his cost to fill the prescription, you would have to raise that fee.  In fact, I made that known to the OIG itself.")

[123] See Deficit Reduction Act of 2005.  ("[T]he Secretary shall substitute 250 percent of the average manufacturer price (as computed without regard to customary prompt pay discounts extended to wholesalers) for 150 percent of the published price.")

[124] Government Accountability Office, "Medicaid Outpatient Prescription Drugs:  Estimated 2007 Federal Upper Limits for Reimbursement Compared with Retail Pharmacy Acquisition Costs," December 22, 2006, GAO-07-239R ("Medicaid Outpatient Prescription Drugs: Estimated 2007 Federal Upper Limits for Reimbursement Compared with Retail Pharmacy Acquisition Costs"), p. 4 ("The AMP-based FULs we estimated using AMP data from first quarter 2006 were lower than average retail pharmacy acquisition costs from the same period for 59 of the 77 drugs in our sample. For our entire sample of 77 multiple-source outpatient prescription drugs, we found that these estimated AMP-based FULs were, on average, 36 percent lower than average retail pharmacy acquisition costs for the first quarter of 2006.")  United States Department of Health and Human Services, Office of Inspector General, "Deficit Reduction Act of 2005:  Impact on the Medicaid Federal Upper Limit Program," June 2007, OEI-03-06-00400, p. iii ("Six of twenty-five selected high-expenditure drugs had estimated average pharmacy acquisition costs that would be below the new Federal upper limit amounts. Based on pricing and sales data provided by distributors, we determined that, on average, pharmacies would have been able to purchase only 6 of 25 selected high-expenditure drugs for less than the new Federal upper limit amounts during the second

**Contains Highly Confidential Materials – Subject to Protective Order**

### There Is No Reason for Dey to Have Believed that its Reporting Practices Affected Medicare and Medicaid Reimbursement Policies

Stores and National Community Pharmacists Association sued the DHHS and CMS to block implementation of the 250 percent of AMP rule, citing concerns over inadequate reimbursement and reduced access, and won an injunction preventing the implementation of the 250 AMP rule.[125]  They also sought intervention by Congress,[126] which subsequently passed legislation that would appear to bolster the injunction and, at least temporarily, prevent CMS from implementing the 250 AMP rule.[127]

In 1997, the Clinton Administration proposed changing Medicare's reimbursement methodology to the lower of the billed charge or the AAC for the dispensed drug.  However, Congress voted instead to adopt a policy whereby Medicare would reimburse on 95% of the median AWP.[128]

---

quarter of 2006. For the remaining 19 drugs, the average pharmacy acquisition costs would have been higher than the new Federal upper limit amounts that quarter. We estimate that 12 of these 19 drugs had average pharmacy acquisition costs that would have been more than double the new reimbursement limit. For 13 of the 25 selected high-expenditure drugs, at least one individual drug product was available for a price at or below the new Federal upper limit amount.")

[125] See, for example, "Frequently Asked Questions (FAQs), Lawsuit Filed by NACDS and NCPA Against CMS Challenging AMP Rule, November 7, 2007" ("FAQs").  www.ncpanet.org/pdf/amp_ncpanacds-lawsuitfaq.pdf. ("Why has the lawsuit been filed? The lawsuit was filed to block implementation of a new federal rule known as the AMP rule. As discussed below, the AMP rule violates the plain language of the Social Security Act. The AMP rule will drastically cut reimbursement payments to community pharmacies that serve disadvantaged Americans in the Medicaid program. The defendants estimated that the AMP rule will reduce Medicaid reimbursement to community pharmacies by more than $8 billion over five years. Studies by the HHS Office of Inspector General and the Government Accountability Office found that Medicaid reimbursement rates will be cut well below the prices that retail pharmacies pay for drugs. [citations omitted] Medicaid reimbursement rates for retail pharmacies were expected to decline as a result of the Deficit Reduction Act of 2005. However, in their zeal to cut retail pharmacy reimbursement rates even further, the Defendants have slashed reimbursement well below the rates called for by Congress. Retail pharmacies will suffer even greater losses then they would if the defendants had faithfully implemented the plain meaning of the statute.  Many community pharmacies, particularly independent pharmacies that that serve a large number of Medicaid patients, are expected to be forced to reduce hours and services, forced out of Medicaid, or forced to close their doors altogether. When that happens, many Medicaid patients will lose access to the community pharmacies they depend on for critical pharmacy care.") See also, www.nacds.org/wmspage.cfm?parm1=5557 ("Judge Grants AMP Rule Injunction"). ("The lawsuit challenges CMS-imposed Medicaid pharmacy reimbursement reductions scheduled to be implemented via rulemaking in January 2008 that would reduce reimbursement rates below what is permitted by law.")

[126] See FAQs  ("Is there still a need for the U.S. Congress to act to address the Medicaid pharmacy reimbursement cuts, and is there still a need for the states to increase dispensing fees? Absolutely. Our lawsuit argues that the defendants must comply with existing law. However, the existing law itself is fundamentally flawed and must be replaced.")

[127] CRS Report for Congress, July 23, 2008, Section 203. www.ohanet.org/finance/medicare/HR6331CMSSummarry.pdf, p. 34 ("The rule has been contested, and CMS is prohibited from implementing its provisions until the court hears the case and makes a final determination of its legality. In the interim, FUL formulas remain calculated by CMS as equal to 150% of the published price for the least costly therapeutic equivalent. The provision will retain, through September 30, 2009, the FUL formulas for federal reimbursement of multiple source drugs as described in federal regulations in effect as of December 21, 2006 (42 CFR 447).")

[128] See Department of Health and Human Services, Office of Inspector General, "Excessive Medicare Payments for Prescription Drugs," December 1997, OEI-03-97-00290, p. iii.,  ("The HCFA's proposal in the President's 1998 budget that would have required physicians to bill Medicare the actual acquisition cost for drugs was not adopted

**Contains Highly Confidential Materials – Subject to Protective Order**

There Is No Reason for Dey to Have Believed that its Reporting Practices Affected
Medicare and Medicaid Reimbursement Policies

According to Ms. DeParle, former Administrator at HCFA, there were proposals in 1999 and
again in 2000 to change reimbursement to 83 percent of AWP, but those proposals were also
rejected by Congress.[129]

After Medicare switched to ASP-based reimbursement method, pharmacists saw their drug
reimbursement drop dramatically. In 2004, the GAO conducted a study to examine the effects of
a reimbursement change to ASP and used albuterol and ipratropium bromide as two of the drugs
to study.[130] The study states that "necessary costs" to dispense inhalation products "may no
longer be covered when Medicare drug payments are closer to acquisition costs with the
implementation of the ASP-based payment system."[131] After the GAO study, an August 2004
survey was conducted that concluded that "89 percent of suppliers would discontinue providing
inhalation drugs to Medicare beneficiaries in the absence of adequate compensation."[132] Using
the methodologies of these studies, CMS concluded that to ensure continued participation from
pharmacists for inhalation drugs, the drug dispensing fee for inhalation drugs was to be increased
from $5 to a $57 monthly fee (or $80 90-day fee), effective in 2005.[133] These dispensing fees
were updated effective January 1, 2006 to $57 for the initial 30-day period, $33 for a subsequent
30-day period, and $66 for each dispensed 90-day period of inhalation drugs.[134]

There was no reason for Dey to expect that total reimbursement for its products would be any
different if its reported WACs were replaced with ASPs. In economic terms, that means there
was no reason for Dey to expect that its reporting policies had any impact on CMS
reimbursement. The nature of Dey's reported prices was known to CMS, which also had
oversight and approval authority for state Medicaid plans. CMS had access to average

---

by Congress.") See also Program Memorandum AB-97-25, Re: Implementation of the New Payment Limit for
Drugs and Biologicals, January 1998, AWP037-0018-19. See also Balanced Budget Act of 1997.

[129] Deposition of Nancy Ann DeParle, December 5, 2007 ("DeParle Deposition, 12-5-2007, pp. 581-82. ("A: [W]e
did in fact propose the same policy again in '98 for the '99 budget and then in '99 we proposed – I think it was
83 percent of AWP instead of actual acquisition cost and we proposed that again in 2000,,,[T]he administration
proposed four different times to change the reimbursement methodology. Twice we proposed actual acquisition
costs and twice we proposed 83 percent of AWP. Q: And each time Congress rejected those proposals, right?
A: Yes.")

[130] See Government Accountability Office, "Medicare: Appropriate Dispensing Fee Needed for Suppliers of
Inhalation Therapy Drugs," October 12, 2004, GAO-05-72 ("Medicare: Appropriate Dispensing Fee Needed for
Suppliers of Inhalation Therapy Drugs").

[131] Medicare: Appropriate Dispensing Fee Needed for Suppliers of Inhalation Therapy Drugs, p. 11. This study
concluded that CMS should evaluate the costs of dispensing inhalation therapy drugs and "modify the dispensing
fee" when Medicare started reimbursing on 106 percent of the ASP (see p. 12).

[132] Federal Register, Vol. 69, no. 219, November 15, 2004, p. 66337. See also Dey's Responses and Objections to
First Set of Interrogatories, pp. 31-32.

[133] Federal Register, Vol. 69, no. 219, November 15, 2004, p. 66338. See also Dey's Responses and Objections to
First Set of Interrogatories, p. 31.

[134] CMS website, CSR Inquiry Assistance, "Supplying Fee and Inhalation Drug Dispensing Fee Revisions and
Clarifications," December 8, 2005, effective January 1, 2006. I note that the inhalation drug dispensing fees are
for inhalation drugs "furnished through DME regardless of the number of shipments or drugs dispensed during
that time."

**Contains Highly Confidential Materials – Subject to Protective Order**

transaction prices and, when the ingredient reimbursement amounts were changed for two of the drugs sold by Dey, dispensing fees were increased.

Access is an essential goal of the CMS programs in addition to cost containment.[135]  The fact that CMS, while having access to multiple sources of information on actual ingredient cost, decided not to use average ingredient cost information in connection with state reimbursement policies is consistent with the desire to balance the goals of access and cost containment.   The fact that Congress declined to impose reimbursement limits more closely tied to ingredient cost also reinforces the fact that ingredient cost alone does not drive reimbursement amounts.

## B.    There Were Alternative Reimbursement Bases Available to Medicare and Medicaid

Medicaid and Medicare had available to them potential alternative price measures on which to base reimbursement methods, if reimbursement closer to drug ingredient cost were CMS' only goal.  Dey's AWPs were not the only basis on which CMS could form its reimbursement policies.  As discussed above, the Government has access to a variety of pricing statistics, including AMPs, and now ASPs, that allow it to assess approximate acquisition costs.  AWP was not the only publicly available reimbursement statistic.  With respect to Dey, specifically, its WACs were reported to the same compendia as its AWPs and were incorporated into the reimbursement practices of 10 state Medicaid agencies.  FSS prices were also publicly available.  The fact that Medicare continued to reimburse on AWP until 2005 was not a result of having been misled by the pharmaceutical companies, but instead was the result of Congressional action.

Moreover, Government agencies have commissioned studies, or gathered information revealing drug ingredient costs and pharmacy transaction prices but have broadly chosen not to reimburse based on this information.  This behavior revealed a persistent preference on the part of CMS and Medicaid agencies for AWP and WAC as reimbursement bases.

### 1.    Dey's WACs

Dey's practice of using WACs as invoice prices to wholesalers and updating them means that Dey's reported WACs represent a clearer pricing signal than its AWPs, which are set once at the launch of the new drug and then, with few exceptions, not updated.  Dey's WACs decline over time mirroring transaction price activity.  Dey's WACs are reported to the same compendia and reported in the same manner (electronically) as its AWPs.  In addition, when Dey reduced its

---

[135] Centers for Medicare and Medicaid, "Safe and Effective Approaches to Lowering State Prescription Drug Costs: Best Practices Among State Medicaid Drug Programs (9/9/04)" September 9, 2004 ("As a result of increasing prescription drug costs, State Medicaid programs have implemented a variety of cost-containment mechanisms in their drug programs over the past few years. These mechanisms have allowed states to reduce their pharmacy expenditures and maintain beneficiary access to a vital part of their overall healthcare.") www.cms.hhs.gov/MedicaidDrugRebateProgram/downloads/StateStrategiestoLowerMedicaidPharmacyCosts.pdf.

**Contains Highly Confidential Materials – Subject to Protective Order**

There Is No Reason for Dey to Have Believed that its Reporting Practices Affected
Medicare and Medicaid Reimbursement Policies

WACs for its drugs, it would distribute this new information to Medicaid officials as well as to
the drug compendia reporting services.[136]

Therefore, Dey's WACs represent a better reimbursement basis for Medicaid if reimbursement
tied to ingredient cost were Medicaid's only goal.  By 2006, only ten states had taken advantage
of this pricing signal.  However, the fact that ten states adopted reimbursement policies based on
WAC and one state changed to ASP-based reimbursement indicates that general organizational
impediments (as proposed by plaintiffs' expert Dr. Marmor) do not explain why the majority of
states elected to maintain reimbursement policies based on AWP.

### 2.  Revised AWP Prices

In 2000, the Department of Justice and the Department of Justice and the National Association of
Medicaid Fraud Control Units ("NAMFCU")  collected information on wholesale prices for 400
NDC codes (representing a variety of drugs), and provided this data to First DataBank to
calculate new average wholesale prices for the drugs based on the actual acquisition cost of the
drugs.  These revised prices were then made available to state Medicaid programs.[137]  At the
time, NAMFCU encouraged states to use the revised prices expecting that the implementation of
these prices would result in a "significant reduction" in Medicaid reimbursement for the drugs
involved.[138]  In its letter to state Medicaid offices, NAMFCU wrote that the new prices provide:

> … an improved means for FDB to provide more accurate information to the
> States.  More importantly, in view of the Medicaid program's legal obligation to
> reimburse true provider acquisition costs, such an effort by the States to ensure
> that payment is based on actual prices is mandatory.[139]

The results of the study gave states a potential alternative price for a variety of drugs, including
Dey's albuterol and cromolyn sodium products, on which to base reimbursement.[140]  In spite of
having access to this additional information, not all states elected to incorporate the new data into
their reimbursement formulas.[141]   In a report regarding these new prices, the OIG noted that 43

---

[136] Galles Deposition, 3-1-2006, Exhibit 273, "Memo, Re: Future Medicaid Mailings," January 7, 1999, DL-TX-
0092446-50.  Moreover, directors of state Medicaid agencies have opportunities to communicate with one
another and with the federal government during meetings of the National Association of State Medicaid
Directors ("NASMD").  See NASMD website at: http://www.nasmd.org/about/about.asp.

[137] See Department of Health and Human Services,  Office of Inspector General, "Medicaid's Use of Revised
Average Wholesale Prices," September 2001, OEI-03-01-00010 ("Medicaid's Use of Revised Average
Wholesale Prices"), pp. i, 3.

[138] Medicaid's Use of Revised Average Wholesale Prices, p. i.

[139] NAMFCU Letter to Medicaid Pharmacy Director, February 16, 2000.  See also Medicaid's Use of Revised
Average Wholesale Prices, p. 3.

[140] Program Memorandum, AB-00-86, Re: An Additional Source of Average Wholesale Price Data in Pricing Drugs
and Biologicals Covered by the Medicare Program, September 8, 2000, pp. 1, 4-6.

[141] Medicaid's Use of Revised Average Wholesale Prices, p. 5.  Initially 30 states incorporated the revised prices
into their drug reimbursement formulas.  I understand that some states expressed concerns about First DataBank
updating the revised prices.  I also understand that states that do not use the updated AWPs have stated that the
prices may be too low when a percentage discount is applied.  (See Medicaid's Use of Revised Average

**Contains Highly Confidential Materials – Subject to Protective Order**

There Is No Reason for Dey to Have Believed that its Reporting Practices Affected
Medicare and Medicaid Reimbursement Policies

states had received complaints about the revised prices from particular providers, including "hemophilia groups, pharmacies, infusion providers, physicians, and drug manufacturers," all who noted that the new prices were too low.[142]   The report also states that some states checked with wholesalers and distributors and "subsequently determined that the revised prices were not readily available to providers in their State."[143]   By the end of 2000, Medicare carriers were advised by DHHS not to use the NAMFCU prices until further notice.[144]

The fact that 30 states, at least for some time, incorporated the NAMFCU price in their reimbursement formulas when this pricing information became available again indicates that organizational impediments such as those proposed by Plaintiff's expert Dr. Marmor, are not the reason that CMS continues to rely on AWP as a reimbursement formula.  Rather, the experience with NAMFCU prices indicates that states are able to adapt their reimbursement formula to incorporate new information, but have not universally done so because reimbursing closer to acquisition cost does not achieve CMS's goal of ensuring access to covered drugs.

### 3.  IMS

IMS is a third-party provider of pharmaceutical data.  IMS provides publicly available data that have been used by the GAO as an estimate of pharmacy acquisition costs.  In 2004, the GAO used IMS data in a study evaluating whether Medicare payments for chemotherapy products

---

Wholesale Prices, p. 7).   See also, "Medicaid Drug Pricing Survey," ("Drug Pricing Survey"), HHD006-00274 in HHD006-0225-524.  In this survey the Iowa representative stated that there was "controversy about whether prices after 10% discount would be too low."   The Kentucky representative stated that "Wholesalers weren't selling for these prices" and that Kentucky "decided [NAMFCU's prices] were not fair pricing."   (Drug Pricing Survey, HHD006-0431).  In particular, hemophilia providers claimed that they would be unable to continue providing treatment with these new prices.  Two states decided to discontinue the new prices for "blood-factor products." (Medicaid's Use of Revised Average Wholesale Prices, p. 7).  Some states were worried that other providers would stop administering drugs when being reimbursed on NAMFCU's prices.  For example, the New Jersey representative responded that New Jersey was using NAMFCU's prices, but did not believe that these new prices would have a significant long-term cost saving impact because "the providers will stop supplying drugs."  (Drug Pricing Survey, HHD006-0315).

[142] Medicaid's Use of Revised Average Wholesale Prices, p.7.  The report goes on to say that some hemophilia providers claimed that they would be unable to continue providing treatment with these new prices.  Two states decided to discontinue the new prices for "blood-factor products." (Medicaid's Use of Revised Average Wholesale Prices, p. 7).

[143] Medicaid's Use of Revised Average Wholesale Prices, p. 7.  I note that many states believed that total savings with these new prices would be small because "there was low utilization for the drugs with revised prices, or that utilization for these drugs would simply shift to other products."  See Medicaid's Use of Revised Average Wholesale Prices, p. 7.

[144] Program Memorandum AB-00-115, Re: Source of Average Wholesale Price Data in Pricing Drugs and Biologicals Covered by the Medicare Program, November 17, 2000.  The letter states that "[t]o avoid the disruption that would result from a decrease in payment allowances followed by an immediate increase due to final congressional action, we are deferring the use of the DOJ AWP date until further notice." According to Ms. DeParle, she made the decision not to use the DOJ AWP prices with oncology and other related drugs because of "concerns over access to patient care."  (DeParle Deposition, 12-5-2007, pp. 464-65).  See also Deposition of Francis Donald Thompson, Senior Technical Advisor to the Hospital and Ambulatory Policy group at CMS, September 30, 2008, p. 148. (Q: [W]ere the DMERCs and carriers ever permitted to use the DOJ AWPs in connection with processing Medicare claims?  A: No.")

**Contains Highly Confidential Materials – Subject to Protective Order**

There Is No Reason for Dey to Have Believed that its Reporting Practices Affected
Medicare and Medicaid Reimbursement Policies

covered providers costs.[145]  The GAO also relied on IMS data in 2006 to assess whether setting a
FUL at 250 percent of AMP would cover pharmacy acquisition costs.[146]

**Figures 3A** to **3K** compare IMS data to Dey's AMPs, prices computed by plaintiffs' experts, and
FSS prices.  These figures show that IMS price data reflect a similar trend as Dey's AMP data,
and could have been used by CMS to estimate acquisition cost.

### 4.  Myers and Stauffer

Finally, if CMS preferred to continue to use AWP or WAC in the reimbursement formulas, but
incorporate a discount that reflected average market discounts off AWP and WAC, information
to estimate an appropriate average discount was also available to CMS.  Throughout the period at
issue in this case, states commissioned a CPA group, Myers and Stauffer, to assess pharmacy
acquisition costs and dispensing fees for the drugs covered by the states' programs.[147]  The
Myers and Stauffer reports evaluated acquisition costs and dispensing fees for brand and generic
drugs, and assessed the adequacy of states' reimbursement methodologies.  The studies
determined whether reimbursement was sufficient to cover pharmacy acquisition costs, and
provided recommendations for changes to the reimbursement plans if reimbursement was found
to exceed acquisition cost.

For example, in 2002, Myers and Stauffer found that California's ingredient reimbursement
(95% of AWP) was "in excess" of a pharmacy's actual acquisition cost in California.[148]  The
report recommended that California increase the discount from the AWP for both single and
multiple-source drugs.  It further concluded that there should be different reimbursement rates
for brand and generic drugs.  For branded drugs, Myers and Stauffer recommended discounting
"at a level between AWP minus 12% and…15%" and "AWP minus 20% [to] …25%" for
generic drugs.[149]  While California has increased its discounts off of AWP since the Myers and
Stauffer report, it has never fully implemented the recommended changes that would reduce
reimbursement for generic drugs to the estimated acquisition costs of pharmacists.[150]

---

[145] Government Accountability Office, "Medicare Chemotherapy Payments: New Drug and Administration Fees Are
Closer to Providers' Costs," December 1, 2004, GAO-05-142R, p. 2.

[146] Medicaid Outpatient Prescription Drugs:  Estimated 2007 Federal Upper Limits for Reimbursement Compared
with Retail Pharmacy Acquisition Costs, pp. 2-3.  This report wrote that "IMS Health collects acquisition cost
data from actual sales transactions from manufacturers and distribution centers, which represent over 85 percent
of total market dollar volume, and projects these data to represent national average acquisition costs." (p. 14).

[147] Deposition of Tracy Allan Hansen, Manager at Myers and Stauffer, December 10, 2008 ("Hansen Deposition,
12-10-2008"), p. 126.  In some instances, these reports were shared with CMS when a state was seeking a
change to their reimbursement methodology and would use the Myers and Stauffer reports for supporting
documentation.  (See Hansen Deposition, 12-10-2008, p. 129).

[148] Hansen Deposition, 12-10-2008, Exhibit 5, p. 797.  See also Deposition of Tracy Allan Hansen, Manager at
Myers and Stauffer, December 11, 2008 ("Hansen Deposition 12-11-2008"), p. 552.

[149] Hansen Deposition, 12-10-2008, Exhibit 5, p. 797.  See also Hansen Deposition, 12-11-2008, pp. 555-56.

[150] California did change its policy from AWP minus five percent to AWP minus 10 percent and eventually AWP
minus 17 percent, but it has never fully implemented the recommendations from Myers and Stauffer to have

**Contains Highly Confidential Materials – Subject to Protective Order**

The Myers and Stauffer reports made states aware that reimbursement exceeded acquisition cost and revealed the amounts by which AWP exceeded pharmacy acquisition costs for the programs studied. As the example mentioned above show, the Myers and Stauffer recommendations were not always fully implemented. The fact that some states did not fully implement the recommendations from these reports is consistent with the reality that states have broader goals than simply covering pharmacy acquisition costs. States also seek to ensure that their reimbursements ensure pharmacy participation, which is attained only if pharmacies are assured of some reasonable profit on their sales to Medicaid patients. For example, when Massachusetts was confronted with the prospect of lowering its EAC to conform with a survey's estimate of acquisition cost, it opted only to make a partial adjustment and to continue to pay above acquisition costs to ensure continued access to covered drugs.[151]

These examples illustrate that information was available to CMS to ensure that the discount off of AWP reflected the discounts that were generally available in the market, but the state Medicaid agencies declined to mirror average market discounts in their reimbursement formulas.

# VI.   Rebuttal to Plaintiffs' Expert Reports

Overall, the plaintiffs' experts' methodology is incomplete and unreliable. Plaintiffs' experts, collectively, do little more than acknowledge that Dey's AWP is not a transaction price and opine that if Medicare and Medicaid had based their reimbursement on Dey's average transaction prices instead of its AWPs and WACs, then "reimbursement" would have been lower. However, they do nothing to demonstrate that such a change in reimbursement would have either 1) covered dispensing costs, 2) been successful at ensuring pharmacy participation, or 3) been acceptable to state Medicaid agencies, CMS, or Congress as a measure of reimbursement. They do not consider the implications of their suggested changes to Dey's reporting practices on its overall business and competitive interactions with other market participants.

None of plaintiffs' experts properly take account of evidence showing that dispensing fees have increased when ingredient cost reimbursement was decreased or that access is a goal of the Medicare and Medicaid program. Without a cogent and complete theory of how CMS might have changed its reimbursement formulas, including its dispensing fees, had pharmaceutical companies reported average discounted transaction prices in place of AWPs, plaintiffs' experts have not shown that there has been any competitive impact from the types of pricing behaviors that have openly existed for more than two decades.

---

different brand and generic reimbursement rates. See **Exhibit 3** and CMS website "Medicaid Prescription Reimbursement Information by State – Quarter Ending December 2008."

[151] Report to General Court, p. 9. The report refers to two OIG reports, which asked pharmacies to submit data for certain months in 1999. One report concluded that the actual acquisition cost for brand name prescription drugs was, on average, "21.84 percent below AWP and 1.81 percent below WAC." The other OIG report found that the acquisition cost for generic drugs was, on average, "65.93 percent below AWP and 30.55 below WAC (excluding non-traditional pharmacies)." However, Massachusetts concluded that "EAC should be established at WAC plus 6.0 percent." (Report to General Court, p. 16).

**Contains Highly Confidential Materials – Subject to Protective Order**

Moreover, they do not present any evidence that Dey believed, or rationally could have expected, that Medicare or Medicaid was deceived by its conduct. They do not describe if or how the government was allegedly misled by Dey's actions.

Below, I summarize the plaintiffs' experts reports and describe in greater detail the errors and omissions I find in each.

## A.     Perri Report

Dr. Perri was asked by plaintiffs to "evaluate the record" and opine on whether Dey's actions with regard to reporting its WACs and AWPs had any "marketing significance."[152] Dr. Perri reaches six opinions, including: 1) that Dey was an "effective pharmaceutical marketer;" 2) Dey controlled the WAC and AWP for its products; 3) Dey was aware of third party reimbursement issues and "marketed the spread;" 4) Dey perceived a benefit by creating a large spread; 5) Dey perceived that its customers benefited from the spread; and, 6) Dey's marketing decisions were made "with the knowledge of the impact of these decisions on Medicare and Medicaid reimbursement."[153]

Dr. Perri's opinions amount to no more than a statement that Dey understands the competitive environment in which it operates. There is nothing untoward about Dey being an "effective pharmaceutical marketer." Indeed if it were otherwise, one would not expect Dey to stay in business. The behavior that Dr. Perri refers to as increasing or marketing the spread is indistinguishable from normal competitive behavior. As Dr. Perri acknowledges, the "spread" between Dey's AWP and average pharmacy transaction price arose because Dey continually reduced its price to compete with other drug companies.[154] Dr. Perri does not cite to or describe any evidence that Dey believed CMS to be unaware of the widely acknowledged phenomenon that generic competition drives prices for generic pharmaceuticals down over time or that Dey attempted to keep its pricing activity a secret from Medicare or Medicaid. To the contrary, Dey reported its pricing activity to CMS in the form of AMPs and publicly signaled its pricing trends in the form of its reported WACs.

Dr. Perri does not point to any testimony, documents, or economic reasoning to suggest that Dey had any reason to expect CMS to be deceived by its actions, or that Dey intended to deceive Medicare and Medicaid by keeping the nature of its AWP and WAC prices a secret from the market. Similarly, Dr. Perri does not point to any testimony, documents, or economic reasoning to suggest that Dey believed that market participants, including CMS and the Medicaid agencies, were not aware that AWP did not represent an actual transaction price or that WAC was an undiscounted list price. He does not investigate the role WAC plays in Dey's sales or the percentage of sales Dey made at or near the WAC. Dr. Perri does not evaluate whether Dey's WAC was a reliable indicator of trends in Dey's transaction prices, or whether the published

---

[152] Perri Report, ¶ 1.

[153] Perri Report, ¶ 17.

[154] See, for example, Perri Report ¶ 69. Dr. Perri writes that "Dey increased reimbursement spread by lowering acquisition costs while maintaining a constant AWP."

**Contains Highly Confidential Materials – Subject to Protective Order**

"spread" between AWP and WAC revealed the allegedly deceptive spread between AWP and Dey's average discounted pharmaceutical price.

Dr. Perri acknowledges that he did not do an economic analysis to support his opinions.[155]  He did not evaluate how conditions in the pharmaceutical markets would have evolved if Dey had reported an average transaction price to the pricing compendia instead of an undiscounted list price.  He does not opine on how, whether, and at what price Dey would have made sales if the pricing compendia had reported an average transaction price for Dey's products and reimbursement for Dey's products was tied to this average transaction price.

Dr. Perri fails to take into account evidence that CMS's reimbursement practices were consistent with its economic interest in providing access to beneficiaries.  He does not evaluate what level of profit margin on reimbursement would be necessary to encourage sufficient numbers of pharmacies to participate in the Medicare and Medicaid programs.

Dr. Perri's evaluation of evidence regarding Dey allegedly reporting inflated WAC prices to First DataBank is flawed.  Dr. Perri refers to a single incident in Florida when Dey allegedly increased its reported WAC to one of the pricing compendia for an albuterol product to "level the playing field" with a competitor.[156]  According to Dey's Robert Mozak, former Executive Vice President of Sales and Marketing at Dey, this episode of Dey reporting an increased WAC for an albuterol product was an error that was later corrected.[157]  Regardless, however, of how this instance occurred, Dr. Perri does not present any evidence that Dey's actions were intended to deceive the Florida state Medicaid agency.  To the contrary, deposition testimony cited by Dr. Perri indicates that Dey appealed directly to the Florida state Medicaid agency to inform it that Florida's reimbursement policies were causing Dey to lose sales to a higher priced competitor.[158]  Moreover, according to the deposition testimony of Dey's former CEO, Florida Medicaid

---

[155] See, for example, Deposition of Dr. Matthew Perri, February 20, 2009 ("Perri Deposition, 2-20-2009"), p.547. ("Q: You did not undertake any economic analysis in connection with your report and your opinions in this matter?  A: No.")

[156] See Perri Report, ¶ 56-57.

[157] Mozak Deposition, 11-1-2001, pp. 189-90.  According to Mr. Mozak, after learning about the increase in the reported WAC, Dey "informed the First Data Bank that they needed to change it."  Although First DataBank did not correct this WAC increase until January 1, 1998 (see First DataBank data), Dey sent a correction to First DataBank on December 4, 1995, notifying it of a price update for some of its WACs, including the albuterol product.  (Mozak Deposition, 11-6-2002, Exhibit 342, "Instructions for 1995-96 Bluebook," DL-TX-0090595 in DL-TX-0090591-96.  This correction also noted the effective date of the reduced WAC as February 1, 1995.

[158] See, for example, Deposition of Ross Uhl, former National Account Manager at Dey, February 24, 2003 ("Uhl Deposition"), pp. 68-69.  (A: Well, this is the reason why this customer wants to put his patients on this product because this [Warrick's] WAC is much higher than Dey's, Dey's WAC, which, if all things are equal, they're using WAC as a parameter…So I felt like it was just a mistake; this number was not intended to be WAC from Warrick...I said [to Jerry Wells from Florida State Medicaid]: You guys are using a fictitious price.  It's not the WAC price.  And he told me: There's nothing I can do about it… I said: I need clarification.  And he said: We just pay what is reported to Blue Book or Red Book.  And I said: But what's being reported is incorrect.  And he said: Well, Warrick will have to call us and get that changed.  I said: They're not going to call you because it's a higher price.  There's no incentive for them to call you and change that.")  Later in the deposition, Mr. Uhl points to a call from a man named Jeff Hunt who told him that he was going to put his patients in Texas and Florida on "Warrick due to a more favorable reimbursement." (Uhl Deposition, p, 76).

**Contains Highly Confidential Materials – Subject to Protective Order**

appears to have encouraged Dey to raise its reported price so as to be more aligned with its competitor.[159]   According to a memo written by Ms. Jackson, former Marketing Services Coordinator at Dey, the Florida state Medicaid representative with whom she spoke, informed her that other companies had brought similar situations to his attention.[160]   These documents indicate that 1) Dey did not attempt to keep the fact that there was a "spread" between its price and Medicaid reimbursement levels a secret from Medicaid and 2) the Florida Medicaid agency was fully aware of this fact.

In addition, Dr. Perri appears to have misread, or misunderstood, the documents he relies on to form his opinions.  In paragraph 86, Dr. Perri refers to a letter that Dey received from AmeriSource Bergen Corporation ("ABC") in which, according to Dr. Perri, Dey was asked to confirm that its price reporting, "specifically WAC, included all discounts and rebates and represented the net price at which Dey sold to ABC."[161]   In fact, the letter referred to by Dr. Perri makes no mention of WAC, but rather reminds Dey that its "reporting of prices at which you sell to [ABC] should include all discounts and rebates."[162]   The prices at which Dey sells to ABC are reported to CMS in the form of AMPs, which include Dey's discounts and rebates.  Dr. Perri makes no reference to the fact that Dey's reported AMPs include discounts and rebates.  His apparent inference that the ABC letter refers to WACs is unsupported and inconsistent with Dey's reading of the same letter.[163]

Dr. Perri's report offers neither an economic analysis nor a marketing analysis.  Dr. Perri opines that Dey was an "effective pharmaceutical marketer" and that it "marketed the spread," but he does not offer an opinion as to whether Dey's marketing activities were instrumental in achieving its sales levels, nor what sales were attributable to any alleged wrongful marketing activities—even though he appears to acknowledge a variety of components as part of Dey's marketing program.  Dr. Perri acknowledges that Dey's customers had their own means of evaluating the profits they would earn on Dey's products.[164]   If Dey's customers are capable of

---

[159] See also Deposition of Charles Rice former CEO at Dey, 11-7-2002 ("Rice Deposition 11-7-2002"), pp. 498-500.  Mr. Rice, states that "[t]here came a time in Florida where I was made aware that customers were complaining that they could make more profits with a competitor's product."  Mr. Rice continues "we approached the state of Florida and they told us they had no control and we should just raise our reported price."

[160] Uhl Deposition, "Memo from Carrie Jackson. Re: State of Florida Medicaid Program", August 12, 1994, Exhibit 777.  The memo notes that "Jerry Wells stated that other companies have brought similar situations to him on a variety of Warrick products."

[161] See Perri Report, ¶ 86.

[162] Mozak Deposition, 3-13-2003 Exhibit 560.

[163] Deposition of Russell Johnston, Senior Manager of Contracts at Dey, December 11, 2008 ("Johnston Deposition 12-11-2008"), pp. 508-27.  Mr. Johnston says that he believes AmeriSource is referring to "Dey's reporting obligations in things such as AMP and various others, best price, non-FAMP."  See also Marrs Deposition 5-15-2008, pp. 189-92.  Ms. Marrs states that at the time of this document, "all of these discounts and rebates are taken in to account in the reporting of AMP."

[164] See, for example, Perri Report, ¶¶ 37 and 105.  Dr. Perri writes that the Cardinal Source program or GeriMed's Emphasys software "assisted providers in determining the lowest priced products, products with the best spreads, AWPs and acquisition prices."  This information helped pharmacies and providers in determining products with the "highest 'reimbursement spread.'"

**Contains Highly Confidential Materials – Subject to Protective Order**

determining the profits they would make on sales of Dey's products, then Dey could have made all of the same sales it did make without "marketing the spread" as defined by Dr. Perri.[165]

Dr. Perri does nothing to examine the plaintiffs' theory in light of any alternatives—specifically the alternative that Dey's conduct was not a deception, was consistent with competition in the market, and that the conduct of CMS was consistent with their mandate to provide adequate access to pharmacy benefits for their beneficiaries.

## B.      Schondelmeyer Report

## 1.      Overview of Dr. Schondelmeyer's Opinions

Dr. Schondelmeyer was retained by plaintiffs to give an overview of the pharmaceutical market and pharmaceutical pricing; a description of the Medicaid drug and rebate programs; a description of Medicare and its programs; and, a review of Dey and Roxane's price reporting activities.[166]  The majority of Dr. Schondelmeyer's report does not relate specifically to Dey and Dey's actions.  Moreover, many of Dr. Schondelmeyer's opinions relate only to branded drugs, which are not at issue in this matter.  Dr. Schondelmeyer's opinions with respect to Dey include: 1) the prices reported by Dey were used as a basis for the formulaic calculation of Medicare and Medicaid reimbursement; 2) Dey was aware that Medicare and Medicaid based ingredient cost reimbursement on prices reported to the drug pricing compendia; 3) if Dey's reported prices were not "actual prices or predictably related to actual prices" then Dey engaged in conduct "whereby some drug manufacturers have caused AWP, WACs, DP and other price reports to become decreasingly representative of actual prices…caus[ing] increases in Medicaid and Medicare reimbursement amounts that were unintended by, and unknown to, the Medicaid and Medicare drug programs;" and, 4) the reporting of inflated pricing information led to the inflation of state Medicaid and Medicare reimbursement amounts.[167]

Dr. Schondelmeyer's first and second opinions regarding Dey are essentially factual statements.  However, the majority of Dey's products are subject to a FUL, a SMAC, or common reimbursement under Medicare.  As noted above, reimbursement for drugs subject to common reimbursement may not be tied directly to the reported prices for the specific drug at issue.  As Dr. Schondelmeyer describes, Medicare reimburses for pharmaceutical products based on the prices in an array for the Medicare code covering a specific drug.[168]  The median price in the array will not necessarily be Dey's price and therefore reimbursement by Medicare will not

---

[165] Dr. Perri defines "marketing the spread" as "creating and communicating [to customers] regarding reimbursement spreads that would be used for promotional nature." Perri Deposition, 2-20-2009, p. 369.

[166] Expert Report of Dr. Stephen W. Schondelmeyer, January 22, 2009 ("Schondelmeyer Report"), ¶ 14.  While Dr. Schondelmeyer analyzes both Dey and Roxanne, for the remainder of this section, I will reference Dr. Schondelmeyer's report only in respect to Dey.

[167] Schondelmeyer Report, ¶¶ 19-24.

[168] Schondelmeyer Report, ¶ 171.

**Contains Highly Confidential Materials – Subject to Protective Order**

necessarily be based on a formulaic calculation using Dey's pricing.[169]  Similarly for Medicaid, SMACs and FULs may not be based on Dey's prices.

Dr. Schondelmeyer does not conduct any analysis to support his third or fourth opinions with respect to Dey.  He does not evaluate whether Dey's reported WAC was related to actual prices paid for Dey's products.  He does not evaluate the extent to which Dey's prices were actually used by Medicaid and Medicare in determining reimbursement amounts.  He does not evaluate whether the reimbursement amounts paid by Medicaid and Medicare were "unintended by and unknown to" Medicaid and Medicare.  And, finally, he does not investigate whether Medicaid and Medicare reimbursement amounts were "inflated" as a result of Dey's pricing practices.

Dr. Schondelmeyer writes that the difference between Dey's reported prices and its actual price to pharmacies and providers created a "substantial" spread.[170]  He does not define what he means by "substantial" and or what degree of spread he believes would be acceptable, if any.  He does not opine on whether he believes the reported price must be an average transaction price for individual classes of trade, or whether it would be reasonable for pharmaceutical companies to report the highest "net price" paid by any customer in any class of trade.  He does not address how the reporting of net transaction prices could affect Dey's negotiations with its customers.

## 2.    Dr. Schondelmeyer's Opinions Do Not Apply to Dey or the Drugs at Issue in this Case

Dr. Schondelmeyer opines that Dey reported drug prices to pricing compendia, including the AWP and WAC, that were "not actual prices, or predictably related to actual prices that …Dey knew were generally paid by customer."[171]   Dr. Schondelmeyer has not performed any analysis to determine whether this statement is true for Dey.  As stated above, Dey's WAC is a reliable indicator of changes in Dey's prices over time, appears on Dey's customers' invoices, is directly proportional to Dey's discounts and is predictably related to Dey's transactions prices as measured by its AMP.  Dr. Schondelmeyer ignores these facts in reaching his opinions.

Dr. Schondelmeyer also opines that "[p]olicymakers and both Medicaid and Medicare program administrators were unaware of the conduct of certain drug manufacturers whereby reported prices…were inflated well beyond the actual prices…."[172]   It is not clear what time frame Dr. Schondelmeyer is referring to in that opinion, or whether he believed that this opinion pertains to Dey.  Certainly he acknowledges that generic competition generally drove transaction prices down over time and this phenomenon was both expected and desirable.[173]   Moreover, Dey's

---

[169] I note that Dr. Duggan frequently found no change in the median price in an array when he substituted 125 percent of Dey's average pharmacy price for Dey's reported AWP price.  See Duggan Report, pp. 102, 104, 110-112, 116, 118, and 123-125.

[170] Schondelmeyer Report, ¶ 102.

[171] Schondelmeyer Report, ¶ 23.

[172] Schondelmeyer Report, ¶ 22.

[173] See, for example, Schondelmeyer Report, ¶ 161. Dr. Schondelmeyer writes that "[d]rug manufacturers with multisource or generic drug products usually lower their actual transaction prices due to price competition from other multisource drugs products."  Dr. Schondelmeyer also writes that generic entry causes the price of the drug

**Contains Highly Confidential Materials – Subject to Protective Order**

products were precisely among those that have been "examined over time by various government agencies."[174]   The earliest such study for albuterol of which I am aware was in 1996.[175]   Since 1968, there has been information available to the government indicating that AWPs did not include potentially substantial discounts.  Moreover, the discussion in the federal register in the mid-1970s over Medicaid reimbursement clearly contradicts Dr. Schondelmeyer's opinion.

Finally, as previously explained, Dey updated its WACs.  Dey's WACs were reported to the same compendia as Dey's AWPs.  Thus, any increase in the "spread" between Dey's AWPs and average prices, was revealed by the accompanying increase in the "spread" between Dey's AWPs and its WACs.  Furthermore, Dr. Schondelmeyer himself states that "Medicaid[] may take into account a known drug product spread amount (such as the AWP to WAC spread) when establishing the reimbursement formula…."[176]   To conclude that Medicaid and Medicare were unaware that Dey's prices were declining relative to the AWPs over time implies, without support and contrary to logic, that Medicaid and Medicare deliberately chose to 1) be "informed" by only one of the pricing statistics available, which behaved contrary to expectations regarding generic prices trends, and 2) ignore information revealed by other pricing statistics, available from exactly the same compendia, that were consistent with how one might reasonably expect generic prices to behave.

### 3.       Dr. Schondelmeyer Does Not Present Any Evidence of Fraud

Dr. Schondelmeyer does not present any evidence that Dey believed it could or was deceiving Medicaid and Medicare or that the agencies were misled by Dey's pricing practices and their own practices were not explained by access.  Dr. Schondelmeyer acknowledges that "AWP and WAC are primarily used as benchmark prices rather than as actual transaction prices," and that he himself reported this fact to CMS in his 2004 report to Medicaid and Medicare.[177]   He also acknowledges that Dey wrote letters to state Medicaid offices explicitly stating that the published WAC and the AWP are not representative of the actual market costs, but he dismisses this evidence in the apparent belief that the state Medicaid agencies are insufficiently staffed to absorb and respond to such information.[178]

As discussed above and acknowledged by Dr. Schondelmeyer, there is abundant public information that prices of generic pharmaceutical products decline over time.  Moreover, Dey, like any other pharmaceutical company, was required to report its AMPs to CMS to be eligible for Medicaid reimbursement.  CMS calculated a URA based on these AMPs which it then

---

or the generic equivalents to fall.  He states that, as a result,  "consumers and others paying for the drug, including state Medicaid drug programs as well as Medicare, should benefit from healthy price competition that should lead to lower prices."  See Schondelmeyer Report, ¶ 112.

[174] Schondelmeyer Report, ¶ 22.

[175] The Department of Health and Human Services, Office of Inspector General, "Suppliers' Acquisition Costs for Albuterol Sulfate," June 1996, OEI-03-94-00393.

[176] Schondelmeyer Report, ¶ 154.

[177] Schondelmeyer Report, ¶ 44.

[178] Schondelmeyer Report, ¶¶ 106-10.

**Contains Highly Confidential Materials – Subject to Protective Order**

submitted to the states.  The URAs revealed to the states the AMPs for Dey's products.  Dr. Schondelmeyer acknowledged that in the case of generic products, the formula for the URA can be reverse-engineered to reveal the underlying AMP.[179]  Mr. Wiberg agreed that for generics, it was possible to come up with the AMP by dividing the URAs by 11 percent.[180]  Jerry Wells, former Bureau Chief at Florida Agency for Healthcare Administration, agreed that with respect to multisource drugs, it was possible to determine what the AMP is, but cited that by using the AMP, he wasn't sure how many providers would be adversely impacted.[181]

Dr. Schondelmeyer argues, without evidence, that it would not be possible for states to adopt a more "accurate" ingredient reimbursement methodology based on the AMPs for three reasons: 1) the AMPs were confidential and not intended to be used for reimbursement purposes;[182] 2) AMPs are not reported for specific package sizes (but instead averaged across package sizes);[183] and 3) because the AMPs were confidential and could not be reported to pharmacies, Dr. Schondelmeyer argues that pharmacies would not likely participate in a program in which they did not know how much they would be reimbursed on sales of Dey's products.[184]   Dr. Schondelmeyer's reasoning is flawed.  First, Dr. Schondelmeyer does not suggest any impediment to Medicaid and Medicare using the AMPs to assess pricing trends and to evaluate the adequacy of their drug reimbursement amounts, and in fact acknowledges that Texas does something very like this.[185]  Even if the AMPs themselves did not appear as part of a reimbursement formula, the information revealed by the AMPs provided a clear roadmap to the agencies for how prices were evolving over time and which non-confidential price points they might have used as substitutes.  Second, Dr. Schondelmeyer's assertion that AMPs cannot be used in reimbursement because they are calculated across package sizes is not supported and

---

[179] Schondelmeyer Report, ¶ 142.  Although Dr. Schondelmeyer notes that reverse engineering was not permitted for any purpose other than "collection of Medicaid rebates," he notes that "this single factor in the URA for a specific drug product could arguably, in some cases, signal that AMP amount to states."

[180] Wiberg Deposition, pp. 270-71.  ("Q: So, therefore, when Minnesota received the URAs, it could, in effect, divide that amount by 11 percent to come up with the AMP?  A: For generic products –  Q: Right.  For generic.  A: –  actually, yeah…You really can't do that with brand-name products because of the inflation factor that's in there…But for generic products and potential – I suppose you potentially could do that.")

[181] Deposition of Jerry Wells, December 15, 2008, pp. 259-60.  ("Q: How was the rebate calculated?  A: That's calculated on the average manufacturer price for that product.  Q: 15 percent of the AMP, correct?  A: Actually 11 percent because they consider that multisource.  Q:  If you receive an 11 cent rebate, per-unit rebate for sodium chloride solution, can you determine from that what the unit rebate level is or what the AMP is from the unit rebate amount?  …  A: You can for a generic multisource product, you can determine what the AMP is.  But the AMP is just that.  It's the average manufacturer price.  I still didn't know the distribution also if I used that to set a state MAC, I didn't know how many providers I was adversely impacting and how many I was being fair with.")  (Objections omitted).

[182] Schondelmeyer Report, ¶¶ 137, 210.

[183] Schondelmeyer Report, ¶¶ 138-46.

[184] Schondelmeyer Report, ¶ 146-47.

[185] In Dr. Schondelmeyer's report "Case Study of the Texas Vendor Drug Program's Approach to Estimating Drug Acquisition Costs," September 26, 2005, p. 23, he writes that the "Texas [Vendor Drug Program] required that the drug manufacturers submit the AMP (they promised manufacturers that this data would be held in confidence).  AMP was not used for setting the payment amount, but as a point of comparison for other price data."

**Contains Highly Confidential Materials – Subject to Protective Order**

contrary to the fact that the rules for setting the FULs are based on the most common package size.

## 4.      Dr. Schondelmeyer's Opinion that Medicaid and Medicare Payments were Inflated is Not Supported

Dr. Schondelmeyer does not present any evidence that Medicaid and Medicare's total reimbursement amounts for Dey's drugs would have been any different if Dey had reported average transaction prices to the pricing compendia.  Dr. Schondelmeyer asserts without support that Dey's behavior caused reimbursement amounts that were "unintended by" Medicaid and Medicare and that these amounts were "inflated."  However, he does no analysis of the amounts that Medicaid and Medicare would have had to pay to ensure participation in their programs and access to the drugs at issue under an alternate reimbursement scheme.  Dr. Schondelmeyer does not evaluate what changes to the dispensing fee would be required if reimbursement for ingredient costs were lowered to ensure that "enough pharmacy providers choose to participate so that patients will have access to the drug products they are prescribed within a reasonable distance from the patient's home or work."[186]

In a 2005 research report to CMS, Dr. Schondelmeyer agrees that while "stakeholders" acknowledge that estimates of acquisition costs are high, dispensing costs and dispensing fees are too low and that it is this combined affect that determines payment and pharmacy participation.[187]  Without an analysis of how CMS would have changed the dispensing fees, Dr. Schondelmeyer's opinions are unsupported and incomplete.  As noted above, based on one study of ingredient costs and dispensing fees, CMS increased its dispensing fee for albuterol inhalation products by roughly the same dollar amount that it decreased the ingredient cost reimbursement amount.  As discussed above, CMS decided to increase its dispensing fees in Medicare, in particular for inhalation products, from $5.00 to $57.00 in order to ensure access to Medicare recipients.  The federal study mentioned above noted that failure to do so would result in 89% of the pharmacies no longer participating in Medicare.

Finally, Dr. Schondelmeyer's opinion that Medicaid and Medicare payments are "inflated" is at odds with his 2007 opinion in connection with the litigation over the 250 percent AMP rule.  In his report in that matter, Dr. Schondelmeyer noted that "[m]any [independent] pharmacies are already economically vulnerable" at the existing reimbursement levels.[188]  He concluded that a "[r]eduction in payments will result in substantial loss, and even closures, for a number of pharmacies."[189]

---

[186] Schondelmeyer Report, ¶ 155.

[187] Schondelmeyer Report, ¶ 154.

[188] Schondelmeyer NACDS Report, ¶ 226.

[189] Schondelmeyer NACDS Report, ¶ 31.

**Contains Highly Confidential Materials – Subject to Protective Order**

## C.    Platt Report

Mr. Platt was retained by counsel for Plaintiffs to calculate the ASPs of Dey's drug products at issue, compare the relationship to his calculated prices to the prices reported to drug pricing compendia, and to assess Dey's ability to report selling prices which were "reflective of the prices…paid by its customers."[190]  I have reviewed Mr. Platt's report but understand that Mr. Platt will not be available to testify in deposition about his methods and assumptions until after this report is filed.  I, therefore, reserve my right to comment on his opinions until I have had an opportunity to consider his deposition testimony.

Mr. Platt's report appears to be little more than a mathematical calculation.  Mr. Platt provides no insight into how he believes his ASPs would or should be used, or how market conditions would be affected if his calculated prices were used for reimbursement purposes.  He does not offer a theory of harm.  Mr. Platt opines that Dey had the ability to report its average transaction prices to the pricing compendia, but he does not opine on whether that would have been a reasonable action for Dey to undertake in the competitive environment in which it operates, what impact that action would have in the broader market in which Dey competes, or how Dey's contract prices might have been affected if its average transaction prices were public knowledge.

I understand that Mr. Platt's price analyses were provided to Dr. Duggan for use in his analysis, which is discussed below.[191]

## D.    Duggan Report

Dr. Duggan purports to calculate:

> the difference between (1) what the federal government reimbursed for certain pharmaceutical products provided to Medicaid and Medicare recipients during the 1992Q1 to 2008Q1 period and (2) what the federal government would have reimbursed for the same products during the same period if prices reflective of the actual prices at which [Dey] was transacting business had been used for the AWP and WAC of certain Dey products.[192]

His report fails to accomplish this objective.  Dr. Duggan makes no effort to determine what the federal government would have reimbursed for the Dey products at issue if Dey had reported AWPs or WACs that were on average lower than the AWPs and WACs that Dey actually reported during the period at issue.

He assumes, without basis or analysis, that the federal government would have reimbursed for Dey's products using the same formulas that it currently uses and applying them in precisely the

---

[190] Expert Report of Simon D. Platt, January 23, 2009 ("Platt Report"), ¶ 5.

[191] Platt Report, ¶ 9.

[192] Report of Mark G. Duggan, January 23, 2009 ("Duggan Report"), ¶ 1.

**Contains Highly Confidential Materials – Subject to Protective Order**

same manner, but now with a different price statistic in the equation.[193]  This assumption is without merit and contrary to evidence.

Dr. Duggan's report appears to ignore the findings of a GAO analysis (deemed reasonable by another plaintiffs' expert, Dr. Schondelmeyer), that "pharmacies are likely to lose money on more than one-half of the generic prescriptions subject to the new AMP-based FULs, even after the 250% multiplier is applied to the new AMP amount."[194]  The 250 percent multiplier in the proposed AMP rule is higher than the 125 percent multiplier that Dr. Duggan applied to the average pharmacy prices to calculate a replacement AWP for use in his report.  Thus, the AMP rule reimbursement amounts, which were deemed by Dr. Schondelmeyer to be insufficient to ensure access, may be even higher than those proposed by Dr. Duggan.

Dr. Duggan asserts that the empirical methods that he used "for calculating the payment amounts that the Medicaid and Medicare programs would have made are consistent with those that [he] and other economists typically use in academic research."[195]  I disagree.  Dr. Duggan fails to use any empirical methods typically employed by economists in performing counterfactual analyses, such as the type he purports to have performed here.  Properly performed, counterfactual analyses must take into account how all market participants would have behaved under circumstances different from (counter to) the actual market circumstances.  Dr. Duggan has not done so.  Thus, his report fails to provide any estimate that could properly be considered "damages."

## E.   Marmor Report

Dr. Marmor was retained by counsel to offer an opinion on whether the historical record of government policy on Medicare and Medicaid drug reimbursement supports the "proposition that the Federal Government…approved of" Dey's pricing conduct.[196]  Dr. Marmor describes the history of Medicare and Medicaid and reviews the program purposes and the policies adopted. He notes that the aim of these programs was to provide access to disadvantaged populations while at the same time meeting the "payments demands" by the providers.[197]  Dr. Marmor opines that the continued use of reported AWP or WAC in reimbursement formulas "does not reflect governmental acquiescence or approval," but merely that the government could not agree on alternative reimbursement methodologies that would be operational.[198]

---

[193] Dr. Duggan replaces Dey's AWP with 125 percent of Dey's average pharmacy-specific price in AWP-based reimbursement formulas and he replaces WAC with the average pharmacy-specific price in WAC-based reimbursement formulas.  Duggan Report, p. 10.

[194] Schondelmeyer NACDS Report, ¶ 213.

[195] Duggan Report, ¶ 4.

[196] Expert Report of Theodore R. Marmor, June 20, 2008 ("Marmor Report"), p. 1.  While I cite to Dr. Marmor's 2008 report, he concludes in Supplemental Report, dated January 21, 2009, that he would have the same conclusions in the Dey case as he did in the Abbott case in June 2008.

[197] Marmor Report, ¶ 35.

[198] Marmor Report, ¶ 86.

**Contains Highly Confidential Materials – Subject to Protective Order**

Dr. Marmor acknowledges that the nature of AWPs and WACs were known to CMS and other government bodies as early as 1984.[199]  Dr. Marmor writes that the Clinton administration proposed reimbursing for Medicare Part B based on actual acquisition costs in the FY98 budget proposal, but the proposal was "rebuffed" by lobbyists and the United States Congress.[200]

Dr. Marmor's primary conclusion is unsupported.  He claims that an "honest presentation of prices – under AWP or WAC – was in fact an operational alternative that the drug industry could use properly."[201]  He does not, however, describe how Congress, CMS and the patient and provider lobby groups, who could not agree on how to change the AWP reimbursement proportion, would have agreed to change the dispensing fees to guarantee access.

Dr. Marmor's report, therefore, suffers from the same fundamental flaws as the reports of the plaintiffs' other experts: 1) it does not describe how the government was misled by Dey's actions (and to the contrary finds that the government was fully informed of the nature of Dey's price signals during the majority of the period in question); and 2) it does not present a coherent alternative for a but-for world and an accompanying coherent theory of harm.  Without a cogent and complete theory of how CMS might have changed its reimbursement formulas, including its dispensing fees, had all pharmaceutical companies reported average discounted transaction prices in place of AWPs, plaintiffs' experts have not shown that there has been any competitive impact from the pricing behavior that has existed for more than two decades.

Signed this 6th day of March 2009:

*Lauren Stiroh*

Lauren J. Stiroh

---

[199] Marmor Report, ¶ 49.

[200] Marmor Report, ¶ 81.

[201] Marmor Report, ¶ 87.  Dr. Marmor concludes the sentence quoted above with the phrase "and some firms did."
It is not clear what "firms" Dr. Marmor is referring to in this sentence.  As is made clear in the body of my report, based on my analysis Dey's WAC is an "honest presentation of prices."

**Contains Highly Confidential Materials – Subject to Protective Order**

# NERA
## Economic Consulting

NERA Economic Consulting
50 Main Street
White Plains, New York 10606
Tel:  +1 914 448 4000
Fax: +1 914 448 4040
www.nera.com

NERA
Economic Consulting

**Lauren J. Stiroh**
Senior Vice President

National Economic Research Associates, Inc.
50 Main Street
White Plains, New York 10766
+1 914 448 4000 Fax +1 914 448 4040
Direct dial: +1 914 448 4143
lauren.stiroh@nera.com

**Exhibit 1**

# LAUREN J. STIROH
## SENIOR VICE PRESIDENT

Dr. Stiroh specializes in the economics of antitrust, intellectual property, and commercial damages. She has conducted research, prepared expert reports, and testified in court on a variety of issues arising from antitrust allegations such as monopolization, exclusionary conduct, tying, vertical restrictions, price fixing, predatory pricing, price discrimination, and abuse of standard setting. Dr. Stiroh has analyzed the competitive effects of mergers, acquisitions, and joint ventures. She has also written expert reports and consulted on matters related to assessing impact and damages in class action litigation. She has performed or critiqued damage calculations in more than a dozen industrial settings.

Dr. Stiroh has also written and testified on the subject of intellectual property value and valuation. She has assessed and critiqued damages from patent, copyright, and trademark infringement in industries including semiconductors, biotechnology, pharmaceuticals, medical devices, and consumer products. Dr. Stiroh is co-editor and contributing author of *Economic Approaches to Intellectual Property Policy*, *Litigation and Management*, published in 2005.

Much of Dr. Stiroh's work and research focuses on the intersection of antitrust and intellectual property litigation. She has written articles and given speeches on this subject for the American Bar Association, Law Seminars International, the Practicing Law Institute, and the 2002 US Department of Justice and Federal Trade Commission joint hearings on "Competition and Intellectual Property Law and Policy in the Knowledge-Based Economy." She has analyzed market power in technology markets and evaluated the competitive implications of licensing arrangements, including tying and patent pooling provisions.

Dr. Stiroh has presented her research before the FTC, the DOJ, the Canadian Competition Bureau, and in expert testimony.

Dr. Stiroh holds a Ph.D. in Economics from Harvard University, an M.A. in Economics from the University of British Columbia and a B.A. in Economics from the University of Western Ontario.

**MMC** Marsh & McLennan Companies

Lauren J. Stiroh

## Education

**Harvard University**
Ph.D., Economics, August 1996

**University of British Columbia**
M.A., Economics, November 1991

**University of Western Ontario**
B.A., Economics, June 1990

## Professional Experience

**NERA Economic Consulting**

March 2005- *Senior Vice President.* Directs projects in the economics of antitrust, intellectual property and consumer damages.

2002-2005 *Vice President.*

1999-2002 S*enior Consultant.*

1996-1999 *Senior Analyst.*

**Unidad de Desarrollo Social**

March 1994 *Consultant.* Prepared two studies for the National Planning Department concerning the
August 1994 effect of the trade liberalization in Colombia on the distribution of income.

**Harvard University**

1994-1996 *Research Assistant.* Research Assistant for Professor Dale Jorgenson. Estimated human capital and national income accounts.

**Harvard University**

1993-1996 *Teaching Fellow in Economics.* Taught principles of economics, the introductory and core course in economics at Harvard College.

## Honors and Professional Activities

Member, American Economic Association.
Derek Bok Teaching Award, 1996.

Harvard University Scholarship 1991-1994.
Social Sciences and Humanities Research Council of Canada Fellowship 1991-1994.

Lauren J. Stiroh

University Graduate Fellowship (University of British Columbia) 1990-1991.
Huron College Corporation Scholarship (University of Western Ontario) 1987-
1989.

## Selected Industry Experience

- Advertising and Marketing Media
    - Coupons
    - In-store Advertising
    - Outdoor Advertising
    - Yellow Pages
- Airline Ticketing
- Biotechnology
- Book Publishing
- Consumer Goods
    - Bicycle Components
    - Contact Lenses
    - Food and Beverages
    - Powered Toothbrushes
    - Recreational Vehicle Accessories
    - Lawn and Garden Products
- Employment
- Entertainment
    - Movie Exhibition
    - Movie Theatres
    - Sports Entertainment Exhibition

- Fast Food Franchises
- Herbicides
- Information Technology/Information Systems
    - Data Backup Systems
    - Magnetic Recording Media
    - Microfiche/Microfilm
    - Rewriteable CDs
    - Computer Memory
    - Integrated Circuits and Semiconductors
- Long Distance Telephone Service
- Marine Engines
- Medical Devices
- Pharmaceuticals
- Real Estate
- Ski Resorts
- Soda Ash
- Sporting Events
- Steel
- Sulfuric Acid
- Textile Rental

## Expert Testimony and Reports

### *United States of America ex rel. Ven-A-Care of the Florida Keys, Inc., v. Dey, Inc.*

Declaration in support of the Defendants Dey, Inc., Dey L.P., Inc., and Dey L.P.'s Motion to Compel Discovery in connection with *United States of America ex rel. Ven-A- Care of the Florida Keys, Inc., v. Dey, Inc.,* February 11, 2009.

### *DigaComm, LLC. v. Vehicle IP, LLC*

Testimony on behalf of the Respondents Vehicle IP, LLC and Bradley Larschan in the arbitration hearing in connection with *DigaComm, LLC. v. Vehicle IP, LLC, Bradley Larschan*, October 30, 2008.

Deposition testimony on behalf of the Defendant Vehicle IP, LLC in connection with *DigaComm, LLC v. Vehicle IP, LLC, Bradley Larschan* (Arbitration and Federal Litigation), September 22, 2008.

Lauren J. Stiroh

Expert report on behalf of the Defendant Vehicle IP, LLC in connection with *DigaComm, LLC v. Vehicle IP, LLC, Bradley Larschan* (Arbitration), September 12, 2008.

Expert report on behalf of the Defendant Vehicle Safety and Compliance, LLC, Pittco Capital Partners, LP, Pittco Capital Partners II, LP, J.R. "Pitt" Hyde III and Andrew Seamons in connection with *DigaComm, LLC v. Vehicle Safety and Compliance, LLC, Pittco Capital Partners, LP, Pittco Capital Partners II, LP, J.R. "Pitt" Hyde III and Andrew Seamons* (Federal Litigation), September 12, 2008.

### Re Hydrogen Peroxide Antitrust Litigation

Deposition testimony on behalf of the Defendant Arkema, Inc. in connection with *In Re Hydrogen Peroxide Antitrust Litigation*, July 31, 2008.

Expert report on behalf of the Defendant Arkema, Inc. in connection with *In Re Hydrogen Peroxide Antitrust Litigation*, July 7, 2008.

### Dairy Queen Operators' Association, et al. v. International Dairy Queen, Inc. et al.

Testimony on behalf of the Plaintiffs Dairy Queen Operators' Association, et al, in the arbitration hearing in connection with *Dairy Queen Operators' Association, et al. v. International Dairy Queen, Inc. et al.,* May 22, 2008 and June 25, 2008.

Rebuttal report on behalf of the Plaintiffs Dairy Queen Operators' Association, et al., in connection with *Dairy Queen Operators' Association, et al. v. International Dairy Queen, Inc. et al.,* May 2, 2008.

Deposition testimony on behalf of the Plaintiffs Dairy Queen Operators' Association, et al., in connection with *Dairy Queen Operators' Association, et al. v. International Dairy Queen, Inc. et al.,* March 19, 2008.

Expert report on behalf of the Plaintiffs Dairy Queen Operators' Association, et al., in connection with *Dairy Queen Operators' Association, et al. v. International Dairy Queen, Inc. et al.,* March 14, 2008.

### Pedinol Pharmacal, Inc. v. Rising Pharmaceuticals, Inc., and Ronald Gold

Trial testimony on behalf of the Defendant Ronald Gold in connection with *Pedinol Pharmacal, Inc. v. Rising Pharmaceuticals, Inc., and Ronald Gold,* February 6, 2008.

Deposition testimony on behalf of the Defendant Ronald Gold in connection with *Pedinol Pharmacal, Inc. v. Rising Pharmaceuticals, Inc., and Ronald Gold,* January 25, 2008.

Expert report on behalf of the Defendant Ronald Gold in connection with *Pedinol Pharmacal, Inc. v. Rising Pharmaceuticals, Inc., and Ronald Gold,* January 18, 2008.

Lauren J. Stiroh

*HCI Technologies, Inc. v. Avaya, Inc.*

Testimony on behalf of the Plaintiff HCI Technologies, Inc. in the arbitration hearing in connection with *HCI Technologies, Inc. v. Avaya, Inc.,* October 15, 2007.

Expert report on behalf of the Plaintiff HCI Technologies, Inc. in connection with *HCI Technologies, Inc. v. Avaya, Inc.,* May 31, 2007.

*AVX Corporation and AVX Limited v. Cabot Corporation*

Declaration in Support of the Plaintiffs AVX Corporation and AVX Limited's Motion to Compel Discovery in connection with *AVX Corporation and AVX Limited v. Cabot Corporation,* September 19, 2007.

Declaration in Support of the Plaintiffs AVX Corporation and AVX Limited's Motion to Compel Discovery in connection with *AVX Corporation and AVX Limited v. Cabot Corporation,* March 1, 2007.

*Floorgraphics, Inc. v. News America Marketing In-store Services, Inc., et al.*

Declaration in Support of Defendants Motion for Summary Judgment in connection with *Floorgraphics, Inc. v. News America Marketing In-Store Services, Inc. and News America Marketing In-Store, Inc.,* September 19, 2007.

Deposition testimony on behalf of the Defendants News America Marketing In-store Services, Inc., et al. in connection with *Floorgraphics, Inc. v. News America Marketing In-store Services, Inc. et. al.,* August 16, 2007.

Expert report on behalf of the Defendants News America Marketing In-store Services, Inc., et al. in connection with *Floorgraphics, Inc. v. News America Marketing In-store Services, Inc. et. al.,* July 13, 2007.

*Kentucky Speedway, LLC. v. National Association Of Stock Car Auto Racing, Inc., AKA NASCAR and International Speedway Corporation*

Deposition testimony on behalf of the Defendants National Association Of Stock Car Auto Racing, Inc., and International Speedway Corporation in connection with *Kentucky Speedway, LLC. v. National Association Of Stock Car Auto Racing, Inc., and International Speedway Corporation,* June 19-20, 2007.

Expert report on behalf of the Defendants National Association Of Stock Car Auto Racing, Inc., and International Speedway Corporation in connection with *Kentucky Speedway, LLC. v. National Association Of Stock Car Auto Racing, Inc., and International Speedway Corporation,* May 25, 2007.

Lauren J. Stiroh

### *Amgen, Inc. v. F. Hoffmann-LaRoche, Ltd., et al.*

Deposition testimony on behalf of counter-claim Plaintiffs F. Hoffmann-LaRoche, Ltd. et al. in connection with *Amgen, Inc. v. F. Hoffmann-LaRoche, Ltd., et al.,* May 31, 2007.

Expert report on behalf of counter-claim Plaintiffs F. Hoffmann-LaRoche, Ltd. et al. in connection with *Amgen, Inc. v. F. Hoffmann-LaRoche, Ltd., et al.,* April 6, 2007.

### *adidas America, Inc. and adidas-Salomon AG v. Kmart Corporation and Footstar, Inc.*

Deposition testimony on behalf of the Defendants Kmart Corporation and Footstar, Inc. in connection with *adidas America, Inc. and adidas-Salomon AG v. Kmart Corporation and Footstar, Inc.,* March 21, 2007.

Expert report on behalf of the Defendants Kmart Corporation and Footstar, Inc. in connection with *adidas America, Inc. and adidas-Salomon AG v. Kmart Corporation and Footstar, Inc.,* January 5, 2007.

### *Peter Wachtell v. Capital One Financial Corporation*

Deposition testimony on behalf of the Defendants Capital One Financial Corp. in connection with *Peter Wachtell v. Capital One Financial Corp.,* March 15, 2007.

Expert report on behalf of the Defendants Capital One Financial Corp. in connection with *Peter Wachtell v. Capital One Financial Corp.,* January 12, 2007.

### *William J. LaPoint and John M. Nehra et al. v. AmerisourceBergen Corporation*

Deposition testimony on behalf of the Plaintiffs in connection with *William J. LaPoint and John M. Nehra et al. v. AmerisourceBergen Corporation,* January 16-17, 2007.

Expert report on behalf of the Plaintiffs William J. LaPoint and John M. Nehra, et. al. in connection with *William J. LaPoint and John M. Nehra et al. v. AmerisourceBergen Corporation,* November 22, 2006.

### *Re Sulfuric Acid Antitrust Litigation*

Deposition testimony on behalf of the Defendants in connection with *Re Sulfuric Acid Antitrust Litigation,* February 22-23, 2006.

Expert report on behalf of the Defendants in connection with *Re Sulfuric Acid Antitrust Litigation,* February 3, 2006.

Deposition testimony on behalf of the Defendants in connection with *Re Sulfuric Acid Antitrust Litigation,* January 16, 2004.

Lauren J. Stiroh

Expert report on behalf of the Defendants in connection with *Re Sulfuric Acid Antitrust Litigation,* December 16, 2003.

### *United Asset Coverage, Inc. v. Avaya, Inc.*

Trial testimony on behalf of the Plaintiff United Asset Coverage, Inc. at the Preliminary Injunction Hearing in connection with *United Asset Coverage, Inc. v. Avaya, Inc.,* Northern District of Illinois, October 28, 2005 and November 7, 2005.

Expert report on behalf of the Plaintiff  in connection with *United Asset Coverage, Inc. v. Avaya, Inc.,* October 12, 2005.

### *Orbit Irrigation Products, Inc. v. L. R. Nelson Corporation*

Deposition testimony on behalf of the Defendant L.R. Nelson Corporation, Inc. in connection with *Orbit Irrigation Products, Inc. v. L .R. Nelson Corporation*, September 15, 2005.

Deposition testimony on behalf of the Defendant L. R. Nelson Corporation, Inc. in connection with *Orbit Irrigation Products, Inc. v. L .R. Nelson Corporation*, May 7, 2003.

Rebuttal report on behalf of the Defendant in connection with *Orbit Irrigation Products, Inc. v. L.R. Nelson Corporation,* February 6, 2003.

Expert report on behalf of the Defendant in connection with *Orbit Irrigation Products, Inc. v. L.R. Nelson Corporation,* January 15, 2003.

### *Theme Promotions, Inc. v. News America FSI, Inc.*

Trial testimony on behalf of the Defendant News America FSI, Inc. in connection with *Theme Promotions, Inc. v. News America FSI, Inc.,* United States District Court in the Northern District of California, August 24-25, 2005.

Deposition testimony on behalf of the Defendant News America FSI, Inc. in connection with *Theme Promotions, Inc. v. News America FSI, Inc.,* July 20, 2005.

Declaration in Support of the Defendant News America FSI, Inc.'s, Motion for Summary Judgment in connection with *Theme Promotions, Inc. v. News America FSI, Inc.,* July 22, 2005.

Rebuttal report on behalf of the Defendant News America FSI, Inc. in connection with *Theme Promotions, Inc. v. News America FSI, Inc.,* June 9, 2005.

Lauren J. Stiroh

**Metropolitan Inter-Collegiate Basketball Association v. National Collegiate Athletic Association, et al.**

Deposition testimony on behalf of the Defendants National Collegiate Athletic Association, et al., in connection with *Metropolitan Inter-Collegiate Basketball Association v. National Collegiate Athletic Association, et al.*, June 14, 2005.

Expert report on behalf of the Defendants National Collegiate Athletic Association, et al., in connection with *Metropolitan Inter-Collegiate Basketball Association v. National Collegiate Athletic Association, et al.*, June 12, 2005.

**BTG International Limited v. Zimmer Holdings, Inc. et al.**

Rebuttal report on behalf of the Plaintiff BTG International Limited in connection with *BTG International Limited v. Zimmer Holdings, Inc. et al.*, March 29, 2005.

Expert report on behalf of the Plaintiff BTG International Limited in connection with *BTG International Limited v. Zimmer Holdings, Inc. et al.*, March 7, 2005.

**International Truck and Engine Corporation vs. Caterpillar Inc.**

Expert report on behalf of the Plaintiff International Truck and Engine Corporation in connection with *International Truck and Engine Corporation vs. Caterpillar Inc.*, February 18, 2005.

**Piatti Restaurant Company v. Steiner Corporation et. al.**

Expert report on behalf of the Defendant Steiner Corporation in connection with *Piatti Restaurant Company v. Steiner Corporation et. al.*, February 14, 2005.

**Kevin T. Keleghan v. Sears, Roebuck & Company and Alan J. Lacy**

Deposition testimony on behalf of the Defendants Sears, Roebuck & Company and Alan J. Lacy, in connection with *Kevin T. Keleghan v. Sears, Roebuck & Company and Alan J. Lacy*, November 5, 2004.

**U.S. Philips Corporation v. Princo Corporation and Princo America Corporation and Gigastorage Corporation and Gigastorage U.S.A. v. U.S. Philips Corporation and Koninklijke Philips Electronic N.V.**

Deposition testimony on behalf of the Plaintiff U.S. Philips Corporation, in connection with *U.S. Philips Corporation v. Princo Corporation and Princo America Corporation and Gigastorage Corporation and Gigastorage U.S.A. v. U.S. Philips Corporation and Koninklijke Philips Electronic N.V.*, September 28, 2004.

Lauren J. Stiroh

Rebuttal report on behalf of the Plaintiff U.S. Philips Corporation, in connection with *U.S. Philips Corporation v. Princo Corporation and Princo America Corporation, and Gigastorage Corporation and Gigastorage U.S.A. v. U.S. Philips Corporation and Koninklijke Philips Electronic N.V.,* September 14, 2004.

### *The Proctor & Gamble Company v. The Coca-Cola Company*

Deposition testimony on behalf of the Defendant The Coca-Cola Company in connection with *The Proctor & Gamble Company v. The Coca-Cola Company,* August 31, 2004.

Expert report on behalf of the Defendant The Coca-Cola Company in connection with *The Proctor & Gamble Company v. The Coca-Cola Company,* July 12, 2004.

### *Auscape International, et al., v. National Geographic Society*

Rebuttal report on behalf of the Defendant National Geographic Society in connection with *Auscape International, et al., v. National Geographic Society, et al.,* July 15, 2003.

Deposition testimony on behalf of the Defendant National Geographic Society in connection with *Auscape International, et al., v. National Geographic Society, et al.,* May 29, 2003.

Expert report on behalf of the Defendant National Geographic Society in connection with *Auscape International, et al., v. National Geographic Society, et al.,* April 2, 2003.

### *Astor Holdings Inc. et al. v. Edward "Trey" Roski, III and BattleBots, Inc.*

Deposition testimony on behalf of the Defendant Battlebots, Inc. in connection with *Astor Holdings Inc. et al. v. Edward "Trey" Roski, III and BattleBots, Inc.*, October 2, 2002.

Expert reports in connection with *Astor Holdings Inc. et al. v. Edward "Trey" Roski, III and BattleBots, Inc.*, May 2002 and June 2002.

### *Menasha Corporation v. News America Marketing In-Store, Inc*

Deposition testimony on behalf of the Defendant News America Marketing In-Store, Inc in connection with *Menasha Corporation v. News America Marketing In-Store, Inc.*, August 13 and 14, 2002.

Rebuttal report on behalf of the Defendant News America Marketing In-Store, Inc in connection with *Menasha Corporation v. News America Marketing In-Store, Inc.,* October 2001 (with Richard T. Rapp).

Expert report on behalf of the Defendant News America Marketing In-Store, Inc in connection with *Menasha Corporation v. News America Marketing In-Store, Inc.,* August 2, 2001 (with Richard T. Rapp).

Lauren J. Stiroh

### Joint Hearings of the US DOJ and FTC

Written submission "Standard Setting and Market Power," to the Joint Hearings of the United States Department of Justice and the Federal Trade Commission on "Competition and Intellectual Property Law and Policy in the Knowledge-Based Economy," Washington, D.C., April 18, 2002 (with Richard T. Rapp).

### Rambus, Inc.

Report in connection with *Rambus, Inc.*, "Supplemental Economic Considerations Bearing on FTC Enforcement," April 12, 2002 (with Richard T. Rapp).

### Medtronic Ave, Inc. v. Boston Scientific Corporation Scimed Life Systems, Inc., & Boston Scientific Scimed, Inc.

Expert report on behalf of the Plaintiff in connection with *Medtronic Ave, Inc. v. Boston Scientific Corporation Scimed Life Systems, Inc., & Boston Scientific Scimed, Inc.,* March 8, 2001.

### Michael B. Sherman v. Master Protection Corporation

Declaration in Support of Defendants Motion for Summary Judgment in connection with *Michael B. Sherman v. Master Protection Corporation*, June 2, 2000.

### Hugh Collins et al. v. International Dairy Queen, Inc.

Deposition testimony on behalf of the Plaintiff Hugh Collins, et al. in connection with *Hugh Collins et al. v. International Dairy Queen, Inc.*, December 29 and 30, 1999.

Supplemental Expert Report on behalf of the Plaintiff Hugh Collins, et al. in connection with *Hugh Collins et al. v. International Dairy Queen, Inc.*, December 17, 1999 (with Richard T. Rapp).

Expert Report on behalf of the Plaintiff Hugh Collins, et al. in connection with *Hugh Collins et al. v. International Dairy Queen, Inc.*, October 29, 1999 (with Richard T. Rapp).

### Halfond et al. v. The Legal Aid Society of the City of New York

Trial testimony on behalf of the Defendant The Legal Aid Society of the City of New York in connection with *Halfond et al. v. The Legal Aid Society of the City of New York.* United States District Court in the Eastern District of New York, September 1999.

Deposition testimony on behalf of the Defendant The Legal Aid Society of the City of New York in connection with *Halfond et al. v. The Legal Aid Society of the City of New York.* United States District Court in the Eastern District of New York, July 1999.

Lauren J. Stiroh

Supplemental Report on Damages on behalf of the Defendant The Legal Aid Society of the City of New York in connection with *Halfond et al. v. The Legal Aid Society of the City of New York*, May 14, 1999.

Expert Report on behalf of the Defendant The Legal Aid Society of the City of New York in connection with *Halfond et al. v. The Legal Aid Society of the City of New York*, May 4, 1999.

### *Directory Consultants, v. GTE Directories Corporation*

Deposition testimony on behalf of the Defendants GTE Directories Corporation in connection with *Directory Consultants, v. GTE Directories Corporation*, November 11, 1997.

## Selected Consulting Assignments

- Consultant to counsel on economic issues relating to class certification in the textile rental industry.

- Consultant to counsel on economic issues related to class certification in the airline industry.

- Analyses of competition in export markets for Soda Ash.

- Evaluated competitive effects of a proposed acquisition in the steel industry.

- Consultant to counsel on matters relating to market power, patent valuation and standard setting in the DRAM industry.

- Consultant to counsel on matters relating to class certification in the pharmaceutical industry.

- Consultant to counsel regarding breach of contract claims in the movie exhibition industry.

- Assisted counsel in assessing compliance with a settlement agreement in the contact lens industry.

- Evaluated competitive effects of an acquisition in the movie theatre industry.

- Statistical analysis evaluating claims of price fixing in the carbon brush industry.

- Evaluated Plaintiff's damage claim involving products related to disaster recovery systems.

- Evaluation of a reasonable royalty for a patent related to magnetic recording media.

- Evaluation of damage claims arising from differential pricing in the book publishing industry.

- Competitive analysis of a merger in the book publishing industry.

- Evaluation of damage claims arising from failure to promote particular brands of non-selective herbicides.

- Evaluation of damage claims in connection with an allegation of false advertising in the powered toothbrush industry.

- Consultant to counsel for an Internet service provider regarding trademark infringement claims.

- Consultant to counsel in connection with evaluation of competitive effects of promotion and incentive programs in the marine engine industry.

- Evaluation of reasonable royalties for patents used in the manufacture of semiconductors.

- Evaluation of business interference claims in the yellow pages advertising industry.

- Evaluation of a model forecasting the value of commercial real estate in Connecticut.

- Analysis of predatory pricing claims as well as a competitive analysis of the market for bicycle components.

- Estimation of damages resulting from patent infringement in the recreational vehicle industry.

- Estimation of damages resulting from false advertising in the long distance telephone industry.

- Competitive analysis of the impact of a merger in the skiing industry.  Predicted the price effects of the merger.

- Competitive Analysis of Vertical Restraints in the Yellow Pages Industry.  Estimated damages resulting from the vertical restraints.

## Presentations

Panelist, "Antitrust Economics for Attorneys:  The Economics of Innovation and Intellectual Property,"  presented by *The Economics and Intellectual Property Committees of the American Bar Association's Section of Antitrust* Law, Washington, D.C.,  July 23, 2008.

Panelist, "Illinois Tool Works and Tying: Impact and Implications," ABA-CLE Teleconference, May 19, 2006.

Panelist, "Antitrust Mock Trial," *presented by The Trial Practice Committee*, American Bar Association Annual Spring Meeting, Washington, D.C., March 30, 2006.

Speech, "Standard Setting, Network Effects and Market Power," presented at Law Seminars International's Conference, Atlanta, Georgia, October 8, 2004.

Lauren J. Stiroh

Speech, "The Relevant Market in Intellectual Property/Antitrust Litigation," presented at the Practising Law Institute, June 2004, June 2002 and June 2001.

Speech "The Economics of Damages in Intellectual Property Litigation," presented at Law Seminars International's workshop, Calculating and Proving Patent Damages, Stamford, Connecticut, May 14, 2004.

Panelist, "Show Me the Money: How to Make Damages Testimony Come Alive," American Bar Association Annual Meeting, Washington, D.C., August 9, 2002.

Panelist, "Unreasonable Royalties," Intellectual Property Seminar Series, National Economic Research Associates, New York, New York, June 2002.

Panel participant on "Licensing Terms in Standards Activities" before the Joint Hearings of the United States Department of Justice and the Federal Trade Commission on "Competition and Intellectual Property Law and Policy in the Knowledge-Based Economy," Washington, D.C., April 18, 2002.

Panelist, "The Implications of Standards Setting for Patent Value and Use," Intellectual Property Seminar Series, National Economic Research Associates, New York, New York, May 2001, and Washington, DC, October 2001.

Faculty member, Econometrics for Litigators, Continuing Legal Education, hosted by NERA, New York, NY, April 2001.

Speech, "Intellectual Property Valuations: Quantitative Methods," presented at the Intellectual Property Management for Corporate Counsel seminar, February 11, 1999.

Panelist, "What Do Option and Stock Market Values Have To Do With Intellectual Property Litigation?" Intellectual Property Seminar Series, National Economic Research Associates, New York, New York, November 1998.

Speech, "Innovations Markets," before the New York County Lawyers Association Trade Regulation Committee, February 11, 1998.


## Publications

"FTC Requires Patentee to Fulfill Licensing Commitments To A Standard-Setting Organization To Prevent Consumer Harm" co-authored with Eugene L. Chang, Esq., William H. Rooney, Esq. and Heather M. Schneider, Esq., Willkie Farr & Gallagher, LLP, *The Metropolitan Corporate Counsel*, 2008.

Chapter 14:  "Proving Causation in Damage Analyses" in Economics of Antitrust, Complex Issues in a Dynamic Economy, edited by Dr. Lawrence Wu, NERA Economic Consulting, 2007.

Lauren J. Stiroh

Co-editor, <u>Economic Approaches to Intellectual Property Policy, Litigation, and Management</u>.  Edited by Dr. Gregory K. Leonard and Dr. Lauren J. Stiroh, NERA Economic Consulting, September 2005.

Chapter 1:  "Uncertainty in the Economics of Knowledge and Information" in <u>Economic Approaches to Intellectual Property Policy, Litigation, and Management</u>, edited by Dr. Gregory K. Leonard and Dr. Lauren J. Stiroh, NERA Economic Consulting, 2005.

Chapter 3:  "A Practical Guide to Damages" co-authored with Dr. Gregory K. Leonard, in <u>Economic Approaches to Intellectual Property Policy, Litigation, and Management</u>, edited by Dr. Gregory K. Leonard and Dr. Lauren J. Stiroh, NERA Economic Consulting, 2005.

Chapter 15:  "Standard Setting and Market Power" co-authored with Dr. Richard T. Rapp in <u>Economic Approaches to Intellectual Property Policy, Litigation, and Management</u>, edited by Dr. Gregory K. Leonard and Dr. Lauren J. Stiroh, NERA Economic Consulting, 2005.

"The Relevant Market in Intellectual Property/Antitrust Litigation" co-authored with Alyssa A. Lutz, Ph.D., *Intellectual Property Antitrust,* Practicing Law Institute, 2001 and 2002.

"Modern Methods for the Valuation of Intellectual Property," co-authored with Richard T. Rapp, *Protecting Your Intellectual Property Assets*, Practicing Law Institute, 1998.

"Returns to Education, Human Capital and Income Inequality in Colombia," Ph.D. Thesis, Harvard University, August 1996.

February 2009

Exhibit 2

**Documents Considered by Lauren J. Stiroh**

**Court Filings**

Complaint, United States of America ex rel. Ven-a-Care of the Florida Keys, Inc., a Florida Corporation, by and through its principal officers and directors, Zachary T. Bentley, T. Mark Jones, Plaintiffs, v. Dey, Inc., Dey L.P., Inc., and Dey L.P., Defendants, United States District Court of Massachusetts, Civil Action No. 05-11084-MEL, August 24, 2006

Findings of Fact and Conclusions of Law, In Re Pharmaceutical Industry Average Wholesale Price Litigation, United States District Court of Massachusetts, Civil Action No. 01-12257-PBS, June 21, 2007

First Amended Complaint, In re: Pharmaceutical Industry Average Wholesale Price Litigation, United States of America ex rel. Ven-a-Care of the Florida Keys, Inc., et al. v. Dey, Inc., et al., United States District Court of Massachusetts, Civil Action No. 01-12257-PBS September 29, 2008

Memorandum and Order, The Commonwealth of Massachusetts, Plaintiff, v. Mylan Laboratories, et al., Defendants, United States District Court of Massachusetts, Civil Action No. 03-11865-PBS, December 23, 2008

**Expert Reports**

Report of Independent Expert Ernst R. Berndt, February 9, 2005, In Re: Pharmaceutical Industry Average Wholesale Price Litigation, United States District Court, M.D.L. No. 1456

Report of Mark G. Duggan, January 23, 2009 and information relied upon

Expert Report of Theodore R. Marmor, June 20, 2008 and information relied upon

Supplemental Report of Theodore R. Marmor, January 21, 2009 and information relied upon

Report of Matthew Perri III, January 21, 2009 and information relied upon

Expert Report of Simon D. Platt, January 23, 2009 and information relied upon

Expert Report of Stephen W. Schondelmeyer, Pharm.D., Ph.D. in connection with National Association of Chain Drug Stores and National Community Pharmacists Association v. United States Department of Health and Human Services, et al., November 7, 2007

Expert Report of Stephen W. Schondelmeyer, January 22, 2009 and information relied upon

**Depositions**

<u>Cardinal Health</u>

Deposition Testimony of Matthew Erick, Senior Vice-President of Market Development for Generic Pharmaceuticals at Cardinal Health, June 17, 2008 and accompanying exhibits

Deposition Testimony of Matthew Erick, Senior Vice-President of Market Development for Generic Pharmaceuticals at Cardinal Health, June 27, 2008 and accompanying exhibits

Deposition Testimony of Donald Lyle, Vice-President of Account Management at Cardinal Health, July 22, 2008 and accompanying exhibits

Deposition Testimony of Neil Warren, Vice-President Industry and Supplier Relations at Cardinal Health, September 9, 2008 and accompanying exhibits

**Contains Highly Confidential Materials Subject to Protective Order**

Exhibit 2

**Documents Considered by Lauren J. Stiroh**

<u>Center for Medicare and Medicaid Studies/Health Care Financing Administration</u>

Deposition Testimony of Charles Booth, Director of Financial Services - Office of Financial Management at CMS/HCFA, April 23, 2007 and accompanying exhibits

Deposition Testimony of Charles Booth, Director of Financial Services - Office of Financial Management at CMS/HCFA, October 29, 2007 and accompanying exhibits

Deposition Testimony of Nancy Deparle, former Administrator at CMS/HCFA, May 18, 2007 and accompanying exhibits

Deposition Testimony of Nancy Deparle, former Administrator at CMS/HCFA, December 5, 2007 and accompanying exhibits

Deposition Testimony of Sue Gaston, former Health Insurance Specialist at CMS/HCFA, January 24, 2008 and accompanying exhibits

Deposition Testimony of Sue Gaston, former Health Insurance Specialist at CMS/HCFA, March 19, 2008 and accompanying exhibits

Deposition Testimony of Thomas Scully, former Administrator at CMS/HCFA, May 15, 2007 and accompanying exhibits

Deposition Testimony of Thomas Scully, former Administrator at CMS/HCFA, July 13, 2007 and accompanying exhibits

Deposition Testimony of Gail Sexton, Health Insurance Specialist at CMS/HCFA, May 20-21, 2008 and accompanying exhibits

Deposition Testimony of David Tawes, Director of Medicare and Medicaid Drug Pricing Unit at CMS/HCFA, April 24-25, 2007 and accompanying exhibits

Deposition Testimony of David Tawes, Director of Medicare and Medicaid Drug Pricing Unit at CMS/HCFA, December 13, 2007 and accompanying exhibits

Deposition Testimony of David Tawes, Director of Medicare and Medicaid Drug Pricing Unit at CMS/HCFA, December 2, 2008 and accompanying exhibits

Deposition Testimony of Francis Donald Thompson, Senior Technical Advisor to the Hospital and Ambulatory Policy group at CMS/HCFA, September 30, 2008 and accompanying exhibits

Deposition Testimony of Bruce Vladeck, former Administrator at CMS/HCFA, May 4, 2007 and accompanying exhibits

Deposition Testimony of Bruce Vladeck, former Administrator at CMS/HCFA, June 21, 2007 and accompanying exhibits

<u>Dey</u>

Deposition Testimony of Roy Barnes, former Territory Manager at Dey, October 30, 2008 and accompanying exhibits

Deposition Testimony of Debra Bronstein, former Director of Marketing at Dey, March 11, 2003 and accompanying exhibits

**Contains Highly Confidential Materials Subject to Protective Order**

Exhibit 2

## Documents Considered by Lauren J. Stiroh

Deposition Testimony of Cynthia Collie, former Manager of Sales at Dey, February 19, 2003 and accompanying exhibits

Deposition Testimony of Robert Ellis, former Product Manager at Dey, February 10, 2003 and accompanying exhibits

Deposition Testimony of Todd Galles, former Group Product Manager at Dey, February 6, 2003 and accompanying exhibits

Deposition Testimony of Todd Galles, former Group Product Manager at Dey, February 28, 2006 and accompanying exhibits

Deposition Testimony of Todd Galles, former Group Product Manager at Dey, March 1, 2006 and accompanying exhibits

Deposition Testimony of James Gist, Key Account Manager for Northern Texas at Dey, November 5, 2002 and accompanying exhibits

Deposition Testimony of Eve Gmeiner, former Senior Product Manager at Dey, January 20, 2003 and accompanying exhibits

Deposition Testimony of Christopher Gurchiek, Regional Sales Manager for the Southeastern U.S. at Dey, May 3, 2002 and accompanying exhibits

Deposition Testimony of William Hill, former District Sales Manager at Dey, November 11, 2008 and accompanying exhibits

Deposition Testimony of Carrie Jean-Jackson, former Marketing Services Coordinator at Dey, April 18, 2003 and accompanying exhibits

Deposition Testimony of Russell Johnston, Senior Manager of Contracts at Dey, May 1, 2002 and accompanying exhibits

Deposition Testimony of Russell Johnston, Senior Manager of Contracts at Dey, December 10-11, 2008 and accompanying exhibits

Deposition Testimony of Pamela Marrs, Chief Financial Officer at Dey, May 2, 2002 and accompanying exhibits

Deposition Testimony of Pamela Marrs, Chief Financial Officer at Dey, April 16, 2003 and accompanying exhibits

Deposition Testimony of Pamela Marrs, Chief Financial Officer at Dey, August 19, 2004 and accompanying exhibits

Deposition Testimony of Pamela Marrs, Chief Financial Officer at Dey, March 10-11, 2005 and accompanying exhibits

Deposition Testimony of Pamela Marrs, Chief Financial Officer at Dey, November 14, 2007 and accompanying exhibits

Deposition Testimony of Pamela Marrs, Chief Financial Officer at Dey, May 15, 2008 and accompanying exhibits

Deposition Testimony of Pamela Marrs, Chief Financial Officer at Dey, July 10, 2008 and accompanying exhibits

Deposition Testimony of Pamela Marrs, Chief Financial Officer at Dey, October 2, 2008 and accompanying exhibits

**Contains Highly Confidential Materials Subject to Protective Order**

Exhibit 2

## Documents Considered by Lauren J. Stiroh

Deposition Testimony of Lewis Mow, former Accounting Manager at Dey, March 29, 2006 and accompanying exhibits

Deposition Testimony of Robert Mozak, former Executive Vice President of Sales and Marketing at Dey, November 1, 2001 and accompanying exhibits

Deposition Testimony of Robert Mozak, former Executive Vice President of Sales and Marketing at Dey, April 30, 2002 and accompanying exhibits

Deposition Testimony of Robert Mozak, former Executive Vice President of Sales and Marketing at Dey, November 6, 2002 and accompanying exhibits

Deposition Testimony of Robert Mozak, former Executive Vice President of Sales and Marketing at Dey, March 13, 2003 and accompanying exhibits

Deposition Testimony of Mark Pope, former Director of Business Development at Dey, April 14, 2003 and accompanying exhibits

Deposition Testimony of Charles Rice, former Chief Executive Office at Dey, October 30, 2001 and accompanying exhibits

Deposition Testimony of Charles Rice, former Chief Executive Office at Dey, November 7, 2002 and accompanying exhibits

Deposition Testimony of Charles Rice, former Chief Executive Office at Dey, March 24, 2003 and accompanying exhibits

Deposition Testimony of Helen Selenati, Marketing Manager at Dey, May 4-6, 2005 and accompanying exhibits

Deposition Testimony of Willia Tate, Director of Sales at Dey, February 7, 2003 and accompanying exhibits

Deposition Testimony of Bruce Tipton, former Director of National Accounts at Dey, February 13, 2003 and accompanying exhibits

Deposition Testimony of Bruce Tipton, former Director of National Accounts at Dey, March 21, 2006 and accompanying exhibits

Deposition Testimony of Ross Uhl, former National Account Manager at Dey, February 24, 2003 and accompanying exhibits

Deposition Testimony of Richard Upp, former National Account Manager at Dey, February 14, 2003 and accompanying exhibits

Deposition Testimony of Gary Walker, Manager of Financial Systems at Dey, May 14, 2008 and accompanying exhibits

Deposition Testimony of Gary Walker, Manager of Financial Systems at Dey, July 9, 2008 and accompanying exhibits

Experts

Deposition Testimony of Mark G. Duggan, February 26-27, 2009

Deposition Testimony of Theodore R. Marmor, February 11-13, 2009

**Contains Highly Confidential Materials Subject to Protective Order**

## Documents Considered by Lauren J. Stiroh

Deposition Testimony of Matthew Perri III, February 19-20, 2009

Deposition Testimony of Stephen W. Schondelmeyer, February 25-27, 2009

First DataBank

Deposition Testimony of Patricia Kay Morgan, former Manager of Editorial Services at First DataBank, August 27, 2007 and accompanying exhibits

Deposition Testimony of Patricia Kay Morgan, former Manager of Editorial Services at First DataBank, November 30, 2007 and select accompanying exhibits

McKesson

Deposition Testimony of Saul D. Factor, Senior Vice-President of Generics at McKesson, June 20, 2008 and accompanying exhibits

Deposition Testimony of Saul D. Factor, Senior Vice-President of Generics at McKesson, September 4, 2008 and accompanying exhibits

Deposition Testimony of Leslie Morgan, Director of Contract Compliance at McKesson, September 3, 2008 and accompanying exhibits

State Medicaid

Deposition Testimony of Jesse Anderson, State Plan Coordinator at the State of Oregon Department of Human Services, December 16, 2008 and accompanying exhibits

Deposition Testimony of Paula Avarista, Chief of Pharmacy at the State of Rhode Island Department of Human Services, December 4, 2008 and accompanying exhibits

Deposition Testimony of Suzette Bridges, Administrator of the Medicaid Prescription Drug Program at the State of Arkansas Department of Human Services, December 10-11, 2008 and accompanying exhibits

Deposition Testimony of Allen D. Chapman, former Assistant Director for Acute and Ambulatory Care at the State of Colorado Department of Health Care Policy & Financing, December 15, 2008 and accompanying exhibits

Deposition Testimony of Gary Cheloha, Pharmacy Consultant at the State of Nebraska Department of Health and Human Services, December 2-3, 2008 and accompanying exhibits

Deposition Testimony of Margaret Clifford, former Medicaid Pharmacy Administrator at the State of New Hampshire Department of Health and Human Services - Medicaid Program, October 29, 2008 and accompanying exhibits

Deposition Testimony of Myra Davis, Manager of the Pharmacy Rates Unit at the State of Washington Department of Social and Health Services, December 3, 2008 and accompanying exhibits

Deposition Testimony of Cynthia Denemark, Director of Pharmacy Services at the State of Delaware Division of Medicaid and Medical Assistance, December 9-10, 2008 and accompanying exhibits

**Contains Highly Confidential Materials Subject to Protective Order**

Exhibit 2

### Documents Considered by Lauren J. Stiroh

Deposition Testimony of Jerry Dubberly, Chief of the Division of Medical Assistance at the State of Georgia Department of Community Health, December 15, 2008 and accompanying exhibits

Deposition Testimony of Lise C. Farrand, Pharmaceutical Services Specialist at the State of New Hampshire Department of Health and Human Services, October 28, 2008 and accompanying exhibits

Deposition Testimony of Joseph L. Fine, former Director of Pharmacy Services at the State of Maryland Department of Health and Mental Hygiene, December 9, 2008 and accompanying exhibits

Deposition Testimony of J. Kevin Gorospe, Chief of Pharmacy Policy at the State of California Department of Health Care Services - Medi-Cal, March 19, 2008 and accompanying exhibits

Deposition Testimony of J. Kevin Gorospe, Chief of Pharmacy Policy at the State of California Department of Health Care Services - Medi-Cal, September 22, 2008 and accompanying exhibits

Deposition Testimony of J. Kevin Gorospe, Chief of Pharmacy Policy at the State of California Department of Health Care Services - Medi-Cal, December 3, 2008 and accompanying exhibits

Deposition Testimony of Anne Haase, Pharmacy Administrator at the State of North Dakota Department of Health and Human Services, December 10, 2008 and accompanying exhibits

Deposition Testimony of Ayuni Hautea-Wimpee, Lead Worker for Non-Institutional Rates at the State of Washington Department of Social and Health Services, November 24, 2008 and accompanying exhibits

Deposition Testimony of Ayuni Hautea-Wimpee, Lead Worker for Non-Institutional Rates at the State of Washington Department of Social and Health Services, December 2, 2008 and accompanying exhibits

Deposition Testimony of Keith T. Hayashi, Pharmacist at the State of Virginia Department of Medical Assistance Services, December 4, 2008 and accompanying exhibits

Deposition Testimony of Roxanne Homar, State Pharmacist at the State of Wyoming Department of Health, December 2-3, 2008 and accompanying exhibits

Deposition Testimony of Larry Iversen, Program Director at the State of South Dakota Department of Social Services, December 15, 2008 and accompanying exhibits

Deposition Testimony of Colleen Jones, Integrity Pharmacist at the State of Wyoming Department of Health, December 3, 2008 and accompanying exhibits

Deposition Testimony of Brendan Joyce, Administrator of Pharmacy Services at the State of North Dakota Department of Health and Human Services - Medicaid Division, December 12, 2008 and accompanying exhibits

Deposition Testimony of James Kenyon, Pharmacy Supervisor at the State of Michigan Department of Community Health - Medical Services Administration, March 25, 2008 and accompanying exhibits

Deposition Testimony of Kathy Ketchum, Assistant Director of Drug Use Research and Management at the State of Oregon State University, December 15, 2008 and accompanying exhibits

Deposition Testimony of Sandra Kramer, former Policy Analyst at the State of Michigan Department of Community Health - Medical Services Administration, March 25, 2008 and accompanying exhibits

Deposition Testimony of Brenda A. McCormick, Director of Health Care Management at the State of Maine Department of Health and Human Services - MaineCare, March 28, 2008 and accompanying exhibits

### Contains Highly Confidential Materials Subject to Protective Order

Exhibit 2

## Documents Considered by Lauren J. Stiroh

Deposition Testimony of Leslie Miliken, former Field Representative at the State of Wyoming Department of Health, December 3, 2008 and accompanying exhibits

Deposition Testimony of Nancy Nesser, Pharmacy Director at the State of Oklahoma Health Care Authority, December 12, 2008 and accompanying exhibits

Deposition Testimony of Frank O'Connor, former Chief of Administration at the State of Delaware Department of Health and Social Services, December 10, 2008 and accompanying exhibits

Deposition Testimony of James Parker, Deputy Administrator of Medical Programs at the State of Illinois Department of Healthcare and Family Services, November 18, 2008 and accompanying exhibits

Deposition Testimony of Robert Paul Reid, Pharmacy Services Unit Administrator at the State of Ohio Department of Jobs and Family Services, December 15, 2008 and accompanying exhibits

Deposition Testimony of C. Benny Ridout, former Medicaid Pharmacy Director at the State of North Carolina Department of Health and Human Services - Medicaid Program Division, December 5, 2008 and accompanying exhibits

Deposition Testimony of Ann Rugg, Deputy Director at the State of Vermont Department of Health, December 15, 2008 and accompanying exhibits

Deposition Testimony of Michael Sharp, Pharmacy Director at the State of Indiana Family and Social Services Administration, March 28, 2008 and accompanying exhibits

Deposition Testimony of Carl Mark Shirley, Pharmacy Operations Manager at the State of Indiana Family and Social Services Administration, December 2-3, 2008 and accompanying exhibits

Deposition Testimony of Robert J. Stevens, Chief of the Benefits Bureau at the State of New Mexico Department of Human Services, December 15, 2008 and accompanying exhibits

Deposition Testimony of Harry Leo Sullivan, former Director of Pharmacy Services at the State of Tennessee TennCare, March 12, 2008 and accompanying exhibits

Deposition Testimony of Mary Julia Terrebonne, Pharmacy Director at the State of Louisiana Department of Health and Hospitals, March 31, 2008 and accompanying exhibits

Deposition Testimony of Mary Julia Terrebonne, Pharmacy Director at the State of Louisiana Department of Health and Hospitals, November 7, 2008 and accompanying exhibits

Deposition Testimony of Frank T. Tetkoski, Manager in Pharmacy at the State of Maryland Department of Health and Mental Hygiene, December 11, 2008 and accompanying exhibits

Deposition Testimony of Howard Bryan Tomlinson II, Director of Division of Healthcare Services at the State of Virginia Department of Medical Assistance Services, November 3-4, 2008 and accompanying exhibits

Deposition Testimony of Edward J. Vaccaro, former Chief Pharmaceutical Services Consultant at the State of New Jersey Department of Human Services, December 2-3, 2008 and accompanying exhibits

Deposition Testimony of Jude E. Walsh, former Director of Pharmacy Services at the State of Maine Department of Health and Human Services, March 26, 2008 and accompanying exhibits

Deposition Testimony of Lisa Weeks, Outpatient Pharmacy Program Manager at the State of North Carolina Department of Health and Human Services, October 21, 2008 and accompanying exhibits

Deposition Testimony of Jerry Wells, former Bureau Chief at the State of Florida Agency for Healthcare Administration - Medicaid Division, December 15, 2008 and accompanying exhibits

**Contains Highly Confidential Materials Subject to Protective Order**

## Documents Considered by Lauren J. Stiroh

Deposition Testimony of Cody Wiberg, former Pharmacy Program Manager at the State of Minnesota Department of Human Services, March 14, 2008 and accompanying exhibits

Deposition Testimony of John Young, former Medicaid Director at the State of Rhode Island Department of Human Services, December 3, 2008 and accompanying exhibits

Others

Deposition Testimony of Zachary Bentley, Business Manager at Ven-A-Care, November 6, 2008 and accompanying exhibits

Deposition Testimony of Tracy Allan Hansen, Manager at Myers & Stauffer, L.C., December 10-11, 2008 and accompanying exhibits


**Production Documents**

Dey Documents

Dey December 2005 Monthly Sales Report

Dey November 2005 Monthly Sales Report

Dey October 2005 Monthly Sales Report

DEY00010257-304, Dey February 2003 Monthly Sales Report

DEY00010357-94, Dey March 2003 Monthly Sales Report

DEY00010395-432, Dey January 2003 Monthly Sales Report

DEY050004976-5036, Dey July 2005 Monthly Sales Report

DEY050005037-97, Dey August 2005 Monthly Sales Report

DEY050005098-165, Dey September 2005 Monthly Sales Report

DEY050005167-206, Dey January 2005 Monthly Sales Report

DEY050005207-74, Dey February 2005 Monthly Sales Report

DEY050005275-359, Dey March 2005 Monthly Sales Report

DEY050005360-445, Dey April 2005 Monthly Sales Report

DEY050005446-512, Dey May 2005 Monthly Sales Report

DEY050005513-81, Dey June 2005 Monthly Sales Report

DEY050005583-641, Dey July 2004 Monthly Sales Report

DEY050005642-98, Dey August 2004 Monthly Sales Report

DEY050005699-757, Dey September 2004 Monthly Sales Report

DEY050005758-809, Dey October 2004 Monthly Sales Report

DEY050005810-65, Dey November 2004 Monthly Sales Report

DEY050005866-925, Dey December 2004 Monthly Sales Report

DEY050005927-66, Dey January 2004 Monthly Sales Report

**Contains Highly Confidential Materials Subject to Protective Order**

Exhibit 2

## Documents Considered by Lauren J. Stiroh

DEY050005967-6019, Dey February 2004 Monthly Sales Report

DEY050006020-72, Dey March 2004 Monthly Sales Report

DEY050006073-125, Dey April 2004 Monthly Sales Report

DEY050006126-78, Dey May 2004 Monthly Sales Report

DEY050006179-236, Dey June 2004 Monthly Sales Report

DEY050006238-352, Dey December 2003 Monthly Sales Report

DEY050006354-410, Dey November 2003 Monthly Sales Report

DEY050006411-509, Dey October 2003 Monthly Sales Report

DEY050006510-69, Dey September 2003 Monthly Sales Report

DEY050006570-623, Dey August 2003 Monthly Sales Report

DEY050006624-73, Dey July 2003 Monthly Sales Report

DEY-MDL0000001-160, Sample Dey Invoices

DL-BO-111498-504, Sample Dey Contract Files - NMC Homecare

DL-BO-136684-769, Sample Dey Contract Files - Total Care Wholesale

DL-TX 0129964-30014, Dey March 2002 Monthly Sales Report

DL-TX 79928-92, Dey January 2002 Monthly Sales Report

DL-TX 79994-80040, Dey February 2002 Monthly Sales Report

DL-TX 80041-92, Dey April 2002 Monthly Sales Report

DL-TX 80093-144, Dey May 2002 Monthly Sales Report

DL-TX 80145-206, Dey June 2002 Monthly Sales Report

DL-TX 80208-72, Dey January 2001 Monthly Sales Report

DL-TX 80273-337, Dey February 2001 Monthly Sales Report

DL-TX 80338-403, Dey March 2001 Monthly Sales Report

DL-TX 80404-70, Dey April 2001 Monthly Sales Report

DL-TX 80471-527, Dey May 2001 Monthly Sales Report

DL-TX 80529-94, Dey June 2001 Monthly Sales Report

DL-TX 80595-660, Dey July 2001 Monthly Sales Report

DL-TX 80661-720, Dey August 2001 Monthly Sales Report

DL-TX 80721-83, Dey September 2001 Monthly Sales Report

DL-TX 80784-848, Dey October 2001 Monthly Sales Report

DL-TX 80849-926, Dey November 2001 Monthly Sales Report

DL-TX 80928-92, Dey December 2001 Monthly Sales Report

**Contains Highly Confidential Materials Subject to Protective Order**

## Documents Considered by Lauren J. Stiroh

DL-TX 80995-1060, Dey January 2000 Monthly Sales Report

DL-TX 81061-136, Dey February 2000 Monthly Sales Report

DL-TX 81137-202, Dey March 2000 Monthly Sales Report

DL-TX 81203-68, Dey April 2000 Monthly Sales Report

DL-TX 81269-333, Dey May 2000 Monthly Sales Report

DL-TX 81335-99, Dey June 2000 Monthly Sales Report

DL-TX 81400-67, Dey July 2000 Monthly Sales Report

DL-TX 81468-533, Dey August 2000 Monthly Sales Report

DL-TX 81535-617, Dey September 2000 Monthly Sales Report

DL-TX 81618-84, Dey October 2000 Monthly Sales Report

DL-TX 81685-97, Dey November 2000 Monthly Sales Report

DL-TX 81751-816, Dey December 2000 Monthly Sales Report

DL-TX 81818-89, Dey January 1999 Monthly Sales Report

DL-TX 81890-923, Dey February 1999 Monthly Sales Report

DL-TX 81957-2018, Dey March 1999 Monthly Sales Report

DL-TX 82019-87, Dey April 1999 Monthly Sales Report

DL-TX 82088-161, Dey May 1999 Monthly Sales Report

DL-TX 82162-224, Dey June 1999 Monthly Sales Report

DL-TX 82225-93, Dey July 1999 Monthly Sales Report

DL-TX 82294-365, Dey August 1999 Monthly Sales Report

DL-TX 82366-438, Dey September 1999 Monthly Sales Report

DL-TX 82439-507, Dey October 1999 Monthly Sales Report

DL-TX 82508-76, Dey November 1999 Monthly Sales Report

DL-TX 82577-647, Dey December 1999 Monthly Sales Report

DL-TX 82649-734, Dey January 1998 Monthly Sales Report

DL-TX 82735-68, Dey February 1998 Monthly Sales Report

DL-TX 82769-804, Dey March 1998 Monthly Sales Report

DL-TX 82805-38, Dey April 1998 Monthly Sales Report

DL-TX 82839-77, Dey May 1998 Monthly Sales Report

DL-TX 82878-951, Dey June 1998 Monthly Sales Report

DL-TX 82952-3024, Dey July 1998 Monthly Sales Report

DL-TX 83025-96, Dey August 1998 Monthly Sales Report

**Contains Highly Confidential Materials Subject to Protective Order**

Exhibit 2

## Documents Considered by Lauren J. Stiroh

DL-TX 83097-173, Dey September 1998 Monthly Sales Report

DL-TX 83174-252, Dey October 1998 Monthly Sales Report

DL-TX 83253-315, Dey November 1998 Monthly Sales Report

DL-TX 83316-77, Dey December 1998 Monthly Sales Report

DL-TX 83379-406, Dey January 1997 Monthly Sales Report

DL-TX 83407-34, Dey February 1997 Monthly Sales Report

DL-TX 83435-64, Dey March 1997 Monthly Sales Report

DL-TX 83465-97, Dey April 1997 Monthly Sales Report

DL-TX 83498-529, Dey May 1997 Monthly Sales Report

DL-TX 83530-61, Dey June 1997 Monthly Sales Report

DL-TX 83562-96, Dey July 1997 Monthly Sales Report

DL-TX 83597-633, Dey August 1997 Monthly Sales Report

DL-TX 83634-84, Dey September 1997 Monthly Sales Report

DL-TX 83685-732, Dey October 1997 Monthly Sales Report

DL-TX 83733-86, Dey November 1997 Monthly Sales Report

DL-TX 83787-829, Dey December 1997 Monthly Sales Report

DL-TX 83831-66, Dey January 1996 Monthly Sales Report

DL-TX 83867-905, Dey February 1996 Monthly Sales Report

DL-TX 83906-45, Dey March 1996 Monthly Sales Report

DL-TX 83946-91, Dey April 1996 Monthly Sales Report

DL-TX 83992-4030, Dey May 1996 Monthly Sales Report

DL-TX 84031-101, Dey June 1996 Monthly Sales Report

DL-TX 84102-38, Dey July 1996 Monthly Sales Report

DL-TX 84139-80, Dey August 1996 Monthly Sales Report

DL-TX 84181-221, Dey September 1996 Monthly Sales Report

DL-TX 84222-60, Dey October 1996 Monthly Sales Report

DL-TX 84261-98, Dey November 1996 Monthly Sales Report

DL-TX 84299-342, Dey December 1996 Monthly Sales Report

DL-TX 84344-72, Dey January 1995 Monthly Sales Report

DL-TX 84373-416, Dey February 1995 Monthly Sales Report

DL-TX 84417-45, Dey March 1995 Monthly Sales Report

DL-TX 84446-73, Dey April 1995 Monthly Sales Report

**Contains Highly Confidential Materials Subject to Protective Order**

**Exhibit 2**

### Documents Considered by Lauren J. Stiroh

DL-TX 84474-502, Dey May 1995 Monthly Sales Report

DL-TX 84503-32, Dey June 1995 Monthly Sales Report

DL-TX 84533-60, Dey July 1995 Monthly Sales Report

DL-TX 84561-89, Dey August 1995 Monthly Sales Report

DL-TX 84590-618, Dey September 1995 Monthly Sales Report

DL-TX 84619-47, Dey October 1995 Monthly Sales Report

DL-TX 84648-76, Dey November 1995 Monthly Sales Report

DL-TX 84677-709, Dey December 1995 Monthly Sales Report

DL-TX 84712-20, Dey December 1994 Monthly Sales Report

DL-TX 84723-32, Dey January 1994 Monthly Sales Report

DL-TX 84733-43, Dey February 1994 Monthly Sales Report

DL-TX 84744-54, Dey March 1994 Monthly Sales Report

DL-TX 84755-69, Dey April 1994 Monthly Sales Report

DL-TX 84770-83, Dey May 1994 Monthly Sales Report

DL-TX 84784-98, Dey June 1994 Monthly Sales Report

DL-TX 84799-809, Dey July 1994 Monthly Sales Report

DL-TX 84810-20, Dey August 1994 Monthly Sales Report

DL-TX 84821-31, Dey September 1994 Monthly Sales Report

DL-TX 84832-42, Dey October 1994 Monthly Sales Report

DL-TX 84843-52, Dey November 1994 Monthly Sales Report

DL-TX-0002000-35, Sample Dey Contract Files - Arlington Hospital

DL-TX-0015676-810, Sample Dey Contract Files - CVS

DL-TX-0020466-720, Sample Dey Contract Files - Gerimed

DL-TX-0020721-853, Sample Dey Contract Files - Gerimed

DL-TX-0020854-20904, Sample Dey Contract Files - Gerimed

DL-TX-0129487-545, Dey December 2002 Monthly Sales Report

DL-TX-0129546-96, Dey November 2002 Monthly Sales Report

DL-TX-0129597-645, Dey October 2002 Monthly Sales Report

DL-TX-0129646-702, Dey September 2002 Monthly Sales Report

DL-TX-0129703-53, Dey August 2002 Monthly Sales Report

DL-TX-0129754-804, Dey July 2002 Monthly Sales Report

**Contains Highly Confidential Materials Subject to Protective Order**

**Documents Considered by Lauren J. Stiroh**

<u>Massachusetts Medicaid Tutorial</u>

Affidavit of Christopher Burke (Massachusetts), March 31, 2008

Donohue Tutorial Slides

Massachusetts Medicaid Tutorial Transcript, May 6, 2008

Massachusetts Notice of Filing, April 22, 2008

Massachusetts Tutorial Order, March 14, 2008

Tutorial of Dr. Julie Donohue and Exhibits (Massachusetts), April 21, 2008

Tutorial of Fiona Scott-Morton (Massachusetts)


**Data**

Dey internal pricing data, sales and transactions data, chargeback data, and wholesaler activity data

Federal Supply Schedule data

First DataBank data

IMS sales data

Medispan data

Red Book data

Indirect Customers.mdb

Lot Expirations Albuterol Ipratropium and Cromolyn.xls

NY01-1336678-v1-FDB AWP FDB WAC and AMP data.xls

Wholesaler Master.xls


**News Articles and Publicly Available Information**

<u>Code of Federal Regulation</u>

Title 42, § 405.517, Revised November 1991

Title 42, § 405.517, Revised October 1, 1999

Title 42, § 405.517, Revised October 1, 2003

Title 42, § 447.332, Revised October 4, 2006


<u>Federal Register</u>

Vol. 40, No. 148, 45 C.F.R., July 31, 1975

Vol. 68, No. 161, 42 C.F.R., August 20, 2003

Vol. 69, No. 4, 42 C.F.R., January 7, 2004


**Contains Highly Confidential Materials Subject to Protective Order**

Exhibit 2

## Documents Considered by Lauren J. Stiroh

Vol. 40, No. 219, November 15, 2004

Legislative Acts

Balanced Budget Act of 1997

Deficit Reduction Act of 2005

Medicare Modernization Act of 2003

Myers & Stauffer Reports

Abood, R.  A Survey of Costs of Dispensing Prescriptions And Estimated Acquisition Cost In the State of Wyoming - Schedule F. Topeka, KS: Myers and Stauffer, Chartered Certified Public Accountants, 1990

Abood, R.  A Survey of Costs of Dispensing Prescriptions And Estimated Acquisition Cost In the State of Wyoming. Topeka, KS: Myers and Stauffer, Chartered Certified Public Accountants, 1990

Hotchkiss, G., & Lee, R. A Survey of Costs of Dispensing Prescriptions and Estimated Acquisition Cost in the State of Kentucky. Topeka, KS: Myers and Stauffer, Chartered Certified Public Accountants, 1998

Hotchkiss, G., & Miller, B. A Survey of Costs of Dispensing Prescriptions and Estimated Acquisition Cost in the State of Connecticut. Topeka, KS: Myers and Stauffer, Chartered Certified Public Accountants, 1987

Hotchkiss, G., & Morgan, C. Report on the Cost of Dispensing Pharmaceutical Prescriptions In the State of Alaska. Topeka, KS: Myers and Stauffer, Chartered Certified Public Accountants, 1988

Hotchkiss, G., & Morgan, C. A Survey of the Costs of Dispensing Prescriptions in the State of Kansas. Topeka, KS: Myers and Stauffer, Chartered Certified Public Accountants, 1992

Hotchkiss, G. A Survey of Dispensing Pharmaceutical Prescriptions and Drug Acquisition Costs in the State of Arkansas -  Schedule F. Topeka, KS: Myers and Stauffer, Chartered Certified Public Accountants, 1998

Hotchkiss, G. A Survey of Dispensing Pharmaceutical Prescriptions and Drug Acquisition Costs in the State of Arkansas. Topeka, KS: Myers and Stauffer, Chartered Certified Public Accountants, 1998

Londeen, K., Mincy, W., & Scott, L. A. Evaluation of Pharmacy Benefit Design. Topeka, KS: Myers and Stauffer, Chartered Certified Public Accountants, 2000

Morgan, C. A Survey of the Costs of Dispensing Prescriptions And Estimated Acquisition Cost In the State of Arkansas. Topeka, KS: Myers and Stauffer, Chartered Certified Public Accountants, 1989

Morgan, C. A Survey of the Costs of Dispensing Prescriptions in the State of Kansas. Topeka, KS: Myers and Stauffer, Chartered Certified Public Accountants, 1993

Morgan, C. A Survey of the Costs of Dispensing Prescriptions in the State of Arkansas - Schedules D & G. Topeka, KS: Myers and Stauffer, Chartered Certified Public Accountants, 1994

Morgan, C. A Survey of the Costs of Dispensing Prescriptions in the State of Arkansas. Topeka, KS: Myers and Stauffer, Chartered Certified Public Accountants, 1994

**Contains Highly Confidential Materials Subject to Protective Order**

Exhibit 2

## Documents Considered by Lauren J. Stiroh

Morgan, C. A Survey of Prescription Dispensing Prices In the State of Wyoming - Schedules B, C & F. Topeka, KS: Myers and Stauffer, Chartered Certified Public Accountants, 1995

Morgan, C. A Survey of Prescription Dispensing Prices In the State of Wyoming. Topeka, KS: Myers and Stauffer, Chartered Certified Public Accountants, 1995

Myers and Stauffer, Chartered Certified Public Accountants. A Survey of Costs of Dispensing Prescriptions in the State of Kansas. Topeka, KS, 1997

Myers and Stauffer, Chartered Certified Public Accountants. A Study of the Cost of Economically and Efficiently Dispensed Prescription Medications. Topeka, KS, 1998

Myers and Stauffer, Chartered Certified Public Accountants. Idaho Drug Acquisition Cost Study. Topeka, KS, 1998

Myers and Stauffer, Chartered Certified Public Accountants. A Survey of Dispensing and Estimated Acquisition Costs of Pharmaceuticals in the State of Wyoming. Topeka, KS, 1999

Myers and Stauffer, Chartered Certified Public Accountants. A Survey of Dispensing and Acquisition Costs of Pharmaceuticals in the Commonwealth of Kentucky. Topeka, KS, 1999

Myers and Stauffer, Chartered Certified Public Accountants. A Survey of Dispensing and Acquisition Costs of Pharmaceuticals in the State of Louisiana. Topeka, KS, 1999

Myers and Stauffer, Chartered Certified Public Accountants. A Survey of Dispensing Costs of Pharmaceuticals in the State of Kansas. Topeka, KS, 1999

Myers and Stauffer, Chartered Certified Public Accountants. A Survey of Dispensing and Acquisition Costs of Pharmaceuticals in the Commonwealth of Kentucky. Topeka, KS, 2000

Myers and Stauffer, Chartered Certified Public Accountants. A Survey of Acquisition Costs of Pharmaceuticals in the Commonwealth of Kentucky. Topeka, KS, 2000

Myers and Stauffer, Chartered Certified Public Accountants. A Survey of Dispensing Costs of Pharmaceuticals in the Commonwealth of Kentucky. Topeka, KS, 2000

Myers and Stauffer, Chartered Certified Public Accountants. An Evaluation of Medicaid Pharmaceutical Management Options for the State of Louisiana. Topeka, KS, 2001

Myers and Stauffer, Chartered Certified Public Accountants. A Survey of Acquisition Costs of Pharmaceuticals in the State of Arkansas. Topeka, KS, 2001

Myers and Stauffer, Chartered Certified Public Accountants. A Survey of Dispensing Costs of Pharmaceuticals in the State of Arkansas. Topeka, KS, 2001

Myers and Stauffer, Chartered Certified Public Accountants. A Survey of Acquisition Costs of Pharmaceuticals in the Commonwealth of Kentucky. Topeka, KS, 2001

Myers and Stauffer, Chartered Certified Public Accountants. A Survey of Dispensing Costs of Pharmaceuticals in the Commonwealth of Kentucky. Topeka, KS, 2001

Myers and Stauffer, Chartered Certified Public Accountants. A Survey of Acquisition Costs of Pharmaceuticals in the State of California. Topeka, KS, 2002

Myers and Stauffer, Chartered Certified Public Accountants. Study of Medi-Cal Pharmacy Reimbursement. Topeka, KS, 2002

Myers and Stauffer, Chartered Certified Public Accountants. Determination of the Cost of Dispensing Pharmaceutical Prescriptions For the Texas Vendor Drug Program. Topeka, KS, 2002

**Contains Highly Confidential Materials Subject to Protective Order**

## Documents Considered by Lauren J. Stiroh

Myers and Stauffer, Chartered Certified Public Accountants. A Survey of Dispensing and Acquisition Costs of Pharmaceuticals in the Commonwealth of Kentucky. Topeka, KS, 2003

Myers and Stauffer, Chartered Certified Public Accountants. Analysis of Pharmacy Dispensing Fees for the Indiana Medicaid Program. Topeka, KS, 2005

Myers and Stauffer, Chartered Certified Public Accountants. Survey of the Average Cost of Filling a Medicaid Prescription in the State of Minnesota. Topeka, KS, 2006

Myers and Stauffer, Chartered Certified Public Accountants. Survey of the Average Cost of Filling a Medicaid Prescription in the State of Louisiana. Topeka, KS, 2007

Myers and Stauffer, Chartered Certified Public Accountants. Analysis of Pharmacy Dispensing Fees for the Indiana Medicaid Program. Topeka, KS, 2007

Myers and Stauffer, Chartered Certified Public Accountants. Survey of Dispensing and Acquisition Costs of Pharmaceuticals in the State of California. Topeka, KS, 2007

Myers and Stauffer, Chartered Certified Public Accountants. Survey of the Dispensing Costs of Pharmaceuticals in the State of Nevada. Topeka, KS, 2007

National Pharmaceutical Council

National Pharmaceutical Council, 1992 Pharmaceutical Benefits under State Medical Assistance Programs. Reston, VA, 1992

National Pharmaceutical Council, 1993 Pharmaceutical Benefits under State Medical Assistance Programs. Reston, VA, 1993

National Pharmaceutical Council, 1994 Pharmaceutical Benefits under State Medical Assistance Programs. Reston, VA, 1994

National Pharmaceutical Council, 1995 Pharmaceutical Benefits under State Medical Assistance Programs. Reston, VA, 1995

National Pharmaceutical Council, 1996 Pharmaceutical Benefits under State Medical Assistance Programs. Reston, VA, 1996

National Pharmaceutical Council, 1997 Pharmaceutical Benefits under State Medical Assistance Programs. Reston, VA, 1997

National Pharmaceutical Council, 1998 Pharmaceutical Benefits under State Medical Assistance Programs. Reston, VA, 1998

National Pharmaceutical Council, 1999 Pharmaceutical Benefits under State Medical Assistance Programs. Reston, VA, 1999

National Pharmaceutical Council, 2000 Pharmaceutical Benefits under State Medical Assistance Programs. Reston, VA, 2000

National Pharmaceutical Council, 2001 Pharmaceutical Benefits under State Medical Assistance Programs. Reston, VA, 2001

National Pharmaceutical Council, 2002 Pharmaceutical Benefits under State Medical Assistance Programs. Reston, VA, 2002

**Contains Highly Confidential Materials Subject to Protective Order**

Exhibit 2

### Documents Considered by Lauren J. Stiroh

National Pharmaceutical Council, 2003 Pharmaceutical Benefits under State Medical Assistance Programs. Reston, VA, 2003

National Pharmaceutical Council, 2004 Pharmaceutical Benefits under State Medical Assistance Programs. Reston, VA, 2004

National Pharmaceutical Council, 2005/2006 Pharmaceutical Benefits under State Medical Assistance Programs. Reston, VA, 2006

National Pharmaceutical Council, 2007 Pharmaceutical Benefits under State Medical Assistance Programs. Reston, VA, 2007


News Articles

"U.S. Medicaid Pharmacy Cuts a 'Prescription for disaster,'" *Pharma Marketletter*, October 17, 2005

Alpert, Bill, "Hooked on Drugs: Why do insurers pay such outrageous Prices for pharmaceuticals?" *Barron's*, June 10, 1996

Cook, Rebecca, "Pharmacists threaten to cut off Medicaid Patients," *The Columbian*, July 31, 2002

Fahmy, Sameh, "Some fear Medicare Cuts in Chemo Funding will harm Patients," *The Tennessean*, August 16, 2004

Gray, Tom, "Construction Ahead," *HomeCare*, October 1, 2002

Manning, Joe, "Pharmacies say Budget Cut would Cost Millions," *The Milwaukee Journal Sentinel*, March 10, 2003

McFadden, Robert D., "Cuomo puts off Medicaid Cut after Pleas from Pharmacists," *New York Times*, February 16, 1992


Program Memoranda

U.S. Department of Health and Human Services, Health Care Financing Administration. Program Memorandum AB-00-86, Re: An Additional Source of Average Wholesale Price Data in Pricing Drugs and Biologicals Covered by the Medicare Program, September 8, 2000

U.S. Department of Health and Human Services, Health Care Financing Administration. Program Memorandum AB-00-115, Re: Source of Average Wholesale Price Data in Pricing Drugs and Biologicals Covered by the Medicare Program, November 17, 2000

U.S. Department of Health and Human Services, Health Care Financing Administration. Program Memorandum AB-00-133, Re: Interim Instructions - Document and Correspondence Name Transition from Health Care Financing Administration to Centers for Medicare & Medicaid Services (CMS), September 24, 2001


State Reports

Commonwealth of Massachusetts. Report to the General Court Reimbursement for Prescribed Drugs, 2002


**Contains Highly Confidential Materials Subject to Protective Order**

## Documents Considered by Lauren J. Stiroh

State of Utah, Department of Health, Division of Health Care Financing. Medicaid Pharmacy - Acquisition Cost of Generic Prescription Drug Products, 1999

Testimony

Testimony of Douglas Holtz-Eakin, former Director of U.S. Congressional Budget Office, July 20, 2005, Payments for Prescription Drugs Under Medicaid

Testimony of George Reeb, former Assistant Inspector General, October 3, 2002

Testimony of George Reeb, former Assistant Inspector General, December 7, 2004

Testimony of Janet Rehnquist, former Inspector General, March 13, 2002, Reimbursement and Access To Prescription Drugs Under Medicare Part B

U.S. Congressional Budget Office Reports

U.S. Congressional Budget Office. How the Medicaid Rebate on Prescription Drugs Affects Pricing in the Pharmaceutical Industry. Washington, D.C., 1996

U.S. Congressional Budget Office. How Increased Competition from Generic Drugs has Affected Prices and Returns in the Pharmaceutical Industry. Washington, D.C., 1998

U.S. Congressional Budget Office. Medicaid's Reimbursements to Pharmacies for Prescription Drugs. Washington, D.C., 2004

U.S. Congressional Budget Office. Prices for Brand-Name Drugs Under Selected Federal Programs. Washington, D.C., 2005

U.S. Congressional Research Services

U.S. Congressional Research Services. The Medicare Improvement for Patients and Providers Act of 2008. Washington, D.C., 2008

U.S. Department of Health and Human Services

U.S. Department of Health and Human Services. Office of the Inspector General. Changes to the Medicaid Prescription Drug Program Could Save Millions. Washington, D.C., 1984

U.S. Department of Health and Human Services. Office of the Inspector General. Re: OIG Management Advisory Report - The Use of Average Wholesale Prices in Reimbursing Pharmacies Participating in Medicaid and the Medicare Catastrophic Coverage Act Prescription Drug Program. Washington, D.C., 1989

U.S. Department of Health and Human Services. Office of the Inspector General. Cost of Dialysis-Related Drugs. Washington, D.C., 1992

U.S. Department of Health and Human Services. Office of the Inspector General. Physicians' Costs for Chemotherapy Drugs. Washington, D.C., 1992

U.S. Department of Health and Human Services. Office of the Inspector General. Medicare Payments for Nebulizer Drugs. Washington, D.C., 1996

**Contains Highly Confidential Materials Subject to Protective Order**

Exhibit 2

## Documents Considered by Lauren J. Stiroh

U.S. Department of Health and Human Services. Office of the Inspector General. Review of Pharmacy Acquisition Costs for Drugs Reimbursed Under the Medicaid Prescription Drug Program of the California Department of Health Services. Washington, D.C., 1996

U.S. Department of Health and Human Services. Office of the Inspector General. A Comparison of Albuterol Sulfate Prices. Washington, D.C., 1996

U.S. Department of Health and Human Services. Office of the Inspector General. Suppliers' Acquisition Costs for Albuterol Sulfate. Washington, D.C., 1996

U.S. Department of Health and Human Services. Office of the Inspector General. Review of Pharmacy Acquisition Costs for Drugs Reimbursed Under the Medicaid Prescription Drug Program of the Montana Department of Public Health and Human Services. Washington, D.C., 1996

U.S. Department of Health and Human Services. Office of the Inspector General. Review of Pharmacy Acquisition Costs for Drugs Reimbursed Under the Medicaid Prescription Drug Program of the Virginia Department of Medical Assistance Services. Washington, D.C., 1996

U.S. Department of Health and Human Services. Office of the Inspector General. Review of Pharmacy Acquisition Costs for Drugs Reimbursed Under the Medicaid Prescription Drug Program of the Missouri Department of Social Services. Washington, D.C., 1997

U.S. Department of Health and Human Services. Office of the Inspector General. Medicaid Pharmacy - Actual Acquisition Cost of Prescription Drug Products for Brand Name Drugs. Washington, D.C., 1997

U.S. Department of Health and Human Services. Office of the Inspector General. Medicaid Pharmacy - Actual Acquisition Cost of Generic Prescription Drug Products. Washington, D.C., 1997

U.S. Department of Health and Human Services. Office of the Inspector General. Excessive Medicare Payments for Prescription Drugs. Washington, D.C., 1997

U.S. Department of Health and Human Services. Office of the Inspector General. Comparing Drug Reimbursement: Medicare and Department of Veterans Affairs. Washington, D.C., 1998

U.S. Department of Health and Human Services. Office of the Inspector General. Infusion Therapy Services Provided in Skilled Nursing Facilities. Washington, D.C., 1999

U.S. Department of Health and Human Services. Office of the Inspector General. Medicare Reimbursement of Albuterol. Washington, D.C., 2000

U.S. Department of Health and Human Services. Office of the Inspector General. Medicare Reimbursement of Prescription Drugs. Washington, D.C., 2001

U.S. Department of Health and Human Services. Office of the Inspector General. Medicaid Pharmacy - Actual Acquisition Cost of Brand Name Prescription Drug Products. Washington, D.C., 2001

U.S. Department of Health and Human Services. Office of the Inspector General. Medicaid's Use of Revised Average Wholesale Prices. Washington, D.C., 2001

U.S. Department of Health and Human Services. Office of the Inspector General. Review of Pharmacy Acquisition Costs for Drugs Reimbursed Under the Medicaid Prescription Drug Program of the Texas Health and Human Services Commission. Washington, D.C., 2001

U.S. Department of Health and Human Services. Office of the Inspector General. Review of Pharmacy Acquisition Costs for Drugs Reimbursed Under the Medicaid Prescription Drug Program of the West Virginia Department of Health and Human Resources. Washington, D.C., 2001

**Contains Highly Confidential Materials Subject to Protective Order**

Exhibit 2

### Documents Considered by Lauren J. Stiroh

U.S. Department of Health and Human Services. Office of the Inspector General. Review of Pharmacy Acquisition Costs for Drugs Reimbursed Under the Medicaid Prescription Drug Program of the Florida Agency for Health Care Administration. Washington, D.C., 2002

U.S. Department of Health and Human Services. Office of the Inspector General. Review of Pharmacy Acquisition Costs for Drugs Reimbursed Under the Medicaid Prescription Drug Program of the Montana Department of Public Health and Human Services. Washington, D.C., 2002

U.S. Department of Health and Human Services. Office of the Inspector General. Excessive Medicare Reimbursement for Albuterol. Washington, D.C., 2002

U.S. Department of Health and Human Services. Office of the Inspector General. Excessive Medicare Reimbursement for Ipratropium Bromide. Washington, D.C., 2002

U.S. Department of Health and Human Services. Office of the Inspector General. Medicaid Pharmacy - Actual Acquisition Cost of Generic Prescription Drug Products. Washington, D.C., 2002

U.S. Department of Health and Human Services. Office of the Inspector General. Medicaid Pharmacy - Additional Analyses of the Actual Acquisition Cost of Prescription Drug Products. Washington, D.C., 2002

U.S. Department of Health and Human Services. Office of the Inspector General. Update: Excessive Medicare Reimbursement for Albuterol. Washington, D.C., 2004

U.S. Department of Health and Human Services. Office of the Inspector General. Update: Excessive Medicare Reimbursement for Ipratropium Bromide. Washington, D.C., 2004

U.S. Department of Health and Human Services. Office of the Inspector General. Medicaid Drug Price Comparisons: Average Manufacturer Price to Published Prices. Washington, D.C., 2005

U.S. Department of Health and Human Services. Office of the Inspector General. Medicaid Drug Price Comparisons: Average Sales Price to Average Wholesale Price. Washington, D.C., 2005

U.S. Department of Health and Human Services. Office of the Inspector General. Determining Average Manufacturing Prices for Prescription Drugs under the Deficit Reduction Act of 2005. Washington, D.C., 2006

U.S. Department of Health and Human Services. Office of the Inspector General. Generic Drug Utilization in State Medicaid Programs. Washington, D.C., 2006

U.S. Department of Health and Human Services. Office of the Inspector General. Deficit Reduction Act of 2005: Impact on the Medicaid Federal Upper Limit. Washington, D.C., 2007

U.S. Department of Health and Human Services, Centers for Medicare and Medicaid Services. 2008 Actuarial Report. Washington, D.C., 2008

U.S. Department of Health, Education, and Welfare

U.S. Department of Health, Education, and Welfare. U.S. Task Force on Prescription Drugs: The Drug Makers and The Drug Distributors. Washington, D.C., 1968

U.S. Government Accountability Office

U.S. Government Accountability Office. Prescription Drugs - Changes in Prices for Selected Drugs. Washington, D.C., 1992

**Contains Highly Confidential Materials Subject to Protective Order**

Exhibit 2

## Documents Considered by Lauren J. Stiroh

U.S. Government Accountability Office. Prescription Drugs - Expanding Access to Federal Prices Could Cause Other Price Changes. Washington, D.C., 2000

U.S. Government Accountability Office. DOD and VA Pharmacy - Progress and Remaining Challenges in Jointly Buying and Mailing Out Drugs. Washington, D.C., 2001

U.S. Government Accountability Office. Medicare - Payments for Covered Outpatient Drugs Exceed Providers' Cost. Washington, D.C., 2001

U.S. Government Accountability Office. Medicare - Appropriate Dispensing Fee Needed for Suppliers of Inhalation Therapy Drugs. Washington, D.C., 2004

U.S. Government Accountability Office. Medicare Chemotherapy Payments: New Drug and Administration Fees are Closer to Providers' Costs. Washington, D.C., 2004

U.S. Government Accountability Office. Medicaid Outpatient Prescription Drugs: Estimated 2007 Federal Upper Limits for Reimbursement Compared with Retail Pharmacy Acquisition Costs. Washington, D.C., 2006


Websites

Center for Drug Evaluation and Research web site, www.fda.gov/cder

Centers for Medicare & Medicaid Services web site, www.cms.hhs.gov

   CMS Strategic Action Plan 2006-2009, October 16, 2006

   CSR Inquiry Assistance, "Supplying Fee and Inhalation Drug Dispensing Fee Revisions and Clarifications," December 8, 2005, effective January 1, 2006

   Healthcare Common Procedure Coding System (HCPCS) Level II Coding Procedures

   Medicaid Prescription Reimbursement Information by State – Quarter Ending December 2008

   Safe and Effective Approaches to Lowering State Prescription Drug Costs: Best Practices Among State Medicaid Drug Programs (9/9/04)

Dey Pharmaceuticals web site, www.dey.com

Kaiser Network web site, www.kaisernetwork.org

   Kaiser Daily Health Policy Report, "Brooks Pharmacy, Walgreens Join CVS in Ending Participation in Massachusetts' Medicaid Program," July 31, 2002

   Medicaid and AWP Hearing: Medicaid Prescription Drug Reimbursement: Why the Government Pays Too Much, December 7, 2004

King Pharmaceuticals web site, www.kingpharm.com

   Letter to Healthcare Professional, May 30, 2008

Massachusetts Public Interest Research Group web site, www.masspirg.org

   Health Care Reform: Prescriptions for Quality Health Care, December 20, 2001

National Association of Chain Drug Stores, www.nacds.org

   Judge Grants AMP Rule Injunction

**Contains Highly Confidential Materials Subject to Protective Order**

**Exhibit 2**

## Documents Considered by Lauren J. Stiroh

National Library of Medicine and National Institute of Health web site, www.nlm.nih.gov

National Community Pharmacists Association web site, www.ncpanet.org

> Frequently Asked Questions, Lawsuit Filed by NACDS and NCPA Against CMS Challenging AMP Rule, November 7, 2007

ProAir HFA - Albuterol Inhalers web site, www.proairhfa.com

Schering-Plough Corporation web site, www.schering-plough.com

St. John Fisher College web site, www.sjfc.edu

> 2008 National Association of Boards of Pharmacy: Survey of Law

U.S. Department of Veteran Affairs web site, www.pbm.va.gov

> VA Federal Supply Schedules: Catalog 2004

U.S. Food and Drug Administration web site, www.fda.gov


Other

American Society of Clinical Oncology, "Reform of the Medicare Payment Methods for Cancer Chemotherapy," May 2001

Castagnoli, William G. "More on AWP: Nevada suit attacks Rx firms on AWP System"

Gencarelli, Dawn M. "Average Wholesale Price for Prescription Drugs: Is There a More Appropriate Pricing Mechanism?" National Health Policy Forum Issue Brief, No. 775, (June 2002)

Hoffman, Earl Dirk, Barbara S. Klees & Catherine A. Curtis, "Brief Summaries of Medicare & Medicaid," as of November 1, 2008

NAMFCU Letter to Medicaid Pharmacy Director, February 16, 2000

Spears, James M. and Pearlman, Jeff. "Using Litigation to Regulate Drug Prices: The Assault on AWP"

Texas Government Code – § 531.070

U.S. Department of Health and Human Services, Food and Drug Administration, "Approved Drug Products with Therapeutic Equivalence Evaluations," 28th Edition: 2008

United States Code Annotated, Title 42, Effective July 15, 2008


**Literature**

Abramson, Richard G., Catherine A. Harrington, Raad Missmar, Susan P. Li, and Daniel N. Mendelson, "Generic Drug Cost Containment in Medicaid: Lessons from Five State MAC Programs," Working Paper (July 2003): 25-34

Duggan, Mark and Scott Morton, Fiona M. "The Distortionary Effects of Government Procurement: Evidence from Medicaid Prescription Drug Purchasing." *The Quarterly Journal of Economics* (February 2006): 1-30

Frank, Richard G., and Salkever, David S. "Generic Entry and the Pricing of Pharmaceuticals." *Journal of Economics & Management Strategy* (Spring 1997): 75-90

**Contains Highly Confidential Materials Subject to Protective Order**

Exhibit 2

## Documents Considered by Lauren J. Stiroh

Grabowski, Henry G. and Vernon, John M. "Brand Loyalty, Entry, and Price Competition in Pharmaceuticals After the 1984 Drug Act." *Journal of Law & Economics* (October 1992): 331-50

Reiffen, David and Ward, Michael R. "Generic Drug Industry Dynamics." *The Review of Economics and Statistics* (February 2005): 37-49

Schondelmeyer, Stephen W. and Wrobel, Marian V. "Medicaid and Medicare Drug Pricing: Strategy to Determine Market Prices." (August 2004)

Schondelmeyer, Stephen W. "Case Study of the Texas Vendor Drug Program's Approach to Estimating Drug Acquisition Costs." (September 2005)

Schondelmeyer, Stephen W. "Impact of the 10 Percent Fee-for- Service Payment Reductions on Medi-Cal Beneficiaries and Pharmacies." (June 2008)

Schweitzer, Stuart O. *Pharmaceutical Economics and Policy*. New York: Oxford University Press, 1997

**Contains Highly Confidential Materials Subject to Protective Order**

Contains Highly Confidential Materials - Subject to Protective Order
Exhibit 3

**National Pharmaceutical Council State Ingredient Reimbursement**
**1991 to 1993 and 1995 to 2007**

| State | NPC 1991 (a) | NPC 1992 (b) | NPC 1993 (c) | NPC 1995 (d) | NPC 1996 (e) | NPC 1997 (f) |
|---|---|---|---|---|---|---|
| Alabama | WAC+9.2% | WAC+9.2% | WAC+9.2% | WAC+9.2% | WAC+9.2% | WAC+9.2% |
| Alaska | AWP-5% | AWP-5% | AWP-5% | AWP-5% | AWP-5% | AWP-5% |
| Arizona[1] | -- | -- | -- | -- | -- | -- |
| Arkansas | AWP-10.5% | AWP-10.5% | AWP-10.5% | AWP-10.5% | AWP-10.5% | AWP-10.5% |
| California | AWP-5% | AWP-5% | AWP-5% | AWP-5% | AWP-5% | AWP-5% |
| Colorado | AWP-10%; WAC+18% | AWP-10%; WAC+18% | AWP-10%; WAC+18% | AWP-10%; WAC+18% | AWP-10%; WAC+18% | AWP-10%; WAC+18% |
| Connecticut[2] | AWP-8% | AWP-8% | AWP-8% | AWP-8% | AWP-12% | AWP-12% |
| Delaware[3] | AAC; AWP-6% | AAC; AWP-6% | AAC | AAC | AAC | AWP-12.9% |
| D.C. | AWP-10% | AWP-10% | AWP-10% | AWP-10% | AWP-10% | AWP-10% |
| Florida | WAC+7% | WAC+7% | WAC+7% | WAC+7% | WAC+7% | WAC+7% |
| Georgia | AWP-10% | AWP-10% | AWP-10% | AWP-10% | AWP-10% | AWP-10% |
| Hawaii | AWP-10.5% | AWP-10.5% | AWP-10.5% | AWP-10.5% | AWP-10.5% | AWP-10.5% |
| Idaho | AWP | AWP | AWP | AWP | AWP | AWP |
| Illinois | AWP-10% | AWP-10% | AWP-10% | AWP-10% | AWP-10%; AWP-12% for multisource drugs | AWP-10%; AWP-12% for multisource drugs |
| Indiana | AWP-10% | AWP-10% | AWP-10% | AWP-10% | AWP-10% | AWP-10% |
| Iowa | AWP-10% | AWP-10% | AWP-10% | AWP-10% | AWP-10% | AWP-10% |
| Kansas[4] | AWP-10% | AWP-10% | AWP-10% | AWP-10% | AWP-10% | AWP-10% |
| Kentucky | AWP-10% | AWP-10% | AWP-10% | AWP-10% | AWP-10% | AWP-10% |
| Louisiana | AWP-10.5% | AWP-10.5% | AWP-10.5% | AWP-10.5% | AWP-10.5% | AWP-10.5% |
| Maine | EAC; AWP-5% | EAC; AWP-5% | EAC; AWP-5% | EAC; AWP-5% | AWP-10% | AWP-10% |
| Maryland[5] | WAC+10% | WAC+10% | WAC+10% | WAC+10% | WAC+10% | WAC+10% |
| Massachusetts | WAC+10% | WAC+10% | WAC+10% | WAC+10% | WAC+10% | WAC+10% |
| Michigan[6] | AWP-10%; AAC | AWP-10%; AAC | AWP-10%; AAC | AWP-13.5% (1 to 4 stores); AWP-15.1% (5+ stores) | AWP-13.5% (1 to 4 stores); AWP-15.1% (5+ stores) | AWP-13.5% (1 to 4 stores); AWP-15.1% (5+ stores) |
| Minnesota | AWP-10% | AWP-10% | AWP-7.6% | AWP-7.6% | AWP-9% | AWP-9% |
| Mississippi | AWP-10% | AWP-10% | AWP-10% | AWP-10% | AWP-10% | AWP-10% |
| Missouri | AWP-10.43% | AWP-10.43% | AWP-10.43% | AWP-10.43% | AWP-10.43% | AWP-10.43% |
| Montana | AWP-10% | AWP-10% | AWP-10% | AWP-10% | AWP-10% | AWP-10% |
| Nebraska | AWP-8.71%; WAC+12.52% | AWP-8.71%; WAC+12.52% | AWP-8.71%; WAC+12.52% | AWP-8.71%; WAC+12.52% | AWP-8.71% | AWP-8.71% |
| Nevada | AWP-10% | AWP-10% | AWP-10% | AWP-10% | AWP-10% | AWP-10% |
| New Hampshire | AWP-10% | AWP-10% | AWP-10% | AWP-10% | AWP-12% | AWP-12% |
| New Jersey[7] | AWP-(0-6%) | AWP-(0-6%) | AWP-(0-6%) | AWP-(0-6%) | AWP-(2-8%) | AWP-10% |
| New Mexico | AWP-10.5% | AWP-10.5% | AWP-10.5% | AWP-10.5% | AWP-10.5% | AWP-12.5% |
| New York | AWP | AWP | AWP | AWP-10% | AWP-10% | AWP-10% |
| North Carolina | AWP-10% | AWP-10% | AWP-10% | AWP-10% | AWP-10% | AWP-10% |
| North Dakota | AWP-10% | AWP-10% | AWP-10% | AWP-10% | AWP-10% | AWP-10% |
| Ohio | AWP-7% | AWP-7% | AWP-7% | AWP-7% | AWP-7.5% | AWP-7.5% |
| Oklahoma | AWP-10.5% | AWP-10.5% | AWP-10.5% | AWP-10.5% | AWP-10.5% | AWP-10.5% |
| Oregon | AWP-11% | AWP-11% | AWP-11% | AWP-11% | AWP-11% | AWP-11% |
| Pennsylvania | AWP | AWP | AWP | AWP | AWP-10% | AWP-10% |
| Rhode Island | AWP | AWP | AWP | WAC + 10% | WAC+5% | WAC+5% |
| South Carolina | AWP-9.5% | AWP-9.5% | AWP-9.5% | AWP-9.5% | AWP-10% | AWP-10% |
| South Dakota | AWP-10.5% | AWP-10.5% | AWP-10.5% | AWP-10.5% | AWP-10.5% | AWP-10.5% |
| Tennessee[8] | AWP-8% | AWP-8% | -- | -- | -- | -- |
| Texas | AWP-10.49% | AWP-10.49% | AWP-10.49%; WAC+12% | AWP-10.49%; WAC+12% | AWP-10.49%; WAC+12% | AWP-10.49%; WAC+12% |
| Utah | AWP-12% | AWP-12% | AWP-12% | AWP-12% | AWP-12% | AWP-12% |
| Vermont | AWP-10% | AWP-10% | AWP-10% | AWP-10% | AWP-10% | AWP-10% |
| Virginia | AWP-9% | AWP-9% | AWP-9% | AWP-9% | AWP-9% | AWP-9% |
| Washington[9] | AWP-11% | AWP-11% | AWP-11% | AWP-11% | AWP-11% | AWP-11% |
| West Virginia | AWP | AWP | AWP | AWP | AWP-12% | AWP-12% |
| Wisconsin | AWP-10% | AWP-10% | AWP-10% | AWP-10% | AWP-10% | AWP-10% |
| Wyoming | AWP-11% | AWP-11% | AWP-4% | AWP-4% | AWP-4% | AWP-4% |

-- Not Reported

Contains Highly Confidential Materials - Subject to Protective Order
Exhibit 3

**National Pharmaceutical Council State Ingredient Reimbursement**
**1991 to 1993 and 1995 to 2007**

| State | NPC 1998 (g) | NPC 1999 (h) | NPC 2000 (i) | NPC 2001 (j) | NPC 2002 (k) |
|---|---|---|---|---|---|
| Alabama | WAC+9.2% | WAC+9.2% | AWP-10%; WAC+9.2% | AWP-10%; WAC+9.2% | AWP-10%; WAC+9.2% |
| Alaska | AWP-5% | AWP-5% | AWP-5% | AWP-5% | AWP-5% |
| Arizona[1] | AWP-10% | AWP-10% | -- | -- | -- |
| Arkansas | AWP-10.5% | AWP-10.5% | AWP-10.5% | AWP-10.5% | AWP-10.5% |
| California | AWP-5% | AWP-5% | AWP-5% | AWP-5% | AWP-10% |
| Colorado | AWP-10%; WAC+18% | AWP-10%; WAC+18% | AWP-10%; WAC+18% | AWP-11%; WAC+18% | B: AWP-13.5%; WAC+18%; G: AWP-35% |
| Connecticut[2] | AWP-12% | AWP-12% | AWP-12% | AWP-12% | AWP-12% |
| Delaware[3] | AWP-12.9% | AWP-12.9% | AWP-12.9% | AWP-12.9% | AWP-12.9% |
| D.C. | AWP-10% | AWP-10% | AWP-10% | AWP-10% | AWP-10% |
| Florida | WAC+7% | AWP-11.5%; WAC+7% | AWP-13.25% | AWP-13.25%; WAC +7% | AWP-13.25%; WAC +7% |
| Georgia | AWP-10% | AWP-10% | AWP-10% | AWP-10% | AWP-10% |
| Hawaii | AWP-10.5% | AWP-10.5% | AWP-10.5% | AWP-10.5% | AWP-10.5% |
| Idaho | AWP | AWP-11% | AWP-11% | AWP-12% | AWP-12% |
| Illinois | AWP-10%; AWP-12% for multisource drugs | AWP-10%; AWP-12% for multisource drugs | AWP-10%; AWP-12% for multisource drugs | AWP-11% | B: AWP-11%; G: AWP-20% |
| Indiana | AWP-10% | AWP-10% | AWP-10% | AWP-10% | B: AWP-13.5%; G: AWP-20% |
| Iowa | AWP-10% | AWP-10% | AWP-10% | AWP-10% | AWP-10% |
| Kansas[4] | AWP-10% | AWP-10% | AWP-10% | AWP-10% | B: AWP-15%; G: AWP-27% |
| Kentucky | AWP-10% | AWP-10% | AWP-10% | AWP-10% | AWP-12% |
| Louisiana | AWP-10.5% | AWP-10.5% | AWP-10.5% | AWP-13.5% (AWP-15% for chains) | AWP-13.5% (AWP-15% for chains) |
| Maine | AWP-10% | AWP-10% | AWP-10% | AWP-10% | AWP-13% |
| Maryland[5] | WAC+10% | AWP-10% | WAC+10%; Direct +10%; AWP-10% | WAC+10%; Direct +10%; AWP-10% | WAC+10%; Direct +10%; AWP-10% |
| Massachusetts | WAC+10% | WAC+10% | WAC+10% | WAC+10% | WAC+5% |
| Michigan[6] | AWP-13.5% (1 to 4 stores); AWP-15.1% (5+ stores) | AWP-13.5% (1 to 4 stores); AWP-15.1% (5+ stores) | AWP-13.5% (1 to 4 stores); AWP-15.1% (5+ stores) | AWP-13.5% (1 to 4 stores); AWP-15.1% (5+ stores) | AWP-13.5% (1 to 4 stores); AWP-15.1% (5+ stores) |
| Minnesota | AWP-9% | AWP-9% | AWP-9% | AWP-9% | AWP-9% |
| Mississippi | AWP-10% | AWP-10% | AWP-10% | AWP-10% | AWP-12% |
| Missouri | AWP-10.43% | AWP-10.43% | AWP-10.43% | AWP-10.43%; WAC+10% | AWP-10.43%; WAC+10% |
| Montana | AWP-10% | AWP-10% | AWP-10% | AWP-10%, direct price for some labelers | AWP-15%, direct price for some labelers |
| Nebraska | AWP-8.71% | AWP-8.71% | AWP-8.71% | AWP-10% | AWP-11% |
| Nevada | AWP-10% | AWP-10% | AWP-10% | AWP-10% | AWP-15% |
| New Hampshire | AWP-12% | AWP-12% | AWP-12% | AWP-12% | AWP-12% |
| New Jersey[7] | AWP-10% | AWP-10% | AWP-10% | AWP-10%; WAC+30% | AWP-10%; WAC+30% |
| New Mexico | AWP-12.5% | AWP-12.5% | AWP-12.5% | AWP-12.5% | AWP-12.5% |
| New York | AWP-10% | AWP-10% | AWP-10% | AWP-10% | AWP-10% |
| North Carolina | AWP-10% | AWP-10% | AWP-10% | AWP-10% | AWP-10% |
| North Dakota | AWP-10% | AWP-10% | AWP-10% | AWP-10% | AWP-10% |
| Ohio | AWP-11% | AWP-11% | AWP-11% | AWP-11% | WAC+9% |
| Oklahoma | AWP-10.5% | AWP-10.5% | AWP-10.5% | AWP-12% | AWP-12% |
| Oregon | AWP-11% | AWP-11% | AWP-11% | AWP-13% | AWP-13% |
| Pennsylvania | AWP-10% | AWP-10% | AWP-10% | AWP-10% | AWP-10% |
| Rhode Island | WAC+5% | WAC+5% | WAC+5% | WAC+5% | WAC+5% |
| South Carolina | AWP-10% | AWP-13% | AWP-10% | AWP-10% | AWP-10% |
| South Dakota | AWP-10.5% | AWP-10.5% | AWP-10.5% | AWP-10.5% | AWP-10.5% |
| Tennessee[8] | -- | -- | -- | -- | -- |
| Texas | AWP-10.49%; WAC+12% | AWP-15%; WAC+12% | AWP-15%; WAC+12% | AWP-15%; WAC+12% | AWP-15%; WAC+12% |
| Utah | AWP-12% | AWP-12% | AWP-12% | AWP-12% | AWP-15% |
| Vermont | AWP-10% | AWP-10% | AWP-11.9% | AWP-11.9% | AWP-11.9% |
| Virginia | AWP-9% | AWP-9% | AWP-9% | AWP-9% | AWP-10.25% |
| Washington[9] | AWP-11% | AWP-11% | AWP-11% | AWP-11% | AWP-14% |
| West Virginia | AWP-12% | AWP-12% | AWP-12% | AWP-12% | AWP-12% |
| Wisconsin | AWP-10% | AWP-10% | AWP-10% | AWP-11.25% | AWP-11.25% |
| Wyoming | AWP-4% | AWP-4% | AWP-4% | AWP-11% | AWP-11% |

-- Not Reported

Contains Highly Confidential Materials - Subject to Protective Order
Exhibit 3

**National Pharmaceutical Council State Ingredient Reimbursement**
**1991 to 1993 and 1995 to 2007**

| State | NPC 2003 (l) | NPC 2004 (m) | NPC 2005/2006 (n) | NPC 2007 (o) |
|---|---|---|---|---|
| Alabama | AWP-10%; WAC+9.2% | AWP-10%; WAC+9.2% | AWP-10%; WAC+9.2% | AWP-10%; WAC+9.2% |
| Alaska | AWP-5% | AWP-5% | AWP-5% | AWP-5% |
| Arizona[1] | ... | ... | ... | ... |
| Arkansas | B: AWP-14%; G: AWP-20% | B: AWP-14%; G: AWP-20% | B: AWP-14%; G: AWP-20% | B: AWP-14%; G: AWP-20% |
| California | AWP-10% | AWP-17% | AWP-17% | AWP-17% |
| Colorado | B: AWP-13.5%; WAC+18%; G: AWP-35% | B: AWP-13.5%; WAC+18%; G: AWP-35% | B: AWP-13.5%; Direct Pricing+18%; G: AWP-35% | B: AWP-13.5%; Direct Pricing+18%; G: AWP-35% |
| Connecticut[2] | AWP-12% | AWP-12% | AWP-14% | AWP-14% |
| Delaware[3] | AWP-14% | AWP-14% | AWP-14% | AWP-14% |
| D.C. | AWP-10% | AWP-10% | AWP-10% | AWP-10% |
| Florida | AWP-13.25%; WAC +7% | AWP-15.4%; WAC +5.75% | AWP-15.4%; WAC +5.75% | AWP-15.4%; WAC +5.75% |
| Georgia | AWP-10% | AWP-11% | AWP-11% | AWP-11% |
| Hawaii | AWP-10.5% | AWP-10.5% | AWP-10.5% | AWP-10.5% |
| Idaho | AWP-12% | AWP-12% | AWP-12% | AWP-12% |
| Illinois | B: AWP-11%; G: AWP-20% | B: AWP-12% | B: AWP-12% | B: AWP-12%; G: AWP-25% |
| Indiana | B: AWP-13.5%; G: AWP-20% | B: AWP-13.5%; G: AWP-20% | B: AWP-13.5%; G: AWP-20% | B: AWP-16%; G: AWP-20% |
| Iowa | AWP-12% | AWP-12% | AWP-12% | AWP-12% |
| Kansas[4] | B: AWP-15%; G: AWP-27% | B: AWP-13%; G: AWP-27% | B: AWP-13%; G: AWP-27% | B: AWP-13%; G: AWP-27% |
| Kentucky | AWP-12% | AWP-12% | AWP-12% | B: AWP-14%; G: AWP-15% |
| Louisiana | AWP-13.5% (AWP-15% for chains) | AWP-13.5% (AWP-15% for chains) | AWP-13.5% (AWP-15% for chains) | AWP-13.5% (AWP-15% for chains) |
| Maine | AWP-15% | AWP-15% | AWP-15% | AWP-15% (retail), 17% (spec.), 20% (mail Order) |
| Maryland[5] | WAC+9%; direct +9%; AWP-11% | WAC+8%; direct +8%; AWP-12% | WAC+8%; direct +8%; AWP-12% | WAC+8%; direct +8%; AWP-12% |
| Massachusetts | WAC+6% | WAC+5% | WAC+5% | WAC+5% |
| Michigan[6] | AWP-13.5% (1 to 4 stores); AWP-15.1% (5+ stores) | AWP-13.5% (1 to 4 stores); AWP-15.1% (5+ stores) | AWP-13.5% (1 to 4 stores); AWP-15.1% (5+ stores) | AWP-13.5% (1 to 4 stores); AWP-15.1% (5+ stores) |
| Minnesota | AWP-11.5% | AWP-11.5% | AWP-12% | AWP-12% (MAC, specialty Pharm AWP-15%) |
| Mississippi | AWP-12% | AWP-12% | AWP-12%; WAC+9% | AWP-12%; WAC+9%; WNU+9% |
| Missouri | AWP-10.43%; WAC+10% | AWP-10.43%; WAC+10% | AWP-10.43%; WAC+10% | AWP-10.43%; WAC+10% |
| Montana | AWP-15% | AWP-15% | AWP-15% | AWP-15% |
| Nebraska | AWP-11% | AWP-11% | AWP-11% | AWP-11% |
| Nevada | AWP-15% | AWP-15% | AWP-15% | AWP-15% |
| New Hampshire | AWP-16% | AWP-16% | AWP-16% | AWP-16% |
| New Jersey[7] | AWP-10%; WAC+30% | AWP-12.75%; WAC+30% | AWP-12.75% | AWP-12.5% |
| New Mexico | AWP-12.5% | AWP-14% | AWP-14% | AWP-14% |
| New York | AWP-12% | B: AWP-12.75%; G: AWP-16.5% | B: AWP-12.75%; G: AWP-16.5% | B: AWP-14%; G: AWP-25% |
| North Carolina | AWP-10% | AWP-10% | AWP-10% | AWP-10% |
| North Dakota | AWP-10% | AWP-10% | AWP-10%; EAC+12.5% | AWP-10%; WAC+12.5% |
| Ohio | WAC+9% | WAC+9% | WAC+7% | WAC+7%; AWP-14.4% |
| Oklahoma | AWP-12% | AWP-12% | AWP-12% | AWP-12% |
| Oregon | AWP-15% (retail); AWP-11% (institutional) | AWP-15% (retail); AWP-11% (institutional) | AWP-15% (retail); AWP-11% (institutional) | AWP-15% (retail); AWP-11% (institutional) |
| Pennsylvania | AWP-10% | AWP-10% | AWP-10%; WAC+7% | AWP-14%, WAC+7% |
| Rhode Island | WAC+5% | WAC+5% | WAC+10% | WAC |
| South Carolina | AWP-10% | AWP-10% | AWP-10% | AWP-10% |
| South Dakota | AWP-10.5% | AWP-10.5% | AWP-10.5% | AWP-10.5% |
| Tennessee[8] | AWP-13% | AWP-13% | AWP-13% | AWP-13% |
| Texas | AWP-15%; WAC+12% | AWP-15%; WAC+12% | AWP-15%; WAC+12% | AWP-15%; WAC+12% |
| Utah | AWP-15% | AWP-15% | AWP-15% | AWP-15% |
| Vermont | AWP-11.9% | AWP-11.9% | AWP-11.9% | AWP-11.9% |
| Virginia | AWP-10.25% | AWP-10.25% | AWP-10.25% | AWP-10.25% |
| Washington[9] | AWP-14% | AWP-14% | AWP-14%; AWP-50% (>5 labelers) | AWP-14%; AWP-50% (>5 labelers) |
| West Virginia | AWP-12% | AWP-12% | AWP-12% | B: AWP-15%; G: AWP-30% |
| Wisconsin | AWP-12% | AWP-13% | AWP-13% | AWP-13% |
| Wyoming | AWP-11% | AWP-11% | AWP-11% | AWP-11% |

-- Not Reported

Contains Highly Confidential Materials - Subject to Protective Order
Exhibit 3

**National Pharmaceutical Council State Ingredient Reimbursement**
**1991 to 1993 and 1995 to 2007**

Notes:

The table represents state reimbursement policies when using the Average Wholesale Price (AWP) or the Wholesale Acquisition Cost (WAC).  It does not include the State Maximum Allowable Costs (MAC), the Federal Upper Limits (FUL), or the usual and customary charge.  Reimbursement is usually based on the lower of these possible bases.

The drug ingredient reimbursement is only one element of state Medicaid reimbursement.  States also include dispensing fees to providers.  These fees are not included on this table.

The National Pharmaceutical Council does not contain information for 1994.

The National Pharmaceutical Council may not reflect all changes in a state Medicaid program ingredient reimbursement policy.  For example, North Carolina's s ingredient reimbursement for physician administered drugs was changed to ASP + 6.7 percent.  However, this is not shown in the National Pharmaceutical Council data.

[1] The Arizona Health Care Cost-Containment System ("AHCCCS") is a jointly funded project by the federal government and the state of Arizona. In traditional Medicaid programs, states assume the responsibility to contract with individual pharmacies and reimburse them.  In AHCCCS, Arizona contracts with pre-paid health plans which are paid on a capitation basis and are responsible for providing all of the services covered by the program.  The delivery of pharmacy services is the responsibility of each prepaid plan.

[2] In 2007, Connecticut reimbursed at the Actual Acquisition Cost ("AAC") + 8% for factor VIII drugs.

[3] From 2003 to 2007, Delaware also reimbursed at AWP-16% for Long Term Care products.

[4] From 2001 to 2007, Kansas also reimbursed at AWP-50% for IVs and AWP-30% for blood products.

[5] In 1995, Maryland reimbursed at the Direct Price + 10%, the distribution price + 10 % or the AWP - 10%.

[6] Michigan's drug reimbursement was AAC with AWP - 10% screens from 1991 to 1993.

[7] New Jersey reimbursed at AWP minus up to 6% based on pharmacy specific data from 1991 to 1995 and AWP minus up to 8% based on pharmacy specific data in 1996.  From 2001 to 2004, New Jersey reimbursed at AAC for injectables.

[8] On January 1, 1994, Tennessee began a state-wide program called TennCare.  TennCare is a government operated health insurance program for low-income individuals and others whose health or employment status makes it difficult for them to access private insurance.  Most participants are those eligible for Medicaid.  In addition, TennCare extends coverage to uninsured and uninsurable persons who are not eligible for Medicaid.  TennCare replaced the traditional Medicaid program.

[9] In 1996, Washington also reimbursed at the AAC for injectables, vaccines, and biologicals, among other drugs.

Sources:

CMS website, "Medicaid Prescription Reimbursement Information by State – Quarter Ending December 2008."

National Pharmaceutical Council, "Benefits Under State Medical Assistance Programs," 1992-2007.

Contains Highly Confidential Materials - Subject to Protective Order
Exhibit 4

**Quarters for Which AWP and FUL Postings Are Available**
**By NDC**
**1992Q1 to 2007Q2**

| NDC | Description | 1992 | | | | 1993 | | | | 1994 | | | | 1995 | | | | 1996 | | | | 1997 | | | | 1998 | | | | 1999 | | | | 2000 | | | | 2001 | | | | 2002 | | | | 2003 | | | | 2004 | | | | 2005 | | | | 2006 | | | | 2007 | |
|---|---|--|--|--|--|--|--|--|--|--|--|--|--|--|--|--|--|--|--|--|--|--|--|--|--|--|--|--|--|--|--|--|--|--|--|--|--|--|--|--|--|--|--|--|--|--|--|--|--|--|--|--|--|--|--|--|--|--|--|--|--|--|--|
| | | 1 | 2 | 3 | 4 | 1 | 2 | 3 | 4 | 1 | 2 | 3 | 4 | 1 | 2 | 3 | 4 | 1 | 2 | 3 | 4 | 1 | 2 | 3 | 4 | 1 | 2 | 3 | 4 | 1 | 2 | 3 | 4 | 1 | 2 | 3 | 4 | 1 | 2 | 3 | 4 | 1 | 2 | 3 | 4 | 1 | 2 | 3 | 4 | 1 | 2 | 3 | 4 | 1 | 2 | 3 | 4 | 1 | 2 | 3 | 4 | 1 | 2 |
| 49502069703 | Albuterol Sulfate Unit Dose, 0.083% inhalation solution, 2.5 mg/3 mL, package of 25 | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | F | F | F | F | F | F | F | F | F | F | F | F | F | F | F | F | A | A | A | F | F | F | F | F | F | F | F | F | F | F | F | F | F | F | F | F | F | F | F | F | F |
| 49502069724 | Albuterol Sulfate Unit Dose, 0.083% inhalation solution, 2.5 mg/3 mL, package of 25 | | | | | | | | | | | | | | | | | | | | | | | | F | F | F | F | F | F | F | F | F | F | F | F | F | F | A | A | A | F | F | F | F | F | F | F | F | F | F | F | F | F | F | F | F | F | F | F | F | F | F |
| 49502069760 | Albuterol Sulfate Unit Dose, 0.083% inhalation solution, 2.5 mg/3 mL, package of 60 | | | | | | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | F | F | F | F | F | F | F | F | F | F | F | F | F | F | F | F | A | A | A | F | F | F | F | F | F | F | F | F | F | F | F | F | F | F | F | F | F | F | F | F | F |
| 49502069761 | Albuterol Sulfate Unit Dose, 0.083% inhalation solution, 2.5 mg/3 mL, package of 60 | | | | | | | | | | | | | | | | | | | | | | | | | F | F | F | F | F | F | F | F | F | F | F | F | F | A | A | A | F | F | F | F | F | F | F | F | F | F | F | F | F | F | F | F | F | F | F | F | F |
| 49502069733 | Albuterol Sulfate Unit Dose, 0.083% inhalation solution, 2.5 mg/3 mL, package of 30 | | | | | | | | | | A | A | A | A | A | A | A | A | A | A | A | A | F | F | F | F | F | F | F | F | F | F | F | F | F | F | F | F | A | A | A | F | F | F | F | F | F | F | F | F | F | | | | | | | | | | | | |
| 49502069729 | Albuterol Sulfate Unit Dose, 0.083% inhalation solution, 2.5 mg/3 mL, package of 30 | | | | | | | | | | | | | | | | | | | | | | | | | F | F | F | F | F | F | F | F | F | F | F | F | F | | | | | | | | F | F | F | F | F | F | F | F | F | F | F | F | F | F | F | F |
| 49502030317 | Albuterol Inhalation Aerosol Metered-Dose Inhaler, 17g | | | | | | | | | | | | | | | | | A | A | A | A | A | A | A | A | F | F | F | F | F | F | F | F | F | F | F | F | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 49502033317 | Albuterol Inhalation Aerosol Metered-Dose Inhaler, 17g | | | | | | | | | | | | | | | | | | | | | | | F | F | F | F | F | F | F | F | F | F | F | F | F | F | A | A | A | A | A | A | A | A | A | A | F | | | | | | | | | | | | | | |
| 49502019620 | Albuterol Sulfate Inhalation Solution 0.5%, 5 mg/mL, 20 mL multi-dose | | | | | | | | | | | | | | | | | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | F | | | | | | | | | | | | | | | | | | | | | | |
| 49502030327 | Albuterol Inhalation Aerosol MDI Refill, 17g | | | | | | | | | | | | | | | | | | | | | A | A | A | A | F | F | F | F | F | F | F | F | F | F | F | F | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 49502033327 | Albuterol Inhalation Aerosol MDI Refill, 17g | | | | | | | | | | | | | | | | | | | | | | | | | F | F | F | F | F | F | F | F | F | F | F | F | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 49502010501 | Albuterol Sulfate Inhalation Solution 0.5% (Sterile) 20 mL multi-dose | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | A | A | A | A | F | F | F | F | F | F | F | F | F | F | F | F | F | F | F | F | F | | | | | | | | | |
| 49502069730 [1] | Albuterol Sulfate Inhalation Solution Single-PakTM, 0.083% 3 mL, package of 30 | | | | | | | | | | | | | | | | | | | | | | | | | F | F | F | F | F | F | F | F | F | F | F | F | F | | | | | | | | F | F | F | F | F | F | F | F | F | F | F | F | F | F | F | F |
| 49502068912 | Cromolyn Sodium Inhalation Solution 20 mg/2 mL, unit dose vials, package of 120 | | | | | | | | | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | | | | | | | | | | | | | |
| 49502068902 | Cromolyn Sodium Inhalation Solution 20 mg/2 mL, unit dose vials, package of 60 | | | | | | | | | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | | | | | | | | | | | | | | |
| 49502068961 | Cromolyn Sodium Inhalation Solution 20 mg/2 mL, unit dose vials, package of 60 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | A | A | A | A | A | A | A | A | A | A | A | A | A | A |
| 49502068503 | Ipratropium Bromide Inhalation Solution 0.02%, 0.5 mg/2.5 mL, package of 25 | | | | | | | | | | | | | | | | | | | | | | | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | F | F | | | | | | | | | | | | |
| 49502068524 [2] | Ipratropium Bromide Inhalation Solution 0.02%, 0.5 mg/2.5 mL, package of 25 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | F | F | F | F | F | F | F | F | F | F | F | | | | | | |
| 49502068560 | Ipratropium Bromide Inhalation Solution 0.02%, 0.5 mg/2.5 mL, package of 60 | | | | | | | | | | | | | | | | | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | F | F | F | | | | | | | | | | | | |
| 49502068561 [1] | Ipratropium Bromide Inhalation Solution 0.02%, 0.5 mg/2.5 mL, package of 60 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | F | F | F | F | F | F | F | F | F | | | | | |
| 49502068562 [1] | Ipratropium Bromide Inhalation Solution 0.02%, 0.5 mg/2.5 mL, package of 60 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | F | F | F | F | F | F | F | F | F | F | F | F | F | F |
| 49502068533 | Ipratropium Bromide Inhalation Solution 0.02%, 0.5 mg/2.5 mL, package of 30 | | | | | | | | | | | | | | | | | | | | | | | | | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | F | | | | | | | | | | | | |
| 49502068529 [2] | Ipratropium Bromide Inhalation Solution 0.02%, 0.5 mg/2.5 mL, package of 30 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | F | F | F | F | F | F | F | | | | | | | |
| 49502068531 [1] | Ipratropium Bromide Inhalation Solution 0.02%, 0.5 mg/2.5 mL, package of 30 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | F | F | F | F | F | F | F | F | F | F | F | F | F | F |
| 49502068526 [1] | Ipratropium Bromide Inhalation Solution 0.02%, 2.5 mL, package of 25 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | F | F | F | F | F | F | F | F | F | F | F | F | F | F |
| 49502068530 [1] | Ipratropium Bromide Inhalation Solution 0.02%, Single-PakTM 2.5 mL, package of 30 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | F | F | F | F | F | F | F | F | F | F | F | F | F | F |

Notes:

Quarters for which the NDC is inactive are shaded out.

"A" indicates only an AWP posting in the quarter.  A quarter is considered to have an AWP posting if there is an AWP posting at any point in the quarter.

"F" indicates a FUL posting available in the quarter.  A quarter is considered to have a FUL posting if there is a FUL posting at any point in the quarter.

FUL postings of zero are considered to be a discontinuation of the FUL.  I do not consider additional FUL postings made after the inactive date.

In the produced First DataBank dataset, the last posting for any of the drugs at issue was made on November 1, 2004.  The last posting for any of the drugs at issue in the Medispan data was October 2, 2006.

[1] These NDCs do not appear in First DataBank.  Postings have been supplemented by Medispan data.

[2] The inactive dates for these NDCs do not appear in First DataBank.  Inactive dates have been supplemented by Medispan data.

Sources:

First DataBank data.
Medispan data.

Contains Highly Confidential Materials - Subject to Protective Order
Exhibit 5

**Distribution of Non-Adjusted Dey Sales to Wholesalers**
**By Percentage of Prevailing WAC**
**1992 to 2006**

| Price Per Unit as a Percentage of Prevailing WAC | | First DataBank (1992Q1 - 2004Q4) | | | First DataBank Adjusted (1992Q1 - 2004Q4) [1] | | | Medispan (1996Q2 - 2006Q4) | | | Red Book (1995Q2 - 2006Q2) | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Greater Than | Less Than or Equal To | Sales | Percent of Sales | Cumulative Percent of Sales | Sales | Percent of Sales | Cumulative Percent of Sales | Sales | Percent of Sales | Cumulative Percent of Sales | Sales | Percent of Sales | Cumulative Percent of Sales |
| ----(Percent)---- | | ----(Dollars)---- | ----(Percent)---- | | ----(Dollars)---- | ----(Percent)---- | | ----(Dollars)---- | ----(Percent)---- | | ----(Dollars)---- | ----(Percent)---- | |
| | | | [(c)/∑(c)*100] | | | [(f)/∑(f)*100] | | | [(i)/∑(i)*100] | | | [(l)/∑(l)*100] | |
| (a) | (b) | (c) | (d) | (e) | (f) | (g) | (h) | (i) | (j) | (k) | (l) | (m) | (n) |
| WAC | | $  1,488,366 | 0.11 % | 0.11 % | $  1,488,366 | 0.12 % | 0.12 % | $  1,801,010 | 0.14 % | 0.14 % | $  814,177 | 0.07 % | 0.07 % |
| | equal to WAC | 1,132,219,514 | 81.23 | 81.34 | 1,132,219,514 | 91.50 | 91.62 | 1,189,478,879 | 94.99 | 95.14 | 1,101,605,000 | 89.30 | 89.36 |
| 95 | WAC | 2,153,962 | 0.15 | 81.49 | 2,153,962 | 0.17 | 91.79 | 2,027,975 | 0.16 | 95.30 | 1,956,549 | 0.16 | 89.52 |
| 90 | 95 | 20,614,602 | 1.48 | 82.97 | 20,614,602 | 1.67 | 93.46 | 9,715,797 | 0.78 | 96.07 | 35,250,667 | 2.86 | 92.38 |
| 85 | 90 | 38,438,886 | 2.76 | 85.73 | 38,438,886 | 3.11 | 96.57 | 309,041 | 0.02 | 96.10 | 35,370,463 | 2.87 | 95.24 |
| 80 | 85 | 16,374,165 | 1.17 | 86.91 | 16,374,165 | 1.32 | 97.89 | 8,993,609 | 0.72 | 96.82 | 9,531,871 | 0.77 | 96.02 |
| 75 | 80 | 6,345,700 | 0.46 | 87.36 | 6,345,700 | 0.51 | 98.40 | 25,398,821 | 2.03 | 98.84 | 36,995,186 | 3.00 | 99.02 |
| 0 | 75 | 176,165,674 | 12.64 | 100.00 | 19,761,638 | 1.60 | 100.00 | 14,473,293 | 1.16 | 100.00 | 12,139,515 | 0.98 | 100.00 |
| | | $ 1,393,800,869 | 100.00 % | | $ 1,237,396,833 | 100.00 % | | $ 1,252,198,425 | 100.00 % | | $ 1,233,663,428 | 100.00 % | |

Notes:

Sales include direct regular shipments to wholesalers.

Prices per unit are calculated by dividing revenue by shelf cartons for each invoice number, NDC, and billing customer number.

Prices per unit are compared to the prevailing WAC as available in the various compendia.  The analysis includes sales through the last quarter in which a WAC posting was made for each compendia.

This analysis excludes records for which there is: (1) a nonpositive or missing price per unit and a non-negative revenue; (2) a nonpositive revenue; or (3) no available WAC data.

First DataBank does not include WAC postings for the following NDCs: 49502068526, 49502068530, 49502068531, 49502068562, and 49502069730.  Red Book does not include WAC postings for the following NDCs: 49502019620, 49502030317, and 49502030327.

[1] These columns exclude the sales made for NDCs 49502069703, 49502069733, and 49502069760 during the period 1995Q3 to 1997Q4 for which FDB reports a WAC increase not reported in other compendia.

Sources:

First DataBank data.

Medispan data.

Red Book data.

Dey wholesaler activity data.

Contains Highly Confidential Materials - Subject to Protective Order
Exhibit 6

**Distribution of Adjusted Dey Sales to Wholesalers**
**By Percentage of Prevailing WAC**
**1992 to 2006**

| Adjusted Price Per Unit as a Percentage of Prevailing WAC | | First DataBank (1992Q1 - 2004Q4) | | | First DataBank Adjusted (1992Q1 - 2004Q4)[1] | | | Medispan (1996Q2 - 2006Q4) | | | Red Book (1995Q2 - 2006Q2) | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Greater Than | Less Than or Equal To | Sales | Percent of Sales | Cumulative Percent of Sales | Sales | Percent of Sales | Cumulative Percent of Sales | Sales | Percent of Sales | Cumulative Percent of Sales | Sales | Percent of Sales | Cumulative Percent of Sales |
| ----(Percent)---- | | ----(Dollars)---- | ----(Percent)---- | | ----(Dollars)---- | ----(Percent)---- | | ----(Dollars)---- | ----(Percent)---- | | ----(Dollars)---- | ----(Percent)---- | |
| | | | [(c)/∑(e)*100] | | | [(f)/∑(f)*100] | | | [(i)/∑(i)*100] | | | [(l)/∑(l)*100] | |
| (a) | (b) | (c) | (d) | (e) | (f) | (g) | (h) | (i) | (j) | (k) | (l) | (m) | (n) |
| WAC | | $ 15,912,569 | 3.15 % | 3.15 % | $ 15,912,569 | 3.41 % | 3.41 % | $ 15,891,148 | 3.69 % | 3.69 % | $ 16,317,581 | 3.85 % | 3.85 % |
| 95 | WAC | 341,498,493 | 67.54 | 70.69 | 341,479,830 | 73.28 | 76.70 | 318,855,273 | 74.12 | 77.81 | 310,092,627 | 73.19 | 77.04 |
| 90 | 95 | 39,481,742 | 7.81 | 78.50 | 39,481,742 | 8.47 | 85.17 | 32,365,430 | 7.52 | 85.33 | 41,445,938 | 9.78 | 86.82 |
| 85 | 90 | 33,664,813 | 6.66 | 85.16 | 33,664,813 | 7.22 | 92.39 | 23,673,217 | 5.50 | 90.84 | 24,063,762 | 5.68 | 92.50 |
| 80 | 85 | 6,416,964 | 1.27 | 86.43 | 6,416,964 | 1.38 | 93.77 | 5,217,807 | 1.21 | 92.05 | 4,549,936 | 1.07 | 93.57 |
| 75 | 80 | 8,736,823 | 1.73 | 88.15 | 8,736,823 | 1.87 | 95.64 | 14,072,144 | 3.27 | 95.32 | 14,253,981 | 3.36 | 96.94 |
| 0 | 75 | 59,898,115 | 11.85 | 100.00 | 20,296,389 | 4.36 | 100.00 | 20,127,839 | 4.68 | 100.00 | 12,980,219 | 3.06 | 100.00 |
| | | $ 505,609,519 | 100.00 % | | $ 465,989,130 | 100.00 % | | $ 430,202,858 | 100.00 % | | $ 423,704,044 | 100.00 % | |

Notes:

Sales include direct sales to wholesalers and exclude indirect sales for which wholesalers act as intermediaries.

Sales take account of adjustments and discounts in the data.

Adjusted prices per unit are calculated by dividing net revenue by shelf cartons for each billing customer number, NDC, and quarter.

Adjusted prices per unit are compared to the prevailing WAC as available in the various compendia. The analysis includes sales through the last quarter in which a WAC posting was made for each compendia.

This analysis excludes records for which there is: (1) a nonpositive or missing adjusted price per unit and a non-negative net revenue; (2) a nonpositive net revenue; (3) an unmatched chargeback such that a record in chargeback data does not correspond to a wholesaler record in sales data; or (4) no available WAC data.

First DataBank does not include WAC postings for the following NDCs: 49502068526, 49502068530, 49502068531, 49502068562, and 49502069730. Red Book does not include WAC postings for the following NDCs: 49502019620, 49502030317, and 49502030327.

[1] These columns exclude the sales made for NDCs 49502069703, 49502069733, and 49502069760 during the period 1995Q3 to 1997Q4 for which FDB reports a WAC increase not reported in other compendia.

Sources:

First DataBank data.

Medispan data.

Red Book data.

Dey wholesaler activity data and chargeback data.

Contains Highly Confidential Materials - Subject to Protective Order

**Figure 1A**
**Comparison of Dey Prices**

Albuterol Sulfate Unit Dose, 0.083% inhalation solution, 2.5 mg/3 mL, package of 25



NDCs Included:     49502069703   49502069724

Contains Highly Confidential Materials - Subject to Protective Order

**Figure 1B**
**Comparison of Dey Prices**
Albuterol Sulfate Unit Dose, 0.083% inhalation solution, 2.5 mg/3 mL, package of 60



NDCs Included:    49502069760   49502069761

Contains Highly Confidential Materials - Subject to Protective Order

**Figure 1C**
**Comparison of Dey Prices**
Albuterol Inhalation Aerosol Metered-Dose Inhaler, 17g



NDCs Included:    49502030317  49502033317

Contains Highly Confidential Materials - Subject to Protective Order

**Figure 1D**
**Comparison of Dey Prices**
Albuterol Sulfate Unit Dose, 0.083% inhalation solution, 2.5 mg/3 mL, package of 30



NDCs Included:     49502069733   49502069729

Contains Highly Confidential Materials - Subject to Protective Order

**Figure 1E**
**Comparison of Dey Prices**
Albuterol Sulfate Inhalation Solution 0.5% (Sterile) 20 mL multi-dose



NDCs Included:    49502019620   49502010501

Contains Highly Confidential Materials - Subject to Protective Order



**Figure  1F**
**Comparison  of  Dey  Prices**
Albuterol Inhalation Aerosol MDI Refill, 17g

NDCs Included:     49502030327    49502033327

Contains Highly Confidential Materials - Subject to Protective Order

**Figure 1G**
**Comparison of Dey Prices**
Cromolyn Sodium Inhalation Solution 20 mg/2 mL, unit dose vials, package of 60



NDCs Included:    49502068902   49502068961

Contains Highly Confidential Materials - Subject to Protective Order

**Figure 1H**
**Comparison of Dey Prices**

Cromolyn Sodium Inhalation Solution 20 mg/2 mL, unit dose vials, package of 120



NDCs Included:     49502068912

Contains Highly Confidential Materials - Subject to Protective Order

**Figure 1I**
**Comparison of Dey Prices**
Ipratropium Bromide Inhalation Solution 0.02%, 0.5 mg/2.5 mL, package of 25



NDCs Included:      49502068503   49502068524

Contains Highly Confidential Materials - Subject to Protective Order

**Figure  1J**
**Comparison  of  Dey  Prices**
Ipratropium Bromide Inhalation Solution 0.02%, 0.5 mg/2.5 mL, package of 60



NDCs Included:      49502068560     49502068561     49502068562

NERA Economic Consulting

Contains Highly Confidential Materials - Subject to Protective Order

**Figure  1K**
**Comparison  of  Dey  Prices**
Ipratropium Bromide Inhalation Solution 0.02%, 0.5 mg/2.5 mL, package of 30



NDCs Included:     49502068533   49502068529   49502068531

Contains Highly Confidential Materials - Subject to Protective Order

## Notes and Sources Corresponding to Figures 1A to 1K

Notes:

I have excluded products for which AMP information was not available. These products are:  Albuterol Sulfate Inhalation Solution Single-PakTM, 0.083%  3 mL, package of 30,
Ipratropium Bromide Inhalation Solution 0.02%, 2.5 mL, package of 25 and Ipratropium Bromide Inhalation Solution 0.02%, Single-PakTM 2.5 mL, package of 30.

Postings for AWP are from Medispan.

Vertical lines indicate the date at which NDCs become inactive, as reported by Medispan.

Sources:

First Amended Complaint In re: Pharmaceutical Industry Average Wholesale Price Litigation, September 29, 2008.

First DataBank Data.

Medispan Data.

NY01-1336678-v1-FDB AWP  FDB WAC  and AMP data.XLS.

Red Book Data.

Contains Highly Confidential Materials - Subject to Protective Order

**Figure 2A**
**Comparison of Mr. Platt's ASPs to Dey's AMPs and FSS Prices**
Albuterol Sulfate Unit Dose, 0.083% inhalation solution, 2.5 mg/3 mL, package of 25



NDCs Included:    49502069703    49502069724

Contains Highly Confidential Materials - Subject to Protective Order

**Figure  2B**
## Comparison of Mr. Platt's ASPs to Dey's AMPs and FSS Prices
Albuterol Sulfate Unit Dose, 0.083% inhalation solution, 2.5 mg/3 mL, package of 60



NDCs Included:    49502069760   49502069761

NERA Economic Consulting

Contains Highly Confidential Materials - Subject to Protective Order

**Figure 2C**
**Comparison of Mr. Platt's ASPs to Dey's AMPs and FSS Prices**
Albuterol Inhalation Aerosol Metered-Dose Inhaler, 17g



NDCs Included:     49502030317   49502033317

NERA Economic Consulting

Contains Highly Confidential Materials - Subject to Protective Order

**Figure 2D**
**Comparison of Mr. Platt's ASPs to Dey's AMPs and FSS Prices**
Albuterol Sulfate Unit Dose, 0.083% inhalation solution, 2.5 mg/3 mL, package of 30



NDCs Included:     49502069733   49502069729

NERA Economic Consulting

Contains Highly Confidential Materials - Subject to Protective Order

**Figure 2E**
**Comparison of Mr. Platt's ASPs to Dey's AMPs and FSS Prices**
Albuterol Sulfate Inhalation Solution 0.5% (Sterile) 20 mL multi-dose



NDCs Included:    49502019620   49502010501

NERA Economic Consulting

Contains Highly Confidential Materials - Subject to Protective Order

**Figure  2F**
**Comparison  of  Mr. Platt's ASPs  to  Dey's  AMPs  and  FSS  Prices**

Albuterol Inhalation Aerosol MDI Refill, 17g



NDCs Included:     49502030327    49502033327

NERA Economic Consulting

Contains Highly Confidential Materials - Subject to Protective Order

**Figure  2G**
## Comparison of Mr. Platt's ASPs to Dey's AMPs and FSS Prices
Cromolyn Sodium Inhalation Solution 20 mg/2 mL, unit dose vials, package of 60



NDCs Included:     49502068902   49502068961

NERA Economic Consulting

Contains Highly Confidential Materials - Subject to Protective Order

**Figure  2H**
## Comparison of Mr. Platt's ASPs to Dey's AMPs and FSS Prices
Cromolyn Sodium Inhalation Solution 20 mg/2 mL, unit dose vials, package of 120



NDCs Included:    49502068912

Contains Highly Confidential Materials - Subject to Protective Order

**Figure  2I**
**Comparison of Mr. Platt's ASPs to Dey's AMPs and FSS Prices**
Ipratropium Bromide Inhalation Solution 0.02%, 0.5 mg/2.5 mL, package of 25



NDCs Included:     49502068503   49502068524

NERA Economic Consulting

Contains Highly Confidential Materials - Subject to Protective Order

**Figure 2J**
**Comparison of Mr. Platt's ASPs to Dey's AMPs and FSS Prices**
Ipratropium Bromide Inhalation Solution 0.02%, 0.5 mg/2.5 mL, package of 60



NDCs Included:    49502068560    49502068561    49502068562

Contains Highly Confidential Materials - Subject to Protective Order

**Figure 2K**
**Comparison of Mr. Platt's ASPs to Dey's AMPs and FSS Prices**
Ipratropium Bromide Inhalation Solution 0.02%, 0.5 mg/2.5 mL, package of 30



NDCs Included:    49502068533   49502068529   49502068531

Contains Highly Confidential Materials - Subject to Protective Order

## Notes and Sources Corresponding to Figures 2A to 2K

Notes:

I have excluded products for which AMP information was not available. These products are:  Albuterol Sulfate Inhalation Solution Single-PakTM, 0.083% 3 mL, package of 30,
Ipratropium Bromide Inhalation Solution 0.02%, 2.5 mL, package of 25 and Ipratropium Bromide Inhalation Solution 0.02%, Single-PakTM 2.5 mL, package of 30.

Vertical lines indicate the date at which NDCs become inactive, as reported by Medispan.

Sources:

Expert Report of Simon D. Platt, January 23, 2009, Summary 5, excluding nonpositive values for shelf cartons and net sales.

Federal Supply Schedule Data for contract number V797P-5658X.

First Amended Complaint In re: Pharmaceutical Industry Average Wholesale Price Litigation, September 29, 2008.

NY01-1336678-v1-FDB AWP  FDB WAC  and AMP data.XLS.

Contains Highly Confidential Materials - Subject to Protective Order

**Figure 3A**
**Comparison of Mr. Platt's ASPs to Dey's AMPs, FSS Prices, and IMS Prices**
Albuterol Sulfate Unit Dose, 0.083% inhalation solution, 2.5 mg/3 mL, package of 25



NDCs Included:   49502069703   49502069724

Contains Highly Confidential Materials - Subject to Protective Order

**Figure 3B**
**Comparison of Mr. Platt's ASPs to Dey's AMPs, FSS Prices, and IMS Prices**
Albuterol Sulfate Unit Dose, 0.083% inhalation solution, 2.5 mg/3 mL, package of 60



NDCs Included:   49502069760   49502069761

Contains Highly Confidential Materials - Subject to Protective Order

**Figure 3C**
**Comparison of Mr. Platt's ASPs to Dey's AMPs, FSS Prices, and IMS Prices**
Albuterol Inhalation Aerosol Metered-Dose Inhaler, 17g



NDCs Included:   49502030317   49502033317

NERA Economic Consulting

Contains Highly Confidential Materials - Subject to Protective Order

**Figure 3D**
**Comparison of Mr. Platt's ASPs to Dey's AMPs, FSS Prices, and IMS Prices**
Albuterol Sulfate Unit Dose, 0.083% inhalation solution, 2.5 mg/3 mL, package of 30



NDCs Included:   49502069733   49502069729

Contains Highly Confidential Materials - Subject to Protective Order

**Figure 3E**
**Comparison of Mr. Platt's ASPs to Dey's AMPs, FSS Prices, and IMS Prices**
Albuterol Sulfate Inhalation Solution 0.5% (Sterile) 20 mL multi-dose



NDCs Included:   49502019620   49502010501

NERA Economic Consulting

Contains Highly Confidential Materials - Subject to Protective Order

**Figure 3F**
**Comparison of Mr. Platt's ASPs to Dey's AMPs, FSS Prices, and IMS Prices**
Albuterol Inhalation Aerosol MDI Refill, 17g



NDCs Included:   49502030327   49502033327

Contains Highly Confidential Materials - Subject to Protective Order

**Figure  3G**
## Comparison of Mr. Platt's ASPs to  Dey's AMPs, FSS Prices, and IMS Prices
Cromolyn Sodium Inhalation Solution 20 mg/2 mL, unit dose vials, package of 60



NDCs Included:   49502068902   49502068961

NERA Economic Consulting

Contains Highly Confidential Materials - Subject to Protective Order

**Figure 3H**
**Comparison of Mr. Platt's ASPs to Dey's AMPs, FSS Prices, and IMS Prices**
Cromolyn Sodium Inhalation Solution 20 mg/2 mL, unit dose vials, package of 120



NDCs Included:   49502068912

NERA Economic Consulting

Contains Highly Confidential Materials - Subject to Protective Order

**Figure 3I**
## Comparison of Mr. Platt's ASPs to Dey's AMPs, FSS Prices, and IMS Prices

Ipratropium Bromide Inhalation Solution 0.02%, 0.5 mg/2.5 mL, package of 25



NDCs Included:   49502068503   49502068524

Contains Highly Confidential Materials - Subject to Protective Order

**Figure 3J**
**Comparison of Mr. Platt's ASPs to Dey's AMPs, FSS Prices, and IMS Prices**
Ipratropium Bromide Inhalation Solution 0.02%, 0.5 mg/2.5 mL, package of 60



NDCs Included:   49502068560   49502068561   49502068562

Contains Highly Confidential Materials - Subject to Protective Order

**Figure 3K**
**Comparison of Mr. Platt's ASPs to Dey's AMPs, FSS Prices, and IMS Prices**
Ipratropium Bromide Inhalation Solution 0.02%, 0.5 mg/2.5 mL, package of 30



NDCs Included:   49502068533   49502068529   49502068531

Contains Highly Confidential Materials - Subject to Protective Order

## Notes and Sources Corresponding to Figures 3A to 3K

Notes:

I have excluded products for which AMP information was not available. These products are:  Albuterol Sulfate Inhalation Solution Single-PakTM, 0.083% 3 mL, package of 30,
Ipratropium Bromide Inhalation Solution 0.02%, 2.5 mL, package of 25 and Ipratropium Bromide Inhalation Solution 0.02%, Single-PakTM 2.5 mL, package of 30.

IMS data include Chain Stores, Food Stores, Independent, Long-Term Care, and Mail Order classes of trade.

IMS package prices are calculated by multiplying package size by IMS unit price.

Vertical lines indicate the date at which NDCs become inactive, as reported by Medispan.

Sources:

Expert Report of Simon D. Platt, January 23, 2009, Summary 5, excluding nonpositive values for shelf cartons and net sales.

Federal Supply Schedule Data for contract number V797P-5658X.

First Amended Complaint In re: Pharmaceutical Industry Average Wholesale Price Litigation, September 29, 2008.

IMS Data.

NY01-1336678-v1-FDB AWP  FDB WAC  and AMP data.XLS.

# Appendix A

**Contains Highly Confidential Materials – Subject to Protective Order**

**DEY**

SEND PAYMENT TO:
DEY LABORATORIES, INC.
DEPT. #01524
SAN FRANCISCO CA 94139-1524

DEY LABORATORIES, INC.
10246 MILLER ROAD
DALLAS TEXAS 75238
PHONE (214) 349-7275

Cust. Contact: ORDERDNET
Dey Contact: HARRALSON

3484   3

WHITMIRE DIST CORP - SACRAMENT
3240 REED AVENUE
WEST SACRAMENTO                CA  95605

3484

WHITMIRE DIST CORP - SACRAMENT
PO BOX 980130
WEST SACRAMENTO                CA  95798

| INVOICE NO | PSL | INVOICE DATE | DATE ORDERED | SLSMN | FOB | TERMS |
|---|---|---|---|---|---|---|
| 151988 | | 17/047/74 | 12/23/93 | WAT | | 2% 30 MAY 3 |

PO NUMBER  901139

SALESMAN NAME  CROUTS, DEBI

| PRODUCT CODE | ORDERED | SHIPPED | B/O | UNIT | DESCRIPTION | LOT | UNIT PRICE | EXTENSION |
|---|---|---|---|---|---|---|---|---|
| 69760 | 24 | 24 | 0 | CN | ALBUTEROL SULF 0.083% 3ML 60'S ** ** EXPIRATION DATE 9505 ** | 9505K600 | 44.400 | 1065.60 |
| 69703 | 96 | 96 | 0 | CN | ALBUTEROL SULF 0.083% 3ML 25'S ** ** EXPIRATION DATE 9504 ** | 9504F037 | 18.950 | 1819.20 |
| 67603 | 12 | 12 | 0 | CN | METAPROTERENOL 0.6% 2.5ML 25'S ** ** EXPIRATION DATE 9505 ** | 9505M592 | 13.990 | 167.88 |
| 16104 | 6 | 6 | 0 | CN | ACETYLCYSTEINE 10% 4 ML 12'S ** ** EXPIRATION DATE 9503 ** | 9503402GH | 25.800 | 154.80 |
| 83003 | 30 | 30 | 0 | CN | SOD CHLORIDE 0.9% 3 ML 100'S ** This is an alternate item for 83003 ** EXPIRATION DATE 9510 ** | 9510JK010 | 13.000 | 390.00 |

TOTAL DUE   3,597.88

SHIPPED FROM TEXAS

SALES FILE COPY

HIGHLY CONFIDENTIAL

DEY-MDL0000027

**DEY**

SEND PAYMENT TO:
**DEY LABORATORIES, INC.**
DEPT. #01524
SAN FRANCISCO CA 94139-1524

DEY LABORATORIES, INC.
10246 MILLER ROAD
DALLAS TEXAS 75238
PHONE (214) 349-7275

Cust. Contact: MAX
Dey Contact: EVKRKTT

3486   1
WHITMIRE DIST CORP - WINSTON S
3936 WESTPOINT BLVD
WINSTON-SALEM                NC 27103

3486
WHITMIRE DIST CORP - WINSTON S
PO BOX 25408
WINSTON-SALEM        NC 27114-5408

INVOICE NO: 151989
PO NUMBER: 900305

| ITEM NUMBER | QUANTITY ORDERED | QUANTITY SHIPPED | QUANTITY B/O | UNIT | DESCRIPTION | LOT | UNIT PRICE | EXTENSION |
|---|---|---|---|---|---|---|---|---|
| 69703 | 32 | 32 | 0 | CN | ALBUTEROL SULF 0.083% 3ML 25'S | 9504B037 | 18.950 | 606.40 |
|  |  |  |  |  | ** EXPIRATION DATE 9504 ** |  |  |  |
| 67803 | 4 | 4 | 0 | CN | METAPROTERENOL 0.4% 2.5ML 25'S | 9503D449 | 13.990 | 55.96 |
|  |  |  |  |  | ** EXPIRATION DATE 9503 ** |  |  |  |
| 18200 | 4 | 4 | 0 | CN | ACETYLCYSTEINE 20% 100 ML 1'S | 9501397RH | 75.900 | 303.60 |
|  |  |  |  |  | ** EXPIRATION DATE 9501 ** |  |  |  |
| 18204 | 12 | 12 | 0 | CN | ACETYLCYSTEINE 20% 4 ML 12'S | 9503404IH | 31.080 | 372.96 |
|  |  |  |  |  | ** EXPIRATION DATE 9503 ** |  |  |  |
| 03005 | 20 | 20 | 0 | CN | SOD CHLORIDE 0.9% 5 ML 25'S | 9C094A39 | 32.200 | 644.00 |
|  |  |  |  |  | ** EXPIRATION DATE 9509 ** |  |  |  |
| 18210 | 12 | 12 | 12 | CN | ACETYLCYSTEINE 20% 10 ML 3'S |  |  |  |

TOTAL DUE   1,982.92
*****************************

PRODUCT 67803 INCREASED TO 4 TO MEET EVEN CASE
QUANTITY REQUIREMENT

SHIPPED FROM TEXAS

SALES FILE COPY

**DEY**

SEND PAYMENT TO:
**DEY, LABORATORIES, INC.**
DEPT. #01524
SAN FRANCISCO CA 94139-1524

DEY LABORATORIES, INC.
10246 MILLER ROAD
DALLAS, TEXAS 75238
PHONE (214) 349-7275

Cust. Contact: ORDRRNET
Dey Contact: HARRALSON

| SOLD TO | | SHIP TO | |
|---|---|---|---|
| 3489 | | 3489 | |
| WHITMIRE DIST CORP - SPOKANE | | WHITMIRE DIST CORP - SPOKANE | |
| EAST 3200 TRENT STREET | | EAST 3200 TRENT STREET | |
| BUILDING B SUITE 4 | | BUILDING B SUITE 4 | |
| SPOKANE | WA 99202 | SPOKANE | WA 99202 |

| ORDER NO | INVOICE DATE | DATE P.O. ORDER | SHIP VIA | FOB | TERMS |
|---|---|---|---|---|---|
| 151991 | 1/04/94 | 12/29/93 | NWFF | JUSTIN | 2% 30 NET 31 |

| P.O. NUMBER | SALESMAN NAME |
|---|---|
| UPKN | |

| LOC CODE | ORDERED | SHIPPED | B/ORDER | U/M | UNIT | DESCRIPTION | LOT NO | UNIT PRICE | EXTENSION |
|---|---|---|---|---|---|---|---|---|---|
| US 2003 | | | | | | | | | |
| 69760 | 48 | 48 | 0 | CN | ALBUTEROL SULF 0.083% 3ML 60'S ** 05K600 | 95030D449 | 44.400 | 2131.20 |
| | | | | | | EXPIRATION DATE 9505 ** | | | |
| 67803 | 60 | 60 | 0 | CN | METAPROT/KRENOL 0.4% 2.5ML 25'S ** | 95030D449 | 13.990 | 839.40 |
| | | | | | | EXPIRATION DATE 9503 ** | | | |
| 18204 | 6 | 6 | 0 | CN | ACETYLCYSTRINR 20% 4 ML 12'S ** 95034041H | | 31.080 | 186.48 |
| | | | | | | EXPIRATION DATE 9503 ** | | | |

TOTAL DUE     3,157.08

SALES FILE COPY

SHIPPED FROM TEXAS

HIGHLY CONFIDENTIAL

DEY-MDL0000030

**DEY**

SEND PAYMENT TO:
**DEY LABORATORIES, INC.**
DEPT. #01524
SAN FRANCISCO CA 94139-1524

DEY LABORATORIES, INC.
10246 MILLER ROAD
DALLAS TEXAS 75238
PHONE (214) 349-7275

Cust Contact: ORD/JERNEY
Dey Contact: JENNINGS

SALES FILE COPY

SHIPPED FROM TEXAS

SHIP TO:
3490 - - 2
WHITMIRE DIST CORP - INDIANAPO
2040 SOUTH LYNHURST DRIVE
SUITE G
INDIANAPOLIS                    IN 46241

BILL TO:
3490 - WHITMIRE DIST CORP - INDIANAPO
PO BOX 421339
INDIANAPOLIS                    IN 46242-1339

| INVOICE NO | PG | INVOICE DATE | DATE OF ORDER | SHIP VIA | DESTINATION |
|---|---|---|---|---|---|
| 15195? | 1 | 12/06/94 | 12/07/93 | RPS | 7/8 30 |

| PO NUMBER | SALESMAN NAME | SPECIAL INSTRUCTIONS |
|---|---|---|
| 01355? | HARLESS, LORI | |

| QUANTITY ORDERED | QUANTITY SHIPPED | UM | QUANTITY B/O | DESCRIPTION | LOT | UNIT PRICE | EXTENSION |
|---|---|---|---|---|---|---|---|
| 200 | 200 | CN | 0 | ALBUTEROL SULF 0.083% 3ML 25.599 04F039 | 04F039 | 18.950 | 3790.00 |
| | | | | ** EXPIRATION DATE 9504 ** | | | |

69203

TOTAL DUE           3,790.00

HIGHLY CONFIDENTIAL

DEY-MDL0000031

**DEY**

SEND PAYMENT TO:
**DEY LABORATORIES, INC.**
DEPT. #01524.
SAN FRANCISCO CA 94139-1524

DEY LABORATORIES, INC.
10246 MILLER ROAD
DALLAS TEXAS 75238
PHONE (214) 349-7275

Cust Contact:  ORDER ENTRY
Dey Contact:   TRAININGS

S H-P-O:
3490 - 7
WHITNIRE DIST CORP - INDIANAPO
2040 SOUTH LYNHURST DRIVE
SUITE C
INDIANAPOLIS         IN 46241

B-J-T-O:
3490
WHITNIRE DIST CORP - INDIANAPO
PO BOX 421339
INDIANAPOLIS         IN 46242-1339

| PHONE NO. | P.O. | INVOICE DATE | DATE OF ORDER | SHIP VIA | F.O.B. | TERMS |
|-----------|------|--------------|---------------|----------|--------|-------|
|  | 151593  | 1 | 1/04/95 | 1/03/94 | ARPW | DESTIN | 2% 30 NET 31 |

| P.O. NUMBER | SALESMAN NAME |
|-------------|----------------|
| 90247 | HARKLESS, LORI |

| LINE/CODE NO. | ORDERED | SHIPPED | B/O | UNIT | DESCRIPTION | UNIT COST | UNIT PRICE | EXTENSION |
|---------------|---------|---------|-----|------|-------------|-----------|------------|-----------|
| 69703 | 100 | 100 | 0 | CN | ALBUTEROL SULF 0.083% 3ML 25 SP50SA141 | | 18.950 | 1896.00 |
|  |  |  |  |  | **EXPIRATION DATE 9505** | | | |
| 18104 | 18 | 18 | 0 | CN | ACETYLCYSTEINE 10% 4 ML 12'S 5503402601 | | 25.800 | 464.40 |
|  |  |  |  |  | **EXPIRATION DATE 9503** | | | |

TOTAL DUE          2,355.40

SHIPPED FROM TEXAS

SALES FILE COPY

HIGHLY CONFIDENTIAL                                    DEY-MDL0000032

**DEY**

SEND PAYMENT TO:
DEY LABORATORIES, INC.
DEPT. #01524
SAN FRANCISCO CA 94139-1524

DEY LABORATORIES, INC.
10246 MILLER ROAD
DALLAS TEXAS 75238
PHONE (214) 349-7275

Cust Contact: ORDKUNIT HARRAISON
Dey Contact:

S-H-I-P T-O
3492 -
WHITMIRE DIST CORP - PHOENIX
4422 SOUTH 38TH PLACE
PHOENIX                        AZ  85040

B-I-L-L T-O
3492
WHITMIRE DIST CORP - PHOENIX
4422 SOUTH 38TH PLACE
PHOENIX                        AZ  85040

| INVOICE NO | PG ID | INVOICE DATE | DATE OF ORDER | SHIP VIA | ITEMS | TERMS |
|---|---|---|---|---|---|---|
| 151395 | | 1/04/94 | 12/30/93 | RDWY | WESTIN 30 NKI JI | 7% 10 |

PO NUMBER: 90223   OPEN
SALESMAN NAME:
SPECIAL INSTRUCTIONS:

| ITEM NO | QUANTITY ORDERED | QUANTITY SHIPPED | QUANTITY B.O. | UNIT | DESCRIPTION | LOT NO | UNIT PRICE | EXTENSION |
|---|---|---|---|---|---|---|---|---|
| 69703 | 292 | 292 | 0 | CN | ALBUTEROL SULF 0.083% 3ML .25'S ** EXPIRATION DATE 9504 ** | R04R039 | 18.950 | 5533.40 |
| 69760 | 24 | 24 | 0 | CN | ALBUTEROL SULF 0.083% 3ML 60'S ** EXPIRATION DATE 9505 ** | R05R055 | 44.400 | 1065.60 |
| 66103 | 12 | 12 | 0 | CN | ISOETHARINE S/F 0.08% 3ML .25'S ** EXPIRATION DATE 9505 ** | R05C354 | 7.750 | 93.00 |
| 66405 | 12 | 12 | 0 | CN | ISOETHARINE S/F 0.1% 5 ML .25'S ** EXPIRATION DATE 9504 ** | R04C355 | 7.750 | 93.00 |
| 66003 | 84 | 84 | 0 | CN | ISOETHARINE S/F 0.17% 3ML .25'S ** EXPIRATION DATE 9506 ** | R06C373 | 7.750 | 651.00 |
| 18104 | 30 | 30 | 0 | CN | ACETYLCYSTEINE 10% 4 ML 12'S ** EXPIRATION DATE 9503 ** | R0340426H | 25.800 | 774.00 |
| 18230 | 24 | 24 | 0 | CN | ACETYLCYSTEINE 20% 30 ML 3'S ** EXPIRATION DATE 9502 ** | R0240015H | 50.640 | 1215.36 |
| 18204 | 6 | 6 | 0 | CN | ACETYLCYSTEINE 20% 4 ML 12'S ** EXPIRATION DATE 9503 ** | R0340411H | 31.060 | 186.40 |

SHIPPED FROM TEXAS

SALES FILE COPY

******CONTINUED****************CONTINUED****************CONTINUED******

HIGHLY CONFIDENTIAL

DEY-MDL0000034

**DEY**

SEND PAYMENT TO:
**DEY LABORATORIES, INC.**
DEPT. #01524
SAN FRANCISCO CA 94139-1524

DEY LABORATORIES, INC.
10246 MILLER ROAD
DALLAS TEXAS 75238
PHONE (214) 349-7275.

Cust Contact:  ORIRRNET
Dey Contact:   HARRAISON

| S H I P T O | 3496 - | | | | | | |
|---|---|---|---|---|---|---|---|
| | WHITMIRE DIST CORP - FRESNO | | | | | | |
| | 4069 WEST SHAW #103 | | | | CA 93722 | | |
| | FRESNO | | | | | | |
| B I L T O | 3496 | | | | | | |
| | WHITMIRE DIST CORP - FRESNO | | | | | | |
| | 4069 WEST SHAW #103 | | | | CA 93722 | | |
| | FRESNO | | | | | | |

| INVOICE NO. | PO | INVOICE DATE | DATE OF ORDER | SHIP VIA | FOB | TERMS |
|---|---|---|---|---|---|---|
| 1513936 | | 17/04/94 | 17/29/93 | AIR RX | DALLAS TX | 2% 30 NET 31 |

| PO NUMBER | SALESMAN NAME | SPECIAL INSTRUCTIONS |
|---|---|---|
| 901202 | OPEN | |

| ROC NO. 46502 | QUANTITY ORDERED | QUANTITY SHIPPED | QUANTITY B/O | UNIT | DESCRIPTION | LOT | UNIT PRICE | EXTENSION |
|---|---|---|---|---|---|---|---|---|
| 69760 | 24 | 24 | 0 | CN | ALBUTEROL SULF 0.083% 3ML 60'S | B505B600 | 44.400 | 1065.60 |
| | | | | | ** EXPIRATION DATE 9505 ** | | | |
| 69703 | 96 | 96 | 0 | CN | ALBUTEROL SULF 0.083% 3ML 25'S | B504F036 | 18.950 | 1819.20 |
| | | | | | ** EXPIRATION DATE 9504 ** | | | |
| 67803 | 12 | 12 | 0 | CN | METAPROTERRENOL 0.4% 2.5ML 25'S | B503D449 | 13.990 | 167.88 |
| | | | | | ** EXPIRATION DATE 9503 ** | | | |
| 18104 | 24 | 24 | 0 | CN | ACETYLCYSTEINE 10% 4 ML 12'S | B034028H | 25.800 | 619.20 |
| | | | | | ** EXPIRATION DATE 9503 ** | | | |
| 18110 | 24 | 0 | 24 | CN | ACETYLCYSTEINE 10% 10 ML 3'S | | | |

TOTAL DUE                 3,671.88

SHIPPED FROM TEXAS

SALES FILE COPY

HIGHLY CONFIDENTIAL

DEY-MDL0000035

**DEY**

SEND PAYMENT TO:
DEY LABORATORIES, INC.
DEPT. #01524
SAN FRANCISCO CA 94139-1524

DEY LABORATORIES, INC.
10246 MILLER ROAD
DALLAS TEXAS 75238
PHONE (214) 349-7275

3497 - 4

SHIP TO:
WHITMIRE DIST CORP - VALLEY VI
6065 TOWPATH DRIVE
VALLEY VIEW
OH 44125

3497
BILL TO:
WHITMIRE DIST CORP - CLEVELAND
PO BOX 93886
CLEVELAND
OH 44101

Cust Contact: ORDRMKT
Dey Contact: JUSTICE

| QUANTITY ORDERED | SHIPPED | B/O | UNIT | DESCRIPTION | LOT# | UNIT PRICE | EXTENSION |
|---|---|---|---|---|---|---|---|
| 12 | 12 | 0 | CN | ALBUTEROL SULF 0.083% 3ML .60'S ** | 06N0270 | 44.400 | 532.80 |
|  |  |  |  | ** EXPIRATION DATE 9506 ** |  |  |  |
| 228 | 228 | 0 | CN | ALBUTEROL SULF 0.083% 3ML .25'S ** | 04F041 | 18.950 | 4320.60 |
|  |  |  |  | ** EXPIRATION DATE 9504 ** |  |  |  |
| 12 | 12 | 0 | CN | ISOETHARINE S/F 0.17% 3ML .25'S | 06C373 | 7.750 | 93.00 |
|  |  |  |  | ** EXPIRATION DATE 9506 ** |  |  |  |
| 12 | 12 | 0 | CN | METAPROTERENOL 0.4% 2.5ML .25'S | 03D449 | 13.990 | 167.88 |
|  |  |  |  | ** EXPIRATION DATE 9503 ** |  |  |  |
| 36 | 36 | 0 | CN | METAPROTERENOL 0.6% 2.5ML .25'S | 05R592 | 13.990 | 503.64 |
|  |  |  |  | ** EXPIRATION DATE 9505 ** |  |  |  |
| 6 | 6 | 0 | CN | ACETYLCYSTEINE 10% 4 ML 12'S | 40Z6H | 25.800 | 154.80 |
|  |  |  |  | ** EXPIRATION DATE 9503 ** |  |  |  |
| 12 | 12 | 0 | CN | ACETYLCYSTEINE 20% 30 ML 3'S | 24015H | 50.640 | 607.68 |
|  |  |  |  | ** EXPIRATION DATE 9502 ** |  |  |  |
| 20 | 10 | 0 | CN | SOD CHLORIDE 0.9% 3 ML 100'S | 03K012 | 13.000 | 130.00 |
|  |  |  |  | This is an alternate item for 83003. |  |  |  |

SHIPPED FROM TEXAS

SALES FILE COPY

***********CONTINUED*********** ***********CONTINUED***********

HIGHLY CONFIDENTIAL

DEY-MDL0000036

**DEY**

SEND PAYMENT TO:
DEY LABORATORIES, INC.
DEPT. #01524.
SAN FRANCISCO CA 94139-1524

DEY LABORATORIES, INC.
10246 MILLER ROAD
DALLAS TEXAS 75238
PHONE (214) 349-7275

Cust Contact: ORDERNET
Dey Contact: JUSTICE

SHIP TO:
3497 - 4
WHITMIRE DIST. CORP - VALLEY VI
6065 TOWPATH DRIVE
VALLEY VIEW                          OH   44125

BILL TO:
3497
WHITMIRE DIST CORP - CLEVELAND
PO BOX 93886
CLEVELAND                            OH   44101

| INVOICE NO. | PO | INVOICE DATE | DATE OF ORDER | SHIP VIA | FOB | TERMS |
|---|---|---|---|---|---|---|
| 151397 | 2 | 11/04/94 | 1703/94 | ARFW | WESTIN 2% 10 NET 31 | |

| SALESMAN NAME | ISSUED |
|---|---|
| UPKN | |

PO NUMBER
90/253

| NDC NUMBER | QUANTITY ORDERED | QUANTITY SHIPPED | QUANTITY B/OED | UNIT | DESCRIPTION | LOT | UNIT PRICE | EXTENSION |
|---|---|---|---|---|---|---|---|---|
| | 0 | 10 | 0 | CN | 50D CHLORIDE 0.9% 3 ML 100's ** EXPIRATION DATE 9510 ** | 95103K012 | 13.000 | 110.00 |
| | | | | | This is an alternate item for 63003 | | | |
| 03010 | 16 | 16 | 0 | CN | 50D CHLORIDE 0.9% 10 ML 125's ** EXPIRATION DATE 9510 ** | 95104445 | 32.200 | 515.20 |
| | | | | | ** EXPIRATION DATE 9510 ** | | | |

TOTAL DUE                                         7,155.60

SALES FILE COPY

SHIPPED FROM TEXAS

HIGHLY CONFIDENTIAL

DEY-MDL0000037

**DEY**

SEND PAYMENT TO:
DEY LABORATORIES, INC.
DEPT. #01524
SAN FRANCISCO CA 94139-1524

DEY LABORATORIES, INC.
10246 MILLER ROAD
DALLAS TEXAS 75238
PHONE (214) 349-7275

Cust. Contact: ORBRENE
Dey Contact: NARRAISON

SALES FILE COPY

SHIPPED FROM TEXAS

S-H-I-P T-O
3502 -
WHITMIRE DIST CORP - ALBUQUER
3530 PAN AMERICAN NORTHEAST
ALBUQUERQUE            NM 87107

S-O-L-D T-O
3502 -
WHITMIRE DIST CORP - ALBUQUER
3530 PAN AMERICAN NORTHEAST
ALBUQUERQUE            NM 87107

| INVOICE NUMBER | PG | INVOICE DATE | DATE OF ORDER | SHIP VIA | TERMS |
|---|---|---|---|---|---|
| 1511998 | 1 | 1/04/94 | 12/30/93 | NWTP | NET 31 |

PO NUMBER 90221J — SALESMAN NAME: OPEN

| NDC NUMBER | QUANTITY ORDERED | QUANTITY SHIPPED | QUANTITY B.O. | UNIT | CUSTOMER | DESCRIPTION | UNIT PRICE | EXTENSION |
|---|---|---|---|---|---|---|---|---|
| 69703 | 80 | 80 | 0 | CN | 59504F040 | ALBUTEROL SULF 0.083% 3ML 25'S<br>** EXPIRATION DATE 9504 ** | 18.950 | 1,516.00 |
| 83005 | 10 | 10 | 0 | CN | 950931136<br>63005 | SOD CHLORIDE 0.9% 5 ML 100'S<br>This is an alternate item for 63005<br>** EXPIRATION DATE 9509 ** | 13.000 | 130.00 |
| 83003 | 20 | 20 | 0 | CN | 35103K012<br>63003 | SOD CHLORIDE 0.9% 3 ML 100'S<br>This is an alternate item for 63003<br>** EXPIRATION DATE 9510 ** | 13.000 | 260.00 |

TOTAL DUE: 1,906.00

HIGHLY CONFIDENTIAL

DEY-MDL0000038

**DEY**

SEND PAYMENT TO
DEY LABORATORIES, INC.
DEPT. #01524
SAN FRANCISCO CA 94139-1524
DEY LABORATORIES, INC
10246 MILLER ROAD
DALLAS TEXAS 75238
PHONE (214) 349-7275

SALES FILE COPY

| S H I P T O | 3503 — WHITMIRE DIST CORP — SAN ANTON 12732 O'CONNER ROAD SAN ANTONIO TX 78233 |
|---|---|
| B I L L T O | 3503 — WHITMIRE DIST CORP — SAN ANTON 12732 O'CONNER ROAD SAN ANTONIO TX 78233 |

| INVOICE NO. | INVOICE DATE | DATE OF ORDER | SHIP VIA | FOB | TERMS |
|---|---|---|---|---|---|
| 151393 | 1/04/94 | 12/29/93 | LWSW | DESTIN | 2% 30 NET 31 |

| PO NUMBER | SALESMAN NAME | SPECIAL INSTRUCTIONS |
|---|---|---|
| 901204 | UFKN | |

Cust Contact:
Dey Contact:

| NDC NUMBER | QUANTITY ORDERED | QUANTITY SHIPPED | UNIT | DESCRIPTION | LOT NUMBER | ORDER UNIT PRICE | EARNINGS | EXTENSION |
|---|---|---|---|---|---|---|---|---|
| 69760 | 12 | 12 | 0 CN | ALBUTEROL SULF 0.083% 3ML '60' ** EXPIRATION DATE 9505 ** | 59505F055 | 44.400 | | 532.80 |
| 69703 | 300 | 300 | 0 CN | ALBUTEROL SULF 0.083% 3ML 25' ** EXPIRATION DATE 9504 ** | 5504F03B | 18.950 | | 5685.00 |
| 67603 | 8 | 8 | 0 CN | METAPROTERENOL 0.6% 2.5ML 25' ** EXPIRATION DATE 9505 ** | 59505E592 | 13.990 | | 111.92 |
| 83003 | 10 | 10 | 0 CN | SOD CHLORIDE 0.9% 3 ML 100's ** EXPIRATION DATE 9510 ** this is an alternate item for 83003 | 95103K010 | 13.000 | | 130.00 |

TOTAL DUE                6,459.72

SHIPPED FROM TEXAS

HIGHLY CONFIDENTIAL                                DEY-MDL0000039



DEY-MDL0000042



HIGHLY CONFIDENTIAL



SALES FILE COPY



HIGHLY CONFIDENTIAL

DEY-MDL0000045



**DEY**

SEND PAYMENT TO:
**DEY LABORATORIES, INC.**
DEPT. #01524
SAN FRANCISCO CA 94139-1524

DEY LABORATORIES, INC.
10246 MILLER ROAD
DALLAS TEXAS 75238
PHONE (214) 349-7275

Cust Contact: ORDERNET
Dey Contact: EVERETT

SHIP TO:
35 29 - 37
BERGEN BRUNSWIG - ANTIOCH
12980 OLD HICKORY BOULEVARD
ANTIOCH                     TN  37013

BILL TO:
35 29
BERGEN BRUNSWIG DRUG COMPANY
PO BOX 5916
ORANGE                      CA  92613

| INVOICE NO | PG | INVOICE DATE | PO | DATE OF ORDER | SHIP VIA | FOB | TERMS |
|---|---|---|---|---|---|---|---|
| 18 2006 | | 1/04/94 | | 12/30/93 | LWSW | AUSTIN | 2% 30 NET 31 |

PO NUMBER / SPECIAL INSTRUCTIONS
SALESMAN NAME: HARPLIN, 100

| NDC No. 48502 | QUANTITY ORDERED | QUANTITY SHIPPED | QUANTITY B/O | UNIT | DESCRIPTION | LOT | UNIT PRICE | EXTENSION |
|---|---|---|---|---|---|---|---|---|
| 69760 | 36 | 36 | 0 | CN | ALBUTEROL SULF 0.083% 3ML 60'S | 95050F055 | 44.400 | 1598.40 |
| | | | | | ** EXPIRATION DATE 9505 ** | | | |
| 69703 | 320 | 320 | 0 | CN | ALBUTEROL SULF 0.083% 3ML 25'S | 95034F030 | 18.950 | 6064.00 |
| | | | | | ** EXPIRATION DATE 9504 ** | | | |
| 67803 | 12 | 12 | 0 | CN | METAPROTERENOL 0.4% 2.5ML 25'S | 95030D449 | 13.990 | 167.88 |
| | | | | | ** EXPIRATION DATE 9503 ** | | | |
| 67803 | 28 | 28 | 0 | CN | METAPROTERENOL 0.6% 2.5ML 25'S | 95056592 | 13.990 | 391.72 |
| | | | | | ** EXPIRATION DATE 9506 ** | | | |
| 18104 | 18 | 18 | 0 | CN | ACETYLCYSTEINE 10% 4 ML 12'S | 95034026H | 25.800 | 464.40 |
| | | | | | ** EXPIRATION DATE 9503 ** | | | |
| 18130 | 12 | 12 | 0 | CN | ACETYLCYSTEINE 10% 30 ML 3'S | 95044065H | 41.970 | 503.64 |
| | | | | | ** EXPIRATION DATE 9504 ** | | | |
| 18204 | 18 | 18 | 0 | CN | ACETYLCYSTEINE 20% 4 ML 12'S | 95034041H | 31.080 | 559.44 |
| | | | | | ** EXPIRATION DATE 9503 ** | | | |
| 18230 | 12 | 12 | 0 | CN | ACETYLCYSTEINE 20% 30 ML 3'S | 95024015H | 50.640 | 607.68 |
| | | | | | ** EXPIRATION DATE 9502 ** | | | |

SHIPPED FROM TEXAS

SALES FILE COPY

*******CONTINUED*************************CONTINUED*******

HIGHLY CONFIDENTIAL

DEY-MDL0000047

# DEY

**SEND PAYMENT TO:**
**DEY LABORATORIES, INC.**
DEPT. #01524.
SAN FRANCISCO CA 94139-1524

**DEY LABORATORIES, INC.**
10246 MILLER ROAD
DALLAS TEXAS 75238
PHONE (214) 349-7275

Cust. Contact: ONDRENET
Dey Contact: EVERETT

SALES FILE COPY

SHIP TO:
BERGEN BRUNSWIG - ANTIOCH
12980 OLD HICKORY BOULEVARD
ANTIOCH                    TN  37013

BILL TO:
BERGEN BRUNSWIG DRUG COMPANY
PO BOX 5916
ORANGE                     CA  92613

SALESMAN NAME: HAMPTON, JOE

| NDC/ORDER NO | QUANTITY ORDERED | SHIPPED | B/O QTY | UNIT | DESCRIPTION | LOT NO | UNIT PRICE NET | EXTENSION |
|---|---|---|---|---|---|---|---|---|
| 50300 | 1 | 1 | 0 | CN | SOD CHLORIDE 0.9% 300 ML 6'S ** | 95K069022 | 28.500 | 28.50 |
|  |  |  |  |  | ** EXPIRATION DATE 9506 ** |  |  |  |
| 83003 | 140 | 140 | 0 | CN | SOD CHLORIDE 0.9% 3 ML 100's | 95103K010 | 13.000 | 1820.00 |
|  |  |  |  |  | This is an alternate item for |  |  |  |
|  |  |  |  |  | ** EXPIRATION DATE 9510 ** | 63003 |  |  |
| 03003 | 4 | 4 | 0 | CN | SOD CHLORIDE 0.9% 3 ML 250's | 95104451 | 32.200 | 128.80 |
|  |  |  |  |  | ** EXPIRATION DATE 9510 ** |  |  |  |
| 18110 | 72 | 72 | 0 | CN | ACETYLCYSTEINE 10% 10 ML 3'S |  |  |  |
| 18210 | 12 | 12 | 0 | CN | ACETYLCYSTEINE 20% 10 ML 3'S |  |  |  |

TOTAL DUE          12,334.46

SHIPPED FROM TEXAS



HIGHLY CONFIDENTIAL

DEY-MDL0000048

35.29 - 41

BERGEN BRUNSWIG - PINEBROOK
ROUTE 80 & ROCK MOUNTAIN ROAD
PINEBROOK          NJ 07058

35.29

BERGEN BRUNSWIG DRUG COMPANY
PO BOX 5916
ORANGE                CA 92613

**DEY**

SEND PAYMENT TO:
**DEY LABORATORIES, INC.**
DEPT. #01524
SAN FRANCISCO CA 94139-1524

DEY LABORATORIES, INC.
10246 MILLER ROAD
DALLAS TEXAS 75238
PHONE (214) 349-7275

Cust Contact:
Dey Contact:

| STOCK NUMBER | ORDERED | SHIPPED | B/O | UNIT | DESCRIPTION | LOT | UNIT PRICE | EXTENSION |
|---|---|---|---|---|---|---|---|---|
| 69760 | 12 | 12 | 0 | CN | ALBUTEROL SULF 0.083% 3ML 60'S | 9506F065 | 44.400 | 532.80 |
| | | | | | ** EXPIRATION DATE 9506 ** | | | |
| 69703 | 300 | 300 | 0 | CN | ALBUTEROL SULF 0.083% 3ML 25'S | 9504F039 | 18.950 | 5685.00 |
| | | | | | ** EXPIRATION DATE 9504 ** | | | |
| 67603 | 24 | 24 | 0 | CN | METAPROTERENOL 0.6% 2.5ML 25'S | 9505E592 | 13.990 | 335.76 |
| | | | | | ** EXPIRATION DATE 9505 ** | | | |
| 102104 | 12 | 12 | 0 | CN | ACETYLCYSTEINE 20% 4 ML 12'S | 95034044I | 31.080 | 372.96 |
| | | | | | ** EXPIRATION DATE 9503 ** | | | |
| 83003 | 30 | 30 | 0 | CN | SOD CHLORIDE 0.9% 3 ML 100'S | 9510K021 | 13.000 | 390.00 |
| | | | | | THIS IS AN ALTERNATE ITEM FOR 83003 | | | |
| 63003 | 10 | 10 | 0 | CN | SOD CHLORIDE 0.9% 3 ML 100'S | 9510 | 13.000 | 130.00 |
| | | | | | ** EXPIRATION DATE 9510 ** | | | |
| 18110 | 0 | 36 | 36 | CN | ACETYLCYSTEINE 10% 10 ML 3'S | 9507443 | | |

TOTAL DUE          7,446.52

SHIPPED FROM TEXAS



******CONTINUED**********************CONTINUED********************CONTINUED******

SALES FILE COPY
******CONTINUED******

HIGHLY CONFIDENTIAL                    DEY-MDL0000050

**DEY**

SEND PAYMENT TO:
**DEY LABORATORIES, INC.**
DEPT. #01524
SAN FRANCISCO CA 94139-1524

DEY LABORATORIES, INC.
10246 MILLER ROAD
DALLAS TEXAS 75238
PHONE: (214) 349-7275

Cust Contact:   OHDRRNET
Dey Contact:   EVERETT

SALES FILE COPY

SHIPPED FROM TEXAS

3529 - 41

BERGEN BRUNSWIG - PINEBROOK
ROUTE 80 & HOOK MOUNTAIN ROAD   N.J   07058
PINEBROOK

3529
BERGEN BRUNSWIG DRUG COMPANY
PO BOX 5916
ORANGE   CA   92613

HIGHLY CONFIDENTIAL

DEY-MDL0000051

**DEY**

SEND PAYMENT TO:
**DEY LABORATORIES, INC.**
DEPT. #01524
SAN FRANCISCO CA 94139-1524

DEY LABORATORIES, INC.
10246 MILLER ROAD
DALLAS, TEXAS 75238
PHONE (214) 349-7275

SHIP TO:
BERGEN BRUNSWIG - SUWANEE
1085 N. SATELLITE BLVD.
SUWANEE                GA   30174

BILL TO:
3529
BERGEN BRUNSWIG DRUG COMPANY
PO BOX 5916
ORANGE                 CA   92613

Cust Contact: ORDRNBY
Dey Contact:  EVERETT

| INVOICE NO. | PG. | INVOICE DATE | DATE OF ORDER | SHIP VIA | FOB | TERMS |
|---|---|---|---|---|---|---|
| 152005 | 2 | 17/04/94 | 12/30/93 | CMON | DESTIN | 2% 30 NET 31 |

PO NUMBER: 117279
SALESMAN NAME: SPENO, RICH

| NDC No./NDC No. | QUANTITY ORDERED | QUANTITY SHIPPED | QUANTITY B/O | UNIT | DESCRIPTION | LOT# | UNIT PRICE | EXTENSION |
|---|---|---|---|---|---|---|---|---|
| 69760 | 12 | 12 | 0 | CN | ALBUTEROL, SULF 0.083% 3ML 60'S | 9505F055 | 44.400 | 532.80 |
| | | | | | ** EXPIRATION DATE 9505 ** | | | |
| 69703 | 412 | 412 | 0 | CN | ALBUTEROL, SULF 0.083% 3ML 25'S | 9504F039 | 18.980 | 7807.40 |
| | | | | | ** EXPIRATION DATE 9504 ** | | | |
| 66103 | 12 | 12 | 0 | CN | ISOETHARINE S/F 0.06% 3ML 25'S | 9505C354 | 7.750 | 93.00 |
| | | | | | ** EXPIRATION DATE 9505 ** | | | |
| 67803 | 4 | 4 | 0 | CN | METAPROTERENOL 0.4% 2.5ML 25'S | 9503D449 | 13.990 | 55.96 |
| | | | | | ** EXPIRATION DATE 9503 ** | | | |
| 67603 | 44 | 44 | 0 | CN | METAPROTERENOL 0.6% 2.5ML 25'S | 9505E592 | 13.990 | 615.56 |
| | | | | | ** EXPIRATION DATE 9505 ** | | | |
| 18104 | 6 | 6 | 0 | CN | ACETYLCYSTEINE 10% 4 ML 12'S | 9503402GH | 25.800 | 154.80 |
| | | | | | ** EXPIRATION DATE 9503 ** | | | |
| 18204 | 6 | 6 | 0 | CN | ACETYLCYSTEINE 20% 4 ML 12'S | 9503404IH | 31.000 | 186.48 |
| | | | | | ** EXPIRATION DATE 9503 ** | | | |
| 18230 | 12 | 12 | 0 | CN | ACETYLCYSTEINE 20% 30 ML 1'S | 9503401SH | 50.640 | 607.68 |
| | | | | | ** EXPIRATION DATE 9502 ** | | | |

SHIPPED FROM TEXAS

*******CONTINUED*******************CONTINUED*******************CONTINUED*******

SALES FILE COPY

HIGHLY CONFIDENTIAL

DEY-MDL0000052

**DEY.**

SEND PAYMENT TO:
**DEY LABORATORIES, INC.**
DEPT. #01524.
SAN FRANCISCO CA 94139-1524

DEY LABORATORIES, INC.
10246 MILLER ROAD.
DALLAS TEXAS 75238
PHONE (214) 349-7275.

Cust. Contact:   ORDERRNET
Dey. Contact:   EVERKTT

| SHIP TO | | | | | | | |
|---|---|---|---|---|---|---|---|
| 3529 - 83 | | | | | | | |
| BERGEN BRUNSWIG - SUWANEE | | | | | | | |
| 1085 N. SATELLITE BLVD | | | | | | | |
| SUWANEE | | | CA  30174 | | | | |

| BILL TO | | | | | | | |
|---|---|---|---|---|---|---|---|
| 3529 | | | | | | | |
| BERGEN BRUNSWIG DRUG COMPANY | | | | | | | |
| PO BOX 5916 | | | | | | | |
| ORANGE | | | CA  92613 | | | | |

| INVOICE NO | PG | INVOICE DATE | DATE OF ORDER | SHIP-VIA | FOB | TERMS | |
|---|---|---|---|---|---|---|---|
| 152009 | | 1/04/94 | 12/30/93 | CWSW | DESTIN | 2% 30 NET 31 | |

| PO NUMBER | SALESMAN NAME | | | SPECIAL INSTRUCTIONS | | | |
|---|---|---|---|---|---|---|---|
| 1317279 | STKNO, RICH | | | | | | |

| ORD-CAT-NO | QUANTITY ORDERED | QUANTITY SHIPPED | QUANTITY B/O | UNIT | DESCRIPTION | NDC-PROD # | UNIT PRICE | EXTENSION |
|---|---|---|---|---|---|---|---|---|
| 83003 | 60 | 60 | 0 | CN | SOD CHLORIDE 0.9% 3 ML 100'S | 95103K011 | 13.000 | 700.00 |
| | | | | | This is an alternate item for 63003 | | | |
| | | | | | ** EXPIRATION DATE 9510 ** | | | |
| 63003 | 10 | 10 | 0 | CN | SOD CHLORIDE 0.9% 3 ML 100'S | 95077643 | 13.000 | 130.00 |
| | | | | | ** EXPIRATION DATE 9507 ** | | | |
| 03003 | 16 | 16 | 0 | CN | SOD CHLORIDE 0.9% 3 ML 250'S | 95104451 | 32.200 | 515.20 |
| | | | | | ** EXPIRATION DATE 9510 ** | | | |

TOTAL DUE    $1,470.88

SHIPPED FROM TEXAS

SALES FILE COPY

HIGHLY CONFIDENTIAL

DEY-MDL0000053

**DEY**

SEND PAYMENT TO:
DEY LABORATORIES, INC.
DEPT. #01524
SAN FRANCISCO CA 94139-1524

DEY LABORATORIES, INC.
10246 MILLER ROAD
DALLAS TEXAS 75238
PHONE (214) 349-7275

Cust Contact: ORDKRNET
Dey Contact: KVRRKTT

3529 - 35

| S H I P T O | BERGEN BRUNSWIG - BRIDGEPORT<br>225 HOWARD AVENUE<br>BRIDGEPORT                CT  06605 |
|---|---|

35 29

| B I L L T O | BERGEN BRUNSWIG DRUG COMPANY<br>PO BOX 5916<br>ORANGE                           CA  92613 |
|---|---|

| INVOICE NO | INVOICE DATE | DATE OF ORDER | SHIP VIA | FOB | TERMS |
|---|---|---|---|---|---|
| 152010 | 17/04/94 | 12/30/93 | WWAY | DESTIN | 7% 30 NET 31 |

PO NUMBER: 531613
SALESMAN NAME: HALCHAK, KATHLE...

| VEND NO | QUANTITY ORDERED | QUANTITY SHIPPED | QUANTITY B/O | UNIT | DESCRIPTION | LOT NO | UNIT PRICE | NET EXTENSION |
|---|---|---|---|---|---|---|---|---|
| 69760 | 12 | 12 | 0 | CN | ALBUTEROL SULF 0.083% 3ML 60'S ** | 95F05F05S | 44.400 | 532.80 |
|  |  |  |  |  | ** EXPIRATION DATE 9505 ** |  |  |  |
| 69703 | 252 | 252 | 0 | CN | ALBUTEROL SULF 0.083% 3ML 25'S | 95F04F039 | 18.950 | 4775.40 |
|  |  |  |  |  | ** EXPIRATION DATE 9504 ** |  |  |  |
| 83003 | 10 | 10 | 0 | CN | SOD CHLORIDE 0.9% 3 ML 100'S | 95103K01 | 13.000 | 130.00 |
|  |  |  |  |  | This is an alternate item for 63003 |  |  |  |
| 03003 | 8 | 8 | 0 | CN | SOD CHLORIDE 0.9% 3 ML 250'S | 95104451 | 32.200 | 257.60 |
|  |  |  |  |  | ** EXPIRATION DATE 9510 ** |  |  |  |
| 18110 | 24 | 0 | 24 | CN | ACETYLCYSTEINE 10% 10 ML 3'S |  |  |  |
|  |  |  |  |  | ** EXPIRATION DATE 9510 ** |  |  |  |
| 18210 | 12 | 0 | 12 | CN | ACETYLCYSTEINE 20% 10 ML 3'S |  |  |  |

TOTAL DUE: 5,695.80

SHIPPED FROM TEXAS

SALES FILE COPY

HIGHLY CONFIDENTIAL

DEY-MDL0000054

**DEY**

SEND PAYMENT TO:
DEY LABORATORIES, INC.
DEPT. #01524
SAN FRANCISCO CA 94139-1524

DEY LABORATORIES, INC.
10246 MILLER ROAD
DALLAS TEXAS 75238
PHONE (214) 349-7275

35.29 - 21

SHIP TO:
BERGEN BRUNSWIG - LOUISVILLE
7841 NATIONAL TURNPIKE
LOUISVILLE                KY  40214

35.29

BILL TO:
BERGEN BRUNSWIG DRUG COMPANY
PO BOX 5916
ORANGE                    CA  92613

Cust Contact:
Dey Contact:

| INVOICE NO. | PG | INVOICE DATE | DATE OF ORDER | SHIP VIA | F.O.B. | TERMS |
|---|---|---|---|---|---|---|
| 15 4011 | 1 | 17/04/94 | 12/30/93 | ARRW | DSTIN | 2% 30 NET 31 |

| P.O. NUMBER | SALESMAN NAME | SPECIAL INSTRUCTIONS |
|---|---|---|
| 161651 | UFRN | |

| NDC NO/48502-25-21 | QUANTITY ORDERED | QUANTITY SHIPPED | QTY B/O | UNIT | DESCRIPTION | LOT | UNIT PRICE | EXTENSION |
|---|---|---|---|---|---|---|---|---|
| 69703 | 364 | 364 | 0 | CN | ALBUTEROL SULF 0.083% 3ML 25'S ** | 9504F039 | 18.950 | 6897.80 |
| | | | | | ** EXPIRATION DATE 9504 ** | | | |
| 67603 | 56 | 56 | 0 | CN | METAPROTERENOL 0.6% 2.5ML 25'S | 9505B592 | 13.990 | 783.44 |
| | | | | | ** EXPIRATION DATE 9505 ** | | | |
| 18104 | 18 | 18 | 0 | CN | ACETYLCYSTEINE 10% 4 ML 12'S | 95034026H | 25.800 | 464.40 |
| | | | | | ** EXPIRATION DATE 9503 ** | | | |
| 18200 | 4 | 4 | 0 | CN | ACETYLCYSTEINE 20% 100 ML 1'S | 95013972H | 75.900 | 303.60 |
| | | | | | ** EXPIRATION DATE 9501 ** | | | |
| 18204 | 12 | 12 | 0 | CN | ACETYLCYSTEINE 20% 4 ML 12'S | 95034041H | 31.000 | 372.96 |
| | | | | | ** EXPIRATION DATE 9503 ** | | | |
| 18230 | 12 | 12 | 0 | CN | ACETYLCYSTEINE 20% 30 ML 3'S | 95024015H | 50.640 | 607.68 |
| | | | | | ** EXPIRATION DATE 9502 ** | | | |
| 83003 | 80 | 80 | 0 | CN | SOD CHLORIDE 0.9% 3 ML 100'S | 95103K011 | 13.000 | 1040.00 |
| | | | | | This is an alternate item for 83003 | | | |
| | | | | | ** EXPIRATION DATE 9510 ** | | | |
| 83005 | 30 | 30 | 0 | CN | SOD CHLORIDE 0.9% 5 ML 100'S | 95093J136 | 13.000 | 390.00 |

SHIPPED FROM TEXAS.

*************CONTINUED************CONTINUED************CONTINUED*************

CURRENT
INVOICE

SALES FILE COPY

HIGHLY CONFIDENTIAL

DEY-MDL0000055

**DEY**

SEND PAYMENT TO:
DEY LABORATORIES, INC.
DEPT. #01524
SAN FRANCISCO CA 94139-1524

DEY LABORATORIES, INC.
10246 MILLER ROAD
DALLAS TEXAS 75238
PHONE (214) 349-7275

SHIP TO: BERGEN BRUNSWIG - LOUISVILLE
7841 NATIONAL TURNPIKE
LOUISVILLE                KY 40214

BILL TO: BERGEN BRUNSWIG DRUG COMPANY
PO BOX 5916
ORANGE                    CA 92613

Cust Contact:
Dey Contact:

| DESCRIPTION | EXTENSION |
|---|---|
| THIS IS AN ALTERNATE ITEM FOR 63005 | |
| ** EXPIRATION DATE 9509 ** | 515.20 |
| SOD CHLORIDE 0.9% 10 ML 125'S | |
| ** EXPIRATION DATE 9510 ** | |
| ACETYLCYSTEINE 10% 10 ML 3'S | |
| TOTAL DUE | 13,375.00 |

SHIPPED FROM TEXAS

SALES FILE COPY

HIGHLY CONFIDENTIAL

DEY-MDL0000056

**DEY**

SEND PAYMENT TO:
DEY LABORATORIES, INC.
DEPT. #01524
SAN FRANCISCO CA 94139-1524

DEY LABORATORIES, INC.
10246 MILLER ROAD
DALLAS TEXAS 75238
PHONE (214) 349-7275

Cost Contact:
Dey Contact: ORDRXNET EVERXTT

SHIP TO:
BERGEN BRUNSWIG - RICHMOND
4825 BETHLEHEM ROAD
RICHMOND
VA 23230

BILL TO:
BERGEN BRUNSWIG DRUG COMPANY
PO BOX 5916
ORANGE
CA 92613

| INVOICE NO. | PG. | INVOICE DATE | DATE OF ORDER | SHIP VIA | TERMS |
|---|---|---|---|---|---|
| 1S 2014 | 1 | 1/04/94 | 12/30/93 | WWAT | DSTIN 2% 30 NET 31 |

PO NUMBER: U711113
SALESMAN NAME: UFKN

| NDC No. | QUANTITY ORDERED | QUANTITY SHIPPED | QUANTITY B/O | UNIT | DESCRIPTION | CONTRACT | UNIT PRICE | EXTENSION |
|---|---|---|---|---|---|---|---|---|
| 69703 | 852 | 852 | 0 | CN | ALBUTEROL SULF 0.083% 3ML 25'S <br> ** EXPIRATION DATE 9504 ** | 95C04FN39 | 18.950 | 16145.40 |
| 66003 | 16 | 16 | 0 | CN | ISOETHARINE S/F 0.17% 3ML 25'S <br> ** EXPIRATION DATE 9506 ** | 95C06C373 | 7.750 | 124.00 |
| 67803 | 20 | 20 | 0 | CN | METAPROTERENOL 0.4% 2.5ML 25'S <br> ** EXPIRATION DATE 9503 ** | 95C03D449 | 13.990 | 279.80 |
| 67603 | 60 | 60 | 0 | CN | METAPROTERENOL 0.6% 2.5ML 25'S <br> ** EXPIRATION DATE 9505 ** | 95C05K592 | 13.990 | 839.40 |
| 10104 | 12 | 12 | 0 | CN | ACETYLCYSTEINE 10% 4 ML 12'S <br> ** EXPIRATION DATE 9503 ** | 95C03402GH | 25.800 | 309.60 |
| 18230 | 36 | 36 | 0 | CN | ACETYLCYSTEINE 20% 30 ML 3'S <br> ** EXPIRATION DATE 9502 ** | 95C24015H | 50.640 | 1823.04 |
| 83003 | 50 | 50 | 0 | CN | SOD CHLORIDE 0.9% 3 ML 100'S <br> This is an alternate item for 63003 | 95103K011 | 13.000 | 650.00 |
| 63003 | 10 | 10 | 0 | CN | SOD CHLORIDE 0.9% 3 ML 100'S <br> ** EXPIRATION DATE 9510 ** | 95077443 | 13.000 | 130.00 |

SHIPPED FROM TEXAS

SALES FILE COPY

*****CONTINUED*****CONTINUED*****CONTINUED*****CONTINUED*****CONTINUED*****

HIGHLY CONFIDENTIAL

DEY-MDL0000059



**DEY**

SEND PAYMENT TO:
**DEY LABORATORIES, INC.**
DEPT. #01524
SAN FRANCISCO CA 94139-1524

DEY LABORATORIES, INC.
10246 MILLER ROAD
DALLAS TEXAS 75238
PHONE (214) 349-7275

Cust Contact: ORDERNKT
Dey Contact? KVERKT.

SALES FILE COPY

SHIPPED FROM TEXAS

| ORDERED | QUANTITY SHIPPED | QUANTITY B/OS | UNIT | DESCRIPTION | LOT NO | UNIT PRICE | EXTENSION |
|---|---|---|---|---|---|---|---|
| 18 | 18 | 0 | CN | ** EXPIRATION DATE 9507 ** SOD CHLORIDE 0.9% 10 ML 125'S | 95104445 | 32.200 | 579.60 |
| 12 | 12 | 12 | CN | ** EXPIRATION DATE 9510 ** ACETYLCYSTEINE 10% 10 ML 3'S | | | |
| 12 | 12 | 12 | CN | ACETYLCYSTEINE 20% 10 ML 3'S | | | |

TOTAL DUE      20,800.84

3529 - 64
BERGEN BRUNSWIG - RICHMOND
4825 BETHLEHEM ROAD
RICHMOND          VA  23230

3529
BERGEN BRUNSWIG DRUG COMPANY
PO BOX 5916
ORANGE            CA  92613

INVOICE NO  15 2014
INVOICE DATE  1/14/94
DATE OF ORDER  12/30/93
SALESMAN NAME  DPERH
PO NUMBER  U71113

TERMS  25 30 NET 31

HIGHLY CONFIDENTIAL

DEY-MDL0000060

**DEY**

SEND PAYMENT TO:
**DEY LABORATORIES, INC.**
DEPT. #01524
SAN FRANCISCO CA 94139-1524

**DEY LABORATORIES, INC.**
10246 MILLER ROAD
DALLAS TEXAS 75238
PHONE (214) 349-7275

Cust Contact: ORDERNET
Dey Contact: EVERETT

SALES FILE COPY

SHIP TO:
3529 - 93
BERGEN BRUNSWIG - ASHVILLE
280 N. HANOVER STREET
ASHEVILLE
NC 28806

BILL TO:
3529
BERGEN BRUNSWIG DRUG COMPANY
PO BOX 5916
ORANGE
CA 92613

| INVOICE NO. 152015 | INVOICE DATE | DATE OF ORDER 12/07/93 | SHIP VIA UPS | FOB POINT DESTIN | TERMS NET 30 OCT 31 |
|---|---|---|---|---|---|
| SALESMAN NAME SPANO, RICH | | | | | |
| P.O. NUMBER 051746 | | | SPECIAL INSTRUCTIONS | | |

| NDC No. 49502 | QUANTITY ORDERED | QUANTITY SHIPPED | BY U/M | UNIT | DESCRIPTION | LOT NO. | UNIT PRICE | EXTENSION |
|---|---|---|---|---|---|---|---|---|
| 69703 | 16 | 16 | 0 | CN | ALBUTEROL SULF 0.083% 3ML 25'S | 95040039 | 18.960 | 303.20 |
|  |  |  |  |  | ** EXPIRATION DATE 9504 ** | | | |
| 67603 | 4 | 4 | 0 | CN | METAPROTERENOL 0.6% 2.5ML 25'S | 95050592 | 13.990 | 55.96 |
|  |  |  |  |  | ** EXPIRATION DATE 9505 ** | | | |
| 18130 | 12 | 12 | 0 | CN | ACETYLCYSTEINE 10% 30 ML 3'S | 95044065H | 41.970 | 503.64 |
|  |  |  |  |  | ** EXPIRATION DATE 9504 ** | | | |
| 18230 | 12 | 12 | 0 | CN | ACETYLCYSTEINE 20% 30 ML 3'S | 95024015H | 50.640 | 607.68 |
|  |  |  |  |  | ** EXPIRATION DATE 9502 ** | | | |
| 83003 | 10 | 10 | 0 | CN | SOD. CHLORIDE 0.9% 3 ML 100's | 95103K011 | 13.000 | 130.00 |
|  |  |  |  |  | This is an alternate item for 63003 | | | |
|  |  |  |  |  | ** EXPIRATION DATE 9510 ** | | | |

TOTAL DUE   1,600.48

SHIPPED FROM TEXAS



HIGHLY CONFIDENTIAL
DEY-MDL0000062

**DEY**

SEND PAYMENT TO:
DEY LABORATORIES, INC.
DEPT. #01524
SAN FRANCISCO CA 94139-1524

DEY LABORATORIES, INC.
10246 MILLER ROAD
DALLAS TEXAS 75238
PHONE: (214) 349-7275

SHIP TO:
3529 - 5
BERGEN BRUNSWIG - SAN JOSE
450 CHARCOT AVENUE
SAN JOSE                        CA  95131

BILL TO:
3529
BERGEN BRUNSWIG DRUG COMPANY
PO BOX 5916
ORANGE                          CA  92613

| INVOICE NO. | PG | INVOICE DATE | DATE OF ORDER | SHIP VIA | POS | DESTIN | ITEMS |
|---|---|---|---|---|---|---|---|
| 152017 | 1 | 17/14/754 | 127/30/753 | WWAT | | DESTIN | 28 30 NRT 31 |

| PO NUMBER | SALESMAN NAME | | SPECIAL INSTRUCTIONS | | Cust Contact: ORDERNET |
|---|---|---|---|---|---|
| 114758 | CODUIT8, DREBI | | | | Dey Contact: HARRALSON |

| NDC No. 48520 | QUANTITY ORDERED | QUANTITY SHIPPED | UNIT | DESCRIPTION | LOT | UNIT PRICE | EXTENSION |
|---|---|---|---|---|---|---|---|
| 69760 | 12 | 12 | CN | ALBUTEROL SULF 0.083% 3ML 60'S ** EXPIRATION DATE 9505 ** | 9505F055 | 44.400 | 532.00 |
| 69703 | 204 | 204 | CN | ALBUTEROL SULF 0.083% 3ML 25'S ** EXPIRATION DATE 9504 ** | 9504F059 | 18.950 | 3865.00 |
| 67803 | 4 | 4 | CN | METAPROTERENOL 0.4% 2.5ML 25'S ** EXPIRATION DATE 9503 ** | 9503D449 | 13.990 | 55.96 |
| 67603 | 116 | 116 | CN | METAPROTERENOL 0.6% 2.5ML 25'S ** EXPIRATION DATE 9505 ** | 9505E592 | 13.990 | 1622.84 |
| 83003 | 30 | 30 | CN | SOD CHLORIDE 0.4% 3 ML 100'S This is an alternate item for | 95103K011 63003 | 13.000 | 390.00 |
| 83005 | 20 | 20 | CN | SOD CHLORIDE 0.9% 5 ML 100'S This is an alternate item for | 95093J136 83005 | 13.000 | 260.00 |
| | | | | ** EXPIRATION DATE 9509 ** | | | |

TOTAL DUE   6,727.40

SHIPPED FROM TEXAS

*****CONTINUED*********************************CONTINUED*******************

*****CONTINUED*********************************CONTINUED*******************

SALES FILE COPY

HIGHLY CONFIDENTIAL                              DEY-MDL0000063

**DEY**

SEND PAYMENT TO:
DEY LABORATORIES, INC.
DEPT. #01524
SAN FRANCISCO CA 94139-1524

DEY LABORATORIES, INC.
10246 MILLER ROAD
DALLAS, TEXAS 75238
PHONE (214) 349-7275

Cust. Contact: ORDERNET
Dey Contact: HARRALSON

SALES FILE COPY

SHIPPED FROM TEXAS

SHIP TO:
3529 - S
BERGEN BRUNSWIG - SAN JOSE
650 CHARCOT AVENUE
SAN JOSE                    CA  95131

BILL TO:
3529
BERGEN BRUNSWIG DRUG COMPANY
PO BOX 5916
ORANGE                      CA  92613

| INVOICE NO | DATE OF ORDER | WHOLESALE DATE | FOB | TERMS | SHIP VIA |
|---|---|---|---|---|---|
| 132017 | 12/30/93 | 17/04/94 | DESTIN | 2% 30 NET 31 | WWAT |

SALESMAN NAME: CODUCK, DEBI
PO NUMBER: 144758

| QTY ORDERED | QTY SHIPPED | UNIT | QTY/UOM | DESCRIPTION | LOT NO | UNIT PRICE | EXTENSION |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

HIGHLY CONFIDENTIAL

DEY-MDL0000064

**DEY**

SEND PAYMENT TO:
DEY LABORATORIES, INC.
DEPT. #01524
SAN FRANCISCO CA 94139-1524

DEY LABORATORIES, INC.
10246 MILLER ROAD
DALLAS, TEXAS 75238
PHONE (214) 349-7275

Cust. Contact: ORLKRNET
Dey Contact: EVERETT

NO. 2776 22

CA 92613

SHIP TO:
BERGEN BRUNSWIG - RALEIGH
8605 EBENEZER CHURCH RD.
RALEIGH

BILL TO:
BERGEN BRUNSWIG DRUG COMPANY
PO BOX 5916
ORANGE

SALESMAN NAME: UPERNO, RICH
PO NUMBER: 0701100

35.29 - 90
35.29 -

| QUANTITY ORDERED | QUANTITY SHIPPED | QUANTITY B/O | UNIT | DESCRIPTION | LOT# | UNIT PRICE | EXTENSION |
|---|---|---|---|---|---|---|---|
| 69760 24 | 24 | 0 | CN | ALBUTEROL SULF 0.083% 3ML 60'S ** EXPIRATION DATE 9505 ** | 9505F055 | 44.400 | 1065.60 |
| 69703 292 | 292 | 0 | CN | ALBUTEROL SULF 0.083% 3ML 25'S ** EXPIRATION DATE 9504 ** | 9504F039 | 18.950 | 5533.40 |
| 67803 8 | 8 | 0 | CN | METAPROTERENOL 0.4% 2.5ML 25'S ** EXPIRATION DATE 9503 ** | 9503D449 | 13.990 | 111.92 |
| 67603 52 | 52 | 0 | CN | METAPROTERENOL 0.6% 2.5ML 25'S ** EXPIRATION DATE 9505 ** | 9505E192 | 13.990 | 727.48 |
| 18104 12 | 12 | 0 | CN | ACETYLCYSTEINE 10% 4 ML 12'S ** EXPIRATION DATE 9503 ** | 95034O2GH | 25.800 | 309.60 |
| 18204 6 | 6 | 0 | CN | ACETYLCYSTEINE 20% 4 ML 12'S ** EXPIRATION DATE 9503 ** | 95034O4JH | 31.080 | 106.48 |
| 03003 2 | 2 | 0 | CN | SOD CHLORIDE 0.9% 3 ML 25'S ** EXPIRATION DATE 9510 ** | 95104451 | 32.200 | 64.40 |
| 18210 36 | 0 | 36 | CN | ACETYLCYSTEINE 20% 10 ML 3'S | | | |

SHIPPED FROM TEXAS

*******CONTINUED************************CONTINUED************************CONTINUED*******

SALES FILE COPY

HIGHLY CONFIDENTIAL

DEY-MDL0000065

**DEY**

SEND PAYMENT TO:
DEY LABORATORIES, INC.
DEPT. #01524
SAN FRANCISCO CA 94139-1524

DEY LABORATORIES, INC.
10246 MILLER ROAD
DALLAS TEXAS 75238
PHONE (214) 349-7275

Cust Contact: ORDERNET
Dey Contact: EVERETT

BERGEN BRUNSWIG - RALEIGH
6605 EBENEZER CHURCH RD.
RALEIGH                NC 27622

BERGEN BRUNSWIG DRUG COMPANY
PO BOX 5916
ORANGE              CA 92613

TERMS  2% 30 NET 31

7,998.80  TOTAL DUE

SALES FILE COPY.

SHIPPED FROM TEXAS

HIGHLY CONFIDENTIAL

DEY-MDL0000066

**DEY**

SEND PAYMENT TO:
**DEY LABORATORIES, INC.**
DEPT. #01524
SAN FRANCISCO CA 94139-1524

DEY LABORATORIES, INC.
10246 MILLER ROAD
DALLAS TEXAS 75238
PHONE (214) 349-7275

Cust Contact: ORDERNET
Dey Contact: EVERETT

35 29   46

BERGEN BRUNSWIG - WILLIAMSTOWN
ONE INDUSTRIAL PARK DRIVE
WILLIAMSTOWN                     NJ 48895

3529   BERGEN BRUNSWIG DRUG COMPANY
PO BOX 5916
ORANGE                           CA 92613

| INVOICE NO | INVOICE DATE | PO# | DATE OF ORDER | SHIP VIA | F.O.B. | TERMS |
|---|---|---|---|---|---|---|
| | 13.10/20 | | 17/04/94  17/30/94 | RDWY | DALLAS TX | 2% 30 NET 31 |

| PO NUMBER | SALESMAN NAME | QTY ORDERED | QTY SHIPPED | QTY B/O | UM | ITEM NO | DESCRIPTION | SPECIAL INSTRUCTIONS | UNITPRICE | EXTENSION |
|---|---|---|---|---|---|---|---|---|---|---|
| 342314 | HARLESS, LORI | 1200 | 1200 | 0 | CN | 69703 | ALBUTEROL SULF 0.083% 3ML 2X 5*SU504X040 ** EXPIRATION DATE 9504 ** | | 18.950 | 22740.00 |

TOTAL DUE          22,740.00

SHIPPED FROM TEXAS

SALES FILE COPY

HIGHLY CONFIDENTIAL                                    DEY-MDL0000068

**DEY**

SEND PAYMENT TO:
DEY LABORATORIES, INC.
DEPT. #01524
SAN FRANCISCO CA 94139-1524

DEY LABORATORIES, INC.
10246 MILLER ROAD
DALLAS, TEXAS 75238
PHONE: (214) 349-7275

Cust Contact: WAYNE HAY
Dey Contact: HARRALSON

SALES FILE COPY

SHIPPED FROM TEXAS.

BERGEN BRUNSWIG - KANSAS CITY
1501 SOUTHERN ROAD
KANSAS CITY

BERGEN BRUNSWIG DRUG COMPANY
PO BOX 5916
ORANGE                    CA  92613

35.29 - 47

35.29

| INVOICE NO | INVOICE DATE | DATE CUST ORDER | QUANTITY ORDERED | QUANTITY SHIPPED | QUANTITY B/O | CONT'T | DESCRIPTION | ORDER NO | UNIT PRICE | EXTENSION |
|---|---|---|---|---|---|---|---|---|---|---|
| 15202 | 1/04/94 | 1/03/94 | 132 | 132 | 0 | CN | ALBUTEROL SULF 0.083% 3ML 25'S | 9505A141 | 18.950 | 2501.40 |

FOB: DESTIN  TX 30 NET 31

SHIP VIA: NWTP

PO BOX: NO  64120

SPECIAL NAME: OPEN

SPECIAL INSTRUCTIONS: ** EXPIRATION DATE 9505 **

SALESMAN NO: 174093

TOTAL DUE    2,501.40

**DEY**

SEND PAYMENT TO:
DEY LABORATORIES, INC.
DEPT. #01524
SAN FRANCISCO CA 94139-1524

DEY LABORATORIES, INC.
10246 MILLER ROAD
DALLAS TEXAS 75238
PHONE (214) 349-7275

Cust. Contact: OAKRKNET
Dey Contact: JENNINGS

C.D.SMITH DRUG
313-323 SOUTH THIRD STREET
PO BOX 789
ST JOSEPH

C.D SMITH DRUG
313-323 SOUTH THIRD STREET
PO BOX 789
ST JOSEPH

MO 6450207789

3542

| NO. | QUANTITY ORDERED | QUANTITY SHIPPED | UNIT | DESCRIPTION | ITEM NO. | UNIT CHARGE | EXTENSION |
|---|---|---|---|---|---|---|---|
| 69760 | 12 | 12 | .2M | ALBUTEROL SULF 0.083% 3ML 60'S ** EXPIRATION DATE 9505 ** | SA505F055 | 44.400 | 532.80 |
| 50300 | 13 | 13 | .2M | SOD CHLORIDE 0.9% 300 ML 6'S ** EXPIRATION DATE 9506 ** | 95069022 | 28.500 | 370.50 |
| 50120 | 2 | 2 | .2M | SOD CHLORIDE 0.9% 120 ML 6'S ** EXPIRATION DATE 9503 ** | 95039020 | 22.500 | 45.00 |

TOTAL DUE   948.30

SALES FILE COPY

SHIPPED FROM TEXAS

HIGHLY CONFIDENTIAL

DEY-MDL0000072

**DEY**

SEND PAYMENT TO:
DEY LABORATORIES, INC.
DEPT. #01524
SAN FRANCISCO CA 94139-1524

DEY LABORATORIES, INC
10246 MILLER ROAD
DALLAS, TEXAS 75238
PHONE (214) 349-7275

Cust. Contact: ORDERNRT
Dey Contact: JENNINGS

SHIP TO:
CHAPMAN - RICHLAND
529 OLD HWY 29 SOUTH
RICHLAND

BILL TO:
CARDINAL HEALTH - MISSISSIPPI
PO BOX 18216
COLUMBUS     OH     43218-2516     MS   39218

TERMS: 2% 30 NET 31
FOB: DALLAS
SHIP VIA: AIR XX

| QUANTITY ORDERED | QUANTITY SHIPPED | U/M | DESCRIPTION | TOTAL | UNIT PRICE | EXTENSION |
|---|---|---|---|---|---|---|
| 20 | 20 | CN | ALBUTEROL SULF 0.083% 3ML 25 5X5X4F0030 ** EXPIRATION DATE 9504 ** | | 18.950 | 379.00 |

TOTAL DUE     379.00

SHIPPED FROM TEXAS

SALES FILE COPY

HIGHLY CONFIDENTIAL

DEY-MDL0000073

**DEY**

SEND PAYMENT TO:
**DEY LABORATORIES, INC.**
DEPT. #01524
SAN FRANCISCO CA 94139-1524

DEY LABORATORIES, INC.
10246 MILLER ROAD
DALLAS TEXAS 75238
PHONE (214) 349-7275

Cust Contact:  ORDERNNT
Dey Contact:  JENNINGS

SHIP TO:
3557 - R
DURR DRUG CO INC - MOBILE
AS SIDNEY PHILLIPS DRIVE
MOBILE
AL. 36607

BILL TO:
3557
DURR DRUG COMPANY INC
PO BOX 244008
MONTGOMERY
AL. 36124

| INVOICE INVOICE DATE | PO | INVOICE DATE | DATE OF ORDER | SHIP VIA | FOB | TERMS |
|---|---|---|---|---|---|---|
| 11 20 26 | N | 1/04/94 | 12/29/93 | LWSW | DESTIN | 2% 30 NET 31 |

PO NUMBER: 
SALESMAN NAME: 07/234910 HAMPTON, JOE

| QUANTITY ORDERED | QUANTITY SHIPPED | QUANTITY B/OL | UNIT | DESCRIPTION | SPECIAL INSTRUCTIONS | UNIT PRICE | EXTENSION |
|---|---|---|---|---|---|---|---|
| 5 28 | 5 28 | 0 | CN | ALBUTEROL SULF 0.083% 3ML 25'S ** EXPIRATION DATE 9504 ** | 504FD030 | 18.950 | 10005.60 |
| 44 | 44 | 0 | CN | METAPROTERENOL 0.6% 2.5ML 25'S ** EXPIRATION DATE 9505 ** | 505ET592 | 13.990 | 615.56 |
| 42 | 42 | 0 | CN | ACETYLCYSTEINE 10% 4 ML 12'S ** EXPIRATION DATE 9503 ** | 5034026H | 25.000 | 1003.60 |
| 36 | 36 | 0 | CN | ACETYLCYSTEINE 20% 4 ML 12'S ** EXPIRATION DATE 9503 ** | 5034041H | 31.000 | 1110.68 |
| 12 | 12 | 0 | CN | ACETYLCYSTEINE 20% 30 ML 3'S ** EXPIRATION DATE 9502 ** | 5024015H | 50.640 | 607.68 |
| 30 | 30 | 0 | CN | SOD CHLORIDE 0.9% 5 ML 100'S ** EXPIRATION DATE 9509 ** | 509JJ135 This is an alternate item for 53005 | 13.000 | 390.00 |

TOTAL DUE  13,821.32

SHIPPED FROM TEXAS

SALES FILE COPY

*********CONTINUED*************CONTINUED*************CONTINUED*************CONTINUED*****

HIGHLY CONFIDENTIAL

DEY-MDL0000074



HIGHLY CONFIDENTIAL

**DEY**

SEND PAYMENT TO:
**DEY LABORATORIES, INC.**
DEPT #01524
SAN FRANCISCO CA 94139-1524

DEY LABORATORIES, INC.
10246 MILLER ROAD
DALLAS-TEXAS 75238
PHONE (214) 349-7275

SHIP TO:
DURR DRUG CO INC - MONTGOMERY
2061 WEST FAIRVIEW AVE
MONTGOMERY                    AL. 36108

BILL TO:
DURR DRUG COMPANY INC
PO BOX 2440008
MONTGOMERY                    AL 36124

Cust Contact: ORDERNET
Dey Contact: JENNINGS

| QUANTITY ORDERED | QUANTITY SHIPPED | B/ORD | UNIT | DESCRIPTION | STOCK NUMBER | UNIT PRICE | EXTENSION |
|---|---|---|---|---|---|---|---|
| 736 | 736 | 0 | CN | ALBUTEROL SULF 0.083% 3ML 25'S | 95.04F.030 | 18.950 | 13947.20 |
| | | | | ** EXPIRATION DATE 9504 ** | | | |
| 76 | 76 | 0 | CN | METAPROTERENOL 0.6% 2.5ML 25'S | 9505ER592 | 13.990 | 1063.24 |
| | | | | ** EXPIRATION DATE 9505 ** | | | |
| 12 | 12 | 0 | CN | ACETYLCYSTEINE 20% 4 ML 12'S | 95034041H | 31.080 | 372.96 |
| | | | | ** EXPIRATION DATE 9503 ** | | | |
| 190 | 100 | 0 | CN | SOD CHLORIDE 0.9% 5 ML 100's | 95093J135 | 13.000 | 1300.00 |
| | | | | This is an alternate item for 83005 | | | |
| | | | | ** EXPIRATION DATE 9509 ** | | | |
| 0 | 90 | 0 | CN | SOD CHLORIDE 0.9% 5 ML 100's | 95093J136 | 13.000 | 1170.00 |
| | | | | This is an alternate item for 83005 | | | |
| | | | | ** EXPIRATION DATE 9509 ** | | | |

TOTAL DUE    17,053.40

SHIPPED FROM TEXAS

SALES FILE COPY

HIGHLY CONFIDENTIAL                    DEY-MDL0000076

3557 - 5

**DEY**

SEND PAYMENT TO:
**DEY LABORATORIES, INC.**
DEPT. #01524
SAN FRANCISCO CA 94139-1524

DEY LABORATORIES, INC.
10246 MILLER ROAD
DALLAS TEXAS 75238
PHONE (214) 349-7275

Cust Contact: ORDERRNEY
Dey Contact: JENNINGS

SHIP TO:
DURR DRUG CO INC - SHREVPORT
1255 NORTH HEARNE AVENUE
SHREVPORT                     LA 71107

BILL TO:
DURR DRUG COMPANY INC
PO BOX 244008
MONTGOMERY                    AL 36124

| MDC No. 4900 | QUANTITY ORDERED | QUANTITY SHIPPED | QUANTITY B/TO | UNIT | DESCRIPTION | CUST COST | UNIT PRICE | EXTENSION |
|---|---|---|---|---|---|---|---|---|
| 69703 | 108 | 108 | 0 | CN | ALBUTEROL SULF 0.083% 3ML 25'S ** EXPIRATION DATE 9504 ** | 9504F03B | 18.950 | 2046.60 |
| 66003 | 8 | 8 | 0 | CN | ISOETHARINE S/F 0.17% 3ML 25'S ** EXPIRATION DATE 9506 ** | 9506C373 | 7.750 | 62.00 |
| 18104 | 12 | 12 | 0 | CN | ACETYLCYSTEINE 10% 4 ML 12'S ** EXPIRATION DATE 9503 ** | 95036026H | 25.800 | 309.60 |
| 50300 | 3 | 3 | 0 | CN | SOD CHLORIDE 0.9% 300 ML 6'S ** EXPIRATION DATE 9506 ** | 95069D22 | 28.500 | 85.50 |
| 83005 | 10 | 10 | 0 | CN | SOD CHLORIDE 0.9% 5 ML 100'S ** EXPIRATION DATE 9509 ** This is an alternate item for 63005 | 95093136 | 13.000 | 130.00 |

TOTAL DUE    2,533.70

SHIPPED FROM TEXAS

SALES FILE COPY

HIGHLY CONFIDENTIAL

DEY-MDL0000077

3557 - 11

SHIP TO:
DURR DRUG CO INC - MERIDIAN
INDUSTRIAL PARK & HWY 11 SOUTH
LAMB DRIVE AND ST LOUIS
MERIDIAN          MS  39301

SOLD TO:
3557   DURR DRUG COMPANY INC
PO BOX 244008
MONTGOMERY        AL  36124

# DEY

SEND PAYMENT TO:
**DEY LABORATORIES, INC.**
DEPT.#01524
SAN FRANCISCO CA 94139-1524

DEY LABORATORIES, INC.
10246 MILLER ROAD
DALLAS TEXAS 75238
PHONE (214) 349-7275.

Cust Contact:  ORDXRKNT
Dey Contact:   JENNINGS

INVOICE NUMBER: 132025   INVOICE DATE: 1/04/94   DATE OF ORDER: 12/23/93   SHIP VIA: CWSW   FOB:   TERMS: 2% 20 NET 31
P.O. NUMBER: 411234410   SALESMAN NAME: OPEN

| NDC No. 49502 | QUANTITY ORDERED | QUANTITY SHIPPED | QUANTITY B/TO | UNIT | DESCRIPTION | LOT | UNIT PRICE | EXTENSION |
|---|---|---|---|---|---|---|---|---|
| 69703 | 440 | 440 | 0 | CN | ALBUTEROL SULF 0.063% 3ML 25'S **EXPIRATION DATE 9504 ** | 9504F0030 | 18.950 | 8339.00 |
| 66103 | 8 | 8 | 0 | CN | ISOETHARINE S/F 0.00% 3ML 25'S **EXPIRATION DATE 9505 ** | 9505USC35.4 | 7.750 | 62.00 |
| 65902 | 4 | 4 | 0 | CN | ISOETHARINE S/F 0.25% 2ML 25'S **EXPIRATION DATE 9502 ** | 9502242B | 7.750 | 31.00 |
| 67803 | 16 | 16 | 0 | CN | METAPROTERENOL 0.4% 2.5ML 25'S **EXPIRATION DATE 9503 ** | 9503D049 | 13.990 | 223.84 |
| 18104 | 66 | 66 | 0 | CN | ACETYLCYSTEINE 10% 4 ML 12'S **EXPIRATION DATE 9503 ** | 95034026II | 25.800 | 1702.80 |
| 18230 | 12 | 12 | 0 | CN | ACETYLCYSTEINE 20% 30 ML 3'S **EXPIRATION DATE 9502 ** | 9502401511 | 50.640 | 607.68 |
| 03003 | 6 | 6 | 0 | CN | SOD CHLORIDE 0.9% 3 ML 250'S **EXPIRATION DATE 9510 ** | 95104451 | 32.200 | 193.20 |
| 83005 | 120 | 120 | 0 | CN | SOD CHLORIDE 0.9% 5 ML 100'S | 950031136 | 13.000 | 1560.00 |

This is an alternate item for 63005

SHIPPED FROM TEXAS

*******CONTINUED*************************CONTINUED*************************CONTINUED*****

SALES FILE COPY ************CONTINUED************************CONTINUED******

HIGHLY CONFIDENTIAL                                          DEY-MDL0000078



**DEY**

SEND PAYMENT TO:
DEY LABORATORIES, INC.
DEPT. #01524
SAN FRANCISCO CA 94139-1524

DEY LABORATORIES, INC.
10246 MILLER ROAD
DALLAS TEXAS 75238
PHONE (214) 349-7275

Cust Contact: ORDERNET
Dey Contact: JENNINGS

SALES FILE COPY

SHIPPED FROM TEXAS

SHIP TO:
DURR DRUG CO INC - MERIDIAN
INDUSTRIAL PARK & HWY 11 SOUTH
LAMAR DRIVE AND ST LOUIS
MERIDIAN                MS  39301

BILL TO:
DURR DRUG COMPANY INC
PO BOX 244008
MONTGOMERY              AL  36124

3557 - 11

3557

* * EXPIRATION DATE 9509 * *

TOTAL DUE

EXTENSION   12,710.52

HIGHLY CONFIDENTIAL




DEY-MDL0000079

**DEY**

SEND PAYMENT TO
DEY LABORATORIES, INC.
DEPT. #01524
SAN FRANCISCO CA 94139-1524

DEY LABORATORIES, INC.
10246 MILLER ROAD
DALLAS TEXAS 75238
PHONE (214) 349-7275

Cust Contact:   ORDRRMET
Dey Contact:    EVRRETT

SHIP TO:
FOXMEYRR - CINCINNATI
925 FREEMAN AVENUE
CINCINNATI                        OH  45203

BILL TO:
FOXMRYRR
PO BOX 814204
DALLAS                            TX  75381 4204

| INVOICE NO | PGS | INVOICE DATE | DATE OF ORDER | SHIP VIA | FOB | TERMS |
|---|---|---|---|---|---|---|
| 1570334 | 1 | 12/04/94 | 12/ 237 94 | ARFW | DESTIN | 2% 30 MAY 31 |

| PO NUMBER | SALESMAN NAME | SPECIAL INSTRUCTIONS |
|---|---|---|
| V20 217 | OPEN | |

| SHIPPED | ORDERED | QUANTITY | UNIT | DESCRIPTION | LOT | UNIT PRICE | NET EXTENSION |
|---|---|---|---|---|---|---|---|
| 69703 | 712 | 712 | 0 CN | ALBUTEROL SULF 0.083% 3ML 25'S | 55.04F037 | 18.950 | 13492.40 |
|  |  |  |  | ** EXPIRATION DATE 9504 ** | | | |

TOTAL DUE                          13,492.40

SHIPPED FROM TEXAS

SALES FILE COPY

**DEY**

SEND PAYMENT TO:
**DEY LABORATORIES, INC.**
DEPT. #01524.
SAN FRANCISCO CA 94139-1524

DEY LABORATORIES, INC.
10246 MILLER ROAD
DALLAS TEXAS 75238
PHONE (214) 349-7275

Cust. Contact:  ORDRRNKT
Dey Contact:  EVRRETT

3564 - 14

FOXMRYER - JACKSONVILLE
6100 PHILLIPS HIGHWAY
JACKSONVILLE

3564
FOXMRYER
PO BOX R14204
DALLAS

FL 32216

TX 753R14204

| INVOICE NO. | PG | INVOICE DATE | DATE OF ORDER | SHP. VIA | CUS/PO# | PO# | TERMS | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 1S 2N35 | | 1/04/94 | 12/ 737/93 | AIR EX | | UPS1IN | 2% 30 NRT 31 | | | |

| PO NUMBER | SALESMAN NAME | QUANTITY ORDERED | QUANTITY SHIPPED | QUANTITY B/O | UNIT | DESCRIPTION | UPC/LOT# | UNIT PRICE | EXTENSION |
|---|---|---|---|---|---|---|---|---|---|
| - V20301 | UPEN | 132 | 132 | 0 | CN | ALBUTEROL SULF 0.0%3% 3ML 60'S | N5055600 | 44.400 | 5060.80 |
| 69760 | | | | | | ** EXPIRATION DATE 9505 ** | | | |

TOTAL DUE    5,860.80

SHIPPED FROM TEXAS

SALES FILE COPY

HIGHLY CONFIDENTIAL

**DEY**

SEND PAYMENT TO:
**DEY LABORATORIES, INC.**
DEPT. #01524
SAN FRANCISCO CA 94139-1524

DEY LABORATORIES, INC.
10246 MILLER ROAD
DALLAS TEXAS 75238
PHONE (214) 349-7275

Cust Contact: ORDXRNT
Dey Contact: HARRALSON

SHIP TO:
3564 - 3
FOXMEYER - LITTLE ROCK
6011 SCOTT HAMILTON
LITTLE ROCK

BILL TO:
3564
FOXMEYER
PO BOX R14204
DALLAS

AR 72209
TX 75381 4204

| SPECIAL INSTRUCTIONS | QUANTITY ORDERED | QUANTITY SHIPPED | UNIT | DESCRIPTION | LOT NO | UNIT PRICE | EXTENSION |
|---|---|---|---|---|---|---|---|
| | 292 | 292 | CN | ALBUTEROL SULF 0.083% 3ML 25'S | 504F037 | 18.950 | 5,533.40 |
| | | | | ** EXPIRATION DATE 9504 ** | | | |

TOTAL DUE  5,533.40

SHIPPED FROM TEXAS

SALES FILE COPY

HIGHLY CONFIDENTIAL

DEY-MDL0000086

**DEY**

SEND PAYMENT TO:
**DEY LABORATORIES, INC.**
DEPT. #01524
SAN FRANCISCO CA 94139-1524

DEY LABORATORIES, INC.
10246 MILLER ROAD
DALLAS TEXAS 75238
PHONE (214) 349-7275

Cust Contact: DNRANET
Dey Contact: JENNINGS

SALES FILE COPY

SHIPPED FROM TEXAS

S H I P   T O:
FOXMEYER - LA CROSSE
3003 AIRPORT ROAD
LA CROSSE                    WI 54603

B I L L   T O:
FOXMEYER
PO BOX 814204
DALLAS                       TX 75301 4204

| INVOICE NO. | INVOICE DATE | PO | DATE OF ORDER | SHIP VIA | SALESMAN NAME/NUMBER | TERMS |
|---|---|---|---|---|---|---|
| 15 2037 | 1/04/94 | 1 | 12/29/93 | RPS | WILSON, MIKE | 2% 30 NET 31 |

| PO NUMBER | NDC | QUANTITY ORDERED | QUANTITY SHIPPED | B/O | UNIT | DESCRIPTION | LOT # | UNIT PRICE | EXTENSION |
|---|---|---|---|---|---|---|---|---|---|
| 020302 | 59760 | 24 | 24 | 0 | CN | ALBUTEROL SULF 0.083% 3ML 60'S 59505 0705 5 ** EXPIRATION DATE 9505 ** | | 44.400 | 1065.60 |

TOTAL DUE          1,065.60

HIGHLY CONFIDENTIAL

DEY-MDL0000087

**DEY**

SEND PAYMENT TO:
**DEY LABORATORIES, INC.**
DEPT. #01524.
SAN FRANCISCO CA 94139-1524

DEY LABORATORIES, INC.
10246 MILLER ROAD
DALLAS TEXAS 75238
PHONE (214) 349-7275

Cust Contact: ORDERNET
Dey Contact: JENNINGS

SHIP TO:
3564 - 9
FOXMEYER - SLIDELL
252 STONE ROAD
SLIDELL          LA -70460

BILL TO:
3564
FOXMEYER
PO BOX 81*204
DALLAS          TX -75381*204

| INVOICE NO | PCS | INVOICE DATE | DATE OF ORDER | SHIP VIA | FOB | DESTIN | TERMS |
|---|---|---|---|---|---|---|---|
| 15.2039 | 1 | 1/04/94 | 12/28/93 | ARFW | | DESTIN | 2% 30 NET 31 |

| PO NUMBER | SALESMAN NAME | SPECIAL INSTRUCTIONS |
|---|---|---|
| 020300 | OPEN | |

| QUANTITY ORDERED | QUANTITY SHIPPED | QUANTITY B/O | UNIT | DESCRIPTION | PRICE | EXTENSION |
|---|---|---|---|---|---|---|
| 276 | 276 | 0 | CN | ALBUTEROL SULF 0.083% 3ML 25'S 59504F036 | 18.950 | 5,230.20 |
| | | | | ** EXPIRATION DATE 9504 ** | | |

69703

TOTAL DUE          5,230.20

SHIPPED FROM TEXAS

SALES FILE COPY



HIGHLY CONFIDENTIAL

DEY-MDL0000089

**DEY**

SEND PAYMENT TO:
DEY LABORATORIES, INC.
DEPT. #01524
SAN FRANCISCO CA 94139-1524

DEY LABORATORIES, INC.
10246 MILLER ROAD
DALLAS TEXAS 75238
PHONE (214) 349-7275

Cust Contact: ONDERNET
Dey Contact: JENNINGS

3586 -
HUMISTON KEELING
700 STATE STREET
CALUMET CITY                IL 60409

3586
HUMISTON KEELING
700 STATE STREET
CALUMET CITY                IL 60409

| INVOICE NO | INVOICE DATE | DATE OF ORDER | SHIP VIA | FOB DALLAS | TERMS |
|---|---|---|---|---|---|
| 15 2042 | 1/04/94 | 12/29/93 | RDWY | DESTIN | 2% 30 NET 31 |

SALESMAN NAME: OPEN
34043

| STOCK NO | QUANTITY ORDERED | QUANTITY SHIPPED | QUANTITY B/O-D | U/M | DESCRIPTION | CUST ITEM | UNIT PRICE | EXTENSION |
|---|---|---|---|---|---|---|---|---|
| 69750 | 24 | 24 | 0 | CN | ALBUTEROL SULF 0.083% 3ML 60'S | 95050055 | 44.400 | 1065.60 |
|  |  |  |  |  | ** EXPIRATION DATE 9505 ** |  |  |  |
| 69703 | 572 | 572 | 0 | CH | ALBUTEROL SULF 0.083% 3ML 25 | 9504E038 | 18.950 | 10839.40 |
|  |  |  |  |  | ** EXPIRATION DATE 9504 ** |  |  |  |
| 67603 | 24 | 24 | 0 | CN | METAPROTERENOL 0.6% 2.5ML 25 | 9505M592 | 13.990 | 335.76 |
|  |  |  |  |  | ** EXPIRATION DATE 9505 ** |  |  |  |
| 18104 | 6 | 6 | 0 | CN | ACETYLCYSTRINE 10% 4 ML 12'S | 95034026H | 25.800 | 154.80 |
|  |  |  |  |  | ** EXPIRATION DATE 9505 ** |  |  |  |
| 18204 | 36 | 36 | 0 | CN | ACETYLCYSTEINE 20% 4 ML 12'S | 95034041H | 31.080 | 1118.88 |
|  |  |  |  |  | ** EXPIRATION DATE 9503 ** |  |  |  |
| 63003 | 12 | 12 | 0 | CN | SOD CHLORIDE 0.9% 3 ML 250'S | 95104451 | 32.200 | 386.40 |
|  |  |  |  |  | ** EXPIRATION DATE 9510 ** |  |  |  |
| 53003 | 20 | 20 | 0 | CN | SOD CHLORIDE 0.9% 3 ML 100'S | 95077443 | 13.000 | 260.00 |
|  |  |  |  |  | ** EXPIRATION DATE 9507 ** |  |  |  |
| 63005 | 10 | 10 | 0 | CN | SOD CHLORIDE 0.9% 5 ML 100'S | 95087456 | 13.000 | 130.00 |
|  |  |  |  |  | ** EXPIRATION DATE 9508 ** |  |  |  |

SHIPPED FROM TEXAS

SALES FILE COPY

*******CONTINUED*********************CONTINUED*********************CONTINUED*******

HIGHLY CONFIDENTIAL



DEY-MDL0000092

# DEY

SEND PAYMENT TO:
**DEY LABORATORIES, INC.**
DEPT. #01524
SAN FRANCISCO CA 94139-1524

DEY LABORATORIES, INC.
10246 MILLER ROAD
DALLAS TEXAS 75238
PHONE (214) 349-7275

SALES FILE COPY
SHIPPED FROM TEXAS

Cust Contact: OUBRNET
Dey Contact: JENNINGS

| | | | | |
|---|---|---|---|---|
| EXTENSION | | | | |
| 14,290.04 | | | | |

TOTAL DUE

S H I P T O
3586
HUMISTON-KEELING
700 STATE STREET
CALUMET CITY
IL 60409

B I L L T O
3586
HUMISTON KEELING
700 STATE STREET
CALUMET CITY
IL 60409

| INVOICE NO. | PG | INVOICE DATE | DATE OF ORDER | SHP.VIA | F.O.B. | TERMS |
|---|---|---|---|---|---|---|
| 15.2042 | 2 | 1/04/94 | 12/29/93 | ROWY | DESTIN | 2% 30 NET 31 |

| PO NUMBER | SALESMAN NAME | SPECIAL INSTRUCTIONS |
|---|---|---|
| 34043 | OPRN | |

| NDC CODE | MODEL NO | DESCRIPTION | LOT | QUANTITY ORDERED | QUANTITY SHIPPED | QUANTITY B/O | UNIT |
|---|---|---|---|---|---|---|---|

DEY-MDL0000093

**DEY**

SEND PAYMENT TO:
**DEY LABORATORIES, INC.**
DEPT. #01524
SAN FRANCISCO CA 94139-1524

DEY LABORATORIES, INC.
10246 MILLER ROAD
DALLAS TEXAS 75238
PHONE (214) 349-7275

Cust Contact: ORDERNET
Dey Contact: EVERETT

3599
ALCO HEALTH SERV - LOUISVILLE
244 EAST WOODLAWN AVENUE
LOUISVILLE          KY 40214

3599
ALCO HEALTH SERV - LOUISVILLE
244 EAST WOODLAWN AVENUE
LOUISVILLE          KY 40214

DESTIN: DESTIN          TERMS: 2% 30 NET 31

| INVOICE NO | PG | INVOICE DATE | DATE OF ORDER | SHIP VIA | SALESMAN NAME |
|---|---|---|---|---|---|
| 152045 | 1 | 11/04/94 | 12/30/93 | ARFW | OPEN |

PO NUMBER: 163155

| STOCK NO. | QUANTITY ORDERED | QUANTITY SHIPPED | QUANTITY B/O | UNIT | DESCRIPTION | LOT | UNIT PRICE | EXTENSION |
|---|---|---|---|---|---|---|---|---|
| 69703 | 332 | 332 | 0 | CN | ALBUTEROL.SULF 0.083% 3ML.25'<br>** EXPIRATION DATE 9504 ** | 9504F039 | 18.950 | 6291.40 |
| 57603 | 40 | 40 | 0 | CN | METAPROTERENOL 0.6% 2.5ML.25'<br>** EXPIRATION DATE 9505 ** | 9505KM92 | 13.990 | 559.60 |
| 18230 | 12 | 12 | 0 | CN | ACETYLCYSTEINR 20% 30 ML 3'S<br>** EXPIRATION DATE 9502 ** | 95024015M | 50.640 | 607.68 |

TOTAL DUE          7,458.68

SALES FILE COPY

SHIPPED FROM TEXAS



HIGHLY CONFIDENTIAL

DEY-MDL0000096

**DEY**

SEND PAYMENT TO:
DEY LABORATORIES, INC.
DEPT. #01524
SAN FRANCISCO CA 94139-1524

DEY LABORATORIES, INC.
10246 MILLER ROAD
DALLAS TEXAS 75238
PHONE (214) 349-7275

Cust Contact:
Dey Contact:

ORDR/NET
EVER/EXT

3601 -

ALCO HEALTH SERV - TOLEDO
3145 NEBRASKA AVENUE
TOLEDO                    OH  43607

3601 -

ALCO HEALTH SERV - TOLEDO
3145 NEBRASKA AVENUE
TOLEDO                    OH  43607

| INVOICE NO. | PG | INVOICE DATE | DATE OF ORDER | SHIP VIA | FOB | TERMS | DESTIN |
|---|---|---|---|---|---|---|---|
| 152046 | 1 | 1/04/94 | 12/30/93 | ARW | | 2% 30 NET 31 | |

PO NUMBER: T63306   OPEN

| QUANTITY ORDERED | QUANTITY SHIPPED | B/O | UNIT | DESCRIPTION | | ORDR UNIT PRICE | NET EXTENSION |
|---|---|---|---|---|---|---|---|
| 356 | 356 | 0 | CN | ALBUTEROL SULF 0.083% 3ML 25'S | 95004F039 | 18.950 | 6746.20 |
| | | | | ** EXPIRATION DATE 9504 ** | | | |
| 12 | 12 | 0 | CN | ISOETHARINE S/F 0.17% 3ML 25'S | 95006C373 | 7.750 | 93.00 |
| | | | | ** EXPIRATION DATE 9506 ** | | | |
| 72 | 72 | 0 | CN | METAPROTERENOL 0.6% 2.5ML 25'S | 95005E592 | 13.990 | 1007.28 |
| | | | | ** EXPIRATION DATE 9505 ** | | | |
| 24 | 24 | 0 | CN | ACETYLCYSTEINE 10% 30 ML 3'S | 95044065H | 41.970 | 1007.28 |
| | | | | ** EXPIRATION DATE 9504 ** | | | |
| 18 | 18 | 0 | CN | ACETYLCYSTEINE 20% 4 ML 12'S | 95034041H | 31.080 | 559.44 |
| | | | | ** EXPIRATION DATE 9503 ** | | | |
| 12 | 12 | 0 | CN | ACETYLCYSTEINE 20% 30 ML 3'S | 95024015H | 50.640 | 607.68 |
| | | | | ** EXPIRATION DATE 9502 ** | | | |
| 30 | 30 | 0 | CN | SOD CHLORIDE 0.9% 3 ML 100's | 95103K011 | 13.000 | 390.00 |
| | | | | This is an alternate item for 63003 | | | |
| 60 | 60 | 0 | CN | SOD CHLORIDE 0.9% 5 ML 100's | 95093J136 | 13.000 | 780.00 |
| | | | | ** EXPIRATION DATE 9510 ** | | | |

SHIPPED FROM TEXAS

*******CONTINUED***********************************CONTINUED*****************

SALES FILE COPY
******CONTINUED******

HIGHLY CONFIDENTIAL

DEY-MDL0000097

**DEY**

SEND PAYMENT TO:
**DEY LABORATORIES, INC.**
DEPT. #01524
SAN FRANCISCO CA 94139-1524

DEY LABORATORIES, INC.
10246 MILLER ROAD
DALLAS TEXAS 75238
PHONE (214) 349-7275

SALES FILE COPY

3601 -
ALCO HEALTH SERV - TOLEDO
3145 NEBRASKA AVENUE
TOLEDO                          OH  43607

3601
ALCO HEALTH SERV - TOLEDO
3145 NEBRASKA AVENUE
TOLEDO                          OH  43607

| INVOICE NO. | PG. | INVOICE DATE | DATE OF ORDER | SHIP VIA | FOB | TERMS |
|---|---|---|---|---|---|---|
| 152046 | 2 | 1/04/94 | 12/30/93 | ARFW | DESTIN | 2% 30 NET 31 |

| SPO/P.O. NUMBER | SALESMAN NAME | SPECIAL INSTRUCTIONS |
|---|---|---|
| T63306 | OP KN | |

Cust Contact:  ORDRNNEY
Dey Contact:  EVERETT

| QUANTITY ORDERED | QUANTITY SHIPPED | UNIT | DESCRIPTION | UNIT PRICE | EXTENSION |
|---|---|---|---|---|---|
| | | | This is an alternate item for 63005 | | 11,190.88 |
| | | | ** EXPIRATION DATE 9509 ** | | |

TOTAL DUE                    11,190.88

SHIPPED FROM TEXAS

HIGHLY CONFIDENTIAL

DEY-MDL0000098

**DEY**

SEND PAYMENT TO:
**DEY LABORATORIES, INC.**
DEPT. #01524
SAN FRANCISCO CA 94139-1524

DEY LABORATORIES, INC.
10246 MILLER ROAD
DALLAS TEXAS 75238
PHONE (214) 349-7275

Cust Contact:  ORDERNET
Dey Contact:   EVERETT

| INVOICE NO. | PG | INVOICE DATE | DATE OF ORDER | SHIP VIA | FOB | TERMS |
|---|---|---|---|---|---|---|
| 132047 | 1 | 1/04/94 | 12/30/93 | RPS | DESTIN | 2% 30 NET 31 |

3604 –
KENDALL DRUG COMPANY
1305 FREDERICK STREET
SHELBY

NC  28150

3604
KENDALL DRUG COMPANY
1305 FREDERICK STREET
SHELBY

NC  28150

PO NUMBER  SALESMAN NAME
77917     OPEN

| QUANTITY ORDERED | QUANTITY SHIPPED | B/O | U/M | DOC NO. | DESCRIPTION | UNIT PRICE | EXTENSION |
|---|---|---|---|---|---|---|---|
| 72 | 72 | 0 | CN | 69703 | ALBUTEROL SULF 0.083% 3ML 25's S9504F039 | 18.950 | 1,364.40 |
| | | | | | ** EXPIRATION DATE 9504 ** | | |
| 10 | 10 | 0 | CN | 81005 | PURIFIED WATER USP 5mL 100's 95063F774 | 14.000 | 140.00 |
| | | | | | This is an alternate item for 61005 | | |
| | | | | | ** EXPIRATION DATE 9506 ** | | |

TOTAL DUE          1,504.40

SHIPPED FROM TEXAS

SALES FILE COPY

**DEY**

SEND PAYMENT TO:
**DEY LABORATORIES, INC.**
DEPT. #01524
SAN FRANCISCO CA 94139-1524

DEY LABORATORIES, INC.
10246 MILLER ROAD
DALLAS TEXAS 75238
PHONE (214) 349-7275

Cust Contact: MAIL
Dey Contact: HARRALSON

SHIP TO:
3648 -
MCKESSON DRUG - SACRAMENTO
3775 SEAPORT BOULEVARD
W SACRAMENTO                    CA  95691

BILL TO:
3648 -
MCKESSON DRUG - SACRAMENTO
3775 SEAPORT BOULEVARD
W SACRAMENTO                    CA  95691

| INVOICE NO. | PG | INVOICE DATE | DATE ORDERED | SHIP VIA | FOB | TERMS |
|---|---|---|---|---|---|---|
| 15204B | 1 | 1/04/94 | 12/29/93 | WWAT | DESTIN | 2% 30 NET 31 |

| SALESMAN NAME | SPECIAL INSTRUCTIONS |
|---|---|
| OPEN | |

| PO NUMBER | QUANTITY ORDERED | QUANTITY SHIPPED | QUANTITY B/O | UNIT | DESCRIPTION | UNIT PRICE | EXTENSION |
|---|---|---|---|---|---|---|---|
| 18252022 | | | | | | | |
| 69760 | 12 | 12 | 0 | CN | ALBUTEROL SULF 0.083% 3ML 60'S 95058G600 | 44.400 | 532.80 |
| | | | | | ** EXPIRATION DATE 9505 ** | | |
| 10230 | 12 | 12 | 0 | CN | ACETYLCYSTEINE 20% 30 ML 3'S 95024015U | 50.640 | 607.68 |
| | | | | | ** EXPIRATION DATE 9502 ** | | |
| 50300 | 1 | 1 | 0 | CN | SOD CHLORIDE 0.9% 300 ML 6'S 95069022 | 28.500 | 28.50 |
| | | | | | ** EXPIRATION DATE 9506 ** | | |
| 83005 | 50 | 50 | 0 | CN | SOD CHLORIDE 0.9% 5 ML 100'S 95093J135 | 13.000 | 650.00 |
| | | | | | This is an alternate item for 63005 | | |
| | | | | | ** EXPIRATION DATE 9509 ** | | |
| 63005 | 10 | 10 | 0 | CN | SOD CHLORIDE 0.9% 5 ML 100'S 95087456 | 13.000 | 130.00 |
| | | | | | ** EXPIRATION DATE 9506 ** | | |

TOTAL DUE                1,948.98

SHIPPED FROM TEXAS                    SALES FILE COPY



HIGHLY CONFIDENTIAL

DEY-MDL0000100

**DEY**

SEND PAYMENT TO:
DEY LABORATORIES, INC.
DEPT. #01524.
SAN FRANCISCO CA 94139-1524

DEY LABORATORIES, INC.
10246 MILLER ROAD.
DALLAS TEXAS 75238
PHONE (214) 349-7275

3662 - 1

S/H/P/TO: ALCO HEALTH SERVICES
1780 SOUTH COUNTY ROAD #1
TIFFIN                          OH  44883

3662

B/L/L/TO: ALCO HEALTH SERV - MEYERS & CO
PO BOX 787
TIFFIN                          OH  44883

| INVOICE NO. | PG | INVOICE DATE | DATE OF ORDER | SHIP VIA | FOB | DESTIN | TERMS |
|---|---|---|---|---|---|---|---|
| 15.2045 | 1 | 1/04/94 | 12/29/93 | ARFW | | DESTIN | 2% 30 NET 31 |

PO NUMBER: -04.2337    SALESMAN NAME: OPEN

Cust Contact:
Dey Contact:

ORDERNET
EVERETT

| NDC/NO | QUANTITY ORDERED | QUANTITY SHIPPED | B/O | UNIT | DESCRIPTION | LOT/NO | NET/UNIT | EXTENSION |
|---|---|---|---|---|---|---|---|---|
| 69703 | 476 | 476 | 0 | CN | ALBUTEROL SULF 0.083% 3ML 25's | S9504F038 | 18.950 | 9020.20 |
| | | | | | ** EXPIRATION DATE 9504 ** | | | |
| 69760 | 12 | 12 | 0 | CN | ALBUTEROL SULF 0.083% 3ML 60's | S9505F055. | 44.400 | 532.80 |
| | | | | | ** EXPIRATION DATE 9505 ** | | | |
| 66003 | 12 | 12 | 0 | CN | ISOETHARINE S/E 0.17% 3ML 25's | S9506C373 | 7.750 | 93.00 |
| | | | | | ** EXPIRATION DATE 9506 ** | | | |
| 67603 | 76 | 76 | 0 | CN | METAPROIRRENOL 0.6% 2.5ML 25's | S9505E592 | 13.990 | 1063.24 |
| | | | | | ** EXPIRATION DATE 9505 ** | | | |
| 18104 | 12 | 12 | 0 | CN | ACETYLCYSTEINE 10% 4 ML 12's | 95034025II | 25.800 | 309.60 |
| | | | | | ** EXPIRATION DATE 9503 ** | | | |
| 18204 | 24 | 24 | 0 | CN | ACETYLCYSTEINE 20% 4 ML 12's | 95034041II | 31.000 | 745.92 |
| | | | | | ** EXPIRATION DATE 9503 ** | | | |
| 18200 | 12 | 12 | 0 | CN | ACETYLCYSTEINE 20% 100 ML 1'S | 95013972H | 75.900 | 910.80 |
| | | | | | ** EXPIRATION DATE 9501 ** | | | |
| 82003 | 20 | 20 | 0 | CN | SOD CHLORIDE 0.45% 3ml 100's | 95062F735 | 14.000 | 280.00 |
| | | | | | This is an alternate item for 62003 | | | |

SHIPPED FROM TEXAS

SALES FILE COPY

******CONTINUED***********************CONTINUED***********************CONTINUED******

DEY-MDL0000101

**DEY**

SEND PAYMENT TO:
DEY LABORATORIES, INC.
DEPT. #01524
SAN FRANCISCO CA 94139-1524

DEY LABORATORIES, INC.
10246 MILLER ROAD
DALLAS TEXAS 75238
PHONE (214) 349-7275

Cust Contact: ORDRRNET
Dey Contact: AVERETT

SHIP TO:
3662 - 1
ALCO HEALTH SERVICES
1780 SOUTH COUNTY ROAD #1
TIFFIN                          OH  44883

BILL TO:
3662
ALCO HEALTH SRRV - MEYERS & CO
PO BOX 787
TIFFIN                          OH  44883

| INVOICE NO | PO | INVOICE DATE | DATE OF ORDER | SHIP VIA | FOB | TERMS |
|---|---|---|---|---|---|---|
| 152049 | 2 | 1/04/94 | 12/29/93 | ARFW | DESTIN | 2% 30 NET 31 |

PO NUMBER: 042337
SALESMAN NAME: OPEN

| STOCK NO | QUANTITY ORDERED | QUANTITY SHIPPED | QUANTITY B/O | UNIT | DESCRIPTION | PRICE/NET LOT | UNIT PRICE | EXTENSION |
|---|---|---|---|---|---|---|---|---|
| 83005 | 50 | 50 | 0 | CN | SOD CHLORIDE 0.9% 5 ML 100's ** EXPIRATION DATE 9506 ** This is an alternate item for | 95093113G  63005 | 13.000 | 650.00 |
| 83003 | 10 | 10 | 0 | CN | SOD CHLORIDE 0.9% 3 ML 100's ** EXPIRATION DATE 9509 ** This is an alternate item for | 95103C010  63003 | 13.000 | 130.00 |
| 03020 | 4 | 4 | 0 | CN | SOD CHLORIDE 0.9% 20 ML 100's ** EXPIRATION DATE 9510 ** ** EXPIRATION DATE 9508 ** | 95084429 | 36.000 | 144.00 |

TOTAL DUE                                13,879.56

SHIPPED FROM TEXAS

SALES FILE COPY

HIGHLY CONFIDENTIAL



**DEY**

SEND PAYMENT TO:
**DEY LABORATORIES, INC.**
DEPT. #01524
SAN FRANCISCO CA 94139-1524

DEY LABORATORIES, INC.
10246 MILLER ROAD
DALLAS TEXAS 75238
PHONE (214) 348-7275

Cust Contact: FRANK
Dey Contact: CYRUS

SHIP TO:
RENO DRUG CORPORATION
315 EAST 89TH STREET
BROOKLYN NY 11236

BILL TO:
RENO DRUG CORPORATION
315 EAST 89TH STREET
BROOKLYN NY 11236

| INVOICE NO | PO | INVOICE DATE | DATE OF ORDER | SHIP VIA | TERMS |
|---|---|---|---|---|---|
| 15205 2 | 1 | 1/04/94 | 12/29/93 | ROWY | DESTIN 2% 30 NET 31 |

| SALESMAN NAME | SALESMAN NUMBER |
|---|---|
| HALCHAK, ESTELLE | 102839 |

| STOCK NO. | QUANTITY ORDERED | QUANTITY SHIPPED | U/M | BY BOX | UNIT | DESCRIPTION | LOT NO | QTY | UNIT PRICE | NET EXTENSION |
|---|---|---|---|---|---|---|---|---|---|---|
| 69703 | 1488 | 828 | | 0 | CN | ALBUTEROL SULF 0.083% 3ML 25'S ** EXPIRATION DATE 9504 ** | 9504F037 | | 18.950 | 15689.60 |
| | 660 | 0 | | 0 | CN | ALBUTEROL SULF 0.083% 3ML 25'S ** EXPIRATION DATE 9504 ** | 9504F03R | | 18.950 | 12507.00 |
| 66003 | 12 | 12 | | 0 | CN | ISOETHARINE S/F 0.17% 3ML 25'S ** EXPIRATION DATE 9506 ** | 9506C373 | | 7.750 | 93.00 |
| 67603 | 20 | 20 | | 0 | CN | METAPROTERKNOL 0.6% 2.5ML 25'S ** EXPIRATION DATE 9505 ** | 9505E592 | | 13.990 | 279.80 |
| 63003 | 20 | 20 | | 0 | CN | SOD CHLORIDE 0.9% 3 ML 100'S ** EXPIRATION DATE 9507 ** | 9507443 | | 13.000 | 260.00 |
| 63005 | 10 | 10 | | 0 | CN | SOD CHLORIDE 0.9% 5 ML 100'S ** EXPIRATION DATE 9508 ** | 9507456 | | 13.000 | 130.00 |

TOTAL DUE                 20,960.40

SALES FILE COPY

SHIPPED FROM TEXAS

HIGHLY CONFIDENTIAL                 DEY-MDL0000105

**DEY**

SEND PAYMENT TO:
DEY LABORATORIES, INC.
DEPT. #01524
SAN FRANCISCO CA 94139-1524

DEY LABORATORIES, INC.
10246 MILLER ROAD
DALLAS TEXAS 75238
PHONE (214) 349-7275

Cust Contact: FAX
Dey Contact: EVERETT

SHIP TO:
ALCO HEALTH SERV - SMITH RIGGI
410 PRINCETON ROAD
JOHNSON CITY                TN 37601

BILL TO:
ALCO HEALTH SERV - SMITH RIGGI
410 PRINCETON ROAD
PO BOX 3909
JOHNSON CITY                TN 37601

| INVOICE NO | PG | INVOICE DATE | DATE OF ORDER | SHIP-VIA | FOB | TERMS |
|---|---|---|---|---|---|---|
| 15203.3 | 1 | 1/04/94 | 12/29/93 | CWSW | DESTIN | 2% 30 NET 31 |

PO NUMBER: 3689   SALESMAN NAME: WILSON - MIKE
CONTAINER: 633897

| ITEM NO. | QUANTITY ORDERED | QUANTITY SHIPPED | UNIT | DESCRIPTION | LOT | UNIT PRICE | EXTENSION |
|---|---|---|---|---|---|---|---|
| 69703 | 276 | 276 | 0 CN | ALBUTEROL SULF 0.083% 3ML 25'S | 9504F037 | 18.950 | 5,230.20 |
|  |  |  |  | ** EXPIRATION DATE 9504 ** |  |  |  |
| 67803 | 12 | 12 | 0 CN | METAPRUTRENOL 0.4% 2.5ML 25'S | 9503D449 | 13.990 | 167.88 |
|  |  |  |  | ** EXPIRATION DATE 9503 ** |  |  |  |
| 67503 | 112 | 96 | 0 CN | METAPROTERENOL 0.6% 2.5ML 25'S | 9505E592 | 13.990 | 1343.04 |
|  |  |  |  | ** EXPIRATION DATE 9505 ** |  |  |  |
| 10104 | 0 | 16 | 0 CN | METAPROTERENOL 0.6% 2.5ML 25'S | 9505E592 | 13.990 | 223.84 |
|  |  |  |  | ** EXPIRATION DATE 9505 ** |  |  |  |
| 18230 | 42 | 42 | 0 CN | ACETYLCYSTEINE 10% 4 ML 12'S | 95034026H | 25.800 | 1,083.60 |
|  |  |  |  | ** EXPIRATION DATE 9503 ** |  |  |  |
| 18230 | 12 | 12 | 0 CN | ACETYLCYSTEINE 20% 30 ML 3'S | 95024015H | 50.640 | 607.68 |
|  |  |  |  | ** EXPIRATION DATE 9502 ** |  |  |  |
| 63005 | 20 | 20 | 0 CN | SOD CHLORIDE 0.9% 5 ML 100'S | 9508745.6 | 13.000 | 260.00 |
|  |  |  |  | ** EXPIRATION DATE 9508 ** |  |  |  |
| 64115 | 4 | 4 | 0 CN | SOD CHLORIDE 10% 15 ML 50'S | 9510C346 | 29.500 | 118.00 |
|  |  |  |  | ** EXPIRATION DATE 9510 ** |  |  |  |

SHIPPED FROM TEXAS

*****CONTINUED*********CONTINUED*********CONTINUED*****

SALES FILE COPY
*****CONTINUED*****

HIGHLY CONFIDENTIAL


DEY-MDL0000106

**DEY**

SEND PAYMENT TO:
**DEY LABORATORIES, INC.**
DEPT. #01524
SAN FRANCISCO CA 94139-1524

DEY LABORATORIES, INC.
10246 MILLER ROAD
DALLAS TEXAS 75238
PHONE (214) 349-7275

Cust Contact:   FAX
Dey Contact:   EVERITT

SHIP TO
3689 -
ALCO HEALTH SERV - SMITH HIGGI
410 PRINCETON ROAD
JOHNSON CITY                    TN 37601

BILL TO
3689 -
ALCO HEALTH SERV - SMITH HIGGI
410 PRINCETON ROAD
PO BOX 3909
JOHNSON CITY                    TN 37601

| INVOICE NO. | PG | DATE ENTERED | DATE OF ORDER | SHIP VIA | FOB | TERMS |
|---|---|---|---|---|---|---|
| 15.2053 | 2 | 1/04/94 | 12/29/93 | CVSW | DESTIN | 2% 30 NKT 31 |

| PO NUMBER | SALESMAN NAME | SPECIAL INSTRUCTIONS |
|---|---|---|
| 639897 | WILSON, MIKE | |

| FWK NDC# | 46023 | QUANTITY ORDERED | QUANTITY SHIPPED | QUANTITY B/O | UNIT | NDC# | DESCRIPTION | | UNIT PRICE | EXTENSION |
|---|---|---|---|---|---|---|---|---|---|---|
| 18110 | | 24 | 0 | 24 | CN | | ACETYLCYSTEINE 10% 10 ML 3'S | | | 9,034.24 |

TOTAL DUE   9,034.24

SHIPPED FROM TEXAS

SALES FILE COPY

HIGHLY CONFIDENTIAL

DEY-MDL0000107

**DEY**

SEND PAYMENT TO:
**DEY LABORATORIES, INC.**
DEPT. #01524
SAN FRANCISCO CA 94139-1524

DEY LABORATORIES, INC.
10246 MILLER ROAD
DALLAS TEXAS 75238
PHONE (214) 349-7275

Cust Contact:   FAX
Dey Contact:    JUSTICE

| SHIP TO | BILL TO |
|---|---|
| 3690 - <br> SMITH WHOLESALE DRUG <br> PO BOX 1779 <br> WOFFORD & FORREST STREETS <br> SPARTANBURG       SC 29301 | 3690 <br> SMITH WHOLESALE DRUG <br> PO BOX 1779 <br> WOFFORD & FORREST STREETS <br> SPARTANBURG       SC 29301 |

INVOICE NO 152054  PG 1  INVOICE DATE 1/04/94  DATE OF ORDER 12/30/93  SHIP VIA CWSW  FOB  TERMS 2% 30 NET 33
PO NUMBER OPEN  SALESMAN NAME  SPECIAL INSTRUCTIONS
SHIP LOC 3210-94

| QUANTITY ORDERED | QUANTITY SHIPPED | B/O | UNIT | DESCRIPTION | PRODUCT CODE | UNIT PRICE | EXTENSION |
|---|---|---|---|---|---|---|---|
| 80 | 80 | 0 | CN | ALBUTEROL SULF 0.083% 3ML 25'S ** EXPIRATION DATE 9504 ** | 69S04F041 | 18.950 | 1516.00 |
| 12 | 12 | 0 | CN | ALBUTEROL SULF 0.083% 3ML 60'S ** EXPIRATION DATE 9506 ** | 69S06D270. | 44.400 | 532.80 |
| 36 | 36 | 0 | CN | ACETYLCYSTEINE 20% 30 ML 3'S ** EXPIRATION DATE 9502 ** | 95024015H | 50.640 | 1823.04 |
| 20 | 20 | 0 | CN | METAPROTERENOL 0.6% 2.5ML 25'S ** EXPIRATION DATE 9505 ** | 69S05E692 | 13.990 | 279.80 |
| 20 | 20 | 0 | CN | ACETYLCYSTEINE 20% 100 ML 1'S ** EXPIRATION DATE 9501 ** | 95013973H | 75.900 | 1518.00 |
| 20 | 20 | 0 | CN | SOD CHLORIDE 0.9% 3 ML 100'S ** EXPIRATION DATE 9507 ** | 95077443 | 13.000 | 260.00 |

TOTAL DUE   5,929.64

SHIPPED FROM TEXAS

SALES FILE COPY

HIGHLY CONFIDENTIAL                    DEY-MDL0000108

**DEY**

SEND PAYMENT TO:
**DEY LABORATORIES, INC.**
DEPT. #01524
SAN FRANCISCO CA 94139-1524

DEY LABORATORIES, INC.
10246 MILLER ROAD
DALLAS TEXAS 75238
PHONE (214) 349-7275

Cust Contact:    FAX
Dey Contact:    EVERETT

| SHIP TO | | | | BILL TO | | |
|---|---|---|---|---|---|---|
| 3695 - 2 | | | | 3695 | | |
| ALCO HEALTH SERV - STROTHER | | | | ALCO HEALTH SERV - STROTHER | | |
| 9221 TIMBERLAKE ROAD | | | | PO BOX 10069 | | |
| LYNCHBURG | | VA 24502 | | LYNCHBURG | | VA 24506 |

| INVOICE NO | PG | INVOICE DATE | DATE OF ORDER | SHIP VIA | FOB | TERMS |
|---|---|---|---|---|---|---|
| 15 2016 | 1 | 1/04/94 | 12/29/93 | RPS | DESTIN | 2% 30 NET 31 |

PO NUMBER   SALESMAN NAME   SPECIAL INSTRUCTIONS

840110   OPEN

| HM CODE NO | QUANTITY ORDERED | QUANTITY SHIPPED | QUANTITY B/O | UNIT | DESCRIPTION | LOT | UNIT PRICE | NET EXTENSION |
|---|---|---|---|---|---|---|---|---|
| 69703 | 68 | 60 | 0 | CN | ALBUTEROL SULF 0.083% 3ML 25'S ** EXPIRATION DATE 9504 ** | 9504F037 | 18.950 | 1288.60 |
| 67603 | 4 | 4 | 0 | CN | METAPROTRRENOL 0.6% 2.5ML 25'S ** EXPIRATION DATE 9505 ** | 9505EX92 | 13.990 | 55.96 |
| 63005 | 10 | 10 | 0 | CN | SOD CHLORIDE 0.9% 5 ML 100'S ** EXPIRATION DATE 9508 ** | 9508745C | 13.000 | 130.00 |

TOTAL DUE     1,474.56

SHIPPED FROM TEXAS

SALES FILE COPY


HIGHLY CONFIDENTIAL

# DEY

SEND PAYMENT TO:
**DEY LABORATORIES, INC.**
DEPT. #01524
SAN FRANCISCO CA 94139-1524

DEY LABORATORIES, INC.
10246 MILLER ROAD
DALLAS TEXAS 75238
PHONE (214) 349-7275

Cust Contact: ORDERNET
Dey Contact: JENNINGS

SHIP TO: 3703 - 2
TWIN CITY WHOLSALE DRUG
259 9TH AVE NORTH
MINNEAPOLIS MN 55401

BILL TO: 3703
TWIN CITY WHOLESALE DRUG
900 NORTH THIRD STREET
MINNEAPOLIS MN 55401

TERMS: 2% 30 NET 31

| ITEM NO. | QUANTITY ORDERED | QUANTITY SHIPPED | QUANTITY B/O | UNIT | DESCRIPTION | LOT | UNIT PRICE | EXTENSION |
|---|---|---|---|---|---|---|---|---|
| 69760 | 12 | 12 | 0 | CN | ALBUTEROL SULF 0.083% 3ML 60'S | 9505F055. | 44.400 | 532.80 |
| | | | | | ** EXPIRATION DATE 9505 ** | | | |
| 69703 | 320 | 320 | 0 | CN | ALBUTEROL SULF 0.083% 3ML 25'S | 9504F030 | 18.950 | 6064.00 |
| | | | | | ** EXPIRATION DATE 9504 ** | | | |
| 18104 | 6 | 6 | 0 | CN | ACETYLCYSTEINE 10% 4 ML 12'S | 9503A026H | 25.800 | 154.80 |
| | | | | | ** EXPIRATION DATE 9503 ** | | | |
| 18230 | 12 | 12 | 0 | CN | ACETYLCYSTEINE 20% 30 ML 3'S | 9502A015H | 50.640 | 607.68 |
| | | | | | ** EXPIRATION DATE 9502 ** | | | |
| 18210 | 12 | 0 | 12 | CN | ACETYLCYSTEINE 20% 10 ML 3'S | | | |

TOTAL DUE   7,359.28

SHIPPED FROM TEXAS

SALES FILE COPY

HIGHLY CONFIDENTIAL

DEY-MDL0000112

**DEY**

SEND PAYMENT TO:
**DEY LABORATORIES, INC.**
DEPT. #01524
SAN FRANCISCO CA 94139-1524

DEY LABORATORIES, INC.
10246 MILLER ROAD
DALLAS TEXAS 75238
PHONE (214) 349-7275

SHIP TO:
3704 - 2
ALCO HEALTH SERV - VALDOSTA
311 WEST CENTRAL AVENUE
VALDOSTA          GA   31601

SOLD TO:
3704
ALCO HEALTH SERV - VALDOSTA
PO BOX 1287
VALDOSTA          GA   31603 1287

| INVOICE NO. | PO | INV DATE | DATE OF ORDER | SHIP VIA | FOB | TERMS |
|---|---|---|---|---|---|---|
| 152059 | 1 | 1/04/94 | 12/29/93 | CWSW | DESTIN | 2% 30 NET 31 |

SALESMAN NAME: SPRNO / RICH
PO NUMBER: 740036

Cust Contact: PAX
Dey Contact: EVERETT

| ITEM NDC/NSC | QUANTITY ORDERED | QUANTITY SHIPPED | QTY B/O | UNIT | DESCRIPTION | | UNIT PRICE | EXTENSION |
|---|---|---|---|---|---|---|---|---|
| 69703 | 180 | 180 | 0 | CN | ALBUTEROL SULF 0.083% 3ML 25's | S9504F037 | 18.950 | 3411.00 |
| | | | | | ** EXPIRATION DATE 9504 ** | | | |
| 69760 | 24 | 24 | 0 | CN | ALBUTEROL SULF 0.083% 3ML 60's | S9505E000 | 44.400 | 1065.60 |
| | | | | | ** EXPIRATION DATE 9505 ** | | | |
| 18130 | 12 | 12 | 0 | CN | ACETYLCYSTEINE 10% 30 ML 3'S | 95040065H | 41.970 | 503.64 |
| | | | | | ** EXPIRATION DATE 9504 ** | | | |
| 18104 | 36 | 36 | 0 | CN | ACETYLCYSTEINE 10% 4 ML 12'S | 95034026H | 25.800 | 928.80 |
| | | | | | ** EXPIRATION DATE 9503 ** | | | |
| 18230 | 12 | 12 | 0 | CN | ACETYLCYSTEINE 20% 30 ML 3'S | 95024015H | 50.640 | 607.68 |
| | | | | | ** EXPIRATION DATE 9502 ** | | | |
| 18204 | 12 | 12 | 0 | CN | ACETYLCYSTEINE 20% 4 ML 12'S | 95034041H | 31.000 | 372.96 |
| | | | | | ** EXPIRATION DATE 9503 ** | | | |
| 63005 | 70 | 70 | 0 | CN | SOD CHLORIDE 0.9% 5 ML 100'S | 95007456 | 13.000 | 910.00 |
| | | | | | ** EXPIRATION DATE 9508 ** | | | |
| 18110 | 12 | 0 | 12 | CN | ACETYLCYSTEINE 10% 10 ML 3'S | | | |

SHIPPED FROM TEXAS

SALES FILE COPY

*****CONTINUED***** *****CONTINUED***** *****CONTINUED***** *****CONTINUED*****

HIGHLY CONFIDENTIAL                                        DEY-MDL0000113

**DEY**

SEND PAYMENT TO:
**DEY LABORATORIES, INC.**
DEPT #01524.
SAN FRANCISCO CA 94139-1524

**DEY LABORATORIES, INC.**
10246 MILLER ROAD
DALLAS TEXAS 75238
PHONE (214) 349-7275

Cust Contact:   FAX
Dey Contact:   EVERETT

| | EXTENSION |
|---|---|
| | 7,799.68 |
| TOTAL DUE | |

SALES FILE COPY

SHIPPED FROM TEXAS

S | 3704 - 2
I | ALCO HEALTH SERV - VALDOSTA
T | 311 WEST CENTRAL AVENUE
O | VALDOSTA          GA  31601

B | 3704 - 2
I | ALCO HEALTH SERV - VALDOSTA
L | PO BOX 1287
T | VALDOSTA          GA  31603 1287
O |

| INVOICE NO. | PG. | INVOICE DATE | DATE OF ORDER | SHIP VIA | FOB | TERMS |
|---|---|---|---|---|---|---|
| 152059 | 2 | 1/04/94 | 12/29/93 | CWSW | DESTIN | 2% 30 NET 31 |

| PO NUMBER | SALESMAN NAME | SPECIAL INSTRUCTIONS |
|---|---|---|
| 740036 | SPENO, RICH | |

HIGHLY CONFIDENTIAL

DEY-MDL0000114

**DEY**

SEND PAYMENT TO:
DEY LABORATORIES, INC.
DEPT. #01524.
SAN FRANCISCO CA 94139-1524

DEY LABORATORIES, INC.
10246 MILLER ROAD
DALLAS TEXAS 75238
PHONE (214) 349-7275

Cust Contact:   FAX
Dey Contact:   JENNINGS

SHIP TO:
3709 -
WALSH LUMPKIN DRUG COMPANY
5005 STATE LINE AVENUE
PO BOX 1918
TEXARKANA                    TX  75504

BILL TO:
3709
WALSH LUMPKIN DRUG COMPANY
5005 STATE LINE AVENUE
PO BOX 1918
TEXARKANA                    TX  75504

| INVOICE NO. | PG | INVOICE DATE | PG | DATE OF ORDER | SHIP VIA | FOB | TERMS | DESTIN |
|---|---|---|---|---|---|---|---|---|
| 1520Ü0 | 1 | 1/04/94 | 12/29/93 | CWSW | | DESTIN | 2% 30 NET 31 | |

| PO NUMBER | SALESMAN NAME | | SPECIAL INSTRUCTIONS |
|---|---|---|---|
| 7715 | OPEN | | |

| NDC NO. 48502- | ORDERED | SHIPPED | QUANTITY | UNIT | U | DESCRIPTION | LOT NO. | UNIT PRICE | EXTENSION |
|---|---|---|---|---|---|---|---|---|---|
| 69703 | 100 | 100 | 0 | CN | | ALBUTEROL SULF 0.083% 3ML 25'S ** EXPIRATION DATE 9504 ** | 9504F03U | 18.950 | 1895.00 |
| 69760 | 12 | 12 | 0 | CN | | ALBUTEROL SULF 0.083% 3ML 60'S ** EXPIRATION DATE 9505 ** | 9505F055. | 44.400 | 532.80 |
| 63005 | 20 | 20 | 0 | CN | | SOD CHLORIDE 0.9% 5 ML 100'S ** EXPIRATION DATE 9509 ** This is an alternate item for 63005 | 9S093J3136 | 13.000 | 260.00 |

TOTAL DUE                     2,687.80

SHIPPED FROM TEXAS

SALES FILE COPY.

HIGHLY CONFIDENTIAL

DEY-MDL0000115

**DEY**

SEND PAYMENT TO:
DEY LABORATORIES, INC.
DEPT. #01524
SAN FRANCISCO CA 94139-1524

DEY LABORATORIES, INC.
10246 MILLER ROAD
DALLAS TEXAS 75238
PHONE (214)349-7275

Cust. Contact: ORDERNET
Dey Contact: JENNINGS

4116 -
ALCO HEALTH SERVICES
1655 EAST 12TH STREET
MISHAWAKA

4114
ALCO HEALTH SERV- MISHAWAKA
1655 EAST 12TH STREET
PO.BOX 1110
MISHAWAKA

INVOICE NUMBER 152064 | INVOICE DATE 1/04/94 | DATE OF ORDER 12/29/93 | SHIP VIA ARFW | FOB | TERMS 2% 30 NET 31 | DKSTIN | IN 46546
PO NUMBER 080008 | SALESMAN NAME HARLESS, LORI | SPECIAL INSTRUCTION | IN 46546110

| PRODUCT NUMBER | QUANTITY ORDERED | SHIPPED | BACK ORDERED | UNIT | DESCRIPTION | LOT | CONTRACT PRICE | EXTENSION |
|---|---|---|---|---|---|---|---|---|
| 69760 | 12 | 12 | 0 | CN | ALBUTEROL SULF 0.083% 3ML 60's ** EXPIRATION DATE 9505 ** | 9505P055 | 44.400 | 532.80 |
| 69703 | 15.2 | 15.2 | 0 | CN | ALBUTEROL SULF 0.083% 3ML 25's ** EXPIRATION DATE 9504 ** | 9504F038 | 18.950 | 2880.40 |
| 18104 | 6 | 6 | 0 | CN | ACETYLCYSTEINE 10% 4 ML 12's ** EXPIRATION DATE 9503 ** | 9503402GH | 25.800 | 154.80 |
| 18204 | 6 | 6 | 0 | CN | ACETYLCYSTEINE 20% 4 ML 12's ** EXPIRATION DATE 9503 ** | 9503404IH | 31.080 | 186.40 |

TOTAL DUE          3,754.48

SHIPPED FROM TEXAS

SALES FILE COPY

HIGHLY CONFIDENTIAL

DEY-MDL0000119

4137 - 10

**SHIP TO:**
BINDLEY WESTERN - CHARLOTTE
10900A S COMMERCE BLVD
CHARLOTTE                    NC  28273

**BILL TO:**
4137   BINDLEY WESTERN DRUG COMPANY
PO BOX 68450
INDIANAPOLIS                 IN  46268

| INVOICE NO. | INVOICE DATE | DATE OF ORDER | SHIP VIA | TERMS |
|---|---|---|---|---|
| 152065 | 1/04/94 | 1/03/94 | CWSW | DESTIN 2% 30 NET 31 |

P.O. NUMBER: 5781210   SALESMAN NAME: SPENO, RICH

**SEND PAYMENT TO:**
DEY LABORATORIES, INC.
DEPT. #01524
SAN FRANCISCO CA 94139-1524

DEY LABORATORIES, INC.
10246 MILLER ROAD
DALLAS TEXAS 75238
PHONE (214) 349-7275

Cust Contact:  BOB
Dey Contact:  JENNINGS

| QUANTITY ORDERED | QUANTITY SHIPPED | QUANTITY B/O | U/M | DESCRIPTION | LOT NO. | UNIT PRICE | EXTENSION |
|---|---|---|---|---|---|---|---|
| 28 | 28 | 0 | CN | ALBUTEROL SULF 0.083% 3ML 25' 9504F041 ** EXPIRATION DATE 9504 ** | 59504F041 | 18.950 | 530.60 |
| 12 | 12 | 0 | CN | ALBUTEROL SULF 0.083% 3ML 60' 9506N270. ** EXPIRATION DATE 9506 ** | 59506N270. | 44.400 | 532.80 |
| 40 | 40 | 0 | CN | SOD CHLORIDE 0.9% 3 ML 100'S ** EXPIRATION DATE 9507 ** | 95077443 | 13.000 | 520.00 |
| 20 | 20 | 0 | CN | SOD CHLORIDE 0.9% 5 ML 100's 9510K003 ** EXPIRATION DATE 9510 ** This is an alternate item for 63005 | 95103K003 | 13.000 | 260.00 |

TOTAL DUE                1,843.40

SHIPPED FROM TEXAS

SALES FILE COPY

HIGHLY CONFIDENTIAL



DEY-MDL0000120



**DEY**

SEND PAYMENT TO:
**DEY LABORATORIES, INC.**
DEPT. #01524
SAN FRANCISCO CA 94139-1524

DEY LABORATORIES, INC.
10246 MILLER ROAD
DALLAS TEXAS 75238
PHONE (214) 349-7275

Cust. Contact: FAX
Dey Contact: HARRALSON

SHIP TO:
4137 - 11
BINDLEY WESTERN - SAN DIMAS
542 COVINA BLVD
SAN DIMAS                    CA   91773

BILL TO:
4137  BINDLEY WESTERN DRUG COMPANY
PO BOX 68450
INDIANAPOLIS                 IN   46268

| INVOICE NO | PS | INVOICE DATE | DATE OF ORDER | SHIP VIA | FOB | TERMS |
|---|---|---|---|---|---|---|
| 152056 | 1 | 1/04/94 | 1/03/94 | WWAT | AUSTIN | 2% 30 NET 31 |

| PROD NUMBER | SALESMAN NAME | SPECIAL INSTRUCTIONS |
|---|---|---|
| 8049BCD | ROBERTSON - STEVE | |

| PROD NO | QUANTITY ORDERED | QUANTITY SHIPPED | B/O | UM | DESCRIPTION | LOT | UNIT PRICE | EXTENSION |
|---|---|---|---|---|---|---|---|---|
| 69703 | 108 | 108 | 0 | CN | ALBUTEROL SULF 0.083% 3ML .25 * | S95O5A141 | 18.950 | 2046.60 |
| | | | | | ** EXPIRATION DATE 9505 ** | | | |
| 69760 | 48 | 48 | 0 | CN | ALBUTEROL SULF 0.083% 3ML .60 * | S95O6B270 | 44.400 | 2131.20 |
| | | | | | ** EXPIRATION DATE 9506 ** | | | |
| 67603 | 200 | 200 | 0 | CN | METAPROTERENOL 0.6% 2.5ML .25 * | S95O5E592 | 13.990 | 2798.00 |
| | | | | | ** EXPIRATION DATE 9505 ** | | | |

TOTAL DUE                    6,975.80

SHIPPED FROM TEXAS

SALES FILE COPY

HIGHLY CONFIDENTIAL

DEY-MDL0000121



DEY

SEND PAYMENT TO:
**DEY LABORATORIES, INC.**
DEPT. #01524
SAN FRANCISCO CA 94139-1524

DEY LABORATORIES, INC.
10246 MILLER ROAD
DALLAS TEXAS 75238
PHONE (214) 349-7275

Cust Contact: RAE ANN JENNINGS
Dey Contact:

SHIP TO:
4137 - 2
BINDLEY WESTERN - INDIANAPOLIS
4212 WEST 71ST
INDIANAPOLIS                IN 46268

BILL TO:
4137
BINDLEY WESTERN DRUG COMPANY
PO BOX 68450
INDIANAPOLIS                IN 46268

INVOICE NO. 182067
DATE ORDERED 1/03/94   DATE SHIPPED 1/04/94   SALESMAN HARLESS, LORI
P.O. NUMBER 27388AD
DESTIN /% 30 NKT 3)

| QUANTITY ORDERED | QUANTITY SHIPPED | QUANTITY B/OLE | UNIT | DESCRIPTION | UNIT PRICE | EXTENSION |
|---|---|---|---|---|---|---|
| 144 | 144 | 0 | CN | ALBUTEROL. SULF 0.083% 3ML 25's 5950SA141 ** EXPIRATION DATE 9505 ** | 18.950 | 2728.80 |
| 24 | 24 | 0 | CN | ALBUTEROL. SULF 0.083% 3ML 60's 5950SA151. ** EXPIRATION DATE 9506 ** | 44.400 | 1065.60 |

TOTAL DUE   3,794.40

SHIPPED FROM TEXAS

SALES FILE COPY

HIGHLY CONFIDENTIAL



DEY-MDL0000122

**DEY**

SEND PAYMENT TO:
DEY LABORATORIES, INC.
DEPT. #01524
SAN FRANCISCO CA 94139-1524

DEY LABORATORIES, INC.
10246 MILLER ROAD
DALLAS TEXAS 75238
PHONE (214) 948-7275

Cust Contact: FAX
Dey Contact: HARRAISON

SHIP TO:
4490
OCP KETCHUM
17608 COMMERCE DRIVE
HURON TOWNSHIP          MI 48164

BILL TO:
4490
KETCHUM DISTRIBUTORS INC
4001 A HADLEY ROAD
SOUTH PLAINFIELD          NJ 07080

| INVOICE NO. | PO | INVOICE DATE | DATE OF ORDER | SHIP VIA | F.O.B. | TERMS |
|---|---|---|---|---|---|---|
| 152070 | 1 | 11/04/94 | 12/30/93 | RPS | DESTIN | .2% 30 NET 31 |

| PO NUMBER | SALESMAN NAME | SPECIAL INSTRUCTIONS |
|---|---|---|
| 120927 | HARLESS, LORI | |

| ITEM NO. | QUANTITY ORDERED | QUANTITY SHIPPED | B/O | UNIT | DESCRIPTION | LOT # | UNIT PRICE | EXTENSION |
|---|---|---|---|---|---|---|---|---|
| 69703 | 52 | 52 | 0 | CN | ALBUTEROL SULF 0.083% 3ML 25'S ** EXPIRATION DATE 9504 ** | 9504F040 | 18.950 | 985.40 |
| 67603 | 20 | 20 | 0 | CN | METAPROTERENOL 0.6% 2.5ML 25'S ** EXPIRATION DATE 9505 ** | 9505E592 | 13.990 | 279.80 |
| 83003 | 10 | 10 | 0 | CN | SOD CHLORIDE 0.9% 3 ML 100's This is an alternate item for 63003 ** EXPIRATION DATE 9510 ** | 95103K012 | 13.000 | 130.00 |
| 03003 | 4 | 4 | 0 | CN | SOD. CHLORIDE 0.9% 3 ML 250'S ** EXPIRATION DATE 9510 ** | 95104451 | 32.200 | 128.80 |

TOTAL DUE          1,524.00

SHIPPED FROM TEXAS

SALES FILE COPY.

HIGHLY CONFIDENTIAL

DEY-MDL0000125

**DEY**

SEND PAYMENT TO:
DEY LABORATORIES, INC.
DEPT. #01524
SAN FRANCISCO CA 94139-1524

DEY LABORATORIES, INC.
10246 MILLER ROAD
DALLAS TEXAS 75238
PHONE (214) 348-7275

Cust Contact:  ORDERNET
Dey Contact:  JENNINGS

S/H/P/T/O:
WHITMIRE DIST CORP - CHICAGO
980 LOMBARD ROAD
PO BOX 667
LOMBARD                    IL  60148

B/I/L/T/O:
WHITMIRE DIST CORP - CHICAGO
980 LOMBARD ROAD
PO BOX 667
LOMBARD                    IL  60148

4655

INVOICE NUMBER: 152073   INVOICE DATE: 1/04/94   PG: 1   DATE OF ORDER: 1/03/94   SHIP VIA: ARFW
PO NUMBER: 902950   STATUS: OPEN   FOB: URSTIN   TERMS: 2% 30 NET 31

| QUANTITY ORDERED | QUANTITY SHIPPED | QUANTITY B/O | UNIT | DESCRIPTION | LOT | UNIT PRICE | EXTENSION |
|---|---|---|---|---|---|---|---|
| 69703 | 472 | 472 | 0 | CN | ALBUTEROL SULF 0.083% 3ML 25'S  ** EXPIRATION DATE 9504 ** | 9504F041 | 18.950 | 8944.40 |
| 66003 | 20 | 20 | 0 | CN | ISOETHARINE S/F 0.17% 3ML 25'S  ** EXPIRATION DATE 9506 ** | 9506C373 | 7.750 | 155.00 |
| 67803 | 8 | 8 | 0 | CN | METAPROTERENOL 0.4% 2.5ML 25'S  ** EXPIRATION DATE 9503 ** | 9503D449 | 13.990 | 111.92 |
| 67603 | 8 | 8 | 0 | CN | METAPROTERENOL 0.6% 2.5ML 25'S  ** EXPIRATION DATE 9505 ** | 9505E592 | 13.990 | 111.92 |
| 18200 | 4 | 4 | 0 | CN | ACETYLCYSTEINE 20% 100 ML 1'S  ** EXPIRATION DATE 9501 ** | 95013972H | 75.900 | 303.60 |
| 18104 | 6 | 6 | 0 | CN | ACETYLCYSTEINE 10% 4 ML 12'S  ** EXPIRATION DATE 9503 ** | 95034026H | 25.800 | 154.80 |
| 18230 | 12 | 12 | 0 | CN | ACETYLCYSTEINE 20% 30 ML 3'S  ** EXPIRATION DATE 9502 ** | 95024015H | 50.640 | 607.68 |
| 18204 | 6 | 6 | 0 | CN | ACETYLCYSTEINE 20% 4 ML 12'S  ** EXPIRATION DATE 9503 ** | 95034041H | 31.080 | 186.48 |

SHIPPED FROM TEXAS

*****CONTINUED*********CONTINUED*********CONTINUED*********CONTINUED*********CONTINUED*****

SALES FILE COPY
*****CONTINUED*****

HIGHLY CONFIDENTIAL

DEY-MDL0000128

4655 -

**DEY**

SEND PAYMENT TO:
DEY LABORATORIES, INC.
DEPT. #01524
SAN FRANCISCO CA 94139-1524

DEY LABORATORIES, INC.
10246 MILLER ROAD
DALLAS TEXAS 75238
PHONE (214) 348-7275

Cust. Contact: ORDERNET
Dey Contact: JENNINGS

SHIP TO: WHITMIRE DIST CORP - CHICAGO
980 LOMBARD ROAD
PO BOX 667
LOMBARD                    IL 60148

BILL TO: WHITMIRE DIST CORP - CHICAGO
980 LOMBARD ROAD
PO BOX 667
LOMBARD                    IL 60148

INVOICE NO: 152073
PO NUMBER: 902950
STATUS: OPEN

| QTY ORDERED | PO | INVOICE DATE | DATE OF ORDER | QUANTITY SHIPPED | SHIPPED VIA | FOB | TERMS |
|---|---|---|---|---|---|---|---|
| | 2 | 1/04/94 | 1/03/94 | | ARFW | DIRSTIN | 2% 30 NET 31 |

SPECIAL INSTRUCTIONS

| CAT NO. & NDC | QUANTITY ORDERED | QUANTITY SHIPPED | QUANTITY B/O | UNIT | DESCRIPTION | SHIP LOT | PRICE | EXTENSION |
|---|---|---|---|---|---|---|---|---|
| 82003 | 10 | 10 | 0 | CN | SOD CHLORIDE 0.45% 3ml, 100's<br>This is an alternate item for 9506 **<br>** EXPIRATION DATE | 95063F735 62003 | 14.000 | 140.00 |
| 83003 | 30 | 30 | 0 | CN | SOD CHLORIDE 0.9% 3 ML 100's<br>This is an alternate item for<br>** EXPIRATION DATE 9510 ** | 95103K012 63003 | 13.000 | 390.00 |

*********************** item 67803 qty increased to meet case requirement ***********************

TOTAL NUR      11,105.00
*********************

SHIPPED FROM TEXAS

SALES FILE COPY



HIGHLY CONFIDENTIAL

DEY-MDL0000129



**DEY**

SEND PAYMENT TO:
**DEY LABORATORIES, INC.**
DEPT. #01524
SAN FRANCISCO CA 94139-1524

DEY LABORATORIES, INC.
10246 MILLER ROAD
DALLAS TEXAS 75238
PHONE (214) 348-7275

Cust Contact:   FAX
Dey Contact:   RVRRKTT

SHIP TO:
4719 - 2
DUFF BROTHERS
200 NORTH HOLLY STREET
CHATTANOOGA          TN  37404

BILL TO:
4719
ALCO HEALTH SERV - DUFF BRO.
PO BOX 31
CHATTANOOGA          TN  37401

| INVOICE NO. | PCS. | DATE OF INVOICE | DATE OF ORDER | SHIP VIA | FOB | TERMS |
|---|---|---|---|---|---|---|
| 152075 | 1 | 1/04/94 | 12/30/93 | CWSW | DESTIN | 2% 30 NET 31 |

P.O. NUMBER: 540256   SALESMAN: HAMPTON, JOE   SPECIAL INSTRUCTIONS:

| ORDERED | SHIPPED | QUANTITY B/O | UNIT | DESCRIPTION | LOT NO. | UNIT PRICE | EXTENSION |
|---|---|---|---|---|---|---|---|
| 196 | 196 | 0 | CN | ALBUTEROL SULF 0.083% 3ML 25' ** EXPIRATION DATE 9504 ** | S9504F038 | 18.950 | 3714.20 |
| 24 | 24 | 0 | CN | ALBUTEROL SULF 0.083% 3ML 60' ** EXPIRATION DATE 9505 ** | S9505F055 | 44.400 | 1065.60 |
| 16 | 16 | 0 | CN | METAPROTRRENOL 0.6% 2.5ML 25' ** EXPIRATION DATE 9505 ** | S9505E892 | 13.990 | 223.84 |
| 10 | 10 | 0 | CN | SOD. CHLORIDE 0.9% 3 ML 100'S ** EXPIRATION DATE 9507 ** | 9507F443 | 13.000 | 130.00 |

TOTAL DUE: 5,133.64

SALES FILE COPY

SHIPPED FROM TEXAS

HIGHLY CONFIDENTIAL                    DEY-MDL0000131

**DEY**

SEND PAYMENT TO:
DEY LABORATORIES, INC.
DEPT. #01524
SAN FRANCISCO CA 94139-1524

DEY LABORATORIES, INC.
10246 MILLER ROAD
DALLAS TEXAS 75238
PHONE (214) 349-7275

Cust Contact:
Dey Contact: JOHN CROMLY HARRAISON

4864 -
PRESCRIPTION SUPPLY INC
1469 SECOR ROAD
TOLEDO                    OH  43607

4864
PRESCRIPTION SUPPLY INC
1469 SECOR ROAD
TOLEDO                    OH  43607

| INVOICE NO. | PGS | INVOICE DATE | DATE OF ORDER | SHIP VIA | FOB | TERMS |
|---|---|---|---|---|---|---|
| 152079 | 1 | 1/04/94 | 12/30/93 | ARFW | DESTIN | 2% 30 NET 31 |

P.O. NUMBER: -108258   SALESMAN NAME: OPEN   SPECIAL INSTRUCTIONS:

| NDC NO. | QUANTITY ORDERED | QUANTITY SHIPPED | QUANTITY B/O | UNIT | DESCRIPTION | UNIT | AMOUNT |
|---|---|---|---|---|---|---|---|
| 68703 | 144 | 144 | 0 | CN | ALBUTEROL SULF 0.083% 3ML 25'S 9504F040 | 18.950 | 2,720.80 |
| 18110 | 12 | 0 | 12 | CN | ACETYLCYSTEINE 10% 10 ML 3'S | | |
| | | | | | *** EXPIRATION DATE 9504 *** | | |

TOTAL DUE          2,728.80

SHIPPED FROM TEXAS

SALES FILE COPY

HIGHLY CONFIDENTIAL

DEY-MDL0000135

**DEY**

SEND PAYMENT TO:
**DEY LABORATORIES, INC.**
DEPT. #01524
SAN FRANCISCO CA 94139-1524

DEY LABORATORIES, INC.
10245 MILLER ROAD
DALLAS TEXAS 75238
PHONE (214) 349-7275

SHIP TO:
ALCO HEALTH SERV - MINNEAPOLIS
6810 SHADY OAK ROAD
EDEN PRAIRIE                    MN 55344

BILL TO:
ALCO HEALTH SERV - MINNEAPOLIS
6810 SHADY OAK ROAD
EDEN PRAIRIE                    MN 55344

| INVOICE NO. | PG. | INVOICE DATE | DATE OF ORDER | SHIP VIA | FOB | TERMS |
|---|---|---|---|---|---|---|
| 152080 | 1 | 1/04/94 | 12/29/93 | RDWY | DESTIN | 2% 30 NET 31 |

PO NUMBER: 313841   SALESMAN NAME: HARLESS, LORI

Cust Contact: ORDER/NEXT
Dey Contact: JENNINGS

| NDC No. 49502 | QUANTITY ORDERED | QUANTITY SHIPPED | QUANTITY B/O | UNIT | DESCRIPTION | LOT | UNIT PRICE | EXTENSION |
|---|---|---|---|---|---|---|---|---|
| 69703 | 240 | 240 | 0 | CN | ALBUTEROL SULF 0.083% 3ML 25'S | 9504F038 | 18.950 | 4540.00 |
|  |  |  |  |  | ** EXPIRATION DATE 9504 ** |  |  |  |
| 69760 | 12 | 12 | 0 | CN | ALBUTEROL SULF 0.083% 3ML 60'S | 9505F055 | 44.400 | 532.80 |
|  |  |  |  |  | ** EXPIRATION DATE 9505 ** |  |  |  |
| 67603 | 4 | 4 | 0 | CN | METAPROTERENOL 0.6% 2.5ML 25'S | 9505E592 | 13.990 | 55.96 |
|  |  |  |  |  | ** EXPIRATION DATE 9505 ** |  |  |  |
| 18204 | 6 | 6 | 0 | CN | ACETYLCYSTEINE 20% 4 ML 12'S | 950340411 | 31.060 | 186.40 |
|  |  |  |  |  | ** EXPIRATION DATE 9503 ** |  |  |  |
| 63003 | 90 | 90 | 0 | CN | SOD CHLORIDE 0.9% 3 ML 100'S | 95077443 | 13.000 | 117.00 |
|  |  |  |  |  | ** EXPIRATION DATE 9507 ** |  |  |  |
| 63005 | 10 | 10 | 0 | CN | SOD CHLORIDE 0.9% 5 ML 100'S | 95087456 | 13.000 | 130.00 |
|  |  |  |  |  | ** EXPIRATION DATE 9508 ** |  |  |  |
| 18110 | 24 | 0 | 24 | CN | ACETYLCYSTEINE 10% 10 ML 3'S |  |  |  |

TOTAL DUE: 6,623.24

SHIPPED FROM TEXAS

SALES FILE COPY

*******CONTINUED*********************CONTINUED*********************CONTINUED*******



HIGHLY CONFIDENTIAL

DEY-MDL0000136

**DEY**

SEND PAYMENT TO:
**DEY LABORATORIES, INC.**
DEPT. #01524
SAN FRANCISCO CA 94139-1524

DEY LABORATORIES, INC.
10246 MILLER ROAD
DALLAS TEXAS 75238
PHONE (214) 349-7275

Cust Contact: ORDERNET
Dey Contact: JENNINGS

SALES FILE COPY

SHIPPED FROM TEXAS

S H I P   T O

4887 -
ALCO HEALTH SERV - MINNEAPOLIS
6810 SHADY OAK ROAD
EDEN PRAIRIE                    MN  55344

B I L L   T O

4887
ALCO HEALTH SERV - MINNEAPOLIS
6810 SHADY OAK ROAD
EDEN PRAIRIE                    MN  55344

| INVOICE NO. | PGS | INVOICE DATE | DATE OF ORDER | SHIP VIA | FOB | TERMS |
|---|---|---|---|---|---|---|
| 15 2080 | 1 | 1/04/94 | 12/29/93 | RDWY | DESTIN | 2% 30 NET 31 |

P.O. NUMBER: 313841   SALESMAN NAME: HARLESS, LORI

| QUANTITY ORDERED | QUANTITY SHIPPED | QUANTITY B/O | UNIT | LOT NO. | DESCRIPTION | UNIT PRICE | EXTENSION |
|---|---|---|---|---|---|---|---|

HIGHLY CONFIDENTIAL

DEY-MDL0000137