# Exhibit B

May 7, 2009

# Rebuttal Report of Lauren J. Stiroh
## In connection with *In re Pharmaceutical Industry Average Wholesale Price Litigation*



NERA
Economic Consulting

**Contains Highly Confidential Materials – Subject to Protective Order**

# TABLE OF CONTENTS

I.      Introduction .................................................................................................................1

II.     Opinions Regarding Dr. Schondelmeyer's Rebuttal Report .................................................1
   A.   Dr. Schondelmeyer's Opinions Do Not Apply to Dey .......................................................1
   B.   The Government Could Have Used Alternative Prices to Gauge Reimbursement
        Formulas ...............................................................................................................2
   C.   Dr. Schondelmeyer's Opinions Regarding Economic Incentives to Inflate Prices for
        Medicare Sales Are Flawed ..........................................................................................6

III.    Summary of Opinions Regarding Dr. Duggan's Rebuttal Report ......................................6
   A.   Dr. Duggan's But-For World Is Incomplete ....................................................................6
   B.   Dr. Duggan's Prices Are No Less Arbitrary than He Claims Reported AWPs to Be .........8

**Contains Highly Confidential Materials – Subject to Protective Order**

# I.      Introduction

I have been asked by counsel for Dey, Inc., Dey L.P., Inc., and Dey L.P. (collectively "Dey") to review and comment on the rebuttal reports of Stephen W. Schondelmeyer and Mark G. Duggan, submitted April 23, 2009 in connection with *In re Pharmaceutical Industry Average Wholesale Price Litigation* ("Schondelmeyer Rebuttal Report" and "Duggan Rebuttal Report," respectively).

My experience and qualifications are described in my initial report in this matter (*Report of Lauren J. Stiroh*, March 6, 2009) and are not repeated here.

The opinions expressed in this report are based on my review of the Schondelmeyer and Duggan Rebuttal Reports.  In addition, I have relied on the documents and data upon which I relied to prepare my initial report in this matter.  A list of additional documents relied on for this report is presented in **Exhibit 1**.  I reserve the right to revise my opinions if additional information is provided to me.  Specifically, I understand that Plaintiffs' experts will not be available for deposition for their rebuttal reports until after I have filed this report.  Therefore, I reserve the right to comment on their methods and opinions after I have had the opportunity to review their depositions.

Neither Dr. Schondelmeyer nor Dr. Duggan address or rebut the opinions that I offered in my initial report.  They offer no evidence that: Dey intended to deceive Medicare and Medicaid; Dey believed Medicare or Medicaid to be deceived; or Medicare and Medicaid were unaware of the nature of Dey's prices as undiscounted benchmark and list prices.  Neither of Plaintiffs' experts' rebuttal reports comments on the fact that Dey's WACs are economically meaningful prices: they are Dey's undiscounted invoice prices to wholesalers and related to its average transaction prices.  Neither expert comments on, or refutes, the analyses in my initial report showing that the prices that were allegedly concealed from Medicare and Medicaid were revealed by other publicly available pricing sources.  Dr. Schondelmeyer's opinion that these alternative prices could not be used in reimbursement formulae is misplaced.  Alternative price measures were available to Medicaid and Medicare and could have been used to gauge the level of drug ingredient reimbursement, if Medicaid and Medicare believed that lower reimbursement would accomplish the goals of access and cost containment.  Finally, neither Dr. Schondelmeyer nor Dr. Duggan establish that Medicare and Medicaid overpaid pharmacists and other providers for supplying Dey's drugs.

# II.     Opinions Regarding Dr. Schondelmeyer's Rebuttal Report

## A.      Dr. Schondelmeyer's Opinions Do Not Apply to Dey

Dr. Schondelmeyer's Rebuttal Report offers a blanket response to opinions expressed in reports written by experts on behalf of Abbott, Roxanne, and Dey, including my own report in this matter submitted March 6, 2009 on behalf of Dey.  Many of Dr. Schondelmeyer's opinions do not apply to Dey or Dey's practices, and Dr. Schondelmeyer does not address the impact the inapplicability of his opinions to Dey has on the Plaintiffs' overall theory of liability for the actions alleged in the Complaint against Dey.

