# EXHIBIT 8

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**Centers for Medicare & Medicaid Services**

**42 CFR Parts 403, 405, 410, 411, 414, 418, 424, 484, and 486**

[CMS–1429–FC]

RIN 0938–AM90

**Medicare Program; Revisions to Payment Policies Under the Physician Fee Schedule for Calendar Year 2005**

**AGENCY:** Centers for Medicare & Medicaid Services (CMS), HHS.

**ACTION:** Final rule with comment period.

**SUMMARY:** This final rule refines the resource-based practice expense relative value units (RVUs) and makes other changes to Medicare Part B payment policy. These policy changes concern: supplemental survey data for practice expense; updated geographic practice cost indices for physician work and practice expense; updated malpractice RVUs; revised requirements for supervision of therapy assistants; revised payment rules for low osmolar contrast media; changes to payment policies for physicians and practitioners managing dialysis patients; clarification of care plan oversight requirements; revised requirements for supervision of diagnostic psychological testing services; clarifications to the policies affecting therapy services; revised requirements for assignment of Medicare claims; addition to the list of telehealth services; and, several coding issues. We are making these changes to ensure that our payment systems are updated to reflect changes in medical practice and the relative value of services.

This final rule also addresses the following provisions of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (Pub. L. 108–17) (MMA): coverage of an initial preventive physical examination; coverage of cardiovascular (CV) screening blood tests; coverage of diabetes screening tests; incentive payment improvements for physicians in shortage areas; payment for covered outpatient drugs and biologicals; payment for renal dialysis services; coverage of routine costs associated with certain clinical trials of category A devices as defined by the Food and Drug Administration; hospice consultation service; indexing the Part B deductible to inflation; extension of coverage of intravenous immune globulin (IVIG) for the treatment in the home of primary immune deficiency diseases; revisions to reassignment provisions; and, payment for diagnostic mammograms, physicians' services associated with drug administration services and coverage of religious nonmedical health care institution items and services to the beneficiary's home.

In addition, this rule updates the codes subject to the physician self-referral prohibition, discusses payment for set-up of portable x-ray equipment, discusses the third five-year refinement of work RVUs, and solicits comments on potentially misvalued work RVUs.

We are also finalizing the calendar year (CY) 2004 interim RVUs and are issuing interim RVUs for new and revised procedure codes for CY 2005.

As required by the statute, we are announcing that the physician fee schedule update for CY 2005 is 1.5 percent, the initial estimate for the sustainable growth rate for CY 2005 is 4.3, and the conversion factor for CY 2005 is $37.8975.

**DATES:** *Effective Date:* These regulations are effective on January 1, 2005.

*Applicability Date:* Section 623 of the MMA, that is, the case-mix portion of the revised composite payment methodology and the budget neutrality adjustment required by the MMA, is applicable on April 1, 2005.

*Comment Date:* To be assured consideration, comments must be received at one of the addresses provided below, no later than 5 p.m. on January 3, 2005.

**ADDRESSES:** In commenting, please refer to file code CMS–1429–FC. Because of staff and resource limitations, we cannot accept comments by facsimile (FAX) transmission.

You may submit comments in one of three ways (no duplicates, please):

1. *Electronically.* You may submit electronic comments on specific issues in this regulation to *http://www.cms.hhs.gov/regulations/ecomments.* (Attachments should be in Microsoft Word, WordPerfect, or Excel; however, we prefer Microsoft Word.)

2. *By mail.* You may mail written comments (one original and two copies) to the following address ONLY: Centers for Medicare & Medicaid Services, Department of Health and Human Services, Attention: CMS–1429–FC, P.O. Box 8012, Baltimore, MD 21244–8012.

Please allow sufficient time for mailed comments to be received before the close of the comment period.

3. *By hand or courier.* If you prefer, you may deliver (by hand or courier) your written comments (one original and two copies) before the close of the comment period to one of the following addresses. If you intend to deliver your comments to the Baltimore address, please call telephone number 800–743–3951 in advance to schedule your arrival with one of our staff members. Room 445–G, Hubert H. Humphrey Building, 200 Independence Avenue, SW., Washington, DC 20201; or 7500 Security Boulevard, Baltimore, MD 21244–1850.

(Because access to the interior of the HHH Building is not readily available to persons without Federal Government identification, commenters are encouraged to leave their comments in the CMS drop slots located in the main lobby of the building. A stamp-in clock is available for persons wishing to retain a proof of filing by stamping in and retaining an extra copy of the comments being filed.)

Comments mailed to the addresses indicated as appropriate for hand or courier delivery may be delayed and received after the comment period.

*Submission of comments on paperwork requirements.* You may submit comments on this document's paperwork requirements by mailing your comments to the addresses provided at the end of the "Collection of Information Requirements" section in this document.

For information on viewing public comments, see the beginning of the **SUPPLEMENTARY INFORMATION** section.

**FOR FURTHER INFORMATION CONTACT:**

Pam West (410) 786–2302 (for issues related to Practice Expense, Respiratory Therapy Coding, and Therapy Supervision).

Rick Ensor (410) 786–5617 (for issues related to Geographic Practice Cost Index (GPCI) and malpractice RVUs).

Craig Dobyski (410) 786–4584 (for issues related to list of telehealth services or payments for physicians and practitioners managing dialysis patients).

Bill Larson or Tiffany Sanders (410) 786–7176 (for issues related to coverage of an initial preventive physical examination).

Cathleen Scally (410) 786–5714 (for issues related to payment of an initial preventive physical examination).

Joyce Eng (410) 786–7176 (for issues related to coverage of cardiovascular screening tests).

Betty Shaw (410) 786–7176 (for issues related to coverage of diabetes screening tests).

Anita Greenberg (410) 786–0548 (for issues related to payment of cardiovascular and diabetes screening tests).

David Worgo (410) 786–5919, (for issues related to incentive payment

Portions Omitted

Act to exclude payment for screening and diagnostic mammograms from the OPPS. Beginning January 1, 2005, we will pay for diagnostic mammograms under the OPPS based on the payments established under the physician fee schedule. Thus, both diagnostic and screening mammography services provided in the OPPS setting will now be paid based on the physician fee schedule.

*Comment:* Commenters expressed support for this proposed change in payment and believe it will assist in ensuring that these services are available to women at risk for breast cancer.

*Response:* We agree that it is important to ensure access to these services. Additional discussion of the MMA provision can also be found in the OPPS final rule, "Medicare Program; Changes to the Hospital Outpatient Prospective Payment System and CY 2005 Payment Rates" currently under development.

