# EXHIBIT 9

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### Centers for Medicare & Medicaid Services

**42 CFR Part 405, 410, 411, 413, 414, 424, and 426**

**[CMS–1502–FC and CMS–1325–F]**

**RINs 0938–AN84 and 0938–AN58**

**Medicare Program; Revisions to Payment Policies Under the Physician Fee Schedule for Calendar Year 2006 and Certain Provisions Related to the Competitive Acquisition Program of Outpatient Drugs and Biologicals Under Part B**

**AGENCY:** Centers for Medicare & Medicaid Services (CMS), HHS.

**ACTION:** Final rule with comment.

**SUMMARY:** This rule addresses Medicare Part B payment policy, including the physician fee schedule that are applicable for calendar year (CY) 2006; and finalizes certain provisions of the interim final rule to implement the Competitive Acquisition Program (CAP) for Part B Drugs. It also revises Medicare Part B payment and related policies regarding: Physician work; practice expense (PE) and malpractice relative value units (RVUs); Medicare telehealth services; multiple diagnostic imaging procedures; covered outpatient drugs and biologicals; supplemental payments to Federally Qualified Health Centers (FQHCs); renal dialysis services; coverage for glaucoma screening services; National Coverage Decision (NCD) timeframes; and physician referrals for nuclear medicine services and supplies to health care entities with which they have financial relationships. In addition, the rule finalizes the interim RVUs for CY 2005 and issues interim RVUs for new and revised procedure codes for CY 2006. This rule also updates the codes subject to the physician self-referral prohibition and discusses payment policies relating to teaching anesthesia services, therapy caps, private contracts and opt-out, and chiropractic and oncology demonstrations.

As required by the statute, it also announces that the physician fee schedule update for CY 2006 is −4.4 percent, the initial estimate for the sustainable growth rate for CY 2006 is 1.7 percent and the conversion factor for CY 2006 is $36.1770.

**DATES:** *Effective Date:* These regulations are effective on January 1, 2006.

*Comment Date:* To be assured consideration, comments must be received at one of the addresses provided below, no later than 5 p.m. on January 3; 2006.

**ADDRESSES:** In commenting, please refer to file code CMS–1502–FC. Because of staff and resource limitations, we cannot accept comments by facsimile (FAX) transmission.

You may submit comments in one of four ways (no duplicates, please):

1. *Electronically.* You may submit electronic comments on specific issues in this regulation to *http://www.cms.hhs.gov/regulations/ecomments.* (Attachments should be in Microsoft Word, WordPerfect, or Excel; however, we prefer Microsoft Word.)

2. *By regular mail.* You may mail written comments (one original and two copies) to the following address ONLY:

Centers for Medicare & Medicaid Services, Department of Health and Human Services, Attention: CMS–1502–FC, P.O. Box 8017, Baltimore, MD 21244–8017.

Please allow sufficient time for mailed comments to be received before the close of the comment period.

3. *By express or overnight mail.* You may send written comments (one original and two copies) to the following address ONLY:

Centers for Medicare & Medicaid Services, Department of Health and Human Services, Attention: CMS–1502–FC, Mail Stop C4–26–05, 7500 Security Boulevard, Baltimore, MD 21244–1850.

4. *By hand or courier.* If you prefer, you may deliver (by hand or courier) your written comments (one original and two copies) before the close of the comment period to one of the following addresses. If you intend to deliver your comments to the Baltimore address, please call telephone number (410) 786–7197 in advance to schedule your arrival with one of our staff members. Room 445–G, Hubert H. Humphrey Building, 200 Independence Avenue, SW., Washington, DC 20201; or 7500 Security Boulevard, Baltimore, MD 21244–1850.

(Because access to the interior of the HHH Building is not readily available to persons without Federal Government identification, commenters are encouraged to leave their comments in the CMS drop slots located in the main lobby of the building. A stamp-in clock is available for persons wishing to retain a proof of filing by stamping in and retaining an extra copy of the comments being filed.)

Comments mailed to the addresses indicated as appropriate for hand or courier delivery may be delayed and received after the comment period.

*Submission of comments on paperwork requirements.* You may submit comments on this document's paperwork requirements by mailing your comments to the addresses provided at the end of the "Collection of Information Requirements" section in this document.

For information on viewing public comments, see the beginning of the **SUPPLEMENTARY INFORMATION** section.

**FOR FURTHER INFORMATION CONTACT:** Pam West (410) 786–2302 (for issues related to practice expense).

Rick Ensor (410) 786–5617 (for issues related to the nonphysician workpool and supplemental survey data).

Stephanie Monroe (410) 786–6864 (for issues related to the geographic practice cost index and malpractice RVUs).

Craig Dobyski (410) 786–4584 (for issues related to list of telehealth services).

Ken Marsalek (410) 786–4502 (for issues related to multiple procedure reduction for diagnostic imaging services and payment for teaching anesthesiologists).

Henry Richter (410) 786–4562 (for issues related to payments for end stage renal disease facilities).

Angela Mason (410) 786–7452 or Catherine Jansto (410) 786–7762 (for issues related to payment for covered outpatient drugs and biologicals).

Fred Grabau (410) 786–0206 (for issues related to private contracts and opt out provision).

David Worgo (410) 786–5919 (for issues related to Federally Qualified Health Centers).

Dorothy Shannon (410) 786–3396 (for issues related to the outpatient therapy cap).

Vadim Lubarsky (410) 786–0840 (for issues related to National Coverage Decision timeframes).

Bill Larson (410) 786–7176 (for issues related to coverage of screening for glaucoma).

Lia Prela (410) 786–0548 (for issues related to the competitive acquisition program (CAP) for part B drugs).

Diane Milstead (410) 786–3355 or Gaysha Brooks (410) 786–9649 (for all other issues).

**SUPPLEMENTARY INFORMATION:**

*Submitting Comments:* We welcome comments from the public on the following issues: interim RVUs for selected procedure codes identified in Addendum C; and the physician self referral designated health services listed in tables 32 and 33. You can assist us by referencing the file code CMS–1502–FC and the specific "issue identifier" that precedes the section on which you choose to comment.

*Inspection of Public Comments:* All comments received before the close of

Portions Omitted

allowable for dispensing inhalation drugs, furnishing blood clotting factor, and supplying certain other Part B drugs. We also discussed proposed changes in how manufacturers calculate the ASP and in the ASP data reported to us.

## 1. ASP Issues

Section 303(c) of the MMA amended Title XVIII of the Act by adding new section 1847A. This new section establishes the use of the ASP methodology for payment for most drugs and biologicals not paid on a cost or prospective payment basis furnished on or after January 1, 2005. The ASP reporting requirements are set forth in section 1927(b) of the Act. Manufacturers must submit ASP data to us quarterly. The manufacturers' submissions are due to us not later than 30 days after the last day of each calendar quarter. The methodology for developing Medicare drug payment allowances based on the manufacturers' submitted ASP data is specified in the regulations in part 414, subpart K. Based on the data we receive, we update the Part B drug payment amounts quarterly.

In this section of the preamble, we discuss: Our proposed changes related to the methodology manufacturers use to calculate the ASP and apply the estimate of lagged price concessions in the ASP calculation; the reporting of ASP data; the weighting methodology we follow to establish the Medicare payment amounts using the ASP data; the comments received and our responses; and our final policy with respect to these issues.

### a. Estimation Methodology for Lagged Price Concessions

Section 1847A(c)(5)(A) of the Act states that the ASP is to be calculated by the manufacturer on a quarterly basis. As a part of that calculation, manufacturers are to take into account price concessions such as—
• Volume discounts.
• Prompt pay discounts.
• Cash discounts.
• Free goods that are contingent on any purchase requirement.
• Chargebacks.
• Rebates (other than rebates under the Medicaid drug rebate program).

If the data on these price concessions are lagged, then the manufacturer is required to estimate costs attributable to these price concessions. Specifically, the manufacturer sums the price concessions for the most recent 12-month period available associated with all sales subject to the ASP reporting requirements. The manufacturer then calculates a percentage using this

summed amount as the numerator and the corresponding total sales data as the denominator. This results in a 12-month rolling average price concession percentage that is applied to the total in dollars for the sales subject to the ASP reporting requirement for the quarter being submitted to determine the price concession estimate for the quarter. The methodology is specified in § 414.804(a)(3).

We identified a refinement of the ASP calculation and lagged price concession estimation methodology related to chargebacks that we believe improves the accuracy of the estimate. As a result, we proposed to clarify the ASP calculation in the August 8, 2005 proposed rule (70 FR 5843).

### b. Price Concessions: Wholesaler Chargebacks

Wholesaler chargebacks are a type of price concession, generally paid on a lagged basis, that apply to sales to customers (for example, physicians) via a wholesaler (or distributor). Wholesaler chargeback arrangements may vary in scope and complexity. Under the current estimation methodology for lagged price concessions, total lagged price concessions, including lagged wholesaler chargebacks, for the 12-month period are divided by total sales for that same period to determine a ratio that is applied to the total sales for the reporting period. The ratio of lagged price concessions to sales is calculated over all sales, both indirect sales (sales to wholesalers and distributors and other similar entities that sells to others in the distribution chain) and direct sales (sales directly from manufacturer to providers, such as hospitals or HMOs). To the extent that the relationship between total dollars for indirect sales and total dollars for all sales is different for the reporting quarter and the 12-month period used, the current ratio methodology for estimating lagged price concessions may overstate or understate wholesaler chargebacks expected for the reporting period. A more accurate estimation of lagged price concessions would minimize the effect of quarter to quarter variations in the relationship between indirect sales and all sales. As a result, we proposed to revise § 414.804 to require manufacturers to calculate the ASP for direct sales independently from the ASP for all other sales subject to the ASP reporting requirement (indirect sales). Then, the manufacturer would calculate a weighted average of the direct sales ASP and the indirect sales ASP to submit to us.

We believed that the weighted average of direct sales ASP and indirect sales

ASP would improve the overall accuracy of the ASP calculation, particularly for NDCs with significant fluctuations in the percentage of sales that are direct sales.

We proposed conforming changes to § 414.804 for the methodology for calculating the lagged price concessions percentage. We also proposed to revise the regulation to clarify that the estimation ratio methodology relates to lagged price concessions and also define "direct sales" and "indirect sales" in § 414.802. In addition, we requested comments about the advisability and potential effects of requiring manufacturers to calculate the ASP for direct sales, including price concessions, independently from the ASP for indirect sales and then calculating a weighted average of these ASPs to submit to us, as well as the proposed definitions of direct sales and indirect sales.

*Comment:* We received many comments on our proposed refinement to the ASP calculation. Nearly all of these commenters opposed this proposal and many asked for clarification of the proposed terminology.

All but one of the comments received from drug manufacturers stated that the proposed change to the ASP calculation would require significant modifications to manufacturers' accounting and reporting data systems while resulting in minimal change or benefit to the ASP-based payment. Many commenters stated that the proposed modification to the ASP calculation would not result in more accurate payments. Further, comments from groups representing drug and biological manufacturers stated that they do not believe the proposed methodology will have a material impact on the overall ASP or the accuracy of the calculation. Many of the commenters opposing the proposal stated that the expense and burden of implementing the proposed change to the ASP calculation would be unjustified because direct and indirect sales and price concessions for a given product are stable over time, particularly for generic products, and further breakdown of the calculation would not have a significant impact on the ASP calculation. Many commenters also noted that implementing the proposed weighted average approach would increase both the complexity of the ASP calculation and the potential for calculation error.

We received comments from manufacturers of oncology, inhalation, contrast media, and other drugs and biologicals that included estimates of the potential impacts of the proposed

modification to the ASP calculation for a limited number of NDCs chosen as examples. These estimates ranged from a slight decrease (less than one half of a percent) to a 4.3 percent increase in the overall ASP for the NDC. One manufacturer estimated that sales would have to vary 20 percent from the 12-month lag period to change the ASP by more than 1 percent. Notwithstanding the potential change in the overall ASP, all but one manufacturer, which reports ASP for a single product, recommended that we not adopt the proposed change. However, some of these commenters suggested that the weighted average approach be voluntary or applicable only in cases where significant fluctuations exist in the proportion of sales that are direct and indirect and there is a compelling need to apply the proposed methodology. Other commenters from the manufacturing community were concerned about consistency across manufacturers and recommended that we not leave it up to each manufacturer to choose whether to use the proposed methodology or not. One commenter suggested that the proposed methodology be mandatory for a manufacturer that has at least one NDC with direct sales of 33 percent or more of gross sales for the prior year. The manufacturer would then be required to calculate the ASP for all of its NDCs using the proposed methodology.

