# **EXHIBIT 12**

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**Centers for Medicare & Medicaid Services**

**42 CFR Parts 405, 410, 411, 414, 418, 424, 484, and 486**

[CMS–1429–P]

RIN 0938–AM90

**Medicare Program; Revisions to Payment Policies Under the Physician Fee Schedule for Calendar Year 2005**

**AGENCY:** Centers for Medicare & Medicaid Services (CMS), HHS.

**ACTION:** Proposed rule.

**SUMMARY:** This proposed rule would refine the resource-based practice expense relative value units (RVUs) and make other changes to Medicare Part B payment policy. The proposed policy changes concern: supplemental survey data for practice expense, updated geographic practice cost indices for physician work and practice expense, updated malpractice RVUs, revised requirements for supervision of therapy assistants, revised payment rules for low osmolar contrast media, changes to payment policies for physicians and practitioners managing dialysis patients, clarification of care plan oversight requirements, revised requirements for supervision of diagnostic psychological testing services, clarifications to the policies affecting therapy services, revised requirements for assignment of Medicare claims, addition to the list of telehealth services, and several coding issues.

We are proposing these changes to ensure that our payment systems are updated to reflect changes in medical practice and the relative value of services. We solicit comments on these proposed policy changes.

This proposed rule also addresses the following provisions of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (MMA): coverage of an initial preventive physical examination; coverage of cardiovascular screening blood tests; coverage of diabetes screening tests; incentive payment improvements for physicians in shortage areas; payment for covered outpatient drugs and biologicals; payment for renal dialysis services; coverage of routine costs associated with certain clinical trials of category A devices as defined by the Food and Drug Administration; hospice consultation service; indexing the Part B deductible to inflation; extension of coverage of intravenous immune globulin (IVIG) for the treatment in the home of primary immune deficiency diseases; revisions to reassignment provisions; clinical conditions for payment of covered items of durable medical equipment; and payment for diagnostic mammograms.

In addition, we discuss physicians' services associated with drug administration services and payment for set-up of portable x-ray equipment.

**DATES:** To be assured consideration, comments must be received at one of the addresses provided below, no later than 5 p.m. on September 24, 2004.

**ADDRESSES:** In commenting, please refer to file code CMS–1429–P. Because of staff and resource limitations, we cannot accept comments by facsimile (FAX) transmission.

You may submit comments in one of three ways (no duplicates, please):

1. *Electronically.* You may submit electronic comments on specific issues in this regulation to *http://www.cms.hhs.gov/regulations/ecomments*. (Attachments should be in Microsoft Word, WordPerfect, or Excel; however, we prefer Microsoft Word.)

2. *By mail.* You may mail written comments (one original and two copies) to the following address ONLY:

Centers for Medicare & Medicaid Services, Department of Health and Human Services, Attention: CMS–1429–P, P.O. Box 8012, Baltimore, MD 21244–8012.

Please allow sufficient time for mailed comments to be received before the close of the comment period.

3. *By hand or courier.* If you prefer, you may deliver (by hand or courier) your written comments (one original and two copies) before the close of the comment period to one of the following addresses. If you intend to deliver your comments to the Baltimore address, please call telephone number (410) 786–7197 in advance to schedule your arrival with one of our staff members.

Room 445–G, Hubert H. Humphrey Building, 200 Independence Avenue, SW., Washington, DC 20201; or 7500 Security Boulevard, Baltimore, MD 21244–1850.

(Because access to the interior of the HHH Building is not readily available to persons without Federal Government identification, commenters are encouraged to leave their comments in the CMS drop slots located in the main lobby of the building. A stamp-in clock is available for persons wishing to retain a proof of filing by stamping in and retaining an extra copy of the comments being filed.)

Comments mailed to the addresses indicated as appropriate for hand or courier delivery may be delayed and received after the comment period.

*Submission of comments on paperwork requirements.* You may submit comments on this document's paperwork requirements by mailing your comments to the addresses provided at the end of the "Collection of Information Requirements" section in this document.

For information on viewing public comments, see the beginning of the **SUPPLEMENTARY INFORMATION** section.

