# Exhibit B

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456<br>Master File No. 01- 12257-PBS<br>Subcategory Case. No. 06-11337 |
| THIS DOCUMENT RELATES TO: | Hon. Patti B. Saris |
| *United States of America ex rel. Ven-A-Care of the Florida Keys, Inc., et al. v. Dey, Inc., et al.*, Civil Action No. 05-11084-PBS | Magistrate Judge<br>Marianne B. Bowler |

### DECLARATION OF NEIL MERKL IN SUPPORT OF DEY DEFENDANTS' REPLY IN FURTHER SUPPORT OF THEIR MOTION TO EXCLUDE FROM EVIDENCE THE REPORTS AND TESTIMONY OF STEPHEN W. SCHONDELMEYER

**NEIL MERKL** declares, pursuant to 28 U.S.C. § 1746, that:

1. I am a member of the law firm of Kelley Drye & Warren LLP, counsel to Dey Pharma, L.P. (formerly known as Dey, L.P.), Dey, Inc., and Dey L.P., Inc. (collectively "Dey"). I am admitted to practice law in the State of New York and have been admitted *pro hac vice* in this action.

2. I make this Declaration in support of Dey's Reply in Further Support of Dey's Motion *in Limine* to Exclude from Evidence the Reports and Testimony of Stephen W. Schondelmeyer.

3. The basis for my knowledge is my review of the files maintained by Kelley Drye & Warren LLP as part of its representation of Dey, including the documents attached hereto, and my own personal knowledge of the facts and circumstances set forth herein.

4. Attached hereto as Exhibit 1 is a true and correct copy of excerpts from the deposition of Stephen W. Schondelmeyer, dated September 15, 2009.

2

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 24, 2010.

                                              /s/ Neil Merkl  
                                              Neil Merkl

## **CERTIFICATE OF SERVICE**

       I certify that a true and correct copy of the foregoing was delivered to all counsel of record by electronic service pursuant to Paragraph 11 of Case Management Order No. 2, by causing to be sent, on June 24, 2010, a copy to LexisNexis File & Serve for posting and notification to all parties.

                                      /s/ Neil Merkl
                                      Neil Merkl

# Exhibit 1

Page 1

```
 1              UNITED STATES DISTRICT COURT

 2             FOR THE DISTRICT OF MASSACHUSETTS

 3

 4   - - - - - - - - - - - - - - x

 5   IN RE:  PHARMACEUTICAL       )  MDL NO. 1456

 6   INDUSTRY AVERAGE WHOLESALE   )  Master File No. 01-12257-PBS

 7   PRICE LITIGATION             )  Subcategory Case No. 06-11337

 8   ----------------------------)

 9   THIS DOCUMENT RELATES TO:   )  Hon. Patti B. Saris

10   State of California, ex rel.)

11   Ven-A-Care v. Abbott         )  Tuesday, September 15, 2009

12   Laboratories, Inc., et al.  )

13   - - - - - - - - - - - - - - x  VOLUME I

14

15          Videotaped deposition of STEPHEN W.

16   SCHONDELMEYER, PHARM.D., Ph.D., held at the Grand

17   Hotel, 615 2nd Avenue South, Minneapolis,

18   Minnesota, commenced at 9:11 a.m., the

19   proceedings being recorded stenographically by

20   Dawn Workman Bounds, Certified Shorthand Reporter

21   and Notary Public of the State of Minnesota, and

22   transcribed under her direction.
```

Page 166

1  actually paid and by -- that would generally be
2  paid by a substantial number of customers.
3      Q.  Well, generic manufacturers, some of
4  them sell direct to independent pharmacies, true?
5      A.  Some sell direct to independent
6  pharmacies. I wouldn't say that's true of all
7  generic manufacturers.
8      Q.  Some do, right?
9      A.  Some do.
10     Q.  Some sell to distributors, right?
11     A.  Some sell through wholesalers or
12 distributors. Those are different, but they're
13 similar.
14     Q.  Two different things, right?
15     A.  Yeah.
16     Q.  So some sell to wholesalers, and some
17 sell to distributors?
18     A.  Uh-huh.
19     Q.  Which of those prices should it report
20 as the generally and currently paid by provider?
21     A.  Well, again, they could have listed all
22 of those prices and picked the one in the middle.

