UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | )<br>)<br>) MDL No. 1456<br>) |
| THIS DOCUMENT RELATES TO: | ) Master Case No. 01-12257-PBS<br>) Subcategory Case No. 06-11337-PBS<br>) |
| *United States of America ex rel. Ven-a-Care of the Florida Keys, Inc. v. Dey, Inc., et al.,* Civil Action No. 05-11084-PBS | )<br>)<br>) |

**MEMORANDUM IN SUPPORT OF UNITED STATES' MOTION
IN LIMINE REGARDING TESTIMONY OF RAYMOND C. WINTER AND
SEQUENCING OF DEPOSITION TESTIMONY**

The United States seeks an *in limine* ruling on the admissibility of testimony by Raymond C. Winter that the government expects to offer at trial against Dey, and also on the sequencing of videotaped deposition testimony of Dey's former Vice President of Sales and Marketing, Robert Mozak, and former President and CEO, Charles Rice. The testimony at issue will demonstrate that Dey knew its price reporting conduct was wrong, and thus goes to whether its reporting of false prices was knowing. Given the time limits placed on the parties' presentations at trial, and Dey's refusal to provide the United States with *any* deposition testimony concerning its various document productions, Mr. Winter's testimony and the proposed sequencing of deposition testimony is necessary to streamline the government's presentation of its case.

Specifically, the United States proposes to call Mr. Winter, an Assistant Attorney General with the Texas Attorney General's Office who represented the state in its price

reporting suit against Dey, to testify after the presentations of designated portions of Mr. Mozak's and Mr. Rice's 2001 and 2002 depositions, and before the presentations of designated excerpts from their 2003 depositions.  Mr. Winter's testimony will address, among other things, the timing of Dey's various document productions in that case in relation to certain false deposition testimony given prior to Dey's later production of some incriminating documents.  The proposed testimony is relevant to refute Dey's anticipated claim that it believed the federal government approved of its price reporting practices.  The testimony will show Dey's President and Vice President attempted to conceal the truth from government investigators.

## I. BACKGROUND AND DESCRIPTION OF THE PROPOSED EVIDENCE

In separate litigation (*State of Texas ex rel Ven-A-Care of the Florida Keys, Inc. v. Dey, Inc., et al.*, District Court of Travis County, Texas, Cause No. GV002327), the State of Texas alleged that Dey reported falsely inflated AWPs and WACs.  Mr. Winter was assigned to prosecute the case.  On October 30, 2001, Mr. Winter, together with counsel for Ven-a-Care, took the deposition of Dey's President and CEO, Charles Rice.  At that deposition, portions of which the United States will play to the jury, Mr. Rice denied that Dey had actively marketed the spread and denied knowledge of certain spread-marketing conduct by Dey sales representatives.  Mr. Rice also stated that he "absolutely" would

not condone such marketing practices "because it's against what Dey represents," and that Mr. Mozak would not have condoned such practices either.[1]

On November 1, 2001, Mr. Winter and counsel for Ven-a-Care took the deposition of Mr. Mozak. Mr. Mozak denied that Dey had a policy of marketing the spread; denied knowledge that Dey had ever marketed the spread; and stated that he would not condone such a practice. In addition, Mr. Mozak denied personal knowledge of a May 30, 1995, memorandum by former Dey employee Helen Burnham (later Helen Selenati) indicating that Dey had reported an inflated WAC to First DataBank in order to "level the playing field for Medicaid reimbursement" in WAC states.[2] When asked if he knew the whereabouts of Ms. Burnham, he said, "not specifically," and "somewhere in California."[3]

Ms. Burnham Selenati is expected to testify that, on November 5, 2001, three days after Mr. Mozak gave the deposition testimony referenced above, Mr. Mozak called and left her a voice-mail message stating he wanted to talk to her "about this issue that came up a couple of years ago relative to this suit," and asking her to "call from an outside

---

[1] See Rice dep., 10/30/01, 161:25-162:14; 167:8-24; 168:6-169:2; and 169:3-12 (attached as Exhibit A).

