# Exhibit A

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc. v. Dey, Inc., et al.*,
Civil Action No. 05-11084-PBS

Exhibit to Plaintiff's Memorandum In Support of United States' Motion
In Limine Regarding Testimony of Raymond C. Winter and
Sequencing of Deposition Testimony

```
                    CAUSE NO. GV002327

THE STATE OF TEXAS            )   IN THE DISTRICT COURT
ex rel.                       )
    VEN-A-CARE OF THE         )
    FLORIDA KEYS, INC.        )
                              )
        Plaintiffs,           )
                              )
VS.                           )   TRAVIS COUNTY, TEXAS
                              )
DEY, INC.; ROXANE             )
LABORATORIES, INC. and        )
WARRICK PHARMACEUTICALS       )
CORPORATION,                  )
                              )
        Defendants.           )   53rd JUDICIAL DISTRICT
```

***************************************************
ORAL AND VIDEOTAPED DEPOSITION OF
CHARLES A. RICE
October 30, 2001
***************************************************

ORAL DEPOSITION OF CHARLES A. RICE, produced as a witness at the instance of the Plaintiffs and duly sworn, was taken in the above-styled and numbered cause on the 30th day of October 2001, from 9:06 a.m. to 5:02 p.m., before Randall N. Finch, CSR in and for the State of Texas, reported by machine shorthand, at the offices of Coudert Brothers, 600 Beach Street, Third Floor, San Francisco, California 94109, pursuant to Notice, the Texas Rules of Civil Procedure and the provisions as previously set forth.

```
 1                    A P P E A R A N C E S

 2    FOR THE PLAINTIFF STATE OF TEXAS:

 3            MR. JOE CRAWFORD, MR. PATRICK J. O'CONNELL,
              MR. JARRETT ANDERSON, MR. RAYMOND WINTER
 4            Office of the Attorney General
              State of Texas
 5            P.O. Box 12548
              Austin, Texas 78711-2548   (512) 475-4300
 6                                       (512) 474-1062 Fax

 7    FOR THE RELATOR:

 8            MR. JAMES JOSEPH BREEN
              The Breen Law Firm, P.A.
 9            8201 Peters Road, Suite 1000
              Plantation, Florida 33324   (954) 916-2713
10                                        (954) 916-2714 Fax
                    -and-
11            MR. JOHN E. CLARK (Of Counsel)
              Goode Casseb Jones Riklin Choate &
12            Watson, P.C.
              2122 North Main Avenue
13            P.O. Box 120480
              San Antonio, Texas 78212-9680  (210) 733-6030
14                                       Fax (210) 733-0330
                    -and-
15            MS. SUSAN THOMAS

16    FOR THE DEFENDANT DEY, INC.:

17            MR. STEPHEN M. HUDSPETH
              Coudert Brothers
18            1114 Avenue of the Americas
              New York, New York 10036-7703   (212) 626-4442
19                                            (212) 626-4120
                    -and-
20            MR. STEVEN A. FLECKMAN
              Fleckman & McGlynn, P.L.L.C.
21            515 Congress Avenue, Suite 1800
              Austin, Texas 78701-3503   (512) 476-6900
22                                       (512) 476-7644 Fax

23    FOR THE DEPARTMENT OF JUSTICE:

24            MR. ANDY MAO, Civil Division
              601 D Street, N.W., Room 9929
25            Washington, D.C. 20004   (202) 616-0539
```

```
 1                A P P E A R A N C E S (Cont'd)

 2    FOR THE DEFENDANT ROXANE LABORATORIES, INC.:

 3            MR. GREG PIERCE
              Scott, Douglass & McConnico, L.L.P.
 4            One American Center, 15th Floor
              600 Congress Avenue
 5            Austin, Texas, 78701   (512) 495-6300
                                     (512) 474-0731 Fax
 6
      FOR THE DEFENDANT WARRICK PHARMACEUTICALS CORPORATION:
 7
              MR. C. MICHAEL MOORE
 8            Locke Liddell & Sapp, L.L.P.
              2200 Ross Avenue, Suite 2200
 9            Dallas, Texas 75201-6776   (214) 740-8000
                                         (214) 740-8800 Fax
10
      FOR THE PLAINTIFF, VEN-A-CARE OF THE FLORIDA KEYS,
11    INC.:

12            MR. ZACHARY BENTLEY


13
      ALSO PRESENT:  Mr. Richard Rienstra, Videographer
14

15

16

17

18

19

20

21

22

23

24

25
```

 1      A.   To the best of my recollection this was a test
 2 whereby we -- before this time we had never sampled
 3 generic products, and in fact the industry at large did
 4 not sample generic products.  It was Homedco's belief
 5 at the time that a physician sampling program could be
 6 used to further penetrate the market with, again, our
 7 product which we felt had certain points of
 8 differentiation in the market.

