# Exhibit B

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc. v. Dey, Inc., et al.*,
Civil Action No. 05-11084-PBS

Exhibit to Plaintiff's Memorandum In Support of United States' Motion
In Limine Regarding Testimony of Raymond C. Winter and
Sequencing of Deposition Testimony

```
                                                                    1
 1                          CAUSE NO. GV002327

 2    THE STATE OF TEXAS              )    IN THE DISTRICT COURT
      ex rel.                         )
 3        VEN-A-CARE OF THE           )
          FLORIDA KEYS, INC.          )
 4                                    )
              Plaintiffs,             )
 5                                    )
      VS.                             )    TRAVIS COUNTY, TEXAS
 6                                    )
      DEY, INC.; ROXANE               )
 7    LABORATORIES, INC. and          )
      WARRICK PHARMACEUTICALS         )
 8    CORPORATION,                    )
                                      )
 9            Defendants.             )    53rd JUDICIAL DISTRICT

10

11    ***********************************************
                 ORAL AND VIDEOTAPED DEPOSITION OF
12                    ROBERT FRANCIS MOZAK
                       November 1, 2001
13    ***********************************************

14

15

16           ORAL DEPOSITION OF ROBERT FRANCIS MOZAK,

17    produced as a witness at the instance of the Plaintiffs

18    and duly sworn, was taken in the above-styled and

19    numbered cause on the 1st day of November 2001, from

20    9:12 a.m. to 4:57 p.m., before Randall N. Finch, CSR in

21    and for the State of Texas, reported by machine

22    shorthand, at the offices of Coudert Brothers, 600

23    Beach Street, Third Floor, San Francisco, California

24    94109, pursuant to Notice, the Texas Rules of Civil

25    Procedure and the provisions as previously set forth.
```

```
                                                                    2
1          1                    A P P E A R A N C E S

2          2      FOR THE PLAINTIFF STATE OF TEXAS:

3          3            MR. JOE CRAWFORD, MR. PATRICK J. O'CONNELL,
                        MR. JARRETT ANDERSON, MR. RAYMOND WINTER
4          4            Office of the Attorney General
                        State of Texas
5          5            P.O. Box 12548
                        Austin, Texas 78711-2548   (512) 475-4300
6          6                                       (512) 474-1062 Fax

7          7      FOR THE RELATOR:

8          8            MR. JAMES JOSEPH BREEN
                        The Breen Law Firm, P.A.
9          9            8201 Peters Road, Suite 1000
                        Plantation, Florida 33324  (954) 916-2713
10        10                                       (954) 916-2714 Fax
                              -and-
11        11            MR. JOHN E. CLARK (Of Counsel)
                        Goode Casseb Jones Riklin Choate &
12        12            Watson, P.C.
                        2122 North Main Avenue
13        13            P.O. Box 120480
                        San Antonio, Texas 78212-9680  (210) 733-6030
14        14                                       Fax (210) 733-0330

15        15      FOR THE DEFENDANT DEY, INC.:

16        16            MR. STEPHEN M. HUDSPETH
                        Coudert Brothers
17        17            1114 Avenue of the Americas
                        New York, New York 10036-7703  (212) 626-4442
18        18                                           (212) 626-4120
                              -and-
19        19            MR. STEVEN A. FLECKMAN
                        Fleckman & McGlynn, P.L.L.C.
20        20            515 Congress Avenue, Suite 1800
                        Austin, Texas 78701-3503   (512) 476-6900
21        21                                       (512) 476-7644 Fax

22        22      FOR THE DEPARTMENT OF JUSTICE:

23        23            MR. ANDY MAO, Civil Division   (Not present)
                        601 D Street, N.W., Room 9929
24        24            Washington, D.C. 20004   (202) 616-0539

25        25
```

