# Exhibit D

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc. v. Dey, Inc., et al.,*
Civil Action No. 05-11084-PBS

Exhibit to Plaintiff's Memorandum In Support of United States' Motion
In Limine Regarding Testimony of Raymond C. Winter and
Sequencing of Deposition Testimony

```
                                                                    465
 1   NO. GV002327
     THE STATE OF TEXAS           ) IN THE DISTRICT COURT
 2   EX REL.                      )
        VEN-A-CARE OF THE         )
 3      FLORIDA KEYS, INC.,       )
             PLAINTIFF(S),        )
 4                                )
     VS.                          ) TRAVIS COUNTY, TEXAS
 5                                )
     DEY, INC.; ROXANE            )
 6   LABORATORIES, INC., WARRICK  )
     PHARMACEUTICALS CORPORATION, )
 7   SCHERING-PLOUGH CORPORATION, )
     AND SCHERING CORPORATION,    )
 8           DEFENDANT(S).        ) 53RD JUDICIAL DISTRICT

 9
             *******************************************
10
     ORAL AND VIDEOTAPED DEPOSITION OF
11
     ROBERT FRANCIS MOZAK
12
     NOVEMBER 6TH, 2002
13
     VOLUME 3
14
             *******************************************
15

16       ORAL AND VIDEOTAPED DEPOSITION OF ROBERT FRANCIS

17   MOZAK, PRODUCED AS A WITNESS AT THE INSTANCE OF THE

18   PLAINTIFF(S), AND DULY SWORN, WAS TAKEN IN THE

19   ABOVE-STYLED AND NUMBERED CAUSE ON NOVEMBER 6TH, 2002,

20   FROM 9:11 A.M. TO 5:01 P.M., BEFORE CYNTHIA VOHLKEN,

21   CSR IN AND FOR THE STATE OF TEXAS, REPORTED BY MACHINE

22   SHORTHAND, AT THE OFFICES OF COUDERT BROTHERS, 600

23   BEACH STREET, SAN FRANCISCO, CALIFORNIA PURSUANT TO

24   THE TEXAS RULES OF CIVIL PROCEDURE.

25
```

```
                                                                  466
 1                     A P P E A R A N C E S

 2    FOR THE PLAINTIFF(S):

 3         MR. PATRICK J. O'CONNELL
           MR. RAYMOND C. WINTER
 4         MS. CYNTHIA O'KEEFFE
           OFFICE OF THE ATTORNEY GENERAL
 5         STATE OF TEXAS
           POST OFFICE BOX 12548
 6         AUSTIN, TEXAS 78711-2548

 7
      FOR THE RELATOR:
 8
           MR. JAMES JOSEPH BREEN
 9         THE BREEN LAW FIRM, P.A.
           P. O. BOX 297470
10         PEMBROKE PINES, FLORIDA 33029-7470

11         -AND-

12         MR. FRANK M. PITRE
           COTCHETT, PITRE, SIMON & MCCARTHY
13         840 MALCOLM ROAD, SUITE 200
           BURLINGAME, CALIFORNIA  94010
14

15    FOR THE DEFENDANT(S) DEY, INC.:

16         MR. STEPHEN M. HUDSPETH
           COUDERT BROTHERS
17         1114 AVENUE OF THE AMERICAS
           NEW YORK, NEW YORK 10036-7703
18
           -AND-
19
           MR. STEVEN A. FLECKMAN
20         FLECKMAN & MCGLYNN, P.L.L.C.
           515 CONGRESS, SUITE 1800
21         AUSTIN, TEXAS 78701-3503

22
      FOR THE DEFENDANT ROXANE LABORATORIES, INC.:
23
           MR. R. ERIC HAGENSWOLD
24         SCOTT, DOUGLASS & MCCONNICO, L.L.P.
           ONE AMERICAN CENTER, FIFTEENTH FLOOR
25         600 CONGRESS AVENUE
           AUSTIN, TEXAS 78701
```

