# Exhibit F

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc. v. Dey, Inc., et al.*,
Civil Action No. 05-11084-PBS

Exhibit to Plaintiff's Memorandum In Support of United States' Motion
In Limine Regarding Testimony of Raymond C. Winter and
Sequencing of Deposition Testimony



CAUSE NO. GV002327

| | | |
|---|---|---|
| THE STATE OF TEXAS | ) | IN THE DISTRICT COURT |
| | ) | |
| *ex rel.* | ) | |
|     VEN-A-CARE OF THE | ) | |
|     FLORIDA KEYS, INC., | ) | |
|     Plaintiff, | ) | |
| | ) | |
| VS. | ) | TRAVIS COUNTY, TEXAS |
| | ) | |
| DEY, INC.; ROXANE | ) | |
| LABORATORIES, INC.; | ) | |
| WARRICK PHARMACEUTICALS | ) | |
| CORPORATION; SCHERING- | ) | |
| PLOUGH CORPORATION; | ) | |
| SCHERING CORPORATION; | ) | |
| LIPHA, S.A.; MERCK-LIPHA, | ) | |
| S.A.; MERCK, KGAA; AND EMD | ) | |
| PHARMACEUTICALS, INC., | ) | |
|     Defendants. | ) | 53RD JUDICIAL DISTRICT |

ORAL AND VIDEOTAPED DEPOSITION OF

**ROBERT FRANCIS MOZAK**
**VOLUME IV**

March 13, 2003



**FREDERICKS-CARROLL REPORTING & LITIGATION SERVICES, INC.**

| | | | | |
|---|---|---|---|---|
| 7719 Wood Hollow Drive ✦ Suite 156 ✦ Austin, Texas 78731 | ✦ | (800) 234-3376 | ✦ | (512)477-9911 | ✦ | (512) 345-1417 | Fax |
| 9 Greenway Plaza ✦ Suite 3112 ✦ Houston, TX 77046 | ✦ | (800) 234-3376 | ✦ | (713) 572-8897 | ✦ | (512) 345-1417 | Fax |
| 909 N.E. Loop 410 ✦ Suite 810 ✦ San Antonio, TX 78209 | ✦ | (800) 767-9161 | ✦ | (210) 222-9161 | ✦ | (210) 225-1476 | Fax |

Page 697

1                    CAUSE NO. GV002327
2  THE STATE OF TEXAS           )IN THE DISTRICT COURT
   ex rel.                      )
3     VEN-A-CARE OF THE         )
      FLORIDA KEYS, INC.,       )
4          Plaintiffs,          )
                                )
5  VS.                          )TRAVIS COUNTY, TEXAS
                                )
6  DEY, INC.; ROXANE            )
   LABORATORIES, INC.; WARRICK  )
7  PHARMACEUTICALS CORPORATION; )
   SCHERING-PLOUGH CORPORATION; )
8  SCHERING CORPORATION;        )
   LIPHA, S.A.; MERCK-LIPHA, S.A.;)
9  MERCK, KGAA; AND EMD         )
   PHARMACEUTICALS, INC.,       )
10         Defendants.          )53RD JUDICIAL DISTRICT
11   *********************************************
            ORAL AND VIDEOTAPED DEPOSITION OF
12
                  ROBERT FRANCIS MOZAK
13                    VOLUME IV
14                  March 13th, 2003
15   *********************************************
16         ORAL AND VIDEOTAPED DEPOSITION OF
17  Robert Francis Mozak, produced as a witness at the
18  instance of the Relator and duly sworn, was taken in
19  the above-styled and numbered cause on the 13th of
20  March, 2003, from 9:37 a.m. to 7:22 p.m., before
21  Debra L. Sietsma, CSR in and for the State of Texas,
22  reported by machine shorthand, at 300 West 15th
23  Street, 9th Floor, Austin, Texas, pursuant to the
24  Texas Rules of Civil Procedure and the provisions as
25  previously set forth.

```
 1                    A P P E A R A N C E S
 2
 3   FOR THE WITNESS, ROBERT FRANCIS MOZAK:
 4            MR. WARTIN F. GAYNOR, III
             Cooley Manion Jones, L.L.P.
 5           21 Custom House Street
             Boston, Massachusetts  02110-3536
 6
     FOR THE PLAINTIFF, STATE OF TEXAS:
 7
             MR. PATRICK J. O'CONNELL,
 8           MR. RAYMOND C. WINTER
             Office of the Attorney General
 9           State of Texas
             Post Office Box 12548
10           Austin, Texas  78711-2548
11              - and -
12           MR. JOSEPH V. CRAWFORD
             Wright & Greenhill, P.C.
13           221 West 6th Street, Suite 1800
             Austin, Texas  78701
14
     FOR THE RELATOR, VEN-A-CARE OF THE FLORIDA KEYS, INC.:
15
             MR. JAMES JOSEPH BREEN
16           The Breen Law Firm, P.A.
             P.O. Box 297470
17           Pembroke Pines, Florida  33029-7470
18              - and -
19           MR. JARRETT ANDERSON
             Attorney at Law
20           2411 Hartford Road
             Austin, Texas  78703
21
     FOR DEFENDANT DEY, INC.:
22
             MR. STEPHEN M. HUDSPETH
23           MR. DARRELL PRESCOTT
             Coudert Brothers
24           1114 Avenue of the Americas
             New York, New York  10036-7703
25
                - and -
```

