# Exhibit 1

Page 1

1              UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF MASSACHUSETTS

3

4    - - - - - - - - - - - - - - x

5    IN RE:  PHARMACEUTICAL       )   MDL NO. 1456

6    INDUSTRY AVERAGE WHOLESALE   )   Master File No. 01-12257-PBS

7    PRICE LITIGATION             )   Subcategory Case No. 06-11337

8    ---------------------------)

9    THIS DOCUMENT RELATES TO:   )   Hon. Patti B. Saris

10   State of California, ex rel.)

11   Ven-A-Care v. Abbott        )   Tuesday, September 15, 2009

12   Laboratories, Inc., et al.  )

13   - - - - - - - - - - - - - - x   VOLUME I

14

15          Videotaped deposition of STEPHEN W.

16   SCHONDELMEYER, PHARM.D., Ph.D., held at the Grand

17   Hotel, 615 2nd Avenue South, Minneapolis,

18   Minnesota, commenced at 9:11 a.m., the

19   proceedings being recorded stenographically by

20   Dawn Workman Bounds, Certified Shorthand Reporter

21   and Notary Public of the State of Minnesota, and

22   transcribed under her direction.

Schondelmeyer, Pharm.D., Ph.D., Steven W. - Vol. I                    September 15, 2009
Minneapolis, MN

Page 166

1   actually paid and by -- that would generally be
2   paid by a substantial number of customers.
3       Q.   Well, generic manufacturers, some of
4   them sell direct to independent pharmacies, true?
5       A.   Some sell direct to independent
6   pharmacies. I wouldn't say that's true of all
7   generic manufacturers.
8       Q.   Some do, right?
9       A.   Some do.
10      Q.   Some sell to distributors, right?
11      A.   Some sell through wholesalers or
12  distributors.  Those are different, but they're
13  similar.
14      Q.   Two different things, right?
15      A.   Yeah.
16      Q.   So some sell to wholesalers, and some
17  sell to distributors?
18      A.   Uh-huh.
19      Q.   Which of those prices should it report
20  as the generally and currently paid by provider?
21      A.   Well, again, they could have listed all
22  of those prices and picked the one in the middle.

Page 167

1   They could have listed all those prices and taken
2   the average.  They could have listed all of those
3   prices and picked one that -- that more than half
4   of their purchasers paid, but the prices actually
5   reported are none of those.
6       Q.   Why couldn't they pick a price at the
7   high end of their ceiling?  Where does it tell
8   them they can't do that?
9       A.   Well, I think that the concept
10  "generally paid" probably would preclude that.
11      Q.   But there is no price generally paid?
12      A.   Well, yes, there is.  A price above
13  which -- you know, above which or below which a
14  price is generally paid, I think one could
15  construct that.  I don't think it's difficult to
16  construct a price that's generally paid.
17      Q.   But does --
18      A.   Is there some leeway about how you
19  define it? Perhaps.  But -- but one could pick a
20  price generally paid, and it wouldn't be the
21  price -- the single highest price that one person
22  paid at one point in time.

Page 168

1       Q.   Okay.  Now, this explanation you've
2   just given me as to how a manufacturer would go
3   back -- go about identifying a price generally
4   and currently paid by providers, where is that
5   written down in the regulations somewhere?
6           MS. THOMAS:  Objection.
7       A.   I think it's in the statutes,
8   regulations, and procedures clearly defined by
9   Medicaid over time.
10      Q.   It doesn't tell them how to go about
11  figuring out which of multiple prices is the one
12  that's generally and currently paid?
13          MR. GLASER:  Objection.
14      A.   Again, I leave it up to the judge to
15  interpret how the regulation that states --
16      Q.   Okay.
17      A.   -- generally and currently paid would
18  be implemented.  But I would point out that --
19  that the prices reported as AWPs to First
20  DataBank are not -- to the best of my knowledge,
21  not paid by anybody.  So there's no possible
22  construction under which one could argue those

