EXHIBIT B

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re:  PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | **MDL No. 1456**<br>**Master File No. 01- 12257-PBS**<br>**Subcategory Case. No. 06-11337** |
| THIS DOCUMENT RELATES TO: | **Hon. Patti B. Saris** |
| *United States of America ex rel. Ven-A-Care of the Florida Keys, Inc., et al. v. Dey, Inc., et al.,* Civil Action No. 05-11084-PBS | **Magistrate Judge Marianne B. Bowler** |

## DECLARATION OF NEIL MERKL IN SUPPORT OF DEY DEFENDANTS' REPLY IN FURTHER SUPPORT OF THEIR MOTION TO EXCLUDE FROM EVIDENCE THE REPORTS AND TESTIMONY OF THEODORE R. MARMOR, PH. D.

**NEIL MERKL** declares, pursuant to 28 U.S.C. § 1746, that:

1.      I am a member of the law firm of Kelley Drye & Warren LLP, counsel to Dey Pharma, L.P. (formerly known as Dey, L.P.), Dey, Inc., and Dey L.P., Inc. (collectively "Dey"). I am admitted to practice law in the State of New York and have been admitted *pro hac vice* in this action.

2.      I make this Declaration in support of Dey's Reply in Further Support of Dey's Motion *in Limine* to Exclude from Evidence the Reports and Testimony of Theodore R. Marmor.

3.      The basis for my knowledge is my review of the files maintained by Kelley Drye & Warren LLP as part of its representation of Dey, including the documents attached hereto, and my own personal knowledge of the facts and circumstances set forth herein.

4.      Attached hereto as Exhibit 1 is a true and correct copy of excerpts from the December 18, 2008 deposition of Dr. Robert Berenson.

5.      Attached hereto as Exhibit 2 is a true and correct copy of excerpts from the September 12, 2007 deposition of Kathleen Buto.

6.      Attached hereto as Exhibit 3 is a true and correct copy of excerpts from the September 13, 2007 deposition of Kathleen Buto.

7.      Attached hereto as Exhibit 4 is a true and correct copy of excerpts from the May 15, 2007 and July 17, 2007 depositions of Thomas Scully.

8.      Attached hereto as Exhibit 5 is a true and correct copy of excerpts from the May 15, 2007 and July 17, 2007 depositions of Thomas Scully.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 30, 2010.

        /s/ Neil Merkl
        Neil Merkl

# EXHIBIT 1

Berenson, Dr. Robert                                    December 18, 2007

Page 1

1

2            FOR THE DISTRICT OF MASSACHUSETTS

3     - - - - - - - - - - - - - - -x

4     IN RE:  PHARMACEUTICAL        :  MDL NO. 1456

5     INDUSTRY AVERAGE WHOLESALE    :  CIVIL ACTION

6     PRICE LITIGATION              :  01-CV-12257-PBS

7     THIS DOCUMENT RELATES TO      :

8     U.S. ex rel. Ven-a-Care of    :  Judge Patti B. Saris

9     the Florida Keys, Inc.        :

10         v.                       :

11    Abbott Laboratories, Inc.,    :  Chief Magistrate

12    No. 06-CV-11337-PBS           :  Judge Marianne B.

13    - - - - - - - - - - - - - - -x    Bowler

14        (CROSS NOTICED CAPTIONS ON FOLLOWING PAGES)

15        Videotaped deposition of DR. ROBERT BERENSON

16                      Volume I

17                            Washington, D.C.

18                            Wednesday, December 18, 2007

19                            10:10 a.m.

20

21

22

Berenson, Dr. Robert                                                December 18, 2007

1   Academy Health, which is the organization that

2   represents health services researchers.  I had a desk

3   there, but I was basically working as an independent

4   consultant doing health policy projects.

5        Q.    Anything related to the reimbursement of

6   Medicare Part B drugs?

7        A.    No.

8        Q.    Anything related to Medicaid?

9        A.    No.

10       Q.    And then before that?

11       A.    Before that, I worked at HCFA.

12       Q.    And in the 2000 to '01 time frame, you

13   were the deputy administrator for HCFA?

14       A.    Well, it started in -- somewhere around

15   the summer of 2000, Nancy-Ann DeParle left summer or

16   early fall, I don't remember exactly.  Mike Hash

17   became the acting administrator, I became the acting

18   deputy administrator.  And then about five weeks

19   before the end, Mike Hash left, and I became -- I

20   didn't change my title, but I became essentially the

21   acting top person.

22       Q.    When you say five weeks before the end, is

Berenson, Dr. Robert                                    December 18, 2007

Page 183

1   have no direct knowledge of what they did.

2        Q.    All right.  Did you draft this language

3   that we have been reading?

4        A.    I doubt that I wrote it.

5        Q.    Okay.  Some of the same language shows up

6   in the letter from Administrator DeParle to Congress

7   before, and I was just trying to figure out if you

8   knew who was the drafter of the language.

