# EXHIBIT 1

```
                                                                              Page 1
 1
 2              FOR THE DISTRICT OF MASSACHUSETTS
 3    - - - - - - - - - - - - - - -x
 4    IN RE:  PHARMACEUTICAL          :   MDL NO. 1456
 5    INDUSTRY AVERAGE WHOLESALE      :   CIVIL ACTION
 6    PRICE LITIGATION                :   01-CV-12257-PBS
 7    THIS DOCUMENT RELATES TO        :
 8    U.S. ex rel. Ven-a-Care of      :   Judge Patti B. Saris
 9    the Florida Keys, Inc.          :
10         v.                         :
11    Abbott Laboratories, Inc.,      :   Chief Magistrate
12    No. 06-CV-11337-PBS             :   Judge Marianne B.
13    - - - - - - - - - - - - - - -x      Bowler
14        (CROSS NOTICED CAPTIONS ON FOLLOWING PAGES)
15        Videotaped deposition of DR. ROBERT BERENSON
16                          Volume I
17                                  Washington, D.C.
18                                  Wednesday, December 18, 2007
19                                  10:10 a.m.
20
21
22
```

```
 1   Academy Health, which is the organization that
 2   represents health services researchers.  I had a desk
 3   there, but I was basically working as an independent
 4   consultant doing health policy projects.
 5        Q.   Anything related to the reimbursement of
 6   Medicare Part B drugs?
 7        A.   No.
 8        Q.   Anything related to Medicaid?
 9        A.   No.
10        Q.   And then before that?
11        A.   Before that, I worked at HCFA.
12        Q.   And in the 2000 to '01 time frame, you
13   were the deputy administrator for HCFA?
14        A.   Well, it started in -- somewhere around
15   the summer of 2000, Nancy-Ann DeParle left summer or
16   early fall, I don't remember exactly.  Mike Hash
17   became the acting administrator, I became the acting
18   deputy administrator.  And then about five weeks
19   before the end, Mike Hash left, and I became -- I
20   didn't change my title, but I became essentially the
21   acting top person.
22        Q.   When you say five weeks before the end, is
```

1  have no direct knowledge of what they did.

2      Q.   All right.  Did you draft this language
3  that we have been reading?

4      A.   I doubt that I wrote it.

5      Q.   Okay.  Some of the same language shows up
6  in the letter from Administrator DeParle to Congress
7  before, and I was just trying to figure out if you
8  knew who was the drafter of the language.

9      A.   It's consistent with my point of view at
10 the time, but I don't remember actually being the
11 person sitting at the typewriter or at the keyboard.

12     Q.   Could it have been someone in your staff?

13     A.   It could well have been somebody in my
14 staff.  This probably would have been produced, both
15 the letter from Miss DeParle and this letter would
16 have been produced by my executive secretariat, which
17 drafts letters.  And I'm sure we had something to do
18 with it, with the letter.

19     Q.   Last but not least, do you have the book
20 that has 221 in it?

21     A.   This one.

22     Q.   So showing you what's been marked

1  previously as 221, and ask if you've seen this
2  before?
3      A.   I don't think I've seen it before.  I'm
4  aware of its existence.
5      Q.   This is another program memorandum to the
6  intermediaries and carriers dated November 17th of
7  2000.  And it indicates that this program memorandum
8  suspends the PMAB-00-86 dated September 8th, 2000,
9  and then continues, "this is to notify you that you
10 should not use the DOJ data," the DOJ AWPs, I'm
11 paraphrasing now, in your next update of the Medicare
12 payment allowances.  Do you remember why -- so let me
13 understand this, and strike all that and I'll back
14 up.
15           So is it your understanding then that the
16 carriers never did actually consider the DOJ AWPs in
17 setting Medicare reimbursement?
18     A.   Well, it was to go into effect the
19 following year, so I don't believe it was ever --
20 they may have been doing some preliminary work, but I
21 don't -- I'm pretty sure it was never implemented.
22     Q.   And do you know why CMS decided to pull

1   its AWPs in this memo?

2       A.   I don't remember the details.  I knew that

3   the Congress was getting heavily involved and was

4   preparing -- whether they had prepared or were going

5   to prepare legislation to prevent us from doing this.

