# EXHIBIT 3

Page 275

```
 1              UNITED STATES DISTRICT COURT

 2            FOR THE DISTRICT OF MASSACHUSETTS

 3      - - - - - - - - - - - - - - - -

 4    IN RE:  PHARMACEUTICAL        ) MDL NO. 1456

 5    INDUSTRY AVERAGE WHOLESALE    ) CIVIL ACTION

 6    PRICE LITIGATION              ) 01-CV-12257-PBS

 7    THIS DOCUMENT RELATES TO      )

 8    U.S. ex rel. Ven-a-Care of    ) Judge Patti B.

 9    the Florida Keys, Inc.        ) Saris

10       v.                         ) Chief Magistrate

11    Abbott Laboratories, Inc.,    ) Judge Marianne B.

12    No. 06-CV-11337-PBS           ) Bowler

13      - - - - - - - - - - - - - - - -

14          (captions continue on following pages)

15

16

17         Videotaped deposition of Kathleen Buto

18                     Volume II

19

20                  Washington, D.C.

21             Thursday, September 13, 2007

22                     9:00 a.m.
```

```
 1           MR. MERKL:
 2               (Exhibit Dey 100 was marked for
 3   identification.)
 4   BY MR. MERKL:
 5       Q.   Would you please read that?
 6       A.   (Reading)  Yes.  I remember the issue
 7   in the budget.
 8       Q.   Do you recognize the article?
 9       A.   Not really, but I was interviewed a lot
10   when I was at HCFA.
11       Q.   When you were interviewed at HCFA did
12   you have to get advance approval from anyone or
13   did people just call you up and you would answer
14   on the phone?
15       A.   You would usually advice -- it was
16   actually usually the case the communications
17   office would ask you to be the commenter.  So
18   it's -- most news inquiries come through the
19   office of communications.
20       Q.   So looking at this article, do you have
21   any reasons to doubt that you gave this interview
22   and made the comments attributed to you in this
```

Page 377

 1   article?
 2        A.   I have no reason to doubt.
 3        Q.   And this article -- am I correct that
 4   the time period of the article appears to be the
 5   end of 1997?
 6        A.   This article doesn't have a date on it,
 7   does it?
 8        Q.   That's true.  That's true.
 9        A.   But -- well, let me just say that it
10   could be -- it could also be right after the
11   president's budget -- I mean, there are two time
12   periods when you start to get stories like this.
13   Information about the budget starts to leak out
14   after Thanksgiving.  That's usually one time
15   period.  And the other is right around the time
16   of the State of the Union message when some of
17   the details start to get out selectively or
18   however, or right after the more detailed
19   summaries of the bills that are being proposed go
20   to Congress.
21        Q.   So this would be either Thanksgiving of
22   '97 --

1    A.   Well, it's after that.  It's more like
2    December, January, February, would be the time
3    period that you would see some of these kinds of
4    reports.
5    Q.   So December '97 through early January
6    '98?
7    A.   Yeah, probably.
8    Q.   And there's a reference here to some
9    prior publicity in September of '96 caused by a
10   Barron's article.  I'm reading the third
11   paragraph in.  I'll read it for the record and
12   for our friends on the phone.
13        "Last year a series of articles in
14   Barons showed that much of the lush profits made
15   on such outpatient care arose from the high
16   prices paid for drugs and oxygen by Medicaid's
17   parent, the Health Care Financing
18   Administration."  And there's a reference to a
19   Barron's article in February '96.  "Medicare pays
20   the published price for drugs, known in the trade
21   as average wholesale price, even those firms
22   applying those drugs to patients pay 60 to 90

```
 1   percent below that level."
 2            Do you recall that Barron's article and
 3   the publicity surrounding it?
 4       A.   No.  But I recall the issue of oxygen
 5   and pharmaceuticals being paid too high.
 6       Q.   Well, do you recall the publicity
 7   they're talking about here, where at this point
 8   now it's in the press or at least the industry
 9   press that that firms are paying 60 to 90 percent
10   below AWP for pharmaceuticals?
11       A.   I don't recall the press.  But
12   certainly the information was out there.
13       Q.   And again, you have no reason to doubt
14   that this article was correctly describing the
15   state of affairs at the time?
16            MR. DRAYCOTT:  Objection.
17       A.   I have no reason to, you know, question
18   their reference to the Barron's article, if
19   that's what you're talking about, and the
20   situation with oxygen and pharmaceuticals.
21       Q.   Now, in the first article they talk
22   about cancer but they talk about home respiratory
```

Page 380

```
 1    therapy.  That's oxygen and that's also
 2    pharmaceuticals as well, because am I correct
 3    that Medicare also reimbursed certain
 4    pharmaceuticals used in home care for respiratory
 5    therapy like albuterol, petroprium, chromium and
 6    things like that?
 7         A.   That's correct.
 8         Q.   And those drugs were also the subject
 9    of this publicity?
10         A.   Yes.  I think that's correct.
11         Q.   Now, you're then quoted to say simply
12    "We need to pay prudently in Medicare for all
13    supplies and services."  And again, you're
14    talking about the drugs and the oxygen and the
15    other stuff as well, correct?
16         A.   That's correct.
17         Q.   And that was of course your goal?
18         A.   That was of course my goal.
19         Q.   Now, at this time you were anticipating
20    that you would propose to Congress that Congress
21    would switch from just using AWP to a -- if not
22    audited, an actual acquisition cost method of
```

Page 381

1    reimbursement, correct?

2         A.   Yes.  That's what I was anticipating.

3         Q.   And you were hoping.  And you just

4    explained earlier Congress did not accept that,

5    correct?

6         A.   Congress did not accept that.

7         Q.   And that was a political decision made

8    by Congress?

9         A.   By definition.  If Congress did not

10   accept it it was political.

11        Q.   But you feel you made your case to

12   Congress for the reasons for switching to an

13   actual acquisition cost, right?

14             MR. DRAYCOTT:  Objection.

15        A.   I felt we had a good basis for making

16   the proposal.  They didn't accept it.

17        Q.   And also it was your feeling at the

18   time -- this goes down -- this is kind of a

19   paraphrase -- that had they gone over to an

20   actual acquisition cost system that HCFA could

21   move quickly to in fact implement and conduct an

22   actual acquisition cost system if that was