# EXHIBIT 1

```
                                                                    Page 1
 1

 2              FOR THE DISTRICT OF MASSACHUSETTS

 3    - - - - - - - - - - - - - - -x

 4    IN RE:  PHARMACEUTICAL         :   MDL NO. 1456

 5    INDUSTRY AVERAGE WHOLESALE     :   CIVIL ACTION

 6    PRICE LITIGATION               :   01-CV-12257-PBS

 7    THIS DOCUMENT RELATES TO       :

 8    U.S. ex rel. Ven-a-Care of     :   Judge Patti B. Saris

 9    the Florida Keys, Inc.         :

10         v.                        :

11    Abbott Laboratories, Inc.,     :   Chief Magistrate

12    No. 06-CV-11337-PBS            :   Judge Marianne B.

13    - - - - - - - - - - - - - - -x     Bowler

14        (CROSS NOTICED CAPTIONS ON FOLLOWING PAGES)

15       Videotaped deposition of DR. ROBERT BERENSON

16                         Volume I

17                                    Washington, D.C.

18                                    Wednesday, December 18, 2007

19                                    10:10 a.m.

20

21

22
```

Page 126

1  444.
2  (Exhibit Abbott 444 was
3  marked for identification.)
4      MR. LIBMAN: For the benefit of those on
5  the phone, would you mind either identifying either
6  by Bates number or date, the documents you're marking
7  so we know what they are?
8      MR. MURRAY: Sure, of course. I'm handing
9  him now what we are marking as 444, which is a
10 document Bates labeled HHC 001-0661.
11     BY MR. MURRAY:
12 Q.  And ask if you've ever seen this before?
13 A.  No. Not that I remember.
14 Q.  Okay. Who is Beverly Parker?
15 A.  I don't know.
16 Q.  Do you know who R. Niemann is?
17 A.  Yes. Bob Niemann was the person I looked
18 to as my technical drug expert, drug pricing expert.
19 Q.  And this appears to be an email from June
20 27th of 2000 from Mr. Niemann to Ms. Parker,
21 indicating you have a meeting and requesting some
22 things in preparation for that meeting, including a

Page 127

1  latest version of the AWP PM. Let me stop right
2  there. Do you know what Ms. Parker might be
3  referring to there?
4  A.  I assume the program memorandum.
5  Q.  And then a state summary of Medicaid
6  experience with OIG list prices. Do you know what
7  she is referring to there?
8  A.  No.
9  Q.  Have you ever seen a state summary of
10 Medicaid experience with OIG list prices?
11 A.  I have a vague recollection, but I'm not
12 -- I can't recall really any details.
13 Q.  And then third is an A 19, re, use of
14 acquisition cost. Do you know what an A 19 is?
15 A.  No.
16 Q.  Okay. Do you have any idea -- it
17 indicates you need these things for a meeting. Do
18 you have any idea what kind of meeting she is talking
19 about?
20 A.  No. I mean, as I said earlier, I had an
21 ASCO meeting, I'm pretty sure. And whether this is
22 related to that or whether it's an internal meeting,

Page 128

1  I don't know.
2  Q.  Okay. She lists some other people to be
3  cc'd with this information. And let me just ask you,
4  do you know who Mark Miller was?
5  A.  Yes, I do.
6  Q.  And who was he?
7  A.  Mark Miller by then had come in to replace
8  Kathy Buto as my deputy.
9  Q.  Okay. And how about S. --
10 A.  Stewart Streimer was another senior person
11 in my immediate office.
12 Q.  How about J. Sanow?
13 A.  She -- I forget her first name -- had
14 something to do -- I don't -- she worked for
15 Gustafson, and I don't really know in what way.
16 Q.  How about L. McWright?
17 A.  She was my -- Laurie McWright was my
18 special assistant.
19 Q.  And what sorts of issues did she deal
20 with?
21 A.  She was a special assistant. She is like
22 a -- she deals with everything that I deal with,

