UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION** | **Master Civil No. 01-cv-12257** <br><br> **MDL No. 1456** |
| **THIS DOCUMENT RELATES TO CLASS 1 JOHNSON & JOHNSON** | **Judge Patti B. Saris** |

## <u>DECLARATION OF ADEEL A. MANGI</u>

I, Adeel A. Mangi, declare as follows:

1.      I am a member of the firm Patterson Belknap Webb & Tyler LLP and represent Johnson & Johnson, Centocor Inc., and Ortho Biotech Products L.P. (collectively, the "J&J Defendants") in this litigation. I offer this declaration in support of The Johnson & Johnson Defendants' Statement Regarding Positions Taken By The Department Of Justice On Dr. Hartman's 30% Liability Benchmark.

2.      Attached hereto as Ex. 1 is a true and accurate copy of the "Brief of the United States as Amicus Curiae In Partial Support of Plaintiffs-Appellees" filed before the United States Court of Appeals for the First Circuit in the matter of *Blue Cross Blue Shield of Massachusetts, et al. v. Astrazeneca Pharmaceuticals L.P.*, No. 08-1056.

I declare under penalty of perjury that the foregoing is true and correct.

/s/ Adeel Mangi
Adeel A. Mangi

Executed on this 20th day of July 2010

# Exhibit 1

4085808v.1

No. 08-1056

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

IN RE PHARMACEUTICAL INDUSTRY
AVERAGE WHOLESALE PRICE LITIGATION

BLUE CROSS BLUE SHIELD OF MASSACHUSETTS, et al.,

Plaintiffs-Appellees,

v.

ASTRAZENECA PHARMACEUTICALS LP,

Defendant-Appellant.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

BRIEF OF THE UNITED STATES AS AMICUS CURIAE
IN PARTIAL SUPPORT OF PLAINTIFFS-APPELLEES

GREGORY G. KATSAS
 Assistant Attorney General

MICHAEL J. SULLIVAN
 United States Attorney

MICHAEL S. RAAB
 (202) 514-4053
ERIC FLEISIG-GREENE
 (202) 514-4815
 Attorneys, Appellate Staff
 Civil Division, Room 7214
 U.S. Department of Justice
 950 Pennsylvania Ave., N.W.
 Washington, DC  20530-0001

## TABLE OF CONTENTS

**Page**

STATEMENT OF INTEREST . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE ISSUE. . . . . . . . . . . . . . . . . . . . 3

STATEMENT OF THE FACTS. . . . . . . . . . . . . . . . . . . . 3

    I.    Statutory and Regulatory Background.. . . . . . . . . 3

    II.  Facts and Prior Proceedings . . . . . . . . . . . 11

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    I.    THE PHRASE "AVERAGE WHOLESALE PRICE" IN
        THE BALANCED BUDGET ACT DOES NOT GRANT THE
        PHARMACEUTICAL INDUSTRY UNFETTERED DISCRETION
        TO REPORT DRUG PRICES THAT BEAR NO RELATION TO
        PRODUCTS' ACTUAL PRICES.. . . . . . . . . . . . . 13

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . 19

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## TABLE OF CITATIONS

**Cases:**

Gen. Motors Corp. v. Darling's, 444 F.3d 98 (1st Cir. 2006) .  14

In Re Pharm. Indus. Average Wholesale Price Litig.,
  460 F. Supp. 2d 277 (D. Mass. 2006) . . . . . . . . 2-3, 11-12

In Re Pharm. Indus. Average Wholesale Price Litig.,
  491 F. Supp. 2d 20 (D. Mass. 2007). . . . . . 11, 12, 17, 18

In Re Pharm. Indus. Average Wholesale Price Litig.,
  520 F. Supp. 2d 267 (D. Mass. 2007) . . . . . . . . . . 12

Nat'l Lead Co. v. United States, 252 U.S. 140 (1920) . . . . . 14

United States ex rel. Ven-a-Care of Fla. Keys v.
  Abbott Labs., Civ. No. 06-11337 (D. Mass.). . . . . . . . . 2

United States ex rel. Ven-a-Care of Fla. Keys v.
  Boehringer Ingelheim Corp., Civ. No. 07-10248 (D. Mass.). . . 2

United States ex rel. Ven-a-Care of Fla. Keys v.
  Dey, Inc., Civ. No. 05-11084 (D. Mass.) . . . . . . . . . . 2

