IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

IN RE:                              )
                                    )  CA No. 01-12257-PBS
PHARMACEUTICAL INDUSTRY AVERAGE     )
WHOLESALE PRICE LITIGATION          )  Pages 1 - 42
                                    )


MOTION HEARING (ASTRAZENECA)

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE


United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
July 12, 2010, 9:37 a.m.


LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 7200
Boston, MA  02210
(617)345-6787

1    A P P E A R A N C E S:

2

    FOR THE PLAINTIFFS:
3
        JENNIFER FOUNTAIN CONNOLLY, ESQ., Hagens Berman Sobol
4    Shapiro, LLP, 1629 K Street, NW, Suite 300, Washington, D.C.,
    20006, for the Class Plaintiffs.
5
        EDWARD NOTARGIACOMO, ESQ., Hagens Berman Sobol Shapiro,
6    LLP, 55 Cambridge Parkway, Suite 301, Cambridge, Massachusetts,
    02142, for the Class Plaintiffs.
7
        KENNETH A. WEXLER, ESQ., Wexler Wallace, LLP,
8    55 West Monroe Street, Suite 3300, Chicago, Illinois, 60603,
    for the Class Plaintiffs.
9

10   FOR THE DEFENDANTS:

11       JOEL M. COHEN, ESQ. and SCOTT WISE, ESQ., Davis Polk &
    Wardwell, LLP, 450 Lexington Avenue, New York, New York, 10017,
12   for AstraZeneca.

13

14

15

16

17

18

19

20

21

22

23

24

25

1          P R O C E E D I N G S

2          THE CLERK:  In Re:  Pharmaceutical Industry Average

3    Wholesale Price Litigation, Civil Action 01-12257, will now be

4    heard before this Court.  Will counsel please identify

5    themselves for the record.

6          MR. NOTARGIACOMO:  Good morning, your Honor.  Ed

7    Notargiacomo, Hagens Berman Sobol Shapiro, for the class

8    plaintiffs.

9          MS. CONNOLLY:  Good morning, your Honor.  Jennifer

10   Connolly, Hagens Berman Sobol Shapiro, for the class

11   plaintiffs.

12         MR. WEXLER:  Ken Wexler, your Honor, from Wexler

13   Wallace for the class plaintiffs.

14         MR. COHEN:  Good morning, your Honor.  Joel Cohen from

15   Davis Polk for AstraZeneca.

16         MR. WISE:  Scott Wise from Davis Polk for the same,

17   your Honor.

18         THE COURT:  It's good to see you all again.  So I've

19   got three AWP matters on today because I thought it might be

20   more convenient for people, and I thank you for rescheduling.

21   As you may have heard, my stepfather died, so I have the family

22   obligations this afternoon, so thank you for rescheduling into

23   the morning.

24         Let me start off by saying, is this the motion for

25   preliminary approval?

1          MR. NOTARGIACOMO:  Yes, it is, your Honor.

2          THE COURT:  The reason I don't just sign it is because

3     I know these are very complex settlements, and I'd like to

4     understand the differences between what we've done this time

5     and what we've done all the other times because I like to make

6     sure there's sort of fairness across the board.  Sometimes

7     these are different just because now it's two years later and

8     we've learned more.  Sometimes it's different because of the

9     drug and the negotiating strategy.  But I at least like to

10    understand it, and I don't always get that from the briefs.

11    so maybe you can start off and explain it to me.

12         MR. NOTARGIACOMO:  Sure, your Honor.  I can start off

13    by saying that in the first instance, just as a general matter,

14    we in the negotiations, both in reaching a settlement and in

15    the subsequent negotiations over papering the settlement, we

16    were very cognizant of what your Honor had approved of and

17    disapproved of in previous settlements; and in every instance

18    we tried to use something that had already been approved by

19    your Honor.  And there are a few differences, but they are

20    minor.  Now, with your Honor's permission, I will just walk

21    through very quickly a brief thumbnail of the settlement and

22    point out some of the differences between this settlement and

23    some of the others.

24         So we start off with a $90 million -- this, of course,

25    your Honor, is in the context of the two settlements that we

69945a20-44f7-40d7-b22f-e93ac7a69dbf

1   filed, one being the Massachusetts-only settlement for

2   $13 million, which your Honor has electronically endorsed,

3   although there is an issue of endorsement of an actual

4   preliminary approval agreement with respect --

5           THE COURT:  Right, I understand that case, I mean,

6   because I tried it basically.  Isn't that the case I tried?

7           MR. NOTARGIACOMO:  Yes, it is, your Honor.

8           THE COURT:  So that's easy.  It was the big one that

9   I'm worried about.

10          MR. NOTARGIACOMO:  Okay.  So this settlement is the

11  national, and it includes all states except Massachusetts,

12  which is covered by the separate agreement.  It's a total of

13  $90 million for Classes 2 and 3 only, Class 2 being what your

14  Honor previously certified in Massachusetts only as the Medigap

15  class of insurers, those insurers paying some portion of the

16  20 percent of their --

17          THE COURT:  This is national?

18          MR. NOTARGIACOMO:  This is national.  And Class 3.

19  And that Class 2 runs from 1991 until the end of 2004, and that

20  was the time period your Honor had previously delineated for

21  Class 2 in other settlements because basically AWP was no

22  longer the basis of payments for the federal government,

23  Medicare and Medigap insurers, after the end of 2004.

24          Then we have Class 3, which is TPPs paying outside of

25  Medicare, as well as consumers in Class 3, who consist of those

1  who pay a percentage copayment, and cash payors, people who

2  have no coverage and are paying out of pocket for the drug.

3          THE COURT:  So it's cash payors as well?

4          MR. NOTARGIACOMO:  That's correct, your Honor, and

5  that's consistent with what we've done in Track Two and in

6  other settlements like GSK that included in Class 3 cash payors

7  as well as percentage co-payors.

8          THE COURT:  All right.  And what are the years?

9          MR. NOTARGIACOMO:  For Class 3, it's 1991 through the

10  date of or close to the date of the signing of the agreement in

11  June of 2010, your Honor.

12          THE COURT:  Why?

13          MR. NOTARGIACOMO:  That's consistent with what we've

14  done in previous settlements.  And I think the idea was, there

15  are still contracts out there in Class 3 in the private context

16  that reference AWP as a holdover from the previous period, and

17  we thought it appropriate to, as of the date of the settlement,

18  cut that class off.

19          THE COURT:  Okay.  I'm sure you'll get to this.  Do

20  you pay the TPPs similarly in what I'll call the out years as

21  the heartland years?

22          MR. NOTARGIACOMO:  Yes, your Honor.  I can skip to

23  sort of the allocation.

