```
                  IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF MASSACHUSETTS


    IN RE:                          )
                                    )  CA No. 01-12257-PBS
    PHARMACEUTICAL INDUSTRY AVERAGE  )
    WHOLESALE PRICE LITIGATION       )  Pages 1 - 38
                                    )
```

MOTION HEARING (JOHNSON & JOHNSON)

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE

```
                    United States District Court
                    1 Courthouse Way, Courtroom 19
                    Boston, Massachusetts
                    July 12, 2010, 10:35 a.m.
```

```
                      LEE A. MARZILLI
                   OFFICIAL COURT REPORTER
                 United States District Court
                  1 Courthouse Way, Room 7200
                     Boston, MA  02210
                       (617)345-6787
```

1    A P P E A R A N C E S:

2

     FOR THE PLAINTIFFS:
3
          JENNIFER FOUNTAIN CONNOLLY, ESQ., Hagens Berman Sobol
4    Shapiro, LLP, 1629 K Street, NW, Suite 300, Washington, D.C.,
     20006, for the Class Plaintiffs.
5
          EDWARD NOTARGIACOMO, ESQ., Hagens Berman Sobol Shapiro,
6    LLP, 55 Cambridge Parkway, Suite 301, Cambridge, Massachusetts,
     02142, for the Class Plaintiffs.
7
          KENNETH A. WEXLER, ESQ., Wexler Wallace, LLP,
8    55 West Monroe Street, Suite 3300, Chicago, Illinois, 60603,
     for the Class Plaintiffs.
9

10   FOR THE DEFENDANTS:

11        ANDREW D. SCHAU, ESQ., Covington & Burling, LLP,
     The New York Times Building, 620 Eighth Avenue, New York,
12   New York, 10018-1405, for Johnson & Johnson.

13

14

15

16

17

18

19

20

21

22

23

24

25

1              P R O C E E D I N G S

2              THE CLERK:  In Re:  Pharmaceutical Industry Average

3    Wholesale Price Litigation, Civil Action 01-12257, will now be

4    heard before this Court.  Will counsel please identify

5    themselves for the record.

6              MS. CONNOLLY:  Good morning again, your Honor.

7    Jennifer Connolly from Hagens Berman Sobol Shapiro on behalf of

8    the class plaintiffs.

9              MR. WEXLER:  Ken Wexler, your Honor, from Wexler

10   Wallace for the class plaintiffs.

11             MR. NOTARGIACOMO:  Ed Notargiacomo, your Honor, for

12   the class plaintiffs.

13             MR. SCHAU:  Andrew Schau, your Honor, from Covington &

14   Burling for Johnson & Johnson.  And let me just add as a

15   footnote, that's the first time I've ever said that in open

16   court.  I changed law firms a couple of weeks ago.

17             THE COURT:  I forget, which firm were you with?

18             MR. SCHAU:  I was at Patterson Belknap, your Honor.

19             THE COURT:  Congratulations on your career switch.

20             So there's been some confusion in my office, and I

21   guess with me -- the buck stops here -- as to what exactly

22   we're doing with Johnson & Johnson because Johnson & Johnson

23   had requested that we defer this until the class rep issue had

24   been satisfied.  So maybe you give me a sense of the class rep,

25   what possible issues might come up, and whether it's worth

1    having an argument on the underlying motions or whether I

2    should wait.

3           MS. CONNOLLY:  I believe both parties are prepared

4    today to argue the underlying motions and that we should go

5    ahead doing that because we provided a preliminary proffer from

6    counsel when we moved to add the new class rep, Ms. Austed; and

7    that set forth basically, you know, that she is a Medicare

8    Part B participant, that she had some supplemental insurance,

9    but it didn't cover all of her payments, she took Remicade.  We

10   have been in the process of gathering her documents.  We did

11   see your electronic order this morning giving us a deadline to

12   provide those, and we do intend to give them over to the

13   Johnson & Johnson defendants.  So my suggestion, your Honor,

14   would be that we have oral argument on these motions.

15          THE COURT:  A lot of times you've thought you had a

16   great class rep, and it hasn't sort of played out.  Have you

17   personally looked at these documents?

18          MS. CONNOLLY:  We have looked at the documents that

19   go -- I personally have not, but my co-counsel have looked at

20   the documents.  The issue has been going back as far as we need

21   to go in order to satisfy Johnson & Johnson that she has got

22   coverage throughout the class period, and that has been a

23   little more difficult.  We needed to subpoena United Healthcare

24   to get those records, so that has been the delay.

25          THE COURT:  I don't understand what you just said.

1    What do you mean?  Why does she have to have coverage

2    throughout the class period?  Have I ruled that?  I don't

3    think --

4              MS. CONNOLLY:  Not through the entire class period.

5    We have documents from 2003, 2004, 2005.  We've always wanted

6    to have --

7              THE COURT:  Oh, so the issue is whether it predates

8    the key period of time?

9              MS. CONNOLLY:  Yes, yes.  We have information that

10   she's been taking the drug that long, but we don't have the

11   claims data yet because we're waiting for her insurer for that.

12             THE COURT:  So that she's in my what we've been

13   calling the period of time where it's the heartland period.

14             MS. CONNOLLY:  That's correct.

15             THE COURT:  Before the effective date of the passage

16   of the Medicare Modernization Act.

17             MS. CONNOLLY:  That's right.

18             THE COURT:  And so that's what you don't have yet?

19             MS. CONNOLLY:  That's right.

20             THE COURT:  And you have her say-so?

21             MS. CONNOLLY:  Yes.

22             THE COURT:  So what might be the problem then that

23   would hold this up?

