IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


IN RE:                              )
                                    )  CA No. 01-12257-PBS
PHARMACEUTICAL INDUSTRY AVERAGE     )
WHOLESALE PRICE LITIGATION          )  Pages 1 - 33
                                    )




STATUS CONFERENCE (BMS)

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE




United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
July 12, 2010, 11:30 a.m.




LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 7200
Boston, MA  02210
(617)345-6787

1    A P P E A R A N C E S:

2

     FOR THE PLAINTIFFS:
3
          JENNIFER FOUNTAIN CONNOLLY, ESQ., Hagens Berman Sobol
4    Shapiro, LLP, 1629 K Street, NW, Suite 300, Washington, D.C.,
     20006, for the Class Plaintiffs.
5
          EDWARD NOTARGIACOMO, ESQ., Hagens Berman Sobol Shapiro,
6    LLP, 55 Cambridge Parkway, Suite 301, Cambridge, Massachusetts,
     02142, for the Class Plaintiffs.
7
          KENNETH A. WEXLER, ESQ., Wexler Wallace, LLP,
8    55 West Monroe Street, Suite 3300, Chicago, Illinois, 60603,
     for the Class Plaintiffs.
9

10   FOR THE DEFENDANT:

11        LYNDON M. TRETTER, ESQ. (By Phone), Hogan Lovells, LLP,
     875 Third Avenue, New York, New York, 10022, for Bristol-Myers
12   Squibb Company.

13

14

15

16

17

18

19

20

21

22

23

24

25

c21105ee-8f32-4559-bae0-1598d1c48146

1          P R O C E E D I N G S

2          THE CLERK:  In Re:  Pharmaceutical Industry Average

3   Wholesale Price Litigation, Civil Action 01-12257, will now be

4   heard before this Court.  Will counsel please identify

5   themselves for the record.

6          MR. NOTARGIACOMO:  Ed Notargiacomo for the class

7   plaintiffs, your Honor.

8          THE COURT:  Now, you need to speak into the mike, or

9   he'll never hear you.

10          MR. NOTARGIACOMO:  Ed Notargiacomo for class

11   plaintiffs, your Honor.

12          MS. CONNOLLY:  Jennifer Connolly for the class

13   plaintiffs.

14          MR. WEXLER:  And Ken Wexler for the class plaintiffs.

15          MR. TRETTER:  Lyndon Tretter of Hogan Lovells for

16   Bristol-Myers Squibb Company.

17          THE COURT:  Good.  So I got the standard motion for

18   more time, and with BMS, the level of frustration is that I

19   literally approved this a year ago August, and I've granted one

20   major continuance and now I'm being requested a second major

21   continuance.  And I'm sure you're sick of hearing me say this,

22   but this is a sick and dying class.  So why is this taking so

23   long?

24          MR. NOTARGIACOMO:  I understand, your Honor.  Well,

25   the holdup had been the production of CMS data.  CMS has now

1    produced data.  We're in the process of verifying the

2    completeness of the data.  There's some question about that

3    and --

4              THE COURT:  When did CMS provide it?

5              MR. NOTARGIACOMO:  The end of last month, your Honor.

6              THE COURT:  So the end of June?

7              MR. NOTARGIACOMO:  The end of June, the last week in

8    June.  And the claims administrator has been working to try to

9    verify.  There's some question, there may be some holes, but

10   the vendor for CMS is being cooperative and working with us to

11   make sure we're filling any of those holes.

12             THE COURT:  Well, can't we send out the letters to the

13   first group?

14             MR. NOTARGIACOMO:  Well, I was just going to sort of

15   address what the schedule is predicated on.  It's predicated on

16   two things:  Turning that data into the notice that goes out to

17   Class 1; and if we verified the data, have complete data by

18   next week, it's still going to take the claims administrator

19   till the end of August to get all the notice out.  They can do

20   it on a rolling basis.  It's not to say it all has to go out at

21   once.

22             THE COURT:  When you say missing data, what are we

23   talking about?

24             MR. NOTARGIACOMO:  There was some question about

25   whether we had all the data for all the NDCs.  There's lots of

1    NDCs in Track Two.  There's almost 200 drugs, and there was

2    some miscommunication.  Frankly, some of it may have been --

3              THE COURT:  That's Track Two, but we're talking

4    about --

5              MR. NOTARGIACOMO:  I'm sorry, I'm sorry, on BMS.  I

6    misspoke.

7              THE COURT:  I know, that's why I needed to see you.

8    BMS is which drugs?  Do you remember?  Do you have it down

9    there?

10              MR. NOTARGIACOMO:  You know, unfortunately I'm not as

11    close to the BMS settlement.  I think there are --

12              MR. TRETTER:  I think I can help on that --

13              THE COURT:  All right.

14              MR. TRETTER:  -- if your Honor wants the names of the

15    drugs.

16              THE COURT:  Yes.

17              MR. TRETTER:  There's Blenoxane.  There is cytoxan.

18    There is Vepesid, Etopophos, Paraplatin, Taxol.

19              THE COURT:  These are all cancer drugs, or most of

20    them, right?

21              MR. TRETTER:  Yes, your Honor.

22              THE COURT:  So I need to move with this.  So where's

23    the hole in the BMS data?

