# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL NO. 1456 |
| THIS DOCUMENT RELATES TO:<br><br>BMS SETTLEMENT | CIVIL ACTION: 01-CV-12257-PBS<br><br>Judge Patti B. Saris |

## CORRECTED CLASS PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF JOINT MOTION FOR FINAL APPROVAL OF CLASS 2 AND CLASS 3 COMPONENTS OF BMS SETTLEMENT

# TABLE OF CONTENTS

**PAGE**

I.     INTRODUCTION .................................................................................................1

II.    SUMMARY OF THE CASE .............................................................................2

       A.     Plaintiffs' Allegations .........................................................................2

       B.     Plaintiffs' Prosecution of the Case....................................................2

       C.     BMS' Response to the Litigation........................................................3

       D.     Summary of the Settlement Negotiations With BMS ......................3

III.   DESCRIPTION OF THE PROPOSED SETTLEMENT .................................4

       A.     The Proposed Settlement Classes ......................................................4

       B.     The Total Settlement Amount and Allocation ..................................5

       C.     The Distribution Plan and Claims Process........................................6

              1.     The distribution plan ................................................................6

              2.     The claims process ...................................................................7

                     a.     Required claims documentation..................................7

                            (1)    Consumer Class Members ................................7

                            (2)    TPP Class Members..........................................8

                     b.     Calculating Recognized Claim Amounts.....................9

                            (1)    Consumer Class Members in Class 3................9

                            (2)    Sample calculations for hypothetical Consumer claims....10

                            (3)    TPP Class Members........................................11

       D.     Attorney's Fees and Expenses and Compensation Awards................11

       E.     Notice Was Given to the Class ..........................................................12

              1.     Notices ......................................................................................14

              2.     Direct Notice Program .............................................................14

3.    Paid Media ........................................................................................14

4.    Results of Notice Program .................................................................15

IV.    ARGUMENT .......................................................................................................15

A.    The Court Should Certify the Proposed Class Pursuant to Rules 23(a) and
23(b)(3) for Purposes of Settlement ........................................................17

1.    The requirements of Rule 23(a) have been satisfied...................17

a.    Numerosity.......................................................................17

b.    Commonality and typicality.............................................18

c.    Adequate representation...................................................20

2.    The requirements of Rule 23(b)(3) have been satisfied............22

a.    Questions of law or fact common to Class Members
predominate over any questions affecting only individual
members.............................................................................23

b.    A class action is superior to other available methods for the
fair and efficient adjudication of this matter...................23

V.    THE SETTLEMENT IS REASONABLE AND SHOULD BE APPROVED .................24

A.    The Standard for Approval of Class Settlement:  A Presumption in Favor of
Settlement .................................................................................................24

B.    Factors to Consider When Determining the Fairness, Adequacy and
Reasonableness of a Settlement ...............................................................26

1.    Comparison of proposed settlement with the likely result of litigation.....27

a.    Risks of establishing liability..........................................28

b.    Risks of proving damages................................................29

c.    Other risks of continuing the litigation ..........................29

d.    The amount recovered......................................................29

2.    Stage of the litigation and the amount of discovery completed................31

3.    Quality of counsel ......................................................................32

- ii -

4.      Conduct of the negotiations:  the proposed Settlement is the result of arduous, arms-length negotiations conducted by highly experienced counsel .......................................................................................................32

5.      Prospects of the case, including risk, complexity, expense and duration .......................................................................................................33

6.      Reaction of the Class ................................................................................34

VI.     CONCLUSION................................................................................................................34

001534-16  408244 v1

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Air Lines Stewards & Stewardesses Ass'n Local 550 v. American Airlines, Inc.*,
  455 F.2d 101 (7th Cir. 1972) ........................................................................................13

*Amchem Prods. v. Windsor*,
  521 U.S. 591 (1997)..........................................................................................12, 16, 23

*Andrews v. Bechtel Power Corp.*,
  780 F.2d 124 (1st Cir. 1985)......................................................................................18, 21

*Bussie v. Allmerica Fin., Corp.*,
  50 F. Supp. 2d 59 (D. Mass. 1999) .................................................................................32

*Carlough v. Amchem Prods., Inc.*,
  158 F.R.D. 314 (E.D. Pa. 1993)......................................................................................12

*City P'ship Co. v. Atlantic Acquisition Ltd. P'ship*,
  100 F.3d 1041 (1st Cir. 1996)...........................................................................16, 24, 25, 32

*Collazo v. Calderon*,
  212 F.R.D. 437 (D.P.R. 2002) ........................................................................................19

*Denney v. Jenkens & Gilchrist*,
  230 F.R.D. 317 (S.D.N.Y. 2005) ................................................................................21, 24

*Detroit v. Grinnell Corp.*,
  495 F.2d 448 (2d Cir. 1974).............................................................................................30

*Donovan v. Estate of Fitzsimmons*,
  778 F.2d 298 (7th Cir. 1985) ..........................................................................................25

*Duhaime v. John Hancock Mut. Life Ins. Co.*,
  177 F.R.D. 54 (D. Mass. 1997)..........................................................................19, 20, 28, 31

*Duhaime v. John Hancock Mut. Life Ins. Co.*,
  183 F.3d 1 (1st Cir. 1999)................................................................................................25

*Durrett v. Housing Auth. of Providence*,
  896 F.2d 600 (1st Cir. 1990)......................................................................................12, 25

*E.E.O.C. v. Hiram Walker & Sons, Inc.*,
  768 F.2d 884 (7th Cir. 1985) ..........................................................................................25

- iv -

*Eisen v. Carlisle & Jacquelin*,
   417 U.S. 156 (1974)..................................................................................13

*Eisenberg v. Gagnon*,
   766 F.2d 770 (3d Cir. 1985).........................................................................16

*Flinn v. FMC Corp.*,
   528 F.2d 1169 (4th Cir. 1975) .....................................................................33

*General Tel. Co. of the Southwest v. Falcon*,
   457 U.S. 147 (1982)..................................................................................18

*George Lussier Enters. v. Subaru of New Eng. Inc.*,
   2001 U.S. Dist. LEXIS 12054 (D.N.H. Aug. 3, 2001) .........................................19

*Girsh v. Jepson*,
   521 F.2d 153 (3d Cir. 1975)........................................................................27

*Giusti-Bravo v. United States Veterans Admin.*,
   853 F. Supp. 34 (D.P.R. 1993).............................................................. *passim*

*Greenspun v. Bogan*,
   492 F.2d 375 (1st Cir. 1974).................................................................13, 28

*Grunin v. International House of Pancakes*,
   513 F.2d 114 (8th Cir. 1975) ......................................................................13

*Hawkins v. Commissioner of New Hampshire Dept. of Health & Human Servs.*,
   2004 U.S. Dist. LEXIS 807 (D.N.H. Jan. 23, 2004)...................................... *passim*

*In re "Agent Orange" Prods. Liab. Litig.*,
   597 F. Supp. 740 (E.D.N.Y. 1984) ...........................................................30, 33

*In re Brand Name Prescription Drugs Antitrust Litig.*,
   1994 U.S. Dist. LEXIS 16658 (N.D. Ill. Nov. 15, 1994) .....................................20

*In re Cardizem CD Antitrust Litig.*,
   200 F.R.D. 297 (E.D. Mich. 2001) ...............................................................20

*In re Compact Disc Minimum Advertised Price Antitrust Litig.*,
   216 F.R.D. 197 (D. Me. 2003).............................................................. *passim*

*In re Corrugated Container Antitrust Litig.*,
   643 F.2d 195 (5th Cir. 1981) ......................................................................31

*In re Crazy Eddie Sec. Litig.*,
   824 F. Supp. 320 (E.D.N.Y. 1993) ...............................................................30

- v -

*In re Fleet/Norstar Sec. Litig.*,
    935 F. Supp. 99 (D.R.I. 1996)............................................................................27

*In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
    55 F.3d 768 (3d Cir. 1995)..........................................................................27, 31

*In re Linerboard Antitrust Litig.*,
    2004 U.S. Dist. LEXIS 10532 (E.D. Pa. June 2, 2004) .........................................30

*In re Lorazepam & Clorazepate Antitrust Litig.*,
    202 F.R.D. 12 (D.D.C. 2001)............................................................................20

*In re Lupron® Mktg. & Sales Practices Litig.*,
    228 F.R.D. 75 (D. Mass. 2005)..........................................................................20

*In re Michael Milken & Assocs. Sec. Litig.*,
    150 F.R.D. 46 (S.D.N.Y. 1993) .........................................................................30

*In re NASDAQ Market-Makers Antitrust Litig.*,
    169 F.R.D. 493 (S.D.N.Y. 1996) .......................................................................23

*In re NASDAQ Market-Makers Antitrust Litig.*,
    187 F.R.D. 465 (S.D.N.Y. 1998) .......................................................................28

*In re Pharm. Indus. Average Wholesale Price Litig.*,
    230 F.R.D. 61 (D. Mass. 2005).......................................................................2, 20

*In re Pharm. Indus. Average Wholesale Price Litig.*,
    233 F.R.D. 229 (D. Mass. 2006) .........................................................................2

*In re Pharm. Indus. Average Wholesale Price Litig.*,
    263 F. Supp. 2d 172 (D. Mass. 2003) ...................................................................2

*In re Pharm. Indus. Average Wholesale Price Litig.*,
    431 F. Supp. 2d 98 (D. Mass. 2006) ....................................................................2

*In re Polymedica Corp. Secs. Litig.*,
    224 F.R.D. 27 (D. Mass. 2004).....................................................................19, 20

*In re Prudential Ins. Co. of Am. Sales Practices Litig.*,
    962 F. Supp. 450 (D.N.J. 1997), *aff'd*, 148 F.3d 283 (3d Cir. 1998).....................25

*In re Prudential Sec., Inc. Ltd. P'ships Litig.*,
    1995 U.S. Dist. LEXIS 22103 (S.D.N.Y. Nov. 20, 1995)....................................30

*In re Relafen Antitrust Litig.*,
    218 F.R.D. 337 (D. Mass. 2003)...................................................................18, 20

