```
                  IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MASSACHUSETTS


    IN RE:                          )
                                    )  CA No. 01-12257-PBS
    PHARMACEUTICAL INDUSTRY AVERAGE )
    WHOLESALE PRICE LITIGATION      )  Pages 1 - 34
                                    )
```

MOTION HEARING

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE

```
                    United States District Court
                    1 Courthouse Way, Courtroom 19
                    Boston, Massachusetts
                    November 19, 2010, 2:17 p.m.
```

```
                         LEE A. MARZILLI
                      OFFICIAL COURT REPORTER
                   United States District Court
                   1 Courthouse Way, Room 7200
                        Boston, MA  02210
                         (617)345-6787
```

 1    A P P E A R A N C E S:

 2

      FOR THE PLAINTIFFS:
 3
          THOMAS M. SOBOL, ESQ. and EDWARD NOTARGIACOMO, ESQ.,
 4    Hagens Berman Sobol Shapiro, LLP, 55 Cambridge Parkway,
      Suite 301, Cambridge, Massachusetts, 02142, for the Class
 5    Plaintiffs.

 6          MARC A. EDELSON, ESQ., Edelson & Associates, 45 West Court
      Street, Doylestown, Pennsylvania, 18901, for the Class
 7    Plaintiffs.

 8          JOHN A. MACORETTA, ESQ., Spector Roseman Kodroff & Willis,
      PC, 1818 Market Street, Philadelphia, Pennsylvania, 19103,
 9    for the Class Plaintiffs.

10          KENNETH A. WEXLER, ESQ., Wexler Wallace, LLP,
      55 West Monroe Street, Suite 3300, Chicago, Illinois, 60603,
11    for the Class Plaintiffs.

12

      FOR THE DEFENDANT:
13
          LYNDON M. TRETTER, ESQ., Hogan Lovells, LLP,
14    875 Third Avenue, New York, New York, 10022,
      for Bristol-Myers Squibb Company.
15
      ALSO PRESENT:  (By Telephone) Cindy Weigel,
16                    Buccaneer, A Vangent Company.

17

18

19

20

21

22

23

24

25

1              P R O C E E D I N G S

2         THE CLERK:  In Re:  Pharmaceutical Industry Average

3    Wholesale Price Litigation, Civil Action 01-12257, will now be

4    heard before this Court.  Will counsel please identify

5    themselves for the record.

6         MR. SOBOL:  Good afternoon, your Honor.  Tom Sobol for

7    the class plaintiffs.

8         MR. NOTARGIACOMO:  Ed Notargiacomo for class

9    plaintiffs.

10         MR. MACORETTA:  Good afternoon, your Honor.  John

11    Macoretta for class plaintiffs.

12         MR. WEXLER:  Ken Wexler, your Honor, for class

13    plaintiffs.

14         MR. EDELSON:  Good afternoon, your Honor.  Marc

15    Edelson for class plaintiffs.

16         MR. TRETTER:  And Lyndon Tretter for Bristol-Myers

17    Squibb Company.

18         THE COURT:  All right, thank you.  Is there anybody

19    here for an objection?  All right.  Has any objection been

20    received.

21         MR. SOBOL:  No, your Honor.  I believe you also have

22    on the phone a representative from CMS.

23         THE COURT:  I thought I was getting the vendor who was

24    responsible for computing the data.

25         MR. NOTARGIACOMO:  You are, your Honor.

1        MS. WEIGEL:  That is correct.  This is Cindy Weigel

2   with Buccaneer.

3        THE COURT:  Yes, it's not CMS, it's a vendor, because

4   this is taking way too long.  But let me get to that later.

5   Just stay on the phone.

6        What is the relationship between Class 1 and Classes 2

7   and 3?  Does anything pour from one class into another?

8        MR. SOBOL:  In effect, yes, it does not pour, but

9   because the distributable amounts that go to Classes 2 and 3

10  depend upon also how many people are in Class 1, as a practical

11  matter, distribution cannot occur to either Class 2 or

12  Class 3 --

13        THE COURT:  Well, I don't understand it from here.  It

14  wasn't spelled out in the memo.  I don't understand it.  I was

15  trying to read the attachment.  Maybe you can help me go

16  through it because I'm very frustrated.  I said to both of you,

17  I mean, I think -- I don't remember who it was, whether it was

18  just Mr. Notargiacomo or whether everyone was here -- "Give me

19  whatever date you want, but we're making that the final date."

20  And he called the vendor, as I understand it, and he gave me a

21  date, and I accepted it.  The settlement was in 2007.  I'm

22  frustrated beyond belief.

23        So I just want the person from the vendor to hear

24  this.  These people are dying.  They are sick, they have breast

25  cancer.  I don't know what's taking so long, and so I'd like to

1   at least get this money out.

2           MR. SOBOL:  I understand completely what you're

3   saying, your Honor, and the reason I'm here today is to make

4   sure that we tell you quite clearly how we're moving along and

5   how it's going to reach a conclusion and how people are going

6   to get paid.  There are two handouts that I've given you.  One

7   should be an estimated use of funds and the other should be a

8   schedule.

9           THE COURT:  Is that these two?  Yes.

10          MR. SOBOL:  Yes.  So I think it makes sense for us

11  first to go through the process, the schedule, and then I'll

12  turn to the estimated use of the funds, if that's all right,

13  your Honor?

