# EXHIBIT 1

## SETTLEMENT AGREEMENT

### I. PARTIES

This Settlement Agreement ("Agreement") is entered into among: the United States of America, acting through the United States Department of Justice and on behalf of the Office of Inspector General ("OIG-HHS") of the Department of Health and Human Services ("HHS") (collectively, the "United States"); Abbott Laboratories, Inc. and Abbott Laboratories ("Abbott"); and Ven-A-Care of the Florida Keys, Inc. ("Relator"). Collectively, the United States, Abbott, and the Relator are referred to herein as the "Parties."

### II. PREAMBLE

As a preamble to this Agreement, the Parties agree to the following:

A.     At all relevant times, Abbott Laboratories Inc. has been a corporation organized under the laws of Delaware with its principal offices in Abbott Park, Illinois. At all relevant times, Abbott Laboratories has been a corporation organized under the laws of Illinois with its principal offices in Abbott Park, Illinois.

B.     Ven-A-Care of the Florida Keys, Inc. is a corporation with its principal place of business in Key West, Florida. Zachary T. Bentley, T. Mark Jones, John M. Lockwood, and Luis E. Cobo are or were officers of Ven-A-Care of the Florida Keys, Inc. As used herein, the term "Relator" refers to Ven-A-Care of the Florida Keys, Inc. and its current and former officers, directors, shareholders, employees, attorneys, contractors, agents, assigns, subsidiaries, and affiliates.

C.     On or about June 23, 1995, Relator filed a *qui tam* action in the United States District Court for the Southern District of Florida captioned *United States ex rel. Ven A Care of the Florida Keys, Inc. v. Abbott Laboratories, et al.*, Civil Action No. 95-1354 (S. D. Fla.) (the

"Florida Civil Action"), relating to, among other manufacturers and products, pharmaceutical products manufactured by Abbott's former Hospital Products Division ("HPD").

      D.     On or about March 17, 2006, the United States intervened with respect to certain allegations made against Abbott in the Florida Civil Action.  The intervened claims against Abbott were severed and assigned a new case number, 06-21303-CV-GOLD (S.D. Fla.) (the "Florida Abbott HPD Case").  Upon intervention, the United States filed an amended complaint. On or about March 17, 2006, Relator sought leave to amend its complaint against Abbott in order to adopt the United States' complaint-in-intervention.  Ven-A-Care's motion was granted on May 16, 2006.  On or about July 28, 2006, the Florida Abbott HPD Case was transferred by the Judicial Panel for Multi District Litigation ("MDL") to the District of Massachusetts, where it became part of MDL 1456 and was assigned case number 06-CV-11337-PBS (D. Mass.).  On November 7, 2007, the United States sought leave to file an amended and superseding complaint against Abbott (the "First Amended Complaint").  On March 13, 2008, the United States' motion was granted in part and denied in part.

      E.     On or about April 10, 2000, Relator filed a separate *qui tam* action in the United States District Court for the District of Massachusetts, Civil Action No. 00-10698-MLW (the "Massachusetts Civil Action")..  On or about February 15, 2001, Relator amended its complaint to assert claims against Abbott relating to certain pharmaceutical products manufactured by Abbott's Pharmaceutical Products Division ("PPD"), captioned *United States ex rel. Ven-A-Care v. Abbott Laboratories, et al.*, Civil Action No. 00-10698-MEL (D. Mass.).  The United States declined to intervene in the claims made against Abbott in the Massachusetts Civil Action.  On or around August 30, 2007, the claims against Abbott in the Massachusetts Civil Action were severed, the severed action against Abbott was assigned Civil Action No. 07-CV-11618-PBS

(the "Massachusetts Abbott PPD Case"), and Relator filed a severed amended complaint ("Relator's Severed Complaint"). The severed claims in Civil Action No. 07-CV-11618-PBS were transferred to MDL 1456.

F.       The United States' First Amended Complaint and Relator's Severed Complaint contend that Abbott submitted, or caused to be submitted, false claims to the Medicare Program, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395-1395hhh ("Medicare"), and the Medicaid Program, 42 U.S.C. §§ 1396-1396v ("Medicaid").

G.       The United States contends that it has certain civil claims, as specified in Paragraph III.3. below, against Abbott for engaging in the following alleged conduct: As alleged in its First Amended Complaint in the Florida Abbott HPD Case (attached hereto as Exhibit A), the United States contends that, during the period January 1, 1991 to December 31, 2001, Abbott set, reported, and maintained, or caused to be set, reported, and maintained, false and inflated List Prices, Direct Prices, Average Wholesale Prices ("AWPs"), and Wholesale Acquisition Costs ("WACs") (the "Reported Prices") for certain drugs identified in paragraphs 30 and 34 of the United States' First Amended Complaint (the "Covered Drugs"). The United States' First Amended Complaint further contends that the Reported Prices caused the Medicare and Medicaid programs to overpay for the Covered Drugs. These and all other allegations contained in the United States' First Amended Complaint are referred to herein as the "Covered Conduct."

H.       This Agreement is neither an admission of facts or liability by Abbott nor a concession by the United States that its claims are not well-founded. Abbott denies the contentions of the United States and the Relator in the United States' First Amended Complaint and in the Relator's Severed Complaint, and all contentions of the Relator in its prior complaints and further denies any liability or wrongdoing related to those contentions. Neither this

Agreement, its execution, nor the performance of any obligation under it, including any payment, nor the fact of settlement, is intended to be, or shall be understood as, an admission of liability or wrongdoing, or other expression reflecting upon the merits of the dispute by Abbott.

I.      Nothing in this paragraph or any other provision of this Agreement constitutes an agreement by the Parties concerning the characterization of the Settlement Amount, as defined in paragraph 1 below, for purposes of the Internal Revenue laws, Title 26 of the United States Code.

J.      Relator claims entitlement under 31 U.S.C. § 3730(d) to a share of the proceeds of the Settlement Amount.  Such amount shall be determined by separate agreement between the United States and the Relator, and shall not be the responsibility of Abbott.

K.      The allocation of the Settlement Amount among the Florida Abbott HPD Case and the Massachusetts Abbott PPD Case, and among the United States and Relator and its counsel, is a matter that was handled separately by and among the United States, Relator, and Relator's counsel.

L.      To avoid the delay, uncertainty, inconvenience, and expense of protracted litigation and trial of the above claims, the Parties have reached a full and final settlement pursuant to the Terms and Conditions below.

### III.  TERMS AND CONDITIONS

1.      Abbott agrees to pay to the United States the sum of one hundred twenty-six million, five-hundred thousand dollars ($126,500,000), plus simple interest accrued thereon at the current one-year treasury yield of .3 % beginning November 1, 2010, and continuing until and including the day before complete payment is made (the "Settlement Amount") in full payment of all monies owed pursuant to this Agreement.  Abbott agrees to pay the Settlement

Amount to the United States by electronic funds transfer pursuant to written instructions to be provided by the United States by the Effective Date of this Agreement. Abbott agrees to make this electronic funds transfer no later than five business days after the Effective Date.

2.      Conditioned upon the United States receiving the Settlement Amount from Abbott and as soon as feasible after receipt, the United States shall pay $29,165,000.00 to Relator by electronic funds transfer as Relator's share of the proceeds pursuant to 31 U.S.C. § 3730(d). The Relator's share of the proceeds shall be paid entirely out of the Settlement Amount.

3.      Subject to the exceptions listed in Paragraph 7 below, in consideration of this Agreement, and conditioned upon Abbott's full payment of the Settlement Amount, the United States (on behalf of itself, its officers, agents, agencies, and departments) releases Abbott, its current and former parents, predecessors, current and former subsidiaries, affiliates, successors and assigns, current and former directors, officers, and employees from any civil or administrative monetary claim the United States has or may have for the Covered Conduct under the False Claims Act, 31 U.S.C. §§ 3729-33, the Civil Monetary Penalties Law, 42 U.S.C. § 1320a-7a, the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801-12, and any other statute creating causes of action for civil damages or civil penalties which the Civil Division of the United States Department of Justice has authority to assert and compromise pursuant to 28 C.F.R. Part O, Subpart I, § 0.45(d), and under common law.

4.      Relator releases Abbott, its affiliates, predecessors, current and former parents, successors, divisions, subsidiaries, directors, officers, and employees from any and all claims or allegations, known or unknown, that Relator asserted or could have asserted relating to the Covered Conduct, including any and all allegations pertaining to any Abbott drug identified in

Relator's prior complaints (or attachments to those complaints) in the Florida Civil Action, as well as all claims or allegations, known or unknown, that Relator asserted or could have asserted in the Massachusetts Abbott PPD Case concerning any drug manufactured by Abbott. This release is expressly limited to any acts, omissions, or conduct that occurred prior to the date of the execution of this Agreement.

5.      Relator represents that it has not assigned to any other person any of the claims released by this Agreement.

6.      OIG-HHS expressly reserves all rights to institute, direct, or maintain any administrative action seeking exclusion against Abbott (and/or its officers, directors, and employees) from Medicare, Medicaid, and all other Federal health care programs (as defined in 42 U.S.C. § 1320a-7b(f)) under 42 U.S.C. § 1320a-7a (the Civil Monetary Penalties Law), 42 U.S.C. § 1320a-7(a) (mandatory exclusion), and/or 42 U.S.C. § 1320a-7(b) (permissive exclusion).

7.      Notwithstanding any term of this Agreement, specifically reserved and excluded from the scope and terms of this Agreement as to any entity or person (including Abbott and Relator) are the following claims of the United States:

    a.    Any civil, criminal, or administrative liability arising under Title 26, United States Code (Internal Revenue Code);

    b.    Any criminal liability;

    c.    Except as explicitly stated in this Agreement, any administrative liability, including mandatory or permissive exclusion from Federal health care programs;

    d.    Any liability to the United States (or its agencies) for any conduct other than the Covered Conduct;

    e.    Any liability based upon obligations created by this Agreement;

f.   Any liability for express or implied warranty claims or other claims for defective or deficient products or services, including quality of goods and services;

g.   Any liability for failure to deliver goods or services due;

h.   Any claims arising from Abbott's obligations to report prices and/or pay rebates to the States under any law or contract, including, but not limited to, under the provisions of the Omnibus Budget Reconciliation Act of 1990 and all amendments thereto; and

i.   Any claims by or on behalf of any state, territory or the District of Columbia.

8.   Relator and its successors, current and former attorneys, agents, and assigns agree not to object to this Agreement and agree and confirm that this Agreement is fair, adequate, and reasonable under all the circumstances, pursuant to 31 U.S.C. § 3730(c)(2)(B), and, conditioned upon receipt of Relator's share, Relator, for itself, its successors, current and former attorneys, agents, and assigns, fully and finally releases, waives, and forever discharges the United States, its officers, agents, and employees from any claims to any portion of the Settlement Amount arising from or relating to 31 U.S.C. § 3730, including 31 U.S.C. §§ 3730(b), (c), (c)(5), (d) and (d)(1); from any claims arising from the filing of claims against Abbott in the Florida Abbott HPD Case and Massachusetts Abbott PPD Case; from any other claims for a share of the Settlement Amount; and in full settlement of any claims Relator may have under this Agreement. This Agreement does not resolve or in any manner affect any claims the United States has or may have against the Relator arising under Title 26, U.S. Code (Internal Revenue Code), or any claims arising under this Agreement.

9.   Abbott waives and shall not assert any defenses Abbott may have to any criminal prosecution or administrative action relating to the Covered Conduct that may be based in whole or in part on a contention that, under the Double Jeopardy Clause in the Fifth Amendment of the Constitution, or under the Excessive Fines Clause in the Eighth Amendment of the Constitution,

this Agreement bars a remedy sought in such criminal prosecution or administrative action. Nothing in this paragraph or any other provision of this Agreement constitutes an agreement by the United States concerning the characterization of the Settlement Amount for purposes of the Internal Revenue laws, Title 26 of the United States Code.

