# EXHIBIT 2

SETTLEMENT AGREEMENT AND RELEASE

I.  PARTIES

This Settlement Agreement and Release (the "Relator-Abbott Settlement Agreement") is entered into among:  Ven-A-Care of the Florida Keys, Inc., for its own behalf, and with respect to such *qui tam* claims as the Relator has pled on behalf of the United States of America (in any of the foregoing capacities, the "Relator") and Abbott Laboratories Inc. and Abbott Laboratories ("Abbott").  Collectively, Relator and Abbott are referred to herein as the "Parties."

II.  PREAMBLE

As a preamble to this Agreement, the Parties agree to the following:

A.     At all relevant times, Abbott Laboratories Inc. has been a corporation organized under the laws of Delaware with its principal offices in Abbott Park, Illinois.  At all relevant times, Abbott Laboratories has been a corporation organized under the laws of Illinois with its principal offices in Abbott Park, Illinois.

B.     Ven-A-Care of the Florida Keys, Inc. is a corporation with its principal place of business in Key West, Florida.  Zachary T. Bentley, T. Mark Jones, John M. Lockwood, and Luis E. Cobo are or were officers of Ven-A-Care of the Florida Keys, Inc.  As used herein, the term "Relator" refers to Ven-A-Care of the Florida Keys, Inc. and its current and former officers, directors, shareholders, employees, attorneys, contractors, agents, assigns, subsidiaries, and affiliates.

C.     On or about June 23, 1995, Relator filed a *qui tam* action in the United States District Court for the Southern District of Florida captioned *United States ex rel. Ven-A-Care of the Florida Keys, Inc. v. Abbott Laboratories, et al.*, Civil Action No. 95-1354 (S. D. Fla.) (the "Florida Civil Action"), relating to, among other manufacturers and products, pharmaceutical

products manufactured by Abbott's former Hospital Products Division ("HPD").  On or about

August 12, 1997, on or about December 9, 1999, and on or about December 11, 2002, Relator

filed amended complaints in the Florida Civil Action under seal which included allegations

related to pharmaceutical products manufactured by Abbott's HPD.  Collectively, the complaints

filed on or about June 23, 1995, August 12, 1997, December 9, 1999, and December 11, 2002 by

the Relator in the Florida Civil Action are referred to herein as the "Relator's Florida Civil

Action Complaints."

       D.     On or about March 17, 2006, the United States intervened with respect to certain

allegations made against Abbott in the Florida Civil Action.  The intervened claims against

Abbott were severed and assigned a new case number, 06-21303-CV-GOLD (S.D. Fla.) (the

"Florida Abbott HPD Case").  Upon intervention, the United States filed an amended complaint.

On or about March 17, 2006, Relator sought leave to amend its complaint against Abbott in order

to adopt the United States' complaint-in-intervention.  Ven-A-Care's motion was granted on

May 16, 2006.  On or about July 28, 2006, the Florida Abbott HPD Case was transferred by the

Judicial Panel for Multi District Litigation ("MDL") to the District of Massachusetts, where it

became part of MDL 1456 and was assigned case number 06-CV-11337-PBS (D. Mass.).  On

November 7, 2007, the United States sought leave to file an amended and superseding complaint

against Abbott (the "First Amended Complaint").  On March 13, 2008, the United States' motion

was granted in part and denied in part.

       E.     On or about April 10, 2000, Relator filed a separate *qui tam* action in the United

States District Court for the District of Massachusetts, Civil Action No. 00-10698-MLW (the

"Massachusetts Civil Action").  On or about February 15, 2001, Relator amended its complaint

to assert claims against Abbott relating to certain pharmaceutical products manufactured by

Abbott's Pharmaceutical Products Division ("PPD"), captioned *United States ex rel. Ven-A-Care v. Abbott Laboratories, et al.*, Civil Action No. 00-10698-MEL (D. Mass.). The United States declined to intervene in the claims made against Abbott in the Massachusetts Civil Action. On or around August 30, 2007, the claims against Abbott in the Massachusetts Civil Action were severed, the severed action against Abbott was assigned Civil Action No. 07-CV-11618-PBS (the "Massachusetts Abbott PPD Case"), and Relator filed a severed amended complaint ("Relator's Severed Complaint"). The severed claims in Civil Action No. 07-CV-11618-PBS were transferred to MDL 1456.

       F.     The United States' First Amended Complaint, the Relator's Florida Civil Action Complaints, and Relator's Severed Complaint contend that Abbott submitted, or caused to be submitted, false claims to the Medicare Program, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395-1395hhh ("Medicare"), and the Medicaid Program, 42 U.S.C. §§ 1396-1396v ("Medicaid").

       G.     The United States' First Amended Complaint in the Florida Abbott HDP Case contends that, from January 1, 1991 to December 31, 2001, Abbott set, reported, and maintained, or caused to be set, reported, and maintained, false and inflated List Prices, Direct Prices, Average Wholesale Prices ("AWPs"), and Wholesale Acquisition Costs ("WACs") for certain drugs identified in paragraphs 30 and 34 of the United States' First Amended Complaint. The Relator's Severed Complaint in the Massachusetts Abbott PPD Case contends that, from January 1, 1995 to the date of this Agreement, Abbott set, reported, and maintained, or caused to be set, reported, and maintained, false and inflated List Prices, Direct Prices, AWPs, and WACs for certain drugs identified in paragraph 33 of the Relator's Severed Complaint. For purposes of this Relator-Abbott Settlement Agreement, the drugs identified in paragraphs 30 and 34 of the United

States' First Amended Complaint, the Abbott drugs identified in any of the Relator's Florida Civil Action Complaints, and the drugs identified in paragraph 33 of the Relator's Severed Complaint are collectively referred to as the "Covered Drugs" and the List Prices, Direct Prices, AWPs, and WACs reported for the Covered Drugs are collectively referred to as the "Reported Prices." The United States' First Amended Complaint, the Relator's Florida Civil Action Complaints, and the Relator's Severed Complaint further contend that the Reported Prices caused the Medicare and Medicaid programs to overpay for the Covered Drugs. The United States' First Amended Complaint, the Relator's Florida Civil Action Complaints, and the Relator's Severed Complaint further contend that Abbott used the difference between the Reported Prices and the prices at which the Covered Drugs were widely and commonly available in marketing, promoting, and selling the Covered Drugs to existing and potential customers. For purposes of this Relator-Abbott Settlement Agreement, these and all other allegations contained in the United States' First Amended Complaint, the Relator's Florida Civil Action Complaints, and the Relator's Severed Complaint are referred to herein as the "Covered Conduct."

      H.     The United States, Relator, and Abbott have agreed to settle the claims asserted in the United States' First Amended Complaint (Florida Abbott HPD Case) and the Relator's Severed Complaint (Massachusetts Abbott PPD Case) consistent with the terms of the Settlement Agreement between the United States, Relator, and Abbott (the "United States Settlement Agreement"), a copy of which is attached hereto as Exhibit A, and this Relator-Abbott Settlement Agreement. This Relator-Abbott Settlement Agreement is conditioned upon the consummation and performance of the United States Settlement Agreement and on the United States providing the United States' Consent to Relator and Defendant's Stipulation for Voluntary Dismissal with Prejudice in the form attached hereto as Exhibit B.

I.      This Agreement is neither an admission of facts or liability by Abbott nor a concession by the Relator that its claims are not well-founded.  Abbott denies the contentions of the Relator in the United States' First Amended Complaint, the Relator's Florida Civil Action Complaints, and the Relator's Severed Complaint, and further denies any liability or wrongdoing related to those contentions.  The Relator will not urge or seek to admit or use this Relator-Abbott Settlement Agreement, or the substance of this Agreement, as evidence of any fault or liability of Abbott or its predecessors, current and former subsidiaries, affiliates, successor and assigns, and current and former directors, officers and employees in any investigation, administrative proceeding, or federal or state court or arbitration proceeding.

J.      Abbott denies that any of the Settlement Amount in the United States Settlement Agreement is being paid for fines, penalties, treble damages, or punitive damages.

K.      The Relator claims entitlement under 31 U.S.C. § 3730(d) to a share of the Settlement Amount to be paid pursuant to the United States Settlement Agreement.  Such amount shall be determined by separate agreement between the United States and the Relator or order of the Court, and shall not be the responsibility of Abbott.

L.      To avoid the delay, uncertainty, inconvenience, and expense of protracted litigation and trial of the above claims, the Parties have reached a full and final settlement pursuant to the Terms and Conditions below.

III.  <u>TERMS AND CONDITIONS</u>

NOW, THEREFORE, in reliance on the representations contained herein and in consideration of the mutual promises, covenants, and obligations of this Agreement, and for good and valuable consideration, the Parties agree as follows:

1.      Consistent with the terms and conditions of the United States Settlement Agreement, Abbott agrees to pay the United States the sum of one hundred twenty-six million, five-hundred thousand dollars ($126,500,000), plus simple interest accrued thereon at the current one-year treasury yield of .3 % beginning November 1, 2010, and continuing until and including the day before complete payment is made (the "Settlement Amount") in full payment of all claims for restitution, compensatory damages, other damages, interest, penalties, fees and costs, and other requests for relief in the United States' First Amended Complaint (Florida Abbott HPD Case) and the Relator's Severed Complaint (Massachusetts Abbott HPD Case).  The allocation of the Settlement Amount among the Florida Abbott HPD Case and the Massachusetts Abbott PPD Case, and among the United States and Relator and its counsel, is a matter that shall be handled separately by and among the United States, Relator, and Relator's counsel without any involvement by or input from Abbott.  All amounts payable to Relator and its attorneys shall be paid out of the Settlement Amount, as provided in the United States Settlement Agreement.

2.      In consideration of this Relator-Abbott Settlement Agreement, and conditioned upon Abbott's full payment of the Settlement Amount pursuant to the United States Settlement Agreement, Relator releases Abbott, its current and former parents, predecessors, current and former subsidiaries, affiliates, successor and assigns, current and former directors, officers, and employees from any and all claims or allegations, known or unknown, that Relator asserted or could have asserted arising from the Covered Conduct, including any claim concerning the

federal share (FMAP) of any Medicaid overpayments relating to the Covered Conduct.  In addition, in consideration of this Relator-Abbott Settlement Agreement, and conditioned upon Abbott's full payment of the Settlement Amount pursuant to the United States Settlement Agreement, Relator releases Abbott, its current and former parents, predecessors, current and former subsidiaries, affiliates, successor and assigns, current and former directors, officers, and employees from any and all claims or allegations, known or unknown to Relator, that Relator has asserted or could assert concerning the List Prices, Direct Prices, AWPs, WACs, or any other price reported to the national pricing compendia for any drug manufactured, marketed, co-marketed, co-promoted, distributed, or sold under the following Abbott labeler codes: 00074, 00300, 00044, 00048, 00524, 00597, 00703, 00822, 60574, 60598, 63459.  This release includes, to the extent Relator is capable under applicable law and subject to the exception in Paragraph 3, any action that Relator has asserted or could assert concerning the "state share" of any alleged Medicaid overpayment caused by the List Prices, Direct Prices, AWPs, WACs, or any other price reported to the national pricing compendia for any drug manufactured, marketed, co-marketed, co-promoted, distributed, or sold under the following Abbott labeler codes: 00074, 00300, 00044, 00048, 00524, 00597, 00703, 00822, 60574, 60598, 63459.  This release is expressly limited to any acts, omissions, or conduct that occurred prior to the date of the execution of this Agreement.  Notwithstanding anything in this Agreement to the contrary, nothing in this Agreement shall benefit or release any drug manufacturer other than Abbott, Knoll Pharmaceutical Company and Kos Pharmaceuticals, Inc., and nothing herein shall in any way prejudice any action by the Relator against any other drug manufacturer, including, but not limited to, Boehringer Ingelheim Pharmaceuticals, Sicor Pharmaceuticals, Inc., Medimmune, Inc., Cephalon, Inc. and Takeda Pharmaceuticals North America.

3.     Notwithstanding any term of this Agreement, specifically reserved and excluded from the scope and terms of this Agreement as to any entity or person (including Abbott) are: (a) any claims arising from obligations to report prices and/or pay rebates, under the provisions of the Omnibus Budget Reconciliation Act of 1990 and all amendments thereto (the "Medicaid Drug Rebate Program") and (b) any claim currently pending in any state court against Abbott to which the Relator is a party concerning List Prices, Direct Prices, AWPs, WACs, or any other price reported to the national pricing compendia for any drug manufactured, marketed, co-marketed, co-promoted, distributed, or sold under the following Abbott labeler codes: 00074, 00300, 00044, 00048, 00524, 00597, 00703, 00822, 60574, 60598, 63459, that has been made known to counsel for Abbott by counsel for the Relator; provided, however, the Relator releases any claim for its share of the proceeds of any recovery, attorney's fees, expenses, and/or costs arising from any claim currently pending in any state court against Abbott to which the Relator is a party concerning List Prices, Direct Prices, AWPs, WACs, or any other price reported to the national pricing compendia for any drug manufactured, marketed, co-marketed, co-promoted, distributed, or sold under the following Abbott labeler codes: 00074, 00300, 00044, 00048, 00524, 00597, 00703, 00822, 60574, 60598, 63459.  Should the attorney general of any state decline to intervene and proceed with any claim currently pending in any state court against Abbott to which the Relator is a party concerning List Prices, Direct Prices, AWPs, WACs, or any other price reported to the national pricing compendia, the Relator agrees to seek leave to dismiss any pending claim it may have as relator.

4.     Except for any claim pending under the Florida False Claims Act, Fla. Stat. § 68.081 *et seq*., that has been made known to counsel for Abbott by counsel for the Relator, the

Relator represents that there are no other current investigations or actions to which Ven-A-Care is currently a party (including any cases currently pending under seal) based on allegations that Abbott set, reported, and maintained, or caused to be set, reported, and maintained false and inflated List Prices, Direct Prices, AWPs, WACs, and/or other prices reported to the national pricing compendia for any drug manufactured, marketed, co-marketed, co-promoted, distributed, or sold under the following Abbott labeler codes: 00074, 00300, 00044, 00048, 00524, 00597, 00703, 00822, 60574, 60598, 63459.  The Relator further represents that it has otherwise resolved its issues with Abbott, and that it will not commence or proceed with additional actions against Abbott based on any acts, omissions, or conduct relating to allegedly false and inflated List Prices, Direct Prices, AWPs, WACs, or any other price reported to the national pricing compendia that occurred prior to the date of this Agreement.  The Relator further understands that Abbott is relying on the representations made by the Relator in this paragraph and that the Relator may be liable to Abbott for damages in the event that these representations are inaccurate. In this regard, Abbott is aware of the following which shall not cause the Relator's representations to be inaccurate:  the Relator's previously dismissed state *qui tam* claims on behalf of various states in the Massachusetts PPD Action; the Relator's Texas and California state court *qui tam* actions which have been settled as to Abbott; the Relator's prior Illinois state court *qui tam* action which was voluntarily dismissed by the Relator; and the assistance previously provided by the Relator to various states in connection with actions against Abbott to which the Relator is not a party.

5.      Relator represents that it has not assigned to any other person any of the claims released by this Relator-Abbott Settlement Agreement.

6.      Relator and its successors, current and former attorneys, agents, and assigns agree not to object to this Relator-Abbott Settlement Agreement or the United States Settlement Agreement and agree and confirm that they are fair, adequate, and reasonable under all the circumstances, pursuant to 31 U.S.C. §  3730(c)(2)(B).

7.      As part of the consideration for resolving the Florida Abbott HPD Case and the Massachusetts Abbott PPD Case, and conditioned upon Abbott's full payment of the Settlement Amount pursuant to the United States Settlement Agreement, Relator will submit the Declaration of Relator Ven-A-Care of the Florida Keys, Inc. in Support of the Comprehensive Settlement of 'AWP-Type Claims' for the Federal Share of Medicaid Overpayments Against Abbott Laboratories in the form attached hereto as Exhibit C (the "Relator's Declaration").  The Relator's Declaration concerns its investigation of Abbott PPD brand drugs reimbursed by the Medicaid and Medicare programs for the time period 1991 to 2005.  Relator agrees that the Relator's Declaration will be made part of the proposed dismissal order to be signed by the Court for the Massachusetts Abbott PPD Case.

8.      Abbott, on behalf of itself and its affiliates, predecessors, current and former parents, successors, divisions, subsidiaries, directors, and assigns fully and finally releases Relator, together with its current and former officers, directors, shareholders, employees, attorneys, contractors, agents, assigns, subsidiaries and affiliates from any claims (including for attorney's fees, costs, and expenses of every kind and however denominated) that Abbott has asserted, could have asserted, or may assert in the future against Relator related to the Relator's investigation and prosecution of the Florida Civil Action, the Florida Abbott HPD Case, and the Massachusetts Abbott PPD Case, up to the Effective Date of this Agreement.

