# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL NO. 1456 |
| THIS DOCUMENT RELATES TO: | CIVIL ACTION: 01-CV-12257-PBS |
| ASTRAZENECA MASSACHUSETTS AND NON-MASSACHUSETTS CLASS 2 AND CLASS 3 SETTLEMENTS | Judge Patti B. Saris |

**CLASS PLAINTIFFS' COMBINED MEMORANDUM OF LAW
IN SUPPORT OF JOINT MOTIONS FOR FINAL APPROVAL
OF MASSACHUSETTS AND NON-MASSACHUSETTS
CLASS 2 AND CLASS 3 ASTRAZENECA SETTLEMENTS**

**TABLE OF CONTENTS**

**PAGE**

I. INTRODUCTION .................................................................................................1

II. SUMMARY OF THE CASE ...............................................................................2

    A. Plaintiffs' Allegations ...............................................................................2

    B. Plaintiffs' Prosecution Of The Case ........................................................2

    C. AstraZeneca's Response To The Litigation..............................................3

    D. Summary of the Settlement Negotiations With AstraZeneca ...................4

III. DESCRIPTION OF THE PROPOSED SETTLEMENT ...................................4

    A. The Proposed Settlement Classes .............................................................4

    B. The Total Settlement Amount And Allocation.........................................5

    C. Summary Of Changes Made In Revised Agreements ..............................6

    D. The Claims Process And Distribution Plan ..............................................8

        1. The claims process ..........................................................................8

            a. Class 3 Consumers..............................................................8

            b. TPPs in Class 2 and Class 3 ...............................................9

        2. The distribution plan.....................................................................10

            a. Class 3 Consumers............................................................10

            b. TPPs and the ISHP Group.................................................10

            c. The ISHP Group initial payment and true-up between TPPs and the ISHP Group ......................................................10

            d. Limited reversion to AstraZeneca of TPP and ISHP money .........12

    E. Attorneys' Fees And Expenses And Compensation Awards...................13

    F. Notice Was Given To The Class..............................................................14

        1. The publication notices ..................................................................16

|   | 2. | The direct notice program | 16 |
|---|----|---------------------------|----|
|   | 3. | Results of the notice program | 16 |

IV. ARGUMENT ............................................................................................................ 17

A. The Court Should Certify The Proposed Class Pursuant To Rules 23(a) And 23(b)(3) For Purposes of Settlement ...... 18

    1. The requirements of Rule 23(a) have been satisfied ...... 18

        a. Numerosity ...... 18

        b. Commonality and typicality ...... 19

        c. Adequate representation ...... 21

    2. The requirements of Rule 23(b)(3) have been satisfied ...... 23

        a. Questions of law or fact common to Class Members predominate over any questions affecting only individual members ...... 24

        b. A class action is superior to other available methods for the fair and efficient adjudication of this matter ...... 24

V. THE SETTLEMENT IS REASONABLE AND SHOULD BE APPROVED ...... 25

A. The Standard For Approval Of Class Settlement:  A Presumption In Favor Of Settlement ...... 25

B. Factors to Consider When Determining the Fairness, Adequacy and Reasonableness of a Settlement ...... 27

    1. Comparison of proposed settlement with the likely result of litigation ...... 28

        a. Risks of establishing liability ...... 29

        b. Risks of proving damages ...... 30

        c. Other risks of continuing the litigation ...... 30

        d. The amount recovered ...... 30

    2. Stage of the litigation and the amount of discovery completed ...... 32

    3. Quality of counsel ...... 33

4.  Conduct of the negotiations:  the proposed Settlement is the result of arduous, arm's-length negotiations conducted by highly experienced counsel ...................................................................................................33

5.  Prospects of the case, including risk, complexity, expense and duration .....................................................................................................34

6.  Reaction of the Class ...................................................................................35

VI.  CONCLUSION.............................................................................................................35

001534-16  413893 v1

## TABLE OF AUTHORITIES

Page(s)

### CASES

*Air Lines Stewards & Stewardesses Ass'n Local 550 v. American Airlines, Inc.,*
455 F.2d 101 (7th Cir. 1972) ...................................................................................15

*Amchem Prods. v. Windsor,*
521 U.S. 591 (1997).................................................................................14, 17, 24

*Andrews v. Bechtel Power Corp.,*
780 F.2d 124 (1st Cir. 1985)..............................................................................19, 22

*Bussie v. Allmerica Fin. Corp.,*
50 F. Supp. 2d 59 (D. Mass. 1999) .......................................................................33

*Carlough v. Amchem Prods., Inc.,*
158 F.R.D. 314 (E.D. Pa. 1993).............................................................................14

*City P'ship Co. v. Atlantic Acquisition Ltd. P'ship,*
100 F.3d 1041 (1st Cir. 1996)...........................................................17, 25, 26, 33

*Collazo v. Calderon,*
212 F.R.D. 437 (D.P.R. 2002) ...............................................................................20

*Denney v. Jenkens & Gilchrist,*
230 F.R.D. 317 (S.D.N.Y. 2005) ......................................................................22, 25

*Detroit v. Grinnell Corp.,*
495 F.2d 448 (2d Cir. 1974)...................................................................................31

*Donovan v. Estate of Fitzsimmons,*
778 F.2d 298 (7th Cir. 1985) .................................................................................26

*Duhaime v. John Hancock Mut. Life Ins. Co.,*
177 F.R.D. 54 (D. Mass. 1997)....................................................................20,21, 29, 32

*Duhaime v. John Hancock Mut. Life Ins. Co.,*
183 F.3d 1 (1st Cir. 1999).......................................................................................26

*Durrett v. Housing Auth. of Providence,*
896 F.2d 600 (1st Cir. 1990)............................................................................14, 26

*E.E.O.C. v. Hiram Walker & Sons, Inc.,*
768 F.2d 884 (7th Cir. 1985) .................................................................................26

*Eisen v. Carlisle & Jacquelin,*
    417 U.S. 156 (1974)..........................................................................................15

*Eisenberg v. Gagnon,*
    766 F.2d 770 (3d Cir. 1985).............................................................................18

*Flinn v. FMC Corp.,*
    528 F.2d 1169 (4th Cir. 1975) .........................................................................33

*General Tel. Co. of the Southwest v. Falcon,*
    457 U.S. 147 (1982)..........................................................................................19

*George Lussier Enters. v. Subaru of New Eng. Inc.,*
    2001 U.S. Dist. LEXIS 12054 (D.N.H. Aug. 3, 2001) .....................................20

*Girsh v. Jepson,*
    521 F.2d 153 (3d Cir. 1975)..............................................................................28

*Giusti-Bravo v. United States Veterans Admin.,*
    853 F. Supp. 34 (D.P.R. 1993)............................................................... *passim*

*Greenspun v. Bogan,*
    492 F.2d 375 (1st Cir. 1974).....................................................................15, 29

*Grunin v. International House of Pancakes,*
    513 F.2d 114 (8th Cir. 1975) ............................................................................15

*Hawkins ex rel. Hawkins v. Commissioner of New Hampshire Dept. of Health & Human
    Servs.,*
    2004 U.S. Dist. LEXIS 807 (D.N.H. Jan. 23, 2004)....................................... *passim*

*In re "Agent Orange" Prods. Liab. Litig.,*
    597 F. Supp. 740 (E.D.N.Y. 1984) .............................................................31, 34

*In re Brand Name Prescription Drugs Antitrust Litig.,*
    1994 U.S. Dist. LEXIS 16658 (N.D. Ill. Nov. 15, 1994) ...................................21

*In re Cardizem CD Antitrust Litig.,*
    200 F.R.D. 297 (E.D. Mich. 2001) ....................................................................1

*In re Compact Disc Minimum Advertised Price Antitrust Litig.,*
    216 F.R.D. 197 (D. Me. 2003)..........................................................22, 23, 26, 28

*In re Corrugated Container Antitrust Litig.,*
    643 F.2d 195 (5th Cir. 1981) ............................................................................32

*In re Crazy Eddie Sec. Litig.,*
    824 F. Supp. 320 (E.D.N.Y. 1993) ...................................................................31

*In re Fleet/Norstar Sec. Litig.*,
   935 F. Supp. 99 (D.R.I. 1996)................................................................28

*In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
   55 F.3d 768 (3d Cir. 1995)............................................................28, 32

*In re Linerboard Antitrust Litig.*,
   2004 U.S. Dist. LEXIS 10532 (E.D. Pa. June 2, 2004) .........................31

*In re Lorazepam & Clorazepate Antitrust Litig.*,
   202 F.R.D. 12 (D.D.C. 2001).................................................................21

*In re Lupron® Mktg. & Sales Practices Litig.*,
   228 F.R.D. 75 (D. Mass. 2005)..............................................................21

*In re Michael Milken & Assocs. Sec. Litig.*,
   150 F.R.D. 46 (S.D.N.Y. 1993) .............................................................31

*In re NASDAQ Market-Makers Antitrust Litig.*,
   169 F.R.D. 493 (S.D.N.Y. 1996) ...........................................................24

*In re NASDAQ Market-Makers Antitrust Litig.*,
   187 F.R.D. 465 (S.D.N.Y. 1998) ...........................................................29

*In re Pharm. Indus. Average Wholesale Price Litig.*,
   230 F.R.D. 61 (D. Mass. 2005).........................................................2, 21

*In re Pharm. Indus. Average Wholesale Price Litig.*,
   233 F.R.D. 229 (D. Mass. 2006)..............................................................2

*In re Pharm. Indus. Average Wholesale Price Litig.*,
   263 F. Supp. 2d 172 (D. Mass. 2003) ......................................................2

*In re Pharm. Indus. Average Wholesale Price Litig.*,
   431 F. Supp. 2d 98 (D. Mass. 2006) ........................................................2

*In re Pharm. Indus. Average Wholesale Price Litig.*,
   491 F. Supp. 2d 20 (D. Mass. 2007) ........................................................3

*In re Pharm. Indus, Average Wholesale Price Litig.*,
   520 F. Supp. 2d 267 (D. Mass. 2007) ......................................................3

*In re Pharm. Indus. Average Wholesale Price Litig.*,
   582 F.3d 156 (1st Cir. 2009)....................................................................3

*In re Pharm. Indus. Average Wholesale Price Litig.*,
   588 F.3d 24 (1st Cir. 2009)......................................................................3

*In re Polymedica Corp. Secs. Litig.*,
    224 F.R.D. 27 (D. Mass. 2004)..............................................................................20, 21

