**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| IN RE: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL NO. 1456 |
| THIS DOCUMENT RELATES TO: | CIVIL ACTION: 01-CV-12257-PBS |
| ASTRAZENECA MASSACHUSETTS AND NON-MASSACHUSETTS CLASS 2 AND CLASS 3 SETTLEMENTS | Judge Patti B. Saris |

**DECLARATION OF STEVE W. BERMAN**
**IN SUPPORT OF LEAD CLASS COUNSEL'S MEMORANDUM OF LAW**
**IN SUPPORT OF MOTION FOR ATTORNEYS' FEES AND COSTS AND**
**COMPENSATION TO THE CLASS REPRESENTATIVES IN ASSOCIATION WITH**
**THE ASTRAZENECA MASSACHUSETTS AND NON-MASSACHUSETTS CLASS 2**
<u>**AND CLASS 3 SETTLEMENTS**</u>

I, Steve W. Berman, declare and state as follows:

1. I am a partner at the law firm of Hagens Berman Sobol Shapiro LLP; my firm served as Co-Lead Counsel in the above-captioned case. I submit this Declaration in Support of Lead Class Counsel's Memorandum of Law in Support of Motion for Attorneys' Fees and Costs and Compensation to the Class Representatives in Association with the AstraZeneca Massachusetts and non-Massachusetts Class 2 and Class 3 Settlements. The matters stated herein are true to the best of my personal knowledge and, if called upon to testify thereto, I would and competently do so.

2. The purpose of this Declaration is to briefly summarize the factual and procedural history of this litigation, including, but not limited to, the initial filing, the multiple rounds of motion to dismiss briefing, class certification proceedings, discovery, summary judgment practice, trial preparation, appellate practice, settlement negotiations, lodestar and litigation expenses. Because this Declaration is submitted in connection with settlements with AstraZeneca, I focus to some extent on Plaintiffs' litigation against that Defendant. As Plaintiffs' Co-Lead Counsel, my firm has been intimately involved in all aspects of this litigation from the outset to the present, and the description set forth below is based on my personal knowledge.

3. This litigation is nearly ten years old. When it was filed in 2001 it was one of the largest class actions in history and challenged fraud that affected the pricing of virtually every prescription drug in the marketplace. In turn, Defendants challenged nearly every material factual allegation or legal claim that we made. While many of our claims were initially dismissed, we survived the second round of briefing after we were given leave to replead.

4. Thereafter, undaunted by the enormity of the case, and in a time before Internet document review platforms were commonplace, we developed an efficient method to divide the work of reviewing documents and developed a core set of documents that were used to brief class certification, summary judgment and ultimately at trial.  We reviewed millions of documents and took and participated in hundreds of depositions of the parties, their consultants and other experts, providers, as well as depositions of nearly every TPP in the country.

5. Class certification was akin to a trial on the merits.  The parties filed multiple rounds of briefing, retained some of the country's most preeminent healthcare economists and industry specialists, gave the Court a two-day expert tutorial on the industry and had an all-out brawl about the expert testimony proffered.  Ultimately, although the Court certified a far more narrow Class that what we had initially requested, we continued to prosecute the case with the same zeal.  We took even more depositions and engaged in another round of expert discovery that resulted in multiple summary judgment briefs filed by the Track 1 Defendants collectively and individually.  We also filed our own motion for partial summary judgment on liability and our motion asking the Court to adopt a "plain meaning" interpretation of AWP, which the Court ultimately did.

6. We then tried the Class 2/Class 3 Massachusetts claims.  We were not entirely successful.  However, we fully briefed the Court's verdicts against AstraZeneca and BMS before the First Circuit and, with regard to AstraZeneca, were successful in every respect. (The BMS appeal has been stayed pending the resolution of the global BMS settlement.)  AstraZeneca ultimately filed a petition for certiorari.  We likewise successfully challenged this Court's entry of judgment against Class 1 and in favor of J&J.

