IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


IN RE:                            )
                                  )  CA No. 01-12257-PBS
PHARMACEUTICAL INDUSTRY AVERAGE   )  CA No. 06-11337-PBS
WHOLESALE PRICE LITIGATION        )  Pages 1 - 49
                                  )




MOTION HEARING

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE




United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
February 8, 2011, 9:25 a.m.




LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 7200
Boston, MA  02210
(617)345-6787

1    A P P E A R A N C E S:

2

3        THOMAS M. SOBOL, ESQ. and EDWARD NOTARGIACOMO, ESQ.,
     Hagens Berman Sobol Shapiro, LLP, 55 Cambridge Parkway,
     Suite 301, Cambridge, Massachusetts, 02142, for the
4    Class Plaintiffs.

5        JENNIFER CONNOLLY, ESQ., Hagens Berman Sobol Shapiro, LLP,
     1629 K Street NW, Suite 300, Washington, D.C., 20006, for the
6    Class Plaintiffs.

7        KENNETH A. WEXLER, ESQ., Wexler Wallace, LLP,
     55 West Monroe Street, Suite 3300, Chicago, Illinois, 60603,
8    for the Class Plaintiffs.

9        JOEL M. COHEN, ESQ., Davis Polk & Wardwell, LLP,
     450 Lexington Avenue, New York, New York, 10017,
10   for AstraZeneca.

11       NICHOLAS C. THEODOROU, ESQ., Foley Hoag, LLP,
     Seaport West, 155 Seaport Boulevard, Boston, Massachusetts,
12   02210-2600, for AstraZeneca.

13   ALSO PRESENT:

14       RICHARD COHEN, ESQ., Lowey Dannenberg Cohen & Hart, LLP,
     for the Independent Settling Health Plans.
15

16

17

18

19

20

21

22

23

24

25

1              P R O C E E D I N G S

2         THE CLERK:  The case of In Re:  Pharmaceutical

3  Industry Average Wholesale Price Litigation, Case No. 01-12257,

4  will now be heard before this Court.  Will the attorneys please

5  identify themselves for the record.

6         MR. SOBOL:  Good morning, your Honor.  Tom Sobol,

7  Hagens Berman Sobol Shapiro, for the class plaintiffs, and with

8  me --

9         MR. NOTARGIACOMO:  Ed Notargiacomo from Hagens Berman

10  Sobol Shapiro, your Honor.

11        MS. CONNOLLY:  Jennifer Connolly from Hagens Berman

12  Sobol Shapiro.

13        MR. WEXLER:  And Ken Wexler from Wexler Wallace, your

14  Honor.

15        MR. COHEN:  Good morning, your Honor.  Joel Cohen from

16  Davis Polk for AstraZeneca.

17        MR. THEODOROU:  Nicholas Theodorou, your Honor, from

18  Foley Hoag for AstraZeneca.

19        THE COURT:  So we have multiple motions on today,

20  right?  This is just the settlement and --

21        MR. SOBOL:  This is just the settlement.

22        THE COURT:  And who's here for California?  You all

23  are?

24        MR. MERKL:  Yes, your Honor.

25        THE COURT:  You're not until 10:30?  I see, so then

1    the second team comes in?

2              MR. MERKL:  Yes.

3              THE COURT:  Okay.  I figured, are you on the

4    California case?  No, you're not.  Poor Mr. Sobol was here

5    yesterday when I was ranting and railing about the boxes I've

6    received on California.  So it turns out he wasn't even the

7    culprit there for that set of boxes, although I was reminded

8    you gave us 27 boxes on -- which one was it, Ms. Phillips?

9              MR. SOBOL:  I wasn't going to defend myself, your

10   Honor.

11             THE COURT:  Summary judgment, that was it.  Good,

12   so --

13             MR. SOBOL:  I wasn't going to defend any of the

14   filings that we've made, so --

15             THE COURT:  Okay.  So here we are on the settlement

16   for AstraZeneca, long awaited.

17             MR. SOBOL:  There's a slide deck in front of you, your

18   Honor, and there should be one for your assistants.

19             THE COURT:  Yes.

20             MR. SOBOL:  If I can just go through it briefly and

21   give you an overview, and then I --

22             THE COURT:  Good.  Can I just stop.  Is there anyone

23   here to object?  And as I understand it from the e-mail, no one

24   has filed written objections.  Is that correct?

25             MR. SOBOL:  There are no objections by third-party

1   payors or consumers.  There are a handful of exclusions for

2   third-party payors and consumers.

3          There's one asterisk to that which I'll have

4   Mr. Notargiacomo address.  There was a letter that has been

5   filed with the court by a consumer who wanted to address

6   certain things about her deceased father.  I don't construe

7   that as an objection to the settlement.  Mr. Notargiacomo will

8   explain the circumstances.

9          THE COURT:  Okay, thank you.

10          MR. SOBOL:  To start, I should say this:  Although

11   there are no opt-outs and although there is only a handful of

12   exclusions, it's still important for us to spend a few minutes

13   going through this because you do have an obligation to the

14   class independently to review the fairness and the adequacy of

15   the settlement.

16          So going through the slides, Slide 2 where it says

17   "Historical Overview," this is simply giving you a reminder

18   about actually what is not before you today, the Class 1

19   AstraZeneca settlement, which had gone up to the First Circuit,

20   was affirmed by the First Circuit.  Class 1 has now been paid

21   out.  Of the gross $24 million settlement for Class 1, there

22   was a distributable approximately $19 million.

23          If you then go to the next slide which is Slide 3,

24   that tells you approximately what claimants received.  The

25   average check for consumers in Class 1 was about $2,250.  Many

b0bb6de9-80aa-4a56-aace-378978928564

1    of those checks, as this slide depicts, were relatively large

2    checks.

3             So then we turn to the settlement that's before you

4    today --

5             THE COURT:  I can't remember what we did with the

6    amount left over.

7             MR. SOBOL:  I'm not sure if there was any.

8             MS. CONNOLLY:  Yes, it goes to cy pres, but it's

9    mutually agreeable between the parties, so you don't have to

10   approve it.  So we're in the process of --

11            THE COURT:  Wait, wait, wait, wait, wait.  I have to

12   approve everything.

13            MR. SOBOL:  She'll want to approve that.

14            THE COURT:  So there's a lot of money.  It's

15   $6 million.  No?

16            MS. CONNOLLY:  We don't have the complete amount

17   available from the claims administrator, but it should be

18   between $4 million and $5 million that are left.

19            THE COURT:  I will approve that.  Okay, I think

20   typically the cy pres has to be approved by the judge.  And was

21   there something that I approved in the original agreement as to

22   where it went?

23            MS. CONNOLLY:  No.  It just goes --

24            THE COURT:  So it definitely has to come back to me.

25   And what's the proposal?

1          MS. CONNOLLY:  There currently isn't one.  The parties

2     are negotiating about that, and we're in the process of

3     reviewing multiple proposals.

4          THE COURT:  Like what?

5          MS. CONNOLLY:  There are some from a group called

6     Cancer Care that are proposing to give the money to set up vans

7     that will administer prostate testing to individuals.  We're

8     trying to solicit some proposals from the American Cancer

9     Society for some research, and there are just a variety of

10    other proposals that are coming in that AstraZeneca solicited

11    and that class counsel solicited as well.

12         THE COURT:  All those sound reasonable.  Judge Stearns

13    also set up something through the Lupron settlement which had

14    to do with research into prostate cancer through --

15         MR. SOBOL:  MGH.

16         THE COURT:  -- some hospital.  All right.  Or Dana

17    Farber?  You think it's Mass. General?

18         MR. SOBOL:  Was it Dana Farber?  One of those big

19    institutions, your Honor.

