Page 1

                    IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF MASSACHUSETTS


        IN RE:                          )
                                        )  CA No. 01-12257-PBS
        PHARMACEUTICAL INDUSTRY AVERAGE )
        WHOLESALE PRICE LITIGATION      )  Pages 1 - 51
                                        )




                         MOTION HEARING (TWO)

                 BEFORE THE HONORABLE PATTI B. SARIS
                    UNITED STATES DISTRICT JUDGE




                         United States District Court
                         1 Courthouse Way, Courtroom 19
                         Boston, Massachusetts
                         February 8, 2011, 10:45 a.m.




                         LEE A. MARZILLI
                      OFFICIAL COURT REPORTER
                   United States District Court
                   1 Courthouse Way, Room 7200
                      Boston, MA  02210
                        (617)345-6787

1    A P P E A R A N C E S:

2        NICHOLAS N. PAUL, ESQ. and MATTHEW C. KILMAN, ESQ.,
     California Department of Justice, Bureau of Medi-Cal Fraud and
3    Elder Abuse, 1455 Frzee Road, Suite 315, San Diego, California,
     92108-4304, for the California Department of Justice.
4
         JAMES J. BREEN, ESQ., The Breen Law Firm,
5    3350 S.W. 148th Avenue, Suite 110, Miramar, Florida, 33027,
     for the Relator, Ven-A-Care of the Florida Keys.
6
         JONATHAN SHAPIRO, ESQ., Stern, Shapiro, Weissberg & Garin,
7    90 Canal Street, Suite 500, Boston, Massachusetts, 02114-2022,
     for the Relator.
8
         DAVID SLOTNICK, ESQ., for the Relator.
9
         JOSEPH ANGLAND, ESQ., White & Case, LLP,
10   1155 Avenue of the Americas, New York, New York, 10036-2787,
     for the Defendant, Sandoz, Inc.
11
         NEIL MERKL, ESQ. and WILLIAM A. ESCOBAR, ESQ., Kelley Drye
12   & Warren, LLP, 101 Park Avenue, New York, New York, 10178,
     for the Defendant, Mylan, Inc.
13

14

15

16

17

18

19

20

21

22

23

24

25

3bcce71d-7cde-4950-a667-04815c68fb06

1                    P R O C E E D I N G S

2          THE CLERK:  The case of In Re:  Pharmaceutical

3   Industry Average Wholesale Price Litigation, No. 01-12257, will

4   now be heard before this Court.  Will attorneys please identify

5   themselves for the record.

6          MR. PAUL:  Good morning, your Honor.  Nicholas Paul

7   for the California Department of Justice for California.

8          THE COURT:  This is your second go-round, huh?

9          MR. KILMAN:  Matthew Kilman for the Department of

10  Justice, State of California.

11         MR. BREEN:  Jim Breen for the relator, Ven-A-Care of

12  the Florida Keys.

13         MR. MERKL:  Neil Merkl for defendant Mylan.

14         MR. ANGLAND:  Joseph Angland for defendant Sandoz,

15  Inc.

16         MR. ESCOBAR:  Bill Escobar for defendant Mylan.

17         THE COURT:  Welcome back to a lot of you.

18         MR. SHAPIRO:  Jonathan Shapiro for the relator.

19         MR. SLOTNICK:  David Slotnick for the relator.

20         THE COURT:  Okay.  So we have our boxes and boxes of

21  documents here.  So let me ask you just as a starting, was this

22  case filed here?

23         MR. PAUL:  Your Honor, this case was originally filed

24  in San Diego County Superior Court and wound up here through

25  the MDL process and federal removal.

1          THE COURT:  So eventually, if there's a trial, it goes

2     back to California.  Is that correct?

3          MR. PAUL:  That's correct, your Honor.

4          THE COURT:  And the thought that I had is, I know

5     there was a motion to remand now which we'll get to, and there

6     may be certain crosscutting issues like what's a FUL, which

7     took us all about eight years to figure out; but there may be

8     some issues that are unique to California law, so does it make

9     sense for me to rule on a few things but not all things?

10          MR. PAUL:  Well, speaking for California, your Honor,

11     I don't think so.  I think the California False Claims Act has

12     a different statute of limitations perhaps than the Federal

13     False Claims Act or other state acts, but the essential

14     structure is similar.  It's just different numbers.  There's

15     not a line of case law in adjudicating it that's markedly

16     different from any other principles guiding statute of

17     limitations.  The government knowledge issues --

18          THE COURT:  So you representing California would

19     prefer for me to do the summary judgment motion here?

20          MR. PAUL:  That's correct, your Honor.

21          THE COURT:  Any trial, of course, would go back to

22     California, though.

23          MR. PAUL:  Yes.

24          THE COURT:  I think this should go up through the

25     Ninth Circuit and should have California jurors.

1           MR. PAUL:  Yes, your Honor, I think that's the way we

2     see it.

3           THE COURT:  Okay, all right.  So you both have filed

4     cross-motions.  Is anyone here from Dey?

5           MR. MERKL:  Yes, your Honor, we also represent Dey.

6     Dey has settled.

7           THE COURT:  Both parts?

8           MR. MERKL:  Dey is completely out of this, the whole

9     thing.  So to the extent you have a Dey motion, you can --

10          THE COURT:  They're not getting their day in court?

11          (Laughter.)

12          MR. MERKL:  Exactly.  You can do whatever you do with

13    motions that don't have to be handled.

14          THE COURT:  Okay.  Okay, so cross-motions for summary

15    judgment and the motion to remand, do you want to start with

16    that somewhat threshold issue?

17          MR. ANGLAND:  Yes, your Honor, I think all counsel are

18    agreed it makes sense to start there because depending upon

19    your ruling, it could moot the rest of the matters.

20          Obviously this Court has discretion regarding whether

21    to recommend remand at this point, and the question is whether

22    it makes sense to do so under these circumstances, and we think

23    that your Honor's ruling and the principles underlying your

24    Honor's ruling in the Montana and Nevada case apply here.

25          As your Honor pointed out in that ruling when she

1    remanded those cases while summary judgment motions were

2    pending, you had already issued a number of opinions

3    explicating your views that would provide guidance to

4    transferor courts, and that was better than a year ago, and

5    you've only added to the body of law since then, so there is

6    plenty of guidance out there.  The question is, is what remains

7    in the summary judgment motions so much intertwined with the

8    other cases, as opposed to being unique to this case, that it

9    really does make sense to retain it?  And I submit that it is

10   not.

11        Now, I'm certainly not going to suggest that there

12   isn't some overlap of issues.  In any MDL you're going to have

13   some overlap from case to case.

14        THE COURT:  Well, most of the issues are almost

15   identical.  They just have different laws and different facts.

16        MR. MERKL:  Well, okay, your Honor --

17        THE COURT:  But the big issues are the same,

18   government knowledge, you know, that sort of thing.

19        MR. ANGLAND:  Well, actually, the government knowledge

20   legal issue would be the same or at least pretty much the same

21   in all these cases, but the factual issue is just completely

22   different basically.

23        THE COURT:  Right.

24        MR. ANGLAND:  And that's what it really turns on.

25        Now, in their papers, the plaintiffs identified what

3bcce71d-7cde-4950-a667-04815c68fb06

1   they said were four key issues that are so integrated between

2   the California case and the other cases that they would justify

3   keeping the case here.  Now, of course, the same could have

4   been said about the Montana and Nevada case which had pretty

5   much the same issues.

6          The first issue was statute of limitations.  Well, in

7   terms of the law, it is a different statute, and indeed, if you

8   get to the substantive summary judgment motions and you see the

9   summary judgment motion on statute of limitations, we cited a

10  federal case for a proposition, and we were admonished by

11  plaintiff that "Oh, that's federal law.  It has no bearing

12  whatever.  The California courts declined to follow

13  constructions of the federal statute of limitations."  So

14  legally it's different to begin with.

