# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) )  MDL No. 1456 ) |
| THIS DOCUMENT RELATES TO: | )  Civil Action No. 01-CV-12257 PBS ) |
| THE BMS SETTLEMENT | )  Hon. Patti B. Saris ) |

**MEMORANDUM OF DEFENDANT BRISTOL-MYERS SQUIBB COMPANY
IN RESPONSE TO OBJECTION TO PROPOSED SETTLEMENT BY
CLASS 1 MEMBER DAVID AARONSON**

Preliminary Statement

The Court properly converted Mr. Haviland's motion on behalf of a former class representative to "enforce" a single-page memorandum of understanding ("MOU") between Bristol-Myers Squibb Company ("BMS") and Class Counsel regarding Class 1 to an objection to the allocation of settlement funds in the preliminarily approved settlement of the claims of all three Classes.[1]   The authorities Mr. Haviland cites – dealing almost exclusively with the enforceability of settlements outside the class action context – have no bearing here.  No settlement of class claims is enforceable purely as a matter of contract law; there must be a court determination that the settlement would be fair and reasonable. Fed. R. Civ. P. 23(e).

Here, as the Court noted in a September 29, 2008 order, BMS raised substantial questions concerning whether the MOU could form the basis of a fair and reasonable Class 1 settlement.   Specifically, BMS showed that the MOU could not be fair and reasonable because it did not contain a distribution plan that was rationally related to the potential damages of Class 1 members as elucidated in prior decisions of the Court.  The MOU provided for $13 million, but even under the most optimistic projections of plaintiffs' expert, Class 1 members at 100% participation were unlikely to be able to claim $4 million given those decisions.  With the benefit of the Court's order and the Court-appointed mediator's help, the parties were thereafter able to reach a $19 million full and final settlement agreement for all three Classes – an agreement that was preliminarily approved with no objection at that time from Mr. Haviland.

Mr. Haviland's latest objection is based on the legal and logical fallacy that, in the BMS settlement now ripe for final approval, Class 1 has "lost over $8.5 million in settlement

---

[1] Mr. Haviland reiterated the objection of the former representative, Rev. David Aaronson, in a filing dated February 28, 2011 -- the last day for objections and opt-outs by Class 1 members.  (See Named Consumer Plaintiff, Rev. David Aaronson's, Objection to the Proposed Settlement with Defendant Bristol-Myers Squibb, dated Feb. 28, 2011 ("2/28/11 Settlement Objection") (Dkt. No. 7440).)

proceeds" to Classes 2 and 3.  (Memorandum in Support of Motion to Enforce Settlement With

BMS, dated Feb. 16, 2010 ("2/16/10 Settlement Objection") (Dkt. No. 6918) at 10-11; see also

2/28/11 Settlement Objection at ¶ 3 (referring to "diver[sion] of $8,630,00 in settlement funds").

As a matter of class action law, the MOU did not entitle Class 1 to the entire sum in the first

place.   The only question for today is whether the $4.37 million allocated to Class 1 (and to

Class 3 consumers) in the $19 million settlement of all three Classes' claims is fair, adequate and

reasonable.  For the reasons stated herein and in Class Counsel's submissions in support of the

settlement, the allocation easily meets that test and the objection based on the MOU should be

overruled.

<u>Facts</u>

Class 1's claims against BMS were scheduled for trial on July 23, 2007.  On the

morning of June 21, 2007, the court-appointed mediator, Mr. Eric Green, telephoned the Court to

report the likely settlement of all three Classes' claims against BMS and to request the Court to

defer the issuance of its opinion regarding the "Massachusetts-only" Class 2/3 trial, which trial

had taken place at the end of 2006.  The Court responded that it had already signed the opinion

and that it was in the process of being issued.  The Court's opinion soon followed.   <u>In re Pharm.</u>

<u>Indus. Average Wholesale Price Litig.</u>, 491 F. Supp. 2d 20 (D. Mass. 2007).

