# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL NO. 1456 |
| THIS DOCUMENT RELATES TO: | CIVIL ACTION: 01-CV-12257-PBS |
| BMS SETTLEMENT | Judge Patti B. Saris |

# CLASS PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF
# JOINT MOTION FOR FINAL APPROVAL
# OF THE CLASS 1 COMPONENT OF THE BMS SETTLEMENT

# TABLE OF CONTENTS

**PAGE**

I.    INTRODUCTION ................................................................................................1

II.    FACT BACKGROUND ......................................................................................2

     A.    Summary Of The Case........................................................................2

     B.    Summary Of The Settlement Negotiations With BMS.......................2

     C.    The Proposed Settlement Classes .......................................................4

     D.    The Total Settlement Amount And Allocation....................................5

     E.    The Distribution Plan And Claims Process For Class 1 .....................7

     F.    Notice To Class 1 ................................................................................9

     G.    The Response From Class 1 ..............................................................10

     H.    The Class 1 Claims Projection ..........................................................10

III.    ARGUMENT: THE BMS SETTLEMENT IS FAIR AND REASONABLE AND SHOULD BE APPROVED ................................................................................12

     A.    The Court Should Certify Class 1 Pursuant to Rules 23(a) and 23(b)(3) for Purposes of Settlement................................................................12

     B.    Notice Was Provided In Accord With The Requirements Of Due Process And Rule 23 ........................................................................13

     C.    The Class 1 Component Of The BMS Settlement Is Fair And Reasonable And Should Be Approved.................................................14

     D.    The Court Should Reject The Aaronson Objection ...........................17

IV.    CONCLUSION................................................................................................20

001534-16  430497 V1

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Air Lines Stewards & Stewardesses Ass'n Local 550 v. American Airlines, Inc.*,
   455 F.2d 101 (7th Cir. 1972) ............................................................................14

*Amchem Prods. v. Windsor*,
   521 U.S. 591 (1997)........................................................................................13

*Carlough v. Amchem Prods., Inc.*,
   158 F.R.D. 314 (E.D. Pa. 1993)......................................................................13

*City P'ship Co. v. Atlantic Acquisition Ltd. P'ship*,
   100 F.3d 1041 (1st Cir. 1996).........................................................................19

*Detroit v. Grinnell Corp.*,
   495 F.2d 448 (2d Cir. 1974)............................................................................15

*Durrett v. Housing Auth. of Providence*,
   896 F.2d 600 (1st Cir. 1990).........................................................................13

*Eisen v. Carlisle & Jacquelin*,
   417 U.S. 156 (1974)......................................................................................14

*Greenspun v. Bogan*,
   492 F.2d 375 (1st Cir. 1974)..........................................................................14

*Grunin v. International House of Pancakes*,
   513 F.2d 114 (8th Cir. 1975) .........................................................................14

*In re "Agent Orange" Prods. Liab. Litig.*,
   597 F. Supp. 740 (E.D.N.Y. 1984) .................................................................15

*In re Crazy Eddie Sec. Litig.*,
   824 F. Supp. 320 (E.D.N.Y. 1993) .................................................................15

*In re Ikon Office Solutions, Inc. Sec. Litig.*,
   194 F.R.D. 166 (E.D. Pa. 2000)......................................................................18

*In re Linerboard Antitrust Litig.*,
   2004 U.S. Dist. LEXIS 10532 (E.D. Pa. June 2, 2004) .......................................15

*In re Michael Milken & Assocs. Sec. Litig.*,
   150 F.R.D. 46 (S.D.N.Y. 1993) .....................................................................15

*In re Omnivision Techs., Inc.*,
559 F. Supp. 2d 1036 (N.D. Cal. 2008) .................................................................................18

*In re Pharmaceutical Indus. Average Wholesale Price Litig.*,
491 F. Supp. 2d 20 (D. Mass. 2007) ....................................................................................15

*In re Pharmaceutical Indus. Average Wholesale Price Litig.*,
588 F.3d 24 (1st Cir. 2009)..........................................................................................16, 20

*In re Pharmaceutical Indus. Average Wholesale Price Litig.*,
460 F. Supp. 2d 277 (D. Mass. 2007) .............................................................................19, 20

*In re Prudential Sec., Inc. Ltd. P'ships Litig.*,
1995 U.S. Dist. LEXIS 22103 (S.D.N.Y. Nov. 20, 1995)......................................................15

*In re Warfarin Sodium Antitrust Litig.*,
391 F.3d 516 (3d Cir. 2004)................................................................................................15

*In re Warfarin Sodium Antitrust Litig.*,
212 F.R.D. 231 (D. Del. 2002),  *aff'd* 391 F.3d 516 (3d Cir. 2004).......................................19

*Mullane v. Central Hanover Bank & Trust Co.*,
339 U.S. 306 (1950)...........................................................................................................14

*Nichols v. Smithkline Beecham Corp.*,
2005 U.S. Dist. LEXIS 7061 (E.D. Pa. Apr. 22, 2005) ........................................................18

*Reppert v. Marvin Lumber & Cedar Co.*,
359 F.3d 53 (1st Cir. 2004).................................................................................................13

### OTHER AUTHORITIES

MANUAL FOR COMPLEX LITIGATION §1-30.212 (3d ed. 1995) .......................................................14

# I.    INTRODUCTION

Class Plaintiff,[1] by her undersigned counsel, respectfully submits this Memorandum in Support of the Joint Motion for Final Approval of the Class 1 Component of the BMS Settlement.  The Class Representatives for Classes 2 and 3 have already moved for final approval of those components of the settlement (*see* Dkt. No. 7308), and this motion follows the completion of the notice and comment period for the members of Class 1.

