```
 1                 IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF MASSACHUSETTS
 2
 3
       In Re:                              )
 4     PHARMACEUTICAL INDUSTRY             ) CA No. 01-12257-PBS
       AVERAGE WHOLESALE PRICE             ) MDL No. 1456
 5     LITIGATION                          ) Pages 1 - 44
 6
 7
 8                         STATUS CONFERENCE
 9               BEFORE THE HONORABLE PATTI B. SARIS
                    UNITED STATES DISTRICT JUDGE
10
11
12
13
                                 United States District Court
14                               1 Courthouse Way, Courtroom 19
                                 Boston, Massachusetts
15                               June 6, 2007, 10:00 a.m.
16
17
18
19
20
21
22
                              LEE A. MARZILLI
23                         OFFICIAL COURT REPORTER
                         United States District Court
24                       1 Courthouse Way, Room 3205
                             Boston, MA  02210
25                             (617)345-6787
```

Page 2

```
 1  A P P E A R A N C E S:
 2  For the Plaintiffs:
 3      STEVE W. BERMAN, ESQ. (By Telephone),
     Hagens Berman Sobol Shapiro LLP, 1301 5th Avenue,
 4   Suite 2900, Seattle, Washington, 98101-1090.
 5      THOMAS M. SOBOL, ESQ., Hagens Berman Sobol Shapiro LLP,
     One Main Street, Cambridge, Massachusetts, 02142.
 6
        DONALD E. HAVILAND, ESQ., The Haviland Law Firm, LLC,
 7   740 S. Third Street, Third Floor, Philadelphia, Pennsylvania,
     19102.
 8
    For the Defendants:
 9
        LYNDON M. TRETTER, ESQ. and THOMAS J. SWEENEY, III,
10   Hogan & Hartson, 875 Third Avenue, New York, New York, 10022,
     appearing for Bristol-Myers Squibb.
11
        THOMAS E. DWYER, JR., ESQ., Dwyer & Collora, LLP,
12   600 Atlantic Avenue, Suite 1200, Boston, Massachusetts,
     02210, appearing for Bristol-Myers Squibb
```

Page 3

P R O C E E D I N G S

THE CLERK: In Re: Pharmaceutical Industry Average Wholesale Price Litigation, Civil Action No. 01-12257, will now be heard before this Court. Will counsel please identify themselves for the record.

MR. SOBOL: Good morning, your Honor. Tom Sobol, Hagens Berman Sobol Shapiro, for the class plaintiffs. On the phone is Mr. Berman.

MR. HAVILAND: Good morning, your Honor. Don Haviland, Haviland Law Firm, for the class plaintiffs.

MR. DWYER: Your Honor, Thomas Dwyer for Bristol-Myers.

MR. SWEENEY: Thomas Sweeney for Bristol-Myers.

MR. TRETTER: And Lyndon Tretter for Bristol-Myers.

THE COURT: Good. Why are we here today?

MR. TRETTER: Well, your Honor, we sent a notice of a lack of class plaintiff.

THE COURT: Right.

MR. TRETTER: And that's why we're here, to discuss that and a few other housekeeping issues, hopefully, in anticipation of the trial on July 23 with respect to BMS.

THE COURT: Thank you.

MR. TRETTER: I just want to get a couple things out.

THE COURT: I just want to make sure I understand.

Page 4

Is that what you view as on the table?

MR. SOBOL: Yes, your Honor, and I just want to check, if you don't mind, your Honor. Mr. Berman, can you hear what's going on?

MR. BERMAN: I can, your Honor.

MR. SOBOL: Nice.

THE COURT: Mr. Sobol was most impressed, to your deference.

MR. TRETTER: I want to make three things clear at the outset, your Honor. We're not here seeking dismissal of the case because of the lack of class plaintiff. We are not here to seek a different trial date, to move it out, we're happy with the 23rd. And we're talking to Mr. Green. All of those things are going on. But we are here to talk about Mrs. Aaronson's claim, and this is something --

THE COURT: Can I just back off just for one minute?

MR. TRETTER: Sure.

THE COURT: I'd be inclined just to allow them to add that woman. I shouldn't say "that woman," but --

MR. TRETTER: Mrs. Swayze.

THE COURT: Mrs. Swayze, and --

MR. TRETTER: Can I cut through, your Honor?

THE COURT: Yes.

MR. TRETTER: If the short answer is "yes," we're

Page 5

inclined to do the same thing, subject to the same vetting process that every plaintiff has to go through. I mean, they gave us one EOB which has a lot --

THE COURT: Well, jump in and watch it, but we're not going to change the trial date. The problem is, listen, listen, this case is so huge and so much has been happening, but you did just alert us to the issue or the possible issue a month before trial. Now, maybe that's when you thought about it, maybe that's when you thought about it, but I'm going to -- you'll just have to -- you've got troops of lawyers, so somebody will just have to go in and look at it before the --

MR. TRETTER: I'm happy to do that. If that's the answer today, we can cut through and we can move on to the other things. I just want the Court to be aware that, you know, when we get this information, it is possible that Mrs. Swayze -- is that the correct pronunciation of her name?

MR. SOBOL: Yes.

MR. TRETTER: -- may have a problem too. I just noted on the EOB that I received, the explanation of benefit form that I received 5:00 o'clock last night, that she received her chemotherapy in 2003. The benefit form was processed in 2007. There are all sorts of things that may be very strange about this situation.

Page 6
1  THE COURT: Fine. I am simply saying, after five
2  years of litigation or longer, if I have to continue it again
3  to get someone, I will because these people are all old and
4  they're all dying and they have bad memories.
5  MR. TRETTER: I agree with that, your Honor, but
6  we're --
7  MR. BERMAN: Your Honor, this is Steve Berman. Can
8  I pitch in for one second?
9  THE COURT: Yes.
10  MR. BERMAN: I appreciate that you're going to
11  allow us to add Mrs. Swayze, and we'll make her available for
12  deposition. There's two issues, though, that I think that
13  are raised by this. One is that we still contend -- and I
14  don't know that you want to resolve it today, and we briefed
15  this in the pleading we filed yesterday -- that the claims of
16  these class members still go through 2004.
17  THE COURT: I know that's your position, and when I
18  saw your brief, which I actually didn't read till this
19  morning because I was busy yesterday afternoon, the bottom
20  line is, I don't know, and I have to think about that.
21  MR. BERMAN: Okay. And the second issue is --
22  THE COURT: I just have to say, both sides have a
23  good point. On the one hand, you're saying I only resolved
24  it in the context of Classes 2 and 3, and that's true.
25  However, the reasoning behind it was that Congress understood

