1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

In Re:   LUPRON MARKETING AND          MDL No. 1430
SALES PRACTICES LITIGATION,
                                       Civil Action No. 01-10861-RGS

TRANSCRIPT OF FAIRNESS HEARING

DAY 3

APRIL 15, 2005, 10:15 a.m.

BEFORE HONORABLE RICHARD G. STEARNS

UNITED STATES DISTRICT COURT

JOHN J. MOAKLEY U.S. COURTHOUSE

ONE COURTHOUSE WAY

BOSTON, MA   02210

DEBRA M. JOYCE, RMR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
1 Courthouse Way, Room 5204
Boston, MA   02210
617-737-4410

4

```
 1                  P R O C E E D I N G S
 2              (The following proceedings were held in the open
 3   court before the Honorable Richard G. Stearns, United States
 4   District Judge, United States District Court, District of
 5   Massachusetts, at the John J. Moakley United States Courthouse,
 6   1 Courthouse Way, Boston, Massachusetts, on April 15, 2005.)
 7              (In robing room.)
 8              THE COURT:  This is Mr. Porter?
 9              MR. KODROFF:  Yes.
10              MR. WILLIAMS:  Before we begin, we'd like to lodge
11   an objection to have Mr. Porter appear by telephone.
12              LAW CLERK:  Mr. Porter, this is Marsha Zierk, the
13   Judge's clerk.  So I'm putting you under oath.
14              THE WITNESS:  Absolutely.
15              WILLIAM PORTER, having been duly sworn by the
16   Clerk, was examined and testified as follows:
17                        DIRECT EXAMINATION
18   BY MR. SOBOL:
19   Q.  Good morning, Mr. Porter.
20   A.  Good morning.
21   Q.  My name is Thomas Sobol, and I'm here in chambers in
22   Boston, Massachusetts.
23              Can you please state your name for the record.
24   A.  William Porter.
25   Q.  Where do you live, sir?
```

```
 1    A.   I'm sorry?

 2    Q.   Where do you live?

 3    A.   I live in Porter, Oklahoma, believe it or not.

 4    Q.   How old are you, sir?

 5    A.   I'm 78.

 6    Q.   Are you the William Porter that is a plaintiff in the

 7    lawsuit pending here in Boston regarding the drug called

 8    Lupron?

 9    A.   Yes, I am.

10    Q.   And, Mr. Porter, are you the same Mr. Porter that gave a

11    deposition in this case quite sometime ago?

12    A.   Yes, I am.

13    Q.   Now, are you aware that there is a proposed settlement in

14    this case?

15    A.   Yes, I am.

16    Q.   In connection with that settlement, can you please describe

17    to the Court what lawyer or lawyers contacted you?

18    A.   Well, the lawyers that are working for me are Spector,

19    Roseman & Kodroff, a firm by that name.

20    Q.   And what are the names of the people at that law firm who

21    have typically spoken to you over time?

22    A.   Jeff Corrigan is my main correspondent.

23    Q.   Anyone else that you remember as you --

24    A.   John Macoretta.

25    Q.   Okay.
```

```
 1   A.  At one time or another.
 2   Q.  All right.  And in connection with the proposed settlement,
 3   what's your best memory as to when you first heard about it?
 4   A.  When I first heard about the settlement?
 5   Q.  Yes.
 6   A.  Oh, it's been several months.
 7   Q.  Okay.  Did you review the proposed terms of the settlement
 8   generally?
 9   A.  I was told by Jeff Corrigan what the settlement was.
10   Q.  And what view or opinions, if any, did you give to
11   Mr. Corrigan?
12   A.  Would you repeat that, please?
13   Q.  Did you express any opinions back to Mr. Corrigan regarding
14   the settlement?
15   A.  I had no opinion at all since I'm not an expert in these
16   matters.
17   Q.  Okay.  And at some point did you review the settlement and
18   approve of the settlement?
19   A.  Yes, I approved of it.
20   Q.  Okay.
21   A.  I had no reason not to.
22   Q.  All right.  And at some point did you review a declaration
23   or an affidavit, a document that you were to sign?
24   A.  Yes.  I received that several weeks ago.
25   Q.  Okay.  And did you -- was the material in that truthful and
```

1   accurate, sir?

