**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| IN RE: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL NO. 1456<br>C.A. No. 01-12257-PBS |
| THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS | Judge Patti B. Saris |

**MOTION TO DISQUALIFY CLASS COUNSEL FROM CONTINUING TO SERVE AS COUNSEL FOR THE CLASS 1 BMS CONSUMER SUB-CLASS**

Named consumer representative plaintiff of the Class 1 litigation consumer Sub-Class against BMS, Rev. David Aaronson, individually and on behalf of the Estate of Susan Ruth Aaronson, by and through his undersigned individual counsel, hereby moves this Court for an Order disqualifying Class Counsel from continuing to serve as counsel for the Class of consumers in the BMS consumer Sub-Class.  In support of this Motion, Rev. Aaronson avers as follow:

1. On June 14, 2002, this Court entered Case Management Order No. 1 ("CMO 1") establishing, among other things, an "Organization of Plaintiffs' Counsel" at Section IV. CMO 1 appointed the current Class Counsel as "Co-Lead Counsel" for all Classes, including the consumer BMS Sub-Class 1.  Dkt. No. 100.

2. On January 30, 2006, this Court entered its Class Certification Order designating, under Section III and pursuant to Fed.R.Civ.Proc. 23(g), five (5) law firms to act as "Co-Lead Counsel" on behalf of the five (5) certified Subclasses of Class 1.  This Order also appointed Rev. Aaronson (and his late wife, Sue Ruth) as the lone consumer class representatives of the GSK and BMS litigation Sub-Classes. *In re Pharmaceutical*

1

*Industry Average Whole Price Litig.*, 233 F.R.D. 229 (D.Mass. 2006).

3. Since his appointment as class representative, Rev. Aaronson has zealously represented the interests of the consumers in the GSK and BMS Sub-Classes. Among other things, Rev. Aaronson has participated in two (2) depositions, produced documents, and communicated with counsel to ensure that the case was being litigated in the best interests of consumers.

4. In its earlier decision on class certification in August 2005, this Court expressed concern about a "possible conflict between TPPs and Medicare Part B beneficiaries with respect to settlements, given the different economic interests of the groups ... I am concerned the TTPs will not serve as adequate and typical representatives of Medicare beneficiaries, particularly those who do not have supplemental health insurance." *In re Pharmaceutical Industry Average Wholesale Price Litig.*, 230 F.R.D. 61 (D.Mass. 2005).

5. On this score, the Supreme Court in *Amchem Products Inc. v. Windsor*, 521 U.S. 591, 627-628 (1997) observed that there must be "structural assurance of fair and adequate representation for the diverse groups and individuals affected" in any class action.

6. On October 2, 2007, the undersigned filed a pleading in this Court that raised serious concerns about Class Counsel's conflict of interest in representing simultaneously the interests of consumers and TPPs, especially in the context of settlement. Dkt No. 4769. Of particular relevance to the instant Motion, that pleading raised the following concerns, *inter alia*, with respect to Class Counsel's simultaneous representation of consumers and TPPs, citing substantial evidence in support thereof:

    a. Class Counsel "diverted millions of settlement dollars from Lupron cancer patients to their rich TPP clients and friends in the *Lupron* case, by, among other

things, having Dr. Hartman put forth an erroneous damage methodology that ignored consumers' co-insurance payments under Medicare Part B" (*id*. at 3);

b. Class Counsel "lied to Judge Stearns about their undisclosed payoff of the lone TPP objector to the *Lupron* settlement in order to get the settlement approved, and then tried to cover up this lie by resisting Judge Stearns' directive to file a public accounting as to their illicit payments out of the class settlement fund." (*id*.);

c. Class Counsel "diverted tens of millions of dollars from millions of cancer patients *in this case* to their rich TPP clients and friends, by having Dr. Hartman replicate his erroneous damage methodology from *Lupron* that ignored consumers' co-insurance payments under Medicare Part B" (*id*. at 4);

d. Class Counsel "failed to disclose to this Court that conflicted GSK settlement allocation counsel for TPPs, after negotiating an allocation for TPPs, threatened to lead a massive opt-out that would blow the deal unless they and their clients were paid off with settlement funds, and then tried to conceal what one of them described as a settlement process that 'looks bastardized' by substituting somebody else's name as allocation counsel for TPPs in the settlement papers." (*id*.);

e. Class Counsel "broke their promise to the Court to produce the BMS settlement agreement by August 2, [2007] and ignored this Court's directive to keep the undersigned 'in the loop,' as they scrambled to fix the problem of having lied to the Court about the time period covered by the proposed BMS settlement and as they unilaterally sought to replace the certified Class 1 representative Reverend Aaronson with a Stage 4 cancer patient (who has provided no supporting

