```
                    IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF MASSACHUSETTS


    IN RE:                            )
                                      )  CA No. 01-12257-PBS
    PHARMACEUTICAL INDUSTRY AVERAGE   )
    WHOLESALE PRICE LITIGATION        )  Pages 1 - 91
                                      )
```


BMS FINAL APPROVAL HEARING

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE




United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
March 28, 2011, 2:17 p.m.




LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 7200
Boston, MA  02210
(617)345-6787

1    A P P E A R A N C E S:

2

3        SEAN R. MATT, ESQ., Hagens Berman Sobol Shapiro, LLP,
     1918 Eighth Avenue, Suite 3300, Seattle, Washington, 98101,
4    for the Class Plaintiffs.

5        JENNIFER FOUNTAIN CONNOLLY, ESQ., Hagens Berman Sobol
     Shapiro, LLP, 1629 K Street NW, Suite 300, Washington, DC,
6    20006, for the Class Plaintiffs.

7        MARC H. EDELSON, ESQ., Edelson & Associates,
     45 West Court Street, Doylestown, Pennsylvania, 18901,
8    for the Class Plaintiffs.

9        JOHN A. MACORETTA, ESQ., Spector Roseman Kodroff & Willis,
     PC, 1818 Market Street, Philadelphia, Pennsylvania, 19103,
10   for the Class Plaintiffs.

11       KENNETH A. WEXLER, ESQ., Wexler Wallace, LLP,
     55 West Monroe Street, Suite 3300, Chicago, Illinois, 60603,
12   for the Class Plaintiffs.

13       LYNDON M. TRETTER, ESQ., Hogan Lovells, LLP,
     875 Third Avenue, New York, New York, 10022,
14   for Bristol-Myers Squibb Company.

15   ALSO PRESENT:

16       DONALD E. HAVILAND, JR., ESQ., Haviland Hughes, LLC,
     111 S. Independence Mall East, The Course, Suite 1000,
17   Philadelphia, Pennsylvania, 19106, for Reverend David Aaronson.

18

19

20

21

22

23

24

25

1            P R O C E E D I N G S

2          THE CLERK:  The Court calls Civil Action 01-12257,

3     In Re:  Pharmaceutical Industry Average Wholesale Price

4     Litigation.  Can counsel please identify themselves for the

5     record.

6          MR. MATT:  Your Honor, John Matt appearing for the

7     class.

8          MS. CONNOLLY:  Good afternoon, your Honor.  Jennifer

9     Connolly for the class.

10         MR. MACORETTA:  Good afternoon, your Honor.  John

11    Macoretta for the class plaintiffs.

12         MR. WEXLER:  Ken Wexler for the class plaintiffs.

13         MR. EDELSON:  Marc Edelson for the class plaintiffs.

14         MR. TRETTER:  Lyndon Tretter, Hogan Lovells, for

15    Bristol-Myers Squibb.

16         MR. HAVILAND:  Good afternoon, your Honor.  Don

17    Haviland for Reverend Aaronson.

18         THE COURT:  Good, all right.  Thank you.  So this is a

19    motion at the final fairness hearing.  I understand that

20    Mr. Haviland is here on behalf of an objector.  Is there anyone

21    else here?  All right, so there's one objector, and as I

22    understand it, this is the only objector to any of the class

23    settlements.  Is that right?

24         MR. MATT:  That's correct, your Honor, from any of the

25    three classes, it's the only objector.

be7428d7-0463-4420-b209-dd0c9d5f18bd

1          THE COURT:  Okay, so proceed.

2          MR. MATT:  Okay.  Your Honor, may I approach?  I have

3     some slides to go through.

4          THE COURT:  I'll give everyone a chance here, so --

5          MR. MATT:  Your Honor, again, Sean Matt for the class.

6     It's been a while since I've been here.  It's a pleasure to

7     appear before you again.

8          May it please the Court, the BMS final fairness

9     hearing is why we're here today.  We are presenting the

10    settlement for final approval on behalf of three classes.  The

11    three classes are very similar to the classes that you have

12    been familiar with the other settlements in the case:  Class 1,

13    which is comprised of the Medicare beneficiaries which took the

14    seven BMS Medicare drugs, Class 2 --

15         THE COURT:  Can we just back up on that.  So the years

16    are 1991 to 2004?

17         MR. MATT:  That's the class that was certified for

18    settlement, correct.

19         THE COURT:  And who is the class rep currently?

20         MR. MATT:  The class rep is Mrs. Agnes Swayze.

21         THE COURT:  Swayze.  And Reverend Aaronson was the

22    class rep until when?

23         MR. MATT:  Until August 30 -- well, that's a little

24    unclear, but he was not a class rep any longer after your

25    August 31, 2007 order appointing Mrs. Swayze.

1          THE COURT:  Because he withdrew, is that it?

2          MR. MATT:  I think there's some confusion in the

3     record.  He certainly threatened to.

4          THE COURT:  All right, I remember the "threatened to,"

5     but when I was pushing my memory, and I'll ask Mr. Haviland

6     then, I don't know that he ever actually did withdraw.  Did he?

7          MR. MATT:  I don't think there's an actual order to

8     that effect, your Honor.

9          THE COURT:  Or motion to withdraw.

10         MR. MATT:  I do not believe, with respect to Reverend

11    Aaronson, there is not.  Unlike the J&J plaintiffs that were

12    associated with Mr. Haviland and there was an actual motion to

13    withdraw, I don't believe there's been a motion to withdraw

14    Reverend Aaronson.

15         THE COURT:  So I have both of them.

16         MR. MATT:  You do and you don't.  He's not the

17    representative of the settlement classes that you certified on

18    August 31, 2009.

19         THE COURT:  I see, so he's not part of the class that

20    I did the preliminary settlement order of approval on?

21         MR. MATT:  He's part of the class, but he's not a

22    representative, that's correct.

23         THE COURT:  Okay.

24         MR. MATT:  And then Class 2, as you may recall, are

25    compromised of the Medigap insurers; you know, same time

1    period, same payments made from January 1, 1991, and

2    December 31, 2004.  And then Class 3 is a class of both TPPs

3    and consumers who made reimbursements during that same time

4    period for the BMS drugs at issue in the private, non-Medicare

5    context.

6              THE COURT:  Do you remember, in my order, the

7    heartland of the drugs for BMS that I found liability for were

8    which ones?

9              MR. MATT:  You found liability for three drugs:

10   Taxol, Vepesid, and Cytoxan, and Rubex, four drugs.

11             THE COURT:  And Ms. Swayze took what?

12             MR. MATT:  She took Paraplatin.

13             THE COURT:  Yes.

14             MR. MATT:  And that's the only BMS drug that she took.

15             THE COURT:  Was that part of the initial trial?

16             MR. MATT:  Paraplatin was part of the Massachusetts

17   Classes 2 and 3 trial, yes, your Honor.

18             THE COURT:  And I found no liability, was that it?

19             MR. MATT:  You found no liability for Paraplatin,

20   correct.

21             THE COURT:  I had thought she took one of the other

22   drugs.  She said in her affidavit --

23             MR. MATT:  Her affidavit says carboplatin, your Honor,

24   which is the generic name for Paraplatin.

25             THE COURT:  I see.

1      MR. MATT:  So that's why probably you picked up on the

2  difference.

3          So there are seven drugs.  The other drugs that I

4  didn't just mention are Blenoxane and Etopophos, and those are

5  also two drugs for which --

6          THE COURT:  Yes, it was carboplatin, that was the one

7  I --

8          So can I just back up on that because I've not yet

9  resolved her adequacy as a class rep.  So I'm just trying to

10 figure out, is Paraplatin one of the drugs that's receiving

11 some recovery in this suit?

12         MR. MATT:  It is.  Under the distribution formula

13 which we based on co-pays, the Paraplatin is treated as a

14 single co-pay damage drug.  So under the distribution model,

15 people who took Paraplatin would get single their co-pays.  So

16 it's not trebled.  It's trebled for the drugs for which you

17 found damages, your Honor.

18         THE COURT:  Okay.  And with respect to

19 Reverend Aaronson, what drug did he take?

20         MR. MATT:  Reverend Aaronson's deceased wife,

21 Mrs. Aaronson, took both Taxol and Paraplatin.  She was

22 administered those drugs in 2004, which was after the time

23 period where the Court found liability.  You might recall --

24         THE COURT:  And is it after the class period in this

25 case?

be7428d7-0463-4420-b209-dd0c9d5f18bd

1          MR. MATT:  It's in the class period, but it was after

2     the time period where you found that AWP was an average.  And

3     so I know this takes us back a bit but --

4          THE COURT:  That's 2003.

5          MR. MATT:  Correct.  So you basically, I think, were

6     intending to cut off damages in 2003, and we had a big issue

7     just prior to the BMS trial as to whether Mrs. Aaronson was

8     going to be adequate, and it was something that your Honor

9     rose.

10          THE COURT:  Did I ever write on that?

11          MR. MATT:  You never had to make a decision on it.

12          THE COURT:  I never made a decision on that.  The

13     issue was --

14          MR. MATT:  No.  I know there was a motion, BMS filed a

15     motion on it, and plaintiffs responded.

16          THE COURT:  And I never decided that, right?

17          MR. TRETTER:  No.

18          THE COURT:  So as far as at least the law of the case

19     goes, Reverend Aaronson was not precluded from being a class

20     rep by anything I've written and neither was Ms. Swayze?

21          MR. MATT:  That's correct.  Actually, there was an

22     extensive discussion over Mrs. Aaronson's standing at a

23     pretrial conference in which you raised pretty serious

24     concerns, and then Ms. Swayze was brought in after that.

25          THE COURT:  Yes, because --

1          MR. TRETTER:  I think you meant Mr. Aaronson or

2     Reverend Aaronson.

3          MR. MATT:  I'm sorry.

4          THE COURT:  Yes.  And as I understand it from you, you

5     did object to Mrs. Swayze, but we never resolved that.

6          MR. TRETTER:  What happened, your Honor, is, we

7     objected first to Reverend Aaronson on the grounds that his

8     wife received all of her injections in 2004, which was after

9     the Medicare Modernization Act.  So they brought forward a new

10    representative, Agnes Swayze.  And at that time when we were

11    going to trial, we said, "Look, we're not going to give anybody

12    a hard time.  We just want to make sure --" I mean, this was

13    very new, and we said, "Did she get one of our drugs in the

14    time period?"  And from what I can see from her affidavit, she

15    says she received Paraplatin in 2003 and that she avers that

16    she paid for it.

17         MR. MATT:  And the documents back that up too.

18         THE COURT:  But under the same argument, Mrs. Aaronson

19    would be in the same category.

20         MR. TRETTER:  Mrs. Aaronson would not have been in the

21    same category because she was in 2004 after --

22         THE COURT:  Right, fair enough, but it was within the

23    class period as you've defined it in this proposed settlement.

24         MR. TRETTER:  For settlement purposes, yes.

25         THE COURT:  I understand, but that's what I'm dealing

1   with right now, so, okay.

2          MR. MATT:  Just so the record is a little bit clearer,

3   on her Paraplatin administration, your Honor found no liability

4   for Paraplatin.  However, there were spreads over what you

5   called the threshold 50 percent of sales being at list.  It was

6   a drug that I think was a close call, and it's possible that a

7   jury could find otherwise.

8          THE COURT:  I don't remember.

9          MR. MATT:  Yes, I just was pulling out your decision

10  here, and discounting did result in spreads which reached as

11  high as 67 percent at one point, but you still found no

12  liability because largely the spreads were not consistently

13  above 30 percent.

14         THE COURT:  They were mostly below 30 percent.

15         MR. MATT:  Mostly, but there was some above, so I

16  think it's not quite clear that a jury would make the same

17  finding as you did, your Honor.

18         THE COURT:  I'm just trying to remember more than

19  argue.  And that was in my extensive findings of fact and law?

20         MR. MATT:  That's correct, post-trial.

21         THE COURT:  Post-trial.

22         MR. MATT:  Yes.

23         THE COURT:  With respect to which classes, 2 and 3?

24         MR. MATT:  2 and 3, Massachusetts only.

25         THE COURT:  Because at that point Class 1 had already

Page 11

1    settled?

2           MR. MATT:  No.  You just did a test trial on

3    Massachusetts Classes 2 and 3.

4           THE COURT:  No, but help me.  But the Medicare Class 1

5    BMS settled before trial.  No?

6           MR. MATT:  It settled after trial.  In fact, the MOU,

7    the original MOU was signed I believe five days after you

8    issued this opinion, which is reported at 491 F. Supp. 2nd,

9    No. 20.  So that's the chronology of events, and that was on

10   the eve of --

11          THE COURT:  Excuse me.  What did I do with Class 1 on

12   BMS?

13          MR. MATT:  It was on the eve of trial.  We were going

14   to trial, I think probably three weeks later is my

15   recollection.

16          THE COURT:  Let me just -- this case has spanned at

17   this point eleven years, all right.  So my trial was on which

18   date?

19          MR. MATT:  Your trial was in November, 2006, which was

20   Massachusetts Classes 2 and 3.  Your decision comes out on

21   June 21, 2007, with respect to the Massachusetts Class 2 and 3

22   trial.  And then the MOU on behalf of Class 1 against BMS was

23   signed four days later on June 25, and your trial for BMS was

24   scheduled for I think the third week in July.  So that's how

25   the sequence unfolded.

1          THE COURT:  The trial for Class --

2          MR. MATT:  Class 1.

3          THE COURT:  For Class 1.

4          MR. MATT:  BMS, correct.

5          THE COURT:  Okay, thank you.

6          MR. MATT:  You're welcome.

7          So we do have the seven drugs at issue, your Honor.

8   Let's discuss briefly the major settlement terms.  It's a

9   $19 million nationwide settlement, including BMS's agreement to

10  pay up to one-half of $1 million in settlement notice costs.

11  There's no spillover of unclaimed consumer funds to TPPs.

12  There's no cy pres.  The full settlement is going to go to the

13  victims here.  And the allocation of the $19 million is split

14  23 percent to consumers, or $4,370,000, and 77 percent to the

15  TPPs, or $14,630,000.

16          After that agreement was struck on the $19 million,

17  those allocation numbers that I just alluded to --

18          THE COURT:  So there were no independent settling

19  health plans?

20          MR. MATT:  ISHPs aren't treated any separately here.

21  They're just part of the TPP pool, so we don't have that

22  situation here.

23          So once the $19 million settlement was reached, we

24  then had an allocation mediation held before Professor Green.

25  We utilized the same process that was used to allocate the GSK

1   moneys, the AstraZeneca Class 2/3 moneys, and the Track Two

2   proposed settlement, which is still pending, your Honor.

