**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| IN RE: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL NO. 1456 |
| THIS DOCUMENT RELATES TO:  BMS SETTLEMENT | CIVIL ACTION: 01-CV-12257-PBS  Judge Patti B. Saris |

**DECLARATION OF STEVE W. BERMAN
IN SUPPORT OF LEAD CLASS COUNSEL'S MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR ATTORNEYS' FEES AND COSTS AND
COMPENSATION TO THE CLASS REPRESENTATIVES IN ASSOCIATION WITH
<u>THE TRACK TWO SETTLEMENT</u>**

I, Steve W. Berman, declare and state as follows:

1. I am a partner at the law firm of Hagens Berman Sobol Shapiro LLP; my firm served as Co-Lead Counsel in the above-captioned case. I submit this Declaration in Support of Lead Class Counsel's Memorandum of Law in Support of Motion for Attorneys' Fees and Costs and Compensation to the Class Representatives in Association with the Track Two Settlement. The matters stated herein are true to the best of my personal knowledge and, if called upon to testify thereto, I would and competently do so.

2. The purpose of this Declaration is to briefly summarize the factual and procedural history of this litigation, including, but not limited to, the initial filing, the multiple rounds of motion to dismiss briefing, class certification proceedings, discovery, trial preparation, settlement negotiations, lodestar and litigation expenses. Because this Declaration is submitted in connection with settlements with Track Two Defendants, I focus to some extent on Plaintiffs' litigation against those Defendants. However, much of the work completed in direct furtherance of the case against Track One Defendants (e.g. class certification proceedings in Track One) inured to Plaintiffs' benefit with respect to preparation of the case against Track Two Defendants, and some of that history is also recounted here. As Plaintiffs' Co-Lead Counsel, my firm has been intimately involved in all aspects of this litigation from the outset to the present, and the description set forth below is based on my personal knowledge.

3. This litigation is ten years old. When it was filed in 2001 it was one of the largest class actions in history and challenged fraud that affected the pricing of virtually every prescription drug in the marketplace. In turn, Defendants, including Track Two Defendants, challenged nearly every material factual allegation or legal claim that we made. While many of

our claims were initially dismissed, we survived the second round of briefing after we were given leave to replead.

4.      Thereafter, undaunted by the enormity of the case, and in a time before Internet document review platforms were commonplace, we developed an efficient method to divide the work of reviewing documents and developed a core set of documents that were used to brief motions to dismiss, class certification, Track One summary judgment and to prepare for trial against both Track One and Track Two Defendants.  We reviewed millions of documents and took and participated in hundreds of depositions of the parties, their consultants and other experts, providers, as well as depositions of nearly every TPP in the country.   With respect to Track Two Defendants specifically, Plaintiffs conducted over 75 depositions of current and former employees, including high level executives and sales personnel.

5.      Class certification against Track One Defendants was akin to a trial on the merits. The parties filed multiple rounds of briefing, retained some of the country's most preeminent healthcare economists and industry specialists, gave the Court a two-day expert tutorial on the industry and had an all-out brawl about the expert testimony proffered.  Ultimately, although the Court certified a far narrower Class that what we had initially requested, we continued to prosecute the case with the same zeal.  We took even more depositions and engaged in another round of expert discovery that resulted in multiple summary judgment briefs filed by the Track One Defendants collectively and individually.  We also filed our own motion for partial summary judgment on liability and our motion asking the Court to adopt a "plain meaning" interpretation of AWP, which the Court ultimately did.

6.      Class Counsel pursued discovery in Track Two with the same vigor.  We took depositions of the Parties, third parties and providers and, until we reached a global settlement

with the Track Two Defendants, participated in the "government knowledge" depositions pursued by the those Defendants. A few months after the summary judgment motions were briefed on the Track One side, Plaintiffs filed a motion to certify the Track Two case, which was opposed by all Track Two Defendants collectively, as well as by many of those Defendants individually. As with the Track One Defendants, the briefing was expert intensive, with boxes and boxes of exhibits submitted to the Court. While the Court did not have argument on those motions because Plaintiffs reached a global settlement with those Defendants, those cases were zealously litigated before they were resolved.

6. In addition to battling on the litigation front, we also engaged in settlement discussions with the Track Two Defendants. Those discussions involved detailed presentations of the Parties' views of the facts and law and required Dr. Hartman to present multiple options for damage calculations. Defendants were determined to litigate these cases to the highest level, so we were only able to bring them to the table by showing them that we, too, were committed to seeing this case to the end, wherever it brought us.

7. We believe that there is full support for an award of thirty percent of the Settlement Fund as our attorneys' fees and expenses. The Settlement will provide real relief for the victims of Track Two Defendants' fraud. As described below, this relief was obtained because of the no-holes-barred approach we took to this litigation.

