UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL NO. 1456 |
| THIS DOCUMENT RELATES TO:<br><br>BMS SETTLEMENT | CIVIL ACTION: 01-CV-12257-PBS<br><br>Judge Patti B. Saris |

**CLASS COUNSEL'S PROPOSAL TO REBALANCE THE
<u>BMS SETTLEMENT ALLOCATION</u>**

## I.   INTRODUCTION

At the BMS settlement final fairness hearing held March 28, 2011, the Court asked Class Counsel to submit a possible "rebalancing" scenario that provides Class 1 members who were administered the BMS "Heartland Drugs" with double or treble their actual damages plus a modest recovery for other BMS Subject Drugs.  The Court also implored the parties to reach an accommodation that resolves the Aaronson objection.  We worked very hard to do so, with the very diligent mediation assistance of Professor Eric Green.  Don Haviland and his client, TPP Allocation Counsel Richard Cohen and Consumer Allocation Counsel Wells Wilkinson and Jeffrey Goldenberg were included in the process.

TPP Allocation Counsel has agreed to increase the $4,370,000 allocation to Class 1 and Class 3 Consumers by $1,000,000 to a total of $5,370,000.  As detailed below, Class Counsel propose to use the additional money to "rebalance" the distribution to Class 1 consumers in a manner that provides single actual damages for "non-Heartland Drugs," double actual damages for the "Heartland Drugs" and a modest $50 recovery for so-called "no damage" drugs.  We

- 1 -

believe that the proposed rebalancing accomplishes the Court's goal of linking the distribution methodology to actual damages and providing a premium for Heartland Drugs, consistent with the Court's prior approval of the AstraZeneca Class 1 settlement, which was sustained by the First Circuit.  The proposed rebalancing is supported by Class Counsel, Consumer Allocation Counsel and TPP Allocation Counsel, who respectfully request that the Court approve it.

In addition, a proposed accommodation has been reached with Reverend Aaronson.  In return for very modest compensation in the approximate amount that Rev. Aaronson would have personally received under the terms of the original $13 million Memorandum of Understanding ("MOU"), Rev. Aaronson has agreed to withdraw his objection and his motion to enforce the original MOU.[1]  Under the agreement, Rev. Aaronson, who the Court considered to have withdrawn as a class representative as of August 5, 2007, is filing a motion under Fed. R. Civ. P. 23(e)(5) for leave of Court to withdraw the objection.[2]  Rev. Aaronson is also submitting a declaration seeking reimbursement for the substantial time that he spent working on the litigation, and Class Counsel support that request.

Class Counsel believe that this accommodation and the proposed rebalancing are fair and reasonable and will enable all claimants to receive their recovery without the undue delay of any appeal.  Accordingly, we respectfully request that the Court approve both.

## II.   A PROPOSED "REBALANCING" SCENARIO

### A.   The Proposal

The Court has asked that we run a "rebalancing" scenario that "either double[s] or treble[s] what I'll call my heartland damages and [gives] something to the others . . . ."  Hearing

---

[1] This amount is $1,571, which is $984 more than what Rev. Aaronson is estimated to receive under the rebalancing proposal contained herein.

[2] Rule 23(e)(5) provides:  "Any class member may object to the proposal if it requires court approval under this subdivision (e); the objection may be withdrawn only with the court's approval."

001534-16 434283 V1

Tr. at 56.  Class Counsel asked claims administrator Rust Consulting to run such a scenario, utilizing the additional $1,000,000 contributed by the TPPs.  The results of this rebalancing scenario are attached as Exhibit B to the Declaration of Daniel Coggeshall Regarding Revised Calculation Concerning Distribution of the Net Settlement Fund to BMS Class 1 and Class Consumers ("Coggeshall Decl.") and summarized below.

The proposal described below results in Class 1 and Class 3 Consumers receiving a Net Distributable Amount of **$3,397,989.85**, after deducting attorneys' fees and the Consumer share of estimated notice and administration costs.  The salient benefits of the rebalancing are summarized as follows:

- The model is based on the AstraZeneca Class 1 distribution formula, which calculated an actual damage amount and applied a multiplier for the "Heartland" years.

- *All* Class 1 and Class 3 Consumers receive more than their actual damages.

- Class 1 Consumers receive double their actual damages for the BMS drugs and years for which the Court found liability at trial.

