**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) | MDL No. 1456 |
| | ) ) | |
| THIS DOCUMENT RELATES TO: | ) | CIVIL ACTION: 01-CV-12257-PBS |
| | ) | |
| ALL CLASS ACTIONS RELATING TO TRACK TWO DEFENDANTS | ) ) | Hon. Patti B. Saris |
| | ) | |

## CLASS MEMBER PATRICIA WEATHERLY'S THIRD REVISED OBJECTION TO CLASS ACTION SETTLEMENT AND NOTICE OF INTENT TO APPEAR

Class 3 Percentage Co-pay Consumer class member Patricia Weatherly ("Weatherly")

of San Antonio, Texas hereby submits a revised Objection to the proposed Track Two

settlement and to Lead Class Counsel's request for attorney's fees. In this Objection

Weatherly summarizes and incorporates her previous Objections filed in this matter. This

Objection includes an opposition to the allocation of funds between classes in this settlement

including the Class 1 allocation. Weatherly is part of this action because between January 1,

1991 and March 1, 2008 she made percentage co-payments for certain drugs identified in the

class membership drug list appended to the proposed settlement. Specifically, on June 17,

2004 Weatherly underwent a procedure at Baptist Hospital in San Antonio, Texas during

which she was administered Acetylcysteine and Lorazepam at a total cost of $410.25, of

1

which she was responsible to pay ten (10%) percent and the balance of which was paid by her health insurer, United Healthcare Insurance. Weatherly gives notice of her intent to appear at the Fairness Hearing scheduled for June 13, 2011 through her undersigned counsel.

## SUMMARY OF OBJECTION

Weatherly's Objection is based on the simple premise that the settlement proposed by Class Counsel should be fair to the Class 3 Percentage Co-pay Consumer subclass. The proposed settlement is not fair for the following reasons:

1. The Class 3 Percentage Co-pay Consumer class has never been quantified;

2. Notice to Class 3 Percentage Co-pay Consumer class has been inadequate resulting in a very low number of claims filed by this subclass;

3. Reasonable alternative methods of identification of Class 3 Percentage Co-pay Consumer class members and methods of direct claims payment to them are well-known to the Court and to Class Counsel and have not been employed;

4. A higher flat fee (easy refund) without need for documentation, is more equitable and would have encouraged more claims;

5. Were proven methods of class member identification and payment used it is very likely that the allocation to the Consumer Settlement Pool would be inadequate to fairly compensate Class 3 Percentage Co-pay Consumer class members;

6. Attorney fees of 30% of the Class 3 Percentage Co-pay Consumer subclass settlement are excessive if not tied to a fair distribution of the settlement to this subclass of consumers.

2

**PROCEDURAL HISTORY**

The Fairness Hearing in this matter has been on hold during the past year and a half while issues mostly regarding notice to Class 1 consumers were resolved. During that time very little emphasis has been placed on giving notice to the Class 3 Cash Payors and Class 3 Percentage Co-pay Consumer class.

In late October 2009 Class Plaintiffs filed a motion to approve the form of notice to cash paying consumers in Class 3 (and also for percentage co-pay consumers) and to reschedule the date for final approval of the settlement.[1] The Court granted the Motion and reset the schedule of dates leading up to final approval of the settlement on February 3, 2011.[2]

On November 30, 2010 the Court issued an Order setting a Final Approval Hearing for the Track Two Settlement for April 19, 2011. The deadline for Objections from any source was set for March 28, 2011.  The Court cited "…the slow pace of the implementation of the settlement in Track Two" and ordered monthly status reports.[3]

On December 4, 2009 Class Plaintiffs filed a motion to indefinitely suspend the schedule set by the Court on the basis that data related to Class 1 and Class 3 cash payor

---

[1] Class Plaintiffs' Motion for Approval of Form of Notice to Cash Paying Consumers in Class 3, Approval of Consumer Claims Schedule, and the Reschedule Date for Final Approval of the Track Two Settlement. (Doc. No. 6581, October 27, 2009).
[2] See, Court Order, (Doc. No. 6591, October 13, 2009).
[3] Order for Final Consideration of Track Two Settlement (Doc. No. 7314, November 30, 2011).

