# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456 |
| THIS DOCUMENT RELATES TO: | CIVIL ACTION:  01-CV-12257-PBS |
| TRACK 2 SETTLEMENT | Judge Patti B. Saris |

## CLASS PLAINTIFFS' SUPPLEMENTAL RESPONSE TO OBJECTIONS TO FINAL APPROVAL OF THE TRACK TWO SETTLEMENT

## TABLE OF CONTENTS

**PAGE**

I.    INTRODUCTION ........................................................................................1

II.   SUMMARY OF SALIENT SETTLEMENT TERMS AND THE PROPOSED
DISTRIBUTION........................................................................................1

III.  THE NOTICE PROGRAM AND CLAIMS EXPERIENCE UPDATE ...........................4

    A.    Notice ...........................................................................................4

        1.    Class 1 Consumers.................................................................5

        2.    Class 3 Consumers.................................................................6

        3.    Third Party Payors ................................................................7

    B.    Requests For Exclusion and Objections Are Minimal................................8

    C.    The Claims Filings .............................................................................8

        1.    Class 1 Consumers.................................................................8

        2.    Class 3 Consumers.................................................................8

        3.    Third-Party Payors ................................................................9

IV.  ARGUMENT ............................................................................................9

    A.    The Overall Settlement Amount is Fair and Reasonable......................10

    B.    Consumer Releases Only Apply To Litigation Drugs ...........................14

    C.    The Proposed Allocation Between Consumers and TPPs is Fair and
Reasonable ......................................................................................15

        1.    The allocation between consumers and TPPs was the result of an
arm's-length negotiation between Allocation Counsel and is fair
and reasonable......................................................................15

        2.    An initial payment to the ISHPs is fair and reasonable and does not
prejudice consumer Class members.........................................19

    D.    Consumers Have Been Adequately Represented................................20

1.    Ms Tonacchio has proper standing to sue, is an adequate Class 1 Medicare beneficiary representative, and has claims typical of the claims of Class 1 members. ...................................................21

    a.    Ms. Tonacchio's mother was administered Anzemet in an oncology clinic. ...........................................................23

    b.    The payment by Ms. Tonacchio's mother was based on AWP because she was a Medicare Part B beneficiary and paid for a Class drug. ...........................................................23

    c.    Ms. Tonacchio has established a payment for a Class drug. .........24

    d.    Ms. Tonacchio has the consent of her siblings to act as a class representative in this settlement. ......................................25

    e.    Ms. Tonacchio approves of the proposed settlement. ....................25

2.    Newly proposed consumer class representatives have proper standing to sue, are adequate representatives, and have claims typical of the claims of Class 1 members. ....................................26

3.    The Association plaintiffs are also typical and adequate representatives for Class 1. ..............................................27

4.    The Association plaintiffs do not have an irreconcilable conflict with consumers over potential *cy pres* distributions. ...............................29

5.    The Taft-Hartley Fund representatives are typical and adequate representatives for Class 3. ..............................................34

E.    The Claims and Distribution Process for Class 3 is Fair and Reasonable ............36

1.    The value of the Settlement to the Consumer Classes as a whole does not depend on any "take up" rate related to Class 3 Consumers. ...........................................................36

2.    The notice and claim forms clearly indicate what Class 3 Consumers can do to document their claim. ...............................38

3.    A specific award need not be specified in the notice. ..............................39

4.    A flat payment of $100 to $150 is impractical and factually unsupported. ...........................................................40

5.    Retrieving payment data via subpoenas to ISHPs and pharmacies is impractical, unduly burdensome, and will swamp monies available for distribution to consumers. ...............................42

F.      Objector Connick Is Not A Class Member And Has No Standing To
        Object ................................................................................................................44

G.      Objections Relating to Attorneys' Fees .........................................................46

        1.      Class Counsel's request for a 30% fee, inclusive of litigation
                expenses, is fair and reasonable. ........................................................46

        2.      Notice to the Class concerning attorneys' fees is adequate. ......................48

        3.      A fee request based in part on money paid to the ISHPs is
                reasonable and has previously been approved by the Court. ....................49

        4.      A lodestar cross-check is not necessary, although the submitted
                lodestar is sufficient for the Court to perform a reasonability cross-
                check on the percentage-of-the-fund approach. .........................................51

        5.      The Court should quickly reject Mr. Wilson's contention that this
                case was easy. ...........................................................................................55

H.      Haviland's Objections are Fueled by Animosity towards Class Counsel
        and this Court ...................................................................................................56

I.      The Court Should Be Wary Of The Lawyer-Driven Objections ..........................58

V.      CONCLUSION ...............................................................................................64

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Amchem Prods. v. Windsor*,
  521 U.S. 591 (1997) ........................................................................................29

*Azizian v. Federated Dep't Stores, Inc.*,
  2007 U.S. App. LEXIS 20844 (9th Cir. Aug. 23, 2007) ....................................59

*Bano v. Union Carbide Corp.*,
  361 F.3d 696 (2d Cir. 2004) ........................................................................27, 28

*Barnes v. FleetBoston Fin. Corp.*,
  2006 U.S. Dist. LEXIS 71072 (D. Mass. Aug. 22, 2006) .........................59, 61, 62

*Benacquisto v. American Express Fin. Corp.*,
  2001 U.S. Dist. LEXIS 23914 (D. Minn. May 14, 2001) ...................................59

*Boeing Co. v. Van Gemert*,
  444 U.S. 472 (1980) ........................................................................................50

*Branch v. FDIC*,
  No. 91-CV-13270, 1998 WL 151249 (D. Mass. Mar. 24, 1998) .......................52

*City P'ship Co. v. Atlantic Acquisition Ltd. P'ship*,
  100 F.3d 1041 (1st Cir. 1996) ..........................................................................15

*Colwell v. HHS*,
  2009 U.S. App. LEXIS 5561 (9th Cir. Mar. 18, 2009) ......................................28

*Conley v. Sears, Roebuck & Co.*,
  222 B.R. 181 (D. Mass. 1998) .....................................................................47, 52

*Downey v. Mortgage Guar. Ins. Corp.*,
  2001 U.S. Dist. LEXIS 24918 (S.D. Ga. Oct. 1, 2001) .....................................62

*Duhaime v. John Hancock Mut. Life Ins. Co.*,
  989 F. Supp. 375 (D. Mass. 1997) ...................................................................52

*Dupler v. Costco Wholesale Corp.*,
  705 F. Supp. 2d 231 (E.D.N.Y. 2010) ..............................................................59

*Gaskill v. Gordon*,
  160 F.3d 361 (7th Cir. 1998) ...........................................................................47

*Hensley v. Eckerhart*,
   461 U.S. 424 (1983)..................................................................................................54

*In re Activision Sec. Litig.*,
   723 F. Supp. 1373 (N.D. Cal. 1989) .......................................................................48

*In re "Agent Orange" Prods. Liab. Litig.*,
   597 F. Supp. 740 (E.D.N.Y. 1984), *aff'd*, 818 F.2d 145 (2d Cir. 1987)..........................10, 14

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
   2010 U.S. Dist. LEXIS 27242 (E.D.N.Y. Mar. 22, 2010) .......................................59

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
   2010 U.S. Dist. LEXIS 30598 (E.D.N.Y. Mar. 29, 2010) .......................................59

*In re Allstate Ins. Co. Underwriting & Rating Practices Litig.*,
   2008 U.S. Dist. LEXIS 107131 (M.D. Tenn. Nov. 14, 2008) .................................59

*In re Buspirone Antitrust Litig.*,
   2003 U.S. Dist. LEXIS 26538 (S.D.N.Y. Apr. 11, 2003)..................................47, 48

*In re Cardinal Health, Inc. Sec. Litig.*,
   550 F. Supp. 2d 751 (S.D. Ohio May 5, 2008) ........................................................59

*In re Charter Communs., Inc.*,
   2005 U.S. Dist. LEXIS 14772 (E.D. Mo. June 30, 2005)........................................59

*In re Compact Disc Minimum Adver. Price Antitrust Litig.*,
   2005 U.S. Dist. LEXIS 15306 (D. Me. July 27, 2005).............................................59

*In re Compact Disc Minimum Advertised Price Antitrust Litig.*,
   2005 U.S. Dist. LEXIS 43704 (J.P.M.L. July 12, 2005) ..........................................59

*In re Compact Disc Minimum Advertised Price Antitrust Litig.*,
   216 F.R.D. 197 (D. Me. 2003)...........................................................................47, 52

*In re Crazy Eddie Sec. Litig.*,
   824 F. Supp. 320 (E.D.N.Y. 1993) ..........................................................................10

*In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prods. Liab. Litig.*,
   236 F. Supp. 2d 445 (E.D. Pa. 2002) .......................................................................44

*In re Fidelity/Micron Secs. Litig.*,
   167 F.3d 735 (1st Cir. 1999)....................................................................................52

*In re Fidelity/Micron Secs. Litig.*,
   1998 U.S. Dist. LEXIS 21698 (D. Mass. June 5, 1998), *vacated on other grounds*,
   167 F.3d 735 (1st Cir. 1999)....................................................................................52

*In re Fleet/Norstar Sec. Litig.*,
   935 F. Supp. 99 (D.R.I. 1996)...................................................................47, 52, 53

*In re Initial Pub. Offering Secs. Litig.*,
   2010 U.S. Dist. LEXIS 68702 (S.D.N.Y. July 7, 2010) .........................................59

*In re Ins. Brokerage Antitrust Litig.*,
   2009 U.S. Dist. LEXIS 114802 (D.N.J. Dec. 8, 2009).........................................59

*In re Joint E. & S. Dist. Asbestos Litig.*,
   737 F. Supp. 735 (E.D.N.Y. 1990) ........................................................................14

*In re Linerboard Antitrust Litig.*,
   2004 U.S. Dist. LEXIS 10532 (E.D. Pa. June 2, 2004)...................................10, 51

*In re Linerboard Antitrust Litig.*,
   No. MDL 1261, 2004 WL1240775 (E.D. Pa. June 4, 2004) ...............................51

*In re Linerboard Antitrust Litig.*,
   333 F. Supp. 2d 343 (E.D. Pa. 2004) ....................................................................50

*In re Lorazepam & Clorazepate Antitrust Litig.*,
   2003 U.S. Dist. LEXIS 12344 (D.D.C. June 16, 2003).........................................48

*In re Lucent Techs., Inc. Sec. Litig.*,
   327 F. Supp. 2d 426 (D.N.J. 2004) .......................................................................59

*In re Lupron Mktg. & Sales Practices Litig.*,
   2005 U.S. Dist. LEXIS 17456 (D. Mass. Aug. 17, 2005) ............................. *passim*

*In re Lupron® Mktg. & Sales Practices Litig.*,
   228 F.R.D. 75 (D. Mass. 2005)..............................................................................35

*In re Managed Care Litig.*,
   416 F. Supp. 2d 1347 (J.P.M.L. 2006)...................................................................59

*In re Metlife Demutualization Litig.*,
   689 F. Supp. 2d 297 (E.D.N.Y. 2010) ...................................................................59

*In re Michael Milken & Assocs. Sec. Litig.*,
   150 F.R.D. 46 (S.D.N.Y. 1993) .............................................................................10

*In re New York City Asbestos Litig.*,
   129 F.R.D. 434 (E.D.N.Y. 1990) ..........................................................................14

*In re Pacific Enters. Sec. Litig.*,
   47 F.3d 373 (9th Cir. 1995) ...................................................................................47

*In re PaineWebber Ltd. P'ships Litig.*
171 F.R.D. 104 (S.D.N.Y. 1997), *aff'd*, 117 F.3d 721 (2d Cir. 1997)....................................16

*In re Paypal Litig.*,
2004 U.S. Dist. LEXIS 22470 (N.D. Cal. Oct. 13, 2004).......................................................59

*In re Pharm. Indus. Average Wholesale Price Litig.*,
230 F.R.D. 61 (D. Mass. 2005)............................................................27, 28, 29, 36

*In re Pharm. Indus. Average Wholesale Price Litig.*,
491 F. Supp. 2d 20 (D. Mass. 2007) ........................................................... *passim*

*In re Polymedica Corp. Secs. Litig.*,
224 F.R.D. 27 (D. Mass. 2004)........................................................................34, 35

*In re Prudential Ins. Co. of Am. Sales Practices Litig. Agent Actions*,
148 F.3d 283 (3d Cir. 1998)......................................................................................53

*In re Prudential Secs., Ltd. P'ships Litig.*,
1995 U.S. Dist. LEXIS 22103 (S.D.N.Y. Nov. 20, 1995) ......................................................10

*In re Relafen Antitrust Litig.*,
231 F.R.D. 52 (D. Mass. 2005)...................................................................... *passim*

*In re Royal Ahold N.V. Sec. & Erisa Litig.*,
2007 U.S. Dist. LEXIS 45935 (D. Md. June 18, 2007) ......................................................59

*In re Serzone Prods. Liab. Litig.*,
2006 U.S. Dist. LEXIS 60151 (S.D. W. Va. Aug. 23, 2006) .................................................59

*In re Terazosin Hydrochloride Antitrust Litig.*,
220 F.R.D. 672 (S.D. Fla. 2004) ...........................................................................34

*In re Thirteen Appeals Arising Out of the San Juan Dupont Plaza Hotel Fire Litig.*,
56 F.3d 295 (1st Cir. 1995)........................................................................52, 53, 54

*In re Union Carbide Corp. Consumer Prods. Bus. Sec. Litig.*,
718 F. Supp. 1099 (S.D.N.Y. 1989).........................................................................10

*In re Visa Check/Mastermoney Antitrust Litig.*,
2009 U.S. Dist. LEXIS 124884 (E.D.N.Y. Oct. 16, 2009)....................................................59

*In re Vitamins Antitrust Litig.*,
2001 U.S. Dist. LEXIS 25067 (D.D.C. July 13, 2001).........................................................48

*In re Wal-Mart Wage & Hour Empl. Practices Litig.*,
2010 U.S. Dist. LEXIS 52001 (D. Nev. May 25, 2010).......................................................59

*In re Warfarin Sodium Antitrust Litig.*,
   212 F.R.D. 231 (D. Del. 2002), *aff'd*, 391 F.3d 516 (3d Cir. 2004) ......................................35

*In re Warfarin Sodium Antitrust Litig.*,
   391 F.3d 516 (3d Cir. 2004).......................................................................10, 59, 62

*Kirby v. Cullinet Software, Inc.*,
   116 F.R.D. 303 (D. Mass. 1987).........................................................................60

*Larson v. Sprint Nextel Corp.*,
   2010 U.S. Dist. LEXIS 3270 (D.N.J. Jan. 15, 2010) ..........................................59

*Lipuma v. American Express Co.*,
   406 F. Supp. 2d 1298 (S.D. Fla. 2005) ...............................................................59

*Mangone v. First USA Bank*,
   206 F.R.D. 222 (S.D. Ill. 2001) ..........................................................................59

*McLaughlin v. Liberty Mut. Ins. Co.*,
   224 F.R.D. 304 (D. Mass. 2004)..........................................................................35

*Morris v. Lifescan, Inc.*,
   2003 U.S. App. LEXIS 820 (9th Cir. Jan. 16, 2003) ...........................................59

*Park v. Thomson Corp.*,
   633 F. Supp. 2d 8 (S.D.N.Y. 2009)......................................................................59

*Reynolds v. Benefit Nat'l Bank*,
   288 F.3d 277 (7th Cir. 2002) ...............................................................................59

*Schwartz v. Citibank, N.A.*,
   2002 U.S. App. LEXIS 21456 (9th Cir. Oct. 10, 2002).........................................59

*Schwartz v. Dallas Cowboys Football Club, Ltd.*,
   2001 U.S. Dist. LEXIS 24121 (E.D. Pa. Nov. 21, 2001)........................................59

*Shaw v. Toshiba Am. Info. Sys.*,
   91 F. Supp. 2d 926 (E.D. Tex. 1999) ...................................................................62

*Simonet v. GlaxoSmithKline*,
   2009 U.S. Dist. LEXIS 82508 (D.P.R. Sept. 10, 2009).........................................59

*Spark v. MBNA Corp.*,
   289 F. Supp. 2d 510 (D. Del. 2003).....................................................................61

*Susman v. Lincoln Am. Corp.*,
   561 F.2d 86 (7th Cir. 1977) .................................................................................60

*Synfuel Techs., Inc. v. DHL Express (USA), Inc.*,
  463 F.3d 646 (7th Cir. 2006) ................................................. 59

*Taubenfeld v. Aon Corp.*,
  415 F.3d 597 (7th Cir. 2005) ................................................. 59

*Tenuto v. Transworld Sys.*,
  2002 U.S. Dist. LEXIS 1764 (E.D. Pa. Jan. 31, 2002) ........................ 59

*Varacallo v. Massachusetts Mut. Life Ins. Co.*,
  226 F.R.D. 207 (D.N.J. 2005) ............................................... 62

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
  396 F.3d 96 (2d Cir. 2005) ................................................. 16

*Waste Mgmt. Holdings, Inc. v. Mowbray*,
  208 F.3d 288 (1st Cir. 2000) ............................................... 29

*Willhauk v. Halpin*,
  953 F.2d 689 (1st Cir. 1991) ............................................... 46

## STATUTES

28 U.S.C. § 1746 .............................................................. 44

## OTHER AUTHORITIES

4 A. CONTE & H. NEWBERG, NEWBERG ON CLASS ACTIONS, §11:53 (4th ed. 2002) ...... 40

Jack B. Weinstein & Eileen B. Hershenov, *Symposium in Honor of Edward W. Cleary:
  Evidence and Procedure for the Future: The Effect of Equity on Mass Tort Law*, 1991
  U. ILL. L. REV. 269 (1991) ................................................. 14

Kenneth R. Feinberg, *Symposium on Business Dispute Resolution: ADR and Beyond:
  Creative Use of ADR: The Court-Appointed Special Settlement Master*, 59 ALB. L.
  REV. 881 (1996) ............................................................ 14

MANUAL ON COMPLEX LITIGATION, FOURTH § 8:32 (2004) ......................... 44, 49

# I.     INTRODUCTION

The final fairness hearing for the Track Two Proposed Settlement is scheduled for June 13, 2011.  Class Plaintiffs have previously filed papers in support of final approval of the Track 2 Proposed Settlement, including the following:  (i) March 2, 2009 Class Plaintiffs' Memorandum of Law in Support of Motion for Final Approval of the Track Two Settlement (Dkt. No. 5935) and accompanying declarations (Dkt. Nos. 5936-37); and (ii) April 9, 2009 Class Plaintiffs' Response to Objections to Final Approval of the Track Two Settlement (Dkt. No. 6003) and accompanying declarations (Dkt. Nos. 6004-09).

