# Exhibit A

```
 1                    IN THE UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF MASSACHUSETTS
 2
 3     IN RE:                              )
                                           )  CA No. 01-12257-PBS
 4     PHARMACEUTICAL INDUSTRY AVERAGE     )
       WHOLESALE PRICE LITIGATION          )  Pages 1-88
 5                                         )
 6
 7
 8
                             SETTLEMENT HEARING
 9
                     BEFORE THE HONORABLE PATTI B. SARIS
10                      UNITED STATES DISTRICT JUDGE
11
12
13
14
                                       United States District Court
15                                     1 Courthouse Way, Courtroom 19
                                       Boston, Massachusetts
16                                     April 27, 2009, 2:15 p.m.
17
18
19
20
21
22                          LEE A. MARZILLI
                         OFFICIAL COURT REPORTER
23                     United States District Court
                        1 Courthouse Way, Room 3205
24                           Boston, MA  02210
                              (617)345-6787
25
```

Page 46

1  it's a good idea. If it's not cost effective, we've got a
2  problem, right? I mean, you don't want to take $5 million
3  out of the fund to do this, right? I mean, there's not
4  enough money there, so ideally speaking, we would --
5      MR. LANDRIGAN: Well, your Honor, I really
6  believe, based on what I've heard talking to class counsel,
7  that where you have sick and elderly patients, there's going
8  to be a very low uptake in this case because of the nature
9  of the clientele, the nature of the patients.
10     THE COURT: I agree with you. I was I guess went
11 with Professor McGovern at one point, and we were very
12 concerned about the percentage claims, and so we looked into
13 an alternative way of doing it. I agree, if we can do this,
14 we will try. But if it's hugely expensive and not
15 transferrable, then I'm not willing to spend another
16 $5 million out of the fund to do it. So you're going to
17 look into that, right?
18     MR. NOTARGIACOMO: We will, your Honor.
19     THE COURT: Because if I had to do it all today,
20 it would be one thing, but, you know -- you've done this
21 before. You have no principled objection to doing this,
22 right?
23     MR. BERMAN: Yes, we'll look into it, and we'll
24 report back to you.
25     THE COURT: Good idea.

Page 47

1      MR. LANDRIGAN: Thank you, your Honor.
2      THE COURT: All right, so who's -- I know,
3  Mr. Haviland, that you want to do this, but I just got this
4  notice that I have to take this call upstairs. So since
5  we've been going since 3:00, why don't I go make this call,
6  and I'll be back in about fifteen minutes.
7      Now, we have Mr. Haviland, and who else is there?
8      MR. FREELEY: Mr. Freeley on behalf of James King,
9  who represents an objector, James Wilson.
10     THE COURT: And what's his objection based on?
11 I'm sorry, I don't remember.
12     MR. FREELEY: Excessive attorneys' fees.
13     THE COURT: Aha, all right. So I'm going to go do
14 this phone call which I just got the message about, and it
15 shouldn't be longer than fifteen minutes. Then I'll come
16 back, okay? And we will definitely reach you. All right.
17     THE CLERK: All rise. Court is in recess.
18     (A recess was taken, 3:05 p.m.)
19     (Resumed, 3:20 p.m.)
20     MR. FREELEY: On behalf of Mr. James King, who
21 represents James Wilson, the objector, Mr. King would just
22 point out that the attorneys' fees are excessive, as the
23 Court has already --
24     THE COURT: How would you do it, though? I mean,
25 the reality is, unlike some other settlements I've seen, the

Page 48

1  independent settling health plans are paying a third of
2  whatever they get, or whatever percentage.
3      MR. FREELEY: I think, you know, it would require
4  obviously -- I think that this should be resolved by way of
5  an alternative dispute resolution where --
6      THE COURT: Why? I mean, I'm just -- it may not
7  be a third. Maybe it will be 25 percent because it's sort
8  of a tagalong kind of case, but why -- in other cases
9  I've -- under the San Juan case, I'm allowed to treat it, I
10 think, under a common fund theory. That's a First Circuit
11 case. I think I'm allowed to. So I had to look at this in
12 another context. So then the other question is, I suppose I
13 could award different percentages for different classes,
14 depending on the degree of difficulty of the case, or I
15 could just reduce the amount; but, in any event, the ISHPs
16 are being lopped off as well for attorneys' fees, right, the
17 same percentage?
18     MR. FREELEY: Right, and I think that whatever the
19 ISHPs have paid should go to the consumers, and it should
20 be --
21     THE COURT: Say it again?
22     MR. FREELEY: It should reduce the amount that
23 ultimately is paid for attorneys' fees.
24     THE COURT: Say it again? What should happen?
25 What should happen?

