```
                  IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF MASSACHUSETTS


        IN RE:                       )
                                     )  CA No. 01-12257-PBS
        PHARMACEUTICAL INDUSTRY AVERAGE  )
        WHOLESALE PRICE LITIGATION    )  Pages 1 - 87
                                     )
```

SETTLEMENT HEARING

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE

```
                      United States District Court
                      1 Courthouse Way, Courtroom 19
                      Boston, Massachusetts
                      June 13, 2011, 2:20 p.m.
```

```
                      LEE A. MARZILLI
                   OFFICIAL COURT REPORTER
                United States District Court
                1 Courthouse Way, Room 7200
                     Boston, MA  02210
                      (617)345-6787
```

74d21743-9b43-4b78-9475-0e39fbd0275a

1    A P P E A R A N C E S:

2

3        EDWARD NOTARGIACOMO, ESQ., Hagens Berman Sobol Shapiro,
     LLP, One Main Street, Cambridge, Massachusetts, 02142,
     for the Plaintiffs.

4

5        STEVE W. BERMAN, ESQ. and SEAN R. MATT, ESQ.,
     Hagens Berman Sobol Shapiro, LLP, 1301 5th Avenue, Suite 2900,
     Seattle, Washington, 98101, for the Plaintiffs.

6

7        MARC H. EDELSON, ESQ., Edelson & Associates, LLC,
     45 West Court Street, Doylestown, Pennsylvania, 18901,
     for the Plaintiffs.

8

9        JOHN A. MACORETTA, ESQ., Spector Roseman Kodroff & Willis,
     PC, 1818 Market Street, Suite 2500, Philadelphia, Pennsylvania,
     19103, for the Plaintiffs.

10

11       KENNETH A. WEXLER, ESQ., Wexler Wallace, LLP,
     55 West Monroe Street, Suite 3000, Chicago, Illinois, 60603,
     for the Plaintiffs.

12

13       STEVEN F. BARLEY, ESQ., Hogan Lovells US, LLP,
     Harbor East, 100 International Drive, Suite 2000, Baltimore,
     Maryland, 21202, for Amgen Corporation.

14

15       PETER W. MORGAN, ESQ., Dickstein Shapiro, LLP,
     1825 Eye Street, N.W., Washington, D.C., 20006-5403, for
     Baxter International, Inc.

16

17       JAMES P. MUEHLBERGER, ESQ., Shook, Hardy & Bacon, LLP,
     2555 Grand Boulevard, Kansas City, Missouri, 64108-2613,
     for Aventis Pharmaceutical.

18

19       J. CLAYTON EVERETT, JR., ESQ., Morgan, Lewis & Bockius,
     LLP, 1111 Pennsylvania Avenue, N.W., Washington, D.C., 20004,
     for Pharmacia Corporation.

20

21       TINA M. TABACCHI, ESQ., Jones Day,
     77 West Wacker, Chicago, Illinois, 60601-1692,
     for Abbott Laboratories.

22

23       JAMES W. MATTHEWS, ESQ., Sherin and Lodgen, LLP,
     101 Federal Street, Boston, Massachusetts, 02110,
     for Watson Pharmaceuticals, Inc.

24

25

74d21743-9b43-4b78-9475-0e39fbd0275a

1    A P P E A R A N C E S:   (Continued)

2         RICHARD D. RASKIN, ESQ., Sidley Austin, LLP,
     One South Dearborn, Chicago, Illinois, 60603,
3    for Bayer Corporation.

4         MICHAEL C. OCCHUIZZO, ESQ., Kirkland & Ellis, LLP,
     655 Fifteenth Street, N.W., Washington, D.C., 20005,
5    for Sicor, Inc.

6         CHRISTOPHER C. PALERMO, ESQ., Kelley Drye & Warren, LLP,
     101 Park Avenue, New York, New York, 10178, for Dey, Inc.
7
          ANDREW L. HURST, ESQ., Reed Smith, LLP,
8    1301 K Street, N.W., Suite 1100, East Tower, Washington, D.C.,
     20005, for Fujisawa Healthcare, Inc.
9

10   APPEARING FOR OBJECTORS:

11        DONALD E. HAVILAND, ESQ. and MICHAEL J. LORUSSO, ESQ.,
     Haviland Hughes, LLC, 111 S. Independence Mall East, The
12   Bourse, Suite 1000, Philadelphia, Pennsylvania, 19106.

13        JAMES P. DUGGAN, ESQ., Suite 525, 50 Congress Street,
     Boston, Massachusetts, 02109.
14
          JOHN J. PENTZ, ESQ., Class Action Fairness Group,
15   2 Clock Tower Plaza, Maynard, Massachusetts, 01754.

16        RICHARD F. LANDRIGAN, ESQ., Costello & Landrigan,
     421 Highland Avenue, Davis Square, Somerville, Massachusetts,
17   02144.

18                       I N D E X

19   EXHIBITS                  RECEIVED IN EVIDENCE

20   1                              56

21   2

22   3                              83

23

24

25

1                    P R O C E E D I N G S

2           THE CLERK:  Court calls Civil Action 01-12257,

3    In Re:  Pharmaceutical Industry Litigation.  Could counsel

4    please identify themselves for the record.

5           MR. BERMAN:  Good afternoon, your Honor.  Steve Berman

6    on behalf of the class.

7           THE COURT:  Thank you.

8           MR. MATT:  Sean Matt on behalf of the class, your

9    Honor.

10          MR. NOTARGIACOMO:  Ed Notargiacomo on behalf of the

11   class.

12          MR. MACORETTA:  Good afternoon, your Honor.  John

13   Macoretta on behalf of the plaintiffs.

14          MR. EDELSON:  Good afternoon.  Marc Edelson on behalf

15   of the plaintiffs.

16          MR. WEXLER:  Ken Wexler, your Honor, for the

17   plaintiffs.

18          MR. MORGAN:  Peter Morgan for Baxter.

19          MR. BARLEY:  Steven Barley for Amgen.

20          MR. MUEHLBERGER:  Jim Muehlberger for Aventis.

21          MS. TABACCHI:  Tina Tabacchi for Abbott Laboratories.

22          MR. RASKIN:  Richard Raskin for Bayer Corporation.

23          MR. HAVILAND:  Judge, Don Haviland, Haviland Hughes,

24   on behalf of the Aaronsons, the Howes, his wife's estate, the

25   estate of the Shepleys, the Estate of Harold Carter, Roger

1    Clark on behalf of his father's estate, Katy Bean on behalf of

2    the estate of Harold Bean, James Monk, Virginia Newel on behalf

3    of her husband's estate, Oral Roots, Rebecca Hopkins and the

4    estate of with George Baker Thompson, and with me is Michael

5    Lorusso.

6              MR. LORUSSO:  Good afternoon, your Honor.

7              MR. DUGGAN:  James Duggan for James Wilson.

8              THE COURT:  That's --

9              MR. DUGGAN:  An objector.

10             MR. MATTHEWS:  Good afternoon, your Honor.  James

11   Matthews for Watson Pharmaceuticals.

12             MR. PALERMO:  Good afternoon, your Honor.  Chris

13   Palermo for Dey.

14             MR. OCCHUIZZO:  Mike Occhuizzo for Sicor, Inc.

15             MR. EVERETT:  Clay Everett for Pharmacia.

16             MR. LANDRIGAN:  Your Honor, Richard Landrigan for

17   Patricia Weatherly.

18             MR. PENTZ:  John Pentz for John Pentz, Jr. and Corinna

19   Connick.

20             MR. HURST:  Andrew Hurst on behalf of Fujisawa.

21             THE COURT:  Okay.  Mr. Berman?

22             MR. BERMAN:  Yes, your Honor.  I thought I'd proceed

23   as follows:  I'll briefly lay out why we think the settlement

24   is fair and reasonable, Mr. Matt will address some suggested

25   redistribution that we'd like to propose to the Court, and then

74d21743-9b43-4b78-9475-0e39fbd0275a

1   I'll take up attorneys' fees, and I'll reserve --

2         THE COURT:  I'm just not hearing.  You'll take up?

3         MR. BERMAN:  Attorneys' fees after that, and then I'll

4   reserve responding to the objectors until we hear what they

5   have to say.

6         THE COURT:  Right.  It isn't a hundred percent clear

7   that we're going to finish today, but it just depends on how

8   long all the objections go.  I was actually overwhelmed with

9   the amount of paper that I had to read to get through this, but

10  some of the pleadings were very old.  So hopefully we can make

11  it current, and then decide whether or not we can finish today

12  or whether we need to come back at another point.

13        MR. BERMAN:  Okay.  To remind the Court, this is a

14  proposed $125 million settlement.  We've divided the settlement

15  into two different classes, we call them, the Class A drugs and

16  the Class B drugs.  The Class A drugs were physician-

17  administered drugs that we could identify like the AstraZeneca

18  drugs, and the Class B drugs were multi-source drugs which had

19  the J-Code problem, J-Code identification problem which I'll

20  remind you of in a second.

21        With respect to Class A, Dr. Hartman estimated damages

22  of $316 million, and the settlement for Class A is

23  $100 million, so it's roughly 30 percent damages.

24        Now, that is a little bit lower than the 42 percent we

25  had for AstraZeneca or the 60 percent we had for BMS, and the

74d21743-9b43-4b78-9475-0e39fbd0275a

1  reasons for that are:  We didn't have a trial verdict or trial

2  benchmarks like we did with AstraZeneca or BMS, and we had to

3  evaluate the liability case, and we just didn't have the hot

4  documents, you know, showing pushing the spread to physicians

5  like we did with AstraZeneca or with BMS.  So the liability

6  case wasn't nearly as strong, and we feel that the settlement

7  of $100 million is substantial, given those risks.

8       THE COURT:  Well, wasn't that originally how we

9  decided fast track versus non-fast track, Track One, Track Two?

10  Is that the reason we triaged initially?  You cherry-picked the

11  other five.

12       MR. BERMAN:  Right, we cherry-picked some

13  multi-source, some not multi-source, yes, so that we put our

14  best case in fast track, AstraZeneca.

15       With respect to the multi-source drug, Dr. Hartman

16  calculated $800 million of damages, but that was using the

17  30 percent yardstick; and the damages, for the reasons I'll

18  explain in a moment, are probably nonexistent for Class B.

19  First of all, we have the J-Code issue, and on the third page

20  of our slides I had quoted from your trial verdict in which you

21  identified the problem that we would have is, we can't match up

22  any single patient's use of multi-source drug with the

23  defendant manufacturer.  So we faced a real problem in that

24  regard.  And we were going to propose some market share theory,

25  but, you know, those theories have not been warmly received by

74d21743-9b43-4b78-9475-0e39fbd0275a

1   the courts, so we had a real problem trying to match up the

2   drugs per defendant on class certification and at liability.

3          The second issue, probably even more substantial, was

4   your ruling, which again I have put at Page 4 of the slides to

5   refresh your recollection because all of this has been going on

6   for so long, that you can only have liability if you prove that

7   a published AWP was above the median.  It turns out that that

8   is almost a Herculean task because in order to do it for any

9   one drug, you'd have to get all of the drug prices from any

10  manufacturer, whether they be a defendant or not, and then it

11  changes every month.  So you may have some months where it

12  affected the median, some it didn't.  Dr. Hartman thought that,

13  based on what he had seen, that was a task that was just not

14  worth undertaking because, in his opinion, it would be unlikely

15  we would find many drugs that caused the median to rise.

16         And the third reason that the Class B settlement is

17  $25 million lower than the others is that there was just no

18  evidence of spread marketing.  You know, at the settlement

19  negotiations, we sat down with each defendant and presented

20  them with the evidence we had, and in some cases it was a

21  single sheet of paper.  Of all the millions of documents, we

22  had one or two documents that may have shown spread marketing.

23  So we had a very weak spread marketing case, and for all those

24  reasons, we wound up with a $25 million settlement.

25         Now, once we --

74d21743-9b43-4b78-9475-0e39fbd0275a

1         THE COURT:  For Class B?

2         MR. BERMAN:  For Class B.  Once we arrived at the

3    $125 million settlement, then we had to do two different

4    allocations.  The first allocation -- we had $125 million.  We

5    had to figure out how to divide that.  We as class counsel

6    evaluated the strengths of the Class A/Class B and recommended,

7    and the allocation counsel did not disagree, that the split be

8    $125 million respectively between the classes.

9         We then had a session with allocation counsel and

10   Professor Green, and they devised or they spent some time

11   working on allocation.  And with respect to the consumers, they

12   basically tried to follow your guidelines from the trials.  So

13   with respect to consumers, Class 1 consumers, their damages

14   were trebled, okay?  For Class 2 they were doubled because

15   that's what you did at trial.  And for Class 3 they were ranked

16   as a single, no enhancement for the Class 3 consumers.  And in

17   addition to that allocation --

18         THE COURT:  So just because this is complex --

19         MR. BERMAN:  Sure.

20         THE COURT:  So that was true for both Drugs A and

21   Drugs B?

22         MR. BERMAN:  I'm sorry.  I was interrupted.  Say that

23   again, your Honor.

24         THE COURT:  You have the Class A drugs, the

25   physician-administered, and Class B which are the multi-source.

1          MR. BERMAN:  Correct.

2          THE COURT:  Did you do that doubling, trebling, and no

3    enhancement with respect to both classes of drugs?

4          MR. BERMAN:  Yes, yes.

5          THE COURT:  Okay.

6          MR. BERMAN:  And in addition, the consumers benefited

7    because what we agreed to do was to take the cost of notice off

8    the top.  And the notice costs were substantial in this case,

9    as you know all the efforts we've gone through, so the TPPs

10   actually wound up bearing the cost in large part of the

11   consumer notice program.  So that was also something that the

12   allocation counsel obtained on behalf of the consumer class.

