IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF MASSACHUSETTS


IN RE:                          )
                                )  CA No. 01-12257-PBS
PHARMACEUTICAL INDUSTRY AVERAGE )
WHOLESALE PRICE LITIGATION      )  Pages 1 - 68
                                )




                         SETTLEMENT HEARING

                BEFORE THE HONORABLE PATTI B. SARIS
                    UNITED STATES DISTRICT JUDGE




                        United States District Court
                        1 Courthouse Way, Courtroom 19
                        Boston, Massachusetts
                        July 7, 2011, 9:18 a.m.




                         LEE A. MARZILLI
                      OFFICIAL COURT REPORTER
                   United States District Court
                   1 Courthouse Way, Room 7200
                       Boston, MA  02210
                         (617)345-6787

1   A P P E A R A N C E S :

2   FOR PLAINTIFFS:

3       SEAN R. MATT, ESQ., Hagens Berman Sobol Shapiro, LLP,
    1918 Eigth Avenue, Suite 3300, Seattle, Washington, 98101.
4
        EDWARD NOTARGIACOMO, ESQ., Hagens Berman Sobol Shapiro,
5   LLP, One Main Street, Cambridge, Massachusetts, 02142.

6       JOHN A. MACORETTA, ESQ., Spector Roseman Kodroff & Willis,
    1818 Market Street, Suite 2500, Philadelphia, Pennsylvania,
7   19103.

8       KENNETH A. WEXLER, ESQ., Wexler Wallace, LLP,
    55 West Monroe Street, Suite 3300, Chicago, Illinois, 60603.
9

10  FOR DEFENDANTS:

11      LYNDON M. TRETTER, ESQ., Hogan Lovells US, LLP,
    875 Third Avenue, New York, New York, 10022, for Bristol-Myers
12  Squibb.

13      PETER W. MORGAN, ESQ., Dickstein Shapiro, LLP,
    1825 Eye Street, N.W., Washington, D.C., 20006-5403,
14  for Baxter International, Inc.

15      JAMES P. MUEHLBERGER, ESQ. and MICHAEL L. KOON, ESQ.,
    Shook, Hardy & Bacon, LLP, 2555 Grand Boulevard, Kansas City,
16  Missouri, 64108-2613, for Aventis Pharmaceutical.

17      J. CLAYTON EVERETT, JR., ESQ., Morgan, Lewis & Bockius,
    LLP, 1111 Pennsylvania Avenue, N.W., Washington, D.C., 20004,
18  for Pharmacia Corporation.

19      TINA M. TABACCHI, ESQ., Jones Day,
    77 West Wacker, Chicago, Illinois, 60601-1692,
20  for Abbott Laboratories.

21      KATY E. KOSKI, ESQ., K&L Gates, LLP,
    State Street Financial Center, One Lincoln Street, Boston,
22  Massachusetts, 02111-2950, for Watson Pharmaceuticals, Inc.

23      RICHARD D. RASKIN, ESQ., Sidley Austin, LLP,
    One South Dearborn, Chicago, Illinois, 60603,
24  for Bayer Corporation.

25

1    A P P E A R A N C E S:   (Continued)

2    FOR DEFENDANTS:

3         JASON PARISH, ESQ., Kirkland & Ellis, LLP,
     655 Fifteenth Street, N.W., Washington, D.C., 20005,
4    for Sicor, Inc.

5         CHRISTOPHER C. PALERMO, ESQ., Kelley Drye & Warren, LLP,
     101 Park Avenue, New York, New York, 10178, for Dey, Inc.
6
          ANDREW L. HURST, ESQ., Reed Smith, LLP,
7    1301 K Street, N.W., Suite 1100, East Tower, Washington, D.C.,
     20005, for Fujisawa USA, Inc. and Fujisawa Healthcare, Inc.
8
          JOSEPH H. YOUNG, ESQ., Hogan Lovells US, LLP,
9    Harbor East, 100 International Drive, Suite 2000, Baltimore,
     Maryland, 21202, for Amgen, Inc.

10

11   FOR OBJECTORS:

12        JOHN J. PENTZ, ESQ., Class Action Fairness Group,
     2 Clock Tower Plaza, Maynard, Massachusetts, 01754,
13   for Corinna Connick and John J. Pentz, Jr.

14

15

16

17

18

19

20

21

22

23

24

25

e9603634-6c20-403d-ae39-edb683f9521f

1           P R O C E E D I N G S

2           THE CLERK:  Court calls Civil Action 01–12257,

3    In Re:  Pharmaceutical Industry Average Wholesale Litigation.

4    Could counsel please identify themselves for the record.

5           MR. MATT:  Good morning, your Honor.  Sean Matt for

6    plaintiffs in the class.

7           MR. NOTARGIACOMO:  Good morning.  Ed Notargiacomo for

8    plaintiffs in the class.

9           MR. MACORETTA:  Good morning, your Honor.  John

10   Macoretta here for plaintiffs in the class.

11          MR. WEXLER:  Ken Wexler, your Honor, for plaintiffs in

12   the class.

13          MR. TRETTER:  Lyndon Tretter for defendant

14   Bristol–Myers Squibb Company.

15          MR. MUEHLBERGER:  Jim Muehlberger for Aventis

16   Pharmaceuticals.

17          MS. TABACCHI:  Tina Tabacchi for Track Two defendant

18   Abbott Laboratories.

19          MR. MORGAN:  Peter Morgan for Baxter Healthcare.

20          MR. EVERETT:  Clay Everett for Pharmacia.

21          MR. YOUNG:  Hank Young for Amgen, Inc.

22          MR. PALERMO:  Chris Palermo for defendant Dey.

23          MR. KOON:  Michael Koon for Track Two defendant

24   Aventis.

25          MR. RASKIN:  Richard Raskin for Bayer Corporation.

1          MR. PENTZ:  John Pentz for Corinna Connick and John J.

2     Pentz, Jr.

3          MR. PARISH:  Jason Parish for defendant Sicor.

4          MS. KOSKI:  Katy Koski for defendant Watson.

5          MR. HURST:  Good morning, your Honor.  Andrew Hurst

6     for the Fugisawa defendants.

7          THE COURT:  Thank you.  All right, you may be seated.

8     Where's Mr. Haviland?  Does anyone know?  He filed something

9     late last night.  Do we know whether he's planning on coming,

10    whether he's just delayed?  Does anyone know anything?

11         MR. MATT:  We have no idea.  We're actually quite

12    surprised he's not here.

13         THE COURT:  Well, he filed something late last night.

14    I don't know that I want to go forward unless I know for sure

15    whether he's coming or not.  Where's Mr. Berman?

16         MR. MATT:  Mr. Berman couldn't make it here today.

17         THE COURT:  Where's Mr. Sobol?

18         MR. NOTARGIACOMO:  Mr. Sobol had a prescheduled

19    vacation, your Honor.  He is on vacation this week.

20         THE COURT:  Does anyone know whether Mr. Haviland was

21    trying to make it here today?  I'm shocked because he filed

22    something at 7:30 last night.

23         MR. MATT:  He filed two briefs last night.

24         THE COURT:  Two briefs last night.  And while it is

25    9:20 and this was called for 9:00 o'clock, I would not like

1    it -- do you know, has anyone been in personal touch with him?

2           MR. MATT:  I've not had any communication with him for

3    the last ten days, so I just don't know.

4           THE COURT:  Do you have his phone?  Do we have his

5    phone?

6           THE CLERK:  I can call him.

7           THE COURT:  Yes, why don't we call him.

8           MR. NOTARGIACOMO:  We have his office number, your

9    Honor.

10          THE COURT:  If he's not coming, that's fine.  I just

11   don't want to -- he's put so much into this at this point, to

12   say the least.

13          (Discussion between the Court and Clerk.)

14          (Call made to Mr. Haviland by the Clerk.)

15          THE COURT:  He told Ms. Molloy -- the phone dropped

16   off by mistake -- that he was excused at the last meeting.

17   Does anyone even remember that?

18          THE CLERK:  He said the June 13 meeting.  I'm going to

19   have him call back in --

20          FROM THE FLOOR:  Your Honor, I do have a recollection

21   that your Honor had said that objectors need not attend.

22          THE COURT:  They don't have to.  That's always true.

23          (Discussion between the Court and Clerk.)

24          THE COURT:  Well, let me just make it clear.  I

25   certainly didn't intend to bar anyone.  I also didn't insist

1  that anyone come.  I'm just surprised because Mr. Haviland has

2  filed two briefs or more.

3         MR. MATT:  Your Honor, based on the volume of paper

4  he's filed with the Court and the positions he's taken, we

5  respectfully submit he should be here, and the fact that he's

6  not I think speaks volumes about --

7         THE COURT:  Well, why don't you get him on the phone

8  and say he wasn't barred, but he -- if he wants to come in by

9  phone, he's welcome to, but if he doesn't want to be, that's

10 fine.

11        Why don't you take down what she says, Lee.

12        THE CLERK:  (On phone.)  Hi.  This is Ms. Molloy

13 again.  I'm trying to reach Mr. Haviland.  I disconnected him

14 by mistake.  I'm sorry, I apologize.  I'm sorry, that was my

15 fault I disconnected you.

16        I'm calling you -- I'm actually in the courtroom with

17 the Judge and counsel.  I do not have you on audio, but I could

18 do that.  You did file two briefs, and the Judge was concerned

19 and wanted to know if you did want to participate in this

20 this morning, since you did file those two briefs.

21        (Pause.)

22        Okay, right, and she understands that she said that

23 objectors didn't have to come back, but where you filed the two

24 briefs, she was concerned that you would want to participate in

25 this today.

1          THE COURT:  Just ask if he wants to be here by phone

2     or rest on the briefs.

3          THE CLERK:  We can do you by audio.  Obviously you

4     won't be here present, but I can do you by the audio, if you'd

5     like me to hook you up on that and hear argument.

6          (Pause.)

7          Just a minute.

8          Unfortunately he has a commitment that he has to

9     start.

10          THE COURT:  Okay.

11          THE CLERK:  Okay, that's fine.  We just wanted to

12     notify you of this.  Okay, that's fine.  Thank you.  Bye-bye.

13          THE COURT:  Okay.  Who are the other people here

14     for -- is there anyone here -- let me just start off on

15     Bristol-Myers.  I'm going to just get that done in case anybody

16     is here on Bristol-Myers.

17          All right, why don't you make a representation about

18     Bristol-Meyers so we can just put that to bed and give me

19     whatever it is I need to sign.

