Exhibit A

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

IN RE:  PHARMACEUTICAL        )
INDUSTRY AVERAGE WHOLESALE    )
PRICE LITIGATION             )  MDL No. 1456
_____    )
                             )  Master File No.
THIS DOCUMENT RELATES TO:    )  1:01-CV-12257-PBS
                             )
United States ex rel.        )  Sub-Category Case
Linnette Sun and Greg        )  No. 1:08-CV-11200
Hamilton, Relators           )
                             )
      v.                     )
                             )
Baxter Hemoglobin            )
Therapeutics and Baxter      )
International Inc.           )

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

        Deposition of GREG HAMILTON, taken before

MARGARET A. BACHNER, CSR, RMR, CRR, and Notary Public,

pursuant to the Federal Rules of Civil Procedure for

the United States District Courts pertaining to the

taking of depositions for the purpose of discovery, at

Suite 600, 300 North LaSalle Street, Chicago,

Illinois, on the 21st day of January, A.D. 2010, at

10:32 a.m.

Page 2

```
 1        There were present at the taking of this
      deposition the following counsel:
 2

 3            on behalf of the Relators;

 4      BY:  MARK ALLEN KLEIMAN, ESQUIRE

 5      2907 Stanford Avenue

 6      Venice, California  90292

 7      310-306-8094

 8

 9            on behalf of Baxter Hemoglobin Therapeutics
      and Baxter International Inc.;

10      DICKSTEIN SHAPIRO LLP

11      BY:  J. ANDREW JACKSON, ESQUIRE

12           RUCHI JAIN, ESQUIRE

13      1825 Eye Street, N.W.

14      Washington, DC  20006-5403

15      202-420-2200

16

17            on behalf of Bayer Corporation.

18      SIDLEY AUSTIN LLP

19      BY:  ENJAMIN KEITH, ESQUIRE

20      One South Dearborn Street

21      Chicago, Illinois  60603

22      312-853-7814

23

      ALSO PRESENT:
24        MR. MICHAEL BOLTON,
          In-House Counsel, Baxter International Inc.
25
```

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 3

1                        I N D E X

2    WITNESS                             EXAMINATION

3    GREG HAMILTON

4      By Mr. Jackson                              5

5

6                      E X H I B I T S

7    DEPOSITION EXHIBIT              FOR IDENTIFICATION

8      Number 1 - Notice of Deposition of Relator        5
                  Greg Hamilton
9
       Number 2 - Pages from drugfraudsettlement.com     16
10                re: Attorneys

11     Number 3 - Page from drugfraudsettlement.com      16
                  re: Drug Expert Greg Hamilton, Sr.
12
       Number 4 - Greg Hamilton curriculum vitae         29
13
       Number 5 - Document entitled Baxter Products      30
14                W/AWP History, GH000001-000009

15     Number 6 - Declaration of Greg Hamilton           35

16     Number 7 - Amended Complaint for Damages          37

17     Number 8 - Document entitled Hemophilia           46
                  Resources of America, Inc.,
18                GH000010-000022

19     Number 9 - Document entitled Express Scripts,     47
                  Inc. First DataBank File Inquiry,
20                GH000023-000046

21     Number 10 - Document entitled Baxter              49
                   BioScience, Customer: Curascript,
22                 GH000047

23     Number 11 - RBC Capital Markets Document          54
                   entitled "A Changing  Paradigm In
24                 Hemophilia," GH000048-000071

25

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 30

1      are wrong.  But it's -- it's an accurate

2      representation.

3          Q.    Have you ever worked for Baxter or any of

4      the -- either of the Baxter entities that are

5      identified as defendants in this case?

6          A.    No, I have not.

7          Q.    Have you ever consulted with Baxter or

8      either of the Baxter entities who are defendants in

9      this case?

10         MR. KLEIMAN:  Objection.  Ambiguous.

11     BY MR. JACKSON:

12         Q.    You can answer the question.

13         A.    I have not been paid as a consultant for

14     Baxter.

15                          (Deposition Exhibit Number 5 was

16                          marked for identification.)

17                          (Document tendered to the

18                          witness.)

19     BY MR. JACKSON:

20         Q.    I show you what's been marked as Deposition

21     Exhibit 5.  Deposition Exhibit 5 is a document that at

22     the top left corner says "Baxter Products W/AWP

23     History."  And under that it's "04.11.05."

24                Have you ever seen this document before?

25         A.    Yes, I have.

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 78

1        A.      I'm not sure exactly, but I'd say probably

2     1993.

3        Q.      Do you still have these original documents?

4        A.      Yes.

5        Q.      In your possession or in your counsel's

6     possession?

