UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>TRACK TWO SETTLEMENT | MDL No. 1456<br><br>CIVIL ACTION:01-CV-12257-PBS<br><br>Judge Patti B. Saris |

**TRACK TWO DEFENDANTS' MEMORANDUM IN SUPPORT OF
THE TRACK TWO CLASS ACTION SETTLEMENT**

I. **INTRODUCTION**

The Track Two Defendants submit this memorandum in response to the Court's July 7, 2011 Order that the parties make additional filings supporting the Track Two settlement. During the July 7th hearing, the Court expressed a desire to have a clearer understanding of the terms of the Track Two Settlement, how the parties arrived at those terms and to learn more about the drugs included within the consumer release. The Court also observed that a single submission summarizing the settlement would assist both it and any appellate court reviewing the matter. This memorandum is intended to respond to the Court's comments.

II. **SETTING THE STAGE FOR THE SETTLEMENT**

Negotiations for what would become the Track Two Settlement began on August 1, 2007. By that date, litigation in MDL 1456 had been underway for more than five years. Much was accomplished by the Court and the parties during this time. Complaints were filed, amended and tested by motions to dismiss. Discovery,

1

both of the proposed classes and on the merits, was undertaken. Motions for summary judgment were filed, argued and decided, and nationwide settlement agreements involving Track One companies were reviewed by the Court. Through these and other efforts, the contours of the relevant liability and damages issues implicated in the litigation emerged. Litigation milestones during this period included the following:

- On February 9, 2005, the Court's independent expert, Prof. Ernest Berndt, provided his extensive report on the prescription drug industry and relevant pricing issues to the Court and the parties, Dkt. 1384;

- On August 16, 2005, the Court entered its original Order on class certification as to the Track One Defendants. Dkt. 1648. Following interlocutory appeal, the Court on January 30, 2006 entered its Consolidated Order refining its prior Order certifying three classes to be litigated, Dkt. 2097;

- On May 8, 2006, Class Plaintiffs filed a motion to certify classes as to the Track Two Defendants, Dkt. 2522, which Track Two Defendants resisted with a comprehensive evidentiary record, including expert declarations, which addressed the gaps Dr. Berndt recognized in his report;

- On August 10, 2006, Class Plaintiffs and Track One Defendant GSK moved for approval of a proposed nationwide settlement of all three classes certified, as well as certain state government suits, Dkts. 2970-2972;

- On September 12, 2006, after extensive briefing and the submission of expert declarations, the Court held a hearing on Class Plaintiffs' motion for Track Two class certification[1], Dkt. 3119;

---

[1] On August 27, 2007, during the Track Two settlement negotiations, the Court held another hearing addressing Track Two class certification issues. Dkt. 4669. On August 31, 2007, the plaintiffs submitted additional briefing seeking a nationwide or multi-state certification as to Track Two Defendants, Dkt. 4675, to which certain Track Two defendants responded on September 21, 2007, Dkts. 4738-4740.

2

- Between November 6, 2006 and January 26, 2007, the Court conducted a bench trial of the Track One Defendants to determine liability of those defendants to Classes 2 and 3 as previously certified by the Court. The Court issued its detailed Findings of Fact and Conclusions of Law on June 21, 2007, Dkt. 4366;

- On May 21, 2007, Class Plaintiffs and Track One Defendant AstraZeneca moved for approval of a proposed nationwide settlement of Class 1 claims. Dkts. 4225-4227.

The Track Two Defendants, although not directly involved in the Track One class certification proceedings or bench trial, were keenly aware of and closely followed those events. Similarly, these defendants had a high level of interest in the resolutions reached by GSK and AstraZeneca with class counsel, and incorporated the publicly available information about those settlements into their own evaluations of the case. Finally, the Track Two defendants developed an extensive evidentiary record opposing certification premised on robust discovery of the Track Two claims. As a result, when negotiations began, all parties involved were well-informed about how to evaluate the Track Two claims.

