# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL NO. 1456 |
| THIS DOCUMENT RELATES TO:<br><br>TRACK TWO SETTLEMENT | CIVIL ACTION: 01-CV-12257-PBS<br><br>Judge Patti B. Saris |

## [REDACTED] DECLARATION OF STEVE W. BERMAN IN SUPPORT OF PLAINTIFFS' SUPPLEMENTAL SUBMISSION IN SUPPORT OF A REBALANCED AND REDISTRIBUTED TRACK TWO SETTLEMENT

I, Steve W. Berman, declare and state as follows:

1.      I am a partner at the law firm of Hagens Berman Sobol Shapiro LLP; my firm served as Co-Lead Counsel in the above-captioned case. I submit this Declaration in Support of Plaintiffs' Supplemental Submission in Support of a Rebalanced and Redistributed Track Two Settlement. The matters stated herein are true to the best of my personal knowledge and, if called upon to testify thereto, I would and competently do so.

2.      In this Declaration, I discuss in greater detail Class Counsel's assessment of the reasonableness of the proposed Settlement. I also outline for the Court the enormous amount of discovery taken into the Track Two Defendants and their drugs that are the subject of this proposed Settlement and discuss the rebalancing.

**A.      Reasonableness of the Settlement Amount**

3.      In assessing the likelihood of success at trial against the Track Two Defendants, on a drug-by-drug basis, Class Counsel applied the Court's "three salient factors" relevant to a finding of unfair conduct as set forth in *In re Pharm. Indus. Average Wholesale Price Litig.*, 491 F. Supp. 2d 20, 101-02 (D. Mass. 2007): (i) where data was available, whether there were egregious spreads above the 30% yardstick expected in the industry, focusing on the extent and duration of the spreads; (ii) the company's history of creating the spread, including an analysis of whether the defendant actually increased the AWP and/or list price as opposed to just increasing the spread through discounts and rebates; and (iii) whether the defendant engaged in a proactive scheme to market the spread.

4.      We also assessed, among other things, whether (i) the particular drug had a substantial volume of Medicare Part B reimbursements, (ii) Defendants' actions caused a significant amount of damages to the Classes in association with the particular drug, and (iii) the

- 1 -

drug was single source or subject to multiple J-Code identification issues, as have befallen the multi-source drugs and multi-brand biologics.

5.      The foregoing factors, and more, were evaluated not only to determine the reasonableness of the $125,000,000 settlement amount, but also to divide the Track Two drugs into two classifications:  Group A and Group B.

6.      Group A contains 7 brand-name drugs with unique J-Codes.  Four of the drugs are manufactured by Amgen (Aranesp, Epogen, Neulasta and Neupogen); one by Aventis (Anzemet, in both tablet and injectable form); and two by Watson (Ferrlecit and Infed).  We believe that the evidence was strongest for these drugs, and this is why they were categorized in Group A and offered substantially more compensation in the original distribution proposal.  Spreads were particularly high for Anzemet, Ferrlecit and Infed; Class damage was quite high for Aranesp, Neulasta, Anzemet, Ferrlecit and Infed; the drugs were all single-source and not plagued by multiple J-Code identification issues; and we saw substantial spread marketing evidence associated with these Defendants.  Although we have had a change of heart with respect to Epogen for the reasons discussed in our brief, we still believe that the remaining Group A drugs are worthy of substantially greater compensation on a drug-by-drug basis than the Group B drugs.

7.      In sum, with the exception of Epogen, we included in Group A the drugs that we believed had most of the following characteristics:  single-source, high spreads and/or spreads increasing over time, high damages, substantial spread marketing evidence for the defendant, and substantial Medicare Part B reimbursements.

8.      Class Counsel assigned 138 drugs to the Group B pool and suggested a lower level of compensation for them because (i) most of the drugs, as multi-source, are subject to

- 2 -

J-Code identification challenges and the median price analysis; (ii) many of the drugs are primarily administered in the inpatient hospital setting, making the level of Medicare Part B reimbursement low; (iii) many of the Group B drugs are inexpensive, resulting in a low level of Class damage (even where spreads are high); (iv) spreads on the small group of single-source branded drugs in the Group B pool tend to be small; and (v) there was a dearth of spread marketing evidence for these Defendants.

9.      In assessing the reasonableness of the $125 settlement amount, among many other data points, we considered calculations performed by Dr. Hartman valuing the Group A drug damages at approximately $317 million and a sampling of Group B "damages," using spreads, at approximately $855 million.  Of course, we recognized that the latter figure substantially overstated damages given that it was based on AWP-ASP spreads, whereas, under this Court's prior rulings, a truly accurate damages calculation would have to be conducted using a median analysis – a burdensome and unrealistic task that would reveal, in any event, a low amount of total damage.  Against this backdrop, along with considering the details and characteristics of the drugs involved (as summarized above) and the risks of proving liability and damages at trial, we concluded that the $125 million settlement amount was fair and reasonable.

10.      Prior to the settlement negotiations we thus had available to us for each drug (1) information as to sales and spreads, (2) an understanding of the difficulties presented by J-Code and median pricing issues, and (3) the strength of the liability case in evidence of spread marketing.

**B.      Summary of the Discovery**

11.      I assure the Court that, contrary to one suggestion, ***none*** of the drugs at issue in the Track Two Settlement were added at the time that this proposed Settlement was reached.  To the contrary, ***all*** of the drugs were subject to litigation for at least two years before this proposed

- 3 -

Settlement was reached in March 2008, and most of the drugs have been at issue for an even longer time period. For example, *all* of the 145 drugs in Exhibit B are identified in the ***March 10, 2006*** Fourth Amended Master Consolidated Complaint Amended to Comply with the Court's Class Certification Order (the "Fourth Amended Complaint") and, therefore, were not added at the time of settlement in 2009 (Dkt. No. 2244).[1]

     12.    I understand that Defendants are submitting an Exhibit B to their brief that, among other things, identifies each complaint in which the specific Track Two drug was included. As demonstrated in that Exhibit B, most of the Group B drugs were subject to litigation long before the Fourth Amended Complaint was filed. Defendants' Exhibit B also demonstrates that every Track Two drug at issue here was subject to some sort of discovery. Rather than reproduce all of that information here in my own declaration, and thereby unduly burden the Court, I would respectfully refer the Court to that filing by the Track Two Defendants.

     13.    In a declaration that I previously submitted in support of Class Counsel's fee application (*see* Dkt. No. 7515-2), I described the history of this litigation and Plaintiffs' discovery efforts. I describe herein in greater detail the discovery conducted into each Track Two Defendant. That discovery included reviewing millions of pages of documents, taking more than 120 depositions of current and former employees of Track Two Defendants, including senior managers and sales personnel (in addition to depositions of third-parties and experts), and working with reams of data and our own experts. We had the benefit of all of this discovery before reaching the proposed Settlement.

---

[1] All 145 drugs also appear in the Fifth Amended Master Consolidated Class Action Complaint Amended to Comply with the Court's Class Certification Order and Order Granting Partial Summary Judgment, which was filed on February 17, 2009 (Dkt. No. 5902).

14.     Because it is impractical and burdensome to detail every piece of discovery taken into each Track Two Defendant and drug, I will keep this presentation at a high level.  However, it is my hope that the information contained herein, the bounty of supporting information provided by the Hartman Declaration and its attachments, and the significant information that the Track Two Defendants are also submitting, will provide the Court with sufficient detail to confidently conclude that Class Counsel had more than ample information with which to assess and recommend this proposed Settlement.

