# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| IN RE:  LUPRON® MARKETING AND SALES PRACTICES LITIGATION | ) ) ) ) | MDL No. 1430 |
| | | Master File No. 01-CV-10861 |
| THIS DOCUMENT RELATES TO ALL ACTIONS | ) ) ) ) ) | Judge Richard G. Stearns |

## REBUTTAL DECLARATION OF RAYMOND S. HARTMAN IN SUPPORT OF THE CERTIFICATION OF THE CLASS OF END-PAYER PURCHASERS OF LUPRON®

### Executive Summary

I have reviewed the rebuttal reports put forward by Mr. Steven Young and Dr. James Langenfeld (as well as the reliance materials they have provided, additional data, discovery materials and deposition transcripts).  I conclude that the criticisms to class certification raised by Mr. Young and Dr. Langenfeld are insufficient to undermine my conclusions pertaining to class-wide injury and class-wide damages, nor do they affect my opinion that the formulaic approaches I posit to calculate injury and damages for the Class are soundly grounded both in the field of applied economics as well as the facts regarding the sale, distribution and reimbursement of Lupron®.

I continue to be of the opinion that the purchasers of Lupron® were injured as a class and damaged economically as a result of the alleged fraudulent pricing and marketing practices and other unlawful conduct of the Defendants.

First, Defendants' practices inflated the average wholesale price (AWP) of Lupron®; this, in turn, increased the AWP-based reimbursement amounts paid to medical providers and distributors by consumers and third-party payers.  Second, the AWP and the wholesale acquisition cost (WAC) are standard prices that, for many branded drugs such as Lupron®, are mathematically related.  The alleged fraudulent pricing and marketing practices therefore affected not only the AWP but also the WAC for Lupron® (to the extent it was published) and caused both to be inflated; as a result, any WAC-based reimbursement amounts paid to medical providers and distributors by consumers and third-party payers (to the limited extent this exists) were simultaneously artificially raised.  Third, Defendants lowered the actual acquisition cost of the drug to selected medical providers through the variety of practices alleged to be unlawful.  As a result, the profitability (at times called "Return to Practice" by TAP) of prescribing and administering Lupron® on the part of medical providers was increased dramatically, thereby increasing the market penetration of Lupron® relative to alternative treatments, including Zoladex, and thereby economically injuring all end payers who made AWP-

based (or, to the limited extent they exist, WAC-based) reimbursements or other end payments for Lupron®.

Finally, class-wide analysis remains feasible and is the most efficient and effective way of analyzing causation and damages. The standard formulaic methodologies to calculate damages to the Class, specifically the amount of overpayments by the Class and the increased profits that Defendants earned inequitably at the expense of the Class, are correct and appropriate.

This report first provides an overview and summary of my analysis. I then address the specific assertions made by Mr. Young and then by Dr. Langenfeld. I then discuss the matter of allocation of class-wide damages (an issue inherent in both defense declarations). Finally, I present my conclusions.

In conducting this analysis, I have reviewed materials additional to those identified in my Declaration on Class Certification of February 20, 2004 (hereafter Class Declaration). These materials are identified in Attachment A of this Declaration.

Since I already have presented my qualifications in testimony previously submitted to this Court,[1] I will not repeat those detailed qualifications here.

I. **Overview and Summary**

1.        I was originally asked by counsel to determine, on the basis of applied economics and econometrics as well as my experience with pharmaceutical pricing and information available regarding the pricing, sale, distribution and reimbursement of Lupron®, whether (and if so, how) it could be determined that the alleged activities of the

---

[1]  See Declaration of Raymond S. Hartman in Support of the Certification of the Class of End-Payer Purchasers of Lupron®, February 20, 2004 (hereafter Class Declaration), submitted in the matter *In re: Lupron® Marketing and Sales Practices Litigation,* MDL No. 1430, Master File No. 01-CV-10861, Judge Richard G. Stearns, United States District Court for the District of Massachusetts. My background remains the same. I am an economist specializing in microeconomics; econometrics, statistics and quantitative methods; and the study of industrial organization. Microeconomics is the science used to analyze and characterize the behavior of groups of consumers and producers that constitute markets. Econometrics and statistics are sciences that make use of mathematics to measure and quantify economic behavior and economic phenomena in markets. The study of industrial organization makes use of microeconomic theory, econometrics and statistics. I have extensive experience with applied econometrics relating to the pharmaceutical industry.

I have taught, conducted economic research and provided economic consulting in these areas of specialization for thirty years. I taught graduate econometrics, statistics and economics as an Assistant Professor and Associate Professor within the Department of Economics at Boston University over the period 1977-1988 and as a Visiting Associate Professor and member of the Visiting Faculty at the School of Law, Boalt Hall, University of California at Berkeley over the period 1988-1993. I was a member of the research faculty at MIT over the period 1977-1982. During the same time, I declined the offer of a Visiting Assistant Professorship within the Department of Applied Economics at MIT, and instead lectured on a selective basis.

For brevity and simplicity of exposition in this Declaration, I refer to and rely upon where appropriate the evidence, scientific literature and calculations cited in my earlier Declaration, rather than reiterate that evidence here.

---

Defendants in this matter injured the Class identified in ¶ 9 of my Class Declaration,[2] and to identify possible formulaic methods for measuring damages on a class-wide basis.

2.      I concluded that class-wide analysis was feasible to analyze injury and damages to the proposed Class.  As a matter of economics and pharmaceutical industry practice, and if the allegations of the Amended Complaint are proven to be true, then the following impacts would have occurred.

a)  All private-sector third-party payers who were the payers to providers or other distributors for patient treatment involving Lupron® were overcharged for the drug.

b)  All Class members (private-sector third-party payers and consumers) who paid the Medicare co-payment (20%) or a private-sector third-party co-payment related to AWP (or WAC) were overcharged.

c)  All consumers who paid in full and out-of-pocket for Lupron® were most probably overcharged.  However, the number of such class members is *de minimis*.

3.      The formulaic methodologies used to calculate the economic injury to the Class caused by the alleged fraudulent practices were set forth in my earlier declaration.[3] Contrary to the assertions of Mr. Young, the presentation of the overcharge methodology *expressly* differentiates overcharges by type of provider (urologist, gynecologist or pediatrician); by therapeutic use (NDC); by type of insurer (Medicare, Medicaid and private-sector third-party payers); and by sales subject to LCA and those not subject to LCA.

4.      Moreover, Mr. Young makes the following assertions, all of which prove incorrect upon closer scrutiny.

---

[2]  The source of which was Corrected Consolidated Amended Class Action Complaint,  *In re: Lupron® Marketing and Sales Practices Litigation*, United States District Court, District of Massachusetts, MDL No. 1430, CA No. 01-CV-10861, June 14, 2002 (hereafter *Complaint*), ¶ 132.  I have been informed by Plaintiffs' counsel that although the *Complaint* states that the Class Period continues to the "present," the Class that Plaintiffs are seeking to have certified has a Class Period end date of September 30, 2001, which is the day after Defendants signed the Plea Agreement and Corporate Integrity Agreement in connection with the government case.

[3]  Specifically, in ¶ 41 of my Class Declaration, I calculate aggregate overcharges suffered by the Class (or any sub-class) as:

Formula (1):               $Overcharges_t = \Delta p_t * q_t,$

where $Overcharges_t$ is the dollar value of aggregate overcharges during period (month, quarter or year) t for the Class; $\Delta p_t$ is the measure of the "overcharge" in period t induced by the Defendants' conduct (calculated as the reimbursement amount (related to the overstated AWP or to Mr. Young's "constant relationship" of 1.25*WAC) minus the amount that would have been paid or reimbursed  "but-for" the alleged illegal conduct) and $q_t$ is the quantity of product that was purchased by the Class.

In ¶¶ 52-54 of my Class Declaration, I present formulaic methodologies for calculating alternative equitable remedies.

a)  Mr. Young incorrectly asserts (¶ 75) that "Dr. Hartman concludes that TAP artificially inflated the published AWP for Lupron®, which ignores the evidence produced to date in this case."

I have not been asked, nor opined, on the issue of liability.  As is standard in any declaration in support of class certification, and as I explicitly state in ¶ 15 of my Class Declaration, I was "directed by counsel to assume the allegations in the Complaint are true."

I do believe the assumption is reasonable.  Moreover, I am of the view that Mr. Young fails to develop or identify *any* evidence to the contrary, and that therefore his criticism that this assumption "ignores the evidence produced to date in this case" lacks merit.  The evidence that has already been put forward in the federal matter, as discussed in the *Sentencing Memorandum*, certainly contradicts Mr. Young's claims, as do the criminal and civil settlement agreements, the Corporate Integrity Agreement and the agreements between TAP and all fifty states and the District of Columbia.

b)  Mr. Young attempts to argue that AWP has no real meaning in this industry while WAC is somehow a real price that is the basis for transactions.  Indeed, he goes so far as to put quotes around AWP (his ¶ 76), implying that WAC somehow reflects some real price while AWP is some formulaic appendage.

As I discuss in Section II.B below, this apparent attempt to draw attention away from AWP to WAC fails entirely.  As Mr. Young himself admits, there is a "constant relationship" (his words) between AWP and WAC for Lupron®; hence, both provide the same economic content.  If WAC somehow reflected real transaction values, then so would AWP, since AWP = k*WAC, where k is a constant.  While WAC is used as a list price for transactions between manufacturers and their direct purchasers (as the name implies, the price at which products may be *acquired* at wholesale), the standard price reported to price compendia and used throughout the industry for reimbursing doctors and pharmacies for their drug purchases is AWP.

c)  Mr. Young asserts incorrectly that this market is too complex to address common injury and develop formulaic methodologies to calculate aggregate damages.  I disagree.  No market is without its complexity and variation, and if market complexity and variation of the type present here were sufficient to render analysis of injury and damages impossible, then damages would never be estimable or recoverable.  The variability of Lupron® transactions – three therapeutic uses (urological, gynecological and pediatric); the three major methods of distribution (provider, wholesaler and retailer); primary types of insurance coverage (Medicare, Medicaid and private third-party payer); and the relevant types of insurance benefit plans (medical or pharmaceutical) involved – is no more complex and varied than many other markets.

For Lupron®, variation has already been anticipated in the calculation of aggregate damages and can indeed be performed using average prices and the methods originally proposed in my Class Declaration.  Formulaic methodologies are available to reasonably apportion those aggregate damage

amounts.  The use of average prices and market totals is common to an extensive literature analyzing aggregate economic injury in markets with as much variability as this market, and they are common to applied economics, econometrics and statistical analysis generally.  The methods that I propose have been approved by courts and used to identify injury and measure damages in a variety of types of litigation, including but not limited to patent infringement, antitrust, employment discrimination and securities fraud. Indeed, methods I propose are similar to those used by the other defense expert, Dr. Langenfeld, in an analysis of the injury to consumers caused by the artificial manipulation by PBMs of AWPs.  Obviously, such an analysis has relevance here and I discuss it in Section III.[4]

Having identified reasons for variability, in ¶¶ 60-67 Mr. Young introduces data summarizing the variation of reimbursement claims paid by three insurers for several dosages of Lupron®.  Mr. Young measures the variation relative to AWP, which is appropriate given the business practices in this market.  While his discussion attempts to introduce the notion that the observed variation of reimbursement rates around AWP demonstrates impossible complexity,[5] the data do no such thing.  Indeed, the data indicate that reimbursement rates are correlated with AWP over time, and there is nothing in this variation that cannot be summarized by the standard analytic methods proposed in my Class Declaration.  Average reimbursement rates will be used, which will also be correlated with AWP.

d) Mr. Young incorrectly asserts (his ¶¶ 84-85) that I do not take proper account of LCA and that given LCA, the Lupron® AWP is irrelevant.

My overcharge model takes explicit account of all sales under LCA (by state and by proportion of total Lupron® units sold); the total units sold subject to LCA; and the prices at which those units were sold.  Furthermore, it is simply incorrect to state, as Mr. Young does, that the Lupron® AWP is irrelevant to units sold under LCA.  Sales at LCA are triggered precisely when the AWP of Lupron® is greater than the AWP of Zoladex; hence, the use of the LCA price occurs as a direct consequence of the AWP of Lupron®.

5.    Dr. Langenfeld makes the following assertions, which also prove incorrect upon closer scrutiny.

a) Dr. Langenfeld makes many similar incorrect assertions that this market is simply too complex and too complicated to demonstrate common impact and develop formulaic methodologies to calculate aggregate damages.  These arguments fail for the same reasons that those of Mr. Young fail.

b) Without putting forward any actual econometric or statistical analysis of his own, Dr. Langenfeld spends an inordinate amount of time critically reviewing

---

[4] I discuss this research at greater length in my ¶¶ 33-35 below.

[5] Indeed, as I demonstrate in Section II, Mr. Young improperly uses some of the claims data in ways which speciously overstate variability.

my preliminary work in which I illustrated how econometrics can isolate the effect of an increasing AWP spread on the number of Lupron® units sold.

For purposes of this stage of the litigation, his analysis and critique are premature and irrelevant to the final analysis I shall develop.  The specific model upon which he focuses was not designed as the final version to be used in my finalized damage model and damage calculation for that single measure of equitable relief.  It was put forward to indicate the type of analysis that could be done when that damage analysis is ultimately undertaken.  Dr. Langenfeld's comments only identify refinements and provide a laundry list of all possible issues that might arise when a scientist is estimating some (any) econometric equation.

