UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL NO. 1456 |
| THIS DOCUMENT RELATES TO: | CIVIL ACTION: 01-CV-12257-PBS |
| TRACK TWO SETTLEMENT | Judge Patti B. Saris |

**PLAINTIFFS' REPONSE TO CERTAIN NAMED PLAINTIFFS' OBJECTIONS TO PLAINTIFFS' SUPPLEMENTAL SUBMISSION IN SUPPORT OF A <u>REBALANCED TRACK TWO SETTLEMENT</u>**

**I.      INTRODUCTION**

Plaintiffs submit this brief response to Don Haviland's "Certain Named Plaintiffs' Objections to Plaintiffs' Supplemental Submission in Support of Rebalanced Track Two Settlement" (Dkt. No. 7728, the "Haviland Response").[1]  At the July 7, 2011 hearing, the Court requested that the parties submit additional evidence supporting approval of the proposed Settlement and describing the Track Two discovery conducted.  The parties responded with a very detailed and exhaustive evidentiary presentation supported by the sworn testimony of Class Counsel, Plaintiffs' expert and counsel for each Track Two Defendant.  In contrast, Haviland's response is based on no evidence at all – only conjecture and invective.  The Court should quickly reject it, grant preliminary approval to the proposed reallocation and redistribution, and authorize additional notice to the affected claimants.

**II.      ARGUMENT**

**A.     No New Drugs Were Added At The Time Of Settlement**

Haviland continues to peddle the myth that 85 drugs were newly added at the time of Settlement.  Haviland Response at 4-5.  When Haviland took that position in prior filings, it was false conjecture.  At this point, in the face of overwhelming *evidence* proving that no new drugs were added, Haviland's conjecture has become a misrepresentation that he perpetuates in violation of Rule 11.  Plaintiffs and Defendants have demonstrated that all of the 145 drugs that are the subject of the Track Two Settlement were in the case no later than March 2006 when the Fourth Amended Complaint was filed; that *almost all* of the drugs were involved in the case well before March 2006 (by virtue of being named in prior complaints and/or the subject of prior

---

[1] The Court should recognize the fiction that Haviland attempts to perpetuate by continually referring to his clients as "Certain Named Plaintiffs."  His clients are not "Named Plaintiffs" or Class Representatives but absent class members.  They were once proffered as class representatives but never made so and, indeed, were considered withdrawn by this Court as a result of Haviland's and his clients' actions detrimental to the Class.

discovery); that discovery was conducted into each and every one of those drugs prior to the proposed Settlement being reached; and that no new drugs were added at the time of the Settlement in March 2008, let alone 85 drugs.[2]

**B.     Haviland *Still* Fails To Present Any Evidence Supporting His Position That The Consumer Allocation Is Inadequate**

For literally years, Class Counsel have repeatedly challenged Haviland to produce expert evidence underlying the speculative positions that Haviland advances. With exaggerated bravado, Haviland is prone to pontificating about his "experience" representing other plaintiffs in other drug-pricing litigation. Yet he has never submitted an opinion from a single expert here in *these* proceedings to substantiate a single position that he has ever taken. That is because he has *no evidence* – expert or otherwise.

And the ruse continues in the Haviland Response, where he attempts to create a false record, first by having his law associate submit a declaration attaching tables that are unreliable, do not constitute admissible evidence and are crafted to mislead, and second by attaching expert declarations from other cases involving other drugs and other reimbursement systems. For these reasons, the Court should reject the argument at pages 5-9 of the Haviland Response and strike both it and the Lorusso Declaration as speculative.

**1.     Haviland's Group B drug spread analysis is not based on any evidence, is unreliable and unsupported by qualified expert opinion and crafted to mislead.**

Haviland states as follows: "[I]n the interest of trying to move the ball on settlement, Certain Named Plaintiffs have worked with their own experts and tried to present a model for damages, and a template for examining reallocation with the TPPs, using Dr. Hartman's

---

[2] Haviland claims that the Court found his observations about purported "new" drugs to be "very cogent," Haviland Response at 3, but the Court was questioning whether the drugs were indeed newly added at the time of settlement and did not just accept Haviland's assertion. *See* July 7, 2011 Hearing Tr. at 23. As the evidence demonstrates, Haviland's assertion is anything but cogent.

