IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF MASSACHUSETTS


IN RE:                           )
                                 )  CA No. 01-12257-PBS
PHARMACEUTICAL INDUSTRY AVERAGE  )
WHOLESALE PRICE LITIGATION       )  Pages 1 - 138
                                 )




              TRACK TWO SETTLEMENT HEARING

         BEFORE THE HONORABLE PATTI B. SARIS
              UNITED STATES DISTRICT JUDGE






                   United States District Court
                   1 Courthouse Way, Courtroom 19
                   Boston, Massachusetts
                   August 8, 2011, 9:20 a.m.








                     LEE A. MARZILLI
                  OFFICIAL COURT REPORTER
                United States District Court
              1 Courthouse Way, Room 7200
                   Boston, MA  02210
                    (617)345-6787

78515059-b96c-4759-a8be-bdac2ac3c612

1    A P P E A R A N C E S:

2

3        EDWARD NOTARGIACOMO, ESQ. and THOMAS M. SOBOL, ESQ.,
     Hagens Berman Sobol Shapiro, LLP, One Main Street, Cambridge,
     Massachusetts, 02142, for the Plaintiffs.

4

5        SEAN R. MATT, ESQ., Hagens Berman Sobol Shapiro, LLP,
     1301 5th Avenue, Suite 2900, Seattle, Washington, 98101,
     for the Plaintiffs.

6

7        MARC H. EDELSON, ESQ., Edelson & Associates, LLC,
     45 West Court Street, Doylestown, Pennsylvania, 18901,
     for the Plaintiffs.

8

9        JOHN A. MACORETTA, ESQ., Spector Roseman Kodroff & Willis,
     PC, 1818 Market Street, Suite 2500, Philadelphia, Pennsylvania,
     19103, for the Plaintiffs.

10

11       KENNETH A. WEXLER, ESQ., Wexler Wallace, LLP,
     55 West Monroe Street, Suite 3000, Chicago, Illinois, 60603,
     for the Plaintiffs.

12

13       STEVEN F. BARLEY, ESQ., Hogan Lovells US, LLP,
     Harbor East, 100 International Drive, Suite 2000, Baltimore,
     Maryland, 21202, for Amgen Corporation.

14

15       PETER W. MORGAN, ESQ., Dickstein Shapiro, LLP,
     1825 Eye Street, N.W., Washington, D.C., 20006-5403,
     for Baxter International, Inc.

16

17       MERLE M. DeLANCEY, JR., ESQ., Dickstein Shapiro Morin
     & Oshinsky, LLP, 2101 L Street, N.W., Washington, D.C., 20037,
     for Baxter Healthcare Corporation.

18

19       JAMES P. MUEHLBERGER, ESQ. and MICHAEL L. KOON, ESQ.,
     Shook, Hardy & Bacon, LLP, 2555 Grand Boulevard, Kansas City,
     Missouri, 64108-2613, for Aventis Pharmaceutical.

20

21       J. CLAYTON EVERETT, JR., ESQ., Morgan, Lewis & Bockius,
     LLP, 1111 Pennsylvania Avenue, N.W., Washington, D.C., 20004,
     for Pharmacia Corporation.

22

23       TINA M. TABACCHI, ESQ., Jones Day,
     77 West Wacker, Chicago, Illinois, 60601-1692,
     for Abbott Laboratories.

24

25       JAMES W. MATTHEWS, ESQ., Sherin and Lodgen, LLP,
     101 Federal Street, Boston, Massachusetts, 02110,
     for Watson Pharmaceuticals, Inc.

78515059-b96c-4759-a8be-bdac2ac3c612

1   A P P E A R A N C E S:   (Continued)

2        RICHARD D. RASKIN, ESQ., Sidley Austin, LLP,
    One South Dearborn, Chicago, Illinois, 60603,
3   for Bayer Corporation.

4        JASON PARISH, ESQ., Kirkland & Ellis, LLP,
    655 Fifteenth Street, N.W., Washington, D.C., 20005,
5   for Sicor, Inc.

6        CHRISTOPHER C. PALERMO, ESQ., Kelley Drye & Warren, LLP,
    101 Park Avenue, New York, New York, 10178, for Dey, Inc.
7
         DOUGLAS K. SPAULDING, ESQ., Reed Smith, LLP,
8   1301 K Street, N.W., Suite 1100, East Tower, Washington, D.C.,
    20005, for Fujisawa Healthcare, Inc.
9
         KATHLEEN M. O'SULLIVAN, ESQ., (By Phone), Perkins Coie,
10  LLP, 1201 Third Avenue, 40th Floor, Seattle, Washington, 98101,
    for Immunex Corporation.
11
    APPEARING FOR OBJECTORS:
12
         DONALD E. HAVILAND, ESQ. and MICHAEL J. LORUSSO, ESQ.,
13  Haviland Hughes, LLC, 111 S. Independence Mall East, The
    Bourse, Suite 1000, Philadelphia, Pennsylvania, 19106.
14
         JOHN J. PENTZ, ESQ., Class Action Fairness Group,
15  2 Clock Tower Plaza, Maynard, Massachusetts, 01754.

16       RICHARD F. LANDRIGAN, ESQ., Costello & Landrigan,
    421 Highland Avenue, Davis Square, Somerville, Massachusetts,
17  02144.

18

19

20

21

22

23

24

25

1                           I N D E X

2     EXHIBITS                DESCRIPTION        RECEIVED IN EVIDENCE

3

      1          Medical Records, JM
4

      2          Medical Records, GT
5

      3          Albuterol box                           108
6

      4          Chart – Drugs Analysis for Proposed
7                Track Two Settlement – Known Examples
                 of Spreads > 30%
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

78515059-b96c-4759-a8be-bdac2ac3c612

1          P R O C E E D I N G S

2          THE CLERK:  Court calls Civil Action 01-12257,

3    In Re:  Pharmaceutical Industry Litigation.  Could counsel

4    please identify themselves for the record.

5          MR. MATT:  Good morning, your Honor.  Class counsel

6    Sean Matt from Hagens Berman Sobol Shapiro.

7          MR. NOTARGIACOMO:  Good morning, your Honor.  Ed

8    Notargiacomo from Hagens Berman Sobol Shapiro for plaintiffs.

9          MR. WEXLER:  Good morning.  Ken Wexler, Wexler

10   Wallace, for the plaintiffs.

11         MR. MACORETTA:  Good morning, your Honor.  John

12   Macoretta from Specter Roseman Kodroff for plaintiffs.

13         MR. EDELSON:  Good morning, your Honor.  Marc Edelson,

14   Hoffman Edelson, for the plaintiffs.

15         MR. HAVILAND:  Your Honor, Don Haviland, Haviland

16   Hughes.  With me is Michael Lorusso, individual counsel for

17   certain named plaintiffs:  Reverend David Aaronson individually

18   on behalf of his wife's estate; Joyce Howe --

19         THE COURT:  Well, is he here, Reverend Aaronson?

20         MR. HAVILAND:  He is not, your Honor.

21         THE COURT:  Oh, I thought you said he was.  I'm sorry.

22         MR. HAVILAND:  No.  I'll just shortchange it.  It's

23   individuals and their estates, your Honor:  the Aaronsons, the

24   Howes, the Youngs, Mary Wright for the Shepleys, Mrs. Carter,

25   Mr. Clark, Mrs. Walters, Mrs. Bean, Pat Truett for her father,

1    Mr. Monk, Oral Roots, Rebecca Hopkins, and Beverly Shaw for her

2    father, Mr. Thomson.

3              THE COURT:  Thank you.

4              MR. HAVILAND:  Thank you.

5              MR. MORGAN:  Peter Morgan for Baxter.

6              MR. MUEHLBERGER:  Good morning, your Honor.  Jim

7    Muehlberger for Aventis Pharmaceuticals

8              MR. BARLEY:  Steven Barley for Amgen.

9              MR. KOON:  Michael Koon for Aventis.

10             MS. TABACCHI:  Tina Tabacchi for Abbott Laboratories.

11             MR. EVERETT:  Clay Everett for Pharmacia.

12             MR. PALERMO:  Chris Palermo for Dey, your Honor.

13             MR. MATTHEWS:  Good morning, your Honor.  James

14   Matthews for Watson.

15             MR. DeLANCEY:  Merle DeLancey for Baxter.

16             MR. PARISH:  Good morning.  Jason Parish for Sicor.

17             MR. SPAULDING:  Good morning, your Honor.  Douglas

18   Spaulding for Fujisawa.

19             MR. RASKIN:  Richard Raskin for Bayer Corporation.

20             MR. PENTZ:  Good morning, your Honor.  John Pentz on

21   behalf of class members John J. Pentz, Jr. and Corinna Connick.

22             MR. LANDRIGAN:  Good morning, your Honor.  Richard

23   Landrigan representing objector Patricia Weatherly.

24             THE COURT:  All right, thank you.

25             THE CLERK:  You may be seated.

1           MR. MATT:  Your Honor, we have a presentation for you
2      if you'd like us to proceed.
3           THE COURT:  Yes, thank you.
4           MR. MATT:  Okay, and I have some PowerPoints I can
5      hand up.
6           THE COURT:  Good morning to everyone.  I was worried
7      I'd lose some of you in the bad weather.  Well, actually, I
8      can't ask am I missing anyone because the person wouldn't poke
9      up, but do we know whether there's anyone we're missing,
10     because the fog is intense?
11          THE CLERK:  Ms. O'Sullivan is on the line.
12          THE COURT:  Ms. O'Sullivan?
13          MS. O'SULLIVAN:  Yes, Katie O'Sullivan for defendant
14     Immunex.
15          MR. MATT:  Okay, may it please the Court, once again,
16     your Honor, Sean Matt for class counsel.  We've handed up some
17     slides that will accompany our presentation this morning.  When
18     we were here last before you, you challenged us to go and put
19     together a detailed review of these drugs for your Honor and a
20     detailed review of the discovery that was done because we lived
21     with this case for almost ten years, but you didn't have a
22     trial on the Track Two defendants.  And we understand that, and
23     so what we've done is, we've put together in a summary as many
24     details as we can without overwhelming the Court, we hope.
25          To begin, there are 145 drugs as part of the Track Two

1   settlement.  None were added, none, for the first time when the

2   settlement was first proposed in March of 2008.  There are no

3   85 new drugs as Mr. Haviland has contested in the past.  It is

4   absolutely false.  Moreover, discovery was taken into all of

5   the drugs.  We have put forth specific evidence --

6         THE COURT:  Well, excuse me.  There were five new

7   drugs, you said, or three to five, depending on how you count

8   it, right, at the time of the Fourth Amended Complaint?

9         MR. MATT:  Exactly.  At the time of the Fourth Amended

10  Complaint, which was two years before the settlement was done,

11  there were three new drugs:  Depo-Provera, Eligard, and

12  Trelstar.  This is summarized on Page 6 of our slides.

13        THE COURT:  Okay, so you'll get to that.

14        MR. MATT:  So those were drugs that were neither cited

15  in the Fourth Amended Complaint -- I'm sorry -- cited in the

16  Fourth Amended Complaint for the first time and had not had

17  prior discovery.

18        Now, in our brief and in the slide it says the

19  defendants say that there are two more, Adenosine and

20  Ketorolac.  They have withdrawn that position, your Honor.

21  They do now agree that the only quote/unquote "new drugs" as of

22  March of 2006 were the three drugs:  Depo-Provera, Eligard, and

23  Trelstar.  And I should emphasize, discovery has been done on

24  all three of those drugs since they were added in March of

25  2006.  So, again, no new drugs added at the time of the

1   settlement.

2          THE COURT:  Well, let me ask you this.  I was a little

3   disappointed because there was not detailed discussion of what

4   discovery was done, not just with respect to these three new

5   drugs but those branded injectables, I guess they're called,

6   the branded drugs in Group B.  In fact, the defendants gave

7   sort of some affidavits that were pretty broad just saying

8   there was discovery.  So from the plaintiffs' point of view,

9   how much discovery were you able to do drug-specifically, not

10  the across-the-board discovery into the defendants -- I'm

11  convinced you did that -- but specific to the drug and how it

12  was marketed and priced and that sort of thing?

13         MR. MATT:  I'm sorry if that wasn't clear.  I thought

14  it was.  We did discovery into every one of these drugs.

15         THE COURT:  All the branded drugs?

16         MR. MATT:  Yes, all of their -- not just the branded

17  drugs but the Group B drugs as well.  All of their document

18  production included these drugs.

19         THE COURT:  Just sort of to tip my hat a little bit, I

20  did read whatever I could read that came in, and I have no

21  problem with what happened here on the multi-source because of

22  all the problems that I'm very familiar with.  I felt less

23  comfortable with the branded drugs because you can discern

24  where those came from and we don't have the median problem.  So

25  I wanted to have some -- none of you, defendants or plaintiffs,

1  really detailed how much was done with the branded drugs.

2  Maybe it was a lot, maybe it was a little, I don't know, but it

3  was a very broad brush, "We did discovery."  So are you making

4  a representation to the Court that you individually did

5  discovery into each one of the branded drugs?

6          MR. MATT:  Yes.

7          THE COURT:  The marketing, the spreads, the

8  overcharges?

9          MR. MATT:  Yes.

10          THE COURT:  For each one of the branded drugs?

11          MR. MATT:  Yes.

12          THE COURT:  Okay.

13          MR. MATT:  So not just the branded drugs but all the

14  other drugs --

15          THE COURT:  I understand you did it all, and you did

16  individual discovery into Eligard, Trelstar -- and how do you

17  pronounce the other one?

18          MR. MATT:  Depo-Provera.

19          THE COURT:  Depo-Provera, all right.

20          MR. MATT:  Sure.  And we'll come back to this as well.

21          THE COURT:  All right.  Just it was unclear because it

22  just said, "We did discovery."

23          MR. MATT:  Okay, well, I'm going to tell you right now

24  the discovery that was done into all of the drugs, okay?

25          THE COURT:  Okay.  Yes, but I'm particularly

1    interested in the branded ones.

2         MR. MATT:  Okay.  So we have document productions that

3    are very significant from each of these defendants that covered

4    all of the drugs.  All of those documents were reviewed by

5    plaintiffs.  Pre-settlement, okay, here's what was done for

6    every drug:  The drug itself was reviewed:  its drug

7    description, its route of administration, whether it was

8    inpatient or outpatient, whether it was a low-dollar versus

9    high-dollar drugs -- I'll come back to that in a moment -- the

10   likelihood of significant damages within the Medicare Part B

11   program, pricing information for all those drugs.  And then --

12        THE COURT:  So you calculated spreads or overcharges

13   for each one of the drugs?

14        MR. MATT:  Well, no, because we couldn't calculate

15   spreads for a good portion of the Group B drugs because of the

16   multi-source problem.

17        THE COURT:  All right, so other than the multi-source,

18   I understand that.  That's a serious issue.  I agreed with

19   their analysis on that.  But with respect to the branded drugs,

20   did you calculate spreads and overcharges?

21        MR. MATT:  We calculated spreads and overcharges for

22   almost half of the branded drugs.

23        THE COURT:  There are 22 branded drugs?

24        MR. MATT:  Yes.  And for the ones that we didn't,

25   there was a reason, and I'm going to go through each of those

1    drugs drug by drug with you in a moment.

2            THE COURT:  Perfect.

3            MR. MATT:  But I want to make sure I get my foundation

4    laid for the discovery on a broader brush stroke first.

5            So in addition to the individual drug-specific

6    discovery, there was also general discovery done into every

7    defendant, and that general discovery kind of falls under the

8    categories of sales and marketing activity, including whether

9    there was any spread marketing.  And that latter part, spread

10   marketing, was also looked at on a drug-by-drug basis.  We

11   didn't always find it, okay, and in fact for --

12           THE COURT:  Well, that's relevant too, but did you

13   find it in some of them, some of the drugs?

14           MR. MATT:  We did, and we found it primarily for most

15   of the Group A drugs, and the Group --

16           THE COURT:  Did you find any in Group B?

17           MR. MATT:  Minimal to none, minimal to none, which is

18   another one of those factors as to why --

19           THE COURT:  Yes, it is.  Just what I didn't get in

20   this was the drug-by-drug.  So, you know, it was in general, so

21   that's why I'm asking now.

22           MR. MATT:  Okay, we'll take you through some

23   drug-by-drug examples and show you where we put that

24   information in the record.  With the government investigations

25   and what was done by government investigating bodies, we looked

1    at corporate-wide policies.  We looked at communications with

2    physicians, communications with publishers.  It was a very

3    thorough discovery, and that really is reflected, your Honor,

4    on Page 5 of our slides, which we call the Track Two discovery

5    metrics, in which we basically summarize for each defendant the

6    number of pages that they've produced and we've reviewed,

7    whether transaction data was provided and reviewed, and whether

8    depositions were taken.  And we reviewed over 12.7 million

9    documents.  We took 124 depositions of these Track Two

10   defendants.  This is all the work that you haven't seen because

11   we haven't had a trial, even though we did have motions for

12   class certification in Class 2.  That's another reason why the

13   lodestar is so high, your Honor.  There was a ton of discovery

14   that was done.

15          Slide 6, you've already covered the stricken drugs.

16   Now let's look at the drugs and break them out by group.  The

17   Group A drugs, there's seven --

18          THE COURT:  Excuse me.  What?  Yes, do you have an

19   extra one for my law clerk because she's trying to follow that

20   as well?

21          MR. MATT:  Oh, I thought I handed two up.

22          THE COURT:  It's very possible you did.  Here, you

23   did.  I thought they were different ones.  That's fine.  Thank

24   you.

25          MR. MATT:  No problem.  Okay, on the Group A drugs,

78515059-b96c-4759-a8be-bdac2ac3c612

1    these are seven brand-name drugs:  Aranesp, Epogen, Neulasta,

2    Neupogen, Anzemet, Ferrlecit, and InFed.  We found --

3              THE COURT:  Now, wait.

4              MR. MATT:  This is on Page 7 of the slides.

5              THE COURT:  Did you jump over 6, I take it?

6              MR. MATT:  I did because we already covered those.

7    Those were those stricken drugs, your Honor.

8              THE COURT:  All right.

9              MR. MATT:  Most of the Group A drugs had the following

10   characteristics:  They were all single-source brand drugs, so

11   easily identifiable.  Most of them have high spreads:  The

12   Aranesp spreads, for instance, growing to over 40 percent;

13   Neulasta spreads, over 60 percent; Anzemet, the spreads grew

14   over 300 percent; Ferrlecit, spreads between 70 and 80 percent;

15   and InFed spreads were over 70 percent.  For some of these

16   drugs, the spreads increased over time, another one of the

17   liability factors your Honor found at the end of the

18   Massachusetts trial.  Aranesp, Anzemet, Ferrlecit, InFed, they

19   all had increases of spread over time.

20             We found that these drugs had significant damages:

21   Aranesp, $23.6 million; Neulasta, $24.4 million; Anzemet,

22   $215 million; Ferrlecit, $31 million; and InFed, $20 million.

23             We also, your Honor, found specific substantial spread

24   marketing evidence for Amgen on Aranesp, Neulasta, Neupogen;

25   Aventis for Anzemet; and the two Watson drugs, InFed and

Case 1:01-cv-12257-PBS   Document 7747   Filed 08/15/11   Page 15 of 139

Page 15

1    Ferrlecit.  We also had substantial Medicare Part B

2    reimbursements for these drugs.  The one exception was Epogen,

3    and I will come back to that later, your Honor.

4              Now, turning to the Group B drugs, most of these,

5    80 percent of them are multi-source, which means we have the

6    J-Code identification challenges and the median price analysis

7    challenges that your Honor is very well acquainted with.  In

8    addition, many of them have low Medicare Part B utilization,

9    another factor we looked at in classifying them into Group B.

10   72 of the drugs are predominantly for inpatient use which is

11   not reimbursed by --

12             THE COURT:  And these are the multi-source?  72 are

13   the multi-source?

14             MR. MATT:  That's right.

15             THE COURT:  Or 72 of all Group B?

16             MR. MATT:  72 of all 138 Group B, predominantly for

17   inpatient use.  What does that mean?  It has a low impact on

18   Medicare Part B.  There's Medicare Part B reimbursements for

19   them.  That's why they're included in the settlement, and we'll

20   explain that in more detail, but that's a factor as to why

21   they're Group B.  Another factor --

22             THE COURT:  But can I just say, from my point of view,

23   it may have been totally appropriate to stick it in Group B as

24   a lower priority, I'm sort of roughly viewing, because either

25   there's a liability problem or a low damage problem, I

78515059-b96c-4759-a8be-bdac2ac3c612

1    understand that, as to how you allocated among the groups and

2    the classes, but I also have to think about liability.  There

3    may be certain things in Group B which are low damages but for

4    which there's high liability.  So that's what I'm thinking

5    about, and it wasn't clear to me as we went through.

6             MR. MATT:  Okay, we're going to go through some of

7    that as well because that is a factor we looked at

8    specifically.

9             Many are inexpensive drugs resulting in really low

10   damage, sticking with the damage theme for a moment.

11   Dr. Hartman said we have 68 J-Codes with a per-transaction cost

12   of $5 or less.

13            THE COURT:  Were any of those the branded?  Oh, these

14   were all the J-Code, the multi-source ones?

15            MR. MATT:  Correct, these are multi-source.

16            THE COURT:  All multi-source.

17            MR. MATT:  86 J-Codes with a per-transaction cost of

18   $10 or less.  So 46 percent of all the Group B drugs are what

19   we would categorize a low-dollar value drugs.  Like I've

20   mentioned before, no specific spread marketing evidence.  And

21   then with respect to the 22 single-source drugs in Group B, the

22   spreads tend to be small, and let's look at some of those

23   examples now.

24            THE COURT:  Now, do you have a slide that talks about

25   the single-source branded drugs?

