# Exhibit A

Thomas W. Corbett, Jr., Attorney General
COMMONWEALTH OF PENNSYLVANIA
16th Floor, Strawberry Square
Harrisburg, PA 17120

### IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | |
|---|---|
| **COMMONWEALTH OF PENNSYLVANIA** by THOMAS W. CORBETT, JR., in his capacity as Attorney General of the Commonwealth of Pennsylvania, <br><br> PLAINTIFF, <br><br> v. <br><br> TAP PHARMACEUTICAL PRODUCTS, INC.; ABBOTT LABORATORIES; ASTRAZENECA PLC; ZENECA HOLDINGS, INC.; ASTRAZENECA PHARMACEUTICALS LP; ASTRAZENECA LP; BAYER AG; BAYER CORPORATION; SMITHKLINE BEECHAM CORPORATION D/B/A GLAXOSMITHKLINE; PFIZER, INC.; PHARMACIA CORPORATION; JOHNSON & JOHNSON; ALZA CORPORATION; CENTOCOR, INC.; ETHICON, INC.; JANSSEN PHARMACEUTICAL PRODUCTS, L.P.; MCNEIL-PPC, INC.; ORTHO BIOTECH, INC.; ORTHO BIOTECH PRODUCTS, L.P.; ORTHO-MCNEIL PHARMACEUTICAL, INC.; AMGEN, INC.; IMMUNEX CORPORATION; BRISTOL-MYERS SQUIBB COMPANY; BAXTER INTERNATIONAL INC.; BAXTER HEALTHCARE CORPORATION; IMMUNO-U.S., INC.; AVENTIS PHARMACEUTICALS, INC.; AVENTIS BEHRING, L.L.C.; HOECHST MARION ROUSSEL, INC.; BOEHRINGER INGELHEIM CORPORATION; BOEHRINGER INGELHEIM PHARMACEUTICALS, INC.; BEN VENUE LABORATORIES, INC.; BEDFORD LABORATORIES; ROXANE LABORATORIES; SCHERING-PLOUGH CORPORATION; WARRICK PHARMACEUTICALS CORPORATION; SCHERING SALES CORPORATION; DEY, INC., <br><br> DEFENDANTS. | No.: 212 M.D. 2004 <br><br>  |

## CORRECTED AMENDED CIVIL ACTION COMPLAINT

The Commonwealth of Pennsylvania, by and through its Attorney General [hereinafter "the Commonwealth"], brings this action on behalf of the Commonwealth's departments, bureaus and agencies of the Commonwealth as injured purchasers and/or reimbursers of prescription drugs, and as representative of, and as *parens patriae* on behalf of the citizens of Pennsylvania [hereinafter "Pennsylvania Consumers"], and to protect the Commonwealth's general economy to obtain compensatory damages, restitution, civil penalties, injunctive and other equitable relief, as more fully set forth below, and, upon information and belief, avers as follows:

### INTRODUCTION

1.    This lawsuit seeks to recover for the Commonwealth and Pennsylvania Consumers money wrongfully paid for overcharges in the cost of prescription drugs as a result of the wrongful conduct of Defendants detailed herein since at least 1991 through the present ["the relevant time period"].

2.    Since the 1960s, prescription drugs have been reimbursed by government agencies and private employers and health plans on the basis of Average Wholesale Price ("AWP"). Originally, AWP was based on actual survey of wholesale prices. More recently, AWP has become a price set by the Defendants at levels which have nothing to do with actual wholesale prices for their drugs. By falsely setting AWP at prices other than actual average wholesale prices, the Defendants have:

        a)    dramatically increased the prices of individual prescription drugs since 1991; and

2

b)    generated a spread between the actual wholesale selling prices and AWP that is used to distort the prescription drug market by (i) paying spreads to prescribers; (ii) paying rebates and kickbacks to others who establish formularies and preferred drug lists; and (iii) otherwise funding promotional activities which mislead prescribers and consumers about the value of prescription drugs.

3.    Two of the principal defendant drug company groups named in this lawsuit, Defendant TAP and the AstraZeneca Defendants, include companies that pled guilty to criminal charges involving unlawful marketing and sales practices with respect to certain of their prescription drugs reimbursed under federal programs, such as Medicare, and Commonwealth programs, such as the Medicaid program, and they paid record criminal penalties for this admittedly wrongful conduct. In addition, four of the other principal defendant drug company groups in this lawsuit, the Bayer Defendants, the GlaxoSmithKline Defendants, the Pfizer Defendants, and the Schering Defendants, include companies that have settled federal civil claims involving unlawful marketing and sales practices with respect to certain of their prescription drugs. Although civil settlements are not an admission of liability, to the extent the conduct covered by those settlements was actually unlawful, the only compensation the Commonwealth has received for those settlements was for the Commonwealth's Medicaid Program.    No compensation for any damages caused to other Commonwealth programs or agencies has been paid by the Defendants. The Commonwealth seeks such damages in this lawsuit.  The Commonwealth does not seek any damages for its Medicaid program for the drugs on which it has already received compensation.

3

4.     The Commonwealth was partially compensated by the foregoing criminal and civil actions for losses suffered by the Commonwealth's Medicaid Program for certain drugs that were reimbursed under the Commonwealth's Medicaid Program. These drugs include Lupron®, Zoladex®, KOaTE®, Kogenate®, Konyne-80 Factor IX Complex, Gamimune N, 5% Immune Globulin Intravenous (Human, 5%), Gamimune N, 10% Immune Globulin Intravenous (Human, 10%), Thrombate III Antithrombin III (Human), Cipro®, Adalat, Flonase®, Paxil®, Claritin, and Lipitor® [the "Subject Drugs"]. The Commonwealth seeks by this action to compel the Defendants to make full restitution under the laws of Pennsylvania to the Commonwealth for all payments made for the Subject Drugs by the Commonwealth, other than the Commonwealth's Medicaid payments, and for all payments [both Medicaid and non-Medicaid] made by the Commonwealth for all other drugs manufactured, distributed, marketed and sold by the Defendants that are subject to the claims set forth herein.

5.     Since no Pennsylvania Consumer has been compensated by the foregoing federal criminal and civil actions for any payments made for the Subject Drugs, the Commonwealth also seeks by this action to compel the Defendants to pay full damages to Pennsylvania Consumers for all drug overpayments, including payments for the Subject Drugs, suffered as a result of the wrongful conduct of the Defendants.

6.     Lastly, the Commonwealth seeks to prohibit and permanently enjoin such wrongful conduct in the future and thereby gain the benefit of significant savings in the form of prices that are not artificially inflated.

7.     The Commonwealth believes and therefore avers that all of the drug companies named in this lawsuit have engaged in a long-standing and far-reaching pattern of wrongful conduct

4

with respect to their marketing and sales of prescription drugs in the Commonwealth of Pennsylvania.

8.      This case does not concern the efficacy of the drugs and drug products sold by the Defendants. Instead, this lawsuit seeks legal redress for the unfair and deceptive marketing and sales acts and practices of the named Defendant pharmaceutical companies which have profited from their wrongful acts and practices at the expense of the Commonwealth and Pennsylvania Consumers.

## THE PARTIES, JURISDICTION AND VENUE

### PLAINTIFF

9.      Plaintiff is the Commonwealth of Pennsylvania. The Commonwealth brings this action by its Attorney General, Thomas W. Corbett, Jr., in its capacity as sovereign and in its proprietary capacity on behalf of departments, bureaus and agencies of the Commonwealth and as representative of, and as *parens patriae* on behalf of, Pennsylvania Consumers.

10.     The Attorney General, as the chief law officer of the Commonwealth of Pennsylvania pursuant to Article IV § 4.1 of the Pennsylvania Constitution, is statutorily authorized to initiate and maintain this action, and does so, pursuant to the Commonwealth Attorneys Act, 71 PA. STAT. § 732-204 and the Unfair Trade Practice and Consumer Protection Law, 73 PA. STAT. §§ 201-1, *et seq.* This action is also maintained pursuant to the Attorney General's common law *parens patriae* powers.

11.     The Commonwealth has been harmed by the wrongful conduct of Defendants in that the Commonwealth is a purchaser/end payor of Defendants' prescription drugs. Specifically, the Commonwealth reimburses pharmacies, physicians, and pharmacy benefit managers for the Defendants' prescription drugs provided to its citizens under the terms of certain programs, such as

5

the Medicaid program, the Pharmaceutical Assistance Contract for the Elderly or "PACE" program, the Communicable Disease Program, several programs under the Bureau of Family Health, including the Renal, Spina Bifida, Cystic Fibrosis, Metabolic Conditions and Metabolic Formula programs as well as other programs for Pennsylvania Consumers who are receiving Workers' Compensation benefits. In addition, the Commonwealth purchases Defendants' prescription drugs for its employees and others through programs such as the Pennsylvania Employees Benefit Trust Fund (the "PEBTF") for its current and retired employees. Because Medicaid, PACE, and PEBTF are the largest reimbursers of prescription drugs in the Commonwealth, the Complaint references these three programs throughout, but any reference to these programs or Commonwealth Programs generally is intended as a reference to all the programs described herein.

12.     The Commonwealth also brings this action as *parens patriae* on behalf of Pennsylvania Consumers who were harmed by the wrongful conduct of Defendants.

13.     The Attorney General deems these proceedings to be in the public interest pursuant to 73 PA. STAT. § 201-4.

## DEFENDANTS

14.     The Defendants named in this Complaint include all of their predecessor entities and all their past and present component, subsidiary and affiliate entities.

15.     The acts alleged in this Complaint to have been done by each of the Defendants were authorized, ordered, done and/or ratified by their respective officers, directors, agents, employees or representatives while engaged in the management, direction, control or transaction of their respective business affairs.

6

## TAP

16.     Defendant, TAP Pharmaceutical Products, Inc. ("TAP"), is an Illinois corporation with its principal place of business located at 675 North Field Drive, Lake Forest, Illinois.

17.     TAP engages in the business of manufacturing, distributing, marketing and selling prescription drugs purchased and/or reimbursed by the Commonwealth and Pennsylvania Consumers. The drugs of TAP include Lupron and Prevacid.

## Abbott

18.     Defendant, Abbott Laboratories ("Abbott"), is an Illinois corporation with its principal place of business located at 100 Abbott Park Road, Abbott Park, Illinois.

19.     Abbott engages in the business of manufacturing, distributing, marketing and selling prescription drugs purchased and/or reimbursed by the Commonwealth and Pennsylvania Consumers.   The drugs of Abbott include Acetylcyst, Acyclovir, A-Methapred, Amikacin, Aminosyn, Biaxin, Calcijex, Cimetidine Hydrochloride, Clindamycin, Depakote, Dextrose, Diazepam, Ery-Tab, Erythromycin, Etoposide, Fentanyl, Flomax, Furosemide, Gentamicin, Heparin, Kaletra, Leucovorin Calcium, Liposyn II, Lorazepam, Prevacid (TAP), Sodium Chloride, Tobra/NaCL, Tobramycin, Tricor and Vancomycin.

## The AstraZeneca Defendants

20.     Defendant, AstraZeneca PLC ("AstraZeneca PLC"), is a British corporation with its principal place of business located at 15 Stanhope Gate, London W1K 1LN, U.K. AstraZeneca PLC, itself and through and with its subsidiaries, engages in the business of manufacturing, distributing, marketing and selling prescription drugs purchased and/or reimbursed by the Commonwealth and Pennsylvania Consumers.

7

21.     Defendant Zeneca Holdings, Inc. ("Zeneca"), a Delaware corporation with its principal place of business located at 1800 Concord Pike, Wilmington, Delaware, is a wholly-owned subsidiary of AstraZeneca PLC.

22.     Defendant, AstraZeneca Pharmaceuticals LP ("AstraZeneca"), is a Delaware limited partnership with its principal place of business located at 1800 Concord Pike, Wilmington, Delaware. AstraZeneca is a wholly-owned subsidiary of AstraZeneca PLC.

23.     Defendant, AstraZeneca LP ("AstraZeneca LP"), is a Delaware limited partnership with its principal place of business located at 725 Chesterbrook Boulevard, Wayne, Pennsylvania. AstraZeneca LP is a wholly-owned subsidiary of AstraZeneca PLC.

24.     AstraZeneca PLC, Zeneca, AstraZeneca, and AstraZeneca LP (collectively, the "AstraZeneca Defendants"), engage in the business of manufacturing, distributing, marketing and selling prescription drugs purchased and/or reimbursed by the Commonwealth and Pennsylvania Consumers. The drugs of the AstraZeneca Defendants, marketed and sold in the U.S. primarily by through the subsidiary AstraZeneca, include Zoladex, Accolate, Arimidex, Atacand, Atacand HCT, Casodex, Cefotan, Diprivan, Elavil Injection, Entocort, Faslodex®, Foscavir®, Merrem®, Nexium, Nolvadex, Prilosec, Pulmicort, Rhinocort, Seroquel, Tenormin® Injection, Toprol, Xylocaine Injection, Zestril and Zomig.

<u>The Bayer Defendants</u>

25.     Defendant, Bayer AG ("Bayer AG"), is a German corporation with its principal place of business located at 51368 Leverkusen, Germany. Bayer AG, itself and through and with its subsidiaries, engages in the business of manufacturing, distributing, marketing and selling

8

prescription drugs purchased and/or reimbursed by the Commonwealth and Pennsylvania Consumers.

26.     Defendant, Bayer Corporation ("Bayer"), is a Delaware corporation with its principal place of business located at 100 Bayer Road, Pittsburgh, Pennsylvania. Bayer is a wholly-owned subsidiary of Bayer AG.

27.     Bayer AG and Bayer (collectively, the "Bayer Defendants"), engage in the business of manufacturing, distributing, marketing and selling prescription drugs purchased and/or reimbursed by the Commonwealth and Pennsylvania Consumers. The drugs of the Bayer Defendants, marketed and sold in the U.S. primarily through the subsidiary Bayer, include Viadur, Adalat CC, Albumin, Avclox, Baycol, Baygam, Bayhep B, Bayrab, Bayrab-D, Bayrho-D, Cipro, Cipro XR, DTIC-DOME, Gamimune, KOaTE®, Kogenate®, Konyne-80 Factor IX Complex, Thrombate III (Antithrombin III), Mithracin, Mycelex, Ninnotop, Plasmanate, Precose and Traslol.

## The GSK Defendants

28.     Defendant SmithKline Beecham Corporation d/b/a GlaxoSmithKline ("SmithKline"), is a Pennsylvania corporation with its principal place of business located at One Franklin Plaza, 200 North 16th Street, Philadelphia, Pennsylvania. SmithKline is a wholly-owned subsidiary of GSK.

29.     GSK and SmithKline (collectively, the "GSK Defendants") engage in the business of manufacturing, distributing, marketing and selling prescription drugs purchased and/or reimbursed by the Commonwealth and Pennsylvania Consumers. The drugs of the GSK Defendants, marketed and sold in the U.S. primarily through the subsidiary SmithKline, include Kyrtil® (granisetron), Zofran® (ondansetron), Advair, Agenerase, Alkeran, Amerge, Augmentin, Avandia, Beconsase AQ, Ceftin, Combivir, Daraprim, Epivir, Flonase, Flovent, Imitrex, Lamictal, Lanoxin, Leukeran,

9

Mepron, Myleran, Navelbine, Paxil, Purinethol, Relenza, Retrovir, Serevent, Thioguanine, Trizivir, Valtrex, Ventolin HFA, Wellbutrin, Zantac, Ziagen, Zofran ODT, Zovirax and Zyban.

## The Pfizer Defendants

30.     Defendant, Pfizer, Inc. ("Pfizer"), is a Delaware corporation with its principal place of business located at 235 East 42nd Street, New York, New York. Pfizer, itself and through and with its subsidiaries, engages in the business of manufacturing, distributing, marketing and selling prescription drugs purchased and/or reimbursed by the Commonwealth and Pennsylvania Consumers.

31.     Defendant, Pharmacia Corporation ("Pharmacia"), is a Delaware corporation with its principal place of business located at 100 Route 206 North, Peapack, New Jersey. Pharmacia was created in April 2000 through the merger of Pharmacia & Upjohn ("P&U") with Monsanto Company ("Monsanto") and its G.D. Searle ("Searle") unit. Pharmacia is a wholly-owned subsidiary of Pfizer.

32.     Pfizer and Pharmacia (collectively, the "Pfizer Defendants") engage in the business of manufacturing, distributing, marketing and selling prescription drugs purchased and/or reimbursed by the Commonwealth and Pennsylvania Consumers. The drugs of the Pfizer Defendants include Lipitor® (atorvastatin calcium) (Pfizer), Trelstar™ Depot (triptorelin pamoate) (Pfizer), Accupril (Pfizer), Accuretic (Pfizer), Adriamycin (Pharmacia), Adrucil (Pharmacia), Amohotercin (Pfizer), Amphocin (Pfizer), Bleomycin Sulfate (Pfizer), Cardura (Pfizer), Celebrex (Pfizer), Celontin (Pfizer), Cleocin-T (Pharmacia), Cytosar-U (Pharmacia), Depo-Testosterone (Pharmacia), Dilantin (Pfizer), Estrostep (Pfizer), Etoposide (Pfizer), Femhrt (Pfizer), Lopid (Pfizer), Minizide (Pfizer), Nardil (Pfizer), Neosar (Pharmacia), Neurontin (Pfizer), Nitrostat (Pfizer), Norvasc (Pfizer), Renese (Pfizer), Rescriptor (Pharmacia), Solu-Cortef (Pharmacia), Solu-Medrol (Pharmacia), Toposar

10

(Pharmacia), Vincasar (Pharmacia), Viracept (Pfizer), Zarontin (Pfizer), Zithromax (Pfizer), Zoloft (Pfizer) and Zyrtec (Pfizer).

## The Amgen Defendants

33.     Defendant Amgen, Inc. ("Amgen") is a California corporation with its principal place of business located at One Amgen Center Drive, Thousand Oaks, California. Amgen, itself and through and with its subsidiaries, engages in the business of manufacturing, distributing, marketing and selling prescription drugs purchased and/or reimbursed by the Commonwealth and Pennsylvania Consumers.

34.     Defendant Immunex Corporation ("Immunex") is a Washington corporation with its principal place of business located at 51 University Street, Seattle, Washington. Amgen owns a majority of Immunex stock and a controlling interest in the company.

35.     Amgen and Immunex (collectively, the "Amgen Defendants") engage in the business of manufacturing, distributing, marketing and selling prescription drugs purchased and/or reimbursed by the Commonwealth and Pennsylvania Consumers. The drugs of the Amgen Defendants include, Aranesp® (darbepoetin alfa), Epogen® (epoetin alfa), Leukine (Immunex), Leucovorin Calcium (Immunex), Prokine (Immunex), and Neupogen® (filgrastim (G-CSF)), Enbrel (Immunex), Kineret and Neulasta, among others.

## The Schering Defendants

36.     Defendant Schering-Plough Corporation ("Schering-Plough") is a New Jersey corporation with its principal place of business located at 2000 Galloping Hill Road, Kenilworth, New Jersey. Schering-Plough, itself and through and with its subsidiaries, engages in the business

11

of manufacturing, distributing, marketing and selling prescription drugs purchased and/or reimbursed by the Commonwealth and Pennsylvania Consumers.

37.     Defendant Warrick Pharmaceuticals Corporation ("Warrick") is, a Delaware corporation with its principal place of business located at 6100 Neil Road #500, Reno, Nevada. Warrick is a wholly-owned subsidiary of Schering-Plough.

38.     Defendant Schering Sales Corporation ("Schering Sales") is a wholly-owned subsidiary of Schering-Plough.

39.     Schering-Plough, Warrick, and Schering Sales (collectively, the "Schering Defendants") engage in the business of manufacturing, distributing, marketing and selling prescription drugs purchased and/or reimbursed by the Commonwealth and Pennsylvania Consumers. The drugs of the Schering Defendants include, Albuterol (Schering Sales), Clarinex (Schering Sales), Claritin (Schering Sales), Claritin-D (Schering Sales), Clotrimazole (Warrick), Diprolene (Schering Sales), Diprosone (Schering Sales), Elocon (Schering Sales), Eulexin (Schering Sales), Griseofulvin (Schering Sales), Integrilin (Schering Sales), Intron (Schering Sales), ISMN (Schering Sales), Lotrisone (Schering Sales), Nasonex (Schering Sales), Oxaprozin (Schering Sales), Peg-Intron (Schering Sales), Perphenazine (Schering Sales), Potassium Chloride (Schering Sales), Proventil® (Schering Sales), Rebetol (Schering Sales), Sebizon (Schering Sales), Sodium Chloride (Schering Sales), Sulcrafate (Schering Sales), Temodar (Schering Sales), Theophylline (Schering Sales), Trinalin (Schering Sales) and Vanceril (Schering Sales), among others.

Bristol-Myers

40.     Defendant, Bristol-Myers Squibb Company ("Bristol-Myers"), is a Delaware corporation with its principal place of business located at 345 Park Avenue, New York, New York

12

Bristol-Myers, itself and through and with its subsidiaries, engages in the business of manufacturing, distributing, marketing and selling prescription drugs purchased and/or reimbursed by the Commonwealth and Pennsylvania Consumers.

41.     Bristol-Myers engages in the business of manufacturing, distributing, marketing and selling prescription drugs and drug products purchased and/or reimbursed by the Commonwealth and Pennsylvania Consumers.  The drugs and drug products of the Bristol-Myers Defendants include Etopophos® (etoposide), Vepesid® (etoposide), Amikacin Sulfate, Amphotercin, Avapro, Blenoxane, Buspar, Carboplatin, Cefzil, Coumadin, Cytoxan, Glucophage, Monopril, Monopril HCT, Paraplatin, Plavix, Pravachol, Rubex, Serzone, Sustiva, Taxol, Tequin, Videx, and Zerit,  among others.

The J&J Defendants

42.     Defendant, Johnson & Johnson ("J&J") is a New Jersey corporation with its principal place of business located at One Johnson & Johnson Plaza, New Brunswick, New Jersey.  J&J, itself and through and with its subsidiaries, engages in the business of manufacturing, distributing, marketing and selling prescription drugs purchased and/or reimbursed by the Commonwealth and Pennsylvania Consumers. J&J includes a number of subsidiary companies that manufacture, distribute, market and sell prescription drugs, including, but not limited to, the following:

> a.     Defendant Alza Corporation ("Alza"), a Delaware Corporation with its principal place of business located at 1900 Charleston Road, Mountain View, California, acquired from Defendant Abbott in 2000;
>
> b.     Defendant Centocor, Inc. ("Centocor"), a Pennsylvania corporation with its principal place of business located at 244 Great Valley Parkway, Malvern, Pennsylvania;

13

c.   Defendant Ethicon, Inc. ("Ethicon"), a New Jersey corporation, with its principal place of business located at Route 22 West, Somerville, NJ;

d.   Defendant Janssen Pharmaceutical Products, L.P. ("Janssen"), with its principle place of business located at 1125 Trenton-Harbourton Road, Titusville, NJ;

e.   Defendant McNeil Consumer & Specialty Pharmaceuticals, a Division of McNeil-PPC, Inc. ("McNeil"), a New Jersey Corporation with its principal place of business located in Fort Washington, PA;

f.   Defendant Ortho Biotech, Inc. ("Ortho"), a New Jersey corporation with its principal place of business located at 700 U.S. Highway, Route 202 South, Raritan, New Jersey;

g.   Defendant Ortho Biotech Products, L.P. ("Ortho Products"), with its principle place of business located at 430 Route 22 East, Bridgewater, NJ; and

h.   Defendant Ortho-McNeil Pharmaceutical, Inc. ("Ortho-McNeil"), a Delaware corporation with its principal place of business located at 1000 U.S. Route 202 South, Raritan, NJ.

43.   J&J, Alza, Centocor, Ethicon, Janssen, McNeil, Ortho, Ortho Products, and Ortho-McNeil (collectively "the J&J Defendants") engage in the business of manufacturing, distributing, marketing and selling prescription drugs purchased and/or reimbursed by the Commonwealth and Pennsylvania Consumers. The drugs of the J&J Defendants include Viadur® (Alza), Procrit® (Ortho), Remicade® (Centacor), Topamax® (Ortho-McNeil), Aciphex (Janssen), Bicitra (Ortho-McNeil), Doxil (Alza), Duragesic (Janssen), Elmiron (Ortho-McNeil), Erycette (Janssen), Flexiril

14

(McNeil), Floxin (Ortho-McNeil), Floxin I.V. (Ortho-McNeil), Grifulvin (Ortho), Haldol (Ortho-McNeil), Haldol Decanoate (Janssen), Levaquin (Ortho-McNeil), Monistat (McNeil), Mycelex (Alza), Pancrease (Ortho-McNeil), Parafon (Ortho-McNeil), Polycitra (Ortho-McNeil), Regranex (Ethicon), Reminyl (Janssen), Renova (Ortho-McNeil), Retin-A (Ortho-McNeil), Retin-A Micro (Janssen), Risperdal (Janssen), Spectazole (Janssen), Sporanox (Janssen), Terazol (Ortho-McNeil), Testoderm (Alza), Tolectin (Ortho-McNeil), Tylenol/COD (Ortho-McNeil), Tylox (Ortho-McNeil), Ultracet (Ortho-McNeil), Ultram (Ortho-McNeil), Urispass (Ortho-McNeil) and Vascor (Janssen), among others.

## The Aventis Defendants

44.     Defendant Aventis Pharmaceuticals, Inc. ("Aventis") is a Delaware corporation with its principal place of business located at 300 Somerset Corporate Boulevard, Bridgewater, New Jersey.  Aventis, itself and through and with its subsidiaries, engages in the business of manufacturing, distributing, marketing and selling prescription drugs purchased and/or reimbursed by the Commonwealth and Pennsylvania Consumers. Aventis includes a number of subsidiary companies that manufacture, distribute, market and sell prescription drugs, including, but not limited to, the following:

> a.      Defendant Aventis Behring L.L.C. ("Aventis Behring"), an Illinois limited
> liability corporation with its principal place of business located at 1020 First
> Avenue, King of Prussia, Pennsylvania.  Adventis Behring LLC is the
> successor-in-interest to Centeon, LLC and Armour Pharmaceuticals; and

15

b.   Defendant Hoechst Marion Roussel, Inc. ("Hoechst"), a Delaware corporation with its principal place of business located at 10236 Marion Park Drive, Kansas City, Missouri.

45.   Aventis, Aventis Behring, Hoechst, Centeon, and Armour (collectively, the Aventis Defendants") engage in the business of manufacturing, distributing, marketing and selling prescription drugs purchased and/or reimbursed by the Commonwealth and Pennsylvania Consumers.  The drugs of the Aventis Defendants include Anzemet® (dolasteron mesylate) (Hoechst), Monoclate-P (factor viii) (Aventis Behring), Allegra (Aventis), Allegra-D (Aventis), Amaryl (Aventis), Arava (Aventis), Azmacort (Aventis), Calcimar (Aventis), Carafate (Aventis), Cardizem (Aventis), Copaxone (Aventis), Gammar-PIV (Aventis), Intal (Aventis), Nasacort (Aventis), Taxotere (Aventis) and Trental (Aventis), among others.

### The Baxter Defendants

46.   Defendant Baxter International Inc. ("Baxter International") is a Delaware corporation with its principal place of business located at One Baxter Parkway, Deerfield, Illinois.  Baxter, itself and through and with its subsidiaries, engages in the business of manufacturing, distributing, marketing and selling prescription drugs purchased and/or reimbursed by the Commonwealth and Pennsylvania Consumers.  Baxter includes a number of subsidiary companies that manufacture, distribute, market and sell prescription drugs, including, but not limited to, the following:

a.   Defendant Baxter Healthcare Corporation ("Baxter Healthcare"), a Delaware corporation with its principal place of business located at One Baxter Parkway, Deerfield, Illinois; and

16

b.      Defendant Immuno-U.S., Inc. ("Immuno"), a Michigan corporation with its principal place of business located at 1200 Parkdale Road, Rochester, Michigan.

47.     Baxter International, Baxter Healthcare and Immuno (collectively, "the Baxter Defendants") engage in the business of manufacturing, distributing, marketing and selling prescription drugs purchased and/or reimbursed by the Commonwealth and Pennsylvania Consumers. The drugs of the Baxter Defendants include Recombinate and Hemofil M (factor viii) and other factor viii drugs, Aggrastat, Ativan, Bebulin, Brevibloc, Buminate, Cisplatin, Claforan, Dextrose, Dextrose/Sodium Chloride, Doxorubicin, Gammagard, Gentam/Nacl, Gentamicin, Gentran, Heparin, Holoxan/Iflex, Iveegam, Lock/Injectible, Osmitrol, Sodium Chlorise, Travasol and Vanocin, among others.

## The Boehringer Defendants

48.     Defendant, Boehringer Ingelheim Corporation ("Boehringer"), is a Nevada corporation with its principal place of business located at 900 Ridgebury Road, Ridgefield, Connecticut. Boehringer, itself and through and with its subsidiaries, engages in the business of manufacturing, distributing, marketing and selling prescription drugs purchased and/or reimbursed by the Commonwealth and Pennsylvania Consumers. Boehringer includes a number of subsidiary companies that manufacture, distribute, market and sell prescription drugs. Boehringer is the sole shareholder of these companies, which include:

a.      Defendant Boehringer Ingelheim Pharmaceuticals, Inc. (Boehringer Pharmaceuticals), a corporation with its principal place of business located at 900 Ridgebury Road, Ridgefield, Connecticut;

17

b.   Ben Venue Laboratories, Inc. ("Ben Venue"), a Delaware corporation with its principal place of business located at 300 Northfield Road, Bedford, Ohio;

c.   Defendant Bedford Laboratories ("Bedford"), a Division of Ben Venue, with its principal place of business located at 300 Northfield Road, Bedford, Ohio; and

d.   Defendant Roxane Laboratories, Inc. ("Roxane"), an Ohio corporation with its principal place of business located at Post Office Box 16532, Columbus, Ohio.

49.   Boehringer, Bedford, Ben Venue and Roxanne (collectively "the Boehringer Defendants") engage in the business of manufacturing, distributing, marketing and selling prescription drugs to the Commonwealth and Pennsylvania Consumers. The drugs of the Boehringer Defendants include various Albuterol and Ipratropium Bromide drug products, Etoposide (Bedford), Acyclovir (Roxane, Bedford), Amikacin (Bedford), Clonidine (as Catapres, Boehringer Pharmaceuticals), Combivent (Boehringer Pharmaceuticals), Cytarabine (Bedford), Doxorubicin (as Adriamycin, Bedford), Leucovorin (Roxane, Bedford), Metaproterenol Sulfate (as Alupent, Boehringer Pharmaceuticals), Methotrexate (Roxane, Bedford), Mitomycin (Bedford) , Nevirapine (as Viramune, Boehringer Pharmaceuticals), Vinblastine (Bedford), Viramune (Boehringer Pharmaceuticals), Tamsulosin (as Flomax, Boehringer Pharmaceuticals) and Vinblastine Sulfate (Bedford), among others.

## Dey

50.   Defendant, Dey, Inc. ("Dey"), is a Delaware corporation with its principal place of business located at 2751 Napa Valley Corporate Drive, Napa, California. Dey engages in the

18

business of manufacturing, distributing, marketing and selling prescription drugs to the Commonwealth and Pennsylvania Consumers. Dey's drugs include AccuNeb™ and other drugs used in the treatment of obstructive airways disease, Acetycysteine, Albuterol, Albuterol Sulfate, Cromolyn Sodium, Ipratropium Bromide and Metaproteren Sulfate, among others.

## JURISDICTION AND VENUE

51.     The jurisdiction of this Court is founded upon 42 PA. CONS. STAT. ANN. § 761 which gives the Commonwealth Court jurisdiction over actions by the Commonwealth government, including those brought by any officer thereof acting in his official capacity.

52.     This Court has personal jurisdiction over each Defendant either because the Defendant resides in Pennsylvania, does business in Pennsylvania and/or has the requisite minimum contacts with Pennsylvania necessary to constitutionally permit the Court to exercise jurisdiction.

53.     The Commonwealth brings this action exclusively under the common law and statutes of the Commonwealth of Pennsylvania. No federal claims are being asserted. No aspect of the claims asserted herein is brought pursuant to any federal law, including either Medicare or ERISA, nor is any aspect of the claims asserted herein brought for the purpose of interpreting a federal contract, including the terms of the settlement agreements with each of the Criminal Defendants, or the terms of an ERISA plan. Similarly, no attempt is being made to recover pursuant to claims that were resolved as part of the aforesaid Criminal Actions. To the extent any claim or factual assertion set forth herein may be construed to have stated any claim under federal law, or a claim for recovery of benefits under an ERISA plan, such claim is expressly and undeniably disavowed and disclaimed by the Commonwealth.

19

## THE UNLAWFUL CONDUCT AT ISSUE

## REIMBURSEMENT AND PURCHASE OF PRESCRIPTION DRUGS BY PENNSYLVANIA

### DEPARTMENTS AND AGENCIES

54.    The Commonwealth purchases and reimburses prescription drugs through a variety of programs. The three largest programs are Medicaid, run by the Department of Public Welfare, PACE, run by the Department of Aging, and the prescription drug benefit provided to Commonwealth employees, retirees and their dependents, run by the Pennsylvania Employee Benefit Trust Fund. As more fully described below, each of these programs pay for prescription drugs using a formula which includes AWP as a key determinant of the amount of reimbursement.

55.    For the Department of Public Welfare, the rate of reimbursement for prescription drugs is mandated by 55 Pa. Code § 1121.55 entitled Method of Payment and 55 Pa. Code § 1121.56 entitled Drug Costs Determination. The current rate of reimbursement is the lower of AWP minus 10% plus a dispensing fee of $4, state MAC, which is similar to the federal upper limit price, which is a maximum payment established by the federal government for a pharmaceutical drug based on current prices for the drug in various compendia (Blue Book, Red Book or Medispan) plus a dispensing fee of $4 or the pharmacy's usual and customary charge. Although that reimbursement rate has changed over the years, at all times relevant to this lawsuit, the reimbursement has involved AWP as the starting point in a mathematical reimbursement formula.

56.    55 Pa. Code § 1121.2 defines AWP as "the average wholesale price for a drug as found in the Department's pricing service publication."

57.    For the 2003-04 fiscal year, the Department of Public Welfare reimbursed $1.5 billion in prescription drug costs for poor Pennsylvanians.

20

58.     For the Department of Aging, the rate of reimbursement for the PACE program is 90% of the "average wholesale cost" which exceeds the co-payment, plus a dispensing fee of $3.50, set forth in 72 P.S. § 3761-509. The current rate of reimbursement is the lower of the pharmacy's usual charge for the drug dispensed with the subtraction of the co-payment and if required, the subtraction of the generic differential or if a generic drug, the most current federal upper payment limits plus a dispensing fee.

59.     "Average wholesale cost" is defined as the cost of a dispensed drug based upon the price published in a national drug pricing system in current use by the Department of Aging as the average wholesale price of a prescription drug in the most common package size.  72 P.S. § 3761-502. Therefore, at all times relevant to this lawsuit, PACE program reimbursement has involved AWP in the definition of average wholesale cost.

60.     For the 2003-04 fiscal year, the Department of Aging reimbursed $506 million in prescription drug costs for low-income Pennsylvanians.

61.     For the Pennsylvania Employees Benefit Trust Fund, the Fund has used a pharmacy benefit manager at all times relevant to this lawsuit to provide the prescription benefit to Commonwealth employees, retirees and their dependents. Although several different firms have held the contract for managing this benefit since 1991, each contract has provided that the PEBTF pays such firms based on AWP for each drug minus a discount, plus a dispensing fee, minus a rebate.

62.     At all times during the relevant period, PEBTF has obtained its AWP information from either the *Blue Book* via a contract with First Databank or the *Red Book* via a contract with Medical Economics.

21

63.    For the fiscal year 2003-04, the PEBTF reimbursed $ 247 million in prescription drug costs for Commonwealth employees, retirees and dependents.

64.    For the Department of Health, the rate of reimbursement for the Bureau of Family Health Programs is 90% of the "average wholesale cost" which exceeds the co-payment, plus a dispensing fee of $3.50. The Department of Health provides a prescription drug benefit for the Renal, Spina Bifida, Cystic Fibrosis, Metabolic Conditions and Metabolic Formula Programs. The prescription drug benefit programs funded by The Department of Health are administered by the Department of Aging pursuant to a memorandum of understanding using PACE's reimbursement formula.

65.    Because of the use of AWP in formulas to calculate reimbursements in each of the three programs, any increase in an AWP for any particular prescription drug will result in an increase in payment from the above Commonwealth program for that drug.

66.    For the Department of Military and Veterans Affairs, some facilities purchased prescription drugs at a price calculated, in part, by AWP.

67.    Budgets for these programs are based on historical data of which AWP is a major component in calculating cost.

68.    In using AWP to prepare budgets for these programs, the Commonwealth determines the scope, such as the extent of the formularies, and the reach, such as eligibility criteria for poor and aged Pennsylvanians, of each program.

### THE UNLAWFUL SCHEME AND CONSPIRACY

69.    There are approximately 65,000 different drug products on the market in the United States.

70.    Distribution of these drugs to consumers is accomplished in several ways, including through dispensing or administering by in-office by prescribers, through retail pharmacies, by home infusion pharmacies, and through other medical providers.

71.    Throughout the relevant time period, Defendants were aware that a figure called the AWP was the embedded standard used by virtually all end payors for drug products, including insurance companies, state and federal aid programs and others, to determine how much to reimburse/pay for a given drug. This standard was required by statute, regulation and contract for the Defendants' prescription drugs reimbursed by the Commonwealth for its agencies and departments.

72.    Throughout the relevant time period, published AWP prices existed for virtually all drugs and classes of drugs, including Defendants' drugs as set forth below, and reimbursement/payment based upon these AWPs by end payors, including the Commonwealth and Pennsylvania Consumers, was a standard and industry-wide practice which was required by statute or contract.

73.    AWP was devised as a way for providing for reimbursement of prescription drugs distributed by retail pharmacies to beneficiaries of state and federal prescription programs at levels which provided recompense to pharmacies, but neither enriched, nor impoverished them.

74.    Such a reimbursement methodology depends on the AWP reflecting actual average wholesale prices. An AWP which reflects prices greater than actual average wholesale prices allows the enrichment of whoever in the chain of distribution receives, directly or indirectly, the difference between actual average wholesale prices and AWP.

23

75.     The Defendants knew or should have known that the government programs, which originally used AWP, were not vehicles to enrich themselves or anyone else in the chain of distribution of prescription drugs.

76.     The Defendants knew or should have known that when they did not report actual average wholesale prices, those prices would increase, and distort reimbursement levels from government programs. Many government programs serve poor and disadvantaged persons who need prescription drugs.

77.     Over time, AWP has been adopted as the reimbursement methodology for almost every government and private program or plan which reimbursed or paid for prescription drugs.

78.     Inflated AWPs are as likely to distort reimbursement in private plans, as they are in government plans.

79.     The Defendants knew, or should have known, that with the widespread adoption of AWP as a component of reimbursement methodology, publication of an inflated AWP would harm government agencies, businesses, consumers, and Pennsylvania's overall economy.

80.     Despite knowing the harm an inflated AWP would cause, the Defendants continued to transmit or allow to be published, inaccurate information about AWPs.

