# EXHIBIT B



**1976** — Establishment of the Office of Inspector General, Department of Health and Human Services

**1986** — False Claims Amendments Act

**1996** — Health Insurance Portability and Accountability Act

# Protecting Public Health and Human Services Programs: A 30-Year Retrospective



Department of Health and Human Services
Office of Inspector General

Case 1:01-cv-12257-PBS   Document 7849-2   Filed 10/19/11   Page 3 of 4

## HEW Office of Inspector General

On October 15, 1976, President Ford signed into law legislation creating an Office of Inspector General (OIG) at the Department of Health, Education and Welfare (HEW). HEW OIG would become HHS OIG in 1980, when the Department was redesignated as the Department of Health and Human Services (HHS).

This law was the culmination of a series of congressional hearings and investigations held between 1974 and 1976, which found serious deficiencies in HEW's ability to address fraud and abuse in its many programs. HEW's program expenditures accounted for almost one third of the Federal budget, but according to the investigations there was no "...central unit with the overall authority, responsibility and resources necessary to insure effective action against fraud and abuse." Resources devoted to fraud and abuse investigations were inadequate and scattered throughout the programs. Additionally, a majority of the investigative staff faced potential conflicts of interest in that they reported to program management whose programs they were investigating. Further there was no central source of information on fraud and abuse in HEW programs available to the Secretary or Congress.

A second set of congressional hearings and investigations found that Medicaid was losing billions of dollars because of fraud at so-called "Medicaid Mills." The Mills were clinics in which ordering unwarranted tests and unnecessary prescriptions and referrals was common practice.

> "This legislation will establish in HEW for the first time a high-level official with no program responsibilities who is charged with giving undivided attention to the prevention of fraud and program abuse and the promotion of economy and efficiency in the administration of HEW's programs, and operations."
>
> – Representative Lawrence H. Fountain
> September 29, 1976

To address the deficiencies identified in these congressional hearings and investigations, Congress introduced legislation to establish an Office of Inspector General for HEW programs. This central office was dedicated solely to fighting fraud, waste, and abuse in HEW. The HEW Audit Agency and Office of Investigative Services were transferred to the HEW Office of Inspector General.

To ensure independence, the Inspector General and Deputy Inspector General were to be appointed by the President, with Senate approval, and could be removed only by the President with a written explanation to Congress. To further ensure the independence of the office, the Inspector General was placed under the general supervision of the Secretary, and in some cases his or her deputy, but no other HEW official. OIG was required to inform the Secretary and Congress about problems and deficiencies relating to the HEW programs and operations through quarterly and annual reports.

The dramatic increase in expenditures reflects an expansion of benefits and programs, increased utilization of services, expanded eligibility, and growth in enrollment. For instance, Medicare added coverage for end stage renal disease, a home health benefit, and most recently, an outpatient prescription drug benefit. Medicaid added payments to hospitals treating a disproportionate share of low-income beneficiaries, and some States implemented the SCHIP through expansions to their Medicaid programs.

With the expansive network of Medicare and Medicaid benefits comes a tremendous responsibility to protect the integrity of these programs and the beneficiaries they serve. OIG has worked extensively with CMS (formerly the Health Care Financing Administration) to identify vulnerabilities in Medicare and Medicaid and recommend improvements, to quantify and reduce improper payments, and to pursue instances of fraud and abuse. To execute these activities, OIG relies on designated funding under the Health Care Fraud and Abuse Control Program, established by the Health Insurance Portability and Accountability Act of 1996 (HIPAA) and funding under the Medicaid Integrity Program, established by the Deficit Reduction Act of 2005 (DRA). In 2006, OIG devoted approximately 80 percent of its resources to activities to protect the integrity of these critical health care programs.

### Measuring Improper Payments

Controlling the costs of Medicare and Medicaid and maximizing public health care dollars involves identifying and resolving improper payments. While some providers engage in fraudulent billing, the majority of providers are honest in their Medicare and Medicaid billings. For instance, improper payments may result from clerical errors, misinterpretations of rules, or poor record keeping.

In 1997, OIG created the first comprehensive, statistically valid quantification of improper Medicare fee-for-service claims. To accomplish this objective, OIG determined for a sample of beneficiary claims whether the claims complied with Medicare laws and regulations. The results for the sample were then projected to the Medicare program to determine the quantity, types, and levels of improper payments. OIG determined the annual error rate for Medicare until FY 2003, when CMS incorporated the error rate process as part of its internal Comprehensive Error Rate Testing and the Payment Error Prevention Program.

By quantifying the extent of improper payments, the Medicare Error Rate demonstrated the pervasiveness of improper payments across Medicare services and provided a performance measure for use in identifying and reducing improper payments. This measure enables both OIG and CMS to target efforts toward areas of particular vulnerability as well as to track progress over time in strengthening these vulnerable areas. The effectiveness of the Medicare Error Rate in identifying improper payments lent support