# EXHIBIT I

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY ) <br> AVERAGE WHOLESALE PRICE ) <br> LITIGATION ) <br> ) | M.D.L. No. 1456 <br> Civil Action No. 01-12257-PBS <br><br> Judge Patti B. Saris |

REPORT OF INDEPENDENT EXPERT

PROFESSOR ERNST R. BERNDT

TO JUDGE PATTI B. SARIS

FEBRUARY 9, 2005

**Attachment B**

**OIG Reports Related to Medicare & Medicaid**

| Date | Report Title | Key Findings / Recommendations |
|------|--------------|-------------------------------|
| Nov. 1992 | "Physicians' Costs for Chemotherapy Drugs" (A-02-91-01049) | For a small, judgmental sample of NY physicians, OIG found that [13] chemotherapy drugs could be purchased at amounts below the established AWP, and that AWP was not a reliable indicator of cost. Recommendations include that HCFA (1) define reimbursement policy to encourage "most economical means" available for physician purchase of drugs; (2) revise coding and reimbursement systems to pay for drugs based on dosage actually administered. NB: Report noted that Equicore, the TN Medicare carrier, based payments for 5 chemo drugs on physician invoice prices. |
| Feb. 1996 | "Medicare Payments for Nebulizer Drugs" (OEI-03-94-00390) | OIG examined differences in reimbursement methodologies between Medicare and Medicaid for 3 inhalation drugs in 17 states (1/94-2/95), finding that Medicare payments were considerably higher than those from Medicaid would have been due to (1) Medicare not using a discounted AWP, and (2) Medicare not having a drug rebate program with manufacturers. Recommendations included (1) use of a discounted AWP to establish drug prices (which would require revising Medicare's claims coding system to an NDC basis); (2) pursuing legislative options to establish a rebate program or competitive bidding process; (3) use the "inherent reasonableness" authority to set charge limits (would require streamlining that authority); (4) base payment on estimated acquisition cost (EAC) (although the regional carriers -- DMERCs -- had not been successful in gathering the necessary information). NB: Report made reference to OIG intent to examine other drugs that Medicare reimburses. |
| May 1996 | "Appropriateness of Medicare Prescription Drug Allowances" (OEI-03-95-00420) | OIG compared Medicare and Medicaid drug payment methodologies for 17 physician-administered drugs (based on Medicare 1994 allowances for those drugs), finding that Medicaid's greater use of more heavily discounted AWP, and rebates, would have afforded lower prices than Medicare was paying. Recommendations were similar to those for nebulizer drugs, above. NB: With respect to Medicaid, the report also noted that states differed in their application of payment methodologies. More states used a discounted AWP to establish reimbursements to pharmacies than they did to physicians, meaning that some states used different discounting methodologies to reimburse pharmacy-dispensed vs. physician-administered drugs. Some states handled rebates differently for physician-administered drugs than for self-administered drugs. |

