# EXHIBIT P

Case 1:01-cv-12257-PBS   Document 7849-16   Filed 10/19/11   Page 2 of 13

# MEDICARE DRUG REIMBURSEMENTS: A BROKEN SYSTEM FOR PATIENTS AND TAXPAYERS

## JOINT HEARING

BEFORE THE

SUBCOMMITTEE ON HEALTH

AND THE

SUBCOMMITTEE ON OVERSIGHT AND INVESTIGATIONS

OF THE

COMMITTEE ON ENERGY AND COMMERCE

HOUSE OF REPRESENTATIVES

ONE HUNDRED SEVENTH CONGRESS

FIRST SESSION

SEPTEMBER 21, 2001

### Serial No. 107-65

Printed for the use of the Committee on Energy and Commerce



Available via the World Wide Web: http://www.access.gpo.gov/congress/house

U.S. GOVERNMENT PRINTING OFFICE

75-756CC                    WASHINGTON : 2001

For sale by the Superintendent of Documents, U.S. Government Printing Office
Internet: bookstore.gpo.gov   Phone: toll free (866) 512-1800; DC area (202) 512-1800
Fax: (202) 512-2250  Mail: Stop SSOP, Washington, DC 20402-0001

## COMMITTEE ON ENERGY AND COMMERCE

W.J. "BILLY" TAUZIN, Louisiana, *Chairman*

MICHAEL BILIRAKIS, Florida
JOE BARTON, Texas
FRED UPTON, Michigan
CLIFF STEARNS, Florida
PAUL E. GILLMOR, Ohio
JAMES C. GREENWOOD, Pennsylvania
CHRISTOPHER COX, California
NATHAN DEAL, Georgia
STEVE LARGENT, Oklahoma
RICHARD BURR, North Carolina
ED WHITFIELD, Kentucky
GREG GANSKE, Iowa
CHARLIE NORWOOD, Georgia
BARBARA CUBIN, Wyoming
JOHN SHIMKUS, Illinois
HEATHER WILSON, New Mexico
JOHN B. SHADEGG, Arizona
CHARLES "CHIP" PICKERING, Mississippi
VITO FOSSELLA, New York
ROY BLUNT, Missouri
TOM DAVIS, Virginia
ED BRYANT, Tennessee
ROBERT L. EHRLICH, Jr., Maryland
STEVE BUYER, Indiana
GEORGE RADANOVICH, California
CHARLES F. BASS, New Hampshire
JOSEPH R. PITTS, Pennsylvania
MARY BONO, California
GREG WALDEN, Oregon
LEE TERRY, Nebraska

JOHN D. DINGELL, Michigan
HENRY A. WAXMAN, California
EDWARD J. MARKEY, Massachusetts
RALPH M. HALL, Texas
RICK BOUCHER, Virginia
EDOLPHUS TOWNS, New York
FRANK PALLONE, Jr., New Jersey
SHERROD BROWN, Ohio
BART GORDON, Tennessee
PETER DEUTSCH, Florida
BOBBY L. RUSH, Illinois
ANNA G. ESHOO, California
BART STUPAK, Michigan
ELIOT L. ENGEL, New York
TOM SAWYER, Ohio
ALBERT R. WYNN, Maryland
GENE GREEN, Texas
KAREN McCARTHY, Missouri
TED STRICKLAND, Ohio
DIANA DeGETTE, Colorado
THOMAS M. BARRETT, Wisconsin
BILL LUTHER, Minnesota
LOIS CAPPS, California
MICHAEL F. DOYLE, Pennsylvania
CHRISTOPHER JOHN, Louisiana
JANE HARMAN, California

DAVID V. MARVENTANO, *Staff Director*
JAMES D. BARNETTE, *General Counsel*
REID P.F. STUNTZ, *Minority Staff Director and Chief Counsel*

