# Exhibit 7

Shanin Specter, Esquire
Donald E. Haviland, Jr., Esquire
KLINE & SPECTER
1800 Chapel Avenue, Suite 302
Cherry Hill, NJ 08002
856-424-9162 telephone

COUNSEL FOR PLAINTIFF AND THE CLASS

| | |
|---|---|
| INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL NO. 68 WELFARE FUND, <br><br> Plaintiff, <br><br> v. <br><br> AstraZeneca PLC; AstraZeneca Pharmaceuticals LP; AstraZeneca LP; Zeneca, Inc.; TAP Pharmaceutical Products, Inc.; Abbott Laboratories; Takeda Chemical Industries, Ltd.; Bayer AG; Bayer Corporation; Miles Laboratories, Inc.; Cutter Laboratories, Inc.; GlaxoSmithKline, P.L.C.; SmithKline Beecham Corporation; Glaxo Wellcome, Inc.; Pharmacia Corporation; Pharmacia & Upjohn, Inc.; Monsanto Company; G.D. Searle Company; Sanofi-Synthelabo Inc.; Johnson & Johnson; Alza Corporation; Centocor, Inc.; Ortho Biotech, Inc.; Alpha Therapeutic Corporation; Hoffman La-Roche Inc.; Amgen, Inc.; Immunex Corporation; Aventis Pharmaceuticals, Inc.; Aventis Behring L.L.C.; Hoechst Marion Roussel, Inc.; Centeon, L.L.C.; Armour Pharmaceuticals; Baxter International Inc.; Baxter Healthcare Corporation; Immuno-U.S., Inc.; Boehringer Ingelheim Corporation; Ben Venue Laboratories, Inc.; Bedford Laboratories; Roxane Laboratories, Inc.; Bristol-Myers Squibb Company; Oncology Therapeutics Network Corporation; Apothecon, Inc.; Dey, Inc.; Fujisawa Pharmaceutical Co., Ltd.; Fujisawa Healthcare, Inc.; Fujisawa USA, Inc.; Novartis International AG; Novartis Pharmaceutical Corporation; Sandoz Pharmaceutical Corporation; Schering-Plough Corporation; Warrick Pharmaceuticals Corporation; Sicor, Inc.; Gensia Sicor Pharmaceuticals, Inc.; Wyeth; Wyeth Pharmaceuticals; Saad Antoun, M.D.; Stanley C. Hopkins, M.D.; Robert A. Berkman, M.D.; Does 1-50; ABC Corporations 1-50; and XYZ Partnerships; and Associations 1-50, <br><br> Defendants. | SUPERIOR COURT OF NEW JERSEY <br><br> EQUITY DIVISION <br><br> MONMOUTH COUNTY <br><br> CIVIL ACTION NO.  C 193.03 <br><br> JURY TRIAL DEMANDED <br><br> CLASS ACTION COMPLAINT <br><br> *MON L 3136.06* |

© 2003 KLINE & SPECTER

### CLASS ACTION COMPLAINT

Plaintiff, International Union of Operating Engineers, Local No. 68 Welfare Fund ("Plaintiff"), by its attorneys, brings this Complaint on its own behalf, and on behalf of all others similarly situated, pursuant to the common law and statutes of New Jersey, to obtain declaratory and injunctive relief, damages, costs of suit, attorneys' fees and other appropriate relief from the Defendants. Plaintiff and the Class it seeks to represent make no claim under any federal law, including ERISA and Medicare, and expressly disavow any right to recover under any federal law, including ERISA and Medicare, to the extent any such right exists under the facts alleged herein and further expressly disavows any so-called "Best Price" claim. Plaintiff complains and alleges, upon information and belief, as follows:

### NATURE OF THE CASE

1.      This case is brought by Plaintiff, International Union of Operating Engineers, Local No. 68 Welfare Fund, as a class action on behalf of hundreds of thousands of individuals and entities to recover monies overpaid as a result of Defendants' fraudulent scheme and conspiracy that targeted at least three (3) types of healthcare patients: (1) "Government Assistance Patients": those who subscribe to and rely on one or more government assistance programs for the partial payment of their medical care and treatment (hereinafter referred to collectively as "government assistance programs"); (2) "Private Assistance Patients": those who subscribe to and rely on private health insurance carriers and programs for the partial payment of their medical care and treatment; and (3) "No Assistance Patients": those who have no insurance at all for the payment of their medical care and treatment.

© 2003 KLINE & SPECTER

2

## CANCER, INHALANT AND MISCELLANEOUS OTHER DRUGS
## INCLUDED IN THIS ACTION

2.      Government assistance programs administered by the federal government, for the most part, do not cover the cost of prescription drugs. However, such programs typically do cover the cost of drugs administered by or under the supervision of a medical physician. These drugs include many intravenously-administered drugs, a large number of which are infused in the doctor's office, as well as drugs administered by implanted delivery systems, and drugs for inhalation administered by nebulizer equipment, among others.

3.      Drugs administered intravenously under the supervision of a physician include drugs which fall within the broad class of cancer (anti-neoplastic) medications. Drugs in the anti-neoplastic class are administered according to the type, class, and stage of the cancer that is being treated. For example, paclitaxel (Anzatax®, Biotax®) is indicated for treatment of forms of lung cancer, breast cancer, ovarian cancer and Kaposi's sarcoma. More than one drug within the class may be indicated for the treatment of a specific type of cancer. For instance, etoposide (Etoposide, Etopophos, Toposar) is also used in the treatment of breast cancer. Prostate cancer is treated with primary and secondary antihormonal medications. Primary antihormonals, include leuprolide acetate (Lupron®, Viadur®, Trelstar™ and Eligard™) and goserelin acetate (Zoladex®). Secondary antihormonals include bicalutamide (Casodex®), flutamide (Eulexin®), and nilutamide (Nilandron®). Other medications to treat prostate cancer include the hormone megestrol (Megace®) and the chemotherapeutic agent etramustine phosphate (Emcyt®).

4.      Drugs used in the treatment of cancer have other effects in addition to their anti-neoplastic actions. These effects are often referred to as side effects. The most frequent side effects reported among anti-cancer agents are anemia (decreased numbers of red blood cells),

© 2003 KLINE & SPECTER                    3

hypercalcemia (increased calcium), nausea, and decreased immune capacity to fight bacterial, fungal and viral infections. There is a wide variety of drugs available for the specific treatment of these side effects, many of which are also administered by a physician and therefore covered by government assistance programs. Drugs used to treat the various deficiencies of blood cells include the erythropoietin class of drugs (Procrit®, Aranesp™, Epogen®), the anti-neutropenic drugs (Neupogen®, Leukine®) and anti-thrombocytopenic drugs (Neumega®). Production of other blood cells made in the bone marrow may be decreased by anticancer drugs including white blood cells (leukopenia) and platelets (thrombocytopenia). Intravenously administered, and therefore physician-administered, medications to combat hypercalcemia include drugs like Aredia® and Didronel®. Anti-nausea medications given intravenously at the time of administration of anti-cancer drugs that cause nausea include Anzemet®, Zofran®, Kytril®, and Reglan®.

5.    Patients with immune deficiencies, such as patients undergoing cancer chemotherapy, organ transplant patients, and patients with HIV/AIDS require intravenous administration of antibiotics, antifungal drugs and antiviral medications, as well as specific plasma proteins and immune globulins.

6.    There are other medical conditions that involve the use of physician-administered medications, or medications given through specialized delivery systems that are covered by government assistance programs. Medications for patients who are undergoing dialysis, such as agents to combat hypocalcemia (decreased serum calcium) like Calciject® and Zemplar®, and the antianemic drugs of the erythropoetin type, may be intravenously administered. Patients with hemophilia require the intravenous administration of blood clotting factors such as factor VIII (Bioclate, Helixate, Humate-P, Monoclate-P, Hemofil M, Kogenate®, Koate®) and factor IX (Mononine, Bebulin).

© 2003 KLINE & SPECTER                4

7.      Government assistance programs also cover medications for the treatment of obstructive airways diseases that are administered with the use of a nebulizer, such as albuterol (Proventil®, Alupent®, Ventolin®, and Flovent®), cromolyn sodium (Intal® and generics) and ipratroprium bromide (Atrovent®, Combivent® and DuoNeb®).

8.      Many intravenously-administered medications must be mixed with various solutions. These solutions contain sodium chloride, dextrose, or various combinations thereof, which are also covered by government assistance programs, as are various plasma components and expanders used in the treatment of plasma volume deficiency.

9.      Medications administered by or under the direct supervision of a physician and/or prescribed by a physician and covered for reimbursement under government assistance programs therefore cover a broad spectrum of classes and indications. Drug manufacturers who produce, market and sell medications which fall within these classes, and may be identical or very similar and have identical or closely-related indications, thus have aligned interests in ensuring that their drugs continue to be prescribed and covered by and reimbursed under government and private assistance programs.

10.      The drugs described above that are included in this lawsuit may be generally classified into three (3) areas: (1) "cancer drugs," (2) "inhalant drugs," and (3) "miscellaneous other drugs" covered under government and/or private assistance programs, and/or paid for or reimbursed at a cost based, in whole or part, on the average wholesale price (or "AWP") for such drugs (or the AWP for the equivalent or "Least Costly Alternative" ["LCA"] after LCA-based reimbursement methodologies were adopted in New Jersey.

11.      "Cancer drugs" include drugs used in the treatment of cancer (*i.e.*, antineoplastic drugs), as well as drugs that are prescribed in conjunction with cancer treatment (*i.e.*, antianemic,

© 2003 KLINE & SPECTER                    5

antihypercalcemic, antineotropenic, antihormonal drugs as described above). Examples of these drugs include: bicalutamide, calcitral carboplatin, cisplatin, docetaxel, doxorubicin, epoetin alpha, etoposide, factor VIII, factor IX, filgrastim, flutamide, goserelin acetate, granisetron, leuprolide acetate, megestrol, nilutamide, and ansetron, paclitaxel, and tamoxifen, among others.

12.     "Inhalant drugs" include drugs used in the treatment of various breathing disorders, including such serious conditions as Chronic Obstructive Pulmonary Disease ("COPD"). Examples of these drugs include:  albuterol sulfate, cromolyn sodium and ipratropium bromide.

13.     "Miscellaneous other drugs" include drugs used to treat various medical conditions, including cardiac and kidney problems, immune deficiencies, hemophilia, organ transplants, etc., (*i.e.*, antihemorrahagic, antihemophilic, antidiabetic, immunosuppressant drugs). Examples of these drugs include: acyclovir, cyclosporine, dexamethasone, factor VIII, mycophenotate mofetil, tacrolimus, and vancomycin, among others.

## SUMMARY OF CLAIMS

14.     During the period from at least 1991 through the present, the exact dates of which are unknown by the plaintiff at this time, defendants created and implemented a fraudulent marketing, pricing, sales and distribution scheme to defraud plaintiff and the Class by substantially increasing the sales of cancer, inhalant and miscellaneous other drugs and reaping unlawful profits at the expense of patients who took these drugs and paid for them.

15.     Among other things, defendants systematically, among themselves and with other entities and individuals, created a pervasive illegal system to cause patients on cancer, inhalant and miscellaneous other drugs to overpay substantial amounts of money for the specific purpose of increasing the market share of these drugs and maximizing corporate profits at the expense of plaintiff and the Class.  The improper marketing, pricing, sales and distribution practices relate to,

*inter alia*, the following: (a) deliberately overstating the Average Wholesale Prices (or "AWPs") for cancer, inhalant and miscellaneous other drugs, the rates upon which reimbursements under government and private assistance programs are made, including the co-payment portions paid by government and private assistance patients and their carriers, so that the plaintiff and the Class paid artificially inflated amounts of money for cancer, inhalant and miscellaneous other drugs; (b) providing and distributing free samples of these drugs to medical providers and instructing them that they could and should bill plaintiff and the Class for such free samples; (c) providing other unlawful inducements to medical providers to prescribe these drugs, causing plaintiff and the Class to pay artificially inflated prices for these drugs; and (d) working in concert with each other and others to circumvent efforts to reduce prescription drug costs.

16.    Because of the unlawful conduct of all of the defendants, plaintiff and the Class paid artificially inflated prices for cancer, inhalant and miscellaneous other drugs.

17.    On behalf of plaintiff and the Class, this action seeks compensatory and punitive damages, statutory damages and equitable relief, including restitution and mandatory and prohibitive injunctive relief, among other forms of relief. It seeks, on behalf of plaintiff and the Class, the imposition of fines, civil penalties, restitution and other monetary relief against each of the defendants.

### JURISDICTION AND VENUE

18.    Plaintiff has asserted claims exclusively under the common law and statutes of New Jersey. No federal claim is asserted.

19.    Plaintiff brings this action exclusively pursuant to consumer protection laws of New Jersey, as well as the New Jersey common law. No aspect of the claims asserted in this Class Action Complaint is brought pursuant to any federal law, including either ERISA or Medicare, and thus no

© 2003 KLINE & SPECTER

federal question is raised by any of the claims asserted.  To the extent any of plaintiff claims or

factual allegations herein may be construed to have stated any claim under federal law, such claim

is expressly and undeniably disavowed and disclaimed by plaintiff and the Class.  Moreover, to the

extent any of plaintiff' claims or factual allegations herein are urged by any Defendant to have stated

any claim under federal law, plaintiff expressly disavows such claims or allegations and reserves the

right to modify this Complaint to conform its claims.

     20.     This Court has subject matter jurisdiction because this is an action for damages

which, in the aggregate, exceeds $10,000.00 exclusive of interest, costs and attorneys' fees.

     21.     This Court has jurisdiction over the Defendants because they are corporations

regulated under the laws of the State of New Jersey and are present or located in, do sufficient

business in, have sufficient minimum contacts with, and/or otherwise intentionally avail themselves

of the laws and markets of the State of New Jersey through the manufacture, promotion, marketing,

distribution and sale of drugs and products in New Jersey.

     22.     Venue is proper in this Court since plaintiff, as well as numerous Class members,

were prescribed and paid for cancer, inhalant and miscellaneous other drugs from doctors, hospitals

and others located in this County and throughout New Jersey, and otherwise engaged in the

transactions which form the basis of this action by having paid for these drugs.  In particular,

defendant Saad Antoun, M.D. resides and works in this County.

### THE PARTIES

**Plaintiff**

     23.     Plaintiff, International Union of Operating Engineers, Local No. 68 Welfare Fund,

resides in the State of New Jersey.

© 2003 KLINE & SPECTER          8

24.    Plaintiff and the Class paid for cancer, inhalant and miscellaneous other drugs manufactured, marketed, distributed and sold by defendants in New Jersey and throughout the country and were charged and paid a price based in whole or in part on the AWP for these drugs each time.   Among other drugs, plaintiff and the Class have paid for the following: acyclovir, albuterol sulfate, bicalutamide, bleomycin, calcitrol, carboplatin, cisplatin, cromolyn sodium, cyclosporine, darbepoetin alfa, dexamethosone, docetaxel, dolasetron mesylate, doxorubicin hydrochloride, epoetin alpha, etidronate disodium, etoposide, Factor VIII, Factor IX, filgrastim, flutamide, glyburide, goserelin acetate, granisetron, heparin sodium, ipratropium bromide, ironatecan, leucovorin calcium, lansoprazole, metaproterenol, mycophenolate mofetil, omeprazole, ondansetron, paclitaxel, pamidronate disodium, tacrolimus, tamoxifen, triptorelin pamoate and vancomycin, as well as other cancer (antineoplastic, antianemic, antihypercalcemic, and antineotropenic), inhalant, and miscellaneous other (antihemorrahagic, antihemophilic, antidiabetic, and immunosuppressant) drugs not listed herein.   These drugs were manufactured, distributed, marketed and sold by the defendants named herein.

25.    Accordingly, plaintiff and the Class suffered direct injury and damages as a result of the unlawful conduct of all of the defendants set forth herein.

**The Defendants**

26.    The Defendants are AstraZeneca PLC, AstraZeneca Pharmaceuticals LP, AstraZeneca LP, Zeneca, Inc., TAP Pharmaceutical Products, Inc., Abbott Laboratories, Takeda Chemical Industries, Ltd., Bayer AG, Bayer Corporation, Miles Laboratories, Inc., Cutter Laboratories, Inc., GlaxoSmithKline, P.L.C., SmithKline Beecham Corporation, Glaxo Wellcome, Inc., Pharmacia Corporation, Pharmacia & Upjohn, Inc., Monsanto Company, G.D. Searle, Sanofi-Synthelabo, Inc., Johnson & Johnson, Alza Corporation, Centocor, Inc., Ortho Biotech, Alpha Therapeutic

© 2003 KLINE & SPECTER                                9

Corporation, Hoffman La-Roche Inc., Amgen, Inc., Immunex Corporation, Aventis Pharmaceuticals, Inc., Aventis Behring L.L.C., Hoechst Marion Roussel, Inc., Centeon, L.L.C., Armour Pharmaceuticals, Baxter International Inc., Baxter Healthcare Corporation, Immuno-U.S., Inc., Boehringer Ingelheim Corporation, Ben Venue Laboratories, Inc., Bedford Laboratories, Roxane Laboratories, Inc., Bristol-Myers Squibb Company, Oncology Therapeutics Network Corporation, Apothecon, Inc., Dey, Inc., Fujisawa Pharmaceutical Co., Ltd., Fujisawa Healthcare, Inc., Fujisawa USA, Inc., Novartis International AG, Novartis Pharmaceutical Corporation, Sandoz Pharmaceutical Corporation, Schering-Plough Corporation, Warrick Pharmaceuticals Corporation, Sicor, Inc., Gensia Sicor Pharmaceuticals, Inc., Wyeth, Wyeth Pharmaceuticals, Saad Antoun, M.D., Stanley C. Hopkins, M.D. and Robert A. Berkman, M.D. [The foregoing corporate defendants, the individual defendants and various "doe" defendants, "ABC" corporations, and "XYZ" partnerships and associations whose names and identifies are not yet known are collectively referred to herein as "defendants."]

27.     Defendant, AstraZeneca PLC ("AstraZeneca PLC"), the third largest pharmaceutical company in the world, is a British corporation with its corporate headquarters, located at 15 Stanhope Gate, London W1K 1LN, U.K. AstraZeneca PLC was formed on April 6, 1999 through the merger of Astra AB of Sweden and Zeneca Group PLC of the United Kingdom. AstraZeneca PLC researches, develops, and manufactures generic and brand name pharmaceutical drugs for use in seven therapeutic areas: cardiovascular, central nervous system, gastrointestinal, infection, oncology, pain control and anaesthesia, and respiratory. One of Zeneca Group PLC's key products, which it brought with it to the merger, was Zoladex® (goserelin acetate). Like its competitor, Lupron®, Zoladex® is used in the treatment of prostate cancer in men, endometriosis and infertility in women, and central precocious puberty in children.

© 2003 KLINE & SPECTER                                    10

28.    Defendant, AstraZeneca Pharmaceuticals LP ("AstraZeneca"), is a Delaware limited partnership with its headquarters located at 1800 Concord Pike, Wilmington, Delaware 19850. AstraZeneca manufactures, markets, sells and distributes cancer and miscellaneous other drugs, like Zoladex®, throughout New Jersey and the United States.

29.    Defendant, AstraZeneca LP ("AstraZeneca LP"), is a limited partnership with its principal place of business at 725 Chesterbrook Boulevard, Wayne, Pennsylvania 19087. AstraZeneca LP maintains an additional facility in Westborough, Massachusetts. AstraZeneca LP is a developer and manufacturer of cancer and miscellaneous other drugs.

30.    Defendant, Zeneca, Inc. ("Zeneca"), is a Delaware corporation with its principal place of business at 1800 Concord Pike, Wilmington, Delaware 19850. Until April 1999, Zeneca, Inc. was a subsidiary of Zeneca Group PLC (UK).

