Connick, Corinna                                                March 24, 2009

Cleveland, OH

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

--------------------------X

IN RE:  PHARMACEUTICAL      : MDL NO.  1456

INDUSTRY AVERAGE            : CIVIL ACTION

WHOLESALE PRICE             : 01-CV-12257-PBS

LITIGATION                  : Judge Patti B. Saris

--------------------------X Chief Magistrate

THIS DOCUMENT RELATES TO  : Judge Marianne B.

ALL CASES IN MDL NO. 1456 : Bowler

--------------------------X

☐ ORIGINAL

DEPOSITION OF CORINNA CONNICK

- - -

Tuesday, March 24, 2009

10:06 o'clock a.m.

Webster & Dubyak

1220 West 6th Street, Suite 600

Cleveland, Ohio  44113

- - -

ANN FORD

REGISTERED PROFESSIONAL REPORTER

EXHIBIT A

Connick, Corinna

Cleveland, OH

March 24, 2009

2  (Pages 2 to 5)

**2**

```
 1          APPEARANCES:
 2
 3  On behalf of the Class Plaintiffs:
 4
 5     JENNIFER FOUNTAIN CONNOLLY, ESQ.
 6     Wexler Wallace LLP
 7     55 West Monroe Street
 8     Suite 3300
 9     Chicago, Illinois  60603
10
11
12  On behalf of Corinna Connick.
13
14     EDWARD W. COCHRAN, ESQ.
15     Law Office of Edward W. Cochran
16     20030 Marchmont Road
17     Shaker Heights, Ohio  44122
18
19
20
21
22
```

**3**

```
 1              INDEX
 2
 3  WITNESS: CORINNA CONNICK           PAGE
 4  Cross-Examination By Ms. Fountain Connolly... 004
 5
 6
 7           EXHIBITS
 8  NUMBER       DESCRIPTION          PAGE
 9  Exhibit Connick 001 - Medical Expenses of
10     Corinna Connick.......... 004
11  Exhibit Connick 002 - Contingent Fee Agreement. 004
12  Exhibit Connick 003 - Objection to Track Two
13     Settlement And Attorney's
14     Fee Request and Notice
15     of Intention to Appear at
16     Fairness Hearing........ 046
17  Exhibit Connick 004 - Motion to Intervene and
18     Memorandum in Support.... 072
19  Exhibit Connick 005 - Subpoena in a Civil Case. 079
20
21
22
```

**4**

```
 1          PROCEEDINGS
 2
 3          (And thereupon, Exhibit Connick 001
 4  & Exhibit Connick 002 were marked for purposes of
 5  identification.)
 6
 7          CORINNA CONNICK,
 8  being by me first duly sworn, as hereinafter
 9  certified, deposes and says as follows:
10
11          CROSS-EXAMINATION
12  BY MS. FOUNTAIN CONNOLLY:
13     Q.  Good morning, Ms. Connick.
14     A.  Good morning.
15     Q.  We just met.  But my name is Jennifer
16  Connolly, and I represent the Class Plaintiffs in
17  this case.
18          Could you state your name and
19  residential address for the record, please.
20     A.  Corinna Connick, and my address is 12545
21  Ashton Trail, Chardon, Ohio, 44024.
22     Q.  Do you have any plans to move in the
```

**5**

```
 1  next year or so?
 2     A.  No, I do not.
 3     Q.  Have you ever had your deposition taken
 4  before?
 5     A.  Never.
 6     Q.  Well, just the basic rules are that I'll
 7  be asking you questions and the court reporter
 8  will be taking down both my questions and your
 9  answers, which means that you have to answer
10  verbally as opposed to our normal human tendencies
11  of shaking your head or nodding your head.
12     A.  Okay.
13     Q.  I'm going to assume that you understand
14  my question unless you tell me that you don't, and
15  I'm happy to restate anything that you don't
16  understand.
17     A.  Okay.
18     Q.  Does that seem reasonable?
19     A.  Yes.
20     Q.  Is there any reason today why you
21  wouldn't be able to either testify truthfully or
22  remember fully?
```

Connick, Corinna                                    March 24, 2009

Cleveland, OH

3 (Pages 6 to 9)

---

Page 6

1      A. No.
2      Q. You're not on any medication that might
3   --
4      A. No, I'm not.
5      Q. Okay.
6      MR. COCHRAN: Just one thing, I would
7   ask you to take very serious her offer that if you
8   don't understand the question --
9      THE WITNESS: Sure.
10      MR. COCHRAN: -- take your time.
11      THE WITNESS: Sure.
12   BY MS. FOUNTAIN CONNOLLY:
13      Q. I just want to get from you some quick
14   background information. I'm not going to belabor
15   this very long, but are you currently employed?
16      A. Yes, I am.
17      Q. Where are you employed?
18      A. I work -- I'm self-employed. I'm a
19   contractor for Medical Billing And Data
20   Management.
21      Q. How long have you been in that job?
22      A. About three years.

---

Page 7

1      Q. Have you been in the medical billing
2   field for a long time?
3      A. No. It's been it.
4      Q. What were you doing before that?
5      A. Before that I cleaned residential
6   properties. Before that I was a business analyst
7   for --
8      MR. COCHRAN: For what?
9      A. -- for an insurance company.
10      Q. Okay. Do you understand that you're
11   here today because you've filed an objection and
12   sought to intervene in a class action pending
13   against what we call the Track Two Defendants?
14      A. Yes, I do.
15      Q. What is your understanding of who the
16   Track Two Defendants are?
17      A. The pharmaceutical companies who have
18   inflated the price of medications, sold it to the
19   consumers.
20      Q. Do you know any of them by name?
21      A. Not particularly.
22      Q. Do you know who the plaintiffs are in

---

Page 8

1   this case?
2      A. The plaintiffs are the third-party
3   providers. The --
4      MR. COCHRAN: She said plaintiffs, not
5   defendants.
6      THE WITNESS: The third-party providers.
7   The insurance companies, the percentage co-payors,
8   the institutional providers, and the self-pays.
9   BY MS. FOUNTAIN CONNOLLY:
10      Q. By self-pays, you mean the people who
11   pay cash?
12      A. Pay 100 percent full amount.
13      Q. What is your understanding of the
14   allegations that the plaintiffs have made against
15   the defendants?
16      A. That they have -- they have inflated the
17   cost of the medications; and basically the
18   consumers, including the third-party payers and
19   the institutional payers, have overpaid for
20   prescription medications.
21      Q. Do you know how long this case has been
22   pending?

---

Page 9

1      A. No, I do not.
2      Q. Other than that basic information or
3   information about the settlement itself, is there
4   any other thing that you learned about this case
5   in the process of deciding to file this objection?
6      A. No.
7      Q. What is your basic understanding of the
8   terms of the Track Two Settlement?
9      A. My understanding is that the
10   pharmaceutical companies have inflated the price
11   of the medications which has caused myself, which
12   is a self-pay, the percentage co-payors and the
13   institutional payers and the third-party payers to
14   overpay for their medications.
15      And can you repeat that question? I
16   want to make sure I answered it all the way.
17      Q. Yeah. Do you understand -- what's your
18   understanding of the terms of the settlement
19   itself?
20      A. Oh, the settlement itself.
21      Q. Yes.
22      A. I'm sorry.

---

Henderson Legal Services, Inc.

Connick, Corinna

Cleveland, OH

March 24, 2009

## 4 (Pages 10 to 13)

**10**

1 Q. That's okay.
2 A. I understand that the institutional
3 payers -- or the institutional providers have
4 already received payment -- partial payment and
5 have made a settlement with the defendants.
6 I know that there is a proposed
7 settlement that offers the percentage co-payers
8 17-and-a-half percent. And I know that me as a
9 self-pay is receiving no benefits. And our rights
10 are being released with the inability to file any
11 claims.
12 Q. Okay. The first thing you said was that
13 the institutional providers had already gotten
14 payments.
15 A. Partial.
16 Q. Partial payments.
17 A. From my knowledge -- to the best of my
18 knowledge.
19 Q. Okay. When you say institutional
20 providers, are you referring to what the
21 settlement has called the ISHPs?
22 A. ISHPs.

**11**

1 Q. Okay. And where did you gain the
2 understanding that the ISHPs are receiving a
3 partial payment or have already received a partial
4 payment?
5 A. I discussed it with my husband who told
6 me.
7 Q. Is your husband an attorney?
8 A. Yes, he is.
9 Q. What type of law does he practice?
10 A. He's a trial attorney.
11 Q. Did you learn about this settlement from
12 your husband?
13 A. Yes, I did.
14 Q. Do you know how he learned about it?
15 A. I'm not really sure. No.
16 Q. So is most of your understanding of the
17 terms of this settlement based on what your
18 husband has told you?
19 A. Based -- he had showed me a copy of the
20 proposed settlement, and through our discussions,
21 yes.
22 Q. Have you had any discussions with anyone

**12**

1 else, other than Mr. Cochran, about this
2 settlement?
3 A. No, I have not.
4 Q. What documents did you review with your
5 husband in order to understand the terms of the
6 settlement?
7 A. The -- I believe it was the actual
8 filing of the class action filing. And he did
9 show me the settlement proposal.
10 Q. When you say class action filing, do you
11 think that might have been the plaintiff's motion
12 for preliminary approval?
13 A. I -- I don't understand the terms. So
14 it's possible.
15 Q. Okay. Some type of pleadings.
16 A. Some type of document. Sure. I'm sorry
17 if I used the --
18 MR. COCHRAN: Let her finish.
19 THE WITNESS: Okay.
20 BY MS. FOUNTAIN CONNOLLY:
21 Q. And then you believe you may have seen a
22 copy of the settlement agreement itself?

