# EXHIBIT G

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL NO. 1456 |
| | CIVIL ACTION: 01-CV-12257-PBS |
| THIS DOCUMENT RELATES TO: | Judge Patti B. Saris |
| ALL CLASS ACTIONS RELATING TO TRACK TWO DEFENDANTS | |

**[PROPOSED] FINAL ORDER AND JUDGMENT GRANTING FINAL APPROVAL TO PROPOSED TRACK TWO CLASS ACTION SETTLEMENTS, APPROVING PROPOSED ALLOCATION OF SETTLEMENT FUNDS, AND APPROVING CLASS COUNSEL'S APPLICATION FOR ATTORNEYS' FEES, REIMBURSEMENT OF LITIGATION EXPENSES AND COMPENSATION FOR CLASS REPRESENTATIVES**

This Court having considered:  (a) the Track Two Settlement Agreement and Release, dated March 7, 2008, including all Exhibits thereto (the "Agreement"), between the Plaintiffs and Defendants Abbott Laboratories, Amgen Inc., Aventis Pharmaceuticals Inc., Hoechst Marion Roussel, Baxter Healthcare Corp., Baxter International Inc., Bayer Corporation, Dey, Inc., Fujisawa Healthcare, Inc., Fujisawa USA, Inc., Immunex Corporation, Pharmacia Corporation, Pharmacia & Upjohn LLC (f/k/a Pharmacia & Upjohn, Inc.), Sicor, Inc., Gensia, Inc., Gensia Sicor Pharmaceuticals, Inc., Watson Pharmaceuticals, Inc., and ZLB Behring, L.L.C. (the "Track Two Defendants"); (b) the Distribution Plan, Claims Process and Notice Plan for the Settlement as contained in the Court's July 2, 2008 order preliminarily approving the Settlement; (c) Class Counsel's Proposal to Rebalance the Track Two Settlement, as embodied in Plaintiffs' Second Supplemental Submission in Support of the Rebalanced Track Two Settlement (Dkt. No. 7750), which the Court preliminarily approved in its August 28, 2011 electronic order (Dkt. No. 7772); and (d) Class Counsel's application for attorneys' fees, reimbursement of litigation expenses, and

- 1 -

compensation for the Class Representatives; and having held hearings on March 14, 2008, April 9, 2008, December 16, 2008, , April 27, 2009, June 13, 2011, July 7, 2011, August 8, 2011 and November 22, 2011 and having considered all of the submissions and arguments with respect thereto, and otherwise being fully informed, and good cause appearing therefor,

IT IS HEREBY ORDERED, ADJUDGED and DECREED that:

1.  This Final Order and Judgment incorporates herein and makes a part hereof, the Agreement, including <u>Exhibit B</u> ("Class Drugs") and all other Exhibits thereto.  Unless otherwise provided herein, the terms as defined in the Agreement shall have the same meanings for purposes of this Final Order and Judgment.

2.  The Court has personal jurisdiction over all Class Representatives, Settlement Class Members, and the Track Two Defendants for purposes of this settlement only, and has subject matter jurisdiction to approve the Agreement.

3.  Based on the record before the Court, including all submissions in support of the Class Settlements set forth in the Agreement ("the Class Settlements"), objections and responses thereto, as well as the Agreement itself, the Court hereby certifies the following nationwide classes (the "Classes") for settlement purposes only:

(a)  Medicare Part B Co-Payment Class ("Class 1")

All natural persons in the United States who, from January 1, 1991 through January 1, 2005, made, or incurred an obligation to make, any portion of a Medicare Part B co-payment for a Class Drug manufactured, marketed, sold, or distributed by a Released Company.

(b)  Third-Party Payor MediGap Supplemental Insurance Class ("Class 2")

All TPPs in the United States who, from January 1, 1991, through January 1, 2005, made, or incurred an obligation to make, reimbursements for any portion of a Medicare Part B co-payment

- 2 -

for a Class Drug manufactured, marketed, sold, or distributed by a Released Company.

(c)     Consumer and Third-Party Payor Class For Payments Made Outside the Medicare Context ("Class 3")

All natural persons in the United States who made, or incurred an obligation to make, a non-Medicare Part B payment for a Class Drug manufactured, marketed, sold, or distributed by a Released Company, and all TPPs in the United States who made, or incurred an obligation to make, non-Medicare Part B reimbursements for a Class Drug manufactured, marketed, sold, or distributed by a Released Company, during the period from January 1, 1991, through March 1, 2008.

Excluded from each of the Settlement Classes are (1) the Released Companies; (2) their respective past, present, and future officers, directors, managers, employees, agents, sales representatives, and liability insurers; and (3) all hospitals, clinics, physicians, or physician practice groups, or other health care provider or group of providers, that purchased drugs manufactured, marketed, sold, or distributed by a Released Company, and that (a) administered, dispensed, or prescribed such drugs to a consumer and (b) billed a consumer, TPP, or ISHP for such drugs (the "Released Parties").  (The exclusion of Released Company "employees" from the Settlement Classes shall not affect the eligibility of any ERISA plans or other TPPs for settlement benefits regardless whether their plan participants might be excluded "employees.")  Additionally excluded from each of the Settlement Classes are the following:  (1) all natural persons who only paid flat co-payments, and not any percentage co-payments, for Class Drugs; (2) all federal, state, and local governmental entities in the United States, except any non-Medicaid state or local governmental agencies or programs that made or incurred an obligation to make a reimbursement for a Class Drug as part of a health benefit plan for their employees, but only with respect to such payments; and (3) the Independent Settling Health Plans ("ISHPs").

- 3 -

In so holding, the Court finds that the prerequisites of FED. R. CIV. P. 23(a) and (b)(3) have been satisfied for certification of the nationwide Classes for settlement purposes: Settlement Class Members, numbering in the thousands, are so numerous that joinder of all members is impracticable; there are questions of law and fact common to each of the Settlement Classes; the claims and defenses of the Class Representatives are typical of the claims and defenses of the Settlement Class Members they represent; the Class Representatives have fairly and adequately protected the interests of the Settlement Classes with regard to the consolidated claims of the Settlement Classes they represent; the common questions of law and fact predominate over questions affecting only individual Settlement Class Members, rendering the Settlement Classes sufficiently cohesive to warrant a nationwide class settlement; and the certification of the Settlement Classes is superior to individual litigation and/or settlement as a method for the fair and efficient resolution of the MDL Class Actions.

In making all of the foregoing findings, the Court has exercised its discretion in certifying the Settlement Classes, based, *inter alia*, upon the Court's familiarity with the claims and parties in these and other cases, including prior AWP class settlements, the interests of the various constituent groups, and the negotiation process overseen by MDL Mediator Eric Green.

4. The record shows that notice has been given to the Settlement Classes in the manner approved by the Court including in its Preliminary Approval Order of March 7, 2008 [Dkt. No. 5426] and its electronic Order Directing Notice of Track Two Settlement Revision to Affected Class Members and Scheduling Fairness Hearing (Dkt. No. 7772). The Court finds that such notice: (i) constitutes reasonable and the best practicable notice; (ii) constitutes notice that was reasonably calculated, under the circumstances, to apprise Class Members of the terms of the Agreement and Class Settlements, and Class Members' right to object to or exclude

themselves from the Settlement Classes and appear at settlement fairness hearings held on March 14, 2008, April 9, 2008, December 16, 2008, April 27, 2009, June 13, 2011, July 7, 2011, August 8, 2011 and November 22, 2011 (the "Fairness Hearings"), (iii) constitutes due, adequate, and sufficient notice to all persons or entities entitled to receive notice; and (iv) meets the requirements of due process and FED. R. CIV. P. 23.

5.       No individuals or entities, other than those listed on <u>Exhibit A</u> hereto, have excluded themselves from the Settlement Classes.  This Order shall have no force or effect on the persons or entities listed on <u>Exhibit A</u> hereto.

6.       The Court finds that extensive arm's-length negotiations have taken place in good faith between Lead Class Counsel and the Track Two Defendants' Counsel resulting in the Agreement.  Additionally the Court finds that extensive arm's-length negotiations have taken place on behalf of separate counsel appointed by Lead Class Counsel to represent the interests of Consumer Settlement Class Members and TPP Settlement Class Members in order to apportion the Settlement Fund between these constituencies and that these arm's length negotiations afforded the structural protection required to ensure adequate representation of these constituencies.

7.       The Court finds that the designated class representatives are appropriate representatives for settlement purposes.  The Court finds that each of these representatives, or an agent or member thereof, has made a purchase or reimbursement payment for one or more of the Class Drugs.

8.       The Court has considered all of the factors enumerated in FED. R. CIV. P. 23(g) and finds that Class Counsel have fairly and adequately represented the interests of the Settlement Classes.

9.     Pursuant to Fed. R. Civ. P. 23(e), the Court hereby finally approves in all respects the Class Settlements set forth in the Agreement and finds that the Class Settlements, the Agreement, as revised in the rebalancing, and the plan of distribution as set forth in Paragraphs III.E-G of the Agreement, are, in all respects, fair, reasonable and adequate, and in the best interest of the Settlement Classes.  The salient changes in the rebalancing are as follows:

(a)     **Increase in Money Available to Consumers.**  $3,125,000 was reallocated from TPPs to Consumers, resulting in Consumer members of Classes 1 and 3 being allocated $25,000,000 of the Settlement Amount and TPPs being allocated $100,000,000 of the Settlement Amount.

(b)     **Change in the Way Class A Drug Claims Are Calculated.**  Class A Drug claims are now based on Plaintiffs' expert's calculation of estimated overcharges or damages associated with the alleged price inflation for Class A Drugs, rather than on the amount of cash payment or co-payment made.  These estimated overcharges will be doubled for the "Heartland Period" December 1, 1997 through December 31, 2003.  This change conforms the Track Two Settlement distribution closer to the distributions in previous settlements approved by this Court in association with the actions against defendants AstraZeneca and BMS.

(c)     **Recharacterization and Additional Documentation Related to Epogen.**  Epogen was moved from a Class A Drug to a Class B Drug because it was consistent with the profile for a Class B Drug and not for a Class A Drug.  Specifically, the spreads for Epogen were calculated by Plaintiff's expert to exceed 30% only in 2003 and then only minimally so, there was minimal or no evidence of spread marketing in connection with Epogen and the Plaintiff's expert concluded that Class 1 and Class 3 members

- 6 -

suffered either minimal or no damage relating to Epogen. Consumer claimants were required to provide documentation evidencing at least one Epogen administration during the eligible period because data received from the Center for Medicare and Medicaid Services ("CMS") did not provide sufficient detail to distinguish an administration of *Epogen* from an administration of *Procrit* due to the fact that *Epogen* and *Procrit* are different brand names for the same biologic compound (epoetin alfa) and share common J-Codes. The additional documentation was necessary to ensure the claimants had made co-payments for Epogen, which is part of this settlement, and not for Procrit, which is not part of this settlement. Furthermore, payments for most administrations of Epogen under Medicare Part B were not based on AWP and are not eligible for compensation in this settlement. Only Epogen administrations – and not Procrit administrations – under Medicare Part B that do not relate to kidney dialysis are eligible for compensation. Administrations for Epogen under Medicare Part B related to dialysis are not eligible for compensation.

(d)     **Additional Documentation Related to Eligard.**  To receive a distribution for Eligard administrations, eligible Consumer claimants are required to provide documentation evidencing at least one Eligard administration during the eligible period. This is necessary because data received from CMS does not provide sufficient detail to distinguish administrations of Eligard from Lupron given that the two drugs share common J-Codes.

(e)     **Additional Documentation Related to Certain Drugs under Medicare Part B.**  To receive a distribution for administrations of certain drugs assigned "not otherwise classified" J-Codes 3490 and J8999 (alcohol injection, bupivacaine, copper

trace/cupric chloride, diltazem hydrochloride, enalaprilat, kineret, labetalol, leucovorin

calcium, manganese chloride, novacaine/procaine, pancuronium bromide, potassium

acetate, propofol, sodium acetate, verapamil HCL and zinc chloride), eligible Class 1

Consumer claimants are required to provide documentation evidencing at least one

administration during the eligible period.  This is necessary because data received from

CMS does not provide sufficient detail to distinguish administration of these drugs from

other drugs covered by the same J-Codes and not part of this Settlement.

   (f) **Payments for Leukine and Novantrone after 2002.**  Administrations of

Leukine and Novantrone after 2002 are no longer eligible for reimbursement.  Defendant

Immunex Corporation sold the rights to market and distribute Leukine and Novantrone in

2002 to non-defendants.

  10. The Court finds that all Class 1 and Class 3 Consumers will receive more than

their actual damages for eligible Class A Drug administrations.  In addition, Class 1 and Class 3

Consumers will receive a substantial portion of their damages for Class B Drug administrations,

and will receive greater than actual damages for some Class B Drugs.

  11. The Court also finds that Class Counsel undertook substantial discovery and

analysis into the Class Drugs and Defendants sufficient to fully evaluate the decision of whether

to recommend this Settlement to the Court and to group the drugs into Class A and Class B.  In

addition, the Court finds that Class Counsel fairly assessed the liability challenges posed by the

facts of this case including the dearth of spread marketing evidence, the challenges associated

with multi-source drugs (including causation issues raised by J-Code identification challenges

and the median price analysis), and the relatively low level of Class damage.  See Plaintiffs'

Supplemental Submission in Support of a Rebalanced Track Two Settlement filed on August 3, 2011 (Dkt. No. 7697).

12.     The Court further approves the establishment of the Settlement Fund as set forth in the Agreement and the Escrow Agreement submitted by the Parties. The Parties are hereby directed to implement and consummate the Class Settlements according to the terms and provisions of the Agreement.   Subject to paragraph 21 below, the Effective Date of the Agreement shall be as set forth in Paragraphs III.K and II.Q of the Agreement and shall not occur until the Final disposition of all appeals relating to the Track Two Settlement, including the Notice of Appeal as to the Order denying her Motion to Intervene (Dkt. No. 7770) filed by Corinna Connick, as well as any appeals of this Order.  In addition, the Parties are authorized to agree to and adopt such amendments and modifications to the Agreement that (i) are consistent in all material respects with this Final Order and Judgment, and (ii) do not limit the rights of the Settlement Classes.

13.     The claims against the Track Two Defendants on behalf of the Classes in the MDL Class Actions are hereby dismissed with prejudice and without costs to any party, except as otherwise provided herein.

14.     Upon the Effective Date of the Agreement, the Class Releasors (as defined in Paragraph II.E of the Agreement) shall release and forever discharge the Released Parties (as defined in Paragraph II.MM of the Agreement) from their respective Released Consumer Class Claims and Released TPP Class Claims (as defined in Paragraphs II.JJ and II.NN of the Agreement).

- 9 -

15.     The Court finds that the Escrow Account is a "Qualified Settlement Fund" as defined in section 1.468B-1(a) of the Treasury Regulations in that it satisfies each of the following requirements:

(a)     The Escrow Account is established pursuant to an order of this Court and is subject to the continuing jurisdiction of this Court;

(b)     The Escrow Account is established to resolve or satisfy one or more contested or uncontested claims that have resulted or may result from an event that has occurred and that has given rise to at least one claim asserting liability arising out of an alleged violation of law; and

(c)     The assets of the Escrow Account are segregated from other assets of the Track Two Defendants, the transferor of payments to the Settlement Fund, and from the assets of persons related to the Track Two Defendants.

16.     Under the "relation-back" rule provided under section 1.468B-1(j)(2)(i) of the Treasury Regulations, the Court finds that:

(a)     The Escrow Account met the requirements of paragraph 15 of this Order prior to the date of this Order approving the establishment of the Settlement Fund subject to the continued jurisdiction of this Court; and

(b)     The Track Two Defendants and the "administrator" under section 1.468B-2(k)(3) of the Treasury Regulations may jointly elect to treat the Escrow Account as coming into existence as a "Qualified Settlement Fund" on the later of the date the Escrow Account met the requirements of paragraphs 15(b) and 15(c) of this Order or January 1 of the calendar year in which all of the requirements of paragraph 15 of this Order were met.  If such relation-back

- 10 -

election is made, the assets held by the Escrow Account on such date shall be treated as having been transferred to the Escrow Account on that date.

17.     Nothing in this Final Order and Judgment, the Class Settlements, the Agreement, or any documents or statements related thereto, is or shall be deemed or construed to be an admission or evidence of any violation of any statute or law or of any liability or wrongdoing by any of the Released Parties.

18.     Class Counsel have moved pursuant to FED. R. CIV. P. 23(h), 54(d) and 52(a) for an award of attorneys' fees and reimbursement of expenses. Pursuant to Rules 23(h)(3) and 52(a) this Court makes the following findings of fact and conclusions of law:

         (a)     that the Class Settlements confer substantial benefits on the Settlement Class Members;

         (b)     that the value conferred on the Settlement Classes is immediate and readily quantifiable (upon this Judgment becoming Final (as defined in the Agreement), Settlement Class Members who have submitted valid Claim Forms will receive cash payments that represent a significant portion of their alleged financial harms);

         (c)     that Class Counsel vigorously and effectively pursued the Settlement Class Members' claims before this Court in this highly complex case;

         (d)     that the Class Settlements were obtained as a direct result of Class Counsel's skillful advocacy;

         (e)     that the Class Settlements were reached following extensive negotiation between Lead Class Counsel and the Track Two Defendants' Counsel, and were negotiated in good-faith and in the absence of collusion;

(f)      that during the prosecution of the Track Two Claims in the MDL Class

Actions, Class Counsel incurred expenses at least in the amount of $10,520,273.88, which

included costs for expert witnesses and other expenses which the Court finds to be reasonable

and necessary to the representation of the Settlement Classes;

(g)      that Settlement Class Members were advised in the notice approved by the

Court that Class Counsel intended to apply for an award of attorneys' fees in an amount of up to

33 1/3% of the Settlement Fund (plus interest thereon from the date of funding of the Settlement

Fund) plus reimbursement of reasonable costs and expenses incurred in the prosecution of this

action, to be paid from the Settlement Fund;

(h)      that few Settlement Class Members have submitted written objections to

the award of attorneys' fees and expenses;

(i)      that counsel who recover a common benefit for persons other than himself

or his client is entitled to a reasonable attorneys' fee from the Settlement Fund as a whole.  *See,*

*e.g., Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980); *Blum v. Stenson*, 465 U.S. 866, 900

n.16 (1984);

(j)      that use of the percentage of the fund method in common fund cases is the

prevailing practice in this Circuit for awarding attorneys' fees and permits the Court to focus on

a showing that a fund conferring benefit on a class resulted from the lawyers' efforts. *In re*

*Thirteen Appeals Arising Out of the San Juan Dupont Plaza Hotel Fire Litig.*, 56 F.3d 295 (1st

Cir. 1995); and

(k)      the requested fee award is within the applicable range of percentage

awards in this Circuit; *In re Relafen Antitrust Litig.*, No. 01-12239 (D. Mass. April 9, 2004)

[Doc. No. 297]; *Mowbray v. Waste Management Holdings*, No. 98-11534-WGY (D. Mass. Aug.

