## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456 |
| THIS DOCUMENT RELATES TO: | CIVIL ACTION:  01-CV-12257-PBS |
| ALL CLASS ACTIONS | Judge Patti B. Saris |
| | (Leave to file granted on 1/17/12) |

### REPLY MEMORANDUM IN SUPPORT OF LEVY'S MOTION FOR MODIFICATION OF LEAD COUNSEL'S ALLOCATION OF FEES AND REIMBURSEMENT OF EXPENSES TO INCLUDE UNCOUNTED TIME AND EXPENSE INCURRED DIRECTLY IN THIS MDL

## I.       INTRODUCTION

The factual record, including the evidence provided in connection with this Reply, coupled with the "private settlement"[1] agreement ("Agreement") between Lead Counsel and Haviland and Lead Counsel's stunning admissions in their opposition papers, demonstrate that Lead Counsel is responsible for paying Levy's claim.  Although Levy is not waiving its alternative request for discovery concerning the Agreement and negotiations leading to it if this Court does not outright rule in Levy's favor, such discovery should not be necessary.  The record as it stands shows that Levy's claim was not compromised by their Agreement and that Lead Counsel, in an abuse of discretion, are improperly refusing to pay Levy for any of its work performed after August 2006 in this MDL.[2]  Accordingly, this Court should order Lead Counsel to modify its allocation and pay Levy for all of his MDL work.[3]

---

[1] The settlement was expressly referred to as a "private settlement" in the Haviland firm's motion to withdraw objections regarding the Track 2 Settlement, Dkt. No. 7766 at p.2, which filing provided no details regarding the settlement and did not mention any written agreement codifying the settlement.

[2] Lead Counsel are already making a full allocation to Levy for its MDL time and expense prior to September 2006. Thus there is no dispute as to that portion of Levy's MDL time and expense.

Lead Counsel knows that they cannot succeed in refusing to pay Levy on the basis of their Agreement. They have therefore resorted to maligning Mr. Levy and attacking his billings as purported justification for not paying Levy. This is a ruse and is retaliation for Levy's assertion of its claim. Not only are Levy's billings appropriate, but Lead Counsel have acted unfairly and arbitrarily in subjecting Levy to a curiously-timed audit style examination and requesting this Court to review Levy's billings while performing and seeking nothing of the sort for other reporting plaintiffs firms. Lead Counsel are paying themselves, the other plaintiffs firms, and even the Haviland firm (as a ***Tier II***[4] firm via their Agreement), without serious or any reservations and no similar examination to determine whether all of their work was properly billed and charged, successful and beneficial to the Classes, and otherwise appropriate to pay in all instances. Lead Counsel's unfair and arbitrary treatment of Levy is a glaring abuse of discretion, and their refusal to pay Levy should not stand.

## II.     ARGUMENT

**A.     The Private Agreement Between Lead Counsel and Haviland Does Not Include Levy or Compromise Levy's Claim, and Does Not Absolve or Protect Lead Counsel from Their Responsibility and Obligation to Pay Levy's Claim.**

The evidence, the Agreement and Lead Counsel's admissions all point to the same conclusion. Levy's fee and expense claim was not resolved or compromised as part of the Agreement, and Lead Counsel is responsible for paying Levy.

---

[3] For the same reasons, Lead Counsel may not rely on their Agreement or Levy's prior Of Counsel position for their refusal to allocate any fees and expenses to Levy for its state court work (most, but not all, of which occurred while Mr. Levy served as Of Counsel). As this Court is aware, the matter of payment for state court work is the subject of a separate pending motion filed by Levy and other firms.

[4] *See* Class Counsel's Proposed Future Fee Allocation Guidelines, Dkt. No. 5836 at 5-7 (describing "tier" payment structure).

1.        **The Lead-Up to the Agreement Supports Levy's Position.**

On the night of Friday July 29, 2011, with Mr. Haviland believing that he was going to close a deal that night with Lead Counsel attorney Sean Matt, Mr. Haviland sent Mr. Levy a phone text notifying Mr. Levy for the first time that he was near a deal with Lead Counsel.[5] However, Mr. Haviland's text indicated that he had incorrectly stated to Lead Counsel a significantly lower figure than the accurate figure for Levy's Of Counsel lodestar, which Mr. Levy pointed out to Mr. Haviland in a responding text.  As a result, Mr. Haviland by reply text told Mr. Levy that he had to do a deal that night and said he intended to tell Lead Counsel that Levy's post-August 2006 time "is separate and u [sic] can stay in Tier 3 all in as ASL."  Supp. Levy Decl. ¶¶ 3-4 & Exh. 1.  Shortly thereafter, Mr. Levy emailed Mr. Haviland stating that he wanted to discuss the matter because of his concern as to whether Lead Counsel would in fact pay Levy for its time and expense accrued while Of Counsel to the Haviland firm.  In an email response, Mr. Haviland told Mr. Levy that there was nothing to discuss, that he intended to tell Mr. Matt that he was dealing in good faith, but not on Mr. Levy's behalf, and that "[y]ou will lose nothing as a result."  *Id.* ¶ 5 & Exh. 2.

A deal was not consummated that evening and, based on Levy's understanding at the time, there was no expectation of a deal.  Unbeknownst to Levy, Haviland and Lead Counsel either kept negotiating or resumed their negotiations leading to their Agreement nearly one month later.  They did so without informing or involving Mr. Levy in the negotiations or telling

---

[5] Prior to that date, Levy knew only that a mediation process was underway and that as part of that process Mr. Haviland submitted to the mediator Levy's accurate "Of Counsel" lodestar and expense figures (identified separately from the Haviland firm's lodestar and expense figures).  Supplemental Declaration of Adam S. Levy in Connection with Reply Memorandum in Support of Motion for Modification of Lead Counsel's Allocation of Fees and Reimbursement of Expenses to Include Uncounted Time and Expense Incurred Directly in this MDL ("Supp. Levy Decl.") ¶ 3.

him about the Agreement.[6]  *Id.* at ¶ 6.  As discussed below, Lead Counsel has admitted in their opposition papers that they completely excluded Levy from their negotiations with Haviland and did not seek a release from Mr. Levy despite their knowledge of Levy's claim.  This is entirely consistent with everything Mr. Haviland told Mr. Levy regarding his intention to enter a deal with Lead Counsel that would not include Levy and would not compromise Levy's claim.

