# EXHIBIT D

| | | |
|---|---|---|
| State of South Carolina | ) | |
| | ) | In the Court of Common Pleas |
| County of Richland | ) | |

| | | |
|---|---|---|
| State of South Carolina, | ) | |
| | ) | December 14, 2011 |
| Plaintiff, | ) | |
| | ) | TRANSCRIPT OF RECORD |
| -vs- | ) | |
| | ) | |
| Abbott Laboratories, Inc., | ) | **2006-CP-40-4394** |
| | ) | |
| Alpharma Branded Products Division, Inc., | ) | 06-CP-40-7157, 06-CP-40-7158 |
| | ) | |
| Barr Pharmaceuticals, Inc., | ) | 07-CP-40-0280, 07-CP-40-0286 |
| | ) | |
| Novartis Pharmaceutical Corporation, | ) | 07-CP-40-0591, 07-CP-40-0592 |
| | ) | |
| Sandoz Inc., | ) | 07-CP-40-0285, 07-CP-40-0287 |
| | ) | |
| Teva Pharmaceuticals USA, Inc. and Ivax Corporation, | ) | 06-CP-40-7154, 06-CP-40-7156 |
| | ) | |
| Watson Pharma, Inc., and Watson Pharmaceuticals, Inc., | ) | 06-CP-40-7152, 06-CP-40-7155 |
| | ) | |
| Defendants. | ) | |
| | ) | |

B E F O R E:

The Honorable J. Cordell Maddox, Jr., Judge

Renee H. Tollison
Circuit Court Reporter

*This original certified transcript has been provided for: Marguerite Willis, Esquire*
*For additional copies please contact the Court Reporter*

2

APPEARANCES:

William E. Hopkins, Jr., Esquire
John Alphin, Esquire
J. Preston Strom, Esquire
Attorneys for the Plaintiff

Marguerite S. Willis, Esquire
Nikole Setzler Mergo, Esquire
Attorneys for Defendants Novartis Pharmaceuticals Corp. and Sandoz Inc.,

Gray T. Culbreath, Esquire
Attorney for Defendants Barr, Teva Pharmaceuticals

Thomas Salane, Esquire
Attorney for Defendant Alpharma Branded Products Div., Inc., Watson
Pharma, Inc., and Watson Pharmaceuticals, Inc.

Sarah P. Spruill, Esquire
Jeremy Cole, Esquire
Attorneys for Abbott Labs

James G. Long, Esquire
Attorney for Defendant Warrick Pharmaceuticals Corp., Schering-Plough
Corp., Schering Corp., Merck & Company

*This original certified transcript has been provided for: Marguerite Willis, Esquire*
*For additional copies please contact the Court Reporter*

3

**I N D E X**

| WITNESSES | PAGE |
|---|---|
| Motion to Compel Privilege Log Documents | 3 |
| Certificate of Reporter | 113 |

**E X H I B I T S**

| No | DESCRIPTION | ID | EV |
|---|---|---|---|
| | No exhibits were presented during the hearing. | | |

*This original certified transcript has been provided for: Marguerite Willis, Esquire*
*For additional copies please contact the Court Reporter*

1                      **December 14, 2011**

2         (WHEREUPON, court convened with all parties present

3         and the following proceedings were had commencing at

4         approximately 11:34 a.m.)

5         THE COURT:  Okay.  I apologize for being

6    cramped in here.  It's just been a disaster that I've

7    tried to avoid but didn't.  We'll get by.

8         Yes, ma'am?

9         MS. WILLIS:  Good morning, Your Honor.

10   Marguerite Willis on behalf of the Defendants.  And I'm

11   sure I speak for everyone in the courtroom when I say

12   Merry Christmas and Happy Holidays to you and your staff.

13        THE COURT:  Same to you.

14        MS. WILLIS:  And to all of the folks who are so

15   nice to us, Mr. Clerk here, in the Anderson Courthouse.

16   And for those of us who came in last night, wow, does the

17   City of Anderson deck the courthouse for Christmas.  It

18   was ablaze with lights last night.

19        THE COURT:  The blinking lights will give you

20   epilepsy.

21        MS. WILLIS:  I didn't see the ones blinking in

22   front of the courthouse.

23        THE COURT:  They blink.

24        MS. WILLIS:  Do they?

25        In any event, as a preliminary matter, I would like

1    to introduce to the Court Mr. Jeremy Cole who's here.

2    He's national counsel for Abbott.

3              THE COURT:  All right.

4              MS. WILLIS:  He's here today from Jones Day in

5    Chicago, and so we welcome him.

6              MR. COLE:  Good morning, Your Honor.

7              THE COURT:  Hey.  Good morning.

8              MS. WILLIS:  And then we have -- Mr. Hopkins

9    and I have consulted on a brief agenda, and we have three

10   items to cover briefly.  First is an update on the Medco

11   motion to compel situation and related status of

12   discovery.  Second is general information from other

13   jurisdictions and some things Mr. Hopkins would like to

14   discuss with the Court.  And then third would be the, you

15   know, main attraction, the head-liner act for today, the

16   Defendant's motion to compel production of the internal

17   documents listed on the Attorney General's privilege log.

18        Let me begin though briefly with what's gone on with

19   Medco.  The Court knows, because we've discussed it for

20   almost a year, that the Defendants subpoenaed Medco.

21   We've had extensive negotiations with Medco, which is the

22   pharmacy benefit manager for the State Health Plan.  They

23   produced a paltry number of documents from the files of

24   folks who've worked for years with the State Health Plan.

25   That's an issue.  But the big issue is they've refused to

1   produce certain types of documents.  We moved to compel,

2   and it was scheduled to be heard, that motion to compel,

3   today.  However, recently, Medco has changed counsel, and

4   they have South Carolina counsel today now that has --

5   had a conflict for today.  So with working through Your

6   Honor and Your Honor's chambers, we have now scheduled a

7   hearing on the Defendant's motion to compel Medco for the

8   18th of January.  We'll be back for that.

9          THE COURT:  Okay.

10          MS. WILLIS:  On a related matter, as best we

11   know at this point that other than the documents we'll be

12   talking about today, the Medco documents are the last in

13   the series of documents that the Defendants are seeking

14   to get before they commence discovery.  Because there are

15   other of these cases pending across the country and

16   because folks have conflicts here and there time-wise,

17   we've held off commencing deposition discovery, as the

18   Court knows, waiting for documents.

19      I spoke to Mr. Hopkins briefly this morning.  We're

20   probably going -- the Defendants are probably going to

21   come back and ask for a modest continuance of the March

22   15th discovery cutoff.  Mr. Hopkins and I will discuss

23   that.  We'll discuss it with the State.  I don't

24   anticipate a lengthy continuance, but we need the

25   documents to move forward.

1          THE COURT:  Sure.  And whatever you need to do,

2    y'all agree on it and let me know.

3          MS. WILLIS:  All right, Your Honor.

4       And then as far as item number two on the agenda,

5    information from other jurisdictions, we just would like

6    to tell the Court that Watson, which is one of the

7    remaining defendants in this case, won a jury trial in an

8    AWP case in West Virginia last month.  So ---

9          MR. SALANE:  Kentucky.

10          MS. WILLIS:  Kentucky.  Kentucky.  West

11    Virginia and Kentucky, it's all the same.  South

12    Carolina.

13          MR. SALANE:  They're all related, Your Honor.

14          MS. WILLIS:  In Kentucy.  Thank you for

15    correcting me on that.

16          THE COURT:  Strike that from the record.

17       (Laughter)

18          MS. WILLIS:  We're happy to announce a jury

19    verdict wherever it's achieved, and this one was a well-

20    fought battle on behalf of Watson which, as I indicated,

21    is a remaining defendant in this case.

22       I think Mr. Hopkins may -- that's my report on that.

23       I'll move back to our motion if you'd like to

24    address to the Court at this time.

25          MR. HOPKINS:  Right.  Absolutely.  Thank you.

*This original certified transcript has been provided for: Marguerite Willis, Esquire*
*For additional copies please contact the Court Reporter*

1       Your Honor, may it please the Court.

2             THE COURT:  Yes, sir.

3             MR. HOPKINS:  Your Honor, I also -- I wanted to

4    introduce -- we have a new lawyer for the State making

5    his first appearance in AWP.  His name is Pete Strom.

6         (Laughter)

7             MR. HOPKINS:  He's just getting in it, so we're

8    happy to have him today.

9         Judge, I discussed with Ms. Willis this morning -- I

10   don't want to get into settlement discussions because I

11   know they're privileged.  But I'll just say this.

12   Beasley Allen -- not me -- but somebody at Beasley Allen

13   received an inquiry from two of the Defendants last week

14   about, you know, possible resolution of the South

15   Carolina cases.

16        So I discussed with Ms. Willis, and we were

17   thinking, Judge, that hopefully by agreement or by a

18   maybe by a court order, that a mediation might be

19   fruitful.  And I don't mean to suggest it'll make the

20   entire case go away, Judge.  But as you know, we're down

21   to six, and at least a couple have expressed interest.

22        But Judge, these negotiations just seem to kind of

23   carry on for so long, going back and forth getting

24   authority.  We really think the best way to do it is have

25   a mediation.  I do not have any particulars to discuss

1   with Ms. Willis.  I just wanted her to check with her

2   clients first.  But we intend to make a proposal to Ms.

3   Willis and/or the Court to have -- we're hoping the Court

4   will require mediation.

5         Of course, mediation is required.  But we'd like to

6   do it, Your Honor, before we get into the depositions, if

7   possible, just because of where things are around the

8   country, Judge.  There are very few cases left in the

9   M.D.L.  Watson, who did win the jury trial -- there was

10  an announcement this morning at seven o'clock -- they

11  settled in the M.D.L.  So there aren't many cases left in

12  the M.D.L., Judge.

13        There's no secret about what these cases are

14  settling for.  At least in South Carolina, we have a

15  pretty good range, an idea.  People know what the value

16  is.  We know the facts and the legal issues we face in

17  South Carolina.  So at this point, the cases are mature.

18  There are no surprises, and we'd like to take a stab at a

19  mediation to get it down to whoever the final players are

20  going to be so when we do have depositions, hopefully,

21  there will be a smaller number, as small a number as

22  possible.  So that's just what I wanted to bring to the

23  Court's attention.

24        The Judge did, an Alabama judge, the judge on his

25  own, ordered mediation.  And Alabama had sued seventy-

1    eight defendants.  And my understanding is they're just

2    about to resolve all of those cases through this court-

3    ordered mediations.  So it is working in getting these

4    cases resolved.

5              THE COURT:  Well, do y'all have an objection to

6    mediation?  I mean, I think it's beneficial, quite

7    frankly, in every case.  But you know, I wouldn't want to

8    -- I want your opinion on it.

9              MS. WILLIS:  Well, thank you, Your Honor.  I

10   heard about this just this morning.  And obviously all of

11   us here need to check with national counsel and with our

12   clients as to what their position is on mediation and

13   when.  We understand that we have to mediate at some

14   point.  The question, I think, is timing and logistics.

15             I'd just like to say in Alabama, even though maybe

16   lots of people have mediated to a resolution, one of my

17   clients won in the Supreme Court, had a jury verdict

18   reversed in the Supreme Court.  So they paid nothing,

19   zero, in Alabama.

20             And so everybody is in a slightly different position

21   and has different views on timing and value.  But we're

22   certainly willing to take any proposal that Mr. Hopkins

23   has back to our respective clients.  And maybe we can

24   talk further about that.  As indicated, we'll be back in

25   any event on the 18th of January because we have Medco.

1    And with the Christmas holiday intervening, we can spend

2    some time seeing sort of maturing folks' positions on

3    this.

4             THE COURT:  Okay.  Why don't y'all talk it.  I

5    mean, I'd be inclined to order mediation, quite frankly,

6    just to get everybody in the same room without a judge

7    and with some freedom to talk about it.  But I'll let

8    y'all talk about it.

9             MS. WILLIS:  Well, I just would say one of the

10   issues, of course, is these are individual cases although

11   we try very hard to represent -- you know, to work

12   cooperatively and collectively.

13            THE COURT:  Yeah, you do.

14            MS. WILLIS:  But in fact, they are separate

15   lawsuits.  And so there's an issue there with regard to

16   anything other than, you know, six rooms of mediation.

17   But nevertheless, we can certainly discuss that with Mr.

18   Hopkins and come back.

19        That brings us to really the order of business for

20   today, which is the Defendants' motion to compel the

21   production of internal documents listed on the Attorney

22   General's privilege log.

23        And I'd just like to say again on behalf of, I

24   think, everyone in the courtroom, a special thanks and

25   appreciation to Nicole Mergo and John Alphin who have

1    worked very hard, along with the help of Tom Salane, to

2    reduce the number of documents at issue for the Court.

3    Through meetings and discussions, we've reduced the

4    number from seventy to forty-two.  I know it's still a

5    large number, but we were able to achieve that through

6    everybody's good offices.

7            And we have this morning an order we'd like the

8    Court to sign with regard to the now, I'm going to call

9    them, de-privileged documents.  It's the same order,

10   essentially.  It's to follow one of your earlier orders.

11   It simply extends protection to those documents of the

12   same sort that were extended to the external A.G.

13   documents including the attorneys eyes only and certain

14   requirements for sealing.  And I think we've got a copy

15   here to hand up to the Court.

16            THE COURT:  Okay.  All right.

17       (WHEREUPON, document was handed up to the Court.)

18            THE COURT:  And like I said, Jessica has spent

19   a good bit of time going through each one of these and

20   has given me a summary of each one of the emails along

21   with their recipients, their document type, whether

22   they're an email, document numbers, dates, et cetera.

23   And in fact, this morning when we were in such a hub-bub

24   up there, I said, well, look, why don't you make a copy

25   of that and take them down stairs.  And she looked at me

1   like I had three heads.  She said, those are the

2   privileged documents.  So I'm ---

3          MS. WILLIS:  It would be okay with us, Your

4   Honor.

5          THE COURT:  Yeah, I know.  That's when you let

6   your anger get ahead of your common sense, if you have

7   any common sense.

8       All right.  I'll sign this.

9          MS. WILLIS:  Thank you, Your Honor.

10         THE COURT:  Okay.

11         MS. WILLIS:  And we appreciate the Court's

12  agreement to work through lunch since we have -- Mr.

13  Hopkins, Mr. Alphin and Mr. Cole all have planes that

14  they need to leave.

15         THE COURT:  Yeah.

16         MS. WILLIS:  And we think we can work

17  diligently and get through what we need to do.

18         THE COURT:  And if you get Mr. Strom here, why

19  should we let him go?

20         MS. WILLIS:  We were actually hoping that the

21  others would have to leave and we'd only have to defend

22  against him.

23         THE COURT:  I just hope he says something.  I'm

24  real concerned that he might have some sort of vocal

25  problem.

1       (Laughter)

2           MS. WILLIS:  In any event, here's the procedure

3   we'd like to follow, Your Honor.  Ms. Mergo is going to

4   give you an overview and general discussion of the

5   documents at issue.  Then Mr. Salane will pick up and

6   briefly outline our legal arguments, at which point we'll

7   turn the floor over to the State to argue with regard to

8   why there is a privilege with regard to the documents.

9   And what we've done is -- and I believe the Court has

10  received a copy of ---

11          THE COURT:  Yeah.

12          MS. WILLIS:  --- this multi-colored document,

13  the remaining documents at issue.  And I believe Mr.

14  Hopkins intends to argue producing documents.  And we

15  hope that way, we'll be able to expedite things for the

16  Court.

17      The only other thing I'll say is, I'm going try real

18  hard not to say anything.  Everybody laugh about that.

19  But seriously, as we proceed, because the Defendants in

20  part are guessing at what these documents have to say --

21  because we don't have them.  Obviously, we only have

22  redacted copies -- there may be folks in here, other

23  counsel, who wish to make a statement and may want to

24  stand from behind the bar here and have something to say

25  on the individual documents.

1          THE COURT:  Sure.

2          MS. WILLIS:  But that's not the way we normally

3     proceed.  But in this instance, all of us are trying to

4     collectively, to a certain extent, guess at what the

5     documents have to say.

