UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456 |
| THIS DOCUMENT RELATES TO:<br><br>ALL CLASS ACTIONS | CIVIL ACTION:  01-CV-12257-PBS<br><br>Judge Patti B. Saris<br><br>(Leave to file granted on 1/17/12) |

**SUPPLEMENTAL DECLARATION OF ADAM S. LEVY IN CONNECTION WITH REPLY MEMORANDUM IN SUPPORT OF MOTION FOR MODIFICATION OF LEAD COUNSEL'S ALLOCATION OF FEESAND REIMBURSEMENT OF EXPENSES TO INCLUDE UNCOUNTED TIME AND EXPENSE INCURRED DIRECTLY IN THIS MDL**

I, Adam S. Levy, declare and state as follows:

1. I submit this supplemental declaration in support of my and my law firm's (collectively "Levy") Motion for Modification of Lead Counsel's Allocation of Fees and Reimbursement of Expenses to Include Uncounted Time and Expense Incurred Directly in this MDL, and in connection with Levy's Reply Memorandum in Support of same.

2. Lead Counsel and Donald Haviland and his firm(s) (collectively "Haviland") entered into a "private settlement" (as referenced in Haviland's motion to withdraw objections to the Track 2 settlement) agreement ("Agreement") last August to resolve Haviland's fees and expenses and the Haviland class member/plaintiffs' objections to the Track 2 settlement.  The central issue in terms of Levy's Motion is whether, under the unique facts and circumstances underlying this dispute, this Court should require Lead Counsel to pay Levy for the work that I performed in the MDL after August 2006 while I was Of Counsel to the Haviland firm (of which

I am no longer affiliated).  As I said in more detail in my original declaration in support of this Motion, I worked on a contingent fee basis while Of Counsel to the Haviland firm and I have not been paid, compensated or reimbursed for my time, expense and work performed in this MDL after August 2006.  Neither Lead Counsel nor Haviland will pay me.  It is Levy's contention that Lead Counsel are responsible for paying Levy's claim in this MDL (irrespective of whether Haviland also has any responsibility for paying Levy, as discussed in Levy's Reply Memorandum) and, accordingly, should make a full allocation of fees and expenses to Levy.

3. On the night of Friday July 29, 2011, with Mr. Haviland apparently believing that he was going to close a deal that night with Lead Counsel attorney Sean Matt, Mr. Haviland sent me an initial phone text notifying me for the first time that he was near a deal with Lead Counsel. Attached as the first page of Exhibit 1 is a photograph of this text as it appears on my cell phone. Prior to that date, I knew only that a mediation process was underway and that as part of that process Mr. Haviland submitted Levy's accurate "Of Counsel" lodestar and expense figures to the mediator (identified separately from the Haviland firm's lodestar and expense figures).

4. The initial phone text that Mr. Haviland sent me indicated that he had incorrectly stated to Lead Counsel a significantly lower figure than the accurate figure for my Of Counsel lodestar, which I pointed out to Mr. Haviland in a responding text.  Attached as the second page of Exhibit 1 is a photograph of my responding text as it appears on my cell phone.  By way of reply text, Mr. Haviland told me that he had to do a deal that night and said he intended to tell Lead Counsel that my post-August 2006 time "is separate and u [sic] can stay in Tier 3 all in as ASL."  Attached as the third and fourth pages of Exhibit 1 is a photograph of Mr. Haviland's reply phone text as it appears on my cell phone.

2

5. Shortly thereafter, I emailed Mr. Haviland stating that I wanted to discuss the matter because of my concern as to whether Lead Counsel would in fact pay me for my time and expense accrued while Of Counsel to the Haviland firm.  In an email response shortly after that, Mr. Haviland told me that there was nothing to discuss, that he intended to tell Mr. Matt that he was dealing in good faith, but not on my behalf, and that "[y]ou will lose nothing as a result." These two emails are attached as Exhibit 2.

6. A deal was not consummated that evening and my understanding at that time was that there was no expectation of a deal.  Unbeknownst to me, Haviland and Lead Counsel either kept negotiating or resumed their negotiations leading to their Agreement (attached as Exhibit 3 to the Berman Opposition Declaration) nearly one month later.  They did so without informing or involving me in the negotiations or telling him about the Agreement.  As I said in my original Declaration, I had requested the Agreement but Lead Counsel did not produce it.  Only after Levy filed its Motion and I then requested it again did Lead Counsel provide the Agreement to me.  Until then, I had not received a copy of the Agreement from anyone.