**Contains Highly Confidential Materials – Subject to Protective Order**

For example, Dr. Schondelmeyer opines that it is not "acceptable for manufacturers to set and report (to the drug pricing compendia) their list prices, benchmark prices, AWPs or WACs in a manner that has no meaning or relationship to any actual transaction price."[1]  Furthermore, Dr. Schondelmeyer disagrees with what he claims is an assertion that "list price and benchmark price are meaningless and can be anything that the manufacturer wants them to be…"[2]  These opinions do not apply to Dey.  First, there was no such assertion in my initial report, but more to the point, as described in my initial report, Dey's AWPs and WACs do have meaning, and its WACs are related to its transaction prices in sales to wholesalers.[3]  Dr. Schondelmeyer does not refute or comment on my analysis showing that Dey's WACs are economically meaningful and do bear a relationship to actual transaction prices on Dey's sales to wholesalers.[4]

Dey's AWPs are also determined in a meaningful way and are not "anything the manufacturer wants them to be."[5]  Dey's AWPs are set at launch in relation to the brand AWP.  While Dr. Schondelmeyer may not be aware of any "industry standard price behavior for first generic entrants in the market," it remains the fact that Dey published its AWPs in accordance with what it believed was the industry standard.[6]  Therefore, setting AWP in relation to the brand AWP is economically meaningful pricing behavior for Dey.

## B.    The Government Could Have Used Alternative Prices to Gauge Reimbursement Formulas

Dr. Schondelmeyer argues that Medicaid and Medicare agencies could not use WACs, AMPs, Medicare ASPs, FSS prices, IMS prices, or other available pricing signals as the basis for reimbursement.[7]  Dr. Schondelmeyer describes eight criteria that he proposes as "essential for estimating acquisition costs in a manner that could serve as the basis for a reimbursement system for all drugs products on the market," and asserts that each of the alternative pricing measures discussed by Defendants' experts fail to meet at least one of his criteria.[8]  Dr. Schondelmeyer does not establish that Medicare and Medicaid ever considered or used these criteria in determining reimbursement formulae, or even viewed the criteria as "essential."  Moreover, Dr. Schondelmeyer's assertion that the Government could not use alternative pricing mechanisms as the basis for setting reimbursement amounts or gauging existing reimbursement formulae is factually wrong.  Some state Medicaid agencies and Medicare did use these alternative pricing mechanisms in setting reimbursement rates.

---

[1] Rebuttal Report of Stephen W. Schondelmeyer, April 23, 2009 ("Schondelmeyer Rebuttal Report"), ¶ 5.

[2] Schondelmeyer Rebuttal Report, ¶ 7.

[3] See Expert Report of Lauren J. Stiroh, March 6, 2009 ("Stiroh Report"), pp. 16-17.

[4] See Stiroh Report, pp. 6, 16-17, Exhibits 5 and 6 and Figures 1A-1K.

[5] Schondelmeyer Rebuttal Report, ¶ 7.

[6] See the discussion of this subject in my initial report, p. 16.  See Schondelmeyer Rebuttal Report, ¶ 15 for the quoted text.

[7] Schondelmeyer Rebuttal Report, Section V, see in particular ¶ 34 and ¶¶ 45-57.

[8] Schondelmeyer Rebuttal Report, ¶ 43-44.

**Contains Highly Confidential Materials – Subject to Protective Order**

It is particularly noteworthy that many of the alternative pricing mechanisms evaluated by Dr. Schondelmeyer fail his "essential criteria" test because the alternative prices are too low.  Dr. Schondelmeyer asserts that WACs, AMPs, FSS prices, and Medicare ASPs all fail to provide "incentives for pharmacies and providers to supply drugs" and "adequate compensation to providers and pharmacies."[9]  This is precisely the criticism I made of Dr. Duggan's but-for prices.  I noted in my initial report that Dr. Duggan failed to consider whether the prices he proposed offered sufficient incentives to pharmacies to participate in Medicaid and Medicare programs.  Dr. Schondelmeyer appears to agree, since he challenges not only AMPs, FSS and Medicare ASPs as being too low but also WACs, which, as undiscounted prices, are higher than the other three statistics.

While I acknowledge and agree that a successful reimbursement scheme must balance Medicaid and Medicare's goals of achieving access and cost containment, Dr. Schondelmeyer's rejection of alternative pricing signals as a basis for gauging reimbursement formulae is misplaced.  Even if the alternative prices themselves are too low to achieve acceptable access to covered drugs for Medicaid and Medicare patients, the alternative measures could still be used as a means for determining an appropriate discount off AWP or markup on WAC (or other such pricing statistic) to be used in the reimbursement formula.