*O. Section 305—Payment for Inhalation Drugs*

The August 5, 2004 proposed rule contained the ASP plus 6 percent payment amounts based on data received from manufacturers' ASP for the first quarter of 2004 for albuterol sulphate and ipratropium bromide. We indicated that such payment amounts were not the payment rates for 2005 and specified that Medicare payment rates for the first quarter of 2005 would be based on data submitted by manufacturers from the third quarter of 2004.

We proposed to establish a separate dispensing fee for inhalation drugs. We noted that Medicare currently pays a monthly dispensing fee of $5 for each inhalation drug used in a nebulizer. We requested information about an appropriate dispensing fee amount.

We also proposed to make several changes related to billing for inhalation drugs. We proposed to allow a prescription for inhalation drugs written by a physician and filled by a pharmacy to be increased from 30-day to a 90-day period. We indicated that we had recently revised the guidelines regarding the time frame for delivery of refills of DMEPOS products to occur no sooner than "approximately five days" prior to the end of usage for the current product. We emphasized the word "approximately" in this time frame. The change allows shipping of inhalation drug refills on "approximately" the 25th day of the month in the case of a 30-day supply and on "approximately" the 85th day in the case of a 90-day supply. We indicated our belief that such revision eliminates the need for suppliers to use overnight shipping of inhalation drugs and allows shipping of inhalation drugs by less expensive ground service.

We also clarified the ordering requirements for DMEPOS items, including drugs. Drugs, including, inhalation drugs, can be dispensed with a verbal physician order and without a written prescription. Although a written prescription must be obtained before submitting a claim, we reiterated that we allowed photocopied, electronic, or pen and ink prescriptions. We pointed out the recent revision to the Program Integrity Manual of acceptable proof of delivery requirements for DMEPOS items. Finally, we proposed to eliminate the requirement that pharmacies have a signed Assignment of Benefits (AOB) form from a beneficiary in order for Medicare to make a payment. Our proposal would eliminate a billing requirement for all drugs, including inhalation drugs and other items where Medicare payment is only made on an assigned basis.

*Comment:* A number of commenters, particularly retail pharmacies, indicated that they are not able to obtain albuterol sulfate at the $0.04 per milligram and ipratropium bromide at the $0.30 per milligram rates specified in the proposed rule based on manufacturer submissions of data for the first quarter of 2004. A large company indicated that the ASPs stated in the proposed rule for albuterol sulfate and ipratropium bromide were extremely close to its own acquisition costs and inferred that the payment amount would be below smaller providers' purchase prices. A commenter questioned the suggestion in the proposed rule that because albuterol sulfate and ipratropium bromide are generic drugs with multiple manufacturers a pharmacy might be able to obtain them at a price below the average. The commenter suggested that this is highly speculative because we have not yet received the information from manufacturers to set the ASP for the first quarter of 2005.

*Response:* The ASP plus 6 percent prices for drugs in the proposed rule were calculated based on manufacturer submissions of data covering the first quarter of 2004. We indicated that such ASP plus 6 percent figures were not actual payment rates for the first quarter of 2005. ASP data submitted by manufacturers for the second quarter of 2004 show some significant changes for inhalation drugs. The data show that the ASP plus 6 percent would be $0.05 per milligram for albuterol sulfate, a 25 percent increase, and $0.45 per milligram for ipratropium bromide, a 50 percent increase. We also note that in its recent study, "Medicare: Appropriate Dispensing Fee Needed for Suppliers of Inhalation Therapy Drugs" (GAO–05–72), the GAO found that acquisition costs of inhalation drugs varied widely. The GAO found that acquisition costs of albuterol sulfate ranged from $0.04 to $0.08 and ipratropium bromide ranged from $0.23 to $0.64. Based on the submission of manufacturer's average sales price data for the second quarter of 2004, Medicare's payment rates for ipratropium bromide and albuterol sulfate are within the acquisition cost range found by the GAO. The GAO also found that acquisition cost was not necessarily related to the size of the supplier.

*Comment:* One commenter suggested that we should consider delaying the implementation of cuts in Medicare reimbursement for inhalation drugs until 2006. The commenter suggested that a delay would ensure that physicians and beneficiaries have a range of options available for managing respiratory diseases.

*Response:* We do not believe that we can delay the implementation of the ASP payment system until 2006 because the MMA provides for the implementation of the ASP payment system in 2005.

*Comment:* Commenters strongly supported our proposal to pay a separate dispensing fee for inhalation drugs, but we received varied comments on the scope of services appropriately included in a dispensing fee. Commenters indicated that an appropriate dispensing fee is necessary because the costs associated with dispensing these drugs typically exceed ASP plus six percent. Without adequate compensation, commenters argued that Medicare beneficiary access to inhalation drugs would be harmed. Commenters referenced an August 2004 report prepared for the American Association of Homecare (AAH) by a consultant that surveyed 109 homecare pharmacies between the end of May and the middle of July 2004. Commenters cited survey results from the report suggesting that 89 percent of suppliers would discontinue providing inhalation drugs to Medicare beneficiaries in the absence of adequate compensation. One commenter believes it is reasonable to expect that reducing Medicare payment for inhalation drugs will trigger an increase in emergency room visits, doctor visits, and hospital admissions. Other commenters suggested a dispensing fee that is too low would result in a concentrated market, thereby adversely affecting beneficiary choice and access.

The AAH study indicated that in order to maintain 2004 levels of service to Medicare beneficiaries and provide an operating margin of 7 percent, Medicare would have to pay an additional payment of $68.10 per service encounter. This figure includes an average of the costs reported as being incurred during the first quarter of 2004 for the pharmacies that responded to the AAH survey. The study defined a service encounter as each instance one or more billing codes were submitted to Medicare for payment. The study reported that the typical Medicare beneficiary has 8.8 service encounters each year, or one service encounter every 42 days. Most commenters who cited the AAH study supported a fee of $68.10 per service encounter.

Commenters also cited another AAH report, dated September 2001 (and updated to 2003) from a different consultant, who surveyed a sample of 19 homecare pharmacies and found that drug acquisition costs accounted for 26 percent of costs incurred by homecare pharmacies. Facility, labor, delivery, patient care and education, billing and collection costs and other direct costs were found to account for 46 percent; indirect costs such as management information systems, regulatory compliance programs, professional liability insurance and field and corporate administration was 25 percent; and bad debt was 3 percent. The study concluded that homecare pharmacies generated after-tax returns of 9.2 percent.