Several commenters expressed concern that the proposed definitions of direct and indirect sales were unclear and required further clarification to ensure consistent application across manufacturers. Several commenters noted that our use of the term supplier was confusing; that it was unclear whether GPO sales would be considered direct or indirect; and it was unclear how utilization rebates to PBMs should be categorized. Several commenters noted that certain purchasers (for example, specialty pharmacies) may purchase both directly and indirectly during a given reporting period. Similarly, we received a comment from a drug manufacturer requesting greater clarification on how to allocate price concessions across direct and indirect sales when a customer purchases under both of these channels. Several manufacturers noted that their current data systems were not capable of capturing data at the level of detail necessary to accurately segregate sales into the direct and indirect categories. Other commenters noted that, in general, manufacturers do not track price concessions associated with direct or indirect sales. As a result, several

commenters recommended that, if the proposed methodology is adopted, we implement the change prospectively to allow for a phase-in period and to delay implementation until April 2006 or later to provide time for systems changes to be implemented and tested.

We received a few comments from drug manufacturers expressing their belief that other market issues cause fluctuation in the ASP, and that it would be more beneficial to receive guidance on how to resolve these issues.

A few commenters were concerned with the time frame for implementation of the proposed modification of the ASP calculation. These commenters recommended that we consider delaying implementation until after a trial period or at least until April 2006.

We also received comments from providers who have experienced difficulty acquiring drugs at or below the payment amount. These commenters, as well as comments from physician organizations, support changes to the ASP calculation insofar as they will result in more appropriate reimbursements for Part B drugs.

*Response:* Our goal is to ensure continued beneficiary access to care through implementation of accurate and sufficient payment systems. To this end, we proposed to refine the ASP calculation because the weighted average of direct sales ASP and indirect sales ASP could potentially improve the overall accuracy of the ASP calculation. We greatly appreciate the efforts undertaken by commenters to examine the potential impacts of the proposed method on the overall ASP calculation. Based on the comments received, we find compelling the commenters' concerns about the challenges and increased burden associated with calculating the ASP independently for direct and indirect sales and then calculating the weighted average ASP. Although we continue to have interest in the potential impacts of quarter to quarter variations in estimates of price concessions, we will not adopt the proposed change at this time.

In reaching our decision, we noted that all of the drug manufacturers that submitted comments reported that the impact of the proposed refinement of the ASP calculation would be minimal or not material. We note that these commenters are in a position to assess the impacts of the proposed methodology on their customers and to weigh the potential benefits and burdens inherent with the proposed change. In all but one case (a manufacturer which reports ASP for only one product), they did not support

the proposal because they believe the burden would outweigh the benefit.

Among the comments received that specified potential percentage changes in the overall ASP, a range of potential impacts was reported. One of the examples submitted suggested that the impact could extend to upwards of a 4 percent increase in the ASP for an NDC, while another example showed a slight decrease. We cannot determine whether the reported examples are representative of other or all NDCs subject to the ASP reporting requirements.

We also noted the concerns expressed by manufacturers regarding the significant additional burdens associated with the proposed methodology, the potential for inconsistent application of the proposed methodology across manufacturers, and the potential effects of the proposed methodology on manufacturers' systems. In addition, we carefully considered the comments from the physician community in support of refinements to the ASP calculation that would increase payments.

Although we are not implementing the proposed refinement to the ASP calculation at this time, we will continue to work with manufacturer to better understand the instances in which the proposed methodology may benefit the program and the potential for appropriate use of that methodology for certain or all NDCs, and whether such an approach would be sustainable.

We did not receive any comments on our proposal to revise the regulations at § 414.804 to clarify that the estimation ratio methodology published on September 16, 2004 (69 FR 55763), relates to lagged price concessions; therefore, we will implement the revised regulatory language as proposed.

c. Determining the Payment Amount Based on ASP Data

As explained in the August 8, 2005 proposed rule (70 FR 45844) in response to inquiries we have received related to the formula we use to calculate the payment amount for each billing code we posted information on our web site (*http://www.questions.cms.hhs.gov*) earlier this year. We included this information (which follows) in the proposed rule to ensure greater public access to this information.

• For each billing code, we calculate a weighted ASP using the ASP data submitted by manufacturers.

• Manufacturers submit ASP data at the 11-digit NDC level.

• Manufacturers submit the number of units of the 11-digit NDC sold and the ASP for those units.

• We convert the manufacturers' ASP for each NDC into the ASP per billing unit by dividing the manufacturer's ASP for that NDC by the number of billing units in that NDC. For example, a manufacturer sells a box of 4 vials of a drug. Each vial contains 20 milligrams (mg). The billing code is per 10 mg. The conversion formula is: manufacturer's ASP/[(4 vials × 20 mg)/10 mg = 8 billable units per NDC].

• Then, the ASP per billing unit and the number of units (11-digit NDCs) sold for each NDC assigned to the Billing Code are used to calculate a weighted ASP for the billing code. We sum the ASP per billing unit times the number of 11-digit NDCs sold for each NDC assigned to the billing code, and then divide by the total number of NDCs sold. The ASP per billing unit for each NDC is weighted equally regardless of package size.

*Comment:* Several manufacturers and other commenters representing the manufacturing community recommended that the formula be revised so that the payment limit is calculated based on the weighted ASP of the number of billing units sold rather than the number of NDCs sold. These commenters noted that products are available in different package sizes and that a billing code may encompass multiple NDCs. As a result, these commenters contend that weighting the ASP payment amount by NDCs sold does not reflect the true weighted average price per billing unit. Several commenters, including manufacturers and their trade associations, noted that altering the formula to weight by the number of billing units sold may increase or decrease the overall ASP. Nonetheless, these commenters recommend adoption of their recommended alternative formula. One commenter suggested that the alternative formula be adopted along with an exception process that would be applicable to billing codes that represent therapies of differing weights or dosage. We also received comments from manufacturers that supported continued use of the current formula.

*Response:* In establishing the formula used to calculate the payment amounts based on the manufacturers' ASP data, we considered various approaches, including the alternative approach recommended by some commenters. For the initial implementation of the ASP methodology, we operationalized the calculation of ASP by weighting the formula by the number of NDCs sold. As we gain more experience with the ASP data and other sources of information become available about the purchasing patterns of providers and their

acquisition costs, we may consider altering the methodology or establishing exceptions, if we find good reason to do so. If we decided such a change is warranted, we would implement the change at the next quarterly update.

*Comment:* Although not directly related to the formula used to calculate the ASP payment amounts, we received several comments from oncology physician practices and other commenters related to the adequacy of the ASP+6 percent payment methodology and other topics. We received several comments from oncology and other providers contending that the Medicare payment amount does not always cover their acquisition costs for certain drugs. A mid-sized oncology practice reported that it is unable to obtain nearly half of the drugs it administers at a price below the Medicare reimbursement rate. This commenter believes that larger practices may not face drug acquisition costs that exceed ASP+6 percent. One oncology practice reported that the ASP+6 percent payment would cover its drug costs if beneficiaries could always afford their cost sharing amounts. A large oncology practice stated that its average Medicare reimbursement, which is 2 percent more than its acquisition costs, was insufficient and would cause it to discontinue treatment for beneficiaries.

On the topic of price concessions, several commenters, including a drug manufacturer, suggested that prompt pay and other discounts given to wholesalers and distributors should not be included in the calculation of the manufacturers' ASP so that the payment amounts would be increased.

*Response:* It is true for all payment systems based on averages that the payment amount may not equal a specific provider's cost for every service. Section 1847A of the Act specifies that the Medicare payment is at 106 percent of ASP for the majority of Part B drugs and biologicals not paid on a cost or prospective payment basis. The statute requires use of the ASP+6 percent payment methodology except in limited instances. Although several commenters (most of which represent oncology practices) reported that the ASP+6 percent methodology was insufficient to cover their drug acquisition costs for certain drugs, these commenters also acknowledged that the Medicare payment exceeds their drug acquisition costs for other drugs. This is consistent with the findings of recent studies by the General Accountability Office (GAO) (GAO–05–142R), Office of Inspector General (OIG) ("Adequacy of Medicare Part B Drug Reimbursement to Physician Practices for the Treatment of

Cancer Patients'', (A–06–05–00024), and MedPAC (October 6, 2005, public meeting report on oncology site visits). These studies have found that physicians generally can obtain oncology drugs for prices below Medicare reimbursement.

We did not propose a change to the price concessions manufacturers must include in the ASP calculation. Section 1847A(c)(3) of the Act specifically identifies prompt pay discounts as a type of price concession that must be included in the manufacturer's calculation of the ASP.

*Comment:* We received comments from a few drug manufacturers requesting clarification and more detailed guidance on the treatment of administrative fees, service fees, and data fees in the ASP calculation.

*Response:* These issues are beyond the scope of this rule. We will continue to work with manufacturers to more fully understand these issues. We expect to publish a final rule on the ASP reporting requirements and will consider these comments in the course of preparing that rule.

*Comment:* We received comments from oncology practices, ESRD facilities and retail pharmacies, as well as IVIG manufacturers and stakeholders, indicating that manufacturer price increases are not reflected timely in the ASP+6 percent payment amounts due to the necessary lag time for calculating the rates and updating the payment systems. One commenter suggested that we implement a "true up" mechanism that immediately reconciles the historic reimbursement rate to reflect manufacturer price increases. Several IVIG stakeholders suggested that we issue payment rates on a retroactive basis.

*Response:* Section 1847A(c)(5)(B) specifies a prospective update in the payment amounts. We agree with the commenters' observations that there is a necessary time frame after the close of a calendar quarter for manufacturers to calculate and submit the ASP data to CMS, for CMS to prepare and issue the payment rates, and for the claims processing contractors to implement the updated payment files. As we stated in the CY 2005 final rule (69 FR 66300), we implement these new prices through program instructions or otherwise at the first opportunity after we receive the data, which is the calendar quarter after receipt.

*Comment:* Several commenters, including patient and industry representatives and physicians as well as manufacturers, requested that we take steps to improve the availability of IVIG. Many of these commenters noted their

ongoing collaboration with the Congress, HHS, CMS and others to better understand the market forces and dynamics influencing the current IVIG situation. These commenters reported that numerous patients and physician practices have been adversely impacted by the change in reimbursement to the ASP+6 percent methodology. These impacts include postponed infusions, increasing intervals between infusions, having to receive treatment in the hospital setting rather than in the physician office, possible unintended reactions as a result of switching brands of IVIG, and increased level of effort to obtain product and schedule services. Several commenters restated suggestions previously communicated to us, including concerns about our proposed changes for IVIG reimbursement in the outpatient setting. Comments from an industry group referenced its new study that it is conducting to help clarify the marketplace and provide insight into the costs for providing IVIG services. The study will examine IVIG acquisition costs and related services. Citing the adverse effects of patients migrating from physician offices to hospitals for treatment, several commenters requested that we consider an interim add-on payment for the complex activities related to furnishing IVIG until the industry study is completed. These commenters noted that the add-on payment would ensure that providers are paid sufficiently for IVIG under Part B so that their provision of IVIG remains viable and beneficiaries' access to IVIG is not reduced.

*Response:* We will continue to work with the IVIG community, manufacturers, the Congress, and other entities to seek better understanding of the supply and market issues influencing the current IVIG market. We look forward to learning of the industry's study findings as that work progresses. We have discussed the accuracy of the ASP data with the manufacturers and have been assured by these manufacturers that their ASPs have been developed in accordance with applicable guidance and that the resulting price reflects the current IVIG market in aggregate. At the same time, the IVIG manufacturers' association, the Plasma Protein Therapeutics Association, reports that the overall supply of IVIG is adequate and has improved in the past several months. However, based on the comments received and our ongoing work with manufacturers, patient groups, and other stakeholders, we continue to be concerned about reports of patients

experiencing difficulties in accessing timely IVIG treatments and reports of providers experiencing difficulties in obtaining adequate amounts of IVIG products on a consistent basis to meet their patients' needs in the current marketplace. Most brands of IVIG have been put on allocation by manufacturers and some manufacturers have reported allocating products to a smaller number of distributors and reducing the size of inventories. In addition, there have been reports of diversion of products to the secondary market and secondary distributors raising prices markedly. The Secretary's Advisory Committee on Blood Safety and Availability has recommended immediate steps be taken to ensure access to IVIG so that patients' needs are being met. However, the complexity of the IVIG marketplace makes it unclear what particular systematic approaches would be most effective in addressing the many individual circumstances that have been shared with us while not exacerbating what appears to be a temporary disruption in the marketplace.