**FOR FURTHER INFORMATION CONTACT:**
Pam West (410) 786–2302 (for issues related to Practice Expense, Respiratory Therapy Coding, and Therapy Supervision).
Rick Ensor (410) 786–5617 (for issues related to Geographic Practice Cost Index (GPCI) and malpractice RVUs).
Craig Dobyski (410) 786–4584 (for issues related to list of telehealth services or payments for physicians and practitioners managing dialysis patients).
Bill Larson or Tiffany Sanders (410) 786–7176 (for issues related to coverage of an initial preventive physical examination).
Cathleen Scally (410) 786–5714 (for issues related to payment of an initial preventive physical examination).
Joyce Eng (410) 786–7176 (for issues related to coverage of cardiovascular screening tests).
Betty Shaw (410) 786–7176 (for issues related to coverage of diabetes screening tests).
Anita Greenberg (410) 786–0548 (for issues related to payment of cardiovascular and diabetes screening tests).
David Worgo (410) 786–5919, (for issues related to incentive payment improvements for physicians practicing in shortage areas).
Angela Mason or Jennifer Fan (410) 786–0548 (for issues related to payment for covered outpatient drugs and biologicals).
David Walczak (410) 786–4475 (for issues related to reassignment provisions).
Henry Richter (410) 786–4562 (for issues related to payments for ESRD facilities).
Steve Berkowitz (410) 786–7176 (for issues related to coverage of routine costs associated with certain clinical trials of category A devices).
Terri Deutsch (410) 786–9462 (for issues related to hospice consultation services).
Karen Daily (410) 786–7176 (for issues related to clinical conditions for payment of covered items of durable medical equipment).

Portions Omitted

*M. Section 614—Payment for Certain Mammography Services*

[If you choose to comment on issues in this section, please include the caption "Section 614" at the beginning of your comments.]

Medicare covers an annual screening mammogram for all beneficiaries who are women age 40 and older, and one baseline mammogram for beneficiaries who are women age 35 through 39. Medicare also covers medically necessary diagnostic mammograms. Payment for screening mammography, regardless of setting, is paid under the physician fee schedule, but diagnostic mammography performed in the hospital outpatient department is currently paid under the hospital outpatient prospective payment system (OPPS).

Section 614 of the MMA amended section 1833(t)(1)(B)(iv) of the Act to exclude payment for screening and diagnostic mammograms from the OPPS. In the OPPS proposed rule, we will discuss our proposal for payment for diagnostic mammograms using the payments established under the physician fee schedule. This proposal will parallel the current practice used for the payment of screening mammography services provided in the OPPS setting and will be effective January 1, 2005.

*N. Section 305—Payment for Inhalation Drugs*

[If you choose to comment on issues in this section, please include the caption "Section 305" at the beginning of your comments.]

1. Background

Lung diseases such as chronic obstructive pulmonary disease (COPD) affect large numbers of Medicare beneficiaries. COPD is the fourth largest cause of death in America behind heart disease, certain cancers, and stroke. We hope to reduce the number of new COPD cases by educating Americans about the disease, its causes, and ways to prevent it. We hope to improve the lives of Medicare beneficiaries and improve beneficiary access to treatment for those who already suffer from these conditions.

Depending on an individual's age and health, a number of steps can be taken to treat or prevent this. Because approximately 85 percent of those with COPD are smokers, the first step to avoid the disease is to stop smoking. Smoking has been linked to a large number of health problems and is a leading cause of cancer and pulmonary disease. The Department of Health and Human Services (HHS) has been actively encouraging Americans to quit smoking through its smoking cessation initiatives. Americans who quit smoking will enjoy longer, healthier lives and avoid diseases such as COPD.

We have also recently approved services to address the needs of Americans suffering from COPD, including lung-volume reduction surgery, which, performed in more serious cases, removes the diseased lung tissue, allowing the rest of the lung to function better. Specifically, effective January 1, 2004, Medicare expanded coverage of lung volume reduction surgery to include patients, who are not high-risk surgical patients, who either have severe, upper-lobe emphysema, or have severe, non-upper-lobe emphysema with low exercise capacity.

A number of drugs are available to treat the persons with asthma or who develop COPD. These include agents, often inhaled, that expand the bronchial tubes, allowing the patient to breathe more freely. Access to these drugs for Medicare beneficiaries has been expanded by the MMA.

Nebulizers and metered dose inhalers (MDIs) are two different delivery methods to administer inhalation drugs to a beneficiary. A nebulizer works by aerosolizing liquefied inhalation drugs so that the medication can be more easily inhaled into the lungs. For about 10 to 30 minutes, a beneficiary breathes the mist via compressor tubing hooked up to the nebulizer. An MDI consists of a canister of pressurized medication that is propelled directly into the airways of the lungs when a beneficiary presses on the inhaler and breathes in through the mouth, thereby allowing the medicine to take effect quickly.