Page 167

1  They could have listed all those prices and taken
2  the average. They could have listed all of those
3  prices and picked one that -- that more than half
4  of their purchasers paid, but the prices actually
5  reported are none of those.
6      Q.  Why couldn't they pick a price at the
7  high end of their ceiling? Where does it tell
8  them they can't do that?
9      A.  Well, I think that the concept
10 "generally paid" probably would preclude that.
11     Q.  But there is no price generally paid?
12     A.  Well, yes, there is. A price above
13 which -- you know, above which or below which a
14 price is generally paid, I think one could
15 construct that. I don't think it's difficult to
16 construct a price that's generally paid.
17     Q.  But does --
18     A.  Is there some leeway about how you
19 define it? Perhaps. But -- but one could pick a
20 price generally paid, and it wouldn't be the
21 price -- the single highest price that one person
22 paid at one point in time.

Page 168

1      Q.  Okay. Now, this explanation you've
2  just given me as to how a manufacturer would go
3  back -- go about identifying a price generally
4  and currently paid by providers, where is that
5  written down in the regulations somewhere?
6          MS. THOMAS: Objection.
7      A.  I think it's in the statutes,
8  regulations, and procedures clearly defined by
9  Medicaid over time.
10     Q.  It doesn't tell them how to go about
11 figuring out which of multiple prices is the one
12 that's generally and currently paid?
13         MR. GLASER: Objection.
14     A.  Again, I leave it up to the judge to
15 interpret how the regulation that states --
16     Q.  Okay.
17     A.  -- generally and currently paid would
18 be implemented. But I would point out that --
19 that the prices reported as AWPs to First
20 DataBank are not -- to the best of my knowledge,
21 not paid by anybody. So there's no possible
22 construction under which one could argue those

Page 169

1  are generally paid.
2      Q.  Is there any scholarly literature, any
3  writing anywhere that defines this concept of
4  what generally and currently paid by providers
5  means in the manner that you've just described,
6  written by anyone other than you?
7      A.  Very few scholars have actually
8  addressed this issue at all, you know, in any
9  context.
10     Q.  So there is none?
11         MR. GLASER: Objection.
12         MS. THOMAS: Objection.
13     A.  I'm not sure. I'm not aware of any. I
14 have written things related to that. I think
15 there have been a number of expert reports in
16 these cases over time that --
17     Q.  Nonlitigation. Let's stay out of
18 litigation. Okay?
19     A.  Okay.
20     Q.  Is there any --
21     A.  But that's been addressed heavily in
22 that context.

Page 170

1  Q. I'll bet.
2     Now, so there is no scholarly report in
3  any peer review journal anywhere that explains
4  what this concept of generally and currently paid
5  by providers means in terms of what a
6  manufacturer should report?
7     MR. GLASER: Objection.
8  A. Again, I believe that the regulation is
9  what it is, and the way that will be interpreted
10 is up to a judge and jury to evaluate.
11 Q. So there -- there is no scholarly
12 writing on this topic at all, is there?
13    MR. GLASER: Objection.
14    MS. THOMAS: Objection.
15 A. I -- I can't answer that. I don't know
16 for sure.
17 Q. This concept that you have that there's
18 this constellation of statutes and regulations
19 that tells manufacturers what they're supposed to
20 report, is there any scholarly article anywhere
21 that addresses or discusses that idea --
22    MR. GLASER: Objection.

Page 171

1  Q. -- other than the one you've written?
2  A. Well, I believe there is the scholarly
3  report that I, along with colleagues, prepared
4  for the Centers for Medicare and Medicaid
5  services addressing the issue of how can they
6  estimate acquisition cost, and that report
7  conducted and developed with a panel of experts
8  who also contributed and concurred with that
9  report.
10 Q. So there is none, a scholarly writing
11 --
12 A. Yes, there is.
13    MR. GLASER: Objection.
14 Q. -- written by anyone other than you
15 that explains the idea of this constellation of
16 statutes and regulations imposing an obligation
17 to report generally and currently paid by
18 provider prices by manufacturers?
19    MR. GLASER: Objection.
20 A. Is there a question pending?
21 Q. Yes. There is -- isn't it true there
22 is, in fact, no article anywhere that anyone

Page 172

1  wrote, other than the one that you wrote, that
2  describes this constellation of statutes that
3  creates an obligation on the part of
4  manufacturers to report generally and currently
5  paid prices?
6  A. No, that's not true. There is an
7  article of which I was a co-author, but there are
8  many other co-authors that contributed in that
9  article that -- that puts that forward. It's
10 multiauthored, and many experts have weighed in
11 on that.
12 Q. What article is that?
13 A. That's the report for the Centers for
14 Medicare and Medicaid Services. Marian Wrobel
15 was a coauthor, and there was an expert panel of
16 many other parties that contributed to that.
17 Q. Other than that document, is there
18 anything?
19 A. I believe there are other documents
20 that discuss that general issue, yes.
21 Q. What are they?
22 A. I can't recall them sitting here today.