[2] See Mozak dep., 11/1/01, 85:23 - 86:11, 47:3 - 48:7, 187:19 - 188:1 (attached as Exhibit B).

[3] See *id.*, 29:21-30:2.

phone because I don't want any record that we've had any discussion."[4]  Mr. Mozak subsequently called Ms. Burnham Selenati again, and told her he was trying to avoid testifying to any knowledge of the situation and asked her to take full responsibility for the May 30, 1995 memorandum, because he needed his job and could not be held responsible for having knowledge of what went on with the WAC price adjustment.[5]

One year later, on November 6, 2002, Mr. Mozak was deposed a second time. Mr. Mozak denied that he knew about the May 5, 1995, memorandum from Helen Burnham until he discovered it in December 1995.  He also denied authorizing an "AWP Reimbursement Promotion" for a Dey customer, GeriMed, and a similar "AWP Reimbursement Promotion" for another Dey customer, Managed Healthcare Associates.[6] Mr. Mozak contradicted his prior testimony concerning his knowledge of Ms. Selenati's whereabouts, and admitted he knew where she lived because he had visited her approximately six times at her home.[7]  The next day, on November 7, 2002, Mr. Rice was deposed a second time.  Mr. Rice testified that he never approved the "reimbursement

---

[4] Selenati dep, 5/5/2005, 242:14 - 243:17 (attached as Exhibit C).  The United States intends to introduce a recording of this voice-mail message at trial (U.S. Trial Ex. 97).

[5] Selenati dep, 5/5/2005, 256:14 - 257:15 (attached as Exhibit C).

[6] See Mozak dep., 11/6/02, 481:7- 482:13, 493:5-494:16, 648:12-652:3 (attached as Exhibit D).  The United States expects former Dey employee Ross Uhl to testify that, in fact, Mr. Mozak did authorize this and other AWP reimbursement programs.  Internal Dey documents will corroborate Mr. Uhl's testimony.

[7] See *id*.(Exhibit D) at 591:23-593:13; 597:4-13.

comparison worksheet" and that Mr. Mozak had told him that he (Mozak) had never approved the use of that type of approach anywhere within Dey.[8]

The United States proposes that it be permitted to call Mr. Winter to testify live, after the designated portions of the 2001 and 2002 depositions of Mr. Rice and Mr. Mozak have been played to the jury. Mr. Winter would testify on the following topics:

1. In 1997, Ven-a-Care of the Florida Keys, Inc. filed under seal a *qui tam* action in Texas state court against Dey, Inc., among other defendants. Ven-a-Care filed a superceding action in 1999. Mr. Winter was assigned to handle the cases.

2. In April 2000, the Office of the Texas Attorney General ("AG") issued a Civil Investigative Demand to Dey requesting documents. After the State of Texas intervened in the case and the complaint was unsealed (in September 2000), the State of Texas, in July 2001, made a formal demand for documents to Dey.

3. From May 2000 through October 29, 2001, Dey, in a series of rolling document productions, produced a significant volume of documents to the Texas AG's office; however, Dey did *not* produce certain critical documents, produced later and described in more detail below, providing evidence of Dey's motivation and objective in setting AWPs, and revealing that Dey's President and CEO, Charles Rice, and its Vice President of Sales and Marketing, Robert Mozak, formally approved the company's policy and practice of marketing the spread on its products.

4. In the late summer of 2002 (after the first day of Mr. Mozak's deposition but before the second day), investigators for the State of Texas located Ms. Burnham

---

[8] Rice dep., 11/7/02, 338:25-340:25 (attached as Exhibit E). The United States will introduce evidence separately, through testimony of former Dey employees Ross Uhl, Todd Galles, and Helen Burnham Selenati, that "spread" was a frequent topic of discussion among Dey sales managers and that Dey trained its sales force, including at a 1995 National sales meeting, to market the spread on its albuterol sulfate products to Dey customers using a "reimbursement comparison worksheet." In addition, Ms. Burnham Selenati is expected to testify that Mr. Mozak in 1995 instructed her to report the inflated WAC price to First DataBank and to issue the May 30, 1995, memorandum.