2:54P  9      Q.   And 9,000 cartons, though, was that a
10 physician sampling program?
11      A.   Yes.
12      Q.   And didn't it provide for additional samples
13 based upon a percentage of sales?
14      A.   Yes, it did.
15      Q.   Did Dey Laboratories go forward with that
16 program with Homedco?
17      A.   My understanding is we did not.  This was
18 changed a number of times.  Again, I believe Mr. Mozak
19 probably has the history on this.
20      Q.   Okay.  Now, did Homedco pay, to the best of
21 your recollection, a price at or above WAC after
22 deducting all rebates, chargebacks, discounts and other
23 reductions in price?
24      A.   Again, I don't recall.
25      Q.   Did Dey Laboratories ever or Dey, Inc. ever

2:56P

1  market the spread between reimbursement amounts and the
2  actual cost of Dey products in an effort to get
3  customers to purchase Dey Laboratories' Albuterol?
4         MR. HUDSPETH:  Objection to form.
5         THE WITNESS:  I'm sorry.  Could you
6  repeat the question?
7         MR. BREEN:  Would you please read the
8  question back.
9         (Requested portion was read)
10        THE WITNESS:  To my knowledge, we did
11  not.  There have been occasions where customers has --
12  have asked us to identify "the spread."  But an active
13  marketing promotion which was solely based on "the
14  spread," no.  Nor would we condone that.
15     Q.  (By Mr. Breen)  Have you ever heard of the AWP
16  reimbursement promotion for Gerimed?
17     A.  I've seen that document, yes.
18     Q.  Did you condone that program?
19     A.  I did not.
20     Q.  Did anybody at Dey Laboratories condone that
21  program?
22     A.  To my knowledge, no.
23     Q.  Was it authorized?
24     A.  To my knowledge, no.  But I -- again, we don't
25  have records on that.

2:57P  1    Q.    Did it happen?
      2    A.    I don't know.
      3          MR. BREEN:  Let's mark this document,
      4  which is a one -- nine-page group of documents, as the
      5  next exhibit.
      6          (Exhibit 74 marked)
      7          MR. WINTER:  74.
      8          THE WITNESS:  Yes.
      9    Q.    (By Mr. Breen)  I'd ask that you go through
     10  that.  I'm not going to represent to you that all those
     11  documents -- that that entire group of papers were all
     12  part of a single Dey document, because I don't know.
     13  We can mark that as a composite or refer to it as a
     14  composite exhibit if it will be helpful, but I will ask
     15  you about each of those pages in a moment.
2:58P 16    A.    I've read it.
     17    Q.    Have you seen that before?
     18    A.    Yes, I have.
     19    Q.    When was the first time you saw one or more of
     20  those documents or those pages?
     21    A.    Within the last three to four months.
     22    Q.    And had -- was that in connection with this
     23  litigation?
     24    A.    No.
     25    Q.    And how is it that you came to see those

```
 1   documents?
 2        A.   These documents were provided to a
 3   congressional committee, and the congressional
 4   committee asked us questions specific to this document
 5   and we responded to those questions.
 6        Q.   Were those documents -- or are the originals
 7   of those documents or copies part of Dey's business
 8   records?
 9        A.   They're in our files, so -- I can say they're
10   in our files.
11        Q.   Do you know how they got in your files?
12        A.   I presume they were inserted there by these
13   sales staff members.
14        Q.   And who was the most senior sales staff member
15   that you believe today would have had anything to do
16   with inserting those documents in Dey's files?
17        A.   Well, there are two names mentioned here,
18   Mr. Bruce Tipton, who was director of national
19   accounts, and Mr. Ross Uhl, whom I believe reported to
20   Mr. Tipton.
21        Q.   Okay.  Do they still work for the company?
22        A.   Neither of them do, no.
23        Q.   When did they leave?
24        A.   I don't recall.
25        Q.   Do you know why they left?
```

2:59P (line 17)

1	A.	I don't.

2	Q.	If you'll go through there you'll see it's an

3	AWP reimbursement program.  Do you see that?

4	A.	I see the title on the page, yes.

5	Q.	What is an AWP reimbursement program?

6	A.	I don't know what an AWP reimbursement program

7	is.  To the extent that this document describes it --

8			MR. HUDSPETH:  That's not the word here.

9			MR. BREEN:  What is it?

10			THE WITNESS:  It's an AWP reimbursement

11	promotion.

12			MR. BREEN:  Promotion.  I'm sorry.

13	Thank you, Counsel.

14			MR. HUDSPETH:  Mm-hmm.

15	Q.	(By Mr. Breen)  What is an AWP reimbursement

16	promotion?

17	A.	Well, it appears they were contemplating a

18	promotion of one product that Dey marketed versus a

19	competitive product but a different dosage form on the

20	basis of the difference between the AWPs.