Mozak, Robert 11-1-01

3

|  |  |
|---|---|
| 1 | A P P E A R A N C E S (Cont'd) |
| 2 | FOR THE DEFENDANT ROXANE LABORATORIES, INC.: |
| 3 |     MR. GREG PIERCE |
| |     Scott, Douglass & McConnico, L.L.P. |
| 4 |     One American Center, 15th Floor |
| |     600 Congress Avenue |
| 5 |     Austin, Texas, 78701   (512) 495-6300 |
| |                             (512) 474-0731 Fax |
| 6 | |
| 7 | FOR THE DEFENDANT WARRICK PHARMACEUTICALS CORPORATION: |
| 8 |     MR. C. MICHAEL MOORE |
| |     Locke Liddell & Sapp, L.L.P. |
| 9 |     2200 Ross Avenue, Suite 2200 |
| |     Dallas, Texas 75201-6776  (214) 740-8000 |
| |                                (214) 740-8800 Fax |
| 10 | |
| 11 | FOR THE PLAINTIFF, VEN-A-CARE OF THE FLORIDA KEYS, INC.: |
| 12 |     MR. ZACHARY BENTLEY |
| 13 | ALSO PRESENT:  Mr. Richard Rienstra, Videographer |

Mozak, Robert 11-1-01

```
                                                              29
  1         1         Q.   I understood from your last answer that --
  2         2    that Mr. Galles and Mr. Johnston might have shared
  3         3    responsibility to report to Texas?
  4         4         A.   The way it would have worked is the marketing
  5         5    person, who in this case would have been Mr. Galles,
  6         6    would have likely prepared the letters and then those
  7         7    letters would have been reviewed by Mr. Johnston and he
  8         8    would have taken the responsibility of sending them
  9         9    out.
 10        10         Q.   I see.
 11        11         A.   That's how it would have worked.
 12        12         Q.   You indicated that Ms. Jackson is no longer
 13        13    with Dey?
 14        14         A.   Yes.
 15        15         Q.   Do you know where she is now?
 16        16         A.   No, I do not.
 17        17         Q.   Is Mr. Hugo still with Dey?
 18        18         A.   No, he's not.
 19        19         Q.   And do you know where he is now?
 20        20         A.   No, I do not.
 21        21         Q.   Is Ms. Burnham still with Dey?
 22        22         A.   No, she is not.
 23        23         Q.   Do you know where she is now?
 24        24         A.   No, I do not know specifically.  I know
 25        25    generally.
```

Mozak, Robert 11-1-01

```
                                                                    30
  1           1        Q.    Do you know generally?
  2   9:47A   2        A.    Somewhere in California.
  3           3        Q.    How about Mr. Galles?
  4           4        A.    He's no longer with Dey.
  5           5        Q.    Is he somewhere in California?
  6           6        A.    Yes, he is in Napa.
  7           7        Q.    He is in Napa.  Is he still in the
  8           8   pharmaceutical industry, do you know?
  9           9        A.    Yes, he is.
 10          10        Q.    With one of your competitors?
 11          11        A.    No, he is not with a competitor.
 12          12        Q.    Do you know who he works for?
 13          13        A.    Works for a company called Senten.
 14          14        Q.    S-a-n --
 15          15        A.    S-e-n-t-e-n.
 16          16        Q.    When we spoke with Mr. Rice the other day, he
 17          17   indicated that Dey tends to sell its products to the
 18          18   same class of customers, say, for example, wholesalers
 19          19   at prices that are within a close range.  Would you
 20          20   agree with that proposition?
 21   9:48A  21        A.    We sell our wholesalers at -- at one price,
 22          22   WAC.  That's our invoice price.
 23          23        Q.    At one set specific price?
 24          24        A.    Yes, to wholesalers, yes.
 25          25        Q.    There's no variance in the price between --
```

47

```
 1        1     wanted that information regarding Mr. Hugo?
 2        2          A.   Yes.
 3        3          Q.   Same question with respect to Ms. Burnham.
 4        4     Do you know why she left Dey?
 5 10:27A 5          A.   She left Dey for another position for more --
 6        6     for more money.
 7        7          Q.   She wasn't fired?
 8        8          A.   No, she was not.  She resigned.
 9        9          Q.   Do you know what company she went to work for?
10       10          A.   She went to a company call Inhale,
11       11     I-n-h-a-l-e.
12       12          Q.   Do you know if she still works at Inhale?
13       13          A.   No, I believe she does not.
14       14          Q.   Why do you believe that she no longer works at
15       15     Inhale?
16       16          A.   Because I received a call from her about two
17       17     years ago telling me that she was going to leave that
18       18     job and take -- go to school to become a psychologist,
19       19     for her Ph.D.
20       20          Q.   Do you know where she was planning on going to
21       21     school to take her Ph.D.?
22       22          A.   No, I do not.
23       23          Q.   Do you remember where she was when she made
24       24     the phone call to you?
25       25          A.   I -- I believe it was probably from Inhale.
```