Mozak, Robert 11-6-2002

```
                                                              467

   FOR THE DEFENDANT WARRICK PHARMACEUTICALS CORPORATION,
   SCHERING-PLOUGH CORPORATION AND SCHERING CORPORATION:

          MS. KARIN B. TORGERSON
          LOCKE LIDDELL & SAPP, LLP
          2200 ROSS AVENUE, SUITE 2200
          DALLAS, TEXAS 75201-6776


   FOR THE WITNESS ROBERT MOZAK:

          MR. MARTIN F. GAYNOR, III
          COOLEY MANION JONES LLP
          21 CUSTOM HOUSE STREET
          BOSTON, MASSACHUSETTS  02110-3536


   ALSO PRESENT:

          MR. THOMAS A. TEMMERMAN,
             CALIFORNIA OFFICE OF THE
             ATTORNEY GENERAL
          MR. ZACHARY TAYLOR BENTLEY, II
          MS. ANNE ARNOLD
          MR. BRIAN BOBBITT, VIDEOGRAPHER
```

Mozak, Robert  11-6-2002

```
                                                              481
```

1   A FACT WITNESS HERE TODAY.

2   IF YOU HAVE A DOCUMENT YOU WANT TO SHOW

3   HIM ABOUT THE COMPANY AND LAY A PROPER FOUNDATION THEN

4   I'LL RECONSIDER MY INSTRUCTION.  FOR NOW IT STANDS.

5   MR. WINTER:  THAT'S FINE.  WE'LL COME UP

6   WITH ANOTHER QUESTION THAT'S PERHAPS BETTER.

7   Q.   (BY MR. WINTER)  MR. MOZAK, I WOULD LIKE TO

8   DRAW YOUR ATTENTION NOW TO A DOCUMENT THAT WAS

9   INTRODUCED AT ONE OF YOUR PRIOR DEPOSITIONS AND IT'S

10  BEEN INDICATED HERE AS EXHIBIT 72.

11  A.   UH-HUH.

12  Q.   DO YOU RECALL THAT EXHIBIT?

13  A.   YES, SIR.

14  Q.   OKAY.  AND DO YOU RECALL THAT WHEN MR. BREEN

15  AND I BELIEVE MYSELF AS WELL ASKED YOU QUESTIONS ABOUT

16  THIS DOCUMENT LAST YEAR, NOVEMBER OF 2001, YOU

17  INDICATED TO US THAT ONE OF THE REASONS WHY YOU

18  BELIEVE THAT EXHIBIT HAD BEEN PREPARED, THAT

19  MEMORANDUM HAD BEEN PREPARED BY MS. BURNHAM, WAS

20  BECAUSE SHE WAS CONCERNED ABOUT A SITUATION IN

21  FLORIDA.  DO YOU RECALL GENERALLY THOSE DISCUSSIONS?

22  A.   NO, I DON'T RECALL THAT.

23  Q.   YOU DON'T?  OKAY.  WELL, LET ME ASK YOU.

24  WHAT IS YOUR UNDERSTANDING AS TO WHY MS. BURNHAM

25  PREPARED THAT MEMORANDUM WHICH IS AT EXHIBIT 72?

482

1  A.  I REALLY DON'T KNOW WHY SHE PREPARED THIS
2  MEMO AND SENT IT OUT.  I WASN'T AWARE OF IT AT THE
3  TIME AND I DIDN'T BECOME AWARE OF IT UNTIL QUITE SOME
4  TIME AFTER THAT.  THE ONLY -- THE ONLY -- MY ONLY
5  UNDERSTANDING OF -- OF -- OF THE TIME FRAME, SO TO
6  SPEAK, IS THIS WAS -- THIS WAS A TIME WHEN SOME OF OUR
7  SALES REPS WERE CONCERNED ABOUT THE WAC AND THAT WAS
8  NOTED BY WARRICK AND THAT, OF COURSE, WAS DEMONSTRATED
9  BY SOME -- SOME OF OUR REPS CALLING ON THE STATES
10 DIRECTLY.  AND I DON'T KNOW WHETHER THAT HAD ANY
11 MOTIVATION AT ALL AS TO WHETHER -- WHY SHE WROTE THIS
12 MEMO, BUT THAT WOULD BE MY ONLY RECOLLECTION OF,
13 QUOTE, THE TIME FRAME.
14 Q.  SO YOU DON'T RECALL DISCUSSING A SITUATION IN
15 FLORIDA IN YOUR DEPOSITION LAST NOVEMBER?
16 A.  YEAH.  THAT'S WHAT I WAS JUST REFERRING TO.
17 THERE WAS A SITUATION THAT OCCURRED IN FLORIDA THAT --
18 WHERE ONE OF OUR REPS WENT TO THE STATE OF FLORIDA TO
19 SO TO SPEAK BRING UP THE WAC ISSUE, THE WARRICK WAC
20 ISSUE, WITH THE STATE OF FLORIDA AND TRY TO INFORM THE
21 STATE THAT THE WAC WAS EXCESSIVE AND -- AND REALLY GOT
22 NO -- NO SATISFACTION FROM THE STATE.
23 Q.  AND WHO WAS THE REPRESENTATIVE IN FLORIDA?
24 A.  I BELIEVE THAT WAS ROSS UHL.
25 Q.  AND DO YOU KNOW HOW MR. UHL CAME TO THE