Page 699

```
 1              MR. STEVEN A. FLECKMAN
                Fleckman & McGlynn, P.L.L.C.
 2              515 Congress Avenue, Suite 1800
                Austin, Texas  78701-3503
 3
     FOR DEFENDANT ROXANE LABORATORIES, INC.:
 4
                MR. R. ERIC HAGENSWOLD
 5              Scott, Douglass & McConnico, L.L.P.
                One American Center, Fifteenth Floor
 6              600 Congress Avenue
                Austin, Texas  78701
 7
     FOR DEFENDANTS WARRICK PHARMACEUTICALS CORPORATION,
 8   SCHERING-PLOUGH CORPORATION AND SCHERING CORPORATION:
 9              MR. C. MICHAEL MOORE
                MR. JOHN P. MCDONALD
10              Locke Liddell & Sapp, L.L.P.
                2200 Ross Avenue, Suite 2200
11              Dallas, Texas  75201-6776
12   FOR THE U.S. DEPARTMENT OF JUSTICE:
13              MS. LAURIE A. OBEREMBT
                Trial Attorney - Civil Division
14              U.S. Department of Justice
                P.O. Box 261, Ben Franklin Station
15              Washington, D.C.  20044
16   FOR THE STATE OF FLORIDA:
                MR. MARK S. THOMAS
17              MS. MARY S. MILLER
                Office of the Attorney General
18              State of Florida
                PL-01 The Capitol
19              Tallahassee, Florida  32399-1050
20   ALSO PRESENT:
                Mr. John Maloy Lockwood, M.D.
21              Mr. Brian Bobbitt, Videographer
22
23
24
25
```

Page 712

```
 1    25's?

 2         A.    Yes, yes, sir.

 3         Q.    Okay.

 4         A.    Beyond that, I don't believe there was any

 5    other document that I turned over that had not already

 6    been produced.  Not that I'm aware of, anyway.

 7                MR. BREEN:  Well -- let me see the

 8    February '92 document.

 9                I'm going to hand you what's been

10    previously marked as Exhibit 459 in this case.

11                I don't know if you've got a copy of

12    that, Steve; but there's another one.

13                THE WITNESS:  Uh-huh.

14                MR. FLECKMAN:  Thanks, Jim.

15         Q.    (BY MR. BREEN)  And it purports to be a -- a

16    Dey Laboratories memoranda dated 24 February, 1992 to

17    Pam Marrs, Charles Rice, Jean-Paul Termier (sic)

18    and -- from  Mr. Robert F. Mozak, and it appears to be

19    signed "Bob."

20                Do you see that?

21         A.    Yes, I do.

22         Q.    And it's a multipage document --

23         A.    Uh-huh.

24         Q.    -- bearing Bates stampers -- Bates Stamp

25    Nos. DL-TX-90851, 52, 53, 54 and 55.
```

072315f1-d34a-45fb-acb1-df81d6e57525

Page 713

1           Do you see that?

2      A.   Yes, I do.

3      Q.   And have you ever seen this document before?

4      A.   Well, I -- obviously, I've seen it, since I

5  wrote it back in '92.  I don't think I've seen it

6  since.  It did -- I -- I -- I did see it recently in

7  February, but prior to that I -- I had forgotten about

8  it totally.  Obviously, I did see it in 1992.