Page 169

1   are generally paid.
2       Q.   Is there any scholarly literature, any
3   writing anywhere that defines this concept of
4   what generally and currently paid by providers
5   means in the manner that you've just described,
6   written by anyone other than you?
7       A.   Very few scholars have actually
8   addressed this issue at all, you know, in any
9   context.
10      Q.   So there is none?
11          MR. GLASER:  Objection.
12          MS. THOMAS:  Objection.
13      A.   I'm not sure.  I'm not aware of any.  I
14  have written things related to this issue.  I think
15  there have been a number of expert reports in
16  these cases over time that --
17      Q.   Nonlitigation.  Let's stay out of
18  litigation.  Okay?
19      A.   Okay.
20      Q.   Is there any --
21      A.   But that's been addressed heavily in
22  that context.

43 (Pages 166 to 169)

Schondelmeyer, Pharm.D., Ph.D., Steven W. - Vol. I                               September 15, 2009
                                        Minneapolis, MN

Page 170

1    Q.   I'll bet.
2        Now, so there is no scholarly report in
3   any peer review journal anywhere that explains
4   what this concept of generally and currently paid
5   by providers means in terms of what a
6   manufacturer should report?
7        MR. GLASER:  Objection.
8    A.   Again, I believe that the regulation is
9   what it is, and the way that will be interpreted
10  is up to a judge and jury to evaluate.
11   Q.   So there -- there is no scholarly
12  writing on this topic at all, is there?
13       MR. GLASER:  Objection.
14       MS. THOMAS:  Objection.
15   A.   I -- I can't answer that.  I don't know
16  for sure.
17   Q.   This concept that you have that there's
18  this constellation of statutes and regulations
19  that tells manufacturers what they're supposed to
20  report, is there any scholarly article anywhere
21  that addresses or discusses that idea --
22       MR. GLASER:  Objection.

Page 171

1    Q.   -- other than the one you've written?
2    A.   Well, I believe there is the scholarly
3   report that I, along with colleagues, prepared
4   for the Centers for Medicare and Medicaid
5   services addressing the issue of how can they
6   estimate acquisition cost, and that report
7   conducted and developed with a panel of experts
8   who also contributed and concurred with that
9   report.
10   Q.   So there is none, a scholarly writing
11  --
12   A.   Yes, there is.
13       MR. GLASER:  Objection.
14   Q.   -- written by anyone other than you
15  that explains the idea of this constellation of
16  statutes and regulations imposing an obligation
17  to report generally and currently paid by
18  provider prices by manufacturers?
19       MR. GLASER:  Objection.
20   A.   Is there a question pending?
21   Q.   Yes.  There is -- isn't it true there
22  is, in fact, no article anywhere that anyone

Page 172

1   wrote, other than the one that you wrote, that
2   describes this constellation of statutes that
3   creates an obligation on the part of
4   manufacturers to report generally and currently
5   paid prices?
6    A.   No, that's not true.  There is an
7   article of which I was a co-author, but there are
8   many other co-authors that contributed in that
9   article that -- that puts that forward.  It's
10  multiauthored, and many experts have weighed in
11  on that.
12   Q.   What article is that?
13   A.   That's the report for the Centers for
14  Medicare and Medicaid Services.  Marian Wrobel
15  was a coauthor, and there was an expert panel of
16  many other parties that contributed to that.
17   Q.   Other than that document, is there
18  anything?
19   A.   I believe there are other documents
20  that discuss that general issue, yes.
21   Q.   What are they?
22   A.   I can't recall them sitting here today.

Page 173

1    Q.   So you can't name another one besides
2   that Wrobel article?
3        MR. GLASER:  Objection.
4    A.   Sitting here right now, I can't name
5   those. I believe there are other documents
6   describing that concept.
7    Q.   Now, that document you're talking
8   about, isn't it a fact that one of the experts on
9   that panel said that if not for the spread,
10  pharmacies would be out of business?
11   A.   I believe that statement is in the
12  document, yes.
13   Q.   So that's authoritative, too, right?
14       MS. THOMAS:  Objection.
15   A.   I believe's that's that person's
16  opinion, and I believe that -- that to be true.
17  It doesn't say how that spread is to be created,
18  who has authority to create it, and who has
19  authority to deter -- determine that as an
20  appropriate payment mechanism.
21   Q.   And that article was written in 2004,
22  right?