9        A.    It's consistent with my point of view at

10  the time, but I don't remember actually being the

11  person sitting at the typewriter or at the keyboard.

12       Q.    Could it have been someone in your staff?

13       A.    It could well have been somebody in my

14  staff.  This probably would have been produced, both

15  the letter from Miss DeParle and this letter would

16  have been produced by my executive secretariat, which

17  drafts letters.  And I'm sure we had something to do

18  with it, with the letter.

19       Q.    Last but not least, do you have the book

20  that has 221 in it?

21       A.    This one.

22       Q.    So showing you what's been marked

Berenson, Dr. Robert                                    December 18, 2007

Page 184

1    previously as 221, and ask if you've seen this

2    before?

3         A.    I don't think I've seen it before.  I'm

4    aware of its existence.

5         Q.    This is another program memorandum to the

6    intermediaries and carriers dated November 17th of

7    2000.  And it indicates that this program memorandum

8    suspends the PMAB-00-86 dated September 8th, 2000,

9    and then continues, "this is to notify you that you

10   should not use the DOJ data," the DOJ AWPs, I'm

11   paraphrasing now, in your next update of the Medicare

12   payment allowances.  Do you remember why -- so let me

13   understand this, and strike all that and I'll back

14   up.

15         So is it your understanding then that the

16   carriers never did actually consider the DOJ AWPs in

17   setting Medicare reimbursement?

18        A.    Well, it was to go into effect the

19   following year, so I don't believe it was ever --

20   they may have been doing some preliminary work, but I

21   don't -- I'm pretty sure it was never implemented.

22        Q.    And do you know why CMS decided to pull

Berenson, Dr. Robert                                    December 18, 2007

Page 185

1    its AWPs in this memo?

2         A.    I don't remember the details.  I knew that

3    the Congress was getting heavily involved and was

4    preparing -- whether they had prepared or were going

5    to prepare legislation to prevent us from doing this.

6    And they were going to take this issue on themselves.

7    And in the face of that reality, I think we -- we

8    backed off.  The Congress basically said, we are

9    going to deal with this issue.

10        Q.    Do you know, did anyone from -- well,

11   strike that.  Did you have any discussions with

12   Congress as to why they might prevent you from doing

13   this?

14        A.    I can't remember that I -- I had any

15   particular -- I don't remember personally having

16   discussions.  I know that we were -- there were a lot

17   of congressional letters coming in.  I didn't

18   personally, that I can remember, have conversations

19   with -- with staff.

20        Q.    Do you recall any reasons Congress

21   expressed as to why they might prevent you from doing

22   this?

Berenson, Dr. Robert                                      December 18, 2007

Page 186

1        A.    They were hearing the same thing from

2   affected parties that were reflected in these

3   letters, both complaining about access problems and

4   alleged mistakes in how it was being implemented.

5   And Congress is always concerned when they hear about

6   access problems, so it was becoming a very big

7   political issue.

8        Q.    Had you had concerns -- any concerns by

9   any pharmaceutical manufacturer with respect to

10  implementing the DOJ AWPs?

11       A.    Not -- not that I can remember.

12       Q.    Okay.  I think that's all I've got.  Can

13  we take a short break?

14            THE VIDEOGRAPHER:  This is the end of tape

15  three.  Off the record at 4:37.

16            (Recess.)

17            THE VIDEOGRAPHER:  This is the beginning

18  of tape number four in the deposition of

19  Dr. Berenson.  On the record at 2:43.

20            BY MR. MURRAY:

21       Q.    Doctor, this is Brian again.  You had

22  indicated right before we came back from break that

Berenson, Dr. Robert                                    December 18, 2007

Page 187

1    you had remembered the name of that center?

2        A.    Yes, the center that had the

3    organizational responsibility for sending out program

4    memoranda was the Center for Beneficiary Services.

5            MS. ALBEE:  Excuse me, this is Mrs. Albee.

6    Could the questioner please speak a little louder?

7            MR. MURRAY:  Perfect.  Sorry.  We have

8    actually switched chairs here in D.C.  That was my

9    last question.  I'm going to pass the witness over to

10   Mr. Neil Merkl, who would like to ask you a few

11   questions.  Thank you, Doctor.

12           EXAMINATION BY COUNSEL FOR DEFENDANT DEY

13           BY MR. MERKL:

14       Q.    Good afternoon, Doctor.  Doctor, my name

15   is Neil Merkl.  I represent a company called Dey,

16   D-E-Y.  Have you ever had any dealings with Dey?

17       A.    No.

18       Q.    And you never communicated with Dey in

19   your professional capacity at CMS/HCFA?

20       A.    Not that I can remember.

21       Q.    When we were talking about Exhibit 221 a

22   minute ago, that was the program memoranda that

Berenson, Dr. Robert                                    December 18, 2007

Page 188

1    rescinded the use of the DOJ AWPs.  Do you have any

2    recollection at all of how you first learned that you

3    weren't going to be using those or recommending that

4    those AWPs be used any more?