6   And they were going to take this issue on themself.

7   And in the face of that reality, I think we -- we

8   backed off.  The Congress basically said, we are

9   going to deal with this issue.

10      Q.   Do you know, did anyone from -- well,

11  strike that.  Did you have any discussions with

12  Congress as to why they might prevent you from doing

13  this?

14      A.   I can't remember that I -- I had any

15  particular -- I don't remember personally having

16  discussions.  I know that we were -- there were a lot

17  of congressional letters coming in.  I didn't

18  personally, that I can remember, have conversations

19  with -- with staff.

20      Q.   Do you recall any reasons Congress

21  expressed as to why they might prevent you from doing

22  this?

1    A.    They were hearing the same thing from
2    affected parties that were reflected in these
3    letters, both complaining about access problems and
4    alleged mistakes in how it was being implemented.
5    And Congress is always concerned when they hear about
6    access problems, so it was becoming a very big
7    political issue.
8         Q.    Had you had concerns -- any concerns by
9    any pharmaceutical manufacturer with respect to
10   implementing the DOJ AWPs?
11        A.    Not -- not that I can remember.
12        Q.    Okay.  I think that's all I've got.  Can
13   we take a short break?
14             THE VIDEOGRAPHER:  This is the end of tape
15   three.  Off the record at 4:37.
16             (Recess.)
17             THE VIDEOGRAPHER:  This is the beginning
18   of tape number four in the deposition of
19   Dr. Berenson.  On the record at 2:43.
20             BY MR. MURRAY:
21        Q.    Doctor, this is Brian again.  You had
22   indicated right before we came back from break that

```
 1   you had remembered the name of that center?
 2        A.    Yes, the center that had the
 3   organizational responsibility for sending out program
 4   memoranda was the Center for Beneficiary Services.
 5            MS. ALBEE:  Excuse me, this is Mrs. Albee.
 6   Could the questioner please speak a little louder?
 7            MR. MURRAY:  Perfect.  Sorry.  We have
 8   actually switched chairs here in D.C.  That was my
 9   last question.  I'm going to pass the witness over to
10   Mr. Neil Merkl, who would like to ask you a few
11   questions.  Thank you, Doctor.
12             EXAMINATION BY COUNSEL FOR DEFENDANT DEY
13             BY MR. MERKL:
14        Q.   Good afternoon, Doctor.  Doctor, my name
15   is Neil Merkl.  I represent a company called Dey,
16   D-E-Y.  Have you ever had any dealings with Dey?
17        A.   No.
18        Q.   And you never communicated with Dey in
19   your professional capacity at CMS/HCFA?
20        A.   Not that I can remember.
21        Q.   When we were talking about Exhibit 221 a
22   minute ago, that was the program memoranda that
```

1   rescinded the use of the DOJ AWPs.  Do you have any

2   recollection at all of how you first learned that you

3   weren't going to be using those or recommending that

4   those AWPs be used any more?

5           MR. LIBMAN:  Objection.  Mr. Libman.

6   Asked and answered.

7           THE WITNESS:  I don't remember any more

8   details about -- I certainly don't remember when I

9   first learned about it.  I probably had something to

10  do with participating in a discussion to -- that

11  resulted in the issuance of that memorandum.

12          BY MR. MERKL:

13      Q.   So the decision to issue the memorandum

14  was a decision made by CMS as opposed to a directive

15  received from Congress?

16          MR. DRAYCOTT:  Objection.

17          THE WITNESS:  I believe we did it on our

18  own with -- understanding that Congress would have so

19  directed us if we hadn't done it, but I may be wrong

20  on that.

21          BY MR. MERKL:

22      Q.   Who is we?

Page 189

1   A.   We meaning the senior leadership at the
2   time.  We are now talking about November, so I would
3   have been in that senior leadership.  I don't
4   remember who else would have been involved in such
5   discussions at this time.  I don't remember.
6        At that point, I was the acting deputy
7   administrator, and had moved from my position as
8   center director, and don't have a good memory as to
9   specifically what Congress's actions were, but it was
10  -- I do remember that Congress really had felt that
11  our program memorandum was -- was something they
12  wanted to suspend.  And I think we anticipated that
13  and withdrew it on our own.  But -- so that the
14  Congress indicated their own preference for taking up
15  the issue.
16   Q.   You say the Congress felt and the Congress
17  indicated.  How was it you became aware of Congress's
18  feelings and indications?
19   A.   I don't remember any of the details about
20  it.  I'm sure there were -- typically, I don't know
21  in this case, typically there are phone calls and
22  letters that are exchanged between, in some cases,

1   members of Congress and Senators, in other cases

2   staff, with our congressional relations people that

3   are communicated to the senior leadership of the

4   agency.