Page 129

1  helps me get ready for meetings, calls people on my
2  behalf, pulls stuff together. So she dealt with
3  everything that I would deal with, and she was an
4  assistant to me and Mark Miller so --
5  Q.  And T. Gustafson?
6  A.  Tom Gustafson was the head of the group
7  that was in charge of acute care payment policy,
8  which would include Part B drugs.
9  Q.  And how about P. Patel?
10 A.  Parashar Patel was the head of one of Tom
11 Gustafson's branches which -- which was in charge of
12 physician payment. And I assume Part B drugs would
13 have been under his jurisdiction.
14 Q.  And then at the bottom, in a line labeled
15 CC, there is also a T. Hefter. Do you know who that
16 is?
17 A.  Tzvi, Tzvi Hefter and Steve Phillips.
18 They both worked in Gustafson's shop somewhere.
19 Steve Phillips was in charge of hospital payment
20 policy and Tzvi Hefter, I worked with on those
21 issues, but I'm sure he had a broader portfolio than
22 that.

Page 150

1  Q.  And I guess that's what I'm just trying to
2  understand is, if you don't know what the methodology
3  was, what other factors led you to become comfortable
4  with these DOJ AWPs being a good source?
5  A.  Rely -- my reliance on staff who were
6  telling me that they were a good source.
7  Q.  And do you have -- did staff ever
8  communicate to you why they thought it was a good
9  source?
10  A.  Are we getting into a -- into an area
11  here?
12      MR. DRAYCOTT:  Well, if you need to confer
13  --
14      THE WITNESS:  I don't think so.  I mean,
15  no.  The simple answer is no.  I had a lot of
16  confidence in Bob Niemann, who was the point person
17  on drugs.  And he, I was looking to, along with his
18  staff.
19      MR. DRAYCOTT:  Again, you can't go into
20  the deliberations, but you can come up -- if there is
21  a -- if you know what their rationale was for making
22  the final decision, you can state it.  Beyond that,

Page 151

1  and with respect to any deliberations that preceded
2  that decision, I instruct you not to answer.
3      THE WITNESS:  Okay.
4      BY MR. MURRAY:
5  Q.  So basically your staff told you that this
6  was a good source, and that was enough for you?
7  A.  Sure.
8  Q.  Okay.
9      MR. DRAYCOTT:  State an objection to the
10  last question for the record.
11      BY MR. MURRAY:
12  Q.  Okay.  Did anyone ever indicate to you
13  that using the DOJ AWPs might create legal problems
14  on the Medicaid side?
15      MR. DRAYCOTT:  Objection.  And can you
16  repeat the question?
17      BY MR. MURRAY:
18  Q.  Let me ask it this way.  Did anyone
19  outside of government ever express any concern to you
20  that using the DOJ AWPs might create legal problems
21  on the Medicaid side?
22      MR. DRAYCOTT:  Which is a different

Page 152

1  question.
2      MR. MURRAY:  Yes.  It's a different
3  question.
4      MR. DRAYCOTT:  Okay.
5      THE WITNESS:  Not that I recall.
6      BY MR. MURRAY:
7  Q.  Let me hand you what we've previously
8  marked as 148.  And ask if you've ever seen that
9  before?
10      MR. LIBMAN:  Brian, did you say 148?
11      MR. MURRAY:  148.  Sorry.  Thank you.
12      MR. LIBMAN:  All right.
13      THE WITNESS:  No.  I haven't.  I don't
14  remember having seen it.
15      BY MR. MURRAY:
16  Q.  It's a letter to state Medicaid pharmacy
17  directors.  It appears to be a form letter of sorts
18  from the ASCP, American Senior Care Pharmacists.  And
19  in the last paragraph, they appear to be expressing a
20  concern that "a benchmark developed solely for the
21  Medicaid program through a methodology distinct from
22  that used to determine the regular AWP is at odds