**Statutes:**

28 U.S.C. § 517 . . . . . . . . . . . . . . . . . . . . . 1

42 U.S.C. §§ 1395 et seq. . . . . . . . . . . . . . . . . 3
42 U.S.C. §§ 1395j to 1395w-4 . . . . . . . . . . . . . . 3-4
42 U.S.C. § 1395u(o)(1)(A)(i), (4)(A) . . . . . . . . . . 10
42 U.S.C. § 1395x(s)(2)(A). . . . . . . . . . . . . . . . 4
42 U.S.C. § 1395x(v)(1)(A), (ff)(2), (fff)(2)(E). . . . . 18
42 U.S.C. § 1396r-8(k)(7)(C)(iii) . . . . . . . . . . . . 16

Pub. L. No. 89-97, sec. 102(a), § 1814(b),
  79 Stat. 286, 296 (1965). . . . . . . . . . . . . . . . 4

Pub. L. No. 89-97, sec. 102(a), § 1833(a),
  79 Stat. 286, 302 (1965). . . . . . . . . . . . . . . 4, 13

Pub. L. No. 89-97, sec. 102(a), § 1862(a)(1),
  79 Stat. 286, 325 (1965). . . . . . . . . . . . . . . . 4

Pub. L. No. 101-239, 103 Stat. 2106 (1989). . . . . . . . . 4

Pub. L. No. 101-239, sec. 6102(a), § 1848(j)(3),
   103 Stat. 2106, 2184 (1989) . . . . . . . . . . . . . . . . . 5, 14

Pub. L. No. 105-33, 111 Stat. 251 (1997) . . . . . . . . . . . 1, 7

Pub. L. No. 105-33, § 4556(a), 111 Stat. 251, 462-63 (1997) . . 8

Pub. L. No. 105-33, § 4556(c), 111 Stat. 251, 463 (1997) . . . . 8

Pub. L. No. 106-554, § 429(a)-(b), 114 Stat. 2763,
   2763A-522 to 2763A-524 (2000) . . . . . . . . . . . . . . . . 10

Pub. L. No. 106-554, § 429(c), 114 Stat. 2763,
   2763A-524 (2000) . . . . . . . . . . . . . . . . . . . . . . 10

Pub. L. No. 108-173, § 303(b), 117 Stat. 2066,
   2238-39 (2003) . . . . . . . . . . . . . . . . . . . . . . . 10

Pub. L. No. 108-173, § 303(c)-(d), 117 Stat. 2066,
   2239-52 (2003) . . . . . . . . . . . . . . . . . . . . . . . 10


**Regulations:**

42 C.F.R. § 405.517 (1992) . . . . . . . . . . . . . . . . . . 6

56 Fed. Reg. 25,792 (June 5, 1991) . . . . . . 4, 5, 13, 14, 16
56 Fed. Reg. 59,502 (Nov. 25, 1991) . . . . . . . 6, 7, 14, 16
68 Fed. Reg. 50,428 (Aug. 20, 2003) . . . . . . . . . . . 4, 10


**Other Authorities:**

Fed. R. App. P. 29(a) . . . . . . . . . . . . . . . . . . . . 1
Fed. R. Civ. P. 54(b) . . . . . . . . . . . . . . . . . . . . 12

H.R. Rep. No. 101-247 (1989) . . . . . . . . . . . . . . . . . 4
H.R. Rep. No. 105-149 (1997) . . . . . . . 7, 8, 15, 16, 17, 18

S. Rep. No. 89-404 (1965) . . . . . . . . . . . . . . . . . . 4

President's Fiscal Year 1998 Budget Proposal for Medicare,
   Medicaid, and Welfare: Hearing Before the S. Comm. on
   Finance, 105th Cong. 265 (1997) . . . . . . . . . . . . . . 7

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 08-1056

IN RE PHARMACEUTICAL INDUSTRY
AVERAGE WHOLESALE PRICE LITIGATION

BLUE CROSS BLUE SHIELD OF MASSACHUSETTS, et al.,

Plaintiffs-Appellees,

v.

ASTRAZENECA PHARMACEUTICALS LP,

Defendant-Appellant.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

BRIEF OF THE UNITED STATES AS AMICUS CURIAE
IN PARTIAL SUPPORT OF PLAINTIFFS-APPELLEES

**STATEMENT OF INTEREST**

Pursuant to 28 U.S.C. § 517 and Federal Rule of Appellate
Procedure 29(a), the United States submits this brief as amicus
curiae in support of plaintiffs-appellees' interpretation of the
term "average wholesale price" in the Balanced Budget Act of
1997, Pub. L. No. 105-33, 111 Stat. 251.