24          THE COURT:  I'll listen in your order.

25          MR. NOTARGIACOMO:  Okay.  So the $90 million was

1  allocated separately by negotiations by consumer allocation

2  counsel and TPP allocation counsel as follows:  Consumers are,

3  of the $90 million, are awarded up to $10 million, and TPPs

4  get --

5          THE COURT:  So say it again.  Consumers get

6  $10 million?

7          MR. NOTARGIACOMO:  That's correct, your Honor.  And

8  here we come to one of the differences in this settlement that

9  doesn't exist, for instance, in Track Two.  The $10 million is

10 subject to a spillover, so the $10 million is the high number.

11 The consumers get paid up to $10 million.  If they don't claim

12 or don't distribute --

13         THE COURT:  Well, why is it a high number?

14         MR. NOTARGIACOMO:  Because Dr. Hartman's analysis of

15 the consumers in Class 3 shows that there are very few

16 co-payors and cash payors in Class 3 for the drugs at issue

17 here.  I think his calculations are that of Class 3 damages,

18 consumers incurred about between 2 and 2.5 percent of all

19 damages.  If you add in Class 2 damages, that percentage as a

20 whole goes down to close to 1 percent.  Here consumers are

21 being allocated 11 percent of the total settlement.

22         THE COURT:  What does 2.2 percent come out to

23 dollarwise?

24         MR. NOTARGIACOMO:  It depends on what the overall

25 number is you're applying it to.  I'm not sure in what context.

1          THE COURT:  I know that.  So take -- you've allocated

2     $10 million for the third class, right, for consumers?

3          MR. NOTARGIACOMO:  Right, the only class that includes

4     consumers in this settlement.

5          THE COURT:  Right.  So what do you think a realistic

6     dollar amount is?

7          MR. NOTARGIACOMO:  For what, your Honor?

8          THE COURT:  For damages to the consumers in that.

9          MR. NOTARGIACOMO:  Well, Dr. Hartman calculated total

10    single damages for Classes 2 and 3 total at $231 million.

11    Class 3, which is what that 2.5 percent applies to, is

12    $157 million.  So 2.5 percent of $157 million --

13         THE COURT:  Good for you, you brought your calculator.

14         MR. NOTARGIACOMO:  I have my iPhone, your Honor.

15    There's an app for everything -- is $3.9 million.

16         THE COURT:  So $3.9 million would go to consumers?

17         MR. NOTARGIACOMO:  That would just be their allocation

18    if we did it strictly based on what Dr. Hartman found.

19         THE COURT:  Then why are we giving them $10 million?

20    Is that the tripling?

21         MR. NOTARGIACOMO:  Well, that accounts for the

22    heartland period where we do triple for consumers.  So we are

23    paying them in some instances greater than their single out

24    of --

25         THE COURT:  Sure.  We've done that have before.  I'm

69945a20-44f7-40d7-b22f-e93ac7a69dbf

1    just trying to understand it.  I'm trying to understand the

2    dollars, which is what I don't get from -- maybe it's in here

3    somewhere, but I want to understand.  So $3.9 million is the

4    third class, right?

5              MR. NOTARGIACOMO:  Of consumers.

6              THE COURT:  Consumers.  So how do we get -- that's if

7    everybody submits a form, which we know won't happen.  So the

8    heartland period is from when?

9              MR. NOTARGIACOMO:  The heartland period is from 1997

10   through 2003.

11             THE COURT:  Not 2004?  No?  Wouldn't it be consistent

12   with Medigap?  Or maybe not.

13             MR. NOTARGIACOMO:  Let me just check, your Honor.  You

14   may be right.  I may have just misspoke.

15             Yes, it's through the end of 2003, so the beginning of

16   2004.

17             THE COURT:  It should be the same for both.  Is there

18   an issue with that?

19             MR. NOTARGIACOMO:  When you say the same for both, you

20   mean --

21             THE COURT:  For Medigap and for Classes 2 and 3, it

22   should have the same --

23             MR. NOTARGIACOMO:  So that Class 2 should end at the

24   time the heartland period for the consumers in Class 3 ends or

25   vice versa?

1          THE COURT:  Well, what did I approve?  Is this what I

2     approved, or is this how you allocated the settlement?

3          MR. NOTARGIACOMO:  This is how the Court has defined

4     the heartland period previously.

5          THE COURT:  All right, but this is what I want to make

6     sure of.  Maybe, but I don't always have the spread of how

7     they're all different.  Is there a rational reason why we end

8     the consumer class earlier than we end the third-party payor

9     class?

10          MR. NOTARGIACOMO:  No, your Honor.  The 2003 -- and

11     maybe I misspoke, so let me be clear.  Consumers are able to

12     make claims throughout the entire period --

13          THE COURT:  I understand that, but there's a heartland

14     period where you get the trebling, right?  We've done that

15     before, I think.  So that's because it's a stronger claim, it's

16     before the statute passed, so it should be the same cutoff date

17     as with the third-party payors.

18          MR. NOTARGIACOMO:  Oh, with Class 2 third-party

19     payors?

20          THE COURT:  Yes, that's all I'm saying, it should be

21     consistent.  Does that make sense or not?  Does that violate --

22          MR. NOTARGIACOMO:  Yes, your Honor, and I need to go

23     back to look to see and make sure.  I may have just misspoken.

24     It may be --

25          THE COURT:  All right, so just make them consistent.

1   I don't know that there would be a care about that.  The

2   heartland period should be the same -- because the principled

3   reason, if I'm remembering correctly, it's when the statute

4   passed.  The whole world knew.  Congress knew.  Congress

5   finally fixed it.  So that's when should be the end of what we

6   call the "heartland period."  And if there's a problem with

7   that, get back to me, just to make that on the documents that I

8   submit, okay?  Unless I'm wrong.  But you live and breathe this

9   stuff, and I forget from time to time.

10       MR. NOTARGIACOMO:  I live and breathe it, and I forget

11   from time to time too, your Honor.

12       THE COURT:  All right, so the principal thing that

13   we're talking about here is that the heartland period or the

14   key area of violation ended when the statute passed, the

15   effective date of the statute.  Or was it a year later?  See,

16   this is what I can't remember.  Do you all remember, because it

17   took a year for them to fix it with the regulations?

18       MR. NOTARGIACOMO:  I think you're right, and that's

19   why the Class 2 period ends not in 2003 but the end of 2004.

20       THE COURT:  I think that's right, and so just make it

21   consistent and principled with that theory.  As soon as it took

22   effect, it was effective with the regulations, is when the

23   consumers stopped getting trebled.

24       MR. NOTARGIACOMO:  Rather than when they passed the

25   legislation.

1          THE COURT:  Yes, I think that's right.  Does anyone

2    have any strong feelings about this one way or another?  All

3    right, just I want to be sure that we're consistent across when

4    we do it.