24             MR. SCHAU:  Your Honor, I can't answer your question

25   about what information she has.  In my conversations with

1    Mr. Macoretta, he has advised me that they have medical records

2    showing payments after 2004.  And you'll recall that you

3    granted summary judgment in Class 1 for 2004 forward based on

4    the passage of the MMA.  He said they were seeking to gather

5    evidence that she took --

6           THE COURT:  Like, does she span at all the -- I don't

7    remember.  We just had this debate in this other context.  Do

8    you remember what the effective date --

9           MR. SCHAU:  Yes, my recollection is that your summary

10   judgment opinion granted summary judgment, I think the phrase

11   is "for the period 2004 forward."  You will recall that the MMA

12   took effect at the beginning of 2004.  There was a one-year

13   transition where 85 percent of the AWP was paid, and then the

14   ASP system kicked in; and during that one year, we were

15   reporting ASPs so that the government could, you know, learn to

16   process that data and we could learn to report it.

17          THE COURT:  So, so far, you only have medical records

18   from 2004 forward?

19          MR. SCHAU:  At this point I have no medical records.

20   I have Mr. Macoretta's representation that such records exist

21   in the post-2004 period.  I'm not here to question that

22   representation, but I have no medical records.

23          THE COURT:  And so let's assume that's true and we

24   also have her under oath that she took some of the drugs before

25   that.

1          MR. SCHAU:  We have nothing under oath from her.  We

2    have Mr. Macoretta's account of his telephone conversation with

3    her.  And let me emphasize, I don't mean to suggest for a

4    moment that Mr. Macoretta is misrepresenting anything.  What I

5    am saying is that I think before your Honor can approve her as

6    a class rep, they need to satisfy their burden of proof that

7    she took Remicade during the class period.

8          THE COURT:  I agree with that actually, but let me

9    just say this.  Let's suppose -- you think you can get the --

10   she's told you that she was taking it during this period of

11   time?

12         MS. CONNOLLY:  That's right.

13         THE COURT:  And so why does -- sorry, I'm just not

14   back in this mode.  So you're saying United.  Why would United

15   matter?

16         MS. CONNOLLY:  Because she was partially covered for

17   her co-payments by insurance, so they have all the records

18   going back further.  She maintained the records back to 2004,

19   but she just doesn't have copies in her files going back

20   further than that.

21         THE COURT:  Sure.  And she's saying that she wasn't

22   completely compensated?  That's how she has a monetary stake in

23   it?

24         MS. CONNOLLY:  That's right.

25         THE COURT:  So she's part of Class 2, is that it?

1        MS. CONNOLLY:  Class 1.

2        THE COURT:  Class 1.

3        MS. CONNOLLY:  That's all that remains for the J&J

4   claims.

5        THE COURT:  So, all right.  Now, suppose -- do you

6   feel confident enough -- I was unsure walking in here today

7   what I was going to hear because I got no little play-by-play

8   on class rep status.  Is it worth it today -- I have not

9   prepared -- I've read them a long time ago -- I've not prepared

10  for motion for summary judgment because I thought we were going

11  to be having an argument about class reps.  I guess that's --

12  you feel confident enough that you're going to be able to get

13  those records and that it will prove it up that she has a

14  monetary stake?

15       MS. CONNOLLY:  Yes, your Honor.  We've actually been

16  working with counsel for United Healthcare.  They have the

17  records literally ready to send.  They just have to process the

18  subpoena, and they can get those records to us.

19       THE COURT:  And they've read them to you on the phone?

20       MS. CONNOLLY:  No, they haven't.  They aren't

21  authorized to do that for HIPAA concerns.

22       THE COURT:  Oh, they can mail them to you, but they

23  can't tell you what they say?

24       MS. CONNOLLY:  Well, they have them queued up, I guess

25  is the way to put it, and then they want the subpoena, and then

1   they can send them to us.

2        THE COURT:  Well, you're both here, so maybe we do the

3   argument now, or we can wait till you -- I mean, you made such

4   a big plug, and I'm not prepared to just kick this over forever

5   if in fact it looks very likely.

6        MR. SCHAU:  I can't comment on whether it's likely,

7   obviously.  I'm prepared to argue the motion if you're prepared

8   to hear it.

9        THE COURT:  Well, let me just ask you this:  Assume

10  for a minute that the records from United prove up that she

11  took the drug and was not fully compensated, so she has a

12  monetary stake in the outcome of the case, does she serve,

13  unless there's something very weird like she's got Alzheimer's

14  or something, does she otherwise become an appropriate class

15  representative?

16       MR. SCHAU:  As I stand here now, I could not give you

17  a different reason why she would not be adequate.

18       THE COURT:  Okay, so then maybe we should proceed.

19       MR. SCHAU:  Okay.  May I make one suggestion on your

20  order this morning?

21       THE COURT:  Yes.

22       MR. SCHAU:  I don't know what "forthwith" meant in

23  terms of supplying these records forthwith, but our response to

24  whatever they provide us is due the 21st.  That may be a little

25  aggressive on the schedule because we don't know when the

1   records will be coming in from United.

2          THE COURT:  Do you want to make it two weeks --

3          MR. SCHAU:  Could we make my response due perhaps, you

4   know, 15 or 20 days after we get the records rather than --

5          THE COURT:  Yes.  That makes total sense.

6          MR. SCHAU:  Okay.

7          MS. CONNOLLY:  That's fine with us, your Honor.

8          THE COURT:  But when are you going to get the records?

9   Like, you expect them --

10         MS. CONNOLLY:  I've been told that it should be very

11  quick, that they have them all prepared, they've done the

12  search.  They're just processing the subpoena in the legal

13  department.  That's what I've been told.

14         THE COURT:  Okay.  The only reason I say that is, I'm

15  very eager to finish the Johnson & Johnson piece of it.  And I

16  lose my wonderful law clerk who's been doing this for two

17  years, and I want it done by the end of the summer.  That is

18  the key here is to finish this piece of it by the end of the

19  summer.  So that's why I'm inclined to hear argument today on

20  Johnson & Johnson; and I am inclined, based on what she said,

21  unless, as I said, the documents don't prove up any monetary --

22  you know, like, let's say she was fully compensated and they

23  don't prove up what she remembers -- I'm inclined to say she's

24  an adequate class representative.