24              MR. NOTARGIACOMO:  So the data request to CMS was both

25    Track Two and BMS together, so they were all mixed in together.

1   It wasn't separate BMS --

2          THE COURT:  No offense to the Track Two drugs; they're

3   not life-threatening illnesses.

4          MR. NOTARGIACOMO:  Understood.

5          THE COURT:  I need to get BMS.  So is BMS all in, all

6   the data is in?

7          MR. NOTARGIACOMO:  It's not clear that all the BMS

8   data is in, but we will have it all in I believe in the next --

9          THE COURT:  I don't want to hold it up for Track Two.

10          MR. NOTARGIACOMO:  We're not holding it up for

11   Track Two.  It will all be done together, your Honor.  The

12   vendor is working with the claims administrator to work on all

13   the drugs that were in the request, some of which are BMS

14   drugs.

15          THE COURT:  No, but you're not hearing me.  Why can't

16   we single out -- BMS has taken forever.  Why can't we get out

17   the subset of those drugs that were just listed by Mr. Tretter

18   and get that notice out?  I don't want to hold it back.

19   Track Two's a monster.

20          MR. NOTARGIACOMO:  Understood, and I'm not proposing

21   we hold BMS back for any of that, your Honor.

22          THE COURT:  Well, when can we get just BMS?  Let's

23   fast-track BMS.  It's a smaller number of drugs and it's cancer

24   drugs.  My guess is that half of them are dead already.  I

25   don't want to lose the other half.

1       MR. NOTARGIACOMO:  We can get the notice out on a

2  rolling basis.  I still think it will take us the better

3  portion of August to do that.

4       There's another separate part of that, your Honor,

5  which is, as part of the BMS settlement, we have both Class 1,

6  2, and 3.  Notice has not gone out to any either TPP or

7  consumer in the class, so the schedule that we gave you is

8  predicated on --

9       THE COURT:  Why not?

10      MR. NOTARGIACOMO:  I think a decision was made, and

11 I'm not sure whether it was in --

12      THE COURT:  But we had a schedule.  I've put it off a

13 year already.  We continued -- I think the preliminary approval

14 was August, right?  And then we were going to have everything

15 done by January, and then I got a continuance again, I think

16 till March, and then a continuance again till this month, and

17 it didn't happen, and now you want another -- I don't trust it.

18 Let me just say, I'm at the point where I don't trust it.  And

19 I didn't ever approve that it be joined at the hip with

20 Track Two.  Track Two is, like, easy drugs.  I mean, I'm not

21 saying people don't have illnesses, but they're not like Taxol.

22      MR. NOTARGIACOMO:  Understood, your Honor.

23      THE COURT:  So I want a hearing about, like -- do you

24 want to do it the Monday that we -- I have to go away the rest

25 of this week.  Like, next Monday, what can we do for BMS to get

1   it done?

2         MR. NOTARGIACOMO:  Well, let me go back to the claims

3   administrator to see if we can come up with something shortened

4   for BMS.

5         THE COURT:  Well, let's have the claims administrator

6   here.  Do we have all the data on the BMS drugs?

7         MR. NOTARGIACOMO:  I believe we have most of that

8   data.  I'd have to go back and check, your Honor.

9         THE COURT:  And do we have the data on the TPPs, the

10  third-party payors, and on the -- I don't even remember that

11  settlement anymore.

12        MR. NOTARGIACOMO:  The only settlement we don't have

13  what we talked about in AZ, which is, we don't have data from

14  third-party payors.  We haven't sent notice yet to third-party

15  payors.  That's relatively easily done.  It can be done in the

16  month of August.  But there's a publication notice to

17  Class 3 that needs to also be accomplished, and that's the

18  other thing that's driving the September deadline the Court

19  took umbrage with.  The publications to Class 3 can't begin

20  because they haven't been ordered yet, and they can be ordered

21  this week.

22        THE COURT:  So did you just ignore the last schedule?

23        MR. NOTARGIACOMO:  No, your Honor.  We were waiting to

24  make sure that we could do it all -- there is a benefit to

25  doing all this notice at once.  So Class 1 members may get a

1    card in the mail, but if they also see something in the paper,

2    they're more likely to return the card than if they think it's

3    some, you know, it's just a one-off thing.  So there has been

4    some feeling that we wanted to do all the notice at once rather

5    than do it ad hoc one wave at a time.

6           THE COURT:  What do you mean all the notice at once?

7    Together with Track Two?  That's more confusing.

8           MR. NOTARGIACOMO:  Not with Track Two, your Honor, but

9    all the notice for the BMS settlement --

10          THE COURT:  But why can't we -- we had a schedule to

11   accomplish that by last week.  Now you want another four months

12   or three months, I forget.  Like, it keeps getting pushed off,

13   and Track Two kept getting pushed off, and I don't -- we need

14   some sense of urgency, and I'm not seeing it.  I understand

15   that it's more effective to do it in conjunction, but it's a

16   serious case, as you know.  You brought it.  So how about,

17   like, having a status next week and have the claims

18   administrator here and have the -- you know, just I want BMS to

19   be fast-tracked ahead of Track Two.  We've always had that in

20   mind.