001534-16  408244 v1

*In re Relafen Antitrust Litig.*,
   221 F.R.D. 260 (D. Mass. 2004)..............................................................................20

*In re Screws Antitrust Litig.*,
   91 F.R.D. 52 (D. Mass. 1981)..................................................................................22

*In re Synthroid Mktg. Litig.*,
   188 F.R.D. 295 (N.D. Ill. 1999)..............................................................................20

*In re Terazosin Hydrochloride Antitrust Litig.*,
   220 F.R.D. 672 (S.D. Fla. 2004)..............................................................................20

*In re Union Carbide Corp. Consumer Prods. Business Sec. Litig.*,
   718 F. Supp. 1099 (S.D.N.Y. 1989).................................................................29, 30

*In re Warfarin Sodium Antitrust Litig.*,
   212 F.R.D. 231 (D. Del. 2002), *aff'd*, 391 F.3d 516 (3d Cir. 2004)....................20

*In re Warfarin Sodium Antitrust Litig.*,
   391 F.3d 516 (3d Cir. 2004)...........................................................................29, 30, 34

*Isby v. Bayh*,
   75 F.3d 1191 (7th Cir. 1996) ...................................................................................25

*M. Berenson Co. v. Faneuil Hall Marketplace, Inc.*,
   671 F. Supp. 819 (D. Mass. 1987) ......................................................................25, 27

*Mars Steel Corp. v. Continental Ill. Nat'l Bank & Trust Co.*,
   834 F.2d 677 (7th Cir. 1987) ...................................................................................33

*Mathewson Corp. v. Allied Marine Indus., Inc.*,
   827 F.2d 850 (1st Cir. 1987).....................................................................................33

*McAdams v. Massachusetts Mut. Life Ins. Co.*,
   2002 U.S. Dist. LEXIS 9944 (D. Mass. May 15, 2002) .............................16, 17, 18

*McCuin v. Secretary of Health & Human Servs.*,
   817 F.2d 161 (1st Cir. 1987).....................................................................................18

*McLaughlin v. Liberty Mut. Ins. Co.*,
   224 F.R.D. 304 (D. Mass. 2004).......................................................................19, 21, 22

*Molski v. Gleich*,
   318 F.3d 937 (9th Cir. 2003) ....................................................................................27

*Mowbray v. Waste Mgmt. Holdings, Inc.*,
   189 F.R.D. 194 (D. Mass. 1999), *aff'd*, 208 F.3d 288 (1st Cir. 2000)....................22

- vii -

*Mullane v. Central Hanover Bank & Trust Co.*,
    339 U.S. 306 (1950)..................................................................................13

*Patterson v. Stovall*,
    528 F.2d 108 (7th Cir. 1976) ...............................................................25

*Payne v. Goodyear Tire & Rubber Co.*,
    216 F.R.D. 21 (D. Mass. 2003)................................................19, 20, 23

*Reppert v. Marvin Lumber & Cedar Co.*,
    359 F.3d 53 (1st Cir. 2004)....................................................................12

*Ressler v. Jacobson*,
    822 F. Supp. 1551 (M.D. Fla. 1992)......................................................28

*Rodrigues v. Members Mortg. Co.*,
    226 F.R.D. 147 (D. Mass. 2005)......................................................18, 22

*Rolland v. Cellucci*,
    191 F.R.D. 3 (D. Mass. 2000).......................................................26, 31, 32

*Smilow v. Southwestern Bell Mobile Sys., Inc.*,
    323 F.3d 32 (1st Cir. 2003)....................................................................17

*Sosna v. Iowa*,
    419 U.S. 393 (1975)...............................................................................21

*Stanton v. Boeing Co.*,
    327 F.3d 938 (9th Cir. 2003) ................................................................19

*United States v. DiBiase*,
    45 F.3d 541 (1st Cir. 1995)....................................................................33

*Waste Mgmt. Holdings, Inc. v. Mowbray*,
    208 F.3d 288 (1st Cir. 2000)............................................................23, 24

## STATUTES

18 U.S.C. § 1964..............................................................................................2

## OTHER AUTHORITIES

MANUAL FOR COMPLEX LITIGATION §§ 23, 30.4 (3d ed. 1995) ...................................26

MANUAL FOR COMPLEX LITIGATION §1-30.212 (3d ed. 1995) ....................................13

Alba Conte & Herbert Newberg, 6 NEWBERG ON CLASS ACTIONS § 18:2-18:4
    (4th ed. 2002) ......................................................................................16

Alba Conte & Herbert Newberg, 6 NEWBERG ON CLASS ACTIONS § 11.41 (4th ed. 2002) .....25, 33

## I.    INTRODUCTION

Class Plaintiffs,[1] by their undersigned counsel, respectfully submit this Memorandum in support of the Class Counsel and BMS' Joint Motion for Entry of an Order Granting Final Approval of the Class 2 and Class 3 Components of BMS Settlement (the "Joint Motion").  The Settlement encompassed by the parties' Settlement Agreement provides for BMS to pay a total of $19,000,000 as well as one-half of all notice costs up to $1 million.[2]  Under the Settlement, consumers were eligible to recover three times their co-payment obligations for the drugs Cytoxan, Taxol and Vepesid, and their actual co-payments for the remaining BMS Subject Drugs.

The Claims Process has yielded significant response from members of both Classes, and the number of claimants is expected to rise as the deadline for filing claims approaches.  This response, with the addition of claims of Class 1 Consumers, will result in distribution of all settlement proceeds to Class Members.  No objections have been filed to the Settlement by any members of Class 2 or Class 3.

Class Counsel believe that the Settlement is fair, reasonable and adequate.  It was reached after years of litigation, a Class 2 and 3 trial, and on the eve of a Class 1 trial with BMS.  The Settlement involved months of arms-length, intensely fought negotiations, all of which were conducted under the auspices of the Court appointed mediator, Eric Green.  And the Settlement

---

[1] The Plaintiffs for Class 2 are United Food and Commercial Workers Unions and Employees Midwest Health Benefits Fund ("UFCW Midwest") and Sheet Metal Workers National Health Fund.  The Plaintiffs for Class 3 are Cheryl Barreca, Anna Choice, Joyce Dison, Donna Kendall, Sandra Leef, Gerald Miller, Constance Nelson, Andrea Palenica, Scott Tell, Pauline Vernick, Mardolyn Vescovi, UFCW Midwest, Pirelli Armstrong Tire Corporation Retiree Medical Benefits Trust, Board of Trustees of Carpenters and Millwrights of Houston and Vicinity Welfare Trust Fund, and Teamsters Health & Welfare Fund of Philadelphia and Vicinity.

[2] Because notice to Class 1 has not yet been accomplished (*see* Class Plaintiffs' Status Report and Motion to Reschedule Dates Associated with the Final Approval of the BMS Settlement, Dkt. No. 7229), Class Counsel is not seeking final approval of that aspect of the settlement at this time.

provides real relief to Class Members.  Accordingly, the Court should grant final approval to the Settlement.

## II.    SUMMARY OF THE CASE

### A.    Plaintiffs' Allegations

Plaintiffs allege that BMS implemented a fraudulent scheme used to manipulate and inflate the monetary spread between the AWP and the cost to doctors and other providers of BMS Subject Drugs in violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1964 ("RICO"), and various state consumer protection laws, directly causing damage to Plaintiffs and the Classes.[3]

### B.    Plaintiffs' Prosecution of the Case

Plaintiffs have aggressively prosecuted their claims since 2001.  Numerous cases were consolidated before this Court by the Judicial Panel on Multi-District Litigation on April 30, 2002.  Plaintiffs overcame motions to dismiss and briefed and argued dozens of discovery motions and more than one motion for class certification.

In discovery, Plaintiffs reviewed, analyzed, coded and loaded into a database millions of pages of documents produced by BMS, the other defendants and third parties.  Plaintiffs also undertook a detailed analysis of transactional data for the BMS Subject Drugs, covering a period of time in excess of ten years.

Plaintiffs also took over 14 depositions of BMS' current and former employees, including senior managers.

---

[3] The Court is well aware of the extensive facts and claims alleged in this action.  *See In re Pharm. Indus. Average Wholesale Price Litig.*, 431 F. Supp. 2d 98 (D. Mass. 2006); *In re Pharm. Indus. Average Wholesale Price Litig.*, 233 F.R.D. 229 (D. Mass. 2006); *In re Pharm. Indus. Average Wholesale Price Litig.*, 230 F.R.D. 61 (D. Mass. 2005); *In re Pharm. Indus. Average Wholesale Price Litig.*, 263 F. Supp. 2d 172 (D. Mass. 2003). Accordingly, we will not repeat all of those allegations here.

As the Court is well aware, the Massachusetts Class 2 and 3 Plaintiffs tried their claims against BMS.  After a trial lasting several weeks, those Plaintiffs prevailed on some drugs but not on others, and the Court did not award the full measure of damages sought.

## C.      BMS' Response to the Litigation

BMS has denied, and continues to deny, that it has committed any violation of law or any wrongdoing, and further denies that it has any liability with respect to any claims asserted in the Complaint.  BMS filed extensive motions to dismiss, vigorously opposed Plaintiffs' Motion for Class Certification of a litigation Class, hotly contested the Massachusetts Class 2 and 3 trial and pursued an appeal in the First Circuit of the trial ruling against BMS, an appeal that has been stayed pending the resolution of this Settlement.  Not surprising given this track record, BMS has indicated that, if the case proceeds, it would continue to vigorously oppose Plaintiffs' claims up to the First Circuit as well as the Supreme Court through a petition for certiorari if necessary.