14          So today is November 19.  Today we're doing the final

15  approval hearing on Classes 2 and 3 only.  We have been told by

16  the vendor that by the second week of December, that we will

17  have the information available, the data available for both

18  Track Two and BMS.

19          Now, it's important for you to be mindful of this:

20  Right now we have an estimate that there will be approximately

21  19 million beneficiaries who are potential members in both

22  Track Two and BMS.

23          THE COURT:  How much just BMS?

24          MR. SOBOL:  We estimate, looking solely at the number

25  of NDCs, that about 6 percent of that 19 million, or

1   approximately 1.2 million, beneficiaries will be potential

2   members in the BMS settlement.  From that, we estimate that

3   about 15 percent of all Medicare beneficiaries pay some form of

4   the 20 percent co-pay.  As a result, we estimate that about

5   180,000 Medicare beneficiaries, who will be receiving notice

6   from us, are members in the class.  From that 180,000 people,

7   we don't know how many people will send the card back.  Prior

8   history tells us maybe something in the low double digits,

9   okay?  Now, those are the processes that we have to go through.

10  So the schedule, therefore, anticipates that we have a

11  hearing on 2 and 3 today, that we get the data from the vendor

12  in the middle of December.  We're told by the claims

13  administrator that it will take them about two weeks to send

14  out the mailing cards.  So hopefully by the end of December

15  these mailing cards go out to 1.2 million people.  They are

16  given 30 days.  At the expiration of 30 days, some portion of

17  that 1.2 million will have sent the card back.  Now we give

18  this smaller segment of people a full notice along with a claim

19  form that they can fill out that you've previously approved.

20  That takes then, again, about another month.

21  Hopefully, with this estimate, by the end of February

22  we will have identified those people who are filing claims or

23  making exclusions or opting out from Class 1.  By that time, of

24  course, we will also have filed our motion for attorneys' fees

25  so that the motion for attorneys' fees is on record before

1    people are filing their exclusions, objections, or opt-outs.

2         Then, by early March, therefore, we would file

3    everything for final approval of Class 1, have a hearing

4    hopefully in March, and hopefully go to judgment in March in

5    this particular settlement.  That's the process that we plan.

6         THE COURT:  It was supposed to be done today.  So

7    you're telling me it's another five months?

8         MR. SOBOL:  Yes, I am telling you it's another five

9    months.

10        THE COURT:  But people are dying.  I mean, this has

11   been a settlement that's gone into effect in 2007.  I'm afraid

12   what happened is that you slowed it all down to package it with

13   Class -- I mean, not for some sort of bad motive, but that it

14   was all slowed down in order to get it all done with the

15   Track Two, which is not as serious diseases.

16        MR. SOBOL:  Right.  If I may, I think what -- well,

17   the bottom line is, it's going to take another five months.

18   I'm not trying to get around that.  If you look -- I went

19   through the papers all morning and last night, your Honor,

20   trying to look at this thing, frankly, because I completely

21   empathize with the Court's frustration.  I really do.

22        It seems to me that what happened here is that between

23   2007, June of 2007, which is when this transaction was first

24   proposed, it took another until, I think, two years, the next

25   summer of 2009, when the parties had fought over whether or not

1   it should just be a Class 1 settlement on the old 13 million or

2   then on the 19 million.  That is -- it's water over the damn,

3   I'm not going to excuse it, but we lost two years ultimately on

4   that fight and negotiating that.  And I can't address it other

5   than to say it's a frustration and it's there.  The next year

6   seems to have been a situation where the CMS vendor for a group

7   of, understandable or not or whatever -- I'm not going to trust

8   the reasons -- has been trying to get us the data, and we've

9   had frustrations implementing the desire of --

10       THE COURT:  Well, why couldn't we have just gone with

11  BMS first?  I mean, the Track Two involves -- I can't even

12  remember all the medications.  It was far more complicated but

13  far less serious diseases.

14       MR. SOBOL:  I can't address that, your Honor.  I can

15  address only today what I can do to make sure to you that this

16  thing is now done.  I cannot address that.  I apologize, I

17  can't.  I just can't.

18       THE COURT:  Well, who's the vendor now?  What's your

19  name?

20       MS. WEIGEL:  My name is Cindy Weigel.  I work with

21  Buccaneer, which is a Vangent Company.

22       THE COURT:  Which is a what company?

23       MS. WEIGEL:  Vangent.

24       THE COURT:  What does that mean?

25       MS. WEIGEL:  It's just the name of the company,

1    Buccaneer, A Vangent Company.  We're a wholly-owned subsidiary

2    of Vangent.

3              THE COURT:  Well, do you swear to tell the truth, the

4    whole truth, and nothing but the truth?

5              MS. WEIGEL:  I do.

6              THE COURT:  All right, you're under oath.  Are you

7    going to be able to finish this by 12/15?

8              MS. WEIGEL:  Yes.

9              THE COURT:  I'm giving you a direct order, subject to

10   contempt, to finish it by December 15.  I don't understand what

11   happened last time.  We gave you the date that you wanted.  I

12   don't understand, so maybe you can explain it to me, why we're

13   now yet another -- we're so far later than what we -- five

14   months later than what we were anticipating.  What happened?

15             MS. WEIGEL:  We are a subcontractor to Centers for

16   Medicare and Medicaid Services, and we were just notified of

17   CMS approval of this request on Wednesday, the 17th.

18             THE COURT:  How can that be?  I had a hearing months

19   ago where Mr. Notargiacomo apparently got on a phone with

20   someone and picked this date.