10.     Abbott, on behalf of itself and its affiliates, predecessors, current and former parents, successors, divisions, subsidiaries, directors, and assigns, fully and finally releases the United States, its agencies, employees, servants, and agents from any claims (including for attorney's fees, costs, and expenses of every kind and however denominated) that Abbott has asserted, could have asserted, or may assert in the future against the United States, its agencies, employees, servants, and/or agents, related to the United States' investigation and prosecution of the Florida Abbott HPD Case and Massachusetts Abbott PPD Case, up to the Effective Date of this Agreement.

11.     Abbott, on behalf of itself and its affiliates, predecessors, current and former parents, successors, divisions, subsidiaries, directors, and assigns fully and finally releases Relator, together with its current and former officers, directors, shareholders, employees, attorneys, contractors, agents, assigns, subsidiaries and affiliates from any claims (including for attorney's fees, costs, and expenses of every kind and however denominated) that Abbott has asserted, could have asserted, or may assert in the future against Relator, related to Relator's investigation and prosecution of the Florida Abbott HPD Case and Massachusetts Abbott PPD Case, up to the Effective Date of this Agreement.

12.     The Settlement Amount shall not be decreased as a result of the denial of claims for any payment now being withheld by any Medicare carrier or intermediary or any state payer, related to the Covered Conduct; and Abbott agrees not to cause to resubmit to any Medicare

carrier or intermediary or any state payer any previously denied claims related to the Covered

Conduct, and agrees not to cause any appeal of any such denials of claims.

13.     Abbott agrees to the following:

a.     <u>Unallowable Costs Defined</u>:  that all costs (as defined in the Federal Acquisition

Regulation, 48 C.F.R. § 31.205-47, in Titles XVIII and XIX of the Social Security Act, 42

U.S.C. §§ 1395-1395hhh and 1396-1396v, and in the regulations and official program directives

promulgated thereunder) incurred by or on behalf of each of Abbott and its present or former

officers, directors, employees, shareholders, and agents in connection with the following shall be

"Unallowable Costs" on government contracts and under the Medicare Program, Medicaid

Program, TRICARE Program, and Federal Employees Health Benefits Program ("FEHBP"):

(1)     the matters covered by this Agreement;

(2)     the United States' audit(s) and civil investigation(s) of the matters covered by this Agreement;

(3)     Abbott's investigation, defense, and corrective actions undertaken in response to the United States' audit(s) and civil investigation(s) in connection with the matters covered by this Agreement (including attorney's fees);

(4)     the negotiation and performance of this Agreement; and

(5)     the payments Abbott makes to the United States pursuant to this Agreement and any payments that Abbott may make to Relator, including costs and attorney's fees.  (All costs described or set forth in this Paragraph are hereafter "Unallowable Costs.")

b.     <u>Future Treatment of Unallowable Costs</u>: If applicable, these Unallowable Costs, if

any, shall be separately determined and accounted for in nonreimburseable cost centers by

Abbott, and Abbott shall not charge such Unallowable Costs directly or indirectly to any

contracts with the United States or any State Medicaid program, or seek payment for such

Unallowable Costs through any cost report, cost statement, information statement, or payment

request submitted by Abbott or any of its subsidiaries or affiliates to the Medicare, Medicaid,

TRICARE, or FEHBP Programs.

      c.     <u>Treatment of Unallowable Costs Previously Submitted for Payment</u>:  Abbott

further agrees that, if applicable, within 90 days of the Effective Date of this Agreement, it shall

identify to applicable Medicare and TRICARE fiscal intermediaries, carriers, and/or contractors,

and Medicaid and FEHBP fiscal agents, any Unallowable Costs included in payments Abbott or

any of its subsidiaries or affiliates previously sought from the United States or any State

Medicaid program, including, but not limited to, payments sought in any cost reports, cost

statements, information reports, or payment requests already submitted by Abbott or any of its

subsidiaries or affiliates, and shall request, and agree, that such cost reports, cost statements,

information reports, or payment requests, even if already settled, be adjusted to account for the

effect of the inclusion of the Unallowable Costs.  Abbott agrees that the United States, at a

minimum, shall be entitled to recoup from Abbott any overpayment plus applicable interest and

penalties as a result of the inclusion of such Unallowable Costs on previously submitted cost

reports, information reports, cost statements, or requests for payment.

      Any payments due after the adjustments have been made shall be paid to the United

States pursuant to the direction of the Department of Justice and/or the affected agencies.  The

United States reserves its rights to disagree with any calculations submitted by Abbott or any of

its subsidiaries or affiliates on the effect of inclusion of Unallowable Costs on Abbott or any of

its subsidiaries' or affiliates' cost reports, cost statements, or information reports.

      d.     Nothing in this Agreement shall constitute a waiver of the rights of the United

States to audit, examine, or re-examine Abbott's books and records to determine that no

Unallowable Costs have been claimed in accordance with the provisions of this Paragraph.

14.     This Agreement is intended to be for the benefit of the Parties only.  The Parties do not release any claims against any other person or entity, except to the extent provided for in Paragraph 15, below, regarding waiver for beneficiaries.

15.     Abbott agrees that it waives and shall not seek payment for any of the health care billings, if any, covered by this Agreement from any health care beneficiaries or their parents, sponsors, legally responsible individuals, or third party payors based upon the claims defined as Covered Conduct.

16.     Abbott warrants that it is solvent within the meaning of 11 U.S.C. §§ 547(b)(3) and 548(a)(1)(B)(ii)(I), and shall remain solvent immediately following payment of the Settlement Amount to the United States.  Further, the Parties warrant that, in evaluating whether to execute this Agreement, they (a) have intended that the mutual promises, covenants, and obligations set forth herein constitute a contemporaneous exchange for new value given to Abbott, within the meaning of 11 U.S.C. § 547(c)(1); and (b) conclude that these mutual promises, covenants, and obligations do, in fact, constitute such a contemporaneous exchange. Further, the Parties warrant that the mutual promises, covenants, and obligations set forth herein are intended to and do, in fact, represent a reasonably equivalent exchange of value that is not intended to hinder, delay, or defraud any entity to which Abbott was or became indebted on or after the date of this transfer, within the meaning of 11 U.S.C. § 548(a)(1).

17.     Within five (5) business days after the Effective Date of this Agreement, the Parties shall file the Stipulation of Voluntary Dismissal together with the proposed Order of Dismissal of the Florida Abbott HPD case which are attached hereto as Exhibit B, and the United States will file a Written Consent to Relator and Defendant's Stipulation for Voluntary

Dismissal with Prejudice of Relator's Severed Complaint in the Massachusetts Abbott PPD Case, in the form attached as Exhibit C hereto.

18.    Each Party shall bear its own legal and other costs, including legal fees, incurred in connection with the matters covered by this Agreement, including the preparation and performance of this Agreement.

19.    The Parties each represent that this Agreement is freely and voluntarily entered into without any degree of duress or compulsion whatsoever.

20.    This Agreement is governed by the laws of the United States. The Parties agree that the exclusive jurisdiction and venue for any dispute arising between or among any or all of the Parties under this Agreement is the United States District Court for the District of Massachusetts.

21.    For purposes of construction, this Agreement shall be deemed to have been drafted by all Parties to this Agreement and shall not, therefore, be construed against any Party for that reason in any subsequent dispute.

22.    This Agreement shall constitute the complete agreement between the Parties as to the matters addressed herein. This Agreement may not be amended except by written consent of all of the Parties. Relator and Abbott will separately execute the Relator-Abbott Settlement Agreement.

23.    The individuals signing this Agreement on behalf of Abbott represent and warrant that they are authorized by Abbott to execute this Agreement. The individuals signing this Agreement on behalf of Relator represent and warrant that they are authorized by Relator to execute this Agreement. The United States' signatories represent that they are signing this Agreement in their official capacities and that they are authorized to execute this Agreement.

24.     This Agreement may be executed in counterparts, each of which constitutes an original and all of which constitute one and the same Agreement.

25.     This Agreement is binding on all successors, transferees, and assigns of the Parties.

26.     Abbott and Relator consent to the United States' disclosure of this Agreement, and information about this Agreement, to the public.  Documents produced by Abbott subject to the Protective Order and Case Management Order in the Florida Abbott HPD Case and Massachusetts Abbott PPD Case shall remain subject to those Orders.

27.     If any provision of this Settlement Agreement, or the application thereof, shall for any reason or to any extent be construed by a court of competent jurisdiction to be invalid or unenforceable, the remainder of this Settlement Agreement, and application of such provision to other circumstances, shall remain in effect and be interpreted so as best reasonably to effect the intent of the Parties.  Notwithstanding the foregoing, if either the payment or any of the release provisions hereof are found to be unenforceable or invalid by a court of competent jurisdiction, then such invalidity or unenforceability shall be cause for voiding the entire Settlement Agreement at the election of the Party the interests of which are injured by the finding of invalidity or unenforceability, in which event all claims and actions dismissed shall be reinstated with all statutes of limitations deemed tolled from the Effective Date of this Agreement.

28.     This Agreement is effective on the date of signature of the last signatory to the Agreement ("Effective Date of this Agreement").  Facsimiles of signatures, and/or electronic signatures in portable document format (.pdf), shall constitute acceptable, binding signatures for purposes of this Agreement.

## THE UNITED STATES OF AMERICA

DATED: _12.6.10_          BY: _[signature]_

**JUSTIN DRAYCOTT**
Trial Attorney
Commercial Litigation Branch
Civil Division
United States Department of Justice


DATED: _12/3/10_          BY: _[signature]_

**MARK LAVINE**
Assistant United States Attorney
United States Attorney's Office for the
Southern District of Florida


DATED:_____          BY: _____

**GREGORY E. DEMSKE**
Assistant Inspector General for Legal Affairs
Office of Counsel to the Inspector General
Office of Inspector General
United States Department of Health and
Human Services

**THE UNITED STATES OF AMERICA**

DATED:_____        BY: _____
                          **JUSTIN DRAYCOTT**
                          Trial Attorney
                          Commercial Litigation Branch
                          Civil Division
                          United States Department of Justice


DATED:_____        BY: _____
                          **MARK LAVINE**
                          Assistant United States Attorney
                          United States Attorney's Office for the
                          Southern District of Florida


DATED: 11/30/10       BY: _____
                          **GREGORY E. DEMSKE**
                          Assistant Inspector General for Legal Affairs
                          Office of Counsel to the Inspector General
                          Office of Inspector General
                          United States Department of Health and
                          Human Services

**ABBOTT LABORATORIES INC. AND ABBOTT LABORATORIES - DEFENDANT**

DATED: _12|7|10_                BY: _____
                               **JAMES R. DALY**
                               Jones Day
                               77 West Wacker
                               Chicago, Illinois  60601
                               Counsel to Abbott Laboratories Inc. and Abbott
                               Laboratories


**VEN-A-CARE OF THE FLORIDA KEYS, INC. - RELATOR**

DATED:_____               BY: _____
                               **T. MARK JONES**
                               President
                               Ven-A-Care of the Florida Keys, Inc.


DATED:_____               BY: _____
                               **JAMES J. BREEN**
                               The Breen Law Firm
                               Suite 260
                               5755 North Point Parkway
                               Alpharetta, GA 33029
                               Counsel to Ven-A-Care of the Florida Keys, Inc.