9.      Within five (5) business days after the Effective Date of this Agreement, the Parties shall file the Stipulation of Voluntary Dismissal With Prejudice together with the proposed Order of Dismissal of the Massachusetts Abbott PPD case in the form attached hereto as Exhibit D.

10.     Each Party shall bear its own legal and other costs incurred in connection with the matters covered by this Relator-Abbott Settlement Agreement, including the preparation and performance of this Relator-Abbott Settlement Agreement.

11.     The Parties each represent that this Relator-Abbott Settlement Agreement is freely and voluntarily entered into without any degree of duress or compulsion whatsoever.

12.     This Agreement is intended to be for the benefit of the Parties only.  The Parties do not release any claims against any other person or entity.

13.     This Relator-Abbott Settlement Agreement is governed by the laws of the United States.  The Parties agree that the exclusive jurisdiction and venue for any dispute arising between or among any or all of the Parties under this Relator-Abbott Settlement Agreement is the United States District Court for the District of Massachusetts.

14.     This Relator-Abbott Settlement Agreement shall constitute the complete agreement between the Parties as to the matters addressed herein.  This Agreement may not be amended except by written consent of all of the Parties.  Notwithstanding the foregoing, contemporaneous within the signing of this Agreement, Relator and Abbott are also parties to the United States Settlement Agreement executed between the United States, Relator, and Abbott which contains additional terms relating to the settlement of the Florida Abbott HPD Case and the Massachusetts Abbott PPD Case.

15.     The individuals signing this Relator-Abbott Settlement Agreement on behalf of Abbott represent and warrant that they are authorized by Abbott to execute this Relator-Abbott Settlement Agreement.  The individuals signing this Relator-Abbott Settlement Agreement on behalf of Relator represent and warrant that they are authorized by Relator to execute this Relator-Abbott Settlement Agreement.  For purposes of construction, this Relator-Abbott Settlement Agreement shall be deemed to have been drafted by all Parties to this Relator-Abbott Settlement Agreement and shall not, therefore, be construed against any Party for that reason in any subsequent dispute.

16.     This Relator-Abbott Settlement Agreement may be executed in counterparts, each of which constitutes an original and all of which constitute one and the same Relator-Abbott Settlement Agreement.

17.     This Relator-Abbott Settlement Agreement is binding on all successors, transferees, and assigns of the Parties.

18.     Abbott and Relator consent to the United States' disclosure of this Relator-Abbott Settlement Agreement, and information about this Relator-Abbott Settlement Agreement, to the public.  Documents produced by Abbott subject to the Protective Order and Case Management Order in the Florida Abbott HPD Case and Massachusetts Abbott PPD Case shall remain subject to those Orders.

19.     If any provision of this Relator-Abbott Settlement Agreement, or the application thereof, shall for any reason or to any extent be construed by a court of competent jurisdiction to be invalid or unenforceable, the remainder of this Relator-Abbott Settlement Agreement, and application of such provision to other circumstances, shall remain in effect and be interpreted so as best reasonably to effect the intent of the Parties.  Notwithstanding the foregoing, if either the

payment or any of the release provisions hereof are found to be unenforceable or invalid by a court of competent jurisdiction, then such invalidity or unenforceability shall be cause for voiding the entire Relator-Abbott Settlement Agreement at the election of the Party the interests of which are injured by the finding of invalidity or unenforceability, in which event all claims and actions dismissed shall be reinstated with all statutes of limitations deemed tolled from the Effective Date of this Relator-Abbott Settlement Agreement.

20.     This Relator-Abbott Settlement Agreement is effective on the date of signature of the last signatory to the Relator-Abbott Settlement Agreement (the "Effective Date of this Relator-Abbott Settlement Agreement").  Facsimiles of signatures, and/or electronic signatures in portable document format (.pdf), shall constitute acceptable, binding signatures for purposes of this Relator-Abbott Settlement Agreement.

**ABBOTT LABORATORIES INC. AND ABBOTT LABORATORIES**

DATED: 12/7/10          BY: _____
                        **JAMES R. DALY**
                        Jones Day
                        77 West Wacker
                        Chicago, Illinois  60601

                        *Counsel to Abbott Laboratories Inc. and Abbott
                        Laboratories*


**VEN-A-CARE OF THE FLORIDA KEYS, INC.**

DATED:_____          BY: _____
                        **T. MARK JONES**
                        President
                        Ven-A-Care of the Florida Keys, Inc.


DATED:_____          BY: _____
                        **JAMES J. BREEN**
                        The Breen Law Firm
                        Suite 260
                        5755 North Point Parkway
                        Alpharetta, GA 33022

                        *Counsel to Ven-A-Care of the Florida Keys, Inc.*

14

## ABBOTT LABORATORIES INC.

DATED:_____     BY: _____
**JAMES DALY**
Jones Day
77 West Wacker
Chicago, Illinois  60601

*Counsel to Abbott Laboratories Inc.*

## VEN-A-CARE OF THE FLORIDA KEYS, INC.

DATED: 12/2/10     BY: _____
**T. MARK JONES**
President
Ven-A-Care of the Florida Keys, Inc.

DATED:_____     BY: _____
**JAMES J. BREEN**
The Breen Law Firm
Suite 260
5755 North Point Parkway
Alpharetta, GA 33022

*Counsel to Ven-A-Care of the Florida Keys, Inc.*

# EXHIBIT A

## SETTLEMENT AGREEMENT

### I. PARTIES

This Settlement Agreement ("Agreement") is entered into among: the United States of America, acting through the United States Department of Justice and on behalf of the Office of Inspector General ("OIG-HHS") of the Department of Health and Human Services ("HHS") (collectively, the "United States"); Abbott Laboratories, Inc. and Abbott Laboratories ("Abbott"); and Ven-A-Care of the Florida Keys, Inc. ("Relator"). Collectively, the United States, Abbott, and the Relator are referred to herein as the "Parties."

### II. PREAMBLE

As a preamble to this Agreement, the Parties agree to the following:

A.      At all relevant times, Abbott Laboratories Inc. has been a corporation organized under the laws of Delaware with its principal offices in Abbott Park, Illinois. At all relevant times, Abbott Laboratories has been a corporation organized under the laws of Illinois with its principal offices in Abbott Park, Illinois.

B.      Ven-A-Care of the Florida Keys, Inc. is a corporation with its principal place of business in Key West, Florida. Zachary T. Bentley, T. Mark Jones, John M. Lockwood, and Luis E. Cobo are or were officers of Ven-A-Care of the Florida Keys, Inc. As used herein, the term "Relator" refers to Ven-A-Care of the Florida Keys, Inc. and its current and former officers, directors, shareholders, employees, attorneys, contractors, agents, assigns, subsidiaries, and affiliates.

C.      On or about June 23, 1995, Relator filed a *qui tam* action in the United States District Court for the Southern District of Florida captioned *United States ex rel. Ven A Care of the Florida Keys, Inc. v. Abbott Laboratories, et al.*, Civil Action No. 95-1354 (S. D. Fla.) (the

"Florida Civil Action"), relating to, among other manufacturers and products, pharmaceutical products manufactured by Abbott's former Hospital Products Division ("HPD").

      D.     On or about March 17, 2006, the United States intervened with respect to certain allegations made against Abbott in the Florida Civil Action.  The intervened claims against Abbott were severed and assigned a new case number, 06-21303-CV-GOLD (S.D. Fla.) (the "Florida Abbott HPD Case").  Upon intervention, the United States filed an amended complaint. On or about March 17, 2006, Relator sought leave to amend its complaint against Abbott in order to adopt the United States' complaint-in-intervention.  Ven-A-Care's motion was granted on May 16, 2006.  On or about July 28, 2006, the Florida Abbott HPD Case was transferred by the Judicial Panel for Multi District Litigation ("MDL") to the District of Massachusetts, where it became part of MDL 1456 and was assigned case number 06-CV-11337-PBS (D. Mass.).  On November 7, 2007, the United States sought leave to file an amended and superseding complaint against Abbott (the "First Amended Complaint").  On March 13, 2008, the United States' motion was granted in part and denied in part.

      E.     On or about April 10, 2000, Relator filed a separate *qui tam* action in the United States District Court for the District of Massachusetts, Civil Action No. 00-10698-MLW (the "Massachusetts Civil Action")..  On or about February 15, 2001, Relator amended its complaint to assert claims against Abbott relating to certain pharmaceutical products manufactured by Abbott's Pharmaceutical Products Division ("PPD"), captioned *United States ex rel. Ven-A-Care v. Abbott Laboratories, et al.*, Civil Action No. 00-10698-MEL (D. Mass.).  The United States declined to intervene in the claims made against Abbott in the Massachusetts Civil Action.  On or around August 30, 2007, the claims against Abbott in the Massachusetts Civil Action were severed, the severed action against Abbott was assigned Civil Action No. 07-CV-11618-PBS

(the "Massachusetts Abbott PPD Case"), and Relator filed a severed amended complaint ("Relator's Severed Complaint"). The severed claims in Civil Action No. 07-CV-11618-PBS were transferred to MDL 1456.

F.     The United States' First Amended Complaint and Relator's Severed Complaint contend that Abbott submitted, or caused to be submitted, false claims to the Medicare Program, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395-1395hhh ("Medicare"), and the Medicaid Program, 42 U.S.C. §§ 1396-1396v ("Medicaid").

G.     The United States contends that it has certain civil claims, as specified in Paragraph III.3. below, against Abbott for engaging in the following alleged conduct: As alleged in its First Amended Complaint in the Florida Abbott HPD Case (attached hereto as Exhibit A), the United States contends that, during the period January 1, 1991 to December 31, 2001, Abbott set, reported, and maintained, or caused to be set, reported, and maintained, false and inflated List Prices, Direct Prices, Average Wholesale Prices ("AWPs"), and Wholesale Acquisition Costs ("WACs") (the "Reported Prices") for certain drugs identified in paragraphs 30 and 34 of the United States' First Amended Complaint (the "Covered Drugs"). The United States' First Amended Complaint further contends that the Reported Prices caused the Medicare and Medicaid programs to overpay for the Covered Drugs. These and all other allegations contained in the United States' First Amended Complaint are referred to herein as the "Covered Conduct."

H.     This Agreement is neither an admission of facts or liability by Abbott nor a concession by the United States that its claims are not well-founded. Abbott denies the contentions of the United States and the Relator in the United States' First Amended Complaint and in the Relator's Severed Complaint, and all contentions of the Relator in its prior complaints and further denies any liability or wrongdoing related to those contentions. Neither this

Agreement, its execution, nor the performance of any obligation under it, including any payment, nor the fact of settlement, is intended to be, or shall be understood as, an admission of liability or wrongdoing, or other expression reflecting upon the merits of the dispute by Abbott.

I.      Nothing in this paragraph or any other provision of this Agreement constitutes an agreement by the Parties concerning the characterization of the Settlement Amount, as defined in paragraph 1 below, for purposes of the Internal Revenue laws, Title 26 of the United States Code.

J.      Relator claims entitlement under 31 U.S.C. § 3730(d) to a share of the proceeds of the Settlement Amount.  Such amount shall be determined by separate agreement between the United States and the Relator, and shall not be the responsibility of Abbott.

K.      The allocation of the Settlement Amount among the Florida Abbott HPD Case and the Massachusetts Abbott PPD Case, and among the United States and Relator and its counsel, is a matter that was handled separately by and among the United States, Relator, and Relator's counsel.

L.      To avoid the delay, uncertainty, inconvenience, and expense of protracted litigation and trial of the above claims, the Parties have reached a full and final settlement pursuant to the Terms and Conditions below.

### III.  TERMS AND CONDITIONS

1.      Abbott agrees to pay to the United States the sum of one hundred twenty-six million, five-hundred thousand dollars ($126,500,000), plus simple interest accrued thereon at the current one-year treasury yield of .3 % beginning November 1, 2010, and continuing until and including the day before complete payment is made (the "Settlement Amount") in full payment of all monies owed pursuant to this Agreement.  Abbott agrees to pay the Settlement

Amount to the United States by electronic funds transfer pursuant to written instructions to be provided by the United States by the Effective Date of this Agreement. Abbott agrees to make this electronic funds transfer no later than five business days after the Effective Date.

2.      Conditioned upon the United States receiving the Settlement Amount from Abbott and as soon as feasible after receipt, the United States shall pay $29,165,000.00 to Relator by electronic funds transfer as Relator's share of the proceeds pursuant to 31 U.S.C. § 3730(d). The Relator's share of the proceeds shall be paid entirely out of the Settlement Amount.

3.      Subject to the exceptions listed in Paragraph 7 below, in consideration of this Agreement, and conditioned upon Abbott's full payment of the Settlement Amount, the United States (on behalf of itself, its officers, agents, agencies, and departments) releases Abbott, its current and former parents, predecessors, current and former subsidiaries, affiliates, successors and assigns, current and former directors, officers, and employees from any civil or administrative monetary claim the United States has or may have for the Covered Conduct under the False Claims Act, 31 U.S.C. §§ 3729-33, the Civil Monetary Penalties Law, 42 U.S.C. § 1320a-7a, the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801-12, and any other statute creating causes of action for civil damages or civil penalties which the Civil Division of the United States Department of Justice has authority to assert and compromise pursuant to 28 C.F.R. Part O, Subpart I, § 0.45(d), and under common law.

4.      Relator releases Abbott, its affiliates, predecessors, current and former parents, successors, divisions, subsidiaries, directors, officers, and employees from any and all claims or allegations, known or unknown, that Relator asserted or could have asserted relating to the Covered Conduct, including any and all allegations pertaining to any Abbott drug identified in

Relator's prior complaints (or attachments to those complaints) in the Florida Civil Action, as well as all claims or allegations, known or unknown, that Relator asserted or could have asserted in the Massachusetts Abbott PPD Case concerning any drug manufactured by Abbott. This release is expressly limited to any acts, omissions, or conduct that occurred prior to the date of the execution of this Agreement.

5.     Relator represents that it has not assigned to any other person any of the claims released by this Agreement.

6.     OIG-HHS expressly reserves all rights to institute, direct, or maintain any administrative action seeking exclusion against Abbott (and/or its officers, directors, and employees) from Medicare, Medicaid, and all other Federal health care programs (as defined in 42 U.S.C. § 1320a-7b(f)) under 42 U.S.C. § 1320a-7a (the Civil Monetary Penalties Law), 42 U.S.C. § 1320a-7(a) (mandatory exclusion), and/or 42 U.S.C. § 1320a-7(b) (permissive exclusion).

7.     Notwithstanding any term of this Agreement, specifically reserved and excluded from the scope and terms of this Agreement as to any entity or person (including Abbott and Relator) are the following claims of the United States:

  a.    Any civil, criminal, or administrative liability arising under Title 26, United States Code (Internal Revenue Code);

  b.    Any criminal liability;

  c.    Except as explicitly stated in this Agreement, any administrative liability, including mandatory or permissive exclusion from Federal health care programs;

  d.    Any liability to the United States (or its agencies) for any conduct other than the Covered Conduct;

  e.    Any liability based upon obligations created by this Agreement;

f.  Any liability for express or implied warranty claims or other claims for defective or deficient products or services, including quality of goods and services;

g.  Any liability for failure to deliver goods or services due;

h.  Any claims arising from Abbott's obligations to report prices and/or pay rebates to the States under any law or contract, including, but not limited to, under the provisions of the Omnibus Budget Reconciliation Act of 1990 and all amendments thereto; and

i.  Any claims by or on behalf of any state, territory or the District of Columbia.

8.  Relator and its successors, current and former attorneys, agents, and assigns agree not to object to this Agreement and agree and confirm that this Agreement is fair, adequate, and reasonable under all the circumstances, pursuant to 31 U.S.C. § 3730(c)(2)(B), and, conditioned upon receipt of Relator's share, Relator, for itself, its successors, current and former attorneys, agents, and assigns, fully and finally releases, waives, and forever discharges the United States, its officers, agents, and employees from any claims to any portion of the Settlement Amount arising from or relating to 31 U.S.C. § 3730, including 31 U.S.C. §§ 3730(b), (c), (c)(5), (d) and (d)(1); from any claims arising from the filing of claims against Abbott in the Florida Abbott HPD Case and Massachusetts Abbott PPD Case; from any other claims for a share of the Settlement Amount; and in full settlement of any claims Relator may have under this Agreement. This Agreement does not resolve or in any manner affect any claims the United States has or may have against the Relator arising under Title 26, U.S. Code (Internal Revenue Code), or any claims arising under this Agreement.

9.  Abbott waives and shall not assert any defenses Abbott may have to any criminal prosecution or administrative action relating to the Covered Conduct that may be based in whole or in part on a contention that, under the Double Jeopardy Clause in the Fifth Amendment of the Constitution, or under the Excessive Fines Clause in the Eighth Amendment of the Constitution,

this Agreement bars a remedy sought in such criminal prosecution or administrative action. Nothing in this paragraph or any other provision of this Agreement constitutes an agreement by the United States concerning the characterization of the Settlement Amount for purposes of the Internal Revenue laws, Title 26 of the United States Code.