*In re Prudential Ins. Co. of Am. Sales Practices Litig.*,
    962 F. Supp. 450 (D.N.J. 1997), *aff'd*, 148 F.3d 283 (3d Cir. 1998).......................26

*In re Prudential Secs. Ltd. P'ships Litig.*,
    1995 U.S. Dist. LEXIS 22103 (S.D.N.Y. Nov. 20, 1995).......................................31

*In re Relafen Antitrust Litig.*,
    218 F.R.D. 337 (D. Mass. 2003).............................................................................19

*In re Relafen Antitrust Litig.*,
    221 F.R.D. 260 (D. Mass. 2004).............................................................................21

*In re Screws Antitrust Litig.*,
    91 F.R.D. 52 (D. Mass. 1981).................................................................................23

*In re Synthroid Mktg. Litig.*,
    188 F.R.D. 295 (N.D. Ill. 1999)..............................................................................21

*In re Terazosin Hydrochloride Antitrust Litig.*,
    220 F.R.D. 672 (S.D. Fla. 2004).............................................................................21

*In re Union Carbide Corp. Consumer Prods. Business Sec. Litig.*,
    718 F. Supp. 1099 (S.D.N.Y. 1989)...................................................................30, 31

*In re Warfarin Sodium Antitrust Litig.*,
    212 F.R.D. 231 (D. Del. 2002), *aff'd*, 391 F.3d 516 (3d Cir. 2004).......................21

*In re Warfarin Sodium Antitrust Litig.*,
    391 F.3d 516 (3d Cir. 2004).........................................................................30, 31, 35

*Isby v. Bayh*,
    75 F.3d 1191 (7th Cir. 1996) .................................................................................26

*M. Berenson Co. v. Faneuil Hall Marketplace, Inc.*,
    671 F. Supp. 819 (D. Mass. 1987) ....................................................................26, 28

*Mars Steel Corp. v. Continental Ill. Nat'l Bank & Trust Co.*,
    834 F.2d 677 (7th Cir. 1987) .................................................................................34

*Mathewson Corp. v. Allied Marine Indus., Inc.*,
    827 F.2d 850 (1st Cir. 1987)...................................................................................34

*McAdams v. Massachusetts Mut. Life Ins. Co.*,
    2002 U.S. Dist. LEXIS 9944 (D. Mass. May 15, 2002) ...................................17, 18

*McCuin v. Secretary of Health & Human Servs.*,
 817 F.2d 161 (1st Cir. 1987) ........................................................................... 19

*McLaughlin v. Liberty Mut. Ins. Co.*,
 224 F.R.D. 304 (D. Mass. 2004) ........................................................... 20, 22, 23

*Molski v. Gleich*,
 318 F.3d 937 (9th Cir. 2003) ............................................................................ 28

*Mowbray v. Waste Mgmt. Holdings, Inc.*,
 189 F.R.D. 194 (D. Mass. 1999), *aff'd*, 208 F.3d 288 (1st Cir. 2000) ................... 23

*Mullane v. Central Hanover Bank & Trust Co.*,
 339 U.S. 306 (1950) ......................................................................................... 15

*Patterson v. Stovall*,
 528 F.2d 108 (7th Cir. 1976) ............................................................................ 26

*Payne v. Goodyear Tire & Rubber Co.*,
 216 F.R.D. 21 (D. Mass. 2003) ............................................................. 20, 21, 24

*Reppert v. Marvin Lumber & Cedar Co.*,
 359 F.3d 53 (1st Cir. 2004) .............................................................................. 14

*Ressler v. Jacobson*,
 822 F. Supp. 1551 (M.D. Fla. 1992) .................................................................. 29

*Rodrigues v. Members Mortg. Co.*,
 226 F.R.D. 147 (D. Mass. 2005) .................................................................. 19, 23

*Rolland v. Cellucci*,
 191 F.R.D. 3 (D. Mass. 2000) ............................................................... 27, 32, 33

*Smilow v. Southwestern Bell Mobile Sys., Inc.*,
 323 F.3d 32 (1st Cir. 2003) .............................................................................. 18

*Sosna v. Iowa*,
 419 U.S. 393 (1975) ......................................................................................... 22

*Stanton v. Boeing Co.*,
 327 F.3d 938 (9th Cir. 2003) ............................................................................ 20

*United States v. DiBiase*,
 45 F.3d 541 (1st Cir. 1995) .............................................................................. 34

*Waste Mgmt. Holdings, Inc. v. Mowbray*,
 208 F.3d 288 (1st Cir. 2000) ....................................................................... 24, 25

## OTHER AUTHORITIES

Alba Conte & Herbert Newberg, 1 NEWBERG ON CLASS ACTIONS § 3.13 (4th ed. 2002)............20

Alba Conte & Herbert Newberg, 6 NEWBERG ON CLASS ACTIONS § 18 (4th ed. 2002)...............19

Alba Conte & Herbert Newberg, 6 NEWBERG ON CLASS ACTIONS § 11.41 (4th ed. 2002).....26, 34

Fed. R. Civ. P. 23 .......................................................................................................... *passim*

MANUAL FOR COMPLEX LITIGATION § 13 (4th ed. 2009) ...................................................27, 28, 34

MANUAL FOR COMPLEX LITIGATION § 21.312 (4th ed. 2009) ...............................................14, 15

001534-16  413893 v1

## I.     INTRODUCTION

Class Plaintiffs,[1] by their undersigned counsel, respectfully submit this Combined Memorandum in support of Class Plaintiffs' and AstraZeneca's Joint Motions for Entry of an Order Granting Final Approval of the Massachusetts and Non-Massachusetts Class 2 and Class 3 Settlements with AstraZeneca.  The Settlements, which have Massachusetts and non-Massachusetts (nationwide) components, provide for AstraZeneca to pay a total of $103 million ($13 million for Massachusetts and $90 million for non-Massachusetts) to settle the claims of all Consumer Class Members, all TPP Class Members, and the claims of all Independent Settling Health Plans ("ISHPs").  Under the Settlements, consumers were eligible to recover three times their co-payment obligations for Zoladex® for payments made within the Heartland Period.  All Court-awarded fees, costs and expenses, compensation to the named Class Representatives and possible reversion amounts related to TPP opt-outs will be paid out of the total settlement amounts.

Although the claims deadline is still two months away, the Claims Process has already yielded significant response from members of both Classes, and the number of claimants is expected to rise as the deadline for filing claims approaches.  To date, no objections have been filed to the Settlements by any members of Class 2 or Class 3.

---

[1] For the Massachusetts Settlement, the class representatives are as follows.  Class 2:  Blue Cross Blue Shield of Massachusetts and Sheet Metal Workers National Health Fund.  Class 3:  Blue Cross Blue Shield of Massachusetts, Pipefitters Local 537 Trust Funds and Vicinity Welfare Trust Fund, and Teamsters Health & Welfare Fund of Philadelphia and Vicinity.

For the non-Massachusetts Settlement, the class representatives are as follows.  Class 2:  United Food and Commercial Workers Unions and Employees Midwest Health Benefits Fund and Sheet Metal Workers National Health Fund.  Class 3:  Richard Wessels, United Food and Commercial Workers Unions and Employees Midwest Health Benefits Fund, Pirelli Armstrong Tire Corporation Retiree Medical Benefits Trust, Board of Trustees of Carpenters and Millwrights of Houston and Vicinity Welfare Trust Fund and Teamsters Health & Welfare Fund of Philadelphia and Vicinity.

Class Counsel believe that the Settlements are fair, reasonable and adequate. They were reached after years of litigation, a Class 2 and 3 trial, a fully-litigated appeal in the First Circuit Court of Appeals, and AstraZeneca's filing of a Petition for Certiorari before the Supreme Court. The Settlements involved months of arm's-length, intensely fought negotiations, all of which were conducted under the auspices of the Court appointed mediator, Eric Green. And the Settlements provide real relief to Class Members. Accordingly, the Court should grant final approval to the Settlements.

## II.     SUMMARY OF THE CASE

### A.     Plaintiffs' Allegations

Plaintiffs allege that AstraZeneca implemented a fraudulent scheme used to manipulate and inflate the monetary spread between the AWP and the cost to doctors and other providers of Zoladex®, a drug used primarily in the treatment of prostate cancer, in violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1964 ("RICO"), and various state consumer protection laws, causing damage to Plaintiffs and the Classes.[2]

### B.     Plaintiffs' Prosecution Of The Case

Plaintiffs have aggressively prosecuted their claims since 2001. Numerous cases were consolidated before this Court by the Judicial Panel on Multi-District Litigation on April 30, 2002. Plaintiffs overcame motions to dismiss and briefed and argued dozens of discovery motions and more than one motion for class certification.

In discovery, Plaintiffs reviewed, analyzed, coded and loaded into a database millions of pages of documents produced by AstraZeneca, the other defendants and third parties. Plaintiffs

---

[2] The Court is well aware of the extensive facts and claims alleged in this action. *See In re Pharm. Indus. Average Wholesale Price Litig.*, 431 F. Supp. 2d 98 (D. Mass. 2006); *In re Pharm. Indus. Average Wholesale Price Litig.*, 233 F.R.D. 229 (D. Mass. 2006); *In re Pharm. Indus. Average Wholesale Price Litig.*, 230 F.R.D. 61 (D. Mass. 2005); *In re Pharm. Indus. Average Wholesale Price Litig.*, 263 F. Supp. 2d 172 (D. Mass. 2003). Accordingly, we will not repeat all of those allegations here.

also undertook a detailed analysis of transactional data for the Zoladex®, covering a time period exceeding ten years.

Plaintiffs also took over 40 depositions of AstraZeneca's current and former employees, including David R. Brennan, the Chief Executive of AstraZeneca, PLC and former President and CEO of AstraZeneca Pharmaceuticals, LP, and Robert Black, the former President of Zeneca, ICI, the predecessor company that developed Zoladex®.

The Massachusetts Class 2 and 3 Plaintiffs tried their claims against AstraZeneca.  After a trial lasting several weeks, those Plaintiffs prevailed and were awarded double damages.[3] AstraZeneca appealed that verdict to the First Circuit and, when that verdict was affirmed,[4] filed a Petition for Certiorari with the United States Supreme Court.  A separate settlement with AstraZeneca was reached in favor of Class 1 (Medicare Part B Co-Payment Class).  That agreement was approved by the Court on October 2, 2008 (Dkt. No. 5824) and affirmed by the First Circuit (*see In re Pharm. Indus. Average Wholesale Price Litig.*, 588 F.3d 24 (1st Cir. 2009)) and is now final.