7.      The BMS and AstraZeneca verdicts were not our first dance before the First Circuit.  To date there have been eight appeals of this Court's decisions, many of which have been fully briefed and three of which have been argued to the Court.  Each time we filed briefs with the First Circuit required a comprehensive examination of every aspect of this litigation.  Even though we have been largely successful, obtaining that success has required tremendous time and effort from Lead Class Counsel.

8.      In addition to battling on the litigation front, we also engaged in settlement discussions with the Track 1 Defendants.  Those discussions involved detailed presentations of the Parties' views of the facts and law and required Dr. Hartman to present multiple options for damage calculations.  Defendants were determined to litigate these cases to the highest level, so we were only able to bring them to the table by showing them that we, too, were committed to this case to the end, wherever it brought us.

9.      We believe that there is full support for an award of thirty-three and one-third percent of the Settlement Funds as our attorneys' fees and expenses.  These Settlements, especially combined with the AstraZeneca Class 1 Settlement, have provided real relief for the victims of AstraZeneca's fraud.  As described below, this relief was obtained because of the no-holes-barred approach we took to this litigation.

**A.      Introduction**

10.     This MDL was formed in 2001 after 98 different cases were transferred to this Court pursuant to 28 U.S.C. § 1407.  When this case began, what this Court has since described as the "perfect storm" of information about AWP had just begun to emerge.  *In re Pharm. Indus. Average Wholesale Price Litig.* ("*In re AWP*"), 491 F. Supp. 2d 20, 41 (D. Mass. 2007).  We knew we had our work cut out for us from the beginning.

11. The initial scope of the case was nearly unprecedented. The first Amended Master Consolidated Complaint ("AMCC") involved 42 different pharmaceutical company defendants and involved potentially thousands of both self-administered and physician-administered drugs. Each defendant was represented by at least one of the best defense firms in the country, all of whom made clear early-on of their intention to litigate this case to trial and through the full appellate process as necessary. Indeed, as the hard work of developing the case began, several of the largest class action firms in the country withdrew from the case, leaving the four Co-Lead firms to head one of the largest class actions ever filed at the time. Nonetheless, believing the scope of the fraud to have been so massive, Class Counsel proceeded in the face of substantial risks also recognizing that unforeseen risks would likely develop.

**B.     Motions to Dismiss**

12. Plaintiffs filed their first Master Consolidated Class Action Complaint ("MCC") on September 6, 2002. Dkt. No. 148. Defendants immediately brought a "kitchen sink" of motions, asking the Court to dismiss the case outright. Defendants argued that this Court should abstain from this action because the questions involved were legislative questions and that Plaintiffs had not properly pled any of our four RICO enterprises, and they claimed that the action was preempted by the Medicare Act and ERISA. Finally, they attacked the standing of the association plaintiffs, argued that Plaintiffs should be required to identify each AWP alleged to be fraudulently published, claimed the case should be dismissed under the filed rate doctrine and the government action doctrine, and argued that all multi-source drugs should be dismissed.

13. After extensive briefing, the Court ultimately agreed with many of Defendants' arguments, but gave Plaintiffs leave to replead. *In re AWP*, 263 F. Supp. 2d 172 (D. Mass. 2003).

14.     On October 28, 2002, the Court entered Case Management Order No. 5, which required Defendants, within 30 days, to produce documents related to existing or previous investigations or other legal proceedings involving AWP. Dkt. No. 161. Defendants subsequently produced hundreds of boxes of documents. Plaintiffs promptly assembled teams of lawyers who reviewed these documents for months in order to develop allegations that would comply with the Court's order in dismissing the MCC. At the time this review occurred, Internet-based document review was not common and, given the timeframe involved, documents had to be reviewed in paper form.

15.     On June 18, 2003, Plaintiffs filed their AMCC, which contained allegations based on their review of the documents produced pursuant to CMO No. 5. Again, Defendants moved to dismiss the case on multiple grounds. Ultimately, the Court granted their motion to dismiss Plaintiffs' RICO claims regarding the manufacturer-publisher enterprise, but denied it with regard to the manufacturer-PBM enterprise. The Court denied Defendants' motion to dismiss all claims involving generic drugs and sustained Plaintiffs' Together Rx antitrust claims. *In re AWP*, 307 F. Supp. 2d 196 (D. Mass. 2004).