20         THE COURT:  Which was approved by the First Circuit,

21    so that would be another option there.

22         MS. CONNOLLY:  That was something that we raised with

23    AstraZeneca.  They were at the time not interested in adding

24    onto that pot, but --

25         THE COURT:  And maybe not.  I'm just simply saying I

b0bb6de9-80aa-4a56-aace-378978928564

1   want to approve it.  I just want to sign off on it.  It's a

2   huge amount of money.

3           And let me just ask you this.  This may not be kosher,

4   so let me ask this:  If for some reason, is there any way of

5   pouring that into the next class, because you basically said

6   that we wouldn't be able to pay everybody who was injured in

7   the third-party payors and the consumers in the next Classes 2

8   and 3?

9           MR. SOBOL:  If you were to do that, first, there are a

10  couple of process issues.  First, I think, because both

11  AstraZeneca and the class had an agreement that it would go to

12  cy pres, I think that technically they'd have to either --

13  AstraZeneca would have to waive its rights for it to go to

14  cy pres, number one.  Number two, I think that you'd at least

15  have to provide notice and opportunity to those people who

16  could be heard about whether, from Class 1 --

17          THE COURT:  Well, no, because I think the people in

18  Class 1, to the extent that it's leftover, no one's claimed for

19  it, that I don't have a problem with.  I do think I'd have to

20  talk to all the parties.  But my thought is, particularly with

21  respect to -- it may just not come to fruition, but if there

22  are consumers who aren't getting full payment out of Classes 2

23  and 3, I at least would be interested in paying off the

24  consumers.  I'm less concerned about the third-party payors.

25          MR. SOBOL:  Yes, okay.  So those are two different

b0bb6de9-80aa-4a56-aace-378978928564

1    issues.  So I think, as you'll find as we go through the

2    settlement on Classes 2 and 3, that the consumers that are in

3    Class 3 are likely to get fully compensated.  You know, all the

4    people who filed claims, they're likely to be fully

5    compensated.  There would be a question about whether or not

6    you'd consider giving them to the third-party payors that are

7    in Classes 2 and 3 because they will be receiving less than one

8    hundred percent of their estimated damages.

9           THE COURT:  Well, I'm open to all of it.  As you

10   probably know, because Mr. Sobol and I have been working

11   together for a long time, a decade, as I like to point out this

12   litigation has lasted, I am more interested in paying people

13   who have been injured than I am cy pres.  But if we are going

14   to go the cy pres route, I want to approve it.  So let's see

15   where we end up on all of this.

16          MR. SOBOL:  Just as an aside, by the way, the MDL

17   panel that heard the AWP case and decided where it should go

18   sat I think in February or March of 2001, and the reason that

19   they sent the AWP case here was because it was the home of the

20   brand-new world champion New England Patriots.  That's a true

21   story.  That's the reason why they were told why they should

22   send it here, is because the Patriots had just won the

23   Superbowl.

24          THE COURT:  So I won the Superbowl is the equivalent?

25   Anyway, all right, let's go on to the next one, but let's put

b0bb6de9-80aa-4a56-aace-378978928564

1   that as sort of a placeholder as to what to do with the

2   $5 million or so.

3            MR. SOBOL:  Okay.  So now moving on to Classes 2 and

4   3, and Slide 4 identifies essentially what the classes are.

5   There are a couple of points I'd make here just briefly.

6   First, Class 2 is, of course, only third-party payors to the

7   extent that they're paying the Medigap insurance; and then

8   Class 3 is the non-Medicare arena AWP claim where you have both

9   third-party payors and a small segment of those consumers who

10  have paid co-insurance, using that very specific term in mind.

11           THE COURT:  Just for the record, the percentage?

12           MR. SOBOL:  Percentage.

13           THE COURT:  Rather than a flat co-pay is what you're

14  referring to?

15           MR. SOBOL:  Right, right.  And there are, of course,

16  two settlements in front of you:  One is Massachusetts and then

17  everything else other than Massachusetts.  So you go to the

18  next slide.  Then there's the non-Massachusetts Class 2 and

19  Class 3 that you're being asked to certify for purposes of

20  settlement.

21           Now, you'll note also that there is a difference in --

22           THE COURT:  Can I back up again.  Did I already

23  certify -- I already certified the Massachusetts classes,

24  right?

25           MR. SOBOL:  Yes.

1          THE COURT:  And it's just I need to certify the

2     national classes?

3          MR. SOBOL:  For purposes of this settlement, yes.

4          THE COURT:  So I haven't certified a class yet in 2

5     and 3, right?

6          MR. SOBOL:  I don't recall whether that actually came

7     up in the non -- in the non-settlement context it did, but I'm

8     not sure whether or not the definitions mirror exactly what

9     you've got here in this proposed settlement that were done for

10    litigation.

11         THE COURT:  So I have an order that actually certifies

12    a class in here, right, or is it just approving a settlement?

13         MR. SOBOL:  A long time ago you had certified a

14    nationwide class.  You stayed it.

15         THE COURT:  Right.

16         MR. SOBOL:  There's now been a settlement.

17    Technically, the four classes that are now before you ought to

18    be certified or recertified because the definitions of these

19    classes I cannot represent to you mirror exactly what you've

20    previously done.

21         THE COURT:  Can you check to make sure that the orders

22    do exactly what I need to do in terms of, A, certifying the

23    classes and then approving the settlements.

24         MR. SOBOL:  Yes.

25         THE COURT:  Just I'll wait till I get sort of that,

1    that it mirrors exactly what I need to do.

2           MR. SOBOL:  Sure.

3           THE COURT:  Because that thought occurred to me as I

4    read the materials that I'd already certified classes, so did I

5    need to reapprove the class?  And you're saying you think I do?

6           MR. SOBOL:  If for no other reason than to make sure

7    that the class definitions are consistent with the terms of the

8    settlement agreement.  But, having said that, what we'll do is,

9    we'll go back and we'll look at the proposed order, and we'll

10   make sure that it reflects what you previously have done by way

11   of certification and what you're now being asked to do and what

12   you're doing, if I hear you correctly.

13          THE COURT:  The reason I'm holding back is, the way

14   the motion is framed is "Approval of Settlement."

15          MR. SOBOL:  Correct.

16          THE COURT:  And I'm looking, and there's a motion of

17   course for the attorneys' fees.  I'm not seeing a motion to

18   approve class certification.  I know this is just a

19   technicality, but I think we need to be very careful.

20          MR. SOBOL:  Yes, I know that I saw in the proposed

21   order the appropriate requirements.  At least that's what I did

22   this morning when I read it.

23          THE COURT:  Now, where is a proposed order because I

24   just have now the binder?

25          MR. SOBOL:  It should be attached to the motion.  It

1    should be final order and judgment.

2          THE COURT:  In back of the motion.  Okay.

3          MR. SOBOL:  But, again, what I'll do because you've

4    brought up a good point, which is, what have you done

5    previously, and are the previous orders at least reflected

6    historically --

7          THE COURT:  Yes, actually, the proposed order doesn't

8    mention approval of the class, so I just would reframe it.

9          MR. SOBOL:  Sure.

10         THE COURT:  I think I need to actually do that.  I

11   know I've already certified classes, but it was a long time

12   ago.  All right, so you're going to get -- so whoever is

13   keeping the punch list, the first thing, I'm going to get a

14   recast order.

15         MR. SOBOL:  Ms. Connolly is keeping the punch lists.

16         THE COURT:  Okay, and you're going to track that just

17   to make sure I capture exactly what you think I need to.

18         MR. SOBOL:  Yes.  Well, I mean, it's all the Rule 23

19   requirements you have to pass on.