15         But, more fundamentally, it's a discovery statute in

16  California, the statute of limitations.  And so the issue then

17  is when California actually discovered enough to invoke, to

18  start the running of the statute of limitations.  That is

19  inherently a state-specific activity.  The evidence we're going

20  to point to there is a California version, but very different,

21  of the sort of evidence that was before your court in the

22  Massachusetts case where you focused upon what Massachusetts

23  did.  Here, for example, we'll be pointing to documents from

24  California from the very beginning of the period where

25  California said, "Oh, there's a big spread here.  The AWP is

1    200 some odd percent of the actual price, and that's a good

2    thing because that gives the profit that we want the pharmacies

3    to have."  And actually, even with that bigger spread on a

4    generic drug -- there are generic drugs involved in this

5    case -- a high spread on a low-cost drug is cheaper for

6    California than a small spread on a brand-name expensive drug.

7           Now, I wish every state had that particular document.

8    They don't.  Every state has its own documents.  But the fight,

9    if you will, is going to be California --

10          THE COURT:  That statement wasn't made till late in

11   the game, right?

12          MR. ANGLAND:  No, it was 1988.  And it wasn't a

13   casual --

14          THE COURT:  Oh, it was very early in the game.

15          MR. ANGLAND:  It was actually two years before the

16   beginning of the relevant period.  And, your Honor, it was not

17   a casual document.  What happened was, there was a proposed

18   change in the reimbursement system, and there were public

19   objections, and the Department of Health Services had to file a

20   formal response to the objections.  And this was in their

21   formal response to the complaint that reimbursement levels

22   would be too low, and they actually point to more than a

23   200 percent ratio between the two and say, "This is a good

24   thing, and we'll save money."

25          Now, that's something that I wish I could use against

3bcce71d-7cde-4950-a667-04815c68fb06

1    every state, but I can't.  And that's one document.  There are

2    hundreds of others.  And I suppose, if you went to different

3    states, you'd find other documents that we think are good that

4    we'd like to rely upon, but the point is, they're different.

5    There is a little bit of overlap, I will concede that.  The

6    little bit of overlap is the federal government issuing reports

7    that went to all the states saying, for generic drugs, the

8    discounts are 50, 60 percent, which leads to ratios of over

9    200 percent if you do the math.  You can never get more than

10   100 percent discount, but you can have in theory an infinite

11   spread.  It's taking the reciprocal basically.  But we have

12   there a --

13            THE COURT:  All right, so statute of limitations.

14   What's the second issue?

15            MR. ANGLAND:  The second is just the government

16   knowledge defense, and I can save time because that overlaps

17   with what I just said.  I also wouldn't characterize it as a

18   government knowledge defense as much as government knowledge

19   vitiating some of the elements of the various claims, but the

20   point is, you have to look at California, and what's true about

21   somebody else is not necessarily true of California.

22            The third is with respect to FULs, and here, the way

23   the issue has evolved, we have only a state-specific issue

24   left.  In their papers, the state explicitly disavows one

25   theory of FULs.  That was the one that was involved in the

1    New York case where the complaint was that the AWPs, the

2    published prices of the defendant companies, had caused the

3    wrong FULs to be set.

4           California here says, "No, that's not our claim.

5    We're making a different claim."  Actually, it's a claim that

6    your Honor mentioned as a possibility in a footnote in one of

7    her prior opinions, which was adopted by the parties here, and

8    that is, even if the FUL was not adversely affected, we have a

9    "lesser of" statute in California.  So if true AWPs, as they

10   would characterize them, had been filed, some of them would

11   have been lower than the FULs, and we would have paid less.

12   Well, that's a factual California-specific issue.  There's no

13   great theoretical crosscutting issue there.  Our position is

14   that California would not have on a systematic --

15          THE COURT:  But don't they win on that issue as a

16   matter of law?  I mean, if --

17          MR. ANGLAND:  Well, as a matter of logic, I do not

18   dispute the proposition that if California said, "We're going

19   to charge the lower of the AWP or the FUL," and if they had

20   kept that position in place even with much lower AWPs, which is

21   a fact question, then I agree with their interpretation of the

22   statute.  I don't have any quarrel with that.  The quarrel

23   therefore is about a fact issue, which is, what would the AWPs

24   have been?  And their expert actually disclaims having computed

25   what AWP should have been, so there's a fact issue there,

1   and --

2          THE COURT:  Well, we all know it would have been lower

3   than the FUL.

4          MR. ANGLAND:  Absolutely, your Honor, absolutely.

5          THE COURT:  It has to be.

6          MR. ANGLAND:  Well, we know it would have been lower

7   than it had been.  We don't know that it would have been lower

8   than FULs.

9          THE COURT:  Yes, we do, don't we?

10         MR. ANGLAND:  Not necessarily, your Honor.

11         THE COURT:  I can't think of a scenario where it

12  wouldn't.

13         MR. ANGLAND:  Well, in fact there are lots of

14  scenarios.  I mean, if you have a situation where there are two

15  different generics --

16         THE COURT:  So tell me what a FUL is again.

17         MR. ANGLAND:  Okay, a FUL is a Federal Upper Limit,

18  which is computed normally at 150 percent of the lowest

19  published price.

20         THE COURT:  Right.

21         MR. ANGLAND:  A given company may be less efficient

22  and may have a higher published price than somebody else, and

23  indeed the evidence in the New York case suggests that that was

24  often the case, that there was really one low price that might

25  generate the FUL, but that other people's real marketplace

1     prices might have been substantially higher.

2           THE COURT:  But that they would ever be higher than

3     the AWP?

4           MR. ANGLAND:  No, your Honor, if I may, I am not

5     saying that the real prices would have been higher than the AWP

6     that was published.  That is not my position.

7           THE COURT:  Oh, oh, oh, all right.

8           MR. ANGLAND:  It might be easier with numbers.  Let's

9     say the AWP was 100 and the FUL was 30.  Well, it might be that

10    the true AWP, as plaintiffs would define it, would have been

11    35, would have been higher than the FUL, so it would have made

12    no difference.  Now, they will say, "Ah, but maybe the AWP

13    would have been lower than the FUL, it would have been 25."

14    Well, maybe, but what we have here is a fact-specific issue, is

15    a very much fact-intensive issue.  We also have the over- --

16          THE COURT:  Maybe.  I don't know.  Could you find some

17    outlier where that was true?  Maybe.  But you could say,

18    typically speaking, that was highly unlikely.

19          MR. ANGLAND:  I don't think so, your Honor.  I have

20    seen nothing in the --

21          THE COURT:  Well, anyway, FUL strikes me as a

22    crosscutting issue for us.

23          MR. ANGLAND:  And if I may, your Honor --

24          THE COURT:  I think we've ruled on it.

25          MR. ANGLAND:  Well, your Honor, there are two

1   different theories regarding FUL.  Your Honor has ruled on one,

2   and on that you've already provided the guidance you want to

3   provide.  Your Honor has also written in a footnote, not in a

4   ruling, something which expounded this theory of, if you will,

5   FUL liability.  The first theory was:  The defendants distorted

6   the creation of FULs.  That's what you ruled on in New York.

7   That's not the issue that's being pressed here.  Here the issue

8   is, even assuming that the FULs were not distorted by

9   defendants, California would have charged less than the FUL

10  amount.  They would have charged the AWP amount --

11          THE COURT:  The true AWP.

12          MR. ANGLAND:  -- because AWP is lower, the true AWP

13  amount where the AWP was lower than the FUL.  And that is a

14  fact question.  There's no great cosmic issue to be determined

15  there.  As you said, your Honor, that's what the statute says.

16  The only question is, would California have, in response to

17  that sort of lower AWP, said, "No, that's not giving enough

18  profits."  The fight is a factual one.  There's no conceptual

19  issue to be dealt with.  The conceptual issue you dealt with in

20  the New York case.  Now, I respectfully disagree with the

21  dealing with it, but you dealt with it, and there's nothing

22  left to be dealt with there.