Four days later, on Monday, June 25, 2007, Class Counsel and counsel for BMS,

with the continued assistance of Mr. Green, were able to reach a MOU for a Class 1 settlement

class consisting of individuals nationwide who paid all or a portion of a Medicare Part B co-

payment for one or more BMS subject drugs.  The single-page document provided for BMS to

pay $13 million plus one-half of the cost of notice to the Class up to $1 million, but did not

contain any details on how individual class members claims were to be valued or what would

happen to settlement amounts in excess of those values.   (See Memorandum of Understanding, dated June 25, 2007, attached as Ex. A to 2/16/10 Settlement Objection.)  The parties' counsel negotiated the overall $13 million figure based, in part, on the Class 1 damages calculations of plaintiffs' expert, Dr. Hartman.   Unfortunately, those calculations were based on the erroneous assumption that the "30% speed limit" for expected spreads that Dr. Hartman had articulated for purposes of Classes 2 and 3 did not apply to Class 1.  (See Declaration of Lyndon M. Tretter (1) In Opposition to Plaintiffs' Motion to Preliminarily Approve Their Proposed Plan of Distribution for the BMS Class 1 Settlement; and (2) In Support of [BMS's] Cross-Motion for a Conference on a Distribution Plan and Other Settlement Issues, dated Sept. 17, 2008 ("9/17/08 Tretter Decl.") (Dkt. No. 5595-2) at ¶ 3.)

The next week, at a hearing before the Court on Tuesday, July 3, 2007, the Court made clear to all counsel that its June 21, 2007 Opinion had "rejected plaintiffs' position [of] per se liability for Class 1 and . . . the 30 percent speed limit should apply to Class 1 as well." (Hearing Tr., July 3, 2007, at 9.)  In a later Memorandum and Order dated September 3, 2010, resolving summary judgment motions by the Johnson & Johnson family of defendants ("J&J") as to Class 1 claims, the Court reaffirmed and refined the imposition of the test as a matter of law in all jurisdictions where consumer fraud claims are triable to the bench.  In re Pharm. Indus. Average Wholesale Price Litig., 738 F. Supp. 2d 227 (D. Mass. 2010).[2]

Under Dr. Hartman's calculations, applying the 30% speed limit to Class 1 would have reduced the Class 1 maximum damages against BMS at trial – let alone a negotiated

---

[2] The Court noted that "in limited circumstances" a jury might consider a drug company's conduct to be unfair and deceptive "even when the spread is within the thirty percent yardstick." Id. at 235.  Neither of the circumstances identified by the Court apply to BMS: (i) a manufacturer's increase in a subject drug's list price in response to Congress' lowering Medicare Part B reimbursement in 1997-98 or (ii) the existence of a 30% WAC-to-AWP mark-up factor on a drug instead of a traditional 20% or 25%.  In fact, BMS never raised the list price on Taxol at all and kept the list price constant on Blenoxane, Cytoxan, Rubex and Vepesid after they lost patent protection in the 1980s and early 1990s.

3

settlement amount – to approximately $4 million.  (See 9/17/08 Tretter Decl. at ¶ 3.)  BMS's expert, Dr. Greg Bell, provided a report in which he showed that Dr. Hartman's $4 million was materially overstated due to improper inclusion of drugs in certain years, for failure to account for co-payments either covered by Class 1 members' insurance or not paid at all, and for not applying statutes of limitations.  Dr. Bell estimated that Class 1 damages ranged from $1.3 million to $3 million, depending on which assumptions were used.[3]

Given the huge disparity between Class 1's maximum damages at trial and the MOU amount, when Class Counsel originally proposed a distribution plan (Class Counsel's Memorandum in Support of Motion to Preliminarily Approve Proposed Plan of Distribution for the BMS Class 1 Settlement, dated Aug. 25, 2008 (Dkt. No. 5518)), BMS noted the unfairness of the plan and petitioned the Court to order a distribution plan rationally related to the legitimate claims of class members.  BMS cited numerous authorities for the proposition that a court must assess the fairness of a distribution plan and, where the available funds exceeded those legitimate claims, should prevent a windfall by directing either a reversion to the defendant or application of the cy pres / fluid recovery doctrines.  (See Memorandum of Defendant Bristol-Myers Squibb Company: (1) In Opposition to Plaintiffs' Motion to Preliminarily Approve Their Proposed Plan of Distribution for the BMS Class 1 Settlement; and (2) In Support of its Cross-Motion for a Conference on a Distribution Plan and Other Settlement Issues, dated Sept. 19, 2008 (Dkt. No. 5595) at 5.)