BMS will pay $19,000,000 under the Settlement, in addition to one-half of all notice costs up to $1 million.  Twenty-three percent (23%) of the settlement amount, or $4,370,000, is allocated to Class 1 and the consumer members of Class 3.  This amount well exceeds Dr. Hartman's actual damages estimate of $3,909,292.62 for the Class 1 claimants.[2]  In other words, the total gross amount allocated to the Class 1 claimants exceeds their actual damages.

Under the allocation plan, consumers are eligible to receive up to three times their co-payment obligations for the drugs Cytoxan, Taxol and Vepesid, and their actual co-payments for the remaining BMS Subject Drugs.  This allocation plan, which is the result of the parties' and the Court's significant efforts to encourage consumer claims by crafting a generous distribution formula and making it easy to submit a claim, has resulted in a very large volume of claims.  In response to the notice, 17,475 Class 1 members have submitted claims.  This extraordinary response will result in distribution of all settlement proceeds to Class Members.  With one exception, no objections have been filed to the Settlement by any members of Classes 1, 2 or 3. The only exception is Don Haviland's client, David Aaronson, who objects to the amount

---

[1] The Representative for Class 1 is Agnes Swayze.

[2] BMS's expert calculated lower damages – in the $1 million to $3 million range.  We rely upon the higher figures calculated by Dr. Hartman in support of the fairness of the settlement.  However, if Class 1's claims had been tried, the damage figure could have been considerably lower.

allocated to Class 1, even though the settlement will provide Mr. Aaronson with a recovery *exceeding* the damages incurred by his deceased wife.

Class Counsel believe that the Settlement is fair, reasonable and adequate.  It was reached after years of litigation, a Massachusetts Class 2 and 3 trial, and on the eve of a Class 1 trial with BMS.  The Settlement involved months of arms-length, intensely fought negotiations, all of which were conducted under the auspices of the Court appointed mediator, Eric Green.  And the Settlement provides real relief to Class Members.  Accordingly, the Court should grant final approval to the Settlement.

## II.      FACT BACKGROUND

### A.      Summary Of The Case

Rather than repeat the presentation of the case summary already included in Plaintiffs' memorandum in support of final approval of the Class 2 and 3 components of the BMS settlement, we respectfully refer the Court to Dkt. No. 7308 at 2-3, which is incorporated by this reference.

### B.      Summary Of The Settlement Negotiations With BMS

The settlement negotiations among the parties, although always courteous, were long and contentious and spanned over a year.  Shortly before the Class 1 trial against BMS was scheduled to commence on June 23, 2007, the parties agreed to a Memorandum of Understanding (the "MOU") providing for BMS to pay $13,000,000 to Class 1, plus one-half of the cost of notice up to $1,000,000.  The MOU did not contain any terms for the distribution of the settlement fund to Class members, leaving a distribution formula for later agreement. Declaration of Steve W. Berman in Support of Motion for Final Approval of BMS Settlement ("Berman Decl."), ¶ 2.

The parties were unable to translate the MOU into a comprehensive settlement agreement.  A dispute erupted over the distribution methodology, with the primary point of controversy focused on whether BMS could influence the distribution process.  More particularly, BMS was insisting on a claims process that required Class Members to obtain detailed written documentation from their physicians to prove that the Class Member was administered a BMS Subject Drug.  BMS also did not believe that administrations of a BMS drug made at times when the spread was under the 30% threshold should be eligible, and that administrations falling outside of the Court's liability period of December 1997 to December 2003 should also not be eligible.  And BMS argued that a distribution plan must be rationally related to the claims of the class members.  *See* Dkt. No. 5595 *passim*.

The parties submitted their dispute to the Court.  Although the Court rejected BMS's argument that it had a right to veto a proposed distribution plan, the Court was influenced by BMS's argument that a substantial residual would be left after a claims-made distribution to the members of Class 1.  Accordingly, the Court ultimately ruled that "BMS raises several interesting ***questions about the fairness of the plan***.  Plaintiffs shall move for a preliminary approval of the plan, and the Court will hold a hearing where the issues will be vetted.  ***The Court will decide on the appropriate distribution plan***."  September 29, 2008 Electronic order entered re:  Motion to Preliminarily Approve Proposed Plan of Distribution for BMS Class 1 Settlement (emphasis added).

Abiding by the Court's clear guidance, Class Counsel interpreted the order as a directive to reconsider counsel's recommended distribution plan.  Further, Class Counsel were mindful of the Court's July 3, 2007 ruling – issued after the MOU was struck – that Dr. Hartman's 30

- 3 -

percent "speed limit" applied to the claims of Class 1, in addition to the Class 2 and 3 claims. Berman Decl., ¶ 3.

The parties returned to mediation efforts with Professor Green in another attempt to settle the claims of all putative classes. These efforts were ultimately successful and resulted in an increase in the settlement amount to $19,000,000, which would cover all three classes.

Throughout this entire process, the parties exchanged information and debated the other's evidence and interpretations. Both sides made detailed presentations to Eric Green and presented extensive analysis and conclusions of experts, and noted their positions on legal theories, evidence and possible damages. The negotiations were conducted at arms' length. Berman Decl., ¶ 4.