Page 7
1  at that point how fictitious AWP was. So now I have to
2  decide what impact that has with respect to Class 1. It's a
3  really good debate, and I need to think about it.
4  MR. TRETTER: I think there's even another point,
5  your Honor.
6  THE COURT: Which is?
7  MR. TRETTER: The statutes that the copays were
8  made under differed. In the class that you certified and you
9  kept it after summary judgment, the payments were made
10  pursuant to the 1997 BBA, and AWP you said had an ambiguous
11  meaning, it wasn't a term of art. In 2003 at the time there
12  was also published ASPs, there was another statute, a totally
13  different statute, that said "average wholesale price."
14  THE COURT: I'm sure it's a good argument, it's a
15  great argument. I just have to think about it. I mean, I
16  read it this morning at 9:00 o'clock. So it's a really good
17  debate, and I don't need to resolve it right now because it
18  doesn't matter a whole lot to whatever the trial is going to
19  be.
20  MR. TRETTER: All right, can we talk then maybe
21  about just the process with respect to this new plaintiff
22  going forward because we can't wait till the eve of trial.
23  THE COURT: I understand. The other issue is, I
24  don't think Sheet Metal has a similar interest, and I --
25  MR. TRETTER: You already denied that with respect

Page 8
1  to Schering. You said -- they tried to do the exact same
2  thing with respect to Schering.
3  THE COURT: You know, this is so huge, maybe I did
4  or maybe I didn't, but even coming to it afresh, they're
5  validly part of Class 2. I forget, do we have any of these
6  organizations who are class representatives also, the --
7  MR. TRETTER: They're out of the case.
8  THE COURT: Are they totally out?
9  MR. SOBOL: Well, for the damage claims, that's
10  correct.
11  THE COURT: For damages, I know that, but did
12  anyone stay in?
13  MR. BERMAN: Just I think there's not against BMS
14  for -- well, let me back up. I think they're in on Class 2
15  and 3 only for injunctive relief.
16  THE COURT: Okay, so none of them were with respect
17  to Class 1.
18  MR. BERMAN: Right.
19  THE COURT: I couldn't remember. All right. So
20  we'll add this woman. What kind of health is she in right
21  now?
22  MR. BERMAN: Well, there's two ladies actually.
23  One we mentioned, we think we've got the records ready, but
24  we want to make sure. This woman, Ms. Swayze, has Stage 4
25  ovarian cancer, and she's very sick, but she's very

Page 9
1  spirited. So we're going to try to gather the documents that
2  we would normally have turned over as soon as we can. We're
3  going to make her available for a deposition, and we're going
4  to do this as a trial deposition because we don't know if
5  she's going to be able to come to the trial. And we would
6  hope that, given the relative lack of real knowledge that
7  these people have over the issue, that BMS won't prolong this
8  deposition for hours and hours.
9  MR. TRETTER: Not at all, your Honor. We're very
10  uninterested in giving Ms. Swayze or anybody else a hard time
11  in a deposition. We're not going to make arguments about
12  whether you're sophisticated, whether you're -- we just want
13  the paper trail that shows when they received their
14  chemotherapy, whether they actually paid for the copay out of
15  their own pocket, which is what Class 1 is about. We don't
16  even need to bother her that much. We just need to bother --
17  THE COURT: Can we get an affidavit from her saying
18  she paid herself and maybe some verification of the dates
19  through the doctor's office and not have to get her at all?
20  MR. TRETTER: I think the doctor might be more
21  interesting. Now --
22  THE COURT: Because, I mean, she's Stage 4. My lay
23  understanding is that that's pretty bad.
24  MR. BERMAN: It's not good.
25  MR. TRETTER: Yes, look, I don't think that we

Page 10

1  would take more than a half an hour. I think the plaintiffs
2  are saying they want her videotaped so that they can present
3  it at trial.
4       THE COURT: Well, see what you can do, but at the
5  very least, we must be able to get the doctor. She's
6  probably been treating for a long time.
7       MR. BERMAN: Right, we're getting records, your
8  Honor, from the Valley Tumor Medical Group right as we speak.
9       MR. TRETTER: Exactly. I just want the Court to be
10 aware that a lot of times when the plaintiffs think they have
11 it, they don't.
12      THE COURT: I fully -- we've seen that, and I think
13 that's fair. It's just the reality is, there needs to be a
14 class representative. This is a highly unusual case because
15 people are so old and so sick, and by being old, their
16 memories aren't fabulous.
17      MR. TRETTER: Understood.
18      THE COURT: So if we have to continue the trial to
19 get there, we will.
20      MR. TRETTER: Okay.
21      THE COURT: But I don't know what to do on the 2004
22 situation.
23      MR. TRETTER: We can brief that separately.
24      THE COURT: Nobody has -- well, I don't even know
25 that you need much more briefing.

Page 11

1       MR. TRETTER: I don't think we do.
2       THE COURT: It's a really important and interesting
3  issue.
4       MR. TRETTER: And I think the issue for your Honor
5  is not so much what was going on in Congress' mind. The
6  charge that you're going to give the jury is whether BMS was
7  acting with intent to defraud, but you've got to realize that
8  any AWPs that are published in the publication at that time
9  are being published simultaneously with ASPs that are going,
10 so the so-called true average is already out there.
11      THE COURT: You've got an excellent argument. My
12 only point is, when you say I've ruled on it, sure, but it
13 was in the context of 2 and 3, and I would be the first to
14 say Class 1 wasn't in the forefront of my mind. So let me
15 just think about it. You may say it was, but I'm telling you
16 it was on the eve of trial on 2 and 3, and I wasn't -- and at
17 least no one was flat-out vetting that. But the truth is,
18 even if I were to allow another class, which I'm very dubious
19 about at this point, I would have to subclass it because it
20 would be a totally separate set of issues and a separate
21 statute. So I'm just not inclined to do that right now, but
22 let me think about it.
23      MR. TRETTER: That's fine. One thing to remember
24 is that when the motion -- the motion practice on summary
25 judgment went differently from the trial. One and 2 were

Page 12

1  done together, and your opinion says this applies to Class 1
2  and Class 2. We moved as defendants, all Track One
3  defendants, on Class 1 and 2 simultaneously.
4       THE COURT: I haven't refocused on it until 9:00
5  o'clock this morning. It's a great issue. We're going to
6  allow you, the plaintiffs, to add Mrs. Swayze. Ideally, if
7  there's somebody else you want to try and add, you'll do it
8  right away, and you'll just -- I know it's coming up on
9  July 4 week, so I think July 4 -- when do we start this
10 trial?
11      MR. BERMAN: July 23, your Honor.
12      THE COURT: July 23. So, ideally speaking, people
13 will respect family time over July 4. So why don't I put a
14 ban on depositions the week of July 4 so people can have some
15 family life because the rest of July will be awful.
16      MR. TRETTER: I would like to have everything done
17 before July 4. I would like to have the hard-copy documents
18 or whatever it is by the end of this week.
19      THE COURT: You know, they'll do what they can do.
20 You raised it two weeks ago.
21      MR. TRETTER: And the doctor, can we get --
22      THE COURT: I don't know. I don't know what the
23 doctor's family plans are. You'll do what you can do.
24      MR. TRETTER: Can we have a deposition of the
25 physician?