2   **A.  Yes, it was.**

3   Q.  All right.

4           MR. SOBOL:  No further questions, your Honor.

5           THE COURT:  Mr. Reidy, any questions?

6           MR. REIDY:  No questions, your Honor.

7           THE COURT:  Mr. Haviland?

8           MR. HAVILAND:  Mr. Williams.

9           MR. WILLIAMS:  Thank you, your Honor.

10                  CROSS EXAMINATION

11  BY MR. WILLIAMS:

12  Q.  Mr. Porter, my name is Kent Williams, I'm counsel for

13  intervenor/objectors in this case.

14          Can you hear me?

15  **A.  Not too well.**

16          THE COURT:  Why don't you stand up over here.

17  Q.  I've moved a little closer to the phone, Mr. Porter.  Can

18  you hear me now?

19  **A.  That's much better.**

20  Q.  Thank you.

21  **A.  You're Kent Williams?**

22  Q.  Yes.  My name is Kent Williams, and I represent the

23  intervenor/objectors in this case.

24  **A.  Yes, I understand.**

25  Q.  You indicated that you learned about the settlement from a

8

1  Spector, Roseman & Kodroff attorney; is that right?
2  A. Yes.
3  Q. And what was that gentleman's name again?
4  A. Jeff Corrigan is the person I talked to with that firm.
5  Q. Jeff Corrigan?
6  A. Yes.
7  Q. And how many conversations have you had with Mr. Corrigan
8  about the settlement?
9  A. Are you kidding?  There's been many, many conversations
10 over the years.  Approximately once a month.
11 Q. So since you've learned about the settlement have you
12 talked to Mr. Corrigan once a month about the settlement?
13 A. Approximately, yes.
14 Q. Okay.  And you said that you first learned about it several
15 months ago.  Can you pin it down a little bit better than that
16 for us?
17 A. No, I can't.
18 Q. Well, was it before Christmas?
19 A. I don't believe so.  I'm not really certain.
20 Q. Okay.
21 A. You have to understand, I'm in the process of moving, and
22 I'm in a very unorganized position here.
23 Q. I see.
24         Mr. Porter, have you been out of the country
25 recently?

In Re: Lupron Marketing, day 3, 041505

1   A.   No, I have not.

2   Q.   Okay.

3   A.   I've been moving from New York state to Oklahoma by myself,

4   doing it -- do-it-yourself move.

5   Q.   I see.  Are you aware that a process server has been trying

6   to serve you with a subpoena to attend this hearing?

7   A.   No, I'm not aware of that at all.

8   Q.   Have you been in New York recently?

9   A.   New York state?

10  Q.   Yes.

11  A.   Yes, I was there a week ago.

12  Q.   Okay.  When did you become aware that you would be

13  testifying today, Mr. Porter?

14  A.   Oh, let's see, a few days ago.

15  Q.   A few days ago?

16  A.   Yes.

17  Q.   And who indicated to you that you would be testifying, sir?

18  A.   Jeff Corrigan.

19  Q.   And did he indicate that you would be testifying by

20  telephone?

21  A.   Yes, yes.  Well, he said that first that was the last --

22  that was the best alternative to me either going -- making a

23  trip to Boston or you people coming out here to Oklahoma.  A

24  telephone idea seemed to be like a best alternative.