3

      documentation proving her membership in the settlement class)(*id.*); and

    f. Class Counsel "fought to maintain Dr. Hartman's erroneous damage methodology in the face of irrefutable evidence that it overpaid TPPs, and then tried to slip the correction past the parties and the Court in an eleventh-hour supplement" (*id.* at 5).

7. The Court has never convened a hearing to address these concerns. Indeed, nowhere does the record reflect any attempt to resolve or address these issues by the Court.

8. As this Court is aware, the certified litigation consumer Sub-Class against BMS was set to go to trial against BMS in July 2007. In advance of the same, the parties sought to mediate an agreeable settlement for the Medicare consumers.

9. On June 25, 2007, Class Counsel (through their designee Sean Matt) signed a Memorandum of Understanding ("MOU") with BMS (through its designee Zenola Harper), committing BMS to pay $13 million in settlement proceeds, plus up to $1 million in notice costs, to the consumers in the BMS Sub-Class 1. *See* MOU attached to the Motion to Enforce at Dkt. No. 6917.

10. When BMS apparently complained about how any residual funds might be distributed,[1] Class Counsel filed pleadings with this Court seeking to determine BMS's rights under the MOU. Dkt. Nos. 5518, 5606. The Court agreed with Class Counsel that BMS had no right to complain about how the proceeds of the consumer settlement might be distributed, and it ordered Class Counsel to file a Motion for Preliminary Approval of the BMS settlement. (Sept. 29, 2008 Electronic Order).

---

[1] The details of BMS's dissatisfaction with the MOU its authorized representative signed on behalf of the company can only be gleaned at this point from the statements of the parties in their pleadings, since this Court has refused to allow Rev. Aaronson to review documents or elicit testimony to develop the factual record of this matter. *See* Procedural Order at Dkt. No. 7472.

11. Class Counsel failed to abide by this Court's explicit Order. Instead, citing this Court's Electronic Order directing Class Counsel to move for preliminary approval as an excuse, they unilaterally decided to go back into mediation. Dkt. No. 7455 at 3 ("Class Counsel interpreted the order as a directive to reconsider counsel's recommended distribution plan."); Dkt. No. 7455 at 4 ("The parties returned to mediation efforts with Professor Green in another attempt to settle the claims of all putative classes.")

12. The result of that effort was a $19 million settlement, plus $1 million in notice costs, for the consumer in BMS Sub-Class 1, as well as the TPPs in Classes 2 and 3. In other words, they obtained an additional benefit of $6 million to account for the interests of the TPPs.

13. Rather than promptly moving for preliminary approval of the $13 million settlement with Class 1 consumers (as codified by the MOU), and the separate $6 million additional consideration obtained to account for the TPP interests in Classes 2 and 3, Class Counsel called for a further meditation/negotiation between ostensible representatives of the consumers and TPPs to re-allocate the settlement proceeds.

14. The result of that mediation/negotiation was that consumers were allocated only $4,370,000 (or 23% of the overall amount). Dkt No. 7455 at 5. After requested fees and costs are taken out, consumers are left with only $2,806,301.41. *Id.* at 15. Given the "overwhelmingly positive" response, 17,475 claim cards have been received from consumer. *Id*. at 10; see also, Dkt. No. 7459 at 4.

15. Unfortunately for consumers like Rev. Aaronson, as Class Counsel's expert attests, that means they are getting only about 8.8% of their "Total Recognized Loss of $32,163,187.72" based upon the pro rata distribution called for by the proposed

settlement. *Id*. at 8.

16. Consumers deserve more. As the Court knows, it has already approved a consumer Class 1 settlement with AstraZeneca that paid consumers three times their damages. In Track 2, the Court has preliminarily approved a settlement that pays consumer three times their out-of-pocket expenses on Subject Drugs.

17. There was a bench trial against BMS in this Court on the more difficult claims of Classes 2 and 3. This Court found liability against BMS.