3   Consumers and TPPs were represented by separate counsel.  They

4   went at it, they negotiated it.  They both used Dr. Hartman's

5   damages model as their points of departure, and using that

6   damage model for the entire United States as a touchstone, and

7   ignoring those states that your Honor didn't include in the

8   class, and ignoring for the moment the statute of limitations

9   damages, according to Dr. Hartman, were calculated roughly

10  15.4 percent for consumers and 84.6 percent for TPPs.  Yet

11  consumers in the allocation ended up receiving 23 percent.  So

12  they did better in the allocation proceedings than the

13  underlying damage percentages would have indicated.  And that

14  was on Page 5 of my slides, your Honor.

15       Let's briefly talk about notice because I know your

16  Honor always asks about the notice report.  For Class 1, a

17  claim card was sent to 695,910 potential members as identified

18  in the CMS data.  That means that the CMS data comes back; it

19  appears that there's roughly 695,000 people who were

20  administered a drug that has a J-Code assigned to one of the

21  seven BMS drugs.  A very short form notice and a claim card is

22  sent to them by regular mail.  They were required only to sign

23  a simple statement under penalty of perjury indicating that

24  they made a percentage co-pay.  So the class members have to

25  self-select.  You might recall, we can't tell from the CMS data

1    who actually made a co-pay and who didn't.  Those people then

2    return the cards, and then they receive a phone notice and a

3    claim form where their transactions are mailed to them.  And if

4    they have any sort of a problem with the transactions, they can

5    challenge it with the notice administrator.  And then at the

6    end of this process, some time after approval, then they just

7    get sent a check.  So it's a very simplified process.  They

8    don't have to produce any evidence that they took the BMS

9    version of the drug; they don't have to produce any evidence

10   that they in fact made a co-pay.

11          THE COURT:  Did you actually see evidence from

12   Mrs. Swayze that she took the carboplatin?

13          MR. MATT:  Yes, and that's actually in the court

14   record as well in her Explanation of Benefits form that was

15   attached to the initial filing.

16          THE COURT:  But there are thousands and thousands and

17   thousands, so maybe you could just get me what docket number it

18   is where she puts in that she actually took it in the time

19   period.

20          MR. MATT:  We'll get that document for you.

21          Class 2 and 3, let's talk about notice to them next?

22          THE COURT:  Yes.

23          MR. MATT:  About 41,900 notices were mailed to TPPs in

24   Rust's database.  Rust is the settlement administrator.  I'm on

25   Page 6 of the slides.  And it was also published in HR Magazine

1    and National Underwriter.  And the TPPs were required to

2    complete a comprehensive claim form and submit some

3    representative data, very similar to the process that has been

4    employed with respect to TPPs in the other settlements.

5             Then in Class 3, the consumers in Class 3, we didn't

6    do any individual mailing.  We don't know who they are.  Notice

7    was published in Newsweek, People, and TV Guide.  We utilized a

8    press release.  There was a whole media campaign that you might

9    recall Ms. Kinsella put together and you approved.

10            The Class 3 consumers were required to return the

11   claim form.  They had two options they could elect:  One was an

12   easy refund of $35.  Another was what we call the "full

13   estimation refund option," which they'd complete a simple claim

14   form, estimate their total out-of-pocket damages; percentage

15   co-pays, that is.

16            THE COURT:  How many people?

17            MR. MATT:  We only had 96 claims from Class 3 members.

18            THE COURT:  So that's a problem.

19            MR. MATT:  Well, I'll go over the whole claims

20   experience for all the classes in a bit, but one thing to

21   understand here is, the Class 3 consumer part of Class 3 is

22   extremely small.  These are largely chemotherapy drugs

23   administered to elderly people.  In fact, Dr. Hartman only

24   estimated that the Class 3 consumer portion of the damages were

25   only $240,000 nationwide.  So it's a very small group to begin

be7428d7-0463-4420-b209-dd0c9d5f18bd

1   with.  So, you know, when I saw the 96, I kind of had a similar

2   reaction, it seems kind of low, but it's also a very small pool

3   to begin with.

4           THE COURT:  Well, but a huge number sent back claims

5   for Medicare, right?

6           MR. MATT:  That's because they were identified in CMS.

7           THE COURT:  Right, precisely.  And so I'm wondering

8   whether it's that there were few people or whether it was an

9   identification issue.

10          MR. MATT:  Well, it is because -- I mean, it could be

11  partially because they didn't get direct mail notice, but,

12  again, we think it's such a small group -- at preliminary

13  approval we had kind of debated this, and I think your Honor

14  was --

15          THE COURT:  And 16,500 returned notice cards, right,

16  that the Rust group --

17          MR. MATT:  Class 1 is 17,375.

18          THE COURT:  All right, so it even went up since my

19  last status reports.

20          MR. MATT:  It is a much higher amount than I think

21  anyone anticipated.

22          THE COURT:  So I'm just thinking out loud about the

23  Class 3, but, in any event, we'll move on.

24          MR. MATT:  Just to close up Class 3, you know, I think

25  we had this conversation at preliminary approval, and I think

1   the Court ultimately became comfortable that the class size was

2   so small, it didn't justify spending money to try and do --

3            THE COURT:  I remember that cost/benefit analysis.

4            MR. MATT:  Right.

5            THE COURT:  I do remember that.  And how much did we

6   spend for these 96 claims?

7            MR. MATT:  Uhm --

8            THE COURT:  You don't know?  All right.

9            MR. MATT:  I was afraid you'd ask that.  No.  You

10  know, it's a widespread publication notice.  I'm sure it was

11  more than $100,000.  It was a good-faith attempt, and, you

12  know, they issued 75 press releases; you know, they targeted

13  websites, bloggers, health-related bloggers; and, you know, it

14  was, I think, a pretty sophisticated media program, considering

15  we don't know exactly who they are, that Kinsella put together.

16            So that brings us to the distribution plan.  Now, I

17  think we touched on it briefly, but I want to go over it again

18  because it's important.  On Page 8 of our slides we set forth

19  this.  For the drugs Cytoxan, Taxol, and Vepesid, what we did

20  is, we took the total of the consumer co-pays and multiplied

21  them by three.  Now, these were the drugs that were responsible

22  for most of the damage.  There's no heartland limitation period

23  here in this methodology.

24            THE COURT:  Well, if I found -- a lot of this is just

25  not remembering, all right.  So if I found liability for four

1  drugs, why did we only treble for three?  What was the fourth

2  drug there?

3          MR. MATT:  Rubex is the one for which you found, and

4  the reason we didn't treble I think was because it was a very

5  small percentage.  It was a very small percentage of class

6  damage, that's why.

7          THE COURT:  I think the theory behind the trebling

8  wasn't what percentage of class damages it was as whether or

9  not there was a really strong claim.

10          MR. MATT:  Well, yes, and we thought that the claim

11  was stronger for those three.

12          THE COURT:  No, but I'm talking about in terms of

13  liability.  In other words, that there really -- I can't

14  remember the -- the duration and amount exceeded the speed

15  bump.

16          MR. MATT:  That was how it was originally formulated.

17  What it kind of morphed into with the AstraZeneca Class 1

18  settlement is the big concern about having any cy pres money

19  left over, and so --

20          THE COURT:  I know, there's no cy pres here.  I'm not

21  a cy pres lady for the most part.

22          MR. MATT:  Right, we understand that now, yeah.

23          THE COURT:  So I'm not a big cy pres lady.  But if you

24  added in Rubex as a trebling, is that a violation of any piece

25  of the agreement?

1          MR. MATT:  It's not, no.

2          THE COURT:  And how many people would I be adding?  Do

3     you know?

4          MR. MATT:  Not many.  Under this formula which, you

5     know, is de-linked from damages, it's co-pays, there were

6     $574,000 in total estimated recognized loss.

7          THE COURT:  For Rubex?

8          MR. MATT:  For Rubex.  I'm sorry, that's Vepesid.

9          THE COURT:  Because that's big.  Anyway, you can get

10    back to me on that, but would it be a violation of any aspect

11    of -- in other words, my theory behind it was, the trebling

12    would be the ones who had the clearest damages, you know, the

13    clearest liability and damages, and the others were ones who I

14    found no liability for, or just simply BMS wanted to put the

15    issue to bed in some way, I think; there was some liability but

16    not so clearcut.  You don't care, do you, if I --

17         MR. TRETTER:  Well, one thing your Honor should be

18    aware about Rubex is, that was a drug that was hardly ever sold

19    at all by BMS.  It really is a drug that is Pharmacia's drug.

20    It's called Adriamycin.  So I have a feeling that when Rust

21    received a lot of these claims for Rubex, they really received

22    it for Adriamycin.

23         THE COURT:  I don't know, but if they said it was

24    Rubex, I'm going to live with that.  And so why don't you find

25    out how much it would be.  But you don't care, right?  You have

be7428d7-0463-4420-b209-dd0c9d5f18bd

1   a maximum exposure.

2          MR. TRETTER:  Right, as long as the exposure -- and

3   we're not against re-jiggering, if that's what your Honor is

4   talking about, you know, re-jiggering the distribution within

5   that amount.  You're right, we don't have a dog in that fight.

6          THE COURT:  Okay, okay.

7          MR. MATT:  And to answer your question again, yes,

8   this was predicated on your rulings trying to provide more

9   money to people who --

10         THE COURT:  Who won.

11         MR. MATT:  -- took the drugs who you found liability

12  for.  So that's the whole why it's set up this way.

13         THE COURT:  Yes, all right, so put as a -- I don't

14  know who's taking notes here.  Hopefully we are.

15         MR. MATT:  We are.

16         THE COURT:  All right, just Rubex is a question mark.

17  The second question mark is -- and I'm just thinking about it,

18  and I do remember that cost/benefit analysis of whether it was

19  worth more notice.  Probably for the tiny amount, maybe that's

20  what we expected, but let's just think about that.

21         All right, so what's the next one?

22         MR. MATT:  Okay, so then the remaining drugs in the

23  distribution formula only receive -- they're single co-pays.

24  And they should receive something, they're given a release,

25  and, again, a jury could find differently than your Honor.  So

1   the foregoing comes to a total recognized claim, and then

2   that's reduced pro rata as necessary.

3           Now, the distribution formula itself is generous.  I

4   mean, the payment is based on co-pays, which is not damage.

5   They're greater than actual damages.  We assigned amounts to

6   people even in years where the AWP did not exceed the

7   30 percent threshold.  We ignored the statute of limitations.

8   We didn't require them to prove the BMS version of the generic

9   drug, and they weren't required to submit any other

10  documentation.  So, you know, we tried to make it as easy as

11  possible, again, coming on the heels of the AstraZeneca Class 1

12  settlement and some of the pioneering work that we did with

13  your Honor in terms of boosting the claims response, and it

14  worked.  I mean, we had a huge response.  Page 10 of the slides

15  set forth the statistics.  We have 17,375 claims from Class 1.

16  About 4,700 of those are deficient.  They didn't sign under the

17  penalty of perjury, for instance, is the most common

18  deficiency.  We asked Rust -- you know, it seems like a pretty

19  easy thing to do -- "What is your expected cure rate?" because

20  they returned it and say, "You need to cure this problem," and

21  they said the expected cure rate is only 25 percent.

22          THE COURT:  How much would it cost to actually try and

23  place a phone call to these people?

24          MR. MATT:  I don't know.  I'd have to ask Rust.  I

25  just don't know.

1          THE COURT:  I know 4,791 is a lot, but they're old

2    people, right?

3          MR. MATT:  They are.  They will receive a very simple

4    letter just saying, "All you have to do is sign this and return

5    it."  But the way Rust explained it to me, there's inertia, so

6    a certain percentage are just not going to respond to direct

7    mail.  Even though they sent something in once, they just don't

8    expect they're going to respond, because I challenged them on

9    it.  I said, it seems like a pretty low percentage.  They were

10   speculating that some people didn't take the BMS version of the

11   drug and weren't comfortable signing under penalty of perjury,

12   because we did ask them to do that, and that could be

13   represented in the large deficiency percentage.  You know, we

14   don't really know, but those are based on Rust's informed

15   experience, and they've been doing this for many years in a lot

16   of settlements.

17          The Class 2/3 TPP claims, about 695.  There's actually

18   more than that because a lot of times claims are submitted on

19   behalf of multiple TPPs.  It's pretty much subscribed as if --

20   it's pretty much subscribed in the same percentage expected in

21   the other settlements that we have, so there's no surprises

22   there.

23          And Class 3, again, 96 claims.  Most of them elected

24   the easy refund option; and, again, it's not surprising that

25   there are few class members there, given that their damages

1    calculated for that entire class for that entire period was

2    only about $240,000.

3              THE COURT:  $240,000 in --

4              MR. MATT:  I can give you the precise number.  It's

5    actually $243,760.

6              THE COURT:  But for how many people?

7              MR. MATT:  Well, we don't know how many people, but

8    just going from aggregate -- remember Dr. Hartman did an

9    damages model that looked at total spend, and looking at total

10   spend, the damages for Class 3 came to that amount, a very low

11   amount.

12             THE COURT:  I think I would need more of a record for

13   that as to --

14             MR. MATT:  Okay, we can put in a declaration from

15   Dr. Hartman.

16             THE COURT:  Because 96 does seem low.  I do remember.

17   I'm not saying that the notice wasn't fair.  We did say that

18   that was the best, it was a good-faith effort from class

19   counsel, given it was a smaller class, but 96, I'm just

20   wondering whether there's -- you know, we devised these other

21   attempts in other litigation to try and get at these people.

22   You know, I remember -- I see Mr. Sobol back there -- didn't we

23   go back through TPPs sometimes and we did things?

24             MR. MATT:  That's correct.  In Track Two, for

25   instance, which is pending and will be before your Honor on

1    June 13, if I remember correctly, the TPPs had a database of

2    people prescribed these drugs in the Track Two universe, the

3    ones that were self-administered, and if I remember correctly,

4    we ended up sending 770,000 individual notices out in

5    association with --

6            THE COURT:  And what did we get back?

7            MR. MATT:  -- Class 3 consumers.

8            THE COURT:  And did we get a good return on that?

9            MR. MATT:  I unfortunately don't know.  I'm not a

10   Track Two guy.

11           THE COURT:  All right, well, we'll put that on a hold,

12   okay?  We'll figure that out.