**A.      Introduction**

8. This MDL was formed in 2001 after 98 different cases were transferred to this Court pursuant to 28 U.S.C. § 1407. When this case began, what this Court has since described as the "perfect storm" of information about AWP had just begun to emerge. *In re Pharm. Indus. Average Wholesale Price Litig.* ("*In re AWP*"), 491 F. Supp. 2d 20, 41 (D. Mass. 2007). We knew we had our work cut out for us from the beginning.

- 3 -

9. The initial scope of the case was nearly unprecedented. The first Amended Master Consolidated Complaint ("AMCC") involved 42 different pharmaceutical company defendants and involved potentially thousands of both self-administered and physician-administered drugs. Each Defendant was represented by at least one of the best defense firms in the country, all of whom made clear early-on of their intention to litigate this case to trial and through the full appellate process as necessary. Indeed, as the hard work of developing the case began, several of the largest class action firms in the country withdrew from the case, leaving the four Co-Lead firms to head one of the largest class actions ever filed at the time. Nonetheless, believing the scope of the fraud to have been so massive, Class Counsel proceeded in the face of substantial risks also recognizing that unforeseen risks would likely develop.

**B.     Motions to Dismiss**

10. Plaintiffs filed their first Master Consolidated Class Action Complaint ("MCC") on September 6, 2002. Dkt. No. 148. Defendants, including Track Two Defendants, immediately brought a "kitchen sink" of motions, asking the Court to dismiss the case outright. Defendants argued that this Court should abstain from this action because the questions involved were legislative questions and that Plaintiffs had not properly pled any of our four RICO enterprises, and they claimed that the action was preempted by the Medicare Act and ERISA. Finally, they attacked the standing of the association plaintiffs, argued that Plaintiffs should be required to identify each AWP alleged to be fraudulently published, claimed the case should be dismissed under the filed rate doctrine and the government action doctrine, and argued that all multi-source drugs should be dismissed.

11. After extensive briefing, the Court ultimately agreed with many of Defendants' arguments, but gave Plaintiffs leave to replead. *In re AWP*, 263 F. Supp. 2d 172 (D. Mass. 2003).

12. On October 28, 2002, the Court entered Case Management Order No. 5, which required Defendants, within 30 days, to produce documents related to existing or previous investigations or other legal proceedings involving AWP. Dkt. No. 161. Defendants, including most Track Two Defendants, subsequently produced hundreds of boxes of documents. Plaintiffs promptly assembled teams of lawyers who reviewed these documents for months in order to develop allegations that would comply with the Court's Order dismissing the MCC. At the time this review occurred, Internet-based document review was not common and, given the timeframe involved, documents had to be reviewed in paper form.

13. On June 18, 2003, Plaintiffs filed their AMCC, which contained allegations based on their review of the documents produced pursuant to CMO No. 5. Again, Defendants collectively and individually moved to dismiss the case on multiple grounds. Ultimately, the Court granted their motion to dismiss Plaintiffs' RICO claims regarding the manufacturer-publisher enterprise, but denied it with regard to the manufacturer-PBM enterprise. The Court denied Defendants' motion to dismiss all claims involving generic drugs and sustained Plaintiffs' Together Rx antitrust claims. *In re AWP*, 307 F. Supp. 2d 196 (D. Mass. 2004).

**C.    Document Production**

14. On March 25, 2004, the Court ordered discovery, motion practice and trial to proceed in two tracks, a fast track (Track 1) and regular track (Track 2), pursuant to which both class certification and summary judgment would be litigated. *See* Dkt. No. 756.

15. Once the scope of the case was determined, discovery began in earnest. The scale of the document production in this case was massive. Not only did Plaintiffs receive millions of pages of documents from both Track One and Track Two Defendants, but one of Defendants' first orders of business was to subpoena documents from nearly every third-party payor in the country. Plaintiffs likewise sought discovery from consultants, providers and other third parties.

Class Counsel had to devote substantial energy and thousands of hours in obtaining, inventorying, and examining millions of documents produced by Track Two Defendants.

16. In order to ensure that we could manage the review, we assigned each Defendant to a separate Co-Lead firm or group of firms, who were responsible for reporting back to the Co-Lead group as a whole regarding the types of documents that were being found. Senior-level attorneys were responsible for reviewing the documents pulled by the document review team and developing discovery strategies based on the documents found.

17. Once this process was completed, what was once millions of pages of documents became a far more discrete set of documents subject to in-depth review by more senior attorneys. Class Counsel thus had a robust database of a more discrete set of documents that we used to take depositions, draft our class certification papers and ultimately prepare for trial. The document review that began in 2003 with the CMO No. 5 production continued nearly until the eve of the Class 2/Class 3 trial in November 2006 with respect to Track One Defendants. Track Two discovery continued until far after that, almost until Plaintiffs reached a settlement agreement with Track Two Defendants in mid 2008.