- *All* Class 1 and Class 3 Consumer Claimants receive a $50 minimum payment, even if they have not incurred any damages.

The Net Distributable Amount of $3,397,989.85 that results from the proposal was calculated as follows.

*1.  Step 1:  Determining Actual Damage.*  Step 1 determines actual damages for each Class 1 member using Dr. Raymond Hartman's damages percentages as applied to the Medicare utilization data.  For each eligible Class 1 claimant co-pay, Rust Consulting applied the percentage overcharges calculated by Dr. Hartman per the table attached as Exhibit A to the

Coggeshall Declaration (see the bottom table termed "Overcharges Ratio"),[3] with the following clarifications:

    a.    <u>Rubex</u>:  Although the Court found liability for Rubex, Rubex administrations receive $0 in Step 1.  This is because (i) BMS did not sell it until 1994 and discontinued it in 2002; (ii) BMS held less than 1% of the market; and (iii) Dr. Hartman estimated only $49,500 in damages on $88,215 in co-payments for Rubex from 1994 through 2000.  Thus, almost all of the Rubex administrations appearing in the CMS database will be for the generic form of doxorubicin hydrochloride manufactured by another drug company and reimbursed under the same J-Code as Rubex.

    b.    <u>Vepesid</u>:  Vepesid administrations in 1991 and 1992 received $0.  This is because there was no "spread" competition in those two years.  For 2003 and 2004 administrations, the overcharge ratio for 2002 was used.

    c.    <u>Cytoxan</u>:  For 2003 and 2004 administrations, the overcharge ratio for 2002 was used.  For 1991 and 1992 overcharge ratios, the 1993 number was used.

    d.    <u>Taxol</u>:  For 2003 and 2004 administrations, the 2002 overcharge ratio was used.

(Where blanks otherwise appear in the overcharge table, that means $0.)

    ***2.    Step 2: "Heartland" Doubling.***  In Step 2, actual damages determined in Step 1 were doubled for the following drugs and years:  Taxol, 2002; Vepesid, 1998-99, 2001-02; and Cytoxan, 1998-2002.  These are the "Heartland Drugs and Years" for which the Court found liability, with one exception.  Although the Court found liability for Taxol in 2001, we did not

---

[3] Dr. Hartman provided the proper evidentiary foundation for the Overcharge Ratios in the Declaration of Raymond S. Hartman in Support of Bristol-Myers Squibb Settlement Allocation (Dkt. No. 7498).

- 4 -

treble these damages because Dr. Hartman found that spreads in late 2001 only exceeded his 30% threshold by 3%, and no Medicare damages resulted given the reimbursement formula of AWP-5%.

      *3.*     *Step 3: Applying a Minimum $50 Payment.* In Step 3, a $50 flat payment was allocated to anyone who was administered Blenoxane, Etopophos, Paraplatin or Rubex, what we are calling the "no damage drugs." It is appropriate to provide these claimants with some compensation (as the Court has recognized), as they are giving a release and a jury could find liability where the Court did not. The payment is a flat $50 per drug, without regard to how many administrations the claimant received of that drug. In addition, Taxol administrations during the years 1991-2001 were also paid $50, regardless of the number of times Taxol was administered during that time period. The Court found no liability for Taxol prior to 2001, when the drug was single-source and did not face any generic competition. Lastly, some claimants had actual damages but in an amount less than $50, and the distribution formula steps them up to $50. Thus, $50 is the minimum payment that a valid Class 1 claimant will receive, even if they had no damage or were damaged in an amount less than $50.

      *4.*     *Class 3 Payments Remain Unchanged.* In the rebalancing scenario, the 97 consumer claimants in Class 3 receive what they would have under the original distribution formula, either the "Easy Refund" option or their Total Recognized Amount calculated as per the notice (that is, estimated out-of-pocket expenditures for the drugs, with the amounts trebled for Cytoxan, Taxol and Vepesid). Here, we could not run the same three-step exercise set forth above for Class 1 claimants because Rust does not have the utilization data necessary to do so.