3

consumers had not yet been received and reviewed.[4] On December 15, 2009 the Court acted on Class Plaintiffs' December 4, 2009 motion and ordered an indefinite suspension of events related to the settlement of this matter.[5]

Class Plaintiffs filed a status report of January 28, 2010 indicating that using the Court-approved (in October 2009) notice to Class 3 cash payors (and also to percentage co-pay consumers) they commissioned "numerous 30 second television advertisements and a campaign of internet banner ads that ran during two weeks in early December 2009." Class Plaintiffs state that the response to the ads to cash payors was "excellent" with 370,000 visits to the settlement website, 82,000 requests for Class 3 claims notices, and the filing of 20,000 Class 3 claims.[6] Parenthetically a revised Class 3 claim form had been posted in a different website with instruction that claims be postmarked no later than February 1, 2010.[7] The TV ads did not reference the revised February 1, 2010 claim filing date. The main AWP Track 2 Settlement website , which was listed in the December 2009 TV ads, still listed then (as it does now in May 2011) May 1, 2009 as the date by which Class 3 claims had to be filed and stated that the time for filing claims has passed. The main AWP Track 2 Settlement website does not reference the fact that a revised Class 3 claim form, with a revised filing date of February 1, 2010, is on a different, hard to find web page.

---

[4] Class Plaintiffs' Motion Regarding Dates Related to Final Approval of the Track Two Settlement, (Doc. No. 6736, December 4, 2009).
[5] Order Regarding Class Plaintiffs' Motion Regarding Dates Related to Final Approval of the Track Two Settlement, (Doc. No. 6760, December 15, 2009).
[6] See, Class Plaintiffs' Notice of Status Related to Final Approval of the Track Two Settlement (Doc. No. 6867, January 28, 2010), at pages 1, 2.
[7] See, AWP Track 2 Settlement Website: http://www.awptrack2settlement.com/pdfs/RevdClass3Claimform.pdf

On February 9, 2011 the Court issued an Order, prepared by Class Counsel, which sets the date for the Final Approval Hearing of the entire Track Two Settlement for June 13, 2011. The Order also set dates for filing Objections and, unlike all previous such Orders, seems to limit Objections to members of Class 1. Weatherly presumes that the reference to Class 1 only was an oversight and that Objections to this settlement are not so limited. In any case her Objection relates to matters that pertain to all three classes to this settlement. [8]

### TRACK TWO CLASS 3 CONSUMER RESPONSE TO CLAIMS NOTICE

The conclusion can be drawn from Class Plaintiffs' January 28, 2010 status report that the 20,000 Class 3 claims filed by January 28, 2010 is close to the final number of claims filed before the February 1, 2010 postmark cut-off date. If, as Class Plaintiffs state, there were 370,000 visits to the AWP Track 2 Settlement Website, and if there 82,000 requests for Class 3 claims notices, the filing of 20,000 Class 3 claims indicates that only 5% of those who visited the web site filed claims and only 24% of those who took the trouble to download the ten page claim form did so.  Not specified is whether those who downloaded the Class 3 claim form downloaded the revised form with the February 1, 2010 filing date or the outdated claim form with the May 1, 2009 filing date and notice that the time to file had passed.

The Track 2 Settlement Website explains that the Class 3 Cash Payment and Percentage Co-pay Consumer settlement is approximately $21.8 million, (or perhaps $14.5 million after deducting 30% attorney fees and expenses.)  Class 3 consumers who can certify

---

[8] Order Granting Class Plaintiff's Motion for Approval of Revised Notice Plan and Schedule for Final Approval of the Track two Settlement (Doc. No. 7406, February 9, 2011).

that they made cash payments or percentage co-payments "can get up to $35.00". Class 3 consumers who can come up with records and bills (dating back to between January 1, 1991 and March 1, 2008) "can receive more money". [9] Assuming that the average claim filed evidenced expenditures of $100 and that 25,000 Class 3 claims were filed up to the cut-off date in early February 2010, the total claims would amount to $2.5 million or 11% of gross consumer allocation of $21.8 million. Such a result would leave around $12 million unclaimed, and a claim disbursed rate of only17.25% (of the net $14.5 million settlement remaining after fees and expenses.) If the average claim is closer to the $35 claim-without-documentation range, and assuming 25,000 claims filed, then the uptake rate of the net settlement could be less than 10%.