In this Supplemental Memorandum filed pursuant to the Court's scheduling order, Plaintiffs provide the Court with a report on the claims experience and the few requests for exclusion received.  Plaintiffs also respond to the objections initially and recently filed by objectors represented by Don Haviland, Richard Landrigan, James King and the professional objectors John Pentz and Edward Cochran.  Each objection is meritless.  Not one of them is supported by evidence or by any expert opinion.  The Court should reject the objections and grant final approval to the Track Two Settlement.

# II.     SUMMARY OF SALIENT SETTLEMENT TERMS
## AND THE PROPOSED DISTRIBUTION

To review, Track Two Defendants have collectively agreed to pay a total of $125 million to settle the MDL Actions,[1] and all related claims of the Class Plaintiffs and the ISHP Group. The $125 million is to be allocated between Consumers and TPPs as follows:

- 17.5% will be allocated to satisfy the claims of Consumer Class Members in both Class 1 and Class 3.

---

[1] The amount that each Track Two Defendant has agreed to contribute to the overall $125 million settlement amount was negotiated separately amongst Track Two Defendants and, as a condition of settlement, remains confidential.

- 82.5% will be allocated to satisfy the claims of TPP Class Members in Class 2 and Class 3, as well as ISHP Group Members.

The amounts allocated to Consumers are further split based on two Classes of drugs. "Class A" drugs will receive approximately 70.3% of the Consumer allocation, with "Class B" drugs receiving approximately 29.7%. The Class A drugs, which are primarily single source drugs and those that were the focus of active litigation, are: Anzemet (injection and tablets), Aranesp, Epogen, Ferrlecit, InFed, Neulasta and Neupogen. The Class B drugs, which are primarily multisource drugs, comprise the remaining drugs designated in Exhibit B to the Settlement Agreement.

With respect to the TPP allocation, the amounts earmarked for TPPs, as in previous AWP MDL settlements involving the ISHP Group, will be initially allocated 50/50 between TPP Class Members and ISHP Class Members. After all TPP Claims have been received and processed, and the ISHP Group provides its purchases to the Claims Administrator and these are audited by the Claims Administrator, there will be a true-up based on actual purchases between TPP Class Members and the ISHP Group such that each TPP Class Member and each member of the ISHP Group receive the same compensation on a dollar-for-dollar basis.

Similar to previous settlements in the *AWP* cases, Class 1 consumers were only required to complete and return a claim card verifying under penalty of perjury that he or she made percentage co-payments for a Class Drug under Medicare Part B during the Class Period. Class 3 Consumers were provided with a choice of (i) an easy refund option paying a flat $35, or (ii) providing an estimate of their total out-of-pocket expenditures during the Class Period for each Class Drug along with at least one form of documentary proof that they incurred a percentage co-payment obligation. TPPs in Classes 2 and 3 were required to submit the amount of purchases of each of the Class Drugs designated as Class A during the period of January 1, 2003 to December

- 2 -

31, 2003, and those TPP Class Members with claimed purchases for Class A Drugs during this proxy period exceeding $300,000 in total were required to submit electronic claims documentation with their claim.

Payments are calculated as follows.  The Class 1 consumer's obligation under Medicare Part B for all Class Drugs during the Class Period, as evidenced in records from CMS, will be the basis of the consumer's claim.  For those Class Drugs designated as "Class A," the consumer's total obligation related to Class A Drugs during the "Heartland" damages period (December 31, 1997 – December 31, 2003) will be multiplied by a factor of three (3x).  This figure will be added to the consumer's total co-payment obligation for Class A Drugs outside the Heartland time period and to their payment obligations for Class Drugs designated as "Class B" (without a multiplication factor).  The sum of these three figures will be the Class 1 consumer's "Total Recognized Claim" used for purposes of calculating the payment made to each Consumer Settlement Class Member.

The amount to which a Class 3 consumer will be entitled will be determined based upon the consumer's election between the Easy Refund and the Full Estimation Refund options. Those Class 3 members electing the Easy Refund have a "Total Recognized Claim" of $35 for purposes of calculating the payment made to that consumer.  For those electing the Full Estimation Refund, the Class 3 consumer's estimated out-of-pocket expenses for Class A drugs will be multiplied by a factor of three (3x) for payments made during the Heartland damages period and added to the consumer's estimated out-of-pocket expenses for Class A Drugs outside of the Heartland period and to their expenses for Class B drugs (without a multiplication factor). The sum of these three figures will constitute the Class 3 consumer's "Total Recognized Claim" for purposes of calculating the payment made to each Consumer Settlement Class Member.

If the sum of all valid Total Recognized Claims for all Consumer Settlement Class Members exceeds the amount of the Settlement Funds allocated to satisfy Consumer Settlement Class Member claims, as is expected, all consumer claims will be reduced proportionately.

For TPPs and ISHP Group Members, their claims will certainly exceed the total amount of funds allocated to satisfy the claims of TPP Settlement Class Members and ISHP Group Members under the Settlement Agreement, and each TPP Settlement Class Member or ISHP Group Member will be paid a pro-rata portion of the Settlement Amount allocated to TPP Settlement Class Members and the ISHP Group. The purchases reported by these Class members for the proxy period, if properly supported by the claimant and accepted by the Claims Administrator, will be the TPP Settlement Class Member's or ISHP Group Member's "Total Recognized Claim" used for purposes of calculating the pro-rata payment made to each TPP Settlement Class Member and ISHP Group Member.[2]

## III.    THE NOTICE PROGRAM AND CLAIMS EXPERIENCE UPDATE

### A.    Notice

On August 2, 2008, the Claims Administrator (Rust Consulting, or "Rust") created an informational website (www.awptrack2settlement.com) where all Class Members could access information about the Settlement and download all notice and claim forms as well as key documents concerning the litigation. *See* Declaration of Eric Miller Regarding Mailing of Notice to Class Members (Dkt. No. 5937, the "Miller Decl."), ¶¶ 10, 12. Rust also established a toll-free telephone hotline, settlement email address and a post office box so that Class Members could submit questions. *Id.*, ¶¶ 10-11. Additional and extensive efforts were undertaken to provide notice to the Classes, as profiled below.

---

[2] There is also an ISHP Group initial payment and "true-up" described more particularly at pages 12-14 of Dkt. No. 5935.

1.      **Class 1 Consumers**

Direct mail notice was provided to members of Class 1 who took Class A drugs during the Class Period.  This was done using records maintained by the Center for Medicare and Medicaid Services ("CMS").  Between December 14 and 29, 2010, Rust received data files from CMS vendors Research Data Assistance Center ("RESDAC") and Buccaneer containing purchase data for individuals who were noted by CMS as having been administered a drug covered by the Track 2 Drug J-Codes.  Rust identified those Class members who were administered Class A drugs, scrubbed the data to ensure eligible drug administrations and adequate address formatting, and eliminated duplicate names and addresses.  Rust then mailed the Class 1 Consumer Notice and Claim Card (the "Class 1 Initial Notice Packet") to 1,956,098 potential Class 1 Consumer Class members who were administered Class A Drugs.  Declaration of Daniel Coggeshall Regarding Mailing of Notice and Claims Activity Related to Class 1 Members and Claims Activity Related to Classes 2 and 3 in the Track Two Settlement ("Coggeshall Decl."), ¶¶ 9-15.  Included with that mailing was a postage pre-paid reply card allowing the potential class member to certify under penalties of perjury that he/she made percentage co-payments for a Class Drug under Medicare Part B during the Class Period (as opposed to flat or no co-payments due to supplemental insurance).  *Id.*, Ex. A.[3]

In addition to direct mail, a multi-pronged paid media program was used to reach Class 1 members.  Notice was published in two newspaper supplements, *Parade* and *USA Weekend*, in 1,418 newspapers reaching every major media market in the country.  Supplemental Declaration

---

[3] The United States Postal Service ("USPS") returned a total of approximately 3,783 Initial Class 1 Notice Packets as undeliverable with a forwarding address.  Rust continues to re-mail Class 1 Initial Notice Packets to each address provided by the USPS on a rolling basis.  USPS returned approximately 547,729 Class 1 Initial Notice Packets as undeliverable without forwarding addresses.  Rust utilized the services of an address database service, to which Rust subscribes, to seek updated addresses.  As a result, Rust received 186,348 updated addresses and subsequently mailed Class 1 Initial Notice Packets to the updated addresses.  Coggeshall Decl., ¶¶ 16-17.

of Katherine Kinsella Regarding Class Notice in the Track Two Settlement ("Supplemental Kinsella Decl."), ¶ 16.  Notice was also published in *AARP Bulletin*, *Prevention*, *Reader's Digest* and *TV Guide*.  *Id.*, ¶¶ 17, 21.  In addition to published notice, notice was provided via broadcast and cable television through the following channels/networks:  ABC, CBS, CNN, Golf, AMC, Fox News, MSNBC, Hallmark and Weather.  *Id.*, ¶ 18.  Notice was also provided through an "earned" media program involving distribution of a press release to almost 5,000 print and broadcast outlets and over 5,000 online media outlets; distribution of a "B-roll" video package that generated 146 stories that aired on stations across the country; and an audio news release distributed to more than 3,000 radio stations and actually aired on 911 stations.  *Id.*, ¶¶ 24-27.

### 2.    Class 3 Consumers

In order to notify Class 3 Consumers of the existence of the Settlement, Class Counsel employed both a national media campaign as well as an extensive direct mail campaign using names and addresses of potential Class 3 members obtained from ISHP members.

With the assistance of Kinsella/Novak Communications ("Kinsella"), a national media plan was crafted to target potential Consumer Class Members.  The media campaign included placement of the consumer publication notice in various national newspapers, general interest magazines and health related publications.  Declaration of Katherine Kinsella Regarding Class Notice in the Track Two Settlement (Dkt. No. 5936, the "Kinsella Decl."), ¶¶ 20-23.  In addition, a television spot appeared on various cable-television channels approximately 229 times, *id.* at ¶ 19, and internet banner advertising was also utilized to provide additional notice opportunities beyond the broad-reaching print program to Class Members.  *Id.*, ¶¶ 25-26.

In addition to these efforts, Class Counsel also worked closely with Counsel for the ISHP Group.  These insurers represent more than 60% of the covered lives in the United States.  At the request of Class Counsel and pursuant to the Court's Order Related to Notice to Consumers of

- 6 -

Track Two Settlement (Dkt No. 5455), using National Drug Codes ("NDCs") associated with the Class Drugs, members of the ISHP Group provided the Claims Administrator with electronic data identifying over 1.7 million potential Class 3 consumers.  These were consumers who, according to ISHP data, were responsible for a percentage co-payment for one or more of the Class Drugs.  The Claims Administrator then undertook a process of eliminating duplicate names and addresses from the data received and culled the list down to approximately 897,489 unique individual Class 3 members, each of whom received a full Class 3 notice with claim form.  Miller Decl., ¶ 19.  A detailed Notice and Claim Form geared specifically toward consumers in Class 3 was also mailed to any consumer who requested one by phone or on the settlement website.

As of May 31, 2011, Rust has mailed 959,362 Class 3 Consumer Notice and Claim Forms in response to requests.  Coggeshall Decl., ¶¶ 25.

**3.      Third-Party Payors**

TPP Class Members in both Class 2 and Class 3 received direct mail notice of the Settlement, based on a proprietary database maintained by Rust for that purpose.  On or about August 1, 2008, Rust mailed the full TPP Notice to each of more than 41,000 TPPs in its proprietary database.  Miller Decl., ¶ 4.  In addition, a Summary Notice directed toward TPP Class Members was published in various TPP trade publications in early August, 2008, including *National Underwriter – Life and Health* as well as *HR Magazine*.  Kinsella Decl., ¶ 24.

As reported to the Court in connection with the status conference held on December 16, 2008, we discovered in November 2008 that the list of drugs included with the notice mailed to TPPs in August 2008 was incomplete.  Plaintiffs sought and obtained the Court's permission to send a curative letter to each TPP enclosing a complete list of the Class Drugs and providing

them with new deadlines to opt-out, file a claim, or lodge an objection to the Settlement. Those curative letters were sent to each TPP.

**B.**     **Requests For Exclusion and Objections Are Minimal**

Requests for exclusion filed by all Class Members have been minimal. The Class 1 opt-out deadline was May 24, 2011. Rust has received requests for exclusion from only 77 members of Class 1. Coggeshall Decl., ¶ 18. Requests for exclusion from members of Class 3 number 242. *Id.*, ¶ 26. Only 19 TPP Class Members have requested exclusion. *Id.*, ¶ 30.

Objections have also been minimal. Out of millions of Consumer Class Members, only 18 consumers have objected (13 of whom are represented by Don Haviland).

**C.**     **The Claims Filings**

    **1.**     **Class 1 Consumers**

The response from Class 1 has been overwhelmingly positive. The postmark deadline for the submission of the Claim Card was March 30, 2011. Rust has received 88,042 Claim Cards. Coggeshall Decl., ¶ 20. In response, Rust has mailed 87,840 Class 1 Notices and Claim Forms, which contain the individual consumer's transactional information, and continues to mail on a rolling basis. *Id.*, ¶ 22. Rust has also mailed 13,701 Notices and Claim Forms to potential Class 1 Members who requested them. *Id.*, ¶ 23.

Rust has sent deficiency letters to 6,818 Class 1 Consumers who did not sign their Claim Card, or did not check the box on the Claim Card indicating that they made percentage co-payments for a Class Drug. *Id.*, ¶ 21. The claims deadline is July 1, and Rust is processing the claims received to date. *Id.*, ¶ 22.

    **2.**     **Class 3 Consumers**

Rust has received 20,857 Class 3 Consumer claims. Coggeshall Decl., ¶ 25. Rust is still receiving Class 3 claims and is still processing the claims received. *Id.*, ¶ 29.

3.      **Third Party Payors**

Rust has received and processed 1,075 claims from TPPs.  Rust is currently reviewing and auditing claims and is in the process of notifying TPP claimants of deficient and ineligible claims and processing responses.  Coggeshall Decl., ¶¶ 31-33.

## IV.    ARGUMENT

The objections are advanced by five discrete groups of class members:  (i) James W. Wilson (Dkt. No. 6778) (the "Wilson Objection"); (ii) Patricia Weatherly (Dkt. No. 7545) (the "Weatherly Objection"); (iii) John and Connie Pentz and Corinna Connick, represented by professional objectors John J. Pentz and Edward Cochran (Dkt. Nos. 5947 and 7542) (the "Pentz Objection"); (iv) the group of clients represented by Don Haviland (Dkt. Nos. 5971 and 7556) (the "Haviland Objection"); and (v) Sheryl Keshishian (the "Keshishian Objection").  Their objections are summarized in Exhibit A hereto.

Because many of the objections overlap, Class Plaintiffs will address them by category.  And because more than two years have passed since Class Plaintiffs initially responded to most of the objections (*see* Dkt. No. 6003), for the Court's convenience we respond below to all objections that have not been withdrawn,[4] including the initial objections that have not been superseded and updates that have recently been filed.  In doing so, we frequently cite to declarations previously submitted to the Court.

---

[4] We will not respond to objections that have been withdrawn.  For example, Pentz initially contended that the settlement did not include cash payors.  Class Counsel explained that cash payors are indeed included, and Pentz has withdrawn this portion of his objection.  *See* Dkt. No. 7542 at 1 n.1.  In addition, Ms. Weatherly's counsel has filed *four* separate objections over the course of almost two-and-a-half years, as he continues to throw arguments against the wall to see what sticks.  *See* Dkt. Nos. 5744, 5921, 6762 and 7545.  Weatherly's Third Revised Objection (Dkt. No. 7545) appears to supersede her prior objections and, consequently, we will respond only to this latest objection.

**A.      The Overall Settlement Amount is Fair and Reasonable**

Haviland complains that the overall settlement amount is too low given that the risks of

continued litigation are purportedly minimal because this and other courts have entered verdicts,

injunctions and settlements against some of these defendants.  Dkt. No. 7556 at 6-8.  ***Tellingly,***

***Haviland does not undertake his own evidentiary assessment of what he believes (i) the case is***

***worth if a verdict of trial is rendered, and (ii) what a fair settlement would be in comparison***.

Haviland also objects to the proposed release including drugs that were never pursued in the

litigation.  Dkt. No. 5971 at 29-30.  These objections, like the others, fail.

As explained in Plaintiffs' opening brief, the percentage of recovery obtained in this

settlement is in line with other settlements of the size and risk of this case.  *See, e.g., In re*

*Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 539 (3d Cir. 2004) (noting that "typical

recoveries in securities class actions range from 1.6% to 14%") (citing *Cendant*, 264 F.3d at

241); *In re Linerboard Antitrust Litig.*, 2004 U.S. Dist. LEXIS 10532, at *15-17 (E.D. Pa. June

2, 2004) (approving settlement of 10-12% of potential damages where substantial risks exist); *In*

*re Prudential Secs., Ltd. P'ships Litig.*, 1995 U.S. Dist. LEXIS 22103 (S.D.N.Y. Nov. 20, 1995)

(approving of settlement of 1.6 - 5% of claimed damages); *In re Crazy Eddie Sec. Litig.*, 824

F. Supp. 320 (E.D.N.Y. 1993) (approving settlement of 6-10% of damages); *In re Michael*

*Milken & Assocs. Sec. Litig.*, 150 F.R.D. 46, 64-65 (S.D.N.Y. 1993); *In re "Agent Orange"*

*Prods. Liab. Litig.*, 597 F. Supp. 740, 762 (E.D.N.Y. 1984), *aff'd*, 818 F.2d 145 (2d Cir. 1987).

But the overall percentage of recovery by itself is not the decisive factor, with the risks of

proceeding towards trial the greater consideration.  *See, e.g., In re Union Carbide Corp.*

*Consumer Prods. Bus. Sec. Litig.*, 718 F. Supp. 1099 (S.D.N.Y. 1989).  The risks here, coupled

with the settlement amount, demonstrate that this settlement is fair and reasonable.

As Dr. Hartman has calculated, applying the 30 percent yardstick to the total AWP inflation for the Track Two drugs yields approximately $1.2 billion.  Declaration of Steve W. Berman in Support of Class Plaintiffs' Response to Objections to Final Approval of the Track Two Settlement (Dkt. No. 6005, the "Berman Decl."), ¶ 15.  Of this, approximately $316 million is attributable to brand-name drugs sold by Track Two Defendants Amgen, Aventis, and Watson.  Thus, $316 million would be the damages that Plaintiffs would seek at trial against these three defendants.  *Id.*, ¶ 16.

Of the remaining $800 million in Dr. Hartman's remaining inflation data, this is ***not*** the expected measure of damages against the remaining Track Two Defendants.  This is because of the substantial challenges that confront Plaintiffs in proving liability and damages for the Track Two multi-source drugs remaining in the case.  *Id.*, ¶ 16.  Defendants have consistently argued that there are serious issues relating to J-Code identification and that there was very little marketing the spread evidence against the Track Two Defendants that manufactured generic drugs.