Page 49

1      MR. FREELEY: I believe that the --
2      THE COURT: You're making the same point that your
3  brother did?
4      MR. FREELEY: Yes.
5      THE COURT: Essentially that whatever the ISHPs
6  would have paid in attorneys' fees should go into the class
7  pot?
8      MR. FREELEY: Right.
9      THE COURT: Why?
10     MR. FREELEY: So that the class could benefit.
11     THE COURT: But that's not --
12     MR. COCHRAN: Well, in fairness, your Honor, I
13 said part of it, but --
14     THE COURT: Anyway, okay, thank you.
15     Is this the -- Mr. Haviland, you --
16     MR. HAVILAND: A shorter version of Friday's
17 filing, your Honor.
18     THE COURT: Okay, because you didn't send me a
19 courtesy copy of that? Or at least we haven't been able to
20 open it yet.
21     MR. HAVILAND: We got to ECF this morning, and
22 you'll have a courtesy copy of the filing this afternoon.
23 I'm going to walk through it so you can see what it was.
24     THE COURT: So you only want me to look at this --
25 there was a huge filing on Friday that I don't think I got a

13 (Pages 46 to 49)

Page 50

1  courtesy copy of, so we haven't downloaded it all. In fact,
2  other than the cover memo, I don't know that I've read any
3  of the attachments.
4       MR. HAVILAND: I can walk through it, your Honor.
5  There are a few additions to the record, but let me begin
6  by --
7       THE COURT: Have you given one to Mr. Berman?
8       MR. HAVILAND: They have a copy of the ECF as
9  well, your Honor.
10      THE COURT: No, but whatever you just handed me?
11      MR. HAVILAND: That is everything from Tab 2 down
12 from Exhibit L. The answer is "no," I haven't given them a
13 copy.
14      What I want to do is explain, what Friday's filing
15 was is an evidentiary submission for today's fairness
16 hearing. Given the record of it, we didn't want to
17 overburden the Court with all these copies here, but in the
18 Category 1 --
19      THE COURT: Then how is he going to follow it? Do
20 you have it?
21      MR. BERMAN: I do not.
22      MR. HAVILAND: They have our declaration, your
23 Honor.
24      THE COURT: It's a thousand pages, isn't it? So
25 do we have a way of putting this up on the screen? Do you

Page 51

1  have an extra copy? Is someone with you right now who has
2  an extra copy that at least he can read along?
3       MR. HAVILAND: We could do that, your Honor, yes.
4  If we could get that copy from your Clerk, we could --
5       THE COURT: Yes, I think that's what's going to
6  happen here because otherwise he won't be able to follow
7  along.
8       MR. HAVILAND: Certainly. That's fine, yes.
9  Thank you.
10      THE COURT: If you've got an extra copy, then
11 Mr. Berman can just follow along with it. Okay.
12      MR. BERMAN: For the record, your Honor, we're
13 going to start with the material that was submitted on
14 Friday, the day before the hearing, when this matter has
15 been fully briefed for some time. I object on the grounds
16 of timeliness.
17      THE COURT: All right, I don't even know what -- I
18 haven't even heard it yet. Let me hear it.
19      MR. HAVILAND: Well, it's a prefiling what we're
20 citing today, your Honor. If this were a trial, we'd be
21 preparing and submitting everything. Most of the stuff
22 that's cited is in the record.
23      THE COURT: Just make your argument. What's wrong
24 with the class?
25      MR. HAVILAND: We've got five principal

Page 52

1  objections, your Honor. And, number one, I need to address
2  the issue of the challenge to my clients' standing, which is
3  a new argument. All of a sudden the folks that came into
4  the case now no longer have standing to appear before the
5  Court to object. The class counsel claimed that somehow,
6  simply because this Court made some comments about their
7  payments around 2004 --
8       THE COURT: Just remind me. So your clients, what
9  did they do? They paid for --
10      MR. HAVILAND: Well, my clients, your Honor, are
11 the named class representatives.
12      THE COURT: What class they're in? They're the
13 consumer --
14      MR. BERMAN: Can I shorten this? We don't attack
15 his clients' standing.
16      MR. HAVILAND: Okay, that's fair enough. In the
17 papers, it wasn't so clear, your Honor. So that's the
18 reason for the deposition transcripts, so that you can see
19 that every one of these people was deposed by the defendants
20 in the context of the Track Two class certification.
21      THE COURT: Okay, so that's no longer in play.
22      MR. HAVILAND: That's right.
23      Now, another preliminary matter is, we had
24 propounded discovery of the proffered consumer
25 representatives, the associations, the Prescription Action

Page 53

1  Litigation Project, Community Catalyst, and Ms. Tonacchio.
2  There were inopposed motions to quash and motions for
3  protective order which haven't been ruled upon. They've
4  been fully briefed. And we asked today to have
5  Ms. Tonacchio appear so we could ask her questions. I don't
6  see her in the courtroom, and I don't know if a
7  representative is here from PAL. What we want --
8       THE COURT: As I understand it, there are no
9  cy pres funds. I clarified that. So that whatever conflict
10 you perceive there to be with the associations, why does it
11 exist now?
12      MR. HAVILAND: Well, your Honor, it's a multilayer
13 problem here. You've got associations who have no standing.
14 This Court already ruled they have no standing to be
15 plaintiffs.
16      THE COURT: They have no standing with respect to
17 the damage claims. They're actually asking me to reconsider
18 that, but putting that aside, they have no standing with
19 respect to the damage claims.
20      MR. HAVILAND: That's right, and they also have no
21 standing with respect to an injunctive claim because there
22 is none. So the one thing that you'd expect them to stand
23 in for the class, Class 1, I think this Court has ruled
24 there is no need for an injunction because of the change in
25 CMS's rules. And so there is no vehicle by which the