13         So we think the consumer class was treated fairly

14   here.  We have --

15         THE COURT:  Of the $125 million, as I understand it, a

16   certain amount went initially to the independent settling

17   health plans, and then they're going to be trued up.  So I

18   think we have to be careful because they're not in the class.

19   That's part of a common fund.  So $25 million went right away

20   to the independent settling health plans, right?

21         MR. BERMAN:  That's correct.

22         THE COURT:  And they're not class members because they

23   essentially opted out.

24         MR. BERMAN:  That's correct.

25         THE COURT:  Okay.

1          MR. BERMAN:  So if you want to have a flow chart,

2     looking back at your order, on Page 8 I did a flow chart that

3     shows what all the money goes for.

4          THE COURT:  Okay.  All right, I didn't jump ahead that

5     much.

6          MR. HAVILAND:  Can I get a copy of the slides?  I

7     wasn't --

8          THE COURT:  Are the slides going -- you know, why

9     aren't they going up on here?  We should probably do that so

10    everyone can see.

11         MR. BERMAN:  I don't have any more.  We didn't bring

12    the electronic version.

13         THE COURT:  Is there an extra -- put them on the ELMO.

14    And I think we have the screens up.

15         (Discussion off the record.)

16         THE COURT:  You just walked in.  Are you representing

17    someone?

18         FROM THE FLOOR:  I am not.

19         THE COURT:  Okay, the interested public, all right.

20         FROM THE FLOOR:  I feel you have enough.

21         (Discussion off the record.)

22         THE COURT:  Why don't we get to Page 8 because that's

23    what we're on.

24         MR. BERMAN:  Yes, and I really wasn't going to belabor

25    the point, but just if you're interested in watching the money

Page 12

1    flow, that's how it works.

2        THE COURT:  I'm confused now.  Maybe -- good.  All

3    right, thank you.

4        MR. BERMAN:  Okay, so that's how the money flows.

5        THE COURT:  Is the public screen on?  I can't see it.

6    You can all see?  Perfect.  All right.

7        MR. BERMAN:  In the interest of time, I'm going to cut

8    this short a little bit because --

9        THE COURT:  Well, don't cut it too short because I

10   think there's a lot of challenges to it, and it's not agreed

11   upon, and I need to understand it fully.

12       MR. BERMAN:  Okay.  So with respect to distribution to

13   the consumers, we used the same consumer friendly format that

14   we've used in the other settlements.  They only need to sign a

15   prepaid postcard.  They received the list of drugs they took

16   from the CMS database.  They also had an Easy Refund Option

17   that they could elect, and, rather than try to document their

18   expenditures, they could seek a refund of $35; and because of

19   the aggressiveness of the claims process, we've had a

20   significant higher claims response than we have in other

21   settlements.

22       So we can take a look at this.  I'm on Page 14 now of

23   the proposal.  So for Class 1 consumers, we had 88,000 claims

24   come in; for Class 3 consumers, we had 20,000; and we had

25   15,000 of those who elected the Easy Refund Option.  So we got

1  a good response from consumers on this.

2      THE COURT:  When you said compared to the others, do

3  you have those numbers?

4      MR. BERMAN:  Do you remember what they were in BMS?

5      MR. MATT:  Well, they're much higher than BMS, your

6  Honor.  BMS, particularly in Class 3, we had just a handful,

7  you know, less than 100 claims.  Here for Class 3 we have

8  20,000 claims.  Part of the difference, your Honor, is that

9  here we actually did a mailing to about 900,000 consumers based

10 on the database that the ISHPs provided.  In addition to that,

11 we had a multi-million-dollar advertising campaign.  So I think

12 that what you're seeing here statistically from Class 3 is a

13 reflection of the more resources applied towards a greater

14 notice campaign.

15     THE COURT:  And do you have the comparison on Class 1?

16 That shouldn't be so different because there it's just the

17 Medicare.

18     MR. MATT:  Correct, there it's just a function, A, of

19 how many drugs are in the settlement and how many mailings are

20 actually made based on the CMS data, and then, B, how many

21 people signed and returned that claim card.

22     MR. BERMAN:  Okay, so now, your Honor, now that we've

23 gone through the claims process and we have processed, you

24 know, all of the claims, we can now see how the claims, just

25 like with BMS, how it's working in the real world in terms of

1    what we thought we were distributing and what's coming in.  And

2    I'm going to let Mr. Matt address that because we're going to

3    want to redistribute the funds a little bit.

4          MR. MATT:  So, your Honor, we're going to take a look

5    at Slide 15, and I'm going to take you through an exercise that

6    is probably going to feel familiar based upon what we did last

7    month in BMS.  The table that is on Slide 15 has three columns.

8    The first column lists the drugs.  The second column lists the

9    actual damages associated with those drugs for this database of

10   consumers in Class 1.

11         THE COURT:  Wait.  Just tell me, estimated damages

12   comes from Mr. Hartman?

13         MR. MATT:  It does.  So the way this column is

14   built --

15         THE COURT:  With the J-Code problem or without?  These

16   are all Class A and we don't have the J --

17         MR. MATT:  Class A.

18         THE COURT:  Okay.

19         MR. MATT:  We're just going to do a Class A analysis

20   right here.  So what Rust did as the settlement administrator

21   is, they took the overcharge ratio that Dr. Hartman's folks

22   calculated for each drug and each time period, and so they

23   applied the overcharge ratio to the actual administrations that

24   each Class 1 member had in the database.  So it's a real live

25   damage calculation, similar to what you saw in AstraZeneca

1    Class 1 and similar to what you represented in the rebalancing

2    proposal that you approved for BMS.  So that's what that second

3    column represents.

4         The third column represents what the total estimated

5    payout is for each drug under the current distribution

6    methodology.  As you might recall, the distribution methodology

7    proposed for Track Two originally was based on co-pays, not

8    damage, co-pays, the actual out-of-pocket the person has to

9    write the check for when they actually get their administration.

10   It's a magnitude larger than actual damage.  So the reason

11   we're presenting this chart is, you will see, when you compare

12   the two columns, the distribution formula as presently proposed

13   is really out of whack with reality, and we think it needs to

14   be adjusted, understanding your Honor's expectation --

15        THE COURT:  Has this been briefed?  Did I miss

16   something here?

17        MR. MATT:  Pardon me?

18        THE COURT:  Was this in the brief?

19        MR. MATT:  No.  These are all new numbers, your Honor,

20   and the reason they are is that the claims period does not

21   close until July 1, so Rust is still processing claims and

22   still receiving claims.  So it's a bit of a moving target,

23   but we --

24        THE COURT:  Payout per current method is based on

25   co-pays, not damages?

1          MR. MATT:  Absolutely.

2          THE COURT:  And what was it in these other classes?

3          MR. MATT:  It's actually three times co-pays.

4          THE COURT:  I said that incorrectly.  What did we do

5     for AstraZeneca and Glaxo, was it based on co-pays or based on

6     actual damages?

7          MR. MATT:  For AstraZeneca, it was based on actual

8     damages.  For BMS, it was originally based on co-pays, but we

9     changed it to be actual damages to reflect reality.  And,

10    again, the reason that -- we don't have the luxury of all this

11    data when we actually proposed the distribution formula

12    originally, so we're able to actually go back and do a damages

13    analysis like we did in this Column 2 because we now have the

14    data from CMS.  So that's the reason for the difference.

15         Now, if we actually compare that, if you take the

16    first drug, Anzemet, we have $1.9 million total estimated

17    damages; yet under current method, only $349,000 will be

18    allocated for that drug.  It's a mismatch that we don't think

19    makes sense, and if you kind of go down the table --

20         THE COURT:  Explain that to me again.  It means

21    because the $349,000 -- the estimated damages were based on the

22    full co-pay and --

23         MR. MATT:  Correct.

24         THE COURT:  And the total estimated payout per current

25    method, where did we set up the current method?

74d21743-9b43-4b78-9475-0e39fbd0275a

1          MR. MATT:  The current method is three times co-pays,

2     but then it's prorated down based on the volume of claims.

3          THE COURT:  See, that's what wasn't clear to me.

4          MR. MATT:  Yes, I didn't finish explaining that.

5     Sorry.  So that's why it's going to be so low because you have

6     a proration.  Now, proration is very low at this point based on

7     the volume of claims.  So when you compare the two columns and

8     you go down it drug by drug, you know, there's a big mismatch,

9     particularly with respect to Epogen, which was included as a

10    Class A drug because it's an antigen drug tied to other Class A

11    drugs.  But the reality is, Dr. Hartman found no damages in the

12    Medicare Class 1 context for two reasons:  One is, a high

13    volume of the drug was used for kidney dialysis, and it was

14    reimbursed at a statutory rate not based on AWP; and for the

15    remaining of the uses, Dr. Hartman found it didn't exceed his

16    spread plus the 5 percent.

17         So, again, we have this mismatch, and we think that

18    what we need to do, your Honor, is, when all the data is in,

19    when we have real final numbers to work with after July 1,

20    propose a redistribution.

21         THE COURT:  Well, how did zero go to $5 million?

22         MR. MATT:  Well, because the $5 million is, again,

23    based on again triple co-pay, then prorated down.  So it was

24    just the way it was set up originally, and we think it needs to

25    be altered now.

1          Now, if you look at the Total Estimated Damages

2   column, you get a subtotal of $3.849 million, and if we double

3   that, we get $7.7 million, just under.  And I think doubling is

4   what your Honor has expected, certainly what you wanted to see

5   in the BMS context.  And, you know, we were kind of forecasting

6   you would probably want to see that here for consistency, so we

7   kind of made this calculation.  And we did that because it

8   shows that right now, under the total current method of payout,

9   there's about $9.1 million available to Class A drugs for

10  Class 1, and the $7.6 million doubling comes well under that.

11  So this is a way of telling you, at least preliminarily, we

12  look like we can actually double it and change the

13  redistribution formula within the existing allocation.

14          Now, the next slide, Slide 16, does the same thing for

15  Class 3.  Now, for Class 3 we did the actual damages

16  calculation, very similar to how we did it in the prior slide

17  for Class 1.  There is a bit of a nuance, in that we don't have

18  the level of detail in the data, in the CMS production, for

19  instance, for Class 3, so we used some average damage numbers

20  that Dr. Hartman provided.  But the snapshot we've taken here

21  for you shows, again, a mismatch between the estimated damages

22  actually incurred for the folks who took these drugs in Class 3

23  and filed claims and the total estimated payout under the

24  current method.  And again, you know, for similar reasons, we

25  think that we should come back to you and propose a

1    redistribution that makes more sense and ties it closer to the

2    actual damage experience like we have done in prior

3    settlements.

4         Unless you have any more questions on the claims

5    experience to date, I'll turn it back to Mr. Berman, but I do

6    want to emphasize these are preliminary --

7         THE COURT:  I'm not sure I totally understand, and I'm

8    trying to learn as you're going through it.  So it would be

9    useful, because I did read everything -- this is different than

10   I thought we'd come in here with, but as I understand, you've

11   got new data, but I think it would make sense to also

12   supplement with a briefing as to what you're planning on doing.

13   I don't understand what you mean by a redistribution.

14        MR. MATT:  Well, redistribution means just changing

15   the formula for redistributing the money within the class,

16   okay?

17        THE COURT:  I understand what it means, but I don't

18   understand what you do.

19        MR. MATT:  Mathematically, you know, we would have to

20   wait till we get all the data.

21        THE COURT:  But just on the big picture, what would

22   your goal be?

23        MR. MATT:  Give everyone double damages in Class A

24   drugs.

25        THE COURT:  In the Class A instead of trebling some?

74d21743-9b43-4b78-9475-0e39fbd0275a

1        MR. MATT:  Yes.

2        THE COURT:  Why?

3        MR. MATT:  We think, for purposes of liability, that

4    it probably doesn't justify a trebling, for instance, like

5    AstraZeneca did.  We think it's more like BMS --

6        THE COURT:  So it's very substantive.  I mean, I

7    missed that piece.  So what you want me to do is change my mind

8    and say that the heartland drugs shouldn't be trebled, and that

9    really what's a fairer approach is to double everything.

10        MR. MATT:  Consistent with what we did in BMS because

11    we think the evidence is not as strong as it was in the

12    AstraZeneca case.

13        THE COURT:  What did we say in our class notice?

14        MR. MATT:  The class notice says three times co-pay.

15    So if we did this, we would have to re-notice those folks, who

16    would receive less under the redistribution proposal than they

17    would have under the original proposal, just like we are doing

18    right now in BMS.

19        THE COURT:  Well, why don't I just keep with the way

20    we've done it?  I understand your point, but I must say,

21    some -- I understand and I respect it.  I'm just saying, it's

22    taken so long already.  I was rereading the history of this,

23    and originally there was going to be a fairness hearing in

24    April of '09.  So I'm wondering, is it worth delaying this?  I

25    imagine some folks, based on the pleadings, are going to

1   appeal.  This is going to already take forever.  I've got a

2   huge concern that we're not giving to people who are sick.  How

3   long would the extra re-noticing take?

4           MR. MATT:  I think it would take probably sixty days

5   in terms of from now because we'd have to actually get all the

6   claims in July 1, do the processing, and send out the notice.

7           THE COURT:  And potentially more objections.

8           MR. MATT:  Potentially more objections, that's

9   correct.

10          THE COURT:  Because you're decreasing.  Just so I can

11  understand it --

12          MR. MATT:  We're decreasing for some people,

13  increasing for others, that's correct.

14          THE COURT:  And why -- in other words, I don't think I

15  understand the merits well enough as to why you think I should

16  do that.

17          MR. MATT:  I think --

18          THE COURT:  I understood BMS.  I knew that drug.  I

19  don't know these drugs as well.