20          MR. MATT:  Okay, your Honor.  We submitted a

21     supplemental submission, Docket No. 7650, on Tuesday that

22     basically reported on the notice that went out of the revision

23     to the settlement.  It was mailed to 3,922 consumers whose

24     amounts were going to be lowered under the new rebalancing and

25     to all of the TPPs, who numbered 715; and we received no

1   objections from the TPPs, and we received four consumer

2   objections.  And they all four had their amounts lowered

3   because they were administered Paraplatin and Taxol during

4   periods in which there were no damage, and so they were getting

5   a flat payment instead of the triple co-pay prorated down

6   payment of the --

7           THE COURT:  Could you explain why because the letters

8   I received -- I understand why people are upset when their

9   amount is reduced.  And these were pro se letters, not by

10  lawyers.  How have we responded to them?

11          MR. MATT:  We have been able to get ahold of three of

12  the four and answer their questions that they asked in their

13  letters.  The fourth we were unable to get ahold of; we're

14  still trying.  And they're still unhappy that their amounts

15  went down.

16          THE COURT:  I've only received three of those.  I've

17  received from Ann Bliss and William Bliss, Ms. Augello,

18  Ms. Wild.  Who's the fourth one?  Do you have it?

19          MR. MATT:  Mr. Byersmith, your Honor.

20          THE COURT:  What?

21          MR. MATT:  Mr. Byersmith, B-y-e-r-s-m-i-t-h.

22          THE COURT:  And with all of those, since I don't have

23  the claims files, do you have the representation -- we should

24  probably put that in the record -- we just couldn't find

25  them -- that all of those people you've personally verified

1    were people who fell into the period where there were no

2    damages?

3           MR. MATT:  Correct, correct.  We had the claims

4    administrator pull their information, and we actually looked at

5    their drug administrations and the dates that they were

6    administered.  And Mr. Byersmith, just for the record, it has

7    been filed with the court.  It's Document No. 7600.

8           THE COURT:  I'm sorry, we missed it then.  Number

9    what?

10          MR. MATT:  7600.

11          THE COURT:  Okay.  So let me just look at BMS.  And,

12   once again, what is the side arrangement you have with

13   Mr. Haviland?

14          MR. MATT:  Mr. Haviland's client, Mr. Aaronson, will

15   be receiving what he would have received under the initial

16   deal, which is more than what he would receive under the

17   revision, so he's getting a little bit more.

18          THE COURT:  What?

19          MR. MATT:  I don't remember the exact amount.  We put

20   that in the paper we filed with the court prior to the BMS

21   hearing last time, and I apologize --

22          THE COURT:  You know what, I have -- AWP is still the

23   biggest thing I've -- I just, you know, they all mix in my

24   mind, so --

25          MR. MATT:  Oh, wait, hold on a second.  I do have -- I

1    think I have our brief here.  I can tell you.

2          THE COURT:  I just want it to go on the record.  You

3    may have put it on last time.  I do remember you mentioned

4    there was a side agreement with him.

5          MR. MATT:  Yes.

6          THE COURT:  Now, do I have to approve that?

7          MR. MATT:  I think you do.

8          THE COURT:  I just want to know what Aaronson got and

9    why he got it.

10          MR. MATT:  Yes, I don't have it with me, your Honor,

11    but it is in the record.  I just don't have it with me.  I

12    apologize.

13          THE COURT:  Well, do you happen to know what docket

14    number it might have been?

15          MR. MATT:  No.

16          THE COURT:  Well, how much more did he get than a

17    normal class representative would have gotten?  Do you know?

18          MR. MATT:  It was extremely modest.  I mean, the

19    payment, his actual recovery itself, it was a very modest

20    amount.  I just don't remember the amount.

21          THE COURT:  No, I understand that, but was it -- I

22    just want to make sure.  It's always a problem when someone is

23    paid pursuant to a side arrangement.  It's essential that I put

24    the exact details.  So you'll send me a letter afterwards and

25    explain how he got to the money and why it's there, so anyone

1    looking at this record later on will know exactly what it is.

2    If it's already in there, great.  Just send me the docket

3    number, okay?  All right, that's what we'll do.

4           And otherwise, with respect to the response, for the

5    record I just want to say in plain English in case these people

6    choose to appeal, as I understand it, the reason their amounts

7    were reduced is because they fell in time periods where there

8    was no finding of a violation.  Is that right?

9           MR. MATT:  That's correct.

10          THE COURT:  Is that true for each of them, and you've

11   checked that personally?

12          MR. MATT:  It is, I've checked it personally.  It's

13   true for all the administrations for Ms. Wild, Ms. Augello,

14   Mr. Byersmith.  And then Mr. Bliss, he received most of his

15   administrations in the no-damage period, as we say, and he

16   received three administrations of Taxol during 2002, in which

17   he actually is getting double his damages.

18          THE COURT:  All right.  And to make it clear, when

19   they get rejected, what do they get in response to these

20   objections?

21          MR. MATT:  What did we do in response to the

22   objections?

23          THE COURT:  In writing, anything?

24          MR. MATT:  Oh.  No, we actually called and talked it

25   through with them.

1           THE COURT:  All right, I think you should put it in

2    writing as to what it is so that they can understand, and just

3    say the Court overruled the objections because they were not in

4    the damage period, and explain what that means, all right, so

5    that they understand that their objections were heard.

6           MR. MATT:  Will do.  And Mr. Tretter has reminded me

7    that we should submit to your Honor a revised final approval

8    order that reflects the --

9           THE COURT:  Yes, and when can you do that?

10           MR. MATT:  Next week for sure.

11           THE COURT:  I'm out of here next week.  I'm on

12    vacation, the first since Christmas, so I'm gone.  So can we do

13    it by tomorrow?  Or you can file it next week, and I won't get

14    to it till the following week.

15           MR. MATT:  We don't think we can get it.  Mr. Tretter

16    is not available tomorrow, so we can get it to you next week,

17    and then --

18           THE COURT:  Then I'll sign it the following Monday,

19    that's fine.  Okay, that's the easy part.

20           Congratulations.  BMS has been on my plate for a very

21    long time.  As you know, I was worried about how long it went,

22    but I do find it was a fair settlement.  And I know the

23    extraordinary lengths people went to.  It's a settlement I feel

24    very comfortable with because I understand the drug and I

25    understand the liabilities.  That's going to stand in stark

Page 14

1    contrast to what we get to next, which is far more complicated

2    and I feel less knowledgeable.  So we're going to move on to

3    Track Two right now unless there's anything I need to do with

4    respect to Track One.  I think we're now officially done with

5    Track One.

6              MR. TRETTER:  May I be excused, your Honor?

7              THE COURT:  You don't like being here?

8              MR. TRETTER:  I love being here, your Honor, but just

9    get off the meter for the client.

10             THE COURT:  You promise, as soon as I say "leave," you

11   go off the meter?

12             MR. TRETTER:  No.

13             (Laughter.)

14             THE COURT:  All right, fine.  Thank you very much for

15   your participation.

16             MR. TRETTER:  Thank you, your Honor.

17             (Mr. Tretter excused.)

18             THE COURT:  Okay, so now we're moving to the far more

19   complicated issue.  Mr. Matt, are you representing the

20   plaintiffs, or are you all as a team doing this?

21             MR. MATT:  We're all as a team, your Honor, but I'll

22   be doing the --

23             THE COURT:  Who starts?  Okay, I found this

24   exceptionally difficult to understand and to follow as it kept

25   going.  As I just mentioned, unlike BMS, I really don't know

e9603634-6c20-403d-ae39-edb683f9521f

1  these drugs.  I really don't know the spreads.  I don't know

2  the evidence.  We didn't have a report from Dr. Hartman that we

3  could find in the record about Track Two.  Is it in there

4  somewhere?

5        MR. MATT:  Your clerk asked us before the hearing

6  started, and we're going to -- I don't know the answer to

7  whether there's a specific docket number associated with it or

8  whether it was actually filed.  We will find out.

9        THE COURT:  All right, I couldn't find it.  I

10  basically have received more objections to this settlement than

11  I've received for the others and more in-depth ones, and I

12  think we have a lot of work to do this morning for me to

13  understand it.  And so why don't we just start from the very

14  beginning.  How did you come up with $125 million?

15        MR. MATT:  That is based on a damage calculation that

16  Dr. Hartman did, your Honor.

17        THE COURT:  Based on what?

18        MR. MATT:  Based on application of his 30 percent

19  speed limit.

20        THE COURT:  To which drugs?

21        MR. MATT:  To all of the drugs in Class A and to, I

22  believe, a sampling of the drugs in Class B.

23        THE COURT:  In Class B -- the nomenclature turns out

24  to be unbelievably difficult, so for the record, Class A and

25  Class B have nothing to do with the classes; it has to do

1    simply with a categorization of two different drugs.  Is that

2    right?

3              MR. MATT:  That's correct.  Maybe it would be better

4    to say Group A and Group B.

5              THE COURT:  It would have been, but right now your

6    briefs all say something else.  So Class A drugs are what?  Are

7    they all physician-administered drugs?

8              MR. MATT:  The Class A drugs I do believe are all

9    physician-administered -- well, no.  It's Amgen, Aventis -- the

10   way we've grouped the drugs, your Honor, is the group Amgen,

11   Aventis, and Watson, okay?

12             THE COURT:  Are in Class A?

13             MR. MATT:  Are in Class A.

14             THE COURT:  And what is the defining principle?  Why

15   are their drugs in Class A?

16             MR. MATT:  The defining principle was, they were put

17   into Class A because they were the drugs and the defendants for

18   which we believed as class counsel we had the best evidence

19   against.

20             THE COURT:  So it has nothing to do with what was

21   generic or what was physician-administered?

22             MR. MATT:  For the --

23             THE COURT:  Or brand?

24             MR. MATT:  Right.

25             THE COURT:  Or self-administered?  It was just where

1    you thought you had the best case?

2         MR. MATT:  Correct.  Now, it just so happens that most

3    of the drugs in Group A are brand-name drugs, but it was based

4    on the strength of the case.

5         THE COURT:  And how would I know that?  In other

6    words, no one's ever briefed these drugs or why you think this

7    was the best case; and it strikes me, now that we're moving to

8    a situation where Class B gets single damages and Class A

9    you're recommending move from treble to double, that I actually

10   have to understand this better.

11        MR. MATT:  Sure.  The analysis was based on your trial

12   ruling in which you focused on --

13        THE COURT:  On what?  Excuse me.

14        MR. MATT:  Your trial ruling in the Massachusetts-only

15   trial against the Track One defendants, where you put in a

16   framework in which you had analyzed each drug based upon what

17   is their spread, okay, was there any spread marketing evidence,

18   and did you have any evidence of spreads increasing at the time

19   actual costs were decreasing?  We call it kind of a scissors

20   effect.

21        THE COURT:  Yes, but most of my Track One involved

22   brand-name physician-administered drugs that I found liability

23   on.  So were some of the Class A drugs multi-source?