7        A.      In my possession.

8                Well, let me -- when you say "original

9     documents," I have the actual appointment books in my

10    possession.  I made photocopies of all these pages and

11    sent them to Mr. Kleiman, who has those in his

12    possession.

13       Q.      I understand.  I'm asking about the

14    originals because we may want to see the originals.

15    So, I'd ask you not to destroy or otherwise get rid of

16    the original documents.

17       A.      I'll keep the shoebox intact.

18       Q.      All right.  Let's look at the first page of

19    Deposition Exhibit 19.  The first page of Deposition

20    Exhibit 19, which appears to be a calendar date of

21    January 24, 2005, has the word "Baxter."

22               And then can you tell me what the word is

23    after that?

24       A.      Sure.  "Royal."

25       Q.      And what's after that?  There is some other

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 79

1    notes or comments or marks.

2         A.    It looks like it says, "Plus?"

3               Oh, you want me to try to interpret that

4    for you in Greg hieroglyphics?

5         Q.    I would.

6         A.    That probably means meeting with Baxter,

7    Royal and possibly somebody else.

8         Q.    Okay.  And where were you meeting with

9    Royal on January 24th, 2005?

10        A.    I don't know.

11        Q.    Did you meet with them then?

12        A.    I can't say for certain.  Typically if

13   there's something like this in my appointment book and

14   the appointment is cancelled, it will be scratched

15   out.  So, I would say I probably did.

16        Q.    Do you remember what the subject of your

17   meeting was at that time?

18        A.    No.

19        Q.    All right.  Let's go to the next page,

20   GH001498.

21               Do you see that?

22        A.    Mm-hmm.

23        Q.    There is on that page what appears to be

24   the name "Royal Stuart."

25               Do you see that?

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 80

1      A.    Mm-hmm.

2      Q.    What's the word after that?

3      A.    I don't know for certain, but if I had to

4   guess, it looks like "10 a.m."

5      Q.    What are the words below that?

6      A.    "Noon Steve."

7      Q.    Do you know what that means?

8      A.    That means I had a meeting at noon with

9   Steve.

10     Q.    Do you know who Steve is?

11     A.    No.

12     Q.    Did you meet with Royal Stuart on January

13   19th, 2005?

14     A.    Again, my appointment book says I had an

15   appointment with him.  That means I probably kept that

16   appointment.

17     Q.    What was the subject of the appointment; do

18   you know?

19     A.    Don't know.

20     Q.    If it occurred, do you remember what was

21   said during that appointment?

22     A.    No, I do not.

23     Q.    All right.  Can you please go to the next

24   page, GH001499?  Are you there?

25     A.    I'm there.

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 81

1        Q.    I see what appears to be "NHF 4-5-6."

2              Do you see that?

3        A.    Yes, I do.

4        Q.    Can you explain that to me?

5        A.    Yeah.  That means that I was in a meeting

6    in Dallas at the Hyatt.  It was the National

7    Hemophilia Foundation meeting, the 4th, 5th and 6th,

8    obviously, of November.

9        Q.    And what year was that?

10       A.    Good question.  '04.

11       Q.    I note on that same page something has been

12   blacked out or redacted.

13             Do you see that?

14       A.    Yes, I do.

15       Q.    Can you tell me why something was redacted

16   on that page?

17       A.    Specifically I can't.  Generally do you

18   want --

19       Q.    Sure.  Why generally are there redactions

20   throughout these pages?

21       A.    I would say that's probably some personal

22   notation, something that had nothing to do with Baxter

23   or this case.

24       Q.    Okay.  Can I have you turn to the next

25   page, GH001500?  Can you read what it says at the top

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 82

1    of that page?

2         A.    If you're referring to the part under

3    "Monday" where it says, "Baxter 1 p.m."?

4         Q.    Yes.

5         A.    Oh, yeah.  Okay.  This says, "Baxter 1 p.m.

6    North to Lake-Cook Road."

7               What that means is that I was meeting with

8    Baxter at their facility in Chicago.

9         Q.    Okay.  Who did you meet with that day?

10        A.    That particular day I can't say for

11   certain.  Typically if I was at Baxter's headquarters,

12   Pete O'Malley would have been there.  But it could

13   have been -- who else was with him I wouldn't know for

14   sure.

15        Q.    Do you have a specific memory what occurred

16   on that day, if that meeting actually occurred?

17        A.    Was that two questions?

18        Q.    I'll start over.

19              Do you remember having a specific meeting

20   on that day?

21        A.    I do not know if it actually occurred.  I

22   believe that's where you're going.  You want me to

23   say, right?