The parties, for example, knew that the Court had declined to certify a nationwide class of consumers whose claims were premised on the use of self-administered drugs (SADs), and understood the Court's reasons for not doing so. The parties also understood the Court had established a three-factor test for determining liability for brand drugs based on the size of the alleged spread, the defendant's role in creating any alleged spread as well as the defendant's actions – if any – allegedly taken to "market" the spread. The parties were also aware of the Court's views on the difficulty of establishing liability under an AWP manipulation

3

theory in the context of multi-source drugs. Armed with this and other knowledge gained from half a decade of intense litigation, the parties began settlement negotiations; they continued to monitor the Court's handling of other aspects of the MDL as those negotiations continued.

Multi-party negotiations were conducted under the guidance of Prof. Eric Green, one of the foremost dispute resolution specialists in the country. The negotiations included in-person sessions in Washington, Boston and New York, as well as multiple telephonic and electronic interactions.

### III. REACHING THE SETTLEMENT

Arms-length negotiations facilitated by Prof. Green continued from August 2007 through March 2008. Each Track Two Defendant analyzed – and re-analyzed – its potential exposure throughout this period, informed by the Court's decisions, the Track One trial evidence, the Track Two class certification proceedings, the GSK and AstraZeneca settlements and other case and client developments. Defendants' individual, company-specific analyses were, of course, privileged and not shared among the Track Two group.

The settlement negotiations were hard-fought and wide-ranging. Class counsel made both group and company-specific arguments to which the Track Two Defendants responded – as a group and separately – under the confidentiality terms imposed by Prof. Green. Under those confidentiality protections, the Track Two Defendants addressed whether a global resolution of the claims was possible and, assuming it was, how they would collectively raise the funds necessary to settle the

4

Track Two claims. Ultimately, Defendants employed a blinded system to tally and combine individual contributions raised in response to demands from class counsel. In early March 2008, the parties were finally able to agree upon a global settlement of the Track Two claims for a total of $125,000,000. Dkts. 5131-5133.

## IV. OVERVIEW OF THE SETTLEMENT

The Court has commented that the Track Two settlement is complicated. Indeed, it could hardly be otherwise given the number and types of payors involved, the lengthy time period for which claims are honored, the size and demographics of the classes benefitted, and the number and attributes of the drugs covered. Accordingly, before turning to a discussion of the key terms of the settlement, the Track Two Defendants provide the following as a conceptual overview of the settlement:

> The Track Two Defendants agreed to collectively pay $125,000,000 to settle the claims of three classes:
>
> *Medicare Part B Co-Payment Class ("Class 1")* - All natural persons in the United States who, from January 1, 1991 through January 1, 2005, made, or incurred an obligation to make, any portion of a Medicare Part B co-payment for a Class Drug manufactured, marketed, sold, or distributed by a Released Company.
>
> *Third-Party Payor ("TPP") MediGap Supplemental Insurance Class ("Class 2")* – All TPP's in the United States who, from January 1, 1991 through January 1, 2005, made, or incurred an obligation to make, reimbursements for any portion of a Medicare Part B co-payment for a Class Drug manufactured, marketed, sold, or distributed by a Released Company.
>
> *Consumer and Third-Party Payor Class For Payments Made Outside the Medicare Context ("Class 3")* - All natural persons in the United States who made, or incurred an obligation to make, a non-Medicare Part B payment for a Class Drug manufactured, marketed, sold, or distributed by a Released Company, and all TPPs in the United States

5

who made, or incurred an obligation to make, non-Medicare Part B reimbursements for a Class Drug manufactured, marketed, sold, or distributed by a Released Company, during the period from January 1, 1991, through March 1, 2008.

The amount of each Track Two Defendant's contribution to the $125,000,000 settlement fund is confidential. Dkt. 5133.