15.     Below is information on each Track Two Defendant that I have gathered from the litigating teams that I supervised.  The discovery into each Defendant was extensive, although the magnitude of discovery conducted does vary by Defendant.

**1.     Abbott**

16.     Substantial discovery was conducted into Abbott's pricing methodologies and spread marketing activities during the Class Period, including reviewing almost a million pages of documents produced by Abbott, engaging in ongoing negotiations and motion practice concerning the scope of its production and search for responsive documents, and deposing nearly fifty former and current Abbott employees.

17.     In December 2003, Class Counsel issued Requests for Production and Interrogatories to numerous Track Two Defendants, including Abbott, and added additional document requests to Abbott and other defendants in March 2004.  Abbott responded to Plaintiffs' document requests and interrogatories in June 2004.  Throughout the litigation, Plaintiffs issued, and Abbott responded to, additional document requests concerning Together RX, IMS data, Average Sales Price, and other more discrete topics.

18.     Plaintiffs reviewed hundreds of thousands of pages of paper and electronic documents produced by Abbott, including those collected from the following departments:

001534-16  465801 V1

- *Sales Department* (including contracts, business plans, communications with customers, price lists, pricing analyses, and others);
- *Marketing Department* (including strategic plans, trade association documents, and documents reflecting discussions about Abbott's pricing methodologies);
- *Sales Team* (including communications between the field sales personnel, their supervisors and marketing packets provided to sales personnel, sales awards, and training documents);
- *Financial Department* (including financial plans, summaries, and Updates and Plan Documents which were used to review the health of the business estimate the next year's financial results); and
- *Human Resources* (including Abbott's Code of Conduct).

19.     Throughout 2005 and 2006, the parties exchanged numerous letters negotiating the scope of Abbott's production, identifying perceived deficiencies, prioritizing production of certain kinds of documents, creating a protocol for searching Abbott's electronic files for relevant documents, and conferring on disputed issues and document categories. Plaintiffs reviewed documents relating both to specific drugs manufactured by Abbott, as well as to corporate policies applicable to all drugs at issue in this litigation. For example, after months of negotiating the document production with Abbott's attorneys, Plaintiffs filed a motion to compel in June 2006 seeking: (i) Calcijex-related sales documents; (ii) company-wide Plan and Update documents; (iii) sales documents; (iv) high-level marketing documents; and (v) a supplemental e-mail production. *See* Dkt. No. 2632. Plaintiffs also focused discovery efforts on specific departments responsible for physician-administered drugs sold by Abbott, including its "Alternate Site" and "Renal Care" divisions.

20.     Plaintiffs additionally received and reviewed documents Abbott produced to the United States government in its related AWP litigation. Third party discovery was also initiated, (although Magistrate Judge Bowler granted Abbott's Motion to Quash) with subpoenas issued to GPOs and home health care companies constituting Abbott's largest customer base for the relevant drugs. Plaintiffs and their experts also analyzed various kinds of data produced by

001534-16 465801 V1

Abbott, including data reflecting purchase details, customer class, rebates, chargebacks, and administrative fees.

21.     In total, the MDL plaintiffs took and/or attended approximately fifty depositions of current and former Abbott employees.  In December 2005, the MDL plaintiffs took three depositions of Abbott employees, including a 30(b)(6) on the following topics:  (1) the identity of documents describing how prices on physician-administered drugs are established and the identity of persons with knowledge on this issue; (2) the identity of documents describing the price paid by physicians or others reimbursing for physician-administered drugs sold by Abbott, and the identity of persons with knowledge on this subject; (3) the types of materials maintained by the sales force, including "detail" reports, field sales notes, and electronic databases; (4) communications, oral or written, with publishers on any of the following:  list price, AWP, net price, suggested wholesale price, WAC, or any other communication with publishers; (5) the identity and nature of the competitive drugs with respect to each physician-administered AWPID; and (6) ASPs on each AWPID and the spread between ASP and AWP, and how defendant calculates ASP.

22.     Plaintiffs noticed many other depositions in late 2005 into early 2006 that had to be postponed indefinitely, largely because of ongoing document discovery disputes with Abbott. In 2007, to streamline discovery and avoid duplication of efforts, the MDL plaintiffs cross-noticed and attended over 40 relevant depositions of current and former Abbott employees noticed by the United States Department of Justice, Texas and Pennsylvania Attorneys General, and the Relator/Ven-A-Care in their parallel lawsuits concerning Abbott's marketing of the AWP spread.

001534-16  465801 V1

2.      **Amgen**

23.      In sum, the Amgen drugs were subject to substantial discovery.  Plaintiffs served

Amgen with Plaintiffs' Request for Production of Documents to Aventis, Abbott, Amgen,

Boehringer, BMS, Johnson & Johnson, GSK, Hoffman, Immunex and Schering-Plough and

Interrogatories to All Defendants Subject to Discovery, dated December 3, 2003; Plaintiffs'

Second Request for Production of Documents to Aventis, Abbott, Amgen, BMS, Johnson &

Johnson, GSK, Hoffman, Immunex and Schering-Plough, dated December 19, 2003[2]; Plaintiffs'

Omnibus Requests for Production and Interrogatories to Defendants Abbott, Amgen, Aventis,

Baxter, Bayer, Boehringer, Braun, Dey, Fujisawa, Novartis, Pfizer, Pharmacia, Sicor, TAP and

Watson and to All Other Defendants With Respect to Drugs That Were Not Previously Subject

to Discovery, dated March 31, 2004; Plaintiffs' Request for Production to Defendants Regarding

HHS ASPs, dated May 26, 2004; and Plaintiffs' Third Request for Production to All Defendants,

dated July 14, 2004.

24.      In addition, on November 15, 2005, plaintiffs served Amgen with their Amended

and/or Supplement Request for Production of Documents to Phase 2 Defendants Relating to IMS

Data.  These IMS discovery requests sought the production of various sales and financial data

compiled by IMS Health, a leading data collector and provider for the pharmaceutical industry.

Shortly thereafter, in mid-January 2006, Plaintiffs served Amgen with notices of deposition for

employees whose names were ascertained during review of Amgen's then-recently produced

documents.  These notices contained limited document requests to the individuals who were their

subjects, pursuant to the then-current version of Fed. R. Civ. P. 30(b)(5).

---

[2] As propounded to Amgen, Plaintiffs' December 3, 2003 and December 19, 2003 requests for production
effectively merged into their Omnibus Requests for Production.

25.     Numerous meet-and-confers with counsel for Amgen were held.  Plaintiffs filed two motions to compel, in October 2005 and February 2006, respectively.  Following the Court's directives to continue working towards resolution of the parties' issue per the Court's guidance, and following yet more conferences and letters between counsel, ultimately, Amgen produced approximately 1.751 million pages of non-IMS documents to the Plaintiffs.  In addition, Amgen produced a quantity of IMS-related material to the Plaintiffs.  These were in addition to sales- and credit-related data that Amgen produced separately.