More importantly, in spite of his serious efforts, I demonstrate that several of Dr. Langenfeld's assertions are incorrect or irrelevant.

c) Dr. Langenfeld makes several assertions concerning the inappropriateness of assuming rather than demonstrating the truth of the allegations in the *Complaint*.  As stated above, in all class certification matters in which I have submitted declarations, I have been asked to make this assumption at this stage of the litigation.

Finally, many of the assertions made by Dr. Langenfeld in his Declaration are impeached by his own research.  Dr. Langenfeld criticizes my assumption of the alleged fraud; my formulaic methodologies and their reliance upon the use of average prices and reimbursement rates in summarizing market variations; and my modeling of the economic incentives of Lupron®'s Return to Practice.  However, Dr. Langenfeld hypothesizes, analyzes, demonstrates and measures, using models and data analogous to mine, the injury to consumers caused by the manipulation of AWPs by "self-dealing" PBMs.[6]   Dr. Langenfeld's approach to complex economic data in his PBM research differs little from the approaches set forth here, and they demonstrate the utility of applied economics when sufficient time and information are provided for the estimation of the effect on pharmaceutical prices of various actual or hypothesized behaviors.

## II.     Response to Mr. Young's Declaration

6.      Mr. Young appeals to the necessity of calculating damages to each and every individual.  That is not my understanding of the purpose of a class action, i.e., I do not understand the purpose to be that of recreating each individual class member's experience with the alleged wrong.

7.      It is my understanding that at this stage of the litigation I must demonstrate commonality of injury and the economic and factual viability of formulaic methods to provide a sufficiently accurate calculation of aggregate damages and injury to the Class

---

[6]  As discussed in ¶¶ 33-35 below, this research appears in his paper with R. Maness, "The Cost of PBM 'Self-Dealing' Under a Medicare Prescription Drug Benefit," September, 9, 2003.

(and sub-classes, if asked).  I understand it is unnecessary that I calculate each individual Class member's damages.  The formulaic methods I propose, which are based upon average measures of price/reimbursement and total units dispensed, will lead to exact aggregations of individual damages without performing calculations for and summations of each and every individual.  It is my understanding that allocation of aggregate damages to the Class (or sub-classes) is left to a later stage of the process.

8.      Likewise, standard formulaic methodologies exist and can be estimated to accurately apportion damages to members of the class (or sub-classes).  Any suggestions to the contrary by Mr. Young (and by Dr. Langenfeld as discussed in Section III) are without basis in applied economics and econometrics; nor are they based on the circumstances inherent in the pricing, sale, distribution and reimbursement of Lupron®.  I present a discussion of allocation issues and claims administration in Section IV below.

### A.   As is standard at this stage of the Litigation, I have been asked to assume that TAP artificially inflated its AWP list price, which is certainly consistent with the facts in evidence

9.      Without identifying the sources of his incorrect assertions, in his ¶ 75, Mr. Young states "Dr. Hartman concludes that TAP artificially inflated the published AWP for Lupron®, which ignores the evidence produced to date in this case."

10.     I know of nothing in my Class Declaration that asserts I have come to this conclusion.  I have been directed by counsel to assume that the allegations in the Complaint are true, as is usual at this stage of the litigation.  The assumption is reasonable. I have reviewed discovery materials and have found the allegations corroborated by the *Sentencing Memorandum,* the guilty pleas and damage payments elaborated in the *Sentencing Memorandum* and by the research reported by the most recent Annual Report to the United States Congress, *Variation and Innovation in Medicare*.[7]

11.     I have found reference to no new specific evidence by Mr. Young.  I frankly have no idea what evidence he is referring to.

### B.   Providers and pharmacies receive AWP-based reimbursements for their Lupron® purchases.  Because the WAC for Lupron® is simply a numerical ratio to AWP, a fraud to inflate AWP is also a fraud to inflate WAC

12.     Mr. Young argues that WAC is the relevant price in this market, and that AWP is somehow an artifact with little relevance to pricing or market behavior.  His conclusion is

---

[7]  Medical Payment Advisory Commission, *Variation and Innovation in Medicare*, Report to the United States Congress, June 2003 (hereafter MedPAC Report). MedPAC is an independent federal body established by the Balanced Budget Act of 1997 (P.L. 105–33) to advise the U.S. Congress on issues affecting the Medicare program. In addition to advising Congress on payments to health plans participating in the Medicare + Choice program and providers in Medicare's traditional fee-for-service program, MedPAC is also tasked with analyzing access to care, quality of care and other issues affecting Medicare. The Commission's 17 members bring diverse expertise in the financing and delivery of health care services.

contrary to the facts of this market and the history of the use of both list prices – AWP and WAC – in this market.

Indeed, Mr. Young's testimony acknowledges that AWP and WAC are two list prices joined "at the hip," or to use Mr. Young's correct characterization, subject to a "constant relationship."  If a manufacturer reports one of these prices, the market immediately knows the other.  Hence, if a manufacturer manipulates either of the prices, the other price is automatically subject to that same manipulation.

13.     The constant relationship between these two prices is repeatedly admitted by Mr. Young.

>    a)  In his ¶ 76, Mr. Young states "It has been my experience that, for most drugs, there is a common mathematical relationship between the published AWP and the published WAC of either 120% or 125% of WAC.   Dr. Hartman acknowledged the direct relationship in his deposition…. Based on my review of the evidence in this case, a constant relationship of AWP at 125% of WAC existed for Lupron® throughout the class period."

>    b)  In his ¶ 77, Mr. Young asserts, without evidentiary support, that "TAP supplied the [industry price] compendia with its WAC and the compendia independently calculated the published AWP based on standard industry practices … [which for TAP involved] multiplying Lupron®'s WAC by 125% before 1995 or after 2001."

The important point to note is that it is irrelevant whether TAP reported WAC or AWP to the standard industry price compendia.  Since they are linked together, reporting one immediately determined the other, and a fraudulent increase in one immediately implied a fraudulent increase in the other.  TAP did not need to "do the math for the compendia" (Mr. Young's ¶ 77).  Given the simple "constant relationship" between the two prices, anyone in the industry could "do the math."  The mathematical implications of this "constant relationship" for pricing, for the calculation of reimbursement rates, and for the calculation of damages are developed in Attachment B.

14.     In fact, the AWP is the published price upon which reimbursement transactions are based in the market for Lupron® (indeed for the preponderance of prescription pharmaceuticals).  Industry reliance upon AWP is documented in my Attachment B. Even in the limited circumstances where reimbursement or end-payer transactions are based on WAC and not AWP, the fixed ratio between AWP and WAC yields the same economic results to the end-payer party (subject to the mathematical adjustment of the two published prices).

### C.  The formulaic methods accurately determine damages on a class-wide basis regardless of predictable variations in Lupron® transactions

15.     Mr. Young incorrectly asserts that the many variations in this market make it impossible to calculate aggregate damages.[8]  These assertions fail.

---

[8]  For selective examples, he incorrectly states the following:

16.     The overcharge damages as presented in ¶¶ 58-73 and Attachments C-G of my Class Declaration explicitly differentiate units used by urologists treating prostate cancer, units used by pediatricians to treat central precocious puberty and those units used by gynecologists to treat endometriosis and uterine fibroids.  The model addresses the three major patient markets Mr. Young identifies and explicitly accounts for differences between them.[9]

17.     Furthermore, variation in the size of the economic entities may affect the specific prices and reimbursement rates involved in Lupron®-related transactions, which is not an uncommon economic feature of markets.  Such variation is easily accommodated in my damages model.  Two specific variations of interest are the size of the provider (say oncology/urology groups) and the size of the third-party payer (TPP).  In Attachment C.1, I focus upon two groups of providers – large and small oncology/urology groups – treating prostatic cancer in two separate years and billing Medicare at AWP.  I demonstrate that my formulaic methodology (which makes use of average prices over all units dispensed) calculates exactly the aggregate damages that I would calculate if I measured and summed the damages arising with *each and every* transaction for *each and every* small and large provider.  The analysis would not change if I used 95% AWP or LCA.

        In  Attachment  C.2,  I  focus  upon  two  groups  of  TPPs  (large  and  small) reimbursing a variety of providers and retail pharmacies for Lupron® related claims.  The two groups are differentiated by the relationship of their allowed reimbursement rates to AWP.  I  demonstrate  that  my  formulaic  methodology  (which  makes  use  of  average

---

a)   "Plaintiffs' expert has ignored the many differences in the distribution, pricing and marketing among the three major patient markets for Lupron®, the various sales channels involved in TAP's sales of those products, and changes in TAP's marketing practices over time" (his ¶ 9).

b)   "Dr. Hartman applies his methodology and assumptions to all units of Lupron®, and ignores sales, marketing and pricing differences in the various Lupron® markets.  My [Mr. Young's] analysis of TAP's sales data demonstrates that different Lupron® patient markets (e.g., urology, gynecology, and pediatric) involve unique distribution methods and pricing practices" (his ¶ 11).

c)   "Lupron® used in the treatment of advanced prostate cancer must be analyzed differently than Lupron® used in the other patient markets because, unlike patients treated by pediatricians and gynecologists, many patients suffering from prostate cancer are eligible for Medicare" (his ¶ 12).

d)   "Dr. Hartman also fails to consider that the availability and extent of discounts offered by TAP varied not only by sales channel and patient market but over time and that TAP's alleged sales and marketing practices for Lupron® ... varied over the ten-year class period" (his ¶ 21).  Mr. Young then discusses dispensing by doctors, pharmacies and hospitals in his ¶¶ 22-33.

[9]  More precisely, Attachment D of my Class Declaration differentiates the units of Lupron® sold by type of patient and treatment, and by type of insurance carrier – Medicare, Medicaid and private third-party payers.  Since my model makes use of detailed invoice data from TAP, which identifies ASPs by NDC (I obtained the AWPs from the price compendia), I differentiate pricing and marketing practices by NDC, on a quarterly basis as they vary over time.  My model also accounts for the variations in channels of distribution by NDC.  Using TAP's own information, it is clear that the preponderance of the urological units (82%) is sold directly to providers; the preponderance of gynecological units is sold directly to wholesalers and retailers; and the preponderance of pediatric units is sold directly to wholesalers (see, for example, TAP-BLI 0007362, TAP-BLI 0007374, TAP-BLI 0007380-81).  Hence, TAP's detailed invoice data already enable my model to address the variations suggested by Mr. Young.

reimbursement rates over all claims reimbursed) calculates exactly the aggregate damages that I would calculate if I measured and summed the damages arising with *each and every* claim reimbursed by *each and every* small and large TPP.

18.     I conclude that Mr. Young's identification of variations in reimbursement formulae, types of patients, distribution channels and types of insurance carriers is only that: an identification of known phenomena typical to most markets, phenomena that economists and econometricians regularly address.  I have demonstrated that an exact summation of the overcharges incurred as a result of the billing practices of alternative urological/oncological providers varying considerably in the size and Return to Practice can be calculated exactly by using average prices and total units dispensed.  I have likewise demonstrated that an exact summation of the overcharges in reimbursements made by alternative TPPs varying in size, numbers of insured lives, negotiating strength and types of drug benefit plans can be calculated exactly by using average reimbursement rates (allowed amounts) and total units dispensed.  *I conclude that the use of average prices and reimbursement rates as proposed in my Class Declaration is sufficient to overcome the types of variation raised by Mr. Young.*

19.     Indeed, Mr. Young goes so far as to assert (¶ 9) that the variations in this market are so daunting that "a patient-by-patient and often unit-by-unit" analysis is required, since each prescription is "affected by factors such as whether the unit was dispensed by a doctor, pharmacy or hospital, and the type of government or private insurance coverage for the unit at the time it was dispensed" (¶ 9).

        This assertion goes too far.  There is nothing unique about the variation presented by the distribution, pricing and reimbursement of Lupron®.  If market variation of this type makes the calculation of aggregate damages impossible, then all econometric analyses and forecasting of a wide variety of product and labor markets that have been conducted and relied upon over the past 40 years have been useless, and any aggregate market analyses conducted by strategic competitors in the pharmaceutical industry that do not include data on the decisions and behavior "patient-by-patient and often unit-by-unit" are useless and of no strategic value.

        Furthermore, both TAP and Dr. Langenfeld make use of precisely the same formulaic approaches that I adopt in my approach to class certification and damage calculation.  TAP, in its ongoing business activities concerning the sale and distribution of Lupron®, maintained extensive reports summarizing ASPs on a monthly basis, aggregated and averaged by product across therapeutic category and class of trade – exactly the same approach I adopt for making meaningful observations of aggregate data.[10]   Similarly, Dr. Langenfeld relies upon such methods and techniques in his research and publications.[11]

20.     All real-world markets are characterized by variability.  The variability can involve differentiated consumers, differentiated products and widely differentiated prices.  Econometric and statistical tools have been developed to deal with such variability in

---

[10]  For example, see TAP-BLI 0007361 – 81.