- 2 -

'scientific study.'" Haviland Response at 5. This is false. Haviland has not worked with any expert nor presented any expert opinion. Nor does he present a viable damages model.

Instead, Haviland merely submits the Declaration of Michael J. Lorusso, Esq., in Support of Opposition to Track Two Settlement (Dkt. No. 7729). But Mr. Lorusso is an associate attorney in Haviland's office. He does not have the necessary experience in health care economics, general econometrics and health sciences like Dr. Hartman. Nor does Mr. Lorusso's so-called damages methodology survive scrutiny. Simply put, it is a joke.

Lorusso's Exhibit A purports to take Dr. Hartman's overcharge ratios for 31 drugs (reproduced in column 3 of Lorusso Exhibit A), calculate "damages" (as reported in column 7), and then divine the "additional funds needed to pay claimants single damages." For several drugs where Dr. Hartman did not present an overcharge ratio, Lorusso just makes up a number purportedly based on an average overcharge for the manufacturer. *See* Dexamethasone sodium, Fluorouracil. For others, he uses an average overcharge for other manufacturer's drugs. *See* Dextrose, Gentamicin, Heparin, Leucovorin calcium, sodium chloride. Averaging in this manner is not sound, because the co-payment data from the Coggeshall declaration does not differentiate between these drugs; it cannot given that the drugs share common J-Codes. But even more troubling, Haviland spins the result as a real damages calculation when it is not. As clearly explained by Dr. Hartman in his declaration (that is, through *reliable evidence*), these are multi-source drugs for which the median analysis applies. Therefore, actual damages are much lower. Hartman Decl. (Dkt. No. 7699), ¶ 33. It is misleading to present the information without this explanation. The information should be stricken.

Lorusso Exhibit B and the conclusions that Mr. Lorusso offers therefrom fare even worse. First, the overcharge ratios presented in column 3 are not overcharge ratios, as Lorusso

- 3 -

admits at paragraph 9 that he has no overcharge ratios for these drugs and instead uses a "total overcharge ratio for their respective manufacturers." This alone justifies striking Exhibit B and the "conclusions" made from it. Furthermore, and contrary to Haviland's suggestion, Dr. Hartman *did* review these drugs, and concluded, with few exceptions, that there are no damages because spreads were below 30% for the vast majority of NDCs and quarters. Hartman Decl., ¶¶ 43-46 & Table 3 (AccuNeb, Aromasin, Camptosar, Ellence, Leukine, Lovenox, Novantrone, Prograf, Taxotere and Zemplar). Others, like Calcijex, Calcimar and Cipro, Idamycin, and Thioplex, went multisource and are subject to the median analysis. *See* Hartman Decl., Table 3. Thus, Lorusso and Haviland's "conclusion" that damages for these 20 drugs amount to $23,622,102.84 is pure fiction.

Moreover, Haviland does not present any reasons why these drugs should be appropriately included in Group A. The framework for Group A inclusion, as formulated from the Court's findings in this litigation, is as follows: single-source, high spreads and/or spreads increasing over time, high damages, substantial spread marketing evidence for the defendant, and substantial Medicare Part B reimbursements. Dkt. No. 7697 at 8. Haviland does not apply this framework to these drugs. Class Counsel did and found that the drugs belong in Group B because they do not satisfy the test for Group A inclusion.