1             MR. MATT:  I don't.  Do you happen to have

2      Dr. Hartman's declaration with you, your Honor?

3             THE COURT:  I think we do.

4             MR. MATT:  Okay.

5             THE COURT:  That would be great.

6             MR. MATT:  And I'm going to take you through a table

7      in there that's going to give you the details that you're

8      looking for.  Okay, so let's take some examples of the

9      brand-name drugs.  So I'm going to refer your Honor to Table 3

10     of the Hartman declaration.  This is where Dr. Hartman put

11     together a really useful summary of information on each of

12     these drugs in Group B.  We have the drug name, the route of

13     administration, the description of the drug, whether there are

14     multiple J-Codes, whether the drug is single- or multi-source,

15     whether it's self-administered or inpatient.  We also, with the

16     benefit of the CMS database, now are able to determine how many

17     claims were filed for a specific drug, what the total amount of

18     payments -- co-payments, that is -- in the database were, and

19     then the average payment per transaction.

20            So let's take some of these Group B drugs and look at

21     them in greater detail as you'd like to do.  AccuNeb is the

22     first drug, okay.  We have multiple J-Codes for that, although

23     it is a single-source drug.  The average member payment per

24     transaction is $22.88, so it's not a very expensive drug.  It

25     looks like this was competing with albuterol sulfate, which is

1    a drug I believe you're familiar with from the Massachusetts

2    trial.

3              THE COURT:  Yes.

4              MR. MATT:  And the spread information, calculated

5    spreads based on wholesaler data are below 30 percent.

6              THE COURT:  Now, one of the criticisms was that some

7    of the direct-to-physician sales wouldn't have wholesaler data.

8    Is that this one?

9              MR. MATT:  That is a criticism that has been raised

10   with respect to part of Ray's analysis of the brand-name drugs

11   in Group B.  Our response to that and Dr. Hartman's response to

12   that is, he looked at not only the wholesaler data, but he did

13   look at the average sales price data that was provided to the

14   government as part of the Medicaid rebate program.  So he has

15   two basic sets of data that he's looking at, and he pretty much

16   is using the Medicaid ASP data as kind of a reality check on

17   what you've seen in the wholesaler data.

18             THE COURT:  But you say -- this is one thing I didn't

19   understand.  Is AccuNeb something sold by wholesalers?

20             MR. MATT:  Yes.

21             THE COURT:  And so your argument here is then that the

22   calculated spreads based on wholesaler data are all below

23   30 percent?

24             MR. MATT:  That's correct.

25             THE COURT:  All right, so we have 22 of these, right?

Page 19

1          MR. MATT:  Correct.  You want to go through each of

2     them?

3          THE COURT:  Yes.

4          MR. MATT:  Okay.  Next up would be Aromasin.  That's

5     Line 16.

6          THE COURT:  Okay, 16.

7          MR. MATT:  Okay.  It's a chemotherapy drug.  It's

8     single-source.  Spreads based on wholesaler data are below

9     30 percent.

10          THE COURT:  And, once again, this is something not

11     sold directly to the physician; it's sold through wholesalers?

12          MR. MATT:  I believe so.

13          THE COURT:  Because would it be generally true, if

14     something is self-administered, it would be something not going

15     through the physician?

16          MR. MATT:  It depends on -- I do recall some drugs,

17     for instance, in Track One that would have been sold straight

18     to the physicians.  But Dr. Hartman, if he's using a wholesaler

19     spread, then he believes it's going to be a reasonable

20     facsimile for spreads.

21          THE COURT:  Okay.  All right, the next one?

22          MR. MATT:  Azmacort, Line 18.  It's an inhalation

23     aerosol, a steroid; it's single-source; it's self-administered.

24     It's a very low dollar amount drug.  The average payment in the

25     database, the average copayment is $1.18.

1          THE COURT:  So we don't have the spreads on this?

2          MR. MATT:  We don't have the spread on that one

3    because it was such a low-dollar one.

4          THE COURT:  Well, no, wait a minute.  I need to stop

5    you there.  So as I understand it, what happened here is, if

6    the dollar amounts were small enough, you made the economic

7    decision not to check on the spreads?

8          MR. MATT:  I think that's accurate for the most part

9    with respect to a handful of these 22, yes.

10          THE COURT:  So we don't know much about whatever this

11    is called, Azmacort, other than that the average member payment

12    per transaction is quite small?

13          MR. MATT:  And this other information appearing in the

14    table.

15          THE COURT:  Well, yes, but that doesn't help me on

16    liability.  We know nothing about liability on this one?

17          MR. MATT:  Right.  Well, we also know that we didn't

18    find any spread marketing evidence either, and that's a

19    liability factor as well.

20          THE COURT:  Yes, but let me just -- that is true, that

21    is true, and it sort of went to if doubled or trebled or the

22    like; but the most important thing, the most important thing

23    was the spread, the overcharge.

24          MR. MATT:  And we don't have it for this one.

25          THE COURT:  Okay, okay.

1          MR. MATT:  The next one, Calcijex.

2          THE COURT:  What's it called?

3          MR. MATT:  Calcijex, Line No. 25.

4          THE COURT:  All right.

5          MR, MATT:  It is an injectable, active form of

6    vitamin D.  It has two J-Codes and multi-brand starting in

7    2001, and wholesale data spreads are below 30 percent.

8          THE COURT:  Was that before or after 2002?

9          MR. MATT:  That would be -- that calculation would

10   have been done -- I think he's looking at multiple time periods

11   when he's doing that.  I don't have the dates in front of me,

12   but I think it's probably before and after.

13         THE COURT:  So all spreads before and after it went

14   multi-brand were below 30 percent, or you have to check?

15         MR. MATT:  That's what he's saying, but, again, once

16   it goes multi-brand --

17         THE COURT:  It's not clear what he's saying.

18         MR. MATT:  -- the spread analysis doesn't apply.

19   Actually, you have to go into the median analysis.

20         THE COURT:  Right, so --

21         MR. MATT:  So I suspect that with the dates he's

22   looking at when he calculated the wholesaler spreads might --

23   it's a guess, so I'm not going to say because it's a guess.  I

24   think he's looking at a time period that is going to be both

25   before and after it goes generic.

1          THE COURT:  So you're going to check on that for me

2      just to make --

3          MR. MATT:  Okay, Calcimar, that's our next one,

4      Line 26.  This is a multi-source drug.

5          THE COURT:  Well, we don't want that.  We just want

6      the branded, right?

7          MR. MATT:  Yeah, well, these are -- it's a brand name.

8      Some of them are branded generics, and where we have branded

9      generics, I'll point that out, so --

10         THE COURT:  I don't really care here because this is

11     the median analysis, right?

12         MR. MATT:  Correct.

13         THE COURT:  Okay.

14         MR. MATT:  The next one is Camptosar, Line 27.  That's

15     a single-source.  Wholesaler data spreads are almost all below

16     30 percent, almost all.  I think this is one of those drugs

17     where he may have had a couple of NDCs over a couple time

18     periods above 30 but below 40.  He had a couple of drugs.  It's

19     in his declaration.

20         THE COURT:  Well, are any of them the spreads at the

21     same level as some of the Group A drugs?

22         MR. MATT:  No, no, we're not seeing any spreads like

23     that in any of these branded drugs, nothing in the order of 60,

24     70, 80 percent.  Let me just reference this paragraph in his

25     declaration because you obviously want the record cite.

1          THE COURT:  This is in the Hartman declaration?

2          MR. MATT:  Yes, it is.  Okay, Paragraph 44, he says,

3     if they're not below 30 percent, they're only slightly above

4     30 percent.  Okay?  So you're not seeing anything like you

5     would see in a Group A drug.

6          Okay, our next drug is Cefizox.  It's Line 29.  And

7     this is a single-source drug used for treating pneumonia.  It's

8     primarily an inpatient drug.  We only have a handful of CMS

9     transactions, 174.  It's also a low-dollar amount drug, $7.30

10    co-pay.

11         THE COURT:  But just to be clear, you don't know the

12    spread on this?

13         MR. MATT:  We don't have the spread on this one,

14    that's correct, we don't.

15         THE COURT:  So when Dr. Hartman says that, there are

16    some he just doesn't know?

17         MR. MATT:  Right, and that's why he qualified that in

18    his paragraphs that relate to --

19         THE COURT:  Now, who manufactures Azmacort?

20         MR. KOON:  That's an Aventis drug, your Honor.

21         THE COURT:  Aventis?  And who makes Celvox (Sic)?

22         MR. MATT:  Which drug, your Honor?

23         THE COURT:  The one you just talked about.

24         MR. MATT:  Cefizox?

25         THE COURT:  Is it Celvox or something?

1          MR. MATT:  Cefizox?  I'm sure I'm butchering the

2     pronunciation on a lot of this.

3          THE COURT:  Who makes that?

4          MR. MATT:  I can look up the manufacturer.

5          MR. SPAULDING:  Your Honor, that's a Fujisawa drug.

6          THE COURT:  Fujisawa?  Okay, thank you.

7          MR. MATT:  Okay, picking up with where we left off, we

8     are now up to Cipro, Line 32, subject to a median analysis

9     starting in 2004.  It's primarily an inpatient drug, low CMS

10    count, low average member payment, and --

11         THE COURT:  But what about --

12         MR. MATT:  -- no spreads calculated prior to 2004 or

13    after 2004.

14         THE COURT:  So we don't know the spreads on Cipro

15    before 2004?

16         MR. MATT:  Correct, subject to the median analysis

17    after 2004.

18         THE COURT:  And who manufactures Cipro?  I should know

19    that.  Bayer?

20         MR. MATT:  It's a Bayer drug, your Honor.

21         MR. RASKIN:  Your Honor, Bayer was the innovator, but

22    there will be --

23         MR. MATT:  Abbott also, your Honor.

24         MR. RASKIN:  Following 2004, there would also be --

25         MR. MATT:  Including defendant Abbott.

1           All right, next drug, Depo-Provera, it is another one

2    of these --

3           THE COURT:  Now, this is a brand-new one, right?

4           MR. MATT:  This is brand-new.  It was added in March

5    of 2006.

6           THE COURT:  Okay.  But you did do discovery on it?

7           MR. MATT:  Yes.  It is single-source.  It's

8    injectable.  It has a relatively small CMS transaction count

9    and a small average member payment of $7.29.  This is another

10   one where we don't have the wholesaler data.

11          THE COURT:  So we don't know?

12          MR. MATT:  So we don't know.

13          The next drug, Eligard, Line 49, we know a fair amount

14   about this drug.  This is basically a competitor to Lupron.  It

15   entered the market in 2002.  It shares a J-Code with Lupron,

16   and the wholesaler spreads are below 30 percent for a vast

17   majority of the quarters, as per Ray Hartman.

18          THE COURT:  And for the ones that they're not below,

19   how far above are they?

20          MR. MATT:  Again, they're going to be minimally above,

21   pursuant to Ray's testimony, nothing like what you see in the

22   Group A drugs.

23          THE COURT:  Any spread marketing?

24          MR. MATT:  No, we've not found -- minimal spread

25   marketing or no spread marketing for Eligard.  It's also -- you

1   know, it was introduced in 2002 after the AWP cases were filed,

2   number one.  Number two, there's a problem with it because it

3   shares a J-Code with Lupron.  So in the data, you're getting

4   Lupron and Eligard numbers both.  You understand that part?

5          THE COURT:  You did say that, but I didn't understand

6   why the significance of that.  In other words, if it's just a

7   question of identifying who's a class member, one could just

8   simply say, give me more documentation.

9          MR. MATT:  We could on that one.  Exactly, we could.

10  The point I was making was, we have 13,873 claims in the

11  database under that J-Code.  I don't know of those 13,873 who's

12  Eligard, who's Lupron.

13         THE COURT:  Right, so I understand that for purposes

14  of not understanding how much out of the pot would come because

15  obviously Lupron is excluded and not Eligard, but let me go

16  back.  For me, the small dollar amount doesn't -- is very

17  relevant to you in deciding how to allocate between the pots,

18  but it's not necessarily relevant to me on whether or not

19  there's liability, on whether there's a strong case for

20  liability, so I'm trying to get a sense of it.  You're

21  representing to me, no, there isn't because there's very

22  little, if any, spreads?

23         MR. MATT:  Right, all of these other factors.

24         THE COURT:  And you've done the discovery?

25         MR. MATT:  Correct.

1           THE COURT:  So minimal, if any, spread marketing

2     evidence, very little spread between the AWP, is that right --

3           MR. MATT:  That's correct.

4           THE COURT:  -- and the actual sales price?

5           MR. MATT:  That's correct.

6           THE COURT:  Okay.

7           MR. MATT:  Ellence is the next drug.

8           THE COURT:  How do you spell it?

9           MR. MATT:  E-l-l-e-n-c-e.

10          The court:  Oh, the next one down.  If you could give

11    me the number, it would be useful because otherwise --

12          MR. MATT:  Yes, I'm trying to find it right now.

13          THE COURT:  No. 50.

14          MR. MATT:  That's No. 50.  It's the next one on the

15    list.

16          THE COURT:  The next one.

17          MR. MATT:  It's single-source, it's injectable, and

18    the wholesaler spreads are almost all below 30 percent based on

19    Ray's check.

20          THE COURT:  All right.

21          MR. MATT:  The next drug is Enbrel, which is Line 52

22    at the bottom of this page.  This is another one of those

23    minimal CMS datas.  It's single-source.  We only have 466

24    claims in the database, and it's a low member --

25          THE COURT:  But we don't know?

1          MR. MATT:  No, we don't have a spread.

2          The next one, Idamycin -- and that is going to be on

3     Line 70 -- this is an injectable.  It went multi-source

4     starting in 2003; a small number of transactions, very small,

5     57 in the database.

6          THE COURT:  We don't know what the spreads are?

7          MR. MATT:  Not prior to 2003, no.  Afterwards it's

8     subject to the median analysis.

9          The next drug is Leukine, Line 82.  It's a

10    single-source drug.  Wholesaler data spreads are below

11    30 percent for the vast majority of NDC quarters.  This is also

12    one of those drugs that Immunex sold the marketing rights to in

13    2002, so we are proposing in our redistribution proposal to cut

14    off any claims coming in after 2002 for that drug because a

15    non-defendant sold it.

16         Lovenox is the next drug, Line 87.  It's

17    single-source, and wholesaler spreads are almost all below

18    30 percent.  It's also a low average member payment per

19    administration at $11.29.

20         Mithracin is the next one, Line 98.  It's

21    single-source, only nine claims in the database, so the

22    wholesaler spreads were not pulled and calculated for that.

23         Novantrone is next.  108 is the line number,

24    single-source.  Wholesaler spreads are almost all below

25    30 percent.  It's another one of those Immunex drugs that were

1    sold in 2002, so we're not going to honor any claims after 2002

2    for it.

3              Prograf is the next drug, and that is on Line 115.  We

4    went to multi-brand in 2001.  Spreads were all below

5    30 percent.

6              Taxotere, Line 126, single-source.  Spreads range from

7    29 to 35 percent, so they're low.  Ray actually has a little

8    added piece on Taxotere on Page 46 of his declaration where he

9    says that "Even though some spreads do range up to 35 percent,

10   given the 30 percent yardstick and the Medicare reimbursement

11   rate of AWP minus 5 percent, these spreads would result in zero

12   damages."

13             Thioplex, the next one -- and it's on Line 127 -- it

14   went multi-source as early as 2001 and subject to the median

15   price analysis beyond that.  I do not believe we calculated

16   spreads for that one prior to 2001.

17             Trelstar, Line 131, we had only 31 transactions in the

18   database, and Ray didn't calculate spreads on Trelstar.

19             THE COURT:  Now, this is one of the ones that was late

20   added.  Did you see --

21             MR. MATT:  In March --

22             THE COURT:  Did you see any spread marketing on this?

23             MR. MATT:  Not for Trelstar.

24             THE COURT:  I mean, in other words, this is one of the

25   ones I struck, so you did do discovery on it?

1        MR. MATT:  Yes, there was discovery done on it, but no

2   spreads were calculated on it.

3        THE COURT:  No spreads, okay.

4        MR. MATT:  And then Zemplar in Line 137, it's listed

5   as a single-source, but it actually did face generic

6   competition in 2001, and wholesaler spreads were almost all

7   below 30 percent, per Ray.

8        Now, in addition to those brand names or branded --

9        THE COURT:  Let me just -- so of these, if we can just

10  recap here, it looks like you've got evidence there was no

11  liability except for -- I'm counting -- nine?  Did I miss one?

12       MR. MATT:  That sounds about right.

13       THE COURT:  All right, on nine we just don't know.  We

14  know that there are small amounts of claims put in, but we

15  don't know on these nine drugs whether some of them were huge

16  spreads or not.  We just don't know.

17       MR. MATT:  We don't, but there's also other factors in

18  that.  You know, there's low Medicare utilization, no damages.

19       THE COURT:  Yes, but I'm talking about for the

20  individual human being.  I understand that there's -- so I'm

21  trying to figure this out, how big a deal, because on the

22  others you said the spreads were either below 30 percent or

23  only minimally above it and sometimes only for a short course,

24  so I understand why you think there's almost no liability.  I

25  threw out of some of those claims.  That makes sense to me.

1    But now I'm talking about the ones where we don't know.  So

2    even if it's only for nine people, it could be that there were

3    spreads of 600 percent, right?

4         MR. MATT:  I just don't know --

5         THE COURT:  I'm making it up, but --

6         MR. MATT:  It's doubtful, but we don't know, you're

7    right.

8         THE COURT:  We don't know.  How big a deal is it to

9    calculate it?  Aren't there published at this point AWPs and

10   ASPs?  It seems sort of simple to do.  Am I missing something?

11        MR. MATT:  No, we could have him do it.

12        THE COURT:  Let me ask you this:  For the companies

13   that manufactured these drugs, have you all done the spreads?

14   Can you put in affidavits?

15        MR. KOON:  Your Honor, for example, Azmacort, which I

16   think may have been one of the first ones where the Court was

17   attracted to it, that's a self-administered drug.  There aren't

18   any spreads.  It's not sold the same way that some of the

19   problematic drugs are.

20        THE COURT:  Well, there are spreads because it depends

21   on what somebody paid for -- you know, what the AWP is, what

22   the reimbursement was and what the co-pay was.  So, I mean, how

23   much was the average sales price versus how much was the AWP is

24   the spread or the overcharge, depending on how you calculate

25   it.  So did you do them?

1              MR. KOON:  I mean, we can provide data with regard

2     particularly to Azmacort.  It's --

3              THE COURT:  Sure, I'm only asking people to do -- some

4     way or another I need to find that there's no liability, or

5     minimal liability, to put this in Class B as opposed to the

6     large spreads in Class A; and I'm not quite sure how to do

7     that, what's the most efficient and effective way.  What are

8     the years that we're talking about?  I forget, 19 --

9              MR. MATT:  The years?  We went back into 1992.

10             THE COURT:  1992 till when?

11             MR. MATT:  Yes, but your order I think applies to '97.

12    It starts in '97 to 2003.

13             THE COURT:  Were heartland?  I just can't --

14             MR. MATT:  Yes, that's the heartland.

15             THE COURT:  Right.  And then we went back to 1992,

16    right?

17             MR. MATT:  Yes.

18             THE COURT:  And we brought it forward to the present

19    date?

20             MR. MATT:  We brought it forward to 2005, I want to

21    say.

22             THE COURT:  I couldn't remember.  All right, I'm sure

23    it's in one of these many pages.  Okay, thank you.

24             So we know -- I just want to make it clear on the

25    record, right -- that with the multi-source drugs, the

1  overwhelming majority, some of them are branded, some of them

2  aren't, most of them aren't, but we also have multi-source

3  biologics; and all of those, just so I make sure I'm

4  understanding correct, are where the pricing is based on a

5  median, so there are both very difficult pricing issues and

6  identification issues as to who took what?

7          MR. MATT:  That's correct.

8          THE COURT:  And on the branded ones, which were much

9  easier -- you can tell exactly what people took for the most

10 part -- you've calculated all but nine to show that there's no

11 significant liability?

12         MR. MATT:  That's correct.

13         THE COURT:  On the others, the reason you put them

14 into B, just so I'm understanding, is not because you've made

15 an assessment as to liability; it's because you've made an

16 assessment that the dollar amounts are likely to be low because

17 there are so few claims based on the CMS data.  Is that right?

18         MR. MATT:  That is right, but we would call that part

19 of the liability analysis when you look at all the factors.

20         THE COURT:  See, but as far as I'm concerned, even if

21 there are only fifty people who had an overcharge of

22 500 percent, I'm thinking about whether it's fair to give them

23 the pro rata allocation rather than the double damages, even if

24 they're just a handful.  That's my thought process over the

25 weekend, you know, how to take care of them.  There may be none

1    because we just don't know, right?  So far you've persuaded me,

2    at least for the ones you went through, that there's no such

3    liability.  So my thought process, is there another kind of

4    drug in Part B that creates that kind of a problem?

5              MR. MATT:  No, and what I was about to go into next,

6    but I think you've just recognized it, is that there are a

7    bunch of quote/unquote "branded drugs" that are actually

8    biologics that are multi-brands, and those are subject to a

9    median analysis.

10             THE COURT:  Okay.

11             MR. MATT:  And I was going to call those out because

12   there was an objection to those raised by Mr. Haviland.

13             THE COURT:  Now, when you say there are very few

14   claims, I know we gave direct mail notice with the Group A

15   drugs.

16             MR. MATT:  Correct.

17             THE COURT:  But we gave a media blitz for the Group B,

18   is that right?

19             MR. MATT:  That's correct.

20             THE COURT:  So when we say there are very few claims

21   for the Group B, it has a little bit less -- I'm not saying

22   there's a problem for due process.  There were huge cost

23   issues, huge.  That having been said, the claims analysis is a

24   little less compelling simply because we didn't do direct mail,

25   right?