81.     Because the Defendants were aware that AWP had been adopted by both government and private reimbursers/payors for prescription drugs and because the Defendants were aware that AWPs would affect consumers in terms of determining co-pays and in setting minimum cash prices, the Defendants had an obligation not to manipulate, market, inflate, falsify or otherwise misrepresent AWPs.

24

82.    AWP prices were provided by the individual drug manufacturers and listed in several periodic pharmaceutical industry compendia including the *Red Book, Blue Book* and others.

83.    Purported AWPs for individual drugs were reported at least annually and sometimes with greater frequency.

84.    During the relevant time period, AWP listed in these publications and used by end payors to set reimbursement/payment rates for each of the individual drugs was exclusively set and controlled by the individual drug manufacturers and the system of reimbursement/payment based upon these purported AWPs was wholly dependent upon the accuracy and integrity of these prices reported to the Compendia by the Defendants.

85.    In addition to controlling and setting the purported AWPs, the prices paid by end payors of their drugs, including the Commonwealth and Pennsylvania Consumers, Defendants also set and controlled the actual acquisition costs of their drugs, *i.e.*, the prices paid by medical providers, pharmacy benefit managers and other purchasers of their drugs who would ultimately seek reimbursement/payment for the same drugs from payors such as the Commonwealth and Pennsylvania Consumers. Defendants maintained exclusive control over data reflecting these acquisition costs and such information is not publicly available. In fact, Defendants require purchasers to keep data reflecting acquisition costs confidential.

86.    Throughout the relevant time period, defendants were the only ones with access to their pricing data and there was no method available for the Commonwealth or Pennsylvania Consumers to determine how Defendants calculated the purported AWPs reported to the compendia for each of their drugs.

25

87.     In fact, the purported AWPs reported by Defendants were not actual average wholesale prices charged for their drugs.

88.     Rather, the purported AWPs were artificial prices, created and manipulated by Defendants for the purpose of generating as much revenue as possible at the expense of purchasers and end payors of their Drugs, including the Commonwealth and Pennsylvania Consumers.

89.     Defendants generated revenue from the creation of the artificial AWPs in several ways.

90.     First, the artificially increased price of the drug generated more direct revenue simply as a result of the price increase itself for sales to those direct purchasers who bought based on AWP.

91.     Second, by maintaining exclusive control over both the acquisition price of the drugs and the purported AWPs of the drugs, the Defendants were able at any time to raise the purported AWPs for their drugs, and/or deeply discount the acquisition costs of their drugs far below the AWP-based prices paid by end payors such as the Commonwealth and Pennsylvania Consumers, creating increased "spreads" between the acquisition price and purported AWP. These spreads enabled Defendants to incentivize prescribers to dispense their drugs and pharmacies to dispense their drugs resulting in increased sales for the Defendants.

92.     Broadly speaking, there were at least five (5) types of acts and practices at the heart of Defendants' marketing and sales scheme and conspiracy:

> a.     establishing and promoting "spreads" on prescription drugs ("promotion of spreads");
>
> b.     providing free goods and drug product with the knowledge and/or expectation that dispensing prescribers would charge the Commonwealth and

26

Pennsylvania Consumers for such free goods and drug product ("provision of free goods and drug product");

c.      providing other financial incentives, as detailed more fully herein, to induce sales of Defendants' drugs at exorbitant prices ("other financial incentives");

d.      failing to account in their reported AWPs for free goods, rebates, discounts and other incentives that reduce actual wholesale prices; and

e.      engaging in efforts to fraudulently conceal and suppress Defendants' wrongful conduct to maintain the scheme and conspiracy ("fraudulent concealment").

Each of these acts and practices is described more fully below.

## Promotion of Spreads

93.     By creating large differences or "spreads" between what physicians, pharmacy benefit managers and other direct purchaser intermediaries were paying for drugs and what those same physicians and others were able to charge the Commonwealth and Pennsylvania consumers for the drugs, Defendants were able to provide strong incentives for physicians and others to purchase their drug over a competitor's drug based upon the increased income that the physicians and others could earn from the spreads.

94.     The financial incentive created by the spread also induced physicians to prescribe treatment with pharmaceuticals over other forms of or options for treatment, resulting in more demand for the drugs with large spreads.

27

95.     In order to gain market share by inducing customers to prescribe one drug over another, the Defendants overtly and aggressively promoted and marketed spreads to their customers throughout the relevant time period as a reason to purchase and/or prescribe their drugs.

### Provision of Free Goods and Drug Product

96.     Certain Defendants provided free samples to medical providers and other purchasers with the knowledge and the expectation that, in violation of the federal Prescription Drug Marketing Act ["PDMA"], medical providers and other purchasers of such free samples would charge patients or others for the free samples. By providing free samples for billing, these Defendants sought to induce the providers and other purchasers thereof to prescribe and sell Defendants' drugs over competing drugs or alternative forms of medical care and treatment.

97.     Upon information and belief, all of the Defendants are known to have used free goods and drug product as a method of providing hidden price concessions or reductions in the acquisition costs for their drugs.

98.     Defendants' offers of free goods and drug product included not only free shipments of drugs and drug product, but also free product bundled with other products, such as "buy ten get one free" deals, as well as other arrangements to provide credit, or to forgo payment, for product already delivered.

99.     Defendants used the provision of free goods and drug product as another form of improper incentive to cause medical providers and other purchasers to prescribe and sell Defendants' drugs.

100.    The Commonwealth and Pennsylvania Consumers were harmed by Defendants' conduct in providing free goods and drug product as an inducement in at least two ways: (1) by

28

paying for the costs of the free samples unlawfully billed, and (2) by otherwise paying the inflated

AWPs for Defendants' drugs that were not reduced by the value of free goods and drug product.

### Other Financial Inducements

101.    Other financial incentives include the provision of trips, consulting opportunities,

"educational grants", seminars, gifts, meals, cash payments and debt forgiveness, among others.

102.    All Defendants provided such incentives in order to promote the sale of their drugs

at inflated prices.

### Unaccounted For Discounts

103.    Upon information and belief, all Defendants provided rebates, discounts and other

incentives that they did not account for in reported AWPs.

104.    All Defendants provided such incentives in order to promote the sale of their drugs

at inflated prices.

### Fraudulent Concealment

105.    Defendants' conduct included efforts to conceal and suppress their unlawful acts and

practices.

106.    Defendants concealed their unlawful acts and practices from the Commonwealth and

Pennsylvania Consumers by controlling the process and methodology by which their AWPs were

set. Defendants also prevented the Commonwealth and Pennsylvania Consumers from knowing

what the actual acquisition costs were to medical providers and others for their drugs, and they

concealed and suppressed from the Commonwealth and Pennsylvania Consumers their provision of

free goods and drug product and other incentives to medical providers and others to induce them to

29

prescribe Defendants' drugs. Moreover, defendants' wrongful conduct was of such a nature as to be self-concealing.

107.    The Commonwealth and Pennsylvania Consumers were diligent in pursuing an investigation of the claims asserted in this Complaint. Through no fault of their own, neither the Commonwealth nor Pennsylvania Consumers received inquiry notice or learned of the factual basis for their claims in this Complaint or their injuries suffered therefrom until recently. In fact, while the recent federal investigations have uncovered a pattern of unlawful acts and practices by the Defendants involving the promotion of spreads and the provision of free goods and drug product, among other things, neither the Commonwealth nor Pennsylvania Consumers know today what the spreads are, or have been, for Defendants' various prescription drugs because only the Defendants and their customers know the actual acquisition costs for the drugs net of all discounts and incentives.

108.    By reason of the foregoing, the claims of the Commonwealth and Pennsylvania Consumers are timely under any applicable statute of limitations pursuant to the discovery rule and/or the doctrine of fraudulent concealment.

109.    The Defendants have been aware of their wrongful acts and practices since at least 1991, and probably before that time.

110.    The Defendants' failure to properly disclose their wrongful conduct, and other acts and omissions as alleged herein, was and is willful, intentional, wanton, malicious, outrageous, and was and continues to be undertaken in deliberate disregard of, or with reckless indifference to, the rights and interests of the Commonwealth and Pennsylvania Consumers.

30

## PRESCRIBER DISPENSED PRESCRIPTION DRUGS

111.    Certain medications are dispensed and sold by the medical professionals who prescribe them. These drugs usually are either administered by injection or intravenously or have such serious side effects they must only be administered in a setting where a medical professional is available to supervise the patient. For purposes of this Complaint, these prescription drugs shall be referred to as Prescriber Dispensed Prescription Drugs.

112.    In the case of Prescriber Dispensed Prescription Drugs, the prescriber purchases the drug at wholesale or from the manufacturer and then resells the drug to consumers. When the consumer is covered by a government or employer-based prescription drug plan, the prescriber will bill the government or employer based on the AWP for the drug.

113.    Because of this billing arrangement, any spread between actual wholesale cost of such drugs and the AWP inures to the benefit of the prescriber.

114.    As set forth in the Introduction to this Complaint, the drug companies named in this lawsuit have engaged in an unfair and deceptive marketing and sales scheme to provide improper incentives and inducements to dispensing prescribers of their drugs to promote the sale of Defendants' drugs at artificially exorbitant prices throughout the Commonwealth of Pennsylvania, to the detriment of both the Commonwealth and Pennsylvania Consumers.

115.    This unfair and deceptive marketing and sales scheme caused harm to the Commonwealth and Pennsylvania Consumers by causing the Commonwealth and Pennsylvania Consumers to pay more for Defendants' drugs than they otherwise would have paid in the absence of Defendants' conduct.

31

116.     The marketing and sales scheme detailed herein was formulated as part of an overall plan and agreement of the Defendants to engage in unlawful and improper methods of competition in the marketing and sales of their drugs and was carried out through a variety of overt acts and practices to unlawfully obtain orders to purchase or prescribe Defendants' drugs that were paid for by the Commonwealth and Pennsylvania Consumers.     These acts and practices include straightforward "quid pro quo" arrangements such as direct cash payments, as well as the provision of free goods and drug product for sale to patients, the provision of profits from spreads and other direct financial inducements from Defendants.

117.     The goal of the marketing and sales scheme was to cause Defendants' drugs to be favored by dispensing prescribers above all other drug therapies and modes or methods of healthcare treatment for particular health conditions, thereby gaining increased market share and increased profits.

### PHARMACY AND NON-PRESCRIBER DISPENSED PRESCRIPTION DRUGS

118.     Most drugs that require a prescription are dispensed to consumers through pharmacies. A health care professional authorized to write prescriptions writes a prescription for a consumer and the consumer takes that prescription to a pharmacy.

119.     At the time of presenting a prescription to a pharmacy, the consumer usually also informs the pharmacy whether the consumer will be paying by cash or whether the consumer has a government or private prescription plan.

120.     If the consumer has a government or private insurance plan such as Medicaid, PACE or PEBTF, those plans are charged for the drugs obtained by the consumer on a formula based on AWP.

32

121.    Since at least 1991, the AWP has not reflected the actual wholesale cost of prescription drugs and AWPs for prescription drugs have risen at a much faster rate than the actual wholesale costs for prescription drugs.

122.    Each prescription drug approved by the Federal Drug Administration has one or more approved uses, *i.e.*, specific diseases or symptoms, the drug is designed to treat.

123.    Each of the Pharmacy Dispensed Prescription Drugs listed in this case has one or more brand name or generic competitors which treat the same diseases or symptoms. In many cases, other drugs treat the same diseases and symptoms at least as effectively, and in some cases, more effectively than the drugs listed in the Complaint.

124.    In order to have their drugs maintained on formularies by hospitals, PBMs, managed care plans and some government payors, the Defendants have had to discount their drugs by lowering the prices of those drugs or by offering rebates.

125.    Despite the fact that the Defendants offered rebates and other incentives which reduced the wholesale cost of their drugs, they rarely ever lowered an AWP for one of their drugs.

126.    By refusing to lower the AWPs of their drugs, and in fact, increasing the AWPs when no increase was justified, the Defendants have been able to dramatically increase the amount of money spent by the Commonwealth, other employers generally, and consumers.

127.    Additionally, by creating large differences or spreads between what pharmacies were paying for drugs and what those same pharmacies were able to charge the Commonwealth and Pennsylvania consumers for the drugs, Defendants were able to provide a strong incentive for pharmacists to purchase their drug over a competitors drug based upon the increased income that the

33

pharmacies could earn from the spreads, thereby increasing Defendants' profits and increasing market share.

## DEFENDANTS' GUILTY PLEAS AND SETTLEMENTS EVIDENCE VIOLATIONS OF PENNSYLVANIA LAW

128.    The guilty pleas, settlements, and admissions of fault of the six principal defendant drug company groups previously named implicate these Defendants in what is known to be a far reaching and widespread scheme in the pharmaceutical industry to unlawfully increase market share and profits for their products. The underlying wrongful conduct admitted by the Defendants involved in these resolutions is evidence that some of the Defendants herein have already admitted conduct in the marketing and sales of their drug products in Pennsylvania which the Commonwealth contends violates the common law and statutes of Pennsylvania as set forth herein. These guilty pleas and settlements also demonstrate that the Commonwealth and Pennsylvania Consumers have been harmed by the wrongdoing of certain Defendants for which these Defendants should pay damages to the Commonwealth and Pennsylvania Consumers.

129.    In January 2001, Bayer agreed to settle the federal criminal investigation into Bayer's marketing and sales practices with respect to KOaTE®, Kogenate®, Konyne-80 Factor IX Complex, Gamimune, Thrombate III (Antithrombin III), and Bayer paid $14 million to the federal and state governments. Then, in 2003, Bayer AG agreed to plead guilty to federal criminal charges and paid fines and civil penalties totaling more than $257 million with respect to the federal criminal investigation of the Bayer Defendants for, *inter alia*, illegally re-labeling its drug Cipro® in order to circumvent the Medicaid Rebate Program, 42 U.S.C. § 1396r-8 thus defrauding the State Medicaid programs of millions of dollars in rebate payments.

34

130.    In October 2001, TAP, in order to resolve federal criminal charges, agreed to plead guilty to federal criminal and civil fraud charges for, among other things, conspiring to violate the PDMA by, *inter alia*, providing free Lupron® to medical providers "knowing and expecting" that these medical providers would charge patients for such free product. This conspiracy admitted by TAP was in violation of the federal conspiracy statute, 18 U.S.C. § 371 (Conspiracy to Commit Offense or to Defraud United States). TAP agreed to pay more than $890 million in fines and civil penalties to the federal government and the fifty (50) states, including the Commonwealth for its Medicaid losses.

131.    Like TAP, in 2003, certain of the AstraZeneca Defendants agreed to plead guilty to criminal charges similar to those brought against TAP. In particular, these AstraZeneca Defendants pled guilty to federal criminal and civil fraud charges for, among other things, conspiring to violate the PDMA by, *inter alia*, providing free Zoladex® to medical providers "knowing and expecting" that these medical providers would charge patients for such free product. This conspiracy admitted by the AstraZeneca Defendants was in violation of the federal conspiracy statute, 18 U.S.C. § 371 (Conspiracy to Commit Offense or to Defraud United States). The AstraZeneca Defendants paid $354.9 million in damages and fines to the federal and state governments.

132.    In 2004, Schering Sales agreed to plead guilty to criminal charges and pay a fine of $52.5 million, while Schering-Plough Corporation agreed to pay more than $290 million to resolve civil liabilities stemming from its fraudulent pricing of Claritin, its blockbuster allergy medication.

133.    Like Bayer, in 2003, GlaxoSmithKline PLC agreed to resolve a federal criminal investigation and to pay fines and civil penalties to the federal and state governments totaling more

35

than \$86 million to resolve claims against the GSK Defendants similar to those made against the Bayer Defendants.

134. Lastly, in 2003, Pfizer also agreed to resolve a federal criminal investigation into its marketing and sales practices. Pfizer admitted providing unrestricted "educational grants" to customers designed to hide the true best price of Lipitor®. While this case does not involve any "best price" claims, the wrongdoing admitted by Pfizer that led to liability under federal law also provides evidence of liability under state law – evidence of Pfizer's participation in the unfair and deceptive scheme and conspiracy in this case, including, but not limited to, evidence that Pfizer provided improper incentives to encourage sales of its products at inflated prices.

## HOW THE SCHEME HARMED PENNSYLVANIA CONSUMERS

135. Pennsylvania Consumers either pay cash for the entire price of a prescription drug or pay a co-pay as required by a government or private prescription drug plan.

136. In most cases where a consumer pays cash, the cash price is usually at least as great as the AWP for the drug since most government and private plans pay on a formula based on AWP or the "Usual Customary and Reasonable Price" of the Pharmacy or other dispenser, whichever is lower. If a pharmacy had a cash price lower than price arrived at using the appropriate AWP formula, then all its reimbursements would take place at the cash price. Therefore, pharmacies set their prices to their cash-paying customers at or above AWP.

137. Consumers pay three general types of co-pays: 1) a flat co-pay, *i.e.* \$6 per prescription regardless of the drug prescribed; 2) a tiered co-pay with lower co-pays for preferred or generic drugs and higher co-pays for non-preferred brand name drugs; and 3) a percentage co-pay based on a percentage of the total cost of the drug, *i.e.* 20%.

36

138.     Consumers who pay percentage co-pays have been injured by the conduct alleged in this complaint.

139.     Consumers who pay percentage co-pays include those who work for certain private employers and those who had a drug reimbursed by Medicare. With some exceptions, the only drugs reimbursed by Medicare are drugs dispensed by prescribers.

140.     Like the Commonwealth, many Pennsylvania Consumers buy prescription drugs through a health plan administered by a Pharmacy Benefit Manager or insurer that uses AWP as a component of a formula to determine prescription drug costs, and computes, in the case of a percentage co-payment, a co-payment based on the AWP of the drug.

141.     Thus, when drug companies intentionally inflate the AWP in order to manipulate and market the spread for drugs, the companies increase the amounts paid by the Pennsylvania Consumers for prescription drugs that they purchase through these health plans.

142.     In particular, Pennsylvania Consumers who purchase prescription drugs under the Medicare program pay more for prescription drugs when AWP is intentionally inflated. The Medicare program reimburses medical providers based upon the AWP for covered drugs. Under the program, senior citizens participating in the federal Medicare program pay 20 percent of the allowable cost of drugs reimbursed (the federal government pays 80 percent).

143.     Thus, when drug companies intentionally inflate the AWP in order to manipulate and market the spread for drugs, the companies increase the Medicare co-payment required of senior citizen Pennsylvania Consumers.

37

## OTHER PROCEEDINGS HAVE FAILED TO FULLY COMPENSATE PLAINTIFFS

144. While a portion of the federal settlement proceeds from the above-described cases has been returned to the states, including the Commonwealth, the Commonwealth has not been compensated fully for its losses from the wrongful conduct that these guilty pleas or civil settlements evidence in that the portion of the above-described cases returned to the Commonwealth represents only Medicare/Medicaid payments and does not take into account payments by Medicaid, PACE, and PEBTF and other such programs.

145. Also, since the federal government has not investigated, charged and/or settled with all of the pharmaceutical companies alleged herein to be involved in the unfair and deceptive scheme and conspiracy set forth in this Complaint, there has been no recovery of the increased and improper costs attributable to the wrongful conduct of these other defendants as set forth below. Absent this litigation, the Commonwealth and Pennsylvania Consumers would not be able to recover any of the increased and improper costs associated with the conduct of those defendants, let alone the full amount of their damages caused by these other defendants and the conspiracy.

146. Moreover, even those pharmaceutical companies which were part of the settlements described above were only part of such settlements with respect to certain of their drugs. There has been no recovery of the increased and improper costs attributable to the wrongful conduct of the settling defendants with respect to conduct and drugs not a part of the settlements. Absent this litigation, the Commonwealth and Pennsylvania Consumers would not be able to recover any of the increased and improper costs associated with such conduct and drugs.

147. Finally, the guilty pleas and settlements have not compensated Pennsylvania Consumers.

38

## TAP'S SPECIFIC CONDUCT

148.    TAP engaged in the unlawful scheme and conspiracy with respect to its Prescriber Dispensed Prescription Drugs, including Lupron, and its Pharmacy Dispensed Prescription Drugs, including Prevacid.

### CONDUCT RESPECTING PRESCRIBER DISPENSED PRESCRIPTION DRUGS

149.    TAP engaged in 1) the creation and promotion of spreads; 2) the provision of free goods and drug product; 3) the provision of other financial incentives; and 4) fraudulent concealment of its actions with respect to its Prescriber Dispensed Prescription Drugs.

150.    TAP engaged in Pennsylvania in the promotion of spreads with respect to the drug Lupron.

151.    In October 2001, TAP agreed to plead guilty to federal charges of conspiracy to violate the Prescription Drug Marketing Act, with parent companies Abbott and Takeda executing side agreements and agreeing to pay, on behalf of TAP, fines and civil penalties in excess of $890 million as a result of TAP's fraudulent drug pricing schemes and sales and marketing misconduct.

152.    The investigation resulting in the guilty plea included the creation, promotion and marketing of spreads on Lupron.  A condition of the guilty plea was that TAP "will report to the Medicare and Medicaid programs the true average sales price for drugs reimbursed by these programs."

153.    Four physicians who pled guilty to conspiring with TAP to bill for free Lupron have admitted that TAP sales representatives marketed the Lupron spreads between AWP and actual selling prices to them as an inducement to purchase Lupron.

39

154. According to the government's sentencing memorandum from U.S. v. TAP Pharmaceutical Products, Inc., the spread between AWP and ASP (average sales price) on Lupron was $97.50 in 1993, $117.75 in 1994, $127.50 in 1995, $140.25 in 1996, $186.63 in 1997, $318.63 in 1998 and $387.65 in 1999.

155. TAP engaged in Pennsylvania in the provision of free goods and drug product with respect to Lupron.

156. For example, in the government sentencing memorandum from U.S. v. TAP Pharmaceutical Products, Inc., it was estimated that between 1993 and 1999, TAP gave $30,000,000 to $60,000,000 worth of free product to physicians, knowing that much of that free product would be billed to patients and end payors.

157. The guilty plea entered by TAP included pleading guilty to conspiring with physicians to bill for free Lupron in direct violation of federal law. As set forth in the plea agreement, "[t]he conduct of TAP and its employees presents a corporate wide scheme to induce physicians to purchase TAP's drug Lupron by providing free samples of the product to physicians, with the intent and expectation that those individuals would use and bill those free samples to their patients and their insurance companies."

158. In addition, as set forth above, four physicians have pled guilty to conspiring with TAP to bill for free Lupron provided by TAP.

159. TAP engaged in Pennsylvania in the provision of other financial incentives with respect to Lupron.

160. By way of example, TAP provided the following forms of incentive, among others, with respect to the drug Lupron: Off-invoice pricing, discounts, all expenses paid trips, "educational

40

grants," payment of bar tabs, payment of holiday party expenses, financial support for advertising expenses, free consulting services and forgiveness of debt.

161.    As stated in the government sentencing memorandum from U.S. v. TAP Pharmaceutical Products, Inc., these other incentives caused losses to patients and end payors much like those losses caused by giving free product because these incentives induced physicians to prescribe Lupron as opposed to other, cheaper alternatives, increasing the cost to patients and end payors.

162.    TAP engaged in the fraudulent concealment of its conduct set forth above in the manner described in paragraphs 105 through 110, above and also by labeling the spreads for its drugs "Return to Practice" or "RTP" in order to conceal and suppress the fact that the spreads for this company's drugs were being marketed as profits and improper financial incentives.

163.    TAP further has attempted to conceal its conduct by warning physicians, under the guise of "contract confidentiality," that if they were to discuss with others their actual acquisition costs for Lupron, "you run the risk of that information getting back to HCFA. If HCF [sic] then realized that AWP is not a true reflection of the price, the AWP could be affected, thus lowering the amount you may charge."

164.    In other words, TAP was freely acknowledging that AWP was not a true reflection of the actual price of Lupron, and, at the same time, was attempting to ensure that government authorities never discovered this fact by threatening physicians that they would earn less money if the government were to find out.

41

## CONDUCT RESPECTING PHARMACY DISPENSED PRESCRIPTION DRUGS

165. With respect to its Pharmacy Dispensed Prescription Drug Prevacid, TAP engaged in the following conduct.

166. TAP reported AWP prices to the major compendia, including the compendia relied upon by the Commonwealth and Pennsylvania businesses and consumers, which reported AWPs that did not reflect actual wholesale prices.

167. Upon information and belief, TAP took various steps to conceal actual average wholesale selling prices by giving discounts, rebates, and other financial incentives and requiring the recipients of those financial incentives to not report and keep those incentives confidential.

168. In addition, TAP has increased the AWPs for Prevacid in amounts which, on information and belief, do not reflect discounts, rebates and other incentives TAP provides to lower the wholesale cost of its drugs.

169. For example, for Prevacid, the AWP for 30 mg, 100-size was $373.45 in 1999, $388.02 in 2000, $414.44 in 2001, and $427.70 in May, 2002.

170. The Commonwealth, on information and belief, asserts that the changes in AWP did not accurately account for discounts, rebates and other financial incentives which reduced the wholesale cost of Prevacid.

## COUNT I
## COMMONWEALTH v. TAP
## UNJUST ENRICHMENT

171. The Commonwealth hereby incorporates by reference thereto the averments of the preceding and subsequent paragraphs hereof as if fully set forth herein and further alleges as follows.

42

172. As set forth above, TAP has been unjustly enriched as a result of engaging in the following practices with respect to the Commonwealth and Pennsylvania Consumers: 1) the creation and promotion of spreads; 2) the provision of free goods and drug product; 3) the provision of other financial incentives; 4) reporting AWPs that do not reflect discounts, rebates and other incentives and changing AWPs without accounting for discounts, rebates and other incentives; and 5) fraudulent concealment of its actions.

173. The Commonwealth and Pennsylvania Consumers were purchasers, reimbursers and/or end payors of TAP's drugs and have paid amounts far in excess of the true cost for TAP's drugs.

174. TAP knew of and has appreciated and retained, or used, the benefits of the Commonwealth and Pennsylvania Consumers' purchases of its drugs at amounts far in excess of the true cost. TAP used the spread between AWPs and the actual selling prices of its drugs to: a) pay prescribers an incentive to prescribe and dispense its drugs; b) provide free goods and other drug products as incentives; and c) create discounts and rebates. Each of these incentives was intended to increase the market share of TAP's drugs thereby increasing sales and profits.

175. For those customers that purchase direct from TAP at prices based on AWPs, TAP's increases to AWPs directly benefit TAP in the form of increased revenue.

176. Based upon TAP's conduct set forth in this complaint, it would be inequitable and unjust for TAP to retain such benefits without payment of value.

177. TAP will be unjustly enriched if it is permitted to retain the direct or indirect benefits it received or used resulting from the purchase of TAP's drugs by the Commonwealth and

43

Pennsylvania Consumers. The Commonwealth on behalf of itself and Pennsylvania Consumers seeks to recover the amounts that unjustly enriched TAP.

178.    The Commonwealth and Pennsylvania Consumers are therefore entitled to equitable relief in the form of an injunction, restitution and disgorgement, legal relief in the form of damages and any other relief the Court deems appropriate.

WHEREFORE, the Commonwealth, on behalf of itself and Pennsylvania Consumers, respectfully seeks the relief set forth below.

## COUNT II
## COMMONWEALTH v. TAP
## MISREPRESENTATION/FRAUD

179.    The Commonwealth hereby incorporates by reference thereto the averments of the preceding paragraphs hereof as if fully set forth herein and further alleges as follows.

180.    Defendant's acts violate Pennsylvania common law proscriptions against fraudulent misrepresentation.

181.    In reporting AWPs to the compendia during the relevant time period for its drugs, TAP was making representations that the AWPs for each of these drugs represented a real and fact-based average wholesale price for its drugs.

182.    These representations were material to the transactions at hand in that the Commonwealth and Pennsylvania Consumers used and relied upon the AWPs as the basis for determining how much to pay and/or reimburse for TAP's drugs.

183.    The Commonwealth prepared analyses using AWP historical data to prepare budgets for program funding, to develop formularies and to establish program eligibility requirements for program beneficiaries.

44

184.   As set forth more fully above, these AWPs were artificial prices, unrelated to any real or fact-based average wholesale price, created and manipulated by TAP for the purpose of generating revenue, thus constituting false representations which TAP knew or, in the absence of recklessness, should have known to be false.

185.   Indeed, the AWP was not a calculation of any average at all but in fact was a result driven number selected exclusively by TAP for the purpose of creating a spread for the payment of rebates and other financial incentives or to simply generate additional revenue.

186.   The value of free product and other incentives given by TAP was not reflected in the setting of the AWP.

187.   TAP knew or, in the absence of recklessness, should have known that the omission of the value of rebates, free product and other incentives in the reporting of AWP to the compendia and the artificial setting of AWP constituted false representations.

188.   TAP made these false representations with the intent of misleading the Commonwealth and Pennsylvania Consumers.

189.   The Commonwealth and Pennsylvania Consumers justifiably relied upon these false misrepresentations in purchasing and/or reimbursing for TAP's drugs in an amount and for a price based upon the AWP.

190.   Because Commonwealth statutes, regulations and contracts require use of AWP, as published by the compendia, in reimbursement formulas, the Commonwealth's reliance on the reported AWP was justified and reasonable.

191.   It was reasonable for Pennsylvania Consumers to rely on prices billed by their prescribers or pharmacists.

45

192.    As a direct result of the false representations of TAP, as set forth above, the Commonwealth and Pennsylvania Consumers were harmed in that they were unaware of the artificial inflation of the AWP, would not have paid and/or reimbursed the artificially inflated prices for TAP's drugs had they known of the false representations and, in fact, overpaid for TAP's drugs because of the false representations.

WHEREFORE, the Commonwealth, on behalf of itself and the Pennsylvania Consumers, respectfully seeks the relief set forth below.

### COUNT III
### COMMONWEALTH v. TAP
### VIOLATION OF THE PENNSYLVANIA
### UNFAIR TRADE PRACTICE AND CONSUMER PROTECTION LAW

193.    The Commonwealth hereby incorporates by reference thereto the averments of the preceding paragraphs hereof as if fully set forth herein and further alleges as follows.

194.    TAP has violated Pennsylvania's Unfair Trade Practice and Consumer Protection Law ("UTPCPL") by its actions more fully described below. 73 P.S. § 201-1 *et seq.*

195.    The Commonwealth is empowered to bring this action on behalf of "persons" who have purchased TAP's prescription drugs at inflated prices and as a result, have suffered, are suffering, and will continue to suffer irreparable harm as a result of TAP's actions. "Persons" include but are not limited to natural persons, corporations, trusts, partnerships, incorporated or unincorporated associations, and any other legal entities within the meaning of 73 P.S.§ 201-2(2).

196.    The Commonwealth also has standing to bring this claim in that the Commonwealth is both an end payor and purchaser/reimburser of TAP's prescription drugs through its Medicaid, PACE, PEBTF and other Commonwealth Programs. The Commonwealth performs these functions

not for its own business purposes, but rather in its representative capacity on behalf and for the benefit of its constituents who, in turn, make use of the prescription drugs primarily for personal, family and/or household purposes.

197.    In distributing, marketing, and selling prescription drugs to the Commonwealth and Pennsylvania Consumers, and in otherwise engaging in the conduct more fully described herein with respect to the above-identified drugs, TAP is engaging in trade or commerce that directly or indirectly harmed consumers in this Commonwealth within the meaning of 73 P.S. § 201-2(3).

198.    Specifically, TAP, by engaging in the practices set forth above, has:

      a.    Deceptively distributed, marketed and sold its drugs by alleging to the Commonwealth and the entities and consumers on whose behalf this action is brought that the AWPs for each of its drugs represented a real and fact-based price for its drugs;

      b.    Concealed from purchasers that AWP prices are exclusively set and controlled by drug manufacturers, while indicating that AWP represents a real and fact-based price, thereby causing a likelihood of confusion or misunderstanding for consumers who are led to believe AWP is a real and fact-based price; and

      c.    As a result of TAP's acts in deceiving consumers that AWPs represent a real and fact-based price for their drugs, consumers who believed they were receiving a discount off AWP in fact paid inordinately high prices and/or co-payments resulting from the reporting of inflated AWPs for needed prescription drugs.

47

199. TAP violated the UTPCPL:

    a.    each time the medical provider charged a patient at the inflated AWP price and benefitted from any spread between the actual wholesale cost of such drugs and the AWP;

    b.    each time free samples were delivered to a medical provider with the understanding and expectation that the provider will charge the patient for free samples;

    c.    each time the medical provider charged a patient for free samples;

    d.    each time an incentive was given to anyone to cause a patient to be billed at the inflated AWP;

    e.    each time a patient was charged at the inflated AWP as a result of incentives given by or on behalf of TAP;

    f.    each time a request for reimbursement was made to a Commonwealth program based on an inflated AWP;

    g.    each time an inflated AWP was published; and

    h.    each time a patient and/or his or her insurer was charged based on an inflated AWP; and

    i.    each time TAP engaged in conduct actionable under the preceding counts of this Complaint and/or engaged in conduct in violation of the statutes and laws of the Commonwealth.

200. TAP's products reimbursed or purchased by the Commonwealth or purchased by Pennsylvania Consumers were used for personal, family or household use.

48

201. TAP's conduct as more fully described herein constitutes unfair methods of competition and unfair or deceptive acts or practices within the meaning of 73 P.S. § 201-2(4), including, but not limited to, the following:

> a. causing likelihood of confusion or misunderstanding as to the source, sponsorship, approval or certification of goods or service, within the meaning of 73 P.S. § 201-2(4)(ii);
>
> b. representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that he does not have within the meaning of 73 P.S. § 201-2(4)(v);
>
> c. advertising goods or services with the intent not to sell them as advertised within the meaning of 73 P.S. § 201-3(4)(ix);
>
> d. making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions within the meaning of 73 P.S. § 201-2(4)(xi);
>
> e. engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding within the meaning of 73 P.S. § 201-2(4)(xxi).

202. TAP's conduct more fully described herein, is, accordingly, proscribed and unlawful pursuant to 73 PA. STAT. § 201-3.

203. TAP's conduct as more fully described herein, was willful within the meaning of 73 P.S. § 201-8.

49

204.    The Attorney General has determined that these proceedings to enjoin TAP's conduct are in the public interest.

205.    The Commonwealth therefore seeks the entry of a permanent injunction restraining TAP's unlawful conduct and mandating corrective measures pursuant to 73 P. S. § 201-4.

206.    The Commonwealth also requests that the Court require TAP to restore to the Commonwealth and Pennsylvania Consumers monies acquired from the sale of its prescription drugs during the period of time its unlawful conduct took place, pursuant to 73 P. S. § 201-4.1.

207.    In addition, and in light of TAP's willful and improper conduct as herein described, the Commonwealth requests that the Court award a civil penalty to the Commonwealth not exceeding:

        a.    as to affected Pennsylvania Consumers under the age of sixty (60) years, $1,000.00 per violation, and

        b.    as to affected Pennsylvania Consumers sixty (60) years of age or older, $3,000 per violation.

208.    TAP is liable for its actions and the actions of its co-conspirators for each of these violations as independent unfair and deceptive acts in violation of the UTPCPL, and for its course of conduct comprising an unfair and deceptive practice in violation of the UTPCPL.

209.    As a result of TAP's unfair and deceptive trade practices, the Commonwealth and Pennsylvania Consumers have and will continue to suffer ascertainable loss and damages in an amount to be determined at trial.

WHEREFORE, the Commonwealth, on behalf of itself and Pennsylvania Consumers, respectfully seeks the relief set forth below.

## ABBOTT'S SPECIFIC CONDUCT

210.   Abbott engaged in the unlawful conduct with respect to its Prescriber Dispensed Prescription Drugs, including Acetylcyst, Acyclovir, A-Methapred, Amikacin, Aminosyn, Calcijex, Cimetidine Hydrochloride, Clindamycin, Depakote, Dextrose, Diazepam, Etoposide, Fentanyl, Furosemide, Gentamicin, Heparin, Leucovorin Calcium, Liposyn II, Lorazepam, Sodium Chloride, and Vancomycin, and its Pharmacy Dispensed Prescription Drugs, including Biaxin, Depakote, Ery-Tab, Erythromycin, Flomax, Kaletra, Prevacid (TAP), Tobra/NaCl, Tricor, and Tobramycin.

### ✦ CONDUCT RESPECTING PRESCRIBER DISPENSED PRESCRIPTION DRUGS

211.   Abbott engaged in 1) the creation and promotion of spreads; 2) the provision of free goods and drug product; 3) the provision of other financial incentives; and 4) fraudulent concealment of its actions with respect to its Prescriber Dispensed Prescription Drugs.

212.   Abbott's unlawful actions include its involvement and conduct with respect to TAP's unlawful sales and marketing practices, as described above in paragraphs 148 through 170, and also with respect to its own drugs.

213.   Upon information and belief, Abbott engaged in Pennsylvania in the promotion of spreads with respect to all of its Prescriber Dispensed Prescription Drugs, including: Acetylcyst, Acyclovir, A-Methapred, Amikacin, Aminosyn, Calcijex, Cimetidine Hydrochloride, Clindamycin, Depakote, Dextrose, Diazepam, Etoposide, Fentanyl, Furosemide, Gentamicin, Heparin, Leucovorin Calcium, Liposyn II, Lorazepam, Sodium Chloride, and Vancomycin.

214.   Abbott's manipulation of AWPs was the subject of an October 2000 letter sent by Representative Pete Stark, the ranking member of the Congressional Ways and Means Committee to Miles White, Abbott's C.E.O., which letter stated, in part:

51

> The price manipulation scheme is executed through Abbott's inflated representations of average wholesale price ("AWP") and direct price ("DP") which are utilized by the Medicare and Medicaid programs in establishing drug reimbursements to providers. The difference between the inflated representations of AWP and DP versus the true price providers are paying, is regularly referred to. . . as "the spread." The evidence . . . clearly shows that Abbott has intentionally reported inflated prices and has engaged in other improper business practices in order to cause its customers to receive windfall profits from Medicare and Medicaid when submitting claims for certain drugs. The evidence further reveals that Abbott manipulated prices for the express purpose of expanding sales and increasing market share of certain drugs. This was achieved by arranging financial benefits or inducements that influenced the decisions of health care providers submitting Medicare and Medicaid claims.

215.    For example, one published report states that Abbott reported an AWP for Amikacin of $54.46 when the actual price was $6.75.

216.    Another example is Abbott's 1999 AWP for Vancomycin of $261.84, when the actual acquisition cost of the drug was $76.00.

217.    In fact, in 2000, the United States Department of Justice identified 16 drugs manufactured by Abbott for which Abbott had reported AWPs ranging from 29% to 20,735% greater than actual average wholesale prices.

218.    Upon information and belief, Abbott engaged in Pennsylvania in the provision of free goods and drug product with respect to all of its Prescriber Dispensed Prescription Drugs, including: Acetylcyst, Acyclovir, A-Methapred, Amikacin, Aminosyn, Calcijex, Cimetidine Hydrochloride, Clindamycin, Depakote, Dextrose, Diazepam, Etoposide, Fentanyl, Furosemide, Gentamicin, Heparin, Leucovorin Calcium, Liposyn II, Lorazepam, Sodium Chloride, and Vancomycin.

219.    Upon information and belief, Abbott engaged in Pennsylvania in the provision of other financial incentives with respect to all of its Prescriber Dispensed Prescription Drugs,

including: Acetylcyst, Acyclovir, A-Methapred, Amikacin, Aminosyn, Calcijex, Cimetidine Hydrochloride, Clindamycin, Depakote, Dextrose, Diazepam, Etoposide, Fentanyl, Furosemide, Gentamicin, Heparin, Levcovorin Calcium, Liposyn II, Lorazepam, Sodium Chloride, and Vancomycin.