Attachment B                                                                 160

| Jun. 1996 (a) | "Suppliers' Acquisition Costs for Albuterol Sulfate' (OEI-03-94-00393) | OIG found that Medicare allowances for albuterol sulfate substantially exceeded suppliers acquisition costs. Same recommendations as for nebulizer drugs. HCFA concurred with recommendations, but noted that OMB did not approve a 1994 survey attempt to collect acquisition cost data because of burdensome nature of the task. |
|---|---|---|
| Jun 1996 (b) | "A Comparison of Albuterol Sulfate Prices" (OEI-03-94-00392) | OIG found that many pharmacies surveyed charged less than the Medicare allowance for albuterol, and that 5 buying groups surveyed had negotiated prices between 56 – 70% less than Medicare's reimbursement amount. Same recommendations as for nebulizer drugs. |
| Apr. 1997 | "Medicaid Pharmacy – Actual Acquisition Costs of Prescription Drug Products for Brand Name Drugs" (A-06-96-00030) | OIG sampled Medicaid pharmacy providers in 11 states, comparing their actual invoices for drug purchases to AWP. OIG identified an average discount of 18.3% off AWP on a national basis (CY 1994), substantially larger than many states' reimbursement policies allowed (typically a 10% discount). OIG recommended HCFA work with states to ensure that reimbursement of the "ingredient portion" of Medicaid drug purchases was more in line with OIG's findings. [NB: Based on methodology, it appears that this analysis would have included primarily, and perhaps exclusively, self-administered drugs.] The report specifically refers to the June 1996 Barrons's article comparing AWP to actual acquisition costs, noting that industry insiders joked that AWP really meant "Ain't What's Paid". |
| Dec. 1997 | "Excessive Medicare Payments for Prescription Drugs" (OEI-03-97-00290) | OIG focused on 22 drug codes representing Medicare's largest dollar outlays in 1995, and found that program and beneficiary payments would have been lower by 29% if reimbursements were based on actual wholesale prices rather than AWP. OIG specifically noted that published AWPs bore little or no resemblance to actual wholesale prices available to the physician and supplier communities. Medicare allowances were significantly greater than prices available thru wholesalers and Group Purchasing Organizations (gpos). OIG also found inconsistency in carriers' establishing and updating Medicare drug reimbursement amounts. Recommendations included (1) basing reimbursement on a more substantial discount off AWP than 5%; (2) pursing an actual or EAC option; establishing limits on increases in subsequent year price increases; (3) invoking the "inherent reasonableness" authority to set charge limits; (4) pursuing legislative options to establish rebates or competitive bidding; (5) standardizing reimbursement amounts for each HCPCS drug code. |
| May 1998 | "Need to Establish Connection Between the Calculation of Medicaid Drug Rebates and Reimbursement for Medicaid Drugs (A-06-97-00052) | OIG recommended that HCFA develop and submit a legislative proposal that would require drug manufacturers participating in Medicaid's outpatient Rx drug program to *pay Medicaid rebates based on AWP rather than on AMP* as provided by statute. OIG sought to reduce the anomaly of reimbursements to pharmacies being calculated relative to AWP while rebates were based on AMP. Manufacturers were |

Attachment B                                                                 161

| | | |
|---|---|---|
| | | inconsistent in their calculation of AMP, and OIG estimated substantial savings from aligning the rebate and reimbursement calculations. OIG recognized that there were problems with AWP but felt that, with certain safeguards, the use of AWP in rebate calculations could result in its being a more "meaningful and accurate number". HCFA did not believe that a legislative initiative was feasible, but agreed that changing from AMP to AWP would reduce an administrative burden. A March 2002 OIG report notes that President Bush's Fiscal Year 2003 budget proposed changing the basis for calculating rebates from AMP to AWP. |
| Jul. 1998 | "The Impact of High-Priced Generic Drugs on Medicare and Medicaid" (OEI-03-97-00510) | OIG examined 4 drugs in which Medicare reimbursements were excessive because of the inclusion of high-priced generics (i.e., higher than brand prices) in the median generic price on which reimbursement was based. Re Medicaid (FL) – OIG examined 8 drugs for which reimbursements could have been less but for (1) inclusion of high-priced generics that (2) yielded lower rebates than branded drugs. OIG recommended the exclusion of higher-priced generics from median calculations used to determine reimbursement levels (Medicare), and restrict reimbursements by Medicaid to [pre-rebate] lower-priced brand or generic drugs. |
| Aug. 1998 | "Are Medicare Allowances for Albuterol Sulfate Reasonable?" (OEI-03-97-00292) | OIG found Medicare allowances for albuterol substantially exceeded what the VA would pay for generic albuterol in 1998, and that mail order customers would pay up to 30% less than Medicare's allowances in 1998. |
| Nov. 1998 | "Comparing Drug Reimbursement: Medicare and the Department of Veterans Affairs" (OEI-03-97-00293) | OIG examined 34 drug codes, for which Medicare payments were substantially greater than VA payments. In the absence of statutory reform, OIG recommended that HCFA invoke "inherent reasonableness" authority, and implement competitive bidding. HCFA noted that its DMERCs were recommending an 11% reduction in albuterol reimbursements, and that other drugs might be similarly reviewed. HCFA was subsequently challenged on the albuterol reductions, with "inherent reasonableness" authority put on hold. |
| Jun. 2000 (a) | "Medicare Reimbursement of Albuterol" (OEI-03-00-00311) | OIG compared Medicare reimbursements for albuterol with those of Medicaid and the VA, as well as with prices paid by chain and internet pharmacies. As with earlier reports, Medicare was again the outlier. Recommendations of previous reports were reiterated, with the notation that ability to invoke the "inherent reasonableness" authority had been limited by the 1999 Balanced Budget Refinement Act – GAO was to study the potential effects of using this measure before HCFA could invoke it. HCFA's response indicated it was moving to take advantage of DOJ and NAMFCU prices provided to First Databank, and was taking other actions including establishing a competitive bidding project in TX for albuterol purchases. The First DataBank prices were considered to be "more accurate data on average wholesale prices developed for Medicaid" as a result of a DOJ |