## SUBCOMMITTEE ON HEALTH

MICHAEL BILIRAKIS, Florida, *Chairman*

JOE BARTON, Texas
FRED UPTON, Michigan
JAMES C. GREENWOOD, Pennsylvania
NATHAN DEAL, Georgia
RICHARD BURR, North Carolina
ED WHITFIELD, Kentucky
GREG GANSKE, Iowa
CHARLIE NORWOOD, Georgia
  *Vice Chairman*
BARBARA CUBIN, Wyoming
HEATHER WILSON, New Mexico
JOHN B. SHADEGG, Arizona
CHARLES "CHIP" PICKERING, Mississippi
ED BRYANT, Tennessee
ROBERT L. EHRLICH, Jr., Maryland
STEVE BUYER, Indiana
JOSEPH R. PITTS, Pennsylvania
W.J. "BILLY" TAUZIN, Louisiana
  (Ex Officio)

SHERROD BROWN, Ohio
HENRY A. WAXMAN, California
TED STRICKLAND, Ohio
THOMAS M. BARRETT, Wisconsin
LOIS CAPPS, California
RALPH M. HALL, Texas
EDOLPHUS TOWNS, New York
FRANK PALLONE, Jr., New Jersey
PETER DEUTSCH, Florida
ANNA G. ESHOO, California
BART STUPAK, Michigan
ELIOT L. ENGEL, New York
ALBERT R. WYNN, Maryland
GENE GREEN, Texas
JOHN D. DINGELL, Michigan,
  (Ex Officio)

(II)

SUBCOMMITTEE ON OVERSIGHT AND INVESTIGATIONS

JAMES C. GREENWOOD, Pennsylvania, *Chairman*

MICHAEL BILIRAKIS, Florida
CLIFF STEARNS, Florida
PAUL E. GILLMOR, Ohio
STEVE LARGENT, Oklahoma
RICHARD BURR, North Carolina
ED WHITFIELD, Kentucky
  *Vice Chairman*
CHARLES F. BASS, New Hampshire
W.J. "BILLY" TAUZIN, Louisiana
  (Ex Officio)

PETER DEUTSCH, Florida
BART STUPAK, Michigan
TED STRICKLAND, Ohio
DIANA DeGETTE, Colorado
CHRISTOPHER JOHN, Louisiana
BOBBY L. RUSH, Illinois
JOHN D. DINGELL, Michigan,
  (Ex Officio)

# CONTENTS

| | Page |
|---|---|
| Testimony of: | |
| Bentley, Zachary T., President, Ven-A-Care, Inc | 46 |
| Connaughton, Thomas A., President, American Association of Homecare | 110 |
| Emanuel, Ezekiel, Chief, Clinical Bioethics Department, Warren G. Magnuson Clinical Center, National Institutes of Health | 117 |
| Grob, George F., Deputy Inspector General, Department of Health and Human Services | 38 |
| Lamphere, JoAnn, Lewin Group | 115 |
| Martyn, Kevin, Executive Director, Care For Life | 107 |
| Norton, Larry, President, American Society of Clinical Oncologists | 101 |
| Scanlon, William J., Director, Health Care Issues, General Accounting Office | 30 |
| Scully, Thomas A., Administrator, Centers for Medicare and Medicaid Services | 82 |
| Material submitted for the record by: | |
| Sands, Leo E., Executive Vice President, Chief Compliance Officer, US Oncology, Inc., letter dated September 19, 2001, to Hon. James Greenwood, enclosing material for the record | 145 |
| Stark, Hon. Pete, a Representative in Congress from the State of California, prepared statement of | 143 |

# MEDICARE DRUG REIMBURSEMENTS: A BROKEN SYSTEM FOR PATIENTS AND TAXPAYERS

## FRIDAY, SEPTEMBER 21, 2001

House of Representatives,
Committee on Energy and Commerce,
Subcommittees on Health,
and Oversight and Investigations,
*Washington, DC.*

The subcommittees met, pursuant to notice, at 9:40 a.m., in room 2123, Rayburn House Office Building, Hon. Michael Bilirakis and Hon. James C. Greenwood presiding.

Members present Subcommittee on Health: Representatives Bilirakis, Barton, Upton, Greenwood, Burr, Ganske, Norwood, Bryant, Buyer, Pitts, Tauzin (ex officio), Brown, Barrett, Capps, Hall, Pallone, Deutsch, Stupak, Engel, and Green.

Members present Subcommittee on Oversight and Investigations: Greenwood, Bilirakis, Stearns, Gillmor, Largent, Burr, Bass, Tauzin (ex officio), Deutsch, and Stupak.