31.    Defendants, AstraZeneca PLC, AstraZeneca Pharmaceuticals LP, AstraZeneca LP and Zeneca, Inc. [hereinafter the "AstraZeneca Defendants"], are manufacturers, marketers, promoters, sellers and distributors of cancer and miscellaneous other drugs, including the aforementioned Zoladex®, and Casodex® (bicalutamide), Arimidex® (anastrozole), Deprivan (propofol), Nolvadex® (tamoxifen), Cefotan®, Elavil Injection, Faslodex®, Foscavir®, Merrem®, Tenormin Injection, Tomodex (ralitrexed), Xylocaine Injection, Prilosec® (omeprazole) and Nexium™ (esomeprazole), direct competitor drugs of TAP's Prevacid®. On June 23, 2003, it was reported that one or more of the AstraZeneca Defendants pled guilty to violating federal law by inflating the AWP for Zoladex® and conspiring with doctors to bill for free samples of the drug. The AstraZeneca Defendants paid $354.9 million in damages and fines. In light of, *inter alia*, one or more of the AstraZeneca Defendants' agreement to settle civil and criminal charges with the federal government, it is believed and therefore averred that the AstraZeneca Defendants engaged in

© 2003 KLINE & SPECTER                    11

unlawful conduct similar to that of the other defendants with respect to their marketing, promotion, sales and distribution of cancer, and miscellaneous other drugs that are paid for by plaintiff and the Class. *not a defendant*

32.     Defendant, TAP Pharmaceutical Products, Inc. ("TAP"), is a joint venture between Takeda Chemical Industries, Ltd. and Abbott Laboratories.  TAP's United States headquarters is located at 675 North Field Drive, Lake Forest, Illinois 60045.  Under a partnership agreement between Abbott and Takeda, TAP (owned 50 percent by Abbott and 50 percent by Takeda), together with its subsidiary, TAP Pharmaceuticals, Inc., develops, markets, promotes, and sells pharmaceutical products for the United States and Canada.  One of these drugs is Lupron® (leuprolide acetate for depot suspension), which, like Zoladex®, is used in the treatment of prostate cancer in men, endometriosis and infertility in women, and central precocious puberty in children. Since Lupron® is the subject of a class action case pending in Cape May County against TAP, Abbott and Takeda, no claim is made herein for Lupron® damages against these defendants.  However, to extent other defendants participated in a fraudulent scheme and conspiracy, which had the effect of causing damages for Lupron®, the claims set forth herein include the joint and several liability of these defendants for Lupron®.  Another of these drugs is Prevacid® (lansoprazole), which, like Prilosec®, is used to treat peptic ulcer disease and gastro-esophageal reflux disease.

33.     Defendant, Abbott Laboratories ("Abbott"), is a highly diversified healthcare corporation the principal business of which is the discovery, development, manufacture, and sale of a broad and diversified line of health care products and services.  Abbott's business includes pharmaceuticals, nutritionals, hospital products, and diagnostics.  Abbott's world headquarters is located in Abbott Park, Illinois.  Abbott manufactures, markets, sells and distributes numerous

© 2003 KLINE & SPECTER                         12

cancer and miscellaneous other drugs which are sold throughout New Jersey and the United States. Moreover, Abbott distributes Prevacid® and Lupron® for TAP.

34.   Defendant, Takeda Chemical Industries, Ltd. ("Takeda"), is Japan's largest pharmaceutical company and is among the largest in the world.  Headquartered in Osaka, Japan, Takeda discovers, develops, manufactures and markets a broad range of pharmaceutical products. Takeda Pharmaceuticals America was created to take advantage of Takeda's growing, international pharmaceutical presence. Takeda Pharmaceuticals America's U.S. headquarters is in Lincolnshire, Illinois. Takeda manufactures, markets, sells and distributes numerous prescription drugs, vitamins and pharmaceutical products throughout New Jersey and the United States.  Moreover, Takeda manufactures and ships Prevacid® and Lupron® to the United States.

35.   Defendants, Abbott, Takeda and TAP, through Defendant TAP, have pleaded guilty to federal criminal and civil fraud charges for, among other things, conspiring to violate the Prescription Drug Marketing Act ("PDMA") by, *inter alia*, providing free samples of Lupron® to medical providers and encouraging them to charge Medicare, other insurance programs and patients in New Jersey and throughout the United States for those free samples.  This conspiracy was in violation of the federal conspiracy statute, 18 U.S.C. § 371 (Conspiracy to Commit Offense or to Defraud United States).  TAP agreed to pay over $890 million in fines and civil penalties to the federal government and the states, of which a portion was paid to New Jersey.  The government agreed not to prosecute Abbott and Takeda in return for TAP's compliance with the plea agreement. As part of its plea agreement, TAP included both of its drugs, Lupron® and Prevacid®.  However, according to the government's Sentencing Memorandum, the fines paid to compensate the federal government and the states in connection with the fraudulent scheme only pertained to Lupron®, not Prevacid®.  Moreover, the fines and civil penalties paid did not compensate plaintiff and the Class

for their losses.  It is believed and therefore averred that defendants TAP, Abbott and Takeda

engaged in unlawful conduct similar to that of the other defendants with respect to their marketing,

promotion, sales and distribution of cancer and miscellaneous other drugs that are paid for by

plaintiff and the Class.

36.     Defendant, Bayer Corporation ("Bayer"), is a highly diversified healthcare company

whose principal business is the development, manufacture and sale of healthcare products and

services, including pharmaceuticals.  Bayer is located at 100 Bayer Road, Pittsburgh, Pennsylvania

15205-9741.

37.     Defendant, Bayer AG ("Bayer AG"), is the parent company of Bayer, the subsidiary

in the United States that markets, sells and distributes prescription drugs to clinicians nationwide.

Bayer AG is a German corporation with its headquarters located at 51368 Leverkusen, Germany.

Bayer AG acquired Cutter Laboratories, Inc. ("Cutter") in 1974 and Miles Laboratories, Inc.

("Miles") in 1978 and the two companies are now subsidiaries of Bayer AG.

38.     Defendants Bayer AG, Bayer, Miles and Cutter [hereinafter the "Bayer Defendants"]

are manufacturers, sellers and distributors of, among other things, prescription drugs used in the

treatment of cancer, among other types of prescription drugs.  One of the Bayer Defendants' drugs

is Viadur® (leuprolide acetate implant), which is similar to Zoladex® and Lupron®.  The Bayer

Defendants license Viadur® from Alza Corporation, another defendant herein, and then the Bayer

Defendants market and distribute the drug.  The Bayer Defendants also are involved in the

manufacturing, marketing, sales and distribution of drugs used to treat hemophilia, including

KoaTE®, Kogenate and KONyNE®, among other drugs.

39.     In January 2002, Bayer, like TAP and the AstraZeneca Defendants, agreed to plead

guilty to federal criminal charges and to settle with the DOJ, paying fines and penalties totaling more

than $257 million relating to the federal criminal investigation of Bayer. It is believed and therefore averred that the Bayer Defendants engaged in unlawful conduct similar to that of the other defendants herein with respect to their marketing, promotion, sales and distribution of cancer and miscellaneous other drugs that are paid for by plaintiff and the Class.

40.   Defendant, Glaxo Wellcome, P.L.C. ("GlaxoSmithKline"), is an English public limited company incorporated on December 6, 1999 under English law, with its corporate headquarters located at 980 Great West Road, Brentford, Middlesex, TW8 9GS, England. GlaxoSmithKline P.L.C. ("GlaxoSmithKline") was formed on December 27, 2000 with the merger of Glaxo Wellcome, P.L.C. and SmithKline Beecham, P.L.C., both English public limited companies. GlaxoSmithKline P.L.C. has its operational headquarters at One Franklin Plaza, 200 North 16th Street, Philadelphia, Pennsylvania 19102, and at Research Triangle Park, North Carolina 27709. GlaxoSmithKline conducts extensive business, including the sale of pharmaceuticals that are the subject of the scheme alleged herein.

41.   Defendant, SmithKline Beecham Corporation ("SmithKline"), a wholly owned subsidiary of GlaxoSmithKline P.L.C. is a Pennsylvania corporation with its principal place of business at One Franklin Plaza, 200 North 16th Street, Philadelphia, Pennsylvania 19102. SmithKline conducts extensive business, including the sale of pharmaceuticals that are the subject of the scheme alleged herein.

42.   Defendant, Glaxo Wellcome, Inc. ("Glaxo"), a wholly owned subsidiary of GlaxoSmithKline P.L.C., is a North Carolina corporation with its principal place of business at 5 Moore Drive, Research Triangle Park, North Carolina 27709. Glaxo conducts extensive business, including the sale of pharmaceuticals that are the subject of the alleged scheme herein.

43.    Defendants, GlaxoSmithKline, SmithKline and Glaxo [hereinafter the "GlaxoSmithKline Defendants"], are manufacturers, sellers and distributors of cancer, inhalation and miscellaneous other drugs. One such drug used in connection with cancer treatment is the antiemetic drug, Zofran® (ondansetron). Prior to the Glaxo/SmithKline merger, one of SmithKline's drugs was the antiemetic, Kytril® (granisetron), which is now one of Hoffman La-Roche's drugs, another defendant herein. GlaxoSmithKline is also involved in the manufacture, marketing, sales and distribution of inhalation drugs used in the treatment of asthma, namely Ventolin® and Flovent® (albuterol sulfates). Like TAP, the AstraZeneca Defendants and Bayer, the GlaxoSmithKline Defendants have agreed to resolve the federal criminal investigation of them and to pay fines and civil penalties totaling more than $86 million. It is believed and therefore averred that the GlaxoSmithKline Defendants engaged in unlawful conduct similar to that of the other defendants with respect to their marketing, promotion, sales and distribution of cancer, inhalation and miscellaneous other drugs that are paid for by plaintiff and the Class.

44.    Defendant, Pharmacia Corporation ("Pharmacia"), is a Delaware corporation located at 100 Route 206 North, Peapack, New Jersey 02977. Pharmacia was created in April 2000 through the merger of Pharmacia & Upjohn ("P&U") with Monsanto Company ("Monsanto") and its G.D. Searle ("Searle") unit. Pharmacia manufactures, sells and distributes various cancer and miscellaneous other drugs.

45.    Defendant, G.D. Searle Company a/k/a G. D. Searle & Co. ("Searle"), is a Delaware corporation with its principal place of business located at 5200 Old Orchard Road, Skokie, Illinois 60077. Searle became a subsidiary of Pharmacia in the 1999 Monsanto-P&U merger. Searle manufactures, distributes and sells pharmaceutical drugs that are the subject of the scheme alleged herein.

© 2003 KLINE & SPECTER                              16

46.   Defendants Pharmacia, P&U, Monsanto and Searle [hereinafter collectively "the Pharmacia Defendants"], are manufacturers, sellers and distributors of, among other things, a prescription drug known as Trelstar™ Depot (triptorelin pamoate), which is similar to TAP's Lupron®, AstraZeneca's Zoladex®, and Bayer's Viadur®, concerning the treatment of prostate cancer, and another drug Synarel® (nafarelin acetate) which is similar to Lupron®, Zoladex® and Viadur® in connection with treatment of endometriosis in women and central precocious puberty in children. Adriamycin® (doxorubicin) is a cancer drug manufactured and sold by the Pharmacia defendants, among others.  It is believed and therefore averred that the Pharmacia Defendants engaged in unlawful conduct similar to that of the other defendants with respect to their marketing, promotion, sales and distribution of cancer and miscellaneous other drugs that are paid for by plaintiff and the Class.

47.   Defendant, Sanofi-Synthelabo Inc. ("Sanofi"), is a French corporation located at 174, avenue de France, 75013 Paris, France, which has designated its 90 Park Avenue, New York, New York location as its commercial headquarters in the United States and the address where service upon its authorized agent can be made.  Additionally, Sanofi maintains its North American pharmaceutical research and development headquarters at 11 Great Valley Parkway, Malvern, Pennsylvania 19355.  Sanofi manufactures, markets, promotes, sells and distributes various cancer and miscellaneous other drugs.  Among these products is Eligard™ (leuprolide acetate) which is similar to Lupron®, Zoladex®, Viadur® and Trelstar™.  It is believed and therefore averred that Sanofi has engaged in unlawful conduct similar to that of the other defendants with respect to their marketing, promotion, sales, and distribution of cancer and miscellaneous other drugs that are paid for by plaintiff and the Class.

48.     Defendant, Johnson & Johnson ("J&J"), is a highly diversified healthcare corporation organized and existing under the laws of the State of New Jersey with a principal place of business and corporate headquarters located at One Johnson & Johnson Plaza, New Brunswick, New Jersey 08933. At all times material hereto, J&J, by and through its wholly-owned subsidiary companies, and their respective officers, directors, employees and agents, was in the business of manufacturing, promoting, marketing, distributing and selling healthcare products and services to medical providers, among others.

49.     Defendant, Alza Corporation ("Alza"), is a wholly-owned subsidiary company of Defendant J&J as of June 22, 2001, and has its corporate headquarters in Mountain View, California. Alza develops, manufactures and licenses Viadur®, among other drugs, a bioequivalent drug to Lupron®, Zoladex®, Trelstar™, and Eligard™, which is used in the treatment of prostate cancer.

50.     Defendant, Centocor, Inc. ("Centocor"), is a Pennsylvania corporation and has been a wholly owned subsidiary of Defendant J&J since its acquisition by J&J in October 1999. Centocor's principal place of business is located at 244 Great Valley Parkway, Malvern, Pennsylvania 19355-1312. Centocor manufactures, distributes, markets and sells prescription drugs to providers nationwide, including pharmaceuticals that are the subject of the scheme alleged herein, such as Remicaid.

51.     Defendant, Ortho Biotech ("Ortho"), is a New Jersey corporation and has been a wholly owned subsidiary of Defendant J&J since its formation by J&J in 1990. Ortho's principal place of business is located at 700 U.S. Highway, Route 202 South, Raritan, New Jersey 08869. Ortho is a biotechnology company. Ortho manufactures, distributes, markets and sells prescription drugs to providers nationwide, including pharmaceuticals that are the subject of the scheme alleged herein, such as Procrit® (epoetin alfa).

© 2003 KLINE & SPECTER                          18

52.     Defendant, J&J, along with its various other affiliated and subsidiary companies, including Centocor, Ortho, and Alza [hereinafter collectively "the J&J Defendants"], manufactures, distributes, markets and sells cancer and miscellaneous other drugs.  It is believed and therefore averred that the J&J Defendants have engaged in unlawful conduct similar to that of the other defendants with respect to their marketing, promotion, sales and/or distribution of cancer and miscellaneous other drugs that are paid for by plaintiff and the Class.

53.     Defendant, Alpha Therapeutic Corporation ("Alpha"), is a California corporation with its corporate headquarters located at 5555 Valley Boulevard, Los Angeles, California 90032-3520. Alpha develops, manufactures, markets, distributes and sells biopharmaceutical products such as Factor VIII.  It is believed and therefore averred that Alpha engaged in unlawful conduct similar to that of the other defendants with respect to their marketing, promotion, sales and distribution of miscellaneous other drugs that are paid for by plaintiff and the Class.

54.     Defendant, Hoffman LaRoche, Inc., ("Hoffman"), is a corporation with its principal place of business at 340 Kingsland Street, Nutley, NJ 07110.  Hoffman manufactures, markets, distributes and sells cancer and miscellaneous other drugs, which are the subject of the scheme alleged herein.  Among others, Hoffman sells the cancer drug Kytril®, which it acquired from GlaxoSmithKline as part of the merger of Glaxo and SmithKline in 2000, and the cancer drugs Roferon®-A (interferon 2-alpha), Vesanoid® (tretinoin), and Xeloda® (capecitabine).  It is believed and therefore averred that Hoffman engaged in unlawful conduct similar to that of the other defendants with respect to its marketing, promotion, sales and distribution of cancer and miscellaneous other drugs that are paid for by plaintiff and the Class.

55.     Defendant, Amgen, Inc. ("Amgen"), is a California corporation with its principal place of business at One Amgen Center Drive, Thousand Oaks, California 91320-1799.  Amgen is

© 2003 KLINE & SPECTER                    19

a biotechnology company that develops, manufactures, distributes, markets and sells cancer and miscellaneous other drugs, which are the subject of the scheme alleged herein.

56.   Defendant, Immunex Corporation ("Immunex"), is a biopharmaceutical company with its principal place of business located at 51 University Street, Seattle, Washington 98101. Immunex was acquired by Amgen, Inc. on July 15, 2002. Immunex manufactures, distributes and sells pharmaceutical drugs that are the subject of the alleged scheme herein.

57.   Defendants, Amgen and Immunex [hereinafter the "Amgen Defendants"], are manufacturers, sellers and distributors of, among other things, cancer and miscellaneous other drugs. It is believed and therefore averred that the Amgen Defendants engaged in unlawful conduct similar to that of the other defendants with respect to its marketing, promotion, sales and distribution of cancer and miscellaneous other drugs that are paid for by plaintiff and the Class.

58.   Defendant, Aventis Pharmaceuticals, Inc. ("Aventis"), is a Delaware corporation with its corporate headquarters at 300 Somerset Corporate Boulevard, Bridgewater, New Jersey, 08807-2854. Aventis was formerly known as Hoechst Marion Roussel, Inc. ("Hoechst"). Aventis is the United States pharmaceutical business of Aventis S.A. Aventis S.A. was created on December 15, 1999 through the merger of Hoechst A.G. and Rhône-Poulenc S.A. Also on this date, the subsidiaries of Hoechst A.G. and Rhône-Poulenc S.A., Hoechst Marion Roussel A.G. and Rhône-Poulenc Rorer Inc. formed Aventis Pharma A.G. The United States pharmaceutical business of Aventis Pharma A.G. is Aventis Pharmaceuticals, Inc. Aventis manufactures and distributes cancer and miscellaneous other drugs.

59.   Defendant, Aventis Behring L.L.C. ("Aventis Behring"), is an Illinois limited liability corporation with its principal place of business at 1020 First Avenue, King of Prussia, Pennsylvania, 19406. Aventis Behring was formerly known as Centeon, L.L.C. Aventis Behring conducts

© 2003 KLINE & SPECTER
                                20

extensive business, including the sale of pharmaceuticals that are the subject of the scheme alleged herein.

60.     Defendant, Hoechst Marion Roussel, Inc. ("Hoechst"), prior to its acquisition by Aventis, was a Delaware corporation with its principal place of business located at 10236 Marion Park Drive, Kansas City, Missouri, 64137-1405.  Hoechst conducts extensive business, including the sale of pharmaceuticals that are the subject of the scheme alleged herein.

61.     Defendant, Centeon L.L.C. ("Centeon"), was formerly a 50/50 joint venture with Aventis Behring.  On January 10, 1996, Hoechst AG and Rhone-Poulenc Rorer formed Centeon. Centeon was headquartered in King of Prussia, Pennsylvania.  Centeon was formerly known as Armour Pharmaceuticals Co.  Centeon conducted extensive business, including the sale of pharmaceuticals that are the subject of the scheme alleged herein.

62.     Defendant, Armour Pharmaceuticals ("Armour"), is a subsidiary of Rhone-Poulenc Rorer, with headquarters at 500 Arcola Road, Collegeville, PA 19426-3909.  Armour is a global pharmaceutical company which develops, manufacturers and markets drugs, including the sale of pharmaceuticals that are subject of the scheme alleged herein.

63.     Defendants, Aventis, Aventis Behring, Hoechst, Centeon and Armour [hereinafter the "Aventis Defendants"], are manufacturers, sellers and distributors of, among other things, cancer and miscellaneous other drugs. It is believed and therefore averred that the Aventis Defendants engaged in unlawful conduct similar to that of the other defendants with respect to their marketing, promotion, sales and distribution of cancer and miscellaneous other drugs that are paid for by plaintiff and the Class.

64.     Defendant, Baxter International Inc. ("Baxter"), is a Delaware corporation with its principal place of business at One Baxter Parkway, Deerfield, Illinois, 60015.  Baxter manufactures

© 2003 KLINE & SPECTER                    21

and distributes prescription drugs to clinical administrators. Baxter is a global medical products company that develops, manufactures, markets and distributes drugs to treat cancer, trauma, hemophilia, immune deficiencies, infectious diseases, kidney disease and other disorders.

65.    Defendant, Baxter Healthcare Corporation ("Baxter Healthcare"), is the principal domestic operating subsidiary of Baxter International. Baxter Healthcare is a global medical products and services company with emphasis on blood therapies, cardiovascular medicine, medication delivery and renal therapy.

66.    Defendant, Immuno-U.S., Inc. ("Immuno"), is a wholly owned subsidiary of Baxter International, Inc. with its principal place of business located at 1200 Parkdale Road, Rochester, MI 48307. Immuno is a bio-pharmaceutical company that develops, manufacturers and distributes drugs that are the subject of the scheme alleged herein.