**13**

1 A. Possibly, yes.
2 Q. So do you understand that the total
3 settlement amount is $125 million?
4 A. Yes, I do.
5 MR. COCHRAN: Again, let her finish.
6 THE WITNESS: I'm sorry.
7 MR. COCHRAN: You need to hear the
8 entire question. She may add another sentence on
9 to that.
10 THE WITNESS: Got you.
11 MS. FOUNTAIN CONNOLLY: It's natural.
12 THE WITNESS: I know.
13 MS. FOUNTAIN CONNOLLY: It's normal
14 speak.
15 BY MS. FOUNTAIN CONNOLLY:
16 Q. So I've read your objection. But in
17 your own words, how would you explain what you
18 find objectionable about the Track Two Settlement?
19 A. Okay. I -- what I object to in the
20 settlement agreement is that there is no consumer
21 class representative. There are some public
22 interest groups but no actual consumer class

Connick, Corinna                                        March 24, 2009

Cleveland, OH

5 (Pages 14 to 17)

**14**

1  representative.
2       The whole payer has not been considered
3  for benefit, and yet we're releasing our rights to
4  file any claims against the defendant.
5       Q.  Anything else?
6       A.  Yes.  If I may just --
7       Q.  Sure.  The record will reflect that
8  she's consulting -- is that your objection?
9       A.  Uh-huh.
10      Q.  Yes.  Consulting her objection.
11      A.  The whole payer receives no benefit.
12  The percentage co-payor does not receive enough
13  benefit.  They should receive more.  I also think
14  that the large -- the largest pharmacy companies,
15  the ten largest pharmacy companies should be
16  subpoenaed to gain prescription data and have the
17  benefits automatically calculated for the
18  consumers instead of having to file claims.
19      Q.  I'm just waiting on you.
20      A.  The institutional providers, from what I
21  understand, have already been paid $25 million,
22  and no consumer has been paid yet.  Almost seems

**15**

1  as though they're getting preferential treatment.
2       And I also object to the attorney fees
3  from the consumers' plaintiff attorneys.  They are
4  required -- they are requesting 30 percent of the
5  settlement of $125 million where the ISHPs have
6  already received 52 million.  And of that 52
7  million, they are probably paying their attorneys
8  out of that.
9       And it's -- the attorneys that are
10  representing the consumer class do not represent
11  the institutional providers, therefore, should not
12  be entitled to a percentage of their settlement.
13  They should receive a percentage, 30 percent,
14  based on the remaining 73 million.
15      Q.  Is that it?  The first thing you talked
16  about was that there's no consumer class
17  representative.  Are you aware that there is a
18  consumer class representative for Class 1 or the
19  Medicare beneficiaries?
20      A.  I know there's no consumer class
21  representative for me, the whole payer.  And I
22  understand that there are some activist groups

**16**

1  that are representing the consumer, but there is
2  no named consumer.
3       Q.  So your concern is that there's not a
4  representative for your particular type of payer?
5       A.  And there's no named consumer for, from
6  what I understand, there's no named consumer for
7  the partial -- or the -- I'm sorry -- percentage
8  co-payor, other than some special interest groups
9  who basically are not the consumer.
10      Q.  Do you have any information that these
11  special interest groups, as you were calling them,
12  have interests that are adverse to consumers?
13      A.  No.  But they don't represent me.  They
14  can't negotiate on my behalf.  They don't have the
15  authority to decide what is proper for me as the
16  consumer.
17      Q.  Do you mean that as a legal matter or
18  what do you mean when you say they can't negotiate
19  on your behalf?
20      MR. COCHRAN:  Objection.  Of course,
21  she's not an attorney.  I don't expect her to
22  answer something that is a legal issue, but

**17**

1  subject to that, go ahead.
2       A.  Can you repeat the question?
3       Q.  Sure.  Can you explain to me what you
4  mean when you're saying they can't represent you?
5       A.  They don't have my best interest.  I
6  have no say-so.  They can't speak for me.  They
7  don't -- they're not coming to me as a class
8  representative and asking me if I agree to the
9  settlement.
10      Q.  Why do you believe they don't have your
11  best interest at heart?
12      A.  I'm not saying they don't have my best
13  interest at heart.  What I'm saying is they can't
14  negotiate for me.  They -- they don't have -- they
15  don't know what I want.  They don't -- they've
16  never consulted me or another consumers as to what
17  we want -- or they have not consulted me as to
18  what I want.
19      Q.  So unless someone has consulted you,
20  they couldn't adequately represent you?
21      A.  Or someone that represents the class.
22      Q.  And do you know whether any of these

Connick, Corinna

Cleveland, OH

March 24, 2009

6 (Pages 18 to 21)

**18**

1  institutional parties have, in fact, consulted
2  with consumers in the course of representing them?
3      A.  Not that I'm aware of.
4      Q.  Would it change your view of their
5  adequacy for consumers if you knew that they had,
6  in fact, consulted with consumers?
7      A.  I'm not sure.  I would have to hear what
8  happened.
9      Q.  Have you done any independent research
10  on these organizations?
11      A.  No, I have not.
12      Q.  So you don't know what their goals are?
13      A.  No, I do not.
14      Q.  You've also said that the co-payors
15  aren't getting enough under the settlement; is
16  that correct?
17      A.  Uh-huh.  Yes.
18      Q.  On what basis do you believe that
19  they're not getting enough?
20      A.  Based on other cases, such as, the
21  McKesson and the Relafen, those consumers were
22  given 30 to 33 percent of the settlement.

**19**

1      Q.  Have you looked at what the co-pay
2  consumers had as damages in those cases versus
3  what co-pay consumers have as damages in this
4  case?
5          MR. COCHRAN:  Objection.  Go ahead.
6      A.  No, I have not.
7      Q.  If someone were to establish for you
8  that co-pay consumers in this case, in fact, had 5
9  percent of the damages but were getting 17.5
10  percent of the settlement, would that assuage your
11  concern that co-pay consumers aren't getting
12  enough?
13      A.  I'm not sure.  It's my understanding
14  that the -- can I scratch that?
15      Q.  Sure.  Of course.  It's your answer that
16  you're not sure?
17      A.  Can you repeat the question for me
18  again?  I'm sorry.
19      Q.  Sure.  If I were to tell you that co-pay
20  consumers in this case only had 5 percent of the
21  damages, for example, would it assuage your
22  concern that they're getting 17.5 percent in this

**20**

1  settlement?
2          MR. COCHRAN:  Do you mean, you're
3  referring to, I presume, to percentage co-pay?
4          MS. FOUNTAIN CONNOLLY:  That's what I
5  said.  I think I said co-pay consumers.
6          MR. COCHRAN:  Well, I mean, excluding a
7  flat rate co-pay.
8          MS. FOUNTAIN CONNOLLY:  Right.
9          THE WITNESS:  I'm not sure.  I'm not
10  sure.
11  BY MS. FOUNTAIN CONNOLLY:
12      Q.  Do you think in general that in a
13  settlement like this one, that there should be a
14  relationship between actual damages and the amount
15  that is awarded to a particular class in the
16  settlement?
17      A.  Yes.
18      Q.  That sounds like a fair concept to you?
19      A.  Yes.
20      Q.  But in this case, you haven't looked at,
21  for example, the damages report of plaintiff's
22  expert that talks about the damages that are

**21**

1  suffered by any particular class?
2      A.  I understand based on the McKesson case
3  that the uninsured consumer is the largest -- I
4  guess it would be the largest consumer, larger
5  than the consumer -- the co-pay consumer.  So I'm
6  not sure I really answered your question.
7      Q.  But in this particular case, the AWP
8  case, have you looked at, for example, Dr.
9  Hartman's expert reports on damages?
10      A.  No.
11      Q.  Has anyone told you what those expert
12  reports say?
13      A.  No.
14      Q.  Okay.  You also said that you wanted the
15  largest pharmacy companies to be subpoenaed for
16  consumer contact information so that consumers
17  would not have to fill out claim forms; is that
18  correct?
19      A.  Uh-huh.  Correct.
20      Q.  Do you have any idea how much it would
21  cost to do that?
22      A.  I do not.  But I do know that it was

Connick, Corinna

March 24, 2009

Cleveland, OH

7 (Pages 22 to 25)

---

**22**

1 done in the past.
2 Q. You're referring to the Relafen case?
3 A. Relafen.
4 Q. Do you know that the Relafen case
5 involved a single drug, while this case involves
6 over 200 drugs?
7 A. I wasn't aware of that.
8 Q. Were you involved in the Relafen case at
9 all?
10 A. No, I was not.
11 Q. And do you have any information that
12 would suggest whether there would actually be a
13 lot of information in the possession of pharmacies
14 as opposed to other providers, like doctors?
15 A. Can you repeat that, please?
16 Q. Do you have any information that would
17 suggest that subpoenaing pharmacies in this case
18 would actually be the appropriate entity as
19 opposed to other medical providers, like doctors?
20 A. No, I do not.
21 Q. You've also talked about your objection
22 to what we as lawyers call the quick pay

---

**23**

1 provision, which is the provision under which the
2 ISHPs got a portion of their recovery in advance
3 of everyone else; is that correct that you're
4 objecting to that provision?
5 A. Yes.
6 Q. Are you aware that that type of
7 provision is common in pharmaceutical pricing
8 settlements?
9 A. No. I'm not familiar with that.
10 Q. Do you have any understanding of the
11 reason that class plaintiffs enter into what we
12 call quick pay provisions in pharmaceutical
13 pricing settlements?
14 A. No.
15 Q. And then you've talked about your
16 objection to the attorney's fees that the
17 plaintiffs are receiving --
18 A. Uh-huh.
19 Q. -- is that correct?
20 A. Yes.
21 Q. Do you have any understanding of how
22 much time the class lawyers have spent in