001534-16 289152 V1

2, 2001); *In re Copley Pharmaceutical, Inc. Sec. Litig.*, No. 94-11897-WGY (D. Mass. Feb. 8,

1996); *Wilensky v. Digital Equipment Corp.*, No. 94-10752-JLT (D. Mass. July 11, 2001).

Accordingly, Class Counsel are hereby awarded (i) $ 7,000,000 from the $25,000,000 Settlement

Fund allocated to Consumers in Classes 1 and 3 under the Rebalancing Proposal (representing

28% of the Settlement Fund allocated to Consumers in Classes 1 and 3), and (ii) $30,000,000

from the $100,000,000 Settlement Fund allocated to third-party payors in Classes 2 and 3 under

the Rebalancing Proposal (representing 30% of the Settlement Fund allocated to TPPs in Classes

2 and 3), as Class Counsel's fee and expense award which the Court finds to be fair and

reasonable, and which amount shall be paid to Class Counsel from the Settlement Fund in

accordance with the terms of the Agreement, with interest from the date of the funding of the

Settlement Fund to the date of payment, at the same net interest rate earned by the Settlement

Fund. This award is consistent with attorneys' fee awards previously approved by the Court in

this litigation. The attorneys' fees and expenses awarded by the Court shall be allocated among

Class Counsel by Lead Class Counsel at their discretion. *subject to review by the Court.*

19.     The present and former Class Representatives are hereby compensated in the

following amounts for their reasonable time spent on tasks related to their representation of the

Classes, which shall be paid from the Settlement Fund: Katie Bean, $6,100; Jimmie May Carter,

$6,100; Pat Drewett, $2,000; Virginia Newell, $4,100; Mary Wright, $6,100; Roger Clark,

$6,100; Rev. David Aaronson, $200; Alex K. Gunther, $5,700; Beverly Thomson Shaw, $3,000;

Rebecca Anne Hopkins, $200; Larry Young, $8,800; M. Joyce Howe, $200; Ethel Walters,

$5,700; Muriel Tonacchio, $500.00; United Food & Commercial Workers Unions & Employers

Midwest Health Benefits, $2,310; Sheet Metal Workers National Health Fund, $2,000; Pirelli

Armstrong Tire Corporation Retiree Medical Benefits Trust, $1,010; Teamsters Health &

- 13 -

Welfare Fund of Philadelphia and Vicinity, $2,540; Board of Trustees of Carpenters &

Millwrights of Houston & Vicinity Welfare Trust Fund, $1,300; Philadelphia Federation of

Teachers Health & Welfare Fund, $2,520; Man-U Service Contract Trust Fund, $3,340; and

Pipefitters Local Union 537 Trust Funds, $1,640.

20.    Without affecting the finality of this Final Order and Judgment, the Court retains

continuing and exclusive jurisdiction over all matters relating to administration, consummation,

enforcement, and interpretation of the Agreement and of this Final Order and Judgment, to

protect and effectuate this Final Order and Judgment, and for any other necessary purpose.  The

Track Two Defendants, Class Representatives, and all Settlement Class Members are hereby

deemed to have irrevocably submitted to the exclusive jurisdiction of this Court, for the purpose

of any suit, action, proceeding or dispute arising out of or relating to the Agreement or the

applicability of the Agreement, including the Exhibits thereto, and only for such purposes.

Without limiting the generality of the foregoing, and without affecting the finality of this Final

Order and Judgment, the Court retains exclusive jurisdiction over any such suit, action, or

proceeding.  Solely for purposes of such suit, action, or proceeding, to the fullest extent they may

effectively do so under applicable law, the parties hereto are deemed to have irrevocably waived

and agreed not to assert, by way of motion, as a defense or otherwise, any claim or objection that

they are not subject to the jurisdiction of this Court, or that this Court is, in any way, an improper

venue or an inconvenient forum.

21.    In the event that the Class Settlements do not become effective according to the

terms of the Agreement, this Final Order and Judgment shall be rendered null and void as

provided by the Agreement, shall be vacated and, all orders entered and releases delivered in

- 14 -

connection herewith shall be null and void to the extent provided by and in accordance with the Agreement.

22.     No Class Member, either directly, representatively, or in any other capacity (other than a Class Member identified on Exhibit A who validly and timely elected to be excluded from one or more of the Classes), shall commence, continue, or prosecute any action or proceeding against any or all Released Party or Parties in any court or tribunal asserting any of the Released Claims defined in the Agreement, and each Class Releasor is hereby permanently enjoined from so proceeding.

23.     Pursuant to FED. R. CIV. P. 54(b) this Court expressly finds that there are no remaining claims between Class Plaintiffs and the Track Two Defendants in the MDL.  There are no subsequent proceedings between the Class Plaintiffs and any remaining party in the MDL that will affect the Court's decision with respect to Class Plaintiffs' settlement with the Track Two Defendants.  No party in the MDL will be prejudiced by the immediate entry of this Final Order and Judgment in accordance with the Settlement Agreement.  Pursuant to FED. R. CIV. P. 54(b), this Court expressly determines that there is no just cause for delay and expressly directs that this Final Order and Judgment, upon filing in 01-CV-12257-PBS, be deemed as a final judgment with respect to each of the Settlement Classes, and specifically all such Settlement Class Members' Released Claims against the Track Two Defendants and all Released Parties.

DATED:     12 |8|2011                    _____
                                          Hon. Patti B. Saris

- 15 -

## CERTIFICATE OF SERVICE BY LEXISNEXIS FILE & SERVE
### Docket No. MDL 1456

I, Steve W. Berman, hereby certify that I am one of plaintiffs' attorneys and that, on December 2, 2011, I caused copies of **[PROPOSED] FINAL ORDER AND JUDGMENT GRANTING FINAL APPROVAL TO PROPOSED TRACK TWO CLASS ACTION SETTLEMENTS, APPROVING PROPOSED ALLOCATION OF SETTLEMENT FUNDS, AND APPROVING CLASS COUNSEL'S APPLICATION FOR ATTORNEYS' FEES, REIMBURSEMENT OF LITIGATION EXPENSES AND COMPENSATION FOR CLASS REPRESENTATIVES** to be served on all counsel of record by causing same to be posted electronically via LEXIS-Nexis File & Serve.

_/s/ Steve W. Berman_

Steve W. Berman

# EXHIBIT H

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL NO. 1456 |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | CIVIL ACTION: 01-CV-12257-PBS Judge Patti B. Saris |

**AFFIDAVIT OF SHANIN SPECTER IN SUPPORT OF
CLASS PLAINTIFFS' JOINT PETITION FOR ATTORNEYS' FEES
AND REIMBURSEMENT OF EXPENSES IN RELATION TO
SETTLEMENT WITH GSK FILED ON BEHALF OF KLINE & SPECTER, P.C.**

I, Shanin Specter, being duly sworn, depose and say:

1.       I am a partner of the law firm of Kline & Specter, P.C., one of the counsel for

plaintiffs in this matter.  I am submitting this Affidavit in support of all plaintiffs' counsel's

(including my firm's) application for an award of attorneys' fees and reimbursement of

expenses provided in connection with the services rendered to plaintiffs and the class by my

firm in the course of this litigation.

2.       I am an attorney in good standing and duly licensed and admitted to the Bars of

Commonwealth of Pennsylvania; United States District Court for the Eastern, Middle and

Western Districts of Pennsylvania; and the United States Courts of Appeals for the Third and

Ninth Circuit.  The statements set in this Declaration are based on first-hand knowledge, about

which I could and would testify competently in open Court if called upon to do so as well as

information gathered within my firm by others.

3.       This firm was counsel of record for various individual plaintiffs and the class in

this litigation and the companion state court litigation.  As one of the counsel for the plaintiffs

P_08084

Case 1:01-cv-12257-PBS Document 8024-2 Filed 01/05/12 Page 20 of 98

Case 1:01-cv-12257-PBS Document 7910 Filed 11/17/11 Page 37 of 49
Case 1:01-cv-12257-PBS Document 6820 Filed 01/06/2010 Page 39 of 43

and class, my firm performed services on this matter as follows: correspondence, telephone conferences and meetings with the class representatives and many individual consumer class members regarding the status of their claims; preparation for and defense of all depositions of the class representatives; factual discovery including extensive collection of all relevant medical and billing records for the class representatives and hundreds of individual consumer class members; factual and legal research regarding claims of the consumer class; drafting of pleadings relating to the consumer class; and email, telephone and live conferences with co-counsel regarding the claims of the consumer class. Additionally, my firm was involved in document reviews related to claims of the TPP class, and drafted pleadings and attended strategy discussions with co-counsel regarding the same.

4.    Attached, as Exhibit 1, is a detailed summary indicating the amount of time spent by each attorney and paralegal of my firm who worked on this litigation and the lodestar calculation based on my firm's historical billing rates (the rates for each timekeeper that were in effect during this litigation, and when the work was performed). The schedule was prepared from computerized records that were contemporaneously generated and kept by my firm in the ordinary course of its business. Time expended in preparing this application for fees and reimbursement of expenses has not been included in this lodestar.

5.    From the inception of the case through August 10, 2006, my firm expended a total of 11,404 hours on behalf of the various plaintiffs and the class. The total lodestar amount for these hours based on my firm's historical hourly billing rates is $3,449,772.32. The hourly rates set out in Exhibit 1 are the same or similar rates that my firm charged, and collected based upon, and which have been the basis for our fee requests from other courts.

P_08085

2

Case 1:01-cv-12257-PBS   Document 8024-2   Filed 01/05/12   Page 21 of 98

Case 1:01-cv-12257-PBS   Document 7910   Filed 11/17/11   Page 38 of 49
Case 1:01-cv-12257-PBS   Document 6820   Filed 01/06/2010   Page 40 of 43

6.     In addition, as detailed in Exhibit 2, my firm expended a total of $568,977.50 in expenses in connection with the prosecution of this litigation.  None of these expenses have been reimbursed to date.

7.     My firm recorded these expenses as they were incurred, and they are reflected in its computerized bookkeeping records which were created from invoices, receipts and other proofs of the charges and payments.

8.     Thus, for this litigation, the total historical lodestar of my firm is $3,449,772.32 and we incurred expenses of $568,977.50.

| CASE | HOURS | LODESTAR | EXPENSES |
|---|---|---|---|
| AWP MDL | 6,681.75 | $2,093,136.25 | $404,180.02 |
| AWP NJ | 1,284.00 | $448,393.75 | $47,491.77 |
| AZ AWP | 77.00 | $21,678.75 | $3,354.42 |
| AZ Lupron[1] | 3,361.25 | $886,563.57 | $113,951.29 |
| TOTALS: | 11,404.00 | $3,449,772.32 | $568,977.50 |

I declare under penalty of perjury under the laws of the Commonwealth of Massachusetts that the foregoing is true and correct.

Executed this 13th day of June, 2007.

Shanin Specter, Esquire
KLINE & SPECTER, P.C.
1525 Locust Street
The Nineteenth Floor
Philadelphia, PA  19102
215-772-1000 telephone
215-735-0957 facsimile

---

[1]  Note these figures do not include the amount apportioned to *Swanston in* the Lupron litigation.

3

P_08086

# EXHIBIT I

Shanin Specter, Esquire
Donald E. Haviland, Jr., Esquire
KLINE & SPECTER
1800 Chapel Avenue, Suite 302
Cherry Hill, NJ 08002
856-424-9162 telephone



COUNSEL FOR PLAINTIFF AND THE CLASS

| | |
|---|---|
| INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL NO. 68 WELFARE FUND, <br><br>                          Plaintiff, <br><br>        v. <br><br> AstraZeneca PLC; AstraZeneca Pharmaceuticals LP; AstraZeneca LP; Zeneca, Inc.;TAP Pharmaceutical Products, Inc.; Abbott Laboratories; Takeda Chemical Industries, Ltd.; Bayer AG; Bayer Corporation; Miles Laboratories, Inc.; Cutter Laboratories, Inc.; GlaxoSmithKline, P.L.C.; SmithKline Beecham Corporation; Glaxo Wellcome, Inc.; Pharmacia Corporation; Pharmacia & Upjohn, Inc.; Monsanto Company; G.D. Searle Company; Sanofi-Synthelabo Inc.; Johnson & Johnson; Alza Corporation; Centocor, Inc.; Ortho Biotech, Inc.; Alpha Therapeutic Corporation; Hoffman La-Roche Inc.; Amgen, Inc.; Immunex Corporation; Aventis Pharmaceuticals, Inc.; Aventis Behring L.L.C.; Hoechst Marion Roussel, Inc.; Centeon, L.L.C.; Armour Pharmaceuticals; Baxter International Inc.; Baxter Healthcare Corporation; Immuno-U.S., Inc.; Boehringer Ingelheim Corporation; Ben Venue Laboratories, Inc.; Bedford Laboratories; Roxane Laboratories, Inc.; Bristol-Myers Squibb Company; Oncology Therapeutics Network Corporation; Apothecon, Inc.; Dey, Inc.; Fujisawa Pharmaceutical Co., Ltd.; Fujisawa Healthcare, Inc.; Fujisawa USA, Inc.; Novartis International AG; Novartis Pharmaceutical Corporation; Sandoz Pharmaceutical Corporation; Schering-Plough Corporation; Warrick Pharmaceuticals Corporation; Sicor, Inc.; Gensia Sicor Pharmaceuticals, Inc.; Wyeth; Wyeth Pharmaceuticals; Saad Antoun, M.D.; Stanley C. Hopkins, M.D.; Robert A. Berkman, M.D.; Does 1-50; ABC Corporations 1-50; and XYZ Partnerships; and Associations 1-50, <br><br>                        Defendants. | SUPERIOR COURT OF NEW JERSEY <br><br> EQUITY DIVISION <br><br> MONMOUTH COUNTY <br><br> CIVIL ACTION NO. _____ <br><br> JURY TRIAL DEMANDED <br><br><br> **CLASS ACTION COMPLAINT** |

© 2003 KLINE & SPECTER

federal question is raised by any of the claims asserted.  To the extent any of plaintiff claims or factual allegations herein may be construed to have stated any claim under federal law, such claim is expressly and undeniably disavowed and disclaimed by plaintiff and the Class.  Moreover, to the extent any of plaintiff' claims or factual allegations herein are urged by any Defendant to have stated any claim under federal law, plaintiff expressly disavows such claims or allegations and reserves the right to modify this Complaint to conform its claims.

20.     This Court has subject matter jurisdiction because this is an action for damages which, in the aggregate, exceeds $10,000.00 exclusive of interest, costs and attorneys' fees.

21.     This Court has jurisdiction over the Defendants because they are corporations regulated under the laws of the State of New Jersey and are present or located in, do sufficient business in, have sufficient minimum contacts with, and/or otherwise intentionally avail themselves of the laws and markets of the State of New Jersey through the manufacture, promotion, marketing, distribution and sale of drugs and products in New Jersey.

22.     Venue is proper in this Court since plaintiff, as well as numerous Class members, were prescribed and paid for cancer, inhalant and miscellaneous other drugs from doctors, hospitals and others located in this County and throughout New Jersey, and otherwise engaged in the transactions which form the basis of this action by having paid for these drugs.  In particular, defendant Saad Antoun, M.D. resides and works in this County.

## THE PARTIES

### Plaintiff

23.   .  Plaintiff, International Union of Operating Engineers, Local No. 68 Welfare Fund, resides in the State of New Jersey.

24.     Plaintiff and the Class paid for cancer, inhalant and miscellaneous other drugs manufactured, marketed, distributed and sold by defendants in New Jersey and throughout the country and were charged and paid a price based in whole or in part on the AWP for these drugs each time.  Among other drugs, plaintiff and the Class have paid for the following: acyclovir, albuterol sulfate, bicalutamide, bleomycin, calcitrol, carboplatin, cisplatin, cromolyn sodium, cyclosporine, darbepoetin alfa, dexamethosone, docetaxel, dolasetron mesylate, doxorubicin hydrochloride, epoetin alpha, etidronate disodium, etoposide, Factor VIII, Factor IX, filgrastim, flutamide, glyburide, goserelin acetate, granisetron, heparin sodium, ipratropium bromide, ironatecan, leucovorin calcium, lansoprazole, metaproterenol, mycophenolate mofetil, omeprazole, ondansetron, paclitaxel, pamidronate disodium, tacrolimus, tamoxifen, triptorelin pamoate and vancomycin, as well as other cancer (antineoplastic, antianemic, antihypercalcemic, and antineotropenic), inhalant, and miscellaneous other (antihemorrahagic, antihemophilic, antidiabetic, and immunosuppressant) drugs not listed herein.  These drugs were manufactured, distributed, marketed and sold by the defendants named herein.

25.     Accordingly, plaintiff and the Class suffered direct injury and damages as a result of the unlawful conduct of all of the defendants set forth herein.

**The Defendants**

26.     The Defendants are AstraZeneca PLC, AstraZeneca Pharmaceuticals LP, AstraZeneca LP, Zeneca, Inc., TAP Pharmaceutical Products, Inc., Abbott Laboratories, Takeda Chemical Industries, Ltd., Bayer AG, Bayer Corporation, Miles Laboratories, Inc., Cutter Laboratories, Inc., GlaxoSmithKline, P.L.C., SmithKline Beecham Corporation, Glaxo Wellcome, Inc., Pharmacia Corporation, Pharmacia & Upjohn, Inc., Monsanto Company, G.D. Searle, Sanofi-Synthelabo, Inc., Johnson & Johnson, Alza Corporation, Centocor, Inc., Ortho Biotech, Alpha Therapeutic

© 2003 KLINE & SPECTER                                    9

Corporation, Hoffman La-Roche Inc., Amgen, Inc., Immunex Corporation, Aventis Pharmaceuticals, Inc., Aventis Behring L.L.C., Hoechst Marion Roussel, Inc., Centeon, L.L.C., Armour Pharmaceuticals, Baxter International Inc., Baxter Healthcare Corporation, Immuno-U.S., Inc., Boehringer Ingelheim Corporation, Ben Venue Laboratories, Inc., Bedford Laboratories, Roxane Laboratories, Inc., Bristol-Myers Squibb Company, Oncology Therapeutics Network Corporation, Apothecon, Inc., Dey, Inc., Fujisawa Pharmaceutical Co., Ltd., Fujisawa Healthcare, Inc., Fujisawa USA, Inc., Novartis International AG, Novartis Pharmaceutical Corporation, Sandoz Pharmaceutical Corporation, Schering-Plough Corporation, Warrick Pharmaceuticals Corporation, Sicor, Inc., Gensia Sicor Pharmaceuticals, Inc., Wyeth, Wyeth Pharmaceuticals, Saad Antoun, M.D., Stanley C. Hopkins, M.D. and Robert A. Berkman, M.D.  [The foregoing corporate defendants, the individual defendants and various "doe" defendants, "ABC" corporations, and "XYZ" partnerships and associations whose names and identifies are not yet known are collectively referred to herein as "defendants."]