Consistent with the evidence above, Levy's original Declaration says that Haviland told Levy that he would tell Lead Counsel that Levy's time and expense would stay separate to be counted and handled within Tier III.  Original Levy Decl. at 17.  Lead Counsel have not denied that Haviland said or that Haviland discussed with them what Haviland told Levy he would say.

2.     **Mr. Haviland's Statements to Mr. Levy After Disclosure of the Private Settlement Are Consistent with his Intentions as Stated to Levy Before the Settlement was Disclosed.**

As stated in Levy's original Declaration, Levy learned of the "private settlement" when Haviland filed the motion to withdraw objections to the Track 2 settlement.  Original Levy Decl. ¶ 13.  Thereafter, consistent with Mr. Haviland's stated intentions prior to entering into the Agreement, Mr. Haviland assured Mr. Levy that he had discussed the matter of Levy's fees and expenses with Lead Counsel as part of their negotiations and they agreed that Levy was not part of the settlement, that Levy's time and expense was carved out of the settlement and that their Agreement did not settle or resolve Levy's claim for payment.  Supp. Levy Decl. ¶ 7; *see also* Original Levy Decl. ¶ 17.  However, despite Levy's request to Mr. Haviland for assistance in

---

[6] The Agreement is attached as Exhibit 3 to Steve Berman's Opposition Declaration.  Lead Counsel sought to keep the Agreement hidden, but reluctantly produced it only because Levy called attention to it in its Motion and because their untenable position is based on it.  Prior to filing its Motion, Levy requested the Agreement but Lead Counsel did not produce it.  Supp. Levy Decl. ¶ 6; *see* original Declaration of Adam S. Levy in Support of Motion for Modification of Lead Counsel's Allocation of Fees and Reimbursement of Expenses to Include Uncounted Time and Expense Incurred Directly in this MDL ("original Levy Decl."), Dkt. 7943 at ¶ 18.  Only *after* Levy filed its Motion and then requested it again did they provide the Agreement to Levy.  Until then, Levy had not received a copy of the Agreement from anyone.  Supp. Levy Decl. ¶ 6.

this matter, Mr. Haviland has told Mr. Levy that he cannot assist Levy because of a provision in the Agreement that bars him from doing so.[7]  Mr. Haviland has obeyed this provision and has refused to help Levy.  *Id.*

> ### 3.    The Agreement And Lead Counsel's Admissions Further Support Levy's Position and Demonstrates the Absurdity of Lead Counsel's Argument.

Consistent with Haviland's representations that he would tell Lead Counsel that Levy's claim was separate and would stay in Tier III, that he intended to tell Sean Matt that he was not negotiating on behalf of Levy and that Levy would "lose nothing as a result," and his representations to Levy after the Agreement was executed, Lead Counsel admit that the amount negotiated and paid to resolve Haviland's claim ***did not include Levy's time.***  Opp. at 3 ("neither Lead Class Counsel nor Haviland Hughes ***expressly*** agreed to compensate Levy or to indemnify each other from any claims that Levy may make, even though ***the amount being negotiated did not include Levy's time.***") (emphasis added); ("the 1.8 million [paid to Haviland] was negotiated off a number ***that did not include Levy's time***[.])"  Opp. at 6.  Tellingly, Lead Counsel's carefully worded Opposition (and supporting Declaration of Steve Berman) does not come right out and say that Lead Counsel and Haviland agreed that Levy's claim for payment in the MDL is barred by the Agreement.  Rather, Lead Counsel say that they did not "expressly agree[] to compensate Levy."

Also consistent with Mr. Haviland's representations, Lead Counsel further admit that they intentionally avoided involving Mr. Levy in or informing him of the negotiations and

---

[7] At that point, Levy still had not obtained a copy of the Agreement.  *See* note 6 *supra.*

attempting to obtain a release from Levy.[8]  Opp. 6 n.20.  If, as Mr. Haviland has represented, he informed Lead Counsel that Levy's time was separate[9] and to be included in Tier III, and that he was not negotiating on Levy's behalf, then there was no reason (at least for ***them***) to include Levy in the negotiations with Haviland for an Agreement to resolve only Haviland's claim for fees and expenses that, as Lead Counsel admit, "did not include Levy's time."  But, despite knowing of Levy's separate claim, and apparently having been told of the expectation that it was not being resolved and would be included in Tier III, Lead Counsel intentionally avoided Levy and moved forward with resolving only Haviland's claim.

As part of the Agreement to pay $1.8 million to Haviland, Lead Counsel demanded and obtained a provision prohibiting Haviland from assisting Levy in making the very claim that they anticipated all along.  Lead Counsel state:

> The Agreement stipulates that Mr. Haviland and his firm may not "advocate for any fees to be paid to anyone else seeking fees, separate and apart from the $1,800,000 awardable to Haviland Hughes, LLC under this agreement."  We included this provision in the Agreement so that Haviland Hughes would not later argue that it was Lead Counsel's responsibility to compensate ***Levy*** out of fees awarded by the Court in the AWP MDL.

Opp. at 3-4 (emphasis added).

---

[8] Throughout their Opposition, Lead Counsel continue to inaccurately call Mr. Levy a former "employee" of the Haviland firm.  As Levy corrected Lead Counsel before, *see* Dkt. No. 7989 at p.1, n.1., Mr. Levy previously served as Of Counsel to the Haviland firm, but was not an "employee" of the firm.