6          THE COURT:  Yeah, that's not a problem.

7     However you want to do it.

8          MS. WILLIS:  All right.  Thank you, Your Honor.

9          THE COURT:  And here's going to be the problem

10    coming down here.  Okay.  We're going to have to cut the

11    lights out.  I hate to do that, but that ---

12          MS. MERGO:  Oh, that's fine.

13       Good morning, Your Honor.

14          THE COURT:  Good morning.

15          MS. MERGO:  Nikole Mergo on behalf of

16    Defendants.

17       What I'm going to do is set the stage for you with

18    -- there's forty-two documents at issue now from seventy.

19    Originally a hundred and fifty-five on both logs, and

20    we're now down to forty-two on which we challenge the

21    privilege.  And what you're going to see is that

22    initially the State tried to cabin the knowledge of the

23    AWP information to Mr. Gambrell as merely someone in the

24    state MFCU office.  But what you're going to see with

25    these documents is that that knowledge permeated the

1    entire Attorney General's office, that Mr. Gambrell kept

2    them fully informed, and it was from the former attorney

3    generals all the way down the chain.  And the State has

4    taken the position in this litigation that it's the

5    Attorney General's knowledge that is dispositive for

6    purposes of the running of the statute of limitations

7    with respect to penalties.

8         Now, we don't agree that that's the only knowledge

9    that matters.  But if they're going to take that

10   position, then we're entitled to know what the Attorney

11   General's office knew.  And there are certain of these

12   documents that clearly show knowledge on their part on

13   AWP related issues prior to the filing -- three years

14   before the filing of the lawsuits.

15        Okay.  So just for reminder, the first of these

16   cases were filed in August of 2006.  The basic fact

17   pattern is that the Defendants reported false and

18   inflated AWPs to First DataBank.  That's going to be

19   important here today because there are five documents on

20   the slide related to First DataBank.  First DataBank is

21   centrally mentioned in their complaint.  That was the

22   information hub, the data provider, that contracted with

23   the State to report the AWPs.  It wasn't the Defendants;

24   it was First DataBank.  So that's why those documents are

25   important to the Defendants.  They allege that the

1   Defendants marketed the spread between those AWPs and the

2   actual prices to the providers and that the State used

3   the First DataBank AWPs to reimburse the providers and

4   thus overpaid for the drugs.

5        Okay.  And as you will recall, these are Unfair

6   Trade Practice claims.  All of the cases allege

7   violations of SCUPTA.  The Medicaid cases seek damages

8   back to '91.  The State Health Plan, separate cases, seek

9   damages back to 2000 which is the date of the point of

10  sale when Medco became involved with the State Health

11  Plan.

12       We've made no secret that SCUPTA has a three-year

13  statute of limitations or repose and that no action may

14  be brought under the article more than three years after

15  the discovery of the unlawful conduct which is the

16  subject of the suit.  So if the State knew or should have

17  known of the alleged unlawful conduct before August 2003

18  for some Defendants, January 2004 for others, then these

19  claims are time-barred.  And it's not that the State had

20  to have a full blown theory of the case; they just had to

21  have inquiry notice or should have known about the

22  information at issue.

23       Okay.  The State put the statute of limitations at

24  issue in this case in their discovery.  The issue of when

25  the State knew or should have known it had a cause of

1   action for a violation of SCUPTA is a question that will

2   be determined during the normal course of discovery.

3   That was in their brief in 2008.  And here we are during

4   the normal course of discovery and they're trying to

5   prohibit us from having the documents.

6        And then they recently conceded -- and this is a

7   quote from Your Honor's June order that was amended in

8   August -- thus, it is the undisputed position of the

9   State in this case that the knowledge of the Attorney

10  General's office is controlling on the statute of

11  limitations as to SCUPTA penalties.

12       So again, while we don't agree that this is the only

13  knowledge that matters, we think we're going to be able

14  to show it throughout the agencies from MFCU to the

15  Attorney General to the State Health Plan and Medicaid,

16  they said it's our knowledge that matters.  And if it's

17  their knowledge that matters, then we should have

18  entitlement to the documents.

19       Okay.  So where we stand is that the Attorney

20  General has deemed all of these documents relevant and

21  responsive, so that's not an issue.  They're all

22  relevant.  On June 23rd, you ordered the production of

23  all the external Attorney General privilege log

24  documents, and then you held under advisement ruling on

25  the seventy internal A.G. privilege log documents.

1      Mr. Alphin, myself and Mr. Salane, we've had a meet

2    and confer where that resulted in agreement on the

3    twenty-seven documents that you have now signed the

4    proposed order on, and those are going to be de-

5    privileged.  So the remaining internal documents at issue

6    are forty-two, and the State has suggested to divide them

7    into three categories, namely First DataBank,

8    miscellaneous and notes, and then settlements.

9      Okay.  We have briefed and argued fully the legal

10   points.  Your Honor has all of those briefs.  Mr. Salane

11   is going to touch on this in just a minute.  But the main

12   points are that the privilege asserted cannot hide the

13   facts.  The facts are discoverable even contained within

14   any privileged documents.  And that there's been

15   extensive subject matter waiver here on all these topics

16   that we've shown Your Honor documents before related to

17   these topics.

18      And then that the State cannot both assert that the

19   statute has not run and then turn around and block the

20   evidence inconsistent with that assertion.  And in

21   addition, Rule 26(b)3 provides for the discovery of

22   documents where work product privilege is claimed if the

23   party has a substantial need of the materials in the

24   preparation of his case.

25      Why do we need these documents?  Because the State

1    is seeking hundreds of millions of dollars from the

2    Defendants in these cases.  There's no doubt that we have

3    a serious statue of limitations or repose issue here.

4    And Your Honor will recall that the State itself, the

5    Medicaid and State Health Plan, never issued a litigation

6    hold in these cases.  And I know Your Honor has mentioned

7    before when we've been talking about these documents,

8    haven't you seen them, don't you know what they say.  We

9    don't know what they say.  We did not -- these have not

10   produced from Medicaid or the State Health Plan, and they

11   didn't have a litigation hold in place.  So this may be

12   the only place where we see these documents.

13        And in fact, your order in August stated the

14   following.  Given the clear import of these documents to

15   the statute of limitations defense, especially in light

16   of the position taken by the A.G., the knowledge of its

17   office is dispositive, and because earlier documents may

18   not have been properly preserved, the Attorney General

19   documents may be the only documents in existence

20   evidencing the knowledge of, quote, the State, at least

21   under the Attorney General's theory in this case.

22        Okay.  Now, we're going to go through the documents.

23   Mr. Hopkins is going to bring them up.  But I wanted to

24   just give you the context for the First DataBank and

25   Nevada, some of the more important documents that we see

1   on the log so that they're not viewed in a vacuum and

2   you'll have the context for them.

3       I might get fired if I don't show this document of

4   Mr. Gambrell in 1998 attending the Ven-A-Care meeting.

5   So I have to put it up.

6               THE COURT:  That poor guy.  That signature's

7   been up here every time.

8               MS. MERGO:  Don't you want to meet Mr.

9   Gambrell?

10              THE COURT:  No.  I feel bad for him.

11              MS. MERGO:  So this was 1998, the Ven-A-Care

12   meeting that Mr. Gambrell attended.  In 2000, this is

13   where we start seeing First DataBank.  NAMFCU brokers a

14   First DataBank settlement in which South Carolina

15   participated.  And this is a little hard to read.  But in

16   February of 2000, NAMFCU sends out a letter that says, as

17   you're aware there's a current national investigation by

18   state and federal agencies revealing a pattern of

19   misrepresentation by drug manufacturers of the average

20   wholesale prices and wholesale acquisition cost of their

21   products.  As a result, Medicaid and Medicare

22   substantially overpaid for these drugs and will continue

23   to do so until corrective measures are implemented.  To

24   that end, First DataBank has been cooperating with

25   representatives of NAMFCU where they start -- they're

1  going to do market wholesale surveys in order to get the

2  prices instead of relying on the manufacturers.  And this

3  was brokered in 2000.

4       Again, it cannot be over-emphasized that in view of

5  the clear evidence we possess that certain current AWP

6  and WAC data is grossly inaccurate for certain drugs.

7  Okay.  And this went to all the state MFCU directors.

8       2001, what happens?  South Carolina participates in

9  global related settlements against Bayer, TAP and Mylan.

10  And as we've shown you before, Mr. Gambrell was fully

11  involved leading the charge on those global settlements.

12  He was the president of NAMFCU at the time.  And it was

13  not just Mr. Gambrell.  There was constant monitoring by

14  the South Carolina A.G.'s office throughout 2001

15  participating in these global AWP related settlements.

16  And in fact, what we're going to go through today,

17  fourteen of these internal documents on the A.G. log are

18  from January to December of 2001 related to AWP

19  settlements.  And there's just a snapshot of the log that

20  they've produced.  All of this in 2001 where everyone at

21  the Attorney General's office was involved in discussions

22  on the AWP settlements including Charlie Condon, the

23  prior attorney general.

24       Okay.  So 2002 rolls around.  In January the Nevada

25  AWP lawsuit was filed.  It was an AWP lawsuit with many

1   of the same defendants that were sued in this case.  You

2   may recall from the last hearing we showed how Mr.

3   Gambrell revised the language in the complaint.  He

4   circulated the complaint, helped draft it.  It accuses

5   the Defendants of fraudulently reporting fictitious AWPs

6   to First DataBank, the same thing the State alleges here

7   in marketing the spread.

8        Two weeks later, Mr. Gambrell moderates a conference

9   call regarding the Nevada complaint and its implications.

10   That's January 2002, the call being moderated by Bill

11   Gambrell.  One day later he sends out a memo on behalf of

12   NAMFCU, as he was President, urging the individual states

13   to take action following the Bayer and TAP AWP

14   settlements.  And he starts to tell them about the fact

15   that the First DataBank settlement has fallen apart

16   because the wholesalers are not reporting to First

17   DataBank.  And we consequently present these

18   considerations to you in the hope that they take -- they

19   make out the case for action on your part.

20        So he's telling the States, we've got Bayer, we've

21   got TAP, AWP has settled, but you need to take action.

22   And here's his letter as president of NAMFCU.  He talks

23   about Bayer and TAP and we should be getting pricing

24   information directly from them, but those are the only

25   two you're getting it from.  The other manufacturers,

1   whose publicized AWPs bear no relation to the market

2   price remain unaffected by those settlements.  And he's

3   saying you need to do something about it.  And you'll

4   see, down here he says, failure to act when some

5   manufacturers are submitting to the states evidence of

6   how much Medicaid is overpaying would be worse than

7   regrettable and would represent another lost opportunity.

8   And that's from Mr. Gambrell to all the state Medicaid

9   directors and pharmacy directors.

10          Two weeks later he prepares a memo on the Nevada AWP

11  lawsuit for distribution to all the State MFCU directors.

12  And he sends an email out that says, next week all

13  directors will be receiving a memo from me summarizing

14  the status of the drug pricing investigations being

15  jointly conducted by NAMFCU and federal law enforcement

16  agencies.  The lawsuit recently filed by the Nevada A.G.

17  has generated great interest.  Please, in the next few

18  days, touch base with your directors in your region to

19  get a sense of the manner in which it is being discussed

20  or analyzed in the various states.

21          And here's his memo, February 2002.  He says, I

22  believe it's crucial for each director to be familiar

23  with the Nevada lawsuit and the status of the NAMFCU drug

24  pricing cases so each MFCU can advise their attorney

25  general.  And we anticipate it will be on the NAG's

1   spring meeting agenda.

2        And then he goes through in this memo, February 1st,

3   2002, and talks all about AWP, what the status of the

4   suit is and what they're suing about.  And he's telling

5   them, you need to meet with your attorney general.  So

6   what does he do?  Two weeks later, we get entry number

7   three on the privilege log.  February 13th, 2002, email

8   regarding litigation strategy meeting, Nevada complaint,

9   Bill Gambrell with the folks at the A.G.'s office.

10  Clearly relevant to this case and what the State is

11  alleging here for purposes of statute of limitations.

12  And they're meeting in 2002 on the Nevada AWP lawsuit.

13  But this is all we see of that email, the Nevada drug

14  pricing lawsuit.

15       And we've hand up to Your Honor, just for reference

16  as we go through these documents today, a binder that

17  shows what we see so you can see what's been redacted.

18            THE COURT:  All right.  And I don't want to

19  stop you.  But who is Treva Ashworth?

20            MS. MERGO:  He's in the Attorney General's

21  office.  He's the assistant -- let me look him up on my

22  list.

23            THE COURT:  In the South Carolina Attorney

24  General's?

25            MS. MERGO:  Yes.

1          THE COURT:  And Sonny Jones was too?

2          MS. MERGO:  Yes.  Treva Ashworth is former

3    Deputy Attorney General.

4          THE COURT:  Okay.  All right.

5          MS. MERGO:  And Sonny Jones currently works in

6    the Attorney General's office also.

7          THE COURT:  Okay.  Thanks.  I didn't mean to

8    interrupt you.

9          MS. MERGO:  Two days later -- okay.  So they

10   talk about Nevada.  Two days later five entries on First

11   DataBank talking about internal discussions on First

12   DataBank settlement.  And this is February 2002, all of

13   these.  And that continues on into June with all the

14   folks from the Attorney General's office including the

15   former attorney general.

16        And we can go over these in more detail when Mr.

17   Hopkins gets up.  But it's interesting to me that they go

18   settlement, settlement, settlement, suit related to First

19   DataBank.  This is all we see is First DataBank multi-

20   state inquiry.  So we don't know what that means, but we

21   do know the context of what was happening at that time

22   with Mr. Gambrell sending out his memo telling people to

23   take action.

24        And why is this important for our case?  Because

25   paragraph twenty-three of the State's Medicaid complaint

1   alleges that the Defendants reported false and inflated

2   AWPs to First DataBank, Red Book and or reported prices

3   which it knew would misrepresent Defendant's true

4   wholesale prices.  So if they knew what was going on with

5   First DataBank, they knew what was going on with the

6   Defendants in these cases.  That was the information hub

7   that they contracted with for the data.

8        Four months later pre-suit conference request, Bill

9   Gambrell to Charlie Condon, Robert Cook and Sonny Jones,

10  all in the Attorney General's office.  Potential

11  litigation -- this is what we see.  Potential litigation

12  by private counsel against drug manufacturers.

13       And then by April of 2003, the outside counselor

14  beating down their doors to try to represent them in what

15  we believe are the AWP cases.  Beasley Allen who's the

16  national counsel in these cases.  A meeting was scheduled

17  by Reece Joy, the third-party lawyer.  And then the

18  meeting happens on April 22nd, 2003 regarding, allegedly

19  TAP, Bayer and G.S.K. which have already settled by this

20  point.  So again, we don't know what these entries say.

21  That's what we see.  These are the notes from the Beasley

22  Allen meeting.

23          THE COURT:  That's pretty good redaction.

24          MS. MERGO:  It's effective.  And here's just an

25  example of the Attorney General getting letters from

1  other lawyers about the average wholesale price

2  litigation in December 2003 telling them about what a

3  great job Beasley Allen would do in AWP litigation.  And

4  you'll see right here, importantly, that Mr. McMaster

5  already has an average wholesale price file that he's

6  putting these documents into.

7      Okay.  And then by November 2003, we have meeting

8  minutes for review and analysis by the A.G. staff.

9  Medicaid -- State Health Plan and Medicaid claims review

10  processing.  So they mail it to Price Waterhouse for what

11  we would believe is to go over the claims data review in

12  this case, but we don't know.  And there's no -- we'll go

13  over this individually.  But there's no attorney present

14  at this meeting whatsoever.  This is all Price Waterhouse

15  and D.H.H.S.

16      Why does this matter?  Because the State has said

17  that here in their interrogatory responses that the A.G.

18  made the decision to bring this lawsuit as the attorney

19  for Medicaid with the Medicaid program's consent.  The

20  State Health Plan says the same thing.  And if they take

21  the undisputed position that their knowledge is

22  controlling on the statute of limitations as to

23  penalties, then we're entitled to documents relevant to

24  what their knowledge was for purposes of the statute of

25  limitations.

1      Okay.  And then Mr. Salane's going to talk about the

2  framework of the argument.

3           MR. SALANE:  You can turn the lights back on.

4           THE COURT:  Yeah.  Close your eyes because we

5  did this all day yesterday with a jury.