7. After I learned of the "private settlement" via Haviland's filing of its motion, consistent with Mr. Haviland's stated intentions prior to entering into the Agreement, Mr. Haviland assured me that he had discussed the matter of Levy's fees and expenses with Lead Counsel as part of their negotiations and they agreed that Levy was not part of the settlement, that Levy's time and expense was carved out of the settlement and that their Agreement did not settle or resolve Levy's claim for payment.  However, despite my request to Mr. Haviland for his assistance in this matter, Mr. Haviland has told me that he cannot assist me because of a provision in the Agreement that bars him from doing so.  (At that point, I still had not obtained a copy of the Agreement.)  Mr. Haviland has obeyed this provision and has refused to help me.

8. Without identifying the Haviland firm's total claimed lodestar and expenses, Lead Counsel calls their payment of $1.8 million to Haviland "materially less than Haviland Hughes's total MDL lodestar and expenses." Opp. at 3 & n.9. Upon information and belief, as of July 20, 2011, a reduction to $1.8 million would have been less than 20% of the Haviland firm's total combined MDL lodestar (without Levy's) and expenses (without Levy's).

9. I attended the first two days of the Track 1, Class 2/Class 3 bench trial in connection with work that I was performing and assistance that I was providing with respect to the testimony of Class 3 consumer plaintiff Rebecca Hopkins who testified on Day 2 of the trial. During my time in the courtroom, I saw Co-Lead Counsel attorneys sitting away from the counsel tables with apparently no participatory role in the trial. I witnessed the same thing at the Boston office of Hagens Berman following the trial day where some Co-Lead Counsel attorneys were preparing for the next day of trial, but other Co-Lead Counsel attorneys appeared to be doing nothing to assist in preparing for trial.

10. With respect to my work in connection with trial witness Rebecca Hopkins, Lead Counsel have accused me of "excessive" billing "consisting largely of a number of short telephone calls and emails." Opp. at 9 n.26; Berman Opp. Decl. ¶9. The pages of Levy's time report cited by Mr. Berman in his Declaration and by Lead Counsel's Opposition show the lack of candor in Lead Counsel's description of my work. The major portions of work relating to Ms. Hopkins "consist[ed] largely" (to use their words) of reviewing my large file, including emails, notes, and memoranda concerning Ms. Hopkins' voluminous records, drafting and revising her trial declaration, and travel for and attendance at trial to meet with and prepare the witness for trial, not "short telephone calls and emails" as Lead Counsel disingenuously claims.

11. Further regarding Ms. Hopkins, Lead Counsel and this Court have properly recognized her efforts by (Lead Counsel) requesting and (the Court) granting her an incentive payment of $19,600 for her thorough and important work performed on behalf of the Classes. Ms. Hopkins performed an enormous amount of work on behalf of the Classes. Lead Counsel, however, criticize my billings with respect to my drafting her declaration of trial testimony and preparing her for trial.

12. Lead Counsel had no direct involvement with Ms. Hopkins and they fail to appreciate my contribution to the success of Ms. Hopkins as a trial witness. No one working on this case spent more time working with Ms. Hopkins and her records or knew the facts and circumstances of her case better than I did. I worked extensively with her and her voluminous records both before I was Of Counsel at the Haviland firm (during which time I performed such tasks as analyzing Ms. Hopkins records and claims, drafting inserts for her in connection with class certification briefing, and preparing her for and defending her at deposition) and while I was Of Counsel to the Haviland firm during which I was instrumental in preparing her and Mr. Haviland (who had not previously worked nearly as closely with Ms. Hopkins or her records) for her testimony and presentation of exhibits at trial.

13. Whether standing on its own or comparing it to Lead Counsel's poor preparation and poorly executed examination of the immediately prior testifying consumer witness, Ms. Hopkins' testimony was a success in great part because of my dedication and work with the witness and my crucial assistance provided to Mr. Haviland. Compare Ms. Hopkins' examination to the examination of Anna Choice performed by one of the Lead Counsel firm's attorneys just prior to Ms. Hopkins. The examination of Ms. Choice demonstrated a lack of preparation and forethought which left this Court wondering how plaintiffs intended to prove

5

their case.  The examining attorney failed to introduce and put into evidence any exhibits as part of Ms. Choice's examination, instead apparently relying on the witness's trial affidavit – a decision as to which the Court expressed displeasure, telling Lead Counsel that they were now at the trial phase, that the witness's trial affidavit was in severe jeopardy, and leaving the Court wondering if it would even take Ms. Choice's direct testimony.  *See* Day Two Bench Trial, Tr. 71-90 (Anna Choice) attached as Exhibit 3.