Dey's WACs meet every criterion proposed by Dr. Schondelmeyer that is within the realm of control of any individual pharmaceutical company.  Dey's WACs are "accurate and reliable," "generally and widely available," "current and up to date," and "transparent and accessible."  The fact that, in Dr. Schondelmeyer's view, WACs are too low without adjustment to guarantee access can be addressed by incorporating a percentage markup in the reimbursement formula as indeed several states have done.  Dr. Schondelmeyer, also, rejects WACs as an alternative reimbursement mechanism on the basis that they are not "comprehensive."[10]  This cannot be rectified by any individual pharmaceutical company acting independently.

In order to meet all of Dr. Schondelmeyer's "essential criteria" including the comprehensive criterion, which according to Dr. Schondelmeyer means that "virtually all drug products would need to have price information of the same type available," then some authoritative body would have to publicly define the desired statistic so that all manufacturers could follow the same guidelines in reporting the price measure.[11]  As described in my initial report, WAC was not statutorily defined until 2003 and then was defined as an undiscounted list price, not an average transaction price.[12]  Moreover, when CMS did request a defined average pricing statistic (AMPs and Medicare ASPs) from the pharmaceutical companies as a condition of participating in the programs, the pharmaceutical companies provided the agencies with the requested information.  Therefore, by rejecting WAC as a price source to be used for setting reimbursement, Dr.

---

[9] Schondelmeyer Rebuttal Report, ¶¶ 44-45.

[10] Schondelmeyer Rebuttal Report, ¶ 45.

[11] See Schondelmeyer Rebuttal Report, ¶ 43 for quoted text.

[12] Medicare Modernization Act of 2003.  ("The term 'wholesale acquisition cost means, with respect to a drug or biological, the manufacturer's list price for the drug or biological to wholesalers or direct purchasers in the United States, not including prompt pay or other discounts, rebates or reductions in price, for the most recent month for which the information is available, as reported in wholesale price guides….")

**Contains Highly Confidential Materials – Subject to Protective Order**

Schondelmeyer appears to be implicitly holding Dey accountable for the fact that the Government did not define, or request, and other companies did not uniformly provide, a uniform measure of WAC.

Dr. Schondelmeyer also rejects AMPs and Medicare ASPs as alternative pricing statistics on the basis that they were too low and AMPS were "not made available to State programs and there were statutory and regulatory restrictions on their use."[13] Contrary to Dr. Schondelmeyer's statement, states can receive AMPs.  Texas currently receives AMPs to help calculate its supplemental rebates.[14]   In a report written in September 2005, Dr. Schondelmeyer states that the Texas Vendor Drug Program required drug manufacturers to submit their AMPs and that the AMP "was not used for setting the payment amount, but as a point of comparison for other price data."[15]  Similarly, Dr. Schondelmeyer's conclusion that Medicare ASPs cannot be used in Medicaid is unfounded.  North Carolina uses the Medicare ASPs provided by Medicare as part of its drug ingredient reimbursement method.[16]

In the Texas Vendor Drug Program paper and contrary to the opinions stated in his reports in this matter, Dr. Schondelmeyer writes that

> "[a]daptation of existing pricing concepts such as ASP or AMP may be possible alternatives for use in Medicaid.  Such prices must be adjusted to ensure that they are sufficient to cover pharmacies' actual costs for the drug product; at a minimum these adjustment [*sic*] should cover changes over time, intermediate cost of the wholesaler or the chain warehouse, and other costs at the pharmacy level."[17]

Dr. Schondelmeyer's reasons for rejecting FSS prices and IMS prices are also erroneous, misguided, or unsupported.  Dr. Schondelmeyer's opinion that FSS prices cannot be used as an alternative pricing signal because they are not transparent to pharmacists and other providers and are not widely available does not apply to the Dey drugs at issue.  As I showed in my prior report, FSS prices are available for the Dey drugs.[18]  These prices are not confidential and can be accessed using the Department of Veteran Affairs website.  As the charts from my previous

---

[13] Schondelmeyer Rebuttal Report, ¶ 48.

[14] Texas Government Code - § 531.070.  Supplemental Rebates.  ("In negotiating terms for a supplemental rebate, the commission shall use the average manufacturer price (AMP), as defined in section 1396r-8(k) (1) of the Omnibus Budget Reconciliation Act of 1990 as the cost of basis for the product.")