A retail pharmacy commented that a dispensing fee five to six times the current dispensing fee of $5 is necessary to cover its costs. Another retail pharmacy indicated that a dispensing fee of $25 would be an adequate dispensing fee, including the additional costs of processing Medicare claims and instructing the patient on using the drugs, and would be profitable for it.

A manufacturer urged CMS to conduct a study of the appropriate pharmacy activities and their costs in calculating a dispensing fee. The commenter believes such a study would yield a more accurate amount than data and information provided as part of comments to proposed rules does. One inhalation company indicated that the costs of rent, delivery and salary had recently increased by specific percentages. Several commenters opposed the inclusion in the dispensing fee of a transitional payment. Another commenter strongly urged establishing a dispensing fee that include an appropriate transitional payment, given the significant payment reductions scheduled to begin in 2005.

On the scope of services, commenters indicated that various services involved with dispensing inhalation drugs to Medicare beneficiaries such as: (i) Training beneficiaries and caregivers on proper use of drugs with nebulizers; (ii) establishing and revising a plan of care and coordinating care; (iii) providing in-home visits; (iv) providing 24-hours/7-days a week on-call personnel; (v) contacting physicians and beneficiaries regarding dispensing of inhalation drugs; (vi) providing follow-up contact with beneficiaries, including compliance monitoring and refill calls. Commenters indicated that they felt CMS has the authority to pay for costs associated with delivering inhalation drugs under the durable medical equipment (DME) benefit.

An association representing pharmacists recommended an expansion of Part B to include compensation for therapy management services furnished by pharmacists. An association representing respiratory therapists recommended a separate payment for beneficiary training by practitioners with documented evidence of education, clinical training and competency testing, such as respiratory therapists. A company suggested that we establish a basic dispensing fee and separately reimbursable codes for those who provide additional services, reflecting the range of management services involved with inhalation drugs. Another association acknowledged that although limited peer reviewed studies exist on the role of homecare providers and the respiratory practitioners in furnishing care to COPD patients, significant anecdotal data and a consensus within the pulmonary medicine and respiratory therapy professional communities support the role and contribution of home respiratory care providers. Several commenters indicated that training a beneficiary on using a nebulizer should also be reimbursed. However, they pointed out that training cannot be done by the physician or physician's staff because many physicians do not have a nebulizer on which to train the beneficiary and the Medicare payment is not sufficient to cover the physician's staff time.

*Response:* We appreciate the support for our proposal to establish a dispensing fee as well as the information about the levels and components of such a fee.

The October 12, 2004 GAO report is based on a survey of 12 companies representing 42 percent of the inhalation therapy market. The GAO found wide variation in suppliers' monthly costs associated with dispensing inhalation drugs. In addition, the GAO found that large suppliers do not necessarily have lower costs and do not necessarily realize economies in costs associated with dispensing inhalation therapy drugs. The GAO indicated that the wide range is due in part to the range of services offered by suppliers and that some costs incurred by suppliers may not be necessary to dispense inhalation drugs, for example marketing, overnight shipping, and 24-hour hotlines for beneficiary questions. The GAO report indicates that the range of costs suppliers are incurring is a good starting point for a dispensing fee amount, but that the appropriate dispensing fee Medicare pays must take into account how excess payments affect the costs.

We note the extreme variation that the GAO found in the costs of dispensing nebulized drugs to Medicare beneficiaries: GAO found that per patient monthly costs of dispensing these medications ranged from a low of $7 to a high of $204 in 2003. Because it appears that the GAO survey and the 2004 AAH survey may have included different costs and services, further research is needed to understand these differences. In addition to the GAO and AAH studies, we note the wide range of comments indicating what services a dispensing fee should cover. We believe that before a determination can be made as to an appropriate dispensing fee for inhalation drugs after 2005, we need to more fully understand the components of and the reasons behind the current variability in the costs of furnishing of these drugs and the services being provided. We intend to work with the AAH, others concerned with inhalation therapy and our partners in the Department of Health and Human Services to explore these issues more fully.

In the interim, for 2005, we are establishing a $57 monthly fee and an $80 90-day fee for furnishing inhalation drugs using data in the AAH study and the GAO report. We established the monthly fee based on the weighted average of the costs for new and established patients from the 2004 AAH study after excluding sales and marketing, bad debt, and an explicit profit margin. Because the AAH study did not establish a fee for the 90-day period, we applied the methodology used in the GAO report to the data in the AAH study to calculate the 2005 90-day fee. Accordingly, we assumed that direct costs associated with a monthly fee are similar to the direct costs associated with the 90-day fee and then we tripled the indirect costs. We intend to further examine the conversion of per

encounter costs as reported in the AAH study to comparable monthly and 90-day cost figures.

We note that although the AAH study contained costs related to services that may be of potential benefit to our beneficiaries, and many commenters indicated that we should provide payment for these and the other services described above, we are concerned that these services may be outside the scope of a dispensing fee. We are continuing to study these services and associated cost categories as the new payment systems are implemented and we gain experience with them. We intend to revisit this issue and proceed through notice and comment rulemaking in order to establish an appropriate dispensing fee for 2006.

*Comment:* A commenter suggested that the dispensing fee be established on a per dose basis. It was argued that this would provide Medicare with protection against pharmacies dispensing partial shipments or shipments more frequently than 30 or 90 days in order to increase the number of dispensing fees. We received comments in support of a need-based dispensing fee to accommodate additional drugs when beneficiaries suffer from disease flare-ups. We also received comments indicating that beneficiary's prescriptions change, often during the first month. Other commenters cited the AAH study, which calculated different costs associated with dispensing inhalation drugs for new patients and established patient.

*Response:* The dispensing fee we are establishing covers all drugs shipped to a beneficiary during a month (or 90-day period) regardless of the number of times a supplier ships inhalation drugs to a beneficiary. If a supplier does not supply the prescription in full, it is the supplier's responsibility to fill and deliver the remainder of the prescription, but Medicare will not pay additional monthly dispensing fees. We will monitor the issue about partial shipments and potentially erroneous billing for multiple monthly dispensing fees. We also are concerned that a per-dose dispensing fee could provide an incentive to supply more drugs.

The 2005 fee is an average across all beneficiaries, new and established, and covers additional drugs shipped during a month if a beneficiary's prescription changes. We will study the issue further of different dispensing fees for new and established beneficiaries and the frequency that additional drugs are shipped for prescription changes.