IVIG is a complicated biological product that is purified from human plasma obtained from human plasma donors. Its purification is a complex process that occurs along a very long timeline, and only a small number of manufacturers provide commercially available products. Historically, numerous factors, including decreased manufacturing capacity, increased usage, more sophisticated processing steps, and low demand for byproducts from IVIG fractionation have affected the supply of IVIG. For CY 2006, there are 2 HCPCS codes that describe all IVIG products, based on their lyophilized versus liquid preparation.

The recent patterns of utilization of IVIG also are unusual in comparison with most other drugs and biologicals. Different IVIG products are FDA-approved in a number of therapeutic areas for various specific conditions which include: anti-infective therapy (bone marrow transplant); immune globulin replacement therapy (primary immune deficiencies and chronic lymphocytic leukemia); anti-inflammatory therapy (Kawasaki disease); and immunomodulation therapy (idiopathic thrombocytopenic purpura). IVIG therapy, which has been available for about 25 years, was initially reserved for the treatment of these FDA-approved indications. More recently, IVIG has been increasingly used off-label so that off-label uses now significantly exceed on-label uses. Many of these off-label uses are for autoimmune, neurological, or systemic inflammatory conditions. Some off-label

uses of IVIG are supported by a robust evidence base, while for other medical conditions the evidence has not demonstrated that IVIG infusions are of significant therapeutic benefit. There are also new emerging indications for IVIG treatment, including those based on recommendations from various professional associations and advisory groups. In addition, despite the growing uses of IVIG there are definite risks associated with IVIG treatment, including both early inflammatory reactions and more rare but serious renal and thromboembolic complications, as well as the inherent risk associated with receipt of any biological product even with the ongoing improvements in the safety of these types of products.

Medicare currently has one national coverage determination in place since CY 2002 regarding IVIG infusions to treat autoimmune blistering diseases, and there are numerous local coverage policies that describe Medicare coverage for specific off-label indications. In the context of these national and local coverage policies, IVIG use in hospital outpatient departments has climbed steeply over the most recent years for which data are available, from about 40,000 infusion days in CY 2002, to 60,000 days in CY 2003, and again to over 70,000 days in CY 2004. The infusion of IVIG in physician offices increased from about 2.3 million grams in CY 2003 to 4.0 million grams in CY 2004. In the face of growing demand for IVIG in the absence of significant changes in the prevalence of medical conditions for which there is high quality evidence regarding the effectiveness of IVIG therapy, we are concerned that all patients with medical need for IVIG continue to have access to this expensive and valuable therapy. Over the upcoming year, we will be using our historical claims databases to study the epidemiology of IVIG treatment of Medicare beneficiaries in outpatient settings. We expect that the health system as a whole should encourage an accountable and scientifically-grounded use of IVIG, and we welcome discussions with industry, providers, and other interested entities regarding efforts to ensure that IVIG is responsibly utilized for evidence-based clinical indications so that optimal benefit is obtained.

Commenters have indicated to us that the infusion of IVIG in physician offices is more complex and resource intensive, particularly during the actual infusion, than many other types of infusions currently reported using the same drug administration CPT codes. They have described the specific resources

Portions Omitted

providers will be disadvantaged as they have less efficient and more costly systems for storage and handling.

*Response:* The ASP+6 percent payment methodology was not intended to cover the handling and storage of drugs.

### 3. Clotting Factor Furnishing Fee

Section 303(e)(1) of the MMA added section 1842(o)(5) of the Act which requires the Secretary, beginning in CY 2005, to pay a furnishing fee in an amount the Secretary determines to be appropriate to hemophilia treatment centers and homecare companies for the items and services associated with the furnishing of blood clotting factor. In the CY 2005 final rule (69 FR 66236), we established a furnishing fee of $0.14 per unit of clotting factor for CY 2005. Section 1842(o)(5) of the Act specifies that the furnishing fee for clotting factor for years after CY 2005 will be equal to the fee for the previous year increased by the percentage increase in the consumer price index (CPI) for medical care for the 12-month period ending with June of the previous year. The percent increase for the 12 months ending June 2005 is 4.2 percent. Consequently, the furnishing fee will be $0.146 per unit clotting factor for CY 2006. While the furnishing fee payment rate is calculated at 3 digits, the actual amount paid to providers and suppliers is rounded to 2 digits. The requests to publish the 2006 furnishing fee in the final rule with comment were the only comments we received on the clotting factor section in the proposed rule.

### 4. Payment for Inhalation Drugs and Dispensing Fee

Medicare Part B pays for inhalation drugs administered via a nebulizer, a covered item of DME. Beginning in CY 2006, coverage for inhalation drugs administered through metered dose inhalers will generally be available through the Medicare Part D benefit. This represents an important expansion in the options available to beneficiaries for inhalation drug coverage under Medicare. We expect that both modes of inhalation drug delivery will play an important role in the Medicare program in the years to come.

Prior to CY 2004, most Medicare Part B covered drugs, including inhalation drugs administered by a nebulizer (hereafter referred to as inhalation drugs), were paid at 95 percent of the AWP. Numerous studies by the OIG and GAO indicated that 95 percent of AWP substantially exceeded suppliers' acquisition costs for Medicare Part B drugs, particularly for the high volume inhalation drugs, albuterol and

ipratropium bromide.[1] The MMA changed the Medicare payment methodology for many Part B covered drugs, including inhalation drugs. As an interim step, in CY 2004, Medicare paid a reduced percentage of AWP, 80 percent of AWP in the case of albuterol and ipratropium bromide. Beginning with CY 2005, Medicare paid for inhalation drugs at 106 percent of the average sales price (ASP+6 percent).

In addition to making payment for the drug itself, Medicare also pays a dispensing fee to suppliers of inhalation drugs. Prior to CY 2005, Medicare paid a monthly $5 dispensing fee for each covered inhalation drug or combination of drugs used. In the August 5, 2004 proposed rule (69 FR 47488), we sought comment on an appropriate dispensing fee level to cover the shipping, handling, compounding, and other pharmacy activities required to get these medications to beneficiaries. We received many comments asserting that a substantial fee was needed to compensate suppliers for a wide range of costs associated with dispensing drugs to beneficiaries, with many citing a 2004 report prepared by a consultant for the American Association for Homecare (AAH) that recommended a $68 fee.[2] The 2004 AAH report provided information for 10 cost categories: clinical intake; establishing/revising the plan of care; delivery of services; compliance monitoring/refill calls; billing/collections; other direct costs; patient education; caregiver training; care coordination; and in-home visits. In addition, as discussed in the August 8, 2005, proposed rule, a 2004 study by the GAO showed substantial variation in supplier costs of dispensing inhalation drugs.[3] With the wide variation in the reported costs and services provided by inhalation drug suppliers suggested by the comments and the GAO study, we stated in the CY 2005 final rule (69 FR 66338) that we would establish an interim dispensing fee for inhalation drugs applicable for CY 2005 and reconsider the issue for CY 2006. The 2005 dispensing fee for a 30-day supply of inhalation drugs was based on the industry recommended $68 fee from the 2004 AAH study, excluding certain costs that Medicare generally does not reimburse regardless of the Medicare

Part B benefit category (that is, sales and marketing, bad debt, and an explicit profit margin). The resulting fee established for a 30-day supply of inhalation drugs was $57 for CY 2005. Because the 2004 AAH study did not establish a fee for a 90-day supply, we applied the methodology used in the 2004 GAO report to convert the 30-day fee to a 90-day fee. Accordingly, the 2005 fee established for a 90-day supply was $80. In establishing the dispensing fee rates for 2005, we indicated in the CY 2005 final rule that although the AAH study contained costs related to services that may be of potential benefit to our beneficiaries, we were concerned that these services may be outside the scope of a dispensing fee. We indicated that we would consider this issue further in order to establish an appropriate dispensing fee for CY 2006.

As discussed in the August 8, 2005 proposed rule (70 FR 45847), we indicated that we intend to establish a dispensing fee amount for 2006 that is appropriate to cover the costs of those services that fall within the scope of a dispensing fee. Furthermore, we indicated that we thought this fee amount likely would be lower than the current fee of $57 per 30-day period in 2005. In the proposed rule we solicited public comments and information on a number of issues including the following:

• What services appropriately fall within the scope of a dispensing fee; the cost of providing those services; and, whether any of the services being provided by inhalation drug suppliers may be covered through another part of the Medicare program, such as the PFS or the DME benefit.

• An appropriate dispensing fee level for 2006 as well as data and information on the various services inhalation drug suppliers are currently providing to Medicare beneficiaries and the associated costs, and typical dispensing costs for an efficient, high-quality supplier.

• The extent to which inhalation drug suppliers have utilized the newly available 90-day scripts in order to reduce unit shipping costs and any reasons as to why 90-day supplies may not have been utilized.

• How revised guidelines regarding the timeframe for delivery of refills has affected the need for overnight delivery services as well as the extent to which suppliers have shifted their shipping to ground services.

• Comments on the potential impact on beneficiaries and providers of possible changes to the inhalation drug dispensing fee in 2006, as well as the

[1] GAO, "Medicare Payment for Covered Outpatient Drugs Exceed Providers' Costs," September 2001. OIG, "Excessive Medicare Reimbursement for Albuterol," March 2002.

[2] Muse & Associates Report for the American Association for Homecare, "The Cost of Delivering Inhalation Drug Services to Medicare Beneficiaries," August 2004.

[3] GAO, "Appropriate Dispensing Fee Needed for Suppliers of Inhalation Therapy Drugs," GAO–050–72, October 2004.

**70226**   **Federal Register** / Vol. 70, No. 223 / Monday, November 21, 2005 / Rules and Regulations

impact of the new drug benefit on inhalation drug access.

*Comment:* Many commenters suggested that dispensing inhalation drugs to Medicare beneficiaries involves a wide range of services that should be compensated through the dispensing fee. A number of commenters referenced a 2005 report by an industry consultant sponsored by the AAH.[4] The 2005 AAH report indicated that suppliers provide services in seven broad categories: Intake; compounding, dispensing, and pharmacy assessment; delivery, set-up, and patient education; follow-up and compliance monitoring; quality assurance, accreditation, licensing, and regulatory compliance; Medicare billing and compliance; and other direct and indirect costs and expenses. Within these seven categories, the 2005 AAH report indicated that there were "117 discrete services" provided to or on behalf of Medicare beneficiaries. The 2005 report surveyed 82 homecare pharmacies. The vast majority of survey respondents thought the 117 discrete services outlined by the consultant fell within the scope of a dispensing fee, and the vast majority of respondents indicated they were providing these services. Several commenters suggested that the survey demonstrated there was widespread agreement that the standard of care for inhalation drug suppliers involved a wide range of services. In addition, one commenter asserted that the 117 services identified in the 2005 AAH report encompassed all of the functions identified in the 2004 AAH report prepared by the same consultant, which formed the basis of the 2005 fee.

*Response:* We established the interim dispensing fee for 2005 based on cost data from the 2004 AAH report. That report provided cost data for 10 service categories: Clinical intake; establishing/revising the plan of care; delivery of services; compliance monitoring/refill calls; billing/collections; other direct costs; patient education; caregiver training; care coordination; and in-home visits. In using this data to establish the 2005 fee in the CY 2005 final rule, we indicated that we were concerned that some of the services in the industry cost data may be outside the scope of a dispensing fee and we would revisit this issue further in order to establish an appropriate dispensing fee for CY 2006. As discussed in the August 8, 2005, proposed rule, we continue to have

concerns with respect to what services should be included within the dispensing fee payment.

Authority for a dispensing fee for inhalation drugs is based on section 1842(o)(2) of the Act, which provides that if payment is made to a licensed pharmacy for a drug or biological under Medicare Part B, the Secretary may pay a dispensing fee (less the applicable deductible and coinsurance) to the pharmacy. The statute did not define the term dispensing fee or set parameters as to what activities should be included within the scope of that definition. However, as discussed below, we do not believe the Congress intended us to adopt the broad reading of dispensing fee suggested by commenters.