Medicare Part B currently pays for nebulizers and inhalation drugs. However, Medicare Part B does not cover MDIs and, therefore, does not pay for inhalation drugs delivered by an MDI. An MDI is considered to be an item of disposable medical equipment (for which there is no current Part B benefit category) while a nebulizer is considered to be an item of DME.

The Part D drug benefit improves beneficiary access to inhalation therapy by covering MDIs (including the inhalation drugs they furnish) beginning January 1, 2006. In addition, the prescription drug discount card began offering discounts on MDIs effective June 1, 2004.

Since Medicare currently covers inhalation drugs provided through nebulizers, but not alternative forms of inhalation therapy, there are strong financial incentives toward use of the former compared to alternatives. Our review of the literature over the past decade did not find that bronchodilators delivered via nebulizers were more effective than bronchodilators delivered via metered dose inhalers.

Since one delivery method is not clinically superior to the other, when Medicare covers both methods of delivery of inhalation therapy, the decision to prescribe one over the other will be made by the physician and beneficiary based on beneficiary needs and preferences consistent with applicable standards of medical practice. It would not be unlikely for many beneficiaries to choose the convenience of MDIs over nebulizers once the Medicare coverage imbalance is removed in 2006. Since MDIs are less expensive, very portable, and easier to use, it is likely there will be a substantial shift of Medicare beneficiaries from nebulizers to MDIs beginning in 2006, even absent the Medicare payment changes for nebulizers and inhalation drugs in 2005.

2. What Medicare Part B Currently Covers

Medicare Part B currently covers and pays for five separate items related to nebulizers. All of the items are subject to the standard Part B deductible and coinsurance.

a. Nebulizers

Medicare Part B currently covers the rental of nebulizers. Nebulizers are in the "capped rental" category of DME for payment purposes. Payment is made on a monthly basis during the period of medical need. Medicare pays 10 percent of the payment amount during the first three months and 7.5 percent during the next 12 months. Section 1834(a) of the Act specifies that the payment amount is equal to the amount paid for purchase of the nebulizer in 1986, indexed to current levels by the cumulative DME update factor specified in this subsection. Thus, Medicare will pay up to a cumulative total of 120 percent of the payment amount for 15 months of renting a nebulizer.

If the beneficiary needs a nebulizer for more than 15 months, and continues to rent it, Medicare makes no further payment for the equipment because the equipment has already been paid for. Medicare does continue to pay for maintenance and servicing of the nebulizer, as well as the inhalation drugs, but the supplier retains title to the equipment.

During the 10th month of continuous rental of a nebulizer, the supplier is required to offer the beneficiary a purchase option, and if the beneficiary accepts the offer and exercises the

purchase option, the supplier transfers title to the nebulizer in the 13th month. In this case, Medicare would make its final monthly rental payment in the 13th month, and the title then would transfer to the beneficiary. About 3 percent of beneficiaries exercise the purchase option.

In 2003, the average Medicare monthly rental payment for nebulizers was $19.07 for the first three months and $14.30 for the fourth through fifteenth month. Thus, Medicare would pay $228.81 for a nebulizer if the beneficiary's period of medical need were 15 months. There are various types of nebulizers (compressor, ultrasonic, portable, disposable) and nebulizer accessories (breathing circuits, air filters, tubing extensions, mouthpieces, spare battery packs, DC adapters) available. Internet prices for compressor nebulizers range from $50 to $100, and prices for portable nebulizers range from $100 to $200, depending on the specific features of the nebulizer. The Medicare payment amount includes payment for delivery of the equipment. (Shipping costs for nebulizers available for purchase on the Internet range from free shipping up to $25).

b. Maintenance and Servicing of Nebulizers

Medicare Part B makes an additional separate payment to the supplier for maintenance and servicing of the equipment (for parts and labor not covered by the supplier's or manufacturer's warranty). For nebulizers that are not purchased, but are used for more than 21 months, the servicing fee covers six-month periods beginning after the 21st month of use. As required by section 1834(a)(7) of the Act, Medicare's payment for maintenance and servicing is equal to the lesser of a reasonable and necessary maintenance and servicing fee, or 10 percent of the total purchase price of the equipment. For nebulizers that are purchased, Medicare may make a payment to the supplier for any necessary maintenance and servicing that is performed.