Page 173

1  Q. So you can't name another one besides
2  that Wrobel article?
3     MR. GLASER: Objection.
4  A. Sitting here right now, I can't name
5  those. I believe there are other documents
6  describing that concept.
7  Q. Now, that document you're talking
8  about, isn't it a fact that one of the experts on
9  that panel said that if not for the spread,
10 pharmacies would be out of business?
11 A. I believe that statement is in the
12 document, yes.
13 Q. So that's authoritative, too, right?
14    MS. THOMAS: Objection.
15 A. I believe's that's that person's
16 opinion, and I believe that -- that to be true.
17 It doesn't say how that spread is to be created,
18 who has authority to create it, and who has
19 authority to deter -- determine that as an
20 appropriate payment mechanism.
21 Q. And that article was written in 2004,
22 right?

Schondelmeyer, Pharm.D., Ph.D., Steven W. - Vol. I  
Minneapolis, MN  
September 15, 2009

Page 174

1    A.   That was 2004, yes.
2    Q.   Now, prior to 2004, was there any
3  article or writing anywhere that would -- that
4  discussed or explained to the manufacturing
5  industry at large this theory of the
6  constellation of statutes and regs that require
7  them to report generally and currently paid
8  prices by providers as their AWP?
9    A.   I believe the federal regulations and
10 the -- the publication of the regulation in about
11 1987 described the price generally and currently
12 paid, where that was.  There was a discussion in
13 the preamble of that regulation that described
14 the intent and use of the concept by the Federal
15 Government.
16        MR. MERKL:  Well -- well, I'll move to
17 -- I'll reserve a motion to strike that, and
18 we'll look at that.
19    Q.   But my question is, is there any
20 article anywhere, any scholarly writing that
21 explained that before 2004?
22        MR. GLASER:  Objection.

Page 175

1    A.   I -- I don't -- I don't know for sure.
2  I don't know that there is or isn't.
3    Q.   Okay.  Now, this theory you have that
4  you're supposed to report a price generally and
5  currently paid by the providers as an AWP, can
6  you name a scholar, other than yourself, that
7  shares that view?
8        MR. GLASER:  Objection.
9    A.   Again, there are very few scholars who
10 focus on this particular area.  I can't think of
11 anyone that I have discussed that issue with,
12 particularly other scholars that -- that deal
13 with this at this level.
14    Q.   So there isn't any?
15    A.   No, that isn't what I said.  I can't
16 think of anyone I've discussed this with to know
17 what their opinions are.  There may well be other
18 scholars who completely agree with that.
19    Q.   But you can't tell me who they are?
20    A.   I haven't discussed that with other
21 scholars to know; no, I haven't pursued that.
22    Q.   Okay.  Now -- and there are experts in

Page 176

1  these cases that disagree with that, right?
2        MR. GLASER:  Objection.
3    A.   There are reports in this case that
4  disagree with that.  I don't know about the
5  background and qualifications of the individuals.
6        MR. MERKL:  Okay.  I have an exhibit
7  that's been previously marked as Abbott 127.  I'm
8  assuming it's from the federal case.
9        MR. GLASER:  I'm sorry?
10       MR. MERKL:  Ven-A-Care, do you know
11 what I'm talking about?  There's a federal case
12 going on between Ven-A-Care and Dey.  A lot of
13 the notices have been cross-noticed.  And this
14 exhibit I have I believe was marked in that as
15 Abbott 127.
16       Are you guys following any convention
17 with marking the exhibits in this case that are
18 pulled in and have been marked elsewhere?
19       MR. GLASER:  I don't know what
20 conventions they're following right now.
21       MR. MERKL:  Okay.  So then I'll --
22 well, I'll just have to mark this then again as

Page 177

1  Schondelmeyer -- whatever we're up to --
2  Schondelmeyer 2.
3        THE REPORTER:  Uh-huh.
4        (Exhibit Schondelmeyer 002 marked.)
5        MR. GLASER:  Do you have a copy,
6  perhaps, or...
7    Q.   Do you recognize this document?
8    A.   I don't looking at it initially, no.
9    Q.   Well, isn't this -- you're sure?  Take
10 a close look.  I'm startled by that.
11       MR. GLASER:  Objection.
12   A.   It appears to be a document out of, you
13 know, somebody's reporting service --
14   Q.   Yeah, it's --
15   A.   -- Medicare and Medicaid guide.
16   Q.   Right.
17   A.   But I don't specifically recall looking
18 at it.
19   Q.   Well, it's a CCH document, Commerce
20 Clearinghouse?
21   A.   Yes.
22   Q.   And my question is -- well, let's take