5

Selenati in California. On August 15, 2002, Mr. Winter obtained, ex parte, a sworn statement of Ms. Burnham Selenati.

5. On October 24, 2002, the State of Texas filed a motion for sanctions against Dey. On December 11, 2002, the Texas state court held a hearing on the motion for sanctions, at which Ms. Selenati testified. As a result of the motion, the Texas court on January 8, 2003, issued an Order finding "that certain false deposition testimony provided by Dey's employee Robert Mozak as to the whereabouts of Helen Selenati (Burnham) justifies the imposition of monetary sanctions to secure compliance with the Rules of Discovery, to deter misconduct in the future, and as punishment for past misconduct." The court imposed monetary sanctions in the amount of $157,203.36, and ordered Dey to produce Mr. Mozak and Mr. Rice for six additional hours each of deposition testimony.[9]

6. After the Texas state court granted the motion for sanctions, Dey produced thousands of pages of additional documents to the State.[10] On January 31, 2003, Dey produced additional documents that included the following:

   a. A Memorandum dated February 24, 1992, from Bob Mozak to Charles Rice, Pam Marrs (Dey's CFO), and Jean Pierre Termier (then Dey's CEO), in which Mr. Mozak stated Dey's pricing objective for the launch of albuterol sulfate, "to provide incentive to retail/chain pharmacies to use Dey's albuterol UD by increasing the spread on Medicare/Medicaid reimbursements." (U.S. Trial Ex. 0017)

   b. Cromolyn launch plans dated December 1993 and January 1994, in which Dey stated as a pricing objective "to provide incentive to retail/chain providers to use Dey's Cromolyn by increasing the spread on Medicare/Medicaid reimbursements." (U.S. Trial Exs. 0152, 0033.)

   c. An April 5, 1995, Memorandum from Todd Galles to Dey's Sales department, cc'd to Bob Mozak and others, attaching a "Reimbursement Comparison Worksheet," and stating, "Attached for your review and use are an AWP price listing guide and a Profit Gain Worksheet for use on

---

[9] As argued *infra*, evidence concerning the Sanctions Order is admissible notwithstanding a subsequent Order vacating the Sanctions Order.

[10] *See* U.S. Trial Exs. 230, 234 (letters to Texas AG's office producing documents).

        your retail calls. . . . It can be a very compelling story when presented properly.  Continued good selling!"  (U.S. Trial Ex. 0030.)

      d.    An agenda and handouts distributed to Dey's sales force at its 1995 National Sales Meeting, including a handout stating: "<u>AWP Reimbursement</u>: Why it's important, how it is calculated, and what it means in terms of reimbursement from the third party payors to the managed care organizations," and "<u>The dramatic effect</u> the conversion has in 'Real Dollars' yielding significant gain to the bottom line profit of the targeted accounts."  (U.S. Trial Exs. 0018, 0144 (emphasis in original).)

7.    In February 2003, the State of Texas took the depositions of several former or current employees of Dey's sales department, including Todd Galles and Ross Uhl (each of whom the United States expects to call to testify at trial).  The deposition testimony of these employees conflicted in certain respects with the prior testimony given by Mr. Rice and Mr. Mozak.

8.    On March 13, 2003, Mr. Winter again examined Mr. Mozak under oath in deposition.  On March 24, 2003, Mr. Winter examined Mr. Rice under oath in deposition.

9.    On April 28, 2003, after the depositions of Mr. Mozak and Mr. Rice had concluded, Dey produced documents showing that Mr. Mozak and Mr. Rice had each formally and personally approved the reimbursement-based marketing tool known as the Reimbursement Comparison Worksheet.  (U.S. Ex. 0050.)