21	Q.	On the difference between the AWPs or the

22	difference between the spreads between reimbursement

23	and actual cost to the customer?

24	A.	Well, in the difference between AWPs as well.

25	I mean, that has to be part of it, yes.  Yes.

1   Q.   Yes, what?

2   A.   Yes, the difference between AWPs and the

3   difference between the spreads related to

4   reimbursement.

5   Q.   And the fact of the matter is, that promotion

6   is comparing Dey's Albuterol with Warrick's.  Correct?

7   A.   Incorrect.

8   Q.   What is it?

9   A.   It's comparing Dey's unit dose dosage form to

10  Warrick's multidose dosage form.  They are two separate

11  NDC numbers and two separate product dosage forms.

12  Q.   But they're both Albuterol.  Correct?

13  A.   Yes, but there are multiple Albuterol dosage

14  forms on the market.

15  Q.   So if they were two different products, two

16  different dosage forms, why was Dey promoting to the

17  customer the fact that the customer could make a larger

18  spread on Dey's product than on Warrick's product?

19          MR. HUDSPETH:  Objection; form.

3:01P  20        THE WITNESS:  I can't answer that

21  question.  We'd have to talk to these sales

22  representatives to find that out.

23  Q.   (By Mr. Breen)  I mean, does the fact that

24  Dey's product had a bigger spread for reimbursement

25  purposes than Warrick's product provide a reason for

1   the customer to buy Dey's product over Warrick's?
2       A.   According to this specific customer, if I
3   remember their request for bid from us, yes, it did.
4   This customer, if you remember the rest of these
5   documents which you haven't provided, stated that the
6   principal decision-making point would be "the spread."
7   And that's the customer's use of that term, not ours.
8       Q.   So whenever a -- is it your testimony, then,
9   that when a customer would come to Dey and -- to your
10  company and say that they would -- wanted to consider
11  the competing product that gave them the biggest spread
12  for reimbursement purposes, that Dey would then market
13  that customer by trying to demonstrate how their spread
14  was bigger than a competitor's?
15      A.   No, I'm not saying that.
16      Q.   Well, isn't that what was done in that
17  document right there?
18      A.   This is what these two individuals apparently
19  recommended.  I don't know if this ever went to the
20  customer.  It wasn't condoned by me.  I don't believe
21  it was condoned by Mr. Mozak.
22      Q.   Would you condone that kind of promotional
23  program today?
24      A.   Absolutely not.
25      Q.   Why not?

1    A.    It's unnecessary.

2    Q.    Is it wrong?

3    A.    I'm not saying it's wrong.  It depends on what
4 the customer perceives is right.  Is it illegal?  I
5 don't know.  I'd have to defer to counsel.

6    Q.    I'm not asking if it's legal.  I'm just saying
7 from your own testimony, you just told us that Gerimed,
8 which was the customer, wanted to buy product that had
9 a greater spread.  Correct?

10   A.    That's what the Gerimed document stated, yes.

11   Q.    Vis-a-vis competing products.  Correct?

12   A.    That's what the Gerimed document said.

13   Q.    So two members of your sales staff put
14 together a promotional package to show Gerimed that
15 they could make a bigger spread on Dey's product than
16 on Warrick's product.  Correct?

17         MR. HUDSPETH:  Objection to form.

18   Q.    (By Mr. Breen)  Is that correct?

3:04P 19   A.    In essence, that's what this document states.

20   Q.    Okay.  Is that not marketing the spread?

21   A.    Marketing the spread is actually going out and
22 promoting this to customers without customers
23 requesting it.  We do not create promotional materials.
24 This is not on Dey letterhead.  I don't know if this
25 ever went to the customer and I have said -- again,

1    I'll repeat: I would not condone it and I do not
2    believe Bob Mozak would condone it.
3         Q.   That was my question. Is it wrong to promote
4    Dey's product over Warrick's product based upon a
5    bigger spread? That's my question.
6              MR. HUDSPETH: Objection to form.
7              THE WITNESS: In -- in my view?
8         Q.   (By Mr. Breen) Yes.
9         A.   Yes.
10        Q.   Why?
11        A.   Because it's against what Dey Laboratories
12   represents.
13        Q.   And what does Dey Laboratories represent that
14   makes that wrong?
15        A.   We treat our customers fairly. We treat our
16   products fairly. We sell our products on the merits of
17   the product -- the clinical, the safety, and the
18   product presentation itself. We do not sell on the
19   spread, period.
20        Q.   Even if it puts your company at a competitive
21   disadvantage. Is that correct?
3:05P 22        A.   Yes.
23        Q.   And do you stand by that principle?
24        A.   Of course I do.
25        Q.   Do you think that Warrick has gained market