Mozak, Robert 11-1-01

|  |  |  |
|---|---|---|
| 10:28A | 1 | Q. Which is based where? |
|  | 2 | A. That's based South Bay, around -- I believe around Palo Alto or in that general vicinity. |
|  | 3 |  |
|  | 4 | Q. Now, I suppose if we went to Ms. Villegas we might be able to get more information about where she could be reached? |
|  | 5 |  |
|  | 6 |  |
|  | 7 | A. Perhaps, yes. |
|  | 8 | Q. Now right before the break I was asking you about percentages of Dey's sales to wholesaler customers that are through group purchasing organizations. |
|  | 9 |  |
|  | 10 |  |
|  | 11 |  |
|  | 12 | A. Yes. |
|  | 13 | Q. And we were talking about whether or not Ms. Marrs could pull up that information. Is that the kind of information that you have occasion to go to Ms. Marrs and request from time to time? |
|  | 14 |  |
|  | 15 |  |
|  | 16 |  |
|  | 17 | A. No, it is not. |
|  | 18 | Q. Is it of any importance to you whatsoever what percentage of -- as the person in charge of sales and marketing, is it not important to you to have a handle on what percentage of the sales of your products are to which classes of your customers? |
|  | 19 |  |
|  | 20 |  |
|  | 21 |  |
|  | 22 |  |
| 10:30A | 23 | A. It's not that important. I don't follow that on a regular basis. |
|  | 24 |  |
|  | 25 | Q. That's not anything that you take into account |

85

11:42A  1     A.   I don't know.
        2     Q.   Do you know who individually handles that
        3  function for Dey?
        4     A.   No, I don't.
        5     Q.   What is your understanding of the term spread?
        6     A.   Well, I would define spread as the difference
        7  between the cost and the reimbursement amount.
        8     Q.   When you say cost, do you mean cost as in that
        9  which is paid by the purchaser?
       10     A.   Yes.
       11     Q.   And when you mean reimbursement amounts, do
       12  you mean the amount paid by Medicaid?
11:43A 13     A.   Could be Medicaid or any third-party payer.
       14     Q.   Let's put this in the context of the issue
       15  that we're all here regarding, and that is payments to
       16  vendors of Dey's products that are dispensed to
       17  Medicaid patients.
       18     A.   Mm-hmm.
       19     Q.   So, is spread the difference between what is
       20  reimbursed to those vendors and the amount that they
       21  actually paid to acquire the product?
       22     A.   Yes.
       23     Q.   Is it Dey's policy to market the spread in its
       24  interaction with its customers?
       25     A.   No, it is not.

Mozak, Robert 11-1-01

86

```
11:44A   1      Q.   Has Dey ever engaged in the practice of
         2   marketing the spread?
         3      A.   Not to my knowledge.
         4      Q.   If it came to your attention that your
         5   employees were engaged in the practice of marketing the
         6   spread, would you condone that practice?
         7      A.   No, I would not.
         8      Q.   I'll represent to you that Mr. Rice was, shall
         9   we say adamant that he did not condone the practice of
        10   marketing the spread.  Do you share that feeling?
        11      A.   Yes, I do.
        12      Q.   Can you tell us why?
        13      A.   Well, I just -- I don't think it's -- it's --
        14   it's proper.  We have never -- that has never been the
        15   policy of the company to market on that basis.  We
        16   market on the basis of the product attributes.
        17              Our customers use our products because
        18   of the attributes that we have and they prefer our
        19   products.  In fact, we have consistently lowered our
        20   WAC over the history of the product and we have always
        21   been a price follower in terms of dropping price.  So
        22   if anything, we're not marketing the spread.  We have
        23   the -- the poorest -- we probably have the worst
        24   position when it comes to spread than our competitors.
11:46A  25      Q.   How do you maintain your position in the
```