493

1  YOU TOLD US IN NOVEMBER OF LAST YEAR
2  THAT YOU DID NOT KNOW ABOUT THIS ACTION THAT'S
3  MANIFEST ON THIS EXHIBIT 72 AT THE TIME?
4  A.   YES, SIR.
5  Q.   AND WHEN YOU SAY AT THE TIME DO YOU MEAN YOU
6  DID NOT KNOW ABOUT THIS ON MAY 30TH, 1995?
7  A.   YES, SIR.
8  Q.   AND I THINK YOU SAID THAT AGAIN TODAY A
9  MOMENT AGO.
10 A.   YES, SIR.
11 Q.   WHEN DID YOU DISCOVER THAT THIS ACTION HAD
12 BEEN TAKEN?
13 A.   MY FIRST RECOLLECTION OF SEEING THIS MEMO WAS
14 WHEN WE WERE PRODUCING DOCUMENTS FOR DISCOVERY, WHICH
15 WOULD HAVE BEEN -- I CAN'T GIVE YOU THE EXACT DATE.
16 IT WOULD HAVE BEEN SEVERAL YEARS LATER.
17 Q.   THAT'S WHEN YOU FIRST SAW THE MEMORANDUM?
18 A.   YES, SIR.
19 Q.   OKAY.  NOW, IN YOUR MIND DO YOU DISTINGUISH
20 BETWEEN SEEING THE MEMORANDUM ON THE ONE HAND AND
21 BEING AWARE THAT ACTION WAS TAKEN TO RAISE THE WAC ON
22 THE OTHER HAND?
23 A.   NO, SIR, I DON'T DISTINGUISH BETWEEN THE TWO.
24 Q.   OKAY.  SO IS IT YOUR TESTIMONY THAT THE FIRST
25 TIME THAT YOU KNEW THAT THE WAC HAD BEEN RAISED WAS

Mozak, Robert  11-6-2002

```
                                                              494
```