9      Q.   You saw it recently in February.  Is that --

10     A.   Yes.

11     Q.   And where did you see it recently in

12  February?

13     A.   It was -- it was shown to me by the Dey

14  attorneys.

15     Q.   By the Dey lawyers?

16     A.   Yes.

17     Q.   Okay.  When you -- were you employed by Dey

18  when they showed you this document in February of --

19     A.   No, I was not.

20     Q.   All right.  And which lawyers showed this

21  document to you?

22     A.   I think Darrell did, Darrell --

23     Q.   Okay.

24     A.   -- Prescott.

25     Q.   And when Mr. Prescott showed you the document

Page 714

1    which is marked Exhibit 459 at this point, did you

2    have a recollection of having authored it?

3        A.   Yes, I did.

4        Q.   All right.  So you remember writing this --

5    authoring this document, correct?

6        A.   Yes, I do.

7        Q.   And the -- do you know if Dey Laboratories

8    provided a copy of this document to its counsel at any

9    time since October 6th, 1997?

10       A.   You mean prior to this February?

11       Q.   Anytime since October 6th, 1997, did Dey

12   Laboratories provide a copy of Exhibit 459 to its

13   counsel?

14       A.   Well, they must have, because it's here.  I

15   assume they did recently.

16       Q.   Recently?

17       A.   Yes.

18       Q.   You assume Dey Laboratories did recently?

19       A.   Yes.

20       Q.   Okay.  Why do you assume that Dey

21   Laboratories provided a copy of what is Exhibit 459 to

22   its counsel recently?

23       A.   Because they -- I -- I think they came into

24   the office and actually did a -- a secondary look

25   through files, and this one popped -- popped up.

Page 715

1      Q.    Okay.  Where did it pop up from?

2      A.    I don't know.  I think -- I -- I think I

3  was -- I think it mentioned -- they mentioned to me it

4  came from Charles Rice's files.

5      Q.    Charles Rice's files?

6      A.    Yeah.

7      Q.    Okay.

8      A.    I believe that's -- I believe that's what I

9  was told.

10     Q.    All right.

11     A.    Or his office, at least.

12     Q.    Okay.  And Charles Rice is one of his --

13  the -- is one of the addressees on this memo, isn't

14  he?

15     A.    Yes.

16     Q.    Okay.  How about Jean-Pierre Termier?  Who is

17  Jean-Pierre Termier?

18     A.    He was the CEO at that point in time.

19     Q.    He was the CEO of Dey Laboratories?

20     A.    That's correct.

21     Q.    As of 24 February, 1992?

22     A.    Yeah, at that point.

23     Q.    And today he is the CEO of Lipha?

24     A.    No.  He left when Charles Rice took over and

25  he -- he went back to Lipha for a number of years, and

072315f1-d34a-45fb-acb1-df81d6e57525

1    I believe he retired a couple of years ago.

2        Q.    Lipha is Dey's parent, correct?

3        A.    Yes.

4        Q.    All right.  And did Jean-Paul Termier (sic)

5    ever have any supervisory responsibility for any of

6    Dey's operations while he was at Lipha?

7        A.    Yes.  He was the CEO.  He was in charge of

8    the whole company.

9        Q.    When he was at Lipha?

10       A.    Excuse me.  He was -- when he -- oh, when he

11   was at Lipha did he have any?

12       Q.    (Nods head affirmatively).

13       A.    Not -- well, not really.  I -- I mean -- no.

14   He had another job.  I think he had another job,

15   actually.