44 (Pages 170 to 173)

Schondelmeyer, Pharm.D., Ph.D., Steven W. - Vol. I                    September 15, 2009
                                   Minneapolis, MN

Page 174

1      A.   That was 2004, yes.
2      Q.   Now, prior to 2004, was there any
3   article or writing anywhere that would -- that
4   discussed or explained to the manufacturing
5   industry at large this theory of the
6   constellation of statutes and regs that require
7   them to report generally and currently paid
8   prices by providers as their AWP?
9      A.   I believe the federal regulations and
10  the -- the publication of the regulation in about
11  1987 described the price generally and currently
12  paid, where that was.  There was a discussion in
13  the preamble of that regulation that described
14  the intent and use of the concept by the Federal
15  Government.
16     MR. MERKL:  Well -- well, I'll move to
17  -- I'll reserve a motion to strike that, and
18  we'll look at that.
19     Q.   But my question is, is there any
20  article anywhere, any scholarly writing that
21  explained that before 2004?
22     MR. GLASER:  Objection.

Page 175

1      A.   I -- I don't -- I don't know for sure.
2   I don't know that there is or isn't.
3      Q.   Okay.  Now, this theory you have that
4   you're supposed to report a price generally and
5   currently paid by the providers as an AWP, can
6   you name a scholar, other than yourself, that
7   shares that view?
8      MR. GLASER:  Objection.
9      A.   Again, there are very few scholars who
10  focus on this particular area.  I can't think of
11  anyone that I have discussed that issue with,
12  particularly other scholars that -- that deal
13  with this at this level.
14     Q.   So there isn't any?
15     A.   No, that isn't what I said.  I can't
16  think of anyone I've discussed this with to know
17  what their opinions are.  There may well be other
18  scholars who completely agree with that.
19     Q.   But you can't tell me who they are?
20     A.   I haven't discussed that with other
21  scholars to know; no, I haven't pursued that.
22     Q.   Okay.  Now -- and there are experts in

Page 176

1   these cases that disagree with that, right?
2      MR. GLASER:  Objection.
3      A.   There are reports in this case that
4   disagree with that.  I don't know about the
5   background and qualifications of the individuals.
6      MR. MERKL:  Okay.  I have an exhibit
7   that's been previously marked as Abbott 127.  I'm
8   assuming it's from the federal case.
9      MR. GLASER:  I'm sorry?
10     MR. MERKL:  Ven-A-Care, do you know
11  what I'm talking about?  There's a federal case
12  going on between Ven-A-Care and Dey.  A lot of
13  the notices have been cross-noticed.  And this
14  exhibit I have I believe was marked in that as
15  Abbott 127.
16     Are you guys following any convention
17  with marking the exhibits in this case that are
18  pulled in and have been marked elsewhere?
19     MR. GLASER:  I don't know what
20  conventions they're following right now.
21     MR. MERKL:  Okay.  So then I'll --
22  well, I'll just have to mark this then again as

Page 177

1   Schondelmeyer -- whatever we're up to --
2   Schondelmeyer 2.
3      THE REPORTER:  Uh-huh.
4      (Exhibit Schondelmeyer 002 marked.)
5      MR. GLASER:  Do you have a copy,
6   perhaps, or...
7      Q.   Do you recognize this document?
8      A.   I don't looking at it initially, no.
9      Q.   Well, isn't this -- you're sure?  Take
10  a close look.  I'm startled by that.
11     MR. GLASER:  Objection.
12     A.   It appears to be a document out of, you
13  know, somebody's reporting service --
14     Q.   Yeah, it's --
15     A.   -- Medicare and Medicaid guide.
16     Q.   Right.
17     A.   But I don't specifically recall looking
18  at it.
19     Q.   Well, it's a CCH document, Commerce
20  Clearinghouse?
21     A.   Yes.
22     Q.   And my question is -- well, let's take

45 (Pages 174 to 177)