5              MR. LIBMAN:  Objection.  Mr. Libman.

6    Asked and answered.

7              THE WITNESS:  I don't remember any more

8    details about -- I certainly don't remember when I

9    first learned about it.  I probably had something to

10   do with participating in a discussion to -- that

11   resulted in the issuance of that memorandum.

12             BY MR. MERKL:

13      Q.   So the decision to issue the memorandum

14   was a decision made by CMS as opposed to a directive

15   received from Congress?

16             MR. DRAYCOTT:  Objection.

17             THE WITNESS:  I believe we did it on our

18   own with -- understanding that Congress would have so

19   directed us if we hadn't done it, but I may be wrong

20   on that.

21             BY MR. MERKL:

22      Q.   Who is we?

Berenson, Dr. Robert                                           December 18, 2007

1          A.     We meaning the senior leadership at the

2      time.  We are now talking about November, so I would

3      have been in that senior leadership.  I don't

4      remember who else would have been involved in such

5      discussions at this time.  I don't remember.

6                 At that point, I was the acting deputy

7      administrator, and had moved from my position as

8      center director, and don't have a good memory as to

9      specifically what Congress's actions were, but it was

10     -- I do remember that Congress really had felt that

11     our program memorandum was -- was something they

12     wanted to suspend.  And I think we anticipated that

13     and withdrew it on our own.  But -- so that the

14     Congress indicated their own preference for taking up

15     the issue.

16         Q.     You say the Congress felt and the Congress

17     indicated.  How was it you became aware of Congress's

18     feelings and indications?

19         A.     I don't remember any of the details about

20     it.  I'm sure there were -- typically, I don't know

21     in this case, typically there are phone calls and

22     letters that are exchanged between, in some cases,

Berenson, Dr. Robert                                    December 18, 2007

Page 190

1    members of Congress and Senators, in other cases

2    staff, with our congressional relations people that

3    are communicated to the senior leadership of the

4    agency.

5         Q.    Who are your congressional relations

6    people?

7         A.    There is an Office of Legislative Affairs.

8    I don't --

9         Q.    For CMS?

10        A.    For CMS.  Yes.  As well as for the

11   department.  There are two different offices.

12        Q.    Do you know whose job that was at CMS?

13        A.    At that time, I don't.  It may have been

14   Bonnie Washington in that position at that time, but

15   she may have left by then.  I don't know.

16        Q.    You say you anticipated Congress might

17   direct CMS not to go ahead?

18        A.    I don't remember the details.  I know that

19   Congress -- no, I don't know anything.  My

20   recollection, which is hazy, is that Congress was

21   preparing legislation to override the program

22   memorandum, but I may not have that exactly right.

Berenson, Dr. Robert                                    December 18, 2007

1      Q.     Did Congress have the ability to direct

2   CMS to do without passing legislation?

3      A.     No.

4             MR. LIBMAN:  Objection.  This is

5   Mr. Libman.

6             BY MR. MERKL:

7      Q.     That was a no?

8      A.     I don't believe Congress can direct --

9   legislation is how Congress directs the executive

10  branch to act.

11     Q.     So unless Congress actually passed

12  legislation, CMS could have gone ahead with the DOJ

13  AWPs, had CMS determined to do so?

14     A.     I believe that's correct.

15     Q.     Okay.  Now, you've already told me you

16  don't recall the individuals that participated in a

17  decision not to go ahead.  Notwithstanding that you

18  don't know their names, is it possible you remember

19  who it would be by function or title or

20  responsibility?

21     A.     We were in the process of -- senior

22  leadership had just changed.  Nancy-Ann DeParle had

Berenson, Dr. Robert                                    December 18, 2007

Page 263

1    Dr. Berenson.  On the record at 4:09.

2              BY MR. MERKL:

3         Q.    Doctor, would you take a look at Exhibit

4    446 marked by Abbott's counsel earlier today, please.

5    And if you look at the bottom right-hand corner of

6    the page, in the numbers ending 2762, is a letter

7    from Congress of the United States.

8         A.    Okay.

9         Q.    And the first letter -- the letter I'm

10   going to talk about in Exhibit 446 is a letter dated

11   September 27th, 2000, with counsel stamp AWP 039-2762

12   through 2763, and it's on the letterhead of Edolphus

13   Towns.  Do you see that letter?

14        A.    Yes.

15        Q.    This is a letter from the Congressional

16   Black Caucus, is that correct?

17        A.    I presume, but looking at some of the

18   names -- do they say they are from -- yes.  I don't

19   know -- I assume that's right, but I don't really --

20        Q.    To Secretary Shalala?

21        A.    Yes.

22        Q.    Dated September 27, 2000, correct?

Berenson, Dr. Robert                                                December 18, 2007

1        A.    Correct.

2        Q.    And it addresses the proposed new AWPs

3   that the DOJ was suggesting you use as a basis for

4   reimbursement, correct?