5        Q.   Who are your congressional relations

6   people?

7        A.   There is an Office of Legislative Affairs.

8   I don't --

9        Q.   For CMS?

10       A.   For CMS.  Yes.  As well as for the

11  department.  There are two different offices.

12       Q.   Do you know whose job that was at CMS?

13       A.   At that time, I don't.  It may have been

14  Bonnie Washington in that position at that time, but

15  she may have left by then.  I don't know.

16       Q.   You say you anticipated Congress might

17  direct CMS not to go ahead?

18       A.   I don't remember the details.  I know that

19  Congress -- no, I don't know anything.  My

20  recollection, which is hazy, is that Congress was

21  preparing legislation to override the program

22  memorandum, but I may not have that exactly right.

1    Q.   Did Congress have the ability to direct
2    CMS to do without passing legislation?
3    A.   No.
4         MR. LIBMAN:  Objection.  This is
5    Mr. Libman.
6         BY MR. MERKL:
7    Q.   That was a no?
8    A.   I don't believe Congress can direct --
9    legislation is how Congress directs the executive
10   branch to act.
11   Q.   So unless Congress actually passed
12   legislation, CMS could have gone ahead with the DOJ
13   AWPs, had CMS determined to do so?
14   A.   I believe that's correct.
15   Q.   Okay.  Now, you've already told me you
16   don't recall the individuals that participated in a
17   decision not to go ahead.  Notwithstanding that you
18   don't know their names, is it possible you remember
19   who it would be by function or title or
20   responsibility?
21   A.   We were in the process of -- senior
22   leadership had just changed.  Nancy-Ann DeParle had

Page 263

1   Dr. Berenson.  On the record at 4:09.

2              BY MR. MERKL:

3        Q.   Doctor, would you take a look at Exhibit

4   446 marked by Abbott's counsel earlier today, please.

5   And if you look at the bottom right-hand corner of

6   the page, in the numbers ending 2762, is a letter

7   from Congress of the United States.

8        A.   Okay.

9        Q.   And the first letter -- the letter I'm

10  going to talk about in Exhibit 446 is a letter dated

11  September 27th, 2000, with counsel stamp AWP 039-2762

12  through 2763, and it's on the letterhead of Edolphus

13  Towns.  Do you see that letter?

14       A.   Yes.

15       Q.   This is a letter from the Congressional

16  Black Caucus, is that correct?

17       A.   I presume, but looking at some of the

18  names -- do they say they are from -- yes.  I don't

19  know -- I assume that's right, but I don't really --

20       Q.   To Secretary Shalala?

21       A.   Yes.

22       Q.   Dated September 27, 2000, correct?

1       A.      Correct.

2       Q.      And it addresses the proposed new AWPs

3   that the DOJ was suggesting you use as a basis for

4   reimbursement, correct?

5       A.      Correct.

6       Q.      Do you recall seeing this letter?

7       A.      No.

8       Q.      In or about 2000?

9       A.      I don't recall seeing it.

10      Q.      Earlier you told me when HCFA decided not

11  to go ahead and use the DOJ AWPs that it was in

12  response in part to concerns expressed by Congress.

13  Do you recall that?

14      A.      That's correct.  I did say that.

15      Q.      Does this letter reflect the concerns you

16  were telling me about before or is this something

17  else?

18      A.      This would be exactly the kind of concerns

19  that Congress would express.

20      Q.      Now, when you say you don't recall this

21  letter, do you have any reason to believe one way or

22  the other whether you saw it or did not see it at the

1   time.  Is this the type of thing you would have seen?

2       A.    No.  It went to Donna Shalala, who was not

3   CMS.  So if it had gone to our administrator, I

4   probably would have seen it.  It might have been

5   routed to somebody at CMS, but this would not be

6   something I would more likely see, because it goes to

7   the department.  I mean, it wouldn't be something I

8   would routinely see, because it would be -- that

9   response to it would be handled at the department and

10  it would be less likely that I would be involved in

11  it, although I might have been.  I just don't

12  remember.