Page 153

1  with the laws governing reimbursement for
2  pharmaceuticals under state medical assistance
3  programs based on a single published AWP."  Do you
4  remember that concern ever being expressed to you?
5      MR. DRAYCOTT:  You can state that --
6  whether or not the concern was expressed in some way
7  or back to the time --
8      THE WITNESS:  This one is easy, because I
9  don't remember any such expression.
10      BY MR. MURRAY:
11  Q.  Let me read the next sentence.  "At a
12  minimum, such a separate Medicaid AWP undercuts the
13  principle embodied in the statutes and regulations
14  governing most state medical assistance programs,
15  that reimbursement for Medicaid covered services will
16  be based on commercial norms in the health care
17  industry."  Let me break that into a couple parts.
18  First of all, do you remember this concern ever being
19  expressed to you?
20      MR. DRAYCOTT:  You can state -- you can
21  answer the question to the extent that you can state
22  whether or not this concern found expression or

Page 182

1   A.  Yes.
2   Q.  And you say, "we plan to take
3   administrative action on chemotherapy administration
4   payments and work with Congress to enact legislation
5   regarding clotting factors."  Do you know whether CMS
6   actually took the administrative action you're
7   talking about here?
8   A.  Well, I think the first part of that
9   sentence was the program memorandum, that we've
10  already talked about.
11  Q.  Right.
12  A.  So -- so the answer is, I mean, I think
13  you're asking, did we issue the program memorandum
14  and we did.
15  Q.  Actually, I'm asking a slightly different
16  question.  Where you say after that, we plan to take
17  administrative action on chemotherapy administration
18  payments?
19  A.  Oh.  That was to be in 2001 in the
20  physician payment rule.  And I was gone and I don't
21  honestly know -- I think they had troubles trying to
22  implement that policy, but I no longer was there and

Page 183

1   have no direct knowledge of what they did.
2   Q.  All right.  Did you draft this language
3   that we have been reading?
4   A.  I doubt that I wrote it.
5   Q.  Okay.  Some of the same language shows up
6   in the letter from Administrator DeParle to Congress
7   before, and I was just trying to figure out if you
8   knew who was the drafter of the language.
9   A.  It's consistent with my point of view at
10  the time, but I don't remember actually being the
11  person sitting at the typewriter or at the keyboard.
12  Q.  Could it have been someone in your staff?
13  A.  It could well have been somebody in my
14  staff.  This probably would have been produced, both
15  the letter from Miss DeParle and this letter would
16  have been produced by my executive secretariat, which
17  drafts letters.  And I'm sure we had something to do
18  with it, with the letter.
19  Q.  Last but not least, do you have the book
20  that has 221 in it?
21  A.  This one.
22  Q.  So showing you what's been marked

Page 184

1   previously as 221, and ask if you've seen this
2   before?
3   A.  I don't think I've seen it before.  I'm
4   aware of its existence.
5   Q.  This is another program memorandum to the
6   intermediaries and carriers dated November 17th of
7   2000.  And it indicates that this program memorandum
8   suspends the PMAB-00-86 dated September 8th, 2000,
9   and then continues, "this is to notify you that you
10  should not use the DOJ data," the DOJ AWPs, I'm
11  paraphrasing now, in your next update of the Medicare
12  payment allowances.  Do you remember why -- so let me
13  understand this, and strike all that and I'll back
14  up.
15      So is it your understanding then that the
16  carriers never did actually consider the DOJ AWPs in
17  setting Medicare reimbursement?
18  A.  Well, it was to go into effect the
19  following year, so I don't believe it was ever --
20  they may have been doing some preliminary work, but I
21  don't -- I'm pretty sure it was never implemented.
22  Q.  And do you know why CMS decided to pull