This appeal arises out of a nationwide class action lawsuit
against pharmaceutical manufacturers for grossly and fraudulently
inflating the drug prices they reported in industry publications
from 1991 to 2003.  Defendants assert that their inflated prices

were authorized by the Balanced Budget Act of 1997, which set
Medicare reimbursement at ninety-five percent of the "average
wholesale price" for their drugs.  The district court rejected
that argument, reasoning that Congress' adoption of average
wholesale pricing did not authorize pharmaceutical companies to
set prices for reimbursement that bore no reasonable relationship
to the actual prices at which their drugs were sold.

The United States is charged with administering the Medicare
program in a fiscally responsible manner that complies with the
statutory mandate of Congress.  The United States also has a
significant interest in guaranteeing that when Medicare pays for
drugs or services at artificially inflated rates, the entities
responsible are held to account for the resulting overpayments.
In its exercise of these responsibilities, the United States has
intervened in three suits against pharmaceutical manufacturers
for actions virtually identical to those at issue in this appeal.
United States ex rel. Ven-a-Care of Fla. Keys v. Boehringer
Ingelheim Corp., Civ. No. 07-10248 (D. Mass.); United States ex
rel. Ven-a-Care of Fla. Keys v. Abbott Labs., Civ. No. 06-11337
(D. Mass.); United States ex rel. Ven-a-Care of Fla. Keys v. Dey,
Inc., Civ. No. 05-11084 (D. Mass.).

The district court's interpretation of "average wholesale
price" properly accounts for these concerns.  The court correctly
held that average wholesale price is "not a term of art for any
price the pharmaceutical industry places in the industry

-2-

publication," but is best understood as a measure of the actual prices charged in the marketplace, consistent with its plain meaning.  In Re Pharm. Indus. Average Wholesale Price Litig., 460 F. Supp. 2d 277, 287-88 (D. Mass. 2006).  The United States accordingly submits this brief as amicus curiae in support of the district court's ruling, and in partial support of plaintiffs-appellees.

## STATEMENT OF THE ISSUE

Whether the Balanced Budget Act of 1997, which provides that certain drugs be reimbursed under Medicare at ninety-five percent of their "average wholesale price," should be read in accord with its plain meaning to reflect actual sales prices of drugs, or instead as a term of art empowering manufacturers to set payment rates with no reasonable relation to their drugs' true prices.

## STATEMENT OF THE FACTS

### I.   Statutory and Regulatory Background

Congress established the Medicare program in 1965 as a federally funded insurance program for the elderly and disabled under Title XVIII of the Social Security Act.  See 42 U.S.C. §§ 1395 et seq.  The Secretary of Health and Human Services administers the Medicare program through the Centers for Medicare and Medicaid Services, formerly known as the Health Care Financing Administration ("HCFA").  Part B of the Medicare program provides insurance for physician services, outpatient hospital services, and other health services.  See 42 U.S.C.

-3-

§§ 1395j to 1395w-4.  Medicare Part B also covers a limited number of prescription drugs, primarily injectable or intravenous drugs, furnished incident to a physician's services.  42 U.S.C. § 1395x(s)(2)(A).  <u>See</u> 68 Fed. Reg. 50,428, 50,428-29 (Aug. 20, 2003).

Since its inception, the Medicare program has sought to "make the best of modern medicine more readily available to the aged" while also ensuring that the program remains financially viable.  S. Rep. No. 89-404, pt. 1, at 24 (1965), <u>as reprinted in</u> 1965 U.S.C.C.A.N. 1943, 1965.  Congress balanced these goals by affording coverage only for items and services "reasonable and necessary" for the patient's well-being, and by limiting payments under Part B to a "reasonable charge."  Pub. L. No. 89-97, sec. 102(a), §§ 1833(a), 1862(a)(1), 79 Stat. 286, 302, 325 (1965); 56 Fed. Reg. 25,792, 25,794 (June 5, 1991).  Congress demanded similar fiscal prudence under Medicare Part A, authorizing payment only for "reasonable costs" of provider care.  Pub. L. No. 89-97, sec. 102(a), § 1814(b), 79 Stat. at 296.