5          MR. NOTARGIACOMO:  Understood, your Honor.

6          THE COURT:  All right, so then that's the consumers.

7          Now, we know from Professor McGovern that unless we do

8    a good job on this, we're only going to get a 3 to 4 percent

9    return rate.  What have you been experiencing?

10          MR. NOTARGIACOMO:  Somewhere between 4 and 6 percent,

11    depending on the settlement.  But before we gloss over it, I

12    wanted to go back.  And I'll immediately get to that issue,

13    your Honor, and the difference between this settlement and the

14    previous settlements that tries to address that.  But before we

15    gloss over it, the $10 million, as I said, is a high watermark.

16    There is a provision in this settlement which doesn't exist in

17    some of the other settlements that if that money is not

18    distributed to consumers, that money inures back to the benefit

19    of TPPs and ISHPs, so they would get the balance of whatever

20    doesn't get used or distributed to consumers.  And that did not

21    exist in Track Two.  It's unlike what we've done previously in

22    GSK, for instance.

23          THE COURT:  Why?

24          MR. NOTARGIACOMO:  I think the thought was, and this

25    was part of the allocation --

1        THE COURT:  This is why I love seeing you.  It's why I

2   don't just sign on the dotted line.  I want to understand the

3   inner workings here.

4        MR. NOTARGIACOMO:  I think part of the rationale there

5   was that we expect the $10 million to compensate everybody in

6   the class based on the allocation formulas that we have, so we

7   don't expect that anyone is going to go without full payment.

8   But at the same time we feel that $10 million, given the

9   numbers that Dr. Hartman posited, may be on the high end; and

10  the TPPs insisted that, because they're getting pennies on the

11  dollar rather than full payment, that the excess money, rather

12  than go back to defendants or be used for some cy pres

13  purposes, be used to further satisfy their claims.

14       THE COURT:  I'm completely content with that.  So let

15  me just say, I've always been uncomfortable with these huge,

16  massive cy pres funds.  I never mind a few thousand here and

17  there going to an excellent charity, but when we're talking

18  about $10 million -- and the judges were talking about that.

19  It was a big topic at the recent Multidistrict Litigation

20  Conference.  So it's much more comfortable to send it back as

21  long as the consumers are fully compensated, but the question

22  that I have is, does it make sense to -- you're trebling the

23  1997 to 2003 or 2004 people?

24       MR. NOTARGIACOMO:  For Zoladex heartland.

25       THE COURT:  So with respect to people, especially cash

69945a20-44f7-40d7-b22f-e93ac7a69dbf

1   payors after that point, does it make sense, first, to give

2   them some multiple damages?  What was the thought process

3   there?

4          MR. NOTARGIACOMO:  Before we discuss that, your Honor,

5   let me talk about a little bit of the -- because I think your

6   Honor's concern is, are we going to get this $10 million out to

7   consumers or not?

8          THE COURT:  Right.

9          MR. NOTARGIACOMO:  And one of the differences in this

10  settlement --

11         THE COURT:  Because my concern is, what if it's much

12  lower than what you're expecting, much lower?  Because we've

13  seen bad numbers, as low as 3 or 4 percent.  I hate to say it

14  because it's mean, it's a dying and old class and --

15         MR. NOTARGIACOMO:  Understood, your Honor.  But one of

16  the differences in this settlement that hasn't occurred

17  previously in AWP settlements is the adoption of what I'm

18  calling the "McKesson model."  So in McKesson, the ISHPs agreed

19  to produce data on their insureds, including contact information

20  and payment information, where available, and to use best

21  efforts.  They didn't guarantee that they could go back to the

22  beginning of the class period.

23         THE COURT:  So in exchange for getting the spillover,

24  they've agreed to give you the data?

25         MR. NOTARGIACOMO:  That's correct, your Honor.  That's

1    the ISHPs.

2            THE COURT:  So it's Aetna?  Who is it?

3            MR. NOTARGIACOMO:  It's actually 70 percent of the

4    covered lives in the United States, Exhibit A, I think to the

5    settlement agreement.

6            THE COURT:  So the big ones like --

7            MR. NOTARGIACOMO:  It's all of the ISHP members, and

8    it includes Aetna, Humana, Cigna, all of the largest

9    third-party payors in the country.

10           THE COURT:  Okay.  So in exchange for them getting the

11   spillover, they've agreed to give you the data?

12           MR. NOTARGIACOMO:  Correct.

13           THE COURT:  And what about the cash payors, how are we

14   going to get to them?  That's always a challenge.

15           MR. NOTARGIACOMO:  Right.  And currently the cash

16   payors, the cash payors, we have a robust publication strategy

17   to try to reach cash payors.  I mean, it applies both to

18   percentage co-payors and cash payors because we won't be able

19   to, even with the data, capture all of the percentage co-payors,

20   so we need to do a publication in order to try to reach other

21   people, including cash payors, who wouldn't necessarily be in

22   the data, who wouldn't be in the data at all.

23           THE COURT:  So let me just ask you this because I know

24   we've gone this route before.  Is there any way of getting to

25   some of -- I forget the big pharmacies -- the CVSs up here?  I

1   don't know what the other big chains are.

2          MR. NOTARGIACOMO:  I know there are probably five or

3   six major retailers, drug retailers, that's not provided for in

4   the settlement currently, your Honor, where we would

5   subpoena -- I think you're referencing a subpoena to those

6   entities?

7          THE COURT:  We've done that before, right?

8          MR. NOTARGIACOMO:  I think we've done it in McKesson.

9   I don't think we've done it in any of the AWP settlements.

10          THE COURT:  Right.  You know, in my mind, they blur.

11   So does that make some sense?  As you know, I have no trust in

12   the publication strategy.  I just don't think people -- I think

13   you do your best.  I'm not knocking you.  I'm just saying, I

14   don't think people read them, and it's hard to -- so I think

15   it's better coming through your mailbox.  And I must say, I've

16   recently gotten a notice of class settlement for my car or

17   something.  I couldn't understand it, and I was laughing

18   because that's what people must say when they see mine.  So,

19   you know, they're just very difficult to follow, so --

20          MR. NOTARGIACOMO:  And I think one of the reasons we

21   didn't include it here, your Honor, is because the evidence on

22   the existence of cash payors is -- certainly they do exist, and

23   we see them come in from other settlements, but they're a very,

24   very tiny percentage of --

25          THE COURT:  Because we don't get to them.

1          MR. NOTARGIACOMO:  They're a very small class in

2     Class 3.

3          THE COURT:  We don't get to them, right?

4          MR. NOTARGIACOMO:  I think it's not just that we don't

5     get to them.  I think that there are very few of them.  For a

6     drug like Zoladex which is very expensive, either you have

7     private insurance, or you happen to be rich enough to be able

8     to afford it.  Otherwise, if you're not, it gets picked up by

9     other public assistance programs.  So what you're really doing

10    is, we're looking to find that very minuscule --

11         THE COURT:  I see.  So you think that the cost benefit

12    for this particular drug is not worth it?