25         MR. SCHAU:  Yes, the problem that we've encountered in

1    the past is not that they haven't paid money but that they

2    haven't paid money based on a percentage of AWP, and that --

3              THE COURT:  Oh, that's a good point.

4              MR. SCHAU:  And that can be difficult to ascertain.

5    It does require some analysis of the records.  And, again, I

6    don't want to suggest that she's inadequate because I don't

7    have enough information to tell you one way or the other, but

8    it will require some analysis.

9              THE COURT:  I know you're going to think I've

10   forgotten everything -- I probably have -- but why if she's in

11   Medicare and it's only Class 1 -- so we know she has paid a

12   percentage based on AWP, and you're saying United sometimes

13   will just pay a flat amount?

14             MR. SCHAU:  When they have Medigap insurance, they

15   sometimes pay a flat co-pay, which would not be tied to AWP.  I

16   don't know the facts.

17             THE COURT:  So that the Medigap will pay for the whole

18   thing, but she would only pay for, like, 25 bucks per

19   prescription, something like that?

20             MR. SCHAU:  Yes, again, I don't know her situation,

21   but we have encountered in the past situations where people who

22   claim to be in Class 1 actually were only making flat

23   co-payments.

24             THE COURT:  Have you asked that?  Does she remember?

25             MS. CONNOLLY:  We have.  She believes they have been

1   percentage co-payments.

2           THE COURT:  Does United -- that should be just

3   actually right out of the policy.  That should be simple enough

4   to figure out.

5           MS. CONNOLLY:  That should come with all the documents

6   that we have requested from them.  They haven't made a

7   representation to us otherwise.

8           THE COURT:  Well, but we should be able to know -- I

9   guess the bottom-line inquiry is, do you want to argue the

10  motions today because you're here and you're prepared?  And

11  then if it turns out -- I'm not going to write a huge, massive

12  summary judgment motion if she's only paying flat payments.

13  That's the thing.  It's a chicken-and-egg thing.  I think, once

14  you're here, you might as well argue it.  We'll get the

15  transcripts.  But I need to not spin my wheels and waste my

16  time on something if -- you should be able to figure that out,

17  like, instantly.  Can you call the lawyer for United and just

18  find out?

19          MS. CONNOLLY:  They're very hesitant to tell us --

20          THE COURT:  No, no, no, it can't be private

21  information whether she's paying a flat pay or a percentage.

22  Should we just have a hearing next week and subpoena him in?

23  It's just got to be simple.  Why are you saying it's so hard?

24          MR. SCHAU:  It's based on experience, your Honor.

25  When you get these medical records, sometimes they're easy to

1    interpret; sometimes they're not so easy to interpret.  I don't

2    know what her medical records will show, and I just don't want

3    to --

4          THE COURT:  What I don't want, my selfishness, because

5    I keep granting these motions and granting these motions, is,

6    I don't want to lose my law clerk before he is able to give his

7    expertise to helping me on this motion, just because it's the

8    summertime and living is easy and where no one gets to figuring

9    out whether it's a flat co-pay or not.  I mean, so that's my

10   problem.

11         MR. SCHAU:  Let's put a pin on that issue then and go

12   ahead and argue the motion.

13         THE COURT:  I think so.  But I also want to know.

14   Within a week, I should be able to know, is it a flat co-pay or

15   not?  You should be able to just write me a -- because I don't

16   want to expend the resources, law clerk resources, if it turns

17   out that there's going to be a mess over class rep.

18         MS. CONNOLLY:  We'll provide you a status report, your

19   Honor.  We'll look into it right away when we get back.

20         THE COURT:  Can you do it in a week?

21         MS. CONNOLLY:  We'll try, so --

22         THE COURT:  I don't want a brief.  I'm not trying to

23   do that.

24         MS. CONNOLLY:  I know, I know you don't.

25         THE COURT:  Just like "yes" or "no" if it was a

1    percentage or not, she has a -- we're able to say in good faith

2    it was a -- and then if you are, we'll move ahead and write

3    this up.  Fair enough?

4            MS. CONNOLLY:  That's fair.

5            MR. SCHAU:  Fair enough.

6            THE COURT:  Okay, thank you.

7            Okay, you're the moving party.

8            MR. SCHAU:  Thank you, your Honor.  I'm actually here

9    to argue two summary judgment motions.  When we were last in

10   front of you on October 8, you made clear to us that your entry

11   of judgment in favor of Johnson & Johnson for Class 1 was

12   intended to only apply to Massachusetts consumers.  There was

13   some confusion on our part, I think there was some confusion on

14   plaintiffs' part about that, but that is --

15           THE COURT:  I clearly wrote it inappropriately.  So I

16   think I just signed off on some order someone gave me, so --

17           MR. SCHAU:  Fair enough.  As a result of that

18   disclosure from the Court, we have divided our motion for

19   summary judgment into two motions:  One is limited to

20   Massachusetts consumers.  That may or may not be a formality,

21   depending on your point of view.

22           THE COURT:  Fair.

23           MR. SCHAU:  But then the second motion relates to

24   consumers outside of Massachusetts.

25           THE COURT:  And I now understand because of the

1    Haviland controversy actually the dynamic of this whole thing a

2    lot better because I hadn't -- it was so not a focus, the rest

3    of the country, or even -- it just wasn't a focus at the last

4    hearing.  It just wasn't.  And so I think the whole thing

5    caught us -- caught me anyway by surprise.  So I think it's

6    appropriate to --

7              MR. SCHAU:  Let me go back in time a little bit

8    because I'll tell you where this came from, and I think it is

9    relevant to what I'm going to ask you to do today.

10              THE COURT:  Okay.

11              MR. SCHAU:  Shortly after you issued your liability

12    opinion in June of 2007, you had a status conference with

13    Bristol-Myers Squibb because they were the next up for a

14    Class 1 trial.  At that status conference, you indicated that

15    you had intended to apply the 30 percent speed bump to Class 1.