21          MR. NOTARGIACOMO:  That's fine, your Honor.  Let me go

22   back and see what we can do.  Rather than have a hearing, maybe

23   I can submit something that will satisfy your Honor.

24          THE COURT:  I don't think so.  I don't believe there's

25   a sense of urgency on the BMS.  I don't understand.  It was

1   just like a boilerplate motion to continue, and it's just

2   important.  And I understand you probably find it makes more

3   sense from the internal office point of view and maybe from the

4   claims administrator, or maybe even from Medicare, to do it in

5   conjunction with Track Two, but that's a huge, huge number of

6   drugs, right?  It would be too confusing to send all the

7   notices out at once anyway.

8               MR. NOTARGIACOMO:  No one is proposing that we send

9   Track Two out with BMS.  I'm not proposing that, your Honor.

10  It's just that the request for CMS was to --

11              THE COURT:  Do you remember how much for Class 1 in

12  the Medicare?

13              MR. NOTARGIACOMO:  How much what, your Honor?

14              THE COURT:  How much money we have in the pot in

15  Track One for BMS?

16              MR. NOTARGIACOMO:  I don't think it's split up between

17  classes, your Honor.  I think it's done consumer versus

18  third-party payor, and I don't recall what the split is.  I'm

19  sorry.

20              THE COURT:  Are there independent settling health

21  plans?

22              MR. NOTARGIACOMO:  In BMS, no, there are no

23  independent settling health plans.

24              THE COURT:  So that's why you don't have the

25  individual data.

1          MR. NOTARGIACOMO:  Correct.

2          THE COURT:  So that's why we would need a more robust

3     publication plan probably.

4          MR. NOTARGIACOMO:  Correct, your Honor, and the most

5     aggressive schedule we can put in currently ends those

6     publications the week of September 6, or September 10 I think

7     is the end of that.  So that's why September 17 was a logical

8     date to put in that schedule, and that's why September 17 is

9     there.  We can do a rolling notice to Class 1, and it will be

10    finished by then at the same time the publications will be

11    finished, and that's the schedule that we provided --

12         THE COURT:  So you haven't put it in any publications

13    yet?

14         MR. NOTARGIACOMO:  Correct.  So even if the claims

15    administrator can, and we will push them to do it quickly --

16         THE COURT:  Let's have a hearing with -- is the claims

17    administrator local?

18         MR. NOTARGIACOMO:  No.  They're in Palm Beach,

19    Florida, your Honor.

20         THE COURT:  I just don't have the sense of urgency

21    that they understand how seriously we need to move this.

22         MR. NOTARGIACOMO:  Well, I think part of it's

23    predicated on the fact that if nothing can happen because the

24    publications can't happen, that, you know, they can do it

25    within that time period, we can do it more quickly for Class 1.

1  BMS only, not Track Two.  We're putting Track Two aside.

2  That's not part of what we're discussing here.  But they can do

3  a rolling notice to Class 1, and it will be finished by the

4  time the publications are finished, and that's the schedule

5  that we've given you.

6          THE COURT:  Well, why is it so long?  Why haven't you

7  put the ads in yet?

8          MR. NOTARGIACOMO:  As I said, your Honor, we were

9  waiting to do it all at once.  I can go back this afternoon and

10  tell Kinsella's office -- and they do all the media buys -- to

11  make the buys for this settlement, and --

12          THE COURT:  Absolutely.

13          MR. NOTARGIACOMO:  -- I will do that, and that still

14  won't get us to the goal line, having all the publications

15  finished, until September 10 because you can't just -- you

16  can't call a publication and have it published the next day or

17  the next week.  There's some lag time and some lead time they

18  need in order to get into the publication.

19          THE COURT:  I forget, they told me once, was it

20  30 days?

21          MR. NOTARGIACOMO:  Every publication is different.

22  Some of the larger ones are 30 days; some of the smaller ones

23  are less time.  But it takes some time, and they have to

24  approve copy, and there is some -- you know, they have to make

25  sure that they have space in the publication.  So the earliest,

1    and I pushed them on this, the earliest they can get this

2    publication --

3              THE COURT:  Can I just say, I know you're busy on a

4    thousand things.  I know this has dipped to less urgent in your

5    office, you know, just because it's sort of on track.  I just

6    have this sense of utter frustration that this is a year after

7    the preliminary approval.

8              MR. NOTARGIACOMO:  I understand.

9              THE COURT:  I don't understand why that's happened.

10             MR. NOTARGIACOMO:  Well, I think it's primarily been

11   the CMS data, but now we've worked through that issue, and now

12   we need to basically push the button, go, and this is the

13   schedule I think that --

14             THE COURT:  And what about Track Two?  What's

15   happening on that?

16             MR. NOTARGIACOMO:  Track Two, we propose to put in a

17   schedule that's somewhat similar to this one.  There's more

18   drugs, as you recognize, and more NDCs.  It may take a little

19   while to turn that data into complete notice, but I think we're

20   at a schedule that's commensurate with this or maybe pushed out

21   a little bit more than that, but we will be filing something.

22             THE COURT:  So why don't we do this:  At least we'll

23   have a hearing, a status conference -- I'm gone the rest of

24   this week -- sometime the following week.  We can put the

25   claims administrator -- I don't want him to spend any more

1    money that comes out of the class's pocket -- on a

2    teleconference with us.  Who else?  Kinsella on a status

3    conference with us.  Who's running this program in your firm,

4    the people who are here?