## D.      Summary of the Settlement Negotiations With BMS

The settlement negotiations among the parties, although always courteous, were long and contentious and spanned over a year.  The parties reached a tentative agreement in June 2007 to settle the claims of the members of Class 1 Medicare Part beneficiaries for $13,000,000, but were unable to translate the Memorandum of Understanding (the "MOU") into a comprehensive settlement agreement.  A dispute erupted over the distribution methodology, with the primary point of controversy focused on whether BMS could influence the distribution process.  More particularly, BMS was seeking to create a residual to its credit by, *inter alia*, insisting on a claims process that required Class Members to obtain detailed written documentation from their physicians.  The parties submitted their dispute to the Court.  Although the Court rejected BMS's argument that it had a right to veto a proposed distribution plan, the Court appeared to be influenced by BMS's argument that a substantial residual would be left after a claims-made

- 3 -

distribution to the members of Class 1.  Accordingly, the Court ultimately ruled that "BMS raises several interesting questions about the fairness of the plan.  Plaintiffs shall move for a preliminary approval of the plan, and the Court will hold a hearing where the issues will be vetted."  September 29, 2008 Electronic order entered re:  Motion to Preliminarily Approve Proposed Plan of Distribution for BMS Class 1 Settlement.

Shortly thereafter, Professor Green continued mediation efforts in another attempt to settle the claims of all putative classes.  These efforts were ultimately successful and resulted in the $19,000,000 Settlement, the Class 2 and Class 3 components of which Plaintiffs seek final approval.

Throughout this entire process, the parties exchanged information and debated the other's evidence and interpretations.  Both sides made detailed presentations to Eric Green and presented extensive analysis and conclusions of experts, and noted their positions on legal theories, evidence and possible damages.  The negotiations were conducted at arms' length.

## III.    DESCRIPTION OF THE PROPOSED SETTLEMENT

### A.    The Proposed Settlement Classes

The proposed Settlement Classes are as follows:[4]

Third-Party Payor MediGap Supplemental Insurance Class ("Class 2"):  All TPPs nationwide that, from January 1, 1991 through December 31, 2004, made, or incurred an obligation to make, reimbursements for any portion of a Medicare Part B co-payment based on AWP for a BMS Subject Drug.

Consumer and Third-Party Payor Class for Payments Made Outside the Medicare Context ("Class 3"):  All natural persons

---

[4] The Settlement Agreement also provides for the resolution of the claims of Class 1, defined as "[a]ll natural persons nationwide who made, or were liable for all or any portion of, a Medicare Part B co-payment based on AWP for any BMS Subject Drug during the period from January 1, 1991, through December 31, 2004.  Excluded from Class 1 are those who made flat co-payments, who were reimbursed fully for their payments, or who have the right to be fully reimbursed."  As set forth in footnote 2, Class Counsel are not seeking preliminary approval of that aspect of the Settlement at this time.

> nationwide who made, or were liable for all or any portion of, a
> non-Medicare Part B payment based on AWP for any BMS
> Subject Drug during the period from January 1, 1991 through
> December 31, 2004, and all TPPs nationwide that, from January 1,
> 1991 through December 31, 2004, made, or incurred an obligation
> to make, non-Medicare Part B reimbursements based on AWP for
> any BMS Subject Drug.  Excluded from Class 3 are those
> consumers who made flat co-payments, who were reimbursed fully
> for their payments, or who have the right to be fully reimbursed.

In addition to the foregoing, excluded from all Classes are the officers, directors, management, and employees of the BMS Group or of any of their subsidiaries and affiliates, as well as all federal, state, and local government entities in the United States, except any such governmental agencies or programs that made or incurred an obligation to make a reimbursement for a Class Drug as part of a health benefit plan for their employees, but only with respect to such payment.

The BMS Subject Drugs are the chemotherapy agents Blenoxane, Cytoxan, Etopophos, Paraplatin, Rubex, Taxol, and Vepesid.

**B.     The Total Settlement Amount and Allocation**

Pursuant to the terms of the Settlement Agreement, attached hereto as Exhibit A, BMS has agreed to pay $19,000,000 to settle the claims of all of the Classes.  In addition, BMS is obligated to pay one-half of the costs of notice to Class Members up to $1 million.

After a settlement-in-principle was reached, a mediation was held on June 22, 2009, under the supervision of Professor Green in order to determine how the Settlement Fund would be allocated between consumers and TPPs.  Each group was separately represented by counsel. Consumers were represented by Jeffrey Goldenberg, Esq., who served as consumer allocation counsel with respect to the Track 2 proposed settlement and was, therefore, quite familiar with the consumer claims in this case generally.  Consumers were also represented by Wells Wilkinson, Esq., Staff Attorney for the Prescription Access Litigation Project, a national

coalition of consumer groups dedicated to redress unlawful drug price manipulations and deceptive marketing.  TPPs were represented by Geoffrey Horn, whose firm, Lowey Dannenberg Cohen & Hart, P.C., represents the large TPPs such as Aetna, CIGNA, Humana, and Wellpoint. The Lowey Danenberg firm has previously served as TPP allocation counsel in prior settlements in these consolidated proceedings.

Using Dr. Hartman's damages estimates for each Class as a point of departure, allocation counsel debated the merits of each side's position and exchanged several rounds of proposals. With the able assistance of Professor Green, allocation counsel were able to reach agreement on an allocation of 23 percent (23%) for the benefit of Consumers (the "Consumer Settlement Pool") and seventy-seven percent (77%) for the benefit of TPP Class Members (the "TPP Settlement Pool").  In addition, consumers and TPPs agreed to share the costs of notice equally.

## C.     The Distribution Plan and Claims Process

### 1.     The distribution plan

The Consumer Settlement Pool, consisting of 23.0% of the distributable funds after deduction of notice costs, attorneys fees and the cost of settlement administration, will be paid to consumer members of Class 3[5] who submitted Proofs of Claim that were accepted by the Claims Administrator and approved by the Court ("Authorized Consumer Claimants") in accordance with the "Distribution Plan and Claims Process" procedures set forth in Exhibit F to the Settlement Agreement and as summarized below.  Each Proof of Claim will be used to establish the claimant's "Total Recognized Claim," which then forms the basis of payment.  For Authorized Consumer Claimants, if the Consumer Settlement Pool is sufficient to pay all claims, then each Authorized Consumer Claimant will receive his or her Total Recognized Claim.  If the

---

[5] After receiving notice, members of Class 1 will be paid from the same Consumer Settlement Pool.

amount of the Consumer Settlement Pool is not sufficient to pay each Authorized Consumer Claimant his or her Total Recognized Claim, then each Authorized Consumer Claimant shall be paid their *pro rata* share of the claimants' Total Recognized Claim.  If there are any unclaimed monies in the Consumer Settlement Pool after all Authorized Consumer Claimants have been paid according to their Total Recognized Claim, then the Court, upon motion of Lead Class Counsel, will determine how the balance of the Consumer Settlement Pool will be disposed. However, under no circumstances will any unclaimed funds in the Consumer Settlement Pool revert to BMS or be used to satisfy TPP claims.  Distribution Plan and Claims Process at ¶ 9.

The TPP Settlement Pool, consisting of 77% of the distributable funds after deduction of notice costs, attorneys fees and the cost of settlement administration, will be paid to TPP Class Members who submitted Proofs of Claim that were accepted by the Claims Administrator and will be approved by the Court ("Authorized TPP Claimants").  Each Proof of Claim will be used to establish the claimant's "Total Recognized Claim."  It is anticipated that the claims of all TPP Class Members will exceed the total amount of funds allocated to satisfy the claims of TPP Class Members under the Settlement Agreement and that each TPP Class Member will, therefore, be paid a pro-rata portion of the Settlement Amount allocated to TPP Class Members.  Distribution Plan and Claims Process at ¶¶ 10, 21.

2.      **The claims process**

a.      **Required claims documentation**

(1)      **Consumer Class Members**

Consumers in Class 3 were provided the option to elect between an "Easy Refund Option" and a "Full Estimation Refund Option."  Consumer Class Members were required to submit one proof of payment for each Subject Drug for which they were seeking payment.  Proof of payment for Consumers in Class 3 who chose the "Easy Refund Option" could be in the form

- 7 -

of a statement signed by the Consumer Class Member under penalty of perjury indicating that the Consumer paid or was obligated to pay a percentage co-payment for one or more of the Subject Drugs during the period January 1, 1991, through December 31, 2004. This statement was also accepted when executed by a spouse of a deceased Consumer Class Member or a legal representative of the deceased Consumer Class Member's estate. Distribution Plan and Claims Process at ¶ 12.

Proof of payment for Consumers in Class 3 who have elected the "Full Estimation Refund Option" could be in the form of the following: (i) a receipt, cancelled check, or credit card statement that shows a payment for one of the Subject Drugs (other than a flat co-payment); (ii) a letter from the Consumer Class Member's doctor stating that he or she prescribed and that the Consumer Class Member paid or is obligated to pay part or all of the cost of one of the Subject Drugs (other than a flat co-payment) at least once; (iii) billing records from a doctor or other health care provider evidencing an obligation to pay part or all of the cost of one of the Subject Drugs (other than a flat co-payment); (iv) an Explanation of Benefits ("EOB") from an insurer or other payor evidencing an obligation to pay part or all of the cost of one of the Subject Drugs (other than a flat co-payment), or (v) any combination of (i)-(iv) above. Distribution Plan and Claims Process at ¶ 13. The Class 3 Claim Form is attached as Exhibit B to the Settlement Agreement and follows the Class 3 Consumer Notice.

### (2)    TPP Class Members

TPP Class Members are required to submit the amount of purchases of each Subject Drug for which they were seeking payment during the period January 1, 2003, to December 31, 2003. This period was substituted for the amount of expenditures for each drug associated with the full class period in recognition of the difficulty that many TPPs have in accessing claims data that are older and likely not kept electronically or on current electronic systems. This "proxy period"

will therefore be used to determine the payments made to each TPP Class Member.  Distribution Plan and Claims Process at ¶ 14.

TPP Class Members with claimed expenditures for Subject Drugs during the proxy period that exceeded $300,000 in total are required to submit electronic claims documentation with their claim.  The form of data required to be submitted are delineated in the TPP Claim Form attached as Exhibit B to the Settlement Agreement and follows the Class 2/3 TPP Notice. Those TPP Class Members whose claimed expenditures are $300,000 or less do not need to submit electronic claims documentation with their claim but are required to furnish such claims documentation upon request of the Claims Administrator.  Distribution Plan and Claims Process at ¶ 15.