21             MR. NOTARGIACOMO:  Not with MS. WEIGEL, your Honor.

22             THE COURT:  No, but who did you talk to?

23             MR. NOTARGIACOMO:  I've been speaking with -- there's

24   another entity in between the vendor and CMS called ResDAC.  I

25   forget what the acronym stands for.

1          THE COURT:  Well, who did you speak with?

2          MR. NOTARGIACOMO:  I don't recall.

3          THE COURT:  Do you know this other company?

4          MS. WEIGEL:  Do I?

5          THE COURT:  Yes.

6          MS. WEIGEL:  Yes.  ResDAC is actually the vendor who

7   assists researchers with obtaining data.

8          THE COURT:  So do they work for you?

9          MS. WEIGEL:  We work in conjunction with CMS.

10         THE COURT:  Well, if you make me this promise, how do

11  I know that the ResDAC people aren't going to balk?

12         MS. WEIGEL:  We now have the request here at

13  Buccaneer, and we are processing.

14         THE COURT:  You just got the request when?

15         MS. WEIGEL:  The request was approved by CMS on

16  Wednesday, the 17th of November.

17         THE COURT:  Well, was somebody lying to me last time?

18  What happened?

19         MR. NOTARGIACOMO:  It's a complicated process, your

20  Honor, but Buccaneer just got approval from CMS, but previous

21  to that, they had been in contact and discussions with ResDAC,

22  who really does lay out the requests, and CMS approval --

23         MS. WEIGEL:  The other thing too was, I think we are a

24  little surprised by the cohort size of the 19 million; and in

25  conversations with Ed, we have said, "Well, let's see if we can

1  go ahead and kick this off."  But then when the cohort came

2  back so large, we hesitated because we weren't sure if CMS

3  would approve that large of a cohort, so we waited before we

4  started the job.

5       THE COURT:  Did you know there was a direct Court

6  order and schedule involved?

7       MS. WEIGEL:  I did not.

8       THE COURT:  Do you understand people are dying of

9  breast cancer who are entitled to these funds?

10      MS. WEIGEL:  We have the request here at Buccaneer,

11  and we are processing.

12      THE COURT:  All right, well, there's a direct order to

13  CMS, Buccaneer, and ResDAC, and I want you to draft it to me,

14  that it be done by December 15 for BMS.  It's just, I don't

15  know how much more frustrated I can express because I gave you

16  everything you asked for last time, and it's been continued how

17  many times?

18      MR. NOTARGIACOMO:  Two or three times, your Honor.

19      THE COURT:  And it's been sitting there, the money for

20  these people, since 2007.  I'm the fiduciary.  At the bottom

21  line, you're responsible and I'm responsible.

22      MR. NOTARGIACOMO:  We will draft an order to that

23  effect, your Honor.

24      THE COURT:  And I think I just don't feel well served,

25  and I don't know where it fell apart, but I don't feel well

1   served, and I'm sure the class isn't being well served, on this

2   piece of it.  Now, let's see if we can hunker down.  If they

3   get the numbers by December 10 or December --

4            MR. SOBOL:  If Complete Claims gets the data by the

5   middle of December, the cards will go out by the end of

6   December, and what we will do is make sure that there is also a

7   direct order to the claims administrator that within 18 days or

8   something of their receipt of the data, that the cards will go

9   out.  So that we'll make sure that this isn't just a schedule,

10   but the claims administrator also understands that it and class

11   counsel, plaintiffs' class counsel, are ordered to make sure

12   that that gets effectuated within that period of time.  I think

13   that makes sense.

14            THE COURT:  All right, so why don't you draft this

15   schedule in the form of a Court order, subject to sanctions,

16   with the claims administrator, CMS vendors, and you.

17            MR. SOBOL:  Correct.

18            THE COURT:  It's got to happen.  I mean, I feel a

19   little sandbagged from the last hearing because I felt so sure

20   we'd be able to do it today, and then to just get a two-page

21   motion for a continuance.

22            So, now, why can't I approve Classes -- and in the

23   memo, it just wasn't clear at all to me what the distribution

24   scheme is, why 1 is interconnected to the other.

25            MR. SOBOL:  Right.  Why 1 is?

1          THE COURT:  Yes, why Class 1 is interconnected with

2     Classes 2 and 3, so maybe we should get to the --

3          MR. SOBOL:  Let me turn to the estimated use of funds

4     then, your Honor, okay?  So we start with a $19 million gross

5     settlement amount.

6          MR. TRETTER:  Tom, I don't know that I got a copy of

7     that.

8          MR. SOBOL:  Oh, I'm sorry.  There you go.

9          MR. TRETTER:  Thanks.

10          MR. SOBOL:  You all set?

11          MR. TRETTER:  Yes.

12          MR. SOBOL:  Okay.  We start with a $19 million gross

13     settlement amount.  There's some amount of attorneys' fees and

14     expenses that we estimate on this.  These are all estimates.

15     I'm not trying to say that, obviously, this is what it is.  So

16     on this basis, you'd have $13.3 million for distribution to

17     both third-party payors and consumers.

18          Now, if you look at administration expenses, we have

19     incurred $200,000 to date in notifying Classes 2 and 3.  We

20     anticipate from the vendor --

21          THE COURT:  Who's paying for that notice to Classes 2

22     and 3?

23          MR. SOBOL:  It's divided evenly between BMS and the

24     class 50/50.

25          THE COURT:  Between which classes, Class 2 and 3?

ff93223f-3263-41e9-9f22-c29ba9486937

1          MR. SOBOL:  All classes.

2          THE COURT:  Well, why should the Class 1 have to pay

3     for the notice to Classes 2 and 3?