**ABBOTT LABORATORIES, INC. - DEFENDANT**

DATED:_____          BY: _____

**JAMES R. DALY**
Jones Day
77 West Wacker
Chicago, Illinois  60601
Counsel to Abbott Laboratories

**VEN-A-CARE OF THE FLORIDA KEYS, INC.  - RELATOR**

DATED: _12/2/10_          BY: _____

**T. MARK JONES**
President
Ven-A-Care of the Florida Keys, Inc.

DATED: _12/2/10_          BY: _____

**JAMES J. BREEN**
The Breen Law Firm
Suite 260
5755 North Point Parkway
Alpharetta, GA 33029
Counsel to Ven-A-Care of the Florida Keys, Inc.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In re: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) | MDL No. 1456 Civil Action No. 01-12257-PBS |
| | ) | |
| **THIS DOCUMENT RELATES TO:** | ) ) | Hon. Patti Saris |
| *United States of America ex rel. Ven-a-Care of the Florida Keys, Inc., v. Abbott Laboratories, Inc.,* CIVIL ACTION NO. 06-11337-PBS | ) ) ) ) | (Original Complaint Filed in the Southern District of Florida, Case No. 06-21303-CIV-GOLD/TURNOFF) |

## THE UNITED STATES' FIRST AMENDED COMPLAINT

The United States brings this fraud action against Abbott Laboratories, Inc. ("Abbott") to recover losses sustained by the Medicare and Medicaid programs. Over the course of several years, Abbott reported inflated pharmaceutical prices that it knew Medicare and Medicaid relied upon to set reimbursement rates for Abbott's pharmaceutical products. Abbott's actual sales prices for its pharmaceutical products were far less than the prices reported by Abbott. By knowingly reporting inflated prices – often 1000% higher than Abbott's actual prices – Abbott ensured its customers received inflated reimbursement and profits from Medicare and Medicaid. Abbott then used the public fisc as a marketing tool, actively promoting government-funded "spreads" between (1) its fraudulently inflated prices and (2) its actual sales prices as an inducement to its customers. In addition, Abbott operated its own home infusion pharmacies and entered into profit-sharing partnerships with health care providers that allowed Abbott to directly profit off Abbott's manipulation of third party reimbursements for its drugs. These efforts allowed Abbott to increase its profits by boosting sales for its drugs.

EXHIBIT A

Civil Action No. 01-12257-PBS/Civil Action No. 06-11337-PBS

## I. NATURE OF ACTION

1.     The United States brings this action to recover treble damages and civil penalties

under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-33, and to recover damages and other

monetary relief under the common law or equitable theories of fraud and unjust enrichment.

2.     The United States bases its claims on Abbott having **submitted and** caused the

submission of false or fraudulent claims to the United States in violation of 31 U.S.C. §

3729(a)(1), and having made and used false statements to get false or fraudulent claims paid by

the United States in violation of 31 U.S.C. § 3729(a)(2).

3.     Within the time frames detailed below, Abbott engaged in a fraudulent scheme

that caused the Medicare and Medicaid programs to pay excessive reimbursement to Abbott's

customers, *e.g.*, pharmacies, physicians, hospitals, home health agencies, nursing homes, home

infusion companies, clinics and physicians (hereafter referred to collectively as "Customers").  In

furtherance of this scheme, Abbott reported false, fraudulent and inflated drug prices for certain

drugs (listed in ¶¶ 30 and 34 below) to several price reporting compendia that the Medicare and

Medicaid programs relied upon to set reimbursement rates for Abbott's customers.  A chart

setting out examples showing the difference between the prices at which Abbott actually sold its

drugs and the false prices reported by Abbott is attached hereto as **Exhibit 1**.  Abbott knew that

the Medicare and Medicaid programs relied on Abbott's reported prices to those compendia to

set reimbursement rates for claims submitted for Abbott's drugs.  Abbott then sold the drugs for

far lower prices, and marketed to existing and potential Customers the government-funded

2

Civil Action No. 01-12257-PBS/Civil Action No. 06-11337-PBS

"spread" between the inflated reimbursement amounts and the actual acquisition costs of the drugs to boost its sales and profits.

4.      Abbott knew that its false price reporting and marketing efforts would cause its Customers to submit claims for fraudulently inflated Medicaid and Medicare reimbursement.

5.      Abbott's fraudulent scheme to induce Customers to purchase its products by ensuring that federal reimbursement rates for those products would be set at artificially inflated levels violated the FCA, the federal anti-kickback statute, 42 U.S.C. § 1320a-7b(b), common law and numerous state laws.

6.      To get fraudulent claims paid by the United States, Abbott also routinely made false statements directly to state Medicaid programs by reporting these same fraudulently inflated prices to the states.  These statements violated the FCA, common law and various state laws.

7.      The United States timely asserts the causes of action alleged herein based on the filing of relator's complaint in this action.

## II. JURISDICTION

8.      The United States' original Complaint in this matter was filed on March 16, 2006 in the Southern District of Florida.[1]  The case was transferred to Multi-District Litigation ("MDL") No. 1456 on July 27, 2006.  The Court has subject matter jurisdiction to entertain this action under 28 U.S.C. §§ 1331 and 1345 and supplemental jurisdiction to entertain the common law and equitable causes of action pursuant to 28 U.S.C. § 1367(a).  The Court may exercise

---

[1]  This case originated in the Southern District of Florida as Case No. 06-21303-CIV-GOLD/TURNOFF.  The United States understands that this matter will be transferred back to the Southern District of Florida for trial upon the completion of these MDL proceedings.

3

Civil Action No. 01-12257-PBS/Civil Action No. 06-11337-PBS

personal jurisdiction over Abbott pursuant to 31 U.S.C. § 3732(a) because Abbott resides or

transacts business in the District of Massachusetts.

### III. VENUE

9.     Venue is proper in the District of Massachusetts under 31 U.S.C. § 3732 and 28

U.S.C. § 1391(b) and (c) because Abbott resides or transacts business in this District.[2]

### IV. PARTIES

10.     The United States brings this action on behalf of the Department of Health and

Human Services ("HHS") and the Centers for Medicare & Medicaid Services ("CMS") (formerly

known as the Health Care Financing Administration), which administer the Medicare and

Medicaid programs.

11.     Relator Ven-A-Care of the Florida Keys, Inc. ("Ven-A-Care"), is a corporation

organized under the laws of Florida, with its principal offices in Key West, Florida.  Ven-A-Care

is a pharmacy licensed to provide the prescription drugs specified in this Complaint and has

been, during the relevant period of this Complaint, a Medicare and Florida Medicaid provider.

Ven-A-Care's principal officers and directors have included John M. Lockwood, M.D., Zachary

Bentley, Luis Cobo and T. Mark Jones, who are each citizens of the United States and reside in

Key West, Florida.  The FCA, 31 U.S.C. § 3730(b)(1), provides that private parties may bring a

lawsuit on behalf of the United States to recover damages for false claims.  Ven-A-Care brought

this action against Abbott on behalf of itself and the United States.

---

[2] Abbott also resides or transacts business in the Southern District of Florida as well.
Thus, venue is also proper in that District.

4

Civil Action No. 01-12257-PBS/Civil Action No. 06-11337-PBS

12.    Defendant Abbott is a corporation organized under the laws of Illinois with its

principal offices in Abbott Park, Illinois.  At all times material to this civil action, Abbott has

transacted business throughout the United States, selling and distributing its drugs, including but

not limited to those identified in this Complaint, to purchasers within this District.

## V.  THE LAW

### A.    The False Claims Act

13.    The FCA provides in pertinent part, that:

(a) Any person who (1) knowingly presents, or causes to be presented, to an
officer or employee of the United States Government or a member of the Armed
Forces of the United States a false or fraudulent claim for payment or approval;
(2) knowingly makes, uses, or causes to be made or used, a false record or
statement to get a false or fraudulent claim paid or approved by the Government

\* \* \*

is liable to the United States Government for a civil penalty of not
less than $5,000 and not more than $10,000, plus 3 times the
amount of damages which the Government sustains because of the
act of that person . . . .
(b) For purposes of this section, the terms  "knowing" and
"knowingly" mean that a person, with respect to information
(1) has actual knowledge of the information; (2) acts in deliberate
ignorance of the truth or falsity of the information; or (3) acts in
reckless disregard of the truth or falsity of the information, and no
proof of specific intent to defraud is required.

31 U.S.C. § 3729.

14.    Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as

amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 (notes), and 64

Fed. Reg. 47099, 47103 (1999), the civil penalties were adjusted to $5,500 to $11,000 for

violations occurring on or after September 29, 1999.

5

Civil Action No. 01-12257-PBS/Civil Action No. 06-11337-PBS

**B.      The Federal Anti-Kickback Statute**

15.      Congress first enacted the federal anti-kickback statute, 42 U.S.C. § 1320a-7b(b),

in 1972 to protect the integrity of Medicare and Medicaid.  Congress strengthened the statute in

1977, and again in 1987, to ensure that kickbacks masquerading as legitimate transactions would

not evade its reach.  *See* Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b)

and (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L.

No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No.

100-93.

16.      The anti-kickback statute prohibits any person or entity from making or accepting

payment to induce or reward any person for referring, recommending or arranging for federally-

funded medical items, including items provided under Medicare and Medicaid.  In pertinent part,

the statute provides:

(b) Illegal remuneration

(1) whoever knowingly and willfully solicits or
receives any remuneration (including any kickback,
bribe, or rebate) directly or indirectly, overtly or
covertly, in cash or in kind –

(A) in return for referring an individual to a
person for the furnishing or arranging for the
furnishing of any item or service for which
payment may be made in whole or in part
under a Federal health care program, or

(B) in return for purchasing, leasing,
ordering, or arranging for or recommending
purchasing, leasing, or ordering any good,
facility, service, or item for which payment

6

Civil Action No. 01-12257-PBS/Civil Action No. 06-11337-PBS

> may be made in whole or in part under a
> Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be
fined not more than $25,000 or imprisoned for not more than five
years, or both.

(2) whoever knowingly and willfully offers or pays any
remuneration (including any kickback, bribe, or rebate)
directly or indirectly, overtly or covertly, in cash or in kind
to any person to induce such person --

(A) to refer an individual to a person for the
furnishing or arranging for the furnishing of any
item or service for which payment may be made in
whole or in part under a Federal health care
program, or

(B) to purchase, lease, order or arrange for or
recommend purchasing, leasing or ordering any
good, facility, service, or item for which payment
may be made in whole or in part under a Federal
health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not
more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b(b). Those who violate the statute also are subject to exclusion from

participation in federal health care programs and, effective August 6, 1997, civil monetary

penalties of up to $50,000 per violation and up to three times the amount of remuneration paid.

42 U.S.C. § 1320a-7(b)(7) and 42 U.S.C. § 1320a-7a(a)(7).

Civil Action No. 01-12257-PBS/Civil Action No. 06-11337-PBS

## VI. THE FEDERAL HEALTHCARE PROGRAMS

17.    Medicaid and Medicare were created to provide access to healthcare for elderly, indigent or disabled residents of the United States.

### A.    The Medicaid Program

18.    Medicaid is a joint federal-state program that provides health care benefits for certain groups, primarily the poor and disabled.

19.    The federal Medicaid statute sets forth the minimum requirements for state Medicaid programs to qualify for federal funding. 42 U.S.C. § 1396a.

20.    The federal portion of states' Medicaid payments, known as the Federal Medical Assistance Percentage ("FMAP"), is based on a state's per capita income compared to the national average. 42 U.S.C. § 1396d(b). Among the states, the FMAP is at least 50%, and as high as 83%.

21.    The Medicaid statute requires each participating state to implement a plan containing certain specified minimum criteria for coverage and payment of claims. 42 U.S.C. §§ 1396, 1396a(a)(13), 1396a(a)(30)(A).

22.    The Medicaid programs of all states reimburse for prescription drugs.

23.    The vast majority of states award contracts to private companies to evaluate and process Medicaid recipients' claims for payment. Typically, after processing the claims, these private companies then generate funding requests to the state Medicaid program, which in turn obtains federal funds from the United States.