10.      Abbott, on behalf of itself and its affiliates, predecessors, current and former parents, successors, divisions, subsidiaries, directors, and assigns, fully and finally releases the United States, its agencies, employees, servants, and agents from any claims (including for attorney's fees, costs, and expenses of every kind and however denominated) that Abbott has asserted, could have asserted, or may assert in the future against the United States, its agencies, employees, servants, and/or agents, related to the United States' investigation and prosecution of the Florida Abbott HPD Case and Massachusetts Abbott PPD Case, up to the Effective Date of this Agreement.

11.      Abbott, on behalf of itself and its affiliates, predecessors, current and former parents, successors, divisions, subsidiaries, directors, and assigns fully and finally releases Relator, together with its current and former officers, directors, shareholders, employees, attorneys, contractors, agents, assigns, subsidiaries and affiliates from any claims (including for attorney's fees, costs, and expenses of every kind and however denominated) that Abbott has asserted, could have asserted, or may assert in the future against Relator, related to Relator's investigation and prosecution of the Florida Abbott HPD Case and Massachusetts Abbott PPD Case, up to the Effective Date of this Agreement.

12.      The Settlement Amount shall not be decreased as a result of the denial of claims for any payment now being withheld by any Medicare carrier or intermediary or any state payer, related to the Covered Conduct; and Abbott agrees not to cause to resubmit to any Medicare

carrier or intermediary or any state payer any previously denied claims related to the Covered

Conduct, and agrees not to cause any appeal of any such denials of claims.

13.     Abbott agrees to the following:

a.     <u>Unallowable Costs Defined</u>:  that all costs (as defined in the Federal Acquisition

Regulation, 48 C.F.R. § 31.205-47, in Titles XVIII and XIX of the Social Security Act, 42

U.S.C. §§ 1395-1395hhh and 1396-1396v, and in the regulations and official program directives

promulgated thereunder) incurred by or on behalf of each of Abbott and its present or former

officers, directors, employees, shareholders, and agents in connection with the following shall be

"Unallowable Costs" on government contracts and under the Medicare Program, Medicaid

Program, TRICARE Program, and Federal Employees Health Benefits Program ("FEHBP"):

(1)     the matters covered by this Agreement;

(2)     the United States' audit(s) and civil investigation(s) of the matters covered by this Agreement;

(3)     Abbott's investigation, defense, and corrective actions undertaken in response to the United States' audit(s) and civil investigation(s) in connection with the matters covered by this Agreement (including attorney's fees);

(4)     the negotiation and performance of this Agreement; and

(5)     the payments Abbott makes to the United States pursuant to this Agreement and any payments that Abbott may make to Relator, including costs and attorney's fees.  (All costs described or set forth in this Paragraph are hereafter "Unallowable Costs.")

b.     <u>Future Treatment of Unallowable Costs</u>: If applicable, these Unallowable Costs, if

any, shall be separately determined and accounted for in nonreimburseable cost centers by

Abbott, and Abbott shall not charge such Unallowable Costs directly or indirectly to any

contracts with the United States or any State Medicaid program, or seek payment for such

Unallowable Costs through any cost report, cost statement, information statement, or payment

request submitted by Abbott or any of its subsidiaries or affiliates to the Medicare, Medicaid, TRICARE, or FEHBP Programs.

        c.     <u>Treatment of Unallowable Costs Previously Submitted for Payment</u>:  Abbott further agrees that, if applicable, within 90 days of the Effective Date of this Agreement, it shall identify to applicable Medicare and TRICARE fiscal intermediaries, carriers, and/or contractors, and Medicaid and FEHBP fiscal agents, any Unallowable Costs included in payments Abbott or any of its subsidiaries or affiliates previously sought from the United States or any State Medicaid program, including, but not limited to, payments sought in any cost reports, cost statements, information reports, or payment requests already submitted by Abbott or any of its subsidiaries or affiliates, and shall request, and agree, that such cost reports, cost statements, information reports, or payment requests, even if already settled, be adjusted to account for the effect of the inclusion of the Unallowable Costs.  Abbott agrees that the United States, at a minimum, shall be entitled to recoup from Abbott any overpayment plus applicable interest and penalties as a result of the inclusion of such Unallowable Costs on previously submitted cost reports, information reports, cost statements, or requests for payment.

        Any payments due after the adjustments have been made shall be paid to the United States pursuant to the direction of the Department of Justice and/or the affected agencies.  The United States reserves its rights to disagree with any calculations submitted by Abbott or any of its subsidiaries or affiliates on the effect of inclusion of Unallowable Costs on Abbott or any of its subsidiaries' or affiliates' cost reports, cost statements, or information reports.

        d.     Nothing in this Agreement shall constitute a waiver of the rights of the United States to audit, examine, or re-examine Abbott's books and records to determine that no Unallowable Costs have been claimed in accordance with the provisions of this Paragraph.

14.     This Agreement is intended to be for the benefit of the Parties only.  The Parties do not release any claims against any other person or entity, except to the extent provided for in Paragraph 15, below, regarding waiver for beneficiaries.

15.     Abbott agrees that it waives and shall not seek payment for any of the health care billings, if any, covered by this Agreement from any health care beneficiaries or their parents, sponsors, legally responsible individuals, or third party payors based upon the claims defined as Covered Conduct.

16.     Abbott warrants that it is solvent within the meaning of 11 U.S.C. §§ 547(b)(3) and 548(a)(1)(B)(ii)(I), and shall remain solvent immediately following payment of the Settlement Amount to the United States.  Further, the Parties warrant that, in evaluating whether to execute this Agreement, they (a) have intended that the mutual promises, covenants, and obligations set forth herein constitute a contemporaneous exchange for new value given to Abbott, within the meaning of 11 U.S.C. § 547(c)(1); and (b) conclude that these mutual promises, covenants, and obligations do, in fact, constitute such a contemporaneous exchange. Further, the Parties warrant that the mutual promises, covenants, and obligations set forth herein are intended to and do, in fact, represent a reasonably equivalent exchange of value that is not intended to hinder, delay, or defraud any entity to which Abbott was or became indebted on or after the date of this transfer, within the meaning of 11 U.S.C. § 548(a)(1).

17.     Within five (5) business days after the Effective Date of this Agreement, the Parties shall file the Stipulation of Voluntary Dismissal together with the proposed Order of Dismissal of the Florida Abbott HPD case which are attached hereto as Exhibit B, and the United States will file a Written Consent to Relator and Defendant's Stipulation for Voluntary

Dismissal with Prejudice of Relator's Severed Complaint in the Massachusetts Abbott PPD Case, in the form attached as Exhibit C hereto.

18.　　Each Party shall bear its own legal and other costs, including legal fees, incurred in connection with the matters covered by this Agreement, including the preparation and performance of this Agreement.

19.　　The Parties each represent that this Agreement is freely and voluntarily entered into without any degree of duress or compulsion whatsoever.

20.　　This Agreement is governed by the laws of the United States. The Parties agree that the exclusive jurisdiction and venue for any dispute arising between or among any or all of the Parties under this Agreement is the United States District Court for the District of Massachusetts.

21.　　For purposes of construction, this Agreement shall be deemed to have been drafted by all Parties to this Agreement and shall not, therefore, be construed against any Party for that reason in any subsequent dispute.

22.　　This Agreement shall constitute the complete agreement between the Parties as to the matters addressed herein. This Agreement may not be amended except by written consent of all of the Parties. Relator and Abbott will separately execute the Relator-Abbott Settlement Agreement.

23.　　The individuals signing this Agreement on behalf of Abbott represent and warrant that they are authorized by Abbott to execute this Agreement. The individuals signing this Agreement on behalf of Relator represent and warrant that they are authorized by Relator to execute this Agreement. The United States' signatories represent that they are signing this Agreement in their official capacities and that they are authorized to execute this Agreement.

24.     This Agreement may be executed in counterparts, each of which constitutes an original and all of which constitute one and the same Agreement.

25.     This Agreement is binding on all successors, transferees, and assigns of the Parties.

26.     Abbott and Relator consent to the United States' disclosure of this Agreement, and information about this Agreement, to the public.  Documents produced by Abbott subject to the Protective Order and Case Management Order in the Florida Abbott HPD Case and Massachusetts Abbott PPD Case shall remain subject to those Orders.

27.     If any provision of this Settlement Agreement, or the application thereof, shall for any reason or to any extent be construed by a court of competent jurisdiction to be invalid or unenforceable, the remainder of this Settlement Agreement, and application of such provision to other circumstances, shall remain in effect and be interpreted so as best reasonably to effect the intent of the Parties.  Notwithstanding the foregoing, if either the payment or any of the release provisions hereof are found to be unenforceable or invalid by a court of competent jurisdiction, then such invalidity or unenforceability shall be cause for voiding the entire Settlement Agreement at the election of the Party the interests of which are injured by the finding of invalidity or unenforceability, in which event all claims and actions dismissed shall be reinstated with all statutes of limitations deemed tolled from the Effective Date of this Agreement.

28.     This Agreement is effective on the date of signature of the last signatory to the Agreement ("Effective Date of this Agreement").  Facsimiles of signatures, and/or electronic signatures in portable document format (.pdf), shall constitute acceptable, binding signatures for purposes of this Agreement.

THE UNITED STATES OF AMERICA

DATED: _12·6·10_        BY: _____
                            JUSTIN DRAYCOTT
                            Trial Attorney
                            Commercial Litigation Branch
                            Civil Division
                            United States Department of Justice


DATED: _12/3/10_        BY: _____
                            MARK LAVINE
                            Assistant United States Attorney
                            United States Attorney's Office for the
                            Southern District of Florida


DATED:_____        BY: _____
                            GREGORY E. DEMSKE
                            Assistant Inspector General for Legal Affairs
                            Office of Counsel to the Inspector General
                            Office of Inspector General
                            United States Department of Health and
                            Human Services

### THE UNITED STATES OF AMERICA

DATED:_____     BY: _____

                                        **JUSTIN DRAYCOTT**
                                        Trial Attorney
                                        Commercial Litigation Branch
                                        Civil Division
                                        United States Department of Justice

DATED:_____     BY: _____

                                        **MARK LAVINE**
                                        Assistant United States Attorney
                                        United States Attorney's Office for the
                                        Southern District of Florida

DATED: 11/30/10     BY: _____

                                        **GREGORY E. DEMSKE**
                                        Assistant Inspector General for Legal Affairs
                                        Office of Counsel to the Inspector General
                                        Office of Inspector General
                                        United States Department of Health and
                                        Human Services

**ABBOTT LABORATORIES INC. AND ABBOTT LABORATORIES - DEFENDANT**

DATED: _12|7|10_      BY: _____

                               **JAMES R. DALY**
                               Jones Day
                               77 West Wacker
                               Chicago, Illinois  60601
                               Counsel to Abbott Laboratories Inc. and Abbott
                               Laboratories


**VEN-A-CARE OF THE FLORIDA KEYS, INC. - RELATOR**

DATED:_____      BY: _____

                               **T. MARK JONES**
                               President
                               Ven-A-Care of the Florida Keys, Inc.


DATED:_____      BY: _____

                               **JAMES J. BREEN**
                               The Breen Law Firm
                               Suite 260
                               5755 North Point Parkway
                               Alpharetta, GA 33029
                               Counsel to Ven-A-Care of the Florida Keys, Inc.

**ABBOTT LABORATORIES, INC. - DEFENDANT**

DATED:_____     BY: _____

**JAMES R. DALY**
Jones Day
77 West Wacker
Chicago, Illinois 60601
Counsel to Abbott Laboratories

**VEN-A-CARE OF THE FLORIDA KEYS, INC. - RELATOR**

DATED: _12/2/10_     BY: _____

**T. MARK JONES**
President
Ven-A-Care of the Florida Keys, Inc.

DATED: _12/2/10_     BY: _____

**JAMES J. BREEN**
The Breen Law Firm
Suite 260
5755 North Point Parkway
Alpharetta, GA 33029
Counsel to Ven-A-Care of the Florida Keys, Inc.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In re: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) | MDL No. 1456 Civil Action No. 01-12257-PBS |
| | ) ) | |
| **THIS DOCUMENT RELATES TO:** | ) ) | Hon. Patti Saris |
| *United States of America ex rel. Ven-a-Care of the Florida Keys, Inc., v. Abbott Laboratories, Inc.,* CIVIL ACTION NO. 06-11337-PBS | ) ) ) ) | (Original Complaint Filed in the Southern District of Florida, Case No. 06-21303-CIV-GOLD/TURNOFF) |

## THE UNITED STATES' FIRST AMENDED COMPLAINT

The United States brings this fraud action against Abbott Laboratories, Inc. ("Abbott") to recover losses sustained by the Medicare and Medicaid programs. Over the course of several years, Abbott reported inflated pharmaceutical prices that it knew Medicare and Medicaid relied upon to set reimbursement rates for Abbott's pharmaceutical products. Abbott's actual sales prices for its pharmaceutical products were far less than the prices reported by Abbott. By knowingly reporting inflated prices – often 1000% higher than Abbott's actual prices – Abbott ensured its customers received inflated reimbursement and profits from Medicare and Medicaid. Abbott then used the public fisc as a marketing tool, actively promoting government-funded "spreads" between (1) its fraudulently inflated prices and (2) its actual sales prices as an inducement to its customers. In addition, Abbott operated its own home infusion pharmacies and entered into profit-sharing partnerships with health care providers that allowed Abbott to directly profit off Abbott's manipulation of third party reimbursements for its drugs. These efforts allowed Abbott to increase its profits by boosting sales for its drugs.

EXHIBIT A

Civil Action No. 01-12257-PBS/Civil Action No. 06-11337-PBS

## I. NATURE OF ACTION

1.      The United States brings this action to recover treble damages and civil penalties under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-33, and to recover damages and other monetary relief under the common law or equitable theories of fraud and unjust enrichment.

2.      The United States bases its claims on Abbott having **submitted and** caused the submission of false or fraudulent claims to the United States in violation of 31 U.S.C. § 3729(a)(1), and having made and used false statements to get false or fraudulent claims paid by the United States in violation of 31 U.S.C. § 3729(a)(2).

3.      Within the time frames detailed below, Abbott engaged in a fraudulent scheme that caused the Medicare and Medicaid programs to pay excessive reimbursement to Abbott's customers, *e.g.*, pharmacies, physicians, hospitals, home health agencies, nursing homes, home infusion companies, clinics and physicians (hereafter referred to collectively as "Customers"). In furtherance of this scheme, Abbott reported false, fraudulent and inflated drug prices for certain drugs (listed in ¶¶ 30 and 34 below) to several price reporting compendia that the Medicare and Medicaid programs relied upon to set reimbursement rates for Abbott's customers. A chart setting out examples showing the difference between the prices at which Abbott actually sold its drugs and the false prices reported by Abbott is attached hereto as **Exhibit 1**. Abbott knew that the Medicare and Medicaid programs relied on Abbott's reported prices to those compendia to set reimbursement rates for claims submitted for Abbott's drugs. Abbott then sold the drugs for far lower prices, and marketed to existing and potential Customers the government-funded

2

Civil Action No. 01-12257-PBS/Civil Action No. 06-11337-PBS

"spread" between the inflated reimbursement amounts and the actual acquisition costs of the

drugs to boost its sales and profits.

  4.  Abbott knew that its false price reporting and marketing efforts would cause its

Customers to submit claims for fraudulently inflated Medicaid and Medicare reimbursement.

  5.  Abbott's fraudulent scheme to induce Customers to purchase its products by

ensuring that federal reimbursement rates for those products would be set at artificially inflated

levels violated the FCA, the federal anti-kickback statute, 42 U.S.C. § 1320a-7b(b), common law

and numerous state laws.

  6.  To get fraudulent claims paid by the United States, Abbott also routinely made

false statements directly to state Medicaid programs by reporting these same fraudulently inflated

prices to the states.  These statements violated the FCA, common law and various state laws.

  7.  The United States timely asserts the causes of action alleged herein based on the

filing of relator's complaint in this action.

## II. JURISDICTION

  8.  The United States' original Complaint in this matter was filed on March 16, 2006

in the Southern District of Florida.[1]  The case was transferred to Multi-District Litigation

("MDL") No. 1456 on July 27, 2006.  The Court has subject matter jurisdiction to entertain this

action under 28 U.S.C. §§ 1331 and 1345 and supplemental jurisdiction to entertain the common

law and equitable causes of action pursuant to 28 U.S.C. § 1367(a).  The Court may exercise

---

  [1] This case originated in the Southern District of Florida as Case No. 06-21303-CIV-
GOLD/TURNOFF.  The United States understands that this matter will be transferred back to the
Southern District of Florida for trial upon the completion of these MDL proceedings.

Civil Action No. 01-12257-PBS/Civil Action No. 06-11337-PBS

personal jurisdiction over Abbott pursuant to 31 U.S.C. § 3732(a) because Abbott resides or

transacts business in the District of Massachusetts.