## C.     AstraZeneca's Response To The Litigation

AstraZeneca has denied, and continues to deny, that it has committed any violation of law or any wrongdoing, and further denies that it has any liability with respect to any claims asserted in the Complaint.  AstraZeneca filed extensive motions to dismiss, vigorously opposed Plaintiffs' Motion for Class Certification of a litigation Class, hotly contested the Massachusetts Class 2 and 3 trial and pursued an appeal in the First Circuit of the trial ruling against AstraZeneca, and filed a Petition for Certiorari.

---

[3] *See In re Pharm. Indus, Average Wholesale Price Litig.*, 520 F. Supp. 2d 267 (D. Mass. 2007); *In re Pharm. Indus. Average Wholesale Price Litig.*, 491 F. Supp. 2d 20 (D. Mass. 2007).

[4] *In re Pharm. Indus. Average Wholesale Price Litig.*, 582 F.3d 156 (1st Cir. 2009).

D.      **Summary of the Settlement Negotiations With AstraZeneca**

The Settlements were reached after arm's-length and intensely fought negotiation

sessions conducted with the Court appointed mediator, Eric Green.  After the global amount was

reached with AstraZeneca, separate counsel representing the TPPs, ISHPs, and consumers

separately negotiated allocation of the $13 million (Massachusetts) and $90 million (non-

Massachusetts) amounts in a separate round of hard-fought negotiations.

### III.     DESCRIPTION OF THE PROPOSED SETTLEMENT

A.      **The Proposed Settlement Classes**

Consistent with the Court's January 30, 2006, Consolidated Order Re:  Motion for Class

Certification, the proposed Settlement Classes are as follows:

**For the Massachusetts Settlement:**

> **Third-Party Payor MediGap Supplemental Insurance Class
> ("Class 2").**  All TPPs that, from January 1, 1991, through January
> 1, 2005, made, or incurred an obligation to make, reimbursements
> for any portion of a Medicare Part B co-payment for Zoladex®
> purchased in the Commonwealth of Massachusetts.

> **Consumer and Third-Party Payor Class For Payments Made
> Outside the Medicare Context ("Class 3").**  All natural persons
> who made, or were liable for all or any portion of, a non-Medicare
> Part B payment for Zoladex® purchased in the Commonwealth of
> Massachusetts, and all TPPs that made, or incurred an obligation to
> make, non-Medicare Part B reimbursements for Zoladex®
> purchased in the Commonwealth of Massachusetts, during the
> period from January 1, 1991, through June 11, 2010.

**For the non-Massachusetts Settlement:**

> **Third-Party Payor MediGap Supplemental Insurance Class
> ("Class 2").**  All TPPs in the United States who, from January 1,
> 1991, through January 1, 2005, made, or incurred an obligation to
> make, reimbursements for any portion of a Medicare Part B co-
> payment for Zoladex® purchased outside the Commonwealth of
> Massachusetts.

**Consumer and Third-Party Payor Class For Payments Made Outside the Medicare Context ("Class 3").**  All natural persons in the United States who made, or incurred an obligation to make, a non-Medicare Part B payment for Zoladex® purchased outside of the Commonwealth of Massachusetts, and all TPPs in the United States who made, or incurred an obligation to make, non-Medicare Part B reimbursements for Zoladex® purchased outside of the Commonwealth of Massachusetts, during the period from January 1, 1991, through June 11, 2010.

Excluded from each of the Settlement Classes are the AstraZeneca Releasees.[5]

Additionally excluded from each of the Settlement Classes are the following:  (1) all natural persons who only paid flat co-payments, and not any percentage co-payments, for Zoladex®; (2) all federal, state, and local governmental entities in the United States, except any such governmental agencies or programs that made or incurred an obligation to make a reimbursement for Zoladex® as part of a health benefit plan for their employees, but only with respect to such payments; and (3) the ISHPs.

**B.**    **The Total Settlement Amount And Allocation**

AstraZeneca has agreed to pay a total of $103 million to settle the MDL Actions, and all related claims of the Class Plaintiffs and the ISHP Group.  $13 million of that amount is for the Massachusetts Settlement; $90 million is for the non-Massachusetts Settlement.

On February 24, 2010, separate counsel representing TPPs and Consumers held their first negotiations to allocate settlement funds between Consumers and TPPs.  Subsequent arm's-length negotiations were held over the following weeks and resulted in an overall allocation agreement.  The $13 million Massachusetts Settlement will be allocated as follows:  Up to 11.11% or $1.44 million is to be allocated to satisfy consumer claims;

---

[5] "AstraZeneca Releasees" means AstraZeneca and its present and former direct and indirect parents, subsidiaries, divisions, partners and affiliates, and its respective present and former stockholders, officers, directors, employees, managers, agents, attorneys and any of their legal representatives, and its predecessors, successors, heirs, executors, trustees, administrators and assigns as of the date of the Settlement Agreements.  "Affiliates" means entities controlling, controlled by or under common control with AstraZeneca.

- 88.89% or $11.56 million is allocated to satisfy the claims of TPPs;

- Any Consumer Funds not distributed to Consumers will be re-allocated to further satisfy TPP claims; and

- Fees and expenses associated with the litigation and administration of the Settlement will be paid in proportion to the total amount allocated to each constituency.

The $90 million non-Massachusetts Settlement will be allocated as follows:

- Up to $10 million is to be allocated to satisfy Consumer claims;

- $80 million is allocated to satisfy the claims of TPPs and ISHPs combined;

- Any Consumer Funds not distributed to Consumers will be re-allocated to further satisfy TPP/ISHP claims; and

- Fees and expenses associated with the litigation and administration of the Settlements will be paid in proportion to the total amount allocated to each constituency.

**C.      Summary Of Changes Made In Revised Agreements**

On June 18, 2010, Class Plaintiffs filed their Motions for Preliminary Approval of the Settlements.  Dkt. Nos. 7141-43 (non-Massachusetts); 7144-46 (Massachusetts).  This Court granted preliminary approval of the Massachusetts settlement by electronic order on June 24, 2010.  On July 12, 2010, the Court held a preliminary hearing on the non-Massachusetts Settlement and, during that hearing, suggested some revisions to the Settlement.

Accordingly, on August 6, 2010, the Parties filed a Revised Settlement Agreement and Release of AstraZeneca Related to Non-Massachusetts Classes 2 and 3 and the Revised Settlement Agreement and Release of AstraZeneca Related to Massachusetts Classes 2 and 3 (collectively, the "Revised Settlement Agreements"), both accompanied by revised exhibits as appropriate.  The Revised Settlement Agreement for the non-Massachusetts Settlement attached a Revised Proposed Final Approval Order that included the following paragraph:

> The Court confirms that Zoladex® was the only AstraZeneca drug
> as to which class claims were certified in the Court's Sept. 26,
> 2008 Memorandum and Order certifying Non-Massachusetts

Classes 2 and 3.  The Court did not certify Non-Massachusetts class claims with respect to Pulmicort Respules® or any other AstraZeneca drug.[6]

The Revised Settlement Agreements, therefore, did not include a release related to Pulmicort, and no funds were allocated to consumers or TPPs related to payments for Pulmicort.  The Revised Settlement Agreements release claims only with respect to Zoladex® and compensate class members only based upon their expenditures related to Zoladex®.

At the July 12, 2010 hearing, the Court was also concerned with using national print publications and directed Class Counsel to have Kinsella Media provide a media plan that maximized use of media that Kinsella, in her experience in AWP settlements as well as in other cases, found to be most effective at prompting consumer response.  The Parties accordingly submitted an Affidavit of Katherine Kinsella attesting to the submission of a Revised Media Plan, under which Kinsella Media removed those elements of the original notice plan designed to reach purchasers of Pulmicort.

In addition, Kinsella Media conducted an in-depth analysis of media vehicles best suited to reach the target audience of Zoladex® users.  In creating the Revised Consumer Notice Program, Kinsella utilized both (i) the process of "indexing" to analyze how prostate prescription drug users consume particular media and (ii) Kinsella Media's extensive prior experience with the types of media that traditionally drive responses in these and other pharmaceutical-related settlements.  The Revised Consumer Notice Program increased the number of broadcast and cable television spots to the point at which it becomes cost inefficient to purchase additional

---

[6] Pursuant to the discussion at the July 12, 2010 hearing, on August 2, 2010, AstraZeneca moved for entry of an order granting judgment and dismissing all claims asserted by Massachusetts Class 2 and 3 under Mass. G.L. ch. 93A with respect to Pulmicort.  Dkt. No. 7209.  On August 4, 2010, the Court entered such an order.  Dkt. No. 7210.

spots.  In addition, *USA Weekend* was eliminated, and other print publications ranked high for consumption by prostate prescription drug users, such as the *AARP Bulletin*, were substituted.

Further, to address the Court's concern that the original $150 "Easy Refund" amount might be inadequate in that it did not approximate the amount an average consumer with an average co-insurance payment would be forced to expend in a single year, the Revised Settlement Agreements provide consumers the option to elect a one-time payment of up to $400 for consumers who elect the "Easy Refund" option.

The Revised Settlement Agreements further extended the "Heartland Period" in which a consumer's out-of-pocket expenditures would be tripled in the calculation of his/her claim from December 1997 to December 2004.  Finally, the Revised Settlement Agreements directed TPPs to provide co-insurance data for the purpose of providing direct mail notice or calculating direct payments to consumers no later than the date originally set forth for the filing of TPP claims.

On August 12, 2010, this Court granted preliminary approval of both Settlements as revised by the Parties.  *See* Dkt. Nos. 7225 (non-Massachusetts) and 7226 (Massachusetts).

**D.     The Claims Process And Distribution Plan**

> **1.     The claims process**
>
> > **a.     Class 3 Consumers**

In light of the difficulty many consumer class members have in obtaining records evidencing their payment of a percentage co-payment for drugs, the Notice to consumers in Class 3 provides consumers with two options for receipt of a payment:

> > (1)   <u>The Easy Refund Option</u>.  If a Consumer elects the "Easy Refund Option" on the claim form provided and the consumer's claim is verified and accepted by the Claims Administrator, the "Total Recognized Claim" used for purposes of calculating their payment made to each such Consumer Settlement Class Member will be $400.