**C.      Document Production**

16.     On March 25, 2004, the Court ordered discovery, motion practice and trial to proceed in two tracks, a fast track (Track 1) and regular track (Track 2), pursuant to which both class certification and summary judgment would be litigated. *See* Dkt. No. 756. AstraZeneca was one of the five Track 1 Defendants.

17.     Once the scope of the case was determined, discovery began in earnest. The scale of the document production in this case was massive. Not only did Plaintiffs receive millions of pages of documents from the Track 1 Defendants, but one of Defendants' first orders of business was to subpoena documents from nearly every third-party payor in the country. Plaintiffs

- 5 -

likewise sought discovery from consultants, providers and other third parties. Class Counsel had to devote substantial energy and thousands of hours in obtaining, inventorying, and examining millions of documents produced by AstraZeneca alone.

18. In order to ensure that we could manage the review, we assigned each Track 1 Defendant to a separate Co-Lead firm or group of firms, who were responsible for reporting back to the Co-Lead group as a whole regarding the types of documents that were being found. Senior-level attorneys were responsible for reviewing the documents pulled by the document review team and developing discovery strategies based on the documents found.

19. Once this process was completed, what was once millions of pages of documents became a far more discrete set of documents subject to in-depth review by more senior attorneys. Class Counsel thus had a robust database of a more discrete set of documents that we used to take depositions, draft our class certification papers and ultimately prepare for trial. The document review that began in 2003 with the CMO No. 5 production continued nearly until the eve of the Class 2/Class 3 trial in November 2006 – and Track 2 discovery, which is not the focus of this Declaration, continued until far after that.

**D.  Depositions**

20. There were hundreds of depositions taken in this case as a whole. Plaintiffs took depositions of Defendants' representatives, physicians targeted by Defendants' schemes and consultants used by the Defendants. Defendants took lengthy depositions of all the consumer and TPP Class Representatives. Moreover, Defendants took depositions of every major TPP and PBM in the country and of consultants used by Class members in working with those entities.

21. In the AstraZeneca case alone, Plaintiffs took 40 depositions of AstraZeneca's current and former employees, including senior managers, consultants, and contractors, as well as David R. Brennan, the Chief Executive of AstraZeneca, PLC and former President and CEO

of AstraZeneca Pharmaceuticals, LP and Robert Black, the former President of Zeneca, ICI, the predecessor company that developed Zoladex®. Plaintiffs also took depositions of relevant third-parties, including reimbursement consultants and doctors targeted by AstraZeneca's Zoladex sales team. The depositions resulted in nearly 700 marked deposition exhibits.

**E.     Discovery Disputes/Motions to Compel**

22.     On April 30, 2004, the Court referred this case for full pretrial case management to Magistrate Judge Bowler. Dkt. No. 825. There were discovery disputes about virtually every aspect of discovery, including responses to interrogatories, the scope of Plaintiffs' 30(b)(6) notices, depositions and documents sought from Class Representatives and absent class members, motions to compel third parties to appear for depositions, privilege logs and assertions of privilege during depositions and multiple motions for sanctions related to discovery conduct. In many instances Judge Bowler held half or full-day hearings during which ten or more discovery motions were heard. Several of her orders were appealed to this Court.

**F.     Class Certification**

23.     All of the discovery described in Sections C and D above was used to support Plaintiffs' class certification papers, in which Plaintiffs sought certification of three nationwide Classes involving 132 drugs. In fact, as this Court has noted, the parties submitted twenty-two (22) boxes of exhibits as well as dozens of briefs and expert reports in briefing class certification. *In re AWP*, 230 F.R.D. 61, 66 n.3 (D. Mass. 2005).

24.     Both Plaintiffs and the Track 1 Defendants relied heavily on nationally-recognized experts in briefing class certification. Those experts not only exchanged multiple rounds of reports, they also sat for multi-day depositions. Both the Track 1 Defendants and Plaintiffs moved to exclude much of the testimony proffered. Indeed, the extensive filings

related to expert testimony led this Court to advise the Parties that no more expert filings would be permitted. Dkt. No. 1456 ("There shall be no more filings in this matter.").