20         THE COURT:  Yes, yes, yes.

21         MR. SOBOL:  Okay, so then if we go to Slide 6, this is

22   the major settlement terms, and there is the Massachusetts

23   settlement and then the nationwide settlement.  The

24   Massachusetts settlement is a gross of $13 million.  There's a

25   mention later on about the Massachusetts judgment doubled was

b0bb6de9-80aa-4a56-aace-378978928564

1    in the area of about $12 million, and then there was attorneys'

2    fees.  And so, anyway, that gives you a ballpark about why that

3    settlement would be reasonable.

4          And then the nationwide settlement is $90 million.

5    Here I wanted to focus more on the allocation.  So what we did

6    again in this situation, as we've done in other situations, is,

7    there were separate counsel.  There are actually three

8    contingencies that were there.  There were two groups of

9    third-party payors, and then there were also consumer

10   allocation counsel, both private counsel and counsel from

11   Prescription Access Litigation.

12         The consumer damages for the co-insurers, the

13   percentage payors in Class 3, are single digits, all the total

14   damages.  They're likely less than 2.5 percent of all the

15   damages, and yet they become eligible in both of these

16   settlements to recover more than 10 percent, about 11 percent

17   of the total amounts that are available.  And so under those

18   circumstances, lead counsel thought that the decisions that

19   were made by the allocation counsel were fair and reasonable to

20   the consumers because it provides a significant portion of the

21   pot, far more than their relative damages for the payments.

22         A couple more observations about this.  If you go to

23   the next slide, in terms of notice, you recall that this has

24   been an iterative process.

25              THE COURT:  Can I back up.  So the $90 million does

1    not include the independent settling health plans?

2              MR. SOBOL:  It does.

3              THE COURT:  It does?

4              MR. SOBOL:  It does.

5              THE COURT:  Okay.

6              MR. SOBOL:  Okay?  They are in there.  So, yes, I

7    spoke too quickly about that.  The three groups of allocation

8    counsel were third-party payors and ISHPs, independent settling

9    health plans.  That group together gets 80 something percent,

10   89 percent or so out of both pots.

11             THE COURT:  So I know we'll be getting to this again

12   when we talk about attorneys' fees and other issues, but the

13   independent settling health plans got $18 million, right, right

14   off the bat, something like that, right?

15             MR. SOBOL:  In terms of the quick pay in the national

16   settlement, yes, but they still pay --

17             THE COURT:  Excuse me.  But they then get back,

18   depending on a very complicated formula, right, they

19   potentially get more?

20             MR. SOBOL:  Correct.  There's a true-up in order to

21   make sure that they get no more nor no less than other

22   third-party payors ratably.  So that the only difference

23   between an ISHP and a class third-party payor is the timing of,

24   in this settlement, is the timing of when they receive their

25   money, not the ratable share of that money.

1       THE COURT:  So how much are they likely to get out of

2   this pot?

3       MR. SOBOL:  I think that their share, isn't it about

4   68 percent or something?  Somewhere between 65 and 70 percent

5   is an estimate about what the share is of independent settling

6   health plans as compared to all third-party payors.

7       THE COURT:  That's of the damages?

8       MR. SOBOL:  Correct.  Well, of the damages and of the

9   sales, yes.

10      THE COURT:  So there was a very complicated

11  description of how much they're likely to get as part of the

12  true-up.  Is there -- maybe you don't have this yet -- what

13  they're likely to get out of the $80 million, what amount is

14  likely to go to the independent settling health plans?

15      MR. SOBOL:  We can do a quick calculation right now to

16  give you an approximation, but I don't have that off the top of

17  my head.

18      THE COURT:  Because it won't be 70 percent of it, or

19  will it?

20      MR. SOBOL:  It will be approximately 70 percent of the

21  net that's available to all third-party payors.  So, for

22  instance, if there's a $90 million settlement and if there were

23  fees that were approximately a third, so that that was

24  $60 million, there were some claims administration expenses or

25  something like that, so you have a -- I'm giving you right now

1    rough nets -- so that if you had a net distributable of about

2    $57 million, roughly, and then you have to determine -- you

3    know the consumer portion of that is about 10 percent, so

4    that's $5.7 million that comes out of that, so you'd have about

5    $52 million available to third-party payors.  Out of that, the

6    independent settling health plans would receive about

7    70 percent of that $52 million.

8             THE COURT:  And any of the unclaimed consumer funds

9    pours into the third-party payors?

10            MR. SOBOL:  In this settlement, that's correct.

11            THE COURT:  I understand that.  And then the issue is,

12   the independent settling health plans get -- when you say a

13   "true-up," I mean, basically we know what they're going to get

14   right now.

15            MR. SOBOL:  Yes, so they've already been paid X

16   amount, you know, and so the balance of what they're going to

17   get is the difference between that rough estimate that I just

18   gave you and what they've already been paid.  And the way that

19   the calculations work in this settlement -- and I want to be

20   corrected if I'm wrong about this by my co-counsel -- but my

21   understanding of this is that the way that the true-up works,

22   it makes sure that every independent settling health plan pays

23   by way of litigation costs and attorneys' fees the same

24   percentage as any third-party payor would pay regardless of

25   whether they are an independent settling health plan or they

b0bb6de9-80aa-4a56-aace-378978928564

1    are a third-party payor class member.

2           THE COURT:  That's what I don't understand.  The

3    attorneys' fees is where I was bogged down last night.  So have

4    they paid you attorneys' fees?

5           MR. SOBOL:  Hold on.

6           THE COURT:  Can we hold on on the attorneys' fees?

7    What?

8           MR. SOBOL:  We have not been paid any attorneys' fees.

9    The true-up calculation makes sure that when they get paid

10   their true-up, they get taxed from that true-up an amount of

11   money that pays out attorneys' fees for all their money at the

12   same rate as all class third-party payors.  In other words,

13   they are owed some money; you know, the independent settling

14   health plans are owed money because they haven't been prepaid

15   all of their money.  There will be a true-up process.  When

16   that true-up process occurs, they get taxed for litigation

17   expenses and attorneys' fees at an amount that will make them

18   have to pay the same as all third-party payors.

19          THE COURT:  They pay, they write the check?

20          MR. SOBOL:  Well, actually, they don't write the

21   check.  They end up -- they don't get paid their true-up.  They

22   only get paid less the amount of the true-up because they have

23   to get taxed more to be caught up.

24          THE COURT:  Let's get to that when we get to

25   attorneys' fees.

1        MR. SOBOL:  Okay.  So on notice -- one second, okay?

2        (Discussion off the record between plaintiff counsel.)

3        MR. SOBOL:  I'm just having Mr. Notargiacomo find that

4   provision so that later when we get to it, I can do a far

5   better job than I have already trying to explain it.

6        THE COURT:  Because let me be clear here.  I have no

7   problems with -- I like the idea that the amount that's not

8   paid to consumers flows to the third-party payors.  They've all

9   been injured parties.  And I wouldn't mind to give any injured

10  party, if instead of going to a cy pres, I wouldn't mind that

11  we, to the extent the people aren't made whole, that we at

12  least make them whole.  That may be breaching certain

13  settlement approvals, but I just want to make sure that the

14  independent settling health plans are paying their full freight

15  in terms of attorneys' fees separately.

16       MR. SOBOL:  I understand that, and I think that we've

17  designed the settlement specifically knowing your concern in

18  mind and addressing that here, and we'll get to that in a few

19  moments.  So move on or --

20       THE COURT:  Okay, notice is fine.

21       MR. SOBOL:  I'm just trying to read your --

22       THE COURT:  No, no, the part that you I'm sure well

23  anticipated, knowing me now, was worrying me was how to figure

24  out the attorneys' fees and expenses.