23          The fourth and final sort of crosscutting issue was

24  that it would facilitate settlement to keep all these cases in

25  one place.  Well, that doesn't really work, if you will.  We've

1   just been going through some settlement discussions with and

2   without a mediator, and the parties have been very free to pull

3   in cases that are not before this Court with cases that are

4   before this Court to talk about various permutations of what

5   can and can't be settled.  No one has ever felt bound by the

6   jurisdiction of the District of Massachusetts in terms of

7   deciding how to package a settlement.  So whether or not that

8   was perceived as an issue a year ago --

9        THE COURT:  I'll go into settlement when we go off the

10  record.  That's usually my --

11       MR. ANGLAND:  Right, and I have no intention of

12  referring to the substance at this point.  My only point is

13  that settlement is not a reason to either remand or to not

14  remand because the parties here are sophisticated enough; we

15  can talk about any combination of cases in settlement that we

16  want to take.

17       So at the end, your Honor, this situation is really

18  identical to that in Montana and Nevada.  There is some overlap

19  of issues, but they're basically local issues.  This is

20  California law and California facts.  The background on how AWP

21  works and how FULs works, that's been dealt with.  You said

22  over a year ago that you had provided ample guidance, and you

23  had.  And so in the end what we have are fact issues, and

24  they're fact issues unique to California, and some legal issues

25  unique to California, and for those, there's really no need to

1    have multi-districting.  And, frankly, as a trial lawyer, your

2    Honor, I'd like to get this sooner rather than later in front

3    of the judge who's actually going to be presiding over the

4    trial, personal preference, but in terms of the actual criteria

5    in terms of when --

6            THE COURT:  Well, I'm sympathetic to it, and I'm also

7    swamped, and I spent an entire weekend reading everything,

8    which is huge, so there's an overwhelming preference to have

9    somebody else write it, since I've written so many of these.

10   On the other hand, some of these issues like FUL are very

11   complicated, and at least one of the issues I think I'll

12   handle, and on the others, I don't know whether government --

13   well, let me ask you this:  Government knowledge, all that,

14   statute of limitations, why doesn't it just make sense to have

15   the judge out there deal with it?  She or he could do it just

16   as well as I could.

17           MR. PAUL:  Your Honor, first, as to the -- well, just

18   to back up, I think this is an average wholesale price

19   litigation MDL, and we are the first pure state average

20   wholesale price case before you.  I mean, we are a poster child

21   for MDL coordination, I think.

22           THE COURT:  I've had, although it was not part of the

23   MDL, I just had a monthlong trial with Mylan, but that was a

24   WAC case.

25           MR. PAUL:  Yes, your Honor, and I understand that.

1          THE COURT:  But many of the issues, many, many of them

2     overlapped, the "lesser of" methodologies, the "what's a claim"

3     and --

4          MR. PAUL:  Yes, your Honor, I understand that, but

5     this is a pure average wholesale price case, I think, as you've

6     seen from the briefing.  And, incidentally, we try not to

7     deluge you.  We've got three blue blinders of briefing.  This

8     is what we responded to.  Defendants are in red, for what

9     that's worth, your Honor.

10         THE COURT:  I know, I recognize all those binders.

11         MR. PAUL:  The statute of limitations, your Honor, you

12    have said in several cases that statute of limitations analysis

13    is a drug-by-drug inquiry, and inevitably it's intertwined with

14    government knowledge issues.  It's messy, and the government

15    knowledge issue I think is one of the most critical areas where

16    this Court's coordination of a focused, consistent approach is

17    necessary, rather than sending these summary judgment issues

18    that are teed up in front of you back to a District Court judge

19    in California who knows nothing about this case.  This case was

20    in the hands of a District Court judge in the Central District

21    of California for no more than three months, and it was never

22    looked at.  The entire issue was whether or not the federal

23    removal would be successfully contested by the state and then

24    the administrative aspects of sending it to this MDL.  So

25    there's no familiarity on the part of any district judge with

1   this case back there.

2          Ultimately this Court may decide once again in this

3   case -- we don't think you need to -- but it may well decide

4   that, again, the statute of limitations issue is a drug-by-drug

5   inquiry, but that inevitably takes us to the heart of the other

6   issues in this case.  Counsel described a 1998 document.  I

7   confess I was unable to pick up on the identity of the document

8   as he spoke, and I'm sure that will be clarified, but this is

9   just one of -- the defendants' argument in this regard is that

10  the California program, essentially every time it attempted to

11  undertake any sort of an analysis or reach out to various

12  stakeholders and respond to them and justify their adjustments,

13  that that constitutes government knowledge and California

14  loses.  It's kind of a simplistic argument, I think.  There is

15  no evidence in the record -- and this anticipates the main

16  motions -- but there is no evidence that California ever

17  understood the extent of the spreads in the defendants' drugs,

18  or, much less, that it --

19         THE COURT:  Well, they did when that study came out in

20  2002, right?

21         MR. PAUL:  Well, the Myers & Stauffer study undertook

22  an analysis of pharmacy acquisition costs.

23         THE COURT:  Well, isn't that what we're talking about?

24         MR. PAUL:  Well, it is, your Honor, but it was not a

25  study of all of the defendants' drugs.

1          THE COURT:  Most of them, though, right?

2          MR. PAUL:  I'm not sure that "most of them" is

3     accurate.

4          THE COURT:  Well, maybe I am jumping into the merits.

5     So the first time you have a drug-by-drug understanding of the

6     extent of the spreads was in 2002.

7          MR. PAUL:  That's right, your Honor.

8          THE COURT:  So then the issue becomes, at that

9     point --

10         MR. PAUL:  How long do you give California?

11         THE COURT:  -- how long do you give California to fix

12    it?

13         MR. PAUL:  We have cut our case off in 2004, your

14    Honor.

15         THE COURT:  I noticed that.

16         MR. PAUL:  So I think that's an important point.

17         THE COURT:  Because at that point you'd have to agree

18    they knew.

19         MR. PAUL:  Well, they knew as to the drugs that were

20    identified in the Myers & Stauffer --

21         THE COURT:  But also on fair inquiry notice on

22    anything else.  I mean, at that point the cat was out of the

23    bag, if it wasn't in --

24         MR. PAUL:  Yes, your Honor, and they took that study,

25    and then they changed AWP-based discount from minus 10 to

1    minus 17 in 2004.

2           THE COURT:  Right.

3           MR. PAUL:  And that was based, as the record

4    indicates, primarily on the fact of that study.  But I think

5    that it's fair to give --

6           THE COURT:  You know, there's another McKesson case in

7    front of me now where they claim that that's because of the

8    extent of the spread, the increase in the 5 percent average

9    wholesale price by McKesson.  So both people are attributing

10   the 17 percent to a different cause.  I'm just -- I happen to

11   have them both right simultaneously in front of me, but --

12          MR. PAUL:  I'm not sure if that's good for you or bad,

13   your Honor.

14          THE COURT:  I don't know either.  It's bad when you're

15   seeing two different theories, knowing more about California

16   reimbursement policy than most other states.  So let's just --

17          MR. PAUL:  The Montana and Nevada remand, your Honor,

18   I think that was four years ago, and there have been a number

19   of opinions this Court has issued since then, and a number of

20   them are crucial to the landscape of this case.  And I don't

21   think that just because they were remanded -- I don't think

22   that was well briefed back then.  I think it was sort of ad hoc

23   the way it came up, and there wasn't a great deal of opposition

24   from the plaintiffs.

25          THE COURT:  And I believe that all of the claims arose

1    under the --

2            MR. PAUL:  State law claims.

3            THE COURT:  -- state law, not that they don't here,

4    but they were very unique to Montana and Nevada Medicaid law,

5    but, you know, some of them are unique to California Medicaid

6    law.

7            MR. PAUL:  That's true, your Honor.  There is one

8    other factor here.  This is a whistleblower case involving

9    Ven-A-Care, and Ven-A-Care is before you in a number of other

10   cases, as I'm sure you're aware.

11           THE COURT:  Right.  There's a big article about

12   Ven-A-Care in PharmaGossip.  Did you see it?

13           MR. BREEN:  I heard about a couple of those, Judge.

14           MR. PAUL:  Describing Mr. Breen as a pit bull, your

15   Honor?

16           THE COURT:  I think that was the one.

17           (Laughter.)