In an Electronic Order dated September 29, 2008, the Court stated that "A plain reading of the MOU demonstrates that BMS does not have the right to 'veto' class counsel's

---

[3] See Supplemental Report and Declaration of Gregory K. Bell, Ph.D. on Behalf of Bristol-Myers Squibb Co. and Oncology Therapeutics Network Corp. in the Trial of Class 1 Claims, dated May 30, 2007 (attached hereto as Exhibit A).

proposed distribution plan.  However, <u>BMS raises several interesting questions about the fairness</u> <u>of the plan</u>.  Plaintiffs shall move for a preliminary approval of the plan, and the Court will hold a hearing where the issues will be vetted.  <u>The Court will decide on the appropriate distribution</u> <u>plan</u>."  (Electronic Order, dated Sept. 29, 2008, attached as Ex. B to 2/16/10 Settlement Objection, emphasis added.)

   The parties took the Court's admonition to heart and, with the help of the Court-appointed mediator, negotiated an increased settlement amount of $19 million for all 3 Classes, plus $1 million toward notice costs.  The parties executed the final settlement agreement on August 4, 2009.  (Settlement Agreement and Release of the BMS Group, dated Aug. 4, 2009 (the "BMS Settlement Agreement") (Dkt. No. 6349-2)).  By its terms, the BMS Settlement Agreement superseded all prior settlement negotiations, including therefore the MOU.[4]  (<u>Id.</u> at ¶ 28.)  BMS took no part in the determination of how the settlement amount or notice money were to be allocated among the Classes.  As a result of a mediation in which the Classes were separately represented by counsel, 23% of the $19 million was allocated to Class 1 and to consumers in Class 3.  (<u>Id.</u>, Ex. F at ¶ 8.)  This represents $4.37 million before attorneys' fees and costs of settlement notice and administration.

   Exhibit F to the BMS Settlement Agreement contains the proposed Distribution Plan and Claims Process.   It is extraordinarily generous to Class 1 members.  Their claims are valued based on their "<u>total</u>" co-payment obligation as shown in CMS records (BMS Settlement Agreement, Ex. F. at ¶ 17), not just the portion of the co-payment that was allegedly inflated

---

[4] This presents another reason why the Court was correct to treat Mr. Haviland's motion to "enforce" the MOU as an objection to the Class 1 allocation: the MOU was merged into the BMS Settlement Agreement and has no separate existence that would allow for enforcement in light of the subsequent Agreement.

beyond the "but for" amount of average selling price plus 30%.[5]  This amount is trebled for Class

1 members who received the BMS subject drugs Cytoxan, Taxol and Vepesid, even if (a) the

AWP did not exceed the 30% speed limit in the year the drug was received by the class member

and/or (b) the drug was subject to generic competition and the class member cannot establish that

he or she received the BMS version of the drug.[6]  Notably, Class 1 members do not have to

submit any documentation to recover other than a sworn statement that they made a percentage

co-payment for the BMS subject drug in question.  By contrast, Class 3 consumers must have

proof of payment amounts unless they elect an "easy refund option" of $35.00 for each claim.

(Compare BMS Settlement Agreement, Ex. F. at ¶ 13 with ¶ 18(a).)

On August 10, 2009, the Court held a hearing on whether the BMS Settlement

Agreement should be preliminarily approved.   Neither the present objector, Rev. Aaronson, nor

his counsel, Mr. Haviland, appeared or submitted any opposition despite notice of the hearing.

Rather, six months later, on February 16, 2010, Mr. Haviland filed a "Motion to Enforce" the

Class 1 MOU with BMS.  (Motion to Enforce Settlement With BMS, dated Feb. 16, 2010 (Dkt.

No. 6917).)  By order dated March 11, 2010, the Court ordered that Mr. Haviland's motion be

treated as an objection to the settlement.  (Electronic Order, dated Mar. 11, 2010 (granting Class

---

[5] By way of example, assume that, in 2000, a class member received 10 billable units of a BMS drug with an AWP of $100 per unit, for a total Medicare Part B allowed amount of $950.00 (10 units x 95% of AWP of $100).  The total co-payment obligation would be 20% of that $950.00 or $190.00.  Assume further that the actual average selling price of the BMS drug in 2000 was $50 per billable unit.  Applying the 30% speed limit, the "but for" price would have been $50 + .30(50) = $65.  The "inflation" per unit would therefore have been $35, creating damages of only 20% of 10 units x (95% of $35) or $66.50.  Thus, in this example the class member's claim of $190 is valued at almost 3 times his or her putative damages of $66.50.