## C.     The Proposed Settlement Classes

The proposed Settlement Classes are as follows:

> Medicare Part B Co-Payment Class ("Class 1"): All natural persons nationwide who made, or were liable for all or any portion of, a Medicare Part B co-payment based on AWP for any BMS Subject Drug during the period from January 1, 1991, through December 31, 2004. Excluded from Class 1 are those who made flat co-payments, who were reimbursed fully for their payments, or who have the right to be fully reimbursed.

> Third-Party Payor MediGap Supplemental Insurance Class ("Class 2"): All TPPs nationwide that, from January 1, 1991, through December 31, 2004, made, or incurred an obligation to make, reimbursements for any portion of a Medicare Part B co-payment based on AWP for a BMS Subject Drug.

> Consumer and Third-Party Payor Class for Payments Made Outside the Medicare Context ("Class 3"): All natural persons nationwide who made, or were liable for all or any portion of, a non-Medicare Part B payment based on AWP for any BMS Subject Drug during the period from January 1, 1991, through December 31, 2004, and all TPPs nationwide that, from January 1, 1991, through December 31, 2004, made, or incurred an obligation to make, non-Medicare Part B reimbursements based on AWP for any BMS Subject Drug. Excluded from Class 3 are those

- 4 -

consumers who made flat co-payments, who were reimbursed fully
for their payments, or who have the right to be fully reimbursed.

In addition to the foregoing, excluded from all Classes are the officers, directors, management, and employees of the BMS Group or of any of their subsidiaries and affiliates, as well as all federal, state, and local government entities in the United States, except any such governmental agencies or programs that made or incurred an obligation to make a reimbursement for a BMS Subject Drug as part of a health benefit plan for their employees, but only with respect to such payment.

The BMS Subject Drugs are the chemotherapy agents Blenoxane, Cytoxan, Etopophos, Paraplatin, Rubex, Taxol, and Vepesid.

**D.     The Total Settlement Amount And Allocation**

After the $19,000,000 settlement-in-principle was reached, it became necessary to allocate it.  Consequently, a mediation was held on June 22, 2009, under the supervision of Professor Green, in order to determine how the Settlement Fund would be allocated between consumers and TPPs.  Each group was separately represented by counsel.  Consumers were represented by Jeffrey Goldenberg, Esq., who served as consumer allocation counsel with respect to the Track 2 proposed settlement and was, therefore, quite familiar with the consumer claims in this case generally.  Consumers were also represented by Wells Wilkinson, Esq., Staff Attorney for the Prescription Access Litigation Project, a national coalition of consumer groups dedicated to redress unlawful drug price manipulations and deceptive marketing.  Mr. Goldenberg and Mr. Wilkinson are collectively referred to as "Consumer Allocation Counsel." TPPs were represented by Geoffrey Horn, whose firm, Lowey Dannenberg Cohen & Hart, P.C., represents the large TPPs such as Aetna, CIGNA, Humana, and Wellpoint.  The Lowey

Danenberg firm has previously served as TPP allocation counsel in prior settlements in these consolidated proceedings.

Using Dr. Hartman's damages estimates for each Class as a point of departure (attached as Exhibit A to the Declaration of Wells G. Wilkinson (the "Wilkinson Decl.")), allocation counsel debated the merits of each side's position and exchanged several rounds of proposals. With the able assistance of Professor Green, allocation counsel were able to reach agreement on an allocation of 23 percent (23%) for the benefit of Consumers (the "Consumer Settlement Pool") and seventy-seven percent (77%) for the benefit of TPP Class Members (the "TPP Settlement Pool").  In addition, consumers and TPPs agreed to share the costs of notice equally.

The damage estimates were as follows:

| Class | Scenario 1 (Entire US) Total Damages[3] | % of Total | Scenario 2 (Class States) Total Damages[4] | % of Total |
|---|---|---|---|---|
| Class 1 | $4,501,102 | 14.6% | $2,367,849 | 22.6% |
| Class 2 | $16,512,163 | 53.7% | $5,395,656 | 51.5% |
| Class 3 (TPPs) | $9,506,629 | 30.9% | $2,631,671 | 25.1% |
| Class 3 (Consumers) | $243,760 | 0.8% | $84,494 | 0.8% |
| **Total** | **$30,763,654** | | **$10,479,670** | |

Wilkinson Decl., Ex. A.  Thus, the potential size and proportion of total *consumer* damages was between 15.4% of $30,763,654 under "Scenario 1" and 23.4% of $10,479,670 under "Scenario 2."  This places the consumer allocation of 23% of the settlement near the upper boundary. Wilkinson Decl., ¶ 11.

---

[3] Scenario 1 applies a 30% threshold to the entire United States.

[4] Scenario 2 applies a 30% threshold and statutes of limitation just to the states included in the Court's original class certification order.

In addition to maximizing the allocation to consumers, Consumer Allocation Counsel's additional goals were to ensure that funds set aside to satisfy consumer claims not be used to "spillover" and satisfy TPP claims, and to encourage consumers to file claims by utilizing a simple claims process and adopting a generous distribution formula.  Both goals were achieved in the settlement.  *See* Declaration of Jeffrey S. Goldenberg, ¶¶ 9-10; Declaration of Wells Wilkinson, ¶ 12.