Page 13

1       THE COURT: I don't know. I mean, if we have clear
2  documents, I don't see why you need --
3       MR. BERMAN: There have been no depositions of
4  physicians in this case to date by any defendant.
5       THE COURT: Why don't you all get on the phone, and
6  then if there's a real need for it -- I don't want to bother
7  these people. If there's a crystal-clear paper trail, we'll
8  go one way. If it's not a crystal-clear paper trail, we'll
9  go on the phone. I'm sure the guy or woman would be willing
10 to talk to you.
11      MR. TRETTER: Right, there may be issues why this
12 EOB was not processed till 2007. It looks like it's a signed
13 claim. I don't know what that means. There are all sorts of
14 issues with respect to this --
15      THE COURT: It's a good point. We'll see. If you
16 can figure it out beforehand, either up or down, if it's an
17 ambiguity, just work out either a telephone deposition or
18 something that just can clean it up.
19      MR. TRETTER: We'll try in the first instance. If
20 we have any problem, we'll come back to you quickly.
21      THE COURT: Good. I will not be here the last week
22 in June. I actually will be around July 4 week, but I think
23 what we should -- I don't know, but I'm going to be away with
24 my family the last week in June, so there it is.
25      Now, is that all we need to do?

Page 14

1 MR. TRETTER: I'd like to bring up two other
2 issues, one minor and one major. The minor issue is the
3 issue of the joint pretrial brief and the trial briefs, which
4 I understand you waived for AstraZeneca, given your
5 familiarity with the case. And we would ask, and I know we
6 asked this and it was already denied once --
7 THE COURT: Well, you didn't. You called Mr. Alba
8 up on the phone. And even though he is a coequal member of
9 the team, it's ideal to actually file a motion.
10 MR. TRETTER: Well, we were doing this as an agreed
11 motion of both sides, and I'd like to make it on the --
12 THE COURT: Is it filed?
13 MR. TRETTER: I'd like to make this motion orally
14 right now.
15 THE COURT: Allowed.
16 MR. TRETTER: Thank you very much, your Honor.
17 THE COURT: It's just Mr. Alba, as great as he is,
18 he actually can't grant the motion on the phone. So
19 basically that's fine. I don't need a pretrial memo.
20 MR. TRETTER: Or individual trial briefs.
21 THE COURT: Or individual trial briefs.
22 MR. TRETTER: Thank you, your Honor.
23 THE COURT: I don't need it. What I do need are
24 witness lists. I mean, I need direction.
25 MR. TRETTER: They're all coming in on Monday.

Page 15

1 THE COURT: Any motions in limine?
2 MR. TRETTER: Monday.
3 THE COURT: Good, good.
4 MR. TRETTER: Now, here's one thing that I want to
5 alert your Honor to that was not involved in AstraZeneca that
6 is involved in BMS: multi-source drugs. AstraZeneca had one
7 drug, Zoladex. There was no problem.
8 THE COURT: I agree, that is a killer, and I'm
9 sitting thinking about it in the other context as well as we
10 speak. It's a very hard case.
11 MR. TRETTER: We briefed this in connection with
12 the Class 2 and 3, which is that the only damages with
13 respect to BMS drugs are in the period where the drugs become
14 subject to multi-source competition and they break the
15 Hartman speed limit of 30 percent.
16 THE COURT: By a lot.
17 MR. TRETTER: By a lot, let's say, okay. Two
18 points. You know, we think there are lots of things we're
19 going to be arguing at trial about how multi-source drugs are
20 different from single-source and the state of knowledge, and
21 whether government intended multi-source drugs to have bigger
22 spreads is one thing. But the issue that I want to raise
23 today is an issue that no class plaintiff is able to show in
24 the case of a multi-source drug that he or she was infused
25 with a BMS version of the drug.

Page 16

1 THE COURT: Right, and I'm struggling with that
2 actually in Classes 2 and 3, and the issue really is,
3 let's -- I mean, I think that's actually one of the hardest
4 legal issues in the litigation.
5 MR. TRETTER: It is.
6 THE COURT: I mean, there's lots of factually
7 complex issues but in terms of a legal question. So let
8 me --
9 MR. TRETTER: And it raises a class issue too
10 because they're proceeding on an alternative liability
11 theory. If you look at their briefing in Class 2 and 3, they
12 say, "Well, Massachusetts recognizes various theories of
13 market share or joint and several," and we disagree with
14 that.
15 THE COURT: Why don't you come up with evidence of
16 what your market share is so you can rebut full liability.
17 You could if you wanted to.
18 MR. TRETTER: Well, our point is, and we make this
19 in our brief, is that even if you look at Massachusetts
20 alone -- and now we have a multistate class -- no court has
21 ever recognized it in the context of economic loss as opposed
22 to a personal injury case. I mean, you have market share
23 theories in lead paint and asbestos and things like that.
24 Nobody's ever --
25 THE COURT: I agree, it's been primarily product

Page 17

1 liability. As I said, it's one of the hardest, narrow
2 questions. But if you look at the Restatement of Torts on
3 apportionment, which you can tell I've been working on this
4 particular issue, so the issue is really, if in fact, though,
5 I'm working out of equity, 93A --
6 MR. TRETTER: Well, but you're not because you're
7 working now on many, many, many state statutes, and we've
8 made this a case -- this is the grand bargain, remember. The
9 grand bargain for Class 1 is that we're getting rid of the
10 various state statutes, and we're going with a Restatement
11 theory of basically common law fraud because deception runs
12 across all the statutes.
13 THE COURT: So take fraud. That's --
14 MR. TRETTER: So we have to do fraud.
15 THE COURT: You do fraud, and then if you do fraud,
16 fraud --
17 MR. TRETTER: Right, I'm with you.
18 THE COURT: And then if you find a fraud, and then
19 there's a common base but there's a way of making a divisible
20 injury --
21 MR. TRETTER: Now I'm losing you.
22 THE COURT: In other words --
23 MR. TRETTER: Let's take a --
24 THE COURT: Let me just say, I don't intend to
25 answer to this question, and I'll look forward to your