25  Q.   I see.  I'd like to talk to you for a couple of minutes

1   about your understanding of the settlement, if I may.  Now,
2   have you actually read the settlement agreement?
3   **A.   Will you describe that agreement?**
4   Q.   It would say "Settlement Agreement" on it.
5   **A.   Well, I've read letters that Jeff Corrigan has sent me,**
6   **which indicated there was a settlement.**
7   Q.   But you don't think you've read the actual agreement?
8   **A.   I'm not really certain what you mean by the actual -- how**
9   **big a document is this?**
10  Q.   It would be several pages long, sir, and it would say
11  "Settlement Agreement" on it.
12  **A.   I'm not really certain that I've seen that.**
13  Q.   All right.  What do you understand to be the allocation of
14  money between the third-party payers and the consumers in the
15  settlement?
16  **A.   Repeat that question?**
17  Q.   Yes.  You understand that there are two groups who are to
18  receive money under the settlement.
19  **A.   The insurance companies and the individuals.**
20  Q.   That's right.
21  **A.   Is that what you mean?**
22  Q.   Yes.  What do you understand to be the allocation of funds
23  between those two groups?
24  **A.   I think the individuals will receive maybe 25 percent and**
25  **75 percent would go to the insurance company, something on that**

1   order.
2   Q.  Okay.  Do you know in terms of a dollar amount what the
3   allocation is?
4   A.  **The total amount, as I understand it, was $150 million.**
5   Q.  Right.  Do you know how that money is allocated amongst the
6   various groups?
7   A.  **Like I said before, approximately 25 percent and 75**
8   **percent.**
9   Q.  Oh, I see.  Do you have an understanding as to what claims
10  are being released in exchange for that money?
11  A.  **Would you restate that again?**
12  Q.  Sure.  Do you have an understanding what claims are being
13  released in exchange for that money?
14  A.  **Released?**
15  Q.  Yes.  You understand in exchange for the money TAP is
16  getting a release of any claims against it?
17  A.  **I think you're getting into legalities which I don't really**
18  **understand.**
19  Q.  Fair enough.  Was that ever explained to you, to your
20  recollection?
21  A.  **I'm sorry?**
22  Q.  Was the nature and scope of a release ever explained to
23  you, to your recollection?
24  A.  **Not in detail as I recall.**
25  Q.  Okay.

1   A.   But I understand that it was -- once the judgment is made,
2   that releases the drug companies from any further problems.
3   Q.   All right.  And that's from everybody?
4   A.   As far as I know, yes.
5   Q.   And you understand that that releases claims that you may
6   not have yourself?
7   A.   Rephrase that again?
8   Q.   Do you understand that the release releases claims for
9   everyone, including claims that you don't have but that others
10  may have?
11  A.   Well, I'm part of the class action, so I assume that it
12  would regard anyone in the class action suit.
13  Q.   Let me ask it this way.  If there were class members who
14  have additional claims that you don't have, that those claims
15  were being released, would you still support the settlement?
16  A.   You're getting into legalities which I don't fully
17  comprehend here.  I'm just -- I'm a member of this class action
18  suit, and that's all I know about.
19  Q.   All right.
20       One last question, sir -- actually, two questions.
21  Do you understand that your -- that there's a proposal to
22  provide you with a $5,000 incentive award?
23  A.   I heard that there might be an additional award to that
24  extent, yes.
25  Q.   And when did you hear that?

13

1    A.    Yesterday.

2    Q.    That was the first time?

3    A.    Yes.

4    Q.    Okay.

5               MR. WILLIAMS:  No further questions, your Honor.

6               THE COURT:  Mr. Sobol?

7               MR. SOBOL:  No, your Honor.

8               THE COURT:  Thank you very much, Mr. Porter, for

9    taking the time to speak to us.

10              THE WITNESS:  Not at all.

11              (Telephone conference adjourned at 9:24 a.m.)

12              (On the record in the courtroom at 9:38 a.m.)

13              THE COURT:  All right.  Mr. Sobol.

14              MR. SOBOL:  Thank you, your Honor.

15              May it please the Court.  Yesterday afternoon, your

16   Honor, I had lunch by myself downstairs, and while I was having

17   a couple of slices of pizza, I was thinking about how it is

18   that I would tick through the various issues by way of rebuttal

19   and closing today, and it reminded me of when I was a

20   seven-year-old or eight-year-old boy and my Uncle Buster came

21   over to my house early spring day, one of his rare visits.