18. Faced with an imminent trial in July 2007 against a more formidable plaintiff group – consumers with no conceivable "knowledge" of BMS's wrongdoing – BMS wisely chose to settle. It settled for more than it has agreed to pay TPPs, for good reason. The Class 2/3 trial provided the parties with a window into the merits of the claims of TPPs, which are far weaker than the claims of consumer cancer patients, like Rev. Aaronson and Ms. Swayze.

19. Consumers deserve more; and they had gotten more on June 25, 2007 when the parties committed to paying consumers $13million for their claims. The express terms of this MOU bound both BMS and Class Counsel to a settlement for consumers in that amount. Unconflicted counsel would have pressed forward for preliminary approval of the settlement, sending notice to all Class members. Had that been done, the already "overwhelmingly positive" consumer claims rate of 17,475 might have been higher. Dkt. No. 7455 at 10.

20. Regardless, the amount paid to consumers like Rev. Aaronson *would have been higher*.

21. Consumers like Rev. Aaronson deserve to be represented by counsel who recognized the tremendous benefit the $13 million settlement provides in relation to the paltry

$4,370,000 they received years later.

22. In 2008, Class Counsel argued to this Court that, "[a] deal is a deal, the Court should enforce the MOU…". Dkt. No. 5606.  Rev. Aaronson agrees.

23. Unfortunately, what BMS portended would happen, did happen: Class Counsel, though conflicted, went back to the mediation table in an effort to garner a good deal for TPPs, their other clients. But, unfortunately for consumers like Rev. Aaronson, Class Counsel caved into BMS's demands, who wanted to take a portion of the consumers' $13 million and divert it to the TPPs, to satisfy their judgment in the Massachusetts Class 2/3 trial, as well as to settle the nationwide claims of all TPPs.  *See* Dkt. No. 5595 at ("***BMS submits that Class Counsel have a conflict***: they are trying to exhaust $13 million in the Class 1 settlement to justify a fee application based upon that amount instead of allowing the possibility that any of those funds might be used to settle the claims of or pay judgments to Class 2 or 3 members – for whom Class counsel would like a separate fee application.")(Emphasis added)

24. After Class Counsel proceeded with that BMS-identified conflict entrenched, the consumer allocation counsel appointed by Class Counsel could not relieve Class Counsel of the conflict, especially since such counsel was himself conflicted.  As they freely admit to this Court, consumers were represented by "Wells Wilkinson, Esq., Staff Attorney for the Prescription Access Litigation Project, a national coalition of consumer groups dedicated to redress unlawful drug price manipulations and deceptive marketing." Dkt. No. 7455 at 5.

25. As has been pointed out to this Court previously, the named plaintiffs in this case, Health Care For All, Inc. ("HCFA"), New York Statewide Senior Action Counsil ("NYSSAC"),

Vermont Public Interest Research Group ("VPIRG"), Wisconsin Citizen Action ("WCA"), and Citizen Action of New York ("CANY"), all were appointed by this Court as representative plaintiffs for consumer Class 1 of the pending Track 2 settlement class and all are member associations of PAL, a "project" and subsidiary of Community Catalyst located in Boston, Massachusetts.[2] *See generally*, Dkt Nos. 5953 and 5971 (Rev. Aaronson's objection to the proposed Track 2 settlement and providing more detail that the subsequent filing that was ordered by this Court).

26. Having chosen to favor their TPP clients over their consumer clients, and having failed to present for approval by the consumer class and the Court a settlement which was appreciably better than the one they subsequently negotiated, Class Counsel have created an irreconcilable conflict of interest for themselves.

27. The only recourse for Rev. Aaronson (and consumers like him who think that $13 million is far better than $4.3 million) is to seek the disqualification of existing Class Counsel, and the appointment of unconflicted counsel by the Court.

28. The law on such conflicts, and the appropriate course of action for a court addressing such conflicts, is clear.

29. The cases applying the ethical standards are in accord that a conflict such as the one at bar cannot be waived, even if Class Counsel had sought to notify Rev. Aaronson and obtained his consent to waive the conflict, which they did not.

30. This Court has adopted the Massachusetts Rules of Professional Conduct.  *See* Local

---

[2]  Both PAL and Community Catalyst are located at 30 Winter Street in Boston, Massachusetts: these are the same offices occupied by the Court-appointed Track 2 consumer settlement class representative, HCFA.  *See* http://www.prescriptionaccess.org/contacts; http://www.communitycatalyst.org/contact_us; http://www.hcfama.org.