13           MR. MATT:  Okay, so we asked Rust to take all of these

14   claims that came in for Class 1 -- and I'm turning to Page 11

15   in the slides -- and we said, let's see if we can estimate the

16   total actual damages associated with these claims because we

17   know that the total recognized loss is going to be, you know,

18   many, many times higher than their actual damages.  So we had

19   them actually take Ray Hartman's estimated damages for each

20   drug and apply it to the co-pays that they have in the data

21   from CMS; and when they did that, assuming a 25 percent cure

22   rate for claims, the total damages associated with that class

23   comes to about $3.9 million.  And even that overstates damages

24   because it just takes a blend.  So, for instance, for Taxol,

25   the damage factor itself is 34 percent.

1          THE COURT:  So we don't know how that would be

2     affected if we included the trebling for Rubex?

3          MR. MATT:  I'm sorry, can you ask that again?  I want

4     to make sure I'm tracking with you.  That doesn't really tell

5     us anything about Rubex.  This is just an aggregate number.

6          THE COURT:  Right.

7          MR. MATT:  Now, we can get that number, okay?

8          THE COURT:  Okay.

9          MR. MATT:  We can get it drilled down to Rubex, but we

10    don't have it in Eric Miller's declaration from Rust.  But

11    they've got that data at their fingerprints, and when we get

12    back to you, we can provide that information.  And the

13    $3.9 million damages associated with Class 1 is comfortably

14    lower than the $4.3 million that Class 1 was allocated.

15          Now, because of the nature of the distribution

16    formula, the percentage of damages received does vary from

17    52.5 percent to 102 percent, based on a small sample that we

18    had Rust run, and the amount received --

19          THE COURT:  Is that recent because now you know exact

20    numbers?  Now you have exact numbers with the exception of the

21    25 percent cure rate.

22          MR. MATT:  Correct.

23          THE COURT:  So is that exact or as close as we're

24    going to get right now?

25          MR. MATT:  That is -- we actually pulled thirteen real

be7428d7-0463-4420-b209-dd0c9d5f18bd

1    claims, real live claims just randomly, and then we did

2    Mrs. Aaronson as well, and that's how we got those numbers.  So

3    those are real numbers.  We've got the data.

4              THE COURT:  And that's assuming what percentage for

5    attorneys' fees?

6              MR. MATT:  Assumes what you have been awarding, which

7    I know to be 30 percent.  That assumes a 30 percent attorneys'

8    fee and takes out some administration costs assigned to Class 1

9    as well.

10             Now, the amount any individual class member receives,

11   of course, depends on the drug administered because of the

12   distribution formula.

13             So let's look at the reaction of the class.  Your

14   Honor, we have four consumer opt-outs from Class 1.  We have no

15   consumer opt-outs from Class 3.  We have twelve TPP opt-outs.

16   We have no TPP objections, we have no Class 3 consumer

17   objections, and we have a single Class 1 consumer objection,

18   and that's Don Haviland's client, Mr. Aaronson.  Now --

19             THE COURT:  Is there an argument that since they're

20   only getting 23 percent of the moneys, that they should only

21   pay 23 percent of the expenses?

22             MR. MATT:  In the allocation, they agreed to split

23   expenses 50/50, I think.

24             THE COURT:  So why is that fair?  In other words, I'm

25   thinking through all these issues.

be7428d7-0463-4420-b209-dd0c9d5f18bd

1          MR. MATT:  Right, that's an interesting -- you know,

2     that was not negotiated by us.  That was the allocation

3     proceeding in which, you know, we actually don't play a role.

4     Consumers and TPPs had separate representation.  We just, you

5     know, provided information in response to their requests.

6          THE COURT:  I mean, just put that on the punch list.

7          MR. MATT:  Okay, that's the next item on the punch

8     list then.  Oh, that's right, yeah, co-counsel just reminded

9     me.  Allocation counsel believe that was a good deal for

10    consumers because the notice costs were much higher because,

11    you know, a mailing went out to 695,000 people, okay, and they

12    had to manipulate the CMS data.  So the notice was more

13    expensive for them than it was for the TPPs, which were already

14    in a database.  There was 40,000 of them in a database that

15    Rust already had.  So that does comport with my recollection of

16    what allocation counsel told me at the time.  They thought they

17    were getting a good deal --

18         THE COURT:  That would be a way of thinking about it

19    because they got percentagewise a smaller amount of the

20    dollars.

21         MR. MATT:  They did.  They got 23 percent, although

22    their damages were 15 percent, so, you know, allocation counsel

23    also felt that they got really good deal in that respect too

24    for the consumers.

25         THE COURT:  And so when BMS agreed to spend up to a

be7428d7-0463-4420-b209-dd0c9d5f18bd

1  million dollars in notices in addition, that was in context

2  with the first MOU, right?

3       MR. MATT:  Second as well.

4       THE COURT:  I know, but I'm thinking --

5       MR. MATT:  Oh, yes, yes, I follow your track.  Yes,

6  the answer is "yes."

7       THE COURT:  And so how much money did it cost for

8  Class 1?  Do we know ballpark?

9       MR. MATT:  We just got a notice bill of about

10  $700,000.

11       THE COURT:  That's one way of thinking about it.  So,

12  all right.  I'm trying to get to a point where I can at least

13  understand a little bit better.  So when it says 52 percent to

14  102 percent percentage of damages, does that include the

15  trebling?

16       MR. MATT:  No, it does not.  That is just a look at

17  their actual damage, so that takes --

18       THE COURT:  So suppose I were to take the four

19  heartland groups, including Rubex, and how many of them are

20  going to be able to -- they're the ones where there was just

21  really strong liability, really strong.  So how many of them

22  are going to be able to get treble based on current numbers?

23       MR. MATT:  Based on the current projection, no one is

24  going to get treble.

25       THE COURT:  No one is going to --

1          MR. MATT:  No one's going to get treble.  Again, this

2     is the disconnect between their true damage and the co-pay

3     distribution model.  Again, when we recommended this

4     distribution model, everyone was concerned about cy pres

5     because of the experience in AstraZeneca Class 1.  So, you

6     know, we basically made it as generous as we could so we could

7     minimize or hopefully not have any cy pres left over.

8          So that's how the distribution methodology works, but

9     we're looking now at their actual damages, okay, and comparing

10    their actual damages to what they're ultimately going to get,

11    and we're finding that some people are getting less and some

12    people are getting more.  It depends on what drug you took.

13    Largely, if you took Taxol, particularly in combination with

14    something else, then, you know, these people are getting

15    100 percent of their actual damages, using Ray Hartman's

16    damages figure, including Mr. Aaronson.  So that's what we're

17    looking at now.  We're drilling into the actual, you know,

18    damage numbers used by Ray Hartman.

19          THE COURT:  Does anyone get treble?

20          MR. MATT:  No.

21          THE COURT:  No one gets treble.  So unlike some of the

22    other classes where some people get treble, no one because of

23    this distribution is getting treble?

24          MR. MATT:  That's correct.

25          Now, let's talk about the overall fairness of the

be7428d7-0463-4420-b209-dd0c9d5f18bd

1   settlement, and this brings us to Page 13 of our slides.

2              THE COURT:  Well, let me --

3              MR. MATT:  I know, we're throwing a lot of numbers at

4   you, but --

5              THE COURT:  No, no, I actually read it before I walked

6   in here.  I've read everything at this point.  So it doesn't

7   ever say in the papers that no one gets treble, so I didn't

8   actually understand that, no one does.  So when you say 52 to

9   100 percent, it's assuming everyone is just getting actual?

10             MR. MATT:  Correct.  Well, it's 102 percent.  And this

11  is based on a small sample.  There could be people outside of

12  the 102 percent.

13             MR. TRETTER:  Can I be heard briefly, your Honor?

14             THE COURT:  Yes.

15             MR. TRETTER:  I mean, when you say 50 to 102 percent,

16  I think that there is one point that you're missing.  Some

17  people had no damages.  Let's say Paraplatin in many years, I

18  think in all years, or Taxol throughout the 1990s, under your

19  ruling there was zero because it never exceeded the 30 percent

20  threshold.  However, in this settlement there are substantial

21  funds going to, for example, Reverend Aaronson's former wife

22  because of Taxol and Paraplatin.

23             THE COURT:  I'm at this point not worried about any

24  individual, okay?  I'm worried only about the fact that there

25  was a period of time where in my view -- and I was upheld --

1    BMS under any theory of the case was liable.  It was a very

2    strong heartland period with the 30 percent whatever, and I

3    want to make sure that those people who had the strongest

4    claims, just as we've done in other settlements, got a

5    stronger -- even if Aaronson is excluded, even if Swayze is

6    excluded, that the heartland people get the biggest recovery.

7              MR. TRETTER:  I would suggest that you would have to

8    take money from the Paraplatin and Taxol buckets, where there

9    were no damages, and move them into the Cytoxan, Vepesid, Rubex

10   buckets.  If you wanted to treble those, you'd have to do it

11   that way.

12             THE COURT:  Well, what if I were to treble -- I

13   don't -- I'm not here at this point worried about, as I said,

14   any individual.  If you were to take all the people who had the

15   heartland claims we've been calling them in other -- didn't we

16   do this with other classes? -- the heartland period of time and

17   the heartland claims and trebled them, would we have enough

18   money for that?

19             MR. MATT:  Here I think you could do -- I don't know

20   the answer to the question.  You would have to certainly do a

21   rebalancing.

22             THE COURT:  At least doubled them.

23             MR. MATT:  I don't know the answer to that question

24   either.  We haven't done the analysis.  We can.  But the

25   rebalancing that Lyndon has just discussed I think is what

1  would have to occur.

2          THE COURT:  Which classes did we do that for?

3          MR. MATT:  What we're speaking of, your Honor,

4  AstraZeneca Class 1 specifically.  What we did there in

5  response to your Honor's suggestion was to treble the claims

6  for those people who had their Zoladex administrations inside

7  the heartland period, so there was only one drug at issue there

8  in the AstraZeneca class.

9          THE COURT:  Right, and here we've got three or four,

10  depending on --

11          MR. MATT:  So you looked at a time period, and you

12  said, "Okay, this is the time period where liability is

13  strongest.  We're going to treble that."  So that's where it

14  started.  Here we're not looking at time periods at all.

15          THE COURT:  I am.

16          MR. MATT:  We're looking at drugs.

17          MR. MATT:  Well, you're looking at drugs, right?

18          THE COURT:  No.  I'm looking at both.  I'm looking at

19  both.  I'm trying to be consistent across the classes.  Listen,

20  I understand you have been working very hard, and for reasons

21  that are not totally clear to me, this is at the end of the

22  list rather than at the beginning of a list.  Now, there was a

23  two-year hiatus there that I've not totally understood, but, in

24  any event, this is at the end of the list, not the beginning.

25  So I have the history of the other litigations that maybe the

be7428d7-0463-4420-b209-dd0c9d5f18bd

1   allocation counsel didn't have.  But I also think there's some

2   fairness -- you know, I gave Glaxo certain attention because it

3   was the first one and we didn't have the experience, and, you

4   know, you were first out of the box.  So I'm trying to

5   understand it a little better and working with what we've come

6   to learn.  And so AstraZeneca we gave the one drug for the

7   heartland period, we trebled, and everybody else got singles?

8   Is that what we did?

9              MS. CONNOLLY:  No.  You trebled for both --

10             THE COURT:  What?

11             MR. MATT:  We ultimately ended trebling because even

12  after you did that, there was so much money left over for

13  cy pres that you wanted to see more money go back to the

14  consumers.

15             THE COURT:  So we trebled everyone.

16             MR. MATT:  So we ended up trebling everyone

17  ultimately.

18             So let's return to the overall fairness of the

19  settlement.  I think it's something that we need to keep in the

20  perspective.  You know, nationwide damages, removing statute of

21  limitations, extending the class period all the way back to

22  1991, even though the Court said no liability prior to 19 --

23  kind of best-case plaintiffs' damages in this case against BMS

24  is $30 million calculated by Dr. Hartman.  The $19 million

25  resulted in a recovery of 62 percent of the $30 million.  I'm

1   on Page 13 of the slides.  That is in comparison to AstraZeneca

2   which was 42 percent.  The reason we make that comparison, your

3   Honor, is, we do not believe that this case against BMS is as

4   strong as the case against AstraZeneca; yet we were able to

5   recover 62 percent of the class's damages, so we feel it's a

6   very, very strong settlement.

7        Now, why do we think the risks are higher here?  You

8   know, BMS you found, your Honor, did not report AWPs; they

9   reported list prices, which a significant percentage of people

10  actually paid from time to time.  Many wholesalers actually

11  bought at that price, especially when the drug had no

12  competition.  You found that "BMS did not completely control

13  the AWP percentage markup of its drugs," and that's a quote.

14  You found no liability for drugs and periods where substantial

15  sales were greater than 50 percent at wholesale list price.

16  You found little spread marketing evidence.

17        THE COURT:  But this was all negotiated after the

18  trial.

19        MR. MATT:  Correct, so we had the benefit of the trial

20  experience.

21        THE COURT:  Right, so there wasn't much risk anymore.

22        MR. MATT:  Pardon me?

23        THE COURT:  There wasn't much risk anymore once you

24  negotiated this.  I'd already ruled.

25        MR. MATT:  You had, but I think there was still a lot

1    of risk.  I mean --

2            THE COURT:  Because of the appeals?

3            MR. MATT:  Yeah, well, the appeals is certainly a big

4    risk, and we still have to go do the case before a jury.  A

5    jury could find differently.

6            THE COURT:  Only the jury on part of it.

7            MR. MATT:  Most of the UDTPA statutes, your Honor,

8    that were in the class that was certified for litigation, you

9    know, have jury trials associated with them.

10           THE COURT:  All right, thank you.

11           MR. MATT:  The Massachusetts statute is actually in

12   the minority.

13           And it is on appeal.  The appeal to the First Circuit

14   has been stayed pending your Honor's determination on the

15   overall fairness of this settlement.  So, you know, there was

16   significant risk, not only going to trial but also on appeal.

17   And other risks included, you know, the difficulty in

18   identifying the BMS version of the generic drugs reimbursed

19   under common J-Codes, which I think is fueling the large claims

20   experience here.  I think we have a lot of people who, you

21   know, took a drug under the J-Code, they were mailed a notice,

22   and they may not necessarily have taken the BMS drug.  It's

23   just the best we can do.

24           So I do think it's a very, very strong settlement,

25   particularly in comparison to AstraZeneca, which we thought was

1    a stronger case.

2         So that brings me now, your Honor, to Don Haviland's

3    objection.

4         THE COURT:  Well, before we get to that, maybe I

5    should let him speak as to what his current objection is

6    because it may have changed based on some of this data.

7         MR. MATT:  Okay, and then if we can reserve some time

8    to reply to that.

9         THE COURT:  Before we do that, so what latitude do I

10   have?  They don't care as long as it's $19 million, right?