**D.    Depositions**

18. There were hundreds of depositions taken in this case as a whole. Plaintiffs took depositions of Defendants' representatives, physicians targeted by Defendants' schemes and consultants used by the Defendants. Defendants, including Track Two Defendants, took lengthy depositions of all the consumer and TPP Class Representatives. Moreover, Defendants took depositions of every major TPP and PBM in the country and of consultants used by Class members in working with those entities.

19.     Plaintiffs took more than 75 depositions of current and former employees of Track Two Defendants, including senior managers and sales personnel. The depositions resulted in thousands of marked deposition exhibits.

**E.      Discovery Disputes/Motions to Compel**

20.     On April 30, 2004, the Court referred this case for full pretrial case management to Magistrate Judge Bowler. Dkt. No. 825. There were discovery disputes about virtually every aspect of discovery, including responses to interrogatories, the scope of Plaintiffs' 30(b)(6) notices, depositions and documents sought from Class Representatives and absent class members, motions to compel third parties to appear for depositions, privilege logs and assertions of privilege during depositions and multiple motions for sanctions related to discovery conduct. Many of these motions concerned discovery sought from or by Track Two Defendants. In many instances Judge Bowler held half or full-day hearings during which ten or more discovery motions were heard. Several of her orders were appealed to this Court.

**F.      Class Certification**

21.     All of the discovery described in Sections C and D above was used to support Plaintiffs' class certification papers, in which Plaintiffs sought certification of three nationwide Classes involving Track Two drugs.

22.     Both Plaintiffs and the Track Two Defendants relied heavily on nationally-recognized experts in briefing class certification. Those experts not only exchanged multiple rounds of reports, they also sat for multi-day depositions.

**G.      Settlement Discussions**

23.     Settlement discussions with all Defendants in this case, including Track Two Defendants, have taken place for years, have involved multiple starts and stops, extensive

reviews of the evidence and damage estimates and have required the oversight of MDL Mediator Eric Green.

24.     In each instance, including with the Track Two Settlement, once an agreement was reached regarding the total sum, Class Plaintiffs sought representation for TPPs and consumers to negotiate a plan of allocation. Class Counsel selected attorneys with substantial experience in these kinds of negotiations.

25.     All of the work described in this Declaration positioned Plaintiffs for the Settlement for which they now seek final approval. In short, the Track Two Defendants would not have come to the table had Plaintiffs not made clear our intention to litigate this case to whatever end was required. In short, we have shown our commitment again and again in this litigation and will continue to do so until all aspects of this case have been resolved.

## II.     ATTORNEYS' FEES AND EXPENSES

26.     Class Counsel seek an award of attorneys' fees and expenses equal to 30% of the Settlement Fund. This amount is more than warranted. The accompanying brief in support of the fee request explains the established judicial preference for using the percentage-of-recovery approach in awarding attorneys' fees in common fund cases.

27.     Class Counsel prosecuted this case in an exhaustive manner. With every setback we regrouped and refined our case, devising strategies to prosecute this case to a successful conclusion. Plaintiffs' counsel advanced nearly $10 million to finance this litigation. Furthermore, Class Counsel's preparation in reviewing millions of documents, identifying those documents that assisted in the prosecution of the case, participating in hundreds of depositions, engaging in aggressive and exhaustive expert discovery, briefing multiple motions for summary judgment, trying the Class 2/Class 3 Massachusetts case and sustaining that verdict on appeal,

assisted settlement negotiations as Track Two defense counsel understood that Class Counsel were ready and willing to litigate this case to whatever extent necessary.

28.    To date, Class Counsel have been awarded fees for three settlements – the GSK global settlement, the AstraZeneca Class 1 Settlement and the AstraZeneca Class 2/3 Settlements.  Class Counsel's fees and expenses were totally contingent and dependent on a fee and expense award by this Court.