\*     \*     \*

The results of the foregoing rebalancing, including a 5% reserve for additional cured claims, are attached as Exhibit B to the Coggeshall Declaration.  As shown, the total net funds paid to consumers under this proposal is $3,397,989.85, split between Class 1 and Class 3 consumers as follows:  $3,046,453.74 to Class 1 Consumers; and $351,536.11 to Class 3 Consumers.  The estimated breakdown by drug for Class 1 is as follows:

| Drug | Estimated Payout |
|---|---|
| Blenoxane | $   12,497.50 |
| Etopophos | 67,992.50 |
| Paraplatin | 284,400.00 |
| Rubex | 251,340.00 |
| Cytoxan | 307,075.80 |
| Taxol | 1,889,642.39 |
| Vepesid | 165,534.96 |
| Amount for $50 minimum | 67,970.59 |
| **Class 1 Total** | **$ 3,046,453.74** |

Even though they receive more than their actual damages, approximately 3,492 Class 1 Consumers will receive less under this proposal than they would under the present distribution formula.  Coggeshall Decl., ¶ 14.  The Court would likely have to send another notice to these Class 1 claimants, advising of the change and providing another period for comment.

**B.      The TPPs Would Forego $1,000,000 Under the Rebalancing Proposal**

In this proposal, the TPPs would forgo $1,000,000.  In other words, an additional $1,000,000 to Consumer Class members, reallocated from the TPP pool, will provide the Consumer Class members with sufficient money to enact the rebalancing proposed here.  This is demonstrated by the following calculation:

|  |  |
|---|---|
| $ 5,370,000 | Consumer Allocation under Rebalancing Proposal |
| ( 1,503,600) | Attorneys' fees at 28% |
| ( 379,380) | Estimated share of notice and administration costs (net of BMS's 50% share)[4] |
| **$ 3,487,020** | Amount available for distribution to Consumers |

This amount is greater than the $3,397,989.85 needed under the rebalancing proposal, leaving a reserve for the Consumer share of any incentive awards that the Court provides to the named representatives.

The Court would likely have to send another notice to TPP Class members who filed claims, advising of the change in allocation and providing another period for comment.

### III.   CONCLUSION

Class Counsel believe that the foregoing rebalancing proposal is fair and reasonable and request that the Court approve both it and the BMS settlement. We also respectfully request that the Court grant Rev. Aaronson's motions to withdraw his objection and to enforce the MOU.

DATED:  May 2, 2011                          By     /s/ **Steve W. Berman**
                                                            Thomas M. Sobol (BBO#471770)
                                                            Edward Notargiacomo (BBO#567636)
                                                            Hagens Berman Sobol Shapiro LLP
                                                            One Main Street, 4th Floor
                                                            Cambridge, MA  02142
                                                            Telephone: (617) 482-3700
                                                            Facsimile: (617) 482-3003

                                                            Steve W. Berman
                                                            Sean R. Matt
                                                            Hagens Berman Sobol Shapiro LLP
                                                            1918 Eighth Avenue, Suite 3300
                                                            Seattle, WA  98101
                                                            Telephone: (206) 623-7292
                                                            Facsimile: (206) 623-0594

---

[4] Under the current allocation agreement, Consumers and TPPs evenly share administration and notice costs (net of BMS's payment of 50% of the notice costs).

001534-16 434283 V1

- 8 -

Jennifer Fountain Connolly
Hagens Berman Sobol Shapiro LLP
1629 K St. NW, Suite 300
Washington, D.C.  20006
Telephone:  (202) 355-6435
Facsimile:  (202) 355-6455

Jeffrey Kodroff
John A. Macoretta
Spector, Roseman, Kodroff & Willis, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA  19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611

Kenneth A. Wexler
Wexler Wallace LLP
55 W. Monroe Street, Suite 3300
Chicago, IL  60603
Telephone: (312) 346-2222
Facsimile: (312) 346-0022

Marc H. Edelson
Hoffman & Edelson LLC
45 West Court Street
Doylestown, PA  18901
Telephone: (215) 230-8043
Facsimile: (215) 230-8735
Co-Lead Counsel

- 9 -

## CERTIFICATE OF SERVICE BY LEXISNEXIS FILE & SERVE

Docket No. MDL 1456

    I, Steve W. Berman, hereby certify that I am one of plaintiffs' attorneys and that, on May 2, 2011, I caused copies of **CLASS COUNSEL'S PROPOSAL TO REBALANCE THE BMS SETTLEMENT ALLOCATION** to be served on all counsel of record by causing same to be posted electronically via Lexis-Nexis File & Serve.

                                                                      /s/ Steve W. Berman
                                                                      Steve W. Berman

001534-16 434283 V1