It may well be that Class Counsel intended that only a very small percentage of this settlement be claimed by consumers such as Weatherly. In April 2009 Class Counsel filed a response to Weatherly's (and others') Objections.[10] Attached to its response was the Declaration of Jeffery S. Goldenberg who had been 'asked by Class Counsel to represent the interests of consumers' in the allocation process. According to Mr. Goldenberg only 3.5% of the total damage amounts assigned to Class 3 were allocated to consumers. According to Mr. Goldenberg the total amount of damages assigned to Class 3 consumers was $2,308,000, out of the total $21,864,000 settlement allocated to consumers.  The difference in the two

---

[9] See, AWP Track 2 Settlement Website:   http://www.awptrack2settlement.com

[10] Class Plaintiff's Response to Objections to Final Approval of the Track Two Settlement (Doc. No. 6003).

consumer allocation amounts appears to be attributable to the TPP consumers getting the balance of the allocation.[11]

To date there is no further update available of the status of Class 3 consumer claims filed. Beginning in December 2010 and continuing through April 2011, at the Court's order Class Counsel has filed six monthly status reports of the Track 2 Settlements.[12] The monthly status reports focus exclusively on problems associated with getting notice to Track Two Class 1 consumers only and are silent with respect to Class 3 consumers.

### GSK SETTLEMENT: Class Counsel record of low percentage disbursement of consumer settlement funds

In 2007 this Court was involved in the settlement of GlaxoSmithKline ("GSK") portion of these cases.[13] In April 2009 Class Counsel, who was also Class Counsel in GSK, reported to the Court that "(t)he Claims Administrator received 6,311 eligible consumer claims with a total Recognized Claim Amount of $1,596,959.08."[14] Counsel went on to say that "(a)fter distribution to consumers with approved claims there will still be a substantial amount of money remaining in the Net Consumer Settlement Pool."[15] (emphasis added). Counsel then solicitously mentioned that it is "…well aware of this Court's oft-expressed

---

[11] See, Declaration of Jeffery S. Goldenberg (Doc. No. 6006). See also, Declaration of Alex Sugerman-Brozan (Doc. No. 6007).

[12] See, Class Plaintiffs' Status Reports for BMS, Track Two, and Astrazeneca Settlements (Docs. No. 7367, 7370, 7398, 7439, 7488, and 7514.)

[13] *In Re Pharmaceutical Industry Average Wholesale Price Litigation*, 1:01-CV-12257-PBS.

[14] Plaintiffs' Motion for Disbursement of Funds to Consumer Claimants in the GSK Settlement (Doc. No. 6011), page 2.

[15] Id, page 3.

desire to get as much of the settlement funds as possible directly into the hands of consumers." [16]

   The portion of the $70 million GSK settlement apportioned to consumers was approximately $19.65m, before attorney fees and expenses,[17] representing approximately 30% of the total $70m settlement after $4.5m of state payments. Attorneys' fees were 33.33%[18], or $6.55m of the consumer portion of the settlement, leaving $13.10m exclusive of expenses. If a very conservative $100k amount of expenses were allocated to the consumer portion of the settlement, the net consumer settlement after fees and expenses was $13m. On June 22, 2009 Mediator Eric Green determined that $11.6m remained of the amount originally allocated to the consumer class in the GSK settlement after distribution to eligible consumers.[19] The claims disbursed amount of just under $1.6m is a paltry 8% of the $19.65m gross consumer allocation of the GSK settlement and was only 13% of the net amount of $13m allocated to the consumer class. In June 2009 Mediator Green set about reallocating the GSK consumer funds, including supplemental payment to five states that participated in the settlement.[20] It is clearly evident that after the reallocation of consumer funds the value of the GSK settlement to the consumer class was nowhere near the value of the settlement as originally approved by this Court.

---

[16] Id.

[17] See, GSK Settlement Consumer Notice, page 6

[18] Id, page 10.

[19] Class Plaintiffs' Notice of Filing Decision of MDL Mediator Regarding Disposition of Unclaimed Consumer Funds in the GSK Settlement (Doc. No. 6171), Exhibit A, page 1.

[20] Id., at page 3.

8

It is interesting that in his Affidavit GSK Claims Administrator Eric Miller cites a litany of steps taken and hurdles overcome, at great expense, in processing the arguably very small number of consumer claims submitted in the GSK settlement (13,461) to pare down to the 6,311 eligible consumer claims ultimately paid.[21] Miller's description of his claims processing tasks is not without a through the looking glass quality. Class Counsel touts Miller's efforts uncritically in its Plaintiffs' Motion for Disbursement of Funds to Consumer Claimants in the GSK Settlement.[22]

While Weatherly took no role in the GSK settlement, her position with regard to the AWP Track Two settlement is based in part on a critical examination of Class Counsel's performance in GSK, and other more recent cases, to actually get (or not get) funds into the hands of consumers.