In assessing the likelihood of success at trial against the Track Two Defendants on a drug-by-drug basis, Class Counsel applied the Court's "three salient factors" relevant to a finding of unfair conduct as set forth in *In re Pharm. Indus. Average Wholesale Price Litig. ("AWP")*, 491 F. Supp. 2d 20, 101-02 (D. Mass. 2007):  (i) whether there were egregious spreads above the 30% yardstick expected in the industry, focusing on the extent and duration of the spreads; (ii) the company's history of creating the spread, including an analysis of whether the defendant actually increased the AWP and/or list price as opposed to just increasing the spread through discounts and rebates; and (iii) whether the defendant engaged in a proactive scheme to market

- 11 -

the spread.  Berman Decl., ¶ 18.  We have also considered the relative lack of spread marketing

evidence, in addition to the J-Code challenges.

Furthermore, there are substantial concerns about proving damages given the Court's

limitation on damages attributable to multi-source drugs, which the Court found to be the

difference between the actual median AWP and the "but for" median AWP had the Defendant in

question reported a true AWP.  *Id.*, ¶ 20; *see also AWP*, 491 F. Supp. 2d at 108.  The Court

underscored the difficulty of recovering such damages as follows:

> Plaintiffs must prove that Warrick was a "but for" cause of
> their injuries when purchasing albuterol sulfate.  In other words,
> plaintiffs must show that they would not have suffered the same
> injury if Warrick had reported a true AWP.  Given the procedure
> for calculating a median this could only possibly be true when
> Warrick's AWP was at or above the median.  In that case,
> reporting a true AWP (which would be well below the median)
> would cause the median to shift down to the AWP of the next
> manufacturer in the ordered series.  If that manufacturer had
> reported a lower AWP (rather than the same AWP), then the
> median would drop.  In this situation, Warrick would affect the
> reimbursement for every version of albuterol sulfate sold.
>
> However, when Warrick's AWPs were below the median,
> moving them farther down to a true AWP would have had no
> effect on the median.  In that case, reporting a true AWP could not
> change the median used for reimbursement and plaintiffs would
> sustain the same injury as when Warrick published an inflated
> AWP.  Warrick would not be a "but for" cause of plaintiffs' injury.
> In sum, Warrick was a legal cause of plaintiffs' injury only when
> reporting a true AWP would have actually shifted the median.

*Id.* at 99.  Indeed, the Court declined to find any damages for Warrick's albuterol sulfate, which

was a multi-source drug throughout the Class Period.  *AWP*, 491 F. Supp. 2d at 108.

Given these concerns, Class Counsel concluded that the expected damages for the multi-

source Track Two drugs is but a fraction of the $800 million.  There are even legitimate concerns

that such damages could be *de minimus*.  Berman Decl., ¶ 21.

- 12 -

As serial objector, Haviland has the convenience of assuming, without basis in fact or reality, that the case is easy to prove against the Track Two Defendants and that damages are readily at hand.  Of course, as is so often the case, Haviland fails to present ***any*** analysis supporting his conjecture.  ***Haviland and the other objectors have not even hired an expert to challenge Dr. Hartman's liability and damage opinions and conclusions, which are based on years of analysis in this litigation***.  And he overlooks the critical impediments to both a liability and damages verdict, including the fact that there is very little marketing the spread evidence against the Track Two Defendants.  Moreover, Haviland also continues to ignore this Court's rulings, including its finding ***drastically*** limited the damages recoverable on generic drugs.[5]  And, damages issues aside, the Court has specifically raised concerns about the difficulty of proving the case against multi-source drugs:

> The interchangeability of these drugs, coupled with the "J-Code" reimbursement system, makes it practically impossible for the plaintiffs to know which drug company's product was dispensed to any party at any point.  Plaintiffs must demonstrate that the unfair conduct caused them harm.  The method for reimbursing multi-source drugs and the difficulty in product identification create extremely difficult legal issues for the branded and generic multi-source drugs in Class 2.

*AWP*, 491 F. Supp. 2d at 97.  Moreover, as for Class 3, most multi-source drugs were not reimbursed based on AWP but on other benchmarks like "maximum allowable cost."  *Id*. at 97 n.75.

---

[5] During the first approval hearing, Haviland handed up a map of the United States with various Attorney General settlements, purporting to show the inadequacy of this proposed settlement.  But the Court appropriately recognized that Haviland's chart not only attempted to compare "apples to oranges," but also omitted key relevant information such as the list of defendants and drugs represented by each settlement.  *See* April 27, 2009 Hearing Tr. at 64:6-68:14 (Dkt. No. 6046).

Notwithstanding the foregoing challenges, Plaintiffs have garnered a proposed

$125,000,000 settlement that represents a substantial percentage of the actual damages

recoverable under this Court's prior rulings.[6]

**B.     Consumer Releases Only Apply To Litigation Drugs**

Haviland complains that the proposed consumer release includes drugs that were never

pursued in the litigation.  Dkt. No. 7556 at 8.  This is not true.  Although the TPPs are releasing

the Track Two Defendants from liability for conduct related to any drug sold by a released

company, the consumer release only applies to the drugs listed on Exhibit B to the Settlement

Agreement, which, in turn, lists only those drugs appearing in the Fifth Amended Master

Consolidated Class Action Complaint.  *See* Track Two Settlement Agreement and Release,

Sections II.JJ. (limiting "Released Consumer Claims" to conduct, events, or transactions relating

to any drug "as listed on Exhibit B") & Exhibit B thereto.  Thus, the inclusion of additional drugs

in the TPP release does not affect the consumer release and does not in any way diminish the

amount of funds available for consumers or the anticipated payout.

In any event, even though this does not apply to the consumer release about which

Haviland complains, it is common practice in settling litigation to include a release that is

---

[6] Weatherly and Haviland, in prior filings now superseded, complained about the confidentiality of the Track Two Defendants' individual contributions to the settlement.  This confidentiality is a key requirement of the settlement, and the parties believe that a global settlement of claims would not have been possible without "blind contributions."  Multi-defendant settlements in large complex cases are difficult to achieve.  Believing that a global resolution would benefit all parties, the Track Two Defendants explored with mediator Eric Green possible ways to overcome these obstacles.  Under Professor Green's direction and management, Class Counsel and the Defendants agreed to employ the "blind contribution" device, believing that the obligation of anonymity held the greatest promise of generating the considerable amount of money necessary to resolve the class claims.  The blind contribution device has been approved for other class and aggregate settlements as an innovative way to surmount negotiation problems and maximize recovery for plaintiffs.  *See, e.g., In re "Agent Orange" Prod. Liab. Litig.*, 597 F. Supp. at 863-64; *In re Joint E. & S. Dist. Asbestos Litig.*, 737 F. Supp. 735 (E.D.N.Y. 1990); *In re New York City Asbestos Litig.*, 129 F.R.D. 434 (E.D.N.Y. 1990); *see also* Jack B. Weinstein & Eileen B. Hershenov, *Symposium in Honor of Edward W. Cleary:  Evidence and Procedure for the Future: The Effect of Equity on Mass Tort Law*, 1991 U. ILL. L. REV. 269, 301-02 (1991); Kenneth R. Feinberg, *Symposium on Business Dispute Resolution: ADR and Beyond: Creative Use of ADR: The Court-Appointed Special Settlement Master*, 59 ALB. L. REV. 881, 888-90 (1996).

- 14 -

broader than the claims in the litigation.  *City P'ship Co. v. Atlantic Acquisition Ltd. P'ship*, 100 F.3d 1041, 1044 (1st Cir. 1996) ("It is well-settled that 'in order to achieve a comprehensive settlement that would prevent relitigation of settled questions at the core of a class action, a court may permit the release of a claim based on the identical factual predicate as that underlying the claims in the settled class action even though the claim was not presented and might not have been presentable in the class action.'") (quoting *TBK Partners, Ltd.* v. *Western Union Corp.*, 675 F.2d 456, 460 (2d Cir. 1982)).

**C.**     **The Proposed Allocation Between Consumers and TPPs is Fair and Reasonable**

A number of the objections relate to the proposed allocation between consumers and TPPs.  The Weatherly Objection simply speculates that the amount allocated to consumers is inadequate, without suggesting what would be an adequate amount.  Dkt. No. 7545 at 17.  The Pentz Objection maintains that the allocation should be revised so that at least one-third of the overall settlement funds go to consumer plaintiffs, including cash payors, although Pentz does not submit any evidence supporting that conjecture.  Dkt. No. 5947 at 3; Dkt. No. 7542 at 5-6. And Haviland asserts that amount allocated to consumers (17.5%) was too low as compared to, for example, the GSK settlement (30%).  Dkt. No. 5971 at 22; Dkt No. 7556 at 6-8.  The Court should reject these objections because the allocation is fair and reasonable.

**1.**     **The allocation between consumers and TPPs was the result of an arm's-length negotiation between Allocation Counsel and is fair and reasonable.**

Unencumbered by any facts related to the process by which an allocation of settlement funds between TPPs and consumers was achieved, objectors' counsel assume that because consumers were not awarded 30% of the settlement amount they were not adequately represented.  Dkt. No. 7542 at 3; Dkt. No. 5971 at 22.  Objectors provide no factual basis to

- 15 -

support a 30% allocation other than the fact that other settlements have allocated 30% of settlement funds to consumers.[7]

In fact, the allocation of settlement funds between consumers and TPPs was the product of arm's-length, adversarial negotiation between counsel appointed to separately represent the interests of consumers and TPPs and conducted with participation of the Court-appointed mediator. After Class Counsel negotiated an overall settlement with Defendants, Alex Sugerman-Brozan, then Director of Prescription Access Litigation Project ("PAL"), along with experienced class action litigator Jeffrey Goldenberg from Ohio, were asked to represent consumers in an allocation negotiation (Messrs. Sugerman-Brozan and Goldenberg are referred to as "Consumer Allocation Counsel"). Mark Fischer and Richard Cohen were asked to represent TPPs ("TPP Allocation Counsel").[8] That negotiation took place on December 18, 2007, at the office of Eric Green, the Court-Appointed MDL mediator. Mr. Green acted as the mediator for the negotiations between TPPs and consumers.

The allocation was a product, in the first instance, of damage allocation information provided to Allocation Counsel by Dr. Hartman. Prior to the allocation negotiation, Class Counsel had, for the purposes of analyzing the allocation, divided the total settlement into two parts: $100 million to be allocated to claims associated with named brand drugs made by Aventis, Amgen and Watson, and $25 million allocated to claims associated with the primarily generic drugs manufactured by the remaining Track Two Defendants. This split reflected what

---

[7] Objectors' counsel also cite no law in support of the argument that consumer should be awarded 30% of the settlement proceeds. Such an inflexible rule is contrary to the "strong judicial policy in favor of settlements, particularly in the class action context." *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116 (2d Cir. 2005) (internal quotes omitted). The goal is an allocation that is fair and reasonable, not one that can be tied to a specific mathematical formula. *In re PaineWebber Ltd. P'ships Litig.* 171 F.R.D. 104, 129 (S.D.N.Y. 1997) (settlement approved "as long as the settlement terms are 'rationally based on legitimate considerations"), *aff'd*, 117 F.3d 721 (2d Cir. 1997).

[8] Consumer Allocation Counsel and TPP Allocation Counsel are collectively referred to herein as "Allocation Counsel."

Class Counsel believed was the appropriate weighting due to the much stronger case against the Aventis, Amgen and Watson brand-name drugs. Within each of these pools, Allocation Counsel then used damage allocation data provided by Dr. Hartman's office to determine an initial share to be allocated to the three Classes. Berman Decl., ¶ 6.

Given other considerations, including a determination that overpayment by unwitting consumers was one of the primary forces behind the success of the litigation and settlement, Consumer Allocation Counsel sought and ultimately obtained an enhanced allocation to Class 1 consumers. Declaration of Jeffrey S. Goldenberg (Dkt. No. 6006, the "Goldenberg Decl."), ¶¶ 9-15; Declaration of Alex Sugerman-Brozan (Dkt. No. 6007, the "Sugerman-Brozan Decl."), ¶¶ 10-12. Rather than allowing Class 1 consumers to recover a straight percentage of their out-of-pocket costs based on utilization data, Consumer Allocation Counsel succeeded in arguing that Class 1 be allocated 3 times their utilization percentage (an approach that mirrors treble damages and has been adopted by the Court in prior settlements). By adopting the three times multiplier and applying it to the utilization numbers provided by Dr. Hartman, Consumer Allocation Counsel were able to increase the amount set aside for consumers for brand-name drugs from $5,500,000 to $13,200,000, and for multi-source drugs from $4,134,000 to $6,396,000. Goldenberg Decl., ¶¶ 12-15; Sugerman-Brozan Decl., ¶¶ 11-12.

Allocation Counsel also agreed that Class 2's utilization percentage should be multiplied by a factor of two, and that Class 3's utilization percentage be used without a multiplier.[9] Sugerman-Brozan Decl., ¶ 11. The resulting percentages were then each proportionately reduced

---

[9] No multiplier was utilized for Class 3 because these were considered the weakest of the consumer claims because there was no statutory or regulatory basis requiring the use of AWP. Goldenberg Decl., ¶ 16.

so that their sum equaled a total of 100%.  Sugerman-Brozan Decl., ¶ 12.[10]  When the

percentages allocated to both the named brand and generic manufactures were combined,

consumers in Class 1 and Class 3 were allocated a total of 17.5% of the settlement and TPPs a

total of 82.5%.  Sugerman-Brozan Decl., ¶ 16; Goldenberg Decl., ¶ 17.  Upon completion of the

negotiations, all of these calculations were memorialized in a two page document and signed by

each of the counsel in attendance.  Sugerman-Brozan Decl., Ex. A; Goldenberg Decl., Ex. A.

     Consumer Allocation Counsel were also successful in having all fees and expenses for

notice and administration taken "off the top" of the settlement before the allocation is made.  As

a result, TPPs pay a disproportionate share of notice costs because of the much greater expense

associated with the Consumer notice programs.

     There was absolutely no collusion among the parties, consumers were independently and

adequately represented, and there is no evidence to suggest otherwise.  Indeed, the work of

Consumer Allocation Counsel, as described above and more particularly in the Goldenberg and

Sugerman-Brozan Declarations, demonstrates that consumer interests were vigorously

represented during the allocation process.  *See* Sugerman-Brozan Decl., ¶ 21; Goldenberg Decl.,

¶ 24.

     The Pentz Objection argues that the consumer settlement fund should follow the

*McKesson* settlement paradigm and be divided 11.5% to cash payors and 6% to co-payors.  Dkt.

No. 5947 at 3.  This division would make no sense, as most of the drugs included in the Track

Two Settlement are physician-administered drugs, for which the vast majority of the patients did

not pay the full cost of their treatment out-of-pocket.  Furthermore, while the Pentz Objectors

approvingly cite the *McKesson* settlement in relation to their unfounded criticisms regarding

---

[10] Because Class 3 included both consumers and TPPs, Allocation Counsel again used information obtained from Dr. Hartman to determine a split within that class as between consumers and TPPs.  Sugerman-Brozan Decl., ¶ 13; Goldenberg Decl., ¶ 16.

allocation to cash payors, Dkt. No. 5947 at 2-3, they conveniently fail to point out that the allocation of funds between consumers and TPPs in the McKesson case is *identical* to the allocation achieved in this settlement:  82.5% to TPPs and 17.5% to consumers (including co-pay and cash payor consumers).  The Court approved this allocation in the *McKesson* case, and the allocation is reasonable here.

> **2.     An initial payment to the ISHPs is fair and reasonable and does not prejudice consumer Class members.**

As the Pentz Objection notes, an initial payment of $25.5 million to the ISHPs was made, and ISHPs are under no obligation to refund that money if the settlement is not approved.  Pentz maintains that this is unfair to consumers.  Dkt. No. 5947 at 7; Dkt. No. 7542 at 4-5.  But there is good reason for this separate treatment, which is not in any way prejudicial or unfair to the consumer Class members (or, for that matter, the TPPs).

ISHPs are independent from class TPPs, are separately represented and, as private litigants, the settlement of ISHP claims against Defendants is not required to be approved by the Court.  As a result, ISHPs are able to provide a full release of claims to Defendants *without* the need for published or mailed notice or the approval process required by Rule 23.  Pursuant to Section VI.A.3 of the Settlement Agreement, in exchange for the initial payment, ISHPs have *already* released their claims against Defendants upon receipt of the initial payment.  If the Settlement Agreement is not approved by the Court, ISHPs will still have provided Defendants a full release of their AWP related claims.  Having provided a full release, it is only fair that they would also retain the payments made by Defendants to procure that release.

Furthermore, the ISHPs have actually provided a release broader than that related to their initial payment.  In recognition of the fact that ISHPs have provided a full release to Defendants and that the initial payment amount of $25.5 million represents only 75% of the initial allocation

- 19 -

of 50% of the funds allocated to satisfy the claims of TPPs under the Settlement Agreement, Section IX.C. of the Settlement Agreement provides that ISHPs are entitled to receive an additional $8.5 million from Defendants in the event that the Settlement Agreement is not approved by the Court.  Because ISHPs have already demonstrated that they represent 60% of the covered lives in the United States, if the Settlement Agreement is not approved by the Court, ISHPs will have provided a full release for a total payment of $34 million – less than 50% of the amount initially allocated to them under the Settlement Agreement.

It is also important to note that the advanced payment to ISHPs as a result of their ability to provide an immediate and full release of claims does not prejudice TPP Class Members.  The Settlement Agreement provides for a complete "true-up" between the ISHPs and TPP class members, that is, the amount a TPP receives will be the same whether they are an ISHP or a TPP class member.  ISHPs must provide the same documentation to the claims administrator as TPP class members, their claims submissions are subject to the same audit and review process, they are equally responsible for the costs associated with litigation and settlement (such as attorneys' fees and claims administration), and they will receive the same distribution on a dollar-for-dollar basis.  That is, for every dollar an ISHP or TPP class member has spent on the covered drugs, they will receive the same recovery.  As a result, TPP Class Members are not prejudiced by the advanced payment to ISHP group members.  Nor are consumers, as the ISHP payment does not come out of the consumer pool.  Notably, Allocation Counsel agreed to the separate ISHP payments and did not believe that such payments in any way disadvantaged the interests that they represented.

## D.     Consumers Have Been Adequately Represented

The Pentz Objection maintains that Class 3 TPP representatives were inadequate to represent consumers.  Dkt. No. 5947 at 2-4.  The Haviland Objection launches an unwarranted

and mean-spirited attack on PAL, claiming that PAL and its affiliates lack standing to sue for damages and are atypical and inadequate to represent the interests of individual consumers; that allocation of the settlement fund for consumers was infected with an irreconcilable conflict of interest given that Class Counsel appointed PAL and that PAL was organized to "create artificial *cy pres* funds in consumer class action litigation" for its own use; and that Ms. Tonacchio has not demonstrated standing to sue and is not typical or adequate.  Dkt. No. 5971 at 19-29; Dkt. No. 7556 at 1-7.  Pentz attempts to incorporate by reference the arguments advanced by Haviland. Dkt. No. 7542 at 6.  These objections are all seriously misguided and should be rejected.