Page 54

1 associations can stand as a plaintiff with standing under
2 Article III or typical or adequate under Rule 23(a)(4). So
3 they can't do it.
4        THE COURT: But just walk me through. There are
5 individual reps, right?
6        MR. HAVILAND: Not for Class 1, your Honor, and
7 I'll get to Ms. Tonacchio. And we asked some basic
8 information. We asked to have her appear for a deposition.
9 We didn't think that was all that controversial, but
10 apparently it was. A motion for a protective order was
11 filed. All of the objectors were deposed. Ms. Tonacchio
12 refused to appear. She is being represented by counsel. We
13 saw a proffer of an affidavit from last summer where
14 Ms. Tonacchio was being put forward as the sole
15 representative for Class 1, if you take the associations
16 out, which I think you have to.
17        THE COURT: Let me ask you, why are you trying
18 to -- assume for a minute she has -- it's unusual. It's
19 usually the defendants who are here trying to eviscerate
20 some class rep. Why do you care in terms of -- she's
21 apparently willing to serve. What do you think just -- you
22 don't like to -- what do you think is the problem here?
23        MR. HAVILAND: I think the problem is, she doesn't
24 have standing, your Honor.
25        THE COURT: But what's the problem?

Page 55

1        MR. HAVILAND: And I'm not trying to do anything
2 other than make sure there's a plaintiff. The device we're
3 operating under, Rule 23 --
4        THE COURT: Do you have someone you want to
5 substitute? Is that --
6        MR. HAVILAND: Well, no, I had twelve people.
7 They weren't good enough. They were told that they weren't
8 allowed to be in the case anymore.
9        THE COURT: They were in Class 3, right?
10        MR. HAVILAND: Class 1, your Honor, all Class 1.
11 They were all deposed in service of this case.
12        THE COURT: Just help me remember, that's all. I
13 have thousands of these issues, okay?
14        MR. HAVILAND: Certainly, your Honor. All right,
15 let's go through --
16        THE COURT: Your people were what? When did they
17 purchase?
18        MR. HAVILAND: Class 1.
19        THE COURT: Are they the ones who purchased after
20 2003?
21        MR. HAVILAND: Some purchased in 2003, some
22 purchased in 2004, yes.
23        THE COURT: Right, that was the problem, which
24 is it was after --
25        MR. HAVILAND: Why is that a problem today?

Page 56

1        THE COURT: Excuse me. It was after -- and that
2 doesn't mean that Ms. Tonacchio has standing. It just is,
3 the problem with your people is that it's a less strong
4 claim because it was after Congress fixed the problem, as I
5 remember it.
6        MR. HAVILAND: Okay.
7        THE COURT: Remember, we've been through this. It
8 was after the statute was changed. So that while there may
9 be some claims, and some of these classes have gone all the
10 way to the current time, we've always given more money to
11 the people in the heartland.
12        MR. HAVILAND: Right.
13        THE COURT: So I'm not saying they have no claim.
14 They just have a lot less strong claim because the statute
15 changed. So if any of them predated that and you wanted to
16 substitute them, that would be something I'd be willing to
17 do. Do you want these people to be class reps?
18        MR. HAVILAND: Your Honor, I thought that they
19 were class reps.
20        THE COURT: Well, maybe they are.
21        MR. HAVILAND: There was a complaint filed in
22 February of 2009.
23        THE COURT: Are they class reps?
24        MR. HAVILAND: No, they're not.
25        THE COURT: Are they class representatives at all?

Page 57

1        MR. BERMAN: We have to go back in history, your
2 Honor. We were working with Mr. Haviland. This goes back
3 to the AstraZeneca settlement. You disqualified him because
4 the class representatives in that class threatened to
5 withdraw.
6        THE COURT: I remember that whole scenario, but
7 did they withdraw?
8        MR. HAVILAND: They didn't, your Honor.
9        THE COURT: They did not?
10        MR. HAVILAND: No, they didn't.
11        THE COURT: Okay, so in this case, are they
12 seeking to be class representatives?
13        MR. HAVILAND: There is pending before the Court a
14 litigation class motion with their names on it to be class
15 reps. During the pendency of that, which I argued with
16 Mr. Sobol some years ago, they settled. They didn't talk to
17 us, they didn't talk to the clients. They just settled.
18 They settled without a class rep.
19        THE COURT: I think I've made it clear throughout
20 this litigation, because it's a dying class, by definition
21 in Class 1, it's a dying class -- they're old and they tend
22 to have illnesses, they are dying -- that I would be more
23 liberal about allowing addition of class representatives, so
24 that as people got old or sick or senile or dead, died, I'd
25 allow the addition. So when did you propose adding these