20          MR. MATT:  I think what we're presenting you with

21  right now is a very similar situation to BMS, where we had the

22  mismatch between what was the actual damages incurred by each

23  class member and the distribution formula.  And so we've kind

24  of forecasted that perhaps you probably wanted to do the same

25  thing here.  And I think if you look at Slide 16 --

1    THE COURT:  Well, I don't -- can I just say, without

2    having had any notice -- I did understand why we did this in

3    BMS, and it was important, and I knew those drugs, and I

4    understood what was going on a little bit better.  You know,

5    none of this has been litigated to the hilt the way BMS was, so

6    I feel as if you haven't presented me with the merits enough

7    for me to be persuaded of that.

8    MR. MATT:  Well, when you look at Class A drugs for

9    Track Two, these drugs right here, Anzemet, Aranesp, et cetera,

10   these are all drugs that are taken in conjunction with

11   chemotherapy.  So in that respect, the Class A drugs for

12   Track Two are actually quite similar to the BMS drugs.  You

13   know, the BMS drugs you might recall, Taxol Paraplatin, you

14   know, chemotherapy agents.  Here you have drugs that are

15   administered usually in conjunction:  Epo, a blood booster,

16   Aranesp, a blood cell booster, if I remember correctly, for

17   cancer patients undergoing pretty aggressive chemotherapy that

18   have dramatic decreases in their red blood cells and therefore

19   their energy levels.  So these drugs are largely administered

20   in conjunction with chemotherapy, so I think from that

21   perspective they're similar.

22   THE COURT:  And why wouldn't trebling for heartland

23   drugs -- didn't we treble for heartland drugs?

24   MR. MATT:  We trebled in AstraZeneca because the

25   spread marketing evidence was so clear.

Page 23

1          THE COURT:  So strong, yes.

2          MR. MATT:  Very strong.  That evidence wasn't so

3    strong for BMS where we doubled, and it's even less strong here

4    in Track Two.  So that's why we propose doubling.  We don't

5    think --

6          THE COURT:  You think this is more analogous to BMS

7    than it is to AstraZeneca?

8          MR. MATT:  Absolutely, your Honor.

9          THE COURT:  This is just new to me.

10          MR. MATT:  Well, there's no trial for Track Two, so --

11          THE COURT:  But also, I read everything, I really did,

12    this weekend.  The binder, if you put everything in, it just

13    was not what I was expecting.  So I'm going to think about

14    that.  I can't rubber-stamp it because I've just heard for the

15    first time about it.  So we can brief it and get an affidavit

16    in support of it and that sort of thing, right?

17          MR. BERMAN:  We weren't intending for you to

18    rubber-stamp it today.  We wanted to flag the issue so you know

19    that we are going to have something from Dr. Hartman.

20          THE COURT:  I see.  You're not ready to go today

21    either then?

22          MR. MATT:  No.

23          MR. BERMAN:  Because we think --

24          THE COURT:  You think this is fairer?

25          MR. BERMAN:  Yes.

1          THE COURT:  And you think I'd have to re-notice?

2          MR. BERMAN:  A small, small group.  We don't want to

3     delay it either, your Honor, so it's not like --

4          THE COURT:  No, I'm sure you don't want to delay it

5     because it's a delay for other things for you as well.  I'm

6     sure you don't want to delay it.  I'm just -- I forget who's

7     been standing here, poor Mr. Notargiacomo every single month.

8     I mean, I was just so worried about the length of time.  A lot

9     of these people have got cancer, right?

10         MR. BERMAN:  Yes, right.  So in terms of approval of

11    the settlement, I think we've said everything we need to say.

12    There's one other issue with respect to approval of the

13    settlement, and that is, we have made a motion for the addition

14    of new class representatives that your Honor, we think, has to

15    rule on that as well.

16         THE COURT:  Yes.  Now, when did you file that?

17         MR. BERMAN:  We filed it on June 1, 2011.

18         THE COURT:  And it is now June 13, so the fourteen

19    days haven't run.  Now, and what happened before Judge Bowler

20    on that?

21         MR. BERMAN:  Judge Bowler denied Mr. Haviland's

22    request to take depositions and ordered a very small group of

23    documents to be produced, any additional billing records that

24    we could find.  And we spent the weekend with our class

25    representatives, some of whom are quite elderly and were in

1    their overheated attics trying to find billing records, and we

2    provided Mr. Haviland with whatever we could.

3              THE COURT:  How long ago did you provide it to him?

4              MR. BERMAN:  Judge Bowler said two hours before the

5    hearing, and we gave it to him two hours before the hearing.

6              THE COURT:  And how many were there, how big a volume?

7              MR. BERMAN:  Oh, this is it right here.

8              THE COURT:  So not very much.

9              MR. BERMAN:  Not very much.

10             THE COURT:  I'm guesstimating from what you're handing

11   me maybe 20 pages, 30?

12             MR. BERMAN:  I don't believe that many.

13             THE COURT:  All right.  Now, can I ask you just on the

14   associations issue, as I understand the legal issue, I denied

15   standing for the associations for a litigation class, which I

16   do think is the law.  You're saying I should apply a different

17   standard now that it's a settlement class?

18             MR. BERMAN:  Well, let me back up.  For the

19   representation, if you grant the motion for leave to amend,

20   every single defendant would be -- we'd have a class rep who's

21   taken a drug from every defendant, and I lay that out for you

22   in our second set of slides, Page 5.

23             So we have basically four new individuals.  It's

24   important to remember that the class includes people who paid

25   out of pocket or who incurred an obligation, right?  What we

1    have from each of these individuals is that CMS gave us the

2    printout showing that they agree that these plaintiffs took the

3    drug.  We have the sworn testimony from each of these people

4    saying that they recall making payments for this drug out of

5    pocket, and in some cases they're able to find their actual

6    credit card receipts on occasion or some billing record.  And

7    so we think that they -- that the association issue almost you

8    don't even have to get to.

9             THE COURT:  I understand that, and it was an

10   interesting actual legal issue because I hadn't thought -- I'm

11   clearly, in my view, correct with respect to a litigation

12   class, but I wasn't sure whether -- we couldn't find any law on

13   it, actually, the associations for settlement class.  So we

14   weren't sure about that, and you don't want to be on the

15   cutting edge in a class this big.  So did you find any cases

16   that allowed associations to be class reps for a settlement

17   class?

18            MR. BERMAN:  We did not.

19            THE COURT:  You did not.  Did you find any that said

20   "no" for a settlement class?

21            MR. BERMAN:  No.  We didn't find any good law.

22            THE COURT:  We didn't find much either.  I don't know

23   if anyone else did, but --

24            So my legal question with respect to these four:

25   Let's assume for a minute they have standing and that they did

74d21743-9b43-4b78-9475-0e39fbd0275a

1    purchase in the relevant time periods and you've proved it up

2    correctly.  One of the concerns I have is, you probably

3    presented to them the settlement almost as a fait accompli

4    because they've come in so late.  It wasn't as if they were

5    involved in the negotiating process.  So while I have no doubt

6    they correctly state, "We agree with it," it was after the

7    fact.

8              MR. BERMAN:  Yes, but I'm not sure that makes --

9              THE COURT:  I don't know.  We couldn't find any cases

10   on it.  In other words, I've allowed you to freely amend and

11   add to preserve your standing.  I'm completely confident that

12   that is within the course of the law.  But I also need to find

13   and make sure that they've been helpful in guiding what the

14   settlement would be.  Let me ask you this:  Did you present to

15   them this whole redistribution?

16             MR. BERMAN:  We have not yet.  We have not, but --

17             THE COURT:  Because, I mean, you just figured that

18   out, and the affidavits predate that.

19             MR. BERMAN:  Yes.

20             THE COURT:  So what I'm worrying about isn't whether

21   they've got constitutional standing as much as -- and it may be

22   the best settlement out there.  Have the associations worked

23   with you?

24             MR. BERMAN:  The associations have, and they support

25   the settlement.

1          THE COURT:  Okay, the ones that are remaining?

2          MR. BERMAN:  That's right, and you've already

3   approved -- the ones that are remaining are fully supportive.

4          THE COURT:  So to the extent that the policy behind

5   this is to have class reps who are actually engaged in the

6   process and approve and sort of look into making sure that

7   their interests are represented, primarily here it was the

8   associations, not these individuals.

9          MR. BERMAN:  Well, they weren't at the time, but

10  certainly these individuals have stepped forward.  They've

11  talked to us.  They've incurred a huge burden.  I mean, we've

12  gone through their records, we've met with them.  They wouldn't

13  do this if they didn't --

14         THE COURT:  I'm not saying they don't have standing.

15  I'm not even saying they don't approve it after the fact.  They

16  do; they said they did.  You understand the policy issue.

17  Usually a fair and adequate class representative is someone

18  who's going to take a role in the litigation, and you've had

19  just an incredibly difficult time finding people.  The

20  associations have been active throughout, as far as I can tell,

21  in trying to assist allocation counsel.  Is that right?

22         MR. BERMAN:  Yes.

23         THE COURT:  So I'm wondering for settlement purposes

24  what to do.  In other words, assume for a minute I allow you to

25  add them, which I'm thinking I will, I also have to think

1   about, is it enough, or do I need to make sure -- what do I

2   need to do to make sure they even agree with the new proposal?

3        MR. BERMAN:  Well, we're going to go back to them and

4   file the new affidavits if they agree.  You know, one of them,

5   for example, takes Epo, or took Epogen, his wife.

6        THE COURT:  I saw that, yes.

7        MR. BERMAN:  So he's going to be zeroed out.  So we

8   have to explain to him why we're doing that, and we will.  I

9   can assure you that --

10       THE COURT:  If you zeroed out, then why is --

11       MR. BERMAN:  There's another drug that he's in for.

12       THE COURT:  I see.

13       MR BERMAN:  And I can assure you that we had the same

14  kind of discussions, the same level of discussions that we

15  would have had if they were there in the moment because at the

16  end of the day, these folks are relying on us.  I mean --

17       THE COURT:  I understand, but the law requires -- so

18  I'm struggling with it.  Even assuming for a minute, which I'm

19  likely to, is allow the motion, I've not yet received an

20  opposition, and I understand I'm going to allow argument on

21  it --

22       MR. BERMAN:  Now, Ms. Swayze was a representative

23  previously in the BMS settlement.

24       THE COURT:  Yes.

25       MR. BERMAN:  So we think that what we'd like you to do

1   is to add these plaintiffs and to allow the associations to act

2   as class representatives because the concern that you cited

3   when you cited the Union Carbide case from the Second Circuit

4   was that there's a difference between individuals who have to

5   prove actual damages at a trial and an association which would

6   not.  That was why you found that the associations lacked

7   standing.

8           THE COURT:  Well, and the case law was just brutal on

9   associations for a litigation class.

10          MR. BERMAN:  That's right.

11          THE COURT:  But there is, what is it Amchem or -- some

12  of the tried-and-true case law which suggests settlement

13  classes may be a little different, and I'm struggling with it,

14  I am.  So, anyway, you file that motion today.  So the action

15  items today, if you will, are, do I allow this motion?  And I

16  guess that's really it.

17          MR. BERMAN:  Yes.  The only action item is on our part

18  to get back to you with some short briefing on why we want to

19  rebalance.

20          THE COURT:  Okay.  And then I guess a third issue at

21  some point, and hopefully we'll do this all today, would be the

22  attorneys' fees issue.

23          MR. BERMAN:  Do you want to turn to that?

24          THE COURT:  Yes.  And the issue I've been struggling

25  with on that has been, so there's the independent settling

1  health plans.  There was an objection that they received the

2  money before everybody else.  Are they paying separate fees at

3  all to you all?

4       MR. BERMAN:  We have an agreement with them that we

5  get a portion of that recovery.

6       THE COURT:  Of the $25 million?

7       MR. BERMAN:  That's right.

8       THE COURT:  So you're not asking me to award that

9  because they're not part of the class?

10       MR. BERMAN:  Yes, we are.

11       THE COURT:  Is there any money on top of the

12  30 percent you're asking for from the $25 million?

13       MR. BERMAN:  No.

14       THE COURT:  All right.  So you're asking me to award

15  the sum as part of a common fund?

16       MR. BERMAN:  That's right.

17       THE COURT:  And, now, they got slightly more than

18  $25 million, if you think about it, because they've had it now

19  for two years, right?  So there's some interest that comes with

20  that?

21       MR. BERMAN:  Well, they've had it, so they've had the

22  use of the money.

23       THE COURT:  They've had the use of the money.  And the

24  reason why you say they get it right away is because the

25  release was able to be given right away?

Page 32

1        MR. BERMAN:  That's correct.

2        THE COURT:  And then the true-up, they might get more

3   depending on how it balances out?  Do we know any more about

4   that now, how that will work?

5        MR. BERMAN:  Do we have any data on the true-up?

6        MR. NOTARGIACOMO:  I don't have the numbers in front

7   of me, your Honor, but I believe it's very similar to all the

8   other settlements where they came in somewhere around

9   70 percent of the third-party payor claims in total.  So they

10  would likely end up with, and I haven't done the calculations,

11  but a little bit more than the $25 million from --

12        THE COURT:  Like what?

13        MR. NOTARGIACOMO:  I don't know.  I don't want to

14  misspeak without having done the calculation, but I believe

15  that at the end of the day, given they're 70 percent of the

16  claims of all TPPs, they would end up with 70 percent of

17  whatever the distributable amount is to all TPPs.

18        THE COURT:  So they'll get more than the $25 million

19  for sure, right?

20        MR. NOTARGIACOMO:  Right, that's correct.

21        THE COURT:  So 70 percent, just doing the math

22  again. . .so they get 80 percent of the $125 million?  Is that

23  how it works?