24        MR. MATT:  I think they were all brand-name.

25        THE COURT:  They were all brand-name.  See, I'm going

1   to ask you to paper this because it is clear to me, now that it

2   is being challenged at its core, that I need to understand it

3   at its core.

4         All right, now, so you're saying, though, that the

5   Hartman report does value Class A, to the best of your memory?

6         MR. MATT:  It does, and he put a value of that case --

7         THE COURT:  Of the Class A, just Class A?

8         MR. MATT:  Just the Class A for approximately

9   $317 million.

10        THE COURT:  How much?

11        MR. MATT:  $317 million.

12        THE COURT:  And does Class A include Epogen?

13        MR. MATT:  It does.

14        THE COURT:  It does.  Now, Class A then, Epogen is not

15   an AWP drug, right?

16        MR. MATT:  That is correct, your Honor.

17        THE COURT:  That's only true for Class 1 and Class 2,

18   right?

19        MR. MATT:  Correct.

20        THE COURT:  Well, yes, because Medicare -- just we

21   need to talk this -- Class 1 and Class 2 are based on Medicare,

22   and, as I understand it, Medicare had a separate statutory

23   formula for Epogen.

24        MR. MATT:  That's correct.

25        THE COURT:  And Procrit, right?

1          MR. MATT:  That's correct.

2          THE COURT:  Class 3 is an AWP-based drug for Epogen.

3          MR. MATT:  It is.

4          THE COURT:  So they properly -- I'm not saying that in

5     a pejorative or a legal way -- under an AWP case, Class 3 will

6     have AWP damages, right?

7          MR. MATT:  If there is a spread that falls within the

8     speed limit.

9          THE COURT:  Right, and did it?

10         MR. MATT:  Dr. Hartman found it did not for Epogen.

11         THE COURT:  All right.  Well, how did we come up with

12    any damages for Classes 1 and 2 on Epogen?

13         MR. MATT:  I don't know the answer to that question,

14    your Honor.  I don't know why Epogen --

15         THE COURT:  Under your columns, it's zero.

16         MR. MATT:  It is zero, your Honor.

17         THE COURT:  So then why are we paying anything for

18    Epogen?

19         MR. MATT:  It was pursued in the case, and class

20    members are being asked to give a release, so we thought it was

21    appropriate to give them some compensation, similar to, for

22    instance, some of the BMS drugs.

23         THE COURT:  No, but there's no liability at all,

24    right?  Epogen was paid out at a statutory formula.  All right,

25    let me just -- I'm going to have a series of questions for us.

1    I'm going to just make a list.  EPO, Epogen, why any damages?

2          MR. MATT:  So what we did in the redistribution

3    proposal is propose that they do receive a flat amount, similar

4    to the class members in the BMS settlement that you approved.

5          THE COURT:  But flat amount --

6          MR. MATT:  There were periods in which there were no

7    damage; Paraplatin, for instance.

8          THE COURT:  But they were at least AWP drugs, and it

9    was based on my finding of a speed bump, right?

10         MR. MATT:  Correct.

11         THE COURT:  In other words, it was giving up

12   essentially appellate rights on that issue.

13         MR. MATT:  Correct.

14         THE COURT:  I think.  So I'm just trying to figure out

15   what they gave up.  If in fact the Medicare paid based on a

16   statute and there was no fraud and no anything, the only people

17   who have given up anything are potentially Class 3 people

18   because that's the only ones who are knocked out by a speed

19   bump.  All right, so Epogen I'm just -- this is why I'm going

20   through this one by one.  All right, but how did Hartman

21   include damages in his analysis for Epogen?  Are any of the

22   damages, any of the $317 million attributable to Epogen?  Do

23   you remember?

24         MR. MATT:  I don't have the backup for the

25   $317 million with me.  I don't remember.  But I do know that

1  his overcharge ratio for those drugs that we submitted to the

2  Court on Tuesday, Docket 7648, did have no damages for EPO.

3         THE COURT:  Right, that's what I saw.  So it looks

4  like we're paying $58 a -- I'd rather -- why wouldn't I rather

5  just pay it to people for whom -- in other words, we're just

6  knocking out -- we're bringing down from treble to double.  I'm

7  just not sure why I need to do that, why I'm paying anything

8  for Epogen.  So that's just a question that's out there.  And I

9  will get to -- is that Amgen?  Yes, so I'll have to hear from

10 you in a minute, why should I pay anything for Epogen?

11        Did you know, by the way, I was the original judge?

12 Did I tell you that?  EPO, I know how it works even.

13        All right, now, the Class B drugs got confusing to me.

14 Am I correct in saying that 85 of the Class B drugs were not

15 part of the Hartman report?

16        MR. MATT:  I can't tell you how many of the Class B

17 drugs were actually part of Ray Hartman's calculation.

18        THE COURT:  Well, how much money did Hartman come up

19 with?

20        MR. MATT:  Roughly $800 million for the Class B drugs.

21        THE COURT:  And let me just ask you, do you know

22 whether he valued every drug -- see, I didn't have it.  We went

23 back through the 2009 and the transcript and your pleadings.  I

24 can't figure out what that valuation is based on, whether it's

25 just the drugs that were in the litigation, because don't

Page 22

1    forget I struck the 85, or whether it was global, whether it

2    was everything.

3          Does anybody from the defense bar know?  Did it

4    include those 85 drugs, the valuation?

5          MR. MATT:  The $800 million itself, your Honor, is a

6    number that we did present to the Court in prior pleadings.  I

7    don't believe that at the time we actually put in Dr. Hartman's

8    report.

9          THE COURT:  Right, so we couldn't find it.  Now, my

10   poor law clerk spent two hours with the docket.  As we all know

11   it, especially in the earlier days, it was almost unreadable,

12   so I'm not barring the possibility that we didn't find it.  But

13   at this point we've tried to organize it in some ways, and we

14   couldn't find it.  And do you remember or does anyone

15   remember -- did the defense bar representing here, did you get

16   Dr. Hartman's report?  Did anyone see it?  No one here seems to

17   remember having seen it.  Do you know whether it was disclosed?

18         MR. MUEHLBERGER:  Your Honor, I don't recall ever

19   seeing that.  I mean, this was all done under the auspices of

20   Mr. Green and negotiations with class counsel, and they had

21   their own theories and their own backup support, and we had

22   ours.

23         THE COURT:  But you didn't exchange expert reports on

24   valuation per drug?

25         MR. MUEHLBERGER:  It's been over three years, your

1    Honor.  I can't say for certain without going back and looking,

2    but I don't recall.

3         MR. MORGAN:  Your Honor, this is Peter Morgan for

4    Baxter.  I think there were individual sessions with class

5    counsel.  So a company would come in and discuss their own

6    exposure and make arguments back and forth, and then people

7    would retreat, and there were general arguments that went back

8    and forth, but I don't think we ever saw a valuation.

9         THE COURT:  All right, so unless somebody clarifies

10   this record, because this sure isn't going to be resolved

11   today, unless somebody clarifies, I am going to assume, I'm

12   going to find, because sitting here are very knowledgeable

13   people, that no experts reports were exchanged.

14        MR. MATT:  It was not litigated.

15        THE COURT:  It was not litigated, it wasn't exchanged.

16   All right, so I don't think I have it.  So do we know whether

17   the -- the big dispute that's come up, it came up in 2009 -- I

18   went back and reread the transcript last night -- and it's

19   reappeared very cogently in Mr. Haviland's filing, is whether

20   or not the release of those 85 drugs is fair, and I would have

21   to evaluate that.  I have to understand it better.  So do we

22   know whether Dr. Hartman's report included those 85 drugs,

23   which I struck from the litigation as tardily filed, not on the

24   merits, not with prejudice, just simply they were too late in

25   the game?  But they were in the Fifth Amended Complaint, and at

1  that point, had Dr. Hartman's evaluation already been

2  formulated?  Do we know timingwise?

3       MR. MATT:  I don't know timingwise, your Honor, but

4  let me tell you a few more things about what I know about that

5  report.

6       THE COURT:  Yes.

7       MR. MATT:  He did go defendant by defendant, okay.  I

8  can't tell you the drugs and whether he did it for all 160.  I

9  highly doubt it because of the median analysis that's required.

10 What he did was, he did a 30 percent spread analysis to come up

11 with the $800 million, which we believe is very, very overly

12 optimistic because it doesn't take into consideration your

13 Honor's order from the trial on the generic drug order, for

14 instance, that you have to establish that the AWP reported

15 affected the median, because the way the reimbursement

16 mechanism works under Medicare for these generics, you've got a

17 constellation of different AWPs, and then the median is taken.

18 So the 30 percent spread analysis is not based on the median

19 analysis.  It's overly optimistic.  So for that reason, we

20 concluded that once he did the $800 million damages, you know,

21 it should be discounted downward from there.

22       THE COURT:  Well, let me just ask again.  As I

23 understand, in the Class B drugs, if you put back in the 85 --

24 and I'm not sure which 85 there are -- some of the 85

25 Mr. Haviland points out are brand-name drugs for whom that

1   explanation would not suffice.

2        MR. MATT:  That is correct, there are some in there,

3   yes.

4        THE COURT:  Has there been a separate analysis of

5   those brand-name drugs?

6        MR. MATT:  I think the answer is "yes," but, you know,

7   when we submit the Hartman declaration, you'll get that answer.

8        THE COURT:  Are the new drugs that were added in for

9   the release, does anyone know whether or not, in your team,

10  those were then valued as to what the release would be

11  releasing?

12       MR. MATT:  The value of --

13       THE COURT:  In other words, I understand and agree

14  with the basic proposition that multi-source drugs are very

15  difficult because of the way they're priced, and I understand

16  why that settlement value may be quite low; but as I understand

17  it, and I think you're not disagreeing, that a certain number

18  of the drugs in Class B are branded drugs and include some

19  physician-administered drugs.  I can't tell how many were in

20  there before the Fifth Amended Complaint and may have been in

21  Dr. Hartman's analysis, or how many were in there after and

22  were thrown in at the end to get the release because the

23  defendants wanted, you know, in your words, the broadest

24  possible release.  I understand that.  I just don't know.  I

25  don't know how I can evaluate fairness until I know.

e9603634-6c20-403d-ae39-edb683f9521f

1      MR. MATT:  So you are asking us to buttress the record

2  on this issue, and we will do so, your Honor.