24        Q.    I'm just trying to assess --

25        A.    And I'm trying to answer you honestly,

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 83

1    okay?  I'm just trying to say if it's in the

2    appointment book and it's not scratched out, that

3    means I believe I had that meeting.  If you say to me,

4    "Are you absolutely certain that that meeting

5    occurred," well, no.

6        Q.    And I need to know what occurred at that

7    meeting.

8        A.    And my answer on that one is I don't know.

9        Q.    Can you turn to the next page, GH001501?

10       A.    Yes.

11       Q.    Can you read that for me on that calendar

12   date?

13       A.    Yes.  "Noon Jeff Beck Millennium Grill."

14       Q.    Who's Jeff Beck?

15       A.    Baxter rep.

16       Q.    Do you remember what you and Jeff Beck

17   discussed that day?

18       A.    No, I do not.

19       Q.    Mr. Hamilton, I'll make this a little

20   easier maybe.  Several of the pages of your calendar

21   pages here mention things like NHF.

22             What does NHF mean?

23       A.    National Hemophilia Foundation meeting.

24       Q.    Okay.  If I ask you what happened, for

25   example, at the National Hemophilia Foundation meeting

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 84

1    that is on GH001502, will you be able to tell me what

2    occurred during that meeting?

3          A.    Specifically, no.

4          Q.    And will you be able to tell me what

5    occurred at any of the meetings that are identified in

6    any of these calendar pages?

7          A.    There may be -- generally speaking the

8    answer is no.

9                There may be one or two where I would be

10   able to say -- for example, if you look at 1506,

11   Friday, August 16th, where it says, "Slides to

12   Baxter," okay?  And it was just 10 days before that we

13   have a -- I have a notation for a Baxter conference

14   call.

15               The slides going to Baxter would have been

16   my what I call PBM 101 slides.  This is where we were

17   discussing things about PBMs and what their

18   involvement in the specialty pharmaceutical market's

19   gonna be.  And I had a slide presentation that

20   described, you know, some just general stuff about how

21   PBMs operate.

22               So, again, we can go back and say that,

23   well, that means that probably Wednesday, February 5th

24   was a discussion about PBMs in the specialty pharmacy

25   market and how it applies to both IGIV and to

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 85

1    hemophilia products.

2              And the following one that says "Slides"

3    would have been I sent them the deck, the slide deck.

4              However, other than that -- let me help

5    you.  Other than that, for these entries where it says

6    Baxter this, NHF that or whatever, it merely indicates

7    that I had a meeting scheduled with them.  And I can't

8    say that it actually happened for certain.  And what

9    the subject was I can't say for certain, either.

10             Does that help?

11        Q.   It does.  Thank you.

12             Let's go to GH001502, "NHF."

13             Can you tell me what year this is?

14        A.   I have a notation at the top that says '03.

15        Q.   Okay.  That handwritten note at the top is

16   your note?

17        A.   My handwriting, yes.

18        Q.   And was that created when you made the

19   copies of this?

20        A.   Yes.  And I did that, obviously, because

21   this particular page of the appointment book didn't

22   have the year on it.

23        Q.   Okay.  Where were you employed at the time?

24        A.   In 2003?

25        Q.   2003.

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 89

```
 1                    (Whereupon, the deposition

 2                    resumed at 1:36 p.m.)

 3                    GREG HAMILTON,

 4    called as a witness herein, having been previously

 5    duly sworn and having testified, was examined and

 6    testified further as follows:

 7                    EXAMINATION (Resumed)

 8    BY MR. JACKSON:

 9         Q.    Mr. Hamilton, can I refer you back to

10    Deposition Exhibit 6, your Declaration, please?

11         A.    Yes.

12         Q.    In paragraph 2, the final sentence, you

13    refer to, "Those meetings specifically concerned the

14    pricing of several of the Baxter products discussed in

15    the Complaint."

16                    Do you see that?

17         A.    Yes, I do.

18         Q.    What pricing were you referring to?

19         A.    The ones -- and again, pricing is a big

20    subject.  We had discussed -- let me read the

21    paragraph first.

22                    (Short interruption.)

23    BY THE WITNESS:

24         A.    Again, "pricing" is kind of a big word.

25    So, when I refer to "pricing," I'm referring to the
```

Page 90

1    price that Baxter was selling to me as a client.

2    BY MR. JACKSON:

3        Q.    At Express Scripts?

4        A.    That is correct.  So, of course, some of

5    the stuff would have been basically, you know,

6    contract negotiations.  Certainly part of -- you know,

7    with every price of what a customer or a manufacturer

8    sells their drug for there's also the accompanying AWP

9    that goes along with that.