## V. KEY TERMS OF THE SETTLEMENT

The Track Two settlement is intended to reflect the Court's prior decisions on liability as supported by the evidence in the Track One trial. Similarly, the structure of the settlement is intended to build on the prior settlements arising out of the MDL. To facilitate its review of the Track Two settlement, the Court has requested additional information about the Track Two drugs. What follows is the Track Two Defendants' effort to respond to that request.

*Classification of Class Drugs* Like prior AWP MDL settlements, class counsel divided drugs for which class members can submit claims into two categories.[2] In the GSK settlement, certain NDCs for two drugs, Kytril and Zofran, were assigned to the "A" category. The remaining NDCs for Kytril and Zofran, as well as all NDCs for the nine other drugs in that settlement, were assigned "B" status. Dkt. 2972. Here, class counsel placed seven drugs into Group A and the remaining Class Drugs into Group B.

Class counsel's classification of drugs in the Track Two settlement is premised upon class counsel's informed liability exposure estimates for those drugs. The drugs included in Group A have been described by class counsel as posing

---

[2] The Track Two Defendants agree with the Court's observation that the use of the terms "Class A" and "Class B" drugs is unnecessarily confusing. Accordingly, this submission refers to the drugs as being in either *Group* A or *Group* B.

6

greater liability exposures, using the Court's liability standards, than those they chose to include in Group B. In other words, as class counsel have advised the Court, "the defining principle was, [Group A drugs] were put into [Group] A because they were the drugs and the defendants for which we believed as class counsel we had the best evidence against."[3] According to class counsel, liability would be difficult to establish for Group B drugs because of: (1) "the J-Code issue" which caused "a real problem trying to match up the drugs per defendant"; (2) the Court's ruling that "you can only have liability if you prove that a published AWP was above the median"; and (3) "there was just no evidence of spread marketing," so Class Counsel "had a very weak spread marketing case . . . ."[4]

Under this regime, consumer class members will have their claims for Group A drugs compensated at a higher rate than their claims for Group B drugs.[5] Class counsel maintain that this classification of payments gives effect to the Court's Track One liability rulings in the Track Two context. As class counsel have acknowledged, plaintiffs would encounter substantial problems in establishing liability for the Group B drugs were they to proceed to trial.[6] This is particularly true for multi-source products where the link between reimbursement level and any individual product's AWP is more attenuated. These drugs are problematic for class counsel for other reasons, as well, as is explained below. Class counsel have candidly concluded that, because of these various problems, recoveries for many

---

[3] July 7, 2011 Hearing Transcript at 16.
[4] June 13, 2011 Hearing Transcript at 7-8.
[5] Of course, some claimants will benefit from payments premised on their use of drugs from both groups.
[6] June 13, 2011 Hearing Transcript at 7-8.

Group B drugs would likely be *de minimis*.[7] The claims data have proven this out, with many claimant co-pays for these drugs amounting to pennies per prescription. Class members would likely fare no better with the branded drugs included in Group B. These claims, if pursued at trial, would face hurdles under the 30% "speed limit" established in the Track One trial.

*The drugs released*  The Court has expressed concern that it suffers from a lack of information about the 145 drugs to be released by the consumer class members under the Track Two settlement in comparison to those drugs involved in the Track One trial over which it presided. While no single pleading could provide the Court with the kind of detailed familiarity it would gain in a lengthy trial, since the July 7th hearing, the Track Two Defendants have compiled a summary chart for the Court's benefit. This chart and attorney declarations from the Track 2 Defendants are attached as group Exhibit A hereto. The chart identifies the Class Drugs by name and alleged manufacturer defendant. It also describes the drugs by type (i.e., generic, branded, etc.) and by their common uses. The chart also includes information about which Complaints include references to the drug, as well as its status as a subject of discovery in the case and as a drug implicated in a motion to strike.