26.     Amgen's document production included many examples of spread-marketing on its part, including the following:

a.      *Aranesp*.  Amgen marketed Aranesp by way of net price reductions vis-à-vis, and price comparisons to, Ortho's Procrit.  In a January 2005 e-mail from an Amgen district manager attaching a chart referring to Aranesp, the author illustrated how, over time, manufacturers, including Amgen, responded to market pressures by ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓"  For Aranesp, that was 2004, according to the chart.  The author also commented that after such a period, "▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓  The document and attachment clearly acknowledged and showed that Amgen knew well how to manipulate spreads to increase sales.

b.      In an August 2002 e-mail sent to "▓▓▓▓▓▓▓▓▓▓▓▓"  the author made the point that all sales reps "▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓"  The author also indicated that every sales rep should know certain points by memory.  These points included profitability figures for Aranesp.  Sales reps were also to be able to

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████"

     c.     By way of another example, in an undated presentation as to Commonwealth Cancer Center, Amgen raised "████████████" Under the banner of Business Issues, Amgen noted that variables include: ████████████████ ████████████████" Amgen also indicated, under the banner "████████████████" that it had the ████████████ ██████████████" including "████████████████████" In addition, it advised that the salesperson (evidently) needed to "████████████" and that the ██████████████████"

     d.     Under the banner "███████████████████" Amgen set forth the equation: "█████████████████████████████████" It advised that "██████████████████████████" Later, under the same banner, Amgen noted: "██████████████████ ████████████" An example of the economic benefit to be gained was given, showing a difference in favor of Aranesp, using the hypotheticals employed, of $120,000 on an annual basis.

     e.     Among the "███████████████" listed at the end of the presentation was: "████████████████████████████████████████████ ██████████████"

f.      In addition, numerous sales-call notes include the entry, "█████ ███████████████████' Given the specific wording, this appears to have been a standard entry that salespeople could select when entering notes into Amgen's Orion Account Activity Report.

g.      There also were numerous examples of Aranesp/Procrit price comparisons in the document production.  These included many examples of documents that not only showed Aranesp/Procrit price comparisons, but also AWPs and after-discount acquisition costs, which permitted the calculation of, or which directly showed, profitability.

h.      There also was a spreadsheet tied to a specific salesperson that was distributed to the '█████████' in August 2002.  It showed graphically '████████ ████████████████████████" ████████████████ He warned '████████████ ████████████████████████████████████████████"

i.      *Neulasta*.  Amgen used a Community Cancer Care Product Agreement (example dated 2003-2004) that contained a spreadsheet with columns for '█████████ ██████████████████████' in addition to columns for WAP, contract price, and AWP. This same document contains a reference to the ████████████████████████ ██████████████████████████████████████████████ ██████████████████████ References to other spreadsheets were found at the end of this document.  This document gave salespersons all the tools they needed to market Neulasta based on the spread.

j.      Another spreadsheet prepared by an Amgen sales representative for a particular account not only allowed spread comparisons for Aranesp and Procrit, but it

also allowed calculations of "█████████" including profits, for Neulasta and

Neupogen.  It also showed "█████████" including profits, for Neulasta per therapeutic

cycle.  This spreadsheet also carried the admonitions ████████████████████████

██████████████████████████████████████████  In addition, the

October 2002 transmittal e-mail carried the note:  "██████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████" Several such spreadsheets were present in the production.

      k.     And in a May 2002 admonition to the "██████████" a district manager

wrote: "██████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████" (Emphasis added.)

Together with the spreadsheets that were found in the production, this document helped

to illustrate that Amgen marketed Neulasta based on its contract and economic benefits,

which translated into profits via the spread.

     27.     Plaintiffs took three Rule 30(b)(6) depositions of Amgen representatives in May

2004.  The deponents were Peter Feldman, Amgen Senior Director, Channel Sales and

Operations; Ole Mikkelsen, Amgen Director of Information Systems; and Helen Streck, Amgen

Corporate Records and Compliance Manager.  Each provided valuable information to the

Plaintiffs, including not only with respect to data and documents that later would be produced by

Amgen, but also for the conferences that Plaintiffs' counsel would have with Amgen's counsel

regarding production issues.

28.     Ms. Streck addressed document retention and preservation practices, including with regard to documents important to Plaintiffs' case.  Mr. Mikkelsen testified as to Amgen's information systems and databases.  As for databases, he provided important information as to Amgen's database of information gathered by the field sales force; the predecessor to that database; Amgen's sales-figures and order-fulfillment database; and Amgen's contract and chargeback system.  This testimony helped Plaintiffs to understand the sorts of documents and data that were available, as well as the nature of, and inter-relationships among, data and documents within Amgen's production once it occurred.

29.     As for Mr. Feldman, he provided information with respect to his three areas of responsibility within Amgen:  pricing and contracting for U.S. markets; channel sales, including Amgen's relationships with its wholesalers and distributors; and customer service, including invoicing of, and interactions with, Amgen's customers.  Mr. Feldman discussed the production of various reports, including sales performance and analytics.  He also spoke to Amgen's distribution model for the drugs at issue, as well as contracting with purchasers.  In addition, he identified Amgen's customer contract system, as well as its chargeback database.  He also spoke to pricing, including the establishment of pricing, as well as pricing histories.  Again, this information was helpful to Plaintiffs not only in and of itself, in terms of understanding Amgen's processes and operations as they pertained to the allegations of Plaintiffs' complaint, but also as Plaintiffs' counsel engaged in conferences with Amgen's lawyers regarding Plaintiffs' discovery requests and Amgen's obligations to respond to them.

**3.     Aventis**

30.     Discovery against Aventis was extensive, aggressive and contested.  Plaintiffs began by reviewing publically available pricing materials and internal Aventis documents produced as part of the various governmental investigations.  Plaintiffs also worked closely with

counsel in other related cases, including the Connecticut Attorney General, who had filed suit against Aventis.

31.     Plaintiffs served Aventis, along with several other Defendants, extensive document requests and an initial Notice of Rule 30(b)(6) deposition.  After receiving some discovery Plaintiffs negotiated, over the course of numerous meet and confer calls and correspondence, the production of additional documents.  Plaintiffs also served a second Request for Production on Aventis.  Additional discovery requests, including differing Notices of Rule 30(b)(6) depositions, were served in related actions, all which required Aventis to produce even more discovery, in the form of documents and witnesses.  Plaintiffs were forced to engage in discovery motion practice with Aventis on several occasions.  Plaintiffs initially filed a Motion to Compel Depositions against Aventis which was resolved by the parties in June, 2005.  Aventis later filed its own Motion for Protective Order seeking to limit the number of depositions Plaintiffs could conduct.  Plaintiffs responded to that motion in detail and an agreement was ultimately reached.  Plaintiffs were also forced to conduct numerous Meet and Confer conferences to negotiate and badger Aventis into producing additional documents and sales data.

32.     Throughout the course of discovery Plaintiffs took nineteen (19) depositions of Aventis employees or ex-employees.  Depositions of several additional former employees were noticed, but not conducted.  The Aventis employees deposed included: several Rule 30(b)(6) designees relating to Aventis' pricing, sales, marketing and contracting practices; Aventis' former President Gerald Belle; and several Senior Vice-Presidents of sales and marketing.  In addition Plaintiffs took several depositions to establish the fact that Aventis stated an AWP and created and marketed a spread for its products.  The Aventis' deponents were:

Mark Alles
Christopher Bianchi

Evelyn Dudley
Lilli Duvall
Patricia Griffin
Daniel C. Leone
Gerald P. Belle
Claire Brunken
Randy Colvin
John Cervione
Pauline Chrenko
Ron Corpora
Herve Gisserot
Herve Hoppenot
Becky Hayes
Michel J. Leach
Leon Moulder
David Pickhardt
James Rademaker

33.     Plaintiffs also obtained and reviewed  a huge volume of document discovery from Aventis.  Plaintiffs reviewed and analyzed over 233,000 pages of discovery, produced mainly in electronic form.