[11]  See my ¶¶ 33-35 below.

such markets. These tools make use of averages or "expected values" to characterize the variability and draw conclusions about average and aggregate economic impacts.[12]

If Mr. Young's position is that no analysis making use of average prices and units sold is possible in markets in which there exists price variability (that is, in markets that do not conform to the proverbial "law of one price"), the logical conclusion is that a great deal of highly respected scientific research is invalid.[13]

If Mr. Young's position is that class can never be certified in markets in which there exists price variability (that is, that do not conform to the proverbial "law of one price"), the logical conclusion is that no class should ever be certified.  Markets subject to price variability greater than that evident here have been the subjects of antitrust claims, employment discrimination claims, securities fraud claims, class actions, damage calculations and legal decisions.  Price fixing in city-to-city airline markets is one example.[14]  Employment discrimination cases are another example.[15]  Securities fraud

---

[12]  In his paper "Equilibrium Price Dispersion in Retail Markets for Prescription Drugs," *Journal of Political Economy*, 108(4), August 2000, Alan Sorensen analyzes variations in retail markets for prescription drugs in New York State.  Not surprisingly, the research finds variation in the prices of prescription drugs in two towns in New York State.  Any student of pharmaceutical markets understands that such variation exists.  The relevant question is whether such variation, or any variation, cripples one's ability to analyze aggregate economic results.  The first sentences of the Sorenson article state, "The proverbial 'law of one price' is virtually never empirically valid.  Homogeneous goods are often sold at widely different prices by rival firms, even in environments that seem particularly conducive to economic competition." Hence, variation characterizes even the most simple homogeneous-product markets.

[13]  For a very limited number of examples, see Congressional Budget Office, *How Increased Competition from Generic Drugs Has Affected Prices and Returns in the Pharmaceutical Industry*, July 1998; Henry G. Grabowski and John M. Vernon, "Brand Loyalty, Entry and Price Competition in Pharmaceuticals After the 1984 Drug Act," *Journal of Law and Economics*, 35(2), 1992; Richard G. Frank and David S. Salkever, "Pricing, Patent Loss and the Market for Pharmaceuticals," *Southern Economic Journal*, 59(2), 1992; Richard G. Frank and David S. Salkever, "Generic Entry and the Pricing of Pharmaceuticals," *Journal of Economics and Management Strategy*, Vol. 6, Spring, 1997; Dong-Churl Suh, Stephen W. Schondelmeyer, Willard G. Manning, Jr., Ronald S. Hadsall and John A. Nyman, "Price Trends Before and After Patent Expiration in the Pharmaceutical Industry," *Journal of Research in Pharmaceutical Economics*, 9(2), 1998; Richard E. Caves, Michael D. Whinston and Mark A. Hurwitz, "Patent Expiration, Entry, and Competition in the U.S. Pharmaceutical Industry:  An Exploratory Analysis," *Brookings Papers on Economic Activity*, 1991; S.F. Ellison, I. Cockburn, Z. Griliches, and J. Hausman, "Characteristics of Demand for Pharmaceutical Products: An Examination of Four Cephalosporins," *Rand Journal of Economics*, 28(3), 1997.

[14]  The Sorenson research finds that retail prices for the same pharmaceutical product in two small towns in New York varied by 50%.  It is well known that airline ticket prices for a given route can vary widely, certainly by more than 50%, but this did not preclude class certification in this industry.  See *In re Domestic Air Transp. Antitrust Litig.* 137 F.R.D. 677 (N.D.Ga.1991) where 12.5 million class members purchased tickets for an array of different routes, at diverse times, at a multitude of varying prices, and on diverse terms.  Also see, *In re Sumitomo Copper Litig.* 182 F.R.D. 85 (S.D.N.Y. 1998).  A class consisting of two subclasses, purchasers and sellers of Comex copper futures contracts over a two-year period, was certified despite differing interests between long and short subclasses: "[in the Second Circuit] factual differences in the amount of damages, date, size or manner of purchase, the type of purchaser, the presence of both purchasers and sellers, and other concerns will not defeat class action certification when plaintiffs allege that the same unlawful course of conduct affected all members of the proposed class" (citations omitted).

---

cases are a third example.[16]  Likewise, courts have certified classes involving markets subject to price variability analogous to that found in this matter.[17]

21.     The markets for Lupron® in the United States, generally, and in any state, specifically, are no different.  These markets are certainly no more complicated than many markets subjected to standard economic analyses; no more complicated than many markets in which classes have been certified; and no more complicated than many markets in which aggregate damages have been calculated.

        The methods that I have proposed in my Class Declaration reflect standard economic methods for analyzing and calculating the aggregate economic impacts of TAPs' alleged fraudulent pricing and marketing practices upon the prices of Lupron® sold.  The method begins with Lupron®'s AWPs and WACs, the gross invoice prices and net transaction prices (ASPs) of Lupron® by NDC sold though different distribution channels and dispensed by different types of doctors to patients with different therapeutic requirements.  Using these prices, measures of average overcharges will be calculated.  Using these measures of average prices, average overcharges and total units sold by NDC, my proposed methodology will provide an accurate measure of the aggregate overcharge damages.  Using these measures of average prices, average overcharges, total units sold by NDC and standard measures of profitability, my proposed methodology will provide an accurate measure of aggregate unjust enrichment damages.

22.     Finally, in his ¶¶ 60-67, Mr. Young introduces analyses of claims for several TPPs, which he graphically displays in his Exhibits C-E and through which he makes the incorrect assertion that Class analysis is impossible in this matter and that individual issues overwhelm common issues.

        For example, in his ¶ 67, he states, "The analysis of the data produced by plaintiff Beacon and two other insurers clearly confirms the great variation in reimbursement structures and levels between insurers, within each insurer, among specialties and among

---

[15] See, for example, *Koski v. Gainer*, 1993 WL 153828, *4 (N.D. Ill. 1993) where despite variations in damages among class members in a sex discrimination case, the court held that "the fact that it is necessary to determine the quantum of damages on an individual basis does not preclude class certification."  Also see, *Rodriguez v. Carlson*, 166 F.R.D. 465, 479 (E.D. WA 1996) where the court certified a class brought by migrant agricultural workers, holding that individual damages issues "are largely overshadowed by the predominant common questions of liability in this case."

[16] See *Blackie v. Barrack*, 524 F.2d 891, 905 (9th Cir. 1975) where in a securities fraud class action, market-related variances in class members' damages will not prevent certification of a class. Also see, *Hoexter v. Simmons*, 140 F.R.D. 416, 421 (D. Az. 1991) (same) and *In re Kulicke & Soffa Industries, Inc. Securities Litigation*, 1990 WL 1478, *4 (E.D. Pa. 1990) (same).

[17] *In re Cardizem CD Antitrust Litigation*, Master File No. 98-MD-1278, 200 F.R.D. 326 (E. D. Mich. 2001); *Cipro Cases I and II,* Judicial Council Coordination Proceeding Nos. 4154 and 4220 (Superior Court, San Diego County); and *In re Terazosin Hydrochloride Antitrust Litigation*, Case No. 99-MDL-1317 Seitz/Garber, United States District Court for the Southern District of Florida.  Furthermore, while not a class action, Rubinfeld and Steiner discuss regression methods to assess average price impacts and damages for a large group of plaintiffs in a pharmaceutical market (sales of ampicillin) subject to the same variabilities found here; see their discussion of *In re Ampicillin Antitrust Litigation*, 88 F.R.D. 174 (D.C. Cir. 1983) in D.L. Rubinfeld and P.O. Steiner, "Quantitative Methods in Antitrust Litigation," *Law and Contemporary Problems*, 46(4), Autumn 1983.

---

dispensers."  However, I have already demonstrated through several hypotheticals (my Attachment C) that variation does not confound the ability of my damage methodologies to calculate *exact* aggregate class-wide damages.  The hypothetical put forward in Attachment C.2 addresses the variation that Mr. Young characterizes in his ¶ 67 and Exhibits C-E.  My hypothetical in Attachment C.2 makes explicit that variation in actual reimbursement rates around AWP (or around WAC) as exhibited in Mr. Young's Exhibits D and E (and as documented by MedPAC) are well-known to exist.  Indeed, the AWP line in Mr. Young's Exhibit E appears to approximate the regression trend line though the scatter of reimbursement rates.  Equally well known is the fact that the use of average calculations and total amounts sold provides exact estimates of the damages required to be calculated in this matter.

The point of the hypotheticals in Attachment C is that the AWP line and all of the reimbursements around that AWP line would be lower absent TAP's fraudulent pricing and marketing practices.  My damage methodologies will accurately calculate the amount by which aggregate reimbursements would be lower absent the fraud.  The allocation analysis discussed in Section IV below will indicate how these aggregate calculations should be disaggregated to equitably address variation (if any) in individual compensation for damages to specific individual groups of Class members.

My damages methodologies, as are all standard quantitative models of markets characterized by variation, are designed to accurately account for the institutional, market and individual variations that exist in this market.  Hence, the variations identified by Mr. Young in his ¶¶ 60-67 and Exhibits C-E pose no issues for the accurate calculation of damages.[18]

### D.  The proposed model takes proper account of LCA

23.    Mr. Young incorrectly asserts that the existence of LCA defeats the use of the class action device.  He goes on to incorrectly assert that I have not taken proper account of the LCA provision of Medicare carriers in the relevant states and that the price of Lupron® is irrelevant to those units sold under LCA prices.

---

[18]  Moreover, my damage models all make use of NDC-specific prices (AWP, WAC, ASP) and units sold. While there will be variation within NDC in actual ASP paid by urologists/oncologists, it will not compromise the accuracy of my aggregate damages calculations (see Attachment C.1 of this Declaration). While there will be variation in the allowable rates reimbursed by NDC across medical/prescription plans and TPPs, it will not compromise the accuracy of my aggregate damages calculations (see Attachment C.2 of this Declaration).

Mr. Young presents such NDC-specific information in his Exhibit C by NDC *and* J-Code (J9217). Notice that the reimbursement data in Exhibit C run from 1998 onward, because the relevant NDC was introduced by TAP in the fourth quarter of 1998 (see Attachments C and G3 of my Class Declaration). However, once Mr. Young moves from his Attachment C to his Attachments D and E, he keeps the same J-Code without making explicit the fact that the J-Code over the relevant time period in those Exhibits must include other NDCs.  The variation across those NDCs will introduce variation attributable to different NDCs rather than variation within a single NDC.  Mr. Young does not address this issue, nor does he provide the information necessary to assess which NDCs he has included.  In any case, my model already accounts for this variation by proceeding on an NDC-by-NDC basis.

a) First, with respect to my treatment of LCA states, in my Class Declaration I could not have been more explicit in explaining that I took account of TAP information summarizing all units sold at LCA. In Attachment F.1 of my Class Declaration, I make use of TAP's most recent data provided through discovery on the percentage of sales at LCA prices and the percentage of sales that were not at LCA prices. These percentages reflect all states subject to LCA as reported in the most recent discovery materials and put forward in Attachment F.2 of my Class Declaration.

Having identified those units and those states, I make use of the appropriate Zoladex AWP to calculate the prices actually reimbursed under LCA for all units by NDC. Those prices are found in Attachment G.9 of my Class Declaration, where the relevant LCA AWPs (or 95% of it) by NDC are used for the LCA units.

Hence, I have fully identified those states and the proportion of those units by NDC that were subject to LCA. When subject to LCA, I have used the LCA price as the relevant reimbursement made, rather than the Lupron® AWP.

b) Second, it is simply incorrect to say that the Lupron® AWP is irrelevant to those units sold at LCA. The LCA reimbursement rate (Zoladex AWP or 95% thereof) is triggered only when the Lupron® AWP > Zoladex AWP. Hence, use of the LCA price occurs as a direct result of the level to which the Lupron® AWP is raised.

It is true that the AWP relevant to reimbursement for LCA sales is the AWP of Zoladex, once the LCA is triggered. In my model, I have used the Zoladex AWP in that case.

24.    In his ¶ 43, Mr. Young incorrectly asserts that the presence of the LCA practice makes it necessary to address every individual transaction over time by state and by year.

This assertion has no basis, given the facts demonstrated in the previous paragraphs. I have identified in the preceding paragraph that I have traced the implementation of the LCA program by each and every state over time as it became implemented. I have made use of TAP data to calculate the percentage of Lupron® sales subject to LCA. When those sales have been subject to LCA, I have made use of the appropriate AWP or 95%AWP (that is, the AWP of Zoladex) as the reimbursement rate to which LCA sales were subject.

Furthermore, to the extent that the use of LCA introduces variations, those variations are accurately summarized by average reimbursement rates, as demonstrated in my Section II.C above.

III.    Response to Dr. Langenfeld's Declaration

25.    Let me say at the outset, Dr. Langenfeld and I *do* agree on the appropriate economic and formulaic methodologies to be applied in this case. Dr. Langenfeld does not challenge the validity of my proposed methodologies; indeed he has used these methodologies in the past. He further concedes that the appropriate economic analysis

here is similar to that used to analyze antitrust cases.[19] Where Dr. Langenfeld and I disagree on methodological issues, I demonstrate that his criticisms are premature both in terms of the legal proceedings and in terms of the econometric/statistical analysis.

I take issue with Dr. Langenfeld as follows: Dr. Langenfeld selectively mischaracterizes my Class Declaration; he misunderstands and misleads the Court on various econometric matters; he demonstrates (or feigns) an unfamiliarity with and/or lack of understanding of this industry as well as economic theory concerning this industry and these markets; he misstates, or worse misrepresents, government studies of pricing and pharmaceutical markets; and he argues legal issues of the litigation that are inappropriate for a class certification analysis and are the subject of the merits phase of the litigation to be argued at a later date.