Exhibit C, pertaining to Eligard and Trelstar, should be stricken for the same reasons. Again, the 50% purported overcharge ratio in the table is simply fabricated and not supported by any expert here.[3] Nor can the co-payment numbers for Eligard in column 5 be relied upon to

---

[3] Haviland attaches old declarations from other experts in the *Lupron* class action (*see* Exhibits C and D to the Haviland Declaration), but the cited testimony is not about Eligard and Trelstar and, therefore, is not properly considered or admissible here. The report of William S. Comanor (*see* Exhibit F), from the Pennsylvania litigation, does not purport to calculate spreads and damages. Warren-Boulton's opinion from Pennsylvania (*see* Exhibit G) offers a methodology unique to the State's payment of drugs there, calculating damage numbers based on reimbursement rates for prescription drugs at the same level as the average for the large customers of retail pharmacies. *See id.* at 7. It is not similar to the 30% benchmark analysis previously adopted by this Court here. *In*

- 4 -

produce the "damage" calculations in the later columns, because Eligard shares a J-Code with Lupron.  And Dr. Hartman finds spreads below 30% for Eligard.  Hartman Decl., Table 3.  This is sensible, because Eligard did not enter the market until 2002, at a time in which AWP litigation (including litigation involving Lupron) was rampant.  Further, these two drugs do not fit the Group A paradigm as analyzed by Class Counsel.

Exhibit D is also defective because as Lorusso admits, it does not present any actual overcharge ratios for the drugs specified (with some exceptions that are immaterial because the median analysis applies).  Further, all of the drugs, except Humate, are subject to a median analysis, either because they are multi-source or multi-brand.  The multi-source drugs subject to median analysis are Amphocin, Cytosar-U, Depo-testosterone, Lasix, Liposyn, Lyphocin, Neosar, Solu-cortef, Solu-Medrol, Toposar and Travasol.  Hartman Decl., Table 3.  The multi-brand drugs on Exhibit D are Bebulin, Bioclate, Buminate, Gamimune, Gammagard, Helixate, Koate, Kogenate, Monoclate, Mononine and Prograf.  *See* Hartman Decl., Table 3.  As Dr. Hartman has explained, multi-brand biologics have multiple competing biologics, which are reimbursed using the same J-Code.  Therefore, this makes them similar to multi-source drugs for reimbursement purposes.  Hartman Decl., ¶ 48.  The resulting "damage" number portrayed in Exhibit D is thus completely fabricated.  Exhibit D should be stricken.  Finally, none of these drugs meet the Group A criteria under Class Counsel's framework.

Fed. R. Evid. 702 allows expert testimony in the nature of "scientific, technical or other specialized knowledge" through a witness qualified by "knowledge, skill, experience or training.…"  Haviland's law associate possesses neither the required "scientific, technical or other specialized knowledge," and is not qualified by "knowledge, skill, experience or training"

---

*any event, if Haviland supposedly has access to experts, why have they not submitted opinions here relating to the Track Two Settlement value and allocation?!*

- 5 -

to submit any evidentiary conclusions based on the Track Two Drugs at issue and the calculation of spreads and damages.

Fed. R. Evid. 702 also provides that an expert can testify if the testimony is (1) based upon sufficient facts or data, (2) is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to this case.  As demonstrated above, none of the Lorusso gymnastics even remotely come close to meeting these requirements. Haviland should not be permitted to lard and confuse the record with such a submission, hoping that the First Circuit will be misled by it on appeal, if this Settlement receives final approval. This material should be stricken.

### 2. Haviland has never presented an expert calculation demonstrating that the Consumer-TPP split is anything but fair and reasonable.

Class Counsel have explained how the Consumer allocation exceeds Consumers' damages.  *See, e.g.,* Dkt. No. 6003 at 9-11.  Haviland has ***never*** presented any evidence to the contrary.  And now the allocation in Consumers' favor has been enhanced through the addition of $3,125,000 in order to respond to the Court's concerns as expressed at the July 7 hearing. Haviland denigrates Class Counsel for obtaining these additional funds, Haviland Response at 2 and 8, yet he should be pleased that Group B drugs will obtain a greater recovery as a result. Nonetheless, Haviland cannot demonstrate with evidence that the total $25 million allocation to Consumers is anything but fair and reasonable.  He should not be permitted to destroy a settlement "on the cheap" without at least attempting to do the work necessary to support his positions.