1          MR. MATT:  It is not the same.

2          THE COURT:  It's not the same.

3          MR. MATT:  I think you recognized it perfectly.  It

4    does comport with due process nonetheless, and there was a huge

5    outreach made for publication, but it's not the same thing.

6          THE COURT:  Right.  In Class 3, on the Group A drugs,

7    did we do direct mail to the extent we had the addresses from

8    the independent settling health plans?  I think we did, right?

9          MR. MATT:  Yes, we did a direct mail component.

10         THE COURT:  Did we do that for A and B?

11         MR. MATT:  And to be more precise, let me look it up

12   because I have the answer right here.

13         There was direct mail provided to about 897,000

14   individual Class 3 members based on data provided, ISHP.

15         THE COURT:  Was it just Group A drugs or also Group B

16   drugs?  I couldn't figure that out.

17         MR. MATT:  We think they're all drugs.  I think

18   they're all drugs.

19         THE COURT:  They were all drugs.

20         MR. MATT:  For Class 3, yes.

21         THE COURT:  So that might be a good proxy actually.

22   Did you get a lot of claims in the Class 3?

23         MR. MATT:  If I remember correctly --

24         THE COURT:  You know, you don't have to -- you're so

25   tall -- you don't have to bend over.  Just bring it up.

1         MR. MATT:  I have so many data sources over here, I

2    just want to make sure they're at my fingerprints.

3         THE COURT:  Whatever you want.  It just looks so

4    uncomfortable.

5         MR. MATT:  Your Honor, my recollection is that there

6    were about 20,000 claims in the Class 3 database.

7         THE COURT:  But what about -- do you remember how many

8    of those were Group B?

9         MR. MATT:  I think I might -- let me check our claims

10   administrator's declaration and see if we can determine for

11   Class 3 the Group A/Group B drug split.

12        I can't tell you that.

13        THE COURT:  I couldn't figure it out, but there are so

14   many volumes of pages, I just wasn't sure whether I missed it.

15        MR. MATT:  I don't have that statistic handy.

16        THE COURT:  So in some ways we did better notice for

17   Class 3 in the sense that we gave direct notice for Group A and

18   B, direct mail notice to the extent we had their addresses from

19   the independent settling health plans.

20        MR. MATT:  I don't know if I would use the word

21   "better" but --

22        THE COURT:  Non-media, I mean direct mail, which is

23   the gold standard if you can afford it, right?

24        MR. MATT:  Right.

25        THE COURT:  So we didn't, as I understand it, on the

1   Medicare because you persuaded that four out of the five

2   wouldn't be applicable, right?

3           MR. MATT:  I don't think we persuaded you.  I think

4   the TPPs persuaded you.  We actually did propose notice be sent

5   to everyone, and then the TPPs objected, and then you actually

6   agreed with them.  And then we had the Group A --

7           THE COURT:  It was an expense.

8           MR. MATT:  Oh, yes, it was a tremendous expense,

9   there's no doubt.  Do you remember how much?

10          It was, you know, $10 million, at least.

11          THE COURT:  Right, because it would come out of the

12  pot.

13          MR. MATT:  Yes.

14          THE COURT:  So I did a cost/benefit analysis there.

15          MR. MATT:  Which the case law permits you to do.

16          THE COURT:  Right.  So on the independent settling

17  health plans, though, we did send out direct mail, we think?

18          MR. MATT:  Yes.  And it doesn't go to everyone, but

19  the ISHPs cover, I think, 60 percent of all the insureds in the

20  United States, and so it's pretty good coverage.

21          THE COURT:  All right, so where were we?

22          MR. MATT:  All right, so picking back up with where we

23  were, let's close out the presentation regarding branded drugs.

24          THE COURT:  You're going to come back to Epogen,

25  right?

1          MR. MATT:  I am.  Okay, so biologics, multi-brand

2     biologics, okay?  I know that Don Haviland has proposed a lot

3     of these be moved to Group A.  They should not be because they

4     are subject to the median analysis that's in Dr. Hartman's

5     declaration at Paragraph 48, and I'm going to call out the

6     names for you:  Bebulin, Bioclate, Buminate; the Gamimune

7     drugs, which are a group of drugs with the name Gamimune,

8     Gammagard.

9          THE COURT:  Excuse me.  Is this one of the slides?

10          MR. MATT:  This actually is not a slide.  I'm just

11     trying to give you some more details consistent with what we

12     just did with the brands.

13          THE COURT:  All right.

14          MR. MATT:  Helixate, Iveegam, Koate, Kogenate,

15     Monoclate, Mononine, Recombinate, and Prograf.  It's also at

16     Page 12 of our brief for the record, Document No. 7697.

17          So that is, I think, your Honor the details you're

18     looking for on the Group B drugs minus the spreads on, I think

19     you said nine drugs for some of the brandeds.  If you would

20     like us to go calculate that, we can do it.  Just so you know,

21     the reason we didn't is because they had extremely low

22     utilization, and Ray Hartman only had --

23          THE COURT:  Well, let me just ask you to play devil's

24     advocate.  My thought is, let's say you even just had a hundred

25     people but they're paying for some of the same spreads as the

1    Group A, why shouldn't they get the heartland double damages?

2            MR. MATT:  I don't think that the drug will, for the

3    other factors we mentioned, belong in Group A because of the

4    spread marketing and those other factors --

5            THE COURT:  No, but spread marketing is less

6    important.  The most important -- I mean, that might determine

7    for trial whether it's double or treble or that kind of thing,

8    but for purposes of liability, let's assume for a minute, which

9    I'm not, that you have spreads as high as the Group A drugs.

10   Even if there are only ten people, I don't see why they don't

11   get the higher damages.

12           MR. MATT:  If that's the only factor we're going to

13   look at, then I would agree.

14           THE COURT:  The primary factor.

15           MR. MATT:  Yes, if you're going to use it as the

16   primary factor, then I would agree.  Again, I think you do

17   understand we used a lot of other factors as well.

18           THE COURT:  But it might not be such huge damages

19   because there were so few claims.

20           MR. MATT:  I doubt it, very highly doubt it, yes.

21           Okay, that brings us to Slide 10, the reallocation.

22   This is easy.  The TPPs agreed to provide $3.125 million more

23   out of their allocation to the consumers.  That brings the

24   split to 20 percent/80 percent, or $25 million total for

25   consumers, $100 million total for TPPs.  We as class counsel

1    are proposing that additional money go to the Group B drug

2    recovery, and then I'd like to show you in some ensuing slides

3    how that mathematics works out.

4            So Slide 11, the redistribution, here's our new

5    formula.  For the Group A drugs, out-of-pocket damages, I think

6    you understand how that's calculated now:  overcharge ratio

7    times their actual co-pay -- it's in the CMS database -- times

8    two.

9            THE COURT:  Now, I had a question for you there.  Why

10   did you do it for years that weren't in the heartland?

11           MR. MATT:  I think you'll find that most of the years

12   are in the heartland, but we just, you know, decided to keep it

13   in the --

14           THE COURT:  Why?

15           MR. MATT:  Just because of the nature --

16           THE COURT:  That's inconsistent with what I've done in

17   some of the other classes.

18           MR. MATT:  Well, let me see.  BMS I think we looked at

19   from the standpoint of heartland drugs.  I don't think we

20   necessarily looked at heartland period in that that you finally

21   approved.  AstraZeneca, it was heartland period originally, and

22   I think you expanded it to be treble for everything, if I

23   remember correctly, because --

24           THE COURT:  Maybe, because we had the extra money, but

25   here we don't, here's the thing.  I mean, every class is

Page 41

1   different.  Here we don't, so put as a hold because when I do

2   another notice, this is it.

3          MR. MATT:  This is it, yes.

4          THE COURT:  This is it.  All right, so put that in

5   your back pocket the out-of-pocket, why we don't -- in other

6   words, the liability is striking in a certain period of time

7   and it's not so striking in another.  It would free up money

8   for the other class, so I'm just sort of -- I don't want to

9   overpay, and every class is different.  I believe, but your

10  memory is probably better than mine because I have so many

11  other things I'm doing these days, but I think we increased it

12  because there was extra money.  I never want to do a cy pres,

13  so I think it was just to put it back in the pocket of

14  consumers --

15         MR. MATT:  That's what we did in AstraZeneca, correct.

16         THE COURT:  -- rather than have a cy pres.  But here

17  we have a different situation.  You've been so successful in

18  the claims process that we don't have enough money.

19         MR. MATT:  I think we have enough money, but I see

20  your point.  And we can model that.

21         THE COURT:  You can model that, right?

22         MR. MATT:  We can tell you exactly how much more money

23  that will free up.

24         THE COURT:  So the question, maybe we should just do

25  two times for the heartland period and see how much money that

1    leaves us.  And then we multiply it because this is damages,

2    it's not the total out-of-pocket costs, this is damages -- I

3    like that -- times two, right?

4             MR. MATT:  Yes.

5             THE COURT:  All right.

6             MR. MATT:  And then the leftover money for the

7    non-heartland period --

8             THE COURT:  We might pour into the other --

9             MR. MATT:  -- we can put into Group B.

10            THE COURT:  We're rebalancing.  Once I rebalance,

11   we're rebalanced.

12            MR. MATT:  But just so I understand, the non-heartland

13   period, they still get their single damages?

14            THE COURT:  Yes.

15            MR. MATT:  That's what you're proposing?

16            THE COURT:  Yes, yes.

17            MR. MATT:  Got it, okay.

18            THE COURT:  They just have much weakened liability.

19   Plus the out-of-pocket payments for Group B, that's single

20   damages, right?

21            MR. MATT:  That's single out-of-pockets, which are

22   themselves greater than damages.

23            THE COURT:  No, but this is why.  Why aren't we doing

24   damages for them?

25            MR. MATT:  Because we can't.

78515059-b96c-4759-a8be-bdac2ac3c612

1          THE COURT:  Why?

2          MR. MATT:  Because, again, 80 percent of those drugs

3     are multi-source, okay?  So we're now into the --

4          THE COURT:  We can't?

5          MR. MATT:  Exactly, we can't.  We're into the Group B

6     paradigm now, all right?

7          THE COURT:  Okay, so we can't figure out sort of the

8     actual damages?

9          MR. MATT:  With the possible exception of nine brands

10    that we're going to follow up on pursuant to your Honor's

11    request.

12         THE COURT:  Except the nine brands.

13         MR. MATT:  So there we have to go with what data we

14    have, and that's the co-pay.

15         THE COURT:  Well, except, so back up.  We have 22

16    brands.  I mean, theoretically, with the brands you could --

17    because you've done them with the other, with the non -- you've

18    actually calculated damages.

19         MR. MATT:  Yes, we're finding no damage, though, so I

20    think it's more fair to just keep them in the Group B pool and

21    have them participate proportionately.

22         THE COURT:  You're finding no damages, but they're

23    still giving something up would be the theory.

24         MR. MATT:  Correct.

25         THE COURT:  Theoretically they should get less.

Page 44

1          MR. MATT:  Uhm --

2          THE COURT:  If there are no damages, it's like Epogen.

3          MR. MATT:  Well, again, a jury may find differently

4     under 30 percent as well.

5          THE COURT:  I'm not saying you don't get anything.

6     I'm just simply saying theoretically for the branded.  All

7     right, so the question mark is the branded; but here it's out

8     of pocket for 80 percent of the drugs because you can't figure

9     out the damages, right?

10          MR. MATT:  That's correct.

11          Okay, let's talk about Epogen, Page 12.  We are

12     proposing a $5 flat fee per Class 1 claimant and a $50 flat

13     payment per Class 3 claimant.  The record has been built pretty

14     strong on this, your Honor.  Medicare Part B reimburses only

15     for dialysis use at a non-AWP statutory rate.  There are

16     nonetheless some Medicare Part B reimbursements because

17     although physicians are supposed to prescribe Epogen for

18     nondialysis uses, defendants are aware of some instances in

19     which Epogen actually is prescribed, but it is the exception

20     and there are just not many.  In any event, Ray is not finding

21     any actionable spreads for Epogen, pursuant to his calculations

22     in his declaration, except for a very small spread in 2003 --

23          THE COURT:  What was small there?

24          MR. MATT:  I'm going to tell you exactly.  Hold on.

25          Okay, Ray's declaration on Page 14, he has in 2003 a

Page 45

1    spread that is going over 30 percent but less than 34 percent.

2          THE COURT:  So, okay, that's very helpful.

3          MR. MATT:  And he's saying that that's within -- even

4    though it's over 30 percent, it's within the --

5          THE COURT:  So answer this legal question.  I was

6    thinking about this all weekend.  So the question is, if the

7    class is defined as people who purchased or made co-payments

8    for drugs based on AWP, why are the people who are getting this

9    $5 flat fee even in the class because the drugs were not based

10   upon AWP; they were based upon the capitated statutory rate?

11         MR. MATT:  We can't tell from the CMS data --

12         THE COURT:  No, take my hypothetical.

13         MR. MATT:  Oh, I thought you were done.  I'm sorry.

14         THE COURT:  No, if somebody paid based on the

15   capitated rate, they're not in the class?

16         MR. MATT:  That's correct.

17         THE COURT:  Okay, so they shouldn't get a penny?

18         MR. MATT:  Correct.

19         THE COURT:  All right.  So now we've got this problem.

20   How many people took Epogen?

21         MR. MATT:  28,000.

22         THE COURT:  So why can't we -- as I understand it,

23   primarily, anyone using it for dialysis was based on a

24   capitated rate?

25         MR. MATT:  In Class 1.  Leave Class 3 out of it for a

Page 46

1    moment, but, yes.

2            THE COURT:  So in Class 1 -- let's start there -- why

3    can't we ask them what they had it used for?

4            MR. MATT:  We're going to do that with respect to some

5    other drugs; we can do it here.

6            THE COURT:  All right, and so if they did it based

7    upon the statutory rate, they don't get it.  It frees up money.

8    There's no cause of action, there's none.  If someone wants to

9    sue and waste their money or do it based on statutory argument,

10   which I've never heard -- no one's ever flushed it out for me

11   that there's a claim here -- good-bye.  I mean, they're not in

12   the class.  That's the biggest problem I have legally, they're

13   not in the class.

14           Now, Part B is, it's true, there's some spillovers,

15   which is some people actually got Epogen at AWP rates for other

16   things.  That's in Class 1 and particularly in Class 3, right?

17           MR. MATT:  Class 3, it's all AWP-based.

18           THE COURT:  It's all AWP.  So I'm only talking now

19   Class 1, they're not in the class.

20           Now, for Class 3, to the extent it's based upon AWP,

21   you're saying there's only liability in year 2003.

22           MR. MATT:  Right, but then Ray would say there's no

23   damage because to get damages you have to be up over a

24   35 percent spread because of the typical reimbursement rate.

25           THE COURT:  So I'm sort of asking that if somebody,

78515059-b96c-4759-a8be-bdac2ac3c612

1  let's say -- well, now you're confusing me.  I had thought

2  you'd said that there was basically no liability, roughly, in

3  the 30 to 40 or something.  What was the spread?  34 percent

4  was the spread?

5           MR. MATT:  That was the highest, 33 point something.

6           THE COURT:  Right, so that's the same as some of these

7  other drugs.

8           MR. MATT:  Right.  There's a --

9           THE COURT:  All right.  So why wouldn't we just give

10  them what the other Class B people got?  Why are we capping it

11  at $50 flat payment, unless they've done an Easy Pay where they

12  get the $35?

13          MR. MATT:  Right, so you're asking why not include

14  them just as a Group B drug regularly and apply the pro rata to

15  them?

16          THE COURT:  Yes, if they're in the same -- they seem

17  the same as the others.

18          MR. MATT:  Okay, I see what you're saying.  Yes, we

19  can look into that.

20          THE COURT:  I mean, and so they get whatever they get

21  on the pro rata basis.  We take them out of Group 1.  And so

22  there may be more money that can be put in the rebalancing into

23  Part B so it can be higher than 14 percent.

24          MR. MATT:  So Class 1, they have to show documentation

25  that they actually were administered it outside of the dialysis

1    context.  That's all we need from them.

2              THE COURT:  Right.

3              MR. MATT:  We don't need anything else than that, I

4    don't think.

5              THE COURT:  Right.  But my second question, would even

6    the Class 1 people more appropriately be in Group B?

7              MR. MATT:  For those that have the proper

8    documentation, yes.

9              THE COURT:  Because it's always at the 34 percent.

10             MR. MATT:  Yes.  And that's the one answer I don't

11   have for you, and that is, I've never been able to figure out

12   why Epogen was a Class A drug to begin with.

13             THE COURT:  Well, all right, so whatever, this is why

14   we're doing the rebalancing.  This is why I'm now

15   evidence-based.  So basically we have evidentiary support for

16   what we're doing.  This is why I went through this.  I'm sure

17   it was a painful exercise for everybody, but it means that I

18   understand what's happening, whereas last time I didn't.

19             So, now, can I hear from -- who's Epogen?  Just I need

20   to --

21             MR. MATT:  Let me just add one more point.  We'll look

22   at this.  I have some recollection of if you moved everyone in

23   the Epogen -- we looked at moving everyone in the Epogen pool

24   into Group B, and it ends up being a lot of money, but that was

25   before your Honor's suggestion that we make them come forward

1    and prove that they took it for nondialysis use.  So the

2    economic impact --

3           THE COURT:  And, by the way, I'd be happy with an

4    affidavit.  I mean, I'd be happy to say, "Were you on dialysis

5    or not?"  I mean, I'm not here to make them go plunge through

6    the 2,000 -- you know, they're older people.  We've accepted

7    affidavits before.  We've accepted physicians' affidavits.  We

8    can accept receipts.  Really, we can figure this out, like

9    we're doing in that other category --

10          MR. MATT:  Exactly.

11          THE COURT:  -- not otherwise -- what is it --

12          MR. MATT:  Not otherwise classified, NOC.

13          THE COURT:  It's a hassle, but at least we know that

14   people are getting it who deserve it.

15          MR. MATT:  Okay, you want to hear from these guys now?

16          THE COURT:  Yes, I do.  Are you the one -- what's your

17   name again?

18          MR. BARLEY:  Steve Barley.

19          THE COURT:  Yes, I've got you right here, Amgen.  It

20   seems like I can never get away from EPO.  So EPO again is this

21   issue here.  I do not believe that people who took based on the

22   statutory rate are members of the class.  It's almost like an

23   intractable legal problem.

24          MR. BARLEY:  Well, I mean, the class definition I

25   think is broader than AWP-based reimbursement, but --

1        THE COURT:  Well, read it to me.  I don't remember

2    that.

3        MR. BARLEY:  "All natural persons in the United States

4    who from January 1, 1991, through January 1, 2005, made, or

5    incurred an obligation to make, any portion of a Medicare

6    Part B co-payment for a Class Drug manufactured, marketed,

7    sold, or distributed by a Released Company."

8        THE COURT:  We didn't have "based on AWP" anywhere?

9        MR. BARLEY:  Not in that definition.

10       THE COURT:  Oh, I see, that's the requested class

11   definition.

12       MR. BARLEY:  Right.

13       THE COURT:  I see, I see.

14       MR. BARLEY:  Right, but I would say, your Honor --

15       THE COURT:  In all my other classes, don't I say

16   "based on AWP"?

17       MR. BARLEY:  I believe so.

18       THE COURT:  So I missed that little nuance.  Thank you

19   for bringing me to it.  I'm an AWP queen.

20            (Laughter.)

21       MR. BARLEY:  Hopefully that will end soon, your Honor.

22       THE COURT:  Hopefully my reign, I will be deposed like

23   the -- what's it, the Arab Spring? -- you will all depose me,

24   and I will go off and do my own thing.  But the truth at the

25   end of the day is, I know AWP.  That's what I know.  And I had

1    the statutory rate case.  Now, where was that?  Somewhere.

2    That came up in motions to dismiss, was that what happened?

3              MR. BARLEY:  We filed numerous motions to dismiss in

4    this case, and we briefed it extensively in the New York

5    counties case.  And, in any event, there is no liability, in my

6    view, for Epogen based on the statutory rate.  You cannot

7    manipulate a statutory rate.  The reimbursement is set at a

8    flat amount.

9              THE COURT:  Bingo, I agree.

10             MR. BARLEY:  Right.  So, you know, the whole basis of

11   the AWP claim is, the manufacturer somehow manipulated the AWP

12   and raised it or lowered their prices so that there would be --

13             THE COURT:  Right, so if we make this rooted in AWP, I

14   think that protects you.  And I don't want to go into the

15   statutory rate.  You all persuaded me multiple times through

16   excellent advocacy over the course of this that there is no

17   claim based on the statutory rate; and as far as I'm concerned,

18   I don't know that I have ever heard a principled basis for why

19   there is.  It's possible there is out there and no one's

20   presented it to me.  It's possible that there is one.  Just

21   based on my record, I don't have it, and so I'm going to limit

22   this to AWP when you can prove that you used it for a

23   non-dialysis purpose, and then I think that -- and the release

24   will go that way.

25             MR. BARLEY:  One other thing that I would suggest, if

Page 52

1    you are going to go the route of having people submit an

2    affidavit or some other evidence that they made an AWP-based

3    reimbursement for Epogen, that it also make it clear that it

4    wasn't for Procrit, because what happens is, people get

5    confused.  They hear Epoetin Alfa, and they think it's Epogen.

6    Epoetin Alfa is the biologic.  The brand is Epogen, but Procrit

7    is the same biologic with a different brand name.  So I think

8    what you may have is people who actually pay for Procrit, which

9    is a Johnson & Johnson subsidiary's drug, who are going to be

10   confused and make claims when they actually made a

11   reimbursement for Procrit.  And that would reduce the amount of

12   claims, I would think, and also target --

13           THE COURT:  Well, I'm sympathetic, but I also know

14   these people are really old.  So to the extent that you can --

15   how hard would that be to do?

16           MR. MATT:  Their physician, okay, their file will say

17   Procrit or Epogen on it.  So they're going to have to talk to

18   their doctor.  They might remember and just say, "I took Epogen

19   for nondialysis."