220.    Abbott engaged in the fraudulent concealment of its conduct set forth above in the manner set forth in paragraphs 105 through 110, above, and also by requiring purchasers of their drugs to keep secret the actual prices that the purchasers were paying for the drugs.

### CONDUCT RESPECTING PHARMACY DISPENSED PRESCRIPTION DRUGS

221.    With regard to the Pharmacy Dispensed Prescription Drugs, Abbott engaged in the following conduct.

222.    Abbott reported AWP prices to the major compendia, including the compendia relied upon by the Commonwealth and Pennsylvania businesses and consumers, which reported AWPs that did not reflect actual wholesale prices.

223.    Upon information and belief Abbott took various steps to conceal actual average wholesale selling prices by giving discounts, rebates, and other financial incentives and requiring the recipients of those financial incentives to not report and keep those incentives confidential.

224.    In addition, Abbott has increased the AWPs for its drugs in amounts which, on information and belief, do not reflect discounts, rebates and other incentives Abbott provides to lower the wholesale cost of its drugs.

225.    For example, for Biaxin Filmtabs, the AWP for 250 mg, 60-size tablets was $211.31 in 1999, $235.90 in 2000, $236.96 in 2001, and $248.58 in May, 2002.

226.    The Commonwealth, on information and belief, asserts that the changes in AWP did not accurately account for discounts, rebates and other financial incentives which reduced the wholesale cost of Biaxin.

227.    Upon information and belief, for Abbott's other Pharmacy Dispensed Prescription Drugs, including: Depakote, Ery-Tab, Erythromycin, Flomax, Kaletra, Prevacid (TAP), Tobra/NaCl, Tricor, and Tobramycin, the AWPs were similarly unrelated to actual wholesale prices and did not account for discounts, rebates and other financial incentives offered by Abbott which lowered wholesale costs.

228.    For Abbott's other Pharmacy Dispensed Prescription Drugs, the AWPs were similarly changed over time and those changes did not account for discounts, rebates or other financial incentives.

## COUNT IV
## COMMONWEALTH v. ABBOTT
## UNJUST ENRICHMENT

229.    The Commonwealth hereby incorporates by reference thereto the averments of the preceding and subsequent paragraphs hereof as if fully set forth herein and further alleges as follows.

230.    As set forth above, Abbott has been unjustly enriched as a result of engaging in the following practices with respect to the Commonwealth and Pennsylvania Consumers: 1) the creation and promotion of spreads; 2) the provision of free goods and drug product; 3) the provision of other financial incentives; 4) reporting of AWPs that do not reflect discounts, rebates and other incentives and increasing of AWPs without accounting for discounts, rebates and other incentives; and 5) fraudulent concealment of its actions.

54

231.     The Commonwealth and Pennsylvania Consumers were purchasers, reimbursers and/or end payors of Abbott's drugs and have paid amounts far in excess of the true cost for Abbott's drugs.

232.     Abbott knew of and has appreciated and retained, or used, the benefits of the Commonwealth and Pennsylvania Consumers' purchases of its drugs at amounts far in excess of the true cost.  Abbott used the spread between the AWPs and the actual selling prices of its drugs to: a) pay prescribers an incentive to prescribe and dispense its drugs; b) provide free goods and other drug products as incentives; and c) create discounts and rebates.  Each of these incentives was intended to increase the market share of Abbott's drugs thereby increasing its sales and profits.

233.     For those customers that purchase direct from Abbott at prices based on AWPs, Abbott's increases to AWPs directly benefit Abbott in the form of increased revenues.

234.     Based upon Abbott's conduct set forth in this complaint, it would be inequitable and unjust for Abbott to retain such benefits  without payment of value.

235.     Abbott will be unjustly enriched if it is permitted to retain the direct or indirect benefits received or used resulting from the purchase of Abbott's drugs by the Commonwealth and Pennsylvania Consumers.  The Commonwealth on behalf of itself and Pennsylvania Consumers seeks to recover the amounts that unjustly enriched Abbott.

236.     The Commonwealth and Pennsylvania Consumers are therefore entitled to equitable relief in the form of an injunction, restitution and disgorgement, legal relief in the form of damages and any other relief the Court deems appropriate.

WHEREFORE, the Commonwealth, on behalf of itself and Pennsylvania Consumers, respectfully seeks the relief set forth below.

55

## COUNT V
## COMMONWEALTH v. ABBOTT
## MISREPRESENTATION/FRAUD

237.    The Commonwealth hereby incorporates by reference thereto the averments of the preceding paragraphs hereof as if fully set forth herein and further alleges as follows.

238.    Defendant's acts violate Pennsylvania common law proscriptions against fraudulent misrepresentation.

239.    In reporting AWPs to the compendia during the relevant time period for its drugs, Abbott was making representations that the AWPs for each of its drugs represented a real and fact-based average wholesale price.

240.    These representations were material to the transactions at hand in that the Commonwealth and Pennsylvania Consumers used and relied upon the AWPs as the basis for determining how much to pay and/or reimburse for Abbott's drugs.

241.    The Commonwealth prepared analyses using AWP historical data to prepare budgets for program funding, to develop formularies and to establish program eligibility requirements for program beneficiaries.

242.    As set forth more fully above, these AWPs were artificial prices, unrelated to any real or fact-based average wholesale price, created and manipulated by Abbott for the purpose of generating revenue, thus constituting false representations which Abbott knew or, in the absence of recklessness, should have known to be false.

243.    Indeed, the AWP was not a calculation of any average at all but in fact was a result driven number selected exclusively by Abbott for the purpose of creating a spread and for the payment of rebates and other financial incentives or to simply generate additional revenue.

56

244.    The value of free product and other incentives given by Abbott was not reflected in the setting of the AWP.

245.    Abbott knew or, in the absence of recklessness should have known, that the omission of the value of rebates, free product and other incentives in the reporting of AWP to the compendia and the artificial setting of AWP constituted false representations.

246.    Abbott made these false representations with the intent of misleading the Commonwealth and Pennsylvania Consumers.

247.    The Commonwealth and Pennsylvania Consumers justifiably relied upon these false misrepresentations in purchasing and/or reimbursing for Abbott's drugs in an amount and for a price based upon the AWP.

248.    Because Commonwealth statutes, regulations and contracts require use of AWP, as published by the compendia, in reimbursement formulas, the Commonwealth's reliance on the reported AWP was justified and reasonable.

249.    It was reasonable for Pennsylvania Consumers to rely on prices billed by their prescribers or pharmacists.

250.    As a direct result of the false representations of Abbott, as set forth above, the Commonwealth and Pennsylvania Consumers were harmed in that they were unaware of the artificial inflation of the AWP, would not have paid and/or reimbursed the artificially inflated prices for Abbott's drugs had they known of the false representations and, in fact, overpaid for Abbott's drugs because of the false representations.

WHEREFORE, the Commonwealth, on behalf of itself and the Pennsylvania Consumers, respectfully seeks the relief set forth below.

57

## COUNT VI
## COMMONWEALTH v. ABBOTT
## VIOLATION OF THE PENNSYLVANIA
## UNFAIR TRADE PRACTICE AND CONSUMER PROTECTION LAW

251.    The Commonwealth hereby incorporates by reference thereto the averments of the preceding paragraphs hereof as if fully set forth herein and further alleges as follows.

252.    Abbott has violated Pennsylvania's Unfair Trade Practice and Consumer Protection Law ("UTPCPL")by its actions more fully described below. 73 P.S. § 201-1 *et seq*.

253.    The Commonwealth is empowered to bring this action on behalf of "persons" who have purchased Abbott's prescription drugs at inflated prices and as a result, have suffered, are suffering, and will continue to suffer irreparable harm as a result of Abbott's actions. "Persons" include but are not limited to natural persons, corporations, trusts, partnerships, incorporated or unincorporated associations, and any other legal entities within the meaning of 73 P.S.§ 201-2(2).

254.    The Commonwealth also has standing to bring this claim in that the Commonwealth is both an end payor and purchaser/reimburser of Abbott's prescription drugs through its Medicaid, PACE, PEBTF and other Commonwealth Programs. The Commonwealth performs these functions not for its own business purposes, but rather in its representative capacity on behalf and for the benefit of its constituents who, in turn, make use of the prescription drugs primarily for personal, family and/or household purposes.

255.    In distributing, marketing, and selling prescription drugs to the Commonwealth and Pennsylvania Consumers, and in otherwise engaging in the conduct more fully described herein with respect to the above-identified drugs, Abbott is engaging in trade or commerce that directly or indirectly harmed consumers in this Commonwealth within the meaning of 73 P.S. § 201-2(3).

256.   Specifically, Abbott, by engaging in the practices set forth above, has:

    a.    Deceptively distributed, marketed and sold its drugs by alleging to the Commonwealth and the entities and consumers on whose behalf this action is brought that the AWPs for each of its drugs represented a real and fact-based price for its drugs;

    b.    Concealed from purchasers that AWP prices are exclusively set and controlled by drug manufacturers, while indicating that AWP represents a real and fact-based price, thereby causing a likelihood of confusion or misunderstanding for consumers who are led to believe AWP is a real and fact-based price; and

    c.    As a result of Abbott's acts in deceiving consumers that AWPs represent a real and fact-based price for its drugs, consumers who believed they were receiving a discount off AWP in fact paid inordinately high prices and/or co-payments resulting from the reporting of inflated AWPs for needed prescription drugs.

257.   Abbott violated the UTPCPL:

    a.    each time the medical provider charged a patient at the inflated AWP price and benefits from any spread between the actual wholesale cost of such drugs and the AWP;

    b.    each time free samples were delivered to a medical provider with the understanding and expectation that the provider will charge the patient for free samples;

59

c.      each time the medical provider charged a patient for free samples;

d.      each time an incentive was given to anyone to cause a patient to be billed at the inflated AWP;

e.      each time a patient was charged at the inflated AWP as a result of incentives given by or on behalf of Abbott;

f.      each time a request for reimbursement was made to a Commonwealth program based on an inflated AWP;

g.      each time an inflated AWP was published;

h.      each time a patient and/or his or her insurer was charged based on an inflated AWP; and

i.      each time Abbott engaged in conduct actionable under the preceding counts of this Complaint and/or engaged in conduct in violation of the statutes and laws of the Commonwealth.

258.    Abbott's products reimbursed or purchased by the Commonwealth or purchased by Pennsylvania Consumers were used for personal, family, or household use.

259.    Abbott's conduct as more fully described herein constitutes unfair methods of competition and unfair or deceptive acts or practices within the meaning of 73 P.S. § 201-2(4), including, but not limited to, the following:

a.      causing likelihood of confusion or misunderstanding as to the source, sponsorship, approval or certification of goods or service, within the meaning of 73 P.S. § 201-2(4)(ii);

60

b.    representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that he does not have within the meaning of 73 P.S. § 201-2(4)(v);

c.    advertising goods or services with the intent not to sell them as advertised within the meaning of 73 P.S. § 201-3(4)(ix);

d.    making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions within the meaning of 73 P.S. § 201-2(4)(xi);

e.    engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding within the meaning of 73 P.S. § 201-2(4)(xxi).

260.    Abbott's conduct more fully described herein, is, accordingly, proscribed and unlawful pursuant to 73 PA. STAT. § 201-3.

261.    Abbott's conduct as more fully described herein, was willful within the meaning of 73 P.S. § 201-8.

262.    The Attorney General has determined that these proceedings to enjoin Abbott's conduct are in the public interest.

263.    The Commonwealth therefore seeks the entry of a permanent injunction restraining Abbott's unlawful conduct and mandating corrective measures pursuant to 73 P. S. § 201-4.

264.    The Commonwealth also requests that the Court require Abbott to restore to the Commonwealth and Pennsylvania Consumers monies acquired from the sale of its prescription drugs during the period of time Defendant's unlawful conduct took place, pursuant to 73 P. S. § 201-4.1.

265.    In addition, and in light of Abbott's willful and improper conduct as herein described, the Commonwealth requests that the Court award a civil penalty to the Commonwealth not exceeding:

   a.    as to affected Pennsylvania Consumers under the age of sixty (60) years, $1,000.00 per violation, and

   b.    as to affected Pennsylvania Consumers sixty (60) years of age or older, $3,000 per violation.

266.    Abbott is liable for its actions and the actions of its co-conspirators for each of these violations as independent unfair and deceptive acts in violation of the UTPCPL, and for its course of conduct comprising an unfair and deceptive practice in violation of the UTPCPL.

267.    As a result of Abbott's unfair and deceptive trade practices, the Commonwealth and Pennsylvania Consumers have and will continue to suffer ascertainable loss and damages in an amount to be determined at trial.

WHEREFORE, the Commonwealth, on behalf of itself and Pennsylvania Consumers, respectfully seeks the relief set forth below.

## THE ASTRAZENECA DEFENDANTS' SPECIFIC CONDUCT

268.    The AstraZeneca Defendants engaged in the unlawful conduct with respect to their Prescriber Dispensed Prescription Drugs, including Cefotan, Diprivan, Elavil Injection, Entocort, Faslodex, Foscavir, Merrem, Tenormin Injection, Xylocaine Injection, and Zoladex, and their

62

Pharmacy Dispensed Prescription Drugs, including Accolate, Arimidex, Atacand, Atacand HCT, Casodex, Nexium, Nolvadex, Prilosec, Pulmicort, Rhinocort, Seroquel, Toprol, Zestril, and Zomig.

## CONDUCT RESPECTING PRESCRIBER DISPENSED PRESCRIPTION DRUGS

269.    The AstraZeneca Defendants engaged in 1) the creation and promotion of spreads; 2) the provision of free goods and drug product; 3) the provision of other financial incentives; and 4) fraudulent concealment of their actions with respect to their Prescriber Dispensed Prescription Drugs.

270.    Upon information and belief, the AstraZeneca Defendants engaged in Pennsylvania in the promotion of spreads with respect to all of their Prescriber Dispensed Prescription Drugs, including Cefotan, Diprivan, Elavil Injection, Entocort, Faslodex, Foscavir, Merrem, Tenormin Injection, Xylocaine Injection, and Zoladex.

271.    One example of the promotion of spreads by the AstraZeneca Defendants is with respect to its drug, Zoladex. Zoladex was the main competition for TAP's drug, Lupron.

272.    In June of 2003, AstraZeneca pled guilty to federal charges of conspiracy to violate the Prescription Drug Marketing Act by conspiring with doctors to bill for free samples of Zoladex. AstraZeneca paid fines and civil penalties of $355,000,000 in settlement of these and other charges. Among the charges made by the federal government was that the AstraZeneca Defendants inflated the AWP of Zoladex while deeply discounting the price physicians paid for the drug and then marketed the "spread" between these two prices to physicians as an inducement to prescribe Zoladex over Lupron.

63

273.    As part of their guilty plea, the AstraZeneca Defendants were required by a corporate integrity agreement to report accurate "average sales prices" for not just Zoladex, but also for Cefotan, Elavil Injection, Faslodex, Foscavir, Merrem, Tenormin Injection and Xylocaine Injection.

274.    Three physicians, while pleading guilty to conspiring with AstraZeneca to bill for free Zoladex, admitted that AstraZeneca sales representatives marketed spreads, between actual wholesale prices and AWP to them in an effort to induce them to prescribe Zoladex.

275.    AstraZeneca's own documents evidence the marketing of spreads on Zoladex against Lupron and set forth for the physicians to whom they were given, how much more money physicians could earn due to the claimed better spread on Zoladex as opposed to Lupron.

276.    Upon information and belief, the AstraZeneca Defendants engaged in Pennsylvania in the provision of free goods and drug product with respect to all of their Prescriber Dispensed Prescription Drugs, including Cefotan, Diprivan, Elavil Injection, Entocort, Faslodex, Foscavir, Merrem, Tenormin Injection, Xylocaine Injection, and Zoladex

277.    One example of AstraZeneca's provision of free goods and drug product is with Zoladex. As set forth above, AstraZeneca pled guilty to conspiring with physicians to bill for Zoladex which AstraZeneca had provided free of charge to physicians, knowing that physicians would then charge patients and end payors for it.

278.    In addition to AstraZeneca's own guilty plea, three physicians pled guilty to conspiring with AstraZeneca to bill for free Zoladex received from AstraZeneca.

279.    Further evidence of AstraZeneca's free product abuse is their offer of "50 free depots (over $11,900 worth of product)" of Zoladex to any physician who would convert this/her patients over to Zoladex from Lupron.

64

280.    The combination of inflated AWPs and free product was a powerful marketing tool for AstraZeneca. For example, AstraZeneca promoted an AWP for Zoladex 3-month of $1206.49 and a cost to physicians of $676.75-$966.79, depending upon how much product the physician purchased. Thus the "spread" was $250 on Zoladex 3-month, even if the physician purchased only one unit. If the physician purchased 192 or more units, the physician could earn $530 on each unit.

281.    Upon information and belief, the AstraZeneca Defendants engaged in Pennsylvania in the provision of other financial incentives with respect to all of their Prescriber Dispensed Prescription Drugs, including Cefotan, Diprivan, Elavil Injection, Entocort, Faslodex, Foscavir, Merrem, Tenormin Injection, Xylocaine Injection, and Zoladex

282.    For example, the AstraZeneca Defendants provided unrestricted educational grants, business assistance grants and services, travel and entertainment, consulting and audit services and honoraria in order to induce physicians to prescribe/purchase Zoladex.

283.    The AstraZeneca Defendants engaged in the fraudulent concealment of their conduct set forth above in the manner set forth in paragraphs 105 through 110, above, and also by requiring purchasers of their drugs to keep secret the actual prices that the purchasers were paying for the drugs.

### CONDUCT RESPECTING PHARMACY DISPENSED PRESCRIPTION DRUGS

284.    With regard to the Pharmacy Dispensed Prescription Drugs, the AstraZeneca Defendants engaged in the following conduct.

285.    The AstraZeneca Defendants reported AWP prices to the major compendia, including the compendia relied upon by the Commonwealth and Pennsylvania businesses and consumers, which reported AWPs that did not reflect actual wholesale prices.

65

286.    Upon information and belief the AstraZeneca Defendants took various steps to conceal actual average wholesale selling prices by giving discounts, rebates, and other financial incentives and requiring the recipients of those financial incentives to not report and keep those incentives confidential.

287.    In addition, the AstraZeneca Defendants have increased the AWPs for their drugs in amounts which, on information and belief, do not reflect discounts, rebates and other incentives the AstraZeneca Defendants provide to lower the wholesale cost of its drugs.

288.    For example, for Prilosec, the AWP for 10 mg, 100-size enteric coated capsules was $357.08 in 1999, $370.83 in 2000, $385.30 in 2001, and $396.85 in May, 2002.

289.    The Commonwealth, on information and belief, asserts that the changes in AWP did not accurately account for discounts, rebates and other financial incentives which reduced the wholesale cost of Prilosec.

290.    For the AstraZeneca Defendants's other Pharmacy Dispensed Prescription Drugs, including Accolate, Arimidex, Atacand, Atacand HCT, Casodex, Nexium, Nolvadex, Pulmicort, Rhinocort, Seroquel, Toprol, Zestril, and Zomig, the AWPs were similarly unrelated to actual wholesale prices and did not account for discounts, rebates and other financial incentives offered by the AstraZeneca Defendants which lowered wholesale costs.

291.    For the AstraZeneca Defendants' other Pharmacy Dispensed Prescription Drugs, the AWPs were similarly changed over time and those changes did not account for discounts, rebates or other financial incentives.

66

## COUNT VII
## COMMONWEALTH v. THE ASTRAZENECA DEFENDANTS
## UNJUST ENRICHMENT

292.    The Commonwealth hereby incorporates by reference thereto the averments of the preceding and subsequent paragraphs hereof as if fully set forth herein and further alleges as follows.

293.    As set forth above, the AstraZeneca Defendants have been unjustly enriched as a result of engaging in the following practices with respect to the Commonwealth and Pennsylvania Consumers: 1) the creation and promotion of spreads; 2) the provision of free goods and drug product; 3) the provision of other financial incentives; 4) reporting of AWPs that do not reflect discounts, rebates and other incentives and increasing of AWPs without accounting for discounts, rebates and other incentives; and 5) fraudulent concealment of their actions.

294.    The Commonwealth and Pennsylvania Consumers were purchasers, reimbursers and/or end payors of the AstraZeneca Defendants' drugs and have paid amounts far in excess of the true cost for the AstraZeneca Defendants' drugs.

295.    The AstraZeneca Defendants knew of and has appreciated and retained, or used, the benefits of the Commonwealth and Pennsylvania Consumers' purchases of their drugs at amounts far in excess of the true cost. The AstraZeneca Defendants used the spread between the AWPs and the actual selling prices of its drugs to: a) pay prescribers an incentive to prescribe and dispense their drugs; b) provide free goods and other drug products as incentives; and c) create discounts and rebates. Each of these incentives was intended to increase the market share of the AstraZeneca Defendants' drugs thereby increasing their sales and profits.

67

296.    For those customers that purchase direct from the AstraZeneca Defendants at a price based on AWPs, the AstraZeneca Defendants' increases to AWPs directly benefit the AstraZeneca Defendants in the form of increased revenues.

297.    Based upon the AstraZeneca Defendants' conduct set forth in this complaint, it would be inequitable and unjust for the AstraZeneca Defendants to retain such benefits without payment of value.

298.    The AstraZeneca Defendants will be unjustly enriched if they are permitted to retain the direct or indirect benefits received or used resulting from the purchase of the AstraZeneca Defendants' drugs by the Commonwealth and Pennsylvania Consumers. The Commonwealth on behalf of itself and Pennsylvania Consumers seeks to recover the amounts that unjustly enriched the AstraZeneca Defendants.

299.    The Commonwealth and Pennsylvania Consumers are therefore entitled to equitable relief in the form of an injunction, restitution and disgorgement, legal relief in the form of damages and any other relief the Court deems appropriate.

WHEREFORE, the Commonwealth, on behalf of itself and Pennsylvania Consumers, respectfully seeks the relief set forth below.

## COUNT VIII
## COMMONWEALTH v. THE ASTRAZENECA DEFENDANTS
### MISREPRESENTATION/FRAUD

300.    The Commonwealth hereby incorporates by reference thereto the averments of the preceding paragraphs hereof as if fully set forth herein and further alleges as follows.

301.    The AstraZeneca Defendants' acts violate Pennsylvania common law proscriptions against fraudulent misrepresentation.

68

302.    In reporting AWPs to the compendia during the relevant time period for their drugs, the AstraZeneca Defendants were making representations that the AWPs for each of their drugs represented a real and fact-based average wholesale price.

303.    These representations were material to the transactions at hand in that the Commonwealth and Pennsylvania Consumers used and relied upon the AWPs as the basis for determining how much to pay and/or reimburse for the AstraZeneca Defendants' drugs.

304.    The Commonwealth prepared analyses using AWP historical data to prepare budgets for program funding, to develop formularies and to establish program eligibility requirements for program beneficiaries.

305.    As set forth more fully above, these AWPs were artificial prices, unrelated to any real or fact-based average wholesale price, created and manipulated by the AstraZeneca Defendants for the purpose of generating revenue, thus constituting false representations which the AstraZeneca Defendants knew or, in the absence of recklessness, should have known to be false.

306.    Indeed, the AWP was not a calculation of any average at all but in fact was a result driven number selected exclusively by the AstraZeneca Defendants for the purpose of creating a spread and for the payment of rebates and other financial incentives or to simply generate additional revenue.

307.    The value of rebates, free product and other incentives given by the AstraZeneca Defendants was not reflected in the setting of the AWP.

308.    The AstraZeneca Defendants knew or, in the absence of recklessness should have known, that the omission of the value of rebates, free product and other incentives in the reporting of AWP to the compendia and the artificial setting of AWP constituted false representations.

69

309.    The AstraZeneca Defendants made these false representations with the intent of misleading the Commonwealth and Pennsylvania Consumers.

310.    The Commonwealth and Pennsylvania Consumers justifiably relied upon these false misrepresentations in purchasing and/or reimbursing for the AstraZeneca Defendants' drugs in an amount and for a price based upon the AWP.

311.    Because Commonwealth statutes, regulations and contracts require use of AWP, as published by the compendia, in reimbursement formulas, the Commonwealth's reliance on the reported AWP was justified and reasonable.

312.    It was reasonable for Pennsylvania Consumers to rely on prices billed by their prescribers or pharmacists.

313.    As a direct result of the false representations of the AstraZeneca Defendants, as set forth above, the Commonwealth and Pennsylvania Consumers were harmed in that they were unaware of the artificial inflation of the AWP, would not have paid and/or reimbursed the artificially inflated prices for the AstraZeneca Defendants' drugs had they known of the false representations and, in fact, overpaid for the AstraZeneca Defendants' drugs because of the false representations.

WHEREFORE, the Commonwealth, on behalf of itself and the Pennsylvania Consumers, respectfully seeks the relief set forth below.

## COUNT IX
## COMMONWEALTH v. THE ASTRAZENECA DEFENDANTS
### VIOLATION OF THE PENNSYLVANIA
### UNFAIR TRADE PRACTICE AND CONSUMER PROTECTION LAW

314.    The Commonwealth hereby incorporates by reference thereto the averments of the preceding paragraphs hereof as if fully set forth herein and further alleges as follows.

315.    The AstraZeneca Defendants have violated Pennsylvania's Unfair Trade Practice and Consumer Protection Law ("UTPCPL")by its actions more fully described below. 73 P.S. § 201-1 *et seq.*

316.    The Commonwealth is empowered to bring this action on behalf of "persons" who have purchased the AstraZeneca Defendants' prescription drugs at inflated prices and as a result, have suffered, are suffering, and will continue to suffer irreparable harm as a result of the AstraZeneca Defendants' actions.   "Persons" include but are not limited to natural persons, corporations, trusts, partnerships, incorporated or unincorporated associations, and any other legal entities within the meaning of 73 P.S.§ 201-2(2).

317.    The Commonwealth also has standing to bring this claim in that the Commonwealth is both an end payor and purchaser/reimburser of the AstraZeneca Defendants' prescription drugs through its Medicaid, PACE, PEBTF and other Commonwealth Programs.  The Commonwealth performs these functions not for its own business purposes, but rather in its representative capacity on behalf and for the benefit of its constituents who, in turn, make use of the prescription drugs primarily for personal, family and/or household purposes.

318.    In distributing, marketing, and selling prescription drugs to the Commonwealth and Pennsylvania Consumers, and in otherwise engaging in the conduct more fully described herein with respect to the above-identified drugs, the AstraZeneca Defendants are engaging in trade or commerce that directly or indirectly harmed consumers in this Commonwealth within the meaning of 73 P.S. § 201-2(3).

319.    Specifically, the AstraZeneca Defendants, by engaging in the practices set forth above, have:

71

a. Deceptively distributed, marketed and sold their drugs by alleging to the Commonwealth and the entities and consumers on whose behalf this action is brought that the AWPs for each of their drugs represented a real and fact-based price for its drugs;

b. Concealed from purchasers that AWP prices are exclusively set and controlled by drug manufacturers, while indicating that AWP represents a real and fact-based price, thereby causing a likelihood of confusion or misunderstanding for consumers who are led to believe AWP is a real and fact-based price; and

c. As a result of the AstraZeneca Defendants' acts in deceiving consumers that AWPs represent a real and fact-based price for their drugs, consumers who believed they were receiving a discount off AWP in fact paid inordinately high prices and/or co-payments resulting from the reporting of inflated AWPs for needed prescription drugs.

320. The AstraZeneca Defendants violated the UTPCPL:

a. each time the medical provider charged a patient at the inflated AWP price and benefits from any spread between the actual wholesale cost of such drugs and the AWP;

b. each time free samples were delivered to a medical provider with the understanding and expectation that the provider will charge the patient for free samples;

c. each time the medical provider charged a patient for free samples;

72

d.    each time an incentive was given to anyone to cause a patient to be billed at the inflated AWP;

e.    each time a patient was charged at the inflated AWP as a result of incentives given by or on The AstraZeneca Defendants' behalf;

f.    each time a request for reimbursement was made to a Commonwealth program based on an inflated AWP;

g.    each time an inflated AWP was published;

h.    each time a patient and/or his or her insurer was charged based on an inflated AWP; and

i.    each time the AstraZeneca Defendants engaged in conduct actionable under the preceding counts of this Complaint and/or engaged in conduct in violation of the statutes and laws of the Commonwealth.

321.    The AstraZeneca Defendants' products reimbursed or purchased by the Commonwealth or purchased by Pennsylvania Consumers were used for personal, family, or household use.

322.    The AstraZeneca Defendants' conduct as more fully described herein constitutes unfair methods of competition and unfair or deceptive acts or practices within the meaning of 73 P.S. § 201-2(4), including, but not limited to, the following:

a.    causing likelihood of confusion or misunderstanding as to the source, sponsorship, approval or certification of goods or service, within the meaning of 73 P.S. § 201-2(4)(ii);

73

b.   representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that he does not have within the meaning of 73 P.S. § 201-2(4)(v);

c.   advertising goods or services with the intent not to sell them as advertised within the meaning of 73 P.S. § 201-3(4)(ix);

d.   making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions within the meaning of 73 P.S. § 201-2(4)(xi);

e.   engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding within the meaning of 73 P.S. § 201-2(4)(xxi).

323.   The AstraZeneca Defendants' conduct more fully described herein, is, accordingly, proscribed and unlawful under 73 PA. STAT. § 201-3.

324.   The AstraZeneca Defendants' conduct as more fully described herein, was willful within the meaning of 73 P.S. § 201-8.

325.   The Attorney General has determined that these proceedings to enjoin the AstraZeneca Defendants' conduct are in the public interest.

326.   The Commonwealth therefore seeks the entry of a permanent injunction restraining the AstraZeneca Defendants' unlawful conduct and mandating corrective measures pursuant to 73 P. S. § 201-4.

74

327.   The Commonwealth also requests that the Court require the AstraZeneca Defendants to restore to the Commonwealth and Pennsylvania Consumers monies acquired from the sale of its prescription drugs during the period of time their unlawful conduct took place, pursuant to 73 P. S. § 201-4.1.

328.   In addition, and in light of the AstraZeneca Defendants' willful and improper conduct as herein described, the Commonwealth requests that the Court award a civil penalty to the Commonwealth not exceeding:

   a.   as to affected Pennsylvania Consumers under the age of sixty (60) years, $1,000.00 per violation, and

   b.   as to affected Pennsylvania Consumers sixty (60) years of age or older, $3,000 per violation.

329.   The AstraZeneca Defendants are liable for their actions and the actions of their co-conspirators for each of these violations as independent unfair and deceptive acts in violation of the UTPCPL, and for their course of conduct comprising an unfair and deceptive practice in violation of the UTPCPL.

330.   As a result of the AstraZeneca Defendants' unfair and deceptive trade practices, the Commonwealth and Pennsylvania Consumers have and will continue to suffer ascertainable loss and damages in an amount to be determined at trial.

WHEREFORE, the Commonwealth, on behalf of itself and Pennsylvania Consumers, respectfully seeks the relief set forth below.

## BAYER DEFENDANT'S SPECIFIC CONDUCT

331.   The Bayer Defendants engaged in the unlawful conduct with respect to their Prescriber Dispensed Prescription Drugs, including Albumin, Baygam, Bayhep B, Bayrab, Bayrho-D, Cipro, DTIC-DOME, Gamimune, KoaTE, Kogenate, Mithracin, Plasmanate, Thrombate III (Antithrombin III), Traslol, and Viadur, and their Pharmacy Dispensed Prescription Drugs, including Adalat CC, Avclox, Baycol, Bayrab-D, Cipro-XR, Mycelex, Ninnotop, and Precose.

### CONDUCT RESPECTING PRESCRIBER DISPENSED PRESCRIPTION DRUGS

332.   The Bayer Defendants engaged in 1) the creation and promotion of spreads; 2) the provision of free goods and drug product; 3) the provision of other financial incentives; and 4) fraudulent concealment of their actions with respect to their Prescriber Dispensed Prescription Drugs.

333.   Upon information and belief, the Bayer Defendants engaged in Pennsylvania in the promotion of spreads with respect to all of their Prescriber Dispensed Prescription Drugs, including: Albumin, Baygam, Bayhep B, Bayrab, Bayrho-D, Cipro, Cipro-XR, DTIC-DOME, Gamimune, KoaTE, Kogenate, Mithracin, Plasmanate, Traslol, and Viadur.

334.   Bayer was aware, and even stated in its own internal documents that "it is a very simple process to increase our AWP, and can be done overnight."

335.   The Bayer Defendants took advantage of the ease of increasing AWPs to make sure that the AWP of their drug Kogenate kept pace with the AWP of Baxter's competing drug.

336.   In addition, an internal Bayer document evidences Bayer's concerns regarding spreads on its drugs versus spreads on drugs of its competitors. In that document, Bayer identifies a spread of $41.40 between the distributor acquisition price and AWP on its Gamimune.

337.    The Department of Justice documented at least 10 instances of AWPs of Bayer drugs being substantially higher than what the actual AWP should have been. These instances involved the Bayer drugs Immune Globulin (Gamimune) and Kogenate.

338.    Bayer produced to the government several price lists setting forth spreads between the AWPs for their drugs and the actual prices at which those same drugs were offered for sale. The list provided to the government identified hundreds of Bayer drugs containing spreads.

339.    As part of their guilty plea to government charges of conspiracy to violate federal drug laws with respect to the marketing of its drugs, the Bayer Defendants were required by a corporate integrity agreement to report accurate "average sales prices" for their drugs.

340.    A January 23, 2001, Justice Department press release announcing the settlement of claims against Bayer, stated that:

> [B]eginning in the early 1990s, [Bayer] falsely inflated the reported drug prices - referred to by the industry as the Average Wholesale Price (AWP), the Direct Price and the Wholesale Acquisition Cost - used by state governments to set reimbursement rates for the Medicaid program. By setting an extremely high AWP and . . . selling the product to doctors at a dramatic discount, Bayer induced physicians to purchase its products rather than those of competitors by enabling doctors to profit from reimbursement paid to them by the government.

341.    Upon information and belief, the Bayer Defendants engaged in Pennsylvania in the provision of free goods and drug product  and in the provision of other financial incentives with respect to their Prescriber Dispensed Prescription Drugs, including: Albumin, Baygam, Bayhep B, Bayrab, Bayrho-D, Cipro, Thrombate III, DTIC-DOME, Gamimune, KoaTE, Kogenate, Mithracin, Plasmanate, Traslol, and Viadur.

77

342.   These incentives took the form of off-invoice rebates, one-time buy-ins, volume discounts, marketing grants, special education grants, payment for data gathering and other similar incentives.

343.   The Bayer Defendants engaged in the fraudulent concealment of their conduct set forth above in the manner set forth in paragraphs 105 through 110, above.

### CONDUCT RESPECTING PHARMACY DISPENSED PRESCRIPTION DRUGS

344.   With regard to the Pharmacy Dispensed Prescription Drugs, the Bayer Defendants engaged in the following conduct.

345.   The Bayer Defendants reported AWP prices to the major compendia, including the compendia relied upon by the Commonwealth and Pennsylvania businesses and consumers, which reported AWPs that did not reflect actual wholesale prices.

346.   Upon information and belief, the Bayer Defendants took various steps to conceal actual average wholesale selling prices by giving discounts, rebates, and other financial incentives and requiring the recipients of those financial incentives to not report and keep those incentives confidential.

347.   In addition, the Bayer Defendants have increased the AWPs for their drugs in amounts which, on information and belief, do not reflect discounts, rebates and other incentives the Bayer Defendants provide to lower the wholesale cost of their drugs.

348.   For example, for Baycol, the AWP for 0.2 mg, 100-size tablets was $132.00 in 1999, $141.90 in 2000, and $162.25 in 2001.

349.   The Commonwealth, on information and belief, asserts that the changes in AWP did not accurately account for discounts, rebates and other financial incentives which reduced the wholesale cost of Baycol.

350.   For the Bayer Defendants' other Pharmacy Dispensed Prescription Drugs, including Adalat CC, Avclox, Bayrab-D, Cipro-XR, Mycelex, Ninnotop, and Precose, the AWPs were similarly unrelated to actual wholesale prices and did not account for discounts, rebates and other financial incentives offered by the Bayer Defendants which lowered wholesale costs.

351.   For the Bayer Defendants' other Pharmacy Dispensed Prescription Drugs, the AWPs were similarly changed over time and those changes did not account for discounts, rebates or other financial incentives.

## COUNT X
## COMMONWEALTH v. BAYER DEFENDANTS
## UNJUST ENRICHMENT

352.   The Commonwealth hereby incorporates by reference thereto the averments of the preceding and subsequent paragraphs hereof as if fully set forth herein and further alleges as follows.

353.   As set forth above, the Bayer Defendants have been unjustly enriched as a result of engaging in the following practices with respect to the Commonwealth and Pennsylvania Consumers: 1) the creation and promotion of spreads; 2) the provision of free goods and drug product; 3) the provision of other financial incentives; 4) reporting of AWPs that do not reflect discounts, rebates and other incentives; and 5) fraudulent concealment of their actions.

354.   The Commonwealth and Pennsylvania Consumers were purchasers, reimbursers and/or end payors of the Bayer Defendants' drugs and have paid amounts far in excess of the true cost for the Bayer Defendants' drugs.

79

355. The Bayer Defendants knew of and have appreciated and retained, or used, the benefits of the Commonwealth and Pennsylvania Consumers' purchases of their drugs at amounts far in excess of the true cost. The Bayer Defendants used the spread between the AWPs and the actual selling prices of their drugs to: a) pay prescribers an incentive to prescribe and dispense their drugs; b) provide free goods and other drug products as incentives; and c) create discounts and rebates. Each of these incentives was intended to increase the market share of the Bayer Defendants' drugs, thereby increasing their sales and profits.

356. For those customers that purchase direct from the Bayer Defendants at a price based on AWPs, the Bayer Defendants' increases to AWPs directly benefit the Bayer Defendants in the form of increased revenue.

357. Based upon the Bayer Defendants' conduct set forth in this complaint, it would be inequitable and unjust for the Bayer Defendants to retain such benefits without payment of value.

358. The Bayer Defendants will be unjustly enriched if they are permitted to retain the direct or indirect benefits received or used resulting from the purchase of the Bayer Defendants' drugs by the Commonwealth and Pennsylvania Consumers. The Commonwealth on behalf of itself and Pennsylvania consumers seeks to recover the amounts that unjustly enriched the Bayer Defendants.

359. The Commonwealth and Pennsylvania Consumers are therefore entitled to equitable relief in the form of an injunction, restitution and disgorgement, legal relief in the form of damages and any other relief the Court deems appropriate.

WHEREFORE, the Commonwealth, on behalf of itself and Pennsylvania Consumers, respectfully seeks the relief set forth below.

## COUNT XI
## COMMONWEALTH v. BAYER DEFENDANTS
## MISREPRESENTATION/FRAUD

360.    The Commonwealth hereby incorporates by reference thereto the averments of the preceding paragraphs hereof as if fully set forth herein and further alleges as follows.

361.    Defendants' acts violate Pennsylvania common law proscriptions against fraudulent misrepresentation.

362.    In reporting AWPs to the compendia during the relevant time period for their drugs, the Bayer Defendants were making representations that the AWPs for each of their drugs represented a real and fact-based average wholesale price.