| | | investigation. |
|---|---|---|
| Jun 2000 (b) | "Medicare Reimbursement of End-Stage Renal Disease Drugs' (OEI-03-00-00020) | OIG comparison of Medicare reimbursement of five ESRD drugs with that of Medicaid and VA. Similar findings, recommendations, and HCFA responses as above, with additional emphasis placed on HCFA's seeking legislative efforts to reduce its outlays. |
| Jan. 2001 | "Medicare Reimbursements of Prescription Drugs" (OEI-03-00-00310) | OIG compared Medicare's reimbursement for 24 drugs (physician-administered or used with a nebulizer) with that of the VA, the physician/supplier community, and Medicaid. In addition to finding Medicare payments far exceeded those of the comparators, OIG noted that local Medicare carriers were not establishing consistent reimbursement amounts for certain drugs. In its response, HCFA noted that efforts to have its carriers use the DOJ's First DataBank AWPs had been hampered by legislation (H.R. 5543) that put a freeze on changes to AWP in use by Medicare as of 9/1/00. |
| Jul. 2001 | "Cost Containment of Medicaid HIV/AIDS Drug Expenditures" (OEI-05-99-00611) | OIG compared Medicaid's net unit cost for antiretrovirals to that of other federal purchasers, and found that Medicaid paid from 5% - 33% more than the comparators. Part of the difference was attributed to different federally mandated formulae, however the discussion highlighted problems in determining an EAC, and the role of AWP manipulation in contributing to excessive payments. |
| Aug. 2001 | "Medicaid Pharmacy - Actual Acquisition Costs of Brand Name Prescription Drug Products (A-06-00-00023) | OIG examined pharmacy actual acquisition costs of brand name drugs for 8 states, determining that the average discount off AWP for branded drugs was 21.84% for 1999 (an increase of 19.3% from their 1997 analysis for 1994 prices). However, this discount was greater than the discount allowed under most states' reimbursement policies. While AWP was not the basis for EAC in all states it was nonetheless predominant, with the average discount on a national basis being 10.31% of AWP. (OIG also compared WAC to actual acquisition price for pharmacies, and determined that invoice prices were, on a national basis, 1.81% below WAC.) |
| Mar. 2002 (a) | "Excessive Medicare Reimbursement for Ipatroprium Bromide" (OEI03-01-00041) | OIG compared Medicare reimbursements (based on AWP) for this inhalant product to prices paid by the VA, and to catalog and wholesaler/supplier prices. Medicare paid considerably more than any of the comparators, even though payments to 23 suppliers (accounting for 60% of Medicare payments) were presumably to outfits purchasing large quantities of the product (and thus able to attract manufacturer discounts). |
| Mar. 2002 (b) | "Medicaid Pharmacy – Actual Acquisition Cost of Generic Prescription Drug Products (A-06-01-00053) | OIG examined pharmacy actual acquisition costs of generic drugs in 8 states, determining that the average discount off AWP for generic drugs was 65.93% for 1999 (an increase of 55% from their 1997 analysis of 1994 prices.) However, states' reimbursement methodologies did not allow them to capture much of this discount, and OIG recommended that reimbursements for ingredient costs be brought more in line with pharmacy acquisition costs. Since some states used WAC to determine reimbursement, OIG also examined WAC |