Staff present: Chuck Clapton, majority counsel; Yong Choe, legislative clerk; and Edith Holleman, minority counsel.

Mr. GREENWOOD. Good morning. This joint hearing of the Energy and Commerce Committee's Subcommittees on Oversight and Investigation and Health will now come to order. Before we proceed with the members' opening statements, Mr. Bilirakis and I would like to make a few remarks.

Among the thousands of lives so hideously taken from us on September 11 was that of Lisa Raines. Lisa Raines was the senior vice president of government relations for Genzyme Corporation. Those of you who knew her know she was a giant in the biotech and pharmaceutical industry for at least the past 15 years and a friend to many. Her memorial service is scheduled for 11 o'clock this morning, and for that reason these subcommittees considered very seriously postponing once again this hearing. We wish we could have done that.

By the conclusion of this hearing, I think it will be apparent to all the urgency to fix this broken AWP system. Given the fact that we have only about 4 weeks for session for this year, we concluded that it was impossible, particularly given next week's short schedule, to postpone this hearing once again. We regret we had to make that decision because we know there were many who would like to be here, but also felt their priority was to be at the memorial service.

(1)

2

Having said that, I would like to recognize Chairman Bilirakis for his comments.

Mr. BILIRAKIS. Thank you, Mr. Chairman.

On September 11 of this year, American's calm was shattered by a horrendous act of terrorism that will long be remembered. Our thoughts and prayers are with those whose lives have been forever altered by this tragedy.

When American Airlines flight 77 went down, the health community lost a dear friend and respected colleague, Lisa Raines. Lisa was a senior vice president of government relations for Genzyme Corporation. Lisa had worked closely and often with the Energy and Commerce Committee through the years, working to enact the Drug Export Amendments Act of 1986, the prescription drug user fee, PDUFA, the FDA Export Reform and Enhancements Act of 1996, and the Food and Drug Administration Monitorization Act, or FDAMA.

A vital member of the Washington biotechnology and pharmaceutical community, Lisa previously worked for the Industrial Biotechnology Association, now BIO, and the Congressional Office of Technology Assessment. Lisa's expertise and insight as well as her bright personality and charm will be missed by this committee, the Congress and the health community. I think the publication BioCentury said it best when it said Lisa was as much a fixture of the biotech industry as a double helix, and it is hard to comprehend that she is gone. She leaves a hole in the industry's relationship with the outside world that will be difficult to fill.

I join with the chairman and members of this committee as we offer our condolences and prayers to Lisa's family and friends. Please join us in a moment of silence in honor of Lisa Raines.

[The prepared statement of Hon. Michael Bilirakis follows:]

PREPARED STATEMENT OF HON. MICHAEL BILIRAKIS, CHAIRMAN, SUBCOMMITTEE ON HEALTH

I'd like to thank Chairman Greenwood for joining me today to examine the issues surrounding the current system for Medicare drug reimbursement. The Health Subcommittee has spent a considerable amount of time in this Congress examining how best to add a comprehensive prescription drug benefit to the Medicare program. This hearing builds off of work we began in the last Congress where we examined the reimbursements for the limited drug coverage currently available in the Medicare program.

I'd like to welcome and thank all of the witnesses, including Tom Scully from CMS and Bill Scanlon from GAO. We rely often on these government officials and their offices for factual information and detailed analysis, thank you for coming today. I'd also like to welcome Mr. Zachary Bentley from my home state of Florida. I know that your testimony, and that of all the witnesses, will help inform the Committee and the public about the issues regarding Medicare's current reimbursements to health care providers for certain drugs used to treat patients.

The Medicare program currently provides coverage for a small number of drugs, limited principally to those that are administered incident to a physician's treatment or in conjunction with covered durable medical equipment, such as inhalation drugs used with a nebulizer. Since at least 1992, Medicare has determined the appropriate reimbursement price for these covered drugs by referring to an industry trade publication known as the Red Book, which lists what manufacturers purport to be the Average Wholesale Price for their drugs. Since 1997, providers who administer these drugs to Medicare beneficiaries have been reimbursed for their cost at prices equal to Average Wholesale Price (AWP) minus five percent. Of this set amount, Medicare Part B covers 80 percent, while Medicare beneficiaries can be required to pay the remaining 20 percent as a co-payment. Today's hearing will examine how Medicare's current reimbursement system, for the relatively few drugs that

3

are covered, is costing beneficiaries and taxpayers more than is necessary and may be having an adverse impact on the health of some of our most vulnerable citizens.