67.    Defendants, Baxter, Baxter Healthcare and Immuno [hereinafter the "Baxter Defendants"], are manufacturers, sellers and distributors of, among other things, cancer and miscellaneous other drugs. It is believed and therefore averred that the Baxter Defendants engaged in unlawful conduct similar to that of the other defendants with respect to their marketing, promotion, sales and/or distribution of cancer and miscellaneous other drugs that are paid for by plaintiff and the Class.

68.    Defendant, Boehringer Ingelheim Corporation ("Boehringer"), is a Nevada corporation with its principal place of business located at 900 Ridgebury Road, Ridgefield, Connecticut, 06877. Boehringer designs, manufactures, markets and distributes pharmaceuticals, including inhalants that are the subject of the scheme alleged herein.

69.    Defendant, Ben Venue Laboratories, Inc. ("Ben Venue"), is a Delaware corporation with its principal place of business at 300 Northfield Road, Bedford, Ohio, 44146. Ben Venue is a

© 2003 KLINE & SPECTER                    22

contract developer and manufacturer of pharmaceuticals and produces generic injectable pharmaceuticals through its Bedford Laboratories division. Boehringer is the United States subsidiary of Boehringer Ingelheim of Germany and acquired Ben Venue in December, 1997. Ben Venue conducts extensive business, including the sale of pharmaceuticals that are the subject of the scheme alleged herein.

70. Defendant, Bedford Laboratories ("Bedford"), is a division of Ben Venue with its principal place of business at 300 Northfield Road, Bedford, Ohio, 44146. Bedford manufactures and distributes pharmaceuticals, including pharmaceuticals that are the subject of the scheme alleged herein.

71. Defendant, Roxane Laboratories, Inc. ("Roxane"), is a subsidiary of Boehringer with its principal place of business located at Post Office Box 16532, Columbus, Ohio, 43216-6532. Roxane manufactures markets, distributes and sells pharmaceuticals, including pharmaceuticals that are the subject of the scheme alleged herein.

72. Defendants, Boehringer, Ben Venue, Bedford and Roxane [hereinafter the "Boehringer Defendants"], are manufacturers, sellers and distributors of, among other things, inhalant and miscellaneous other drugs. It is believed and therefore averred that the Boehringer Defendants engaged in unlawful conduct similar to that of the other defendants with respect to their marketing, promotion, sales and/or distribution of inhalant and miscellaneous other drugs that are paid for by plaintiff and the Class.

73. Defendant, Bristol-Myers Squibb Company ("Bristol-Myers"), is a Delaware corporation with its principal place of business located at 345 Park Avenue, New York, New York, 10154. Bristol-Myers is a pharmaceutical and healthcare products company. Bristol-Myers

manufactures, markets, sells and distributes cancer drugs, among other prescription drugs, that are the subject of the scheme alleged herein.

74.     Defendant, Oncology Therapeutics Network Corporation ("OTN"), is a Delaware corporation with its principal place of business located at 395 Oyster Point Boulevard, Suite 405, South, San Francisco, California, 94080.  OTN is a wholly owned subsidiary of Bristol-Myers and distributes cancer drugs, products and services to office-based oncology practices.

75.     Defendant, Apothecon, Inc. ("Apothecon"), is a division of Bristol-Myers with its principal place of business at 777 Scudders Mill Road, Plainsboro, New Jersey, 08536.  Apothecon manufactures pharmaceutical drugs that are the subject of the alleged scheme herein.

76.     Defendants Bristol-Myers, OTN and Apothecon [hereinafter the "Bristol-Myers Defendants"], are manufacturers, sellers and distributors of, among other things, cancer and miscellaneous other drugs.  It is believed and therefore averred that the Bristol-Myers Defendants engaged in unlawful conduct similar to that of the other defendants with respect to their marketing, promotion, sales and distribution of cancer and miscellaneous other drugs that are paid for by plaintiff and the Class.

77.     Defendant, Dey, Inc. ("Dey"), is a Delaware corporation with its principal place of business located at 2751 Napa Valley Corporate Drive, Napa, California, 94558. Dey manufactures, distributes, markets and sells, among other things, inhalant drugs. On June 13, 2003, it was reported that Dey settled a civil suit with the federal government and the State of Texas for $18.5 million arising out of Dey's sale and marketing of its prescription drugs. It is believed and therefore averred that Dey engaged in unlawful conduct similar to that of the other defendants with respect to their marketing, promotion, sales and distribution of inhalant drugs that are paid for by plaintiff and the Class.

© 2003 KLINE & SPECTER                      24

78.   Defendant, Fujisawa Pharmaceutical Co., Ltd. ("Fujisawa"), is a Japanese corporation with its headquarters located at 4-7, Doshomachi 3-Chome, Chuo-ku, Osaka 541-8514, Japan. Fujisawa Ltd. is a pharmaceutical manufacturer which offers a broad range of pharmaceutical products worldwide.

79.   Defendant, Fujisawa Healthcare, Inc. ("Fujisawa Healthcare"), is a Delaware corporation with its principal place of business located at 3 Parkway North, Deerfield, Illinois, 60015. Fujisawa Healthcare is a wholly owned subsidiary of Fujisawa Pharmaceutical Co., Ltd., Osaka, Japan. Fujisawa Healthcare is a pharmaceutical manufacturer with business concentrations in therapeutics, transplantation, anti-infectives, dermatology and cardiovascular care, among others.

80.   Defendant, Fujisawa USA, Inc. ("Fujisawa USA"), is a Delaware corporation with its principal place of business located at 3 Parkway North, Deerfield, Illinois, 60015. Fujisawa USA is a wholly-owned subsidiary of Fujisawa. In 1998, Fujisawa Healthcare assumed responsibility for Fujisawa USA's portfolio of proprietary products.

81.   Defendants, Fujisawa, Fujisawa Healthcare and Fujisawa USA [hereinafter the "Fujisawa Defendants"], are manufacturers, sellers and distributors of, among other things, cancer and miscellaneous other drugs. It is believed and therefore averred that the Fujisawa Defendants engaged in unlawful conduct similar to that of the other defendants with respect to their marketing, promotion, sales and distribution of cancer and miscellaneous other drugs that are paid for by plaintiff and the Class.

82.   Defendant, Novartis International AG ("Novartis AG"), is a Swiss company with its corporate headquarters located at Lichtstrasse 35, CH-4056, Basel, Switzerland. Defendant Novartis AG was created in 1996 with the merger of Swiss companies Ciba-Geigy and Sandoz

© 2003 KLINE & SPECTER                              25

Pharmaceutical Corporation ("Sandoz"). Defendant Novartis AG develops, manufacturers, markets and sells cancer and miscellaneous other drugs that are the subject of the scheme alleged herein.

83.    Defendant, Novartis Pharmaceutical Corporation ("Novartis"), is a South Dakota corporation with its principal place of business located at One Health Plaza, East Hanover, New Jersey, 07936-1080. Novartis is the United States affiliate of Novartis AG. Novartis develops, manufacturers, markets and sells cancer and miscellaneous other drugs, that are the subject of the scheme alleged herein.

84.    Defendants, Novartis AG, and Novartis [hereinafter the "Novartis Defendants"], are manufacturers, sellers and distributors of, among other things, cancer and miscellaneous other drugs. It is believed and therefore averred that the Novartis Defendants engaged in unlawful conduct similar to that of the other defendants with respect to their marketing, promotion, sales and distribution of cancer and miscellaneous other drugs that are paid for by plaintiff and the Class.

85.    Defendant, Schering-Plough Corporation ("Schering-Plough"), is a New Jersey corporation with its principal place of business located at 2000 Galloping Hill Road, Kenilworth, New Jersey, 07033. In June 2003, Schering-Plough revealed that it was going to be criminally indicted for unlawful conduct described herein, including providing free samples of drugs knowing and expecting that doctors and others would bill for them. Schering manufactures, markets and sells prescription drugs, including pharmaceuticals that are the subject of the alleged scheme herein.

86.    Defendant, Warrick Pharmaceuticals Corporation ("Warrick"), is a Delaware corporation with its principal place of business located at 6100 Neil Road #500, Reno, Nevada, 89511. Warrick is a wholly-owned subsidiary of Schering. Warrick manufactures and sells prescription drugs, including inhalants, that are the subject of the alleged scheme herein.

© 2003 KLINE & SPECTER                    26

87.    Defendants, Schering and Warrick [hereinafter the "Schering Defendants"], are manufacturers, sellers and distributors of, among other things, cancer, inhalant and miscellaneous other drugs. It is believed and therefore averred that the Schering Defendants engaged in unlawful conduct similar to that of the other defendants with respect to their marketing, promotion, sales and distribution of cancer, inhalant and miscellaneous other drugs that are paid for by the plaintiff and the Class.

88.    Defendant, Sicor, Inc. ("Sicor"), is a Delaware corporation with its principal place of business located at 19 Hughes, Irvine, California 92618. Sicor was created in 1997 with the merger of Gensia, Inc., a finished dosage manufacturer, and Rakepoll Holding, a European-based supplier of pharmaceuticals. Sicor manufactures, markets and sells generic injectable pharmaceutical products that are the subject of the alleged scheme herein.

89.    Defendant, Gensia Sicor Pharmaceuticals, Inc. ("Gensia"), is a Delaware corporation with its principal place of business located at 17 Hughes, Irvine, California 92618. Gensia is a wholly-owned subsidiary of Sicor and offers products in the fields of oncology, cardiology and anesthesiology. Gensia formed a strategic alliance with Abbott in 1999 to market and distribute oncology products in the United States. In March 2002, Sicor and Abbott restructured their agreement. Gensia develops, manufactures, markets and sells injectable pharmaceuticals.

90.    Defendants, Sicor and Gensia [hereinafter the "Sicor Defendants"], are manufacturers, sellers and distributors of, among other things, cancer and miscellaneous other drugs. It is believed and therefore averred that the Sicor Defendants engaged in unlawful conduct similar to that of the other defendants with respect to their marketing, promotion, sales and distribution of cancer and miscellaneous other drugs that are paid for by plaintiff and the Class.

© 2003 KLINE & SPECTER                    27

91.    Defendant, Wyeth ("Wyeth"), formerly American Home Products Corporation, is a Delaware corporation with its principal place of business located at Five Giralda Farms, Madison, New Jersey, 07940. Wyeth manufactures, markets, and distributes pharmaceutical drugs that are the subject of the alleged scheme herein.

92.    Defendant, Wyeth Pharmaceuticals ("Wyeth Pharmaceuticals"), formerly Wyeth-Ayerst Laboratories, is a New York corporation with its headquarters located at 500 Arcola Road, Collegeville, Pennsylvania, 19426. Wyeth Pharmaceuticals manufactures, markets, distributes and sells pharmaceutical drugs that are the subject of the alleged scheme herein.

93.    Defendants, Wyeth and Wyeth Pharmaceuticals [hereinafter the "Wyeth Defendants"], are manufacturers, distributors and sellers of, among other things, cancer and miscellaneous other drugs. It is believed and therefore averred that Wyeth Defendants engaged in unlawful conduct similar to that of the marketing, promotion, sales and distribution of cancer and miscellaneous other drugs that are paid for by plaintiff and the Class.

94.    Defendant, Saad Antoun, M.D. ("Antoun"), is an individual and resident of the State of New Jersey, and is and was a licensed physician with a specialty in urology, with offices located at 733 North Beers Street, Suite L6, Holmdel, New Jersey 07733. Dr. Antoun was indicted and pled guilty to, among other things, receiving free samples of Zoladex® from the AstraZeneca Defendants and charging his patients for them.

95.    Defendant, Stanley C. Hopkins, M.D. ("Hopkins"), is an individual and resident of the State of Florida, and is and was a licensed physician with a specialty in urology, with offices located at 2419 South Seacrest Boulevard, Boynton Beach, Florida 33435. Dr. Hopkins was indicted and pled guilty to, among other things, receiving free samples of Zoladex® from the AstraZeneca Defendants and charging his patients for them.

© 2003 KLINE & SPECTER
                                    28

96.    Defendant, Robert A. Berkman, M.D. ("Berkman"), is an individual and resident of the State of Ohio, and was a licensed physician with a specialty in urology, with offices located at 5969 East Broad, #306, Columbus, Ohio 43213.  Dr. Berkman was charged with, among other things, receiving free samples of Zoladex® from the AstraZeneca Defendants and charging his patients for them.

97.    The acts alleged in this Complaint to have been done by each of the defendants were authorized, ordered, done and/or ratified by their respective officers, directors, agents, employees or representatives while engaged in the management, direction, control or transaction of their respective business affairs.

98.    Various persons and/or firms, not named as defendants herein, including various medical providers across New Jersey, have participated as co-conspirators in the violations alleged herein and have performed acts and made statements or omissions in furtherance thereof.

## PLAINTIFF CLASS ALLEGATIONS

99.    Plaintiff seek to bring this case as a class action pursuant to Rule 4:32-1 of the New Jersey Rules Governing the Courts, on behalf of themselves and all others similarly situated in New Jersey as members of a proposed class, defined as follows (the "Class"):

> All persons and entities in New Jersey and throughout the county who, during the period beginning at least 1991 through the present, paid any portion of the cost of cancer, inhalant and miscellaneous other drugs manufactured, marketed, distributed and sold by Defendants, which cost was based, in whole or in part, upon the published AWPs for such drugs.  Excluded from the Class are Defendants, any entity in which a Defendant has a controlling interest, and their legal representatives, heirs, successors, any governmental entities, and any person or entity seeking to make a claim under ERISA, Medicare, or federal law.

<u>NUMEROSITY</u>

100.   The proposed Class is so numerous that joinder of all of its members is impractical.

Each year, hundreds of thousands of patients, including men, women, and children are prescribed

and pay for cancer, inhalant and miscellaneous other drugs manufactured, marketed, distributed and

sold by Defendants at a price which is based, in whole or in part, on the AWPs for such drugs.

<u>COMMON QUESTIONS OF LAW AND FACT</u>

101.   Virtually all of the issues of law and fact in this class action are common to the Class

and include at least the following:

i.      Whether the Defendants engaged in the fraudulent marketing and sales
        scheme and conspiracy as alleged herein;

ii.     Whether the Defendants unlawfully set the AWPs for cancer, inhalant and
        miscellaneous other drugs;

iii.    Whether the Defendants conspired and agreed amongst themselves and with
        others to raise, fix, maintain or stabilize the AWPs for cancer, inhalant and
        miscellaneous other drugs;

iv.     Whether the conspiracy was implemented;

v.      Whether the Defendants unlawfully marketed and promoted the spreads
        between the AWPs and the actual costs for their drugs to medical providers
        and others;

vi.     Whether the Defendants provided free samples of their drugs to medical
        providers and others and/or otherwise distributed such free samples;

vii.    Whether the Defendants encouraged medical providers and others to charge
        patients for free samples provided by sales representatives, and/or otherwise
        knew or expected that medical providers and others would in fact charge
        patients for such free samples;

viii.   Whether the Defendants engaged in a conspiracy and/or a pattern and practice
        of deceiving and defrauding the Class and concealing their unlawful conduct
        and conspiracy;

© 2003 KLINE & SPECTER                    30

ix.     Whether the Defendants provided other inducements to medical providers and others to get them to prescribe Defendants' drugs;

x.      Whether the Defendants engaged in a conspiracy and/or concerted conduct designed to avoid efforts to reduce the costs of prescription drugs;

xi.     Whether the Defendants violated the consumer protection laws of New Jersey;

xii.    Whether plaintiff and the members of the Class are entitled to compensatory damages, and, if so, the nature of such damages;

xiii.   Whether plaintiff and members of the Class are entitled to declaratory and injunctive relief as to Defendants' conduct; and

xiv.    Whether plaintiff and members of the Class are entitled to an award of punitive damages, reasonable attorneys' fees, prejudgment interest, post-judgment interest, costs of suit, and other appropriate relief under the circumstances of this case.

## TYPICALITY

102.    Plaintiff' claims are typical of the claims of other members of Class. Plaintiff and all members of the Class sustained damages. The losses of each member of the Class were directly caused by the Defendants' fraudulent marketing and sales scheme and conspiracy.

## ADEQUACY OF REPRESENTATION

103.    Plaintiff can and will fairly and adequately represent and protect the interests of the Class and plaintiff has no interests that conflict with or are antagonistic to the interests of Class members. Plaintiff has retained attorneys competent and experienced in class actions, including consumer fraud and protection class actions. No conflict exists between plaintiff and the Class members.

<u>SUPERIORITY</u>

104.   A class action is superior to any other available method for the fair and efficient adjudication of this controversy and common questions of law and fact overwhelmingly predominate over any individual questions that may arise.

105.   The prosecution of separate actions by individual members of the plaintiff Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class. These adjudications would establish incompatible standards of conduct for the Defendants which would, as a practical matter, be dispositive of the claims of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

106.   Defendants have acted or refused to act on grounds generally applicable to all members of the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

## FACTUAL BACKGROUND

107.   Defendants, in the course of operating their pharmaceutical manufacturing, distribution, marketing and sales businesses, and engaging in the sale of same to plaintiff and the Class, either directly or through the medical providers of plaintiff and the Class, offered for sale the pharmaceuticals referenced herein, and others not specifically referenced herein.

## AWP INFLATION AND UNLAWFUL PROMOTION OF "SPREADS"

108.   Defendants engaged in a fraudulent scheme and conspiracy to deliberately inflate the AWPs for cancer, inhalant and miscellaneous other drugs and other prescription drugs. The AWP is used by government and private assistance programs for reimbursement.

109.   Government and private assistance programs have announced publicly that they would use the AWP published in pharmaceutical industry publications as a basis for reimbursement,

© 2003 KLINE & SPECTER                    32

in whole or in part. Specifically, reimbursement for cancer, inhalant and miscellaneous other drugs under these programs is based, either in whole or in part, on the AWP reflected in pharmaceutical industry publication sources, such as the *Red Book* which is published in Montvale, New Jersey.

110.    The *Red Book* and other publications set forth the AWPs for the various dose forms of defendants' drugs. However, in periodically announcing the AWPs for those drugs, the *Red Book* and other publications simply published the prices that were supplied to them by the defendants. Defendants knew that they could, and did directly, control and raise the AWP for their drugs at any time simply by forwarding to the *Red Book* and other publications a new and higher AWP.

111.    There are significant discrepancies between the AWPs set by the defendants for cancer, inhalant and miscellaneous other drugs and reported in the *Red Book* and other publications, and the prices charged for these drugs by the defendants to medical providers and other suppliers. The AWPs for these drugs is set by the defendants pursuant to a standard industry formula that causes the AWPs to be substantially higher than the actual cost for these drugs to medical providers and other suppliers.

112.    By deliberately inflating the AWP above the actual acquisition cost to the medical provider or other seller, the prescription drug manufacturer defendants created a "spread" between what they set as the AWP and the actual price paid by medical providers and other suppliers for their drugs. Once established, such spreads were then marketed by the defendants as a profit to medical providers and other suppliers and were used to incentivize medical providers and other suppliers to prescribe and sell the particular cancer, inhalant and miscellaneous other drugs over other drugs and other alternative courses of treatment.

113.    This scheme allowed the defendants to control, as part of their sales, marketing and distribution strategies, how much reimbursement would be collected by medical providers and other

© 2003 KLINE & SPECTER                                33

suppliers under government and private assistance programs, from plaintiff and the Class, for cancer, inhalant and miscellaneous other drugs. Defendants deliberately marketed and promoted the sale of their cancer, inhalant and miscellaneous other drugs based on the availability of inflated payments made by government and private assistance programs and their beneficiaries as a result of the available spreads. These spreads were often referred to by defendants in internal documents as "Return To Practice," "RTP," "return on investment," "ROI" and "profit." The defendants even prepared side-by-side comparisons of the spreads available on their drugs versus their competitor's drugs in order to promote the higher profits available by choosing one drug over another. These comparisons were used by company sales representatives as marketing and sales tools for use with medical providers and other suppliers. As a result, senior citizens, patients with cancer and many other ailing and infirm Class members who took the prescription drugs manufactured, distributed, marketed and sold by the defendants, and paid some or all of the cost of these drugs, which cost was based in whole or in part on inflated AWPs, have paid millions of dollars in inflated drug prices. Plaintiff and the Class likewise paid more for these drugs than it otherwise should have as a result of defendants' conduct.

## FREE SAMPLE FRAUD

114. Defendants' fraudulent scheme also involved providing free samples of their drugs to medical providers and others and with the knowledge, expectation and encouragement that medical providers would bill Government Assistance, Private Assistance, and No Assistance Patients, for such free samples. Such conduct is civilly fraudulent and criminal.