---

**24**

1 litigating this case?
2 A. I'm sure it's considerable.
3 Q. But you're not aware of exact numbers?
4 A. No.
5 Q. Do you have an idea in your head of what
6 you believe to be a reasonable attorney's fees for
7 class counsel in this case?
8 A. I think that the 30 percent on the 73
9 million would be reasonable.
10 Q. So, in other words, if we were to remove
11 the ISHP portion of the settlement and get fees on
12 the remaining amount, that to you would be
13 reasonable?
14 A. I believe that would be reasonable.
15 Q. I'm sorry?
16 A. I believe that would be reasonable.
17 Q. Let's go ahead and look at what the
18 court reporter has already marked as Connick
19 Exhibit 1, which was -- which you produced this
20 morning pursuant to our subpoena, I believe. Can
21 you identify for me what this document is?
22 A. This is the list of medications that I

---

**25**

1 had filled at the Giant Eagle Pharmacy in Chardon,
2 Ohio from January of '07 to December of '07.
3 Q. And why did you pull these records from
4 this particular time period?
5 A. Because during this time frame is when I
6 purchased the prescription Climara, which is
7 Estradiol, and it was during your -- the class
8 period, the class action period.
9 Q. Is this the only document that you have
10 showing your purchase of what we call a class
11 drug, or one of the drugs that's at issue in this
12 settlement?
13 MR. COCHRAN: Excuse me. Are you by
14 that question referring to the two statements?
15 MS. FOUNTAIN CONNOLLY: Yes. The entire
16 exhibit.
17 THE WITNESS: Yes.
18 BY MS. FOUNTAIN CONNOLLY:
19 Q. So to your knowledge, Estradiol is the
20 only class drug that you took during the class
21 period?
22 A. That I'm aware of, yes.

Connick, Corinna

Cleveland, OH

March 24, 2009

8   (Pages 26 to 29)

---

26

1    Q.  Do you have any documents that reflect
2  your actual payment for the drug, such as, a
3  credit card receipt or a canceled check?
4      A.  I could get that. I don't have that.
5      Q.  Do you recall how you paid for this
6  drug, whether it was by credit card or by check?
7      A.  It was probably by credit card.
8      Q.  So this report date on this document is
9  showing that you obtained this on March 11 of this
10  year; is that right, if you look above the
11  pharmacist's signature?
12     A.  Yes.
13     Q.  Prior to filing your objection in this
14  case, did you verify that you had indeed paid for
15  Estradiol?
16     A.  Yes.
17     Q.  How did you do that?
18     A.  Well, did I verify it?  No. But I knew
19  that I had paid full price for it. I knew without
20  a doubt I paid full price for it.
21     Q.  Why did you recall paying full price for
22  the drug?

---

27

1      A.  Because I remember — I'm not sure why -
2  - but I do remember the pharmacist telling me that
3  it wasn't covered under my insurance.
4      Q.  That was my next question. So it's your
5  understanding that you paid cash on this
6  particular instance because your insurance did not
7  cover this prescription?
8      A.  Correct.
9      MR. COCHRAN:  I think she said credit
10  card.
11     A.  Right.  I didn't pay cash. I don't
12  believe I paid cash.
13     Q.  Right. I'm sorry. When I'm referring
14  to cash --
15     A.  Some form of legal tender, yes.
16     Q.  Right. Exactly. I meant that more
17  generically.
18     MR. COCHRAN:  That's okay.
19  BY MS. FOUNTAIN CONNOLLY:
20     Q.  So it's your understanding that you paid
21  for this yourself --
22     A.  Yes.

---

28

1      Q.  -- because your insurance didn't cover
2  it?
3      A.  Yes.
4      Q.  Do you know why your insurance didn't
5  cover it?
6      A.  I don't remember. I know the pharmacist
7  told me. But I don't recall why.
8      Q.  What type of insurance did you have in
9  2007?
10     A.  I believe it was Anthem. It was Anthem.
11  It was Anthem.
12     Q.  Do you recall whether for brand drugs
13  you had to pay some type of co-pay normally?
14     A.  No. I don't remember. I don't remember
15  that.
16     Q.  I'm sure that based on your age that
17  this is not the case, but I need to ask for the
18  record, you're not currently on Medicare, right?
19     A.  No.
20     Q.  And you're not on Medicaid either?
21     A.  No.
22     Q.  Do you recall whether you took the pill

---

29

1  or injection formulation of Estradiol?
2      A.  I took the patch.
3      Q.  The patch. Okay. And the
4  administration that's reflected on Exhibit A is
5  the only time that you paid cash for it?
6      MR. COCHRAN:  You mean Exhibit 1?
7      MS. FOUNTAIN CONNOLLY:  Exhibit 1. Yes.
8  Sorry.
9      THE WITNESS:  Other than my co-pay, yes.
10  BY MS. FOUNTAIN CONNOLLY:
11     Q.  So it's the only time you paid the full
12  amount for the drug?
13     A.  Correct.
14     Q.  Did you continue to take Climara after
15  this administration?
16     A.  Yes.
17     Q.  But those continuing patches were
18  covered by insurance?
19     A.  I'm trying to recall. I don't recall
20  that. I don't remember if I paid full price or if
21  I had a co-pay.
22     Q.  Do you recall how long you took Climara?

---

Connick, Corinna

March 24, 2009

Cleveland, OH

9  (Pages 30 to 33)

30

1     A.  What do you mean by that?
2     Q.  Well, this administration was in
3  December of 2007.  Do you recall how long after
4  that you continued to take the drug?
5     A.  I'm still taking it.
6     Q.  You're still taking it.  Okay.
7        Do you have different insurance now than
8  you had in 2007?
9     A.  I have the same insurance company, but
10  the plan changed.
11     Q.  When did your plan change?
12     A.  I believe it was January of '08.
13     Q.  How did the plan change?
14     A.  Anthem under the current plan, which is
15  the plan that we've had since '08, they will pick
16  up the first $2,000 of the -- any medical
17  expenses, pharmacy expenses that we have.  And
18  then after that, we pick up the remaining 2,000.
19  I believe they call it an HRA, but I'm not 100
20  percent sure.
21     Q.  Sounds like it.  Did you change your
22  plan in January 2008 yourself or was this

31

1  something that Anthem changed for you?
2     A.  It was done through my husband's
3  employer.  I'm not sure why.
4     Q.  So it was not the case that you sought
5  to change your insurance coverage after you
6  discovered you had to pay cash or had to pay the
7  full amount for Climara?
8     A.  Correct.
9     Q.  How often do you purchase Climara?
10     A.  Once a year.
11     Q.  I don't want to go in depth into your
12  medical history, but just very briefly, why were
13  you taking the Climara?
14     A.  I'm currently on birth control.  And
15  when I would go off for the, you know, on the
16  placebo pills, I would get terrible headaches.  So
17  the doctor put me on continuous for three packs of
18  the birth control and then one week on the Climara
19  to alleviate the headaches.
20     Q.  Did you start taking Climara in December
21  of 2007 or before then?
22     A.  That's when I started.

32

1     Q.  Do you have any understanding of whether
2  your full payment, the $55.99 price that you paid
3  in December of 2007, was based on average
4  wholesale price?
5     A.  No, I'm not aware -- I'm not sure.
6     Q.  Do you have any understanding of what
7  this price is based on at all?
8     A.  No.
9     Q.  I think we can put that away.  So we've
10  talked a little bit about your decision to file an
11  objection to this settlement.  But I just wanted
12  to get a more complete understanding of when you
13  came to the decision to file an objection.  Can
14  you tell me that?
15     A.  Uh-huh.  Are you -- are you referring to
16  time frames?
17     Q.  Or reasons why.
18        MR. COCHRAN:  Well, you either do one or
19  the other for a question.  I mean, what is the
20  question?  Why don't we get a fresh question?
21  BY MS. FOUNTAIN CONNOLLY:
22     Q.  Why don't you tell me the circumstances

33

1  under which you came to decide to file an
2  objection to the settlement.
3     A.  My husband had a list of medications
4  that he brought home.  He said that he remembered
5  me taking the Estradiol, not sure of dates that I
6  had taken it.  And I had told him that I did take
7  the medication in December of '07.  And repeat the
8  question.
9     Q.  How did you come to decide to object?
10     A.  In discussing with my husband, I learned
11  that there was no consumer class representative
12  for the whole payers.  I knew that I had paid for
13  the drug myself.  And I didn't feel that that was
14  right, and I wanted to get involved.
15     Q.  Do you recall approximately when your
16  husband brought this list to you?
17     A.  I would say somewhere in mid -- mid
18  February, late February.
19     Q.  Do you know how he got the copy of the
20  list?
21     A.  No, I'm not sure.
22     Q.  So how did you come to get in touch with

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

Connick, Corinna                                      March 24, 2009
                        Cleveland, OH

## 10  (Pages 34 to 37)

**34**

1   Mr. Cochran?
2       A.  Through my husband.  My husband referred
3   him to me -- referred me to him because Mr.
4   Cochran has experience in this area.
5       Q.  Has your husband worked with Mr. Cochran
6   previously?
7       A.  I'm not -- I'm not sure.
8       Q.  Do you know whether your husband and Mr.
9   Cochran knew each other personally prior to this -
10  - getting involved in this settlement?
11      A.  I don't know.  I don't know.
12      Q.  So did you or your husband contact Mr.
13  Cochran?
14      A.  My husband contacted Mr. Cochran on my
15  behalf.
16      Q.  And when was that?
17      A.  Mid, late February.
18      Q.  How did you come to learn that Mr.
19  Cochran had experience in this area?
20      A.  My husband told me.
21      Q.  And when you say this area, what do you
22  mean?