27.     Defendant, AstraZeneca PLC ("AstraZeneca PLC"), the third largest pharmaceutical company in the world, is a British corporation with its corporate headquarters, located at 15 Stanhope Gate, London W1K 1LN, U.K.  AstraZeneca PLC was formed on April 6, 1999 through the merger of Astra AB of Sweden and Zeneca Group PLC of the United Kingdom.  AstraZeneca PLC researches, develops, and manufactures generic and brand name pharmaceutical drugs for use in seven therapeutic areas: cardiovascular, central nervous system, gastrointestinal, infection, oncology, pain control and anaesthesia, and respiratory.  One of Zeneca Group PLC's key products, which it brought with it to the merger, was Zoladex® (goserelin acetate).  Like its competitor, Lupron®, Zoladex® is used in the treatment of prostate cancer in men, endometriosis and infertility in women, and central precocious puberty in children.

© 2003 KLINE & SPECTER                    10

28.     Defendant, AstraZeneca Pharmaceuticals LP ("AstraZeneca"), is a Delaware limited partnership with its headquarters located at 1800 Concord Pike, Wilmington, Delaware 19850. AstraZeneca manufactures, markets, sells and distributes cancer and miscellaneous other drugs, like Zoladex®, throughout New Jersey and the United States.

29.     Defendant, AstraZeneca LP ("AstraZeneca LP"), is a limited partnership with its principal place of business at 725 Chesterbrook Boulevard, Wayne, Pennsylvania 19087. AstraZeneca LP maintains an additional facility in Westborough, Massachusetts.  AstraZeneca LP is a developer and manufacturer of cancer and miscellaneous other drugs.

30.     Defendant, Zeneca, Inc. ("Zeneca"), is a Delaware corporation with its principal place of business at 1800 Concord Pike, Wilmington, Delaware 19850. Until April 1999, Zeneca, Inc. was a subsidiary of Zeneca Group PLC (UK).

31.     Defendants, AstraZeneca PLC, AstraZeneca Pharmaceuticals LP, AstraZeneca LP and Zeneca, Inc. [hereinafter the "AstraZeneca Defendants"], are manufacturers, marketers, promoters, sellers and distributors of cancer and miscellaneous other drugs, including the aforementioned Zoladex®, and Casodex® (bicalutamide), Arimidex® (anastrozole), Deprivan (propofol), Nolvadex® (tamoxifen), Cefotan®, Elavil Injection, Faslodex®, Foscavir®, Merrem®, Tenormin Injection, Tomodex (ralitrexed), Xylocaine Injection, Prilosec® (omeprazole) and Nexium™ (esomeprazole), direct competitor drugs of TAP's Prevacid®.  On June 23, 2003, it was reported that one or more of the AstraZeneca Defendants pled guilty to violating federal law by inflating the AWP for Zoladex® and conspiring with doctors to bill for free samples of the drug.  The AstraZeneca Defendants paid $354.9 million in damages and fines.  In light of, *inter alia*, one or more of the AstraZeneca Defendants agreement to settle civil and criminal charges with the federal government, it is believed and therefore averred that the AstraZeneca Defendants engaged in

© 2003 KLINE & SPECTER                      11

unlawful conduct similar to that of the other defendants with respect to their marketing, promotion, sales and distribution of cancer, and miscellaneous other drugs that are paid for by plaintiff and the Class.

32.    Defendant, TAP Pharmaceutical Products, Inc. ("TAP"), is a joint venture between Takeda Chemical Industries, Ltd. and Abbott Laboratories. TAP's United States headquarters is located at 675 North Field Drive, Lake Forest, Illinois 60045. Under a partnership agreement between Abbott and Takeda, TAP (owned 50 percent by Abbott and 50 percent by Takeda), together with its subsidiary, TAP Pharmaceuticals, Inc., develops, markets, promotes, and sells pharmaceutical products for the United States and Canada. One of these drugs is Lupron® (leuprolide acetate for depot suspension), which, like Zoladex®, is used in the treatment of prostate cancer in men, endometriosis and infertility in women, and central precocious puberty in children. Since Lupron® is the subject of a class action case pending in Cape May County against TAP, Abbott and Takeda, no claim is made herein for Lupron® damages against these defendants. However, to extent other defendants participated in a fraudulent scheme and conspiracy, which had the effect of causing damages for Lupron®, the claims set forth herein include the joint and several liability of these defendants for Lupron®. Another of these drugs is Prevacid® (lansoprazole), which, like Prilosec®, is used to treat peptic ulcer disease and gastro-esophageal reflux disease.

33.    Defendant, Abbott Laboratories ("Abbott"), is a highly diversified healthcare corporation the principal business of which is the discovery, development, manufacture, and sale of a broad and diversified line of health care products and services. Abbott's business includes pharmaceuticals, nutritionals, hospital products, and diagnostics. Abbott's world headquarters is located in Abbott Park, Illinois. Abbott manufactures, markets, sells and distributes numerous

cancer and miscellaneous other drugs which are sold throughout New Jersey and the United States. Moreover, Abbott distributes Prevacid® and Lupron® for TAP.

34.     Defendant, Takeda Chemical Industries, Ltd. ("Takeda"), is Japan's largest pharmaceutical company and is among the largest in the world. Headquartered in Osaka, Japan, Takeda discovers, develops, manufactures and markets a broad range of pharmaceutical products. Takeda Pharmaceuticals America was created to take advantage of Takeda's growing, international pharmaceutical presence. Takeda Pharmaceuticals America's U.S. headquarters is in Lincolnshire, Illinois. Takeda manufactures, markets, sells and distributes numerous prescription drugs, vitamins and pharmaceutical products throughout New Jersey and the United States. Moreover, Takeda manufactures and ships Prevacid® and Lupron® to the United States.

35.     Defendants, Abbott, Takeda and TAP, through Defendant TAP, have pleaded guilty to federal criminal and civil fraud charges for, among other things, conspiring to violate the Prescription Drug Marketing Act ("PDMA") by, *inter alia*, providing free samples of Lupron® to medical providers and encouraging them to charge Medicare, other insurance programs and patients in New Jersey and throughout the United States for those free samples. This conspiracy was in violation of the federal conspiracy statute, 18 U.S.C. § 371 (Conspiracy to Commit Offense or to Defraud United States). TAP agreed to pay over $890 million in fines and civil penalties to the federal government and the states, of which a portion was paid to New Jersey. The government agreed not to prosecute Abbott and Takeda in return for TAP's compliance with the plea agreement. As part of its plea agreement, TAP included both of its drugs, Lupron® and Prevacid®. However, according to the government's Sentencing Memorandum, the fines paid to compensate the federal government and the states in connection with the fraudulent scheme only pertained to Lupron®, not Prevacid®. Moreover, the fines and civil penalties paid did not compensate plaintiff and the Class

© 2003 KLINE & SPECTER                                13

for their losses. It is believed and therefore averred that defendants TAP, Abbott and Takeda engaged in unlawful conduct similar to that of the other defendants with respect to their marketing, promotion, sales and distribution of cancer and miscellaneous other drugs that are paid for by plaintiff and the Class.

36.     Defendant, Bayer Corporation ("Bayer"), is a highly diversified healthcare company whose principal business is the development, manufacture and sale of healthcare products and services, including pharmaceuticals. Bayer is located at 100 Bayer Road, Pittsburgh, Pennsylvania 15205-9741.

37.     Defendant, Bayer AG ("Bayer AG"), is the parent company of Bayer, the subsidiary in the United States that markets, sells and distributes prescription drugs to clinicians nationwide. Bayer AG is a German corporation with its headquarters located at 51368 Leverkusen, Germany. Bayer AG acquired Cutter Laboratories, Inc. ("Cutter") in 1974 and Miles Laboratories, Inc. ("Miles") in 1978 and the two companies are now subsidiaries of Bayer AG.

38.     Defendants Bayer AG, Bayer, Miles and Cutter [hereinafter the "Bayer Defendants"] are manufacturers, sellers and distributors of, among other things, prescription drugs used in the treatment of cancer, among other types of prescription drugs. One of the Bayer Defendants' drugs is Viadur® (leuprolide acetate implant), which is similar to Zoladex® and Lupron®. The Bayer Defendants license Viadur® from Alza Corporation, another defendant herein, and then the Bayer Defendants market and distribute the drug. The Bayer Defendants also are involved in the manufacturing, marketing, sales and distribution of drugs used to treat hemophilia, including KoaTE®, Kogenate and KONyNE®, among other drugs.

39.     In January 2002, Bayer, like TAP and the AstraZeneca Defendants, agreed to plead guilty to federal criminal charges and to settle with the DOJ, paying fines and penalties totaling more

than $257 million relating to the federal criminal investigation of Bayer. It is believed and therefore averred that the Bayer Defendants engaged in unlawful conduct similar to that of the other defendants herein with respect to their marketing, promotion, sales and distribution of cancer and miscellaneous other drugs that are paid for by plaintiff and the Class.

40.     Defendant, Glaxo Wellcome, P.L.C. ("GlaxoSmithKline"), is an English public limited company incorporated on December 6, 1999 under English law, with its corporate headquarters located at 980 Great West Road, Brentford, Middlesex, TW8 9GS, England. GlaxoSmithKline P.L.C. ("GlaxoSmithKline") was formed on December 27, 2000 with the merger of Glaxo Wellcome, P.L.C. and SmithKline Beecham, P.L.C., both English public limited companies. GlaxoSmithKline P.L.C. has its operational headquarters at One Franklin Plaza, 200 North 16th Street, Philadelphia, Pennsylvania 19102, and at Research Triangle Park, North Carolina 27709. GlaxoSmithKline conducts extensive business, including the sale of pharmaceuticals that are the subject of the scheme alleged herein.

41.     Defendant, SmithKline Beecham Corporation ("SmithKline"), a wholly owned subsidiary of GlaxoSmithKline P.L.C. is a Pennsylvania corporation with its principal place of business at One Franklin Plaza, 200 North 16th Street, Philadelphia, Pennsylvania 19102. SmithKline conducts extensive business, including the sale of pharmaceuticals that are the subject of the scheme alleged herein.

42.     Defendant, Glaxo Wellcome, Inc. ("Glaxo"), a wholly owned subsidiary of GlaxoSmithKline P.L.C., is a North Carolina corporation with its principal place of business at 5 Moore Drive, Research Triangle Park, North Carolina 27709. Glaxo conducts extensive business, including the sale of pharmaceuticals that are the subject of the alleged scheme herein.

43.     Defendants, GlaxoSmithKline, SmithKline and Glaxo [hereinafter the "GlaxoSmithKline Defendants"], are manufacturers, sellers and distributors of cancer, inhalation and miscellaneous other drugs. One such drug used in connection with cancer treatment is the antiemetic drug, Zofran® (ondansetron).  Prior to the Glaxo/SmithKline merger, one of SmithKline's drugs was the antiemetic, Kytril® (granisetron), which is now one of Hoffman La-Roche's drugs, another defendant herein.  GlaxoSmithKline is also involved in the manufacture, marketing, sales and distribution of inhalation drugs used in the treatment of asthma, namely Ventolin® and Flovent® (albuterol sulfates).  Like TAP, the AstraZeneca Defendants and Bayer, the GlaxoSmithKline Defendants have agreed to resolve the federal criminal investigation of them and to pay fines and civil penalties totaling more than $86 million.  It is believed and therefore averred that the GlaxoSmithKline Defendants engaged in unlawful conduct similar to that of the other defendants with respect to their marketing, promotion, sales and distribution of cancer, inhalation and miscellaneous other drugs that are paid for by plaintiff and the Class.

44.     Defendant, Pharmacia Corporation ("Pharmacia"), is a Delaware corporation located at 100 Route 206 North, Peapack, New Jersey 02977.  Pharmacia was created in April 2000 through the merger of Pharmacia & Upjohn ("P&U") with Monsanto Company ("Monsanto") and its G.D. Searle ("Searle") unit.  Pharmacia manufactures, sells and distributes various cancer and miscellaneous other drugs.

45.     Defendant, G.D. Searle Company a/k/a G. D. Searle & Co. ("Searle"), is a Delaware corporation with its principal place of business located at 5200 Old Orchard Road, Skokie, Illinois 60077.  Searle became a subsidiary of Pharmacia in the 1999 Monsanto-P&U merger.  Searle manufactures, distributes and sells pharmaceutical drugs that are the subject of the scheme alleged herein.

© 2003 KLINE & SPECTER                    16

46.     Defendants Pharmacia, P&U, Monsanto and Searle [hereinafter collectively "the Pharmacia Defendants"], are manufacturers, sellers and distributors of, among other things, a prescription drug known as Trelstar™ Depot (triptorelin pamoate), which is similar to TAP's Lupron®, AstraZeneca's Zoladex®, and Bayer's Viadur®, concerning the treatment of prostate cancer, and another drug Synarel® (nafarelin acetate) which is similar to Lupron®, Zoladex® and Viadur® in connection with treatment of endometriosis in women and central precocious puberty in children. Adriamycin® (doxorubicin) is a cancer drug manufactured and sold by the Pharmacia defendants, among others.  It is believed and therefore averred that the Pharmacia Defendants engaged in unlawful conduct similar to that of the other defendants with respect to their marketing, promotion, sales and distribution of cancer and miscellaneous other drugs that are paid for by plaintiff and the Class.

47.     Defendant, Sanofi-Synthelabo Inc. ("Sanofi"), is a French corporation located at 174, avenue de France, 75013 Paris, France, which has designated its 90 Park Avenue, New York, New York location as its commercial headquarters in the United States and the address where service upon its authorized agent can be made.  Additionally, Sanofi maintains its North American pharmaceutical research and development headquarters at 11 Great Valley Parkway, Malvern, Pennsylvania 19355.  Sanofi manufactures, markets, promotes, sells and distributes various cancer and miscellaneous other drugs.  Among these products is Eligard™ (leuprolide acetate) which is similar to Lupron®, Zoladex®, Viadur® and Trelstar™.  It is believed and therefore averred that Sanofi has engaged in unlawful conduct similar to that of the other defendants with respect to their marketing, promotion, sales, and distribution of cancer and miscellaneous other drugs that are paid for by plaintiff and the Class.

© 2003 KLINE & SPECTER                    17

48.     Defendant, Johnson & Johnson ("J&J"), is a highly diversified healthcare corporation organized and existing under the laws of the State of New Jersey with a principal place of business and corporate headquarters located at One Johnson & Johnson Plaza, New Brunswick, New Jersey 08933. At all times material hereto, J&J, by and through its wholly-owned subsidiary companies, and their respective officers, directors, employees and agents, was in the business of manufacturing, promoting, marketing, distributing and selling healthcare products and services to medical providers, among others.

49.     Defendant, Alza Corporation ("Alza"), is a wholly-owned subsidiary company of Defendant J&J as of June 22, 2001, and has its corporate headquarters in Mountain View, California. Alza develops, manufactures and licenses Viadur®, among other drugs, a bioequivalent drug to Lupron®, Zoladex®, Trelstar™, and Eligard™, which is used in the treatment of prostate cancer.

50.     Defendant, Centocor, Inc. ("Centocor"), is a Pennsylvania corporation and has been a wholly owned subsidiary of Defendant J&J since its acquisition by J&J in October 1999. Centocor's principal place of business is located at 244 Great Valley Parkway, Malvern, Pennsylvania 19355-1312. Centocor manufactures, distributes, markets and sells prescription drugs to providers nationwide, including pharmaceuticals that are the subject of the scheme alleged herein, such as Remicaid.

51.     Defendant, Ortho Biotech ("Ortho"), is a New Jersey corporation and has been a wholly owned subsidiary of Defendant J&J since its formation by J&J in 1990. Ortho's principal place of business is located at 700 U.S. Highway, Route 202 South, Raritan, New Jersey 08869. Ortho is a biotechnology company. Ortho manufactures, distributes, markets and sells prescription drugs to providers nationwide, including pharmaceuticals that are the subject of the scheme alleged herein, such as Procrit® (epoetin alfa).

© 2003 KLINE & SPECTER                    18

52.     Defendant, J&J, along with its various other affiliated and subsidiary companies, including Centocor, Ortho, and Alza [hereinafter collectively "the J&J Defendants"], manufactures, distributes, markets and sells cancer and miscellaneous other drugs.  It is believed and therefore averred that the J&J Defendants have engaged in unlawful conduct similar to that of the other defendants with respect to their marketing, promotion, sales and/or distribution of cancer and miscellaneous other drugs that are paid for by plaintiff and the Class.

53.     Defendant, Alpha Therapeutic Corporation ("Alpha"), is a California corporation with its corporate headquarters located at 5555 Valley Boulevard, Los Angeles, California 90032-3520. Alpha develops, manufactures, markets, distributes and sells biopharmaceutical products such as Factor VIII.  It is believed and therefore averred that Alpha engaged in unlawful conduct similar to that of the other defendants with respect to their marketing, promotion, sales and distribution of miscellaneous other drugs that are paid for by plaintiff and the Class.

54.     Defendant, Hoffman LaRoche, Inc., ("Hoffman"), is a corporation with its principal place of business at 340 Kingsland Street, Nutley, NJ 07110.  Hoffman manufactures, markets, distributes and sells cancer and miscellaneous other drugs, which are the subject of the scheme alleged herein.  Among others, Hoffman sells the cancer drug Kytril®, which it acquired from GlaxoSmithKline as part of the merger of Glaxo and SmithKline in 2000, and the cancer drugs Roferon®-A (interferon 2-alpha), Vesanoid® (tretinoin), and Xeloda® (capecitabine).  It is believed and therefore averred that Hoffman engaged in unlawful conduct similar to that of the other defendants with respect to its marketing, promotion, sales and distribution of cancer and miscellaneous other drugs that are paid for by plaintiff and the Class.

55.     Defendant, Amgen, Inc. ("Amgen"), is a California corporation with its principal place of business at One Amgen Center Drive, Thousand Oaks, California 91320-1799.  Amgen is

© 2003 KLINE & SPECTER                    19

a biotechnology company that develops, manufactures, distributes, markets and sells cancer and miscellaneous other drugs, which are the subject of the scheme alleged herein.

56.    Defendant, Immunex Corporation ("Immunex"), is a biopharmaceutical company with its principal place of business located at 51 University Street, Seattle, Washington 98101. Immunex was acquired by Amgen, Inc. on July 15, 2002. Immunex manufactures, distributes and sells pharmaceutical drugs that are the subject of the alleged scheme herein.