[9] Lead Counsel point to the fact that Haviland's reporting of time and expense in 2010 (and possibly as early as 2008) also reported Levy's time and expense.  *See* Opp. at 5 n.17 and Exhibit 1 to the Berman Declaration.  From that material, Lead Counsel knew that Haviland's submission also separated out Levy's time and expense from Haviland's.  The Berman Declaration Exhibit 1provides a one-page summary chart (at page 6 of the Exhibit), which plainly and specifically sets out Levy's "Of Counsel" hours, lodestar and expense apart from "Haviland Hughes, LLC's" hours, lodestar and expense, before providing a "combined" total of the two.  No other person affiliated with the Haviland firm had such specifically separated information.  Indeed, the rest of the 240-page exhibit consists of the individual and separate fee and expense detail reports of all members, associates and employees of the Haviland firm ***without*** Levy (on the one hand) and of Levy exclusive of the Haviland firm (on the other).  Thus, in addition to whatever Lead Counsel and Haviland discussed with respect to Levy's time and expense as part of their secret negotiations over the Agreement, Lead Counsel long ago knew of a certain separateness in Haviland's reporting of Levy's time and expense.  Nevertheless, they went to pains to avoid "expressly" discussing Levy in their Agreement.  Opp. at 3.

Stunningly, according to Lead Counsel, this provision muting Mr. Haviland was crafted for the sole purpose of thwarting Levy's attempt to make a rightful claim. The intention of this "Levy Provision" was to block Levy from a crucial and the only viable source of evidence – *i.e.* Mr. Haviland – were Levy ever to make the claim they anticipated. If the Agreement had clearly, unambiguously and legitimately covered and resolved Levy's claim, then the Levy Provision that has muzzled Mr. Haviland would have been completely unnecessary.

This explains why Lead Counsel so cleverly and carefully chose their words when they said that "neither Lead Class Counsel nor Haviland Hughes ***expressly agreed to compensate Levy***[.]" Opp. at 3. Lead Counsel may not have expressly agreed to compensate Levy in their Agreement, but nor did they expressly agree ***not*** to pay or compromise Levy's claim despite knowing about his time and excluding it from their negotiations and final agreed sum. For the same reasons, and given the compelling factual record that supports Levy's position, it is mystifying that Lead Counsel places any significance on the fact that the Agreement is "silent" as to Levy. Opp. at 3. If anything, that silence is a further indication that they did not compromise Levy's claim and that they remain responsible for paying Levy for his work.

Lead Counsel's refusal to pay Levy based on the Agreement is absurd on multiple levels and is inconsistent with the evidence of Haviland's intentions and representations and Lead Counsel's lack of denials, with their own admissions that Levy's time was not included in their negotiations and Agreement, with their intentional efforts to exclude Levy from the negotiations with Haviland despite knowledge and anticipation of Levy's claim, and with the existence of and need for a provision that prohibited Haviland from assisting Levy with the very claim that they anticipated but did not protect against. Because the settlement with Haviland did not compromise or include payment for Levy's claim in the MDL, Lead Counsel have an obligation

to pay Levy for the work he did on behalf of plaintiffs and the Classes, or that otherwise benefitted the Classes, in the same manner and under the same standards that they are paying other firms, including Haviland (now as Tier II).  Lead Counsel's refusal to pay Levy is an abuse of discretion and they should be ordered to make a full allocation of fees and expenses for Levy's MDL work after August 2006.

> **B.      Even if the Agreement Were Absurdly Construed to Include Levy's Claim, Lead Counsel is Culpable and Responsible for Paying Levy Because of  Their Admitted Role in Attempting to Thwart Levy's Legitimate Claim.**

Even if against the evidence the Agreement were absurdly construed to have resolved Levy's claim for payment from Lead Counsel or in some other fashion would permit them to avoid  paying Levy, Lead Counsel would not be absolved of culpability for ***their own admitted role*** in thwarting (or the attempt to thwart) Levy's legitimate claim for payment in the MDL. Astoundingly, Lead Counsel have represented that they worked in concert ***with*** Mr. Haviland intending that "***neither" of them*** would pay Levy anything for its MDL work during Mr. Levy's time as Of Counsel.  Opp. at 3.  If this is true, then they appear to have demonstrated, among other things, that they conspired with Mr. Haviland to thwart payment to Levy, intentionally and tortiously interfered with Levy's contractual and business relations with Haviland, assisted Haviland in breaching a fiduciary duty that Lead Counsel knew or should have known Haviland owed to Levy, engaged or participated in a conversion of the fees and expenses owed to Levy, and unjustly enriched themselves.  Further, via the Levy Provision, they have attempted to obstruct justice by keeping relevant facts and evidence from Levy and this Court.  Therefore, Lead Counsel should still be held responsible for paying Levy.

Lead Counsel's allocation decisions must be "fair and transparent."  Electronic Order (Saris, J., Dec. 10, 2008 entered at 4:06 PM).  Lead counsel in any class action has a duty to

make sure that a court has all the facts in passing on a fee application and an allocation of fees, and a court has the authority to reject an agreement to allocate fees among class counsel whenever there is cause to do so. *Allapattah Servs., Inc. v. Exxon Corp.*, 454 F.Supp.2d 1185, 1225-26 (S.D. Fla. 2006). Lead counsel must also fulfill their obligation to "'act fairly … in the interest of all parties and parties' counsel.'" *In re Cardinal Health, Inc. ERISA Litig.,* 225 F.R.D. 552, 555 (S.D. Ohio 2005) (quoting *Manual for Complex Litigation* (4th ed. 2004) § 10.22); *accord San Juan Dupont Plaza Hotel Fire Litig.*, 111 F.3d 220, 234 (1st Cir. 1997) (quoting same with respect to obligation of a plaintiffs steering committee). Courts impose a demanding level of trust on lead counsel, and with allocation of a very large total fee award, a court can expect "'[n]ot honesty alone, but the punctilio of an honor most sensitive.'" *In re Vitamins Antitrust Litig.*, 398 F.Supp.2d 209, 237 (D.D.C 2005) (quoting Judge Cardozo in *Meinhard v. Salmon*, 249 N.Y. 458, 464, 164 N.E. 545, 546 (1928)).