6           MR. SALANE:  Your Honor, Tom Salane from Turner

7  Padgett and I'm representing several of the Defendants,

8  among them the Watson Defendants who were successful in

9  Kentucky.

10           MS. WILLIS:  West Virginia.

11      (Laughter)

12           MR. SALANE:  Your Honor, initially there were

13  four privileges that were asserted by the State, and it's

14  now reduced to two.  The two privileges that are out are

15  the law enforcement privilege which was withdrawn and the

16  common interest privilege which was conceded and Your

17  Honor ruled did not apply because there was no document

18  in writing at the time the documents were created.

19      That leaves two that are asserted either variously

20  or together in connection with these documents on the

21  list.  That's the attorney/client privilege and the work

22  product document.

23      The attorney/client privilege, Your Honor -- let me

24  make one observation.  Every one of the documents that

25  Your Honor is looking at today were created prior to the

1    remote reaches of the statute of limitations or repose.

2    For example, the Watson Defendants' complaint was filed

3    on December the 7th of 2006.  Three years before that

4    would be December the 7th of 2003.  And I think virtually

5    all of these documents come from periods from 1998

6    through 2003.  And what we essentially are dealing with

7    here on the attorney client privilege ...

8         And Your Honor knows what the attorney client

9    privilege is.  I'm not going to burden the Court with

10   long explanations.  But the South Carolina law says that

11   it's up to the party asserting the privilege to establish

12   that it exists.  And they must do that by demonstrating

13   to the Court the following essential elements.  And that

14   is that there's legal advice of some kind that's being

15   sought from a professional legal advisor in his capacity

16   as a legal advisor and the communications relating to

17   that purpose are made in confidence by the client or at

18   his insistence permanently protected from disclosure by

19   himself or by the legal advisor except where the

20   protection is waived.  And that's what the Court simply

21   said in *Tobaccoville* and *Floyd* and other cases.

22        However, under South Carolina law, the party

23   asserting the privilege must establish the lack of

24   waiver.  Waiver can be explicit and expressed, and it can

25   be implied.  And one of the fundamental -- and what we're

1   really relying on here -- is the implied waiver of that

2   privilege, if it were to exist in any document, by virtue

3   of the at issue waiver.  At issue has been recognized by

4   South Carolina courts.  It's been recognized by federal

5   courts applying South Carolina law.

6        What the at issue doctrine basically says is that

7   where a party injects a factual or legal issue into the

8   case, they may not then hide behind the assertion of

9   attorney/client privilege to prevent or suppress or

10  garble the truth by not making the production of those

11  documents.  The at issue in this case is the fact that

12  the Attorney General's office, although seeking damages

13  and claiming conduct existed back to 1990 and not filing

14  suit until December of 2006 in my case -- or at the

15  earliest, I think August of 2006 -- and that in arguments

16  before you are motions to dismiss and on motions to make

17  more definite and certain said that they were relying on

18  the discovery rule and that in terms of that discovery

19  rule, that they were not aware of or didn't have

20  sufficient knowledge to be placed on notice of the

21  conduct that they're challenging in these lawsuits until

22  sometime within three years of the filing of the actions

23  which would put it back to the end of 2003.

24        Further, as was demonstrated by Nikole a few moments

25  ago, they're asserting that the State's knowledge, that

1   is the knowledge which triggers the statute of

2   limitations, is the knowledge of the Attorney General's

3   office and no one else.  And as Nikole said, we don't

4   agree with that.  But even accepting it, that then places

5   into issue what they knew and when they knew it.

6        And we are not seeking the production, Your Honor,

7   of anything except for documents that were generated

8   prior to the period of time when they claim that they did

9   not know and had no inquiry notice of what this conduct

10  was that they're now complaining about.  And in order to

11  establish that they had -- did not waive through the at

12  issue doctrine, they're going to have to demonstrate to

13  you under the circumstances that Nikole pointed out to

14  you a few moments ago that those documents and the

15  subject matter of those documents don't relate to their

16  degree of knowledge at that point in time as to the

17  inflation of AWP or the use of inflated AWP in pricing

18  with First DataBank or these other entities to the

19  detriment of the State.

20       The second basis by which they withhold documents is

21  the work product document or immunity.  It's not a

22  privilege.  It is a rule that is an outgrowth of our

23  discovery rules, Rule 26.  The elements that are

24  necessary to prove up a work product immunity are the

25  fact that they have to be documents, and the central

1   inquiry in each is that the party seeking to protect

2   those documents must demonstrate that they were prepared

3   in anticipation of the litigation or for use at trial.

4   And here we have that world-old conundrum.  And that is,

5   if they didn't know about it, how could they prepare it

6   in anticipation of trial.  The very assertion of the work

7   product privilege belies the lack of knowledge and belies

8   or undercuts their claim of work product privilege.

9        So determining the driving force behind the

10  preparation of each requested document is therefore

11  required to resolve the work product immunity question in

12  this case.  The mere fact that litigation subsequently

13  ensued is not enough.  That it doesn't cloak those

14  materials with the work product immunity.  The doctrine

15  -- the document itself must be prepared because of the

16  prospect of litigation.  And you'll note -- and let me

17  emphasize this as Nicole went through some of these

18  documents that related to these so-called settlements

19  like First DataBank settlements -- the First DataBank

20  settlement had occurred prior to the time -- and I'm

21  talking a year or two years prior to the time -- that

22  some of these documents are being asserted as being

23  privileged as a work product privilege.  So that they

24  must obviously represent some discussion about the

25  settlement in a current context rather than a past

1    context.

2         Your Honor, there are cases, I think, that were

3    cited to you earlier in briefs, and one of them I thought

4    was particularly significant and on point.  It was from

5    the United States Federal District Court Illinois that

6    involved a motion -- a subpoena and a motion to quash

7    with regard to an attempt to obtain attorney's records

8    regarding conferences with a plaintiff who had consulted

9    an attorney about injuries that he had received in

10   connection with a fire and then had not brought suit.  I

11   think actually he got -- he was a fireman.  He was

12   involved in a fire at a chemical plant in 1990.

13        In 2003 he was diagnosed with bladder cancer.  The

14   bladder cancer was ultimately linked to his exposure to

15   the burning chemicals at that fire.  In November of 2003

16   he went to attorneys to consult with them about what

17   legal recourse he may have had against whomever.  That he

18   then did not bring suit until 2006, March 14th of 2006.

19   And the issue was can you obtain the attorney/client

20   records from the lawyers regarding the initial

21   consultation.  And the district court then ruled that by

22   invoking the discovery rule and voluntarily raising the

23   issue of when he knew or should have known of his injury

24   and its cause, that the plaintiff put at issue the

25   communications and advice he received from his attorneys.

1   And this Court finds that the plaintiff waived the

2   attorney/client privilege with respect to communications

3   with his attorneys between November 2003 and March 14th

4   of 2004 when the suit was filed.

5        And that's exactly what this case is looking to do,

6   what we're looking to do in this case.  And that is, one,

7   we don't think -- and we'll have to go through each entry

8   and probably do them collectively.  But with regard to

9   those entries, the inquiry is going to be with regard to

10  attorney/client privilege.  Does it meet the elements of

11  the attorney/client privilege?  But the big one being

12  does this -- does the injection of the discovery rule and

13  knowledge of what they knew and when they knew it

14  constitute a waiver of the subject matter for these

15  communications that occurred prior to the -- in my case,

16  December 7, 2003?  And that's the essential issue that

17  has to be focused on every attorney/client claim of

18  privilege as we go through this.

19       With regard to work product, the work product rule

20  is the easiest one to overcome because that's not a

21  privilege, it's not absolute.  All you have to do is show

22  the necessity for the information, that it's either

23  necessary and that it cannot be obtained in a less --

24  well, it cannot be obtained from other means without

25  significant effort by the parties.

1          THE COURT:  The attorney/client privilege is

2     the one that worries me.  I think work product is more

3     cut and dry in my mind.

4          MR. SALANE:  Right.  And most of these are work

5     product privileges.  The work product privileges, you can

6     get through that real easily.  On the attorney/client

7     privilege, we're not on a fishing expedition.

8          THE COURT:  Right.

9          MR. SALANE:  Of these forty-two documents, I

10    would project, Your Honor, that there may be six that may

11    be critical.

12          THE COURT:  Hold on just a second.

13       (Off record discussion)

14          THE COURT:  Sorry about that.

15          MR. SALANE:  Yes, sir.  Even on the

16    attorney/client privilege, if the communication is

17    privileged, but certainly the facts, the base facts that

18    are stated in there, are not privileged.  And you know,

19    that information -- and I'm not sure -- and I can't

20    criticize the redaction because I can't see anything.

21    There are a couple of documents there, for example, that

22    appear to be an email, and it didn't show who it was to.

23    There are a couple of documents that said they had

24    attachments, but there's no identification of the

25    attachment.  It wasn't with the email.

1       But nonetheless -- and for example, there were some

2   that we'll get to that I don't think -- that were claimed

3   as work product which were, you know, how to investigate

4   a pricing case, that sort of thing -- I don't think were

5   written by anybody in the Attorney General's office.  I

6   think they were pulled off the back page of NAMFCU or

7   done through one of the pricing task force forces that

8   Mr. Gambrell -- and since we've learned too that Mr.

9   Sonny Jones was on one of the pricing task forces as

10  well.

11      So as we go through the materials, it will be

12  incumbent upon the Plaintiffs in this case to explain not

13  only that the attorney/client privilege attaches to it,

14  but also that the attorney/client privilege is not waived

15  through placing their knowledge at issue.

16              THE COURT:  If we're at a good break point ...

17              MR. HOPKINS:  Sure.

18              THE COURT:  ... I've got to go deal with that.

19  It won't take me five minutes, okay?  I'll be right back.

20              MR. HOPKINS:  Sure.

21      (WHEREUPON, court stood at recess for a short

22      break.)

23              THE COURT:  Thanks.  Y'all have a seat.  I'm

24  sorry about that.  Jessica has gone up to get y'all a

25  plate of cookies so y'all can snack.  Okay.  Sorry about

1   that.  I had to go return that call.

2          MR. HOPKINS:  Okay.  Judge, I went back and

3   told the folks at Beasley Allen -- I said, you know, Ms.

4   Willis always has these PowerPoint presentations at every

5   hearing, and she wins most of them.  So why don't we at

6   least try to do the same thing and come up with one?  So

7   we've got one here today.  And I don't believe this will

8   take too long, Judge.

9          THE COURT:  Well, hers are in color.

10          MR. HOPKINS:  Judge, you've got to start

11   somewhere.

12          THE COURT:  Okay.  I got you.

13          MR. HOPKINS:  You know, you've got to start --

14   I had to bring somebody with me just to make sure I

15   didn't screw this up.

16          THE COURT:  I got you.

17          MR. ALPHIN:  It goes well with the pink

18   courthouse, though, courtroom.

19          THE COURT:  This is not pink.  It's supposed to

20   calm defendants.  And all it does is make me feel like

21   I'm inside of a Milk of Magnesia bottle.  But this is my

22   life, so don't be making a whole lot of fun about it.

23   All right.

24          MR. HOPKINS:  Okay, Judge.  Thank you.  Judge,

25   I think this won't take long.  There really are three --

1  we've got them broken down to three groups of documents,

2  the First DataBank documents, the settlement documents,

3  and then the miscellaneous notes.  Now, the miscellaneous

4  notes we will have to go through one at a time.

5          THE COURT:  Okay.

6          MR. HOPKINS:  I think the First DataBank and

7  the settlements are really an argument that would apply

8  to all the documents.  Judge, we've handed up two

9  documents initially that we wanted to show you.  One of

10 them, the first one, Your Honor, shows -- and this is

11 just a sampling -- in addition to things you've ordered

12 to be produced, NAMFCU documents, other things, external

13 documents.  And this is a very small sampling of some

14 documents that have already been produced from Bill

15 Gambrell's files, from the privilege log.  And this lists

16 several documents, Your Honor.  And the reason I wanted

17 to show you this is my understanding of the Defendants'

18 argument is, well, if these are privileged, we're going

19 to say you waived it, you put it at issue; therefore, we

20 need it.  We need it.  We have to have it to prove our

21 statute of limitations or statute of repose defense.  We

22 don't think it's a statute of repose, but they say we

23 need it.

24      Judge, all of these documents, as you can see, are

25 pre-2003.  They already have them in their possession.

1    As you know, we see the 1998 document at all these

2    hearings.  They have that.  So the point of this, Judge,

3    is that I'm not sure we really follow or understand the

4    argument that this Court should set aside or not observe

5    a privilege, one of the most important fundamental, basic

6    fundamental rights in the law, a privilege, set it aside

7    and disregard it to give the Defendants documents which

8    clearly they already have a lot that go to the statute of

9    limitations issue, Judge.  So I just wanted to let you

10   know that it's not as if they are begging to get two or

11   three documents, Judge, that are before 2003 to prove

12   their case.  They have plenty.  In fact, we don't know

13   how it could get any better.  But I just wanted you to

14   know -- I want you to know that they've got that.

15        Also, Your Honor, we've handed up an order.  I had

16   given Your Honor this order before and the Defendants.

17   This is an order from Mississippi, Judge, in the case

18   over there.  In Mississippi, Judge, the court appointed a

19   special referee, Bobby Sneed, Robert Sneed, to hear

20   discovery matters and other matters.  He didn't actually

21   -- wasn't the judge who tried the case.  And I'll tell

22   Your Honor, just two months ago at the end of September,

23   our firm, Beasley Allen, tried the case in Mississippi

24   against Sandoz for three weeks.  And the judge -- tried

25   to a judge, not a jury.  And the judge in Mississippi

1   awarded the State thirty-eight point two million dollars.

2   And I'm sure -- I guess that's being appealed.  I don't

3   know.  Fortunately, the only AWP case I have to work on,

4   Judge, is South Carolina.

5        But the reason I hand up this order, Judge, is

6   because it has some good language about this putting at

7   issue.  This was an issue in this case, Your Honor, where

8   the defendants sent a subpoena to the state MFCU unit,

9   wanted to depose the state MFCU director, who would be in

10  our case Bill Gambrell.  Wanted all of these documents.

11  And the Court quashed the subpoena and refused to let

12  them depose the MFCU director and also refused to make

13  them produce documents.

14       As we said earlier, Judge, these cases are so

15  mature.  There has not been a new, original, creative

16  argument in AWP in years.  Everything Your Honor's

17  hearing, it's already been briefed, ruled upon, and

18  decided in courts all over the country.  This issue has.

19  And you'll see, Judge, on page thirteen where he really

20  disposes of, fairly quickly, this idea that well, the

21  state put it at issue, therefore, you know, it's like a

22  sword.  You have to give it to us.

23       Now, there's no statute of limitations in

24  Mississippi, so they couldn't use that.  So they said,

25  well, you alleged fraud.  And since you put fraud in

1    there, we're entitled -- you put our conduct at issue,

2    and we're entitled to get all of these documents because

3    you put the privilege at issue simply through alleging

4    fraud.  And the court disposed of that summarily and said

5    that's ridiculous.  He said if you follow that to its

6    logical conclusion, every time there's a fraud case,

7    you'd be entitled to go depose the Attorney General's

8    office and get their documents.

9        In this case, Judge, the Defendants have said simply

10   because the State asserted the discovery rule, which is

11   the law anyway -- all the State said is the discovery

12   rule applies -- you put it at issue.  Therefore, we're

13   entitled to get all of this.  And I don't even know that

14   I follow that argument, but obviously that's something

15   for Your Honor to consider.  But we absolutely reject

16   simply because we asserted the discovery rule, which is

17   the law of this State, that somehow that could ever act

18   as a waiver of an attorney/client privilege or any other

19   type of privilege document, Your Honor.  They have a lot

20   of documents already that go to this, and we don't think

21   the Court needs to or should set aside any privileges.

22       So having given you that order, Your Honor, and

23   these other documents, I'll move forward for our

24   presentation.  The first seven documents, Your Honor, are

25   the First DataBank documents.  These are a series of, I

1  believe, six documents or five documents, Your Honor,

2  that talk about the First DataBank litigation.  And I

3  need to give Your Honor just a little bit of background

4  and history as to what was going on at the time.