14.     Ms. Hopkins's testimony went much more smoothly because of my work and preparation in connection with Ms. Hopkins and the assistance I provided Mr. Haviland so that he would be prepared and able to introduce into evidence medical and payment records for BMS drugs (unlike with Ms. Choice).  My work was not excessive in the least.  Whatever time Lead Counsel spent "preparing" Ms. Choice and themselves for her testimony was far less (if at all) of value than the time I spent preparing for and assisting with respect to Ms. Hopkins.  Between the two, only Ms. Hopkins' testimony achieved what was needed.  *See* Day Two Bench Trial, Tr. 91-115 (Rebecca Hopkins) attached as Exhibit 4.

15.     Lead Counsel also criticizes my "received and reviewed" time and my billing in quarter of an hour increments.  The Haviland billing reports submitted with the Berman Opposition Declaration show some similar receive and review billing (examples detailed in Levy's Reply Memorandum) and that Haviland billed for all of its activities in 0.25 hour increments with that being the firm's minimum charge for any activity and which comports with my understanding of how the Haviland firm billed when I was Of Counsel to the firm.  Haviland has been paid for its received and reviewed time (including the many entries showing such time for emails of whatever length) and billings in 0.25 hour increments, but I have been criticized for

it and not paid for it.  I am also aware that Levy and Haviland are not the only of the reporting plaintiff firms that billed in 0.25 increments.

16. Based on the Haviland time reports contained in Exhibit 1 of the Berman Opposition Declaration, approximately 62 percent (2,318 hours) of the Haviland firm's total time was billed at a rate above $500 an hour, and nearly 44 percent (1,624 hours) of the firm's total time was billed at a rate above $600 an hour.

17. Levy, in presenting its time records to Lead Counsel (in September 2011) and its claim in this Court, has used rates that are lower than the rates designated by Mr. Haviland for Mr. Levy's Of Counsel time in the time reports that Haviland previously submitted to Lead Counsel (appearing in Exhibit 1 of the Berman Declaration).  To arrive at the lower $238,251.25 that Levy is claiming for its unpaid MDL time, Levy used Levy's historical rates (absent any affiliation with Haviland) of $450, $490 and $495 over the course of the relevant period (versus rates between $490 and $610 appearing in Berman Exhibit 1).

18. Further regarding Lead Counsel's criticism of Levy's received and reviewed time, the specific entries that Lead Counsel cite came at or near the time of the Track 1 Class 2-3 trial when I was working on trial matters on behalf of the trial team, and then afterward at a time when I and the Haviland firm had begun looking forward to the anticipated AstraZeneca Class 1 trial.  Later, as the billing records in Berman Exhibit 1 show, I did directly assist the trial team in preparation for that trial.  In identifying the "primar[y]" "projects" that I worked on, Lead Counsel failed to identify my AstraZeneca Class 1 trial related work.

19. Mr. Berman in his Declaration and Lead Counsel in their Opposition have materially misrepresented the number of hours they say I devoted to work on the response to the motion for protective order regarding Muriel Tonaccio's deposition and the opposition to that

motion's supporting memorandum, and on a separate motion to quash subpoenas *duces tecum* for the consumer associations and the opposition to that motion's supporting memorandum, in connection with the Track 2 settlement. They say that I devoted "143.75" hours to these projects. This is false. In actuality, 25 percent (36 hours) of the "143.75" hours that Mr. Berman certified as being related to these projects (Berman Decl. at ¶ 9) was for work that I performed in connection with a response and opposition to Lead Counsel's emergency motion to seal attorney work product and to strike the Haviland clients' opposition to Track 2 settlement approval. This was a different task than the motions to which Mr. Berman and Lead Counsel's Opposition refer. Levy's Reply Memorandum cites pleadings and Levy's related time entries concerning the response/opposition to the motion to seal/strike.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 15th Day of January, 2012

                                                      /s/ Adam S. Levy

## CERTIFICATE OF SERVICE

I hereby certify that on January 17, 2012, I caused an electronic copy of the foregoing **SUPPLEMENTAL DECLARATION OF ADAM S. LEVY IN CONNECTION WITH REPLY MEMORANDUM IN SUPPORT OF MOTION FOR MODIFICATION OF LEAD COUNSEL'S ALLOCATION OF FEES AND REIMBURSEMENT OF EXPENSES TO INCLUDE UNCOUNTED TIME AND EXPENSE INCURRED DIRECTLY IN THIS MDL (with Exhibits 1-4)** to be filed of record and served on all interested counsel via the Court's CM/ECF system.

/s/ Adam S. Levy_____