[15] Stephen W. Schondelmeyer, "Case Study of the Texas Vendor Drug Program's Approach to Estimating Drug Acquisition Costs," September 26, 2005 ("Case Study of the Texas Vendor Drug Program's Approach to Estimating Drug Acquisition Costs"), p. 23.

[16] See Centers for Medicare & Medicaid Services website found at www.cms.hhs.gov, "Medicaid Prescription Reimbursement Information by State – Quarter Ending March 2009."  Washington also determines its EAC "by applying a percentage adjustment to available reference pricing from national sources such as wholesale acquisition cost (WAC), average whole price (AWP), average sales price (ASP), and average manufacturer price (AMP).  See Washington State Legislature, "WAC 388-530-8000: Reimbursement method – Estimated Acquisition Cost (EAC)," found at http://apps.leg.wa.gov/WAC/default.aspx?cite=388-530-8000.

[17] Case Study of the Texas Vendor Drug Program's Approach to Estimating Drug Acquisition Costs, p. 69.

[18] Stiroh Report, Figures 2A-2K.

**Contains Highly Confidential Materials – Subject to Protective Order**

report show, the FSS prices for the drugs at issue are similar to reported AMPs and Mr. Platt's ASPs for the subject drugs.

Dr. Schondelmeyer rejects IMS data as a potential pricing alternative on the basis that IMS is allegedly not oriented towards serving third party payers or pharmacies and because it does not have a database that "would easily serve this market."[19]  Dr. Schondelmeyer writes that obtaining IMS data for every drug in the Medicaid and Medicare programs would be prohibitively expensive for Medicaid programs, providers, and third party payers.[20]  These opinions are unsupported.  Dr. Schondelmeyer does not estimate what the cost to CMS of obtaining IMS data would be, or whether purchasing IMS data would be a worthwhile expenditure as an alternative to allegedly overpaying for pharmaceutical products.  In Dr. Schondelmeyer's report "Medicaid and Medicare Drug Pricing: Strategy to Determine Market Prices," he discusses the potential for using IMS invoice data as part of the reimbursement method.  IMS invoice data is a database that surveys wholesaler and manufacturer invoices to pharmacies and other providers.  In his strategy report for Medicaid and Medicare, Dr. Schondelmeyer seemed to dismiss the concern that the database could not easily serve the market writing "the data [are] broken down by class of trade for each drug product at the NDC level" and "[i]f CMS had access to this data, little additional data processing would be necessary and the actual analysis would be fairly straightforward."[21]  While Dr. Schondelmeyer also expresses his concern that IMS may not want its data used to determine reimbursement methods, Dr. Schondelmeyer does not appear to have done any analysis or conducted any investigation to support his supposition that IMS is not oriented toward serving third party payers or would be reluctant to do so.

All of the alternative prices mentioned in Dr. Schondelmeyer's rebuttal report could have been used by Medicaid and Medicare to gauge an appropriate discount off AWP or markup on WAC when establishing drug reimbursement methodologies.  Most of these prices were and continue to be available for all of the Complaint drugs.  Moreover, some of these prices mentioned above are currently used to provide assistance in determining reimbursement methods.

As described in my initial report, the fact that some state Medicaid agencies continue to use AWP in their reimbursement methodology is consistent with the agencies' published goal of providing adequate access to covered pharmaceutical products.[22]  Neither Dr. Schondelmeyer nor any of Plaintiffs' experts can rule out the possibility that AWP-based formulas yield precisely the level of payments required to guarantee access, because none of plaintiffs' experts have evaluated the net level of payment necessary to provide "adequate compensation to providers and pharmacies" and "incentives for pharmacies and providers to supply drugs" to program beneficiaries.

---

[19] Schondelmeyer Rebuttal Report, ¶ 55.

[20] Schondelmeyer Rebuttal Report, ¶ 55.

[21] Stephen W. Schondelmeyer and Marian V. Wrobel, "Medicaid and Medicare Drug Pricing: Strategy to Determine Market Prices," August 30, 2004 ("Medicaid and Medicare Drug Pricing: Strategy to Determine Market Prices"), pp. 25-26.

[22] As discussed in my original report, the Federal Register in 1975 stated that the AWP should not be used as a basis for actual acquisition cost.  (Federal Register, July 31, 1975, Vol. 40, No. 148, 45 C.F.F 19, pp. 32293-94).