*Comment:* A manufacturer recognized that compounded products can be covered under certain circumstances and that compounding could be included appropriately in a dispensing fee. Another manufacturer expressed concern about including compounding in the activities that a dispensing fee covers. A suggestion was made that a HCPCS modifier be used for inhalation drugs that are compounded.

*Response:* The costs of compounding are included in the AAH study but are not separately identified in the direct cost line items. Because the 2005 fee is based on the AAH study, we need to avoid duplicate payment. With compounding bundled into the fee for 2005, we have concerns about paying separately for compounding in 2005.

*Comment:* A commenter recommended that we address compounding circumstances that might be inconsistent with FDA's policy prohibiting pharmacy compounding of two or more separate FDA-approved products when a combination product approved by the FDA is commercially available and compounding that might be done without the necessary controls to ensure drug product sterility and potency.

*Response:* The fact that we consider compounding to be included in the 2005 fee to furnish inhalation drugs does not in any way support practices that are inconsistent with FDA guidelines.

*Comment:* The commenter also suggested that we consider creating a HCPCS modifier for drugs that a prescribing physician intends to be compounded but which a pharmacy dispenses separately in non-compounded form. The commenter believes that such a modifier would help discourage pharmacies from leaving the responsibility for compounding to the beneficiary who would be combining the drugs in non-sterile, uncontrolled conditions.

*Response:* We understand the commenter's concerns and will study this issue.

*Comment:* We received comments suggesting that the actual savings attributable to MMA section 305 may be both higher and lower than the November 20, 2003 Congressional Budget Office (CBO) estimate for MMA section 305. One company suggested that the actual savings could be less than estimated by CBO because the ASP model potentially motivates drug manufacturers to increase drug costs, which will be directly passed on to the government. Other commenters cited two different estimates from the AAH report. Using one calculation, the commenters argued that a dispensing fee of $68.10 per encounter would still enable Medicare to achieve savings of $350 million per year or more than $4 billion over 10 years. Using another calculation, the commenters argued that the savings would be $7 billion over the 10-year budget-scoring window. The commenters indicated that the $4 billion savings figure was comparable to the initial projections made by the Congressional Budget Office (CBO) in 2003 and the $7 billion figure was in excess of the CBO estimated savings. Commenters cited these figures to argue that establishment of a per service encounter fee of $68.10 would set the payment at the level originally envisioned by Congress. Another commenter suggested that a dispensing fee of $0.85 per 2.5 mg dose for albuterol sulfate and $0.97 per dose for a blended mix of other inhalation drugs including ipratropium bromide would be consistent with what they believe are the 17.7 percent savings assumed by CBO. One commenter indicated that CBO underestimated the savings from section 305.

*Response:* MMA specifically requires the use of the ASP methodology to establish more appropriate payment rates for drugs. MMA explicitly requires the establishment of a supplying fee for Part B covered oral drugs as determined to be appropriate by the Secretary. MMA also explicitly requires establishment of a furnishing fee for blood clotting factors. However, MMA does not specify a particular dispensing fee amount for inhalation drugs, nor does MMA specify a method to determine a dispensing fee for inhalation drugs. Accordingly, CMS used existing authority to propose in the NPRM that an appropriate dispensing fee be established. Because MMA did not require a specific method or amount for a dispensing fee for inhalation drugs, we find the arguments unpersuasive that a dispensing fee of a particular amount was envisioned by Congress or consistent with Congressional intent as reflected in a CBO estimate.

*Comment:* We received comments that supported and opposed the use of 90-day prescriptions. One commenter supporting the proposed change indicated that most beneficiaries who receive nebulized medications suffer from chronic lung diseases and will require medication to manage their disease for prolonged periods. The commenter indicated that allowing a prescription for 90-days would reduce paperwork and redundant effort for beneficiaries, physicians and DME suppliers. A commenter indicated that there would be modest savings in dispensing, billing and shipping costs with allowance of a 90-day supply of

refills. One company suggested savings of 12.5 percent, most notably in shipping. Commenters opposing 90-day prescriptions gave various reasons, including that beneficiaries may experience side effects and change prescriptions within the first month and a certain percent of beneficiaries die each month resulting in non-returnable product. In addition, some argued that pharmacy savings for a 90-day shipment would not be significant because shipping costs account for only an estimated 16 percent of supplier's non-acquisition costs associated with providing inhalation drugs. Another company argued that a 90-day shipment would substantially increase provider's expenses for boxes and shipping. Some commenters agreed that certain chronic use medications should be provided in larger quantities, but urged caution due to the practices of some suppliers who automatically ship additional product without knowing whether the patient's current supply is exhausted. Some comments suggested that a 60-day supply might be more cost-effective in the long-term because there would be a reduced risk that large quantities of medications might be wasted. Another commenter suggested that the policy be defined to cover only drugs that are proven to be stable for at least 90 days following dispensing.

*Response:* As we indicated in the proposed rule, we believe that reasonableness should govern filling a monthly vs. 90-day prescription depending on the circumstances of the beneficiary. We agree with the commenter that the initial prescription for a new patient should be written for a 30-day period because of the potential for adverse reactions or changes in the treatment regimen. We would expect prescriptions for new patients to be for 30-day periods. In addition, we believe that it is reasonable for physicians to write a 30-day prescription for those beneficiaries who they believe are less stable. Similarly, we believe that refill prescriptions for 90-day periods are reasonable, particularly for stable beneficiaries. Although the Medicare program would achieve savings from the appropriate use of 30-day and 90-day prescriptions, we believe that given the comments it would be prudent for us to monitor the 90-day supply issue. Section 4.26.1, the Proof of Delivery Methods section of the Program Integrity Manual, instructs that suppliers of DMEPOS product refills contact the beneficiary prior to dispensing the refill to ensure that the refilled item is necessary and confirm any changes or modifications to the order. Suppliers who ship either a 30-day or 90-day supply of inhalation drugs without knowing the beneficiary's current supply is exhausted would be in violation of this policy. The 90-day period should not be of concern for inhalation drugs because most of these drugs are stable for at least 90-days and thus can be dispensed for such period. We would revisit this issue if additional inhalation drugs that are unstable after 90-days become available.

Because we received limited data on costs of furnishing a 90-day supply, it is more difficult to determine a 2005 fee for furnishing a 90-day supply of inhalation drugs. However, given that this is an optional payment arrangement for beneficiaries whose course of treatment has stabilized to the point that the required dosage can be predicted with a reasonable degree of certainty over a 90-day period, we believe that it is important to establish a 90-day fee. As described earlier, we are establishing a 90-day fee for furnishing inhalation drugs by applying the methodology from the GAO report to the data in the AAH study. We assumed all of the direct costs associated with a monthly fee are similar to the direct costs associated with a 90-day fee and we tripled the indirect costs. We plan to study this issue further.