We are not persuaded by suggestions that Medicare should broadly define the definition of dispensing fees for inhalation drugs to include pharmacy care management services such as patient education, caregiver training, care coordination, and in-home visits. A number of commenters suggested the dispensing fee be based on the total costs of supplying inhalation drugs indicated by the 2004 AAH report data. That data indicated that suppliers expend on average 63.5 minutes per new patient and 50 minutes per established patient per month on patient education, caregiver training, care coordination, and in-home visits. Such services represent pharmacy care management services, which (if included in dispensing fee payments) would extend the definition of dispensing fee beyond what we believe should be reasonably included within the scope this benefit. As an initial matter, we do not believe that there is any indication that the Congress intended these care management activities to be included in the definition of dispensing fees. Where the Congress wished for us to cover the costs of such training and management services under Medicare, it specifically directed us to do so (for example, by amending the statute to recognize diabetes outpatient self management training under Medicare Part B and medication therapy management programs under Medicare Part D (see sections 1861(qq) and 1860D–4(c) of the Social Security Act). Therefore, in accordance with our interpretation of the statute, we do not believe it is reasonable for us to define the term dispensing fee under Medicare Part B to include the costs of such services.

In addition, we also believe that the inclusion of beneficiary education and training about use of nebulizers would raise duplicate payment issues. Payment

for DME is based on fee schedule amounts which include, in part, amounts for training beneficiaries on the use of nebulizer equipment. Thus, the equipment supplier is responsible for educating the beneficiary on the use of the DME or ensuring that "another qualified party" has done so as specified in § 424.57(c)(12). In addition, under the physician fee schedule Medicare makes a separate payment for beneficiary training by a physician or physician's staff regarding use of a nebulizer (CPT code 94664, demonstration and/or evaluation of patient utilization of an aerosol generator, nebulizer, metered dose inhaler or IPPB device). We believe that physicians can play an important role in beneficiary training concerning the use of nebulizers, as they are ultimately responsible for directing beneficiary care, and determining what drug treatment regimen is most effective for an individual patient. Accordingly, because payment for education, training, and management concerning use of nebulizer equipment may be separately recognized under Medicare, we are concerned that the inclusion of such services within the definition of dispensing fee would increase the potential for double billing.

We are also not persuaded by commenters' suggestions that the 2005 AAH report demonstrates that the standard of care for supplying inhalation drugs includes a broad range of services. The 2005 AAH report presented results from a survey of homecare companies, in which the companies were asked whether 117 activities or overhead items should be included in the dispensing fee and whether the companies currently provide or undertake each activity/item (although the frequency and extent to which each activity/item was provided was not asked). The 2005 report identified services provided but failed to provide any information on the proportion of beneficiaries actually receiving various services (for example, patient education, caregiver training, in-home visits). It also did not provide any information on the cost of various services (other than delivery), or the amount of time involved in providing these services to the typical beneficiary. Consequently, the 2005 AAH report fails to demonstrate that the 117 activities/overhead items outlined in the 2005 report translate into an average of 63.5 minutes per new patient and 50 minutes per established patient each month for the care management services of patient education, caregiver training, in-home visits, and care coordination in the 2004 AAH report. Since the 2005 report did

---

[4] Muse Associates Report Prepared for the American Association for Homecare, "Examination of Inhalation Drug Services to Medicare Beneficiaries Under the Average Sales Price Reimbursement Methodology in Response to the CMS Notice of Proposed Rule Making (CMS–1502–P)," September 2005.

not include information on costs, the 2004 AAH report is the only information we have on average cost and time per activity. However, even the 2004 AAH report does not contain information on the proportion of beneficiaries that actually receive the care management services. Accordingly, given the data identified in the reports, we are not persuaded by the AAH reports that the standard of care for supplying inhalation drugs includes extensive care management services for patient education, caregiver training, in-home visits, and care coordination.

Furthermore, a September 2005 OIG study entitled "Review of Services Provided by Inhalation Drug Suppliers" [5] found little evidence that inhalation drug suppliers provide care management services to many beneficiaries. The OIG report sought to ascertain the nature and extent of services provided by inhalation drug suppliers. The OIG examined services such as clinical intake, revising the plan of care, patient/caregiver education, responding to patient/caregiver inquiries about the drug, contacting the physician's office, contacting a patient for a refill, reviewing medication compliance, and other certain services. The OIG did not focus on certain core activities such as filling prescriptions, delivery, and billing that they indicated were necessary for suppliers to dispense drugs and receive reimbursement. They also indicated that they excluded equipment related services because Medicare pays suppliers separately for equipment.

The OIG report concluded that beneficiaries receive few services from their inhalation drug supplier beyond calls to ask if they need a drug refill. The OIG report found that among beneficiaries with at least 2 months of claims in 2003, 16 percent received no services (that is, no educational services, refill calls, or other adjunct services the OIG examined) from their inhalation drug supplier during the entire year. The OIG found that refill calls accounted for the majority of services provided by inhalation drug suppliers. In addition, the OIG found that only 16 percent of beneficiaries received an educational service from their drug supplier, 8 percent made a non-billing inquiry to their drug supplier, 8 percent received an in-home visit, 5 percent had a care plan revision, and 3 percent received a respiratory assessment from their drug supplier at least once during 2003. Furthermore,

the OIG report indicated that only 27 percent of beneficiaries had their medication compliance reviewed by drug supplier at least once in 2003, with 89 percent of these reviews occurring during refill calls. Accordingly, in light of the OIG findings regarding services actually provided, we remain unconvinced regarding the standard of care contentions set forth in comments concerning the 2004 and 2005 AAH reports.

As mentioned previously, we do not believe it is appropriate to include care management services such as patient education, caregiver training, care coordination, and in-home visits in the inhalation drug dispensing fee. Furthermore, the OIG found that few care management services were actually provided to a typical beneficiary. While it is possible that some types of care management services may be of potential benefit to some beneficiaries, at this time there is not clear evidence that such services are widely provided to beneficiaries nor have there been studies evaluating the effect of such services on beneficiary outcomes. Given such concerns, we do not believe it is appropriate for us to define dispensing fee under Medicare Part B to include care management services. However, we believe it is very important that the Medicare program support better patient care outcomes, particularly for beneficiaries with chronic respiratory conditions. We plan to explore how the Medicare program can engage physicians and their partners on issues of quality and performance to foster high quality of care for Medicare beneficiaries using respiratory drugs. For example, we believe there may be an opportunity under our demonstration authority to implement a demonstration program to test whether care management and care coordination services by physicians and their partners can improve health outcomes and reduce Medicare costs for beneficiaries who use inhalation drugs.

*Comment:* Some commenters criticized the OIG report as being too narrow in scope. A few commenters suggested that the OIG study excluded many essential services such as drug deliveries and billing activity that account for the bulk of services and costs. Another commenter suggested that the study did not capture all the services inhalation drug suppliers provide, including many that are required by State and Federal regulations (for example, Food and Drug Administration and State Pharmacy Boards), and standards of care for pharmacy practice. The commenters also criticized the OIG report for

excluding billing services and not taking into account the substantial amounts of time spent doing the following: Collecting and processing the relevant billing information from the beneficiary and beneficiary's physician, which the commenter indicated often requires multiple on-site visits to doctors offices; verifying eligibility and processing reimbursement from secondary insurers responsible for payment of coinsurance; and researching and on-site verification of beneficiary financial and living circumstances in order to validate a waiver of coinsurance for hardship. The commenters also criticized the OIG report for not taking into account non-payment of coinsurance by Medicaid, the costs of Medicare billing requirements, and costs of oversight by multiple carriers. Furthermore, several commenters suggested that the OIG study undercounted services because the OIG survey instrument requested documentation for each service provided and the report focused on documented services. Some commenters suggested that this approach left out those services for which suppliers did not have documentation, either because they had discarded the documentation after it was no longer useful or because they had not documented services since there was no requirement to do so. Some commenters indicated that the mandatory refill calls require two telephone contacts on average before contact is made with the beneficiary. One commenter indicated that it maintains documentation of failed call attempts only for several months, and is not required to maintain long-term documentation of repeated calls and visits to patient homes and physicians' offices to gather documentation and information. In addition, one commenter noted that the OIG report expanded the categories of services it analyzed in its report based on information submitted by respondents in the survey instrument's "other" category. The commenter believed that this meant participants in the OIG report may not have always been explicitly asked about certain types of services. This commenter also criticized the OIG report for not conducting field work to observe the activities of inhalation drug suppliers, and indicated its belief that the GAO and 2004 AAH report included a more thorough analysis. Another commenter stated that the OIG report does not address the issue that the costs of dispensing drugs are higher than the current $57 fee for high quality suppliers in compliance with applicable requirements. Furthermore, the commenter stated that

---

[5] Office of the Inspector General, "Review of Services Provided by Inhalation Drug Suppliers," September 2005, OEI–01–05–00090.

**70228**   **Federal Register** / Vol. 70, No. 223 / Monday, November 21, 2005 / Rules and Regulations

the service levels suggested in the OIG report are not representative of high quality suppliers. The commenter also stated that the behavior of noncompliant suppliers should not serve as a basis for reducing the fee because they contend the various services are required to comply with the regulations of Medicare, other government entities, and accrediting or quality assurance organizations.

*Response:* We do not find the criticisms of the OIG report persuasive. While a number of commenters criticized the methodology and findings of the OIG study, we believe that the results of the OIG study are credible. The OIG study examined the extent to which certain services such as patient/caregiver education, responding to patient/caregiver inquiries about drugs, revising the plan of care, contacting the physician's office, contacting a patient for a refill, reviewing medication compliance, and certain other services were actually being provided to beneficiaries by inhalation drug suppliers. The OIG failed to find evidence that many beneficiaries received such services from their inhalation drug suppliers, with the exception of drug refill calls.

Although some commenters criticized the OIG report for not including core dispensing activities such as filling the prescription and billing, the OIG report indicated that it did not focus on those activities because it did not have cause to question that they are necessary to dispense drugs and be reimbursed. The OIG instead focused on those services where less was known about the extent to which the services were actually being provided to beneficiaries. The OIG report examined a set of services that accounted for 60 percent of costs included in the 2004 AAH data. In addition, some costs cited by one commenter as being improperly excluded from the OIG study, such as non-payment of coinsurance by Medicaid, costs associated with waivers of coinsurance for indigent beneficiaries, and assessment of the beneficiary's situation for coinsurance waiver, are not generally reimbursed under Medicare Part B as a matter of general policy.

We are not persuaded by those commenters who suggested that the OIG study should be disregarded because the OIG undercounted the number of services suppliers actually provide due to the OIG's focus on documented services. Although the OIG focused its analysis on documented services, the OIG report indicated that if they had included undocumented services reported by suppliers in their analysis,

the average number of services per beneficiary would still have been low (increasing from an average of 1.2 to 1.59 services per beneficiary per month). In addition, if various services are essential to dispensing these drugs to beneficiaries as some have suggested, we would have expected that suppliers would have documented the content and frequency of the services in patient records in order to track patient progress and maintain continuity of care. Furthermore, although some contend that the OIG study suggests that some suppliers are non-compliant in their provision of required services, as commenters pointed out, the OIG study did not generally collect information on the core services required to furnish inhalation drugs, with the exception of refill recalls. The OIG report found that not all beneficiaries who should have received a refill call actually got one. We plan to study the issue of refill call compliance further, and we believe it is important to reflect the costs of refills call in the dispensing fee.

In terms of the comment that the OIG study added several service categories based on information submitted by commenters, the survey instrument included an "other" category under which suppliers could report any services that were not captured by the categories provided. We do not view the opportunity for suppliers to elaborate on the types of services provided to be a weakness but rather a strength of the study. Although the OIG study was criticized by some for not conducting field work, the OIG adopted a methodology that was designed to provide information on a representative sample of beneficiaries receiving inhalation drugs.

While the OIG report does not provide information on supplier costs, that was not the objective of the OIG study. The OIG report provides information on the percent of beneficiaries that received various services from their drug suppliers, and as a result, and we believe it offers helpful information in our consideration of the inhalation drug dispensing fee.