In 2003, the average service fee for nebulizers was $19.07 per six-month period. Other than routine cleaning of the unit (that is, cleaning and changing filters, cleaning and disinfecting nebulizers, tubing, and mouthpieces), very little maintenance is required to maintain a nebulizer's peak performance. There is usually no scheduled maintenance for the nebulizer. Medicare pays for the usual frequency for replacement of accessories. Maintenance kits and replacement parts are available through online suppliers for approximately $5 to $15.

c. Inhalation Drugs

Medicare Part B pays for drugs that the nebulizer furnishes to a beneficiary. Unlike nebulizers, inhalation drugs are not an explicit benefit covered by statute. However, there was an administrative decision made early in the program's history to cover inhalation drugs as a supply so that the nebulizer could work. Without the inhalation drugs, the nebulizer would not be effective for a beneficiary.

The two most common inhalation drugs used by beneficiaries are albuterol sulfate (a beta-adrenergic bronchodilator) and ipratropium bromide (an anticholinergic bronchodilator). A beneficiary may use one or the other of these inhalation drugs, and they are frequently prescribed together. Both albuterol sulfate and ipratropium bromide are manufactured in powder form, but are generally liquefied and furnished to beneficiaries in liquid form for use in a nebulizer. The beneficiary may use a solution of one drug, or a combination of both drugs, in addition to saline if necessary, with the nebulizer. The beneficiary may mix the solution, or the supplier may furnish the drug in a pre-mixed form (either commercially pre-mixed or pharmacy compounded). The shelf life of these drugs is at least 18 to 24 months, and they do not require any special storage arrangements such as refrigeration.

Medicare also pays for other inhalation drugs, such as budesonide (an inhaled corticosteroid), which are used in conjunction with albuterol sulfate and ipratropium bromide. These drugs can also be administered using a nebulizer or an MDI.

d. Dispensing Fee

Medicare has paid a monthly $5 dispensing fee for each covered inhalation drug or combination of drugs used in a nebulizer. The dispensing fee is paid for each drug dispensed, not the number of unit dose vials provided to the beneficiaries. Additionally, if two or more drugs are combined in single unit dose vials, only one dispensing fee will be paid per drug combination per month. A dispensing fee for saline is not separately billable or payable. Inhalation drugs are the only drugs for which Medicare Part B currently pays a separate dispensing fee.

e. Beneficiary Training.

In 2003, CPT code 94664 was revised to include beneficiary training by a physician or physician's staff regarding use of a nebulizer, MDI, aerosol generator, or intermittent positive pressure breathing (IPPB) machine. The narrative terminology for the code currently is—Demonstration and/or evaluation of patient utilization of an aerosol generator, nebulizer, metered dose inhaler or IPPB machine.'' The 2004 Medicare physician fee schedule payment for this service is $13.44. This service has no physician work relative value units reflecting that the training is typically performed by physician office staff. In 2004, this service has 0.32 practice expense relative value units (RVUs) and 0.04 malpractice RVUs. Additionally, the supplier of the nebulizer, under § 424.57(c)(12), must "document that it or another qualified party has at an appropriate time, provided beneficiaries with necessary information and instructions on how to use Medicare covered-items safely and effectively." Beneficiary training by a physician or physician's staff regarding use of a nebulizer would meet the definition of "another qualified party" for purposes of this supplier requirement.

3. Medicare Spending for Nebulizers and Inhalation Drugs

In 2003, Medicare spent about $1.6 billion for nebulizers and inhalation drugs. This amount includes—

(a) About $130 million for nebulizers (both rental and purchase) and nebulizer related accessories and supplies;

(b) About $13 million for servicing/maintenance fees;

(c) About $1.3 billion for albuterol sulfate and ipratropium bromide and another $120 million for other inhalation drugs for a total of approximately $1.4 billion. (This represents about 88 percent of Medicare spending for inhalation therapy.);

(d) About $35.5 million for 7.1 million dispensing fees; and

(e) About $4.5 million for beneficiary training under CPT code 94664 (though this figure also includes training for other items as well as nebulizers).

Medicare spending for inhalation drugs has grown rapidly. Preliminary data indicate that between 2001 and 2003, Medicare spending increased by 77 percent for albuterol sulfate and ipratropium bromide.

4. Inspector General and General Accounting Office Studies

The HHS IG issued 10 reports between February 1996 and January 2004 about Medicare payments for albuterol sulfate and ipratropium bromide in excess of acquisition costs. In a report issued in September 2001,

the General Accounting Office (GAO) also concluded that Medicare payment for these drugs was in excess of acquisition costs.