The United States proposes that it be permitted to play to the jury excerpts of Mr. Mozak and Mr. Rice's March 2003 depositions following Mr. Winter's testimony.  In the March 13, 2003, deposition, Mr. Mozak acknowledged that: he wrote the February 24, 1992, memorandum regarding Dey's pricing strategy for albuterol sulfate and that he discussed it with the recipients of the memorandum and they agreed on the strategy; training on promoting the reimbursement spread took place at the 1995 National Sales Meeting; and he agreed with and authorized Mr. Ellis to publish and implement the

pricing strategies associated with the Cromolyn launch as shown in the Cromolyn launch plans.[11]

In his March 24, 2003, deposition, Mr. Rice testified that he did not approve of the process described in the Reimbursement Comparison Worksheet, he would not have condoned it, and that if other Dey employees were to testify that he approved it, he would disagree.[12]

## II.    ARGUMENT

The United States anticipates that Dey may seek to exclude the above testimony, or seek to minimize its impact by objecting to the order in which the United States proposes to present the evidence.  Any such objections would miss the mark, however, because the proposed evidence is relevant to refute Dey's "government knowledge" defense by showing Dey did not believe the federal government approved of Dey's price reporting practices.  The evidence is admissible under the Federal Rules of Evidence. Moreover, Dey is not prejudiced by Mr. Winter's testimony, as Dey has at all relevant times been aware of Mr. Winter's knowledge of its conduct in the Texas litigation and, in any event, Dey will have the opportunity to cross-examine Mr. Winter at trial.  In addition, Dey itself helped to create the conditions necessitating Mr. Winter's testimony

---

[11]   See Mozak dep., 3/13/03, 712:9-716:3; 719:4-721:17; 730:15-731:3; and 734:15-736:24, 773:17-778:23 (attached as Exhibit F).

[12]   See Rice dep., 3/24/2003, 761:18 - 763:22 (attached as Exhibit G).

by refusing to provide to the United States *any* deposition testimony on the subject of its various document productions.

As to the proposed sequencing of the evidence, it is necessary to present efficiently and comprehensibly a chain of events spanning thirty months and involving the interplay among at least six depositions and multiple document productions. Mr. Mozak and Mr. Rice's deposition testimony cannot be understood fully unless viewed in the context of Dey's conduct in discovery, including Mr. Mozak's initial false testimony as to Ms. Burnham Selenati's whereabouts and the timing of Dey's production of certain inculpatory documents. There is no prejudice to Dey from permitting the United States to present the evidence in a way that reveals the relationship between how Mr. Mozak and Rice testified and the timing of Dey's production of incriminating evidence.

### A. The Proposed Testimony Is Admissible Under the Rules of Evidence

The deposition testimony of Mr. Rice and Mr. Mozak is plainly admissible. Most of it is not offered for its truth, but to show that Dey's President and CEO and its Vice President of Sales and Marketing gave false and/or misleading testimony in order to conceal the nature of Dey's price-reporting conduct, and then changed their story after incriminating documents were produced after sanctions were imposed by the Texas Court. In short, the testimony is being offered to show consciousness of guilt, and to refute any claim by Dey that it did not act "knowingly" under the False Claims Act because it believed its reported AWPs were truthful. Fed. R. Ev. 404(b); *see, e.g.,*

*United States v. Ayala-Tapia*, 520 F.3d 66, 69 (1ˢᵗ Cir. 2008) (inference of consciousness of guilt from deliberately false alibi); *United States v. Young*, 955 F.2d 99, 103-04 (1ˢᵗ Cir. 1992) (defendant's falsification to a government agency revealed a consciousness of guilt); *United States v. Passos-Paternina*, 918 F.2d 979, 985 (1st Cir. 1990) (jury may construe knowingly false statement as evidence of consciousness of guilt).

    Mr. Winter will testify based on his first-hand knowledge of the events in question.  Mr. Winter received and helped to review the documents produced by Dey and is personally familiar with the documents and when they were produced by Dey.  He was present at the depositions of Mr. Rice and Mr. Mozak, and was personally involved in the sanctions proceedings in Texas state court.  That the United States is calling Mr. Winter as a witness is not a surprise to Dey.  Dey at all relevant times knew of Mr. Winter's participation in and knowledge of its document productions and the testimony of Dey witnesses during the Texas litigation.  Morever, Dey is plainly familiar with the subject matter of Mr. Winter's testimony, given that it participated in all of the relevant depositions and it was the originator of the various document productions.  In the face of such knowledge, Dey has no cause to complain that the United States did not identify Mr. Winter in its Rule 26(a) disclosures.  *Johnson v. H.K. Webster, Inc.*, 775 F.2d 1, 7 (1st Cir. 1985) ("We must therefore not read Rule 26 mechanically, but rather in light of its dual purposes, 'narrowing of issues and elimination of surprise.'")