Mozak, Robert 11-1-01

187

```
 1         1    and divergent spreadsheets prepared purportedly by Dey
 2         2    Laboratories, is a term used by Dey Laboratories in its
 3         3    own communication systems.
 4         4         A.   It is -- it is not normally used.
 5         5         Q.   It's -- okay, not normally used.  And in order
 6         6    to find out why the word "Net Price" keeps popping up
 7         7    on these types of spreadsheets as we have in front of
 8         8    us now, who at Dey should I go talk to?
 9  4:17P  9         A.   Finance department or the contract department,
10        10    either one.
11        11         Q.   And would your answer be the same for the
12        12    suggested sales price or the suggested sale price?
13        13         A.   Yes.
14        14         Q.   Go talk to finance or accounting.  Who there?
15        15         A.   Pam Marrs.
16        16         Q.   Pam Marrs.  Okay.  And how about in contracts?
17        17         A.   Russell Johnston.
18        18         Q.   Russell Johnston.  Okay.
19        19              Now, let me show you what was marked as
20        20    Exhibit 72 yesterday during Mr. Rice's deposition.
21        21    I'll ask, have you ever seen that document before?
22  4:18P 22         A.   I saw it about two years ago for the first
23        23    time during when we were collecting documents.
24        24         Q.   You were surprised when you saw that document
25        25    for the first time two years ago?
```

Mozak, Robert 11-1-01

```
                                                              188
 1       1       A.   Yes, I was.
 2       2       Q.   Why?
 3       3       A.   Well, first of all, it's incorrect.  It should
 4       4  have never gone out.
 5       5       Q.   Incorrect in what context?
 6       6       A.   In -- in several contexts.  It didn't -- it
 7       7  didn't mention all the WAC states.  It's also incorrect
 8       8  as it -- as it relates to the first sentence in the
 9       9  second paragraph, where it says WAC is not
10      10  representative of the published wholesale prices.
11      11       Q.   Well, what WAC states did it miss, to your
12      12  knowledge?
13      13       A.   Probably missed Texas, I -- and I'm not sure
14      14  I -- others.
15      15       Q.   Okay.  But Texas is conspicuously absent?
16      16       A.   Yes, it was.
17      17       Q.   Okay.  It also talks about increasing the WAC
18      18  prices as a competitive response to Warrick.  Correct?
19 4:20P 19       A.   Doesn't quite say that in those terms, no.
20      20       Q.   Well, why don't you read it?  I hate to have
21      21  you do this, but just read the language that we're
22      22  talking about right now so we can discuss it and make
23      23  sure that the questions are clear.
24      24       A.   The whole -- with the whole letter or just the
25      25  last sentence?
```

Mozak, Robert 11-1-01

```
                                                              189
 1      Q.   The last sentence about adjusting WAC prices.
 2      A.   "Our updated WAC values are in line with the
 3 Warrick WAC value -- Warrick WAC values provided by
 4 First Data Bank and should level the playing field for
 5 Medicaid reimbursements."
 6      Q.   Did Mrs. -- was Mrs. Burnham involved in
 7 increasing WAC prices at Dey Laboratories at or about
 8 the time of that memo?
 9      A.   Yes, she did.
10      Q.   Was she authorized to do that?
11      A.   No, she was not.
12      Q.   Was she disciplined for it.
13      A.   She left the company approximately three
14 months after it happened, so she was not disciplined.
15      Q.   And when it happened -- I realize you first
16 saw the memo about two years ago, but that memo goes
17 back to what, '95?
18      A.   Yes.  Correct.
19      Q.   Were you aware that Ms. Burnham had increased
20 WAC prices at or about the time that she did it?
21      A.   I was not aware that she had done that.
22      Q.   When did you first become aware that she had
23 done that?
24      A.   I became aware of it about six months later
25 when through normal routine checks one of the other
```

Mozak, Robert 11-1-01