1  WHEN YOU SAW THAT DOCUMENT IN PREPARATION OF DOCUMENT
2  PRODUCTION IN CONNECTION WITH THIS LAWSUIT OR ANOTHER
3  LAWSUIT?
4  MR. HUDSPETH:  OBJECTION, FORM.
5  A.   WELL, I WOULD HAVE -- I WOULD HAVE BECOME
6  AWARE OF IT IN DECEMBER OF '95 WHEN WE WERE PRODUCING
7  A NEW PRICE PAGE FOR THE INTRODUCTION OF A -- OF A NEW
8  PRODUCT.  I THINK IT WAS ALBUTEROL MDI.  AND OUR
9  NORMAL PROCEDURE AT THAT POINT IN TIME WOULD BE TO
10 SEND AROUND A PRICE PAGE WHICH WOULD HAVE -- ALL OF
11 THE PRICES WOULD HAVE BEEN CHECKED.  AND SO I SIGNED
12 OFF ON THAT PRICE PAGE WHICH INDICATED 14.50 FOR
13 ALBUTEROL AND THAT IN TURN TRIGGERED ONE OF THE
14 MARKETING PERSONNEL TO INFORM THE FIRST DATABANK THAT
15 THE PRICE THAT HAD BEEN INCREASED WOULD HAVE -- SHOULD
16 BE CHANGED.
17 Q.   OKAY.  LET ME TALK TO YOU ABOUT THAT AND MAKE
18 SURE I UNDERSTAND WHAT YOU'RE TELLING ME.  DECEMBER
19 1995, IS THAT THE MONTH WE ARE IN NOW?
20 A.   YES, SIR.
21 Q.   OKAY.  AND YOU ARE TALKING ABOUT A DOCUMENT
22 THAT YOU ARE CALLING A PRICE PAGE; IS THAT CORRECT?
23 A.   YES.
24 Q.   WHAT IS A PRICE PAGE, PLEASE?
25 A.   IT'S REALLY OUR -- OUR PUBLISHED PRICE PAGE

```
                                                                591
1    MARINE WORLD PARKWAY TO GO TO THIS RESTAURANT THAT YOU
2    DINED AT WITH MS. SELENATI SOMETIME IN 2000?
3    A.   YES, I WOULD HAVE.
4    Q.   YOU WOULD HAVE DONE THAT.  OKAY.
5    A.   YEAH.
6    Q.   AND THAT'S APPROXIMATELY 50 MILES FROM YOUR
7    HOME?
8    A.   YES, SIR.
9    Q.   WHY WOULD YOU TRAVEL 50 MILES FROM YOUR HOME,
10   GO THAT FAR TO GO TO A RESTAURANT TO HAVE DINER WITH
11   MS. SELENATI OR MS. BURNHAM?
12   A.   I DON'T KNOW WHETHER I MADE A SPECIFIC TRIP
13   TO SEE HER.  I MAY HAVE BEEN IN THE AREA FOR SOME
14   OTHER BUSINESS, EITHER IN SAN FRANCISCO, OR IT'S EVEN
15   POSSIBLE I WAS EITHER GOING OR COMING ON A TRIP.  I
16   DON'T RECALL THE EXACT CIRCUMSTANCES, BUT -- SO THAT'S
17   MY -- THAT'S MY BEST RECOLLECTION.  IT -- IT WAS
18   LIKELY SOME OTHER REASONS I WAS IN THE AREA.
19   Q.   ALL RIGHT.  WELL, THE RESTAURANT IS CERTAINLY
20   NOT CONVENIENT TO YOUR HOME FOR DINING PURPOSES, IS
21   IT?
22   A.   NO, SIR, IT'S NOT.
23   Q.   SO WHY WOULD YOU BE -- WHY PICK THAT
24   PARTICULAR LOCATION FOR A RESTAURANT TO HAVE -- HAVE
25   DINNER AT?  IT'S NOT CONVENIENT FOR YOU.  WAS IT
```

Mozak, Robert 11-6-2002

```
                                                               592
 1    CONVENIENT FOR MS. BURNHAM-SELENATI?
 2    A.    YES, I BELIEVE IT WAS.
 3    Q.    WHY WAS IT CONVENIENT FOR HER?
 4    A.    BECAUSE I BELIEVE SHE LIVED REASONABLY CLOSE
 5    TO THAT RESTAURANT.
 6    Q.    AND WHEN YOU SAY "REASONABLY CLOSE,"
 7    APPROXIMATELY HOW FAR?
 8    A.    PROBABLY A COUPLE OF MILES.
 9    Q.    COUPLE OF MILES.
10    A.    SURE.
11    Q.    AND DO YOU KNOW HOW TO GET -- OR AT LEAST IN
12    2000 WHEN YOU HAD DINNER WITH MS. SELENATI, FORMERLY
13    MS. BURNHAM, AT THIS RESTAURANT, DID YOU KNOW HOW TO
14    GET FROM THAT RESTAURANT TO HER HOME?
15    MR. HUDSPETH:  OBJECTION, FORM.
16    A.    I KNOW IT WAS IN THE VICINITY, BUT I -- I
17    PROBABLY COULDN'T HAVE ACTUALLY FOUND -- FOUND IT.  IF
18    I RECALL, WE MET AT THE RESTAURANT --
19    Q.    (BY MR. BREEN)  OKAY.
20    A.    -- NOT AT HER HOME.
21    Q.    OKAY.  YOU HAD NEVER BEEN TO HER HOME?
22    A.    OH, YES, I HAD BEEN TO HER HOME.
23    Q.    HOW MANY OCCASIONS HAVE YOU BEEN TO HER HOME?
24    A.    I HAD BEEN TO HER HOME -- I CAN'T GIVE YOU
25    THE SPECIFIC NUMBER, BUT IT -- IT WOULD HAVE BEEN IN
```