16       Q.    Okay.  Who at Lipha had supervisory

17   responsibility over Dey Laboratories once

18   Jean-Paul (sic) ceased to become the CEO of Dey?

19              MR. HUDSPETH:  Objection, form.

20              THE WITNESS:  I'm trying to remember.  I

21   think -- I think Charles Rice reported to a gentleman

22   by the name of Treilles, Mr. Treilles --

23       Q.    Okay.

24       A.    -- in France.

25       Q.    Okay.  Mr. Treilles in France?

Page 719

1   told you to prepare the memoranda re Albuterol pricing

2   strategies which is now Exhibit 459?

3        A.   No, no.  That's not what you asked me.

4        Q.   Well, my -- my question is:  Who told you to

5   prepare this?

6        A.   I prepared the memo.  I -- I thought your

7   question was who prepared the pricing.

8        Q.   Who told you to prepare Exhibit 459?

9        A.   Oh, I -- I'm sure I prepared it.

10       Q.   Who told you to do it?

11       A.   Who told me to do it?

12            I don't know.  I think this -- what

13   this -- I can't say that anybody actually told me to

14   do it.  Some of the information that I have in here I

15   got from a secondary source, as I was just mentioning

16   to you.  This was apparently a -- a premarketing

17   meeting to try to establish a pricing structure for a

18   new generic product, Albuterol unit dose.

19            MR. BREEN:  Would you hand Mr. Mozak a

20   copy of his November 1st, 2001 deposition, please.

21       Q.   (BY MR. BREEN)  And I'll ask, Mr. Mozak, that

22   you open it to Page 85, and I'm going to direct your

23   attention to Line 19.  And I'm going to -- I'm going

24   to ask that you read the -- I'm going to go through

25   the -- a couple of the questions and answers here.

1    Then I'm going to ask you some questions from them.
2              On Line 19, Question:  "So is spread the
3    difference between what is reimbursed to those vendors
4    and the amount that they actually paid to acquire the
5    product?"
6              Answer:  "Yes."
7              Question:  "Is it Dey's policy to market
8    the spread in its interaction with its customers?"
9              Answer:  "No, it's not."
10             Question:  "Has Dey ever engaged in the
11   practice of marketing the spread?"
12             Answer:  "Not to my knowledge."
13             Question:  "If it came to your attention
14   that your employees were engaged in the practice of
15   marketing the spread, would you condone that
16   practice?"
17             Answer:  "No, I would not."
18             "I represent" -- Question:  "I represent
19   to you that Mr. Rice was, shall we say, adamant that
20   he did not condone the practice of marketing the
21   spread.  Do you share that feeling?"
22             Answer:  "Yes, I do."
23             Now, do you recall being asked those
24   questions and giving those answers on November 1st,
25   2001?

1        A.    Yes, I do.

2        Q.    All right.  Now, I'll ask that you go to

3    Exhibit 459, and I'll specifically --

4        A.    To -- oh, yeah, 469 (sic).

5        Q.    -- direct your attention to the second page,

6    Bates-stamped DL-TX-0090852.  Do you see that?   It

7    says "Objectives" at the top under "Pricing."

8        A.    Oh, yes, yes.

9        Q.    All right.  And then there's objectives on

10   there, and look at the third one.  It says, "To

11   provide incentive to retail/chain providers to use

12   Dey's Albuterol UD by increasing the spread on

13   Medicare/Medicaid reimbursements."

14              Do you see that?

15       A.    Yes, I do.

16       Q.    And you wrote that on there, didn't you?

17       A.    Yes, I did.

18       Q.    All right.  Now, were you aware that you had

19   prepared an Albuterol pricing strategy whose -- at

20   least one objective was "to provide incentive to

21   retail/chain providers to use Dey's Albuterol UD by

22   increasing the spread on Medicare/Medicaid

23   reimbursements"?

24              Were you aware that you prepared a

25   strategy with that objective when you gave the answers

072315f1-d34a-45fb-acb1-df81d6e57525

1      A.    I -- in this context, I -- I take exception

2   to the use of "marketing strategy of spreads," because

3   all we were doing is establishing a price.