5        A.    Correct.

6        Q.    Do you recall seeing this letter?

7        A.    No.

8        Q.    In or about 2000?

9        A.    I don't recall seeing it.

10        Q.    Earlier you told me when HCFA decided not

11   to go ahead and use the DOJ AWPs that it was in

12   response in part to concerns expressed by Congress.

13   Do you recall that?

14        A.    That's correct.  I did say that.

15        Q.    Does this letter reflect the concerns you

16   were telling me about before or is this something

17   else?

18        A.    This would be exactly the kind of concerns

19   that Congress would express.

20        Q.    Now, when you say you don't recall this

21   letter, do you have any reason to believe one way or

22   the other whether you saw it or did not see it at the

Berenson, Dr. Robert                                    December 18, 2007

1    time.  Is this the type of thing you would have seen?

2        A.    No.  It went to Donna Shalala, who was not

3    CMS.  So if it had gone to our administrator, I

4    probably would have seen it.  It might have been

5    routed to somebody at CMS, but this would not be

6    something I would more likely see, because it goes to

7    the department.  I mean, it wouldn't be something I

8    would routinely see, because it would be -- that

9    response to it would be handled at the department and

10   it would be less likely that I would be involved in

11   it, although I might have been.  I just don't

12   remember.

13       Q.    But does this letter accurately reflect

14   concerns that you became -- that you were made aware

15   of that Congress was expressing about the change?

16            MR. DRAYCOTT:  Objection.

17            THE WITNESS:  This is the kind of concern

18   when I said earlier that politics became a factor,

19   this is the kind of thing I'm referring to.  Yes.

20            BY MR. MERKL:

21       Q.    Well --

22       A.    And I'm not saying politics in a

Berenson, Dr. Robert                                          December 18, 2007

Page 266

1    pejorative sense.

2         Q.    For instance, if we look at the second

3    paragraph of the letter from Congressman Towns, he

4    says, "this pricing change directed by HCFA will

5    result in a 66 percentage in the respiratory

6    medication Albuterol.  This reduction will

7    effectively force the current Medicare providers of

8    home respiratory medication out of business and

9    eliminate this benefit to the African-American

10   community."  Is he correct?

11            MR. DRAYCOTT:  Objection.

12            MS. ALBEE:  Objection.

13            THE WITNESS:  I have no idea if he is

14   correct.  Just the fact that it's here doesn't make

15   it correct, but it's -- I don't know.

16            BY MR. MERKL:

17        Q.    But you have no reason and you had no

18   evidence at the time to suggest he wasn't telling the

19   truth here, right?

20            MR. DRAYCOTT:  Objection.

21            THE WITNESS:  A lot of this -- I have no

22   reason to think that he is wrong about the 66 percent

Berenson, Dr. Robert                                    December 18, 2007

Page 267

1    reduction, that's verifiable, a projection about

2    people going out of business and eliminating care for

3    the African-American community, I don't have any

4    prior assumption whether this is correct or not

5    correct.

6            BY MR. MERKL:

7        Q.    Well, isn't it fair to say that this was a

8    concern as expressed by Congress that you would have

9    to take seriously?

10       A.    Absolutely.

11           MR. DRAYCOTT:  Objection.

12           BY MR. MERKL:

13       Q.    And you did take it seriously?

14       A.    We did take it seriously.

15       Q.    Would you take a look at the next letter,

16   please, starting at page AWP 039-2765.  Again, to

17   Secretary Shalala from members of Congress.  The

18   first one is Pete Sessions.

19       A.    Yes.

20       Q.    Do you recognize this letter?

21       A.    No.

22       Q.    Would you just take a look through it and

Berenson, Dr. Robert                                    December 18, 2007

1   tell me is this the type of concern that was in fact

2   expressed to you in or about 2000 about the potential

3   use of DOJ AWPs?

4        A.    This is the type of concern that was being

5   expressed.  Yes.

6        Q.    And the substance of what's in here in

7   fact was expressed to you, correct?

8        A.    For cancer drugs, yes.

9        Q.    And again, you took these concerns

10  seriously, right?

11             MR. DRAYCOTT:  Objection.

12             THE WITNESS:  Any letter from Congress,

13  you take seriously.

14             BY MR. MERKL:

15       Q.    And this letter here, this July 20th

16  letter and the letter that we just looked at from the

17  black -- Congressional Black Caucus were in fact two

18  of the reasons that you elected to continue using the

19  AWPs as published in the Red Book and Blue Book for

20  reimbursement of Medicare rather than going with the

21  DOJ numbers, correct?

22             MR. DRAYCOTT:  Objection.

Berenson, Dr. Robert                                          December 18, 2007

Page 269

 1            THE WITNESS:  Yes.  That's correct.

 2            BY MR. MERKL:

 3       Q.   Would you take a look at the next letter,

 4  please.  This is a letter from the Senate dated

 5  August 1st, 2000.  To Secretary Shalala from John

 6  Breaux, Orrin Hatch, Bill Frist, Mary Landrieu and

 7  Max Baucus.  Take a look.  Do you recall this letter?

 8       A.   No.

 9       Q.   You don't recall seeing it?

10       A.   No.

11       Q.   Would you take a look, and tell me if you

12  recall being aware of the sum and substance of the

13  concerns being expressed in this letter?