13      Q.    But does this letter accurately reflect

14  concerns that you became -- that you were made aware

15  of that Congress was expressing about the change?

16          MR. DRAYCOTT:  Objection.

17          THE WITNESS:  This is the kind of concern

18  when I said earlier that politics became a factor,

19  this is the kind of thing I'm referring to.  Yes.

20          BY MR. MERKL:

21      Q.    Well --

22      A.    And I'm not saying politics in a

1   pejorative sense.

2       Q.   For instance, if we look at the second

3   paragraph of the letter from Congressman Towns, he

4   says, "this pricing change directed by HCFA will

5   result in a 66 percentage in the respiratory

6   medication Albuterol.  This reduction will

7   effectively force the current Medicare providers of

8   home respiratory medication out of business and

9   eliminate this benefit to the African-American

10  community."  Is he correct?

11              MR. DRAYCOTT:  Objection.

12              MS. ALBEE:  Objection.

13              THE WITNESS:  I have no idea if he is

14  correct.  Just the fact that it's here doesn't make

15  it correct, but it's -- I don't know.

16              BY MR. MERKL:

17      Q.   But you have no reason and you had no

18  evidence at the time to suggest he wasn't telling the

19  truth here, right?

20              MR. DRAYCOTT:  Objection.

21              THE WITNESS:  A lot of this -- I have no

22  reason to think that he is wrong about the 66 percent

Page 267

1  reduction, that's verifiable, a projection about
2  people going out of business and eliminating care for
3  the African-American community, I don't have any
4  prior assumption whether this is correct or not
5  correct.
6           BY MR. MERKL:
7     Q.   Well, isn't it fair to say that this was a
8  concern as expressed by Congress that you would have
9  to take seriously?
10    A.   Absolutely.
11           MR. DRAYCOTT:  Objection.
12           BY MR. MERKL:
13    Q.   And you did take it seriously?
14    A.   We did take it seriously.
15    Q.   Would you take a look at the next letter,
16 please, starting at page AWP 039-2765.  Again, to
17 Secretary Shalala from members of Congress.  The
18 first one is Pete Sessions.
19    A.   Yes.
20    Q.   Do you recognize this letter?
21    A.   No.
22    Q.   Would you just take a look through it and

```
 1   tell me is this the type of concern that was in fact

 2   expressed to you in or about 2000 about the potential

 3   use of DOJ AWPs?

 4         A.    This is the type of concern that was being

 5   expressed.  Yes.

 6         Q.    And the substance of what's in here in

 7   fact was expressed to you, correct?

 8         A.    For cancer drugs, yes.

 9         Q.    And again, you took these concerns

10   seriously, right?

11               MR. DRAYCOTT:  Objection.

12               THE WITNESS:  Any letter from Congress,

13   you take seriously.

14               BY MR. MERKL:

15         Q.    And this letter here, this July 20th

16   letter and the letter that we just looked at from the

17   black -- Congressional Black Caucus were in fact two

18   of the reasons that you elected to continue using the

19   AWPs as published in the Red Book and Blue Book for

20   reimbursement of Medicare rather than going with the

21   DOJ numbers, correct?

22               MR. DRAYCOTT:  Objection.
```

```
 1              THE WITNESS:  Yes.  That's correct.
 2              BY MR. MERKL:
 3       Q.    Would you take a look at the next letter,
 4   please.  This is a letter from the Senate dated
 5   August 1st, 2000.  To Secretary Shalala from John
 6   Breaux, Orrin Hatch, Bill Frist, Mary Landrieu and
 7   Max Baucus.  Take a look.  Do you recall this letter?
 8       A.    No.
 9       Q.    You don't recall seeing it?
10       A.    No.
11       Q.    Would you take a look, and tell me if you
12   recall being aware of the sum and substance of the
13   concerns being expressed in this letter?
14       A.    I actually hadn't heard a couple of these
15   concerns.
16       Q.    Which ones are they?
17       A.    The impact on First DataBank's current
18   contract with subscribers, the effect on private
19   insurance contracts.  The impact of reloading data on
20   to computers for HCFA.  And again, private insurance
21   companies.  So those concerns, I wasn't generally
22   aware of.
```