Page 185

1   its AWPs in this memo?
2   A.  I don't remember the details.  I knew that
3   the Congress was getting heavily involved and was
4   preparing -- whether they had prepared or were going
5   to prepare legislation to prevent us from doing this.
6   And they were going to take this issue on themself.
7   And in the face of that reality, I think we -- we
8   backed off.  The Congress basically said, we are
9   going to deal with this issue.
10  Q.  Do you know, did anyone from -- well,
11  strike that.  Did you have any discussions with
12  Congress as to why they might prevent you from doing
13  this?
14  A.  I can't remember that I -- I had any
15  particular -- I don't remember personally having
16  discussions.  I know that we were -- there were a lot
17  of congressional letters coming in.  I didn't
18  personally, that I can remember, have conversations
19  with -- with staff.
20  Q.  Do you recall any reasons Congress
21  expressed as to why they might prevent you from doing
22  this?

Page 186

1    A.   They were hearing the same thing from
2    affected parties that were reflected in these
3    letters, both complaining about access problems and
4    alleged mistakes in how it was being implemented.
5    And Congress is always concerned when they hear about
6    access problems, so it was becoming a very big
7    political issue.
8        Q.   Had you had concerns -- any concerns by
9    any pharmaceutical manufacturer with respect to
10   implementing the DOJ AWPs?
11       A.   Not -- not that I can remember.
12       Q.   Okay.  I think that's all I've got.  Can
13   we take a short break?
14           THE VIDEOGRAPHER:  This is the end of tape
15   three.  Off the record at 4:37.
16           (Recess.)
17           THE VIDEOGRAPHER:  This is the beginning
18   of tape number four in the deposition of
19   Dr. Berenson.  On the record at 2:43.
20           BY MR. MURRAY:
21       Q.   Doctor, this is Brian again.  You had
22   indicated right before we came back from break that

Page 187

1    you had remembered the name of that center?
2        A.   Yes, the center that had the
3    organizational responsibility for sending out program
4    memoranda was the Center for Beneficiary Services.
5            MS. ALBEE:  Excuse me, this is Mrs. Albee.
6    Could the questioner please speak a little louder?
7            MR. MURRAY:  Perfect.  Sorry.  We have
8    actually switched chairs here in D.C.  That was my
9    last question.  I'm going to pass the witness over to
10   Mr. Neil Merkl, who would like to ask you a few
11   questions.  Thank you, Doctor.
12          EXAMINATION BY COUNSEL FOR DEFENDANT DEY
13           BY MR. MERKL:
14       Q.   Good afternoon, Doctor.  Doctor, my name
15   is Neil Merkl.  I represent a company called Dey,
16   D-E-Y.  Have you ever had any dealings with Dey?
17       A.   No.
18       Q.   And you never communicated with Dey in
19   your professional capacity at CMS/HCFA?
20       A.   Not that I can remember.
21       Q.   When we were talking about Exhibit 221 a
22   minute ago, that was the program memoranda that

Page 188

1    rescinded the use of the DOJ AWPs.  Do you have any
2    recollection at all of how you first learned that you
3    weren't going to be using those or recommending that
4    those AWPs be used any more?
5            MR. LIBMAN:  Objection.  Mr. Libman.
6    Asked and answered.
7            THE WITNESS:  I don't remember any more
8    details about -- I certainly don't remember when I
9    first learned about it.  I probably had something to
10   do with participating in a discussion to -- that
11   resulted in the issuance of that memorandum.
12           BY MR. MERKL:
13       Q.   So the decision to issue the memorandum
14   was a decision made by CMS as opposed to a directive
15   received from Congress?
16           MR. DRAYCOTT:  Objection.
17           THE WITNESS:  I believe we did it on our
18   own with -- understanding that Congress would have so
19   directed us if we hadn't done it, but I may be wrong
20   on that.
21           BY MR. MERKL:
22       Q.   Who is we?