In 1989, as part of a "systematic and comprehensive reform of the methodology used under Medicare to pay for physicians' services," Congress enacted the Omnibus Budget Reconciliation Act of 1989, Pub. L. No. 101-239, 103 Stat. 2106, which replaced the "reasonable charge" system with a national fee schedule for most services under Part B.  <u>See</u> H.R. Rep. No. 101-247, at 337-38 (1989), <u>as reprinted in</u> 1989 U.S.C.C.A.N. 1906, 2063-64.  In

-4-

implementing the new reimbursement system, HCFA determined that
it would be impractical to create a national fee schedule for
Part B drugs "given the large number of different drugs and the
myriad of dosage levels." 56 Fed. Reg. at 25,800.  Instead, HCFA
opted to exercise the Secretary's discretionary authority under
the Act "to exclude the cost of drugs from the national fee
schedule and to continue to pay for them under the current
'reasonable charge' system." Id. (citing Pub. L. No. 101-239,
sec. 6102(a), § 1848(j)(3), 103 Stat. 2106, 2184 (1989)).

Although HCFA declined to adopt a fee schedule for Part B
drugs, it acknowledged "a need for greater consistency in how
drugs are paid for under the program," and offered to meet that
need by designing its new reasonable charge system to "require a
consistent method in pricing to be used by the carriers."
56 Fed. Reg. at 25,800.  HCFA accordingly provided that Part B
carriers would reimburse drug costs based on the "national
average wholesale price of the drug," and proposed that the price
be measured using figures "published in the Red Book and similar
price listings." Id.  HCFA originally suggested that
reimbursement be limited to 85% of national average wholesale
price, based on findings by the Department of Health and Human
Services Inspector General that pharmacies could purchase drugs
at "an average discount of 15.9 percent off the published
wholesale price." Id.  HCFA explained that because "Medicare
policy, since the beginning of the Medicare program, has been to

-5-

base payment for 'incident to' drugs on the estimated acquisition costs," and because the agency had "no reason to believe prices paid by physicians are any higher than pharmacies pay," a 15% discount was warranted to guarantee that payments would be commensurate with the "true cost" borne by physicians purchasing covered drugs.  Id.

HCFA received a substantial number of comments on its proposed reimbursement plan.  Most commentators argued that "many drugs could be purchased for considerably less than 85 percent of AWP" but also noted that "others were not discounted."  56 Fed. Reg. 59,502, 59,524 (Nov. 25, 1991).  Other commentators contended that "while pharmacies and perhaps large practices could receive substantial discounts on their drug purchases, individual physicians could not."  Id.  A number of oncologists also argued that greater compensation was needed for chemotherapy drugs, both to cover breakage, wastage, and similar inventory costs and to compensate for inadequate chemotherapy administration payments under Medicare.  Id.  In response, HCFA modified its rule to reimburse drugs at 100% of national average wholesale price.  56 Fed. Reg. at 59,525; 56 Fed. Reg. at 59,621 (promulgating 42 C.F.R. § 405.517 (1992)).  The agency's final rule also required individual carriers to estimate the actual acquisition costs of covered drugs, and to base drug payments on

the lower of the resulting estimate or the average wholesale price for each drug.  Id.[1]

    HCFA's regulation remained in effect through 1997, when Congress enacted the Balanced Budget Act of 1997, Pub. L. No. 105-33, 111 Stat. 251.  As HCFA had done earlier in the decade, the House Committee on the Budget considered the Inspector General's reports on Medicare drug pricing, which expressed concern that the program had "paid significantly more for drugs and biologicals than physicians and pharmacists pay to acquire such pharmaceuticals" and found that Medicare payments for the most popular oncology drugs substantially exceeded providers' acquisition costs.  H.R. Rep. No. 105-149, at 1354 (1997).  The Senate likewise heard testimony from the Secretary of Health and Human Services, advocating that Congress tie Medicare drug payments to actual acquisition costs rather than to listed average wholesale prices, because the latter was "not the average price actually charged by wholesalers to their customers" but rather "a 'sticker' price set by drug manufacturers and published in several commercial catalogs."  President's Fiscal Year 1998 Budget Proposal for Medicare, Medicaid, and Welfare: Hearing Before the S. Comm. on Finance, 105th Cong. 265 (1997) (statement of Donna E. Shalala, Sec'y of Health and Human Servs.).