13         MR. NOTARGIACOMO:  That's correct, your Honor.

14         THE COURT:  Because of the nature of this drug.

15    Whereas, it might on a Lipitor or something, you know,

16    something that's --

17         MR. NOTARGIACOMO:  On a more modestly priced drug,

18    you'll find more people who can afford to pay out of pocket and

19    wouldn't need to go to some sort of public assistance in order

20    to pay for it.

21         THE COURT:  I see.  So, anyway, there's a spillover.

22    Now, what about the ISHPs?

23         MR. NOTARGIACOMO:  The ISHP provisions in this

24    settlement are almost identical to the provisions that have

25    been approved previously by your Honor in Track Two and in GSK.

1    They are originally allocated half of the money set aside for

2    third-party payors, 50 percent.  Even though as a predicate to

3    signing this agreement they had to show us 60 percent, they

4    actually came up with 70 percent of the covered lives in the

5    United States, which we have found previously to be a very good

6    proxy for their claims ultimately.

7              THE COURT:  So the ISHPs, I forget, you told me

8    $90 million is the national settlement?

9              MR. NOTARGIACOMO:  $90 million is national.

10   $80 million gets set aside for a third-party payor class and

11   ISHPs.  They were originally allocated $40 million.  That's

12   half of the $80 million.  Of that amount, we make certain

13   assumptions about attorneys' fees and cost of administration

14   and subtract that from the $40 million.  That resulting figure,

15   we take 75 percent of that, and that's the amount that the

16   ISHPs will receive as an upfront payment, and in exchange for

17   that upfront payment --

18             THE COURT:  What do you decide on attorneys' fees?

19             MR. NOTARGIACOMO:  Just for purposes only of figuring

20   out the most conservative thing by way of paying the ISHPs, we

21   assumed a 33 percent attorneys' fee.  Now, that may not be the

22   case, your Honor may award something differently, but that all

23   gets worked out on the back end so that the ISHPs and the class

24   TPPs are paying the exact same freight.  They pay the same

25   attorneys' fees, they pay the administrative fees.  At the end

1    of the day, they get the same recovery per dollar than the

2    class TPPs do.

3            THE COURT:  Who's representing the ISHPs?

4            MR. NOTARGIACOMO:  The ISHPs are represented by ISHP

5    counsel.  They're defined in the settlement agreement.  It's

6    Lowey Dannenberg and The Rollins Group, the same set of

7    attorneys that have previously represented them.

8            THE COURT:  And who's representing consumers?

9            MR. NOTARGIACOMO:  The consumers are represented by --

10   consumer counsel included attorneys for Prescription Access

11   Litigation, as well as Mr. Goldberg, who previously represented

12   consumers in negotiations in, I believe, GSK and Track Two.

13           THE COURT:  And do you similarly allocate to consumers

14   attorneys' fees and administrative costs?  How do you do that?

15           MR. NOTARGIACOMO:  That allocation was simply as a

16   matter of convenience to try to figure out what's a safe number

17   that we can calculate to give the ISHPs as an upfront payment.

18   It's only an assumption so that if you do award 33 percent and

19   we do have high administrative costs, we're very conservative

20   in the number that we've given the ISHPs up front.  It's not

21   meant to be an actual allocation.

22           THE COURT:  But how do we allocate to consumers the

23   costs and the attorneys' fees?

24           MR. NOTARGIACOMO:  All attorneys' fees and other

25   expenses are allocated in accordance with the amount put into

1     the respective pots.  So 11 percent of the money of the

2     $90 million goes to consumers.  Any bill that comes in,

3     administrative or otherwise, class fees or otherwise, gets paid

4     at the same percentage.  So consumers will pay 11 percent of

5     those bills; TPPs will pay 89 percent of those bills.

6              THE COURT:  Is that how it's been allocated before?

7              MR. NOTARGIACOMO:  That is how it's been allocated

8     previously.

9              There's no provision for money to flow back to

10    defendants, except in one instance where we have third-party

11    payor opt-outs.  If there are large or significant -- if there

12    are third-party payor opt-outs, there's a mechanism whereby

13    either we can get information from those opt-outs or estimate

14    with defendants what those third-party payors would have been

15    paid in the settlement had they opted in.  That money or that

16    percentage of the pot then gets sent back to defendants, if you

17    will.  We have done this previously.  The only other settlement

18    where it's come all the way through to the point where we had

19    distribution and we knew who the third-party payor opt-outs

20    were were GSK, and in that instance there were seven very small

21    third-party payor opt-outs, and GSK in the end decided it

22    wasn't worth the candle to try to figure out --

23              THE COURT:  Have any of them sued?

24              MR. NOTARGIACOMO:  Not to my knowledge.  I mean, I'd

25    have to check with GSK --

1           THE COURT:  You'd wonder why they'd opt out unless

2    they were going to sue.

3           MR. NOTARGIACOMO:  Many of the TPP opt-outs that --

4           THE COURT:  Those TPPs who hate class actions as a

5    principled matter?

6           MR. NOTARGIACOMO:  I'm not sure what was behind the

7    opt-out, your Honor, but as far as I know, they haven't sued.

8           THE COURT:  All right, so is there anything about this

9    before we get to the notification program that is different

10   from any of the other settlements?

11          MR. NOTARGIACOMO:  The only other difference, you

12   know -- and I'm not sure your Honor cares about this -- but the

13   only other difference is a slight difference in what the

14   defendants have to do by way of notifying class counsel if they

15   do settle with one of those TPP opt-outs.  In the past, I think

16   in the Track Two settlement, they're obligated to tell us of

17   any settlement at all with any of the opt-outs.  In this

18   instance, they only need to tell us if there's a settlement

19   greater than $1 million.  And class counsel has agreed, rather

20   than seek fees from AstraZeneca, to seek fees in whatever court

21   is appropriate, you know, based on that payment to an opt-out.

22   That's different than what was in other settlements, but --

23          THE COURT:  Any bones buried here?  Anything that

24   objectors are going to be upset about?

25          MR. NOTARGIACOMO:  Your Honor, this settlement

1    includes Pulmicort Respules, not just Zoladex.

2            THE COURT:  Okay, so tell me about that.

3            MR. NOTARGIACOMO:  Pulmicort Respules is one of the

4    drugs --

5            THE COURT:  I remember not knowing anything about

6    that.