16    We interpreted that, rightly or wrongly, to mean the entirety

17    of Class 1.  As a result --

18              THE COURT:  Now, this is a status for the Mass. trial?

19    Or just --

20              MR. SCHAU:  This is a status conference after you

21    entered your liability opinion.

22              THE COURT:  Okay.

23              MR. SCHAU:  Mr. Berman had said at one point towards

24    the end of that conference -- you asked him what's left.  He

25    said, "We still have Class 1 Johnson & Johnson."  You said, "I

f0596d9e-7e2a-4409-b60e-18816d8688a9

1    thought I dismissed Johnson & Johnson."  He said, "Yes, but

2    it's not clear that the 30 percent standard applies to

3    Class 1."  And you then responded that it did apply to Class 1.

4    For whatever reason, you know, it was our mistake, whosoever, we

5    interpreted that to mean --

6              THE COURT:  It was probably mine, but that's fine.

7              MR. SCHAU:  -- you were prepared to enter a judgment

8    for Class 1.  We submitted to you a form of judgment that did

9    that.  You signed that judgment.

10             Mr. Berman and the rest of class counsel did not

11   appeal the entry of judgment against Classes 1, 2, or 3.

12   Mr. Haviland did, only with respect to Classes 1 and 3.

13             You then disqualified Mr. Haviland.  The appeal he had

14   noticed was then taken over by Mr. Berman's firm and the other

15   class counsel.  They presented a Class 1 argument in the First

16   Circuit, and the First Circuit remanded and asked for

17   additional explanation from you.

18             THE COURT:  Right.  Okay, thank you.

19             MR. DALY:  So that brings us up to October 8 of last

20   year when we were before you on a status conference, and I

21   indicated to you at that time that I thought you could resolve

22   the Johnson & Johnson issues on summary judgment.  You

23   encouraged us to mediate the case in front of Mr. Green.  We

24   did that without success, so we are now back, having briefed

25   the argument for summary judgment.  And, of course, we had the

1    detour along the way of the then class reps withdrawing, but,

2    in any event, aside from the question of whether Ms. Austed is

3    an adequate class rep, we're here.

4         And, as I said, we've divided our motion into two

5    parts based on what we learned, but I think at core, the same

6    arguments that compel summary judgment in Massachusetts also

7    compel summary judgment in the rest of the United States.  And

8    let me first, if I can, identify for you the material

9    undisputed facts that we think should result in summary

10   judgment.

11        First and foremost, plaintiffs have conceded that

12   spreads of up to approximately 30 percent are not fraudulent or

13   inflated.  They are untainted, if you will, by the AWP scheme.

14   That is Dr. Hartman's words.

15        The second undisputed fact is that the government, not

16   just private payors but the government -- and by the

17   government, I mean Congress and Medicare -- set the

18   reimbursement rate for Part B medications with the expectation

19   that spreads would not exceed approximately 30 percent.  So the

20   30 percent spread idea is baked into the reimbursement formula

21   as set by the government.

22        The third undisputed fact, of course, is that Remicade

23   and Procrit, the two drugs at issue for Johnson & Johnson, both

24   had spreads of no greater than approximately 30 percent, and,

25   in the case of Procrit, it was almost always below 25 percent.

1          And the crux of the point that I want to make today is

2     the next undisputed fact, and that is that Class 1 consumers

3     never heard of AWP and had no idea how it was that their

4     co-payments were calculated by the government.  And that's key

5     because that differentiates Class 1 from both Classes 2 and 3.

6     Both Classes 2 and 3 themselves were involved in -- well, I

7     should say at least Class 3 themselves were involved in setting

8     the reimbursement rate that they paid.  So what they understood

9     about AWP, their expectations, to adopt Dr. Hartman's

10    formulation, informed the formulas that they wrote down on

11    paper and they paid.  That is not so for Class 1.  Class 1

12    never heard of AWP; they had no idea how their reimbursement

13    was calculated.

14          So Class 1 never made a decision that hinged on their

15    understanding of AWP or their lack of understanding of AWP.

16    They were completely divorced from it, and that raises the

17    question of whose expectation matters for Class 1:  Is it the

18    absence of expectation by Class 1, or is it the full

19    understanding on the part of the government that set the

20    reimbursement rate that matters?  And I submit to you that the

21    only rational expectation that one needs to look at in order to

22    determine liability for Class 1 are the expectations of the

23    government when they set the reimbursement rate because their

24    expectations mattered.  They were capable, in your words, of

25    being duped by mega-spreads.  They were capable of overpaying

Page 19

1    themselves, and then, incidentally, so too would the

2    beneficiaries, by companies that set the spread in a way that

3    was outside of their expectations.  But if you didn't dupe the

4    government, then nobody overpaid; and we have a concession here

5    undisputed that the government understood 30 percent spreads

6    when they set the reimbursement rate.

7             THE COURT:  Where does that come from again?

8             MR. SCHAU:  We have that from Dr. Hartman, both in

9    testimony and in his reports, his Class 1 and 2 reports, and we

10   have that -- well, basically from Dr. Hartman.  And let me just

11   quote to you a couple of --

12            THE COURT:  Well, I think the Department of Justice --

13            MR. SCHAU:  Well, we also have the Department of

14   Justice, not part of this record necessarily, but them having

15   signed on, if you will, to the Schering settlement, for

16   example, which --

17            THE COURT:  Do you know if they've taken the -- I

18   believe somewhere in this court the Department of Justice may

19   have taken the position that they were not challenging the

20   30 percent speed bump, but I can't remember exactly in what

21   context.

22            MR. SCHAU:  I believe they've done that in a few

23   places.  They've done it, I believe, in briefing of the Dey

24   case.  And forgive me, I'm not as familiar with the Ven-A-Care

25   record as perhaps I should be.  It's not something I get paid

Page 20

1    to follow, but I believe that they have, in the context of the

2    Ven-A-Care cases, said they accept your liability analysis in

3    the 30 percent.