5          MR. NOTARGIACOMO:  It would be me, your Honor.

6          THE COURT:  All right, so let's just do that for like

7    the week of July 19, like for 15 minutes just to make sure

8    everything -- I'm not even approving this yet.  I want to make

9    sure everything is in place.  And I'm going to give a court

10   order so it's at the contempt level, or I'll disapprove

11   attorneys' fees or something.  It's got to be the priority.

12         MR. NOTARGIACOMO:  I understand.

13         THE COURT:  When did the First Circuit order come down

14   approving it?  It was a year ago, right?

15         MR. NOTARGIACOMO:  I'm not sure it's quite a year, but

16   it's been a while.

17         THE COURT:  So when can we do it for fifteen minutes?

18         THE CLERK:  July 20 at 3:00.

19         MR. TRETTER:  Your Honor, this is Lyndon Tretter.  The

20   only day I'm not available, I'm in Pittsburgh on Monday.

21         THE CLERK:  Tuesday the 20th at 3:30.

22         THE COURT:  Can you do Tuesday the 20th at 3:30?

23         MR. TRETTER:  Yes, your Honor.

24         THE COURT:  That's good.  And I'm hoping you're just

25   simply going to say "done," the ads have been placed, the

1    letters have gone out, we've got third-party notices in play,

2    and it will take two minutes.

3            MR. NOTARGIACOMO:  I hope so, your Honor.  I know the

4    ads -- I can report that the ads will be placed.

5            THE COURT:  So what else are the hold-ups?

6            MR. NOTARGIACOMO:  Just getting the notice out may

7    take some time, but I'll work with the claims administrator.

8            THE COURT:  Well, why does it take time, and why

9    hasn't it happened, sort of, like, been in motion?

10           MR. NOTARGIACOMO:  It has been, your Honor, but we had

11   to get the data.  There is a considerable amount of data that

12   the claims administrator needs to look at and make sure they

13   have all the data fields that they had for all of the NDCs that

14   were requested.  That's a process --

15           THE COURT:  Yes, and I'm assuming what's happened

16   there is that they've done them all in a jumble rather than

17   separate for BMS, so if they --

18           MR. NOTARGIACOMO:  And that was the fault of class

19   counsel.  We put them in together thinking, frankly, we would

20   save money if we did it.  If we did them separately, there

21   would be a separate charge from CMS's vendor for --

22           THE COURT:  Well, no, you just front-end one.  Why

23   would it be more expensive?

24           MR. NOTARGIACOMO:  Well, they don't really --

25           THE COURT:  Unless I'm not understanding.

1        MR. NOTARGIACOMO:  Well, I mean, the way CMS runs

2   data, they run the request all at once.  It's not as if --

3        THE COURT:  Yes, but now that we've got -- why would

4   it be more expensive for the claims administrator?

5        MR. NOTARGIACOMO:  No, I meant just simply when we

6   requested the data from CMS --

7        THE COURT:  Right, so have the claims administrator

8   front-end the BMS drugs.

9        MR. NOTARGIACOMO:  We intend to do that, your Honor.

10  There's been no hint that we would tie notice on Class 1 to

11  BMS.

12       THE COURT:  But even reviewing the accuracy of the

13  data, that should all be able to be done in a week.  You were

14  saying that you thought maybe it wouldn't be, so --

15       MR. NOTARGIACOMO:  I think that it will be done by the

16  end of this week or early next week.

17       THE COURT:  Good, so we'll have that hearing.  And

18  then once he's verified the adequacy of the data, is that just

19  pressing a button and all the notices go out?

20       MR. NOTARGIACOMO:  No.  They need to print those

21  notices and mail them out.

22       THE COURT:  So we're doing it by snail mail?

23       MR. NOTARGIACOMO:  It's not electronic.  Yes.

24       THE COURT:  And how many people are we talking about?

25       MR. NOTARGIACOMO:  It's in the millions.  I'm not

1  exactly sure how many --

2        THE COURT:  All right, so it's a huge number of

3  people, so it might take a while literally to --

4        MR. NOTARGIACOMO:  Right, which, as I tried to explain

5  to your Honor, that may take a good portion, two, three, maybe

6  four weeks to do that to do it on a rolling basis; and that's

7  what led us to the beginning of September for the finalization

8  of Class 1 notice.  Then we have the publications as I

9  explained --

10       THE COURT:  The publications should happen, like,

11  tomorrow, so that's not --

12       MR. NOTARGIACOMO:  Well, the ordering, yes, the

13  ordering of the publications can happen this afternoon, but

14  those publications don't appear for a month or more.

15       THE COURT:  So if you have millions of people for BMS

16  alone -- is that what you're saying?

17       MR. NOTARGIACOMO:  I believe so, your Honor.  I don't

18  know the exact number.

19       THE COURT:  Okay, all right, so that's a huge number

20  of data, and they need to go verify it and then press a button.

21  Is that what happens?

22       MR. NOTARGIACOMO:  No.  They need to then take that

23  data and turn it into printed notice and mail to Class 1 the

24  notice.

25       THE COURT:  Okay, all right, that's fair enough.  And

1   you got that data from CMS the end of the month, the last

2   month.

3           MR. NOTARGIACOMO:  Right.

4           THE COURT:  And so have they already started this

5   process?