### b.  Calculating Recognized Claim Amounts

Procedures for establishing a Recognized Claim for each Consumer Member of Class 3 and TPP Class Member are as follows:

### (1)  Consumer Class Members in Class 3

For Consumers in Class 3, the amount to which the Class 3 Consumer is entitled is determined based upon the Consumer's election on a claim form provided by the Claims Administrator between two options.

a.  <u>Easy Refund Option</u>.  If a Class 3 Consumer elected the "Easy Refund Option" on the claim form provided, and the Consumer's claim is verified and accepted by the Claims Administrator, the "Total Recognized Claim" used for purposes of calculating the payment made to each such Consumer Class Member is $35.00. Distribution Plan and Claims Process at ¶ 18.

b.  <u>Full Estimation Refund Option</u>.  If a Class 3 Consumer elected the "Full Estimation Refund Option" on the claim form provided, then the Consumer is required to

- 9 -

estimate the Consumer's total out-of pocket expenses associated with percentage co-payments or full payments for each Subject Drug for which the consumer was seeking payment.  Each such Consumer is also required to provide documentary support, as described above, in support of the Consumer's estimated out-of-pocket expenses. Distribution Plan and Claims Process at ¶ 18.

For the drugs Cytoxan, Taxol, and Vepesid, the Consumer's estimated out-of-pocket expenses for such drugs are summed and then multiplied by a factor of three (3x).  For the drugs Blenoxane, Etopophos, Paraplatin, and Rubex, the Consumer's estimated out-of-pocket expenses for such drugs are summed (but will not be multiplied by a factor).  Both figures will be added to determine the Consumer's "Total Recognized Claim" used for purposes of calculating the payment made to each Consumer Class Member.  Distribution Plan and Claims Process at ¶ 18.

### (2) Sample calculations for hypothetical Consumer claims

Below is an example for how hypothetical Consumer claims were paid (*see* Distribution Plan and Claims Process at ¶ 19).

Consumer information:

> Consumer Settlement Class Member in Class 3.  Consumer validly certifies under penalty of perjury that the Consumer paid or was obligated to pay percentage co-payments during the Class Period under both Medicare Part B and under one or more private health insurance plans.

> Consumer states that total co-payment obligations under Medicare Part B were $200 for Cytoxan, Taxol, and Vepesid and $100 for Blenoxane, Etopophos, Paraplatin, and Rubex during the class period.

> Consumer chooses "Easy Refund Option" for Class 3 refund.

Calculation:

> Cytoxan, Taxol, and Vepesid:   $200 x 3 = $600
> Blenoxane, Etopophos, Paraplatin, and Rubex:   $100

> Total Recognized Claim = $805 ($600 + $100 +$105), unless total Recognized Claims of all Consumer Class Members exceeds the amount allocated to pay Consumer claims, in which case the payment will be reduced in proportion to all such Recognized Claim amounts.

### (3)    TPP Class Members

In recognition of the fact that the claims of all TPP Class Members will exceed the total amount of funds allocated to satisfy the claims of TPP Class Members under the Settlement Agreement and that each TPP Class Member will be paid a pro-rata portion of the Settlement Amount allocated to TPP Class Members, the recognized claim for TPP Class Members will be the total amount of purchases during the period of January 1, 2003, to December 31, 2003, of all Subject Drugs.  This figure, if properly supported and accepted by the Claims Administrator, will be the TPP Class Member's "Total Recognized Claim" used for purposes of calculating the payment made to each TPP Class Member.  Distribution Plan and Claims Process at ¶ 20.

## D.    Attorney's Fees and Expenses and Compensation Awards

Understanding that the award of attorneys' fees is a matter committed to the sole discretion of this Court, subject to Court approval, BMS has agreed not to object to Class Counsel's request for a reasonable attorney's fee not to exceed 33 1/3% of the total Settlement Amount of $19 million.  BMS will also not object to Counsel's request to the Court for an award of reasonable expenses to be paid from the Settlement Amount.  Classes 2 and 3 were notified that Class Counsel's fee request would not exceed 33 1/3% of the total Settlement Amount, and there have been no objections to the attorneys' fees.  Class Counsel have not yet filed a motion for an award of attorneys' fees because, until the Class 1 final fairness hearing is held, the Court cannot enter the form of Judgment that the parties proffered.  Class Counsel will file their fee application prior to the Class 1 fairness hearing and in accordance with a schedule to be set by the Court.

E.      **Notice Was Given to the Class**

Reasonable notice must be provided to Class Members to allow them an opportunity to object to the proposed Settlement.  *See Durrett v. Housing Auth. of Providence*, 896 F.2d 600, 604 (1st Cir. 1990).  Rule 23(e) requires notice of a proposed settlement "in such manner as the court directs."  In a settlement class maintained under Rule 23(b)(3), class notice must meet the requirements of both Fed. R. Civ. P. 23(c)(2) and 23(e).  *See Carlough v. Amchem Prods., Inc.*, 158 F.R.D. 314, 324-25 (E.D. Pa. 1993) (stating that requirements of Rule 23(c)(2) are stricter than requirements of Rule 23(e) and arguably stricter than the due process clause).  Under Rule 23(c)(2), notice to the class must be "the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." *Amchem Prods. v. Windsor*, 521 U.S. 591, 617 (1997); *Reppert v. Marvin Lumber & Cedar Co.*, 359 F.3d 53, 56 (1st Cir. 2004).

The MANUAL FOR COMPLEX LITIGATION sets forth several elements of the "proper" content of notice.  If these requirements are met, a notice satisfies Fed. R. Civ. P. 23(c)(2) and 23(e) and due process, and binds all members of the Class. The Notice must:

1.      Describe the essential terms of the Settlement;

2.      Disclose any special benefits or incentives to the class representatives;

3.      Provide information regarding attorneys' fees;

4.      Indicate the time and place of the hearing to consider approval of the Settlement, and the method for objection to and/or opting out of the Settlement;

5.      Explain the procedures for allocating and distributing Settlement funds; and

6.      Prominently display the address of class counsel and the procedure for making inquiries.

MANUAL FOR COMPLEX LITIGATION § 1-30.212 (3d ed. 1995); *see also*, *e.g.*, *Air Lines Stewards & Stewardesses Ass'n Local 550 v. American Airlines*, *Inc.*, 455 F.2d 101, 108 (7th Cir. 1972) (notice that provided summary of proceedings to date, notified of significance of judicial approval of settlement and informed of opportunity to object at the hearing satisfied due process); *Grunin v. International House of Pancakes*, 513 F.2d 114, 122 (8th Cir. 1975); *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173 (1974); *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 315 (1950) ("The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it."); *Greenspun v. Bogan*, 492 F.2d 375, 382 (1st Cir. 1974).  The notice program proposed by the parties and approved by the Court clearly meets this standard.

Class Counsel complied with the Court's directives concerning Class notice.  The contents of the Notice met the foregoing requirements.  Among other things, the Notice described why the Class Member received the Notice and what the lawsuit is about; advised that the recipient could be a member of the Class; described the terms and benefits of the Settlement, including compensation provided to Class Counsel; gave instructions for making a claim by completing a Claim Form, which was included with the Notice, as well details on how the Settlement would be distributed; and provided instructions for commenting on the Settlement and appearing at the final Fairness Hearing.

To distribute the Notice, Class Counsel employed, and the Court appointed, Rust Consulting, Inc. ("Rust"), which specializes in the administration of class actions, to oversee the administration of the Classes and execute the Notice Plan.  The details of that execution are set forth in the Declaration of Katherine Kinsella ("Kinsella Decl."), Exhibit B hereto, and the

details of the Direct Notice Plan to TPPs are set forth in the Declaration of Eric Miller ("Miller Decl."), Exhibit C hereto, but are summarized as follows.

**1.      Notices**

The Notice Program used two publication notices to reach third-party payor ("TPP") and Consumer Class Members.  Kinsella Decl. ¶¶ 5, 6.  True and correct copies of the TPP Publication Notice and the Consumer Publication Notice are attached as Exhibit 1 to the Kinsella Declaration.

**2.      Direct Notice Program**

Rust Consulting, Inc. ("Rust") maintains a mailing database of 41,916 potential TPP Class Members.  Miller Decl. ¶ 4.  In accordance with the Court's Order of August 6, 2010, direct mail notice to TPPs was completed on September 8, 2010.  A total of 41,916 TPP notices were mailed first class to all TPPs in the Claim Administrator's TPP database.  Miller Decl. ¶ 6.

**3.      Paid Media**

Paid media was used to supplement the Direct Notice program implemented by Rust. Kinsella Decl. ¶ 7.  The Consumer Publication Notice appeared in *Newsweek*, *People*, and *TV Guide*.  *Id.* ¶ 8.  The TPP Publication Notice appeared in *HR Magazine* and *National Underwriter:  Life & Health*.  *Id.* ¶ 9.

A press release, Exhibit 2 to the Kinsella Declaration, was used to augment the published notice and contained a message that highlighted the benefits of the Settlement, explained the claims filing process and gave information on where Class Members could go for additional information.  Kinsella Decl. ¶ 10.  The press release was sent to over 75 cancer and health-related reporters, bloggers, publications and website.  *Id.* ¶ 11.

4.      **Results of Notice Program**

The deadline for TPPs to file claims, as set forth in the Court's Order, is November 19, 2010.  To date, the Claims Administrator has received a total of 193 claims from TPP Class Members.  Miller Decl. ¶ 13.  Because TPPs traditionally file in the days just prior to the claims deadline, Class Counsel expect the number of TPP claims to increase substantially by the claims deadline.

The deadline for the submission of claims by Class 3 consumers is also November 19, 2010.  To date the Claims Administrator reports a total of 44 Class 3 consumer claims filed. Miller Decl. ¶ 14.  Of these, 84%  have opted for the "easy refund" option as opposed to providing documentation for a full refund Miller Decl. ¶ 14.  Class Counsel anticipate that the number of Class 3 consumer filing claims will also increase as the November 19, 2010 deadline approaches.