4          MR. SOBOL:  Well, I'll show you in just one second how

5     it benefits Class 1, okay?  The $200,000 has been incurred to

6     date.  There will be an estimated $1.8 million in notice and

7     administration that's for Class 1 only.  The result of that is

8     that for this whole BMS settlement, there's an estimate of

9     $2 million of notice and administration estimated.  BMS picks

10    up the tab up to $1 million, a half up to $1 million, so it

11    will pick up $1 million.  So $1 million is left to be paid by

12    the class of notice and administration.  The agreement

13    between --

14          MR. TRETTER:  All three classes in that case.

15          MR. SOBOL:  All three groups for the whole settlement

16    is $1 million.  The agreement between the third-party payor

17    representatives and the consumer representatives, which are the

18    consumers in Class 1 and the consumers in Class 3, is that the

19    TPPs pick up 50 percent of the costs and the consumers pick up

20    50 percent of the costs.  As a result, there will be a $500,000

21    cost --

22          THE COURT:  Well, is that a fair way of doing it,

23    given the fact that the TPPs picked up about 77 percent of

24    the --

25          MR. SOBOL:  Well, it's a way for the TPPs -- it's a

1    monetary negotiation.  The TPPs are actually paying up more

2    than, quote, their "fair share" of --

3              THE COURT:  Of what it cost to notify them.

4              MR. SOBOL:  What's that?

5              THE COURT:  Of what it cost to notify them?

6              MR. SOBOL:  Correct.  So they actually end up helping

7    the consumers out by paying more on the notice and

8    administration side.

9              Now, the consumer allocation before notice and

10   administration is the agreed 23 percent allocation for both

11   consumers in Class 1 and consumers in Class 3.  So that's

12   23 percent of $13.3 million, which is $3,059,000 estimated.

13   Subtract the one-half of $1 million that all consumers will

14   owe, and there's a net distributable pool of $2,559,000 for

15   consumers in Class 1 and Class 3.

16             Now, there's also a similar calculation for TPPs there

17   that I don't need to belabor you with.  Going back to the

18   consumer piece, how to distribute that $2.9 million will depend

19   upon how many consumers respond to the direct-notice mailing

20   for Class 1.  So once we know that, then we'll know how to do

21   all the distribution for the consumers in Class 1 and the

22   consumers in Class 3.  Okay?

23             THE COURT:  So the spillover from whatever -- so, in

24   other words, you're lumping together the consumers in Classes 1

25   and 3?

1       MR. SOBOL:  In Classes 1 and 3.

2       THE COURT:  And then let's assume that it doesn't pay

3   it all, that all of it isn't paid out, does that flow into the

4   TPPs?

5       MR. SOBOL:  No, it does not.  Then there's a

6   discretionary decision, after a motion and application and

7   opportunity to be heard, that you make the decision as to how

8   to deal with it.  And you might either pay more money to

9   consumers.  You might have it spill over.  You might do

10  cy pres.  There's a variety of things that --

11      THE COURT:  Well, the consumers, some are getting

12  triple and some are getting single?

13      MR. NOTARGIACAMO:  Correct.

14      THE COURT:  What I'm likely to do, just so we can

15  just -- well, let me just ask you.  There's so many consumers

16  involved, are we likely -- how many consumers have already

17  submitted claims from Class --

18      MR. SOBOL:  Yes, so there's two answers to that.  You

19  could have a potentially very large pool in the Class 1 side

20  because you have about 180,000 eligible class members who are

21  going to be receiving a direct notice.  If you assume that

22  10 percent of them or 20 percent of them send back a card,

23  you'll have either 18,000 or 36,000 people on that side of the

24  group.  There have been almost -- there has been very few

25  consumers on the Class 3 side that have actually responded.  I

1   think the date for them posting the cards is today.  We only

2   have about fifty consumer claims in on that side.

3          THE COURT:  Really?  Is that because they've died?

4          MR. SOBOL:  I think it's probably because you're

5   talking about a pretty narrow class of individuals for these

6   drugs back -- yeah, probably because they died.  I mean, it's

7   six years, right?  2004 is when the class period ends, and, you

8   know, some of these are cancer drugs.

9          THE COURT:  That's why I'm so upset about it.  So, in

10  any event, so only fifty have put in.

11         MR. SOBOL:  Yes.  And so if you end up with a class of

12  participants of 20,000 or 30,000 people, and you divide that by

13  the 2 point whatever million you have, there will be a range of

14  what the average check will be, but it could be, you know, $25

15  or $50.  Again, it will depend upon how many people

16  participate.  You can do that math there.  But that's how that

17  piece of things results, and that's net after all --

18         THE COURT:  So you've probably done the math.  Will

19  everybody be able to collect a hundred percent from the

20  Medicare, based on your assumptions?

21         MR. SOBOL:  Right.  If you take a step back and look

22  at what the settlement is, the settlement before attorneys'

23  fees and expenses makes available to consumers an amount of

24  money that's approximately single damages.

25         MR. TRETTER:  One hundred percent.

1    MR. SOBOL:  Almost 100 percent of their single

2    estimated damages in connection with the litigation itself,

3    okay?

4        Now, by the time we go through notice and fees, and

5    then some people have, like, the triple-X-what-they-paid piece

6    of the claim, it probably will be the case that consumers will

7    still be receiving at least their single -- if they file a

8    claim, it is, I will put it this way, far more likely than not

9    that every person who receives an amount of money will receive

10   an amount of money that at least is their single damages and is

11   likely to exceed that.  That's the way I would put it.  I'm not

12   trying to be coy about it.