Civil Action No. 01-12257-PBS/Civil Action No. 06-11337-PBS

24.     By becoming a participating supplier in Medicaid, suppliers agree to abide by all

laws, regulations, and procedures applicable to that program, including those governing

reimbursement.

**B.      The Medicare Program**

25.     In 1965, Congress enacted Title XVIII of the Social Security Act, known as the

Medicare program, to pay for the costs of certain healthcare services and items.  Entitlement to

Medicare is based on age, disability or affliction with end-stage renal disease.  42 U.S.C. §§ 426-

426a, 1395o.

26.     HHS is responsible for the administration and supervision of the Medicare

program.  CMS is an agency of HHS and directly administers the Medicare program.  The

Medicare program has several parts, including Medicare Part B ("Supplementary Medical

Insurance for the Aged and Disabled"), which covers physician services, as well as durable

medical equipment ("DME") and certain drug products and supplies.  42 U.S.C. § 1395k; 42

C.F.R. § 410.10.

27.     Medicare Part B generally covers drugs which are provided either:  (a) incident to

a physician's service and cannot usually be self-administered (42 C.F.R. § 410.26 (*e.g.*, certain

oncology drugs)); or (b) in conjunction with the medical necessity of an infusion pump or

nebulizer or other DME device payable under Medicare's DME benefit.  42 C.F.R. §§ 405.517,

414.701.

Civil Action No. 01-12257-PBS/Civil Action No. 06-11337-PBS

28.     During the relevant time period, CMS contracted with private insurance carriers ("Contractors") to administer and pay Part B claims from the Medicare Trust Fund.  42 U.S.C. § 1395u.  In this capacity, the Contractors act on behalf of CMS.  42 C.F.R. § 421.5(b).

29.     Contractors receive, process and pay claims under Medicare Part B for drugs from various Medicare providers and suppliers.  Typically, once a contractor approves a claim, the contractor then submits a payment request to a Medicare bank account funded by federal funds.

## C.   Drug Reimbursement Under Medicaid and Medicare

30.     The Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301-97, requires pharmaceutical companies to submit to the Food and Drug Administration ("FDA") a listing of every drug product in commercial distribution.  21 U.S.C. § 355.  The FDA provides for the assignment to each listed drug product of a unique 11-digit, 3-segment number, known as the National Drug Code ("NDC").  FDA has assigned approximately 170,000 NDCs to drug products.  The drugs and corresponding NDCs at issue in this case are listed below:

| DRUG | NDC# |
| --- | --- |
| Sodium Chloride Injection | 00074196607 |
| Water for Injection 30 ml | 00074397703 |
| Vancomycin HCl 500 mg | 00074433201 |
| Water for Injection 10 ml | 00074488710 |
| Water for Injection 20 ml | 00074488720 |
| Sterile Water for Injection | 00074488750 |
| Sodium Chloride Injection | 00074488810 |
| Sodium Chloride Injection | 00074488820 |
| Sodium Chloride Irrigation | 00074613802 |
| Sodium Chloride Irrigation | 00074613803 |
| Sodium Chloride Irrigation | 00074613822 |
| Sterile Water for Irrigation | 00074613902 |
| Sterile Water for Irrigation | 00074613903 |

Civil Action No. 01-12257-PBS/Civil Action No. 06-11337-PBS

| | |
|---|---|
| Sterile Water for Irrigation | 00074613922 |
| Vancomycin HCl 5 gm | 00074650901 |
| Vancomycin HCl 1 gm | 00074653301 |
| Vancomycin HCL 500 mg Add-Vantage | 00074653401 |
| Vancomycin HCl 1 gm Add-Vantage | 00074653501 |
| 5% Dextrose in Water 50 ml | 00074710013 |
| 5% Dextrose in Water 100 ml | 00074710023 |
| Sodium Chloride Injection | 00074710102 |
| Sodium Chloride 0.9% 50ml | 00074710113 |
| Sodium Chloride 0.9% 100 ml | 00074710123 |
| Dextrose Injection | 00074712007 |
| Sodium Chloride Irrigation | 00074713809 |
| Sterile Water for Irrigation | 00074713909 |
| Dextrose 5%/ Kcl/NaCl 1000 ml | 00074790209 |
| Dextrose Injection | 00074792202 |
| 5% Dextrose in Water 500 ml | 00074792203 |
| 5% Dextrose in Water1000 ml | 00074792209 |
| Dextrose Injection | 00074792336 |
| Dextrose Injection | 00074792337 |
| Dextrose 5% and 0.225% NaCL Injection | 00074792409 |
| Dextrose 5% and 0.225% NaCL Injection | 00074792609 |
| 5% Dextrose/ NaCl 0.9% 1000 ml | 00074794109 |
| Sodium Chloride Irrigation | 00074797205 |
| Sterile Water for Irrigation | 00074797305 |
| Sodium Chloride 0.9% 250 ml | 00074798302 |
| Sodium Chloride 0.9% 500 ml | 00074798303 |
| Sodium Chloride 0.9% 1000 ml | 00074798309 |
| Sodium Chloride Injection | 00074798436 |
| Sodium Chloride Injection | 00074798437 |
| Sodium Chloride Injection | 00074798509 |
| Water for Injection1000 ml | 00074799009 |
| Acyclovir Sodium 500 mg | 00074442701 |
| Acyclovir Sodium 1 gm | 00074445201 |

31.      Drug manufacturers, such as Abbott, have not typically submitted claims for

reimbursement to federal health care programs.  Instead, Abbott marketed its products to its

Customers, who then purchased the products either directly or through wholesalers based on a

price the Customers negotiated with Abbott.  In addition to using wholesalers, Customers also

Civil Action No. 01-12257-PBS/Civil Action No. 06-11337-PBS

purchased Abbott products through group purchasing organizations ("GPO"), who negotiated

prices on behalf of Abbott's Customers. However, as described in ¶¶ 111-138 below, Abbott

also had a business unit that, among other activities, operated home infusion pharmacies and

actually submitted reimbursement claims for drugs on behalf of various clients.

32.    Abbott's Customers then submitted claims for payment for Abbott products to

Medicare and Medicaid after dispensing or administering Abbott drugs. Medicare and Medicaid

reimbursed some of the claims submitted by Abbott's home infusion pharmacies. In other

instances, Abbott administered reimbursement claims for certain home infusion clients and

collected portions of those clients' Medicare and Medicaid reimbursements as compensation for

those services.    .

33.    For the most part, in the Medicaid program, claims submitted by retail pharmacies

are processed and tracked using the NDC of the drug.

34.    The Medicare program generally uses the Healthcare Common Procedural Coding

System ("HCPCS") to reimburse for drugs. The HCPCS utilize 5-digit alphanumeric codes to

identify and bill for medical products and supplies. The codes at issue here are listed below:

| HCPCS | Description |
|-------|-------------|
| J2912 | Sodium Chloride, .9 percent, per 2 ml |
| J3370 | Vancomycin HCl, 500 mg |
| J7030 | Normal Saline Solution, 1000 cc |
| J7040 | Normal Saline Solution, 500 ml |
| J7042 | 5 percent Dextrose/Normal Saline Solution, 500 ml |
| J7050 | Normal Saline Solution, 250 cc |
| J7051 | Sterile Saline or Water, up to 250 cc |
| J7060 | 5 percent Dextrose/Water, 500 ml |
| J7070 | D-5-W, 1000 cc |
| J7110 | Dextran 75, 1000 ml |
| J7130 | Hypertonic Saline Solution, 50 or 100 mEq, 20 cc vial |

12

Civil Action No. 01-12257-PBS/Civil Action No. 06-11337-PBS

35.    During the relevant period, Abbott usually reported prices to various price publishers and services on an annual basis.  The price publishers used the information to publish pricing compendia.

36.    The reimbursement amounts for claims submitted by Abbott or Abbott's Customers for the drugs at issue in this Complaint were directly influenced by Abbott's false price representations.  The information contained in the published pricing compendia was used by most third party payor insurance companies, including the Medicare and Medicaid programs, in determining the reimbursement rates for prescription drugs.  Abbott documents show that Abbott knew of the impact of its price representations on government reimbursement on claims submitted by its Customers for its drugs.  Abbott documents also show that the company actively marketed the government-funded profits or "spreads" on its drugs created by its false price representations.

37.    No governmental payor knew of or sanctioned Abbott's conduct as set forth in this Complaint, i.e., its deliberate manipulation of its published prices for certain of its products to induce its Customers to purchase those products.

**D.    Medicaid Reimbursement Formulas**

38.    When reimbursing for drugs, the State Medicaid programs' goal has been to pay an amount which, in the aggregate, reflects the lower of (1) the estimated acquisition cost ("EAC") of covered drugs, plus a reasonable dispensing fee, or (2) a provider's usual and customary charges to the general public. To determine the EAC for a covered drug, State

13

Civil Action No. 01-12257-PBS/Civil Action No. 06-11337-PBS

Medicaid programs are required to develop reimbursement formulas that must be approved by

the Secretary of HHS.  42 C.F.R. §§ 447.331, 447.332, and 447.333 (2005).

39.     While the specific reimbursement formulas vary from state to state, the various

State Medicaid programs have generally reimbursed for each drug based on the lowest of (a) the

EAC as set by the states,  (b) the maximum allowable cost ("MAC") set by the state

Pharmaceutical Reimbursement Boards, or (c) the providers' usual and customary charge.  For

multiple source drugs subject to a federal upper limit, states must in the aggregate not pay more

than those limits. 42 C.F.R. §§ 447.331, 447.332 and 447.333 (2005).

40.     The states' methodology for arriving at EAC includes:

A.     discounting a percentage off of the Average Wholesale Price ("AWP");

B.     adding a percentage to the Wholesale Acquisition Cost ("WAC") ; and/or,

C.     requiring the drug companies to certify prices directly in writing to the

Medicaid program in response to state requests for particular pricing information.

41.     AWP is used to refer to the price at which a pharmaceutical firm or a wholesaler

sells a drug to a retail Customer who then administers it to a patient.  WAC is used to refer to the

price at which a pharmaceutical firm typically sells a drug to wholesalers who would then resell

it to a retail Customer.

42.     While the majority of states use published AWPs to calculate reimbursement,

approximately six states (Alabama, Florida, Maryland, Massachusetts, Rhode Island and Texas)

have used the wholesale acquisition cost ("WAC") to set the EAC.

14

Civil Action No. 01-12257-PBS/Civil Action No. 06-11337-PBS

43.     The AWPs and WACs relied upon by the State Medicaid programs have generally been those published by (1) Thomson Publishing, publisher of the *Red Book* and various other price publications, (2) First Databank, publisher of the *Blue Book* and other electronic price publications; or (3) Medi-Span, Inc., publisher of an electronic or automated price service and the Hospital Formulary Pricing Guide.  Thompson Publishing, First Databank and Medi-Span, Inc. are hereafter referred to as the "Publishers" and their various publications and data services are hereinafter referred to as "Price Publications."

44.     In addition to relying on the manufacturers' reported prices as published in the Price Publications, some State Medicaid programs also received price representations directly from manufacturers, and relied on these representations to confirm the accuracy of the figures they use to determine state reimbursement amounts.  For example, the State of Texas required drug companies to submit their prices directly to the Texas Medicaid program in a signed certification attesting to the accuracy of the price information.

**E.      Medicare Reimbursement Formulas**

45.     From 1992 through 1997, Medicare based its reimbursement for multi-source generic drugs, the drugs at issue here, at the lower of the EAC or the median AWP of all generic forms of a drug.  42 C.F.R. § 405.517 (1992-1998).  In general, Medicare relied on median AWPs to set reimbursement rates.