### III. VENUE

9.      Venue is proper in the District of Massachusetts under 31 U.S.C. § 3732 and 28

U.S.C. § 1391(b) and (c) because Abbott resides or transacts business in this District.[2]

### IV. PARTIES

10.     The United States brings this action on behalf of the Department of Health and

Human Services ("HHS") and the Centers for Medicare & Medicaid Services ("CMS") (formerly

known as the Health Care Financing Administration), which administer the Medicare and

Medicaid programs.

11.     Relator Ven-A-Care of the Florida Keys, Inc. ("Ven-A-Care"), is a corporation

organized under the laws of Florida, with its principal offices in Key West, Florida.  Ven-A-Care

is a pharmacy licensed to provide the prescription drugs specified in this Complaint and has

been, during the relevant period of this Complaint, a Medicare and Florida Medicaid provider.

Ven-A-Care's principal officers and directors have included John M. Lockwood, M.D., Zachary

Bentley, Luis Cobo and T. Mark Jones, who are each citizens of the United States and reside in

Key West, Florida.  The FCA, 31 U.S.C. § 3730(b)(1), provides that private parties may bring a

lawsuit on behalf of the United States to recover damages for false claims.  Ven-A-Care brought

this action against Abbott on behalf of itself and the United States.

---

[2] Abbott also resides or transacts business in the Southern District of Florida as well.
Thus, venue is also proper in that District.

4

Civil Action No. 01-12257-PBS/Civil Action No. 06-11337-PBS

12.    Defendant Abbott is a corporation organized under the laws of Illinois with its

principal offices in Abbott Park, Illinois.  At all times material to this civil action, Abbott has

transacted business throughout the United States, selling and distributing its drugs, including but

not limited to those identified in this Complaint, to purchasers within this District.

## V.  THE LAW

### A.    The False Claims Act

13.    The FCA provides in pertinent part, that:

> (a) Any person who (1) knowingly presents, or causes to be presented, to an
> officer or employee of the United States Government or a member of the Armed
> Forces of the United States a false or fraudulent claim for payment or approval;
> (2) knowingly makes, uses, or causes to be made or used, a false record or
> statement to get a false or fraudulent claim paid or approved by the Government
>
> * * *
>
> is liable to the United States Government for a civil penalty of not
> less than $5,000 and not more than $10,000, plus 3 times the
> amount of damages which the Government sustains because of the
> act of that person . . . .
> (b) For purposes of this section, the terms  "knowing" and
> "knowingly" mean that a person, with respect to information
> (1) has actual knowledge of the information; (2) acts in deliberate
> ignorance of the truth or falsity of the information; or (3) acts in
> reckless disregard of the truth or falsity of the information, and no
> proof of specific intent to defraud is required.

31 U.S.C. § 3729.

14.    Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as

amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 (notes), and 64

Fed. Reg. 47099, 47103 (1999), the civil penalties were adjusted to $5,500 to $11,000 for

violations occurring on or after September 29, 1999.

5

Civil Action No. 01-12257-PBS/Civil Action No. 06-11337-PBS

**B.    The Federal Anti-Kickback Statute**

15.    Congress first enacted the federal anti-kickback statute, 42 U.S.C. § 1320a-7b(b),

in 1972 to protect the integrity of Medicare and Medicaid.  Congress strengthened the statute in

1977, and again in 1987, to ensure that kickbacks masquerading as legitimate transactions would

not evade its reach.  *See* Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b)

and (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L.

No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No.

100-93.

16.    The anti-kickback statute prohibits any person or entity from making or accepting

payment to induce or reward any person for referring, recommending or arranging for federally-

funded medical items, including items provided under Medicare and Medicaid.  In pertinent part,

the statute provides:

> (b) Illegal remuneration
>
> > (1) whoever knowingly and willfully solicits or
> > receives any remuneration (including any kickback,
> > bribe, or rebate) directly or indirectly, overtly or
> > covertly, in cash or in kind –
> >
> > > (A) in return for referring an individual to a
> > > person for the furnishing or arranging for the
> > > furnishing of any item or service for which
> > > payment may be made in whole or in part
> > > under a Federal health care program, or
> > >
> > > (B) in return for purchasing, leasing,
> > > ordering, or arranging for or recommending
> > > purchasing, leasing, or ordering any good,
> > > facility, service, or item for which payment

6

Civil Action No. 01-12257-PBS/Civil Action No. 06-11337-PBS

> may be made in whole or in part under a
> Federal health care program,

> shall be guilty of a felony and upon conviction thereof, shall be
> fined not more than $25,000 or imprisoned for not more than five
> years, or both.

> (2) whoever knowingly and willfully offers or pays any
> remuneration (including any kickback, bribe, or rebate)
> directly or indirectly, overtly or covertly, in cash or in kind
> to any person to induce such person --

> (A) to refer an individual to a person for the
> furnishing or arranging for the furnishing of any
> item or service for which payment may be made in
> whole or in part under a Federal health care
> program, or

> (B) to purchase, lease, order or arrange for or
> recommend purchasing, leasing or ordering any
> good, facility, service, or item for which payment
> may be made in whole or in part under a Federal
> health care program,

> shall be guilty of a felony and upon conviction thereof, shall be fined not
> more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b(b).  Those who violate the statute also are subject to exclusion from

participation in federal health care programs and, effective August 6, 1997, civil monetary

penalties of up to $50,000 per violation and up to three times the amount of remuneration paid.

42 U.S.C. § 1320a-7(b)(7) and 42 U.S.C. § 1320a-7a(a)(7).

7

Civil Action No. 01-12257-PBS/Civil Action No. 06-11337-PBS

## VI.  THE FEDERAL HEALTHCARE PROGRAMS

17.    Medicaid and Medicare were created to provide access to healthcare for elderly, indigent or disabled residents of the United States.

### A.    The Medicaid Program

18.    Medicaid is a joint federal-state program that provides health care benefits for certain groups, primarily the poor and disabled.

19.    The federal Medicaid statute sets forth the minimum requirements for state Medicaid programs to qualify for federal funding.  42 U.S.C. § 1396a.

20.    The federal portion of states' Medicaid payments, known as the Federal Medical Assistance Percentage ("FMAP"), is based on a state's per capita income compared to the national average.  42 U.S.C. § 1396d(b).  Among the states, the FMAP is at least 50%, and as high as 83%.

21.    The Medicaid statute requires each participating state to implement a plan containing certain specified minimum criteria for coverage and payment of claims.  42 U.S.C. §§ 1396, 1396a(a)(13), 1396a(a)(30)(A).

22.    The Medicaid programs of all states reimburse for prescription drugs.

23.    The vast majority of states award contracts to private companies to evaluate and process Medicaid recipients' claims for payment.  Typically, after processing the claims, these private companies then generate funding requests to the state Medicaid program, which in turn obtains federal funds from the United States.

8

Civil Action No. 01-12257-PBS/Civil Action No. 06-11337-PBS

24.     By becoming a participating supplier in Medicaid, suppliers agree to abide by all laws, regulations, and procedures applicable to that program, including those governing reimbursement.

**B.**     **The Medicare Program**

25.     In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare program, to pay for the costs of certain healthcare services and items.  Entitlement to Medicare is based on age, disability or affliction with end-stage renal disease.  42 U.S.C. §§ 426-426a, 1395o.

26.     HHS is responsible for the administration and supervision of the Medicare program.  CMS is an agency of HHS and directly administers the Medicare program.  The Medicare program has several parts, including Medicare Part B ("Supplementary Medical Insurance for the Aged and Disabled"), which covers physician services, as well as durable medical equipment ("DME") and certain drug products and supplies.  42 U.S.C. § 1395k; 42 C.F.R. § 410.10.

27.     Medicare Part B generally covers drugs which are provided either:  (a) incident to a physician's service and cannot usually be self-administered (42 C.F.R. § 410.26 (*e.g.*, certain oncology drugs)); or (b) in conjunction with the medical necessity of an infusion pump or nebulizer or other DME device payable under Medicare's DME benefit.  42 C.F.R. §§ 405.517, 414.701.

Civil Action No. 01-12257-PBS/Civil Action No. 06-11337-PBS

28.     During the relevant time period, CMS contracted with private insurance carriers ("Contractors") to administer and pay Part B claims from the Medicare Trust Fund.  42 U.S.C. § 1395u.  In this capacity, the Contractors act on behalf of CMS.  42 C.F.R. § 421.5(b).

29.     Contractors receive, process and pay claims under Medicare Part B for drugs from various Medicare providers and suppliers.  Typically, once a contractor approves a claim, the contractor then submits a payment request to a Medicare bank account funded by federal funds.

## C.     Drug Reimbursement Under Medicaid and Medicare

30.     The Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301-97, requires pharmaceutical companies to submit to the Food and Drug Administration ("FDA") a listing of every drug product in commercial distribution.  21 U.S.C. § 355.  The FDA provides for the assignment to each listed drug product of a unique 11-digit, 3-segment number, known as the National Drug Code ("NDC").  FDA has assigned approximately 170,000 NDCs to drug products.  The drugs and corresponding NDCs at issue in this case are listed below:

| DRUG | NDC# |
|---|---|
| Sodium Chloride Injection | 00074196607 |
| Water for Injection 30 ml | 00074397703 |
| Vancomycin HCl 500 mg | 00074433201 |
| Water for Injection 10 ml | 00074488710 |
| Water for Injection 20 ml | 00074488720 |
| Sterile Water for Injection | 00074488750 |
| Sodium Chloride Injection | 00074488810 |
| Sodium Chloride Injection | 00074488820 |
| Sodium Chloride Irrigation | 00074613802 |
| Sodium Chloride Irrigation | 00074613803 |
| Sodium Chloride Irrigation | 00074613822 |
| Sterile Water for Irrigation | 00074613902 |
| Sterile Water for Irrigation | 00074613903 |

10

Civil Action No. 01-12257-PBS/Civil Action No. 06-11337-PBS

| | |
|---|---|
| Sterile Water for Irrigation | 00074613922 |
| Vancomycin HCl 5 gm | 00074650901 |
| Vancomycin HCl 1 gm | 00074653301 |
| Vancomycin HCL 500 mg Add-Vantage | 00074653401 |
| Vancomycin HCl 1 gm Add-Vantage | 00074653501 |
| 5% Dextrose in Water 50 ml | 00074710013 |
| 5% Dextrose in Water 100 ml | 00074710023 |
| Sodium Chloride Injection | 00074710102 |
| Sodium Chloride 0.9% 50ml | 00074710113 |
| Sodium Chloride 0.9% 100 ml | 00074710123 |
| Dextrose Injection | 00074712007 |
| Sodium Chloride Irrigation | 00074713809 |
| Sterile Water for Irrigation | 00074713909 |
| Dextrose 5%/ Kcl/NaCl 1000 ml | 00074790209 |
| Dextrose Injection | 00074792202 |
| 5% Dextrose in Water 500 ml | 00074792203 |
| 5% Dextrose in Water1000 ml | 00074792209 |
| Dextrose Injection | 00074792336 |
| Dextrose Injection | 00074792337 |
| Dextrose 5% and 0.225% NaCL Injection | 00074792409 |
| Dextrose 5% and 0.225% NaCL Injection | 00074792609 |
| 5% Dextrose/ NaCl 0.9% 1000 ml | 00074794109 |
| Sodium Chloride Irrigation | 00074797205 |
| Sterile Water for Irrigation | 00074797305 |
| Sodium Chloride 0.9% 250 ml | 00074798302 |
| Sodium Chloride 0.9% 500 ml | 00074798303 |
| Sodium Chloride 0.9% 1000 ml | 00074798309 |
| Sodium Chloride Injection | 00074798436 |
| Sodium Chloride Injection | 00074798437 |
| Sodium Chloride Injection | 00074798509 |
| Water for Injection1000 ml | 00074799009 |
| Acyclovir Sodium 500 mg | 00074442701 |
| Acyclovir Sodium 1 gm | 00074445201 |

31.     Drug manufacturers, such as Abbott, have not typically submitted claims for

reimbursement to federal health care programs.  Instead, Abbott marketed its products to its

Customers, who then purchased the products either directly or through wholesalers based on a

price the Customers negotiated with Abbott.  In addition to using wholesalers, Customers also

Civil Action No. 01-12257-PBS/Civil Action No. 06-11337-PBS

purchased Abbott products through group purchasing organizations ("GPO"), who negotiated

prices on behalf of Abbott's Customers. However, as described in ¶¶ 111-138 below, Abbott

also had a business unit that, among other activities, operated home infusion pharmacies and

actually submitted reimbursement claims for drugs on behalf of various clients.

32.     Abbott's Customers then submitted claims for payment for Abbott products to

Medicare and Medicaid after dispensing or administering Abbott drugs. Medicare and Medicaid

reimbursed some of the claims submitted by Abbott's home infusion pharmacies. In other

instances, Abbott administered reimbursement claims for certain home infusion clients and

collected portions of those clients' Medicare and Medicaid reimbursements as compensation for

those services.

33.     For the most part, in the Medicaid program, claims submitted by retail pharmacies

are processed and tracked using the NDC of the drug.

34.     The Medicare program generally uses the Healthcare Common Procedural Coding

System ("HCPCS") to reimburse for drugs. The HCPCS utilize 5-digit alphanumeric codes to

identify and bill for medical products and supplies. The codes at issue here are listed below:

| HCPCS | Description |
|---|---|
| J2912 | Sodium Chloride, .9 percent, per 2 ml |
| J3370 | Vancomycin HCl, 500 mg |
| J7030 | Normal Saline Solution, 1000 cc |
| J7040 | Normal Saline Solution, 500 ml |
| J7042 | 5 percent Dextrose/Normal Saline Solution, 500 ml |
| J7050 | Normal Saline Solution, 250 cc |
| J7051 | Sterile Saline or Water, up to 250 cc |
| J7060 | 5 percent Dextrose/Water, 500 ml |
| J7070 | D-5-W, 1000 cc |
| J7110 | Dextran 75, 1000 ml |
| J7130 | Hypertonic Saline Solution, 50 or 100 mEq, 20 cc vial |

Civil Action No. 01-12257-PBS/Civil Action No. 06-11337-PBS

35.    During the relevant period, Abbott usually reported prices to various price publishers and services on an annual basis.  The price publishers used the information to publish pricing compendia.

36.    The reimbursement amounts for claims submitted by Abbott or Abbott's Customers for the drugs at issue in this Complaint were directly influenced by Abbott's false price representations.  The information contained in the published pricing compendia was used by most third party payor insurance companies, including the Medicare and Medicaid programs, in determining the reimbursement rates for prescription drugs.  Abbott documents show that Abbott knew of the impact of its price representations on government reimbursement on claims submitted by its Customers for its drugs.  Abbott documents also show that the company actively marketed the government-funded profits or "spreads" on its drugs created by its false price representations.

37.    No governmental payor knew of or sanctioned Abbott's conduct as set forth in this Complaint, i.e., its deliberate manipulation of its published prices for certain of its products to induce its Customers to purchase those products.

**D.    Medicaid Reimbursement Formulas**

38.    When reimbursing for drugs, the State Medicaid programs' goal has been to pay an amount which, in the aggregate, reflects the lower of (1) the estimated acquisition cost ("EAC") of covered drugs, plus a reasonable dispensing fee, or (2) a provider's usual and customary charges to the general public. To determine the EAC for a covered drug, State

Civil Action No. 01-12257-PBS/Civil Action No. 06-11337-PBS

Medicaid programs are required to develop reimbursement formulas that must be approved by

the Secretary of HHS.  42 C.F.R. §§ 447.331, 447.332, and 447.333 (2005).

39.     While the specific reimbursement formulas vary from state to state, the various

State Medicaid programs have generally reimbursed for each drug based on the lowest of (a) the

EAC as set by the states,  (b) the maximum allowable cost ("MAC") set by the state

Pharmaceutical Reimbursement Boards, or (c) the providers' usual and customary charge.  For

multiple source drugs subject to a federal upper limit, states must in the aggregate not pay more

than those limits. 42 C.F.R. §§ 447.331, 447.332 and 447.333 (2005).

40.     The states' methodology for arriving at EAC includes:

A.      discounting a percentage off of the Average Wholesale Price ("AWP");

B.      adding a percentage to the Wholesale Acquisition Cost ("WAC") ; and/or,

C.      requiring the drug companies to certify prices directly in writing to the

Medicaid program in response to state requests for particular pricing information.

41.     AWP is used to refer to the price at which a pharmaceutical firm or a wholesaler

sells a drug to a retail Customer who then administers it to a patient.  WAC is used to refer to the

price at which a pharmaceutical firm typically sells a drug to wholesalers who would then resell

it to a retail Customer.

42.     While the majority of states use published AWPs to calculate reimbursement,

approximately six states (Alabama, Florida, Maryland, Massachusetts, Rhode Island and Texas)

have used the wholesale acquisition cost ("WAC") to set the EAC.