(2)     The Full Estimation Refund Option.  If a Consumer elects the "Full Estimation Refund Option," the consumer will be required to estimate the consumer's total out-of pocket expenses associated with percentage co-payments or full cash payments for each drug for which the consumer is seeking payment in the Settlement.  The consumer will also be required to provide documentation to support the consumer's estimated out-of-pocket expenses for each drug.

The Consumer's estimated out-of-pocket expenses for Zoladex® during the period of December 1, 1997, through December 31, 2004 will be multiplied by a factor of three (3x), and added to the consumer's total obligation related to Zoladex® outside of this time period (without a multiplication factor).  The sum of these two figures will be used to calculate the payment made to each Consumer.

**b.     TPPs in Class 2 and Class 3**

In order to make a valid claim, TPP Class Members are required to provide the amount of their Zoladex® purchases during the period of January 1, 2003, to December 31, 2004.  This period serves as a proxy for claims associated with the full class period because of the difficulty TPPs have in accessing claims data that is older and likely not maintained electronically or on current electronic systems.  This "proxy period" will be used to determine the payments made to each TPP Class Member.

In order to validate their claim,TPP Class Members claiming Zoladex® purchases during the proxy period that exceed $300,000 in total are required to submit electronic claims documentation with their claim.  Those TPPs with claimed purchases of $300,000 or less do not have to submit electronic claims documentation with their claim but may be required to furnish such claims documentation if the Claims Administrator requests it.

2.      **The distribution plan**

a.      **Class 3 Consumers**

The amount to which a Class 3 consumer will be entitled will be determined based upon

the consumer's election between the Easy Refund and the Full Estimation Refund options as

outlined above in Section III(D)(1)(a).  If the sum of all valid Total Recognized Claims for all

Consumer Settlement Class Members exceeds the amount of the Settlement Funds allocated to

satisfy Consumer Settlement Class Member claims, all consumer claims will be reduced

proportionately.  If, on the other hand, the sum of all valid Total Recognized Claims for all

Consumer Settlement Class Members is less than the amount of Settlement Funds allocated to

satisfy Consumer Settlement Class Member Claims, the undistributed funds will be shared

equally by TPPs and ISHPs to further satisfy their claims.

b.      **TPPs and the ISHP Group**

The claims of all TPP Settlement Class Members and ISHP Group Members for

Zoladex® purchases will exceed the total amount of funds allocated to satisfy the claims of TPP

Settlement Class Members and ISHP Group Members under the Settlement Agreement.

Therefore, each TPP Settlement Class Member or ISHP Group Member will be paid a pro rata

portion of the Settlement Amount allocated to TPP Settlement Class Members and the ISHP

Group based on each TPP's and ISHP's "Total Recognized Claim."

c.      **The ISHP Group initial payment and true-up between TPPs and the
        ISHP Group**

Shortly after preliminary approval of the Settlement, pursuant to the terms of the non-

Massachusetts Settlement, the ISHP Group was paid an initial $18.3 million.  The remaining

funds available to pay ISHP claims have been segregated and subject to a "true-up" between the

ISHP Group and TPP Settlement Class Members.  In exchange for receipt of this initial payment,

the ISHPs fully released their claims against AstraZeneca.  Because they are separately represented and are not Class members, the ISHP Group was able to provide a release to AstraZeneca without the need for Court approval or the time involved in providing notice.  In return, the non-Massachusetts Settlement provided for an expedited payment of some portion of the monies the ISHP Group would ultimately be entitled to from the Settlement.

The $18.3 million initial payment was derived by making some very conservative assumptions about the size of the ISHP Group claims as compared to those of TPP Settlement Class Members.  First, ISHPs were required to show that they insure more than 60% of the "covered lives" in the United States (that is, those individuals with private health insurance).  In fact, as demonstrated in Exhibit A to the Settlement Agreement, ISHPs insure over 70% of the covered lives in the United States.  Yet despite having coverage of 70% of the covered lives in the United States, the ISHP Group Members, in the aggregate, were initially allocated only 50% of the total funds allocated to all TPPs.  Second, certain robust assumptions were made about the amount of attorneys' fees and costs that would be applied to the amounts ultimately available to be distributed to the ISHP Group and subtracted from the 50% allocation.  Finally, in determining the initial payment amount, only 75% of the net allocation was paid out to the ISHP Group as part of the initial payment, leaving the remainder to be subject to the true-up between the ISHP Group and TPP Settlement Class Members.

The true-up formula is a simple one.  Each TPP Settlement Class Member and ISHP Group member individual claim will be calculated in exactly the same manner, as a percentage of all TPP related claims.  The amount of funds paid to the ISHP Group after all claims have been calculated by the Claims Administrator will account for the $18.3 million initial payment.  Essentially, the $18.3 million will be subtracted from what the ISHP Group is ultimately due,

and they will be paid the balance of what they are entitled to at the end of the claims and auditing process.

### d.    Limited reversion to AstraZeneca of TPP and ISHP money

There is no provision in either Settlement for a refund to AstraZeneca resulting from valid Consumer Opt-Outs.

For TPPs, AstraZeneca has limited reversionary rights.  For the Massachusetts Settlement, in the event there are valid TPP Opt-Outs from the Class, once all claims of all TPP Class Members have been received and audited by the Claims Administrator, AstraZeneca will be entitled to a refund of a percentage of the $11.56 million set aside for TPP claims.  For the non-Massachusetts Settlement, in the event there are valid TPP Opt-Outs from the Class, once all claims of all TPPs, including TPP Class Members and the ISHP Group have been received and audited by the Claims Administrator, AstraZeneca will be entitled to a refund of a percentage of the $80 million set aside for TPP claims.  For both Settlements, the amount of the refund is meant to approximate the amount of funds the TPP Opt-Outs would have been entitled to under the claims process, free of any reduction for attorneys' fees or costs of notice or administration.

Under both Settlements, the percentage of the amount potentially refunded to AstraZeneca will be equal to the percentage of purchases by TPP Opt-Outs compared to the claimed purchases of all TPPs, including the ISHP Group, that have submitted claims documentation to the Claims Administrator.  So under the Massachusetts Settlement, if TPP Opt-Outs represent purchases that are 2% of the purchases of the sum of all TPP and TPP Opt-Out purchases, AstraZeneca will receive 2% of the total funds ultimately allocated to TPPs and ISHPs combined ($11.56 million plus any of the $1.44 million set aside for Consumer Claims and not claimed by Consumers, if any).  And under the non-Massachusetts Settlement, if TPP Opt-Outs represent purchases that are 2% of the purchases of the sum of all TPP purchases,

including TPP Class purchases, ISHP Group purchases and TPP Opt-Out purchases, AstraZeneca will receive 2% of the total funds ultimately allocated to TPPs and ISHPs combined ($80 million plus any of the $10 million set aside for Consumer Claims and not claimed by Consumers).

TPPs seeking exclusion were asked to provide the amount of their Zoladex purchases during the proxy period (although it was not required) in order to facilitate calculating the refund to AstraZeneca and the "true-up" of TPP/ISHP claims.  In the event insufficient information is provided by TPP Opt-Outs, the parties have agreed to cooperate and use other available information to estimate the purchases of TPP Opt-Outs.  The Settlement Agreement provides that AstraZeneca must notify Lead Class Counsel of any notices of a TPP Opt-Out in excess of $1 million.  To date, Class Counsel has not received such a notice.

**E.**     **Attorneys' Fees And Expenses And Compensation Awards**

Contemporaneously with this Motion, Class Counsel have filed a Motion for attorneys' fees and costs and compensation to the class representatives in association with the these Settlements pursuant to which Class Counsel are seeking 33⅓% of the Settlement Funds as attorneys' fees and expenses and compensation awards for the Class Representatives at the Court's pre-approved rate of $100/hour.  Understanding that the award of attorneys' fees is a matter committed to the sole discretion of this Court, subject to Court approval, AstraZeneca has agreed not to object to these requests.

Class Counsel have reached an agreement with members of the ISHP Group and ISHP Group Counsel concerning attorneys' fees.  That agreement is identified for the Court pursuant to Fed. R. Civ. P. 23(3).  *See* Settlement Agreement, Exhibit M.

F.      **Notice Was Given To The Class**

Reasonable notice must be provided to Class Members to allow them an opportunity to object to the proposed Settlement.  *See Durrett v. Housing Auth. of Providence*, 896 F.2d 600, 604 (1st Cir. 1990).  Rule 23(e) requires notice of a proposed settlement "in such manner as the court directs."  In a settlement class maintained under Rule 23(b)(3), class notice must meet the requirements of both Fed. R. Civ. P. 23(c)(2) and 23(e).  *See Carlough v. Amchem Prods., Inc.*, 158 F.R.D. 314, 324-25 (E.D. Pa. 1993) (stating that requirements of Rule 23(c)(2) are stricter than requirements of Rule 23(e) and arguably stricter than the due process clause).  Under Rule 23(c)(2), notice to the class must be "the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." *Amchem Prods. v. Windsor*, 521 U.S. 591, 617 (1997); *Reppert v. Marvin Lumber & Cedar Co.*, 359 F.3d 53, 56 (1st Cir. 2004).

The MANUAL FOR COMPLEX LITIGATION sets forth several elements of the "proper" content of notice.  If these requirements are met, a notice satisfies Fed. R. Civ. P. 23(c)(2) and 23(e) and due process, and binds all members of the Class.  The Notice must:

1.      Define the Class and any subclasses;

2.      Describe clearly the options open to the class members and the deadlines for taking action;

3.      Describe the essential terms of the proposed settlement;

4.      Disclose any special benefits provided to the class representatives;

5.      Provide information regarding attorney fees;

6.      Indicate the time and place of the hearing to consider approval of the settlement;

7.      Describe the method for objecting to or opting out of the settlement;

8.    Explain the procedures for allocating and distributing settlement funds and, if the settlement provides different kinds of relief for different categories of class members, clearly set forth those variations;

9.    Explain the basis for valuation of nonmonetary benefits if the settlement includes them;

10.   Provide information that will enable class members to calculate or at least estimate their individual recoveries, including estimates of the size of the Class and any subclasses; and

11.   Prominently display the address and phone number of class counsel and how to make inquiries.

MANUAL FOR COMPLEX LITIGATION § 21.312 (4d ed. 2009); *see also*, *e.g.*, *Air Lines Stewards & Stewardesses Ass'n Local 550 v. American Airlines, Inc.*, 455 F.2d 101, 108 (7th Cir. 1972) (notice that provided summary of proceedings to date, notified of significance of judicial approval of settlement and informed of opportunity to object at the hearing satisfied due process); *Grunin v. International House of Pancakes*, 513 F.2d 114, 122 (8th Cir. 1975); *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173 (1974); *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 315 (1950) ("The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it."); *Greenspun v. Bogan*, 492 F.2d 375, 382 (1st Cir. 1974).