25. In addition, the Court retained its own expert, Professor Ernest Berndt. The Court likewise held a two-day hearing during which it received "tutorials" from Professor Meredith Rosenthal on behalf of Plaintiffs and Dr. Gregory Bell and Dr. Fiona Scott Morton on behalf of Defendants. As the Court explained in its first class certification opinion:

> Professor Berndt's report, which provides substantially more detail than this Order about the structure and history of the pharmaceuticals market, is available on the electronic docket at entry number 1384. He supplemented this report with a short memorandum on August 9, available at entry number 1639. The Court also received the reports of plaintiffs' experts, Dr. Raymond Hartman, an economist and a director at Greylock McKinnon Associates litigation consulting firm with extensive teaching and research experience; Professor Stephan Schondelmeyer, an economist at the University of Minnesota who is head of the Department of Pharmaceutical Care & Health Systems; and Professor Richard Frank, a professor of health economics at Harvard Medical School; and the reports of defendants' experts, Steven Young, the Managing Director of Huron Consulting Group's Healthcare and Higher Education Consulting practice; Dr. Eric Gaier, a partner at Bates White, a professional services firm that specializes in economic analysis; Dr. Robert Navarro, a pharmacist, an expert in pharmacy benefit managers, and president of the consulting firm NavarroPharma LLC; and Professor Halbert White, a professor in economics at the University of California, San Diego, who specializes in econometrics. The Court also attended a two-day tutorial hearing presented by plaintiffs' expert Dr. Meredith Rosenthal, an assistant professor of Health Economics and Policy at the Harvard School of Public Health, and defendants' experts Professor Fiona Scott Morton of the Yale School of Management (who spoke on a DVD tutorial but not at the hearing) and Dr. Gregory Bell, a Group Vice President at the Charles River Associates consulting firm.

*In re AWP*, 230 F.R.D. at 67 n.5.

26. Ultimately, the Court certified a nationwide Class of Medicare Part B beneficiaries, a Massachusetts-only Class of MediGap payors and a Massachusetts-only Class of

TPPs who paid for the Subject Drugs outside of the Medicare context. However, the Court refused to certify any claims for self-administered drugs. *See In re AWP*, 233 F.R.D. 229 (D. Mass. 2006).

27.  The Track 1 Defendants subsequently petitioned the First Circuit under Fed. R. Civ. P. 23(f) for review of this Court's class certification opinion, but the First Circuit denied their Petition.

28.  After the Court issued its class certification order, Plaintiffs and the Track 1 Defendants continued to take fact and expert depositions to prepare motions for summary judgment. Plaintiffs filed motions for partial summary judgment, and the Track 1 Defendants collectively and individually filed summary judgment motions. As with the class certification briefing, the summary judgment briefing was massive – involving boxes of exhibits, multiple rounds of expert reports and a complete review of the evidence that had been taken in the case to date.

29.  Ultimately, the Court denied the vast majority of these motions in lieu of the Class 2/Class 3 bench trial. However, it did grant Plaintiffs' motion for partial summary judgment on the plain meaning of AWP and granted Defendants' motion for summary judgment for drugs furnished after 2004. *In re AWP*, 491 F. Supp. 2d 20 (D. Mass. 2007). Briefing Plaintiffs' plain meaning motion involved an unprecedented examination of the legislative and regulatory record on AWP and set the stage for the Court's ultimate adoption of Dr. Hartman's 30% benchmark.

**G.   Track Two Discovery**

30.  Class Counsel pursued discovery in Track 2 with the same vigor. We took depositions of the Parties, third parties and providers and, until we reached a global settlement

- 9 -

with the Track 2 Defendants, participated in the "government knowledge" depositions pursued by the those defendants. A few months after the summary judgment motions were briefed on the Track 1 side, Plaintiffs filed a motion to certify the Track 2 case, which was opposed by all Track 2 Defendants collectively as well as by many of those defendants individually. As with the Track 1 Defendants, the briefing was expert intensive, with boxes and boxes of exhibits submitted to the Court. While the Court did not have argument on those motions because Plaintiffs reached a global settlement with those Defendants, those cases were zealously litigated before they were resolved.