25       MR. SOBOL:  Sure, sure.

1          THE COURT:  All right.

2          MR. SOBOL:  So on notice, the program followed what it

3     is that was discussed at preliminary approval.  It was designed

4     specifically to deal with the demographics of this particular

5     drug.  There was a direct mail program that went out, so there

6     was an effort to get and we did get data from some independent

7     settling health plans and third-party payors regarding

8     beneficiaries or insureds of those insurers who had

9     co-insurance and who paid for these drugs, and there was a

10    mailing of approximately 70,000 or somewhat north of 70,000

11    direct mail letters to those --

12         THE COURT:  To consumers.

13         MR. SOBOL:  To consumers.

14         THE COURT:  Individual human beings, right.

15         MR. SOBOL:  Individual human beings telling them that

16    there is this case, that you have a right to make a claim,

17    giving them the information to be able to make the claim.

18         THE COURT:  And what has the return so far been in

19    making claims, what percent?

20         MR. SOBOL:  The returns, out of the settlement there

21    is approximately so far about $3 million, maybe $3.5 million in

22    claims that have been filed to date by consumers.

23         THE COURT:  So that's --

24         MR. SOBOL:  So there will be a net that's available to

25    them of approximately -- what was it, $9 million?  A net,

1    depending upon how you deal with the attorneys' fees, there's a

2    net that's available to consumers of about $7.5 million.  Right

3    now we have claims that are totaling about half of that amount.

4    The claims deadline is like next week, but we've been told by

5    the claims administrator that a significant number of claims

6    are coming in from consumers this week toward the end of the

7    deadline.

8            THE COURT:  So I remember that we talked to -- who's

9    that wonderful expert?

10           MR. SOBOL:  Katherine Kinsella?

11           THE COURT:  Well, she's wonderful too, but the one

12   from Virginia, the expert who knows about claims processes?

13           MR. SOBOL:  Was that Mr. Tom Glenn or --

14           THE COURT:  No.

15           MR. SOBOL:  I'm not sure who you're talking about.

16           THE COURT:  Anyway, the percentages --

17           MR. SOBOL:  Oh, you're thinking of --

18           THE COURT:  I'm just trying to figure out whether we

19   could before --

20           MR. SOBOL:  McGovern.

21           THE COURT:  McGovern, bingo -- whether we should

22   figure out a way to try and get more consumers to use up their

23   portion.  Now, some may be dead, it's taken so long, or some

24   may be just not interested.  Is there a follow-up going back to

25   the -- how should we do that?

1        MR. SOBOL:  I don't know enough of the details about

2   how we got the list of 70,000 beneficiaries, and I don't know

3   whether or not there weren't any one or two large insurers that

4   might have been out of that process for one reason or another,

5   either timing or communications.  I don't know.  So, frankly,

6   in answering that question, I'd want to go back, and, frankly,

7   I'd want to speak to some of the ISHP counsel to --

8        THE COURT:  And maybe Kinsella, the claims

9   administrator.  I understand that -- I don't know if that's

10  considered a good feedback or not, a good response rate.  I

11  remember he said that typically it's pretty low, like, I forget

12  whether he was saying it was under 10 percent.  But I just want

13  to make sure that we don't give any moneys up from these

14  individuals to the third-party payors till we're sure that --

15  you know, some of these people are old and they may sleep.

16  Aren't they mostly sick people who have prostate cancer?  So

17  they may be -- it's been ten years now, just to make sure

18  whether it makes sense to send out a second letter or

19  whether --

20        MR. SOBOL:  We'll visit that then.  We'll visit all

21  those possibilities.  We'll send out another letter, depending

22  upon what the rate of response was on the 70,000.

23        THE COURT:  Yes.

24        MR. SOBOL:  And also whether or not there's the

25  possibility of sending out some more letters, we can visit that

1    too.

2            THE COURT:  Just to make sure that, you know, that --

3    you know, I know what my mother is like.  We all know what our

4    mothers are like.  You know, like, they just put it aside, they

5    don't have it.  You know, just to make sure that we've

6    maximized that claim process until we flow it over to the

7    third-party payors.  And it sounds like we have so much money,

8    we could probably afford a second mailing, right?

9            MR. SOBOL:  Oh, yes.

10           THE COURT:  So, anyway, okay.

11           MR. SOBOL:  If you turn to the next slide which talks

12   about "Consumer Friendly Terms and Claim Form" -- and this is

13   really just by way of reminder -- there are two different ways

14   that a consumer can participate.  Either they simply indicate

15   by returning a slip, just signing under the pains and penalties

16   of perjury:  "I did pay a percentage co-pay for this drug," you

17   know, "Tom Sobol."  And they send it back; there's a minimum of

18   $400 that goes back to that person.  Or, alternatively, they

19   file, you know, a more involved claim form because they want to

20   recover more than the $400.  And, again, both options are

21   available here.  As you recall from Class 1, quite a few people

22   filed the more detailed claim form to be able to receive very

23   substantial compensation.

24           THE COURT:  Yes, and I like very much that easy refund

25   option.  And my suggestion is, if we do send out a second

1  letter, we just basically say, you know, here are the two

2  things -- check easy refund under pains and penalties, and, you

3  know, do it in two weeks -- you know, so we don't hold

4  everybody else in the whole world up.  In fact, it may take two

5  weeks just to get the letter out, but --

6          MR. SOBOL:  Yes.  Well, I mean, that will take a

7  couple weeks to get the letters out, but we'll do that.

8          THE COURT:  Yes, yes, because that's a wonderful thing

9  that you've done there.  That's exactly what Mr. McGovern was

10  talking about with sick people, which is just to give them just

11  a quick return.  Thank you.

12          MR. SOBOL:  Okay.  So then the next slide is just

13  providing a little bit more of information, actually what I've

14  told you already.  Again, the damages for this group were at or

15  less than 2.5 percent or so.

16          I see that Mr. Wortmann is interrupting the

17  proceedings here.

18          FROM THE FLOOR:  My apologies, your Honor.

19          MR. SOBOL:  He's a good friend of mine.

20          Then if you turn to Slide 10, this is an issue that

21  I'm sure we're going to work out with AstraZeneca, but just to

22  be clear, there are eight small third-party payor opt-outs.

23  There is a provision in the agreement that indicates that the

24  parties will try to work out in good faith, you know, whether

25  there is a reversion that's necessary and what the amount of

b0bb6de9-80aa-4a56-aace-378978928564

1    the reversion would be.  Again, this is a relatively de minimis

2    amount we project, and I'm anticipating that the parties will

3    agree and no part of the process will be held up by that.

4           Next slide, "Reaction of the Class," again, in terms

5    of just looking at the settlement itself, there were numerous

6    cable television placements.  There was also a broad media

7    outreach, use of Internet banners, 70,000 letters went out, no

8    consumer or third-party payor objections.

9           In terms of looking at the fairness of the settlement,

10   Class 2 and Class 3 nationwide damages are estimated to be

11   about $220 million.  Now, of course, you know better than

12   anybody that in these cases the estimate of the damages, you

13   know, can fluctuate significantly depending upon the time

14   period that you're involved, or the amount of the premium that

15   you're alleging that might exist on the drug, and a myriad

16   other factors, but essentially the $90 million settlement we

17   think represents about 41 percent of the overall damages that

18   are fairly estimated in the case.  And, of course, that's a

19   pretty good percentage for settlements, particularly generally

20   in class actions.