18           MR. PAUL:  We do not explicitly disavow the New York

19   counties' FUL theory at all, your Honor.  New York is mandated

20   to pay on a FUL, as you're well aware.  Therefore, the way to

21   establish falsity was to undertake the analysis, which the

22   plaintiffs did; and that established, on top of the AWP injury,

23   that the defendants have caused, at least as to those nine

24   drugs, the entire FUL system to be contaminated with false --

25           THE COURT:  Well, what do you say about your brother's

1   suggestion, that even you said that many drugs of the AWP would

2   have been lower than the FUL, you can't do that on a wholesale

3   basis, that there may be a few outliers there where that wasn't

4   the case?

5             MR. PAUL:  Well, your Honor --

6             THE COURT:  How do I address that?

7             MR. PAUL:  I think one way to look at it is that

8   California pays on a "lowest of" system, as the Court is well

9   aware.  And that means, if the usual and customary is lowest,

10  that's how it gets paid, if the FUL is lowest, et cetera.  Our

11  expert, using the same claims data that was provided the

12  defendants with our initial disclosures, identified 312,000

13  instances in which California paid at one of their AWPs which

14  was lower than the FUL.  So the California system works at its

15  "lowest of" method, and for the defendants to contend that we

16  never could have run a program paying at less than the FUL is

17  belied by that simple fact.

18            THE COURT:  I think what his point was, that

19  occasionally the AWP may have been higher than the FUL.

20            MR. PAUL:  Most of the time AWPs were higher than

21  FULs.

22            THE COURT:  No, I'm sorry, I said that incorrectly.

23  The true AWP.

24            MR. PAUL:  Well, the true AWP that was calculated by

25  our expert is --

Page 22

1        THE COURT:  Is it always lower?

2        MR. PAUL:  I believe it's almost always lower, your

3   Honor, yes, and one way to --

4        THE COURT:  So is that the in the record?  I didn't go

5   through it.  So your expert went out and actually calculated

6   the true AWP --

7        MR. PAUL:  Yes, your Honor.

8        THE COURT:  -- for every single one of the challenged

9   drugs in the NDCs?

10        MR. PAUL:  Yes, your Honor, and that's set forth in

11   Exhibit 4 to his report.  I'm sorry.  Exhibit 5 is a statement

12   of the damages.  Exhibit 4 is a statement of the spreads.

13        THE COURT:  And he proves up that every single true

14   AWP for the challenged drugs was below the FUL?

15        MR. PAUL:  No, your Honor, no.

16        THE COURT:  The true ones, the true ones.

17        MR. PAUL:  I cannot stand here and tell you that every

18   single true AWP was at all times lower than the FUL.

19        THE COURT:  So you would exclude those from your

20   damages then?

21        MR. PAUL:  Your Honor, we claim damages anytime that

22   his calculated AWP for a particular claim was higher than the

23   price at which the claim was actually paid, regardless of the

24   basis on which it was paid.  I may be saying the same thing as

25   your Honor.  I'm not sure.

1      THE COURT:  Given his example, if the false AWP, the

2  phony one, was at 100 and the true AWP was 35, his true AWP --

3      MR. PAUL:  And the FUL was 30.

4      THE COURT:  -- and the FUL was 30, I'm assuming you

5  would have paid at the FUL and they wouldn't be liable.

6      MR. PAUL:  That claim is not in the case, your Honor,

7  that's correct.

8      THE COURT:  Okay.

9      MR. MERKL:  Your Honor, the record, we disagree with

10  that characterization of what their expert purports to do.  My

11  understanding of Professor Leitzinger's work is, he explicitly

12  disclaims that he is calculating what should have been reported

13  as an AWP.  What he says he is doing is, he is looking at our

14  data, crunching a number that is a fully down-to-the-bone

15  absolute discounted number, and then he just grosses it up by

16  15 to 20 percent based on some assumptions he was asked to

17  make, I believe by counsel.  I don't think he's saying this is

18  an AWP that should have been reported.  Also --

19      THE COURT:  Well, what was he saying it was then?

20      MR. MERKL:  It's part of his damage analysis.

21      THE COURT:  No, no, no, excuse me.  But let's just say

22  that's his best estimate of what the AWP was likely to be, that

23  sounds good enough.

24      MR. MERKL:  Well, I think he is not saying as an

25  expert, "And this is what I think AWP should have been."  He's

1   not making that determination because if you look at what the

2   California --

3          THE COURT:  Well, let's say he is going to say.  Let's

4   say he -- let me just say this, that, you know, there are lots

5   of different terms for these things, the true one being the ASP

6   or the AMP.  I mean, people have come up with different ways of

7   thinking about it, but let's just say, "This is my best

8   estimate based on the data I have of what the true AWP was."

9   Now, you might want to refute that and say, "No, the true AWP

10  was different," but why isn't that a fair expert opinion on his

11  part?

12         MR. MERKL:  I guess I'm not saying it's not a fair

13  expert opinion on his part if he had actually opined, "This is

14  what AWP should have been."  He's not saying that.

15         THE COURT:  Excuse me.  Do you think he is?

16         MR. PAUL:  Your Honor, our expert did not want to --

17  he calculated an AWP, and he explained it should have been a

18  "but for" AWP, and he explained it's utterly transparent as to

19  how he got there.  He calculated a wholesale net cost using the

20  defendants' own data, and he built in numerous corrections to

21  the benefit of the defendants based on the fact that California

22  has certain economic inefficiencies, it --

23         THE COURT:  So he scaled it up for the normal margin,

24  the profit margin from the --

25         MR. PAUL:  He started off, he added 2.7 to 5.4 percent

3bcce71d-7cde-4950-a667-04815c68fb06

1   which is the --

2           THE COURT:  The wholesale.

3           MR. PAUL:  The wholesale, correct, your Honor.  And

4   that was the "but for" AWP that he calculated.  He said, "I

5   cannot opine that this is the AWP that the defendants should

6   have reported because I think that is a matter of law."

7           THE COURT:  Excuse me.  Let me just say this:  Why

8   isn't that fair?  He takes essentially the WAC, whatever the

9   acquisition cost over the wholesaler -- sometimes it's called

10  the wholesale -- what's it called, net acquisition cost or

11  wholesale acquisition cost? -- and he nets up the profit.

12          MR. MERKL:  I think that's what he's doing, and I

13  think what he's computing is kind of an alternate version of

14  AMP.

15          THE COURT:  Yes, but that's what people have been

16  using as a proxy all along in this litigation.

17          MR. MERKL:  And one of the problems with using an AMP

18  as an AWP is that an AMP incorporates down the line discounts

19  that aren't known and could not be known.

20          THE COURT:  That's a different issue.

21          MR. MERKL:  I think one of the reasons, though, this

22  is so confusing now, your Honor, is, they have not moved for

23  summary judgment on the FUL theory.  This really isn't in the

24  papers.  What happened is, we filed a motion --

25          THE COURT:  Well, maybe not, but I do think the FUL

1    issue is in those boxes of documents you gave me.  So let me

2    just ask you, so it's not --

3           MR. MERKL:  This particular issue that we're arguing

4    about now really is not.  We argued that based on FUL, their

5    claim should be reduced because they had not proved up --

6    there's a similar argument that later we lost on, to be blunt,

7    in New York, that because of the way FULs are set --

8           THE COURT:  Right, that's the one I remember, and

9    that's the one I resolved, and that's the one I should tell the

10   California court about.

11          MR. MERKL:  And that's really the only FUL issue here.

12   The one we're talking about now about summary judgment on FUL

13   hasn't been made and we haven't addressed it.

14          THE COURT:  Well, your brother just raised it, so, I

15   mean --

16          MR. MERKL:  I know he raised it, but I thought we were

17   just getting into why isn't this --

18          THE COURT:  I mean, this might be one that's

19   crosscutting and unique to me.  That's all I'm saying.

20          MR. ANGLAND:  Your Honor, if I could add briefly on

21   that, I mentioned FUL because it's one of the four issues that

22   they flagged as cutting across issues.