[6] Cytoxan (cyclophosphamide), Taxol (paclitaxel) and Vepesid (etoposide) are the BMS subject drugs with significant Medicare Part B utilization in the class period where -- because of "multisource" (i.e., generic) competition -- the "spreads" between published AWPs and actual average selling prices exceeded the 30% speed limit.  (In the case of Taxol, however, such spreads did not start until 2001.)  If the example in footnote 5, supra, involved one of these three drugs, the trebling of the Class 1 claimant's claim based on the $190.00 total co-payment -- resulting in a claim of $570 -- would be valued at almost nine times the hypothetical damages of $66.50 to that claimant.

6

Plaintiffs' Motion for Leave of Court to Respond to Motion to Enforce Settlement with BMS at the Time Set for Response to All Other Objections to the BMS Settlement (Dkt. No. 6938)).)  On the last day of the period for objections, February 28, 2011, Mr. Haviland renewed his objection and cited no additional information or legal authority.  (See 2/28/11 Settlement Objection.)

Argument

Agreements to settle class actions are different from agreements to settle individual actions.  The latter may be enforced simply as a matter of contract between individual parties; the former are always subject to the court's equitable powers and conditioned on approval of, among other things, the settlements' overall fairness and reasonableness.  In re Cendent Corp. Prides Litig., 233 F.3d 188, 194 & n.7 (3d Cir. 2000) (The "argument that this case [settlement] is governed only by black letter contract law is unavailing.  In a class action settlement, a court retains special responsibility to see to the administration of justice."); Zients v. LaMorte, 459 F.2d 628, 630 (2d Cir. 1972) (in a class action, "[u]ntil the fund created by the settlement is actually distributed, the court retains its traditional equity powers" to direct the funds); see also Walker v. Commercial Recovery Sys., Inc., No. 99 C 5512, 2000 WL 1810066, at *4 (N.D. Ill. Dec. 7, 2000) (letter agreement purporting to settle class action was "wholly inadequate . . . given that a class action settlement must encompass many provisions other than the payment of money").

*All* of the cases cited by Mr. Haviland except one involve settlements in individual actions, not class actions, and thus are inapposite here.   The proper legal question in this case is not whether the MOU, despite its lack of terms is theoretically capable of being enforced as a matter of state contract law; but rather, whether the final settlement, in which the various classes' allocations were mediated, is fair and reasonable to Class 1 under Fed. R. Civ. P

7

23.   See In re Lease Oil Antitrust Litig., No. MDL 1206, 2009 WL 5195977, at *9-15 (S.D. Tex. Dec. 22, 2009) (federal court's equitable powers over class action settlement distribution under Fed. R. Civ. P. 23 unaffected by state law requiring unclaimed funds in litigation to escheat to state).

On this pertinent issue, the sole class action case Mr. Haviland cites, In re Fernald Litigation, No. C-1-85-149, 1989 WL 267039 (S.D. Ohio Sept. 29, 1989), is also off point. There, the court approved the overall settlement amount as fair and reasonable, but was "not in a position to make a determination as to the distribution of the funds" as between the settlement sub-classes. Id. at *6.  This case involves the determination *not* at issue in Fernald.   Simply put, this Court is being called upon to exercise its equitable jurisdiction to determine whether the final distribution plan in the BMS Settlement Agreement is fair and reasonable to class members. "Approval of a plan of allocation of a settlement fund in a class action is 'governed by the same standards of review applicable to approval of the settlement as a whole: the distribution plan must be fair, reasonable and adequate.'"   In re Computron Software, Inc., 6 F. Supp. 2d 313, 321 (D.N.J. 1998) (quoting In re Oracle Sec. Litig., No. C-90-0931-VRW, 1994 WL 502054, at *1 (N.D. Cal. June 18, 1994)).  One of the issues the Court should take into account now is the fact that the MOU was mistakenly and unduly generous to Class 1 for the reasons previously identified by BMS.  Compare In re Warfarin Sodium Antitrust Litig., 212 F.R.D. 231, 243-45 (D. Del. 2002) (settlement provisions requiring consumer claimants to file proofs of recognized losses after reimbursement by insurers deemed fair and reasonable).