**E.**     **The Distribution Plan And Claims Process For Class 1**

The Consumer Settlement Pool, consisting of 23.0% of the distributable funds after deduction of notice costs, attorneys fees' and the cost of settlement administration, will be paid to Class 1 members who returned valid claim cards and to consumer members of Class 3 who submitted Proofs of Claim accepted by the Claims Administrator and approved by the Court ("Authorized Consumer Claimants") in accordance with the "Distribution Plan and Claims Process" procedures set forth in Exhibit F to the Settlement Agreement (*see* Dkt. No. 6349-2 at Exhibit F) and as summarized below.  Each Proof of Claim will be used to establish the claimant's "Total Recognized Claim," which then forms the basis of payment.  For Authorized Consumer Claimants, if the Consumer Settlement Pool is sufficient to pay all claims, then each Authorized Consumer Claimant will receive his or her Total Recognized Claim.  If the amount of the Consumer Settlement Pool is not sufficient to pay each Authorized Consumer Claimant his or her Total Recognized Claim, then each Authorized Consumer Claimant shall be paid their *pro rata* share of the claimants' Total Recognized Claim.  Distribution Plan and Claims Process at ¶ 9.

Consumers in Class 1 were only required to sign a simple statement under penalty of perjury indicating that the Consumer paid or was obligated to pay a percentage co-payment for one or more of the Subject Drugs during the period January 1, 1991, through December 31,

- 7 -

2004.  This statement will also be accepted when executed by a spouse of a deceased Consumer

Class Member or a legal representative of the deceased Consumer Class Member's estate.

Distribution Plan and Claims Process at ¶ 12.

For Consumers in Class 1 for whom the Claims Administrator obtained records from

CMS evidencing the Consumer's total co-payment obligation under Medicare Part B during the

class period, the total co-payment obligation, as evidenced in records from CMS, forms the basis

of the Class 1 Consumer's claim.  For the drugs Cytoxan, Taxol, and Vepesid – the drugs driving

most of the Classes damages – the Consumer's total co-pay obligation for such drugs is summed

and then multiplied by a factor of three (3x).  For the drugs Blenoxan, Etopophos, Paraplatin,

and Rubex, for which Dr. Hartman calculated minimal damages during the Class Period, the

Consumer's total co-pay obligation for such drugs is summed but not multiplied by a factor.

Both figures are added to determine the Consumer's "Total Recognized Claim" used for

purposes of calculating the payment made to each Consumer Class Member.  Distribution Plan

and Claims Process at ¶ 17.

A simple example of how the distribution formula works for a member of Class 1

follows.  The Consumer validly certifies under penalty of perjury that he or she paid or was

obligated to pay percentage co-payments during the Class Period.  CMS records indicate total

co-payment obligations under Medicare Part B to be $200 for Cytoxan, Taxol, and Vepesid and

$100 for Blenoxane, Etopophos, Paraplatin, and Rubex during the class period.

Calculation:

> Cytoxan, Taxol, and Vepesid:   $200 x 3 = $600
> Blenoxane, Etopophos, Paraplatin, and Rubex:   $100
>
> Total Recognized Claim = $700, unless Total Recognized Claims of all Consumer
> Class Members exceeds the amount allocated to pay Consumer claims, in which
> case the payment is reduced in proportion to all such Recognized Claim amounts.

- 8 -

### F.   Notice To Class 1

To distribute the Notice, Class Counsel employed, and the Court appointed, Rust Consulting, Inc. ("Rust"), which specializes in the administration of class actions, to oversee the administration of the Classes and execute the Notice Plan.

Pursuant to ¶ 1 of the Order for Final Consideration of BMS Settlement dated November 29, 2010 (the "November 2010 Order"), between December 14 and 29, 2010, Rust received 242 data files from the Center for Medicare and Medicaid Services ("CMS"), Research Data Assistance Center and Buccaneer containing purchase data for 695,910 individuals who were noted by CMS as having been administered a drug covered by the BMS J-Codes.  Rust scrubbed the data to ensure eligible drug administrations and adequate address formatting and eliminated duplicate names and addresses.  Rust mailed the Class 1 Consumer Notice and Claim Card (the "Class 1 Notice Packet") to these 695,910 potential Class 1 Consumer Class members. Declaration of Eric J. Miller Concerning Class Notice and Claims Activity Related to Class 1 in the BMS Settlement ("Miller Decl."), ¶¶ 9-12.[5]

Paid media was used to supplement the Direct Notice program implemented by Rust. Declaration of Katherine Kinsella (Dkt. No. 7305-2) ("Kinsella Decl."), ¶ 7.  The Consumer Publication Notice appeared in *Newsweek*, *People*, and *TV Guide*.  *Id.* ¶ 8.

A press release, Exhibit 2 to the Kinsella Declaration, was used to augment the published notice and contained a message that highlighted the benefits of the Settlement, explained the claims filing process and gave information on where Class Members could go for additional

---

[5] The United States Postal Service ("USPS") returned a total of 664 Class 1 Notice Packets as undeliverable with a forwarding address.  Rust subsequently re-mailed Classs 1 Notice Packets to each address provided by the USPS.  USPS returned 181,850 Class 1 Notice Packets as undeliverable without forwarding addresses.  Rust utilized the services of an address database service, to which Rust subscribes, to seek updated addresses.  As a result, Rust received 68,077 updated addresses and subsequently mailed Class 1 Notice Packets to the updated addresses.  Miller Decl., ¶¶ 13-14.

- 9 -

information.  Kinsella Decl. ¶ 10.  The press release was sent to over 75 cancer and health-related reporters, bloggers, publications and website.  *Id.* ¶ 11.

## G.  The Response From Class 1

The response from Class 1 has been overwhelmingly positive.  The postmark deadline for the submission of the Claim Card was January 31, 2011.  Rust received 17,475 Claim Cards.  Miller Decl., ¶ 15.   Rust has mailed 17,375 Class 1 Consumer Claim Forms, which contain the individual consumer's transactional information.  Miller Decl., ¶ 18.