Page 18
1  briefing. As you can tell, I'm struggling with it in
2  Classes 2 and 3, but let me ask --
3       MR. TRETTER: It's a bigger issue in Class 1
4  because you have 40 states, all of which don't recognize
5  these same theories. The whole -- I understood the grand
6  bargain with respect to a single-source drug. You were going
7  to say: Okay, real deception cuts across all these states.
8  It rings the bell in every state's statute. Therefore we can
9  have a charge. And we're not like AstraZeneca. We're not
10 saying you can't do that.
11      THE COURT: What do you call it, the big bargain?
12      MR. TRETTER: The grand bargain.
13      THE COURT: The grand bargain.
14      MR. TRETTER: The grand bargain for the plaintiffs
15 was, we're going to have this unique situation because nobody
16 other than you has had a class action like this.
17      THE COURT: I think this is an incredibly important
18 issue. I'm struggling with it in the Class 2 and 3
19 93A in Massachusetts. I will look forward to your briefing.
20 I don't know what I'm going to do. But I do know one thing,
21 that at least you would be able to, as I understand under the
22 most gen -- is to demonstrate market share and reduce your
23 damages that way, and so I would suggest you put that in.
24      MR. TRETTER: Okay, we'll do that, but the thing is
25 that Dr. Hartman proceeds on a different basis. He doesn't

Page 19
1  care about market shares. He proceeds, he says, "Well, I
2  estimate that one million units of BMS product got into the
3  Medicare channel."
4       THE COURT: So let me turn to you. I'll obviously
5  take briefing on it. It's a serious issue. It's probably
6  the most serious legal issue in the case.
7       MR. SOBOL: Is there currently -- this is a
8  question not only to you, your Honor, but also to the parties
9  because I'm not actually aware of this. Is there currently a
10 vehicle by which this issue can be briefed, either in the
11 context of the upcoming trial or Class 2 or 3 further?
12      THE COURT: Well, I think Class 2 and 3 are gone,
13 too far gone on that.
14      MR. SOBOL: Okay, so that's what I assumed to be
15 the case.
16      THE COURT: But I am --
17      MR. SOBOL: So there should be, although the Court
18 has waived pretrial briefs by the parties, if the parties
19 wish to brief this issue before the jury trial, they may.
20      MR. TRETTER: We plan on doing an in limine
21 motion. They'll be getting our brief on Monday. I'm just
22 raising it right now to alert your Honor.
23      THE COURT: Well, it's a very serious, important
24 threshold issue.
25      MR. TRETTER: And the final point is, if we win on

Page 20
1  it, there are no damages in the case. It's something that
2  has to be resolved early. I'm raising it at this status
3  conference, which we appreciate, but basically if you get rid
4  of multi-source --
5       THE COURT: Suppose I were to do this, though. I'm
6  allowed to -- what would I do? I could move it into another
7  thing, another kind of class under another section. So I
8  could say class -- I'm thinking out loud, so think about
9  this. Let's say if you're not culpable, that's a classwide
10 finding.
11      MR. TRETTER: That's the fraud, the grand bargain
12 idea.
13      THE COURT: Yes, you're not culpable under fraud.
14 But if you are culpable but I find that it's impossible to
15 figure out damages state by state, can't I do a liability
16 finding? And then I could farm it out to the states, and
17 they could figure out damages?
18      MR. TRETTER: It's not a damages issue, your
19 Honor. The issue is whether somebody who cannot prove that
20 they received the good that is at issue --
21      THE COURT: That's where I might not be with you.
22 For me, the struggle is -- I'll hear you brief it. I'm
23 thinking as you're talking because I haven't thought about it
24 this way before. I think you could probably say, let's say,
25 Taxol, which is one of your great drugs, right? Everybody

Page 21
1  uses it?
2       MR. TRETTER: Absolutely.
3       THE COURT: It's one of the only ones I had
4  actually heard of before I came into this litigation.
5       MR. TRETTER: Right, breast and ovarian cancer, and
6  it's called paclitaxel, and it went generic in 2000.
7       THE COURT: All right, so I think that most states
8  would be able to say that if there was a finding of deceit
9  and fraud, that it was likely that they were injured, there
10 were consumers in their state injured, that there was someone
11 in -- what's your market --
12      MR. TRETTER: Well --
13      THE COURT: Excuse me. Will you let me finish?
14      MR. TRETTER: Yes, sure.
15      THE COURT: That there was somebody who was
16 injured. Then what's going to be a problem is, what are the
17 damages that flow from that? Now, you could probably figure
18 that out in a market share theory, if a state would recognize
19 that, on a probability basis, but you're right, it's cutting-
20 edge law. And so one way of doing it is putting to a jury --
21 I'm thinking out loud -- liability. If you're exonerated,
22 you're exonerated across the country. If you're found
23 liable, you could do intent to deceive, causation of some
24 harm to the state. And then if I find that I can't --
25 because this is one crop I hadn't thought of before when we

Page 22

1  were talking about certifying -- possibly doing something
2  along the lines of sending it back to each state for an
3  analysis of whether or not there's damages.  Or I could do it
4  myself, I suppose, but I'd just have to make a state-by-state
5  evaluation.
6  　　　　　And if I found as a court sitting in diversity,
7  which is essentially what I am, that in most states -- not
8  all states -- but I would have to do something along the
9  lines of, if there was no state case law on it, I would
10 either send it back to the state, or I would have to say that
11 there's no law that supports that theory of recovery, and
12 just do an injunction or something along those lines.  I am
13 open to suggestions.
14 　　　　　MR. TRETTER:  Okay.  Sorry for stepping on your
15 Honor.  I do think that this is a threshold issue.
16 　　　　　THE COURT:  I do.
17 　　　　　MR. TRETTER:  It's not an issue of whether we
18 committed bad acts and be punished for those bad acts.  Most
19 every state statute requires actual damage on the part of the
20 plaintiff.  This is not a parens patriae case where a state
21 can come in and say, "We're punishing BMS."
22 　　　　　THE COURT:  Well, help me, though.  Why couldn't
23 they say by the statewide class, when you have something as
24 well known or well used as Taxol, that it is likely that
25 members of the consumer class were injured in the state of

Page 23

1  Kansas?
2  　　　　　MR. TRETTER:  Well, it's not a matter of
3  likeliness.
4  　　　　　THE COURT:  Why, why?
5  　　　　　MR. TRETTER:  It's not a matter of whether somebody
6  in Kansas likely received Taxol.
7  　　　　　THE COURT:  Why?
8  　　　　　MR. TRETTER:  It's a question of whether, when
9  somebody comes to --
10 　　　　　THE COURT:  Someone in the class.
11 　　　　　MR. TRETTER:  Let's take it in the question of the
12 class plaintiffs, for example.  There's going to have to be
13 some proof that they received the brand that is BMS's.
14 Otherwise, they don't have actual damages.
15 　　　　　THE COURT:  Well, what if there was an 80 percent
16 market share?
17 　　　　　MR. TRETTER:  They still have to prove it.  What if
18 they got --
19 　　　　　THE COURT:  Isn't it likely, if there's an 80
20 percent market share, it was likely more than a 50 percent
21 shot yours?  I don't know.  I'm going to think about those.
22 I mean, I have no idea what your market share is.
23 　　　　　MR. TRETTER:  It depends on the drug.
24 　　　　　THE COURT:  I think it would make a difference to
25 me if you were 2 percent market share.  So I don't know.