22   There was still snow on the ground, so my Uncle Buster and my

23   dad and me went out on this wooden sled and we went down this

24   hill and went right through into a pricker bush, untangled

25   ourselves, and from my T-shirt I had all these prickers, my

In Re: Lupron Marketing, day 3, 041505

1  shoulders, my arms and my chest, that kind of thing.  It didn't
2  feel that bad until I got home and my mom pulled out a pair of
3  tweezers and slowly and carefully each one of the prickers had
4  to come out of my arm.  Just not exactly sure why that story
5  came to mind when I was going through these issues, but here we
6  go.
7         First, I think in the order of the presentation I'm
8  going to make today is simply in the order of the issues that
9  you'd normally expect in a class certification in a settlement
10 context.  Some of these issues are in the way of cleanup and
11 others are more substantive.
12        If I may then, first you recall that I needed to
13 make a math correction to slide A.  This is the correction of
14 the math to slide A where the estimated settlement of estimated
15 net TPP settlement fund of 38.87 million on the antiquated
16 suggestions that I gave to your Honor.
17        The next issue that I wanted to go over in a little
18 bit more detail, your Honor, was this.  We sort of skipped over
19 it briefly earlier.  How is it that we came to the -- how is it
20 that class counsel arrived at the 30 percent figure as the
21 average damage for each of the consumers?  So it's important to
22 understand that the wealth of the data that we acquired was
23 quite significant.
24        Essentially, the data sets that our expert had
25 spanned the early 1990s until about 2001, I believe it was.  In

```
 1   that data was for every NDC, which as your Honor knows is a new
 2   drug code, meaning every formulation of Lupron.  There are
 3   about -- I can't remember right now, there are about a dozen,
 4   dozen and a half formulations of Lupron for every year during
 5   those many years.  And what we were able to do is go back over
 6   time, estimate the average selling price per NDC per quarter
 7   for Lupron.  And then we are able to compare that for every NDC
 8   for every quarter during that time period obtaining the AWP.
 9   And we're able to determine the extent to which the AWP
10   exceeded the ASP for every formulation of Lupron for every
11   quarter during most of the years of the class.
12           At that point, what we are then able to do is
13   determine what was the average amount by which the AWP exceeded
14   the average selling price during the class period?  And that
15   average ended up being 1.82, meaning that if you look at and
16   drill down into all of TAP's data to find out what they
17   actually netted for each NDC for every quarter during the class
18   period and then compared that with the published average
19   wholesale price and did a weighted average of those units over
20   time, what you'd be able to determine is that the AWP was 1.82
21   of the ASP over the class period.
22           Essentially what one is then able to do is take a
23   proxy and say what should have been the AWP during the class
24   period -- and we take an aggressive stance on that -- and say
25   the AWP should only have been 1.25 of the AWP.  As a result,
```

1  the overage, if you will, is the delta between the 1.82 and the
2  1.25 resulting then, essentially, in a difference of .69 for 30
3  percent on the average.  The AWP was 30 percent higher than
4  what it should have been for -- on a weighted average for every
5  NDC for every formulation of Lupron during the class period.
6  And you'll see that this is also in Dr. Hartman's declaration
7  as well as this method of calculation.
8           As a result, your Honor, it just needs to be made
9  clear that our estimation of the consumer damage in the
10 proposed allocation for the proposed settlement is not
11 arbitrary, but, in fact, is well-grounded in a thorough and
12 detailed analysis of the claims that -- not the claims data --
13 the sales data of TAP and the published average wholesale
14 prices for the class during time, and it's something that was
15 also -- is backed up by economic study.
16          The next issue I want to address in terms of the
17 structure of the settlement itself is this, your Honor:  The
18 reason there is a TPP 2000-2001 claim period is that works as a
19 proxy, which has been completely accepted by all the SHPs and
20 all the TPP claimants.  The notion is there's no need for the
21 TPPs and the SHPs to go through all of the many years of their
22 data in order to be able to establish how they relationally as
23 between one TPP and another are related.  Because again, what
24 one is going to be dealing with here in the TPP area is how
25 they stand vis-a-vis one another.  It really is immaterial