Rule 83.6(4)(B) of the United States District Court for the District of Massachusetts.

31. Massachusetts Rules of Professional Conduct 1.7[3] addresses representational conflicts that might adversely affect the interests of another client. *Smith & Nephew, Inc. v. Ethicon, Inc*. 98 F. Supp. 2d 106, 108 (D. Mass. 2000).

32. Rule 1.7 provides in pertinent part that:

   a. A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:

      (1) The lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and

      (2) Each client consents after consultation.

   b. A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:

      (1) The lawyer reasonably believes the representation will not be adversely affected; and

      (2) The client consents after consultation. When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.

MRPC 1.7(a), (b); *see also, Ethicon,* 98 F.Supp. 2d at 108-109.

33. In addition, the comments to Rule 1.7 provide that:

   Loyalty is an essential element in the lawyer's relationship to a client. An impermissible conflict of interest may exist before representation is undertaken, in

---

[3] MRPC 1.7 is identical to ABA Model Rule 1.7.

> which event the representation should be declined. The lawyer should adopt reasonable procedures, appropriate for the size and type of firm and practices, to determine in both litigation and non-litigation matters the parties and issues involved and to determine whether there are actual or potential conflicts of interest.
>
> * * *
>
> Loyalty to a client is also impaired when a lawyer cannot consider, recommend or carry out an appropriate course of action for the client because of the lawyer's other responsibilities or interests. The conflict in effect forecloses alternatives that would otherwise be available to the client. Paragraph (b) addresses such situations. A possible conflict does not itself preclude the representation. The critical questions are the likelihood that a conflict will eventuate and, if it does, whether it will materially interfere with the lawyer's independent professional judgment in considering alternatives or foreclose courses of action that reasonably should be pursued on behalf of the client. Consideration should be given to whether the client wishes to accommodate the other interest involved.

*See* MRPC 1.7, comments 1 and 4 respectively.

34. It is well settled law, regardless of jurisdiction, that attorneys owe their clients a fiduciary duty. *Huber v. Taylor,* 469 F. 3d 67, 81 (3d Cir. 2006)(citations omitted).

35. Here, Class Counsel breached the fiduciary duty to their consumer clients, like Rev. Aaronson, by taking away over $8 million in settlements guaranteed by the signed MOU. They violated Rule 1.7 by failing to present <u>that settlement</u> to the consumers, via a Motion for Preliminary Approval to the Court and notice to the Class.

36. By essentially taking over $8 million in guaranteed settlement proceeds and giving the money to their other clients, the TPPs, Class Counsel demonstrated that their conflict was real.

37. The appropriate course for this Court to provide relief to Rev. Aaronson and the Class is to disqualify Class Counsel from serving as counsel to the BMS consumer sub-class.

38. In anticipation of Class Counsel's opposition to this Motion, and given the nature of the factual inquiry involved, if the Court is not inclined to grant this Motion on the strength

on the aforesaid averments, Rev. Aaronson respectfully requests that the Court conduct an evidentiary hearing to establish an appropriate factual record upon which to render its decision.

WHEREFORE, Reverend David Aaronson, by and through his undersigned counsel, respectfully requests that this Honorable Court grant his Motion to Disqualify Class Counsel from continuing to serve as counsel for the Class of consumers in the BMS consumer Sub-Class, and enter an appropriate Order respecting the same.

Respectfully submitted,

Dated:   March 25, 2011

/s/ Donald E. Haviland, Esquire
Donald E. Haviland, Esquire
Michael P. Donohue, Esquire
**HAVILAND HUGHES, LLC**
111 S. Independence Mall East
The Bourse, Suite 1000
Philadelphia, PA 19106
Telephone: (215) 609-4661
Facsimile:  (215) 392-4400

*ATTORNEYS FOR THE
REVEREND DAVID AARONSON*

## CERTIFICATE OF SERVICE

     I, Donald E. Haviland, Jr., Esquire, hereby certify that on March 25, 2011 a true and correct copy of the foregoing Motion to Disqualify Class Counsel from Continuing to Serve as Class Counsel for the Class 1 BMS Consumer Sub-Class was served on all counsel of record via CM/ECF notification.

                                                  /s/ Donald E. Haviland, Jr., Esquire
                                                  Donald E. Haviland, Jr., Esquire