11        MR. TRETTER:  That's right, your Honor.

12        THE COURT:  And I understand there were allocation

13   counsel between TPPs and consumers.  Are they in the room?

14        MR. MATT:  Two of them are, your Honor, Wells

15   Wilkinson who represented consumers and then Mr. Cohen who was

16   TPP counsel.

17        THE COURT:  Okay.  So one of the concerns might be --

18   and I don't know if I can number crunch this today -- if I

19   wanted to make it consistent with AstraZeneca in the sense of

20   providing double or treble, multiple damages to people who had

21   the strongest claims, but some damages to the people in the

22   full period of time, even if that meant that some of the people

23   with the weaker claims got a little less, are those numbers --

24   let's suppose we were to come up with them, am I bound by, in

25   your view, the allocation, or can I play with the allocation?

Page 37

1    In other words, to give every person in the heartland period,

2    let's say, double and everybody else single, how much into the

3    other piece of the TPP pie do I go?

4            MR. MATT:  I think, your Honor, it's a two-step

5    process.  I don't know if you even have to get there because

6    what we would do -- and it sounds like you want us to do this

7    so we'll do this --

8            THE COURT:  Yes.

9            MR. MATT:  -- is take a snapshot of what a rebalancing

10   looks like within Class 1, giving people their damages, their

11   damages only for periods in which you found liability, and

12   then double --

13           THE COURT:  Well, it might be the consumers in Class 3

14   too.

15           MR. MATT:  Yes, they're included in the pool, so it's

16   consumers total -- and take a look at the math and see what it

17   looks like at this point, report back to your Honor and say,

18   "We did this rebalancing.  We looked at their damages.  We did

19   double for the heartland drugs, the three drugs, and there's

20   enough money --"

21           THE COURT:  Four, four.

22           MR. MATT:  Four because you want Rubex added in, and

23   we can come back and say, "Okay, there is enough money to do

24   this and accomplish what you're suggesting to be accomplished

25   with the money that's already allocated to Class 1," or, "No,

1    your Honor, we can't.  There's not enough money there, and

2    we're short X amount."

3              THE COURT:  And then can I --

4              MR. MATT:  And then you make a decision from there.

5    In terms of whether you can do it, I mean, your Honor, whether

6    a settlement is fair and reasonable is within your discretion.

7              THE COURT:  So as far as you're concerned, the

8    allocation counsel, the only person I actually have to be

9    worried about is BMS in terms of the deal.  Between allocation

10   counsel for TPPs and consumers, you represent the whole

11   umbrella.

12             MR. MATT:  Correct.

13             THE COURT:  You can essentially represent -- I guess

14   I'm just not bound by what allocation counsel did other than

15   that was one fair way of proceeding before Mr. Green.

16             MR. MATT:  That's correct, your Honor, but if you

17   change the allocation, I mean, we have to look into whether

18   notice has to be redone.  If you rebalance it within Class 1, I

19   don't think you have to re-notice all of Class 1.  I think you

20   can just --

21             THE COURT:  Of course I don't, no.

22             MR. MATT:  You just have to re-notice, I think,

23   probably the people who submitted the claim cards, so 17,000 --

24             THE COURT:  I'm not sure I have to re-notice at all

25   because that's what the fairness hearing is about.

1        MR. MATT:  I don't know the answer to that.  I'm

2   basically suggesting we need to look into that.

3        THE COURT:  I don't think we re-noticed everyone, did

4   we, in AstraZeneca?  Did we?

5        MR. MATT:  Well, you were giving them more.

6        THE COURT:  Oh, I was giving them more.  I see, I see.

7        MR. MATT:  So if you rebalance, you're probably going

8   to be taking away from Paraplatin people and --

9        THE COURT:  Well, I don't know.  That's why I wanted

10  to make sure there was enough.

11       MR. MATT:  Now, if you change the TPP allocation, I

12  think you've got to re-notice the TPPs probably.  You know, we

13  can look into that.

14       THE COURT:  How much did that cost?

15       MR. MATT:  That's not that expensive, your Honor.  You

16  know, there was direct mail notice to 41,000 of them, and, you

17  know, I think that we have to take a look at that.  I just

18  can't automatically say.

19       THE COURT:  Okay, all right, all right, I understand.

20  I need to put this all into my cauldron and figure this out.

21       MR. MATT:  I don't want to commit to that either way,

22  but it's an issue that I wanted to red flag that we have to

23  look into.

24       THE COURT:  Yes.

25       MR. MATT:  Okay.

1          THE COURT:  Okay, fine.  All right, the objections,

2     Mr. Haviland, go ahead.  Do you want to come on up?

3          MR. HAVILAND:  I will.

4          THE COURT:  In the notice, we don't mention doubling

5     or trebling, do we?

6          MR. MATT:  We do.  In the distribution formula we tell

7     people in Class 1 that they're going to have their co-pays

8     trebled, and that's going to form the total recognized lost

9     base factor for the three heartland drugs, and then it's single

10    co-pays for the other drugs.  That was in the notice.

11         THE COURT:  Oh, so then why would I have to re-notice

12    it?

13         MR. MATT:  I don't know.  We need to look at it.

14         THE COURT:  Think about it, think about it.  All

15    right.

16         MR. HAVILAND:  Good afternoon, your Honor.  Don

17    Haviland.  My son gave me a cold, I'm sure in the last 48

18    hours, so my voice isn't as strong as I'd like it to be.

19          I just looked at the chart with Mr. Sobol to see

20    whether there was enough money.  I don't see it.  I just don't

21    see it.  I'm looking at an exhibit from the Declaration of Eric

22    Miller, March 14, Docket 7459, and it's a tab on Page 26 of 44

23    which lays out essentially how they're spending the money, if

24    you were to award fees and costs, $2.8 million.  Just to try to

25    double the Taxol, which, your Honor, I'm here for

be7428d7-0463-4420-b209-dd0c9d5f18bd

Page 41

1    Reverend Aaronson.  Let's just be very clear.

2             THE COURT:  Yes, actually, could you start off with

3    that?

4             MR. HAVILAND:  Sure.

5             THE COURT:  I can't remember.  This case has been

6    going on for a very long time.

7             MR. HAVILAND:  I thought that would be helpful.  Let

8    me back up.

9             THE COURT:  Did he, in your view -- I remember being

10   annoyed because you said, "Then I'll take away my class rep."

11   So did that actually happen?

12            MR. HAVILAND:  No, your Honor, and let me just try to

13   clear the air for the first time in many, many years.  You

14   know, when I was asked to come in with my old firm and try to

15   help this case out, we had represented thousands of people in

16   the Lupron case before Judge Stearns, cancer patients.

17   Reverend Aaronson is a prostate patient, recovered in the

18   Lupron settlement.  His wife unfortunately had breast cancer

19   and passed away.  So when we were asked to try to identify some

20   class representatives in August of '05, when your Honor wrote

21   your opinion saying, "I'm inclined to certify a class, but you

22   don't have a rep," Mr. Sobol and I had a lunch down in

23   Philadelphia, and he said, "Do you think you could help us

24   out?"  I said, "Sure.  We'll talk to our clients."

25            And we then, I think we filed the third amended class

1   action complaint back then, and we intervened all these people:

2   Reverend Aaronson, Mrs. Aaronson, Mrs. Howe, her late husband,

3   Mr. Howe, who was our AstraZeneca class representative.

4          THE COURT:  You know, let's just stick right now with

5   BMS.

6          MR. HAVILAND:  Sure.  So the Aaronsons were appointed

7   by your Honor in January of '06, okay.  Your opinion, which I

8   have a copy of but it's a reported decision, actually makes

9   that appointment.  And that's significant because you asked the

10  question, "Where are they now?"  233 F.R.D. 229 is your

11  decision, and in the very first page, Paragraph 3, you say you

12  certify the following plaintiffs as representatives:  David and

13  Sue Ruth Aaronson as GlaxoSmithKline and BMS Class 1 reps.

14  They're my clients.

15         Mrs. Aaronson was getting very sick at the time of her

16  deposition.  Her husband took the deposition not once but

17  twice, so he went through the gauntlet in this case.  I think

18  there were ten defense lawyers that examined him the second

19  time around.  He's 84 years old, your Honor.  He's very sick

20  himself, and I just want you to know, when we sent notices out

21  last week --

22         THE COURT:  Let's just move --

23         MR. HAVILAND:  So Reverend Aaronson just wants to try

24  to make this work, okay?  So that's what I'm here to do.

25         THE COURT:  What happened when -- at some point I was

1   under the impression that he was unhappy, he was withdrawing.

2   I disqualified you.  I can't even remember the whole thing.

3   Did he ever actually withdraw?

4        MR. HAVILAND:  He didn't, no.  What happened was, I

5   think -- it's hard for me to understand what happened other

6   than there was a huge breakdown between counsel in the room and

7   myself in trying to communicate what my clients were saying

8   about what they thought about the litigation and then what the

9   other lawyers were doing with their TPP clients.  I think that

10  that's essentially what's happening.  You didn't have any

11  Class 1 representatives over here; you had all my clients.  And

12  I have this bad habit of calling them and talking to them a lot

13  about their case, so --

14       THE COURT:  I'm just trying to -- so we had this

15  hearing, and you were angry and they were angry.  And then I

16  approved a class where Mr. Aaronson was not a class rep and

17  didn't hear from anybody.  So you're saying that he wants to

18  still be a class rep?

19       MR. HAVILAND:  No.  Let me see if I can be clear about

20  that.  The first one you approved was GlaxoSmithKline.

21       THE COURT:  I understand.

22       MR. HAVILAND:  $70 million, and he's the rep there.

23       THE COURT:  Right.  I'm talking about BMS.  Tell me

24  about BMS.

25       MR. HAVILAND:  All right, in BMS, I think what

1   happened -- you've got to go back to the summer of '07.  It's

2   about that time AstraZeneca settled.  It's about that time

3   Mrs. Howe, my client, didn't like that the agreement, the MOU,

4   had set aside about $10 million of cy pres for PAL,

5   Mr. Wilkinson's organization.  We objected to that.  Your Honor

6   said, "File an affidavit under seal, Mr. Haviland, explain the

7   objection."  We did.

8           MR. MATT:  It wasn't set aside for PAL, your Honor.

9   It's just not true.

10          MR. HAVILAND:  You can look at the record, your Honor.

11   My affidavit has it.

12          THE COURT:  I have no memory.

13          MR. HAVILAND:  The bottom line is, that was the

14   objection we raised.  I think your Honor agreed; you're not a

15   cy pres judge.  So more money needed to go back to the

16   consumers, and that happened.  But at the same time BMS was

17   going to trial.  I think the Astra trial was the spring of '07,

18   and we had a July 23 date in BMS.  There was an effort to

19   attack the Aaronsons' standing, and their adequacy was defended

20   by both myself and class counsel.  We filed pleadings.

21          So when we all appeared before you July 3, 2007, which

22   to me is the important date -- that's the date we all stood

23   before you two weeks from trial -- I didn't know the case had

24   settled at that point.  We were still working through the

25   AstraZeneca settlement, and it was announced to you that the

1    case had settled.  I'll never forget Mr. Tretter turning around

2    and saying, "Well, what does Mr. Haviland think?" and I said,

3    "Well, it's the first I'm hearing about this, and I'll have to

4    talk to Reverend Aaronson."  And you said, your Honor, "Well,

5    as long as Mr. Haviland is co-lead counsel, keep him in the

6    loop."

7              So I went back and I talked to Reverend Aaronson, and

8    we discussed this settlement, $13 million.  This is the one

9    that I'm here on today; a signed MOU signed by Mr. Matt and

10   Zenola Harper, the general counsel, with Mediator Green, agreed

11   to $13 million for consumers, which to headline where I'm going

12   today, if you enforce that settlement, I go home.

13             THE COURT:  Excuse me.  My only issue here today --

14             MR. HAVILAND:  Yes.

15             THE COURT:  -- is the current settlement fair and

16   reasonable?  That's part of the context.

17             MR. HAVILAND:  Yes.

18             THE COURT:  All I have in front of me today is whether

19   the $19 million settlement is fair and reasonable.  I

20   understand you think it isn't.  And I'm not here to enforce a

21   contract because contracts can be modified, and so I'm only

22   here as a class action judge, not a contract -- I'm not in

23   contract litigation.  But let's just -- let's just -- I just

24   want to understand this.  You don't view Aaronson as currently

25   a class rep?

1        MR. HAVILAND:  No, I think he is, your Honor.  I

2   believe that your order --

3        THE COURT:  Well, then get me there, okay.

4        MR. HAVILAND:  In January of '06 you appointed all my

5   clients as the Class 1 class reps.  You've never rescinded that

6   order.  Reverend Aaronson never withdrew.  What happened was,

7   when we were having that rift you identified, I was asked by my

8   clients to step up and make sure their interests were

9   protected.  I then asked to modify CMO-1, your very first

10  order, to make clear that the interests of consumers would be

11  protected.  I kept getting outvoted, and I think you saw that

12  in the record back then that I was getting outvoted on issues.

13  So that rift never got resolved.  The affidavits I filed with

14  Reverend Aaronson, Mrs. Howe that your Honor was so upset about

15  and, you said that they were toys, being treated as toys, were

16  the honest affidavits of those folks.  Mrs. Howe actually

17  underscored the part --

18       THE COURT:  Well, what did they say?  They said --

19       MR. HAVILAND:  They said, "We just want to know that

20  Mr. Haviland is going to be there with his firm to protect our

21  interests."

22       THE COURT:  And if not?

23       MR. HAVILAND:  "And if not, then we're going to go."

24       THE COURT:  Right, that's what I remember.

25       MR. HAVILAND:  Right.

be7428d7-0463-4420-b209-dd0c9d5f18bd

1          THE COURT:  That's what I remember.  Now, it may be

2     that we didn't cross the T and dot the I.  I deemed that a

3     withdrawal.  Now, maybe I should have issued an order deeming

4     them no longer class reps, but, you know, no one asked me to

5     and I didn't do it.  But I remember at the time distinctly

6     believing, because I remember there was then a problem with the

7     class, and I said, "Can you find someone else?"  Wasn't that

8     how this all evolved?  I remember thinking that that might

9     undercut the whole class action, and I think I deemed it, and I

10    think no one disabused me of it, as a withdrawal that might

11    undermine the viability of the class.

12         MR. HAVILAND:  Well, I don't think anybody got that

13    from you, Judge.  I certainly didn't.  What happened was --

14         THE COURT:  Well, they must have because they went out

15    and got someone else.