29.    Class Counsel took on this highly complex case on a wholly contingent basis with no guarantee that their costs would ever be recovered or their fees ever paid.  From the outset, Class Counsel understood that they were embarking on an expensive and lengthy campaign with no guarantee of payment resulting from their investment of time, money and effort.  In fact, there are numerous class actions in which Class Counsel expended thousands of hours, but received no remuneration despite their diligence and expertise.  *See Robbins v. Kroger Props.*, 116 F.3d 1441 (11th Cir. 1997); *Backman v. Polaroid Corp.*, 910 F.2d 10 (1st Cir. 1990); *Krinsk v. Fund Asset Mgmt., Inc.*, 715 F. Supp. 472 (S.D.N.Y. 1988), *aff'd*, 875 F.2d 404 (2d Cir. 1989); *Landy v. Amsterdam*, 815 F.2d 925 (3d Cir. 1987); *Radol v. Thomas*, 772 F.2d 244 (6th Cir. 1985); *Rosenblatt v. Getty Oil Co.*, 1983 Del. Ch. LEXIS 570 (Del. 1983); *Spielman v. General Host Corp.*, 402 F. Supp. 190 (S.D.N.Y. 1975), *aff'd*, 538 F.2d 39 (2d Cir. 1976).  Examples of cases that were dismissed before trial, but only after substantial efforts had been expended, are also abundant.  *See In re Convergent Tech. Sec. Litig.*, 721 F. Supp. 1133 (N.D. Cal. 1988) (granting summary judgment for defendants after almost five years of litigation), *aff'd*, 1991 U.S. App. LEXIS 19733 (9th Cir. 1991); *Kalish v. Franklin Advisers, Inc.*, 742 F. Supp. 1222 (S.D.N.Y. 1990) (judgment for defendants after bench trial), *aff'd*, 928 F.2d 590 (2d Cir. 1991); *I. Meyer Pincus & Assoc., P.C. v. Oppenheimer & Co.*, 1990 U.S. Dist. LEXIS 13752 (S.D.N.Y. Oct. 15,

1990) (dismissing third amended complaint without leave to replead), *aff'd*, 936 F.2d 759 (2d Cir. 1991). A good example of the nature of the risks confronted by Class Counsel in actions such as this is the *Polaroid* litigation. That case lasted for more than 11 years. Plaintiffs won at trial, but the verdict was reversed on appeal years later. *See Backman v. Polaroid*, 910 F.2d 10 (1st Cir. 1990). Thus, despite their trial victory, plaintiff's counsel ultimately received nothing for eleven years (and many thousands of hours) of labor. Therefore, the contingent nature of this litigation posed a great deal of risk for Class Counsel in undertaking this case.

30. In undertaking to represent the Class, Class Counsel also needed to insure that sufficient resources and funds existed at all times, not only to prosecute the litigation in a cost-effective manner, but also to compensate experts and vendors. Firms in a contingent litigation practice involving complex multi-district cases must not only pay regular overhead, but also advance the expenses of litigation. The financial burden on contingent fee counsel is far greater than it is on firms that are paid on an ongoing basis throughout lengthy and complex litigation.

31. Indeed, when Class Counsel undertook representation of the Class, there were no assurances that any fees would ever be received. There was no "model" for a case like this and many of the issues we litigated were issues of first impression. Because of this, we were always aware that we would likely have to overcome the daunting difficulties, and would have to expend thousands of hours and millions of dollars to prosecute this case over an extended period of time before having even a possibility of recovering fees and expenses. Class Counsel alone bore the risk of the case being dismissed at the pretrial stage, of not prevailing at trial, or even losing on appeal.

### III.   INCENTIVE AWARDS FOR CLASS REPRESENTATIVES

32. Class Counsel request that the Court approve incentive awards for the Class Representatives who represented the class throughout this litigation.

- 10 -

33. Neither the Track Two Settlement nor the case as a whole would exist without the efforts of the Class Representatives. The Class Representatives were integral in helping Class Counsel analyze their claims and the evidence. With the exception of Muriel Tonacchio, the Class Representatives met with counsel at the outset of the action, responded to interrogatories, searched for and produced documents to forward the litigation, requested and received reports from Class Counsel, prepared for depositions with Class Counsel, attended depositions, communicated with Class Counsel and monitored the status of the case. Ms. Tonacchio became a representative of Class 1 later in the litigation, but she, too, met and communicated with Class Counsel and spent time reviewing medical records, the complaint and other documents.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 28th day of April, 2011 in Seattle, Washington.

                                              **/s/ Steve W. Berman**
                                                    Steve W. Berman

## CERTIFICATE OF SERVICE

  I hereby certify that I, Steve W. Berman, an attorney, caused a true and correct copy of the foregoing, **DECLARATION OF STEVE W. BERMAN IN SUPPORT OF LEAD CLASS COUNSEL'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR ATTORNEYS' FEES AND COSTS AND COMPENSATION TO THE CLASS REPRESENTATIVES IN ASSOCIATION WITH THE TRACK TWO SETTLEMENT**, to be delivered to all counsel of record by electronic service pursuant to Paragraph 11 of the Case Management Order No. 2, by sending on April 28, 2011, a copy to LEXISNexis File & Serve for posting and notification to all parties.

              /s/ Steve W. Berman
             Steve W. Berman