**McKESSON SETTLEMENT: A more effective consumer settlement procedure**

This Court approved the recent settlement of New England Carpenters Health Benefits Fund, et al. v. First Data Bank, Inc. and McKesson Corporation ("McKesson").[23] There Class Counsel, who was Class Counsel in McKesson, agreed to subpoena records for cash payor class members from the ten largest pharmacies. But in McKesson Class Counsel was permitted by the Court to subpoena pharmacy records only after the case settlement was

---

[21] Affidavit of Eric Miller Regarding Allocation and Distribution of the Net Settlement Fund to Consumer Claimants in the GSK Settlement, (Doc. No.6011-2).

[22] Plaintiffs' Motion for Disbursement of Funds to Consumer Claimants in the GSK Settlement (Doc. No. 6011), pages 2-4.

[23] New England Carpenters Health benefits Fund, et al. v. First Data Bank, Inc. and McKesson Corporation, 1:05cv1148-PBS.

approved by the Court[24], as opposed to <u>Relafen</u> where (the same) Class Counsel had been required by Judge Young to subpoena consumer records prior to approval of the settlement.[25]

<u>McKesson</u> involved a multiplicity of consumer products. In its response to Weatherly's prior Objection [26] Class Counsel stated that Weatherly's suggestion that records be subpoenaed from pharmacies in this Track Two settlement was unworkable and that the recovery of records from pharmacies in <u>Relafen</u> was comparatively simple since <u>Relafen</u> involved a single oral medication.

Interestingly, in <u>McKesson</u> this Court ordered Third Party Payors (TPPs) to provide the Claims Administrator with certain information about the Consumer Co-Pay class to assist in the identification of Consumer Co-Payment class members. In its March 5, 2009 Order Granting Preliminary Approval of the McKesson Settlement,[27] this Court provided direction to facilitate the delivery of information to the Claims Administrator with regard to some Co-Pay (but not Cash Payor) consumer claims. On page 9 of the Order the Court states:

> "To increase the proportion of the consumer class members who obtain
> financial recovery from the settlement, the Court hereby orders members
> of the TPP Class, to provide certain information about their percentage
> Co-Payor members to the Claims Administrator, as set forth in the TPP
> claims form (Exhibit K)."

---

[24] Class Plaintiffs' Unopposed Motion for a Supplemental Order on Preliminary Approval of the McKesson Settlement, (Doc. No. 785).

[25] *In Re Relafen Antitrust Litigation*, 01-CV-12239-WGY (D. Mass.), Memorandum of Judge Young, (Doc. No 457, September 28, 2005), page 19.

[26] Class Plaintiff's Response to Objections to Final Approval of the Track Two Settlement (Doc. No. 6003), page 31.

[27] <u>See</u>, Order Granting Preliminary Approval of the McKesson Settlement, Certifying the U&C Class for settlement Purposes only, Directing Notice to the Class and Scheduling Final Approval Hearing, at page 9

The Order goes on to say that the information will be provided to the Claims Administrator, who will be subject to the Court's October 11, 2006 Protective Order governing the use of confidential health information, and that the Claims Administrator:

> "…shall use the data for the sole purpose of calculating the checks and sending them to members of the Co-Pay consumer class."

On page 10 of the Order the Court further provides that the TPPs fall within a safe harbor of the HIPPA Act and therefore shall have no liability for supplying the information.[28]

In the Plan of Allocation in <u>McKesson</u> Class Counsel took responsibility to work with Third Party Payor (TPP) counsel to determine the feasibility of identifying Co-Pay class members and to explore the possibility of sending class members checks without the need to file a claim, but only to do so at an unspecified time <u>after</u> the execution of the Settlement Agreement.[29] Arguably, this Court should have, as Judge Young did in <u>Relafen,</u> withheld approval of the <u>McKesson</u> settlement until after the TPP information had been received and processed and until after the members of the consumer co-payment class in <u>McKesson</u> were identified. When Judge Young insisted on that process being completed <u>before</u> approving settlement in <u>Relafen,</u> the small number of class members that submitted claims in response to a traditional notice plan (2,761) was <u>increased 92 times</u> to 250,905 class members who were

---

[28] Id., at page 10.