> **1.    Ms. Tonacchio has proper standing to sue, is an adequate Class 1 Medicare beneficiary representative, and has claims typical of the claims of Class 1 members.**

Even though Haviland continues to promote himself as the only true "consumer representative" in this litigation, he sees fit to attack the Class 1 consumer representative for the Track Two Settlement, Muriel Tonacchio, claiming that she "lacks standing, and is not typical or adequate to be a Track 2 Class 1 consumer class representative."  Dkt. No. 5971 at 25. Haviland's thinly-disguised attempts to have Ms. Tonacchio dismissed as a class representative are for the obvious reason of wanting his clients to take her place.  The Court should reject the attempt.

As the Court has recently explained, it has already deemed Haviland's clients to have withdrawn as class representatives.  Thus, Haviland, who claims to be interested in consumers and not himself, would actually leave Class 1 ***unrepresented*** if his arguments succeed.  Further, although Haviland lodges his objection on behalf of 13 purported Class 1 consumers, two have formally withdrawn from the litigation (Young and Shepley).[11]

---

[11] The "Named Consumer Plaintiffs" on whose behalf Haviland purports to appear are David Aaronson and the Estate of Susan Ruth Aaronson; M. Joyce Howe and the Estate of Robert Howe; Larry Young and the Estate of

Contrary to Haviland's claims, Class Counsel already submitted information establishing that Ms. Tonacchio is both an adequate and typical representative of Class 1.  *See* Affidavit of Muriel Tonacchio in Support of Plaintiffs' Motion to Add Estate of Wilma Mort as Class 1 Representative for Track 2 Settlement (Dkt. No. 5409-2, the "Tonacchio Aff.").  Specifically, before passing away in September 2003, Ms. Tonacchio's mother, Wilma Mort, had cancer and, in trying to treat that disease, was administered chemotherapy over a period of two years in a clinic run by the Weirton Medical Center.  *Id.*, ¶ 2.  During the period that Ms. Tonacchio's mother was administered chemotherapy, she was enrolled in Medicare Part B.  *Id.*, ¶ 3. Although Ms. Tonacchio's mother had supplemental insurance, that insurance refused to cover some portions of her mother's drugs, including $42.44 of her mother's purchases of Anzemet, a Class A Drug.  *Id.*  Ms. Tonacchio attached billing statements that support her Affidavit.  *See* Ex. A to Affidavit.  After being provided information about Plaintiffs' settlement with the Track Two Defendants, and understanding the duties the position would entail, Ms. Tonacchio agreed to serve as a class representative for Class 1.  *Id.*, ¶ 5.

Ms. Tonacchio's mother was a Medicare Part B beneficiary who was administered and paid for a Track Two Class Drug.  In its previous orders, the Court has held that Class 1 plaintiffs established standing by similar means.  *See, e.g.,* Dkt. No. 1648 ("[W]hen plaintiffs amend the complaint to propose individual class representatives, they shall allege facts demonstrating the typicality and adequacy of the class representatives and disclose the

---

Patricia Young; Therese Shepley and the Estate of James Shepley; Harold Carter; Roger Clark and the Estate of David Clark; Ethel Walters and the Estate of Hunter Walters; Katie Bean and the Estate of Harold Bean; James Monk; Virginia Newell and the Estate of William Newell; Oral Roots; Rebecca Hopkins; and George Baker Thomson.  Only three of the foregoing appear to have filed claims:  Larry Young and the Estate of Patricia Young; Harold Carter; and, perhaps, Roger Clark and the Estate of David Clark (several claims bear these names). Coggeshall Decl., ¶ 34.

- 22 -

documents demonstrating that the proposed class representatives made co-insurance payments
(at least in part) under Medicare Part B based on AWP.").

Rather than supporting consumers, as he so often claims to be doing, Haviland seeks to
impose a heightened burden on consumer representative Ms. Tonacchio and thereafter lists eight
purported "defects" with her standing.  Dkt. No. 5971 at 25-29.  However, the vast majority of
Haviland's identified "defects" are not defects at all; rather, Haviland is simply speculating about
what Ms. Tonacchio's documents *might* mean and what Class Counsel *likely* have done.  *See,
e.g.,* Dkt. No. 5971 at 25 ("the statement appears to show . . . Ms. Mort may have been treated"),
26 ("Presumably, it was never sent to Ms. Mort . . ."), 27 ("she likely did *not* make such a
payment").  As such, it is not Ms. Tonacchio's affidavit that is "devoid of evidentiary substance"
(Dkt. No. 5971 at 25), it is Haviland's attack on Ms. Tonacchio that is void of evidence and reeks
of self-motivation.

### a.  Ms. Tonacchio's mother was administered Anzemet in an oncology clinic.

Haviland speculates that Ms. Tonacchio's mother "may have been treated at a hospital,"
noting that "Weirton Medical Center [i]s a 238-bed, non-profit, acute-care general community
hospital."  *See* Dkt. No. 5971 at 25 & n.35.  But Ms. Tonacchio has clearly explained that her
mother's "chemotherapy was administered at *a clinic run by* the Weirton Medical Center."  *See*
Tonacchio Aff., ¶ 2 (emphasis added).  The clinic, although located in the hospital, is a separate,
outpatient facility known as the oncology clinic.  *See* April 8, 2009 letter from Barbara Urbowicz
at Weirton Medical Center, Ex. 8 to the Berman Declaration.

### b.  The payment by Ms. Tonacchio's mother was based on AWP because she was a Medicare Part B beneficiary and paid for a Class drug.

Haviland next attacks the amount that Ms. Tonacchio's mother paid in order to claim that
her payment was not based on AWP.  Dkt. No. 5971 at 26.  Because Ms. Tonacchio's mother

was a Medicare Part B beneficiary who paid for a Class Drug, Haviland's complaints about the amount of the payment, the lack of J-Codes on billing information, as well as his speculation that the payment does not appear to have been AWP-based are irrelevant.[12]  Furthermore, Haviland's new-borne protest is hypocritical given his prior position, taken many times before this Court, that Medicare beneficiaries who paid out-of-pocket for their covered drugs (other than flat co-pays under Medicare HMO) made payments based on AWP.  So either Haviland no longer believes that Medicare beneficiaries like Ms. Tonaccio paid based on AWP or he is making statements he knows are untrue for reasons known only to him.

### c.      Ms. Tonacchio has established a payment for a Class drug.

Haviland next claims that Ms. Tonacchio has not established that either her mother or her mother's estate paid for, or incurred an obligation to pay for, Anzemet.  Dkt. No. 5971 at 26-27.  However, Ms. Tonacchio has signed a sworn affidavit to this effect.  *See* Tonacchio Aff., ¶ 4 ("It is my understanding that those records, attached in part as Exhibit A to this Declaration, ***reflect my mother's payment*** of $42.44 for Anzemet in May 2003.  I have also spoken with a representative of the Weirton Medical Center who informed me over the phone that the amount ***my mother was required to pay*** in this instance was due to her supplemental insurance's unwillingness to pay for all of the Anzemet she was administered.") (emphasis added).  Because such a sworn statement is sufficient for class members making claims under the settlement (*see, e.g.*, Class 3 Claim Form § F), it is equally sufficient for Ms. Tonacchio.

---

[12] The amount Medicare paid for Ms. Mort's Anzemet was indeed AWP-based.  The AWP for that dosage of Anzemet in May 2003 was $173.16.  85% of that amount is $147.18, and 80% of that amount is $117.75, the amount billed to Medicare shown on Ms. Mort's records.  While there may have been an error in billing Anzemet at AWP-15%, the amount was nonetheless AWP-based.  The unusual amount that Ms. Mort paid is likely due to the fact that Ms. Mort was required to pay for Anzemet only at the point at which her supplemental insurance refused to pay for it.

It has been many years since Ms. Tonacchio's mother was administered Anzemet and since her mother passed away.  As this case has been long fought and has been continually extended by Haviland's *ad nauseam* objections, and as the claims process for this Settlement recognizes, it can be extremely difficult to locate canceled checks and credit card statements under these circumstances.  Regardless, this information is simply not required to establish Ms. Tonacchio's standing here.

> d.   **Ms. Tonacchio has the consent of her siblings to act as a class representative in this settlement.**

Haviland further implies that Ms. Tonacchio may not legally represent her deceased mother's estate.  *See* Dkt. No. 5971 at 28 n.38.  Ms. Tonacchio is one of her mother's five surviving children.  *See* Tonacchio Aff., ¶ 1.  Ms. Tonacchio has acted as a class representative in this settlement with the full consent from her remaining four siblings.  Haviland has no evidence to the contrary.

> e.   **Ms. Tonacchio approves of the proposed settlement.**

Finally, Haviland states, once again without any support, that "Ms. Tonacchio never affirmatively states whether she or the Estate of Ms. Mort in fact approve of the settlement." Dkt. No. 5971 at 29.  However, Ms. Tonacchio has previously submitted an affidavit to the Court that she made clear was "in support of Plaintiffs' Motion to Add the Estate of Wilma Mort as Class 1 Representative for Track 2 Settlement."  *See* Tonacchio Aff., ¶ 1.  The last paragraph of that Affidavit provides:

> I have been provided with information regarding Plaintiffs'
> settlement with the corporations I understand are referred to as the
> Track Two Defendants in this litigation.  I support my mother's
> estate serving as a class representative for all Medicare Part B
> beneficiaries who paid or incurred an obligation to pay all or some
> portion of the 20% co-pay for the Track Two Defendants' drugs.  I
> understand the duties of a class representative, including that the
> Court may want additional information from me to support

- 25 -

Plaintiffs' Motion, and am willing to fulfill those duties on behalf
of my mother.

*Id.*, ¶ 5.  No more is required of Ms. Tonacchio.

> **2.**  **Newly proposed consumer class representatives have proper standing to sue, are adequate representatives, and have claims typical of the claims of Class 1 members.**

While Plaintiffs believe that Ms. Tonacchio, along with the originally proposed Class 1

associational class representatives,[13] are adequate representatives of Class 1 consumers, out of an

abundance of caution Class Counsel seek leave to add three additional Class 1 individual

consumer representatives for purposes of the Track Two Settlement.  *See* Class Plaintiffs'

Motion to Add Individual Plaintiffs as Class Representatives for Track Two Settlement (the

"Motion," Dkt. No. 7572).  The three newly proposed Class representatives are Ms. Agnes

Swayze (who is also a BMS class representative), Mr. Thomas Trusky (as executor of the estate

of his wife Theresa Trusky) and Ms. Mariella Laday.  If the Court grant's Plaintiffs' Motion,

addition of these three individuals as Class 1 representatives, along with Ms. Tonacchio, will

cover payments for one or more drugs manufactured by each of the Track Two Defendants.

As described in the Motion, and as evidenced in the affidavits and supporting materials

attached thereto, each of the new proposed Class 1 representatives were administered one or

more Track Two Drugs during the Class Period, as confirmed by data received by CMS.  Each

paid out of pocket for their 20% co-payment obligation under Medicare for these drugs, because

they either had no supplemental insurance or a high yearly deductible that required out-of-pocket

---

[13] The originally proposed Class 1 representatives are organizational plaintiffs and include Vermont Public Interest Research Group, Wisconsin Citizen Action, New York Statewide Senior Action Council, Citizen Action of New York and Health Care For All.  Health Care For All ("HCFA") offered to withdraw in order to avoid any conflict given the Court's Procedural Order of March 23, 2011 (Dkt. No. 7472) concerning HCFA.  HCFA's motion to withdraw was opposed by Don Haviland (Dkt. No. 7528).  On May 5, 2011, the Court referred the motion to withdraw to Magistrate Bowler, who heard oral argument on May 23, 2011.  As of the date of this filing, no decision on HCFA's motion to withdraw has been issued.

expenditures for their co-payment obligations before supplemental insurance would pay.  Each newly proposed representative is familiar with the *AWP* litigation, has reviewed and approved the terms of the Track Two Settlement and is willing to serve as a class representative for purposes of the Settlement.

> 3.     **The Association plaintiffs are also typical and adequate representatives for Class 1.**

In addition to individual class representative Muriel Tonacchio, Class 1 representation has been bolstered by five organizations that pursue and vindicate the rights of consumers. Consumer organizations Vermont Public Interest Research Group, Wisconsin Citizen Action, New York Statewide Senior Action Council, and Citizen Action of New York are typical and adequate representatives for Class 1.  As the Court has found, an agent or member of each of these organizations made a purchase or reimbursement for one or more of the Class Drugs.  Dkt. 5426 at 5.

In a prior opinion, the Court held that an association of affected patients could not serve as a class representative at trial to recover damages against manufacturers accused of inflating the patients' cost of drugs.  *AWP*, 230 F.R.D. 61, 80 (D. Mass. 2005).  The Court relied on *Bano v. Union Carbide Corp.*, 361 F.3d 696 (2d Cir. 2004), which declined to certify as a class representative in a damages action a grass-roots organization formed to help the victims of an explosion at a chemical manufacturing facility in India that killed thousands and injured hundreds-of-thousands of others.  The Court's earlier litigation class certification decision and *Bano* are distinguishable because they both involved certification for trial, not for settlement purposes only.

It is well-established that an association may have standing to bring claims on behalf of its members if the following requirements are met:

- 27 -

> (a) its members would otherwise have standing to sue in their own
> right; (b) the interests it seeks to protect are germane to the
> organization's purpose; and (c) neither the claim asserted nor the
> relief requested requires the participation of individual members in
> the lawsuit.

*AWP*, 230 F.R.D. at 79 (quoting *United Food & Commer. Workers Union Local 751 v. Brown Group*, 517 U.S. 544, 553 (1996)).  The first element is met if the association has members who purchased the drugs at issue at a price inflated by the defendant's fraudulent price increase, which is the case here.  The second requirement is satisfied because the purposes of the Associations include furthering the rights of consumers, especially with respect to the access-to-health care issues invoked in this lawsuit.  *See, e.g., Colwell v. HHS*, 2009 U.S. App. LEXIS 5561, at *21-22 (9th Cir. Mar. 18, 2009) (applying the three factors).

The third prong represents a prudential rather than a constitutional requirement for standing.  *Bano*, 361 F.3d at 715.  It presented an obstacle to adequate representation in *Bano* because the complaint there claimed that "individuals have suffered bodily harm and damage to real property they own.  Necessarily, each of those individuals would have to be involved in the proof of his or her claims."  *Id.* at 714-15.  At the time of litigation certification, this Court, too, faced similar concerns with respect to Class 1.  *AWP*, 230 F.R.D. at 79-80.  But the Court implicitly recognized that an association could be an appropriate representative of a class, where individualized proof was not necessary to establish the fact and extent of injury.  *Id.* at 79 (quoting *Irish Lesbian & Gay Org. v. Giuliani*, 143 F.3d 638, 650 n.5 (2d Cir. 1998) ("An association generally cannot seek relief in damages for injuries to its members because unless the alleged injury is common to its entire membership, and shared by all to an equal degree, both the fact and extent of injury would require individualized proof.")).  This is precisely the case here, where the Court certified the class for settlement purposes only.

- 28 -

Individualized proof of damages is solely a management issue, *see AWP*, 230 F.R.D. at 81, which becomes moot when the class is certified for settlement purposes only.  *See*, *e.g.*, *Amchem Prods. v. Windsor*, 521 U.S. 591, 620 (1997); *Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 298 (1st Cir. 2000).  This is particularly true in this case, where damages have been established on an aggregate basis, and individual claims can be easily adjudicated through the claims administration process.  The Associations are therefore adequate and appropriate representatives because they meet the other requirements of adequacy and typicality and because individual members' participation is not necessary to establish the fact and extent of the damages to the Class for the purposes of settlement.

4.    **The Association plaintiffs do not have an irreconcilable conflict with consumers over potential *cy pres* distributions.**

Haviland continues to insist that PAL's "'mission' is to recover 'a separate *cy pres* fund" in this litigation, and that this alleged motivation creates a conflict between the Association plaintiffs, who are members of PAL, and consumers.  Dkt. No. 5971 at 22.  As "support" for his assertion, Haviland submits a contorted and misleading description of PAL's core mission and history of advancing consumer interests.  *Id.* at 2-24.  Haviland then continues his long-standing attack on Class Counsel by announcing that Class Counsel never disclosed this conflict of interest to any consumer client or the Court.  *Id.* at 23.  But there was no need for Class Counsel to ever disclose such a conflict for the simple reason that no such conflict existed or exists.

PAL is a national coalition of more than 130 organizations, including consumers, seniors, heath care, labor, legal services, women's health, and human services groups in 36 states and the District of Columbia.  Its members in the Commonwealth of Massachusetts are Boston Building Service Employee Trust Fund (SEIU Local 615), Commonwealth Care Alliance, Community Catalyst, IUOE Local 4 Health and Welfare Fund, IUOE Local 98, Health Care For All Inc.,

- 29 -

Health Law Advocates, Lynn Health Task Force, Massachusetts Breast Cancer Coalition, MASSPIRG, Massachusetts Senior Action Council, New England Regional Council of Carpenters, Our Bodies Ourselves, Pipefitter's Local 537 Trust Funds, SEIU Local 615, Sheet Metal Workers Local Union 17 Insurance Fund, TeamstersCare, and Women's Health Institute. Declaration of Wells Wilkinson in Support of Final Approval of the Track Two Settlement (Dkt. No. 6008, the "Wilkinson Decl."), ¶ 4.

PAL's mission is to make prescription drug prices more affordable for consumers. It seeks to accomplish this mission through public education and class action litigation challenging illegal pricing tactics and deceptive marketing by drug companies, Pharmacy Benefit Managers, and other pharmaceutical industry players. PAL and its members have been involved in more than 32 class action lawsuits challenging drug industry tactics to illegally raise the price of prescription drugs. There have been 10 final settlements in these cases (for a combined total of $599 million), allowing consumers and health plans who were illegally overcharged to be reimbursed and putting drug companies on notice that their illegal tactics will not go unopposed. *Id.*, ¶ 5.

One of the goals of PAL is to ensure that settlements reached in any pharmaceutical litigation involving consumers provide consumers with fair compensation, and that other provisions of those settlements, such as notice and claims administration procedures, are as consumer-friendly as possible. PAL's desire is that as much money as possible be returned to consumers who have suffered damage in the cases with which PAL is involved. *Id.*, ¶ 7. In addition, PAL's position is that any dollars unclaimed by consumers should not "spill over" to satisfy third-party payor claims. PAL helps ensure that this does not happen by advocating maximum payouts to consumers. *Id.*, ¶ 8. PAL has never applied for or received any *cy pres*

funds from any litigation or settlement, *id.* at ¶ 10,[14] although Community Catalyst has been the

beneficiary of *cy pres* distributions in cases in which it was not a named plaintiff.  Wilkinson

Decl., ¶¶ 13-16.[15]

These twin goals – advocating against a spillover to TPPs of monies in the consumer pool

and seeking to maximize payouts to consumers – were pursued by Allocation Counsel here.