Page 58

1  people?
2      MR. HAVILAND: Your Honor, they were brought in --
3  let me give you the history. They were asked to be brought
4  in by class counsel in 2005 when counsel said to you they
5  had people waiting in the wings, okay, they said, "We've got
6  consumers waiting in the wings." Your August, 2005 decision
7  made clear you have to have a representative per defendant,
8  okay? We were asked to intervene at that point and come in
9  with these clients. And you don't have to tell me about
10 dying cancer patients. I represent them. I talk to their
11 wives and their husbands --
12     THE COURT: Sure, so just remind me. I don't
13 remember. Did you ask to add them to Track Two as the
14 Class 1 representatives?
15     MR. HAVILAND: They came in in the August, 2005
16 time frame with the -- I think it was the third amended
17 complaint. They all came in, yes.
18     THE COURT: So why aren't they still class reps?
19     MR. HAVILAND: I don't know.
20     THE COURT: I don't know either, so maybe I ask
21 Mr. Berman if he remembers.
22     MR. BERMAN: Sure, I remember exactly. At the
23 time that we were litigating the class, they did not have
24 standing. They were beyond your cutoff when you said things
25 have been changed. We asked Mr. Haviland over and over

Page 59

1  again, "Can you help us?" At one hearing, I think it was
2  the BMS, you turned to him and said, "The problem I have
3  about your clients is they're not within the time period."
4  And you said, "I want you to go get more class reps," and we
5  went out and we did.
6      THE COURT: All right, so --
7      MR. HAVILAND: Well, your Honor, in fairness, the
8  answer is this: The settlement before you today includes up
9  through 2005. Whether or not it's a bigger or better claim
10 when you're in 2004 or 2005, these folks have standing.
11 That's never been questioned. They had standing when they
12 filed suit.
13     THE COURT: Is there a proposal here today to add
14 them? Is that what the standing is?
15     MR. HAVILAND: Your Honor, I can't have them jump
16 in on a settlement that they haven't been privy to. That's
17 the problem.
18     THE COURT: So you're not proposing to add them?
19     MR. HAVILAND: I don't know their status because
20 class counsel unilaterally decided to exclude them. So all
21 I have when I explain to my clients this case, when they
22 say, "Mr. Haviland, why were we deposed, why did we step up
23 in this case --"
24     THE COURT: Have they put in claims?
25     MR. HAVILAND: Have they put in claims? They

Page 60

1  expect to.
2      THE COURT: Okay. All right, so --
3      MR. HAVILAND: But they also object, your Honor,
4  because the problem is, the settlement is not fair,
5  reasonable, or adequate, and I understand that you think it
6  is.
7      THE COURT: Why?
8      MR. HAVILAND: Well, because you start from the
9  premise, your Honor, that you don't have a client there, so
10 you don't have anybody advocating. You just have lawyers.
11 That's number one, and that's an important issue for us.
12     THE COURT: Hold on. So Tonacchio you think
13 doesn't -- they've supplemented with all these affidavits,
14 so what are the remaining issues as to why she isn't --
15 they've cleaned up a bunch of it, so what's left?
16     MR. HAVILAND: Okay, there's one simple issue. If
17 you accept Ms. Tonacchio's affidavit at face value -- she
18 wasn't deposed. She didn't produce anything more than two
19 pages of a seven-page record from last spring, which was
20 just gotten, which deals with an Anzemet injection, one
21 injection for Aventis. Now, of the eleven defendants here,
22 at best, she could be a representative for that defendant.
23 You don't have one for the other ten. And that would
24 abrogate your Honor's rulings from the beginning of this
25 case that you need a representative for each defendant.

Page 61

1      THE COURT: All right, so I don't need a
2  deposition. So the gist of it is, with all these -- you
3  know, a lot of this has gone away; the brothers and the
4  sisters agreed to the suit, all this. So the gist of it is,
5  there's a legal question, which is, because she only would
6  be a good class rep with respect to -- which defendant?
7      MR. HAVILAND: Aventis.
8      THE COURT: Aventis -- that she can't represent
9  the rest of the class for settlement purposes. That's the
10 gist of it?
11     MR. HAVILAND: That's right. And then --
12     THE COURT: Okay, okay, it's a legal --
13     MR. HAVILAND: -- if you focus on Aventis, then
14 you can look at the specifics of her situation to see if she
15 has standings on that. But let me --
16     THE COURT: I did make that ruling, and so then
17 the question would come about the associations and whether
18 or not --
19     MR. HAVILAND: Right, and that --
20     THE COURT: So that's the legal question.
21     MR. HAVILAND: That's right, that's the legal
22 question.
23     THE COURT: You don't need a deposition to resolve
24 that.
25     MR. HAVILAND: Well, I do for this reason, and