24        MR. BERMAN:  They get 82.5.

25        THE COURT:  Percent of the $125 million?

1          MR. NOTARGIACOMO:  I believe, your Honor, just doing

2    very rough math, they would be likely entitled to about

3    $19 million in addition to the $25 million that they've

4    received.

5          THE COURT:  All right, so the $25 million they had

6    early, and the extra $19 million, if it works out that way,

7    they'll get at the same time as everybody else basically.

8          MR. NOTARGIACOMO:  That's right, your Honor.

9          THE COURT:  And as I understand it, the ISHPs are also

10   paying for all the noticing?  What expenses are they paying

11   for?

12         MR. NOTARGIACOMO:  They're paying for everything, your

13   Honor.  All of those expenses come off the top before the

14   true-up is calculated.  So the true-up takes into account the

15   fact that they're paying the same percentage of attorneys' fees

16   that you award, the same percentage on the dollar for notice

17   costs and administration costs.  So they're paying the same

18   tax, if you will, per dollar that all the TPPs in the class are

19   paying.

20         THE COURT:  Now, just to give the history of it, what

21   took us two years?  Because that's what I couldn't figure out.

22   The first fairness hearing was scheduled for April of 2009.

23         MR. NOTARGIACOMO:  A large part of that delay was

24   getting the actual CMS data.  And you remember your Honor

25   finally broke that logjam at the end of 2010, and they produced

1    that data, and we were able to send out notice in early January

2    to Class 1.  I also believe, and I haven't done a whole

3    history, your Honor, but there was a delay -- there was a

4    previous hearing, and there was an issue of whether or not cash

5    payors had actually been included in the settlement and whether

6    they had been noticed, and your Honor ordered a round of notice

7    to cash payors that also delayed --

8         THE COURT:  Yes, that would be useful in whatever memo

9    you file to give a history to explain that because I believe I

10   held one fairness hearing already, and that was the cash payor

11   issue, and we had a lot of these objectors, right?

12        MR. NOTARGIACOMO:  That's correct, your Honor.

13        THE COURT:  We knew what was happening, and then we

14   added them in.  Just sort of refresh -- I have so many of

15   these.  This is the last of them, isn't it?

16        MR. BERMAN:  They were always in.  We just made the

17   notice clearer on that.  There was a discrepancy between, I

18   think, if I recall, one form of notice that made it clear they

19   were in and another form that was ambiguous.  So if I recall,

20   we re-noticed that to make it clearer.

21        THE COURT:  And how many people who are the cash

22   payors actually have filed claims?  Do we know?

23        MR. MATT:  We don't have that.

24        MR. BERMAN:  We don't have that statistic.

25        THE COURT:  You don't have it here today, or they

1    didn't keep it that way?

2           MR. MATT:  We can get it.

3           THE COURT:  So we would know?

4           MR. MATT:  We could get it.

5           THE COURT:  That would be useful, just even data as to

6    whether the media campaign, how effective it was, because

7    that's one of the objections, isn't it, that we didn't go to

8    the pharmacies?

9           MR. BERMAN:  Yes.

10          THE COURT:  So we'll get to that in a minute, because

11   the other ones we went directly, direct mailings from the TPPs,

12   from the CMS.  I mean, we did direct mailings.  Cash was more

13   challenging.  So I just don't remember, and the problem is, it

14   goes back a long time now, and there have been at least four or

15   five class settlements, not to mention McKesson, and they start

16   jumbling in my mind.  So I think I need to make sure that I'm

17   remembering correctly on the history of why we did things and

18   when we did it.  Okay, I think to create the record here, that

19   would be very useful.

20          All right, so now we have objections and -- well, let

21   me first ask, is there anything else you wanted to say,

22   Mr. Berman?

23          MR. BERMAN:  No, your Honor.

24          THE COURT:  Anything defendants want to say before I

25   get into the objections?

1          MR. BARLEY:  No, your Honor.

2          THE COURT:  Okay.  You're always so quiet at this

3    stage and so lively at all other stages.

4          Now, the objectors, I've got -- I know Mr. Haviland.

5    Well, I've seen them all, so why don't we start with

6    Mr. Haviland, and we'll go from there.

7          MR. HAVILAND:  Your Honor, if it's all right, I'll

8    speak from here?

9          THE COURT:  Fine, good.  Do you have slides or no?

10          MR. HAVILAND:  I don't, your Honor.

11          THE COURT:  All right.

12          MR. HAVILAND:  May it please the Court, Don Haviland,

13    Haviland Hughes, on behalf of what I've called certain named

14    plaintiff objectors.  And to be clear, your Honor, these

15    individuals I've named all came into this case in 2005 at the

16    invitation of class counsel.  Many of them were certified as

17    part of the Track One cases, and I believe nearly all of them

18    were proposed at one point in time as representatives of

19    Track Two litigation class.

20          I think we understand now that class counsel has

21    concluded their proffer, I, like you, were troubled by the late

22    presentation of some of those changes in the numbers.  We have

23    great difficulty today understanding what the settlement means

24    because we know the macro number, the $125 million; we know the

25    split from Mr. Berman's affidavit initially allocating

Page 37

1    $100 million and $25 million to these Class A and B; but for

2    consumers and for my clients, it's very, very difficult to know

3    what they're actually going to get.  And I want to go through

4    that with you because as claims go up, obviously the numbers

5    are going to go down, but I want to look at the snapshot with

6    you today to give you an appreciation of what we think we're

7    looking at in terms of the numbers.

8            You asked --

9            THE COURT:  Now, can I just ask?

10           MR. HAVILAND:  Sure.

11           THE COURT:  I found your brief incredibly hard to

12   follow.  First of all, it was long, but, second of all, it

13   focused on an issue that I want to just make it clear, has it

14   gone away?  There are going to be no cy pres funds?

15           MR. HAVILAND:  That's what I understand from the

16   representation.

17           THE COURT:  So that issue has disappeared?

18           MR. HAVILAND:  Well, the issue of whether or not the

19   original associations can benefit out of this settlement, I

20   think that's gone away by what they've represented.  But that

21   begs the question, Judge, of --

22           THE COURT:  I just want to understand because the

23   first half of the brief was about cy pres funds, and so finally

24   I reach at some point Mr. Berman's brief, I think, where

25   there's going to be no cy pres funds.  So I just want to make

1   it clear:  From our point of view, that goes away.  There are

2   going to be no cy pres funds, there are no conflict of

3   interests.  It's gone.

4        MR. HAVILAND:  Well, the latter part I don't agree

5   with because I don't think that you can just simply look from a

6   "Monday morning quarterback" perspective back in time and say

7   there was no conflict.  In the process of litigating the case,

8   for all the period of time that there was no consumer

9   representative, you had these associations, and most

10  importantly you had PAL at the table negotiating as the proxy

11  for consumers.  And we have a problem with that.  We have a

12  problem with the Health Care for All entity being at the table.

13  There was no advocate -- and I know my fellow objectors

14  agree -- no one who understood the consumer case in that room

15  advocating just for them.

16        THE COURT:  Why, why?

17        MR. HAVILAND:  Why?

18        THE COURT:  They understand it better than these older

19  people.  I mean, if you came down and just did some reality

20  play, these older folks are sick and old.  And they are

21  probably very well-intentioned, yours as well as -- some of

22  yours did some pretty poor deposition answers too.  And I'm not

23  faulting any of them; they're probably doing the best they can.

24  But the associations understand it.

25        MR. HAVILAND:  Well, what the consumers understand

1   best is writing checks, having to treat with cancer, and then

2   learning that the drug companies have engaged in a scheme to

3   manipulate that.

4         THE COURT:  Sure, sure.

5         MR. HAVILAND:  So they charged the lawyers, strongly

6   so, to go out and advocate, to not accept that the third-party

7   payors are equal to them, to not accept that 17.5 percent is

8   acceptable.  We had a different situation back in

9   GlaxoSmithKline where the consumers got 30 percent, a lot more

10  than they got here, so --

11        THE COURT:  Yes, but let me back you up on Glaxo.

12  You're right, and I do compare across, and that's a very

13  important thing to do, but wasn't that the first settlement way

14  in the beginning before -- they were the first out of the box.

15  They sort of broke the logjam.  We didn't really understand the

16  issues or we weren't as nuanced as we are now.  When was that,

17  2000 -- it was the first one, right?

18        MR. BERMAN:  It was the first one.

19        THE COURT:  It was the first one, so you're right,

20  but --

21        MR. HAVILAND:  And I think the lesson in that, Judge,

22  if I may, is that we've learned that the consumer claims are

23  strongest.  I think at that time we were still engaged in a

24  belief that the TPPs had really strong claims.  They hadn't

25  been tried yet.  This whole issue of the knowledge defense

1    hadn't been developed.  The speed limit hadn't been imposed,

2    all of those things.  So I agree with you.  But you look at the

3    30 percent that was negotiated there at arm's length and you

4    look at where we are now, there's no one in this room that

5    would say that the consumers knew anything, and yet we find

6    them falling further and further behind as these cases develop.

7    You look at the AstraZeneca, you look at BMS, and you look at

8    where we are now, we're at 17 percent.  And here's the most

9    important point about that, Judge:  That negotiation took place

10   over one day with PAL and HCFA in the room, okay?

11            THE COURT:  Which one?

12            MR. HAVILAND:  The Health Care for All entity, their

13   counsel was there.

14            THE COURT:  Wait.  Which negotiation, for Glaxo?

15            MR. HAVILAND:  The allocation, the split.

16            THE COURT:  For this one or for Glaxo?

17            MR. HAVILAND:  For this one.

18            THE COURT:  All right.  But they were involved in all

19   of them, weren't they?

20            MR. HAVILAND:  Well, I don't believe so, your Honor.

21   I don't believe so.

22            THE COURT:  Were they?

23            MR. BERMAN:  I'm sorry, what was the question?

24            THE COURT:  Were all these associations involved in

25   the other settlements?

1          MR. BERMAN:  Yes.  They've been involved in every

2     settlement.

3          THE COURT:  In every settlement.

4          MR. HAVILAND:  Well, I don't remember them being there

5     in AstraZeneca, but, regardless, we're going downhill; and

6     there's no explanation for that, for why the consumers are

7     getting less and less as we going forward in this case.  And

8     here's the problem:  Now you have a stark situation where the

9     consumers don't have enough money to fulfill what the promise

10    was.  The promise was:  You can get 3X, heartland drugs.  We

11    recognize that folks who took Amgen products, you were most

12    harmed.

13         But now we're seeing, just today, let's take this

14    little bit of money, and let's just shuffle it around and try

15    to justify an initial allocation that was inadequate.  And

16    that's the problem, your Honor.  That's the problem.  You

17    didn't have a serious negotiation there over the course of one

18    day.  One day that allocation was done.

19         The recommendation of class counsel for the initial

20    split of $100 million/$25 million, somehow those advocates gave

21    up that split, and now it's 70/30.  So the Class A drugs, it's

22    only 70 percent of the pot, and the Class B drugs got more.

23    And now you're seeing another allocation trying to adjust those

24    numbers around.  It's getting difficult to follow the moving

25    target, and we won't know the end until July 1 when the claims

1    are fully done, but this is a substantial claims amount.

2    There's a lot of people in this group that are making claims.

3         I don't want to pass over the concerns we have about

4    the conflicts in this case because having PAL in this case from

5    the beginning, having Health Care for All at the table, at the

6    choice of class counsel, a client of theirs, is a conflict.  It

7    should have been dealt with then; it hasn't been dealt with.

8    So we're not giving up on that.  The problem we have is --

9         THE COURT:  You're just saying it's a different

10   conflict from the cy pres conflict?

11        MR. HAVILAND:  Correct.  That was an issue at the

12   time.  It was an issue in AstraZeneca when there was a part of

13   the negotiation that tried to set some money aside for PAL.

14   Here it was done in a room --

15        THE COURT:  Well, it never happened, right?

16        MR. HAVILAND:  Well, it never happened because your

17   Honor agreed with the objection that there was too much money

18   out there.  And you remember in AstraZeneca it was reduced

19   substantially, the cy pres, so it got fixed, as in BMS, BMS got

20   fixed.  But if you're going to look at the fact that these

21   entities stood as representatives of the consumers, you have to

22   question their adequacy when you see that these settlements

23   keep getting fixed.  AstraZeneca, the cy pres negotiated got

24   fixed.  BMS, it got increased.

25        And that brings me to Mr. Swayze and those associations.

1   They were perfectly happy with BMS.  Reverend Aaronson was not.

2   And you ask, what does a consumer bring?  Well, there is an

3   individual who was deposed twice, lost his wife in the service

4   of this case, but understands that aspect of his situation,

5   understands the drugs his wife took, understands the payments

6   he made --

7            THE COURT:  I didn't say what do they bring?  I

8   said -- first of all, they're constitutionally required, but,

9   second of all, the true nuances of how you negotiate are, as a

10  practical matter, never going to be left to them.  They just

11  need to be there to make sure they think it's fair.

12           MR. HAVILAND:  Agreed, they need to be there.  I agree

13  with you.  And I think your Honor raised a very important

14  issue, I think a very important legal issue.  This is the first

15  case that I can fathom where you've had the class

16  representatives pulled out of the settlement pool, folks that

17  made claims.  Class counsel cite for all the representatives

18  the actual CMS database as evidence that those folks actually

19  took an AWP Track Two drug, paid based on AWP.  That's nothing

20  but data.  But they obviously went to that claim database to

21  say, let's get these three or four people to come in.

22           THE COURT:  So at the end of this day, from your point

23  of view, you don't want the class to be certified.  Your bottom

24  line is:  No class, no payment to anyone?

25           MR. HAVILAND:  I want to go through those issues with

1    you; number one, their standing.