3      THE COURT:  Well, why as we stand here today -- until

4  the recent spade of filings -- I went back and read 2009 -- I

5  think Mr. Berman didn't understand the questions that I was

6  asking because he kept saying, "No, they're all in the

7  complaint, they're all in the complaint," and that the

8  third-party payors were giving the broadest release possible,

9  unlike the consumers who were only giving up drugs that were in

10  the complaint.  I hadn't understood at that point, and now very

11  much do, that many of those drugs were sought to be added in

12  the Fifth Amended Complaint, and I struck them at defendants'

13  instance for case management reasons, not on the merits, for

14  case management, that you kept adding and adding and adding; I

15  was ready to bring some closure to it.  So I don't understand

16  how I release those drugs unless there was an opportunity for

17  discovery.  Was there discovery about those 85 drugs?

18      MR. MATT:  I can tell you unequivocally that there was

19  discovery into some of them.

20      THE COURT:  So, all right, which ones?

21      MR. MATT:  Lovenox is one example.

22      THE COURT:  Who manufactures that?

23      MR. MACORETTA:  Aventis.

24      MR. MATT:  Aventis.

25      THE COURT:  Aventis?

1          MR. MATT:  I'm not sure whether they're on the list,

2    but Leukine and Novantrone were two drugs highlighted in

3    Mr. Haviland's recent filings.  They're Immunex drugs.  Immunex

4    was acquired by Amgen.  I know there was specific discovery

5    done into those drugs.  Those are examples.

6          THE COURT:  So does anyone from the defense bar know

7    about any other drugs for which there was discovery?

8          MR. MUEHLBERGER:  Your Honor, Jim Muehlberger for

9    Aventis.  Initially, I'd like to point out that the underlying

10   factual predicate, the spread marketing of these drugs, was the

11   subject of mountains of discovery, roomfuls of documents,

12   dozens of depositions for each of these defendants.

13         THE COURT:  Excuse me.  I understand that's true for

14   the initial drugs.  I'm talking about for the new drugs.

15         MR. MUEHLBERGER:  But the deposition testimony from

16   our marketing people, from our salespeople, from our

17   officers --

18         THE COURT:  Did they address the different drugs?

19         MR. MUEHLBERGER:  They addressed the marketing

20   allegations, which were not many times drug-specific.  The

21   question was not, "Did you spread market for Drug X?"  It's

22   "Let's talk about spread marketing."  And so the underlying

23   factual predicate for this release and these drugs was spread

24   marketing.  It didn't matter whether it was one drug or 99

25   drugs in many instances.

1       THE COURT:  Well, with respect to the two, at least,

2  that Mr. Haviland flags -- I forget their names, they had to do

3  with prostate cancer -- and he says that it was marketed the

4  same way Lupron was, was there discovery into those drugs?

5  Whose drugs were those?

6       MR. MUEHLBERGER:  Your Honor, one of them was Eligard,

7  which is a Sanofi drug.  Your Honor, again, we can get into the

8  weeds of these hundreds of drugs, but the point is, there was

9  discovery as to these drugs, lots of discovery.

10      THE COURT:  Well, under the case law, defendants have

11 persuaded me that I can have a release broader than the actual

12 claims, but there had to have been sufficient discovery, and

13 there had to have been -- I have to make an evaluation of the

14 fairness of the release.  I have no record.  I have nothing.  I

15 can't tell, I don't know.  I don't know what these drugs are.

16 I do agree, because I have such incredible knowledge and depth

17 of knowledge, that with respect to multi-source drugs, that it

18 makes no sense to spread market, to do the marketing, and that

19 the liability and causation issues are overwhelming in terms

20 of -- especially the causation issue because of this median

21 issue.  I'm not talking about for a Medicaid case.  I'm talking

22 about for -- so I can lump all those in and perhaps get an

23 explanation as to why the settlement is fair with respect to

24 the multi-source.

25      With respect to the brand name, though, I have

1    nothing.  I don't know what the drugs are.  I can't respond as

2    to whether they're fair.  This case is very vulnerable because

3    I can't make that quintessential fairness finding.  That's my

4    problem.

5              MR. MUEHLBERGER:  Your Honor, the other point that I

6    wanted to make was, in the case of all of these drugs, they

7    have been noticed to all the consumers.  Consumers have filed

8    claims for all of the Group B or Exhibit B drugs that

9    Mr. Haviland complains of.  The consumers will be paid for

10   their co-pays for these drugs.

11             THE COURT:  But they're getting creamed in terms of

12   the value of -- compared to Class A, at least under the

13   proposed reallocation, they're getting close to 100 percent,

14   isn't that right, except for Epogen?

15             MR. MATT:  That's correct.  It's double actually.

16             THE COURT:  What?

17             MR. MATT:  It's double, double their actual damage.

18             THE COURT:  Right, okay.  With respect to Class B, as

19   I understand it, even under the reallocation, which was

20   designed to make it more fair -- I understand that -- they're

21   only getting 5 percent, and that's single damages.  Is that

22   right?

23             MR. MATT:  Apples and oranges, your Honor.

24             THE COURT:  Excuse me.  Is that accurate?

25             MR. MATT:  No, because your use of the word "damage"

1   makes it inaccurate.  They're getting 5 percent of their triple

2   co-pay amount, okay?  The co-pay is what they have to pay when

3   they have their Medicare treatment, right?  And so the co-pay

4   itself is already more than their actual damage because their

5   actual damage --

6           THE COURT:  Excuse me.  Now I'm confused.  I thought

7   that Class B was single damages.  No?

8           MR. MATT:  Let me back up.

9           THE COURT:  All right, now I am ahead of myself, so

10  let me just back up.  For right now, the to-do list is, and I

11  need it:  What did you get when you valued the Class B?  Let me

12  assume, because I think it's true, that Mr. Hartman's report

13  did not cover the 85 new drugs.  All right, let's just assume

14  that that's true -- if it's wrong, you're going to let me know,

15  all right -- that Hartman doesn't cover 85, and that you

16  received discovery on maybe some of the drugs that were just

17  listed, Lovenox, Leukine, and Novantrone, and maybe a few

18  others.  You're going to let me know what you get discovery on.

19  So how did you value these 85 drugs in deciding to include them

20  in the class and then providing them the same relief that you

21  provided other people?

22          MR. MATT:  We'll include that in our filing, your

23  Honor.

24          THE COURT:  Okay.  So I don't know how you valued

25  that.  I mean, I'm worried that some of these people may be

Page 31

 1   overpaid, perhaps like the Epogen people, and some of them may

 2   be underpaid; for example, if they were brand-name drugs with

 3   higher bumps.  And, in any event, even assuming that it was

 4   totally fairly done at arm's length before Eric Green, I don't

 5   have a basis for evaluating it, what percentage of the

 6   fairness.  I just don't know.

 7          So let me ask defendants:  How did you come up with

 8   valuations?  Was there a principled basis, or did everybody

 9   just come up with a fudge factor?

10          MR. MORGAN:  Well, your Honor, I think that the

11   defendants did not have access to --

12          THE COURT:  You're with?

13          MR. MORGAN:  Baxter.

14          THE COURT:  Just to make it clear every time so we get

15   that right.

16          MR. MORGAN:  The defendants ran their own evaluations

17   of their own company's risks for all of the drugs that they

18   had, and, under our blind contribution format that we had with

19   Eric Green, continued to increase how much they were going to

20   put on the table.  And it was an arm's length bargaining, which

21   I should point out, on the other side of the table, there's no

22   dispute that the third-party payors, who are very sophisticated,

23   were a chief opponent in all this and quite well aware of what

24   the negotiations were, and at some point the parties settled on

25   $125 million.  They had their own valuation, we had our own,

1    and I don't think that at the time that there was any way they

2    were going to get more than $125 million from all the Track Two

3    defendants.

4         THE COURT:  Well, you might have to pay nothing.  If I

5    don't find that there's a settlement, we'll just go forward

6    with the litigation.

7         Let me ask you this.  From the defendants' point of

8    view, let's assume -- there has been no objector, as far as I

9    can tell, from any of the third-party payors.  Why can't I just

10   approve Class 2 today, or is it all intertwined?

11        MR. MORGAN:  Well, I think the settlement agreement is

12   one total package.  There is a provision --

13        THE COURT:  So you say I can't approve one class and

14   not the others, or you'd have to at least think about it?

15        MR. MORGAN:  Yes, we would.  I think we'd have to talk

16   with our clients about that.

17        THE COURT:  Yes, I understand that, because right now

18   you're expecting me to accept in blind faith that this is a

19   good deal for the consumers.  I think the third-party payors

20   are highly sophisticated, it was arm's length, and they can do

21   what they want to do.  But I've received no objectors.  I've

22   got to believe that they have a sense themselves because they

23   paid for these drugs.  That's a very different situation than

24   older and sick people.  And so that's one thing on the table,

25   why don't we just say, which is, can I just approve Class 2 and

1    potentially the TPP version of Class 3?  So leave that on the

2    table as to what we're talking about.

3           So you're going to have to show me why it's fair.  I

4    need those filings from the defendants too; how you've done

5    your valuations, why this is fair.  It has been challenged, and

6    I have no record right now, because I believe, maybe

7    incorrectly, that the 5 percent recovery is based on the

8    $800 million, but that probably under the same methodology that

9    should be a much higher number if you include the 85 additional

10   drugs.

11          MR. MATT:  Or more likely a much lower number because

12   the $800 million itself was based on the spread analysis that

13   actually overestimates damages.

14          THE COURT:  Well, that could be, it could be.  You

15   were being overly generous at one point, which is you were

16   doing out-of-pocket pays rather than actual damages.  We don't

17   need to do that.  We just need to talk about actual damages,

18   how much of the percentage of the co-pay reflects the

19   inflation?  That's what you did in Class A, right?

20          MR. MATT:  Correct.

21          THE COURT:  Well, why didn't you do that in -- so why

22   don't we talk about -- so we'll talk about reallocation in a

23   minute.  So we know for a minute that at least we've got to

24   figure out this release situation because while I agree you can

25   release claims broader, it's according to the case law where

1    there's been discovery into those claims and a basis for me to

2    decide that that's fair to release them; and it's been subject

3    to a rather scathing attack that I don't have an answer to as

4    of 7:30 last night.

5           MR. MATT:  And to clarify, your Honor, the Class B

6    drugs, the reason that the distribution formula remains

7    different under our redistribution proposal from Class A is

8    because it is very difficult to actually do a drug-by-drug

9    spread analysis.

10          THE COURT:  Why?

11          MR. MATT:  Because of the median issue, and we're

12   talking about fairness.

13          THE COURT:  Put the median aside.  I agree with that.

14          MR. MATT:  Okay, so that's why it is --

15          THE COURT:  How many --

16          MR. MATT:  When I said apples to oranges, that's why I

17   said that.

18          THE COURT:  Okay.

19          MR. MATT:  Okay?  So that's why under the rebalancing

20   or redistribution proposal we are still proposing that the

21   distribution methodology for the Group B drugs be based on

22   their triple co-pays and then prorated down based on the claims

23   experience.  And, again, the co-pays --

24          THE COURT:  But why triple that?  Doesn't that seem

25   unfair to the Class A where you've got the strongest case?  In

1   other words, I don't know why -- I think the consumers in both

2   classes should be treated the same.