10             In addition to that, we also discussed on

11   several occasions what's called PHS, otherwise known

12   as 340B pricing.

13       Q.    All right.  So, let's --I understand when

14   you refer to some of those communications referred to

15   the price to Express Scripts.  What was your

16   communication with Larry Guiheen or Peter O'Malley

17   regarding AWP?

18       A.    I actually -- I mean, I can't tell you any

19   specific time and exactly what we talked about.

20       Q.    Okay.  With regard to the PHS, the 340B

21   pricing, can you tell me what you discussed with these

22   gentlemen as you reference in paragraph 2?

23       A.    I can.  There was one particular time, and

24   I can't tell you what the date was, but it was one of

25   the meetings I had at Baxter headquarters.

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 91

1          Pete O'Malley had asked me to come out and

2     discuss contracting issues.  He brought into the room

3     people that he identified as Baxter contracting --

4     people who work in their Contracting Department.  And

5     he asked me to go through and explain to them how 340B

6     pricing worked, how it was calculated and

7     administered.  And I did that.

8          Q.     Now, is any of the information that took

9     place in that meeting regarding 340B the subject of

10    any of your claims in this Complaint that is Exhibit

11    7?

12         A.     No, not specifically.

13         Q.     In paragraph 4, the first sentence is the

14    following:  "While serving in those positions I

15    frequently met with Baxter's senior management to

16    discuss the market for hemophilia products."

17              Do you see that?

18         A.     Yes, I do.

19         Q.     Do you remember specific conversations you

20    had with senior management regarding hemophilia

21    product pricing?

22         A.     Well, --

23         Q.     I'm sorry.  The market for hemophilia.  You

24    don't say "pricing" there.  You say, "market."

25         A.     Yes.  There is one conversation that I do

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 92

1    remember very specifically.  I'll address the others

2    after I address this first one.

3            And that was -- it was when we met with

4    Larry Guiheen.  And this was -- oh, I'm going to guess

5    this was within six months of Advate's launch.  And I

6    met with Larry at some sort of a trade show.  It could

7    have been NHF.  But I do remember it was in an exhibit

8    hall.  I can picture where we were.

9            So, we were in an exhibit hall, and we were

10    talking about Advate.  I expressed to Larry that my

11    opinion that they had come out with, they'd launched

12    with too high of a premium for Advate over their other

13    product and the comparable products, the recombinant

14    products, and that they came out just too high and

15    they needed to drop that price.

16            And I felt that his uptake on conversions

17    from other factor products to Advate was being

18    inhibited by the extensive or excessive margin.  You

19    know, they were charging too much for it in comparison

20    to the other drugs.

21            And I remember suggesting, you know, if you

22    could just drop that 7 or 8 cents or whatever the

23    number was at the time, I think that you could reduce

24    the differential to where it's not a deal breaker for

25    insurance companies and people aren't gonna go, "Wait

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 93

1    a minute. 15 cents a unit times a couple hundred

2    thousand units a year, prove to me that Advate's that

3    much better," which, of course, would be a very

4    difficult thing to do because it's a conceptual issue.

5          So, I made that point, and I said, "If you

6    could get it down to where it's, you know, 5 cents, 6

7    cents, I don't think you'd have the push back and you

8    could convince the patients, you know, to recommend or

9    to ask their doctor for a switch and that they could

10   then get it through the insurance companies."

11         So, that was one very, very specific

12   discussion we had on pricing. It was of Advate.

13         Q.    Do you remember when Advate launched?

14         A.    Yeah. It was, like, spring of 2003, summer

15   of 2003, somewhere in there.

16         Q.    And when you say "launched," do you mean

17   actually can start making sales?

18         A.    Yeah. I forget the approval date, but we

19   can look that up. I think it was approved in, I don't

20   know, April, May, something like that. But there

21   wasn't a great delay from when it was approved to when

22   it was launched. It was probably, I don't know, two

23   months at the most.

24         Q.    Okay. And when you say -- this is my term,

25   my phrase, "uptake or uptick over its other products,"

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 94

1          did you mean the price that Baxter would sell to the

2          market over the price it would sell to the market for

3          Recombinate?

4                A.     Yes.   The difference -- what I was trying

5          to point out was that the difference -- Recombinate

6          was selling for, let's say, 89 cents at the time.   And

7          when they launched Advate, it came out as a buck 15

8          ballpark.  And so, the difference between 89 cents and

9          $1.15 was just too great.

10               Q.     For what?

11               A.     For universal acceptance, for insurance

12         companies, for payers to say, "Yeah, it's worth it.

13         I'll pay that much more."  Because if they're going to

14         pay an extra 20 cents a unit and patients are using

15         anywhere from a hundred thousand to a million units a

16         year, that turns out to be a lot of dollars.  And it

17         got people's attention.