The seven drugs assigned to Group A by class counsel are all branded, physician administered drugs. Each had a unique J-code, making utilization,

---

[7] Class Plaintiffs' Supplemental Response to Objections to Final Approval of Track Two Settlement at 12 (June 1, 2011). Dkt. 7573.

pricing, reimbursement and other analyses relatively straightforward.[8] Class counsel argue that these drugs are similar in their administration to some of the drugs at issue in the Track One trial, such as Zoladex. Class counsel undertook substantial discovery of the Group A drugs. For example, Aventis made multiple document and data productions on its Group A drug, Anzemet.[9] Likewise, Amgen provided extensive discovery on its Group A drugs, Aranesp, Epogen, Neupogen and Neulasta, while Watson provided extensive discovery on Ferrlecit and InFed.[10]

The drugs assigned by class counsel to Group B are a more diverse collection of products than those in Group A. The Group B drugs fall into three broad categories: (1) branded, single-source; (2) multi-source; and (3) multi-source biologics.

*Branded, single source drugs*   Group B includes 22 branded single source drugs for which at least one consumer class member has filed a claim. A number of these drugs, however, generated very few claims; nine generated fewer than 100 claims nationally for the entire claims period. Only twelve had total claims in excess of $50,000 for the period. Expert review of these twelve drugs supports the Track Two Defendants' arguments that they generally complied with the Court's 30% spread "speed limits" and other liability tests during the claims period.

---

[8] One exception to this is Amgen's Epogen, which shares a J Code with Ortho Biotech's Procrit. Epogen is discussed in greater detail in the individual memorandum submitted by Amgen.
[9] The multiple data productions included pricing and transactional level information on the drug; the multiple document productions included Anzemet's brand plans, pricing strategy, and sales and promotional material. *See generally* Exhibit A.
[10] *See generally* Exhibit A.

9

*Multi-source drugs*  The vast majority of Group B drugs are multi-source drugs. The Court has written extensively on the challenges associated with proving liability for multi-source drugs under the AWP manipulation theories class counsel have advanced.[11]  In addition to these well-documented proof issues, there are additional liability hurdles implicated for the multi-source drugs in Group B. For example, the Track Two Defendants believe that, in many cases, class counsel would be unable to prove that the defendants here actually provided the multi-source drugs taken by class members. The Track Two Defendants have identified nearly 200 non-defendant sources of one or more of these products during the class period. August 3, 2011 Declaration of Stephen J. Young attached hereto as Exhibit B. Many of the Group B drugs were hospital products where Medicare reimbursement in the hospital in-patient setting (Medicare Part A) or the hospital out-patient setting (Medicare Part B) would not have been made based on AWP.

*Multi-source biologics*  The Group B drugs include 13 multi-source biologics. These products are produced from human material and, as a result, are not subject to the provisions of the Hatch-Waxman Act allowing for generic entry through FDA approval of an Abbreviated New Drug Application (ANDA). The biologics included as Group B drugs have multiple competitors, all of which are reimbursed using a shared J code. They are, accordingly, akin for reimbursement purposes to multiple source drugs. Because of the similarity in reimbursement protocols, these niche

---

[11] *In re Pharm. Average Wholesale Price Litig.*, 491 F.Supp.2d 20, 39 ("TPP reimbursement for multi-source drugs is generally not calculated based on the drug's AWP. Accordingly, no damages have been calculated for multi-source drugs in Class 3."); *Id.* at 97 ("The method for reimbursing multi-source drugs and the difficulty in product identification create extremely difficult legal issues for the branded and generic multi-source drugs in Class 2.")

products carry the same risk for class members seeking to prove an AWP manipulation claim as do the more common multi-source drugs.