34.     Plaintiffs also obtained and reviewed a substantial amount of electronic sales and purchasing data from Aventis.  Working closely with Dr. Hartman's office, Plaintiffs analyzed the net sales and estimated spreads for the Aventis drugs.  Dr. Harman later calculated damages for Aventis.

35.     Plaintiffs' discovery efforts identified Aventis' drug Anzemet as a drug in which liability and damages were substantial.  Plaintiffs identified the fact that Aventis created, maintained and marketed a large spread on Anzemet.  It should be noted that Anzemet was the third to market drug which competed with GSK's drugs Kytril and Zofran, largely on price.

36.     Plaintiffs' discovery also identified Taxotere as a Part B drug with the potential for abuse.  However the discovery information developed did not turn up as convincing a case against Taxotere.

- 15 -

37.     Similarly, Plaintiffs conducted discovery for the Aventis drug Lovenox, a widely used blood thinner.  Plaintiffs reviewed thousands of pages of documents and conducted deposition of senior Aventis employees Christopher Bianchi and Herve Gisserot relating specifically to Lovenox.  However, discovery revealed that the pricing of Lovenox was not substantially below WAC, thus spreads were not substantial.  Nor did discovery indicate any substantial marketing efforts to sell Lovenox based on its spread.

**4.     Baxter**

38.     Class Counsel conducted substantial discovery into Baxter's pricing methodologies and spread marketing activities during the Class Period, including reviewing millions of pages of documents produced by Baxter and deposing eleven current and former Baxter employees, including five 30(b)(6) depositions.

39.     As part of their investigation into Baxter's drug pricing and marketing practices, Class Counsel closely followed relevant government investigations.  For example, the House Committee on Commerce, Department of Health and Human Services, and Department of Justice were each involved in an extensive review of the prices Medicare paid for prescription drugs, and scrutinized Baxter's activities.  In June 2002, Class Counsel submitted Freedom of Information requests to the United States Department of Justice seeking documents relating to any investigations of Baxter for overstating AWP, marketing the spread, providing free samples and financial incentives to doctors or overcharging Medicare for physician-administered drugs.

40.     On March 31, 2004, Class Counsel served all Track 2 Defendants with omnibus requests for the production of documents and interrogatories spanning the following categories: General Corporate, Trade Associations, Government Investigations, Communications with Government Entities, AWPs and Pricing, Inducements to Physicians, Marketing Plans and Sales Representatives, Publishers, PBMs and Wholesalers, and Communications with Other

- 16 -

Manufacturers.  Throughout the litigation, Plaintiffs issued, and Baxter responded to, additional document requests concerning IMS data, Average Sales Price, and other more discrete topics.

41.     By June 2006, Baxter's total document production comprised nearly 6 million pages of documents, including documents previously produced to the Government, contract related documents identified by Class Counsel after a review of hundreds of boxes on-site at Baxter, and the electronic equivalent of 250,000 pages of transactional data.  Class Counsel reviewed documents relating both to specific drugs manufactured by Baxter, as well as to corporate policies and procedures applicable to all drugs at issue in this litigation.  The documents were wide-ranging, from internal memoranda, correspondence, and communications with publishers, to price lists, PBM contracts, sales training materials, product price change notices, AWP price histories, purchase agreements, and internal documents reflecting policies and procedures on pricing, reimbursement and marketing.

42.     Class Counsel additionally reviewed a number of Baxter-related documents produced by publishers, wholesalers and other third parties.

43.     Plaintiffs' interrogatories, furthermore, asked Track 2 Defendants like Baxter to provide a wide range of information for each of the drugs listed in Exhibit A to the Complaint, including: 1) their total volume of sales; 2) reported AWPs, AMPs, ASPs and WACs, as well as the methods used to calculate them and the individuals responsible for doing so; and 3) a description of any marketing efforts based upon the spread between the provider's costs and reimbursement.

44.     Plaintiffs took approximately 11 depositions of current and former employees of Baxter, focusing on the company's policies with respect to AWP or list price, pricing and

001534-16 465801 V1

reimbursement, and non-drug specific discussions of spread. Included in the depositions were the following five 30(b)(6) witnesses for Baxter:

- **Peter O'Malley, May 23, 2005.** Mr. O'Malley, a former sales representative and Vice President of Sales, held the title of Vice President, General Manager when he was deposed. He testified concerning Baxter's general marketing practices and training of its sales force.

- **Michael Bradley, May 24, 2005.** Mr. Bradley was Baxter's Senior Director of Healthcare Economics. He testified regarding Baxter's communications with publishers and procedures for conducting quarterly business reviews, the relationship between WAC and AWP, and payer relations.

- **Bryant Gunnerson, May 24, 2005.** As a "Finance Manager 2" at Baxter, Mr. Gunnerson was the primary contact with the states on Medicaid rebate issues. His team was responsible for doing all of the payout calculations at the completion of a contract and for reviewing guideline pricing for new contracts. They also ran reports accounting for the distribution of free product samples.

- **Juliana M. Reed, July 13, 2005.** Ms. Reed, Baxter's Director of Healthcare Economics and Reimbursement, was a point of contact between Baxter and First DataBank, provided training to Baxter's sales force on fraud and abuse and reimbursement issues, manned its reimbursement hotline, researched reimbursement issues for the company, and prepared a presentation on the government's investigation into AWP to Baxter's senior staff in 2001-2002. She testified with respect to the following topics: (1) the identity of documents describing the price paid by entities or individuals reimbursing for physician-administered drugs, and the identity of persons with knowledge on this subject; (2) communications, oral or written, with publishers on any of the following: list price, AWP, net price, suggested wholesale price, WAC, or any other communication with publishers; and (3) the ASPs on each AWPID, the spread between ASP and AWP, and how each defendant calculates ASP.

- **Greg Neier, August 12, 2005.** Mr. Neier, the Vice President of Sales for Baxter's Medical Delivery division, testified with respect to the following topics: (1) the identity of documents describing how prices on physician-administered drugs are established and the identity of persons with knowledge on this issue; (2) The identity of documents describing the price paid by physicians for physician-administered drugs, and the identity of persons with knowledge on this subject; (3) The types of materials maintained by the sales force, including "detail" reports, field sales notes, and electronic databases; and (4) The identity and nature of the competitive drugs with respect to each physician-administered AWPID.

45.     In 2006, Class Counsel additionally took the depositions of the following six current or former employees of Baxter: (1) Bernadette Connolly on May 17, 2006, (2) Catherine Schrank on May 18, 2006, (3) Judy Reuter on May 19, 2006, (4) Rosalee Satterthwaite on June 13, 2006, (5) Candy Pullano on July 19, 2006, and (6) Pam Koo on June 21, 2006.

**5.      Bayer**

46.     Class Counsel conducted substantial discovery into Bayer's pricing methodologies and spread marketing activities during the Class Period, including reviewing nearly a million pages of documents produced by Bayer and deposing two of its corporate representatives.