## A. The formulaic methods accurately determine damages on a class-wide basis regardless of predictable market variations

26.     Dr. Langenfeld identifies variations or individualized issues that he incorrectly asserts render my analysis incorrect or make class certification too complex and indeed impossible.  His laundry list includes the usual litany of variations:  differences in total Lupron® demand (¶ 14); differences in doctor practices (¶ 15); differences in doctor information about competitive benefits (¶ 16); differences in Return to Practice (¶ 17); differences in competition (¶ 18); differences in NDCs (¶ 19); differences in state Medicare practices and coverage (¶ 21); differences in time trends (¶ 22);  variations in reimbursement practices and rates (¶ 27); variations in educational grants (¶ 29); variations in whether samples were sold (¶ 30); variations in therapeutic substitutes (¶ 32); variations in  AWP, ASP, alpha and reimbursement rates (¶ 43); variation in patients and insurers (¶ 44); and variations in states and LCA (¶ 45).

Notice the following. First, some of these criticisms are redundant, e.g., variations in state Medicare practices and coverage (¶ 21) and variations in LCA by state (¶ 45). Second, the variations that he cites in his ¶¶ 11-22 are directed entirely and solely at the preliminary econometric analysis that I put forward to demonstrate the implementation of econometric analysis needed for one of the models of unjust enrichment that I was asked by counsel to evaluate.  Third, notice further the following facts, as put forward in my Class Declaration and above.  I have been provided with and made use of detailed invoice data from TAP which identifies the gross invoice price and all invoiced price offsets of each unit of each NDC of Lupron® sold directly to each customer in the TAP invoice data base.  Hence, I can differentiate units and their relevant ASPs by state, month and NDC.  I have Red Book data on AWP for both Lupron® and Zoladex over the same period.  As discussed above, I have identified the mix of units by NDC sold under LCA and those not subject to LCA.   I have calculated the mix of sales by type of treating

---

[19]  Deposition of James Langenfeld, July 9, 2004 (hereafter Langenfeld Deposition), at p. 76:

   Q.   In terms of the economic analysis that you've been asked to prepare, is your analysis any different in this case than it would be in an antitrust case?

   A.   I always take the same approach in terms of approaching any type of class certification as I do frankly with damages or antitrust liability issues.

physician and patient disease. I have differentiated the number of units that are reimbursed under Medicare, Medicaid and by private-sector TPPs. Hence, my methodologies already account for much of the variation posited by Dr. Langenfeld. Any remaining variation will be accommodated by my methodologies.[20]

The remaining variations will not prevent my damages methodologies, which make use of average measure of damages, from providing an accurate aggregate (as made clear in my hypotheticals in Attachment C – see Section II.C above) measure of class-wide injury.

27. Dr. Langenfeld's incorrect assertions and criticisms and his mischaracterizations include.

a) In his ¶ 7, Dr. Langenfeld asserts that I provide "no method, preliminary or otherwise, for allocating alleged overcharge damages to the individual class members. In effect, Dr. Hartman's work to date is little more than a statement that he presumes he can calculate class-wide damages at some point in the future."

This is not true. I have put forward specific formulaic methodologies that I will use to calculate aggregate damages. I have presented in great detail one of those methodologies, the formulaic methodology to calculate overcharge damages. I have demonstrated that the use of average prices and average reimbursement rates in the overcharge damages methodology will yield an exact calculation of aggregate damages equal to the calculation that would occur if I summed the damages of each and every class member.

b) Dr. Langenfeld asserts: "There is evidence in Dr. Hartman's own materials, however, that many insurers do not reimburse based on AWP" (¶ 27). "[I]f any sales of Lupron® were reimbursed without reference to Lupron®'s AWP, they presumably should be excluded from Dr. Hartman's overcharge calculation, because they were not reimbursed at a price calculated by reference to AWP and hence not part of the punitive class" (¶ 28).

The criticism is ill-founded. First, there is nothing in my declaration that would support the notion that Lupron® is reimbursed on anything other than an AWP basis.

Second, all evidence demonstrates that Lupron® is reimbursed on the basis of the published AWP. Within the Medicare system, it is required by statute and by regulatory practice. In the private payer arena, private third-party payers follow both the Medicare AWP-based reimbursement system for Lupron® (Lupron® has been one of the largest Medicare drug cost line items) as well as the essentially ubiquitous use of AWP as the benchmark for all branded drugs in the pharmaceutical industry.

---

[20] Indeed, in his deposition, Dr. Langenfeld admits that price variation alone does not preclude class certification (pp. 187-189, 192), and that one does not need to show that everyone paid the same price in order to certify a class (p. 186).

Third, the AWP-based reimbursement system for Lupron® is shown by TAP's own actions. TAP's "Return To Practice" program is grounded on the exploitation of the AWP-based reimbursements; without that system, it would be irrational from an economic point of view to engage in the Return To Practice program at all.[21]

Fourth, all available evidence in this case shows that private third-party payers reimburse for Lupron® on the basis of the AWP. For example, the proposed class representatives have testified under oath that their Lupron® payments were so based, and other testimony also confirms this (see Attachment B). In this case, the produced contracts of the parties show AWP-based reimbursements for Lupron®.

Fifth, I understand that close to 40 independent third-party payers have brought litigation against TAP for Lupron® over-payments, all of whom allege that their Lupron® payments were based on AWP and that they were defrauded by TAP's inflation of that benchmark (see Attachment B). These insurers include some of the largest insurers in the country.

Sixth, all available literature indicates that brand name drugs such as Lupron® are reimbursed on the basis of the published AWP. This evidence includes the OIG Report and the MedPAC Report.[22]

c) Dr. Langenfeld asserts (p. 11), "Evidence indicates that one cannot reliably estimate ASP in a formulaic way without conducting individual inquiries" (§IV.B heading). He goes on to discuss the following specific issues: "Most economists would not agree, for example, that educational grants are typically part of an average selling price. To the extent that some of these grants or other expenses that Dr. Hartman deducts from Lupron®'s gross sale price are at least in part found legitimate for some physicians, he has proposed no way to make these adjustments, and the adjustments would presumably have to be based on individual inquiries" (¶ 29). "It is inappropriate to include all samples in Lupron®'s unit sales when one calculates the ASP without conducting individual inquiries into which doctors sought reimbursement on samples of Lupron®" (¶ 30).

I concur that, in most situations, educational grants are not typically considered to be reflected in ASP. However, this is not most situations. This matter is subject to litigation precisely because under the allegations I have been asked to assume, TAP has used certain reimbursement practices (such as educational grants) to obscure promotional incentives to move product. In this case, such grants are indeed costs of selling and should be netted out to calculate ASP, as I have done.

---

[21] See the *Sentencing Memorandum*, pp. 11-18.

[22] Department of Health and Human Services, Office of Inspector General, "Physicians' Costs for Chemotherapy Drugs," November 1992 (hereafter OIG Report). See also MedPAC Report, *op. cit.*

Furthermore, the accounting information that I have used to identify total educational grants and free samples have come directly from TAP. I have found that manufacturers, such as TAP, keep very good information concerning the individual recipients of educational grants and free samples. That information will be used to appropriately adjust the average ASP required of the overcharges damage model. That information will also be used to account for variation in educational grants and free samples during the allocation phase, as discussed in Section IV below.

d) Dr. Langenfeld argues (¶¶ 31-35) the irrelevance of generic entry to this litigation while incorrectly asserting that I plan to make use of analyses of generic entry to quantify damages in this matter. He bases this assertion upon a single sentence in ¶ 34 of my Class Declaration, where I state that aggregate overcharge methodologies such as the ones I propose for Lupron® are analogous in general analytic structure to those used in a variety of Hatch-Waxman cases. Indeed, as Dr. Langenfeld has testified in deposition (see footnote 19 above), he approaches damage situations analogously.

Dr. Langenfeld incorrectly interprets this single sentence as a basis for concluding that my calculation of the parameter α will make use of data summarizing pricing dynamics revealed under generic entry. Put simply, I do not plan to, nor have I proposed to, rely upon pricing dynamics revealed by generic entry as data for my calculation of α.

When it comes time to fully implement my overcharge damage model, I shall make use of a variety of sources of information to provide alternative yardsticks to serve as the basis for my estimate of the average value of α required by my model, as discussed in ¶ 43 of my Class Declaration. Among other sources, I shall review and draw conclusions from the OIG Report.

Dr. Langenfeld mischaracterizes the findings of the OIG Report and incorrectly insinuates that its findings are unreliable for purposes of my overcharge damage analysis.[23] While the OIG Report will be only one of a

---

[23] Specifically, Dr. Langenfeld cites (his ¶ 38) one page from Appendix II to the OIG Report which states "AWP is not a reliable indicator of the cost of a drug to physicians." However, he fails to cite the main body of the Report (p. 7), which states

"Physicians had also asserted that discounts below AWP generally apply only to multiple-source drugs. *Our review of physician invoices, however, showed that the correlation between AWP and cost remains fairly consistent for both single-source and multiple-source drugs from a given manufacturer.* For example, comparison of the actual cost to the AWP for Cyclophosphamide, 500 mg, showed that one brand name manufacturer sells this drug at 20 percent below AWP while another sells it at 59 percent below AWP. Although neither the manufacturers nor the Red Book could explain these relationships, *we found that products of the first manufacturer were generally available at 20 percent below AWP while products of the second manufacturer were generally available at 55 to 60 percent below AWP. We, therefore, conclude that the cost/AWP relationship depends on the manufacturer regardless of whether the drug is available from multiple sources* (see Appendix III). For example, oncology wholesalers tended to discount all single- and multiple-source drugs from one major manufacturer at a uniform percentage below the AWP" (p. 7 emphasis added).

variety of yardsticks upon which I shall rely, contrary to Dr. Langenfeld's assertions, it is certainly one source of yardsticks worth considering.  The use of such yardsticks is common in damage analyses like those cited on the LECG website.[24]

## B.  Dr. Langenfeld's belabored critical review of my econometric work is premature, misplaced and at times incorrect as a matter of econometric theory

28.    Nearly half of Dr. Langenfeld's Rebuttal Declaration applies only to the econometric analysis involved in the econometric model to estimate the effect of increasing spread on incremental profits.[25]   This measure of equitable relief is the smallest of the three possible equitable recoveries applicable to this case.   The econometric analysis is irrelevant to my calculation of overcharge damages.

I find his detailed response neither relevant nor appropriate at this stage of the analysis.  The detail of the rebuttal he has put forward would be relevant at the damages stage, once I have actually put forward my complete and final model of this unjust enrichment calculation.   The model I put forward in Attachment I of my Class Declaration was not intended to be final and was only meant to be illustrative, as I admitted in my deposition (pp. 406-8).  It could not be final since I have yet to receive all the data I expect to gather during discovery and during my damage analysis.

29.    For example, Dr. Langenfeld asserts (¶ 12) "Dr. Hartman neglects many other factors that could have affected Lupron®'s sales,[26] and imposes many restrictions that Dr. Hartman does not test to verify whether they are valid."[27]   He incorrectly concludes "As a result, Dr. Hartman fails to show that he can reliably calculate the equitable monetary relief on a class-wide basis based on his illustration.  Because of the number of statistical problems inherent in Dr. Hartman's illustration, one cannot conclude, or even

---

Hence, the OIG Report finds that drug costs invoiced by physicians were correlated to AWP and the discounts did not depend upon whether the relevant drug was single-source or multiple-source.  Such findings and data are consistent with my damages model and will provide a portion of all information upon which I shall rely to calculate the "best" value of α.   Such findings are confirmed by Exhibits D-E of Mr. Young's Report.

[24]  See http://www.lecg.com.

[25]  In his deposition he admits (pp. 160-161) that his criticisms appearing through his ¶ 23 apply only to the regression analysis of my "equitable monetary relief model."

[26]  The factors Dr. Langenfeld asserts I exclude consist of increased total demand for prostate cancer treatment resulting from the increased proportion of elderly men in the population during the class period (¶ 14); increased demand for Lupron® resulting from certain advantages of Lupron® relative to other treatments (¶ 15); the fact that Lupron® is injected while Zoladex is implanted (¶ 16); the competitive Return to Practice offered by Zoladex (¶ 18); and the product life cycle of the different presentations of Lupron® and migration from one to another (¶ 19).

[27]  The hypothesis tests that Dr. Langenfeld proposes I implement concern alternative time trends by NDC (¶ 22) and the variation of the elasticity of the sales effect of Return to Practice over time and state (¶ 21).

---

infer, that there exists a formulaic relationship between Lupron® sales and the return to practice, as Dr. Hartman claims."

    a)  Dr. Langenfeld is correct in asserting that I have not *yet* included all factors that I do plan to ultimately include and statistically test in this particular relationship. He is also correct that any econometric model should avoid omitting relevant explanatory variables (his footnote 10).

    The important point is that Dr. Langenfeld is incorrect in drawing the conclusion that I shall be unable to implement a sufficiently complete and reasonably accurate final version during the damage phase of this litigation. As a matter of economic principles and practice, I can already infer that there is a relationship between Lupron® sales and the Return to Practice. The *Sentencing Memorandum* makes those incentives unmistakably clear. To claim otherwise, as Dr. Langenfeld seems to be doing, is to claim that economic incentives do not work. Yet, he must be making the claim that economic incentives do not work, if he asserts that I cannot assume the relationship that I will need to estimate accurately during the damages phase of this litigation.