- 6 -

001534-16  466796 V1

### C. No New Notice To The Entire Class Is Required

Haviland now objects to the content of the notice to the Classes 1 and 3, and the methods by which those notices were distributed. Haviland Response at 14-19. The Court can quickly reject these new objections.

First, this is a new objection that Haviland has not articulated previously. As such, it is waived. The only objections that may be entertained now are those pertaining to the proposed rebalancing and redistribution plan.

Second, Haviland has no client with standing to challenge the Class 3 notice. His clients are Medicare beneficiaries who seek to be members of Class 1 only.

Third, Haviland's attack on the prior notice is unfounded. The notice effort was extensive and comported with both Rule 23 and due process standards as Plaintiffs previously explained in their June 1, 2011 filing (Dkt. No. 7573). Direct mail notice was provided to members of Class 1 who took Group A drugs during the Class Period. This was done using records maintained by the Center for Medicare and Medicaid Services ("CMS"). Between December 14 and 29, 2010, Rust received data files from CMS vendors Research Data Assistance Center ("RESDAC") and Buccaneer containing purchase data for individuals who were noted by CMS as having been administered a drug covered by the Track 2 Drug J-Codes. Rust identified those Class members who were administered Group A drugs, scrubbed the data to ensure eligible drug administrations and adequate address formatting, and eliminated duplicate names and addresses. Rust then mailed the Class 1 Consumer Notice and Claim Card (the "Class 1 Initial Notice Packet") to 1,956,098 potential Class 1 Consumer Class members who were administered Group A Drugs. Dkt. 7575, ¶¶ 9-15. Included with that mailing was a postage pre-paid reply card allowing the potential class member to certify under penalties of perjury that he/she made percentage co-payments for a Class Drug under Medicare Part B during

- 7 -

the Class Period (as opposed to flat or no co-payments due to supplemental insurance).  *Id.*, Ex. A.

In addition to direct mail, a multi-pronged paid media program was used to reach Class 1 members.  Notice was published in two newspaper supplements, *Parade* and *USA Weekend*, in 1,418 newspapers reaching every major media market in the country.  Dkt. No. 7574, ¶ 16.  Notice was also published in *AARP Bulletin*, *Prevention*, *Reader's Digest* and *TV Guide*.  *Id.*, ¶¶ 17, 21.  In addition to published notice, notice was provided via broadcast and cable television through the following channels/networks:  ABC, CBS, CNN, Golf, AMC, Fox News, MSNBC, Hallmark and Weather.  *Id.*, ¶ 18.  Notice was also provided through an "earned" media program involving distribution of a press release to almost 5,000 print and broadcast outlets and over 5,000 online media outlets; distribution of a "B-roll" video package that generated 146 stories that aired on stations across the country; and an audio news release distributed to more than 3,000 radio stations and actually aired on 911 stations.  *Id.*, ¶¶ 24-27.

In order to notify Class 3 Consumers of the existence of the Settlement, Class Counsel employed both a national media campaign as well as an extensive direct mail campaign using names and addresses of potential Class 3 members obtained from ISHP members.  With the assistance of Kinsella/Novak Communications ("Kinsella"), a national media plan was crafted to target potential Consumer Class Members.  The media campaign included placement of the consumer publication notice in various national newspapers, general interest magazines and health related publications.  Dkt. No. 5936, ¶¶ 20-23.  In addition, a television spot appeared on various cable-television channels approximately 229 times, *id.* at ¶ 19, and internet banner advertising was also utilized to provide additional notice opportunities beyond the broad-reaching print program to Class Members.  *Id.*, ¶¶ 25-26.