20           THE COURT:  I don't think it's too big a demand to ask

21   them to go talk to their doctor; or if they even can say, "I

22   believe it was one versus the other," if you don't prompt them,

23   you know what I mean, just so that we know, I think that's a

24   good idea.

25           MR. MATT:  We'll make that clear in the notice, not

1   Procrit.

2        Okay, so that's Epogen.  Let's move on to the next

3   item of our proposed redistribution which is on Page 13, and

4   these are, as you've noted, the "not otherwise classified"

5   J-Codes.  My settlement administrator says we should refer to

6   these as NOCs.  I said "no more acronyms."  We have enough.

7   We're going to spell it out, "not otherwise classified."  This

8   is J-Codes 3490 and 8999.  These codes include, unfortunately,

9   at least 36 drugs that are not part of this settlement, not

10  part of this case even.  So therefore we cannot identify which

11  of the 15 Group B drugs are in the data itself provided by CMS,

12  so we do need Class 1 claimants to demonstrate which drug they

13  took.  And we just need one piece of evidence; we'll make it

14  real easy for them.

15       THE COURT:  Okay.

16       MR. MATT:  Next bullet point on Page 13, as I have

17  alluded to before, we're going to cut recovery for Leukine and

18  Novantrone off at 2002 because no Track Two defendant sold the

19  drugs after then.

20       And this brings me to the second-to-last slide,

21  Page 14, the redistribution, what this means for the Group B

22  drugs.  So even without the changes that we've discussed here

23  with your Honor to Epogen, for instance, the reallocation of

24  additional money from TPPs, the redistribution that we have

25  proposed results in an estimated 240 percent increase in the

1    money distributable to the Group B drugs.  This brings the

2    estimated pro rata payment for Group B to a little over

3    14 percent of out-of-pocket payments, which themselves are much

4    greater than actual damages.  That record is detailed in the

5    Dan Coggeshall declaration, and unless you have questions about

6    it, we don't need to go through it, but I want to give some

7    examples of the impact of that at 14 percent.  You know, this

8    means that for a lot of these Group B drugs, your Honor, these

9    people are going to get a significant percentage back of their

10   co-pay.  I want to take an example, Gamimune, okay?  Now, this

11   is one of those --

12        THE COURT:  Can I ask you, as I'm thinking about it,

13   the Brand B drugs, which we actually can calculate damages,

14   shouldn't they just be getting single damages in the heartland

15   period, since we can do it?

16        MR. MATT:  So, okay, if I understand what you're

17   asking is, of the nine drugs, if we go and we calculate spreads

18   and we find that they're actionable --

19        THE COURT:  Well, actually, I said that incorrectly

20   because now I'm getting confused.  I think what I really want

21   to say is the out-of-pocket damages rather than just the

22   out-of-pocket costs, if we can calculate them.

23        MR. MATT:  I'm sorry, your Honor, I'm lost.  I don't

24   know what you're asking.

25        THE COURT:  In other words, in the Group A drugs, we

1    can calculate actual damages to the consumer.

2              MR. MATT:  Correct.

3              THE COURT:  You told me in the Group B drugs, we can't

4    calculate.

5              MR. MATT:  Correct, so we use their co-pays as a --

6              THE COURT:  We use the co-pays as a proxy, but on the

7    brand drugs, you could calculate?

8              MR. MATT:  For those that have damages, but I think

9    the record is pretty clear most of them don't, but we have

10   those nine we're going to go readdress.

11             THE COURT:  Right.

12             MR. MATT:  But, yes, if we find that they have

13   actionable damages, we could do it.

14             THE COURT:  We could actually calculate what their

15   damage is?

16             MR. MATT:  Yes, and we can treat them as Group A but

17   not triple them because we don't have the other markers.

18             THE COURT:  No, no, okay, all right.

19             MR. MATT:  That's what you're suggesting as a

20   possibility?

21             THE COURT:  Yes.

22             MR. MATT:  Okay.  Is that a preference or just

23   something for us to look at?  I'm trying to see what you're

24   signaling.

25             THE COURT:  What I'm signaling is, what you're telling

1   me -- and I can live with this, it seems reasonable -- that if

2   you only have a slight minimal or a slight amount over

3   30 percent, that's not very much liability, and it should be in

4   Group B; but if it turns out that it's a huge amount, it moves

5   into Group A.  And huge amount, I don't know what I mean by

6   that, but what's the lowest amount that's in Group A?

7           MR. MATT:  The lowest amount that's in Group A of

8   those drugs that are left once Epogen comes out, oh, I want to

9   say 60 percent spread.

10          THE COURT:  Yes, so something that's --

11          MR. MATT:  Something in that magnitude.

12          THE COURT:  -- within that magnitude.  Now, where I go

13  between 40 and 60, I don't know, but I would err in terms of --

14  what I did with Johnson & Johnson in the Track One trial I

15  remember is, 32-33 for a few periods I said wasn't enough to

16  establish liability, but --

17          MR. MATT:  Right.  You need to get it over

18  30 percent -- I'm sorry -- or 35 percent.

19          THE COURT:  You need to get it consistently and

20  significantly over 30 percent.

21          MR. MATT:  Yes.

22          THE COURT:  Significantly and consistently over

23  40 percent would strike me would be enough to create damages

24  as you look at them.

25          Anyway, okay, so now you're telling me -- so assume

1  for a minute we might actually have more than a pro rata

2  payment of 14 percent.

3         MR. MATT:  Which we may likely have based on the

4  changes that we've discussed in court today, but let's assume

5  it's the 14 percent.  I was going to just pick an example for

6  you.  You know, on a lot of these low-dollar drugs, okay, the

7  14 percent is going to be meaningful; and with respect to the

8  low-dollar drugs, again, you know, 46 percent of all of them

9  are under ten bucks.  These people actually tend to take more

10  than one of these drugs, so when they're having their

11  treatment, there's a lot, a lot, a lot of claims in the

12  database where people are getting more than one drug.  So they

13  are going to get a significant recovery.  And one example I

14  just pulled out this morning before I came over here is a drug

15  called Gamimune, which is in Group B.  This is one of those

16  drugs where Ray did an overcharge ratio for it, okay?

17         THE COURT:  What is it?  Is it multi-source?

18         MR. MATT:  It's multi-source.  Multi-brand I think you

19  should call this one.  It has an overcharge ratio of

20  17.2 percent.  Now, a caveat, right?  We know that the actual

21  ratio is going to be less than that because the median analysis

22  is really going to apply for this drug, but let's just be

23  ultraconservative and say it's a 17.2 percent overcharge.  It's

24  going to be much less than that, your Honor.  And if you apply

25  that to average member payment of $329.58, the person would

Page 58

1   receive a check for $56.69.  If we take the proration of

2   14.087 percent, that person is going to get $46.43.  So for

3   Gamimune, this person is going to get almost --

4           THE COURT:  Could you do that math again.  So his

5   out-of-pocket payments are $56.

6           MR. MATT:  No.  They're $329.58.  That's your average,

7   okay?

8           THE COURT:  I see.  And so he's going to get $46?

9           MR. MATT:  He's going to get $46.  You know, with this

10  example for that year of 2000, that's probably -- it could be

11  more than his actual damages based on the median analysis.  The

12  point I'm trying to demonstrate is, you know, you're not

13  getting 1 and 2 percent recoveries of actual damage in the

14  Group B drugs; you're getting significant recoveries of damage.

15          Which leads me to my last slide, which is, your Honor,

16  it's been a long road.  You know, we heard your frustration

17  during the last hearing, and we shared some of it ourselves.

18  Again, we lived with this for a long time.  We did a ton of

19  work you never saw.  I think now you're seeing the fruits of

20  that brought forward in very specific evidentiary declarations

21  from Mr. Berman, Dr. Hartman, all the defendants.  You know, we

22  think that it looks like we may have a few more tweaks to do,

23  but overall this is a fair, adequate, and reasonable settlement.

24  We're going to ask that you approve it.  A strong presumption

25  in favor of settlement exists when sufficient discovery has

1    been provided and the parties have bargained at arm's length.

2    That all happened here, your Honor.

3         THE COURT:  Yes, thank you.  What do we do about

4    notice?  In other words, that TPP emergency motion came in at

5    the last minute flagging in a very powerful way the amount of

6    money it would cost and you only benefitting one out of five.

7    Is there any way of -- I forget, we were at some deadline to

8    make magazine deadlines and stuff.  I mean, there were things

9    that were going on at the time.  In retrospect, since we have

10   to re-notice anyway, what are you recommending we do?

11        MR. MATT:  Well, in this instance, I think the only

12   people that need to be re-noticed are those who are going to

13   receive less compensation in the settlement than they would

14   have under the original proposal.

15        THE COURT:  Do we give them a second opt-out?  I'm

16   thinking particularly for those, what's it 38,000 EPO people?

17   I don't think they have -- first of all, most of them aren't in

18   the class, right?  Most of them aren't even in the class, so I

19   don't know that we have to do some notice that says, "You're

20   not in the class," you know, "Your rights aren't being bound

21   and you're not in the class, as the Judge determined it."  But

22   then let me ask you this:  Of the other group where it's

23   minimal damages, if any, that we're moving potentially to

24   Group B, they could potentially be getting less damages, and

25   I'm sort of thinking that they may want to opt out.

1        MR. MATT:  With respect to whether an additional

2   opt-out right is given, that is your discretion under Rule 23.

3   I think that defendants might have something to say about that.

4        THE COURT:  I understand, but that is my discretion,

5   and the problem is that some of them may freak out who thought

6   they were getting double damages.

7        MR. MATT:  Right.

8        THE COURT:  And I think a class should be done for the

9   ones that are based on AWP, and you're going to redefine the

10  class to say "based on AWP."  But I'm thinking that they could

11  essentially be unhappy.  I'm thinking of Mr. Haviland's people

12  in particular.  A few of them I think were EPO people.

13       MR. MATT:  I think, as you observed, people don't want

14  to be told they're going to get less money, and we'll get

15  objections --

16       THE COURT:  How many people are going to get

17  significantly less?  It's the whole Epogen group, right?

18       MR. MATT:  Well, yes, there's 38,000 there.  I can

19  give you the exact statistics because we had Mr. Coggeshall run

20  that for you, and he has found around 42,000 people.

21       THE COURT:  For all sorts of drugs?

22       MR. MATT:  Yes, for all sorts of drugs, but 38,000

23  took Epogen -- I'm pretty sure of that -- and then you have

24  approximately 14,000 in the "not otherwise classified" group.

25       THE COURT:  That are going to get less?

Page 61

1        MR. MATT:  That are going to get less.  Or, no, they

2   need to get re-noticed so they can prove what they took.  I

3   think that sheer number, 14,000, demonstrates how many people

4   we have in there that took a drug that has nothing to do with

5   this case.  So you're talking a mailing of upwards of 60,000

6   people.  And people will object, no doubt about it, and we had

7   some in BMS when we did this.  We had a lot fewer than I

8   thought, by the way, but we did have some.

9        THE COURT:  How many?

10        MR. MATT:  I think we had five.

11        THE COURT:  Five.

12        MR. MATT:  Yes.  So we'll get more here, no doubt.

13   We'll get more here.  It's a much bigger group.  I think in BMS

14   we mailed to -- I want to say 12,000 people.

15        THE COURT:  And it's direct mail?

16        MR. MATT:  This is direct mail, so the address we have

17   from the CMS database, or if it's Class 3, they provided us

18   with their addresses, the claimants did, so it will be a very

19   robust and updated database that we use.

20        THE COURT:  Now, last but not least, I want that data

21   on those nine drugs.  Is it something that's -- and I'm just

22   looking at defendants and you -- does it make more sense for

23   you to do it with an affidavit from Mr. Hartman?

24        MR. MATT:  I do think that's the proper way to go to

25   have a good record.  Defendants hopefully will help us out with

Page 62

1    some data, and, you know, I'm like you, I want this stuff done

2    yesterday.  My one issue right now with Dr. Hartman is that his

3    person, Mike Augustine, who helps us on this case, is on

4    vacation for this next week.  Now, I might be able to get

5    another one from his office to step in; but if we can get data

6    quickly, you know, I'd like to get back to you at the absolute

7    worst within two weeks, hopefully sooner depending on what I --

8              THE COURT:  On all the rebalancing, how you do it, a

9    proposal.  And you're going to do the same attorneys' fees

10   structure that I did in BMS.

11             MR. MATT:  Yes, and we already did that in this round,

12   yes.

13             THE COURT:  All right, okay.

14             MR. MATT:  So this 14 percent proration, that's all

15   based on 28 percent, not 30.

16             THE COURT:  Okay, thank you.

17             MR. MATT:  Okay.  Oh, and --

18             THE COURT:  Thank you.  I know it takes a lot to

19   master that information, so I do think now I personally

20   understand it better, whereas I didn't really understand it

21   last time, so I thank you.

22             MR. MATT:  Good, good.  You're welcome.  And I

23   obviously, and not surprising to you, I'm sure, have quite a

24   few things to say about the objectors, but I would like to

25   reserve some time after they say their piece.

Page 63

1          THE COURT:  Yes, that makes sense.

2          MR. MATT:  Okay, thank you, your Honor.

3          THE COURT:  All right, anybody?  I've let people pop

4    up in between on the defense side.  You may want to wait till

5    you hear from the objectors?  Does that make the most sense at

6    this point?

7          Okay, now, I want to thank the objectors for coming.

8    I was surprised last time you didn't come, and I certainly

9    didn't require it, but I did read all your materials, as you

10   can tell from the transcript.  So I'm not sure whether --

11         Lee, do you want to take a quick break because I think

12   this may go for about another maybe hour anyway?  So I think a

13   five-minute break for the Court Reporter, and then we'll come

14   back.  Thank you.

15         THE CLERK:  All rise.

16         (A recess was taken, 10:40 a.m.)

17         (Resumed, 10:57 a.m.)

18         THE COURT:  Where is Mr. Haviland?  There you are.

19   Come on up, Mr. Haviland.

20         MR. HAVILAND:  Your Honor, I'd prefer the other

21   objectors' counsel.  I don't think their presentations are all

22   that long.

23         THE COURT:  Okay.  I have no vested stake.  Mr. Pentz,

24   is it, or Landrigan?  All right.

25         MR. PENTZ:  Good morning, your Honor.  John Pentz

1    again for John Pentz, Jr. and Corinna Connick.

2           My objection primarily goes to the reduction in the

3    amount for Epogen class members, especially in Class 3.  Now, I

4    understand that this morning that plan has been amended once

5    again and that Epogen is --

6           THE COURT:  I've been worried about Epogen.  What if

7    we gave a second opt-out?

8           MR. PENTZ:  A second opt-out for people who paid a

9    couple grand for Epogen?  I don't think it's that worthwhile

10   for most people.

11          THE COURT:  So you don't want a second.  I'm thinking

12   about Epogen.  It's sui generis in this whole thing, and I'm

13   thinking about whether if somebody were upset because the

14   amount were reduced --

15          MR. PENTZ:  Well, I think, as a technical matter, yes,

16   a second opt-out right is probably required, but I doubt few

17   people --

18          THE COURT:  It's not required.

19          MR. PENTZ:  -- practically are going to take advantage

20   of it.

21          THE COURT:  I'm thinking about it.  Well, talk to me

22   about the merits because I've been struggling with it.  Do your

23   clients, did they take Epogen based on a capitated rate or

24   based on a --

25          MR. PENTZ:  No.  Based on an AWP.  In fact, my clients

Page 65

1   purchased Epogen from a pharmacy, and some of the purchases

2   were not covered, some were covered partially, but they made

3   substantial, you know, $200, $300, in one case $600 co-payments

4   for the Epogen that they purchased at a pharmacy.

5           THE COURT:  All right, so they're the AWP crowd.  So,

6   now, we've got evidence that the most it ever flipped up was in

7   2003, and that moved up to 34 percent, so based on the

8   95 percent methodology, that there really were no damages under

9   the 30 percent bump.  Do you have any evidence to the contrary?

10          MR. PENTZ:  No evidence to the contrary.  However,

11  there was another Class A drug, Neupogen, for which there was

12  only evidence during one year of any kind of spread.  So, I

13  mean, Epogen would seem to be similarly situated --

14          THE COURT:  Did your people purchase in 2003?

15          MR. PENTZ:  No.  No, they did not.

16          THE COURT:  When did they purchase?

17          MR. PENTZ:  I believe it was '07.

18          THE COURT:  What was the spread in that year?

19          MR. PENTZ:  In that year?  I don't believe there's --

20          THE COURT:  Was it below the 30 percent?

21          MR. PENTZ:  I don't have Dr. Hartman's --

22          MR. MATT:  More to the point, your Honor, I think you

23  made a ruling in the Track One case that everyone knew AWP was

24  no longer an average wholesale price after 2005; so a 2007

25  administration, if not in this settlement, would never recover

1    money in a court of law.

2          THE COURT:  You said it wasn't even in the settlement,

3    right?  It only goes up to two thousand --

4          MR. MATT:  Well, we're honoring those claims in

5    Class 3, so you can claim --

6          THE COURT:  I'm sorry, I'm sorry, I'm sorry.  I

7    thought we went up to -- I wrote down somewhere -- the end of

8    the class period is when, to the present?

9          MR. MATT:  To 2008, so the Class 3 claims are able to

10   go past --

11         THE COURT:  You're a Class 3 person, is that right,

12   sir?

13         MR. PENTZ:  Yes.

14         THE COURT:  All right, so you're Class 3.  So you'd be

15   in the class, all right.  So it looks like there isn't a -- it

16   doesn't go over the 30 percent bump.  Will you confirm that?

17   So why is it unfair?

18         MR. PENTZ:  Well, there's another drug, for example,

19   Neupogen, for which there's no evidence of any kind of spread

20   marketing for any year other than 2003.  Neupogen is a Class A

21   drug for the entire class period.

22         THE COURT:  All right.  So you're saying, why treat

23   one one way and one the other way?

24         MR. PENTZ:  Right, right, exactly.  It's the inequity

25   of treating Epogen differently than Neupogen, I would say,

1  where the evidence is limited to one year for each of those

2  drugs.

3          MR. MATT:  Your Honor?

4          THE COURT:  Yes.  Excuse me, I'm just going to go back

5  and forth so that I can truly understand this.

6          MR. MATT:  I apologize.  I forgot, I was going to

7  represent that Neupogen -- let me double-check and make sure

8  it's the drug I'm thinking of -- come out of Group A and go

9  into Group B.

10          THE COURT:  For the same reason?

11          MR. MATT:  Yes.  Let me just make sure I've got the

12  right drug in mind.  I don't want to be imprecise.

13          THE COURT:  Because it was only one year and a small

14  spread, is that it?

15          MR. MATT:  Yes.

16          THE COURT:  So basically have you stated your reasons

17  now?  It's primarily you think that Epogen --

18          MR. MATT:  Neupogen is the drug I'm thinking of, yes.

19          THE COURT:  So you think that Epogen should be treated

20  the same as Neupogen, and so I need to make a decision with

21  respect to both drugs because at most they went over the

22  30 percent in one quarter?

23          MR. PENTZ:  Right, correct, your Honor.

24          THE COURT:  But it wasn't the quarter your person

25  purchased on?

1          MR. PENTZ:  No, it was.  But for the people who

2     purchased Neupogen in, say, 2007, they're going to be

3     treated -- they're going to be compensated based on Group A

4     drugs.

5          THE COURT:  He's now proposing --

6          MR. PENTZ:  But if they're coming out, then I guess my

7     objection would be, you know, they should be treated the

8     same --

9          THE COURT:  Okay.

10         MR. PENTZ:  -- however they're treated, to the extent

11    that would increase the recovery for everybody in Group B.

12         My other objection is, if the 14 percent of amount

13    paid is going to be the new standard for fairness, then I

14    believe that there needs to be more money for the consumer side

15    of this, and here's why:  Mr. Landrigan is about to argue that

16    because the notice to the Class 3 members was defective in that

17    it provided the incorrect date for filing a claim, if re-notice

18    is made to those people -- and I think it should be because if

19    we're going to do another notice and it's going to be the final

20    notice, it should include those Class 3 people who got the

21    wrong claim form date -- we're going to see additional claims

22    come in; and, therefore, to maintain that 14 percent of amount

23    paid for Group B, we're going to need more money.

24         THE COURT:  So the incorrect date was Class 3?

25         MR. PENTZ:  Right.  And I think Mr. Landrigan, I'm

1    going to allow him to make those arguments, but he makes a good

2    point, in that the number of claims downloaded from the website

3    was 80,000, and yet the amount of claims filed was only 20.

4    Why would people go to the trouble of downloading a claim form

5    and then not file that?  The probable answer is, that claim

6    form itself said claims must be filed by March, 2009, instead

7    of the new date in 2010.

8              THE COURT:  Was the claim form wrong or the website?

9              MR. PENTZ:  Both.

10             MR. MATT:  The website, your Honor.

11             THE COURT:  I think it was just the website, they

12   said.  Are you sure?

13             MR. PENTZ:  I'm not sure about the claim form, whether

14   a claim form was mailed with the direct mail notice.  I'm not

15   sure about that, but for the one on the website, I believe it

16   still had the incorrect date on it for people who were

17   downloading it from the website.

18             THE COURT:  I see.  So I'll let him discuss that, and

19   then I'll let plaintiffs' counsel.  All right, so your two

20   arguments, as I understand it, Epogen should be treated like

21   Neupogen, and the second is that we should have a new notice to

22   Class 3 people?

23             MR. PENTZ:  Right, and therefore more money for

24   Class 3 or for consumers generally because I expect we'll see

25   more claims if that corrected claim form is mailed to the

Page 70

1    Class 3 class members who received incorrect notice.

2           My other argument for that, for that reallocation

3    between TPPs and consumers is, and you mentioned it earlier,

4    your Honor, the knowledge that people had that AWP was not the

5    true cost of acquisition, that it became widespread in 2005.