363.    These representations were material to the transactions at hand in that the Commonwealth and Pennsylvania Consumers used and relied upon the AWPs as the basis for determining how much to pay and/or reimburse for the Bayer Defendants' drugs.

364.    The Commonwealth prepared analyses using AWP historical data to prepare budgets for program funding, to develop formularies and to establish program eligibility requirements for program beneficiaries.

365.    As set forth more fully above, these AWPs were artificial prices, unrelated to any real or fact-based average wholesale price, created and manipulated by the Bayer Defendants for the purpose of generating revenue, thus constituting false representations which the Bayer Defendants knew or, in the absence of recklessness, should have known to be false.

366.    Indeed, the AWP was not a calculation of any average at all but in fact was a result driven number selected exclusively by the Bayer Defendants for the purpose of creating a spread and for the payment of rebates and other financial incentives or to simply generate additional revenue.

81

367. The value of free product and other incentives given by the Bayer Defendants was not reflected in the setting of the AWP.

368. The Bayer Defendants knew or, in the absence of recklessness, should have known that the omission of the value of rebates, free product and other incentives in the reporting of AWP to the compendia and other incentives and the artificial setting of AWP constituted false representations.

369. The Bayer Defendants made these false representations with the intent of misleading the Commonwealth and Pennsylvania Consumers.

370. The Commonwealth and Pennsylvania Consumers justifiably relied upon these false misrepresentations in purchasing and/or reimbursing for the Bayer Defendants' drugs in an amount and for a price based upon the AWP.

371. Because Commonwealth statutes, regulations and contracts require use of AWP, as published by the compendia, in reimbursement formulas, the Commonwealth's reliance on the reported AWP was justified and reasonable.

372. It was reasonable for Pennsylvania's consumers to rely on prices billed by their prescribers or pharmacists.

373. As a direct result of the false representations of the Bayer Defendants, as set forth above, the Commonwealth and Pennsylvania Consumers were harmed in that they were unaware of the artificial inflation of the AWP, would not have paid and/or reimbursed the artificially inflated prices for the Bayer Defendants' drugs had they known of the false representations and, in fact, overpaid for the Bayer Defendants' drugs because of the false representations.

82

WHEREFORE, the Commonwealth, on behalf of itself and the Pennsylvania Consumers, respectfully seeks the relief set forth below.

**COUNT XII**
**COMMONWEALTH v. BAYER DEFENDANTS**
**VIOLATION OF THE PENNSYLVANIA**
**UNFAIR TRADE PRACTICE AND CONSUMER PROTECTION LAW**

374.    The Commonwealth hereby incorporates by reference thereto the averments of the preceding paragraphs hereof as if fully set forth herein and further alleges as follows.

375.    The Bayer Defendants have violated Pennsylvania's Unfair Trade Practice and Consumer Protection Law ("UTPCPL")by their actions more fully described below. 73 P.S. § 201-1 *et seq*.]

376.    The Commonwealth is empowered to bring this action on behalf of "persons" who have purchased the Bayer Defendants' prescription drugs at inflated prices and as a result, have suffered, are suffering, and will continue to suffer irreparable harm as a result of the Bayer Defendants' actions. "Persons" include but are not limited to natural persons, corporations, trusts, partnerships, incorporated or unincorporated associations, and any other legal entities within the meaning of 73 P.S.§ 201-2(2).

377.    The Commonwealth also has standing to bring this claim in that the Commonwealth is both an end payor and purchaser/reimburser of the Bayer Defendants' prescription drugs through its Medicaid, PACE, PEBTF and other Commonwealth Programs. The Commonwealth performs these functions not for its own business purposes, but rather in its representative capacity on behalf and for the benefit of its constituents who, in turn, make use of the prescription drugs primarily for personal, family and/or household purposes.

83

378.    In distributing, marketing, and selling prescription drugs to the Commonwealth and Pennsylvania Consumers, and in otherwise engaging in the conduct more fully described herein with respect to the above-identified drugs, the Bayer Defendants are engaging in trade or commerce directly or indirectly harmed consumers in this Commonwealth within the meaning of 73 P.S. § 201-2(3).

379.    Specifically, the Bayer Defendants, by engaging in the practices set forth above, have:

a.    Deceptively distributed, marketed and sold their drugs by alleging to the Commonwealth and the entities and consumers on whose behalf this action is brought that the AWPs for each of their drugs represented a real and fact-based price for their drugs;

b.    Concealed from purchasers that AWP prices are exclusively set and controlled by drug manufacturers, while indicating that AWP represents a real and fact-based price, thereby causing a likelihood of confusion or misunderstanding for consumers who are led to believe AWP is a real and fact-based price; and

c.    As a result of the Bayer Defendants' acts in deceiving consumers that AWPs represent a real and fact-based price for their drugs, consumers who believed they were receiving a discount off AWP in fact paid inordinately high prices and/or co-payments resulting from the reporting of inflated AWPs for needed prescription drugs.

380.    The Bayer Defendants violated the UTPCPL:

84

a.     Each time the medical provider charged a patient at the inflated AWP price, and benefits from any spread between the actual wholesale cost of such drugs and the AWP;

b.     Each time free samples were delivered to a medical provider with the understanding and expectation that the provider will charge the patient for free samples;

c.     Each time the medical provider charged a patient for free samples;

d.     Each time an incentive was given to anyone to cause a patient to be billed at the inflated AWP;

e.     Each time a patient was charged at the inflated AWP as a result of incentives given by or on the Bayer Defendants' behalf;

f.     Each time a request for reimbursement was made to a Commonwealth program based on an inflated AWP;

g.     Each time an inflated AWP was published;

h.     Each time a patient and/or his or her insurer was charged based on an inflated AWP; and

i.     Each time the Bayer Defendants engaged in conduct actionable under the preceding counts of this Complaint and/or engaged in conduct violation of the statutes and laws of the Commonwealth.

381.    The Bayer Defendants' products reimbursed or purchased by the Commonwealth or purchased by Pennsylvania Consumers were used for personal, family or household use.

382. The Bayer Defendants' conduct as more fully described herein constitutes unfair methods of competition and unfair or deceptive acts or practices within the meaning of 73 P.S. § 201-2(4), including, but not limited to, the following:

> a. causing likelihood of confusion or misunderstanding as to the source, sponsorship, approval or certification of goods or service, within the meaning of 73 P.S. § 201-2(4)(ii);
>
> b. representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that he does not have within the meaning of 73 P.S. § 201-2(4)(v);
>
> c. advertising goods or services with the intent not to sell them as advertised within the meaning of 73 P.S. § 201-3(4)(ix);
>
> d. making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions within the meaning of 73 P.S. § 201-2(4)(xi);
>
> e. engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding within the meaning of 73 P.S. § 201-2(4)(xxi).

383. The Bayer Defendants' conduct more fully described herein, is, accordingly, proscribed by and unlawful under 73 PA. STAT. § 201-3.

384. The Bayer Defendants' conduct as more fully described herein, was willful within the meaning of 73 P.S. § 201-8.

385.    The Attorney General has determined that these proceedings to enjoin the Bayer Defendants' conduct are in the public interest.

386.    The Commonwealth therefore seeks the entry of a permanent injunction restraining the Bayer Defendants' unlawful conduct and mandating corrective measures pursuant to 73 P. S. § 201-4.

387.    The Commonwealth also requests that the Court require the Bayer Defendants to restore to the Commonwealth and Pennsylvania Consumers monies acquired from the sale of their prescription drugs during the period of time Defendants' unlawful conduct took place, pursuant to 73 P. S. § 201-4.1.

388.    In addition, and in light of the Bayer Defendants' willful and improper conduct as herein described, the Commonwealth requests that the Court award a civil penalty to the Commonwealth not exceeding:

> a.    as to affected Pennsylvania Consumers under the age of sixty (60) years, $1,000.00 per violation, and
>
> b.    as to affected Pennsylvania Consumers sixty (60) years of age or older, $3,000 per violation.

389.    The Bayer Defendants are liable for their actions and the actions of their co-conspirators for each of these violations as independent unfair and deceptive acts in violation of the UTPCPL, and for their course of conduct comprising an unfair and deceptive practice in violation of the UTPCPL.

390.    As a result of the Bayer Defendants' unfair and deceptive trade practices, the Commonwealth and Pennsylvania Consumers have and will continue to suffer ascertainable loss and damages in an amount to be determined at trial.

WHEREFORE, the Commonwealth, on behalf of itself and Pennsylvania Consumers, respectfully seeks the relief set forth below.

## THE GSK DEFENDANTS' SPECIFIC CONDUCT

391.    The GSK Defendants engaged in the unlawful conduct with respect to their Prescriber Dispensed Prescription Drugs, including Alkeran, Augmentin, Imitrex, Kyrtil, Lanoxin, Navelbine, Retrovir, Zantac, Zofran (odansetron) and Zovirax, and their Pharmacy Dispensed Prescription Drugs, including Advair, Agenerase, Amerge, Augmentin, Avandia, Beconsase AQ, Ceftin, Combivir, Daraprim, Epivir, Flonase, Flovent, Imitrex, Lamictal, Leukeran, Mepron, Myleran, Paxil, Purinethol, Relenza, Serevent, Thioguanine, Trizivir, Valtrex, Ventolin HFA, Wellbutrin, Ziagen, Zofran (odansetron), Zofran ODT, and Zyban.

### CONDUCT RESPECTING PRESCRIBER DISPENSED PRESCRIPTION DRUGS

392.    The GSK Defendants engaged in 1) the creation and promotion of spreads; 2) the provision of free goods and drug product; 3) the provision of other financial incentives; and fraudulent concealment of their actions with respect to their Prescriber Dispensed Prescription Drugs.

393.    Upon information and belief, the GSK Defendants engaged in Pennsylvania in the promotion of spreads with respect to all of their Prescriber Dispensed Prescription Drugs, including Alkeran, Imitrex, Kyrtil, Lanoxin, Navelbine, Retrovir and Zantac.

394.    The GSK Defendants promoted and tried to maximize the spread because these Defendants understood that their customers routinely engaged in "spread shopping" - comparing their AWPs with those of their competitors in order to determine the greatest spread and therefore the drug products that would provide the greatest profit.

395.    One example of the promotion of spreads by the GSK Defendants is found in the GSK Defendants' conduct with respect to the drugs Zofran and Kytril, both of which minimize the nausea associated with chemotherapy.

396.    Prior to the merger of Glaxo and SmithKline, Glaxo, which produced and marketed Zofran, and SmithKline, which produced and marketed Kytril, competed head-to-head in the same market. Much of the competition concerned which product generated the greater spread, or profit, for physicians, not which product was better for patients.

397.    In 1995, in response to a larger spread between acquisition cost and AWP on Kytril (20%) than on its own drug Zofran (16 2/3 %), Glaxo increased the AWP of Zofran, took a small actual price increase from its customers at the same time, and instituted a wholesaler rebate to effectively lower the actual price offered to medical providers and increase spread. Specifically:

> Effective January 3, 1995. Glaxo has increased the acquisition costs of Zofran injection. The new AWP is set at $233.02. However, the company has provided incentives to the market place which will ensure that Zofran price to physicians and clinics will be lower than the contractual price available prior to the increase.

398.    In March 1996 Glaxo again increased the AWP for Zofran by 4.8%. In response, SmithKline immediately increased the AWP for Kytril by 4.8%, recognizing that its actions were in direct response to the Glaxo increase.

89

399.    Glaxo's internal documents directly compared "Profit Per Dose" and "Profit as %" and "Profit Per Vial" of Zofran to Kytril.

400.    SmithKline's internal documents similarly recognized the overriding significance of the spread in affecting directly the amount of revenue medical providers receive and, thereby, the overall demand for Kytril:

> In the clinic setting however, since Medicare reimbursement is based on AWP, product selection is largely based upon the spread between acquisition cost and AWP

> *    *    *

> From this analysis, there seems to be no other reason, other than profitability, to explain uptake differentials between the hospital and clinical settings, therefore explaining why physicians are willing to use more expensive drug regimens.

401.    SmithKline's internal documents similarly revealed how it marketed the spread to its customers by demonstrating how much additional revenue and "spread per patient" a medical provider would make by using Kytril due to its larger spread. Internal documents refer to "Cost v. Profit" and the "Kytril Profit Model" in comparing Kytril to Zofran to demonstrate the additional revenue and profit the provider will receive by using Kytril.

402.    Upon information and belief, the GSK Defendants engaged in Pennsylvania the provision of free goods and drug product with respect to all of their Prescriber Dispensed Prescription Drugs, including Alkeran, Imitrex, Kyrtil, Lanoxin, Navelbine, Retrovir and Zantac.

403.    For example SmithKline knew that medical providers were billing patients for a 1 mg single dose vial of Kytril per patient but were actually using less than the full single dose per patient. For patients who weighed less, medical providers were able to use less of the drug. SmithKline

subsequently introduced a Kytril 4 mg Multi-Dose vial that allowed medical providers to bill 6 treatments, and obtain 6 reimbursements, for the price of 4, and marketed "Kytril Vial Usage" to its customers.

404.   Glaxo similarly marketed a multi-dose vial as creating better reimbursement and profit.

405.   Upon information and belief, the GSK Defendants engaged in Pennsylvania in the provision of other financial incentives with respect to all of their Prescriber Dispensed Prescription Drugs, including Alkeran, Imitrex, Kyrtil, Lanoxin, Navelbine, Retrovir and Zantac.

406.   For example, as set forth above, Glaxo, as part of its efforts to match or surpass SmithKline's spread on Kytril, provided wholesaler rebates in addition to artificially inflating the spread to offset its price increase to customers.

407.   Also by way of example, SmithKline promised to contribute to research and education programs through the OnCare Foundation if OnCare agreed to use Kytril instead of a competing drug, in addition to providing rebates and other incentives.

408.   The GSK Defendants engaged in the fraudulent concealment of their conduct set forth above in the manner described in paragraphs 105 through 110, above.

409.   Another example of GSK's concealment is found in correspondence between the General Counsel's Offices of Glaxo and SmithKline in 1995 in which Glaxo accused SmithKline of fraud relating to its marketing and sales practices for Kytril and SmithKline responded by leveling similar allegations against Glaxo's marketing and sales practices for Zofran.

410.   Glaxo's counsel accused SmithKline sales representatives, among other improper activities, of using a lap top computer program to demonstrate profit to the medical provider from

91

use of Kytril and challenged SmithKline's sales representatives' recommendations to medical

professionals to use one vial of Kytril for two patients but charge Medicaid for multiple vials as

raising significant fraud and abuse issues.

411.    SmithKline's counsel responded with similar allegations of fraud:

> In an apparent effort to increase the reimbursement to physicians and
> clinics, effective 1/10/95, Glaxo increased AWP for Zofran by 8.5%,
> while simultaneously fully discounting this increase to physicians.
> The latter was accomplished by a 14% rebate available to wholesalers
> on all non-hospital Zofran sales on the multi-dose vial. The net effect
> of these adjustments is to increase the amount of reimbursement
> available to physicians from Medicare and other third party payors
> whose reimbursement is based on AWP. Since the net price paid to
> Glaxo for the non-hospital sales of the Zofran multi-dose vial is
> actually lower, it does not appear that the increase in AWP was
> designed to increase revenue per unit to Glaxo. Absent any other
> tenable explanation, this adjustment appears to reflect an intent to
> induce physicians to purchase Zofran based on the opportunity to
> receive increased reimbursement from Medicare and other third party
> payors.

412.    In response, counsel for Glaxo admitted that the AWP price increase for Zofran does

not affect the actual cost to medical providers and that Glaxo's sales representatives were using the

spread to gain market share.

413.    Yet neither company took any action to bring these activities to the attention of the

public or appropriate authorities.

### CONDUCT RESPECTING PHARMACY DISPENSED PRESCRIPTION DRUGS

414.    With regard to the Pharmacy Dispensed Prescription Drugs, the GSK Defendants

engaged in the following conduct.

415. The GSK Defendants reported AWP prices to the major compendia, including the compendia relied upon by the Commonwealth and Pennsylvania businesses and consumers, which reported AWPs that did not reflect actual wholesale prices.

416. Upon information and belief, the GSK Defendants took various steps to conceal actual average wholesale selling prices by giving discounts, rebates, and other financial incentives and requiring the recipients of those financial incentives to not report and keep those incentives confidential.

417. In addition, the GSK Defendants have increased the AWPs for their drugs in amounts which, on information and belief, do not reflect discounts, rebates and other incentives the GSK Defendants provide to lower the wholesale cost of their drugs.

418. For example, for Valtrex, the AWP for 500 mg, 42 size tablets was $127.07 in 1999, $139.07 in 2000, $146.02 in 2001 and $162.49 in May, 2002.

419. The Commonwealth, on information and belief, asserts that the changes in AWP did not accurately account for discounts, rebates and other financial incentives which reduced the wholesale cost of Valtrex.

420. For the GSK Defendants' other Pharmacy Dispensed Prescription Drugs, including Advair, Agenerase, Amerge, Beconsase AQ, Ceftin, Combivir, Daraprim, Epivir, Flonase, Imitrex, Lamictal, Leukeran, Mepron, Myleran, Paxil, Purinethol, Relenza, Serevent, Thioguanine, Trizivir, Ventolin HFA, Wellbutrin, Ziagen, Zofran ODT, and Zyban, the AWPs were similarly unrelated to actual wholesale prices and did not account for discounts, rebates and other financial incentives offered by the GSK Defendants which lowered wholesale costs.

93

421.    For the GSK Defendants' other Pharmacy Dispensed Prescription Drugs, the AWPs were similarly changed over time and those changes did not account for discounts, rebates or other financial incentives.

## COUNT XIII
## COMMONWEALTH v. GSK DEFENDANTS
## UNJUST ENRICHMENT

422.    The Commonwealth hereby incorporates by reference thereto the averments of the preceding and subsequent paragraphs hereof as if fully set forth herein and further alleges as follows.

423.    As set forth above, the GSK Defendants have been unjustly enriched as a result of engaging in the following practices with respect to the Commonwealth and Pennsylvania Consumers: 1) the creation and promotion of spreads; 2) the provision of free goods and drug product; 3) the provision of other financial incentives; 4) reporting of AWPs that do not reflect discounts, rebates and other incentives; and 5) fraudulent concealment of their actions.

424.    The Commonwealth and Pennsylvania Consumers were purchasers, reimbursers and/or end payors of the GSK Defendants' drugs and have paid amounts far in excess of the true cost for the GSK Defendants' drugs.

425.    The GSK Defendants knew of and have appreciated and retained, or used, the benefits of the Commonwealth and Pennsylvania Consumers purchases of their drugs at amounts far in excess of the true cost. The GSK Defendants used the spread between the AWPs and the actual selling prices of their drugs to: a) pay prescribers an incentive to prescribe and dispense their drugs; b) provide free goods and other drug product as incentives; and c) create discounts and rebates. Each of these incentives was intended to increase the market share of the GSK Defendants' drugs, thereby increasing its sales and profits.

94

426. For those customers that purchase direct from the GSK Defendants at a price based on AWP, the GSK Defendants' increases to AWP directly benefit the GSK Defendants in the form of increased revenue.

427. Based upon the GSK Defendants' conduct set forth in this complaint, it would be inequitable and unjust for the GSK Defendants to retain such benefits without payment of value.

428. The GSK Defendants will be unjustly enriched if they are permitted to retain the direct or indirect benefits received or used resulting from the purchase of the GSK Defendants' drugs by the Commonwealth and Pennsylvania Consumers. The Commonwealth on behalf of itself and Pennsylvania Consumers seeks to recover the amount that unjust enriched the GSK Defendants.

429. The Commonwealth and Pennsylvania Consumers are therefore entitled to equitable relief in the form of an injunction, restitution and disgorgement, legal relief in the form of damages and any other relief the Court deems appropriate.

WHEREFORE, the Commonwealth, on behalf of itself and Pennsylvania Consumers, respectfully seeks the relief set forth below.

### COUNT XIV
### COMMONWEALTH v. GSK DEFENDANTS
### MISREPRESENTATION/FRAUD

430. The Commonwealth hereby incorporates by reference thereto the averments of the preceding paragraphs hereof as if fully set forth herein and further alleges as follows.

431. Defendants' acts violate Pennsylvania common law proscriptions against fraudulent misrepresentation.

95

432.    In reporting AWPs to the compendia during the relevant time period for their drugs, the GSK Defendants were making representations that the AWPs for each of these drugs represented a real and fact-based average wholesale price for their drugs.

433.    These representations were material to the transactions at hand in that the Commonwealth and Pennsylvania Consumers used and relied upon the AWPs as the basis for determining how much to pay and/or reimburse for the GSK Defendants' drugs.

434.    The Commonwealth prepared analyses using AWP historical data to prepare budgets for program funding, to develop formularies and to establish program eligibility requirements for program beneficiaries.

435.    As set forth more fully above, these AWPs were artificial prices, unrelated to any real or fact-based average wholesale price, created and manipulated by the GSK Defendants for the purpose of generating revenue, thus constituting false representations which the GSK Defendants knew or, in the absence of recklessness, should have known to be false.

436.    Indeed, the AWP was not a calculation of any average at all but in fact was a result driven number selected exclusively by the GSK Defendants for the purpose of creating a spread and for the payment of rebates and other financial incentives or to simply generate additional revenue.

437.    The value of free product and other incentives given by the GSK Defendants was not reflected in the setting of the AWP.

438.    The GSK Defendants knew or, in the absence of recklessness, should have known that the omission of the value of rebates, free product and other incentives in the reporting of AWP to the compendia and other incentives and the artificial setting of AWP constituted false representations.

439.    The GSK Defendants made these false representations with the intent of misleading the Commonwealth and Pennsylvania Consumers.

440.    The Commonwealth and Pennsylvania Consumers justifiably relied upon these false misrepresentations in purchasing and/or reimbursing for the GSK Defendants' drugs in an amount and for a price based upon the AWP.

441.    Because Commonwealth statutes, regulations and contracts require use of AWP, as published by the compendia, in reimbursement formulas, the Commonwealth's reliance on the reported AWP was justified and reasonable.

442.    It was reasonable for Pennsylvania consumers to rely on prices billed by their prescribers or pharmacists.

443.    As a direct result of the false representations of the GSK Defendants, as set forth above, the Commonwealth and Pennsylvania Consumers were harmed in that they were unaware of the artificial inflation of the AWP, would not have paid and/or reimbursed the artificially inflated prices for the GSK Defendants' drugs had they known of the false representations and, in fact, overpaid for the GSK Defendants' drugs because of the false representations.

WHEREFORE, the Commonwealth, on behalf of itself and the Pennsylvania Consumers, respectfully seeks the relief set forth below.

## COUNT XV
## COMMONWEALTH v. GSK DEFENDANTS
## VIOLATION OF THE PENNSYLVANIA
## UNFAIR TRADE PRACTICE AND CONSUMER PROTECTION LAW

444.    The Commonwealth hereby incorporates by reference thereto the averments of the preceding paragraphs hereof as if fully set forth herein and further alleges as follows.

97

445.   The GSK Defendants have violated Pennsylvania's Unfair Trade Practice and
Consumer Protection Law ("UTPCPL")by their actions more fully described below. 73 P.S. § 201-1
*et seq.*

446.   The Commonwealth is empowered to bring this action on behalf of "persons" who
have purchased the GSK Defendants' prescription drugs at inflated prices and as a result, have
suffered, are suffering, and will continue to suffer irreparable harm as a result of the GSK
Defendants' actions. "Persons" including but not limited to natural persons, corporations, trusts,
partnerships, incorporated or unincorporated associations, and any other legal entities within the
meaning of 73 P.S.§ 201-2(2).

447.   The Commonwealth also has standing to bring this claim in that the Commonwealth
is both an end payor and purchaser/reimburser of the GSK Defendants' prescription drugs through
its Medicaid, PACE, PEBTF and other Commonwealth Programs. The Commonwealth performs
these functions not for its own business purposes, but rather in its representative capacity on behalf
and for the benefit of its constituents who, in turn, make use of the prescription drugs primarily for
personal, family and/or household purposes.

448.   In distributing, marketing, and selling prescription drugs to the Commonwealth and
Pennsylvania Consumers, and in otherwise engaging in the conduct more fully described herein with
respect to the above-identified drugs, the GSK Defendants are engaging in trade or commerce
directly or indirectly harmed consumers in this Commonwealth within the meaning of 73 P.S. § 201-
2(3).

449.   Specifically, the GSK Defendants, by engaging in the practices set forth above, have:

98

a.  Deceptively distributed, marketed and sold their drugs by alleging to the Commonwealth and the entities and consumers on whose behalf this action is brought that the AWPs for each of their drugs represented a calculation of a real and fact-based price for their drugs;

b.  concealed from purchasers that AWP prices are exclusively set and controlled by drug manufacturers, and indicating AWP represents a calculation of real and fact-based price, thereby causing a likelihood of confusion or misunderstanding for consumers who are led to believe AWP is a calculation of real and fact-based price; and

c.  As a result of the GSK Defendants' acts in deceiving consumers that AWPs represent a calculation of a real and fact-based price for their drugs, consumers who believed they were receiving a discount off AWP in fact paid inordinately high prices and/or co-payments resulting from the reporting of inflated AWPs for needed prescription drugs.

450.  The GSK Defendants violated the UTPCPL:

a.  each time the medical provider charged a patient at the inflated AWP price, and benefits from any spread between the actual wholesale cost of such drugs and the AWP;

b.  each time free samples were delivered to a medical provider with the understanding and expectation that the provider will charge the patient for free samples;

c.  each time the medical provider charged a patient for free samples;

99

    d.      each time an incentive was given to anyone to cause a patient to be billed at the inflated AWP;

    e.      each time a patient was charged at the inflated AWP as a result of incentives given by or on the GSK Defendants' behalf;

    f.      each time a request for reimbursement was made to a Commonwealth program based on an inflated AWP;

    g.      each time an inflated AWP was published;

    h.      each time a patient and/or his or her insurer was charged based on an inflated AWP; and

    i.      each time the GSK Defendants engaged in conduct actionable under the preceding counts of this Complaint and/or engaged in conduct violation of the statutes and laws of the Commonwealth.

451.   The GSK Defendants' products reimbursed or purchased by the Commonwealth or purchased by Pennsylvania Consumers were used for personal, family or household use.

452.   The GSK Defendants' conduct as more fully described herein constitutes unfair methods of competition and unfair or deceptive acts or practices within the meaning of 73 P.S. § 201-2(4), including, but not limited to, the following:

    a.      causing likelihood of confusion or misunderstanding as to the source, sponsorship, approval or certification of goods or service, within the meaning of 73 P.S. § 201-2(4)(ii);

    b.      representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have

or that a person has a sponsorship, approval, status, affiliation or connection that he does not have within the meaning of 73 P.S. § 201-2(4)(v);

c.     advertising goods or services with the intent not to sell them as advertised within the meaning of 73 P.S. § 201-3(4)(ix);

d.     making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions within the meaning of 73 P.S. § 201-2(4)(xi);

e.     engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding within the meaning of 73 P.S. § 201-2(4)(xxi).

453.    The GSK Defendants' conduct more fully described herein, is, accordingly, proscribed by and unlawful under 73 PA. STAT. § 201-3.

454.    The GSK Defendants' conduct as more fully described herein, was willful within the meaning of 73 P.S. § 201-8.

455.    The Attorney General has determined that these proceedings to enjoin the GSK Defendants' conduct are in the public interest.

456.    The Commonwealth therefore seeks the entry of a permanent injunction restraining the GSK Defendants' unlawful conduct and mandating corrective measures pursuant to 73 P. S. § 201-4.

457.    The Commonwealth also requests that the Court require the GSK Defendants to restore to the Commonwealth and Pennsylvania Consumers monies acquired from the sale of their

101

prescription drugs during the period of time Defendants' unlawful conduct took place, pursuant to 73 P. S. § 201-4.1.

458.    In addition, and in light of the GSK Defendants' willful and improper conduct as herein described, the Commonwealth requests that the Court award a civil penalty to the Commonwealth not exceeding:

> a.    as to affected Pennsylvania Consumers under the age of sixty (60) years, $1,000.00 per violation, and

> b.    as to affected Pennsylvania Consumers sixty (60) years of age or older, $3,000 per violation.

459.    The GSK Defendants are liable for their actions and the actions of their co-conspirators for each of these violations as independent unfair and deceptive acts in violation of the UTPCPL, and for their course of conduct comprising an unfair and deceptive practice in violation of the UTPCPL.

460.    As a result of the GSK Defendants' unfair and deceptive trade practices, the Commonwealth and Pennsylvania Consumers have and will continue to suffer ascertainable loss and damages in an amount to be determined at trial.

WHEREFORE, the Commonwealth, on behalf of itself and Pennsylvania Consumers, respectfully seeks the relief set forth below.

## THE PFIZER DEFENDANTS' SPECIFIC CONDUCT

461.    The Pfizer Defendants engaged in the unlawful conduct with respect to their Prescriber Dispensed Prescription Drugs, including Adriamycin, Adrucil, Amohotercin, Amphocin, Bleomycin Sulfate, Cystosar-U, Deop-Testosterone, Dilantin, Etoposide, Neosar, Nitrostat, Toposar,

102

Trelstar Depot, Vincasar, and Zithromax, and their Pharmacy Dispensed Prescription Drugs, including Accupril, Accuretic, Cardura, Celebrex, Celontin, Cleocin-T, Dilantin, Estrostep, Femhrt, Lipitor, Lopid, Minizide, Nardil, Neurontin, Norvasc, Renese, Rescriptor, Solu-Cortef, Solu-Medrol, Viracept, Zarontin, Zoloft, and Zyrtec.

### CONDUCT RESPECTING PRESCRIBER DISPENSED PRESCRIPTION DRUGS

462.    The Pfizer Defendants engaged in 1) the creation and promotion of spreads; 2) the provision of free goods and drug product; 3) the provision of other financial incentives; and 4) fraudulent concealment of their actions with respect to their Prescriber Dispensed Prescription Drugs.

463.    Upon information and belief, the Pfizer Defendants engaged in Pennsylvania in the promotion of spreads with respect to all of their Prescriber Dispensed Prescription Drugs, including Adriamycin, Adrucil, Amohotercin, Amphocin, Bleomycin Sulfate, Cystosar-U, Deop-Testosterone, Dilantin, Etoposide, Neosar, Nitrostat, Toposar, Trelstar Depot, Vincasar, and Zithromax.

464.    The Pfizer Defendants engaged in an ongoing deliberate scheme to inflate AWPs. According to one member of the Congressional Ways and Means Committee:

> The evidence . . . indicates that [Pharmacia & Upjohn] have knowingly and deliberately inflated their representations of the average wholesale price ("AWP"), wholesale acquisition cost ("WAC") and direct price ("DP") which are utilized by the Medicare and Medicaid programs in establishing drug reimbursements to providers.
>
> \*    \*    \*
>
> [T]hese practices must stop and ... these companies must return the money to the public that is owed because of their abusive practices.

103

465.    The Pfizer Defendants promotion of spreads was detailed in documents published as part of a Congressional investigation. In a letter dated October 3, 2000, to Pharmacia (with accompanying exhibits), Representative Stark addressed the Pharmacia Group's illegal practices:

> The manipulated disparities between your company's reported AWPs and DPs are staggering. For example, in 1997, Pharmacia & Upjohn reported an AWP of $946.94 for 200 mg. of Adriamycin PFS while offering to sell it to American Oncology Resources (AOR) for $168.00 and to Comprehensive Cancer Center for $152.00. . . . Your company then aggressively marketed its cancer drugs to health care providers by touting financial inducements and other types of incentives. Pharmacia & Upjohn created and marketed the financial inducements for the express purpose of influencing the professional judgment of doctors and other health care providers in order to increase the company's market share.

*    *    *

> Pharmacia & Upjohn's own internal documents . . . reveal that the company abused its position as a drug innovator in an initial *Phase III* FDA clinical trial for a cancer drug used to treat lymphoma. . . .

> ". . . Clinical Research Trials

>> Initial Phase III Protocol trial for "Oral Idamycin" in lymphomas. This trial will offer AOR $1.1 M [million] in additional revenues. Two hundred twenty-five (225) patients at $5,000 per patient . . . (emphasis added by Rep. Stark)

>> The above . . . items are contingent on the signing of the AOR Disease Management Partner Program. AOR's exclusive compliance to the purchase of the products listed in the contract product attachment is also necessary for the above items to be in effect."

> The linking of doctor participation in FDA clinical drug trials to their purchase and administration of profit-generating oncology drugs is entirely inconsistent with the objective scientific testing that is essential to the integrity of the trial.

*    *    *

104

It is clear that Pharmacia & Upjohn targeted health care providers, who might be potential purchasers, by creating and then touting the windfall profits arising from the price manipulation. For example, Pharmacia & Upjohn routinely reported inflated average wholesale prices for its cancer drug Bleomycin, 15u, as well as direct prices. The actual prices paid by industry insiders was in many years less than half of what Pharmacia & Upjohn represented. Pharmacia & Upjohn reported that the average wholesale price for Bleomycin, 15u, rose from $292.43 to $309.98, while the price charged to industry insiders fell by $43.15. . . .

\* \* \*

Pharmacia & Upjohn reported price increases in October 1997 with full knowledge that the true prices of the drugs were falling. For example, Composite Exhibit "7" reveals that Pharmacia & Upjohn voluntarily lowered its price of Adriamycin PFS 200 mg to $152.00 while reporting an AWP of $946.94:

"Dear Willie,

A (VPR) Voluntary Price Reduction will become effective May 9, 1997. The wholesalers have been notified, however it may take two weeks to complete the transition . . ."

Additionally, internal Pharmacia & Upjohn documents secured through the Congressional investigations show that Pharmacia & Upjohn also utilized a large array of other inducements to stimulate product sales. These inducements, including "educational grants" and free goods, were designed to result in a lower net cost to the purchaser while concealing the actual price beneath a high invoice price. Through these means, drug purchasers were provided substantial discounts that induced their patronage while maintaining the fiction of a higher invoice price – the price that corresponded to reported AWPs and inflated reimbursements from the government. Composite Exhibit "8" highlights these inducements:

AOR/PHARMACIA & UPJOHN PARTNERSHIP PROPOSAL: Medical Education Grants. A $55,000 grant has been committed for 1997 for the AOR Partnership for excellence package including Education/Disease Management, Research Task Force, AOR Annual Yearbook. A $40,000 grant to sponsor the AOR monthly

105

teleconference. This sponsorship was committed and complete in February 1997...

PHARMACIA & UPJOHN, INC. INTEROFFICE MEMO:
If needed, you have a "free goods" program to support your efforts against other forms of generic doxorubicin...

Use your "free goods" wisely to compete against other generic forms of Adriamycin, not to shift the customer to direct shipments. The higher we can keep the price of Adriamycin, the easier it is for you to meet your sales goals for Adniamycin (emphasis added by Rep. Stark).

466.    Upon information and belief, the Pfizer Defendants engaged in Pennsylvania in the provision of free goods and drug product with respect to all of their Prescriber Dispensed Prescription Drugs, including Adriamycin, Adrucil, Amohotercin, Amphocin, Bleomycin Sulfate, Cystosar-U, Deop-Testosterone, Dilantin, Etoposide, Neosar, Nitrostat, Toposar, Trelstar Depot, Vincasar, and Zithromax.

467.    One example of Pfizer's provision of free goods and drug product was set forth in the above-described letter, which details the Pfizer Defendants use of free goods to sell Adriamycin.

468.    Upon information and belief, the Pfizer Defendants engaged in Pennsylvania in the provision of other financial incentives with respect to all of their Prescriber Dispensed Prescription Drugs, including Adriamycin, Adrucil, Amohotercin, Amphocin, Bleomycin Sulfate, Cystosar-U, Deop-Testosterone, Dilantin, Etoposide, Neosar, Nitrostat, Toposar, Trelstar Depot, Vincasar, and Zithromax.

469.    One example of Pfizer's provision of other financial incentives is detailed in the above-described letter to Congressman Stark, and involves the Pfizer Defendants' offering to

American Oncology Resources grants and incentives in connection with clinical trial of "Oral Idamycin."

470.    The Pfizer Defendants engaged in the fraudulent concealment of their conduct set forth above in the manner set forth in paragraphs 105 through 110, above, and also by requiring purchasers of their drugs to keep secret the actual prices that the purchasers were paying for the drugs.

## CONDUCT RESPECTING PHARMACY DISPENSED PRESCRIPTION DRUGS

471.    With regard to the Pharmacy Dispensed Prescription Drugs, the Pfizer Defendants engaged in the following conduct.

472.    The Pfizer Defendants reported AWP prices to the major compendia, including the compendia relied upon by the Commonwealth and Pennsylvania businesses and consumers, which reported AWPs that did not reflect actual wholesale prices.

473.    Upon information and belief, the Pfizer Defendants took various steps to conceal actual average wholesale selling prices by giving discounts, rebates, and other financial incentives and requiring the recipients of those financial incentives to not report and keep those incentives confidential.

474.    In addition, the Pfizer Defendants have increased the AWPs for their drugs in amounts which, on information and belief, do not reflect discounts, rebates and other incentives the Pfizer Defendants provide to lower the wholesale cost of its drugs.

475.    For example, for Dilantin Kapseals, the AWP for 100 size tablets was $259.66 in 1999, $259.66 in 2000, $290.01 in 2001 and $298.71 in May, 2002.

476. The Commonwealth, on information and belief, asserts that the changes in AWP did not accurately account for discounts, rebates and other financial incentives which reduced the wholesale costs of Dilantin.

477. For the Pfizer Defendants's other Pharmacy Dispensed Prescription Drugs, including Accupril, Accuretic, Cardura, Celebrex, Celontin, Cleocin-T, Estrostep, Fenhrt, Lipitor, Lopid, Minizide, Nardil, Neurontin, Norvasc, Renese, Rescriptor, Solu-Cortef, Solu-Medrol, Viracept, Zarontin, Zoloft, and Zyrtec, the AWPs were similarly unrelated to actual wholesale prices and did not account for discounts, rebates and other financial incentives offered by the Pfizer Defendants which lowered wholesale costs.

478. For the Pfizer Defendants' other Pharmacy Dispensed Prescription Drugs, the AWPs were similarly changed over time and those changes did not account for discounts, rebates or other financial incentives.

## COUNT XVI
## COMMONWEALTH v. THE PFIZER DEFENDANTS
## UNJUST ENRICHMENT

479. The Commonwealth hereby incorporates by reference thereto the averments of the preceding and subsequent paragraphs hereof as if fully set forth herein and further alleges as follows.

480. As set forth above, the Pfizer Defendants have been unjustly enriched as a result of engaging in the following practices with respect to the Commonwealth and Pennsylvania Consumers: 1) the creation and promotion of spreads; 2) the provision of free goods and drug product; 3) the provision of other financial incentives; 4) reporting of AWPs that do not reflect discounts, rebates and other incentives and increasing of AWPs without accounting for discounts, rebates and other incentives; and 5) fraudulent concealment of their actions.

108

481.    The Commonwealth and Pennsylvania Consumers were purchasers, reimbursers and/or end payors of the Pfizer Defendants' drugs and have paid amounts far in excess of the true cost for the Pfizer Defendants' drugs.