Attachment B                                                                                              163

| | | |
|---|---|---|
| | | relative to acquisition cost, finding invoice prices averaging 30.55% below WAC. OIG felt that WAC was not a true wholesale acquisition cost and was significantly higher than actual acquisition costs for generic drugs. OIG also cited a 1984 report in which it found that pharmacies purchased drugs at 15.9% below AWP, and a 1989 report showing a 15.5% discount. However, these reports combined brand and generic drugs. The cover letter to this report references the Bush FY 2003 proposal to use AWP rather than AMP in rebate calculations. |
| Sep. 2002 | "Medicaid Pharmacy – Additional Analyses of the Actual Acquisition Cost of Prescription Drug Products (A-06-02-00041) | A follow-up to the March 2002 report, OIG extended their analysis of discounts off AWP for additional drug categories, including single and multiple source innovator drugs, and drugs with and without federal upper limits (FULs). OIG found wide variation in prices paid by pharmacies, with average discounts off AWP ranging from 17.2% for single source innovator drugs to 72.1% for multiple source drugs with upper limits. OIG recommended that for states that continued to reimburse for drugs based on AWP, a four-tiered reimbursement methodology be introduced that better captured the within-category fluctuations in actual discounts: (1) single source innovator drugs; (2) all drugs without FULs; (3) multiple source drugs without FULs; (4) multiple source drugs with FULs. Without evaluating CMS' FUL prices, OIG also observed that drug manufacturers appeared to provide steeper discounts off AWP for drugs with FUL listings. Finally, OIG reiterated their recommendation that AWP be substituted for AMP in calculating rebates due from manufacturers. |
| Jan. 2004 (a) | "Update: Excessive Medicare Reimbursement of Albuterol" (OEI-03-03-00510) | Another comparison of Medicare reimbursements vs. Medicaid payments for albuterol. Findings similar to above; some additional discussion about DMERCs charged with determining reimbursement methodologies in their respective regions, based on Medicare methodology. |
| Jan. 2004 (b) | "Medicare Reimbursement for Lupron" (OEI-03-03-00250) | OIG discusses a "local medical review policy ("LRMP") whereby Medicare carriers apply a "least costly alternative" standard in determining reimbursement. Specifically, OIG reviewed jurisdictions' application of that standard with respect to Lupron being covered at the less expensive Zoladex price, and found that not all jurisdictions were applying the standard. |
| Jan. 2004 © | "Update: Excessive Medicare Reimbursement for Ipatroprium Bromide" (OEI-03-03-00520) | Update of 2002 OIG comparison of Medicare reimbursements for this inhalant relative to those of Medicaid and the VA. |
| Sep. 2004 | 'Variation in State Medicaid Drug Prices" (OEI-05-02-00681) | For 28 drugs, OIG found considerable variation across states in reimbursement rates, with prices varying more for the 10 non-innovator drugs than for the 18 innovator products. Comparable estimated acquisition cost formulae (e.g., AWP-10%) might still yield very different prices. There were also |

Attachment B                                                                                                                         164

| | | differences in setting "U&C" charges as well as MAC. |
|---|---|---|

All reports accessed through www.oig.hhs.gov/reports.htm.