I recently toured a Clearwater oncology center in my Florida district and I can tell you what great work oncologists do and how important their work is to so many Americans. At the request of my constituent Dr. Marcos Joppert I would like to admit this white paper on oncology payments into the record.

This will prove to be a lengthy hearing and thus I will limit my opening statement so that we may get to the important testimony of the witnesses—who I again thank for their effort and cooperation.

Mr. GREENWOOD. Thank you, Chairman Bilirakis, for your comments. As the President said, let us get back to work.

Let me begin by thanking all of the witnesses who have agreed to testify today at today's hearing. Your testimony will shed light on an insidious problem about how the Medicare program reimburses health care providers for certain drugs used to treat very sick patients. Today's hearing, which is a culmination of years of investigative and audit work performed by subcommittee staff and the witnesses from our first panel, will examine how Medicare's reimbursement system for the relatively few drugs currently covered by the program is costing Medicare and its beneficiaries roughly $1 billion every year in overcharges while having an adverse impact on the health care of some of our most vulnerable elderly and disabled citizens.

We will hear how the manufacturer of a chemotherapy drug like Vincasar sold it to health care providers for $7.50, then reported the price to Medicare as $740. Medicare paid the doctor almost $600 for the same drug, and the poor sick patient got hit up for another $150.

We will also hear today from the Department of Health and Human Services Office of Inspector General about how many other overcharges result in Medicare paying more than $886 million every year in inflated prices for just a sample of 24 Medicare-covered drugs reviewed by that office. The total figure for all Medicare-covered drugs very likely exceeds a billion dollars each year.

It should be noted that Medicare currently reimburses for a very limited number of drugs, chemotherapy agents, blood-clotting factors used to treat hemophilia and inhalant drugs used to treat respiratory diseases, the total cost of which is approximately $4 billion a year. A billion dollars of taxpayer dollars is wasted every year in this program because under current Federal law and regulations, Medicare is paying for drugs at AWP. AWP, or average wholesale price, could also be an acronym for "ain't what's paid." It is quite clear that despite its name, AWP is not the average wholesale price at which these drugs are sold to health care providers or anything close to it. To the contrary, it appears that for many of these drugs, AWP is simply an artificial price established by certain drug manufacturers and reported to industry trade publications for purposes of third-party reimbursement, a price which bears little, if any, relationship to what is actually paid for these drugs by health care providers.

Before we go further, however, let us be clear about one thing. Most drug companies establish AWPs that are, in fact, fairly reliable indicators of average wholesale prices, but in those instances where they do not, the difference between what providers actually pay and what Medicare reimburses results in what is commonly re-

4

ferred to as a spread, an unwarranted profit pocketed by the health care provider each time he or she utilizes that particular drug. We will see evidence today demonstrating how some drug manufacturers have manipulated the reported AWPs and thus the spreads on their drugs in order to create financial incentives for providers to use their drugs over competitors' products. In doing so they have provided a financial windfall to the health care providers that enables them to sell more of their drugs. In the words of one manufacturer, this is a win-win-win situation for manufacturers, wholesalers and health care providers. The big losers in these marketing ploys are the Medicare program, its elderly and disabled beneficiaries, and the American taxpayer, all of whom have to foot the bill for greatly inflated drug costs.

Of even greater concern to America's seniors than the impact of having to pay inflated copayments on drugs based on prices that are sometimes tens or hundreds of times higher than what their health care provider actually paid for the drugs is that they also may have had the quality of their health care adversely affected by this perverse system. We will hear how the profits available for utilizing certain drugs appear to be improperly affecting some health care providers' clinical decisions, influencing them to provide unnecessary care and utilize drugs based on profit margins rather than therapeutic efficiency.