115. Defendants, TAP, Abbott and Takeda, through TAP, admitted the criminality of their involvement in such fraudulent conduct by TAP pleading guilty to having provided free samples to medical providers and having conspired with medical providers to charge patients for such free

© 2003 KLINE & SPECTER                    34

samples. As a result, Government, Private and No Assistance Patients, paid the full cost for Lupron® and Prevacid® that should have been free.   Moreover, no New Jersey consumer has been compensated for his or her losses as a result of this conduct.

116.   Several urologists have pleaded guilty to federal Criminal Informations charging them with participating in the conspiracy with TAP to commit free sample fraud as described herein. At the time of this Complaint, the following medical providers have all been indicted, and most have pleaded guilty, for participating in a conspiracy with TAP to commit free sample fraud, among other things:

    i.    Dr. John Romano of Plymouth, Massachusetts;

    ii.    Dr. Joel S. Olstein of Lewiston, Maine;

    iii.    Dr. Rodney Mannion of LaPorte and Michigan City, Indiana;

    iv.    Dr. Jacob Zamstein of Bloomfield, Connecticut; and

    v.    Dr. Joseph Spinella of Bristol, Connecticut.

115.   In addition, as set forth more fully below, other defendants provided free samples of their drugs to medical providers and others for which plaintiff and the Class were charged fraudulently.

116.   The AstraZeneca Defendants have engaged in free sample fraud. Three doctors – one in Holmdel, New Jersey, Dr. Saad Antoun, one in Boynton Beach, Florida, Dr. Stanley C. Hopkins, and one in Columbus, Ohio, Dr. Robert A. Berkman – all have been criminally indicted for having received free samples of Zoladex® from the AstraZeneca Defendants and charging their patients for them with the knowledge of and encouragement by the AstraZeneca Defendants. Dr. Antoun and Dr. Hopkins pleaded guilty to the crime charged. The AstraZeneca Defendants were indicted for and pled guilty to free sample fraud.

© 2003 KLINE & SPECTER            35

117.    Similarly, the Amgen Defendants have engaged in free sample fraud.  National Medical Care, Inc. a purchaser of drugs from the Amgen Defendants, pled guilty to having received free samples of Epogen® from Amgen and billing Medicare and Medicare patients for these drugs.

118.    The Schering Defendants also have engaged in free sample fraud, having been notified recently by the federal government that they will be indicted for free sample fraud, among other things, as described herein.

119.    According to the various Criminal Informations of doctors, both the TAP and the AstraZeneca Defendants provided medical providers, such as those listed above, with free samples and other financial incentives as inducements to increase the usage of Lupron® and Zoladex®, respectively. *See, e.g., United States of America v. Spinella*, (D. Mass. Dec. 8, 2000); *United States of America v. Mannion*, (D. Mass. Feb. 28, 2000); *United States of America v. Zamstein*, (D. Mass. Nov. 3, 2000); *United States of America v. Olstein*, (D. Mass. April 11, 2001) ("Criminal Informations"); *United States of America v. Antoun*, No. 02-CR-13-ALL (D. Del., Jan. 15, 2002) ("Criminal Informations"). It is believed and therefore averred that medical providers and others in New Jersey were similarly provided with free samples by defendants and encouraged to bill plaintiff and the Class for them.

120.    Such inducements caused medical providers to prescribe certain cancer, inhalant and miscellaneous other drugs over competitor drugs, and over potentially alternative courses of treatment, such as surgery, radiation and other non-drug therapies. For instance, medical providers treating patients with prostate cancer were induced to prescribe Lupron®, Zoladex®, Viadur®, Trelstar™ and Eligard™, as opposed to recommending a less expensive and equally or more effective treatment.

© 2003 KLINE & SPECTER                    36

121.    Once these medical providers switched their patients to the cancer, inhalant and miscellaneous other drugs of the defendants, they then charged their patients the AWP for these drugs for future injections.  As a result, the defendants profited from greater sales of their drugs, while medical providers profited from the spreads between the AWPs for these drugs and the actual cost they paid for the drugs.  It is believed and therefore averred that all defendants engaged in similar conduct to induce medical providers to prescribe their drugs over competitor drugs, and over potentially alternative courses of treatment.

### OTHER INDUCEMENTS TO PURCHASE DRUGS

122.    Defendants also have provided and/or arranged for many other inducements to stimulate sales of cancer, inhalant and miscellaneous other drugs at the expense of plaintiff and the Class.  Such inducements included, but were not limited to, kickbacks to medical providers, which consisted of cash payments, free drugs, trips to resorts, free consulting services to doctors and other customers, golf outings and other free entertainment, free continuing medical education courses, and debt forgiveness, among other things.

123.    All defendants engaged in the practice of providing such inducements to medical providers in furtherance of their fraudulent marketing and sales scheme and conspiracy.

124.    This fact was confirmed in April, 2002 when the trade association of the pharmaceutical industry, PhRMA, adopted a new marketing code to govern the pharmaceutical industry's relationships with physicians and other healthcare professionals. The voluntary code took effect on July 1, 2002.

125.    Despite the adoption of this voluntary code, it is believed and therefore averred that defendants have continued the practice of providing inducements to medical providers in furtherance of their fraudulent scheme and conspiracy.

© 2003 KLINE & SPECTER                    37

126.   In October, 2002, the Office of Inspector General for the federal government adopted a Draft Compliance Guideline respecting the provision of such inducements by defendants to medical providers. The Draft Compliance Guideline prohibited and/or significantly curtailed many of the aforesaid inducements.

127.   Despite the promulgation of such Draft Compliance Guideline, it is believed and therefore averred that defendants have continued the practice of providing such inducements to medical providers in furtherance of their fraudulent scheme and conspiracy.

128.   . One such inducement which has been specifically prohibited by both the Voluntary Compliance Code and the Draft OIG Compliance Guideline is the provision of free samples with the knowledge and expectation that physicians would bill their patients for the same, an inducement which both TAP and the AstraZeneca Defendants have admitted they used with medical providers and others and for which they were criminally indicted.   Despite the prohibitions against this practice, the practice continues as to one or more defendants, as set forth more fully herein.

### FEDERAL GOVERNMENT'S RECOVERY OF
### CRIMINAL FINES AND CIVIL PENALTIES AND DAMAGES SOUGHT HEREIN

129.   . The United States Government, in its criminal investigation of and settlements with TAP, Abbott, Takeda, the Bayer Defendants the GlaxoSmithKline Defendants and the AstraZeneca Defendants, principally has sought to recover only the federal government's portion of the fraudulent charges caused by the defendants, which represents up to 75-80% of the overpayments caused by defendants to federal government assistance program recipients, depending on the program.   For instance, CHAMPUS provided reimbursement of 75% of the cost of certain cancer, inhalant and miscellaneous other drugs, while Medicare provided reimbursement of 80% of the cost of certain of these drugs.

© 2003 KLINE & SPECTER                    38

130.    While a portion of the federal settlement proceeds has been returned to the states, plaintiff and the Class have not been compensated for any losses incurred from these settlements.

131.    Moreover, since the federal government has not investigated, charged and/or settled with all of the pharmaceutical companies alleged herein to be involved in the fraudulent scheme to inflate the AWPs of their drugs and to promote spreads, absent this litigation, plaintiff and the Class would not be able to recover the amounts that it overpaid.

132.    Absent this litigation, Class members classified as Government Assistance Patients would not recover from defendants the balance of the 20-25% overpayments they made through co-payment and/or deductible amounts paid under federal and state government assistance programs.

133.    Absent this litigation, Private Assistance Patients, who also over paid for cancer, inhalant and miscellaneous other drugs through co-payment and/or deductible amounts, would not recover.

134.    Absent this litigation, No Assistance Patients, who paid up to the full price for cancer, inhalant and miscellaneous other drugs, would not recover.

135.    Furthermore, absent this litigation, plaintiff and the Class who paid for free samples of defendants drugs, as a result of the wrongful inducement by the defendants, would not recover.

### DEFENDANTS' CONSPIRACY AND FRAUDULENT CONCEALMENT

136.    Defendants conspired and agreed to accomplish the fraudulent marketing and sales scheme set forth herein in order to increase the sales of their drugs, profits, and market shares, and they committed acts in furtherance of this conspiracy which are outlined in this Complaint to fulfill these goals.

© 2003 KLINE & SPECTER

137.   In furtherance of this scheme and conspiracy to defraud plaintiff and the Class, defendants created centralized, national, marketing, distribution and sales plans which were implemented through their employees and agents in the following manner, among others:

a.   Setting the actual average wholesale prices (or list prices) at which cancer, inhalant and miscellaneous other drugs were sold;

b.   Setting the AWPs for these drugs in the *Red Book* and other similar publications at levels which were materially greater than the actual average wholesale prices (or list prices) for these drugs in order to create "spreads";

c.   Contacting the *Red Book* and other industry publications for the purpose of setting and controlling the AWPs;

d.   Contacting medical providers about both the reported AWPs, the actual average wholesale prices (or list prices, and the spreads) for these drugs;

e.   Creating and disseminating marketing and sales materials that showed the spreads between the reported AWPs and the actual average wholesale prices (or list prices);

f.   Establishing and offering discounts off of the actual average wholesale prices (or list prices) for their drugs to create even greater spreads for their drugs;

g.   Providing massive amounts of free samples of their drugs to medical providers with the knowledge, expectation and encouragement that such providers would bill plaintiff and the Class for them;

h.   Creating and disseminating marketing and sales materials to medical providers and others which discussed how billing for free samples could lower acquisition costs and increase profits;

© 2003 KLINE & SPECTER                    40

i.    Creating and disseminating marketing and sales materials to medical providers and others which discussed other inducements available from defendants for prescribing defendants' drugs;

j.    Inducing plaintiff and the Class to pay inflated payments for cancer, inhalant and miscellaneous other drugs based upon the inflated AWPs established by defendants and to pay for free samples of these drugs;

k.    Distributing cancer, inhalant and miscellaneous other drugs with knowledge and in furtherance of this scheme;

l.    Receiving the proceeds and benefits of their fraudulent scheme;

m.    Working in concert to circumvent efforts to reduce the costs of cancer, inhalant and miscellaneous other drugs by the government.

138.    Defendants concealed their fraudulent conduct from plaintiff and the Class by controlling the process and methodology by which the AWP was set as well as the actual average wholesale prices (or list prices) for their drugs.  Defendants also prevented plaintiff and the Class from knowing what the actual acquisition costs to medical providers and others for their drugs were, and they failed to inform plaintiff and the Class of their provision of free samples of such drugs and other inducements to medical providers and others to induce them to prescribe cancer, inhalant and miscellaneous other drugs.  Moreover, defendants' fraudulent conduct was of such a nature as to be self-concealing.

139.    Plaintiff and the Class were diligent in pursuing an investigation of the claims asserted in this Complaint.  Through no fault of their own, they did not receive inquiry notice or learn of the factual basis for its claims in this Complaint or their injuries suffered therefrom until recently.

© 2003 KLINE & SPECTER                                41

140.   By reason of the foregoing, the claims of plaintiff and the Class are timely under any applicable statute of limitations pursuant to the discovery rule and the doctrine of fraudulent concealment.

141.   The defendants have been aware of their unlawful conduct and conspiracy since at least 1991, and probably before that time.

142.   Despite this knowledge and awareness, the defendants have continued to promote and sell cancer, inhalant and miscellaneous other drugs at artificially inflated prices, and to give away free samples of their drugs knowing and expecting that doctors would bill patients for them.

143.   The defendants' failure to properly disclose their unlawful conduct and conspiracy, and other acts and omissions as alleged herein, was and is willful, intentional, wanton, malicious, outrageous, and was and continues to be undertaken in deliberate disregard of, or with reckless indifference to, the rights and interests of plaintiff and the Class.

## DEFENDANTS' UNLAWFUL CONDUCT IN NEW JERSEY

144.   By virtue of the agreement of many of the defendants and third party medical providers herein to plead guilty to conspiracy relating to the sale of cancer, inhalant and miscellaneous other drugs, and to pay fines to resolve both criminal and civil charges against them, it is clear that the conduct of these and other defendants had an effect upon plaintiff and the Class.

145.   These defendants' guilty pleas and settlements included the sum of more than $890 million from TAP, Abbott and Takeda to be paid to the United States and 50 states, including the District of Columbia, $257 million from Bayer to the United States and 47 states, $86 million from GlaxoSmithKline and $350 million from AstraZeneca. The Schering Defendants have been notified of an impending indictment by the federal government. Accordingly, such defendants have agreed

© 2003 KLINE & SPECTER                    42

and/or have been apprised, either explicitly or implicitly, that their unlawful conduct and conspiracy

has affected the plaintiff and the Class Consumers as more specifically set forth herein.

### THE ASTRAZENECA DEFENDANTS', DR. ANTOUN'S, DR. HOPKINS' AND DR. BERKMAN'S UNLAWFUL CONDUCT IN NEW JERSEY

146.   It is believed and therefore averred that the AstraZeneca Defendants, along with

defendants Dr. Antoun, Dr. Hopkins and Dr. Berkman, engaged in conduct similar to the other

defendants with respect to their marketing, promotion, sale and distribution of cancer and

miscellaneous other drugs manufactured, distributed, marketed and sold by them.  In particular, it

is averred that the AstraZeneca Defendants adopted similar unlawful practices, such as the provision

of free samples for which doctors could charge and the artificial inflation of the AWPs for their

cancer drugs and miscellaneous other drugs, in order to create spreads in their drug prices for the

benefit of medical providers and others who purchased AstraZeneca's drugs.

147.   The drugs manufactured, distributed, marketed and sold by the AstraZeneca

Defendants and covered by government and private assistance programs include, but may not be

limited to: Zoladex® (goserilin acetate implant), Arimidex® (anastrozole), Casodex® (bicalutamide),

Nolvadex® (tamoxifen citrate), Tomudex® (raltitrexed), Diprivan® (propofol), Prilosec®

(omeprazole), and Nexium™ (esomeprazole), Cefotan®, Elavil Injection, Faslodex®, Foscavir®,

Merrem®, Tenormin Injection and, Xylocaine Injection, among other prescription drugs.  Upon

information and belief, all of these drugs had "spreads" and were paid for by plaintiff and the Class.

148.   Zoladex® is used in the primary medical treatment of prostate cancer and for the same

indications, and therefore in the same patient population, as leuprolide (Lupron® - TAP, Viadur® -

Bayer, Eligard™ - Sanofi-Synthelabo).  In addition, Zoladex® may used in this population of patients

in combination with the anti-androgen medications, such as bicalutamide (Casodex® - the

AstraZeneca Defendants) and flutamide (Eulexin® - the Schering Defendants). Tomudex® is used in the treatment of colon cancer, as is irinotecan (Camptosar® - the Pharmacia Defendants).

149.    One or more of the AstraZeneca Defendants pled guilty to falsely reporting prices for Zoladex® and conspiring to bill for free samples.

150.    The guilty plea was not unexpected. In the government's Sentencing Memorandum relating to TAP, AstraZeneca is discussed prominently as having been TAP's major competitor throughout most of the 1990's, both for Lupron® and Prevacid®. AstraZeneca manufactures and sells Zoladex®, a competitor to TAP's Lupron® and Prilosec®, a competitor drug to TAP's Prevacid®. In the Sentencing Memorandum, the government observed:

> ...in 1995, TAP, in a moment of delicious irony, accused its competitor, the manufacturer of Zoladex, with providing inducements to physicians in violation of the Medicare fraud and abuse laws, to include the fact that employees of the competitor were giving free samples to doctors to encourage them to switch from Lupron to Zoladex. The competitor, in turn, accused TAP of the very same conduct. Top employees from the two companies met in a summit meeting to discuss this exchange of criminal allegations. Did the serious allegations curb TAP's conduct? Did TAP, aware of allegations that its employees had engaged in criminal conduct, undertake expeditiously to stop the behavior, to train its employees in the rules and to enforce their adherence to the rules? Did either company, in possession of information that a competitor was violating the rules, report the conduct to the prosecutive authorities in an effort to clean up the industry? Unfortunately, the answer to all of these questions is no: TAP [and Astra Zeneca] cognizant of the rules and having been accused of violations, simply carried on [their] business as [they] always had, full criminal speed ahead.

151.    In fact, these cross-allegations of illegal fraudulent conduct by TAP and the AstraZeneca Defendants were levied by the in-house counsel for the companies, thereby making the failure to report the fraud, and the consummation of a conspiracy to engage in a mutual fraudulent scheme, even more egregious.

© 2003 Kline & Specter                        44

152.   In that same Sentencing Memorandum, the government observed that TAP's own management acknowledged that TAP was not alone in committing the fraudulent scheme and conspiracy in a quote from a TAP employee, who said:

> Yes, sure there are rules, but, we operate in a tough competitive marketplace with other pharmaceutical companies. If our employees have to break some rules to win and beat the competition, well, that is what will happen. We have profits to earn and owners to keep happy and bonuses to earn for ourselves and obeying the rules will just have to take a number in line behind all those other priorities. So what if we are breaking the laws: so are our competitors: how can we be expected to follow the rules if they aren't?

153.   As previously noted, the AstraZeneca Defendants broke the rules time and again and proceeded "full criminal speed ahead" by providing free samples to providers to induce them to use Zoladex® knowing and expecting that providers would bill patients and government and private assistance programs at an artificially inflated AWP. For example, in 1995, the AstraZeneca Defendants proposed to Medical providers that, Zeneca would provide 50 Free Depots (Over $11,900 Worth of Product) to a particular urology practice for converting the practice's patient's to Zoladex® from Lupron®.

154.   Another similar proposal was made to Central Indiana Urology which offered $15,000 in free Zoladex® goods if the practice switched patients to converted to Zoladex® from Lupron®.

155.   On September 18, 2002, a Holmdel, New Jersey urologist, Saad Antoun, M.D., pleaded guilty to charges of accepting free samples of Zoladex® from the AstraZeneca Defendants with the intent of billing patients and their health insurance providers for those free goods.

156.   According to the Criminal Indictment against Dr. Antoun, beginning in or about the fourth quarter of 1995 and continuing through at least 1999, Antoun received from the AstraZeneca Defendants, without charge, approximately 195 one-month sample doses of Zoladex®. Throughout

that time period, Dr. Antoun prescribed and administered those free doses to patients and submitted claims to government and private insurance programs, receiving reimbursement for administering at least 114 of those free doses.

157.    Moreover, throughout the same period, the AstraZeneca Defendants and their employees knew and understood: (a) that, because of 'return to practice' (RTP), a doctor who purchased an injection of Zoladex® and then billed that injection to government and private insurance programs and to the patient at the published 'average wholesale price' (AWP) for Zoladex® rather than at its purchase-price, would earn a substantial profit; and (b) that a doctor who received an injection of Zoladex® for free would earn no profit at all from receiving that free dose, assuming that he obeyed the law and did not bill for that dose.

158.    On December 17, 2002, a Boynton Beach, Florida urologist, Stanley C. Hopkins, M.D., pleaded guilty to charging patients and their health insurers for free samples of Zoladex®. Dr. Hopkins admitted to conspiring with the AstraZeneca Defendant to obtain free samples of Zoladex® in violation of the PDMA, which, *inter alia*, prohibits billing patients or their insurance carriers for free drug samples.

159.    According to the Criminal Information against Dr. Hopkins, beginning in or around January 1995 and continuing until at least July 1996, Dr. Hopkins received from the AstraZeneca Defendants, for free, approximately 223 one-month equivalent sample doses of Zoladex®. Throughout that time period, Dr. Hopkins prescribed and administered those free doses to patients and submitted claims for at least 152 of those samples to the patients and their insurers and was paid for the prescription of at least 152 of these free dosages.

160.    On May 19, 2003, a Columbus, Ohio urologist, Robert A. Berkman, M.D., was indicted for engaging in a conspiracy with the AstraZeneca Defendants by accepting 223 free

samples of Zoladex® from the AstraZeneca Defendants and billing his patients and their health insurance providers for at least 220 of them.

### DEFENDANTS TAP'S AND TAKEDA'S
### UNLAWFUL CONDUCT IN NEW JERSEY

161.    It is believed and therefore averred that TAP and Takeda engaged in conduct similar to the other defendants with respect to their marketing, promotion, sale and distribution of cancer and miscellaneous other drugs manufactured, distributed, marketed and sold by them.  In particular, it is averred that TAP and Takeda adopted similar unlawful practices, such as the provision of free samples for which doctors could charge and the artificial inflation of the AWPs for TAP's and Takeda's cancer and miscellaneous other drugs, in order to create spreads in their drug prices for the benefit of medical providers and others.