**35**

1       A.  I know he's worked on other class
2   actions with pharmaceutical companies.  And I know
3   that he has worked with -- on other class action
4   suits.
5       Q.  Do you know which class actions he's
6   been involved with with pharmaceutical companies?
7       A.  Not -- I don't recall.  I know he told
8   me, but I don't recall.
9       Q.  When you say he told me, do you mean
10  your husband?
11      A.  They probably both did.
12      Q.  When was the first time that you met Mr.
13  Cochran?
14      A.  I believe we met by phone beginning of
15  March.
16      Q.  How long did you talk to him on the
17  phone?
18      A.  It was brief.
19      Q.  Ten minutes?
20      A.  Yes.  Maybe.
21      Q.  Other than that conversation, have you
22  had any discussions with him?

**36**

1       A.  Oh, I've had extensive discussions with
2   him.  We met in preparation for this deposition.
3   We've conversed a number of times on the phone as
4   well as meeting.
5       Q.  And all of those times have been since
6   the beginning of March?
7       A.  Yes.
8       Q.  Do you know John Pentz, the other
9   attorney who's on your pleadings?
10      A.  I've never met him.
11      Q.  Have you ever spoken to him?
12      A.  No, I have not.  Everything that I have
13  done has gone through Mr. Cochran.
14      Q.  Okay.  Do you know John or Connie Pentz,
15  the other people who are objecting to the
16  settlement?
17      A.  No.  I know that he is the
18  representative in Boston.  He's the -- or he is
19  the local counsel there.
20      Q.  Do you know the -- I guess it's John
21  Pentz, Sr., the gentleman who's actually objecting
22  to the settlement as opposed to the attorney, his

**37**

1   son?
2       A.  No.
3       Q.  And you don't know Connie Pentz either,
4   right?
5       A.  No, I do not.
6       Q.  Do you know Patricia Wetherly?
7       A.  No, I do not.
8       Q.  Do you know Don Havaland?
9       A.  No, I do not.
10      Q.  Do you know Gracio Florez?
11      A.  No, I do not.
12      Q.  Have you seen any of the objections to
13  the Track Two Settlement filed by other objectors?
14      A.  I don't know.
15      Q.  Let's talk about what the court reporter
16  has previously marked as Connick Exhibit 2.  Can
17  you tell me what that document is, please?
18      A.  This is a contingency fee agreement
19  between Mr. Cochran and myself and Mr. Pentz.
20      Q.  And this shows that -- it's very weak -
21  but appears that you signed this on March 1; is
22  that correct?

Connick, Corinna                                    March 24, 2009

Cleveland, OH

11 (Pages 38 to 41)

**38**

1    A.  Uh-huh.
2    Q.  That's your signature?
3    A.  Yes, it is.
4    Q.  It barely looks like your signature.
5    A.  It is.  I'm sorry.
6    Q.  And this agreement provides that you
7  have retained Mr. Cochran on a contingent fee
8  basis; is that correct?
9    A.  Yes.  Yes, ma'am.
10    Q.  What is your understanding of what that
11  means?
12    A.  My understanding is that Mr. Cochran
13  will represent me.  And he will -- will accept a
14  fee only if there is an amount awarded to them by
15  the court.
16    Q.  Do you understand -- do you have an
17  understanding of what percentage that he might
18  accept if you ultimately recover something in
19  connection with this objection?
20    A.  I'm not sure.  I'm not sure.
21    Q.  Okay.  You're not sure you understand my
22  question, or you're not sure --

**39**

1    A.  Oh, no.  I'm not sure I understand --
2    Q.  The percentage that he would take?
3    A.  Right.
4    Q.  And then in the second paragraph, the
5  first sentence says, "I voluntarily, and without
6  promise of any remuneration or special favor agree
7  to act as a class representative for a proposed
8  class in said Pharmaceutical AWP Litigation and/or
9  Objector."
10       Can you tell me what your understanding
11  of that sentence is?
12    A.  I'm not -- I have not been promised any
13  award or anything for being a class
14  representative.  I have not been promised any --
15  any financial benefit.
16    Q.  Okay.  So you've undertaken this
17  objection without any promise of getting any
18  financial recovery; is that correct?
19    A.  Correct.
20    Q.  What do you hope to get by filing this
21  objection?
22    A.  I want myself and the other people that

**40**

1    I represent to receive some benefit from this
2  class action.  And I don't -- I definitely don't
3  want our rights to be released without our
4  involvement.
5    Q.  So if there were some way that the group
6  of cash payers were to be included in this
7  settlement, would that satisfy your objection?
8    A.  I don't know.  I would have to talk to
9  my attorneys about that.
10    Q.  Do you hope to make any money by filing
11  this objection?
12    A.  I'm not necessarily looking for money.
13  I'm looking just to help the millions of other
14  people who have paid -- who have been harmed in
15  this and who need to receive some benefit.
16    Q.  Do you hope Mr. Cochran will get paid by
17  virtue of you filing this objection?
18       MR. COCHRAN:  Objection.  Go ahead and
19  answer.
20    A.  I'm sorry.  Can you repeat the question?
21    Q.  Do you hope that Mr. Cochran will get
22  paid by virtue of you filing this objection?

**41**

1    A.  By filing the objection or --
2    Q.  If you ultimately prevail, do you hope
3  that he'll get paid?
4    A.  Sure.
5    Q.  Do you have in your mind an amount that
6  would be reasonable for him to get paid?
7       MR. COCHRAN:  Objection.
8    A.  I don't.
9    Q.  If the District Court ultimately rejects
10  your objection on any grounds, do you have plans
11  to appeal it?
12    A.  I'd have to talk to my attorneys about
13  that.
14    Q.  Do you have any understanding that when
15  an objector appeals a settlement, that it delays
16  the distribution of those funds for possibly years
17  to the class members who are waiting for them?
18    A.  Sure.
19    Q.  Have you realized in looking over the
20  documents in this case that many of the consumers
21  that you're seeking to represent are sick and
22  elderly and have been waiting for payments in this

**Connick, Corinna**                                    **March 24, 2009**

Cleveland, OH

12 (Pages 42 to 45)

---

**42**

1  case for seven years?
2       MR. COCHRAN: Objection. Do you mean
3  the whole payers?
4       MS. FOUNTAIN CONNOLLY: Any of the
5  consumers.
6       MR. COCHRAN: Any consumer. Okay.
7       THE WITNESS: I'm aware of that.
8  BY MS. FOUNTAIN CONNOLLY:
9       Q.  So you realize that the filing of your
10 objection may have the effect of delaying payments
11 to some of those people who are so sick?
12      MR. COCHRAN: Objection. You're
13 referring to the appeal, not the objection.
14      MS. FOUNTAIN CONNOLLY: Well, the
15 objection could delay it too.
16      MR. COCHRAN: All right. Go ahead and
17 answer. You were talking about the appeal before.
18 I think it's confusing her.
19      THE WITNESS: Can you repeat the
20 question, please?
21 BY MS. FOUNTAIN CONNOLLY:
22      Q.  Sure. Do you have any understanding

---

**43**

1  that your filing of this objection and the
2  resolution of it may delay payments to people who
3  are very sick and elderly?
4       A.  I believe it's possible. I would
5  discuss that with my attorneys.
6       Q.  One of the reasons that you're objecting
7  to this settlement is because you're concerned
8  that the ISHPs got a quick pay but consumers are
9  still waiting for their payments, right?
10      A.  Yes.
11      Q.  That's a concern to you?
12      A.  Yes.
13      Q.  And you would like for consumers to get
14 paid as soon as possible; is that right?
15      A.  I want it to be fair though. That's
16 most important.
17      Q.  And your view of fair is to make sure
18 that cash payers get some type of distribution
19 from the settlement; is that correct?
20      A.  Correct.
21      Q.  Okay. You understand that you, as
22 opposed to the Pentzes, have sought to become a

---

**44**

1  class representative in this case. Do you have
2  that understanding?
3       A.  Yes.
4       Q.  What is your understanding of what a
5  class representative is?
6       A.  I represent the co -- or I'm
7  representing for the whole payer and I'm
8  representing the co-pay plaintiffs.
9       Q.  And when you say co-pay plaintiffs, you
10 mean percentage co-pays, right?
11      A.  Yes.
12      Q.  I'm just glancing at Exhibit 1 again,
13 and it looks like the co-pays, at least for this
14 one drug on here, are flat co-pays. Do you have
15 evidence of your having paid percentage co-pays
16 for the drugs at issue in this case?
17      A.  I want to make sure I understand your
18 question. Can you repeat that?
19      Q.  Sure. Do you have evidence of your
20 having paid a percentage co-pay for any of the
21 drugs at issue in this case?
22      A.  No.

---

**45**

1       Q.  Do you still want to represent that
2  group of consumers?
3       A.  I want to represent the whole payers for
4  sure. I don't believe that the percentage co-
5  payors were adequately represented in the
6  settlement amount.
7       Q.  What's your understanding of the duties
8  of the class representative?
9       A.  My duty is to make sure that people such
10 as myself receive benefit, and that it's proper
11 and reasonable, with the help of my attorneys, and
12 my rights are considered.
13      Q.  Do you have an understanding that part
14 of your duties as a class representative is to,
15 for example, appear for today's deposition, to
16 produce documents, and things like that?
17      A.  Yes.
18      Q.  Have you heard the term that class
19 representatives have a fiduciary duty to the class
20 that they seek to represent? Have you ever heard
21 that term?
22      A.  No.