57.    Defendants, Amgen and Immunex [hereinafter the "Amgen Defendants"], are manufacturers, sellers and distributors of, among other things, cancer and miscellaneous other drugs. It is believed and therefore averred that the Amgen Defendants engaged in unlawful conduct similar to that of the other defendants with respect to its marketing, promotion, sales and distribution of cancer and miscellaneous other drugs that are paid for by plaintiff and the Class.

58.    Defendant, Aventis Pharmaceuticals, Inc. ("Aventis"), is a Delaware corporation with its corporate headquarters at 300 Somerset Corporate Boulevard, Bridgewater, New Jersey, 08807-2854. Aventis was formerly known as Hoechst Marion Roussel, Inc. ("Hoechst"). Aventis is the United States pharmaceutical business of Aventis S.A. Aventis S.A. was created on December 15, 1999 through the merger of Hoechst A.G. and Rhône-Poulenc S.A. Also on this date, the subsidiaries of Hoechst A.G. and Rhône-Poulenc S.A., Hoechst Marion Roussel A.G. and Rhône-Poulenc Rorer Inc. formed Aventis Pharma A.G. The United States pharmaceutical business of Aventis Pharma A.G. is Aventis Pharmaceuticals, Inc. Aventis manufactures and distributes cancer and miscellaneous other drugs.

59.    Defendant, Aventis Behring L.L.C. ("Aventis Behring"), is an Illinois limited liability corporation with its principal place of business at 1020 First Avenue, King of Prussia, Pennsylvania, 19406. Aventis Behring was formerly known as Centeon, L.L.C. Aventis Behring conducts

extensive business, including the sale of pharmaceuticals that are the subject of the scheme alleged herein.

60.     Defendant, Hoechst Marion Roussel, Inc. ("Hoechst"), prior to its acquisition by Aventis, was a Delaware corporation with its principal place of business located at 10236 Marion Park Drive, Kansas City, Missouri, 64137-1405. Hoechst conducts extensive business, including the sale of pharmaceuticals that are the subject of the scheme alleged herein.

61.     Defendant, Centeon L.L.C. ("Centeon"), was formerly a 50/50 joint venture with Aventis Behring. On January 10, 1996, Hoechst AG and Rhone-Poulenc Rorer formed Centeon. Centeon was headquartered in King of Prussia, Pennsylvania. Centeon was formerly known as Armour Pharmaceuticals Co. Centeon conducted extensive business, including the sale of pharmaceuticals that are the subject of the scheme alleged herein.

62.     Defendant, Armour Pharmaceuticals ("Armour"), is a subsidiary of Rhone-Poulenc Rorer, with headquarters at 500 Arcola Road, Collegeville, PA 19426-3909. Armour is a global pharmaceutical company which develops, manufacturers and markets drugs, including the sale of pharmaceuticals that are subject of the scheme alleged herein.

63.     Defendants, Aventis, Aventis Behring, Hoechst, Centeon and Armour [hereinafter the "Aventis Defendants"], are manufacturers, sellers and distributors of, among other things, cancer and miscellaneous other drugs. It is believed and therefore averred that the Aventis Defendants engaged in unlawful conduct similar to that of the other defendants with respect to their marketing, promotion, sales and distribution of cancer and miscellaneous other drugs that are paid for by plaintiff and the Class.

64.     Defendant, Baxter International Inc. ("Baxter"), is a Delaware corporation with its principal place of business at One Baxter Parkway, Deerfield, Illinois, 60015. Baxter manufactures

and distributes prescription drugs to clinical administrators. Baxter is a global medical products company that develops, manufactures, markets and distributes drugs to treat cancer, trauma, hemophilia, immune deficiencies, infectious diseases, kidney disease and other disorders.

66.     Defendant, Baxter Healthcare Corporation ("Baxter Healthcare"), is the principal domestic operating subsidiary of Baxter International. Baxter Healthcare is a global medical products and services company with emphasis on blood therapies, cardiovascular medicine, medication delivery and renal therapy.

66.     Defendant, Immuno-U.S., Inc. ("Immuno"), is a wholly owned subsidiary of Baxter International, Inc. with its principal place of business located at 1200 Parkdale Road, Rochester, MI 48307. Immuno is a bio-pharmaceutical company that develops, manufacturers and distributes drugs that are the subject of the scheme alleged herein.

67.     Defendants, Baxter, Baxter Healthcare and Immuno [hereinafter the "Baxter Defendants"], are manufacturers, sellers and distributors of, among other things, cancer and miscellaneous other drugs. It is believed and therefore averred that the Baxter Defendants engaged in unlawful conduct similar to that of the other defendants with respect to their marketing, promotion, sales and/or distribution of cancer and miscellaneous other drugs that are paid for by plaintiff and the Class.

68.     Defendant, Boehringer Ingelheim Corporation ("Boehringer"), is a Nevada corporation with its principal place of business located at 900 Ridgebury Road, Ridgefield, Connecticut, 06877. Boehringer designs, manufactures, markets and distributes pharmaceuticals, including inhalants that are the subject of the scheme alleged herein.

69.     Defendant, Ben Venue Laboratories, Inc. ("Ben Venue"), is a Delaware corporation with its principal place of business at 300 Northfield Road, Bedford, Ohio, 44146. Ben Venue is a

contract developer and manufacturer of pharmaceuticals and produces generic injectable pharmaceuticals through its Bedford Laboratories division. Boehringer is the United States subsidiary of Boehringer Ingelheim of Germany and acquired Ben Venue in December, 1997. Ben Venue conducts extensive business, including the sale of pharmaceuticals that are the subject of the scheme alleged herein.

70.     Defendant, Bedford Laboratories ("Bedford"), is a division of Ben Venue with its principal place of business at 300 Northfield Road, Bedford, Ohio, 44146. Bedford manufactures and distributes pharmaceuticals, including pharmaceuticals that are the subject of the scheme alleged herein.

71.     Defendant, Roxane Laboratories, Inc. ("Roxane"), is a subsidiary of Boehringer with its principal place of business located at Post Office Box 16532, Columbus, Ohio, 43216-6532. Roxane manufactures markets, distributes and sells pharmaceuticals, including pharmaceuticals that are the subject of the scheme alleged herein.

72.     Defendants, Boehringer, Ben Venue, Bedford and Roxane [hereinafter the "Boehringer Defendants"], are manufacturers, sellers and distributors of, among other things, inhalant and miscellaneous other drugs. It is believed and therefore averred that the Boehringer Defendants engaged in unlawful conduct similar to that of the other defendants with respect to their marketing, promotion, sales and/or distribution of inhalant and miscellaneous other drugs that are paid for by plaintiff and the Class.

73.     Defendant, Bristol-Myers Squibb Company ("Bristol-Myers"), is a Delaware corporation with its principal place of business located at 345 Park Avenue, New York, New York, 10154. Bristol-Myers is a pharmaceutical and healthcare products company. Bristol-Myers

manufactures, markets, sells and distributes cancer drugs, among other prescription drugs, that are the subject of the scheme alleged herein.

74.    Defendant, Oncology Therapeutics Network Corporation ("OTN"), is a Delaware corporation with its principal place of business located at 395 Oyster Point Boulevard, Suite 405, South, San Francisco, California, 94080. OTN is a wholly owned subsidiary of Bristol-Myers and distributes cancer drugs, products and services to office-based oncology practices.

75.    Defendant, Apothecon, Inc. ("Apothecon"), is a division of Bristol-Myers with its principal place of business at 777 Scudders Mill Road, Plainsboro, New Jersey, 08536. Apothecon manufactures pharmaceutical drugs that are the subject of the alleged scheme herein.

76.    Defendants Bristol-Myers, OTN and Apothecon [hereinafter the "Bristol-Myers Defendants"], are manufacturers, sellers and distributors of, among other things, cancer and miscellaneous other drugs. It is believed and therefore averred that the Bristol-Myers Defendants engaged in unlawful conduct similar to that of the other defendants with respect to their marketing, promotion, sales and distribution of cancer and miscellaneous other drugs that are paid for by plaintiff and the Class.

77.    Defendant, Dey, Inc. ("Dey"), is a Delaware corporation with its principal place of business located at 2751 Napa Valley Corporate Drive, Napa, California, 94558. Dey manufactures, distributes, markets and sells, among other things, inhalant drugs. On June 13, 2003, it was reported that Dey settled a civil suit with the federal government and the State of Texas for $18.5 million arising out of Dey's sale and marketing of its prescription drugs. It is believed and therefore averred that Dey engaged in unlawful conduct similar to that of the other defendants with respect to their marketing, promotion, sales and distribution of inhalant drugs that are paid for by plaintiff and the Class.

© 2003 KLINE & SPECTER                    24

78.    Defendant, Fujisawa Pharmaceutical Co., Ltd. ("Fujisawa"), is a Japanese corporation with its headquarters located at 4-7, Doshomachi 3-Chome, Chuo-ku, Osaka 541-8514, Japan. Fujisawa Ltd. is a pharmaceutical manufacturer which offers a broad range of pharmaceutical products worldwide.

79.    Defendant, Fujisawa Healthcare, Inc. ("Fujisawa Healthcare"), is a Delaware corporation with its principal place of business located at 3 Parkway North, Deerfield, Illinois, 60015. Fujisawa Healthcare is a wholly owned subsidiary of Fujisawa Pharmaceutical Co., Ltd., Osaka, Japan. Fujisawa Healthcare is a pharmaceutical manufacturer with business concentrations in therapeutics, transplantation, anti-infectives, dermatology and cardiovascular care, among others.

80.    Defendant, Fujisawa USA, Inc. ("Fujisawa USA"), is a Delaware corporation with its principal place of business located at 3 Parkway North, Deerfield, Illinois, 60015. Fujisawa USA is a wholly-owned subsidiary of Fujisawa. In 1998, Fujisawa Healthcare assumed responsibility for Fujisawa USA's portfolio of proprietary products.

81.    Defendants, Fujisawa, Fujisawa Healthcare and Fujisawa USA [hereinafter the "Fujisawa Defendants"], are manufacturers, sellers and distributors of, among other things, cancer and miscellaneous other drugs. It is believed and therefore averred that the Fujisawa Defendants engaged in unlawful conduct similar to that of the other defendants with respect to their marketing, promotion, sales and distribution of cancer and miscellaneous other drugs that are paid for by plaintiff and the Class.

82.    Defendant, Novartis International AG ("Novartis AG"), is a Swiss company with its corporate headquarters located at Lichtstrasse 35, CH-4056, Basel, Switzerland. Defendant Novartis AG was created in 1996 with the merger of Swiss companies Ciba-Geigy and Sandoz

Pharmaceutical Corporation ("Sandoz"). Defendant Novartis AG develops, manufacturers, markets and sells cancer and miscellaneous other drugs that are the subject of the scheme alleged herein.

83.     Defendant, Novartis Pharmaceutical Corporation ("Novartis"), is a South Dakota corporation with its principal place of business located at One Health Plaza, East Hanover, New Jersey, 07936-1080. Novartis is the United States affiliate of Novartis AG. Novartis develops, manufacturers, markets and sells cancer and miscellaneous other drugs, that are the subject of the scheme alleged herein.

84.     Defendants, Novartis AG, and Novartis [hereinafter the "Novartis Defendants"], are manufacturers, sellers and distributors of, among other things, cancer and miscellaneous other drugs. It is believed and therefore averred that the Novartis Defendants engaged in unlawful conduct similar to that of the other defendants with respect to their marketing, promotion, sales and distribution of cancer and miscellaneous other drugs that are paid for by plaintiff and the Class.

85.     Defendant, Schering-Plough Corporation ("Schering-Plough"), is a New Jersey corporation with its principal place of business located at 2000 Galloping Hill Road, Kenilworth, New Jersey, 07033. In June 2003, Schering-Plough revealed that it was going to be criminally indicted for unlawful conduct described herein, including providing free samples of drugs knowing and expecting that doctors and others would bill for them. Schering manufactures, markets and sells prescription drugs, including pharmaceuticals that are the subject of the alleged scheme herein.

86.     Defendant, Warrick Pharmaceuticals Corporation ("Warrick"), is a Delaware corporation with its principal place of business located at 6100 Neil Road #500, Reno, Nevada, 89511. Warrick is a wholly-owned subsidiary of Schering. Warrick manufactures and sells prescription drugs, including inhalants, that are the subject of the alleged scheme herein.

87.     Defendants, Schering and Warrick [hereinafter the "Schering Defendants"], are manufacturers, sellers and distributors of, among other things, cancer, inhalant and miscellaneous other drugs.  It is believed and therefore averred that the Schering Defendants engaged in unlawful conduct similar to that of the other defendants with respect to their marketing, promotion, sales and distribution of cancer, inhalant and miscellaneous other drugs that are paid for by the plaintiff and the Class.

88.     Defendant, Sicor, Inc. ("Sicor"), is a Delaware corporation with its principal place of business located at 19 Hughes, Irvine, California 92618.  Sicor was created in 1997 with the merger of Gensia, Inc., a finished dosage manufacturer, and Rakepoll Holding, a European-based supplier of pharmaceuticals.  Sicor manufactures, markets and sells generic injectable pharmaceutical products that are the subject of the alleged scheme herein.

89.     Defendant, Gensia Sicor Pharmaceuticals, Inc. ("Gensia"), is a Delaware corporation with its principal place of business located at 17 Hughes, Irvine, California 92618.  Gensia is a wholly-owned subsidiary of Sicor and offers products in the fields of oncology, cardiology and anesthesiology.  Gensia formed a strategic alliance with Abbott in 1999 to market and distribute oncology products in the United States.  In March 2002, Sicor and Abbott restructured their agreement.  Gensia develops, manufactures, markets and sells injectable pharmaceuticals.

90.     Defendants, Sicor and Gensia [hereinafter the "Sicor Defendants"], are manufacturers, sellers and distributors of, among other things, cancer and miscellaneous other drugs.  It is believed and therefore averred that the Sicor Defendants engaged in unlawful conduct similar to that of the other defendants with respect to their marketing, promotion, sales and distribution of cancer and miscellaneous other drugs that are paid for by plaintiff and the Class.

91.     Defendant, Wyeth ("Wyeth"), formerly American Home Products Corporation, is a Delaware corporation with its principal place of business located at Five Giralda Farms, Madison, New Jersey, 07940.  Wyeth manufactures, markets, and distributes pharmaceutical drugs that are the subject of the alleged scheme herein.

92.     Defendant, Wyeth Pharmaceuticals ("Wyeth Pharmaceuticals"), formerly Wyeth-Ayerst Laboratories, is a New York corporation with its headquarters located at 500 Arcola Road, Collegeville, Pennsylvania, 19426.  Wyeth Pharmaceuticals manufactures, markets, distributes and sells pharmaceutical drugs that are the subject of the alleged scheme herein.

93.     Defendants, Wyeth and Wyeth Pharmaceuticals [hereinafter the "Wyeth Defendants"], are manufacturers, distributors and sellers of, among other things, cancer and miscellaneous other drugs.  It is believed and therefore averred that Wyeth Defendants engaged in unlawful conduct similar to that of the marketing, promotion, sales and distribution of cancer and miscellaneous other drugs that are paid for by plaintiff and the Class.

94.     Defendant, Saad Antoun, M.D. ("Antoun"), is an individual and resident of the State of New Jersey, and is and was a licensed physician with a specialty in urology, with offices located at 733 North Beers Street, Suite L6, Holmdel, New Jersey 07733.  Dr. Antoun was indicted and pled guilty to, among other things, receiving free samples of Zoladex® from the AstraZeneca Defendants and charging his patients for them.

95.     Defendant, Stanley C. Hopkins, M.D. ("Hopkins"), is an individual and resident of the State of Florida, and is and was a licensed physician with a specialty in urology, with offices located at 2419 South Seacrest Boulevard, Boynton Beach, Florida 33435.  Dr. Hopkins was indicted and pled guilty to, among other things, receiving free samples of Zoladex® from the AstraZeneca Defendants and charging his patients for them.

© 2003 KLINE & SPECTER                    28

96.     Defendant, Robert A. Berkman, M.D. ("Berkman"), is an individual and resident of the State of Ohio, and was a licensed physician with a specialty in urology, with offices located at 5969 East Broad, #306, Columbus, Ohio 43213.  Dr. Berkman was charged with, among other things, receiving free samples of Zoladex® from the AstraZeneca Defendants and charging his patients for them.

97.     The acts alleged in this Complaint to have been done by each of the defendants were authorized, ordered, done and/or ratified by their respective officers, directors, agents, employees or representatives while engaged in the management, direction, control or transaction of their respective business affairs.

98.     Various persons and/or firms, not named as defendants herein, including various medical providers across New Jersey, have participated as co-conspirators in the violations alleged herein and have performed acts and made statements or omissions in furtherance thereof.

## PLAINTIFF CLASS ALLEGATIONS

99.     Plaintiff seek to bring this case as a class action pursuant to Rule 4:32-1 of the New Jersey Rules Governing the Courts, on behalf of themselves and all others similarly situated in New Jersey as members of a proposed class, defined as follows (the "Class"):

> All persons and entities in New Jersey and throughout the county who, during the period beginning at least 1991 through the present, paid any portion of the cost of cancer, inhalant and miscellaneous other drugs manufactured, marketed, distributed and sold by Defendants, which cost was based, in whole or in part, upon the published AWPs for such drugs.  Excluded from the Class are Defendants, any entity in which a Defendant has a controlling interest, and their legal representatives, heirs, successors, any governmental entities, and any person or entity seeking to make a claim under ERISA, Medicare, or federal law.