If Lead Counsel's representations are true, their conduct soundly violates these standards. While responsibility for payment may also rest on Haviland, Lead Counsel cannot escape their own complicity and, minimally, Lead Counsel has abused its discretion and should be held responsible for paying Levy. Thus, under any scenario, Lead Counsel should be required to make a full allocation to Levy for its post-August 2006 time and expense.[10]

---

[10] Because of Lead Counsel's individual responsibility to pay Levy and their culpability for their **own** conduct, Levy should not, as Lead Counsel implies, be made to initiate separate litigation outside of this forum against Haviland in order to get paid. *See, e.g.*, Opp. at 1 (referring to Levy's association with Haviland and stating that "Levy's dispute is not with Lead Counsel or this Court"), at 5 ("that Haviland Hughes has not paid Levy for his work while he was Of Counsel to that firm does not entitle Levy to a separate fee award by the Court"), and at 7 ("The fact that Levy perceives Lead Counsel as an easier target than Haviland Hughes does not change this result."). However, although Levy maintains that Lead Counsel is responsible for paying Levy in this MDL, and that Levy should not be made to institute separate litigation against Haviland, Levy does not waive and is not waiving any rights, and reserves all rights, that Levy has or may have against Mr. Haviland and/or his law firms (past and present) for any responsibility or culpability that exists or may exist on their part.

**C.     Lead Counsel's Meritless, Unfair, and Arbitrary Attack of Levy's Billings are in Retaliation Against Levy for Asserting its Claim and are an Abuse of Discretion.**

Levy denies Lead Counsel's allegations of improper work, over-billing or work that should otherwise not be compensated.  However, Levy's billings are not the real story here.  Lead Counsel's attack is a diversion and a ruse.  As shown above, Lead Counsel's reliance on their Agreement with Haviland affords them no protection from Levy's claim.  Knowing this, they have resorted to maligning Mr. Levy and attacking some of Levy's billings as justification for non-payment.  Despite having Levy's time detail since at least early 2010, if not since 2008, only now have they raised this.  *See* Opp. at 5 & n.17; *see also* note 9 *supra*.  Even more telling is that Lead Counsel have not performed (or requested the Court for permission to perform) a similar audit style examination of, or taken serious issue with, the billings of other firms in this case.  The real story is that Lead Counsel's audit and attack in this Court ***only of Levy's*** fee detail is retaliation for asserting in this Court a claim that they simply do not want to pay.

This singling-out of Levy is patently arbitrary and unfair.  Nor are they acting transparently.  No one has access to the fee detail of Lead Counsel or to the other firms that report to Lead Counsel.  They can make very serious accusations about any one firm's or attorney's time entries without concern over having their own billings (or those of anyone they arbitrarily choose to pay) inspected and analyzed for that which the Court might refuse to permit payment.  Lead Counsel is the proverbial fox guarding the henhouse, *see In re High Sulfur Content Gasoline Prods. Liab. Litig.*, 517 F.3d 220, 235 (5th Cir. 2008) (citing *In re Diet Drugs Prods. Liab. Litig.*, 401 F.3d 143, 173 (3d Cir. 2005) (Ambro J., concurring)), and have demonstrated their arbitrariness in attacking Levy's time only.  While it is ***not*** Levy's preference to request that this Court perform a review and audit of every firm's time and to make

appropriate adjustments, Lead Counsel should not be permitted to treat Levy differently than other firms.  If Lead Counsel are permitted not to pay Levy based on their audit and request for Court review, fairness dictates that the Court perform a review and audit of all firms' time, including Lead Counsel's.

Even without access to the time and expense detail of Lead Counsel and other firms, it is easy to see that Lead Counsel's non-compensable work and inappropriate billings have resulted in bloated lodestars and ***millions of dollars*** improperly paid to themselves.  Though the attack is directed only at Levy, it appears that the reporting plaintiffs firms in this case are being paid their full lodestars without reservation, except for apparently the most minor "time adjust[ments]" to "***some*** Tier III firms … for time that was deemed ***extraneous***."[11]  *See* Co-Lead Counsel, Hoffman & Edelson's memorandum in support of its motion to stay distribution of fees, Dkt. 8002 at 3 ("Edelson Mem. re Motion to Stay") (emphasis added).  This is consistent with Lead Counsel's "all-in" approach to allocating fees, by which they have unwaveringly maintained that unsuccessful or non-beneficial efforts (mostly by Lead Counsel) should be fully compensated, because this properly "recognize[s] the contribution of everyone's work to the benefits achieved on a class-wide basis in all settlements."  *See* Response to Williams' Motion for Court Review of Lead Counsel's Allocation of GSK Fee Award, Dkt. No. 5685, at 21-22.

The Edelson firm's motion papers show that the Lead Counsel firms are lining their own pockets based on work that should not be compensated.  Through November 2011, the four "Tier I" Co-Lead Counsel firms alone have billed in excess of ***$50,000,000,*** nearly 70% of the total

---

[11] Comparing the various charts compiling the Tier III firms' lodestars over time, and accounting for the disappearance of Haviland Hughes' prior (lesser) credited lodestar from the latest chart of lodestar through November 2011 attached as Exhibit B to Mr. Edelson's Declaration in support of his firm's pending motion to stay distribution, Dkt. 8001 at p.33, it appears that Lead Counsel's time adjustments have resulted in only very small time reductions.  *Compare id. with, e.g.,* Exh. 1 attached to Edelson Declaration in Support of Lead Counsel's Motion for Award of Attorneys' Fees and Costs in Association with the Track Two2 Settlement, Dkt. 7515-3 at p.6.

lodestar in the case, or more than twice as much as the 23 other firms listed in Hoffman &
Edelson's chart of firms.  *See* Declaration of Marc H. Edelson in support of Hoffman &
Edelson's motion to stay distribution ("Edelson Decl. re Motion to Stay"), Dkt. No. 8001, Exh.
B, at 33.[12]  Mr. Edelson's Declaration, for example, demonstrates that his firm's colossal
lodestar is comprised of a massive amount of unsuccessful work on the J&J defendants.  *Id.* at ¶¶
20-22.  This certainly is not unique to Edelson or to work on the J&J Defendants, as other firms
performed work on J&J other unsuccessful defendants (*e.g.*, Schering).  Similarly, a review of
their time would demonstrate significant quantities of work on myriad claims (*e.g.* RICO), drugs,
theories and issues that were unsuccessful or otherwise failed to benefit the Classes.