5       There's no doubt, Judge, in the '99, 2000, 2001, at

6  that time, Your Honor, First DataBank and the Defendants

7  were really pointing fingers at each other.  First

8  DataBank was saying, well, we just report the information

9  you give us.  And the Defendants, the companies, were

10 saying, no, you don't.  You get our information and you

11 automatically mark it up twenty percent or put a twenty

12 percent on top of it or, you know, we don't even give you

13 our information.  You use old information.  So those two

14 were really going back and forth with each other.  And so

15 First DataBank got sued.

16      In 2000 we have the infamous or famous Lupinetti

17 letter which they've put up on the screen.  And as I told

18 you, Your Honor, unfortunately, they don't put the second

19 page where Attorney General Spitzer spends about a couple

20 of paragraphs extolling the virtues of the great work he

21 did and he's fixed this problem and saved the states.  We

22 have now cooperated with First DataBank and the

23 manufacturers, and they're going to start reporting

24 accurate information.  First DataBank's going to get

25 accurate information from the manufacturer.  They're

1   going to report accurate information.  We've fixed this

2   for you.  So that was the Lupinetti letter in 2000.

3        So that gets me to this point, Your Honor.  There's

4   no doubt there was First DataBank litigation.  All of

5   these documents talk about that, Your Honor.  So when we

6   assert the work product privilege, I certainly understand

7   Mr. Salane's point.  Well, if you knew there was

8   litigation how could it be anticipation of litigation if

9   you didn't know it?

10       The work product applies to the First DataBank

11  litigation, Judge.  As you can see, every one of these

12  documents was authored by an attorney at the Attorney

13  General's office and sent to an attorney at the Attorney

14  General's office.  And we don't believe that just because

15  it's unrelated litigation that work product should still

16  apply, carry over from one litigation to another.  In

17  other words, we certainly don't think it would be logical

18  for the Court to say, well, this is a different

19  litigation, you lose your privilege.  This was not

20  privileged -- I mean, this was not work product in

21  regards to any AWP litigation.  It's all work product and

22  discussions in the provision of legal advice about First

23  DataBank's settlement, whether the State should get

24  involved, what considerations there were, whether they

25  should compromise claims.  Your classic request and

1    provision of legal advice regarding First DataBank.

2              THE COURT:  And that case is settled?

3              MR. HOPKINS:  That case is settled, yes, sir.

4              THE COURT:  Okay.

5              MR. HOPKINS:  So that, Your Honor –– I can go

6    through these one at a time.  The first document, Your

7    Honor, is clearly attorney/client privileged.  Legal

8    advice is provided directly to the Deputy Attorney

9    General McIntosh on the litigation.  We've asserted the

10   privilege attorney/client and work product privilege.

11   The author was Sonny Jones, a Deputy A.G.  The recipients

12   were each attorney generals.  And that set of documents,

13   again, Your Honor, was a recommendation, legal advice, a

14   legal recommendation attached to the first document being

15   forwarded with legal advice to the attorney general

16   himself.  The author was John McIntosh, the Deputy A.G.

17   The recipient was the Attorney General, Charlie Condon.

18   The next document, Your Honor, was just a follow-up.

19             THE COURT:  All right.  Do me a favor.  Back up

20   to that one.  And I understand that this creates a little

21   bit of a disadvantage –––

22             MR. HOPKINS:  That's okay.

23             THE COURT:  ––– to the Defense since they don't

24   know what it says.

25             MR. ALPHIN:  Yes, sir.

1           THE COURT:  How is that privileged?

2           MR. HOPKINS:  This is document 5757.

3           THE COURT:  Right, from John McIntosh to Condon

4   dated 2/15/2002, 10:51:59 a.m.

5           MR. HOPKINS:  Yes, sir.  Your Honor, we think

6   it's giving legal advice.  There's only one sentence

7   there, and it is legal advice to Attorney General Condon

8   with the recommendation of how to proceed with regards to

9   the First DataBank settlement.  It has his

10  recommendation.

11          THE COURT:  And how would that in any way be

12  detrimental to you?  Assuming that ---

13          MR. HOPKINS:  Assuming that it's privileged,

14  how does it hurt you?

15          THE COURT:  Right.

16          MR. HOPKINS:  Well, Judge, again, we don't want

17  to go down that slippery slope of starting to say, well,

18  it's privileged, but we're going to give it to them

19  because it doesn't hurt your case.  You know where that

20  leads and where that heads.  That's only going to get you

21  in trouble.  Of course, the client doesn't like it.  The

22  A.G. absolutely believes these are communications between

23  lawyers with legal advice.  So I understand they want to

24  stand by the privilege.  But I understand your point,

25  Judge.  Are we going to win or lose the case on that?

1    No, sir, we're not.  I'm with you.

2         THE COURT:  And I guess my point is some of

3    these assertions of privilege are not contextual.  In

4    other words, they're just blanket assertions because

5    that's your position, not because you feel that these

6    things would be detrimental.  Because, quite frankly,

7    after reading them all, I could probably pick five that I

8    think they would care about.

9         MR. HOPKINS:  Judge, I don't disagree with what

10   you're saying.  There are probably between about seven

11   documents that are really important.

12        THE COURT:  Yeah.

13        MR. HOPKINS:  So having said that, then I'll

14   move on past First DataBank.  I think you understand our

15   position.

16        MS. MERGO:  Can I say just one thing, Your

17   Honor?  They've not asserted privilege on these five,

18   just to be clear.  It's only work product that they've

19   asserted on these five.

20        THE COURT:  On those five is work product?

21        MR. HOPKINS:  That's correct.

22        THE COURT:  Not attorney/client privilege?

23        MS. MERGO:  Not attorney/client privilege.

24        MS. WILLIS:  And might I just say something to

25   Your Honor?  It is not clear to us that there actually

1   was a lawsuit against First DataBank.  Now, Mr. Hopkins

2   could convince me otherwise perhaps.  But there were

3   negotiations in 2000 by NAMFCU folks including Mr.

4   Gambrell ---

5              THE COURT:  Right.

6              MS. WILLIS:  --- to try to convince First

7   DataBank to report what they were said were -- I'm going

8   to use the word in quotes -- accurate AWPs.  And then we

9   saw in January of 2002 a letter from Mr. Gambrell saying

10  that fell apart.  It didn't work.  That arrangement, that

11  agreement as it were, with First DataBank, didn't work

12  because only Bayer and others were required to produce to

13  First DataBank accurate, in quotes, AWPs.  So I don't

14  know and we can't tell whether these are the First

15  DataBank who are contemplating a resolution with First

16  DataBank.  I don't believe there was actually litigation

17  filed.

18      Now, what's interesting about that is we know that

19  today some of the states are suing First DataBank along

20  with drug wholesalers saying, wait a minute, you're the

21  guys who created all this problem from the beginning.

22  All we know standing here is that First DataBank is an

23  essential allegation in their complaint because all the

24  drug pricing information that Medicaid received on AWP

25  came from First DataBank.  That's what we know.

1          THE COURT:  Was there a suit?

2          MR. HOPKINS:  Yes, sir.

3          THE COURT:  And it was settled?

4          MR. HOPKINS:  There were several private ones,

5   and the F.T.C. brought a suit.  The F.T.C. brought a suit

6   that was -- I think the settlement amount is in this

7   first document, Judge, and also the private ones.  And

8   the settlement amount is in this email resulted -- that

9   showed the settlement to the states that brought private

10  actions.  So it was both a federal government case ---

11          THE COURT:  Oh, okay.

12          MR. HOPKINS:  But I don't know whether a South

13  Carolina case was filed.  I do not know, Judge, if South

14  Carolina filed.  I don't think they did, so I don't want

15  to go on the record and say that they did.

16          THE COURT:  Okay.  But those are not

17  attorney/client privileges; that's a work product

18  assertion on all the First DataBank?

19          MR. HOPKINS:  Yes, sir.

20          THE COURT:  Okay.

21          MR. HOPKINS:  That it was work product related

22  to potential, possible or actual litigation against First

23  DataBank.

24          THE COURT:  Okay.  And I don't mean to keep

25  interrupting you.

1          MR. HOPKINS:  No, sir.  That's fine.

2          THE COURT:  I hated that when people did that

3    to me, but ---

4          MR. HOPKINS:  No, if we can move through it

5    quicker, I'll get to the point and we'll get through it.

6       Judge, our second set of miscellaneous notes, these

7    are the ones we might have to go through individually,

8    but I'll try to move through them.  The first one 75087.

9          MS. MERGO:  Your Honor, can we respond on First

10   DataBank before we move on?

11         MR. HOPKINS:  I'm sorry.

12         THE COURT:  Sure, that would be fine.

13         MS. MERGO:  Your Honor, first of all, if

14   they're -- if this is a potential suit against First

15   DataBank related to AWP and they allege in their

16   complaint that it was the reporting to First DataBank

17   that caused the issue here, it's clearly relevant and we

18   need these documents just for work product assertion, if

19   that's their only assertion here.  It's clearly relevant

20   to this case which centers around First DataBank's

21   knowledge.  If they knew First DataBank was

22   misrepresenting -- were misreporting AWPs, then they knew

23   the Defendants allegedly were.

24         MR. HOPKINS:  I would say, Judge, that I don't

25   think though that that's being discussed as to who knew

1    what.  He's just saying this is out there.

2              THE COURT:  Yeah.

3              MR. HOPKINS:  You know, some people are saying

4    it's the manufacturers.  The manufacturers are saying

5    it's First DataBank.  They're misreporting our

6    information.  You know, they're talking about litigation

7    going on out there.  It's not about the suit against the

8    manufacturers.

9              THE COURT:  Okay.  I get it.  I get it.

10             MR. HOPKINS:  Sure.

11             THE COURT:  Y'all share the cookies.

12        (Laughter)

13             MR. HOPKINS:  I'm sorry.

14             THE COURT:  Only in Anderson would people bring

15    you cookies to eat.

16        Okay.

17             MR. HOPKINS:  All right.  The next document.

18             THE COURT:  Hold on just a second.

19             MR. HOPKINS:  Yes, sir.

20             THE COURT:  All right.  Just so you know, after

21    you finish, I need to ask you a question specifically

22    about document 323, AG085660 which is the Reece Joy.  But

23    I'll let you get through.  Just so I don't surprise you.

24             MR. HOPKINS:  Yes, sir.  Okay.  All right.

25    Judge, if that's one that's just setting up a meeting?

1          MS. MERGO:  Yes.

2          MR. HOPKINS:  If that is one setting up a

3   meeting, we're going to produce that.

4          THE COURT:  Yeah.  That's the only one that is

5   -- the reason that's jumped out is that's the only one

6   where the sole claim is attorney/client.

7          MR. HOPKINS:  Judge, if that's the email of ---

8          MS. MERGO:  That is the one that Reece Joy is

9   setting up the meeting, 323.

10         MR. HOPKINS:  323, we're going to produce that,

11  Judge.  Mr. Alphin and I looked at that.  He didn't

12  designate it and I didn't.  We're pretty confident this

13  is in a group of documents Mr. Strom was responsible for

14  designating, but we don't think this should be

15  attorney/client privilege, Judge.

16         THE COURT:  You think he threw them down the

17  steps of his mansion and said, whichever ones go the

18  farthest are ...

19      (Laughter)

20         MS. MERGO:  If it's all right with Mr. Hopkins

21  and the Court, we'll add it to the number, the one that

22  you've signed.

23         THE COURT:  Okay.  Yeah.  And when this is over

24  and everybody is safe on their flights, remind me to tell

25  you a story about Reece Joy, rest his soul.

1          MR. HOPKINS:  All right.

2          THE COURT:  Okay.  So that one's going to be

3    furnished?  Okay.

4          MR. HOPKINS:  Yes, sir, we'll produce that.

5          THE COURT:  Okay.  Sorry about that.

6          MR. HOPKINS:  No problem at all.

7       This next document, Your Honor, is an email from

8    Bill Gambrell to Sonny Jones and Treva Ashworth, both

9    Deputy Attorney Generals, with a copy to John McIntosh

10   discussing this Nevada litigation that has been

11   commenced.  And again, Judge, you know, this isn't going

12   to make or break the suit.  But our client believes its

13   privileged.  It's discussing litigation, and it's from

14   one attorney to another attorney.  So they wish to stand

15   by the privilege, Judge.

16         THE COURT:  Okay.  Hold on just a second.  Let

17   me ...

18         MR. HOPKINS:  Sure.

19         THE COURT:  I mean, obviously I won't make a

20   decision based upon the triviality of these things, but

21   it'll certainly be easier for me.

22         MR. HOPKINS:  I understand.

23         THE COURT:  Okay.

24         MR. HOPKINS:  I just don't want, Your Honor, to

25   -- like I said, we're concerned, you know, about

1    conceding things that shouldn't be conceded.

2           THE COURT:  Yeah.  Oh, yeah.  No, I understand.

3           MR. HOPKINS:  And I think Your Honor's got the

4    idea.  There are a few that we feel strongly about.  One

5    other thing I wanted to make clear though, Judge.  And I

6    don't mean to say it was a misrepresentation.  I just

7    want the Court to be clear.  We do take the position that

8    it's the knowledge of the Attorney General that matters

9    for the penalties.  That's the position they take in all

10   litigation, that our statute provides only the A.G. can

11   get penalties.  So for the penalties claim, only the

12   knowledge of the A.G.  But as to the case in general, the

13   damages case, we absolutely contend it's the knowledge of

14   the state agency, Medicaid and the Employee Health Plan

15   that matters for the statute of limitations on those

16   claims.  A minor difference.  I mean, it's a small thing.

17   I just want you to understand our position.

18           THE COURT:  Yeah.  I mean, you know, again, as

19   I said once before, it's not rocket science.  You know,

20   the issue really is you've got in '98 really, Mr.

21   Gambrell, who is very involved in all this stuff,

22   president of NAMFCU, sending out emails and talking about

23   these lawsuits.  I mean, the difficulty for me in regard

24   to the statute of limitations is -- and y'all have done a

25   good job of arguing so far.  But it's hard for me to see,

1    quite frankly, how that doesn't start the statute

2    running.  And I -- because that's knowledge on behalf of

3    the attorney general who would have to initiate action.

4              MR. HOPKINS:  The penalties case, yes, sir.

5              THE COURT:  Right.

6              MR. HOPKINS:  The penalties case.  We don't

7    think it triggers the other two, but it definitely for

8    the penalties case.  Yes, sir.

9              THE COURT:  Yeah.  Okay.  And I'm getting

10   ahead.  And again, I keep interrupting you.  Go ahead.

11             MR. HOPKINS:  That's okay.  No.

12             THE COURT:  All right.  So we're at that one.

13   I understand what you're saying there.

14             MR. HOPKINS:  I'm sorry.  You want to go ahead.

15             MS. MERGO:  Can I respond on number three?

16             THE COURT:  Yeah.

17             MS. MERGO:  Let me just remind the Court, as we

18   put on our slides on the PowerPoint, the Attorney General

19   in its interrogatory responses said, we made the decision

20   to bring suit on behalf of Medicaid and the State Health

21   Plan, they didn't make the decision.  And there are

22   penalties at issue in this case.  So their knowledge --

23   they made their knowledge relevant.  It's not just

24   damages; it's also penalties.

25        Now, on number three, as we showed on the slides,

1    February 1st, Gambrell sends out a memo to all NAMFCU,

2    state NAMFCU, directors and says, you need to talk to

3    your attorney general about the Nevada AWP lawsuit.  And

4    then twelve days later we have an entry on the privilege

5    log about the Nevada drug pricing lawsuit.

6         So it's clearly relevant.  It's the same suit as

7    AWP.  It's many of the same defendants, and we should be

8    entitled to this.  At least if there are facts in this

9    document, we should be entitled to those.  It clearly

10   puts the knowledge in the ---

11        THE COURT:  Well, without giving you too much,

12   there isn't a whole lot of facts in any of these

13   documents.  I mean, I -- again, just I understand where

14   both sides are.  But with the exception of -- I say five,

15   they say seven -- you know, it's just dribble.  But I

16   understand why you need it, and I understand why you

17   don't want dribble released because that's starts the ---

18        MR. HOPKINS:  Well, unfortunately, Judge,

19   relevance isn't the standard.  I agree it's relevant, but

20   privileged -- relevance doesn't overcome privilege.  I

21   don't disagree.

22        MS. MERGO:  It does when your knowledge is

23   dispositive for purposes of the statute of limitations

24   ---

25        THE COURT:  Right.

1        MS. MERGO:  --- and you've passed it along now

2   to the A.G.