**Contains Highly Confidential Materials – Subject to Protective Order**

## C.     Dr. Schondelmeyer's Opinions Regarding Economic Incentives to Inflate Prices for Medicare Sales Are Flawed

Finally, Dr. Schondelmeyer's opinion regarding the alleged economic incentives for generic manufacturers to inflate prices for Medicare sales is unfounded and misapplied to this case.  Dr. Schondelmeyer opines that there is an economic incentive to inflate prices for Medicare sales because pharmacies allegedly stock only one or two versions of a generic drug and pharmacies "may chose the generic drug in stock based on incentives under Medicaid or other third party programs which constitute a larger share of the pharmacy's business."[23]  However, Dr. Schondelmeyer fails to offer any evidence to support his claim.  Moreover, this proposed economic incentive for pharmaceutical manufacturers to inflate the prices does not apply to drugs which are subject to common reimbursement under state Medicaid programs, which is the case for drugs covered by a FUL or a SMAC.  As indicated in my initial report in this matter, all but three of the Dey complaint drugs were subject to a FUL at some point during the alleged damage period.

## III.     Summary of Opinions Regarding Dr. Duggan's Rebuttal Report

## A.     Dr. Duggan's But-For World Is Incomplete

Dr. Duggan fails to correct the flaws in his original report that I described in my initial report in this matter.  Specifically, Dr. Duggan fails to establish that Medicare and Medicaid overpaid providers for the drugs at issue.  His model fails as a method for calculating damages because he did not take into account what he terms the "indirect effect" of the pharmacies and other providers' responses to the reduction in reimbursement that he proposes.  Dr. Duggan's attempt in his rebuttal report to justify his analysis as an "all else equal" analysis is improper and irrelevant.

Economic damages are calculated by comparing the reimbursements that the plaintiff would likely have paid in a hypothetical but-for world in which the complained-of acts did not occur to the actual reimbursements paid by the plaintiff in the real world in which the complained-of acts are alleged to have occurred.  The actual world and the hypothetical, but-for world are identical except for the acts and the impact, if any, of the acts alleged in a plaintiff's complaint.

Properly applied to the damages context, "all else equal" analyses hold exogenous market factors constant: they do not allow one to overlook basic economic relationships and still opine that the resulting calculation is in any way meaningful.  Dr. Duggan's analysis is akin to an employer saying, "If I pay my employees less, my profits will be higher" without considering that if he paid his employees less, they may leave his firm for better wages elsewhere.  The "direct" implication of Dr. Duggan's but-for prices, is that if reimbursement were reduced to the amounts he proposes, pharmacies and other providers would earn lower profits on the drugs at issue.  It is improper not to consider how this change would affect the pharmacies' willingness to supply the drugs at issue.

---

[23] Schondelmeyer Rebuttal Report, ¶ 72.

**Contains Highly Confidential Materials – Subject to Protective Order**

Dr. Duggan's attempt to dismiss this "indirect effect" by saying that if pharmacies did not supply the Dey drugs at issue, Medicaid and Medicare would have saved even more money because they would not have to reimburse on these drugs is mistaken and compounds the errors in his overall approach.[24]  First, Dr. Duggan again fails to take account of the fact that one of Medicaid and Medicare's stated goals is to ensure access to covered drugs, not to seek to save money by having some drugs not supplied.  Moreover, Dr. Duggan fails to appreciate that Medicare and Medicaid would not necessarily save any money in the scenario he envisions.  There are (or were during the damage period) alternative manufacturers for each of Dey's drugs at issue.  If pharmacies stopped supplying Dey's drugs because compensation was inadequate, the pharmacies could have substituted another generic manufacturer's products for a Medicaid or Medicare patient's prescription and Medicare and Medicaid would have simply reimbursed the purchase of a different manufacturer's drugs.  Dr. Duggan has not established that Medicaid and Medicare would have paid providers lower amounts on these other drugs.  Thus, again, Dr. Duggan fails to establish that Medicaid and Medicare overpaid providers for the drugs at issue.

Dr. Duggan writes "[w]hen estimating the causal effect of one variable on some other variable, it is common practice in applied microeconomics to hold other factors constant and to focus on the direct rather than indirect effects."[25]  This is incorrect, and does not apply in this context.  Such an analysis is termed a partial equilibrium analysis and is misplaced in a damages context.  It is inappropriate to hold all else equal if the resulting outcome imposes irrational responses on the part of market participants.  The results of a partial equilibrium analysis could not be used for policy determination, because the full impact of the proposed policy could not be evaluated unless one took into effect the "indirect" effects Duggan seeks to ignore.  Similarly, it is inappropriate in a damages setting for a plaintiff to assert that if price were higher he would have made greater profits, without considering whether, if price were higher total sales would have fallen.  Such naïve calculations have been routinely dismissed by courts, and Dr. Duggan essentially seeks to makes the mirror image of just such a naïve calculation here.