*Comment:* Many commenters acknowledged that most DMEPOS items, including drugs, can be dispensed based on verbal orders. Several commenters objected to the requirement that a written order from the physician still must be obtained before billing. They suggested that we revise policy so that a prescription could be both filled and billed based solely on a verbal order from a physician. They pointed out that the requirement that a pharmacy still obtain a written order for a prescription in order to be able to bill Medicare creates a significant administrative burden for a pharmacy because it often requires persistent follow-up with a physician. Another commenter suggested that we consider accepting electronic transmissions of prescriptions, for example, e-scripts. Another commenter requested clarification of the rule for dispensing based on a verbal order for inhalation drugs and the proposed requirement that an order for an item of DMEPOS be signed and dated within 30 days of a face-to-face examination of a beneficiary.

*Response:* The policy that allows dispensing based on a verbal order but requires a written order for billing applies to all DMEPOS items. This policy balances fraud and abuse concerns with prompt dispensing of DMEPOS items to beneficiaries. Written orders from the physician can be faxed, photocopied, or provided via electronic or pen and ink forms. In accordance with current policy, pharmacies may accept electronic prescriptions from physicians.

Beneficiaries receiving inhalation drugs are having face-to-face exams routinely and generally do not need additional visits to re-order their drugs. A single face-to-face exam is generally sufficient for items ordered, that is, we would not require a separate face-to-face exam for the nebulizer and for the inhalation drugs. We assume that physicians would order them at the same time because they are used together.

*Comment:* One commenter supported the revision made earlier this year that provides flexibility regarding the timeframe for refilling Medicare prescriptions. The commenter noted that most third party plans allow pharmacies to refill prescriptions within five days of the end of usage for the previous prescription quantity dispensed. Another commenter recommended that the time frame for subsequent deliveries be expanded beyond five days. The commenter indicated that they believe a five-day time frame is too short a period for ground service and would not eliminate the need for overnight shipping. This is based on the commenter's experience that beneficiaries do not respond to calls to confirm that they need additional supply until the beneficiary has only a few days' supply left.

*Response:* As we indicated in the proposed rule, the revised time frame for delivery of refills of DMEPOS products provides for refills to occur no sooner than "approximately five days prior to the end of the usage for the current product." In the proposed rule we emphasized the word "approximately." While we believe that normal ground service would allow delivery in five days, if there were circumstances where ground service could not occur in five days, the guideline would still be met if the shipment occurs in six or seven days. As another commenter noted, the five-day standard is consistent with the time frame for shipping used by most third party plans. Given the consistency with private sector plans, because the requirement applies to all DMEPOS product refills, and because the standard is not a firm five-day limit, we do not believe that it is necessary to lengthen the standard. We will study further the ability of a supplier to contact beneficiaries for refills compared with its ability to provide

beneficiary and caregiver training on a monthly basis.

*Comment:* One commenter indicated that the DMERCs have not consistently implemented the revised proof of delivery provisions but that they are engaged in dialogue with CMS and the DMERCs to clarify the requirements and standardize their interpretation across the four DMERCs. Other commenters suggested that the proof of delivery requirement be eliminated.

*Response:* We encourage dialogue to ensure consistent understanding and application of the proof of delivery requirements. The proof of delivery requirements have recently undergone an extensive review and revision and, based on the need to prevent fraud and abuse, we see a need to continue them.

*Comment:* Those commenters who addressed our proposed elimination of the Assignment of Benefits (AOB) form for items and services, including drugs, where assignment is required by statute, supported our proposed change. Commenters agreed that obtaining an AOB in each instance is redundant because the supplier is required by statute to accept the assignment. Some commenters suggested that a onetime AOB be obtained from the beneficiary that will be valid for every DMEPOS item he or she receives during the period of his or her medical necessity.

*Response:* We appreciate the support for our proposal. As discussed in section IV of this final rule, we are adopting our proposal to eliminate the requirement for AOB form for items and services, including drugs, where assignment is required by statute. We do not agree with the suggestion to allow for a one-time AOB form to cover items and services provided in the future because there could be fraud and abuse issues.

*Comment:* We received conflicting comments about the impact of the changes and clarifications relating to billing requirements on the costs of dispensing inhalation drugs.

Commenters differed on the impact of the revisions to the proof of delivery requirements that we pointed out in the proposed rule that went into effect in early 2004. One company that currently uses automated systems indicated that the revision to the proof of delivery requirements would not generate savings for them. Commenters indicated that the DMERCs have not consistently implemented the changes, and that consequently there has not been significant administrative relief and subsequent savings.

We received conflicting comments about the impact of the revised time frame for shipping guidelines. While one commenter indicated that savings had already been achieved because the provision had already been implemented, another commenter indicated that the revision would have negligible effect because the commenter would not change its existing business practice of using overnight shipping.

One commenter said it had already adopted the provision of prescriptions being filled by verbal order, followed up by a written order for the claim submission and that these changes did not generate any additional savings for the commenter. Some suggested that the elimination of the AOB form for drugs would have limited savings because some suppliers currently obtain the AOB form at the same time that they obtain other forms that would be continued. Retail pharmacies agreed that elimination of the AOB form and verbal prescription order would reduce their paperwork. However, inhalation companies did not agree.

*Response:* We understand the commenters concerns and will study the impact of these billing changes on the different suppliers' costs as the new payment system is implemented.