*Comment:* We received a number of comments recommending either an increase or no reduction in the dispensing fee for 2006. Several commenters suggested the 2005 AAH report provided an appropriate fee for 2006. For that report, a consultant surveyed homecare pharmacies about what fee level they thought was appropriate for 2006. Survey respondents on average suggested a fee of $66.55 for a 30-day supply and a fee of $138.80 a 90-day supply. Suggested fees from other commenters ranged from

$57 to $68, with a few commenters suggesting an inflation adjustment on top of those levels. One insurer commented that the current dispensing fee appears high.

Some commenters provided cost information as part of their contention that the fee should not be reduced or should be increased. One large supplier indicated that its costs were about $75 per beneficiary for a 30-day period, with the 3 cost categories accounting for the largest share being delivery, setup, and patient education ($20); clinical intake ($15); and compounding, dispensing, and assessment ($14). Another supplier indicated its costs broke out as follows: delivery, set-up, and patient education (27.3 percent); compounding, dispensing, pharmacy assessment (19.0 percent); patient intake (17.8 percent); follow-up and compliance monitoring (11.6 percent); quality assurance, accreditation, licensing and regulatory compliance (9.1 percent), other direct and indirect costs (4.2 percent). The supplier indicated that its costs were largely for salaries, freight and other delivery charges, and business infrastructure.

A number of commenters stated that the dispensing fee should not be based on retail pharmacy costs, stating that retail pharmacies do not provide the array of services that homecare pharmacies do. One retail pharmacy clarified its comments from the prior year cited in the proposed rule. By suggesting a fee of 5 to 6 times the current fee last year, the retail pharmacy said they meant 5 to 6 times the $10 proposed supplying fee (for immunosuppressive, oral anticancer, and oral anti-emetic drugs) for 2005 (that is, $50 to $60). In addition, a respiratory company stated that a comment received on the August 5, 2004 proposed rule from another retail pharmacy, which was cited in the August 8, 2005 proposed rule, may have been intended to mean $25 per prescription rather than $25 per 30-day period. Also, the commenter stated that the prior cost data was irrelevant because it preceded experience with the ASP system. Comments from retail pharmacies and a pharmacy association indicated support for the dispensing fee level urged by the 2005 AAH report.

A number of commenters stated there would be adverse effects on beneficiary access to inhalation drugs if the fee were reduced. Some suppliers asserted that they would reduce the services offered to beneficiaries or cease supplying inhalation drugs to Medicare beneficiaries. A number of commenters pointed to the 2005 AAH survey, which indicated that 45 percent of providers

would not accept Medicare patients if the dispensing fee were reduced more than a nominal amount, while 50 percent indicated they would reduce services provided to beneficiaries, and 2.5 percent indicated they would close. One commenter maintained that some providers had already closed or are seeking acquisition by other companies under current reimbursement rates. Another commenter speculated that a reduction in the dispensing fee would cause a shift away from small home care pharmacies to retail pharmacies, and asserted that these pharmacies would have to gear up by increasing inventories or directing patients to their mail order pharmacies. Some commenters suggested that a fee reduction could lead to adverse health effect for beneficiaries, reduced quality, or use of more intensive Medicare services. Others raised concerns that a reduction could create adverse incentives for substituting MDIs for nebulizers, even for patients where nebulizers are the preferred delivery mechanism.

Some commenters suggested that it is premature to reduce the dispensing fee. Some of these commenters asserted that CMS did not provide any new cost data in the proposed rule that would warrant a reduction. Several commenters stated costs had increased due to higher fuel prices, unforeseen natural disasters, and wage inflation. Several commenters pointed to the 2005 AAH study which indicated that the average cost of shipping increased from $12.13 in 2004 to $14.41 in 2005. One commenter indicated that its overnight shipping costs were between $27 to $40 per shipment. Another commenter cited a 12.5 percent increase in the fuel surcharge cap for one large shipping company, which they indicated would cause their delivery costs to increase an additional 4 percent on top of prior increases. One commenter indicated that its cost per shipment had increased by $0.40 due to increased fuel costs in 2005, and it expected additional future increases. In urging an increase in the fee to take into account inflation, another commenter mentioned that it had consolidated the number of pharmacies it operated to increase efficiency, but indicated that the number of costs that could be reduced was limited. Another commenter stated that we should not reduce the fee because the agency indicated in a October 8, 2004 letter to GAO that a fee of $55 to $64 was a reasonable range for a 2005 fee. Other commenters asserted that experience with the ASP system and the current dispensing fee is too

limited to conclude there are overpayments. One commenter stated that the payment reduction in 2005 was greater than the Congressional Budget Office or the CMS Actuaries Office had projected prior to passage of the Medicare Modernization Act. This commenter suggested actual levels in 2005 claims data be compared to original estimates before taking any action.

*Response:* As noted previously, we established the 2005 dispensing fee using data from the 2004 AAH report. That report included costs for a wide range of services beyond basic dispensing, such as patient education, caregiver training, care coordination, and in-home visits. As discussed previously, we believe these activities represent care management services that should not fall within the scope of a dispensing fee. Furthermore, the September 2005 OIG report found little evidence that many beneficiaries receive these care management services. Consequently, we are establishing a dispensing fee for 2006 using the 2004 AAH cost data excluding separable costs for care management services. We believe this interpretation represents an appropriate reading of the statute. Based on the 2004 AAH data for homecare pharmacies, excluding costs for care coordination, in-home visits, patient education, and caregiver training (as well as sales, marketing, bad debt and profit which were also excluded last year because Medicare does not generally reimburse those costs with respect to Part B services), we are establishing a dispensing fee of $33 for a 30-day supply of inhalation drugs. Because greater levels of effort may be involved in dispensing inhalation drugs when a patient begins these drugs for the first time, we have decided to maintain the current $57 dispensing fee for the first 30-day period in which an individual uses inhalation drugs as a Medicare beneficiary. Thus, beginning in 2006, we will pay a dispensing fee of $57 for the first month an individual uses inhalation drugs as a Medicare beneficiary, and $33 for a 30-day supply of inhalation drugs for all other months.

Although some commenters urged an inflation adjustment, we do not believe it is warranted for 2006 because we do not believe it is clear that total dispensing costs have increased since the 2004 industry cost data was collected. Although data from the 2004 industry report may not reflect wage inflation or increased delivery costs due to fuel price increases, it would also not include any efficiencies that providers may have achieved as they have adjusted to the new payment system in

2005. The 2005 AAH report did not provide updated cost data for the service categories included in the 2004 AAH report. Given that the 2004 AAH cost data would not reflect inflationary pressures, nor increased efficiencies in business operations, it is uncertain whether an upward or downward adjustment to the 2004 cost data should be made. As a result, we believe it is best to use the 2004 AAH data as is. We will consider the appropriateness of an inflation adjustment for the future.

Regarding concerns raised by some commenters about beneficiary access, we believe, as discussed previously, that the fee level we are establishing is appropriate to cover suppliers' dispensing costs, and beneficiaries will maintain good access to inhalation drugs. The fee amount is based on the 2004 AAH cost data for clinical intake, establishing/revising the plan of care, delivery of services, refill calls/compliance monitoring, billing/collections, "other" direct costs, and indirect costs, excluding sales, marketing, bad debt, and profit which are not reimbursed by Medicare. Having based the 2006 dispensing fee on industry cost data for those activities that we believe fall within the scope of a dispensing fee, we believe the fees are appropriate to cover providers' costs and will not impair access. In addition, we will continue to monitor access to care.

Regarding concerns raised by some commenters about CMS lowering the fee without the benefit of new cost data, we believe it is our fiduciary responsibility to establish an appropriate payment for 2006. As discussed previously, our decision is based on our determination that certain services should not fall within the scope of the dispensing fee and the OIG report which found that these services are furnished infrequently to beneficiaries. We believe our decision to lower the fee for 2006 is consistent with our October 8, 2004 letter to the GAO, in which we stated that a dispensing fee in the range of $55 to $64 would be appropriate for the interim 2005 fee. Regarding the comment that the savings from the ASP system are greater for inhalation drugs than the savings projected by CBO or the CMS actuaries prior to enactment of the MMA, we recognize the concerns regarding the shift from a payment system based on AWP; however, we do not believe such concerns are an appropriate consideration in determining the dispensing fee for 2006. Medicare does not generally establish payment rates based on budget projections. Rather, we use the most reliable cost data available to establish

a payment rate that is consistent with the statute and appropriate for Medicare covered services.

*Comment:* In response to our request for comments on providers' experience with the dispensing fee for a 90-day supply, we received a number of comments. One commenter pointed to the 2005 AAH survey, which found that most respondents (77 percent) do not provide a 90-day supply, and among those that do it represents 3 percent of their business. Reasons cited by survey respondents for non-use of a 90-day supply included—(1) 30-day supply promotes more contact with patients and compliance monitoring; (2) patient prescriptions often change; and (3) many suppliers believed the 90-day dispensing fee ($80 in 2005) was not adequate to cover costs. Less than 1 percent indicated they do not provide a 90-day supply because it is less profitable than a 30-day supply. A few other commenters raised concerns about the 90-day dispensing fee and provided similar reasons for non-use of the 90-day supply as the 2005 AAH survey. In addition, one commenter cited Medicare's refund requirements for unused drugs as being another reason for non-use of the 90-day supply. However, one commenter suggested that the 90-day supply is not used because it receives less reimbursement overall than using the 30-day supply. A physician specialty group supported the 90-day prescription because it reduces paperwork and redundant efforts by patients, physicians, and DME suppliers.

*Response:* We agree with the physician specialty group that dispensing a 90-day supply has merit; thus, we have continued the 90-day dispensing fee for 2006. As cited by respondents to the 2005 AAH study, a 30-day supply may be most appropriate for certain beneficiaries such as those with changing prescriptions. However, for those situations where it is medically appropriate, we believe it is important to have a 90-day option available.

In the CY 2005 final rule, we calculated the 90-day dispensing fee by taking direct costs for the 30-day fee and tripling indirect costs (which was based on the methodology used in the October 2004 GAO report). However, as discussed, some commenters voiced concern about the adequacy of the 2005 90-day dispensing fee. Some commenters supported the reimbursement amounts suggested by respondents in the 2005 AAH survey. In that survey, respondents suggested an average fee for a 90-day supply ($138.80) that was roughly twice the

amount they suggested for a 30-day supply ($66.55). For 2006 using a 2 to 1 ratio for the 90-day versus 30-day fee would yield a 90-day fee about 40 percent higher than our previous methodology. We believe it is important that adequate reimbursement be available for the 90-day option, as well as, the 30-day option. Therefore, using the 2 to 1 ratio recommended by commenters for the 90-day versus 30-day supply payment rates, we are establishing a fee of $66 for a 90-day supply of inhalation drugs for 2006.

Although we established two levels of dispensing fees for a 30-day supply, an initial 30-day fee of $57 and a 30-day fee of $33 for all other months, we do not believe a higher initial fee is warranted for a 90-day supply given that we do not believe a 90-day supply is generally used when a beneficiary first begins inhalation drugs. A number of commenters noted that the 90-day supply is not well-suited for patients whose prescriptions are likely to change. We recognize that beneficiaries who begin using inhalation drugs for the first time are more likely than established patients to experience changes in drugs or dosages, or to discontinue use altogether. Accordingly, we do not believe it is appropriate to encourage use of a 90-day supply when a beneficiary first begins using inhalation drugs by establishing a higher initial 90-day fee. Consequently, given such concerns, we have not provided two levels of dispensing fees with the 90-day option.

*Comment:* Some commenters noted that refill calls are a service required by Medicare.

*Response:* We agree that Medicare requires that a supplier confirm that a beneficiary needs a refill before sending a new shipment, and we have included the costs of refill calls from the 2004 AAH report within the dispensing fee.

*Comment:* A few commenters suggested that many of the activities they carry out are required to maintain compliance with FDA, Medicare, and State regulations, and with standards imposed by accrediting bodies such as JCAHO. Some commenters noted that CMS has issued draft supplier quality standards, and that they are required to provide certain services as part of those standards. The commenters suggested that the dispensing fee should accommodate their costs in these areas.