Table 1 of the Interim Final Rule regarding Changes to Medicare Payment for Drugs and Physician Fee Schedule Payments for Calendar Year 2004, published in the January 7, 2004 **Federal Register** (69 FR 1084), showed that the acquisition cost (averaging IG and GAO results) was 34 percent of the Average Wholesale Price (AWP) for ipratropium bromide and 17 percent for albuterol sulfate. Prior to 2004, Medicare paid 95 percent of the AWP for each of these drugs and beneficiary coinsurance was 20 percent of the Medicare payment amount. In the case of albuterol sulfate, the beneficiary coinsurance was more than the actual acquisition cost for the drug. During 2004, Medicare payment is 80 percent of the AWP for each of these drugs. Beginning with 2005, Medicare payment will be 106 percent of the Average Sales Price (ASP).

The IG report issued in January 2004 again concluded that Medicare payments were far in excess of acquisition costs for both albuterol sulfate and ipratropium bromide. The IG found that the Medicare 2004 payment (and payment in prior years) was a multiple of the actual acquisition costs for both drugs based on a comparison to the median price that the drug was available through wholesalers/distributors and group purchasing organizations (GPOs) and comparison to the manufacturer-reported Wholesale Acquisition Cost (WAC).

5. Inhalation Drug Spread

In 2003, ipratropium bromide and albuterol sulfate were the third and seventh largest drugs in terms of Medicare spending for carrier paid drugs. The differences between Medicare's payment amount and acquisition costs (that is, spread) for albuterol sulfate and ipratropium bromide are among the largest spreads for drugs studied by the IG and GAO. Based on the actual acquisition costs determined by IG and GAO studies, in 2003, Medicare paid an estimated nearly $900 million in excess of acquisition costs for albuterol sulfate and ipratropium bromide.

The IG and GAO findings of large differences between Medicare payment amounts and acquisition costs for inhalation drugs provided the foundation for Congressional enactment of section 305 of the MMA. This section of the MMA sets Medicare payment for inhalation drugs at 106 percent of the ASP. (The Congressional Budget Office's November 20, 2003 pricing of the MMA estimated section 305 as having savings of $4.2 billion over 10 years.)

Suppliers argue that inhalation drug spread has allowed them to fund activities related to care for beneficiaries with asthma or COPD that otherwise do not have a Medicare Part B benefit category. These other activities may include the following:

• Respiratory therapists on staff or in networks available on-call for home visits or telephone consultations.
• On-call pharmacists.
• Monthly calls to schedule medication refills.
• Continuous education on disease states, including monthly follow-ups.
• 24-hour support lines.
• On-call and/or monthly home delivery of medication and supplies.
• Quality improvement programs.

6. Nebulizers vs. MDIs

Medicare Part B currently covers only one type of inhalation therapy, nebulizers and inhalation drugs. Although Medicare Part B does not cover MDIs and the inhalation drugs they furnish, the new Part D benefit beginning in 2006 will cover these alternative hand-held inhalation therapy devices (MDIs). In addition, the discount card and $600 transitional assistance payment for low-income beneficiaries will help seniors buy inhalers in 2004 and 2005, helping to bridge the gap until 2006 when coverage begins.

MDIs are the quickest and easiest way to take inhalation medication for most asthmatics and patients with COPD. The medication is propelled directly into the lungs, allowing it to take effect more quickly, and with fewer medication side effects. An MDI contains a specific number of "metered inhalations," and is made to deliver the prescribed amount of medication for the labeled number of doses (typically 200 doses, which is 8 doses per day for 25 days). Inhalation accessory devices, such as holding chambers and spacers, are used to improve the direction and deposition of medication delivered by MDIs, making it easier for beneficiaries to use an MDI and making the MDI more effective in delivering the medicine to the lungs.

Since Medicare currently covers nebulizers and inhalation drugs, but not alternative forms of inhalation therapy, there are strong financial incentives toward use of the former compared to alternatives. Our review of the literature over the past decade, including two meta-analyses and over two dozen individual studies applicable to adults, did not find that bronchodilators delivered via nebulizer were more effective than when delivered via metered dose inhaler.

Since one delivery method is not clinically superior to the other, when Medicare covers both methods of delivery of inhalation therapy, the decision to prescribe one over the other will be made by the physician and beneficiary based on beneficiary needs and preferences consistent with applicable standards of medical practice. It would not be unlikely for many beneficiaries to choose the convenience of MDIs over nebulizers once the Medicare coverage imbalance is removed in 2006. Since MDIs are less expensive, very portable, and easier to use, it is likely there will be a substantial shift of Medicare beneficiaries from nebulizers to MDIs beginning in 2006, even absent the Medicare payment changes for nebulizers and inhalation drugs in 2005.