In any event, the United States indicated that it expected to call Mr. Winter as a witness in March, 2010 – approximately six *months* prior to the scheduled trial date. Where, as here, a party has known of a witness' identity for many months and will have the opportunity to cross-examine the witness at trial, there is no prejudice.  *See, e.g.*, *Design Strategies, Inc. v. Davis*, 228 F.R.D. 210, 211 (S.D.N.Y 2005) (denying plaintiff's motion to exclude testimony of former executive not listed in initial disclosures; "in light of the familiarity that [plaintiff] already has with [the former executive] and which [plaintiff's] own witness has with the subject of [the former executive's] proffered testimony, there is sufficient time--nine days--for [plaintiff] to conduct an adequate deposition.")[13]

Moreover, the need for Mr. Winter's testimony was in large part created by Dey's refusal to provide the United States with *any* testimony regarding its various document productions.  The United States served Dey with a notice of deposition pursuant to Fed. R. Civ. P. 30(b)(6), calling upon Dey to provide testimony concerning its production of documents in the Texas litigation.  Exhibit H hereto (Topic #15).  The United States fully informed Dey of the purpose of its inquiry into this topic.  Exhibit I hereto.  Although Dey counsel gave assurance that Dey would provide testimony on the topic, Dey's designee (Chief Financial Officer Pamela Marrs) testified that she had no knowledge concerning Dey's production of documents and had done nothing to prepare on the topic.

---

[13] Here, given that Dey already has full knowledge of the subject matter of Mr. Winter's testimony, there is no need for a deposition.

11

At the deposition, she produced a single document production letter from the Texas litigation and provided no substantive testimony on the topic. Exhibit J hereto (10/2/2008 Rule 30(b)(6) dep.), 668:19 - 676:12. It should come as no surprise to Dey that the United States now seeks to establish the sequence of Dey's document productions through independent means.

Dey may argue that any evidence concerning the Texas Court's January 8, 2003, Sanctions Order is inadmissible in light of a subsequent order vacating the Sanctions Order.[14] However, the vacatur order was entered six months after the Sanctions Order, after Dey fully complied with the Order by paying the fine and producing Mr. Rice and Mr. Mozak for additional deposition examination. Dey's unopposed motion to vacate the Sanctions Order, which was made pursuant to the terms of a final settlement (fully executed before the vacatur order), did not challenge the merits of the factual findings stated in the Sanctions Order, and the Texas Court did not revisit its prior findings. In the circumstances, the Sanctions Order is admissible pursuant to Fed. R. Evid. 803(8)(C), which establishes a hearsay exception for "records, reports, statements, or data compilations . . . of public offices or agencies" which set forth "in civil actions and proceedings . . . factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances

---

[14] Copies of the Sanctions Order, Dey's motion to vacate the order, and the Order vacating the Sanctions Order are attached as Exhibits K, L and M, respectively. The United States intends to add the Sanctions Order to its list of trial exhibits.

indicate lack of trustworthiness." Here, the Texas Court entered the Sanctions Order after conducting an evidentiary hearing, and there is no reason to doubt the trustworthiness of the court's findings. *See Lubanski v. Coleco Indus.*, 929 F.2d 42, 45 (1st Cir. 1991) (evidence admissible under Rule 803(8)(C) as long as it was "based on a factual investigation and satisfies the Rule's trustworthiness requirement").