Mozak, Robert 11-6-2002

593

1   THE -- YOU KNOW, '96 PERIOD, THE PERIOD AFTER SHE LEFT
2   DEY THROUGH '96, I DON'T KNOW, HALF A DOZEN TIMES
3   MAYBE, BUT -- BUT AFTER THAT PERIOD I -- I DID NOT GO
4   TO HER HOME.
5   Q.   ALL RIGHT.  SO YOU WENT TO HER HOME -- THIS
6   IS THE HOME NEAR THE RESTAURANT APPROXIMATELY SIX
7   MILES SOUTH OF SAN FRANCISCO AIRPORT --
8   A.   YES.
9   Q.   -- THAT YOU ARE TALKING ABOUT?  OKAY.  AND
10  YOU HAD GONE TO HER HOME APPROXIMATELY HALF A DOZEN
11  TIMES IN THE '96 TIME FRAME AFTER SHE LEFT DEY
12  LABORATORIES.
13  A.   YES, MORE OR LESS.
14  Q.   OKAY.  AND DO YOU KNOW IF SHE RESIDED AT THAT
15  HOME DURING THE TIME THAT SHE ACTUALLY WORKED AT DEY
16  LABORATORIES?
17  A.   YES.  NO.  EXCUSE ME.  AT THE TIME SHE -- NO.
18  LET ME CORRECT THAT.  AT THE TIME SHE LIVED -- WORKED
19  WITH DEY LABORATORIES SHE LIVED IN NAPA.
20  Q.   IN NAPA.
21  A.   YES.  AND SHE -- AND SHE MOVED TO THAT
22  ADDRESS AFTER SHE LEFT DEY LABORATORIES.
23  Q.   ALL RIGHT.  DID YOU EVER VISIT MISS THEN
24  BURNHAM, NOW SELENATI'S HOME IN NAPA?
25  A.   YES, I DID.

Mozak, Robert 11-6-2002

```
                                                               597
```

1  MR. BREEN:  NO, HOME NEAR THE RESTAURANT

2  SIX TIMES.

3  MR. FLECKMAN:  OKAY.  GOT YOU.

4  Q.  (BY MR. BREEN)  ON EACH OCCASION THAT YOU

5  WENT TO THAT HOME NEAR THE RESTAURANT SIX TIMES,

6  APPROXIMATELY SIX TIMES, DID YOU DRIVE YOURSELF?

7  A.  YES, SIR.

8  Q.  OKAY.  AND DID YOU HAVE ANYBODY IN THE CAR

9  WITH YOU TELLING YOU HOW TO GET TO HER HOUSE?

10 A.  NO, SIR.

11 Q.  OKAY.  AND WHO GAVE YOU THE DIRECTIONS TO HER

12 HOUSE?

13 A.  SHE DID.

14 Q.  AND DID YOU EVER -- DID YOU HAVE HER PHONE

15 NUMBER WHEN YOU USED TO --

16 A.  YES, I DID.

17 Q.  -- WHEN YOU USED TO VISIT HER?

18 A.  YES.

19 Q.  OKAY.  AND WHEN YOU HAD DINNER WITH HER

20 SOMETIME IN 2000 AT THIS RESTAURANT SOUTH OF SAN

21 FRANCISCO AIRPORT DID YOU HAVE HER PHONE NUMBER AT

22 THAT TIME?

23 A.  YES, I WOULD HAVE -- I WOULD HAVE I BELIEVE

24 HAD HER PHONE NUMBER, WORK PHONE -- WORK PHONE NUMBER

25 IF SHE WAS STILL THERE.  AND HER HOME, I WOULD HAVE

```
                                                                    648
 1   Q.   (BY MR. BREEN)  ARE YOU AWARE OF ANY -- ASIDE

 2   FROM WHAT -- WHAT YOU MAY OR MAY NOT GLEAN FROM THE

 3   EXHIBIT THAT I JUST SHOWED YOU TO, EXHIBIT 344, ARE

 4   YOU AWARE OF ANY ACTIONS THAT RICK UPP TOOK ON BEHALF

 5   OF DEY LABORATORIES THAT WERE NOT AUTHORIZED?

 6   A.   I'M NOT AWARE OF ANY.

 7   Q.   LET ME SHOW YOU WHAT WAS MARKED YESTERDAY

 8   AS --

 9   MR. BREEN:  WELL, BEFORE WE DO THAT, CAN

10   YOU GO TO EXHIBIT 74, RAY?

11   MR. WINTER:  (COMPLIES).

12   Q.   (BY MR. BREEN)  NOW, DO YOU RECALL BEING

13   ASKED ABOUT EXHIBIT 74 DURING YOUR -- YOUR LAST --

14   LAST DEPOSITION?

15   A.   YES, SIR.

16   Q.   AND TAKE A MOMENT TO THUMB THROUGH IT, BUT

17   YOU'LL SEE IN THERE AN AWP REIMBURSEMENT PROGRAM.

18   A.   YES, SIR.

19   Q.   AND YOU'LL SEE THERE THAT -- SOME FORMULAS

20   AND CALCULATIONS DONE TO CONVINCE GERIMED CUSTOMERS

21   THAT THEY SHOULD BUY DEY'S UNIT DOSE INSTEAD OF

22   WARRICK'S MULTIDOSE EVEN THOUGH DEY'S UNIT DOSE IS

23   MORE EXPENSIVE?

24   A.   YES, SIR.

25   Q.   AND -- AND -- AND THE -- AND THE PROPOSAL WAS
```

```
                                                              649
```