4              And to answer your question, no, I

5   didn't discuss that with anybody at Lipha.

6      Q.    But Mr. Rice, in his sales commentaries,

7   would -- would -- would provide Merck with that

8   information about the spread, wouldn't it?

9              MR. FLECKMAN:  Objection, form.

10     Q.   (BY MR. BREEN)  Wouldn't he?

11     A.    I'm not aware of what he put in his

12  commentaries.

13     Q.    All right.  We'll get -- we'll get back to

14  that.

15             Now, Mr. Termier went to Lipha after he

16  left Dey Laboratories --

17     A.    Yes, he did.

18     Q.    -- correct?

19             And he was fully aware -- and I'll --

20  let me use your words.  He was fully aware that it was

21  Dey's pricing strategy to provide incentives to

22  providers to use Dey's products by increasing the

23  spread on Medicare and Medicaid reimbursements,

24  correct?  Mr. Termier knew that that was Dey's pricing

25  strategy?

Page 731

1      A.   Yes.  He was -- he received this memo and --

2   and I believe he was present at the meeting when we

3   talked about it.

4      Q.   Okay.  And -- and after going to Lipha, did

5   anybody at Lipha ever instruct you or anybody else at

6   Dey, to your knowledge, that they should not follow

7   the pricing strategy that is stated in your memo dated

8   February 24th, 1992?

9            MR. FLECKMAN:  Objection, form.

10           THE WITNESS:  No.  Nobody instructed me.

11     Q.   (BY MR. BREEN)  Now -- let me see Cromolyn.

12           Did Dey continue to follow the pricing

13   strategy that was announced in your memo of

14   February 24th, 1992 all the way up until the time you

15   left the company?

16           MR. GAYNOR:  Objection, form.

17           THE WITNESS:  I believe in establishing

18   a -- a price for a new generic, we followed

19   essentially the same guidelines that we were advised

20   by First DataBank, which was to set the AWP at

21   approximately, you know, the area of ten percent below

22   the branded product and the WAC price at somewhere

23   between 15 and 25 percent below the AWP price.  This

24   was the advice we got from First DataBank.

25           And whenever we were the first generic

1      Q.    (BY MR. BREEN)  All right.  Well, let's do --

2   let me -- let me do it this way.

3                Would you please look at what's been

4   marked as Exhibit --

5      A.    Because we've talked about spread a lot of

6   times.  Excuse me.  Maybe I shouldn't interrupt.

7                MR. BREEN:  Counsel, I don't have a

8   question pending right now.

9                THE WITNESS:  Okay.

10                MR. BREEN:  And I would object to the

11   witness' comments as nonresponsive.  Move to strike.

12                Would you please show the witness what

13   has been marked as Exhibit 476.

14                THE WITNESS:  Thank you.

15      Q.    (BY MR. BREEN)  Okay.  This purports to be a

16   Cromolyn sodium nebulizer solution marketing plan?

17      A.    Yes, sir.

18      Q.    Bates-stamped DL-TX-0091006.  I believe it's

19   sequential up to 91074.

20      A.    Okay.

21      Q.    Have you ever seen this before?

22      A.    Yes, I have.

23      Q.    Purports to be dated December 15th, 1993,

24   prepared by Robert Ellis?

25      A.    Yes, sir.

072315f1-d34a-45fb-acb1-df81d6e57525

1      Q.    Did Mr. Ellis work for you?

2      A.    Yes, he did.

3      Q.    Okay.

4      A.    Not directly, but he was in my department.

5      Q.    All right.  And was Mr. Ellis -- was part of

6   his responsibilities to carry out Dey's pricing

7   strategy of providing incentives to retail/chain

8   providers to use Dey's products by increasing the

9   spread on Medicare/Medicaid reimbursements?

10     A.    Well, I think he was following the same

11  procedure we did with Albuterol, which was to -- since

12  Cromolyn was the first generic on the market, we --

13  the only guideline that we had was the branded product

14  Intal.  And so we followed the same pricing strategy

15  of establishing our first products -- first prices on

16  the marketplace, and that would have been basically

17  the same idea.  We -- we -- we set an AWP at

18  approximately ten percent or so below the branded AWP,

19  and we established a WAC price that was somewhere 15

20  to 25 percent below that.