14       A.   I actually hadn't heard a couple of these

15  concerns.

16       Q.   Which ones are they?

17       A.   The impact on First DataBank's current

18  contract with subscribers, the effect on private

19  insurance contracts.  The impact of reloading data on

20  to computers for HCFA.  And again, private insurance

21  companies.  So those concerns, I wasn't generally

22  aware of.

EXHIBIT 2

Buto, Kathleen                                          September 12, 2007
Washington, DC

Page 1

 1                UNITED STATES DISTRICT COURT

 2             FOR THE DISTRICT OF MASSACHUSETTS

 3      - - - - - - - - - - - - - - - -

 4      IN RE:  PHARMACEUTICAL        ) MDL NO. 1456

 5      INDUSTRY AVERAGE WHOLESALE    ) CIVIL ACTION

 6      PRICE LITIGATION              ) 01-CV-12257-PBS

 7      THIS DOCUMENT RELATES TO      )

 8      U.S. ex rel. Ven-a-Care of    ) Judge Patti B.

 9      the Florida Keys, Inc.        ) Saris

10          v.                        ) Chief Magistrate

11      Abbott Laboratories, Inc.,    ) Judge Marianne B.

12      No. 06-CV-11337-PBS           ) Bowler

13      - - - - - - - - - - - - - - - -

14          (captions continue on following pages)

15

16

17        Videotaped deposition of Kathleen Buto

18                     Volume I

19

20                  Washington, D.C.

21            Wednesday, September 12, 2007

22                     9:00 a.m.

Page 59

1        A.    Pete Rodler.

2        Q.    Rodler.

3        A.    I don't remember where he was and

4   whether he was in that office.  He may have been.

5   I really don't remember.  The name rings a bell,

6   but I can't remember where he was.

7        Q.    Do you recall him being someone who was

8   involved with Medicare reimbursement of drugs and

9   Medicaid reimbursement of drugs?

10        A.    I don't recall it.  The name rings a

11   bell, but I couldn't tell you what issues he

12   worked on.

13        Q.    Moving on in your resume you left HCFA

14   -- or -- I'm sorry -- you changed your position

15   at HCFA from associate administrator of policy in

16   July of 1997 and became the deputy director of

17   center for health plans and providers?

18        A.    Yes.

19        Q.    And tell me about that position.

20        A.    Well, first, the reason I changed is we

21   eliminated the associate administrators and

22   reorganized the whole agency.  So the

Page 60

1  organization I just described to you kind of went

2  away.  What they created in its place were a set

3  of centers. And the center for health plans and

4  providers was intended to bring managed care and

5  fee for service Medicare under the same

6  management.

7           The idea was in part in part to respond

8  to concern that the managed care organization

9  within HCFA was sort of a stepchild, so it wasn't

10  fully staffed, it didn't have the resources, it

11  didn't have the kind of focus it should have.

12  And the idea was to bring those two together.

13  And then as well to bring in from what used to be

14  the bureau of program operations, people who

15  dealt with carriers and fiscal intermediaries,

16  the people who actually wrote the instructions to

17  carriers and intermediaries.

18           So there was an operational arm to this

19  that was really about policy communication to our

20  partners, our contractors, that had always been

21  separate.  So the idea was let's create a better

22  pathway and alignment between the regulations

Page 61

1    that we write and what we tell the contractors to

2    do to implement those regulations.  So the whole

3    organization was different.

4              For instance, office of research and

5    demonstrations went to a whole different group

6    called the office of strategic -- something --

7    planning, I think.  OSP.  I can't remember now.

8    But they reorganized everything.

9         Q.   And that was in July of 1997?

10        A.   Yes.

11        Q.   And was the responsibility for

12   promulgating regulations and implementing those

13   regulations relating to Medicare reimbursement of

14   drugs, was that still within --

15        A.   Yes, that organization.

16        Q.   Your purview, the center for health

17   plans and providers?

18        A.   Now, I should say that the directors of

19   each of these centers were political appointees.

20   So it was a little bit like the associate

21   administrator structure where the political

22   appointees were kind of the key staff to the

EXHIBIT 3

Page 275

```
 1                 UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF MASSACHUSETTS

 3        - - - - - - - - - - - - - - - -

 4    IN RE:  PHARMACEUTICAL        ) MDL NO. 1456

 5    INDUSTRY AVERAGE WHOLESALE    ) CIVIL ACTION

 6    PRICE LITIGATION              ) 01-CV-12257-PBS

 7    THIS DOCUMENT RELATES TO      )

 8    U.S. ex rel. Ven-a-Care of    ) Judge Patti B.

 9    the Florida Keys, Inc.        ) Saris

10         v.                       ) Chief Magistrate

11    Abbott Laboratories, Inc.,    ) Judge Marianne B.

12    No. 06-CV-11337-PBS           ) Bowler

13        - - - - - - - - - - - - - - - -

14          (captions continue on following pages)

15

16

17        Videotaped deposition of Kathleen Buto

18                    Volume II

19

20                  Washington, D.C.

21            Thursday, September 13, 2007

22                    9:00 a.m.
```

Buto, Kathleen - Vol. II                                    September 13, 2007
Washington, DC

Page 376

1          MR. MERKL:

2               (Exhibit Dey 100 was marked for

3     identification.)