Page 189

1        A.   We meaning the senior leadership at the
2    time.  We are now talking about November, so I would
3    have been in that senior leadership.  I don't
4    remember who else would have been involved in such
5    discussions at this time.  I don't remember.
6            At that point, I was the acting deputy
7    administrator, and had moved from my position as
8    center director, and don't have a good memory as to
9    specifically what Congress's actions were, but it was
10   -- I do remember that Congress really had felt that
11   our program memorandum was -- was something they
12   wanted to suspend.  And I think we anticipated that
13   and withdrew it on our own.  But -- so that the
14   Congress indicated their own preference for taking up
15   the issue.
16       Q.   You say the Congress felt and the Congress
17   indicated.  How was it you became aware of Congress's
18   feelings and indications?
19       A.   I don't remember any of the details about
20   it.  I'm sure there were -- typically, I don't know
21   in this case, typically there are phone calls and
22   letters that are exchanged between, in some cases,

Page 246

1   A. Deep discounts.
2   Q. Okay. And you did not oppose -- well, and
3   that eventually, HCFA decided it was not going to
4   require physicians and their providers to reimburse
5   at the lower rate proposed by the DOJ, correct?
6       MR. DRAYCOTT: Objection.
7       THE WITNESS: As we talked about earlier,
8   we -- Congress indicated that they didn't want us to
9   act in that area. And so we did not act in that
10  area, but not necessarily because of the merits, but
11  because of the politics.
12      BY MR. MERKL:
13  Q. When you say the politics, you know,
14  Congress is in charge, right, ultimately?
15  A. Yes. Congress is in charge ultimately.
16  Right.
17  Q. All right. And in either case, it was a
18  decision independently arrived at by HCFA to stick
19  with reimbursing Medicare at 95 percent of AWP, even
20  though HCFA knew that Albuterol and cromolyn and
21  other inhalant drugs were available at margins
22  substantially below AWP, correct?

Page 247

1       MR. DRAYCOTT: Objection.
2       MS. ALBEE: Objection. This is
3   Mrs. Albee.
4       THE WITNESS: HCFA made a decision not to
5   implement that particular program memorandum that
6   would have reduced reimbursement.
7       BY MR. MERKL:
8   Q. With the knowledge that the providers were
9   able to obtain those inhalant drugs at numbers
10  substantially below AWP, correct?
11      MR. DRAYCOTT: Objection.
12      THE WITNESS: Correct.
13      BY MR. MERKL:
14  Q. Are you familiar with the term -- it's an
15  acronym, WAC, W-A-C, it stands for wholesale
16  acquisition cost?
17  A. I think I've seen it, but I couldn't tell
18  you the definition at this moment.
19  Q. Well, are you aware that WAC also is a
20  published price for drugs?
21  A. No.
22  Q. And that WAC also appears in the FDB

Page 248

1   periodical, I think it's the Blue Book?
2   A. No. I'm not aware of that.
3   Q. And are you aware whether or not WACs are
4   consistently higher or lower than AWPs?
5   A. I have no knowledge of WACs.
6   Q. Have you ever heard the term AMP?
7   A. Average manufacturer's price.
8   Q. Average manufacturer's price?
9   A. I've heard the term.
10  Q. What is your understanding of that term?
11  A. Actually, I can't tell you that. I don't
12  have an understanding at this moment.
13  Q. Are you aware that manufacturers of
14  pharmaceuticals report AMPs for each NDC number drug
15  that they sell as part of the Medicaid program?
16  A. No. I'm not.
17  Q. In the course of your duties at HCFA/CMS,
18  did you ever have occasion to look at AMPs?
19  A. Not that I can remember.
20  Q. Were you aware of the existence of the AMP
21  information?
22  A. From Medicaid?