---

[1]This portion of the regulation was never implemented, due to associated paperwork and reporting burdens which the Office of Management and Budget did not approve.  See Plaintiffs' Addendum ("P. Add.") 130; Deferred Joint Appendix ("JA") 25213-14; Defs' Exs. 1059-60.

Congress ultimately limited the typical payment for Part B drugs to "95 percent of the average wholesale price." Pub. L. No. 105-33, § 4556(a), 111 Stat. at 462-63. The accompanying House report explained that the Secretary retained responsibility for "determining the average wholesale price," and expressed an expectation that the Secretary would "take into consideration commercially available information" including commercially published or reported data. H.R. Rep. No. 105-149, at 1354. The report further stated that, in addition to reducing the rate of drug reimbursement, the Committee would monitor average wholesale prices to ensure that the statute's reform would "not simply result in a 5% increase in AWPs." Id. Congress likewise ordered the Secretary of Health and Human Services to study the legislation's effect on average wholesale prices of covered drugs, and to report her findings to Congress by July 1999. Pub. L. No. 105-33, § 4556(c), 111 Stat. at 463.

Subsequent investigations by the Department of Health and Human Services Inspector General revealed further disparities in Medicare drug pricing. Two Inspector General reports, issued in December 1997 and November 1998, found that published average wholesale prices for "22 of the top drugs paid by Medicare" exceeded the price advertised to Medicare providers by forty-one percent. P. Add. 131. See also Defs' Ex. 1075, at 7. The Secretary of Health and Human Services reiterated these findings in her 1999 report to Congress, concluding that "most drugs can

-8-

be obtained at a much lower cost than the AWP," and that this
discrepancy had caused Medicare to consistently overpay for Part
B drugs.  P. Add. 130-31.

The following year, HCFA proposed to allow Medicare carriers
to set payment rates for forty-nine Medicare drugs using "more
accurate wholesale prices" compiled by the Department of Justice
during an investigation into drug pricing.  Defs' Ex. 1090, at 2.
Members of Congress wrote to the Secretary of Health and Human
Services to object on a variety of grounds, including that such
action would jeopardize the financial viability of outpatient
oncology practices and that such action was beyond HCFA's
authority.  JA 25278-79, 25282-83; Defs' Ex. 1087.

At approximately the same time, the House Committee on
Commerce expressed "deep concerns" to the pharmaceutical industry
over results of its own pricing investigation, which "strongly
suggest[ed]" that certain drug manufacturers were deliberately
inflating their reported average wholesale prices in order to
increase sales.  P. Add. 147.  The Committee condemned such
actions as "wholly inappropriate," and stated that it had
referred its findings to both HCFA and the Department of Justice
in the hope that they would take steps "to protect Medicare and
its beneficiaries from this type of abuse in the future."
P. Add. 148.

Before year's end, Congress enacted the Medicare, Medicaid,
and SCHIP Benefits Improvement and Protection Act of 2000, which

-9-

required the Comptroller General to study and report on the drug reimbursement system, and empowered the Secretary to revise the system based on that report notwithstanding prior law.  Pub. L. No. 106-554, § 429(a)-(b), 114 Stat. 2763, 2763A-522 to 2763A-524.  The Act required that the Secretary review the Comptroller General's report before "directly or indirectly decreas[ing] the rates of reimbursement" for covered drugs. Pub. L. No. 106-554, § 429(c), 114 Stat. at 2763A-524.

The Comptroller General's report, released in September 2001, found further discrepancies between drugs' reported prices and their actual market prices, amounting to average discounts of between 13% and 34% for most physician-administered drugs under Part B.  JA 26041.  Following the report, HCFA solicited comments on various proposals to revise the drug reimbursement system under Part B.  68 Fed. Reg. 50,428 (Aug. 20, 2003).  Before the agency issued a final rule, Congress enacted the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173, § 303(c)-(d), 117 Stat. 2066, 2239-52, replacing the existing system with one based on either a competitive acquisition program or an average sales price for the vast majority of drugs provided after 2004.  The Act also provided a phase-out period, reimbursing drugs provided before 2004 at 95% of average wholesale price, and drugs provided in 2004 at 85% of that price.  Id. § 303(b), 117 Stat. at 2238-39 (codified at 42 U.S.C. § 1395u(o)(1)(A)(i), (4)(A)).