7            MR. NOTARGIACOMO:  Pulmicort Respules is one of the

8    drugs that we were originally sued on in the class complaints,

9    and it made its way all the way through the fifth or sixth

10   iteration, whichever the last iteration of the class complaint

11   was.  And it also plays a part in your Honor's class

12   certification ruling, not in the body of it, but you certified

13   a class of purchasers of -- I forget what it's called -- either

14   defined drugs or class drugs, and Pulmicort Respules is one of

15   those drugs.  So in negotiations --

16           THE COURT:  So I've already certified a class in it?

17           MR. NOTARGIACOMO:  Even though your Honor didn't

18   concentrate on --

19           THE COURT:  I never heard of it before.  That's why

20   I'm sort of getting through this, so --

21           MR. NOTARGIACOMO:  So as part of the negotiations and

22   back-and-forth, AstraZeneca has insisted that they need a

23   release for both Zoladex and Pulmicort Respules.

24           THE COURT:  And how much money is allocated to that

25   drug?

1          MR. NOTARGIACOMO:  We don't allocate a specific amount

2     of money to that drug, but what we do, in recognition of the

3     fact that the spreads on Pulmicort Respules are much smaller

4     than Zoladex --

5          THE COURT:  What were they?

6          MR. NOTARGIACOMO:  I don't know offhand what the

7     spreads were, your Honor.  I do know that they were minuscule

8     compared to Zoladex, and in fact --

9          THE COURT:  Zoladex was, like, one of the poster

10    children for the problem.

11         MR. NOTARGIACOMO:  Correct.

12         THE COURT:  And so I understand that, but I do need to

13    get to a certain level.  What are these other drugs?

14         MR. NOTARGIACOMO:  There's only one other drug, and

15    that's Pulmicort Respules.

16         THE COURT:  Yes, but what are they?

17         MR. NOTARGIACOMO:  It's an asthma drug used primarily

18    for the treatment of pediatric asthma, I believe.

19         THE COURT:  Well, what were the spreads on them?

20         MR. NOTARGIACOMO:  Your Honor, I don't know --

21         THE COURT:  Do they go over the 30 percent yardstick?

22         MR. NOTARGIACOMO:  I believe so, but I don't know, and

23    I would have to get that number for your Honor.

24         THE COURT:  Well, let me ask you this:  If you took

25    some of this stuff, what kinds of damages do you get?

1        MR. NOTARGIACOMO:  In the settlement?  So in

2    recognition of the fact that the spreads were smaller and the

3    liability evidence was not as strong as Zoladex, what we've

4    done is, Pulmicort Respules pays out for the entire class

5    period at 25 percent of out-of-pockets.  So as compared to

6    Zoladex where on the bookends, outside the heartland period,

7    you're getting one-time out-of-pocket, you're only getting

8    25 percent for Pulmicort Respules.  The same thing for the

9    heartland period:  Across the board, it's a .25 --

10        THE COURT:  So let me just ask this:  Am I

11    releasing -- maybe I didn't notice -- did I release that for

12    Massachusetts too?  Did I approve that?

13        MR. NOTARGIACOMO:  Yes.  Massachusetts mirrors, except

14    for the fact that there's no ISHP provisions, it mirrors --

15        THE COURT:  I've never basically done anything with

16    that, so are you going to give me some memo on why I think this

17    is fair for Pulmicort -- how do you spell it, by the way?

18        MR. NOTARGIACOMO:  P-u-l-m-i-c-o-r-t R-e-s-p-u-l-e-s.

19        THE COURT:  Okay, so what page do you discuss that on

20    this brief, I mean, in other words, the fairness part of it?  I

21    know Zoladex.  I mean, I know that.  I understand that issue.

22    I understand why they're settling.  Thank you very much.  I

23    think it's time to put this case to bed.  It's been a decade.

24    We'll all have a reunion.  But I never heard of this other

25    drug.  We've all aged together, put kids through college.

1          MR. NOTARGIACOMO:  I know there's a mention of

2     Pulmicort Respules and the reason we include it in the

3     settlement, your Honor.

4          THE COURT:  Well, let me ask you, from your point of

5     view, from the defense point of view, what's your exposure on

6     it?  Do either of you know anything about Pulmicort Respules?

7          MR. COHEN:  Good morning, your Honor.  As to exposure,

8     that's a question for what they would try to prove.  Our only

9     issue is that there's a certified class that includes the

10    drugs --

11         THE COURT:  Why don't I just decertify it, rather than

12    approve something as fair that I know nothing about and

13    apparently neither lawyer knows anything about?

14         MR. COHEN:  Well, I wouldn't say we know nothing about

15    it.  Just so you know what it is --

16         THE COURT:  What was the spread on it?  How high did

17    it go?

18         MR. COHEN:  That, I don't know.

19         THE COURT:  As someone who has sat on these things,

20    for better or for worse, what seemed to become consensus was

21    that the industry, government, understood that there could be

22    as high as a 30 percent spread; and the shock, if you will, was

23    the mega-spread.  History may prove that wrong, but that's at

24    least what I've got in front of me.  So what I've tended to

25    do -- this has been your theory of the case from the

1    beginning -- is anything that was consistently above

2    30 percent, not like just one quarter but just consistently

3    above, I thought there was a problem if it was significantly

4    above, and some were a thousand percent spreads.  If it was

5    consistently below or only occasionally went to 31 percent, I

6    tended not to say it was outrageous.  Wasn't that basically

7    what's been going on as our benchmark?  So what was this?  Was

8    this above or below 30 percent?

9              MR. NOTARGIACOMO:  I don't recall, your Honor,

10   truthfully.

11             MS. CONNOLLY:  Can I speak to that for a second.  I

12   mean, I can say, your Honor, that we indicated right before we

13   started the trial that we weren't going to pursue that drug.

14             THE COURT:  Right.

15             MS. CONNOLLY:  And part of the basis of that decision

16   was that the spreads didn't justify it.  So while we can't tell

17   you the exact numbers, we decided not to go to trial based on

18   the numbers that we looked at before we went.  It was, you

19   know, something that appeared in your pretrial papers in a

20   footnote that we weren't going to be pursuing it at trial.

21             THE COURT:  So why should we be -- why should I be --

22   if there's no merit to it?  I'm just trying to understand it.

23             MR. COHEN:  From our perspective, it was simply that

24   it was in the certification order, so --

25             THE COURT:  Did you put in money in the pot for this

1    drug extra?

2        MR. COHEN:  The negotiation of the whole thing

3    included all of the subject drugs, so we didn't divide it up,

4    but our understanding when we negotiated --

5        THE COURT:  Well, aren't we better off -- and the drug

6    that so clearly was a violation of the law, in my view, aren't

7    we better off just giving those people, including the pennies

8    on the dollar TPPs, money for a drug that actually clearly was

9    a fraudulent price from one that we just don't know anything

10   about?

11       MR. NOTARGIACOMO:  I would say, your Honor, this

12   probably only really practically affects the consumer payments

13   because third-party payors are paid pro rata.  So as long as

14   everyone is claiming for the same drugs, generally their

15   payments as a percentage of the whole pot would be the same.