4         THE COURT:  I believe that's true.  I don't remember

5    whether it was in the context of settlement or national court

6    pleadings, and we will look at that.  And I would ask if you

7    could have one of the people at Covington, your minions maybe

8    just flip through and see if you can find it.  But I believe

9    that that is the case.  But let's assume for a minute it is the

10   case, what weight do I give that?

11        MR. SCHAU:  I can give you a couple of examples where

12   I know they said something very similar.  One is, if you'll

13   recall, when Schering settled in the Ven-A-Care case, they

14   asked you for absolution on their branded drugs, and so that

15   they were only settling on albuterol, their generic inhalant.

16   In that context, they presented to your Honor an analysis of

17   their branded drug showing that by and large they were

18   underneath the speed limit, and the government signed off on

19   that settlement.  That was a settlement between Ven-A-Care and

20   Schering, but Schering required as a condition --

21        THE COURT:  I don't know that I can take that as an

22   admission in court, so if you find something --

23        MR. SCHAU:  They filed a piece of paper that said

24   that.

25        THE COURT:  Maybe, but that's a settlement.  I'm just

1    wondering if there was any other statement of facts or anything

2    like that.  So if you see anything, I'd appreciate just a

3    little something.

4          MR. SCHAU:  Yes, we'll make a point of looking for

5    that.

6          THE COURT:  All right, so let's assume for a minute,

7    though -- because it does ring a bell -- that the government

8    has conceded it's a 30 percent speed bump, and industry has

9    conceded it's a 30 speed bump, but consumers didn't know.  Now,

10   I came to a certain legal conclusion in Massachusetts that it

11   doesn't rise to the standard of rascality, if you will.  But

12   the problem I ran into in a national class, which either I made

13   a mistake by moving too quickly -- I don't remember -- or I

14   just misread something, but what I didn't think through, if

15   there's a state standard that didn't rise to the level of

16   rascality, if you will --

17         MR. SCHAU:  Well, let me put a pin on that "rascality"

18   term, only because you did decide Massachusetts under the more

19   liberal Section 9 of Chapter 93A as opposed to under Section 11

20   which requires rascality.  But be that as it may, I think the

21   fundamental question to think about in deciding whether to

22   grant Johnson & Johnson's motion is whose expectation matters.

23   From a causation vantage point, think of it this way:  If the

24   consumer had no idea how the co-payment was calculated, the

25   consumer had no opportunity, if you will, to say yes or no,

1  "I'll pay that amount," because they weren't basing their

2  decision to make a payment on an expectation as to the

3  relationship between selling prices and AWP.

4          THE COURT:  Well, I can't hinge it on their

5  expectations because they --

6          MR. SCHAU:  Exactly.

7          THE COURT:  No, no, but --

8          MR. SCHAU:  They had no expectations, and that's

9  undisputed.

10          THE COURT:  No, but the flip side of it is, if this is

11  unfair and deceptive with respect to the government, they're

12  the victims.

13          MR. SCHAU:  Exactly right.  And it wasn't unfair and

14  deceptive as to the government unless you qualify as a

15  mega-spread, because it's admitted in this record, in the

16  expert reports, in testimony, that the 30 percent expectation

17  applied to both Medicare and Congress.  And if you'll recall --

18          THE COURT:  So you're basically saying, unless it

19  was -- have you looked at all the state statutes?  Are there

20  any that would not have this -- they're all mini-FTC statutes,

21  so most of them look like this but not all of them, and that's

22  the concern I had and I needed the summary judgment on.

23          MR. SCHAU:  Well, we do in great detail go through the

24  state statutes in these briefs, and I will tell you that if we

25  have to do that at this oral argument, I will fail you because

1   there's a lot of states out there, but --

2         THE COURT:  Are there any that struck you as a looser

3   standard?

4         MR. SCHAU:  No.  Here's the point.

5         THE COURT:  By "looser" I mean -- I didn't mean

6   looser.  Actually, I probably meant a different statute that

7   might capture this.

8         MR. SCHAU:  Sure.  When you certified Class 1

9   nationwide, a predicate of your decision to certify the class

10  was that there were, quote, "no material differences" or that

11  the differences were "unlikely to be material," I should say --

12  that was your phrase -- in terms of the different state

13  statutes.  Had you concluded the other way, I don't think you

14  would have certified the class nationwide because then you

15  would have had genuine state-by-state problems in crafting a

16  verdict form, in figuring out how one jury could decide

17  liability under materially different state statutes.  So in

18  certifying a nationwide class, you were persuaded by plaintiffs

19  that there were no significant material differences among the

20  state statutes.

21        THE COURT:  And I carved out a bunch of states, right?

22  So we're only --

23        MR. SCHAU:  You carved out those that did not permit

24  class actions.

25        THE COURT:  And did I carve out any others?  I thought

1    there were some that --

2         MR. SCHAU:  No.  There have since been some

3    concessions that under some states even plaintiffs agree they

4    can't make a claim.  For example, Utah requires that the

5    conduct at issue have already been adjudicated unlawful in

6    order for a consumer to state a claim.

7         THE COURT:  I see.

8         MR. SCHAU:  But those are the exceptions.  From a

9    big-picture vantage point of view, there are no material

10   differences.  And in fact at one point you specifically

11   inquired of Mr. Sobol and Mr. Berman, "Who has the broadest

12   consumer protection statute in the country?"  And they

13   unequivocally told you it was Massachusetts, and that's quoted

14   in our papers.  At one point you said then, "Even California?"

15        THE COURT:  I was just about to make the same comeback.

16        MR. SCHAU:  You said, "Even California?"  And the

17   answer was, "Yes, your Honor, even California."

18        Now, California is out of this case for a different

19   reason, as you'll see in our brief, but I think you can be

20   comfortable, based on your analysis on the class certification

21   motion, and the representations you've received from class

22   counsel, and the fact that you decided the case under Section 9

23   of Chapter 93A, the more lenient provision, that you will not

24   be disadvantaging any citizen of any state based on a legal

25   difference in what the plaintiff needs to prove.

f0596d9e-7e2a-4409-b60e-18816d8688a9

1    THE COURT:  And how many of those states -- another

2  issue that came up was, of course, to the extent I certified it

3  and would have done a bench trial on all of them, I said what I

4  said; but to the extent it was a jury call, how many of them

5  are jury calls?