6           MR. NOTARGIACOMO:  They have, and there were some

7   issues, and they talked to the vendor and worked through those,

8   so the vendor --

9           THE COURT:  But do you know whether they've done that

10  intermingled between BMS and the other --

11          MR. NOTARGIACOMO:  I don't know.  I'd have to go back

12  and find out.

13          THE COURT:  Because I understand what your problem is:

14  You need to make sure that the millions of people for BMS have

15  adequate notices.

16          MR. NOTARGIACOMO:  Correct.

17          THE COURT:  So if they haven't front-ended BMS, you

18  may not have that ready.

19          MR. NOTARGIACOMO:  Or they can front-load BMS.

20          THE COURT:  We're going to front-load it now, but it

21  may not be doable within a week, so what we'll have is a status

22  report about when it is doable, right?

23          MR. NOTARGIACOMO:  Sure, yes, your Honor.

24          THE COURT:  Because that's a lot of people, and you

25  need them to be correct.  And what about the third-party payor

1    notices, can that be ready by next week?  Who does that, the

2    claims administrator?

3            MR. NOTARGIACOMO:  The claims administrator does that

4    as well, and that can be done -- I think it takes them a total

5    of two weeks to get that out.  It's much smaller.  It's 40,000

6    pieces of mail, so I think they can --

7            THE COURT:  And do you have to have actual dollar

8    amounts on these notices?

9            MR. NOTARGIACOMO:  On the TPP claims, no.

10           THE COURT:  But you do on the class?

11           MR. NOTARGIACOMO:  Not on the initial class notice.

12   There's a postcard that goes out, a page with a cut-out

13   postcard, and then they return that, and then a further notice

14   goes out and --

15           THE COURT:  Oh, then why would it take so long to

16   verify the data then if the dollar numbers aren't going on it?

17           MR. NOTARGIACOMO:  Just because of the -- you know,

18   I'm not a computer technician, your Honor.  I'm not sure

19   exactly what's all involved, but --

20           THE COURT:  I'm sure you will, huh?  Because I think

21   if it's just the address and you're not verifying, you know,

22   the amount of money they spent on these drugs, that may not

23   take so long, right?

24           MR. NOTARGIACOMO:  I think the issue was to make sure

25   they ran all of the correct NDCs because, you know, one person

1    may be associated with three or four different NDCs, or one

2    person may be associated with just one NDC, and if you've

3    missed that NDC, you've missed that address sort of thing, so

4    I'll get clarification, your Honor.

5            THE COURT:  That would be great.  So that hopefully it

6    will either be done by that Tuesday, or at least you'll know

7    exactly where it is in the pipeline so there will be no more

8    continuances, right?

9            MR. NOTARGIACOMO:  Correct.

10           THE COURT:  And what happens if all these people have

11   died and there's a huge excess, what happens to that money?

12           MR. NOTARGIACOMO:  It's not clear.  I don't recall

13   what, in the Bristol-Meyers settlement, whether that's left up

14   to the discretion of the Court or whether there's some

15   predetermined payment.  I think it may go to cy pres, but I

16   don't recall.

17           THE COURT:  That's my concern.

18           Do you remember, Mr. Tretter?

19           MR. TRETTER:  I do not, your Honor.

20           THE COURT:  And I don't either.  So we need to move

21   with all due speed.

22           Now, on the Track Two, do I see a motion for another

23   continuance coming down the line?

24           MR. NOTARGIACOMO:  We don't currently have a schedule.

25   What you'll find is, we'll file a motion for a schedule.

1       THE COURT:  Well, so maybe on that Tuesday you can

2   come up with a definitive statement, because you'll be doing

3   the research anyway, so we can get that done.

4       MR. NOTARGIACOMO:  Sure.

5       THE COURT:  Because that's the end of it for you,

6   right, in terms of your commitment to this litigation?

7       MR. NOTARGIACOMO:  Right.  Once, you know, J&J gets

8   clarified or some decision is made there, we have AZ which we

9   just heard, and we have these BMS and Track Two --

10      THE COURT:  I mean, we're within three to six months

11  of finishing this litigation.

12      MR. NOTARGIACOMO:  Correct, your Honor.

13      THE COURT:  By year end, really.  Does that sound

14  right?  I have the Justice Department stuff.  I have New York

15  counties.  I've got various states.  But from the class, which

16  you're the ones I started with, it's over by year end.  Is that

17  everybody's goal?

18      MR. NOTARGIACOMO:  That is our goal, your Honor.

19      MS. CONNOLLY:  From your perspective.  Absent appeals.

20      THE COURT:  Absent -- oh, fair enough, from my point

21  of view.  Do we see any appeals on the BMS?  I don't even

22  remember.

23      MR. NOTARGIACOMO:  Don Haviland has sort of already

24  shot across the bow, if you will, and he does have a motion

25  that will be heard, or I'm not sure if it's a motion or an

1   objection that will be heard along with --

2           THE COURT:  Have I heard this yet?

3           MR. NOTARGIACOMO:  Yes.

4           THE COURT:  This is about what?

5           MR. NOTARGIACOMO:  He has filed a motion seeking to

6   have the Court enforce a separate memorandum of understanding

7   with respect to Class 1 only.