The deadline for objections and request for exclusions was October 29, 2010.  The claims administrator received a total of 11 requests for exclusion by TPP Class Members.  Miller Decl. ¶ 16.  Eight of those requests were received by the Claims Administrator on or before the October 29, 2010 deadline while three we received shortly after that deadline.  *Id.*

Class Counsel is not aware of any objections to the settlement by TPP or Class 3 Consumer members.[6]

## IV.     ARGUMENT

A class action cannot be compromised or settled without the approval of the Court.  Fed. R. Civ. P. 23(e).  Prior to addressing the adequacy of a proposed Settlement, the Court must

---

[6] Class 1 representative David Aaronson, represented by Don Haviland, filed a Motion to enforce a previous settlement with BMS.  Dkt. No. 6917.  This Court agreed with Plaintiffs that his objection should not be addressed until final approval.  *See* Mar. 11, 2010 electronic order.  Because Plaintiffs do not seek final approval of the Class 1 component of this Settlement at this time, Plaintiffs do not address the issues raised by Mr. Haviland's Motion here but will in moving for approval of the proposed Class 1 portion of the settlement.

determine whether the plaintiff class, as agreed to by the parties, may be certified for purposes of the Settlement. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613 (1997); *Hawkins ex rel. Hawkins v. Commissioner of New Hampshire Dept. of Health & Human Servs.*, 2004 U.S. Dist. LEXIS 807, at *2 (D.N.H. Jan. 23, 2004).  Further, the decision to approve or reject a proposed settlement is committed to the Court's sound discretion.  *City P'ship Co. v. Atlantic Acquisition Ltd. P'ship*, 100 F.3d 1041, 1043-44 (1st Cir. 1996).  Class actions have long been recognized by the courts as an essential tool for adjudication of cases involving multiple claims that are susceptible of similar factual and/or legal inquiries, and for which individual recovery might be too modest to warrant prosecution of the case on an individual basis.  To that end, when analyzing a motion to certify, "district courts in this circuit have frequently recognized that 'Rule 23(a) should be liberally construed in order not to undermine the policies underlying the class action rule.'"  *McAdams v. Massachusetts Mut. Life Ins. Co.*, 2002 U.S. Dist. LEXIS 9944, at *7 (D. Mass. May 15, 2002) (quoting *Lessard v. Metropolitan Life Ins. Co.*, 103 F.R.D. 608, 610 (D. Me. 1984)), *aff'd*, 391 F.2d 287 (1st Cir. 2004).  Consistent with this rule, "when a court is in doubt as to whether to certify a class action, it should err in favor of allowing a class."  *McAdams*, 2002 U.S. Dist. LEXIS, at *8 (quoting *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 303 (E.D. Mich. 2001)); *see also Eisenberg v. Gagnon*, 766 F.2d 770, 785 (3d Cir. 1985) ("The interests of justice require that in a doubtful case[,] any error, if there is to be one, should be committed in favor of allowing a class action.").

Certification of the Settlement Class is appropriate in this case because the requirements of Rule 23(a) and Rule 23(b) are satisfied.

001534-16  408244 v1

A.     **The Court Should Certify the Proposed Class Pursuant to Rules 23(a) and 23(b)(3) for Purposes of Settlement**

On August 4, 2009, Class Plaintiffs filed their for Preliminary Approval of the Settlement.  Dkt. No. 6348.   On August 26, 2009, pursuant to the Court's request, the parties submitted a modified Settlement Agreement, and modified proposed order granting preliminary approval reflecting the changes to that Agreement.  Dkt. No. 6407.  More specifically, the revised Settlement provided (i) another opportunity to request exclusion to those Class 1 members who remained part of the Medicare Part B beneficiary class previously certified in the litigation, and (ii) an enhanced, $105 payment to consumer Class Members of Class 3 who file claims and elect the "easy refund" option (in lieu of the $35 payment originally proposed).  On August 31, 2009, this Court granted preliminary approval of the Settlement as revised by the Parties.

1.     **The requirements of Rule 23(a) have been satisfied**

Rule 23(a) of the Federal Rules of Civil Procedure requires a party seeking class certification to satisfy four prerequisites:  (i) numerosity; (ii) commonality; (iii) typicality; and (iv) adequacy of representation.  *Smilow v. Southwestern Bell Mobile Sys., Inc.*, 323 F.3d 32, 38 (1st Cir. 2003) (citing *Amchem*, 521 U.S. at 613).  In this case, all four requirements of Rule 23(a) have been met.

a.     **Numerosity**

Numerosity requires that the class include so many members that joinder would be impracticable.  Fed. R. Civ. P. 23(a)(1).  Although there is no magic number of Class Members that will qualify for class certification, numerosity "is not a difficult burden to satisfy." *McAdams*, 2002 U.S. Dist. LEXIS 9944, at *9 (quoting *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 303 (E.D. Mich. 2001)).  Courts have generally found groups of more than forty to

- 17 -

satisfy the numerosity requirement.  *Id*. at *10; *see also In re Relafen Antitrust Litig.*, 218 F.R.D. 337, 342 (D. Mass. 2003) (broadly drawn class definition "suggests that members of the class, once identified, will be 'so numerous and widely dispersed that joinder . . . is impracticable'"). Precise quantification of Class Members is not necessary, and a court may make common sense assumptions to support a finding of numerosity.  *McCuin v. Secretary of Health & Human Servs.*, 817 F.2d 161, 167 (1st Cir. 1987); *see also Andrews v. Bechtel Power Corp.*, 780 F.2d 124, 131-32 (1st Cir. 1985) (court can consider economy, geographic dispersion and ability of individual members to bring suit); Alba Conte & Herbert Newberg, 6 NEWBERG ON CLASS ACTIONS ("NEWBERG") § 18:2-18:4 (4th ed. 2002).

In this case, the numerosity requirement is not in doubt.  Notice was mailed to over 40,000 TPPs nationwide, a large subset of which are Class Members, and over 200 members of Class 2 and Class 3 have filed claims.  Classes of this size makes joinder of all members impracticable.

### b.    Commonality and typicality

The commonality requirement is met if "there are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  Typicality, on the other hand, requires that the claims of the named plaintiffs be typical of the claims of the class.  Fed. R. Civ. P. (23)(a)(3).  Often, the requirements of Rule 23(a)(2) and (3) are considered together.  *See General Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147, 157 n.13 (1982); *Rodrigues v. Members Mortg. Co.*, 226 F.R.D. 147, 151 (D. Mass. 2005).  The crux of both requirements is to ensure that "maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence."  *Falcon*, 457 U.S. at 157 n.13.

- 18 -

To satisfy the commonality requirement, the named plaintiffs' claims must share at least one common question of law or fact with the class' claims. *See*, *e.g.*, *McLaughlin v. Liberty Mut. Ins. Co.*, 224 F.R.D. 304, 309 (D. Mass. 2004) (While requiring that "questions of law or fact be shared by the prospective class," Rule 23(a)(2) does not require that "every question be common."); *Stanton v. Boeing Co.*, 327 F.3d 938, 953 (9th Cir. 2003); *Collazo v. Calderon*, 212 F.R.D. 437, 442 (D.P.R. 2002). The "commonality" requirement of Rule 23(a)(2) "is a 'low hurdle' easily surmounted." *Duhaime v. John Hancock Mut. Life Ins. Co.*, 177 F.R.D. 54, 63 (D. Mass. 1997) (citations omitted). It requires only that there be a single question of law or fact that is common to all class members. *George Lussier Enters. v. Subaru of New Eng. Inc.*, 2001 U.S. Dist. LEXIS 12054, at *11 (D.N.H. Aug. 3, 2001). The commonality requirement "does not require that class members' claims be identical." *Payne v. Goodyear Tire & Rubber Co.*, 216 F.R.D. 21, 25 (D. Mass. 2003) (quoting *Mack v. Suffolk Cty.*, 191 F.R.D. 16, 23 (D. Mass. 2000)).

With respect to typicality, "[t]he central inquiry in determining whether a proposed class has typicality is 'whether the class representatives' claims have the same essential characteristics as the claims of the other members of the class.'" *In re Polymedica Corp. Secs. Litig.*, 224 F.R.D. 27, 36 (D. Mass. 2004) (quoting *In re Amerifirst Secs. Litig.*, 139 F.R.D. 423, 428 (S.D. Fla. 1991)), *vacated on other grounds*, 432 F.3d 1 (1st Cir. 2005); *McLaughlin*, 224 F.R.D. at 310; *see also* 1 NEWBERG § 3.13 (the typicality requirement is usually met "when it is alleged that the same unlawful conduct was directed at or affected both the named Plaintiffs and the class sought to be represented"). Furthermore, the plaintiff does not need to show "substantial identity between [his] claims and those of absent class members," but only that "[his] claims arise from the same course of conduct that gave rise to the claims of the absent members." *In re*

*Polymedica*, 224 F.R.D. at 36 (quoting *Priest v. Zayre Corp.*, 118 F.R.D. 552, 555 (D. Mass. 1988) (internal quotation marks omitted)); *see Payne*, 216 F.R.D. at 26 (typicality requires "the same essential characteristics" among claims).