13       THE COURT:  In both classes?

14       MR. SOBOL:  Class 1 and Class 3 consumers.  On the

15   other hand, for third-party payors, it is far more likely than

16   not that they will be paid less than their single damages,

17   given the size of the claims that they have submitted.

18       THE COURT:  If there is excess funds, doesn't it make

19   the most sense to just -- if I read the agreement correctly, we

20   agreed that for certain heartland drugs for which liability was

21   found, that we awarded treble damages.  Wouldn't it make more

22   sense to allocate those treble to the consumers who are left?

23       MR. SOBOL:  I think the answer to that would be "yes,"

24   but because I'm class counsel and the settlement agreement

25   applies for consumers and third-party payors, there's a bit of

1    a process that I think has to be honored, at least, so we can

2    do --

3            THE COURT:  Well, why don't you do the process.  When

4    you said that I have to order it, that's what my inclination

5    would be, because I did read Mr. Haviland's memo again from way

6    back when, and the original deal, wasn't it, was that it was

7    more money to Class 1?  And I understand you can amend and

8    modify a deal, parties can do that; but I've got to, I mean,

9    say, why would I give it to the third-party payors?

10           MR. SOBOL:  What I would suggest on that is this,

11   okay?  When the cards come back, you'll know the size of the

12   consumer group.  There's a window of time that you have before

13   the checks can actually go out where you can see what the

14   actual facts are and issue an order and have an order to show

15   cause why I shouldn't do this; and if somebody wants to

16   complain about your doing whatever you want to do at that time,

17   which is probably going to be what you just said -- I don't

18   have any problem with it -- that that's the most efficient way

19   for you to be able to do it and to deal with it knowing exactly

20   what you're doing.

21           THE COURT:  So --

22           MR. SOBOL:  And so what we'll do, just so you'll

23   know -- I just want to make sure -- we will put in this order,

24   okay, that class counsel are ordered to report to the Court

25   when we get the cards back and to propose an order for you

1  about how to address this issue that we just did, so that we

2  know that it's done most efficiently, there's no timing issues

3  about it in having to --

4            THE COURT:  I don't want to hold anything up.

5            MR. SOBOL:  Exactly.

6            THE COURT:  Is Mr. Haviland's client, whose name I

7  forget who was the original objector, is he likely to object?

8  Do we know that?  No one's filed an objection to Classes 2 and

9  3, but I'm going to accept objections with respect to

10 Class 1 --

11           MR. SOBOL:  I don't know the answer to that.

12           MR. TRETTER:  I believe that you have issued an order

13 treating Mr. Haviland's motion on behalf of his client as an

14 objection.

15           THE COURT:  Right.

16           MR. TRETTER:  So there is an objection for Class 1

17 purposes that we'll have to deal with.

18           THE COURT:  For Class 1 purposes.  So I will have to

19 address that at the time, and so I'm going to want to know how

20 much gets paid out to these people.  And do I need to certify

21 classes now for settlement purposes, or have I already

22 certified everything?

23           MR. TRETTER:  It's done.

24           MR. SOBOL:  It's done.

25           THE COURT:  It's done, I've done everything.  And the

1   class rep is who?  Have I already certified him as a class rep

2   because remember -- I can't remember, we have so many cases --

3   where there were substitute class reps along the way?

4           MR. MACORETTA:  Agnes Swayze is the class rep.  I'm

5   not certain because it's been a while.  I think that you

6   certified her as the rep as well.

7           THE COURT:  Could you just double-check because I have

8   so many cases that I just don't remember.  That class

9   representation issue came up in several of these cases that you

10  had a hard time, and I almost dismissed one.  It may have been

11  the McKesson line of cases, I don't remember, but just to make

12  sure that we've dotted the I's and crossed the T's with respect

13  to the settlement classes.

14          MR. MACORETTA:  That's J&J where there may not be a

15  rep.  I think that's before you as well.

16          THE COURT:  Yes, but at least on the BMS settlement --

17          MR. SOBOL:  Going back to this other issue you

18  mentioned, okay, because you anticipate addressing

19  Mr. Haviland's objection and you may or may not get some other

20  ones, when class counsel file their papers in early March for

21  final approval, at that point in time we will know who has

22  objected, who's excluded, and who has filed claims, right?  So

23  you'll have the information then to know exactly what maybe you

24  need to do with the residue.  So we will incorporate in an

25  order that class counsel also has to recommend at that time how

1  to address if there is a residue, and if so, what to do with

2  it, because you'll be able to deal with all of these issues.

3  The bottom line is, what I'm trying to say is, by the final

4  approval hearing, you should be able to deal with all of these

5  issues once and for all to get it done.

6         THE COURT:  If everything is on time, but there's

7  going to be a contempt power here.  I mean, it's going to

8  happen.  The reason I deferred the issue, which actually at

9  first crack, when you read the memorandum of understanding, I

10 understand where the objection came from, is, I want to see how

11 much money we're talking about, how many claims there are,

12 whether it matters.  And that's why, I mean, I thought the

13 point was decent.  I'm unlikely to pour it over into the

14 third-party payors unless all of the class members in 1 -- I

15 can't remember 3 well enough -- but are paid as much as we can

16 pay them within the terms of the settlement agreement, either

17 at one time or three times the amount.  So hopefully someone

18 can do that math for me.

19        Now, I don't know how to compare the consumers in

20 Class 1 and Class 3, who's got the more viable claims.  I just

21 don't know.