46.     From January 1, 1998, until December 31, 1998, Medicare based its reimbursement for all generic forms of a drug at 95% of the median AWP for the drug.  Balanced Budget Act of 1997, 42 U.S.C. § 1395u(o); 42 C.F.R. § 405.517 (1998).

15

Civil Action No. 01-12257-PBS/Civil Action No. 06-11337-PBS

47.     From 1999 through 2004, Medicare based its reimbursement for all generic forms of a drug at the lower of (1) 95% of the median published AWP for the drug; or (2) the AWP of the least expensive brand-name drug.  42 U.S.C. § 1395u(o); 42 C.F.R. § 405.517 (1999-2004).

48.     After the reimbursement amount is calculated, Medicare pays 80 percent and the Medicare beneficiary is responsible for the remaining 20 percent co-payment.  If the Medicare beneficiary is also a Medicaid recipient, the Medicaid program generally pays the 20 percent Medicare co-payment.

49.     Medicare generally relied upon the AWPs published by Thomson Publishing in its annual national compendium known as the *Drug Topics Red Book* ("*Red Book*"), as well as *Red Book* monthly updates to set reimbursement rates for covered drugs.

## VII. ABBOTT'S SCHEME

50.     From at least on or before January 1, 1991, and continuing through 2001,  Abbott defrauded the United States by knowingly causing the Medicare and Medicaid programs to pay false or fraudulent claims for dextrose solutions, sodium chloride solutions, sterile water, Vancomycin and Acyclovir Sodium.

51.     The specific dextrose solutions, sodium chloride solutions, sterile water, Vancomycin and Acyclovir Sodium products at issue herein are identified by NDC or HCPCS Code in ¶¶ 30 and 34 above and are hereinafter referred to jointly as the "Drugs."

52.     Dextrose solutions, sodium chloride solutions, and sterile water are generic, water-based solutions used to facilitate the intravenous infusion of other drugs and for fluid replacement, and are commonly referred to as large volume parenterals ("LVPs").

16

Civil Action No. 01-12257-PBS/Civil Action No. 06-11337-PBS

53.     Vancomycin is a powerful, intravenous antibiotic that Abbott has sold as a generic drug since 1988.

54.     Acyclovir Sodium ("Acyclovir") is an antiviral drug used to treat several opportunistic viral infections, some of which are associated with HIV/AIDS.

55.     Abbott marketed and sold its products, including the Drugs, to Customers.

56.     The Customers purchased the products either directly from Abbott, through a GPO contract or through wholesalers.

57.     The amount paid by a Customer was typically based on a price negotiated with Abbott or the GPO.

58.     Regardless of the method of purchase, Abbott's Customers submitted claims for payment to Medicare and Medicaid when an Abbott product was administered to a program beneficiary. The claims submitted by Abbott's Customers were paid at amounts directly influenced by Abbott's false and fraudulent prices.

59.     Abbott routinely disseminated false pricing information for the Drugs to the Pricing Publications. Abbott employees typically reported the false and fraudulent prices to the Price Publications annually, although they sometimes did so more often. On most occasions, Abbott reported inflated "List Prices" or "Direct Prices" (both referred to hereinafter as LP), WACs and/or AWPs. A LP is supposed to reflect the price paid by a Customer that buys drugs directly from Abbott and not through a wholesaler.

60.     When Abbott reported a LP, some Price Publications (*e.g.*, *Blue Book*, which provided pricing information for the vast majority of the state Medicaid programs) calculated

17

Civil Action No. 01-12257-PBS/Civil Action No. 06-11337-PBS

Abbott's AWPs by applying a markup – usually 18.75% – to the LPs. Abbott was aware of how

the Price Publications set its AWPs and knew (1) that the markup remained constant and (2) that

its LPs ultimately controlled the AWP reported by the Price Publications for many of its

products. Abbott reported WACs for several of its drugs as well, but during the time period

covered by the Complaint, the Price Publications used Abbott's LPs (plus the standard markup)

to set the AWPs used by the Medicaid and Medicare programs.

61.     In some circumstances, Abbott itself calculated and supplied the AWP which it

sought to have published.

62.     For example, in a January 16, 1996 letter from Abbott's Reimbursement Manager

to Medi-Span, Abbott directly reported AWPs for two of its products.

63.     Abbott documents also confirm its knowledge that the LPs it reported directly

impacted the AWP. In a March 20, 1995 e-mail between Abbott employees regarding the

reporting of new Vancomycin LPs, one employee notes, "Please notify Red Book and Medi-Span

of these changes ASAP. They are the sources for creating the AWP that is important to

[Abbott's] Alternate Site [sales division]."

64.     Abbott also submitted false and fraudulent prices directly to state Medicaid

programs. In an October 1, 1997, Abbott "Medicaid Coordinator" Tena Brown represented in a

letter to the State of Texas Medicaid Program that the price on Abbott's Vancomycin 1 GM

Fliptop vial- sterile, NDC 00074-6533-01 ("Vancomycin 1 GM FTV") was $583.70 for a

package of 10, or $58.37 a unit. That led the Texas Medicaid program to set reimbursement for

18

Civil Action No. 01-12257-PBS/Civil Action No. 06-11337-PBS

Vancomycin 1 GM FTV at that price ($58.37 a unit). At the time, Abbott sold Vancomycin 1 GM FTV to certain Customers for $5.53 per unit, through a GPO called Oncology Solutions.

65.    With extremely few exceptions, Abbott reported increasingly higher prices for the Drugs from at least on or before January 1, 1991 through 2001. At the same time, the prices Abbott actually charged to its Customers decreased or remained the same.

66.    Abbott knew that the prices which it reported to the Price Publications directly affected reimbursement amounts paid by the Medicaid and Medicare programs. As Abbott's Manager for Reimbursement noted in an April 26, 1995 memorandum, "[h]aving a published [LP] that is high allows a provider to bill at that list price." The false or fraudulent prices Abbott reported to the Price Publications inflated government reimbursement amounts on claims submitted by Abbott's Customers for the Drugs. A chart setting out some examples showing the difference between the prices at which Abbott actually sold its drugs and the false prices reported by Abbott is attached hereto as **Exhibit 1**.

67.    Abbott manipulated its LPs, AWPs and WACs to induce its Customers to purchase Abbott's products, including the Drugs, by marketing the huge profits that would result to its Customers.

68.    Abbott was well aware of how the Government used its pricing information to reimburse Abbott products. For example, Abbott organized an internal entity known as the "Medicare Working Group." The group (1) was organized by high level Abbott executives, (2) involved representatives responsible for reimbursement issues from all major Abbott divisions, and (3) discussed and organized efforts to influence government reimbursement for drugs.

19

Civil Action No. 01-12257-PBS/Civil Action No. 06-11337-PBS

69.    Documents from the Medicare Working Group establish that Abbott knew that
AWP is based upon Abbott's reported price plus, according to the Medicare Working Group
documents, "a mark-up of 15-20%." Minutes from a January 21, 1997 meeting note that this
AWP based on Abbott's reported prices is subsequently reported in "the Red Book, Blue Book
and Medispan Book and is used by Medicare, Medicaid and Commercial insurance carriers to
determine reimbursement levels."

70.    Neither the Medicaid nor the Medicare programs knew of or sanctioned Abbott's
conduct as set forth in this Complaint, *i.e.*, the deliberate manipulation of its published prices to
induce its Customers to purchase the Drugs. Abbott never disclosed the price reporting practices
for the Drugs identified in this Complaint to the Medicaid or Medicare programs.

## A.    Vancomycin

71.    Abbott first introduced its generic Vancomycin in 1988. Abbott's scheme to
defraud the United States by causing inflated Vancomycin reimbursements ran from
approximately 1989 through 2001. Over that time period, Medicare and Medicaid paid in excess
of $75 million for Abbott's Vancomycin.

72.    During that time period, Abbott reported increasingly higher LPs and AWPs for
Vancomycin to the Price Publications while the actual contract prices at which Abbott sold
Vancomycin to its Customers decreased significantly.

73.    Abbott sold its Vancomycin in several doses and forms. The Vancomycin 1 GM
FTV was the most common dose of Vancomycin reimbursed by Medicare and Medicaid.

Civil Action No. 01-12257-PBS/Civil Action No. 06-11337-PBS

Abbott's false and fraudulent price reporting on its Vancomycin 1 GM FTV represents how

Abbott reported false and fraudulent prices on its other Vancomycin products.

74.    When Abbott first introduced its Vancomycin 1 GM FTV in 1988, the published

per unit AWP was $25.20. By early 2001, Abbott reported false prices that drove the AWP for

Vancomycin 1 GM FTV to $76.42. At the same time, the price at which Abbott's Vancomycin

was widely available to purchasers decreased to under $4.00 by early 2001; the difference (and

potential profit) between the reported price and the actual selling price for Vancomycin 1 GM

FTV was as great as $72.42 a dose, or more than 18 times the actual price at which Abbott sold

Vancomycin 1GM FTV.

75.    Abbott fully controlled and manipulated the AWPs for Vancomycin 1 GM FTV to

boost its Vancomycin sales at the expense of third party payors, including Medicare and

Medicaid.

76.    Abbott's manipulation of its reported Vancomycin prices between 1989 and 2001

created spreads sufficient to induce increased sales of that drug. Internal memoranda from senior

Abbott sales staff reveal that Abbott actively knew about and marketed the large spreads on

several of its drugs, including Vancomycin. Those efforts proved successful; the percentage of

Abbott's Vancomycin sales reimbursed by Medicaid increased from less than 10% in 1991 to

approximately 70% in 2000.

77.    Abbott's reporting of Vancomycin prices in 1995 exemplifies the manner in

which Abbott manipulated the price of Vancomycin to maintain and grow its market share. In

March 1995, Abbott temporarily reported dramatically lower LPs and AWPs for Vancomycin.

21

Civil Action No. 01-12257-PBS/Civil Action No. 06-11337-PBS

Prior to the March 1995 LP/AWP price change, the Price Publications listed a per unit LP of

$50.90 for Abbott's Vancomycin 1 GM FTV, and a per unit AWP of $60.44 for that drug.

78.     In late March 1995, Abbott reported a new LP of $15.00 for a unit of Vancomycin

1 GM FTV.  Based on this new information from Abbott, the Price Publications published

revised per unit prices for Vancomycin 1 GM FTV.  They reported a LP of $15.00 and an AWP

of $17.81.

79.     Abbott received numerous complaints from Customers over the resulting

decrease in the spread.  Abbott deliberated internally on whether and by how much Abbott

should again increase its spread so that it could reestablish the inducement that had come to be

expected by its Customers.  Abbott documents show Abbott's pricing personnel carefully

considering the additional profits they could generate for Abbott's Customers if they artificially

re-inflated the reported prices for Vancomycin 1 GM FTV at various levels.

80.     Abbott subsequently reversed its earlier decision to lower its reported prices and

instead raised its reported Vancomycin prices.  In early May 1995, Abbott reported a new per

unit LP for its Vancomycin 1 GM FTV of $32.95.  The revised AWP for Abbott's Vancomycin 1

GM FTV became $39.13 (once the Price Publication applied the standard markup).

81.     That reported price increase proved insufficient.  Later that same month (May

1995), Abbott reported yet another set of prices for Vancomycin.  The LP Abbott reported for its

Vancomycin 1 GM FTV rose to $52.94 and its AWP rose to $62.86 (once the Price Publication

applied the standard markup).

22

Civil Action No. 01-12257-PBS/Civil Action No. 06-11337-PBS

82.     Thereafter, Abbott reported higher Vancomycin LPs and AWPs to the Publishers each year, despite decreases in its actual prices to Customers for Vancomycin over that same period.  The AWP for Abbott's Vancomycin 1 GM FTV peaked at $76.42 per unit in early 2001 at the same time that the actual sales price was less than $4 per unit.