14

43.     The AWPs and WACs relied upon by the State Medicaid programs have generally been those published by (1) Thomson Publishing, publisher of the *Red Book* and various other price publications, (2) First Databank, publisher of the *Blue Book* and other electronic price publications; or (3) Medi-Span, Inc., publisher of an electronic or automated price service and the Hospital Formulary Pricing Guide.  Thompson Publishing, First Databank and Medi-Span, Inc. are hereafter referred to as the "Publishers" and their various publications and data services are hereinafter referred to as "Price Publications."

44.     In addition to relying on the manufacturers' reported prices as published in the Price Publications, some State Medicaid programs also received price representations directly from manufacturers, and relied on these representations to confirm the accuracy of the figures they use to determine state reimbursement amounts.  For example, the State of Texas required drug companies to submit their prices directly to the Texas Medicaid program in a signed certification attesting to the accuracy of the price information.

**E.      Medicare Reimbursement Formulas**

45.     From 1992 through 1997, Medicare based its reimbursement for multi-source generic drugs, the drugs at issue here, at the lower of the EAC or the median AWP of all generic forms of a drug.  42 C.F.R. § 405.517 (1992-1998).  In general, Medicare relied on median AWPs to set reimbursement rates.

46.     From January 1, 1998, until December 31, 1998, Medicare based its reimbursement for all generic forms of a drug at 95% of the median AWP for the drug.  Balanced Budget Act of 1997, 42 U.S.C. § 1395u(o); 42 C.F.R. § 405.517 (1998).

Civil Action No. 01-12257-PBS/Civil Action No. 06-11337-PBS

47.     From 1999 through 2004, Medicare based its reimbursement for all generic forms of a drug at the lower of (1) 95% of the median published AWP for the drug; or (2) the AWP of the least expensive brand-name drug.  42 U.S.C. § 1395u(o); 42 C.F.R. § 405.517 (1999-2004).

48.     After the reimbursement amount is calculated, Medicare pays 80 percent and the Medicare beneficiary is responsible for the remaining 20 percent co-payment.  If the Medicare beneficiary is also a Medicaid recipient, the Medicaid program generally pays the 20 percent Medicare co-payment.

49.     Medicare generally relied upon the AWPs published by Thomson Publishing in its annual national compendium known as the *Drug Topics Red Book* ("*Red Book*"), as well as *Red Book* monthly updates to set reimbursement rates for covered drugs.

## VII.  ABBOTT'S SCHEME

50.     From at least on or before January 1, 1991, and continuing through 2001,  Abbott defrauded the United States by knowingly causing the Medicare and Medicaid programs to pay false or fraudulent claims for dextrose solutions, sodium chloride solutions, sterile water, Vancomycin and Acyclovir Sodium.

51.     The specific dextrose solutions, sodium chloride solutions, sterile water, Vancomycin and Acyclovir Sodium products at issue herein are identified by NDC or HCPCS Code in ¶¶ 30 and 34 above and are hereinafter referred to jointly as the "Drugs."

52.     Dextrose solutions, sodium chloride solutions, and sterile water are generic, water-based solutions used to facilitate the intravenous infusion of other drugs and for fluid replacement, and are commonly referred to as large volume parenterals ("LVPs").

16

Civil Action No. 01-12257-PBS/Civil Action No. 06-11337-PBS

53.     Vancomycin is a powerful, intravenous antibiotic that Abbott has sold as a generic drug since 1988.

54.     Acyclovir Sodium ("Acyclovir") is an antiviral drug used to treat several opportunistic viral infections, some of which are associated with HIV/AIDS.

55.     Abbott marketed and sold its products, including the Drugs, to Customers.

56.     The Customers purchased the products either directly from Abbott, through a GPO contract or through wholesalers.

57.     The amount paid by a Customer was typically based on a price negotiated with Abbott or the GPO.

58.     Regardless of the method of purchase, Abbott's Customers submitted claims for payment to Medicare and Medicaid when an Abbott product was administered to a program beneficiary.  The claims submitted by Abbott's Customers were paid at amounts directly influenced by Abbott's false and fraudulent prices.

59.     Abbott routinely disseminated false pricing information for the Drugs to the Pricing Publications.  Abbott employees typically reported the false and fraudulent prices to the Price Publications annually, although they sometimes did so more often.  On most occasions, Abbott reported inflated "List Prices" or "Direct Prices" (both referred to hereinafter as LP), WACs and/or AWPs.  A LP is supposed to reflect the price paid by a Customer that buys drugs directly from Abbott and not through a wholesaler.

60.     When Abbott reported a LP, some Price Publications (*e.g.*, *Blue Book*, which provided pricing information for the vast majority of the state Medicaid programs) calculated

17

Civil Action No. 01-12257-PBS/Civil Action No. 06-11337-PBS

Abbott's AWPs by applying a markup – usually 18.75% –  to the LPs.  Abbott was aware of how

the Price Publications set its AWPs and knew (1) that the markup remained constant and (2) that

its LPs ultimately controlled the AWP reported by the Price Publications for many of its

products.  Abbott reported WACs for several of its drugs as well, but during the time period

covered by the Complaint, the Price Publications used Abbott's LPs (plus the standard markup)

to set the AWPs used by the Medicaid and Medicare programs.

61.     In some circumstances, Abbott itself calculated and supplied the AWP which it

sought to have published.

62.     For example, in a January 16, 1996 letter from Abbott's Reimbursement Manager

to Medi-Span, Abbott directly reported AWPs for two of its products.

63.     Abbott documents also confirm its knowledge that the LPs it reported directly

impacted the AWP.  In a March 20, 1995 e-mail between Abbott employees regarding the

reporting of new Vancomycin LPs, one employee notes, "Please notify Red Book and Medi-Span

of these changes ASAP.  They are the sources for creating the AWP that is important to

[Abbott's] Alternate Site [sales division]."

64.     Abbott also submitted false and fraudulent prices directly to state Medicaid

programs.  In an October 1, 1997, Abbott "Medicaid Coordinator" Tena Brown represented in a

letter to the State of Texas Medicaid Program that the price on Abbott's Vancomycin 1 GM

Fliptop vial- sterile, NDC 00074-6533-01 ("Vancomycin 1 GM FTV") was $583.70 for a

package of 10, or $58.37 a unit.  That led the Texas Medicaid program to set reimbursement for

Civil Action No. 01-12257-PBS/Civil Action No. 06-11337-PBS

Vancomycin 1 GM FTV at that price ($58.37 a unit). At the time, Abbott sold Vancomycin 1
GM FTV to certain Customers for $5.53 per unit, through a GPO called Oncology Solutions.

65.     With extremely few exceptions, Abbott reported increasingly higher prices for the
Drugs from at least on or before January 1, 1991 through 2001. At the same time, the prices
Abbott actually charged to its Customers decreased or remained the same.

66.     Abbott knew that the prices which it reported to the Price Publications directly
affected reimbursement amounts paid by the Medicaid and Medicare programs. As Abbott's
Manager for Reimbursement noted in an April 26, 1995 memorandum, "[h]aving a published
[LP] that is high allows a provider to bill at that list price." The false or fraudulent prices Abbott
reported to the Price Publications inflated government reimbursement amounts on claims
submitted by Abbott's Customers for the Drugs. A chart setting out some examples showing the
difference between the prices at which Abbott actually sold its drugs and the false prices reported
by Abbott is attached hereto as **Exhibit 1**.

67.     Abbott manipulated its LPs, AWPs and WACs to induce its Customers to
purchase Abbott's products, including the Drugs, by marketing the huge profits that would result
to its Customers.

68.     Abbott was well aware of how the Government used its pricing information to
reimburse Abbott products. For example, Abbott organized an internal entity known as the
"Medicare Working Group." The group (1) was organized by high level Abbott executives, (2)
involved representatives responsible for reimbursement issues from all major Abbott divisions,
and (3) discussed and organized efforts to influence government reimbursement for drugs.

19

Civil Action No. 01-12257-PBS/Civil Action No. 06-11337-PBS

69.     Documents from the Medicare Working Group establish that Abbott knew that AWP is based upon Abbott's reported price plus, according to the Medicare Working Group documents, "a mark-up of 15-20%." Minutes from a January 21, 1997 meeting note that this AWP based on Abbott's reported prices is subsequently reported in "the Red Book, Blue Book and Medispan Book and is used by Medicare, Medicaid and Commercial insurance carriers to determine reimbursement levels."

70.     Neither the Medicaid nor the Medicare programs knew of or sanctioned Abbott's conduct as set forth in this Complaint, *i.e.*, the deliberate manipulation of its published prices to induce its Customers to purchase the Drugs. Abbott never disclosed the price reporting practices for the Drugs identified in this Complaint to the Medicaid or Medicare programs.

## A.    **Vancomycin**

71.     Abbott first introduced its generic Vancomycin in 1988. Abbott's scheme to defraud the United States by causing inflated Vancomycin reimbursements ran from approximately 1989 through 2001. Over that time period, Medicare and Medicaid paid in excess of $75 million for Abbott's Vancomycin.

72.     During that time period, Abbott reported increasingly higher LPs and AWPs for Vancomycin to the Price Publications while the actual contract prices at which Abbott sold Vancomycin to its Customers decreased significantly.

73.     Abbott sold its Vancomycin in several doses and forms. The Vancomycin 1 GM FTV was the most common dose of Vancomycin reimbursed by Medicare and Medicaid.

20

Civil Action No. 01-12257-PBS/Civil Action No. 06-11337-PBS

Abbott's false and fraudulent price reporting on its Vancomycin 1 GM FTV represents how

Abbott reported false and fraudulent prices on its other Vancomycin products.

74.     When Abbott first introduced its Vancomycin 1 GM FTV in 1988, the published

per unit AWP was $25.20.  By early 2001, Abbott reported false prices that drove the AWP for

Vancomycin 1 GM FTV to $76.42.  At the same time, the price at which Abbott's Vancomycin

was widely available to purchasers decreased to under $4.00 by early 2001; the difference (and

potential profit) between the reported price and the actual selling price for Vancomycin 1 GM

FTV was as great as $72.42 a dose, or more than 18 times the actual price at which Abbott sold

Vancomycin 1GM FTV.

75.     Abbott fully controlled and manipulated the AWPs for Vancomycin 1 GM FTV to

boost its Vancomycin sales at the expense of third party payors, including Medicare and

Medicaid.

76.     Abbott's manipulation of its reported Vancomycin prices between 1989 and 2001

created spreads sufficient to induce increased sales of that drug.  Internal memoranda from senior

Abbott sales staff reveal that Abbott actively knew about and marketed the large spreads on

several of its drugs, including Vancomycin.  Those efforts proved successful; the percentage of

Abbott's Vancomycin sales reimbursed by Medicaid increased from less than 10% in 1991 to

approximately 70% in 2000.

77.     Abbott's reporting of Vancomycin prices in 1995 exemplifies the manner in

which Abbott manipulated the price of Vancomycin to maintain and grow its market share.  In

March 1995, Abbott temporarily reported dramatically lower LPs and AWPs for Vancomycin.

Civil Action No. 01-12257-PBS/Civil Action No. 06-11337-PBS

Prior to the March 1995 LP/AWP price change, the Price Publications listed a per unit LP of

$50.90 for Abbott's Vancomycin 1 GM FTV, and a per unit AWP of $60.44 for that drug.

78.     In late March 1995, Abbott reported a new LP of $15.00 for a unit of Vancomycin

1 GM FTV. Based on this new information from Abbott, the Price Publications published

revised per unit prices for Vancomycin 1 GM FTV. They reported a LP of $15.00 and an AWP

of $17.81.

79.     Abbott received numerous complaints from Customers over the resulting

decrease in the spread. Abbott deliberated internally on whether and by how much Abbott

should again increase its spread so that it could reestablish the inducement that had come to be

expected by its Customers. Abbott documents show Abbott's pricing personnel carefully

considering the additional profits they could generate for Abbott's Customers if they artificially

re-inflated the reported prices for Vancomycin 1 GM FTV at various levels.

80.     Abbott subsequently reversed its earlier decision to lower its reported prices and

instead raised its reported Vancomycin prices. In early May 1995, Abbott reported a new per

unit LP for its Vancomycin 1 GM FTV of $32.95. The revised AWP for Abbott's Vancomycin 1

GM FTV became $39.13 (once the Price Publication applied the standard markup).

81.     That reported price increase proved insufficient. Later that same month (May

1995), Abbott reported yet another set of prices for Vancomycin. The LP Abbott reported for its

Vancomycin 1 GM FTV rose to $52.94 and its AWP rose to $62.86 (once the Price Publication

applied the standard markup).

Civil Action No. 01-12257-PBS/Civil Action No. 06-11337-PBS

82.    Thereafter, Abbott reported higher Vancomycin LPs and AWPs to the Publishers each year, despite decreases in its actual prices to Customers for Vancomycin over that same period. The AWP for Abbott's Vancomycin 1 GM FTV peaked at $76.42 per unit in early 2001 at the same time that the actual sales price was less than $4 per unit.

83.    The false prices reported by Abbott directly impacted the amount Medicaid and Medicare reimbursed for Vancomycin. For example, in 1999 Abbott's Vancomycin 1 GM FTV was widely available for approximately $4.75 a unit. Yet, Abbott reported a per-unit Vancomycin LP in 1999 – which served as the baseline for determining the AWP – to First DataBank of $64.35. As a result, the 1999 AWP for Vancomycin 1 GM FTV was set at $76.42.

84.    New York State's Medicaid program relied on the First DataBank prices to set its reimbursement rate for the Vancomycin 1 GM FTV. New York State's Medicaid reimbursement rate for the Vancomycin 1 GM FTV in 1999 was $68.77; the AWP for Vancomycin 1 GM FTV was $76.42 at the time. New York's reimbursement for Vancomycin 1 GM FTV was AWP minus 10%, a reimbursement formula generally similar to those of other states. Abbott's false price representations created a profit spread of approximately $64.02 for Abbott's Customers, on a drug that Abbott sold to those same Customers for approximately $4.75 a unit. The spread between the New York state Medicaid reimbursement for Vancomycin 1 GM FTV – directly influenced by Abbott's false price reporting – and the actual acquisition cost was 1,348%. The profit to Abbott's Customers was 13.5 times the typical acquisition cost for the drug.

85.    Abbott's practice of price manipulation continued into early 2001. At that time, Abbott reported new, lower WACs to the Price Publications for many of its drugs, including

23

Vancomycin, without also reporting new LPs or AWPs. At the time Abbott submitted the new prices in early 2001, it had been under investigation by the Government for pricing fraud. In addition, members of the House Ways and Means Committee accused Abbott of engaging in price reporting misconduct that threatened public safety in the fall of 2000; the Centers for Disease Control had expressed concerns that over-prescription of Vancomycin could lead to the growth in the population of Vancomycin-resistant bacteria. Also, in October 2001, an Abbott joint venture, TAP Pharmaceuticals, Inc. paid $875 million to the Government to resolve its criminal responsibility and civil liability for fraudulent pricing and kickbacks in connection with the marketing of a drug called Lupron. When Abbott submitted reduced WACs, First DataBank changed the way it calculated Abbott's AWP. First Databank personnel set new AWPs for Abbott products by applying a 25% markup to the newly supplied WACs instead of setting Abbott's AWPs by applying a 18.75% markup to Abbott's still inflated LPs. Abbott tried to convince First DataBank personnel not to set Abbott's AWP by reference to these new, lower WACs; Abbott wanted First DataBank to continue to use Abbott's then still inflated LPs to maintain its inflated AWPs. First DataBank refused Abbott's request. Ultimately, Abbott reduced its LPs and WACs to reflect the average sales price for the Drugs on April 30, 2001.

86.     The switch to using the lowered WACs drastically dropped Abbott's reported AWPs in 2001. For Abbott's Vancomycin 1 GM FTV, the AWP dropped from $76.42 per unit in early 2001 (when AWP was determined using the inflated LPs) to $17.72 per unit in 2001 (when AWP was set using the revised, lowered WACs). By 2002, the AWP for this product was down to $6.06 a unit.

24

Civil Action No. 01-12257-PBS/Civil Action No. 06-11337-PBS

87.     As a result of the drop in AWP, the spread on the reimbursement by Medicare and Medicaid was reduced from $60-$70 a unit to approximately $2.00 a unit.

88.     Abbott's Customers recognized that Abbott was responsible for creating and maintaining the spread. Numerous Customers complained to Abbott or the group purchasing organizations (GPOs) who negotiated prices on behalf of Abbott's Customers. A large Customer of Abbott went so far as to demand restitution for the almost $10.5 million in lost profits due to the decrease in spread resulting from Abbott's 2001 submission of lowered prices to the reporting agencies.

89.     Internal memoranda from senior Abbott sales staff reveal that Abbott actively knew about and marketed the large spreads on several of its drugs, including Vancomycin, as an inducement to purchase Abbott's drugs.