The notice program proposed by the parties and approved by the Court clearly meets this standard.  Among other things, the Notice described why the Class Member received the Notice and what the lawsuit is about; advised that the recipient could be a member of the Class; described the terms and benefits of the Settlement, including compensation to be sought by Class Counsel; gave instructions for making a claim by completing a Claim Form, which was included with the Notice, as well details on how the Settlement would be distributed; and provided instructions for commenting on the Settlement and appearing at the final Fairness Hearing.

To distribute the Notice, Class Counsel employed, and the Court appointed, Rust Consulting, Inc. ("Rust"), which specializes in the administration of class actions, to oversee the administration of the Classes and execute the Notice Plan.  The details of that execution, which are summarized below, are set forth in the Declaration of Katherine Kinsella ("Kinsella Decl."), Exhibit A hereto, and the details of the Direct Notice Plan to TPPs are set forth in the Declaration of Robin M. Niemiec ("Niemiec Decl."), Exhibit B hereto.

### 1. The publication notices

The Notice Program used a Publication Notice to reach TPP and Consumer Class Members.  Kinsella Decl., ¶¶ 21-23.  It was published in *Parade, AARP Bulletin, Newsweek, Reader's Digest*, and in the leading paper in every county in Massachusetts.  *Id.*  A true and correct copies of the Publication Notice is attached as Exhibit 1 to the Kinsella Declaration.

In addition to published notice, KM placed a 30-second television spot designed to appeal specifically to Class Members.  Kinsella Decl. ¶¶ 24-25.  KM also used Internet banner advertising to provide additional notice opportunities beyond the broad-reaching print program to Class Members.  *Id.* ¶¶ 26-28.

### 2. The direct notice program

Rust maintains a mailing database of 41,916 potential TPP Class Members.  Niemiec Decl., ¶ 4.  In accordance with the Court's Order dated August 12, 2010, direct mail notice to TPPs was completed on August 27, 2010.  *Id.* ¶ 6.  A total of 41,916 TPP notices were mailed first class to all TPPs in the Claim Administrator's TPP database.  *Id.* ¶ 7.

### 3. Results of the notice program

The deadline for TPPs to file claims, as set forth in the Court's Orders, was October 26, 2010.  The Claims Administrator has received a total of 370 claims from TPP Class Members.  Niemiec Decl. ¶ 13.

- 16 -

The deadline for the submission of claims by Class 3 consumers is also February 15, 2011.  To date the Claims Administrator reports a total of 608 Class 3 consumer claims filed. Niemiec Decl. ¶ 14.  Class Counsel anticipate that the number of Class 3 consumer filing claims will also increase as the claims deadline approaches.  This is particularly true because Rust obtained names and addresses for additional consumers as a result of the data submitted by TPPs that had claims in excess of $300,000 and claims filed by ISHPs.  As of December 10, 2010, Rust mailed 70,389 Consumer Notice Packets using that data.  *Id.*  ¶ 16.

The deadline for objections and request for exclusions is December 31, 2010.  To date, the claims administrator has received a total of 6 requests for exclusion by TPP Class Members and 1 request from a Consumer Class Member.  Niemiec Decl. ¶ 17.  Class Counsel have not received any objections to either settlement by TPPs or Class 3 Consumer members.

## IV.    ARGUMENT

A class action cannot be compromised or settled without the approval of the Court.  Fed. R. Civ. P. 23(e).  Prior to addressing the adequacy of a proposed Settlement, the Court must determine whether the plaintiff class, as agreed to by the parties, may be certified for purposes of the Settlement.  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613 (1997); *Hawkins ex rel. Hawkins v. Commissioner of New Hampshire Dept. of Health & Human Servs.*, 2004 U.S. Dist. LEXIS 807, at *2 (D.N.H. Jan. 23, 2004).  Further, the decision to approve or reject a proposed settlement is committed to the Court's sound discretion.  *City P'ship Co. v. Atlantic Acquisition Ltd. P'ship*, 100 F.3d 1041, 1043-44 (1st Cir. 1996).  Class actions have long been recognized by the courts as an essential tool for adjudication of cases involving multiple claims that are susceptible of similar factual and/or legal inquiries, and for which individual recovery might be too modest to warrant prosecution of the case on an individual basis.  To that end, when analyzing a motion to certify, "district courts in this circuit have frequently recognized that 'Rule

- 17 -

23(a) should be liberally construed in order not to undermine the policies underlying the class action rule.'" *McAdams v. Massachusetts Mut. Life Ins. Co.*, 2002 U.S. Dist. LEXIS 9944, at *7 (D. Mass. May 15, 2002) (quoting *Lessard v. Metropolitan Life Ins. Co.*, 103 F.R.D. 608, 610 (D. Me. 1984)), *aff'd*, 391 F.2d 287 (1st Cir. 2004).  Consistent with this rule, "when a court is in doubt as to whether to certify a class action, it should err in favor of allowing a class." *McAdams*, 2002 U.S. Dist. LEXIS, at *8 (quoting *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 303 (E.D. Mich. 2001)); *see also Eisenberg v. Gagnon*, 766 F.2d 770, 785 (3d Cir. 1985) ("The interests of justice require that in a doubtful case[,] any error, if there is to be one, should be committed in favor of allowing a class action.").

Certification of the Settlement Class is appropriate in this case because the requirements of Rule 23(a) and Rule 23(b) are satisfied.

**A.  The Court Should Certify The Proposed Class Pursuant To Rules 23(a) And 23(b)(3) For Purposes of Settlement**

**1.    The requirements of Rule 23(a) have been satisfied**

Rule 23(a) of the Federal Rules of Civil Procedure requires a party seeking class certification to satisfy four prerequisites:  (i) numerosity; (ii) commonality; (iii) typicality; and (iv) adequacy of representation.  *Smilow v. Southwestern Bell Mobile Sys., Inc.*, 323 F.3d 32, 38 (1st Cir. 2003) (citing *Amchem*, 521 U.S. at 613).  In this case, all four requirements of Rule 23(a) have been met.

**a.    Numerosity**

Numerosity requires that the class include so many members that joinder would be impracticable.  Fed. R. Civ. P. 23(a)(1).  Although there is no magic number of Class Members that will qualify for class certification, numerosity "is not a difficult burden to satisfy." *McAdams*, 2002 U.S. Dist. LEXIS 9944, at *9 (quoting *In re Cardizem CD Antitrust Litig.*, 200

F.R.D. 297, 303 (E.D. Mich. 2001)).  Courts have generally found groups of more than forty to satisfy the numerosity requirement.  *Id.* at *10; *see also In re Relafen Antitrust Litig.*, 218 F.R.D. 337, 342 (D. Mass. 2003) (broadly drawn class definition "suggests that members of the class, once identified, will be 'so numerous and widely dispersed that joinder . . . is impracticable'"). Precise quantification of Class Members is not necessary, and a court may make common sense assumptions to support a finding of numerosity.  *McCuin v. Secretary of Health & Human Servs.*, 817 F.2d 161, 167 (1st Cir. 1987); *see also Andrews v. Bechtel Power Corp.*, 780 F.2d 124, 131-32 (1st Cir. 1985) (court can consider economy, geographic dispersion and ability of individual members to bring suit); Alba Conte & Herbert Newberg, 6 NEWBERG ON CLASS ACTIONS ("NEWBERG") § 18:2-18:4 (4th ed. 2002).

In this case, the numerosity requirement is not in doubt.  Notice was mailed to over 40,000 TPPs nationwide, a large subset of which are Class Members, and almost 1,000 members of Class 2 and Class 3 have filed claims.  Classes of this size makes joinder of all members impracticable.

### b.  Commonality and typicality

The commonality requirement is met if "there are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  Typicality, on the other hand, requires that the claims of the named plaintiffs be typical of the claims of the class.  Fed. R. Civ. P. (23)(a)(3).  Often, the requirements of Rule 23(a)(2) and (3) are considered together.  *See General Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147, 157 n.13 (1982); *Rodrigues v. Members Mortg. Co.*, 226 F.R.D. 147, 151 (D. Mass. 2005).  The crux of both requirements is to ensure that "maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence."  *Falcon*, 457 U.S. at 157 n.13.

To satisfy the commonality requirement, the named plaintiffs' claims must share at least one common question of law or fact with the class' claims. *See, e.g.*, *McLaughlin v. Liberty Mut. Ins. Co.*, 224 F.R.D. 304, 309 (D. Mass. 2004) (While requiring that "questions of law or fact be shared by the prospective class," Rule 23(a)(2) does not require that "every question be common."); *Stanton v. Boeing Co.*, 327 F.3d 938, 953 (9th Cir. 2003); *Collazo v. Calderon*, 212 F.R.D. 437, 442 (D.P.R. 2002). The "commonality" requirement of Rule 23(a)(2) "is a 'low hurdle' easily surmounted." *Duhaime v. John Hancock Mut. Life Ins. Co.*, 177 F.R.D. 54, 63 (D. Mass. 1997) (citations omitted). It requires only that there be a single question of law or fact that is common to all class members. *George Lussier Enters. v. Subaru of New Eng. Inc.*, 2001 U.S. Dist. LEXIS 12054, at *11 (D.N.H. Aug. 3, 2001). The commonality requirement "does not require that class members' claims be identical." *Payne v. Goodyear Tire & Rubber Co.*, 216 F.R.D. 21, 25 (D. Mass. 2003) (quoting *Mack v. Suffolk Cty.*, 191 F.R.D. 16, 23 (D. Mass. 2000)).

With respect to typicality, "[t]he central inquiry in determining whether a proposed class has typicality is 'whether the class representatives' claims have the same essential characteristics as the claims of the other members of the class.'" *In re Polymedica Corp. Secs. Litig.*, 224 F.R.D. 27, 36 (D. Mass. 2004) (quoting *In re Amerifirst Secs. Litig.*, 139 F.R.D. 423, 428 (S.D. Fla. 1991)), *vacated on other grounds*, 432 F.3d 1 (1st Cir. 2005); *McLaughlin*, 224 F.R.D. at 310; *see also* 1 NEWBERG § 3.13 (the typicality requirement is usually met "when it is alleged that the same unlawful conduct was directed at or affected both the named Plaintiffs and the class sought to be represented"). Furthermore, the plaintiff does not need to show "substantial identity between [his] claims and those of absent class members," but only that "[his] claims arise from the same course of conduct that gave rise to the claims of the absent members." *In re*

*Polymedica*, 224 F.R.D. at 36 (quoting *Priest v. Zayre Corp.*, 118 F.R.D. 552, 555 (D. Mass. 1988) (internal quotation marks omitted)); *see Payne*, 216 F.R.D. at 26 (typicality requires "the same essential characteristics" among claims).