**H.     Trial**

31.     After the Court decided the summary judgment motions, we then prepared for and ultimately tried the Class 2/Class 3 Massachusetts case against four Defendants: AstraZeneca, Bristol-Myers Squibb, Johnson & Johnson, and Schering-Plough/Warrick. Since the results of the trial are well-known to the Court, I will not repeat them in substantial detail here. The trial took 20 days, involved testimony from nearly 40 witnesses and hundreds of documents and deposition transcripts. *In re AWP*, 491 F. Supp. 2d at 31.

32.     Specifically, the trial involved experts retained by Plaintiffs, the Track 1 Defendants collectively and experts retained by individual Track 1 Defendants, including AstraZeneca. All of the experts were renowned in their fields; one of Defendants' expert economists was the winner of a Nobel Prize. Expert testimony involved topics including the nature of Defendants' marketing activities, industry and government understandings of AWP, and what constituted unfair or deceptive spreads and the calculation of those spreads. It canvassed nearly every piece of economic, legislative or legal literature discussing AWP of pharmaceutical pricing generally written in the past 20 years.

33. As they had been throughout the case, Defendants were represented by some of the best trial lawyers in the country. AstraZeneca not only had its Class Counsel Davis Polk & Wardwell, but also retained Foley Hoag as its trial counsel. All four Defendants had full teams of lawyers inside and outside of the courtroom working on the trial. There were multiple issues briefed during and after trial. In short, Defendants spared no expense in raising every factual and legal issue available to them. They were formidable adversaries from beginning to end.

### I.   Appellate Proceedings

34. In addition to the proceedings before this Court, Class Counsel have expended significant efforts in the First Circuit Court of Appeals. To date there have been eight separate appeals filed of this Court's decisions in this case, not including Defendants' 23(f) Petition. Those appeals have ranged from an appeal of this Court's final approval of the GSK settlement and the bond entered in connection with that one-sentence appeal, Don Haviland's appeal of the Class 1 AstraZeneca settlement, his appeal under multiple mechanisms of this Court's disqualification order, an appeal of this Court's entry of judgment against Class 1 and in favor of the J&J Defendants, as well as the appeals by BMS and AstraZeneca of this Court's Class 3/Class 3 verdict under Mass. ch. 93A. With regard to AstraZeneca, Plaintiffs fully briefed and argued AstraZeneca's appeal of the Court's verdict, which was affirmed in full by the First Circuit. *In re AWP*, 582 F.3d 156 (1st Cir. 2009). And after the First Circuit denied AstraZeneca *en banc* review, it petitioned the United States Supreme Court for a Petition for Certiorari.

35. Plaintiffs' work in the First Circuit is not over yet. The First Circuit recently set a briefing schedule for Don Haviland's appeal of the Court's order granting his clients' motion to withdraw as class representatives for the J&J case and, given past practice, it is possible that

Class Counsel will face one or more appeals should this Court grant final approval this settlement, and the BMS global and Track 2 global settlements.

**J.      Settlement Discussions**

36.     Settlement discussions with all Defendants in this case, including AstraZeneca, have taken place for years, have involved multiple starts and stops, extensive reviews of the evidence and damage estimates and have required the oversight of MDL Mediator Eric Green.

37.     In each instance, including with AstraZeneca, once an agreement was reached regarding the total sum, Class Plaintiffs sought representation for TPPs and consumers to negotiate a plan of allocation. Class Counsel selected attorneys with substantial experience in these kinds of negotiations.

38.     All of the work described in this Declaration positioned Plaintiffs for the Settlements for which they seek final approval today. In short, the Defendants that litigated this case, including AstraZeneca, would not have come to the table had Plaintiffs not likewise made clear our intention to litigate this case to whatever end was required. With AstraZeneca, we not only litigated the Class 2/Class 3 case to the Supreme Court but also settled the Class 1 case on the eve of a jury trial. In short, we have shown our commitment again and again in this litigation and will continue to do so until all aspects of this case have been resolved.