21           In terms of the Massachusetts settlement also --

22           THE COURT:  Of course, the big risk in the nationwide

23   settlement would be whether or not it was feasible to do,

24   something I struggle hugely over, is a national or whether it's

25   going to be fifty different class actions -- well, not fifty

b0bb6de9-80aa-4a56-aace-378978928564

1  because there weren't so many states that had it, but let's say

2  thirty different class actions in thirty different states, that

3  was going to be a big challenge litigation-wise for everybody

4  in this room.  So the challenge wasn't just the dollar amounts;

5  it was legally whether you could try it in one forum or have to

6  try it multiple times.

7          MR. SOBOL:  That was an issue, though we thought that

8  you were up to the task, so --

9          THE COURT:  Well, it took us a year to write that

10  opinion.  It was a struggle.  And one way or another it would

11  have been tried, I'm sure.  It just was going to be a huge

12  litigation burden on everybody.

13          MR. SOBOL:  It's actually not an uncommon issue you

14  see in class actions nowadays in the post-CAFA world where all

15  sorts of class actions go up to the Federal Courts, and then

16  they're all consolidated in front of one judge, and the system

17  is sort of set up to all of a sudden dump on one federal judge

18  all of the class actions across the country.

19          THE COURT:  Yes, that MDL, people are studying that

20  now.  It's been an interesting phenomenon.  Yes, all right, go

21  ahead.

22          MR. SOBOL:  So fairness of the Massachusetts

23  settlement, I don't think I need to belabor that.  You know,

24  again, there was the entry of your decision.  $13 million

25  settlement there we think is fair and reasonable.

1          So if you have any questions first before I then move

2     into the fee application --

3          THE COURT:  Okay.

4          MR. SOBOL:  Okay?  So on the fee application,

5     reviewing a couple of things, as you know, there have been many

6     law firms that have worked on the case.  What I think you are

7     most attuned to is, you want to know, where have we been and

8     where are we going, so that as these fee applications continue

9     to go, you know, there doesn't end up being overpayment or

10    underpayment, and you want to find out where we are in the

11    process.

12         There have been two fee awards to date in AWP.  There

13    was the GSK fee award, $21.6 million, and the Class 1

14    AstraZeneca fee award of $8.58 million.  The total lodestar,

15    meaning historical rates, so back in 2001 or 2002, whatever our

16    rates were back then times the time that has been put into the

17    case by all the law firms is $70 million.  The expenses are

18    about $9.4 million.

19         THE COURT:  Have you broken that lodestar out for me

20    about what the individual people were charging?

21         MR. SOBOL:  I don't think that in this current

22    application that is identified, but I do know that in the GSK

23    settlement, we gave you the hourly rates, I'm pretty sure.

24         THE COURT:  So you and Mr. Berman were up, I forget,

25    $700 or $800 an hour, something like that?

b0bb6de9-80aa-4a56-aace-378978928564

1        MR. SOBOL:  I think that most of the time that my time

2   was kept in AWP, it was at either $500 or $550 an hour, and I

3   don't think until very recently that Mr. Berman's rate went up

4   to $600 and then $650.

5        THE COURT:  I don't remember, but I remember they were

6   pretty high rates, so --

7        MR. SOBOL:  Yes, yeah.  And, you know, by the way, I

8   also empathize with that issue too in terms of rates.  I will

9   say that my firm's rates are actually relatively low in terms

10  of what I see for what we do nationally.  When I worked back at

11  a large Boston law firm in 2000, my rate was $500 then, and

12  it's still only $550 or $600 now about eleven years later.

13       THE COURT:  Yes, just the whole world has crashed, as

14  you know, and those aren't the kind of rates we're getting

15  anymore.  But, in any event, I understand your point.  Go

16  ahead.

17       MR. SOBOL:  And then there's different, you know -- in

18  the AWP cases and many other cases, we have been looking at

19  at least a benchmark of a third, 33 percent, 30 or 33 percent.

20  So if you go two slides down, you'll see that in the GSK global

21  settlement we asked for and received a third.  Then AZ-1, we

22  received 30 percent.  This is an important slide, so I'm

23  looking at Slide 16 now.  And what we did is, we --

24       THE COURT:  So help me out.  What did we do with these

25  independent settling health plans?  That's always been a

1    bugaboo of mine, which is trying to figure out what's the fair

2    thing to do so they weren't freeloading.

3           MR. SOBOL:  Right.  So hold on a second, please.

4           THE COURT:  I think we crafted a certain solution at

5    some point.

6           MR. SOBOL:  Yeah, no, well, we did.  I'm being handed

7    a bunch of things here.

8           THE COURT:  Well, do you want to wait two seconds?

9           MR. SOBOL:  The solution in this case -- and I'm going

10   to have Mr. Cohen address it briefly too, okay -- the solution

11   in this case is that the independent settling health plans are

12   being taxed, are paying fees at the same amount as the

13   third-party payors are also paying fees.

14          THE COURT:  I understand, but I think before -- you

15   know, I'm getting old, so, you know, just excuse me if the

16   brain cells are going, but I think we worked out a solution

17   last time that I can't pay -- the common fund principle only

18   allows me to give whatever percentage it is off the common

19   fund, which is the class fund.  And so I think at least in one

20   of these settlements -- we had this discussion before -- that

21   it would be 30 or 33 percent or whatever it was of what the

22   class got, and you would have to work out with the settling

23   health plans what the remainder was.  That's why I keep

24   pressing that point.  I'm not going to award anything as a

25   Court mandate for the independent settling health plans.

1          MR. SOBOL:  Correct.  Mr. Cohen would like to say

2     something, so I'm going to yield to him.

3          THE COURT:  Okay.  I saw you nodding vigorously.  You

4     were engaging, you smiled, you knew I was going to ask this

5     question.

6          MR. COHEN:  Your Honor, my name is Richard Cohen.  I'm

7     with Lowey Dannenberg Cohen & Hart, and I've been counsel for

8     the independently settling health plans.  And seven or eight

9     years ago Mr. Notargiacomo and I crafted this arcane formula in

10    the Relafen case, and we then tweaked it in the Lupron case and

11    discovered it actually works.  And it's been used now in

12    several cases, and what it does is this:  The independently

13    settling health plans are treated for all purposes as if they

14    were class members.  They share and share alike according to

15    their purchases as if they were class members, the only

16    difference being that they have accepted a risk and a reward of

17    the quick pay.  The reward is obviously that they got paid

18    something up front quicker, the risk being that they give their

19    release at that time before there is a true-up.  But in the

20    event that the settlement proceeds, as it has and as every

21    settlement in which we've done this has eventually proceeded to

22    final approval, we have been treated as if we were class

23    members, the court awards the fee based upon the class

24    recovery, and it flows through according to this formula.

25               THE COURT:  Yes, the mechanisms matter, and I'm almost

1    positive that this has come up in other cases where I've --

2    what I'm going to do is issue a percentage -- I think I've even

3    written an opinion on this -- it's before Ms. Phillips' time --

4    but I think I'm going to issue a percentage off of the common

5    fund for the class, and then I think under the -- I think it's

6    actually a First Circuit case, under San Juan, I have the

7    discretion to also require the independent settling health

8    plans to pay a third off of what they ultimately get, or

9    whatever the percentage is.

10            MR. SOBOL:  Whatever the percentage is.

11            THE COURT:  But my award from the class is different,

12   and that's what's going to create some mathematical

13   differences, I think.

14            MR. SOBOL:  So what we've done in this case, in order

15   to have that model that what you just said be self-executing,

16   is that the true-up that goes to the independent settling

17   health parties at the end gets calculated as follows:  You

18   start with the overall settlement amount.  Whatever the fees

19   are that you're going to apply get applied to the overall

20   settlement amount.  That comes off the top.  The balance of

21   that is then allocated between the consumers and all kinds of

22   third-party payors, including the ISHPs.  Then when the ISHPs'

23   relative amount with all the other third-party payors is

24   calculated, you take the amount of the quick pay that they got,

25   and you find out what the balance is that they have.