23          THE COURT:  It is.

24          MR. ANGLAND:  The way FUL arises here is, when we move

25   for summary judgment, we make a number of arguments about why

1    they can't establish causation.  One of them is FUL.  So

2    basically, if we were to lose the FUL issue, what would do

3    is remove one of six or seven grounds on which we are moving

4    for summary judgment.  What we don't have here is the record

5    that was established in New York.  In New York the claim was,

6    FULs got distorted because inflated prices were published.

7    It's basically what your Honor concluded.  In our opening

8    papers, we challenged that and pointed out there was no record

9    evidence here.  And these papers were written before your

10   New York opinion, by the way, your Honor, and so there's no

11   record evidence to establish it.

12        Here, California did not respond the way New York did.

13   New York responded by trying to show how FULs were distorted by

14   published prices by the defendants.  California submits

15   nothing.  There's nothing in this record on that.  It's

16   completely silent.  Instead they say, "No, defendants, you

17   misunderstand our theory of FUL.  Our theory isn't that the

18   wrong FULs get set.  Our theory is, there's still causation

19   because of the 'lesser of' standard," the analysis your Honor

20   just properly explained.  So all we have here now is really an

21   argument of what the "lesser of" price would have been in

22   California.

23        THE COURT:  Yes, but I'm not going to -- all right, at

24   least I understand the issue.  That is one that is very

25   difficult, it took us years to understand, and might be of some

1   guidance to another court, as opposed to government knowledge,

2   which it's an evolving concept but it's just basically

3   fact-based.

4           MR. PAUL:  It is, your Honor, but I think that it

5   necessarily contemplates how Medicaid runs, the concept of EAC

6   and how these large, cumbersome, complex agencies work.

7   California's Medicaid program supports seven million people.

8   That's more than the population of thirty-eight states.  It's a

9   huge, sprawling bureaucracy.

10          THE COURT:  It's huge.

11          MR. PAUL:  You cannot turn it on a dime, and you

12  cannot impugn government knowledge to the agency based on an

13  honest, forthright discussion with stakeholders who are

14  complaining about a proposed reimbursement change.

15          THE COURT:  Those are the statements that happened

16  very recently, right?  There were a few statements that were

17  quoted which were after that report.

18          MR. PAUL:  After the Myers & Stauffer 2002 report.

19          THE COURT:  Yes.

20          MR. PAUL:  Yes, your Honor.

21          I did want to reserve a few minutes for Mr. Breen on

22  the issue of remand as well.

23          THE COURT:  Yes, go ahead.

24          MR. BREEN:  Just briefly, your Honor, as you're aware,

25  Ven-A-Care has before your Honor Boston-filed federal cases

1   under the United States False Claims Act with respect to

2   Sandoz, Mr. Angland's client, and also a small piece of it's

3   left with respect to Mylan -- we settled the rest of it -- as

4   it relates to the --

5          THE COURT:  I didn't know there was anything left in

6   that.  What's left in Mylan?

7          MR. BREEN:  Just the California, the United States'

8   interest in the California claims, so that is left with respect

9   to Mylan.  And so --

10          THE COURT:  So when I send this back, which I may well

11   eventually, does that go with it?

12          MR. BREEN:  No.

13          THE COURT:  Why?

14          MR. BREEN:  Because it was a case that was initiated

15   here in Boston.  We filed it in this district.  It is a Boston

16   federal false claims case.

17          THE COURT:  Yes, but it could be under 1404 if it's

18   all California.

19          MR. BREEN:  Theoretically it could or --

20          THE COURT:  The general transfer statute.

21          MR. BREEN:  I mean, the other way is, we could go back

22   to California and transfer that here because most of the cases

23   are here, so it's kind of a -- but you're right, that's the

24   transfer statute.  But the point I wanted to make, though, your

25   Honor --

1          THE COURT:  Whatever it is, it should be in one forum.

2          MR. BREEN:  I think we've agreed to that, haven't we?

3          MR. MERKL:  We don't really have a disagreement on, I

4     think, how we're going to work that at all.  We both agree we

5     have to work it out, we both agree it should be one case, and I

6     think we just have to hash out how we're going to do that.

7          MR. BREEN:  We may have a difference of opinion on how

8     we get it to one case, but I think we're in agreement that it

9     ought to be one case in terms of the relator and Mylan.

10          THE COURT:  All right.

11          MR. MERKL:  Because the overlap is the same matter.

12          MR. BREEN:  But the point I want to make, Judge, is, I

13     mean, this is the AWP MDL, and we've been here for a long time,

14     and the California case has been here for a long time.  The

15     litigants and the lawyers have worked real hard to get as many

16     of these things resolved, including my brothers here today, to

17     get as much of this stuff resolved as we can nationally, but --

18          THE COURT:  This is not resolvable.

19          MR. BREEN:  It hasn't been yet, and we can talk

20     about -- as your Honor indicated, that might be something we'd

21     want to talk about.  But my point is, this is really the first

22     time the MDL court has been asked to rule on where AWP, a

23     straight AWP reimbursement system falls under a False Claims

24     Act; not common law fraud where there's reasonable reliance;

25     not between two arm's length business people where there's all

3bcce71d-7cde-4950-a667-04815c68fb06

1   that.  I'm talking about a straight-up False Claims Act that's

2   on all fours as far as the unlawful acts or the acts go with

3   the United States federal False Claims Act.  And so the risk of

4   conflicting decisions on this core point is exactly why we have

5   an MDL.  So we'd respectfully submit, your Honor, that all

6   these issues on liability that we've teed up --

7        THE COURT:  No, I understand that and appreciate that

8   point, and it may be that I'd be helpful in ruling on some of

9   the issues, but when I get to government knowledge -- I mean,

10  maybe we're just morphing into the merits, as I read

11  everybody's briefs -- you're both cross-moving for summary

12  judgment on government knowledge.  It may be more complicated

13  than that.  For certain periods of time, no way, there's just

14  not enough; for certain periods of time, you know flat out.

15  But then I don't know that I could rule as a matter of law how

16  quickly you have to turn the Queen Elizabeth; I mean, you know,

17  once they know, which they do with the Myers & Stauffer, you

18  know, how quickly you have to do something.  That may be a jury

19  question.

20        MR. BREEN:  But I think, your Honor, it's a core

21  issue.  A gut issue here, though, is, under the Federal False

22  Claims Act and the California False Claims Act is, when the

23  pharmaceutical manufacturers make misstatements of price, if

24  the law is going to be or the Court determination is going to

25  be that California or the United States has to change their

3bcce71d-7cde-4950-a667-04815c68fb06

1   reimbursement system because of misstatements of price, that is

2   a critical legal determination that is going to be far-reaching

3   in these cases and all kinds of cases.  And talking about

4   government knowledge for statute of limitations is one thing,

5   but right now we're talking about government knowledge in that

6   whether or not there's acquiescence to a particular defendant's

7   conduct or whatever.  What you're saying here, your Honor, I

8   believe is:  At some point maybe we'll find that the United

9   States has to change their reimbursement system and California

10  has got to change theirs because drug companies aren't telling

11  the truth.  And that is a critical gut, core issue, that if

12  that's going to be determined one way or the other -- and

13  obviously we have some strong opinions about it -- then that

14  needs to be determined in the MDL, not multiple decisions out

15  there for everybody to decide.

16       On statute of limitations, though, that's a different

17  issue, in my opinion, in relator's opinion; and whether or not

18  a particular government civil prosecutor office was placed on

19  sufficient notice to start the running of the statute, I think

20  that's a totally different question from this huge issue of

21  government knowledge --

22       THE COURT:  Well, that's a very good point, Mr. Breen,

23  which is essentially you're saying, all right, there are just

24  certain policy issues that the MDL court should decide, and so

25  maybe I'd carve off statute of limitations, which would be

3bcce71d-7cde-4950-a667-04815c68fb06

1   maybe nothing so special in terms of who knew what when and

2   what triggered the duty, as opposed to the basic policy issues

3   that are crosscutting.