BMS's and Class Counsel's determination that the MOU should be superseded by the BMS Settlement Agreement was made at arms' length and with input from both the Court-appointed mediator and the Court itself.   The objection to the Settlement Agreement must fail

because it does not provide any evidence whatsoever to overcome the presumption that the final result represents a rational allocation of settlement benefits.  In re Excess Value Ins. Coverage Litig., No. M-21-84RMB, MDL-1339, 2004 WL 1724980, at \*14 (S.D.N.Y. July 30, 2004) (citing Thompson v. Metro. Life Ins. Co., 216 F.R.D. 55, 65 (S.D.N.Y. 2003)).

 "In general, a plan of allocation that reimburses class members based on the type and extent of their injuries is reasonable."  In re Ikon Office Solutions, Inc. Sec. Litig., 194 F.R.D. 166, 184 (E.D. Pa. 2000).[7]  Obviously, a distribution plan is unreasonable if it is not rationally related to the type and extent of class members' injuries.  That was the problem with the MOU.  Cf. Law v. Nat'l Collegiate Athletic Assoc., 108 F. Supp. 2d 1193, 1195, 1199 (D. Kan. 2000) (approving petition to re-allocate settlement proceeds because original plan "over-compensated [certain] claimants . . . at the expense of [other] claimants who were more likely to have been damaged").

 Another way to look at the same issue is through the concepts of (i) "reversion" of settlement funds to the class action defendant and/or (ii) the cy pres and "fluid recovery" doctrines, which parties and courts apply when funds theoretically available in a settlement

---

[7] See also In re Holocaust Victim Assets Litig., 413 F.3d 183, 186 (2d Cir. 2005) ("Any allocation of a settlement of this magnitude and comprising such different types of claims must be based, at least in part, on the comparative strengths and weaknesses of the asserted legal claims."); In re Telik, Inc. Sec. Litig., 576 F. Supp. 2d 570, 581 (S.D. N.Y. 2008) ("Pro-rata distribution of settlement funds based on investment loss is clearly a reasonable approach.") (internal citation omitted); In re Enron Corp. Sec., Derivative & "ERISA" Litig., No. MDL-1446, 2008 WL 4178151, at \*10 (S.D. Tex. Sept. 8, 2008) ("A plan of allocation that reimburses class members on the extent of their injuries is generally reasonable.") (internal citation omitted); In re Omnivision Techs., Inc., 559 F. Supp. 2d 1036, 1045 (N.D. Cal. 2008) ("It is reasonable to allocate the settlement funds to class members based on the extent of their injuries or the strength of their claims on the merits."); In re Worldcom, Inc. Sec. Litig., No. 02 Civ. 3288 (DLC), 2005 WL 2319118, at \*19 (S.D. N.Y. Sept. 21, 2005) ("Settlement proceeds may be allocated according to the strengths and weaknesses of the various claims. . ."); In re AremisSoft Corp. Sec. Litig., 210 F.R.D. 109, 126 (D.N.J. 2002) ("A plan of allocation that reimburses class members based on the type and extent of their injuries is generally reasonable."); In re Aetna Inc., No. Civ. A. MDL 1219, 2001 WL 20928, at \*13 (E.D. Pa. Jan. 4, 2001) (approving as fair allocations among shareholders who purchased stock at different times in class period because "[t]he distinctions made [in allocation of settlement] are fair and accurately reflect the different risks and losses experienced by individuals who acquired Aetna stock at different times"); In re Citric Acid Antitrust Litig., 145 F. Supp. 2d 1152, 1154 (N.D. Cal. 2001) ("A plan of allocation that reimburses class members based on the type and extent of their injuries is generally reasonable.").

exceed the legitimate claims of class members.   For example, in going from the MOU to a final

settlement agreement, BMS and Class Counsel, in theory, could have agreed that any money not

taken up in legitimate proofs of claim by Class 1 members be returned to BMS.  See 3 WILLIAM

B. RUBENSTEIN, ALBA CONTE, & HERBERT B. NEWBERG, NEWBERG ON CLASS ACTIONS § 10:15

(4th ed. 2002) ("In a settlement context, subject to court approval, counsel for the parties have

great flexibility in negotiating an agreement concerning how any unclaimed balance of an

aggregate class recovery should be distributed.  The parties may agree that any surplus funds

revert to the defendant . . . .").  In the absence of the parties' agreement to such a reversion, the

Court may impose it – especially where, as here, the parties negotiating the MOU were acting

under an "erroneous assumption" about the legitimate extent of the losses suffered by the class.