Rust has sent deficiency letters to 4,791 Class 1 Consumers who did not sign their Claim Card, did not check the box on the Claim Card indicating that they made percentage co-payments for the BMS drugs, or did not have any CMS reimbursed administrations for BMS Subject Drugs.  As of March 11, 2011, 245 Class 1 Consumers have corrected these deficiencies.  It is Rust's experience in other similar settlements that approximately 25% of these Consumers will correct this type of simple deficiency.  Miller Decl., ¶¶ 16-17.

The opt-out deadline was February 28, 2011.  Rust has received requests of exclusion from only four Class 1 Consumers.   Miller Decl., ¶ 19.

The objection deadline was also February 28, 2011.  No Class 1 objections were received, Miller Decl., ¶ 20, with the predictable exception of Don Haviland, who filed with the Court an objection on behalf of David Aaronson.

## H.  The Class 1 Claims Projection

Rust has processed the claims received to date and provided estimated claims calculations.  Given the Class 1's strong response to the notice campaign, it appears that the Class 1 settlement fund will be exhausted and that no monies will remain for a *cy pres* distribution.

The total damages associated with the Class 1 claims, assuming a 25% cure rate for deficient claims, is $3,909,292.62.  This number was calculated by totaling all of the co-pays made by each Class 1 claimant for each BMS Subject Drug and then multiplying each total by the average damage factor calculated by Dr. Hartman for each drug.  Those average damage factors are:  Blenoxane, 0%; Cytoxan, 53%; Etopophos, 0%; Paraplatin, 0%; Rubex, 56%; Taxol, 34%; and Vepesid, 47%.  Miller Decl., ¶¶ 25-27.  Thus, the total damages of $3,909,292.62 associated with all of the Class 1 claims is comfortably lower than the $4,370,000 allocated to Class 1 and the consumer members of Class 3.[6]  And it is well above Dr. Hartman's low-range Class 1 damages estimate of $2,367,849.[7]

Because Class 1's share of attorneys' fees and administration costs are first deducted from the $4,370,000, approximately $2,833,751.50 is available for distribution.  Subtracting $27,450.09 that will be paid to the Class 3 consumer claimants leaves $2,806,301.41 for distribution the Class 1 claimants.  Miller Decl., ¶ 23.

This means that, if all Class 1 members were to participate, not all claimants would recover their total damages.  However, because there has been (as in all class cases) less than 100% participation, many Class 1 claimants will receive 100% or more of their damages.  Based on a random sampling of 13 Class 1 members plus Mrs. Aaronson, Rust is projecting that Class 1 claimants will receive between 52.5% and 102.13% of their actual damages.  Miller Decl., ¶¶ 32-35.  The percentage of actual damages recovered by any given Class 1 member is influenced by, among other things, the co-pay trebling formula for "damage" drugs and whether the Class

---

[6] In contrast, the TPP allocation of $14,630,000 is substantially less than TPP estimated damages of approximately $26 million.

[7] Dr. Hartman estimates Class 1 damages at a low of $2,367,849 (applying 30% threshold and statutes of limitation just to states included in the Court's original class certification order) to a high of $4,501,102 (applying 30% threshold and including all states).  Wilkinson Decl., Ex. A.

member was administered one of the three BMS drugs for which Dr. Hartman found no damages. Notably, David Aronson, the objector represented by Don Haviland, is projected to receive 102.13% of his deceased wife's damages based on her Taxol and Paraplatin administrations during the class period. Miller Decl., ¶¶ 36-39.

### III.    ARGUMENT:
### THE BMS SETTLEMENT IS FAIR AND REASONABLE
### AND SHOULD BE APPROVED

**A.    The Court Should Certify Class 1 Pursuant to Rules 23(a) and 23(b)(3) for Purposes of Settlement**

In their brief in support of final approval of the Class 2 and 3 components of the BMS settlement, Plaintiffs set forth the criteria for certification of settlement classes under Rule 23 and explained why those criteria had been satisfied vis-à-vis BMS Classes 2 and 3. In lieu of repeating all of those standards here, Class Counsel respectfully refer the Court to pages 15-24 of Docket No. 7308, which are incorporated herein by this reference. For the same reasons, Class Representative Agnes Swayze and Class 1 satisfy the requirements of Rule 23(a) and Rule 23(b), and the Court should certify settlement Class 1. Additionally, Ms. Swayze has been an adequate representative. She suffers from ovarian cancer, for which she underwent treatment in 1994 and 2002-03 with, among other drugs, BMS's version of carboplatin (Paraplatin). Dkt. No. 7427 at ¶ 3. Ms. Swayze, who is 76, made her Medigap co-payments for these treatments. *Id*. at ¶ 4. She has vigorously represented the interests of Class 1 by reviewing her medical records, reviewing case documents, including the complaint, meeting with Class Counsel and otherwise having numerous discussions with Class Counsel about the progress of the case and settlement negotiations. *Id*. at ¶¶ 5-6.

**B.     Notice Was Provided In Accord With The Requirements Of Due Process And Rule 23**

Reasonable notice must be provided to class members to allow them an opportunity to object to the proposed Settlement.  *See Durrett v. Housing Auth. of Providence*, 896 F.2d 600, 604 (1st Cir. 1990).  Rule 23(e) requires notice of a proposed settlement "in such manner as the court directs."  In a settlement class maintained under Rule 23(b)(3), class notice must meet the requirements of both Fed. R. Civ. P. 23(c)(2) and 23(e).  *See Carlough v. Amchem Prods., Inc.*, 158 F.R.D. 314, 324-25 (E.D. Pa. 1993) (stating that requirements of Rule 23(c)(2) are stricter than requirements of Rule 23(e) and arguably stricter than the due process clause).  Under Rule 23(c)(2), notice to the class must be "the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." *Amchem Prods. v. Windsor*, 521 U.S. 591, 617 (1997); *Reppert v. Marvin Lumber & Cedar Co.*, 359 F.3d 53, 56 (1st Cir. 2004).