Page 24

1  It's a great issue, and it's the thing we go to law school to
2  do.
3  　　　　　MR. BERMAN:  And it's an issue, your Honor, I've
4  been thinking about this --
5  　　　　　THE COURT:  Yes, I'd love to hear from you,
6  Mr. Berman and Mr. Sobol.
7  　　　　　MR. BERMAN:  I mean, Mr. Tretter has been arguing
8  his motion here.
9  　　　　　THE COURT:  Yes, it's good, it's a heads-up.  So
10 what do you think?  Do you have actual --
11 　　　　　MR. BERMAN:  The one thing that he hasn't talked
12 about that Dr. Berndt mentioned in his report, almost
13 anticipated this, is the equity of a situation where the
14 defendants can hide behind the anonymity of these J-Codes and
15 say, "Look, you don't know for a fact it was our drug," and
16 basically they can all get away with it.  And a court sitting
17 in equity, as you will be doing in part, when there's been a
18 nationwide finding of fraud, assuming there is, we think --
19 and we'll be glad to brief this -- there are lots of ways
20 that you can in equity find damages on a statewide basis.
21 　　　　　THE COURT:  You know what, that's true under 93A
22 and under equitable causes of action.  My concern is that,
23 and it's a well-made point by Mr. Tretter, that I'm sitting
24 in common law when I do a fraud case.  And so it's a good
25 point.  I just have to think about it.

Page 25

1  　　　　　And it's not just market share theory, by the way.
2  The Restatement of Torts deals with it under joint and
3  several versus whether something's -- and I have been
4  struggling with it because it's not so clear.
5  　　　　　MR. TRETTER:  This is Summer V. Tice, when you have
6  two shooters -- and they talk about it in law school -- one
7  bullet hits the victim.
8  　　　　　THE COURT:  Right.
9  　　　　　MR. TRETTER:  That you have to join both
10 codefendants in the case.  You can't have a theory where, "It
11 was IVAX or BMS.  I'm only going to sue BMS, and it was
12 likely, because of their share, it was BMS."  You have to
13 have, even in the states that allow it --
14 　　　　　THE COURT:  Excuse me.  That's only true -- I've
15 been reading this stuff recently, so you've sort of got
16 somebody in the middle of it.  It's only true if it's an
17 indivisible injury, like the guy died.  What if somebody hit
18 someone in the arm and the other hit someone in leg?  Now,
19 obviously this is personal injury.  I'm going back to basics
20 myself in thinking about it.  What if you have somebody -- in
21 any event, we have to work through what's a divisible injury,
22 what's an indivisible injury, and I think this is a very
23 difficult legal issue.  And what makes it easier in
24 Massachusetts is, I have one state's body of law.
25 　　　　　MR. TRETTER:  Right.

Page 26

1  THE COURT: You're right that I have to think about
2  it in the context of 48 states.
3  MR. TRETTER: Well, maybe we should just await
4  the briefing, your Honor.
5  MR. SOBOL: Obviously we'll brief whatever it is
6  that Mr. Tretter wants to file. I will remind your Honor of
7  our fundamental position on this issue, which is that this
8  case is about conduct, not product. And to use sort of a
9  Johnnie Cochran type phrase, we have to go back to this.
10  It's BMS's conduct at issue --
11  THE COURT: You're quoting Johnnie Cochran?
12  MR. SOBOL: It's conduct, not product.
13  MR. DWYER: The late.
14  MR. SOBOL: The late Johnnie Cochran.
15  THE COURT: Does he, like, have a treatise or --
16  MR. SOBOL: Well, he doesn't, but --
17  MR. DWYER: He's the treatise.
18  MR. SOBOL: In this case, what BMS would like to do
19  is say that you have to prove that the consumers consumed our
20  product in order to find liability. But that's not what the
21  case is about. The case is about BMS's deception in terms of
22  the AWP that caused increased inflation regardless of the
23  product that they purchased. And that's not novel. That's
24  classic consumer protection and fraud law. If somebody came
25  along and lied to me about somebody else's product, and, as a

Page 27

1  result, I bought that product, the person who lied to me upon
2  whom I relied would still be liable, even though I did not
3  buy that person's product.
4  THE COURT: Right, and you made that argument,
5  that's your theory of joint and several liability, but it
6  only works with an indivisible injury. And here you've got a
7  market which is divisible in the sense that someone bought
8  Company X's product. I know your position. You argued it
9  the last time. I'm simply saying, Mr. Sobol, I don't know
10  what I'm going to do. It's a really cutting-edge issue. I
11  guarantee, though, there will be a trial. Whether I do it on
12  the whole shmear -- that's a legal term -- or just on part of
13  it, I don't know. I have to -- because one way or another,
14  this case has been going so long in the MDL, this will either
15  settle or go to trial. We'll have a jury finding on the
16  intent to deceive, as you say, conduct.
17  MR. SOBOL: Conduct.
18  THE COURT: You'll have a jury finding on
19  causation. Whether I can adequately under -- he's taking
20  down every word I've got. I can hear him typing.
21  MR. BERMAN: Sorry, your Honor.
22  THE COURT: Whether I can do a damage situation, I
23  don't know. And I'm glad you raised the issue, and I'll have
24  to think about it. I suggest you all help me by mucking
25  through the Restatement of Torts because I think it's that

Page 28

1  basic. Most states follow that, and it's at least something
2  that I could look at across the states to see what I could do
3  on this.
4  MR. SOBOL: When we do brief it, your Honor, I just
5  want to make clear that our position in terms of it being the
6  conduct, not the product, is not an interpretation of joint
7  and several liability. That's an entirely different issue in
8  the case, from our perspective. It is the case that if a
9  defendant on their own -- and it's immaterial whether there
10  were other defendants who also happened to have been
11  committing a tort at the time. Independently of that, if a
12  defendant commits conduct that someone relies upon to their
13  damage, regardless of whether other people did the same thing
14  or not, they are responsible, period.
15  THE COURT: For what? It's the whole what?
16  MR. SOBOL: For the conduct, for the damages that
17  was the proximate cause of the lie.
18  THE COURT: Suppose you have 29 generic
19  multi-source manufacturers of drugs.
20  MR. SOBOL: Right.
21  THE COURT: And one of them is late in the market,
22  lies about his price, but is below median and only has
23  2 percent market share. You're going to say I'm going to
24  impose the entire liability on him?
25  MR. SOBOL: If you can prove -- and this is what