1  given the amount of claims that get involved, which is
2  significant, that -- of what the gross actual dollars are for
3  the whole period.
4           Now, of course, if you compare this to the
5  consumers, the consumers are actually benefiting, because a
6  consumer, wherever they are in a class period, they can file a
7  claim.  So, actually, if one is going to be comparing those
8  things -- but it's really apples to oranges -- but if one did a
9  comparison, consumers are better off.
10          Finally then, I'll just then remark that it's also
11 apples to oranges to be able to say consumers are getting 30
12 percent of their expenditures, whereas the proxy period that's
13 being used by the TPPs is for their full amount during 2000 and
14 2001.  Again, because of the claims experience already to date
15 concretely in this case shows that the TPPs' and SHPs' claims are
16 going to exceed the amount of the fund that's available, the
17 only issue there is how they relate to one another, not what
18 the gross amounts are.
19          Those are the issues I think were important to
20 cleanup in terms of the structure of the settlement, your
21 Honor.  Now I'm going to get into the Rule 23 requirements of
22 the settlement.
23          Rule 23(e)(1)(a) says you need to approve or
24 disapprove the settlement.  Obviously that's the reason we're
25 here.

1              Rule 23(e)(1)(b) requires that notice be sent.
2    What are the issues, just to make clear, why it is the notice
3    was sent here in this case is adequate?
4              First, you have before you the affidavit of
5    Mr. Hilsee, and you also have yesterday's testimony of
6    Mr. Hilsee.
7              Second, there was no need to do a direct mailing in
8    this case whatsoever.  Again, the HIPAA complications, the
9    costs, the privacy concerns, the fact that it is not necessary
10   all show that direct notice would have been both impracticable
11   and not necessary under these circumstances.
12             Similarly, placards.  The notion of trying to
13   require doctors to keep placards in their offices as opposed to
14   in a normal situation where you might have a prescription drug
15   that's filled in pharmacies is simply not adequate.
16             I'll also note, your Honor, the intervenors, when
17   the intervenors got their cases certified, notice was sent out
18   in North Carolina and also New Jersey.  There was no direct
19   mailing program in New Jersey or North Carolina.  There were no
20   placards that were sent out in New Jersey or North Carolina in
21   order to be able to send out notice.
22             Finally, and perhaps most importantly in terms of
23   rejecting the objections of the intervenors in this case
24   regarding notice is they don't have any evidence to show that
25   what occurred here isn't adequate.  Where's their expert?  No

1  expert.  If there was a gross insufficiency of the notice
2  requirements here, they would have come forward with expert
3  testimony to that effect.  They provide none whatever.  Notice
4  is fulfilled in this case, your Honor.
5              Next rule, 23(e)(2), the need for class counsel to
6  disclose the existence of any agreements.  That we have done.
7  We have filed the settlement agreement, and we have filed the
8  modifications to that settlement agreement.
9              There has been a suggestion that there are some
10 kind of hidden agreements, some kind of clandestine deals that
11 class counsel have engaged in.  There are none.  I'll give you
12 a couple of the suggestions and then the rebuttals to it.
13             First there's been a suggestion by intervenors'
14 counsel that the withdrawal of the objection by the Treskow
15 objector and their law firms, there might have been something
16 behind that.  There is nothing at all.  Once I had received the
17 objection from counsel for Treskow, that counsel I'm familiar
18 with, sometimes I'm adverse with them, sometimes my clients are
19 in line with them.  I spoke to them on a variety of occasions,
20 communicating on the merits of the settlement, gave them
21 information they requested, information almost identical to the
22 kinds of information that were given to Kline & Specter.  They
23 asked for follow-up information on the merits, which I gave to
24 them.  And on the basis of an intelligent discussion of the
25 merits of the settlement, they decided to withdraw the