16         MR. HAVILAND:  Well, I continued as class counsel up

17    until the point you disqualified me three months after I

18    appeared in front of you in January of 2008, I believe it was.

19         THE COURT:  That's probably because it took me so long

20    to write the opinion, but three months, two or three months or

21    whatever.

22         MR. HAVILAND:  Well, it was a quick opinion.  And in

23    the interim I was continuing to represent the consumers.  I

24    took the appeal of Johnson & Johnson on behalf of Shepley, and

25    your Honor pointed out, "Boy, I wish someone had pointed out to

1    me that I had dismissed the whole class."  Well, we took that

2    appeal.  And then you disqualified my firm, myself, and they

3    substituted in.  My clients are not happy at all with how that

4    case is going, and they withdrew.  And your Honor now has a

5    sanction order against me that we've had to appeal because, you

6    know --

7              THE COURT:  Well, where is that?

8              MR. HAVILAND:  It's in the First Circuit now because

9    you have a sanction against me ever being class counsel, and I

10   just can't have that --

11             THE COURT:  Never being class counsel -- no, here,

12   here.

13             MR. HAVILAND:  No, no, anywhere, your Honor, you said

14   anywhere.

15             MR. MATT:  In AWP-related litigation.

16             THE COURT:  In AWP.

17             MR. HAVILAND:  In a Federal Court.

18             THE COURT:  In AWP.

19             MR. HAVILAND:  In a Federal Court, you said I cannot

20   be class counsel --

21             THE COURT:  Yes, but not ever in any case from the

22   beginning of time.  At least I didn't plan to do that.  I

23   mean --

24             MR. HAVILAND:  But why that's important, your Honor,

25   is, I am class counsel in a New Jersey case.  I've been in that

1  case in 2003, and the defendants keep threatening to remove it.

2  The moment I come to Federal Court I'm out, and defense counsel

3  would love to see that because they disqualify me on your

4  order.  And I've never had a vetting on that.  As a matter of

5  fact, your Honor, you know what I've been doing the last year?

6  Trying cases.  I tried a case against BMS.  I got $27.6 million

7  against them in a case in Pennsylvania, so --

8          THE COURT:  Excuse me.  That was a long time ago.

9  That hasn't had a ruling yet from the First Circuit?

10         MR. HAVILAND:  No, no, no, it's never had a ruling in

11 the First Circuit.  Every time I try to get a ruling from the

12 First Circuit it gets opposed.  So the sanction order you just

13 did, which I think the issue which we're doing a reply brief

14 this week on is, counsel in the room says it's an extension of

15 your disqualification order.

16         Your Honor, I would be happy to never come --

17         THE COURT:  What?  You are now losing me.  Can I just,

18 like, just focus here?

19         MR. HAVILAND:  Please.

20         THE COURT:  So they said, "We're not happy the way

21 things are going, and, therefore, if he's not counsel, we don't

22 want to be part of this."  I remember viewing that as a

23 withdrawal.

24         MR. HAVILAND:  Okay.  I didn't hear that, your Honor,

25 nor did I think the counsel because we continued with the

1    representatives in place.

2        THE COURT:  Well, can I just -- all right, you'll just

3    keep notes as to what you're going to respond.  All right, so I

4    did, and that's why we came back with Swayze.

5        MR. HAVILAND:  Okay.

6        THE COURT:  And, in any event, it doesn't matter; he

7    still has the right to object.

8        MR. HAVILAND:  Right.

9        THE COURT:  He's still a member of the class, he

10   didn't withdraw from the class.

11       MR. HAVILAND:  Sure, and so --

12       THE COURT:  All right, so now you're objecting.

13       MR. HAVILAND:  Now we're objecting because

14   Mrs. Aaronson, Reverend Aaronson, they have been in this case

15   since 2005, were deposed.  They did everything they were called

16   upon to do.  They paid for Taxol, which is one of your very

17   important drugs.  I saw the PowerPoint, by the way.  It says

18   it's the best evidence in the case.  I mean, I like seeing that

19   because I agree, I tried the case against BMS in Pennsylvania,

20   and we got a very nice verdict against them; but Page 15 of the

21   slides says the primary spread marketing evidence was for

22   Taxol, '01 and '02.

23       Well, now, let's try to figure out how we can work

24   through the problem here because Reverend Aaronson is getting

25   8.8 percent.  The whole class is getting 8.8 percent of their

1    out-of-pockets.  So this settlement is nothing like what you've

2    seen, what's being proposed on Track Two, what's been done in

3    GSK or AstraZeneca.  They're taking the out-of-pockets and

4    applying 8.8 percent.  And that's Miller's affidavit, and I

5    cited you the slide at his affidavit, 7459 on the docket.

6    Page 26 gives you the math.  It shows $32 million of

7    out-of-pocket co-pays and $2.8 million being allocated.

8         Now, that's the problem because you're going across

9    the board just giving everybody 8.8 percent.

10        Now, Mr. Tretter has argued here that you shouldn't

11   give Paraplatin anything because there's no damages.  This is

12   what's strange about it.  Mrs. Aaronson took both drugs, Taxol

13   and Paraplatin; but if you were to just do what you've done in

14   other cases, she'd get three times her damages that she's being

15   paid here, $500.  She'd get $1,500.  I'm sure Reverend Aaronson

16   would say that's the best I could do under North Carolina law,

17   Chapter 75, treble damages and attorneys' fees, he'd be happy

18   with that.

19        Now, you wouldn't give Ms. Swayze anything because

20   that's all she took.  She hasn't identified the carboplatin as

21   Paraplatin, which is important because you need to have the

22   standing to sue.  Reverend Aaronson --

23        THE COURT:  They said it was the same thing.

24        MR. HAVILAND:  Well, it's generic.  We don't know

25   that.  I'm sure Mr. Tretter would tell you that he doesn't know

1    if it's the BMS's Paraplatin.  It says "carboplatin."  If you

2    look at the actual document that they filed, your Honor, it's

3    just an EOB, which is odd.  When Mr. Tretter faced you in the

4    summer of '07, he said, "I want to vet Ms. Swayze.  I'm

5    entitled to vet her."  And I see her EOB, and it says that she

6    took the drug in '03.  The EOB says the payment was made in the

7    spring of '07, and he raised that as a concern for your Honor.

8    What's going on here?  Did she get the drug in '03, and then

9    why is Medicare paying it four years later?  And did she pay

10   for it?  Did she actually pay something out of pocket?  You

11   don't have any evidence in the record on that.  You just have

12   this EOB I heard today --

13          THE COURT:  Well, that's true for all that we --

14          MR. HAVILAND:  Well, in fairness, your Honor, every

15   one of my clients had to go through this very difficult process

16   to demonstrate their standing because we were in litigation,

17   okay, and so Reverend Aaronson is a viable class representative.

18          THE COURT:  Well, he pulled out.

19          MR. HAVILAND:  He didn't pull out, your Honor.  He's

20   right here today still with your January, 2006 order.

21          THE COURT:  Excuse me.  I've got to go back and read

22   the affidavit, but he said, "I don't want to be there if my

23   lawyer isn't there" or -- well, I'll find out.  We'll get the

24   docket number, and I'll go back and reread it.

25          MR. HAVILAND:  All right.  So if he's disqualified

1  when I was disqualified, then you're right, he's not here as a

2  representative, and he's here just as an objector.

3          THE COURT:  I didn't disqualify him.  He withdrew.  So

4  he would have been -- I don't --

5          MR. HAVILAND:  Well, our point is, you need to have a

6  representative, somebody to give traction to this curve that

7  says to the lawyers, "Hey, you know what?  I've got cancer, and

8  I see what you're doing, and I don't agree with it.  I think

9  you should do better."  That's why the $13 million, if you

10 order it, trebles.  That gives us the trebling.

11          And, your Honor, I do disagree with you.  The named

12 representative is the party in this case.  There was a trial in

13 this courtroom July 23.  We settled that case June 25.

14 Mr. Matt signed an agreement with BMS and said, "We commit to

15 all the material terms."  Your Honor ordered -- there was a

16 debate about whether or not there should be a distribution of

17 cy pres.  I just heard Mr. Matt say today it was because of

18 that AstraZeneca issue that we were arguing about it, should it

19 be guaranteed to go to some other source?  But the $13 million

20 is $13 million.  They committed -- BMS I'm pointing to --

21          THE COURT:  Excuse me.  You know, you're beating a

22 dead horse.  I'm here as to what we're doing here is fair.

23 Now, I think the $13 million does shed some light on whether

24 $4 million is enough.

25          MR. HAVILAND:  That's my point.

be7428d7-0463-4420-b209-dd0c9d5f18bd

1          THE COURT:  But it doesn't mean I'm going to enforce a

2     contract.  The issue is only whether $4 million is enough.

3          MR. HAVILAND:  I don't think you have enough money,

4     your Honor, to do anything nearly fair what you've done in the

5     other cases, and that's the primary problem I've got with this.

6     You've got allocation counsel that went in and just rubber

7     stamped numbers they were given by an expert well after the

8     trial.

9          You know, it's interesting, we're now bringing the

10    30 percent limit back in.  We were going to trial and trying

11    these claims.  Your Honor had already ruled on Classes 2 and 3,

12    and a jury would have done what it would have done, but I felt

13    pretty good about what we were going to do in that case.  I

14    actually tried this case last fall, and we won against BMS with

15    a judge on our statutory claim.  Mr. Tretter will point out

16    that the fraud claim the jury found against us, but we found

17    liability on a statutory claim, $27.6 million.

18         THE COURT:  Where was this, Pennsylvania?

19         MR. HAVILAND:  In Pennsylvania.  I want to hand that

20    up to you.

21         THE COURT:  This is like a consumer protection

22    claim --

23         MR. HAVILAND:  It is, your Honor.

24         THE COURT:  -- a bench trial?

25         MR. TRETTER:  It had nothing to do with Taxol, and the

1    judge refused to apply the 30 percent.

2         MR. HAVILAND:  Well, your Honor, I want to hand that

3    up because it's the only other verdict -- it's the only other

4    time that BMS went to trial, and they lost.

5         THE COURT:  Without knowing more context, it would be

6    hard for me to evaluate it.  But, in any event, I understand

7    your position is, you agree he's no longer class rep.  Did you

8    need compensation for him for the time that he spent during

9    the -- did you put in money for him?

10         MR. HAVILAND:  I didn't, your Honor.  We put in --

11         THE COURT:  You did or you did not?

12         MR. HAVILAND:  I did in the GSK.  He was never paid an

13    incentive fee.  He should have been.  We need to put another

14    affidavit in for him and Mrs. Hopkins, our Class 3

15    representative, who testified in your trial.  I don't know if

16    you remember that.

17         THE COURT:  Why didn't you send in --

18         MR. HAVILAND:  We were never called that they were

19    going to do an incentive fee.

20         THE COURT:  That probably needs to happen.

21         MR. HAVILAND:  They excluded them.  I mean, they

22    excluded Reverend Aaronson and Mrs. Hopkins, and that's

23    upsetting to them that they put their time in.

24         THE COURT:  All right, all right, that's a different

25    issue, but let me just --

Page 56

1        MR. TRETTER:  May I be heard for one second, your

2   Honor?

3        THE COURT:  Yes, eventually.  So the objections are on

4   the grounds of what?

5        MR. HAVILAND:  Well, number one, your Honor --

6        THE COURT:  It's not fair because --

7        MR. HAVILAND:  -- we filed a motion to enforce a

8   settlement saying that there was $13 million, which is more --

9   it's enough to give people what you wanted to give them the way

10  you've just framed your argument.  If you try to do anything

11  else, you don't have the money.  The $13 million was agreed to,

12  and it's part of the $19 million, so I think you reallocate and

13  give the $13 million to consumers.

14       THE COURT:  Well, if I either doubled or trebled what

15  I'll call my heartland damages and gave something to the

16  others, some percentage of their actual out-of-pockets, why

17  isn't that fair?

18       MR. HAVILAND:  I'm not saying it's not fair, your

19  Honor.  I think that that would be fair.  If you give people

20  trebling in the heartland --

21       THE COURT:  I said double or trebled, depending on --

22       MR. TRETTER:  And I think you can do that within the

23  existing numbers.  That was going to be my point, your Honor.

24       THE COURT:  Maybe.  I'm just --

25       MR. TRETTER:  Well, if I could --

1          THE COURT:  Can you just let him finish.

2          MR. HAVILAND:  I'm almost finished, your Honor.  I

3    just want to point out to you that the exhibit Mr. Miller put

4    in with the $2.8 million, which is net after fees and costs is

5    allocated, it's 8.8 percent, that's not damages, so let me be

6    clear about that.  Damages are set forth in class counsel and

7    BMS's Joint Motion For Final Approval at Docket 7454.  On

8    Page 11 they set forth what the damages are.  For Taxol it's 34

9    percent, not 8.8 percent.  So you have to re-jigger, using

10   Mr. Tretter's words, the numbers to get to actual damages and

11   then trebling.  And that's where, if I start running those

12   numbers, you go well above $2.8 million very quickly just

13   trying to deal with the heartland, not to mention what you do

14   with Paraplatin and the single-damages drugs.  I don't know

15   that you could find, your Honor, that it's fair, reasonable,

16   and adequate to take away someone's claim on Paraplatin and

17   give them nothing.  I think that that claim could be tried,

18   should be tried.  To give them zero in this settlement --

19          THE COURT:  It may be, it may be, yes.  I'm not saying

20   to give nothing, but it's a much weaker claim, much weaker,

21   so --

22          MR. HAVILAND:  I agree.

23          THE COURT:  So it may be that it's not entitled to the

24   multiple damages or even full actual damages.  So let me

25   just -- all right, I think I hear -- by the way, your motion to

be7428d7-0463-4420-b209-dd0c9d5f18bd

Page 58

1   disqualify class counsel is untimely.  That I got today, I

2   think today.

3          MR. HAVILAND:  Your Honor, the problem I have is that

4   you've got counsel who decided to abandon $13 million.

5          THE COURT:  Excuse me.  You know what --

6          MR. HAVILAND:  And instead of fighting for that in

7   allocation --

8          THE COURT:  You've known that for two years and you

9   file it this morning?

10          MR. HAVILAND:  Your Honor, I have been on trial.  What

11   I did is read what Mr. Tretter said.  He called it a conflict

12   at the time.  He opposed what they --

13          THE COURT:  Yes, I'm overruling the motion to

14   disqualify on complete untimeliness.  But he has objected, and

15   he preserved the $13 million issue.  That's been here all

16   along.  I've treated it as an objection.  I think it's properly

17   treated as an objection, and that's been timely.  So that's

18   part of this case right now as to whether or not the

19   $4 million, or whatever it is, is a fair number.