[29] <u>See</u>, Plan of Allocation, at page 2, attached as Exhibit J to the Amended Settlement Agreement and Release.

identified through the court authorized subpoenas to pharmacies. Using that information the claims administrator in <u>Relafen</u> made direct payment to consumer class members.[30]

**WEATHERLY'S OBJECTIONS**

Weatherly's previous Objections[31] have raised a number of issues with respect to the adequacy of the proposed settlement for Class 3 Percentage Co-pay Consumers such as herself. These issues, reiterated below, were raised at the Fairness Hearing held on April 27, 2009. Two years later the issues raised have not been satisfactorily addressed.

### 1. Class Counsel has failed to determine the size of Class 3

The failure of Class Counsel to inform the Court about the size of the Class 3 Consumer class and the likelihood that class members will be able to submit documented claims prevents the Court from determining how much the settlement agreement will be worth to the class. Without some sense of the size of the class and the average class member's out-of-pocket expense, the Court could not fairly assess the value of the settlement to the Class 3 Cash Payor and Percentage Co-pay Consumers. To determine whether the settlement is fair, this Court must assess the value of the settlement to the class based on the class's size and the strength of the Plaintiffs' case on the merits.[32]

---

[30] *In Re Relafen Antitrust Litigation*, supra,  Affidavit of Thomas R. Glenn, Allocation and Distribution of the Net Settlement Funds, (Doc. No. 512).

[31] See, Revised Objection to Class Action Settlement and Notice of Intent to Appear of Class Member Patricia Weatherly, (Doc. No. 5291, February 23, 2009). Weatherly's Second Revised Objection to Class Action Settlement, (Doc. No. 6762, December 15, 2009).

[32] Roberts v. Bausch & Lomb,  No. CV-94-C-1144-W (N.D. Ala. 1996).

## 2.  Claims Documentation is Excessively Burdensome

The requirements set forth in the Class 3 Percentage Co-pay Consumer settlement notice[33] create arbitrary and unnecessary barriers to recovery. Specifically, the requirement for records of out-of-pocket expenses to substantiate a claim pursuant to the so-called Full Estimation Refund Option or partial refund is extremely burdensome. The proposed settlement agreement does not outline meaningful or practical ways for members to recover required claims documentation records for the period January 1, 1991 to March 1, 2008 short of each claimant attempting to recover his or her expenditure records, physician records, EOBs, or pharmacy records. Because of the difficulty some class members have assumedly had in obtaining proof of their out-of-pocket expenses, and mindful of the historic low take-up rate for claims-based class action settlements,[34] it is reasonable to expect that a substantial number of Percentage Co-pay Consumer class members will not be able to recover full "partial refund" of out-of-pocket expenses. Take-up rates in pharmaceutical cases are generally much lower than with other consumer products cases because of consumers' poor recollection of their pharmaceutical purchases, spread over multiple dates and covering an extended period. Given the added difficulty that many Class 3 Percentage Co-pay Consumer class members will have had recovering documentation of their out-of pocket expenses it is reasonable to expect that take-up rates of Class 3 Percentage Co-pay Consumer class members in this case will be very low. As presented in the Class 3 Percentage Co-pay

---

[33] Revised Objection to Class Action Settlement and Notice of Intent to Appear of Class Member Patricia Weatherly, (Doc. No. 5291, February 23, 2009), Exhibit 1.

[34] See, eg. Strong v. Bellsouth Telecomm., Inc., 173 F.R.D. 167, 169 (W.D. La. 1997), aff'd, 137 F.3d 844 (5th Cir. 1998) where 4.3% of class members participated in claims process offering payments of $12 to $20. Even when class members are offered significantly higher minimum payments than those in the settlement agreement here, participation remains low. See, Sylvester v. Cigna Corp., 369 F. Supp. 2d 34, 44 (D. Me. 2005).

13

Consumer settlement notice, recovery for class members who are unable or unwilling to locate the necessary documentation will be limited to "up to $35" (per the Class 3 Percentage Co-pay Consumer Class Notice). The small amount of money allocated for those claimants unable or unwilling to obtain sufficient documentation renders the settlement inadequate and unfair.