Allocation Counsel Alex Sugerman-Brozan, PAL's former Executive Director, and attorney Jeff

Goldenberg, vigorously represented the consumers' interests in the allocation negotiations.  They

were able to increase the overall amount originally earmarked for consumers under Dr.

Hartman's utilization model; advocated for a treble co-pay payment to encourage claims and

otherwise emphasized that the claim form and claim process should not be complicated; and

strenuously objected to any spillover of unclaimed consumer monies to the TPPs and asserted

that any unclaimed funds in the consumer pool be distributed in a manner that benefits

consumers either in the form of direct payments to consumers or a court-approved *cy pres*

mechanism.  Goldenberg Decl., ¶¶ 9-23; Sugerman-Brozan Decl., ¶¶ 10-23.[16]  Mr. Goldenberg,

who is not affiliated with PAL or the Association Plaintiffs, was not aware of any evidence

backing Haviland's theory that PAL has sought to funnel settlement funds to itself or its

members at the expense of the consumer class members.  Goldenberg Decl., ¶ 24.  ***And, in any***

---

[14] This is consistent with what Mr. Sobol has observed in working with PAL over the years, although Mr. Sobol has, typically, not represented PAL itself.  Declaration of Thomas M. Sobol in Support of Class Plaintiffs' Response to Objection to Final Approval of the Track Two Settlement (Dkt. No. 6005, the "Sobol Decl."), ¶ 5.  As Mr. Sobol explains:  "[I]t is my understanding that PAL has never sought or accepted *cy pres* funds from any litigation or settlement, and that its non-profit parent, Community Catalyst, has not accepted *cy pres* funds from any litigation in which it was a plaintiff.  . …..  As far as I know, when the choice is between consumer recovery and *cy pres*, PAL has always sided on the need to obtain consumer recovery."  *Id.*, ¶¶ 6, 8.

[15] The only instance of a PAL member organization receiving a *cy pres* distribution in class litigation in which the member was a plaintiff was in *Relafen*, where United Senior Action of Indiana received a $17,000 sub-grant in order to educate consumers about the benefits of generic drugs.  Wilkinson Decl., ¶ 14.

[16] Mr. Sugerman-Brozan was the genesis of the "easy refund" consumer claim option.  He and PAL believed that inclusion of a flat payment option would motivate consumers not otherwise inclined to look for medical records to participate in the settlement.  *Id.*, ¶ 23.

- 31 -

*event, there will be no cy pres monies here, as the Consumer Allocation will be fully distributed to consumers*.

Haviland also misrepresents positions taken in the *Lupron* litigation in a misguided effort to paint himself as the sole savior for consumers.  Dkt. No. 5971 at 24 & n.34.  In *Lupron*, a total settlement of $150 million was reached on behalf of third-party payors and consumers.  After appropriate allocation by the parties, payment of administrative expenses and fees, and payouts to third-party payors and consumers, approximately $11.4 million in unclaimed funds remains in the consumer settlement pool.  Sobol Decl., ¶ 10.  This large surplus is the direct result of CMS's initial refusal to provide class member data to assist with the *Lupron* claims administration, despite counsel's efforts in *Lupron* to obtain administration data, including names and addresses, of Medicare beneficiaries who received Lupron.  *Id.* at 4-5 n.1.

Given CMS's apparent change of policy here in the *AWP* litigation and its willingness to provide administration data so that notice and claim forms can be provided to targeted Medicare beneficiaries, a proposal was submitted to Judge Stearns that the remaining funds be used to obtain relevant names and addresses of Lupron recipients from CMS, provide a supplemental notice by direct mail to them, and then pay the valid claims submitted in response.  This would be in lieu of any *cy pres* payment to any organization.  *Id.*, ¶ 11.

Hagens Berman Sobol Shapiro LLP, Class Counsel here, as well as part of the class counsel team in *Lupron*, argued that the consumer surplus in *Lupron* be distributed in this manner.  *Id.*, ¶¶ 11-12.  And even though PAL's parent Community Catalyst advocated that the remaining funds be paid to organizations, including Community Catalyst, for the benefit of, among others, programs that will research the detection, treatment, and prevention of prostate cancer, endometriosis, and other diseases and educate consumers on their health and choices (as

- 32 -

are other co-leads in *Lupron* but not HBSS), PAL itself took the position in *Lupron* that the remaining funds should be paid to eligible Medicare beneficiaries identified from the CMS database. *Id.*, ¶¶ 11-12; *see also* Wilkinson Decl., ¶ 12. PAL supported a *cy pres* distribution to benefit consumers in *Lupron* only if the Court there rejected the renewed CMS-data based claims proposal (and only so that consumer monies do not spill-over to fund claims by TPPs). Wilkinson Decl., ¶¶ 22-24. Thus, Haviland has it exactly backwards: *Lupron* is an example of Hagens Berman Sobol Shapiro and PAL arguing against *cy pres*.[17]

In contrast, Haviland's proposal in *Lupron* was for the remaining funds to be paid to consumers who already filed claims, even though those claimants have already been paid more than their full damages and even though written notice had not previously been sent to all Medicare beneficiaries who were administered Lupron. Moreover, Haviland would have disposed of the remainder in this manner only after additional attorneys' fees to Haviland were taken out of the pool. Notably, Haviland was the ***only*** attorney advocating that the remaining funds be diminished by the payment of additional attorneys' fees. Sobol Decl., ¶ 14.

Given his interference in *Lupron*, Haviland well knows that both Hagens Berman Sobol Shapiro and PAL have taken the position that the remaining consumer funds in *Lupron* be distributed to the Lupron consumers, and not in *cy pres*. *Id.*, ¶ 13. However, Haviland has failed to advise this Court of these facts, facts that are very material to, and indeed eviscerate, Haviland's own trumped-up conspiracy theory that Hagens Berman Sobol Shapiro and PAL have set out to minimize the consumer payout here in order to provide monies to others in *cy pres*.

---

[17] Another example of PAL advocacy in working to maximize benefits to consumers is provided by *Government Employees Hospital Association v. Serono International, S.A., et al.*, No. 1:05-cv-11935-PBS, where PAL worked with counsel to put together a novel, and ultimately effective, notice program by which class member names were obtained through the issuance of subpoenas to pharmacies and others. Sobol Decl., ¶ 8. "As the *Serono* case and PAL's track record makes clear, PAL has singularly advanced the interests of consumers in pharmaceutical litigation, maximizing returns to consumers." *Id.*

- 33 -

***Once again, Haviland has sought to mislead this Court***.  But as the foregoing conclusively demonstrates, Haviland's theory of a conspiracy by PAL to deny consumers their rightful recovery in this case is supported by absolutely no evidence whatsoever and is but a charade in Haviland's long-running efforts to harass Class 1 for his own purposes and to deny Class members their long-awaited recovery.

### 5.    The Taft-Hartley Fund representatives are typical and adequate representatives for Class 3.

The Court has preliminarily certified settlement Class 3 with the following six Taft-Hartley Funds as the representatives:  Teamsters Health & Welfare Fund of Philadelphia and Vicinity, Philadelphia Federation of Teachers Health and Welfare Fund, Man-U Service Contract Trust Fund, Pipefitters Local Union 537 Trust Funds, Board of Trustees of Carpenters and Millrights of Houston and Vicinity Welfare Trust Fund, United Food and Commercial Workers Unions and Employers Midwest Health Benefits Fund.  Dkt. No. 5426 at 5.

With respect to payors representing consumer interests in Class 3, in its litigation class certification decision the Court found that TPPs were typical and adequate representatives because the "TPP serves as the intermediary for its plan beneficiaries in negotiating with providers over reimbursement rates, and no conflict is immediately apparent" between TPP and consumer interests.  *AWP*, 230 F.R.D. at 87 n.25.  Indeed, other courts have held that the claims of consumer and TPPs are typical of the claims of all class members notwithstanding variations in the amount of damages.  *See, e.g., In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672, 688-90 (S.D. Fla. 2004).

"The central inquiry in determining whether a proposed class has typicality is 'whether the class representatives' claims have the same essential characteristics as the claims of the other members of the class.'"  *In re Polymedica Corp. Secs. Litig.*, 224 F.R.D. 27, 36 (D. Mass. 2004)

(quoting *In re Amerifirst Secs. Litig.*, 139 F.R.D. 423, 428 (S.D. Fla. 1991)), *vacated on other grounds*, 432 F.3d 1 (1st Cir. 2005); *McLaughlin v. Liberty Mut. Ins. Co.*, 224 F.R.D. 304, 310 (D. Mass. 2004).  The plaintiff does not need to show "substantial identity between [his] claims and those of absent class members," but only that "[his] claims arise from the same course of conduct that gave rise to the claims of the absent members."  *In re Polymedica*, 224 F.R.D. at 36 (quoting *Priest v. Zayre Corp.*, 118 F.R.D. 552, 555 (D. Mass. 1988) (internal quotation marks omitted)).

The Class 3 consumers and TPPs engaged in the exact same type of transactions (retail payments for Subject Drugs), most often as partners in common transactions (as co-payers) and suffered the same damage as a result of AWP inflation – they paid more than they otherwise would have paid for the drugs.  There is no conflict between the interests of TPPs and consumers in Class 3.  Moreover, any potential for conflict was eliminated during the allocation phase by having the consumer interests represented by separate counsel (Messrs. Goldenberg and Sugerman-Brozan).  Such structural protections moot any objections of intra-class conflicts.  *See, e.g., In re Relafen Antitrust Litig.*, 231 F.R.D. 52, 74-76 (D. Mass. 2005) (separate blocks of attorneys were appointed to represent the interests of TPPs and individual consumers, respectively, for purposes of dividing the proposed settlement; court cited PAL's peripheral participation in the negotiations); *In re Lupron® Mktg. & Sales Practices Litig.*, 228 F.R.D. 75, 90-91 (D. Mass. 2005) (approving settlement in which TPPs and consumers participated jointly and noting that no objector complained of the disparity in the benefits negotiated on behalf of consumer-purchasers and TPPs); *In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 260 (D. Del. 2002) (approving settlement and recognizing that the plan of allocation was agreed to by both consumer and TPP class representatives), *aff'd*, 391 F.3d 516 (3d Cir. 2004).

To be sure, the Court in its initial class certification decision was concerned that TPPs

may be subject to unique defenses that would threaten to become the focus of the litigation in

Class 1. *AWP*, 230 F.R.D. at 80 (citing *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222

F.3d 52, 59 (2d Cir. 2000)). However, the Court did not cite the same concerns with respect to

TPP representation of consumers in ***Class 3*** and, indeed, in awarding damages in favor of the

Massachusetts Class 3 after trial, the Court did not find that the TPPs there were subject to any

unique defenses.[18]

**E.     The Claims and Distribution Process for Class 3 is Fair and Reasonable**

The Weatherly Objection posits a number of perceived flaws with the distribution to

Class 3: (i) the proposed settlement fails to estimate how large Class 3 is, and it does not provide

an estimate of the average class member's out-of-pocket expenses (Dkt. No. 7545 at 7-9); (ii)

obtaining claims documentation is excessively burdensome (*id.* at 13-14); (iii) the proposed

settlement does not inform class members exactly what they receive, leaving them unable to

make a fully informed decision (*id.* at 14); (iv) the settlement should provide for $100 to $150

flat award without requiring class members to provide records (*id.* at 14-15); and (v) the

distribution should be changed to be direct payment based on billing records subpoenaed from

the ISHPs and retail pharmacies (*id.* at 16-17).[19]  These criticisms are unwarranted.

**1.     The value of the Settlement to the Consumer Classes as a whole does not
depend on any "take up" rate related to Class 3 Consumers.**

In arguing that the Settlement cannot be approved because Class Counsel has not

provided an estimate of the size of Class 3 or an estimate of the average class member's out-of-

pocket expenses, Ms. Weatherly suggests that the Court cannot evaluate the value of the

---

[18] The representatives of Class 3 for the Massachusetts trial were Pipefitters Local 537 Trust Funds, Blue Cross/Blue Shield of Massachusetts, and Health Care for All. *See* Dkt. No. 2097-1 at 6.

[19] Weatherly also contends that the amount allocated to consumers is inadequate and that attorneys' fees are too high. Dkt. No. 7545 at 17-18. Plaintiffs rebut these contentions in Section IV.C, *supra*, and Section IV.G *infra*.

- 36 -

Settlement.  Dkt. No. 7545 at 10.  This has not been an issue in other settlements approved by this and other Courts, largely because the pool dedicated to consumers is known.

The 17.5% or $21,875,000 allocated to consumers under the proposed settlement will be paid out by Defendants for the benefit of consumers regardless of how many consumers file claims or how many Class 3 claimants opt for a full refund and provide documentation of their expenditures.  There is no provision for any reversion to Defendants of any monies allocated to consumers and, indeed, Consumer Allocation Counsel refused to agree to any spillover of consumer monies to the TPP pool.  Further, there will not be any funds left after all consumers have been paid their claimed share of consumer funds.  So, it will all be paid out.

Ms. Weatherly also contends that the average class member's out-of-pocket expense must be known.  But out-of-pocket expense is ***not*** the relevant metric; actual damage is, which is a subset of out-of-pocket payments.  Here, Dr. Hartman has estimated that Class 3 damage for Class A drugs is $252,135,098, of which 3.5% constitutes damage to the consumers.  *See* Berman Decl., Ex. 1.  This comes to about $8.8 million and is well within the $21,875,000 allocated to consumers under the proposed settlement.  Notably, Ms. Weatherly presents no rebutting expert testimony.

Ms. Weatherly also fails to explain how out-of-pocket expenses could be estimated class-wide or what significance it has to whether the settlement is fair and reasonable.  It should be obvious that, at the outset, it is not possible to know or reliably estimate how many consumers will submit claims and how many will choose the "easy refund" or full refund options.  Consumer decisions are based on their individual circumstances, including how much money the consumer paid out-of-pocket, the difficulty in obtaining one proof of purchase related to each drug for which the consumer would make a claim for a full refund, and the inclination of each

consumer to make the effort to make a claim for a full refund versus the "easy refund" option. There is no reason why Class Counsel and the Court should have to foresee future claims rates, especially given the lengths to which Class Counsel have gone to make the claims process as easy as possible.  What is important is that consumers have a real opportunity to participate (as they do), and that, as Allocation Counsel have guaranteed, the allocation to consumers is fair and reasonable.  The fact that 20,857 Class 3 consumers have filed claims thus far demonstrates that they have had a real opportunity to participate.

> **2.     The notice and claim forms clearly indicate what Class 3 Consumers can do to document their claim.**

Ms. Weatherly complains that filing a claim is too burdensome in the event that a member of Class 3 elects the Estimated Refund Option.  Dkt. No. 7545 at 13-14.  Section 5 of the Class 3 Notice, titled "What do I need to do to get a payment?," explains that, in order to make a valid claim, a Class 3 consumer should "complete the attached claim form and provide documentation."  Section F of the claim form clearly indicates what a consumer can do to document their estimated out-of-pocket expenditures:

> If you chose Option 2, you must provide proof that you made a percentage co-payment for each of the Class Drugs you are claiming in the charts in Section E above. You only need to provide one form of proof for each of the drugs.
>
> Any one of the following are acceptable as proof of a percentage co-payment for one of the Class Drugs:
>
> (1) A receipt, cancelled check, or credit card statement that shows a payment for one of the drugs (other than a flat co-payment); or
> (2) A letter from a doctor saying that he or she prescribed one of the drugs and you paid part of the cost of one of the drugs (other than a flat co-payment) at least once; or
> (3) An EOB (explanation of benefits) from your insurer that shows you made or are obligated to make percentage co-payments for the Class Drugs; or
> (4) A notarized statement signed by you indicating you paid or are obligated to pay a percentage copayment for the Class Drugs

- 38 -

> between January 1, 1991 through March 1, 2008, including the
> total of all percentage co-payments for the drugs during the time
> period; or
> (5) Records from your pharmacy showing that you made
> percentage co-payments for the Class Drugs purchased between
> January 1, 1991 through March 1, 2008.

The list of documentation is self-explanatory, and the Court already recognized during the first fairness hearing that there was nothing ambiguous about it. *See* April 27, 2009 Hearing Tr. at 38:13-16 (Dkt. No. 6046). The documentation requirement is not burdensome and, indeed, was crafted so that it would be easy for Class 3 members to make claims. For example, if the Class 3 member cannot provide backup documentation, they can instead supply a notarized statement indicating a percentage co-payment for a Class drug.[20] Short of requiring no documentation at all, which would invite fraud, it is difficult to envision an easier process. Tellingly, Ms. Weatherly fails to suggest any workable alternative.

### 3.      A specific award need not be specified in the notice.

Ms. Weatherly complains that Class 3 Consumers cannot adequately evaluate the fairness of the Settlement because they have not been informed of exactly how much they might receive from the Settlement. Dkt. No. 7545 at 14. This argument is unavailing.

The Notice to Class 3 Consumers indicates that an individual who chooses the "easy refund" may get "*up to* $35," and that in the event there is not enough money available to pay 100% of all consumer claims, "each consumer's claim will be reduced proportionately." Language in the notice indicating that awards may be proportionately reduced appears in almost all notices associated with class settlements simply because, despite the best information available and the experience of Class Counsel, it is always possible that there will be more

---

[20] And if class members have any questions concerning how to go about obtaining documentation, they are provided a toll-free number to call to get further information and guidance. If they are unsatisfied with the information they receive or have questions beyond those that can be provided by the call center, they are directed to Class Counsel for further information and direction.

- 39 -

claims than anticipated.[21]  Consumers need to be informed that there is always the possibility that claims will exceed available distributable funds.  Not to provide such information to consumers would be misleading and would surely meet with objection in the event there were insufficient funds, as will likely be the case here.  Further, it is a rare settlement in which the notice precisely specifies the exact amount that the Class member will receive.  And Rule 23(e) does not require it.  It only requires that the notice inform class members of the nature of the pending litigation and the settlement's general terms, that complete information is available from the court files, and that any class member may appear and be heard at the fairness hearing.  *See* 4 A. CONTE & H. NEWBERG, NEWBERG ON CLASS ACTIONS, §11:53 at 164 (4th ed. 2002).  The notice did all of this, and more.