Page 62

1  I'll get to that in a moment. Before we move off of our
2  clients who are in the case, remember in GSK you had one
3  consumer class representative. It was the Aaronsons, my
4  clients. You never heard this challenge, okay? So now
5  you've got the problem legally that class counsel is saying
6  that the Aaronsons are not adequate for Aventis, and that's
7  why this is important. The Aaronsons, at the same time they
8  got their chemotherapy, were getting some Kytril and Zofran,
9  the GSK drugs, and Anzemet.
10         THE COURT: Were they within the class period?
11         MR. HAVILAND: They bought in 2004.
12         THE COURT: So they're another 2004 --
13         MR. HAVILAND: For that drug.
14         THE COURT: -- but did we allow them in for
15  settlement purposes for Glaxo? Is that what we did?
16         MR. HAVILAND: In Glaxo they were the litigation
17  class rep certified in January of 2006 and then the
18  settlement class rep.
19         THE COURT: The settlement class rep.
20         MR. HAVILAND: Yes. So we're undermining one of
21  the legs of the stool of GSK by saying they don't have
22  standing and they can't represent a class here, Judge.
23  That's the problem I've got. All of a sudden you've got a
24  class rep --
25         THE COURT: Excuse me, excuse me.

Page 63

1         MR. HAVILAND: Yes, yes.
2         THE COURT: This case has changed hugely from when
3  it began. It's just evolved and changed. There are
4  different -- now, as you point -- but what I haven't heard
5  you say is whether or not you wanted to add your people.
6  You're saying "no" because --
7         MR. HAVILAND: Well, I'm saying, your Honor --
8         THE COURT: -- even though they're going to put in
9  claims, because you say you're not sure that the settlement
10  is fair. That's the gist of what you're saying, because it
11  may well be that now that the -- for settlement purposes as
12  opposed to what I was willing to certify a class as, right,
13  what you're arguing is, you don't want your people to be
14  class reps because you don't think the settlement is fair.
15         MR. HAVILAND: Well, no. I would like to have had
16  the opportunity to have my clients involved in that
17  settlement because I think they bring a lot to the table.
18  If you read those depositions, you'll see they're just not
19  dying cancer patients, your Honor. They're very
20  knowledgeable, they're smart. You ask them the question
21  that Mr. Berman posed to you --
22         THE COURT: What do you want? Why don't you think
23  it's fair? I mean --
24         MR. HAVILAND: Well, let me get to that, your
25  Honor, because --

Page 64

1         THE COURT: -- the truth is that a multi-source
2  case is a very difficult case, and have you given me
3  somewhere in here an alternative damage calculation?
4         MR. HAVILAND: Sure have.
5         THE COURT: Where is it?
6         MR. HAVILAND: If you can go to Category 4, which
7  is Tab 4 for your Honor, you'll see there's a couple of
8  charts here because you remember back in February, 2005,
9  when class certification was argued, you had a couple of
10  Attorneys General representatives appear here. The Attorney
11  General from Pennsylvania's representative was here, and so
12  was Illinois, and there was a question posed, "Well, why
13  don't you just do a carve-out for the states? Let the
14  states run with their own cases, they can do well by their
15  consumers, and let the class have what's left." And class
16  counsel objected to that and said, "No, no, no, let's run in
17  tandem because --"
18         THE COURT: Do these class settlements that I'm
19  looking at now include Medicaid?
20         MR. HAVILAND: These are AG settlements, your
21  Honor. They're not class settlements. Yes, they are
22  Medicaid.
23         THE COURT: That's a whole different --
24         MR. HAVILAND: Right, and that's the point I want
25  to make, your Honor. The Medicaid cases are much more

Page 65

1  difficult. You've got knowledge --
2         THE COURT: A lot more money.
3         MR. HAVILAND: Well, arguably not, your Honor,
4  because the bottom line is, the Medicaid programs don't
5  necessarily track what the consumers' payments are or the
6  TPPs in the various states.
7         THE COURT: These are parens -- these are --
8         MR. BERMAN: Can you show me what you're looking
9  at?
10         MR. HAVILAND: It's under Tab -- we're looking at
11  T, Tab T. There you go.
12         THE COURT: So I may not be looking at the right
13  thing.
14         MR. HAVILAND: Well, there's two charts, and I'll
15  walk through, your Honor. You've got the verdicts sheet,
16  and then you've got the settlement sheet. So I want to look
17  at it from both standpoints because you've got Track Two
18  defendants that have not been tested in this court in a
19  trial. Take the state of Wisconsin that tried a case. They
20  came to a verdict on February 17, 2009. Do you see that?
21  That represents less than two percent of the population.
22  They got $9 million. If you extrapolate from that, you're
23  looking at $450 million as a potential outcome for Pharmacia
24  alone.
25         THE COURT: But I'm not even --