2          THE COURT:  Is that right?

3          MR. HAVILAND:  Well, there's a question of standing,

4    Judge.  This Court doesn't have jurisdiction if there's not a

5    party.  That's what it comes down to.  You don't start --

6          THE COURT:  Excuse me.  There will clearly be parties.

7    The issue is whether or not they're fair and adequate class

8    representatives.

9          MR. HAVILAND:  That's an additional consideration.

10          THE COURT:  Not an additional.  It is the

11    consideration.  They've provided documentation, right?

12          MR. HAVILAND:  Right, and I want to go through that.

13    We do object to the motion to add, and I'll go through that

14    with you because I think what you've got here is a proffer that

15    is nothing near what this Court called for in August, 2005,

16    what the defendants called for when they were in a litigative

17    posture.  And in answer to the question you raised, Judge,

18    Amchem doesn't give us a free pass.  Amchem says very clearly

19    that not only do you have to meet all the requisite for class

20    certification except for manageability, but the attention you

21    must apply is heightened at this stage, and especially

22    adequacy.  That's what Amchem was all about.  They were

23    concerned that there were all of these compromises made for

24    future claims and such, and the Supreme Court said:  You better

25    get it right then because the last time you're going to see

1  this case in settlement is now, because if you let it go, then

2  it will go on for years and years --

3          THE COURT:  So your bottom line is, there's no class,

4  right?

5          MR. HAVILAND:  There's no class.

6          THE COURT:  Right.  So your bottom line is that no one

7  gets a penny?

8          MR. HAVILAND:  My bottom line is:  This case can't be

9  settled.  That's my bottom line right here.

10          THE COURT:  Right, nobody gets a penny, that's what

11  you want.

12          MR. HAVILAND:  No, that's not what I want, your Honor.

13  What I want to do is go through with you what these folks have

14  done so that we could try to parse that.  I think they put

15  something up for Amgen.  And you're going to be challenged now,

16  Judge, what do you do about Amgen because you've been given a

17  blind settlement.

18          THE COURT:  Say it again now?

19          MR. HAVILAND:  Amgen, one of the defendants.

20  Mr. Barely is here.

21          THE COURT:  I missed the point, I'm sorry.

22          MR. HAVILAND:  The point is -- let me just go through

23  these representatives with you, if I may, because the brief

24  period for the motion is not for another day, but we have today

25  to talk about these folks.

1          The decision tree was established by the defendants.

2   First, your Honor pointed out in your August, 2005 decision

3   what needs to be shown, and I think it's very clear when you

4   said, "When plaintiffs amend the complaint to propose

5   additional class representatives, they shall allege facts

6   demonstrating typicality and adequacy of the class

7   representatives, and disclose the documents demonstrating that

8   the proposed class representatives made co-insurance payments,

9   at least in part, under Medicare Part B based on AWP."  That's

10  what you said.  And that was in response to defense objections

11  in the litigation posture.  And I looked at the Pharmacia

12  objection, Track Two, and they made a very clear objection that

13  there has to be four elements that are established:  You've got

14  to have a payment.  You've got to have a Track Two drug.  It's

15  got to be during the relevant time period up to 2003, and it

16  has to be a payment based on a published AWP by a Track Two

17  defendant.

18          Now, what you have here is four individuals, and we

19  have struggled to try to get some information about their

20  payments, why they claim to have standing.  What we got was, in

21  response to Judge Bowler's order, three pages for one of the

22  individuals, which I'll get to in a moment.  But for the first

23  individual -- and I think, your Honor, they filed of record the

24  letter of transmittal.  It's on the ECF, and I believe that the

25  documents are under seal, so I don't have copies for the Court,

1    but I will go through and try to make clear what the documents

2    are in terms of the reference.

3              First, you've got Ms. Tonacchio.  And I think the last

4    time we were together, Judge, we talked about that

5    Ms. Tonacchio at best would demonstrate a payment for an

6    Aventis drug, so one company.  But all the questions we raised

7    at that time about the lone record that she has attached.

8    There's a document -- there's only a couple of pages of the

9    multipage document produced.  We asked for and I believe

10   Judge Bowler clearly ordered that a full production be made of

11   all the billing payment records, because the snapshot we have

12   is just pieces lifted out of the record.  It doesn't show you

13   the beginning, who all the covered, the entities are, whether

14   it's Medicare Part B, supplemental insurer, and in the end, the

15   true-up by the provider as to who's paying for what, and then

16   the attachment of the Track Two settlement notice form which we

17   got today.  That's one of the six documents we got today, your

18   Honor.  You asked the number.  At noon today -- seven, I'm

19   sorry -- the claim form for Ms. Tonacchio was handed to us,

20   which doesn't add anything.  It just shows what the data shows.

21   It doesn't show that Ms. Tonacchio actually made any payment

22   for the Anzemet drug.

23              Now, we've fully briefed Ms. Tonacchio several times,

24   so I won't spend any time.  You have before you Mr. Trusky.

25   Now, he --

74d21743-9b43-4b78-9475-0e39fbd0275a

1      THE COURT:  You know what, this is actually not going

2  to be helpful to me actually.

3      MR. HAVILAND:  I'm happy to file a brief.

4      THE COURT:  You're going to file an opposition

5  tomorrow, is that what you're going to do?

6      MR. HAVILAND:  Yes, your Honor.

7      THE COURT:  And then we'll have all these documents

8  attached, and I'll just have to go through them.  And the

9  question at the end of the day is, if there's a payment, I'm

10 going to allow them.  You know, if there's a documented payment

11 or an obligation, I guess is the other thing, I'm going to

12 allow them to be class reps.  Now, whether they're enough,

13 that's what the thing is that's worrisome to me because the

14 legal piece we couldn't find case law on is so late in the

15 game, and that's why I'm struggling with the association issue.

16      I'm also struggling with, Mr. Haviland, I mean,

17 despite -- I worry that the real motive here is to just defeat

18 any payments whatsoever to the class at any time.

19      MR. HAVILAND:  Your Honor, I would have hoped that you

20 wouldn't have that belief because I think --

21      THE COURT:  Well, but that's the concern.  At the end

22 of this rainbow, what you're asking me to do is not certify the

23 class and provide any payments to these people at all.

24      MR. HAVILAND:  Your Honor, what I'm asking you to do

25 is follow through on the thing that you asked everybody, and

74d21743-9b43-4b78-9475-0e39fbd0275a

1    that's be reasonable with one another.  And I have to report to

2    you because you asked me to take charge of that, and I reached

3    out to class counsel.  They seem to be bent on making this a

4    battle.  They really do not want to talk reasonably.  I sent an

5    e-mail solicitation, could we talk?  They didn't respond.  I

6    had breakfast with Eric Green in Philadelphia at his behest.

7    We spent two hours together to try to talk about how we could

8    work through these issues.

9            I learned today the things they've done.  That was

10   weeks ago.  They chose not to involve us.  They chose not to

11   have my client, who clearly took a Dey product, there's no

12   question in this record --

13           THE COURT:  Took a --

14           MR. HAVILAND:  A Dey product, one of the Track Two

15   defendants.  Instead they'd rather substitute someone in that I

16   think didn't because there's no evidence of payment.  And

17   there's probably a good reason for that, because that

18   individual doesn't know any better.  That individual was pulled

19   out of the database --

20           MR. HAVILAND:  So what you are essentially doing,

21   proposing your clients as additional class reps?

22           MR. HAVILAND:  I talked to Eric Green about a number

23   of proposals in the context of trying to make a resolution,

24   trying to have some traction so that there could be a real

25   negotiation --

1          THE COURT:  Excuse me.  Is your proposal on the table

2     now to have your people be class reps?

3          MR. HAVILAND:  I made a proposal to Professor Green.

4     I never heard back.

5          THE COURT:  You're not answering my question.

6          MR. HAVILAND:  Okay.

7          THE COURT:  My question is, you seem to be finding --

8     and maybe you're right -- this, that, and the other problems

9     with these class reps.  Maybe you're right, maybe you're wrong.

10    Have you proposed your people as class reps?

11         MR. HAVILAND:  I haven't.

12         THE COURT:  You have not?

13         MR. HAVILAND:  I have not.

14         THE COURT:  All right.

15         MR. HAVILAND:  But with Eric Green, I talked about a

16    number of proposals in the context of trying to talk about this

17    settlement.  There is no adequate representative, which opens

18    the door to an intervention.  I know one of the objectors

19    sought intervention, and they were resoundingly fought.  So, I

20    mean, that's the problem we have.  Your Honor deemed my clients

21    withdrawn --

22         THE COURT:  Well, they did withdraw.  Is this the case

23    they withdrew from, or is that another one?  They withdrew

24    from --

25         MR. HAVILAND:  It was during the Track Two

1    litigation --

2             THE COURT:  You withdrew from everything, didn't you?

3             MR. HAVILAND:  They filed affidavits asking to have me

4    serve as counsel, yes --

5             THE COURT:  You withdrew from --

6             MR. HAVILAND:  -- and you deemed that a withdrawal.

7             THE COURT:  Excuse me.  We went through this game last

8    time.

9             MR. HAVILAND:  We did.

10            THE COURT:  You did, thank you.  So it's not an option

11   for me, right?  You withdrew.  So, I mean, I have what I have,

12   and they'll either pass muster or not pass muster.  And if they

13   do pass muster, they've made the payment; I will allow them to

14   be class reps.  I am worried a little bit about how late this

15   is, and that's just a legal question that I'm going to have to

16   grapple with.

17            MR. HAVILAND:  And I want you to know, from our

18   perspective, we've not found one case where substitution was

19   allowed post-settlement because the policy implications of

20   that --

21            THE COURT:  Excuse me.  Can I ask you this.

22            MR. HAVILAND:  Yes.

23            THE COURT:  Did you find any that -- we actually came

24   up with a blank -- did you find any that denied substitution so

25   late?

1           MR. HAVILAND:  No.  It's a novel concept if they --

2           THE COURT:  It is novel, all right, okay.

3           MR. HAVILAND:  -- are looking into a settlement

4    database for a client.  That's the problem.

5           THE COURT:  I agree with you, it's novel.  It's novel.

6    And so we found some marginal cases that would be a little

7    helpful in discussing.  It's new, and I wish it weren't so

8    late, but that's what I've got.  But I just want to make it

9    clear for the record, you are not proposing your people as

10   class reps?

11          MR. HAVILAND:  Not at this time, your Honor.

12          THE COURT:  So at the end of this rainbow, if you win,

13   there's no money for anybody, right?

14          MR. HAVILAND:  I don't know what's going to happen

15   after tomorrow, your Honor.

16          THE COURT:  Okay.

17          MR. MATT:  Your Honor, can we respond just very

18   briefly?

19          THE COURT:  Yes.

20          MR. MATT:  We had a process in place with

21   Professor Green, and I'm not going to disclose what we've

22   discussed with Professor Green because I think it would be

23   inappropriate because the mediation privilege does apply.  We

24   are still involved this that process.  Mr. Haviland has not

25   heard from us because we are still dealing with trying to get

1    this data down, and that's why we presented numbers for you

2    today.  We're not intentionally delaying.

3              THE COURT:  Mr. Matt, can I just say, one of the

4    problems I have is, there's thinly veiled hostility and there

5    has been for a while.

6              MR. MATT:  I didn't know it was veiled.

7              (Laughter.)

8              THE COURT:  All right, I think you say it better than

9    I did.  There is hostility.  I'm trying to be nice here, you

10   know, sort of like "I'm okay, you're okay"?  So there's

11   hostility here.

12             So you all were able to work something out with the

13   Bristol—Meyers suit, with huge efforts on Professor Green's

14   part, for which I am always indebted; but it is a little

15   troubling when you don't let him know that you were going to

16   propose this whole thing when you knew he was going to stand up

17   here and be upset.  The others are newer to it, but we know the

18   ongoing issue with Mr. Haviland.  So it would have been nice to

19   have called him and let him know.  You knew this was going to

20   come today.  So now I can't resolve this today, and everybody's

21   going to want to see these numbers in the briefs, and I'm going

22   to get another round of briefing, and it's going to be

23   complicated.

24             So, in any event, is there anything else, Mr. Haviland?

25   so you'll file something tomorrow or whenever it is on the

1    opposition to the class reps.

2         MR. HAVILAND:  Yes, your Honor.

3         THE COURT:  And then if there's a brief reply you

4    want, within a week or something like that.  All right, so are

5    there any other issues?

6         MR. HAVILAND:  Two other points I wanted to raise

7    which have to do with the settlement, but it's a little

8    difficult to get our arms around the issue now, but I did want

9    to make a record on where we are today.  The first issue, we've

10   lodged an objection to the overall settlement amount.  I have a

11   chart I'd like to mark as an exhibit.  We could call it named

12   Plaintiffs' Exhibit 1, which is an effort to try to respond to

13   your Honor's comment about what's happening out there in the

14   other cases.  You used the term "apples and oranges," and I

15   want to point out to you what the states are doing in

16   coordination under CMO 9 --

17        THE COURT:  Have you filed this before either?

18        MR. HAVILAND:  I haven't.  It's a demonstrative.  We

19   filed earlier, your Honor, of record an attachment that listed

20   some of these values.  This is a demonstrative.  Your Honor has

21   the ability to call any of these states, including

22   Massachusetts, to see these resolutions that have happened.

23   You will see that over $200 million has been recovered from

24   these Track Two defendants, not counting the amount of money

25   that was done by blind settlements.

1            THE COURT:  $200 million who, by the Attorney

2    Generals?

3            MR. HAVILAND:  Yes, your Honor.

4            THE COURT:  What kind of cases were they?

5            MR. HAVILAND:  Medicaid cases.

6            THE COURT:  False Claims Act cases?

7            MR. HAVILAND:  False Claims and consumer fraud.  In

8    Wisconsin, Kentucky, Pennsylvania, and other states, they

9    allege consumer fraud just like here.  And the result is, these

10   defendants have paid money.  They paid --

11           THE COURT:  Did any individual -- it wasn't a class

12   action.  It was an individual collections.  This is the AG as

13   parens patriae or something?