3            MR. MATT:  Well, I don't think it's unfair to the

4   Class A drugs, your Honor, because the Class A drugs, they are

5   getting double their actual damages, even for time periods

6   outside of your heartland period finding.  So we believe it's a

7   very generous allocation.

8            THE COURT:  I'm second-guessing the reallocation.  Why

9   aren't we giving treble damages to the people in the

10  heartland --

11           MR. MATT:  Which could be done.

12           THE COURT:  -- and single damages to everyone else?

13  That's how we treated these other classes for the most part,

14  didn't we?

15           MR. MATT:  No.  No, what we did, your Honor, in

16  AstraZeneca, it was trebling, as you may recall, because the

17  spread marketing evidence was so strong against AstraZeneca on

18  that Zoladex drug.  If you might recall, in BMS we gave double

19  damages because --

20           THE COURT:  For what?  Double for what, heartland?

21           MR. MATT:  For the heartland period.

22           THE COURT:  All right, so why don't we do that --

23           MR. MATT:  We said heartland drugs, for the drugs for

24  which there were times in which damages were found, okay, so

25  Ray Hartman did an overcharge ratio table.  We did submit that

1   to the Court.  Rust, the claims administrator, took that and

2   calculated the damage for each individual class member in

3   Class 1, okay, using the CMS data that we now have, and came up

4   with their recovery.  That was double their actual damages.  We

5   didn't believe triple was appropriate because when we look at

6   the continuum of the evidence, the spread marketing evidence

7   that we had against BMS, there was some, but it wasn't anywhere

8   near as strong as what we had for AstraZeneca; and your Honor

9   actually made that finding in your trial ruling.  So that's why

10  we're proposing double here instead of triple because --

11          THE COURT:  But why don't we just do double in the

12  heartland period, single -- just before we re-notice this, we

13  have to just nail this -- double, two times in the heartland --

14  this is Class A -- one time in the non-heartland, and on the

15  Class B drugs -- now, this is their actual damages, right, in

16  Class A?

17          MR. MATT:  Correct.

18          THE COURT:  Why am I treating it any differently?  I

19  have no basis for distinguishing between consumers in Class A

20  and Class B as to who gets actual -- why can't we do actual

21  damages in Class B?

22          MR. MATT:  When we supplement the record with material

23  from Dr. Hartman, you will find that he can't do that for the

24  Class B drugs because of the median problem associated with the

25  generics.

1        THE COURT:  So he can't -- all right, all right, all

2  right.

3        MR. MATT:  Class B is mostly generic.

4        THE COURT:  All right, so that's a good explanation.

5  So Class B is mostly generics.  So for the generics you can't

6  calculate actual.  All right, now, why are we trebling?

7        MR. MATT:  That was a vestige of what happened in the

8  wake of the AstraZeneca settlement in which there was money

9  left over, and so everyone was concerned on our side that there

10 would be money left over.  And so in order to goose

11 participation and have people file their claims, we put in a

12 formula that was very generous, triple their co-pay, although

13 we did tell them --

14       THE COURT:  Well, I'm happy to --

15       MR. MATT:  That's how we did it.  That's how we got

16 here.

17       THE COURT:  Now, if we doubled it, people would be

18 getting -- excuse me.  If we just treated them -- I don't

19 remember if there was a heartland period that would be

20 considered for generics or not?

21       MR. MATT:  No.

22       THE COURT:  So either you doubled everybody or you

23 singled everyone.  Would you have extra money?  Probably not.

24       MR. MATT:  Well, no, because the proration is brought

25 down so low.  But let me ask a clarifying question, if I may,

1    your Honor.

2              THE COURT:  Excuse me.  Say it again.

3              MR. MATT:  The proration has brought it down, you

4    know, to 5 percent of the actual triple co-pays, so you're not

5    freeing up a lot of money is what I'm saying.

6              Now, the clarifying question I'd like to ask is your

7    idea -- and I understand you're thinking out loud -- your idea

8    for making the Class A drugs double just for the heartland

9    period, in case that will free up some money, is your

10   suggestion to perhaps move that money to the Class B drugs?

11             THE COURT:  Well, I'm thinking out loud.  Yes,

12   5 percent is so low.

13             MR. MATT:  That will increase the recovery.

14             THE COURT:  Now, you could talk me into maybe even

15   tripling heartland.  I don't feel strongly between double and

16   triple on the heartland drugs with the strongest case for

17   liability, but in Class B we've got the added problem that we

18   suddenly have all these people in there for whom we have no

19   understanding whether there's any claim or not with respect to

20   the branded drugs.  I've got that problem here.

21             MR. MATT:  And we'll get that nailed down for you,

22   your Honor.

23             THE COURT:  So in the initial set of drugs, before the

24   85 were added, were any of those brand name in Class B?

25             MR. MATT:  I just don't have in my head --

1       THE COURT:  Does anyone know?  Were all the added-in

2    drugs the ones that are the brand-name ones that people are

3    disputing?

4       MR. MACORETTA:  Judge, we think Lovenox, for example,

5    was always in the case and was not a later drug.  That was a

6    brand-name drug.  It was in Class B all along because at the

7    time we concluded that the claim against it was not strong.  I

8    cannot tell you the reason, but --

9       THE COURT:  Well, then no wonder there was discovery

10   into it.  I'm assuming there was discovery into everything that

11   was initially in the complaint.

12      MR. MACORETTA:  There's discovery to everything in

13   the -- yes.  Some discovery was stronger than --

14      THE COURT:  So on the drugs I struck, I am assuming

15   there was no discovery unless it was, as you describe it, part

16   of the crosscutting kinds of deposition witnesses who are more

17   broad-brush.

18      MR. MATT:  We believe there was discovery into a lot

19   of those drugs.

20      THE COURT:  The 85?

21      MR. MATT:  Yes.

22      MR. MACORETTA:  And, Judge, by discovery, I should

23   also point out, there was certainly some analysis of publicly

24   available spreads and pricing.  That's why we decided we wanted

25   to put them in.

1          THE COURT:  And that may be.  I just don't have it.

2          Now, on the brand-name drugs, what additional value

3     was added in for those, and should I treat them as the

4     multi-source or in a different way?  In other words, I got

5     confused in reading all of this, and it all keeps changing, and

6     I'm certainly not going to send out another notice plan until

7     I'm convinced it's fair because I think you have to re-notice

8     everybody.  That's the crisis we're in, right?

9          MR. MATT:  Even if they're going to get more?

10          THE COURT:  What?

11          MR. MATT:  I don't think we have to re-notice the

12     folks that are going to get more under the redistribution.

13          THE COURT:  Maybe, but I don't know whether it's easy

14     to parse those out or not.  I mean, it's a lot of people who

15     are getting less.

16          MR. MATT:  We have over a 100,000 claims, and it's

17     approximately 38,000 people who are getting less.

18          THE COURT:  Yes, it's a lot of people, right?  It's a

19     lot of people who are getting less.

20          MR. MATT:  It's still not the majority, though.

21          THE COURT:  So let me ask you this:  When you threw in

22     all these drugs, the defendants, for the release, how did you

23     value what that risk was to your company?  Was that just a

24     freebee; in other words, you got the value of the named drugs

25     and then you got this in as an afterthought?

e9603634-6c20-403d-ae39-edb683f9521f

1          MR. KOON:  Your Honor, Michael Koon for Aventis.  We

2     read the Court's opinions as well.  We took a look at all the

3     drugs that were included, whether Class A or Class B, for an

4     exposure analysis.

5          THE COURT:  So you have those reports, and you can

6     explain it to me, why this is fair, and how much you threw in

7     based on what you thought your exposure was.

8          MR. KOON:  I think that how much we put in for each

9     individual drug or each individual defendant is not something

10    that, the way the deal is structured now, that we're going to

11    share with the Court unless you order us to do so.

12         THE COURT:  Well, let me put it this way:  How do you

13    all think I'm going to -- it's been challenged.  How do you

14    think you're even going to survive on appeal?  There's no

15    record.

16         MR. KOON:  It seems to me that we need to get together

17    on both sides, plaintiffs and the defendants, and put the stuff

18    that we have been working on for the past seven years in front

19    of the Court so that you have that record in one place.

20         MR. MATT:  I echo that, your Honor, and I apologize

21    that it's not.  We didn't put a sufficient number of details in

22    there for you to understand this.  We've lived with this, okay,

23    for ten years almost.  Seven I think is probably a more

24    accurate number with respect to Track Two.  And your Honor

25    hasn't had a Track Two trial, so we understand that you're not

1  as familiar with this as we are.

2       THE COURT:  Or summary judgment, and, in fairness to

3  me, we've tried.  There's nothing in this record about those 85

4  additional drugs.

5       MR. MATT:  So all that work, most of that work that we

6  have done you haven't seen, you don't have the benefit of, and

7  we will do our best to make a much better record for you.

8       THE COURT:  All right.  And I'm not sure, let's just

9  put it this way, what I'm going to do on it.  I've actually

10  moved past a few legal issues.  I think class representation is

11  a less serious issue for a settlement class, both with respect

12  to the associations and with respect to the individual

13  plaintiffs.  However, no one has given me a record at all.  I

14  mean, you apparently turned over a bunch of documents to

15  Mr. Haviland pursuant to Judge Bowler's order which I don't

16  think I've gotten.

17       MR. MATT:  No, all of the documents that we believe

18  are necessary to demonstrate the plaintiffs' standing and their

19  typicality and adequacy we have submitted to your Honor.

20       THE COURT:  I understand, I've received those, but now

21  Mr. Haviland, whom I hoped was here today, has challenged that.

22  I'm not going to allow discovery if it's apparent on the face

23  of the documents, but I haven't received the documents he's

24  referring to.

25       MR. MATT:  My understanding, your Honor, is, what was

1   provided to Mr. Haviland most recently were documents that we

2   submitted with our reply brief.  So, in other words, the

3   plaintiffs continued to look and search their records -- their

4   attic, for instance, with one plaintiff that Mr. Berman alluded

5   to -- and they found more material since our last hearing, and

6   we provided that to the Court.  So I'm under the impression

7   that you're not missing anything from us.

8           THE COURT:  Well, why don't you double-check that.

9           MR. MATT:  Okay.

10          MR. MACORETTA:  Judge, to be sure, the documents

11  Mr. Haviland is referring to are for plaintiffs Swayze, I think

12  Trusky, and Laday, and they should have been attached to the

13  affidavits, those three reps filed with our reply brief of a

14  few weeks ago.