18                      So, the difference was so great -- it's

19         kind of like pricing that's called the noticeable

20         difference curve.  It was the same thing.  It was so

21         noticeable that it got attention.

22                      Had the number been smaller, it would have

23         passed through without people scrutinizing it and

24         more -- and patients would have been accepted and

25         insurance companies wouldn't have even probably given

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 95

1      it a second thought in terms of paying.

2              And so, therefore, they'd be able to

3      convert patients from current therapies, whether it be

4      theirs or someone else's, to Advate more rapidly than

5      what they were doing.

6      Q.    Okay.  So, from your perspective you did

7      not believe that the market price of Advate, the new

8      therapy, that the delta was not justified by the

9      difference in the products?

10     A.    Yes.  But let me say justified in the minds

11     of the people who were actually paying the bill, the

12     payers, okay?  And the delta was so large that it got

13     their attention.  And that was the key.  First of all,

14     it got their attention.  The delta was so large that

15     it jumped out, you know.

16             And all of a sudden the claims were bigger

17     than they were before and the dollar signs caught

18     their attention.  That brought scrutiny to the

19     product.  And that made people then question is this

20     new product worth that much more than what the other

21     one is?

22             And, of course, Baxter was standing up

23     straight and saying, "Recombinate's a very safe drug

24     and it treats Factor VIII."  And they were saying all

25     these wonderful things about Recombinate.  As a matter

Page 96

1      of fact, they were saying the same thing about the

2      plasma products.  Yeah, plasma products are perfectly

3      safe.  Recombinate's perfectly safe.

4              Okay.  Why do you want to spend 15, 20,

5      20-some cents more for another safe product?  Does it

6      treat the bleed any better?  Well, no.  Well, then,

7      why this huge premium?

8              And that -- again, the delta was so big

9      that it was getting insurance companies', what I call

10     payers, attention, and it was inhibiting their

11     conversion rate.

12         Q.    Conversion rate, again just to understand,

13     you mean converting from some other form of factor up

14     to Advate?

15         A.    Let's not say "form" because then you get

16     into whether it's Factor VIII or Factor IX.

17         Q.    I don't mean that.

18         A.    I don't, either, but I just want to be

19     clear.  From some competitor, let's say, including

20     themselves.

21         Q.    Got it.  Switching from a previously used

22     product to Advate?

23         A.    Factor VIII product to Advate, yes.

24         Q.    Okay.  I understand.

25              All right.  In paragraph 4 the third line

Page 97

1    up, fourth line up, it says, "I also made at least

2    three trips to Baxter's Deerfield, Illinois offices to

3    meet with Baxter managers to discuss pricing."

4           Now, you've already told me about the 340B

5    conversation.  And that's kind of in the next several

6    sentences.

7           Do you remember what the other two meetings

8    were about?

9        A.    Not specifically, no.

10       Q.    Okay.  If you turn to paragraph 6, you

11   reference it this paragraph 6 of your Declaration that

12   is Deposition Exhibit 6, you reference a meeting with

13   Larry Guiheen about Baxter's pricing of Advate.

14          Is this the conversation that you and I

15   just had about the moving -- what's a good way to

16   describe the conversation we had?  A marketing issue?

17       A.    It's pricing and marketing.

18       Q.    Okay.

19       A.    And yes, that is the conversation I'm

20   referring to.

21       Q.    Okay.  Got it.

22          In paragraph 7 you refer to your time at

23   Express Scripts and Curascript and you talk about how

24   you, quote, interacted with Baxter's pricing managers,

25   close quote.

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 98

1          Do you have any specific memory of pricing

2     conversations then?

3          A.   No.

4          Q.   And in the last sentence of paragraph 7 you

5     also reference, quote, numerous discussions with them

6     about pricing strategies.

7          Do you remember what the subject of those

8     pricing discussions were in paragraph 7?

9          A.   I do not remember specific discussions.

10                    (Deposition Exhibit Number 21 was

11                    marked for identification.)

12                    (Document tendered to the

13                    witness.)

14    BY MR. JACKSON:

15         Q.   Let me show you what's been marked as

16    Deposition Exhibit 21.  Deposition Exhibit 21 is the

17    Memorandum in Opposition to Baxter International

18    Inc.'s Motion to Dismiss Relators' Complaint.

19         Do you see that?

20         A.   Yes, I do.

21         Q.   I have a generic question for you, sir.  In

22    the Complaint --

23         A.   Is this a generic question coming from a

24    brand manufacturer?

25         Q.   -- there are repeated allegations, and I'll