## VI. ARGUMENT

Court approval is required for class action settlements to ensure that they are fair, reasonable, and adequate. In evaluating such resolutions, courts are mindful of the "strong judicial policy in favor of settlements, particularly in the class action context."[12] In evaluating a class action settlement, courts are entitled to rely on the unique abilities of the counsel involved to assess the potential risks and rewards of litigation; a presumption of fairness, adequacy, and reasonableness attaches to a class action settlement reached in arms-length negotiations between experienced, capable counsel.[13] Absent fraud or collusion, courts typically are hesitant to substitute their judgment for that of the parties who negotiated the settlement.[14] The Court is not called upon to determine whether the settlement reached by the parties is the best possible deal,[15] nor is it the Court's function to enter into negotiations with the litigants in the hope of improving the settlement terms.[16] While the opinion and recommendation of experienced counsel is not to be

---

[12] *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116 (2d Cir. 2005) (quoting *In re PaineWebber Ltd. P'ships Litig.*, 147 F.3d 132, 138 (2d Cir. 1998)).
[13] *See Id.* at 116.
[14] *See e.g. In re EVCI Career Colls. Holding Corp. Sec. Litig.* No. 05 Civ. 10240, 2007 WL 2230177, at *4 (S.D.N.Y. July 27, 2007).
[15] *E.E.O.C. v. Hiram Walkder & Sons, Inc.*, 768 F.2d 884 (7th Cir. 1985).
[16] *Argo v. Harris*, 84 F.R.D. 646, 648 (E.D.N.Y. 1979) (quoting *Levin v. Mississippi River Corp.*, 59 F.R.D. 353, 361 (S.D.N.Y. 1973) *aff'd on op. below sub nom. Wesson v. Mississippi River Corp.*, 486 F.2d 1398 (2d Cir. 1973) *cert. denied*, 414 U.S. 1112 (1973)).

11

blindly followed by the trial court, "such opinion should be given weight in evaluating the proposed settlement."[17]

On appeal, the First Circuit accords deference to trial courts' approval of class action settlements. The appellate court's role "is not to decide whose assertions are correct, but merely to ascertain whether the district court clearly abused its discretion in approving the settlement."[18] Settlement approval is only an abuse of discretion when "one side is so obviously correct . . . that it would be clearly unreasonable to require it to compromise to the extent of the settlement."[19]

### The Track Two Settlement is Fair, Adequate and Reasonable

First Circuit courts look at several factors to determine whether a settlement is fair, adequate, and reasonable. The fairness determination "is not based on a single inflexible litmus test, but, instead, reflects [the court's] studied review of a wide variety of factors bearing on the central question of whether the settlement is reasonable in light of the uncertainty of litigation."[20] The factors considered as part of the fairness determination include: (1) the risk, complexity, expense and duration of the case; (2) comparison of the proposed settlement with the likely result of continued litigation; (3) reaction of the class to the settlement; (4) stage of the litigation and the amount of discovery completed; and (5) quality of counsel and conduct during litigation and settlement negotiations.[21]

---

[17] *Flinn v. FMC Corp.*, 528 F.2d 1169, 1173 (4th Cir. 1975) (internal citations omitted.)
[18] *City P'ship Co. v. Atlantic Acquisition Ltd. P'ship*, 100 F.3d 1041, 1043-44 (1st Cir. 1996). (quoting *Greenspun v. Bogan*, 492 F.2d 375, 381 (1st Cir. 1974).
[19] *Id.* at 1044.
[20] *Rolland v. Cellucci*, 191 F.R.D. 3, 8 (D. Mass. 2000).
[21] *In re Tyco Intern., Ltd. Multidistrict Litig.* 535 F.Supp.2d 249, 259 (D.N.H. 2007); *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 216 F.R.D. 197, 203 (D.Me. 2003).

12

Class counsel have spoken to these factors on a number of occasions and the Track Two Defendants anticipate that class counsel's submission in response to the Court's July 7, 2011 Order will further elaborate on them. Rather than duplicate that submission, the Track Two Defendants will focus on the concerns expressed by the Court at the hearing on July 7, 2011, and on objections lodged to the proposed settlement to date.

### The Settlement Fairly Values Group B Drug Claims

Much of the energy spent in evaluating the fairness of the Track Two settlement has focused on the appropriateness of the treatment accorded claims premised on consumer class members' use of those drugs assigned by class counsel to Group B under the settlement. There is abundant support for the Court's accepting class counsel's allocation.