47.     As part of their investigation into Bayer's drug pricing and marketing practices, Class Counsel closely followed relevant government investigations. For example, in January of 2001, Bayer settled a suit brought against it by 45 states which alleged that Bayer caused providers to submit fraudulent claims to state Medicaid programs. Bayer agreed to pay the states $14 million in the suit, which also alleged that Bayer fraudulently inflated AWP and knowingly underpaid Medicaid for rebates it owed to the states. As part of the settlement, Bayer agreed to submit to a corporate integrity agreement.

48.     In June 2002, Class Counsel submitted Freedom of Information requests to the United States Department of Justice seeking documents relating to any investigations of Bayer for overstating AWP, marketing the spread, providing free samples and financial incentives to doctors and overcharging Medicare for physician-administered drugs.

49.     On March 31, 2004, Class Counsel served all Track 2 Defendants with omnibus requests for the production of documents and interrogatories spanning the following categories: General Corporate, Trade Associations, Government Investigations, Communications with Government Entities, AWPs and Pricing, Inducements to Physicians, Marketing Plans and Sales

- 19 -

Representatives, Publishers, PBMs and Wholesalers, and Communications with Other Manufacturers. Throughout the litigation, Plaintiffs issued, and Bayer responded to, additional document requests concerning IMS data, Average Sales Price, and other more discrete topics.

50. Counsel conducted a preliminary review of hundreds of boxes of Bayer's documents, from which they selected documents to be produced for further review. In 2005 and 2006 Bayer then produced, and Class Counsel reviewed, nearly a million pages of documents. The production was comprised of a wide range of documents, including codes of conduct, compliance policies and procedures, corporate financial policies and procedures manuals, corporate integrity agreements, price determination procedures, organization charts, price change strategy memos, PBM contract strategy memos, business reviews, pharmacy agreements, rebate and chargeback data, price lists, e-mails, and correspondence. Class Counsel additionally reviewed transactional data produced by Bayer from 1997 to 2001 and Bayer-related documents produced by publishers, wholesalers and other third parties.

51. Plaintiffs' interrogatories, furthermore, asked Track 2 Defendants like Bayer to provide a wide range of information for each of the AWPIDs listed in Exhibit A to the Complaint, including: 1) their total volume of sales; 2) reported AWPs, AMPs, ASPs and WACs, as well as the methods used to calculate them and the individuals responsible for doing so; and 3) a description of any marketing efforts based upon the spread between the provider's costs and reimbursement.

52. Class Counsel took the depositions of two corporate representatives of Bayer. On November 10, 2005, they deposed Terry D. Tenbrunsel, an employee of Bayer and its predecessors since 1985 and Vice President of Sales and Marketing in Bayer's Biological Products Division since 1999. Mr. Tenbrunsel testified not only with respect to specific Track 2

- 20 -

drugs, but on a wide range of topics covering Bayer's corporate policies and procedures

applicable to all drugs at issue in this litigation, including the following:

- Bayer's policies and/or practices concerning how prices on its physician-administered drugs are established and/or changed, and the identity of persons with knowledge on this issue;

- The identity of documents that describe the price paid by physicians for Bayer's physician-administered drugs and/or the formulas or methods by which the physician-administered drugs are reimbursed by government programs and/or private health plans, and the identity of persons with knowledge on this subject;

- The identity and nature of any documents discussing, promoting or marketing the Spread on any of Bayer's physician-administered AWPIDs to customers or potential customers;

- The identity of the competitive drugs with respect to each physician-administered AWPID and the nature and identity of documents reflecting any comparisons of any price, Spread, rebate or incentive for any of Bayer's physician-administered drugs with any price, Spread, rebate or incentive for a competing drug;

- Bayer's training and education of its sales representatives with respect to policies regarding selling or promoting physician-administered AWPIDs to physicians and/or other customers;

- The types of materials maintained by the sales force, including detail reports and field sales notes, as well as any computer database used to record and/or summarize the nature of the discussions between sales representatives and customers and/or potential purchasers;

- The Average Sales Price ("ASP") or "net price" for each physician-administered AWPID, the ASPs on each AWPID, the spread between ASP and AWP, and how each defendant calculates ASP;

- The identity of documents that describe or analyze the amount of profit from each of Bayer's physician-administered AWPIDs; and

- Bayer's policies and practices concerning the provision of free samples of physician-administered AWPIDs to physicians.

53.     On December 1, 2005, Class Counsel also deposed Leslie E. Noble, an employee

of Bayer since 1993 and Director of Strategic Contracting and Customer Operations from 1998

to 2004.  Ms. Noble testified on behalf of Bayer with respect to its communications with

publishers.

### 6.    Dey

54.    Class Counsel conducted substantial discovery into Dey's pricing methodologies

and spread marketing activities during the Class Period, including reviewing 2 million pages of

documents produced by Dey.

55.    In addition, Dey produced 11 discs containing sales transaction data.

56.    On March 31, 2004, Class Counsel served all Track 2 Defendants with omnibus

requests for the production of documents and interrogatories spanning the following categories:

General Corporate, Trade Associations, Government Investigations, Communications with

Government Entities, AWPs and Pricing, Inducements to Physicians, Marketing Plans and Sales

Representatives, Publishers, PBMs and Wholesalers, and Communications with Other

Manufacturers.  Throughout the litigation, Plaintiffs issued, and Dey responded to, additional

document requests concerning IMS data, Average Sales Price, and other more discrete topics.

57.    Plaintiffs' interrogatories, furthermore, asked Track 2 Defendants like Dey to

provide a wide range of information for each of the drugs listed in Exhibit A to the Complaint,

including: 1) their total volume of sales; 2) reported AWPs, AMPs, ASPs and WACs, as well as

the methods used to calculate them and the individuals responsible for doing so; and 3) a

description of any marketing efforts based upon the spread between the provider's costs and

reimbursement.

58.    Class Counsel took one Rule 30(b)(6) deposition of a Dey corporate

representative.

**7.      Fujisawa**

59.      Class Counsel conducted substantial discovery into Dey's pricing methodologies and spread marketing activities during the Class Period.

60.      Plaintiffs reviewed publicly available pricing data for Fujisawa's drugs and internal marketing produced through various governmental investigations.  Plaintiffs' also served Fujisawa, like all defendants with extensive document requests in March 2004.  Plaintiffs than engaged in a series of oral and written meet and confer conversations with Fujisawa's counsel over the scope of the production.

61.      Fujisawa produced almost 100,000 pages of discovery relating to its subject drugs, which Plaintiffs' counsel reviewed.

62.      Fujisawa also made two productions of electronic sales data for most of its drugs, which Dr. Hartman's office reviewed.

63.      Plaintiffs' review of Fujisawa's documents identified some instances of spread marketing efforts.

64.      However the sales data plaintiffs obtained revealed that sales of many of the drugs were not substantial, especially during the later years of the class period (Fujisawa sold a portion of its portfolio in 1998).  For the one Fujisawa drug with substantial sales, Prograf, there was no indication of spreads above 30% or spread marketing or manipulation.

**8.      Immunex**

65.      Class Counsel conducted substantial discovery into Immunex's pricing methodologies and spread marketing activities during the Class Period, including discovery into all five of Immunex drugs (leucovorin calcium, Leukine, methotrexate sodium, Novantrone, and Thioplex/thiotepa).