    Furthermore, given the obvious economic incentives involved, as a matter of econometric principles and practice, market models of this form are one of the most standard econometric models estimated. Dr. Langenfeld has put forward no evidence demonstrating that the models cannot be estimated. He has merely speculated on possible factors that may have an impact,[28] and at times his speculations are incorrect.[29]

    b)  Without introducing any evidence indicating that my results are wrong or inappropriate or would change, and without having performed any of the suggested statistical tests himself,[30] Dr. Langenfeld introduces myriad

---

[28] He also introduces technical obfuscation in his footnote 8. These issues are irrelevant and of second order importance. I have already made use of a fixed effects model, which is known to produce consistent estimates in situations of this sort, whereas a random effects model may not. While these issues are standard, the relevant ones will be addressed in the final damage analysis. To raise them now is certainly premature and unnecessarily distracting.

[29] For a technical example, he asserts without demonstration in his ¶ 17, "If both the demand for Lupron® and the return to practice have increased during the class period, by not taking into account the factors that affect the demand for Lupron® in his illustration, Dr. Hartman is likely to attribute incorrectly the increased Lupron® sales ... to the increase in the return to practice." As the data show, the sales of particular NDCs and their Return to Practice do not increase uniformly over time; there is a quadratic pattern to Return to Practice and sales by NDC; see Attachment C of my Class Declaration. Hence, my estimate of the effect of Return to Practice on sales cannot be picking up these other factors that increase steadily and uniformly over time.

[30] As he admitted in his deposition testimony, Dr. Langenfeld 1) *has not* tried to construct a regression analysis or other kind of statistical methodology to calculate the damages in this case (pp. 15-16); 2) *has not* tested whether the advantages of Lupron® over Zoladex had any effect on Lupron® sales (pp. 114-15); 3) *has not* done anything to determine the extent to which the relationship between unit sales and Return to Practice would vary across NDCs, states or time (pp. 134-35); 4) *has not* run any tests for fixed versus random coefficients, heteroscedasticity or autocorrelation problems (pp. 136-37); 5) *has not* reviewed any individual payment data, any reimbursement data, any provider fee schedules or any contracts with

---

questions concerning my use of time trends to capture the life cycle pattern of each NDC and proposes a variety of possible parameter restrictions to be tested.[31]

However, as with everything else in his discussion regarding my econometric work, these proposals are premature. During the complete damage model development, I will perform all appropriate hypothesis tests. Some of Dr. Langenfeld's tests may be unnecessary; those that are necessary will be performed.

c)  I conclude that Dr. Langenfeld and I are in agreement as follows. One needs to include sufficiently complete information to calculate my proposed regression model correctly. One needs to perform the appropriate statistical hypothesis tests on particular model restrictions. This is standard procedure. However, I do not need to perform that complete analysis at this stage of the litigation. During the damages phase of this litigation, I shall perform that analysis; I shall gather all information required; I shall estimate an accurate version of my proposed formulaic regression model; and I shall perform the necessary hypothesis tests.

30.   Taking the obvious point that my final regression model remains to be completed during the damages phase of the litigation, it is interesting to observe the leap of logic made by Dr. Langenfeld. So far, we have been discussing the econometric estimation of only one component of one of the three models of equitable recovery in my Class Declaration. However, having merely hypothesized several variables *that may yet need to be included*, Dr. Langenfeld overreaches and concludes that I am "in effect just asserting there exists a formulaic relationship between Lupron® sales and the return to practice. Omission of these various factors and sources to measure them casts serious doubt whether Dr. Hartman can ever reliably calculate equitable relief on a class-wide basis" (¶ 20).

There exists a formulaic relationship between Lupron® sales and the Return to Practice, *as a matter of economic theory*, not as a matter of anything I have asserted. I have preliminarily demonstrated that it can be calculated econometrically. I will complete my econometric analysis during the damage analysis. Notice, however, that Dr. Langenfeld has generalized his criticisms of this single preliminary regression to the casting of doubt on the calculation of "equitable relief on a class-wide basis" generally. This is simply overreaching.

31.   Dr. Langenfeld exerts considerable energy "addressing aggregation" issues in my analysis. Unfortunately his exertions are for naught and demonstrate the lack of rigor he brings to the analysis of these econometric issues. He asserts that "Dr. Hartman has no way of knowing if he applies his illustrative model to the individual data … whether he would find any formulaic relationship between Lupron® sales and the return to practice,

---

individual providers (pp. 143-44); 6) *has not* done any analysis to determine whether educational grants were used to lower acquisition costs (pp. 165-66); and 7) *has not* done any analysis of the extent to which there is variation in actual AWP, ASP and alpha across physicians (pp. 178-79).

[31]  See his footnote 11, ¶¶ 12 & 22.

or whether his aggregation is driving his illustrative results" (his footnote 24). He also asserts that "[g]rouping the data to the state level increases [my] illustration's ability to 'explain' the amount of variation in Lupron® sales" (his footnote 24). *The first assertion is both irrelevant and incorrect; the second is simply irrelevant.*[32]

32.     I conclude that while Dr. Langenfeld has introduced a variety of statistical and econometric questions that can be found in any elementary graduate text on econometrics, his discussion has merely pointed out some issues relevant to the final damages model and some that are irrelevant or incorrect. As a matter of economics and econometrics, he *simply cannot argue* that a relationship – an estimable relationship given the appropriate data – does not exist between Lupron® sales and Return to Practice. He can argue about how I specify and estimate it. Indeed, that is all that he has done.

### C.   Remaining Criticisms of Dr. Langenfeld

33.     The greatest concern raised by the many assertions made by Dr. Langenfeld discussed in Section III.A and III.B above is that they are impeached by his own research. Specifically, Dr. Langenfeld has found strategic pricing incentives and behavior among business entities in this market analogous to those alleged in this matter. In his scientific research, he has modeled the effects of such behavior using methods similar to those that I have proposed yet he is now claiming cannot be used. He has also found consumer injury and damages analogous to those that I have demonstrated will be found.

---

[32] As a matter of economic theory and TAP's admitted business strategies (see *Sentencing Memorandum*), higher Returns to Practice were offered to individual doctors to incentivize them to "move market share," that is, to prescribe more Lupron® relative to the alternatives. Hence, we (and Defendants) expected that higher Returns to Practice would increase the dispensing of Lupron® at the individual provider level. If I now add up all of those individuals by city, by county or by state, I will find that increased Returns to Practice increased Lupron® dispensed by providers at the aggregate level. I can econometrically estimate this effect using *either* individual data *or* aggregate data. Since econometricians may require measuring demand behavior for individual purchasers and/or for groups of individual purchasers, there is no one single form that is deemed superior to the other. The analytic requirements dictate the level of aggregation. For the purposes of aggregate class damages, we are interested in the aggregate responses, and aggregate data are appropriate to use for the purposes of this litigation.

Moving on to the second point, Dr. Langenfeld cites the Glossary in Peter Kennedy's, A Guide to Econometrics, 4th edition, MIT Press, Cambridge, MA, 1998 (p. 406) to support his irrelevant proposition concerning "goodness of fit" or R2. The source of Peter Kennedy's discussion is an article by Y. Grunfeld and Z. Griliches, "Is Aggregation Necessarily Bad?", The Review of Economics and Statistics, 42(1) (1960). Closer examination of the Grunfeld and Griliches article finds that they conclude:

"[A]ggregation does not only produce an aggregation error, but may also produce an aggregation gain" (p. 1). "We have emerged, out of the sea of algebra, with two major conclusions: (1) It is quite likely that a macro equation will have a higher $R^2$ [that is have a better "fit"] than a micro equation, but *this is not very relevant in judging the performance of either equation*; (2) considering the more relevant comparison, the aggregate equation may explain the aggregate data better than all the micro equations combined if our micro equations are not 'perfect'" (p. 9, emphasis added).

More specifically, he finds[33] that "PBMs with captive mail order houses can also profit by repackaging prescription drugs and selling the repackaged drugs at higher per unit AWP than the manufacturer originally charged.  We found 15 instances when the branded drug Celebrex was repackaged and the unit price of the repackaged drug exceeded the original manufacturer's per unit price by more than 7 percent and as much as 176 percent.  Since the PBM is acting as both dispenser (through its mail order pharmacy) and claims adjudicator, it has both the incentive and the ability to dispense these higher priced products to its patients and to earn profits on the difference between its acquisition costs and its inflated price."  This finding clearly alludes to Return to Practice ("profits on the difference between its acquisition costs and its inflated price") providing an incentive to dispense the relevant drug presentation.  This is precisely the relationship that Dr. Langenfeld states I "cannot conclude, or even infer."[34]

Dr. Langenfeld repeatedly asserts in his expert report that there is no relationship between Lupron® sales and the Return to Practice.[35]  He goes so far as to say that I have taken the relationship as "a matter of faith."[36]  As I have discussed above, the relationship between sales and economic incentives is not a matter of faith; it is a well-supported result of basic economic theory.  *But Dr. Langenfeld knows this*, since the basic premise of his article on PBM self-dealing is precisely the same incentives and behavior – that people and institutions respond to economic incentives offered by artificially inflated AWPs.  He explains:

> "The following example demonstrates how these incentives can work to harm payers and consumers. Suppose a PBM negotiates with retail pharmacies on behalf of its plans and obtains retail pricing of AWP minus 10 percent plus a $3 dispensing fee. If, as is the case with Celebrex (see figure 5, *infra*), the manufacturer's AWP is $105.34 for a 60 day supply ($1.76 a unit) per prescription, the plan would pay the retail pharmacy $97.81 to fill the prescription ($94.81 plus a $3 dispensing fee). The PBM might tell the plan sponsor that it is going to offer a "better" deal on mail order to encourage members to use mail order. For instance, it might offer to fill mail order prescriptions at AWP minus 25 percent with no

---

[33] James Langenfeld and Robert Maness, "The Cost of PBM 'Self-Dealing' Under a Medicare Prescription Drug Benefit," (September 9, 2003), p. 1-2.

[34] As cited in my ¶ 29 above, Dr. Langenfeld states, "One cannot conclude, or even infer, that there exists a formulaic relationship between Lupron® sales and the return to practice, as Dr. Hartman claims."

[35] In addition to his assertion in ¶ 12 (cited in the preceding footnote), Dr. Langenfeld also asserts the following:  "Dr. Hartman hypothesizes that a relationship exists between a doctor's decision to select a new NDC and the return to practice" (¶ 19); "Dr. Hartman is in effect just asserting there exists a formulaic relationship between Lupron® sales and the return to practice" (¶ 20);  "Dr. Hartman has no way of knowing if he applies his illustrative model to the individual data … whether he would find any formulaic relationship between Lupron® sales and the return to practice" (footnote 24).

   As will presently be discussed, it would seem that I need not "hypothesize" or "know" this relationship; I can rely upon Dr. Langenfeld's research.

[36] More fully, "Dr. Hartman does not show whether any formulaic relationship between Lupron® sales and the return to practice would exist … and he takes it as a matter of faith that such a relationship would exist" (footnote 25).

dispensing fee. However, if the mail order firm has inflated the AWP of its repackaged product, it can fulfill the literal terms of its contract and still make more money."[37]

I conclude that Dr. Langenfeld has demonstrated precisely the incentives and behavior that he claims I cannot assume or demonstrate, thereby impeaching his critical assertions of my analysis on this matter.

34.     Furthermore, Dr. Langenfeld has sharply attacked the methodologies proposed for calculating damages in this case for relying on average prices and aggregate quantities and for failing to make individual inquiries to account for variations in patient and physician practices over time, for differences in AWP, ASP and α, and for differences in reimbursement rates among physicians and states and over time. Yet his own published article on estimating the costs of PBM self-dealing relies on AWP, average prices, aggregate quantities and makes no individual inquiries to account for the variations he identified in this case. Although Dr. Langenfeld explicitly recognizes that variation exists among patients and plans, he relies on averages to compute his cost estimate.[38]

Indeed, in calculating consumer harm, Dr. Langenfeld follows essentially the same overcharge methodology proposed in this case. Dr. Langenfeld calculates aggregate costs (or damages) to a group (or class) of Medicare and patient payers using the same methods that I have proposed in this case, including aggregate number of beneficiaries, average brand and generic prices based on AWP, common dispensing rates and aggregate price differences.[39]

I therefore conclude that his critical assertions dismissing my methodologies because of inadequate treatment of individual inquiries are impeached by his own research.

35.     To summarize, examination of Dr. Langenfeld's analytic methods in his published articles[40] impeach his rebuttal testimony for at least two reasons.  First, his estimation of

---

[37]  Langenfeld and Maness, *op. cit.*, pp. 5-6.  Likewise, at page 1 they state, "Since mail-order dispensing is more profitable for PBMs than plan administration, a PBM has a strong incentive to direct as many prescriptions as possible through its mail order pharmacy. Moreover, because PBMs receive larger rebates from pharmaceutical companies on single source brand name prescription drugs than on multiple-source drugs with generic equivalents, PBMs with captive mail order houses have an incentive to sell newer and higher priced single-source drugs, even when it may be more costly for the payer."

In addition, Dr. Langenfeld agrees in deposition that price moves market share and that people would switch on price (p. 108).

[38]  For example, "While the actual extent of cost sharing by patients will depend greatly on the details of the plans available and the specific plans in which individual patients enroll, we assume that the average Medicare co-payments will be roughly the same as the average co-payments under private health plans." See Langenfeld and Maness, *ibid.*, p. 19.