In addition to these efforts, Class Counsel also worked closely with Counsel for the ISHP Group.  These insurers represent more than 60% of the covered lives in the United States.  At the request of Class Counsel and pursuant to the Court's Order Related to Notice to Consumers of Track Two Settlement (Dkt No. 5455), using National Drug Codes ("NDCs") associated with the Class Drugs, members of the ISHP Group provided the Claims Administrator with electronic data identifying over 1.7 million potential Class 3 consumers.  These were consumers who, according to ISHP data, were responsible for a percentage co-payment for one or more of the Class Drugs.  The Claims Administrator then undertook a process of eliminating duplicate names and addresses from the data received and culled the list down to approximately 897,489 unique individual Class 3 members, each of whom received a full Class 3 notice with claim form.  Dkt. No. 5937, ¶ 19.  A detailed Notice and Claim Form geared specifically toward consumers in Class 3 was also mailed to any consumer who requested one by phone or on the settlement website.  As of May 31, 2011, Rust had mailed 959,362 Class 3 Consumer Notice and Claim Forms in response to requests.  Dkt. No. 7575, ¶ 25.

In a settlement Class maintained under Rule 23(b)(3), Class notice must meet the requirements of both the Federal Rules of Civil Procedure 23(c)(2) and 23(e).  *See Carlough v. Amchem Prods., Inc.*, 158 F.R.D. 314, 324-25 (E.D. Pa. 1993) (stating that requirements of Rule 23(c)(2) are stricter than requirements of Rule 23(e) and arguably stricter than the due process clause). Under Rule 23(c)(2), notice to the Class must be "the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."  *Amchem Prods. v. Windsor*, 521 U.S. 591, 617 (1997); *Reppert v. Marvin Lumber & Cedar Co.*, 359 F.3d 53, 56 (1st Cir. 2004).  The foregoing constitutes "the best notice practicable under the circumstances," and the Court has already appropriately made this finding.

- 9 -

### III.     CONCLUSION

During the July 7, 2011 hearing, the Court issued a call for specific evidence.  Haviland offers nothing but trickery and misrepresentations.  His new objections should be quickly rejected.

DATED:  August 5, 2011               By     /s/ Steve W. Berman
                                      Thomas M. Sobol (BBO#471770)
Edward Notargiacomo (BBO#567636)
Hagens Berman Sobol Shapiro LLP
One Main Street, 4th Floor
Cambridge, MA  02142
Telephone: (617) 482-3700
Facsimile: (617) 482-3003

Steve W. Berman
Sean R. Matt
Hagens Berman Sobol Shapiro LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA  98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

Jennifer Fountain Connolly
Hagens Berman Sobol Shapiro LLP
1629 K St. NW, Suite 300
Washington, D.C.  20006
Telephone:  (202) 355-6435
Facsimile:  (202) 355-6455

Jeffrey Kodroff
John A. Macoretta
Spector, Roseman, Kodroff & Willis, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA  19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611

- 11 -

Kenneth A. Wexler
Wexler Wallace LLP
55 W. Monroe Street, Suite 3300
Chicago, IL  60603
Telephone: (312) 346-2222
Facsimile: (312) 346-0022

Marc H. Edelson
Hoffman & Edelson LLC
45 West Court Street
Doylestown, PA  18901
Telephone: (215) 230-8043
Facsimile: (215) 230-8735
Co-Lead Counsel

- 12 -

## CERTIFICATE OF SERVICE BY LEXISNEXIS FILE & SERVE

Docket No. MDL 1456

I, Steve W. Berman, hereby certify that I am one of plaintiffs' attorneys and that, on August 5, 2011, I caused copies of **PLAINTIFFS' REPONSE TO CERTAIN NAMED PLAINTIFFS' OBJECTIONS TO PLAINTIFFS' SUPPLEMENTAL SUBMISSION IN SUPPORT OF A REBALANCED TRACK TWO SETTLEMENT**, to be served on all counsel of record by causing same to be posted electronically via Lexis-Nexis File & Serve.

          /s/ Steve W. Berman
          Steve W. Berman