6    But in fact for the third-party payors and ISHPs, it was

7    widespread long before that; and I cite to an Alabama case in

8    my objection that basically threw out claims by TPPs, or the

9    State of Alabama, which is essentially a TPP, because they

10   cited extensive evidence in the records of knowledge extending

11   back to the '70s that this is an industry --

12          THE COURT:  Can I say something?  I had a whole trial

13   on this, and I rejected that as a factual matter and was

14   upheld by the First Circuit, and I'm sticking with it.  But it

15   is in fact -- you know, I don't always get affirmed, so if I

16   get affirmed on an issue, I'll stick with it.  But I do agree

17   that by 2001 there was a perfect storm.  Isn't that what I

18   think the language I used?  Everyone knew.  The plaintiffs

19   filed their suit.  It was in the Wall Street Journal and the

20   like, so by 2001, but how does that help you?

21          MR. PENTZ:  Well, it would just help me argue for a

22   lower portion of the settlement fund going to the TPPs, since

23   they presumably knowingly paid these inflated or spread prices.

24   And the consumers certainly -- you know, it may have been

25   widespread in the Wall Street Journal, but the consumers didn't

1   know about this.  They still don't.

2        THE COURT:  I said that for TPPs, that's fair.  I

3   didn't say it for consumers.

4        MR. PENTZ:  Right.

5        THE COURT:  All right, thank you very much, Mr. Pentz.

6        MR. PENTZ:  That concludes my objection at this point.

7   Thank you.

8        THE COURT:  Can I -- yes, I think it makes sense to

9   have the two of you, and then I'll have a response.  That makes

10  the most sense here, and then I'll hear from Mr. Haviland.

11       Mr. Landrigan?  Thank you.

12       MR. LANDRIGAN:  Thank you, your Honor.  Richard

13  Landrigan representing one of the Class 3 consumer co-payment

14  claimants here, who is Mrs. Weatherly from Texas.  To

15  reiterate --

16       THE COURT:  And her drug was again?

17       MR. LANDRIGAN:  I'll have to go back and look, your

18  Honor, if I may.

19       She used two drugs, your Honor, Acetylcysteine and

20  lorazepam.

21       THE COURT:  Are those multi-source?

22       MR. LANDRIGAN:  Your Honor, I didn't check the list,

23  and I should have.

24       THE COURT:  Well, let's do it now.

25       MR. MATT:  They are.

Page 72

1          THE COURT:  They are, they're both multi-source?

2          MR. MATT:  Group B drugs, your Honor.

3          THE COURT:  Okay.

4          MR. LANDRIGAN:  Your Honor, the basic --

5          THE COURT:  Did she submit a claim?

6          MR. LANDRIGAN:  I believe she has.

7          THE COURT:  So what's your objection?  Is it about the

8    wrong date on the website?

9          MR. LANDRIGAN:  Your Honor, yes, the issue is notice

10   to the class, to this subclass of the class, the fact that

11   370,000 visits --

12          THE COURT:  So it's a subclass?

13          MR. LANDRIGAN:  Well, it's the consumer --

14          THE COURT:  It's the Class 3.

15          MR. LANDRIGAN:  Class 3 consumer co-pays.  There are

16   some cash payors that are also in that group.

17          Of the 370,000 visits that were reported to the

18   website with the wrong information as far as the filing date,

19   only 5 percent filed claims, and that was as of January, 2010.

20   Now in May of 2011 we learn that there have been 959,000

21   responses to requests mailed but only two percent have filed

22   claims.  That's 21,000 people out of 959,000 --

23          THE COURT:  Say that again?  Of the --

24          MR. LANDRIGAN:  Of the requests for consumer notices

25   and claim forms, 959,000 --

Page  73

1                    THE COURT:  In Class 3?

2                    MR. LANDRIGAN:  Right -- only 21,000 claims have been

3          filed.

4                    THE COURT:  Out of how many who made requests?

5                    MR. LANDRIGAN:  Rust mailed 959,362 Class 3 consumer

6          notice and claim forms in response to requests.

7                    THE COURT:  And did those things that were sent out

8          have the correct date on them?

9                    MR. LANDRIGAN:  I believe they did not.

10                    THE COURT:  So you think that the actual claim forms

11          mailed out had the wrong date?

12                    MR. LANDRIGAN:  I think it was the notice, your Honor,

13          and it was the notice on the website, and it may have also been

14          on the forms that were mailed.  I didn't --

15                    THE COURT:  No, no, be very careful here.  I

16          understand, they're conceding there was a mistake on the

17          website.

18                    MR. LANDRIGAN:  Yes.

19                    THE COURT:  But they're saying that the actual claim

20          form had the right date on it.

21                    MR. LANDRIGAN:  I am not saying that.  I don't believe

22          it did.

23                    THE COURT:  No, no, not you.  I think they're saying

24          that, is that right?  Do I have that correct?

25                    MR. MATT:  That is our belief that the notices in the

Page 74

1    claim form did have the correct date, your Honor.

2            THE COURT:  And how do you know that?

3            MR. MATT:  Well, we've been looking at it from the

4    website perspective, and we got full rebuttal on that, but I

5    believe this is the first time it's been suggested that the

6    notice itself had the wrong date on it.  So we need to check

7    it, but I'm pretty sure it was right.

8            THE COURT:  So what evidence do you have that the

9    notice itself had the wrong date on it?

10           MR. LANDRIGAN:  Well, your Honor, I'm focusing on the

11   website notice information.  It specifically said on the

12   website that the form --

13           THE COURT:  Okay, okay, I understand, you've been

14   consistent in that, but it's not -- if somebody clicks -- I

15   actually have never done this, but if you click on the website

16   and you ask for a claim form --

17           MR. LANDRIGAN:  Well, you first see that the claim --

18           THE COURT:  I understand that.  They concede that date

19   was wrong.

20           MR. LANDRIGAN:  I believe the claim form is --

21           THE COURT:  Now, let's say you click, does the claim

22   form also have the wrong date on it?

23           MR. LANDRIGAN:  I don't believe it does, your Honor.

24           THE COURT:  All right, so this is the inconsistency.

25   So the claim form says the right thing, and the website says

1  the wrong thing, at least for a period of time.  How long, do

2  you know?

3          MR. LANDRIGAN:  It still does.

4          THE COURT:  It still does?  You haven't fixed it?

5          MR. LANDRIGAN:  I checked it Friday.

6          THE COURT:  Really?  Oh, great.  All right, all right.

7  So the issue really is, if someone just saw that and got scared

8  away and didn't even bother clicking the claim form, they'd

9  never see the information on the claim form, is that right?

10         MR. LANDRIGAN:  That is part of the thesis, yes.

11  Well, that is the thesis.

12         THE COURT:  All right, because if there's something I

13  don't know -- now, your person actually went in?

14         MR. LANDRIGAN:  Yes, right.

15         THE COURT:  So I'm just thinking out loud.  They say,

16  the plaintiffs say you don't have standing to make this

17  objection; maybe someone who incorrectly relied on the website

18  might, but you don't.  I think that's the gist of what they're

19  saying.

20         MR. LANDRIGAN:  Well, that's their argument, your

21  Honor.

22         THE COURT:  So is there any case on that?  Can you

23  raise the issues of other class members, since you weren't

24  affected?

25         MR. LANDRIGAN:  I'm going to defer it to a later date,

Page 76

1    your Honor.  I don't know.

2         THE COURT:  There is no later date.  Let's go here.  I

3    mean, there is going to be to the extent I have to say that I

4    have to rebalance this again.

5         MR. LANDRIGAN:  Sure.

6         THE COURT:  But if you found a case or two --

7         MR. LANDRIGAN:  Well, obviously my client was aware of

8    the issues in this case.  In fact, her son-in-law is an

9    attorney in Texas, a friend of mine.  They were well aware of

10   these issues, so it didn't affect them directly.  I won't

11   contend --

12        THE COURT:  Well, it may be valid or not.  Just there

13   was obviously a mistake, not badly motivated, not bad faith.

14   It was a mistake.  And so the question is, A, do you have

15   standing, and, B, has it effectively been cured?  And so I'm

16   going to turn to plaintiffs, but at least I understand your

17   theory, right?

18        MR. LANDRIGAN:  Yes.

19        THE COURT:  Okay, all right.

20        MR. MATT:  Okay, your Honor, I think we're going to be

21   able to demonstrate to you that the error that was on that

22   website is immaterial, okay?  And I'm going to take you through

23   some dates, and I'll do it slowly but just so --

24        THE COURT:  Can you by any chance, you computer

25   whizzes, can you get the website up for me?  Do you have it on

Page  77

1    your computers?  Or I'll look on my own.  How do you find it?

2              MR. MATT:  www.awptrack2settlement.com.

3              THE COURT:  AWP track --

4              MR. MACORETTA:  No. 2, your Honor.

5              MR. MATT:  2settlement.com, and then when you get

6    there, you --

7              THE COURT:  Is it all one word?

8              MR. MATT:  It is.

9              THE COURT:  And how do you spell track, t-r-a-c-k?

10             MR. MATT:  Yes.

11             THE COURT:  Okay.

12             MR. MATT:  And when you get there, you've got a button

13   for consumers and a button for TPPs.

14             THE COURT:  All right, so I click consumers, what

15   happens?

16             MR. MATT:  You click consumers, and here's what --

17   well, I admittedly did not check the website this last week, so

18   I don't know what it says, but let me take you through a

19   chronology.

20             THE COURT:  She's bringing it up.  She's good.  All

21   right.

22             MR. MATT:  Okay, while she's doing that, let me take

23   you through how we got there, the chronology kind of step by

24   step, which will show you that the error is not material.  The

25   website was created -- and just for the record so the law clerk

1    is following, this is all set forth in Document No. 7647 at

2    Pages 10 to 11, a brief that we filed in July.  The website was

3    created on July 29, 2008.  At that time the original due date

4    for filing of Class 3 claims was listed as January 31, 2009.

5    Then, in response to the Court's January 7, 2009 order

6    resetting the dates related to settlement, the due date for the

7    Class 3 claims listed on the website was changed to May 1,

8    2009.  The Court then ordered supplemental notice sent to cash

9    payors after that, and the website was changed to reflect a new

10   due date for Class 3 claims of February 1, 2010.

11          In December of 2009, the Court suspended all dates for

12   notice and approval of the settlement -- I think this was

13   related to all the problems we were having with getting the CMS

14   data -- and the following language was then added to the

15   Class 3 website:  "Please note that the relevant deadlines for

16   filing a claim, an objection to the settlement, or a request

17   for exclusion have been temporarily suspended until further

18   notice.  Consumers can still file claims during this period and

19   are urged to do so."

20          On February 12, 2011, so this year, the Court

21   established new deadlines for the Class 1 claims.  Because the

22   dates established for the Class 1 claims did not apply to the

23   Class 3 claims, the current language concerning the May 1, 2009

24   Class 3 deadline was added to the Class 3 page.  That is the

25   point in which an error occurred on the website.

1           THE COURT:  So on what date did the error occur?

2           MR. MATT:  The error occurred, I don't know the

3    precise date, but it was around late February of 2011.

4           THE COURT:  Thanks.

5           MR. MATT:  Okay?

6           THE COURT:  The mistake was February --

7           MR. MATT:  It would have been no earlier than

8    February 12, 2011, probably within two weeks after that.

9           THE COURT:  That was the mistake?

10          MR. MATT:  That was the mistake, okay?  The date that

11   should have been listed was May 1, 2010, okay?  This is not a

12   problem.  Why?  Because the addition of the errant language in

13   February, 2011, more than a year after the actual February 1,

14   2010 claims deadline cutoff for Class 3, could not possibly be

15   said to discourage any Class 3 claims.  In other words, this is

16   not an issue.

17          THE COURT:  Because it was after the date.

18          MR. MATT:  This is all after the fact.  It was an

19   error, but it didn't affect anyone.  So our position is, it's

20   an error that has absolutely zero consequence with respect --

21          THE COURT:  And the evidentiary basis for this is

22   what?  Is there an affidavit?

23          MR. MATT:  It's all in Document 7649.

24          THE COURT:  Yes, and I've got this my wonderful law

25   clerk instantly got, but it's basically -- was there an

Page 80

1    affidavit that says these things?  I see a brief.

2            MR. MATT:  I don't think so, but I'll double-check,

3    and if not, we'll get you one.

4            THE COURT:  Yes, do we have the -- you'll check,

5    you'll see.  Okay, okay.

6            MR. MATT:  I don't think there's one.  We'll do that

7    saying exactly what we say in this brief in a declaration so

8    you have the evidentiary value of it, your Honor.  So --

9            THE COURT:  Excuse me.  Mr. Landrigan, before we go,

10   do you have any reason to doubt that?

11           MR. LANDRIGAN:  I'm sorry, doubt what, your Honor?

12           THE COURT:  The chronology that he just set forth.

13           MR. LANDRIGAN:  I believe that it is a correct

14   chronology, yes.

15           THE COURT:  So undisputed facts.  So then I decide

16   what legal thing, if any, flows from it.  Fine, thank you.

17           MR. MATT:  And my last point is, there's always a

18   large disparity between the number of people who go and visit

19   the website, and then take the next step to download forms, and

20   then to take the next step to file.  It happens all the time.

21           THE COURT:  Yes, my biggest issue is, I want to make

22   sure no one went on, saw the wrong date before the due date,

23   and then just didn't bother going the next step.  And you're

24   saying that all the wrong dates happened after the cutoff date?

25           MR. MATT:  And just on the website.

1           THE COURT:  And just on the website, not on the claim

2    forms?

3           MR. MATT:  Correct.

4           THE COURT:  Okay.

5           MR. MATT:  And can I give a quick rebuttal to

6    Mr. Pentz, or do you want me to wait?

7           THE COURT:  No.  Go right ahead.

8           MR. MATT:  Again, his quote/unquote "client" is his

9    father.  His administration was in 2007, so very late.

10          THE COURT:  My father used to call on my legal

11   services.  He said he paid the legal bill back in the day.  All

12   right.

13          MR. MATT:  He's used his father to object in a lot of

14   other cases, your Honor.  That's the significance of why I

15   raise that.  He has no expert at all.  That's the only points I

16   have to Mr. Pentz.

17          MR. PENTZ:  Your Honor, I said I was finished, but I

18   had one more issue that I would like to raise just because I'd

19   like to get an answer for it today.  It's the issue of the

20   inclusion of Climara, or the actual exclusion --

21          THE COURT:  It's not in there.

22          MR. PENTZ:  But why not?  We've now --

23          THE COURT:  Excuse me.  I'm done, I'm done.  You can

24   bring whatever lawsuit you want on Climara.  Who even

25   manufacturers it?

Page 82

1          MR. PENTZ:  It's Bayer.

2          THE COURT:  Good, have fun.

3          MR. PENTZ:  But it's chemically equivalent to

4    Estradiol.

5          THE COURT:  Actually don't, please, because it will

6    come here.

7          (Laughter.)

8          THE COURT:  No, you can do what -- I can't force them

9    to add drugs.  I'm just -- thank you.

10         All right, Mr. Haviland.

11         MR. HAVILAND:  May it please the Court, Don Haviland

12   for what we call the "certain named plaintiffs" for simplicity

13   sake, your Honor.

14         We have essentially five objections, and I want to

15   work through those with your Honor because they obviously are

16   impacted by the things that have happened, but let me get them

17   out so we have a road map.  We lodged an objection a while ago

18   to the overall settlement amount.  I think the record is clear

19   now, though, that counsel did not have the wherewithal to

20   assess the value of the claims that they're settling, which has

21   put us in this difficult position of trying to take moneys that

22   are not enough and allocate them, which takes me to my next

23   objection, which is to the allocation between the consumers and

24   the TPPs.  In a moment I'm going to call upon allocation

25   counsel and see if they're in the courtroom to answer for what

1    they did at the time they did, but we're dealing with their

2    mistakes.

3              THE COURT:  You mean, you have a witness?

4              MR. HAVILAND:  I'd like to call them and see if they

5    can testify --

6              THE COURT:  No, no, no.

7              MR. HAVILAND:  -- yes, your Honor.

8              THE COURT:  So you're looking to call counsel to the

9    stand from the other side?

10             MR. HAVILAND:  I'm looking to call the allocation --

11             THE COURT:  Allocation counsel.

12             MR. HAVILAND:  -- which is Mr. Brozan.  It was in our

13   notice on Friday.

14             THE COURT:  Right, but can I say, I thought -- the

15   motion to quash is allowed.  You can't file those things Friday

16   afternoon and expect people to show up on a Monday morning.

17   For all those people and all those document productions, you

18   knew -- this has been perking along for a very long time now,

19   and so that is just untimely and overly burdensome and

20   unreasonable to do it like that.  I was even out of town.  I

21   didn't even find out about the controversy until, what is it,

22   Friday afternoon?  So that's clear, we are not doing that.

23   Now --

24             MR. HAVILAND:  Understood, your Honor.  I won't

25   belabor the point.  I would make proffers as to each of the

1    witnesses, but let me just point out, we've been asking for

2    over two years now to talk to those folks.  We issued

3    deposition notices.  We've asked them repeatedly to come to

4    hearings.  Friday's transmittal was just another request to see

5    if they would come to the hearing.  That's all.

6           The third objection is to the scope of the release,

7    that it is overbroad as to the addition of new defendants, and

8    we've had some discussion --

9           THE COURT:  New defendants?

10          MR. HAVILAND:  Yes, your Honor.

11          THE COURT:  Who?

12          MR. HAVILAND:  Sanofi-Aventis, for instance, the

13   makers of Eligard.  Aventis does not make it, your Honor.  If

14   you check the website, if you check the materials that we

15   submitted, it's a Sanofi drug.  You can look at some lawsuit

16   that was brought in Chicago by TAP Pharmaceuticals against

17   Sanofi and its subsidiary Atrix where they were actually

18   fighting over Dr. Bell and whether or not they could each use

19   Dr. Bell because of this lawsuit.  You know Dr. Bell very well.

20   Well, that's how I found out about it because if you Google

21   that, you'll find that pleading out there on the Internet.

22   Well, it's interesting TAP would sue Sanofi and Atrix, not

23   Aventis.  It's their drug.  So when we objected to adding new

24   defendants, it kind of led us to the fact that they were adding

25   new drugs.

78515059-b96c-4759-a8be-bdac2ac3c612

1          THE COURT:  So just so I understand, so it's really

2     just one new defendant, Sanofi?

3          MR. HAVILAND:  Well, they also have CSL Behring, and

4     these are those multi-branded biologics, your Honor.  Bayer

5     sold off its division.  I will point out -- and in a moment I'm

6     going to hand up a document -- Leukine was actually sold to a

7     company called Berlex in 2002 by Immunex, but then it was sold

8     to Bayer.  So at the time they settled, it was a Bayer drug, a

9     defendant drug, but I've gotten ahead of myself.  But the

10    CSL Behring line of business, it was sold by Aventis in, I

11    believe, March of 2004.  And so to have all those drugs, it

12    could save us a lot of trouble if you just dismiss them, Judge,

13    because they shouldn't have even been in the case.

14    CSL Behring shows up as, I think, ZLB Behring.  It's very

15    difficult to follow the line of that company, but it's an

16    Australian-based company at this point.

17         THE COURT:  But it's the same drug, right?

18         MR. HAVILAND:  Those drugs were originally Aventis

19    drugs, and the entire unit was sold off to another company

20    altogether in 2004.  So we have the same issue that they raised

21    with the Novantrone and Leukine; Leukine came back by Bayer.

22    So you've got new defendants; you've got new drugs.  When we

23    were last in front of you in June, there were some strong

24    statements about whether or not Group B actually had brands.

25    Now we've at least gotten confirmation from the defendants that

1   there are 22 brands, and I appreciate your Honor working

2   through those issues with us.

3           I thought it interesting Mr. Matt asked the defendants

4   to help out on the nine drugs.  Well, that makes our point.

5           THE COURT:  Well, actually, he at the end of the day

6   said he'd do it.

7           MR. HAVILAND:  Well, he asked for data, your Honor, I

8   think, and that's our point.  I don't think they ever had data.

9           THE COURT:  Well, on those nine they didn't.

10          MR. HAVILAND:  Sure.  So how do you --

11          THE COURT:  On the others they did, so, I mean, it is

12   what it is.

13          MR. HAVILAND:  It kind of circles back to the problem

14   of, how do you settle a case without knowing what the damages

15   are?  And that's the problem.  And I'm going to focus for a

16   moment on Eligard and Trelstar because they're very big-ticket

17   items.  Eligard alone in this database is almost $3 million

18   utilization.

19          Before I get too far ahead, your Honor, we've got

20   about a dozen folks we represent.  They're implicated by the

21   settlement.  Mr. Monk, now represented by his daughter -- he

22   passed away -- was told many, many years ago, got a document

23   from Hagens Berman saying these drugs are not in play.  They

24   did not want these folks to be part of this case.  And in 2007,

25   2008 they're swept back in and told, now, not only are they in

1   play, but they're being told first 4 percent, now 14 percent.

2   So we're playing catch-up here.  We're trying to

3   figure out --

4           THE COURT:  So you've been involved for a while.

5           MR. HAVILAND:  Yes.

6           THE COURT:  So do you have anything to refute that the

7   overcharge or spread isn't what -- I think on these two

8   actually we have the numbers -- that it's basically only

9   minimally above the bump-up?

10          MR. HAVILAND:  I don't agree with that, Judge, and

11  I'll get to that in a moment.

12          THE COURT:  All right.

13          MR. HAVILAND:  Leuprolide acetate and Eligard was

14  heavily marketed.  Your Honor knows the Zoladex case very well.

15  You tried that case.  Well, these folks here know the Lupron

16  case, and Judge Stearns knows it very well.