482.    The Pfizer Defendants knew of and has appreciated and retained, or used, the benefits of the Commonwealth and Pennsylvania Consumers' purchases of their drugs at amounts far in excess of the true cost. The Pfizer Defendants used the spread between the AWPs and the actual selling prices of its drugs to: a) pay prescribers an incentive to prescribe and dispense their drugs; b) provide free goods and other drug products as incentives; and c) create discounts and rebates. Each of these incentives was intended to increase the market share of the Pfizer Defendants' drugs thereby increasing their sales and profits.

483.    For those customers that purchase direct from the Pfizer Defendants at a price based on AWPs, the Pfizer Defendants' increases to AWPs directly benefit the Pfizer Defendants in the form of increased revenues.

484.    Based upon the Pfizer Defendants' conduct set forth in this complaint, it would be inequitable and unjust for the Pfizer Defendants to retain such benefits without payment of value.

485.    The Pfizer Defendants will be unjustly enriched if they are permitted to retain the direct or indirect benefits received or used resulting from the purchase of the Pfizer Defendants' drugs by the Commonwealth and Pennsylvania Consumers. The Commonwealth on behalf of itself and Pennsylvania Consumers seeks to recover the amounts that unjustly enriched the Pfizer Defendants.

486.     The Commonwealth and Pennsylvania Consumers are therefore entitled to equitable relief in the form of an injunction, restitution and disgorgement, legal relief in the form of damages and any other relief the Court deems appropriate.

WHEREFORE, the Commonwealth, on behalf of itself and Pennsylvania Consumers, respectfully seeks the relief set forth below.

## COUNT XVII
## COMMONWEALTH v. THE PFIZER DEFENDANTS
### MISREPRESENTATION/FRAUD

487.     The Commonwealth hereby incorporates by reference thereto the averments of the preceding paragraphs hereof as if fully set forth herein and further alleges as follows.

488.     The Pfizer Defendants' acts violate Pennsylvania common law proscriptions against fraudulent misrepresentation.

489.     In reporting AWPs to the compendia during the relevant time period for their drugs, the Pfizer Defendants were making representations that the AWPs for each of their drugs represented a real and fact-based average wholesale price.

490.     These representations were material to the transactions at hand in that the Commonwealth and Pennsylvania Consumers used and relied upon the AWPs as the basis for determining how much to pay and/or reimburse for the Pfizer Defendants' drugs.

491.     The Commonwealth prepared analyses using AWP historical data to prepare budgets for program funding, to develop formularies and to establish program eligibility requirements for program beneficiaries.

492.     As set forth more fully above, these AWPs were artificial prices, unrelated to any real or fact-based average wholesale price, created and manipulated by the Pfizer Defendants for the

purpose of generating revenue, thus constituting false representations which the Pfizer Defendants knew or, in the absence of recklessness, should have known to be false.

493.    Indeed, the AWP was not a calculation of any average at all but in fact was a result driven number selected exclusively by the Pfizer Defendants for the purpose of creating a spread and for the payment of rebates and other financial incentives or to simply generate additional revenue.

494.    The value of rebates, free product and other incentives given by the Pfizer Defendants was not reflected in the setting of the AWP.

495.    The Pfizer Defendants knew or, in the absence of recklessness should have known, that the omission of the value of rebates, free product and other incentives in the reporting of AWP to the compendia and the artificial setting of AWP constituted false representations.

496.    The Pfizer Defendants made these false representations with the intent of misleading the Commonwealth and Pennsylvania Consumers.

497.    The Commonwealth and Pennsylvania Consumers justifiably relied upon these false misrepresentations in purchasing and/or reimbursing for the Pfizer Defendants' drugs in an amount and for a price based upon the AWP.

498.    Because Commonwealth statutes, regulations and contracts require use of AWP, as published by the compendia, in reimbursement formulas, the Commonwealth's reliance on the reported AWP was justified and reasonable.

499.    It was reasonable for Pennsylvania Consumers to rely on prices billed by their prescribers or pharmacists.

500.    As a direct result of the false representations of the Pfizer Defendants, as set forth above, the Commonwealth and Pennsylvania Consumers were harmed in that they were unaware of

111

the artificial inflation of the AWP, would not have paid and/or reimbursed the artificially inflated prices for the Pfizer Defendants' drugs had they known of the false representations and, in fact, overpaid for the Pfizer Defendants' drugs because of the false representations.

WHEREFORE, the Commonwealth, on behalf of itself and the Pennsylvania Consumers, respectfully seeks the relief set forth below.

## COUNT XVIII
## COMMONWEALTH v. THE PFIZER DEFENDANTS
## VIOLATION OF THE PENNSYLVANIA
## UNFAIR TRADE PRACTICE AND CONSUMER PROTECTION LAW

501. The Commonwealth hereby incorporates by reference thereto the averments of the preceding paragraphs hereof as if fully set forth herein and further alleges as follows.

502. The Pfizer Defendants have violated Pennsylvania's Unfair Trade Practice and Consumer Protection Law ("UTPCPL")by its actions more fully described below. 73 P.S. § 201-1 et seq.

503. The Commonwealth is empowered to bring this action on behalf of "persons" who have purchased the Pfizer Defendants' prescription drugs at inflated prices and as a result, have suffered, are suffering, and will continue to suffer irreparable harm as a result of the Pfizer Defendants' actions. "Persons" include but are not limited to natural persons, corporations, trusts, partnerships, incorporated or unincorporated associations, and any other legal entities within the meaning of 73 P.S.§ 201-2(2).

504. The Commonwealth also has standing to bring this claim in that the Commonwealth is both an end payor and purchaser/reimburser of the Pfizer Defendants' prescription drugs through its Medicaid, PACE, PEBTF and other Commonwealth Programs. The Commonwealth performs

112

these functions not for its own business purposes, but rather in its representative capacity on behalf and for the benefit of its constituents who, in turn, make use of the prescription drugs primarily for personal, family and/or household purposes.

505.  In distributing, marketing, and selling prescription drugs to the Commonwealth and Pennsylvania Consumers, and in otherwise engaging in the conduct more fully described herein with respect to the above-identified drugs, the Pfizer Defendants are engaging in trade or commerce that directly or indirectly harmed consumers in this Commonwealth within the meaning of 73 P.S. § 201-2(3).

506.  Specifically, the Pfizer Defendants, by engaging in the practices set forth above, have:

   a.  Deceptively distributed, marketed and sold their drugs by alleging to the Commonwealth and the entities and consumers on whose behalf this action is brought that the AWPs for each of their drugs represented a real and fact-based price for its drugs;

   b.  Concealed from purchasers that AWP prices are exclusively set and controlled by drug manufacturers, while indicating that AWP represents a real and fact-based price, thereby causing a likelihood of confusion or misunderstanding for consumers who are led to believe AWP is a real and fact-based price; and

   c.  As a result of the Pfizer Defendants' acts in deceiving consumers that AWPs represent a real and fact-based price for their drugs, consumers who believed they were receiving a discount off AWP in fact paid inordinately high prices

113

and/or co-payments resulting from the reporting of inflated AWPs for needed prescription drugs.

507.   The Pfizer Defendants violated the UTPCPL:

   a.   each time the medical provider charged a patient at the inflated AWP price and benefits from any spread between the actual wholesale cost of such drugs and the AWP;

   b.   each time free samples were delivered to a medical provider with the understanding and expectation that the provider will charge the patient for free samples;

   c.   each time the medical provider charged a patient for free samples;

   d.   each time an incentive was given to anyone to cause a patient to be billed at the inflated AWP;

   e.   each time a patient was charged at the inflated AWP as a result of incentives given by or on The Pfizer Defendants' behalf;

   f.   each time a request for reimbursement was made to a Commonwealth program based on an inflated AWP;

   g.   each time an inflated AWP was published;

   h.   each time a patient and/or his or her insurer was charged based on an inflated AWP; and

   i.   each time the Pfizer Defendants engaged in conduct actionable under the preceding counts of this Complaint and/or engaged in conduct in violation of the statutes and laws of the Commonwealth.

114

508.    The Pfizer Defendants' products reimbursed or purchased by the Commonwealth or purchased by Pennsylvania Consumers were used for personal, family, or household use.

509.    The Pfizer Defendants' conduct as more fully described herein constitutes unfair methods of competition and unfair or deceptive acts or practices within the meaning of 73 P.S. § 201-2(4), including, but not limited to, the following:

a.    causing likelihood of confusion or misunderstanding as to the source, sponsorship, approval or certification of goods or service, within the meaning of 73 P.S. § 201-2(4)(ii);

b.    representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that he does not have within the meaning of 73 P.S. § 201-2(4)(v);

c.    advertising goods or services with the intent not to sell them as advertised within the meaning of 73 P.S. § 201-3(4)(ix);

d.    making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions within the meaning of 73 P.S. § 201-2(4)(xi);

e.    engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding within the meaning of 73 P.S. § 201-2(4)(xxi).

510.    The Pfizer Defendants' conduct more fully described herein, is, accordingly, proscribed and unlawful under 73 PA. STAT. § 201-3.

115

511.   The Pfizer Defendants' conduct as more fully described herein, was willful within the meaning of 73 P.S. § 201-8.

512.   The Attorney General has determined that these proceedings to enjoin the Pfizer Defendants' conduct are in the public interest.

513.   The Commonwealth therefore seeks the entry of a permanent injunction restraining the Pfizer Defendants' unlawful conduct and mandating corrective measures pursuant to 73 P. S. § 201-4.

514.   The Commonwealth also requests that the Court require the Pfizer Defendants to restore to the Commonwealth and Pennsylvania Consumers monies acquired from the sale of its prescription drugs during the period of time their unlawful conduct took place, pursuant to 73 P. S. § 201-4.1.

515.   In addition, and in light of the Pfizer Defendants' willful and improper conduct as herein described, the Commonwealth requests that the Court award a civil penalty to the Commonwealth not exceeding:

       a.    as to affected Pennsylvania Consumers under the age of sixty (60) years, $1,000.00 per violation, and

       b.    as to affected Pennsylvania Consumers sixty (60) years of age or older, $3,000 per violation.

516.   The Pfizer Defendants are liable for their actions and the actions of their co-conspirators for each of these violations as independent unfair and deceptive acts in violation of the UTPCPL, and for their course of conduct comprising an unfair and deceptive practice in violation of the UTPCPL.

116

517.    As a result of the Pfizer Defendants' unfair and deceptive trade practices, the Commonwealth and Pennsylvania Consumers have and will continue to suffer ascertainable loss and damages in an amount to be determined at trial.

WHEREFORE, the Commonwealth, on behalf of itself and Pennsylvania Consumers, respectfully seeks the relief set forth below.

## THE AMGEN DEFENDANTS' SPECIFIC CONDUCT

518.    The Amgen Defendants engaged in the unlawful scheme and conspiracy with respect to their Prescriber Dispensed Prescription Drugs, including Aranesp, Enbrel, Epogen, Kineret, Leukine, Leucovorin Calcium, Neulasta, Neupogen, and Prokine.

### CONDUCT RESPECTING PRESCRIBER DISPENSED PRESCRIPTION DRUGS

519.    The Amgen Defendants engaged in 1) the creation and promotion of spreads; 2) the provision of free goods and drug product; 3) the provision of other financial incentives; and  4) fraudulent concealment of their actions with respect to their Prescriber Dispensed Prescription Drugs.

520.    Upon information and belief, the Amgen Defendants engaged in Pennsylvania the promotion of spreads with respect to all of their Prescriber Dispensed Prescription Drugs, including Aranesp, Enbrel, Epogen, Kineret, Neulasta, Leukine, Leucovorin Calcium, Neupogen and Prokine.

521.    The Amgen Defendants acknowledged the importance of marketing the spread in internal documents, stating for example that:

> Our sales depend on payment and reimbursement from third-party payors, and a reduction in the payment rate or reimbursement rate could result in decreased sales of our products.

> In both domestic and foreign markets, sales of our products are
> dependent, in part, on the availability of reimbursement from third-
> party payors ...we believe that sales of Aranesp and Neulasta are and
> will be affected by government and private payor reimbursement
> policies. ...If reimbursement for our marketed products changes
> adversely or if we fail to obtain adequate reimbursement for our other
> current or future products, health care providers may limit how much
> or under what circumstances they will administer them, which could
> reduce the use of our products or cause us to reduce the price of our
> products. This could result in lower product sales or revenues ...

522.    Upon information and belief, the Amgen Defendants engaged in Pennsylvania in the

provision of free goods and drug product with respect to all of their presciber dispensed prescription

drugs, including Aranesp, Enbrel, Epogen, Kineret, Leukine, Leucovorin Calcium, Neulasta,

Neupogen, and Prokine.

523.    On information and belief, the Amgen Defendants engaged in the provision of other

financial incentives with respect to all of their drugs, including Aranesp, Enbrel, Epogen, Kineret,

Leukine, Leucovorin Calcium, Neulasta, Neupogen, and Prokine.

524.    One example of Amgen's provision of other financial incentives is detailed in an OIG

Report regarding Amgen. The report detailed how Amgen gave substantial year-end rebates to its

customers based on their purchases of Epogen. The report noted that Medicare and Medicare

beneficiaries did not receive the benefit of any rebates; all monies remained with the provider. There

was no way to provide for any rebates on Medicare claims forms, and Amgen's rebates were not

provided until year-end:

> [T]he effect of the rebates is that it reduces the actual cost of EPO to
> a dialysis facility, thus increasing their gross profit. Presently, the
> rebates represent price reductions which benefit the facilities
> exclusively.

118

525.     The Amgen Defendants engaged in the fraudulent concealment of their conduct set forth above in the manner set forth in paragraphs 105 through 110, above, and also by requiring purchasers of their drugs to keep secret the actual prices that the purchasers were paying for the drugs.

## COUNT XIX
## COMMONWEALTH v. AMGEN DEFENDANTS
## UNJUST ENRICHMENT

526.     The Commonwealth hereby incorporates by reference thereto the averments of the preceding and subsequent paragraphs hereof as if fully set forth herein and further alleges as follows.

527.     As set forth above, the Amgen Defendants have been unjustly enriched as a result of engaging in the following practices with respect to the Commonwealth and Pennsylvania Consumers: 1) the creation and promotion of spreads; 2) the provision of free goods and drug product; 3) the provision of other financial incentives; 4) reporting of AWPs that do not reflect discounts, rebates and other incentives and increasing of AWPs without accounting for discounts, rebates and other incentives; and 5) fraudulent concealment of their actions.

528.     The Commonwealth and Pennsylvania Consumers were purchasers, reimbursers and/or end payors of the Amgen Defendants' drugs and have paid amounts far in excess of the true cost for the Amgen Defendants' drugs.

529.     The Amgen Defendants knew of and have appreciated and retained, or used, the benefits of the Commonwealth and Pennsylvania Consumers' purchases of their drugs at amounts far in excess of the true cost. The Amgen Defendants used the spread between the AWPs and the actual selling prices of its drugs to: a) pay prescribers an incentive to prescribe and dispense its drugs; b) provide free goods and other drug products as incentives; and c) create discounts and

119

rebates. Each of these incentives was intended to increase the market share of the Amgen Defendants' drugs thereby increasing their sales and profits.

530.    Based upon the Amgen Defendants' conduct set forth in this complaint, it would be inequitable and unjust for the Amgen Defendants to retain such benefits without payment of value.

531.    The Amgen Defendants will be unjustly enriched if they are permitted to retain the direct or indirect benefits received or used resulting from the purchase of the Amgen Defendants' drugs by the Commonwealth and Pennsylvania Consumers. The Commonwealth on behalf of itself and Pennsylvania Consumers seeks to recover the amounts that unjustly enriched the Amgen Defendants.

532.    The Commonwealth and Pennsylvania Consumers are therefore entitled to equitable relief in the form of an injunction, restitution and disgorgement, legal relief in the form of damages and any other relief the Court deems appropriate.

WHEREFORE, the Commonwealth, on behalf of itself and Pennsylvania Consumers, respectfully seeks the relief set forth below.

## COUNT XX
## COMMONWEALTH v. AMGEN DEFENDANTS
## MISREPRESENTATION/FRAUD

533.    The Commonwealth hereby incorporates by reference thereto the averments of the preceding paragraphs hereof as if fully set forth herein and further alleges as follows.

534.    Defendants' acts violate Pennsylvania common law proscriptions against fraudulent misrepresentation.

120

535.    In reporting AWPs to the compendia during the relevant time period for its drugs, the Amgen Defendants were making representations that the AWPs for each of their drugs represented a calculation of a real and fact-based average wholesale price.

536.    These representations were material to the transactions at hand in that the Commonwealth and Pennsylvania Consumers used and relied upon the AWPs as the basis for determining how much to pay and/or reimburse for the Amgen Defendants' drugs.

537.    The Commonwealth prepared analyses using AWP historical data to prepare budgets for program funding, to develop formularies and to establish program eligibility requirements for program beneficiaries.

538.    As set forth more fully above, these AWPs were artificial prices, unrelated to any real of fact-based average wholesale price, created and manipulated by the Amgen Defendants for the purpose of generating revenue, thus constituting false representations which the Amgen Defendants knew or, in the absence of recklessness, should have known to be false.

539.    Indeed, the AWP was not a calculation of any average at all, but in fact was a result driven number selected exclusively by the Amgen Defendants for the purpose of creating a spread and for the payment of rebates and other financial incentives or to simply generate additional revenue.

540.    The value of free product and other incentives given by the Amgen Defendants was not reflected in the setting of the AWP.

541.    The Amgen Defendants knew or, in the absence of recklessness, should have known, that the omission of the value of rebates, free product and other incentives in the reporting of AWP to the compendia and the artificial setting of AWP constituted false representations.

542.   The Amgen Defendants made these false representations with the intent of misleading the Commonwealth and Pennsylvania Consumers.

543.   The Commonwealth and Pennsylvania Consumers justifiably relied upon these false misrepresentations in purchasing and/or reimbursing for the Amgen Defendants' drugs in an amount and for a price based upon the AWP.

544.   Because Commonwealth statutes, regulations and contracts require use of AWP, as published by the compendia, in reimbursement formulas, the Commonwealth's reliance on the reported AWP was justified and reasonable.

545.   It was reasonable for Pennsylvania Consumers to rely on prices billed by their prescribers or pharmacists.

546.   As a direct result of the false representations of the Amgen Defendants, as set forth above, the Commonwealth and Pennsylvania Consumers were harmed in that they were unaware of the artificial inflation of the AWP, would not have paid and/or reimbursed the artificially inflated prices for the Amgen Defendants' drugs had they known of the false representations and, in fact, overpaid for the Amgen Defendants' drugs because of the false representations.

WHEREFORE, the Commonwealth, on behalf of itself and the Pennsylvania Consumers, respectfully seeks the relief set forth below.

## COUNT XXI
## COMMONWEALTH v. AMGEN DEFENDANTS
## VIOLATION OF THE PENNSYLVANIA
## UNFAIR TRADE PRACTICE AND CONSUMER PROTECTION LAW

547.   The Commonwealth hereby incorporates by reference thereto the averments of the preceding paragraphs hereof as if fully set forth herein and further alleges as follows.

548.    The Amgen Defendants have violated Pennsylvania's Unfair Trade Practice and Consumer Protection Law ("UTPCPL") by their actions more fully described below. 73 P.S. § 201-1 *et seq.*

549.    The Commonwealth is empowered to bring this action on behalf of "persons" who have purchased the Amgen Defendants' prescription drugs at inflated prices and as a result, have suffered, are suffering, and will continue to suffer irreparable harm as a result of the Amgen Defendants' actions.    "Persons" include, but are not limited to natural persons, corporations, trusts, partnerships, incorporated or unincorporated associations, and any other legal entities within the meaning of 73 P.S.§ 201-2(2).

550.    The Commonwealth also has standing to bring this claim in that the Commonwealth is both an end payor and purchaser/reimburser of the Amgen Defendants' prescription drugs through its Medicaid, PACE, PEBTF and other Commonwealth Programs. The Commonwealth performs these functions not for its own business purposes, but rather in its representative capacity on behalf and for the benefit of its constituents who, in turn, make use of the prescription drugs primarily for personal, family and/or household purposes.

551.    In distributing, marketing, and selling prescription drugs to the Commonwealth and Pennsylvania Consumers, and in otherwise engaging in the conduct more fully described herein with respect to the above-identified drugs, the Amgen Defendants are engaging in trade or commerce that directly or indirectly harmed consumers in this Commonwealth within the meaning of 73 P.S. § 201-2(3).

552.    Specifically, the Amgen Defendants, by engaging in the practices set forth above, have:

123

    a.      deceptively distributed, marketed and sold their drugs by alleging to the Commonwealth and the entities and consumers on whose behalf this action is brought that the AWPs for each of their drugs represented a calculation of a real and fact-based price for their drugs;

    b.      concealed from purchasers that AWP prices are exclusively set and controlled by drug manufacturers, while indicating that AWP represents a real and fact-based price, thereby causing a likelihood of confusion or misunderstanding for consumers who are led to believe AWP is a real and fact-based price; and

    c.      as a result of the Amgen Defendants' acts in deceiving consumers that AWPs represent a real and fact-based price for their drugs, consumers who believed they were receiving a discount off AWP in fact paid inordinately high prices and/or co-payments resulting from the reporting of inflated AWPs for needed prescription drugs.

553.    The Amgen Defendants violated the UTPCPL:

    a.      each time the medical provider charged a patient at the inflated AWP price and benefits from any spread between the actual wholesale cost of such drugs and the AWP;

    b.      each time free drug product was delivered to a medical provider with the understanding and expectation that the provider will charge the patient for that free drug product;

    c.      each time the medical provider charged a patient for free drug product;

d.      each time an incentive was given to anyone to cause a patient to be billed at
the inflated AWP;

e.      each time a patient was charged at the inflated AWP as a result of incentives
given by or on the Amgen Defendants' behalf;

f.      each time a request for reimbursement was made to a Commonwealth
program based on an inflated AWP;

g.      each time an inflated AWP was published;

h.      each time a patient and/or his or her insurer was charged based on an inflated
AWP; and

i.      each time the Amgen Defendants engaged in conduct actionable under the
preceding counts of this Complaint and/or engaged in conduct in violation of
the statutes and laws of the Commonwealth.

554.    The Amgen Defendants' products reimbursed or purchased by the Commonwealth
or purchased by Pennsylvania Consumers were used for personal, family or household use.

555.    The Amgen Defendants' conduct as more fully described herein constitutes unfair
methods of competition and unfair or deceptive acts or practices within the meaning of 73 P.S. §
201-2(4), including, but not limited to, the following:

a.      causing likelihood of confusion or misunderstanding as to the source,
sponsorship, approval or certification of goods or service, within the meaning
of 73 P.S. § 201-2(4)(ii);

b.      representing that goods or services have sponsorship, approval,
characteristics, ingredients, uses, benefits or quantities that they do not have

125

or that a person has a sponsorship, approval, status, affiliation or connection that he does not have within the meaning of 73 P.S. § 201-2(4)(v);

c.  advertising goods or services with the intent not to sell them as advertised within the meaning of 73 P.S. § 201-3(4)(ix);

d.  making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions within the meaning of 73 P.S. § 201-2(4)(xi);

e.  engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding within the meaning of 73 P.S. § 201-2(4)(xxi).

556.  The Amgen Defendants' conduct more fully described herein, is, accordingly, proscribed and declared unlawful by 73 PA. STAT. § 201-3.

557.  The Amgen Defendants' conduct as more fully described herein, was willful within the meaning of 73 P.S. § 201-8.

558.  The Attorney General has determined that these proceedings to enjoin the Amgen Defendants' conduct are in the public interest.

559.  The Commonwealth therefore seeks the entry of a permanent injunction restraining the Amgen Defendants' unlawful conduct and mandating corrective measures pursuant to 73 P. S. § 201-4.

560.  The Commonwealth also requests that the Court require the Amgen Defendants to restore to the Commonwealth and Pennsylvania Consumers monies acquired from the sale of their

126

prescription drugs during the period of time Defendants' unlawful conduct took place, pursuant to 73 P. S. § 201-4.1.

561.    In addition, and in light of the Amgen Defendants' willful and improper conduct as herein described, the Commonwealth requests that the Court award a civil penalty to the Commonwealth not exceeding:

> a.    as to affected Pennsylvania Consumers under the age of sixty (60) years, $1,000.00 per violation, and

> b.    as to affected Pennsylvania Consumers sixty (60) years of age or older, $3,000 per violation.

562.    The Amgen Defendants are liable for their actions and the actions of their co-conspirators for each of these violations as independent unfair and deceptive acts in violation of the UTPCPL, and for their course of conduct comprising an unfair and deceptive practice in violation of the UTPCPL.

563.    As a result of the Amgen Defendants' unfair and deceptive trade practices, the Commonwealth and Pennsylvania Consumers have and will continue to suffer ascertainable loss and damages in an amount to be determined at trial.

WHEREFORE, the Commonwealth, on behalf of itself and Pennsylvania Consumers, respectfully seeks the relief set forth below.

## THE SCHERING DEFENDANTS' SPECIFIC CONDUCT

564.    The Schering Defendants engaged in the unlawful conduct with respect to their Prescriber Dispensed Prescription Drugs, including Integrilin, Intron, Peg-Intron, Potassium Chloride, and Theophylline, and its Pharmacy Dispensed Prescription Drugs, including Albuterol,

127

Clarinex, Claritin, Claritin-D, Clotrimazole, Diprolene, Diprosone, Elocon, Eulexin, Griseofulvin, ISMN, Lostrisone, Nasonex, Oxaprozin, Perphenazine, Proventil, Rebetol, Sebizon, Sodium Chloride, Sulcrafate, Temodar, Trinalin, and Vanceril.

## CONDUCT RESPECTING PRESCRIBER DISPENSED PRESCRIPTION DRUGS

565.    The Schering Defendants engaged in 1) the creation and promotion of spreads; 2) the provision of free goods and drug product; 3) the provision of other financial incentives; and 4) fraudulent concealment of their actions with respect to their Prescriber Dispensed Prescription Drugs.

566.    The Schering Defendants unlawful actions include their involvement and conduct with respect to Schering Sales Corp.'s unlawful sales and marketing practices, as described above in paragraph 132.

567.    Upon information and belief, the Schering Defendants engaged in Pennsylvania in the promotion of spreads with respect to all of their drugs, including Integrilin, Intron, Peg-Intron, Potassium Chloride, and Theophylline.

568.    Internal Schering documents demonstrate the Defendants' recognition that intermediaries choose drugs based on favorable AWP spreads and that the Schering Defendants touted spreads of 529% on a Warrick albuterol inhalation product and 482% spread on the refill.

569.    In a report to Congress, the GAO has reported that albuterol sulfate was one of the small number of products that accounted for the majority of Medicare spending and volume.  It accounted for 6.3% of total spending, ranking fifth out of more than 400 covered drugs, and 65.8% of total units reimbursed, ranking first for volume of units covered.

570.    Upon information and belief, the Schering Defendants engaged in the provision of free goods and drug product with respect to all of their drugs, including Integrilin, Intron, Peg-Intron, Potassium Chloride, and Theophylline.

571.    Upon information and belief, the Schering Defendants engaged in Pennsylvania in the provision of other financial incentives with respect to all of their drugs, including Integrilin, Intron, Peg-Intron, Potassium Chloride, and Theophylline.

572.    Upon information and belief, the Schering Defendants engaged in the fraudulent concealment of their its conduct in the manner described in paragraphs 105 through 110, above.

## CONDUCT RESPECTING PHARMACY DISPENSED PRESCRIPTION DRUGS

573.    With regard to the Pharmacy Dispensed Prescription Drugs, the Schering Defendants engaged in the following conduct.

574.    The Schering Defendants reported AWP prices to the major compendia, including the compendia relied upon by the Commonwealth and Pennsylvania businesses and consumers, which reported AWPs that did not reflect actual wholesale prices.

575.    Upon information and belief, the Schering Defendants took various steps to conceal actual average wholesale selling prices by giving discounts, rebates, and other financial incentives and requiring the recipients of those financial incentives to not report and keep those incentives confidential.

576.    In addition, the Schering Defendants have increased the AWPs for their drugs in amounts which, on information and belief, do not reflect discounts, rebates and other incentives the Schering Defendants provide to lower the wholesale cost of their drugs.

577.    For example, for Diprolene, the AWP for Gel TP, 0.05%, 50 g was $67.19 in 1999, $69.88 in 2000, $73.76 in 2001, and $78.28 in May, 2002.

578.    The Commonwealth, on information and belief, asserts that the changes in AWP did not accurately account for discounts, rebates and other financial incentives which reduced the wholesale cost of Diprolene.

579.    For the Schering Defendants' other Pharmacy Dispensed Prescription Drugs, including Albuterol, Clarinex, Claritin, Claritin-D, Clotrimazole, Diprosone, Elocon, Eulexin, Griseofulvin, ISMN, Lostrisone, Nasonex, Oxaprozin, Perphenazine, Proventil, Rebetol, Sebizon, Sodium Chloride, Sulcrafate, Temodar, Trinalin, and Vanceril, the AWPs were similarly unrelated to actual wholesale prices and did not account for discounts, rebates and other financial incentives offered by the Schering Defendants which lowered wholesale costs.

580.    For the Schering Defendants' other Pharmacy Dispensed Prescription Drugs, the AWPs were similarly changed over time and those changes did not account for discounts, rebates or other financial incentives.

## COUNT XXII
## COMMONWEALTH v. SCHERING DEFENDANTS'
## UNJUST ENRICHMENT

581.    The Commonwealth hereby incorporates by reference thereto the averments of the preceding and subsequent paragraphs hereof as if fully set forth herein and further alleges as follows.

582.    As set forth above, the Schering Defendants have been unjustly enriched as a result of engaging in the following practices with respect to the Commonwealth and Pennsylvania Consumers: 1) the creation and promotion of spreads; 2) the provision of free goods and drug product; 3) the provision of other financial incentives; 4) reporting of AWPs that do not reflect

130

discounts, rebates and other incentives and increasing of AWPs without accounting for discounts, rebates and other incentives; and 5) fraudulent concealment of their actions.

583.     The Commonwealth and Pennsylvania Consumers were purchasers, reimbursers and/or end payors of the Schering Defendants' drugs and have paid amounts far in excess of the true cost for the Schering Defendants' drugs.

584.     The Schering Defendants knew of and have appreciated and retained, or used, the benefits of the Commonwealth and Pennsylvania Consumers' purchases of their drugs at amounts far in excess of the true cost. The Schering Defendants used the spread between the AWPs and the actual selling prices of their drugs to: a) pay prescribers an incentive to prescribe and dispense their drugs; b) provide free goods and other drug products as incentives; and c) create discounts and rebates. Each of these incentives was intended to increase the market share of the Schering Defendants' drugs thereby increasing their sales and profits.

585.     For those customers that purchase direct from the Schering Defendants at a price based on AWPs, the Schering Defendants' increases to AWPs directly benefit the Schering Defendants in the form of increased revenues.

586.     Based upon the Schering Defendants' conduct set forth in this complaint, it would be inequitable and unjust for the Schering Defendants to retain such benefits without payment of value.

587.     The Schering Defendants will be unjustly enriched if they are permitted to retain the direct or indirect benefits received or used resulting from the purchase of the Schering Defendants' drugs by the Commonwealth and Pennsylvania Consumers. The Commonwealth on behalf of itself

131

and Pennsylvania Consumers seeks to recover the amounts that unjustly enriched the Schering Defendants.

588.    The Commonwealth and Pennsylvania Consumers are therefore entitled to equitable relief in the form of an injunction, restitution and disgorgement, legal relief in the form of damages and any other relief the Court deems appropriate.

WHEREFORE, the Commonwealth, on behalf of itself and Pennsylvania Consumers, respectfully seeks the relief set forth below.

## COUNT XXIII
## COMMONWEALTH v. SCHERING DEFENDANTS'
## MISREPRESENTATION/FRAUD

589.    The Commonwealth hereby incorporates by reference thereto the averments of the preceding paragraphs hereof as if fully set forth herein and further alleges as follows.

590.    Defendants' acts violate Pennsylvania common law proscriptions against fraudulent misrepresentation.

591.    In reporting AWPs to the compendia during the relevant time period for their drugs, the Schering Defendants were making representations that the AWPs for each of their drugs represented a real and fact-based average wholesale price.

592.    These representations were material to the transactions at hand in that the Commonwealth and Pennsylvania Consumers used and relied upon the AWPs as the basis for determining how much to pay and/or reimburse for the Schering Defendants' drugs.

593.    The Commonwealth prepared analyses using AWP historical data to prepare budgets for program funding, to develop formularies and to establish program eligibility requirements for program beneficiaries.

132

594. As set forth more fully above, these AWPs were artificial prices, unrelated to any real or fact-based average wholesale price, created and manipulated by the Schering Defendants for the purpose of generating revenue, thus constituting false representations which the Schering Defendants knew or, in the absence of recklessness, should have known to be false.

595. Indeed, the AWP was not a calculation of any average at all but in fact was a result driven number selected exclusively by the Schering Defendants for the purpose of creating a spread and for the payment of rebates and other financial incentives or to simply generate additional revenue.

596. The value of free product and other incentives given by the Schering Defendants was not reflected in the setting of the AWP.

597. The Schering Defendants knew or, in the absence of recklessness should have known, that the omission of the value of rebates, free product and other incentives in the reporting of AWP to the compendia and the artificial setting of AWP constituted false representations.

598. The Schering Defendants made these false representations with the intent of misleading the Commonwealth and Pennsylvania Consumers.

599. The Commonwealth and Pennsylvania Consumers justifiably relied upon these false misrepresentations in purchasing and/or reimbursing for the Schering Defendants' drugs in an amount and for a price based upon the AWP.

600. Because Commonwealth statutes, regulations and contracts require use of AWP, as published by the compendia, in reimbursement formulas, the Commonwealth's reliance on the reported AWP was justified and reasonable.

133

601.     It was reasonable for Pennsylvania Consumers to rely on prices billed by their prescribers or pharmacists.

602.     As a direct result of the false representations of the Schering Defendants, as set forth above, the Commonwealth and Pennsylvania Consumers were harmed in that they were unaware of the artificial inflation of the AWP, would not have paid and/or reimbursed the artificially inflated prices for the Schering Defendants' drugs had they known of the false representations and, in fact, overpaid for the Schering Defendants' drugs because of the false representations.

≐     WHEREFORE, the Commonwealth, on behalf of itself and the Pennsylvania Consumers, respectfully seeks the relief set forth below.

## COUNT XXIV
## COMMONWEALTH v. SCHERING DEFENDANTS'
## VIOLATION OF THE PENNSYLVANIA
## UNFAIR TRADE PRACTICE AND CONSUMER PROTECTION LAW

603.     The Commonwealth hereby incorporates by reference thereto the averments of the preceding paragraphs hereof as if fully set forth herein and further alleges as follows.

604.     The Schering Defendants have violated Pennsylvania's Unfair Trade Practice and Consumer Protection Law ("UTPCPL")by their actions more fully described below. 73 P.S. § 201-1 *et seq.*

605.     The Commonwealth is empowered to bring this action on behalf of "persons" who have purchased the Schering Defendants' prescription drugs at inflated prices and as a result, have suffered, are suffering, and will continue to suffer irreparable harm as a result of the Schering Defendants' actions. "Persons" include but are not limited to natural persons, corporations, trusts,

134

partnerships, incorporated or unincorporated associations, and any other legal entities within the meaning of 73 P.S.§ 201-2(2).

606.   The Commonwealth also has standing to bring this claim in that the Commonwealth is both an end payor and purchaser/reimburser of the Schering Defendants' prescription drugs through its Medicaid, PACE, PEBTF and other Commonwealth Programs. The Commonwealth performs these functions not for its own business purposes, but rather in its representative capacity on behalf and for the benefit of its constituents who, in turn, make use of the prescription drugs primarily for personal, family and/or household purposes.

607.   In distributing, marketing, and selling prescription drugs to the Commonwealth and Pennsylvania Consumers, and in otherwise engaging in the conduct more fully described herein with respect to the above-identified drugs, the Schering Defendants are engaging in trade or commerce that directly or indirectly harmed consumers in this Commonwealth within the meaning of 73 P.S. § 201-2(2).

608.   Specifically, the Schering Defendants, by engaging in the practices set forth above, have:

> a.   Deceptively distributed, marketed and sold their drugs by alleging to the Commonwealth and the entities and consumers on whose behalf this action is brought that the AWPs for each of their drugs represented a real and fact-based price for their drugs;

> b.   Concealed from purchasers that AWP prices are exclusively set and controlled by drug manufacturers, while indicating that AWP represents a real and fact-based price, thereby causing a likelihood of confusion or

135

misunderstanding for consumers who are led to believe AWP is a real and fact-based price; and

c.  As a result of the Schering Defendants' acts in deceiving consumers that AWPs represent a real and fact-based price for their drugs, consumers who believed they were receiving a discount off AWP in fact paid inordinately high prices and/or co-payments resulting from the reporting of inflated AWPs for needed prescription drugs.

609.  The Schering Defendants violated the UTPCPL:

a.  each time the medical provider charged a patient at the inflated AWP price and benefits from any spread between the actual wholesale cost of such drugs and the AWP;

b.  each time free samples were delivered to a medical provider with the understanding and expectation that the provider will charge the patient for that free samples;

c.  each time the medical provider charged a patient for free samples;

d.  each time an incentive was given to anyone to cause a patient to be billed at the inflated AWP;

e.  each time a patient was charged at the inflated AWP as a result of incentives given by or on the Schering Defendants' behalf;

f.  each time a request for reimbursement was made to a Commonwealth program based on an inflated AWP;

g.  each time an inflated AWP was published;

136

h.      each time a patient and/or his or her insurer was charged based on an inflated
AWP; and

i.      each time the Schering Defendants engaged in conduct actionable under the
preceding counts of this Complaint and/or engaged in conduct in violation of
the statutes and laws of the Commonwealth.

610.    The Schering Defendants' products reimbursed or purchased by the Commonwealth
or purchased by Pennsylvania Consumers were used for personal, family, or household use.

611.    The Schering Defendants' conduct as more fully described herein constitutes unfair
methods of competition and unfair or deceptive acts or practices within the meaning of 73 P.S. §
201-2(4), including, but not limited to, the following:

a.      causing likelihood of confusion or misunderstanding as to the source,
sponsorship, approval or certification of goods or service, within the meaning
of 73 P.S. § 201-2(4)(ii);

b.      representing that goods or services have sponsorship, approval,
characteristics, ingredients, uses, benefits or quantities that they do not have
or that a person has a sponsorship, approval, status, affiliation or connection
that he does not have within the meaning of 73 P.S. § 201-2(4)(v);

c.      advertising goods or services with the intent not to sell them as advertised
within the meaning of 73 P.S. § 201-3(4)(ix);

d.      making false or misleading statements of fact concerning the reasons for,
existence of, or amounts of price reductions within the meaning of 73 P.S. §
201-2(4)(xi);

137

     e.     engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding within the meaning of 73 P.S. § 201-2(4)(xxi).

612.     The Schering Defendants' conduct more fully described herein, is, accordingly, proscribed and unlawful pursuant to 73 PA. STAT. § 201-3.

613.     The Schering Defendants' conduct as more fully described herein, was willful within the meaning of 73 P.S. § 201-8.

614.     The Attorney General has determined that these proceedings to enjoin the Schering Defendants' conduct are in the public interest.

615.     The Commonwealth therefore seeks the entry of a permanent injunction restraining the Schering Defendants' unlawful conduct and mandating corrective measures pursuant to 73 P. S. § 201-4.