For example, we will learn of cases in which the utilization of certain drugs skyrocketed without any reasonable clinical justification after manufacturers created large Medicare-funded financial windfalls to health care providers to encourage them to use their drugs. In one such case, and the case is on the screen there, Medicare utilization and reimbursements of the inhalation drug ipratropium bromide used to treat respiratory diseases increased more that twentyfold between 1995 and 2000, from $14 million in 1995 to more than $300 million in 2001, a time period in which the drug went from having no spread to having a Medicare-covered spread of 300 percent.

We will also hear about how terminal cancer patients received aggressive courses of chemotherapy, raising questions about whether the motivation for providing such care was the profit available from the use of Medicare-covered chemotherapy drugs.

Congress has long championed the fight against cancer. We supported increased funding for research at the National Institutes of Health and to improve the quality of clinical care. We fought to ensure that the proper incentives exist to develop new and innovative drugs. To then learn of the instances in which quality of patient care might have been adversely affected by the financial benefits available to providers from utilizing certain drugs is nothing short of outrageous. While providers and their associations strongly denied being influenced by any such considerations, we cannot tolerate a system that could leave such motivations even open to question.

Providers do not generally deny that they often reap huge profits on the utilization of certain Medicare-covered drugs. Instead they argue that they currently depend on these profits in order to make up for other services in which Medicare under-reimburses them. We will hear testimony today that will confirm that like many

5

other groups of providers, these providers who administer Medicare-covered drugs are not fully reimbursed for all the costs associated with treating their patients.

We should reimburse all providers fairly for their expenses; nevertheless a system in which the use of certain drugs can influence clinical medical decisions is not the answer. Life-and-death decisions about the treatment of those who suffer from the scourge of cancer should be governed exclusively by a concern for the patient and not the margin of profit.

When this hearing is over, my colleagues and I will work with this new administration as well as providers and drug companies to scrap this flawed system. We will need to develop a solution that results in Medicare paying prices for drugs that are closer to the actual prices paid by health care providers. Similarly we will need to take steps to ensure that health care providers are sufficiently reimbursed for all of their services so that the quality of care they provide to the Medicare patients is not diminished by changes made to the drug reimbursement system.

I look forward to hearing from CMS Administrator Scully today about what steps his agency can be directed to take to guarantee that this scandal is resolved as quickly as and effectively as possible. In these new and perilous times when our Nation and our people may be called upon to make great personal and financial sacrifices in the defense of our country, Congress has the heavy burden of making sure that every available resource is used wisely, and if we hope to find a way to pay for an expanded Medicare drug benefit that will assist seniors to purchase prescription drugs even as we take on a renewed and determined defense of our homeland, these abuses cannot be tolerated.

If we are going to provide Medicare beneficiaries with a comprehensive prescription drug benefit, and we must, we have to stop wasting billions of dollars on the existing program. We will need every Medicare dollar we can find. In addition, our efforts to resolve this problem will hopefully serve as an example for those State Medicaid problems and other third-party payers who face similar issues in their reimbursements for the costs of drugs. This in turn could result in billions of additional dollars in taxpayers' savings beyond those amounts that were discussed above applicable only to Medicare.

There is one more important lesson in all of this. Government-run programs such as this, which escape the rigors and discipline of the marketplace, inevitably end as expensive failures. It is only by forming an honest partnership between Government and private sector that we can hope to build a new and better Medicare program on a sound financial footing.

Again, I wish to extend my thanks to all of the witnesses who agreed to appear at today's hearing to inform us about this serious problem. While I am disappointed that the invited drug manufacturers declined to testify today about these practices and how the system could be reformed, I am nonetheless committed to moving forward on this issue in a positive and productive manner with all parties so that we can fix this system quickly and protect America's Medicare beneficiaries from further financial and personal harm.

6

The Chair yields 5 minutes to the ranking member of the Oversight and Investigations Subcommittee, Mr. Deutsch.

Mr. DEUTSCH. Thank you, Mr. Chairman. Thank you also for your opening comments. I think for any of us not to mention September 11 would be a mistake. This is, I know, my first hearing since then, and I think for all of us on this dais, and America and the world changed on September 11, and even our work here in a sense has changed. I think if we do everything we do in our lives, I think all Americans do everything they do a little bit differently, in fact maybe a lot differently than—after September 11.