162.    The drugs manufactured, distributed, marketed and sold by TAP and Takeda and covered by government and private assistance programs include, but may not be limited to: Lupron® and Prevacid®.  These drugs had "spreads" and were paid for by plaintiff and the Class.

163.    As set forth herein, Takeda manufactures both Lupron® and Prevacid® for TAP, among other drugs.  Through TAP, both companies, along with Abbott, have admitted their unlawful conduct in the October 2001 guilty plea by TAP.  This case seeks to recover against these companies for unlawful conduct relating to Prevacid® only.

### DEFENDANT ABBOTT'S
### UNLAWFUL CONDUCT IN NEW JERSEY

164.    It is believed and therefore averred that Abbott engaged in conduct similar to the other defendants with respect to their marketing, promotion, sale and distribution of cancer and miscellaneous other drugs manufactured, distributed, marketed and sold by it.  In particular, it is averred that Abbott adopted similar unlawful practices, such as the provision of free samples for

© 2003 KLINE & SPECTER                    47

which doctors could charge and the artificial inflation of the AWPs for Abbott's cancer and miscellaneous other drugs, in order to create spreads in its drug prices for the benefit of medical providers and others.

165.    The drugs manufactured, distributed, marketed and sold by Abbott and covered by government and private assistance programs include, but may not be limited to: acetylcysteine, acyclovir, amikacin sulfate, calcitriol, cimetidine hydrochloride, clindamycin phosphate, evelosporine, dextrose, dextrose sodium chloride, diazepam, furosemide, gentamicin sulfate, heparin lock flush, lansoprazole, leuprolide acetate, metholprednisolone sodium succinate, sodium chloride, tobramycin sulfate, vancomycin, and zemplar, among other prescription drugs. All of these drugs had "spreads" and were paid for by plaintiff and the Class.

166.    Nearly all of the intravenously administered medications listed herein are administered via some form of infusion and must be mixed with an intravenous carrier solution consisting of dextrose solution, sodium chloride solution, or dextrose sodium chloride solution, as are manufactured and sold by Abbott. The antibiotics manufactured, marketed and sold by Abbott may be administered to patients whose immune systems are suppressed by anti-neoplastic medications, such as anti-neoplastic drugs manufactured by, among others, AstraZeneca Defendants (Tomudex® - raltitrexed), the J&J Defendants (Leustatin - cladribine, Doxil - doxorubicin hydrochloride), the Pharmacia Defendants (Adriamycin® - doxorubicin hydrochloride, Adrucil® - fluorouracil, Neosar® - cyclophosphamide, Cystosar-U - cytarabine, Toposar - etoposide, and others), the Boehringer Defendants (bleomycin, cisplatin, cyclosporine, etoposide, leukovorin and others), the Bristol-Myers Defendants (Cytoxan - cyclophosphamide, Rubex - doxorubicin hydrochloride, VePesid and Etopophos - etoposide), and the Baxter Defendants (etoposide, doxorubicin), as may the anti-viral medication acyclovir. Abbott's Calcitriol and Zemplar may be used to raise serum

© 2003 KLINE & SPECTER                          48

calcium level in dialysis patients who are prone to anemia and may receive drugs of the epoetin class

such as Procrit (the J&J Defendants), Epogen® (the Amgen Defendants) and Aranesp™ (the Amgen

Defendants).

167.   United States Congressman Pete Stark underscored the unlawful conduct of defendant

Abbott in a letter to Abbott Chief Executive Officer Miles White, dated October 31, 2000:

> The price manipulation scheme is executed through Abbott's inflated
> representations of average wholesale price ("AWP") and direct price
> ("DP") which are utilized by the Medicare and Medicaid programs in
> establishing drug reimbursements to providers.   The difference
> between the inflated representations of AWP and DP versus the true
> price providers are paying, is regularly referred to... as "the spread."
> ...Abbott has intentionally reported inflated prices and has engaged in
> other improper business practices in order to cause its customers to
> receive windfall profits from Medicare and Medicaid when
> submitting claims. ...Abbott manipulated prices for the express
> purpose of expanding sales and increasing market share for certain
> drugs... by arranging financial benefits or inducements that influenced
> the decisions of health care providers submitting Medicare and
> Medicaid claims.

168.   Abbott has admitted that it deliberately sets the AWPs for its drug products, including

Calcijex, to ensure that medical providers achieve profits from the spreads created by Abbott.

169.   Abbott's unlawful behavior is reflected in a letter from Congressman Tom Bliley to

the Health Care Financing Administration dated, February 25, 2000, which notes that "prices... are

routinely made available to many providers... far below Medicare reimbursement rates.  They

include 1999 prices for vancomycin, the Abbott Labs-manufactured antibiotic, which a health care

provider could buy for $76.00 but for which the AWP upon which Medicare's reimbursement was

based on was $261.84."

© 2003 KLINE & SPECTER                    49

### THE J&J DEFENDANTS'
### UNLAWFUL CONDUCT IN NEW JERSEY

170.   It is believed and therefore averred that the J&J Defendants engaged in conduct similar to the other defendants with respect to their marketing, promotion, sale and distribution of cancer and miscellaneous other drugs manufactured, distributed, marketed and sold by them. In particular, it is averred that the J&J Defendants adopted similar unlawful practices, such as the artificial inflation of the AWPs for their cancer drugs and miscellaneous other drugs in order to create spreads in their drug prices for the benefit of medical providers and others. Further, it is averred that the J&J defendants engaged in unlawful promotion activities with other defendants, like TAP, with respect to their medical products.

171.   The drugs manufactured, distributed, marketed and sold by the J&J Defendants and covered by government and private assistance programs include, but may not be limited to: Viadur®, (leuprolide acetate), ReoPro® (abciximab), an anti-blood clotting medication, Retavase® (reteplase), an anti-blood clotting agent, Procrit® (epoetin alfa), for the treatment of anemia, Leustatin® (cladribine), for the treatment of leukemia, Orthoclone® (muromonab-CD3), used to prevent organ transplant rejection, Sporanox® (itraconazole), used in the treatment of fungal infections, Doxil® (doxorubicin), an anti-neoplastic drug, and Remicade® (infliximab), an anti-inflammatory drug, among other prescription drugs. All of these drugs had "spreads" and were paid for by plaintiff and the Class.

172.   Anemia and fungal infections occur in patients undergoing cancer chemotherapy with any of a number of chemotherapy agents. Therefore patients receiving these drugs are likely to receive medications in the epoetin alpha class (Procrit®), such as Aranesp™ (darbepoetin alfa - the Amgen Defendants) and Epogen® (epoetin alpha - the Amgen Defendants). They may also be in

© 2003 KLINE & SPECTER                    50

need of the administration of a drug like Sporanox®, Amphocin (amphotericin - the Pharmacia

Defendants) or Fujizone (the Bristol-Myers Defendants).   Cancer or anti-neoplastic drugs are

manufactured and sold by TAP, Abbott and Takeda (Lupron® - leuprolide), the AstraZeneca

Defendants (Zoladex® - goserelin, Tomudex® - raltitrexed), the J&J Defendants (Leustatin -

cladribine, Doxil - doxorubicin hydrochloride), the Pharmacia Defendants (Adriamycin® -

doxorubicin hydrochloride, Adrucil® - fluorouracil, Neosar® - cyclophosphamide, Cystosar-U -

cytarabine, Trelstar™, and others), the Boehringer Defendants (bleomycin, cisplatin, cyclosporine,

etoposide, leukovorin and others), the Bristol-Myers Defendants (Cytoxan - cyclophosphamide,

Rubex - doxorubicin hydrochloride, VePesid and Etopophos - etoposide), and the Baxter Defendants

(etoposide, doxorubicin), among others.

173.   In addition to the evidence set forth above respecting the J&J Defendants, the J&J

Defendants deliberately marketed and promoted the sale of Remicade® to physicians based on the

availability of inflated payments made by Medicare, assuring them that they would make a

significant profit from the purchase of Remicade as a result of the spread between the actual price

to physicians and reimbursement based on the published AWP.   The J&J Defendants created

promotional materials and worksheets to market the spread.   For example, a publication accessible

through the J&J Defendants' website entitled "Office-Based Infusion Guide" demonstrates the J&J

Defendants' aggressive marketing of this spread, specifically noting that, "[d]epending on

reimbursement, office-based infusion may provide a financial impact to a physician's practice."

Moreover, the "Financial Analysis" section of the guide includes a "REMICADE® (infliximab)

Financial Impact Worksheet," which enables doctors to see in actual dollars how much additional

revenue the use of Remicade would bring to their practice.   Remacid competes with other anti-

inflammatory drugs, such as Enbrel® and Kineret™ (the Amgen Defendants).

© 2003 KLINE & SPECTER                              51

### THE PHARMACIA DEFENDANTS'
### UNLAWFUL CONDUCT IN NEW JERSEY

174.   It is believed and therefore averred that the Pharmacia Defendants engaged in conduct similar to the other defendants with respect to their marketing, promotion, sale and distribution of cancer and miscellaneous other drugs manufactured, distributed, marketed and sold by them.  In particular, it is averred that the Pharmacia Defendants adopted similar unlawful practices, such as the provision of free samples for which doctors could charge and the artificial inflation of the AWPs for their cancer, inhalant and miscellaneous other drugs in order to create spreads in their drug prices for the benefit of medical providers and others.

175.   The drugs manufactured, distributed, marketed and sold by the Pharmacia Defendants and covered by government and private assistance programs include, but may not be limited to: Adriamycin PFS® (doxorubicin hydrochloride), Adrucil® (fluorouracil), Amphocin® (amphotericin), Aromasin® (bleomycin), Camptosar® (irinotecan hydrochloride), Cleocin Phosphate® (clindamycin phosphate), Cytosar-U (cytarabine), Depo-Testosterone® (testosterone cypionate), Ellence® (epirubicin HCL), Glynase (glyburide), Idamycin® (idarubicin hydrochloride), Medrol® (methylprednisolone), Micronase (glyburide), Neosar® (cyclophosphamide), Solu-Cortef® (hydrocortisone sodium succinate), Toposar® (etoposide), Trelstar™ (triptorelin pamoate), and Vincasar® (vincristine sulfate), among other prescription drugs. All of these drugs had "spreads" and were paid for by plaintiff and Class.

176.   The majority of the above-named medications manufactured and marketed by Pharmacia Defendants are members of the cancer (anti-neoplastic) class of medications.  Patients receiving these medications therefore may receive physician-administered anti-nausea medications such as Kytril® (granisetron hydrochloride - Hoffman), Zofran® (ondansetron hydrochloride -

GlaxoSmithKline Defendants), Lemet (ondonsetron - the Sicor Defendants), Reglan (metoclopramide - the Wyeth Defendants), Pramilem (metoclopramide – the Sicor Defendants), and Anzemet (dolasetron mesylate - the Aventis Defendants). They may also receive medications to treat anemia by increasing the production of red blood cells, such as Procrit® (epoetin alpha - J&J Defendants), Epogen® (epoetin alpha - the Amgen Defendants) and Aranesp™ (darbepoetin alfa - the Amgen Defendants). Side effects such as a decrease in white blood cells or platelets may necessitate the administration of agents such as Neupogen® (filgrastim - the Amgen Defendants) or Neumega (oprelvekin - the Wyeth Defendants).

177.   In September 1995, and prior to that time, P&U often used such offers of free goods to offset price differences between its drugs and those of its competitors.

178.   By early October 1996, P&U had in place a free goods program to support its sales representatives' efforts to sell Adriamycin® against other forms of generic doxorubicin. Free goods were used to lower the cost of Adriamycin® and increase profits to medical providers.

179.   Representative Pete Stark commented before the Congressional Ways and Means Committee that:

> The evidence... shows that Pharmacia & Upjohn has knowingly and deliberately inflated their representations of the average wholesale price ("AWP"), wholesale acquisition cost ("WAC") and direct price ("DP") which are utilized by the Medicare and Medicaid programs in establishing drug reimbursements to providers.

180.   An excerpt of a letter from Congressman Stark to Pharmacia details the fraudulent practices by Pharmacia to manipulate AWPs for its drugs.

> The manipulated disparities between your company's reported AWPs and DP are staggering. For example, in 1997, Pharmacia & Upjohn reported an AWP of $946.94 for 200 mg. of Adriamycin PFS while offering to sell it to American Oncology Resources (AOR) for $168.00 and to Comprehensive Cancer Center for $152.00

© 2003 KLINE & SPECTER                    53

(Composite Exhibit "1"). Your company then aggressively marketed its cancer drugs to health care providers by touting financial inducements and other types of incentives. Pharmacia & Upjohn created and marketed the financial inducements for the express purpose of influencing the professional judgment of doctors and other health care providers in order to increase the company's market share.

The linking of doctor participation in FDA clinical drug trials to their purchase and administration of profit-generating oncology drugs is entirely inconsistent with the objective scientific testing that is essential to the integrity of the trial.

It is clear that Pharmacia & Upjohn targeted health care providers, who might be potential purchasers, by creating and then touting the windfall profits arising from the price manipulation. For example, Pharmacia & Upjohn routinely reported inflated average wholesale prices for its cancer drug Bleomycin, 15u, as well as direct prices. The actual prices paid by industry insiders was in many years less than half of what Pharmacia & Upjohn represented. Pharmacia & Upjohn reported that the average wholesale price for Bleomycin, 15u, rose from $292.43 to $309.98, while the price charged to industry insiders fell by $43.15 (Composite Exhibit "4").

[I]nternal Pharmacia & Upjohn documents... show that Pharmacia & Upjohn also utilized a large array of other inducements to stimulate product sales... including "educational grants" and free goods... designed to result in a lower net cost to the purchaser while concealing the actual price beneath a high invoice price. Through these means, drug purchasers were provided substantial discounts that induced their patronage while maintaining the fiction of higher invoice price - the price that corresponded to reported AWPs and inflated reimbursements from the government.

In a September 28, 2000 letter to the Pharmaceutical Research and Manufacturers of America ("PhRMA"), Congressman Pete Stark summarized the drug profits that Pharmacia marketed to doctors:

PHARMACIA: Some of the drugs on the multi-source list offer you savings of over 75% below list price of the drug. For a drug like Adriamycin, the reduced pricing offers AOR a reimbursement of over $8,000,000 profit when reimbursed at AWP. The spread from acquisition cost to reimbursement on the multi-source products offered on the contract give AOR a wide margin for profit.

© 2003 KLINE & SPECTER                    54

### THE AMGEN DEFENDANTS'
### UNLAWFUL CONDUCT IN NEW JERSEY

181.    It is believed and therefore averred that the Amgen Defendants engaged in conduct similar to the other defendants with respect to their marketing, promotion, sale and distribution of cancer and miscellaneous other drugs manufactured, distributed, marketed and sold by them.  In particular, it is averred that the Amgen Defendants adopted similar unlawful practices, such as the provision of free samples for which doctors could charge and the artificial inflation of the AWPs for their cancer, inhalant and miscellaneous other drugs, in order to create spreads in their drug prices for the benefit of medical providers and others.

182.    The drugs manufactured, distributed, marketed and sold by the Amgen Defendants-and covered by government and private assistance programs include, but may not be limited to: Aranesp™ (darbepoetin alfa), Enbrel® (etanercept), Epogen® (epoetin alfa), Kineret™ (anakinra), Neulasta™ (pegfilgrastim), and Neupogen® (filgrastim), among other prescription drugs. All of these drugs had "spreads" and were paid for by plaintiff and the Class.

183.    These medications, some of which may be used to treat the bone marrow suppressant effects of many cancer (anti-neoplastic) medications, may be administered to the same patient population receiving cancer (anti-neoplastic) drugs manufactured by the AstraZeneca Defendants (Tomudex® - raltitrexed), the J&J Defendants (Leustatin® - cladribine), the Pharmacia Defendants (Adriamycin® - doxorubicin hydrochloride, Adrucil® - fluorouracil, Neosar® - cyclophosphamide, Cystosar-U - cytarabine, and others), the Boehringer Defendants (bleomycin, cisplatin, cyclosporine, etoposide, leukovorin and others), the Bristol-Myers Defendants (Cytoxan - cyclophosphamide, Rubex - doxorubicin hydrochloride, VePesid and Etopophos - etoposide), and the Baxter Defendants

©2003 KLINE & SPECTER                    55

(etoposide, doxorubicin), among others. Enbrel® also treats rheumatoid arthritis as does Remicaid (the J&J defendants).

184.    On May 10, 2002, Fresenius AG, National Medical Care (NMC), Dialysis Division, reached a settlement with the Office of Inspector General (OIG) of the Department of Defense (DoD), after an investigation disclosed that NMC had billed federal health care programs, including TRICARE/CHAMPUS, for Amgen's drug Epogen®, which NMC had received free of charge from the Amgen Defendants as part of a clinical study.  The Amgen Defendants knew and expected that NMC would bill for the free samples of Epogen® supplied to NMC.

185.    Moreover, as set forth herein, because of the integral relationship of the drug products of the Amgen Defendants in the treatment of cancer, the Amgen Defendants had the same interest as other defendants in maintaining AWP as the benchmark for reimbursement under government and private assistance programs.  Accordingly, beginning in at least 1994, the Amgen Defendants met and communicated with other defendants, including TAP, Abbott, the AstraZeneca Defendants and the Bristol-Myers Defendants, among others, to work to oppose efforts by the government to change reimbursement for cancer drugs and miscellaneous other drugs.  In particular, these defendants and possibly others, worked in concert among themselves and with others to maintain AWP as a reimbursement benchmark and to prevent plaintiff and the Class from discovering their fraudulent inflation of AWP and promotion of spreads with respect to their cancer, inhalant and miscellaneous other drugs.

186.    Congressman Stark exposed Immunex's involvement in the scheme to inflate AWPs in a letter dated September 28, 2000, to the president of a national pharmaceutical trade group:

> The documents further expose the fact that certain of your members deliberately concealed and misrepresented the source of AWP's: In

© 2003 KLINE & SPECTER                               56

a 1996 Barron's article entitled "Hooked on Drugs" the following quote from Immunex appeared (Composite Exhibit #11):

> IMMUNEX: "But Immunex, with a thriving generic cancer-drug business says its average wholesale prices aren't its own.   The drug manufacturers have no control over the AWP's published...." (IMX003079) However, Immunex's own internal documents indisputably establish the knowledge of the origin of their AWP's and their active concealment.

### THE AVENTIS DEFENDANTS' UNLAWFUL CONDUCT IN NEW JERSEY

187.    It is believed and therefore averred that the Aventis Defendants engaged in conduct similar to the other defendants with respect to their marketing, promotion, sale and distribution of cancer and miscellaneous other drugs manufactured, distributed, marketed and sold by them.  In particular, it is averred that the Aventis Defendants adopted similar unlawful practices, such as the provision of free samples for which doctors could charge and the artificial inflation of the AWPs for their cancer, inhalant and miscellaneous other drugs in order to create spreads in their drug prices for the benefit of medical providers and others.

188.    The drugs manufactured by the Aventis Defendants and covered by government and private assistance programs include, but may not be limited to: Anzemet® (dolasteron mesylate), Bioclate® (antihemo factor viii), Gammar® (immune globulin), Helixate® (antihemo factor viii), Humate-P® (antihemo factor viii), Mononine® (antihemo factor ix complex), Monoclate-P® (antihemo factor viii) and Taxotere® (docetaxel), among other prescription drugs.  All of these drugs had "spreads" and were paid for by plaintiff and the Class.

189.    Taxotere is a cancer (anti-neoplastic) drug used to treat cancers of the breasts and lungs. Like cancer drugs of other defendants, such as the Bristol-Myers Defendants (Taxol®) and Abbott (Paclitaxel).  Anzemet is an intravenous anti-nausea medication similar to Kytril®

© 2003 KLINE & SPECTER                                    57

(granisetron hydrochloride - Hoffman) and Zofran® (ondansetron hydrochloride - GlaxoSmithKline

Defendants). It may be administered to patients receiving cancer (anti-neoplastic) medications

including, but not limited to cancer (anti-neoplastic) drugs manufactured by the AstraZeneca

Defendants (Tomudex® - raltitrexed), the J&J Defendants (Leustatin® - cladribine), the Pharmacia

Defendants (Adriamycin® - doxorubicin hydrochloride, Adrucil® - fluorouracil, Neosar® -

cyclophosphamide, Cystosar-U - cytarabine, and others), the Boehringer Defendants (bleomycin,

cisplatin, cyclosporine, etoposide, leukovorin and others), the Bristol-Myers Defendants (Cytoxan

- cyclophosphamide, Rubex - doxorubicin hydrochloride, VePesid and Etopophos - etoposide) and

the Baxter Defendants (etoposide, doxorubicin), among others.