---

Connick, Corinna

March 24, 2009

Cleveland, OH

13 (Pages 46 to 49)

46

```
1          (And thereupon, Exhibit Connick 003
2    was marked for purposes of identification.)
3    BY MS. FOUNTAIN CONNOLLY:
4        Q.  I'm going to hand you what the court
5    reporter has marked as Connick Exhibit 3. Can you
6    tell me whether you've seen that document before?
7        A.  Yes. Let me make sure. Yes.
8        Q.  Is that the objection that you filed on
9    March 9 of this year?
10       A.  Yes, it is.
11       Q.  When did you first see a copy of this?
12       A.  I would -- somewhere early March.
13       Q.  Did you see it before it was filed?
14       A.  Yes, I did.
15       Q.  Did you make any changes to it before it
16   was filed?
17       A.  With the help of my husband. I mean, we
18   went through it. I can't say that I personally
19   made any changes to it.
20       Q.  We've already gone through some of the
21   nature of your objection. But I want to address
22   some of the specific points that you've made in
```

47

```
1    this objection. So I'm going to go through some
2    of the parts with you.
3           The first part, which is Roman Numeral
4    I, you're objecting to the fact that consumer
5    class members have not been adequately represented
6    and are claiming that the settlement allocation
7    harms consumer class members; is that correct?
8        A.  Correct.
9        Q.  Do you know what the split between
10   consumers and third-party payers was under the
11   allocation process?
12       A.  I know that the consumers, which was the
13   co-pay consumers, were to receive 17-and-a-half
14   percent. And I believe the third-party payers
15   were to receive somewhere around 40 percent or so.
16   And I know that the institutional -- the ISHPs
17   received 52 million, but I don't really know what
18   the percentage of that was.
19       Q.  Do you know the factors that the
20   allocation committee considered in deciding that
21   that was an appropriate split?
22       MR. COCHRAN: Objection. Go ahead.
```

48

```
1        A.  I'm not -- I don't know.
2        Q.  Do you know Alex Sugarman Brosan?
3        A.  No.
4        Q.  Do you know Jeffrey Goldenberg?
5        A.  I do not know him other than from what I
6    have seen that he is an individual who agreed to
7    the allocation of the -- that provides no
8    settlement for people such as myself.
9        Q.  Do you believe that both Mr. Sugarman
10   Brosan and Mr. Goldenberg were inadequate
11   representatives of consumers in the allocation
12   process?
13       A.  I don't know who Mr. Sugarman is, but I
14   do believe that Mr. Goldenberg was an inadequate
15   representative.
16       Q.  And you believe he was inadequate
17   because you believe the 17.5 percent to be an
18   inadequate percentage for consumers?
19       A.  For the co-pay consumers.
20       Q.  Are there any other reasons you believe
21   him to be inadequate?
22       A.  Because he did not allocate any benefits
```

49

```
1    for the whole payers.
2        Q.  Do you think that in order for someone
3    to adequately represent consumers in an allocation
4    context, that they need to have been a consumer
5    themselves?
6        A.  I don't know about that. But I do know
7    that, I mean, they have to take everybody into
8    consideration. And the whole payers were not
9    taken into consideration.
10       Q.  The reason I was asking if you look on
11   Page 1 of your objection, after Roman Numeral I,
12   the first sentence says, "At the December 16, 2008
13   hearing in this matter, class counsel conceded
14   that no consumer plaintiffs were involved in
15   negotiations about the allocation of the
16   settlement fund."
17          So you're not actually objecting to the
18   fact that no consumer plaintiff negotiated the
19   allocation, you're objecting to the result of the
20   allocation; is that right?
21       MR. COCHRAN: Objection. I don't
22   understand. It's not clear to me what your
```

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

Connick, Corinna

Cleveland, OH

March 24, 2009

14 (Pages 50 to 53)

**50**

1   question is.
2   BY MS. FOUNTAIN CONNOLLY:
3       Q.  Do you understand the question?
4       A.  I am --
5       Q.  Restate it?
6       A.  Can you please restate it.
7       Q.  Is your objection regarding the
8   allocation process, is the objection the fact that
9   there were no consumers on the allocation
10  committee, or is your objection to the result of
11  the allocation?
12      MR. COCHRAN:  Well, you're excluding
13  both, doesn't have to be one or the other.  It's a
14  non-fair question.
15      MS. FOUNTAIN CONNOLLY:  Well, that's
16  your objection.
17  BY MS. FOUNTAIN CONNOLLY:
18      Q.  Do you understand the question?
19      A.  I understand the question.  I'm not --
20  I'm not sure I understand.
21      Q.  This sentence says, "No consumer
22  plaintiffs were involved in negotiations about the

**51**

1   allocation of the settlement fund."
2       Are you objecting to the fact that there
3   were no consumers who were involved in the
4   allocation itself?
5       A.  I am objecting to that we were -- the
6   settlement allocation -- we were excluded in the
7   settlement allocation.
8       Q.  So you were excluded by not having
9   consumers on the allocation committee, or you were
10  excluded because there was no portion that was
11  allocated to cash payers?
12      A.  I believe I'm objecting to both.
13      Q.  That's what I wanted to understand.
14  You've referred to in your testimony when you talk
15  about in this objection on Page 2 the McKesson
16  case; is that right?
17      A.  Yes.
18      Q.  Have you reviewed any documents from the
19  McKesson case?
20      A.  I have just gone over it with my
21  husband, and that was about it.  I have not
22  reviewed the document itself.

**52**

1       Q.  So your husband's just explained to you
2   what happened in that case?
3       A.  Right.
4       Q.  What, in general, has he told you about
5   that case?
6       MR. COCHRAN:  Objection.
7   Attorney/client privilege.
8       MS. FOUNTAIN CONNOLLY:  Her husband is
9   acting as her attorney?
10      THE WITNESS:  He's my personal attorney.
11  BY MS. FOUNTAIN CONNOLLY:
12      Q.  In this case?  Where is your retainer
13  agreement with him?
14      MR. COCHRAN:  For the record, it's her
15  husband.  He's not charging her.
16      MS. FOUNTAIN CONNOLLY:  What do you mean
17  he's not charging her?
18      MR. COCHRAN:  I'm not sure what you
19  mean.
20      MS. FOUNTAIN CONNOLLY:  I don't
21  understand what you mean by he's not charging her.
22      MR. COCHRAN:  I mean by that what I just

**53**

1   said.
2       MS. FOUNTAIN CONNOLLY:  Well, you
3   haven't raised the objection to any other
4   discussions that she's had with her husband the
5   entire morning.
6       MR. COCHRAN:  You haven't asked for
7   specific communications, what did he say to her,
8   what did she say to him until now.  You've asked
9   who did they consult with and what subject matter
10  and how did she find out.  I understand -- if you
11  want to read back the question, maybe I'm
12  misstating it.
13      (Question read back.)
14      MR. COCHRAN:  Yeah.  I think you can ask
15  her what she knows about the case, but I don't
16  think you can ask her what her attorney -- one of
17  her attorneys specifically has said to her.
18      MS. FOUNTAIN CONNOLLY:  Okay.
19      MR. COCHRAN:  You can ask her what the
20  source of her knowledge of it, what she knows.
21  But to ask her specifically what did your husband
22  say to you when he's acting as her attorney in

Connick, Corinna

March 24, 2009

Cleveland, OH

15 (Pages 54 to 57)

**54**

1 that communication. But go ahead.
2 BY MS. FOUNTAIN CONNOLLY:
3    Q. Let me just ask you some basic
4 questions. Is it your position that your husband
5 is acting as your attorney in connection with this
6 objection?
7    A. No. Mr. Cochran is.
8    Q. So is it your position that your husband
9 is just, in general, your personal attorney for
10 all reasons?
11    A. Yes.
12    Q. Can you describe to me the other
13 instances where you've used your husband as your
14 personal attorney?
15    MR. COCHRAN: Objection. That's not
16 relevant to this case.
17    MS. FOUNTAIN CONNOLLY: It absolutely is
18 relevant. She's claiming that he is her attorney
19 for all purposes.
20    MR. COCHRAN: Yeah.
21    MS. FOUNTAIN CONNOLLY: I would like
22 some support for that assertion other than the

**55**

1 fact that --
2    MR. COCHRAN: What is the relevance of
3 identifying another matter that he's represented
4 her?
5    MS. FOUNTAIN CONNOLLY: Well, you can
6 instruct her not to answer if you like, but I
7 think it's relevant.
8    MR. COCHRAN: I'm asking you what the
9 relevance is.
10    MS. FOUNTAIN CONNOLLY: It's relevant in
11 establishing the validity of the purported
12 attorney/client relationship.
13    MR. COCHRAN: Well, it only has to be in
14 this case. You don't have to have prior cases --
15 if I have an attorney, a personal attorney, in
16 order to establish attorney/client privilege, I
17 don't have to prove to you that I used that
18 attorney on some other occasion.
19    MS. FOUNTAIN CONNOLLY: Yes. She has to
20 establish that she uses him for some purpose. You
21 can't just say that he's her attorney for all
22 purposes in order for the privilege to be valid.