# EXHIBIT J



COPY

DEC 2 0 2002

MICHAEL K. JEANES, CLERK
DEPUTY CLERK

1  Harry J. Miller III, Esquire
   AZ Bar No. 014556
2  80 East Columbus
   Phoenix, Arizona 85012
3  602-264-4965 telephone
   602-277-0144 facsimile
4
5  Donald E. Haviland, Jr.
   KLINE & SPECTER, P.C.
6  1525 Locust Street, 19th Floor
   Philadelphia, PA 19102
   215-735-0957 facsimile

Attorneys for Plaintiff and the Class
[Additional Counsel appear on signature page]

7

## SUPERIOR COURT OF THE STATE OF ARIZONA
## IN AND FOR THE COUNTY OF MARICOPA

8

9  ROBERT J. SWANSTON, individually and
   on behalf of himself and all others similarly situated,
                    Plaintiff,
10
              v.
11 TAP PHARMACEUTICAL PRODUCTS INC.; ABBOTT
   LABORATORIES; TAKEDA CHEMICAL INDUSTRIES, LTD.;
12 ZENECA, INC.; ASTRAZENECA PHARMACEUTICALS LP;
   ASTRAZENECA LP; ASTRAZENECA PLC; PHARMACIA
13 CORPORATION; PHARMACIA & UPJOHN, INC.; MONSANTO
   COMPANY; G.D. SEARLE; JOHNSON & JOHNSON; ETHICON
14 ENDO-SURGERY, INC.; INDIGO LASER CORPORATION; ALZA
   CORPORATION; CENTOCOR, INC.; ORTHO BIOTECH; BAYER
15 CORPORATION; WYETH; WYETH PHARMA-CEUTICALS; AMGEN,
   INC.; IMMUNEX CORPORATION; AVENTIS PHARMACEUTICALS,
16 INC.; AVENTIS BEHRING L.L.C.; HOECHST MARION ROUSSEL,
   INC.; BAXTER INTERNATIONAL INC.; BAXTER HEALTHCARE
17 CORPORATION; BOEHRINGER INGELHEIM CORPORATION; BEN
   VENUE LABORATORIES, INC.; BEDFORD LABORATORIES;
18 ROXANE LABORATORIES, INC.; BRISTOL-MYERS SQUIBB
   COMPANY; ONCOLOGY THERAPEUTICS NETWORK
19 CORPORATION; APOTHECON, INC.; FUJISAWA HEALTHCARE,
   INC.; FUJISAWA USA, INC.; GLAXOSMITHKLINE, P.L.C.;
20 SMITHKLINE BEECHAM CORPORATION; GLAXO WELLCOME,
   INC.; SCHERING-PLOUGH CORPORATION; WARRICK
21 PHARMACEUTICALS CORPORATION; SICOR, INC.; GENSIA SICOR
   PHARMA-CEUTICALS, INC.; DEY, INC.; DAVID JETT AND JANE
22 DOE JETT; CHRISTOPHER COLEMAN AND JANE DOE COLEMAN;
   SCOTT HIDALGO AND AMANDA HIDALGO; MICHAEL
23 GENDELMAN AND JANE DOE GENDELMAN; EDDY JAMES HACK
   AND JANE DOE HACK; KIMBERLEE CHASE AND JOHN DOE
24 CHASE; JANICE M. SWIRSKI AND JOHN DOE SWIRSKI; DONNA
   TOM AND JOHN DOE TOM; DAVID GUIDO AND JANE DOE
25 GUIDO; HENRY VAN MOURIK AND JANE DOE VAN MOURIK;
   AND ALAN MACKENZIE AND JANE DOE MACKENZIE; DOES
26 1-50; ABC CORPORATIONS 1-50; AND XYZ PARTNERSHIPS AND
   ASSOCIATIONS 1-50.
                    Defendants.

CAUSE NO. CV2002-004988

**SECOND
AMENDED COMPLAINT**

CLASS ACTION

(Jury Trial Demanded)

27

28

¹ 2002 KLINE & SPECTER, P.C.

## CLASS ACTION COMPLAINT

Plaintiff, Robert J. Swanston, by his attorneys, brings this Complaint on his own behalf and on behalf of all others similarly situated to obtain declaratory and injunctive relief, damages, costs of suit, attorneys' fees and other appropriate relief from the Defendants.  Plaintiff complains and alleges, upon information and belief, as follows:

## NATURE OF ACTION

1.      This case is brought by Plaintiff, Robert J. Swanston, as a class action on behalf of thousands of individuals and entities to recover monies overpaid as a result of Defendants' fraudulent scheme that targeted at least three types of healthcare patients: (1) "Government Assistance Patients": those who subscribe to and rely on one or more government assistance programs for the partial payment of their medical care and treatment, including Medicare, Medicaid, and TRICARE (formerly CHAMPUS) (hereinafter referred to collectively as "government assistance programs"); (2) "Private Assistance Patients": those who subscribe to and rely on private health insurance carriers and programs for the partial payment of their medical care and treatment; and (3) "No Assistance Patients": those who have no insurance at all for the payment of their medical care and treatment.  Although there are at least three types of healthcare patients, they, along with the entities that are included in the Class, all share the same, common characteristic and circumstance: they all paid more for prescription drugs than they otherwise should have as a result of the unlawful conduct of the Defendants.

2.      The Defendants are TAP Pharmaceutical Products Inc. ("TAP") (a wholly-owned joint venture of Abbott and Takeda, and prior to April 2000 known as TAP Holdings, Inc.), Abbott Laboratories ("Abbott"), Takeda Chemical Industries, Ltd. ("Takeda"), Zeneca, Inc., AstraZeneca Pharmaceuticals LP, AstraZeneca LP, AstraZeneca PLC ("Astra Zeneca"), Pharmacia Corporation ("Pharmacia"), Pharmacia & Upjohn, Inc. ("P&U"), Monsanto Company ("Monsanto"), G. D. Searle Company ("Searle"), Johnson & Johnson ("J&J"), Ethicon Endo-Surgery, Inc. ("Ethicon") (a wholly-owned subsidiary of J&J), Indigo Laser Corporation ("Indigo") (a wholly-owned subsidiary of J&J and Ethicon), Alza Corp. ("Alza"), Centocor, Inc. ("Centocor"), Ortho Biotech ("Ortho"), Bayer

1    Corporation ("Bayer"), Wyeth ("Wyeth"), Wyeth Pharmaceuticals ("Wyeth Pharmaceuticals"),

2    Amgen, Inc. ("Amgen"), Immunex Corporation ("Immunex"), Aventis Pharmaceuticals, Inc.

3    ("Aventis"), Aventis Behring, L.L.C. ("Aventis Behring"), Hoechst Marion Roussel, Inc.

4    ("Hoechst"), Baxter International Inc. ("Baxter"), Baxter Healthcare Corporation ("Baxter

5    Healthcare"), Boehringer Ingelheim Corporation ("Boehringer"), Ben Venue Laboratories, Inc. ("Ben

6    Venue"), Bedford Laboratories ("Bedford"), Roxane Laboratories, Inc. ("Roxane"), Bristol-Myers

7    Squibb Company ("Bristol-Myers"), Oncology Therapeutics Network Corporation ("OTN"),

8    Apothecon, Inc. ("Apothecon"), Fujisawa Healthcare, Inc. "(Fujisawa"), Fujisawa USA, Inc.

9    ("Fujisawa USA"), GlaxoSmithKline, P.L.C. ("GlaxoSmithKline"), SmithKline Beecham

10    Corporation ("SmithKline"), Glaxo Wellcome, Inc. ("Glaxo"), Schering-Plough Corporation

11    ("Schering"), Warrick Pharmaceuticals Corporation ("Warrick") [the foregoing corporate defendants

12    are collectively referred to herein as "the Corporate Defendants"], Sicor, Inc. ("Sicor"), Gensia Sicor

13    Pharmaceuticals, Inc. ("Gensia"), Dey, Inc. ("Dey"), David Jett ("Jett") (a former employee of

14    Indigo), and his wife, Jane Doe Jett, Christopher Coleman ("Coleman") (a former employee of

15    Indigo), and his wife, Jane Doe Coleman, Scott Hidalgo ("Hidalgo") (a former employee of TAP and

16    a current employee of Indigo), and his wife, Amanda Hidalgo (a former employee of TAP), Michael

17    Gendelman ("Gendelman") (a current employee of Indigo), and his wife, Jane Doe Gendelman, Eddy

18    James Hack ("Hack") (owner and operator of Oncology Solutions a/k/a International Oncology

19    Network), and his wife, Jane Doe Hack, Kimberlee Chase ("Chase") (a former employee of TAP),

20    and her husband, John Doe Chase, Janice Swirski ("Swirski") (a former employee of TAP), and her

21    husband, John Doe Swirski, Donna Tom ("Tom") (a former employee of TAP), and her husband,

22    John Doe Tom, David Guido ("Guido") (a former employee of TAP), and his wife, Jane Doe Guido,

23    Henry Van Mourik ("Van Mourik") (a former employee of TAP), and his wife, Jane Doe Van

24    Mourik, Alan MacKenzie ("MacKenzie") (a former employee of TAP), and his wife, Jane Doe

25    MacKenzie [the foregoing individual defendants are collectively referred to herein as "Individual

26    Defendants"], and various "doe" defendants, "ABC" corporations, and "XYZ partnerships and

27

28

1   associations whose names and identities are not yet known [all of the foregoing defendants are

2   collectively referred to herein as "Defendants"].

3       3.    Defendants, Abbott, Takeda and TAP, are manufacturers, distributors and sellers of

4   a drug known as Lupron®, among other prescription drugs, who, through Defendant TAP, have

5   pleaded guilty to federal criminal and civil fraud charges for, among other things, conspiring to

6   violate the Prescription Drug Marketing Act ("PDMA") by, *inter alia*, providing free samples of

7   Lupron® to medical providers and encouraging them to charge patients in Arizona and throughout

8   the United States [hereinafter "the Lupron® Manufacturer Defendants"]. This conspiracy was in

9   violation of the federal conspiracy statute, 18 U.S.C. § 371 (Conspiracy to Commit Offense or to

10  Defraud United States). *See* Indictment, Letter Agreement dated September 28, 2001, Judgment

11  dated December 6, 2001, Corporate Integrity Agreement ("CIA"), Side Letter Agreements with

12  Abbott and Takeda, and Sentencing Memorandum of the United States dated  December 4, 2001

13  ("Sentencing Memorandum") [hereinafter the "Guilty Plea Document[s]"], attached hereto

14  collectively as Exhibit "A."

15      4.    Defendants Zeneca, Inc.; AstraZeneca Pharmaceuticals LP; AstraZeneca LP;

16  AstraZeneca PLC [hereinafter "the AstraZeneca Defendants"] manufacture, sell and distribute

17  prescription drugs, including Zoladex® and Casodex®. Zoladex® is a prescription drug similar to

18  Lupron® that is used in the treatment of prostate cancer in men, endometriosis and infertility in

19  women and central precocious puberty in children. Casodex® is also used in the treatment of prostate

20  cancer. It is believed and therefore averred that the AstraZeneca Defendants engaged in unlawful

21  conduct similar to that of the other Defendants herein with respect to their marketing, promotion,

22  sales and distribution of prescription drugs which treat cancer, and other prescription drugs, that are

23  reimbursed under federal and state government assistance programs, such as Medicare and Medicaid,

24  among others.

25      5.    Defendants Pharmacia, P&U, Monsanto and Searle are manufacturers, sellers and

26  distributors of, among other things, a prescription drug similar to Lupron®, known as Trelstar Depot,

27  that  is used in the treatment of prostate cancer, among other cancer and prescription drugs

28

1    [hereinafter collectively "the Pharmacia Defendants"]. It is believed and therefore averred that the

2    Pharmacia Defendants engaged in unlawful conduct similar to that of the other Defendants with

3    respect to their marketing, promotion, sales and distribution of prescription drugs which treat cancer,

4    and other prescription drugs, that are reimbursed under federal and state government assistance

5    programs, such as Medicare and Medicaid, among others.

6        6.      Defendants, J&J, Ethicon, and Indigo, are manufacturers and sellers of, among other

7    things, the Indigo LASEROPTIC Treatment System, a minimally invasive procedure that treats

8    patients with enlarged prostates, otherwise known as benign prostatic hyperplasia ("BPH")

9    [hereinafter "the J&J Lupron Defendants"]. BPH is a condition that often attends or coincides with

10   prostate cancer.  In addition, J&J, along with its various other affiliated and subsidiary companies,

11   including Centocor, Inc., Ortho Biotech and Alza Corporation [hereinafter collectively "the J&J

12   Defendants"], manufactures, sells and distributes prescription drugs that are reimbursed under

13   federal and state government assistance programs, such as Medicare and Medicaid, among others.

14   It is believed and therefore averred that the J&J Defendants engaged in unlawful conduct similar to

15   that of the other Defendants with respect to their marketing, promotion, sales and/or distribution of

16   prescription drugs, such as Lupron, and other prescription drugs that are reimbursed under federal

17   and state government assistance programs, such as Medicare and Medicaid, among others.

18       7.      Defendants Baxter International, Inc. ("Baxter") and Baxter Healthcare Corporation

19   ("Baxter Healthcare") are manufacturers, sellers and distributors of, among other things, prescription

20   drugs used in the treatment of cancer, among other prescription drugs [hereinafter the "Baxter

21   Defendants"]. It is believed and therefore averred that the Baxter Defendants engaged in unlawful

22   conduct similar to that of the other Defendants with respect to their marketing, promotion, sales

23   and/or distribution of prescription drugs, which treat cancer, and other prescription drugs that are

24   reimbursed under federal and state government assistance programs, such as Medicare and Medicaid,

25   among others.

26       8.      Defendants Bayer and Alza are manufacturers, sellers and distributors of, among other

27   things, a prescription drug similar to Lupron®, known as Viadur®, that is used in the treatment of

28

1   prostate cancer, among other prescription drugs.  It is believed and therefore averred that these

2   Defendants engaged in unlawful conduct similar to that of the other Defendants herein with respect

3   to their marketing, promotion, sales and distribution of prescription drugs which treat cancer, and

4   other prescription drugs, that are reimbursed under federal and state government assistance

5   programs, such as Medicare and Medicaid, among others.

6       9.      Defendants Amgen, Inc. ("Amgen") and Immunex Corporation ("Immunex") are

7   manufacturers, sellers and distributors of, among other things, prescription drugs used in the

8   treatment of cancer, among other prescription drugs [hereinafter the "Amgen Defendants"].  It is

9   believed and therefore averred that the Amgen Defendants engaged in unlawful conduct similar to

10  that of the other Defendants with respect to their marketing, promotion, sales and distribution of

11  prescription drugs which treat cancer, and other prescription drugs, that are reimbursed under federal

12  and state government assistance programs, such as Medicare and Medicaid, among others.

13      10.     Defendants Aventis, Aventis Behring and Hoechst are manufacturers, sellers and

14  distributors of, among other things, prescription drugs used in the treatment of cancer, among other

15  prescription drugs [hereinafter the "Aventis Defendants"].  It is believed and therefore averred that

16  the Aventis Defendants engaged in unlawful conduct similar to that of the other Defendants with

17  respect to their marketing, promotion, sales and distribution of prescription drugs which treat cancer,

18  and other prescription drugs, that are reimbursed under federal and state government assistance

19  programs, such as Medicare and Medicaid, among others.

20      11.     Defendants Boehringer, Ben Venue, Bedford and Roxane are manufacturers, sellers

21  and distributors of, among other things, prescription drugs used in the treatment of cancer, among

22  other prescription drugs [hereinafter the "Boehringer Defendants"].  It is believed and therefore

23  averred that the Boehringer Defendants engaged in unlawful conduct similar to that of the other

24  Defendants with respect to their marketing, promotion, sales and distribution of prescription drugs

25  which treat cancer, and other prescription drugs, that are reimbursed under federal and state

26  government assistance programs, such as Medicare and Medicaid, among others.

27

28

© 2002 KLINE & SPECTER, P.C.                    5

12.     Defendants GlaxoSmithKline, SmithKline and Glaxo are manufacturers, sellers and distributors of, among other things, prescription drugs used in the treatment of cancer, among other prescription drugs [hereinafter the "GlaxoSmithKline Defendants"].  It is believed and therefore averred that the GlaxoSmithKline Defendants engaged in unlawful conduct similar to that of the other Defendants with respect to their marketing, promotion, sales and distribution of prescription drugs which treat cancer, and other prescription drugs, that are reimbursed under federal and state government assistance programs, such as Medicare and Medicaid, among others.

13.     Defendants Schering and Warrick are manufacturers, sellers and distributors of, among other things, prescription drugs used in the treatment of cancer, among other prescription drugs [hereinafter the "Schering Defendants"]. It is believed and therefore averred that the Schering Defendants engaged in unlawful conduct similar to that of the other Defendants with respect to their marketing, promotion, sales and distribution of prescription drugs which treat cancer, and other prescription drugs, that are reimbursed under federal and state government assistance programs, such as Medicare and Medicaid, among others.

14.     Defendants Bristol-Myers, OTN and Apothecon are manufacturers, sellers and distributors of, among other things, prescription drugs, and pharmaceutical products used in the treatment of cancer, among other prescription drugs, and drug products [hereinafter the "Bristol-Myers Defendants"]. It is believed and therefore averred that the Bristol-Myers Defendants engaged in unlawful conduct similar to that of the other Defendants with respect to their marketing, promotion, sales and distribution of prescription drugs which treat cancer, and other prescription drugs, that are reimbursed under federal and state government assistance programs, such as Medicare and Medicaid, among others.

15.     Defendants Wyeth and Wyeth Pharmaceuticals are manufacturers, sellers and distributors of, among other things, prescription drugs used in the treatment of cancer, among other prescription drugs [hereinafter the "Wyeth Defendants"]. It is believed and therefore averred that the Wyeth Defendants engaged in unlawful conduct similar to that of the other Defendants with respect to their marketing, promotion, sales and distribution of prescription drugs which treat cancer,

1   and other prescription drugs, that are reimbursed under federal and state government assistance

2   programs, such as Medicare and Medicaid, among others.

3         16.     Defendant Sicor, Inc. ("Sicor") and Gensia Sicor Pharmaceuticals, Inc. ("Gensia")

4   are manufacturers, sellers and distributers of, among other things, prescription drugs used in the

5   treatment of cancer, among other prescription drugs [hereinafter the "Sicor Defendants"]. It is

6   believed and therefore averred that the Sicor Defendants engaged in unlawful conduct similar to that

7   of the other Defendants with respect to their marketing, promotion, sales and distribution of

8   prescription drugs which treat cancer, and other prescription drugs, that are reimbursed under federal

9   and state government assistance programs, such as Medicare and Medicaid, among others.

10        17.     Defendant Dey, Inc. ("Dey") is a manufacturer, distributor and seller of, among other

11   things, prescription drugs used in the treatment of cancer, among other prescription drugs

12   [hereinafter the "Dey Defendant"]. It is believed and therefore averred that the Dey Defendant

13   engaged in unlawful conduct similar to that of the other Defendants with respect to their marketing,

14   promotion, sales and distribution of prescription drugs which treat cancer, and other prescription

15   drugs, that are reimbursed under federal and state government assistance programs, such as Medicare

16   and Medicaid, among others.

17        18.     Defendants Fujisawa Healthcare, Inc. ("Fujisawa") and Fujisawa USA, Inc.

18   ("Fujisawa USA") are manufacturers, distributors and sellers of, among other things, prescription

19   drugs used in the treatment of cancer, among other prescription drugs [hereinafter the "Fujisawa

20   Defendants"]. It is believed and therefore averred that the Fujisawa Defendants engaged in unlawful

21   conduct similar to that of the other Defendants with respect to their marketing, promotion, sales and

22   distribution of prescription drugs which treat cancer, and other prescription drugs, that are

23   reimbursed under federal and state government assistance programs, such as Medicare and Medicaid,

24   among others.