Reductions in the time of Lead Counsel and other firms that worked on such unsuccessful
matters may well be appropriate.  *See Guckenberger v. Brown Univ.*, 8 F. Supp. 2d 91, 102, 109
(D. Mass. 1998); *see also Gay Officers Action League v. Puerto Rico*, 247 F.3d 288, 298 (1st Cir.
2001) ("Where a plaintiff prevails on some, but not all, of multiple claims, a fee reduction may
be in order.  In such a situation, the court must filter out time spent on unsuccessful claims and
award the prevailing party fees related solely to time spent litigating winning claim(s)") (citing
*Hensley v. Eckerhart*, 461 U.S. 424, 434-35 (1983)).  In *Guckenberger*, this Court ultimately
reduced the lodestar of plaintiffs' counsel ***by 15 percent*** for plaintiffs' failure to succeed on all of
their claims and to obtain all of their requested relief despite their overall success and having
"won the day."  *Guckenberger* at 109-11.  Fifteen percent of Lead Counsel's combined lodestars
alone would be more than ***7,500,000.*** [13]

---

[12] It is interesting that Hoffman and Edelson's are accusing the Hagens Berman firm of allocating to themselves
lodestar that belongs to Hoffman and Edelson, which is precisely what Lead Counsel are doing with respect to Levy.
Edelson Decl. re Motion to Stay, Dkt. 8001, at 3 ¶ 9.

[13] To the extent that Lead Counsel might argue that the Court has already considered and permitted a reduction of
counsels' fees as part of the settlement approvals even though the Court has not performed an examination of
counsels' billing entries similar to that performed in *Guckenberger*, if Levy's time were included within Tier III (as

Not only have the other firms' work and billings escaped serious (if any) scrutiny, even the Haviland firm is now being "treated as a Tier II firm (as set forth in Class Counsel's filings of record)" and has been paid $1.8 million as "reasonable lodestar and expenses incurred," Agreement at ¶ 3 (Berman Opp. Decl. Exh. 3, Dkt. 8015-3), which accounted for a great majority of its total billed MDL lodestar (excluding Levy's, of course).[14]  Putting aside all of the work that Haviland, like Lead Counsel, did on the J&J defendants that did not benefit the Classes, the payment to Haviland included the firm's work battling Co-Lead Counsel under Rule 23(g), objecting to settlements, appealing this Court's decisions, and otherwise, which Lead Counsel previously stated it would not pay at all and which involved the vast majority of time the Haviland firm performed in the MDL.[15]  There is no evidence whatsoever that Lead Counsel paid Haviland's claim with a reduction of less than 20 percent to account for the type, kind, amount, nature, quality, manner, time or result of its work in the case.  Rather, they appear to

---

it should have been) it would have been affected, if at all, in the same manner as any other Tier III firm.  Lead Counsel's attempt to make yet a further reduction of Levy's time would be an arbitrary and much more significant second layer of reductions that other firms are not being made to undergo.

[14] Without identifying the Haviland firm's total claimed lodestar and expenses, Lead Counsel calls their payment of $1.8 million to Haviland "materially less than Haviland Hughes's total MDL lodestar and expenses."  Opp. at 3 & n.9.  Upon information and belief, as of July 20, 2011, this "material" reduction to $1.8 million would have been *less than 20%* of the Haviland firm's total combined MDL  lodestar (without Levy's) and expenses (without Levy's).  Supp. Levy Decl. ¶ 8.

[15] *See* April 28, 2011, Declaration of Marc H. Edelson in Support of Lead Class Counsel's Motion for Award of Attorney Fees and Costs in Association with the Track Two Settlement, Dkt. No. 7515-3 at ¶ 11 & Exh. 1 thereto.  As of the filing of that Declaration, Lead Counsel had cut off the Haviland firm's lodestar at May 22, 2007 (coinciding with Haviland's objection to the AstraZeneca Class 1 settlement) and credited the Haviland firm with only $752,245.00 of lodestar.  Thus it is clear that Lead Counsel now regards Haviland's work after May of 2007 as "reasonable lodestar" and has paid Haviland for it.  As Lead Counsel has pointed out concerning Haviland's *prior* reporting of Mr. Levy's Of Counsel time, the pre-June 2007 portion of lodestar with which Lead Counsel previously had no issue and said they would pay included Mr. Levy's Of Counsel time and expense through that period.  Now, however, they are taking issue with this time and refusing to pay any of it.  Such behavior is similar to that which Lead Counsel is displaying regarding the separate motion for payment of state court time and expense wherein the movants, including Levy, have pointed out that Lead Counsel's sworn Declaration submitted in this Court said that the state court work benefitted the Classes and should be compensated, but have now done a complete reversal and are refusing to pay for it.

have come close to paying all of it by simply agreeing to a large, round figure that each side could live with,[16] including a condition demanded by Haviland to sweep him in as a Tier II firm.

The duplicity and arbitrariness of Lead Counsel's attack of Levy's work is palpable. Lead Counsel, for instance, has attacked Levy's relatively small amount of work on the Howe objection and appeal with respect to the AstraZeneca Class 1 settlement as being unsuccessful and non-beneficial to the Classes, *see* Opp. at 9, while apparently finding as reasonable *per se* Haviland's greater quantum of work and related lodestar generated on that very settlement, objection and appeal.  In addition, the record clearly demonstrates Lead Counsel's lack of candor in falsely asserting that Howe's objection was baseless and failed to benefit the Classes.[17]  Lead Counsel's accusations are unfair and without merit, and Levy should be paid for this time.