3        THE COURT:  Right.  And like I said, in very

4   few of these things is there information that I think

5   would push your case forward.  I'll just tell you that.

6   And again, I think they would agree.  There are four or

7   five.  And when we get to those, that will take a little

8   more time.  So I understand.

9        MR. HOPKINS:  Yes, sir.  And you know, if it's

10  privileged, Judge, then the only way legally they can

11  overcome that is through this argument of waiver by

12  putting it at issue.  That's the only -- I mean, if it's

13  privileged, it's privileged.  It doesn't matter.  So we

14  think they have the burden of proving, you know, a

15  waiver.  That's on them.  And I don't see any waiver.

16  Just because we said the discovery rule applies, we waive

17  the privilege?  I think that's a stretch.

18        THE COURT:  Well, of course, I think the key

19  issue in this case is -- you know, the interesting thing

20  is we've -- in all the time that I've been involved in

21  this suit, the substance of the lawsuit maybe has never

22  been mentioned other than in Ms. Willis' wonderful thing.

23  I mean, and in my own reading.  We're still talking about

24  whether the lawsuit can be brought because it's barred.

25  I mean, this is all -- all these months really are about

1   pre-lawsuit knowledge and whether or not the cases should

2   be dismissed out of hand because of the statute of

3   limitations.  So yeah, I mean, there's not a whole lot of

4   substance in any of these things.  So I -- you know, I

5   understand.

6        Okay.  What's the next one?

7           MR. HOPKINS:  The next one is document 22 and

8   318, Judge.  And this is followup to a previous

9   communication where the attorney that's the attorney,

10  Bill Gambrell, is sending this to the A.G., Charlie

11  Condon, John McIntosh, and Sonny Jones and Robert Cook.

12  And we did assert attorney/client privilege on this

13  document, Your Honor.  And again, this is clearly -- we

14  think this one is providing legal advice and

15  recommendations from Mr. Gambrell to the Attorney General

16  Charlie Condon.  Again, we think this is privileged and

17  we don't think it's waived.  We also asserted the common

18  interest privilege and the law enforcement privilege.

19  But at the end of the day, Judge, we think it's

20  attorney/client privilege, giving legal advice.

21       Would you like to respond, Nikole?

22          MS. MERGO:  All we have, Your Honor, is

23  potential litigation by private counsel against drug

24  manufacturers to the highest person in the chain of

25  command at the attorney general's office in October of

1  2002, after all this discussion about the Nevada AWP

2  lawsuit and First DataBank, Bayer and TAP.  Which

3  litigation?  We're entitled to know that.  By which

4  private counsel?  Which drug manufacturers?  I mean, it

5  appears to us that this is October 2002 and they're

6  discussing the AWP lawsuit.  We don't know what it says,

7  but that's what it appears.

8        MR. HOPKINS:  And she makes a good point.

9  Judge, this mentions two manufacturers that are not

10  defendants in this case.  There are only two companies --

11  two drug manufacturers are mentioned in this memo, and

12  neither one of them is a defendant now or anytime.

13  Lawsuits were not brought by the Attorney General against

14  the two companies that are mentioned in this.

15        THE COURT:  But their position is this

16  triggered your knowledge.

17        MS. MERGO:  If it's the same subject matter,

18  Your Honor, it doesn't matter whether they ultimately

19  brought it or not.  Maybe they settled with them.

20        THE COURT:  Yeah.  But it doesn't really matter

21  because it triggers the knowledge of the fact that there

22  is this cause of action.

23        MS. MERGO:  Correct.  And they don't have to

24  have the full-blown theory of their case at that time or

25  all the defendants that they're going to sue at that

1   time.

2           THE COURT:  This was one of the ones that --

3   one of the seven as far as I was concerned.

4           MR. HOPKINS:  Yes, sir.  Yes, sir.

5           THE COURT:  Although I will note that there's a

6   lot of discussion on who's going to pay for the plane

7   ticket?  Did you notice that?  Typical state budgets.

8           MR. HOPKINS:  Fiscal crisis.

9           THE COURT:  Yeah.

10          MR. HOPKINS:  You've got it.  So ...

11          THE COURT:  All right.  I'll come back to that

12  one.

13          MR. HOPKINS:  Yes, sir.  That one we would ask

14  you to give that one a closer look.

15          THE COURT:  Yeah, I will.

16          MS. MERGO:  So would we.

17      (Laughter)

18          THE COURT:  In all seriousness, I'm so happy

19  y'all have worked together well because this could be

20  just hell on wheels.  And I'm assuming y'all really do.

21  This is not a show for me.

22          MR. ALPHIN:  Oh, we did, yeah.

23          THE COURT:  Except for ---

24          MS. MERGO:  Your Honor, that one is the same as

25  318.  22 and 318 are the same document.

1          THE COURT:  Right.

2          MR. ALPHIN:  They came from two different

3    files, but they're the same document.

4          THE COURT:  Okay.  All right.  I'll tab that

5    one, and that one will get a little special -- again, you

6    know, the problem I've got is, I'm not so sure that I

7    should tab them because I'm not sure whether I think

8    they're important has anything to do with it.  But I am

9    going to review them more carefully just to be ----

10          MR. HOPKINS:  Judge, I'm confident you've got

11    it pinned down to the same ones that we do, so we're not

12    worried about that.

13          Judge, the next four are all in a group, 78, 85, 86,

14    and 87.  And we'll produce 86 because that was not sent

15    to or from an attorney.

16          THE COURT:  All right, 86 is going to be

17    produced?

18          MR. HOPKINS:  Yes, sir.

19          THE COURT:  And then 78 -- I've got them

20    listed.  Let me find that.

21          MR. MERGO:  78 and 85 are also not attorneys.

22    Cheryl Ruff was the Division of Program Integrity

23    Director at D.H.H.S.

24          THE COURT:  Right.

25          MR. HOPKINS:  But she sent it to -- Judge, she

1   sent it to the A.G.'s office specifically seeking advice

2   on this proposal.

3           THE COURT:  Right.  In fact, I think everyone

4   or no one at this meeting was an attorney; is that

5   correct?

6           MS. MERGO:  That's correct.

7           MR. HOPKINS:  That's right, Judge.  That's

8   exactly right.  And I mean, I can tell the Defendants

9   somebody came in, made a pitch, not about litigation, not

10  about these manufacturers.  A company came in and makes a

11  pitch to these people.  She takes the pitch, sends it to

12  the attorney general's office and says, what do you

13  think?  And then he responds with his legal advice.  So

14  that's the gist of this, Judge.  But I agree, the first

15  thing in her notes from her meeting that she sent to the

16  A.G.s say, what do you think about this.  There was not

17  attorney there at that.

18          MS. MERGO:  The fact that she sent her notes

19  would not immunize the notes themselves.

20          THE COURT:  Right.

21          MS. MERGO:  If there was no attorney there and

22  it was all outside -- in fact, there was an outside

23  vendor there, Price Waterhouse, who was in accounting.

24  So there's clearly no lawyer there.  And then she sends

25  them along apparently in 86, entry 86.  And at the bottom

1  of the chain on 86, other than that very top entry which

2  goes to Mr. Gambrell, the entire bottom of the chain does

3  not involve a lawyer.  In fact, it's got Jared Duzan

4  (phonic), who we believe was with Meyers and Stouffer

5  that did data processing for thirty-five state Medicaid

6  agencies.

7          MR. ALPHIN:  That's the one we're producing.

8          MR. HOPKINS:  Yeah.  That's the one we're

9  producing, Judge.

10          MS. MERGO:  That's the one.

11          THE COURT:  Okay.  You're producing that.

12  Well, hold on.  Let me look at this and see if it's ...

13          MR. ALPHIN:  The one that goes together is

14  AG076981, which is the next document.

15          THE COURT:  I'm just trying to see if there's

16  any -- have you had a chance to review these documents to

17  see if there's any information contained in 86 that's not

18  contained in 73?  In other words, once you've given up 86

19  ...

20          MR. HOPKINS:  No, sir.  The notes were not

21  attached ...

22          MS. MERGO:  The notes were not attached.

23          MR. HOPKINS:  ... to 86, right.

24          THE COURT:  And I'm just wondering ---

25          MS. MERGO:  Entry 78 appears to be just the

1   notes itself ...

2            MR. HOPKINS:  That's right, Judge.

3            MS. MERGO:  ... with no lawyer there.

4            THE COURT:  Right.  And ---

5            MR. HOPKINS:  The notes from the meeting, and

6   then the next she sends it to Mr. Gambrell and ---

7            THE COURT:  I'm just wondering if the note from

8   Cheryl Ruff contains all of the pertinent information

9   from the notes.  And reading through it quickly, it

10   almost looks as if she's summarizing ---

11            MR. HOPKINS:  Right.

12            THE COURT:  --- those three pages of notes with

13   the information that's important.  Okay.  All right.  So

14   you're giving that one up?

15            MR. HOPKINS:  The email from -- with Jared at

16   Meyers and Stouffer, yes, sir.  The ones we -- you know,

17   her sending the email to Mr. Gambrell asking for his

18   thoughts or advice and his response are what we think are

19   privileged, Judge.

20            MS. MERGO:  So let me understand.  He's

21   claiming privilege on 85 which is sending it to Mr.

22   Gambrell?

23            MR. HOPKINS:  Yes, because ---

24            MS. MERGO:  My argument is that 85, the notes

25   themselves, would not be privileged.  That's factual

1   information where no attorney was present.  What she said

2   to Mr. Gambrell is one thing.  But the notes themselves

3   with no lawyer there, there's nothing that would cause

4   this to be privileged.

5            MR. HOPKINS:  I think you mean 78.

6            MS. MERGO:  78.  78 are the notes.

7            THE COURT:  Yeah, 78.

8            MR. HOPKINS:  78 is the notes, right.

9            MS. MERGO:  We'd clearly be ---

10            THE COURT:   78 are the notes from the meeting

11   with staff and other people, and that's the meeting where

12   there's no lawyer there.

13            MS. MERGO:  There's an outside vendor -- no

14   lawyer and an outside vendor there.  The fact that she

15   sent them along to Mr. Gambrell doesn't immunize the

16   notes.

17            THE COURT:  Yeah.  I have to tell you, I'm

18   inclined to agree with her on that.  So I -- go ahead and

19   produce that.  I've read it.  I doubt there's any shock

20   in there.  It actually may be the longest thing.

21            MR. HOPKINS:  All right.

22            THE COURT:  I'll give you a minute if you want

23   to read through it and make sure that you don't have

24   something.  But ...

25            MR. HOPKINS:  No, sir.  We read it again, John

1   and I did, this week again.  So like I said, that's why

2   we separated them out, Judge.

3          THE COURT:  Okay.

4          MR. HOPKINS:  These are the notes.  So you want

5   us to produce the notes?  Not her email to Gambrell and

6   his response, but produce the notes?

7          THE COURT:  Right.

8          MR. HOPKINS:  78 we'll produce.

9          THE COURT:  The notes between -- and now ---

10         MR. HOPKINS:  Yes, sir.

11         THE COURT:  --- everyone can know.  It's, you

12   know, with Price Waterhouse and the State Employee Health

13   Plans and D.H.H.S.

14         Mr. Hopkins:  Very good.  I'll move on to the

15   next ...

16         MS. MERGO:  87.  Did we deal with 87 as part of

17   that group?

18         MR. SALANE:  Your Honor, could I raise a

19   question?

20         THE COURT:  Sure.

21         MR. SALANE:  I just need some assurance that

22   the notes being attached in 85 are the same as the notes

23   in the 78 that Your Honor said to go ahead and produce.

24   And the only reason I say that is the subject there is

25   forwarding notes from P.W.C. meeting today.  And it's

1   dated 12/16, and the notes are dated 11/24.  And so I

2   just -- we were not supplied with document number 85,

3   were not supplied with the attachment.  And so I'm left

4   guessing what the attachment was.

5           THE COURT:  Well, the attachment would be 85.

6       Isn't that correct?

7           MR. HOPKINS:  78.  85 is -- 78 were her notes

8   that Ms. Ruff prepared -- I believe it was Ms. Ruff --

9   that she prepared.

10          THE COURT:  Okay.

11          MR. HOPKINS:  And then she emailed them.  In 85

12  she emailed them to Mr. Gambrell at the A.G.'s office.

13          THE COURT:  Okay.

14          MR. HOPKINS:  As you'll see below that, Judge,

15  is the 11/24 date where the notes were sent to -- so it

16  is the same.  And that should satisfy Mr. Salane.

17          MR. SALANE:  I see.

18          MR. HOPKINS:  Right.  So it's the 11/24 notes

19  from that meeting.

20          MR. SALANE:  Does that mean that Ms. Snyder's

21  the one that took the notes?

22          THE COURT:  She doesn't appear to be on this

23  list.

24          MR. SALANE:  She was on the list on 78.

25          MR. HOPKINS:  Yeah, she's the last person.

1    She's with D.H.H.S.

2              MR. SALANE:  Okay.  Thank you.  That's solves

3    it.

4              THE COURT:  Oh, Cathy Snyder?  Cathy Snyder?

5              MR. ALPHIN:  Yes, sir, Your Honor.

6              THE COURT:  Okay.

7              MR. HOPKINS:  Yes.  Okay.

8              THE COURT:  All right.

9              MS. MERGO:  87 and 88 are part of the same

10   group?

11             MR. HOPKINS:  87 is the email back from Mr. ---

12             MS. MERGO:  It's from Cheryl Ruff.

13             MR. HOPKINS:  --- to Mr. Gambrell and James

14   Assie (phonic), of course, who was the head of the

15   pharmacy program over there in Medicaid for many, many

16   years.

17             MS. MERGO:  And we don't even have the subject

18   line of that email, Your Honor.  It's been redacted.

19             THE COURT:  That's A.G.'s number 076981.

20   That's part of my problem.  I have them listed

21   differently.  That's why it's taking me ---

22             MS. MERGO:  Your Honor, we're on number 87.

23             MR. HOPKINS:  And the document is 77133.

24   That's under tab 87.

25             THE COURT:  I've got you.

1          MS. MERGO:  The entry on the log says email

2     scheduling conference at state agency regarding Jayco's

3     (phonic) potential federal litigation, and our subject

4     line is redacted for some reason which would not be

5     privileged.

6          MR. SALANE:  And for the Court's reference,

7     Your Honor, Jayco simply refers to medications that are

8     physician administered.  And they are the -- they were

9     the Ven-a-Care generation of suits in which the AWPs were

10    allegedly inflated with regard to infusion medications,

11    physician administered medications.

12          THE COURT:  All right.  Look at that one which

13    would be 87 and ---

14          MR. HOPKINS:  Yes, sir.  Our understanding of

15    that, Judge, is where Ms. Ruff is responding to both Mr.

16    Gambrell and James Assie basically informing them about

17    her understanding of the conversation with Mr. Gambrell

18    or information he provided to her about the litigation.

19          MS. MERGO:  Which litigation?  I mean, the fact

20    that the subject matter is litigation should not be

21    privileged.  Is it in anticipation of this litigation?

22          THE COURT:  I can tell you that it's not there.

23    I mean, I don't mind telling you that.  You wouldn't be

24    able to tell.  It looks like ---

25          MR. SALANE:  Your Honor ---

1          MS. MERGO:  Can you tell us why they would

2     redact the subject matter line?

3          THE COURT:  No.  I mean, it's not -- the

4     subject matter is almost unintelligible.  It looks like

5     it's a forward of a forward of a forward that -- if

6     that's what you're asking.  Which suit this is involved

7     in?  Isn't that right?

8          MR. HOPKINS:  Yes, sir.

9          MS. MERGO:  Yes, sir.

10          THE COURT:  I mean, it's a -- you know, now

11    we're getting into looking at email chains that people

12    are forwarding back and forth, and it sort of loses it's

13    ...