The calculations performed by Dr. Duggan are not damage calculations and cannot be supported as such by asserting that this style of analysis is common practice.  Dr. Duggan appeared to be aware of the shortcomings of his calculations by resisting calling them a damages analysis during his deposition. [26]  He did not claim that it would have been economically rational for Medicaid and Medicare to pay the reimbursement amounts he calculated and he did not claim to have evaluated the likely response of pharmacies to the prices he proposed.  In his rebuttal report, Dr. Duggan appears now to be attempting to justify his calculation as a full-fledged damage analysis by offering examples of situations in which dispensing fees were not increased when drug

---

[24] See Rebuttal Report of Mark G. Duggan, April 23, 2009 ("Duggan Rebuttal Report"), p. 4.

[25] Duggan Rebuttal Report, p. 2.

[26] Deposition of Mark Duggan, February 26, 2009 ("Duggan Deposition"), p. 121.  ("[W]hat my report set out to do was to show how the difference, the total Medicaid and Medicare spending would change as a function of these alternative prices.  There are an infinite number of possible statistics one could use."  He also states that "I basically examine how reimbursement would have been affected if the AWPs and WACs had been replaced, as I described in my report."  (Duggan Deposition, p. 23).  Later, when asked if his number was a damage number, Dr. Duggan replied that "[t]his number represents how much greater Medicaid spending was for the complaint NDCs by the federal government than it would have been in [sic] the alternative AWPs and WACs had been used as I lay out in my report."  (Duggan Deposition, p. 244).

**Contains Highly Confidential Materials – Subject to Protective Order**

ingredient reimbursement payments were decreased.[27]  The examples referred to by Dr. Duggan do nothing to address the general failing in his report – namely, that he has not established that Medicaid and Medicare overpaid on Dey's or any other manufacturer's drugs.

The examples that Dr. Duggan offers in support of the proposition that total reimbursement payments would fall by the gross reduction in drug ingredient reimbursement all appear to come from the 2000-2001 reduction in AWPs associated with the implementation of DOJ-AWPs.[28]  As explained in my initial report, the DOJ-AWPs (referred to in that report as NAMFUCU prices) were discontinued or never used by some states because pharmacies and other providers had responded, saying that the new prices were inaccurate, not readily available to providers, and did not provide adequate compensation to providers.[29]  Thus, the DOJ-AWP examples do nothing to support Dr. Duggan's unfounded supposition that his calculation a) represents damages, and b) represents a lower bound on damages.

## B.    Dr. Duggan's Prices Are No Less Arbitrary than He Claims Reported AWPs to Be

Dr. Duggan repeatedly implies that current AWPs are not "truthful."[30]  However, Dr. Duggan's own suggested AWPs (125 percent of his calculated ASPs) are themselves arbitrarily inflated numbers, seemingly similar to Plaintiffs' complaints regarding Dey's AWPs and WACs.  In fact, Dr. Duggan agrees that his calculation of the 125 percent is not the result of "some economic analysis."[31]  According to his deposition testimony, Dr. Duggan decided to use 125 percent of his

---

[27] See Duggan Rebuttal Report, pp. 5-7.

[28] Duggan Rebuttal Report, pp. 4-6.

[29] See, for example, Stiroh Report, Footnotes 141-43.  Medicare carriers were also instructed by the Department of Health and Human Services to not use the DOJ-AWP prices. (See Program Memorandum AB-00-115, Re: Source of Average Wholesale Price Data in Pricing Drugs and Biologicals Covered by the Medicare Program, November 17, 2000).  Ms. DeParle, former Administrator at CMS/HCFA, stated in her deposition that Medicare was instructed not to use the prices for oncology and other related drugs because of "concerns over access to patient care."  (See Deposition of Nancy-Ann Min DeParle, former Administrator at CMS/HCFA, December 5, 2007, pp. 464-65).