*Comment:* Several commenters suggested that we review and consider changing several aspects of billing that might have cost-savings potential for suppliers of drugs. Several commenters indicated that Medicare's lack of on-line adjudication represented a significant cost and burden to them. One retail pharmacy commented that pharmacies face higher than normal rejection rate on claims because Medicare claims are not processed on-line, resulting in higher administrative costs. Others commented that pharmacies that dispense Medicare prescriptions must obtain documentation that is typically provided by the physician. For example, one company indicated that suppliers are held responsible for the appropriate medical necessity documentation in the patient's medical record but that the supplier has no control over physician records. Some suggested that we consider eliminating the requirement that a diagnosis code be required on the prescription. One pharmacy commented that pharmacies should not be expected to verify that the physician has in fact performed a face-to-face exam for the purpose of treating and evaluating the patient's medical condition or whether the physician has created appropriate documents in his records. Rather, the pharmacy believes that this responsibility should be left to the physician, and the creation of a prescription should be all that is needed to verify that the physician has complied with all Medicare requirements. A commenter noted that Medicare requires that suppliers submit claims with the physician's Unique Physician Identification Number (UPIN) while most third party plans require the physician's DEA number and suggested that we consider adopting usage of the physician's DEA number instead of UPIN. A pharmacy commented that dispensing units are different than current National Council for Prescription Drug Programs (NCPDP) standards; Medicare reimburses products based on a per mg price while the NCPDP standard suggests reimbursement on a per ml price. The pharmacy indicated that this makes it more difficult for the pharmacy to calculate proper reimbursement for these Medicare claims. Other commenters suggested that the Medicare enrollment and reenrollment process for suppliers be significantly streamlined. A retail pharmacy indicated that Medicare requires pharmacy suppliers to submit extensive and often duplicative pharmacy-specific paperwork that is more voluminous than any other third party plan in which retail pharmacies participate. One inhalation company suggested certain aspects of billing such as the requirement that the supplier query the physician and beneficiary to find out if the beneficiary had already received a same or similar item from another supplier. The company also identified what it claimed are several other labor-intensive, costly aspects of Medicare billing including electronic claims filing requirements; information system programming and testing; paperwork and new business procedures required to be compliant with HIPAA; Medicare and secondary insurance benefits verification and qualification; responding to significantly increased pre-payment audit activities; administering the Patient Financial Hardship Waiver prior to billing deductible and coinsurance amounts; billing and writing off beneficiary cost-sharing as bad debts; and differing DMERC policies concerning documentation needed to support home inhalation therapies.

*Response:* We thank the commenters for identifying these items. We plan to examine these aspects of billing. To the extent that there are different interpretations or applications of national policy by DMERCs, our goal is increased standardization.

*Comment:* A comment from a group focused on respiratory care indicated that there may be over utilization of albuterol sulfate. The comment indicated that a large amount of scientific evidence concludes that high albuterol sulfate use is indicative of

poor overall disease management. The commenter further indicated that Medicare's costs related to the use of albuterol sulfate may result from the fact that alternative drug treatment regimes are not adequately considered in the management of the patient's disease. The commenter urged us to examine the underlying causes of high utilization rates of albuterol sulfate.

*Response:* Our goal is to ensure that Medicare beneficiaries have access to the appropriate drugs to treat their diseases. We believe that the availability of discounts through the Medicare drug card and the implementation of the Part D drug benefit beginning in 2006 promote treatment decisions being made based on the best clinical evidence, rather than being influenced by differential coverage.

*Comment:* We received many comments addressing the issue of nebulizers versus metered dose inhalers (MDIs). Most commenters questioned whether a significant shift of Medicare beneficiaries to MDIs would occur when MDIs are covered in the Part D drug benefit beginning in 2006. We received many comments, studies and literature reviews on nebulizers and MDIs. Some commenters identified the specific disadvantages of MDIs and holding chambers or spacers. Some commenters questioned the conclusion of the literature review mentioned in the proposed rule that nebulizers are not clinically superior in delivering inhalation drugs than MDIs and the commenters asserted that the two are not fully substitutes. Some commenters quantified the costs to beneficiaries of nebulizers and MDIs. One commenter pointed out that MDIs would increase in 2006 based on the ban of the propellent chlorofluorocarbon. Another commenter questioned the point in the proposed rule that MDIs are more portable than nebulizers since advances in nebulizer technology have included additional portability. The commenter noted that since Medicare covers only one standard nebulizer, many of their patients have purchased portable nebulizers on an out-of-pocket basis to use as a second device while outside of their home.

*Response:* A number of drugs are available to treat the persons with asthma or who develop COPD. These include drugs, often inhaled, that expand the bronchial tubes and allow the patient to breathe more freely. Depending on the needs of the individual patient, these medications can be delivered using nebulizers or MDIs. Although nebulizers have long been covered under Medicare Part B, the MMA expanded access to MDIs beginning in 2006 through the new Medicare Part D drug benefit. While two meta-analyses cited by one commenter are consistent with the literature review mentioned in the proposed rule that found a lack of overall clinical superiority of MDIs over nebulizers, we recognize that even after coverage of MDIs begins in the Part D drug benefit in 2006, due to their particular circumstances, many beneficiaries will require the use of nebulizers and that nebulizers will continue to play an important role in inhalation therapy. Part B does not currently cover MDIs and we will gain experience with the costs of MDIs as the Part D drug benefit is implemented.

*Comment:* Comments were received from respiratory drug distributors and homecare providers addressing drugs that are supplied from the manufacturer in more than one form. One company suggested that since inhalation drugs are provided by the manufacturer in two forms, a premixed solution or as a powder (or other concentrate) that is diluted by the pharmacist, the ASP should be calculated separately for each of these two forms in order to reflect the different acquisition costs to the pharmacy for the different forms. The company suggested use of a modifier for the J-code to distinguish between these two forms for reimbursement purposes.

*Response:* We disagree. Consistent with the statute, the ASP is calculated by the HCPCS codes rather than the NDC code. This allows flexibility in appropriate drug delivery.

*Comment:* We received letters from individual beneficiaries and their family members indicating that the beneficiary has tried MDIs unsuccessfully and that inhalation drugs administered through a nebulizer were a successful treatment. They asked us not to assume that everyone on a nebulizer could be switched to inhalers and asked that we allow inhalation medications administered through nebulizers to remain funded by Medicare.

*Response:* We recognize that nebulizers are required by many beneficiaries due to their particular health circumstances. We did not propose to eliminate Medicare funding for inhalation medications administered through nebulizers.

*Comment:* Several commenters questioned why there should be public funding for COPD treatments for persons who chose to smoke cigarettes. The commenters indicate that it may be too harsh a policy to cease all reimbursement for COPD treatments, but they suggested two alternatives: (1) No individual who currently smokes should receive any Medicare benefit for the treatment of any respiratory condition, and (2) Any individual who historically smoked heavily and receives treatment for respiratory disorders should face an annual deductible equal to the cost of smoking a pack of cigarettes a day.

*Response:* As we indicated in the proposed rule, smoking has been linked to a large number of health problems and is the leading cause of cancer and pulmonary disease. The Department of Health and Human Services (HHS) has been actively encouraging Americans to quit smoking through its smoking cessation initiatives. Americans who quit smoking will enjoy longer, healthier lives and avoid diseases such as COPD. However, the Medicare law does not limit benefits to persons who do not currently smoke, nor does the Medicare law impose a deductible that is different for smokers and non-smokers. This regulation implements the law as it is currently written.