*Response:* With the exception of certain guidelines concerning compounding, we do not believe that the requirements applicable to inhalation drug suppliers are in general substantially different from the requirements applicable to pharmacies

dispensing other drugs. Furthermore, we view costs such as regulatory compliance and quality assurance as part of overhead, which we have included in the dispensing fee based on the 2004 AAH cost data for overhead and other direct costs. We also do not believe that the costs associated with regulatory requirements applicable to equipment suppliers should be compensated through the inhalation drug dispensing fee. The Medicare program makes separate payments to equipment suppliers for rental/purchase of nebulizers and maintenance, and regulatory requirements applicable to equipment suppliers would be covered through the basic payment rates for the equipment, not the Medicare payment rate for drugs or dispensing.

Regarding the draft supplier quality standards that have been released for comment, we note that the agency has adopted a two-step process for developing those standards. An initial document with draft quality standards for suppliers of several types of durable medical equipment has been released for public comment. We expect to release a second document that will clarify which quality standards apply to inhalation drug suppliers. We expect that the standards applying to inhalation drug suppliers will be consistent with accepted quality standards for pharmacies. Furthermore, the standards will establish minimum requirements for being a supplier, which we consider to be part of the standard cost of doing business that is covered through our basic payment rates. As with conditions of participations (COP) for providers, we do not increase our payment rate as a result of a change in COP requirements.

*Comment:* One commenter stated that section 1842(b)(3) of the Act requires Medicare payments be reasonable. The commenter asserted that the agency has established in § 405.502(a) criteria for determining what is reasonable, and stated that Medicare has a history of recognizing and reimbursing services related to patient care.

*Response:* We recognize the commenter's concern regarding the reasonableness of Medicare payments. We have based the dispensing fee payment rates on industry cost data from the 2004 AAH report, which was submitted as part of comments by AAH on the CY 2005 proposed rule, and used in the CY 2005 final rule, to establish the 2005 dispensing fee. To establish the 2006 dispensing fee, we have used the 2004 AAH cost data excluding those services that fall outside the scope of a dispensing fee.

*Comment:* Some commenters cited Medicare's drug payment rates (ASP+6 percent) as a reason the dispensing fee should remain the same or be increased. One homecare pharmacy indicated that it could not obtain drugs at ASP+6 percent. A few commenters stated that their costs exceed reimbursement for drugs in cases where a physician writes brand medically necessary and the drug is in a billing code that contains both brand and generic drugs. An inhalation drug supplier indicated that for three inhalation drugs its acquisition costs exceeded Medicare reimbursement. Some commenters indicated Medicare drug payments (ASP+6 percent) were inadequate for a variety of reasons such as exclusion of wholesaler markup from ASP, the lag time between sales for a quarter and the inclusion of such information in the Medicare ASP+6 drug payment rates, volatility in ASP+6 reimbursement from quarter to quarter, and class of trade differences in pricing. One commenter suggested that Medicare had addressed concerns about the adequacy of ASP+6 percent reimbursement for oncology patients by implementing the Demonstration of Improved Quality of Care for Cancer Patients Undergoing Chemotherapy. They also suggested that the ASP+6 percent cap on reimbursement for the upcoming Part B drug competitive acquisition program (CAP) was a reason for its delay, because they asserted vendors did not want to commit to a program where ASP+6 percent was the reimbursement limit. The commenter stated that the issues it has encountered with ASP+6 percent are similar to the issues faced by oncologists and vendors under CAP program and therefore should be addressed through the inhalation drug dispensing fee.

In addition, a few commenters suggested that Medicare payments for equipment were inadequate, necessitating a substantial dispensing fee.

*Response:* Although some commenters stated that the dispensing fee should account for drug acquisition costs in excess of the ASP+6 percent payment, we disagree. Section 1847A of the Act specifies that the Medicare payment for inhalation drugs is at 106 percent of the ASP. We believe the Congress established the ASP based payment for inhalation drugs and separate authority for dispensing of these drugs for good reason, namely to pay appropriately for each service and to eliminate cross subsidization of services. Similarly, we believe payment for nebulizer equipment is a distinct policy separate from the dispensing fee, and one should not cross subsidize the

other. In establishing the dispensing fee of $33 for a 30-day supply of inhalation drugs (and higher first month payment), we are focusing on what we believe is the appropriate scope and payment for the dispensing fee.

Although one commenter suggested that we had addressed perceived issues about ASP+6 percent payment adequacy by implementing the Demonstration of Improved Quality of Care for Cancer Patients Undergoing Chemotherapy, we disagree. The purpose of the demonstration program is to promote improvements in quality by measuring patient outcomes in several areas of concern often cited by patients undergoing chemotherapy, which can then be traced to treatments and outcomes. In addition, we believe that the commenter's statement that the change in the timeframe for implementation of the Medicare Part B drug CAP was a result of the ASP+6 percent cap on vendor reimbursement is not accurate and not related to the inhalation drug dispensing fee.

*Comment:* A few commenters expressed concern that the 30-day dispensing fee is the same regardless of the number of prescriptions dispensed. They noted that if a prescription is changed in the middle of the 30-day period they do not receive an additional fee. They suggested CMS consider a per script fee.

*Response:* The dispensing fee amount we have established is based on the 2004 AAH report data, which presented average costs for a month. Consequently, we believe our payment rate should be adequate to cover situations where multiple prescriptions are provided. We will consider the suggestion of a per script fee in future rulemaking, as necessary.

*Comment:* Several commenters indicated that our revised guidelines concerning the timeframe for shipping refills had not reduced their need to use of overnight shipping. An industry association indicated that several factors often force overnight shipping such as hospitals giving beneficiaries only a one or two dose supply and beneficiaries waiting until they are out of medication to reorder. The 2005 AAH survey indicated that the percent of shipments that were overnight increased slightly from 56.3 percent in 2004 to 56.9 percent in 2005. One commenter indicated that 60 percent of its shipments occur on an overnight basis because of several factors such as needing multiple calls to reach a beneficiary and new prescriptions reportedly needing to be shipped overnight. The commenter urged us to permit refill calls as needed to be ready

to ship refill orders at least 7 days before the patient's medication runs out. The commenter believes that this would allow for ground shipping in most cases, including refill dates that fall on weekends and 3-day holidays. One commenter suggested that the 30-day dispensing fee reimbursement guideline had reduced the amount of drugs that they could ship in a month, necessitating more use of overnight shipping. In addition, one commenter asserted if beneficiaries come in for a refill before the end of the month, then the pharmacy would receive no fee. While most commenters indicated that the revised delivery timeframes had not had a substantial impact on their delivery practices, one commenter indicated that 70 percent of its shipment through the third quarter of 2005 were ground deliveries, and they hoped to transition an additional 20 percent of shipments to ground delivery in the fourth quarter of 2005 as a result of Medicare's extension of the patient notification and shipment window.

*Response:* In the CY 2005 final rule, we made several administrative changes aimed at reducing inhalation drug supplier costs, including providing more flexible refill timeframes. We currently allow refills to be sent up to approximately 5 days before the end of the current usage period. To further facilitate the use of ground delivery, we are in the process of working to expand this timeframe to allow refills to be sent up to 7 days before the end of the current usage period. Under this new delivery timeframe, we will allow a dispensing fee to be paid up to 7 days before the end of current usage period, with up to 12 months of dispensing fees payable per year per beneficiary.

In addition, we note that for 2006, we are establishing a dispensing fee of $57 for the first month an individual uses inhalation drugs as a Medicare beneficiary because greater levels of effort may be involved in dispensing inhalation drugs when a patient begins these drugs for the first time, for example, following hospital discharge.

*Comment:* Many commenters responded to our request for comments on the impact of Medicare Part D coverage of metered dose inhalers on beneficiary access to care. A number of commenters asserted that they did not believe there would be a substantial shift to MDIs when they become covered under Medicare Part D. One commenter said that MDIs are not a substitute for nebulizers, as many patients require nebulizers due to inability to use MDIs properly, or physicians' experience has shown nebulizers are more effective than MDIs.

Another commenter said that although research has not been able to demonstrate the superiority of nebulizers to MDIs, nebulizers are the standard of care for COPD and chronic lung diseases in the moderate to severe stages. Other reasons commenters cited for their belief that there would not be a substantial shift to MDIs include: Physician inability to properly train patients on MDIs; patient familiarity with nebulizer use gained during hospital stays; research suggesting patient preference for nebulizers; potential use of nebulizers and MDIs by the same patient; and potential differences in cost-sharing across Medicare Part B and Part D. However, one physician specialty group said that it anticipates many Medicare beneficiaries will migrate to MDIs, and those that remain on nebulizers will be more frail and in need of more personalized service.

*Response:* We believe expansion of Medicare coverage of inhalation drugs to include MDIs under Medicare Part D will provide additional options for treatment and positively impact access to care. As we indicated in the proposed rule, we recognize that nebulizers are required by many beneficiaries because of their individual circumstances. We believe that physicians will choose the treatment option that best meets a beneficiary's needs, and both nebulizers and MDIs will play an important role in the Medicare program in the years to come.

*Comment:* A health professional association asserted that individuals that provide patient education on use of nebulizers, MDIs, and dry powder inhalers (DPIs) should be qualified by virtue of education, training, and competency testing. It also urged CMS to pay a separate education fee to physicians when prescribing an MDI or dry powder inhaler. The commenter also proposed various levels of fees for initial and follow-up services.

Another commenter raised concerns about what it asserts is a trend toward drop shipping respiratory related devices. The commenter expressed concern that contact between a respiratory patient and provider may disappear, raising potential concerns about correct usage of the respiratory device.

*Response:* We agree that it is important that beneficiaries are properly trained in the use of nebulizers. The Medicare program provides that equipment suppliers either directly train the beneficiary in the use of the nebulizer or ensure that the beneficiary has been trained by other qualified individuals (§ 424.57(c)(12)). In

addition, under the physician fee schedule, Medicare will pay physicians to train the beneficiary in the use of a nebulizer, MDI, or inhalation device (CPT code 94664, demonstration and/or evaluation of patient utilization of an aerosol generator, nebulizer, metered dose inhaler or IPPB device).

*Comment:* One commenter stated that CMS evaded its notice and comment rulemaking obligations under the Administrative Procedures Act (APA) to collect meaningful data in support of an appropriate dispensing fee. The commenter urged us to publish data in a subsequent rule, and seek comment, before publishing a final payment rate for 2006.

*Response:* In the August 8, 2005 proposed rule, we identified and reviewed available studies and data on the cost of providing inhalation drugs, sought comment as well as additional data and information concerning an appropriate payment amount and scope, and indicated that we thought it likely that the payment amount for 2006 would be lower than the current amount. Furthermore, in establishing the 2006 dispensing fee, we analyzed the available studies and data in response to comments received on the proposed rule and based on that analysis have continued to use the 2004 AAH data that was identified in the proposed rule and also used to establish the 2005 fee. Furthermore, as discussed previously, it is our opinion that the rates established in this rule are appropriate in light of the statute and our understanding of Congressional intent. We believe, therefore, this met our obligations under the APA.

*Comment:* One commenter took issue with our description in the proposed rule of inhalation drugs as supplies.

*Response:* Medicare coverage of inhalation drugs is derived from their use in covered nebulizers. For Medicare coverage purposes, they are considered covered supplies.

*Comment:* A few commenters expressed concern about precedents Medicare Part B will set for Medicare Part D. They asserted that 90-day scripts are not appropriate for nursing home patients.

*Response:* The Medicare Part B policy concerning a 90-day dispensing fee does not carry over to Medicare Part D.

*Comment:* Although the assignment of benefits form (AOB) has been eliminated, one commenter noted that the requirement to obtain a payment authorization signed by the beneficiary before submitting the claim diminishes the benefit of eliminating the AOB. The commenter urged CMS to eliminate the requirement for signed payment

authorization for providers and those reimbursed based on assignment only.

*Response:* We thank the commenter for the comment. CMS is reviewing the beneficiary signature requirement for claims submission in light of the elimination of the AOB in instances of mandatory assignment. However, CMS currently requires a beneficiary signature for claims submission.

*Comment:* One drug manufacturer suggested that compounding that attempts to mimic production of commercially available products threatens patient safety. The commenter urged CMS to structure the dispensing fee to reduce the likelihood of inappropriate compounding. The commenter also suggested code modifiers for pharmacy-compounded medications to help identify their occurrence. Another drug manufacturer suggested that reducing the dispensing fee could spur suppliers to provide compounded versions of commercially available products without physician or patient authorization. The commenter suggested that we review supplier documentation to ensure compounded solutions are only furnished where documentation supports medical necessity of a customized product.