Some claim that beneficiaries cannot use MDIs because they do not have the dexterity to use them. Use of an MDI requires proper inhalation techniques in order to receive the full benefit possible from the amount of medication included in each dose. Spacers and holding chambers extend the mouthpiece of the inhaler and increase the air volume into which the medication is atomized, allowing more time for the patient to breathe the medication and avoid misdirecting the medication onto the soft tissues inside the mouth where it will have little effect on lung function.

A nebulizer may also require a certain level of dexterity (that is, operating, maintaining, and cleaning the nebulizer correctly). There may also be beneficiaries who do not have the dexterity to use either an MDI or nebulizer, which would require the availability of alternative therapies, such as an IPPB machine to aid in the delivery of aerosol medication by increasing the depth of breathing more than the patient alone can achieve.

7. Payments Beginning in 2005 Including Provisions of the Proposed Rule

Our goal is to assure that each beneficiary who needs inhalation therapy has access to the most appropriate medication and delivery method. We expect that the combined changes to cover MDIs, adjust payments for inhalation drugs, and provide for an appropriate dispensing fee will improve beneficiary access and choice. We seek comments about an appropriate amount for a dispensing fee that would assure beneficiary access to inhalation medications provided through nebulizers.

We believe that a dispensing fee is intended to cover a pharmacy's activities to get inhalation drugs to beneficiaries. We seek data and information on the additional services these pharmacies provide to Medicare beneficiaries, the extent to which inhalation drugs can be furnished without these additional services and the extent to which such services are covered under Medicare. We are concerned about significant shifts in beneficiary access to inhalation therapy prior to implementation of the Part D drug benefit in light of the reduction in Medicare payment for inhalation drugs beginning in 2005, and also seek comments about whether the dispensing fee should include a somewhat higher, transitional payment.

Below we discuss, changes in payment for inhalation drugs and nebulizers beginning in 2005.

a. Nebulizers

Section 1834(a)(21) of the Act, as amended by section 302(c)(2) of the MMA, requires a reduction in Medicare payment, beginning with 2005, for specified items of DME, including nebulizers paid under code E0570. The reduction is the difference in payment amounts under Medicare and the median Federal Employees Health Benefits (FEHB) plan, as identified in IG testimony before the Senate Committee of Appropriations on June 12, 2002. Other codes for nebulizers and related equipment are not affected by the payment reduction.

b. Maintenance and Servicing of Nebulizers

Since the maintenance and servicing fee is equal to the first month's rental payment, the maintenance and servicing fee for nebulizers will also be reduced in 2005.

c. Inhalation Drugs

As discussed in the ASP payment section of this proposed rule, for the first quarter of 2005, the Medicare payment at ASP plus 6 percent is estimated to be $0.04 per milligram for albuterol sulfate and $0.30 per milligram for ipratropium bromide. While these figures represent estimated reductions from 2004 payment levels of about 90 percent, they are not necessarily the actual payment amounts for the first quarter of 2005. The actual payment amounts will be based on ASP's calculated from the manufacturer ASP to be submitted for the third quarter of 2004.

Both albuterol sulfate and ipratropium bromide are generic drugs that have multiple manufacturers. Since these ASPs are average figures across all manufacturers, a pharmacy should be able to acquire albuterol sulfate and ipratropium bromide at these prices. Moreover, to the extent there is price variation among manufacturers, there will be some manufacturers with lower prices than others. In this case, a pharmacy might be able to obtain albuterol sulfate and ipratropium bromide at a price below the average.

The Medicare payment amount includes a 6 percent add-on. Assuming that ASP remains constant between the first and third quarters of 2004, the 6 percent add-on would be about $1.00 for a typical month's supply of 450 milligrams of albuterol sulfate and about $3.00 for a 90-day supply. Similarly, the 6 percent add-on would be about $1.60 for a typical month's supply of 93 milligrams of ipratropium bromide and about $4.80 for a 90-day supply. Because albuterol sulfate and ipratropium bromide are often prescribed together, Medicare payment at 106 percent of ASP would include, as additional payments above the acquisition cost of the drugs, a total payment to the supplier of about $2.60 for a 30-day supply and about $7.80 for a 90-day supply of both drugs.

d. Dispensing Fee

Given the overall reduction in payment for inhalation drugs, we are concerned about beneficiary access to these drugs. Because shipping, handling, compounding, and other pharmacy activities would usually exceed the 6 percent payment above the drug acquisition cost, we believe that it is appropriate for Medicare to continue to pay a separate dispensing fee to pharmacies that furnish inhalation drugs to beneficiaries.