## B. Mr. Winter's Testimony Will Expedite the Presentation of Evidence and Avoid Juror Confusion

Dey's initial withholding of incriminating documents in the Texas litigation and subsequent production of documents, after the entry of a sanctions order, occurred over the course of more than 30 months of litigation, including numerous document productions and six days of testimony by Messrs. Rice and Mozak. While it is conceivable that the United States could present the sequence of Dey's non-production and subsequent production of documents through Dey witnesses, that approach would likely be cumbersome and confusing to the jury, given the hundreds of thousands of documents produced during the pertinent time over the course of more than 22 separate productions.

Permitting the United States to sequence the presentation of evidence so that the jury first hears the 2001 and 2002 videotaped depositions of Rice and Mozak, then hears Mr. Winter's testimony concerning the sequence of document production and the sanctions hearing, and then hears the 2003 depositions of Rice and Mozak, will allow for a more clear and chronological presentation of the government's consciousness-of-guilt

evidence, with no unfair prejudice to Dey.  Important events occurred between the 2002 depositions and the 2003 depositions, and the jury will be better able to understand the chronology of events if the excerpts of the 2003 depositions are played after Mr. Winter testifies about the intervening events.  The United States does not propose to interrupt any particular day of deposition or preclude Dey from making appropriate counter-designations of the deposition testimony.[15]

Rule 611(a) of the Federal Rules of Evidence provides that the court "shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment."  The rule vests the trial court with considerable discretion in controlling the presentation of evidence.  *See, e.g., United States v. Milkiewicz*, 470 F.3d 390, 398 (1st Cir. 2006); *Fraser v. Major League Soccer, L.L.C.*, 284 F.3d 47, 67 (1st Cir.2002).  In this case, the testimony of Mr. Winter will permit the government to present in an efficient manner evidence that is highly relevant to Dey's "knowing" reporting of false, inflated prices through a live witness, and the sequencing of the deposition testimony of Mr. Rice and Mr. Mozak will facilitate the jury's understanding of the chronology of events.  There is no unfair prejudice to Dey

---

[15] Of course, the United States reserves its right to object to specific counter-designations by Dey and to make "fairness" designations in response to Dey's counter-designations.

resulting from this method of presentation.  The government's proposal is therefore fully consistent with the objectives of Rule 611(a).

## CONCLUSION

For the foregoing reasons, the Court should allow Assistant Attorney General Raymond C. Winter to testify as outlined above and should permit the United States to present the evidence in the order proposed above.

|  |  | Respectfully submitted, |
|---|---|---|
| TONY WEST<br>ASSISTANT ATTORNEY GENERAL |  | CARMEN M. ORTIZ<br>UNITED STATES ATTORNEY |
|  | By: | /s/ *George B. Henderson, II* |
| Joyce R. Branda<br>Daniel R. Anderson<br>Laurie A. Oberembt<br>Civil Division<br>Commercial Litigation Branch<br>P. O. Box 261<br>Ben Franklin Station<br>Washington, D.C.  20044<br>(202) 514-3345 |  | George B. Henderson, II<br>Barbara Healy Smith<br>James J. Fauci<br>Assistant U.S. Attorneys<br>United States Courthouse<br>1 Courthouse Way, Suite 9200<br>Boston, MA 02210<br>(617) 748-3272 |

FOR THE RELATOR,

| James J. Breen | Gary Azorsky |
|---|---|
| The Breen Law Firm, P.A. | Susan Schneider Thomas |
| 5755 Northpoint Parkway, Suite 260 | Roslyn G. Pollack |
| Alpharetta, GA 30022 | Berger & Montague, P.C. |
| Tel.  (770) 740-000 | 1622 Locust St. |
| fax:  (954) 499-1173 | Philadelphia, PA 19103 |
|  | (215) 875-3090 |

CERTIFICATE OF SERVICE

    I hereby certify that I have this day caused an electronic copy of the above document to be served on all counsel of record via electronic service pursuant to Paragraph 11 of Case Management Order No. 2 by sending a copy to LexisNexis File & Serve for posting and notification to all parties.

|  |  |
|---|---|
|  | /s/ George B. Henderson, II |
| Dated: June 29, 2010 | George B. Henderson, II |