1  EXPLAINED TO THEM THAT DEY'S UNIT DOSE IS MORE

2  PROFITABLE BECAUSE OF -- ON REIMBURSEMENT, DO YOU

3  RECALL THAT?

4  A.   YES, SIR.

5  Q.   DO YOU RECALL TESTIFYING THAT YOU AGREE WITH

6  MR. RICE, THAT KIND OF MARKETING WAS NOT CONSISTENT

7  WITH DEY'S POLICY?

8  A.   YES, SIR.

9  Q.   IS THAT STILL YOUR TESTIMONY?

10 A.   WE -- CLEARLY THERE HAVE BEEN SEVERAL

11 INSTANCES WHERE THIS OCCURRED AND AS WE'VE SEARCHED

12 THE DOCUMENTS THERE'S -- THERE'S BEEN SEVERAL

13 INSTANCES THAT THAT HAS -- HAS COME OUT.  MOST OF

14 THOSE WERE PROPOSALS SUCH AS -- AS THIS PARTICULAR

15 DOCUMENT THAT WOULD HAVE GONE TO A -- A CONTRACTING

16 ANALYST AND SO NOT NECESSARILY WOULD I HAVE SEEN THESE

17 AT THE TIME THAT YOU ASKED ME THOSE -- YOU KNOW, AT

18 THE TIME THAT THEY WERE DONE.

19 Q.   OKAY.

20 A.   SO YES.

21 Q.   OKAY.  SO THIS IS THE KIND OF THING THAT WENT

22 TO A DEY CONTRACT ANALYSIS, RIGHT?

23 A.   THAT'S CORRECT.

24 Q.   ALL RIGHT.  AND SO YOU'RE NOT AWARE OF ANY

25 INFORMATION THAT WOULD INDICATE TO YOU THAT DEY

```
                                                                  650
 1    SALESPEOPLE ACTUALLY WERE PERMITTED TO MAKE SALES
 2    PITCHES CONTAINING THE SAME KIND OF INFORMATION TO
 3    ACTUAL DEY CUSTOMERS, ARE YOU?
 4    A.   WELL, UPON RESEARCHING THE DOCUMENTS I
 5    HAVE -- IT'S COME TO MY ATTENTION THAT THERE WAS SOME
 6    OF THESE PRESENTATIONS BEING DONE IN OR ABOUT 1995,
 7    '96.
 8    Q.   AND THEY WEREN'T AUTHORIZED, WERE THEY?
 9    A.   I WAS NOT AWARE OF THEM AT THE TIME.
10    Q.   AND IF -- IF -- SO IF MR. UPP WERE GOING
11    AROUND THE COUNTRY TELLING HIS SALESPEOPLE TO MAKE
12    THESE KIND OF PRESENTATIONS TO CUSTOMERS, THAT WAS
13    WITHOUT YOUR KNOWLEDGE, WASN'T IT?
14    A.   IT WAS NOT -- I WAS NOT AWARE OF MR. UHL
15    DOING THAT, YES.
16    Q.   MISTER WHO?
17    A.   MR. UHL.  RUSS UHL.
18    Q.   ALL RIGHT.  BUT MY QUESTION, IF MR. UPP,
19    THE -- A REGIONAL SALES MANAGER --
20    A.   OH, MR. UPP.
21    Q.   -- WERE GOING AROUND THE COUNTRY TELLING HIS
22    SALESPEOPLE TO MAKE PRESENTATIONS TO DEY'S CUSTOMERS
23    USING THE SAME MARKETING TECHNIQUE TRYING TO CONVINCE
24    THE CUSTOMER TO BUY THE MORE EXPENSIVE DEY UNIT DOSE
25    BECAUSE IT WAS MORE PROFITABLE THAN THE CHEAPER
```