21           So on the -- so the answer to your

22  question, he was -- yes.  He was following the same

23  strategy of establishing a price for a new generic

24  product on the marketplace.

25     Q.    Could you please go to Page 48 of the

072315f1-d34a-45fb-acb1-df81d6e57525

1    marketing plan, which is Bates-stamped 0091054?

2         A.    Yes.  I see it.

3         Q.    And you see where it -- it says, "Control and

4    Implementation Aqueous Cromolyn" at the top?

5         A.    Oh, yes, yes.

6         Q.    Three is "Pricing," and then there's the

7    "Objectives" there.

8                    Do you see that?

9         A.    Yes, I do.

10        Q.    And one of the objectives is "To seek the

11   highest prices possible in retail, home care and

12   hospital segments."

13                   Do you see that?

14        A.    Yes, I do.

15        Q.    And the next -- next one is "To maximize

16   Dey's profitability."

17                   Do you see that?

18        A.    Yes.

19        Q.    And then the fourth one is "To provide

20   incentive to retail/chain providers to use Dey's

21   Cromolyn by increasing the spread on Medicare/Medicaid

22   reimbursements."

23                   Do you see that?

24        A.    Yes, sir.

25        Q.    How would increasing the spread on

072315f1-d34a-45fb-acb1-df81d6e57525

1   how large Merck is internationally in its sales, or

2   was during your tenure there?

3          A.    I believe that figures of about -- around

4   5 billion, but that includes a lot of kinds of

5   businesses.  It's not just pharmaceutical business.

6   About 2 -- maybe 2 billion of it is pharmaceutical.

7   The rest is dyes and chemicals and a whole variety of

8   other things.

9          Q.    Okay.  Did any of the Dey University classes

10  or presentations or training sessions, to your

11  knowledge, ever deal in any manner with this issue of

12  the reimbursement spread that you spoke about in your

13  memo dated February 24th, 1992?

14         A.    Dey University?

15         Q.    Correct.

16         A.    No, I don't believe so.

17         Q.    But that issue of the reimbursement spread

18  was part of the training presentations that were --

19  that were provided during the national sales

20  conferences in 1994 and 1995, correct, the national

21  sales meetings?

22         A.    I -- I don't believe that, you know, we had,

23  quote, a "training" on -- at a national sales meeting

24  on -- on reimbursement spreads.  I mean we -- we -- we

25  didn't use -- we didn't use reimbursement as a -- as a

1    principal way of -- of promoting our products.  We

2    used the features and benefits.

3                Our training always centered around, you

4    know, product features, product benefits.  There may

5    have been occasional discussions.  Certainly, reps

6    occasionally brought up the question of spread; and

7    there may have been occasional questions, and there

8    may have been an occasional discussion of it.  But it

9    was not a principal, you know, thing that we -- we got

10   involved with.

11        Q.    Now, the -- the -- the classes or the

12   presentations that were given at the national sales

13   meetings, they were approved by you, weren't they?

14        A.    Well, I -- I -- I guess, since I was

15   responsible for the overall meeting, then I would have

16   had responsibility for what the agenda was.  I did

17   look at the agendas, yes.

18        Q.    Now, these national sales meetings occurred

19   annually, correct?

20        A.    Usually.

21        Q.    Okay.  And -- and -- and the agenda would be

22   prepared in advance by a -- a group of senior people

23   at a manager's meeting, correct?

24        A.    Yes, yes.

25        Q.    And you would -- you would run those

1   manager's meetings, correct?

2        A.   Yeah.   I would be -- yeah.   I would certainly

3   be in that meeting, yes.

4        Q.   All right.   So the -- the final approval of

5   the agenda and the courses to be taught or

6   presentation to be made at the national sales meeting

7   was your final approval, correct?

8        A.   I guess I would have to take responsibility

9   for that, yes.