4     BY MR. MERKL:

5          Q.   Would you please read that?

6          A.   (Reading)  Yes.  I remember the issue

7     in the budget.

8          Q.   Do you recognize the article?

9          A.   Not really, but I was interviewed a lot

10    when I was at HCFA.

11         Q.   When you were interviewed at HCFA did

12    you have to get advance approval from anyone or

13    did people just call you up and you would answer

14    on the phone?

15         A.   You would usually advice -- it was

16    actually usually the case the communications

17    office would ask you to be the commenter.  So

18    it's -- most news inquiries come through the

19    office of communications.

20         Q.   So looking at this article, do you have

21    any reasons to doubt that you gave this interview

22    and made the comments attributed to you in this

Buto, Kathleen - Vol. II                                            September 13, 2007
Washington, DC

Page 377

1    article?

2         A.    I have no reason to doubt.

3         Q.    And this article -- am I correct that

4    the time period of the article appears to be the

5    end of 1997?

6         A.    This article doesn't have a date on it,

7    does it?

8         Q.    That's true.  That's true.

9         A.    But -- well, let me just say that it

10   could be -- it could also be right after the

11   president's budget -- I mean, there are two time

12   periods when you start to get stories like this.

13   Information about the budget starts to leak out

14   after Thanksgiving.  That's usually one time

15   period.  And the other is right around the time

16   of the State of the Union message when some of

17   the details start to get out selectively or

18   however, or right after the more detailed

19   summaries of the bills that are being proposed go

20   to Congress.

21        Q.    So this would be either Thanksgiving of

22   '97 --

Buto, Kathleen - Vol. II                                September 13, 2007

Washington, DC

Page 378

1        A.   Well, it's after that.  It's more like

2   December, January, February, would be the time

3   period that you would see some of these kinds of

4   reports.

5        Q.   So December '97 through early January

6   '98?

7        A.   Yeah, probably.

8        Q.   And there's a reference here to some

9   prior publicity in September of '96 caused by a

10  Barron's article.  I'm reading the third

11  paragraph in.  I'll read it for the record and

12  for our friends on the phone.

13          "Last year a series of articles in

14  Barons showed that much of the lush profits made

15  on such outpatient care arose from the high

16  prices paid for drugs and oxygen by Medicaid's

17  parent, the Health Care Financing

18  Administration."  And there's a reference to a

19  Barron's article in February '96. "Medicare pays

20  the published price for drugs, known in the trade

21  as average wholesale price, even those firms

22  applying those drugs to patients pay 60 to 90

Washington, DC

Page 379

1    percent below that level."

2              Do you recall that Barron's article and

3    the publicity surrounding it?

4         A.    No.  But I recall the issue of oxygen

5    and pharmaceuticals being paid too high.

6         Q.    Well, do you recall the publicity

7    they're talking about here, where at this point

8    now it's in the press or at least the industry

9    press that that firms are paying 60 to 90 percent

10   below AWP for pharmaceuticals?

11        A.    I don't recall the press.  But

12   certainly the information was out there.

13        Q.    And again, you have no reason to doubt

14   that this article was correctly describing the

15   state of affairs at the time?

16              MR. DRAYCOTT:  Objection.

17        A.    I have no reason to, you know, question

18   their reference to the Barron's article, if

19   that's what you're talking about, and the

20   situation with oxygen and pharmaceuticals.

21        Q.    Now, in the first article they talk

22   about cancer but they talk about home respiratory

Buto, Kathleen - Vol. II                                          September 13, 2007

Washington, DC

Page 380

1    therapy.  That's oxygen and that's also

2    pharmaceuticals as well, because am I correct

3    that Medicare also reimbursed certain

4    pharmaceuticals used in home care for respiratory

5    therapy like albuterol, petroprium, chromium and

6    things like that?

7         A.   That's correct.

8         Q.   And those drugs were also the subject

9    of this publicity?

10        A.   Yes.  I think that's correct.

11        Q.   Now, you're then quoted to say simply

12   "We need to pay prudently in Medicare for all

13   supplies and services."  And again, you're

14   talking about the drugs and the oxygen and the

15   other stuff as well, correct?

16        A.   That's correct.

17        Q.   And that was of course your goal?

18        A.   That was of course my goal.

19        Q.   Now, at this time you were anticipating

20   that you would propose to Congress that Congress

21   would switch from just using AWP to a -- if not

22   audited, an actual acquisition cost method of

Page 381

1    reimbursement, correct?