Page 249

1   Q. Yes.
2   A. I don't believe I was.
3   Q. And that's because you were not involved
4   in Medicaid?
5   A. Correct.
6   Q. And did you have any involvement with
7   Medicaid rebates?
8   A. No.
9   Q. Did you ever consider using a rebate
10  program for the Medicare drugs?
11  A. I was -- I had operational responsibility
12  for implementing what we had. I think there may have
13  been other people in the agency who might have been
14  thinking about it, but I wasn't involved with that.
15  Q. Who were those people?
16  A. Again, as I said earlier, there was a
17  report from the Office of Strategic Planning that
18  laid out a whole variety of rebate models. So that
19  typically would have been the group that would have
20  been thinking about how you reform the program,
21  people in the Office of Strategic Planning.
22  Q. What is the Office of Strategic Planning

Page 262

1  MR. DRAYCOTT: Objection.
2  THE WITNESS: Correct.
3  BY MR. MERKL:
4  Q. All right. Now, when a -- well, when a
5  generic manufacturer attempted to introduce a
6  competing generic with an existing brand drug into
7  the market, it would have to account for the
8  existence of that spread in setting its price,
9  wouldn't it?
10  MR. DRAYCOTT: Objection.
11  MR. LIBMAN: Objection. This is
12  Mr. Libman.
13  THE WITNESS: I don't know enough about
14  how drug companies set prices to offer a response.
15  BY MR. MERKL:
16  Q. Okay. All right. Why don't we take a
17  break.
18  THE VIDEOGRAPHER: This is the end of tape
19  four. Off the record at 4 o'clock.
20  (Recess.)
21  THE VIDEOGRAPHER: This is the beginning
22  of tape number five in the deposition of

Page 263

1  Dr. Berenson. On the record at 4:09.
2  BY MR. MERKL:
3  Q. Doctor, would you take a look at Exhibit
4  446 marked by Abbott's counsel earlier today, please.
5  And if you look at the bottom right-hand corner of
6  the page, in the numbers ending 2762, is a letter
7  from Congress of the United States.
8  A. Okay.
9  Q. And the first letter -- the letter I'm
10  going to talk about in Exhibit 446 is a letter dated
11  September 27th, 2000, with counsel stamp AWP 039-2762
12  through 2763, and it's on the letterhead of Edolphus
13  Towns. Do you see that letter?
14  A. Yes.
15  Q. This is a letter from the Congressional
16  Black Caucus, is that correct?
17  A. I presume, but looking at some of the
18  names -- do they say they are from -- yes. I don't
19  know -- I assume that's right, but I don't really --
20  Q. To Secretary Shalala?
21  A. Yes.
22  Q. Dated September 27, 2000, correct?

Page 264

1  A. Correct.
2  Q. And it addresses the proposed new AWPs
3  that the DOJ was suggesting you use as a basis for
4  reimbursement, correct?
5  A. Correct.
6  Q. Do you recall seeing this letter?
7  A. No.
8  Q. In or about 2000?
9  A. I don't recall seeing it.
10  Q. Earlier you told me when HCFA decided not
11  to go ahead and use the DOJ AWPs that it was in
12  response in part to concerns expressed by Congress.
13  Do you recall that?
14  A. That's correct. I did say that.
15  Q. Does this letter reflect the concerns you
16  were telling me about before or is this something
17  else?
18  A. This would be exactly the kind of concerns
19  that Congress would express.
20  Q. Now, when you say you don't recall this
21  letter, do you have any reason to believe one way or
22  the other whether you saw it or did not see it at the

Page 265

1  time. Is this the type of thing you would have seen?
2  A. No. It went to Donna Shalala, who was not
3  CMS. So if it had gone to our administrator, I
4  probably would have seen it. It might have been
5  routed to somebody at CMS, but this would not be
6  something I would more likely see, because it goes to
7  the department. I mean, it wouldn't be something I
8  would routinely see, because it would be -- that
9  response to it would be handled at the department and
10  it would be less likely that I would be involved in
11  it, although I might have been. I just don't
12  remember.
13  Q. But does this letter accurately reflect
14  concerns that you became -- that you were made aware
15  of that Congress was expressing about the change?
16  MR. DRAYCOTT: Objection.
17  THE WITNESS: This is the kind of concern
18  when I said earlier that politics became a factor,
19  this is the kind of thing I'm referring to. Yes.
20  BY MR. MERKL:
21  Q. Well --
22  A. And I'm not saying politics in a