-10-

**II. Facts and Prior Proceedings**

The present appeal arises out of a "massive nationwide multi-district class action" over pharmaceutical companies' pricing of Medicare drugs from 1991 to 2003. <u>In Re Pharm. Indus. Average Wholesale Price Litig.</u>, 491 F. Supp. 2d 20, 29 (D. Mass. 2007). As relevant here, patients and third-party payors in Massachusetts alleged that pharmaceutical manufacturers had violated state law against unfair and deceptive trade practices by fraudulently and grossly inflating the drug prices they reported in industry publications, using those false prices to increase their sales. <u>Id.</u> at 29-30. Because patient costs and copayments under Medicare and private plans were pegged to these inflated prices, plaintiffs alleged that they had paid vastly more than the actual prices of defendants' drugs. The district court structured plaintiffs' suit into two tracks of defendants for trial, placing AstraZeneca among those in the first track. <u>See id.</u> at 29.

Before trial, both sides moved for summary judgment on the meaning of "average wholesale price" in the Balanced Budget Act of 1997. Defendants contended that the phrase required Medicare to pay whatever prices a drug manufacturer reported in industry publications, regardless of whether the listed prices accurately reflected the price charged by the manufacturer. The district court rejected that position, reasoning that Congress did not intend to "surrender[] all control over Medicare fiscal

responsibility by anchoring Medicare reimbursement to a metric
that is wholly dictated by the pharmaceutical industry." In Re
Pharm. Indus. Average Wholesale Price Litig., 460 F. Supp. 2d
277, 286 (D. Mass. 2006).  The court concluded that average
wholesale price was "not a term of art for any price the
pharmaceutical industry places in the industry publication," but
should rather be read in light of its plain meaning to include a
reflection of a drug's true sales price including discounts and
rebates.  Id. at 287-88.

Following a twenty-day bench trial, the district court held
AstraZeneca liable for unfair and deceptive trade practices in
the pricing of its drug Zoladex.  In Re Pharm. Indus. Average
Wholesale Price Litig., 491 F. Supp. 2d at 102-03.  The court
found that AstraZeneca had listed Zoladex's price at spreads
exceeding 169% above its actual average price, and had actively
used this spread to increase sales.  Id. at 102.  In light of the
company's "grossly inflated" pricing, and its pattern of
"manipulating and marketing the spread with gusto," the district
court "easily" found AstraZeneca to have violated state law.  Id.
at 103.  The district court held AstraZeneca liable for just
under $13 million in damages to plaintiffs, and entered judgment
pursuant to Fed. R. Civ. P. 54(b) on November 20, 2007.  See In
Re Pharm. Indus. Average Wholesale Price Litig., 520 F. Supp. 2d
267, 273 (D. Mass. 2007).  AstraZeneca timely appealed.  JA 323-
24.

-12-

**ARGUMENT**

I.   **THE PHRASE "AVERAGE WHOLESALE PRICE" IN THE BALANCED BUDGET ACT DOES NOT GRANT THE PHARMACEUTICAL INDUSTRY UNFETTERED DISCRETION TO REPORT DRUG PRICES THAT BEAR NO RELATION TO PRODUCTS' ACTUAL PRICES.**

Since its inception, Medicare Part B reimbursement has been based on the principle that providers may recover only a reasonable charge for their services or drugs.  Pub. L. No. 89-97, sec. 102, § 1833(a), 79 Stat. at 302; 56 Fed. Reg. at 25,794.  The introduction of average wholesale price into the Medicare lexicon--first through the Secretary's 1992 regulations, and later through the Balanced Budget Act of 1997--did not alter this basic tenet of the program.  AstraZeneca provided Medicare and plaintiffs with fictional prices that bore no reasonable relationship to what was actually charged in the marketplace.  Nothing in the Balanced Budget Act justifies such a dramatic break from the fiscal foundations of the Medicare system.  As the district court recognized, both the text of the statute and the regulation on which it was based show a clear intent that average wholesale price, like any other metric for reimbursement under Medicare, reflect the actual price of the product that program beneficiaries receive.  The district court's judgment in this respect should be affirmed.