16   So it's practically -- I understand as a legal nicety, but on a

17   practical matter, there's probably not a lot of impact one way

18   or the other for third-party payors.

19       THE COURT:  Well, let me put it this way:  How much

20   does this throw things off if I just -- I don't know how I

21   would do it at this point -- approve a settlement for -- how

22   much money did you add to the pot for this?

23       MR. NOTARGIACOMO:  I mean, it was an all-in

24   negotiation.  I'm not sure there was a specific amount set

25   aside in the thought process.

69945a20-44f7-40d7-b22f-e93ac7a69dbf

1      THE COURT:  Why don't I decertify it and give the

2  extra money to the consumers?

3      MR. NOTARGIACOMO:  The Zoladex consumers?

4      THE COURT:  Yes.

5      MR. NOTARGIACOMO:  I haven't discussed that with --

6      THE COURT:  Well, why don't you all discuss it, all

7  right?  And if not, you should probably -- I'm not here to

8  destroy someone's vacation.  I'm really eager to move these

9  things.  Could you give me a memo on that drug and what the

10  spreads are?  I've got to do something to say it's fair, even

11  at 25 percent.  What strikes me as more fair is if they're

12  consistently below 30 percent unless there's -- are you hearing

13  from the Pulmicort Respules consumer advocates?  I mean, do the

14  consumer counsel care about this?

15      MR. COHEN:  Our issue, your Honor, there is just no

16  judgment dismissing that claim, although --

17      THE COURT:  I understand that, it's a fair game.

18  Maybe I decertify, or maybe I just get a stipulation of

19  dismissal which I approve, and then whatever money may have

20  been allocated to that.  Otherwise it will go -- I mean, people

21  lost a lot of money on the primary drug here, and this one, now

22  that you're refreshing my recollection, we did nothing with,

23  you didn't move forward on it.

24      MR. NOTARGIACOMO:  There was discovery up until, you

25  know --

1    THE COURT:  You must not have thought there was much

2    there.  I know Mr. Berman and Mr. Sobol.  If they had a viable

3    case, they would have given it to me.

4         MR. COHEN:  Class counsel on the way to trial

5    acknowledged that they were not pursuing, a judgment could be

6    rendered to defendants.  If your Honor wants to, obviously,

7    stipulate a dismissal based on the same record upon which they

8    agreed, that's obviously fine with us.

9         THE COURT:  I tell you what:  Go back, caucus, let me

10   know what you want to do, and then I'll sign off on that.  And

11   we should probably do the same thing with Massachusetts.  I

12   deliberately didn't sign the order, and maybe what I'll do is

13   go back and recalibrate it because it's got to be consistent

14   across the board.

15        Is there any other bone that some objector from across

16   the country, some Attorney General, some attorney who disagrees

17   with you all the time, somebody who could be -- is there

18   anything else in here that I should be worried about?

19        MR. NOTARGIACOMO:  Not that comes to class counsels'

20   mind, your Honor.

21        THE COURT:  Anything else that you've heard about?

22   No, all right.

23        MR. COHEN:  We have not heard any.

24        THE COURT:  One of the things that always worries me

25   in a nationwide class, as I unfortunately spent an entire year

1   doing, is worrying about whether there are any other state

2   statutes that might give someone more.  And I think the most I

3   saw in any state statute was a trebling, which this would take

4   into account.  Have you heard from any other Attorney Generals

5   who might be looking for different kinds of settlements?

6          MR. NOTARGIACOMO:  No, your Honor.

7          THE COURT:  Does this pick up any government -- this

8   doesn't pick up any Medicaid kinds of situations or that sort

9   of thing, right?

10         MR. NOTARGIACOMO:  The only payments that usually get

11  picked up -- and those have been picked up in other

12  settlements -- where it's a government program, and they had a

13  TPA, a third- party administrator, for their employees, for the

14  government employees, but not for the actual program by itself.

15         THE COURT:  All right, so then the next issue is the

16  notice program.  So you're going to try to get info from the

17  ISHPs.  And one of the things that's got me very frustrated,

18  which we'll hear about in the BMS settlement, coming right up,

19  is how long it takes to get this data, which has been an

20  enormous sense of frustration.  So what I'd like in the order

21  is a deadline.  Is it in there?

22         MR. NOTARGIACOMO:  Well, TPPs have to provide the data

23  along with their claims, so in order to submit the claim --

24         THE COURT:  Yes, but I don't want them to dilly-dally

25  because I think we need to -- they may not care so much when

1    they get their claims, and where I care hugely about getting

2    this money into the hands of the consumers.  So can we say they

3    give us their data in 60 days or something?  Does that seem

4    doable?

5            MR. NOTARGIACOMO:  They usually run this data

6    alongside their claims data.

7            THE COURT:  All right, so give me a deadline.  Write

8    one in there.  Just what's fair, 60 days?

9            MR. NOTARGIACOMO:  Well, we haven't given you a claims

10   deadline yet, so I assume --

11           THE COURT:  No, but I don't want to -- because I need

12   to get the information in order to send out the notices, right?

13           MR. NOTARGIACOMO:  That's correct, your Honor.

14           THE COURT:  So when?

15           MR. NOTARGIACOMO:  We can provide a date.

16           THE COURT:  Provide a date.

17           MR. NOTARGIACOMO:  But just --

18           THE COURT:  It almost doesn't matter what it is as

19   long as there's a date.  I'm not here to screw them and make

20   people spend weekends over the beautiful summer.  I mean, I

21   just want a date because I'm now a year -- we did the numbers

22   on the BMS settlement.  I still don't have the data.  We

23   haven't sent out notices yet, and we'll get to that later.  I

24   want something, 60, 90 days, where you get the data.

25           So that's the best way we know to get into it, right?

1      MR. NOTARGIACOMO:  That's correct, your Honor.  And

2  let me just point out, it's not just ISHPs, but class TPPs,

3  when they submit their claims, are also requested to provide

4  these data.  So we try to get it from everybody, not just --

5      THE COURT:  A great idea.  So let's just 60, 90, 120

6  days, okay?

7      Now, the publication, I don't worry so much about

8  third-party payors.  I've got to assume that they have

9  attorneys who can review it.  So we're really --

10      MR. NOTARGIACOMO:  They get direct mail, your Honor.

11      THE COURT:  Yes, so it's just really not -- you've got

12  that down to a T, PP.  But let's just get this -- for consumers

13  who are cash payors, is it worth trying to -- and I'm assuming

14  those third-party payors will give us the info so we can get to

15  their people paying co-payments, right?  That's what we're

16  looking for.  So basically their data is going to do most of

17  that for us.  So on the cash payors, what's been your feedback

18  in the past from the publications?