6    MR. SCHAU:  Sure.  I think the count on that is,

7  there's no jury in Illinois, Nebraska, New Hampshire.

8    THE COURT:  Say it again.  Illinois?  Go ahead.

9    MR. SCHAU:  Illinois, Nebraska, New Hampshire, North

10  Carolina, and one of the two provisions at issue in --

11    THE COURT:  Somebody coughed.  I didn't hear you.  So

12  North Carolina.

13    MR. SCHAU:  North Carolina and one of the two

14  provisions in California.  There's a second provision in

15  California that they can't satisfy --

16    THE COURT:  So the rest of them are jury.  So I

17  suppose the issue would be:  Regardless of what you say, Saris,

18  a jury might want to disregard the speed bump and be able to

19  find that because it was significantly higher than the actual

20  cost, that that's an unfair practice.

21    MR. SCHAU:  I think, as a practical matter, that can't

22  happen, and the reason for that is, from the very get-go, from

23  the expert reports on Class 1 liability submitted by the

24  plaintiffs, there has been an admission that the government

25  understood and expected spreads up to 30 percent when it set

1   the reimbursement rate.  So the only question that leaves, I

2   submit to you, is a completely legal question, and that is

3   whose expectation matters, okay?  There's no dispute on the one

4   hand that consumers had no expectation, no fact dispute.

5   There's no dispute on the other hand that the government

6   expected spreads of up to 30 percent.  Again, no factual

7   dispute.  So we have two pillars, neither of which is disputed.

8           The question, and I submit to you it's a legal

9   question, is whose expectation matters.

10          THE COURT:  Okay, thank you.  All right.

11          MS. CONNOLLY:  The way we look at this argument, your

12  Honor, is basically that it breaks down into two components,

13  and the first component is for the state statutes that require

14  a jury trial, which is the vast majority of state statutes that

15  we're talking about today.  On those states, we believe that,

16  first of all, the jury would be entitled to decide disputed

17  issues of fact.

18          The way that you reached whether something was unfair

19  in the bench trial was, as you'll recall, there were three

20  factors that you considered.  One of those and the most

21  pronounced of those was your adoption of Dr. Hartman's

22  30 percent benchmark.  We believe that a jury, properly

23  instructed on the law of what constitutes unfair, could decide

24  to use different factual factors.  That is what the First

25  Circuit has held in the Incase decision.

1           THE COURT:  In the what case?

2           MS. CONNOLLY:  Incase, I-n-c-a-s-e.

3           THE COURT:  What's that?  Is that a 93A case?

4           MS. CONNOLLY:  No.  It was just a decision in which

5      the First Circuit held that it was the jury's role to weigh the

6      factual nature of the claim as opposed to the legal nature of

7      the claim.  It's cited in both J&J's --

8           THE COURT:  So what are the fact disputes here?  And I

9      need to go find it myself, but I had thought that the Justice

10     Department has now agreed that they knew that there was a

11     spread of up to 30 percent.  It's possible that you're going to

12     need to take -- I don't know if that is something that's

13     binding.  It's part of the MDL, which is fine; I'm a MDL judge.

14     I don't know whether it's binding on you because the class is a

15     separate party.  But assume for a minute that that -- have you

16     followed that?

17          MS. CONNOLLY:  I'm not sufficiently up to speed on

18     that, your Honor.

19          THE COURT:  I think you both need to look a little bit

20     at that and maybe talk to the lawyers in it.  And it may be

21     taking you by surprise, which I don't mean to do.  We have to

22     go refresh our memories too of it, but I do believe in

23     general -- I know it's true for settlement, but I think it's

24     beyond settlement -- they haven't challenged a government

25     knowledge defense of up to 30 percent.  You know, it's come up

1    in that context, the defense there.  So if that's so, if the

2    government knew and industry knew and that's undisputed, what

3    factors would a jury look at for spreads under 30 percent to

4    say it was unfair and deceptive?

5            MS. CONNOLLY:  Well, the jury could do a variety of

6    things.  First of all, your Honor, just to be clear, regardless

7    of the position the government takes on the 30 percent spread,

8    it is our position, as Mr. Schau stated, the fundamental

9    dispute here is whose knowledge matters; and it's our position

10   that regardless of the government's knowledge, that Class 1

11   didn't know, and that justifies the --

12           THE COURT:  But everyone agrees on those facts, so

13   they're not disputed.  So, I mean, everyone agrees, I mean, no

14   consumer knew about AWP.

15           MS. CONNOLLY:  That's right.

16           THE COURT:  He's conceding that point, so no one knew

17   about any spreads.  No one even heard of the term probably.

18   And then we have the government that knew and industry that

19   knew.  And in a way, you're in a awkward position because

20   you're arguing against a little bit the position that's

21   consistently taken before, but you need to -- it doesn't sound

22   like there are any disputed issues of fact.  That's what I'm

23   searching for here.

24           MS. CONNOLLY:  The one disputed issue of fact that we

25   have put in our summary judgment motions is, as you recall,

Page 29

1   there was significant evidence at trial through the Dooley

2   memos and otherwise that J&J concealed, actively concealed its

3   conduct from the government, that it didn't want pricing

4   surveys, that it didn't want its true prices known.  We think

5   those factors are relevant factors that a jury would consider

6   in deciding whether the government did truly know.

7          For example, there wasn't evidence at trial that the

8   jury knew that Johnson & Johnson was setting Remicade

9   automatically at 30 percent of WAC.  Recall, that was that

10  unusual drug with J&J where we had testimony at trial that they

11  had set -- unlike most of the drugs at issue in this litigation

12  that were set at 20 to 25, Remicade was set at 30 percent.  And

13  that's why you held when you were looking at damages for

14  Remicade that it was a close call.  And the First Circuit

15  seized on your language in looking at entering judgment in

16  favor of Johnson & Johnson and against Class 1 saying that if

17  there is a close call to be had here, it's really a jury

18  question and probably not something appropriate for summary

19  judgment.