8           THE COURT:  Is that the attorneys' fees?

9           MR. NOTARGIACOMO:  No.

10          THE COURT:  What's it about?

11          MR. NOTARGIACOMO:  The settlement between BMS and the

12  class was originally Class 1 only, and then there was a dispute

13  about the interpretation of the memorandum of understanding

14  related to that settlement.  And BMS was attempting to have any

15  excess payment to Class 1 spill over to payments to a potential

16  settlement with Class 2 and Class 3.  We disagreed with that.

17  That MOU was put in front of your Honor for interpretation.  I

18  think your decision was that while BMS did not have the right

19  under the MOU to direct the excess funds that weren't paid to

20  Class 1 you did make some statements about some of the

21  arguments that BMS made, they might have some merit.  Class

22  counsel decided that given that, there was some risk and we

23  should go back; and we negotiated a settlement for Classes 1,

24  2, and 3, which is what is in front of you today.  The original

25  settlement was Class 1 only for $13 million.  This settlement

1  is Classes 1, 2, and 3 for a total of $19 million, plus

2  $1 million, I think, in either claims or attorneys' fees.  I

3  think it's actually claims expenses.  So that's a total of

4  $20 million.

5           THE COURT:  And the objection is what, that this isn't

6  a fair allocation?

7           MR. NOTARGIACOMO:  So Don Haviland has filed a motion

8  with your Honor to have your Honor enforce -- I think he's

9  actually argued that you should enforce both the original MOU

10  and this current settlement, but, at any rate, he wants you to

11  enforce at least the original MOU, which was a $13 million

12  settlement for Class 1 only.  I don't know if Mr. Tretter has a

13  different take on the history.

14           THE COURT:  And how long ago was that filed?

15           MR. NOTARGIACOMO:  That was filed I would say two,

16  three months ago prior to -- yes, I would say about two or

17  three months ago, and there was some question about whether

18  that would be heard then or we would wait until final approval

19  of the BMS settlement, and I think the Court ordered that we

20  would wait until final approval to consider Mr. Haviland's

21  motion.

22           MR. TRETTER:  I think that's essentially right.  It's

23  an allocation issue, your Honor, and your Honor issued a ruling

24  saying that "I'm going to treat Mr. Haviland's motion to

25  enforce the Class 1 MOU as an objection to the settlement."

1          THE COURT:  All right.

2          MR. TRETTER:  And we'll hear it, you know, and the

3     parties have to brief their response.

4          THE COURT:  All right.

5          MR. NOTARGIACOMO:  That's the only objection that I'm

6     aware of with respect to BMS.

7          THE COURT:  I know there isn't fabulous blood between

8     the parties, but have you all tried to work with him to work

9     that issue out?

10         MR. NOTARGIACOMO:  I haven't personally.  I'm not sure

11    if we've reached out to him.  I think we've had a few initial

12    conversations, you know, concerning the scheduling of his

13    motion or the response to his motion.

14         THE COURT:  Because what I don't want is what happened

15    with one of these along the way -- I can't remember which

16    one -- we had to go back and renotice everybody because there

17    was a substantial change as a result of my -- was that this

18    case?

19         MR. NOTARGIACOMO:  I believe you're thinking about

20    Track Two and cash payors, and we had to go back and notice

21    cash payors, and we did that.

22         THE COURT:  Is there anyone who these days has a

23    speaking relationship with Mr. Haviland?  The Wexler firm?

24         MR. WEXLER:  No.

25         MR. NOTARGIACOMO:  He's always very polite, and we

1   have a cordial relationship with him, but --

2           MR. TRETTER:  You know, your Honor, I think that one

3   important point is going to be something that you said a few

4   minutes ago, which is, once these notices go out, you're going

5   to see what kind of response there is.  I mean, that is going

6   to inform everybody's opinion about this ultimate issue about

7   the allocation.

8           THE COURT:  Well, what I don't like is -- it's only

9   happened once that I remember in this case, but I think it's

10  happened in another one of my cases, where I do think one of

11  the objections is valid, let's say, and then we have to -- it's

12  such -- that's why I'm feeling this sense of urgency.  And then

13  I end up -- so if there's any way of before I send out this

14  notice of what the settlement is about, who at this point would

15  be the appropriate person to reach out to Mr. Haviland and --

16          MR. WEXLER:  I'm willing to do so, your Honor.  I'm

17  perfectly willing to do so.

18          THE COURT:  Rather than have this be always such a

19  pitched battle, because while I understand there's a lot of bad

20  blood here for lots of reasons, some of which I found, I think,

21  in prior opinions is valid, the bottom line is that sometimes

22  he has good ideas and thoughts, and so it's at least worth to

23  see if there's a -- if not, I'll rule on objections and I'll

24  see what I think, but it's at least worth a stab.

25          MR. WEXLER:  I'm volunteering to take that stab with

1   the understanding that --

2          MR. TRETTER:  You know, I don't think I'm the right

3   person.  Let's put it that way.

4          MR. WEXLER:  I'm not hopeful, but I will try.

5          THE COURT:  Maybe someone from his old firm?  I don't

6   even know who the right people would --

7          MR. WEXLER:  They're in litigation.

8          THE COURT:  Oh.  I leave it up to you.  That's why I'm

9   here is to rule on objections.  But I do think that the worst

10  of all possible worlds would be to send all this out, have a

11  final approval hearing, let's say in November or whenever we're

12  going to do it, and then have me think that there's an issue.