Both commonality and typicality are present here. As the Court has already ruled in certifying litigation classes in this case, "there are numerous common factual issues:  whether the AWPs and/or WACs for the AWPIDs were misrepresented, whether that misrepresentation was intentional, whether it was done with a fraudulent intent, and whether it proximately caused harm to consumers." *In re Pharm. Indus. Average Wholesale Price Litig.*, 230 F.R.D. 61, 78 (D. Mass. 2005). As to typicality, Plaintiffs' claims arise out of the same course of conduct and are based on the same legal theories as those of the absent Class Members. Plaintiffs and Class Members were all harmed by BMS' unlawful scheme. Accordingly, the named Plaintiffs' interests are not only "typical" of the absent Class Members, they are identical and easily satisfy Rule 23(a)(3).[7]

### c.    Adequate representation

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." This inquiry is satisfied if:  (i) the plaintiff's counsel is qualified,

---

[7] Various other courts have certified nationwide classes in drug pricing cases involving schemes not dissimilar to those alleged in this case. *See In re Lupron® Mktg. & Sales Practices Litig.*, 228 F.R.D. 75 (D. Mass. 2005); *In re Relafen Antitrust Litig.*, 221 F.R.D. 260, 288 (D. Mass. 2004) (certifying class of persons and entities who "purchased" a drug); *In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 248 (D. Del. 2002) ("Several other courts have recently certified nationwide or multi-state classes under federal and state laws in actions alleging overpayment for prescription drugs."), *aff'd*, 391 F.3d 516 (3d Cir. 2004); *In re Lorazepam & Clorazepate Antitrust Litig.*, 202 F.R.D. 12 (D.D.C. 2001) (conspiracy to prevent competition and raise price of drugs); *In re Synthroid Mktg. Litig.*, 188 F.R.D. 295 (N.D. Ill. 1999) (drug manufacturer alleged to have suppressed information in order to protect generic drug competition); *In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672, 703 (S.D. Fla. 2004) (certifying class of persons and entities who "paid" all or part of the purchase price for a drug); *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 332 (E.D. Mich. 2001) (class of "purchasers" of Cardizem); *In re Brand Name Prescription Drugs Antitrust Litig.*, 1994 U.S. Dist. LEXIS 16658, at *3-4 (N.D. Ill. Nov. 15, 1994) (class of "purchasers" of "brand name prescription drugs"). Indeed, Courts in this District have approved closely analogous classes in a variety of circumstances. *See, e.g., Duhaime*, 177 F.R.D. at 54 (class was ascertainable because it was defined to include persons who purchased life insurance policies from one time period through another).

- 20 -

experienced, and able to prosecute the action on behalf of the class vigorously, and (ii) the interests of the representative parties do not conflict with the interests of any class members. *Sosna v. Iowa*, 419 U.S. 393, 403 (1975); *McLaughlin*, 224 F.R.D. at 310, *Andrews*, 780 F.2d at 130; *Hawkins*, 2004 U.S. Dist. LEXIS 807, at *10; *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 216 F.R.D. 197 (D. Me. 2003).  It is well established that "in complex litigations . . . a plaintiff need not have expert knowledge of all aspects of the case to qualify as a class representative, and a great deal of reliance upon the expertise of counsel is to be expected." *Denney v. Jenkens & Gilchrist*, 230 F.R.D. 317, 327 (S.D.N.Y. 2005) (quoting *In re AM Int'l Inc., Secs. Litig.*, 108 F.R.D. 190, 196-97 (S.D.N.Y. 1985)).

Class Counsel include some of the most qualified and experienced lawyers in the United States in the successful prosecution of class actions.  These firms have vigorously pursued the rights of the Class Members in this case for nearly ten years, conducted discovery, prepared countless filings and memoranda in this action, tried and prevailed on the Class 2/3 Massachusetts claims, and have engaged in extensive settlement negotiations with BMS. Further, these firms and their co-counsel continue to stand ready, willing and able to devote the resources necessary to litigate this case vigorously and to see it through to the best possible resolution, if the Settlement is not approved, and the Court has repeatedly found that Class Counsel were adequate.[8]

Neither the Plaintiffs nor Class Counsel have any interests that are antagonistic to those of the Class Members who now stand to benefit from the Settlement.  The central issues in this

---

[8] The Court has found counsel adequate when issuing its original class certification opinion; issuing its class certification order; preliminarily approving the proposed GSK settlement; preliminarily approving the BMS Settlement; granting final approval to the AstraZeneca Class 1 Settlement; and approving the final GSK settlement. The resumes of the Class Counsel whose approval is sought, Hagens Berman Sobol Shapiro LLP, Spector, Roseman, Kodroff & Willis P.C., Wexler Wallace LLP, and Edelson & Associates, LLC, have been previously submitted to the Court but will be provided again upon request.

case – the existence, unlawfulness and effect of BMS' scheme to improperly manipulate the AWP of its Subject Drugs – are common to the claims of Plaintiffs and the other members of the Class. The representative Plaintiffs, like each absent Class Member, have a strong interest in proving BMS' scheme, establishing its unlawfulness, and demonstrating how the Class was affected by the illegal conduct. Plaintiffs have submitted to discovery and worked with his counsel for the protection of the Class. There is no conflict between the Plaintiffs and the Class Members, so Plaintiffs satisfy the requirements of Rule 23(a)(4).

> **2.     The requirements of Rule 23(b)(3) have been satisfied**

In addition to having satisfied the prerequisites of Rule 23(a), the Class also satisfies those of Rule 23(b)(3), namely, (i) questions of law or fact common to Class Members predominate over any questions affecting only individual members, and (ii) the class action is superior to other available methods for the fair and efficient adjudication of this matter. *McLaughlin*, 224 F.R.D. at 311; *Rodrigues*, 226 F.R.D. at 152; *In re Compact Disc*, 216 F.R.D. at 204; *Mowbray v. Waste Mgmt. Holdings, Inc.*, 189 F.R.D. 194, 196-97 (D. Mass. 1999), *aff'd*, 208 F.3d 288 (1st Cir. 2000); *In re Screws Antitrust Litig.*, 91 F.R.D. 52, 55 (D. Mass. 1981).

In this case, all the specific and general issues – Defendant's liability under various state consumer protection acts; the formation and fulfillment of the scheme; liability evidence showing improper promotion of the spread and its effect on the Class; aggregate damages to the Class as a whole – are common, uniform, and applicable to all Class Members. Adjudication of Plaintiffs' and Class Members' claims can be done most efficiently as a class action. A class action is the superior method of adjudicating the nearly identical claims of the many Class Members in this case because it reduces variations and inconsistencies in the adjudication of similar claims, effectively utilizes judicial resources and economically allows for the adjudication of many claims involving an identical complex scheme and legal theory.

- 22 -

### a.   Questions of law or fact common to Class Members predominate over any questions affecting only individual members

The Rule 23(b) predominance inquiry is satisfied "unless it is clear that individual issues will overwhelm the common questions and render the class action valueless." *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 517 (S.D.N.Y. 1996). This inquiry, however, does not require "uniformity of claims across the entire class." *Payne*, 216 F.R.D. at 26 (citing *Amchem*, 521 U.S. at 623-25). In determining whether common questions of law or fact predominate, the Court should determine if the various claims of the Plaintiffs are sufficiently cohesive to justify treating them all in one, single judicial forum. *See Amchem*, 521 U.S. at 625 ("Predominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws."); *see Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 296 (1st Cir. 2000) ("single, central issue" as to the defendant's conduct vis-à-vis class members can satisfy predominance requirement even when other elements of the claim require individualized proof).

Individual issues in this case will not overwhelm the common questions of law or fact because the central question is whether BMS illegally manipulated the published AWP for its Subject Drugs and improperly marketed the spread. There is no doubt that the Plaintiffs would present common evidence regarding the existence and scope of the alleged scheme at any trial of this matter, much as was done in the Massachusetts Class 2 and 3 trial.

### b.   A class action is superior to other available methods for the fair and efficient adjudication of this matter

With respect to the superiority requirement, a court considers: (i) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (ii) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (iii) the desirability or undesirability of concentrating the litigation of the

- 23 -

claims in the particular forum; and (iv) the difficulties likely to be encountered in the management of a class action.  Fed. R. Civ. P. 23(b)(3).  As to the last of these factors, where a Court is "[c]onfronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, for the proposal is that there be no trial."  *Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d at 298 (citing *Amchem*, 521 U.S. at 620); *Denney*, 230 F.R.D. at 326.

Analyzing the three remaining factors under the superiority requirement, it is clear that a class action would provide the fairest and most efficient method of adjudication.  First, Class Members have losses too small to pursue through individual cases, even though those losses are significant to them.  In addition, the large size of the both Classes, the complexity of the litigation, the cost of the litigation and similar issues all make a class action the superior method of adjudicating the claims of members of both Classes.  The interests of Class Members in individually controlling the prosecution of separate claims are outweighed by the efficiency of the class mechanism.  It would be a waste of judicial and the parties' resources to require thousands of separate prosecutions.  Such an approach would necessarily risk inconsistent adjudications establishing varying standards for identical conduct.

## V.       THE SETTLEMENT IS REASONABLE AND SHOULD BE APPROVED

### A.       The Standard for Approval of Class Settlement:  A Presumption in Favor of Settlement

In determining whether to approve a settlement, the First Circuit, as required by Rule 23(e)(1)(C), has held that "[a] district court can approve a class action settlement only if it is fair, adequate and reasonable."  *City P'ship Co.*, 100 F.3d at 1043.  The Court must undertake a detailed assessment of the terms of the Settlement, the interests of the Class Members as well as any third parties that might be affected by the settlement, and the circumstances of the litigation

and the proposed settlement.  *See Duhaime v. John Hancock Mut. Life Ins. Co.*, 183 F.3d 1, 2, 7 (1st Cir. 1999); *Durrett*, 896 F.2d at 604; *Hawkins*, 2004 U.S. Dist. LEXIS 807, at *14.

The First Circuit has given great deference to trial courts and has "refrain[ed] from intervening unless there is found to be an abuse of discretion."  *City P'ship Co.*, 100 F.3d at 1043-44; *Durrett*, 896 F.2d at 603.  A court reviewing a settlement "is not to decide whose assertions are correct, but merely to ascertain whether the district court clearly abused its discretion in approving the settlement."  *City P'ship Co.*, 100 F.3d at 1043-44.[9]

In this Circuit, a presumption in favor of settlement is to be found "[w]hen sufficient discovery has been provided and the parties have bargained at arms-length."  *City P'ship Co.*, 100 F.3d at 1043; *In re Compact Disc*, 216 F.R.D. at 207; *M. Berenson Co. v. Faneuil Hall Marketplace, Inc.*, 671 F. Supp. 819, 822 (D. Mass. 1987); *see also* NEWBERG § 11.41 at 453. And the law has long favored settlement of litigation.  This is particularly true in class actions and other complex cases where substantial resources can be conserved by avoiding the time, cost and rigors of prolonged litigation.  In addition, there is an overriding public interest in favor of settlement of complex class action suits, especially where the substantive issues of the case "reflect a broad public interest in the rights to be vindicated or the social or economic policies to be established."  *See, e.g.*, *Donovan v. Estate of Fitzsimmons*, 778 F.2d 298, 307 (7th Cir. 1985).