22        MR. SOBOL:  Well, I think there will be spelled out,

23 again, in the settlement some proposals as to how to address

24 those adjustments, but --

25        (Discussion off the record between plaintiff counsel.)

1          MR. SOBOL:  Yeah, that's right, thank you.  I've been

2    reminded that the estimate, in terms of preparing for trial,

3    the estimate of the damages was that consumers in Class 3, of

4    all damages, whether they're third-party payors or consumers of

5    any kind, the consumers in Class 3 were less than one percent

6    of all the damages.

7          THE COURT:  I see.  So that really isn't what's

8    driving it at this point.

9          MR. SOBOL:  It's not at all.

10         THE COURT:  Right, I understand that.  Are there any

11   other possible or potential objections that you know of?

12         MR. SOBOL:  We're not aware of any, no.

13         THE COURT:  Now, let me ask you this:  Why is the

14   amount of attorneys' fees being shared evenly between the

15   classes?  In other words, we're taking the $5.7 million, which

16   is your proposal, off the top rather than divvying them up

17   between Classes 1 and 3.  In other words -- excuse me, I said

18   that wrong.  If the third-party payors are getting 77 percent

19   of the benefits, shouldn't they pay 77 percent of the

20   attorneys' fees?

21         MR. SOBOL:  They are because if you take it off the

22   top, there's a pie that's that much less, so that they're

23   paying 77 percent of the attorneys' fees.

24         (Discussion off the record between plaintiff counsel.)

25         MR. SOBOL:  You got me there for a second, but I think

1    that's right.

2           MR. TRETTER:  There may be a reason why we're all

3    lawyers.  Let's figure that out.

4           MR. NOTARGIACOMO:  It doesn't matter which way you do

5    it, whether you subtract it first and then split it or split it

6    and then subtract it.

7           MR. TRETTER:  Yes, it should be the same result, I

8    think.

9           THE COURT:  I'm not positive, but maybe we can do the

10   math --

11          MR. SOBOL:  Sure.  We'll do the math.

12          THE COURT:  -- because we have all the notices and

13   the --

14          MR. SOBOL:  That was the intent.  The intent was that

15   they pay pro rata.

16          THE COURT:  77 percent goes --

17          MR. SOBOL:  Correct, correct.  I mean, I'll go back.

18   You've caught me there because I think it works out like that,

19   but I'll go back --

20          THE COURT:  But that's your intent anyway.

21          MR. SOBOL:  Our intent is pro rata.  And what was not

22   pro rata was the splitting a half on the notice, but that

23   worked to the benefit of the consumers.

24          THE COURT:  Yes, you've persuaded me of that.  You've

25   persuaded me.  And with the attorneys' fees proposal, what I'd

1  like to have also is how much you've been paid to date on

2  attorneys' fees.  I just don't remember.  And it includes the

3  McKesson cases, and, also, given the results in this case, why

4  a third makes sense.

5        MR. SOBOL:  Sure.  And I suppose, again, because we're

6  trying to move forward with all of these, and just so that you

7  know, you will have in AWP AZ, AstraZeneca, a final fairness

8  hearing on the third week of January in which there will be a

9  fee application, so we'll address all of the concerns you just

10  identified just now in a fee application in connection with

11  that as well.

12        THE COURT:  I'm glad you asked this.  Are there any

13  independent people who have opted out, independent third-party

14  payors in this case?

15        MR. SOBOL:  In the BMS case, is there any independent

16  settling health plan piece?  No.  I mean, they've submitted

17  claims, but there's no side deal with them.

18        THE COURT:  Yes, like there is on some of these.

19  You've disclosed them.  I don't want to make it sound sleazy

20  that there's a side deal.  You've told me about them, but --

21        MR. SOBOL:  No, no, no, right.  You wouldn't know it.

22  You wouldn't know to ask the question if we hadn't told you.

23        THE COURT:  That's right.  So there are none of those.

24  And I think at this point I can't even approve this.  I could

25  probably approve Class 2 because it's unlikely to get any more

1   money, but it probably is the safest thing to wait because you

2   need to go through your process.  Is that right?

3         MR. SOBOL:  You know, I think I'll -- do you have an

4   issue with that, Mr. Tretter?

5         MR. TRETTER:  I think waiting, since we're dealing

6   with one ball of wax, I think that your Honor's plan and what

7   Mr. Sobol is proposing is, let's see how the Class 1 stuff

8   comes in and then decide because you are talking about a

9   proportion at distribution of a single amount.  And so whereas

10  I'm gratified with the process thus far, there haven't been

11  that many opt-outs in Classes 2 and 3, I do think we have to

12  wait and see what the final tally is before you can actually

13  approve anything.

14        THE COURT:  So let's pick a date right now in March.

15  You're going to get me this order like Monday or Tuesday so I

16  can sign it.  No matter what, I'm not canceling these fairness

17  hearings.  When you ask at the last minute, which is what

18  happened here, to cancel a fairness hearing, that's not fair

19  because then I've got a problem with anybody who might show up

20  or give objections.  I need to have the fairness hearings when

21  they show up in the notice.  It's happened two or three times.

22  No matter what, I'm going to have the hearing.  I may not

23  resolve it then, but then at least I can be sure I'm here, and

24  no one can claim they would have objected and shown up in

25  person, or they thought it was all going to be deferred.  I

ff93223f-3263-41e9-9f22-c29ba9486937

1   need it to all be happening at the sequence that we've said.