83.     The false prices reported by Abbott directly impacted the amount Medicaid and Medicare reimbursed for Vancomycin.  For example, in 1999 Abbott's Vancomycin 1 GM FTV was widely available for approximately $4.75 a unit.  Yet, Abbott reported a per-unit Vancomycin LP in 1999 – which served as the baseline for determining the AWP – to First DataBank of $64.35.  As a result, the 1999 AWP for Vancomycin 1 GM FTV was set at $76.42.

84.     New York State's Medicaid program relied on the First DataBank prices to set its reimbursement rate for the Vancomycin 1 GM FTV.  New York State's Medicaid reimbursement rate for the Vancomycin 1 GM FTV in 1999 was $68.77; the AWP for Vancomycin 1 GM FTV was $76.42 at the time.  New York's reimbursement for Vancomycin 1 GM FTV was AWP minus 10%, a reimbursement formula generally similar to those of other states.  Abbott's false price representations created a profit spread of approximately $64.02 for Abbott's Customers, on a drug that Abbott sold to those same Customers for approximately $4.75 a unit.  The spread between the New York state Medicaid reimbursement for Vancomycin 1 GM FTV – directly influenced by Abbott's false price reporting – and the actual acquisition cost was 1,348%. The profit to Abbott's Customers was 13.5 times the typical acquisition cost for the drug.

85.     Abbott's practice of price manipulation continued into early 2001.  At that time, Abbott reported new, lower WACs to the Price Publications for many of its drugs, including

Vancomycin, without also reporting new LPs or AWPs. At the time Abbott submitted the new

prices in early 2001, it had been under investigation by the Government for pricing fraud. In

addition, members of the House Ways and Means Committee accused Abbott of engaging in

price reporting misconduct that threatened public safety in the fall of 2000; the Centers for

Disease Control had expressed concerns that over-prescription of Vancomycin could lead to the

growth in the population of Vancomycin-resistant bacteria. Also, in October 2001, an Abbott

joint venture, TAP Pharmaceuticals, Inc. paid $875 million to the Government to resolve its

criminal responsibility and civil liability for fraudulent pricing and kickbacks in connection with

the marketing of a drug called Lupron. When Abbott submitted reduced WACs, First DataBank

changed the way it calculated Abbott's AWP. First Databank personnel set new AWPs for

Abbott products by applying a 25% markup to the newly supplied WACs instead of setting

Abbott's AWPs by applying a 18.75% markup to Abbott's still inflated LPs. Abbott tried to

convince First DataBank personnel not to set Abbott's AWP by reference to these new, lower

WACs; Abbott wanted First DataBank to continue to use Abbott's then still inflated LPs to

maintain its inflated AWPs. First DataBank refused Abbott's request. Ultimately, Abbott

reduced its LPs and WACs to reflect the average sales price for the Drugs on April 30, 2001.

     86.    The switch to using the lowered WACs drastically dropped Abbott's reported

AWPs in 2001. For Abbott's Vancomycin 1 GM FTV, the AWP dropped from $76.42 per unit in

early 2001 (when AWP was determined using the inflated LPs) to $17.72 per unit in 2001 (when

AWP was set using the revised, lowered WACs). By 2002, the AWP for this product was down

to $6.06 a unit.

Civil Action No. 01-12257-PBS/Civil Action No. 06-11337-PBS

87.     As a result of the drop in AWP, the spread on the reimbursement by Medicare and Medicaid was reduced from $60-$70 a unit to approximately $2.00 a unit.

88.     Abbott's Customers recognized that Abbott was responsible for creating and maintaining the spread. Numerous Customers complained to Abbott or the group purchasing organizations (GPOs) who negotiated prices on behalf of Abbott's Customers. A large Customer of Abbott went so far as to demand restitution for the almost $10.5 million in lost profits due to the decrease in spread resulting from Abbott's 2001 submission of lowered prices to the reporting agencies.

89.     Internal memoranda from senior Abbott sales staff reveal that Abbott actively knew about and marketed the large spreads on several of its drugs, including Vancomycin, as an inducement to purchase Abbott's drugs.

90.     Abbott's share of the Medicaid market has dropped steadily since the more accurate prices started being published in 2001 and thereafter went from approximately 70% in early 2001 to approximately 20% in 2004.

**B.    Large Volume Parenterals**

91.     In addition to false price reporting for Vancomycin, Abbott engaged in similar conduct with respect to its LVPs.

92.     LVPs are essentially sterile water, usually mixed with either salt (sodium chloride) or sugar (dextrose). LVPs are cheap to produce and are sold at very low prices.

93.     One of the most commonly utilized Abbott LVPs was 5% Dextrose in Water, 500 ml, NDC # 00074-7922-03 ("5% Dextrose 500 ml").

25

Civil Action No. 01-12257-PBS/Civil Action No. 06-11337-PBS

94.    In 1993, Abbott's 5% Dextrose 500 ml could be widely purchased for as little as $1.80 for a 500ml bag.

95.    The Red Book AWP for 5% Dextrose 500 ml in 1993 was $8.72.

96.    Two years later, in 1995, the price for Abbott's 5% Dextrose 500ml was widely available for even less; one wholesaler was selling it at $1.50 for a 500 ml bag.

97.    During the same two year period from 1993 to 1995 that the actual prices dropped, Abbott twice reported higher prices to the Price Publications for 5% Dextrose 500 ml. The AWP – based on Abbott's representations – increased by 5% in 1994 to $9.16 and was increased by an additional 3% in 1995 to $9.43.

98.    Thus, while Abbott's price to the wholesaler dropped by 20% between 1993 and 1995 (from $1.80 to $1.50), Abbott caused its AWP to increase by 8%. By 1995, the spread between the AWP and the resale price of that wholesaler was 628%.

99.    Abbott sold these products directly to Customers at prices comparable to those offered by the wholesaler.

100.    Abbott continued to report increasing prices for 5% Dextrose 500 ml after 1995. By reporting increasingly inflated LPs, Abbott caused the Red Book AWP for 5% Dextrose in Water, 500 ml, NDC # 00074-7922-03 to increase in 1996 to $9.71, in 1997 to $10.20, in 1998 to $10.71, in 1999 to $11.25 and in 2000 to $11.80. Medicaid and Medicare used these reported prices to set their reimbursement levels. At the same time, Abbott regularly sold the product to its Customers for $1.50 or less per bag of the water-based solution.

Civil Action No. 01-12257-PBS/Civil Action No. 06-11337-PBS

101.    Abbott's reporting of increasingly false and fraudulent prices for its 5% Dextrose 500ml reflects the manner in which Abbott implemented its scheme for all of the LVPs during the relevant time period.  Abbott engaged in identical conduct with respect to the "prices" and marketing of the other LVP products and package sizes identified by NDC and HCPCS code in ¶¶ 30, 34 of this Complaint.

102.    Abbott used the false and fraudulent prices Abbott reported to the Price Publications for these water solutions to manipulate reimbursement; the reported prices did not reflect the actual prices Abbott was charging to its Customers.

103.    Due to Abbott's conduct, Abbott's Customers submitted inflated claims to Medicare and Medicaid and received millions of dollars in inflated reimbursement for these water and water-based solutions.  Abbott profited off the scheme by increasing its sales volume and profits.  Medicare and Medicaid have paid Abbott's Customers in excess of $100 million for Abbott's LVPs when the typical acquisition costs for those Customers were a fraction of that amount.

**C.    Acyclovir Sodium**

104.    Acyclovir Sodium (Acyclovir) is an antiviral drug used to treat several infections. The brand version, called Zovirax, was originally manufactured by Glaxo Welcome, Inc.  Abbott began selling its generic version of the drug on April 22, 1997.

105.    At the time Abbott launched its versions of Acyclovir in 1997, it reported a LP of $80.00 for the 500MG Dose of its generic version of Acyclovir (NDC#00074-4427-01).  The

27

Civil Action No. 01-12257-PBS/Civil Action No. 06-11337-PBS

1997 Blue Book AWP for Abbott's Acyclovir Sodium 500MG was $95.00 (reflecting the

standard price publication mark up on Abbott products of 18.75%).

106.    By 1999, Abbott had raised its reported LP for its Acyclovir Sodium 500MG to

$88.20; the AWP for that dose of Abbott's Acyclovir Sodium had risen to $104.74.

107.    Yet, competition among manufacturers of Acyclovir drove the contract prices for

the drug down sharply.  In 1997, Abbott's Acyclovir Sodium 500MG could be purchased for

$30.00.  By 2000, the typical purchase price for Abbott's Acyclovir Sodium 500MG had eroded

to around $11.

108.    Thus, the spread on Abbott's Acyclovir went from as much as 316% at product

launch in 1997 to as much as 960% by 2000.

109.    Abbott actively marketed the reimbursement spread on Acyclovir to Customers,

including Ven-A-Care, the relator in this matter.  Ven-A-Care operated a home infusion

pharmacy that largely serviced HIV/AIDS patients.  On or around May 30, 1997, an Abbott

national account manager directly marketed the spread on its Acyclovir Sodium to Ven-A-Care.

That national account manager sent documents reflecting the spread on Abbott's Acyclovir and

had conversations with Ven-A-Care where he explicitly marketed the spreads on Abbott's

Acyclovir products.

110.    On April 30, 2001, Abbott reported new LPs and WACs for its Acyclovir

products.  As noted above, the price reporting compendia changed the method it used to calculate

Abbott's AWP.  First Databank began using Abbott's WAC and applying a 25% markup.  The

LP for Abbott's Acyclovir Sodium 500MG dropped from $88.20 to $4.00; the WAC dropped to

Civil Action No. 01-12257-PBS/Civil Action No. 06-11337-PBS

$3.81.  The per unit AWP – based on a 25% markup from the $3.81 WAC – for Abbott's

Acyclovir Sodium 500MG dropped from $104.74 to $4.76.  The revised LP, WAC and AWP

was in keeping with the actual contract price for Abbott's Acyclovir Sodium 500MG, which by

mid-2001 was around $4.00 a unit.

**D.**   **Abbott's Home Infusion Pharmacies, Home Infusion Partnerships and Consignment Arrangements.**

    **1.**   **Home Infusion Pharmacies**

    111.   From approximately 1982 until, upon information and belief, 2003, Abbott owned

and operated its own Home Infusion Pharmacies ("Abbott HI Pharmacies") as part of its Hospital

Products Division's ("HPD"), Alternate Site Home Infusion Department.

    112.   Abbott's HI Pharmacies were located at various times in Atlanta, Georgia,

Chicago, Illinois, Los Angeles, California, and in New Jersey.  At some point in that period, the

Abbott HI Pharmacy in Atlanta Georgia closed.

    113.   Abbott billed Medicare and Medicaid for products and services dispensed by the

Abbott HI Pharmacies using Abbott's EIN number and Abbott's own Medicare and Medicaid

provider codes.

    114.   Abbott HI Pharmacies stocked and dispensed Abbott products, including, without

limitation, products identified in this Amended Complaint in ¶ 30, as well as other products

produced and sold by Abbott and other manufacturers.  Upon information and belief, Abbott

stocked its own products at or near the manufacturing costs for those products.  Upon

information and belief, Abbott was able to acquire other manufacturers' drugs at reduced,

contracted prices.

Civil Action No. 01-12257-PBS/Civil Action No. 06-11337-PBS

115. The Abbott HI Pharmacies billed Medicare and Medicaid through the "Abbott Reimbursement Department" in Abbott's HPD Alternate Site Home Infusion Department.

116. Each of the Abbott HI Pharmacies would operate as follows:

A. The Abbott HI Pharmacies would receive patient prescriptions from physicians, hospitals, outpatient clinics or other care providers.

B. Abbott's Reimbursement Department would ascertain whether the referred patient was eligible for reimbursement for his or her prescription costs through Medicare, Medicaid or a third party insurer.