90.     Abbott's share of the Medicaid market has dropped steadily since the more accurate prices started being published in 2001 and thereafter went from approximately 70% in early 2001 to approximately 20% in 2004.

**B.      Large Volume Parenterals**

91.     In addition to false price reporting for Vancomycin, Abbott engaged in similar conduct with respect to its LVPs.

92.     LVPs are essentially sterile water, usually mixed with either salt (sodium chloride) or sugar (dextrose). LVPs are cheap to produce and are sold at very low prices.

93.     One of the most commonly utilized Abbott LVPs was 5% Dextrose in Water, 500 ml, NDC # 00074-7922-03 ("5% Dextrose 500 ml").

25

Civil Action No. 01-12257-PBS/Civil Action No. 06-11337-PBS

94.     In 1993, Abbott's 5% Dextrose 500 ml could be widely purchased for as little as $1.80 for a 500ml bag.

95.     The Red Book AWP for 5% Dextrose 500 ml in 1993 was $8.72.

96.     Two years later, in 1995, the price for Abbott's 5% Dextrose 500ml was widely available for even less; one wholesaler was selling it at $1.50 for a 500 ml bag.

97.     During the same two year period from 1993 to 1995 that the actual prices dropped, Abbott twice reported higher prices to the Price Publications for 5% Dextrose 500 ml. The AWP – based on Abbott's representations – increased by 5% in 1994 to $9.16 and was increased by an additional 3% in 1995 to $9.43.

98.     Thus, while Abbott's price to the wholesaler dropped by 20% between 1993 and 1995 (from $1.80 to $1.50), Abbott caused its AWP to increase by 8%.  By 1995, the spread between the AWP and the resale price of that wholesaler was 628%.

99.     Abbott sold these products directly to Customers at prices comparable to those offered by the wholesaler.

100.    Abbott continued to report increasing prices for 5% Dextrose 500 ml after 1995. By reporting increasingly inflated LPs, Abbott caused the Red Book AWP for 5% Dextrose in Water, 500 ml, NDC # 00074-7922-03 to increase in 1996 to $9.71, in 1997 to $10.20, in 1998 to $10.71, in 1999 to $11.25 and in 2000 to $11.80.  Medicaid and Medicare used these reported prices to set their reimbursement levels.  At the same time, Abbott regularly sold the product to its Customers for $1.50 or less per bag of the water-based solution.

26

Civil Action No. 01-12257-PBS/Civil Action No. 06-11337-PBS

101.   Abbott's reporting of increasingly false and fraudulent prices for its 5% Dextrose

500ml reflects the manner in which Abbott implemented its scheme for all of the LVPs during

the relevant time period.  Abbott engaged in identical conduct with respect to the "prices" and

marketing of the other LVP products and package sizes identified by NDC and HCPCS code in

¶¶ 30, 34 of this Complaint.

102.   Abbott used the false and fraudulent prices Abbott reported to the Price

Publications for these water solutions to manipulate reimbursement; the reported prices did not

reflect the actual prices Abbott was charging to its Customers.

103.   Due to Abbott's conduct, Abbott's Customers submitted inflated claims to

Medicare and Medicaid and received millions of dollars in inflated reimbursement for these

water and water-based solutions.  Abbott profited off the scheme by increasing its sales volume

and profits.  Medicare and Medicaid have paid Abbott's Customers in excess of $100 million for

Abbott's LVPs when the typical acquisition costs for those Customers were a fraction of that

amount.

C.   **Acyclovir Sodium**

104.   Acyclovir Sodium (Acyclovir) is an antiviral drug used to treat several infections.

The brand version, called Zovirax, was originally manufactured by Glaxo Welcome, Inc.  Abbott

began selling its generic version of the drug on April 22, 1997.

105.   At the time Abbott launched its versions of Acyclovir in 1997, it reported a LP of

$80.00 for the 500MG Dose of its generic version of Acyclovir (NDC#00074-4427-01).  The

Civil Action No. 01-12257-PBS/Civil Action No. 06-11337-PBS

1997 Blue Book AWP for Abbott's Acyclovir Sodium 500MG was $95.00 (reflecting the

standard price publication mark up on Abbott products of 18.75%).

106.    By 1999, Abbott had raised its reported LP for its Acyclovir Sodium 500MG to

$88.20; the AWP for that dose of Abbott's Acyclovir Sodium had risen to $104.74.

107.    Yet, competition among manufacturers of Acyclovir drove the contract prices for

the drug down sharply.  In 1997, Abbott's Acyclovir Sodium 500MG could be purchased for

$30.00.  By 2000, the typical purchase price for Abbott's Acyclovir Sodium 500MG had eroded

to around $11.

108.    Thus, the spread on Abbott's Acyclovir went from as much as 316% at product

launch in 1997 to as much as 960% by 2000.

109.    Abbott actively marketed the reimbursement spread on Acyclovir to Customers,

including Ven-A-Care, the relator in this matter.  Ven-A-Care operated a home infusion

pharmacy that largely serviced HIV/AIDS patients.  On or around May 30, 1997, an Abbott

national account manager directly marketed the spread on its Acyclovir Sodium to Ven-A-Care.

That national account manager sent documents reflecting the spread on Abbott's Acyclovir and

had conversations with Ven-A-Care where he explicitly marketed the spreads on Abbott's

Acyclovir products.

110.    On April 30, 2001, Abbott reported new LPs and WACs for its Acyclovir

products.  As noted above, the price reporting compendia changed the method it used to calculate

Abbott's AWP.  First Databank began using Abbott's WAC and applying a 25% markup.  The

LP for Abbott's Acyclovir Sodium 500MG dropped from $88.20 to $4.00; the WAC dropped to

28

Civil Action No. 01-12257-PBS/Civil Action No. 06-11337-PBS

$3.81.  The per unit AWP – based on a 25% markup from the $3.81 WAC – for Abbott's

Acyclovir Sodium 500MG dropped from $104.74 to $4.76.  The revised LP, WAC and AWP

was in keeping with the actual contract price for Abbott's Acyclovir Sodium 500MG, which by

mid-2001 was around $4.00 a unit.

**D.**     **Abbott's Home Infusion Pharmacies, Home Infusion Partnerships and Consignment Arrangements.**

      **1.**     **Home Infusion Pharmacies**

      111.     From approximately 1982 until, upon information and belief, 2003, Abbott owned

and operated its own Home Infusion Pharmacies ("Abbott HI Pharmacies") as part of its Hospital

Products Division's ("HPD"), Alternate Site Home Infusion Department.

      112.     Abbott's HI Pharmacies were located at various times in Atlanta, Georgia,

Chicago, Illinois, Los Angeles, California, and in New Jersey.  At some point in that period, the

Abbott HI Pharmacy in Atlanta Georgia closed.

      113.     Abbott billed Medicare and Medicaid for products and services dispensed by the

Abbott HI Pharmacies using Abbott's EIN number and Abbott's own Medicare and Medicaid

provider codes.

      114.     Abbott HI Pharmacies stocked and dispensed Abbott products, including, without

limitation, products identified in this Amended Complaint in ¶ 30, as well as other products

produced and sold by Abbott and other manufacturers.  Upon information and belief, Abbott

stocked its own products at or near the manufacturing costs for those products.  Upon

information and belief, Abbott was able to acquire other manufacturers' drugs at reduced,

contracted prices.

Civil Action No. 01-12257-PBS/Civil Action No. 06-11337-PBS

115.   The Abbott HI Pharmacies billed Medicare and Medicaid through the "Abbott

Reimbursement Department" in Abbott's HPD Alternate Site Home Infusion Department.

116.   Each of the Abbott HI Pharmacies would operate as follows:

A.   The Abbott HI Pharmacies would receive patient prescriptions from

physicians, hospitals, outpatient clinics or other care providers.

B.   Abbott's Reimbursement Department would ascertain whether the referred

patient was eligible for reimbursement for his or her prescription costs through Medicare,

Medicaid or a third party insurer.

C.   Upon receipt of the prescriptions, the Abbott HI Pharmacies would fill the

prescription and would, upon information and belief, at times provide pharmacist services.

D.   After the prescriptions were filled by an Abbott HI Pharmacy, the Abbott

Reimbursement Department would bill either Medicare, Medicaid or a third-party insurer for the

dispensed drug or product, depending upon patient eligibility.

E.   For those patients covered under Medicare or Medicaid, a reimbursement

clerk in the Abbott Reimbursement Department would complete a paper or, at a later point, an

electronic, Medicare HCFA 1500 form seeking reimbursement from Medicare or a Medicaid

reimbursement form.

117.   The HCFA 1500 forms or Medicaid reimbursement forms submitted by the

Abbott Reimbursement Department would reflect Abbott's EIN number and provider number as

the entity to be reimbursed.

Civil Action No. 01-12257-PBS/Civil Action No. 06-11337-PBS

118.    Depending upon the drug and the state program, Medicaid would typically pay to Abbott the AWP or WAC-based reimbursement for drug or product for which Abbott's HI Pharmacy billed.   Medicare would typically pay to Abbott the AWP-based reimbursement for drug or product for which Abbott's HI Pharmacy billed.  Abbott would retain for itself as a profit the difference between the cost of the drug or product to Abbott and the amount of the AWP-based reimbursement ("Abbott HI Pharmacy spread").

119.    Upon information and belief, Abbott did not disclose the Abbott HI Pharmacy spreads to the Medicare or Medicaid programs when it submitted reimbursement forms.

120.    The amounts Abbott HI Pharmacies were reimbursed by Medicare and Medicaid regularly exceeded the cost to Abbott in stocking and dispensing the drugs and products dispensed by the Abbott HI Pharmacies – including its own.

121.    In the case of the Abbott Drugs identified in this Complaint, Abbott's HI Pharmacies were reimbursed inflated amounts for any claims they submitted for those Drugs due to Abbott's fraudulent price reporting scheme.

**2.      Abbott's Home Infusion Partnerships and Consignment Arrangements**

122.    From approximately 1984 until, upon information and belief, 2003, Abbott HPD's Alternate Site Home Infusion Department entered into home infusion partnerships ("HI Partnerships") with various hospitals, care facilities and other medical entities.  These HI Partnerships permitted Abbott's home infusion partners ("HI Partners") or – in some instances Abbott – to bill government health programs on behalf of its HI Partners for the Drugs identified in ¶ 30 at inflated reimbursement levels.

31

Civil Action No. 01-12257-PBS/Civil Action No. 06-11337-PBS

123. Abbott had at least 20 to 25 home infusion partners ("HI Partners") in these partnerships including, but not limited to:[3] University of Michigan's HomeMed, Children's Memorial Hospital of Chicago, Care Partners, Baylor, Harris Methodist, UniHealth, Intermountain, Cedars Sinai, University of Virginia, Seattle Children's Hospital, Cleveland Clinic, and University Hospitals of Cleveland.

124. Abbott entered into standard partnership agreements with the HI Partners and others. Under the terms of the partnership agreements, Abbott would:

     A.     Provide its HI Partners Abbott drugs and products free of charge on a consignment basis, including but not limited to, the Drugs identified in ¶ 30 of this Complaint;

     B.     Provide its HI Partners agreed upon services, including, on occasion, "reimbursement services;" and

     C.     Add the HI Partner to a group purchasing organization of which Abbott was a member, so that the HI Partner, or Abbott on behalf of the HI Partner, could purchase drugs and products that Abbott did not manufacture or sell ("Other Non-Abbott products") at a substantially reduced contract rate.

125. The HI Partner would dispense the drugs or products from its pharmacy. If the drug or product was an Abbott product, that product would be a consigned product that the HI

_____

[3] These HI partners are described herein as identified by an Abbott witness. For some of these HI partners, the witness did not provide full and complete name information.

Partner would not pay for on an individual basis, or at any time prior to when the HI Partner

billed Medicare or Medicaid.

126.    As part of its "reimbursement" services for some HI Partners, Abbott's

Reimbursement Department would submit claims to Medicare, Medicaid and other third party

payors for drugs, medical devices and medical services on the HI Partner's behalf, using the HI

Partner's EIN number and Medicare and Medicaid provider codes.

127.    For patients covered under Medicare or Medicaid, an Abbott reimbursement clerk

in the Reimbursement Department would complete a paper or, at a later point,  electronic,

Medicare HCFA 1500 form seeking reimbursement from Medicare, or the appropriate Medicaid

reimbursement form seeking reimbursement from a State Medicaid program on behalf of the HI

Partner.

128.    Abbott provided reimbursement services to, among others, Care Partners,

University of Michigan, Children's Hospital and the University of Virginia.

129.    If Abbott was providing reimbursement services to an HI Partner, Abbott's

Reimbursement Department would collect reimbursements from Medicare, Medicaid and other

third party payors for claims submitted on behalf of that HI Partner.  Those reimbursement

amounts were collected in lock box bank accounts that, upon information and belief, were

maintained in the name of the HI Partner or Abbott.

130.    Upon information and belief, Abbott would never bill the HI Partners for the

drugs and products it consigned to them, and would never expect payment for them.  Abbott's

payment for the consigned Abbott drugs would be some percentage of the HI Partner's entire pool

33

Civil Action No. 01-12257-PBS/Civil Action No. 06-11337-PBS

of collections from Medicare, Medicaid and third party payors, regardless of whether it was

Abbott or the HI Partner that submitted the claim.

131.    Under the Consignment Partnership Agreements, the HI Partners would never pay

Abbott individual amounts for the drugs or products consigned to the HI Partner.  The Medicare

and Medicaid drug reimbursements were used by Abbott to compensate it for billing and

consulting services not related to the provision of patient care.

132.    For example, a December 1996 Consignment Partnership Agreement, required a

HI Partner to pay Abbott 45.1 % of its gross revenue collections for all of its IVIG treatment,

including any administration fee and/or any drug ingredient cost.  Thus, Abbott would receive a

percentage of any inflated reimbursement spreads for the Drugs identified in ¶ 30 of this

Complaint that were provided to its HI Partners on consignment.

133.    Abbott never disclosed to the Medicare or Medicaid programs that it was directly

profiting from the reimbursement spreads in the above-described arrangement with the HI

Partners.

134.    If an HI Partner would not contract for reimbursement services, the HI Partner

would submit the claims to Medicare and Medicaid and directly collect the reimbursements.

However, Abbott would still consign its drugs and products to the HI Partner and still share in a

percentage of the total collections collected by the HI Partner.

135.    Several state Medicaid programs would reimburse for Abbott drugs covered by

this arrangement at amounts tied to the AWPs or WACs for those drugs.  Medicare also

reimbursed for Abbott drugs covered by these arrangements at amounts tied to the AWPs for the

34

Civil Action No. 01-12257-PBS/Civil Action No. 06-11337-PBS

Abbott drugs. That amount would then be paid to the HI Partner, who in turn would provide a

percentage share to Abbott of its entire collections as payment for various types of categories of

services.

136.    The cost to Abbott in stocking the HI Partner's warehouses with Abbott and non-

Abbott drugs and products was far less than the amounts reimbursed by Medicare and Medicaid

for those drugs and products.

137.    Abbott did not disclose to the Medicare and Medicaid programs that the drugs and

products it sought reimbursement for from Medicare or Medicaid actually cost Abbott far less to

consign to the HI Partner than the ultimate Medicare or Medicaid reimbursement amount.

138.    In the case of the Abbott Drugs identified in this Complaint, Abbott's percentage

of HI Partner reimbursements Abbott that collected was improperly inflated due to Abbott's

fraudulent price reporting scheme.

## FIRST CAUSE OF ACTION

(False Claims Act: Presentation of False Claims)
(31 U.S.C. § 3729(a)(1))

139.    Plaintiff repeats and realleges ¶¶ 1 through 138 as if fully set forth herein.

140.    Abbott knowingly caused or caused to be presented false or fraudulent claims for

payment or approval to the United States for the Drugs for reimbursement that were substantially

higher than providers' actual acquisition costs for the Drugs and based on reported prices that

were fraudulently and artificially manipulated by Abbott. Abbott knowingly used the spread as

an unlawful inducement in violation of the federal anti-kickback statute, causing resulting false

and fraudulent claims to be submitted.

35

Civil Action No. 01-12257-PBS/Civil Action No. 06-11337-PBS

141.    By virtue of the false or fraudulent claims that Abbott caused to be made, the United States has suffered damages and therefore is entitled to multiple damages under the False Claims Act, to be determined at trial, plus civil penalties of not less than $5,000 and up to $10,000 for each violation occurring before September 29, 1999, and not less than $5,500 and up to $11,000 for each violation occurring on or after September 29, 1999.

## SECOND CAUSE OF ACTION

(False Claims Act:  Making or Using False
Records or Statements to Cause Claims to be Paid)
(31 U.S.C. § 3729(a)(2))

142.    Plaintiff repeats and realleges  ¶¶ 1 through 138 as if fully set forth herein.

143.    Abbott knowingly made, used, or caused to be made or used, false records or statements – *i.e.*, the false certifications and representations made or caused to be made by defendants to state Medicaid programs when seeking to ensure that the Medicaid programs would reimburse for the Drugs, and the false representations to the Publishers upon which Medicare and Medicaid relied – to cause false or fraudulent claims paid or approved by the United States.