Both commonality and typicality are present here.  As the Court has already ruled in certifying litigation classes in this case, "there are numerous common factual issues:  whether the AWPs and/or WACs for the AWPIDs were misrepresented, whether that misrepresentation was intentional, whether it was done with a fraudulent intent, and whether it proximately caused harm to consumers."  *In re Pharm. Indus. Average Wholesale Price Litig.*, 230 F.R.D. 61, 78 (D. Mass. 2005).  As to typicality, Plaintiffs' claims arise out of the same course of conduct and are based on the same legal theories as those of the absent Class Members.  Plaintiffs and Class Members were all harmed by AstraZeneca's unlawful scheme.  Accordingly, the named Plaintiffs' interests are not only "typical" of the absent Class Members, they are identical and easily satisfy Rule 23(a)(3).[7]

### c.    Adequate representation

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class."  This inquiry is satisfied if:  (i) the plaintiff's counsel is qualified,

---

[7] Various other courts have certified nationwide classes in drug pricing cases involving schemes not dissimilar to those alleged in this case.  *See In re Lupron® Mktg. & Sales Practices Litig.*, 228 F.R.D. 75 (D. Mass. 2005); *In re Relafen Antitrust Litig.*, 221 F.R.D. 260, 288 (D. Mass. 2004) (certifying class of persons and entities who "purchased" a drug); *In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 248 (D. Del. 2002) ("Several other courts have recently certified nationwide and multi-state classes under federal and state laws in actions alleging overpayment for prescription drugs."), *aff'd*, 391 F.3d 516 (3d Cir. 2004); *In re Lorazepam & Clorazepate Antitrust Litig.*, 202 F.R.D. 12 (D.D.C. 2001) (conspiracy to prevent competition and raise price of drugs); *In re Synthroid Mktg. Litig.*, 188 F.R.D. 295 (N.D. Ill. 1999) (drug manufacturer alleged to have suppressed information in order to protect generic drug competition); *In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672, 703 (S.D. Fla. 2004) (certifying class of persons and entities who "paid" all or part of the purchase price for a drug); *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 332 (E.D. Mich. 2001) (class of "purchasers" of Cardizem); *In re Brand Name Prescription Drugs Antitrust Litig.*, 1994 U.S. Dist. LEXIS 16658, at *3-4 (N.D. Ill. Nov. 15, 1994) (class of "purchasers" of "brand name prescription drugs").  Indeed, Courts in this District have approved closely analogous classes in a variety of circumstances.  *See, e.g.*, *Duhaime*, 177 F.R.D. at 54 (class was ascertainable because it was defined to include persons who purchased life insurance policies from one time period through another).

experienced, and able to prosecute the action on behalf of the class vigorously, and (ii) the interests of the representative parties do not conflict with the interests of any class members. *Sosna v. Iowa*, 419 U.S. 393, 403 (1975); *McLaughlin*, 224 F.R.D. at 310, *Andrews*, 780 F.2d at 130; *Hawkins*, 2004 U.S. Dist. LEXIS 807, at *10; *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 216 F.R.D. 197 (D. Me. 2003). It is well established that "in complex litigations … a plaintiff need not have expert knowledge of all aspects of the case to qualify as a class representative, and a great deal of reliance upon the expertise of counsel is to be expected." *Denney v. Jenkens & Gilchrist*, 230 F.R.D. 317, 327 (S.D.N.Y. 2005) (quoting *In re AM Int'l Inc. Secs. Litig.*, 108 F.R.D. 190, 196-97 (S.D.N.Y. 1985)).

Class Counsel include some of the most qualified and experienced lawyers in the United States in the successful prosecution of class actions. These firms have vigorously pursued the rights of the Class Members in this case for nearly ten years, conducted discovery, prepared countless filings and memoranda in this action, tried and prevailed on the Class 2/3 Massachusetts claims, sustained that verdict at the First Circuit, and have engaged in extensive settlement negotiations with AstraZeneca. Further, these firms and their co-counsel continue to stand ready, willing and able to devote the resources necessary to litigate this case vigorously and to see it through to the best possible resolution, if the Settlement is not approved, and the Court has repeatedly found that Class Counsel were adequate.[8]

Neither the Plaintiffs nor Class Counsel have any interests that are antagonistic to those of the Class Members who now stand to benefit from the Settlement. The central issues in this

---

[8] The Court has found counsel adequate when issuing its original class certification opinion; issuing its class certification order; preliminarily approving the proposed GSK settlement; preliminarily approving these Settlements; granting final approval to the AstraZeneca Class 1 Settlement; and approving the final GSK settlement. The resumes of the Class Counsel whose approval is sought, Hagens Berman Sobol Shapiro LLP, Spector, Roseman, Kodroff & Willis P.C., Wexler Wallace LLP, and Edelson & Associates, LLC, have been previously submitted to the Court but will be provided again upon request.

case – the existence, unlawfulness and effect of AstraZeneca's scheme to improperly manipulate the AWP of its Subject Drugs – are common to the claims of Plaintiffs and the other members of the Class. The representative Plaintiffs, like each absent Class Member, have a strong interest in proving AstraZeneca's scheme, establishing its unlawfulness, and demonstrating how the Class was affected by the illegal conduct. Plaintiffs have submitted to discovery and worked with counsel for the protection of the Class. There is no conflict between the Plaintiffs and the Class Members, so Plaintiffs satisfy the requirements of Rule 23(a)(4).

      **2.**      **The requirements of Rule 23(b)(3) have been satisfied**

In addition to having satisfied the prerequisites of Rule 23(a), the Class also satisfies those of Rule 23(b)(3), namely, (i) questions of law or fact common to Class Members predominate over any questions affecting only individual members, and (ii) the class action is superior to other available methods for the fair and efficient adjudication of this matter. *McLaughlin*, 224 F.R.D. at 311; *Rodrigues*, 226 F.R.D. at 152; *In re Compact Disc*, 216 F.R.D. at 204; *Mowbray v. Waste Mgmt. Holdings, Inc.*, 189 F.R.D. 194, 196-97 (D. Mass. 1999), *aff'd*, 208 F.3d 288 (1st Cir. 2000); *In re Screws Antitrust Litig.*, 91 F.R.D. 52, 55 (D. Mass. 1981).

In this case, all the specific and general issues – Defendant's liability under various state consumer protection acts; the formation and fulfillment of the scheme; liability evidence showing improper promotion of the spread and its effect on the Class; aggregate damages to the Class as a whole – are common, uniform, and applicable to all Class Members. Adjudication of Plaintiffs' and Class Members' claims can be done most efficiently as a class action. A class action is the superior method of adjudicating the nearly identical claims of the many Class Members in this case because it reduces variations and inconsistencies in the adjudication of similar claims, effectively utilizes judicial resources and economically allows for the adjudication of many claims involving an identical complex scheme and legal theory.

### a.    Questions of law or fact common to Class Members predominate over any questions affecting only individual members

The Rule 23(b) predominance inquiry is satisfied "unless it is clear that individual issues will overwhelm the common questions and render the class action valueless." *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 517 (S.D.N.Y. 1996).  This inquiry, however, does not require "uniformity of claims across the entire class."  *Payne*, 216 F.R.D. at 26 (citing *Amchem*, 521 U.S. at 623-25).  In determining whether common questions of law or fact predominate, the Court should determine if the various claims of the Plaintiffs are sufficiently cohesive to justify treating them all in one, single judicial forum.  *See Amchem*, 521 U.S. at 625 ("Predominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws."); *see Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 296 (1st Cir. 2000) ("single, central issue" as to the defendant's conduct vis-à-vis class members can satisfy predominance requirement even when other elements of the claim require individualized proof).

Individual issues in this case will not overwhelm the common questions of law or fact because the central question is whether AstraZeneca illegally manipulated the published AWP for Zoladex® and improperly marketed the spread.  There is no doubt that the Plaintiffs would present common evidence regarding the existence and scope of the alleged scheme at any trial of this matter, much as was done in the Massachusetts Class 2 and 3 trial.

### b.    A class action is superior to other available methods for the fair and efficient adjudication of this matter

With respect to the superiority requirement, a court considers:  (i) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (ii) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (iii) the desirability or undesirability of concentrating the litigation of the

claims in the particular forum; and (iv) the difficulties likely to be encountered in the management of a class action.  Fed. R. Civ. P. 23(b)(3).  As to the last of these factors, where a court is "[c]onfronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, for the proposal is that there be no trial."  *Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d at 298 (citing *Amchem*, 521 U.S. at 620); *Denney*, 230 F.R.D. at 326.

Analyzing the three remaining factors under the superiority requirement, it is clear that a class action would provide the fairest and most efficient method of adjudication.  First, Class Members have losses too small to pursue through individual cases, even though those losses are significant to them.  In addition, the large size of both Classes, the complexity of the litigation, the cost of the litigation and similar issues all make a class action the superior method of adjudicating the claims of members of both Classes.  The interests of Class Members in individually controlling the prosecution of separate claims are outweighed by the efficiency of the class mechanism.  It would be a waste of judicial and the parties' resources to require thousands of separate prosecutions.  Such an approach would necessarily risk inconsistent adjudications establishing varying standards for identical conduct.

## V.     THE SETTLEMENT IS REASONABLE AND SHOULD BE APPROVED

### A.     The Standard For Approval Of Class Settlement:  A Presumption In Favor Of Settlement

In determining whether to approve a settlement, the First Circuit, as required by Rule 23(e)(1)(C), has held that "[a] district court can approve a class action settlement only if it is fair, adequate and reasonable."  *City P'ship Co.*, 100 F.3d at 1043.  The Court must undertake a detailed assessment of the terms of the Settlement, the interests of the Class Members as well as any third parties that might be affected by the settlement, and the circumstances of the litigation

and the proposed settlement. *See Duhaime v. John Hancock Mut. Life Ins. Co.*, 183 F.3d 1, 2, 7 (1st Cir. 1999); *Durrett*, 896 F.2d at 604; *Hawkins*, 2004 U.S. Dist. LEXIS 807, at *14.