## II.     ATTORNEYS' FEES AND EXPENSES

39.     Class Counsel seek an award of attorneys' fees and expenses equal to 33⅓% of the Settlement Funds. This amount is more than warranted. The accompanying brief in support of the fee request explains the established judicial preference for using the percentage-of-recovery approach in awarding attorneys' fees in common fund cases.

40.     Class Counsel prosecuted this case in an exhaustive manner. With every setback we regrouped and refined our case, devising strategies to prosecute this case to a successful

- 12 -

conclusion. Plaintiffs' counsel advanced nearly $10 million to finance this litigation. Furthermore, Class Counsel's preparation in reviewing millions of documents, identifying those documents that assisted in the prosecution of the case, participating in hundreds of depositions, engaging in aggressive and exhaustive expert discovery, briefing multiple motions for summary judgment, trying the Class 2/Class 3 Massachusetts case and sustaining that verdict on appeal, assisted settlement negotiations as defense counsel understood that Class Counsel were ready and willing to litigate this case to whatever extent necessary.

41. To date, Class Counsel have only been awarded fees for two settlements – the GSK global settlement and the AstraZeneca Class 1 settlement. Class Counsel's fees and expenses were totally contingent and dependent on a fee and expense award by this Court.

42. Class Counsel took on this highly complex case on a wholly contingent basis with no guarantee that their costs would ever be recovered or their fees ever paid. From the outset, Class Counsel understood that they were embarking on an expensive and lengthy campaign with no guarantee of payment resulting from their investment of time, money and effort. In fact, there are numerous class actions in which Class Counsel expended thousands of hours, but received no remuneration despite their diligence and expertise. *See Robbins v. Kroger Props.*, 116 F.3d 1441 (11th Cir. 1997); *Backman v. Polaroid Corp.*, 910 F.2d 10 (1st Cir. 1990); *Krinsk v. Fund Asset Mgmt., Inc.*, 715 F. Supp. 472 (S.D.N.Y. 1988), *aff'd*, 875 F.2d 404 (2d Cir. 1989); *Landy v. Amsterdam*, 815 F.2d 925 (3d Cir. 1987); *Radol v. Thomas*, 772 F.2d 244 (6th Cir. 1985); *Rosenblatt v. Getty Oil Co.*, 1983 Del. Ch. LEXIS 570 (Del. 1983); *Spielman v. General Host Corp.*, 402 F. Supp. 190 (S.D.N.Y. 1975), *aff'd*, 538 F.2d 39 (2d Cir. 1976). Examples of cases that were dismissed before trial, but only after substantial efforts had been expended, are also

abundant.  *See In re Convergent Tech. Sec. Litig.*, 721 F. Supp. 1133 (N.D. Cal. 1988) (granting summary judgment for defendants after almost five years of litigation), *aff'd*, 1991 U.S. App. LEXIS 19733 (9th Cir. 1991); *Kalish v. Franklin Advisers, Inc.*, 742 F. Supp. 1222 (S.D.N.Y. 1990) (judgment for defendants after bench trial), *aff'd*, 928 F.2d 590 (2d Cir. 1991); *I. Meyer Pincus & Assoc., P.C. v. Oppenheimer & Co.*, 1990 U.S. Dist. LEXIS 13752 (S.D.N.Y. Oct. 15, 1990) (dismissing third amended complaint without leave to replead), *aff'd*, 936 F.2d 759 (2d Cir. 1991).  A good example of the nature of the risks confronted by Class Counsel in actions such as this is the *Polaroid* litigation.  That case lasted for more than 11 years.  Plaintiffs won at trial, but the verdict was reversed on appeal years later.  *See Backman v. Polaroid*, 910 F.2d 10 (1st Cir. 1990).  Thus, despite their trial victory, plaintiff's counsel ultimately received nothing for eleven years (and many thousands of hours) of labor.  Therefore, the contingent nature of this litigation posed a great deal of risk for Class Counsel in undertaking this case.