1          Now, the result of that is that the independent

2     settling health plans have paid exactly the same amount by way

3     of fees and litigation expenses, because that came off the top,

4     as everybody else.

5          THE COURT:  Yes, but you also get -- I don't know how

6     the math works out because I'm not quick enough to figure it

7     out, but let me just start here:  I only have authority as a

8     class action settlement to do a common fund for the class,

9     okay.  And so I'm going to award 30 percent of what's going

10    to the -- I think 30 is what I'm coming up with, which is what

11    Class 1 was -- 30 percent of what the class is getting.  Then

12    I'm going to require 30 percent of what they get as, after all

13    the true-ups, the initial everything, they'll pay.  And I think

14    I have the authority to do that, and we should word the order

15    that way.  The math may end up a little differently.  I don't

16    know if it does or it doesn't.  My guess is, it does

17    potentially end up a little differently.

18         Now we've got to talk about expenses.  You say that

19    you're just folding them in, so I don't have to think about

20    them, right?

21         MR. SOBOL:  Correct, though we're asking to fold them

22    in at a third, not 30 percent, but --

23         THE COURT:  I understand that, but I gave 30 percent

24    to Class 1, and these are huge numbers.  So I think when you

25    rewrite the award, that's how it has to be done.  I believe, to

1   make sure that there's no freeloading here, if you will, I have

2   the authority under the San Juan line of cases -- I think I've

3   written about this -- to order the independent settling health

4   plans to pay a third so that you don't come out short.

5           MR. SOBOL:  We'll make sure that the order reflects

6   that, the 30 percent on both sides of the ledger that you just

7   indicated.

8           THE COURT:  Right, and that the 30 percent from the

9   class comes out of the class funds, and the 30 percent of the

10  ISHPs come out of whatever they end up getting paid all

11  together.  So that the class only pays its 30 percent, and the

12  ISHPs may end up paying more or less, depending on how that

13  number looks, but it shouldn't affect you.  I mean, the class

14  won't pay a disproportionate amount --

15          MR. SOBOL:  I understand.

16          THE COURT:  -- because of the true-up situation.

17          MR. SOBOL:  Right, okay.

18          THE COURT:  Okay?  So we'll just award it that way.

19          MR. SOBOL:  And the order will reflect that.

20          THE COURT:  I'm not sure because I'm not fast enough

21  with the math to know whether it matters hugely.  It won't

22  matter to you.  It may matter to the independent settling

23  health plans.

24          MR. SOBOL:  Well, it ought not.

25          THE COURT:  Or to the class, really.  I mean, really,

1    it could cut either way depending on how --

2           MR. SOBOL:  I am confident that the order that we'll

3    submit will reflect that.  It is the intent and purpose of the

4    settlement agreement that the ISHPs pay the same fee rate as

5    the balance of the class, as the class, so that will not be an

6    issue.

7           I do want to just sort of belabor a little bit

8    Slide 16 so you have an understanding about not only where

9    we've been but where we're going.  The intent of this was

10   essentially to identify either actual or projected fees,

11   because you had raised a question about a month ago or so when

12   I was here on something else, to be able to figure out exactly

13   where we're going to go.  So there still is the BMS global

14   settlement.  There's the Track 2 global settlement that's out

15   there.  These are calculations that are at a third or

16   30 percent of each of those settlements.

17          If you go to the next slide, the overall calculation

18   in terms of what our lodestar plus expenses is, so if you take

19   the $70 million plus the $9 and change million in terms of

20   expenses, you have about $79 million whatever in investment

21   over the amounts of the fees, the multiplier that you'd end up

22   being at would be at about that range.  And, of course, that's

23   with historical rates, so --

24          THE COURT:  Well, they're sky-high rates, but let me

25   ask you this.  One of the biggest concerns I've had at this

1  point is why -- I understand where the mistakes came in the

2  BMS, since we've been following that so closely, and Track 2

3  and how long the vendor took.  I mean, I understand, that's

4  just been an upsettingly slow process.  What happened here that

5  took so long in AstraZeneca?

6          MR. SOBOL:  Mr. Notargiacomo will get into that.

7  Mr. Notargiacomo?

8          MR. NOTARGIACOMO:  I'm not sure what you're exactly

9  referring to, your Honor.

10         THE COURT:  When was my trial?

11         MS. CONNOLLY:  It ended in January of 2007.  Your

12  findings of fact were the following June, and then we had

13  judgment entered at the end of '07.  After that, AstraZeneca

14  appealed it to the First Circuit.  We had full briefing, oral

15  argument.  Their decision came down towards the -- I think it

16  was the end of 2009.

17         THE COURT:  Okay.

18         MS. CONNOLLY:  And then AstraZeneca filed a petition

19  for certiori with the Supreme Court, and at that time we

20  resumed settlement negotiations, which resulted in our moving

21  for preliminary approval in July of last year.

22         MR. NOTARGIACOMO:  And originally this settlement

23  included Pulmicort Respules and Zoladex.  We had a preliminary

24  approval hearing --

25         THE COURT:  I remember I was part of this problem

1  because I didn't want to provide money for drugs that I never

2  adjudicated and I had no sense on the merits of.  So I just

3  wanted that to go on the record because I think this is a

4  different situation for the reasons you just described than BMS

5  or Track 2.  So, I mean, to the extent there's been a delay, if

6  you will, it's been about a year and a half rather than the

7  full span of when I ruled on the case.

8       MR. SOBOL:  It's also my understanding -- and, you

9  know, although I don't agree with it, it's understandable -- my

10  understanding is that AZ's position was that the consumers in

11  Class 1 were in a materially different position than

12  third-party payors, and that therefore that's why you saw a

13  settlement to Class 1 predate much earlier a settlement to

14  Classes 2 and 3.

15       THE COURT:  But my sense is that AZ -- the issue here

16  wasn't a situation with a vendor --

17       MR. SOBOL:  No.

18       THE COURT:  -- or the slowdown.  I mean, I've been, as

19  you know, much more frustrated with BMS and Track 2 than

20  AstraZeneca, and I think that mostly was -- some of the issues

21  were my issue, right, that I didn't want to pay for drugs that

22  I knew nothing about like Pulmicort and stuff.  So did you end

23  up going back and renoticing?  I can't remember.

24       MR. SOBOL:  We changed the notice program and tailored

25  it to --

1          THE COURT:  Yes, so that's fine.  I just want to make

2     sure that the record reflected what happened there because it

3     does seem like a long time and then -- under any theory, it

4     seems like, you know, I had a trial five years ago, four years

5     ago, and what's happened?  So thank you.

6          MR. SOBOL:  There's a final slide.  There's a "Class

7     Representative Compensation Awards."

8          THE COURT:  Yes, that was confusing because when I

9     divided and did the math, some people are being paid at $40 an

10    hour and some at $100 an hour.  Is that wrong?

11         MS. CONNOLLY:  The only one that should be at $100,

12    your Honor, is that Richard Wessels, who is the consumer

13    representative, was only a Zoladex representative, and so the

14    consumer got 100 percent because that was the only drug that he

15    represented for.  The third-party payors, on the other hand,

16    have been representatives for all of the defendants, so we were

17    awarding them portions, a 40 percent portion.

18         MR. SOBOL:  Across cases.

19         MS. CONNOLLY:  Yes, across all cases.  So we have

20    historically asked you for a percentage of their time with each

21    settlement that we have submitted.  So the third-party

22    payors --

23         THE COURT:  I didn't know that.  That's like a

24    brand-new thing for me.  So how much -- well, let me just ask.