4        MR. BREEN:  Exactly.

5        THE COURT:  I hear that, and I'm tempted actually

6   because I have a vested stake here, but the truth is -- and

7   here's what the big problem is -- and poor Mr. Sobol was here

8   yesterday with the McKesson case, and I just finished up the

9   AstraZeneca case, and I have a huge Neurontin case, and I just

10  became Chairman of the United States Sentencing Commission --

11  you may not know that -- it could take a long time to get out

12  this opinion.  And the concern I have here -- I know what the

13  situation is in California -- you can't help but read the

14  newspaper, even here in Boston -- I'm worried because one piece

15  of this has got to be the congestion in this court with the

16  huge numbers of drug cases that I'm dealing with.  So I'm

17  trying to figure out some manageable piece of this that I could

18  help a court out there with without the massive opinion that

19  would necessarily flow should I go through every piece of this

20  record on every company and every drug on statute of

21  limitations.  So I'm looking for a middle ground, if you will,

22  and this is a very helpful discussion, really.

23       MR. BREEN:  Absolutely.

24       MR. ANGLAND:  Your Honor, if I can just respond to

25  Mr. Breen's point specifically.  On government knowledge as it

1    relates to liability as opposed to statute of limitations,

2    there are really two elements:  What should the law be, and

3    then what are the facts?  Your Honor has written I think three

4    opinions that explain that just having some government

5    knowledge is not enough, and you explain how the cases say

6    either that there must be government approval or there must be

7    government knowledge of really all the detailed facts on

8    liability.  Now, putting aside any objections we might have to

9    that law, your Honor has said that, it's there.  What's left

10    are the facts.

11           THE COURT:  The cases aren't specific.  I have written

12    on it a number of times, and it's come up recently, but the

13    touchstone is, it's not mere knowledge, but neither does there

14    have to be a formal, as you would say, approval and a rule or a

15    vote, but it's got to be that it's an affirmative adoption of

16    it as a policy.  And I'm saying it probably not so precisely.

17           MR. ANGLAND:  I understand what you're saying, your

18    Honor, and I guess my point was going to be that that really

19    only can be assessed in light of the facts.  It's one of those

20    things that I think your Honor would probably not start and

21    just describe, you know, sort of a civil law rule that the

22    following are exactly the criteria.  You would look at what

23    happened in the state, and what happened in California is

24    different from what happened anywhere else.  And so other

25    really than having the principles you've already articulated in

3bcce71d-7cde-4950-a667-04815c68fb06

1  general about the role of government knowledge, what would be

2  left would be the application of those principles to the facts

3  of each case, and every case is different.

4        THE COURT:  Well, let me ask you this:  I mean, it did

5  strike me there are different time periods.  For sure, you have

6  the strongest case by far and away, maybe even as a matter of

7  law, at some point after Myers & Stauffer; but, as he points

8  out, they stopped the case in 2004.  Wouldn't it be a jury call

9  as to how quickly, once you know the facts, you have to change

10 things?

11       MR. ANGLAND:  Well, if Myers & Stauffer were at the

12 beginning of the knowledge, then I think I would agree with

13 you, but, you know, we point to knowing that there were, you

14 know, 50, 60 percent spreads, which again -- I'm sorry -- that

15 there were discounts of 50 or 60 percent, which means sort of

16 200 percent ratios back in 1996.  And the document I referred

17 to before was the 1988 document which says, no, this

18 200 percent ratio is a great thing.  That's two years before

19 the case began.

20       Now, Mr. Merkl is going to actually argue the merits

21 of the government knowledge stuff, so I don't want to preempt

22 his thunder on it --

23       THE COURT:  All right, maybe we should just -- that's

24 the key issue here, the government knowledge really.  The

25 cross-motions, for sure, if I say there are questions of fact,

1    that goes back to a California court, and I'm likely to send

2    both of them back.

3            MR. MERKL:  Your Honor, government knowledge, the

4    questions of fact that we raise in response to their motion for

5    summary judgment, we're missing a couple of them here.  I mean,

6    they're presenting our government knowledge argument as though

7    it's a fait accompli we commit fraud; that we lied, we knew

8    what we were doing, we shouldn't do this, and the government

9    approved it, so it's okay, we should get a pass.  That really

10   isn't the whole story.

11           Our argument, it's like the way you charged the jury

12   in the Massachusetts case.  You have to break the California

13   False Claims Act claims down into its elements, and two of

14   those elements are materiality and scienter.  And if you look

15   at the body of documents and legislative history and what went

16   on in California, that's how you have to evaluate materiality.

17   Here what we're arguing, it's not as though we're claiming we

18   admit we did something wrong, we should get a pass.  What we're

19   saying is that California understood their system fundamentally

20   differently.  In 1977, for instance, California defines AWP, or

21   maybe -- California issues a report --

22           THE COURT:  Excuse me.  You've been peddling this

23   theory all along that somehow they were going to give the

24   publishing companies a free pass on whatever they wanted to

25   print.

1        MR. MERKL:  No, no, no, this is different.

2        THE COURT:  All right, all right.

3        MR. MERKL:  All I'm saying is, the California

4   Department of Finance had a report, said, "What is AWP?  We

5   have to look at it.  We're figuring out how we're setting these

6   price ceilings."  And they define it.  They say AWP, unlike the

7   list price, is a price set that's used to take discounts off,

8   which is what we've been saying, all right?

9        You move ahead to '86, '87, right?  CMS changes the

10  rule.  CMS decides, "We need to promote the use of generics.

11  We need to allow them to get a profit on these things."

12        California then has a document, '86, '88, where they

13  go through an example saying:  Here is a drug.  The AWP is, I

14  forget, $100.  The actual sale price is $50, okay?  But that's

15  good because that $50 spread is going to incentivize the local

16  druggist to buy generics.

17        Our point is that you have to look at the California

18  system that way, that in part this is by design, that they knew

19  that AWP is a benchmark, not a true approximation of an

20  average.  And I am not saying that that means it can be

21  anything we want it to.  I understand that, and I'm not saying

22  that.  I am saying that, really, the world of generics is an

23  entirely different world.  It is not how this case started out.

24  When we started out with these cases, we're looking at

25  marketing the spread.  Remember that?  They're going into

1   doctors' offices.  They're raising spreads $100 so the doctor

2   can make $400 instead of $100.

3          THE COURT:  Right, that's how we started.

4          MR. MERKL:  That has nothing to do with the world of

5   generics.  Generics is completely different.  We're not selling

6   to doctors.  These big spreads that you'll see from time to

7   time when you see an AWP of $10 and we're only selling it for

8   $1, we lose money on that spread.  It's a true spread.  We're

9   discounting.  We're giving away our money.  Our money is going

10  to the pharmacist on that discount, not the state money.  The

11  state is still playing the same flat amount.  When you look at

12  the --

13         THE COURT:  You know what, stay on track there because

14  I don't think I have anything in the record that you were

15  losing money.  I don't totally believe it, but --

16         MR. MERKL:  I'm not saying we're losing.  I'm saying

17  that we're not making money on the spread.  It's not a

18  situation where, like, you can go in, right --

19         THE COURT:  No, but excuse me.  Let me just say, I

20  understand the core argument here has always been -- it was

21  true in Massachusetts and is true here -- that basically the

22  government turned a blind eye to known spreads because they

23  wanted to either, A, incentivize the pharmacists to use the

24  generics, or, B, they weren't paying a high enough dispensing

25  fee and couldn't get that through the legislature, and this was

3bcce71d-7cde-4950-a667-04815c68fb06

1    sort of a cross-subsidy.

2          MR. MERKL:  Yes, right.

3          THE COURT:  Those have been the two big arguments that

4    you raise, that there was an affirmative conscious policy

5    decision on those two grounds, right?

6          MR. MERKL:  Yes.

7          THE COURT:  And so they then disagree with that, and

8    the question is -- I spent a month in Mylan, actually

9    Schering-Plough, Warrick, what was left, basically trying that

10   case, and so I don't see how that doesn't get tried.

11         MR. MERKL:  Well, I agree with you.  That's my point.

12         THE COURT:  I thought you both were cross-moving for

13   summary judgment on government knowledge.

14         MR. MERKL:  Our only summary judgment motion where we

15   want judgment is that 2002 post-Myers & Stauffer's point and on

16   the statute of limitations point --

17         THE COURT:  But you can't win post-2002 because

18   governments are governments.  Have you ever worked for the

19   government?