Friedman v. Lansdale Parking Auth., No. Civ. A. 92-7257, 1995 WL 141467, at *4-5 (E.D. Pa.

Mar. 31, 1995); see also Lessard v. City of Allen Park, 470 F.Supp.2d. 781, 783 (E.D. Mich.

2007) (where "unclaimed funds indicate the likelihood of smaller damages among the class than

was originally contemplated" it makes sense to return class settlement funds to defendants).

Alternatively, under the cy pres doctrine (sometimes also called the "fluid

recovery" doctrine), the parties may agree or the Court may direct that settlement funds not

needed to settle class claims be used for some other purpose, such as settling other claims,

charitable donations or escheatment to government. In re Pharm. Indus. Average Wholesale

Price Litig., 588 F.3d 24, 33-37 (1st Cir. 2009) (approving cy pres distribution provided for in

settlement agreement between AstraZeneca and Class Counsel herein); In re Neurontin Mktg. &

Sale Practices Litig., 244 F.R.D. 89, 113 (D. Mass 2007) (Saris, J.); see also Beecher v. Able,

575 F.2d 1010 (2d Cir. 1978) (affirming revised allocation plan among various classes).  Thus, in

going from the MOU to a final settlement agreement, BMS and Class Counsel might have

reached a distribution plan less generous to Class 1 than the one in the final BMS Settlement

Agreement and directed that the remainder of the settlement amounts go to the other classes.

      "Often these strategies come into play <u>after the parties agree on a settlement in</u>

<u>principle and begin to draft the [final] settlement agreement</u> and discuss the mechanics of

terminating the class suit."  4 WILLIAM B. RUBENSTEIN, ALBA CONTE, & HERBERT B. NEWBERG,

NEWBERG ON CLASS ACTIONS § 11:20 (4th ed. 2002) (emphasis added).  So too, after the Class 1

MOU and in the negotiations of the final BMS Settlement Agreement, the parties agreed to

expand the consideration from $13 million to $19 million, to include all 3 classes, and to mediate

before Eric Green and with separate legal representation for each class the percentages to be

allocated among the classes.  <u>See</u> <u>In re Gypsum Cases</u>, 386 F. Supp. 959 (N.D. Cal. 1974)

(allocation of lump sum settlement among classes negotiated at arms' length among various class

representatives).

      Mr. Haviland's objection is really to the result of the mediation in which Class 1

and Class 3 consumers receive 23% of the $19 million settlement amount – or $4.37 million.

Since this amount is considerably more than these consumers could have reasonably hoped to

have received at trial, the objection should be overruled.

Conclusion

      For all the foregoing reasons, the objection based on the Motion to Enforce the

June 25, 2007 Memorandum of Understanding (Dkt. Nos. 6917, 6918 and 7440) should be

overruled.

Dated:  Boston, Massachusetts
      March 14, 2011

11

Respectfully submitted,

**COLLORA LLP**

By:  /s/ *Azure M. Abuirmeileh* (BBO# 670325)
           Azure M. Abuirmeileh (BBO# 670325)

600 Atlantic Avenue
Boston, MA  02210
Tel:  (617) 371-1000
Fax:  (617) 371-1037

**HOGAN LOVELLS US LLP**

Steven M. Edwards, Esq. (SE 2773)
Lyndon M. Tretter, Esq. (LT 4031)
875 Third Avenue
New York, NY  10022
Tel:  (212) 918-3000
Fax:  (212) 918-3100

*Attorneys for Defendants Bristol-Myers Squibb
Company, Oncology Therapeutics Network
Corporation and Apothecon, Inc.*

12

## CERTIFICATE OF SERVICE BY LEXIS-NEXIS FILE & SERVE

I, Azure M. Abuirmeileh, hereby certify that on March 14, 2011, I have caused true and correct copies of the foregoing Memorandum of Defendant Bristol-Myers Squibb Company with attached exhibit, to be served on all counsel of record by electronic service pursuant to Paragraph 11 of the Case Management Order No. 2, by sending a copy to Lexis-Nexis File & Serve for posting and notification to all parties.

Dated:  March 14, 2011

/s/ *Azure M. Abuirmeileh*
Azure M. Abuirmeileh