The MANUAL FOR COMPLEX LITIGATION sets forth several elements of the "proper" content of notice.  If these requirements are met, a notice satisfies Fed. R. Civ. P. 23(c)(2) and 23(e) and due process, and binds all members of the Class. The Notice must:

1.     Describe the essential terms of the Settlement;

2.     Disclose any special benefits or incentives to the class representatives;

3.     Provide information regarding attorneys' fees;

4.     Indicate the time and place of the hearing to consider approval of the Settlement, and the method for objection to and/or opting out of the Settlement;

5.     Explain the procedures for allocating and distributing Settlement funds; and

6.     Prominently display the address of class counsel and the procedure for making inquiries.

- 13 -

MANUAL FOR COMPLEX LITIGATION § 1-30.212 (3d ed. 1995); *see also*, *e.g.*, *Air Lines Stewards & Stewardesses Ass'n Local 550 v. American Airlines*, *Inc.*, 455 F.2d 101, 108 (7th Cir. 1972) (notice that provided summary of proceedings to date, notified of significance of judicial approval of settlement and informed of opportunity to object at the hearing satisfied due process); *Grunin v. International House of Pancakes*, 513 F.2d 114, 122 (8th Cir. 1975); *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173 (1974); *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 315 (1950) ("The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it."); *Greenspun v. Bogan*, 492 F.2d 375, 382 (1st Cir. 1974).  The notice program proposed by the parties and approved by the Court clearly meets this standard.

Class Counsel complied with the Court's directives concerning Class notice.  The contents of the Notice met the foregoing requirements.  Among other things, the Notice described why the Class 1 member received the Notice and what the lawsuit is about; advised that the recipient could be a member of the Class; described the terms and benefits of the Settlement, including compensation provided to Class Counsel; gave instructions for making a claim by completing the Claim Card, which was included with the Notice, as well as details on how the Settlement would be distributed; and provided instructions for commenting on the Settlement and appearing at the final Fairness Hearing.  Notice was provided by direct mail to Class 1 members using the CMS records, and it was also published.

C.    **The Class 1 Component Of The BMS Settlement Is Fair And Reasonable And Should Be Approved**

In their brief in support of final approval of the Class 2 and 3 components of the BMS settlement, Plaintiffs set forth the standards for evaluating whether to grant final approval to a class action settlement and explained why those criteria were satisfied for BMS Classes 2 and 3.

In lieu of repeating all of those standards and argument here, Class Counsel respectfully refer the Court to pages 24-34 of Docket No. 7308, which are incorporated herein by this reference. For the same reasons, the Class 1 component of the BMS settlement should also be approved.

The $4,370,000 allocated to Class 1 and 3 consumers, even after deducting amounts claimed by the consumer members of Class 3, **exceeds** the $3,909,292.62 in total damages for the Class 1 claimants. This result is manifestly fair and reasonable, especially given case law endorsing final approval of settlements providing a recovery of just small percentages of estimated damages. *See, e.g., In re Linerboard Antitrust Litig.*, 2004 U.S. Dist. LEXIS 10532, at *15-17 (E.D. Pa. June 2, 2004) (noting approval of class settlements providing a recovery of 10-12% of potential damages where substantial risks exist); *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 539 (3d Cir. 2004) (Third Circuit noted that "typical recoveries in securities class actions range from 1.6% to 14%"); *In re Prudential Sec., Inc. Ltd. P'ships Litig.*, 1995 U.S. Dist. LEXIS 22103 (S.D.N.Y. Nov. 20, 1995) (approving of settlement of 1.6 - 5% of claimed damages); *In re Crazy Eddie Sec. Litig.*, 824 F. Supp. 320 (E.D.N.Y. 1993) (approving settlement of 6-10% of damages); *see also In re Michael Milken & Assocs. Sec. Litig.*, 150 F.R.D. 46, 64-65 (S.D.N.Y. 1993); *In re "Agent Orange" Prods. Liab. Litig.*, 597 F. Supp. 740, 762 (E.D.N.Y. 1984); *Detroit v. Grinnell Corp.*, 495 F.2d 448, 455 n.2 (2d Cir. 1974). And the settlement amount here compares favorably with the AstraZeneca Class 1 settlement amount approved by the Court, which was valued at approximately 62 percent of single damages.

Moreover, the distribution formula that the Court preliminarily approved delivers payments to all Class 1 claimants, even for three of the BMS Subject Drugs for which Dr. Hartman found minimal or no damages,[8] and provides enhanced recovery for Class 1 claimants

---

[8] In the Massachusetts Class 2 and 3 trial, the Court found no liability associated with Blenoxane, Etopophos and Paraplatin. *In re Pharmaceutical Indus. Average Wholesale Price Litig.*, 491 F. Supp. 2d 20, 106-08 (D. Mass.

who were administered Cytoxan, Rubex, Taxol and Vepesid.  The generousness of the

distribution formula is also underscored by the following additional facts:

- The "Realized Loss" for purposes of determining the base payment amount, before pro-
  rating, is based on co-payments, which are greater than damages.