Page 29

1  the law says in terms of conduct -- the plaintiffs' burden is
2  to prove that the defendant's wrongful acts were a
3  substantial contributing factor to --
4  THE COURT: How can that by law be a substantial
5  contributing factor?
6  MR. SOBOL: It probably would not be.
7  THE COURT: Okay, I'm just saying it's not so
8  simple.
9  MR. SOBOL: I agree, but the construct is the
10  causation, substantial contributing factor. It's not joint
11  and several on that conduct versus product theory. That's
12  all the point I was trying to make, and we will brief it.
13  THE COURT: So, Mr. Dwyer?
14  MR. DWYER: One last point on the Bristol side.
15  Preparing the voir dire questions and the proposed
16  questionnaire --
17  THE COURT: I know a practical suggestion.
18  MR. DWYER: -- on a case with oncology drugs raises
19  a lot of difficult issues, not just issues that -- there are
20  nonprivacy questions which I think we should be entitled to
21  get, and I think then obviously there are privacy questions.
22  THE COURT: I think we should eliminate anyone who
23  either themselves or a close family member took these drugs.
24  MR. DWYER: Right.
25  THE COURT: So I think I can ask that without --

Page 30

1  MR. DWYER: Or a coworker, I was thinking also
2  coworker, close friend.
3  THE COURT: Well, propose a few of those. I mean,
4  I think we've got to be able to discuss -- are most of them
5  breast cancer and what else?
6  MR. TRETTER: No. There are some that are
7  testicular. You know, the Etoposide is used for other
8  things. So, I mean, there are all sorts of things, head and
9  neck. You've got a lot.
10  MR. DWYER: I think one of the other things that
11  we're just trying to raise and see what your reaction is
12  today as we get these papers ready for Monday is, then you
13  have a whole class of people who either themselves are
14  beneficiaries of some government program, or a child with
15  disability government program, or a mother, you know --
16  THE COURT: Sure.
17  MR. DWYER: So we've got this whole category of
18  people again who are going to bring this whole government
19  benefit claim issue into the jury room in a way -- does that
20  sound like something that --
21  THE COURT: We need voir dire questions on that. I
22  may not necessarily exclude them from the jury, but we'd want
23  to know about them.
24  MR. DWYER: Right.
25  THE COURT: So you put through your voir dire, and

Page 31

1  I'll see what makes sense, because I didn't have to actually
2  walk through this with AstraZeneca, and that was only one
3  drug, and these are multi-drugs.
4  But can I jump to Mr. Sobol and Mr. Berman. As we
5  were going through the other case, it wasn't clear to us that
6  all the drugs -- you don't even discuss all of them with
7  Bristol-Myers.
8  MR. TRETTER: There's a zero --
9  THE COURT: There are about three that you don't do
10  much with.
11  MR. TRETTER: There's a zero for damages under
12  Dr. Hartman's calculation for something called Blenoxane. He
13  zeros that out.
14  THE COURT: Yes, so there are a bunch like that,
15  and so -- well, not a bunch but two or three where it was
16  really questionable, even under the Hartman speed limit. So
17  I think you need to relook through those drugs and see, just
18  so that I'm not spinning my wheels on it and it's not
19  confusing, all these names, to a jury when I'm asking these
20  questions. I don't want to ask people questions about
21  diseases that they have if I'm going to end up directing them
22  out. So I can't remember exactly which they were, but there
23  were two or three that were very marginal cases under the
24  speed limit.
25  MR. BERMAN: Okay, we'll take a look at that, your

Page 32

1  Honor.
2  MR. DWYER: Can I raise another practical issue?
3  THE COURT: Yes.
4  MR. DWYER: Whether it's a voir dire question or
5  it's a questionnaire, someone says that their wife is being
6  treated for breast cancer. I know your usual practice is not
7  even to entertain the questionnaires, and I know you're
8  entertaining at least the thought of it in this case. Have
9  you thought about what your preference would be if the person
10  says "yes"? Where do we go if the person either raises their
11  hand to a voir dire question or it's on a questionnaire?
12  Have you thought whether you're going to do a lobby inquiry?
13  THE COURT: I haven't thought about it at all, and
14  I think you can raise it. I mean, I think the reality is, if
15  somebody's actually taking a drug at issue, they should be
16  off the jury. But if someone's wife has just simply had
17  breast cancer and they don't know what drug they used or they
18  used a different drug, I don't think that's, at least my
19  initial instinct, an automatic disqualifier, as long as they
20  look me in the face and say they can be fair and impartial.
21  You can challenge them on a peremptory, but I don't know if
22  that's for cause just because -- I mean, almost everybody
23  knows somebody who's had some form of cancer. I wouldn't
24  have a jury.
25  MR. DWYER: Well, if in that particular example you

Page 33

1  just talked about, you'd have the issue of the copay
2  potentially coming out of the household budget, so again you
3  have a --
4  THE COURT: But if it's a different drug, I don't
5  know. I'll hear you. I don't know. I don't know that I'd
6  make that an automatic for cause if it was a different drug.
7  I'd want to hear about whether they thought they could sit
8  fairly, though. I mean, between breast, lung, ovarian,
9  prostate, don't we all know people? So we'd have to be more
10  discrete about that. But I'm willing to entertain -- I'm
11  open. See what you can do.
12  When I've done questionnaires in the past, I've
13  limited it to one page so it's simple, and I have them do it
14  right in front of me. I do it particularly in child
15  pornography cases or race cases because sometimes people are
16  embarrassed to say certain things; like, you know, do you
17  have problems with someone of a different race, or do you
18  have any problems that would prevent you from sitting on a
19  child pornography case? I suppose we could just ask somebody
20  in writing whether or not they have any problems sitting on a
21  case involving drugs involved with cancer. We'll see what we
22  can do. Have you thought through your voir dire questions?
23  MR. SOBOL: Steve?
24  MR. BERMAN: Well, we submitted a questionnaire for
25  the AstraZeneca trial, your Honor. It's about two pages, and

Page 34

1  we think we pretty much have the same questions here.
2      THE COURT:  Okay.  Well, we'll have to go find it.
3  One of the problems is, we're up to 4,400 or 4,300 docket
4  entries in this.  So what's really useful -- and they're
5  coming in in all sorts of cases at this point.  I'm looking
6  at Mr. Haviland because I have to tell you, I did not read
7  your objections before I did that preliminary approval.  You
8  filed them, I don't even know --
9      MR. HAVILAND:  That morning, your Honor.
10     THE COURT:  That morning.  We hadn't even
11 downloaded it.  You can't expect that I'm going to instantly
12 review that docket and grab them on everything.  So some of
13 those objections actually were interesting and something I'm
14 going to want to think about at the final settlement
15 conference.
16     MR. HAVILAND:  I appreciate that, your Honor.
17     THE COURT:  But, you know, if you're going to file
18 something an hour before a hearing, even with CM-ECF, you've
19 got to give us a call and let us know.
20     MR. HAVILAND:  Your Honor, actually, in that
21 situation we didn't know that the filing was coming that we
22 responded to.  We had about a 24-hour turnaround, so we did
23 the best to get those issues so the Court could have it for
24 preliminary approval --
25     THE COURT:  But even if you had a paralegal make a