20          MR. HAVILAND:  And that's our objection.  I do want to

21   point out, your Honor, there was representations -- I read the

22   fairness hearing from the Class 2/3, Mr. Sobol's discussion

23   with you, and there was a representation that you've already

24   dealt with the class.  I don't believe you have.  I don't

25   believe you've dealt with the class issues you've got before

1    you.  You have a broader class because you added in those

2    additional states like the AstraZeneca settlement, so it's a

3    bigger class.  You also have a new representative being

4    proposed, and she hasn't been vetted.

5             THE COURT:  Right, I --

6             MR. HAVILAND:  So I just want to make clear that I

7    think there is a level of class findings you need to make under

8    Amchem to find it's fair.

9             THE COURT:  I agree with that.

10            MR. HAVILAND:  Thank you, your Honor.

11            THE COURT:  I absolutely do have to do that.  But that

12   having been said, what I don't appreciate is having it all come

13   up -- arguably, it's two weeks late, I'm going to accept it,

14   but not the thing this morning.  That's way too late.

15            MR. HAVILAND:  Can I just address that, your Honor?  I

16   really want to address that because July 3, 2007, your Honor

17   said, "Well, keep Mr. Haviland in the loop."  They didn't.

18   Last summer as I was about to go on trial against Mr. Tretter's

19   client, you said to class counsel, "Well, why don't you reach

20   out to Mr. Haviland and find a simple solution," and Mr. Wexler

21   said, "I'll do that."  I never got a phone call, an e-mail.  I

22   don't like coming up here as a pro bono counsel, your Honor,

23   because I've not been paid or reimbursed anything in this case,

24   but I do it for my clients because they ask me to.

25            THE COURT:  Well, excuse me.  There's some money put

Page 60

1      in for you.

2              MR. HAVILAND:  I've gotten nothing, your Honor.

3              THE COURT:  Excuse me.  There's some money put in for

4      you.

5              MR. HAVILAND:  I did see that.  For the first time

6      I've seen that, that they just put something --

7              THE COURT:  I noticed it.

8              MR. HAVILAND:  I have to go back and look at it and

9      see if it's the money that I actually incurred, but --

10             THE COURT:  The claim is what you said was your

11     lodestar, so you must have put in something for them to come up

12     with that dollar amount.

13             MR. HAVILAND:  Well, I gave them time a long time ago,

14     your Honor.  I'm just saying that we've never gotten an expense

15     back, period, in this case, given the situation we have, but I

16     never got a phone call.  I'm saying to you, you pick up the

17     phone, maybe we could have worked some of this stuff out.  We

18     didn't have to have today be what it is today.

19             THE COURT:  Mr. Wexler, did you call him back?  Did

20     you call him?

21             MR. WEXLER:  Did I?  No.  I'm having a hard time

22     recalling --

23             THE COURT:  I remember that actually.

24             MR. HAVILAND:  I read the transcript, your Honor.  It

25     was news to me somebody was going to call me.

Page 61

1          THE COURT:  You may have forgotten, but it --

2          MR. WEXLER:  But, you know, I can assure you that

3    there were many attempts to talk to Mr. Haviland over the years

4    by a lot of different counsel at this table.

5          THE COURT:  Maybe.  Things did fall apart.

6          MR. HAVILAND:  I appreciate your time, your Honor,

7    very much.

8          THE COURT:  All right, thank you.

9          MR. MATT:  Okay, your Honor, there is a few points

10   that I want to clarify in the record about the history of

11   Mr. Haviland's involvement and about Mr. Aaronson's

12   involvement.  Your Honor was very, very upset with Mr. Haviland

13   and those clients because Mr. Aaronson signed a declaration in

14   August of 2007 that said, quote, "If Mr. Haviland and his firm

15   cannot serve as class counsel, I would like to withdraw as a

16   class representative."

17          THE COURT:  What's the docket number on that?

18          MR. MATT:  4649.  Your Honor was very, very upset, and

19   understandably so, as were class counsel.  The fact that no one

20   called Mr. Haviland, I mean, there's no secret here that, you

21   know, in light of the circumstances in this case in which you

22   disqualified him for taking actions contrary to the interests

23   of this class, including the representation of a competing

24   class in New Jersey without disclosing that to your Honor,

25   including filing confidential materials in the public record,

be7428d7-0463-4420-b209-dd0c9d5f18bd

Page 62

1    he's done a lot of things that --

2          THE COURT:  You know what, I don't want to relitigate

3    all that.  I did what I did.  I remember getting the phone call

4    from some judge, whose name now escapes me, from New Jersey.  I

5    remember that.  But going forward -- all right, so you've

6    reminded me, his guy withdrew.  He probably should still get

7    some compensation for the time he spent on the class matters.

8          MR. MATT:  We have no problems with that, your Honor,

9    and we agree that the objection is timely.

10         THE COURT:  Right, and the objection is timely, not on

11   your motion to disqualify you; but it is also accurate that I

12   think I need to make class findings.  It's a different class.

13   And I also have to afresh, anew decide whether or not this is

14   fair because the $13 million would have probably paid off

15   everyone at treble.

16         MR. MATT:  The $4.3 million still may, your Honor.

17         THE COURT:  It may, it may.  I don't know.  So that's

18   what I need to think about.  And I also need to think about

19   expenses and what's the right percentage for attorneys' fees.

20   I mean, all of this comes into a certain, you know, what's the

21   final sum.

22         MR. MATT:  And on that point, it's important to

23   understand the difference between co-pays and damages.

24   Mr. Haviland just said the class is getting 8.8 percent of

25   their out-of-pockets.  That's not true.  What's important to

1   look at is damages, not their co-pays, because the damages are

2   a smaller percentage of the co-pay.

3          THE COURT:  I agree, so what did --

4          MR. MATT:  So it's just not true they're getting

5   8.8 percent of out-of-pockets.  They're getting between 52 and

6   102 percent.  Like his client is getting 102 percent based on

7   the sample we did.  So I just want to make sure we're comparing

8   apples to apples when we're talking on the record.

9          THE COURT:  What does the notice say?  I can't

10  remember.  Did the notice say it was going to be double or

11  treble their damages or their co-pays?

12         MR. MATT:  Their co-pays.  That's just the

13  distribution methodology, but the notice also says --

14         THE COURT:  Mr. Sobol is having heart failure back

15  there.

16         MR. MATT:  The notice also says that it's going to be

17  prorated, okay.  So you actually have -- you build a formula.

18  The formula is based on their co-pays.  And then the class was

19  advised that "Your recovery may be lower than this, depending

20  on the number of claims when we do a proration."  So they

21  weren't guaranteed triple their co-pays.

22         THE COURT:  I understand that, but --

23         MR. MATT:  I just want to make sure that that is clear

24  on the record because --

25         THE COURT:  Excuse me.  When I'm trying to evaluate

Page 64

1    it, you know, I've got to see, is it fair?  And if the notice

2    says "co-pays," I can see where he came up with the 8.8.  Now,

3    you're telling me I should think about actual damages, which is

4    frequently less than that, right, because they had to pay

5    20 percent of the delta?

6              MR. MATT:  That's correct.

7              THE COURT:  So is there a way of evaluating that and a

8    way of --

9              MR. MATT:  That's what we're going to do for you, your

10   Honor, and report back.

11             THE COURT:  Okay, okay.  In other words, evaluate

12   what's the actual damages as opposed to co-pays, the percent

13   that they'll get paid, if we can come up with that figure.

14   But, more importantly, in terms of allocation, I would like to

15   give the people with the strongest claims -- I'm holding open

16   the issue of Rubex.  I don't understand it well enough as to

17   why you took it out, but, in any event, maybe give me options

18   with and without Rubex, doubling, trebling, where that leaves

19   the people with Paraplatin.

20             Let me ask you this:  What is the issue with -- she

21   says carboplatin.  Was that manufactured -- that's the generic?

22             MR. MATT:  Carboplatin is the chemical name for

23   Paraplatin, which is the brand name.

24             MR. TRETTER:  It was single source in 2003.  It went

25   generic in 2004.

1          THE COURT:  All right, so we know it was a BMS drug.

2          MR. TRETTER:  And that one had to have been the BMS

3     product if it were in fact administered in 2003.

4          THE COURT:  All right, now, that's your question,

5     which is, how do we know since it wasn't billed till 2007?

6     That's, I guess, the question that BMS raised.  What have you

7     done to be sure that that's when she -- is that from CMS?

8          MR. MATT:  We have the dates of her administrations,

9     your Honor, yes.

10         THE COURT:  Why don't you just put something in the

11    record.  I don't want this woman to be -- if you have an

12    affidavit that says, you know, "Here's our documentation,

13    here's the data from CMS," the representation from

14    Bristol-Meyers that it was a single-source generic in the first

15    year, which is in fact the way it usually is, I am satisfied

16    that she would be an adequate class representative.  So I don't

17    think we need to bother her at her home, but I do think, in

18    fairness, since I have to decide she's an adequate class rep, I

19    should have that in the record now that it's been challenged,

20    okay.

21         MR. MATT:  We'll do that.

22         THE COURT:  Now, now that it's been raised for me, I

23    would love some sort of way of thinking about doing something

24    along the lines of what I did for AstraZeneca, providing the

25    other people with some damages, because, as you say, a jury

1    could have seen it otherwise, but recognizing that there's a

2    stronger claim for people who had such huge mega spreads.  And

3    so I guess you think, Mr. Tretter, we can do that within the

4    allocation.

5            MR. TRETTER:  I would like to be heard, your Honor.

6            THE COURT:  Yes, I will, I'll get to you.

7            So you're going to get that back to me, right.

8            MR. MATT:  We will.

9            THE COURT:  All right.

10           MR. MATT:  And there's already materials in the record

11   about the drugs that Ms. Swayze took.  We will supplement that

12   record with a little bit more direct a declaration.  Also, I

13   was just handed a document which indicates she was also a

14   recipient of Taxol.  So it's Taxol and Paraplatin.  I don't

15   know why this wasn't attached to the declaration.  We'll put

16   this in the record.  And just so you know also --

17           THE COURT:  Just to nail it down.

18           MR. MATT:  -- there was a vetting process.  I mean,

19   you know, the documents were pulled together.  They were

20   produced to BMS.  They saw that she did in fact have these

21   administrations as reflected in the hospital records.  So she's

22   not someone that's unknown to the parties, your Honor.  She

23   just hasn't had her deposition taken.

24           THE COURT:  Fine.  And if the records are clear-cut,

25   she won't need to.

1          MR. MATT:  Thank you.

2          THE COURT:  If they're not clear-cut, then I'll have

3    to revisit it.  But you seem to think it's pretty clear-cut,

4    so --

5          Go ahead, your turn.

6          MR. TRETTER:  Thank you, your Honor.  I'd like to

7    address the issue that you've raised about the $4 million.  The

8    $4 million is a figure that was the single damages figure that

9    came up by Dr. Hartman for all of Class 1.

10         THE COURT:  So that's from 1991 to 2004, all drugs?

11         MR. TRETTER:  Right, all drugs all around.  Of course,

12   we had a very different figure through Dr. Bell, which was

13   $1 million to $2 million, implementing your Honor's decision in

14   the Class 2/Class 3 December 2006 trial.  When you came out

15   with your decision and you said "This drug this year" and were

16   very precise about which drugs had the biggest spreads and

17   which drugs didn't, we overlaid that, or Dr. Bell did, and he

18   came up with $1 million to $2 million for Class 1, okay?  So

19   that was --

20         And then the other thing that I want to point out is,

21   when we were back here in November on the Class 2/Class 3,

22   Mr. Sobol said, well, let's see what the actual claims

23   experience is, what does Rust get in?  And I think that that's

24   been -- I wasn't able to address that in my papers because I

25   didn't have it at the time, but if your Honor has this one

1    affidavit that Mr. Haviland was talking about, I think it will

2    go to the issue of whether there's enough money within a

3    $4 million settlement to do the doubling or tripling of

4    whatever you want in the so-called "heartland drugs."

5              THE COURT:  And that's tab?

6              MR. TRETTER:  There is a declaration of Eric J.

7    Miller.

8              THE COURT:  Do you remember, is this part of the tabs?

9              MR. TRETTER:  Oh, I don't know how they set up your

10   binder, your Honor.  It's a declaration of somebody from Rust.

11             THE COURT:  Do you have it?

12             MR. TRETTER:  Eric J. Miller, it's Document No. 7459.

13             THE COURT:  Wait, let me just -- I've got Berman,

14   Goldenberg, Wilkinson, Miller.

15             MR. TRETTER:  Miller, okay, and Miller has lots of

16   exhibits, and I would like to focus, your Honor, Exhibit D, all

17   right?  And if you see on the left, there's a list of the BMS

18   drugs at issue by their brand name.

19             THE COURT:  Yes.

20             MR. TRETTER:  And then there are dollar figures by

21   drug, and my understanding -- and class counsel can correct me

22   if I'm wrong -- is this is the total co-pays, not the alleged

23   inflation or damages, that were received by drug by Rust; and

24   then in the second column is an estimate if they cured

25   25 percent more.  Do you see that, your Honor?

1    THE COURT:  Yes.

2    MR. TRETTER:  And if you keep going over, they add the

3  two columns to get you, in the case of Blenoxane, $113,000 of

4  total co-pays.  And they have something called the "percentage

5  overpayment."  Now, this is Dr. Hartman's thing.  I don't want

6  to suggest that I endorse this, but he found zero damages on

7  Blenoxane, so he comes out with a zero there.  He finds that of

8  the total co-pay for Cytoxan, there was a 53 percent inflation

9  rate.  Do you see that, your Honor?

10    THE COURT:  Yes.

11    MR. TRETTER:  So Rust comes up with a single damages

12  for Cytoxan for the people who responded of $193,000.  I

13  suggest you could double that amount without very much problem

14  in this case.  And, you know, you'd have to find it somewhere,

15  but we can talk about Paraplatin and Taxol in a second.

16    If you go down to the bottom, your Honor, which is

17  another one of the big drugs that you said, you know, large

18  spreads because Vepesid went generic in the early 1990s, it's

19  $90,000.  That's the alleged single damages; again, easy to

20  double or triple within this regime.  I would suggest to you

21  that --

22    THE COURT:  Actually, Rubex is pretty big.

23    MR. TRETTER:  Rubex is a very strange case, your

24  Honor, and I think what I bring to this table today is, I

25  understand BMS sales of BMS drugs.  I don't think that that --

1   I understand that the people were entitled to just sort of sign

2   a document and they don't have to show that they received the

3   Bristol drug.  We didn't even sell $1.7 million worth of Rubex.

4   In fact, we didn't sell at all in 2001 and 2002.  I would be

5   surprised, if somebody went into the actual claims, that there

6   was a lot of real BMS Rubex utilization.  It's really going to

7   be Pharmacia utilization.