### 3.  Claims Notice fails to adequately specify award amount

The proposed settlement fails to inform with any specificity what Class 3 Percentage Co-pay Consumer class members can expect to receive from the settlement. The proposed Notice only states that some class members will get "up to $35.00" and that, alternatively, claimants "can estimate what (they) paid and show that (they) made percentage co-payments through receipts or bills" and "receive a partial refund of the total amount spent." (emphasis supplied). At best, such opaque guidance did not provide the Class 3 Percentage Co-pay Consumer class members sufficient information to decide whether to invest in the acquisition of billing records and whether the "partial refund" that may result could be more than the cost of those records.  The lack of transparency could well have served as a disincentive to file a claim. If Class Counsel is unable to specify a definite amount that Class 3 Percentage Co-pay consumer class members should expect to receive, then a better alternative is called for.

### 4.  A Flat Dollar Award is more Equitable than one based on Billing Records

Assuming that retrieval of records for the extensive span of years (1991 to 2008) encompassed in the proposed settlement is determined to be impractical, a fall back approach

may be needed to adequately compensate Percentage Co-pay Consumer class members with a flat fee, albeit higher than the $35 proposed. If the average cost of medical/billing records retrieval may be estimated at around $100 to $150 per claimant, perhaps an award of $100 to $150, or higher, per claimant without documentation provides a more equitable result under such a structure. Members of the class would have a stronger incentive to respond to settlement notices.  The Court mentioned a higher amount, a $300 flat award figure award, during the colloquy on Weatherly's initial Objection on December 16, 2008 and, although that amount would certainly serve to more fairly, reasonably, and adequately compensate Percentage Co-pay Consumer class members who elect not to submit documentation of their claims, it may be beyond the range of an acceptable compromise settlement amount, barring a re-allocation of the settlement. There is, however, room for an appropriate figure between $35 and $300. Such adjustment is not without precedent. For example, in the settlement of a class action case in state court in Illinois in 2007,[35] where considerations very similar to those in this case were in issue, the award to consumer class members without documentation of their Paxil purchases was increased from the originally proposed $15 to $100 per claimant. Also in that case a cap of $300,000 on consumer claims was removed in the final settlement making available more payments to a larger portion of potential claimants. In the recent Astrazeneca settlement this Court approved an Easy Refund of $400 per claimant.[36]

---

[35] Hoormann, et al. v. SmithKline Beecham, Third Judicial Circuit, Madison County, Illinois, Case No. 04-L-715.

[36] In Re Pharmaceutical Industry Average Wholesale Price Litigation, 1:01-CV-12257-PBS. Order Granting Preliminary Approval of the Settlement Agreement and Release of Astrazeneca Related Massachusetts (and Non-Massachusetts) Classes Two and Three, Directing Notice to the Classes and Scheduling Fairness Hearing, (Doc. Nos. 7226 and 7226, August 10, 2010), at page 12.

5.  **Direct Payment based on Billing Records would result in an equitable and wide-spread distribution of settlement awards**

To ensure that Percentage Co-pay Consumer class members in this case actually benefit in a significant number from the settlement fund, any settlement agreement should provide for **direct payment** to Percentage Co-pay Consumer class members based on billing records subpoenaed from their individual health insurers ("ISHPs") and on records subpoenaed from pharmacies. The ISHPs have already been tasked with supplying the names and addresses of Percentage Co-pay Consumer class members that they have in their data. It seems notably more efficient and effective that a significant percentage of potential Percentage Co-pay Consumer class members, along with their billing/records histories, can be identified and obtained directly from the files of the ISHPs.  In addition, any settlement agreement should provide for direct payment to Percentage Co-pay Consumer class members based on billing records subpoenaed from several of the leading pharmacies. Proper HIPPA protection can be addressed, as was done in McKesson.[37] A similar approach to class claims identification has been used with great success in another class action settlement in this District, specifically the In Re: Relafen Antitrust Litigation, 01-CV-12239-WGY (D. Mass.). In Relafen, the plaintiffs were represented by Plaintiff counsel in the instant case and in Relafen the entire amount of the consumer portion of the settlement funds was able to be distributed in full. If a sufficiently large number of Percentage Co-pay Consumer class

---

[37] See, Order Granting Preliminary Approval of the McKesson Settlement, Certifying the U&C Class for settlement Purposes only, Directing Notice to the Class and Scheduling Final Approval Hearing, at page 10.

members' records could be obtained from the ISHPs and from pharmacies, the issue of records cost reimbursement is less of a factor. If fairness, reasonableness and adequacy are the mandate of FRCP 23(e)(2), any methodology with a demonstrable impact of increasing the number of Percentage Co-pay Consumer class members who can participate in this settlement should be given serious consideration.