### 4.    A flat payment of $100 to $150 is impractical and factually unsupported.

Ms. Weatherly suggests as an alternative to the current distribution plan that each member of Class 3 be provided, without any documentation of their claim, a flat payment of $100 to $150 rather than the $35 "easy refund."  Dkt. No. 7545 at 15-16.  Ms. Weatherly suggests that this would provide a "more equitable result" but provides no explanation as to why such an alternative is superior.

Ms. Weatherly contends that the $100 to $150 payment could be based on the "average cost of medical/billing records retrieval."  *Id.*  But Weatherly provides no evidentiary support for the assertion.  During the December 16, 2008 status hearing, the Court asked Class Counsel how much medical records cost to retrieve.  The response was that, in general, it varied from person to person based on the volume of the records and the specific institutions producing the records.

---

[21] As examples, similar language appeared in the consumer notices approved and used in *Lupron*, *Relafen* and the AstraZeneca Class 1 settlements, to name a few.

*See* December 16, 2008 Tr. at 6 (Dkt. No. 5814).[22]  Class Counsel has been involved in numerous settlements involving pharmaceuticals that include the same list of documentary evidence used in this Settlement and have never encountered consumer claimant complaints that the records needed to substantiate claims were prohibitively expensive, let alone in the $100 to $150 range.

It should be noted that Class 3 members need not provide records to substantiate ***every*** purchase or payment during the entire class period in order to obtain a full refund.  Class 3 consumers are required only to estimate their total out of pocket expenditures for each drug for which they are making a claim and provide ***one*** form of proof for each of the drugs for which they are making a claim.  This greatly reduces the amount of documentary evidence required to be submitted but ensures that the consumer has provided some evidence that they paid for the drugs in order to deter potential fraudulent claims.  The forms of proof do not even need to include medical records but can instead be a letter from their doctor or their own notarized statement attesting to the fact that they made percentage co-payments for the drugs – neither of which cost substantial amounts to obtain and in most instances are free.

Even if it were a reasonable assumption (which it is not) that it would cost the average consumer $100 to $150 for medical records, Ms. Weatherly fails to explain why this amount should form the basis of a recovery by consumers when no records are being required to substantiate a claim in Ms. Weatherly's alternative plan.  The $35 "easy refund" was designed to encourage the participation of class members who are not otherwise inclined to provide documentation.  It was set at an amount that Class Counsel believed would motivate legitimate

---

[22] Counsel did say that he has seen bills for medical records vary from $15 to $150, but this figure was based on experience as legal counsel having obtained records in, for instance, personal injury matters, not specific costs that a Class 3 member might encounter.  Many institutions provide records to an individual requesting their own medical records free of charge, while they may charge attorneys or other third parties a per page fee.

class members to file a simple claim form, but not be a windfall amount that might either swamp the funds available to pay consumers who filed for full refunds with documentation or that would encourage fraudulent claims.

> **5.      Retrieving payment data via subpoenas to ISHPs and pharmacies is impractical, unduly burdensome, and will swamp monies available for distribution to consumers.**

Ms. Weatherly and Pentz suggest that payment data be obtained from TPP insurers (such as ISHPs) and from pharmacies and PBMs in order to make a direct payment to Class 3 members.  Dkt. No. 7545 at 16-17; Dkt. No. 5947 at 5-6.  The goal is laudable and is shared by Class Counsel, many of whom were directly involved in the *Relafen* case and helped design and execute the subpoena project referenced as an example in Ms. Weatherly's objection.  ***However, Relafen is a poor model for the Track Two Settlement***.

*Relafen* involved a single oral medication with a few dosage forms, and thus just a handful of related NDCs.  In contrast, this Settlement involves almost 200 drugs, most with multiple dosage forms, and thousands of related NDCs.  Furthermore, this proposed settlement primarily involves injectable drugs administered in physician offices and not oral medications dispensed from a pharmacy.

The fact that Relafen, an anti-inflammatory often prescribed by rheumatologists, was an oral medication is significant in that it was exclusively dispensed through retail pharmacies and mail-order pharmacies operated by PBMs.  Although a major undertaking, issuing subpoenas to the top ten retail pharmacies and the five largest mail-order PBM pharmacies meant that a significant portion of the class members' records were obtained.  In contrast, the vast majority of the drugs in this Settlement are injectable drugs not distributed through pharmacies.  Obtaining the payment records of consumers through retail and PBM pharmacies would not provide information for the vast majority of class purchases.  Instead, subpoenas would have to issue to

- 42 -

thousands or tens-of-thousands of physicians, if they can be reasonably identified.  This would simply be unworkable.

And for the minority of drugs that are self-administered, the sheer logistics involved in coordinating and collating data from tens of pharmacy chains and potentially hundreds of TPPs would prove an insurmountable obstacle.  In *Relafen*, the claims administrator obtained data from approximately 15 entities (ten national retail pharmacies and five PBMs), each of which had separate computer systems.  Significant effort was involved in ensuring that the data obtained was in an identical and usable format and that the data fields obtained were identical across the pharmacies.  Because the same individual may fill prescriptions in a number of different pharmacies, and in order to avoid the cost of processing separate checks to the same individual, the data obtained from the different companies had to be combined.  Further, information related to individuals appearing in multiple data sets needed to be combined, so that a single check could be cut to that individual.  In many instances, this process was a manual one because identifying information was not always identical across the pharmacies.[23]

The logistical challenges posed in *Relafen* pale in comparison to those associated with this Track Two proposed settlement.  First, TPPs generally do not maintain insured claim information in their active databases for more than a three or four years.  Older data either exists in an archived format that is expensive and difficult to restore or was maintained in computer systems that are no longer active and have been replaced.  Second, the numbers of drugs and NDCs in this Settlement are significantly higher than in *Relafen*.  Just the seven brand-name drugs involved here have a combined total of 129 associated NDCs.  The remaining 183 drugs on the list have thousands of NDCs.  Third, obtaining data from potentially hundreds of TPPs, all

---

[23] For instance one TPP database may list an individual as "Bill Smith" and another as "William P. Smith." These entries need to be manually reviewed to ensure that other identifying information, such as a home address, are identical before the entries from separate databases are combined.

- 43 -

with separate data systems, and then combining them in a usable fashion and combining

individual consumer information that appears in multiple databases would be prohibitively time

consuming and costly.

Class Counsel do not suggest that this approach could not be undertaken. They do

suggest however, that the time and money that would be required makes such an approach

prohibitive and would likely consume a substantial, if not majority amount, of the money set

aside for the consumers. Ms. Weatherly's speculation that such a monumental task is feasible is

just that – speculation – and is not supported by any prior settlement paradigm or any specific

evidence from this case.[24] Indeed, recognizing how such massive costs deplete the funds

available to consumers, the Court has acknowledged that a third-party notice campaign such as

that envisioned by Ms. Weatherly only makes sense for either single drug settlements or

substantially larger multiple-drug settlements. *See* April 27, 2009 Hearing Tr. at 45:20-46:4

(Dkt. No. 6046).

## F.   Objector Connick Is Not A Class Member And Has No Standing To Object

Pentz objector Corinna Connick lacks standing to act as an objector (and, as set forth in

Plaintiffs' opposition to her motion to intervene, *see* Dkt. No. 6010, certainly cannot act as a

class representative) because she is not a member of the Class she seeks to represent. Ms.

Connick took Climara, which is ***not*** a Class Drug. *See* Ex. 5 to Berman Decl. (Connick's

---

[24] The Pentz Objection also maintains that consumers should not be required to file claims and that, instead, a distribution method should be devised to send checks to consumers identified through serving subpoenas on the ten largest pharmacy chains. Dkt. No. 5947 at 5-6. Even if feasible (and it is not), this will tell nothing about whether the consumer's payment went unreimbursed by insurance. As Special Master McGovern concluded in reporting to the Court on the fairness of the GSK settlement, a claims process involving proof of payment is "typical of this type of consumer settlement." Report of the Special Master to the Court at 5; *see also In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prods. Liab. Litig.*, 236 F. Supp. 2d 445 (E.D. Pa. 2002) (utilizing claims process in which claim had to be certified by a cardiologist or cardiothoracic surgeon); MANUAL FOR COMPLEX LITIGATION, FOURTH at 331 (2004) ("Class members must usually file claims forms providing details about their claims and other information needed to administer the settlement. . . . Verification of claims forms by oath or affirmation under 28 U.S.C. § 1746 may be required, and it may be appropriate to require substantiation of the claims (*e.g.*, through invoices, confirmations, or brokers' records).").

- 44 -

prescription label showing Climara); *see also id.* (Connick Dep. at 25:19-22 (testifying that Climara was the only Class Drug Ms. Connick took)).  The generic version of Estradiol is a Class Drug and not the branded Climara taken by Ms. Connick.

While Ms. Connick claims that she has standing because Climara is the branded version of Estradiol, which is a Class Drug (*see* Dkt. No. 7542 at 2-3), the plain language of the Settlement Agreement makes clear that the only consumer claims released in this settlement are claims related to Class Drugs.  *See id.* § II (JJ).  Therefore, because Ms. Connick did not take a Class Drug, her claims are not being released in this case, and she lacks standing to object to the settlement or to intervene as a proposed class representative.  Ms. Connick does not offer any evidence to the contrary.

Instead, Ms. Connick argues that the list of settlement drugs is vague and ambiguous because Climara does not appear on it.  Dkt. No. 7542 at 2-3.  The drug list is not vague. Climara, a brand name drug manufactured by Bayer, is ***not*** on the list of Class Drugs – period. Thus, it is not part of the Settlement.  And as Ms. Connick's attorneys can easily determine, Climara also was not part of the litigation.  Quick reference to paragraph 299 of the Fifth Amended Master Consolidated Class Action Complaint (Dkt No. 5902), which specifies the precise Bayer drugs for which relief is sought in the case, reveals that Climara is not on the list and, therefore, not part of the case against Bayer.  Ms. Connick's attorneys are perfectly capable of verifying this fact, and their attempt to sow confusion where none exists should be rejected.[25]

---

[25] Connick claims that "thousands of purchasers of branded drugs will fail to file claims to settlement funds to which they are entitled," but that's just rhetoric.  If the brand name was administered and the brand name is released in the settlement, the name on the claim form will match the settlement drug list and the consumer can make a claim. To the extent that a consumer took a generic, and the consumer will not know if she took a generic manufactured by a Track 2 defendant, the claim will still be honored.  This is just one of the consequences of a settlement that involves multi-source drugs.  But it is over-inclusive and, therefore, not the proper basis of an objection.

G.     **Objections Relating to Attorneys' Fees**

The objections relating to attorneys' fees are as follows:  requested attorneys' fees are too high (Dkt. No. 5738 at 1; Dkt. No. 7563; Dkt. No. 7545 at 18); the Notice is not sufficiently specific regarding fees, because it does not specify whether the percentage sought is from $21.8 million or $125 million (Dkt. No. 5738 at 1); attorneys' fees were based in part on amounts that went to ISHPs, which were not represented by Class Counsel (Dkt. No. 5947 at 7-10; Dkt. No. 7542 at 6-8); and by failing to estimate lodestar applicable to Track Two Defendants, Class Counsel have not properly documented lodestar for purposes of the cross-check (Dkt. No. 5947 at 8-9).[26]  These objections are baseless.

1.     **Class Counsel's request for a 30% fee, inclusive of litigation expenses, is fair and reasonable.**

In the Memorandum In Support of Class Counsel's Petition For Attorney's Fees, Reimbursement of Expenses, and Compensation to the Class Representatives in Association with the Track Two Settlement (Dkt. No. 5938), Class Counsel requested that the Court award a payment of attorneys' fees and litigation expenses of 30% of the common fund of $125 million or $ 37,500,000.  *See also* April 28, 2011 Lead Class Counsel's Memorandum of Law in Support of Motion for Attorneys' Fees and Costs and Compensation to the Class Representatives in Association with the Track Two Settlement (Dkt. No. 7515-1).  The Wilson Objection provides no detail as to why Wilson believes the requested fee is too high or unreasonable other than merely stating that the arbitrary amount of $10 million would be reasonable instead.  Dkt. No. 6778 at 2.[27]  The Keshishian objection likewise rotely concludes that the fees requested are too high in relation to the amount recovered for consumers.  Failure of an objector to provide any

---

[26] Ms. Keshishian also objects on the basis that the fee award should include litigation costs (*see* Dkt. No. 7563), but it does.

[27] Grasping at straws, Wilson also conflates the *AWP* case with the unrelated case against McKesson.  Dkt. No. 6778.  As the Court well knows, the cases are completely separate.

detail about his objection or to provide any substantive argument alone provides the Court with adequate basis to dismiss the objection. *Willhauk v. Halpin*, 953 F.2d 689, 700 (1st Cir. 1991) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work. Judges are not expected to be mind readers . . . .").

In support of their fee petitions, Class Counsel provided the Court with exhaustive briefing in support of a 30% award (*see* Dkt. Nos. 5938 and 7515-1) and in the interest of brevity will not repeat that briefing here. The Court has awarded a 33 1/3% attorneys fee and expense award in the GSK Settlement and a 30% award of fees in the AstraZeneca Settlements. In doing so, the Court has recognized that the risks incurred by Class Counsel in these highly complex cases and the results achieved for the Classes have warranted the fee awards:

> Well, I do think one-third is appropriate. I might say that, for the record, I approved that in the other case [GSK]. I think this was an incredibly risky piece of litigation which was cutting-edge and no certainty of success. The pharmaceutical companies have done a fabulous job defending it, and it was fought tooth and nail the entire way along with the best firms in the country.

May 1, 2008 Hearing Tr. at 24 (AstraZeneca Class 1 Settlement Hearing) (Dkt. No. 5290).

Moreover, Courts routinely approve fee awards in common fund cases in the range of 25-45%. *See*, *e.g.*, *In re Relafen Antitrust Litig.*, 231 F.R.D. 52 (D. Mass. 2005) (awarding class counsel $22,311,000 in fees or 33% of class fund of $67,000,000, plus a separate award of litigation expenses in the amount of $1,297,301); *In re Fleet/Norstar Sec. Litig.*, 935 F. Supp. 99, 109 (D.R.I. 1996); *Conley v. Sears, Roebuck & Co.*, 222 B.R. 181, 187 (D. Mass. 1998); *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 216 F.R.D. 197, 216 n.45 (D. Me. 2003); *Gaskill v. Gordon*, 160 F.3d 361, 363-64 (7th Cir. 1998) (affirming award of 38% of class

action settlement fund); *In re Pacific Enters. Sec. Litig.*, 47 F.3d 373, 379 (9th Cir. 1995) (awarding 33% of $12 million common settlement fund); *In re Buspirone Antitrust Litig.*, 2003 U.S. Dist. LEXIS 26538, at *11 (S.D.N.Y. Apr. 11, 2003) (awarding fees of 33⅓% of $220 million common fund to Direct Purchaser Plaintiff's Class Counsel); *In re Lorazepam & Clorazepate Antitrust Litig.*, 2003 U.S. Dist. LEXIS 12344 (D.D.C. June 16, 2003) (awarding class counsel 30% of the common fund); *In re Vitamins Antitrust Litig.*, 2001 U.S. Dist. LEXIS 25067, at *57 (D.D.C. July 13, 2001) (determining that the one-third award was reasonable and granting class counsel fee petition in the amount of $123,188,032 plus interest, or approximately 34% of the total estimated settlement amount, in antitrust price fixing litigation); *In re Activision Sec. Litig.*, 723 F. Supp. 1373, 1375 (N.D. Cal. 1989) (awarding a 32.8% fee and adopting a "policy of awarding approximately 30% of the fund as attorneys' fees in the ordinary case," as "well-justified in light of the lengthy line of cases which find such an award appropriate and reasonable…").  Wilson does not even attempt to distinguish these cases, which were first cited in Class Counsel's fee petitions.

A 30% fee and expense award in the Track Two Settlement is also reasonable, and Mr. Wilson's and Ms. Keshishian's unsupported objections should be rejected.

**2.      Notice to the Class concerning attorneys' fees is adequate.**

Ms. Weatherly complains that notice to consumers is inadequate because it does not state the specific amount of attorneys' fees requested and instead indicates that "Class Counsel will ask the Court to award them a fee of up to 33 1/3% plus interest and litigation expenses" but does not specify whether the percentage would be applied to the $21.8 million allocated to consumers or the total settlement fund of $125 million.[28]  Class Counsel believe that consumers

---

[28] It should be noted that the Settlement website clearly indicated that the fee request of 33 1/3% would be of the entire settlement amount.  *See* http://www.awptrack2settlement.com/consumerclass3.htm.

reading the above quoted language would understand that the fee would be requested on the entire $125 million.  However, even if a consumer understood that the fee requested would relate only to that portion of the settlement funds allocated to consumers, he or she would still have the correct understanding of the impact of the fee request on his or her recovery.  Whether the fee request is one-third of each of the separate amounts allocated to consumers and TPPs or one-third of the entire settlement, the math is identical and the resulting attorneys' fee is the same.

Again Ms. Weatherly provides no case law or authority to support the contention that adequate notice must include a specific amount of fees being requested.  In fact, no such authority exists.  The *Manual on Complex Litigation* indicates that a valid notice, as it relates to the issue of attorneys' fees, should "generally apprise class members that fees will be sought and awarded by the court at the settlement hearing or a subsequent hearing and indicate whether the defendants or the settlement fund will bear such costs."  MANUAL ON COMPLEX LITIGATION, FOURTH, § 8:32 (2004).  The class notice provides this information and is not deficient because it does not set forth a specific amount of fees to be requested by counsel.

### 3.     A fee request based in part on money paid to the ISHPs is reasonable and has previously been approved by the Court.

The Pentz Objection fundamentally mischaracterizes the reason and effect of inclusion of the ISHPs in the Settlement stating that "the only effect of including the ISHP settlement funds in the Track Two Settlement is to inflate Class Counsel's attorney's fees."  Dkt. No. 5947 at 8. Pentz fails to realize that, without Class Counsel's ability to ensure the participation of ISHPs, there would either be no settlement, or the value of the settlement to the Class would be diminished.  Participation of the ISHPs, who represent 60% or more of the covered lives in the United States, benefited the Class in a number of ways.  The ability to provide total peace to Defendants and include all or virtually all TPPs within the Settlement increased Class Counsel's

negotiation power and inured to the benefit of the Class.  Inclusion of the ISHPs also means that they share in the costs associated with the litigation and settlement administration at the same rate as TPPs within the class so that class members do not bear a disproportionate burden as compared to ISHPs.