Page 66

1    MR. HAVILAND: Tab T, your Honor.
2    THE COURT: Wisconsin, $9 million verdict against
3 Pfizer. What kind of drug was it for?
4    MR. HAVILAND: It's for all their drugs, as far as
5 I can tell, all the ones that are included in the
6 settlement.
7    THE COURT: And it was an Attorney General suit,
8 and it involved -- was it parens patriae as well as
9 Medicaid?
10    MR. HAVILAND: I don't believe so. It was just
11 for their program costs, your Honor.
12    THE COURT: And do you know what the statute was a
13 to whether or not it was --
14    MR. HAVILAND: Well, it was a Medicaid claim, so I
15 think they had the statutory claims that allow the Attorney
16 General to recover for the Medicaid dollars. But if you
17 just extrapolate from that to what the country could have
18 gotten, which is what you have here today, you've got the
19 whole country, you're looking at $450 million based on a
20 verdict.
21    What I'm suggesting, your Honor, is, under
22 Reynolds analysis, you've got to look at what are the
23 potentials that we could have recovered here? Okay, you
24 just can't say $125 million is a lot of money. Amchem
25 was $200 million, and in retrospect, I'm sure everyone

Page 67

1 wonders why the Supreme Court said "not good enough,"
2 because you had problems with adequacy, you had problems
3 with structure. That's a lot of money. There's no question
4 about it. It came out of Philadelphia, and then our Third
5 Circuit judge, Ed Becker, overturned it, and it went to the
6 Supreme Court. There's a reason for that. You've got to
7 have the traction there to make sure you've got litigants
8 that are actually looking out for this.
9    The Reynolds analysis of the Seventh Circuit
10 requires us to look at what could have happened. I give you
11 that one verdict as a way to look at where the Track Two
12 case could have gone. By the way, all the assumptions about
13 how difficult it is, there is a verdict, okay? Look at the
14 settlements. That's another way to look at it too. You can
15 go to the next chart which is U, and there you've got a host
16 of settlements by a number of these defendants. Look at
17 Dey.
18    Now, I want to try to break it down for us, your
19 Honor, because what you were told was, $100 million of
20 $125 million is paid for by three companies. Okay, you've
21 got Aventis, Amgen, and Warrick. That means the balance of
22 the eight paid $25 million. Now, you're not given the
23 shares as to know who's paid what, so we can assume
24 $3 million a head gets us to about $24 million of the
25 $8 million. So at $3 million a head, Dey is in there, they

Page 68

1 paid $34 million so far to the states; Abbott, $35 million
2 so far to the states.
3    THE COURT: Do you know how many drugs were
4 involved?
5    MR. HAVILAND: All the same drugs as here, your
6 Honor. I don't think there's much --
7    THE COURT: Was it the same Medicaid -- like, in
8 Massachusetts, they have their own -- it's a WAC-based
9 claim, and there are just all these idiosyncrasies as to how
10 they do it.
11    MR. HAVILAND: They're very difficult cases, yes,
12 because you've got, first of all --
13    THE COURT: See, I don't know if I'm comparing
14 apples and apples is the thing.
15    MR. HAVILAND: Well, and I'm trying to give you
16 some apples because all you're getting is a number that's
17 pulled out and says, okay, here is a fair number. I mean,
18 take $800 million for instance. You're talking 3 percent is
19 what they got, Hartman's total number. Now, Mr. Berman
20 discounts that down to $40 million by putting his layers on
21 top of it. This is the reality of these cases in the world
22 out there. And you can look at this chart and see what Dey
23 has paid, Abbott has paid, Amgen has paid, Bayer has paid,
24 Baxter has paid, real dollars with more difficult cases.
25 The Attorney General here in Massachusetts got $2.9 million

Page 69

1 for Dey. Arguably more difficult cases. That establishes a
2 better floor for us to understand, what is a range of
3 possible approval, if you're actually pushing the cases?
4    Now, admittedly, maybe they're not all that good.
5 Maybe the Pharmacia case is better. They tried to verdict
6 in Wisconsin and they won. But we're being asked to accept
7 an all-in settlement here blind. They tell you it had to be
8 a blind settlement. Well, this tells you it didn't have to
9 be. Texas and Pennsylvania settled with Abbott. It didn't
10 have to be a blind settlement. They didn't say, "No, no, we
11 have twenty other companies or states that are suing us."
12 They settled. And the issue is whether or not we had the
13 litigation traction here. There was not a consumer class
14 representative until after the settlement.
15    Ms. Tonacchio wasn't proffered until the spring of
16 last year, after it was all said and done, and that's the
17 problem I have. Our folks were on the sidelines over here,
18 weren't involved, weren't asked their opinions. The lawyers
19 settle it. Then they bring in a Ms. Tonacchio to say
20 rubber-stamp this. Now, her mother arguably bought Anzemet
21 for one time. Now, the claim form or the affidavit actually
22 shows that the TPP failed to pay the amount that was due.
23 All other injections for her cancer agents over the two
24 years of her mother's life were paid for by Medicare and the
25 TPP.