14           MR. HAVILAND:  No.  I don't think anyone has

15   parens patriae.  In Pennsylvania we pursued that, but when we

16   went to trial, we didn't pursue that claim.  It's strictly

17   Medicaid.

18           THE COURT:  Yes, it's the False Claims Act.  I've

19   done, unfortunately --

20           MR. HAVILAND:  Well, the "apples and oranges" part is

21   the part that I wanted to talk to your Honor about.  If you

22   think about it, the Medicaid population is the subset of the

23   population before this Court.  You've got consumers and

24   third-party payors around the country in various states.  So

25   you're just looking at the Medicaid population when you see

1    that settlement or that verdict.

2            THE COURT:  Okay.  Well, I'll take the exhibit.  I

3    just want to understand:  They're False Claims Act or Medicaid

4    fraud cases, right, kind of thing?

5            MR. HAVILAND:  Yes, your Honor.

6            (Exhibit 1 received in evidence.)

7            MR. HAVILAND:  Your Honor, the chart is -- the

8    information that we had the last time in 2009, I think that

9    there have been some subtle updates, but the yellow boxes are

10   strictly individualized settlements that are publicly

11   available.  I can tell you that we have a coalition of the

12   states that worked together cooperatively.  Mr. Berman's states

13   is now part of that, so I don't have Nevada and Montana on

14   here.  I don't know what they've recovered there.  But for the

15   coalition, this is what they've recovered.  If you look at what

16   Abbott has paid, over $46 million; what Amgen with Immunex has

17   paid, over $15 million.

18           THE COURT:  And these are to the states, right?

19           MR. HAVILAND:  To the states, Medicaid program for

20   false claims and -- but my sense is that most of the cases have

21   these consumer fraud claims, your Honor, and that's where the

22   trials have been conducted.

23           THE COURT:  Can you put it on the screen just so

24   everyone can see.

25           MR. HAVILAND:  Sure.  I'm not as handy here, but I'll

1   pop that on.

2          Okay, so as I said, your Honor, Abbott has paid over

3   $46 million.  We can't see the blind settlements that were

4   done, say in Alabama.  $85 million was paid, of which Abbott

5   was a part, along with Aventis and I believe ZLB Behring.  So

6   there's some portion there, and you would bump up the amount

7   that Abbott paid.  But, remember, your Honor, this is just a

8   few states in the fifty you have before you.  So we're trying

9   to get a snapshot of what is out there, what's possible in the

10  various state courts.

11         You've got Baxter paying $23 million.  You can't

12  reverse engineer what they paid in Pennsylvania to my state

13  because it was Amgen, Boehringer, and Baxter combined that paid

14  $18 million.  Across the board you've got $9.4 million for

15  Pharmacia, Gensia Sicor.

16         The dollar signs, your Honor, we wanted to point out

17  that there are a number of undisclosed settlement amounts, but

18  your Honor could find that out.  Those states for some reason

19  reached agreement with those defendants not to disclose to the

20  group what the settlement amounts were, but you can see a

21  number of dollar signs paid by these folks around the country,

22  which are just going to take the $200 million up higher.

23         So I wanted to respond to the critique by Mr. Berman

24  last time that this isn't a fair comparison.  This is AWP.

25  These are cases that have been litigating parallel to, ahead

1   of, and in tandem with this case, including the Massachusetts

2   action you have before you, and I know you have the New York

3   counties.

4           THE COURT:  Yes, but let me just say, I don't

5   obviously know every single one of these states, but I've had

6   some of them, and they tend to be the Medicaid reimbursements

7   for these drugs, so that's different than the co-pays from a

8   consumer.

9           MR. HAVILAND:  It's true, but the Medicaid program is

10  just the TPP.  I know in many cases where the settlements have

11  happened it's just another third-party payor.

12          THE COURT:  That's why it's hard to compare apples to

13  apples when you're looking at what the -- you're saying the

14  consumer portion is too small.

15          MR. HAVILAND:  No, I'm looking at the $125 million.  I

16  have two points I wanted to make before I sat down.

17          THE COURT:  I see.

18          MR. HAVILAND:  The overall settlement of $125 million

19  you can look at just as to these defendants, and there's

20  already over $200 million, and the grid is not done yet.  The

21  states aren't finished with these defendants around the

22  country.  That's the point I tried to make earlier.  Here is a

23  better representation of those numbers.

24          The second point is how this has been allocated.

25          THE COURT:  So you're saying the TPPs didn't get as

1    good a deal as they should have because you say that's the

2    comparative group?

3                 MR. HAVILAND:  I'm saying that that's just one -- if

4    you just look at the TPPs, Judge, you've got $200 million.  You

5    haven't even looked at the consumer piece of it in the overall

6    scheme of things.

7                 The other issue that I believe is going to come up

8    when you start looking at the issue of what can you have in

9    this case, and there has been a presentation of a

10   representative for Amgen.  It looks to us that he paid in '04,

11   so he's outside the class period.  He's in the -- you have the

12   heartland period, then you have somebody in '04.

13                THE COURT:  What are we talking about now?

14                MR. HAVILAND:  I'm going back to the representative

15   issue for one point before I leave to go back to Philadelphia.

16   You have the opportunity to go look at these allocations.  This

17   is the point I want to make to you, Judge.

18                THE COURT:  All right.

19                MR. HAVILAND:  It's a blind settlement but not

20   necessarily to you.  Under the settlement agreement -- well,

21   first of all, Eric Green has something called the "final

22   Track Two funding document" where these portions that were paid

23   by all these defendants to make up $125 million are disclosed.

24   In the settlement document at Paragraph III-B-2, you'll see the

25   confidentiality provision.  And that's Docket 5133, Judge.  It

1    doesn't make it confidential as to you.  It makes it

2    confidential as to everybody else who'd like to see how these

3    various defendants paid their various amounts so we could

4    understand whether Amgen paid a fair amount.  But you can look

5    at that.  You can see like, as you did I think in the Schering

6    case, there was an X amount of money proposed, you made some

7    recommendations to reconfigure, and it was reconfigured.  So

8    I'm not suggesting that this case couldn't go forward in some

9    part.  It sounds like and it may be, if you accept '04, this

10   individual that's outside the heartland period, he had a credit

11   card payment, and that if that's paid in the '04 period and you

12   accept that, then he's a representative for Amgen.

13        Now, the other drugs he lists are generic

14   multi-source.  He doesn't identify the brand manufacturer.  I

15   wanted to let you know that, that there is an ability for you,

16   Judge, to look inside to the bones of the settlement and

17   understand the pieces of it.

18        The second part, the allocation, this is a concern for

19   all the folks that have come to object.  It's certainly a

20   concern of ours.  The allocation, the 17.5 percent, is the

21   lowest we've seen.  And I want to show you a representation of

22   that.  This is something that we sent to class counsel in BMS

23   which helped to facilitate, I believe, the renegotiation and

24   ultimately got to a number that was acceptable to my client.

25        May I approach, your Honor?

74d21743-9b43-4b78-9475-0e39fbd0275a

1          THE COURT:  Sure.  Have you given this to the other

2   side?

3          MR. HAVILAND:  I will.

4          THE CLERK:  Should I mark it as an exhibit?

5          THE COURT:  I wouldn't mark it as an exhibit yet.

6   What is it?

7          MR. HAVILAND:  Named Plaintiff Exhibit 2, and I

8   believe the numbers on here represent where we are today.  I

9   looked at the slides that were presented by Mr. Berman, and

10  nothing has changed in terms of the number of claims.  But if

11  you just take the 17.5, 82.5, and attorneys' fees, working down

12  from $125 million, carving out the fees, assuming you order

13  30 percent, you then get a split of about 87.5.  I'm not taking

14  account the quick pay for the TPPs, but looking at just the

15  consumer piece, we wanted to break down the further allocation

16  from the original $125 million, which, as I said, was 80/20.

17  We ended up at 70.3 and 29.7, which values actually come out to

18  about $10.7 million and $4.5 million.  I've got my notes right

19  here.

20         THE COURT:  Yes, can you put it on the screen.  And,

21  also, I can't -- you're going too fast for me.  I'm just trying

22  to --

23         MR. HAVILAND:  Let me just point out where I

24  went down.  There's the total settlement amount.  Over here

25  you've got the breakdown between the consumers and the TPPs and

1   the attorneys' fees.  And if you take those numbers and apply

2   them against the hundred percentile of the settlement, that's

3   your rough split, not counting the quick pay.

4          Attorneys' fees are over here at 37.5.  Taking that

5   all together and netting out the fees, you get to 87.5.

6   Now, if you apply those percentages you split, you end up at

7   the 72 and 15.  That's the number that we're looking at, the 15

8   for the consumers.  And that's it.  What we heard today was not

9   what happened in BMS, Judge, and I wanted to be clear with you

10  about this.  In BMS we went and got more money from the TPPs.

11  That's not what they're proposing here.  They're just proposing

12  to reallocate the money that's already been allocated to

13  consumers, and we're seeing a real decline in the amount of

14  claims being paid out.  But the Class 1 consumer allocation was

15  $10.7 million.  Class 3 is $4.5 million.

16         Applying the claims filed, we're trying to come up

17  with a sense for what we could tell our clients you can expect

18  because we don't know how they're going to crush these claims

19  down at the end of the day; but Class 1 looks to be getting, if

20  you just do across the board claims into the amount available,

21  about $122.  Now, as I say, that's the average claim across the

22  board.  Some will get more, some will get less, and the claims

23  may go up.

24         On Class 3 it's higher.  It's $218, and that's based

25  on existing claims.  I wanted to do this run so that I could

74d21743-9b43-4b78-9475-0e39fbd0275a

1    see how different Class 1 was versus Class 3, and it's

2    surprising to us that the Class 3 consumers would get $100 more

3    as we stand here today.  That's before you do any kind of

4    reallocation, reshuffling things around.  It's just taking the

5    amount of money that was initially allocated by these consumer

6    allocation counsel, and now I have to explain to our clients,

7    "You're going to look at something like a hundred bucks until I

8    can actually see how they do these claims."  And that's a

9    hundred bucks, Judge.  We could spend a long time talking about

10   the merits of the Amgen claim.  I wanted to show you the other

11   states because they've litigated those cases.

12           The last point I wanted to make to you is about the

13   scope of the release, and I've raised this issue with you

14   before.  I now understand from what Mr. Berman said to you at

15   the end of the last hearing in '09, the Exhibit B to the

16   settlement agreement is a document that lists all the drugs

17   named in the complaint.  And this is important, Judge, because

18   when you look at the Class A/Class B issue, it's not accurate

19   to say Class B is all multi-source drugs.  You've got drugs

20   like Enbrel.  It's a brand Amgen arthritic drug just like

21   Remicade, which I know you remember from the Johnson & Johnson

22   case.  And it's on the list, and it never should have been

23   there because the defendants moved to strike.  And they

24   succeeded in that.  Your Honor twice ruled, in 2006 and 2007,

25   "no new drugs."

1    So I didn't understand till you asked Mr. Berman about our

2    concern about new drugs being added.  That list, Exhibit B, is

3    a list of everything that was listed in the amended complaint.

4    The defendants attacked that and said, "No, we object," and

5    your Honor agreed.  And they have a chart to their motion to

6    strike the chart that the class counsel put in on Track Two

7    litigation class.  And let me just give you the documents, and

8    then I'll conclude.

9         THE COURT:  Was this in your brief?

10        MR. HAVILAND:  It is, your Honor, but I didn't have

11   the ability to know what Mr. Berman was saying about the new

12   drugs.  We raised the issue of no new drugs, but he represented

13   to the Court that the exhibit they put into the settlement

14   agreement was an accepted group of drugs.  It's not because the

15   defendants fought that successfully.

16        The group of drugs is actually the group of drugs that

17   is on a chart that the defendants put in the litigation class

18   certification.  That's what should be the limits of this

19   release.  You said, "Why am I concerned about that?"  Because

20   if you add Enbrel, you're taking folks who never even had a

21   claim litigated, shouldn't have had a claim settled, and

22   they're diminishing those numbers.  I'm trying to get that

23   number up to the highest value, obviously.  I'm looking at $100

24   for a Class 1 consumer, just looking at per capita; but when

25   you start adding in dozens of drugs, brand drugs --

1        THE COURT:  Are you saying there are dozens that

2   weren't in the initial complaint?

3        MR. HAVILAND:  Dozens.  No, they were in there, Judge,

4   but you struck them, you see?  They were never litigated.  The

5   defendants didn't want them in the case.  You agreed.  They

6   came back in this settlement.  I pointed out to you twelve --

7        THE COURT:  I can't -- this case has been running a

8   decade.  Why did I strike them, because of untimely or lack of

9   merit?

10        MR. HAVILAND:  Untimely.  You said there's a limit to

11   this case.  There was no discovery.  You took them out of the

12   case, so there was never any discovery, so how can we stand

13   before the Court --

14        THE COURT:  I hear that point.  I'll ask them.

15        MR. HAVILAND:  -- and say there's no merit when we

16   don't know the discovery of it?  So I've got a --

17        THE COURT:  I want you to give them a list of the ones

18   that I struck and that you think shouldn't be in the release.

19        MR. HAVILAND:  I will do that, Judge.  I have the

20   reference to the documents.  I'll just tell the Court.  The

21   list Mr. Berman talked to you about in '09 was Docket 5133.