15          THE COURT:  What did you hand -- I have something, but

16  he keeps referring to other documents.

17          MR. MACORETTA:  Not true.

18          THE COURT:  Did you hand him documents because of

19  Judge Bowler's order that I don't have?

20          MR. MACORETTA:  No.  We gave Mr. Haviland everything

21  we could find that Judge Bowler ordered us to give him, but all

22  of those documents are attached to pleadings which we have

23  filed in the court.  There is nothing that Mr. Haviland has

24  that is not attached to a plaintiff's affidavit that your Honor

25  has.

1          MR. MATT:  And our most recent supplementation, your

2     Honor, just for the record so you guys can find it, is Docket

3     No. 7622, Docket No. 7621, Docket No. 7620.  Those are three

4     declarations that attach to the initial --

5          THE COURT:  All right, so it's clear for the record, I

6     have everything that Mr. Haviland has?

7          MR. MACORETTA:  That's correct, yes.

8          MR. MATT:  Look, Mr. Haviland continues to make his

9     arguments, and they're just off-base.  He's wrong.  For each of

10    those plaintiffs -- and I wanted to reemphasize this because I

11    think it's very important -- they were Medicare beneficiaries

12    during the settlement class period.  They were administered a

13    Track Two drug during that class period.  The data is

14    unequivocal.  We have the CMS data, okay?  CMS provided the

15    data to the settlement administrator.  The settlement

16    administrator then prints out the claim form showing each

17    J-Code for each of those drugs, and we presented that to your

18    Honor.  There is no doubt that those plaintiffs took a drug

19    subject to this settlement during the class period.

20         THE COURT:  We have gone through the documents that we

21    have, and I believe that there's not only standing but that

22    they can serve as class representatives.  And indeed the

23    intriguing legal issue, if I have time to do it, would be --

24    I'm not even sure that my one representative, one defendant,

25    and that associations can't serve as class reps applies in a

1   settlement class context as opposed to a litigation class

2   context.  So, as I say, I've moved beyond that legal issue, and

3   I find that they are adequate class reps.  I just wanted to

4   make sure there was nothing out there that I didn't have.  I

5   believe we have them all at this point.  My law clerk spent the

6   last two days going through them, and I've gone through that

7   evidence as well, and we have a flow chart.  I think that's

8   going to be all right for adequacy of class representative in

9   terms of standing.

10          Similarly, I think for settlement class,

11   associations -- actually, it's an interesting legal issue --

12   may actually be able to be class representative.  I'll think

13   about that one.  That's a different -- it's a good legal point,

14   and we're going to move on from there.

15          I also agree that you can waive claims that weren't

16   pressed, but there are certain limitations on it, and I've got

17   to be able to decide it's fair.  I'm not positive it is so far.

18   I have to understand the drugs a whole lot more to understand,

19   especially with such little recovery for Class 3, whether some

20   of those people who are giving releases are being underpaid for

21   it who should more appropriately be considered heartland; and

22   some of them may be grossly overpaid because, like with Epogen,

23   there's no claim, there's no "there" there.  It can't just be

24   to provide sort of solace to the defendants.  I can't deplete

25   what the rest of the class who have real claims get is I guess

e9603634-6c20-403d-ae39-edb683f9521f

Page 46

1    what I'm trying to say.

2          MR. YOUNG:  Hank Young on behalf of Amgen.  Your

3    Honor, I mean, with respect to Epogen, though, Epogen is a case

4    that has been a subject drug since day one.  It's in the very

5    first of the complaints.  It's carried all the way through

6    and --

7          THE COURT:  Well, where's your exposure if you paid

8    according to statute?

9          MR. YOUNG:  The exposure, your Honor, is, we've made

10   motions for summary judgment based on that and had them denied.

11         THE COURT:  But what's the issue?

12         MR. YOUNG:  Well, the issue is, I mean, it is a drug

13   in a settlement class for which there's compensation.

14         THE COURT:  No, no, no, you're not hearing me.  You're

15   going to brief it, I'm sure, but if you paid according to

16   statute whatever the statutory formula was and you didn't lie

17   about any prices, like AWPs are phony, if you didn't lie about

18   something, where's the exposure?  I just don't know the claim.

19         MR. YOUNG:  With respect to what you're pointing to on

20   Part B, that's what we've argued that there wasn't liability,

21   but the Court denied those motions and --

22         THE COURT:  Why?  I didn't rule on summary judgment in

23   this case.

24         MR. YOUNG:  Well, maybe it was a motion to dismiss at

25   the outset, I guess, your Honor.

1          THE COURT:  Yes, maybe, but it's obviously

2     incredibly --

3          MR. YOUNG:  I understand, but it was a drug that was

4     included in this litigation when we went to the table to

5     negotiate a settlement, and the settlement class is -- I mean,

6     it's defined as any -- "Made or incurred an obligation to make

7     any portion of --" this for Class 1 -- "any portion of a

8     Medicare Part B co-payment as a class drug manufactured,

9     marketed, sold, or distributed by a released company."  So it

10    was intentionally broad to cover all of the products that were

11    included as subject drugs.

12         THE COURT:  But just bring me up to speed, reeducate

13    me.  If I denied the motion to dismiss, it was eight years ago.

14         MR. YOUNG:  Your Honor, I have forgotten --

15         THE COURT:  You too, right?  All right.  In the

16    context of a motion to dismiss, it's very hard for me often to

17    understand it well enough because you have briefs that float

18    like ships in the night, and I didn't rule on summary judgment.

19    I want to understand.  EPO was always different because the

20    Congress passed a statute.  Now, do you remember why you

21    claimed that there was fraud in the EPO area?

22         MR. MATT:  There are some administrations, my

23    understanding, that -- the statute applies to -- correct me if

24    I'm wrong -- dialysis uses of the drug.  There are some other

25    uses that may have been reimbursed under AWP, but you can't

1    differentiate it, B; and then there was this market agreement

2    with Procrit, the other drug, that Epogen was supposed to be

3    used for primarily kidney purposes.  There's a lot more that

4    goes into it than just the simple reference to the statutory

5    formula, and we'll clarify that for you in our filing.

6          THE COURT:  Fine, if there's exposure, but right now

7    all I have is that goose egg under that column, and so I'm not

8    seeing why I'm paying anything.

9          MR. MATT:  Exposure is extremely, we believe it now,

10   it's very small.  But they want a release, and if they're going

11   to get a release, we think that the people should get paid for

12   giving that release, and that's why we --

13         THE COURT:  I know, but you pulled a figure out of the

14   air, and it's depleting what's available to other people who

15   are getting nothing, or not nothing but a tiny return on their

16   investment.  I just need to understand it, where the exposure

17   is, and are we overpaying these people who have no real claim

18   because it was paid based on a statute?  I'd rather have

19   that -- what was it? -- a certain amount of money in that

20   column go into paying more people from Class 3, if there's no

21   claim.

22         MR. MATT:  You mean Class 3 or Class B?  Class B

23   drugs?

24         THE COURT:  I'm sorry.  People in Class -- wait a

25   minute -- Class 3 with respect to Class B drugs I think is the

1    way it's correct to say it.  No?

2            MR. MATT:  Class B drugs are in both Class 1 and --

3            THE COURT:  In both classes.

4            MR. MATT:  So, your Honor, also, if we can get some

5    more benefit of your brainstorming here, I think we have taken

6    to heart some of your ideas, and we're going to work on them.

7    Let me ask you a question, if I may.  The Easy Pay, we've got

8    people back up to the full $35.  Okay, remember in Class --

9            THE COURT:  Thank you.  That was an improvement.

10           MR. MATT:  Okay, is that something we want to maintain

11   going forward, your Honor?

12           THE COURT:  Yes.

13           MR. MATT:  Okay.

14           THE COURT:  We told them they were going to get $35.

15           MR. MATT:  Well, we told them it was going to be

16   prorated too, but most people don't pay too much attention to

17   that latter part, right?

18           THE COURT:  I mean, $35 is what we -- I mean, I would

19   like to pay them the $35.  It's a flat fee.  It's not very much

20   money.

21           So how do we proceed from here?  Were there any other

22   big legal issues I needed to go through?  I don't have a

23   problem with reallocation because I understand why you're doing

24   it.  I understand why you're doing it.  But I do agree with the

25   point that it is so fundamentally different from what we

e9603634-6c20-403d-ae39-edb683f9521f

1    promised, unless you can stick with it, unless you can stick

2    with where we originally were, that I don't know how we don't

3    re-notice everybody.  And that's expensive, right?

4         MR. MACORETTA:  Yes.

5         MR. MATT:  It's actually -- you know, of course,

6    whatever we do is not cheap, right?  But I don't think we need

7    to re-notice everyone.  If people end up with more, I don't

8    think they need to get re-noticed because they are getting more

9    than they were originally entitled to under the redistribution.

10   It's not going to change their decision-making in terms of

11   whether to object or not.  They're getting more.  So I think we

12   only need to notice, just like in BMS, those people who are

13   getting less.  This is, again, although your --

14        THE COURT:  But it's such bad -- what can I say?  It's

15   bad for the system when I'm telling a huge number of people

16   they're getting less.  And it may, if I'm not persuaded by the

17   case, be that I just decide the thing isn't fair at all because

18   it isn't taking into account the value of the 85 drugs that are

19   being released.  So I guess we're going to have to first, when

20   we come in next time, have essentially a notice plan that I

21   could approve if I go along with it.

22        I was hoping, more than anybody in this room, to put

23   this to bed today, but it can't be, and when can we come back?

24        MR. MATT:  So let me just summarize what I think we're

25   going to give your Honor.  One, buttress the record, including

1    information from Dr. Hartman on the damages calculations, and

2    answer the other many questions that you have had that we have

3    been writing down; two, tweak the redistribution proposal in

4    response to your comments here today; and then, three, a notice

5    plan.  So those are things we'll come back to you with.  In

6    terms of timing --

7              THE COURT:  And if it turns out that a bunch of these

8    85 drugs were just thrown in, and we didn't do a valuation on

9    them, and we didn't have discovery on them, and I can't find

10   their fairness, defendants are going to have to figure out

11   whether, A, to back down on the release on them, or, B, put in

12   some more money for them, and, C, whether part of this can be

13   approved and the rest of it can move on.  In other words, you

14   have to have some thought here, and the real issue is whether

15   or not -- I understand you've been in front of Eric Green for

16   some of this.  I don't know whether it's worth doing yet.  You

17   may fully persuade me that the dollar amounts from these 85

18   drugs were taken into account and there was full discovery and

19   you understood what you were releasing.  I'm sort of reading

20   between the lines it's going to be difficult for you.

21             MR. MATT:  I think that we'll be able to make a

22   showing that will satisfy your Honor.  Let us do that.  In

23   terms of timing, I've got to be able to go back to Dr. Hartman.