First, as noted above, class counsel have clearly and repeatedly acknowledged that the liability case for those drugs within Group B is weaker than for the drugs they assigned to Group A. For the branded drugs assigned to Group B, the primary liability challenge is the risk that class counsel would be unable to show either actionable spreads, or the marketing of any spreads, or both.

For the multi-source products assigned to Group B, the liability problems for class members are even greater. First, there are the many problems associated with establishing AWP-based overpayments in the multi-source arena. For example, administrations of these drugs in the Medicare Part B hospital out-patient setting are not paid based on AWP. Finally, if they proceeded to trial, plaintiffs

would face causation problems as most of the suppliers of the multi-source drugs identified by class counsel are not defendants in any MDL 1456 case. Indeed, the small number of multi-source drug suppliers involved in the Track Two case is dwarfed by the nearly 200 non-defendant sources of one or more of these products identified.

Finally, it is important to note that the co-payments for the multi-source drugs included in Group B were generally small. Claims data for these products show co-payments for more than half of these relatively inexpensive drugs ranged below 50 cents per drug transaction; for more than 40 of these drugs, the co-payment ranged as low as one penny per transaction. Given that any alleged overcharge would be equal to only a portion of the class member's co-payment, class counsel were clearly correct in describing the damages that may have been sustained by these class members as *de minimis*.

### The Scope of the Consumer Class Members' Release is Fair

Concerns have been raised about the list of covered drugs for which consumer class members may qualify for settlement benefits and as to which the Track Two Defendants receive a release. Objector Haviland has argued that the Track Two Defendants surreptitiously added dozens of unexamined drugs to the list of those for which the Track Two Defendants will receive a consumer release.[22] In support of this position, Haviland proffers a listing of 85 drugs he claims were never subject

---

[22] Response to Track Two Defendants' Memorandum in Support of Track Two Class Action Settlement at 5-6 (July 5, 2011). Dkt. 7652.

14

to discovery and for which class counsel performed no analysis. Haviland's objection is meritless.

Contrary to Haviland's assertions, each Class Drug was named in one or more versions of the Complaints and each Class Drug was subject to discovery. The listing of drugs Haviland proffers was taken from an October 2006 email between defense and class counsel transmitting routine, redline corrections to a listing of certain drugs in the then operative Complaint. Haviland incorrectly links this drug listing to the Court's earlier, April 13, 2006 procedural decision to strike "new drugs" in order to manage discovery. From this flawed premise, Haviland argues that the Group B drug list includes dozens of drugs about which class counsel knew essentially nothing. That is simply not true.

The truth is that the compilation of the drug list for which the Track Two Defendants would be released by the consumer class plaintiffs involves neither conspiracies nor drama. The Class Drug list was the subject of hard-fought, arms-length negotiations, just as was true for all other aspects of the settlement. The Track Two Defendants advocated for a broader listing and class counsel resisted effectively.

Nor is Haviland correct in his assertion that class counsel was blindly negotiating the scope of the release without an evidentiary basis for evaluating the drugs included there. Although it is clear that class counsel could have supported approval of a broader release under First Circuit law,[23] the protocol to which the

---

[23] *City P'ship Co. v. Atlantic Acquisition Ltd. P'ship*, 100 F.3d at 1044 ("In order to achieve a comprehensive settlement that would prevent relitigation of settled questions at the core of a class

15

parties ultimately agreed required that each Class Drug had to have been referenced in one or more versions of the Complaint. The accompanying chart provides citations showing where each drug was mentioned within one or more Complaints, and confirms that each drug was subject to discovery. The settlement was designed to provide benefits to individual consumers who used each such drug, and corresponding release protection specific to such drugs to the Track Two Defendants.

As a result, the scope of the consumer release here is narrower than permitted by law, and the result of informed, arms-length negotiations between experienced counsel. It, like the other aspects of the settlement, is fair and deserving of the Court's approval.