- 23 -

66.     On March 31, 2004, Class Counsel served all Track 2 Defendants with omnibus requests for the production of documents and interrogatories spanning the following categories: General Corporate, Trade Associations, Government Investigations, Communications with Government Entities, AWPs and Pricing, Inducements to Physicians, Marketing Plans and Sales Representatives, Publishers, PBMs and Wholesalers, and Communications with Other Manufacturers.  Throughout the litigation, Plaintiffs issued, and Immunex responded to, additional document requests concerning IMS data, Average Sales Price, and other more discrete topics.

67.     Plaintiffs' interrogatories, furthermore, asked Track 2 Defendants like Immunex to provide a wide range of information for each of the drugs listed in Exhibit A to the Complaint, including:  1) their total volume of sales; 2) reported AWPs, AMPs, ASPs and WACs, as well as the methods used to calculate them and the individuals responsible for doing so; and 3) a description of any marketing efforts based upon the spread between the provider's costs and reimbursement.

68.     Immunex produced and Plaintiffs reviewed over 120 boxes of documents, containing hundreds-of-thousands of pages.  Much of this review was conducted early in the litigation, and was comprised of documents that Immunex produced to various government entities in response to AWP-related government subpoenas.

69.     Immunex made various supplemental productions of other documents and produced additional transactional data on May 20, 2005, August 1, 2005, and September 14, 2005.  Transaction data was produced for all of its drugs.

70.     In addition, Plaintiffs took 11 depositions of Immunex witnesses.  The deponents were:  Michael Ambielli, Bob Bettencourt, John Frande, Joyce Golden, Ann Kerner, Mary

- 24 -

Lipinsky, Kurt Miller, Mike Preberowsky, Sigrid Schreiner, Kathleen Stamm, and Kendall Stever. Collectively, these depositions covered all five of the Immunex drugs, in addition to corporate-wide pricing and marketing policies.

### 9. Pharmacia

71.     Class Counsel conducted substantial discovery into Pharmacia's pricing methodologies and spread marketing activities during the Class Period, including reviewing hundreds of thousands of pages of documents produced by Pharmacia.

72.     On March 31, 2004, Class Counsel served all Track 2 Defendants with omnibus requests for the production of documents and interrogatories spanning the following categories: General Corporate, Trade Associations, Government Investigations, Communications with Government Entities, AWPs and Pricing, Inducements to Physicians, Marketing Plans and Sales Representatives, Publishers, PBMs and Wholesalers, and Communications with Other Manufacturers. Throughout the litigation, Plaintiffs issued, and Pharmacia responded to, additional document requests concerning IMS data, Average Sales Price, and other more discrete topics.

73.     Plaintiffs' interrogatories, furthermore, asked Track 2 Defendants like Pharmacia to provide a wide range of information for each of the drugs listed in Exhibit A to the Complaint, including: 1) their total volume of sales; 2) reported AWPs, AMPs, ASPs and WACs, as well as the methods used to calculate them and the individuals responsible for doing so; and 3) a description of any marketing efforts based upon the spread between the provider's costs and reimbursement.

74.     Pharmacia produced and counsel reviewed over 140,000 pages of documents produced by Pharmacia covering all of its drugs in the Track Two Settlement.

75.     In addition, counsel took the depositions of eleven Pharmacia witnesses, including two who testified as corporate representatives under Rule 30(b)(6).

**10.     Sicor/Gensia**

76.     Class Counsel conducted substantial discovery into Sicor/Gensia's pricing methodologies and spread marketing activities during the Class Period, including reviewing millions of pages of documents produced by Sicor/Gensia.

77.     Initially, Plaintiffs' counsel reviewed documents and public statements from various governmental investigations, including DOJ investigations, and publically available pricing information.

78.     On March 31, 2004, Class Counsel served all Track 2 Defendants with omnibus requests for the production of documents and interrogatories spanning the following categories: General Corporate, Trade Associations, Government Investigations, Communications with Government Entities, AWPs and Pricing, Inducements to Physicians, Marketing Plans and Sales Representatives, Publishers, PBMs and Wholesalers, and Communications with Other Manufacturers.  Throughout the litigation, Plaintiffs issued, and Sicor/Gensia responded to, additional document requests concerning IMS data, Average Sales Price, and other more discrete topics.

79.     Plaintiffs' interrogatories, furthermore, asked Track 2 Defendants like Sicor/Gensia to provide a wide range of information for each of the drugs listed in Exhibit A to the Complaint, including:  1) their total volume of sales; 2) reported AWPs, AMPs, ASPs and WACs, as well as the methods used to calculate them and the individuals responsible for doing so; and 3) a description of any marketing efforts based upon the spread between the provider's costs and reimbursement.

80.   Sicor/Gensia produced over 167,000 pages of documents, all of which we reviewed by Plaintiffs.

81.   Counsel also obtained electronic sales data from Gensia/Sicor on the drugs at issue.  Working with Dr. Hartman's office, this data was analyzed to determine the likely volume of sales to Class members.  For at least 2 of the Gensia/Sicor drugs (Acyclovir and Amphotercin) sales to the Class were very small.

82.   Counsel also noticed and conducted the deposition of Gensia/Sicor's Rule 30(b)(6) designee, Diane Morales.  Ms. Morales was examined as to various company-wide procedures, including pricing policies, rebates and contracting with large GPO's.

83.   Counsel also took the deposition of Michael Burton, Gensia/Sicor's national sales and marketing Director.

**11.   Watson**

84.   Watson produced 83,700 pages of documents, which were reviewed by Plaintiffs.

85.   Watson deponents included Kathleen Barclay, Watson's Director of Contract Operations from 1998 through the end of the class period; Joseph Canny, InFed's Product Manager from 1998 to 2001 and from 2003 to the end of the class period; Timothy Callahan, Watson's Vice President of Sales and Marketing; and Napoleon Clark, Watson's Senior Product Manager for Generic Products; and Andrew Boyer, a VP of Sales and marketing.  Both Mr. Boyer and Mr. Callahan were produced in response to a Rule 30b6 Notice.

86.   Plaintiffs also attended the deposition of Watson witness, Lisa Recchia, who was a generic drug pricing manager during most of class period and was deposed in the Attorney General of Massachusetts action.

87.   Discovery revealed that Watson marketed the spread on Watson's branded products, Ferrlecit and INFeD, which represented 48% of Watson's revenues and 60% of its

- 27 -

profits.  Watson has admitted that it, and not a third party, set and controlled, and published the

AWPs for the drugs that are at issue in this case.  A June 30, 2000 letter from Schein's (Watson's

predecessor) Senior Vice President of Sales and Marketing, Steve Basile, stated "████████

████████████████████████████████████████████████

████████████████████████████" Watson was aware that its published pricing

served as a '████████' to its real selling prices.  Schein maintained a pricing policy whereby

its real selling price would be set as much as 30% below the published WAC price.  WAC prices

were set so that Schein's customers could feel they were getting '████████████' off the list

price.

88.     Watson's first name-brand drug was INFeD, an intravenous, physician-

administered drug used in the treatment of patients with iron deficiency.  INFeD came to market

in approximately 1992 and is one of the drugs Medicare identified as having an artificially

inflated price.  In 1997, Schein was marketing INFeD as a "premium priced injectable iron

product."  Schein marketed the spread on INFeD through its direct sales force calling on

physicians in their offices.  Schein trained its sales representatives to sell INFeD's financial

benefit by pointing out that, while INFeD cost $21 to $23 per vial, the physician was being

reimbursed at $37.00.