[39]  *Ibid.*, p. 21 Figure 8.

[40]  In addition to Langenfeld and Maness, *ibid.,* see Ted Frech, James Langenfeld and Michaelyn Corbett, "Managed Health Care Effects: Medical Care Costs and Access to Insurance," University of California, Santa Barbara, Department of Economics Working Paper (2000).  With regard to this second research paper, the criticisms Dr. Langenfeld has leveled against my analysis and proposed formulaic methodologies did not stop him from ignoring individual inquiries and taking "estimates of the percentage of cost savings for each type of managed care practice and managed care organization, and us[ing] them to estimate the

the cost to Medicare of PBM self-dealing makes use of essentially the same methodology that I have proposed in this matter.  Second, Dr. Langenfeld's methodologies are subject to the very same purported criticisms that he raises in this case.

36.     Examining lesser problems, Dr. Langenfeld, like Mr. Young, incorrectly criticizes me for assuming the allegations in this matter, stating, "Indeed, Dr. Hartman's declaration does not even attempt to identify, measure or discuss the notion of whether the proposed class, or any member of that class, has been injured by TAP's alleged conduct.  Instead, Dr. Hartman simply assumes that is the case by assuming the allegations of the Complaint are true *and* assuming that TAP's alleged misconduct will cause injury to all class members" (¶ 26).

        As explained in Section II.A above, at this stage of the litigation I was directed by counsel to assume that the allegations of the complaint are true.  This is standard procedure.  The facts that I reviewed certainly corroborated the veracity of the allegations and the correctness of the assumptions.  Having assumed the allegations, the class-wide injury and damages result as a matter of economics and the business practices in pharmaceutical and health care service markets.

37.     Finally, Dr. Langenfeld confounds and confuses legal theories and theories of economic recovery.  Specifically, he asserts that my "proposed monetary relief based on TAP's profits earned from Lupron® sales is inconsistent with basic economics" (§ III.B heading).  I have not put forward this theory based upon an economic theory.[41]  I have been directed by counsel to assume that the law allows for different possible equitable theories of economic recovery.  Recovery of all TAP profits is one legal form of damages; recovery of TAP's incremental profits from the sale of Lupron® is another.  I have merely demonstrated how to calculate those measures, not make them consistent with economic theory.

## IV.   Aggregate Class-Wide Damages May Be Apportioned Through Formulaic Methods

38.     The same data and formulaic methods that make it possible to accurately calculate class-wide damages also make it possible to apportion damages to members of the Class.  At the damages phase of this litigation, the injury and total amount of damages incurred (i.e., the overall liability of the Defendants) is calculated and determined for the Class as a whole (or sub-classes, if so directed).  At apportionment, allocation amongst members of the Class (or sub-classes) will raise a broad or narrow range of differences within the Class depending on the instructions of counsel and the directions of this Court.

39.     As discussed in my Class Declaration, the implementation of my overcharge damages model will make use of detailed TAP invoice and accounting data that I have

---

loss from eliminating particular practices" (p. 17).  Consistent with standard economic practices, using aggregate numbers Dr. Langenfeld concludes that "the extra cost of eliminating all managed care practices for the four-year period 2002-2005 is $329 billion" (p. 26).

[41]  Dr. Langenfeld asserts (¶ 23) that "'Profits earned by TAP on all Lupron® sold' implies that TAP would not have made any sales of Lupron® "but-for" the alleged fraudulent pricing and marketing practice."

received to date plus additional invoice and accounting data that I will request for 1991-1993 and post 2000. Such data are generally referred to in pharmaceutical pricing litigation as "top-down" data, since they are taken from the economic entity at the top of this distribution chain, the manufacturer. As discussed in Section II above, these data will allow me to calculate ASP by NDC, AWP by NDC, and LCA price by NDC. Given my calculation of α from appropriate yardsticks an accurate calculation of aggregate class-wide damages will be derived.

40.   These "top-down" data will also provide information for the allocation of aggregate damages to individual Class members. The data enumerate all units sold and their gross invoice amount, by NDC (hence by therapeutic use, dosage and type of provider) and by customer billing identity and location. The invoice data include invoice-based price offsets, from which ASPs can be calculated gross of off-invoice incentive payments. Evaluation of the accounting data reveal the size of the total off-invoice incentives identified in the *Sentencing Memorandum* and the *Complaint*. Using the top-down data and the requisite 30(b)(6) depositions for selected providers, I will be able to differentiate invoice and off-invoice incentive payments by types of provider, thereby identifying the variation in ASP across types of provider and therapeutic use over time. Where appropriate and the data permit I will group providers by volume of practice (large, medium and small), type of reimbursement contracts, location and time period.

This variation will allow me to differentiate the ASPs (and the quantum of damages) by groups of urological providers, and thereby differentiate any claims under Medicare Part B copays for those patients and their insurers who submitted claims to particular groups of urological providers by time and by NDC/dosage.

Furthermore, I can compare my calculations of the ASPs to the calculations of the ASPs made by TAP contemporaneously with the activities that give rise to the lawsuit. The TAP data and TAP's own ASP analysis enable comparisons of spreads between therapeutic category, between different classes of trade, between different time periods, between dosages and other possible lines of demarcation. Once claims are submitted by Class members, those claims will be sorted along these various lines of demarcation to assess how the individual claims may vary from the average claim used to calculate aggregate damages.

41.   The allocation process will be further informed by the use of "bottom-across" data, that is, electronic data summarizing insurance claims (reimbursements) gathered from a sample of TPPs, retail pharmacies and/or specialty pharmacies. The "bottom-across" data will resemble those data already provided by Mr. Young in his Exhibits C-E. Indeed, Mr. Young has identified a variety of TPP reimbursement data that will be very useful for my allocation models.

For example, we find in his Exhibit D the Cigna reimbursement claims for J-Code 9217. However, his presentation of these data is incomplete. TPPs (e.g., Cigna) generally track not only the reimbursement claims paid but also the date the claim was paid, the relevant NDC (hence therapeutic use), the benefit plan under which the reimbursement was paid (pharmaceutical or medical), the insured plan member, the provider involved and the pharmacy reimbursed (if reimbursement is paid directly to the pharmacy). As discussed in Section II above, reimbursement rates will vary by claim

based upon the specific medical/pharmaceutical benefit plan under which the reimbursement occurred, the specific provider reimbursed, the specific TPP paying the claim, the retail pharmacy reimbursed from which the dosage may have been "brown-bagged," and the retailer and or wholesaler from which the provider procured the dosage. While the formulaic methods allow for the use of average measures to accurately calculate aggregate damages, and thereby avoid the need for focusing upon this variation, at the allocation phase we shall want to examine such variation.

The "bottom-across" data will allow me to do so by allowing me to estimate a regression model that will measure how reimbursement claims (or allowable amount (AA), or reimbursement allowed) are related to AWP[42] *and* how that relationship between AA and AWP may differ for claims paid by different TPPs (varying by size and identity, e.g., Cobalt versus a Blue versus Cigna), by date of reimbursement, by therapeutic use (NDC and dosage), by the benefit plan under which the reimbursement was paid (pharmaceutical or medical), by provider (differentiated by type of practice), and by the pharmacy reimbursed (differentiated by identity (i.e., CVS versus a small pharmacy), type (retail versus and specialty) and by size).

Once such a regression model is estimated and once I have estimated the but-for AWP as discussed in my Class Declaration, I will be able to use this regression to estimate how reimbursements (AA) would vary by TPP, date of reimbursement, therapeutic use (NDC), type of provider and by type of pharmacy reimbursed.

Once a claim is submitted during the claims administration period, the Court will be able to place that claim within one or several of the categories identified above and calculate the appropriate but-for reimbursement rate that should have been paid, by claim. That calculation will allow for an accurate allocation of total damages during the claims administration phase.

42.    During the allocation process, the regression analysis derived from the "bottom-across" data will permit, if necessary or required, the aggregate damage amount to be allocated to different groups in different amounts. If, for example, the facts show overcharges to larger TPPs were smaller (perhaps due to their greater bargaining power) than those to self-insured groups with little bargaining power, the regression will permit the allocation to these groups to reflect those differences.

I declare under penalty of perjury that this Declaration is true and correct. Executed on July 26, 2004.

---

[42] Indeed, note that in Mr. Young's Exhibit E where there exists a longer time period, the AWP line resembles a regression line with the allowable amount distributed around it based presumably upon the other factors identified in the text. Of course, such a regression model has to be appropriately specified and estimated, in light of the discussion of Section III.B above.

---

**Attachment A**

**Attachment A: Additional Documents Relied Upon**

Anderson, Gerard F., et al., *Doughnut Holes and Price Controls*, July 2004.

*Blackie v. Barrack*, 524 F.2d 891, 905 (9th Cir. 1975).

Caremark Therapeutic Services, "Glossary," available at http://www.rxrequest.com/rxr/html/cts/glossary.html.

Casualty Actuarial Society, "Glossary of Terms in Managed Health Care," at http://www.casact.org/health/glossary.htm.

*Cipro Cases I and II,* Judicial Council Coordination Proceeding Nos. 4154 and 4220 (Superior Court, San Diego County).

Complaints filed *In re: Lupron® Marketing and Sales Practices Litigation*:

> "Corrected Consolidated Amended Complaint," *In re: Lupron® Marketing and Sales Practices Litigation* (Mass. Dist. Ct. 2002) (No. 01-CV-10861).
>
> "First Amended Complaint*," In re: Lupron® Marketing and Sales Practices Litigation* (Mass. Dist. Ct. 2004) (No. 01-CV-10861) (relating to Aetna Health, Inc. v. TAP Pharm. Prod., Inc., No. 04-CV-10176).
>
> "Second Amended Consolidated Complaint," *In re: Lupron® Marketing and Sales Practices Litigation* (Mass. Dist. Ct. 2003) (No. 01-CV-10861) (relating to Empire Healthchoice, Inc. v. TAP Pharm. Prod. Inc., No. 02-10015).

Dyckman & Associates, *Health Plan Payment for Physician-Administered Drugs*, August 2003.

Express Scripts Inc., *2002 Annual Report*, May 6, 2003.

Fludara.com, "Reimbursement Glossary," at http://www.fludara.com/hcp/reimgloss.html.

Frech, Ted, James Langenfeld and Michaelyn Corbett, "Managed Health Care Effects: Medical Care Costs and Access to Insurance," University of California, Santa Barbara, Department of Economics Working Paper, 2000.

Gencarelli, Dawn M., National Health Policy Forum, "Average Wholesale Price for Prescription Drugs: Is There a More Appropriate Pricing Mechanism?" June 7, 2002.

Gross, David J., Susan O. Raetzmann and Stephen W. Schondelmeyer, AARP Public Policy Institute, "Trends in Manufacturer Prices of Brand Name Prescription Drugs Used by Older Americans, 2000 Through 2003," June 2004.

Grunfeld, Yehuda and Zvi Griliches, "Is Aggregation Necessarily Bad?" *The Review of Economics and Statistics*, 42(1), February 1960.

*Hoexter v. Simmons*, 140 F.R.D. 416, 421 (D. Az. 1991).

*In re Cardizem CD Antitrust Litigation*, Master File No. 98-MD-1278, 200 F.R.D. 326 (E. D. Mich. 2001).

*In re Domestic Air Transp. Antitrust Litigation*, 137 F.R.D. 677 (N.D.Ga.1991).

*In re Kulicke & Soffa Industries, Inc. Securities Litigation*, 1990 WL 1478, *4 (E.D. Pa. 1990).

*In re Sumitomo Copper Litigation*, 182 F.R.D. 85 (S.D.N.Y. 1998).

*In re Terazosin Hydrochloride Antitrust Litigation*, Case No. 99-MDL-1317 Seitz/Garber, United States District Court for the Southern District of Florida.

Kennedy, Peter, *A Guide to Econometrics,* 4th ed., Cambridge, MA: MIT Press, 1998.

*Koski v. Gainer*, 1993 WL 153828, *4 (N.D. Ill. 1993).

Kreling, David H., "Cost Control for Prescription Drug Programs: Pharmacy Benefit Manager PBM Efforts, Effects, and Implications," 2000; available at http://aspe.hhs.gov/health/reports/Drug-papers/Kreling-Final.htm.

Langenfeld, James, Declaration, *In re: Lupron® Marketing and Sales Practices Litigation,* June 14, 2004.

Langenfeld, James, Deposition, *In re: Lupron® Marketing and Sales Practices Litigation,* July 9, 2004.

Langenfeld, James and Robert Maness, "The Cost of PBM 'Self-Dealing' Under a Medicare Prescription Drug Benefit," September, 9, 2003.

National Pharmaceutical Counsel, Pharmaceutical Benefits 2000, "Appendix E: Glossary," 2000.

NORC at the University of Chicago and Georgetown University, *Physician-Administered Drugs: Distribution and Payment Issues in the Private Sector*, 2003.

Pam Pohly Associates, "Glossary of Terms Used in Managed Health Care," available at http://www.pohly.com/terms.html.

*Rodriguez v. Carlson*, 166 F.R.D. 465, 479 (E.D. WA 1996).

Rubinfeld, Daniel L. and P.O. Steiner, "Quantitative Methods in Antitrust Litigation," *Law and Contemporary Problems*, 46(4), Autumn 1983.

Rx Examiner, "Glossary," at http://www.rxaminer.com/glossary.html.