17          THE COURT:  I know the Lupron case too.  I mean --

18          MR. HAVILAND:  That's a $150 million settlement.  Just

19  look at it from that vantage, one drug.

20          THE COURT:  What was the spread on those?

21          MR. HAVILAND:  The spreads -- and we gave you our

22  expert reports, just so you know.  I apologize for the volume

23  but --

24          THE COURT:  No, but just tell me.  That's why I had

25  this hearing.

1          MR. HAVILAND:  70 percent, 75 percent on average,

2     and --

3          THE COURT:  Excuse me.  And that was 70 to 75 percent

4     on --

5          MR. HAVILAND:  Lupron, yes.

6          THE COURT:  Lupron.

7          MR. HAVILAND:  If you look at the Dr. Schondelmeyer

8     report, Judge --

9          THE COURT:  All right, fine, fine.  So what was it on

10    Eligard?

11         MR. HAVILAND:  What we had and we put in the record

12    already is, at launch, Trelstar, launched in about 1998, 1999,

13    was launched with competitive spreads.  The same with Eligard.

14    These companies had the same AWP, so they had the same

15    WAC-to-AWP spread; they had the same contracts with these

16    companies, the purchasers.  If you look at the Trelstar

17    evidence we put in a while ago -- and I've got some additional

18    documents I want to give you, but I want to just go back to the

19    documents we showed you before --

20         THE COURT:  So what's the spread for Trelstar?

21         MR. HAVILAND:  Comparable.  We would say they're about

22    70 to 75 percent.  And so when we gave you Exhibit C, which was

23    an estimate of what the damages might be in Mr. Lorusso's

24    affidavit, we chose 50 percent.  Let me tell you why I did

25    that.  When we settled the Lupron case -- and by that, I mean

1    the objectors settled -- the class counsel settled for 30 cents

2    on the dollar, 30 percent of the out-of-pocket.  We objected,

3    and then through the process of negotiation, we settled for

4    50 percent.

5         Now, in this courtroom that would equate to

6    100 percent because the spread was 50 and it would be 2X.  We

7    submit that these brands should be Group A.  The liability

8    couldn't be stronger when you talk about the Zoladex story line

9    and the Lupron story line.

10        THE COURT:  All right, all right, so this is a fact

11   dispute you're asking me to resolve, which is, there was a

12   representation that there was -- I forget exactly, I have it

13   here somewhere -- that it was never much above 30 percent, and

14   you're saying they were closer to somewhere between 50 and

15   70 70 percent.

16        MR. HAVILAND:  I think I know why that is, Judge, and

17   it's very difficult to follow the paper.  I can only imagine

18   what your Honor is going through, but looking at Dr. Hartman's

19   affidavit that he put in last week, he looks at wholesaler

20   data.  Well, wholesaler data is not relevant to what we're

21   talking about here.  I want to show you Mr. Monk's records in a

22   moment.

23        THE COURT:  So what do you mean?  You mean WAC?

24        MR. HAVILAND:  Direct-to-physician administrations and

25   purchases.  These drugs are sold in the physicians' oncology

1  and neurology offices.  There's a channel of distribution in

2  each of these companies.  I know the TAP case very well.  TAP

3  had its own tracking for how much they sold.  They knew exactly

4  what the ASP was, the real ASP.  Bayer has their own ASP too

5  for their drugs for what they sell to physicians.

6          THE COURT:  So what does wholesaler data mean in your

7  view?

8          MR. HAVILAND:  Well, that's selling to pharmacy.

9  That's the primary modality to get to the pharmacy and to big

10  GPNs and big, you know, institutionals.  You typically see

11  wholesaler data used for the pills.  When we tried the cases in

12  Pennsylvania, we looked at wholesaler data on the pills.  But

13  when you've got these cancer agents that are sold to doctors

14  and hospitals and outpatient clinics, you look at the

15  direct-to-physician channel.  That's why -- I looked at

16  Dr. Hartman's affidavit very carefully, and it's only I think

17  Taxotere where he says he looked at Aventis' data, and there he

18  came out with 29 to 35 percent.  But that's the data you have

19  to look at.

20          THE COURT:  Let me ask you.  At some point I remember

21  the physicians started going through mail order houses and

22  wholesalers.

23          MR. HAVILAND:  I think there's some of that, your

24  Honor.  There is certainly some of that in Lupron, and I think

25  when class counsel settled it, it was not a core part of that

Page 91

1    $150 million settlement.  There was so much --

2         THE COURT:  You're just saying Eligard and Trelstar

3    need to be explored more?

4         MR. HAVILAND:  And I started looking at that with --

5    we have experts as well down in Pennsylvania.  If you look at

6    just that J-Code and you look at the market share, you see

7    Eligard's share growing from the time of launch up until the

8    time when this class ends for settlement purposes.  So you

9    could quickly take that utilization of CMS data and do a split

10   because you're only talking two drugs using that J-Code.  It's

11   not all that complicated, and these folks here have that Lupron

12   data at least available to them, and if not, I'm sure Judge

13   Stearns --

14        THE COURT:  Yes, right, right.  We could also just

15   require additional documentation.  That I'm not worried about.

16   It's the spread.

17        MR. HAVILAND:  Right.

18        THE COURT:  So you're saying -- and this is important,

19   and I'm going to ask you to come back -- that the reason there

20   is this difference, which is what should be simple math, is

21   that it depends what you use, and that the wholesaler data is

22   inappropriate for the manufacturer-to-physician sale?

23        MR. HAVILAND:  Agreed.  That's what our point is, your

24   Honor.

25        THE COURT:  Your big point is here?

Page 92

1           MR. HAVILAND:  Yes.  You're going to have some spread

2     at the wholesaler data for people that went to the pharmacy,

3     there's no doubt about that; but the core, our clients, just so

4     you know, every single one of these clients, a husband, a

5     father, was a Lupron patient, every one of them.

6           THE COURT:  Lupron or --

7           MR. HAVILAND:  Lupron.  Reverend Aaronson, my

8     client --

9           THE COURT:  Then they're not --

10          MR. HAVILAND:  No, no, no.  They got prostate cancer.

11    That's how we came to represent them.

12          THE COURT:  I understand, and I'm sorry about that.

13    Just did they use Trelstar and Eligard?

14          MR. HAVILAND:  Yes.  And what happened was, a lot of

15    them were flipped.  Let me just show you an example.  I hope it

16    will be helpful, your Honor.

17          THE COURT:  All right.

18          MR. HAVILAND:  I want to show you Mr. M's records and

19    tell you why this is such a significant issue.

20          THE COURT:  Is this on the document camera?

21          MR. HAVILAND:  I'll hand up a copy and I'll put one

22    out for --

23          THE COURT:  Do you all have this?

24          MR. HAVILAND:  I'm about to hand up copies.

25          THE COURT:  All right.  And I'm sure Lee will do this,

1    but when this shows up in the record, maybe just use this guy's

2    initials or something, and we'll blank out his name.

3              MR. HAVILAND:  Do you want to just call it

4    Objector's 1 or something like that?  We could put a label on

5    it, if Lee wants to do it that way, just so we have a record of

6    it.  But these are just the records that were produced by Mr. M

7    at the time he was being evaluated as a class representative.

8    Let me just do it this way.  Dr. Lupo was his urologist back in

9    the 1990s, and you can see the beginning of his first patient

10   consultation there in 1998.

11             Let me see if I can zoom this.

12             THE COURT:  No, no, no, you're making it worse.

13             MR. HAVILAND:  I'm sorry.  Oh, that's the focus, okay.

14   I'm out of focus.  There we go.

15             THE COURT:  Perfect.

16             MR. HAVILAND:  How about that?  And zoom is -- okay,

17   good.

18             So just to acquaint ourselves, there's only eleven

19   pages here or twelve pages.  These were given to the defendants

20   as part of the original profer in discovery, but I wanted to

21   get us right to the point that I want to make here.  If you go

22   to Page 9, there's an interesting discussion in the progress

23   records by Mr. M's new physician, a Dr. Curry down in

24   Greenville, Mississippi.  If you see what I've highlighted,

25   Judge, in June of '04, first of all, his PSA was going up, and

Page 94

1    that's the specific antigen test that shows the marker for the

2    cancer.  So now the man is starting to get a little more sick

3    and the prostate cancer is taking over, so he's pretty upset

4    about it.  But he's told by his doctor that he's only going to

5    get Eligard because -- this is the new doctor reporting --

6    "Less than a year ago he was told by Dr. Lupo that they had

7    switched from Depo-Lupron to Eligard, and he didn't like the

8    side effects with the Eligard and wanted to go back to

9    Depo-Lupron.  Dr. Lupo in Pine Bluff, who had been giving his

10   shots, no longer gives Lupron, so he came to me so that we can

11   start him on Depo-Lupron injections, and we will do that and

12   continue to follow."

13        Then you see he was put on the Depo-Lupron after that

14   four months, and four months later he came back for a visit.

15   His PSA went up to 7.6 and then it went up to 10.3.  I just

16   point that out because it became a significant issue for Mr. M

17   to be switched.  And I don't know if your Honor remembers the

18   Zoladex story that well, but there was a lot of that happening

19   in the field, the companies trying to switch patients, "Buy my

20   drug."  Now, you've just heard Eligard is the same as Lupron.

21   Why would you switch?  Why would you take somebody off one?

22   It's just for the money.  That's the spread marketing documents

23   that we don't think they have in the record.

24        THE COURT:  Or efficacy.

25        MR. HAVILAND:  Possibly but unlikely.  This doctor

78515059-b96c-4759-a8be-bdac2ac3c612

1    stopped giving Lupron altogether.  He says, "I'm only giving

2    Eligard."

3            He clearly paid for it.  If you go and look at the

4    next record, you'll see they're still calling it Lupron because

5    it's still leuprolide acetate on January 14, 2004.  We believe

6    that's an Eligard injection based on the switch.

7            THE COURT:  Well, how do you know that?

8            MR. HAVILAND:  Well, the clients told us, Judge.  Back

9    in the day when we were talking to him about that switch, he

10   said, "I was switched over to Eligard."

11           THE COURT:  So you think he made one payment for

12   Eligard?

13           MR. HAVILAND:  He made two, two, and you see the

14   payments on the CMS notice which follows.

15           THE COURT:  Does it say Eligard?

16           MR. HAVILAND:  No.  It just says J9217, which is the

17   same.  So this is the rubber hitting the road.  Here's a client

18   that could clearly tell you, and I bet you if you asked any

19   prostate cancer patient, they'll tell you what they're taking.

20   They know if it's Lupron or Eligard.

21           THE COURT:  So what year was this in?

22           MR. HAVILAND:  2004.

23           THE COURT:  So in 2004, have you calculated the

24   spread?

25           MR. HAVILAND:  All I did, Judge -- I don't have their

1   data, to be honest with you.  I do not have Aventis' data on

2   this.  I used the proxy that was in Lupron.  I can tell you

3   what the Lupron spreads were based on the reports that we put

4   in the record from that case, but without the data to know what

5   their actual ASP was to the physician channel, we can't tell

6   you what the spread is.  But I think it's higher than

7   14 percent.  I mean, that's the point, that this drug like

8   Trelstar --

9             THE COURT:  Well, higher than 14 percent, you mean

10   higher than 30 percent?

11            MR. HAVILAND:  Well, no, they're getting 14 percent

12   currently, and the objection is, they're getting only

13   14 percent in Group B.

14            THE COURT:  I'm talking spread talk.  Do you think

15   that the spread was between the actual amount paid by the

16   physician, on average, and the AWP, what they got reimbursed

17   at, AWP minus what, 5 percent in those days?

18            MR. HAVILAND:  Yes.

19            THE COURT:  I don't remember exactly, but whatever the

20   reimbursement formula was minus the amount the doctor actually

21   paid, that that spread was over 30 percent, the speed bump?

22            MR. HAVILAND:  On the order of 70 to 75 percent.

23            THE COURT:  That's what you believe?

24            MR. HAVILAND:  Based on our expert's analysis, yes,

25   Judge.

1          THE COURT:  Based on your expert's analysis --

2          MR. HAVILAND:  From Lupron.

3          THE COURT:  From Lupron?

4          MR. HAVILAND:  Yes.

5          THE COURT:  All right, so I understand what you're

6    saying.  You're saying they must have been competing in the

7    marketplace; that's likely the reason for the switch, in your

8    view.  So you think that's at least a red flag to look further?

9          MR. HAVILAND:  Yes, yes.  Now, let me just pause a

10   moment on Trelstar, which is a competitor in the same

11   marketplace.  It's triptorelin pamoate.  This is a Pharmacia

12   drug now.  Okay, it competes with Lupron and Zoladex and

13   Eligard, and it came in in 1998.  This is another one of these

14   new drugs, and this is the record which I'll hand up for Mr. T.

15   Now, he's a Class 3 purchaser.  He purchased at pharmacy.

16         THE COURT:  Oh, so Mr. M was a Class 1?

17         MR. HAVILAND:  Yes.  He was a Medicare patient.  The

18   record is a little difficult to read, your Honor, but you'll

19   see that is an insurance summary for Mr. T, who's now deceased,

20   and his doctor, Dr. Desai, and the amounts that he was being

21   charged, $123.  And you can see that more clearly in the

22   last --

23         THE COURT:  That's his co-pay, right?

24         MR. HAVILAND:  Correct, Judge.  You can see on the

25   insurance document from the pharmacy, Trelles Pharmacy, on the

1    last two pages the $123 carried through and Mr. T's handwritten

2    note about his check payment.  I didn't bring all the records.

3    They're actually in an affidavit that we prepared some time ago

4    that's in the record, and we cite it in our briefs.  So he has

5    these two payments here in 2003.  One is May and one is

6    November.  And the breakdown of that is more clearly on the

7    invoice from the infusion technology folks.  You'll see

8    Trelstar.  I believe that's a three-month injection, 11.25, for

9    an '04 injection.  Again he makes a payment in September of

10   '04.

11          Trelstar, we have submitted a fairly detailed record

12   already of documents from Pharmacia that were available through

13   a Congressional FOIA request, and I'll hand up an affidavit

14   that attaches all those documents just so you can have them

15   again in front of you, Judge.  We handed them in in the June

16   submission, but just so they're front and center, I want to

17   make sure that you've got a complete set.

18          THE COURT:  So the bottom line is, is it evidence that

19   the spread was higher than 30 percent?

20          MR. HAVILAND:  Yes, your Honor.

21          THE COURT:  What was the spread?

22          MR. HAVILAND:  Again, it's the same as Lupron based

23   on -- may I approach, your Honor?

24          THE COURT:  Yes.  And that's based on something more

25   akin to ASP data rather than wholesaler data?

1          MR. HAVILAND:  Correct, Judge.  That document, Judge,

2    attaches -- it's a chart that shows our clients, and there are

3    three drugs that were discussed by counsel:  Trelstar, Eligard

4    and Depo-Provera.  You'll see that we have three clients that

5    purchased those drugs, so they're particular drugs of interest

6    to our clients.  Those documents, the ones I'd like you to

7    focus on on Trelstar are the AOR contract, which I believe was

8    used in depositions by class counsel, so they had the document;

9    but there's a proposal there at the time of launch of

10   triptorelin pamoate saying it was going to be launched with

11   comparable spreads, not my words, Pharmacia's.  So that's 1998

12   coming forward.

13          THE COURT:  Where is that?

14          MR. HAVILAND:  I handed up my copy.  Let me grab mine.

15          THE COURT:  You don't have another one?

16          MR. HAVILAND:  I have a backup here, Judge.

17          MR. MATT:  What page are you on, Don?

18          MR. HAVILAND:  Just give me one second.  If you go to

19   what we had as W-6 -- this is from another submission we made

20   in another case, Judge, but W-6 the tab, there's a proposal

21   there between --

22          THE COURT:  Wait.  I'm just --

23          MR. HAVILAND:  I think it's the last document if you

24   work forward.

25          THE COURT:  It's the last --

1          MR. HAVILAND:  The last series of documents, there's a

2     tab that says Exhibit W-6.  It looks like that.

3          THE COURT:  I'm there.  So now where do you want me?

4          MR. HAVILAND:  If you turn to the next page, Judge,

5     you'll see AOR Pharmacy and Upjohn Partnership Proposal, and

6     this is from 1998.

7          THE COURT:  AOR, I'm sorry, stands for?

8          MR. HAVILAND:  American Oncology Resources.  It's one

9     of these direct buying groups, Judge, that I'm talking about.

10    The data that Pharmacia would have to provide would be not

11    wholesaler data but the data that would show the purchases by

12    AOR and groups like that.  And the part I'd like you to look

13    at, Judge, with me is New Product Introductions.  P and U,

14    Pharmacy and Upjohn, is going to work with AOR on new product

15    introductions.  If you look at the next bullet where my finger

16    is, it says, "P and U will work with AOR at introducing our

17    LHRH."  That's the agonist to compete against Zoladex and

18    Lupron.  "Our LHRH brand Triptorelin will be available in late

19    second quarter or early third quarter."  The important part is

20    here:  "Pharmacia working with AOR would establish a pricing

21    mechanism for Triptorelin with spreads favoring AOR versus

22    current."  So that's actually saying that the spreads were

23    better.

24          Now, this is one of the few documents I can show you

25    in court, Judge, because it came from Congress.  It was

1    attached to a letter written to Congressman Stark.  You may be

2    familiar.

3             THE COURT:  Yes.

4             MR. HAVILAND:  He wrote some nasty letters to some of

5    the companies.

6             THE COURT:  I remember that.  Do you remember what

7    year this was?

8             MR. HAVILAND:  This is 1998, around the time that

9    triptorelin/Trelstar was launched.

10            THE COURT:  And is Trelstar the same as triptorelin?

11            MR. HAVILAND:  Yes.  It would be like leuprolide

12   acetate and Lupron/Eligard.  The brand name for it in the

13   marketplace would be Trelstar, but the chemical substrate would

14   be triptorelin pamoate, the same as goserelin acetate and

15   leuprolide acetate, okay?

16            THE COURT:  Okay, I understand.  So this is your proof

17   that at least for some period of time it was equivalent to

18   Lupron?

19            MR. HAVILAND:  Yes.  And the question is, we didn't

20   get discovery because it wasn't in the case, so we have to

21   probe past 1998 and see what was happening for the period of

22   time.  And we're in the heartland period, so it would be

23   important because we'd be talking 2X damages under the current

24   methodology.

25            THE COURT:  All right, so that's the scope of the

1    release.  And four would be how Eligard and Trelstar are

2    treated, and what was the fifth point?  Maybe there wasn't?

3              MR. HAVILAND:  No, no, no, I'm pausing.  I wanted to

4    make sure that under the scope of the release, we -- we do

5    object to the release of injunctive claims by this group of

6    plaintiffs where there's been no injunctive relief provided.

7    It's particularly of concern to folks in Class 3 like

8    Mr. Thomson, Mrs. Hopkins, our clients.  You've got the relief

9    given to Medicare recipients, but you don't have it -- the

10   simple fact is, you shouldn't release a claim like that if

11   you're not getting the relief; and the consumer association

12   plaintiffs who have been certified, that's their mission is to

13   change practices, and they haven't gotten any relief for that.

14   That's in our papers but -- so we have --

15             THE COURT:  Just out of curiosity, whatever happened?

16   Didn't I abolish or -- isn't AWP a relic of the past?

17             MR. HAVILAND:  One would hope, Judge, but in Medicare,

18   yes.  In some states, I suppose Medicaid has gotten away from

19   it, but --

20             THE COURT:  Didn't we in the McKesson case, weren't we

21   going to stop publishing AWPs?

22             MR. HAVILAND:  I don't think it's happened yet, Judge.

23   That's the problem.  It's still out there affecting folks.

24             THE COURT:  When is that going to happen?  Soon, if

25   not -- do you remember, Mr. Sobol?

Page 103

1           MR. SOBOL:  Both First DataBank and Medi-Span

2     represented, not as a part of the settlement but generally,

3     that they were going to discontinue, and I was reading some

4     articles just last night that there are going to be some

5     meetings of some Medicaid and non-Medicaid people to talk about

6     the eventuality of there being no --

7           THE COURT:  Do you remember what the timetable was?  I

8     don't.

9           MR. SOBOL:  I think it varied, actually, for the two

10    of them.  First DataBank I think is maybe this year.  I think

11    the Medi-Span has actually had some shifting of what it may or

12    may not do, so --

13          THE COURT:  I thought that was part of the agreement.

14          MR. SOBOL:  Actually, I think what you have indicated

15    is that you do not want that to be a part of the agreement

16    because you didn't want to be in the business of enforcing it.

17          THE COURT:  Oh.

18          MR. SOBOL:  So we took it out.

19          THE COURT:  No, I didn't want to be in the business of

20    enforcing what the price was, but, anyway, all right.

21          MR. HAVILAND:  A couple other points, Judge.  So I

22    wanted to bring that up as well, that the release should be

23    narrowed to not release injunctive claims in case someone

24    wanted to go out there and prosecute their claim and prevent a

25    situation like Trelstar being overcharged.

1            The fourth objection is to the representation itself

2     that took place in this case, and I don't want to beat the

3     drum, Judge.  You've substituted folks in, but none of those

4     folks bought any of these new drugs.  And if you go back to

5     basic principles, these drugs were not part of the calculus,

6     which is why the number was not sufficient to allow for an

7     adequate allocation.  You had individuals designated by lead

8     counsel to go into the negotiation room.  One was a PAL

9     representative, one was a HCFA representative, and an attorney,

10    Mr. Goldenberg.  But they were essentially given the same

11    matrix that we're dealing with today, 37 drug analysis by

12    Dr. Hartman, multi-source drugs, seven brands.  They never

13    looked at these drugs.  I've looked at these records very

14    closely to see and try to parse the words, but these were not

15    part of the drugs that were --

16           THE COURT:  When you say "these," you're talking about

17    the --

18           MR. HAVILAND:  The new ones.  We call them 85 --

19           THE COURT:  Excuse me.  There are only three to five

20    new ones.