616.     The Commonwealth also requests that the Court require the Schering Defendants' to restore to the Commonwealth and Pennsylvania Consumers monies acquired from the sale of their prescription drugs during the period of time Defendants' unlawful conduct took place, pursuant to 73 P. S. § 201-4.1.

617.     In addition, and in light of the Schering Defendants' willful and improper conduct as herein described, the Commonwealth requests that the Court award a civil penalty to the Commonwealth not exceeding:

     a.     as to affected Pennsylvania Consumers under the age of sixty (60) years, $1,000.00 per violation, and

> b.    as to affected Pennsylvania Consumers sixty (60) years of age or older, $3,000 per violation.

618.    The Schering Defendants are liable for their actions and the actions of their co-conspirators for each of these violations as independent unfair and deceptive acts in violation of the UTPCPL, and for their course of conduct comprising an unfair and deceptive practice in violation of the UTPCPL.

619.    As a result of the Schering Defendants' unfair and deceptive trade practices, the Commonwealth and Pennsylvania Consumers have and will continue to suffer ascertainable loss and damages in an amount to be determined at trial.

WHEREFORE, the Commonwealth, on behalf of itself and Pennsylvania Consumers, respectfully seeks the relief set forth below.

### THE BRISTOL-MYERS DEFENDANTS' SPECIFIC CONDUCT

620.    The Bristol-Myers Defendants engaged in the unlawful scheme and conspiracy with respect to their Prescriber Dispensed Prescription Drugs, including Amikacin Sulfate, Blenoxane, Carboplatin, Coumadin, Cytoxan, Etopophos, Paraplatin, Taxol, Tequin, and Vepesid, and their Pharmacy Dispensed Prescription Drugs, including Amphotercin, Avapro, Buspar, Cefzil, Coumadin, Glucophage, Monopril, Monopril HCT, Plavix, Pravachol, Serzone, Sustiva, Tequin, Videx, and Zerit.

### CONDUCT RESPECTING PRESCRIBER DISPENSED PRESCRIPTION DRUGS

621.    The Bristol-Myers Defendants engaged in 1) the creation and promotion of spreads; 2) the provision of free goods and drug product; 3) the provision of other financial incentives; and

4) fraudulent concealment of their actions with respect to their Prescriber Dispensed Prescription Drugs.

622.    Upon information and belief, the Bristol-Myers Defendants engaged in Pennsylvania in the promotion of spreads with respect to all of their drugs, including Amikacin Sulfate, Blenoxane, Carboplatin, Coumadin, Cytoxan, Etopophos, Paraplatin, Taxol, Tequin, and Vepesid.

623.    One example of the promotion of spreads by the Bristol-Myers Defendants is detailed in reports of government investigations. These investigations confirm that the Bristol-Myers Defendants engaged in an ongoing deliberate scheme to inflate AWPs. For example, by letter dated February 27, 2001 to Bristol-Myers Defendants, Congressman Stark outlined numerous examples of illegal practices by the Bristol-Myers Defendants:

a)    Bristol has control over the AWPs, DPs, and WACs published for its drugs and directs national publishers to change their prices. Bristol directed a national publisher of drug prices to increase all of Bristol's AWPs for oncology drugs by multiplying Bristol's supplied direct prices by a 25% factor rather than the previous 20.5% factor . . . . The increase in the AWP created a spread that, in itself, provided a financial kickback to oncologists for prescribing Bristol's cancer drugs.

b)    In the same letter, Rep. Stark noted:

The evidence clearly shows that Bristol has intentionally reported inflated prices and has engaged in other improper business practices in order to cause its customers to receive windfall profits from Medicare and Medicaid when submitting claims for certain drugs. The evidence further reveals that Bristol manipulated prices for the express purpose of expanding sales and increasing market share of certain drugs where the arranging of a financial benefit or inducement would influence the decisions of healthcare providers submitting the Medicare and Medicaid claims.

c)    Another government investigation uncovered specific examples of the Bristol-Myers Defendants' deceptive AWPs. Specifically:

140

1.    In the 2000 edition of the *Red Book*, BMS reported an AWP of $1296.64 for Vepesid (Etoposide) for injection while BMS was actually offering to sell the exact same drug to a large customer for only $70.00.

2.    From 1995 through 1998 the *Red Book* listed AWP for BMS' Blenoxane 15u increased from $276.29 to $304.60, while the actual cost to physicians declined from, $224.22 to $140.00, resulting in a spread of $164.60 in 1998.

624.    Upon information and belief, the Bristol-Myers Defendants engaged in Pennsylvania in the provision of free goods and drug product with respect to all of their Prescriber Dispensed Prescription Drugs, including Amikacin Sulfate, Blenoxane, Carboplatin, Coumadin, Cytoxan, Etopophos, Paraplatin, Taxol, Tequin, and Vepesid.

625.    One example of Bristol-Myers's provision of free goods and drug product involved the drug Etopophos, which was provided free to doctors in exchange for their promise to buy other Bristol-Myers drugs.

626.    Upon information and belief, the Bristol-Myers Defendants engaged in the provision of other financial incentives with respect to all of their Prescriber Dispensed Prescription Drugs, including Amikacin Sulfate, Blenoxane, Carboplatin, Coumadin, Cytoxan, Etopophos, Paraplatin, Taxol, Tequin, and Vepesid.

627.    One example of Bristol-Myers's provision of other financial incentives was the provision of free medical devices used in connection with the administration of Bristol-Myers' drugs.

628.    The Bristol-Myers Defendants engaged in the fraudulent concealment of their conduct set forth in the manner set forth in paragraphs 105 through 110, above, and also by requiring purchasers of their drugs to keep secret the actual prices that purchasers were paying for the drugs.

## CONDUCT RESPECTING PHARMACY DISPENSED PRESCRIPTION DRUGS

629.    With regard to the Pharmacy-Dispensed Prescription Drugs, the Bristol-Myers Defendants engaged in the following conduct.

630.    The Bristol-Myers Defendants reported AWP prices to the major compendia, including the compendia relied upon by the Commonwealth and Pennsylvania businesses and consumers, which reported AWPs that did not reflect actual wholesale prices.

631.    Upon information and belief, the Bristol-Myers Defendants took various steps to conceal actual average wholesale selling prices by giving discounts, rebates, and other financial incentives and requiring the recipients of those financial incentives to not report and keep those incentives confidential.

632.    In addition, the Bristol-Myers Defendants have increased the AWPs for their drugs in amounts which, on information and belief, do not reflect discounts, rebates and other incentives the Bristol-Myers Defendants provide to lower the wholesale cost of their drugs.

633.    For example, for Buspar, the AWP for 10 mg, 100-size tablets was $130.00 in 1999, $143.13 in 2000, and $158.19 in 2001.

634.    The Commonwealth, on information and belief, asserts that the changes in AWP did not accurately account for discounts, rebates and other financial incentives which reduced the wholesale cost of Buspar.

635.    For the Bristol-Myers Defendants' other Pharmacy Dispensed Prescription Drugs, including Amphotercin, Avapro, Cefzil, Coumadin, Glucophage, Monopril, Monopril HCT, Plavix, Pravachol, Serzone, Sustiva, Tequin, Videx, and Zerit the AWPs were similarly unrelated to actual

142

wholesale prices and did not account for discounts, rebates and other financial incentives offered by the Bristol-Myers Defendants which lowered wholesale costs.

636.     For the Bristol-Myers Defendants' other Pharmacy Dispensed Prescription Drugs, the AWPs were similarly changed over time and those changes did not account for discounts, rebates or other financial incentives.

## COUNT XXV
## COMMONWEALTH v. BRISTOL-MYERS DEFENDANTS
## UNJUST ENRICHMENT

637.     The Commonwealth hereby incorporates by reference thereto the averments of the preceding and subsequent paragraphs hereof as if fully set forth herein and further alleges as follows.

638.     As set forth above, the Bristol-Myers Defendants have been unjustly enriched as a result of engaging in the following practices with respect to the Commonwealth and Pennsylvania Consumers: 1) the creation and promotion of spreads; 2) the provision of free goods and drug product; 3) the provision of other financial incentives; 4) reporting of AWPs that do not reflect discounts, rebates and other incentives and increasing of AWPs without accounting for discounts, rebates and other incentives; and 5) fraudulent concealment of their actions.

639.     The Commonwealth and Pennsylvania Consumers were purchasers, reimbursers and/or end payors of the Bristol-Myers Defendants' drugs and have paid amounts far in excess of the true cost for the Bristol-Myers Defendants' drugs.

640.     The Bristol-Myers Defendants knew of and have appreciated and retained, or used, the benefits of the Commonwealth and Pennsylvania Consumers' purchases of their drugs at amounts far in excess of the true cost. The Bristol-Myers Defendants used the spread between the AWPs and the actual selling prices of its drugs to: a) pay prescribers an incentive to prescribe and

dispense its drugs; b) provide free goods and other drug products as incentives; and c) create discounts and rebates. Each of these incentives was intended to increase the market share of the Bristol-Myers Defendants' drugs thereby increasing its sales and profits.

641.    For those customers that purchase direct from the Bristol-Myers Defendants at a price based on AWPs, the Bristol-Myers Defendants' increases to AWPs directly benefit the Bristol-Myers Defendants in the form of increased revenues.

642.    Based upon the Bristol-Myers Defendants' conduct set forth in this complaint, it would be inequitable and unjust for the Bristol-Myers Defendants to retain such benefits without payment of value.

643.    The Bristol-Myers Defendants will be unjustly enriched if they are permitted to retain the direct or indirect benefits received or used resulting from the purchase of the Defendants Bristol-Myers' drugs by the Commonwealth and Pennsylvania Consumers.

644.    The Commonwealth on behalf of itself and Pennsylvania Consumers seeks to recover the amounts that unjustly enriched the Bristol-Myers Defendants.

645.    The Commonwealth and Pennsylvania Consumers are therefore entitled to equitable relief in the form of an injunction, restitution and disgorgement, legal relief in the form of damages and any other relief the Court deems appropriate.

WHEREFORE, the Commonwealth, on behalf of itself and Pennsylvania Consumers, respectfully seeks the relief set forth below.

## COUNT XXVI
## COMMONWEALTH v. BRISTOL-MYERS DEFENDANTS
## MISREPRESENTATION/FRAUD

646.    The Commonwealth hereby incorporates by reference thereto the averments of the preceding paragraphs hereof as if fully set forth herein and further alleges as follows.

647.    Defendants' acts violate Pennsylvania common law proscriptions against fraudulent misrepresentation.

648.    In reporting AWPs to the compendia during the relevant time period for its drugs, the Bristol-Myers Defendants were making representations that the AWPs for each of these drugs represented a real and fact-based average wholesale price.

649.    These representations were material to the transaction at hand in that the Commonwealth and Pennsylvania Consumers used and relied upon the AWPs as the basis for determining how much to pay and/or reimburse for the Bristol-Myers Defendants' drugs.

650.    The Commonwealth prepared analyses using AWP historical data to prepare budgets for program funding, to develop formularies and to establish program eligibility requirements for program beneficiaries.

651.    As set forth more fully above, these AWPs were artificial prices, unrelated to any real or fact-based average wholesale price created and manipulated by the Bristol-Myers Defendants for the purpose of generating revenue, thus constituting false representations which the Bristol-Myers Defendants knew or, in the absence of recklessness, should have known to be false.

652.    Indeed, the AWP was not a calculation of any average at all, but in fact was a result driven number selected exclusively by the Bristol-Myers Defendants for the purpose of creating a

spread and for the payment of rebates and other financial incentives or to simply generate additional revenue.

653.    The value of free product and other incentives given by the Bristol-Myers Defendants was not reflected in the setting of the AWP.

654.    The Bristol-Myers Defendants knew or, in the absence of recklessness, should have known, that the omission of the value of free product in the reporting of AWP to the compendia and the artificial setting of AWP constituted false representations.

655.    The Bristol-Myers Defendants made these false representations with the intent of misleading the Commonwealth and Pennsylvania Consumers.

656.    The Commonwealth and Pennsylvania Consumers justifiably relied upon these false misrepresentations in purchasing and/or reimbursing for the Bristol-Myers Defendants' drugs in an amount and for a price based upon the AWP.

657.    Because Commonwealth statutes, regulations and contracts require the use of AWP, as published by the compendia, in reimbursement formulas, the Commonwealth's reliance on the reported AWP was justified and reasonable.

658.    It was reasonable for Pennsylvania Consumers to rely on prices billed by their prescribers or pharmacists.

659.    As a direct result of the false representations of the Bristol-Myers Defendants, as set forth above, the Commonwealth and Pennsylvania Consumers were harmed in that they were unaware of the artificial inflation of the AWP, would not have paid and/or reimbursed the artificially inflated prices for the Bristol-Myers Defendants' drugs had they known of the false representations and, in fact, overpaid for the Bristol-Myers Defendants' drugs because of the false representations.

WHEREFORE, the Commonwealth, on behalf of itself and the Pennsylvania Consumers, respectfully seeks the relief set forth below.

## COUNT XXVII
## COMMONWEALTH v. BRISTOL-MYERS DEFENDANTS
## VIOLATION OF THE PENNSYLVANIA
## UNFAIR TRADE PRACTICE AND CONSUMER PROTECTION LAW

660.    The Commonwealth hereby incorporates by reference thereto the averments of the preceding paragraphs hereof as if fully set forth herein and further alleges as follows.

661.    The Bristol-Myers Defendants have violated Pennsylvania's Unfair Trade Practice and Consumer Protection Law ("UTPCPL")by their actions more fully described below. 73 P.S. § 201-1 *et seq*.

662.    The Commonwealth is empowered to bring this action on behalf of "persons" who have purchased the Bristol-Myers Defendants' prescription drugs at inflated prices and as a result, have suffered, are suffering, and will continue to suffer irreparable harm as a result of the Bristol-Myers Defendants' actions. "Persons" include but are not limited to natural persons, corporations, trusts, partnerships, incorporated or unincorporated associations, and any other legal entities within the meaning of 73 P.S.§ 201-2(2).

663.    The Commonwealth also has standing to bring this claim in that the Commonwealth is both an end payor and purchaser/reimburser of the Bristol-Myers Defendants' prescription drugs through its Medicaid, PACE, PEBTF and other Commonwealth Programs. The Commonwealth performs these functions not for its own business purposes, but rather in its representative capacity on behalf and for the benefit of its constituents who, in turn, make use of the prescription drugs primarily for personal, family and/or household purposes.

147

664.     In distributing, marketing, and selling prescription drugs to the Commonwealth and Pennsylvania Consumers, and in otherwise engaging in the conduct more fully described herein with respect to the above-identified drugs, the Bristol-Myers Defendants are engaging in trade or commerce that directly or indirectly harmed consumers in this Commonwealth within the meaning of 73 P.S. § 201-2(3).

665.     Specifically, the Bristol-Myers Defendants, by engaging in the practices set forth above, have:

          a.     deceptively distributed, marketed and sold their drugs by alleging to the Commonwealth and the entities and consumers on whose behalf this action is brought that the AWPs for each of their drugs represented a real and fact-based price for their drugs;

          b.     concealed from purchasers that AWP prices are exclusively set and controlled by drug manufacturers, while indicating that AWP represents a real and fact-based price, thereby causing a likelihood of confusion or misunderstanding for consumers who are led to believe AWP is a real and fact-based price; and

          c.     as a result of the Bristol-Myers Defendants' acts in deceiving consumers that AWPs represent a real and fact-based price for their drugs, consumers who believed they were receiving a discount off AWP in fact paid inordinately high prices and/or co-payments resulting from the reporting of inflated AWPs for needed prescription drugs.

666.    The Bristol-Myers Defendants violated the UTPCPL:

    a.    each time the medical provider charged a patient at the inflated AWP price and benefits from any spread between the actual wholesale cost of such drugs and the AWP;

    b.    each time free samples were delivered to a medical provider with the understanding and expectation that the provider will charge the patient for that free samples;

    c.    each time the medical provider charged a patient for free samples;

    a.    each time an incentive was given to anyone to cause a patient to be billed at the inflated AWP;

    b.    each time a patient was charged at the inflated AWP as a result of incentives given by or on the Bristol-Myers Defendants' behalf;

    c.    each time a request for reimbursement was made to a Commonwealth program based on an inflated AWP;

    d.    each time an inflated AWP was published;

    e.    each time a patient and/or his or her insurer was charged based on an inflated AWP; and

    f.    Each time the Bristol-Myers Defendants engaged in conduct actionable under the preceding counts of this Complaint and/or engaged in conduct in violation of the statutes and laws of the Commonwealth.

149

667.    The Bristol-Myers Defendants' products reimbursed by or purchased by the Commonwealth or purchased by Pennsylvania Consumers were used for personal, family or household use.

668.    The Bristol-Myers Defendants' conduct as more fully described herein constitutes unfair methods of competition and unfair or deceptive acts or practices within the meaning of 73 P.S. § 201-2(4), including, but not limited to, the following:

    a. causing likelihood of confusion or misunderstanding as to the source, sponsorship, approval or certification of goods or service, within the meaning of 73 P.S. § 201-2(4)(ii);

    b. representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that he does not have within the meaning of 73 P.S. § 201-2(4)(v);

    c. advertising goods or services with the intent not to sell them as advertised within the meaning of 73 P.S. § 201-3(4)(ix);

    d. making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions within the meaning of 73 P.S. § 201-2(4)(xi);

    e. engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding within the meaning of 73 P.S. § 201-2(4)(xxi).

669. The Bristol-Myers Defendants' conduct more fully described herein, is, accordingly, proscribed and declared unlawful pursuant to 73 PA. STAT. § 201-3.

670. The Bristol-Myers Defendants' conduct as more fully described herein, was willful within the meaning of 73 P.S. § 201-8.

671. The Attorney General has determined that these proceedings to enjoin the Bristol-Myers Defendants' conduct are in the public interest.

672. The Commonwealth therefore seeks the entry of a permanent injunction restraining the Bristol-Myers Defendants' unlawful conduct and mandating corrective measures pursuant to 73 P. S. § 201-4.

673. The Commonwealth also requests that the Court require the Bristol-Myers Defendants to restore to the Commonwealth and Pennsylvania Consumers monies acquired from the sale of their prescription drugs during the period of time Defendants' unlawful conduct took place, pursuant to 73 P. S. § 201-4.1.

674. In addition, and in light of the Bristol-Myers Defendants' willful and improper conduct as herein described, the Commonwealth requests that the Court award a civil penalty to the Commonwealth not exceeding:

> a. as to affected Pennsylvania Consumers under the age of sixty (60) years, $1,000.00 per violation, and

> b. as to affected Pennsylvania Consumers sixty (60) years of age or older, $3,000 per violation.

675. The Bristol-Myers Defendants are liable for their actions and the actions of their co-conspirators for each of these violations as independent unfair and deceptive acts in violation of the

151

UTPCPL, and for their course of conduct comprising an unfair and deceptive practice in violation of the UTPCPL.

676.    As a result of the Bristol-Myers Defendants' unfair and deceptive trade practices, the Commonwealth and Pennsylvania Consumers have and will continue to suffer ascertainable loss and damages in an amount to be determined at trial.

WHEREFORE, the Commonwealth, on behalf of itself and Pennsylvania Consumers, respectfully seeks the relief set forth below.

## THE J&J DEFENDANTS' SPECIFIC CONDUCT

677.    The J&J Defendants engaged in the unlawful conduct with respect to their Prescriber Dispensed Prescription Drugs, including Floxin (Ortho-McNeil), Floxin I.V., Haldol (Ortho-McNeil), Levaquin (Ortho-McNeil), Procrit (Ortho Products), Remicade (Centocor), and Viadur (Alza) and their Pharmacy Dispensed Prescription Drugs, including Aciphex (Janssen), Bicitra (Ortho-McNeil), Duragesic (Janssen), Elmiron (Ortho-McNeil), Erycette (Janssen), Flexeril (McNeil), Floxin (Ortho-McNeil), Grifulvin (Ortho), Haldol (Ortho-McNeil), Haldol Decanoate (Janssen), Monistat (McNeil), Mycelex (Alza), Pancrease (Ortho-McNeil), Parafon (Ortho-McNeil), Polycitra (Ortho-McNeil), Regranex (Ethicon), Reminyl (Janssen), Renova (Ortho-McNeil), Retin-A (Ortho-McNeil), Retin-A Micro (Janssen), Risperdal (Janssen), Spectazole (Janssen), Sporanox (Janssen), Terazol (Ortho-McNeil), Testoderm (Alza), Tolectin (Ortho-McNeil), Topamax (Ortho-McNeil), Tylenol/COD (Ortho-McNeil), Tylox (Ortho-McNeil), Ulltracet (Ortho-McNeil), Ultram (Ortho-McNeil), Urispas (Ortho McNeil), and Vascor (Jannssen).

152

## CONDUCT RESPECTING PRESCRIBER DISPENSED PRESCRIPTION DRUGS

678.    The J&J Defendants engaged in 1) the creation and promotion of spreads; 2) the provision of free goods and drug product; 3) the provision of other financial incentives; and 4) fraudulent concealment of their actions with respect to their Prescriber Dispensed Prescription Drugs.

679.    Upon information and belief, the J&J Defendants engaged in Pennsylvania in the promotion of spreads with respect to all of their Prescriber Dispensed Physician Drugs, including Floxin (Ortho-McNeil), Haldol (Ortho-McNeil), Levaquin (Ortho-McNeil), Procrit (Ortho Products), Remicade (Centocor), and Viadur (Alza).

680.    One example of the promotion of spreads by the J&J Defendants is found with respect to epoetin alfa (sold by J&J as Procrit). J&J is identified in various *Red Book* publications as one of two sources for epoetin alfa. The other source is Defendant Amgen.[1]

681.    In September 2001, the GAO reported that epoetin alfa accounted for the second highest percentage of Medicare expenditures on drugs in 1999, accounting for 9.5% of spending for prescription drugs by Medicare in 1999 and 3.4% of all Medicare allowed services. These massive and inflated expenditures are even more outrageous given that the research and development of epoetin alfa was originally underwritten by federal government grants.[2]

---

[1]      Amgen markets epoetin alfa (as Epogen) for use in the treatment of dialysis patients. The right to market epoetin alfa for all other uses is licensed to J&J.

[2]      Epogen and Procrit are based on a patented process technology developed at Columbia University with the support of grants from the NIH. Columbia licensed the technology to Amgen for Epogen and to J&J for Procrit.

682.    By way of further example, the J&J Defendants have deliberately overstated and continue to overstate the AWP for Remicade, a physician administered rheumatoid arthritis treatment. The published AWP for Remicade has continued to rise through the years. For example, the AWP for a 100 mg vial of Remicade as of November 1999 was listed at $611.33 and rose to $655.65 when listed in the 2001 edition of the *Red Book*.   During this same time period, the J&J Defendants deliberately marketed and promoted the sale of the drug to physicians based on the availability of the inflated Medicare reimbursement and the spread between actual price to physicians and reimbursement based on the inflated AWP.

683.    The J&J Defendants created promotional materials and worksheets to allow them to market the spread to physicians, including a publication accessible through the J&J Defendants' web sites entitled "Office-Based Infusion Guide" that specifically noted that, "depending on reimbursement, office-based infusion may provide a financial impact to a physician's practice." The "Financial Analysis" section of the publication included a "REMICADE® (infliximab) Financial Impact Worksheet" that enabled doctors to see, in actual dollars, how much additional revenue use of Remicade would bring to their practices.

684.    Upon information and belief, the J&J Defendants engaged in Pennsylvania in the provision of free goods and drug product and employed other financial incentives with respect to all of their Prescriber Dispensed Physician Drugs, including Floxin (Ortho-McNeil), Haldol (Ortho-McNeil), Levaquin (Ortho-McNeil), Procrit (Ortho Products), Remicade (Centocor), and Viadur (Alza).

685.    Upon information and belief, the J&J Defendants engaged in Pennsylvania in the provision of other financial incentives with respect to all of their Prescriber Dispensed Physician

154

Drugs, including Floxin (Ortho-McNeil), Haldol (Ortho-McNeil), Levaquin (Ortho-McNeil), Procrit (Ortho Products), Remicade (Centocor), and Viadur (Alza).

686.    The J&J Defendants engaged in the fraudulent concealment of their conduct set forth above in the manner described in paragraphs 97 through 102, above, and by routinely requiring their customers to keep secret the prices they were being charged for the J&J Defendants' drugs.

## CONDUCT RESPECTING PHARMACY DISPENSED PRESCRIPTION DRUGS

687.    With regard to the Pharmacy Dispensed Prescription Drugs, the J&J Defendants engaged in the following conduct.

688.    The J&J Defendants reported AWP prices to the major compendia, including the compendia relied upon by the Commonwealth and Pennsylvania businesses and consumers, which reported AWPs did not reflect actual wholesale prices.

689.    Upon information and belief, the J&J Defendants took various steps to conceal actual average wholesale selling prices by giving discounts, rebates, and other financial incentives and requiring the recipients of those financial incentives to not report and keep those incentives confidential.

690.    In addition, the J&J Defendants have increased the AWPs for their drugs in amounts which, on information belief, do not reflect discounts, rebates and other incentives the J&J Defendants provide to lower the wholesale cost of their drugs.

691.    For example, for Grifulvin V, the AWP for 500 mg, 100 size tablets was $135.48 in 1999, $140.88 in 2000, $149.05 in 2001, and $168.09 in May, 2002.

155

692.    The Commonwealth, on information and belief, asserts that the changes in AWP did not accurately account for discounts, rebates and other financial incentives which reduced the wholesale cost of Grifulvin.

693.    For the J&J Defendants' other Pharmacy Dispensed Prescription Drugs, including Aciphex, Bicitra (Ortho-McNeil), Duragesic (Janssen), Elmiron (Ortho-McNeil), Erycette (Janssen), Flexeril (McNeil), Floxin (Ortho-McNeil), Haldol (Ortho-McNeil), Haldol Decanoate (Janssen), Monistat (McNeil), Mycelex (Alza), Pancrease (Ortho-McNeil), Parafon (Ortho-McNeil), Polycitra (Ortho-McNeil), Regranex (Ethicon), Reminyl (Janssen), Renova (Ortho-McNeil), Retin-A (Ortho-McNeil), Retin-A Micro (Janssen), Risperdal (Janssen), Spectazole (Janssen), Sporanox (Janssen), Terazol (Ortho-McNeil), Testoderm (Alza), Tolectin (Ortho-McNeil), Topamax (Ortho-McNeil), Tylenol/COD (Ortho-McNeil), Tylox (Ortho-McNeil), Ulltracet (Ortho-McNeil), Ultram (Ortho-McNeil), Urispas (Ortho McNeil), and Vascor (Jannssen), the AWPs were similarly unrelated to actual wholesale prices and did not account for discounts, rebates and other financial incentives offered by the J&J Defendants which lowered wholesale costs.

694.    For the J&J Defendants' other Pharmacy Dispensed Prescription Drugs, the AWPs were similarly changed over time and those increases did not account for discounts, rebates or other financial incentives.

## COUNT XXVIII
## COMMONWEALTH v. J&J DEFENDANTS
## UNJUST ENRICHMENT

695.    The Commonwealth hereby incorporates by reference thereto the averments of the preceding and subsequent paragraphs hereof as if fully set forth herein and further alleges as follows.

696.    As set forth above, the J&J Defendants have been unjustly enriched as a result of engaging in the following practices with respect to the Commonwealth and Pennsylvania Consumers: 1) the creation and promotion of spreads; 2) the provision of free goods and drug product; 3) the provision of other financial incentives; 4) reporting AWPs that do not reflect discounts, rebates and other incentives and changing AWPs without accounting for discounts, rebates and other incentives; and 5) fraudulent concealment of their actions.

697.    The Commonwealth and Pennsylvania Consumers were purchasers, reimbursers and/or end payors of the J&J Defendants' drugs and have paid amounts far in excess of the true cost for the J&J Defendants' drugs.

698.    The J&J Defendants knew of and have appreciated and retained, or used, the benefits of the Commonwealth and Pennsylvania Consumers' purchases of their drugs at amounts far in excess of the true cost. The J&J Defendants used the spread between the AWPs and the actual selling prices of their drugs to: a) pay prescribers an incentive to prescribe and dispense their drugs; b) provide free goods and other drug products as incentives; and c) create discounts and rebates. Each of these incentives was intended to increase the market share of the J&J Defendants' drugs thereby increasing sales and profits.

699.    For those customers that purchase direct from the J&J Defendants at prices based on AWPs, the J&J Defendants' increases to AWPs directly benefit the J&J Defendants in the form of increased revenues.

700.    Based upon the J&J Defendants' conduct set forth in this complaint, it would be inequitable and unjust for the J&J Defendants to retain such benefits without payment of value.

701. The J&J Defendants will be unjustly enriched if they are permitted to retain the direct or indirect benefits they received or used resulting from the purchase of the J&J Defendants' drugs by the Commonwealth and Pennsylvania Consumers. The Commonwealth on behalf of itself and Pennsylvania Consumers seeks to recover the amounts that unjustly enriched the J&J Defendants.

702. The Commonwealth and Pennsylvania Consumers are therefore entitled to equitable relief in the form of an injunction, restitution and disgorgement, legal relief in the form of damages and any other relief the Court deems appropriate.

WHEREFORE, the Commonwealth, on behalf of itself and Pennsylvania Consumers, respectfully seeks the relief set forth below.

## XXIX
## COMMONWEALTH v. J&J DEFENDANTS
### MISREPRESENTATION/FRAUD

703. The Commonwealth hereby incorporates by reference thereto the averments of the preceding paragraphs hereof as if fully set forth herein and further alleges as follows.

704. Defendants' acts violate Pennsylvania common law proscriptions against fraudulent misrepresentation.

705. In reporting AWPs to the compendia during the relevant time period for its drugs, the J&J Defendants were making representations that the AWPs for each of these drugs represented a real and fact-based average wholesale price.

706. These representations were material to the transactions at hand in that the Commonwealth and Pennsylvania Consumers used and relied upon the AWPs as the basis for determining how much to pay and/or reimburse for the J&J Defendants' drugs.

158

707. The Commonwealth prepared analyses using AWP historical data to prepare budgets for program funding, to develop formularies and to establish program eligibility requirements for program beneficiaries.

708. As set forth more fully above, these AWPs were artificial prices, unrelated to any real or fact-based average wholesale price, created and manipulated by the J&J Defendants for the purpose of generating revenue, thus constituting false representations which the J&J Defendants knew or, in the absence of recklessness, should have known to be false.

709. Indeed, the AWP was not a calculation of any average at all but in fact was a result driven number selected exclusively by the J&J Defendants for the purpose of creating a spread for the payment of rebates and other financial incentives or to simply generate additional revenue.

710. The value of free product and other incentives given by the J&J Defendants was not reflected in the setting of the AWP.

711. The J&J Defendants knew or, in the absence of recklessness, should have known that the omission of the value of rebates, free product and other incentives in the reporting of AWP to the compendia and the artificial setting of AWP constituted false representations.

712. The J&J Defendants made these false representations with the intent of misleading the Commonwealth and Pennsylvania Consumers.

713. The Commonwealth and Pennsylvania Consumers justifiably relied upon these false misrepresentations in purchasing and/or reimbursing for the J&J Defendants' drugs in an amount and for a price based upon the AWP.

159

714.    Because Commonwealth statutes, regulations and contracts require use of AWP, as published by the compendia, in reimbursement formulas, the Commonwealth's reliance on the reported AWP was justified and reasonable.

715.    It was reasonable for Pennsylvania Consumers to rely on prices billed by their prescribers or pharmacists.

716.    As a direct result of the false representations of the J&J Defendants, as set forth above, the Commonwealth and Pennsylvania Consumers were harmed in that they were unaware of the artificial inflation of the AWP, would not have paid and/or reimbursed the artificially inflated prices for the J&J Defendants' drugs had they known of the false representations and, in fact, overpaid for the J&J Defendants' drugs because of the false representations.

WHEREFORE, the Commonwealth, on behalf of itself and the Pennsylvania Consumers, respectfully seeks the relief set forth below.

## COUNT XXX
## COMMONWEALTH v. J&J DEFENDANTS
## VIOLATION OF THE PENNSYLVANIA
## UNFAIR TRADE PRACTICE AND CONSUMER PROTECTION LAW

717.    The Commonwealth hereby incorporates by reference thereto the averments of the preceding paragraphs hereof as if fully set forth herein and further alleges as follows.

718.    The J&J Defendants have violated Pennsylvania's Unfair Trade Practice and Consumer Protection Law ("UTPCPL") by their actions more fully described below. 73 P.S. § 201-1 *et seq.*

719.    The Commonwealth is empowered to bring this action on behalf of "persons" who have purchased the J&J Defendants' prescription drugs at inflated prices and as a result, have

suffered, are suffering, and will continue to suffer irreparable harm as a result of the J&J Defendants'
actions. "Persons" include but are not limited to natural persons, corporations, trusts, partnerships,
incorporated or unincorporated associations, and any other legal entities within the meaning of 73
P.S.§ 201-2(2).

720.    The Commonwealth also has standing to bring this claim in that the Commonwealth
is both an end payor and purchaser/reimburser of the J&J Defendants' prescription drugs through
its Medicaid, PACE, PEBTF and other Commonwealth Programs. The Commonwealth performs
these functions not for its own business purposes, but rather in its representative capacity on behalf
and for the benefit of its constituents who, in turn, make use of the prescription drugs primarily for
personal, family and/or household purposes.

721.    In distributing, marketing, and selling prescription drugs to the Commonwealth and
Pennsylvania Consumers, and in otherwise engaging in the conduct more fully described herein with
respect to the above-identified drugs, the J&J Defendants are engaging in trade or commerce that
directly or indirectly harmed consumers in this Commonwealth within the meaning of 73 P.S. § 201-
2(3).

722.    Specifically, the J&J Defendants, by engaging in the practices set forth above, have:

        a.    Deceptively distributed, marketed and sold their drugs by alleging to the
              Commonwealth and the entities and consumers on whose behalf this action
              is brought that the AWPs for each of their drugs represented a real and fact-
              based price for their drugs;

        b.    Concealed from purchasers that AWP prices are exclusively set and
              controlled by drug manufacturers, while indicating that AWP represents a

real and fact-based price, thereby causing a likelihood of confusion or misunderstanding for consumers who are led to believe AWP is a real and fact-based price; and

c.      As a result of the J&J Defendants' acts in deceiving consumers that AWPs represent a real and fact-based price for their drugs, consumers who believed they were receiving a discount off AWP in fact paid inordinately high prices and/or co-payments resulting from the reporting of inflated AWPs for needed prescription drugs.

723.    The J&J Defendants violated the UTPCPL:

a.      each time the medical provider charged a patient at the inflated AWP price and benefitted from any spread between the actual wholesale cost of such drugs and the AWP;

b.      each time free samples were delivered to a medical provider with the understanding and expectation that the provider will charge the patient for that free samples;

c.      each time the medical provider charged a patient for free samples;

d.      each time an incentive was given to anyone to cause a patient to be billed at the inflated AWP;

e.      each time a patient was charged at the inflated AWP as a result of incentives given by or on behalf of the J&J Defendants;

f.      each time a request for reimbursement was made to a Commonwealth program based on an inflated AWP;

162

g.     each time an inflated AWP was published; and

h.     each time a patient and/or his or her insurer was charged based on an inflated AWP; and

i.     each time the J&J Defendants engaged in conduct actionable under the preceding counts of this Complaint and/or engaged in conduct in violation of the statutes and laws of the Commonwealth.

724.    The J&J Defendants' products reimbursed or purchased by the Commonwealth or reimbursed by Pennsylvania Consumers were used for personal, family or household use.

725.    The J&J Defendants' conduct as more fully described herein constitutes unfair methods of competition and unfair or deceptive acts or practices within the meaning of 73 P.S. § 201-2(4), including, but not limited to, the following:

a.     causing likelihood of confusion or misunderstanding as to the source, sponsorship, approval or certification of goods or service, within the meaning of 73 P.S. § 201-2(4)(ii);

b.     representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that he does not have within the meaning of 73 P.S. § 201-2(4)(v);

c.     advertising goods or services with the intent not to sell them as advertised within the meaning of 73 P.S. § 201-3(4)(ix);

163

d.     making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions within the meaning of 73 P.S. § 201-2(4)(xi);

e.     engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion of misunderstanding within the meaning of 73 P.S. § 201-2(4)(xxi).

726.    The J&J Defendants' conduct more fully described herein, is, accordingly, proscribed and unlawful pursuant to 73 PA. STAT. § 201-3.

727.    The J&J Defendants' conduct as more fully described herein, was willful within the meaning of 73 P.S. § 201-8.

728.    The Attorney General has determined that these proceedings to enjoin the J&J Defendants' conduct are in the public interest.

729.    The Commonwealth therefore seeks the entry of a permanent injunction restraining the J&J Defendants' unlawful conduct and mandating corrective measures pursuant to 73 P. S. § 201-4.

730.    The Commonwealth also requests that the Court require the J&J Defendants to restore to the Commonwealth and Pennsylvania Consumers monies acquired from the sale of their prescription drugs during the period of time Defendants' unlawful conduct took place, pursuant to 73 P. S. § 201-4.1.

731.    In addition, and in light of the J&J Defendants' willful and improper conduct as herein described, the Commonwealth requests that the Court award a civil penalty to the Commonwealth not exceeding:

164

      a.      as to affected Pennsylvania Consumers under the age of sixty (60) years, $1,000.00 per violation, and

      b.      as to affected Pennsylvania Consumers sixty (60) years of age or older, $3,000 per violation.

732.    The J&J Defendants are liable for their actions and the actions of their co-conspirators for each of these violations as independent unfair and deceptive acts in violations of the UTPCPL, and for their course of conduct comprising an unfair and deceptive practice in violation of the UTPCPL.

733.    As a result of the J&J Defendants' unfair and deceptive trade practices, the Commonwealth and Pennsylvania Consumers have and will continue to suffer ascertainable loss and damages in an amount to be determined at trial.

WHEREFORE, the Commonwealth, on behalf of itself and Pennsylvania Consumers, respectfully seeks the relief set forth below.

## THE AVENTIS DEFENDANTS' SPECIFIC CONDUCT

734.    The Aventis Defendants engaged in the unlawful scheme and conspiracy with respect to their Prescriber Dispensed Prescription Drugs, including Anzemet, Calcimar, Copaxone, Gammar-PIV, Monoclate-P, and Taxotere, and their Pharmacy Dispensed Prescription Drugs, including Allegra, Allegra-D, Amaryl, Anzemet, Arava, Azmacort, Carafate, Cardizem, Intal, Nasacort, and Trental.

### CONDUCT RESPECTING PRESCRIBER DISPENSED PRESCRIPTION DRUGS

735.    The Aventis Defendants engaged in 1) the creation and promotion of spreads; 2) the provision of free goods and drug product; 3) the provision of other financial incentives; and

fraudulent concealment of their actions with respect to their Prescriber Dispensed Prescription Drugs.

736.    On information and belief, the Aventis Defendants engaged in Pennsylvania in the promotion of spreads with respect to all of their drugs, including Calcimar, Copaxone, Gammar-PIV, Monoclate-P, and Taxotere.

737.    One example of the promotion of spreads and provision of financial incentives by the Aventis Defendants involves the drug Anzemet. An internal Aventis document describes the benefits of the spread to customers, and describes how the spread impacts marketing and sales, and also describes the rebates given as additional incentives.