Let me mention three things and summarize an opening statement. The three things in terms of the issue in front of us that are most disconcerting, the first issue is there appears to be some evidence, and I hope it is developed in the course of the hearing, that some manufacturers, by increasing the spread on the average wholesale price, have encouraged physicians to actually do substitutions on medication. That is obviously incredibly disserving from best medical practices to best financial incentives for that individual position or office, and that is obviously a system which is fundamentally broken.

The second issue, which again is a very disconcerting issue, is that for Medicare beneficiaries, as most people are aware, their copayments are based upon Medicare reimbursements, not on the reimbursement that the physician is paying for the drug. So there apparently, again, the testimony, I think, will be brought out during the course of this hearing cases, and apparently many cases, where the 20 percent copayment is, in fact, more than the physician actually paid for the drug, and obviously the situation of Medicare beneficiaries, that is an absolutely absurd situation.

As we develop this—and this is part of the problem, and I am looking forward to testimony about this as well—is we have a situation where we have a reimbursement system which I don't think anyone can honestly defend in terms of the average wholesale price, but I think we also have a reimbursement system on the physicians' side that is hard to defend as well. Obviously these two things are related. I guess there is debate about how related they actually are, but I think that we need to acknowledge that, and we need to do our part in terms of fixing it.

I have a lengthy statement, which I think at this point, based on the time, I would rather submit for the record. So I will submit that for the record as well as Mr. Dingell has a statement and the chairman of the Ways and Means Committee, Mr. Stark, also has a statement that they were going to submit for the record as well.

[The prepared statement of Hon. Peter Deutsch follows:]

PREPARED STATEMENT OF HON. PETER DEUTSCH, A REPRESENTATIVE IN CONGRESS FROM THE STATE OF FLORIDA

Thank you, Mr. Chairman, for holding this very important and long overdue hearing. For many years, the Inspector General of the Department of Health and Human Services—like a voice crying in the wilderness—has been issuing reports telling the Department and the Congress that the taxpayers were being gouged for drug payments under both the Medicaid and the Medicare programs. These federal programs were paying providers the published Average Wholesale Price or AWP for prescription drugs which was, in truth, far more than the drug manufacturers were charging them. The program now has spun so far out of control that the annual overpayments may be as high as $1.9 billion. We will hear testimony today of a

7

scheme where doctors prescribing drugs to be administered in patients' homes wanted a kickback from the infusion companies based on the AWP spread over actual cost. The Justice Department and numerous states have been investigating this situation, and hundreds of millions of dollars have been recovered.

Only Congress and the reimbursing agency have been silent. In fact, we—particularly those on the other side of the aisle who are concerned about anything that they think might resemble setting prices—have stopped almost every reform effort. We must take steps now to eliminate this abuse.

Over the years, Medicaid at both the federal and state levels has been able to get a 15 percent discount from the AWP plus a rebate from the manufacturer that can reach up to another 16 percent based on the reported Average Manufacturers Price or AMP. But drug manufacturers, the Medicare carriers, the Centers for Medicare and Medicaid Services (CMS) and its predecessor, the Health Care Financing Administration, or HCFA, the Congress and the providers have all combined to establish, further and abuse the fraudulent Medicare drug reimbursement system. The drug companies—who, Mr. Chairman, are notable by their absence at this hearing since they *were*, I believe, the instigators of this scheme—reported artificial and false Average Wholesale Prices to the public for reimbursement purposes while at the same time *not one* of their customers was paying those prices.

The Medicare carriers paid those prices and failed their responsibility to assure that actual drug prices were being paid. HCFA tried to reform the system, but often gave up because of provider objections. Congress and the Executive branch also aborted HCFA's reform attempts by citing the Paperwork Reduction Act and requiring reports from the General Accounting Office before any changes could be made. The reports we are receiving today are the most recent mandated by Congress in place of real action.

As we will hear in testimony today and is verified by the documents to be placed into the record, the pricing abuses have reached the point at which drug manufacturers use the "spread" between the AWP and the actual price paid as a marketing tool to sell their products. Not only does the taxpayer get gouged; so does the Medicare beneficiary who is required to pay 20 percent of the total cost of the drug. A chart prepared by one of the witnesses provides *nine* examples in which the 20 percent copayment covered the entire cost of the drug to the provider. A breast cancer treatment costs the provider $450; it charges Medicare $1,359. The co-pay is $272; the profit is $909.