190.    U.S. Congressman, Thomas J. Bliley, in a letter dated May 4, 2002 to Behring,

highlighted the unlawful practice of the Aventis Defendants of inflating average wholesale prices

for their drugs.

> The Office of Inspector General (OIG) at the Department of Health
> and Human Services determined that the Medicare allowed amount
> for immune globulin, a pharmaceutical product sold by your company
> under the name Gammar, in Fiscal Year 1996 was $42.21. The OIG
> further estimated that the actual wholesale price of this drug was
> $16.12 and the highest available wholesale price that the OIG was
> able to identify was $32.11.

191.    Similarly, Congressman Pete Stark, summarized the scheme implemented by Hoechst

to inflate the AWPs for its drugs. In a letter to the PhRMA, dated September 28, 2000, Congressman

Stark explains:

> The following chart represents a comparison of Hoechst's fraudulent
> price representations for its injectable...drug versus the truthful prices
> paid by the industry insider. It... also compares Hoechst's price
> representations for the tablet form of Anzemet and the insider's true
> prices. It is extremely interesting that Hoechst did not create a spread
> for its tablet form of Anzemet but only the injectable form. This is
> because Medicare reimburses Doctors for the injectable form of this

drug and by giving them a profit, can influence prescribing. The tablet form is dispensed by pharmacists, who accept the Doctor's order. And this underscores the frustration that federal and state regulators have experienced in their attempts to estimate the truthful prices being paid by providers in the marketplace for prescription drugs and underscores the fact that, if we cannot rely upon the drug companies to make honest and truthful representations of their prices, Congress will be left with no alternative other than to legislate price controls.

192.    The government's investigation has uncovered substantial evidence that the Aventis Defendants' fraudulent practices are widespread. For example, in a report published by DHHS, the DOJ documented at least 15 instances where the published AWPs for drugs manufactured by the Aventis Defendants were substantially higher than the actual prices listed by wholesalers.

193.    The same report concluded that (i) the AWP for all immune globulin 5 mg doses listed in the 1997 *Red Book* were inflated by an average spread of 32.21%; (ii) a 10 mg dose of Anzemet® had a Medicare median of $14.82 and a Catalog median of $8.29, resulting in a spread of 78.76%; and (iii) a 20 mg dose of Taxotere® had a Medicare median of $283.65 and a Catalog median of $8.29, resulting in a spread of 18.75%.

### THE BOEHRINGER DEFENDANTS' UNLAWFUL CONDUCT IN NEW JERSEY

194.    It is believed and therefore averred that the Boehringer Defendants engaged in conduct similar to the other defendants with respect to their marketing, promotion, sale and distribution of cancer and miscellaneous other drugs manufactured, distributed, marketed and sold by them. In particular, it is averred that the Boehringer Defendants adopted similar unlawful practices, such as the provision of free samples for which doctors could charge and the artificial inflation of the AWPs for their cancer drugs and miscellaneous other drugs, in order to create spreads in their drug prices for the benefit of medical providers and others.

© 2003 KLINE & SPECTER                    59

195.   The drugs manufactured, distributed, marketed and sold by the Boehringer Defendants and covered by government and private assistance programs include, but may not be limited to: acyclovir, amikacin sulfate, bleomycin, cisplatin, cyclosporine, cytarabine, doxorubicin hydrochloride, doxycycline, etoposide, ipratropium bromide, leucovorin calcium, methotrexate, mitomycin, paclitaxel, pamidronate disodium, and vinblastine sulfate, among other prescription drugs. All of these drugs had "spreads" and were paid for by plaintiff and the Class.

196.   Most of the above medications are members of the cancer (anti-neoplastic) class. Therefore, patients receiving them may need anti-nausea medications such as Anzemet (dolasteron mesylate - Aventis Defendants), Kytril® (gransietron hydrochloride - GlaxoSmithKline Defendants), Zofran (ondansetron hydrochloride - GlaxoSmithKline Defendants), Reglan (metoclopramide - the Wyeth Defendants), (ondansetron - the Sicor Defendants), Pramilem (metoclopramide - the Sicor Defendants) . Patients receiving these anti-neoplastics may also require medications in the epoetin alpha class such as Procrit®, (J&J Defendants), Aranesp™ (darbepoetin alfa - Amgen Defendants) and Epogen® (epoetin alpha - Amgen Defendants).

197.   Senior executives of the Boehringer Defendants have communicated directly with executives of competitor companies in furtherance of the fraudulent scheme alleged herein. Moreover, executives of the Boehringer Defendants have worked to maintain the provision of other inducements, as set forth herein, to advance the prescription of cancer, inhalant and miscellaneous other drugs pursuant to the fraudulent scheme herein.

198.   One such executive, Ursula Bartels, while she was employed as an executive of SmithKline accused SmithKline's competitor, Glaxo, of fraudulent conduct in furtherance of the fraudulent scheme alleged herein. Glaxo, in turn, accused Ms. Bartels and SmithKline of similar

fraudulent conduct. Neither company, aware of each other's fraudulent conduct, either changed its conduct or reported the fraud to the authorities.

199.   While at Boehringer, Ms. Bartels has continued to advance the fraudulent scheme through her efforts in conjunction with the industry trade association, PhRMA, and in chairing the committee that drafted the PhRMA Code of Conduct described herein.

200.   The Boehringer Defendants also have fraudulently promoted the AWPs for their drugs as being low priced, among other things.

### THE BAXTER DEFENDANTS'
### UNLAWFUL CONDUCT IN NEW JERSEY

201.   It is believed and therefore averred that the Baxter Defendants engaged in conduct similar to the other defendants with respect to their marketing, promotion, sale and distribution of cancer and miscellaneous other drugs manufactured, distributed, marketed and sold by them.  In particular, it is averred that the Baxter Defendants adopted similar unlawful practices, such as the provision of free samples for which doctors could charge and the artificial inflation of the AWPs for their cancer drugs and miscellaneous other drugs, in order to create spreads in their drug prices for the benefit of medical providers and others.

202.   The drugs manufactured, distributed, marketed and sold by the Baxter Defendants and covered by government and private assistance programs include, but may not be limited to: Bebulin® (factor ix complex), Buminate® (human albumin), cisplatin, dextrose, diazepam, Endoxan® (cyclophosphamid), Gammagard® (immune globulin), Hemofil M® (antihemo factor viii), Holoxan® (ifosfanide), Iveegam® (immune globulin), Proplex T® (factor ix complex), Recombinate® (antihemo factor viii), sodium chloride and Uromitexan® (mesna), among other prescription drugs. All of these drugs had "spreads" and were paid for by plaintiff and the Class.

203.    The above group of medications include anti-hemophilic factors (Bebulin, Hemofil, Hemofil M, Proplex, and Recombinate). Patients receiving those medications may receive similar agents such as Bioclate (factor VIII - Aventis Defendants), Mononine (factor IX - Aventis Defendants), and Kogenate (factor VIII - Bayer). In addition, patients treated with anti-neoplastics such as Endoxan® and cisplatin, may need treatment for nausea with drugs such as Anzemet (dolasteron mesylate - Aventis Defendants), Kytril® (gransietron hydrochloride - GlaxoSmithKline Defendants), Zofran® (ondansetron hydrochloride - GlaxoSmithKline Defendants), Reglan (metoclopramide - the Wyeth Defendants), (ondansetron - the Sicor Defendants), Pramilem (metoclopramide - the Sicor Defendants). Patients receiving these anti-neoplastics may also require medications in the epoetin alpha class such as Procrit® (J&J Defendants), Aranesp™ (darbepoetin alfa - Amgen Defendants) and Epogen® (epoetin alpha - Amgen Defendants), among others.

204.    The Baxter Defendants also provided medical providers and other purchasers of their drugs with free samples of drugs with the knowledge and expectation that the medical providers and purchasers would bill for those free samples, in violation of the law. In particular, the Baxter Defendants provided Quantum Healthcare with free goods as a way to reduce its overall price for Recombinate.

205.    The Baxter Defendants have admitted that increasing AWPs was a large part of our negotiations it's the large homecare company purchasers.

206.    The Baxter Defendants also have acknowledge the involvement of other defendants in the fraudulent scheme. In particular, the Baxter defendants were aware of the problem of other defendants using spreads for their drugs, and profits therefrom, and the need for the Baxter Defendants to address this problem. The Baxter Defendants addressed the problem by joining the

© 2003 KLINE & SPECTER                    62

fraudulent scheme and conspiracy by manipulating the AWPs for their drugs and creating and

maintaining spreads comparable to those of their competitors.

### THE BAYER'S DEFENDANTS'
### UNLAWFUL CONDUCT IN NEW JERSEY

207.   It is believed and therefore averred that the Bayer Defendants engaged in conduct

similar to the other defendants with respect to their marketing, promotion, sale and distribution of

cancer and miscellaneous other drugs manufactured, distributed, marketed and sold by them.  In

particular, it is averred that the Bayer Defendants adopted similar unlawful practices, such as the

provision of free samples for which doctors could charge and the  artificial inflation of the AWPs

for their cancer drugs and miscellaneous other drugs, in order to create spreads in their drug prices

for the benefit of medical providers and others.

208.   The drugs manufactured, distributed, marketed and sold by the Bayer Defendants and

covered by government and private assistance programs include, but may not be limited to: Viadur®

(leuprolide acetate implant), Kogenate® (antihemo factor viii), and Koate-DVI® (antihemo factor viii)

and Gamimune® (immune globulin), all used to treat hemophilia, and Gamimune® which is used in

the treatment of immunodeficiency and autoimmune disorders, among other prescription drugs.  All

of these drugs had "spreads" and were paid for by plaintiff and the Class.

209.   The Bayer Defendants have acknowledged their involvement in the fraudulent scheme

through the fact that they admit that "many" health care providers are paid on a discount from AWP.

210.   A September 28, 2000 letter from Representative Stark to PhRMA also shows the

Bayer Defendants' deliberate and unlawful scheme to inflate the AWPs and market the spreads for

their products.

> BAYER:...".[I]f Baxter has increased their AWP then we must do the
> same.  Many of the Homecare companies are paid based on a discount

© 2003 KLINE & SPECTER                          63

from AWP. If we are lowed [sic] than Baxter then the return will be lower to the HHC. It is a very simple process to increase our AWP, and can be done overnight."

211.   A Justice Department press release regarding settlement of claims against Bayer, dated January 23, 2001, clearly indicates the involvement of the Bayer Defendants in the fraudulent scheme and conspiracy to inflate AWPs for their products.

> [B]eginning in the early 1990s [Bayer] falsely inflated the reported drug prices - referred to by the industry as the Average Wholesale Price (AWP), the Direct Price and the Wholesale Acquisition Cost - used by state governments to set reimbursement rates for the Medicaid program. By setting an extremely high AWP and... selling the product to doctors at a dramatic discount, Bayer induced physicians to purchase its products rather than those of competitors by enabling doctors to profit from reimbursement paid to them by the government.

> ––   The investigation further revealed that the practice in which Bayer selectively engaged, commonly referred to as "marketing the spread," also had the effect of discouraging market competition from manufacturers that do not inflate AWPs as a way of inducing doctors to purchase their products.

212.   The DOJ also found that "some physicians and home health companies ignore the products of companies that refuse to create these profit windfalls for customers."

213.   Beginning in the early 1990s, the Bayer Defendants began to falsely inflate reported drug prices. Bayer set an extremely high AWP and sold prescription drugs and medical products to medical providers at dramatic discounts which enabled those medical providers to receive excessive reimbursements from patients and government and private assistance programs.

214.   Similar to TAP, the Bayer Defendants agreed to settle criminal charges brought by the federal government alleging that the Bayer Defendants caused medical providers to submit fraudulent claims to 47 state Medicaid programs. The government had alleged, as here, that the

Bayer Defendants falsely inflated the AWPs for certain of its drugs and biologic products and "marketed the spread" between those AWPs and the actual cost to medical providers.

215.   In settlement of these charges, the Bayer Defendants agreed to pay the total sum of $257 million to the United States and 47 states, including New Jersey.  The Bayer Defendants also agreed to enter into a Corporate Integrity Agreement which, like the one entered into by TAP, provides for Bayer to change its drug pricing practices.  Despite this settlement, plaintiff and the Class have not been compensated for their losses.

### THE BRISTOL-MYERS DEFENDANTS' UNLAWFUL CONDUCT IN NEW JERSEY

216.   It is believed and therefore averred that the Bristol-Myers Defendants engaged in conduct similar to the other defendants with respect to their marketing, promotion, sale and distribution of cancer and miscellaneous other drugs manufactured, distributed, marketed and sold by them.  In particular, it is averred that the Bristol-Myers Defendants adopted similar unlawful practices, such as the provision of free samples for which doctors could charge and the artificial inflation of the AWPs for their cancer drugs and miscellaneous other drugs, in order to create spreads in their drug prices for the benefit of medical providers and others.

217.   The drugs manufactured, distributed, marketed and sold by the Bristol-Myers Defendants and covered by government and private assistance programs include, but may not be limited to: Blenoxane® (bleomycin sulfate), Paraplatin® (carboplatin), Cytoxan® (cyclophospamide), Rubex® (doxorubicin hydrochloride), Etopophos® (etoposide), VePesid® (etoposide), TaxolV (paclitaxel) and Fungizone® (amphotericin B), among other prescription drugs.  All of these drugs had "spreads" and were paid for by plaintiff and the Class.

218.   It is believed and therefore averred that the Bristol-Myers Squibb Defendants had a similar "free goods" program designed to lower the net cost to their purchasers while concealing the actual cost of the drugs from the government and plaintiff and the Class.   Such arrangements had the effect of lowering the net cost of the cancer drugs and miscellaneous other drugs to the medical providers and others who purchased these drugs and creating even greater spreads than would already result from the invoiced prices.

219.   The Bristol-Myers Defendants worked with the other defendants, including TAP Abbott, the AstraZeneca Defendants, and the Amgen Defendants,  to ensure that government assistance programs did not change the AWP-based reimbursement systems put in place beginning in 1992.   Among other things, the Bristol-Myers Defendants held meetings with and otherwise communicated with the other defendants to maintain AWP as a basis for reimbursement under government assistance programs.

220.   Acknowledging the need for all the defendants to conspire and agree to work together to ensure AWP remained a benchmark for reimbursement, Bristol-Myers' 1994 Annual Report stated that "[t]he possibility of price controls being included in future proposals [to reform the U.S. Healthcare system] is something to which Bristol-Myers Squibb and the entire pharmaceutical industry must remain vigilant."

221.   As part of this "vigilance" maintained by the "pharmaceutical industry," in 1994, employees and/or representatives of the Bristol-Myers Defendants met with employees and/or representatives of Abbott, TAP, the AstraZeneca Defendants and the Amgen Defendants to discuss proposed changes by HCFA in the payment for certain drugs, especially the highest volume drugs, reimbursed by government assistance programs.   These proposed changes included changes in the AWP and/or the use of AWP as a basis for reimbursement.   As a result of these meetings and

communications between and among the aforesaid defendants, it is believed and therefore averred that subsequent meetings and communications took place between and among these defendants and other defendants to ensure that all agreed to work to ensure that AWP remained a fixture of a government assistance reimbursement, so that the fraudulent scheme and conspiracy to inflate AWPs could continue.

222.   By 2001, members of Congress were accusing the Bristol-Myers Defendants of fraud. In a letter dated February 27, 2001, Congressman Pete Stark of the Committee on Ways and Means of the U.S. House of Representatives wrote to Peter Bolen, President of Bristol-Myers, the following:

> Ongoing Congressional investigations have uncovered compelling evidence that Bristol-Myers Squibb ("Bristol") has for many years deliberately overstated the prices of some of its prescription drugs in order to cause the Medicare and Medicaid programs to pay inflated amounts to Bristol's customers. Bristol's participation in this scheme is costing American taxpayers billions of dollars in excessive drug costs and is jeopardizing the public's health, safety and welfare.
>
> The price manipulation scheme is executed through Bristol's falsely inflated representations of average wholesale price ("AWP"), direct price ("DP") and wholesaler acquisition cost ("WAC"), which are utilized by Medicare, Medicaid and most private third party payers in establishing drug reimbursements to providers. The difference between the inflated representations of AWP, DP, and WAC versus the true prices that providers are paying is regularly referred to in your industry as "the spread."

### THE GLAXOSMITHKLINE DEFENDANTS' UNLAWFUL CONDUCT IN NEW JERSEY

223.   It is believed and therefore averred that the GlaxoSmithKline Defendants engaged in conduct similar to the other defendants with respect to their marketing, promotion, sale and distribution of cancer and miscellaneous other drugs manufactured, distributed, marketed and sold by them. In particular, it is averred that the GlaxoSmithKline Defendants adopted similar unlawful practices, such as the provision of free samples for which doctors could charge and the artificial

© 2003 KLINE & SPECTER                           67

inflation of the AWPs for their cancer drugs and miscellaneous other drugs, in order to create spreads in their drug prices for the benefit of medical providers and others.

224.    The drugs manufactured, distributed, marketed and sold by the GlaxoSmithKline Defendants and covered by government and private assistance programs include, but may not be limited to: Hycamtin® (topotecan hydrochloride), Ventolin® (albuterol) and Zofran® (ondansetron hydrochloride).  Pierre Fabré Médicament licenses another government and private assistance program, Navelbine® (vinorelbine tartrate), to GlaxoSmithKline. GlaxoSmithKline Beecham P.L.C. manufactured and sold Kytril® (granisetron hydrochloride), another drug covered by government and private assistance programs (and a competitor to Zofran®), prior to the merger.  To secure regulatory approval for the merger, SmithKline Beecham P.L.C. sold Kytril®'s global rights to the Roche Group now part of Hoffman La-Roche, in approximately December of 2000.  All of these drugs of the GlaxoSmithKline Defendants had "spreads" and were paid for by plaintiff and the Class.

225.    The GlaxoSmithKline Defendants acted to avoid government price controls in drug reimbursement under government assistance programs.

226.    In 1994, Glaxo recognized the implications of increasing the AWP for Zofran to create a better spread, which implications included increased costs to patients and government and private assistance programs.  Despite such recognition, Glaxo chose to continue to not disclose its pricing strategy respecting increased AWPs and spreads for Zofran in order to conceal the same from the public, including plaintiff and the Class.

227.    Similar to the way the in-house lawyers for TAP and the AstraZeneca Defendants first accused each other of fraud in the creation and promotion of spreads, among other things, but then forged an agreement to mutually engage in the scheme to defraud patients and proceed "full criminal

speed ahead," in-house counsel for Glaxo and SmithKline, before the companies merged, accused each other of similar fraud, but then conspired and agreed to not stop one another.

228.   Timothy D. Proctor, Senior Vice President, General Counsel and Secretary for Glaxo, wrote to J. Charles Wakerly, Senior Vice President, Director and General Counsel for SmithKline accusing SmithKline of fraud in the advertising and marketing of Kytril®, including the promotion of spreads and profits to medical providers and other purchasers.

229.   Ursula B. Bartels, Vice President and Associate General Counsel for SmithKline (now General Counsel of Boehringer) wrote in response and accused Glaxo of engaging in similar fraudulent conduct.

230.   On April 25, 1995, Adrianna L. Carter, Glaxo Assistant General Counsel responded to SmithKline's accusations and admitted that Glaxo's AWP increase for Zofran® did not affect the actual cost to medical providers and that Glaxo's sales representatives were using the spread to gain market share.

231.   The fact that Glaxo and SmithKline each accused the other of the same fraudulent conduct, but neither brought it to the attention of the public or the federal or state authorities, is evidence that both companies were engaged in the same fraudulent scheme and conspiracy.

232.   In a September 27, 2000 article in USA Today, Glaxo spokesman Rick Sluder stated that average wholesale prices are not "representative of actual prices." Mr. Sluder also noted that Glaxo changed its wholesale prices to keep up with its competitors because "We [Glaxo] didn't want to put ourselves at a price disadvantage." Mr. Sluder admitted that the marketing of Glaxo drugs is based, in part, on the spread. He noted that Glaxo's sales staff is briefed on the price advantages to doctors who get reimbursed based upon the AWP.