**56**

1    MR. COCHRAN: Well, she said that he's
2 advising her in connection with this objection.
3    MS. FOUNTAIN CONNOLLY: But she said you
4 were her attorney for this objection.
5    MR. COCHRAN: Well, I'm the attorney of
6 record. I mean, it's not -- you're making a
7 mountain out of a molehill. He is the attorney
8 for her.
9    MS. FOUNTAIN CONNOLLY: That's not what
10 she said.
11    MR. COCHRAN: He brought the case to me.
12 And I am the attorney of record, along with John
13 Pentz. Because I am her attorney of record, does
14 that exclude her from having a personal attorney
15 representing her as not counsel of record?
16    MS. FOUNTAIN CONNOLLY: She testified
17 that he wasn't representing her in connection with
18 this objection.
19    MR. COCHRAN: Answer my question.
20    MS. FOUNTAIN CONNOLLY: Yes, it does
21 because she testified her husband wasn't
22 representing her in connection with this

**57**

1 objection.
2    MR. COCHRAN: Well, he's not of counsel
3 of record in the objection. He's her personal
4 attorney. He's obviously counseled her on the
5 subject of why she would object and what the
6 objection would be. And he's acted as her
7 counsel, but he's not her counsel of record in
8 these pleadings. That's obvious.
9    MS. FOUNTAIN CONNOLLY: I've asked her
10 whether he represented her, and she said no. Just
11 because there --
12    MR. COCHRAN: Well, why don't you clear
13 up -- why don't you clear --
14    THE WITNESS: Okay. He is not my
15 attorney on record, but he is my personal
16 attorney. He is not the attorney on record for
17 this case.
18 BY MS. FOUNTAIN CONNOLLY:
19    Q. When did you ask him to retain you? I
20 mean, when did you ask him to represent you in
21 connection with this?
22    A. When we discussed it when he brought

Connick, Corinna

March 24, 2009

Cleveland, OH

16 (Pages 58 to 61)

**58**

1   home the drug and we realized that I actually am a
2   claimant in this matter.
3       Q.  You asked him to be your attorney?
4       A.  I — I don't — I just think it was
5   assumed that he represents me.  I have never
6   formally sat him down and asked him to represent
7   me.
8       Q.  Just assume because he's your husband
9   and he's an attorney?
10      A.  Sure.
11      MS. FOUNTAIN CONNOLLY:  For the record,
12  I object to the assertion of the privilege in this
13  context; but, of course, we'll go on.
14      MR. COCHRAN:  It's not that important of
15  a subject matter, I would propose to you, so why
16  don't we move on.
17  BY MS. FOUNTAIN CONNOLLY:
18      Q.  What understanding do you have, if any,
19  of what happened in the McKesson litigation?
20      A.  I understand that pharmaceutical
21  companies there also inflated the price — the
22  prices of the medications, and that they included

**59**

1   the whole payer as well as the co-payor
2   percentage.
3       Q.  Do you have any understanding of the
4   nature of the drugs that were at issue in the
5   McKesson case?
6       A.  Not any particulars.
7       Q.  So do you have any reason to believe
8   that the numbers that were reported in the
9   McKesson litigation as the percentage of co-payors
10  that were out there likewise applied to the type
11  of drugs that are at issue in this litigation?
12      A.  Repeat the question for me, please.
13      Q.  Do you have any reason to believe that
14  the numbers that were reported in the McKesson
15  litigation as being the percentage of cash payers
16  likewise applied to the drugs that are at issue in
17  this case?
18      A.  I'm not sure how the numbers should be
19  allocated, but I do know they should be more than
20  we currently have in this case.
21      Q.  And what's your basis for saying they
22  should be more?

**60**

1       A.  Because you need to have more than zero.
2   Right now we're getting zero.  There needs to be
3   something.  We were the most harmed.  We paid out
4   of our pocket.
5       Q.  Can you turn to Page 4 of your
6   objection.  There's a sentence above Roman Numeral
7   II that says, "At a minimum, consumer Full Cash
8   payers like the Pentz/Connick Objectors must be
9   allocated at least 11.5 percent of the overall
10  settlement amount, or $14.4 million."  Do you see
11  that sentence?
12      A.  Uh-huh.
13      Q.  Can you tell me how you reached the
14  number of 11.5 percent?
15      A.  I believe that — hang on.  That was the
16  number that was in McKesson.  That's what the
17  whole payer received in — full cash payers
18  received in McKesson.
19      Q.  So it's just applying that percentage to
20  this case?
21      A.  Yes.  At least.
22      Q.  Why do you say at least?  Do you have

**61**

1   any basis for thinking it should be more in this
2   case?
3       A.  I'm not sure.
4       Q.  Do you believe that the total $125
5   million settlement amount is adequate?
6       MR. COCHRAN:  Objection.
7       A.  I'm not sure.
8       Q.  Roman Numeral III talks about the
9   proposal we've discussed a little bit about
10  sending subpoenas to the ten largest pharmacy
11  chains in order to get contact information for
12  cash payers.
13      Do you have any view on who should pay
14  for this process?
15      MR. COCHRAN:  What process are you
16  referring to?
17      MS. FOUNTAIN CONNOLLY:  The process of
18  subpoenaing the pharmacies.
19      MR. COCHRAN:  Are you talking about the
20  process of preparing and filing subpoenas?
21      MS. FOUNTAIN CONNOLLY:  Process of --
22  yeah.

Connick, Corinna

Cleveland, OH

March 24, 2009

17 (Pages 62 to 65)

**62**

1  MR. COCHRAN: Okay.
2  THE WITNESS: I'm not sure.
3  BY MS. FOUNTAIN CONNOLLY:
4  Q. You have, if you turn to Page 6 of your
5  objection, the last sentence of the partial first
6  paragraph, so above, "The Court should require the
7  parties," it says, "The suspect allocation of the
8  settlement fund between consumers and
9  institutional plaintiffs in this case is
10  compounded by the difficulty of filing a consumer
11  claim form." And I'll represent that the sentence
12  goes on, but I'm going to stop there.
13  What do you believe to be difficult
14  about filling out the consumer claim form in this
15  case?
16  A. Well, I feel that there's a lot of
17  people that don't even know this is going on.
18  They may never find out this is going on. And
19  there are older people, there are people who are
20  mentally not capable of filling out the form, but
21  yet they are entitled to receive their benefits.
22  And if there's an easier way out there

**63**

1  to get it to them, that's what we should do;
2  that's what should happen.
3  Q. Have you looked at the claim form
4  itself?
5  A. No, I have not.
6  Q. So you're just saying in general it
7  would be easier for people to get checks --
8  A. Yes.
9  Q. -- than to fill out a form?
10  A. Yes. If the information is there, it
11  should be used.
12  MR. COCHRAN: Page 7.
13  MS. FOUNTAIN CONNOLLY: Page 7?
14  MR. COCHRAN: Oh, I thought that's where
15  we were going.
16  BY MS. FOUNTAIN CONNOLLY:
17  Q. No. We've covered a lot of this. So I
18  don't want to duplicate what we've talked about
19  before already.
20  If you turn to Page 8, in the first full
21  paragraph it starts with, "Class counsel have
22  requested," there's a sentence there that starts

**64**

1  with, "There is only one problem, Class Counsel
2  does not represent the ISHPs, who will receive
3  51.8 million of the $125 million total, and,
4  therefore, there is no basis for Class Counsel to
5  request any portion of that 51.8 million under the
6  common benefit doctrine."
7  I just wanted to clarify that that is
8  actually your position, that there is no basis for
9  class counsel to request any portion of those
10  funds; is that the case?
11  A. I don't think they should get 30 percent
12  of the 51 or the 52 million. That seems awfully
13  high for a group that has their own attorneys and
14  who were charged by their attorneys.
15  Q. Do you have any understanding that class
16  counsel represented those large ISHPs throughout
17  the course of this litigation?
18  A. That — I do not believe that to be my
19  understanding. I believe they had their own
20  attorneys.
21  Q. Would that change your understanding of
22  class counsel's entitlement to some of that fee if

**65**

1  you knew that class counsel had represented some
2  of these ISHPs throughout the course of the
3  litigation?
4  A. I would have to discuss that with my
5  attorneys.
6  MR. COCHRAN: Couldn't that be a
7  conflict of interest?
8  MS. FOUNTAIN CONNOLLY: I don't think
9  I'm the one under examination here.
10  MR. COCHRAN: No. I'm just saying your
11  suggestion that you're representing the class and
12  at the same time you're representing the ISHPs,
13  that suggested that in the question to the
14  witness. I'm saying, how could that be? Wouldn't
15  that be a conflict of interest since they're
16  fighting against each other for the same fund?
17  MS. FOUNTAIN CONNOLLY: The question was
18  throughout the course of the litigation, not
19  during the allocation process.
20  MR. COCHRAN: Well, in the course of the
21  litigation, wouldn't that still be a conflict of
22  interest?

Connick, Corinna

Cleveland, OH

March 24, 2009

18 (Pages 66 to 69)

**66**

1  MS. FOUNTAIN CONNOLLY: I don't believe
2  so, but apparently you have a different view.
3  MR. COCHRAN: Did that happen? Did you
4  guys — you've suggested by that question that
5  class counsel represented the ISHPs in the course
6  of the litigation. I don't know if that's true or
7  not, but you seem to be telling her that. Are you
8  telling her something that's true? Is that true?
9  MS. FOUNTAIN CONNOLLY: I asked her a
10  question. She answered it. The record will
11  reflect the question and answer. Let's move on.
12  MR. COCHRAN: I object if the premise of
13  the question is false. I object. And I think —
14  and I'm challenging the premise. I think you
15  ought to be willing to clear it up.
16  MS. FOUNTAIN CONNOLLY: Well, you know -
17  -
18  MR. COCHRAN: I mean, it's a real simple
19  question. Did you guys represent the ISHPs? Yes
20  or no?
21  MS. FOUNTAIN CONNOLLY: I'm not under
22  examination. I asked her a question and answer.