25        19.     Defendants, Jett and Coleman, at times material hereto, were employees and sales

26   representatives of Indigo, a wholly-owned subsidiary company of Defendants, J&J and Ethicon.

27   Defendant, Hidalgo, at all times material hereto, was either an employee of TAP or Indigo.

28

1    Defendant, Amanda Hidalgo, the wife of Scott Hidalgo, at all times material hereto, was an

2    employee of Defendant TAP. Defendant Gendelman, at all times material hereto, was either an

3    employee of TAP or Indigo. Defendant Hack, at all times material hereto, was the owner and

4    operator of Oncology Solutions a/k/a International Oncology Network, the nation's largest

5    community based oncologist network. These Defendants [hereinafter collectively referred to as the

6    "Individual Defendants"], with the exception of Amanda Hidalgo and Defendant Gendelman, all

7    pled guilty to a one-count Criminal Information charging the same conspiracy in connection with

8    a violation of the PDMA (unlicensed wholesaling of prescription drugs). In particular, these

9    Individual Defendants pled guilty to, *inter alia*, assisting in a conspiracy with other Defendants

10   involving the unlawful distribution and diversion of Lupron® by physicians to circumvent efforts by

11   Medicare to reduce the reimbursement costs of prescription prostate cancer drugs. Such efforts

12   culminated in a program known as Least Costly Alternative ("LCA"). These Individual Defendants,

13   excepting Amanda Hidalgo and Defendant Gendelman, also pled guilty to receiving kickbacks for

14   their efforts in furtherance of the conspiracy.

15        20.    In addition to the above-named Individual Defendants, several current and former

16   employees of TAP have been charged by the United States Department of Justice ("DOJ") with

17   various crimes as part of the overall conspiracy alleged herein. Charged with conspiracy were:

18             a.    Kimberlee Chase of Dedham, Massachusetts, formerly a District Manager

19                   employed by TAP;

20             b.    Janice M. Swirski of Chestnut Hill, Massachusetts, formerly a National

21                   Account Manager employed by TAP;

22             c.    Donna Tom of New York, New York, formerly a District Manager employed

23                   by TAP;

24             d.    David Guido of Quaker Hill, Connecticut, currently a Hospital Account

25                   Executive employed by TAP;

26             e.    Henry Van Mourik of Roseville, California, currently a District Manager

27                   employed by TAP; and

28

1          f.     Alan MacKenzie of Barrington, Illinois, formerly Vice President of Sales for

2          TAP.

3  These Defendants, along with Scott Hidalgo, Amanda Hidalgo and Michael Gendelman, [hereinafter

4  collectively referred to as the "TAP Employee Defendants"] were all directly involved in the

5  fraudulent scheme and violations alleged herein. Further charges were leveled against certain of

6  these individuals as follows: Ms. Chase was charged with 63 counts involving illegal kickbacks and

7  aiding and abetting; Ms. Swirski was likewise charged with providing illegal kickbacks.

8       21.    Defendant, Amanda Hidalgo, though not charged or indicted as part of the overall

9  conspiracy, is believed and therefore averred to have arranged for, facilitated and otherwise

10  participated in the same aspects of the conspiracy to which the Individual Defendants pled guilty and

11  for which the TAP Employee Defendants were indicted.

12       22.    Defendants, Scott Hidalgo and Michael Gendelman, at all times material hereto, were

13  employees of Defendants TAP or Indigo. Though not indicted, it is believed and therefore averred

14  that Gendelman, like Hidalgo, arranged for, facilitated and otherwise participated in the same aspects

15  of the conspiracy to which the Individual Defendants pled guilty and for which the TAP Employee

16  Defendants were indicted.

17       23.    Because of the unlawful conduct of all these Defendants, Plaintiff and the members

18  of the Class paid artificially inflated prices for cancer drugs and other prescription drugs.

19       24.    During the period from at least 1991 through the present, the exact dates of which are

20  unknown by Plaintiff at this time, Defendants created and implemented a fraudulent marketing,

21  pricing, sales and distribution scheme to defraud cancer patients and other consumers of prescription

22  drugs by substantially increasing the sales of these drugs and reaping unlawful profits at the expense

23  of patients who took these drugs and paid for them. Among other things, Defendants systematically,

24  among themselves and with other entities and individuals, created a pervasive illegal system to cause

25  patients on cancer and other prescription drugs to overpay substantial amounts of money for the

26  specific purpose of increasing the market share of these drugs and maximizing their profits at the

27  expense of Plaintiff and the Class. The improper marketing, pricing, sales and distribution practices

28

# EXHIBIT K

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL NO. 1456 |
| THIS DOCUMENT RELATES TO: | CIVIL ACTION: 01-CV-12257-PBS |
| ASTRAZENECA CLASS 1 SETTLEMENT | Judge Patti B. Saris |

**CLASS PLAINTIFFS' OPPOSITION TO DON HAVILAND'S MOTION TO STAY DISTRIBUTION OF ASTRAZENECA FEE AWARD AND FOR COURT REVIEW OF LEAD COUNSEL'S ALLOCATION OF FEES AND REIMBURSEMENT OF COSTS**

### I.    INTRODUCTION

Having suffered an ignominious defeat in the First Circuit on his errant appeal of this Court's approval of the AstraZeneca Class 1 settlement, Don Haviland now moves the Court for an Order Staying Distribution of the AstraZeneca Fee Award and for Court Review of Lead Counsel's Allocation of Fees and Reimbursement of Costs (Dkt. No. 6809). Contrary to Haviland's contentions, no firms, including Lead Class Counsel, have been paid any fees approved by the Court in association with the AstraZeneca Class 1 Settlement. The reason: Haviland's frivolous appeal of that settlement effectively stayed the distribution of the fee award, just as Haviland's frivolous appeal has precluded distribution of settlement monies to sick and dying class members and to his own clients. If, at the time the fee distribution is made, Haviland is unhappy, he can object then. But Haviland's unsupported motion is premature, the relief that he seeks is unnecessary, and the Court should deny the motion.

001534-16 345844 V2

## II.   FACTUAL BACKGROUND

In October 2008, Lead Class Counsel distributed the fees and expenses awarded by the Court out of the GSK Settlement, using a well-reasoned tier approach reflecting the risks borne and quality of work performed by various plaintiffs' counsel.  At that time, Class Counsel did not distribute any fees and expenses associated with the GSK Settlement to Don Haviland, who was an associate at the Kline & Specter law firm at the time the GSK Settlement was reached.  Kline & Specter, a former Co-Lead counsel firm, received a distribution directly.  Haviland, who was well aware that Class Counsel distributed the GSK Settlement fees directly to Kline & Specter, did not object.

In an electronic Order issued on December 10, 2008, the Court directed "lead counsel to consult with all firms regarding its plan for allocating fees in this MDL in the future and submit a proposal to the Court within 30 days."  In that same Order, the Court held that any objections to Lead Class Counsel's future fee allocations will "be reviewed on an abuse of discretion standard."

On January 9, 2009, and pursuant to the Court's December 10, 2008 Order, Class Counsel filed with the Court Class Counsel's Proposed Future Fee Allocation Guidelines (Dkt. No. 5836) (the "Fee Allocation Guidelines," attached hereto as Exhibit 1).  Given that (i) substantial claims remained to be litigated in the case, (ii) two proposed settlements still awaited final approval, and (iii) Class Counsel could not predict with any certainty the magnitude of expense reimbursements and fees that may be approved by the Court in the future, the Fee Allocation Guidelines did not contain a detailed fee allocation plan.  The Fee Allocation Guidelines did, however, present a summary of the factors that Class Counsel intend to apply to all future fee allocations.  Those factors are well established and supported by decisions such as *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 50 (2d Cir. 2000), and *Gunter v. Ridgewood*

- 2 -

*Energy Corp.*, 223 F.3d 190, 195 n.1 (3d Cir. 2000).  <u>Haviland did not object to these Fee</u>

<u>Allocation Guidelines filed a year ago</u>.

The Court has approved a fee award in association with the AstraZeneca Class 1

Settlement.  Haviland's appeal of the Court's final approval of the AstraZeneca Class 1

Settlement, however, has prevented a distribution from that settlement, either to Class members

or the attorneys.  The First Circuit recently and emphatically rejected <u>all</u> of Haviland's

contentions on appeal, calling them "meritless."  *See In re Pharm. Indus. Average Wholesale*

*Price Litig.*, 2009 U.S. App. LEXIS 25536 (1st Cir. 2009) (attached as Ex. 2).  Nevertheless,

Class Counsel have not yet applied the Fee Allocation Guidelines and distributed the

AstraZeneca Class 1 fee award.[1]

### III.   ARGUMENT

In his motion, Haviland brings a hodge-podge of arguments, all of which are

unsupported, and none of which justify the stay that he seeks.  We address each of them below.

**A.   Haviland Has Not Been Paid Because He Was Not Entitled to Participate in the GSK Fee Distribution.**

Haviland complains that his firm has not been paid any fee or cost reimbursement for his

new firm's work on the case.  Br. at 2.  This is true, but for good reason.  First, the only fees and

expenses distributed to date have been associated with the GSK Settlement, and Haviland's firm

– HLF – did not even exist at the time of that Settlement.  Thus, HLF was <u>not</u> entitled to directly

receive a share of the GSK Settlement fees.  Haviland undoubtedly recognizes this, which is why

he <u>never</u> objected to the GSK Settlement fee distribution made by Class Counsel way back in

---

[1] In addition to the foregoing settlements, settlements are pending in favor of all Classes with respect to BMS and the Track 2 Defendants.  None of these additional settlements are final.  Consequently, there have not been any fee and expense distributions with respect to any of them.

October 2008 and has waived doing so. For this reason, Haviland's present motion does not appear to seek any share of the fees from the GSK Settlement.[2]

Second, no fees and expenses associated with any other settlement have been distributed to any firm. Distribution of the AstraZeneca Class 1 fee and expense award was held up by Haviland's frivolous appeal.

Thus, Haviland has not been directly paid any fees because he has not been entitled to receive any to date. He has no reason to complain and his motion is thus frivolous.

**B.     Haviland Was Not Included in the Fee Allocation Guidelines Because He Was Not Entitled to Participate in the GSK Fee Distribution.**

Haviland next complains that his firm was excluded from the Tier groupings contained in the Fee Allocation Guidelines. Br. at 2-3. This is true. However, Haviland failed to object at the time that those Guidelines were filed almost one year ago and has remained silent on this issue ever since. In any event, Haviland was excluded from the Fee Allocation Guidelines for the simple reason that he was not eligible to participate in the GSK fee distribution. He is not alone, as other firms that did not participate in work on behalf of plaintiffs prior to the GSK Settlement were excluded as well.[3]

**C.     Haviland Is Eligible to Participate in the AstraZeneca Class 1 Fee Distribution.**

Haviland claims that Class Counsel do not propose to pay HLF any fees or costs out of the proceeds of the AstraZeneca Settlement. Br. at 3. Class Counsel have not yet drawn up any plans to distribute the AstraZeneca Class 1 fee. At the time that the AstraZeneca Class 1 fee is distributed, Haviland's efforts will be evaluated under the same criteria as other counsel.[4] If he

---

[2] And even if it did, that would be a matter for Haviland to take up with his former employer, Kline & Specter, and not with Class Counsel.

[3] One example is the firm of Murdock Goldenberg Schneider & Groh, which worked on Track 2 defendants.

[4] We have not seen the time Haviland seeks compensation for, but class counsel do not intend to compensate Haviland for time spent raising issues the First Circuit deemed were "without merit."

Case 1:01-cv-12257-PBS   Document 8024-2   Filed 01/05/12   Page 62 of 98

has any objection to the amount that he is ultimately allocated, then he can object after the

allocation is made, as contemplated by the Court. *See* December 12, 2008, Order (providing that

any objections to fee allocations "shall be reviewed on an abuse of discretion standard").

**D.     Haviland's Clients Have Not Been Paid Any Incentive Fees Because They Have Not Been Eligible to Receive Any Incentive Fees.**

Haviland next complains that his clients have not been paid the incentive fees that have

been awarded.  This is true, but it is Haviland's own fault that this has not been done.  As with all

other distributions pertaining to the AstraZeneca Class 1 Settlement, Class Counsel have not

distributed incentive fees to <u>any</u> class representatives because of Haviland's appeal.  Mrs. Howe

will be entitled to receive the compensation award that the Court approved for her at the time the

distribution is made, as will the other class representative, Mr. Townsend.  Of course, both

representatives would have long ago received their awards had Haviland not pursued his

frivolous appeal.

**E.     No Other Firms Have Been Paid Any Fees From the AstraZeneca Class 1 Settlement.**

Haviland contends that other firms have been paid while he has not.  Br. at 4.  Again, <u>no</u>

firms have been paid any part of the fee award approved by the Court for the AstraZeneca

Class 1 Settlement.  The only *AWP*-related fee distribution made to date was in association with

the GSK Settlement, and Haviland's new firm, HLF, was not eligible to participate in that fee

distribution, which occurred in October 2008.

**F.     The Court Should Disregard Haviland's Continuing Crusade Against Kline & Specter.**

Lastly, Haviland contends that his former firm, Kline & Specter, "appears to be inflating

its lodestar. . . ."  Br. at 4-5.  Tellingly, Haviland offers no specific evidence, only speculation.

Class Counsel have no reason to believe that Kline & Specter, a former member of the Co-Lead

Class Counsel team, has inflated its lodestar.  Indeed, it is difficult to view Haviland's

unsupported assertion as credible given the fact that Haviland has litigation pending against

Kline & Specter relating to fee splits in several cases.

The facts, ignored by Haviland, are as follows.  On June 22, 2007, Marc Edelson

submitted a declaration to the Court in support of class counsel's petition for attorneys' fees and

reimbursement of expenses in relation to the settlement with GSK.  Dkt. No. 4399.  In Exhibit 1

attached to his declaration, Mr. Edelson indicated that Kline & Specter had a total of 6,681.75

hours, $2,093,136.25 in lodestar, and $404,180.02 in expenses as of August 10, 2006.  These

numbers were inaccurate, as they failed to reflect all of the relevant work performed and

expenses paid by Kline & Specter that benefitted the certified class in this case.  More

specifically, Kline & Specter worked on several other, related cases, all of which were eventually

consolidated with MDL 1456, and all of which benefitted the class in this case.

On April 16, 2008, Mr. Edelson submitted a second declaration to the Court, this time in

relation to the settlement with AstraZeneca.  *See* Dkt. No. 5222.  In this declaration, Mr. Edelson

correctly indicated that Kline & Specter had $3,486,937.32 in lodestar and $602,739.90 in

expenses that benefitted the class.  These numbers accurately reflected all of the work performed

and expenses paid by Kline & Specter in all of the case that benefitted the class and were

consolidated in the MDL.  Shanin Specter, Esquire, a principal of Kline & Specter, reported the

specific breakdown of Kline & Specter's hours, lodestar and expenses in each of the cases

handled by Kline & Specter that benefitted the class to Mr. Edelson on December 19, 2006, and

again by affidavit on June 13, 2007.  *See* Ex. 3 attached hereto.

Tellingly, Mr. Haviland was aware that Kline & Specter had a lodestar of around

$3,500,000.00, and was the individual at Kline & Specter who reported that number of

- 6 -

Mr. Specter and was responsible for preparing the time report prior to his discharge from Kline & Specter in September 2006. *See* email correspondence attached hereto as Ex. 4. Quite obviously, Mr. Haviland is attempting to discredit his former employer, with whom he continues to litigate, with no grounds for doing so. He should not be allowed to open a new litigation was with his old firm via the AWP MDL.

## IV.   CONCLUSION

Haviland closes his brief with the statement that "court intervention is required to avoid having the fee dispute become a separate, parallel litigation." Br. at 6. There simply is no fee dispute at this time, as Class Counsel have not allocated or distributed any portion of the AstraZeneca Class 1 fee award. Thus, court intervention is not necessary and frankly as demonstrated above each of his contentions in support of his motion are flat out frivolous.

Further, Haviland's statement is ironic: his motion, filed without any consultation or meet and confer with Class Counsel, seeks "separate, parallel litigation" relating to fees, which courts uniformly frown upon. Having been handed a crushing defeat of his appeal of the Court's final approval of the AstraZeneca Class 1 Settlement, it now appears that Haviland intends to perpetuate his misguided and disruptive objection efforts to the realm of fee awards. That is unfortunate, but Haviland so frequently chooses the unfortunate path of action, and one that unnecessarily taxes the Court's resources.

For the foregoing reasons, Haviland's motion should be denied.

001534-16 345844 V2

DATED:  January 6, 2010

By___**s/ Steve W. Berman**_____
    Thomas M. Sobol (BBO#471770)
    Edward Notargiacomo (BBO#567636)
Hagens Berman Sobol Shapiro LLP
One Main Street, 4th Floor
Cambridge, MA  02142
Telephone: (617) 482-3700
Facsimile: (617) 482-3003

**LIAISON COUNSEL**

Steve W. Berman
Sean R. Matt
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

Jeffrey Kodroff
John A. Macoretta
Spector, Roseman, Kodroff & Willis, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA  19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611

Kenneth A. Wexler
Jennifer Fountain Connolly
Wexler Wallace LLP
One North LaSalle Street, Suite 2000
Chicago, IL  60602
Telephone: (312) 346-2222
Facsimile: (312) 346-0022

Marc H. Edelson
Hoffman & Edelson
45 West Court Street
Doylestown, PA  18901
Telephone: (215) 230-8043
Facsimile: (215) 230-8735

**CO-LEAD COUNSEL FOR
PLAINTIFFS**

001534-16 345844 V2

## CERTIFICATE OF SERVICE

      I hereby certify that I, Steve W. Berman, an attorney, caused a true and correct copy of the foregoing, **CLASS PLAINTIFFS' OPPOSITION TO DON HAVILAND'S MOTION TO STAY DISTRIBUTION OF ASTRAZENECA FEE AWARD AND FOR COURT REVIEW OF LEAD COUNSEL'S ALLOCATION OF FEES AND REIMBURSEMENT OF COSTS**, to be delivered to all counsel of record by electronic service pursuant to Paragraph 11 of the Case Management Order No. 2, by sending on January 6, 2010, a copy to LexisNexis File & Serve for posting and notification to all parties.

                              **s/ Steve W. Berman**
                              Steve W. Berman

001534-16 345844 V2

# Exhibit 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL NO. 1456 |
| THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS | CIVIL ACTION: 01-CV-12257-PBS<br><br>Judge Patti B. Saris |

**CLASS COUNSEL'S PROPOSED FUTURE FEE ALLOCATION GUIDELINES**

- 1 -

## I.    INTRODUCTION

In an electronic Order issued on December 10, 2008, the Court directed "lead counsel to consult with all firms regarding its plan for allocating fees in this MDL in the future and submit a proposal to the Court within 30 days." In that same Order, the Court held that any objections to Lead Class Counsel's future fee allocations will "be reviewed on an abuse of discretion standard."