In addition to Lead Counsel's refusal to reduce their own time for massive amounts of work on unsuccessful claims, drugs and defendants, an audit would likely reveal massive effort and tasks that were "duplicative, unproductive, excessive, and otherwise unnecessary" which should be "subtract[ed]" from their time.  *Guckenberger*, 8 F.Supp.2d at 100 (citing *Lipsett v. Blanco*, 975 F.2d 934, 937 (1st Cir. 1992)).  In *Guckenberger*, this Court noted that even where a case involves "herculean efforts by multiple counsel," it may be necessary to substantially deduct time to address overstaffing, excessive conferencing or other unnecessary work, *id.* at 101, and that reducing for redundancy and excessive and unproductive effort becomes even more appropriate when "at some point 'there came a time of diminishing returns.'"  *Id.* (quoting *Ackerly Communications, Inc., v. City of Sommerville*, 901 F.2d 170, 172 (1st Cir. 1990)).

---

[16] Under Class Counsel's Proposed Future Fee Allocation Guidelines, Lead Counsel's "aspirational goals" are to "endeavor in good faith" to pay each firm up to 80 percent of lodestar and expenses or 100 percent if the total fee and expense awards were to exceed all firms' lodestar and expenses, once again demonstrating the "all-in" approach.  *See* Dkt No. 5836 at p.7.  Here, as noted above, Lead Counsel paid Haviland in excess of 80 percent.

[17] *See* note 20, *infra*. (identifying the benefits to the Medicare Part B Co-Payment Class provided by the Howe Objection, among others).

As a framework, the Court divided legal work into "core" versus "non-core" work and assigned lower rates for the latter. *Id.* at 101-102.   Here, Co-Lead Counsel attorneys spent a decade billing for "non-core" legal work such as letter writing and talking on the telephone (among many other things). *Id.* at 101.   The same is true of the many attorneys who attended, but had no participatory role in, depositions, court hearings, and even the multi-week Track 1 Class 2-3 bench trial in this case.   For instance, Mr. Levy witnessed such non-participation by Co-Lead Counsel attorneys during his attendance at the first two days of trial to assist with the testimony of Class 3 consumer plaintiff Rebecca Hopkins.   Supp. Levy Decl. ¶ 9.

Regarding the bench trial and Levy's work with trial witness Ms. Hopkins, Lead Counsel ridiculously and ***falsely*** accuse Levy of "excessive" billing of "nearly $ 20,000" ***"consisting largely of a number of short telephone calls and emails."*** Opp. at 9 n.26 (emphasized portion also appearing in Berman Opp. Decl. ¶9) (emphasis added).[18]   *See* Supp. Levy Decl. ¶ 10.

Lead Counsel's request for, and this Court's Order granting, an incentive award of $19,600 to Ms. Hopkins properly recognized her thorough and important work on behalf of the Classes.   *See* Order (July 19, 2011), Dkt. 7674 at ¶ 15; Supp. Levy Decl. ¶ 11.   Lead Counsel, however, criticize Levy's work with and related to Ms. Hopkins.   They had no direct involvement (or other involvement worth speaking of) with Ms. Hopkins and were not in a position to appreciate the vital contribution of Levy to her success as a trial witness.   As detailed in Mr. Levy's accompanying Declaration (not fully repeated herein for sake of brevity), whether standing on its own or comparing it to Lead Counsel's poor preparation and poorly executed

---

[18] The pages of Levy's time report cited by Mr. Berman's in his Declaration and by the Opposition show the lack of candor in Lead Counsel's assertion.  The major portions of work relating to Ms. Hopkins "consist[ed] largely" (to use their words) of reviewing Levy's large file, including emails, notes, and memoranda concerning Ms. Hopkins' voluminous records, drafting and revising her trial declaration, and travel for and attendance at trial to meet with and prepare the witness for trial, not "short telephone calls and emails" as Lead Counsel disingenuously claims.  Supp. Levy Decl. ¶ 10.

examination of the immediately prior testifying consumer witness (something this Court was critical of at the time), Ms. Hopkins' testimony was a success in great part because of Mr. Levy's dedication and important work with the witness and his crucial assistance provided to Mr. Haviland.  Supp. Levy Decl. ¶¶ 11-14.  Mr. Levy's time entries are appropriate on their face, and the results speak for themselves.

Lead Counsel's duplicity in charging that some of Levy's work did not benefit the Classes (especially work involving the Haviland firm's objectors) and should not be paid is also found in their non-transparent payment of fees to non-class counsel who performed no discernible work of benefit to the Classes.  This includes the millions of dollars paid to counsel for the Independent Settling Health Plans ("ISHPs") and any secret fees paid to the attorneys for various objectors[19] who simply rode the coattails of the Haviland firm's objectors while doing nothing themselves to improve settlements or to benefit the Classes.[20]  Lead Counsel have

---

[19] With the Track 2 settlement alone, this may include counsel for Objector Patricia Weatherly, counsel for Objectors John and Connie Pentz, and counsel for Objector James Wilson, and possibly others.  The terms of any agreements with and amounts paid to them, if any, in exchange for withdrawing their objections have not been revealed as far as Levy is aware.  *See* Dkt. Nos. 7804, 7811 and 783 (withdrawn objections without stating whether based on an agreement or whether fees were paid to counsel).  And as this Court may recall, Lead Counsel paid at least one other objector counsel with respect to a settlement in this case for work that was not shown to have benefitted the Classes.  *See, e.g.,* Decl. of Steve Berman in Support of Lead Class Counsel's Response to Williams' Motion for Court Review of Lead Counsel's Allocation of GSK Fee Award, Dkt. No. 5687 at ¶ 7 (resolving Derma Jones objection to GSK settlement for $100,000 despite belief that objection was without merit).