14          MR. SALANE:  Right.  And Your Honor, just to

15    put a point on it, to the extent it's allegedly a

16    attorney/client relationship or whatever, the description

17    given in the privilege log is, email scheduling

18    conference with state agency regarding Jacyo and

19    potential federal litigation.  Obviously the attorney

20    general's office and the agency involved, D.H.H.S., which

21    Plaintiff has taken the position or staked out a position

22    today that we're going to have to separately show their

23    knowledge, is being advised of potential federal

24    litigation involving Jayco, which are in essence the same

25    as the AWP litigation that's in front of us today with

1  the exception that it involves Jayco, which are infusible

2  medications.  So it certainly would go to notice or

3  knowledge not only of the Attorney General but notice and

4  knowledge of the agency that he's contending that he

5  wants to show or needs to -- we need to show knowledge

6  to.  So ---

7          MS. MERGO:  And on our copy, Your Honor, the

8  last email address, the 'C' is cut off.  We just have 'C'

9  dot, dot, dot.

10         THE COURT:  Hold on just a second.  That's the

11  only thing on here.

12         MS. MERGO:  Okay.

13         THE COURT:  So just to take away a little bit

14  of concern that there might be something screwy going on

15  here, these two emails look like they're literally one

16  person -- me sending you an email saying, let's meet

17  tomorrow at one, and an email back that says, one's fine.

18  There's a little bit more information, but the 'C' dot,

19  dot, dot is the way it's listed on here.  And the subject

20  is a forward of a forward, it looks like.

21         MR. SALANE:  We suspect that 'C' is a person

22  named Carolyn Sojourn (phonic) who is the -- who was the

23  head of that department.

24         THE COURT:  Yeah.  And you won't be able to

25  tell from this.  But again, I'll ---

1            MR. SALANE:  Right.

2            THE COURT:  Okay.  This is not one of the

3   seven?

4            MR. HOPKINS:  No, it's not.  And for what it's

5   worth, it's inside the three-year period, Judge.  I mean,

6   it's December 16th, 2003.  So it's not prior to statute.

7            MS. MERGO:  There are some defendants that were

8   sued January.

9            THE COURT:  Okay.

10            MR. SALANE:  But it's probably not the smoking

11   pistol.

12            THE COURT:  Oh, it isn't.

13            MR. HOPKINS:  Not even a water gun on that one,

14   Judge.

15            THE COURT:  No.

16            MR. HOPKINS:  All right.

17            MR. SALANE:  It could be a club.

18       (Laughter)

19            MS. MERGO:  88.

20            MR. HOPKINS:  88, two on 88, but that's it on

21   88, Judge.

22            THE COURT:  All right.  Hold on a minute.

23   Another multi-forwarded one.  Okay.

24            MS. MERGO:  You'll see the copy that we have in

25   the attachments, the last attachment is Jacyo and AWP.

1            MR. HOPKINS:  And this appears, Judge -- it

2    appears to be related back, if you see, because he talks

3    about -- he says he's forwarding an email from Cheryl

4    Ruff.  His description is so general and vague, I don't

5    know if we're talking about the same Cheryl Ruff email or

6    not.

7            THE COURT:  Yeah.

8            MR. HOPKINS:  It's just -- there's no

9    description of it.  There's no -- it's certainly not any

10   of the things that are in the attachment.

11           MS. MERGO:  And we don't have ---

12           THE COURT:  What about the other person

13   mentioned in there as an email from?  I don't want to say

14   names just because I'm afraid to give something away.

15           MR. HOPKINS:  I think they already know who it

16   is, Judge.  Cantores (phonic) with Sun Company, kind of a

17   ---

18           THE COURT:  Scanty Bodies?

19           MR. HOPKINS:  --- nut job who was complaining

20   about something totally unrelated to drug pricing and AWP

21   litigation.  He was some guy who was complaining -- he

22   owned a company, and he was complaining about something

23   totally unrelated to it.

24           THE COURT:  Well, his company name is Scanty

25   Bodies.

1          MR. HOPKINS:  Yes, sir.  I've read a few emails

2     from him.  He's an interesting guy to say the least, but

3     it has nothing to do with ---

4          THE COURT:  Well, I may go on his web page

5     later.  Okay.  All right.  Scanty Bodies, that may be the

6     worst name I've ever seen for a company.  Okay.  That

7     one's obviously not of real import.

8          MR. HOPKINS:  No, it's not, Judge.  Teresa's

9     his law clerk.  There's no last name on it.  Mr. Gambrell

10    sent it to Teresa.  Her name was Teresa Shealy.

11         THE COURT:  Okay.

12         MS. MERGO:  But this is the first instance,

13    Your Honor, where we've seen Jacyo's AWP -- where we've

14    seen AWP.  These prior emails, we haven't had the benefit

15    of seeing, but -- and he appears to be forwarding prior

16    emails, but they say AWP.  It's clearly relevant if they

17    were discussing it.

18         THE COURT:  Now, would 12/16/2003 be inside or

19    outside the statute?

20         MS. MERGO:  Inside for some.

21         MR. HOPKINS:  Inside for some.  Outside for

22    some, inside for some.

23         THE COURT:  Okay.

24         MR. HOPKINS:  Your Honor, I think we had

25    tolling agreements for the ones that were filed later.

1        MR. ALPHIN:  That relate back to December the

2    1st.

3        MR. HOPKINS:  I do -- I know we had tolling

4    agreements.  This has been so long, Judge, I'd hate to

5    tell you for the record because I'll make a mistake.

6        THE COURT:  Okay.

7        MR. HOPKINS:  But there were tolling agreements

8    until January '07.

9        THE COURT:  All right.

10        MR. HOPKINS:  Judge, the next one -- if we can

11    skip 89.  And I'll explain that to you.

12        THE COURT:  Okay.

13        MR. HOPKINS:  And go to 225, the very next one,

14    225.  Judge, this was nothing but -- these were legal

15    comments relating on language in a release for a drug

16    totally unrelated to any of this litigation, Clorazil.

17    But the -- some of the comments could possibly talk about

18    language that the State would want to use in other types

19    of litigation, not necessarily AWP.  But it's just legal

20    impressions of lawyers talking about language to be

21    included in the release, in a release for this case.

22        MS. MERGO:  In a release for this case?

23        MR. HOPKINS:  No.  For the Clorazil case.  But

24    saying, hey, maybe we should consider this type of

25    language in other state settlements.  So that's what we

1  think is the legal impressions of a lawyer talking about

2  language that the State would want in settlement

3  agreements in general.  Not AWP settlements or AWP cases

4  or drug issues.  Just other types of settlements.

5          MS. MERGO:  Well, Your Honor, they've put it on

6  the log as relevant and responsive.  They've also not

7  shown who the author of the document is.  They say it's

8  unknown, but it was in Mr. Gambrell's files.

9          THE COURT:  Do you have the title to the

10  document?

11          MS. MERGO:  An effort doomed to failure.  And

12  then we have the first paragraph.

13          THE COURT:  I suspect ---

14          MS. MERGO:  This may be a NAMFCU document that

15  was on the back page of Mr. Gambrell's files.  But they

16  haven't even proven who the author is.

17          MS. HOPKINS:  Judge, unfortunately, as we told

18  you back when we were having problems getting the

19  documents, we had to search emails, emails to the State

20  people, separately than the attachments or documents.  So

21  it was very hard.  And I'm going to get to that next.  We

22  spent a lot of time trying to link up attachments and

23  emails, and we think we're ninety-nine point nine percent

24  there.  But this is one, Judge, it was a document.  We

25  don't have an email.  Don't know who it was sent to, who

1   it was sent from.  Don't know who drafted it.  This was

2   on -- this was found in the documents over there.  I'm

3   sorry I don't have more information.

4            MR. SALANE:  It certainly fails the work

5   product contest.

6            THE COURT:  Kind of.

7            MS. MERGO:  Correct.

8            MR. SALANE:  And it fails the attorney/client

9   test if he can't identify a client.

10            MS. MERGO:  A client at all or that ---

11            MR. HOPKINS:  Well, I think the client is the

12   State.  I mean, that's what they're talking about.

13   They're talking about -- Judge, on the second page,

14   they're talking about incorporating release language to

15   use whenever the State brings consumer fraud cases.  So

16   clearly, it's the legal impressions of the lawyer talking

17   about -- you know, the client clearly is the State of

18   South Carolina.  They're talking about language they want

19   to incorporate in settlement agreements that utilize

20   consumer fraud theories.

21            MS. MERGO:  If it is was in Mr. Gambrell's

22   files, Your Honor, and the author is unknown, Mr.

23   Gambrell prepared all of these fraud investigatory

24   documents for NAMFCU as part of his role in NAMFCU.

25            MR. HOPKINS:  Well, I'm not sure we're there

1   yet, Judge.  Now, they may get that from him in a

2   deposition.  I don't know.  But if they do, you know,

3   maybe you can revisit this.  But I don't know that I'm

4   willing to agree to that just yet.  Mr. Gambrell was one

5   man in NAMFCU.  They have their own lawyers and general

6   counsel at NAMFCU.  So the general counsel at NAMFCU

7   plays the role of lawyer for that organization, Judge.

8          MS. MERGO:  And Your Honor's already ruled

9   there's no common interest agreement to protect the

10  NAMFCU documents in this case.

11         MR. HOPKINS:  I agree.  And if it's a NAMFCU

12  document, as I said, we'll revisit it, Judge.  But all

13  that I can tell you right now is that it appears to be a

14  -- based on some of this language on the second page, we

15  think -- because it specifically refers to our office,

16  that tells me, Judge, that it had to be a specific South

17  Carolina A.G. document.  It doesn't talk about all --

18  they say, in our office to ensure that -- to ensure the

19  program is protected.  It's not the NAMFCU.  They're

20  talking about -- I read that, Judge -- but again, they

21  can ask Mr. Gambrell some questions about it.  But the

22  way I read it, it appears to be talking about South

23  Carolina A.G. and South Carolina -- because other states

24  may not even have consumer fraud theories for A.G.s to

25  bring.  So that's why it doesn't appear to me to be a

1    general NAMFCU document.

2              MR. SALANE:  Your Honor, if I may weigh in just

3    in the context of that document with other documents.

4    They've already produced to us external documents, one of

5    which was Mr. Gambrell's email to somebody, I think it

6    was, in Nevada in connection with the Nevada lawsuit.

7    And they were discussing what theories that you could

8    bring it under.  And the problems that Mr. Gambrell was

9    having was trying to bring it within the rubric of the

10   Social Security Act or Medicaid Act in terms of Medicaid

11   fraud because the pharmaceuticals were not providers.

12   And so Mr. Gambrell was in search of a theory or

13   discussions of a search of a theory on which to bring

14   such suits.  And here we have a document, according to

15   counsel, from the redacted portion, in which the advice

16   that's being rendered -- and sometime in 2003.  We don't

17   know when, but presumably prior to December or the end of

18   the year.  They're saying, oh, wait, you need to be using

19   consumer fraud-type legislation as the vehicle to mount

20   these suits against pharmaceutical companies.  And lo and

21   behold, that now supplies the theory in the case to use

22   the Unfair Trade Practices Act.

23              THE COURT:  Yeah, I don't see -- and I want to

24   make sure I'm not missing it.  I don't see anything in

25   this document entitled an effort doomed to failure that

1    connects it to South Carolina at all.  In fact, am I

2    missing something?  It looks like -- it appears to be

3    just ruminations of a lawyer or somebody.  And I -- I

4    mean, it has places where you can fill in names.

5              MR. HOPKINS:  Judge, I -- you know, there's a

6    ---

7              THE COURT:  If you look down either, there's a

8    first name that could be connected.

9              MR. HOPKINS:  That's right.  The first page

10   appears to be the proposed release language.

11             THE COURT:  Right.

12             MR. HOPKINS:  And then the second page is

13   somebody's thoughts on this release language, somebody's

14   ruminations on it.  He's talking about policy issues

15   versus legal issues, release issues.  So you're right.

16   The first page -- it specifically has blanks for the

17   particular states, so I agree that would not -- I can't

18   say all of that's South Carolina specific.  But then the

19   second page written by somebody -- Judge, we'll leave it

20   up to you.  I don't know what else to say to you.  You

21   can read it, and we'll leave it up to you.  We don't

22   consider this to be one of the seven or eight lynchpins

23   here, so ...

24             THE COURT:  Yeah.  I'm going to -- what I'm

25   going to do, based upon the fact that it's a fairly

1   poorly written document that I'd be surprised was written

2   by a lawyer, I'll allow them to have that mainly because

3   I don't think there's any proof or there can't be a

4   showing that it's work product or attorney/client other

5   than the last sentence that says, so why don't we let

6   everyone cover their respective subjects and get on with

7   our day jobs.

8           MR. HOPKINS:  If it was written by a lawyer, it

9   must be that one guy that was behind me in law school.

10          THE COURT:  The slow antelope.  All right.

11  I'll let them have that one just because I don't think it

12  is work -- I don't think there's any showing of work

13  product or attorney/client.

14          MR. HOPKINS:  Okay.  Now, Judge, the next four,

15  89, 230, 245, 246, John Alphin and I spent a lot of time

16  doing our best -- this got really confusing as to what

17  was attached because they came to us as separate

18  documents.  So we'll go through these, but I want you to

19  know this would be the only case where we're not

20  confident that a document went with a particular email.

21  And I think you'll see why when we get ---

22          THE COURT:  All right.  Hold on.  Let me find

23  that because, again, I don't have them listed as 88.  So

24  you're starting with 88?

25          MR. ALPHIN:  89.

1          THE COURT:  89, which is AG075872?

2          MR. ALPHIN:  Yes, sir, Your Honor.

3          THE COURT:  All right.  I've got AG073 --

4    excuse me -- AG075872.

5          MR. HOPKINS:  That's it, Judge.  That's where

6    it starts.

7          THE COURT:  All right.  Okay.

8          MR. HOPKINS:  It's an email from Mr. Gambrell

9    to his law clerk, Teresa Shealy.  And he says, I'm

10   attaching this, and we will use this to start.  You know,

11   I want you to go draft something else.  Take this and go

12   draft me, you know, a legal memorandum.  Okay.  So we got

13   that.

14        So now if you go to 230, Judge, we think -- after

15   studying on this and just thinking on it for a while, we

16   think that this is the memo that Mr. Gambrell attached to

17   his email.  And of course, this is 12/30/2003.  This is

18   within the time period.  So really it's not even outside

19   the statutory time period, Judge.  But as you can see,

20   there's no date on it, no identifying anything on it as

21   to when it was prepared, who prepared it.  Nothing at

22   all.  It's just a memo.  And in fact, the confusing

23   thing, Judge, is that what he says it's about in his

24   email -- he says, I'm attaching you a memo on 'X' --

25   isn't even the title of the memo.  But we really believe

1    that it goes with it.

2              MS. MERGO:  I think I can help with this

3    argument.

4              THE COURT:  Okay.  Yeah, because I've got a

5    problem with the order.  What number do you have as the

6    email?

7              MR. HOPKINS:  The email is 89.

8              THE COURT:  Right.

9              MR. HOPKINS:  Which is 75872.  And then what we

10   think was attached is 230.

11             MR. ALPHIN:  And that's number 077079 for the

12   Court, Your Honor.

13             THE COURT:  Say that again?

14             MR. HOPKINS:  No ---

15             MR. STROM:  077079.

16             MR. HOPKINS:  No.  It's 75862.  75862 to 75864.

17             MS. MERGO:  Your Honor, this, we believe, is a

18   NAMFCU document clearly because Mr. Gambrell was on the

19   best price investigative team.  And that's where you see

20   B.P. memo dot dot.  And then December of 2003 -- this is

21   July 2003 -- he's appointed to the best price

22   investigative team.  Best price has to do with the

23   manufacturers have to report to C.M.S. their best price

24   for purposes of rebates that go back to the State.  And

25   so this was a best price working group created by NAMFCU

1   for violations of the Medicaid rebate statute.  On

2   December 16th, 2003, he prepares a rough draft of a

3   survey and a memo to go out to the directors regarding

4   the best price working group project.  And we think this

5   is the memo that he sends out on December 30th, 2003.

6   Now, we can't be sure, but that's what it appears to be.

7   I think it's a NAMFCU document, not something that he did

8   specifically for South Carolina.  And if that's the case,

9   he did it as a part of the working group for NAMFCU, it

10  would be covered by your order.

11          THE COURT:  And what do you -- do you have

12  anything on -- is it entirely redacted, or do you have

13  ---

14          MS. MERGO:  I have it.  It says, how to conduct

15  a drug pricing investigation.

16          THE COURT:  Okay.  All right.

17          MS. MERGO:  Which is what he was doing for

18  NAMFCU in this memo and survey and best price working

19  group project.  They were coming up with the plan to tell

20  all directors how do you conduct a best price survey.