[30] Throughout his rebuttal report, Dr. Duggan poses questions asking what the effect would be if Dey had reported more "truthful" prices.  For example, Dr. Duggan asks "[w]ould the more truthful reporting by Dey have caused its competitors to report more truthful prices?"  (Duggan Rebuttal Report, p. 3).  After citing to many different factors that might change if Dey's reporting of its prices, Dr. Duggan states that "[a]ll of these factors and many more become potentially relevant once one opens up the possibility that truthful price reporting by Dey would have had indirect effects."  (Duggan Rebuttal Report, p. 4).  In discussion of Medicaid utilization, he writes that "Thus even with this massive change in AWPs, there was not a correspondingly significant change in utilization, thus undermining the claim that utilization of Dey's Complaint products would have plummeted if they had reported more truthful AWPs." (Duggan Rebuttal Report, p. 5).

[31] Duggan Deposition, pp. 121-22.  ("Q: But the 125 is not the result of some economic analysis that led you to 125, is it?  A: Well, I believe the analysis that I just described of the state of adjudication algorithms isn't, I would call that an analysis that has been undertaken.")

**Contains Highly Confidential Materials – Subject to Protective Order**

calculated ASP because "it is consistent with a scaling factor that [Dr. Duggan] used in [his] Abbott report."[32]

Thus, Dr. Duggan's but-for prices are as arbitrary as he claims Dey's reported prices to be. However, as stated in my initial report, and repeated here, Dey's prices are not arbitrary: Dey's AWP is set in meaningful relation to the brand AWP and its WACs are undiscounted invoice prices to wholesalers. Dr. Duggan's invention of a "transaction-based AWP" equal to 125 percent of the average pharmacy indirect price is no less arbitrary than an AWP set to 10 percent below the brand is implied to be. Dr. Duggan's price is just lower.

Signed this 7th day of May 2009:


*Lauren Stiroh*
_____

Lauren J. Stiroh

---

[32] Duggan Deposition, p. 113. Dr. Duggan later states that "[t]here are an infinite number of possible statistics that one could use…The average price. The 95[th] percentile price, 125 percent of the average which is ensuring that in the vast majority of cases, the Medicaid adjudication algorithm would not reimburse below average cost, even with their AWP discounts." (Duggan Deposition, p. 121).

**Contains Highly Confidential Materials – Subject to Protective Order**

# NERA
Economic Consulting

NERA Economic Consulting
50 Main Street
White Plains, New York 10606
Tel:  +1 914 448 4000
Fax: +1 914 448 4040
www.nera.com

Exhibit 1

## Additional Documents Considered by Lauren J. Stiroh

**Court Filings**

Order Granting Motion for Temporary Restraining Order, Washington State Pharmacy
 Association; National Community Pharmacists Association; National Association of Chain
 Drug Stores; Shiraz Specialty Pharmacy, Inc.; Cathlamet Pharmacy, Inc.; Cammack's
 Pharmacies, Inc. d/b/a Jim's Pharmacy; Independent Pharmacists Relief Service, Inc. d/b/a
 Ritzville Drug Company; Soas, L.L.C.; Camp-Riley Drug Company d/b/a Pharm-a-Save; and
 Paul Glasebrook, Plaintiffs vs. Christine Gregoire; Stan Marshburn; and Washington State
 Department of Social and Health Services, Defendants, United States District Court -
 Western District of Washington, No. C09 5174-BHS, March 31, 2009


**Expert Reports**

Declaration of Stephen W. Schondelmeyer, March 27, 2009 and accompanying exhibit

Rebuttal Report of Mark G. Duggan, April 23, 2009 and information relied upon

Rebuttal Report of Stephen W. Schondelmeyer, April 23, 2009 and information relied upon


**Deposition**

Deposition of Simon D. Platt, March 18, 2009


**Publicly Available Information**

Centers for Medicare & Medicaid Services website, www.cms.hhs.gov:
 Medicaid Prescription Reimbursement Information by State – Quarter Ending March 2009

Klass, Tim, "Judge blocks Washington state's Medicaid prescription cuts," *The Seattle Times,*
 March 31, 2009

Klass, Tim "Judge blocks state's Medicaid prescription drug plan," *KOMO News – Seattle,*
 March 31, 2009

Washington State Legislature website, www.apps.leg.wa.gov:
 WAC 388-530-8000: Reimbursement Method – Estimated Acquisition Cost (EAC)


**Other**

IMS Health, Dataview User's Guide (Version 2.0), Appendix A: IMS Audit Information


**Contains Highly Confidential Materials Subject to Protective Order**