*Result of Evaluation of Comments*

In the proposed rule, we requested comments on the appropriate separate dispensing fee for inhalation drugs used in a nebulizer. In this final rule we are establishing 2005 fees of $57.00 for furnishing a 30-day prescription and $80.00 for furnishing a 90-day prescription for inhalation drugs. This fee would be paid in addition to the Medicare payment amount for the drug.

As discussed in section IV, we are finalizing our proposal to eliminate the Assignment of Benefits (AOB) form for items and services, including drugs, where assignment is required by statute. We reiterate language in the recently updated guidelines for DMEPOS refills, emphasizing the word "approximately". This allows for refill prescriptions to be shipped by ground service on "approximately" the 25th or 85th day of the respective prescription period. In addition, we clarified the ordering requirements for DMEPOS items, including drugs, which can be dispensed with just a verbal physician order.

*P. Section 706—Coverage of Religious Nonmedical Health Care Institution Services Furnished in the Home*

1. Background

Section 706(a) of the MMA amended section 1821(a) of the Act by adding home health services to the list of services furnished to an individual by a religious nonmedical health care institution (RNHCI). Section 706(b) added section 1861(aaa) to the Act to expand the term "home health agency" (HHA) to include a RNHCI. However,

Portions Omitted

**TABLE 45:**
Medicare Cost Estimates for MMA Provisions 612 and 613
(in millions)

| MMA Provision | FY 2005 | FY 2006 | FY 2007 | FY 2008 | FY 2009 |
|---|---|---|---|---|---|
| Sec. 612 Cholesterol and Blood Lipid | 50 | 80 | 90 | 90 | 100 |
| Sec. 613 Diabetes Screening | 20 | 40 | 50 | 60 | 80 |

4. Section 413—Incentive Payment for Physician Scarcity

*a. Physician Scarcity Areas*

Section 413(a) of the MMA provides a new 5-percent incentive payment to physicians who furnish services in physician scarcity areas. The MMA provides for paying primary care physicians furnishing services in a primary care scarcity area, and specialty physicians furnishing services in a specialist care scarcity county, an additional amount equal to 5 percent of the amount paid for their professional services under the fee schedule from January 1, 2005 to December 31, 2007. We estimate that this new incentive payment for physicians' services will result in an increase in Medicare payments that are shown in Table 46.

*b. Improvement to Medicare HPSA Incentive Payment Program*

Section 413(b) of the MMA amended section 1833(m) of the Act to mandate that we automate payment of the 10 percent HPSA incentive payment to eligible physicians. Since the inception of the HPSA incentive payment program, physicians have been required to determine their eligibility and correctly code their Medicare claims using modifiers. We estimate that this change to the HPSA incentive payment program to provide for automation of payment will result in an increase in Medicare payments because many eligible physicians are not applying for bonuses due to the burden of verifying eligibility. The impact of this provision is shown in Table 46.

**TABLE 46:**
Medicare Cost Estimates for MMA Provisions
(in millions)

| MMA Provision | FY05 | FY06 | FY07 | FY08 | FY09 |
|---|---|---|---|---|---|
| Sec. 413(a) Physician Scarcity Areas | 30 | 50 | 50 | 20 | - |
| Sec. 413(b) Improvement to HPSA | 20 | 30 | 30 | 30 | 30 |

5. Sections 303–304—Payment for Covered Outpatient Drugs and Biologicals and Section 305—Payment for Inhalation Drugs

Sections 303 and 304 of the MMA make changes to Medicare payment for covered outpatient drugs and biologicals and changes to the administration of those drugs. Section 305 makes changes to payment for inhalation drugs. We implemented provisions of sections 303 through 305 changing payments in 2004 for drugs and their administration in the January 7, 2004 **Federal Register** (69 FR 1084). In this final rule, we are making further changes to Medicare's payment for drugs and drug administration for 2005 required by sections 303 through 305 of the MMA. As indicated earlier in this final rule, we are revising the codes and payments for drug administration based on recommendations of the CPT Editorial Board and the Relative Value Update Committee. Consistent with section 1848(c)(2)(J) of the Act (as amended by section 303(a) of the MMA), the increase in payment resulting from this review are exempt from the budget neutrality requirements that apply to changes in RVUs. We are further increasing payments to physicians that treat patients with cancer who participate in a national demonstration project. In addition, we are also paying a supplying fee of $50 per month for the first month and $24 for each subsequent month for Medicare Part B oral drug prescriptions. We are also proposing to pay a furnishing fee of $0.14 per unit of clotting factor and a dispensing fee of $57 per month for inhalation drugs. Taking all of these provisions into account, we estimate Medicare savings for section 303–305 as follows:

**TABLE 47:**

Medicare Cost (Savings)
Estimates for MMA Provision 303-305
(in millions)

| Provision | FY05 | FY06 | FY07 | FY08 | FY09 |
|---|---|---|---|---|---|
| 303-305 | (730) | (1,300) | (1,650) | (1,820) | (1,990) |

6. Section 952—Reassignment

The reassignment provisions discussed in section III.F is currently estimated to have no significant impact on Medicare expenditures.

7. Section 623—Payment for Renal Dialysis Services

*a. Effects on the Medicare Program (Budgetary Effect)*

Because the basic case mix adjusted composite payment rate and the revised payment for ESRD drugs must be budget neutral in accordance with section 623(d)(1) of the MMA, except for the statutorily required 1.6 percent increase set forth in section 623(a), we estimate that there would be no budgetary impact for the Medicare program beyond this increase. The impact of this provision (net of beneficiary liability) is shown in the following table:

**TABLE 48:**

Medicare Cost Estimates for MMA Provision 623
(in millions)

| Provision | FY 2005 | FY 2006 | FY 2007 | FY 2008 | FY 2009 |
|---|---|---|---|---|---|
| Section 623 | $40 | $50 | $50 | $60 | $60 |

*b. Impact on ESRD Providers*

To understand the impact of the changes affecting payments to ESRD facilities that result from enactment of the MMA on different categories of ESRD facilities, it is necessary to compare estimated payments under the current payment system (current payments) to estimated payments under the revisions to the composite rate payment system as set forth in this final rule (MMA payments). To estimate the impact among various classes of ESRD facilities, it is imperative that the estimates of current payments and MMA payments contain similar inputs. Therefore, we simulated MMA payments only for those ESRD facilities for which we are able to calculate both current payment and MMA payment.