*Response:* The inclusion of costs for pharmacy compounding in the dispensing fee is not in any way an endorsement of compounding that is inconsistent with FDA guidelines. Furthermore, Medicare expects that pharmacies comply with FDA guidelines irrespective of the dispensing fee payment amount established. We understand the concerns the commenters raised and will consider the issues further.

*Comment:* One commenter urged us to require code modifiers for claims associated with patient compounding of inhalation drugs. The commenter asserts that when a physician writes a prescription for a compounded drug, the inhalation drug supplier has an incentive to dispense the drugs separately in order to obtain two dispensing fees. The commenter asserts that implementing the modifiers would allow us to pay only one dispensing fee, instead of two, under these circumstances.

*Response:* Medicare pays only one dispensing fee per 30-day (or 90-day) period, regardless of the number of drugs dispensed. As a result, these modifiers would not affect Medicare expenditures.

*Comment:* We received some comments in response to our request for information about why there is substantial variation in costs across

suppliers. A few commenters suggested that many beneficiaries receive services from small providers who may have higher costs.

*Response:* We appreciate the comments. We note that the GAO report, which showed wide cost variation, found that larger suppliers did not necessarily have lower costs than small suppliers. We continue to believe that this is an issue that might benefit from further study.

5. Supplying Fee

Section 303(e)(2) of the MMA added section 1842(o)(6) of the Act which requires the Secretary to pay a supplying fee (less applicable deductible and coinsurance) to pharmacies for certain Medicare Part B drugs and biologicals, as determined appropriate by the Secretary. The types of Medicare Part B drugs and biologicals eligible for a supplying fee are immunosuppressive drugs described in section 1861(s)(2)(J) of the Act, oral anticancer chemotherapeutic drugs described in section 1861(s)(2)(Q) of the Act, and oral anti-emetic drugs used as part of an anticancer chemotherapeutic regimen described in section 1861(s)(2)(T) of the Act.

Beginning with CY 2005, Medicare established a supplying fee of $24 per prescription for these categories of drugs, with a higher fee of $50 for the initial immunosuppressive prescription supplied in the first month after a transplant. When multiple drugs are supplied to a beneficiary, a separate supplying fee is paid for each prescription, except when different strengths of the same drug are supplied on a single day. When we established the $24 supplying fee in the CY 2005 final rule (69 FR 66236), we indicated that we were establishing a rate higher than that of other payers due to the additional costs associated with Medicare Part B's lack of online claims adjudication.

As part of the August 8, 2005 proposed rule (70 FR 45848), we proposed changes to the supplying fee for multiple prescriptions supplied during the same month. We proposed to continue paying $24 for the first prescription supplied during a month (or $50 for the first oral immunosuppressive prescription supplied in the first month after a transplant) and a supplying fee of $8 for each additional prescription the pharmacy supplied to the beneficiary during the same month. Each pharmacy supplying these drugs to a beneficiary during a month would be entitled to one $24 supplying fee per beneficiary during that month. In making this proposal, we

indicated that when a pharmacy supplies multiple drugs to a beneficiary during the same month, many of which are likely to be supplied on the same day, we were concerned that we were overpaying for the costs associated with our lack of online claims adjudication. Furthermore, we indicated that we believe that the $24 supplying fee for the first prescription would adequately compensate a supplier for the billing costs associated with the lack of on-line claims adjudication, and that the cost of supplying additional prescriptions in the same month should be comparable to that of other payers.

We also proposed to expand the circumstances under which we pay supplying fees for multiple prescriptions filled on the same day. Currently, we pay a supplying fee for each prescription supplied on the same day as long as the prescriptions are for different drugs. We proposed to pay a supplying fee for each prescription, even if the prescriptions are for different strengths of the same drug.

We requested comments about the appropriateness of our proposed supplying fee for multiple prescriptions supplied during a single month along with data and information about the incremental costs of supplying additional prescriptions to a Medicare beneficiary during a single month. We also asked for comments about how pharmacy costs and reimbursement for supplying oral drugs under Medicare compares to that of other payers.

We received numerous comments regarding our supplying fee proposals. Those comments and responses are provided below.

*Comment:* Numerous commenters were supportive of our proposal to expand the circumstances under which we pay a supplying fee to include paying separate fees when multiple strengths of the same drug are supplied on the same day. However, many commenters expressed concern about our proposal to pay a supplying fee of $24 to a pharmacy for the first prescription and $8 for all subsequent prescriptions supplied in a 30-day period. Commenters generally urged no reduction in the supplying fee when multiple prescriptions are provided in the same month, and a few urged a payment increase. In opposing the $8 subsequent fee, some commenters stated that the agency had included no new cost data in the proposed rule to support a reduction. At the same time, some commenters provided cost information as part of their comments.

A few commenters indicated that the cost of supplying a drug for an insurer with online claims adjudication had

increased from $8 (as cited in the proposed rule) to $9 to $10 based on new studies. An association representing chain drug stores provided information from a few large chains indicating that the average cost to supply a Medicare Part B prescription was between $19 and $21, noting that small chains or independent pharmacies may have higher costs. The association asserted that the current $24 fee was reasonable considering the fact that Medicare currently does not pay separate supplying fees for different strengths of the same drug supplied on the same day. The association urged us to consider an increase in the $24 fee to take into account inflation, and an increase in the $50 fee for the first prescription after a transplant to compensate for the intense patient monitoring that the association indicated was needed. A large chain pharmacy indicated its average cost of supplying a Medicare prescription was $19.02, which included $5.54 for bad debt.

An association for specialty transplant pharmacies submitted data suggesting that Medicare's reimbursement (combined payment for the drug and supplying fee) to these pharmacies for 2 large volume immunosuppressive drugs is comparable or lower than that of Medicaid or private payers. This association pointed to a 2004 report prepared by a consultant, which indicated that specialty pharmacy costs for immunosuppressive drugs for Medicare patients averaged about $35. This association also indicated that transplant pharmacies have higher costs because they offer more extensive services, routinely stock specialty medicines and maintain regular and consistent contact with their Medicare clients. The association suggested that these services should be compensated through the supplying fee. In addition, this association also claimed that chain pharmacy data collected in a similar manner to the specialty pharmacy data yield costs of $21. The group asserted that the chain costs appear lower than the specialty pharmacy costs in part because chains supply items such as diabetic test-strips, which they indicate cost less to supply.

In opposing a reduction in the supplying fee for subsequent prescriptions in a month, a number of commenters took issue with the rationale provided in the proposed rule for the reduction, saying that there are not economies of scale in processing Medicare claims when multiple prescriptions are provided in the same month. Many commenters outlined costs associated with billing Medicare.

Portions Omitted

components relating to training such as technical staff, medical supplies, and the special costs of education (manuals and education materials). These requests may include overhead and other indirect costs to the extent that these costs are directly attributable to the additional training costs.

(e) *Documentation.* The pediatric ESRD facility must provide the following information to support its exception request:

(1) A copy of the facility's training program.

(2) Computation of the facility's cost per treatment for maintenance sessions and training sessions including an explanation of the cost difference between the two modalities.

(3) Class size and patients' training schedules.

(4) Number of training sessions required, by treatment modality, to train patients.

(5) Number of patients trained for the current year and the prior 2 years on a monthly basis.

(6) Projection for the next 12 months of future training candidates.

(7) The number and qualifications of staff at training sessions.

(f) *Accelerated training exception.* (1) A pediatric ESRD facility may bill Medicare for a dialysis training session only when a patient receives a dialysis treatment (normally 3 times a week for hemodialysis). Continuous cycling peritoneal dialysis (CCPD) and continuous ambulatory peritoneal dialysis (CAPD) are daily treatment modalities; ESRD facilities are paid the equivalent of three hemodialysis treatments for each week that CCPD and CAPD treatments are provided.

(2) If a pediatric ESRD facility elects to train all its patients using a particular treatment modality more often than during each dialysis treatment and, as a result, the number of billable training dialysis sessions is less than the number of actual training sessions, the facility may request a composite rate exception, limited to the lesser of the—

(i) Facility's projected training cost per treatment; or

(ii) Cost per treatment the facility receives in training a patient if it had trained patients only during a dialysis treatment, that is, three times per week.

(3) An ESRD facility may bill a maximum of 25 training sessions per patient for hemodialysis training and 15 sessions for CCPD and CAPD training.

(4) In computing the payment amount under an accelerated training exception, CMS uses a minimum number of training sessions per patient (15 for hemodialysis and 5 for CAPD and CCPD) when the facility actually

provides fewer than the minimum number of training sessions.

(5) To justify an accelerated training exception request, an ESRD facility must document that a significant number of training sessions for a particular modality are provided during a shorter but more condensed period.

(6) The facility must submit with the exception request a list of patients, by modality, trained during the most recent cost report period. The list must include each beneficiary's—

(i) Name;

(ii) Age; and

(iii) Training status (completed, not completed, being retrained, or in the process of being trained).

(7) The total treatments from the patient list must be the same as the total treatments reported on the cost report filed with the request.

### § 413.192 [Removed]

■ 18. Section 413.192 is removed.

## PART 414—PAYMENT FOR PART B MEDICAL AND OTHER HEALTH SERVICES

■ 19. The authority citation for part 414 continues to read as follows:

**Authority:** Secs. 1102, 1871, and 1881(b)(1) of the Social Security Act (42 U.S.C. 1302, 1395hh, and 1395rr(b)(1)).

### Subpart B—Physicians and Other Practitioners

■ 20. Section 414.65 is amended by revising paragraph (a)(1) to read as follows:

### § 414.65   Payment for telehealth services

(a) * * *

(1) The Medicare payment amount for office or other outpatient visits, consultation, individual psychotherapy, psychiatric diagnostic interview examination, pharmacologic management, end stage renal disease related services included in the monthly capitation payment (except for one visit per month to examine the access site), and individual medical nutrition therapy furnished via an interactive telecommunications system is equal to the current fee schedule amount applicable for the service of the physician or practitioner.

* * * * *

### Subpart J—Submission of Manufacture's Average Sales Price Data

■ 21. Section 414.804(a) is amended by revising paragraph (a)(3)(iv) to read as follows:

### § 414.804   Basis of payment.

(a) * * *

(3) * * *

(iv) *Example.* The total lagged price concessions (discounts, rebates, etc.) over the most recent 12-month period available associated with direct sales for National Drug Code 12345–6789–01 subject to the ASP reporting requirement equal $200,000. The total in dollars for the sales subject to the average sales price reporting requirement for the same period equals $600,000. The lagged price concessions percentage for this period equals 200,000/600,000 = .33333. The total in dollars for the direct sales subject to the average sales price reporting requirement for the quarter being reported equals $50,000 for 10,000 units sold. Assuming no non-lagged price concessions apply, the manufacturer's average sales price calculation for this National Drug Code for this quarter is: $50,000 − (0.33333 × $50,000) = $33,334 (net total sales amount); $33,334/10,000 = $3.33 (average sales price).

* * * * *

■ 22. Section 414.904 is amended by—

■ A. Revising paragraph (a) introductory text.

■ B. Adding a new paragraph (d)(2)(iii).

■ C. Revising paragraphs (d)(3) and (e)(2).

The revisions and additions read as follows:

### § 414.904   Basis of payment

(a) *Method of payment.* Payment for a drug furnished on or after January 1, 2005 is based on the lesser of—

* * * * *

(d) * * *

(2) * * *

(iii) Effective for drugs and biologicals furnished in 2006, the payment for such drugs and biologicals furnished in connection with renal dialysis services and separately billed by freestanding and hospital-based renal dialysis facilities not paid on a cost basis is 106 percent of the average sales price.

(3) *Widely available market price and average manufacturer price.* If the Inspector General finds that the average sales price exceeds the widely available market price or the average manufacturer price by 5 percent or more in calendar year 2006, the payment limit in the quarter following the transmittal of this information to the Secretary is the lesser of the widely available market price or 103 percent of the average manufacturer price.

(e) * * *

(2) *Infusion drugs furnished through a covered item of durable medical equipment.* The payment limit for an

infusion drug furnished through a covered item of durable medical equipment is calculated using 95 percent of the average wholesale price in effect on October 1, 2003 and is not updated in 2006.

\* \* \* \* \*

■ 23. Section 414.906 is amended by revising paragraph (f) to read as follows:

§ 414.906   Competitive acquisition program as the basis for payment.