We propose to establish a separate dispensing fee for inhalation drugs. This separate dispensing fee will be in addition to the difference between the supplier's acquisition cost and the Medicare payment for the drug. For example, if a supplier is acquiring albuterol and ipratropium bromide for the average sales price, the supplier would receive a separate dispensing fee amount plus their acquisition cost plus $7.80 for a 90-day supply. The $7.80 is the amount included in the payment for the drug itself since Medicare pays 6 percent above the average sales price.

As noted above, Medicare has paid a $5 monthly dispensing fee for each covered inhalation drug or combination of drugs used in a nebulizer. Dispensing fees are paid by Medicaid and private insurers; we seek information about these dispensing fees for inhalation drugs and their applicability to Medicare. In addition, we seek comments about an appropriate dispensing fee amount to cover the shipping, handling, compounding, and other pharmacy activities required to get these inhalation medications to Medicare beneficiaries. We seek data and information that explains the direct labor and non-labor costs as well as indirect costs of overhead for these pharmacy activities as they relate to dispensing of inhalation drugs.

Consideration of dispensing fees needs to be viewed in the context of several important changes and clarifications in Medicare policy and billing requirements.

First, we are proposing to allow a prescription for inhalation drugs covering a 90-day period to be written by a physician and filled by a pharmacy. Current guidelines are that a pharmacy generally should not fill a prescription for inhalation drugs for more than a month's supply for a beneficiary. We believe that this requirement needs revision in the case of inhalation drugs for two key reasons. Most beneficiaries who use inhalation drugs use them for extended periods of time and often use them for the rest of their lives. In addition, we understand that many inhalation drugs are delivered to a beneficiary through the mail. We understand that a mail-order prescription drug model works well for a 90-day prescription. We believe that there will be significant savings in shipping for a 90-day prescription rather than a monthly prescription.

We would expect that reasonableness would govern filling a monthly vs. a 90-day prescription with a physician writing and a pharmacy filling a monthly or a 90-day prescription depending on the circumstances of the beneficiary. For example, it would be reasonable to expect that the first time a beneficiary receives a prescription for a nebulizer and inhalation drugs that the prescription would be for a month. Similarly, it would be reasonable to expect that refill prescriptions for beneficiaries would be for a 90-day period. Carriers would continue to assess claims for dispensed quantities greater than what would be reasonable based on usual dosing guidelines. We would expect that the bulk of prescriptions would be for 90-day periods.

Second, we recently revised the guidelines regarding the time frame for delivery of refills of DMEPOS products to occur no sooner than "approximately 5 days prior to the end of the usage for the current product". As previously noted, inhalation drugs are often furnished to a beneficiary by mail. It has

been suggested that Medicare guidelines for refill prescriptions allowed too short of a window between shipping the next month's prescription and the end of the current month. It was argued that as a result, a pharmacy "effectively" had to ship the product to a beneficiary using an overnight delivery service.

On January 2, 2004, we revised the guidelines (effective February 2, 2004) regarding the time frame for subsequent deliveries of refills of DMEPOS products to occur no sooner than "approximately 5 days prior to the end of the usage for the current product" (see section 4.26.1 of Chapter 4—Benefit Integrity of the Medicare Program Integrity Manual). This change allows shipping of inhalation drugs on "approximately" the 25th day of the month in the case of a month's supply, and on "approximately" the 85th day in the case of a 90-day supply. We emphasize the word "approximately"; while we believe that normal ground service shipping would allow delivery in 5 days, if there were circumstances where ground service could not occur in 5 days, the guideline would still be met if the shipment occurs in 6 or 7 days. ("Days" refers to business days or shipping days applicable to the shipper, that is, a 6 day week in the case of the U.S. Postal Service.). We believe that this change eliminates the need for suppliers to use overnight shipping methods and allows shipping of inhalation drugs by less expensive ground service.