651

1  WARRICK MULTIDOSE, THAT WAS WITHOUT YOUR KNOWLEDGE,
2  WASN'T IT?
3  A.   I HAVE A VAGUE RECOLLECTION OF SOME OF THAT
4  GOING ON AT -- SOME OF OUR REPS CLEARLY DID DISCUSS
5  REIMBURSEMENTS TO SOME OF OUR CUSTOMERS DURING THAT
6  PERIOD OF TIME.
7  Q.   BUT THAT WASN'T AUTHORIZED BY YOU, WAS IT?
8  A.   I WAS NOT AWARE OF THE EXTENT THAT IT WAS
9  BEING DONE DURING THAT PERIOD OF TIME.
10  Q.   YOU WEREN'T AWARE OF THE EXTENT THAT IT WAS
11  BEING DONE?
12  A.   RIGHT.  I HAD SEEN SOME FORMS, BUT I DIDN'T
13  REALIZE THAT THEY HAD ACTUALLY BEEN IMPLEMENTED.
14  Q.   YOU NEVER AUTHORIZED THOSE FORMS, DID YOU?
15  A.   I DIDN'T -- I DIDN'T AUTHORIZE THEM, NO.
16  Q.   AND YOU DIDN'T AUTHORIZE ANYBODY ELSE TO
17  AUTHORIZE THEM, DID YOU?
18  A.   NOT TO MY RECOLLECT -- RECOLLECTION.
19  Q.   AND IT WAS YOUR INTENTION AT THE TIME THAT
20  THEY SHOULD NOT BE AUTHORIZED, WASN'T IT?
21  A.   IF I HAD KNOWN THE DOCUMENTS THAT I'VE SEEN I
22  CERTAINLY WOULD HAVE DONE SOMETHING ABOUT IT AT THE
23  TIME.
24  Q.   BECAUSE IT WAS YOUR POLICY AS THE EXECUTIVE
25  VICE PRESIDENT OF SALES AND MARKETING THAT YOUR PEOPLE

```
                                                           652
 1   WERE NOT SUPPOSED TO BE ENGAGING IN THAT KIND OF

 2   MARKETING, WERE THEY?

 3   A.   THAT WAS MY UNDERSTANDING AT THE TIME.

 4   Q.   AND -- AND -- AND YOU GAVE YOUR SUBORDINATES

 5   INSTRUCTIONS NOT TO ENGAGE IN THAT KIND OF MARKETING,

 6   DIDN'T YOU?

 7   A.   I DON'T REMEMBER ANY SPECIFIC INSTRUCTIONS

 8   THAT I GAVE THEM FOR OR AGAINST IT, BUT CLEARLY THERE

 9   WAS SOME DISCUSSION OF SPREAD, PARTICULARLY WHEN IT

10   CAME TO MULTIDOSE VERSUS UNIT DOSE BY SOME OF OUR

11   SALES REPRESENTATIVES DURING THE PERIOD OF '95 AND

12   EARLY '96 AT LEAST.

13   Q.   AND WHEN YOU SAY DISCUSSION OF THE SPREAD,

14   YOU MEAN USING THE GREATER SPREAD ON REIMBURSEMENT ON

15   DEY'S PRODUCT IN ORDER TO MARKET THE PRODUCT, CORRECT?

16   A.   THE DISCUSSION OF THE REIMBURSEMENT

17   DIFFERENCES BETWEEN UNIT DOSE AND MULTIDOSE, THAT'S

18   WHAT I'M REFERRING TO.

19   Q.   ARE YOU REFERRING TO THE DISCUSSION AS IT

20   RELATED TO USING THE GREATER REIMBURSEMENT SPREAD ON

21   DEY'S MULTIDOSE AS A MARKETING TOOL?

22   A.   NOT ON MULTIDOSE.

23   Q.   I'M SORRY, ON THE UNIT DOSE?

24   A.   ON THE UNIT DOSE.

25   Q.   OKAY.   NOW, IF YOU DIDN'T AUTHORIZE THAT KIND
```

Mozak, Robert 11-6-2002