10       Q.   Now, let me show you what's been marked as

11  Exhibit 460 in this -- in these depositions.   It

12  purports to be a -- an excerpt from the 1995 national

13  sales meeting.   Specifically I'll direct your

14  attention to the first page, DL-TX-0090875.   It talks

15  about "AWP Reimbursement:  Why it's important, how it

16  is calculated and what that means in terms of

17  reimbursement from the third-party payers to the

18  managed care organizations."

19            I'll ask that your counsel hand that to

20  you and that you look at that.

21            Do you recall authorizing a presentation

22  at the 1994 national sales meeting on AWP -- 1995

23  national sales meeting on "AWP Reimbursement:  Why

24  it's important, how it is calculated and what that

25  means in terms of reimbursement from the third-party

1    "payers to the managed care organizations"?

2        A.    Well, I mean I -- you know, since I was

3    responsible for the meeting -- I -- I'm not sure if I

4    exactly saw this document before it was presented.

5    But, certainly, if it was presented there, I would

6    certainly have been aware of it.

7        Q.    So I'll ask the question again:  At the

8    national sales meetings that you were responsible for,

9    were your sales personnel trained about reimbursement

10   spread resulting from AWP representations made by Dey

11   Laboratories?

12       A.    Well, I -- I think it's clear from the

13   documentation that our -- our sales representatives

14   were doing a -- a promotion between unit dose and

15   multidose during that '95 period, and I -- and I -- I

16   believe that's what this purports to be.  And so, yes,

17   that would have been something that, since I was at

18   the meeting, I would have had to be responsible for.

19       Q.    Okay.  So you're -- you're talking about

20   the -- the sales -- the sales policy and procedure

21   where your salespeople were supposed to market Dey's

22   unit-dose Albuterol by showing customers how they

23   could make more profit on reimbursement than they

24   could on Warrick's multidose Albuterol, correct?

25       A.    Yes, sir.  That's -- that was something that

1    was done in -- in '95 and maybe early '96, and I think

2    at that point it ended.

3        Q.    Okay.

4        A.    We didn't do it any longer.

5        Q.    And that was -- that was Dey's sales policy

6    and practice to have its salespeople go out and make

7    that kind of marketing presentation, correct?

8        A.    Well, I wouldn't call it -- characterize it

9    as a policy.  It was a promotion that one of our, I

10   guess, sales or marketing people put together for

11   comparing the reimbursement between unit dose and

12   multidose, yes.

13       Q.    And -- and your -- your regional sales

14   managers like Rick Upp would -- would direct their

15   salespeople to make those types of presentations,

16   correct?

17       A.    Yes.  From the reports I've seen, that's

18   correct.

19       Q.    All right.  And -- and -- and in January

20   1994, were you the executive vice-president of sales

21   and marketing at that time?

22       A.    Yes, I was.

23       Q.    So you would have approved the presentations

24   made at the national sales meetings?

25       A.    Well a lot of these presentation were done in

072315f1-d34a-45fb-acb1-df81d6e57525

Page 778

1    small groups.  This was -- I don't know whether this
2    was a -- a -- a general group presentation or whether
3    this was just done in a small group.  Many times they
4    had small group presentations and somebody was asked
5    to put together a presentation on -- on different
6    subjects.  Sometimes it was on retail pharmacies.
7    Other times it could have been on hospitals, and
8    apparently this was one that was done on this.  So,
9    yeah, it did -- obviously did take place, and I don't
10   know -- I don't particularly remember whether I was
11   involved in this particular presentation or not, but
12   it probably did take place.
13        Q.   Now, you're referring again to the 1995
14   presentation which is part of the exhibit that I --
15        A.   Yes.
16        Q.   -- you've got in front of you?
17             My -- my question was going to go to
18   the '94 sales meeting but -- but I'll understand your
19   response to be referring to the '95 sales meeting,
20   correct, when you were just answering my question?
21        A.   Well, I'm not sure which is which now --
22        Q.   All right.  Okay.
23        A.   -- to be honest with you.
24             MR. BREEN:  All right.  I think it's
25   time to take our agreed lunch break.