2         A.    Yes.   That's what I was anticipating.

3         Q.    And you were hoping.   And you just

4    explained earlier Congress did not accept that,

5    correct?

6         A.    Congress did not accept that.

7         Q.    And that was a political decision made

8    by Congress?

9         A.    By definition.   If Congress did not

10   accept it it was political.

11        Q.    But you feel you made your case to

12   Congress for the reasons for switching to an

13   actual acquisition cost, right?

14              MR. DRAYCOTT:   Objection.

15        A.    I felt we had a good basis for making

16   the proposal.   They didn't accept it.

17        Q.    And also it was your feeling at the

18   time -- this goes down -- this is kind of a

19   paraphrase -- that had they gone over to an

20   actual acquisition cost system that HCFA could

21   move quickly to in fact implement and conduct an

22   actual acquisition cost system if that was

EXHIBIT 4

Scully, Thomas A.                                                                    May 15, 2007
                              Washington, DC

```
                                                                        Page 1
 1                 UNITED STATES DISTRICT COURT

 2             FOR THE DISTRICT OF MASSACHUSETTS

 3     - - - - - - - - - - - - - -x

 4     IN RE:  PHARMACEUTICAL       :   MDL NO. 1456

 5     INDUSTRY AVERAGE WHOLESALE   :   CIVIL ACTION

 6     PRICE LITIGATION             :   01-CV-12257-PBS

 7     THIS DOCUMENT RELATES TO     :

 8     U.S. ex rel. Ven-a-Care of   :   Judge Patti B. Saris

 9     the Florida Keys, Inc.       :

10          v.                      :

11     Abbott Laboratories, Inc.,   :   Chief Magistrate

12     No. 06-CV-11337-PBS          :   Judge Marianne B.

13     - - - - - - - - - - - - - -x    Bowler

14

15

16

17

18

19

20

21

22
```

Page 48

1    then.  I guess it was probably -- I can't remember

2    who was in power, but Senator Grassley or Baucus, one

3    of those, which committee.

4              But you know, most of the committee staff

5    and the relevant committees, I had known for years

6    and the members and the ranking members and chairmen.

7         Q.    And that would be, that would include the

8    Ways and Means Committee?

9         A.    Yes.

10        Q.    And the Senate Finance Committee?

11        A.    Senate Finance, and Commerce.

12        Q.    Commerce.

13        A.    Commerce.

14        Q.    And these are the folks that you would

15   have had periodic contact with throughout your tenure

16   as president and CEO of FAH?

17        A.    Yes.  And all through the first Bush

18   Administration, generally people I had known for

19   years.  All through the first Bush Administration.

20        Q.    And you stayed with FAH until 2001, is

21   that correct?

22        A.    Yep.

Scully, Thomas A.                                                    May 15, 2007
                          Washington, DC

                                                                    Page 49

1        Q.    And then you were appointed --

2        A.    Start from scratch, we are in trouble.

3        Q.    And then you were appointed to be the

4    administrator of HCFA, is that correct?

5        A.    I think I was probably nominated in

6    February-March.  I think I was confirmed roughly in

7    May, but I took -- basically became a consultant with

8    HCFA, I think in probably early 2001.  Until I was

9    confirmed.

10       Q.    All right.  So you were nominated, and

11   prior -- I just want to understand that -- prior to

12   being confirmed, you worked as a consultant?

13       A.    Prior to being confirmed, I worked as a

14   consultant.

15       Q.    So beginning in February or March?

16       A.    Yes.

17       Q.    And we are talking 2001?

18       A.    2001.

19       Q.    And insofar as you know, how is it that

20   you came to be nominated for this position?

21       A.    God knows.  I think I had a long

22   relationship with first, obviously the first Bush

Page 50

1    Administration.  And not planning to go back into the

2    government, but I ran into Secretary Thompson or

3    something, and a mutual friend had recommended that

4    he encourage me to do this.  So it was largely

5    through Secretary Thompson.  And since I had a long

6    history with the Bush Administration, hopefully I was

7    an acceptable choice to the White House.

8         Q.    And you stayed there until -- you stayed

9    as administrator of HCFA and CMS, which was one of

10   the first things you did was to change the name,

11   until what, the end of --

12        A.    Technically, it was January 4th of 2004,

13   was my technically last day.

14        Q.    Will you mark this?  This will be 181, I

15   believe.  Exhibit Abbott 181.

16             MS. MILLER:  Mary Miller on behalf of the

17   Florida Attorney General's office.  Florida reserves

18   the right to strike all testimony relating to

19   documents used as exhibits here today with respect to

20   the Mylan case and cross-noticed case, due to failure

21   to produce said documents based on properly served

22   request for production of documents.