Page 266

1  pejorative sense.
2  Q.  For instance, if we look at the second
3  paragraph of the letter from Congressman Towns, he
4  says, "this pricing change directed by HCFA will
5  result in a 66 percentage in the respiratory
6  medication Albuterol.  This reduction will
7  effectively force the current Medicare providers of
8  home respiratory medication out of business and
9  eliminate this benefit to the African-American
10 community."  Is he correct?
11      MR. DRAYCOTT:  Objection.
12      MS. ALBEE:  Objection.
13      THE WITNESS:  I have no idea if he is
14 correct.  Just the fact that it's here doesn't make
15 it correct, but it's -- I don't know.
16      BY MR. MERKL:
17 Q.  But you have no reason and you had no
18 evidence at the time to suggest he wasn't telling the
19 truth here, right?
20      MR. DRAYCOTT:  Objection.
21      THE WITNESS:  A lot of this -- I have no
22 reason to think that he is wrong about the 66 percent

Page 267

1  reduction, that's verifiable, a projection about
2  people going out of business and eliminating care for
3  the African-American community, I don't have any
4  prior assumption whether this is correct or not
5  correct.
6       BY MR. MERKL:
7  Q.  Well, isn't it fair to say that this was a
8  concern as expressed by Congress that you would have
9  to take seriously?
10 A.  Absolutely.
11      MR. DRAYCOTT:  Objection.
12      BY MR. MERKL:
13 Q.  And you did take it seriously?
14 A.  We did take it seriously.
15 Q.  Would you take a look at the next letter,
16 please, starting at page AWP 039-2765.  Again, to
17 Secretary Shalala from members of Congress.  The
18 first one is Pete Sessions.
19 A.  Yes.
20 Q.  Do you recognize this letter?
21 A.  No.
22 Q.  Would you just take a look through it and

Page 268

1  tell me is this the type of concern that was in fact
2  expressed to you in or about 2000 about the potential
3  use of DOJ AWPs?
4  A.  This is the type of concern that was being
5  expressed.  Yes.
6  Q.  And the substance of what's in here in
7  fact was expressed to you, correct?
8  A.  For cancer drugs, yes.
9  Q.  And again, you took these concerns
10 seriously, right?
11      MR. DRAYCOTT:  Objection.
12      THE WITNESS:  Any letter from Congress,
13 you take seriously.
14      BY MR. MERKL:
15 Q.  And this letter here, this July 20th
16 letter and the letter that we just looked at from the
17 black -- Congressional Black Caucus were in fact two
18 of the reasons that you elected to continue using the
19 AWPs as published in the Red Book and Blue Book for
20 reimbursement of Medicare rather than going with the
21 DOJ numbers, correct?
22      MR. DRAYCOTT:  Objection.

Page 269

1       THE WITNESS:  Yes.  That's correct.
2       BY MR. MERKL:
3  Q.  Would you take a look at the next letter,
4  please.  This is a letter from the Senate dated
5  August 1st, 2000.  To Secretary Shalala from John
6  Breaux, Orrin Hatch, Bill Frist, Mary Landrieu and
7  Max Baucus.  Take a look.  Do you recall this letter?
8  A.  No.
9  Q.  You don't recall seeing it?
10 A.  No.
11 Q.  Would you take a look, and tell me if you
12 recall being aware of the sum and substance of the
13 concerns being expressed in this letter?
14 A.  I actually hadn't heard a couple of these
15 concerns.
16 Q.  Which ones are they?
17 A.  The impact on First DataBank's current
18 contract with subscribers, the effect on private
19 insurance contracts.  The impact of reloading data on
20 to computers for HCFA.  And again, private insurance
21 companies.  So those concerns, I wasn't generally
22 aware of.