1.  When HCFA first adopted average wholesale pricing in 1992, as an alternative to a nationwide fee schedule, the agency expressly stated that its new approach to drug reimbursement

-13-

would "continue to pay for [drugs] under the current 'reasonable charge' system." 56 Fed. Reg. at 25,800 (citing Pub. L. No. 101-239, sec. 6102(a), § 1848(j)(3), 103 Stat. 2106, 2184 (1989)). HCFA suggested a 15% payment discount on the assumption that the result would most accurately approximate the "true cost" borne by physicians in the marketplace. Id. at 25,800-01. When comments on the proposed regulation called the accuracy of that assumption into question, the agency amended its final rule to allow reasonable payment at the full value of average wholesale price, again demonstrating its intent to provide payment at a rate that would be reasonable in light of physicians' actual costs. 56 Fed. Reg. at 59,524-25.

The Balanced Budget Act reflects that same understanding. The statute requires that payment be based on "average wholesale price"--a term that on its face contemplates an average of actual prices. See Gen. Motors Corp. v. Darling's, 444 F.3d 98, 108 (1st Cir. 2006) (barring absurd results or inherent ambiguity, a statute's plain language governs). Moreover, the phrase echoes the standard previously used by the agency. As AstraZeneca acknowledges, "Congress is presumed to have legislated with knowledge of such an established usage of an executive department of the government." Br. 49 (quoting Nat'l Lead Co. v. United States, 252 U.S. 140, 147 (1920)).

Indeed, Congress did not disclaim the agency's focus on reasonable charges, but rather reinforced it, reducing drug

-14-

payments from 100% to 95% of average wholesale price.  The
accompanying House report likewise indicated that manufacturers
did not possess carte blanche to inflate their reported prices,
stating that the Committee on the Budget would monitor those
prices "to ensure that this provision does not simply result in a
5% increase in AWPs."  H.R. Rep. No. 105-149, at 1354.  And when
the House Committee on Commerce discovered that manufacturers had
increased their listed prices in just such a fashion, it decried
the actions as "wholly inappropriate" and an "abuse" of the
Medicare system, referring the findings to both HCFA and the
Department of Justice to remedy the situation.  P. Add. 148.

There is no indication that Congress authorized the practice
of AstraZeneca and the handful of other drug manufacturers whose
listed prices were so abusive as to lack any resemblance to the
actual prices of their drugs.  The notion that Congress intended
to grant manufacturers unfettered discretion to adopt spreads
exceeding 150%, and cabin the problem by reducing reimbursement
rates by five percent, is difficult to fathom.  Such an extreme
deviation from Medicare's thirty-year commitment to reasonable
charges finds no mention in the text or legislative history of
the Balanced Budget Act, and should be rejected.

2.  AstraZeneca's insistence (Br. 46-53) that Congress
required average wholesale price to be measured exclusively by
industry publications, divorced from actual prices, is wide of
the mark.  Congress may have expected that average wholesale

-15-

prices would be approximated through sources including industry publications.  E.g., H.R. Rep. No. 105-149, at 1354; 56 Fed. Reg. at 25,800.  But nothing in the statute so requires.  The statute refers to average wholesale price, not to industry publications. When Congress intended to require HCFA to use industry publications in its administration of the Social Security Act, it said so.  E.g., 42 U.S.C. § 1396r-8(k)(7)(C)(iii) (defining a drug's marketing and sale based on "a published national listing of average wholesale prices selected by the Secretary").

    HCFA elected to measure average wholesale price using industry publications based on the belief that they would reflect a reasonable estimate of actual drug prices in the marketplace-- not a fabricated figure to be devised entirely at manufacturers' discretion.  See 56 Fed. Reg. at 25,800; 56 Fed. Reg. at 59,525. That expectation was fulfilled by most manufacturers, whose list prices reflected only limited markups from their true prices. HCFA noted that manufacturers' reported average wholesale prices were not exact proxies for the prices available in the marketplace, citing Inspector General reports that called into question the accuracy of reported prices for some drugs.  56 Fed. Reg. at 25,800.  See also H.R. Rep. No. 105-149, at 1354.  But as the agency made clear, those early investigations were of limited scope, focusing on a small number of drugs and drawing no conclusions about the frequency of discounts or the ability of physicians to regularly obtain them.  See, e.g., JA 25042, 25052,

-16-

25054.  For many drugs, by contrast, manufacturers' listed prices did reflect a reasonable approximation of their actual prices in the marketplace.  Through 2003, reported prices for a preponderance of single-source drugs did not exceed actual sales prices by more than twenty percent.  <u>In Re Pharm. Indus. Average Wholesale Price Litig.</u>, 491 F. Supp. 2d at 40, 87-88.  The Comptroller General's 2001 report likewise found that "[f]or most physician-administered drugs, the average discount from AWP ranged from 13 percent to 34 percent."  JA 26041.