19      MR. NOTARGIACOMO:  I mean, I think it's commensurate

20  with your Honor's understanding, although it's not entirely

21  clear when we get a claim that it's a claim that results from

22  the Web or --

23      THE COURT:  I mean, we've been doing this for a decade

24  now.  I keep asking for this information.  Can't we ask the

25  claims administrator to find out whether we're paying money for

1   all these publications without -- can't somebody put a little

2   check, "I found it in an advertisement," where, or, "I found it

3   on the website," or, "I found it through my third-party payor,"

4   so we can find out?

5        MR. NOTARGIACOMO:  Going forward, we can do that, your

6   Honor.  The problem is, going back five years or six years,

7   that wasn't done, so --

8        THE COURT:  Right, so I want to do it now.  I want to

9   do it now so we can just find out whether this money is worth

10  it.  What do you think?  They must do surveys, Kinsella Group,

11  the leading group, right?

12       MR. NOTARGIACOMO:  I'm sure there are surveys, your

13  Honor.  My understanding is that they concentrate not just on

14  actual results, but, you know, what's necessary

15  constitutionally to give full notice to the class.

16       THE COURT:  Can I say, though, I agree -- you know me,

17  I totally agree with you.  But if all we're getting from the

18  ads is a 2 to 3 percent return, that's part of the due process

19  notice.  Is there a better way to do it?  I understand you need

20  to say 80 million hits, I mean, I understand that that's part

21  of it, but is there a better way to do this?  That's what I'm

22  trying to figure out.

23       MR. NOTARGIACOMO:  I think the only other way to do it

24  that I know of is what your Honor has already identified, which

25  is to try to find other sources where actual class members'

1  data is recorded somewhere.  And with cash payors, you know, I

2  think that's only the retail outlets that actually sell the

3  product because that's who they're transacting with.  They're

4  not transacting with an insurance company that would pick up

5  their data.  There's no other way that I know of.  There's no

6  federal agency that would --

7         THE COURT:  How much money do you have allocated to

8  putting a little ad in the back of Parade magazine?

9         MR. NOTARGIACOMO:  There's no specific breakdown by

10 publication, but the publication strategy here is over a

11 million dollars, your Honor.

12        THE COURT:  And how much money do we think we're going

13 to give out for that million dollars for the cash payors, which

14 is really what we're talking about here?

15        MR. NOTARGIACOMO:  Yes, the problem is that we don't

16 know exactly -- you know, all we know is that Dr. Hartman's

17 data shows there are very few cash payors.

18        THE COURT:  That's what you just told me, so I'm

19 trying to think whether it's worth it to spend the million.

20 I'd rather give them to the people.  I mean, I know it

21 sounds -- I understand you're worried about a due process

22 challenge, but can we get that down by half?

23        MR. NOTARGIACOMO:  When you say get that down, you

24 mean the amount --

25        THE COURT:  Publications.  I'm not here to be the

1    final death knell for the magazines and their advertising -- I

2    know it's a tough world out there -- but are we better off just

3    with ads on TV, one prime-time ad after "American Idol" or

4    something?

5              MR. NOTARGIACOMO:  I do know that according to

6    Ms. Kinsella, the most effective methods that we've used to

7    date are the 30-second cable TV ads as well as the Internet

8    advertisement --

9              THE COURT:  And how do we know that?

10             MR. NOTARGIACOMO:  -- Parade and some of the others.

11             THE COURT:  How do we know that?

12             MR. NOTARGIACOMO:  That's just a question I put

13   directly to Ms. Kinsella in the past, and I think in the

14   context of Track Two, where we were looking to get to cash

15   payors, that's where we concentrated.

16             THE COURT:  Would you have her do this for me:  Ask

17   her if we can -- she's been doing this now for a decade, and so

18   she owes the Court something here.  I want a cost effectiveness

19   for how many people will she expect to hit by doing these ads

20   in these magazines as opposed -- I'd rather spend more money on

21   the Internet and on cable TV ads, if that's where she thinks

22   it's more effective, if she's only getting a very small return

23   on these ads.  Okay?  That makes the most sense here.  And it

24   will be, to be honest, much cleaner if we don't have to deal

25   with Pulmicort Respules, if we just have one drug, one claim.

1   And then you have a quicky form, right, where you can just get

2   a quick return?

3          MR. NOTARGIACOMO:  In this settlement, it's unlike the

4   Track One where we have a quicky postcard return.  I think

5   there's an actual -- and we may be able to simplify it if we

6   eliminate Pulmicort Respules, so we'd have to take a look.

7          THE COURT:  So what do you have to do to make a claim?

8          MR. NOTARGIACOMO:  You need to estimate your complete,

9   your total out-of-pocket expenditures; and in that estimate,

10   because we have the heartland versus the book ends, you need to

11   give us some dates so that we can accurately calculate the

12   claim.

13          THE COURT:  But if they can't do any of that, can't we

14   give them a quick return?

15          MR. NOTARGIACOMO:  When you say "quick return" --

16          THE COURT:  In other words, they're old people.  I

17   think of my mother, okay?  So she doesn't remember.  My

18   stepfather wouldn't have remembered.  They don't remember.

19   It's going back years.  So if they just don't remember but they

20   swear they took it, how much do they get?

21          MR. NOTARGIACOMO:  $150, your Honor.

22          THE COURT:  All right, there is, so there is a quick

23   return.

24          MR. NOTARGIACOMO:  When you said "quick return," I was

25   thinking --

1          THE COURT:  So just like, "I don't remember, but this

2     is what I think," and then you just check it off and send it

3     in.

4          MR. NOTARGIACOMO:  And certify under pains and

5     penalties that you've made a percentage co-payment for the drug

6     or drugs, and you get a flat payment of $150.

7          THE COURT:  Fine.  Is that a good number, or should it

8     be higher?  How much does the drug cost?

9          MR. NOTARGIACOMO:  It's in the thousands.

10         THE COURT:  And how much would a typical co-pay be?

11         MR. NOTARGIACOMO:  A typical co-payment is between 20

12    and 25 percent, according to Dr. Hartman.

13         THE COURT:  So maybe what we should be doing is

14    increasing the $150.  Is there a way of figuring out what a

15    typical co-pay is and just saying that's presumptively what you

16    get if you can't remember?

17         MR. NOTARGIACOMO:  We could try --

18         THE COURT:  How much does the drug cost, $2,000?  A

19    typical course of treatment, like, wasn't it huge?  That was

20    part of the problem, like $2,000 or something?

21         MR. NOTARGIACOMO:  Or more, your Honor.

22         THE COURT:  All right.  And the co-pay is typically

23    what?

24         MR. NOTARGIACOMO:  Between 20 and 25 percent, so it

25    could be $500 or more per year.