20         THE COURT:  So the question that I have is, did you

21  ever take the government's depositions with respect to these

22  drugs?

23         MS. CONNOLLY:  There were a number of government

24  knowledge depositions that were taken by the defendants in this

25  case.  They really didn't get under way until the Track Two

1    portion of the case, so they never came into play with the

2    Track One portion of the case.

3              THE COURT:  So are they part of the record you've

4    given me?

5              MS. CONNOLLY:  They are not.

6              THE COURT:  Do you think I can legitimately look at

7    the Justice Department's concession in the Ven-A-Care cases?

8              MS. CONNOLLY:  I don't think it's a part of a record

9    what's before you here.  I also don't think it's legally

10   relevant because --

11             THE COURT:  It's legally relevant.  Whether it's

12   dispositive, I don't know.  If the government says they knew,

13   that certainly goes to whether this is unfair, deceptive,

14   et cetera, if the government knew.  It's relevant.  Whether

15   it's dispositive, I don't know.  But the question is, being an

16   MDL judge, I have a hard time shutting my eyes to it.  I think

17   it's true, and I'm just thinking out loud as to whether or not

18   I can consider it, since neither of you have sort of put that

19   in.

20             MS. CONNOLLY:  Right.  The only thing that is in the

21   record with regard to the government's position was before the

22   First Circuit where the government put in an amicus brief about

23   the plain meaning of AWP, but there was nothing in that brief

24   that related to --

25             THE COURT:  Well, as far as I'm concerned, I can do

1   what I want.  The First Circuit was asking for more findings,

2   so they weren't, I mean, I don't think -- but the question I

3   really want to know is, can I take judicial notice of, or is

4   this prejudicial to everybody, of what happened in the

5   Ven-A-Care cases with the government -- I don't think the

6   government was specific to Johnson & Johnson, don't get me

7   wrong.  I think they just basically conceded a 30 percent speed

8   bump.

9            MS. CONNOLLY:  I think that's something where we'd

10  have to look into the nature of the admission and perhaps

11  submit some research on the appropriateness of considering that

12  with this record.

13           THE COURT:  Well, I'm thinking of it, but I'm giving

14  you notice.  So I think you both should look at that record.

15  And I also have to refresh my recollection as to whether it was

16  in the settlement context, in which case it would not be

17  binding, as opposed to whether it was actually in a government

18  document on it.  So you're basically saying that the Remicade

19  situation is the one that you're really pressing for a jury

20  trial on?

21           MS. CONNOLLY:  We're pressing for both, but we

22  believe --

23           THE COURT:  What's the other drug?

24           MS. CONNOLLY:  Procrit.

25           THE COURT:  Procrit.

1           MS. CONNOLLY:  We're pressing for both, but we admit

2      that the case for a jury is much stronger with Remicade.

3           THE COURT:  Because they went right up to the margin?

4           MS. CONNOLLY:  Exactly.

5           THE COURT:  Okay, thank you.  And what would your --

6      so she's raising the fact that there were act of concealment,

7      and I don't remember the evidence well enough to actually go

8      there, but let me ask you this:  Is that a disputed issue of

9      fact for purposes of this motion about the act of concealment

10     and that sort of thing?

11          MR. SCHAU:  Whether we concealed or didn't conceal I

12     don't think is really disputed because there is an admission

13     that the government knew about spreads of up to 30 percent.

14     Kathy Dooley's memos were talking about spreads of 20,

15     25 percent.  You know, a jury could read those memos either

16     way, but at the end of the day, if there's a --

17          THE COURT:  So I can take the Dooley memos as a given,

18     and what you're saying is, yes, there's evidence that I have to

19     take in their favor on act of concealment, but it's immaterial

20     because the government understood these were talking about

21     spreads of 20 and 25 percent, not 30 percent?

22          MR. SCHAU:  Sure.  When you look at the acts of

23     concealment evidence, though, I think the inference you'll draw

24     is that they did not take a price increase for fear that the

25     government would then start focusing on them, as opposed to

1    actively concealing the price of the drug.  In fact, I don't

2    know if it's in this record, but CMS has testified that the one

3    company that told them about the First DataBank bump from 20 to

4    25 percent was Johnson & Johnson.  We sent somebody down to

5    complain.  And I know it's counterintuitive to you that we

6    would do such a thing, but the reason, frankly, is that all of

7    our PBM rebate contracts were based on AWP, so when our drugs'

8    AWPs went up, our rebate obligations to the PBMs went up, so --

9             THE COURT:  So you're a victim of both a --

10            MR. SCHAU:  The system has conflicting --

11            THE COURT:  Is this all over, by the way, yet?  Has

12   AWP, has the rollback all happened and that sort of thing?

13            MR. SCHAU:  I believe it has.

14            MS. CONNOLLY:  That's right.

15            THE COURT:  You see almost nothing about it in the

16   paper.  I don't get the industry press, so --

17            MS. CONNOLLY:  There's still a lot of talk about it in

18   the industry press, your Honor, because the PBMs have attempted

19   to neutralize the rollback, and that's been the new controversy.

20            MR. SCHAU:  Yes, remember, since AWP is a benchmark

21   and you're just taking a number, it's like the prime rate.  You

22   know, you can negotiate 2 points below the prime rate, and then

23   if they change the prime rate on you, you move it to 1 1/2

24   points --

25            THE COURT:  So it has a very blip effect for a brief

f0596d9e-7e2a-4409-b60e-18816d8688a9

1  period of time.

2       MR. SCHAU:  I think you very correctly identified the

3  fact that there was a period of time in which retailers got

4  more money and payors paid more money, but the system kind of

5  accommodated that over time.