13  I haven't even read the stuff, as you can tell.  I didn't think

14  it was appropriate to do early on, but I don't want to just be

15  blindsided by it and then think, "Oh, gee, he has a point

16  here."  At least it's worth an effort to see if there's some

17  resolution.  You and I have worked together on things, and the

18  preliminary approval I didn't think totally flew correctly, and

19  it was a good, you know, conversation, I thought, you know.  So

20  maybe there are certain things that can be done where BMS won't

21  care.

22          MR. NOTARGIACOMO:  Well, I think the problem, your

23  Honor, speaking frankly, is, I don't think he's requesting

24  changes or making objections to particulars in this settlement.

25  I think he's sort of, you know, arguing something completely --

1   you know, an animal of a different color, which is enforce a

2   separate settlement agreement that was embodied in a separate

3   MOU that's beside this settlement.

4           THE COURT:  Well, I can't do that.  It's got to be

5   part of the settlement, so -- it's of course got to be

6   disclosed to me, and I guess that's happened.

7           MR. NOTARGIACOMO:  It has, your Honor.  That MOU was

8   put in front of you for interpretation.

9           THE COURT:  Well, I haven't read it yet, I haven't

10  done anything, but I sure as heck don't want to have to, you

11  know, have a simple solution be there that you could have

12  negotiated, and then --

13          MR. NOTARGIACOMO:  Well, I by no means want to suggest

14  that it's not worth reaching out to Mr. Haviland and having a

15  discussion.  I think it is.

16          THE COURT:  I think it is too.  Well, thank you very

17  much.  So, ideally speaking, when I see you on the 20th, it's

18  going to be a three-minute hearing where you're just going to

19  explain that this is on its way and I'm not going to get

20  another motion for a continuance, that's my big goal here,

21  because what happens once everything is done?  It takes us

22  another two months, right?  Now, when does the money start

23  going out the door?

24          MR. NOTARGIACOMO:  Oh, it usually takes -- even after

25  final approval, it takes months to --

1        THE COURT:  That's what's so worrying me.

2        MR. NOTARGIACOMO:  And we always do prioritize --

3        THE COURT:  And what if I have to take a month or two

4   to rule on the MOU?  I mean, I'm just ready to fly on this.

5        MR. NOTARGIACOMO:  Understood, your Honor.  Yes, we

6   always prioritize payment of consumers before third-party

7   payors, but that does take -- it does take some time.  It's not

8   an immediate right after the approval order is signed.

9        THE COURT:  So maybe you can have a little timetable

10  for the claims administrator so we can make sure that the

11  consumers are prioritized and how long the claims process.  But

12  when would we have the final approval hearing, like in

13  November?

14        MR. NOTARGIACOMO:  November 12 is the proposed

15  schedule, so a week before Thanksgiving I guess that would be.

16        THE COURT:  So that means people wouldn't be seeing

17  money till January or February, right?

18        MR. NOTARGIACOMO:  That's correct, your Honor.

19        MR. WEXLER:  And that's with no objections, no --

20        THE COURT:  Right, that's what's worrying me to death.

21  That's why, you know, the no appeal thing, we've just -- it's

22  terrible.  I'm just --

23        MR. WEXLER:  I mean, we know from past experience --

24        THE COURT:  So work it out with him if you can and

25  then get these -- I know that, and that's why when I saw the

1    sort of another three or four months after I'd already granted

2    three or four months, I'm worried.  So that's why I -- I'm not

3    angry at you.  I just need --

4            MR. NOTARGIACOMO:  I understand.

5            THE COURT:  I just need a fire going under this.  It

6    could take another year if it goes up on appeal.  I once tried

7    to impose a bond, and I don't know if they declined it or it

8    was withdrawn.  I don't know what the deal was, but --

9            MS. CONNOLLY:  They appealed the entry of the bond.

10           MR. WEXLER:  Right, they opposed it.  Then they

11   appealed the entry of the bond.

12           THE COURT:  And what happened?  Do we even know?  I

13   never even saw a ruling on it.

14           MS. CONNOLLY:  That was the one that we resolved the

15   appeal.

16           THE COURT:  Oh, you resolved the appeal.  I just don't

17   want to be there.

18           MS. CONNOLLY:  We don't either, your Honor.

19           MR. WEXLER:  We don't want to have to resolve the

20   appeal --

21           THE COURT:  Well, there's nothing I can do about it,

22   so I think someone needs to have a serious conversation and try

23   and work it out to get the money in these people's hands.

24           So thank you very much.  It's been a very, very

25   fruitful morning.  Does anyone have anything they need?

1          MR. TRETTER:  Just a logistical question, your Honor,

2     about this thing on Tuesday.  Is there going to be some sort of

3     conference call number?

4          THE COURT:  You don't have to come up for it.

5          MR. TRETTER:  Okay.  I didn't understand whether the

6     settlement administrators would be on the line or --

7          THE COURT:  We can work out a conference call, can't

8     we?

9          MR. NOTARGIACOMO:  Or we can provide one.

10         THE COURT:  Yes, that would be great.

11         MR. TRETTER:  All right, so I'll just get that from

12    Mr. Notargiacomo.

13         THE COURT:  And one last thing before I let you go.  I

14    don't want to fall off the cliff the Connecticut McKesson

15    trial, which I got another continuance on.  And who's working

16    on that?  Are you working on that, Ms. Connolly?