---

[9] Also, as a general rule, courts will not substitute their own thoughts for the parties' business judgment in arriving at a settlement.  *Patterson v. Stovall*, 528 F.2d 108, 114 (7th Cir. 1976).  Accordingly, the Court is not called upon to determine whether the Settlement reached by the parties is the best possible deal, nor whether Class Members will receive as much from a settlement as they might have recovered from victory at trial.  *See Giusti-Bravo v. United States Veterans Admin.*, 853 F. Supp. 34, 36 (D.P.R. 1993) (In evaluating proposed class action settlement, "courts are required to make an inquiry to determine whether the proposal, taken as a whole, is fair, adequate, reasonable and in the best interests of all those who will be affected by it."); *In re Compact Disc*, 216 F.R.D. at 211 (Judge notes that "[a]s supervising judge [he is] not to prejudge the merits of the case...and [is not] to second-guess the settlement, [but is] only to determine if the parties' conclusion is reasonable."); *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F. Supp. 450, 534 (D.N.J. 1997), *aff'd*, 148 F.3d 283 (3d Cir. 1998); *E.E.O.C. v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 889 (7th Cir. 1985).  Courts challenged with evaluating a proposed class action settlement recognize that the "essence of settlement is compromise" and will not represent a total win for either side.  *Isby v. Bayh*, 75 F.3d 1191, 1200 (7th Cir. 1996) (quoting *Armstrong v. Board of Sch. Dir.*, 616 F.2d 305, 315 (7th Cir. 1980)).

By supporting the settlement of complex, class action disputes, the judicial system can help minimize litigation expenses on both sides, reduce the strain on scarce judicial resources, and avoid the risk of trial to both parties.  MANUAL FOR COMPLEX LITIGATION, §§ 23, 30.4 (3d ed. 1995).

These concerns apply with particular force in a case such as this, where thousands of third-party payors and consumers throughout the country were subject to allegedly deceptive and unfair practices in connection with the marketing and sale of BMS' Subject Drugs.  Individual litigation would clog the courts of this and many other states; would take years to resolve; and, given the relatively modest amount of damages suffered by most members of Class 2 and Class 3, it likely would be available only to the largest TPPs wealthy and sophisticated enough to retain their own lawyers.  The proposed Settlement is the best and only vehicle to assure that all members of both Classes, regardless of their means, receive the relief to which they are entitled in a prompt and efficient manner.

This Settlement was the result of intense litigation and arms-length negotiations between counsel.  The litigation was hard fought and the negotiations were lengthy and detailed.  There was no collusion, and all the negotiations were conducted at arms length.  Therefore, the Settlement should be presumed to be fair.

**B.  Factors to Consider When Determining the Fairness, Adequacy and Reasonableness of a Settlement**

There is no single test in the First Circuit for determining whether a proposed class action settlement is fair.  As one court has explained, "[t]he fairness determination is not based on a single inflexible litmus test, but, instead, reflects [the court's] studied review of a wide variety of factors bearing on the central question of whether the settlement is reasonable in light of the uncertainty of litigation." *Rolland v. Cellucci*, 191 F.R.D. 3, 8 (D. Mass. 2000).

- 26 -

Other Circuits generally have considered "the negotiating process by which the settlement was reached and the substantive fairness of the terms of the settlement compared to the result likely to be reached at trial." *In re Compact Disc*, 216 F.R.D. at 206.  Among the factors that other courts have employed are the following:

(1)      comparison of the proposed settlement with the likely result of litigation;

(2)      stage of the litigation and the amount of discovery completed;

(3)      quality of counsel;

(4)      conduct of the negotiations; and

(5)      prospects of the case, including risk, complexity, expense and duration.

*In re Compact Disc*, 216 F.R.D. at 206.[10] Applying these six factors to the proposed Settlement in this case clearly indicates that the Settlement is more than adequate and should be approved.

### 1.      Comparison of proposed settlement with the likely result of litigation

This factor involves the question of "how the value of the settlement compares to the relief the plaintiffs might recover after a successful trial and appeal, discounted for risk, delay and expense." *In re Compact Disc*, 216 F.R.D. at 207; *Giusti-Bravo*, 853 F. Supp. at 36 (noting that if settlement were rejected, "plaintiffs could very well face a long and winding road toward trial and almost unsurmountable obstacles in attempting to obtain a more comprehensive relief than the one provided"); MANUAL FOR COMPLEX LITIGATION (FOURTH) § 13 (4th ed. 2004) ("The high stakes in complex cases increase the incentive to avoid the risk of trial, and the burgeoning cost of pretrial activity places a premium on settling early in litigation.").

---

[10] *See also Molski v. Gleich*, 318 F.3d 937, 953 (9th Cir. 2003); *In re Fleet/Norstar Sec. Litig.*, 935 F. Supp. 99, 105 (D.R.I. 1996); *In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 785(3d Cir. 1995); *Giusti-Bravo*, 853 F. Supp. at 36; *M. Berenson Co.*, 671 F. Supp. at 822-23; *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975).

In making this assessment, a court is cautioned not to "decide the merits of the case or resolve unsettled legal questions." *Giusti-Bravo*, 853 F. Supp. at 36; *Greenspun v. Bogan*, 492 F.2d at 381 (district court should not "engage in a trial of the merits, for the purpose of settlement is precisely to avoid such a trial"); *Ressler v. Jacobson*, 822 F. Supp. 1551, 1553 (M.D. Fla. 1992) (courts should limit inquiry to "whether the possible rewards of continued litigation with its risks and costs are outweighed by the benefits of the settlement").  Also, the court "cannot, and should not, use as a benchmark the highest award that could be made to the plaintiff after full and successful litigation of the claim.  Nor should the court consider cases of particular individual class members to determine whether each and every member of the class receives the fullest possible compensation." *Duhaime*, 177 F.R.D. at 68.

As part of their settlement negotiations, and the ultimate decision to accept the Settlement, Plaintiffs analyzed various risks of continuing litigation.  These included risks related to establishing liability at trial and risks relating to the amount of damages that could be recovered at trial.  A consideration of all the various risk factors and potential recovery reveals that the Settlement is more than adequate.

### a.     Risks of establishing liability

While the Court in a bench trial had ruled against BMS on liability, Plaintiffs realized that they faced the potential of challenges to that verdict in the First Circuit and ultimately the Supreme Court.[11]  Plaintiffs also realized that, should they try non-Massachusetts claims to a jury, a jury could likewise find differently than how this Court found after the bench trial.

---

[11] As the court in *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465 (S.D.N.Y. 1998) recognized, "[i]t is known from past experience that no matter how confident one may be in the outcome of litigation, such confidence is often misplaced." *Id.* at 475 (citation omitted).

**b.** **Risks of proving damages**

Class Counsel are also mindful of the Court's Class 2 and 3 trial ruling that limit damages to the time period 1998 through 2002.  A jury on non-Massachusetts claims could have found the same limitation, which would deprive Class Members of compensation for other time periods.  In contrast, the Settlement opens claims to Class Members who were administered BMS Subject Drugs outside of this time period.

**c.** **Other risks of continuing the litigation**

Another important factor considered by the Class Plaintiffs in evaluating the reasonableness of the Settlement was the value to Class Members of receiving payment as soon as possible, as opposed to litigating through appeals at multiple levels.  *See In re Warfarin Sodium Antitrust Litig.,* 391 F.3d 516, 536 (3d Cir. 2004) ("[I]t was inevitable that post-trial motions and appeals would not only further prolong the litigation but also reduce the value of any recovery to the class.").

Because of the uncertainty surrounding the outcome of this litigation, approval of this Settlement will afford the entire Class "the quickest, surest remedy to their claims."  The Settlement will provide Class Members with "benefits fully commensurate with any results reasonably attainable after protracted litigation."  *Giusti-Bravo*, 853 F. Supp. at 38.  Weighing all of the risks the Plaintiffs faced, the Settlement is reasonable.

**d.** **The amount recovered**

Many courts have cautioned that the overall percentage of recovery by itself is not telling; what must be considered are the risks of proceeding towards trial and ultimately sustaining trial results on appeal.  The court in *In re Union Carbide Corp. Consumer Prods. Business Sec. Litig*., 718 F. Supp. 1099 (S.D.N.Y. 1989), recognized that "[t]he dollar amount of the settlement by itself is not decisive in the fairness determination . . . Dollar amounts are judged not in

- 29 -

comparison with the possible recovery in the best of all possible worlds, but rather in light of the strengths and weaknesses of plaintiffs' case." *Id*. at 1103. Other Courts have approved settlements which provide only a small percentage of the recovery sought. *See In re Michael Milken & Assocs. Sec. Litig.*, 150 F.R.D. 46, 64-65 (S.D.N.Y. 1993); *In re "Agent Orange" Prods. Liab. Litig.*, 597 F. Supp. 740, 762 (E.D.N.Y. 1984); *Detroit v. Grinnell Corp.*, 495 F.2d 448, 455 n.2 (2d Cir. 1974) ("[T]here is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery.").

Many other courts have approved settlements providing a recovery of 10-12% of potential damages where substantial risks exist. *See In re Linerboard Antitrust Litig.*, 2004 U.S. Dist. LEXIS 10532, at *15-17 (E.D. Pa. June 2, 2004). Similarly, in *Warfarin*, the Third Circuit noted that "typical recoveries in securities class actions range from 1.6% to 14%." *Warfarin*, 391 F.3d at 539 (citing *Cendant*, 264 F.3d at 241); *see also In re Prudential Sec., Inc. Ltd. P'ships Litig.*, 1995 U.S. Dist. LEXIS 22103 (S.D.N.Y. Nov. 20, 1995) (approving of settlement of 1.6 - 5% of claimed damages) and *In re Crazy Eddie Sec. Litig.*, 824 F. Supp. 320 (E.D.N.Y. 1993) (approving settlement of 6-10% of damages).