2   So I'm going to give an hour in March.

3           MR. SOBOL:  March 16, your Honor?  I think it would be

4   helpful if I were here, and I have a family vacation planned

5   the next day for a week out of the country, so either March 16

6   or Monday, March 28.

7           THE COURT:  March 16.

8           (Discussion off the record between the Court and

9   Clerk.)

10          THE COURT:  Can we do it the week before March 16?

11          MR. SOBOL:  You'll be cutting us tight in terms of --

12   I'm trying to give you promises that we think we can meet, and

13   I think we'll be cutting things close if we do it then.

14          THE COURT:  So March 28 then.

15          MR. SOBOL:  Thank you.

16          MR. MACORETTA:  The 28th at 2:00 o'clock, your Honor?

17          THE CLERK:  Yes.

18          THE COURT:  It will happen no matter what.  If for

19   some reason I can't do it, I'll have one of the magistrate

20   judges here do it, not to sign off finally -- I think only I

21   can do it -- but to take whatever objections come in, because

22   the problem is that I don't -- it's hard to schedule so far --

23   I can reschedule almost anything else in the world other than a

24   fairness hearing because people count on them for objections,

25   so I can't get one of these motions to continue at the last

1    time.  And if for some reason the vendor isn't making these

2    deadlines -- let me be clear, I'm not talking about a day.  I'm

3    talking about a hiatus like -- I don't know why I found out a

4    week before the hearing that we were so far off from the

5    vendor.  So as we said, this time it's going to come with

6    contempt power.  It's got to happen.  And now I've got huge

7    concerns about what are we going to do on Track Two?  When is

8    that supposed to happen?

9            MR. SOBOL:  So on Track Two --

10           (Document passed to the Court.)

11           THE COURT:  Thank you.

12           MR. SOBOL:  On Track Two, again, we anticipate

13   receiving from the vendor by the middle of December the data.

14   Now, without looking at their schedule for a moment, the next

15   entry is the most important thing for you to understand and for

16   us all to focus on.  We have an estimate of about 18 million

17   letters that might go to Medicare beneficiaries, no more than

18   15 percent of whom we anticipate are people who are in the

19   class for Track Two.  If we are to send out a mailing to

20   18 million Medicare beneficiaries -- and that's roughly a third

21   of all Medicare beneficiaries in the country, by the way, your

22   Honor, right?

23           THE COURT:  Right, I don't have a serious problem --

24   Track Two people weren't seriously ill, were they, for the most

25   part?  It was like Claritin.  I don't remember what the drugs

ff93223f-3263-41e9-9f22-c29ba9486937

1   were.  Were some of them dying?  Do we have a dying class in

2   Track Two, other than the normal course of human mortality?

3      MR. NOTARGIACOMO:  There are some drugs, your Honor,

4   that -- the list of drugs in Track Two are divided by Class A

5   drugs and Class B.  The Class B drugs, and there were lots of

6   them, were I think less serious things, everything -- I think

7   there may even be like saline solution at some point or

8   something like that on there.  The Class A drugs are more

9   serious drugs.  I think they're name-brand drugs, and there's a

10   differential in the payout between Class A and Class B as

11   currently designed.

12      MR. SOBOL:  But here's the thing I want to flag for

13   you, your Honor, and we're not sure how we are going to suggest

14   that we address it, but it needs to be addressed soon and we

15   will.  Here's the issue:  We have been told by Complete Claims

16   that in order to send out letters to 18 million people and to

17   staff a phone bank to anticipate roughly -- I can't remember

18   how many they said but whatever, a gazillion telephone calls --

19      MR. NOTARGIACOMO:  Over 850,000.

20      MR. SOBOL:  -- 850,000 telephone calls, and then to

21   send out more notice and to get them the checks, that whole

22   process for that 18 million people is going to cost

23   $24 million.  That's what they've given us as a price tag.

24   Now --

25      THE COURT:  Now, how much is the settlement worth

1   again?

2         MR. SOBOL:  And the settlement total was $125 million.

3   And, now, don't try to do the math right now because actually

4   it's a little bit counterintuitive and we have to spell it out

5   to you, and I've already started doing this, because what

6   happens if you take $125 million, but a lot of the notices the

7   TPPs have to pay for.  So of those $24 million, the TPPs are

8   taking care of a lot of that, so there's less of a --

9         THE COURT:  No, I'm not as worried about this as long

10  as I'm on a timetable.  So when --

11        MR. SOBOL:  Well, all I'm saying is this:  What we're

12  going to do, what we suggest we'll do here is, when we get

13  actually how many notices are going to go out, we're going to

14  send you a status report in December telling you:  This is what

15  we plan on doing, Judge.  Right?  And before we do it, we just

16  want you to know what the consequences are and what the

17  alternatives, if there are any, are.  We're going to go forward

18  with the mailing notice, and this is the schedule so you'll be

19  able to move forward with it, which is not materially -- I

20  mean, it requires a little bit more things that need to be

21  done --

22        THE COURT:  All right, so you'll do a contempt order

23  for the data in this for the claims administrator and for

24  everyone to accomplish this.  This isn't as serious because

25  this -- I mean, we had 13 million on the table in 2007.  That's

1    my concern.

2              MR. SOBOL:  Right.

3              THE COURT:  Whereas this was much later, if I'm

4    remembering correctly.

5              MR. SOBOL:  Well, it was somewhat later, yes.

6              THE COURT:  When was the settlement of Track Two?

7              MR. SOBOL:  I think it was roughly around the same

8    time that we did the second deal here.