C. Upon receipt of the prescriptions, the Abbott HI Pharmacies would fill the prescription and would, upon information and belief, at times provide pharmacist services.

D. After the prescriptions were filled by an Abbott HI Pharmacy, the Abbott Reimbursement Department would bill either Medicare, Medicaid or a third-party insurer for the dispensed drug or product, depending upon patient eligibility.

E. For those patients covered under Medicare or Medicaid, a reimbursement clerk in the Abbott Reimbursement Department would complete a paper or, at a later point, an electronic, Medicare HCFA 1500 form seeking reimbursement from Medicare or a Medicaid reimbursement form.

117. The HCFA 1500 forms or Medicaid reimbursement forms submitted by the Abbott Reimbursement Department would reflect Abbott's EIN number and provider number as the entity to be reimbursed.

30

Civil Action No. 01-12257-PBS/Civil Action No. 06-11337-PBS

118.   Depending upon the drug and the state program, Medicaid would typically pay to Abbott the AWP or WAC-based reimbursement for drug or product for which Abbott's HI Pharmacy billed.   Medicare would typically pay to Abbott the AWP-based reimbursement for drug or product for which Abbott's HI Pharmacy billed.  Abbott would retain for itself as a profit the difference between the cost of the drug or product to Abbott and the amount of the AWP-based reimbursement ("Abbott HI Pharmacy spread").

119.   Upon information and belief, Abbott did not disclose the Abbott HI Pharmacy spreads to the Medicare or Medicaid programs when it submitted reimbursement forms.

120.   The amounts Abbott HI Pharmacies were reimbursed by Medicare and Medicaid regularly exceeded the cost to Abbott in stocking and dispensing the drugs and products dispensed by the Abbott HI Pharmacies – including its own.

121.   In the case of the Abbott Drugs identified in this Complaint, Abbott's HI Pharmacies were reimbursed inflated amounts for any claims they submitted for those Drugs due to Abbott's fraudulent price reporting scheme.

**2.      Abbott's Home Infusion Partnerships and Consignment Arrangements**

122.   From approximately 1984 until, upon information and belief, 2003, Abbott HPD's Alternate Site Home Infusion Department entered into home infusion partnerships ("HI Partnerships") with various hospitals, care facilities and other medical entities.  These HI Partnerships permitted Abbott's home infusion partners ("HI Partners") or – in some instances Abbott – to bill government health programs on behalf of its HI Partners for the Drugs identified in ¶ 30 at inflated reimbursement levels.

31

Civil Action No. 01-12257-PBS/Civil Action No. 06-11337-PBS

123.    Abbott had at least 20 to 25 home infusion partners ("HI Partners") in these

partnerships including, but not limited to:[3] University of Michigan's HomeMed, Children's

Memorial Hospital of Chicago, Care Partners, Baylor, Harris Methodist, UniHealth,

Intermountain, Cedars Sinai, University of Virginia, Seattle Children's Hospital, Cleveland

Clinic, and University Hospitals of Cleveland.

124.    Abbott entered into standard partnership agreements with the HI Partners and

others.  Under the terms of the partnership agreements, Abbott would:

A.    Provide its HI Partners Abbott drugs and products free of charge on a

consignment basis, including but not limited to, the Drugs identified in ¶ 30 of this

Complaint;

B.    Provide its HI Partners agreed upon services, including, on occasion,

"reimbursement services;" and

C.    Add the HI Partner to a group purchasing organization of which Abbott

was a member, so that the HI Partner, or Abbott on behalf of the HI Partner, could

purchase drugs and products that Abbott did not manufacture or sell ("Other Non-Abbott

products") at a substantially reduced contract rate.

125.    The HI Partner would dispense the drugs or products from its pharmacy.  If the

drug or product was an Abbott product, that product would be a consigned product that the HI

---

[3] These HI partners are described herein as identified by an Abbott witness.  For some of
these HI partners, the witness did not provide full and complete name information.

Civil Action No. 01-12257-PBS/Civil Action No. 06-11337-PBS

Partner would not pay for on an individual basis, or at any time prior to when the HI Partner

billed Medicare or Medicaid.

126.    As part of its "reimbursement" services for some HI Partners, Abbott's

Reimbursement Department would submit claims to Medicare, Medicaid and other third party

payors for drugs, medical devices and medical services on the HI Partner's behalf, using the HI

Partner's EIN number and Medicare and Medicaid provider codes.

127.    For patients covered under Medicare or Medicaid, an Abbott reimbursement clerk

in the Reimbursement Department would complete a paper or, at a later point, electronic,

Medicare HCFA 1500 form seeking reimbursement from Medicare, or the appropriate Medicaid

reimbursement form seeking reimbursement from a State Medicaid program on behalf of the HI

Partner.

128.    Abbott provided reimbursement services to, among others, Care Partners,

University of Michigan, Children's Hospital and the University of Virginia.

129.    If Abbott was providing reimbursement services to an HI Partner, Abbott's

Reimbursement Department would collect reimbursements from Medicare, Medicaid and other

third party payors for claims submitted on behalf of that HI Partner. Those reimbursement

amounts were collected in lock box bank accounts that, upon information and belief, were

maintained in the name of the HI Partner or Abbott.

130.    Upon information and belief, Abbott would never bill the HI Partners for the

drugs and products it consigned to them, and would never expect payment for them. Abbott's

payment for the consigned Abbott drugs would be some percentage of the HI Partner's entire pool

Civil Action No. 01-12257-PBS/Civil Action No. 06-11337-PBS

of collections from Medicare, Medicaid and third party payors, regardless of whether it was

Abbott or the HI Partner that submitted the claim.

131.    Under the Consignment Partnership Agreements, the HI Partners would never pay

Abbott individual amounts for the drugs or products consigned to the HI Partner.  The Medicare

and Medicaid drug reimbursements were used by Abbott to compensate it for billing and

consulting services not related to the provision of patient care.

132.    For example, a December 1996 Consignment Partnership Agreement, required a

HI Partner to pay Abbott 45.1 % of its gross revenue collections for all of its IVIG treatment,

including any administration fee and/or any drug ingredient cost.  Thus, Abbott would receive a

percentage of any inflated reimbursement spreads for the Drugs identified in ¶ 30 of this

Complaint that were provided to its HI Partners on consignment.

133.    Abbott never disclosed to the Medicare or Medicaid programs that it was directly

profiting from the reimbursement spreads in the above-described arrangement with the HI

Partners.

134.    If an HI Partner would not contract for reimbursement services, the HI Partner

would submit the claims to Medicare and Medicaid and directly collect the reimbursements.

However, Abbott would still consign its drugs and products to the HI Partner and still share in a

percentage of the total collections collected by the HI Partner.

135.    Several state Medicaid programs would reimburse for Abbott drugs covered by

this arrangement at amounts tied to the AWPs or WACs for those drugs.  Medicare also

reimbursed for Abbott drugs covered by these arrangements at amounts tied to the AWPs for the

34

Civil Action No. 01-12257-PBS/Civil Action No. 06-11337-PBS

Abbott drugs. That amount would then be paid to the HI Partner, who in turn would provide a

percentage share to Abbott of its entire collections as payment for various types of categories of

services.

136. The cost to Abbott in stocking the HI Partner's warehouses with Abbott and non-

Abbott drugs and products was far less than the amounts reimbursed by Medicare and Medicaid

for those drugs and products.

137. Abbott did not disclose to the Medicare and Medicaid programs that the drugs and

products it sought reimbursement for from Medicare or Medicaid actually cost Abbott far less to

consign to the HI Partner than the ultimate Medicare or Medicaid reimbursement amount.

138. In the case of the Abbott Drugs identified in this Complaint, Abbott's percentage

of HI Partner reimbursements Abbott that collected was improperly inflated due to Abbott's

fraudulent price reporting scheme.

### FIRST CAUSE OF ACTION

(False Claims Act: Presentation of False Claims)
(31 U.S.C. § 3729(a)(1))

139. Plaintiff repeats and realleges ¶¶ 1 through 138 as if fully set forth herein.

140. Abbott knowingly caused or caused to be presented false or fraudulent claims for

payment or approval to the United States for the Drugs for reimbursement that were substantially

higher than providers' actual acquisition costs for the Drugs and based on reported prices that

were fraudulently and artificially manipulated by Abbott. Abbott knowingly used the spread as

an unlawful inducement in violation of the federal anti-kickback statute, causing resulting false

and fraudulent claims to be submitted.

35

Civil Action No. 01-12257-PBS/Civil Action No. 06-11337-PBS

141.    By virtue of the false or fraudulent claims that Abbott caused to be made, the

United States has suffered damages and therefore is entitled to multiple damages under the False

Claims Act, to be determined at trial, plus civil penalties of not less than $5,000 and up to

$10,000 for each violation occurring before September 29, 1999, and not less than $5,500 and up

to $11,000 for each violation occurring on or after September 29, 1999.

### SECOND CAUSE OF ACTION

(False Claims Act:  Making or Using False
Records or Statements to Cause Claims to be Paid)
(31 U.S.C. § 3729(a)(2))

142.    Plaintiff repeats and realleges  ¶¶ 1 through 138 as if fully set forth herein.

143.    Abbott knowingly made, used, or caused to be made or used, false records or

statements – *i.e.*, the false certifications and representations made or caused to be made by

defendants to state Medicaid programs when seeking to ensure that the Medicaid programs

would reimburse for the Drugs, and the false representations to the Publishers upon which

Medicare and Medicaid relied – to cause false or fraudulent claims paid or approved by the

United States.

144.    By virtue of the false records or false statements made by Abbott, the United

States suffered damages and therefore is entitled to treble damages under the False Claims Act,

to be determined at trial, plus civil penalties of not less than $5,000 and up to $10,000 for each

violation occurring before September 29, 1999, and not less than $5,500 and up to $11,000 for

each violation occurring on or after September 29, 1999.

36

Civil Action No. 01-12257-PBS/Civil Action No. 06-11337-PBS

## THIRD CAUSE OF ACTION

### (Unjust Enrichment)

145.    Plaintiff repeats and realleges ¶¶ 1 through 138 as if fully set forth herein.

146.    This is a claim for the recovery of monies by which Abbott has been unjustly
enriched, including (1) profits earned by Abbott through its HI Pharmacies and Consignment
Partnership Agreements and (2) profits from increased sales resulting from the illegal
inducements that Abbott arranged to be paid to its Customers.

147.    By obtaining monies as a result of its violations of federal and state law, Abbott
was unjustly enriched, and is liable to account for and pay such amounts, which are to be
determined at trial, to the United States.

148.    By this claim, the United States requests a full accounting of all revenues (and
interest thereon) and costs incurred by Abbott on sales to Customers to whom it arranged for
unlawful inducements, and disgorgement of all profits earned and/or imposition of a constructive
trust in favor of the United States on those profits.

## FOURTH CAUSE OF ACTION

### (Common Law Fraud)

149.    Plaintiff repeats and realleges ¶¶ 1 through 138 as if fully set forth herein.

150.    Abbott made material and false representations concerning the prices of the Drugs
with knowledge of their falsity or reckless disregard for the truth, with the intention that the
United States act upon the misrepresentations to its detriment.  The United States acted in
justifiable reliance upon Abbott's misrepresentations by making payments on the false claims.

37

Civil Action No. 01-12257-PBS/Civil Action No. 06-11337-PBS

151.     Had the true facts of Abbott's false price reporting as set forth in this Complaint been known to the United States, the United States would not have paid for Abbott products.

152.     By reason of these payments, the United States has been damaged in an as yet undetermined amount.

## PRAYER FOR RELIEF

WHEREFORE, the United States demands and prays that judgment be entered in its favor against Abbott, jointly and severally, as follows:

1.     On the First and Second Causes of Action, for the amount of the United States' damages, trebled as required by law, and such civil penalties as are required by law, together with all such further relief as may be just and proper.