144.    By virtue of the false records or false statements made by Abbott, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus civil penalties of not less than $5,000 and up to $10,000 for each violation occurring before September 29, 1999, and not less than $5,500 and up to $11,000 for each violation occurring on or after September 29, 1999.

36

Civil Action No. 01-12257-PBS/Civil Action No. 06-11337-PBS

## THIRD CAUSE OF ACTION

### (Unjust Enrichment)

145.   Plaintiff repeats and realleges ¶¶ 1 through 138 as if fully set forth herein.

146.   This is a claim for the recovery of monies by which Abbott has been unjustly enriched, including (1) profits earned by Abbott through its HI Pharmacies and Consignment Partnership Agreements and (2) profits from increased sales resulting from the illegal inducements that Abbott arranged to be paid to its Customers.

147.   By obtaining monies as a result of its violations of federal and state law, Abbott was unjustly enriched, and is liable to account for and pay such amounts, which are to be determined at trial, to the United States.

148.   By this claim, the United States requests a full accounting of all revenues (and interest thereon) and costs incurred by Abbott on sales to Customers to whom it arranged for unlawful inducements, and disgorgement of all profits earned and/or imposition of a constructive trust in favor of the United States on those profits.

## FOURTH CAUSE OF ACTION

### (Common Law Fraud)

149.   Plaintiff repeats and realleges ¶¶ 1 through 138 as if fully set forth herein.

150.   Abbott made material and false representations concerning the prices of the Drugs with knowledge of their falsity or reckless disregard for the truth, with the intention that the United States act upon the misrepresentations to its detriment. The United States acted in justifiable reliance upon Abbott's misrepresentations by making payments on the false claims.

37

Civil Action No. 01-12257-PBS/Civil Action No. 06-11337-PBS

151.    Had the true facts of Abbott's false price reporting as set forth in this Complaint been known to the United States, the United States would not have paid for Abbott products.

152.    By reason of these payments, the United States has been damaged in an as yet undetermined amount.

## PRAYER FOR RELIEF

WHEREFORE, the United States demands and prays that judgment be entered in its favor against Abbott, jointly and severally, as follows:

1.    On the First and Second Causes of Action, for the amount of the United States' damages, trebled as required by law, and such civil penalties as are required by law, together with all such further relief as may be just and proper.

2.    On the Third Cause of Action, for the damages sustained and/or amounts by which Abbott was unjustly enriched, including an accounting of all revenues unlawfully obtained by Abbott, the imposition of a constructive trust upon such revenues, and the disgorgement of the illegal profits obtained by Abbott, plus interest, costs, and expenses, and all such further relief as may be just and proper.

3.    On the Fourth Cause of Action, for compensatory and punitive damages in an amount to be determined, together with costs and interest, and for all such further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

The United States demands a jury trial in this case.

38

Civil Action No. 01-12257-PBS/Civil Action No. 06-11337-PBS

For the United States of America,

MICHAEL J. SULLIVAN
UNITED STATES ATTORNEY

George B. Henderson, II
Assistant U.S. Attorney
John Joseph Moakley
U.S. Courthouse
Suite 9200, 1 Courthouse Way
Boston, MA 02210
Phone: (617) 748-3272
Fax: (617) 748-3971

R. ALEXANDER ACOSTA
UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF
FLORIDA

/s/ Mark A. Lavine
Mark A. Lavine
Ana Maria Martinez
Ann St.Peter-Griffith
Special Attorneys for the Attorney
General
99 N.E. 4th Street, 3rd Floor
Miami, FL 33132
Phone: (305) 961-9003
Fax: (305) 536-4101

PETER D. KEISLER
ASSISTANT ATTORNEY GENERAL

/s/ Gejaa T. Gobena
Joyce R. Branda
Daniel R. Anderson
Renée Brooker
Justin Draycott
Rebecca A. Ford
Gejaa T. Gobena
Civil Division
Commercial Litigation Branch
P. O. Box 261
Ben Franklin Station
Washington, D.C. 20044
Phone: (202) 307-1088
Fax: (202) 307-3852

Dated: June 4, 2007

**CERTIFICATE OF SERVICE**

       I hereby certify that I have this day caused an electronic copy of the above **UNITED STATES' FIRST AMENDED COMPLAINT** to be served on all counsel of record via electronic service pursuant to Paragraph 11 of Case Management Order No. 2 by sending a copy to LexisNexis File & Serve for posting and notification to all parties.

                               /s/ Mark A. Lavine
Dated: June 4, 2007              Mark A. Lavine

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In re: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) | |
| _____ | ) | MDL No. 1456 |
| | ) | Master File No. 01-12257-PBS |
| THIS DOCUMENT RELATES TO: | ) | Subcategory Case No. 06-11337 -PBS |
| | ) | |
| *United States of America ex rel. Ven-a-Care of* | ) | |
| *the Florida Keys, Inc. v. Abbott Laboratories,* | ) | Hon. Patti B. Saris |
| *Inc.*, Civil Action No. 06-11337-PBS | ) | |
| | ) | Magistrate Judge Marianne B. Bowler |

## STIPULATION FOR VOLUNTARY DISMISSAL

Pursuant to Rule 41(a) of the Federal Rules of Civil Procedure and the *qui tam* provisions

of the False Claims Act, 31 U.S.C. § 3730(b)(1), and in accordance with the terms of the

November ___, 2010, Settlement Agreement between the United States, Relator Ven-A-Care of

the Florida Keys, Inc. ("Relator"), and Abbott Laboratories Inc. and Abbott Laboratories

("Abbott") (collectively, the "Parties"), the Parties hereby stipulate, through their undersigned

counsel, to the entry of an order dismissing with prejudice the United States' First Amended

Complaint filed against Abbott in *In re: Pharmaceutical Industry Average Wholesale Price*

*Litigation*, MDL-No. 1456, C.A. No. 01-12257-PBS (D. Mass.) (relating to *United States ex rel.*

*Ven-A-Care of the Florida Keys, Inc. v. Abbott Laboratories, Inc.*, Civil Action No. 06-11337-

PBS.  The dismissed claims, which were previously assigned No. 06-21303-CV-GOLD (S.D.

Fla.), were transferred to this MDL for pre-trial proceedings pursuant to MDL 1456 Conditional

Transfer Order-30 (July 11, 2006).

EXHIBIT B

This stipulation has no effect on claims or allegations against any defendants other than Abbott in *In re: Pharmaceutical Industry Average Wholesale Price Litigation*, MDL-No. 1456, C.A. No. 01-12257-PBS (D. Mass.).

Each party shall bear its own costs and attorneys' fees.

WHEREFORE, to permit them to effectuate the terms of their Settlement Agreement, pursuant to Rule 41(a) of the Federal Rules of Civil Procedure and the *qui tam* provisions of the federal False Claims Act, 31 U.S.C. § 3730(b)(1), the Parties respectfully request that the Court enter an order in the form attached hereto as Exhibit 1.

Respectfully Submitted,

For the United States of America,

CARMEN M. ORTIZ
UNITED STATES ATTORNEY

TONY WEST
ASSISTANT ATTORNEY GENERAL


George B. Henderson, II
Assistant U.S. Attorney
John Joseph Moakley U.S. Courthouse
Suite 9200, 1 Courthouse Way
Boston, MA 02210
Phone: (617) 748-3272
Fax: (617) 748-3971

WIFREDO A. FERRER
UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF FLORIDA


___/s_____
Mark A. Lavine
Special Attorney for the Attorney General
99 N.E. 4th Street, 3rd Floor
Miami, FL  33132
Phone:  (305) 961-9003
Fax: (305) 536-4101

___/s_____
Joyce R. Branda
Daniel R. Anderson
Renée Brooker
Justin Draycott
Rebecca Ford
Civil Division
Commercial Litigation Branch
P. O. Box 261
Ben Franklin Station
Washington, D.C. 20044
Phone: (202) 307-1088
Fax: (202) 307-3852


For the Defendant Abbott Laboratories, Inc.

___/s_____
James Daly
Jones Day
77 West Wacker
Chicago, IL 60601-1692

For the relator, Ven-A-Care of the Florida Keys, Inc.


___/s_____
James J. Breen
The Breen Law Firm, P.A.
3350 S.W. 148th Avenue, Suite 110
Miramar, FL 33027
Tel: (954) 874-1635
Fax: (954) 874-1705

## CERTIFICATE OF SERVICE

I hereby certify that I have this day caused an electronic copy of the above **"STIPULATION FOR VOLUNTARY DISMISSAL"** to be served on all counsel of record via electronic service pursuant to Paragraph 11 of Case Management Order No. 2 by sending a copy to LexisNexis File & Serve for posting and notification to all parties.

_____

November _____, 2010

4

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) |
| ——————————————— | ) |
| | ) |
| THIS DOCUMENT RELATES TO: | ) ) |
| *United States of America ex rel. Ven-a-Care of the Florida Keys, Inc. v. Abbott Laboratories, Inc.*, Civil Action No. 06-11337-PBS | ) ) ) ) |
| | ) ) ) |

MDL No. 1456
Master File No. 01-12257-PBS
Subcategory Case No. 06-11337-PBS

Hon. Patti B. Saris

Magistrate Judge Marianne B. Bowler

## **ORDER OF DISMISSAL**

Pursuant to Rule 41(a) of the Federal Rules of Civil Procedure and the *qui tam* provisions of the federal False Claims Act, 31 U.S.C. § 3730(b)(1), the United States, Relator Ven-A-Care of the Florida Keys, Inc., and Abbott Laboratories Inc. and Abbott Laboratories ("Abbott") (collectively, the "Parties") filed with this Court a Stipulation of Voluntary Dismissal in the above-captioned case.  Upon due consideration of the Stipulation of Voluntary Dismissal,

**IT IS ORDERED** that:

1.       Consistent with the terms of the November__, 2010, Settlement Agreement executed by the United States, Abbott, and Relator (a copy of which is attached as Exhibit A), all civil monetary claims asserted on behalf of the United States in *United States ex rel. Ven-A-Care of the Florida Keys, Inc. v. Abbott Laboratories, Inc.*, 06-21303-CV-GOLD (S.D. Fla.)

EXHIBIT 1

(previously captioned *United States ex rel. Ven-A-Care of the Florida Keys, Inc. v. Abbott Laboratories, Inc.*, 06-CV-11337-PBS (D. Mass.)), shall be dismissed with prejudice.

    2.    Each party shall bear its own costs and attorneys' fees.

    3.    The Court shall retain jurisdiction to enforce the terms, conditions, and releases of the Parties' Settlement Agreement to the extent reasonably necessary and appropriate.

    IT IS SO ORDERED THIS __ day of _____, 2010.


_____
THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT COURT JUDGE

cc: Counsel of Record

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| IN RE: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) | MDL NO. 1456 |
| | ) ) | CIVIL ACTION: 01-CV-12257-PBS Subcategory Docket: 06-CV-11337-PBS |
| THIS DOCUMENT RELATES TO | ) ) ) | Judge Patti B. Saris |
| *U.S. ex rel. Ven-A-Care of the Florida Keys, Inc. v. Abbott Laboratories, Inc.*, No. 07-CV-11618-PBS | ) ) ) ) | Magistrate Judge Marianne B. Bowler |

## UNITED STATES' CONSENT TO RELATOR AND DEFENDANT'S STIPULATION FOR VOLUNTARY DISMISSAL WITH PREJUDICE

Relator Ven-A-Care of the Florida Keys, Inc. (the "Relator") and Abbott Laboratories Inc., have agreed to settle and dismiss the above-captioned action.

Pursuant to 31 U.S.C. § 3730(b)(1), the United States consents to (i) the settlement between Relator and Abbott Laboratories Inc.; and (ii) the dismissal with prejudice of the above-captioned action.  The United States has determined that the amount it will receive in connection with the settlement in the above-captioned case is fair, adequate, and reasonable.

**EXHIBIT C**

Respectfully submitted,

**FOR THE UNITED STATES OF AMERICA,**

CARMEN M. ORTIZ
UNITED STATES ATTORNEY
George B. Henderson, II
Assistant U.S. Attorney
John Joseph Moakley U.S. Courthouse
Suite 9200, 1 Courthouse Way
Boston, MA 02210
Phone: (617) 748-3272
Fax: (617) 748-3971

WIFREDO A. FERRER
UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF FLORIDA

_____
Mark A. Lavine
Special Attorney for the Attorney General
99 N.E. 4th Street, 3rd Floor
Miami, FL 33132
Fax: (305) 536-4101
Phone: (305) 961-9003

Dated: November__, 2010

TONY WEST
ASSISTANT ATTORNEY GENERAL

_____
Joyce R. Branda
Daniel R. Anderson
Renée Brooker
Justin Draycott
Rebecca Ford
Civil Division
Commercial Litigation Branch
P. O. Box 261
Ben Franklin Station
Washington, D.C. 20044
Phone: (202) 307-1088
Fax: (202) 616-3085

2

## CERTIFICATE OF SERVICE

    I hereby certify that I have this day caused an electronic copy of the above **"UNITED STATES' CONSENT TO RELATOR AND DEFENDANT'S STIPULATION FOR VOLUNTARY DISMISSAL WITH PREJUDICE"** to be served on all counsel of record via electronic service pursuant to Paragraph 11 of Case Management Order No. 2 by sending a copy to LexisNexis File & Serve for posting and notification to all parties.

                _____

November _____, 2010

3

# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| IN RE: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) | MDL NO. 1456 |
| | ) | CIVIL ACTION:  01-CV-12257-PBS |
| | ) | Subcategory Docket:  06-CV-11337-PBS |
| | ) | |
| THIS DOCUMENT RELATES TO | ) | Judge Patti B. Saris |
| | ) | |
| *U.S. ex rel. Ven-A-Care of the Florida Keys, Inc. v. Abbott Laboratories, Inc.*, No. 07-CV-11618-PBS | ) ) ) ) | Magistrate Judge Marianne B. Bowler |

**UNITED STATES' CONSENT TO RELATOR AND DEFENDANT'S**
**STIPULATION FOR VOLUNTARY DISMISSAL WITH PREJUDICE**

Relator Ven-A-Care of the Florida Keys, Inc. (the "Relator") and Abbott Laboratories Inc., have agreed to settle and dismiss the above-captioned action.

Pursuant to 31 U.S.C. § 3730(b)(1), the United States consents to (i) the settlement between Relator and Abbott Laboratories Inc.; and (ii) the dismissal with prejudice of the above-captioned action.  The United States has determined that the amount it will receive in connection with the settlement in the above-captioned case is fair, adequate, and reasonable.

**EXHIBIT C**

Respectfully submitted,

**FOR THE UNITED STATES OF AMERICA,**

CARMEN M. ORTIZ
UNITED STATES ATTORNEY
George B. Henderson, II
Assistant U.S. Attorney
John Joseph Moakley U.S. Courthouse
Suite 9200, 1 Courthouse Way
Boston, MA 02210
Phone: (617) 748-3272
Fax: (617) 748-3971

WIFREDO A. FERRER
UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF FLORIDA

_____
Mark A. Lavine
Special Attorney for the Attorney General
99 N.E. 4th Street, 3rd Floor
Miami, FL 33132
Fax: (305) 536-4101
Phone: (305) 961-9003

Dated: November\_\_, 2010

TONY WEST
ASSISTANT ATTORNEY GENERAL

_____
Joyce R. Branda
Daniel R. Anderson
Renée Brooker
Justin Draycott
Rebecca Ford
Civil Division
Commercial Litigation Branch
P. O. Box 261
Ben Franklin Station
Washington, D.C. 20044
Phone: (202) 307-1088
Fax: (202) 616-3085

## <u>CERTIFICATE OF SERVICE</u>

   I hereby certify that I have this day caused an electronic copy of the above "**UNITED STATES' CONSENT TO RELATOR AND DEFENDANT'S STIPULATION FOR VOLUNTARY DISMISSAL WITH PREJUDICE**" to be served on all counsel of record via electronic service pursuant to Paragraph 11 of Case Management Order No. 2 by sending a copy to LexisNexis File & Serve for posting and notification to all parties.