The First Circuit grants substantial deference to trial courts and has "refrain[ed] from intervening unless there is found to be an abuse of discretion." *City P'ship Co.*, 100 F.3d at 1043-44; *Durrett*, 896 F.2d at 603.  A court reviewing a settlement "is not to decide whose assertions are correct, but merely to ascertain whether the district court clearly abused its discretion in approving the settlement." *City P'ship Co.*, 100 F.3d at 1043-44.[9]

In this Circuit, a presumption in favor of settlement is to be found "[w]hen sufficient discovery has been provided and the parties have bargained at arms-length." *City P'ship Co.*, 100 F.3d at 1043; *In re Compact Disc*, 216 F.R.D. at 207; *M. Berenson Co. v. Faneuil Hall Marketplace, Inc.*, 671 F. Supp. 819, 822 (D. Mass. 1987); *see also* NEWBERG § 11.41 at 453. And the law has long favored settlement of litigation.  This is particularly true in class actions and other complex cases where substantial resources can be conserved by avoiding the time, cost and rigors of prolonged litigation.  In addition, there is an overriding public interest in favor of settlement of complex class action suits, especially where the substantive issues of the case "reflect a broad public interest in the rights to be vindicated or the social or economic policies to be established." *See*, *e.g.*, *Donovan v. Estate of Fitzsimmons*, 778 F.2d 298, 307 (7th Cir. 1985).

---

[9] Also, as a general rule, courts will not substitute their own thoughts for the parties' business judgment in arriving at a settlement. *Patterson v. Stovall*, 528 F.2d 108, 114 (7th Cir. 1976).  Accordingly, the Court is not called upon to determine whether the Settlement reached by the parties is the best possible deal, nor whether Class Members will receive as much from a settlement as they might have recovered from victory at trial. *See Giusti-Bravo v. United States Veterans Admin.*, 853 F. Supp. 34, 36 (D.P.R. 1993) (In evaluating proposed class action settlement, "courts are required to make an inquiry to determine whether the proposal, taken as a whole, is fair, adequate, reasonable and in the best interests of all those who will be affected by it."); *In re Compact Disc*, 216 F.R.D. at 211 (judge notes that "[a]s supervising judge [he is] not to prejudge the merits of the case ... and [is not] to second-guess the settlement, [but is] only to determine if the parties' conclusion is reasonable"); *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F. Supp. 450, 534 (D.N.J. 1997), *aff'd*, 148 F.3d 283 (3d Cir. 1998); *E.E.O.C. v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 889 (7th Cir. 1985).  Courts challenged with evaluating a proposed class action settlement recognize that the "essence of settlement is compromise" and will not represent a total win for either side. *Isby v. Bayh*, 75 F.3d 1191, 1200 (7th Cir. 1996) (quoting *Armstrong v. Board of Sch. Dir.*, 616 F.2d 305, 315 (7th Cir. 1980)).

- 26 -

By supporting the settlement of complex, class action disputes, the judicial system can help minimize litigation expenses on both sides, reduce the strain on scarce judicial resources, and avoid the risk of trial to both parties.  MANUAL FOR COMPLEX LITIGATION § 13 (4th ed. 2009).

These concerns apply with particular force in a case such as this, where thousands of third-party payors and consumers throughout the country were subject to allegedly deceptive and unfair practices in connection with the marketing and sale of Zoladex®.  Individual litigation would clog the courts of this and many other states; would take years to resolve; and, given the relatively modest amount of damages suffered by most members of Class 2 and Class 3, it likely would be available only to the largest TPPs wealthy and sophisticated enough to retain their own lawyers.  The proposed Settlement is the best and only vehicle to assure that all members of both Classes, regardless of their means, receive the relief to which they are entitled in a prompt and efficient manner.

These Settlements were the result of intense litigation and arm's-length negotiations between counsel.  The litigation was hard fought and the negotiations were lengthy and detailed. There was no collusion, and all the negotiations were conducted at arm's length.  Therefore, the Settlements should be presumed to be fair.

**B.      Factors to Consider When Determining the Fairness, Adequacy and Reasonableness of a Settlement**

There is no single test in the First Circuit for determining whether a proposed class action settlement is fair.  As one court has explained, "[t]he fairness determination is not based on a single inflexible litmus test, but, instead, reflects [the court's] studied review of a wide variety of factors bearing on the central question of whether the settlement is reasonable in light of the uncertainty of litigation."  *Rolland v. Cellucci*, 191 F.R.D. 3, 8 (D. Mass. 2000).

Other Circuits generally have considered "the negotiating process by which the settlement was reached and the substantive fairness of the terms of the settlement compared to the result likely to be reached at trial." *In re Compact Disc*, 216 F.R.D. at 206.  Among the factors that other courts have employed are the following:

(1)      comparison of the proposed settlement with the likely result of litigation;

(2)      stage of the litigation and the amount of discovery completed;

(3)      quality of counsel;

(4)      conduct of the negotiations; and

(5)      prospects of the case, including risk, complexity, expense and duration.

*In re Compact Disc*, 216 F.R.D. at 206.[10] Applying these six factors to the proposed Settlement in this case clearly indicates that the Settlement is more than adequate and should be approved.

### 1.      Comparison of proposed settlement with the likely result of litigation

This factor involves the question of "how the value of the settlement compares to the relief the plaintiffs might recover after a successful trial and appeal, discounted for risk, delay and expense." *In re Compact Disc*, 216 F.R.D. at 207; *Giusti-Bravo*, 853 F. Supp. at 36 (noting that if settlement were rejected, "plaintiffs could very well face a long and winding road toward trial and almost unsurmountable obstacles in attempting to obtain a more comprehensive relief than the one provided"); MANUAL FOR COMPLEX LITIGATION (FOURTH) § 13 (4th ed. 2009) ("The high stakes in complex cases increase the incentive to avoid the risk of trial, and the burgeoning cost of pretrial activity places a premium on settling early in litigation.").

---

[10] *See also Molski v. Gleich*, 318 F.3d 937, 953 (9th Cir. 2003); *In re Fleet/Norstar Sec. Litig.*, 935 F. Supp. 99, 105 (D.R.I. 1996); *In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 785 (3d Cir. 1995); *Giusti-Bravo*, 853 F. Supp. at 36; *M. Berenson Co.*, 671 F. Supp. at 822-23; *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975).

In making this assessment, a court is cautioned not to "decide the merits of the case or resolve unsettled legal questions." *Giusti-Bravo*, 853 F. Supp. at 36; *Greenspun v. Bogan*, 492 F.2d at 381 (district court should not "engage in a trial of the merits, for the purpose of settlement is precisely to avoid such a trial"); *Ressler v. Jacobson*, 822 F. Supp. 1551, 1553 (M.D. Fla. 1992) (courts should limit inquiry to "whether the possible rewards of continued litigation with its risks and costs are outweighed by the benefits of the settlement"). Also, the court "cannot, and should not, use as a benchmark the highest award that could be made to the plaintiff after full and successful litigation of the claim. Nor should the court consider cases of particular individual class members to determine whether each and every member of the class receives the fullest possible compensation." *Duhaime*, 177 F.R.D. at 68.

As part of their settlement negotiations, and the ultimate decision to accept the Settlement, Plaintiffs analyzed various risks of continuing litigation. These included risks related to establishing liability at trial and risks relating to the amount of damages that could be recovered at trial. A consideration of all the various risk factors and potential recovery reveals that the Settlements are more than adequate.

### a.    Risks of establishing liability

While the Court in a bench trial had ruled against AstraZeneca on liability, and the First Circuit affirmed that ruling, AstraZeneca filed a Petition for Certiorari with the Supreme Court.[11] Plaintiffs realized that there was some risk that the Court would accept that Petition on a number of issues. Plaintiffs also realized that, should they try non-Massachusetts claims to a jury, a jury could likewise find differently than how this Court found after the bench trial.

---

[11] As the court in *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465 (S.D.N.Y. 1998), recognized, "[i]t is known from past experience that no matter how confident one may be in the outcome of litigation, such confidence is often misplaced." *Id*. at 475 (citation omitted).

### b.      Risks of proving damages

Class Counsel are also mindful of the Court's Class 2 and 3 trial ruling that limit damages to the time period 1998 through 2002.  A jury on non-Massachusetts claims could have found the same limitation, which would deprive Class Members of compensation for other time periods.  In contrast, the Settlement opens claims to Class Members who were administered AstraZeneca Subject Drugs outside of this time period.

### c.      Other risks of continuing the litigation

Another important factor considered by the Class Plaintiffs in evaluating the reasonableness of the Settlement, especially given the age of the consumer Class Members, was the value to Class Members of receiving payment as soon as possible, as opposed to taking the risk of losing the value of the Settlements if the Supreme Court were in any way to alter the verdict obtained.  *See In re Warfarin Sodium Antitrust Litig.,* 391 F.3d 516, 536 (3d Cir. 2004) ("[I]t was inevitable that post-trial motions and appeals would not only further prolong the litigation but also reduce the value of any recovery to the class.").

Because of the uncertainty surrounding the outcome of this litigation, approval of this Settlement will afford the entire Class "the quickest, surest remedy to their claims."  The Settlement will provide Class Members with "benefits fully commensurate with any results reasonably attainable after protracted litigation." *Giusti-Bravo*, 853 F. Supp. at 38.  Weighing all of the risks the Plaintiffs faced, the Settlement is reasonable.

### d.      The amount recovered

Many courts have cautioned that the overall percentage of recovery by itself is not telling; what must be considered are the risks of proceeding towards trial and ultimately sustaining trial results on appeal.  The court in *In re Union Carbide Corp. Consumer Prods. Business Sec. Litig*., 718 F. Supp. 1099 (S.D.N.Y. 1989), recognized that "[t]he dollar amount of the settlement by

itself is not decisive in the fairness determination … Dollar amounts are judged not in comparison with the possible recovery in the best of all possible worlds, but rather in light of the strengths and weaknesses of plaintiffs' case." *Id*. at 1103.  Other courts have approved settlements which provide only a small percentage of the recovery sought.  *See In re Michael Milken & Assocs. Sec. Litig.*, 150 F.R.D. 46, 64-65 (S.D.N.Y. 1993); *In re "Agent Orange" Prods. Liab. Litig.*, 597 F. Supp. 740, 762 (E.D.N.Y. 1984); *Detroit v. Grinnell Corp.*, 495 F.2d 448, 455 n.2 (2d Cir. 1974) ("[T]here is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery.").