43.     In undertaking to represent the Class, Class Counsel also needed to insure that sufficient resources and funds existed at all times, not only to prosecute the litigation in a cost-effective manner, but also to compensate experts and vendors.  Firms in a contingent litigation practice involving complex multi-district cases must not only pay regular overhead, but also advance the expenses of litigation.  The financial burden on contingent fee counsel is far greater than it is on firms that are paid on an ongoing basis throughout lengthy and complex litigation.

44.     Indeed, when Class Counsel undertook representation of the Class, there were no assurances that any fees would ever be received.  There was no "model" for a case like this and many of the issues we litigated were issues of first impression.  Because of this, we were always aware that we would likely have to overcome the daunting difficulties, and would have to expend thousands of hours and millions of dollars to prosecute this case over an extended period of time

- 14 -

before having even a possibility of recovering fees and expenses. Class Counsel alone bore the risk of the case being dismissed at the pretrial stage, of not prevailing at trial, or even losing on appeal.

### III.    INCENTIVE AWARDS FOR CLASS REPRESENTATIVES

45.     Class Counsel request that the Court approve incentive awards for the nine Class Representatives who represented the class throughout this litigation.

46.     Neither these Settlements nor the case as a whole would exist without the efforts of the Class Representatives. The Class Representatives were integral in helping Class Counsel analyze their claims and the evidence. The Class Representatives met with counsel at the outset of the action, responded to interrogatories, searched for and produced documents to forward the litigation, requested and received reports from Class Counsel, prepared for depositions with Class Counsel, attended depositions, communicated with Class Counsel and monitored the status of the case, and, in some cases, testified at trial.

47.     As this Court is aware, the lead TPP plaintiff, Blue Cross Blue Shield of Massachusetts ("BCBSMA"), was the target of aggressive discovery and was the focus of the Defendants' efforts during the Class 2/Class 3 Massachusetts trial. In all, thirteen individuals from BCBSMA were deposed. (One of those individuals was not employed by BCBSMA at the time of his deposition.) At trial, multiple BCBSMA witnesses were required to testify, at great inconvenience to the conduct of its business. Then, during mediation, BCBSMA remained active in the settlement negotiations, attending them in person. In short, this case would not be where it is without the substantial efforts of BCBSMA and the assistance it gave to Class Counsel.

48.     Daniel W. Ryan, the Fund Administrator for Fund Administrator of United Food and Commercial Workers Unions and Employers Midwest Health Benefits Fund ("UFCW"),

spent over 20 hours of uncompensated time working with attorneys for the Plaintiffs to prepare for trial, traveling to and from Boston and attending trial, even though he was not ultimately called as a witness. Glenn Randle and Sharon Faulkner, a Trustee and third-party administrator for Class 2 representative Sheet Metal Workers National Health Fund, likewise traveled to Boston to testify at trial.

49. In addition, all the Class Representatives remained active in these cases through their settlement. In fact, representatives from BCBSMA attended the settlement negotiations and took a key role in seeing these Settlements to their conclusion.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 15th day of December, 2010 in Seattle, Washington.

                                                /s/ Steve W. Berman
                                                    Steve W. Berman

## CERTIFICATE OF SERVICE

      I hereby certify that I, Steve W. Berman, an attorney, caused a true and correct copy of the foregoing, **DECLARATION OF STEVE W. BERMAN IN SUPPORT OF LEAD CLASS COUNSEL'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR ATTORNEYS' FEES AND COSTS AND COMPENSATION TO THE CLASS REPRESENTATIVES IN ASSOCIATION WITH THE ASTRAZENECA MASSACHUSETTS AND NON-MASSACHUSETTS CLASS 2 AND CLASS 3 SETTLEMENTS**, to be delivered to all counsel of record by electronic service pursuant to Paragraph 11 of the Case Management Order No. 2, by sending on December 15, 2010, a copy to LEXISNexis File & Serve for posting and notification to all parties.

                                                     /s/ Steve W. Berman
                                                     Steve W. Berman