25    My basic touchstone is, how many hours did they put in, and I

1    would pay them a certain rate.  For me, it didn't matter which

2    case it involved.  So how many hours and what rate are we

3    paying people?

4            MS. CONNOLLY:  It's $100 an hour, which is what you've

5    previously --

6            THE COURT:  Yes, I'd approve that.  And just so that I

7    get a sense, no one's getting more than that?

8            MS. CONNOLLY:  That's right, your Honor.

9            THE COURT:  Okay.  I just want to make sure.

10           MR. SOBOL:  And the idea about having some people get

11   paid less than $100 an hour here was so that they're not

12   double-dipping one settlement after another after another

13   because some of them are third-party payors.

14           THE COURT:  All right, just as long as you're

15   certifying that no one is sort of getting some windfall here,

16   that everybody is just getting $100 an hour for the number of

17   hours they literally put in.

18           MS. CONNOLLY:  That's right.

19           MR. SOBOL:  Correct, correct.

20           THE COURT:  Okay, so you're going to -- good.  Well,

21   congratulations.  This is over, right?  Defendants have been

22   quiet.  Is there anything you want to put into this?

23           MR. COHEN:  No, your Honor.  I think Mr. Sobol has

24   done a fine job.

25           THE COURT:  All right, the cy pres on the -- when do

1    you think you can --

2         MR. SOBOL:  Class 1?

3         THE COURT:  Yes.  I'd love to wrap this class up.

4         MS. CONNOLLY:  For Class 1?  I believe we should be

5    able to, your Honor, probably by the end of this month to

6    submit to you a proposal on cy pres for Class 1.

7         THE COURT:  All right.  And when do you think you can

8    get me a proposed order on, A, approving the classes -- that's

9    a key thing -- B, making sure that I've allocated attorneys'

10   fees appropriately?

11        MR. SOBOL:  You'll have it by the end of the week.  Do

12   you want that in Word, by the way, e-mail it in Word?

13        THE COURT:  That would be very useful.

14        MR. SOBOL:  That's what Hiller Zobel always had us

15   doing with him, so --

16        THE COURT:  I know, but the federal government for

17   some reason uses WordPerfect still.  We can now convert.

18        So BMS and Track 2 are on track?

19        MR. NOTARGIACOMO:  BMS is on track, your Honor, in

20   accordance to the schedule that we set, I think in December.

21   With respect to Track 2, we've made a number of filings in

22   January.  Your Honor made a decision in I think the first week

23   of January, January 7, that rather than do full notice to

24   19.3 million consumers that were evidenced in the CMS data,

25   that we would do something less, which is full direct mail

1   notice to 2.2 million people who had Class A drug

2   administrations.  Those were the --

3           THE COURT:  Right, that was the one where you gave me

4   three options, I picked one, and then you said, "You picked the

5   wrong one."

6           MR. NOTARGIACOMO:  We didn't say you picked the wrong

7   one, your Honor.

8           THE COURT:  Just, you know, that was the gist of it.

9   It reminded me of Indiana Jones and the "You chose poorly."  Do

10  you remember that, when he chooses the wrong goblet, "You chose

11  poorly"?

12          MR. NOTARGIACOMO:  As a result of the new choice that

13  your Honor made to directly notice 2.2 million people, the

14  other part of that was to do national media notice to the other

15  portions of that class.  As a result of needing to do that --

16          THE COURT:  Right, but just are we on track?

17          MR. NOTARGIACOMO:  Well, I'm getting there right now,

18  your Honor.  Last week we filed a motion for approval of

19  revised schedule because we needed to go out and buy TV spots

20  and print ads in order to do the national media.  That would

21  put us back about six, seven weeks on the schedule, and so we

22  filed --

23          THE COURT:  You didn't tell me that when you gave me

24  that as an option.

25          MR. NOTARGIACOMO:  We did, your Honor, actually.  In

Page 41

1   all of the options that included additional notice, we made it

2   clear that that would require a different schedule than the one

3   that we had.  We've been very aggressive in --

4          THE COURT:  I got it on my Blackberry as you e-mailed

5   me in crisis mode that it had to be done that day or you

6   couldn't meet the schedule.

7          MR. NOTARGIACOMO:  I'm not quite sure of the timing.

8          THE COURT:  I was out of time, you may remember.  It

9   was a crisis; if I didn't do it that second, we would be put

10  behind months.

11         MR. NOTARGIACOMO:  I think the issue there was

12  deciding which of the notice plans we were going to go with;

13  were we going to send 19 million pieces of mail?  And we were

14  ready to do that.

15         THE COURT:  But would that have gone out in time?

16         MR. NOTARGIACOMO:  Yes, and we were fully prepared to

17  send out the 19.3 million pieces, but it would have cost

18  $20 million to do that, your Honor, and that was the issue that

19  we identified.  We could have done it and done it on schedule,

20  but it would have cost an inordinate amount of money to send

21  out all of those pieces of mail to many people who were not

22  class members because, remember, the CMS data list is --

23         MR. SOBOL:  Is there an order for the Judge now?

24         MR. NOTARGIACOMO:  There is, and it was filed -- well,

25  the motion was filed --

b0bb6de9-80aa-4a56-aace-378978928564

1           THE COURT:  You know, I just feel like this is the --

2    why didn't we figure this out before?  I'm feeling so

3    frustrated with this, I can't even tell you.  Another two

4    months, how many more people die?  I mean, just it's been -- I

5    don't feel the same way about AstraZeneca.  I understand the

6    issues.  I'm feeling this way big time about BMS.

7           MR. SOBOL:  Well, on this one, your Honor, I will say

8    this:  We are moving absolutely humanly possibly as quickly as

9    we possibly can.  There's no delays.  And with all respect,

10   your Honor, I went well out of my way last November or late

11   October, whenever I was here, trying to make sure that I

12   identified to you this precise issue, which was --

13          THE COURT:  But you gave me three options.  I chose

14   one that I preferred.  You then shot me back an e-mail.  I

15   was -- was I in Costa Rica?  I don't know where I was.  I was

16   somewhere.  Where?  Oh, just in D.C.?  All right.  And I get it

17   on my Blackberry, and Ms. Phillips says, "You've got to do it

18   now, or they're going to spend a gazillion dollars and things

19   are going to get out of it."  So I'm sitting there reading it

20   on my Blackberry.  You know, "you don't even have a week to do

21   this.  You've got to do it now."  That was the tenor of thing,

22   "You've got to do it now."  So what am I going to do?  I mean,

23   I feel like a hostage in this.

24          MR. SOBOL:  On this issue, let me just say, there

25   clearly was a miscommunication then.  Class counsel gave you

Page 43

1   the options.  You decided.  Then counsel for third-party payors

2   made a request that you reconsider it, not us, but counsel for

3   third-party payors made an emergency motion asking you to

4   reconsider it, giving their reasons, but also indicating --

5   well --

6          THE COURT:  That it had to be done that day or we fell

7   behind schedule.  That was what was given to me, right,

8   something like that, as I'm reading it on the little screen of

9   the Blackberry?

10         MR. SOBOL:  Well, actually, I don't know what that

11  said.  All I do know is that you are right:  We, the class

12  counsel, were ready to send out the 19.5 million notices that

13  day, like, because we had to tell them, and it was going to go,

14  and we were under your court order to do it; and if we weren't

15  stopped, that's what we were going to do.

16         THE COURT:  Well --

17         MR. SOBOL:  So let me just tell you -- I understand

18  that you're frustrated -- you have saved the class millions of

19  dollars by this decision.  We are still on time and target.