20         MR. MERKL:  No.

21         THE COURT:  Yeah, well, let me tell you, let me tell

22   you.  Well, let's even start with what the pharmacies did to

23   me, never mind what they do to the legislatures.  I mean,

24   they're very vocal and a strong force, and it takes a while to

25   craft a compromise, or at least sort of get past the politics,

3bcce71d-7cde-4950-a667-04815c68fb06

1    right?

2              MR. MERKL:  Yes.

3              THE COURT:  So I think you can't say, bingo, they had

4    to turn on a dime the minute the Myers & Stauffer report came

5    out.

6              MR. MERKL:  That's not our whole argument.  The reason

7    why it should end at Myers & Stauffer in 2002, at least as a

8    matter of law, is because of the element of materiality unique

9    to a False Claims Act claim.  Once they know that you have

10   spreads of 80 percent, 60 percent, right --

11             THE COURT:  1,000 percent, 5,000 percent.

12             MR. MERKL:  All right, once they know all that and

13   they sit down -- and they do take a year and a half, they do

14   meet with the lobbyists, they do do all this --

15             THE COURT:  Right, of course.

16             MR. MERKL:  -- they don't knock it down that.  They

17   just knock it down 5 points.  That tells you --

18             THE COURT:  That can't be a matter of law.

19             MR. MERKL:  Well, but our argument is --

20             THE COURT:  That's a good argument for a jury.

21             MR. MERKL:  But that tells you that these spreads are

22   not material in the sense they argue they are.

23             THE COURT:  Not as a matter of law.  So that's where

24   I'm struggling with your position, and it may be that early

25   on -- I have to go back and reread this 1988 memo.  Have you

3bcce71d-7cde-4950-a667-04815c68fb06

1   figured that one out yet?

2          MR. PAUL:  Your Honor, I think the short answer to

3   that 1988 memo is, it's like other documents that the

4   defendants have pointed to:  It shows some general awareness

5   that there is an AWP inflation problem.  But this is a program

6   that spends $6 billion a year on drugs, just drugs.  It's a

7   $45-billion-a-year program.  Eighty percent of that expenditure

8   is for branded drugs where this AWP fraud, to be blunt, is not

9   in evidence, not the way it is with generic drugs.  And there

10  is not a single document that the defendants have pointed to in

11  their briefing -- and I know that Sandoz has an AMP argument,

12  and I'm not trying to bulldoze over it, but setting that

13  aside -- there's not a single document that the defendants have

14  pointed to that identifies any instance in which the program

15  knew that their drugs were inflated to the extent that they are

16  until the 2002 Myers & Stauffer report.

17          So if it's enough to defeat a False Claims Act if the

18  program is out there stumbling around trying to identify

19  without any constructive input from the defendants, who of

20  course never respond to any of these OIG reports or Myers &

21  Stauffer or any other report saying, "California Medicaid, we'd

22  like to come clean with you.  Those spreads, we agree, those

23  are way too high," there's none of that, of course.  So they're

24  operating pretty much in an information vacuum with regard to

25  their ability to identify any attribute of the true, accurate

3bcce71d-7cde-4950-a667-04815c68fb06

Page 42

1    average wholesale prices, giving that term a fair common-sense

2    meaning as this Court has done over and over again.

3            THE COURT:  All right, thank you.  I've read this.  I

4    want to make sure we have a chance to do all the individual --

5    are you looking for summary judgment on the FUL point or --

6            MR. PAUL:  Your Honor, we've moved for summary

7    judgment on two counts under the California False Claims Act:

8    The defendants caused false claims to be presented, and that

9    they caused false statements to be made in the paying of

10   claims.  So it's that simple.  One of their grounds on which

11   they have moved for summary judgment is that California has no

12   claim for damages for any claim paid at a FUL, and we of course

13   oppose that and --

14           THE COURT:  All right, thank you.  So can we just --

15   the one piece I feel that I -- only individual motions that

16   have unique issues.

17           MR. MERKL:  Mylan and Sandoz each made a motion on

18   statute of limitations, which I think we've already covered.

19   When this motion was originally filed, there was kind of a

20   joint defendants' motion, and we each peeled off and filed

21   individuals.  And the statute of limitations motions we've been

22   talking about I think are in the Mylan and Sandoz individual

23   motions.  Is that right?

24           MR. ANGLAND:  That's correct.

25           MR. MERKL:  And it is basically the same motion, that

3bcce71d-7cde-4950-a667-04815c68fb06

1   as of '98 -- I'm sorry -- three years back from 2002 when it

2   was filed in '99, everything before that is barred because

3   California should have been on inquiry notice as to what

4   happened.  And they've raised some objections to that based on

5   California law, whether it's enough for the head of DHS, the

6   Department of Health Services, to know or whether the Attorney

7   General has to know, whether this stuff really is good enough

8   notice and --

9           THE COURT:  Okay, so that's all that's unique to your

10  two companies?

11          MR. MERKL:  We both have that.  Then Mylan has the

12  motion on Mylan, Inc. to get out because it's a holding

13  company, and it is not actually the company that sells,

14  markets, and does this stuff.

15          THE COURT:  Haven't I ruled on this before?

16          MR. MERKL:  I think you did rule on it -- I think you

17  might have resolved it in the past.  It's come up before.

18          THE COURT:  It sure has.  I just, you know, I don't

19  remember --

20          MR. MERKL:  I don't remember.  Their argument is that

21  because --

22          THE COURT:  I don't want to -- if I've done it, could

23  you just find out where I did it.  Mylan must know somewhere.

24          MR. MERKL:  I think this has come up.  I don't think

25  it's come up with Mylan, though.

3bcce71d-7cde-4950-a667-04815c68fb06

Page 44

1        MR. PAUL:  Your Honor, we haven't located any, unless

2   it happened since the briefing.

3        MR. MERKL:  I'll double-check.  It may be we did it

4   and it was resolved, but I don't think you've ruled on it.

5        THE COURT:  Didn't this come up in the -- I don't

6   remember.

7        MR. MERKL:  It may be, your Honor, in another Mylan

8   case that we've since settled or resolved some of this, and it

9   never had to be decided.

10        THE COURT:  Yes, I thought it did.  Judge Bowler ruled

11   on it and it came up.  Anyway, could you just take another pass

12   through.  It's possible that it was another one of the

13   corporations with a similar issue.

14        MR. MERKL:  Mylan has another issue that you have

15   ruled on in the past, and there's citations in the papers where

16   we settled an antitrust case involving the claims on two drugs.

17   Our claim basically is, it's transactional, that, you know, you

18   brought a case --

19        THE COURT:  Have I rejected that before?

20        MR. MERKL:  You ruled against that.

21        THE COURT:  All right, so you're just making a

22   placeholder there?

23        MR. MERKL:  Yes.

24        THE COURT:  Okay, okay.  I have too much to do to go

25   back and revisit it, but, okay.

Page 45

1        MR. MERKL:  Well, believe me, it's not a lot of the

2   papers.

3        THE COURT:  Okay, all right.

4        MR. ANGLAND:  And, your Honor, Sandoz, as counsel just

5   mentioned, had one other Sandoz-specific summary judgment

6   motion.  That was based upon the submission of AMPs

7   undercutting the scienter element of a claim under California

8   law.

9        THE COURT:  Is this AMPs to the Center for Medicare

10  and Medicaid Services?

11       MR. ANGLAND:  Yes, and Sandoz submitted them to

12  California as well, and that was drug by drug --

13       THE COURT:  I see.  So this was not part of the

14  Medicaid rebate agreement?

15       MR. ANGLAND:  It was all -- they were created for the

16  purpose of a Medicaid rebate agreement; but rather than just

17  sending them to the federal government, which I believe is all

18  Sandoz had to do, it actually sent them to the state of

19  California as well, and it lists drug by drug what the actual

20  after-discount transaction price is.