- A "Realized Loss" amount was assigned even if the AWP did not exceed Dr. Hartman's
  30% threshold during the year that the drug was administered.[9]

- Claimants are not required to prove that they were administered the BMS version of a
  generic drug.

- Claimants are not required to submit any documentation supporting their claims and
  instead were only required to provide a sworn statement attesting to paying a percentage
  co-pay for one of the BMS Subject Drugs.

As a result of this process, many of the members of Class 1, like David Aaronson, will recover

*more* than their actual damages.[10]

And the generous distribution formula did exactly what it was intended to do:  encourage

broad-based participation by Class 1 and eliminate or minimize the prospect that monies would

be left over for distribution in *cy pres*.  As the Court may recall, it was uncomfortable with the

prospect of *cy pres* payments and, as a result, the Court previously requested the parties to alter

distribution formulae in other AWP settlements, including in the AstraZeneca Class 1 settlement,

---

2007).  But because class members who were administered Blenoxane, Etopophos and Paraplatin are providing a
release of claims under the terms of the settlement, and because it is possible that a jury would ultimately decline to
apply the 30% speed limit to Class 1 claims, class members have been allocated a minimal amount of compensation
for these drug administrations.

[9] Taxol provides a prime example.  Dr. Hartman found damages associated with Taxol only for 2002, after the
drug faced generic competition.  Nonetheless, the distribution formula includes Taxol administrations prior to 2002.

[10] As the First Circuit found in rejecting the challenges of M. Joyce Howe, another Haviland client, to the Class
1 AstraZeneca settlement, it is not an abuse of discretion to approve a settlement where class members receive more
than their actual damages.  *See In re Pharmaceutical Indus. Average Wholesale Price Litig.*, 588 F.3d 24, 37 (1st
Cir. 2009).

to boost consumer claims.  Measures taken in response to Court directives on this issue included

providing higher "easy pay" amounts to Class 3 consumers and providing multipliers on

estimated per-claim damage or per-claim co-pays.  The tweaking of distribution formulae over

time in these AWP settlements has reaped dividends here given the tremendous level of

participation garnered.

Class 1 overwhelmingly approves.  Only one objection has been lodged.

**D.      The Court Should Reject The Aaronson Objection**

Haviland asserts an objection on behalf of Mr. Aaronson, contending that the proposed

settlement cannot be fair and reasonable to Class 1 because Class 1 is being allocated $4,370,000

instead of the $13,000,000 that was specified in the original Memorandum of Understanding.

Dkt. No. 7440 at ¶ 3.  Haviland fails to support the objection with references to case law or

expert analysis.[11]

The Court should reject the objection.  First, Haviland acts as if the MOU had been

implemented via a written settlement agreement, but it never was because of Court concerns

about its fairness.  As the Court is aware, the parties could never agree on a distribution formula.

After BMS pointed out the substantial disconnect between the settlement amount and the

damages actually suffered by Class 1, the Court took notice and questioned the fairness of the

distribution plan.  The signal sent by the Court was quite clear:  ensure that amounts distributed

to Class 1 are rationally related to the damages actually incurred by claimants and minimize the

need for any *cy pres* distribution of unallocated amounts.  This guidance, coupled with the

Court's indication that it would apply the 30% speed limit to Class 1, impelled the parties back to

---

[11] Haviland contends that Mr. Aaronson is the representative for Class 1.  Dkt. No. 7440 at ¶ 1.  He is not.  The Court appointed Agnes Swayze to represent Class 1, Dkt. No. 6407 at ¶ 4 (endorsed by electronic order entered August 31, 2009), after expressing significant concern about whether Mr. Aaronson could represent the Class given that Mrs. Aaronson BMS drug administrations were given in 2004, after Congress knew that AWP was not an average.

- 17 -

further negotiations in which the BMS global settlement was forged.  Thus, faced with these

rulings, an MOU that had not been translated into a settlement agreement, and the near certainty

that the Court would decline to approve the BMS distribution plan initially contemplated by

Class Counsel, a more rational deal resulted.

The $4,370,000 allocated to consumers is fair and reasonable.  The amount is also linked

to the damages actually incurred by Class 1, which is significant given that courts approve

allocations based on the extent of the injuries actually sustained by the class members.  *See, e.g.,*

*In re Ikon Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166, 184 (E.D. Pa. 2000) ("plan of

allocation that reimburses class members based on type and extent of their injuries is

reasonable"); *In re Omnivision Techs., Inc*., 559 F. Supp. 2d 1036, 1045 (N.D. Cal. 2008) ("It is

reasonable to allocate the settlement funds to class members based on the extent of their injuries

or the strength of their claims on the merits.").  Indeed, as discussed above, the Class 1 allocation

exceeds the actual damages suffered by the Class 1 claimants under Plaintiffs' damages model

($3,909,292.62), which, in turn, greatly exceeds the estimated damages calculated by BMS's

expert, who, among other things, considered several defense arguments that, if accepted by the

Court or jury, would substantially lower Dr. Hartman's damages estimates.