Page 35

1  phone call to the clerk saying, you know, "Be watching."
2      MR. BERMAN:  And, your Honor, we're filing a
3  response to Mr. Haviland's position today because you've
4  referred it to the magistrate, and --
5      THE COURT:  I have?
6      MR. BERMAN:  And Professor Green has also filed
7  something.
8      THE COURT:  If I have, I didn't mean to.
9      MR. SOBOL:  Yes, it made no sense, your Honor.
10     MR. BERMAN:  Well, I think there is a docket entry
11 referring that to the magistrate.
12     THE COURT:  Referring what?
13     MR. HAVILAND:  I think Mr. Berman is talking about
14 something else.  The issue your Honor was addressing was the
15 AstraZeneca settlement and our statement as to the
16 preliminary approval, which your Honor did need a brief on --
17     THE COURT:  Excuse me.  I thought what I referred
18 to a magistrate judge was the disagreement between class
19 counsel over your respective roles on the team.  That's
20 different from the objections to the preliminary approval in
21 AstraZeneca, which I have to candidly say I did not read
22 before I walked out there.  I didn't know about them.  And
23 you never said anything at the proceeding, right?
24     MR. HAVILAND:  Your Honor, I wasn't there.  I had
25 gone on vacation, as I had reported to your Honor.  We didn't

Page 36

1  know the timetable.  It got filed -- the hearing wasn't even
2  scheduled on the docket, so it all happened very, very
3  quickly.  The pleading got filed.  The hearing took place
4  sometime that morning.  We turned the brief around in about
5  twelve hours just to get the positions that had been
6  discussed --
7      THE COURT:  Well, you could have moved for
8  reconsideration.  None of the notices had gone out.  In any
9  event, I'm just saying for the record I hadn't read it,
10 so -- and no one here was saying anything, and I -- some of
11 the points I don't necessarily agree with, but some of them
12 seem like something I'll want to think about, and so --
13     MR. HAVILAND:  We made the points to
14 Special Mediator Green as well, just to try to get them
15 addressed so that it didn't become an outside-the-settlement
16 issue.  The particular problem we had, your Honor, is that
17 the named class representative was not getting a full
18 recovery, and she's entitled to it.  It was overlooked.
19     THE COURT:  Well, skip her for a minute because
20 she's supposed to represent the whole class.  Some of the
21 issues were well taken; you know, why don't I increase the
22 moneys going to class members rather than going to a cy pres
23 fund.  I mean, that's a good point.
24     MR. HAVILAND:  We think send checks, your Honor,
25 just send them.

Page 37

1      THE COURT:  Or just send checks.  I can deal with
2  that at the final analysis.  But as far as your -- you're
3  separately representing the 2004 person, right?
4      MR. HAVILAND:  Could I address just one point on
5  that, your Honor?  Your Honor talked about the summary
6  judgment.  I just want to make sure.  I do represent the
7  Aaronsons, and unfortunately Mrs. Aaronson passed away a few
8  months ago, and her husband is very committed to this case.
9  He was deposed twice.  He expects to be at trial.  It's his
10 case.  He stepped up two years ago to prosecute this case.
11     THE COURT:  Well, he may well be able to be a
12 witness, but in terms of -- but let me just say, I think
13 there's a serious issue here.  It's at least a different
14 statute, and --
15     MR. HAVILAND:  And, your Honor, what we don't think
16 got presented at the time it was briefed because of the
17 context of the trial, the TPP trial, very late in the
18 knowledge issues, the consumers were very -- it was kind of
19 like at the beginning of your Honor's opinion, and then the
20 briefing never addressed consumers, the role of consumers,
21 the consumer fraud laws that we're suing under and whether or
22 not this could be an absolute bar to recovery.  It was more
23 in the nature of an advisory opinion as we read it from the
24 consumers' standpoint.
25     THE COURT:  Well, let me say this:  There's a very

Page 38

1  serious legal question here.  So if I don't have her as part
2  of the class, that doesn't mean that they can't still sue.
3  It just means it's a separate legal question that's not
4  common to the class.
5       MR. HAVILAND:  Fair enough, for the '04 folks,
6  understood, your Honor.
7       THE COURT:  For the '04 folks.  So maybe they could
8  just -- it means that there's no class, I'm not certifying a
9  class, so you could probably enter into your own settlement,
10 if that's what the issue happens to be, or I could carve it
11 off and send her back to North Carolina.
12      MR. HAVILAND:  The other issue that we put in our
13 original paper and then we saw class counsel's filing is
14 about the Sheet Metal Workers.  We absolutely agree with your
15 Honor.  You've ruled on that time and again.  We don't think
16 it's appropriate at this juncture to have a TPP come in for
17 the Class 1 consumers.  There's just so many issues right now
18 between those two groups that to have an existing TPP, for
19 which your Honor did rule back in November, substitute in,
20 but I think your Honor's already decided that.
21      THE COURT:  It's interesting whether the class
22 action vehicle actually works for a class like this, where by
23 definition everyone is so old and so sick.  You know, I know
24 the Supreme Court said that organizations shouldn't be
25 allowed to be class representatives for the most part, you

Page 39

1  know, unless you can prove that individual members took it;
2  but I must say we've had a lot of class plaintiffs die just
3  in the course of this, so it's not an ideal scenario for
4  anybody.
5       MR. HAVILAND:  It works for this reason:  That the
6  consumers, the cancer patients, are the ones these defendants
7  screwed the most.  They're the ones they do not want in this
8  courtroom testifying about what Reverend Aaronson told me
9  last night, the $13,000 bills he had to see while his wife
10 was dying in hospice.  That's the testimony they do not want
11 to have.  To have it just be a commercial case, the jury
12 would never get a sense of that.  Or if a TPP and the
13 representative that was proffered said, "We just passed those
14 damages on," there's just not the same flavor.  That's what
15 the class action vehicle is all about, to help these folks,
16 these folks that have no voice.
17      So I respect your Honor, believe me, more than
18 anyone, having to deal with many, many clients dying and the
19 widows and widowers.  It's very difficult to take those phone
20 calls and to continue to work with the clients.
21      THE COURT:  I agree.  I'm just simply saying that
22 it's just a sense of frustration I have because we're going
23 to have to deal with this right up against trial, but that's
24 what we're going to have to do.
25      You said you had possibly another one, is that