8          So I think there is a good reason -- I mean, I

9   understand class counsel has their reasons and the Court

10  probably has its reasons for saying, "I just want to pay

11  people.  I don't want them to have to comb records.  I don't

12  want them to have to do anything," but I think there are strong

13  reasons why you would not want to treble Rubex.

14         THE COURT:  Well, that's useful as well.

15         MR. TRETTER:  And I can tell you that, and we could go

16  back into the actual data of sales --

17         THE COURT:  I would just need more of a record for

18  that.

19         MR. TRETTER:  I understand, but if you stick with me,

20  your Honor, I think if you looked at Blenoxane, which was

21  zeroed but you gave them something, you doubled Cytoxan and you

22  doubled Vepesid, you're not very far from the actual amounts

23  here as long as you just take down Taxol and Paraplatin some.

24         THE COURT:  Well, that might be a way of possibly

25  reordering it.

1          MR. TRETTER:  Right, without interfering with the

2     whole allocation because I stand from the proposition that I

3     can't believe that people are looking at a $4 million nominal

4     settlement for Class 1 when -- as a problematic because it's

5     huge compared to the $1 million to $2 million that we thought

6     Class 1 would be entitled to.

7          THE COURT:  Okay, thank you.

8          MR. TRETTER:  Okay, I'll sit down.

9          THE COURT:  And it would be very useful, though, if

10    you could get me some support for what you were saying, that

11    that figure seems to dwarf what you actually had sales for.

12         MR. TRETTER:  I just have one other point.  On Taxol

13    your Honor found and the reason why we have these differences

14    is that is Taxol throughout the entire 1990s never broke the

15    30 percent rule.  It didn't go generic until 2001, so you have

16    a tremendous number in Taxol here of claims --

17         THE COURT:  Right, but it wasn't one of the heartland

18    drugs where there was a clear liability, right?

19         MR. TRETTER:  Well, only for two years, Taxol for 2001

20    and 2002.

21         THE COURT:  Right.

22         MR. TRETTER:  That's it.  I mean, but this $7 million

23    of Taxol co-pays is probably going back to 1991.

24         THE COURT:  Right.  So when I'm asking them to go back

25    to what I call the "heartland period," it was for which I found

be7428d7-0463-4420-b209-dd0c9d5f18bd

Page 72

1   liability, not --

2           MR. TRETTER:  And I'm saying that even though Taxol is

3   a treble drug, you only found it for --

4           THE COURT:  Two years.

5           MR. TRETTER:  -- an extremely small piece of the class

6   period.

7           THE COURT:  Right, so they're going to go back and

8   recalibrate.

9           MR. TRETTER:  Rebalance.

10          THE COURT:  Rebalance is a little bit better than

11  the -- "re-jigger" just doesn't have that formality to it.

12          MR. TRETTER:  Thank you, your Honor.

13          THE COURT:  But, I mean, you know, come back, you'll

14  come up with a proposal.

15          Now, on attorneys' fees, let me ask you this.  I've

16  not done this before.  One thing I'm thinking about is a

17  different percentage for Classes 2 and 3 as from Class 1.  And

18  the reason I am saying that, it actually has nothing to do with

19  the current dispute but the amount of time it's taken after the

20  $13 million settlement to come to resolution on Class 1.  We've

21  had discussions over the last year or two about this issue, and

22  I know it's said that one of the reasons is efficient,

23  expeditious -- I forget the words -- counsel.

24          I'll say for the record, I think, legally speaking,

25  the plaintiffs' class team has been excellent in terms of all

1    the legal issues and the legal hurdles.  And you did take a

2    risk, and that's why I gave 33 1/3 percent for the first

3    settlement out of the box.  You've taken risks, et cetera.  But

4    it took too long for this particular settlement, not the 2 and

5    3.  Even that's a little bit of a problem and Track Two is a

6    little bit of a problem, but you know my sense of utter

7    frustration with Class 1.

8         MR. MATT:  We recognize your frustration, your Honor,

9    and, you know, we had a year delay out of the box because we

10   had this disagreement with BMS.  We weren't just sitting

11   around.  We were trying to reach resolution.  In fact, we went

12   back to Professor Green before we even came to you with a

13   dispute.

14        THE COURT:  Why didn't you just move for a preliminary

15   approval?  I would have jump-started this.  I would have done

16   something.

17        MR. MATT:  In hindsight, we wish we had come to you

18   earlier.  We're sorry we didn't.  But that was the first year

19   of delay.  That's where I think the delay was, but we were

20   trying.

21        THE COURT:  And then it took forever to get this data.

22   For some reason you hooked BMS into Track Two in terms of going

23   to that vendor who works with CMS, and that then took forever.

24   So I'm thinking about -- I don't have those issues as much for

25   Classes 2 and 3, but we did have the $13 million on the table

be7428d7-0463-4420-b209-dd0c9d5f18bd

1    since 2007.  It's been a worry for me.  So I'm thinking of, and

2    I don't know if there's a reason I can't do it -- I'm flagging

3    this -- of having, you know, my classic 30 percent for the

4    Classes 2 and 3 and a smaller percentage for Class 1.

5            MR. MATT:  I think you can do it.  I don't think it

6    requires --

7            THE COURT:  There's no legal bar to doing that?

8            MR. MATT:  No.  As long as you aren't charging

9    Classes 2 and 3 more as a result, I think --

10           THE COURT:  No, no, no.  I mean, I've been

11   systematically doing 30, which is what you've assumed, but I

12   must say that for Class 1, I'm not -- I understand, I've read,

13   you know, how you all won't get that much of a multiplier, but,

14   you know, you keep coming back to the expenses and how I should

15   take into account that you've folded those in.  But the flip

16   side of it is, I don't get to do any due diligence about them.

17   I don't know how they're allocated; I don't know if they're

18   reasonable; I don't know anything about them.  You haven't even

19   sought to tax them against the other side, which some of them

20   maybe could be allocable?  So I have a hard time just getting

21   my arms around what to do with that figure.  It's a big figure,

22   but you've decided to absorb it rather than have them audited,

23   or, you know, have me look at them.  I'm assuming it's a fair

24   amount, but --

25           MR. MATT:  It's a bona fide lodestar, your Honor.

1        THE COURT:  I know you say that, but I can't exercise

2    my fiduciary about them.  So I'm taking you at your offer,

3    which is just to fold them in, but then you've got to take the

4    downside that comes with that.

5        MR. MATT:  I think the bottom line here, your Honor,

6    is, the multiplier is going to be very small at the end of the

7    day.  We're at, you know, approximately 1.2 now.  It's going to

8    continue to, you know, decline because we have lots of

9    administration issues.  We still have T-2 to get approval of.

10   We still have Mr. Haviland appeals to deal with.  There's still

11   a lot of work left.

12       THE COURT:  Well, yes, we'll get to that.  I am deeply

13   concerned -- that's why I was so upset that this took so

14   long -- it's a dying class.  I'm worried, actually, the reason

15   you only came up with such a small number is so many of these

16   people are probably now frail or dead, and so -- not on the

17   Medicare actually but on the other side.  I am worried about

18   the appeal; there's no doubt about it.  I am worried about it

19   because, Mr. Haviland, if you take it, all these people are

20   going to be dead and never see their benefits.  And so I don't

21   know how to resolve that, and I asked last time that you try

22   and work it out, and I'm asking that again.  And I understand

23   it looks like a payoff, and there's a piece of me that it rubs

24   totally the wrong way to buy off an appeal.  That having been

25   said, I'm asking you on behalf of the interests of this class

1   not to delay this another two years while it goes up on appeal.

2          MR. HAVILAND:  I'm not looking to do that at all.  I

3   thought that we were going to move forward with the MOU back in

4   '07.

5          THE COURT:  Please, excuse me.  You don't believe that

6   now.  I mean, so the MOU, you waited a couple of years, I think

7   it was, after you knew about the change in the settlement.  At

8   this point I am imploring you all as members of the court.

9   I've got an old and dying class, old and dying.  That's why I

10  was -- I say that, it's almost like a mantra -- that's why I

11  was so upset and I started requiring monthly status reports on

12  getting the data.  I'm more worried about this than any other.

13  This is the breast cancer case, just like AstraZeneca was the

14  prostate cancer case.  I am as eager as I can that unlike

15  Mrs. Aaronson, that all of these women who had to pay too much

16  money will get them.  And to the extent I can move this along

17  or there's a way of trying to resolve it, I would like you to

18  try and do it because if you appeal it, it will take another

19  year and a half to two years.

20         MR. HAVILAND:  Well, I would hope there's enough money

21  there.  I do have a question which kind of helps things because

22  you're finding ways to allocate; and re-jiggering with a

23  limited of $19 million, that's the problem we're running into

24  because we're going to be taking at some point from TPPs.  I

25  don't see how we don't do that.

be7428d7-0463-4420-b209-dd0c9d5f18bd

1        THE COURT:  I don't know.  I have to see the way that

2   they've -- I'm only looking for those years in which I found

3   liability as either a doubling or a trebling -- I'm not vested

4   in that -- and something to the other folks because, as you

5   point out, a jury could potentially find them something, and

6   that's what I'm trying to figure out.  It may be you're right,

7   and I would ask them to go back to the drawing boards if

8   it's -- but I'm also, as you've just heard, trying to deal with

9   the attorneys' fees issues.  I also need you to submit some

10  money on behalf of Reverend Aaronson and -- I forget, you

11  mentioned another name?

12       MR. HAVILAND:  Mrs. Hopkins.

13       THE COURT:  Was she the BMS?

14       MR. HAVILAND:  She was a Class 3 representative who

15  testified at trial.  She was the one who knew --

16       THE COURT:  I'm basically paying $100 an hour for

17  people who sought to benefit the class.  It's, I thought, a

18  reasonable figure without going into who doesn't -- you know,

19  they're older people, they're probably not working at all right

20  now, but I thought that was at least a reasonable ballpark

21  figure.

22       So at this point what I am going to do is ask people

23  to supplement, and I will come up with a number.  And I am

24  hoping that you'll all have an opportunity to talk.  I am not

25  going to be enforcing the $13 million settlement.  Personally I

be7428d7-0463-4420-b209-dd0c9d5f18bd

1    thought it was reasonable to go back to the drawing boards, but

2    then I have to decide whether this is fair and reasonable, and

3    I want to see what my options are to do that.

4            Now, you've --

5            MR. HAVILAND:  Can I ask you a question about the

6    attorneys' fees --

7            THE COURT:  Yes.

8            MR. HAVILAND:  -- because you made the point, and I've

9    had the question myself, about taxing the defendant.  This case

10   went to trial, and there was a verdict under Chapter 93.  My

11   understanding is, there's a fee component to that that's

12   mandatory.  I may be wrong on that, but I looked at the

13   cases --

14           THE COURT:  It's not mandatory.  You can settle

15   anything under the sun.  I mean, if you can waive your Fifth

16   Amendment rights, et cetera, you can do anything.  So, you

17   know, you can settle.  They've settled.  They've agreed to

18   absorb them under their attorneys' fees.  That's their right to

19   do that.  If it were a different situation, maybe I'd feel

20   differently.  But then you can't sort of use it against me in

21   the sense of, oh, and the investment doesn't come back.  I

22   mean, that's a risk that you've all taken; that's part of your

23   investment in the case.

24           But let me just go back and just deal with Track Two

25   for a minute.  As I put on the record before, it may be that I

1   have a conflict dealing with the alleged collusion between -- I

2   don't even remember who it was between, but one of the names

3   that was mentioned was Health Care for All.  So I've asked

4   Judge Bowler to possibly take -- I'm going to refer -- well,

5   let me ask you this:  Is it still an issue?

6            MR. HAVILAND:  I think you appointed HCFA as the class

7   rep on the settlement, your Honor.  I think it is.

8            THE COURT:  As to whether there was collusion --

9            MR. HAVILAND:  I just read your order, and I went back

10  to look --

11           THE COURT:  This is why these things take so long.

12  The world changed.  My daughter just took a job there.  I had

13  forgotten all about it.  I had mentioned it to Mr. Sobol --

14           MR. HAVILAND:  I actually think Health Care for All --

15           MR. MATT:  Muriel Tunacio is the Class 1

16  representative for Track --

17           THE COURT:  What?

18           MR. MATT:  Muriel Tunacio is the Class 1

19  representative.

20           THE COURT:  Is Health Care for All class rep still in

21  Track Two for anything?

22           MR. MATT:  I don't -- again, I'm not Track Two guy,

23  but I don't think so.  I do not think so.

24           THE COURT:  I couldn't remember.  I don't think that

25  they are.

1        MR. HAVILAND:  Class 3, your Honor, I believe they're

2   the appointed rep.

3        THE COURT:  Well, go check.  It either is or it isn't.

4   They think it isn't; you think it is.  Why don't you just talk

5   about it.  It either is or it isn't, but, in any event, I

6   obviously, if they're still in it, can't deal with them.  So we

7   have a choice as to how to deal with it.  I'm not taking myself

8   off the whole case.  I'll only deal with whatever the Health

9   Care for All aspect is, if they are in at all.  So you'll look

10  and let me know, are they in at all?  But regardless of whether

11  they're still in, if they are still in, I can refer to

12  Judge Stearns; Judge Bowler, if you agree to let her just

13  resolve them, because she's so familiar with the case.  And the

14  other judge who I think has had something to do with AWP was

15  actually Judge Young because he had one of the criminal cases.

16  And Judge Zobel of course is taken up by all the appeals.  So

17  I'd like to go to somebody who actually isn't starting from

18  scratch.

19        So let me start from this:  Would anyone here disagree

20  with my referring for just on the merits to Judge Bowler

21  whatever dispute comes in, if Health Care for All is still part

22  of this?

23        MR. MATT:  Your Honor, let us take a look first

24  because this could be a completely hypothetical debate.  We

25  don't know if we even have this issue.  If we don't have this

1   issue, it would be plaintiffs' strong preference that nothing

2   gets referred because it's going to turn into a sideshow, and

3   we're going to take up the time of another judge.  I mean, it's

4   just --

5          THE COURT:  I don't know.  Well, so my option is on

6   the table:  Agree to Judge Bowler, which is my personal

7   preference because she knows so much about it.  I don't know

8   whether it makes sense to have Judge Stearns do it because he's

9   been doing the Lupron case, but it raises some of the very same

10  issues; or Judge Young, who I think at least knows the AWP

11  issues, he knows them.  And so I need a solution here.  I need

12  a --

13         MR. HAVILAND:  I'm happy to go on record as saying

14  that I have no objection to Judge Bowler or Judge Young.