## 6. Allocation

The allocation of funds in the proposed settlement of the Cash Payor and the Percentage Co-pay Consumer class claims is inadequate. At the Fairness Hearing on December 16, 2008 Plaintiff counsel stated to the Court that he did not know the potential size of Percentage Co-pay Consumer class. The inadequate notices sent to Class 3 Percentage Co-pay Consumers has failed to solicit claims from anywhere close to number in the potential Class 3 Percentage Co-pay Consumer subclass. The Court has not been provided sufficient information to determine the adequacy of the compensation for potential Percentage Co-pay Consumer class members' claims. In her (first) Revised Objection Weatherly presented some statistics estimating the potential pool of Percentage Co-pay Consumer class members. Weatherly indicated that if a significant number of the Percentage Co-pay Consumer class members are eventually identified, the proposed settlement amount allocated in the Consumer Settlement Pool will be inadequate to fairly compensate Class 3 Percentage Co-pay Consumer class members.[38]

---

[38] See, Revised Objection to Class Action Settlement and Notice of Intent to Appear of Class Member Patricia Weatherly, (Doc. No. 5291, February 23, 2009), at pages 13, 14.

## 7.  Attorneys' Fees

Class Counsel has requested the Court approve attorneys' fees of 30% of the Track Two settlement, plus expenses.[39] The Court should couple the attorney fee percentage awarded for the portion of the settlement received by the Class 3 Percentage Co-pay Consumer class to the percentage distribution of the settlement awarded to that subclass, and before any settlement amounts are doubled or trebled or otherwise redistributed or reallocated by the Court.

## ARGUMENT

As the guardian of the absent class members' interests, this Court has an independent obligation, pursuant to Fed. R. Civ. P. 23 (e) (2), to determine whether the settlement agreement is "fair, reasonable, and adequate." See, Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 620 (1997).

As indicated, it appears that Class Counsel intended that only a very small percentage of this settlement be claimed by non-TPP consumers such as Weatherly. Notice to the Class 3 Percentage Co-pay Consumer class was by any standard inadequate. There is no evidence of a strong Percentage Co-pay Consumer subclass advocate in the allocation process. Representatives of the consumer class were present at the allocation at the invitation of Class Counsel. The allocation of the settlement should be reconsidered and independent allocation counsel representing only the Percentage Co-pay Consumer

---

[39] Lead Class Counsel's Motion for Attorneys' Fees and Costs and Compensation of the Class Representatives in Association with the Track Two Settlement (Doc. No. 7515, April 28, 2011).

class should be named. In a recent case in this District addressed the issue of adequate protection of the interests of a subclass in a class action settlement:

> The Manuel for Complex Litigation states that "(i)f the certification decision includes the creation of a subclass reflecting divergent interests among class members, *each subclass must have separate counsel to represent its interests*." MANUEL FOR COMPLEX LITIGATION, FOURTH, § 21.27 (emphasis added); id. at § 21.23; see Ortiz v. Fireboard Corp., 527 U.S. 815, 856 (1999) (emphasis added) stating "it is obvious after Amchem that a class divided between holders of present and future claims … requires division into homogenous subclasses under Rule 23(c)(4)(B), with separate representation to eliminate conflicting interests of counsel.") [40]

Assuming that there is a fair re-allocation and adequate notice to the Percentage Co-pay Consumer class, given that asking consumers to document their pharmaceutical purchases over a long period of years often acts as a deterrent to consumer recovery, the proposed settlement should focus on specification of consistent methodologies for identification of Consumer Percentage Co-Payment Class members and should provide to the greatest extent possible for direct payment of settlement funds to Percentage Co-pay Consumer subclass consumer class members. The settlement should minimize the requirement for Percentage Co-pay Consumer class members to provide documentation of their purchase of listed drugs.

In his very detailed Memorandum describing the Relafen settlement, issued before the Final Order and Judgment granting final approval of the settlement in that case, Judge Young commented:

---

[40] Kingsborough et al. v. Sprint Communications, et al., C.A. No. 07-10651-LTS, Order Re: Potential Conflict of Interest (April 26, 2009).