Pentz appears to be under the misimpression that there were two separate litigations, one involving the Class and another involving ISHPs.  "The $51.8 million that will be paid to the ISHPs was created by the ISHPs' counsel, who are entitled to fees based upon the ISHP settlement fund," Pentz proclaims.  Dkt. No. 5947 at 8.  First, having stated that they do not object to the payment of 30% of the fund that Class Counsel created for members of the class (as opposed to the ISHPs), it is difficult to understand how the Pentz Objectors have standing to object to a fee being paid by entities outside the Class.  More important is the undeniable fact that Class Counsel were the only counsel litigating this case and have been doing so at their own risk, without contribution in money or effort from ISHP counsel, for ten years.  Any funds paid to the ISHPs will be the result of the efforts of Class Counsel who have vigorously litigated this case.  In recognition of this fact, by both ISHPs and their counsel, they have agreed that Class Counsel are entitled to whatever fee the Court awards with respect to the entire settlement fund, including monies that will be paid to the ISHPs.[29]

Despite the fact that ISHPs are not class members, the Court clearly retains continuing jurisdiction relating to the fees and costs requested by counsel from a common fund.  *See In re*

---

[29] The Supreme Court "has recognized consistently that a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole."  *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) (citing *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375 (1970); *Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161 (1939); *cf. Hall v. Cole*, 412 U.S. 1 (1973)).  The Court stated, "[t]he common-fund doctrine reflects the traditional practice in courts of equity…." *Id.* (citing *Internal Imp. Fund Trustees v. Greenough*, 105 U.S. 527, 532-537 (1881)).  "The doctrine rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense… Jurisdiction over the fund involved in the litigation allows a court to prevent this inequity by assessing attorney's fees against the entire fund, thus spreading fees proportionately among those benefited by the suit."  *Id.* (citing *Mills*, 396 U.S. at 394).

*Linerboard Antitrust Litig.*, 333 F. Supp. 2d 343, 344  (E.D. Pa. 2004) ("The Court retains

continuing jurisdiction over this matter including jurisdiction over the Settlement Fund and its

distribution, the Funds to be distributed pursuant to this Order, as well as all issues relating to the

fees and costs of counsel in this action."); *In re Linerboard Antitrust Litig.*, MDL No. 1261, 2004

WL 1240775, at *1 (E.D. Pa. June 4, 2004) (explains exercise of ancillary or supplemental

jurisdiction was necessary to protect the integrity of the court).  Thus the Court is not restrained

from awarding a fee on monies that will ultimately be paid to ISHPs.

Finally, the fee structure between ISHPs, ISHP counsel and Class Counsel in this

Settlement is identical to that used in the GSK AWP Settlement which was approved by this

Court as fair and reasonable.  There is no reason to change course now.[30]

> ### 4.     A lodestar cross-check is not necessary, although the submitted lodestar is sufficient for the Court to perform a reasonability cross-check on the percentage-of-the-fund approach.

Mr. Wilson argues for a detailed lodestar cross-check.  Dkt. No. 6778 at 3-5.  The Pentz

Objectors complain that counsel have not segregated lodestar associated with litigation against

Track Two Defendants and that this provides insufficient information for the Court to perform a

cross-check on the percent of funds requested by Class Counsel.  Dkt. No. 5947 at 8.  Both

positions are unfounded.

In the First Circuit, percentage-of-the-fund ("POF") is the prevailing method for

awarding fees from a common fund because it has distinct advantages in complex cases.  For

example, it is less burdensome to administer,[31] reduces the possibility of collateral disputes,

---

[30] Pentz also claims in the alternative that Class Counsel's receipt of fees on the ISHP portion of the settlement fund should be offset by a reduction in fees from the consumers' settlement funds in order to remedy a breach of fiduciary duty to the non-ISHP class members.  Dkt. No. 7542.  As detailed above, there has been no such breach, and the Court should also reject this portion of the bankrupt Pentz objection.

[31] "Rather than forcing the judge to review the time records of a multitude of attorneys in order to determine the necessity and reasonableness of every hour expended, the POF method permits the judge to focus on 'a showing that

enhances efficiency throughout the litigation, and better approximates the workings of the

marketplace.  *See In re Thirteen Appeals Arising Out of the San Juan Dupont Plaza Hotel Fire

Litig.*, 56 F.3d 295, 307-08 (1st Cir. 1995); *see also In re Fidelity/Micron Secs. Litig.*, 167 F.3d

735, 737 (1st Cir. 1999).

   As a result, many district courts within the First Circuit have indicated their preference

for the POF method over the lodestar method.  *See*, *e.g.*, *In re Relafen Antitrust Litig.*, 231

F.R.D. at 79; *In re Lupron Mktg. & Sales Practices Litig.*, 2005 U.S. Dist. LEXIS 17456, at *9

(D. Mass. Aug. 17, 2005); *In re Fidelity/Micron Secs. Litig.*, 1998 U.S. Dist. LEXIS 21698 (D.

Mass. June 5, 1998), *vacated on other grounds*, 167 F.3d 735 (1st Cir. 1999); *Branch v. FDIC*,

No. 91-CV-13270, 1998 WL 151249, at *2-4 (D. Mass. Mar. 24, 1998); *In re Compact Disc*, 216

F.R.D. at 215 (describing the method as determining whether the "total fee [is] reasonable when

examined as a percentage of recovery"); *Duhaime v. John Hancock Mut. Life Ins. Co.*, 989 F.

Supp. 375, 377 (D. Mass. 1997); *Conley v. Sears, Roebuck & Co.*, 222 B.R. at 187; *In re

Fleet/Norstar Secs. Litig.*, 935 F. Supp. at 108.

   In this case in particular, where there are multiple Defendants and the Court is

considering only the fee related to settlement of claims against a subset of those Defendants, use

of the POF method saves the Court and the parties from the near impossible task of allocating the

particular hours of the many attorneys involved to a particular Defendant.  This Court has

already used the POF approach in awarding fees associated with the GSK and AstraZeneca Class

1 settlements.  The Court should not be baited into collateral litigation over lodestar when it has

adopted the First Circuit's preference for the POF approach.  Even Wilson admits that the "First

Circuit does not require a court to cross check the percentage of the settlement fund against the

---

the fund conferring a benefit on the class resulted from' the lawyers' efforts."  *Id.* at 307 (quoting *Camden I Condo.
Ass'n, Inc. v. Dunkle*, 946 F.2d 768, 774 (11th Cir. 1991)).

lodestar in its determination of the reasonableness of the requested fee." Dkt. No. 6778 at 3 (citing *In re Thirteen Appeals*). Thus, the inquiry should end with the reasonableness of the percentage requested.

But if the Court chooses the non-mandatory lodestar cross-check, it is not the detailed inquiry that Mr. Wilson and Pentz demand. When used as a cross-check, the lodestar calculation can be based on time and expense summaries in lieu of detailed records. *In re Prudential Ins. Co. of Am. Sales Practices Litig. Agent Actions*, 148 F.3d 283, 332 n.107 (3d Cir. 1998). In other words, the Court's inquiry into the lodestar is not as focused and detailed as it would otherwise be for an award primarily determined under a lodestar method, which is consistent with the First Circuit's desire that district courts focus on the benefit conferred on the class and not on a complex and time-consuming "review [of] the time records of a multitude of attorneys in order to determine the necessity and reasonableness of every hour expended . . . ." *In re Thirteen Appeals*, 56 F.3d at 307 (quoting *Camden I Condo. Ass'n, Inc. v. Dunkle*, 946 F.2d 768, 774 (11th Cir. 1991)).

More than 250 attorneys have spent time working on this case for plaintiffs. The sheer number of work hours underpinning the total lodestar of Class Counsel (223,769 hours as of March 31, 2011) highlights how time-consuming and burdensome a detailed lodestar inquiry would be and demonstrates why the Percent of Fund approach works best for this litigation. *See In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 148 F.3d at 331; *In re Fleet/Norstar Sec. Litig.*, 935 F. Supp. at 108. A settlement was achieved with the Track Two Defendants after plaintiffs engaged in significant, labor-intensive discovery related to their claims. Given the breadth of common issues and the number of tasks completed over the last ten years, it is

- 53 -

extremely difficult to apportion counsel's 223,769 hours by Defendant or to attribute a specific

lodestar to the group of Track Two Defendants.

In addressing multiple claims based on a core of common facts, the Supreme Court has

recognized that the focus should be placed on the overall relief provided:

> In other cases the plaintiff's claims for relief will involve a
> "common core of facts" or will be based on related legal theories.
> Much of counsel's time will be devoted generally to the litigation
> as a whole, making it difficult to divide the hours expended on a
> claim-by-claim basis.  Such a lawsuit cannot be viewed as a series
> of discrete claims.  Instead the district court should focus on the
> significance of the overall relief obtained by the plaintiff in relation
> to the hours reasonably expended on the litigation.
>
> Where a plaintiff has obtained excellent results, his
> attorneys should recover a fully compensatory fee.

*Hensley v. Eckerhart*, 461 U.S. 424, 434-35 (1983).  The same concept applies here to claims

against multiple defendants where common issues are inextricably intertwined.  An immense

amount of work was done on common issues, work that cannot be segregated from other aspects

of the prosecution of this case.

Given the "extremely broad" discretion that the Court has in evaluating an attorneys' fee

and cost petition in class litigation, *In re Thirteen Appeals*, 56 F.3d at 309, the total lodestar and

expense information provided by Class Counsel suffices for purposes of a rough cross-check on

the reasonableness of the POF fee and cost award.  And we reiterate that an award of 30% in this

Settlement, coupled with other awards made by the Court, ***will result in only a small multiplier***

***of 1.45 on Class Counsel's overall lodestar in the MDL and a multiplier of just 1.28 given that***

***counsel's collective expenses of more than $9.4 million are subsumed within the percentage***

***award***.  Dkt. No. 7515-1 at 13-14.  Thus, when the Court also considers the fact that Class

Counsel is not separately requesting reimbursement of any portion of the more than $9.4 million

in out-of-pocket expenses associated with the litigation, Class Counsel's request for a 30% fee is even more reasonable given the results achieved for the Classes.

> ### 5. The Court should quickly reject Mr. Wilson's contention that this case was easy.

Mr. Wilson's pure conjecture that the case was not challenging and presented no difficult issues should also be rejected.  It is certainly belied by the Court's recognition that it "was an incredibly risky piece of litigation which was cutting-edge and no certainty of success" and that the "pharmaceutical companies have done a fabulous job defending it, and it was fought tooth and nail the entire way along with the best firms in the country."  May 1, 2008 Hearing Tr. at 24 (AstraZeneca Class 1 Settlement Hearing) (Dkt. No. 5290).

Furthermore, in the Declaration of Steve W. Berman In Support of Lead Class Counsel's Memorandum of Law in Support of Motion for Attorneys' Fees and Costs and Compensation to the Class Representatives in Association with the Track Two Settlement (Dkt. No. 7515-2), which Plaintiffs incorporate by this reference, Class Counsel has detailed the enormous amount of difficult work accomplished for the Classes.  In sum, this litigation has endured for over ten years.  When it was filed in 2001, it was one of the largest class actions in history and challenged a fraud that affected the pricing of virtually every prescription drug in the marketplace.  All of the Defendants, including the Track Two Defendants involved in this latest settlement, challenged nearly every material factual allegation and legal claim made.  Discovery was extensive, with the expert work in particularly being intensively difficult and complex.  As just one example, the class certification proceedings alone involved multiple rounds of briefing, with the Court holding a two-day expert tutorial on pharmaceutical pricing.  And the risks are highlighted by the many issues on which Plaintiffs did not prevail, including losing some claims at trial.  *See* Dkt. No. 7515-2, ¶¶ 2-25.  Mr. Wilson just ignores all of this evidence and offers no

rebuttal to the Declaration.  Nor could he, as it is beyond dispute that this litigation was cutting edge, and littered with many difficult hurdles that Plaintiffs and their counsel had to overcome.[32]

## H.   Haviland's Objections are Fueled by Animosity towards Class Counsel and this Court

The Court has found that Haviland engaged in a "breach of trust as class counsel" when he sought "a nationwide class in New Jersey at the same time he was seeking to represent a nationwide class here without disclosing the conflict of interest to this Court." Jan. 3, 2008, Memorandum and Order at 8 (Dkt. No. 4972).  The Court found that Haviland made a material misrepresentation to the New Jersey court regarding his status as Class Counsel here.  *Id.* at 9.  And the Court found that "Mr. Haviland intended to coerce the Court into appointing him as Co-Lead Class Counsel or risk losing class representatives in a class action involving the sick and elderly."  *Id.* at 10.  To say that Haviland bears a substantial grudge against this Court and Class Counsel likely understates his true emotional state.  It undoubtedly animates his every action and argument.

As one example, Haviland's conspiracy theory here is eerily reminiscent of the arguments that he advanced in the *Bridgeport Fire* court, where that court found that Haviland's objections were "at least partially fueled by Mr. Haviland's animosity to his former law firm." February 27, 2009 Order and Opinion, *In re: Bridgeport Fire Litig.* (Court of Common Pleas, Montgomery County, Pennsylvania) at 18 (Berman Decl. Ex. 4).  In quashing subpoenas that Haviland served in that case regarding the settlement, the court also found that "Mr. Haviland

---

[32] All of the fee petitions filed thus far in this litigation, including supporting declarations, also put the lie to Wilson's contention that the work done cannot support the lodestar reported.  Wilson also argues – again without any support – that attorneys' fees should be reduced due to purported "mistakes" by Class Counsel that led to delays in the Track Two approval hearings.  Dkt. No. 6778 at 4.  Wilson does not explain what mistakes Class Counsel purportedly made, because Class Counsel have not made any material mistakes that have delayed these approval proceedings.  As the Court is well aware, delays have been the result of problems with the CMS vendor.  Certainly, the actions of objectors like Wilson are not contributing to the swift approval of the Track Two Settlement and only have the potential to delay it further.

- 56 -

appears to have been trying to seek this information in support of a 'wild goose chase' to prove a self-created theory that the Settlement Agreement was a product of collusion, a theory that has absolutely no basis in fact.  Mr. Haviland had no independent basis to support such an outrageous and manufactured allegation. . . .  Mr. Haviland has continuously operated to delay and disrupt these proceedings and aggravate his former employer law firm." *Id.* at 19-20.  So it is here, too, with Haviland's trumped up "PAL conspiracy."

The Court is well aware of Haviland's unbridled antics and the lengths to which he will go in misguided attempts to disrupt pending class litigation where Haviland perceives that he has not been provided the lead role that he believes he deserves.  From the deliberate misrepresentations that Judge Stearns found that Haviland made in *Lupron*, to the injunction issued against him in the *Bridgeport Fire* case, to the misrepresentations made to the New Jersey AWP court, and the misrepresentations made to this Court about his client's position in the AstraZeneca settlement, the scope of class he was seeking in New Jersey, and Class Counsel's and PAL's position on *cy pres* in *Lupron*, Don Haviland has constructed a clear record of harassing courts and counsel.  Without belaboring the point,[33] it is important to highlight the fact that Haviland's zeal to satisfy his quest for revenge necessarily colors ***all*** of his arguments, rendering them suspect and motivated by animosity.  Therefore, the Court should view the Haviland Objection with a jaundiced eye.

A final word is due about Haviland's recklessness.  If the Court adopted Haviland's arguments in abrogating the proposed settlement, what would Haviland leave in its wake?

---

[33] We will not take the time here to catalog all of Haviland's many misdeeds before this and other Courts and instead incorporate prior filings on the issue.  *See* Plaintiffs' Response to the Haviland Memorandum Concerning the Appointment of Class Counsel for the Track 2 Classes Pursuant to Fed. R. Civ. P. 23(g), and Class Counsel's Submission Dated September 18, 2007 (Dkt. No. 4776); Class Counsel's Response to the Misrepresentations Contained in the Supplemental Memorandum of the Haviland Law Firm, LLC in Support of Motion for Appointment as Class Counsel for the Track 2 Consumer Sub-Classes Pursuant to Fed. R. Civ. P. 23(g) (Dkt. No. 4735); Class Counsel's Submission Regarding Mr. Haviland's Participation as Co-Lead Counsel (Dkt. No. 4723).

Nothing.  In his haste to lay waste to the settlement, Haviland loses sight of the fact that his

clients may be unable to step up and assume the mantle of leadership for the Classes.  First, the

Court has expressed substantial concerns about whether any of Haviland's clients have viable

claims.  *See* Jan. 3, 2008 Memorandum and Order (Dkt. No. 4972) (the "Disqualification Order")

at 10 & n.5 (noting that most if not all of his client's claims arose after the cut-off date for the

litigation certification).  Second, the Court was troubled by Haviland engineering his clients'

threats to withdraw if Haviland were not appointed as Class Counsel, *id.* at 10, making it

extremely unlikely that the Court would appoint his clients as class representatives even if their

claims had fallen within the class period.  Third, Haviland himself would be unable to represent a

class as counsel, because the Court struck him as Class Counsel as a result of his material

misrepresentations and disloyalty to the Classes.  *Id.* at 11 & *passim*.  And, as discussed above, it

turns out that only three of Haviland's 13 clients are even members of Class 1.[34]  Thus,

Haviland's arguments would not only take away the relief that is close at hand under the

proposed settlement but would leave the Classes without any relief from the Track Two

Defendants – ever.  That would be the price of Haviland's grudge.

## I.       The Court Should Be Wary Of The Lawyer-Driven Objections

The Court must recognize by now that, unfortunately, a small cottage industry of

objectors now plagues class action litigation, seeking to interfere with fair and reasonable class

settlements in order to extract attorneys' fee payments.  As one court has observed:

> [C]lass actions also attract those in the legal profession who subsist
> primarily off of the skill and labor of, to say nothing of the risk
> borne by, more capable attorneys.  These are the opportunistic
> objectors.  Although they contribute nothing to the class, they
> object to the settlement, thereby obstructing payment to lead
> counsel or the class in the hope that lead plaintiff will pay them to

---

[34] *See infra* n.11.

> go away.  Unfortunately, the class-action kingdom has seen a
> Malthusian explosion of these opportunistic objectors, which now
> seem to accompany every major securities litigation.

*In re Cardinal Health, Inc. Sec. Litig.*, 550 F. Supp. 2d 751, 754 (S.D. Ohio May 5, 2008).

John J. Pentz, counsel to objectors Pentz and Connick, is a frequent objector to class

settlements, having served as objector counsel in at least 33 cases according to a recent Lexis

search.[35]  Formerly appearing under the moniker of "The Objectors Group" and now the

Orwellian "Class Action Fairness Group," Pentz has used his father,[36] wife,[37] mother-in-law,[38]

and, apparently, even a deceased grandmother[39] to further his agenda as objector counsel.

Objector John Pentz here is counsel John Pentz's 83-year old father.