Page 70

1    THE COURT: We've always allowed that. You just
2 needed to have some. But you're right that we've said, at
3 least in a litigation context, I needed a class rep per
4 defendant. But the question is, this is settlement, and so
5 their argument is whether it should be different.
6    MR. HAVILAND: I don't know if Amchem allows us to
7 do a shortcut like that because you know the problem, Judge?
8 Now is the last time we look at it, whereas in litigation
9 you have the chance to fix it.
10    THE COURT: What about the argument that, you
11 know, as a practical matter, these associations are actually
12 more proactive than an individual whose mother took an
13 injection would be. So assuming they only have standing for
14 a limited purpose, not for damages but for injunction or
15 declaratory relief when I originally put them in, won't they
16 be proactive for consumers?
17    MR. HAVILAND: Well, one would hope so, but the
18 problem we have with Prescription Action Litigation, it was
19 a group that was in part founded by the lawyers in this
20 room. The mission statement that we put before the Court
21 demonstrates that one of their five missions in life is to
22 get cy pres. Now, your Honor made the comment earlier
23 there's not cy pres in this case, but think about this case
24 in totality. In AstraZeneca, there was a set-aside for
25 cy pres, a guarantee. One of the objections, frankly, the

Page 71

1 principal objection --
2    THE COURT: I think I rejected it.
3    MR. HAVILAND: Well, no, you didn't, your Honor.
4 You scaled it back, and we appreciated that.
5    THE COURT: Dramatically, dramatically.
6    MR. HAVILAND: We appreciated that. Mrs. Howe saw
7 that, my client, as an impediment to her getting her full
8 due under the settlement. But there's still that built-in
9 set-aside which is buttressing that settlement from getting
10 what we're getting here. Today, your Honor, I hear, if
11 there's money left over, we'll give it back to the
12 consumers. Let's do that in AstraZeneca. Let's not have a
13 set-aside for cy pres.
14    THE COURT: I'm not talking about AstraZeneca.
15    MR. HAVILAND: I understand, but that's the
16 problem I have with PAL. You asked the question, why
17 shouldn't PAL be a good proxy? Well, in that case, your
18 Honor, the record that you have before you shows the
19 set-aside was for PAL. That's what it says in the e-mails
20 that were filed of record with you. So that's a conflict,
21 your Honor. The problem is, when lawyers --
22    THE COURT: Aren't there like six other consumer
23 associations?
24    MR. HAVILAND: They're all PAL members. Our
25 papers demonstrate they're all PAL. I mean, in essence

Page 72

1 it's --
2    THE COURT: So you're saying, so I get the legal
3 argument, and I need to get to Mr. Berman, the legal
4 argument is, regardless of what I say, the associations
5 under that Second Circuit case do not have standing, and
6 Tonacchio only does with respect to one defendant, and
7 therefore that isn't enough at best?
8    MR. HAVILAND: If you find that she in fact made a
9 payment or had an amount due and owing.
10    THE COURT: And, in any event, you would say it's
11 not a fair and reasonable amount?
12    MR. HAVILAND: Because if you look at the reality
13 of what's been happening in these cases --
14    THE COURT: With the Attorney Generals as a
15 comparison.
16    MR. HAVILAND: Correct, your Honor.
17    THE COURT: Okay, thank you, I understand.
18    MR. HAVILAND: The last point, if I may, because
19 Mr. Berman made the point that we were somehow saying
20 something false about what's in this case. Mr. Monk and
21 Mr. Thomson, my clients, were added to the complaint in
22 2005. Mr. Monk bought Eligard, and Mr. Thomson bought
23 Trelstar. Now, your Honor ruled in response to defendants'
24 motions that they were out; those drugs were not in the
25 case, they were new drugs newly added, and they were

Page 73

1 dismissed. My clients were then sent packing. Now they're
2 back in. So if you look at the record, you're going to see
3 those drugs in there under the second B.
4    THE COURT: But not for consumers, just for TPPs.
5    MR. HAVILAND: No, they're in there for consumers,
6 your Honor, and there's a full release happening. And our
7 problem is, Aventis doesn't look like that it paid any money
8 for Eligard because it's in Class B. Aventis, according to
9 the record that I see, says they paid it in Class A. They
10 paid nothing on Eligard. Why is that important? If you
11 look under the tab, your Honor, you're going to see that's
12 Lupron. Eligard and Trelstar are Lupron.
13    THE COURT: Okay, now you're losing me again. I
14 missed this point in all the filings, so --
15    MR. HAVILAND: Well, they're brand drugs, number
16 one, so they don't belong below that line in the Class B
17 drugs. Aventis makes Eligard, and they're above the line in
18 Class A. But they haven't paid any money for that drug.
19 It's just kind of lumped in there. And Mr. Monk says to
20 himself, "Why is that? I was told years ago by the Court
21 that there's no drug that I can represent a class for." So
22 he's kicked out. Then it comes back in the settlement. The
23 same thing with Trelstar.
24    THE COURT: Does he want to come back as a class
25 rep?