22   That's Exhibit B.  The defendants' motion to strike was

23   Docket 3500.  In that document, which actually has an exhibit

24   to it, took the plaintiffs' chart that was the litigation group

25   of drugs, and then did a lot of red line and strike-out, and it

74d21743-9b43-4b78-9475-0e39fbd0275a

1    has a series of notes saying, "This one was stricken, this one

2    was stricken, this one was never pled."  So I won't burden the

3    Court with it, but it's dozens of drugs.  When I talk to you

4    about just Trelstar and Eligard, it's because I have two

5    clients that were never in this case, and then they got brought

6    into the case, and they're asking me, "Well, what am I going to

7    get for Trelstar?"  I have no clue because it was never in the

8    case.

9            THE COURT:  Well, thank you.  Thank you for raising

10   that.  I've got all these other objectors to get to, and I want

11   to make sure they don't have to come back.

12           MR. HAVILAND:  Thank you, Judge.

13           THE COURT:  So thank you.  Did you want to respond

14   now, or should we wait till --

15           MR. BERMAN:  I'll be real brief while it's fresh in

16   your mind, your Honor.  Two points really, three points.  One,

17   Mr. Haviland keeps saying that the consumer allocation is going

18   down.  The consumer allocation, and this is in the record

19   before you, was driven in large part, the 82/17 percent split,

20   by Dr. Hartman's utilization numbers.  It was based in

21   scientific study.

22           For all the years that Mr. Haviland has come before

23   this Court and told us these settlements are too low or we're

24   doing it wrong, where's his expert?  Never brought one.  This

25   is all extemporaneous speaking.  No proof, right?  He compares

1    the state Medicaid cases to this case.  I'd love to have a

2    state Medicaid case.  You rejected it.  What did you reject?

3    The zero threshold.  You remember?  In the Johnson & Johnson

4    case, we said any excess spread over zero, it's actionable.

5    You said, no, we had to have 30 percent.  All of those state

6    cases are based on statutory formulas that the theory of the

7    case is zero percent spread.

8           That's not this case, and so I can't make, you know,

9    ice cream out of something that I don't have the right

10   ingredient with.  Based on what we have now, which Mr. Haviland

11   has never addressed -- he's never come in and said, "Here's the

12   good marketing documents.  Here's the good spread documents.

13   Here's real damages based on your threshold."  He's never done

14   it.  It's all a bunch of hot air.

15          THE COURT:  All right, let me ask you this.  I think

16   this came up in one of the other cases, and we didn't add new

17   drugs.  If there were drugs that were struck from -- defendants

18   should focus on this too -- if it wasn't part of the complaint

19   and I struck it, why is it part of the release?

20          MR. BERMAN:  I have to confess, since I don't recall

21   Mr. Haviland raising this, I didn't go through his 70-page

22   brief because you had already stricken it once, I have to go

23   refresh myself on this.  I have no recollection what he's

24   talking about, I just don't.

25          THE COURT:  All right, so you'll confer because we

1    shouldn't be releasing drugs that weren't subject to

2    litigation.

3           MR. BARLEY:  If I may, your Honor, they were subject

4    to litigation.  You struck them, but they could have appealed

5    that ruling.  They were in the case at one time, and then they

6    were stricken.

7           THE COURT:  I know, I just --

8           MR. BARLEY:  Well, but that's part of a negotiation of

9    a settlement.

10          THE COURT:  I don't know.  That just adds a whole new

11   wrinkle.  I don't know.

12          MR. BARLEY:  Let me give you an example, your Honor.

13   If there was a complaint that was filed that had ten counts and

14   you dismissed half of them but five went forward, any defendant

15   as part of a settlement would ask for release of all claims.

16   It's no different.

17          THE COURT:  I don't know if it's different.  Do you

18   have case law on it?

19          MR. BARLEY:  We can see if we can find some.

20          MR. MUEHLBERGER:  Yes, your Honor.

21          MR. BARLEY:  I'm sure we do, though.

22          MR. MUEHLBERGER:  For instance, the City Partnership

23   Company case, Atlantic Acquisition that your Honor handled, it

24   was a settlement in which there was an objection to the class

25   settlement before the First Circuit with respect to whether

1    certain derivative claims were ever raised in the lawsuit, and

2    the First and Second Circuit ruled, as other courts have ruled,

3    such as Walmart Stores v. Visa --

4            THE COURT:  No, would you just --

5            MR. MUEHLBERGER:  We'll file a brief.

6            THE COURT:  File like a three-page brief.  But let me

7    ask you this:  Was it -- I don't know whether you can or you

8    can't.  I remember this came up in another litigation where

9    there was a lot that was released that I didn't realize in one

10   of these lengthy appendices.  I don't know.  I would like to

11   know if they're drugs -- and these people who took them are

12   going to get money for those drugs?

13           MR. MUEHLBERGER:  Yes, your Honor.

14           MR. BARLEY:  Yes, your Honor, yes.

15           THE COURT:  And that was in the class notice?

16           MR. MORGAN:  Yes.

17           MR. BARLEY:  Yes, your Honor.

18           MR. MUEHLBERGER:  Yes, your Honor.

19           THE COURT:  So I don't know what the issue is if

20   people are getting paid for them.  If it was in the notice and

21   they're getting the double and the treble, even though they may

22   have not even been litigated, I don't know how there's harm.

23   But you'll do a two- or three-page brief on them, as long as it

24   isn't just something thrown into the release where nobody could

25   collect on it.  So thinking out loud, it's just a new issue for

1  me.  I hadn't focused on it either.

2         Who else wants to argue?

3         MR. PENTZ:  John Pentz, your Honor.  John Pentz on

4  behalf of John Pentz, Jr. and Corinna Connick.  Unlike

5  Mr. Haviland, I'm less concerned with the formal Article III

6  standing of these late-named plaintiffs as I am with the timing

7  of it.  Regardless of whether they can come forward with

8  documents showing that they purchased class drugs from each of

9  the defendants in this case, as your Honor said, the fact that

10  they are coming in now defeats the whole purpose of having an

11  adequate named plaintiff in the case to begin with because the

12  critical times in this case when an adequate consumer plaintiff

13  was needed was when the settlement was being negotiated with

14  the defendants and when these critical allocation decisions

15  were being made by the associations and by their appointed

16  counsel, who didn't represent any class member with standing in

17  the case.  And while --

18         THE COURT:  Well, I think that's actually not

19  necessarily true.  I think there were members of the

20  associations who had standing.  I just said that based on the

21  case law, at least that was in existence at the time, they

22  couldn't be representatives of a litigation class.  As I

23  understand it -- I may be wrong about this -- didn't they have

24  members who actually purchased the drugs?  That was the

25  allegation anyway, right?

Page 71

1           MR. BERMAN:  Yes.

2           THE COURT:  Yes, it was just a question of whether

3     they could be class reps.

4           MR. PENTZ:  Right, but if you can't be a class rep for

5     a litigation class, Amchem says you can't be a class rep in a

6     settlement because --

7           THE COURT:  I wasn't sure.

8           MR. PENTZ:  -- you'd be disarmed.  I think, if you

9     look in Amchem and search for the word "disarmed," that's where

10    the Supreme Court really addresses why you can't do that,

11    because if you can't threaten litigation, then why were you

12    negotiating a settlement or an allocation because what would

13    you threaten if you couldn't go forward or you didn't get what

14    you wanted?

15          THE COURT:  What I'm struggling with is whether if you

16    have class reps with standing, which you do now, who are late

17    filed, but you also have associations who are vigorously

18    fighting for consumers, it's the combination.

19          MR. PENTZ:  No, your Honor, you can't combine them or

20    bootstrap them like that.

21          THE COURT:  I don't know.

22          MR. PENTZ:  But your question to Mr. Haviland earlier

23    was, "Well, what do we do?  We just decertify and go home?"

24    No.  My suggestion in my objection is, first let's vet these

25    new plaintiffs, give Mr. Haviland the opportunity to depose

1    them, to test their adequacy to see if they know the minimum

2    necessary to be class reps.  And you raised a good point

3    earlier, your Honor, that perhaps these elderly, frail named

4    plaintiffs who have come to us through the claims process may

5    not be the best people to negotiate this settlement or the

6    allocation.

7              THE COURT:  The best ones are the lawyers sitting in

8    this room.  I mean, they're going to fight for it.

9              MR. PENTZ:  But here's why the lawyers aren't as good

10   as the actual consumers who are damaged.  Mr. Berman just said

11   they followed the utilization statistics, but in a real

12   negotiation, you wouldn't be bound by that.  And as

13   Mr. Haviland pointed out, in BMS they went back and got more

14   money.

15             THE COURT:  You know, I'm the only one out there in

16   the world who loved the PSLRA, the Private Security Litigation

17   Reform Act, because it got me real plaintiffs who are

18   institutional forces who actually fought and actually were as

19   involved, but as a practical matter, when you have old sick

20   people -- I shouldn't mention my mother -- but, you know, how

21   much are they going to do for you?  They're going to be enough

22   to show that there was harm, and that's what the Constitution

23   requires, that there was harm and that real people were harmed;

24   but it seems a little bit like a fiction when I'm going to say,

25   you know, that they would do a better job than the

1    associations.  That's what I'm struggling with.  I struggled

2    with it a while ago and I struggle with it again.  I just don't

3    know constitutionally what I should do here is what I'm

4    struggling with.

5            So, Mr. Pentz, at the end of the day, what do you

6    want?

7            MR. PENTZ:  Well, I would like your Honor -- I asked

8    for this in my objection -- to appoint new adequate lead

9    plaintiffs who have standing, consumers; then go back and

10   renegotiate this allocation.  I mean, these claims data today,

11   the claims have been so high in this case, which is a good

12   thing, but the allocation was clearly based on an assumption

13   that the claims rate would be much lower.  And this pro rata

14   reduction for the consumers and looking at the new proposed

15   allocation, Epogen is one of the drugs being zeroed out, and

16   one of my clients spent over $1,000 on Epogen out of pocket.

17           THE COURT:  I do agree, they have to explain that.

18           MR. PENTZ:  They're getting nothing now.

19           THE COURT:  Excuse me.  I do agree, they have to

20   explain that, but I haven't approved that.  I'm worried about

21   that, so I'm not going to come in off the bat, but at this

22   point they've got a class rep who hopefully will be involved

23   with that.  That's a big decision for me, and I understand

24   that.

25           MR. PENTZ:  I think, your Honor, the class rep needs

1    to be --

2         THE COURT:  Then don't I just not agree to the

3    reallocation as they're proposing it and just come up with

4    another reallocation, or none?

5         MR. PENTZ:  Well, your Honor, even the original

6    allocation, the one they put in the notice, even that is

7    defective now or inadequate because of the high rate of

8    consumer claims that's going to reduce the actual --

9         THE COURT:  No, no, no, because that's the -- to be

10   honest, that's the silver lining here is, we finally have got

11   it down in how you can find these people.  I mean, they did a

12   terrific job in the claims process as far as I'm concerned.

13   That's the good news.  That's where we've come in a good way

14   since the Glaxo settlement.  I mean, that's what I was

15   struggling with first time around was our yield.  So we've

16   learned, we've learned.  You know, we're sending out direct

17   notices as well as the media campaigns, and that's what I think

18   is producing the numbers.  Now, that creates it's own problems,

19   right, because --

20        MR. PENTZ:  Exactly, right.  I too praise the great

21   take rate here in this case, but it does have a flip side,

22   which is now the claims payouts are going to be so diluted.

23   And Mr. Haviland raised that with respect to the people who

24   purchased drugs that were carved out of this case when it was

25   being litigated; bringing them back in is going to dilute the

Page 75

1    claims of people who really belong in this case and who have

2    litigated claims from the outset and whose drugs were never

3    eliminated from the litigation.

4            THE COURT:  All right, thank you.  By the way, you're

5    representing Ms. Connick, is that it?

6            MR. PENTZ:  That's correct.

7            THE COURT:  She's likely not a member of this class.

8            MR. PENTZ:  Well, yes --

9            THE COURT:  So but you still have -- she's not the one

10   who's got the Epo, right?

11           MR. PENTZ:  Right.  The Epogen was purchased by my

12   other client, John Pentz, Jr.

13           THE COURT:  All right.  You probably don't know this,

14   but I had the first -- my first patent case as a judge, and in

15   fact the first cloning case in the United States of America,

16   involved erythropoietin, which was my case.  So I know Epo very

17   well, brilliantly discovered.  But, anyway -- it's also the

18   subject of these pricing cases.  So, anyway, thank you very

19   much.

20           So we're not going to talk about -- so you're

21   basically, just so I can get this here, challenging -- you're

22   saying, given the large number of people who have now come in

23   the front door, you think it should be renegotiated for a

24   larger amount?

25           MR. PENTZ:  Everything is subject to renegotiation, as

1  evidenced today by this new allocation proposal from

2  Mr. Berman, and from Mr. Haviland's recount of what happened,

3  his experience in the BMS case, where they actually got more

4  money from the TPPs; and that is still possible here.  I mean,

5  the allocation is still subject to modification and

6  renegotiation once you have adequate named plaintiffs.

7           THE COURT:  Thank you.

8           MR. PENTZ:  Thank you.

9           THE COURT:  And who else, Mr. Weatherly?  We have two

10  people here.  All right, so who's representing Mr. Wilson

11  and Ms. Weatherly?

12           MR. LANDRIGAN:  Good afternoon, your Honor.  Richard

13  Landrigan representing Patricia Weatherly.

14           Just to reiterate, her claim, your Honor, she's part

15  of the Class 3 consumer copayment class.  It's a very small

16  group of people, given the universe of claimants in this case.

17  And I see from the information we received today that 21,000

18  claims have been filed by Class 3 consumers, and I presume that

19  includes Ms. Weatherly and others in that small class.