24   I know that he has been in a trial, I think, the last couple of

25   weeks, so --

1          THE COURT:  Where?

2          MR. MATT:  I don't know.

3          THE COURT:  Does he do something other than AWP and

4    Neurontin?  I didn't think I left him any time.

5          MR. MATT:  Oh, yes, he does a lot of other stuff,

6    so --

7          THE COURT:  All right.

8          MR. MATT:  I would love to be able to come back to you

9    within a week, but we're not going to be able to do that

10   because of Dr. Hartman's schedule.  In addition, I believe that

11   we should try to continue mediation efforts simultaneously and

12   concurrently.

13         THE COURT:  But let me just say this:  Yes, I'm happy

14   to have you do that, but at the end of the day, I have to be

15   able to in good conscience, the way I was in the BMS case and

16   the other cases that I know, be able to say, "This is fair,

17   this makes sense."  So even if the mediator helps -- that helps

18   enormously, I have enormous respect for Mr. Green -- I just

19   have to understand it, and I don't understand it now.  It seems

20   like a blind box that you dropped:  Who contributed what?  What

21   was your exposure?  How much exposure was there on these

22   release drugs?  I don't know.  I'll need briefs and affidavits

23   from everybody or one collective one.

24         MR. YOUNG:  Your Honor, that's the point I was going

25   to make.  Would it be acceptable to the Court to get a

1    submission from the defendants as well as to why this makes

2    sense from a fairness standpoint?

3            THE COURT:  Well, I need you because right now they

4    don't actually even know, right, is what you're telling me.

5    This was some sort of behind-the-door black box as to who put

6    in what and what the internal allocation of risk was, right?

7    They don't know.  They couldn't even help me, right?

8            MR. MACORETTA:  Yes.

9            THE COURT:  So, for example, if Epogen you put in very

10   little for and they turn out to be the bulk of the claims, what

11   am I going to do with that?  I don't know.

12           MR. MATT:  We're completely blind to what the

13   defense --

14           THE COURT:  Right, but they turn out to be the --

15           MR. MATT:  It's their prerogative.

16           THE COURT:  It turns out to be the number that sunk

17   the ship in a way, right, on Class A?

18           MR. MATT:  In terms of -- well, no.  I think there

19   were other -- there were other mismatches, not just Epogen,

20   when we actually finally got the benefit of the CMS data.  It

21   wasn't just Epogen, but it was a significant impact, yes.

22           THE COURT:  They should be paying more, I mean, or

23   whoever the -- I don't know what happened.  It may just be that

24   other people died faster because there are more serious

25   diseases, right?

Page 54

1        Are any of your class reps here?

2        MR. MATT:  They're not in the courtroom, no.

3        THE COURT:  The other thing you need to do in redoing

4   this is, Mr. Berman's affidavit was inadequate on this point:

5   "I am assured by members of the class team that they told the

6   class reps about the settlement and they agree."

7        MR. MATT:  Your Honor, we have to walk a fine line

8   there, right?  We can't betray attorney-client privilege

9   information.  We can't --

10        THE COURT:  They're class reps.

11        MR. MATT:  But we can't tell you everything that we

12   talked about and everything they said in response, but there

13   were --

14        THE COURT:  That was not adequate.  This needs --

15   while I do think they have standing and I think they're

16   adequate, they can't be a rubber-stamp.  I need more.

17        MR. MATT:  They're not.  There was a specific

18   conversation held between a lawyer on the class counsel team

19   and each of those plaintiffs explaining this entire process and

20   what happened, and asking them whether they believed it was

21   fair to redistribute it to get, particularly in Class A, more

22   closer lines of damages, and they were on board, they were on

23   board.  There's no rubber-stamping.

24        THE COURT:  Just what he submitted sounded inadequate.

25        MR. MATT:  All right, we'll fly and flesh that out

1   more, but we need to be careful that we don't overstep the

2   bounds.

3           THE COURT:  No, his was totem pole hearsay:  He said

4   that the class team members said that the person said.  I'd

5   like an affidavit --

6           MR. WEXLER:  I'm one of the class team members.

7           MR. MACORETTA:  I'm one as well, your Honor.

8           THE COURT:  Just have the class rep put in an

9   affidavit and discuss it as you go along.  I kept reading and

10  rereading.  I had trouble understanding what you were talking

11  about, the difference between actual loss and recognized loss,

12  and why you're doing Class A different than Class C, and why is

13  it called "class" when it involves people but also "class" when

14  it's a drug?  I mean, if I were explaining this to my mother,

15  it would be a hard explanation.

16          Now, some of these are children of the sick person,

17  right?  They're the executors of estates, and so it's a little

18  easier.  I understand that.  But I need some explanation as to

19  how they're involved and how we're redoing it because once I

20  re-notice this, that's going to be it.  And people are going to

21  be really angry when they get reduced amounts.  And it's hard

22  to explain to people who are sick, and one woman, it was

23  heartbreaking what she said, how difficult it was for her, and

24  she was counting on the money.  Does anyone remember this

25  woman?  "I have been a widow for nearly eleven years and on a

1    fixed income.  I really was depending on this reimbursement."

2    These are hard -- I understand I have to be the tough judge who

3    decides who has liability or not, but it's hard to say to an

4    old person, "You're going to get X," and have them count on it,

5    and then have that not happen.

6         MR. MACORETTA:  Judge, I spoke to her, and it was

7    hard.  That's Ms. Augello, yes.  Yes, it was hard, but I can

8    tell you that I spoke to her, and I think she understands

9    better now, and we'll send her a letter pursuant to what --

10        THE COURT:  Maybe she's eating cat food.  I'm just

11   saying, it's very difficult to say 38,000 people are going to

12   get less than what we promised them.  I'd like to minimize that

13   number if that's feasible.  I'm also likely to do 28 percent

14   attorneys' fees again, so I want you to build that in.

15        MR. MATT:  For the consumer part?

16        THE COURT:  I don't remember how I -- whatever I --

17        MR. MATT:  I think you did 30 percent for the TPP part

18   and 20 percent for the --

19        THE COURT:  Yes, whatever I did for the --

20        MR. MATT:  BMS.

21        THE COURT:  -- BMS.

22        MR. MATT:  Okay.

23        THE COURT:  So is there anything else anyone wants to

24   say at this moment?

25        MR. RASKIN:  Your Honor, Richard Raskin on behalf of

Page 57

1    Bayer.

2              THE COURT:  Yes.

3              MR. RASKIN:  I just wanted to respond to one point

4    that you raised on behalf of my client and my client alone,

5    which is, you raised the possibility that you might have to

6    revisit settlement amounts, 85 drugs, et cetera.  And, you

7    know, this hasn't been said today but I think it's critically

8    important that from my client's perspective, this was a very

9    fair and rigorous process.  And when we talk about fairness, we

10   really have to go back to the beginning where this case was

11   brought against all of our drugs initially, and over time

12   certain things got narrowed out.  And my client and many other

13   clients here were subjected to considerable discovery, massive,

14   I might say, discovery about all of our drugs.  The scope of

15   the release is a critical part of this settlement.  I see,

16   frankly, standing here today, not having consulted with my

17   client on the specific issue of your comments today, I see no

18   chance that we could parse out portions of this settlement.

19             This was a $125 million settlement.  There's no --

20   there's a lot of zeros there, and the reason there is the zeros

21   is, there's a certain amount of rounding that goes into this

22   kind of analysis.  We did not as defendants collectively build

23   up a dollar-for-dollar damages amount in the way that we might

24   have had this been litigated to the end; but this was an effort

25   to achieve finality, and the class is getting a lot out of our

1   desire to achieve finality.  And part of that finality was,

2   there are a great many drugs at issue here, but we want AWP

3   litigation to end.  And I say that -- I say that --

4            THE COURT:  I'm with you.

5            (Laughter.)

6            MR. RASKIN:  I know you are.  I know you are.  You

7   were weary, plaintiffs were weary, and we were weary.  And I

8   want to point out in particular that Bayer settled AWP with the

9   government in 2001, and on that basis sought various dismissals

10  from your Honor in the course of this, and finality was an

11  essential --

12           THE COURT:  Based on what I've got, you will have no

13  finality.  It will go up on appeal and be remanded because I

14  cannot make a fairness decision today.  I couldn't approve it

15  today.

16           MR. RASKIN:  What I ask you to consider is that part

17  of that fairness equation, part of that fairness equation is

18  our need to achieve finality to get significant benefits to the

19  class.  I understand you need more information, and we're going

20  to give you more information, but that needs to play a part in

21  the balance here too.  And we would just respectfully ask that

22  you consider that we need to close this down, and we need to

23  close it finally, all of AWP litigation, as to our drugs.

24           THE COURT:  Well, let me ask you this:  How many drugs

25  were in the first four amended complaints for Bayer?  Do you

Page 59

1   remember?

2           MR. RASKIN:  Oh, gosh.  Your Honor, like you, I've

3   been living this since the beginning, and like you, I don't

4   remember.

5           THE COURT:  Well, how many were added --

6           MR. RASKIN:  But I will tell you that the first

7   complaint was all of our drugs.

8           THE COURT:  Well, what about the release?  How many

9   were struck from the -- how many releases are you getting for

10  which there was no discovery or no valuation?  Do you know?  Do

11  you remember?

12          MR. RASKIN:  Your Honor, none.  As Mr. Muehlberger

13  said, we have faced discovery on a companywide, all-drugs

14  basis.  Now, there were certain drugs where there was more

15  burrowing than others, but you don't do discovery by sending

16  out individual drug requests.  You say, "What are your

17  company's practices?"  And we provided, frankly, discovery on

18  many drugs that weren't necessarily on that list.

19          THE COURT:  Well, what were released that I had --

20  what were added back in after I struck them, do you know?  Do

21  you remember as you sit here?  Were there any brand names?

22          MR. RASKIN:  I don't understand your question.

23          THE COURT:  I think the heart of the contention is

24  that 85 drugs the defendants moved to strike as late filed, and

25  I allowed that motion to strike because it was -- I needed to

1    create a final list of drugs and plaintiffs kept adding them

2    in.  It wasn't done the merits; it was done as a case

3    management decision.  And those are the 85 drugs that, as I

4    understand it, there's a challenge that there was a release of

5    those drugs without sufficient monetary compensation to the

6    class, and that's why the returns were so poor; you know, 3 and

7    5 percent in the Class B area.  So the question is, it's been

8    explained that the multi-source drugs there really wasn't much

9    value to -- I actually agree with that -- but then there was

10   the issue of, there were several that were brand named which

11   had higher spreads.  Were any of those Bayer's, do you know?