**The Settlement is Fair and Preferable to Additional Litigation**

Ultimately, the Court's decision to approve the Track Two settlement "involves balancing the advantages and disadvantages of the proposed settlement as against the consequences of going to trial or other possible but perhaps unattainable variations on the proffered settlement."[24] In this case, the settlement is clearly preferable to additional months and years of litigation that would consume the time and resources of the Court and the parties without any probability of benefitting the ill and elderly consumer class members.

---

action, a court may permit the release of a claim based on the identical factual predicate as that underlying the claims in the settled class action even though the claim was not presented and might not have been presentable in the class action.")
[24] *National Ass'n of Chain Drug Stores v. New England Carpenters Health Benefits Fund*, 582 F.3d 30, 44 (1st Cir. 2009).

4623090 v1

The Track Two settlement was supported not only by the evidentiary record with which the parties negotiated, but by a desire on both sides to reduce the risks posed by continued litigation. The Track Two Defendants were prepared to agree to the settlement, in significant part, because it represented finality and certainty. In order to be sure that the settlement served those goals, the Track Two settlement was constructed as an unseverable, integrated agreement. By its express terms, the agreement is terminated if the Court declines to enter an Order approving it.[25]

The Track Two settlement was a remarkable achievement that was premised on the parties' willingness – in early 2008 – to compromise their differences in favor of resolving an extraordinarily complex dispute. Much has changed since that time. If the Court were to decline to approve the settlement, it likely would mean not a revised agreement creating global resolution, but additional litigation. The consumer class beneficiaries in particular would seem to be the parties most likely to see their positions erode in such a circumstance. The Track Two Defendants believe the settlement before the Court is both substantively fair and preferable to the prospect of additional litigation of these disputed claims.

## VII. CONCLUSION

The Track Two settlement, reached more than three years ago after seven months of difficult, arms-length negotiations, merits the Court's approval. The settlement is a fair and appropriate resolution to this decade-old litigation. It gives practical effect to the Court's rulings in similar cases without the cost, delay and uncertainty of further protracted litigation. The objections that have been lodged to

---

[25] Track Two Settlement Agreement, paragraphs VIII, I; IX, A. Dkt. 5133.

the settlement lack legal and factual support. Finally, it is unlikely that the parties to this agreement would – or could – find sufficient ground to resolve the case anew, were the Court to refuse to approve the settlement.

Accordingly, the Track Two Defendants ask that the Court approve the Track Two settlement, and for such other and further relief as may be appropriate.

Respectfully submitted,

/s/ Michael L. Koon

Michael L. Koon
James P. Muehlberger
SHOOK, HARDY & BACON L.L.P.
2555 Grand Blvd.
Kansas City, Missouri 64108-2613
(816) 474-6550

Attorneys for Aventis Pharmaceuticals Inc. and on behalf of the following Track Two Defendants:

Abbott Laboratories, Amgen Inc., Aventis Pharmaceuticals Inc., Baxter Healthcare Corp., Baxter International Inc., Bayer Corporation, Dey, Inc., Fujisawa Healthcare Incorporation, Fujisawa USA, Inc., Hoechst Marion Roussel, Inc., Immunex Corporation, Pharmacia Corp., Pharmacia & Upjohn LLC (f/k/a Pharmacia & Upjohn, Inc.), Sicor, Inc. f/k/a Gensia, Inc., Gensia Sicor Pharmaceuticals, Inc., Sicor Pharmaceuticals, Inc., Watson Pharmaceuticals, Inc., and ZLB Behring L.L.C.

## CERTIFICATE OF SERVICE

I hereby certify that on August 3, 2011, a true and correct copy of the foregoing **TRACK TWO DEFENDANTS' MEMORANDUM IN SUPPORT OF THE TRACK TWO CLASS ACTION SETTLEMENT** was served upon all counsel of record via electronic service by causing a copy to be sent to Lexis-Nexis File & Serve.

/s/ Michael L. Koon

Michael L. Koon

4623090 v1