89.     INFeD's sales during the Class Period were approximately $907.5 million, at

ASP.  Its AWP at launch was $349.50.  In 1996, AWP increased to $377.04.  ASP, however,

decreased from $205.31 at launch to $161.34 in 1998.  In 1999, ASP increased to $203.42, as

part of Watson's strategy to shift sales from INFeD to Ferrlecit.

90.     Watson's primary brand-name product, Ferrlecit, was launched in 1999.  Ferrlecit

is an IV infusion drug used for treating iron deficiency anemia in patients undergoing

hemodialysis. Ferrlecit was targeted for marketing to dialysis centers, hospitals, and cancer clinics. Ferrlecit was intended to launch at a premium price. In order to optimize profits, Schein determined that it was necessary to "████████████████████████████"

91.    Numerous other documents produced detail the methods by which Schein's sales staff engaged in profit discussions with customers. For example, at the Ferrlecit launch meeting in June 1999, John Nosenzo, Schein's National Sales Manager, instructed field sales staff to use a computer demonstration to show the physician Ferrlecit's profit potential, but not to let the physician retain any of the materials used. Ferrlecit and INFeD prices were to be entered into the computer prior to the call. During the sales call, only the computer was to be used, the customer could take notes, but could not get printouts.

92.    Field sales staff were instructed to demonstrate Ferrlecit's '████████████ ████████' Sales staff were permitted to discuss the financial benefits of using Ferrlecit with office managers and financial managers, if they first asked. One account manager reported that in her region, doctors committed to starting 1,000 patients on Ferrlecit during the first week of June 1999. This manager noted, "████████████████████████████ ██████████████"

93.    In 2001, Watson developed a Ferrlecit marketing program called '████████ ████████' Its slogan was '████████████████████████" This program tutors field sales staff on promotional programs highlighting the financial benefits of using Ferrlecit. One of the financial promotions demonstrated is to show the physician how Ferrlecit offers the highest approved daily dose of any IV iron.

94.     On August 24, 2001, a Watson sales representative attended a meeting with a major customer's vice president. At that meeting, the representative was able to '███████████ ███████████████████████████' of having the customer switch to Ferrlecit.

95.     During March 2002, Watson began planning for a presentation it was going to make for one of its major customers, FMC. Tim Callahan instructed that there '█████████ ███████████████████████████████████████████████ ███████████████████████████████' The presentation demonstrated Watson's new rebate programs, which increased rebates from 7.25% to 13.25%.

96.     During August 2002, another of Watson's major customers, Davita, switched from Ferrlecit to Venofer. Joe Papa, Watson's CEO, scheduled a meeting with Davita's CEO to discuss the switch. Tim Callahan's background memo on Davita's business model included key point to be made during the meeting, among them the fact that '██████████████████ █████████████████████████████'

97.     In April 2003, FMC changed its rebate policy so that rebates were paid at the regional level. Watson's corporate account manager viewed this an opportunity because it "██████████████████████████████████"

98.     Until 2003, Watson offered unrestricted educational grants to its major dialysis customers in exchange for maintaining and increasing the customers' Ferrlecit sales. Watson routinely offered unrestricted educational grants to Gambro, a chain of dialysis centers. Gambro clinics dispensing Ferrlecit were entitled to quarterly $1,000.00 grants, in addition to quarterly Best Practices and Most Improved $500.00 to $1,000.00 grants. In fact, Watson sales representative had the grant checks in hand to give to customers and had to ask the customer to put a request in writing, so that they could hand the check over. Another customer, NNA, was

offered $1,000.00 grants each for Best Practices and Most Improved outcomes. These grants were offered every 6 months. Another customer, Dr. Finkelstein, wanted to do a '███████' and wanted free Ferrlecit and '█████████████████████ ████' " Clearly, at least in this instance knew that there was no basis for Watson offering the grant, other than buying itself another account. Watson's use of unrestricted grants continued until, finally, one of its customer's compliance officers requested that Watson terminate the practice.

99.     Since its launch, neither Ferrlecit's WAC nor AWP have changed. The spread for Ferrlecit's published prices has always been 35.22%. Ferrlecit's ASP has, however, decreased every year since launch. In 1999, its ASP was $283.99. By 2004, ASP decreased to $218.87. Thus Ferrlecit's true spread increased to 50.9 percent. Ferrlecit's sales from 1999 to 2004 were $645 million, at ASP.

**C.     The Proposed Rebalancing is a Fair Settlement Under Fed. R. Civ. P. 23**

100.     Class counsel believe that the original settlement of $125 million is fair and an excellent settlement under Fed. R. Civ. P. 23 for the reasons previously outlined, and that the rebalancing and redistribution that we have proposed enhances that fairness.

101.     To review, under the proposed distribution methodology submitted to the Court on July 5 in Class Counsel's Proposal to Redistribute the Track Two Consumer Allocation (Dkt. No. 7647), a "Total Recognized Claim" is calculated for Class 1 consumers and for the Class 3 consumers who chose the "Full Estimation Refund" option instead of the $35 "Easy Pay" refund option. The calculation is made by summing *damages* for Group A drugs (as calculated by applying Dr. Hartman's overcharge ratios to actual cash or co-pay outlays), multiplying the sum by two, and then adding out-of-pocket cash or co-payments for Group B drugs reduced

proportionately based on all Group B drug claims filed.[3]  Graphically, the formula is depicted as follows:

$$\text{Out of Pocket } \textit{Damages} \text{ for Group A Drugs} \quad \textbf{X 2} \quad + \quad \text{Out of Pocket Payments for Group B Drugs, reduced proportionately} \quad = \quad \text{Total Recognized Claim}$$

102.    Class Counsel now propose to modify the foregoing distribution methodology further in order to enhance the fairness and reasonableness of the proposed Settlement.

103.    The first modification proposed comes from the TPPs.  Based upon the Court's prior guidance in the BMS settlement process, Class Counsel contacted TPP counsel who have agreed to increase the consumer allocation by an additional $3,125,000.  This changes the Consumer/TPP allocation to 20%/80%.  Class Counsel propose that these proceeds be used to enhance the Group B drug payout.

104.    The Group B drug pool will be increased not only by the additional $3,125,000 contributed by TPPs, but also by three additional adjustments to the manner in which the consumer monies are distributed.  First, the Court has asked whether substantial settlement monies should be allocated to Group 1 Epogen administrations given that Medicare generally did not reimburse Epogen using AWP.  Based on Dr. Hartman's conclusion that Medicare established a non-AWP, capitated reimbursement rate for Epogen and that some, though few Medicare reimbursements were made at AWP, Class Counsel propose that the Class 1 member receive $5 for all Epogen administrations as consideration for providing a legal release.  Given that most Medicare reimbursements at AWP were for Procrit and not Epogen, we expect that this

---

[3] Importantly, the Group B payment is based, prior to proportionate reductions, on co-pays or cash pays, *which are greater than actual damages*.

change in the distribution methodology will generate approximately $1.9 million more cash for the Class B drug group.[4]

105.    The second change proposed by Class Counsel applies to Class B drugs reimbursed by Medicare under the "not otherwise classified" J-Codes.  Because many other drugs fall into these codes that are not part of this litigation or Settlement, and because we cannot determine from the settlement database whether a reimbursement corresponding to the "not otherwise classified" codes was for a Track Two drug, Class Counsel propose that claiming Class 1 members who were administered the foregoing 15 drugs present some documentary proof that they were administered a Track Two drug before receiving any compensation in the settlement.  This can be done by submitting to the Claims Administrator one form of documentary proof that the Track Two drug was administered at least once.  This proof can be in the form of the prescribing physician's notes in the Class member's medical file, a letter from the prescribing physician, or some other documentary evidence from the prescribing physician's office identifying the Track Two drug has having been administered at least once.