Sorensen, Alan, "Equilibrium Price Dispersion in Retail Markets for Prescription Drugs," *Journal of Political Economy*, 108(4), August 2000.

TAP Bates-Numbered Documents: TAP-BLI 0007361 - 81.

Von Oehsen III, William H., Public Health Institute, "Pharmaceutical Discounts Under Federal Law: State Program Opportunities," 2001.

Young, Steven J., Declaration, *In re: Lupron® Marketing and Sales Practices Litigation*, June 14, 2004.

Young, Steven J., Deposition, *In re: Lupron® Marketing and Sales Practices Litigation,* July 13, 2004.

**Attachment B**

**Attachment B:  Industry Reliance on AWP and the Mathematical
Relationship Between WAC and AWP**

**B.1.    Pricing based on WAC is equivalent to pricing based on AWP**

Since there is a "constant relationship" between AWP and WAC, it does not matter whether reimbursement rates are based on AWP or WAC. Any formula based on WAC can be converted to one based on AWP and *vice versa*. Thus, pricing based on one is equivalent to pricing based on the other.

From Mr. Young's own testimony, we know that AWP equals 125% of WAC:

(1)      $AWP = 125\%*WAC = 1.25*WAC.$

Using this formula to solve for WAC, we find

(2)      $WAC = (1/1.25)*AWP = 0.80*AWP = 80\%*AWP.$

Thus, WAC is always 80% of AWP.  Equivalently, we can think of WAC as "AWP less 20%," to use industry terminology.

Now consider Mr. Young's pricing based on WAC, not AWP. In a simple example, we will demonstrate that this is equivalent to pricing based on AWP. Assume as Mr. Young does in ¶ 65 of his declaration that Beacon contracts with retail pharmacies for "brown-bagged" Lupron at prices based not upon AWP but upon WAC, such that the allowable amount ("AA") equals WAC plus 4% or

(3)      $AA = 104\%WAC = 1.04*WAC.$

We can express the allowable amount in terms of AWP using our previous formula, which states that $WAC = 0.80*AWP = $ "AWP – 20%." Substituting this expression for WAC in the above formula, we obtain

(4)      $AA = 1.04*WAC = 1.04(0.80*AWP)$
$= 0.832*AWP = 83.2\%AWP.$

Hence, the allowable amount paid by Beacon is related to both WAC and AWP. Whether one chooses to express the allowable amount in terms of AWP or WAC is merely a matter of convenience. The relationship expressed here appears to be confirmed in Mr. Young's Exhibit C-2 of Beacon's reimbursements to retail pharmacies.

**B.2.   Fraudulently inflating AWP is equivalent to fraudulently inflating WAC**

Now let us consider another example that shows that fraudulently inflating AWP is equivalent to fraudulently inflating WAC since the two are related by the simple formula given in equation 1. Suppose that TAP has fraudulently inflated its AWP by say 40% over some period of time.  In this case, the "fraudulent AWP" = $AWP_f$ is given by

(5)      $AWP_f = 140\%*(\text{non-fraudulent AWP}) = 1.40*AWP$.

Since there is a "constant relationship" between AWP and WAC, we can determine the "fraudulent WAC," $WAC_f$, by starting with equation 2 and substituting for fraudulent AWP from equation 5. This yields

(6)      $WAC_f = 0.80*AWP_f = 0.80*(1.40*AWP) = 1.12*AWP = 112\%AWP$.

Thus fraudulently inflating AWP by 40% creates a "fraudulent WAC" equal to AWP plus 12%.

Note further that given the constant relationship between AWP and WAC in equation 1 (AWP = 1.25*WAC), $WAC_f = 1.12*AWP = 1.12*1.25*WAC = 1.40*WAC = 140\%*WAC$.  This means that the fraudulent WAC ($WAC_f$) has been raised 40% above the non-fraudulent WAC because the fraudulent AWP ($AWP_f$) has been raised by 40% above the non-fraudulent AWP.  Given their constant relationship, the fraud raises both list prices by the same percentage.

**B.3.   Calculating damages based on WAC is equivalent to calculating damages based on AWP**

Finally, I demonstrate that calculating damages based on WAC is equivalent to calculating damages based on AWP. Recall that the allowable amount was defined as WAC plus 4%. Assume again that AWP (and therefore WAC) has been fraudulently inflated by 40%. In this case, AWP and WAC represent the "but-for" AWP and the "but-for" WAC. The injury or damages caused by the fraud is the difference between the allowable amount under fraud less the allowable amount absent fraud.

(7)      "Damages Caused by Fraud" = $AA_f - AA$.

This can be calculated as follows:

(8)      $AA_f - AA$    = "$WAC_f$ plus 4%" – "WAC plus 4%"
                            $= 1.04* WAC_f - 1.04*WAC$
                            $= 1.04*( WAC_f - WAC)$.

Recall that WAC is 80% of AWP from equation 2 and that $WAC_f$ is 80% of $AWP_f$ from equation 6.  Substituting in the last line of the above equation yields

(9)     $AA_f - AA$     $= 1.04*(0.80*AWP_f - 0.80*AWP)$
                        $= 1.04*0.80*(AWP_f - AWP)$
                        $= 0.832*(AWP_f - AWP)$.

Substituting for $AWP_f$ in the last line above using equation 5 gives an expression for the damages in terms of AWP

(10)    $AA_f - AA$     $= 0.832*(AWP_f - AWP)$
                        $= 0.832*(1.40*AWP - AWP)$
                        $= 0.832*0.40*AWP$
                        $= 0.3328*AWP$
                        $= 33.28\%*AWP$.

Using equation 1, I can also convert this equation to one based on WAC

(11)    $AA_f - AA$     $= 0.3328*AWP$
                        $= 0.3328*(1.25*WAC)$
                        $= 0.4160*WAC$
                        $= 41.60\%WAC$.

Therefore, the overcharge on the allowable amount to Beacon given a fraudulent increase in the AWP by 40% (0.40), is 33.28% of AWP (but-for) and 41.60% of WAC (but-for), even though the allowable amount is expressed using WAC, according to Mr. Young. Note also that $33.28\%AWP = 41.60\%WAC$, so use of either list price will provide the exact same calculation of overcharge damages when properly used.

### B.4.   WAC and AWP are both meaningful prices in pharmaceutical markets

Based upon my experience of more than five years in pharmaceutical pricing litigation matters and my knowledge of the branded drug industry, the industry standard for private third-party payers for the reimbursement of pharmacists and providers for branded drugs such as Lupron is the use of the published average wholesale price (AWP). Mr. Young is simply incorrect in stating or implying that AWP is not the basis for reimbursement. His view is contradicted not only by my experience and the many pharmaceutical and economic experts with whom I work, it is contradicted by the following substantial authorities:

a)  For Lupron, the Red Book consistently reports AWP, not WAC, although it is clearly understood that WAC = 80%AWP. In most years, the Red Book only reports AWP, which is reported to it by TAP.

b)  According to the 2003 study by MedPAC (*op. cit.,* p. 166), "until recently, private payers devoted little attention to price and utilization of specialty drugs. Their payment systems, and the problems associated with them, have mirrored Medicare's AWP-based formula. These drugs are most often administered through a health plan's major medical benefit rather than as part of the pharmacy benefit. When filling drugs through the major medical

benefit, physicians purchase needed drugs and submit claims to their patient's insurance plan along with other claims for services."

c) MedPAC further sponsored a survey of 32 health plans (*ibid.*) and found "all plans reported pricing formulas based upon the AWP. … Some of the plans used varying percentages of AWP for different categories of drugs, such as medications for chemotherapy, immunization and vaccines."

d) Every named plaintiff in this case has averred to the fact that their payments for Lupron were based upon AWP.[1]   Contracts produced by Beacon demonstrate that their payments and their reimbursements were based upon AWP.[2]   When asked about these contracts in deposition, Mr. Young could not deny that the negotiated reimbursement rates with retail pharmacies are based on AWP.[3]   Those third-party payers that have opted out of this litigation have stipulated that they reimbursed based upon AWP and that reimbursement based upon AWP is standard industry practice.[4]

e) The President of TAP, Thomas Watkins, has himself admitted to industry reliance upon AWP, referring in particular to the list prices published in the Red Book, which for Lupron are solely the AWP.[5]

f) A substantial scientific and business literature demonstrate industry reliance upon AWP.[6]

---

[1] Corrected Consolidated Amended Complaint ¶¶ 49-54, In re: Lupron Marketing and Sales Practices Litigation (Mass. Dist. Ct. 2002) (No. 01-CV-10861) (hereinafter "CCAC"); First Amended Complaint ¶ 14, In re: Lupron Marketing and Sales Practices Litigation (Mass. Dist. Ct. 2004) (No. 01-CV-10861) (relating to Aetna Health, Inc. v. TAP Pharm. Prod., Inc., No. 04-CV-10176) (hereinafter "First Am. Compl."); and Second Amended Consolidated Complaint ¶¶ 16-26B, In re: Lupron Marketing and Sales Practices Litigation (Mass. Dist. Ct. 2003) (No. 01-CV-10861) (relating to Empire Healthchoice, Inc. v. TAP Pharm. Prod. Inc., No. 02-10015) (hereinafter "Second Am. Consol. Compl.").

[2] See materials produced by Beacon Healthplans, Inc. in response to Request No. 56 of TAP Pharmaceutical Products Inc.'s First Request For Production of Documents.

[3] Young Deposition, pp. 123-25.

[4] CCAC, *supra* footnote 1, at ¶¶ 53-54; First Am. Compl., *supra* footnote 1, at ¶ 14; and Second Am. Consol. Compl., *supra* footnote 1, at ¶¶ 16-26B.

[5] CCAC, *supra* footnote 1, at ¶ 26 (noting, regarding AWP, that Thomas Watkins, president of TAP Pharmaceutical Products, reported "Medicare and other insurance companies base their payment in many respects for Lupron® for prostrate cancer based off published industry pricing done in a Red Book, or book called the Red Book").

[6] Gerard F. Anderson, et al., *Doughnut Holes and Price Controls* 397-398 (Jul. 2004) (regarding a study undertaken to compare pharmaceutical prices, writing:

"The prices compared are the average wholesale prices (AWP)—those faced by major U.S. purchasers, not individual consumers at pharmacies—because these are the prices that Medicare and other large purchasers would pay. However, since these purchasers rarely pay the full AWP, we also calculated the price index assuming a 20 percent discount.)"

at  http://content.healthaffairs.org/cgi/reprint/hlthaff.w4.396v1.pdf (last visited Jul. 21, 2004); Caremark Therapeutic Services, "Glossary" (noting AWP "is often used by pharmacists as a cost basis when pricing prescriptions."), at http://www.rxrequest.com/rxr/html/cts/glossary.html (last visited Jun. 2002); Casualty Actuarial Society, "Glossary of Terms in Managed Health Care" (defining AWP as being "[c]ommonly used in pharmacy contracting, the AWP is generally determined through reference to a common source of

information."), at http://www.casact.org/health/glossary.htm (last visited Jul. 20, 2004); Dyckman & Associates, "Health Plan Payment for Physician-Administered Drugs" (Aug. 2003) (noting that of the surveyed private health plans in a study performed for the Medicare Payment Advisory Commission, "[a]ll of the plans use a percentage of AWP formula… [M]ost plans use an AWP pricing formula that is in the range of 90 to 100 percent of AWP."); Express Scripts Inc., *2002 Annual Report* (2003) (reporting "AWP is a standard pricing measure used throughout the industry, as well as by us, as a basis for calculating drug prices under our contracts with health plans and pharmacies and rebates with pharmaceutical manufacturers."); Fludara.com, Reimbursement Glossary (defining AWP as being "used by Medicare Part B and most third-party payers as a basis for reimbursement."), at http://www.fludara.com/hcp/reimgloss.html (last visited Jul. 2004); Dawn M. Gencarelli, National Health Policy Forum, "Average Wholesale Price for Prescription Drugs: Is There a More Appropriate Pricing Mechanism?" (Jun. 7, 2002), p. 11 (hereinafter "Gencarelli, Average Wholesale Price") (noting "[m]any private payers … often contract with pharmacy benefit managers (PBMs) to manage prescription drug benefits for their enrollees.  PBMs serve as intermediaries between these third-party payers and drug manufacturers, retail pharmacies, pharmacists, and wholesalers.   PBMs base their pharmacy reimbursements on the AWP for brand-name drugs."); Gencarelli, Average Wholesale Price, p. 3 (writing "[t]he AWP has often been equated with a 'sticker price' or 'list price,' as those terms are used in the automobile industry.  It has become an important prescription drug pricing benchmark for payers throughout the health care industry."); David J. Gross, Susan O. Raetzmann and Stephen W. Schondelmeyer, AARP Public Policy Institute, "Trends in Manufacturer Prices of Brand Name Prescription Drugs Used by Older Americans," 2000 Through 2003 (Jun. 2004) (noting AWP "is frequently used to determine payment and reimbursement rates for community pharmacies in private and third-party programs."), available at http://research.aarp.org/health/2004_06_drugprices.pdf (last visited Jul. 20, 2004); David H. Kreling, "Cost Control for Prescription Drug Programs: Pharmacy Benefit Manager PBM Efforts, Effects, and Implications" (2000) (writing "[i]ngredient cost payment for a brand name drug with an existing patent typically is determined by deducting a percentage from the drug's average wholesale price (AWP) as an estimate of the pharmacy's acquisition cost of the drug.") at http://aspe.hhs.gov/health/reports/Drug-papers/Kreling-Final.htm (last visited Jul. 21, 2004); National Pharmaceutical Counsel, Pharmaceutical Benefits 2000, "Appendix E: Glossary" (2000) (defining AWP as being "often used by pharmacies as a cost basis for pricing prescriptions."); NORC at the University of Chicago and Georgetown University, "Physician-Administered Drugs: Distribution and Payment Issues in the Private Sector" (2003) , p. 3  (noting "[p]rivate payers have followed Medicare, paying physicians from a low of AWP minus 20 percent to a high of AWP plus 10 percent."); Pam Pohly Associates, "Glossary of Terms Used in Managed Health Care" (AWP is "[c]ommonly used in pharmacy contracting."), at http://www.pohly.com/terms.html (last visited Jul. 20, 2004); Rx Examiner, "Glossary" (defining AWP as being "[o]ften used by pharmacists as a drug cost basis."), at https://www.rxaminer.com/glossary.html (last visited Jul. 20, 2004); William H. Von Oehsen III, Public Health Institute, "Pharmaceutical Discounts Under Federal Law: State Program Opportunities" (2001), p. i, noting, in a section entitled Private Sector Pricing:

> "Cash Customers – The first model involves cash customers who either lack prescription drug coverage and therefore pay out of their own pockets, or have indemnity-type insurance that reimburses them after they have made their cash purchases.  Cash customers generally pay the highest prices for drugs because they lack the opportunity, let alone the bargaining power, to negotiate discounts from either the retail pharmacy or the manufacturer.  They generally pay at or above a drug's average wholesale price (AWP) which is the manufacturer's list price.