21           MR. HAVILAND:  I understand that point.  We don't --

22    your Honor struck the drugs back in '06.  You struck new drugs

23    in '07.  We don't agree that the discovery was adequate.  I've

24    read the affidavits of defense counsel.  We dealt with that in

25    Pennsylvania.

1       THE COURT:  That's why I deliberately asked those

2   questions.  And I happen to agree with you that the affidavits

3   were broadly written, but I've drilled down, and they have

4   said, they've confirmed it's drug by drug.

5       MR. HAVILAND:  Well, if you look at the order of the

6   Pennsylvania judge we put in the record --

7       THE COURT:  I know, but I --

8       MR. HAVILAND:  -- they disagree with those affidavits.

9   And they were ordered to do some things that they haven't done

10  in this court, and they produced data that they didn't produce

11  in this court in evidence, so --

12      THE COURT:  Was it in the context of a settlement?

13      MR. HAVILAND:  No.  Litigation.

14      The problem we have now is, there's no one other than

15  your Honor forcing the reallocation decisions.  To do this

16  right, you need to have someone in the room that's going to

17  fight it.  Mr. Pentz offered to do that.  We filed a motion to

18  intervene.  At this point in time, it's clear that these drugs

19  aren't going out.  There was a decision months ago.  Your Honor

20  could have said we're not going to expand the scope of the

21  release.

22      You remember the City Partnership discussion.  Two

23  components of City Partnership:  discovery and adequate

24  traction from intervenors.  So we don't have the latter.  We're

25  just constantly trying to put glue into a situation to try to

1    fix it, but we're not starting with basic principles:  What

2    were the damages?  We've given you an estimate of that.

3    There's an attack on Mr. Lorusso's affidavit.  It's simply an

4    Excel spreadsheet, your Honor, that takes two variables,

5    Dr. Hartman's actual spread analysis and Mr. Coggeshall's

6    claims data, and it marries the two and tells you what the

7    differential is over and above the 14 percent that people are

8    currently getting.

9            Now, why is that important?  I want to show you why

10   everyone should be given the chance to make a --

11           THE COURT:  I don't understand what you just said, so

12   help me through that.

13           MR. HAVILAND:  Well, what we did with each of those

14   tables is, we took all the drugs that Dr. Hartman now

15   calculated a spread for.  We didn't have this until Wednesday,

16   but he went ahead and calculated some 30 drugs and said these

17   are the spreads.  Dey is in there, for instance.  He says

18   albuterol has a spread of 70 some percent.

19           THE COURT:  Yes, but the spreads on the multi-source

20   are weak.

21           MR. HAVILAND:  No.  Actually --

22           THE COURT:  You can't figure it out.  You just can't

23   figure it out unless you do the full median analysis.

24           MR. HAVILAND:  Well, that's true for litigation, but

25   this is settlement, and Dey has settled.  So the question now

1    becomes, how are we going to allocate Dey's money, in my mind?

2    And the median analysis is less important when you've got

3    somebody that can say, "I bought a Dey drug.  Why shouldn't I

4    be paid damages?" when Dr. Hartman says the damages for Dey

5    albuterol is X, and in his affidavit he says 77 to 80 percent.

6              THE COURT:  It was making certain assumptions, though,

7    right?  I mean, I have to take into account -- and actually not

8    one person here objected on the points being made of the median

9    analysis, which is that you have to figure out whether or not

10   drug-by-drug the phony AWP would have dropped the median.  It

11   was very difficult for me.  It was probably the hardest issue

12   in Track One as to how to address those.  So Hartman, as I

13   understand, was just making certain assumptions but wasn't

14   actually doing the median analysis, right?

15             MR. HAVILAND:  I think I agree with that, Judge, he's

16   not doing median analysis, but he is looking at spread and

17   overcharge analysis per defendant.

18             Now, I want to again bring it down to something that

19   makes sense and important.  I want to hand up my third exhibit

20   for Mr. W, survived by his wife Ethel.

21             THE COURT:  Have we been marking these, by the way?

22             MR. HAVILAND:  I'm calling them 1, 2, 3, 4.

23             THE COURT:  Now, I'm embarrassed to say, I have been

24   marking up your exhibits.  We should probably have some clean

25   ones for the --

Page 108

1           THE CLERK:  Do you want to call this 4?

2           THE COURT:  3, this is 3.  And maybe you'll give her

3    the 1 and 2 so that there's a record.

4           (Exhibit 3 received in evidence.)

5           MR. HAVILAND:  So the reason why I gave you this is,

6    Mr. W was deposed in this case before he passed along, and I

7    think Dey's counsel was surprised to learn that he had a box.

8    And, Judge, if I may, I'd like to hand this up to you.  It's

9    the demonstrative from the deposition.

10          The screens are just the copies that were marked at

11   the deposition, but Mr. W actually was a pack rat and he kept

12   his boxes, and it shows that he bought albuterol from Dey in

13   2003 and 2004.  Inside the box, Judge, there's the cover of the

14   box from 2003.

15          Now, the reason why I take the time to talk to you

16   about this is, Mr. W while he was living was a very, very

17   strong-willed individual, and I remember very distinctly a

18   conversation I had with him where he made me promise that we're

19   going to do the right thing in this case.  He didn't like class

20   actions, didn't like the way class counsel lawyers operate, but

21   he made me commit to this.  Now, his wife Ethel knows how

22   strong-willed he was and keeps asking me, how are we going to

23   get this thing done?  So the issue is, how are we going to get

24   it done?  He can demonstrate he bought Dey's product.  There's

25   no question about it.  We have in the records my affidavit in

1    support of the Track Two class certification from a while back,

2    the actual deposition, and the proofs that he paid for the

3    drugs --

4            THE COURT:  I don't think anyone's challenging

5    standing.  I didn't see it.

6            MR. HAVILAND:  The only issue, Judge, is, should he

7    just get 15 percent, or should he get something nearer to the

8    77 percent that Dr. Hartman calculated as a Dey spread?  That's

9    the issue for the Court.  It's a multi-source issue, yes, but

10   we're in settlement.  We've settled with a number of companies

11   that make albuterol.  They've put money in a blind box, and we

12   have to decide now how to allocate that.  So it's a blind

13   amount of money.  Why isn't it fair to say to those folks, "If

14   you can do this, you can get damages"?  To me, the thing you're

15   offering to the folks in Epogen is the same thing you should

16   offer to anyone else.  If you're going to go and give that

17   notice, it's to me cleaner to say to them, "If you can prove

18   that you have bought albuterol from Dey, you'll get damages."

19           THE COURT:  Well, they are going to get damages.

20           MR. HAVILAND:  I don't think so, Judge.  I think

21   albuterol is lumped into the group of Group B drugs at

22   14 percent.

23           THE COURT:  Right, right, right, so they'll get

24   prorated.

25           MR. HAVILAND:  Yes, and I'm just suggesting, now that

78515059-b96c-4759-a8be-bdac2ac3c612

1    we're in damage mode, we've switched the matrix from

2    out-of-pocket to damage mode, make it damage mode; give

3    everyone the option to get damages.

4         THE COURT:  Well, they're getting more than damages.

5    They're getting the out-of-pocket costs, as I understand it.

6         MR. HAVILAND:  Well, I'd like to see --

7         THE COURT:  They're actually getting a better deal in

8    some senses than the 600 percenters, or whatever it was,

9    because they're not going based on damages; they're going based

10   on costs because they can't compute them.

11        MR. HAVILAND:  If you look at Mr. Lorusso's

12   spreadsheet, he actually takes Dr. Hartman's overcharge and

13   runs it against the 14 percent to show you the difference.  And

14   there are a couple of instances, Judge, where you're going to

15   be reducing people from the 14 percent, but it's more equitable

16   to do that and pay people damages based across the board than

17   it is to do it piecemeal.  That's the point we're making.

18        THE COURT:  All right.

19        MR. HAVILAND:  If it's damages, make it damages and

20   allow people -- you'd be very surprised, Judge, people actually

21   know what they're taking.  Especially cancer patients, they

22   have someone in their care, a wife, a daughter, a son, who goes

23   with their parent, or whoever, and knows the drugs.  We got

24   drug lists right away from our client.  That's why our guy knew

25   he was switched to Eligard.  He wasn't happy about it.  This is

78515059-b96c-4759-a8be-bdac2ac3c612

1    their lives.  So I think it's -- if you're going to do it, just

2    let them do it.  That's all I'm asking.

3              THE COURT:  I get your point.  I'm not sure I'm going

4    to agree with you on the multi-source.  I think that that has

5    intractable and unique problems to both figuring out who's

6    taken what here -- this gentleman doesn't have that problem,

7    but it does for a lot of people -- but more importantly how to

8    figure out damages.  I'm not as worried about that at this

9    point as I am about how to calculate with these brand-name

10   drugs the spreads.

11             MR. HAVILAND:  I want to go over that with you, Judge,

12   and I'd like to --

13             THE COURT:  No, no, no, at this point I understand.

14   You're talking about Eligard and Trelstar, right?

15             MR. HAVILAND:  I've got some additional points I

16   wanted to make.  If you go to the Amgen drugs, and Enbrel is a

17   drug they excluded and put that in Group B, but they kept all

18   these Amgen drugs in Group A.  I don't understand that.  It's

19   interesting Mr. Matt said the same thing.  I'm looking at

20   Dr. Hartman's Table 1, and I'll put it up on the screen --

21             THE COURT:  And Enbrel, I thought we talked about

22   moving Neupogen.

23             MR. HAVILAND:  Well, and that's what I'm going to,

24   Judge.  I want to talk to you about that because I really don't

25   understand the logic behind moving one and not all based on

1    some matrix that makes --

2         THE COURT:  Well, it had to do with the percentage of

3    spread, right?

4         MR. HAVILAND:  There we go.  What I have here, I've

5    written "Neupogen."  There it is, you can see the one year --

6    and I'm on table 1 of Dr. Hartman's analysis -- 1.5 percent for

7    that one year.  But look at the others, Judge:  Neulasta,

8    3.2 percent in '02, 3.5 percent in '03, with an aggregate of

9    3.4 percent.

10        THE COURT:  Well, what does that mean?  There's

11   overcharge rather than --

12        MR. HAVILAND:  That's overcharge, so that's net of the

13   30 percent speed limit, okay, so you're below 35 percent, I

14   would assume.  Aranesp, you're just barely above that.

15        MR. MATT:  Those are overcharge ratios, your Honor.

16   They're not spreads.  Spreads are significantly larger than

17   that.  It's a calculation that Don doesn't understand.

18        MR. HAVILAND:  Well, I'm going right to the basic --

19        THE COURT:  Listen, listen, we don't -- let me just

20   say, so what would roughly those spreads be, the ones you gave

21   me, is that right?

22        MR. MATT:  I'm trying to find it for you, your Honor.

23        THE COURT:  All right, well, you'll look it up, and

24   then you'll -- so, in other words, he's saying that you're

25   comparing apples and oranges.

78515059-b96c-4759-a8be-bdac2ac3c612

1          MR. HAVILAND:  Well, Judge, I'm taking overcharge.

2     I'm trying to be consistent.  It kind of flips back and forth

3     between overcharge and spreads.  It's very hard to follow.  But

4     let's look at overcharge, just a 1.5 percent overcharge.  Some

5     of the criteria that were just recently added to the criterion

6     for Class A, if you go back and look at the '08 and '09

7     submissions, it wasn't that way.  It was simply, if it was

8     single-source brand with a spread --

9          THE COURT:  They're conceding they're putting Neupogen

10    in with Epogen.

11         MR. HAVILAND:  Okay.  Well, you've got to look at the

12    whole class.  You've got to look at the whole class and decide,

13    if you're going to take that one out, where is the line here

14    versus here?  And Neulasta is 3.2.  Aranesp is 6.9.

15         THE COURT:  It's triple.  So, I mean, you have to draw

16    some line.

17         MR. HAVILAND:  Okay.  Now, I want to understand the

18    line, Judge.  The utilization for Neupogen was $50,000 worth of

19    claims.  The drugs that you just went through with counsel had

20    millions of dollars.  Zemplar was $20 million.  So if you're

21    going to adopt these new criteria for in or out of Class A,

22    they have to be consistent because I look at that list of

23    drugs, and I focused on Eligard, it's 3 million.  But,

24    remember, there's an important part to that.  That's claims.

25    It's claims because we didn't tell people.  We didn't give

1   folks in the Medicare group of 19.3 that notice that they

2   should have gotten, the Eligard folks:  "Hey, you may have a

3   claim too," the Zemplar folks.

4        So I submit to you on notice -- and you wanted to know

5   what our last objection was, it's notice -- the notice should

6   go to everyone who had a --

7        THE COURT:  Well, let me ask you this:  The reason

8   I -- I initially agreed with you, and then when I saw the huge

9   amount of money that it would cost, and the fact that it would

10  come right out of the class's pockets with a very small

11  return -- I'd only get one out of five or so -- I made that

12  cost/benefit analysis because it's so much money.

13       MR. HAVILAND:  Judge, I am sympathetic to that.  I

14  looked and I was surprised to see how much money Rust and

15  Kinsella cost so far, $10 million.  But it's the defendants

16  that want to expand the scope.  Why shouldn't they pay the

17  notice costs at this point over and above?

18       THE COURT:  Because these are the two new ones.

19       MR. HAVILAND:  Why shouldn't they pay the notice for

20  all these new brands?  Remember the premise we began with.

21  These were all multi-source generics --

22       THE COURT:  No, only three are new, but maybe with

23  those -- so --

24       MR. HAVILAND:  My only point on notice, Judge, if I

25  may, is, if it's a brand, and people know it's a brand, and we

1  have a CMS database of identifiable people that bought those

2  brands, we can send it to their home with the data and say,

3  "Here's your damage.  Don't do anything.  Wait till the

4  preliminary approval is done, and at final approval you'll get

5  a check."  That's exactly what happened in Class A.  But now

6  we're rethinking the entire matrix.  We're thinking of taking

7  Neupogen --

8          THE COURT:  Yes, we're rebalancing -- I like that

9  term -- we are.

10          MR. HAVILAND:  So I'm only suggesting that you've got

11  a lot of solid brands here with a lot of utilization.  And

12  that's based on just having media notice, Judge.  Those folks

13  didn't get any mail, but you've got 20 million Zemplar claims,

14  3 million Eligard?

15          THE COURT:  We may have to go back into it,

16  particularly if we move some into A, but we don't have that

17  data yet.  So, all right, I get it, so notice.  So thank you.

18  So that's helpful.

19          All right, so now let me just hear from --

20          MR. HAVILAND:  Can I just say one -- I'm sorry, Judge,

21  I'll be finished.  I have one more objection, and it goes to

22  the core of --

23          THE COURT:  Number six.

24          MR. HAVILAND:  No, no, this has to do with the

25  allocation.  I'm sorry, I was jumping around with you, but --

1          THE COURT:  That's point two.

2          MR. HAVILAND:  Sub-point in allocation, and it goes to

3    TPP versus consumer because we seem to be hitting this wall.

4          THE COURT:  You said that, right.

5          MR. HAVILAND:  Well, the problem I have with the TPP

6    is, you've got ISHP with this, you know, black box where they

7    get money and then they're gone, and then you have TPP class,

8    and I'm not quite sure what's what.  But the case law we cited

9    to you in our recent objection says very clearly:  A class

10   member cannot opt out of a case down the road; you have to make

11   a decision early on.

12         THE COURT:  That confused me, but he was only a class

13   rep for Track One.

14         MR. HAVILAND:  Well, that's the interesting question.

15         THE COURT:  Not he.  I'm sorry, Blue Cross Blue

16   Shield.

17         MR. HAVILAND:  Blue Cross Blue Shield.  But they're

18   also bound by your verdict, Judge, so the question becomes --

19   this was one case they brought, and all of a sudden they want

20   to move over to ISHP.  I didn't see an opt-out form.

21         THE COURT:  Excuse me.  All of a sudden?  They haven't

22   been an ISHP all along?

23         MR. HAVILAND:  No.  They were your class rep in

24   Class 2 at trial.

25         THE COURT:  No, no, no, hear me out.  They were always

1   a class rep in Track one.  Were they ever a class rep in

2   Class 2?

3           MR. HAVILAND:  Good question.

4           THE COURT:  Excuse me, I said that wrong.  I'm getting

5   so confused.  Were they ever the class rep in Track Two?

6           MR. HAVILAND:  According to the filings, the complaint

7   and the class pleadings, I'd say "yes."  According to the most

8   recent, and I say in the last couple of months when they had to

9   give that ISHP list, which is an exhibit to a recent filing,

10  that list now tells us Blues of Massachusetts is over the ISHP.

11  There's no opt-out that I see because the opt-out list is a

12  group of about 20.

13          THE COURT:  Oh, so you're saying they didn't opt out

14  in a timely way?

15          MR. HAVILAND:  Correct.

16          THE COURT:  All right, well, that's a useful point.

17  Thank you.

18          MR. HAVILAND:  And I questioned the opt-out

19  measurement, and I asked your Honor to look at it closely, and

20  you say why?  More money to TPP class is more money potentially

21  to allocate to consumers in a renegotiation to refix.  On the

22  opt-out list, you've got two defendants, AstraZeneca and

23  Boehringer, and one law firm, Davis Polk.  Why are they as an

24  opt-out in this case?  It makes me think that the group of TPP

25  class members isn't being defined very well if we're putting

1    affidavits in saying that of the 20, 15 percent are defendants

2    in defense law firms.  So there's a lot of money in TPP

3    universe that we don't look at, Judge.

4         THE COURT:  Now I'm confused.  You're saying

5    AstraZeneca is --

6         MR. HAVILAND:  There's an opt-out list, and the

7    company AstraZeneca has opted out of this class settlement.  So

8    has Boehringer Ingelheim.  So has Davis Polk, the law firm.

9         THE COURT:  Well, why would they be in it?

10        MR. HAVILAND:  Good question.  They shouldn't be, but

11   why were they defined and think they had to opt out?  We need

12   to look at that group of people that are claiming in TPPs to

13   see whether or not there's other companies, other law firms

14   that aren't in the class.  That's my only point.  There's money

15   there that shouldn't be claimed.

16        THE COURT:  I'm now confused.  You briefed the Blue

17   Cross, but I didn't know the others, so that may be new to you

18   as well.  So, okay, thank you very much, Mr. Haviland.

19        MR. HAVILAND:  Thank you, Judge.

20        MR. MATT:  I don't understand Don's point on that,

21   your Honor.  Blue Cross, they're bound by the settlement.

22        THE COURT:  Say it --

23        MR. MATT:  They're bound by the settlement, ISHPs.

24        THE COURT:  No, but did they opt out in a timely way?

25        MR. MATT:  I'm confused by that.  I don't think the

1    ISHPs are opting out.

2           THE COURT:  Of course they are.

3           MR. MATT:  They give a full release.  They give a full

4    release.

5           THE COURT:  Excuse me.  ISHPs, if I've defined the

6    class as all third-party payors, the reason somebody is an

7    independent settling health plan is because they've opted out

8    because they did their own deal.  Is that wrong?

9           MR. MATT:  They give a full release within the context

10   of this settlement.

11          THE COURT:  Excuse me.  Wait, stop, stop.  Let me

12   start at base one:  Are there independent settling health

13   plans?

14          MR. MATT:  All right, I'm going to quote from the

15   settlement agreement, which defines TPP settlement class

16   members means, "Any TPP that falls within the definitions of

17   Settlement Classes 2 and/or 3 is a TPP and not a natural person

18   and is not an opt-out.  Members of the ISHP group are TPPs but

19   are not TPP settlement class members."

20          THE COURT:  Right, because they've opted out.

21          MR. MATT:  That doesn't clarify for me whether they

22   opt out.  I just don't know.

23          THE COURT:  They've got to opt out.

24          MR. BARLEY:  They're not part of the class.

25          MR. MORGAN:  Peter Morgan for Baxter, your Honor.  I

Page 120

1   think they were defined out of the class.  It may be a

2   functional equivalent of opting out, but they're defined out of

3   the class by the definition.

4           THE COURT:  Well, as you know, I haven't certified the

5   class, and all these little clauses keep popping up that I

6   don't understand the significance of.  In the past what's

7   happened is, ISHPs opted out and did a separate arrangement

8   where they got paid earlier.  That's what happened in the past.

9   Is that what happened here?

10          MR. MATT:  That's what happened.  I don't know about

11  the opt-out language, but they got paid, and, you know, they

12  give a full release whether or not the settlement is approved.

13          THE COURT:  I mean, just that's weird to do it the way

14  you just did that.

15          MR. BARLEY:  Well, as I understand it, they were never

16  defined as part of the class, so they didn't need to opt out.

17  There was a separate settlement with them.

18          THE COURT:  Well --

19          MR. MATT:  I'm not going to say anything else about it

20  because you've exhausted my minimal knowledge on it.  I

21  apologize.

22          THE COURT:  Well, let me ask you this.

23          MR. MATT:  They give a release.

24          THE COURT:  If we did it that way, it's different than

25  we've done all the others, right?

Page 121

1          MR. MATT:  The same way it was handle in the

2     AstraZeneca settlement.

3          THE COURT:  We didn't do it as an opt-out; we did it

4     as a definition?

5          MR. MATT:  Yes.

6          THE COURT:  In all of the other ones?

7          MR. MATT:  Yes.

8          THE COURT:  I had been understanding all along that

9     they'd opted out.  I'm not sure the difference has a legal

10    meaning.  I'm not sure.

11         MR. MATT:  The practical effect is immaterial.

12         THE COURT:  I'm not sure if it matters.

13         MR. HAVILAND:  Judge, that "it's the same as

14    AstraZeneca" makes my point.  BCBS went to trial in AstraZeneca

15    and had a verdict rendered, so they couldn't have opted out.