738.    Upon information and belief, the Aventis Defendants engaged in Pennsylvania in the provision of free goods and drug product with respect to all of their drugs, including Calcimar, Copaxone, Gammar-PIV, Monoclate-P, and Taxotere.

739.    Upon information and belief, the Aventis Defendants engaged in Pennsylvania in the provision of other financial incentives with respect to all of their drugs, including Calcimar, Copaxone, Gammar-PIV, Monoclate-P, and Taxotere.

740.    The Aventis Defendants engaged in the fraudulent concealment of their conduct set forth above in the manner described in paragraphs 105 through 110, above.

## CONDUCT RESPECTING PHARMACY DISPENSED PRESCRIPTION DRUGS

741.    With regard to the Pharmacy Dispensed Prescription Drugs, the Aventis Defendants engaged in the following conduct.

166

742. The Aventis Defendants reported AWP prices to the major compendia, including the compendia relied upon by the Commonwealth and Pennsylvania businesses and consumers, which reported AWPs that did not reflect actual wholesale prices.

743. Upon information and belief, the Aventis Defendants took various steps to conceal actual average wholesale selling prices by giving discounts, rebates, and other financial incentives and requiring the recipients of those financial incentives to not report and keep those incentives confidential.

744. In addition, the Aventis Defendants have increased the AWPs for their drugs in amounts which, on information and belief, do not reflect discounts, rebates and other incentives the Aventis Defendants provide to lower the wholesale cost of their drugs.

745. For example, for Allegra-D, the AWP for 60-120 mg, 100-size extended release tablets was $111.18 in 1999, $115.62 in 2000, $122.56 in 2001, and $132.36 in May, 2002.

746. The Commonwealth, on information and belief, asserts that the changes in AWP did not accurately account for discounts, rebates and other financial incentives which reduced the wholesale cost of Allegra-D.

747. For the Aventis Defendants' other Pharmacy Dispensed Prescription Drugs, including Allegra, Amaryl, Anzemet, Arava, Azmacort, Carafate, Cardizem, Intal, Nasacort, and Trental, the AWPs were similarly unrelated to actual wholesale prices and did not account for discounts, rebates and other financial incentives offered by the Aventis Defendants which lowered wholesale costs.

748. For the Aventis Defendants' other Pharmacy Dispensed Prescription Drugs, the AWPs were similarly changed over time and those changes did not account for discounts, rebates or other financial incentives.

## COUNT XXXI
## COMMONWEALTH v. AVENTIS DEFENDANTS
## UNJUST ENRICHMENT

749.    The Commonwealth hereby incorporates by reference thereto the averments of the preceding and subsequent paragraphs hereof as if fully set forth herein and further alleges as follows.

750.    As set forth above, the Aventis Defendants have been unjustly enriched as a result of engaging in the following practices with respect to the Commonwealth and Pennsylvania Consumers: 1) the creation and promotion of spreads; 2) the provision of free goods and drug product; 3) the provision of other financial incentives; 4) reporting of AWPs that do not reflect discounts, rebates and other incentives without accounting for discounts, rebates and other incentives; and 5) fraudulent concealment of their actions.

751.    The Commonwealth and Pennsylvania Consumers were purchasers, reimbursers and/or end payors of the Aventis Defendants' drugs and have paid amounts far in excess of the true cost for the Aventis Defendants' drugs.

752.    The Aventis Defendants knew of and have appreciated and retained the benefits of the Commonwealth and Pennsylvania Consumers purchases of their drugs at amounts far in excess of the true cost. Aventis Defendants used the spread between the AWPs and the actual selling price of their drugs to: a) pay prescribers an incentive to prescribe and dispense their drugs; b) provide free goods and other drug products as incentives; and c) create discounts and rebates. Each of these incentives was intended to increase market share of Aventis Defendants' drugs, thereby increasing its sales and profits.

753.    For those customers that purchase direct from the Aventis Defendants at a price based on AWPs, Aventis Defendants' increases to AWPs directly benefit Aventis Defendants in the form of increased revenues.

754.    Based upon the Aventis Defendants' conduct set forth in this complaint, it would be inequitable and unjust for the Aventis Defendants to retain such benefits without payment of value.

755.    The Aventis Defendants will be unjustly enriched if they are permitted to retain the direct or indirect benefits received or used resulting from the purchase of Aventis Defendants' drugs by the Commonwealth and Pennsylvania Consumers. The Commonwealth, on behalf of itself and Pennsylvania consumers, seeks to recover the amounts that unjustly enriched Aventis Defendants.

756.    The Commonwealth and Pennsylvania Consumers are therefore entitled to equitable relief in the form of an injunction, restitution and disgorgement, legal relief in the form of damages and any other relief the Court deems appropriate.

WHEREFORE, the Commonwealth, on behalf of itself and Pennsylvania Consumers, respectfully seeks the relief set forth below.

### COUNT XXXII
### COMMONWEALTH v. AVENTIS DEFENDANTS
### MISREPRESENTATION/FRAUD

757.    The Commonwealth hereby incorporates by reference thereto the averments of the preceding paragraphs hereof as if fully set forth herein and further alleges as follows.

758.    Defendants' acts violate Pennsylvania common law proscriptions against fraudulent misrepresentation.

759.    In reporting AWPs to the compendia during the relevant time period for their drugs, the Aventis Defendants were making representations that the AWPs for each of their drugs represented a calculation of a real and fact-based average wholesale price.

760.    These representations were material to the transaction at hand in that the Commonwealth and Pennsylvania Consumers used and relied upon the AWPs as the basis for determining how much to pay and/or reimburse for the Aventis Defendants' drugs.

761.    The Commonwealth prepared analyses using AWP historical data to prepare budgets for program funding, to develop formularies and to establish program eligibility requirements for program beneficiaries.

762.    As set forth more fully above, these AWPs were artificial prices, unrelated to any real or fact-based average wholesale price, created and manipulated by the Aventis Defendants for the purpose of generating revenue, thus constituting false representations which the Aventis Defendants knew or, in the absence of recklessness, should have known to be false.

763.    The value of free product and other incentives given by the Aventis Defendants was not reflected in the setting of the AWP.

764.    Indeed, the AWP was not a calculation of any average at all but in fact was a result driven number selected exclusively by the Aventis Defendants for the purpose of creating a spread for prescriber dispensed drugs and for the payment of rebates and other financial incentives with pharmacy-dispensed drugs or to simply generate additional revenue.

765.    The Aventis Defendants knew or, in the absence of recklessness, should have known that the omission of the value of free product in the reporting of AWP to the compendia and the artificial setting of AWP constituted false representations.

170

766.    The Aventis Defendants made these false representations with the intent of misleading the Commonwealth and Pennsylvania Consumers.

767.    The Commonwealth and Pennsylvania Consumers justifiably relied upon these false misrepresentations in purchasing and/or reimbursing for the Aventis Defendants' drugs in an amount and for a price based upon the AWP.

768.    Because Commonwealth statutes, regulations and contracts require use of AWP, as published by the compendia, in reimbursement formulas, the Commonwealth's reliance on the reported AWP was justified and reasonable.

769.    It was reasonable for Pennsylvania Consumers to rely on prices billed by their prescribers or pharmacists.

770.    As a direct result of the false representations of the Aventis Defendants, as set forth above, the Commonwealth and Pennsylvania Consumers were harmed in that they were unaware of the artificial inflation of the AWP, would not have paid and/or reimbursed the artificially inflated prices for the Aventis Defendants' drugs had they known of the false representations and, in fact, overpaid for the Aventis Defendants' drugs because of the false representations.

WHEREFORE, the Commonwealth, on behalf of itself and the Pennsylvania Consumers, respectfully seeks the relief set forth below.

## COUNT XXXIII
### COMMONWEALTH v. AVENTIS DEFENDANTS
### VIOLATION OF THE PENNSYLVANIA
### UNFAIR TRADE PRACTICE AND CONSUMER PROTECTION LAW

771.    The Commonwealth hereby incorporates by reference thereto the averments of the preceding paragraphs hereof as if fully set forth herein and further alleges as follows.

171

772.    The Aventis Defendants have violated Pennsylvania's Unfair Trade Practice and
Consumer Protection Law ("UTPCPL")by their actions more fully described below. 73 P.S. § 201-1
*et seq.*

773.    The Commonwealth is empowered to bring this action on behalf of "persons" who
have purchased the Aventis Defendants' prescription drugs at inflated prices and as a result, have
suffered, are suffering, and will continue to suffer irreparable harm as a result of the Aventis
Defendants' actions. "Persons" include but are not limited to natural persons, corporations, trusts,
partnerships, incorporated or unincorporated associations, and any other legal entities within the
meaning of 73 P.S.§ 201-2(2).

774.    The Commonwealth also has standing to bring this claim in that the Commonwealth
is both an end payor and purchaser/reimburser of the Aventis Defendants' prescription drugs through
its Medicaid, PACE, PEBTF, and other Commonwealth Programs. The Commonwealth performs
these functions not for its own business purposes, but rather in its representative capacity on behalf
and for the benefit of its constituents who, in turn, make use of the prescription drugs primarily for
personal, family and/or household purposes.

775.    In distributing, marketing, and selling prescription drugs to the Commonwealth and
Pennsylvania Consumers, and in otherwise engaging in the conduct more fully described herein with
respect to the above-identified drugs, the Aventis Defendants are engaging in trade or commerce that
directly or indirectly harmed consumers in this Commonwealth within the meaning of 73 P.S. § 201-
2(3).

776.    Specifically, the Aventis Defendants, by engaging in the practices set forth above,
have:

a.    Deceptively distributed, marketed and sold their drugs by alleging to the Commonwealth and the entities and consumers on whose behalf this action is brought that the AWPs for each of their drugs represented a real and fact-based price for their drugs;

b.    concealed from purchasers that AWP prices are exclusively set and controlled by drug manufacturers, and indicating that AWP represents a real and fact-based price, thereby causing a likelihood of confusion or misunderstanding for consumers who are led to believe AWP is a real and fact-based price; and

c.    As a result of the Aventis Defendants' acts in deceiving consumers that AWPs represent a real and fact-based price for their drugs, consumers who believed they were receiving a discount off AWP in fact paid inordinately high cash prices and/or co-payments resulting from the reporting of inflated AWPs for needed prescription drugs.

777.    Aventis Defendants violated the UTPCPL:

a.    each time the medical provider charged a patient at the inflated AWP price and benefits from any spread between the actual wholesale cost of such drugs and the AWP;

b.    each time free samples were delivered to a medical provider with the understanding and expectation that the provider will charge the patient for that free samples;

c.    each time the medical provider charged a patient for free samples;

d.      each time an incentive was given to anyone to cause a patient to be billed at
the inflated AWP;

e.      each time a patient was charged at the inflated AWP as a result of incentives
given by or on Aventis Defendants' behalf;

f.      each time a request for reimbursement was made to a Commonwealth
program based on an inflated AWP;

g.      each time an inflated AWP was published;

h.      each time a patient and/or his or her insurer was charged based on an inflated
AWP; and

i.      each time Aventis Defendants engaged in conduct actionable under the
preceding counts of this Complaint and/or engaged in conduct in violation of
the statutes and laws of the Commonwealth.

778.    Aventis Defendants' products reimbursed or purchased by the Commonwealth or
purchased by Pennsylvania consumers were used for personal, family or household use.

779.    The Aventis Defendants' conduct as more fully described herein constitutes unfair
methods of competition and unfair or deceptive acts or practices within the meaning of 73 P.S. §
201-2(4), including, but not limited to, the following:

a.      causing likelihood of confusion or misunderstanding as to the source,
sponsorship, approval or certification of goods or service, within the meaning
of 73 P.S. § 201-2(4)(ii);

b.      representing that goods or services have sponsorship, approval,
characteristics, ingredients, uses, benefits or quantities that they do not have

174

or that a person has a sponsorship, approval, status, affiliation or connection that he does not have within the meaning of 73 P.S. § 201-2(4)(v);

c.      advertising goods or services with the intent not to sell them as advertised within the meaning of 73 P.S. § 201-3(4)(ix);

d.      making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions within the meaning of 73 P.S. § 201-2(4)(xi);

e.      engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding within the meaning of 73 P.S. § 201-2(4)(xxi).

780.    The Aventis Defendants' conduct more fully described herein, is, accordingly, proscribed and declared unlawful pursuant to 73 PA. STAT. § 201-3.

781.    The Aventis Defendants' conduct as more fully described herein, was willful within the meaning of 73 P.S. § 201-8.

782.    The Attorney General has determined that these proceedings to enjoin the Aventis Defendants' conduct are in the public interest.

783.    The Commonwealth therefore seeks the entry of a permanent injunction restraining the Aventis Defendants' unlawful conduct and mandating corrective measures pursuant to 73 P. S. § 201-4.

784.    The Commonwealth also requests that the Court require the Aventis Defendants to restore to the Commonwealth and Pennsylvania Consumers monies acquired from the sale of their

prescription drugs during the period of time Defendants' unlawful conduct took place, pursuant to 73 P. S. § 201-4.1.

785.    In addition, and in light of the Aventis Defendants' willful and improper conduct as herein described, the Commonwealth requests that the Court award a civil penalty to the Commonwealth not exceeding:

a.    as to affected Pennsylvania Consumers under the age of sixty (60) years, $1,000.00 per violation, and

b.    as to affected Pennsylvania Consumers sixty (60) years of age or older, $3,000 per violation.

786.    The Aventis Defendants are liable for their actions and the actions of their co-conspirators for each of these violations as independent unfair and deceptive acts in violation of the UTPCPL, and for their course of conduct comprising an unfair and deceptive practice in violation of the UTPCPL.

787.    As a result of the Aventis Defendants' unfair and deceptive trade practices, the Commonwealth and Pennsylvania Consumers have and will continue to suffer ascertainable loss and damages in an amount to be determined at trial.

WHEREFORE, the Commonwealth, on behalf of itself and Pennsylvania Consumers, respectfully seeks the relief set forth below.

## THE BAXTER DEFENDANTS' SPECIFIC CONDUCT

788.    The Baxter Defendants engaged in the unlawful conduct with respect to their Prescriber Dispensed Prescription Drugs, including Aggrastat, Bebulin, Brevibloc, Buminate, Cisplatin, Claforan, Dextrose, Dextrose/Sodium Chloride, Doxrubicin, Gammagard, Gentran,

Hemofil M, Heparin, Holoxan/Ifex, Iveegam, Lock/Injectable, Osmitrol, Recombinate, and Travasol, and their Pharmacy Dispensed Prescription Drugs, including Ativan, Gentam/NaCl, Gentamicin, Sodium Chlorise, and Vanocin.

### CONDUCT RESPECTING PRESCRIBER DISPENSED PRESCRIPTION DRUGS

789.    The Baxter Defendants engaged in 1) the creation and promotion of spreads; 2) the provision of free goods and drug product; 3) the provision of other financial incentives; and 4) fraudulent concealment of their actions with respect to their Prescriber Dispensed Prescription Drugs.

790.    Upon information and belief, the Baxter Defendants engaged in Pennsylvania in the promotion of spreads with respect to all of their Prescriber Dispensed Prescription Drugs, including Aggrastat, Bebulin, Brevibloc, Buminate, Cisplatin, Claforan, Dextrose, Dextrose/ Sodium Chloride, Doxrubicin, Gammagard, Gentran, Hemofil M, Heparin, Holoxan/Ifex, Iveegam, Lock/Injectable, Osmitrol, Recombinate, and Travasol.

791.    One example of the promotion of spreads by the Baxter Defendants involves Gammagard S/D. Aware that its competitors were marketing spreads, the Baxter Defendants stated in an internal memo that

> The deliberate manipulation of AWP or WAC prices is a problem that we need to address. The spread between acquisition cost and AWP/WAC is direct profit for customers, and is being used to increase product positioning in the market by certain manufacturers.

792.    Upon information and belief, the Baxter Defendants engaged in Pennsylvania in the provision of free goods and drug product with respect to all of their Prescriber Dispensed Prescription Drugs, including Aggrastat, Bebulin, Brevibloc, Buminate, Cisplatin, Claforan,

177

Dextrose, Dextrose Sodium Chloride, Doxrubicin, Gammagard, Gentran, Hemofil M, Heparin, Holoxan/Ifex, Iveegam, Lock/Injectable, Osmitrol, Recombinate, and Travasol.

793.    One example of Baxter's provision of free goods and drug product involves the drug Recombinate. Baxter's fraudulent use of free goods aimed at increasing market share is evidenced by an internal memorandum from a Baxter contract administrator to certain field sales managers encouraging the distribution by U.S. mail or otherwise of free product to achieve overall price reduction:

> BAXTER: "The attached notice from Quantum Headquarters was sent on April 10th to all centers regarding the reduction on Recombinate pricing. Please note that they want to continue to be invoiced at the $.81 price. They have requested that we send them free product every quarter calculated by looking at the number of units purchased in that quarter and the $.13 reduction in price . . . free product given to achieve overall price reduction."

794.    Upon information and belief, the Baxter Defendants engaged in Pennsylvania in the provision of other financial incentives with respect to all of their Prescriber Dispensed Prescription Drugs, including Aggrastat, Bebulin, Brevibloc, Buminate, Cisplatin, Claforan, Dextrose, Dextrose/Sodium Chloride, Doxrubicin, Gammagard, Gentran, Hemofil M, Heparin, Holoxan/Ifex, Iveegam, Lock/Injectable, Osmitrol, Recombinate, and Travasol.

795.    The Baxter Defendants engaged in the fraudulent concealment of their conduct set forth above in the manner set forth in paragraphs 105 through 110, above, and also by requiring purchasers of their drugs to keep secret the actual prices that the purchasers were paying for the drugs.

## CONDUCT RESPECTING PHARMACY DISPENSED PRESCRIPTION DRUGS

796.    With regard to the Pharmacy Dispensed Prescription Drugs, the Baxter Defendants engaged in the following conduct.

797.    The Baxter Defendants reported AWP prices to the major compendia, including the compendia relied upon by the Commonwealth and Pennsylvania businesses and consumers, which reported AWPs that did not reflect actual wholesale prices.

798.    Upon information and belief, the Baxter Defendants took various steps to conceal actual average wholesale selling prices by giving discounts, rebates, and other financial incentives and requiring the recipients of those financial incentives to not report and keep those incentives confidential.

799.    In addition, the Baxter Defendants have increased the AWPs for their drugs in amounts which, on information and belief, do not reflect discounts, rebates and other incentives the Baxter Defendants provide to lower the wholesale cost of its drugs.

800.    For example, for Ativan, the AWP for .5mg, 100-size tablets was $77.90 in 1999, $83.29 in 2000, $86.95 in 2001 and $89.91 in May, 2002.

801.    The Commonwealth, on information and belief, asserts that the changes in AWP did not accurately account for discounts, rebates and other financial incentives which reduced the wholesale cost of Ativan.

802.    For the Baxter Defendants's other Pharmacy Dispensed Prescription Drugs, including Gentam/NaCl, Gentamicin, Sodium Chlorise, and Vanocin, the AWPs were similarly unrelated to actual wholesale prices and did not account for discounts, rebates and other financial incentives offered by the Baxter Defendants which lowered wholesale costs.

179

803.    For the Baxter Defendants' other Pharmacy Dispensed Prescription Drugs, the AWPs were similarly changed over time and those changes did not account for discounts, rebates or other financial incentives.

## COUNT XXXIV
## COMMONWEALTH v. THE BAXTER DEFENDANTS
## UNJUST ENRICHMENT

804.    The Commonwealth hereby incorporates by reference thereto the averments of the preceding and subsequent paragraphs hereof as if fully set forth herein and further alleges as follows.

805.    As set forth above, the Baxter Defendants have been unjustly enriched as a result of engaging in the following practices with respect to the Commonwealth and Pennsylvania Consumers: 1) the creation and promotion of spreads; 2) the provision of free goods and drug product; 3) the provision of other financial incentives; 4) reporting of AWPs that do not reflect discounts, rebates and other incentives and increasing of AWPs without accounting for discounts, rebates and other incentives; and 5) fraudulent concealment of their actions.

806.    The Commonwealth and Pennsylvania Consumers were purchasers, reimbursers and/or end payors of the Baxter Defendants' drugs and have paid amounts far in excess of the true cost for the Baxter Defendants' drugs.

807.    The Baxter Defendants knew of and has appreciated and retained, or used, the benefits of the Commonwealth and Pennsylvania Consumers' purchases of their drugs at amounts far in excess of the true cost. The Baxter Defendants used the spread between the AWPs and the actual selling prices of its drugs to: a) pay prescribers an incentive to prescribe and dispense their drugs; b) provide free goods and other drug products as incentives; and c) create discounts and

180

rebates. Each of these incentives was intended to increase the market share of the Baxter Defendants' drugs thereby increasing their sales and profits.

808.    For those customers that purchase direct from the Baxter Defendants at a price based on AWPs, the Baxter Defendants' increases to AWPs directly benefit the Baxter Defendants in the form of increased revenues.

809.    Based upon the Baxter Defendants' conduct set forth in this complaint, it would be inequitable and unjust for the Baxter Defendants to retain such benefits without payment of value.

810.    The Baxter Defendants will be unjustly enriched if they are permitted to retain the direct or indirect benefits received or used resulting from the purchase of the Baxter Defendants' drugs by the Commonwealth and Pennsylvania Consumers. The Commonwealth on behalf of itself and Pennsylvania Consumers seeks to recover the amounts that unjustly enriched the Baxter Defendants.

811.    The Commonwealth and Pennsylvania Consumers are therefore entitled to equitable relief in the form of an injunction, restitution and disgorgement, legal relief in the form of damages and any other relief the Court deems appropriate.

WHEREFORE, the Commonwealth, on behalf of itself and Pennsylvania Consumers, respectfully seeks the relief set forth below.

**COUNT XXXV**
**COMMONWEALTH v. THE BAXTER DEFENDANTS**
**MISREPRESENTATION/FRAUD**

812.    The Commonwealth hereby incorporates by reference thereto the averments of the preceding paragraphs hereof as if fully set forth herein and further alleges as follows.

181

813. The Baxter Defendants' acts violate Pennsylvania common law proscriptions against fraudulent misrepresentation.

814. In reporting AWPs to the compendia during the relevant time period for their drugs, the Baxter Defendants were making representations that the AWPs for each of their drugs represented a real and fact-based average wholesale price.

815. These representations were material to the transactions at hand in that the Commonwealth and Pennsylvania Consumers used and relied upon the AWPs as the basis for determining how much to pay and/or reimburse for the Baxter Defendants' drugs.

816. The Commonwealth prepared analyses using AWP historical data to prepare budgets for program funding, to develop formularies and to establish program eligibility requirements for program beneficiaries.

817. As set forth more fully above, these AWPs were artificial prices, unrelated to any real or fact-based average wholesale price, created and manipulated by the Baxter Defendants for the purpose of generating revenue, thus constituting false representations which the Baxter Defendants knew or, in the absence of recklessness, should have known to be false.

818. Indeed, the AWP was not a calculation of any average at all but in fact was a result driven number selected exclusively by the Baxter Defendants for the purpose of creating a spread and for the payment of rebates and other financial incentives or to simply generate additional revenue.

819. The value of rebates, free product and other incentives given by the Baxter Defendants was not reflected in the setting of the AWP.

820. The Baxter Defendants knew or, in the absence of recklessness should have known, that the omission of the value of rebates, free product and other incentives in the reporting of AWP to the compendia and the artificial setting of AWP constituted false representations.

821. The Baxter Defendants made these false representations with the intent of misleading the Commonwealth and Pennsylvania Consumers.

822. The Commonwealth and Pennsylvania Consumers justifiably relied upon these false misrepresentations in purchasing and/or reimbursing for the Baxter Defendants' drugs in an amount and for a price based upon the AWP.

823. Because Commonwealth statutes, regulations and contracts require use of AWP, as published by the compendia, in reimbursement formulas, the Commonwealth's reliance on the reported AWP was justified and reasonable.

824. It was reasonable for Pennsylvania Consumers to rely on prices billed by their prescribers or pharmacists.

825. As a direct result of the false representations of the Baxter Defendants, as set forth above, the Commonwealth and Pennsylvania Consumers were harmed in that they were unaware of the artificial inflation of the AWP, would not have paid and/or reimbursed the artificially inflated prices for the Baxter Defendants' drugs had they known of the false representations and, in fact, overpaid for the Baxter Defendants' drugs because of the false representations.

WHEREFORE, the Commonwealth, on behalf of itself and the Pennsylvania Consumers, respectfully seeks the relief set forth below.

183

## COUNT XXXVI
## COMMONWEALTH v. THE BAXTER DEFENDANTS
## VIOLATION OF THE PENNSYLVANIA
## UNFAIR TRADE PRACTICE AND CONSUMER PROTECTION LAW

826.   The Commonwealth hereby incorporates by reference thereto the averments of the preceding paragraphs hereof as if fully set forth herein and further alleges as follows.

827.   The Baxter Defendants have violated Pennsylvania's Unfair Trade Practice and Consumer Protection Law ("UTPCPL")by its actions more fully described below. 73 P.S. § 201-1 et seq.

828.   The Commonwealth is empowered to bring this action on behalf of "persons" who have purchased the Baxter Defendants' prescription drugs at inflated prices and as a result, have suffered, are suffering, and will continue to suffer irreparable harm as a result of the Baxter Defendants' actions. "Persons" include but are not limited to natural persons, corporations, trusts, partnerships, incorporated or unincorporated associations, and any other legal entities within the meaning of 73 P.S.§ 201-2(2).

829.   The Commonwealth also has standing to bring this claim in that the Commonwealth is both an end payor and purchaser/reimburser of the Baxter Defendants' prescription drugs through its Medicaid, PACE, PEBTF and other Commonwealth Programs. The Commonwealth performs these functions not for its own business purposes, but rather in its representative capacity on behalf and for the benefit of its constituents who, in turn, make use of the prescription drugs primarily for personal, family and/or household purposes.

830.   In distributing, marketing, and selling prescription drugs to the Commonwealth and Pennsylvania Consumers, and in otherwise engaging in the conduct more fully described herein with

184

respect to the above-identified drugs, the Baxter Defendants are engaging in trade or commerce that directly or indirectly harmed consumers in this Commonwealth within the meaning of 73 P.S. § 201-2(3).

831.    Specifically, the Baxter Defendants, by engaging in the practices set forth above, have:

a.    Deceptively distributed, marketed and sold their drugs by alleging to the Commonwealth and the entities and consumers on whose behalf this action is brought that the AWPs for each of their drugs represented a real and fact-based price for its drugs;

b.    Concealed from purchasers that AWP prices are exclusively set and controlled by drug manufacturers, while indicating that AWP represents a real and fact-based price, thereby causing a likelihood of confusion or misunderstanding for consumers who are led to believe AWP is a real and fact-based price; and

c.    As a result of the Baxter Defendants' acts in deceiving consumers that AWPs represent a real and fact-based price for their drugs, consumers who believed they were receiving a discount off AWP in fact paid inordinately high cash prices and/or co-payments resulting from the reporting of inflated AWPs for needed prescription drugs.

832.    The Baxter Defendants violated the UTPCPL:

185

a.   each time the medical provider charged a patient at the inflated AWP price and benefits from any spread between the actual wholesale cost of such drugs and the AWP;

b.   each time free samples were delivered to a medical provider with the understanding and expectation that the provider will charge the patient for that free samples;

c.   each time the medical provider charged a patient for free samples;

d.   each time an incentive was given to anyone to cause a patient to be billed at the inflated AWP;

e.   each time a patient was charged at the inflated AWP as a result of incentives given by or on The Baxter Defendants' behalf;

f.   each time a request for reimbursement was made to a Commonwealth program based on an inflated AWP;

g.   each time an inflated AWP was published;

h.   each time a patient and/or his or her insurer was charged based on an inflated AWP; and

i.   each time the Baxter Defendants engaged in conduct actionable under the preceding counts of this Complaint and/or engaged in conduct in violation of the statutes and laws of the Commonwealth.

833.   The Baxter Defendants' products reimbursed or purchased by the Commonwealth or purchased by Pennsylvania Consumers were used for personal, family, or household use.

186

834.    The Baxter Defendants' conduct as more fully described herein constitutes unfair methods of competition and unfair or deceptive acts or practices within the meaning of 73 P.S. § 201-2(4), including, but not limited to, the following:

>    a.    causing likelihood of confusion or misunderstanding as to the source, sponsorship, approval or certification of goods or service, within the meaning of 73 P.S. § 201-2(4)(ii);

>    b.    representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that he does not have within the meaning of 73 P.S. § 201-2(4)(v);

>    c.    advertising goods or services with the intent not to sell them as advertised within the meaning of 73 P.S. § 201-3(4)(ix);

>    d.    making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions within the meaning of 73 P.S. § 201-2(4)(xi);

>    e.    engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding within the meaning of 73 P.S. § 201-2(4)(xxi).

835.    The Baxter Defendants' conduct more fully described herein, is, accordingly, proscribed and unlawful under 73 PA. STAT. § 201-3.

836.    The Baxter Defendants' conduct as more fully described herein, was willful within the meaning of 73 P.S. § 201-8.

187

837.    The Attorney General has determined that these proceedings to enjoin the Baxter Defendants' conduct are in the public interest.

838.    The Commonwealth therefore seeks the entry of a permanent injunction restraining the Baxter Defendants' unlawful conduct and mandating corrective measures pursuant to 73 P. S. § 201-4.

839.    The Commonwealth also requests that the Court require the Baxter Defendants to restore to the Commonwealth and Pennsylvania Consumers monies acquired from the sale of its prescription drugs during the period of time their unlawful conduct took place, pursuant to 73 P. S. § 201-4.1.

840.    In addition, and in light of the Baxter Defendants' willful and improper conduct as herein described, the Commonwealth requests that the Court award a civil penalty to the Commonwealth not exceeding:

   a.    as to affected Pennsylvania Consumers under the age of sixty (60) years, $1,000.00 per violation, and

   b.    as to affected Pennsylvania Consumers sixty (60) years of age or older, $3,000 per violation.

841.    The Baxter Defendants are liable for their actions and the actions of their co-conspirators for each of these violations as independent unfair and deceptive acts in violation of the UTPCPL, and for their course of conduct comprising an unfair and deceptive practice in violation of the UTPCPL.

842. As a result of the Baxter Defendants' unfair and deceptive trade practices, the Commonwealth and Pennsylvania Consumers have and will continue to suffer ascertainable loss and damages in an amount to be determined at trial.

WHEREFORE, the Commonwealth, on behalf of itself and Pennsylvania Consumers, respectfully seeks the relief set forth below.

## THE BOEHRINGER DEFENDANTS' SPECIFIC CONDUCT

843. The Boehringer Defendants engaged in the unlawful scheme and conspiracy with respect to their Prescriber Dispensed Prescription Drugs, including Amikacin (Bedford), Clonidine (as Catapres, Boehringer Pharmaceuticals), Cytarabine (Bedford), Doxorubicin (as Adriamycin, Bedford), Etoposide (Bedford), Leucovorin (Roxane, Bedford), Methotrexate (Roxane, Bedford), Mitomycin (Bedford), Vinblastine (Bedford), and Vinblastine Sulfate (Bedford), and their Pharmacy Dispensed Prescription Drugs, including Acyclovir (Roxane, Bedford), Albuterol (Boehringer Pharmaceuticals), Combivent (Boehringer Pharmaceuticals), Ipratropium Bromide (as Atroven, Boehringer Pharmaceuticals), Leucovorin (Roxane, Bedford), Metaproterenol Sulfate (as Alupent, Boehringer Pharmaceuticals), Nevirapine (as Viramune, Boehringer Pharmaceuticals), and Tamsulosin (as Flomax, Boehringer Pharmaceuticals).

## CONDUCT RESPECTING PRESCRIBER DISPENSED PRESCRIPTION DRUGS

844. The Boehringer Defendants engaged in 1) the creation and promotion of spreads; 2) the provision of free goods and drug product; 3) the provision of other financial incentives; and fraudulent concealment of their actions with respect to their Prescriber Dispensed Prescription Drugs.

845.     Upon information and belief, the Boehringer Defendants engaged in Pennsylvania in the promotion of spreads with respect to all of their Prescriber Dispensed Prescription Drugs, including Amikacin (Bedford), Clonidine (as Catapres, Boehringer Pharmaceuticals), Cytarabine (Bedford), Doxorubicin (as Adriamycin, Bedford), Etoposide (Bedford), Leucovorin (Roxane, Bedford), Methotrexate (Roxane, Bedford), Mitomycin (Bedford), Vinblastine (Bedford), and Vinblastine Sulfate (Bedford).

846.     The Department of Health and Human Services and the Department of Justice have documented fraudulently inflated AWPs and spreads on the Boehringer Defendants' Prescriber Dispensed Prescription Drug products. For 2001 DHHS and DOJ calculated the following spreads between AWP and actual wholesale prices: Amikacin, $372.17 (570%); Mitomycin, $76.22 (147%); Cytarabine, $58.95 (1,661%); Doxorubicin, $806.23 (577%); Etoposide, $101.55 (1,202%); Leucovorin, $181.64 (6,581%); Methotrexate, $66.17 (2,516%); and, Vinblastine Sulfate, $204.31 (2,495%).

847.     Upon information and belief, the Boehringer Defendants engaged in Pennsylvania in the provision of free goods and drug product and the provision of other financial incentives such as rebates with respect to all of their Prescriber Dispensed Prescription Drugs, including Amikacin (Bedford), Clonidine (as Catapres, Boehringer Pharmaceuticals), Cytarabine (Bedford), Doxorubicin (as Adriamycin, Bedford), Etoposide (Bedford), Leucovorin (Roxane, Bedford), Methotrexate (Roxane, Bedford), Mitomycin (Bedford), Vinblastine (Bedford), and Vinblastine Sulfate (Bedford).

848.     The Boehringer Defendants engaged in the fraudulent concealment of their conduct set forth above in the manner described in paragraphs 105 through 110 above.

190

849. The Boehringer Defendants' fraudulent concealment is further evidenced by their pricing mechanisms. The Boehringer Defendants have stated that they did not employ AWPs based on Medicare reimbursement rates, but rather Hospital List Prices, that they represented as purported suggested retail prices. The Boehringer Defendants further represented that they considered AWPs to reflect average wholesale prices, as those words are ordinarily defined. In fact, the Boehringer Defendants have routinely signed product listing verifications of reporting compendia such as *Red Book* that have listed the Hospital List Prices provided as the AWPs for those drugs. Further, these defendants in communicating with the compendia and their own customers refer to the Hospital List Prices as AWPs for their drug products.

## CONDUCT RESPECTING PHARMACY DISPENSED PRESCRIPTION DRUGS

850. With regard to the Pharmacy Dispensed Prescription Drugs, the Boehringer Defendants engaged in the following conduct.

851. The Boehringer Defendants reported AWP prices to the major compendia, including the compendia relied upon by the Commonwealth and Pennsylvania businesses and consumers, which reported AWPs that did not reflect actual wholesale prices.

852. Upon information and belief, the Boehringer Defendants took various steps to conceal actual average wholesale selling prices by giving discounts, rebates, and other financial incentives and requiring the recipients of those financial incentives to not report and keep those incentives confidential.

853. In addition, the Boehringer Defendants have increased the AWPs for their drugs in amounts which, on information and belief, do not reflect discounts, rebates and other incentives the Boehringer Defendants provide to lower the wholesale cost of their drugs.

191

854.    For example, for Nevirapine (as Viramune), the AWP for 200 mg, 60-size tablets was $278.64 in 1999, $292.30 in 2000, $318.86 in 2001 and $336.08 in May, 2002.

855.    The Commonwealth, on information and belief, asserts that the changes in AWP did not accurately account for discounts, rebates and other financial incentives which reduced the wholesale cost of Nevirapine (as Viramune).

856.    For the Boehringer Defendants' other Pharmacy Dispensed Prescription Drugs, including Acyclovir (Roxane, Bedford), Albuterol (Boehringer Pharmaceuticals), Combivent (Boehringer Pharmaceuticals), Ipratropium Bromide (as Atroven, Boehringer Pharmaceuticals), Leucovorin (Roxane, Bedford), Metaproterenol Sulfate (as Alupent, Boehringer Pharmaceuticals), and Tamsulosin (as Flomax, Boehringer Pharmaceuticals), the AWPs were similarly unrelated to actual wholesale prices and did not account for discounts, rebates and other financial incentives offered by the Boehringer Defendants which lowered wholesale costs.

857.    For the Boehringer Defendants' other Pharmacy Dispensed Prescription Drugs, the AWPs were similarly changed over time and those changes did not account for discounts, rebates or other financial incentives.

## COUNT XXXVII
## COMMONWEALTH v. BOEHRINGER DEFENDANTS
### UNJUST ENRICHMENT

858.    The Commonwealth hereby incorporates by reference thereto the averments of the preceding and subsequent paragraphs hereof as if fully set forth herein and further alleges as follows.

859.    As set forth above, the Boehringer Defendants have been unjustly enriched as a result of engaging in the following practices with respect to the Commonwealth and Pennsylvania Consumers: 1) the creation and promotion of spreads; 2) the provision of free goods and drug

192

product; 3) the provision of other financial incentives; 4) reporting of AWPs that do not reflect discounts, rebates and other incentives and increasing of AWPs without accounting for discounts, rebates and other incentives; and 5) fraudulent concealment of their actions.

860.    The Commonwealth and Pennsylvania Consumers were purchasers, reimbursers and/or end payors of the Boehringer Defendants' drugs and have paid amounts far in excess of the true cost for the Boehringer Defendants' drugs.

861.    The Boehringer Defendants knew of and have appreciated and retained the benefits of the Commonwealth and Pennsylvania Consumers purchases of their drugs at amounts far in excess of the true cost. Boehringer Defendants used the spread between the AWPs and the actual selling prices of its drugs to: a) pay prescribers an incentive to prescribe and dispense its drugs; b) provide free goods and other drug products as incentives; and c) create discounts and rebates. Each of these incentives was intended to increase the market share of Boehringer Defendants' drugs thereby increasing its sales and profits.

862.    For those customers that purchase direct from Boehringer Defendants at a price based on AWPs, Boehringer Defendants' increases to AWPs directly benefit Boehringer in the form of increased revenues.

863.    Based upon the Boehringer Defendants' conduct set forth in this complaint, it would be inequitable and unjust for the Boehringer Defendants to retain such benefits without payment of value.

864.    The Boehringer Defendants will be unjustly enriched if they are permitted to retain the direct or indirect benefits received or used resulting from the purchase of Boehringer Defendants' drugs by the Commonwealth and Pennsylvania Consumers. The Commonwealth, on behalf of itself

193

and Pennsylvania Consumers, seeks to recover the amounts that unjustly enriched Boehringer
Defendants.

865.    The Commonwealth and Pennsylvania Consumers are therefore entitled to equitable
relief in the form of an injunction, restitution and disgorgement, legal relief in the form of damages
and any other relief the Court deems appropriate.

WHEREFORE, the Commonwealth, on behalf of itself and Pennsylvania Consumers,
respectfully seeks the relief set forth below.

**COUNT XXXVIII**
**COMMONWEALTH v. BOEHRINGER DEFENDANTS**
**MISREPRESENTATION/FRAUD**

866.    The Commonwealth hereby incorporates by reference thereto the averments of the
preceding paragraphs hereof as if fully set forth herein and further alleges as follows.

867.    Defendants' acts violate Pennsylvania common law proscriptions against fraudulent
misrepresentation.

868.    In reporting AWPs to the compendia during the relevant time period  for their drugs,
the Boehringer Defendants were making representations that the AWPs for each of their drugs
represented a real and fact-based average wholesale price.