Some of the providers of out-patient drug treatment that we will hear from today will say that they are using these excessive payments to cover their treatment costs in other areas. They allege that they will not be able to continue providing service if this is not remedied. If that is true, their arguments and those of other specialities suffering from similar under payments should be documented and presented to CMS. However, there is a pilot Medicare drug program in Texas underway in which competitive drug pricing is used. The costs are down, and there is no evidence of the withdrawal of any providers. We must also remember that the General Accounting Office has found a number of times that there is little or no evidence of under-reimbursement of providers under either Medicare or Medicaid.

Mr. Chairman, I look forward to hearing from these witnesses.

Mr. GREENWOOD. Without objection, all members' opening statements will be submitted for the record.

The Chair recognizes the chairman of the full committee, the gentleman from Louisiana, Mr. Tauzin.

Chairman TAUZIN. Thank you, Mr. Chairman.

Mr. Chairman, I, too, want to thank you for the moment of silence for the recognition of Lisa Raines and the loss of so many friends across America, but also your determination to move forward with this important hearing, and I want to congratulate the staff who worked with you to develop this hearing, which I believe will highlight one of the most important abuses within the Medicare system that this committee has ever uncovered.

What you will see today is a situation that has turned Adam Smith on his head; a situation which, because of the system in which we reimburse physicians for the cost of certain drugs particularly in chemotherapy and inhalants and several other categories, but the Government of the United States is paying in some

8

cases many times the price that the physician is actually buying the drugs for. Worse than that, worse than this loss of billions of dollars of Medicare dollars that taxpayers put up to make sure that our mothers and fathers and grandmothers and grandfathers and all our relatives are properly cared for in the Medicare health system and in the Medicaid system, by the way, worse than this loss of the funds that are critical to sustain the program is the fact that the patients, those loved ones we protect under this system, are being required under this system to put up not 20 percent of the cost of the drugs to the doctor, but in one case—and I have a chart I want to show you up there, the Medicare 20 percent copay chart—in one case with a drug called Doxorubicin, the patient is putting up not 20 percent, but 200 percent of the cost. The patient who is supposed to put up 20 percent is putting up 200 percent of the true cost of the drug.

Look at the drug etoposide. In that case the patient is putting up not 20 percent, but 300 percent of the cost, triple the cost the doctor spends on the drug. The poor Medicare patient ends up tripling his contribution for the total cost of that drug instead of putting up just one-fifth of the cost.

Look at the drug Leucovorin. It sounds like a character in The Godfather, maybe properly named. In that case the Medicare patient is putting up 500 percent of the cost of the Medicare drug as a copay.

Look at the column of the Florida Medicare allowable. Look at what the doctor is getting back from the Medicare system in Florida for those three drugs. The doctor is paying for Leucovorin $1.25 for 50 milligrams, and the patient is putting up $7.09, and the Medicare system is paying the doctor up to $35.47. That is the spread we have been talking about. The spread between the real cost of the physician and the cost the Medicare system is paying for the drug, and perhaps the copay cost the poor patient has to put up, in some cases as high as 500 percent of the real cost of the drug to the doctor. How can we tolerate such a system any longer?

Mr. Chairman, I really appreciate your uncovering this and allowing this hearing literally to go forward when I know most people are concerned about us getting back to work too fast. We have got to get to work on this one fast. Not only does this rob the Treasury and the Medicare fund of billions of dollars that should not be paid because they are not the average wholesale prices, they are some kind of awful artificial wholesale price, but, again, it turns Adam Smith on his head.

Think about this with me for a second. We introduced generic drugs into the system to create competition. Do you know what happens to the system when a generic drug comes into play? Evidence we have that we will develop today indicates that when a generic drug comes into competition with a patent drug finally, the price doesn't come down. The price goes up because both of the drug companies understand that if they are going to sell that drug to the doctor, they have got to give them a bigger spread. So they are in competition to give them a bigger spread, and they both post higher and higher artificial wholesale prices to the Medicare system.