### THE SCHERING DEFENDANTS'
### UNLAWFUL CONDUCT IN NEW JERSEY

233.    It is believed and therefore averred that the Schering Defendants engaged in conduct similar to the other defendants with respect to their marketing, promotion, sale and distribution of cancer and miscellaneous other drugs manufactured, distributed, marketed and sold by them. In particular, it is averred that the Schering Defendants adopted similar unlawful practices, such as the provision of free samples for which doctors could charge and the artificial inflation of the AWPs for their cancer drugs and miscellaneous other drugs, in order to create spreads in their drug prices for the benefit of medical providers and others.

234.    The drugs manufactured, distributed, marketed and sold by the Schering Defendants and covered by government and private assistance programs include, but may not be limited to: Proventil® (albuterol sulfate), Integrelin® (eptifibatide), Intron A® (interferon alfa-2b recombinant) and Temodar® (temozolomide), among other prescription drugs. All of these drugs had "spreads" and were paid for by plaintiff and the Class.

235.    Temodar® (temozolomide) is a cancer (anti-neoplastic) agent similar to those manufactured by the J&J Defendants (Leustatin®), the Pharmacia Defendants (Adriamycin®, Adrucil®, Neosar®, Idamycin®, and others), the Boehringer Defendants (bleomycin, cisplatin, paclitaxel, vinblastine and others), the Baxter Defendants (Endoxan®), the GlaxoSmithKline Defendants (Hycamptin, Navelbine), the Schering Defendants (Temodar), the Bristol-Myers Squibb Defendants (Blenoxane, Paraplatin®, Rubex, Etophopos), the Wyeth Defendants (Mylotarg), and the Sicor Defendants (Bleomycin, Epirubicin, Thiotepa), among others. Proventil® is an albuterol sulfate product similar to ones manufactured and sold by the Boehringer Defendants, the GlaxoSmithKline Defendants and Dey.

© 2003 KLINE & SPECTER                          70

236.   The Schering Defendants have engaged in the fraudulent scheme to inflate AWPs and promote spreads.   A May 4, 2000, letter from Congressman Tom Bliley, Chairman of the Congressional Committee on Commerce, to the President of Defendant Warrick noted that:

> [O]ne of the drugs reflecting a significant variation between the AWP-based prices paid by Medicare and the prices generally charged to private sector purchasers is albuterol sulfate, a drug manufactured by Warrick Pharmaceuticals.

237.   In a May 4, 2000 letter, Congressman Bliley outlined the Schering Defendants' fraudulent scheme with respect to the prescription drug albuterol sulfate. The government's investigation uncovered a significant spread between the amount Medicare reimbursed for albuterol sulfate and the amount the Schering Defendants actually charged. U.S. Representative Bliley also stated:

> The OIG [Office of the Inspector General] has determined that the Medicare-allowed amount for albuterol sulfate, a pharmaceutical product sold by your company, in the Fiscal Year 1996 was $.42. The OIG further estimated that the actual wholesale price of this drug was $.15 and the highest available wholesale price that the OIG was able to identify was $.21.

238.   In June 2003, the Schering Defendants revealed that they had been notified by the U.S. Attorney in Boston that they were going to be indicted criminally for engaging in various aspects of the fraudulent scheme alleged herein, including the provision of free samples of drugs knowing and expecting that medical providers and other purchasers would charge for them and inflating the AWPs for their drugs and promoting spreads.

### THE WYETH DEFENDANTS' UNLAWFUL CONDUCT IN NEW JERSEY

239.   It is believed and therefore averred that the Wyeth Defendants engaged in conduct similar to the other defendants with respect to their marketing, promotion, sale and distribution of cancer and miscellaneous other drugs manufactured, distributed, marketed and sold by them.  In

particular, it is averred that the Wyeth Defendants adopted similar unlawful practices, such as the provision of free samples for which doctors could charge and the artificial inflation of the AWPs for their cancer drugs and miscellaneous other drugs, in order to create spreads in their drug prices for the benefit of medical providers and others.

240.    The drugs manufactured, distributed, marketed and sold by the Wyeth Defendants and covered by government and private assistance programs include, but may not be limited to: Ativan (lorazepam), Benefix (recombinant antihemophilic), Mylotarg (gemtuzumab ozogamicin), Neumega (oprelvekin), Pipracil® (piperacillin sodium), Refacto (antihemophilic factor recombinant), Reglan (metoclopramide), Zocyn (piperacillin sodium/tazobactam sodium), and Protonix® (pantoprazole sodium).  All of these drugs had "spreads" and were paid for by plaintiff and the Class.

241.―  Reglan is an antiemetic, *i.e.*, anti-nausea, medication used to treat the side effects of cancer (anti-neoplastic) chemotherapy agents such as those manufactured and marketed by the J&J Defendants (Leustatin®), the Pharmacia Defendants (Adriamycin®, Adrucil®, Neosar®, Idamycin®, and others), the Boehringer Defendants (bleomyscin, cisplatin, paclitaxel, vinblastine and others), the Baxter Defendants (Endoxan®), the GlaxoSmithKline Defendants (Hycamptin, Navelbine), the Schering Defendants (Temodar), the Bristol Myers (Blenoxane, Paraplatin®, Rubex, Etophopos), the Wyeth Defendants (Mylotarg), and the Sicor Defendants (Bleomycin, Epirubicin, Thiotepa), among others).  Reglan is in the same class of medications and is used in the same patient population as Pramilem (metoclopramide - Sicor Defendants), Lemet (ondansetron - Sicor Defendants), Anzemet (dolasteron mesylate - Aventis Defendants), Kytril® (granisetron hydrochloride - Hoffman Defendants) and Zofran® (ondansetron hydrochloride - GlaxoSmithKline Defendants).

242.    Neumega (oprelvekin) is a drug used to help maintain adequate numbers of blood platelets in patients whose bone marrow has been suppressed by the effect of cancer (anti-neoplastic)

© 2003 KLINE & SPECTER                                72

chemotherapy agents such as those listed in the preceding paragraph, and others. It may be used in patients also receiving other drugs that counter the effects of bone marrow suppression, such as Procrit (epoetin alpha - J&J Defendants), Epogen® (epoetin alpha - Amgen Defendants), Aranesp™ (darbepoetin alfa - Amgen Defendants), and Neupogen® (filgrastim - Amgen Defendants).

243.   Patients receiving cancer (anti-neoplastic) medications may have an increased susceptibility to infection and may require the administration of antibiotics, such as those manufactured by the Wyeth Defendants (Zosyn® and Pipracil®).

244.   Protonix® competes with TAP, Abbott and Takeda's Prevacid® and the AstraZeneca Defendants' Prilosec®, among others.

245.   Despite the OIG Guidelines on inducements to medical providers to prescribe particular drugs, the Wyeth Defendants continue to provide inducements, including unrestricted cash grants, in furtherance of the fraudulent scheme alleged herein.

**DEFENDANT DEY'S
UNLAWFUL CONDUCT IN NEW JERSEY**

246.   It is believed and therefore averred that Dey engaged in conduct similar to the other defendants with respect to their marketing, promotion, sale and distribution of cancer and miscellaneous other drugs manufactured, distributed, marketed and sold by them. In particular, it is averred that Dey adopted similar unlawful practices, such as the provision of free samples for which doctors could charge and the artificial inflation of the AWPs for their cancer drugs and miscellaneous other drugs, in order to create spreads in their drug prices for the benefit of medical providers and others.

247.   The drugs manufactured, distributed, marketed and sold by Dey and covered by government and private assistance programs include, but may not be limited to: AccuNeb (albuterol),

albuterol sulfate solution, cromolyn sodium solution, DuoNeb (albuterol solution/ipratropium bromide solution), ipratropium bromide solution, and sodium chloride solution for inhalation. All of these drugs had "spreads" and were paid for by plaintiff and the Class.

248.   All of these products are used in the treatment of obstructive airways disease in the same patient populations as other bronchodilator drugs in the same form, including Atrovent (ipratropium bromide - Boehringer Defendants), Ventolin® (albuterol - GlaxoSmithKline Defendants) and Proventil® (albuterol - Schering Defendants). Sodium chloride for inhalation may be used alone or as a diluent for administration of bronchodilator medications.

249.   Dey has engaged in fraudulent pricing practices with respect to albuterol sulfate. The Office of Inspector General (OIG) found that Medicare's reimbursement amount for albuterol was nearly six times higher than the median catalog price and that "Medicare and its beneficiaries would save between $226 million and $245 million a year if albuterol were reimbursed at prices available to suppliers."

250.   On June 13, 2003, it was reported that Dey settled a civil case brought by the federal government and the State of Texas for $18.5 million.

## THE FUJISAWA DEFENDANTS' UNLAWFUL CONDUCT IN NEW JERSEY

251.   It is believed and therefore averred that the Fujisawa Defendants engaged in conduct similar to the other defendants with respect to their marketing, promotion, sale and distribution of cancer and miscellaneous other drugs manufactured, distributed, marketed and sold by them. In particular, it is averred that the Fujisawa Defendants adopted similar unlawful practices, such as the provision of free samples for which doctors could charge and the artificial inflation of the AWPs for

their cancer drugs and miscellaneous other drugs, in order to create spreads in their drug prices for the benefit of medical providers and others.

252.    The drugs manufactured, distributed, marketed and sold by the Fujisawa Defendants and covered by government and private assistance programs include, but may not be limited to: AmBisome (amphoteracin B liposome for injection), Aristocort suspension and Arisocort Forte suspension (sterile triamcinolone diacetate suspension), Atristospan suspension (sterile triamcinolone hexacetonide suspension, USP), Cefizox IM/IV Injection and Cefizox IV Injection Minibag (ceftizoxime sodium), Prograf (tacrolimus) and Ganite (galliumnitrate). All these drugs had "spreads" and were paid for by plaintiff and the Class.

253.    AmBisome is an antifungal agent that may be used to treat opportunistic fungal infections in patients with compromised immune systems due to treatment with cancer (anti-neoplastic) medications, such as those manufactured and marketed by J&J Defendants (Leustatin®), Pharmacia Defendants (Adriamycin®, Adrucil®, Neosar®, Idamycin®, and others), Boehringer Defendants (bleomyscin, cisplatin, paclitaxel, vinblastine and others), Baxter Defendants (Endoxan®), GlaxoSmithKline Defendants (Hycamptin, Navelbine), Schering Defendants (Temodar), Bristol Myers Defendants (Blenoxane, Paraplatin®, Rubex, Etophopos), Wyeth Defendants (Mylotarg), and Sicor Defendants (Bleomycin, Epirubicin, Thiotepa, and others), Patients receiving these cancer (anti-neoplastic) medications may also receive medications to treat the side effect of nausea, such as Pramilem (metoclopramide - Sicor Defendants), Lemet (ondansetron - Sicor Defendants), Anzemet (dolasteron mesylate - Aventis), Kytril® (granisetron hydrochloride - Hoffman Defendants) and Zofran® (ondansetron hydrochloride - GlaxoSmithKline Defendants). They may also be treated with agents to counter the bone marrow suppressant effects of cancer (anti-neoplastic) drugs, such as Procrit (epoetin alpha - J&J Defendants), Epogen® (epoetin

alpha - Amgen), Aranesp™ (darbepoetin alfa - Amgen), Neupogen® (filgrastim - Amgen), and Neumega (oprelvekin - Wyeth). These patients may also receive antibiotics made by Fujisawa Defendants such as Cefizox and antivirals such as Acyclovir (GlaxoSmithKline Defendants). The patients to whom AmBisome is marketed also comprise the market for antifungals made by other defendants, including the Pharmacia Defendants (Amphocin - amphotericin B), the J&J defendants (Sporanox - itraconazole), and the Bristol Myers Defendants Fungizone (Amphotericin B). Granite was co-promoted with Defendant TAP and is a hypercalcemic drug like Aredia® (Novartis Defendants) and Bumotonide (the Boehringer Defendants).

254.    A letter dated September 28, 2000 from U.S. Representative Pete Stark to the PhRMA details how the Fujisawa Defendants fraudulently inflated the AWPs for their drugs.

> I would have liked to see us match Abbott's AWP for our complete Vanco, [Vancomycin Hydrochloride], and Cefezolin line. I will settle for the five gram at $1 below Abbott but that means that we still have to compete at the other end of the equation. For example, if Abbott's AWP is $163 and their contract is $30 and if our AWP is $162 we will have to be at least $29 to have the same spread. Follow?

### THE SICOR DEFENDANTS' UNLAWFUL CONDUCT IN NEW JERSEY

255.    It is believed and therefore averred that the Sicor Defendants engaged in conduct similar to the other defendants with respect to their marketing, promotion, sale and distribution of cancer and miscellaneous other drugs manufactured, distributed, marketed and sold by them. In particular, it is averred that the Sicor Defendants adopted similar unlawful practices, such as the provision of free samples for which doctors could charge and the artificial inflation of the AWPs for their cancer drugs and miscellaneous other drugs, in order to create spreads in their drug prices for the benefit of medical providers and others.

© 2003 KLINE & SPECTER                         76

256.   The drugs manufactured, distributed, marketed and sold by the Sicor Defendants and covered by government and private assistance programs include, but may not be limited to: bleomycin sulfate, cyclosporine, daunorubicin hydrochloride, dexrazoxane, doxorubicin hydrochloride, epirubicin hydrochloride, etoposide, mitomycon, thiotepa, amikacin sulfate, idarubicin hydrochloride, l-cysteine hydrochloride, vincristine sulfate, leucovorin calcium, cisplatin, amphotericin, vancomycin, clindamycin, metoclopramide, ondansetron, carboplatin, flutamide, paclitaxel and leuprolide acetate, among others. All of these drugs had "spreads" and were paid for by plaintiff and the Class.

257.   The Sicor Defendants' marketing strategies further demonstrate its fraudulent practices, including the provision of free samples with knowledge and the expectation that medical providers would bill patients for them. For instance, Gensia offered a 10% free goods program to its top AIDS hospital which accounts which reduced the price for drugs supplied by Gensia by 10%.

258.   The Sicor Defendants also have engaged in the fraudulent scheme to inflate AWPs. By letter dated September 25, 2000 to the HCFA administrator, the chairman of the Commerce Committee stated that:

> [I]n 1998, a health care provider could buy Gensia's Etoposide for $14.00, while the AWP used to determine Medicare reimbursement was $141.97.

### THE NOVARTIS DEFENDANTS' UNLAWFUL CONDUCT IN NEW JERSEY

259.   It is believed and therefore averred that the Novartis Defendants engaged in conduct similar to the other defendants with respect to their marketing, promotion, sale and distribution of cancer and miscellaneous other drugs manufactured, distributed, marketed and sold by them. In particular, it is averred that the Novartis Defendants adopted similar unlawful practices, such as the

© 2003 KLINE & SPECTER                                     77

provision of free samples for which doctors could charge and the artificial inflation of the AWPs for their cancer drugs and miscellaneous other drugs, in order to create spreads in their drug prices for the benefit of medical providers and others.

260.   The drugs manufactured, distributed, marketed and sold by the Novartis Defendants and covered by government and private assistance programs include, but may not be limited to: Aredia® (pamindronate disodium), Femara (letrozole), Gleevec/Glivec (imatinib mesylate), Lentaron (fomestane), Leucomas (mulgramostim), Navoban (tropisetron hydrochloride), Neoral® (cyclosporine), Orimeten (aminoglutethimide), Sandimmun Neoral® (cyclosporin), Simulect (basiliximab), and Zometa (zoledronic acid). All of these drugs had "spreads" and were paid for by plaintiff and the Class.

261.   Navoban is an anti-nausea medication used to treat the side effects of cancer (anti-neoplastic) chemotherapy agents such as those manufactured and marketed by the J&J Defendants (Leustatin®), Pharmacia Defendants (Adriamycin®, Adrucil®, Neosar®, Idamycin®, and others), Boehringer Defendants (bleomycin, cisplatin, paclitaxel, vinblastine, and others), Baxter Defendants (Endoxan®), GlaxoSmithKline Defendants (Hycamptin, Navelbine), Schering Defendants (Temodar), Bristol Myers (Blenoxane, Paraplatin®, Rubex, Etophopos), Wyeth Defendants (Mylotarg), and Sicor Defendants (Bleomycin, Epirubicin, Thitepa), among others. Navoban is in the same class of medications and is used in the same patient population as Pramilem (metoclopramide - Sicor Defendants), Lemet (ondansetron - Sicor Defendants), Anzemet (dolasetron mesylate - Aventis), Kytril® (granisetron hydrochloride - Hoffman Defendants) and Zofran® (ondansetron hydrochloride - GlaxoSmithKline Defendants).

262.   Leucomas (mulgramostim) is a drug used to help maintain adequate numbers of white blood cells in patients whose bone marrow has been suppressed by the effect of cancer

(anti-neoplastic) chemotherapy agents such as those listed in the preceding paragraph, and others. It may be used in patients also receiving other drugs that counter the effects of bone marrow suppression, such as Procrit (epoetin alpha - J&J defendants), Epogen® (epoetin alpha - Amgen), Aranesp™ (daropoetin alpha - Amgen), and Neupogen® (filgrastim - Amgen). Leucomas is in the same class of agents and helps to maintain numbers of the same line of blood cells as Neupogen® (filgrastim - Amgen).

263.   Cancer (anti-neoplastic) chemotherapy agents manufactured, distributed and sold by the Novartis Defendants include Femara (letrozole), Gleevec (also marketed as Glivec) (imatinib mesylate), Lentaron (fomestane), Orimeten (aminoglutethimide), and Zometa (zoledronic acid).

264.   Neoral® (cyclosporine) and Sandimmun Neoral (cyclophosporine) are immunosuppressant drugs administered to patients who have had organ transplants, including kidney transplants, to prevent organ rejection, similar to Rapamune (sirolimus - Wyeth Defendants), Prograf (tacrolimus - Fujisawa Defendants), and Gengraf (cyclosporine - Abbott). Simulect (basiliximab) is used for prophylaxis against acute rejection of transplanted organs.

265.   Aredia® (pamindronate disodium) is an anti-osteopenic drug used in patients undergoing various types of cancer chemotherapy to combat the effects of those chemotherapeutic agents that cause reduction in bone density, similar to drugs such as Bumetanide (the Boehringer Defendants) and Ganite (galliumnitrate - Fujisawa and TAP).

266.   Patients undergoing cancer chemotherapy very often suffer from opportunistic bacterial and viral infections due to the immunosuppressant effects of many of the chemotherapeutic agents used. Famvir (famcyclovir) is an antiviral agent, similar to Zovirax (acyclovir - GlaxoSmithKline Defendants), Foscavir (foscarnet sodium - Astra Zeneca), and Valtrex (valcyclovir

© 2003 KLINE & SPECTER                    79

- GlaxoSmithKline Defendants), which is used in the treatment of opportunistic herpes virus infections that can occur in patients undergoing chemotherapy.

267.   Among other things, in 1995, Sandoz Pharmaceuticals (now part of Novartis) considered expediting monthly shipments of free drug (Sandoglobulin®) to be a critical item when servicing customer accounts and promoting lower prices to its purchasers.

### DEFENDANT ALPHA'S
### UNLAWFUL CONDUCT IN NEW JERSEY

268.   It is believed and therefore averred that Alpha engaged in conduct similar to the other defendants with respect to their marketing, promotion, sale and distribution of cancer and miscellaneous other drugs manufactured, distributed, marketed and sold by them. In particular, it is averred that Alpha adopted similar unlawful practices, such as the artificial inflation of the AWP (or reimbursement prices) for their cancer drugs and miscellaneous other drugs, in order to create a spread in their drug prices for the benefit of medical providers and others.