**67**

1  We're moving on.
2  MR. COCHRAN: No, but it relates to the
3  question. It's an honest question that ought to
4  be cleared up for this deposition. It's not a big
5  deal.
6  MS. FOUNTAIN CONNOLLY: If you have
7  questions of class counsel, you can pose them in
8  another context, not in a deposition of your
9  client.
10  MR. COCHRAN: Well, I'm just trying to
11  be -- I mean, come on, be reasonable. You
12  suggested in the question that you represent them.
13  Now you're refusing to admit that the premise is
14  true?
15  MS. FOUNTAIN CONNOLLY: I'm refusing to
16  answer questions in this deposition because I'm
17  not under oath. So let's move on.
18  MR. COCHRAN: No. I'm not suggesting
19  that you have to answer any questions. I'm not
20  suggesting you're under oath. I'm just suggesting
21  you brought something up which is shocking to me
22  that you may have represented the ISHPs at the

**68**

1  same time you were representing her class. And
2  you suggested that by the question. Now, is it
3  true, the premise of your question, true or not?
4  That's all.
5  MS. FOUNTAIN CONNOLLY: I'm not
6  answering that question. So let's move on.
7  BY MS. FOUNTAIN CONNOLLY:
8  Q. Do you have any sort of philosophical
9  objection to attorneys getting fees in connection
10  with a successful class action settlement?
11  A. Can you repeat that?
12  Q. Do you have any sort of philosophical
13  objection to attorneys getting fees in a class
14  action settlement?
15  MR. COCHRAN: Objection. What does
16  philosophical mean?
17  A. Yeah. I don't understand that.
18  Q. Do you think that -- there's a lot of
19  bad press out there about class action lawyers.
20  And a lot of people think that they shouldn't get
21  paid for their efforts in collection -- in
22  connection with class action settlements. Are you

**69**

1  one of those people?
2  A. No.
3  Q. Do you have any sort of philosophical
4  objection to class actions themselves?
5  A. No.
6  Q. If we turn to Page 8 of your objection,
7  at the bottom of the page, talks about, "If the
8  Track Two Defendants represent approximately 10
9  percent of the total defendants in the case, one
10  may fairly apportion 10 percent of the overall
11  lodestar to the Track Two cases."
12  Can you tell me what you mean by the
13  Track Two Defendants representing approximately 10
14  percent of the total defendants in the case?
15  A. If the Track Two Defendants represent --
16  MR. COCHRAN: I'm sorry. Could you
17  repeat the question?
18  BY MS. FOUNTAIN CONNOLLY:
19  Q. What do you mean by the sentence, "If
20  the Track Two Defendants represent approximately
21  10 percent of the total defendants in the case,
22  one may fairly apportion 10 percent of the overall

Connick, Corinna

Cleveland, OH

March 24, 2009

19 (Pages 70 to 73)

**70**

1　lodestar to the Track Two cases."?
2　　　MR. COCHRAN: Now, wait a minute. For
3　the record, we don't want to trick the witness I
4　don't think, do you? I mean, that is thrown out
5　as an example to illustrate -- he's not saying
6　there that they do represent 10 percent. He's
7　just saying if there's 10 percent, they should get
8　10 percent of the lodestar roughly. If they're 20
9　percent, the lodestar should be 20 percent.
10　　　I don't know if you're trying to examine
11　the factual question which is just a postulation
12　in the pleading.
13　　　MS. FOUNTAIN CONNOLLY: I asked her what
14　she meant by that sentence. I don't think there's
15　anything tricky about that if she actually read
16　the objection.
17　BY MS. FOUNTAIN CONNOLLY:
18　　Q. Can you tell me what you mean by that
19　sentence?
20　　A. I believe what that means is if the
21　Track Two defendant in this case represents 10
22　percent -- represents 10 percent of the total

**71**

1　defendants in this case, the overall of the
2　defendants in this case, that 10 percent of the, I
3　would say the judgment should fall on their
4　shoulders.
5　　Q. So, in other words, let's say
6　hypothetically there were only ten defendants in
7　this case. And one of those defendants was the
8　Track Two defendant, so 10 percent.
9　　　That's the basis that you're using to
10　pick the -- that's the basis that you're using to
11　conclude that class counsel should get 10 percent
12　of an overall lodestar?
13　　A. That's my understanding.
14　　Q. So it's just the number of the
15　defendants should determine the relationship of
16　the percentage of lodestar that class counsel
17　gets; is that what you're saying?
18　　A. I believe that's reasonable.
19　　　MR. COCHRAN: Are we done with that
20　exhibit?
21　　　MS. FOUNTAIN CONNOLLY: Yes. We're done
22　with that exhibit.

**72**

1　　　MR. COCHRAN: More exhibits.
2　　　MS. FOUNTAIN CONNOLLY: More filings.
3　　　(And thereupon, Exhibit Connick 004
4　was marked for purposes of identification.)
5　BY MS. FOUNTAIN CONNOLLY:
6　　Q. I've handed you what's been marked as
7　Connick Exhibit 4. Can you tell me what that is,
8　please?
9　　A. I want to intervene in this class
10　action. I feel that the designated counsel has
11　not done an adequate job in representing consumer
12　plaintiffs.
13　　　MR. COCHRAN: Off the record.
14　　　(Off the record.)
15　　　(Question read back.)
16　BY MS. FOUNTAIN CONNOLLY:
17　　Q. So what is your understanding of what
18　you would actually be doing in intervening?
19　　　MR. COCHRAN: Objection. Go ahead.
20　　A. Repeat that for me, please.
21　　Q. You've moved to intervene. What's your
22　understanding of what that means?

**73**

1　　A. I'm -- I do not feel that the designated
2　counsel has done a good job in representing the
3　consumers in this case. And I'm not sure I
4　finished. Repeat it again.
5　　Q. Do you have any understanding -- let me
6　rephrase the question.
7　　　Do you have an understanding the
8　difference between objecting to a class action
9　settlement and moving to intervene in a case?
10　　A. Yes. Intervening means I want to
11　basically, with the help of my attorneys, take
12　over the consumer portion of the claim because the
13　designated counsel did not do an adequate job of
14　representing the consumer plaintiffs.
15　　Q. And when you say take over the consumer
16　portion, are you referring to the percentage co-
17　pay portion and the cash pay portion, or just the
18　cash pay portion?
19　　　MR. COCHRAN: Or and/or.
20　　A. Both. Or one. Or the whole, one.
21　　Q. Other than what's stated in your
22　objection, which we talked about extensively

Henderson Legal Services, Inc.

202-220-4158

www.hendersonlegalservices.com

Connick, Corinna

Cleveland, OH

March 24, 2009

20 (Pages 74 to 77)

**74**

1 today, is there any other basis for your
2 conclusion at the bottom of Page 1 of Exhibit 4
3 that "The designated counsel and consumer
4 plaintiffs have done such a poor job representing
5 consumer plaintiffs' interests thus far in the
6 litigation"?
7     A. I'm sorry. Can you repeat that?
8     Q. Other than what's set forth in your
9 objection, do you have any other basis for
10 concluding that the consumer plaintiffs and class
11 counsel "Have done such a poor job representing
12 consumer plaintiffs' interests thus far in this
13 litigation"?
14     A. I believe I stated it already.
15     Q. Why do you believe that Mr. Pentz and
16 Mr. Cochran will be better than class counsel have
17 been in this case?
18     A. They're going to represent me and my --
19 the people like me who are zero -- who are the
20 whole payers. And I feel they'll be thorough.
21 And I feel that they will work for the best
22 interest of myself and the other consumer

**75**

1 plaintiffs in providing fair allocation and
2 settlement funds.
3     Q. Again, the only basis that you have to
4 conclude that class counsel have not acted in your
5 best interest are the things that are set forth in
6 your objection; is that correct?
7     A. I believe so.
8     MR. COCHRAN: Well, we just discovered
9 on the record today that there may be a conflict
10 of interest that neither she nor I knew about,
11 which is that class counsel were representing
12 these institutional ISHPs as well, and we've just
13 learned that today. And I don't want to leave the
14 record short because that may be the biggest
15 reason of all. Nonetheless, go forward.
16     MS. FOUNTAIN CONNOLLY: Well, I don't
17 think she's adopted your position yet.
18     THE WITNESS: Yes, I have.
19     MS. FOUNTAIN CONNOLLY: And if you are
20 saying that you are just learning that today talks
21 about your adequacy.
22     MR. COCHRAN: Well, you wouldn't even

**76**

1 tell me on the record today. I asked you today if
2 you guys represented -- if specific class counsel
3 specifically represented their interests in the
4 litigation, and you've very clearly don't want to
5 and refuse to answer.
6     MS. FOUNTAIN CONNOLLY: It's not the
7 nature of the question. I'm not engaging in a
8 colloquy with you, period, about any subject.
9     MR. COCHRAN: Well, it would be one --
10 one sentence in a question and one sentence
11 answer, yes or no. That's not a colloquy.
12 BY MS. FOUNTAIN CONNOLLY:
13     Q. Can we look at your representation on
14 Page 4 under Letter C. It says that, "Intervenor
15 Connick has yet to receive mailed notice of the
16 Track Two Settlement, and the terms of the Track
17 Two Settlement were only recently disclosed and
18 publicized."
19     Since the filing of this motion, have
20 you seen the written notice?
21     MR. COCHRAN: Excuse me. Where is that
22 sentence?

**77**

1     MS. FOUNTAIN CONNOLLY: It's in the
2 second sentence in the first full paragraph under
3 Letter C on Page 4.
4     MR. COCHRAN: Oh, okay. Go ahead.
5     THE WITNESS: Repeat the question.
6 BY MS. FOUNTAIN CONNOLLY:
7     Q. Since the filing of this motion to
8 intervene, have you seen a copy of the written
9 notice for the Track Two Settlement?
10     A. I have not received anything in the
11 mail, if that's what you're asking me. But my
12 husband had showed me the proposed settlement or
13 what I -- let me restate that. I -- I think I may
14 have seen it.
15     Q. Okay. You don't recall anything
16 specific about it, but you think you may have seen
17 it?
18     A. I think I may have seen it.
19     Q. Okay. The bottom of Page 5, there's a
20 representation that, "Intervenors suspect that,
21 rather than assenting to a settlement that is
22 directly contrary to her interests, Ms. Hopkins" -

Connick, Corinna

Cleveland, OH

March 24, 2009

21 (Pages 78 to 81)

**78**

1  - and that refers to Rebecca Hopkins -- "was in
2  fact never informed of the Track Two Settlement,
3  and never consented to it."
4          Other than your suspicion, do you have
5  any basis to believe that that is true?
6      A.  No.
7      Q.  Can you turn to your affidavit, which is
8  -- actually comes after the Complaint In
9  Intervention.
10         MR. COCHRAN:  Have you found it?
11         THE WITNESS:  Yeah.
12         MR. COCHRAN:  Okay.
13         THE WITNESS:  Right there.
14  BY MS. FOUNTAIN CONNOLLY:
15     Q.  I take it you've seen this document
16  before?
17     A.  Yes, I've seen it.
18     Q.  That is your signature at the bottom?
19     A.  Yes, it is.
20     Q.  The Thomas J. Connick that notarized
21  that, is that your husband?
22     A.  Yes.