Thus far, the Court has granted final approval to the GSK Settlement and the AstraZeneca Class 1 Settlement. Lead Class Counsel have distributed the fees and expenses awarded in the GSK Settlement. The AstraZeneca Class 1 Settlement is not yet final, as the appeal period has not expired. Consequently, there has not yet been a fee and expense distribution from that settlement. In addition to the foregoing settlements, settlements are pending in favor of all Classes with respect to the Track 2 Defendants, and Lead Class Counsel hope to present the BMS Class 1 Settlement to the Court for preliminary approval shortly.

Claims on behalf of multi-state Classes 2 and 3 are still pending against both AstraZeneca and BMS, and the Court has not yet entered a final order certifying those classes or set those claims for trial. We may spend millions in costs and fees preparing for and prosecuting those claims at trial, and Plaintiffs may yet lose the trials. In addition, the First Circuit Court of Appeals has yet to issue a decision on the appeals arising from the trial of the claims of Massachusetts Classes 2 and 3. It is possible that a partial retrial of claims may follow the First Circuit decision.

Given that (i) substantial claims remain to be litigated in this case, (ii) two proposed settlements still await final approval, and (iii) the inability to predict with any certainty the magnitude of expense reimbursements and fees that may be approved by the Court in the future, Lead Class Counsel are unable to submit to the Court a detailed fee allocation plan at this time.

- 1 -

However, we outline below the guidelines that we intend to apply to all future fee allocations. As was done in allocating the GSK award, Lead Class Counsel will be guided by factors that courts consider in awarding fees in class litigation. *See, e.g., Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 50 (2d Cir. 2000); *Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 195 n.1 (3d Cir. 2000). Lead Class Counsel will apply a multi-factor analysis in an objective manner in allocating expenses and fees in a process similar to that used in allocating the GSK fee, which resulted in only a single objection from the 25 firms involved. As the Court requested, Lead Class Counsel have communicated the below guidelines to all Plaintiffs' counsel in this case.

## II.     THE GUIDELINES

### A.     Reimbursing Advanced Expenses.

As a first step in allocating any future fee awards, Lead Class Counsel will reimburse a specific portion of total expenses advanced. Expenses are paid first because they are substantial out-of-pocket outlays that magnify risk. In addition, it is important to partially recharge expense budgets on an ongoing basis as out-of-pocket costs, and particularly expert costs, continue to accrue in the case. The aggregate amount allocated to expenses will be reduced from the total fee award to determine the net amount remaining to be allocated as "fees."

### B.     The Primary Fee Allocation Factors.

Courts delegate substantial discretion to lead counsel to allocate a fee award across participating counsel and will not disturb that allocation provided that is fair and reasonable. The Court has recognized this by stating in its December 10 Order that any objections to Lead Class Counsel's future fee allocations will "be reviewed on an abuse of discretion standard."

Lead Class Counsel's fee allocation decisions will be guided by the factors that courts consider in awarding fees in class litigation, including the following three factors as the "primary" drivers of discerning each firm's contribution to the litigation: (i) the risks borne by

- 2 -

counsel in litigating a complex case on a contingency fee basis, (ii) the quality of the representation provided, and (iii) the time and labor expended by counsel. *See, e.g., Goldberger,* 209 F.3d at 50; *Gunter,* 223 F.3d at 195 n.1.

We consider risk to be the most important factor. *Goldberger,* 209 F.3d at 54 ("We have historically labeled the risk of success as 'perhaps the foremost' factor to be considered in determining whether to award an enhancement."). This Court has already recognized the magnitude of risk faced by class counsel in this case. *See* May 1, 2008 Hearing Tr. at 24. This litigation has entailed, and continues to entail, an extraordinarily high level of risk. It has involved novel and complex legal and factual issues, and the limited resources of Lead Class Counsel have been pitted against the seemingly infinite resources of defendants and their well-heeled counsel, who pursue appeals at every opportunity. In assessing risk profiles, Lead Class Counsel will consider the magnitude of advanced expenses and each firm's commitment of full-time firm personnel to the exclusion of other case opportunities.

With respect to the quality of representation factor, we will primarily consider each firm's leadership position; its quality and volume of substantive work; whether the firm was an integral component of the trial team; the number, experience and quality of the partners and senior associates assigned to the case and whether and to what extent lower value contract lawyers were utilized; and the consistency of the firm's commitment throughout the duration of the litigation, including work on appellate issues.

With respect to the time and labor expended by counsel factor, we will consider each firm's productive lodestar. Lodestar will not be the sole or even determinative factor in Lead Class Counsel's analysis. Lead Class Counsel have collected and reviewed, and will continue to collect and review, unaudited lodestar and expense information. In determining reasonableness,

we have reviewed, and will continue to review, hourly rates, the time asserted to have been

spent, and the work performed.

**C.      The Tiers.**

Lead Class Counsel have employed the foregoing factors and will group the 25 Plaintiffs'

firms reporting time and expenses in the AWP litigation into three tiers based on their

contributions to the litigation as follows:[1]

| Tier | Firm |
|------|------|
| I | Hagens Berman Sobol Shapiro LLP<br>Wexler Toriseva Wallace LLP<br>Spector, Roseman, Kodroff & Willis, P.C.<br>Hoffman & Edelson, LLC |
| II | Heins, Mills & Olson, P.L.C.<br>Kline & Specter, P.C. |
| III | Audet & Partners, LLP<br>Bolognese & Associates, LLC<br>Carey & Danis, LLC<br>Cuneo Gilbert & Laduca, LLP<br>Freeman & Lorry, P.C.<br>Hanzman, Criden & Love, P.A.<br>Hulett Harper Stewart, LLP<br>Karmel Law Firm<br>Law Office of Adam S. Levy<br>Piper & Associates<br>RodaNast, P.C.<br>Rossbacher Firm<br>Sheller, P.C.<br>Shepherd, Finkleman, Miller & Shah, LLC<br>Squitieri & Fearon, LLP<br>Trujillo Rodriguez & Richards, LLC<br>Weller, Green, Toups & Terrell, L.L.P.<br>Williams Law Firm<br>Young, Pickett & Lee |

We will allocate a specific percentage of each fee award to each tier, similar to the

approach taken in the GSK fee allocation.  In light of the contributions highlighted below, the

Tier I firms will receive a higher percentage of future fee allocations than the other tiers.

---

[1] These are the same tiers that were utilized in allocating the GSK fee, except that the three sub-tiers previously employed for Tier III have been removed.

001534-16 279757 V1

### 1.   The Tier I contributions.

The Tier I firms have led the case from inception to the present, done most of the work, advanced the most expenses (approximately 84% to date), shouldered most of the risk of nonpayment and were the primary drivers of the results achieved thus far.  Among other work, certain members of the Lead Class Counsel team have made the following contributions:  headed the litigation; comprised the trial team; spearheaded all substantive oral arguments and served as the primary "face" of the team in court; prepared most, if not all, of the substantive briefing; conducted the expert work; were liaison counsel to the Court; handled almost all of the case filings for the Plaintiffs; led on all case management order and pre-trial order negotiations and drafting; coordinated and conducted third-party TPP discovery; covered the so-called "government knowledge" depositions; coordinated with the DOJ on federal issues; conducted wholesaler discovery; conducted publisher discovery, with some help from a Tier III firm; and were responsible for discovery of all of the defendants.

### 2.   The Tier II contributions.

The Tier II firms once participated in leadership roles and, for a time, shared some of the Tier I responsibilities.  The Tier II firms' former participation in leadership roles differentiates them from the Tier III firms, although the Tier II firms dropped out of the case and thereby minimized their risks.

### 3.   The Tier III contributions.

The roles of the Tier III firms were primarily but not exclusively limited to participating in document review projects early in the litigation.  This work was important and necessary to filter the literally millions of documents produced by the defendants in this case.  And the fact that many Plaintiffs' counsel participated in document review projects does not mean that time spent reviewing documents was duplicative.  To the contrary, all of the documents produced

needed to be read, coded, and analyzed whether the case was litigated by few firms or many. Lead Class Counsel instituted procedures designed to avoid duplication and inefficiency and divided document review responsibilities in a cogent manner. The Tier III firms did not play a leadership role and generally have either no or minimal additional time and expenses in the case after 2006.

### D.   Lead Class Counsel's Aspirational Goals.

As we have explained to the Court in prior submissions, the total lodestar of Plaintiffs' counsel in this case dwarf the fees awarded thus far and will likely do so for some time. In addition, expenses and lodestar continue to grow as the case progresses. Both the timing and magnitude of any future fee awards are difficult if not impossible to predict, especially since a significant part of the case is still being litigated. Under these circumstances, it should come as no surprise that we cannot guarantee that any firm – including each firm on the Lead Class Counsel team – will recover its total lodestar.

We have, however, set certain fee allocation goals that pertain to the ultimate resolution of the case, that is, after all litigation is over. In the event that all awarded fees from all AWP MDL cases at the conclusion of all matters total less than the collective lodestar and expenses of all Plaintiffs' counsel (the "Total Lodestar Over Total Fees Percentage"), Lead Class Counsel will endeavor in good faith to provide each firm up to a total of 80 percent of its lodestar and expense reimbursement. If the Court awards the percentage fees requested in all settlements and/or judgments, and if the Total Lodestar Over Fees Percentage exceeds 100 percent, then Lead Class Counsel will endeavor in good faith to provide each firm 100 percent of its lodestar and expense reimbursement. Given the uncertainty associated with future fee recoveries, the foregoing are aspirational goals and not guarantees. There are several scenarios under which we

- 6 -

would be unable to meet these goals, including an aggregate result where the Total Lodestar

Over Fees Percentage is close to or less than 80 percent.

### III.   CONCLUSION

Lead Class Counsel intend to objectively deploy the three primary *Goldberger* factors

outlined above in allocating future fee awards across the proposed tiers.  The process has been

and will remain fair and transparent, as the Court has directed.


DATED:  January 9, 2009.              By___/s/ Steve W. Berman_____
                                         Thomas M. Sobol (BBO#471770)
                                         Edward Notargiacomo (BBO#567636)
                                      Hagens Berman Sobol Shapiro LLP
                                      One Main Street, 4th Floor
                                      Cambridge, MA  02142
                                      Telephone: (617) 482-3700
                                      Facsimile: (617) 482-3003

                                      **LIAISON COUNSEL**

                                      Steve W. Berman
                                      Sean R. Matt
                                      Hagens Berman Sobol Shapiro LLP
                                      1301 Fifth Avenue, Suite 2900
                                      Seattle, WA  98101
                                      Telephone: (206) 623-7292
                                      Facsimile: (206) 623-0594

                                      Jeffrey Kodroff
                                      John Macoretta
                                      Spector, Roseman Kodroff & Willis, P.C.
                                      1818 Market Street, Suite 2500
                                      Philadelphia, PA  19103
                                      Telephone: (215) 496-0300
                                      Facsimile: (215) 496-6611

Kenneth A. Wexler
Jennifer Fountain Connolly
Wexler Wallace LLP
55 W. Monroe, Suite 3300
Chicago, IL  60603
Telephone: (312) 346-2222
Facsimile: (312) 346-0022

Marc H. Edelson
Hoffman & Edelson LLC
45 West Court Street
Doylestown, PA  18901
Telephone: (215) 230-8043
Facsimile: (215) 230-8735

**CLASS COUNSEL**

001534-16 279757 V1

## CERTIFICATE OF SERVICE

    I hereby certify that I, Steve W. Berman, an attorney, caused a true and correct copy of the foregoing submission to be delivered to all counsel of record by electronic service pursuant to Paragraph 11 of the Case Management Order No. 2, by sending on January 9, 2009, a copy to LexisNexis File & Serve for posting and notification to all parties.

                           /s/ Steve W. Berman
                           Steve W. Berman

001534-16 279757 V1

EXHIBIT L

**KLINE & SPECTER**

A PROFESSIONAL CORPORATION

ATTORNEYS AT LAW

THE NINETEENTH FLOOR

1525 LOCUST STREET

PHILADELPHIA, PENNSYLVANIA 19102

WWW.KLINESPECTER.COM

SHANIN SPECTER                          215-772-1000                  SHANIN.SPECTER@KLINESPECTER.COM

                                        FAX: 215-772-1359

October 3, 2007

Steve W. Berman, Esquire
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101

**RE: AWP Litigation**

Dear Steve:

Thank you for your letter of September 21, 2007 forwarding a check to us in the amount of $90,481.29 (which we have deposited).

Your letter indicates that this check is for one-fifth of our expenses. Per my letter of December 19, 2006 to Mark Edelson, our total expenses were $602,739.90, of which, our AWP MDL expenses were $437,857.67. I enclose herewith an additional copy of this letter.

Per our agreement from the fall of 2005, it is our hope and expectation to be recognized on all these costs.

If we disagree on this, I am certainly prepared to put off the resolution of this disagreement until a later time.

Best regards.

Sincerely,

SHANIN SPECTER

SS/dg
Enclosure
cc: Marc H. Edelson, Esquire (w/enc.)

# EXHIBIT M

**KLINE & SPECTER**
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
THE NINETEENTH FLOOR
1525 LOCUST STREET
PHILADELPHIA, PENNSYLVANIA 19102
WWW.KLINESPECTER.COM

———

215-772-1000
FAX: 215-772-1359

August 31, 2011

**VIA EMAIL**

Steve W. Berman, Esquire
**HAGENS BERMAN SOBOL SHAPIRO, LLP**
1918 8th Avenue, Suite 3300
Seattle, WA  98101

Thomas M. Sobol, Esquire
**HAGENS BERMAN SOBOL SHAPIRO LLP**
One Main Street, 4th Floor
Cambridge, MA  02142

Marc H. Edelson, Esquire
**EDELSON & ASSOCIATES, LLC**
45 West Court Street
Doylestown, PA  18901

Kenneth A. Wexler, Esquire
**WEXLER WALLACE LLP**
55 W. Monroe Street, Suite 3300
Chicago, IL  60603

Jeffrey L. Kodroff, Esquire
**SPECTOR ROSEMAN KODROFF & WILLIS P.C.**
1818 Market Street, Suite 2500
Philadelphia, PA 19103

Re:     *In re: Pharmaceutical Industry Average Wholesale Price Litigation;* MDL 1456

Dear Steve, Marc, Jeff, Tom and Ken:

Congratulations to you all on the recoveries in this litigation to date. This has been extremely difficult and hard fought litigation and you have done a tremendous job in producing these results. I understand that a distribution of costs and fees is soon to be made.

Naturally, we want to be sure our firm is appropriately compensated. As you will recall, in 2005, we agreed as follows: "Kline & Specter will be compensated for their time and costs on a par with the co-leads. All current co-leads' and Kline & Specter's compensation may be modified from parity to the extent appropriate under principles of equity and fairness. Kline & Specter's time and costs to date, which total approximately 2-3 million dollars will be added to the already existing time and costs of current MDL co-lead counsel and be compensated along with other MDL co-lead counsel upon recovery of attorneys' fees and costs in MDL 1456." *See* various emails at Exhibit "A." We served for 11 months time as co-lead counsel and made financial contributions. While our service as co-leads was brief, I hope you feel that we made valuable contributions both during our service as co-leads and from time to time since then.

**KLINE & SPECTER**

A PROFESSIONAL CORPORATION

August 31, 2011
Page 2

_____

In an earlier distribution, we were treated as Tier 2 counsel along with Heins, Mills, who I understand also have been a non-permanent co-lead counsel.  While we all agreed that our firm would be compensated on a par with other co-leads, I did not challenge the earlier distribution that was made to us at a Tier 2 level.  We have not done so because of our respect for this group and for what this group has accomplished.

Our loadstar was $3,486,937.32 and our expenses were $602,739.90.  These were set forth for the Court in Mark Edelson's Declaration of March 2, 2009, a copy of which is attached as Exhibit "B."

I would appreciate being advised of what we may expect to receive in connection with the next distribution and the basis thereof.

Thank you for your anticipated reply.  Best regards.

Sincerely,

SHANIN SPECTER

SS/dg/kms
Enclosures

# EXHIBIT "A"

**Fortucci, Lisa**

| | |
|---|---|
| From: | Specter, Shanin |
| Sent: | Monday, October 17, 2005 1:42 PM |
| To: | Fortucci, Lisa |
| Subject: | Fw: DRAFT co-counsel agreement |

Print.


-----Original Message-----
From: Steve Berman <Steve@hbsslaw.com>
To: Specter, Shanin <Shanin.Specter@KlineSpecter.com>; Thomas Sobol <Tom@hbsslaw.com>
CC: Haviland, Donald E. <Donald.Haviland@KlineSpecter.com>
Sent: Sat Oct 15 14:28:41 2005
Subject: RE: DRAFT co-counsel agreement

I have forwarded this to co lead cunsel as an accurate reflecton of our discussions. We
will cacus at 7am pst on Monday and will call you all thereafter

steve

-----Original Message-----
From: Specter, Shanin [mailto:Shanin.Specter@KlineSpecter.com]
Sent: Saturday, October 15, 2005 8:11 AM
To: Steve Berman; Thomas Sobol
Cc: Haviland, Donald E.
Subject: DRAFT co-counsel agreement

Steve/Tom -- here is the draft agreement...

DRAFT
It is hereby agreed between the MDL co-lead counsel and Kline & Specter as
follows:

1.  MDL co-lead counsel have invited Kline & Specter to join the litigation of
plaintiffs' claims in MDL 1456.

2.  Kline & Specter and MDL co-lead counsel will file claims for Kline & Specter's
consumer clients in MDL 1456 to comply with the opinion and order of Judge Saris of August
2005 respecting consumer claims.

3.  MDL co-lead counsel will fully support and endorse Kline & Specter as an additional
co-lead in MDL 1456.

4.  Kline & Specter will be compensated for their time and costs on a par with the co-
leads.  All current co-leads' and Kline & Specter's compensation may be modified from
parity to the extent appropriate under principles of equity and fairness.  Kline &
Specter's time and costs to date, which total approximately 2-3 million dollars will be
added to the already existing time and costs of current MDL co-lead counsel and be
compensated along with other current MDL co-lead counsel upon recovery of attorneys' fees
and costs in MDL 1456.

5.  Kline & Specter will make contributions to the Litigation Fund on par with the other
co-leads for expenses going forward.  MDL counsel and Kline & Specter will promptly
exchange time records and costs records and will share such information going forward.
All counsel will keep records distinctly allocating time and costs among the various AWP
cases.