[20] For instance, concerning the AstraZeneca Class 1 settlement, objections brought by certified class representative Joyce Howe resulted in this Court's decision that more money should go to the plaintiffs than to *cy pres*.  The Court ultimately instructed the parties to adjust the settlement to pay treble damages first to the "heartland plaintiffs," then to all plaintiffs pro rata, and then to charity via *cy pres*.  Class Counsel fees were also reduced to 30% percent of the recovery.  *See In re Pharm. Indus. Average Wholesale Price Litig.,* 588 F.3d 24, 31-32 (1st Cir. 2009); Mem. and Order re Requested Final Approval of the AstraZeneca Class 1 Settlement (Oct. 2, 2008), Dkt. No. 5624.  Concerning the BMS settlement, objections brought by consumer plaintiff and former consumer class representative Rev. David Aaronson resulted in the Court requesting Lead Counsel to attempt to modify the allocation between consumers and the TPPs to provide greater damages to consumers who purchased BMS drugs during the "heartland" period.  This resulted in presentation of a second plan of distribution and, ultimately, resolution of the objections and a settlement that improved the recoveries of both Rev. Aaronson and the consumer Class.  Am. Motion to Withdraw Motion to Enforce Settlement with BMS Filed by Rev. David Aaronson and Objection to the Proposed BMS Settlement (Dkt. No. 7534).  Regarding the Track 2 settlement, Haviland's consumer plaintiffs' objections to the $125 million settlement for division among the consumer and TPP Classes, and the ISHPs, resulted in modification of the proposed settlement that raised the consumer allocation from 17.5% to 20% of the settlement (an increase of $3,125,000), a reduction in Class Counsel's fees to 28% (a reduction of over $460,000) and an increase in the

recognized that the efforts of the Haviland firm on behalf of the objectors benefitted the Classes by paying the firm and treating it as Tier II.  Therefore, Lead Counsel's treatment of Levy is unfair and quintessentially arbitrary.

For many of the same reasons already stated, Lead Counsel's criticism of Levy's "received and reviewed time"[21] and billing at quarter of an hour increments, Opp. at 8, should not be given any credence, and Levy should be paid for the time.  Based on this record, neither Levy nor this Court can verify whether the extent to which Lead Counsel has credited or otherwise paid any "receive and review" time of any "non-Lead firm" that did not receive "specific[] "authoriz[ation]" to do so.  *Id.*  As discussed above, apparently Lead Counsel have not reduced other firms' time, except perhaps likely minor adjustments for extraneous time. Moreover, it is likely that the multiple Co-Lead firms with their many attorneys – who apparently did bill for receive and review time – overbilled for such work.  With "so many cooks in the kitchen," *Guckenberger* at 101, creating Lead Counsel's collective lodestar of over $50,000,000, it strains credulity that they did not overbill in this fashion, and likely without any reduction in their rate[22] for what likely would be regarded as "non-core" legal work.

Even the available Haviland firm's billing records show some similar receive and review billing given to filed pleadings,[23] as well as a great quantity of receive and review time for

---

estimated pro rata recovery for most of the Track 2 Subject Drugs from 5.8281% to 14.9520% (an increase of 256.55%) for Class 1 and Class 3 consumers.  Certain Consumer Plaintiffs' Motion to Withdraw All Pending Motions, Submissions and Objections Concerning the Proposed Track 2 Settlement, Dkt. No. 7766 at 2 (citing Dkt. Nos. 7752, 7648).

[21] Levy has not attempted to determine the accuracy, and therefore does not admit to the accuracy, of Lead Counsel's stated dollar figure that they attribute to the "receive and review" time that they are attacking.

[22] The rates employed by Lead Counsel and other firms could warrant an additional reduction in lodestar and should also be scrutinized.  *Guckenberger,* 108 F.Supp.2d at 103-05.  Without access to their records, it is not possible to determine whether each firm/timekeeper used appropriate rates.

[23] *See, e.g.,* Exhibit 1 to Berman Decl. at pp. 19-22 of Haviland time report (pp. 25-27 of the Exhibit itself) (3/1/2007 billing of **1.25 hours** for receive and review time of a pleading; billing of another **0.25 hours** on the same

emails (many likely short and requiring only a short response, if any) which Lead Counsel paid without reservation. Supp. Levy Decl. ¶ 15. The Haviland billing report also shows that it billed for all of its activities (including receive and review time) in 0.25 increments with the minimum charge for any activity being 0.25.[24]  *Id.*  Levy used this same billing convention, but Haviland was treated as a Tier II firm and paid for it (at hourly rates as high as $685.00[25] as of April 2010) while ***only*** Levy (utilizing hourly rates under $500.00[26]) has been criticized for it.[27]  *Id.*

Moreover, the specific entries that Lead Counsel cite came at or near the time of the Track 1 Class 2-3 trial when Mr. Levy was working on trial matters on behalf of the trial team, and then afterward at a time when Mr. Levy and the Haviland firm had begun looking forward to the anticipated AstraZeneca Class 1 trial. Later, Mr. Levy did directly assist the trial team in preparation for that trial, but in identifying the "primar[y]" "projects" that he worked on, Lead Counsel failed to identify his AstraZeneca Class 1 trial related work. Supp. Levy Decl. ¶ 18; *see* Opp. at 9; Berman Decl. Exh. 1 at pp.114-117 (pp. 20-23 of Levy billing records). Billing for

---

day for more receive and review time of a pleading that consisted of ***two short paragraphs*** of text on one page; 3/6/2007 billing of ***0.75 hours*** for receive and review time of pleadings).

[24] *See generally* Exh. 1 to Berman Decl. (Haviland time report portion) at pp. 7-79 of Exhibit itself. Although the summary pages at the end of the Haviland firm's billing report shows one (1) out of the 21 individual timekeeper summary billing lines with something other than a .025, .50, .75, or .00 in the hours column, that one entry appears to be an error or the result of an anomaly. *See id.* at pp. 77-78 of Exh. 1 itself (pp. 71-72 of Haviland report). Looking at each individual billing entry within the report shows that billing was performed in 0.25 hour increments, which comports with Mr. Levy's understanding of how the Haviland firm billed when he was Of Counsel.