21          THE COURT:  I got you.

22          MR. SALANE:  It's totally redacted other than

23  the ---

24          MS. MERGO:  Yeah.  Other than the title, it's

25  redacted for us.

1            MR. HOPKINS:  Judge, I'm sorry.  Go to -- you

2    have 245.

3            MS. MERGO:  And 245, also.

4            THE COURT:  Well, here's the problem.  I don't

5    have -- this thing that I've got ---

6            MR. HOPKINS:  Doesn't have the tab numbers.

7            THE COURT:  It doesn't have the tab numbers.

8    It's got the A.G. numbers.  That's how it listed them.

9    So ...

10           MR. HOPKINS:  And Mr. Alphin was right.  It's

11   our document, and on the log it's 240 for counsel.  I

12   mean, 245.  But for Your Honor it's 77079.

13           MS. MERGO:  Your amendment to 245?

14           MR. HOPKINS:  Right.

15           MS. MERGO:  245 for us is totally blank.

16           MR. HOPKINS:  Right.  So I think 245 is the

17   attachment.  And then as a result, what she did in

18   response to him, how to conduct a drug investigation is

19   in 239.

20           MS. MERGO:  You said it was 230.

21           MR. HOPKINS:  Yeah, I know.  I made a mistake.

22   Yeah, 230.  I'm sorry.

23        230, right.  He sends her memo and says, take this

24   and come up with this.  So we think he sent her the memo

25   that's 245, 77079.  And then she sent back to him 230.

1  Do you see what I'm saying?

2            MR. ALPHIN:  Which is 75862 for the Court, Your

3  Honor.

4            MS. MERGO:  In any event, it was all part of

5  NAMFCU, part of the best price working group.  It wasn't

6  something he was doing just for South Carolina.

7            THE COURT:  And wouldn't that be covered by the

8  previous ---

9            MS. MERGO:  It would be covered by your

10  previous order, the external order.

11            MR. HOPKINS:  If that's what it was.  But,

12  Judge, I don't know.  We can't tell that's that's -- I

13  know they want to say, well, that memo, 245, 0779, that's

14  a NAMFCU document.

15            THE COURT:  Who would know?

16            MR. HOPKINS:  Yeah.  Again, Judge, they may be

17  right.  I don't know.  It doesn't have anything on here

18  that says NAMFCU.

19            MS. MERGO:  It says B.P. memo, dot, dot.  And

20  he was leading the best price working group.

21            THE COURT:  Could you go to Mr. Gambrell and

22  say, Judge Maddox needs to know is this a NAMFCU?

23            MR. HOPKINS:  Sure.

24            THE COURT:  And if you had some concern that he

25  might tailor his answer based upon the question, I'd be

1   happy to have him do an affidavit that it was NAMFCU.  I

2   mean, if it is, it comes under the other order, and we

3   can stop arguing about it.

4           MR. HOPKINS:  And it may very well may.  We

5   need to need to ask him.  But that's what we think,

6   Judge, is that he sent his law clerk this document,

7   77079, and then she sent back to him document 230.

8           THE COURT:  Which is?

9           MR. ALPHIN:  75862, Your Honor.

10          MR. HOPKINS:  75862.

11          MS. MERGO:  If you could also take a look, Your

12   Honor, at 077111.

13          MR. HOPKINS:  Right.  And that's the next one.

14          MS. MERGO:  It's the same -- the first memo is

15   how to conduct one, and the second one is how to

16   participate in it.

17          MR. HOPKINS:  Exactly.  So that's why we think

18   that he sent her that memo, and then her project was that

19   she drafted the next two.  How to do one and how to

20   participate in one, I think was her approach.  That's all

21   we can put together is we think he -- she was assigned

22   that task to come up with a memo on a drug investigation,

23   and that was what she did.

24          MS. MERGO:  And I would note on the privilege

25   log that they have the author being unknown.  So they

1  clearly haven't proven a privilege or a work product on

2  that.

3          MS. WILLIS:  And they claim common interest.

4          MS. MERGO:  And they claim common interest

5  which has been held to be not being valid in law

6  enforcement if they waive themselves, gave up on that in

7  a brief.  So again, our position is that all of this

8  whole group was created by Mr. Gambrell and his

9  involvement with the best price working group as part of

10 NAMFCU in 2003.

11          MR. SALANE:  Right.  And Your Honor, I think

12 they originally designated it common interest.  I don't

13 think that counsel did.  I think the A.G.'s office did.

14 They originally designated it common interest.  And the

15 only way they could get it designated common interest if

16 it was related to NAMFCU which is the only reason they

17 would assert it to start with.  In addition to which -- I

18 don't know who authored this.  But I went to law school

19 with Billy Gambrell, and I don't think he authored it.

20 And if you take a look at -- at least from looking at the

21 ...

22     (Laughter)

23          MR. SALANE:  It's even printed in different

24 fonts.  And I still think it came off of NAMFCU's back

25 page or was a back page document on a how-to.

1           THE COURT:  All right.  How about doing me a

2    favor.

3           MR. HOPKINS:  And the other thing, Judge -- I

4    know where you're going.  But on her work for him, if it

5    was work for South Carolina, we'd assert the privilege.

6    If she says, he told me to do this for NAMFCU, I agree,

7    we'll give it up.

8           THE COURT:  Yeah.  How about finding out and

9    asking him, and tell him he's going to have to do, you

10   know, an affidavit that these were either NAMFCU or South

11   Carolina documents.  If they're NAMFCU, I think they come

12   under the other order and they're out.  Again, I don't

13   think there's any mystery to any of this stuff.

14          MR. HOPKINS:  Right.

15          THE COURT:  And if they're South Carolina, I'll

16   have to address the attorney/client or the work product.

17          MS. MERGO:  And Your Honor, that -- just to

18   clarify, that would cover 89, 230, 245, and 246?

19          THE COURT:  Yep.

20          MR. HOPKINS:  Yeah.  That's right, Judge.

21   Right.  Yeah, if she was instructed to do this project on

22   the investigation for NAMFCU, we agree that it should be

23   released.

24          THE COURT:  Right.

25          MR. HOPKINS:  But if he says it was done just

1   for the A.G.'s office in South Carolina, we'll probably

2   argue it again.  But we'll get to the bottom of that,

3   Judge.

4              THE COURT:  Okay.

5              MR. HOPKINS:  That was very hard to pin down

6   who sent who what and why she was doing it.

7              THE COURT:  Yeah.  Okay.

8              MR. HOPKINS:  323, this is a good time to take

9   a break, Judge.  We're going to produce it.  And this

10  brings up Reece Joy.  And you can talk about Reece and

11  we'll take a break.

12             THE COURT:  Yeah.  Let's take a break a minute.

13  I need another cookie.

14             MS. MERGO:  They're wearing me down, Your

15  Honor.

16             MR. HOPKINS:  We only have two more of the

17  miscellaneous, and then it's just the settlements which

18  is one of them.

19      (WHEREUPON, court stood at recess for a short

20      break.)

21             MR. HOPKINS:  We're down to just two things

22  here, Judge.

23             THE COURT:  All right.

24             MR. HOPKINS:  Two big ones.  The next two,

25  Judge, are the handwritten notes from Attorney General

1   McMaster in a meeting with several lawyers, and the

2   second also, again, are handwritten notes of Attorney

3   General McMaster in another meeting with some other

4   lawyers.  Those are the next two, Judge.  They're in the

5   privilege log 329 and 332.  For Your Honor they're 86050

6   and 86041.

7            THE COURT:  Okay.  All right.

8            MR. HOPKINS:  Okay.  Judge, these are

9   handwritten notes that Attorney General McMaster took in

10  a meeting with lawyers, private lawyers, outside lawyers,

11  about obviously potential AWP litigation.  We've asserted

12  work product.  This is covered by the work product

13  doctrine, Your Honor, and it has not been waived.  If it

14  has been waived -- we don't think it has been waived by

15  putting it at issue, Judge.  But if it has, we would

16  assert the common interest privilege.  I know that Your

17  Honor has already ruled there was no common interest

18  between the State, the A.G. office and NAMFCU.  We would

19  assert certainly there's a common interest between the

20  litigating states.

21       As you can see in this first group, Judge, there

22  were lawyers from Beasley Allen there, Deke Miles, Clint

23  Carter, who at the time were representing other

24  litigating states including Alabama and are today.  They

25  were there in connection with the litigation that they

1   were handling in other states, Your Honor.  And that was

2   the point, as you can see from these notes, the point of

3   the pitch.  So we believe these notes handwritten by

4   Attorney General McMaster, we think they're privileged,

5   Judge, covered by work product.  There's been no waiver.

6   We don't think that the at issue doctrine waives it.  But

7   if there is a waiver, we would assert the defense of the

8   common interest doctrine.

9         And again, Your Honor, I'd ask you to look at that

10  Mississippi opinion which again talks about the common

11  interest doctrine of the states and state agencies that

12  are -- whose sole purpose is to look out for the state

13  agencies and programs being defrauded.  And in

14  Mississippi the Court found a common interest.  And in

15  fact it cited the *Tobaccoville* case.  And of course,

16  we've already talked about the *Tobaccoville* McMaster

17  case, at length, Your Honor, and whether it was limited

18  and in what respects it may be limited.  But again, we

19  would refer to that Mississippi order and ask Your Honor

20  to consider that in reviewing the common interest of

21  these litigating states.

22        I think it's also important to note, Your Honor,

23  that these notes only refer to three companies who have

24  not been sued by South Carolina, were not sued by South

25  Carolina.  A couple of them had previously settled under

1   Mr. Condon, Attorney General Charlie Condon's tenure.

2        So these obviously are the biggies, Judge.  We think

3   they're privileged, Judge.  That's it.  Thank you.

4             THE COURT:  All right.  Yes, ma'am.

5             MS. MERGO:  Your Honor, these are the biggies

6   because they're meeting with Beasley Allen, national

7   counsel on this case, in April 2003, more than three

8   years before the statute had run.  They've only asserted

9   work product.  Counsel has now just said that this was

10  prepared related to AWP.  It's clearly relevant to this

11  case, and they only asserted work product.  And we have a

12  substantial need for it for purposes of proving the

13  statute of limitations where they've put their knowledge

14  at issue as dispositive for penalties.

15       As to the Mississippi opinion, the statue of

16  limitations doesn't run against the sovereign in

17  Mississippi.  That's irrelevant to this Court.  And as

18  far as now asserting two years after we get a privilege

19  log that they're now going to claim a common interest for

20  multi-states, litigating states, they've never asserted

21  that before.  It's not on their log.  And to the extent

22  other common interest related to NAMFCU, you've already

23  ruled on that.  But if they're going to assert that

24  there's a multi-state litigation common interest, then

25  we're going to have to brief that.  We've had this log

1   for two years, and they've never asserted a common

2   interest of the multi -- of the states.

3        At the time of this meeting, Beasley Allen was not

4   counsel for the State.  So it's clearly not work product.

5   And to the extent that there are facts contained within

6   this document -- we previously asked them to redact the

7   names of the people that were present, the subject matter

8   that was discussed -- that would not be privileged.

9   Facts containing their work product are not subject to

10  work product protection.

11        MR. SALANE:  Your Honor, this document and

12  perhaps the admissions made by counsel just a few minutes

13  ago are the smoking gun in all of these documents.  And

14  that is if you'll go back to the prior document when Mr.

15  Joy made an appointment with the Attorney General's

16  office to come up with a settlement on these lawsuits.

17  And these are the notes of the Attorney General taken

18  during that meeting.  And you'll note that even after the

19  handwrites notes, then there's some articles given about

20  these three lawsuits, TAP, G.S.K. and Bayer.  I'm going

21  to remind the Court that at this point in time all of

22  those cases have resolved or had been settled.  What

23  they're doing is they're touting the fact that they can

24  bring similar suits on behalf of the State to have a

25  South Carolina individualized suit.  Or this is my

1   suspicion anyway.  And that they attach articles at the

2   end of this series of documents, one of which in the

3   middle is blacked out, is redacted in total.

4            MS. MERGO:  86054 is totally redacted for us.

5            MR. SALANE:  I don't even know if those are

6   handwritten notes or if that's an article or something

7   that was provided to the Attorney General during the

8   course of the meeting.  But when I say, Your Honor --

9   first, it cannot be attorney/client privilege because

10  there is no attorney/client relationship.  There is no

11  expectation.  I know that they didn't allege it.  They

12  just said it from the podium.  But I point out that there

13  is no attorney/client privilege that can attach, and that

14  attorney/client privilege is what is impacted by the at

15  issue doctrine.

16       At issue doctrine does not activate the work product

17  privilege or eliminate the work product privilege.  What

18  eliminates the work product privilege is simply the

19  necessity.  And this is the only place that that document

20  can be obtained.  This is the only source of that record.

21  Do they really want us to now start sending subpoenas and

22  motions to Beasley Allen for their copy of all records

23  and the substance of what they did in taking depositions

24  to that effect?  You don't have to do that.  In other

25  words, the fact that you can take somebody's deposition

1   is not an excuse for failing to produce the relevant

2   document.  And the only asserted reason for not producing

3   this is that it's a work product.

4       We'll concede that the handwriting is Attorney

5   General McMaster's handwriting.  We'll concede for

6   purposes of this argument this is a description of what

7   he was told during that meeting or what was discussed

8   during that meeting.  But simply because he recorded

9   notes to that meeting does not now mean that he can claim

10  a work product privilege.

11      I go back to what I started with.  It has to be in

12  anticipation of litigation.  If this was indeed in

13  anticipation of litigation, the only anticipated

14  litigation would be the very litigation we're in.  And

15  this would be the best evidence, Your Honor, the smoking

16  pistol, that prior to December 7th of 2006 they had a

17  fully formed theory of the case.  They were interviewing

18  and talking to attorneys to bring the very lawsuits they

19  didn't bring until after the statute ran.

20      MS. MERGO:  And the facts that they pitched to

21  the Attorney General contain within the alleged work

22  product are not protected.  Who was there, what they

23  talked about that, none of that's protected.

24      MR. HOPKINS:  Your Honor?  Your Honor, we have

25  not asserted attorney/client privilege.  These documents

1   are not attorney/client privilege.  I don't believe I

2   said they were.  They're work product.  We did not assert

3   the common interest privilege because, as the South

4   Carolina Supreme Court held in *Tobaccoville*, that is not

5   a privilege.  Common interest is a defense to waiver of

6   privilege.  Our Supreme Court set it out clearly.  If you

7   have a work product document or attorney/client document

8   and it is shared with another person, ordinarily that

9   would be waiver.  Our South Carolina Supreme Court held

10  up that there's an exception to the waiver.

11      So the common interest is not a privilege to be

12  asserted, it is a defense.  To the extent this

13  information was shared by these other litigating states

14  and by their counsel with South Carolina, to the extent

15  it could be argued waiver, we assert the common interest

16  privilege.  Judge, this is clearly work product.  There

17  can be no doubt it's in anticipation of litigation.  It's

18  work product.  It's privileged.  The only way Your Honor

19  can order this to be produced is to find a waiver.  And

20  the only way Your Honor can find a waiver is to buy into

21  this thing that, well, you said the discovery rule

22  applies; therefore, you put it at issue, which makes

23  sense, Judge.  But he said, well, this is the smoking

24  gun.  A smoking gun doesn't make it overcome privilege.

25  When is the law in this State you have a smoking gun,

1   it's privileged?  Oh, Judge, it's a smoking gun,

2   therefore privilege fades.  Well, Judge, it's pretty

3   simple.  This is a privileged document.  It's covered by

4   the privilege.  There has been no waiver.  If there has

5   been a waiver, Your Honor has to decide if the common

6   interest applies.  So that's it.

7        These other things -- I don't know, Judge -- we're

8   not asserting attorney/client, we're not asserting a

9   common interest privilege.  At the end of the day, this

10  is work product in anticipation of litigation.  There's

11  been no waiver.  There's no basis for Your Honor to order

12  it.

13       Thank you.

14       MS. MERGO:  The smoking gun doesn't say it;

15  Rule 26(b)3 says it.  If you have a substantial or

16  compelling need, then you're entitled to overcome the

17  work product protection that they allege is attached to a

18  document.