Due to data limitations, we are unable estimate current and MMA payments for 461 facilities that bill for ESRD drugs. ESRD providers were grouped into the categories based on characteristics provided in the Online Survey and Certification and Reporting (OSCAR) file and the most recent cost report data from HCRIS. We also used the June 2004 update of CY 2003 Standard Analytical File (SAF) claims as a basis for Medicare dialysis treatments and separately billable drugs and biologicals. As we stated in the proposed rule, this final rule impact on providers uses updated OSCAR, cost report and claims data.

**BILLING CODE 4120–01–P**

Portions Omitted

the wholesale acquisition cost for the product.

(2) *Payment limit for a drug furnished to an end-stage renal disease patient.* (i) Effective for drugs and biologicals furnished in 2005, the payment for such drugs and biologicals, including erythropoietin, furnished to an end-stage renal disease patient that is separately billed by an end-stage renal disease facility and not paid on a cost basis is acquisition cost as determined by the Inspector General report as required by section 623(c) of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 inflated by the percentage increase in the Producer Price Index.

(ii) Except as provided in paragraph (a) of this section, the payment for drugs and biologicals, furnished to an end-stage renal disease patient that is separately billed by an end-stage renal disease facility, is based on 106 percent of the average sales price.

(3) *Widely available market price and average manufacturer price.* If the Inspector General finds that the average sales price exceeds the widely available market price or the average manufacturer price by 5 percent or more in calendar year 2005, the payment limit in the quarter following the transmittal of this information to the Secretary is the lesser of the widely available market price or 103 percent of the average manufacturer price.

(e) *Exceptions to the average sales price.* (1) *Vaccines.* The payment limits for hepatitis B vaccine furnished to individuals at high or intermediate risk of contracting hepatitis B (as determined by the Secretary), pneumococcal vaccine, and influenza vaccine and are calculated using 95 percent of the average wholesale price.

(2) *Infusion drugs furnished through a covered item of durable medical equipment.* The payment limit for an infusion drug furnished through a covered item of durable medical equipment is calculated using 95 percent of the average wholesale price in effect on October 1, 2003 and is not updated in 2005.

(3) *Blood and blood products.* In the case of blood and blood products (other than blood clotting factors), the payment limits are determined in the same manner as the payment limits were determined on October 1, 2003.

(4) *Payment limit in a case where the average sales price during the first quarter of sales is unavailable.* In the case of a drug during an initial period (not to exceed a full calendar quarter) in which data on the prices for sales of the drug are not sufficiently available from the manufacturer to compute an average sales price for the drug, the payment limit is based on the wholesale acquisition cost or the applicable Medicare Part B drug payment methodology in effect on November 1, 2003.

(f) Except as otherwise specified (see paragraph (e)(2) of this section) for infusion drugs, the payment limits are updated quarterly.

(g) The payment limit is computed without regard to any special packaging, labeling, or identifiers on the dosage form or product or package.

(h) The payment amount is subject to applicable deductible and coinsurance.

■ 31. Part 414 is amended by adding a new subpart L to read as follows:

**Subpart L—Supplying and Dispensing Fees**

Sec.
414.1000   Purpose.
414.1001   Basis of Payment.

**§ 414.1000   Purpose.**

This subpart implements section 1842(o)(2) and section 1842(o)(6) of the Act, as added by section 303(e)(2) of the MMA, by specifying a supplying fee for drugs and biologicals covered under Part B of Title XVIII of the Act that are described in sections 1861(s)(2)(J), 1861(s)(2)(Q), and 1861(s)(2)(T) of the Act.

**§ 414.1001   Basis of payment.**

(a) A supplying fee of $24 shall be paid to a pharmacy for each supplied prescription of drugs and biologicals described in sections 1861(s)(2)(J), 1861(s)(2)(Q), and 1861(s)(2)(T) of the Act.

(b) A supplying fee of $50 is paid to a pharmacy for the initial supplied prescription of drugs and biologicals described in sections 1861(s)(2)(J) of the Act provided to a patient during the first month following a transplant.

(c) During 2005, a dispensing fee of $57 is paid to a supplier for each dispensed 30-day supply of inhalation drugs furnished through durable medical equipment covered under section 1861(n) of the Act, regardless of the number of partial shipments of that 30-day supply.

(d) During 2005, a dispensing fee of $80 is paid to a supplier for each dispensed 90-day supply of inhalation drugs furnished through durable medical equipment covered under section 1861(n) of the Act, regardless of the number of partial shipments of that 90-day supply.

**PART 418—HOSPICE CARE**

■ 32. The authority citation for part 418 continues to read as follows:

Authority: Secs. 1102 and 1871 of the Social Security Act (42 U.S.C. 1302 and 1395hh).

■ 33. Section 418.205 is added to subpart F to read as follows:

**§ 418.205   Special requirements for hospice pre-election evaluation and counseling services.**

(a) *Definition.* As used in this section the following definition applies.

*Terminal illness* has the same meaning as defined in § 418.3.

(b) *General.* Effective January 1, 2005, payment for hospice pre-election evaluation and counseling services as specified in §418.304(d) may be made to a hospice on behalf of a Medicare beneficiary if the requirements of this section are met.

(1) *The beneficiary.* The beneficiary:
(i) Has been diagnosed as having a terminal illness as defined in § 418.3.
(ii) Has not made a hospice election.
(iii) Has not previously received hospice pre-election evaluation and consultation services specified under this section.

(2) *Services provided.* The hospice pre-election services include an evaluation of an individual's need for pain and symptom management and counseling regarding hospice and other care options. In addition, the services may include advising the individual regarding advanced care planning.

(3) *Provision of pre-election hospice services.*
(i) The services must be furnished by a physician.
(ii) The physician furnishing these services must be an employee or medical director of the hospice billing for this service.
(iii) The services cannot be furnished by hospice personnel other than employed physicians, such as but not limited to nurse practitioners, nurses, or social workers, physicians under contractual arrangements with the hospice or by the beneficiary's physician, if that physician is not an employee of the hospice.
(iv) If the beneficiary's attending physician is also the medical director or a physician employee of the hospice, the attending physician may not provide nor may the hospice bill for this service because that physician already possesses the expertise necessary to furnish end-of-life evaluation and management, and counseling services.

(4) *Documentation.* (i) If the individual's physician initiates the request for services of the hospice medical director or physician, appropriate documentation is required.
(ii) The request or referral must be in writing, and the hospice medical