\* \* \* \* \*

(f) *Substitution or addition of drugs on an approved CAP vendor's CAP drug list.* (1) *Short-term substitution of a CAP drug.* On an occasional basis (for a period of time less than 2 weeks), an approved CAP vendor may agree to furnish a substitute NDC within a HCPCS code on the approved CAP vendor's CAP drug list if the approved CAP vendor—

(i) Is willing to accept the payment amount that was established for the HCPCS code under this section; and

(ii) Obtains the participating CAP physician's prior approval.

(2) *Long-term substitution or addition of a CAP drug.* An approved CAP vendor may submit a request, as specified in paragraph (f)(3) of this section, for approval to substitute an NDC supplied by the approved CAP vendor for another NDC within the same HCPCS code or to add an NDC to the approved CAP vendor's drug list, if at least one of the following criteria is met:

(i) Proposed substitution of an NDC for a period of 2 weeks or longer.

(ii) Proposed addition of one or more NDCs within a HCPCS code included in the CAP drug category specified by CMS or on the approved CAP vendor's approved CAP drug list.

(iii) Proposed addition of—

(A) One or more newly issued HCPCS codes; or

(B) One of the following single indication orphan drug J codes or their updates: J0205, J0256, J9300, J1785, J2355, J3240, J7513, J9010, J9015, J9017, J9160, J9216.

(iv) Beginning January 1, 2007, the proposed addition of a drug(s) that has not yet been assigned a HCPCS code, but for which a HCPCS code must be established.

(3) *Requesting the addition or substitution of CAP drug.* An approved CAP vendor that meets the one of the criteria specified in paragraph (f)(2) must submit a written request to CMS or its designee. The request must—

(i) Specify the NDC(s) and the respective HCPCS code that is to be added or substituted.

(ii) Address the rationale for the substitution or addition of the NDC(s) or

the addition of the HCPCS code(s) as applicable; and

(iii) Address the impact of the substitution of the NDC(s) or the addition of the NDC(s) or HCPCS code(s), or both on—

(A) Patient and drug safety;

(B) Drug waste; and

(C) The potential for cost savings.

(4) *Approval of a request(s).* CMS or its designee notifies the approved CAP vendor of its decision.

(i) Except as specified in paragraph (f)(4)(ii) of this section, an approved request is effective at the beginning of the next calendar quarter.

(ii) Approved substitutions for request based on a drug shortage or other exigent circumstance may become effective immediately provided that—

(A) CMS approves the immediate substitution; and

(B) The approved CAP vendor's notifies its CAP participating physicians of the substitution immediately following CMS approval.

(5) *Payment for an approved drug change(s).* The payment for— (i) Substituted or added CAP drugs that are within a HCPCS code for which payment is computed under paragraph (c)(1) of this section is the single payment for that HCPCS code, as determined and updated in accordance with paragraph (c)(1) of this section; and

(ii) Added CAP drugs that are not within a HCPCS code for which payment is computed under paragraph (c)(1) of this section is specified under paragraph (c)(2) of this section.

■ 24. Section 414.908 is amended by—
■ A. Revising paragraphs (a)(3)(v)(M).
■ B. Redesignating paragraphs (a)(3)(vi) through (a)(3) (xii) as (a)(3)(viii) through (a)(3)(xiv).
■ C. Adding new paragraphs (a)(3)(vi) and (a)(3)(vii).
■ D. Revising paragraph (a)(5).

The revisions and additions read as follows:

§ 414.908   Competitive acquisition program.

(a) \* \* \*

(3) \* \* \*

(v) \* \* \*

(M) Additional patient information: date of birth, allergies, height/weight, ICD–9–CM (if necessary).

(vi) Agrees to accept the particular National Drug Codes (NDCs) supplied by the approved CAP vendor for the duration of the participating CAP physician's enrollment with the approved CAP vendor, subject to paragraphs (a)(3)(vii) and (a)(3)(xiv) of this section. By electing to participate with an approved CAP vendor, the participating CAP physician also agrees

to accept the changes to the approved CAP vendor's CAP drug list that have been approved in accordance with § 414.906(f).

(vii) Agrees to place routine orders for CAP drugs at the HCPCs level, except when medical necessity requires a particular formulation on the approved CAP vendor's CAP drug list. Medical necessity must be documented. When the conditions of this paragraph are met, the participating CAP physician may submit a prescription order to the approved CAP vendor that specifies the NDC.

\* \* \* \* \*

(5) *Additional opt out provision.* In addition to the circumstances listed in paragraph (a)(2) of this section, if the approved CAP vendor refuses to ship to the participating CAP physician because the conditions of § 414.914(h) were met, the physician can withdraw from the CAP category for the remainder of the year immediately upon notice to CMS and the approved CAP vendor.

\* \* \* \* \*

■ 25. Section 414.914 is amended by—
■ A. Redesignating paragraphs (f)(9) through (f)(11) as paragraphs (f)(14) through (f)(16).
■ B. Redesignating (f)(5) through (f)(8) as paragraphs (f)(9) through (f)(12) and paragraphs.
■ C. Adding new paragraphs (f)(5) through (f)(8) and (f)(13).
■ D. Revising paragraph (g)(3).
■ E. Revising paragraphs (h)(1) through (h)(3), (h)(5) and (h)(6), and (h)(8).

The revisions and additions read as follows:

§ 414.914   Terms of contract.

\* \* \* \* \*

(f) \* \* \*

(5) Respond within 2 business days to any inquiry, or sooner if the inquiry is related to drug quality;

(6) Staff a toll-free telephone line from 8:30 a.m. or earlier and until 5 p.m. or later for all time zones served in the continental United States by the CAP vendor on business days (Monday through Friday excluding Federal holidays) to provide customer assistance, and establish reasonable hours of operation for Hawaii, Alaska, Puerto Rico, and the other U.S. territories;

(7) Staff an emergency toll-free telephone line for weekend and evening access when the call center is closed, and determine what hours on Saturday and Sunday the call center is staffed and which hours a toll-free emergency line is activated; and

(8) Include assistance for the disabled, the hearing impaired, and Spanish-

**70334** **Federal Register** / Vol. 70, No. 223 / Monday, November 21, 2005 / Rules and Regulations

speaking inquirers in all customer service operations.

\*   \*   \*   \*   \*

(13) Provide direct notification to participating CAP physicians enrolled with them of updates to the approved CAP vendor's CAP drug list on a quarterly basis. Changes must be disseminated at least 30 days before the approved changes are due to take effect, unless immediate notification as described in § 414.906(f)(4) is required. The approved CAP vendor's entire CAP drug list must be disseminated at least once yearly; and approved CAP vendors must make a complete list that incorporates the most recent updates available to physicians on an ongoing basis. CMS posts on its web site the updated CAP drug lists for each approved CAP vendor.

\*   \*   \*   \*   \*

(g) \* \* \*

(3) A full or partial waiver of the cost-sharing amount after determining in good faith that the individual is in financial need or the failure of reasonable collection efforts, provided that the waiver meets all of the requirements of section 1128A(i)(6)(A) of the Act and the corresponding regulations at paragraph (1) of the definition of "Remuneration" in § 1003.101 of this title. The availability of waivers may not be advertised or be made as part of a solicitation. Approved CAP vendors must inform beneficiaries that they generally make available the categories of assistance described in paragraphs (g)(1), (g)(2), and (g)(3) of this section. In no event may the approved CAP vendor include or make any statements or representations that promise or guarantee that beneficiaries receive cost-sharing waivers.

(h) \* \* \*

(1) Subsequent to receipt of final payment by Medicare, or the verification of drug administration by the participating CAP physician, the approved CAP vendor must bill any applicable supplemental insurance policies.

(2) If a balance remains, after the supplemental insurer pays their share of the bill, or if there is no supplemental insurance, the approved CAP vendor may bill the beneficiary.

(3) At the time of billing the beneficiary, or the participating CAP physician's presentation of the bill on behalf of the approved CAP vendor, the approved CAP vendor must inform the beneficiary of any types of cost-sharing assistance that may be available consistent with the requirements of section 1128A(a)(5) of the Act and § 414.914(g).

(4) \* \* \*

(5) For purposes of paragraph (h) delivery means postmark date, or the date the coinsurance bill or notice was presented to the beneficiary by the participating CAP physician on behalf of the approved CAP vendor.

(i) Except as specified in paragraph (h)(5)(ii), if after 45 days from delivery of the approved CAP vendor's bill to the beneficiary, the beneficiary's cost-sharing obligation remains unpaid, the approved CAP vendor may refuse further shipments to the participating CAP physician for that beneficiary.

(ii) If the beneficiary has requested cost-sharing assistance within 45 days of receiving delivery of the approved CAP vendor's bill, provisions of paragraphs (h)(6), (h)(7), or (h)(8) of this section, apply.

(6) If the approved CAP vendor implements a reasonable payment plan, as specified in § 414.914(g)(2), the approved CAP vendor must continue to ship CAP drugs for the beneficiary, as long as the beneficiary remains in compliance with the payment plan and makes an initial payment under the plan within 15 days after the delivery of the approved CAP vendor's written notice to the beneficiary offering the payment plan.

(7) \* \* \*

(8) If the approved CAP vendor refers the beneficiary to a bona fide and independent charity in accordance with § 414.914(g)(1), the approved CAP vendor may refuse to ship drugs if the past due balance is not paid 15 days after the date of delivery of the approved CAP vendor's written notice to the beneficiary containing the referral for cost-sharing assistance.

\*   \*   \*   \*   \*

## Subpart L—Supplying and Dispensing Fees

■ 26. Section 414.1001 is revised to read as follows:

**§ 414.1001   Basis of payment.**

(a) *Supplying fees.* Beginning in CY 2006—

(1) A supplying fee of $24 is paid to a pharmacy for the first prescription of drugs and biologicals described in sections 1861(s)(2)(J), 1861(s)(2)(Q), and 1861(s)(2)(T) of the Act, that the pharmacy provided to a beneficiary during a 30-day period.

(2) A supplying fee of $16 is paid to a pharmacy for each prescription following the first prescription (as specified in paragraph (a)(1) of this section) of drugs and biologicals described in sections 1861(s)(2)(J), 1861(s)(2)(Q), and 1861(s)(2)(T) of the

Act, that the pharmacy provided to a beneficiary during a 30-day period.

(3) A separate supplying fee is paid to a pharmacy for each prescription of drugs and biologicals described in sections 1861(s)(2)(J), 1861(s)(2)(Q), and 1861(s)(2)(T) of the Act.

(b) *Supplying fees following transplant.* Beginning CY 2006—(1) A supplying fee of $50 is paid to pharmacy for the initial supplied prescription of drugs and biologicals described in section 1861(s)(2)(J) of the Act, that the pharmacy provided to a patient during the first 30-day period following a transplant.

(2) A supplying fee of $16 is paid to a pharmacy for each prescription following an initial prescription after a transplant (as specified in paragraph (b)(1) of this section) of drugs and biologicals describe in section 1861(s)(2)(J) of the Act, that the pharmacy provided to a beneficiary during a 30-day period.

(c) *30-day dispensing fees.* Beginning CY 2006—(1) A dispensing fee of $57 is paid to a supplier to the extent that the prescription is for the initial dispensed 30-day supply of inhalation drugs furnished through durable medical equipment covered under section 1861(n) of the Act, regardless of the number of partial shipments of that 30-day supply.

(2) Except for supplied inhalation drugs that meet criteria described in paragraph (c)(1) of this section, a dispensing fee of $33 is paid for each dispensed 30-day supply of inhalation drugs furnished through durable medical equipment covered under section 1861(n) of the Act, regardless of the number of partial shipments of that 30-day supply.

(d) *90-day dispensing fee.* Beginning CY 2006, a dispensing fee of $66 is paid to a supplier for each dispensed 90-day supply of inhalation drugs furnished through durable medical equipment covered under section 1861(n) of the Act, regardless of the number of partial shipments of that 90-day supply.

## PART 424—CONDITIONS FOR MEDICARE PAYMENT

■ 27. The authority citation for part 424 continues to read as follows:

**Authority:** Secs. 1102 and 1871 of the Social Security Act (42 U.S.C. 1302 and 1395hh).

**§ 424.22   [Amended]**

■ 28. In § 424.22—
■ A. The footnote for paragraph (a)(1)(iv), the term "hosptial" is removed and the term "hospital" is added in its place.