Third, we understand that some pharmacies believe that Medicare has a requirement that a pharmacy must obtain an original signed prescription before each prescription is dispensed. The Program Integrity Manual (section 5.1 of Chapter 5) addresses the ordering requirement for DMEPOS items. The Manual indicates that most DMEPOS items, including drugs, can be dispensed based on a verbal order from a physician. The Manual further indicates that a written order must be obtained before submitting a claim, but that such written order may be faxed, photocopied, electronic or pen and ink. The order for inhalation drugs must specify the name of the drug, the concentration (if applicable), dosage, and frequency of administration. We hope that clarification of this requirement would reduce a pharmacy's costs of supplying covered inhalation drugs to Medicare beneficiaries to the extent that pharmacies are currently applying an original signed prescription requirement.

Fourth, Medicare regulations (§ 424.57) specify the requirements a DMEPOS supplier must meet in order to receive payment for a Medicare covered item. Section 424.57(c)(12) contains the proof of delivery requirement and indicates that a "supplier must be responsible for the delivery of Medicare covered items to beneficiaries and maintain proof of delivery." We recently revised the Program Integrity Manual (section 4.26 of Chapter 4) to address proof of delivery requirements for suppliers. As discussed in the Manual, the burden of proving delivery is left to the supplier. The Manual provides examples of the types of proof that are reasonable and acceptable, but it does not provide an all-inclusive list. Other acceptable proof-of-delivery methods may exist and may be employed by suppliers. This documentation is normally only requested by the contractor when a complaint is received that the item was not provided or received. The documentation is necessary to investigate the allegation. We believe that the current provisions on proof of delivery are adequate and appropriate for inhalation drugs.

Fifth, in section IV.H (Assignment of Medicare Claims—Payment to the Supplier) of this proposed rule, we propose to change current regulations at § 424.55 to eliminate the requirement that beneficiaries assign claims to suppliers in situations where suppliers are required by section 1842(o)(3) of the Act to accept assignment. This change would eliminate the need for suppliers to have a signed Assignment of Benefits (AOB) form from a beneficiary in order for Medicare to make payment. Because such section of the Act requires Medicare to make payment for drugs only on an assigned basis, this change would eliminate a billing requirement for drugs, including inhalation drugs. We believe that this change would reduce a pharmacy's costs of supplying covered inhalation drugs to Medicare beneficiaries to the extent that pharmacies are requiring a signed AOB form before submitting a claim.

We believe that the amount of dispensing fee needs to be considered in conjunction with—

(1) Our proposal to allow 90-day prescriptions;

(2) Our recent revision to allow the next month's refill prescription to be shipped approximately 5 business days prior to the end of usage for the product, that is, to allow shipping on the 25th of the month for a month's supply, and shipping or 85th day in the case of a 90-day period;

(3) Our policy clarification regarding signed original orders before a prescription is filled;

(4) Our proof of delivery requirement revisions; and

(5) Our proposed change regarding the Assignment of Benefits form.

e. Beneficiary Training

Medicare Part B will continue to pay for beneficiary training by a physician's staff regarding use of a nebulizer, MDI, aerosol generator, or IPPB machine. Section 424.57(c)(12) specifies that "The supplier must document that it or another qualified party has at an appropriate time, provided beneficiaries with necessary information and instructions on how to use Medicare covered-items safely and effectively." Beneficiary training by a physician or physician's staff regarding use of a nebulizer would meet the definition of "another qualified party" for purposes of this supplier requirement.

**IV. Other Issues**

*A. Proposals Related to Therapy Services*

1. Outpatient Therapy Services Performed "Incident To" Physicians' Services

[If you choose to comment on issues in this section, please include the caption "Therapy—Incident To" at the beginning of your comments.]

In last year's proposed rule, we requested comments on clarifying that the personnel qualifications of therapists in home health settings at § 484.4 apply consistently to all therapy settings, including the offices of physical and occupational therapists, physicians, and nonphysician practitioners. We received comments from therapists, physicians, nontherapist health care providers and their representative organizations. After consideration of all comments, we now propose to revise 42 CFR 410.26, 410.59, 410.60 and 410.62 to reflect that physical therapy, occupational therapy, and speech-language pathology services provided incident to a physician's professional services are subject to certain limitations as described at section 1862(a)(20) of the Act.

Regulations in 42 CFR 485.705 specify that, in almost all settings, outpatient rehabilitative therapy services, (physical therapy (PT), occupational therapy (OT), or speech-language pathology (SLP)) can be furnished only by the following individuals meeting the qualifications in § 484.4: physical therapists, occupational therapists, appropriately supervised physical therapist assistants, appropriately supervised occupational therapy assistants, and speech-language pathologists. Some States permit licensed physicians, physician assistants, clinical nurse specialists, and nurse practitioners to furnish PT, OT,