Scully, Thomas A.                                                                    May 15, 2007
Washington, DC

Page 43

1    try and reform AWP in the late '90s.  And a couple of

2    the larger hospital chains obviously also benefited

3    from the spread on outpatient drugs.  And they

4    instructed me that it was their interest to not have

5    any reforms happen.  So I was a pretty active

6    participant in trying to postpone or delay or kill

7    any reforms of the Clinton Administration.  And

8    Nancy-Ann Mindeparo was my predecessor, somebody I

9    knew quite well, spent a lot of time with Congress in

10   there trying to either modify or reduce the reforms

11   that Secretary Shalala and Nancy and others had in

12   mind.

13            And one of the reasons that I became such

14   a rabid advocate for fixing the government was

15   because when I was representing those hospitals, I

16   realized how totally outrageous the policy was.  So

17   my history at the Federation probably resulted in me

18   putting on my top one or two or three list of things

19   to fix when I became the HCFA CMS administrator.

20       Q.    And do you recall that what the Clinton

21   Administration proposed in approximately 1997 was

22   that Medicare move to actual acquisition cost for the

Scully, Thomas A.                                                    May 15, 2007
                            Washington, DC

Page 44

 1   reimbursement of Medicare Part B drugs?

 2        A.    Generally, that's -- I remember that.

 3        Q.    And you worked, you worked against that

 4   proposal as part of your duties on behalf of the FH

 5   -- FAH, correct?

 6        A.    Yes.

 7        Q.    And can you just sort of explain what you

 8   mentioned in terms of how it is that hospitals

 9   benefit in part from the spread between AWP and

10   actual acquisition costs?

11        A.    Probably from the beginning, the biggest

12   issue just because of the volume of the dollars was

13   always Procrit appropriate, and then later Aranesp,

14   and the fact that how, you know, how outpatient

15   departments usually back then for oncology would

16   acquire drugs for, let's say, a two-week dose back

17   then I think was 5 or 600 dollars, they could

18   actually buy it.  Medicare was reimbursing 95 percent

19   of average wholesale price, which was frequently 1500

20   dollars or more.  And the hospitals obviously had

21   come to rely on that spread just like physicians did.

22              And hospitals, you know, to them, revenue

EXHIBIT 5

Page 443

1              UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF MASSACHUSETTS

3    - - - - - - - - - - - - - - -x

4    IN RE:  PHARMACEUTICAL      :   MDL NO. 1456

5    INDUSTRY AVERAGE WHOLESALE  :   CIVIL ACTION

6    PRICE LITIGATION            :   01-CV-12257-PBS

7    THIS DOCUMENT RELATES TO    :   U.S. ex rel.

8    Ven-a-Care of The Florida   :   Judge Patti B. Saris

9    Keys, Inc.                  :

10       v.                      :

11   Abbott Laboratories, Inc.,  :   Chief Magistrate

12   No. 06-CV-11337-PBS         :   Judge Marianne B.

13   - - - - - - - - - - - - - -x   Bowler

14

15

16            THOMAS A. SCULLY - VOLUME II

17                 JULY 13, 2007

18                WASHINGTON, DC

19

20

21

22    (CAPTION CONTINUED)

Scully, Thomas A. - Vol. II                                    July 13, 2007
Washington, DC

1    there were these kinds of spread in terms like

2    Ipatropium Bromide and drugs like Albuterol?

3             MR. NEAL:  I'll object to the form.

4        A.   It's abundantly on the record, for many

5    years, they knew all about it, I'm not sure they

6    understood it that well, but they certainly knew

7    about it.

8             See, when I came in, in 2001, it was

9    very -- I don't think there was a lot of stomach

10   for fixing it, I spent a lot of time trying to

11   create political support for fixing it.

12       Q.   So the issue was not knowledge but it

13   was generating the right political support to

14   make these changes; right?

15       A.   It's one thing to have the aging

16   committee having a hearing and wave an OIG

17   report, it's another thing to get 218 votes in

18   the House and 60 votes in the Senate to fix it

19   when the constituents -- 218 votes in the House

20   and 60 in the Senate to fix the reimbursement

21   when you have constituents screaming and yelling

22   that they don't want it changed.  So it was a

Scully, Thomas A. - Vol. II                                                July 13, 2007
Washington, DC

1    political issue.

2              (Exhibit Roxanne 003 marked for

3    identification.)

4    BY MR. GORTNER:

5        Q.   I'm going to hand you what's been

6    marked -- pre-marked as Exhibit Roxane 003.  For

7    the record, this is an Office of Inspector

8    General report entitled update excessive Medicare

9    reimbursement for Ipatropium Bromide, and it's

10   dated January, 2004.

11             Mr. Scully, I will ask you to quickly

12   flip through this document and let me know if you

13   recognize it?

14       A.   I remember, generally, I don't remember

15   reading it, specifically.

16       Q.   Would you turn to page one of the

17   report? And at the top of page one there's a

18   paragraph entitled objective, and it reads, to

19   update data provided in a 2002 report comparing

20   Medicaid -- Medicare reimbursement for Ipatropium

21   Bromide to prices available to Medicaid, the

22   supplier community, and the Department of