HCFA tolerated those limited markups both as a concession to administrative efficiency and as a means to ensure sufficient payment to cover actual physician drug costs, using manufacturer price listings as a convenient and inexpensive method to measure average wholesale prices.  <u>See</u> <u>supra</u> pages 4-7.  The House report accompanying the Balanced Budget Act likewise contemplated that the agency would continue to "consider[] commercially available information including such information as may be published or reported in various commercial reporting services" in determining average wholesale prices under the statute.  H.R. Rep. No. 105-149, at 1354.  But that does not mean that whatever was reported in an industry publication thereby became a drug's average wholesale price.  To the contrary, the House report specifically stated that the task of "determining the average wholesale price" would fall to the Secretary, not to drug

-17-

manufacturers, and did not require that the Secretary use any particular source for that purpose.  Id.

A reading of the statute that divested the Secretary of such authority, placing it entirely in the hands of private drug manufacturers, would run counter to the longstanding traditions of the Medicare program.  It would rob "average" and "wholesale" of their meaning entirely.  And as the district court explained, it would "produce[] the absurd result of penalizing the very beneficiaries the statute was designed to help" by "intentionally subjecting Medicare beneficiaries, who are often old, poor, and sick, to exorbitant drug co-payments based on artificially high prices."  In Re Pharm. Indus. Average Wholesale Price Litig., 460 F. Supp. 2d at 287.  Nothing in the statute compels such an interpretation.

AstraZeneca systematically manipulated its reported prices, and "unfairly took advantage of the [Medicare] system by setting sky high prices with no relation to the marketplace."  In Re Pharm. Indus. Average Wholesale Price Litig., 491 F. Supp. 2d at 95.  Those practices are inconsistent with the "reasonable charge" principles of Medicare's reimbursement program, and inconsistent with the language of the statute.  It is no more statutorily authorized than, for example, a physician who claims that certain procedures are necessary for the treatment of a patient, when in fact they are not.  See, e.g., 42 U.S.C. § 1395x(v)(1)(A), (ff)(2), (fff)(2)(E).

-18-

That such opportunities for abuse exist in the Medicare statute does not mean that Congress has authorized them.  The Balanced Budget Act and its history indicate that Congress intended average wholesale prices to reasonably reflect actual average prices for drugs in the marketplace, not whatever fanciful prices a pharmaceutical manufacturer might provide.  The portion of the district court's judgment so holding should be affirmed.

### CONCLUSION

For the foregoing reasons, the district court's interpretation of "average wholesale price" in the Balanced Budget Act of 1997 should be affirmed.

Respectfully submitted,

GREGORY G. KATSAS
 Assistant Attorney General

MICHAEL J. SULLIVAN
 United States Attorney

MICHAEL S. RAAB
 (202) 514-4053
ERIC FLEISIG-GREENE
 (202) 514-4815
 Attorneys, Appellate Staff
 Civil Division, Room 7214
 U.S. Department of Justice
 950 Pennsylvania Ave., N.W.
 Washington, DC  20530-0001

SEPTEMBER 2008

**CERTIFICATE OF COMPLIANCE**

Pursuant to Rules 29(c)(5) and 32(a)(7)(C) of the Federal Rules of Appellate Procedure, I hereby certify that this brief complies with the type-volume limitation in Rules 29(d) and 32(a)(7)(B).  The brief is presented in monospaced Courier New font of no more than 10.5 characters per inch, and contains 4,128 words from its Statement of Jurisdiction through its Conclusion according to the count of this office's word processing system.

_____/s/_____
Eric Fleisig-Greene
Counsel for Appellee

**CERTIFICATE OF SERVICE**

I hereby certify that on September 16, 2008, I filed and served the foregoing brief by causing ten copies (including one electronic version) to be sent to this Court by Federal Express overnight delivery, and by causing two copies to be sent by overnight mail to:

D. Scott Wise
Davis Polk & Wardwell
450 Lexington Avenue
New York, NY 10017
(212) 450-4000

Steve W. Berman
Hagens Berman Sobol Shapiro LLP
1301 5th Avenue, Suite 2900
Seattle, WA 98101-0000
(206) 623-7292

_____/s/_____
Eric Fleisig-Greene