1          THE COURT:  But let's take the low end.  So it's a

2     fifth, so $400, right, would be a typical co-pay?  Why wouldn't

3     we give them that?

4          MR. NOTARGIACOMO:  Well, your Honor, there is also the

5     ability if -- once we have all of the data and we see, you

6     know, what it is we can give out and what we can't give out,

7     and if there's money, we could decide, "All right, we told you

8     you were going to get $150 as a minimum payment.  You're going

9     to get that, plus you're also going to get another $50."  We

10    can always do that after the fact.

11         THE COURT:  Well, why wouldn't we do it now?

12         MR. NOTARGIACOMO:  Just because we're always leery

13    about promising something that ultimately we can't deliver.  So

14    it says up to $150.  If for some reason --

15         THE COURT:  Why don't we say "up to $400, depending on

16    the claim"?

17         MR. NOTARGIACOMO:  We could do that, your Honor.  It

18    just seems to us, from the perspective of expectations, better

19    to tell someone they're going to get $150, give them $300, than

20    telling them they're getting $400 and give them $300.

21         THE COURT:  I don't know what the right dollar is.  I

22    think we should take the low end of -- like, say, if 20 percent

23    is the typical co-pay, I don't know.  I don't want to overstate

24    it.  Come up with the consumer reps what it would typically

25    cost.  Most old people aren't going to remember.  They don't

1    remember.  They just -- do you keep records?  I don't keep

2    records of every time I -- no one keeps records.  Why should

3    they?  They don't even remember their doctors' names.  I don't,

4    and so maybe I'm getting to that point, but they sure don't.

5         And so let's just take a typical co-pay and say,

6    "Depending on the number of people who submit claims, you could

7    get up to $400."  And then people have an incentive to send in

8    that little form.  That's a lot of money for an old person.

9    And then if it ends up being $150, so be it.

10        MR. NOTARGIACOMO:  That's fine, your Honor.  We can do

11   that.

12        THE COURT:  You might want to even add a little, "It

13   could be $150, but depending on the number, it could be up to

14   $400," and just so they know the range, but it still makes it

15   worth it to someone, and we've had such abysmal returns on

16   this.  And I'm not saying it's got to be $400.  I think you'd

17   be better off --

18        You don't care, right?  You're just doing a big global

19   amount.  The people who might care would be the third-party

20   payors.  But since they're getting this incredible spillover

21   which they never got before, they should be okay with that,

22   because these are the people who are out of pocket, and they're

23   old and they're sick and the most worthy.

24        MR. NOTARGIACOMO:  You know, I don't speak for TPP

25   allocation counsel, but I think that they wouldn't have an

69945a20-44f7-40d7-b22f-e93ac7a69dbf

Page 40

1    issue with that.

2          THE COURT:  Okay.  So I've done what I can do with

3    this.  You're going to get me these changes.  I'll sign.  So

4    just if we can go through this again.  The first is, you're

5    going to check on whether we can go up to something like $400

6    for the claim, the automatic claim.  I'll do the speedy claim

7    process; you know, $150 to $400, you know, give them a sense of

8    the range.

9          Second is, Kinsella will figure out, do we have to

10   spend that much money on -- I mean, I want some affidavit on

11   what they've found effective to date.  Maybe we can shift some

12   of that money more into advertising and the Internet so that we

13   can -- unless she has good proof, which she might.  I mean,

14   I've seen her before.  She's come here two or three times, I

15   think, over the course, you know, which she must know by know,

16   she must.  If she didn't, she's being ineffective because she's

17   gotten so much money handling this.  She must have a sense as

18   to what's working or not working on these things.

19         The third thing, I think my --

20         MR. NOTARGIACOMO:  Pulmicort Respules?

21         THE COURT:  Excuse me?

22         MR. NOTARGIACOMO:  Pulmicort Respules?

23         THE COURT:  Yes, is the Pulmicort Respules.  And,

24   otherwise, I think we're set to go.  And, finally, the

25   Massachusetts class, we just need to change the order for

1    whatever we do with Pulmicort Respules.

2            Now, can I ask you this:  So what have we resolved in

3    terms of the national class?  What's left?  So we've got

4    AstraZeneca is taken care of.  BMS is taken care of.

5            MR. NOTARGIACOMO:  And J & J is the only --

6            THE COURT:  J & J, so that's terrific.  So we just

7    need to work on J & J, which is coming up later this morning

8    for those who want to stay tuned -- there you are -- which I

9    know I have to figure out the whole class rep issue and what

10   drugs are left on the table and all that sort of thing, so --

11   and then you're done with me?

12           MR. NOTARGIACOMO:  Once we've got final approval of

13   all --

14           THE COURT:  Where's Track Two?

15           MR. NOTARGIACOMO:  It's similar to BMS, which we'll

16   talk about at 11:00.

17           THE COURT:  Because I'm enormously frustrated on BMS.

18   So is someone here from BMS?  What time is that at?

19           THE CLERK:  11:00.

20           MR. NOTARGIACOMO:  Lyndon Tretter will be here by

21   telephone.

22           THE COURT:  Okay.  When is J&J?

23           MS. CONNOLLY:  It was scheduled for 10:00 o'clock.

24           THE COURT:  All right, so you're all here?  Okay, so

25   maybe we'll do the swap.  I'll take a quick break.  Thank you

Page 42

1    very much.  When do we do the reunion, when it's all done?

2              MR. NOTARGIACOMO:  A picnic next summer, your Honor.

3              THE COURT:  All right.  I think that I've got the

4    Justice Department claims and the New York county claims, Iowa.

5    Where else?  I've got Connecticut.  I'm coming to a close here.

6              MR. WISE:  Making progress.

7              THE COURT:  What?

8              MR. WISE:  Making progress.

9              THE COURT:  Yes.  Thank you very much.

10             MS. CONNOLLY:  Thank you.

11             THE CLERK:  Court is in recess.

12             (Adjourned, 10:27 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 43

1                    C E R T I F I C A T E

2

3

  UNITED STATES DISTRICT COURT )
4 DISTRICT OF MASSACHUSETTS    ) ss.
  CITY OF BOSTON               )

5

6

7          I, Lee A. Marzilli, Official Federal Court Reporter,

8 do hereby certify that the foregoing transcript, Pages 1

9 through 42 inclusive, was recorded by me stenographically at

10 the time and place aforesaid in Civil Action No. 01-12257-PBS,

11 In Re:  Pharmaceutical Industry Average Wholesale Price

12 Litigation, and thereafter by me reduced to typewriting and is

13 a true and accurate record of the proceedings.

14     In witness whereof I have hereunto set my hand this 21st

15 day of July, 2010.

16

17

18

19

20          /s/ Lee A. Marzilli
           _____
21          LEE A. MARZILLI, CRR
           OFFICIAL FEDERAL COURT REPORTER
22

23

24

25