6       THE COURT:  I sort of expected that actually.  So I

7  was hearing all this Sturm and Drang about how the world was

8  going to collapse, and I thought, "Hmm, probably not."  But

9  anyway, let me do this.

10       MR. SCHAU:  May I approach the bench just for one

11  thing.  I don't know if you'll find this helpful.

12       THE COURT:  You can give it to Mr. Alba.  That would

13  be great.  Have you seen it?

14       MS. CONNOLLY:  Yes, I have.  He provided it to me this

15  morning.

16       MR. SCHAU:  I tried to create a chart that was more

17  readable that summarized our articulation about the different

18  state standards.  I don't know that you'll find that helpful or

19  even need to reach it because, like I said, I think the core

20  issue is whose knowledge matters.  But be that as it may, I

21  thought you might find this helpful.

22       THE COURT:  Did you file it?

23       MR. SCHAU:  It's a visual representation of a chart

24  that's in the brief.

25       THE COURT:  I read this without my glasses and thought

f0596d9e-7e2a-4409-b60e-18816d8688a9

1    it was the Utopia comparison.  It's the -- anyway, that's not

2    the way it reads.

3             MR. SCHAU:  Your Honor can do with it as you will.  I

4    just thought it might be --

5             THE COURT:  Well, can I say, could you docket it?  I

6    think it's really useful.  I appear to be one of the few judges

7    in the United States who's actually tried to group these

8    statutes and to analyze them all, and, to the extent it ever

9    comes up again, someone might want to come back through and

10   actually see this.  It would be very useful.

11            MR. SCHAU:  Sure, we'll do that.

12            THE COURT:  In any event, let me just say this:  So as

13   this comes down to it, it's really a question of, in the

14   jurisdictions that have a jury trial, where it's clear, I

15   think, that both the government and the industry understood

16   that there was a 30 percent speed bump, consumers, it's

17   conceded, didn't understand anything, had no expectations at

18   all, is there enough evidence for a jury trial where there are

19   certain things like act of concealment underneath the speed

20   bump that could come to a point of unfair and deceptive?  And I

21   think we understand what the issue is, and it's particularly

22   close.  I don't remember even why I said that, but I'll take,

23   on Remicade, as what I must have said before, on a bench trial;

24   and the question is whether that bootstraps it up to a jury

25   trial in these other jurisdictions.  So, I mean, am I right,

1    that's the issue?  It's a fairly narrow issue.

2            MS. CONNOLLY:  That's right, your Honor.

3            MR. SCHAU:  I would be remiss if I didn't tell you one

4    thing.

5            THE COURT:  Yes?

6            MR. SCHAU:  And that is, in the course of our

7    mediation efforts, we have identified the damages that would be

8    associated with applying a 25 percent speed bump to Remicade,

9    and I don't know that I'm at liberty to disclose that number --

10           THE COURT:  No, don't tell me.

11           MR. SCHAU:  -- but I think, if they give me

12   permission, I'll tell you because I don't believe you would

13   want to hold a jury trial in that event.  I think it would be a

14   waste of the Court's time.

15           THE COURT:  Well, let me go off the record just for

16   one minute here because I don't want the exact numbers.

17           (Discussion off the record.)

18           THE COURT:  Can we go back on the record.  We had a

19   very brief discussion about settlement, and I'm going to ask

20   you to talk, and, if it seems worthwhile, to see Mr. Green

21   again.  He's around because he's still doing stuff, great stuff

22   with my cases.

23           And the second thing is, I am considering certain

24   litigation positions taken by the Justice Department, and I

25   don't know what to do with that.  It's like the purple elephant

1  in the room where the Department of Justice has agreed to the

2  30 percent speed bump.  I don't know what I'd do with that.

3  And maybe you could think about that and file something within

4  a week, does that make sense, to try and figure that out?  You

5  haven't been as involved in Dey and Ven-A-Care.

6        MR. SCHAU:  No, you know, I -- it drifts across my

7  desk, but I don't --

8        THE COURT:  And I juggle so many of these different

9  balls in the AWP litigation, I can't remember whether that was

10  for settlement purpose or for litigation purposes, and I'm

11  going to have to look myself.  I suggest you all look and maybe

12  make some phone calls.  And I really encourage you, if that is

13  the case, for you to do some serious thinking about trying to

14  settle the case.  And I don't want to hear numbers in the way

15  we were talking about, okay?  So great.  I thank you very much.

16  You all reminded me of all the interesting issues in this case.

17  And I think we should move on to BMS right now, is that right?

18        MR. NOTARGIACOMO:  Yes, your Honor.

19        THE COURT:  Okay, thank you very much.

20        MS. CONNOLLY:  Thank you, your Honor.

21        THE CLERK:  Court is in recess.

22        MR. SCHAU:  And I'll just docket this as something

23  that was submitted to the Court.

24        THE COURT:  Yes, I just think you might want it for

25  the future.  It's really useful for people.

Page 38

1        MR. SCHAU:  Okay.

2        MS. CONNOLLY:  We have no objection to docketing it.

3        (Adjourned, 11:27 a.m.)

4

5               C E R T I F I C A T E

6

7

UNITED STATES DISTRICT COURT )
8   DISTRICT OF MASSACHUSETTS    ) ss.
CITY OF BOSTON                )
9

10

11        I, Lee A. Marzilli, Official Federal Court Reporter,

12   do hereby certify that the foregoing transcript, Pages 1

13   through 38 inclusive, was recorded by me stenographically at

14   the time and place aforesaid in Civil Action No. 01-12257-PBS,

15   In Re:  Pharmaceutical Industry Average Wholesale Price

16   Litigation, and thereafter by me reduced to typewriting and is

17   a true and accurate record of the proceedings.

18      In witness whereof I have hereunto set my hand this 21st

19   day of July, 2010.

20

21

22

23            /s/ Lee A. Marzilli
             _____
24            LEE A. MARZILLI, CRR
             OFFICIAL FEDERAL COURT REPORTER
25