17         MS. CONNOLLY:  Yes, your Honor.  The issue with the

18    Connecticut trial was that we have a settlement in principle on

19    the monetary amount.  There are two conditions in the

20    settlement, one of which requires the federal government to

21    provide a signoff that our settlement represents Connecticut's

22    dollars only and that the government will go separately after

23    the federal Medicaid dollars.

24         THE COURT:  Well, we've done that before and --

25         MS. CONNOLLY:  They have agreed in principle to that.

1  The process of working out the agreement with them has been

2  very difficult.  They actually have represented to us that they

3  have never actually reached an agreement like this before.  So

4  it has proven more difficult than we anticipated.  So it may

5  be, your Honor, you said --

6           THE COURT:  But I don't want to just have this lag

7  along.  Here's my problem:  I actually had this time blocked

8  off for it.  I actually planned on trying it, and now I'm sort

9  of down two or three weeks.  So the question is, do you want

10 the date to speed it along?  Do you --

11          MS. CONNOLLY:  You've set a status for August 5, and I

12 think at that time, if we come before you and there are still

13 difficulties with the Department of Justice, that we may

14 request your intervention in working with them to make the deal

15 go through.

16          THE COURT:  Well, could you get them -- I know that

17 Mr. Green has gotten concessions in various of the other cases.

18          MS. CONNOLLY:  Yes, we could possibly have

19 Judge Infante.  He's worked --

20          THE COURT:  All right, Infante is fine too.  I haven't

21 met him, but I've heard he's done good work on this too.  But I

22 just -- I know they've signed off on some of these before

23 because we've had these settlements before.  And, by the way, I

24 am trying the Mylan case the beginning of September, and then I

25 have the Dey cases, if they don't wrap up, and so it's not like

1  I can just snap my fingers and give you another date.  That's

2  my problem.

3         MS. CONNOLLY:  That's right, we understand, your

4  Honor.  And perhaps it would be worthwhile for Judge Infante to

5  reach out to Eric Green and for them to discuss how this has

6  been accomplished before to facilitate --

7         THE COURT:  That would make a lot of sense.  Why don't

8  you have him do that.

9         MS. CONNOLLY:  Sure.

10        THE COURT:  Because on August 5 I'm going to set a

11 trial date, but I will have to tell you that, you know, you

12 basically had a beautiful three or four weeks bought in time,

13 and you've lost it, and you go down into a later period of

14 time.

15        MS. CONNOLLY:  Right.  Well, even if we're not going

16 forward in Connecticut, as you'll recall, your Honor, the

17 states of Oklahoma and Montana are ready to go forward, so

18 they'll take whatever trial date you give, even if we're

19 finished with Connecticut.

20        THE COURT:  So we should send out trial dates on both

21 of those?

22        MS. CONNOLLY:  Yes.

23        THE COURT:  All right, Robert, maybe we will do that.

24 Okay, sounds good to me.  And are those a part of the MDL, or

25 they're separate?

1          MS. CONNOLLY:  There is no MDL in the public payor

2     cases.  They're all consolidated, but there is no MDL.

3          THE COURT:  Oh, that's the issue of whether I should

4     even do them then or whether I should send them out to the

5     hinterlands, right, to where they're from?  Why should I do

6     them?

7          MS. CONNOLLY:  The states wanted to be here, your

8     Honor.  And, you know, as we discussed, it's a nationwide venue

9     statute under RICO.

10         THE COURT:  I know, but, you know, I just tried the

11    Neurontin case, which is not yours but my other MDL, both of

12    which are, you know, assigned here.  And that was Kaiser versus

13    Pfizer, and the only real connection here was my expertise

14    because of the MDL, which is fine, but at some level it

15    involved -- it's been involving difficult areas of California

16    law.  And so at some point, though, it makes sense to come up

17    to their local, you know, the courts that are more familiar

18    with the local laws.  So why don't we resolve all that on

19    August 5.

20         MS. CONNOLLY:  Yes.

21         THE COURT:  Okay, thank you.  All right.

22         MS. CONNOLLY:  Thank you, your Honor.

23         THE CLERK:  Court is in recess.

24         (Adjourned, 12:03 p.m.)

25

Page 34

1                       C E R T I F I C A T E

2

3

   UNITED STATES DISTRICT COURT )
4  DISTRICT OF MASSACHUSETTS    ) ss.
   CITY OF BOSTON               )

5

6

7            I, Lee A. Marzilli, Official Federal Court Reporter,

8  do hereby certify that the foregoing transcript, Pages 1

9  through 33 inclusive, was recorded by me stenographically at

10 the time and place aforesaid in Civil Action No. 01-12257-PBS,

11 In Re:  Pharmaceutical Industry Average Wholesale Price

12 Litigation, and thereafter by me reduced to typewriting and is

13 a true and accurate record of the proceedings.

14      In witness whereof I have hereunto set my hand this 21st

15 day of July, 2010.

16

17

18

19

20            /s/ Lee A. Marzilli

            _____
21            LEE A. MARZILLI, CRR
            OFFICIAL FEDERAL COURT REPORTER
22

23

24

25