The recovery obtained here is a substantial amount of the aggregate Class damage. Coming on the heels of the Class 2 and 3 trial, Plaintiffs were very well acquainted with the prospective strengths and risks of the case. Notwithstanding these risks, with which the Court is also well acquainted, Plaintiffs were able to garner a Settlement Amount of $19,000,000, with BMS's agreement to additionally pay half of the costs of notice up to a maximum of $1,000,000. For context, Plaintiffs' expert, Raymond Hartman, has estimated damages of $10,479,670 based on the Court's drug-by-drug liability findings from the Massachusetts trial for each year,

- 30 -

applying relevant statutes of limitation and including those states included in the Court's opinion on multi-state certification. When the class is expanded to include all states and the District of Columbia, and removing statutes of limitation from consideration and expanding the damage period back to 1991 (even though the Court did not find liability prior to 1998 at trial), the estimate is $30,763,654. Using either number as a touchstone, the $19,000,000 garnered is more than fair and reasonable. Further, consumers are eligible to recover three times their co-payment obligations for the drugs Cytoxan, Taxol and Vepesid, and their actual co-payments for the remaining BMS Subject Drugs.

In sum, the amount recovered militates heavily in favor of approving the Settlement.

### 2.       Stage of the litigation and the amount of discovery completed

The Court is also required to evaluate whether the amount of evidence obtained through discovery is sufficient to determine the settlement's adequacy. *Giusti-Bravo*, 853 F. Supp. at 38 (finding that although it is probable substantial discovery still remains, the amount of discovery already conducted was sufficient to permit "an accurate assessment of each party's chances at trial"); *Rolland*, 191 F.R.D. at 8 (finding discovery to be sufficient given that the parties had a voluminous amount of information at the time as well as the advice and reports of their experts).[12] In addition, courts have taken into consideration the stage of litigation at which settlement is reached "because it indicates how fully the district court and counsel are able to evaluate the merits of plaintiffs' claims." *Duhaime*, 177 F.R.D. at 67 (citing *Armstrong v. Board of Sch. Dir.*, 616 F.2d 305, 325 (7th Cir. 1980)); *In re GMC*, 55 F.3d at 783 (trial court should consider whether counsel participating in the settlement negotiations "had access to sufficient information to appreciate the merits of the class's case").

---

[12] Settlements have been supported with far less discovery. *See*, *e.g.*, *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 211 (5th Cir. 1981) (where no formal discovery was taken, access to other information such as indictments, documents produced to Grand Jury and leadings was deemed adequate).

Sufficient discovery has been conducted in this matter to allow Class Counsel to fairly investigate the pertinent legal and factual issues. The parties exchanged written discovery, conducted many depositions, and BMS produced millions of documents. Class Counsel spent more than four years reviewing said documents, organizing documents for use, creating an electronic database and making determinations on utilization of important documents, additional discovery and general assistance in the litigation of this matter. Trial was held on two Classes, and trial was imminent for Class 1. In sum, Class Counsel were fully aware of the value of the Class claims before the case was settled.

### 3.    Quality of counsel

As stated above, "[w]hen the parties' attorneys are experienced and knowledgeable about the facts and claims, their representations to the court that the settlement provides class relief which is fair, reasonable and adequate should be given significant weight." *Rolland*, 191 F.R.D. at 10; *Bussie v. Allmerica Fin., Corp.*, 50 F. Supp. 2d 59, 77 (D. Mass. 1999). With respect to the quality of counsel, the Court has looked at a variety of factors, including "the length of their involvement in the litigation, their competence, and their experience in this particular type of litigation." *Giusti-Bravo*, 853 F. Supp. at 40. This Court has already repeatedly found that Class Counsel are qualified to represent the Class. Class Counsel have been involved in this case from the beginning, having created and filed the original Class Action Complaint in this Court, even prior to the creation of an MDL. As detailed in the previously-submitted resumes of Class Counsel, the firms have been appointed lead counsel in numerous class actions.

### 4.    Conduct of the negotiations:  the proposed Settlement is the result of arduous, arms-length negotiations conducted by highly experienced counsel

There is a presumption of correctness attached to a Class settlement reached in arms-length negotiations between experienced, capable counsel. *City P'ship Co.*, 100 F.3d at 1043;

- 32 -

*see also Hawkins*, 2004 U.S. Dist. LEXIS 807, at *15; *Flinn v. FMC Corp.*, 528 F.2d 1169, 1173 (4th Cir. 1975) ("While the opinion and recommendation of experienced counsel is not to be blindly followed by the trial court, such opinion should be given weight in evaluating the proposed settlement."); *see also* NEWBERG § 11.41 at 87-89.

The United States Court of Appeals for the Seventh Circuit, in approving a class action settlement, noted that "[r]ather than attempt to prescribe the modalities of negotiation, the district judge permissibly focused on the end result of the negotiation. . . .  The proof of the pudding was indeed in the eating."  *Mars Steel Corp. v. Continental Ill. Nat'l Bank & Trust Co.*, 834 F.2d 677, 684 (7th Cir. 1987); *see also In re "Agent Orange"*, 597 F. Supp. at 762 (most important concern for the court in reviewing a settlement of a class action is the strength of the plaintiffs' case if it were fully litigated).

In the instant action, the parties actively engaged in many rounds of negotiations, for many months.  The parties negotiated arduously and at arms-length with the Court-appointed Mediator.  The negotiations involved submissions of proposals, counter-proposals, evaluation of all discovery and factual arguments.  The parties have worked long and hard to reach a resolution of this matter, and Plaintiffs submit it is fair, appropriate, and in the best interests of the Class Members.

## 5.    Prospects of the case, including risk, complexity, expense and duration

The last factor outlined in *Compact Disc* captures the "prudential policy favoring settlement as a preferred alternative to costly, time-consuming litigation."  *Mathewson Corp. v. Allied Marine Indus., Inc.*, 827 F.2d 850, 852 (1st Cir. 1987); *United States v. DiBiase*, 45 F.3d 541, 546 (1st Cir. 1995) ("[S]ettlements reduce excessive litigation expenses and transaction costs."); MANUAL FOR COMPLEX LITIGATION (FOURTH) § 13.22 (4th ed. 2004) ("One of the major incentives to settle is to avoid the cost and burden of further discovery.").  Without

question, in a "complex class action involving prolonged litigation" such as this, "settlements are strongly favored by the courts because they represent the easiest, and quickest, way of disposing of the case." *Giusti-Bravo*, 853 F. Supp. at 35-36.[13]

It has been a substantial undertaking for the Plaintiffs and their counsel to prosecute this case. If this case proceeded further, significant additional resources would have been expended by Class Counsel in the First Circuit and beyond, as BMS is now appealing the Class 2 and 3 trial verdict. It is reasonable to assume that, absent settlement, a final result would not be reached for several more years.

**6.      Reaction of the Class**

Some courts also consider the reaction of the Class and opposition to the settlement. *Hawkins*, 2004 U.S. Dist. LEXIS 807, at *15 (citing *In re General Motors Corp. Pick-Up Truck Fuel Tank*, 55 F.3d 768, 785 (3d Cir. 1995)). Here there are ***no*** objectors to the Class 2 and Class 3 components of this Settlement.

**VI.      CONCLUSION**

The Settlement here is the result of hard fought litigation and negotiation. The Settlement provides an excellent result. The Court should certify the Settlement Classes and grant final approval to the Settlement Agreement.

---

[13] In the *Warfarin Sodium Antitrust Litig.*, the Court stated "[w]e agree with the District Court's conclusion that this factor favors settlement because continuing litigation through trial would have required additional discovery, extensive pretrial motions addressing complex factual and legal questions, and ultimately a complicated, lengthy trial. Moreover, it was inevitable that post-trial motions and appeals would not only further prolong the litigation but also reduce the value of any recovery to the class. In a class action of this magnitude . . . the time and expense leading up to trial would have been significant." *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d at 536.

DATED: November 19, 2010            By____/s/ **Steve W. Berman**____
                                        Thomas M. Sobol (BBO#471770)
                                        Edward Notargiacomo (BBO#567636)
                                    Hagens Berman Sobol Shapiro LLP
                                    55 Cambridge Parkway, Suite 301
                                    Cambridge, MA  02142
                                    Telephone: (617) 482-3700
                                    Facsimile: (617) 482-3003

                                    **LIAISON COUNSEL**

                                    Steve W. Berman
                                    Sean R. Matt
                                    Hagens Berman Sobol Shapiro LLP
                                    1918 Eighth Avenue, Suite 3300
                                    Seattle, WA  98101
                                    Telephone: (206) 623-7292
                                    Facsimile: (206) 623-0594

                                    Jennifer Fountain Connolly
                                    Hagens Berman Sobol Shapiro LLP
                                    1629 K St. NW, Suite 300
                                    Washington, DC  20006
                                    Telephone: (202) 355-6435
                                    Facsimile: (202) 355-6455

                                    Jeffrey Kodroff
                                    John Macoretta
                                    Spector, Roseman Kodroff & Willis, P.C.
                                    1818 Market Street, Suite 2500
                                    Philadelphia, PA  19103
                                    Telephone: (215) 496-0300
                                    Facsimile: (215) 496-6611

                                    Kenneth A. Wexler
                                    Wexler Wallace LLP
                                    55 W. Monroe, Suite 3300
                                    Chicago, IL  60603
                                    Telephone: (312) 346-2222
                                    Facsimile: (312) 346-0022

- 35 -

Marc H. Edelson
Hoffman & Edelson LLC
45 West Court Street
Doylestown, PA  18901
Telephone: (215) 230-8043
Facsimile: (215) 230-8735

**CLASS COUNSEL**

001534-16  408244 v1

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I, Steve W. Berman, an attorney, caused a true and correct copy of the foregoing, **CLASS PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF JOINT MOTION FOR FINAL APPROVAL OF CLASS 2 AND CLASS 3 COMPONENTS OF BMS SETTLEMENT**, to be delivered to all counsel of record by electronic service pursuant to Paragraph 11 of the Case Management Order No. 2, by sending on November 19, 2010, a copy to LEXISNexis File & Serve for posting and notification to all parties.

  **/s/ Steve W. Berman**
Steve W. Berman

- 37 -