9              THE COURT:  Which was when?

10             MR. SOBOL:  2009 is my memory.

11             THE COURT:  All right, all right, yes.

12             MR. SOBOL:  I haven't been directly involved in all

13   the negotiations, but I've been asked --

14             THE COURT:  No, well, I'm pleased to have a -- so the

15   second order will be on Track Two, all right?

16             (Document passed to the Court.)

17             THE COURT:  Thank you.

18             MR. SOBOL:  This is the schedule that we're currently

19   on for AWP AZ.  So AWP AZ leads to a final approval hearing in

20   January.  There's a deadline for consumers to file claims.

21   It's after that period of time, but this is the currently

22   ordered schedule there.

23             THE COURT:  Well, did I say December 31 last time?  It

24   just seems --

25             MR. SOBOL:  It was I think when we had the -- when you

1   would have done the --

2          THE COURT:  It's typically not a real --

3          MR. SOBOL:  All I know is what the order -- I wasn't

4   involved in this, but I've read the documentation, and the

5   preliminary approval order sets forth this schedule.

6          THE COURT:  Well, let me say this:  I'm not going to

7   redo it now but obviously take it if it comes in in early

8   January.  That's just a hard time period for people.

9          MR. SOBOL:  Yes.  Actually, it's not uncommon for the

10  claims administrator to say, "We got these following things in

11  late," or someone's asked for an excuse; and we just file a

12  perfunctory order with you, and it's almost inevitably allowed,

13  so --

14         THE COURT:  All right.  And does it make sense at this

15  point, with respect to all of these settlements, to simply

16  maybe give me, Mr. Notargiacomo, just to keep everybody on

17  target, what do you think, a monthly status report on all of

18  these?

19         MR. SOBOL:  Just on these, yes.

20         THE COURT:  Well, what else do you have with me?

21         MR. SOBOL:  Well, there's also J&J, but that's it.

22  But I meant -- I think my office still prepares you some big

23  long list of motions that go on --

24         THE COURT:  Yes, but this is actually a little

25  different.  This is just -- I'm feeling terribly, as you can

1   imagine, and I think you all should be too, that the BMS

2   settlement has taken so long.  I don't understand why this

3   vendor just heard within the last month that she's got

4   authority.  That's just inexcusable.  I'm not blaming you, the

5   vendor.  I am just saying I don't understand it.  I have been

6   assured every single time.  I mean, I think you've been in

7   front of me three times for continuances.  I don't understand

8   what happened.  I don't get it.

9           MR. SOBOL:  I don't get it either, your Honor.  That's

10  why I'm here to say, whatever it is, it's going to be taken

11  care of, and I'm here to, you know, fall on whatever grenade

12  needs to be dealt with, all right?

13          THE COURT:  So you'll take personal -- the three of

14  you here are going to take personal responsibility here?

15          MR. SOBOL:  Yes.

16          MR. NOTARGIACOMO:  Your Honor, you want a monthly

17  status report filed separately on these settlements alongside

18  the monthly status report that --

19          THE COURT:  Yes.  And you think I owe you something on

20  Johnson & Johnson?  Is that it?

21          MR. MACORETTA:  "Owe" is the wrong word, Judge.  J&J

22  moved to remove our class representative because we couldn't

23  prove that she had claims in the class period.  We responded.

24  That's sitting in front of you.

25          THE COURT:  So how long have I been sitting on that?

ff93223f-3263-41e9-9f22-c29ba9486937

1          MR. MACORETTA:  About a month.

2          THE COURT:  Oh, okay.  So maybe we could right now set

3     that up for hearing.

4          MR. MACORETTA:  If it needs one, Judge.

5          THE COURT:  Oh, you think I can do it on the papers?

6          MR. MACORETTA:  I think you can, yes.

7          THE COURT:  All right, we'll look at the J&J one.

8          MR. SOBOL:  Has J&J asked for a hearing?

9          MR. MACORETTA:  They have not.

10          THE COURT:  I don't remember.

11          MR. SOBOL:  I just want to make sure that we don't say

12     that --

13          MR. MACORETTA:  They have not, and they didn't even

14     file a reply brief.  It was their motion.  We responded.  They

15     didn't file a reply.

16          THE COURT:  We'll look at that.

17          MR. MACORETTA:  I'll confer with Mr. Schau, but I'm

18     quite certain that they did not --

19          THE COURT:  Perfect.  All right, have a nice

20     Thanksgiving.

21          MR. SOBOL:  Thank you, your Honor.

22          THE COURT:  Next time I see you, no continuances, no

23     more.  And let me be clear.  If it's a day or two, I'm not --

24     I'm talking about anything like this.

25          (Adjourned, 2:58 p.m.)

1                      C E R T I F I C A T E

2

3

   UNITED STATES DISTRICT COURT )
4  DISTRICT OF MASSACHUSETTS    ) ss.
   CITY OF BOSTON               )
5

6

7          I, Lee A. Marzilli, Official Federal Court Reporter,

8  do hereby certify that the foregoing transcript, Pages 1

9  through 34 inclusive, was recorded by me stenographically at

10 the time and place aforesaid in Civil Action No. 01-12257-PBS,

11 In Re:  Pharmaceutical Industry Average Wholesale Price

12 Litigation, and thereafter by me reduced to typewriting and is

13 a true and accurate record of the proceedings.

14     In witness whereof I have hereunto set my hand this 30th

15 day of November, 2010.

16

17

18

19

20          /s/ Lee A. Marzilli
           _____
21          LEE A. MARZILLI, CRR
            OFFICIAL FEDERAL COURT REPORTER
22

23

24

25