2.     On the Third Cause of Action, for the damages sustained and/or amounts by which Abbott was unjustly enriched, including an accounting of all revenues unlawfully obtained by Abbott, the imposition of a constructive trust upon such revenues, and the disgorgement of the illegal profits obtained by Abbott, plus interest, costs, and expenses, and all such further relief as may be just and proper.

3.     On the Fourth Cause of Action, for compensatory and punitive damages in an amount to be determined, together with costs and interest, and for all such further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

The United States demands a jury trial in this case.

38

Civil Action No. 01-12257-PBS/Civil Action No. 06-11337-PBS

For the United States of America,

MICHAEL J. SULLIVAN
UNITED STATES ATTORNEY

George B. Henderson, II
Assistant U.S. Attorney
John Joseph Moakley
U.S. Courthouse
Suite 9200, 1 Courthouse Way
Boston, MA 02210
Phone: (617) 748-3272
Fax: (617) 748-3971

R. ALEXANDER ACOSTA
UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF
FLORIDA

/s/ Mark A. Lavine
Mark A. Lavine
Ana Maria Martinez
Ann St.Peter-Griffith
Special Attorneys for the Attorney
General
99 N.E. 4th Street, 3rd Floor
Miami, FL 33132
Phone: (305) 961-9003
Fax: (305) 536-4101

PETER D. KEISLER
ASSISTANT ATTORNEY GENERAL

/s/ Gejaa T. Gobena
Joyce R. Branda
Daniel R. Anderson
Renée Brooker
Justin Draycott
Rebecca A. Ford
Gejaa T. Gobena
Civil Division
Commercial Litigation Branch
P. O. Box 261
Ben Franklin Station
Washington, D.C. 20044
Phone: (202) 307-1088
Fax: (202) 307-3852

Dated: June 4, 2007

39

**CERTIFICATE OF SERVICE**

   I hereby certify that I have this day caused an electronic copy of the above **UNITED STATES' FIRST AMENDED COMPLAINT** to be served on all counsel of record via electronic service pursuant to Paragraph 11 of Case Management Order No. 2 by sending a copy to LexisNexis File & Serve for posting and notification to all parties.

             /s/ Mark A. Lavine

Dated: June 4, 2007       Mark A. Lavine

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

In re: PHARMACEUTICAL INDUSTRY          )
AVERAGE WHOLESALE PRICE                  )
LITIGATION                                        )
                                                       )   MDL No. 1456
_____    )   Master File No. 01-12257-PBS
                                                       )   Subcategory Case No. 06-11337 -PBS
THIS DOCUMENT RELATES TO:          )
                                                       )
*United States of America ex rel. Ven-a-Care of*  )
*the Florida Keys, Inc. v. Abbott Laboratories,*   )   Hon. Patti B. Saris
*Inc.*, Civil Action No. 06-11337-PBS      )
                                                       )   Magistrate Judge Marianne B. Bowler
                                                       )

## STIPULATION FOR VOLUNTARY DISMISSAL

Pursuant to Rule 41(a) of the Federal Rules of Civil Procedure and the *qui tam* provisions

of the False Claims Act, 31 U.S.C. § 3730(b)(1), and in accordance with the terms of the

November ___, 2010, Settlement Agreement between the United States, Relator Ven-A-Care of

the Florida Keys, Inc. ("Relator"), and Abbott Laboratories Inc. and Abbott Laboratories

("Abbott") (collectively, the "Parties"), the Parties hereby stipulate, through their undersigned

counsel, to the entry of an order dismissing with prejudice the United States' First Amended

Complaint filed against Abbott in *In re: Pharmaceutical Industry Average Wholesale Price*

*Litigation*, MDL-No. 1456, C.A. No. 01-12257-PBS (D. Mass.) (relating to *United States ex rel.*

*Ven-A-Care of the Florida Keys, Inc. v. Abbott Laboratories, Inc.*, Civil Action No. 06-11337-

PBS.  The dismissed claims, which were previously assigned No. 06-21303-CV-GOLD (S.D.

Fla.), were transferred to this MDL for pre-trial proceedings pursuant to MDL 1456 Conditional

Transfer Order-30 (July 11, 2006).

EXHIBIT B

This stipulation has no effect on claims or allegations against any defendants other than Abbott in *In re: Pharmaceutical Industry Average Wholesale Price Litigation*, MDL-No. 1456, C.A. No. 01-12257-PBS (D. Mass.).

Each party shall bear its own costs and attorneys' fees.

WHEREFORE, to permit them to effectuate the terms of their Settlement Agreement, pursuant to Rule 41(a) of the Federal Rules of Civil Procedure and the *qui tam* provisions of the federal False Claims Act, 31 U.S.C. § 3730(b)(1), the Parties respectfully request that the Court enter an order in the form attached hereto as Exhibit 1.

Respectfully Submitted,

For the United States of America,

CARMEN M. ORTIZ                          TONY WEST
UNITED STATES ATTORNEY                    ASSISTANT ATTORNEY GENERAL


George B. Henderson, II                        /s
Assistant U.S. Attorney                   Joyce R. Branda
John Joseph Moakley U.S. Courthouse       Daniel R. Anderson
Suite 9200, 1 Courthouse Way              Renée Brooker
Boston, MA 02210                          Justin Draycott
Phone: (617) 748-3272                     Rebecca Ford
Fax: (617) 748-3971                       Civil Division
                                          Commercial Litigation Branch
WIFREDO A. FERRER                         P. O. Box 261
UNITED STATES ATTORNEY                     Ben Franklin Station
SOUTHERN DISTRICT OF FLORIDA              Washington, D.C. 20044
                                          Phone: (202) 307-1088
                                          Fax: (202) 307-3852
    /s
Mark A. Lavine
Special Attorney for the Attorney General
99 N.E. 4th Street, 3rd Floor
Miami, FL  33132
Phone:  (305) 961-9003
Fax: (305) 536-4101


For the Defendant Abbott Laboratories, Inc.   For the relator, Ven-A-Care of the Florida
                                              Keys, Inc.

    /s
James Daly
Jones Day                                         /s
77 West Wacker                            James J. Breen
Chicago, IL 60601-1692                    The Breen Law Firm, P.A.
                                          3350 S.W. 148th Avenue, Suite 110
                                          Miramar, FL 33027
                                          Tel: (954) 874-1635
                                          Fax: (954) 874-1705

3

## CERTIFICATE OF SERVICE

I hereby certify that I have this day caused an electronic copy of the above **"STIPULATION FOR VOLUNTARY DISMISSAL"** to be served on all counsel of record via electronic service pursuant to Paragraph 11 of Case Management Order No. 2 by sending a copy to LexisNexis File & Serve for posting and notification to all parties.

_____

November _____, 2010

4

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In re: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) | |
| ──────────────────────── | ) | |
| | ) | |
| THIS DOCUMENT RELATES TO: | ) ) | MDL No. 1456 Master File No. 01-12257-PBS |
| *United States of America ex rel. Ven-a-Care of the Florida Keys, Inc. v. Abbott Laboratories, Inc.*, Civil Action No. 06-11337-PBS | ) ) ) ) | Subcategory Case No. 06-11337 -PBS |
| | ) ) | Hon. Patti B. Saris |
| | ) ) | Magistrate Judge Marianne B. Bowler |

### ORDER OF DISMISSAL

Pursuant to Rule 41(a) of the Federal Rules of Civil Procedure and the *qui tam* provisions of the federal False Claims Act, 31 U.S.C. § 3730(b)(1), the United States, Relator Ven-A-Care of the Florida Keys, Inc., and Abbott Laboratories Inc. and Abbott Laboratories ("Abbott") (collectively, the "Parties") filed with this Court a Stipulation of Voluntary Dismissal in the above-captioned case. Upon due consideration of the Stipulation of Voluntary Dismissal,

**IT IS ORDERED** that:

1.     Consistent with the terms of the November__, 2010, Settlement Agreement executed by the United States, Abbott, and Relator (a copy of which is attached as Exhibit A), all civil monetary claims asserted on behalf of the United States in *United States ex rel. Ven-A-Care of the Florida Keys, Inc. v. Abbott Laboratories, Inc.*, 06-21303-CV-GOLD (S.D. Fla.)

EXHIBIT 1

(previously captioned *United States ex rel. Ven-A-Care of the Florida Keys, Inc. v. Abbott Laboratories, Inc.*, 06-CV-11337-PBS (D. Mass.)), shall be dismissed with prejudice.

      2.     Each party shall bear its own costs and attorneys' fees.

      3.     The Court shall retain jurisdiction to enforce the terms, conditions, and releases of the Parties' Settlement Agreement to the extent reasonably necessary and appropriate.

      IT IS SO ORDERED THIS __ day of _____, 2010.

_____
THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT COURT JUDGE

cc: Counsel of Record

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| IN RE: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) | MDL NO. 1456 |
| | ) ) | CIVIL ACTION:  01-CV-12257-PBS Subcategory Docket:  06-CV-11337-PBS |
| THIS DOCUMENT RELATES TO | ) ) ) | Judge Patti B. Saris |
| *U.S. ex rel. Ven-A-Care of the Florida Keys, Inc. v. Abbott Laboratories, Inc.*, No. 07-CV-11618-PBS | ) ) ) ) | Magistrate Judge Marianne B. Bowler |

## UNITED STATES' CONSENT TO RELATOR AND DEFENDANT'S STIPULATION FOR VOLUNTARY DISMISSAL WITH PREJUDICE

Relator Ven-A-Care of the Florida Keys, Inc. (the "Relator") and Abbott Laboratories Inc., have agreed to settle and dismiss the above-captioned action.

Pursuant to 31 U.S.C. § 3730(b)(1), the United States consents to (i) the settlement between Relator and Abbott Laboratories Inc.; and (ii) the dismissal with prejudice of the above-captioned action.  The United States has determined that the amount it will receive in connection with the settlement in the above-captioned case is fair, adequate, and reasonable.

**EXHIBIT C**

Respectfully submitted,

**FOR THE UNITED STATES OF AMERICA,**

CARMEN M. ORTIZ                                 TONY WEST
UNITED STATES ATTORNEY                          ASSISTANT ATTORNEY GENERAL
George B. Henderson, II
Assistant U.S. Attorney
John Joseph Moakley U.S. Courthouse             _____
Suite 9200, 1 Courthouse Way                    Joyce R. Branda
Boston, MA 02210                                Daniel R. Anderson
Phone: (617) 748-3272                           Renée Brooker
Fax: (617) 748-3971                             Justin Draycott
                                                Rebecca Ford
                                                Civil Division
WIFREDO A. FERRER                               Commercial Litigation Branch
UNITED STATES ATTORNEY                          P. O. Box 261
SOUTHERN DISTRICT OF FLORIDA                    Ben Franklin Station
                                                Washington, D.C. 20044
                                                Phone: (202) 307-1088
_____                     Fax: (202) 616-3085
Mark A. Lavine
Special Attorney for the Attorney General
99 N.E. 4th Street, 3rd Floor
Miami, FL 33132
Fax: (305) 536-4101
Phone: (305) 961-9003

Dated: November__, 2010

2

## CERTIFICATE OF SERVICE

        I hereby certify that I have this day caused an electronic copy of the above **"UNITED STATES' CONSENT TO RELATOR AND DEFENDANT'S STIPULATION FOR VOLUNTARY DISMISSAL WITH PREJUDICE"** to be served on all counsel of record via electronic service pursuant to Paragraph 11 of Case Management Order No. 2 by sending a copy to LexisNexis File & Serve for posting and notification to all parties.

_____

November _____, 2010

3