          _____

November _____, 2010

3

# EXHIBIT C

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| IN RE: PHARMACEUTICAL INDUSTRY | ) | MDL NO. 1456 |
| AVERAGE WHOLESALE PRICE | ) | |
| LITIGATION | ) | CIVIL ACTION:  01-CV-12257-PBS |
| | ) | Subcategory Docket:  06-CV-11337-PBS |
| | ) | |
| THIS DOCUMENT RELATES TO | ) | Judge Patti B. Saris |
| | ) | |
| *U.S. ex rel. Ven-A-Care of the Florida Keys,* | ) | Magistrate Judge Marianne B. Bowler |
| *Inc. v. Abbott Laboratories, Inc., et al.,* No. | ) | |
| 06-CV-11337-PBS and *U.S. ex rel. Ven-A-* | ) | |
| *Care of the Florida Keys, Inc. v. Abbott* | ) | |
| *Laboratories, Inc.,* No. 07-CV-11618-PBS | ) | |

### Declaration of Relator, Ven-A-Care of the Florida Keys, Inc., in Support of the Comprehensive Settlement of "AWP Type Claims" for the Federal Share of Medicaid Overpayments Against Abbott Laboratories Inc.

1.      Ven-A-Care of the Florida Keys, Inc. is the *qui tam* Relator in both of the above

styled cases brought against Abbott Laboratories Inc. ("Abbott") pursuant to the federal False

Claims Act (31 U.S.C. § 3729, *et. seq.*) (collectively, the "Abbott *Qui Tam* FCA Actions").  The

first action was commenced in June 1995 in the United States District Court for the Southern

District of Florida (the "Florida Civil Action").  In March 2006, the United States intervened

with respect to certain allegations made against Abbott in the Florida Civil Action.  At that time,

the intervened claims against Abbott were severed and assigned case number 06-21303-CV-

GOLD (S.D. Fla.).  In July 2006, the intervened claims against Abbott were transferred to MDL

and assigned case number 06-CV-11337-PBS.  This action, hereafter the "Florida Abbott HPD

Case," relates to pharmaceutical products manufactured by Abbott's former Hospital Products

Division.

2.      The second action was commenced in April 2000 in the United States District

Court for the District of Massachusetts (the "Massachusetts Civil Action").  The Relator

amended this action in February 2001 to include claims against Abbott relating to pharmaceutical products manufactured by Abbott's Pharmaceutical Products Division ("PPD"). The United States declined to intervene in the claims made against Abbott in the Massachusetts Civil Action.  The Relator has proceeded with the civil prosecution of the claims against Abbott in the Massachusetts Civil Action on behalf of the United States.  In August 2007, the claims against Abbott in the Massachusetts Civil Action were severed, the severed action against Abbott was assigned Civil Action No. 07-CV-11618-PBS (the "Massachusetts Abbott PPD Case"), and Relator filed a severed amended complaint.  The severed claims in Civil Action No. 07-CV-11618-PBS were transferred to MDL 1456.

3.     The Abbott *Qui Tam* FCA Actions are both based on the Relator's disclosures of information to the United States and allegations that Abbott engaged in a course of conduct whereby it allegedly knowingly reported falsely inflated prices for some of its drugs in order to cause the states and federal jointly funded Medicaid Program, and for some drugs the Medicare Program, to overpay for Abbott's pharmaceutical products, thus creating a financial inducement for Abbott's customers which the Relator alleges Abbott knowingly exploited as a marketing advantage.  The Relator has alleged that Abbott's conduct violated the False Claims Act (31 U.S.C. § 3729, *et. seq.*) and the Medicare and Medicaid Anti-kickback Statute (42 U.S.C. §1320a-7b(b)).

4.     The Abbott *Qui Tam* FCA Actions are two of many  "AWP Type Cases" included in this MDL and otherwise filed in other courts around the United States.  The Relator has brought similar AWP Type Cases against Abbott under the *qui tam* provisions of other state statutes similar to the federal FCA seeking recovery of alleged Medicaid overpayments.

5.     The Relator, Abbott, and the United States have agreed to a resolution that will encompass both of the Abbott *Qui Tam* FCA Actions.  Although the United States declined to intervene in the Massachusetts Abbott PPD Case, the Relator cannot effectively settle that case unless the United States consents to its dismissal with prejudice.  The Relator understands that the requisite consent will be given as part of the parties' comprehensive resolution of the Abbott *Qui Tam* FCA Actions.  The Relator has agreed to provide this Declaration in order to facilitate the resolution of the Massachusetts Abbott PPD Case.  The Relator, acting through its current officer and director, John Lockwood, M.D. and with the knowledge and consent of the Relator's President, T. Mark Jones, understands that the representations contained herein will be made part of the proposed order dismissing the Massachusetts Abbott PPD Case.

6.     In the Massachusetts Abbott PPD Case, the Relator alleged FCA violations with respect to various National Drug Codes of the drug, Erythromycin, sold by Abbott's PPD Division.  The Relator's allegations in the Massachusetts Abbott PPD Case focus on those drugs for which the Relator determined that FCA violations could be established and substantial damages recovered based, in part, on an analysis and drug selection process similar to the standards that would later be applied by the Court in the present MDL, consistent with the "30% yardstick expected in the industry" (the "30% yardstick") and the Court's finding that "if more than 50 percent of all sales were made at or about [within 5%] the list price, the list price will not be deemed fictitious" (the "50% within 5% WAC" test).  *See In re: Pharmaceutical Industry Average Wholesale Price Litigation*, 491 F. Supp.2d 20, 32, 101-02, 105 (D. Mass. 2007).

7.     The Relator's investigations of Abbott's conduct have included, but have not been limited to, an investigation of price reporting and related marketing conduct with respect to Abbott PPD brand drugs for which there was substantial Medicaid reimbursement, on a WAC

plus or AWP minus basis, during the 1991 thorough 2005 time period.  In addition to the

Erythromycin products identified in the Massachusetts Abbott PPD Case, the Relator's

investigation included those Abbott PPD brand drugs listed on Exhibit A attached hereto.  The

Relator carefully analyzed its industry insider pricing and marketing information relating to those

brand drugs reflected on Exhibit A, including, but not limited to, the McKesson/Econolink

pricing data at various points in time, the Amerisource Bergen Echo pricing database at various

points in time, and pricing information from various group purchasing organizations and other

sources.[1]  To determine whether the WAC and AWP prices would be considered false,

fraudulent, or deceptive consistent with the standards applied by this Court, the Relator

compared the market price information contained in McKesson/Econolink pricing data,

Amerisource Bergen Echo pricing database, and various other sources with the WAC and AWP

information published by First Databank for those drugs listed on attached Exhibit A.  In

addition, the Relator further considered its industry insider information in an effort to identify

instances where it considered the manufacturer to have marketed an inflated spread for those

drugs reflected on Exhibit A.

---

[1] Relator understands that additional NDCs of the drugs listed in Exhibit A were sold in the marketplace.  The Relator analyzed those NDCs for which it had pricing information.

8.      Based on its analysis of its industry insider pricing and marketing information, and with reference to the three-factor test applied by this Court in other AWP cases (*see In re: Pharmaceutical Industry Average Wholesale Price Litigation*, 491 F. Supp.2d 20, 101-02 (D. Mass. 2007), the Relator did not find pricing and marketing conduct with respect to those brand drugs not identified in the Massachusetts Abbott PPD Case, and reflected on Exhibit A attached hereto, to be false, fraudulent, or deceptive.  Accordingly, the Relator did not believe them to be a proper basis for an FCA claim based on the theory of liability set forth in Paragraph 3 above.

_____

Dr. John Lockwood

Dated:  November __, 2010

# EXHIBIT A

# to Relator Declaration

| NDC | Drug |
| --- | --- |
| 00074258611 | BIAXIN |
| 00074258660 | BIAXIN |
| 00074316313 | BIAXIN |
| 00074316350 | BIAXIN |
| 00074318813 | BIAXIN |
| 00074318850 | BIAXIN |
| 00074336811 | BIAXIN |
| 00074336860 | BIAXIN |
| 00074338660 | BIAXIN |
| 00074316511 | BIAXIN XL |
| 00074316541 | BIAXIN XL |
| 00074316560 | BIAXIN XL |
| 00074166413 | CARTROL |
| 00074166513 | CARTROL |
| 00074602513 | CYLERT |
| 00074605713 | CYLERT |
| 00074607313 | CYLERT |
| 00074608813 | CYLERT |
| 00074156410 | DEPACON |
| 00074568113 | DEPAKENE |
| 00074568216 | DEPAKENE |
| 00074621211 | DEPAKOTE |
| 00074621213 | DEPAKOTE |
| 00074621411 | DEPAKOTE |
| 00074621413 | DEPAKOTE |
| 00074621453 | DEPAKOTE |
| 00074621511 | DEPAKOTE |
| 00074621513 | DEPAKOTE |
| 00074621553 | DEPAKOTE |
| 00074821213 | DEPAKOTE |
| 00074712611 | DEPAKOTE ER |
| 00074712613 | DEPAKOTE ER |
| 00074611411 | DEPAKOTE SPRINKLE |
| 00074611413 | DEPAKOTE SPRINKLE |
| 00074337704 | DESOXYN |
| 00074694104 | DESOXYN |
| 00074694808 | DESOXYN |
| 00074695907 | DESOXYN |
| 00074379401 | DICUMAROL |
| 00074683801 | ENDURONYL |
| 00074685401 | ENDURONYL FORTE |
| 00074332213 | HYTRIN |
| 00074332311 | HYTRIN |
| 00074332313 | HYTRIN |
| 00074332413 | HYTRIN |
| 00074332511 | HYTRIN |
| 00074332513 | HYTRIN |
| 00074380511 | HYTRIN |
| 00074380513 | HYTRIN |
| 00074380611 | HYTRIN |
| 00074380613 | HYTRIN |

| | |
|---|---|
| 00074380711 | HYTRIN |
| 00074380713 | HYTRIN |
| 00074380811 | HYTRIN |
| 00074380813 | HYTRIN |
| 00074395646 | KALETRA |
| 00074395977 | KALETRA |
| 00074780411 | K-TAB |
| 00074780413 | K-TAB |
| 00074780419 | K-TAB |
| 00074780425 | K-TAB |
| 00074314201 | NEMBUTAL |
| 00074311401 | NEMBUTAL SODIUM |
| 00074314801 | NEMBUTAL SODIUM |
| 00074315011 | NEMBUTAL SODIUM |
| 00074316401 | NEMBUTAL SODIUM |
| 00074377804 | NEMBUTAL SODIUM |
| 00074377805 | NEMBUTAL SODIUM |
| 00074194063 | NORVIR |
| 00074663322 | NORVIR |
| 00074949202 | NORVIR |
| 00074376930 | OMNICEF |
| 00074376960 | OMNICEF |
| 00074377113 | OMNICEF |
| 00074377160 | OMNICEF |
| 00074615113 | OMNICEF |
| 00074615160 | OMNICEF |
| 00074338913 | PCE |
| 00074629060 | PCE |
| 00074373513 | PROSOM |
| 00074373613 | PROSOM |
| 00074269913 | TRANXENE SD |
| 00074299713 | TRANXENE SD |
| 00074438913 | TRANXENE T-TAB |
| 00074439013 | TRANXENE T-TAB |
| 00074439113 | TRANXENE T-TAB |
| 00074400990 | TRICOR |
| 00074401390 | TRICOR |
| 00074434290 | TRICOR |
| 00074641590 | TRICOR |
| 00074644790 | TRICOR |

# EXHIBIT D

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| IN RE: PHARMACEUTICAL INDUSTRY | ) | MDL NO. 1456 |
| AVERAGE WHOLESALE PRICE | ) | |
| LITIGATION | ) | CIVIL ACTION: 01-CV-12257-PBS |
| | ) | Subcategory Docket: 06-CV-11337-PBS |
| | ) | |
| THIS DOCUMENT RELATES TO | ) | Judge Patti B. Saris |
| | ) | |
| *U.S. ex rel. Ven-A-Care of the Florida Keys,* | ) | Magistrate Judge Marianne B. Bowler |
| *Inc. v. Abbott Laboratories, Inc.*, No. 07-CV- | ) | |
| 11618-PBS | ) | |

## STIPULATION OF VOLUNTARY DISMISSAL WITH PREJUDICE

Pursuant to Rule 41(a) of the Federal Rules of Civil Procedure and the *qui tam* provisions of the False Claims Act, 31 U.S.C. § 3730(b)(1), and in accordance with the terms of the November __, 2010, Settlement Agreement between the United States, Relator Ven-A-Care of the Florida Keys, Inc. ("Relator"), and Abbott Laboratories Inc. and Abbott Laboratories ("Abbott") ("United States Settlement Agreement") (attached hereto as *Exhibit 1*), and the November __, 2010 Settlement Agreement and Release between Relator and Abbott ("Relator-Abbott Settlement Agreement") (attached hereto as *Exhibit 2*), the Relator and Abbott hereby stipulate, through their undersigned counsel, to the entry of an order dismissing with prejudice all claims that were stated or that could have been stated in the Relator's Complaint For Violations of the False Claims Act, 31 U.S.C. §3729, *et seq*. against Abbott Laboratories, Inc. in *United States ex rel. Ven-A-Care v. Abbott Laboratories, Inc.,* No. 07-CV-11618-PBS (D. Mass.) ("Massachusetts Abbott PPD Case"). The dismissed claims, which were previously assigned Civil Action No. 00-10698-MEL (D. Mass.), were transferred to this MDL for pre-trial proceedings. A proposed Order of Dismissal With Prejudice is attached hereto as *Exhibit 3*.

Separately, pursuant to 31 U.S.C. § 3730(b)(1), the United States has submitted the United States' Consent to Relator and Defendant's Stipulation for Voluntary Dismissal with Prejudice (attached hereto as *Exhibit 4*), which consents to the parties' settlement and dismissal of claims in this action.

In addition, pursuant to the Relator-Abbott Settlement Agreement, the Relator has provided a Declaration (attached hereto as *Exhibit 5*) concerning its investigation, using its industry insider pricing and marketing information, of drugs manufactured by Abbott's Pharmaceutical Products Division ("PPD") that were reimbursed by either the Medicaid or Medicare programs for the time period 1991 through 2005. Using standards consistent with those applied by the Court in MDL 1456 – including but not limited to the "30% yardstick expected in the industry" for brand name drugs (the "30% yardstick") and the Court's finding that "if more than 50 percent of all sales were made at or about [within 5%] the list price, the list price will not be deemed fictitious" (the "50% within 5% WAC" test), *see In re: Pharmaceutical Industry Average Wholesale Price Litigation*, 491 F. Supp.2d 20, 32, 101-02, 105 (D. Mass. 2007) – the Declaration summarizes the Relator's investigation as to whether there is a basis to allege that reported prices and marketing conduct for drugs manufactured by Abbott's PPD were false, fraudulent, or deceptive.

The Relator's investigation determined that, consistent with the standards previously applied by this Court and affirmed by the First Circuit, the reported prices and marketing conduct for Abbott PPD drugs not identified in the above-captioned case, and reflected on Exhibit A to the Relator's Declaration, were neither false, fraudulent, or deceptive. Consistent with this determination and the Relator-Abbott Settlement Agreement, the Relator has agreed to release, to the extent it is capable under applicable law and subject to the exception in Paragraph 3 of the

Relator-Abbott Settlement Agreement, any and all claims that Relator asserted or could have asserted concerning the List Prices, Direct Prices, Average Wholesale Prices, Wholesale Acquisition Costs, or any other price reported to the national pricing compendia for any drug manufactured, marketed, co-marketed, co-promoted, distributed, or sold under the following Abbott labeler codes: 00074, 00300, 00044, 00048, 00524, 00597, 00703, 00822, 60574, 60598, 63459.

This stipulation has no effect on claims or allegations against any defendants other than Abbott in *In re: Pharmaceutical Industry Average Wholesale Price Litigation*, MDL-No. 1456, C.A. No. 01-12257-PBS (D. Mass.).

Each party shall bear its own costs and attorneys' fees.

WHEREFORE, to permit them to effectuate the terms of the United States Settlement Agreement and the Relator-Abbott Settlement Agreement, pursuant to Rule 41(a) of the Federal Rules of Civil Procedure and the *qui tam* provisions of the federal False Claims Act, 31 U.S.C. § 3730(b)(1), the parties respectfully request that the Court enter an order in the form attached hereto as Exhibit 3.

Respectfully Submitted,


**FOR THE RELATOR, VEN-A-CARE OF THE FLORIDA KEYS, INC.**

/s_____
James J. Breen
The Breen Law Firm, P.A.
3350 S.W. 148th Avenue, Suite 110
Miramar, FL 33027
Tel: (954) 874-1635
Fax: (954) 874-1705

*Counsel for Relator*


**FOR THE DEFENDANT ABBOTT LABORATORIES INC.**

/s_____
James Daly
Jones Day
77 West Wacker
Chicago, IL 60601-1692

*Counsel for Abbott Laboratories Inc.*

Dated:  November __, 2010

## CERTIFICATE OF SERVICE

I hereby certify that I have this day caused an electronic copy of the above **STIPULATION FOR VOLUNTARY DISMISSAL WITH PREJUDICE** to be served on all counsel of record via electronic service pursuant to Paragraph 11 of Case Management Order No. 2 by sending a copy to LexisNexis File & Serve for posting and notification to all parties.

_____
David S. Torborg

November __, 2010
.