Many other courts have approved settlements providing a recovery of 10-12% of potential damages where substantial risks exist.  *See In re Linerboard Antitrust Litig.*, 2004 U.S. Dist. LEXIS 10532, at *15-17 (E.D. Pa. June 2, 2004).  Similarly, in *Warfarin*, the Third Circuit noted that "typical recoveries in securities class actions range from 1.6% to 14%." *Warfarin*, 391 F.3d at 539 (citing *Cendant*, 264 F.3d at 241); *see also In re Prudential Secs. Ltd. P'ships Litig.*, 1995 U.S. Dist. LEXIS 22103 (S.D.N.Y. Nov. 20, 1995) (approving of settlement of 1.6 - 5% of claimed damages) and *In re Crazy Eddie Sec. Litig.*, 824 F. Supp. 320 (E.D.N.Y. 1993) (approving settlement of 6-10% of damages).

The recovery obtained here is a substantial amount of the aggregate Class damage. Coming on the heels of the Class 2 and 3 trial, Plaintiffs were very well acquainted with the prospective strengths and risks of the case.  Notwithstanding these risks, with which the Court is also well acquainted, Plaintiffs were able to garner a Settlement Amount of $103,000,000.  For context, Plaintiffs' expert, Raymond Hartman, has estimated damages of $156,740,961 based on the Court's liability findings from the Massachusetts trial for each year, applying relevant

statutes of limitation and including those states included in the Court's opinion on multi-state certification.  When the class is expanded to include all states and the District of Columbia, and removing statutes of limitation from consideration and expanding the damage period back to 1995, the year Zoladex was introduced (even though the Court did not find liability prior to 1998 at trial), the estimate is $231,313,715.  Using either number as a touchstone, the $103,000,000 garnered is more than fair and reasonable.  Further, consumers are eligible to recover three times their damages for Zoladex purchased during an extended Heartland Period.

In sum, the amount recovered militates heavily in favor of approving the Settlement.

### 2.     Stage of the litigation and the amount of discovery completed

The Court is also required to evaluate whether the amount of evidence obtained through discovery is sufficient to determine the settlement's adequacy.  *Giusti-Bravo*, 853 F. Supp. at 38 (finding that although it is probable substantial discovery still remains, the amount of discovery already conducted was sufficient to permit "an accurate assessment of each party's chances at trial"); *Rolland*, 191 F.R.D. at 8 (finding discovery to be sufficient given that the parties had a voluminous amount of information at the time as well as the advice and reports of their experts).[12]  In addition, courts have taken into consideration the stage of litigation at which settlement is reached "because it indicates how fully the district court and counsel are able to evaluate the merits of plaintiffs' claims."  *Duhaime*, 177 F.R.D. at 67 (citing *Armstrong v. Board of Sch. Dir.*, 616 F.2d 305, 325 (7th Cir. 1980)); *In re GMC*, 55 F.3d at 783 (trial court should consider whether counsel participating in the settlement negotiations "had access to sufficient information to appreciate the merits of the class's case").

---

[12] Settlements have been supported with far less discovery.  *See, e.g., In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 211 (5th Cir. 1981) (where no formal discovery was taken, access to other information such as indictments, documents produced to Grand Jury and pleadings was deemed adequate).

Sufficient discovery has been conducted in this matter to allow Class Counsel to fairly investigate the pertinent legal and factual issues.  The parties exchanged written discovery, conducted many depositions, and AstraZeneca produced millions of documents.  Class Counsel spent more than four years reviewing said documents, organizing documents for use, creating an electronic database and making determinations on utilization of important documents.  Trial was held on the Massachusetts claims of Class 2 and Class 3, and trial was imminent for Class 1.  In sum, Class Counsel were fully aware of the value of the Class claims before the case was settled.

### 3. Quality of counsel

As stated above, "[w]hen the parties' attorneys are experienced and knowledgeable about the facts and claims, their representations to the court that the settlement provides class relief which is fair, reasonable and adequate should be given significant weight."  *Rolland*, 191 F.R.D. at 10; *Bussie v. Allmerica Fin. Corp.*, 50 F. Supp. 2d 59, 77 (D. Mass. 1999).  With respect to the quality of counsel, the Court has looked at a variety of factors, including "the length of their involvement in the litigation, their competence, and their experience in this particular type of litigation."  *Giusti-Bravo*, 853 F. Supp. at 40.  This Court has already repeatedly found that Class Counsel are qualified to represent the Class.  Class Counsel have been involved in this case from the beginning, having created and filed the original Class Action Complaint in this Court, even prior to the creation of an MDL.  As detailed in the previously-submitted resumes of Class Counsel, the firms have been appointed lead counsel in numerous class actions.

### 4. Conduct of the negotiations:  the proposed Settlement is the result of arduous, arm's-length negotiations conducted by highly experienced counsel

There is a presumption of correctness attached to a Class settlement reached in arm's-length negotiations between experienced, capable counsel.  *City P'ship Co.*, 100 F.3d at 1043; *see also Hawkins*, 2004 U.S. Dist. LEXIS 807, at *15; *Flinn v. FMC Corp.*, 528 F.2d 1169, 1173

(4th Cir. 1975) ("While the opinion and recommendation of experienced counsel is not to be blindly followed by the trial court, such opinion should be given weight in evaluating the proposed settlement."); *see also* NEWBERG § 11.41 at 87-89.

The United States Court of Appeals for the Seventh Circuit, in approving a class action settlement, noted that "[r]ather than attempt to prescribe the modalities of negotiation, the district judge permissibly focused on the end result of the negotiation.…  The proof of the pudding was indeed in the eating."  *Mars Steel Corp. v. Continental Ill. Nat'l Bank & Trust Co.*, 834 F.2d 677, 684 (7th Cir. 1987); *see also In re "Agent Orange"*, 597 F. Supp. at 762 (most important concern for the court in reviewing a settlement of a class action is the strength of the plaintiffs' case if it were fully litigated).

In the instant action, the parties actively engaged in many rounds of negotiations, for many months.  The parties negotiated arduously and at arm's-length with the Court-appointed Mediator.  The negotiations involved submissions of proposals, counter-proposals, evaluation of all discovery and factual arguments.  The parties have worked long and hard to reach a resolution of this matter, and Plaintiffs submit it is fair, appropriate, and in the best interests of members of both Classes.

### 5.      Prospects of the case, including risk, complexity, expense and duration

The last factor outlined in *Compact Disc* captures the "prudential policy favoring settlement as a preferred alternative to costly, time-consuming litigation."  *Mathewson Corp. v. Allied Marine Indus., Inc.*, 827 F.2d 850, 852 (1st Cir. 1987); *United States v. DiBiase*, 45 F.3d 541, 546 (1st Cir. 1995) ("[S]ettlements reduce excessive litigation expenses and transaction costs."); MANUAL FOR COMPLEX LITIGATION (FOURTH) § 13 (4th ed. 2009) ("One of the major incentives to settle is to avoid the cost and burden of further discovery.").  Without question, in a "complex class action involving prolonged litigation" such as this, "settlements are strongly

favored by the courts because they represent the easiest, and quickest, way of disposing of the case." *Giusti-Bravo*, 853 F. Supp. at 35-36.[13]

It has been a substantial undertaking for the Plaintiffs and their counsel to prosecute this case. If this case proceeded further, significant additional resources would have been expended by Class Counsel in the Supreme Court. It is reasonable to assume that, absent settlement, a final result would not be reached for at least another year.

### 6.       Reaction of the Class

Some courts also consider the reaction of the Class and opposition to the settlement. *Hawkins*, 2004 U.S. Dist. LEXIS 807, at *15 (citing *In re General Motors Corp. Pick-Up Truck Fuel Tank*, 55 F.3d 768, 785 (3d Cir. 1995)). Here, so far there are ***no*** objectors to the Class 2 and Class 3 components of this Settlement.

## VI.       CONCLUSION

The Settlement here is the result of hard fought litigation and negotiation. The Settlement provides an excellent result. The Court should certify the Settlement Classes and grant final approval to the Settlement Agreement.

---

[13] In the *Warfarin Sodium Antitrust Litig.*, the Court stated "[w]e agree with the District Court's conclusion that this factor favors settlement because continuing litigation through trial would have required additional discovery, extensive pretrial motions addressing complex factual and legal questions, and ultimately a complicated, lengthy trial. Moreover, it was inevitable that post-trial motions and appeals would not only further prolong the litigation but also reduce the value of any recovery to the class. In a class action of this magnitude … the time and expense leading up to trial would have been significant." *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d at 536.

DATED: December 15, 2010

By    **/s/ Steve W. Berman**
    Thomas M. Sobol (BBO#471770)
    Edward Notargiacomo (BBO#567636)
Hagens Berman Sobol Shapiro LLP
55 Cambridge Parkway, Suite 301
Cambridge, MA  02142
Telephone: (617) 482-3700
Facsimile: (617) 482-3003

**LIAISON COUNSEL**

Steve W. Berman
Sean R. Matt
Hagens Berman Sobol Shapiro LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA  98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

Jennifer Fountain Connolly
Hagens Berman Sobol Shapiro LLP
1629 K St. NW, Suite 300
Washington, DC  20006
Telephone: (202) 355-6435
Facsimile: (202) 355-6455

Jeffrey Kodroff
John Macoretta
Spector, Roseman Kodroff & Willis, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA  19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611

Kenneth A. Wexler
Wexler Wallace LLP
55 W. Monroe, Suite 3300
Chicago, IL  60603
Telephone: (312) 346-2222
Facsimile: (312) 346-0022

Marc H. Edelson
Hoffman & Edelson LLC
45 West Court Street
Doylestown, PA  18901
Telephone: (215) 230-8043
Facsimile: (215) 230-8735

**CLASS COUNSEL**

001534-16 413893 v1

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I, Steve W. Berman, an attorney, caused a true and correct copy of the foregoing, **CLASS PLAINTIFFS' COMBINED MEMORANDUM OF LAW IN SUPPORT OF JOINT MOTIONS FOR FINAL APPROVAL OF MASSACHUSETTS AND NON-MASSACHUSETTS CLASS 2 AND CLASS 3 ASTRAZENECA SETTLEMENTS**, to be delivered to all counsel of record by electronic service pursuant to Paragraph 11 of the Case Management Order No. 2, by sending on December 15, 2010, a copy to LEXISNexis File & Serve for posting and notification to all parties.

**/s/ Steve W. Berman**
Steve W. Berman

001534-16 413893 v1