20  We're going to get several weeks -- you know, four or five or

21  six weeks are going to be delayed, but this is still going to

22  be done by the summer, and we are moving ahead.  And although I

23  can understand your frustration in terms of time, the reality

24  is that you've saved the class millions of dollars by doing

25  this alternative method.

1          THE COURT:  It's just taking so long.

2          MR. SOBOL:  I absolutely agree.  It's going to be

3     done.  It's being done this year, and it's being done according

4     to the schedule.

5          THE COURT:  Is Track 2 on time?

6          MR. SOBOL:  That's what we're talking about is

7     Track 2, and BMS is on time and on target.

8          THE COURT:  Oh, all right, all right, all right.

9     BMS --

10         MR. SOBOL:  What's the docket number so that the

11    Court --

12         THE COURT:  BMS is on time, that's what I was talking

13    about.

14         MR. SOBOL:  Docket No. 7399.

15         THE COURT:  Is BMS on time?

16         MR. NOTARGIACOMO:  Yes, your Honor.

17         THE COURT:  BMS I care about more than Track 2 because

18    it's the cancer drugs.

19         MR. SOBOL:  Yes, this is not affecting BMS.

20         THE COURT:  All right, all right.

21         MR. SOBOL:  But on Track 2, Docket 7399, we need the

22    Court's endorsement of it so that we can get that done too.

23         THE COURT:  But when is BMS's hearing?

24         MR. SOBOL:  March 27.

25         THE COURT:  Okay.  And that's all on track?

b0bb6de9-80aa-4a56-aace-378978928564

1          MR. NOTARGIACOMO:  Yes, your Honor, it is.

2          THE COURT:  Perfect.  That's what I care the most

3    about right now.  Track 2 has always been Track 2.  This delay

4    is not going to delay BMS?

5          MR. SOBOL:  Correct.

6          THE COURT:  Good.  So I will see you on March 27.

7    Congratulations on AstraZeneca.  Does this put this case to bed

8    pretty much?

9          MR. SOBOL:  This one is done, yes.

10         THE COURT:  This one is done.  So then we'll finish

11   BMS in March, right?

12         MR. SOBOL:  Right, and then in the summer --

13         THE COURT:  Finish Track 2 this summer.

14         MR. SOBOL:  And you're done with the private payor.

15         THE COURT:  Then I'm done with the private payor, and

16   all that's left are the New York County and the California.

17   McKesson isn't a separate MDL, is it?

18         MR. SOBOL:  It's not an MDL.

19         THE COURT:  Because you call it "in re" something.

20         MR. SOBOL:  Right.

21         THE COURT:  Why?

22         MR. SOBOL:  Because there's a case management order

23   that's in place and --

24         THE COURT:  So that's why, because it's never been

25   designated MDL, right?  Are we anticipating any more of those

b0bb6de9-80aa-4a56-aace-378978928564

1   cases flowing in?

2          MR. SOBOL:  Not here, not here.

3          (Laughter.)

4          THE COURT:  Good.  So what's happening on that?

5   There's a proposed class cert for everybody.

6          MS. CONNOLLY:  That's right, and we just submitted a

7   status report to the Court basically stating that we're ready

8   to get in the process of setting a trial date for the class

9   cases, but we need the class certification decision in order to

10  be able to set the trial date so that we don't have reverse

11  intervention problems and that sort of thing, so --

12         THE COURT:  So that with you all, I will finish with

13  Track 2, and then I have this one McKesson case left?  Is that

14  all?

15         MS. CONNOLLY:  Well, the two class cases, that's

16  right.

17         THE COURT:  Two class.

18         MS. CONNOLLY:  The San Francisco Health Plan and the

19  Douglas County.

20         THE COURT:  Oh, all right.  Terrific, all right.

21         MR. WEXLER:  Your Honor, I don't want the Court to be

22  misled.  I represent two municipalities in Michigan that have

23  filed, and you stayed those cases.  And there is another case

24  that we are planning on filing, with the -- this is in the

25  McKesson area -- with the advanced understanding that it will

1   be stayed, and Hagens Berman will be our local counsel, but I

2   don't want you to be misled.

3           THE COURT:  What are the new cases from, where?

4           MR. WEXLER:  City of Detroit.

5           THE COURT:  So, I mean, doesn't it make sense, though,

6   to have me either do some trial and create some sort of issue

7   preclusion kinds of situations and then try it in Michigan?

8           MR. WEXLER:  Perhaps, but we've been directed by the

9   client to file, and we understand it will be stayed, and --

10          THE COURT:  But will it be filed here originally or

11  transferred here from Michigan?

12          MR. WEXLER:  It will be filed here originally because

13  you have all these cases pending here.

14          THE COURT:  I understand that.

15          MR. WEXLER:  We have two other county cases that your

16  Honor has stayed.

17          THE COURT:  From Michigan?

18          MR. WEXLER:  From Michigan, yes.

19          THE COURT:  And so when you say not here, are there a

20  slew of other ones?

21          MR. SOBOL:  I wasn't aware of the situation that

22  Mr. Wexler just identified, and it was my understanding -- but

23  I'll have to go back now and check -- that although other

24  public entities are trying to recoup funds on this, that they

25  would not be filing their cases directly in this court.

b0bb6de9-80aa-4a56-aace-378978928564

1          MS. CONNOLLY:  That's right.

2          THE COURT:  So these are public entities not covered

3     by your order?

4          MS. CONNOLLY:  There are other state Medicaid cases

5     that --

6          THE COURT:  State Medicaid.

7          MS. CONNOLLY:  That's right.

8          THE COURT:  I understand, I understand.

9          MS. CONNOLLY:  They are pending elsewhere.

10         THE COURT:  Okay, but they may be waiting for whatever

11    happens, for the issue preclusion types of issues, right, the

12    liability issues?

13         MS. CONNOLLY:  They actually are not a part of the

14    class that you have.

15         THE COURT:  Right, they're certainly not.  First of

16    all, you withdrew them, but, second of all, they couldn't have

17    been.  So that's fine.  Okay, good.

18         Anything else from all of you?

19         MR. THEODOROU:  No, your Honor.

20         THE COURT:  This took longer than you probably thought

21    it would, but, good.  Well, thank you.  I think AstraZeneca is

22    a good result, and we'll just finish that off by the end of

23    this week or next week, right?

24         MR. SOBOL:  Yes, we will.

25         THE COURT:  Perfect, perfect.  Great.  All right,

1     thank you.

2             MR. COHEN:   Thank you, your Honor.

3             MR. SOBOL:   Thank you, your Honor.

4             THE CLERK:   Court is in recess.

5             (Adjourned, 10:23 a.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

    UNITED STATES DISTRICT COURT )
4   DISTRICT OF MASSACHUSETTS    ) ss.
    CITY OF BOSTON               )

5

6

7           I, Lee A. Marzilli, Official Federal Court Reporter,

8   do hereby certify that the foregoing transcript, Pages 1

9   through 49 inclusive, was recorded by me stenographically at

10  the time and place aforesaid in Civil Action No. 01-12257-PBS

11  and 06-11337, In Re:  Pharmaceutical Industry Average Wholesale

12  Price Litigation, and thereafter by me reduced to typewriting

13  and is a true and accurate record of the proceedings.

14      In witness whereof I have hereunto set my hand this 10th

15  day of February, 2011.

16

17

18

19

20          /s/ Lee A. Marzilli

            _____
21          LEE A. MARZILLI, CRR
            OFFICIAL FEDERAL COURT REPORTER
22

23

24

25

b0bb6de9-80aa-4a56-aace-378978928564