21       THE COURT:  That's interesting.

22       MR. ANGLAND:  It didn't do that for the entire period,

23  your Honor.  It did it through 1997.  For the years after 1997,

24  we have the argument that California had the URA and could

25  quickly have computed it.  And if I can --

1          THE COURT:  Yes, but I've rejected that up and down,

2     but --

3          MR. ANGLAND:  Well, if I may, your Honor, there's one

4     paragraph on that --

5          THE COURT:  But you're unique because I think most

6     people don't send the AMPs directly to the state, so --

7          MR. ANGLAND:  And that's why we made this ourselves.

8     In the Mylan case, you do reject a version of the argument but

9     not the argument that we're making here, your Honor, if I can

10    make the distinction.  In the Mylan case, your Honor says,

11    "Well, yes, they might have had the URAs from which AMPs could

12    be computed, but they didn't compute them, and therefore I will

13    not find that this constituted state approval of these big

14    spreads."

15         We are not raising AMPs in that context here.  We are

16    saying it goes to Sandoz's scienter, not government approval,

17    but to whether we had bad intent.

18         THE COURT:  I would never do that as a matter of law.

19    It may be relevant evidence for a court to take in.

20         MR. ANGLAND:  As my last shot on this, your Honor, and

21    it will only take a moment, I would say that analytically what

22    we have here, although not quite as neat, is really not

23    different from a situation wherein California said, "Please

24    send us your published AWPs," and we sent them the so-called

25    inflated AWPs, but we had a column next to it that said "real

1    price."

2             THE COURT:  Did you?

3             MR. ANGLAND:  The AMPs were the real price.  They were

4    not on the same piece of paper.

5             THE COURT:  Well, but the actual AMPs makes an

6    interesting question.  That's different than the reverse

7    engineering, the URAs that go to a different agency.

8             MR. ANGLAND:  Right, we had actual AMPs through '97,

9    reverse engineering for the next few --

10            THE COURT:  And you sent the AMPs directly to the

11   Medicaid agency?

12            MR. ANGLAND:  Directly.  We have the exhibit there,

13   and it's drug by drug.  And if I can add, your Honor --

14            THE COURT:  No, no, can I -- yes, go ahead.

15            MR. ANGLAND:  When their expert does his report to

16   figure out what his "but for" prices are, they're basically

17   almost identical to our AMPs.  I mean, they're extremely close.

18            THE COURT:  So what happens there?  We actually had

19   that come up in the Mylan case where at some point

20   Schering-Plough actually sent them what the real price was.

21            MR. PAUL:  That's different, your Honor.  The AMPs are

22   part of California's mandatory supplemental rebate program,

23   which is a way to contain costs; and, as counsel accurately

24   states, Sandoz did for a period report its AMPs to the state,

25   as required to do so, in order to enter into a supplemental

1    rebate contract.  But that information -- and the record

2    establishes this, the evidence that we put in via our summary

3    judgment motion -- it's protected just as closely in the rebate

4    shop.  This is all rebates.  It may be state rebates but it's

5    rebates.  It's highly confidential.  Every pharmaceutical

6    manufacturer has always insisted on protecting their AMPs and

7    affording them that kind of confidentiality.

8         So, no, no one in the California program took their

9    AMPs and compared them to their AWPs.  And we have briefing

10   there additionally, your Honor.  The industry seems to have

11   adopted a curious position on the accuracy of AMPs, as we

12   explained to you, regarding the stance taken by the Generic

13   Pharmaceutical Association, of which Sandoz sits on the

14   Executive Committee, coincident with the recent new FUL formula

15   based on AMPs which are now in the open, and they've disavowed

16   the accuracy of AMPs as a basis for reimbursement.  So I think

17   that kind of undercuts any assertion that this number was

18   useful to compare.

19        THE COURT:  I don't think drug pricing will ever be

20   clear.

21        MR. ANGLAND:  There are really two points there.

22   First is, could California have used the AMPs to compare them

23   to the real prices and say, "Whoa, there were spreads here of

24   1,000 percent or 2,000 percent"?  Absolutely nothing that they

25   cite in their papers says that California can't do that.

1          Now, they do cite evidence that says California could

2     not have created a reimbursement formula based on AMP; and even

3     assuming that's true, that's not our point.  Our point is, all

4     you have to do is compare the two.  He adds, "Well, we didn't

5     compare them," not that they couldn't but that they didn't

6     compare them.  That may be relevant to other issues in this

7     case, but it's not relevant to scienter.

8          THE COURT:  But let me just be clear.  I understand

9     your point, and it may well be relevant to scienter; and if I

10    were the trial judge, just as I did in the case in

11    Massachusetts, I would allow it in as evidence of scienter, but

12    that doesn't make it so as a matter of law.

13         MR. ANGLAND:  Well, you can see why I'm anxious to get

14    this before the trial judge, your Honor.

15         THE COURT:  I'm anxious for you to get it in front of

16    that judge too, so --

17         MR. ANGLAND:  And I'll sit down after the next

18    sentence, which is basically, yes, several years after all this

19    happened Sandoz said, "We don't like basing reimbursement on

20    AMPs."  It didn't like basing reimbursement on any average.

21    Half the people are going to be below, half above, and there

22    are other technical problems.

23         THE COURT:  I understand.  Okay, that's useful.

24    What's the last issue?  Was there another issue, an individual

25    company issue?

3bcce71d-7cde-4950-a667-04815c68fb06

Page 50

1          MR. ANGLAND:  I don't think so, your Honor.

2          THE COURT:  No?  That's it.

3          MR. MERKL:  Your Honor, we have some defendant-specific

4   evidence, but it's not a separate dispute issue.

5          THE COURT:  Okay.  Okay, thank you.

6          MR. BREEN:  Your Honor, can I just make one point on

7   AMPs real quick because we keep throwing it around, but I think

8   the record is real clear on this.  Until after 2000 in I think

9   Texas -- and we just tried a case last month in Texas that I

10  tried --

11         THE COURT:  How did you do?

12         MR. BREEN:  $170 million verdict where AMPs was at

13  issue.

14         THE COURT:  State court, was this this kind of case?

15         MR. BREEN:  Yes, your Honor.  It was against one of

16  the defendants, one of the co-defendants in the federal case,

17  Actavis.

18         THE COURT:  I think every single jury that's tried one

19  of these cases has come back for the plaintiffs, with Alabama,

20  the Supreme Court reversing one verdict, right?

21         MR. BREEN:  Exactly, and that was a reasonable

22  reliance case for brands.  And AMPs, your Honor, were in that

23  case, and they were in the Texas case only because Texas

24  required them to be reported after 2002 to the reimbursement

25  people.  And if your Honor will recall, in the Warrick case,

3bcce71d-7cde-4950-a667-04815c68fb06

1    Texas started the Warrick case also with our Ven-A-Care Texas

2    case against Warrick.  They began to report AMPs in connection

3    with reimbursement and authorized the states to use them.  So

4    until a state actually asked for AMP for reimbursement

5    purposes, or a defendant says, "Here, use it for reimbursement

6    purposes," those are the only instances that I'm aware of where

7    AMP has been relevant to the knowledge of the defendant.  Other

8    than that, everybody knows they're being used for rebate

9    purposes and they're not being used for reimbursement purposes.

10          THE COURT:  Okay, thank you.  Can I see counsel at

11   side bar just for one -- I don't know who's sitting out there.

12   Actually, I know some of the people who are sitting out there,

13   but I'm going to talk the "S" word.

14          (Side-bar conference off the record.)

15          (Adjourned, 11:54 a.m.)

16

17

18

19

20

21

22

23

24

25

3bcce71d-7cde-4950-a667-04815c68fb06

1                       C E R T I F I C A T E

2

3

   UNITED STATES DISTRICT COURT )
4  DISTRICT OF MASSACHUSETTS    ) ss.
   CITY OF BOSTON               )
5

6

7          I, Lee A. Marzilli, Official Federal Court Reporter,

8  do hereby certify that the foregoing transcript, Pages 1

9  through 51 inclusive, was recorded by me stenographically at

10 the time and place aforesaid in Civil Action No. 01-12257-PBS,

11 In Re:  Pharmaceutical Industry Average Wholesale Price

12 Litigation, and thereafter by me reduced to typewriting and is

13 a true and accurate record of the proceedings.

14      In witness whereof I have hereunto set my hand this 22nd

15 day of February, 2011.

16

17

18

19

20          /s/ Lee A. Marzilli

           _____
21          LEE A. MARZILLI, CRR
           OFFICIAL FEDERAL COURT REPORTER
22

23

24

25