Nor can Haviland challenge the allocation process.  The allocation was arrived at under

the mediation auspices of Professor Green and through vigorous and arms'-length negotiations

by counsel separately appointed to represent consumer and TPP interests, respectively.  Courts

routinely approve allocations resulting from a process ensuring that competing interests have

independent and vigorous representation (like was done here).  *See, e.g*., *Nichols v. Smithkline*

*Beecham Corp.*, 2005 U.S. Dist. LEXIS 7061, at *57-60 (E.D. Pa. Apr. 22, 2005) (endorsing

consumer-TPP allocation in antitrust class action where Court appointed separate counsel to

represent the interests of each group); *In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 250-51 (D. Del. 2002) ("The existence of separate consumer and TPP counsel provides adequate 'structural protections to assure that differently situated plaintiffs negotiate for their own unique interests.'") (quoting *Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 631 (3d Cir. 1996), *aff'd Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997)), *aff'd* 391 F.3d 516 (3d Cir. 2004). Further, there is a presumption of correctness attached to a class settlement reached in arm's-length negotiations between experienced and capable counsel. *City P'ship Co. v. Atlantic Acquisition Ltd. P'ship*, 100 F.3d 1041, 1043 (1st Cir. 1996).

Haviland is also in the untenable position – once again – of pursuing an objection on behalf of a class member who will receive more than his actual damages, even after his pro rata share of attorneys' fees and administration costs are deducted. The CMS data reveal that Mrs. Aaronson received eight administrations of Taxol and six administrations of Paraplatin during 2004. His co-pays for these administrations total $1,488.12 (Paraplatin) and $1,580.78 (Taxol). The damages associated with these co-pays total $537.47, yet Mr. Aaronson will receive a $548.94 settlement payment, or about ***102% of actual damages***. Miller Decl., ¶¶ 36-39 & Ex. G-13. Thus, Mr. Aaronson's objection that Class 1 should receive more is tantamount to an objection that he should receive more than his actual damages or, actually, a ***larger "bonus"*** since he is already projected to receive more than actual damages. Haviland cannot cite any case law supporting this novel theory of objecting.

And the Aaronson recovery is even more generous considering that Mrs. Aaronson's qualifying drug administrations were in 2004, after the point in time when, as the Court found, Congress recognized that AWP was not an actual average of wholesale prices. *See In re Pharmaceutical Indus. Average Wholesale Price Litig.*, 460 F. Supp. 2d 277, 288 (D. Mass.

- 19 -

2007) ("The statute and the legislative history indicate that by 2003, it had become a term of art. At that point, Congress clearly did understand AWP was different than average sales price and was not reflective of actual prices in the marketplace.").  Indeed, the Court consequently questioned the Aaronsons' ability to represent the Class during the June 6, 2007 pretrial conference.  *See* Berman Decl., Ex. A at 6-7, 11, 37-38.  Thus, the Court could find that no member of Class 1 suffered any damages after 2003.

For these reasons, the Court should reject the lawyer-driven Aaronson objection.

Lastly, Haviland contends that he reserves the right to object in more detail once the proposed BMS settlement "is proffered for approval."  Dkt. No. 7440 at ¶ 4.  The BMS settlement was fully proffered for approval when plaintiffs filed their motion for preliminary approval, which attached the settlement agreement, described the allocation proceedings, and set forth in detail the distribution methodology.  The deadline for filing objections was February 28, 2011.  As Haviland "learned the hard way" in attempting to bring tardy objections to the AstraZeneca Class 1 settlement, he is not entitled to raise any new objections not contained in his February 28, 2011 filing.  *See In re Pharmaceutical Industry Average Wholesale Price Litig.*, 588 F.3d at 30 n.7, 37-38 (finding that Haviland waived numerous arguments).  Thus, Haviland's purported reservation of a non-existent right to bring further objections is null and void, and any attempt by Haviland to file additional material will be swiftly and justifiably met with a motion to strike and request for sanctions.

## IV.   CONCLUSION

The BMS Settlement is the result of hard fought litigation and negotiation.  The Settlement provides an excellent result for all of the BMS Classes.  The Court should certify each of the three BMS Settlement Classes and grant final approval to all aspects of the Settlement Agreement.

DATED:  March 14, 2011

By_____/s/ **Steve W. Berman**_____
    Thomas M. Sobol (BBO#471770)
    Edward Notargiacomo (BBO#567636)
Hagens Berman Sobol Shapiro LLP
55 Cambridge Parkway, Suite 301
Cambridge, MA  02142
Telephone: (617) 482-3700
Facsimile: (617) 482-3003

**LIAISON COUNSEL**

Steve W. Berman
Sean R. Matt
Hagens Berman Sobol Shapiro LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA  98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

Jennifer Fountain Connolly
Hagens Berman Sobol Shapiro LLP
1629 K St. NW, Suite 300
Washington, DC  20006
Telephone: (202) 355-6435
Facsimile: (202) 355-6455

Jeffrey Kodroff
John Macoretta
Spector, Roseman Kodroff & Willis, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA  19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611

Kenneth A. Wexler
Wexler Wallace LLP
55 W. Monroe, Suite 3300
Chicago, IL  60603
Telephone: (312) 346-2222
Facsimile: (312) 346-0022

001534-16  430497 V1

Marc H. Edelson
Hoffman & Edelson LLC
45 West Court Street
Doylestown, PA  18901
Telephone: (215) 230-8043
Facsimile: (215) 230-8735

**CLASS COUNSEL**

001534-16  430497 V1

## CERTIFICATE OF SERVICE

I hereby certify that I, Steve W. Berman, an attorney, caused a true and correct copy of the foregoing, Class Plaintiff's Memorandum of Law In Support of Joint Motion For Final Approval of The Class 1 Component of The BMS Settlement, to be delivered to all counsel of record by electronic service pursuant to Paragraph 11 of the Case Management Order No. 2, by sending on March 14, 2011, a copy to LEXISNexis File & Serve for posting and notification to all parties.

                                   **/s/ Steve W. Berman**
                                     Steve W. Berman

001534-16  430497 V1