Page 40

1  right, Mr. Berman?
2       MR. BERMAN:  Yes, we do, your Honor.  We have a
3  woman from Michigan who told us that she made out-of-pocket
4  payments.  We didn't want to represent to the Court that she
5  was good until we actually saw the documents, but we're
6  working on that as well.
7       THE COURT:  All right, so you'll get that as soon
8  as possible.  Is she a little healthier?
9       MR. BERMAN:  I think she is a little healthier.  I
10 think she may actually be able to come, but I don't want to
11 represent that until I get a little better feel for her
12 health.
13      MR. SOBOL:  If I may, your Honor, there's an issue
14 that I'm not sure whether or not Mr. Berman and I want to
15 address.  I just sent him an E-mail about it.  I want to ask
16 if he could just take a look at that because it's important
17 before now that --
18      (Pause.)
19      MR. BERMAN:  Yes, I think you should raise that,
20 Tom.
21      MR. SOBOL:  So I think the issue then, in terms of
22 Aaronson, Mr. Haviland's client, is that I think that we
23 should deal with it in briefing, in the context of the
24 briefing in the '04 issue, the question as to whether or not
25 Aaronson will or will not be representing the class as a

Page 41

1  whole or only herself.  If she goes forward and she with
2  others is representing the class as a whole, then it makes
3  sense for them all to go forward with the trial in the end of
4  July.  On the other hand, if you rule that the particular
5  circumstances of her having an '04 claim are sufficiently
6  different from the balance of the class, then, as class
7  counsel, we would say that we would carve off Ms. Aaronson's
8  claim and proceed forward with the class trial with the
9  substitute representatives for '03 and beforehand.
10      THE COURT:  All right, let me defer on that.  We'll
11 see where all this is going, and I need to think about the
12 big issue.
13      MR. SOBOL:  Right.  I just wanted to make sure.
14 That's an issue we obviously need to resolve before we get to
15 impaneling the jury, that's all.
16      MR. HAVILAND:  Your Honor, just to impress the
17 gravity of that big issue, Mrs. Aaronson is the lone class
18 representative for the GSK classwide settlement, a very, very
19 important issue to us.  We believe she had standing at the
20 time, and I would not want to see that undermined by anything
21 that comes in the wake of all this briefing that took place
22 in the class TPP context, and then all of a sudden we get to
23 this eleventh hour and, "Oh, consumers have no rights in
24 '04," without fulsome briefing because it's a serious
25 question.

Page 42

1    THE COURT: You might want to be looking for
2 another GSK representative to head that off.
3    MR. TRETTER: I'm a little bit confused. I had
4 thought that Ms. Aaronson was being substituted for, that was
5 the upshot of what we said in the first five minutes.
6    THE COURT: In the first five minutes, they were
7 going to add one, maybe two class representatives, and I took
8 under advisement the very serious argument that she should
9 not be the class representative.
10    MR. TRETTER: There was also a summary judgment
11 motion that was made before your Honor's opinion with respect
12 to Mrs. Aaronson. BMS made a summary judgment motion on
13 Class 1 on two grounds: One is, she was treated in a
14 hospital, Presbyterian Hospital. The second is that she
15 received a charge, a hospital charge, and she paid 20 percent
16 of the hospital charge. And we put in an affidavit that the
17 hospital did not charge based on AWP. So her 20 percent was
18 paid on the hospital charge, and the hospital said no AWP.
19 So there are separate issues --
20    THE COURT: The hospital said that they didn't pay
21 based on AWP?
22    MR. TRETTER: They didn't charge based on AWP. In
23 other words --
24    THE COURT: You know what, I have no memory of this
25 whatsoever.

Page 43

1    MR. TRETTER: It's in our brief. I cite you our
2 brief.
3    THE COURT: The new brief?
4    MR. TRETTER: No. This is back -- we have an issue
5 of Mrs. Aaronson.
6    THE COURT: You know, I don't have recall.
7    MR. TRETTER: I understand.
8    THE COURT: So do you remember what docket number
9 this was?
10    MR. TRETTER: I can give you the date of it, your
11 Honor, and I can give you the title. This is BMS defendant's
12 reply memorandum of law in support of their motion for
13 summary judgment dated April 28, 2006. So there are issues
14 with respect to Ms. Aaronson that go beyond 2004. And what's
15 going to happen, if she were actually here at trial or
16 Reverend Aaronson were here at trial, we would say, for
17 instance, "Reverend Aaronson, your wife actually received the
18 treatment in a hospital, not in a doctor's office, correct?"
19    THE COURT: I'm glad you reminded me. All right,
20 let's go off the record.
21    MR. HAVILAND: Your Honor, if I may just on the
22 record, just as a response to that? Your Honor got this
23 exact same argument in class certification. We showed you
24 EMBs, EOMBs in processing, so it's been resolved.
25    THE COURT: I don't remember. Did I expressly

Page 44

1 resolve it?
2    MR. TRETTER: No.
3    MR. HAVILAND: You made her a class representative
4 based on that proffer that she still paid based on AWP.
5    THE COURT: You know, that was maybe three law
6 clerks ago. I just don't even remember it. There were
7 hundreds of, I'd say, technical -- and I don't mean that in a
8 negative way -- objections to all the class representatives,
9 and at some point we walked through that, and I don't
10 remember. I don't remember the issue. I don't remember if I
11 ruled on it. I remember nothing.
12    MR. TRETTER: All I'm suggesting, your Honor, is,
13 there are a lot of reasons why Reverend Aaronson should not
14 represent this class because what's going to happen at the
15 end of the day, whether it's 2004 or some other reason,
16 there's going to be no claim, just, you know, adjudication on
17 the merits.
18    THE COURT: It's a serious issue. Let's go off the
19 record.
20    (Discussion off the record.)
21    (Adjourned, 10:55 a.m.)

C E R T I F I C A T E

UNITED STATES DISTRICT COURT )
DISTRICT OF MASSACHUSETTS    ) ss.
CITY OF BOSTON               )

   I, Lee A. Marzilli, Official Federal Court
Reporter, do hereby certify that the foregoing transcript,
Pages 1 through 44 inclusive, was recorded by me
stenographically at the time and place aforesaid in Civil
Action No. 01-12257-PBS, MDL No. 1456, In re: Pharmaceutical
Industry Average Wholesale Price Litigation, and thereafter
by me reduced to typewriting and is a true and accurate
record of the proceedings.
   In witness whereof I have hereunto set my hand this
8th day of June, 2007.


      /s/ Lee A. Marzilli
      _____
      LEE A. MARZILLI, CRR
      OFFICIAL FEDERAL COURT REPORTER