15  Judge Stearns has before -- well, actually it went up on

16  appeal.  He has an $11 million cy pres involving PAL.

17  Mr. Wilkinson argued about it, and one of my clients there is

18  objecting to that, so there's an issue there.

19         THE COURT:  Well, just try and -- if it -- just I

20  can't.  I mean, that's one thing, as of two months ago couldn't

21  do it.

22         Now, let me ask you another.  Prescription Access

23  Litigation has been involved in some of these.  Do they have a

24  common umbrella with Health Care for All?  I'm now a little

25  confused about all the relationships.

1          MR. MATT:  Well, first of all, when you say it's been

2     involved, PAL is not the named representative in this case

3     under any settlement.  They're not.

4          THE COURT:  Okay, okay.

5          MR. MATT:  No cy pres was ever intended to go to PAL.

6     They won't even except it if you give it to them.

7          THE COURT:  Okay.

8          MR. MATT:  They put that in a declaration.  And so,

9     you know, PAL was allocation --

10          THE COURT:  This may be a nonissue.

11          MR. MATT:  PAL represents consumers.  You know,

12     they're a nonprofit to do that.  They're allocation counsel.

13          THE COURT:  Well, as I say, I'm for cy pres if it's a

14     few thousand dollars left over that you can't distribute.  I

15     mean, of course, there's a reason for cy pres.  It's when the

16     amount of the cy pres dwarfs the amount of the payout that I

17     get nervous.  That's probably the best way of putting it.  It's

18     a red flag for me.  And then I say, can I give those consumers

19     any more?  I think we've been through this.

20          So on Track Two, how much is about to be left over?

21     Do we know whether it's a big cy pres and who it would be going

22     to?

23          MR. MATT:  We don't know.  It's too early, your Honor.

24     We're back here before you on June 13.  We're not expecting a

25     significant cy pres.

1      THE COURT:  And didn't we do something with

2  AstraZeneca where essentially you all came back to me and asked

3  me to approve, and you just did that and I think I just

4  approved it?

5      MS. CONNOLLY:  Yes, you did, you approved a partial

6  distribution of the Class 1 funds, and then we're going to try

7  to increase the consumer distribution and come back to you, and

8  hopefully there will be a smaller amount left to --

9      THE COURT:  A true cy pres, I mean, that's fine,

10  that's fine.  So just let me know.  Talk.  It's been a lot of

11  years of water under the bridge.  I know that there's been some

12  hostile feelings, but I am very eager to just get this money

13  out the door.  I'm just very eager to get it out the door, and

14  so see what you can work out.  And if not, I'll just do what I

15  do, write my opinion, and then it will have to go up on appeal.

16  But I've got to get it to the next step.  I need to do

17  something with it fast.  So when do you think -- as you know,

18  I'm out of town a lot these days, so can you do it by

19  mid-April?

20      MR. MATT:  I think we can get a recommendation for you

21  on a rebalancing.  You know, Rust will run the data and give

22  you some snapshots to look at, you know, real-life stuff,

23  probably by the end of next week.

24      THE COURT:  Good.

25      MR. MATT:  Okay, we'll give this a high priority.

Page 84

1          THE COURT:  And if either BMS or Mr. Haviland on

2     behalf of Reverend Aaronson has any feedback or objections or

3     agreement with anything there, that would be very good for me;

4     and then, if not, I'll just have to write an opinion.  I don't

5     plan on coming back in here.  As far as I'm concerned, no other

6     objections are timely, and I'd like to just get the money out

7     the door.

8          The second thing is where I'm going to put the burden

9     on Mr. Haviland, but I'm going to require you all to talk, is

10    to figure out if there is a Track Two issue with Health Care

11    for All.  I just need to know it.  I just need to understand

12    it.  Now, Judge Bowler could take it, and I want to know if

13    there's an agreement to her; and if not an agreement, I will

14    refer it to her anyway with an appeal to either Judge Young or

15    Judge Stearns.  I mean, that's how I'm going to, I think -- I

16    have to find out who's -- now that I hear there's some concern,

17    maybe I'd go to Judge Young.  But he's lightning quick.  I

18    mean, he'll turn it around in no time at all, so I'm not

19    worried about a delay there, but the delay may be if there's a

20    need for any kind of discovery.  And so that's Track Two, but I

21    don't want to wait till June to do that.  I sort of would like

22    to do that beforehand, so when June comes in, we're ready if

23    there's any kind of an outstanding issue.  And it sounds like

24    there isn't.  It sounds like there's going to be no cy pres.

25          It was your concern, Mr. Haviland, that there was

be7428d7-0463-4420-b209-dd0c9d5f18bd

1   going to be money going to one of them?

2          MR. HAVILAND:  On Track Two?

3          THE COURT:  Yes.  Now that they're eschewing it,

4   they're saying that there's no money going in any cy pres, I

5   think the issue may be over.

6          MR. HAVILAND:  It may be.  I haven't looked at it in a

7   long time.

8          THE COURT:  So think about it and get back to me

9   within the same time period about whether there's still an

10  issue.  So is there anything else I need to do?

11         MR. MATT:  We do have one request, your Honor.

12         THE COURT:  Yes.

13         MR. MATT:  While we would hope you wouldn't reduce

14  attorneys' fees, if you're going to do it for Class 1, it would

15  be great to get some guidance from you right now on your

16  thoughts because it does go into the rebalancing exercise we're

17  about to do.

18         THE COURT:  That's fair enough.  I haven't finally

19  made up my mind yet.  I was thinking 30 for Classes 2 and 3 and

20  28 for Class 1 is what I was thinking.

21         MR. MATT:  Okay.  We'll proceed to run numbers based

22  on that.

23         THE COURT:  And you may urge me to reconsider and give

24  me options, but basically that kind of thought process.

25         Let me just also say this:  That I grant the amount

1   for compensation payments.  You're going to get the amount for

2   your two in.  There's one problem I had with one of the

3   requests, which it looks as if she was from -- you said there

4   was a typographical error and she did not get paid out of the

5   Glaxo fund?

6           MR. MATT:  Yes.  Mr. Wexler?  Well, Jen can explain

7   it.

8           MS. CONNOLLY:  Yes, that's exactly what happened.  We

9   meant to submit her --

10          THE COURT:  What's her name now?

11          MS. CONNOLLY:  I'm actually forgetting.

12          THE COURT:  It begins with a C.  I have it somewhere

13  here.

14          MS. CONNOLLY:  Let's see.  It may have been Nelson?

15          THE COURT:  Anyway, one of the women, there was a

16  substantial sum.  She was up at $10,000, and everyone else is

17  at $1,000.

18          MS. CONNOLLY:  Right, that's right, your Honor.

19          THE COURT:  And so the $1,000 and $2,000 seemed

20  perfectly reasonable, but $10,000 seemed totally out of whack.

21          MS. CONNOLLY:  Well, what's happened, your Honor, is,

22  the TPPs we submit to you with every single settlement because

23  they have coverage for all the drugs.  For consumers, what

24  we've tried to do is give you a total amount that they're

25  entitled to, and then we would divide that up based on the

be7428d7-0463-4420-b209-dd0c9d5f18bd

Page 87

1   defendants' drugs that they were administered.  So,

2   hypothetically, if there were a consumer who took one GSK drug

3   and one BMS drug, then we would take 50 percent of that award

4   from GSK --

5          THE COURT:  Ms. Choice, that's what it was,

6   Ms. Choice.

7          MS. CONNOLLY:  Thank you, your Honor.  Then it would

8   be 50 percent from GSK and 50 percent from BMS.  With regard to

9   Ms. Choice, there was a mistake where we did not submit her

10  amount for the GSK settlement, and she was one of the consumers

11  who came here to testify at trial in Boston.  She actually --

12         THE COURT:  But I can't pay it out of this class.  So

13  I can only pay out of this class what she did for this class.

14         MS. CONNOLLY:  Well, but her testimony at trial was

15  actually for this class.  I mean, that's where the injustice

16  comes because not only did we --

17         THE COURT:  But then I'm going to pay her for this

18  class, but I'm not going to pay her for GSK.

19         MS. CONNOLLY:  But it's not actually for GSK time.

20  The time that she has done, the vast majority of her time is

21  going to be with regard to the BMS case because that's what she

22  came to Boston to testify at trial for.  So, yes, we forgot to

23  ask you in GSK --

24         THE COURT:  Well, just give me her time for BMS.  Her

25  flying here her, her taking the time to do it, et cetera, is

Page 88

1    probably going to be close to that, right?

2            MS. CONNOLLY:  It will be close to that, your Honor,

3    yes.  We can submit you a revised declaration that will reflect

4    that.

5            THE COURT:  Yes.  Is GSK totally paid out?

6            MS. CONNOLLY:  Yes.

7            THE COURT:  There's none of those little thousand or

8    two cy pres type moneys?  There's no little dribs or drabs

9    left?

10           (Discussion off the record between plaintiff counsel.)

11           THE COURT:  No, nothing?

12           MR. MACORETTA:  We believe GSK is done, your Honor,

13   yes, yes.

14           THE COURT:  All right.  Well, then I will pay.  It

15   sounds like most of it will be paid anyway.  I just can't pay

16   her for GSK time.

17           MS. CONNOLLY:  I understand.

18           THE COURT:  If you can fairly and fully allocate it to

19   BMS time, I'm happy to pay.

20           MS. CONNOLLY:  Okay, so we will submit a revised

21   declaration with regard to Ms. Choice.  There's likewise

22   another representative where there is a similar error where we

23   will submit that to you.  You will have the total number in the

24   order that we submit to you.

25           THE COURT:  All right.

1          MR. HAVILAND:  I wanted to give you a little heads-up.

2     I had a colleague call Mrs. Hopkins.  I haven't spoken to her

3     since the trial.  I understand she's got probably close to 200

4     hours.  She came out to Boston and did a lot of prep work.  You

5     said that $10,000 sounds like a lot.  I told my colleague to go

6     back and work with her on the time and see what she was

7     claiming for.

8          THE COURT:  The number of hours on BMS?

9          MR. HAVILAND:  She was doing a lot of work on document

10    collection and so on, so we have to look at it.  I wouldn't be

11    surprised if Reverend Aaronson and Mrs. Hopkins have over 100

12    hours, given the time for the trial and the prep work.  As I

13    understand, Judge, we're going to have to sit down with them

14    and go through it, but whatever had been put forward, it will

15    have been vetted by us, and we'll send it to class counsel to

16    make sure they at least know the position of the client.  I

17    just wanted to give you a heads-up that that's what I heard

18    before I came out here today, that the client's position, they

19    spent a lot of time on this case, so we need to --

20         THE COURT:  Well, it's got to be reasonably spent, so

21    obviously anything going through their own personal medical

22    records, their time testifying, their time at a deposition, and

23    perhaps a few conferences with you, but I'm not going to pay

24    them to go through all the documents in the case.

25         MR. HAVILAND:  Right.  No, I understand that.

be7428d7-0463-4420-b209-dd0c9d5f18bd

1    Reverend Aaronson with two deaths and a lot of prep, I could

2    see that getting up there, though, considering all the time.

3            THE COURT:  What I think is reasonable is for him to

4    go through his own stuff and his own deposition and his own

5    trial and perhaps a conference with you about this case.

6            MR. HAVILAND:  That's helpful, Judge.  Thank you.

7            THE COURT:  On the merits, not the objections, not

8    the --

9            MR. HAVILAND:  That's helpful.  With that I can --

10           THE COURT:  You can just sort of blame me.  It's about

11   the case, it's about preparing the case on behalf of the class.

12           MR. HAVILAND:  That's very helpful.  You understand

13   perceptions of clients.

14           THE COURT:  Yes, yes, blame me.  He's probably blamed

15   me enough anyway, but --

16           So I think that does it.  Thank you very much.  I am

17   hoping to put this to bed.  And then the Track Two is on track?

18           MS. CONNOLLY:  That's correct.

19           MR. MATT:  Yes.

20           MS. CONNOLLY:  It's on schedule.

21           THE COURT:  All right.  And then come June, if the

22   cards are played correctly, this is the end of this case?

23           MR. MATT:  It's entirely possible.

24           MS. CONNOLLY:  Absent appeals.

25           THE COURT:  I'm looking at you, Mr. Haviland.

Page 91

1        MR. HAVILAND:  Your Honor, I've completely settled the

2   Pennsylvania Attorney General case, so I'm pleased to say that

3   I'm happy to get these cases over with.

4        THE COURT:  I still have a few of the state cases, but

5   that's not your hunt.

6        MR. HAVILAND:  Oh, I'm sorry.  Mr. Tretter reminds we

7   have post-trial on his verdict --

8        THE COURT:  Yes, but I'm talking about my MDL with you

9   all should be roughly over in June.

10        MR. MACORETTA:  We're still waiting on your Honor to

11   rule on the Johnson & Johnson motion that was briefed in

12   November.  Both sides have waived oral argument.  That's on

13   our --

14        THE COURT:  All right.  All right, she knows.

15        You're going to be victims of the budget crisis,

16   you're about to be.  You all look at me quizzically.  Why?

17   Because I don't get any more third law clerk because there's no

18   money for them.  So I am trying to wrap up as much as I can in

19   this clerkship cycle because after that, it's just going to be

20   very difficult for me.  So you yourselves are victims.

21        MR. TRETTER:  Thank you, your Honor.

22        THE COURT:  We stand in recess.

23        MR. MATT:  Thank you, your Honor.

24        MR. HAVILAND:  Thank you, Judge.

25        (Adjourned, 4:03 p.m.)

1                    C E R T I F I C A T E

2

3

   UNITED STATES DISTRICT COURT )
4  DISTRICT OF MASSACHUSETTS     ) ss.
   CITY OF BOSTON                )
5

6

7           I, Lee A. Marzilli, Official Federal Court Reporter,

8  do hereby certify that the foregoing transcript, Pages 1

9  through 91 inclusive, was recorded by me stenographically at

10 the time and place aforesaid in Civil Action No. 01-12257-PBS,

11 In Re:  Pharmaceutical Industry Average Wholesale Price

12 Litigation, and thereafter by me reduced to typewriting and is

13 a true and accurate record of the proceedings.

14      In witness whereof I have hereunto set my hand this 30th

15 day of March, 2011.

16

17

18

19

20           /s/ Lee A. Marzilli
           _____
21         LEE A. MARZILLI, CRR
           OFFICIAL FEDERAL COURT REPORTER
22

23

24

25