> "One of the challenges for a court in a class action is to ensure that consumers
> actually receive compensation for the damages they have suffered, and not just
> the attorneys or the institutional plaintiffs."[41]

Arguably, the value of the settlement to consumer class members in this case depends entirely on how many consumers are able to take advantage of the settlement and in what amounts. One clear example of the devaluation of a class action settlement is Roberts v. Bausch & Lomb, supra, where the defendant set aside $67 million into a fund for consumer class members. The dollars that were actually received by the consumer class amounted to only $9.2 million, or 14% percent of the gross settlement amount,[42] versus an even poorer 8% distribution of the gross settlement amount in GSK. Without some sense of the size of the class and the average class member's claim, this Court simply cannot determine how much the settlement agreement will be worth to the consumer class. See, Duhaime v. John Hancock Mutual Life Ins., 989 F. Supp. 375, 378 (D. Mass. 1997); Bowling v. Pfizer, Inc., 922 F. Supp. 1261, 1284 (S.D. Ohio 1996). Without knowing how valuable the settlement agreement is to the consumer class there is no way to determine whether the proposed settlement is fair, reasonable, and adequate, or in the consumer class's best interests. The Court should insist that Class Counsel provide the information on the value of this settlement to the Percentage Co-pay Consumer Class before the settlement is approved.

---

[41] *In Re Relafen Antitrust Litigation*, supra, Memorandum of Judge Young, (Doc. No. 457, September 28, 2005), page 20.

[42] Deborah Hensler & Thomas Rowe, Jr., *Beyond "It Just Ain't Worth It": Alternative Strategies for Damage Class Action Reform*, 64 L. & Contemp. Probs. 137, 149 (Summer 2001).

Weatherly argues for identification of Percentage Co-pay Consumer class members through subpoenas of ISHP records and through subpoena of retail and mail order pharmacy records before settlement so that under Court supervision direct payment can be made to as many class members as possible.

**CONCLUSION**

Weatherly is cognizant of the fact the foregoing proposals add a significant alternative direction to the settlement of Percentage Co-payment Consumer class claims. However, given (a) the lack of specificity  in the identification of potential Class 3 Percentage Co-pay Consumer class members, (b) the extended time frame encompassed in this settlement, (c) the challenges co-payment consumers face in retrieving records for that long time period, (d) the award of treble damages to a fair percentage of possible claims, and (e) the very low flat fee proposed for settlement of what could reasonably be a far higher average claim, the Percentage Co-payment Consumer Class 3 settlement as proposed is simply inadequate. A reasonable alternative is to award, based on a notarized statement, a flat amount of $100 to $150, or higher, per claimant who elect not to submit documentation. The pool of potential Percentage Co-Payment Consumer class members can be increased significantly through subpoenas of records for ISHPs and from pharmacies and mail order pharmacies, to include billing records that will substantiate claims and which will obviate the need for an additional award of billing records costs. Should such a mechanism be implemented, funds allocated to the Class 3 Consumer Settlement Pool are inadequate to compensate an expected significant increase in the number of Percentage Co-pay Consumer class, and cash payor claimants, and

it is Weatherly's position that the Consumer Settlement Pool should be reasonably increased to between $83,250,000 and $166,500,000 to sufficiently compensate Class 3 flat fee awards of $100 to $150 per claimant. The Court's experience in the GSK settlement, having to reallocate consumer funds after the fact, can be avoided here by adequately identifying the consumer pool that should be receiving the settlement funds.

The Court should couple the attorney fee percentage awarded for the portion of the settlement received by the Class 3 Percentage Co-pay Consumer class to the percentage distribution of the settlement awarded to that subclass, and before any settlement amounts are doubled or trebled or otherwise redistributed or reallocated by the Court.

For each of the reasons stated above, the Court should reject the proposed class action settlement in its entirety as not being fair, reasonable, and adequate.  Weatherly reserves the rights to withdraw, revise, add to, and expand upon her objections and call witnesses and experts in support thereof.

Dated:  May 17. 2011                          Respectfully submitted
                                              Patricia Weatherly,

                                              By: **/s/ Richard F. Landrigan**
                                              Richard F. Landrigan (BBO# 284960)
                                              COSTELLO & LANDRIGAN
                                              421 Highland Avenue
                                              Somerville, MA  02144
                                              Telephone: 617-625-4322
                                              Facsimile:  617-625-5911

## CERTIFICATE OF SERVICE

I, Richard F. Landrigan, certify that a true copy of the foregoing document was served upon the attorney of record for each other party through the Court's electronic filing service on May 17, 2011.

**/s/ Richard F. Landrigan**
Richard F. Landrigan