---

[35] *See In re Initial Pub. Offering Secs. Litig.*, 2010 U.S. Dist. LEXIS 68702 (S.D.N.Y. July 7, 2010)*; In re Wal-Mart Wage & Hour Empl. Practices Litig.*, 2010 U.S. Dist. LEXIS 52001 (D. Nev. May 25, 2010); *Dupler v. Costco Wholesale Corp.*, 705 F. Supp. 2d 231 (E.D.N.Y. 2010); *In re Air Cargo Shipping Servs. Antitrust Litig.*, 2010 U.S. Dist. LEXIS 30598 (E.D.N.Y. Mar. 29, 2010); *In re Air Cargo Shipping Servs. Antitrust Litig.*, 2010 U.S. Dist. LEXIS 27242 (E.D.N.Y. Mar. 22, 2010); *In re Metlife Demutualization Litig.*, 689 F. Supp. 2d 297 (E.D.N.Y. 2010); *Larson v. Sprint Nextel Corp.*, 2010 U.S. Dist. LEXIS 3270 (D.N.J. Jan. 15, 2010); *In re Ins. Brokerage Antitrust Litig.*, 2009 U.S. Dist. LEXIS 114802 (D.N.J. Dec. 8, 2009); *In re Visa Check/Mastermoney Antitrust Litig.*, 2009 U.S. Dist. LEXIS 124884 (E.D.N.Y. Oct. 16, 2009); *Simonet v. GlaxoSmithKline*, 2009 U.S. Dist. LEXIS 82508 (D.P.R. Sept. 10, 2009); *Park v. Thomson Corp.*, 633 F. Supp. 2d 8 (S.D.N.Y. 2009); *Azizian v. Federated Dep't Stores, Inc.*, 2007 U.S. App. LEXIS 20844 (9th Cir. Aug. 23, 2007); *Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646 (7th Cir. 2006); *Taubenfeld v. Aon Corp.*, 415 F.3d 597 (7th Cir. 2005); *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516 (3d Cir. 2004); *Morris v. Lifescan, Inc.*, 2003 U.S. App. LEXIS 820 (9th Cir. Jan. 16, 2003); *Schwartz v. Citibank, N.A.*, 2002 U.S. App. LEXIS 21456 (9th Cir. Oct. 10, 2002); *Reynolds v. Benefit Nat'l Bank*, 288 F.3d 277 (7th Cir. 2002); *In re Allstate Ins. Co. Underwriting & Rating Practices Litig.*, 2008 U.S. Dist. LEXIS 107131 (M.D. Tenn. Nov. 14, 2008); *In re Royal Ahold N.V. Sec. & Erisa Litig.*, 2007 U.S. Dist. LEXIS 45935 (D. Md. June 18, 2007); *In re Serzone Prods. Liab. Litig.*, 2006 U.S. Dist. LEXIS 60151 (S.D. W. Va. Aug. 23, 2006); *Barnes v. FleetBoston Fin. Corp.*, 2006 U.S. Dist. LEXIS 71072, at *4 (D. Mass. Aug. 22, 2006); *In re Managed Care Litig.*, 416 F. Supp. 2d 1347 (J.P.M.L. 2006); *Lipuma v. American Express Co.*, 406 F. Supp. 2d 1298 (S.D. Fla. 2005); *In re Relafen Antitrust Litig.*, 231 F.R.D. 52 (D. Mass. 2005); *In re Compact Disc Minimum Adver. Price Antitrust Litig.*, 2005 U.S. Dist. LEXIS 15306 (D. Me. July 27, 2005); *In re Charter Communs., Inc.*, 2005 U.S. Dist. LEXIS 14772 (E.D. Mo. June 30, 2005); *In re Paypal Litig.*, 2004 U.S. Dist. LEXIS 22470 (N.D. Cal. Oct. 13, 2004); *In re Lucent Techs., Inc. Sec. Litig.*, 327 F. Supp. 2d 426 (D.N.J. 2004); *Tenuto v. Transworld Sys.*, 2002 U.S. Dist. LEXIS 1764 (E.D. Pa. Jan. 31, 2002); *Schwartz v. Dallas Cowboys Football Club, Ltd.*, 2001 U.S. Dist. LEXIS 24121 (E.D. Pa. Nov. 21, 2001); *Benacquisto v. American Express Fin. Corp.*, 2001 U.S. Dist. LEXIS 23914 (D. Minn. May 14, 2001); *Mangone v. First USA Bank*, 206 F.R.D. 222 (S.D. Ill. 2001).

[36] *See, e.g., Tenuto*, 2002 U.S. Dist. LEXIS 1764, at *6.

[37] *See, e.g., Taubenfeld*, 415 F.3d 597; *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 2005 U.S. Dist. LEXIS 43704 (J.P.M.L. July 12, 2005).

[38] *See, e.g., Barnes*, 2006 U.S. Dist. LEXIS 71072, at *4.

[39] *See* http://pslranugget.blogspot.com/2005/07/seventh-circuit-shoots-down.html.

Federal courts have repeatedly held that there is an apparent and actual conflict of interest between a class representative and class counsel who are closely related.  *See Susman v. Lincoln Am. Corp.*, 561 F.2d 86, 90-91 (7th Cir. 1977) ("a majority of courts . . . have refused to permit class attorneys, their relatives, or business associates from acting as the class representative"). Even though Mr. Pentz has (likely quite deliberately) not sought to become a class representative and instead only objects to the settlement, the same reasoning should apply to an objector.  For example, in *Kirby v. Cullinet Software, Inc.*, 116 F.R.D. 303 (D. Mass. 1987), plaintiffs sought certification of a class in a securities case and proposed as one of their class representatives a man whose son was a partner in one of the firms that was class counsel in the case.  *Id.* at 308-09.  In holding that class representative to be inadequate, this Court adopted the reasoning of the cases following the Seventh Circuit's opinion in *Susman*, holding that a district court's independent ability to protect the Class by evaluating the adequacy of proposed class representatives and class counsel was not a substitute for the absolute requirement that a proposed class representative fairly and adequately represent the class.  *Id.* at 310.  This Court therefore held that "[t]he closeness of the father-son relationship and the active involvement and heavy reliance on the son create an unnecessary risk of conflict between the representative plaintiff and other class members." *Id.*   Here the same concern exists.  Mr. Pentz repeatedly testified that he relied on his son regarding the substance of his objection.  Berman Decl. Ex. 6 (Deposition of John Pentz at 24:11-14; 32:11-18; 33:1-5; 52:4-8; 57:7-18; 59:4-10; and 62:4-9). Especially given that heavy reliance, Mr. Pentz cannot be said to be asserting the best interests of the class rather than the interests of his son, who seeks to get paid for his role in this litigation.

One court has referred to Mr. Pentz and the "clients" that he has represented as "professional objectors, bringing this appeal not in the interests of the class, but in their own

interest."  *Barnes*, 2006 U.S. Dist. LEXIS 71072, at *3.  In commenting on one of Mr. Pentz's

objections, another court observed:

> The objector's "opposition" to class counsel's fee petition
> appears to be nothing more than an attempt to receive attorneys'
> fees.  The objector has done nothing more than propose an
> unsupported, alternative fee distribution scheme, apparently
> attempting to take advantage of the fact that defendants have not
> opposed class counsel's request.  Indeed, the objector does not
> dispute that class counsel is entitled to the requested fees.

*Spark v. MBNA Corp.*, 289 F. Supp. 2d 510, 514 (D. Del. 2003).  In ordering Pentz's mother-in-

law to post a $645,111.60 bond securing the appeal of the denial of her objection in a recent

case, Judge Gertner recognized the threat that professional objectors, like Pentz, pose to

providing relief to consumers:

> Repeat objectors to class action settlements can make a living
> simply by filing frivolous appeals and thereby slowing down the
> execution of settlements.  The larger the settlement, the more cost-
> effective it is to pay the objectors rather than suffer the delay of
> waiting for an appeal to be resolved (even an expedited appeal).
> Because of these economic realities, professional objectors can
> levy what is effectively a tax on class action settlements, a tax that
> has no benefit to anyone other than to the objectors.  Literally
> nothing is gained from the cost:  Settlements are not restructured
> and the class, on whose behalf the appeal is purportedly raised,
> gains nothing.
>
> *             *             *
>
> Feldman and her attorney, John Pentz (who is also her son-
> in-law) are professional objectors, not unlike the plaintiff in
> Sckolnick, whom the First Circuit described as a "litigious pro se
> who has filed numerous lawsuits in state court."  *Sckolnick*, 820
> F.2d at 15.  In *In Re Compact Disc Minimum Advertised Price
> Antitrust Litig.*, 2003 U.S. Dist. LEXIS 25788, No. MDL 1361,
> 2003 WL 22417252, at *3 (D. Me. Oct. 7, 2003), the court
> required Hannah Feldman, also represented by Mr. Pentz, to post a
> bond because that appeal "might be frivolous," and because
> imposition of sanctions on appeal pursuant to Rule 38 was "a real
> probability."  The court noted that a bond for "damages resulting
> from delay or disruption of settlement administration caused by a

> frivolous appeal may be included in a Rule 7 bond." Id.  Ms.
> Feldman voluntarily dismissed her appeal several days later.

*Barnes*, 2006 U.S. Dist. LEXIS 71072, at *3-5.

Consistent with the foregoing pattern, Pentz stalks settlements in which Hagens Berman

is class counsel.  Of these cases, Pentz has appeared as an objector or counsel in *New England*

*Carpenters Health Benefits Fund v. First DataBank, Inc. & McKesson Corp.*, No. 05-cv-11148-

PBS, where Pentz impeded a $350 million settlement on behalf of classes of patients taking

prescription drugs and their insurers; in *In re Expedia Hotel Taxes & Fees Litigation*, No. 05-2-

02060-1 SEA, State of Washington King Cty. Sup. Ct., where Pentz appeared *pro se* as an

objector without disclosing he was an attorney and attempted to block a $123.4 million consumer

settlement; and in *In re LifeLock, Inc. Marketing & Sales Practices Litig.*, No. 2:08-md-01977

(D. Ariz.), where Pentz was "retained" by a relative who joined the class *after* the case was

settled and after defendant LifeLock changed its services and advertisements to comply with

federal and state law.

Although perhaps less prolific than Mr. Pentz, Edward Cochran, who represents Objector

Connick, has also appeared as counsel to objectors in many class actions.[40]

In light of the foregoing, it is perhaps not surprising that the Connick and Pentz

Objections are lawyer-driven and should, therefore, be viewed skeptically.  As discussed above,

Ms. Connick was not administered a Class Drug and has no standing to object.  Mr. Pentz

---

[40] *See, e.g., In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516 (3d Cir. 2004); *In re Relafen Antitrust Litig.*, 231 F.R.D. 52 (D. Mass. 2005); *Varacallo v. Massachusetts Mut. Life Ins. Co.*, 226 F.R.D. 207 (D.N.J. 2005); *Downey v. Mortgage Guar. Ins. Corp.*, 2001 U.S. Dist. LEXIS 24918 (S.D. Ga. Oct. 1, 2001); *Shaw v. Toshiba Am. Info. Sys.*, 91 F. Supp. 2d 926 (E.D. Tex. 1999).

similarly cannot act as an objector because of the inherent conflict of interest that exists because Mr. Pentz is the attorney Pentz's father.[41]

Moreover, although consumer plaintiffs are not required to be experts in class litigation or be knowledgeable about all of the specific details underlying their positions in the case, they should at least be aware of the bases of their own objections.  But that is not the case here.  For example, Objector Connick was unable to articulate any specific knowledge about the Class 1 and 3 representatives notwithstanding her complaint that they are not adequate and was not aware that there is a consumer representative for Class 1;[42] had no information about whether the Association plaintiffs had interests adverse to consumers;[43] believed that consumers were not represented in the allocation proceedings (when, in fact, they were);[44] and had never looked at the claim form before taking the position that it is difficult to complete.[45]

Mr. Pentz, a retired attorney, was unfamiliar with the general allegations in the *AWP* litigation;[46] did not understand his objection that consumers were not adequately represented;[47] did not understand why he is alleging that the consumer/TPP fund allocation is unfair;[48] and was unaware that he had previously filed objections in other class cases with his son as counsel.[49]

---

[41] Connie Pentz, attorney Pentz's mother, lacks standing to pursue her objection as well.  She only claims standing by virtue of having paid for the Epogen Mr. Pentz took out of an account she holds jointly with Mr. Pentz. She has not taken or paid for a Class Drug herself.   *See* Berman Decl. Ex. 7 (Connie Pentz Dep. at 12:21-14:5).

[42] Connick Dep. at 15:14-16:9, attached as Ex. 5 to the Berman Decl.

[43] *Id.* at 16:10-17:21; 18:9-18:13.

[44] *Id.* at 50:21-51:12.

[45] *Id.* at 63:3-11.

[46] Pentz Dep. at 19, attached as Ex. 6 to the Berman Decl.

[47] *Id.* at 33.

[48] *Id.* at 36-37.

[49] *Id.* at 12-13.

- 63 -

Ms. Weatherly initially filed an objection solely asserting that members of Class 3 should be compensated for the cost of obtaining their medical records in order to file claims.  *See* Dkt. No. 5744 (filed Dec. 1, 2008).  Ms. Weatherly's attorney appeared at the December 16, 2008 fairness hearing and represented that to be the extent of Ms. Weatherly's objection.  *See* Dkt. No. 5814, Status Hearing Tr. at 5:8-22; 11:2-8; 15:25-16:24 ("That is the essence of the objection, yes, your Honor.").  Ms. Weatherly's counsel pledged at that hearing to work with Class Counsel to attempt to resolve his objection.  *See generally id.* at 15-17.  Despite this pledge, Ms. Weatherly's attorneys never took the meet and confer process seriously and, instead, two months later, filed an amended objection listing a number of additional, but unsupported, objections as set forth above.  *See* Dkt. No. 5921 (filed Feb. 23, 2009).

Such lawyer-driven objections, as we have here, cast doubt on the veracity of the positions advanced by these objectors.

## V.    CONCLUSION

The Settlement here is the result of hard fought litigation and negotiation.  The Settlement provides an excellent result.  The Court should grant final approval to the Settlement Agreement and reject the positions advanced by the various Objectors.

DATED:  June 1, 2011

By____/s/ Steve W. Berman_____
   Thomas M. Sobol (BBO#471770)
   Edward Notargiacomo (BBO#567636)
Hagens Berman Sobol Shapiro LLP
One Main Street, 4th Floor
Cambridge, MA  02142
Telephone: (617) 482-3700
Facsimile: (617) 482-3003

**LIAISON COUNSEL**

Steve W. Berman
Sean R. Matt
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

Jennifer Fountain Connolly
Hagens Berman Sobol Shapiro LLP
1629 K Street, NW
Suite 300
Washington, D.C.  20006
Telephone:  (202) 355-6435
Facsimile:  (202) 355-6455

Jeffrey Kodroff
Spector, Roseman & Kodroff, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA  19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611

Kenneth A. Wexler
Wexler Wallace LLP
55 W. Monroe, Suite 3300
Chicago, IL  60603
Telephone: (312) 346-2222
Facsimile: (312) 346-0022

Marc H. Edelson
Hoffman & Edelson
45 West Court Street
Doylestown, PA  18901
Telephone: (215) 230-8043
Facsimile: (215) 230-8735

**CLASS COUNSEL**

- 65 -

**EXHIBIT A:**
**SUMMARY OF OBJECTIONS**

The objections are advanced by four discrete groups of class members:  (i) James W. Wilson (Dkt. No. 6778) (the "Wilson Objection"); (ii) Patricia Weatherly (Dkt. No. 5921) (the "Weatherly Objection"); (iii) John and Connie Pentz and Corinna Connick, represented by professional objectors John J. Pentz and Edward Cochran (Dkt. No. 5947) (the "Pentz Objection"); and (iv) the group of clients represented by Don Haviland (Dkt. No. 5971) (the "Haviland Objection").  Their objections are summarized as follows:

The Wilson Objection

- Requested attorneys' fees are too high and $10 million would be more reasonable.

- A lodestar cross-check should be used (even though Wilson admits that percentage-of-the fund is the prevailing method in the First Circuit and that the First Circuit does not require lodestar cross-checks).

- The lodestar is inflated (no evidence cited).

- The case was easy and presented no difficult issues.

The Weatherly Objection

- The proposed settlement fails to estimate how large Class 3 is, and it does not provide an estimate of how many members of Class 3 may be able to document their out-of-pocket expenditures.

- Requiring claims documentation is excessively burdensome.

- The proposed settlement does not inform class members exactly what they receive, leaving them unable to make a fully informed decision.  It should state with specificity the range of potential awards based on definable factors.

- The settlement should provide for a sufficiently high flat award without records so that offsetting the cost of obtaining records is less of an impediment to a fair settlement.  But it should still provide a mechanism for class members to recover their costs of obtaining documentation.

- The distribution should be changed to be direct payment based on billing records subpoenaed from the ISHPs and retail pharmacies.

- The amount allocated to consumers is inadequate.

- Attorneys' fees are excessive.

## The Pentz Objection

- The Class 3 TPP representatives were inadequate to represent consumers; a consumer representative is necessary.

- The allocation should be revised so that at least one-third of the overall settlement funds go to consumer plaintiffs, including cash payors.

- Consumers should not be required to file claims.  Instead, a distribution method should be devised to send checks to consumers identified through serving subpoenas on the ten largest pharmacy chains.

- It was unfair for ISHPs to be paid first.

- Attorneys' fees were based in part on amounts that went to ISHPs, which were not represented by class counsel.

- By failing to estimate lodestar applicable to T2 defendants, Class Counsel have not properly documented lodestar for purposes of the cross-check.

- The Class Drug List is vague, and Ms. Connick is a member of the Class.

## The Haviland Objection

- Consumer organizations lack standing to sue for damages and are atypical and inadequate to represent the interests of individual consumers.

- The overall settlement amount is too low given that the risks of continued litigation are minimal because this and other courts have entered verdicts and settlements against some of these defendants.

- Allocation of the settlement fund for consumers was infected with an irreconcilable conflict of interest given that Class Counsel appointed PAL and that PAL was organized to "create artificial cy pres funds in consumer class action litigation" for its own use.

- Ms. Tonacchio has not demonstrated standing to sue and is not typical or adequate.

- The amount allocated to consumers (17.5%) was too low as compared to, for example, the GSK settlement (30%).

- The proposed release includes defendants and drugs that were never pursued in the litigation.

The Keshishian Objection

- A one-third of the common fund attorneys' fee award plus litigation expenses is too high and is greater than the amount allocated to consumers in the settlement.

001534-16  450711 V1

**<u>CERTIFICATE OF SERVICE BY LEXISNEXIS FILE & SERVE</u>**
Docket No. MDL 1456

     I, Steve W. Berman, hereby certify that I am one of plaintiffs' attorneys and that, on June 1, 2011, I caused copies of **CLASS PLAINTIFFS' SUPPLEMENTAL RESPONSE RESPONSE TO OBJECTIONS TO FINAL APPROVAL OF THE TRACK TWO SETTLEMENT** to be served on all counsel of record by causing same to be posted electronically via LEXIS-Nexis File & Serve.


                   **/s/ Steve W. Berman**
                   Steve W. Berman

001534-16  450711 V1