Page 74
1    MR. HAVILAND:  Well, I'd like to have that
2 actually decided, your Honor, because think about what we've
3 done with Lupron.  $150 million --
4    THE COURT:  I don't even understand this point,
5 I'm sorry.  I understood --
6    MR. HAVILAND:  We're adding drugs.  "No new drugs"
7 was a bright-line rule twice ruled by the Court.  We're
8 adding drugs.  Okay, that's it, that's the objection.  We'd
9 ask you to carve those drugs out.  And they also add an
10 additional defendant in.  G.D. Searle was never in this
11 case.  They got added in too.  It's in our papers, so I
12 won't belabor the point.
13    THE COURT:  The problem is the papers --
14    MR. HAVILAND:  We think the release is overbroad,
15 your Honor, because it includes drugs that violated the
16 "no new drugs" rule, and it added at least one defendant in
17 that we know was never litigated.
18    THE COURT:  Okay, thank you.
19    So, Mr. Berman?
20    MR. BERMAN:  Yes, thank you, your Honor.
21    THE COURT:  Let me, first of all, did you object
22 to putting -- when was there a request for a deposition for
23 this woman who is the class rep?  Was there one?
24    MR. BERMAN:  Yes, there was.
25    THE COURT:  How long ago?

Page 75
1    MR. BERMAN:  Recently, the last month or two?
2 Eight weeks ago.
3    THE COURT:  So you didn't want to make her
4 available for a deposition?
5    MR. BERMAN:  I did not, I mean, and the reason is
6 simply that we have put forth a good-faith basis, sworn
7 statements, a letter which is Exhibit A to my declaration
8 from the clinic saying that she paid for a Part B Medicare
9 drug.  So she's made a showing.  Now, Mr. Haviland has asked
10 for lots of discovery.  He's asked for deposition of PAL and
11 every --
12    THE COURT:  No, no, no, no, we're not doing that,
13 but the deposition of the class rep is a pretty standard
14 thing.
15    MR. BERMAN:  It is when the defendant asks for it.
16 But when this woman has made a showing, including a letter
17 from the hospital saying that she is part of the class, why
18 would we subject her to a deposition?
19    THE COURT:  All right, assume for a minute she's a
20 class rep for purposes of one defendant.  We had as a
21 general matter just talked about a class rep for each
22 defendant, so help me through this.
23    MR. BERMAN:  Okay, we did, and then we went and we
24 had an argument on Bristol-Myers' class certification, and
25 some of the other class certifications were also before your

Page 76
1 Honor for the Track Two defendants.  At that hearing it
2 turned out that you examined Mr. Haviland's clients, who
3 were at that time involved in the case.  They were all
4 outside of your liability cutoff.
5    THE COURT:  Right.
6    MR. BERMAN:  We told you we had another plaintiff
7 that we were going to proffer, which we did for BMS, and you
8 said, "Going forward, this is a dying class, I may consider
9 one Part B representative being good enough for a group of
10 defendants, so go make sure you find at least one," and we
11 did, Ms. Tonacchio.  In addition, when we're talking about a
12 settlement --
13    THE COURT:  Do you have the transcript where I
14 said that?
15    MR. BERMAN:  I don't, but I will go get it.
16    THE COURT:  Because I probably could never find it
17 again.  But the concern is, for settlement purposes, the
18 question -- I insisted for the Track One that there be a
19 separate class rep for each, and that while I would allow
20 third-party payors to represent their own beneficiaries,
21 that for Class 1, that that wouldn't work.
22    MR. BERMAN:  Right, and --
23    THE COURT:  And so you're saying that I made an
24 early -- I'm not sure I --
25    MR. BERMAN:  You didn't make a ruling.  You said

Page 77
1 you were thinking about the problems, and you said, "I may
2 get there."
3    THE COURT:  So I'm at the point now where I really
4 need to make a ruling.
5    MR. BERMAN:  Yes, yes.
6    THE COURT:  I haven't actually written on this,
7 right?
8    MR. BERMAN:  That's correct.
9    THE COURT:  I did for the Track One in nauseating
10 detail, but what you're saying is that I should think about
11 it in the context of a settlement class for Class 1 as to
12 whether or not a class rep for one of the drugs would be
13 sufficient with respect to all of the drugs.  You're saying
14 I haven't written on that.
15    MR. BERMAN:  That's correct.  I mean, as you point
16 out, things have changed.  So, for example, Mr. Haviland
17 says, well, the GSK class rep had bought a drug in 2004,
18 2005; that was good enough then; why is it not good enough
19 now?  Well, because you in the interim had this ruling that
20 by a certain period of time, there were no litigation
21 claims.  So Mr. Haviland's clients who bought post-
22 litigation ruling were no longer good representatives for
23 the litigation class.
24    THE COURT:  Right.
25    MR. BERMAN:  So this has been evolving.  And, now,