20  However, the universe of potential claimants is very large in

21  this class.  By the class counsels' own figures in their reply

22  brief, the ISHPs identified six percent of the lives at a total

23  of $1.7 million in this class; and if you extrapolate that to a

24  hundred percent, there would be 2.8 million people.  So what we

25  have here is 21,000 claims out of 2,800,000 potential

1   claimants.  That's a rate of about one-tenth of one percent.

2   So contrary to some of my other objector co-counsel, the rate

3   here is very small.  It's one-tenth of one percent or one-half

4   of one percent of the potential universe of people who could

5   have been filing claims, according to the ISHPs's own

6   information.

7          Based on the ISHP information, 960 responses for

8   requests were mailed.  Only 21,000 came back.  That's a return

9   of two percent, and I say that the reason for this, going back

10  to my original objection as to the cost of preparing records to

11  make these claims is a preventive factor.  Another one is the

12  fact that you have to --

13         THE COURT:  Did you ever present any evidence on that?

14  It's been a couple of years.  I remember you raised that.  And

15  since they're requiring so little actually, I sort of didn't

16  end up thinking that proved up.

17         MR. LANDRIGAN:  Well, there is a requirement to prove

18  the cost if you're going to itemize.  Obviously the --

19         THE COURT:  Wouldn't you just do a notarized statement

20  or one bill?  I mean, it was de minimis.  If anything --

21  well --

22         MR. LANDRIGAN:  The other factor, your Honor, and I

23  raised this before, is that the flat fee was so low at $35 that

24  there was a disincentive to file or to prepare all the

25  information needed to --

1           THE COURT:  All you have to do is fill in a form for

2    the $35, right?

3           MR. LANDRIGAN:  Well, arguably, yes, but given the low

4    rate of return, apparently the form was too cumbersome for

5    most --

6           THE COURT:  I just don't know what else you do.  We

7    followed all the things that we're supposed to do:  the easy

8    return, the minimal documentation, the direct mail.  I mean,

9    we've done we can -- at some level I agree, I mean, you'd like

10   to get everybody, but you can only be reasonable about this.

11          MR. LANDRIGAN:  One of the factors I raised in my

12   brief, your Honor, is the fact that when the class counsel

13   published in newspapers and on TV and the Internet banners in

14   December of 2009, they sent people to the website, which showed

15   that the period for filing the claim was already closed.

16          (Discussion off the record.)

17          MR. LANDRIGAN:  So, your Honor, the claims form that

18   was --

19          THE COURT:  Yes, you did say there was a mistake on

20   the website, right?

21          MR. LANDRIGAN:  Right.  Well, if people went to the

22   website, they were given the information that the period to

23   file a claim had already closed.  Again, that's another

24   disincentive for people in this class to file claims.

25          So bottom line, your Honor, there were a number of

1    claims filed, but it's a very small number compared to the

2    universe out there.  And I believe, and I won't say there was a

3    conspiracy to prevent the claims, but I think there was an

4    effort not to have claims filed, given the allocation.  The

5    allocation to this subclass --

6          THE COURT:  I think that's unfounded, but I am worried

7    about that mistake because he did mention it.  Did anyone look

8    at that to see if that's true, that there was a mistake on the

9    claims filing deadline?  I noticed that yesterday.  Did anyone

10   focus on that, that it brings you to a website, he says, and

11   that there was a -- it says claims deadline due, I think it was

12   February, 2009, when in fact it was May, 2010, or something

13   like that, right?

14         MR. LANDRIGAN:  Your Honor, on the website, the

15   website that was published in these ads in December of 2009

16   said that it was closed as of May, 2009.

17         MR. NOTARGIACOMO:  I believe, your Honor, that may

18   have -- I'd have to look into it to be sure, but I believe that

19   was a small glitch for a short period of time.  Once those

20   notices went out, that problem was fixed shortly thereafter so

21   that it's correct.

22         THE COURT:  You mean --

23         MR. NOTARGIACOMO:  On the website.

24         THE COURT:  So the notices, the actual notices that

25   went out --

1    MR. NOTARGIACOMO:  Were correct.

2    THE COURT:  And so what about people who may have come

3    in through the mediation campaign?

4    MR. NOTARGIACOMO:  Well, once those notices went out,

5    the website would have been changed to effect the correct --

6    THE COURT:  All right, so can you just make sure that

7    you check on that and make sure that that's true because I did

8    notice -- that was actually the one thing that grabbed me as I

9    was reading the materials, how many people that might have

10   affected and whether it was correct and that sort of thing.

11   MR. NOTARGIACOMO:  Yes, your Honor.

12   THE COURT:  Thank you for bringing that to my

13   attention.  Is there anything else?

14   MR. LANDRIGAN:  Yes.  As of last week, your Honor, the

15   website is still listing May, 2009, as the closing date.

16   THE COURT:  Well, when was it supposed to have been,

17   May, 2010?

18   MR. LANDRIGAN:  No.  The actual date was February 1,

19   2010.

20   THE COURT:  All right, so why don't you check that and

21   check where the notices are and just let me know what the story

22   is there.

23   MR. LANDRIGAN:  Well, your Honor, with respect to the

24   allocation, 3.5 percent of the allocation was for this

25   particular class of consumers.  That's $763,000.  And, as I

74d21743-9b43-4b78-9475-0e39fbd0275a

1   say, given the nature of the sloppiness in getting the message

2   out to this class of consumers, we indeed have a return that

3   probably matches that low allocation; but had the advertising

4   and the notice been adequate, I think that the return would

5   have been far in excess of what the allocation was, this low

6   allocation for this subgroup of people.

7          THE COURT:  Thank you.  And last but not least,

8   Mr. Wilson's objection?

9          MR. DUGGAN:  Yes, Judge, I don't know that this is the

10  time -- I'm pretty sure it's the place -- but I just want to

11  make sure that the Court has Mr. Wilson's amended objection

12  which was filed in December of '09 before it.  It's Docket

13  No. 6758, and therein Mr. Wilson's objections to attorneys'

14  fees in excess of $10 million were cited.  I would just draw

15  your attention to that and ask you to consider it.

16         THE COURT:  Thank you.

17         MR. DUGGAN:  Thank you.

18         MR. HAVILAND:  Judge --

19         THE COURT:  No.  I think we're pretty done here.

20         MR. HAVILAND:  I had one exhibit I wanted to admit to

21  the record, if your Honor were to allow it.  Exhibit 3 I

22  neglected to hand up to the Court.

23         THE COURT:  What is it?

24         MR. HAVILAND:  It's the original document I was handed

25  down in the cafeteria for Mrs. Swayze.  I wanted to make sure

Page 82

1  that we had the original of record.  It became more important

2  as I was listening to Mr. Berman talk about the Epogen client.

3  The three documents I got two hours before this hearing

4  don't --

5          THE COURT:  You know what, right now you'll brief it,

6  but we'll mark that as Exhibit 3.

7          MR. HAVILAND:  Exhibit 3.  Thank you, Judge.

8          THE COURT:  All right, that's Mrs. Swayze, is that it?

9          MR. HAVILAND:  Yes, and just to be clear, your Honor,

10  these are the original documents that I was given pursuant to

11  Judge Bowler's order, Exhibit 3.

12          THE COURT:  Do you want to make a photocopy and mail

13  them to us?

14          MR. HAVILAND:  No, I think the original is important,

15  Judge, because --

16          THE COURT:  No, excuse me.  I'm happy to take them,

17  but that means you don't have a copy.

18          MR. HAVILAND:  Well, I think they were filed under

19  seal.  The reason I wanted to bring to the Court's attention --

20          THE COURT:  No, not now.  I've been on trial all day.

21  You're going to brief them.  I can't follow if you give on such

22  and such a date and not -- I haven't received any of this

23  briefing.  I don't know the documents.  I don't know the

24  allegations.  I don't know them.

25          MR. HAVILAND:  The document redacts the word

1   "Procrit," Judge.  That's why I want the original of record.

2   The redaction is interesting.  It redacts the word "Procrit."

3         THE COURT:  All right, thank you.  You'll brief it.

4   So Exhibit 3.

5         (Exhibit 3 received in evidence.)

6         THE COURT:  Now, you were going to brief the --

7   explain why you wanted this reallocation and why we're zeroing

8   out Epogen.  I don't understand it, so you're going to brief

9   that.

10        MR. BERMAN:  That's correct.

11        THE COURT:  As far as I'm concerned, the oppositions

12  to the motions to amend should come in tomorrow or they're

13  untimely.  And they have to be within the page limit, within

14  the page limit, no 70-page briefs.  Any replies to any of this

15  should come in within seven days afterwards because I've got to

16  move this thing.  The only thing I'm not a hundred percent sure

17  of is whether I should be holding another hearing because even

18  if I allow this reallocation, I think I have to set up, you all

19  agree, even a new notice campaign, notice thing.  So I think we

20  might have to get -- I'm trying to think.  If you get this --

21  what is it, the first week in July is where we're putting us

22  for a hearing?  I know most people have a life.

23        MR. MACORETTA:  Judge, we're here on July 7 for a BMS

24  hearing, your Honor.

25        THE COURT:  Does July 7 make sense?

1          MR. BERMAN:  For what, your Honor?  I mean, we'll

2     probably file our --

3          (Discussion off the record between the Court and

4     Clerk.)

5          THE COURT:  Just the cleanup on this and what I do on

6     the reallocation and if I --

7          MR. BERMAN:  Well, we're getting the final claims

8     numbers on July 1.

9          THE COURT:  Right.

10          MR. BERMAN:  So we need a little bit of time to study

11     that and make your proposal, so I think we could file our brief

12     by July 7.

13          THE COURT:  Well, just you give me a date.

14          MR. BERMAN:  Okay.

15          THE COURT:  But here's my problem, okay, and I know

16     it's not your problem:  I lose the law clerk who understands

17     the stuff, and I'm starting all over again.  You guys have been

18     doing this for ten years.  I'm a constant theme; some of you

19     are constant themes.  This is our last thing together, right,

20     this and BMS?

21          MR. BERMAN:  Yes, your Honor.

22          THE COURT:  So I want it over by the end of the

23     summer.  That's the essential thing for me.  And also I see,

24     unfortunately, I may have to write.  And last but not least,

25     does it make sense, as you did with BMS, to try and work things

1    out with Mr. Green?

2            MR. BERMAN:  Yes.

3            THE COURT:  So why don't we have a hearing on the 7th

4    when you're going to be here for BMS, and if you find it's just

5    impossible to do the numbers -- I understand it's the week of

6    July 4th, I understand you all have families -- then what we'll

7    do is, you'll move for a continuance and we'll figure out when

8    it's doable, but at least now it's on my plate.  But it can't

9    be August, that's the key thing here; and also my life is more

10   complicated now, so I don't have the same flexibility on

11   timing.

12           So when are you all going to meet with Mr. Green on

13   all of this?

14           MR. BERMAN:  It's up to Mr. Green.  Well, we don't

15   have fixed dates.  We call him, he talks to Mr. Haviland, it

16   goes back and forth.

17           THE COURT:  Well, you need a fixed date because it was

18   successful last time.  And I put on the record again what I did

19   last time:  This is a sick and dying class, and I've already

20   lost two years here.  I don't totally understand why I lost two

21   years, but I did.  There was a fairness hearing supposed to

22   happen in April, 2009.  And to boot, I don't completely --

23   well, I believe a lot of these objections are being made so

24   that there can be an appeal, and that will take another year or

25   two.  It's extremely frustrating to me, but it is what it is.

1  And so I can let it prolong forever and go up on appeal

2  forever, or we can try and work this out, because we have real

3  human beings at the end of this who overpaid for these drugs,

4  some of which were cancer drugs and some of which were not as

5  serious, but some of which was serious, Epogen which I know is

6  for serious illnesses and the like.  So let's try and do it on

7  the 7th, and if I can't, you'll come up with another date, but

8  at least I'll be in this room on the 7th.

9          I do not expect objectors to have to come back.

10  You've made your objections.  There will be permitted no

11  further objections except to this brand-new information that we

12  received today.  Other objections would be considered untimely,

13  but there is new information you and I are both getting, and we

14  have to just figure that out, so on that level I would allow an

15  objection.  But you can do it in writing, and I wouldn't expect

16  you to have to show up here if you've already been here today.

17  So why don't we do that.

18          Why don't you also make the effort to schedule with

19  Mr. Green and see if we can work it out, and if not, I'll try

20  and get an opinion out by the end of the summer, if I have to

21  write everything.  So, fine, thank you.  We'll stand in recess.

22          MR. BERMAN:  Thank you.

23          THE CLERK:  All rise.

24          THE COURT:  You know what, we didn't even discuss

25  attorneys' fees.  I think we can do that next time.

1           MR. BERMAN:  That's fine.

2           THE COURT:  Or do it on the papers, is that

3    satisfactory?

4           MR. BERMAN:  The papers are satisfactory.

5           THE COURT:  All right.

6           (Adjourned, 4:06 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

   UNITED STATES DISTRICT COURT )
4  DISTRICT OF MASSACHUSETTS    ) ss.
   CITY OF BOSTON               )
5

6

7        I, Lee A. Marzilli, Official Federal Court Reporter,

8  do hereby certify that the foregoing transcript, Pages 1

9  through 87 inclusive, was recorded by me stenographically at

10 the time and place aforesaid in Civil Action No. 01-12257-PBS,

11 In Re:  Pharmaceutical Industry Average Wholesale Price

12 Litigation, and thereafter by me reduced to typewriting and is

13 a true and accurate record of the proceedings.

14    In witness whereof I have hereunto set my hand this 19th

15 day of June, 2011.

16

17

18

19

20        /s/ Lee A. Marzilli

          _____
21        LEE A. MARZILLI, CRR
          OFFICIAL FEDERAL COURT REPORTER
22

23

24

25