12          MR. RASKIN:  I do not know, your Honor.

13          THE COURT:  See, my --

14          MR. RASKIN:  I will say, however, that the plaintiffs

15   were in a very good position in the course of this litigation

16   to know which drugs they wanted to pursue most aggressively and

17   which drugs they thought were less likely to result in a

18   significant recovery because they have been spending years

19   attempting to make that determination and narrow their drug

20   lists appropriately.

21          THE COURT:  I agree totally, and then they tried to

22   add in these 85, and then I struck it.  And so that's the nub

23   of where I'm concerned, not the stuff that was litigated from

24   the get-go where you had the Hartman report and you had

25   discovery.  I'm not necessarily second-guessing that.  What I'm

1    concerned about are the releases for the 85 drugs which were

2    not subject to full-bore litigation.  There may have been some

3    general discovery that, you know, picks those drugs up, and

4    then maybe I'll feel completely satisfied, or maybe there

5    weren't.  But the point that was made that I can't blow past is

6    that some of them were brand name, and they weren't this

7    multi-source issue, and they were thrown in at the end is what

8    the allegation is.  Maybe it's true, maybe it's not, but the

9    truth is, I don't know, and, frankly, it sounds like no one in

10   this room knows.

11           MR. RASKIN:  I would think that from a settlement

12   standpoint, the fact that they had been stricken would decrease

13   their value for the class.  They were stricken.  They were

14   subject to appeal, and --

15           THE COURT:  Well, no, or a new class action.  I mean,

16   I just did it on -- I didn't do it with prejudice.  It was too

17   late.  Of course, there are now statute of limitations issues,

18   true, fair enough, but there was some value to those claims.

19           MR. RASKIN:  Yes, there was.

20           THE COURT:  And that's why you want them to be

21   released, and I just have to make sure that the class got the

22   value.  It may be much reduced, much discounted.  I need to

23   understand it better, and nobody in this room can tell me

24   because you all forgot, and I never knew, and so -- and it has

25   been vigorously valued.

1          MR. RASKIN:  Your Honor, I will say that -- I would be

2     remiss in leaving without saying it -- aspects of this vigorous

3     challenge are just factually incorrect, and the Court needs to

4     address that at some point too.  For instance, at the last

5     hearing Mr. Haviland, you know, pointed at Enbrel, Amgen's

6     Enbrel, and said, you know, it was a brand-new drug and we

7     struck it back in April of 2006.  Well, your Honor, we can cite

8     every docket entry from 2003 showing that it was a subject drug

9     from the time of the AMCC.  So, I mean, there are --

10          THE COURT:  I'd love to see that brief.  I haven't --

11          MR. MATT:  Well, we got his brief last night.  I got

12     it at midnight when I got to my hotel room.  We'll respond to

13     his brief, your Honor.

14          THE COURT:  In fairness to him, you got me your brief

15     at 8:30 at night the night before.  So, I mean, every morning I

16     come in with a present on my chair.

17          MR. MATT:  Well, and one of his briefs is filed in

18     ostensible response to a brief that the defendants submitted

19     three weeks ago.

20          THE COURT:  I know, but that wasn't very effective,

21     but the one that was effective was this one.  Now, listen, the

22     following is true:  We need to set a hearing date.

23          MR. MATT:  We do.  Your Honor, we --

24          THE COURT:  What do you think?

25          (Discussion between the Court and Clerk.)

1          THE COURT:  We need to do this at the end of July

2     because my law clerk leaves.  I start with a brand-new clerk.

3     I can't be starting from scratch on this.

4          MR. MATT:  I just don't know if we can get this done

5     for you by then.

6          THE COURT:  Yes, but how am I going to do it?  So why

7     don't we say that all filings -- I'm going to be down at the

8     Sentencing Commission the first week of August.  I need to have

9     a hearing the last week in July, and then I need to have my law

10    clerk writing, and then if there's any other problem, I need to

11    finish it by the end of August.  7/27?

12         MR. MATT:  Your Honor, I'm doubtful we can get all

13    this information to you by then.  We can try, but I'm

14    concerned.  We have a lot of work to do for you, and we're

15    going to do it as hard as we can and as vigorously as we can,

16    but I am concerned it's an unrealistic expectation.

17         THE COURT:  Well, shoot for 7/27, and I'm willing to

18    put it -- the following week I'm at the Sentencing Commission,

19    so the week after that would be the week of -- I'm basically --

20    what about August 8 as a fallback date?

21         MR. MATT:  That sounds much more realistic, your

22    Honor.

23         THE COURT:  But understand, I've got a problem and

24    it's a big one at this point.  The budget for the Federal

25    Courts has been decimated.  I do not get a third law clerk.  I

e9603634-6c20-403d-ae39-edb683f9521f

1    am losing my law clerk.  It's a huge, big deal.  And that means

2    that any brief I won't accept -- I can't do what we did the

3    last two days, which is 8:30 at night, 9:30 at night these huge

4    briefs coming in.  So that means that any briefs that are filed

5    have to be filed at least three working days before the

6    hearing, which means what day?

7              THE CLERK:  Let's do Wednesday, the 3rd, August 3.

8              THE COURT:  All briefs, all filings.  Any oppositions

9    will have to come in that Friday.

10             THE CLERK:  Which would be August 5.

11             THE COURT:  No filings shall be longer than 20 pages.

12   You've been good about that.  That's one thing Mr. Haviland has

13   not been good about, 20 pages.  Now, that doesn't mean you

14   can't have attachments and all that sort of thing.

15             MR. MACORETTA:  What time on the 8th, your Honor?

16             THE CLERK:  Nine.

17             THE COURT:  Nine o'clock.

18             MR. MATT:  Can we ask your assistance on something,

19   your Honor?

20             THE COURT:  Yes.

21             MR. MATT:  Would you be willing to either order or

22   request that Mr. Haviland participate in mediation?

23             THE COURT:  He is welcome to.  I don't know what you

24   want me to do here.

25             MR. MATT:  A nudge would be helpful.  We have --

1        THE COURT:  I thought he was involved in the mediation

2   and that it must not have worked out because I didn't get the

3   wonderful Eric Green call with the little note that says "good

4   news," so --

5        MR. MATT:  Without getting into the details, which I

6   don't think we should, I think we need some help getting him

7   there.

8        THE COURT:  Right, but --

9        MR. MATT:  We've repeated your Honor's words.  We've

10  taken it to heart that we've got to try and get this done and

11  there can be no appeals, and we can't do that without him there

12  in mediation.

13       THE COURT:  I will order that he attempt to mediate

14  the case.

15       MR. MATT:  That would help.  Thank you.

16       THE COURT:  Not that he go to mediation.  Now,

17  understand, though, there are other objectors here.

18       MR. PENTZ:  Your Honor, John Pentz again for the

19  objectors.  If there's going to be a mediation, I think we

20  should all be in attendance.

21       MR. MATT:  I'm not talking about a mediation session

22  because I can't speak to Mr. Green's schedule.  I'm talking

23  about participating in mediation efforts, so -- and we'll talk

24  with you too, Mr. Pentz.

25       THE COURT:  You're welcome to if you want to, but the

1    key here is -- and I'm like a broken record -- no one wanted to

2    approve this more than I did today.  And this kept flowing in

3    the last few days, and then reallocation late two nights ago,

4    and then the opposition to the release late last night.  All I

5    could do was to stay with catch-up, and this needs to go --

6    it's the most complicated settlement I've ever presided over,

7    even complicated by AWP standards, because of the number of

8    drugs, the number of defendants, the lack of knowledge on my

9    part.  I never did go through a summary judgment hearing.  I

10   don't know these issues.  And I've never, as far as I'm

11   concerned, gotten a full-blown brief on why this is fair, and

12   that's -- are you going to file a joint pleading from the

13   defendants or separate ones?

14           MR. MUEHLBERGER:  We'll have to talk about it, your

15   Honor.

16           THE COURT:  You'll have to talk about it.

17           MR. MUEHLBERGER:  One other thing, your Honor -- Jim

18   Muehlberger for Aventis -- I want to make clear on the record

19   today, we will provide you with the information you have

20   requested, but I don't want you to be surprised when we point

21   out the numerous inaccuracies and errors in this so-called

22   85 drug list that Mr. Haviland --

23           THE COURT:  It may be.  I just don't know it.  I just

24   don't know because that hasn't come in.  And it may be wrong.

25   It's just I don't have that record.  But this is what -- how

1    many defendants are there currently?

2              MS. TABACCHI:  Eleven.

3              THE COURT:  I don't want eleven 20-page briefs.  So

4    we'll do it the way we did the last time:  There could be one

5    crosscutting brief for 20, and if there's something unique to

6    your client, do it at 5 pages.  I just won't have time to read

7    it, okay?

8              So the goal here is to provide some compensation for

9    this class of people, and I will do what I need to do to do it,

10   but I am deeply worried about how it keeps slipping on me.  But

11   I think we've made progress here today.  Have a nice weekend,

12   and I will see you in what is basically a month.  So we'll see

13   you then.  Okay, thank you.

14             MR. MATT:  Thank you.

15             MR. MACORETTA:  Thank you, your Honor.

16             THE CLERK:  All rise.

17             THE COURT:  And you're going to give me the paperwork

18   on BMS.

19             MR. MATT:  Yes.

20             THE COURT:  Thank you.

21             THE CLERK:  Counsel, I want to make sure I gave you

22   the right date.  It's Monday, 8/8.

23             MR. WEXLER:  Yes, 9:00 a.m.

24             THE CLERK:  8/8.  It's a Monday at 9:00.

25             MR. WEXLER:  Briefs are due Wednesday, the 3rd.

1           THE CLERK:  Wednesday, the 3rd, and then the

2    oppositions are due Friday, the 5th.  Good, okay, so those are

3    the dates.

4           MR. MATT:  Thanks.

5           (Adjourned, 10:47 a.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                     C E R T I F I C A T E

2

3

    UNITED STATES DISTRICT COURT )
4   DISTRICT OF MASSACHUSETTS    ) ss.
    CITY OF BOSTON               )
5

6

7           I, Lee A. Marzilli, Official Federal Court Reporter,

8   do hereby certify that the foregoing transcript, Pages 1

9   through 68 inclusive, was recorded by me stenographically at

10  the time and place aforesaid in Civil Action No. 01-12257-PBS,

11  In Re:  Pharmaceutical Industry Average Wholesale Price

12  Litigation, and thereafter by me reduced to typewriting and is

13  a true and accurate record of the proceedings.

14      In witness whereof I have hereunto set my hand this 11th

15  day of July, 2011.

16

17

18

19

20          /s/ Lee A. Marzilli

            _____
21          LEE A. MARZILLI, CRR
            OFFICIAL FEDERAL COURT REPORTER
22

23

24

25