106.    It is difficult to predict with any certainty the amount of "not otherwise classified" drug claims that will result from this change, but it is not likely to be significant.  For purposes of our modeling, we have assumed that Total Recognized Claims for these drugs will drop from $5.1 million to less than $500,000.

107.    Class Counsel propose a third and final change to the distribution formula. Because Defendant Immunex Corporation sold the marketing rights to Class B drugs Leukine and Novantrone to non-Defendants in 2002, reimbursements for these two drugs after 2002

---

[4] We are proposing a flat payment of $50 for Class 3 Epogen administrations.  The amount is larger for Class 3 because Epogen was reimbursed at AWP in the Class 3 context.  However, a flat amount is still appropriate (as opposed to determining an actual overcharge), because (i) spreads for Epogen exceeded 30% only in 2003 and then minimally so (Hartman Decl., ¶ 28 & Figure 2.B); and (ii) because Rust does not have year-by-year administration data for Class 3, each year in which a Class 3 claimant was administered Epogen cannot be determined.

should not be eligible for participation in the Settlement. Although we expect that this change

will result in a modest decrease of about $650,000 in Total Recognized Loss, it is only fair to all

Class members and will generate additional funds for distribution to all eligible Class B drug

administrations.

108.   As demonstrated in Exhibit B to the Supplemental Declaration of Daniel

Coggeshall Regarding Estimated Net Consumer Settlement Fund and Estimated Class 1 and

Class 3 Consumer Payments for the Track Two Settlement (the "Supplemental Coggeshall

Decl."), the foregoing distribution changes, as well as the additional $3,125,000 from the TPPs,

is estimated to increase the "estimated pro rata" recovery on the Class B drugs from 5.868% as

reported in Dkt. No. 7648 to 14.087%, *or a 240% increase*.

109.   In sum, the modified reallocation and redistribution plan accomplishes the

following, including the changes that we recommended in Class Counsel's Proposal to

Redistribute the Track Two Consumer Allocation (Dkt. No. 7647):

1. Class 1 and 3 consumers receive *double* their actual damages incurred on eligible administrations of Group A drugs, *even for administrations outside of the Court's "Heartland Period."*

2. Class 1 and Class 3 consumers administered Epogen receive a flat payment of $5 and $50, respectively, for all administrations of Group A drug Epogen, for which they incurred either minimal or no damage but for which they are providing a release.

3. Class 3 consumers electing the "Easy Pay" refund option receive a *full* $35 flat payment, instead of $2.04 under the original pro-ration.

4. Additional monies are allocated to the Group B drugs, resulting in more robust payouts under the original Total Recognized Loss formulation and, in many cases, a substantial percentage of their actual damages. Given the challenges posed in identifying generic drugs (due to interchangeable J-Codes) and reimbursement schemes based on median AWP (for Medicare) and maximum allowable costs (outside of Medicare), we do not believe that any further enhanced payouts for the Group B drugs are necessary. Further, there is very little spread marketing evidence for the Group B drugs. These factors have led Class Counsel to conclude that Group B damages are but a small proportion of overall Track Two damages, as supported by the Hartman Declaration.

- 34 -

110.    Thus, under this proposal, **all** Class 1 and Class 3 consumers will receive more than their actual damages for their Group A drug administrations and will receive a lower yet substantial amount for Group B drug administrations and a modest flat payment for Epogen administrations.  The Class 1 and Class 3 splits would be as follows:

- Class 1 will receive a total of approximately **$14,837,942.71** – $6,582,334.97 for Group A drugs, $8,058,317.74 for Group B drugs and $197,290.00 for Epogen. *See* Supplemental Coggeshall Decl., Ex. B.

- Class 3 will receive a total of approximately **$1,723,145.65** – $359,832.35 for Group A drugs, $898,968.31 for Group B drugs, $451,832.50 total in $35 Easy Pays and $12,512.50 for Epogen.  *See* Supplemental Coggeshall Decl., Ex. B.

The splits by drug groupings would be as follows:

- Group A, $6,942,167.32;

- Group B, $8,957,286.05;

- Epogen flat payments, $209,802.50; and

- $451,832.50 in $35 Easy Pay flat payments.

111.    The $8,957,286.05 for the Group B drugs is more than **double** the $4,030,393.02 previously allocated to the Group B drugs in Plaintiffs' July 5, 2011 redistribution proposal (*see* Dkt. No. 7648, Ex. D).  Importantly, this estimated increase is **not** the result of diminishing compensation for other deserving claimants.  Excluding Epogen, the Group A drug claimants still receive double their actual damages.  The Easy Pay group is unaffected, and the "not otherwise classified" claimants need only demonstrate that they took a Track Two eligible drug to receive their compensation (as opposed to one of the many drugs not covered in this Settlement or litigation that are also included in the "not otherwise" classified J-Codes).  The categories receiving lower compensation are the Immunex drugs Leukine and Novantrone after

2002 (because no Track Two Defendant marketed them after 2002) and Epogen, which – as demonstrated above – has little actionable damages associated with it.

112.    Class Counsel have reviewed the proposed redistribution plan with the Class Representatives, and they approve.

## II.    CONCLUSION

113.    The Track Two proposed Settlement was crafted after arduous discovery.  It reflects Class Counsel's considered judgment based on their deep experience in this AWP litigation and the Court's prior liability and damages decisions.  The Settlement also builds upon AWP settlements that have come before.  If finally approved, this Settlement will at last complete this complex, AWP multi-district litigation, which has been pending for a decade.

114.    The proposed Settlement is worthy of final approval.  The overall $125 million value is fair and reasonable in light of the estimated damages and the risks of proceeding to trial and beyond.  The reallocation and redistribution plans embodied herein – while undoubtedly not perfect – are fair and calculated to deliver substantial recoveries to all Class members.  Objections, though at times strident, have been very few.

115.    Class Counsel and the Class Representatives believe that the foregoing reallocation redistribution proposal is fair and reasonable and request that the Court approve both it and the Track Two settlement.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 3rd day of August, 2011 in Seattle, Washington.


　　　　　　　　　　　　　　 /s/ Steve W. Berman
　　　　　　　　　　　　　　　　Steve W. Berman


- 36 -

001534-16 465801 V1

## CERTIFICATE OF SERVICE

I hereby certify that I, Steve W. Berman, an attorney, caused a true and correct copy of the foregoing, *[Redacted] Declaration of Steve W. Berman In Support of Supplemental Submission in Support of a Rebalanced and Redistributed Track Two Settlement,* to be delivered to all counsel of record by electronic service pursuant to Paragraph 11 of the Case Management Order No. 2, by sending on August 3, 2011, a copy to LEXISNexis File & Serve for posting and notification to all parties.

 /s/ Steve W. Berman
Steve W. Berman

001534-16  465801 V1