> "Pharmacy Benefit Managers – The second model shares the same distribution channel as the first model, but the pricing arrangements are altered because of the discounts negotiated by a PBM on behalf of consumers and their insurers.  PBMs are private third parties that manage drug benefits for large groups of individuals, such as enrollees in an insurance plan or employees of a self-insured company.  By negotiating both discounts from participating pharmacies and rebates from preferred manufacturers, PBM customers typically pay less than a drug's average manufacturer price (AMP) – which is about 20 percent below AWP – and as low as 40 percent below AWP.

> "Institutional Purchasers – The third distribution and pricing model involves institutional purchasers, such as hospitals and group or staff model HMOs, that own and operate their own

g)  As made clear in the *Complaint* and the *Sentencing Memorandum*, the history of Medicare reimbursement demonstrates reliance upon AWP.

h)  I have seen no contrary evidence, nor does it appear that TAP makes available any other basis upon which reimbursement by private parties could be based.

---

pharmacies.  Hospitals and HMOs generally receive favorable pricing from manufacturers because they do not have to buy through retail channels and can negotiate directly with manufacturers, either individually or as part of a group purchasing organization.  Depending on their volume of pharmaceutical purchases and their ability to move market share in selected therapeutical classes of drugs, institutional purchasers can achieve discounts between 20 and 40 percent below AWP."

**Attachment C**

**Attachment C:**
**Hypotheticals Addressing Market Variabilities**

In this Attachment, I examine the effects of variations among Lupron transactions by size of provider and size of third-party payer. I provide two sets of hypotheticals which demonstrate that the formulaic methods that I use to calculate aggregate overcharge damages, which are based upon average prices and reimbursement rates and the total number of units sold and reimbursed, provide an exact calculation of the summation of individual overcharge damages.

1.    In Attachment C.1, I provide an example focusing upon variations among large and small providers (urologists/oncologists) treating prostatic cancer in two separate years and billing Medicare at AWP. The analysis would not change if I used 95% AWP or LCA.

In Attachment C.1, the first two sets of columns present data for the individual hypothetical providers. By assumption, there are 20 urology/oncology groups with large practices who administer 100 units of a given NDC of Lupron per month, or 2000 units in total per month. At the same time there exist 1000 urologists with small practices, i.e., 2 units dispensed per month, for a total of 2000 units per month. For all 1020 urologists/oncologists, 4000 units of this NDC are dispensed per month, for an average of 3.92 units per urologist/oncologist.

Given this NDC, we know the AWP and WAC by month and year from the usual price compendia. Assume further that as a result of the invoiced price offsets and off-invoice payments made to these large urologists, their ASPs are quite low, $25 in 1996 and $50 in 1998, with a resulting "Return to Practice" (RTP) of $75 and $150 in 1996 and 1998 respectively.[1] If we now take the measure of damages to Medicare to be the difference between the AWP and the ASP (see ¶ 71 of my Class Declaration), the damages caused by the units of Lupron dispensed by the urology/oncology groups with the large practices were $150,000 in 1996 and $300,000 in 1998.

By assumption, the price offsets and off-invoice incentives offered to the small providers were less; their ASPs were higher ($75 in 1996 and $150 in 1998); and their RTPs were lower ($25 in 1996 and $50 in 1998). If we again take the measure of damages to Medicare to be the difference between the AWP and the ASP, the damages caused by the units of Lupron dispensed by the urology/oncology groups with the small practices were $50,000 in 1996 and $100,000 in 1998.

Total exact damages calculated by summing across all individual providers (the 20 large practices and the 1000 small practices) results in total exact damages of $200,000 in 1996 and $400,000 in 1998.

2.    Suppose now that I do not use individual data, but rather make use of averages and totals. In Attachment C.1, it is clear that there are 1020 urology/oncology groups, dispensing on average 3.92 units per month for a total of 4000 (ignoring rounding). The AWPs and WACs are the same in 1996 and 1998 for all oncology groups (large and

---

[1]   In proportional terms, the RTP = AWP/ASP = 4.00.

small) as they are for each individual practice. However, the average ASP (calculated from TAP's invoice data) for all units sold is $50 (2000 at ASP = $25 and 2000 at ASP = $75) in 1996 and $100 in 1998. Using these average ASPs times the total number of units dispensed and reimbursed (4000) and the standard definition of overcharge damages used above, total damages in 1996 are $200,000 and $400,000 in 1998.

*Note that these calculations of total damages are precisely the same as those calculated by exactly summing all damages by individual oncology/urology group,* demonstrating the well-known fact that the use of average prices and average overcharges, as is done in my damage models, taken over widely varying individuals will lead to an exact calculation of aggregate damages.

3.      The second hypothetical in Attachment C.2 examines variations among third-party payers (TPPs), either based upon alternative drug/medical reimbursement plans for a given TPP or based upon the size and bargaining power among TPPs. While the conclusion would be the same, let me discuss the hypothetical as if it involves TPPs differing in size.

In the first set of columns in Attachment C.2, I present the reimbursement plan for a large TPP with many insured lives that negotiates lower reimbursement rates for the administration of Lupron, whether the reimbursement is paid to the provider or to the pharmacy. I have demonstrated in Attachment B that the reimbursement formula of any TPP can be written equivalently in terms of AWP or WAC. For this example, I use AWP and designate the contracted reimbursement rate with pharmacies and providers by the two large TPPs (each accounting for 1000 insured lives being reimbursed for Lupron injections per month) at an allowable amount (AA) = AWP – 40% = 0.60*AWP. In the second set of columns, I describe the reimbursement formula of 200 small TPPs (each accounting for only 10 insured lives members being reimbursed for Lupron injections per month) at an AA = AWP + 10% =1.1*AWP. Note that this variation is consistent with the variation found in the survey reported by MedPAC, where reimbursement rates ranged from 85-90% of AWP to 115% of AWP.[2] Note also that these reimbursement rates are consistent with the variation that Mr. Young cites in his Exhibits C-E.

As with the previous hypothetical, given the detail of the TAP invoice data that I have included in my model, I conduct the discussion for a given NDC. The AWP for this NDC is the same for both TPPs. However, since the reimbursement formula for each TPP is quite different, the allowable amounts (AA) permitted under each reimbursement formula for this particular NDC are quite different: $60/dosage by the large TPP and $110 by the small TPP. Hence, the total reimbursements paid by the 2 large TPPs for the 2000 dosages per month are $120,000, while total reimbursements paid by the 200 small TPPs per month were $220,000.

In this case, total reimbursements paid by all 202 TPPs on all 4000 units dispensed were $340,000, which implies an average AA = $85 per unit. Notice that if all of these 4000 units were reimbursed by the average reimbursement formula, that formula would be AA = AWP – 15% = .85*AWP. These averages and totals are summarized in the right-most two columns of Attachment C.2.

---

[2]  MedPAC Report, *op. cit.*, p. 167.

4.      Suppose now we learn that the existing AWP (hence WAC) had been manipulated and raised by 25% above the but-for AWP (which is related to ASP).  In this case, the but-for AWP = $AWP_{bf}$ was $75/unit = .75*AWP.  Let us calculate damages using the individual data and the aggregate data in Attachment C.2.

Given the individual data on each and every patient and each and every unit reimbursed in this hypothetical, we have in Attachment C.2 that the but-for allowable amount ($AA_{bf}$) for the large TPPs is $AA_{bf}$ = .60*$AWP_{bf}$ = .60*.75*AWP = $45; the unit overcharge on the allowable amount is $(AA - AA_{bf})$ = $60 – $45 = $15; the total but-for reimbursements are $90,000; and the implied total overcharges are $30,000, *calculated exactly*, for both large TPPs and each and every unit dispensed by the large TPPs.

Likewise, if given individual data on each and every patient and each and every unit reimbursed for the small TPPs, the $AA_{bf}$ for the small TPPs is $AA_{bf}$ = 1.1*$AWP_{bf}$ = 1.1*.75*AWP = $82.50; then implied unit overcharge is ($110 – $82.50) = $27.50; the total but-for reimbursements are $165,000; and the implied overcharges are $55,000, *calculated exactly*, for all small TPPs and each and every unit dispensed by them.

Adding the individual totals together *provides an exact calculation of overcharges of $85,000.*

5.      Suppose now I merely have aggregate data and data on average allowable amounts.  I know that for the 202 TPPs, 4000 units were reimbursed at an average AA of $85, which implies the reimbursement formula of AA = AWP – 15% = .85*AWP.  Given my analysis that the but-for AWP = .75*AWP discussed above, the average but-for AA = .85*.75*AWP = $63.75 and total but-for reimbursements at this rate are $255,000.  The overcharge damages calculated using these average reimbursement rates and total units dispensed are therefore $340,000 - $255,000 = $85,000.

*Notice that this calculation using average reimbursement rates and the reimbursement formula implied thereby, in addition to the but-for AWP and total units dispensed, is exactly equal to the exact summation of the individual damages of each unit sold to each and every TPP*.  This conclusion would hold if I allowed the drug and medical benefit plans to vary within a single TPP or across all TPPs.

## Attachment C.1: Variation in Size of Urological/Oncological Provider

| | Use of Individual Data | | | | | | Use of Totals and Averages | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Large Urologist/Oncologist | | Small Urologist/Oncologist | | Exact Total | | | |
| Number Of Providers | 20 | | 1,000 | | | | 1,020 | |
| Size Of Practice/Injections Per Month: | 100 | | 2 | | | | 3.92 | |
| Total Units Per month | 2,000 | | 2,000 | | | | 4,000 | |
| | 1996 | 1998 | 1996 | 1998 | 1996 | 1998 | 1996 | 1998 |
| AWP | 100 | 200 | 100 | 200 | | | 100 | 200 |
| WAC/RAC | 80 | 160 | 80 | 160 | | | 80 | 160 |
| ASP | 25 | 50 | 75 | 150 | | | 50 | 100 |
| RTP ($) | $75 | $150 | $25 | $50 | | | $50 | $100 |
| RTP = AWP/ASP | 4.00 | 4.00 | 1.33 | 1.33 | | | 2.00 | 2.00 |
| Total Payments (to TAP) @ ASP | 50,000 | 100,000 | 150,000 | 300,000 | | | 200,000 | 400,000 |
| Total Reimbursement @ AWP | 200,000 | 400,000 | 200,000 | 400,000 | | | 400,000 | 800,000 |
| Total Damages | 150,000 | 300,000 | 50,000 | 100,000 | 200,000 | 400,000 | 200,000 | 400,000 |

## Attachment C.2: Variation In Reimbursement Rates (Allowable Amounts)

| | Rates Offered by Individual TPPs | | | Use of Totals and Averages | |
| --- | --- | --- | --- | --- | --- |
| | Large TPP | Small TPP | Exact Total | | |
| Pricing Formula | AWP - 40% = 60% AWP | AWP + 10% = 110% AWP | | | |
| Number of TPPs | 2 | 200 | | 202 | |
| Units Reimbursed/TPP | 1,000 | 10 | | | |
| Total Units Reimbursed | 2,000 | 2,000 | | 4,000 | |
| | $ Per Unit / Total | $ Per Unit / Total | | $ Per Unit / Total | |
| AWP | 100 / 200,000 | 100 / 200,000 | | 100 / 400,000 | |
| AA | 60 / 120,000 | 110 / 220,000 | 340,000 | 85 / 340,000 | |
| $AWP_{bf}$ =.75 AWP | 75 / 150,000 | 75 / 150,000 | | 75 / 300,000 | |
| $AA_{bf}$ | 45.00 / 90,000 | 82.50 / 165,000 | | 63.75 / 255,000 | |
| Overcharges | 15.00 / 30,000 | 27.50 / 55,000 | 85,000 | 21.25 / 85,000 | |
| Implied Pricing Formula | | | | AWP - 15% = 85% AWP | |