16         THE COURT:  But that was Track one.  They can take a

17    different stance in Track Two.  I just have never focused on

18    that before, quite candidly, that there wasn't a technical

19    opt-out; it was a class definition.  I'm not sure it matters.

20    I'm just thinking about it for the first time.

21         What do you think?

22         MR. SOBOL:  Your Honor, my recollection is that in

23    each of the other AWP, and, frankly, other settlements, it's a

24    definitional issue with respect to the class.  It's

25    functionally accomplishing, though, an opt-out because we are

Page 122

1  told prior to negotiating the terms of the settlement that

2  there is a group of third-party payors that want to be called

3  "independent settling health plans."  So to accomplish the

4  function of them, quote, "opting out" of the class, they're

5  defined out of the class to begin with as a part of the

6  settlement agreement.

7          THE COURT:  And BCBS, was it part of the group that

8  you understood right from the get-go was an independent

9  settling health plan no matter whether you described it as an

10 opt-out or as a definition?

11         MR. SOBOL:  I don't know for Track Two.  I think for

12 Track Two it appears that they were treated as an ISHP.

13         THE COURT:  All along, so it had no impact on

14 settlement?

15         MR. MATT:  Okay.

16         THE COURT:  You don't know?

17         MR. MATT:  No, that --

18         THE COURT:  Will you confirm that?  So that's on your

19 little checklist of things to do.

20         MR. MATT:  We'll put it on our checklist.

21         THE COURT:  All right, so that at this point may be a

22 side issue.  I just incorrectly thought that they were opt-outs

23 rather than it's a definitional issue.

24         So let me start with the one that to me is the most

25 troubling, which is, you know, I flagged it as we went through

1  each of the branded drugs, why we were using wholesaler data

2  when we dealt with direct sales to physicians.  That resonates

3  because I remember looking at that in Track One.  So why didn't

4  Dr. Hartman look at ASPs, average sales price, for the record?

5  Why wouldn't he look at some approximation of that rather than

6  at wholesale data?

7       MR. MATT:  He did in addition to wholesale data.  So

8  what he describes in his declaration is that it's not just

9  based on wholesaler data but also based on ASPs reported to the

10  government, and those ASPs include discounts that wouldn't

11  otherwise show up in the wholesaler data.

12       So what he hasn't done, okay -- let's just be clear on

13  what he hasn't done -- he hasn't taken all of the underlying

14  transaction data transaction by transaction from the defendants

15  for these group of drugs, okay, because he doesn't have it.

16  What he's done instead is, he's looked at the wholesaler data,

17  and he's augmented it with reasonability checks based on what's

18  called ASP data that's reported to the government like in an

19  ex post basis.  They report it, I believe, quarterly.

20       THE COURT:  Right, this is part of the Medicaid.

21       MR. MATT:  Part of the Medicaid, exactly.

22       THE COURT:  So he compared it.  So what would be

23  useful to have when you go back to him, or Mr. Augustine after

24  his -- he won't have a week in the sun, it's cloudy -- he

25  should come back to me, and next week he should have his week

Page 124

1    in the sun -- but is look at ASP data because doesn't that

2    sound more close to what we're worried about?

3         MR. MATT:  He did, but we'll double-check that.

4         THE COURT:  Double-check because he does say

5    wholesaler data.  Remember I asked about that, and it got me

6    worried because I remember back to Track One, where I learned

7    most of what I have to know about this, that in the physician

8    context, for the most part the wholesalers like McKesson

9    weren't involved.

10        So you think as we sit here right now that the

11   30 percent, you know, that quote "minimally over 30 percent,"

12   if at all, is based on ASP data, not on wholesaler?

13        MR. MATT:  Both, he's looking at both.

14        THE COURT:  Yes, I understand, but they're radically

15   different sometimes.

16        MR. MATT:  They are, but he's using them as a

17   reasonable proximity, so he's doing kind of a double check on

18   it, okay?

19        THE COURT:  That isn't intuitively making sense to

20   me -- maybe I'm getting tired -- because the wholesaler data,

21   the WAC, if you will -- or I forget what else they called

22   them -- I think sometimes they're called direct price --

23   there's another wholesaler acronym term that's being used --

24   are always different than ASPs.

25        MR. MATT:  He's finding that it's consistent based on

1   the ASPs he did review.  That is in his declaration, but we'll

2   double-check.

3          THE COURT:  So you'll go back and double-check on that

4   to make sure it's true because I understand what Mr. Haviland

5   is saying with the two that competed with Lupron.  If those

6   were up at 70 to 75 percent, there's at least some concern.

7   Maybe it turns out not to prove up --

8          (Discussion between Mr. Sobol and Mr. Matt.)

9          MR. HAVILAND:  Judge, I just ask you to look at

10  Dr. Hartman's affidavit at Footnote 50 where he says that

11  wholesaler data does not include rebates or direct sales from

12  the manufacturer to the relevant classes of trade; and at

13  Paragraph 45 he says that he only looked at published ASPs as

14  of January, 2005, with the new Medicare regulations to

15  corroborate those findings.  So the ASP data we're talking

16  about is manufacturer-driven, direct-to-physician sales, the

17  information they know when their sales reps go out and sell

18  their drugs.

19         THE COURT:  All right, thank you.

20         MR. MATT:  We'll narrow that down some more with

21  Dr. Hartman, but he has taken into consideration ASPs, and he's

22  thought that based on his ASP review, his wholesaler review is

23  reasonable.

24         THE COURT:  Now, let me just say this:  This is for

25  settlement.  I don't need the same quality of data that you

1    would have in litigation.  I mean, we could do spot checks.  In

2    other words, we could go across one a year or different

3    quarters just randomly chosen.  But I do think it has to be

4    based on ASP and not the wholesaler data.  I mean, I don't know

5    that we need everything the way you would in a trial, but you

6    have some -- I understand what he's saying, Mr. Haviland, that

7    if Eligard and Trelstar were competing with Lupron, as I

8    understand the market based on the way you taught it to me,

9    they would need to be able to compete on the spread in the

10   beginning.  Who manufactures those again?

11            MR. MATT:  Lupron manufactured --

12            MR. KOON:  Eligard is an Aventis product.

13            THE COURT:  So do you know whether that data is easily

14   accessible?  Did you produce it during discovery?  Do you know?

15            MR. KOON:  I'm not sure exactly what we produced, but

16   we will make sure that the experts for the plaintiffs have what

17   they need.

18            THE COURT:  Because that's the one thing that I've

19   heard so far that might make a difference on the brand in terms

20   of the amount of the settlement.  Right now the way you've cast

21   it, the amount seems perfectly reasonable because there's so

22   little liability; but if it turns out that the wholesaler

23   numbers don't correspond with the ASPs, in part or in whole,

24   then it may be not a fair allocation, or, more importantly, a

25   fair amount.  If in fact they do, I don't see what the problem

Page 127

1   is with the amount.  So, I mean, that's a question mark for all

2   of us, and we're only talking about the 22 brand drugs.

3        MR. MATT:  We will narrow that down further for you,

4   your Honor.

5        THE COURT:  So that would just be worth doing.

6        On the notice issue -- well, let me just say, on the

7   scope of the release, I actually think, if there's no liability

8   for a drug, I have no problem with a new defendant being added

9   to a release on that drug, but it's on the assumption that

10  there's no liability.  As I said, the settlement amount and the

11  allocation seem reasonable to me, if the liability plays out

12  the way you expect it to.  If it doesn't, it may not.  So

13  that's the spread numbers.

14       On the rebalancing, you're going to give it to me.

15  One thing I'm just thinking through, the class reps, I think I

16  can -- while I have insisted for litigation purposes a rep for

17  every drug, I'm not positive that's necessary for settlement

18  purposes, and, in addition, I've found no bar to adding the

19  reps at this point that have been proposed.

20       Now, we get to notice.  I was extremely worried about

21  the cost of the notice.  As you know, that's why -- I didn't

22  get an objection from you all, and I just did it because the

23  money was so overwhelming.  And I can't remember what the

24  deadline was that unless I did something by such and such, I

25  was going to move this class off by months or -- there was some

78515059-b96c-4759-a8be-bdac2ac3c612

Page 128

1  cycle, wasn't that right?  There was a reason why I got this

2  emergency motion on a Friday.  There was some -- to make the

3  deadlines we had set, I think it was.

4          MR. MATT:  Are you talking about last Friday?

5          THE COURT:  No, I'm sorry.  This was --

6          MR. MATT:  Oh, you're talking about way back?

7          THE COURT:  -- way back when I made the decision.

8          MR. MATT:  Oh, yeah, this was the whole problem with

9  being the CMS data.

10          THE COURT:  Yes, but it also had to do -- there was an

11  emergency motion on how we were going to pay for it because we

12  needed to meet certain deadlines as set out in the website or

13  something.  I'm trying to remember.  But apart from that, now I

14  have a second bite if I rebalance it.  So on the notice, the

15  issue really is at the end of the day, if we change all this

16  and we rebalance it all, your proposal is, I give direct mail

17  to anybody whose amount goes down?

18          MR. MATT:  Who filed a claim, correct.

19          THE COURT:  So now I'm just trying to figure this out.

20          MR. MATT:  It's going to be about less than 60,000

21  people.

22          THE COURT:  But if we move people into Class A --

23          MR. MATT:  They might get more, so they don't even get

24  the notice.

25          THE COURT:  But at least theoretically, if I move a

1    drug into Class A, they should have received the direct mail to

2    begin with.  So I don't know if anything falls in that

3    category, but as you're doing the rebalancing, you need to

4    think about that.  Let's say I took Eligard and Trelstar, for

5    example.  Let's say you found out that it really, at least for

6    certain periods, was closer to Lupron and we needed to move it

7    into Class A, I think we need to do a notice to those people

8    and give them the same rights that the Class A people got;

9    whereas anyone we moved out of it, we'd only have to give them

10   notice if they're getting a less amount of money.

11         I'm hoping I'm going to get a transcript of this so

12   that I remember everything that I have said, but hopefully you

13   will as well.

14         What I really want to do is essentially, ideally, put

15   this to bed, but what's critical are these new numbers and the

16   new rebalancing; and I want a principled basis on an

17   evidentiary record, which I am now understanding so much

18   better, so thank you to everybody, to everybody, including the

19   objectors.  I think I understand it.  I didn't understand it at

20   all last time, and I'm beginning to.  It's far more complicated

21   than Track One, and I understood Track One a lot better, but

22   I'm getting there.  I'm getting close, in fact very close.  So

23   as soon as we have all these numbers -- I'm not seeing a need

24   to come back here unless I don't understand the numbers.  I

25   know Mr. Haviland has flown back here.  People put a lot of

1    effort, a huge amount of effort.  I hate to think what this

2    three hours cost.  I don't know that I need another hearing.

3    So I'm just trying to figure out a procedure right now, which

4    is, you'll give me the new data by -- unless it's impossible.

5    I'm working off the deadline of this law clerk leaving too, all

6    right?  I understand your expert is on vacation next week.  So

7    if we put it at --

8              MR. MATT:  This week actually.

9              THE COURT:  Oh, that poor guy.  He should come back.

10   Where is he?  It's going to rain the entire time.

11             MR. MATT:  I don't know.  He wouldn't even tell me.

12             (Laughter.)

13             MR. MATT:  You know, he did all this for us, and then

14   there was a huge McKesson declaration due apparently as well,

15   so --

16             THE COURT:  If he's on Cape Cod, he wants to come back

17   for the week, but if not, maybe there's a place in the sun,

18   Saint Augustine, Florida, maybe.  So let's just say -- today is

19   the 8th? -- he's gone for the week.  So unless you can get

20   someone else, my guess is, he can't get it to me till the 19th.

21   Is that right?

22             MR. MATT:  I think that would be the earliest.  We'll

23   try to do it earlier than that, but I think that that. . .

24             THE COURT:  And do it by noon?

25             MR. MATT:  That's cutting it real close.  The 19th is

1    what, next Wednesday?

2              THE CLERK:  Next Friday.

3              MR. MATT:  That's next Friday?  Okay.

4              THE COURT:  Not this Friday, next Friday.

5              MR. MATT:  I tell you what, we'll shoot for it, all

6    right?  If we meet and caucus with them and they say it's

7    impossible because X, Y, Z, we'll file a very specific one-page

8    filing saying why we can't do it.

9              THE COURT:  Only on that issue.  I don't want any

10   other issue coming up.  If there's any objections -- well,

11   you're going to also have to file something with me on your

12   rebalancing.

13             MR. MATT:  Oh, that's assumed in this, yes.

14             THE COURT:  So this is just going to be on the data --

15             MR. HAVILAND:  Judge, I'm sorry to interrupt.

16             THE COURT:  No, no, no, I'm just trying to figure

17   out --

18             MR. HAVILAND:  Yes, there were three drugs.  I didn't

19   spend the time on Depo-Provera.  You remember there were three.

20   And Mr. R, our client, took Depo-Provera.  It's one of those

21   small volume, you know, $10 drugs but --

22             THE COURT:  He's going to be doing these ASPs with all

23   the branded drugs.  We're going to figure out what the spread

24   is and whether they should be in A or B on a principled basis

25   based on their spreads, which if there's marketing -- as I

1    understand it, very little marketing data, spread marketing has

2    been found, so it's only about the spreads.  If it proves up

3    the way Dr. Hartman predicted, there's likely to be very little

4    change other than maybe Epogen.  But if in fact Mr. Haviland is

5    correct that it was competing with Lupron for certain periods

6    and this was up around those 70 percent spreads, then we may

7    move it into A.  That's why the rebalancing can't happen till

8    you find out these numbers.

9            So let's assume you get those numbers simultaneously

10   with me, that's going to be critical to your thought process,

11   right, as to how you think about them?  So you're going to have

12   to do what, get me a new brief by, ideally speaking, when, like

13   the --

14           MR. MATT:  I'm going to try and give you everything on

15   the 18th.

16           THE COURT:  Gee, that would be terrific.

17           MR. MATT:  I'm going to try.

18           THE COURT:  Whenever you get it in, I'll give

19   objectors -- in particular, since it's really been

20   Mr. Haviland's issue, send it to him and work through the

21   numbers with him because at that point I would like there to

22   be, ideally speaking -- I don't know that I got his.  He was

23   going to submit an in camera declaration, have you done that,

24   about why it didn't mediate?

25           MR. HAVILAND:  I have one, your Honor.  I'm happy to

1    submit it.

2        THE COURT:  Well, at this point, why don't we hold in

3    abeyance and see once we have the numbers.  But if you're going

4    to object, I'm not here to destroy anyone's vacation, but I've

5    got a problem, in that this law clerk walks out the door

6    September 2, and for me to hand it to someone else will be a

7    huge big deal if I need to write.  I'm not sure I do need to

8    write, by the way, other than maybe on the class reps issue.  I

9    may just speak off the bench.  And if we can't do it, we can't

10   do it, but I would like to try and do it and not see you all

11   again other than if it's essential to my not understanding

12   something.

13       Does everyone agree?  No one needs to see me again,

14   right?

15       MR. BARLEY:  Your Honor, the only other point that I

16   would raise is that this issue with respect to Epogen is more

17   than just an allocation issue.  It's actually proposing the

18   extent of the release.  And I hear everything your Honor has

19   said today, and I'll convey it to my client, but I do need to

20   speak with my client to make sure that the change that your

21   Honor has suggested today would be something that they would

22   agree to, since it changes what they paid for the settlement.

23       THE COURT:  Right.

24       MR. BARLEY:  So I just didn't -- if there was some

25   issue, I didn't want to catch you by surprise.

1          THE COURT:  So let me know, let me know.  I just don't

2    see there being any liability there, but some liability on the

3    AWP side.

4          MR. BARLEY:  I agree with that analysis.  I don't know

5    about liability but some risk for sure.  And certainly in the

6    statutory rate, I don't believe there's any risk or any

7    liability, but it is different than what the client has signed

8    off on.  It came up today.

9          THE COURT:  I agree, you need to check with your

10   client.

11         MR. BARLEY:  Exactly.

12         THE COURT:  Otherwise he would be -- or it, she,

13   whoever it is -- would be pretty annoyed, I agree.

14         MR. BARLEY:  Yes.  Thank you, your Honor.

15         MR. MATT:  Your Honor, I have a very important

16   housekeeping matter before we adjourn.

17         THE COURT:  Yes, but before we're over, and you're

18   going to give me a proposal for the notice, and we'll talk

19   about this.  And the only question I have is, do I need another

20   hearing?  Should we even set one just in case?

21         MR. MATT:  Why don't you wait to see what comes in on

22   18th and make your decision then.

23         THE COURT:  Okay.  Okay, so assuming it all comes in

24   on the 18th, and what did I say, three business --

25         MR. MATT:  The 19th, I'm sorry.

1          THE COURT:  The 19th, and then I say three business

2     days for any objectors.  So by the 25th at noon I should get

3     something filed by any objector.  You guys are fast at turning

4     it around.

5          MR. MATT:  It has taken a monumental effort.

6          THE COURT:  And no one here should be super-macho.  Am

7     I destroying someone's vacation here?

8          MR. MATT:  It's already done.  We're already past

9     that.

10          (Laughter.)

11          MR. MATT:  I spent more time talking to him from

12     Hawaii than I did playing, and it's only a slight exaggeration.

13          THE COURT:  So maybe we'll invite all the meaningful

14     relationships to come in for a reunion.  But if it's humanly

15     possible, I would like to finish this by the time Ms. Phillips

16     leaves.  If it is not, I've got really smart ones coming in the

17     front door.  The most important thing, and I've given it

18     careful attention, is to get it right.  It's very important to

19     get this money out to these people.  And I'm concerned about

20     appeals.  That's why I am setting a very -- because that will

21     delay it two or three years.  And what I would also like is

22     some sort of, if you have time, briefing on whether it would be

23     appropriate to set an appeal bond.  I've done that before.  And

24     I am delaying and being painstaking here in trying to figure

25     out whether I'm going to accept this because I did think the

1   brand issue was just the one that sort of -- and Epogen were

2   the two that stuck on me as to whether or not once I've fixed

3   this all and we've re-noticed it, it will be what I believe in

4   my heart is a fair settlement, and I will try to discourage it

5   from being held up forever.  I don't remember what the case law

6   is on that, but it would be useful to brief that.

7          MR. MATT:  You already did in the context of GSK, if I

8   remember correctly.

9          THE COURT:  I did.

10         MR. MATT:  Yes, so there's precedent for an appeal

11  bond here.

12         THE COURT:  But that was a long time ago, and I don't

13  know what the case law has been since then.  If I remember,

14  there was a paucity of case law.

15         MR. MATT:  We'll brief that for you, your Honor.

16         My last housekeeping matter is, we have filed a motion

17  to strike the Michael Lorusso declaration, and we implore the

18  Court to please take a careful look at that motion.  This is --

19         THE COURT:  Well, I have not read that yet.

20         MR. MATT:  Okay.

21         THE COURT:  I have not read that yet.  I do deny the

22  motion to quash.  I do deny the motion to intervene as

23  untimely, and I've got class representatives.  I haven't read

24  that one yet.

25         MR. MATT:  You mean you grant the motion to quash

1    the --

2            THE COURT:  I grant the motion to quash.  I deny the

3    motion to intervene.  I just haven't read that one yet.

4            MR. MATT:  Okay, and we --

5            THE COURT:  To the extent it's just a comparison of

6    numbers -- I haven't read it -- to the extent it's just

7    comparing numbers, I don't know why even a lawyer, even a

8    lawyer couldn't do that as a summary document.

9            MR. MATT:  I assure you it goes well beyond that and

10   purports to calculate damages based on nonexistent spreads.

11   Our brief is very clear.  I've got nothing to add to our brief.

12           THE COURT:  Well, let me put it this way:  Whatever

13   weight I give it will not be based on that; it will be based on

14   real numbers from these drugs; but the point is well-taken that

15   we should be looking at the equivalent of ASPs.

16           MR. MATT:  I'm worried about the First Circuit looking

17   at this, not your Honor.  I think your Honor understands it for

18   what it's worth, and it's not worth much.

19           THE COURT:  Well, I haven't read it, I haven't read

20   it.

21           MR. MATT:  You'll read our motion and --

22           THE COURT:  It just came in, and I just haven't read

23   it, okay.  Of all the things I'm worried about, it's the least

24   of it.  The most important thing, is the settlement amount

25   right?  Is the allocation right?  How do we balance?  Are the

1    numbers that Dr. Hartman gave us, do they prove up against

2    ASPs?

3            And then last but not least is, how do I notice

4    people?  I'm likely to do for people who are getting less a

5    second opt-out.  I don't know why they might want to stay with

6    it.  I mean, I don't know.  Maybe they'll hate me and be so

7    disgusted they won't have nothing to do with it, or maybe

8    they'll stay with it, but in fairness to them, it's a different

9    deal.  So thank you.  We stand in recess.

10           MR. MATT:  Thank you, your Honor.

11           (Adjourned, 12:28 p.m.)

1                C E R T I F I C A T E

2

3

   UNITED STATES DISTRICT COURT )
4  DISTRICT OF MASSACHUSETTS    ) ss.
   CITY OF BOSTON               )
5

6

7          I, Lee A. Marzilli, Official Federal Court Reporter,

8  do hereby certify that the foregoing transcript, Pages 1

9  through 138 inclusive, was recorded by me stenographically at

10 the time and place aforesaid in Civil Action No. 01-12257-PBS,

11 In Re:  Pharmaceutical Industry Average Wholesale Price

12 Litigation, and thereafter by me reduced to typewriting and is

13 a true and accurate record of the proceedings.

14    In witness whereof I have hereunto set my hand this 15th

15 day of August, 2011.

16

17

18

19

20         /s/ Lee A. Marzilli

21         _____
           LEE A. MARZILLI, CRR
22         OFFICIAL FEDERAL COURT REPORTER

23

24

25

78515059-b96c-4759-a8be-bdac2ac3c612