869.    These representations were material to the transaction at hand in that the
Commonwealth and Pennsylvania Consumers used and relied upon the AWPs as the basis for
determining how much to pay and/or reimburse for the Boehringer Defendants' drugs.

870.    The Commonwealth prepared analyses using AWP historical data to prepare budgets
for program funding, to develop formularies and to establish program eligibility requirements for
program beneficiaries.

194

871.    As set forth more fully above, these AWPs were artificial prices, unrelated to any real or fact-based average wholesale price, created and manipulated by the Boehringer Defendants for the purpose of generating revenue, thus constituting false representations which the Boehringer Defendants knew or, in the absence of recklessness, should have known to be false.

872.    Indeed, the AWP was not a calculation of any average at all but in fact was a result driven number selected exclusively by Boehringer Defendants for the purpose of creating a spread and for the payment of rebates and other financial incentives or to simply generate additional revenue.

873.    The value of free product and other incentives given by the Boehringer Defendants was not reflected in the setting of the AWP.

874.    The Boehringer Defendants knew or, in the absence of recklessness, should have known that the omission of the value of free product in the reporting of AWP to the compendia and the artificial setting of AWP constituted false representations.

875.    The Boehringer Defendants made these false representations with the intent of misleading the Commonwealth and Pennsylvania Consumers.

876.    The Commonwealth and Pennsylvania Consumers justifiably relied upon these false misrepresentations in purchasing and/or reimbursing for the Boehringer Defendants' drugs in an amount and for a price based upon the AWP.

877.    Because Commonwealth statutes, regulations and contracts require use of AWP, as published by the compendia, in reimbursement formulas, the Commonwealth's reliance on the reported AWP was justified and reasonable.

195

878. It was reasonable for Pennsylvania Consumers to rely on prices billed by their prescribers or pharmacists.

879. As a direct result of the false representations of the Boehringer Defendants, as set forth above, the Commonwealth and Pennsylvania Consumers were harmed in that they were unaware of the artificial inflation of the AWP, would not have paid and/or reimbursed the artificially inflated prices for the Boehringer Defendants' drugs had they known of the false representations and, in fact, overpaid for the Boehringer Defendants' drugs because of the false representations.

WHEREFORE, the Commonwealth, on behalf of itself and the Pennsylvania Consumers, respectfully seeks the relief set forth below.

### XXXIX
### COMMONWEALTH v. BOEHRINGER DEFENDANTS
### VIOLATION OF THE PENNSYLVANIA
### UNFAIR TRADE PRACTICE AND CONSUMER PROTECTION LAW

880. The Commonwealth hereby incorporates by reference thereto the averments of the preceding paragraphs hereof as if fully set forth herein and further alleges as follows.

881. The Boehringer Defendants have violated Pennsylvania's Unfair Trade Practice and Consumer Protection Law ("UTPCPL")by their actions more fully described below. 73 P.S. § 201-1 *et seq.*

882. The Commonwealth is empowered to bring this action on behalf of "persons" who have purchased the Boehringer Defendants' prescription drugs at inflated prices and as a result, have suffered, are suffering, and will continue to suffer irreparable harm as a result of the Boehringer Defendants' action. "Persons" include but are not limited to natural persons, corporations, trusts,

196

partnerships, incorporated or unincorporated associations, and any other legal entities within the meaning of 73 P.S.§ 201-2(2).

883.    The Commonwealth also has standing to bring this claim in that the Commonwealth is both an end payor and purchaser/reimburser of the Boehringer Defendants' prescription drugs through its Medicaid, PACE, PEBTF and other Commonwealth Programs. The Commonwealth performs these functions not for its own business purposes, but rather in its representative capacity on behalf and for the benefit of its constituents who, in turn, make use of the prescription drugs primarily for personal, family and/or household purposes.

884.    In distributing, marketing, and selling prescription drugs to the Commonwealth and Pennsylvania Consumers, and in otherwise engaging in the conduct more fully described herein with respect to the above-identified drugs, the Boehringer Defendants are engaging in trade or commerce that directly or indirectly harmed consumers in this Commonwealth within the meaning of 73 P.S. § 201-2(3).

885.    Specifically, the Boehringer Defendants, by engaging in the practices set forth above, have:

        a.      Deceptively distributed, marketed and sold their drugs by alleging to the Commonwealth and the entities and consumers on whose behalf this action is brought that the AWPs for each of their drugs represented a real and fact-based price for their drugs;

        b.      concealed from purchasers that AWP prices are exclusively set and controlled by drug manufacturers, and indicating that AWP represents a real and fact-

197

based price, thereby causing a likelihood of confusion or misunderstanding for consumers who are led to believe AWP is a real and fact-based price; and

c.     As a result of the Boehringer Defendants' acts in deceiving consumers that AWPs represent a real and fact-based price for their drugs, consumers who believed they were receiving a discount off AWP in fact paid inordinately high prices and/or co-payments resulting from the reporting of inflated AWPs for needed prescription drugs.

886.   Boehringer Defendants violated the UTPCPL:

a.     each time the medical provider charged a patient at the inflated AWP price and benefits from any spread between the actual wholesale cost of such drugs and the AWP;

b.     each time free samples were delivered to a medical provider with the understanding and expectation that the provider will charge the patient for that free samples;

c.     each time the medical provider charged a patient for free samples;

d.     each time an incentive was given to anyone to cause a patient to be billed at the inflated AWP;

e.     each time a patient was charged at the inflated AWP as a result of incentives given by or on Boehringer Defendants' behalf;

f.     each time a request for reimbursement was made to a Commonwealth program based on an inflated AWP;

g.     each time an inflated AWP was published;

> h.   each time a patient and/or his or her insurer was charged based on an inflated
>      AWP; and
>
> i.   each time Boehringer Defendants engaged in conduct actionable under the
>      preceding counts of this Complaint and/or engaged in conduct in violation of
>      the statutes and laws of the Commonwealth.

887.   The Boehringer Defendants' products reimbursed or purchased by the Commonwealth or purchased by Pennsylvania Consumers were used for personal, family or household use.

888.   The Boehringer Defendants' conduct as more fully described herein constitutes unfair methods of competition and unfair or deceptive acts or practices within the meaning of 73 P.S. § 201-2(4), including, but not limited to, the following:

> a.   causing likelihood of confusion or misunderstanding as to the source,
>      sponsorship, approval or certification of goods or service, within the meaning
>      of 73 P.S. § 201-2(4)(ii);
>
> b.   representing that goods or services have sponsorship, approval,
>      characteristics, ingredients, uses, benefits or quantities that they do not have
>      or that a person has a sponsorship, approval, status, affiliation or connection
>      that he does not have within the meaning of 73 P.S. § 201-2(4)(v);
>
> c.   advertising goods or services with the intent not to sell them as advertised
>      within the meaning of 73 P.S. § 201-3(4)(ix);
>
> d.   making false or misleading statements of fact concerning the reasons for,
>      existence of, or amounts of price reductions within the meaning of 73 P.S. §
>      201-2(4)(xi);

   e. engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding within the meaning of 73 P.S. § 201-2(4)(xxi).

889. The Boehringer Defendants' conduct more fully described herein, is, accordingly, proscribed and declared unlawful pursuant to 73 PA. STAT. § 201-3.

890. The Boehringer Defendants' conduct as more fully described herein, was willful within the meaning of 73 P.S. § 201-8.

891. The Attorney General has determined that these proceedings to enjoin the Boehringer Defendants' conduct are in the public interest.

892. The Commonwealth therefore seeks the entry of a permanent injunction restraining the Boehringer Defendants' unlawful conduct and mandating corrective measures pursuant to 73 P. S. § 201-4.

893. The Commonwealth also requests that the Court require the Boehringer Defendants to restore to the Commonwealth and Pennsylvania Consumers monies acquired from the sale of their prescription drugs during the period of time Defendants' unlawful conduct took place, pursuant to 73 P. S. § 201-4.1.

894. In addition, and in light of the Boehringer Defendants' willful and improper conduct as herein described, the Commonwealth requests that the Court award a civil penalty to the Commonwealth not exceeding:

   a. as to affected Pennsylvania Consumers under the age of sixty (60) years, $1,000.00 per violation, and

200

b.      as to affected Pennsylvania Consumers sixty (60) years of age or older, $3,000 per violation.

895.    The Boehringer Defendants are liable for their actions and the actions of their co-conspirators for each of these violations as independent unfair and deceptive acts in violation of the UTPCPL, and for their course of conduct comprising an unfair and deceptive practice in violation of the UTPCPL.

896.    As a result of the Boehringer Defendants' unfair and deceptive trade practices, the Commonwealth and Pennsylvania Consumers have and will continue to suffer ascertainable loss and damages in an amount to be determined at trial.

WHEREFORE, the Commonwealth, on behalf of itself and Pennsylvania Consumers, respectfully seeks the relief set forth below.

## DEY'S SPECIFIC CONDUCT

897.    Dey engaged in the unlawful conduct with respect to its Pharmacy Dispensed Prescription Drugs, including AccuNeb, Acetycysteine, Albuterol, Albuterol Sulfate, Cromolyn Sodium, Ipratropium Bromide, and Metaproteren Sulfate.

### CONDUCT RESPECTING PHARMACY DISPENSED PRESCRIPTION DRUGS

898.    Dey reported AWP prices to the major compendia, including the compendia relied upon by the Commonwealth and Pennsylvania businesses and consumers, which reported AWPs did not reflect actual wholesale prices, and it promoted the spreads with respect to all its drugs.

899.    An example of Dey's recognition of the significance of spreads and its competing based on promotion of spreads is found in internal worksheets filled out by Dey in preparation for bids to potential customers. In one such work sheet, Dey wrote that the customer was looking for

201

pricing at AWP-40% or better and had not switched to the Dey product line due to the spread. In another case, Dey acknowledged that where certain of its generic products were competing with branded products customer perception was that pricing for the generic should be at AWP-60%.

900.    As another example, in a 1995 pricing proposal to McKesson Drug Company, one of the country's largest wholesalers, Dey listed the AWP and wholesale acquisition cost (WAC) for each of the included drugs, but also listed a "Suggested Sell Price" below WAC, the "% Discount from WAC," and a "% Spread," with spreads for its products ranging from 45% to 278%.

≑  901.    Investigations by state and federal law enforcement authorities have revealed that Dey's spread for Albuterol Sulfate, a drug that constituted 37% of Dey's income in 1998, drastically increased between 1992 and 1998. In 1992, Dey's *Red Book* AWP for Albuterol Sulfate (.083% concentration, 3 ml) was $32.30. McKesson Drug Company's wholesale price for the drug was $25.45 (a spread of $6.85 or 27%). By 1998, Dey's *Red Book* AWP for the same concentration and dose had declined slightly, to $30.25, while the wholesale price had decreased to $10.00 (a spread of $20.25 or 202%).

902.    Upon information and belief, Dey engaged in Pennsylvania in the provision of other financial incentives with respect to all of its drugs, including AccuNeb, Acetylcysteine, Albuterol or Albuterol Sulfate, Cromolyn Sodium, Ipratropium Bromide, and Metaproteren Sulfate.

903.    For example, in an announcement of a special incentive program to its customers to promote purchase of its Ipratropium Bromide Inhalation solution, Dey sent its customers an offer sheet titled "Profitability Enhancement for You" in which it offered free goods of either a Cromolyn Sodium Inhalation Solution at 1 times the rebate amount or Ipratropium Bromide Inhalation Solution at 1.5 times the rebate amount for Cromolyn.

202

904.    Upon information and belief, Dey took various steps to conceal actual average wholesale selling prices by giving discounts, rebates, and other financial incentives and requiring the recipients of those financial incentives to not report and keep those incentives confidential.

905.    An example of Dey's efforts to conceal the existence of spreads from end payors and actual wholesale prices of its drugs, is found in a handwritten memorandum to Dey's pricing committee discussing potential pricing with a customer:

> I met with IPC to discuss our contract offer (illegible)... Tom Konnelly (IPC) said he wanted to keep net pricing hidden from 3rd parties by increasing in the purchase price on our offer by 25%. IPC then requires a 25% rebate back to IPC... I have remarked the pricing. If this offer is accepted, the higher price will go into McKesson as a chargeback contract. Dey will then rebate IPC 25% on contract purchases on a quarterly basis....

906.    The Commonwealth, on information and belief, asserts that the changes in AWP in Dey's drugs did not accurately account for discounts, rebates and other financial incentives which reduced the wholesale costs of Albuterol Sulfate.

907.    For Dey's other Pharmacy Dispensed Prescription Drugs, the AWPs were similarly unrelated to actual wholesale prices and did not account for discounts, rebates and other financial incentives offered by Dey which lowered wholesale costs.

908.    For Dey's other Pharmacy Dispensed Prescription Drugs, the AWPs were similarly changed over time and those changes did not account for discounts, rebates or other financial incentives.

## COUNT XL
## COMMONWEALTH v. DEY
## UNJUST ENRICHMENT

909.    The Commonwealth hereby incorporates by reference thereto the averments of the preceding and subsequent paragraphs hereof as if fully set forth herein and further alleges as follows.

910.    As set forth above, Dey has been unjustly enriched as a result of engaging in the following practices with respect to the Commonwealth and Pennsylvania Consumers: 1) the creation and promotion of spreads; 2) the provision of free goods and drug product; 3) the provision of other financial incentives; 4) reporting of AWPs that do not reflect discounts, rebates and other incentives and increasing of AWPs without accounting for discounts, rebates and other incentives; and 5) fraudulent concealment of its actions.

911.    The Commonwealth and Pennsylvania Consumers were purchasers, reimbursers and/or end payors of Dey's drugs and have paid amounts far in excess of the true cost for Dey's drugs.

912.    Dey knew of and has appreciated and retained, or used, the benefits of the Commonwealth and Pennsylvania Consumers' purchases of its drugs at amounts far in excess of the true cost.  Dey used the spread between the AWPs and the actual selling prices of its drugs to:  a) pay prescribers an incentive to prescribe and dispense its drugs; b) provide free goods and other drug products as incentives; and c) create discounts and rebates.  Each of these incentives was intended to increase the market share of Dey's drugs thereby increasing its sales and profits.

913.    For those customers that purchase direct from Dey at a price based on AWPs, Dey's increases to AWPs directly benefit Dey in the form of increased revenues.

204

914.   Based upon Dey's conduct set forth in this complaint, it would be inequitable and unjust for Dey to retain such benefits without payment of value.

915.   Dey will be unjustly enriched if it is permitted to retain the direct or indirect benefits received or used resulting from the purchase of Dey's drugs by the Commonwealth and Pennsylvania Consumers. The Commonwealth on behalf of itself and Pennsylvania Consumers seeks to recover the amounts that unjustly enriched Dey.

916.   The Commonwealth and Pennsylvania Consumers are therefore entitled to equitable relief in the form of an injunction, restitution and disgorgement, legal relief in the form of damages and any other relief the Court deems appropriate.

WHEREFORE, the Commonwealth, on behalf of itself and Pennsylvania Consumers, respectfully seeks the relief set forth below.

## COUNT XLI
## COMMONWEALTH v. DEY
## MISREPRESENTATION/FRAUD

917.   The Commonwealth hereby incorporates by reference thereto the averments of the preceding paragraphs hereof as if fully set forth herein and further alleges as follows.

918.   Defendant's acts violate Pennsylvania common law proscriptions against fraudulent misrepresentation.

919.   In reporting AWPs to the compendia during the relevant time period for its drugs, Dey was making representations that the AWPs for each of its drugs represented a real and fact-based average wholesale price.

920. These representations were material to the transactions at hand in that the Commonwealth and Pennsylvania Consumers used and relied upon the AWPs as the basis for determining how much to pay and/or reimburse for Dey's drugs.

921. The Commonwealth prepared analyses using AWP historical data to prepare budgets for program funding, to develop formularies and to establish program eligibility requirements for program beneficiaries.

922. As set forth more fully above, these AWPs were artificial prices, unrelated to any real or fact-based average wholesale price, created and manipulated by Dey for the purpose of generating revenue, thus constituting false representations which Dey knew or, in the absence of recklessness, should have known to be false.

923. Indeed, the AWP was not a calculation of any average at all but in fact was a result driven number selected exclusively by Dey for the purpose of creating a spread and for the payment of rebates and other financial incentives or to simply generate additional revenue.

924. The value of free product and other incentives given by Dey was not reflected in the setting of the AWP.

925. Dey knew or, in the absence of recklessness should have known, that the omission of the value of rebates, free product and other incentives in the reporting of AWP to the compendia and the artificial setting of AWP constituted false representations.

926. Dey made these false representations with the intent of misleading the Commonwealth and Pennsylvania Consumers.

206

927.    The Commonwealth and Pennsylvania Consumers justifiably relied upon these false

misrepresentations in purchasing and/or reimbursing for Dey's drugs in an amount and for a price

based upon the AWP.

928.    Because Commonwealth statutes, regulations and contracts require use of AWP, as

published by the compendia, in reimbursement formulas, the Commonwealth's reliance on the

reported AWP was justified and reasonable.

929.    It was reasonable for Pennsylvania Consumers to rely on prices billed by their

prescribers or pharmacists.

930.    As a direct result of the false representations of Dey, as set forth above, the

Commonwealth and Pennsylvania Consumers were harmed in that they were unaware of the artificial

inflation of the AWP, would not have paid and/or reimbursed the artificially inflated prices for Dey's

drugs had they known of the false representations and, in fact, overpaid for Dey's drugs because of

the false representations.

WHEREFORE, the Commonwealth, on behalf of itself and the Pennsylvania Consumers,

respectfully seeks the relief set forth below.

## COUNT XLII
## COMMONWEALTH v. DEY
## VIOLATION OF THE PENNSYLVANIA
## UNFAIR TRADE PRACTICE AND CONSUMER PROTECTION LAW

931.    The Commonwealth hereby incorporates by reference thereto the averments of the

preceding paragraphs hereof as if fully set forth herein and further alleges as follows.

932.    Dey has violated Pennsylvania's Unfair Trade Practice and Consumer Protection Law

("UTPCPL")by its actions more fully described below. 73 P.S. § 201-1 *et seq.*

933.    The Commonwealth is empowered to bring this action on behalf of "persons" who have purchased Dey's prescription drugs at inflated prices and as a result, have suffered, are suffering, and will continue to suffer irreparable harm as a result of Dey's actions. "Persons" include but are not limited to natural persons, corporations, trusts, partnerships, incorporated or unincorporated associations, and any other legal entities within the meaning of 73 P.S.§ 201-2(2).

934.    The Commonwealth also has standing to bring this claim in that the Commonwealth is both an end payor and purchaser/reimburser of Dey's prescription drugs through its Medicaid, PACE, PEBTF and other Commonwealth Programs. The Commonwealth performs these functions not for its own business purposes, but rather in its representative capacity on behalf and for the benefit of its constituents who, in turn, make use of the prescription drugs primarily for personal, family and/or household purposes.

935.    In distributing, marketing, and selling prescription drugs to the Commonwealth and Pennsylvania Consumers, and in otherwise engaging in the conduct more fully described herein with respect to the above-identified drugs, Dey is engaging in trade or commerce that directly or indirectly harmed consumers in this Commonwealth within the meaning of 73 P.S. § 201-2(2).

936.    Specifically, Dey, by engaging in the practices set forth above, has:

   a.    Deceptively distributed, marketed and sold its drugs by alleging to the Commonwealth and the entities and consumers on whose behalf this action is brought that the AWPs for each of its drugs represented a real and fact-based price for its drugs;

   b.    Concealed from purchasers that AWP prices are exclusively set and controlled by drug manufacturers, while indicating that AWP represents a

real and fact-based price, thereby causing a likelihood of confusion or misunderstanding for consumers who are led to believe AWP is a real and fact-based price; and

c. As a result of Dey's acts in deceiving consumers that AWPs represent a real and fact-based price for its drugs, consumers who believed they were receiving a discount off AWP in fact paid inordinately high prices and/or co-payments resulting from the reporting of inflated AWPs for needed prescription drugs.

937. Dey violated the UTPCPL:

a. each time the medical provider charged a patient at the inflated AWP price and benefits from any spread between the actual wholesale cost of such drugs and the AWP;

b. each time free samples were delivered to a medical provider with the understanding and expectation that the provider will charge the patient for that free samples;

c. each time the medical provider charged a patient for free samples;

d. each time an incentive was given to anyone to cause a patient to be billed at the inflated AWP;

e. each time a patient was charged at the inflated AWP as a result of incentives given by or on Dey's behalf;

f. each time a request for reimbursement was made to a Commonwealth program based on an inflated AWP;

209

g.    each time an inflated AWP was published;

h.    each time a patient and/or his or her insurer was charged based on an inflated AWP; and

i.    each time Dey engaged in conduct actionable under the preceding counts of this Complaint and/or engaged in conduct in violation of the statutes and laws of the Commonwealth.

938.    Dey's products reimbursed or purchased by the Commonwealth or purchased by Pennsylvania Consumers were used for personal, family, or household use.

939.    Dey's conduct as more fully described herein constitutes unfair methods of competition and unfair or deceptive acts or practices within the meaning of 73 P.S. § 201-2(4), including, but not limited to, the following:

a.    causing likelihood of confusion or misunderstanding as to the source, sponsorship, approval or certification of goods or service, within the meaning of 73 P.S. § 201-2(4)(ii);

b.    representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that he does not have within the meaning of 73 P.S. § 201-2(4)(v);

c.    advertising goods or services with the intent not to sell them as advertised within the meaning of 73 P.S. § 201-3(4)(ix);

d.   making false or misleading statements of fact concerning the reasons for,
existence of, or amounts of price reductions within the meaning of 73 P.S. §
201-2(4)(xi);

e.   engaging in any other fraudulent or deceptive conduct which creates a
likelihood of confusion or misunderstanding within the meaning of 73 P.S.
§ 201-2(4)(xxi).

940.   Dey's conduct more fully described herein, is, accordingly, proscribed and unlawful
pursuant to 73 PA. STAT. § 201-3.

941.   Dey's conduct as more fully described herein, was willful within the meaning of 73
P.S. § 201-8.

942.   The Attorney General has determined that these proceedings to enjoin Dey's conduct
are in the public interest.

943.   The Commonwealth therefore seeks the entry of a permanent injunction restraining
Dey's unlawful conduct and mandating corrective measures pursuant to 73 P. S. § 201-4.

944.   The Commonwealth also requests that the Court require Dey to restore to the
Commonwealth and Pennsylvania Consumers monies acquired from the sale of its prescription drugs
during the period of time Defendant's unlawful conduct took place, pursuant to 73 P. S. § 201-4.1.

945.   In addition, and in light of Dey's willful and improper conduct as herein described,
the Commonwealth requests that the Court award a civil penalty to the Commonwealth not
exceeding:

a.   as to affected Pennsylvania Consumers under the age of sixty (60) years,
$1,000.00 per violation, and

211

b.     as to affected Pennsylvania Consumers sixty (60) years of age or older, $3,000 per violation.

946.     Dey is liable for its actions and the actions of its co-conspirators for each of these violations as independent unfair and deceptive acts in violation of the UTPCPL, and for its course of conduct comprising an unfair and deceptive practice in violation of the UTPCPL.

947.     As a result of Dey's unfair and deceptive trade practices, the Commonwealth and Pennsylvania Consumers have and will continue to suffer ascertainable loss and damages in an amount to be determined at trial.

WHEREFORE, the Commonwealth, on behalf of itself and Pennsylvania Consumers, respectfully seeks the relief set forth below.

## COUNT XLIII
## COMMONWEALTH v. ALL DEFENDANTS
## CIVIL CONSPIRACY

948.     The Commonwealth hereby incorporates by reference thereto the averments of the preceding paragraphs hereof as if fully set forth herein and further alleges as follows.

949.     As set forth more fully above, beginning at least as early as 1991, the exact date being unknown to the Commonwealth and Pennsylvania Consumers, and continuing thereafter until the present, Defendants, between and among themselves and others, entered into an agreement and/or otherwise engaged in a continuing conspiracy to deceive and defraud the Commonwealth and Pennsylvania Consumers by causing them to pay more for Defendants' drugs than they otherwise would have in the absence of Defendants' conspiracy.

950.     Pursuant to the widespread unfair and deceptive marketing and sales scheme and conspiracy alleged herein, and in furtherance thereof, Defendants and their co-conspirators engaged

in a wide range of activities, the purpose and effect of which was to deceive and defraud consumers, including Pennsylvania Consumers, and the states, including this Commonwealth, and to act or take substantial steps in furtherance of the conspiracy. Those acts include the following:

   a.   Defendants discussed and agreed among themselves and with their co-conspirators that they would provide free goods and drug samples to medical providers and other purchasers of their drugs and encouraged them to charge for such free goods and drug samples.

   b.   Defendants discussed and agreed among themselves and with their co-conspirators that they would inflate the AWPs for their drugs.

   c.   Defendants discussed and agreed among themselves and with their co-conspirators that they would establish, market and promote spreads between the AWPs and the actual acquisition costs for their drugs as an incentive and inducement for medical providers and other purchasers to prescribe, or cause to be prescribed, and to sell, or cause to be sold, their drugs instead of other drugs or alternative modes and methods of healthcare treatment.

   d.   Defendants discussed and agreed among themselves and with their co-conspirators that they would provide other inducements and incentives to medical providers and others to prescribe, or cause to be prescribed, or to sell, or cause to be sold, their drugs, instead of other drugs or alternative modes and methods of healthcare treatment.

213

e.  Defendants discussed and agreed among themselves and with their co-conspirators that they would work together and with others to oppose and avoid efforts to reduce prescription drug costs and/or to change the way in which payors reimburse for prescription drugs, and that they would act to conceal and suppress their conduct to prevent detection by others, including the Commonwealth and Pennsylvania Consumers.

951.  By way of example, and in addition to the specific facts set forth in the foregoing Counts as to individual defendants, TAP and Abbott engaged in conspiratorial meetings with the AstraZeneca Defendants, the Amgen Defendants, the Bristol-Myers Defendants and the J&J Defendants, among the purposes of which meetings were to discuss the importance of controlling AWPs, maintaining inflated AWPs for their drugs and blocking efforts by Medicare/Medicaid to eliminate AWP as the reimbursement benchmark, all in an effort to increase their individual profits and market share at the expense of reimbursers and end payors for their drugs, including the Commonwealth and Pennsylvania Consumers.

952.  Additional conspiratorial meetings, conferences, telephone and other communications were held between and among the defendants for the purpose of discussing the improper sales and marketing practices set forth above and throughout this Complaint.

953.  Defendants performed the conspiratorial acts set forth above and in the individual Counts of the Complaint intending to injure reimbursers and end payors of their drugs, including the Commonwealth and Pennsylvania Consumers, by causing them to pay artificially inflated prices for defendants' drugs.

214

954.    Defendants performed these acts alleged herein in furtherance of the common plan or design for the conspiracy with intent, malice and/or with knowledge of the injury and damage it would cause to the Commonwealth and Pennsylvania Consumers and with knowledge and intent to cause such injuries and/or with reckless disregard for the consequences.

955.    As a direct and proximate result of Defendants' conspiracy as alleged herein, the Commonwealth and Pennsylvania Consumers have been injured and damaged, and Defendants are jointly and severally liable for such injuries and damages.

WHEREFORE, the Commonwealth, on behalf of itself and Pennsylvania Consumers, respectfully seeks the relief set forth below.

## AD DAMNUM

WHEREFORE, the Commonwealth demands the following:

1.    Judgment in its favor, and against Defendants;

2.    Compensatory damages;

3.    The entry of an Order permanently enjoining each and every Defendant from continuing the deceptive and/or unfair acts or practices complained of herein, and requiring corrective measures;

4.    On behalf of itself and Pennsylvania Consumers, disgorgement by Defendants, and each of them, of all profits and gains earned in whole or in part through the unfair and/or deceptive acts or practices complained of herein;

5.    On behalf of itself and Pennsylvania Consumers, compensatory damages;

6.    On behalf of itself and Pennsylvania Consumers, statutory restitution ;

215

7.     On behalf of itself and Pennsylvania Consumers, exemplary and punitive damages in an amount in excess of the jurisdictional limit;

8.     In its own right, civil penalties in the amount of $1,000 per violation of the Unfair Trade Practice and Consumer Protection Law, and $3,000 per Defendant for each violation involving a victim 60 years old or older;

9.     All elements of interest, including but not limited to pre- and post-judgment interest;

10.     Attorneys fees, expert witness fees, costs of investigation, and other reasonably related costs, including court costs, litigation expenses, and fees;

11.     The entry of an Order permanently enjoining each and every Defendant from continuing the deceptive and/or unfair acts or practices complained of herein, and requiring corrective measures; and

12.     Such other and further relief as the Court deems just and appropriate.

## JURY DEMAND

The Commonwealth demands a trial by jury of all issues so triable in this cause.

Respectfully submitted,

COMMONWEALTH OF PENNSYLVANIA
OFFICE OF THE ATTORNEY GENERAL
**Thomas W. Corbett, Jr., Attorney General**
(I.D. No. 22809)
Alexis L. Barbieri, Executive Deputy Attorney General
(I.D. No. 37272)
Office of Attorney General
16th Floor, Strawberry Square
Harrisburg, PA 17120
(717) 787-4530 telephone
(717) 705-7110 facsimile

James A. Donahue, III
Chief Deputy Attorney General
Antitrust Section
14th Floor, Strawberry Square
Harrisburg, PA 17120

KLINE & SPECTER
A PROFESSIONAL CORPORATION

By: _____
Donald E. Haviland, Jr., Esquire
(I.D. No. 66615)
Shanin Specter, Esquire
(I.D. No. 40928)
Louis C. Ricciardi, Esquire
(I.D. No. 70734)
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
215-772-1000 telephone
215-735-0957 facsimile

## VERIFICATION

I, Louis C. Ricciardi, am authorized to make this verification on behalf of the Plaintiff in the within action. I hereby verify that the facts set forth in the foregoing Amended Complaint are true and correct to the best of my knowledge, information and belief. I understand that the statements made therein are made subject to the penalties of 18 Pa. C.S. §4904 relating to unsworn falsifications to authorities.

Dated: _3/9/ 2005_

_____
**LOUIS C. RICCIARDI**

Thomas W. Corbett, Jr., Attorney General
COMMONWEALTH OF PENNSYLVANIA
16th Floor, Strawberry Square
Harrisburg, PA 17120

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA by
THOMAS W. CORBETT, JR., in his capacity as
Attorney General of the Commonwealth of
Pennsylvania,

                    PLAINTIFF,

        v.                                              Dkt. No.: 212 MD 2004

TAP PHARMACEUTICAL PRODUCTS, INC.; ABBOTT
LABORATORIES; TAKEDA CHEMICAL INDUSTRIES,
LTD.; ASTRAZENECA PLC; ZENECA, INC.;
ASTRAZENECA PHARMACEUTICALS LP;
ASTRAZENECA LP; BAYER AG; BAYER
CORPORATION; GLAXOSMITHKLINE, P.L.C.;
SMITHKLINE BEECHAM CORPORATION; GLAXO
WELLCOME, INC.; PFIZER, INC.; PHARMACIA
CORPORATION; JOHNSON & JOHNSON; AMGEN, INC.;
BRISTOL-MYERS SQUIBB COMPANY; BAXTER
INTERNATIONAL INC.; AVENTIS PHARMACEUTICALS,
INC.; BOEHRINGER INGELHEIM CORPORATION;
SCHERING-PLOUGH CORPORATION; DEY, INC.,
                    DEFENDANTS.

## CERTIFICATE OF SERVICE

        I hereby certify that on this date, March 10, 2005, a true and correct copy of

Commonwealth's Corrected Amended Complaint was served on the parties on the attached list via

U.S. First Class mail.

                                Respectfully submitted,


                                JAMES A. DONAHUE, III, ESQUIRE

## ATTORNEYS FOR ABBOTT LABORATORIES

Joseph U. Metz, Esquire
DILWORTH PAXSON
112 Market Street, Suite 800
Harrisburg, PA 17101

John D. Goetz, Esquire
John W. Boyle, Esquire
JONES DAY
One Mellon Bank Center, 31st Floor
500 Grant Street
Pittsburgh, PA 15219-2502

## ATTORNEYS FOR AMGEN, INC.

Joseph H. Young, Esquire
Steven F. Barley, Esquire
HOGAN & HARTSON, LLP
111 S. Calvert St., Suite 1600
Baltimore, MD 21202

James J. Rohn, Esquire
Frank R. Emmerich, Jr., Esquire
CONRAD O'BRIEN GELLMAN & ROHN, P.C.
1515 Market Street, 16th Floor
Philadelphia, PA 19102-1916

## ATTORNEYS FOR ASTRAZENECA, P.L.C.

Kimberly Harris, Esquire
D. Scott Wise, Esquire
Carlos M. Pelayo
DAVIS POLK & WARDWELL
450 Lexington Ave.
New York, NY 10017

John G. Harkins, Jr., Esquire
Eleanor Morris Illoway, Esquire
David W. Engstrom, Esquire
HARKINS CUNNINGHAM
2800 One Commerce Square
2005 Market Street
Philadelphia, PA 19103-7042

## ATTORNEYS FOR AVENTIS PHARMACEUTICALS, INC.

Michael L. Koon, Esquire
Nicola R. Heskett, Esquire
SHOOK, HARDY & BACON, LLP
2555 Grand Boulevard
Kansas City, MO 64108

Paul S. Schleifman, Esquire
SHOOK, HARDY & BACON, LLP
Hamilton Square
600 14th Street, N.W., Suite 800
Washington, DC 20005-2004

Brian T. Feeney, Esquire
Brett A. Schlossberg, Esquire
Bryan L. Norton, Esquire
GREENBERG TRAURIG, LLP
Two Commerce Sq., Suite 2700
2001 Market Street
Philadelphia, PA 19103

## ATTORNEYS FOR BAXTER INTERNATIONAL, INC.

Merle Miller DeLancey, Jr., Esquire
Maria Colsey Heard, Esquire
Eden M. Heard, Esquire
DICKSTEIN, SHAPIRO MORIN & OSHINSKY, LLP
2101 L. St. NW
Washington, D.C. 20037

## ATTORNEY FOR BAYER CORPORATION

Richard D. Raskin, Esquire
Michael P. Doss, Esquire
SIDLEY AUSTIN BROWN & WOOD LLP
Bank One Plaza
10 S. Dearborn Street, 48th Floor
Chicago, IL 60603

Robert E. Welsh, Jr., Esquire
WELSH & RECKER
2000 Market Street
Suite 2903
Philadelphia, PA 19103

### ATTORNEYS FOR BOEHRINGER INGELHEIM CORPORATION

Paul J. Coval, Esquire
Douglas L. Rogers, Esquire
Darrell A.H. Miller, Esquire
**VORYS, SATER, SEYMOUR AND PEASE LLP**
52 East Gay Street
P.O. Box 1008
Columbus, OH 43216-1003

Alan Klein, Esquire
Carrie E. Nelson, Esquire
**DUANE MORRIS, LLP**
One Liberty Place
Philadelphia, PA 19103-7396

### ATTORNEYS FOR BRISTOL-MYERS SQUIBB COMPANY

Steven M. Edwards, Esquire
Lyndon M. Tretter, Esquire
James S. Zucker, Esquire
**HOGAN & HARTSON LLP**
875 Third Avenue, 25th Floor
New York, NY 10022

David Newmann, Esquire
**HOGAN & HARTSON LLP**
1835 Market Street, 28th Floor
Philadelphia, PA 19103

### ATTORNEYS FOR DEY, INC.

Christopher C. Palermo, Esquire
Philip D. Robben, Esquire
**KELLEY DRYE & WARREN, LLP**
101 Park Avenue
New York, NY 10178

Abraham C. Reich, Esquire
Louis W. Fryman, Esquire
**FOX ROTHSCHILD**
2000 Market Street, 10th Floor
Philadelphia, PA 19103-3291

### ATTORNEYS FOR JOHNSON & JOHNSON

Andrew D. Schau, Esquire
William F. Cavanaugh, Jr., Esquire
Erik Haas, Esquire
Estella J. Schoen, Esquire
Adeel A. Mangi, Esquire
**PATTERSON, BELKNAP, WEBB & TYLER, LLP**
1133 Ave. of the Americas
New York, NY 10036-6710

Jack M. Stover, Esquire
**BUCHANAN INGERSOLL, PC**
P.O. Box 12023
Harrisburg, PA 17108-2023

### ATTORNEYS FOR PFIZER, INC. AND PHARMACIA CORPORATION

John C. Dodds, Esquire
Erica J. Smith-Klocek, Esquire
**MORGAN, LEWIS & BOCKIUS, LLP**
1701 Market Street
Philadelphia, PA 19103-2921

Scott A. Stempel, Esquire
**MORGAN, LEWIS & BOCKIUS, LLP**
1111 Pennsylvania Avenue
Washington, DC 20004-2921

### ATTORNEYS FOR SCHERING-PLOUGH CORPORATION

Brien T. O'Connor, Esquire
John T. Montgomery, Esquire
Crystal Talley, Esquire
John R. Therien, Esquire
**ROPES & GRAY**
One International Place
Boston, MA 02110

Mark D. Meredith, Esquire
**ROPES & GRAY**
45 Rockefeller Plaza
New York, NY 10111-0087

Richard L. Scheff, Esquire
Scott A. Coffina, Esquire
Lathrop B. Nelson, III, Esquire
Jessica C. Goebeler, Esquire
**MONTGOMERY, McCRACKEN, WALKER &
RHOADS, LLP.**
123 S. Broad Street
Philadelphia, PA 19109

*ATTORNEYS FOR SMITHKLINE BEECHAM
CORPORATION D/B/A GLAXOSMITHKLINE
AND GLAXO WELCOME, INC.*

Mark H. Lynch, Esquire
Ethan M. Posner, Esquire
Ronald G. Dove, Jr., Esquire
**COVINGTON & BURLING**
1201 Pennsylvania Avenue, N.W.
Washington, DC 20044-7566

Thomas H. Lee, II, Esquire
Brennan J. Torregrossa, Esquire
**DECHERT, LLP**
4000 Bell Atlantic Tower
1717 Arch Street
Philadelphia, PA 19103-2793

Frederick G. Herold, Esquire
**DECHERT, LLP.**
975 Page Mill Road
Palo Alto, CA 93404

*ATTORNEYS FOR TAKEDA CHEMICAL
INDUSTRIES, LTD.*

Robert R. Stauffer, Esquire
Thomas P. Sullivan, Esquire
Jeffrey D. Colman, Esquire
Anthony C. Porcelli, Esquire
**JENNER & BLOCK**
One IBM Plaza, 45th Floor
330 N. Wabash Avenue
Chicago, IL 60611

Allen C. Warshaw, Esquire
**KLETT, ROONEY, LIEBER & SCHORLING**
240 N. Third Street
Harrisburg, PA 17101

*ATTORNEYS FOR TAP PHARMACEUTICAL
PRODUCTS, INC.*

Thomas B. Schmidt, III, Esquire
Alexandra Makosky, Esquire
**PEPPER HAMILTON, LLP**
200 One Keystone Plaza
North Front and Market Streets
P.O. Box 1181
Harrisburg, PA 17108-1181

Anita B. Bapooji, Esquire
Joseph F. Savage, Jr., Esquire
**GOODWIN PROCTER, LLP**
Exchange Place
53 State Street
Boston, MA 02109