269.   The drugs manufactured, distributed, marketed and sold by Alpha and covered by the government and private assistance programs include, but may not be limited to: Venoglobulin-S (human immune globulin intravenous), Alphanate (human antihemophilic factor), AlphaNine SD (human coagulation factor IX), Profilnine SD (human coagulation factor IX), Albutein 5% (5% human albumin), Albutein 10% (10% human albumin), and Albutein 25% (25% human albumin). Venoglobulin-S is an immune globulin for intravenous administration for the treatment of immunodeficiency and other disorders, similar to Gammagard® (immune globulin - Baxter Defendants), Iveegam® (immune globulin - Baxter Defendants), and Gamimmune (immune globulin - Bayer Defendants). Alphanate, AlphaNine SD, and Profilnine SD are human coagulation factors used in the treatment of hemophilia, similar to Kogenate® (factor VIII - Bayer Defendants),

© 2003 KLINE & SPECTER                    80

Koate-DVI® (factor VIII - Bayer Defendants),  Bioclate (factor VIII - Aventis Defendants),

Mononine (factor IX - Aventis Defendants), Bebulin (factor IX - Baxter Defendants), Hemofil

(factor VIII - Baxter Defendants), Hemofil M (factor VIII - Baxter Defendants), Proplex T® (factor

IX - Baxter Defendants), and Recombinate® (factor VIII - Baxter Defendants).   Albutein 5%,

Albutein 10%, and Albutein 25% are human albumin preparations used as volume expanders as well

as an adjunct in kidney dialysis, similar to Buminat (human albumin - Baxter Defendants),

Albuminar-5 and Albuminar-10 (human albumin - Aventis Defendants), and Plasbumin -5,

Plasbumin-10, and Plasbumin-25 (human albumin - Bayer Defendants).  All of these drugs had

"spreads" and were paid for by plaintiff and the Class.

270.    Alpha engaged in the fraudulent scheme alleged herein by, among other things,

deliberately adjusting its spreads for its drugs to compete with or exceed the spreads offered by

Alpha's competitor's, and promoting such spreads to Alpha's purchasers.

**HOFFMAN'S
UNLAWFUL CONDUCT IN NEW JERSEY**

271.    It is believed and therefore averred that Hoffman engaged in conduct similar to the

other defendants with respect to their marketing, promotion, sale and distribution of cancer and

miscellaneous other drugs manufactured, distributed, marketed and sold by them.  In particular, it

is averred that the Hoffman Defendants adopted similar unlawful practices, such as the provision of

free samples for which doctors could charge and the artificial inflation of the AWPs for their cancer

drugs and miscellaneous other drugs, in order to create spreads in their drug prices for the benefit

of medical providers and others.

272.    The drugs manufactured, distributed, marketed and sold by the Hoffman Defendants

and covered by government and private assistance programs include, but may not be limited to:

© 2003 KLINE & SPECTER                        81

Kytril® (granisetron hydrochloride), Roferon®-A (interferon 2-alpha), Vesanoid® (tretinoin), Xeloda®

(capecitabine), Rocaltrol® (calcitriol), and CellCept® (mycophenolate mofetil). All of these drugs

had "spreads" and were paid for by plaintiff and the Class.

273.    Hoffman acquired Kytril® from the GlaxoSmithKline Defendants and, pursuant to

the fraudulent scheme and conspiracy alleged herein, maintained the same spreads for the drugs. In

addition, and in furtherance of the scheme and conspiracy and the fraudulent concealment of the

same, Hoffman has stated falsely that it does not set the AWPs for its drugs, including Kytril®,

Rocaltrol®, and CellCept®, among others. Instead, Hoffman has stated falsely that the AWPs for its

drugs have been set by the *Red Book* and other publications.

### SANOFI'S
### UNLAWFUL CONDUCT IN NEW JERSEY

274.    It is believed and therefore averred that Sanofi engaged in conduct similar to the other

defendants with respect to their marketing, promotion, sale and distribution of cancer and

miscellaneous other drugs manufactured, distributed, marketed and sold by them. In particular, it

is averred that Sanofi adopted similar unlawful practices, such as the provision of free samples for

which doctors could charge and the artificial inflation of the AWPs for their cancer drugs and

miscellaneous other drugs, in order to create spreads in their drug prices for the benefit of medical

providers and others.

275.    The drugs manufactured, distributed, marketed and sold by Sanofi and covered by

government and private assistance programs include, but may not be limited to: Eligard™ (leuprolide

acetate), Plavix® (clopidogrel bisulfate), Avapro® (irbesartan), Ambien® (zolpidem tartrate),

Primacor® (milrinone lactate injection), and Hyalgan® (sodium hyaluronate). All of these drugs had

"spreads" and were paid for by plaintiff and the Class.

© 2003 KLINE & SPECTER                                  82

276.     Irbesarten and Plavix® have been part of a co-development and marketing agreement with Bristol-Myers since 1993. Through this joint marketing effort, the defendants have advanced the fraudulent scheme and conspiracy set forth herein.

277.     In addition, Sanofi has artificially inflated the AWPs for Eligard™ and has set the spreads for this drug to be competitive with the spread for Lupron®, Zoladex®, Trelstar™ and Viadur®, in furtherance of the fraudulent scheme and conspiracy set forth herein.

## FRAUDULENT CONCEALMENT

278.     Plaintiff had no knowledge of the conspiracy, concerted action and other unlawful conduct alleged herein, or of any facts that might have led to the discovery thereof in the exercise of reasonable diligence. Plaintiff could not have discovered the conspiracy, concerted action or other unlawful conduct alleged herein by the exercise of due diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of and to conceal their unlawful conduct and conspiracy. These techniques of secrecy included, but were not limited to, secret meetings and communications, misstatements about the AWP, and other conduct alleged herein.

279.     Because the unlawful conduct and conspiracy was kept secret by Defendants and their co-conspirators, plaintiff and the Class were unaware of the fact that the prices of cancer, inhalant and miscellaneous other drugs were secretly agreed upon and artificially set as alleged herein. Plaintiff also did not know that Defendants provided free samples of their cancer and other prescription drugs to medical providers with knowledge and the expectation that such providers would bill their patients for them.

© 2003 KLINE & SPECTER                    83

280.   By reason of the foregoing, the claims of plaintiff and members of the Class are timely under any applicable statute of limitations (as tolled by the filing of this class action Complaint) pursuant to the discovery rule and the doctrine of fraudulent concealment.

281.   The defendants have been aware of their unlawful conduct and conspiracy since at least 1991, and probably before that time.

282.   Despite this knowledge and awareness, the defendants have continued to promote and sell cancer, inhalant and miscellaneous other drugs at artificially inflated prices, and to give away free samples of their drugs knowing and expecting that doctors would bill patients for them.

283.   The defendants' failure to properly disclose their unlawful conduct and conspiracy, and other acts and omissions as alleged herein, was and is willful, wanton, malicious, outrageous, and was and continues to be undertaken in deliberate disregard of, or with reckless indifference to, the rights and interests of the plaintiff and members of the Class.

## COUNT I
## UNJUST ENRICHMENT

284.   Plaintiff hereby incorporates by reference thereto the averments of paragraphs 1 through 283 hereof as if fully set forth here and further allege as follows.

285.   By engaging in the conduct described in this Complaint, defendants have knowingly obtained benefits from plaintiff and the Class under circumstances such that it would be inequitable and unjust for these defendants to retain them.

286.   Defendants have collected payments for cancer, inhalant and miscellaneous other drugs from plaintiff and each member of the Class which payment vastly exceeded the payments to which defendants were entitled as a matter of law. Moreover, certain defendants have admitted that they supplied medical providers and others with free samples of Prevacid®, Zoladex®, among other

drugs and encouraged them to charge patients for such samples, in violation of the PDMA and other federal and state laws: TAP, Abbott, Bayer, GlaxoSmithKline Defendants, AstraZeneca Defendants and Dey have likewise settled charges that they unlawfully inflated the AWP for their drugs and/or manipulated their drug prices in violation of federal and state laws.

287.    Thus, defendants will be unjustly enriched if they are permitted to retain the full amounts paid to them by plaintiff and each member of the Class, either directly or indirectly.  The claims of plaintiff and each member of the Class seek to recover the individual payments made by plaintiff and the Class for cancer, inhalant and miscellaneous other drugs.

288.    Plaintiff and each member of the Class are therefore entitled to an award of compensatory damages in an amount to be determined at trial, or the imposition of a constructive trust upon the profits derived by defendants by means of the overcharges they imposed upon plaintiff and each member of the Class.

289.    Plaintiff and the members of the Class have no remedy at law to prevent defendants from continuing the inequitable conduct alleged herein.

WHEREFORE, Plaintiff, on behalf of itself and each member of the Class, respectfully seeks the relief set forth below.

## COUNT II
## FRAUD

290.    Plaintiff and the Class hereby incorporate by reference thereto the averments of paragraphs 1 through 289 hereof as if fully set forth here and further allege as follows.

291.    By engaging in the acts and omissions alleged in this Complaint, Defendants have committed fraud on the plaintiff and the Class.

© 2003 KLINE & SPECTER                        85

292.   Defendants have made false and fraudulent statements and material omissions relating to the costs of their cancer, inhalant and miscellaneous other drugs, the AWPs for such drugs, the spreads for such drugs, the fact that certain of these drugs were provided as free samples, and the fact that they provided other inducements to prescribe these drugs, among other things.

293.   These defendants intended that plaintiff and the Class would rely on their statements, representations and omissions to their detriment. In particular, the defendants reported inflated prices for cancer, inhalant and miscellaneous other drugs in the AWPs reported to *Red Book* and other publications upon which plaintiff, members of the Class, patients and government and private assistance programs relied. Defendants knew these AWPs were false. Plaintiff and the Class did in fact reasonably and rightfully rely on the false representations and statements of these defendants and suffered injury and damages thereby, as more fully set forth herein.

294.   In addition, these defendants concealed and suppressed and/or omitted material facts about their unlawful agreements and discussions with one another and others, and they concealed and suppressed their unlawful acts and omissions as set forth more fully herein. Among other things, these Defendants concealed and suppressed and/or omitted the fact that the AWPs upon which the prices paid for cancer, inhalant and miscellaneous other drugs by plaintiff and the Class were based were artificially inflated, thereby causing plaintiff and the Class to pay more for these drugs than they otherwise would have. Defendants also concealed and suppressed their provision of free samples for which patients were charged, and they concealed and suppressed their concerted efforts to circumvent efforts to reduce prescription drug costs.

295.   As a result of Defendants' acts of concealment and suppression, and their fraudulent omissions as to the true costs of their drugs, including that some of their drugs were given for free, plaintiff and the Class were unaware of the above-referenced facts, and would not have paid the

© 2003 KLINE & SPECTER                                86

artificially inflated prices for cancer, inhalant and miscellaneous other drugs that they did had they

known of the facts Defendants misrepresented concealed, suppressed and omitted.

296.    Indeed, as a result of the federal government's investigation into certain of

Defendants' practices, TAP, Bayer, the AstraZeneca Defendants and the GlaxoSmithKline

Defendants as part of their respective settlements of the criminal charges, have agreed to report the

true, lower prices of their respective drugs to the government and to allow regular auditing of their

sales and marketing practices.

297.    As a direct and proximate result of defendants' fraudulent representations and

omissions, and the concealment and suppression of material facts by defendants, plaintiff and the

Class have suffered and will continue to suffer damages.

WHEREFORE, Plaintiff, on behalf of themselves and the members of the Class, respectfully

seek the relief set forth below.

## COUNT III
## CIVIL CONSPIRACY

298.    Plaintiff and the Class hereby incorporate by reference thereto the averments of

paragraphs 1 through 297 hereof as if fully set forth here and further allege as follows.

299.    As set forth more fully above, beginning at least as early as 1991, the exact date being

unknown to plaintiff and the Class, and continuing thereafter until the present, defendants and their

co-conspirators entered into an agreement and/or otherwise engaged in a continuing conspiracy to

defraud the plaintiff and the Class by causing plaintiff and the Class to pay more for cancer, inhalant

and miscellaneous other drugs than they otherwise would have in the absence of defendants'

conspiracy.

© 2003 KLINE & SPECTER                        87

300.   According to the DOJ, on or before October 3, 2001, defendants Abbott and Takeda, by and through their joint venture, TAP, agreed to plead guilty to a federal conspiracy with other unnamed parties to violate the PDMA in violation of 18 U.S.C. § 371, and to pay a $290 million criminal fine, the largest criminal fine ever in a U.S. health-care fraud prosecution case. Additionally, these Defendants agreed to settle the government's claims for $875 million, plus interest, which consisted of the $290 million criminal fine, $559.5 million in civil liabilities for filing false and fraudulent claims, and $25.5 million in civil liabilities to fifty states and the District of Columbia.

301.   Defendant Bayer, the GlaxoSmithKline Defendants, and the AstraZeneca Defendants also have agreed to settle similar charges of unlawfully inflating the AWPs for their drugs, and paid substantial fines.

302.   Ten individual employees of TAP were also indicted for their participation in the federal conspiracy with others, along with eight urologists/urologic practices throughout the country, involving Lupron®.

303.   Moreover, three current and former employees of the J&J Defendants, all pleaded guilty to conspiracy involving cancer drugs.

304.   Three doctors have been indicted for and pleaded guilty to conspiracy with the AstraZeneca Defendants involving free samples of Zoladex®.

305.   Pursuant to their widespread conspiracy alleged herein and in furtherance thereof, Defendants and their co-conspirators engaged in a wide range of activities, the purpose and effect of which was to defraud the plaintiff and the Class and to act or take substantial steps in furtherance of the conspiracy. Those activities include the following:

(a)     Defendants discussed and agreed among themselves and with their co-conspirators that they would provide free samples to medical providers and encourage medical providers to charge for such samples;

(b)     Defendants discussed and agreed among themselves and with their co-conspirators that they would fix the AWPs for cancer, inhalant and miscellaneous other drugs;

(c)     Defendants discussed and agreed among themselves and with their co-conspirators that they would provide other inducements and incentives to medical providers to prescribe their respective drugs, instead of other drugs and instead of alternative therapies;

(d)     Defendants discussed and agreed amongst themselves and with their co-conspirators that they would market and promote the spreads between the AWPs and the actual wholesale costs (or list prices) for their drugs as an incentive for medical providers to prescribe their drugs instead of other drugs or alternative therapies; and

(e)     Defendants discussed and agreed among themselves and with their co-conspirators that they would work together to oppose and avoid efforts to reduce prescription drug costs.

306.   Defendants performed these acts alleged herein in furtherance of the common plan or design for the conspiracy with knowledge of the injury and damage it would cause to plaintiff and the Class and with intent to cause such injuries or with reckless disregard for the consequences.

© 2003 KLINE & SPECTER                    89

307.    As a direct and proximate result of defendants' conspiracy as alleged herein, plaintiff and the Class have been injured and damaged, and defendants are jointly and severally liable for such injuries and damages.

WHEREFORE, Plaintiff, on behalf of themselves and the members of the Class, respectfully seek the relief set forth below.

## COUNT IV
## CONCERT OF ACTION

308.    Plaintiff and the Class hereby incorporate by reference thereto the averments of paragraphs 1 through 307 hereof as if fully set forth here and further allege as follows.

309.    Beginning at least as early as 1991, the exact date being unknown to plaintiff and the Class, and continuing thereafter until the present, defendants and their co-conspirators engaged in concerted activity and/or a concert of action with each other to commit fraud and other tortious acts and omissions on the plaintiff and the Class, causing plaintiff and the Class to pay more for cancer and other prescription drugs than they otherwise would have in the absence of defendants' concerted activity.

310.    Defendants acted in concert with one another, and with medical providers and others throughout New Jersey and the country, to commit fraud on plaintiff and the Class.  Moreover, defendants acted pursuant to a common design or plan with respect to the commission of such fraud.

311.    Defendants gave substantial assistance or encouragement to medical providers and others throughout New Jersey and the country to charge plaintiff and the Class the AWPs for their drugs, even though their actual acquisition costs (or list price) were much lower.  Defendants also gave substantial assistance or encouragement to medical providers and others to charge for free

© 2003 KLINE & SPECTER                90

samples of drugs.   Defendants also gave substantial assistance or encouragement to medical providers and others to oppose and avoid efforts to reduce prescription drug costs.

312.   In providing such substantial assistance or encouragement to medical providers and others, and performing such other acts and omissions set forth in this Complaint, defendants violated federal and state laws, and otherwise breached a duty owed to plaintiff and the Class.

313.   Defendants knew that the conduct of medical providers and others in charging the AWPs for their drugs (when their acquisition costs were much lower) and charging for free samples of their drugs constituted a fraud on plaintiff and the Class, violated federal and state laws, and otherwise breached a duty owed by medical providers and others to plaintiff and the Class.

314.   Despite such knowledge, defendants gave substantial assistance or encouragement to medical providers to so conduct themselves.

315.   As a direct and proximate result of defendants' concerted action as alleged herein, plaintiff and the Class have been injured and damaged, and defendants are jointly and severely liable for such injuries and damages.

WHEREFORE, Plaintiff, on behalf of themselves and the members of the Class, respectfully seek the relief set forth below.

## COUNT V
## VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT

316.   Plaintiff and the Class hereby incorporate by reference thereto the averments of paragraphs 1 through 315 hereof as if fully set forth here and further allege as follows.

317.   Plaintiff and the Class are consumers who purchased cancer and other prescription drugs for personal use. New Jersey has enacted laws to protect consumers against unfair, deceptive

© 2003 KLINE & SPECTER                    91

or fraudulent business practices, unfair competition and false advertising. New Jersey allows consumers a private right of action under such laws.

318.   By the misrepresentations and non-disclosure of material facts alleged above, the defendants deceived and continue to deceive consumers, such as plaintiff and the Class. This conduct constitutes unconscionable, unlawful, unfair, deceptive and/or fraudulent business practices within the meaning of the New Jersey Consumer Fraud Act, 56:8-1, *et seq.*

319.   In addition, the defendants' continuous and systematic reporting of inflated AWPs for their cancer, inhalant and miscellaneous other drugs to the *Red Book* based in New Jersey and their use of media to promote the sales of their drugs through false and deceptive representations in New Jersey, and other conduct as alleged above, constitutes an unconscionable business practice, unfair competition and unfair, deceptive, untrue, or misleading advertising within the meaning of the New Jersey Consumer Fraud Act, 56:8-1, *et seq*, and warrants the application of the laws of New Jersey to all defendants in this Court.

320.   As part of their guilty pleas and payments of fines and money for civil liabilities, Defendants TAP, Abbott, Takeda, Bayer, the GlaxoSmithKline Defendants and the AstraZeneca Defendants agreed to pay substantial sums of money to the states, including New Jersey. Such admission of liability and payment of civil liabilities to the states warrants the application of the laws of New Jersey to all defendants in this Court.

321.   As a result of the defendants' unfair and deceptive trade practices throughout the fifty states and the District of Columbia, including New Jersey, plaintiff and the Class have and will continue to suffer damages in an amount to be determined at trial.

© 2003 KLINE & SPECTER                    92

WHEREFORE, Plaintiff, on behalf of themselves and the members of the Class, respectfully seek the relief set forth below.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Class request the Court to enter the following relief:

a.      Certify this case as a class action pursuant to New Jersey Court Rules 4:32- 1, *et seq.* and denominating plaintiff as representatives for the Class and their undersigned counsel as counsel for the Class;

b.      Enter judgment against all defendants for the violations alleged herein;

c.      Enjoin the defendants from committing the acts complained of herein;

d.      Award the actual damages incurred by plaintiff and the members of the Class as a result of the wrongful acts complained of, along with pre-judgment and post-judgment interest at the maximum rate allowed by law;

e.      Award of treble damages or multiple damages by operation of law;

f.      Award punitive damages;

g.      Award plaintiff the costs of this action, including reasonable attorney's fees, and, where applicable, expert fees; and

h.      Award such other and further relief as the Court may deem just and appropriate.

© 2003 KLINE & SPECTER

93

## JURY DEMAND

Plaintiff and the Class demand a trial by jury of all issues so triable in this cause.

Respectfully submitted,

Dated: *June 30*, 2003

Shanin Specter, Esquire
Donald E. Haviland, Jr., Esquire
TerriAnne Benedetto, Esquire
R. Matthew Plona, Esquire
KLINE & SPECTER
1800 Chapel Avenue, Suite 302
Cherry Hill, NJ 08002
856-424-9162 telephone
856-424-4446 facsimile

John E. Keefe, Jr., Esquire
LYNCH ✦ MARTIN
830 Broad Street
Shrewsbury, NJ 07702
732-224-9400 telephone
732-224-9494 facsimile

Raymond A. Gill, Jr., Esquire
GILL & CHAMAS
655 Florida Grove Road
P.O. Box 760
Woodbridge, NJ 07095
732-324-7600 telephone
732-324-7606 facsimile

**ATTORNEYS FOR PLAINTIFF AND THE CLASS**

G:\DEH\LAWFN\J701-final

© 2003 KLINE & SPECTER                    94