**79**

1      Q.  That shows your having signed it on
2  March 3.  Is that to the best of your recollection
3  of when you signed the affidavit?
4      A.  I believe so.
5      Q.  Did you review this before signing it?
6      A.  Yes.
7      Q.  Did you see drafts of it before it was
8  finalized?
9          MR. COCHRAN:  Drafts of what?
10         MS. FOUNTAIN CONNOLLY:  The affidavit.
11         THE WITNESS:  I believe so.
12         MR. COCHRAN:  Are you done with that
13  exhibit?
14         MS. FOUNTAIN CONNOLLY:  Yes.  We're
15  done.
16         (And thereupon, Exhibit Connick 005
17  was marked for purposes of identification.)
18  BY MS. FOUNTAIN CONNOLLY:
19     Q.  The court reporter has handed you what's
20  been marked as Connick Exhibit 5.  Can you tell me
21  whether you've seen that document before?
22     A.  I -- I may have seen it when I was

**80**

1  meeting with Mr. Cochran.
2      Q.  Are you referring to this morning or
3  sometime --
4      A.  Oh, no, in the past.
5      Q.  Okay.  If you turn to the requests for
6  production that are on Page 3, have you seen these
7  requests before?
8      A.  Yes.  So I have seen this.
9      Q.  Did you search for documents in response
10  to these requests?
11     A.  As far as the documents -- I have to
12  look to see what these are.  The first one --
13  okay.  I'm sorry.  Can you repeat your question?
14     Q.  Sure.  Did you search for documents in
15  response to these requests?
16     A.  I believe I searched for this document
17  prior to the subpoena.
18     Q.  Okay.  And the documents that you found
19  in response to the subpoena were Exhibits 1 and 2?
20     A.  Yes.
21     Q.  Exhibit 5 asks for -- or excuse me --
22  Request Number 5 asks for "All documents relating

**81**

1  to any objections filed by you to any other
2  settlement of a class action or derivative
3  lawsuit."  And you didn't have any documents
4  responsive to that request; is that right?
5      A.  Correct.
6      Q.  Have you ever filed an objection to a
7  class action settlement before?
8      A.  No.
9      Q.  Have you ever been a plaintiff in a
10  class action before?
11     A.  No.
12     Q.  How did you prepare for this deposition
13  today?
14     A.  I met with Mr. Cochran both in person
15  and by phone.
16     Q.  How long did you talk to Mr. Cochran by
17  phone?
18         MR. COCHRAN:  There was more than one
19  phone call.  So --
20     A.  Yeah.  What are you looking for?  Are
21  you looking for accumulation of time?  I -- I -- I
22  would say hours.  I -- I -- I'm not sure.  I

Connick, Corinna

Cleveland, OH

March 24, 2009

## 22 (Pages 82 to 85)

---

**82**

1 wouldn't be able to tell you exactly an exact
2 number, but extensive.
3 Q. You had numerous telephone
4 conversations?
5 A. Right.
6 Q. And that's about this deposition
7 specifically? In other words, you previously
8 testified you've talked to Mr. Cochran a lot.
9 A. Yes. Right.
10 Q. So I'm just trying to isolate the
11 discussions you've had about this deposition.
12 A. Yes. Okay.
13 Q. You have -- let me just confirm. You
14 had numerous conversations by telephone with Mr.
15 Cochran regarding this deposition; is that
16 correct?
17 A. Correct.
18 Q. You likewise met with him this morning,
19 correct?
20 A. Yes.
21 Q. For about 30 minutes?
22 A. Sure. Yeah. About 30 minutes, maybe

---

**84**

1 MS. FOUNTAIN CONNOLLY: I was talking
2 about to prepare for this deposition.
3 THE WITNESS: Oh, yes.
4 MS. FOUNTAIN CONNOLLY: I don't have any
5 further questions. So unless Mr. Cochran has
6 examination --
7 MR. COCHRAN: No, I don't have.
8 MS. FOUNTAIN CONNOLLY: -- we can
9 conclude today. Thank you for your time.
10 THE WITNESS: Thank you.
11 MR. COCHRAN: Thank you.
12 THE COURT REPORTER: Signature.
13 MR. COCHRAN: We need to see it.
14 (Signature not waived.)
15 (And, thereupon, the deposition was
16 concluded at approximately 11:41 a.m.)
17
18
19
20
21
22

---

**83**

1 45. I did meet with him prior to that as well in
2 person, not just this morning.
3 Q. Okay. How long was that meeting?
4 A. Hours, few hours.
5 Q. Did you look at any documents to prepare
6 for this deposition?
7 A. I believe I -- I did. I have seen, I
8 mean, we went over the objections, the motion to
9 intervene, contingency agreement, all -- most of
10 the documents here.
11 Q. Most of the documents we've looked at
12 today?
13 A. Uh-huh.
14 Q. Are there any documents that we haven't
15 looked at today that you looked at to prepare for
16 this deposition?
17 A. I don't know. I don't really know.
18 Q. You don't recall whether you looked at
19 the settlement agreement or any pleadings filed in
20 this case?
21 MR. COCHRAN: I think she's already
22 testified she's seen the settlement agreement.

---

**85**

1 State of Ohio :
2 SS:
3 County of Franklin:
4 I, CORINNA CONNICK, do hereby certify that
5 I have read the foregoing transcript of my deposition
6 given on March 24, 2009; that together with the
7 correction page attached hereto noting changes in
8 form or substance, if any, it is true and correct.
9
10
11 _____
       CORINNA CONNICK
12
13 I do hereby certify that the foregoing
14 transcript of the deposition of CORINNA CONNICK was
15 submitted to the witness for reading and signing;
16 that after she had stated to the undersigned Notary
17 Public that she had read and examined her deposition,
18 she signed the same in my presence on the _____
19 day of _____, _____.
20
21 _____
       Notary Public
22 My commission expires _____

---

Connick, Corinna

Cleveland, OH

March 24, 2009

23 (Page 86)

86

```
 1              CERTIFICATE
         State of Ohio   :
 2                  SS:
         County of Knox   :
 3              I, Ann Ford, Notary Public in and for the
 4       State of Ohio, duly commissioned and qualified,
 5       certify that the within named CORINNA CONNICK was by
 6       me duly sworn to testify to the whole truth in the
 7       cause aforesaid; that the testimony was taken down by
 8       me in stenotypy in the presence of said witness,
 9       afterwards transcribed upon a computer; that the
10       foregoing is a true and correct transcript of the
11       testimony given by said witness taken at the time and
12       place in the foregoing caption specified.
13              I certify that I am not a relative,
14       employee, or attorney of any of the parties hereto,
15       or of any attorney or counsel employed by the
16       parties, or financially interested in the action.
17              IN WITNESS WHEREOF, I have set my hand and
18       affixed my seal of office at Columbus, Ohio, on this
19       26th day of March, 2009.

20              _____
                ANN FORD, Notary Public
                in and for the State of Ohio
21              and Registered Professional
                Reporter
22       My Commission expires:  April 18, 2011.
```

Henderson Legal Services, Inc.

202-220-4158

www.hendersonlegalservices.com

Connick, Corinna

Cleveland, OH

March 24, 2009

85

```
 1    State of Ohio      :

 2                          SS:

 3    County of Franklin:

 4              I, CORINNA CONNICK, do hereby certify that

 5    I have read the foregoing transcript of my deposition

 6    given on March 24, 2009; that together with the

 7    correction page attached hereto noting changes in

 8    form or substance, if any, it is true and correct.

 9

10                        _____

11                        CORINNA CONNICK

12

13              I do hereby certify that the foregoing

14    transcript of the deposition of CORINNA CONNICK was

15    submitted to the witness for reading and signing;

16    that after she had stated to the undersigned Notary

17    Public that she had read and examined her deposition,

18    she signed the same in my presence on the _____

19    day of _____, _____.

20                        _____

21                        Notary Public

22    My commission expires _____
```

```
 1                    CERTIFICATE
     State of Ohio     :
 2                     SS:
     County of Knox     :
 3              I, Ann Ford, Notary Public in and for the
 4   State of Ohio, duly commissioned and qualified,
 5   certify that the within named CORINNA CONNICK was by
 6   me duly sworn to testify to the whole truth in the
 7   cause aforesaid; that the testimony was taken down by
 8   me in stenotypy in the presence of said witness,
 9   afterwards transcribed upon a computer; that the
10   foregoing is a true and correct transcript of the
11   testimony given by said witness taken at the time and
12   place in the foregoing caption specified.
13              I certify that I am not a relative,
14   employee, or attorney of any of the parties hereto,
15   or of any attorney or counsel employed by the
16   parties, or financially interested in the action.
17              IN WITNESS WHEREOF, I have set my hand and
18   affixed my seal of office at Columbus, Ohio, on this
19   26th day of March, 2009.
20
21              ANN FORD, Notary Public
                in and for the State of Ohio
22              and Registered Professional
                Reporter
23
24   My Commission expires:  April 18, 2011.
25
```