6.  Kline & Specter and Hagens Berman will make best efforts to cause the states they
represent in the AWP litigation to associate the current MDL
co-leads and Kline & Specter as co-leads in each state's case.  If this
cannot be accomplished, Kline & Specter and Hagens Berman will make best efforts to have

1

the current co-leads and Kline & Specter associate formally or informally in each state's AWP case.  Fees and costs attributed to the state cases will be divided according to principles of equity and fairness.

7.  The compensation of the current co-leads and Kline & Specter for time and costs will be by mutual agreement.  If agreement cannot be achieved, compensation will be set by binding arbitration.  The arbitrator will be selected by agreement.  If agreement cannot be achieved on the identity of the arbitrator, the arbitrator will be selected by the presiding judge of the case in which there is no agreement.  All aspects of the arbitration will be confidential.

8. This agreement is not dependent on the Court in MDL 1456 appointing Kline & Specter as an additional co-lead.  If Kline & Specter is not appointed as an additional co-lead, the agreements outlined herein will not be affected.

9.  All co-leads and Kline & Specter may use the work product, experts and fruits of  any and all AWP cases in any and all other AWP cases, subject to the provisions above.

10.  Kent Williams, Adam Levy and the firm of Jennings Haug will be invited to participate in MDL 1456 as a non co-lead.

11.  No party shall be considered to be the drafter of this agreement.

**Fortucci, Lisa**

| | |
|---|---|
| **From:** | Specter, Shanin |
| **Sent:** | Monday, October 17, 2005 1:42 PM |
| **To:** | Fortucci, Lisa |
| **Subject:** | Fw: DRAFT co-counsel agreement |

Print.


-----Original Message-----
From: Steve Berman <Steve@hbsslaw.com>
To: Specter, Shanin <Shanin.Specter@KlineSpecter.com>; Thomas Sobol <Tom@hbsslaw.com>
CC: Haviland, Donald E. <Donald.Haviland@KlineSpecter.com>
Sent: Sat Oct 15 14:26:22 2005
Subject: RE: DRAFT co-counsel agreement

I agree this reflects what we discussed. My only issue I have as follows. In the penn case
I don't want you using our expert work product unless we agree, we have spent several
years working with a panel of experts and we don't want them saying something in penn case
that would later hurt any other case. This is part of par 6, would appreciate your
thoughts

-----Original Message-----
From: Specter, Shanin [mailto:Shanin.Specter@KlineSpecter.com]
Sent: Saturday, October 15, 2005 8:11 AM
To: Steve Berman; Thomas Sobol
Cc: Haviland, Donald E.
Subject: DRAFT co-counsel agreement

Steve/Tom -- here is the draft agreement...

DRAFT
It is hereby agreed between the MDL co-lead counsel and Kline & Specter as
follows:

1.  MDL co-lead counsel have invited Kline & Specter to join the litigation of
plaintiffs' claims in MDL 1456.

2.  Kline & Specter and MDL co-lead counsel will file claims for Kline & Specter's
consumer clients in MDL 1456 to comply with the opinion and order of Judge Saris of August
2005 respecting consumer claims.

3.  MDL co-lead counsel will fully support and endorse Kline & Specter as an additional
co-lead in MDL 1456.

4.  Kline & Specter will be compensated for their time and costs on a par with the co-
leads.  All current co-leads' and Kline & Specter's compensation may be modified from
parity to the extent appropriate under principles of equity and fairness.  Kline &
Specter's time and costs to date, which total approximately 2-3 million dollars will be
added to the already existing time and costs of current MDL co-lead counsel and be
compensated along with other current MDL co-lead counsel upon recovery of attorneys' fees
and costs in MDL 1456.

5.  Kline & Specter will make contributions to the Litigation Fund on par with the other
co-leads for expenses going forward.  MDL counsel and Kline & Specter will promptly
exchange time records and costs records and will share such information going forward.
All counsel will keep records distinctly allocating time and costs among the various AWP
cases.

6.  Kline & Specter and Hagens Berman will make best efforts to cause the states they
represent in the AWP litigation to associate the current MDL
co-leads and Kline & Specter as co-leads in each state's case.   If this

1

cannot be accomplished, Kline & Specter and Hagens Berman will make best efforts to have the current co-leads and Kline & Specter associate formally or informally in each state's AWP case.  Fees and costs attributed to the state cases will be divided according to principles of equity and fairness.

7.   The compensation of the current co-leads and Kline & Specter for time and costs will be by mutual agreement.  If agreement cannot be achieved, compensation will be set by binding arbitration.  The arbitrator will be selected by agreement.  If agreement cannot be achieved on the identity of the arbitrator, the arbitrator will be selected by the presiding judge of the case in which there is no agreement.  All aspects of the arbitration will be confidential.

8. This agreement is not dependent on the Court in MDL 1456 appointing Kline & Specter as an additional co-lead.  If Kline & Specter is not appointed as an additional co-lead, the agreements outlined herein will not be affected.

9.   All co-leads and Kline & Specter may use the work product, experts and fruits of  any and all AWP cases in any and all other AWP cases, subject to the provisions above.

10.   Kent Williams, Adam Levy and the firm of Jennings Haug will be invited to participate in MDL 1456 as a non co-lead.

11.   No party shall be considered to be the drafter of this agreement.

2

## Fortucci, Lisa

| | |
|---|---|
| **From:** | Specter, Shanin |
| **Sent:** | Monday, October 17, 2005 11:02 AM |
| **To:** | Fortucci, Lisa |
| **Subject:** | Fw: our agreement |

Print.


-----Original Message-----
From: Specter, Shanin <Shanin.Specter@KlineSpecter.com>
To: 'Steve@hbsslaw.com' <Steve@hbsslaw.com>; 'Tom@hbsslaw.com' <Tom@hbsslaw.com>;
Haviland, Donald E. <Donald.Haviland@KlineSpecter.com>
CC: Kline, Thomas R. <Tom.Kline@KlineSpecter.com>
Sent: Mon Oct 17 11:00:35 2005
Subject: Re: our agreement

:-)



-----Original Message-----
From: Steve Berman <Steve@hbsslaw.com>
To: Specter, Shanin <Shanin.Specter@KlineSpecter.com>
Sent: Mon Oct 17 10:58:56 2005
Subject: RE: our agreement

Agree with all of the below:)

-----Original Message-----
From: Specter, Shanin [mailto:Shanin.Specter@KlineSpecter.com]
Sent: Monday, October 17, 2005 7:58 AM
To: Steve Berman; Haviland, Donald E.
Cc: Sean Matt; Thomas Sobol
Subject: Re: our agreement

I'm glad to be working with you and your litigation partners.  I gather that all co-leads
are paying the 150k -- if so, count us in.  As expressed on our call and in the Draft
Agreement, I need to see the ledger information to date...

And we're happy to have someone else redraft -- this is a form only matter, I trust...



-----Original Message-----
From: Steve Berman <Steve@hbsslaw.com>
To: Haviland, Donald E. <Donald.Haviland@KlineSpecter.com>; Specter, Shanin
<Shanin.Specter@KlineSpecter.com>
CC: Sean Matt <Sean@hbsslaw.com>; Thomas Sobol <Tom@hbsslaw.com>
Sent: Mon Oct 17 10:40:17 2005
Subject: our agreement

we agree to join . the group would prefer to redraft the agreement so that the fee stuff
is in one place not several. also they want to clarify that you will pay the current
assessment of 150k


we are due to submit a proposed class cert order today and we will list ks as proposed
lead counsel

1

# EXHIBIT "B"



24016702

Mar 2 2009
9:56PM

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL NO. 1456 |
| THIS DOCUMENT RELATES TO: | CIVIL ACTION: 01-CV-12257-PBS |
| TRACK 2 SETTLEMENT | Judge Patti B. Saris |

**DECLARATION OF MARC H. EDELSON IN SUPPORT OF CLASS PLAINTIFFS'
JOINT PETITION FOR ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES
IN RELATION TO TRACK 2 SETTLEMENT**

I, Marc H. Edelson, being duly sworn, depose and say:

1.      I am a partner of the law firm of Hoffman & Edelson, LLC one of the Co-Lead

Class Counsel for plaintiffs in this matter.  I am submitting this Affidavit in support of all

Plaintiffs' Counsel's (including my firm's) application for an award of attorneys' fees and

reimbursement of expenses provided in connection with the services rendered to plaintiffs and

the Class by Plaintiffs Class Counsel in the course of this litigation.  Plaintiffs' Counsel are

seeking an award of fees and expenses in the aggregate amount of Thirty Seven Million Five

Hundred Thousand Dollars ($37,500,000.00) to be paid out of the One Hundred Twenty Five

Million Dollar ($125,000,000.00) common fund created by the settlement.

2.      I am an attorney in good standing and duly licensed and admitted to the Bars of

New York and Pennsylvania.  The testimony set forth in this Declaration is based on first-hand

knowledge, about which I could and would testify competently in open Court if called upon to

do so.

3.     My firm is counsel of record for plaintiff, Philadelphia Federation of Teachers Health and Welfare Fund.  As one of Plaintiffs' Co-Lead Class Counsel, my firm collected and tracked loadstar and expenses by Plaintiffs' Class Counsel from the inception of the litigation.

4.     I attach, as <u>Exhibit 1</u>, a detailed summary indicating the amount of hours spent by each firm who worked on this litigation and the lodestar calculation based on each firm's historical billing rates (the rates for each timekeeper that were in effect during this litigation, and when the work was performed).  The schedule was prepared from computerized records that were contemporaneously generated and kept by each firm in the ordinary course of its business.  Time expended in preparing Plaintiffs' Class Counsel's application for fees and reimbursement of expenses has not been included in the hour or lodestar calculations.

5.     From the inception of the case through March 31, 2008[1], Plaintiffs' Class Counsel expended a total of 206,789.09 hours on behalf of the Class Plaintiffs and the Class.  The total lodestar amount for these hours based on each firm's historical hourly billing rates is $71,387,965.47.  The hourly rates used in determining the loadstar set out in <u>Exhibit 1</u> are the same rates that each firm charged, and collected from, its hourly clients paying for services on a non-contingent basis and on which they have received fee awards from other courts.

6.     In addition, as detailed in <u>Exhibit 1</u>, Plaintiffs' Class Counsel expended a total of $10,520,273.88 in expenses in connection with the prosecution of this litigation up to March 31, 2008.

7.     Each firm has represented to Co-Lead Class Counsel that they recorded these expenses as they were incurred, and they are reflected in its computerized bookkeeping records

---

[1] April 4, 2008 is the date the Settlement Agreement with the Track 2 defendants was executed.

which were created from invoices, receipts and other proofs of the charges and payments. Evidence of same will be provided to the Court upon request.

8.      Thus, for this litigation, the total historical lodestar of for all Plaintiffs' firms is $71,387,965.47 and the firms incurred expenses of $10,520,273.88.

9.      The foregoing numbers remain unaudited, and it is it is possible that we have not received complete information from all counsel. Consequently, the lodestar information may change. Nonetheless, we believe that it is a reasonable approximation of the hours and expenses incurred by counsel through March 31, 2008.

10.     Previously, Plaintiffs' counsel were awarded $21,615,000 as compensation for both attorneys' fees and expenses from the settlement with GSK. Plaintiffs' counsel have also been awarded $8,580,000.00 as compensation for both attorneys' fees and expenses in regard to the settlement with AstraZeneca. The settlement with AstraZeneca is not as yet final and is currently on appeal before the United States Court of Appeals for the First Circuit.

I declare under penalty of perjury under the laws of the Commonwealth of Massachusetts that the foregoing is true and correct to the best of my knowledge.

Executed this 2nd day of March, 2009.


                                        /s/ Marc H. Edelson
                                        Marc H. Edelson

## CERTIFICATE OF SERVICE

I hereby certify that I, Steve W. Berman, an attorney, caused a true and correct copy of the foregoing, **DECLARATION OF MARC H. EDELSON IN SUPPORT OF CLASS PLAINTIFFS' JOINT PETITION FOR ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES IN RELATION TO TRACK 2 SETTLEMENT**, to be delivered to all counsel of record by electronic service pursuant to Paragraph 11 of the Case Management Order No. 2, by sending on March 2, 2009, a copy to LexisNexis File & Serve for posting and notification to all parties.

                                      **/s/ Steve W. Berman**
                                      Steve W. Berman

# Exhibit 1

**AWP Settlement Lodestar & Expense Report**

| Firm Name | Firm Hours Inception – March 2008 | Firms Lodestar Inception – March 2008 | Firms Expenses Inception – March 2008 |
|---|---|---|---|
| Audet & Partners, LLP | 960.00 | $353,250.00 | $18,550.17 |
| Bolognese & Associates, LLC | 1,807.25 | $485,487.50 | $25,665.10 |
| Carey & Danis, LLC | 463.45 | $120,837.50 | $20,867.82 |
| Cohen, Milstein, Hausfeld & Toll, LLC | 1,350.60 | $404,187.50 | $15,996.13 |
| Cuneo Gilbert & Lacua, LLP | 2,383.36 | $1,160,626.25 | $122,584.53 |
| Freeman & Lorry, P.C. | 26.10 | $5,872.50 | $00.0 |
| Hagens Berman Sobol Shapiro, LLP | 53,765.24 | $20,395,821.50 | $3,623,585.16 |
| Criden & Love, P.A. | 80.00 | $44,575.00 | $734.57 |
| Heins, Mills & Olson, P.L.C. | 21,150.25 | $6,780,446.25 | $511,926.83 |
| Hoffman & Edelson, LLC | 28,431.75 | $9,890,607.50 | $1,670,990.46 |
| Hulett Harper Stewart, LLP | 19.80 | $10,098.00 | $1,682.69 |
| Karmel Law Firm | 78.25 | $31,300.00 | $423.37 |
| Keller Rohrback, LLP | 204.05 | $93,440.60 | $7,857.74 |
| Kline Spector, P.C. | 6,681.75 | $3,486,937.32 | $602,739.90 |
| Law office of Adam S. Levy | 772.59 | $297,412.50 | $9,229.62 |
| Milberg, LLP | 701.25 | $209,860.00 | $4,945.25 |
| Piper  & Associates | 2,353.00 | $782,050.00 | $109,883.58 |
| RodaNast, P.C. | 4,260.10 | $983,957.75 | $17,008.23 |
| Rossbachler Firm | 549.45 | $146,534.25 | $42,620.95 |
| Sheller, P.C. | 7,235.10 | $2,066,208.25 | $103,647.94 |
| Shepherd, Finkelman, Miller & Shah, LLC | 4,255.00 | $1,435,025.50 | $29,422.01 |
| Spector, Roseman  Kodroff & Willis, P.C. | 22,965.60 | $7,587,436.75 | $1,620,836.12 |
| Squitieri & Fearon, LLP | 345.50 | $121,062.50 | $17,902.03 |
| Trujillo Rodriguez & Richards, LLC | 1,311.10 | $400,965.50 | $4,486.30 |
| Weller, Green, Toups & Terrell, L.L.P. | 4,726.45 | $1,624,852.50 | $34,618.30 |
| Wexler Wallace LLP | 33,391.25 | $10,355,473.05 | $1,843,426.21 |
| Williams Law Firm | 5,863.75 | $1,834,287.00 | $58,587.00 |
| Young, Pickett & Lee | 657.10 | $279,352.50 | $55.87 |

# EXHIBIT N

## Baldwin, Kila B.

| | |
|---|---|
| **From:** | medelson@edelson-law.com |
| **Sent:** | Friday, October 07, 2011 3:04 PM |
| **To:** | Specter, Shanin; Marc Edelson |
| **Cc:** | Baldwin, Kila B. |
| **Subject:** | Re: AWP MDL |

Nothing has been discussed

Marc H. Edelson
Edelson & Associates, LLC
45 West Court Street
Doylestown, Pennsylvania 18901
Telephone (215) 230-8043
Fax (215) 230-8735

medelson@edelson-law.com

---

**From:** "Specter, Shanin" <Shanin.Specter@KlineSpecter.com>
**Date:** Fri, 7 Oct 2011 18:52:59 +0000
**To:** 'medelson@edelson-law.com'<medelson@edelson-law.com>
**Cc:** Baldwin, Kila B.<Kila.Baldwin@KlineSpecter.com>
**Subject:** Re: AWP MDL

Thanks for the email...

May I please trouble you to address these questions?

1. What's the procedure going forward for consideration of the fee split among the plaintiffs' firms?

2. Are the figures you used with the Court for us -- $3,486,937.32 for lodestar and $602,739.90 -- still going to be utilized? This amount includes work in the state cases, which helped advance the litigation, as is implicit in your inclusion of it in your submission to the Court.

3. How much may we expect to receive and what is the basis for that proposed figure?

Best regards to you and the team...

Shanin

---

**From:** Marc Edelson [mailto:medelson@edelson-law.com]
**Sent:** Friday, October 07, 2011 08:55 AM
**To:** Baldwin, Kila B.
**Cc:** Specter, Shanin
**Subject:** Re: AWP MDL

this was sent to a select group of tier three firms who never supplied their backup

Marc H. Edelson, Esq.
Edelson & Associates, LLC
45 West Court Street
Doylestown, Pennsylvania  18901
(215) 230-8043
(215) 230-8735 (fax)
(215) 272-0517 (mobile)
medelson@edelson-law.com

----- Original Message -----
**From:** Baldwin, Kila B.
**To:** medelson@edelson-law.com
**Cc:** Specter, Shanin
**Sent:** Thursday, October 06, 2011 4:59 PM
**Subject:** RE: AWP MDL

May we please have a copy? What is the procedure from here?

**From:** medelson@edelson-law.com [mailto:medelson@edelson-law.com]
**Sent:** Thursday, October 06, 2011 3:18 PM
**To:** Baldwin, Kila B.; Marc Edelson
**Cc:** Specter, Shanin
**Subject:** Re: AWP MDL

The letter merely requested backup for time and expenses previously submitted.

Marc H. Edelson
Edelson & Associates, LLC
45 West Court Street
Doylestown, Pennsylvania 18901
Telephone (215) 230-8043
Fax (215) 230-8735

medelson@edelson-law.com

**From:** "Baldwin, Kila B." <Kila.Baldwin@KlineSpecter.com>
**Date:** Thu, 6 Oct 2011 18:45:25 +0000
**To:** medelson@edelson-law.com<medelson@edelson-law.com>
**Cc:** Specter, Shanin<Shanin.Specter@KlineSpecter.com>
**Subject:** AWP MDL

Hi Marc. I called you recently without success.

Shanin and I recently spoke to Kent Williams and learned that a letter was sent to co-counsel in the MDL, apparently with the exception of Kline & Specter, asking for lodestar and/or cost submissions. We are curious why Kline & Specter did not get a letter, if it was sent, and when a fee allocation may take place. The last time we spoke, you told me it would be several years before any allocation was made.

Please return my call when convenient...

Thanks,

2