[25] *See* Berman Decl. Exh. 1 at pp. 77-78 of Exhibit 1 itself (pp. 71-72 of Haviland report showing rates for each timekeeper). Exhibit 1 shows that approximately 62 percent (2,318 hours) of the Haviland firm's total time was billed at a rate above $500 an hour, and nearly 44 percent (1,624 hours) of the firm's total time was billed at a rate above $600 an hour. Supp. Levy Decl. ¶ 16.

[26] As Lead Counsel has noted, *see* Opp. at 2 n.5, Levy, in presenting its time records to Lead Counsel (in September 2011) and its claim in this Court, has used rates that are ***lower*** than the rates designated by Mr. Haviland for Mr. Levy's Of Counsel time in the time reports that Haviland previously submitted to Lead Counsel (appearing in Berman Decl. Exh. 1). To arrive at the lower $238,251.25 that Levy is claiming for its unpaid MDL time, Levy used Levy's historical rates (absent any affiliation with Haviland) of $450, $490 and $495 over the course of the relevant period (versus rates between $490 and $610 appearing in Berman Exh. 1). Supp. Levy Decl. ¶ 17.

[27] Levy and Haviland are not the only of the reporting plaintiff firms that billed in 0.25 increments. Supp. Levy Decl. ¶ 15.

filings to keep apprised of case developments (especially, though not only, when directly involved in trial preparation assistance) is not improper.

Likewise, Lead Counsel's refusal to pay for Levy's other work should not be permitted. In connection with the Track 2 settlement, Lead Counsel assert that they should not be required to pay for Levy's work on a response to a motion for protective order regarding Muriel Tonaccio's deposition and opposition to supporting memorandum, or on a separate motion to quash subpoenas *duces tecum* for the consumer associations and opposition to that motion's supporting memorandum. Lead Counsel represent to the Court that "Levy billed 143.75 hours, at a cost of over $71,000," which "was not authorized or monitored by Lead Class Counsel" and "did not benefit the Classes" (Opp. 8, 9) and egregiously accuse Mr. Levy of "fraudulent over-billing" (Opp. at 11) and "'padding' the bill" (Berman Decl. at ¶ 9) regarding his time working on these motions.

Amazingly, Mr. Berman under penalty of perjury and Lead Counsel in their Opposition have materially misrepresented the number of hours Levy devoted to this project. ***Twenty-five (25) percent*** (36 hours) of the "143.75" hours that Mr. Berman certified as being related to the motions for protective order and to quash (Berman Decl. at ¶ 9) was for work that Levy performed on ***a different task***.[28] Supp. Levy Decl. ¶ 19. If Lead Counsel believe that their payment to Haviland of $1.8 million was a **"material"** reduction from Haviland's total claim (without Levy's lodestar and expense) because it was nearly (but not even) ***20 percent*** less than that claim (*see* note 14 *supra.*) then Mr. Berman's misrepresentation is material as well.

---

[28] This was work performed in connection with a response and opposition to Lead Counsel's emergency motion to seal attorney work product and to strike the Haviland clients' opposition to Track 2 settlement approval *See, e.g.,* Dkt. No. 5957 (Lead Counsel's motion to seal/strike filed 3/18/2009) and Dkt. No. 5970 (opposition to Lead Counsel's motion to strike/seal, filed 3/20/2009). Levy's work on this project is found in Levy time report entries on March 18 through March 20, 2009, and the second of two entries on March 24, 2009. *See* Berman Decl. Exh. 1 at pp. 135-36 of Exhibit (pp. 41-42 of Levy time report). Supp. Levy Decl. ¶ 19.

Lead Counsel is again acting arbitrarily in refusing to pay Levy while paying the Haviland firm for all of its so-called unauthorized and non-beneficial work with respect to the Track 2 settlement objections, ***including*** time that office spent also working on the oppositions to these same motions and related matters.  Levy's work on these motions was part of an overall objection to the Track 2 settlement that ultimately provided benefits to the consumer Class members, *see* note 20 *supra*., for which Lead Counsel paid Haviland but not Levy.

Beyond these matters, which alone are cause to require that Lead Counsel pay Levy, the work itself merits payment.  It involved separate responses and separate oppositions to two separate motions and two supporting briefs.  Although there was some overlapping content, the matters involved particularities unique to the specific representatives and the circumstances at issue and resulted in much content that was different or additional.  A review of other firms' time would likely show the same type of time commitment to many of the plethora of motions filed in this case over the course of a decade.

### III.   CONCLUSION

For all the foregoing reasons, Levy respectfully requests that this Court grant its Motion and enter an Order directing Lead Counsel to make an allocation to Levy for all of its post-August 2006 MDL time and expense.

If this Court does not enter this requested Order because of an issue regarding the Lead Counsel/Haviland Agreement, then Levy requests the Court to enter an Order permitting Levy to take discovery of Lead Counsel and Haviland, including document production and depositions, concerning the Agreement and the negotiations that led to the Agreement.

Additionally, if this Court enters an Order permitting Lead Counsel to reduce the amount of payment to Levy based on an examination of Levy's billings and work, then to ensure fairness

and transparency Levy requests that the Court perform a full audit and accounting of the time, expense and billings of Lead Counsel and any firm that has already received or expects to receive payment of fees and expenses from Lead Counsel.


Dated:  January 15, 2012                    /s/ Adam S. Levy
                                            Adam S. Levy
                                                     AND
                                            Law Office of Adam S. Levy, LLC

                                            P.O. Box 88
                                            Oreland, PA 19075
                                            (267) 994-6952

                                            CERTAIN OF THE REPORTING
                                            COUNSEL FOR PLAINTIFFS

**CERTIFICATE OF SERVICE**

I hereby certify that on January 17, 2012, I caused an electronic copy of the foregoing **REPLY MEMORANDUM IN SUPPORT OF MOTION FOR MODIFICATION OF LEAD COUNSEL'S ALLOCATION OF FEES AND REIMBURSEMENT OF EXPENSES TO INCLUDE UNCOUNTED TIME AND EXPENSE INCURRED DIRECTLY IN THIS MDL** to be filed of record and served on all interested counsel via the Court's CM/ECF system.

/s/ Adam S. Levy_____