19       MS. SPRUILL:  Work product is a protection, not

20  a privilege.  So the waiver discussion that might attach

21  to attorney/client privilege does not attach to work

22  product protection which stems right back to the section

23  of the rule Ms. Mergo just read to you.

24       MS. MERGO:  And again, Your Honor, if they're

25  now going to claim some common interest, I find it ironic

1   that they've claimed the common interest that they didn't

2   think they had to claim before on all the other

3   documents, but now because they're desperate to keep this

4   document out of the case, they're now going to assert a

5   common interest.  Well, if that's the case, they need to

6   go through the *Tobaccoville*, produce the document and

7   meet all the requirements that they were unable to do

8   before that you already ruled on with respect to NAMFCU.

9   And I highly doubt that they're able to do that.

10         THE COURT:  Well, now, you're alleging a

11   separate common interest than the NAMFCU?

12         MR. HOPKINS:  Yes, sir.  This is a -- you've

13   already ruled on the NAMFCU.

14         THE COURT:  Right.

15         MR. HOPKINS:  You've ruled on that.  No, sir.

16   This is -- Beasley Allen at the time represented other

17   litigating states.

18         MS. MERGO:  Where's the common interest written

19   agreement that *Tobaccoville* requires?

20         MR. HOPKINS:  Well, Judge ---

21         MS. SPRUILL:  Well, and I would point out,

22   again, they're not asserting privilege; they're asserting

23   work product protection.  So the common interest

24   exception to waiver of attorney/client privilege is not

25   applicable anyway.

1          MS. HOPKINS:  And Your Honor, on the necessity,

2    that's why we gave you this, Your Honor.  This is five

3    pages of literally hundreds of pages of documents that

4    they have to establish their statute of limitations

5    defense, Judge.  So they have -- I don't think the

6    necessity argument flies in this matter at all.

7          You know, at the end of the day, Judge, we're -- and

8    you've already stated where we're at on this case.  If

9    they continue to commit the fraud over and over again, if

10   they're doing it today, we could file suit today and we

11   could only get three years of damages.  They want to say

12   it's a statute of repose.  And that's ultimately what

13   Your Honor's going to have to rule on.  If it's a statute

14   of limitations, our case was filed within three years of

15   them giving the State false information.  They gave the

16   false information last year.  So we all -- we may be

17   limited to three years damages, but we don't get thrown

18   out of court.  The only way we get thrown out of court is

19   if Your Honor buys into the fact it's a statute of

20   repose, which we don't think it is, and not a statute of

21   limitations.

22         Again, I don't think I'm conceding anything big

23   here.  These cases generally -- we've been seeking three

24   years of damages and not going back past that because of

25   the statute of limitations says what it says.

1          Thank you, Judge.

2               MS. WILLIS:  Your Honor, Marguerite Willis,

3     just to respond to that last point on the statute of

4     limitations versus repose.  Our position is very clear.

5     If they had knowledge or reason to know, knew or should

6     have known, more than three years before these lawsuits

7     were filed, that bars all actions for damages or

8     penalties.  The only thing they could have sought under

9     the statute is injunctive relief, and they didn't.  And

10    why is that?  It makes perfectly good sense.  This is an

11    Unfair Trade Practices Act.  And anyone who's engaged in

12    any kind of conduct that goes on open and notoriously for

13    years and years and years, there's no damage to be

14    recovered by the State from that because they've allowed

15    it to go forward.

16         The State, however, could enjoin it prospectively.

17    And in this case particularly, that's important because,

18    as this Court knows, in every single year at issue here,

19    the Legislature with regard to Medicaid adopted a

20    reimbursement formula that included AWP as part of the

21    formula for reimbursing pharmacists in connection with

22    drugs that were dispensed to Medicaid patients,

23    beneficiaries.  The Legislature adopted that year after

24    year after year after year, a recommendation coming from

25    Medicaid to the Governor's desk, from the Governor to the

1   Legislature.  And everyone knew without question -- and

2   we see in these documents, at least by 2003, and we say

3   earlier -- that AWP meant ain't what's paid.  And so

4   there is no action left here, we say, for damages on the

5   statutory minimums.

6        And the State has not sought and does not seek

7   injunctive relief.  Why?  Because the Legislature still,

8   as we speak, every year -- not prospectively now, because

9   I think it's going to change.  I think it's going to

10  change now.  But for every year this case has been

11  pending to this date, every year adopted a reimbursement

12  formula based on AWP.

13       MR. SALANE:  I'm sorry, Your Honor.  Just one

14  final comment just by way of reply.  I don't think it's a

15  very effective argument to suggest that we've given you

16  enough nails already in our documents to close your

17  coffin pretty tight, and therefore, we don't have to give

18  you any more.  And that's the argument I'm hearing.  This

19  is the quintessential argument that will forever put to

20  rest as to whether the Attorney General all the way up

21  the line knew prior to the statutory period of the

22  conduct that he's claiming was unlawful that brought the

23  suit about.

24       THE COURT:  All right.  What I'm going to need

25  y'all to do is brief this issue briefly as an issue of --

1   this new one, the common interest.

2          MR. HOPKINS:  Yes, sir.  And Judge the last

3   group we may have an agreement.  The last group of

4   documents are settlements.

5          MS. WILLIS:  Hold on.  You didn't deal with

6   332, Bill.  Not the Beasley Allen but the ---

7          MS. MERGO:  Can I just ask on the 329 that

8   we're still on, because like Tom said, our page 86054 is

9   totally redacted.  Is that a continuation of notes, or is

10  that an article?  It's unclear to us why it's in the

11  middle of articles that were handed out at the meeting

12  and why it's redacted.

13         MR. HOPKINS:  They're handwritten notes.

14         MR. ALPHIN:  It's handwritten notes.

15         THE COURT:  There are, just so you'll know,

16  three pages of handwritten notes, an article and then

17  another just brief notes -- actually it looks like

18  doodles -- and then another article.  So whatever you

19  have redacted, I'm not sure what it is.  But there's

20  three full pages of notes and then just a very -- at the

21  very top of the page some scribblings that is sandwiched

22  between two sets of articles.

23         MS. MERGO:  Okay.  Thank you, Your Honor.

24         THE COURT:  So you must have the scribblings

25  that are redacted.

1           MS. MERGO:  Right.

2           THE COURT:  Okay.

3           MS. WILLIS:  And before we move on, Your Honor,

4    could we get a schedule for the briefing?

5           THE COURT:  Yeah.  How much time you need with

6    the holidays?

7           MS. WILLIS:  Well, I would suggest that they

8    start since it's their new theory, and then we can

9    respond.

10          MR. SALANE:  And did I understand this was

11   common interest as between Beasley Allen and other states

12   or between this state and other states?

13          THE COURT:  I guess it's between Beasley Allen

14   and other states.

15          MR. HOPKINS:  The common interest, I believe,

16   would be between South Carolina and the other litigating

17   states that were pursuing litigation on behalf of their

18   state agencies.  Just as the Mississippi order said,

19   Judge, these -- if the A.G. has responsibility for

20   representing the state agencies and they're communicating

21   with other state agencies, whether it's NAMFCU, state

22   MFCU or whatever it is, if they have a common interest,

23   then ---

24          THE COURT:  See, the reason Mississippi doesn't

25   seem to have a lot of efects, there's no, like you say,

1   there's no statute of limitations.  And it doesn't

2   address her issue of work product being -- it doesn't

3   address that.  When can you get me something on that so

4   that I can -- Christmas Eve?

5           MR. HOPKINS:  Judge, what's the date?  Today is

6   the 14th?

7           THE COURT:  Heck, I don't even know.  The 13th.

8           MR. SALANE:  Today's the 14th.

9           THE COURT:  The 14th.

10          MR. HOPKINS:  Judge, how about we get it the

11  first week of -- I'm traveling this week and next week in

12  depositions.  Can we make it the first week of January?

13          THE COURT:  Yeah.  I'm not reading anything for

14  a while.  So yeah.

15          MR. HOPKINS:  Okay.

16          THE COURT:  We'll say the 10th?

17          MR. SALANE:  The 10th.

18          THE COURT:  Yeah, the second hearing's January,

19  what, the 15th?

20          MR. HOPKINS:  18th.

21          THE COURT:  Yeah.  Because I'm sure we'll deal

22  with it by then.

23          MS. WILLIS:  Well, we would ask for some time

24  to respond if they're going to brief it.

25          THE COURT:  Yeah.

1          MR. SALANE:  We'll respond before the 18th.

2          THE COURT:  How about the 7th?

3          MR. HOPKINS:  Yes, sir.

4          THE COURT:  Okay.  And then if you need more

5    time, we'll figure that out.

6          MS. MERGO:  And our response just prior to the

7    hearing?

8          THE COURT:  Yeah.

9          MR. HOPKINS:  This next group, Judge, is also

10   some handwritten notes from a meeting with some other

11   lawyers.  And we'll raise that in our brief, too.  But on

12   this one it's a little more confusing because there were

13   some lawyers there whose names we can't read.  It talks

14   about other states, but I don't know if they represented

15   other states.  We don't know.  We just can't read -- I

16   see the name -- I don't mind saying.  We see the name

17   Howard Hammer on here.

18          MS. MERGO:  John Simmons.

19          MR. HOPKINS:  Is that who that -- yeah, that's

20   ...

21      John Simmons.  And then there are the names of three

22   other people.  And I just need to get -- but we'll

23   address it in our brief.  But basically the same

24   argument, Judge.  We think it would be work product

25   protected.

1          MS. SPRUILL:  And we would mention in the last

2    document he made a point of saying none of the drug

3    companies listed there are parties to this case.  Well,

4    my client, Abbott Labs, is very definitely listed on this

5    one.

6          THE COURT:  Okay.

7          MR. HOPKINS:  That's true.  That's true, Your

8    Honor.  Abbott was sued though on August the 1st of 2006,

9    so this would be within their statutory time frame.

10         MS. SPRUILL:  I don't know about that.  I can't

11   see the document, and I don't know what time period

12   they're talking about.  I don't know how far back it

13   goes.  That doesn't get him off the hook.

14         MR. HOPKINS:  I think we've identified the

15   date, Judge, as October 17th, 2003.  So if they were sued

16   in June of 2006 it would be in the time.  But we'll

17   address that in our briefs, Your Honor.

18         THE COURT:  Okay.

19         MR. HOPKINS:  The good news, Judge, we're on

20   the last set of documents, the settlements.  The

21   Defendants have the final signed or executed copies of

22   all the settlement agreements, Judge.  What they want are

23   drafts where lawyers are making changes to language.  And

24   just during our break I asked Ms. Willis what it is that

25   they wanted or what would be different in a draft than

1   the final agreement.  And I think -- I don't want to

2   misstate her.  But I think my understanding is they want

3   to know the people who were working on it, the names or

4   identities of people in the A.G.'s office who would have

5   been working on it to know about the settlement.  And if

6   that's the case, we may be able to enter into a

7   stipulation and just tell her who was working on them.

8   They're just drafts, changes to settlement agreements or

9   releases.

10          MS. WILLIS:  Well, Your Honor, we do

11  acknowledge we have the settlement agreements.  We know

12  the companies with which South Carolina reached AWP

13  settlements prior to the statutory period.  What we ask

14  though here is a representation that all these -- that

15  all that's contained in these settlement agreements is in

16  fact information such as we're going to settle with

17  Bayer, it involves 'X' drug, we think that damages will

18  be 'Y' as opposed to something like, well, we've settled

19  with Bayer and now we've got ten other folks that we're

20  looking at down the road.  We don't know what's in here

21  other than about the settlement details.  If it's just

22  settlement details, what we do want it for is not the

23  detail.  We do want to be able to show that numerous

24  people were involved in analyzing AWP lawsuits, they

25  worked on it, they considered various resolutions, and it

1   started at the ground level and it went all the way up to

2   the attorney general.  If that's what we're talking about

3   here, I think we can sit down and reach some type of

4   stipulation that we could use at trial on this point.  We

5   can't use obviously use the privilege log.

6           THE COURT:  Are you in agreement with that?

7           MR. HOPKINS:  Yes.  I can state to the Court

8   that all of those documents consists of two things,

9   drafts of settlement agreements with suggested changes

10  and recommendations from somebody in the A.G.'s office to

11  the A.G. telling him a recommendation of we think he

12  should sign it and why he should sign it.

13          MS. WILLIS:  And to that end, for example --

14  again, it's our entry 289 and 300, your document,

15  AG080051.  There's one where we've got a document that

16  from Mr. Gambrell to Robbie Kerr over at Medicaid.  So we

17  see there the knowledge, as it were, moving over into the

18  agency.  Again, as Ms. Mergo's indicated, we think the

19  buck stops, you know, by their admission at the Attorney

20  General's office, but we also think there was knowledge

21  throughout the government to Medicaid and the State

22  Health Plan here.  And here's a document that would be

23  useful for us in establishing that in fact the folks at

24  Medicaid were involved as well.

25          THE COURT:  Okay.  If y'all can't work out

1    that, let me know.  We'll do it by phone.

2         MR. HOPKINS:  I don't foresee any problems with

3    that, Judge.

4         MS. WILLIS:  And Mr. Salane reminds me here

5    that the document I was just referring to was not

6    produced by D.H.H.S. where Mr. Kerr was the director.  So

7    this is the only place we have that document.  But we'll

8    certainly sit down and see if we can reach a stipulation

9    with regard to what we're looking to use these documents

10   for because, again, if it's just the details of the back

11   and forth, how do we want to phrase this, does it cover

12   that drug, we're less concerned about that than the fact

13   that these were AWP settlements way before the statute.

14        THE COURT:  Right.  Okay.

15        MS. WILLIS:  One other point.  Ms. Mergo tells

16   me that she does not believe that we have been the

17   recipients of the G.S.K. settlement.  We don't think we

18   have that one.

19        MS. MERGO:  Bayer, too, and G.S.K.

20        MS. WILLIS:  Bayer, too.  The second Bayer.

21        MS. MERGO:  325 through 328.

22        MS. WILLIS:  And so if those were at any ---

23        MR. HOPKINS:  You don't think you got the final

24   executed copies?

25        MS. MERGO:  Correct.

1          MS. WILLIS:  That's correct.  If we could

2   receive those.  We'll work on that as well as part of the

3   stipulation.

4          THE COURT:  Okay.  Is that it?

5          MR. HOPKINS:  Judge, I hate to tell you, that's

6   it from us.

7          MS. WILLIS:  Well, popping up.  We would

8   simply, if it's possible, would like to retrieve the

9   order you signed earlier and add -- if you still have it

10  up there, perhaps if it hasn't already gone down to the

11  Clerk's office.

12         THE COURT:  It may have already gone

13  downstairs.

14         MS. MERGO:  This is it.

15         MS. WILLIS:  This is it?

16         MR. HOPKINS:  She has it.

17         MS. WILLIS:  Oh, my goodness.  Well, I've

18  already screwed that up.  I marked on it.

19      Well, I didn't realize I had it, Your Honor.  We

20  have another copy of that.  We're just going to add, with

21  permission of the State, two additional documents that

22  are being voluntarily produced as they indicated.

23         MR. ALPHIN:  86 and 323.

24         MS. WILLIS:  86 and 323, correct?

25         MR. ALPHIN:  Yes, ma'am.

1          THE COURT:  Did everybody give their name to

2   Renee?  That's one thing she's going to ask me about.

3   Everybody did?  Everybody in the courtroom?

4          MADAM COURT REPORTER:  Yes, sir.

5          THE COURT:  All right.  We're off the record.

6       (WHEREUPON, court stood at recess in this case.)


7       *** END OF REQUESTED TRANSCRIPT OF RECORD ***

8

1                        Certificate of Reporter


2        I, the undersigned Renee H. Tollison, Official Court

3   Reporter for the Fifth Judicial Circuit of the State of

4   South Carolina, do hereby certify that the foregoing is a

5   true, accurate, partial transcript of record of the

6   proceedings had and evidence introduced in the hearing of

7   the captioned case, relative to appeal, in the Circuit

8   Court for Richland County, South Carolina, on the 14th

9   day of December 2011.

10       This transcript may contain quoted material.  Such

11   material is reproduced as read by the speaker.

12       I do further certify that I am neither of kin,

13   counsel, nor interest to any party hereto.

14                              December 26, 2011

15

16                       _____

17                       Circuit Court Reporter