# Exhibit 4

**Page 90**

1  MR. MONTGOMERY: And at the right time, your Honor,
2  and you decide when the right time is, I have the same issue
3  to raise with respect to Ms. Faulkner because she is the
4  class rep for Class 2 with respect to albuterol, the only
5  one. She has no knowledge, and so a motion to strike would
6  be appropriate, and I just did not wish to interrupt the
7  proceedings --
8  THE COURT: She's the only supplemental payor?
9  MR. MONTGOMERY: She's it.
10 MR. BERMAN: No. Actually Mr. Randle --
11 THE COURT: Is the class rep.
12 MR. BERMAN: Ms. Faulkner is just the third-party
13 administrator.
14 MR. MONTGOMERY: Well, okay, she is the
15 representative -- okay, I misspoke, but as to Randle and as
16 to Faulkner, there is an issue as to whether there is a
17 viable class with respect to albuterol.
18 THE COURT: Maybe, so I hadn't focused on that
19 particular one, but I think we need to deal with the consumer
20 class issue. Okay, thank you.
21 THE CLERK: All rise. Court is in recess
22 (A recess was taken, 11:05 a.m.)

**Page 91**

1  (11:37 a.m.)
2  IN OPEN COURT
3  THE COURT: Please be seated.
4  REBECCA HOPKINS, PLAINTIFFS' WITNESS, SWORN
5  THE CLERK: Thank you. You may be seated and
6  please state your name and spell it for the record.
7  THE WITNESS: It's Rebecca Hopkins, R-E-B-E-C-C-A,
8  H-O-P-K-I-N-S.
9  MR. HAVILAND: Good morning, your Honor. Don
10 Haviland. The plaintiffs next call Rebecca Hopkins, as she's
11 just said.
12                DIRECT EXAMINATION
13 BY MR. HAVILAND:
14 Q. Good morning, Mrs. Hopkins. How are you?
15 A. Just fine, thank you. And yourself?
16 Q. And if you could keep your voice up. I know you're very
17 soft-spoken, but lean into the -- pull the mike a little
18 closer. We have a very large audience today.
19 A. Okay.
20 Q. All right. Could you tell the Court where you live?
21 A. Northeast Pennsylvania.
22 Q. And how old are you, ma'am?
23 A. Fifty years old.
24 Q. Are you married?
25 A. Yes.

**Page 92**

1  Q. What is the highest level of education that you've
2  reached?
3  A. I have a graduate degree from Syracuse.
4  Q. Okay. Do you work?
5  A. Well, we have our own business, Oakland Consulting.
6  Q. With your husband.
7  A. Yes.
8  Q. Okay. And what sort of business is that?
9  A. He's a manufacturing consultant.
10 Q. Okay. I'd like to go right to the heart of the matter
11 so that we can try to simplify things for the Court.
12 And I realize that your cancer has been a long
13 time, since 1991, is that correct?
14 A. Yes.
15 Q. Okay. Could you just summarize for the Court generally
16 your course of therapy from 1991 up to the present?
17 THE COURT: No. You know, I've seen it in her
18 affidavit.
19 MR. HAVILAND: Okay. Fair enough, Judge.
20 THE COURT: I think, you know, that very difficult
21 period of time is well documented here.
22 MR. HAVILAND: Thank you, Judge. I'll go right
23 to --
24 BY MR. HAVILAND:
25 Q. I'd like to direct your attention to 19 --

**Page 93**

1  THE COURT: Just get right to the drugs.
2  MR. HAVILAND: Sure thing.
3  THE COURT: Okay.
4  Q. In 1995, did you have a recurrence, Ms. Hopkins?
5  A. Yes.
6  Q. Okay. And do you recall, you treated with some
7  prescription medications?
8  A. I was treated with Bleomycin, Etoposide VP 16, and CIS
9  Platinum.
10 Q. Okay. You said Etoposide and VP 16. Do you actually
11 remember that the Etoposide that you took was VP 16?
12 A. Yes.
13 Q. Are you aware --
14 A. That's what it's called.
15 Q. Okay. Are you aware today that that's a Bristol-Meyers
16 drug?
17 A. Today I am, yes.
18 MR. SWEENEY: Objection, your Honor. Foundation.
19 THE COURT: How do you know that?
20 THE WITNESS: My attorney has told me.
21 MR. SWEENEY: Move to strike, your Honor.
22 THE COURT: Sustained.
23 MR. HAVILAND: Fair enough, your Honor.
24 Your Honor, I've handed the Court a set of exhibits
25 that I've placed in front of the witness. They're all --

**Page 94**

    with the exception of the last exhibit, the Dr. Hartman exhibit, they're all exhibits produced by the plaintiffs in the case. There are two copies there, one for your law clerk as well. We have two sets there, your Honor.

BY MR. HAVILAND:

Q. Now, Mrs. Hopkins, if you could turn to the first exhibit, do you notice that that is an exhibit of a bill that came from Roswell Park Clinic?

A. Yes, mm-hm.

Q. Now, is that a clinic that you treated for your cancer in 1995?

A. Yes.

Q. All right. And do you recall receiving a copy of this bill?

A. Yes. It came in the mail.

    MR. SWEENEY: Has this document been marked?

    MR. HAVILAND: I'm going to mark the entire set, Judge. We have a logistical issue. I'm going to mark this set as 4000. With Robert we agreed to move up to the next range, and I'd like to mark the entire set and move the admission at the end of my examination with the exception of the Dr. Hartman exhibit, they'll all be the Rebecca Hopkins medical records, Judge.

    THE COURT: Ma'am, have you always lived in New York?

**Page 95**

    THE WITNESS: No.

    THE COURT: While you were sick, was your treatment in New York?

    THE WITNESS: No. My first treatment in '91 was in Berkeley, California, and then in '95 we lived in northeast Pennsylvania, but I went -- I was referred to Dr. Hembling at Roswell Park in Buffalo.

    THE COURT: Have you ever been treated in Massachusetts?

    THE WITNESS: No, I have not.

    THE COURT: Were any of your doctors or providers from Massachusetts?

    THE WITNESS: Not that I'm aware of.

BY MR. HAVILAND:

Q. In the Roswell Park bill that you received, Mrs. Hopkins, you notice that there were a number of injections listed in there?

A. Yes.

Q. You received several injections of Bleomycin and Etoposide?

A. Yes.

Q. Now, when you said earlier that you remembered that the Etoposide you received was VP 16, is that in the time frame that you treated at Roswell Park Clinic?

A. Yes.

**Page 96**

Q. Okay. And you'll see also -- let me back up a little bit.

    In your affidavit to the Court, the written affidavit, you talked about your insurance situation, the fact that there was some variation in your insurance coverage over time.

    At this point in time in 1995, did you have insurance?

A. No.

Q. Okay. So when you treated at Roswell Park Clinic and this bill in particular I placed in front of you, did you pay for that bill yourself?

A. Well, I did not have insurance for the first month of my chemo, but then we picked up insurance after that, so this is before.

Q. Right. And particularly, if you look at the exhibit, Mrs. Hopkins, you see the reference down at the bottom of a March 6, 1995. It says "Patient Payment." Do you see the amount of $3,067?

A. Yes.

Q. Do you remember actually writing a check to the Roswell Park Cancer Institute in that amount of money?

A. My husband did.

Q. Okay. If you turn the page, then, you see on May the 10th, 1995 it also lists "Payments Patient" in the amount

**Page 97**

$171.75?

A. Yes.

Q. Do you recall you or your husband sending a check in that amount to the Roswell Park Cancer Institute?

A. Yes.

Q. Okay. And did you understand when you were writing those check payments to Roswell Park, that you were in fact paying for your cancer treatments that are reflected in this invoice?

A. Yes.

Q. Now, skipping ahead, if we can, because during the course of your ovarian cancer, you had several recurrences, is that right?

A. Yes.

Q. Is it fair to say that you had several drug treatments during that time frame as well?

A. Yes.

Q. I'd like to move forward in the interest of expedience into 2001. Did you have a recurrence then?

A. Yes.

Q. And do you recall where you treated for that cancer flare-up?

A. The Regional Health Center in Erie, Pennsylvania.

Q. Nearer to your home?

A. Yes.

## Page 98

Q. If you turn to the next exhibit I've placed in front of you.
   THE COURT: Now, are these expenses, are these doctors' offices or are they hospitals, like the Roswell Park Cancer Institute?
   THE WITNESS: That's a hospital in Buffalo.
   THE COURT: It's a hospital. And the Erie one, what's that?
   MR. HAVILAND: Regional Cancer Center.
   THE COURT: Is that a hospital or is it a doctor's office?
   THE WITNESS: It's a clinic. It's not -- you don't stay overnight.
   THE COURT: Okay.
BY MR. HAVILAND:
Q. And did you treat on an outpatient basis?
A. Yes.
Q. Okay. So you got your injections and then went home, is that fair?
A. Yes.
Q. All right. And the bill I placed in front of you, is that a copy of a bill that was sent to you by the Regional Cancer Center?
A. Yes.
Q. And with respect to this bill and the one that I showed

## Page 99

you earlier, did you maintain these bills in your home files?
A. Yes.
Q. And did you produce them to your attorneys in this litigation?
A. Yes.
Q. And do you understand that those bills were then turned over to the defense counsel in the case?
A. Yes.
Q. Now, as to this particular exhibit, does this refresh your recollection about the treatments that you got in late December into '02, late December 2001 and into '02?
A. Yes.
Q. Okay. Do you remember what drugs you took?
A. Taxol.
Q. You had some others as well; you just don't remember?
A. I believe it was just the Taxol and then backup drugs for nausea and allergy and things like that.
Q. On the bill it has Zofran. Is that a nausea medication you took?
A. Yes.
Q. Okay. Do you recall taking the Taxol?
A. Yes.
Q. All right. And over what period of time in this late 2001 period did you take the Taxol as part of your chemotherapy regimen?

## Page 100

A. I took it for nine weeks ending January 15th, I think it was.
Q. So December 2001 into January 15th, 2002?
A. Yes.
Q. Okay. And do you know who manufactures the Taxol that you took?
   MR. SWEENEY: Objection, your Honor. Foundation.
   THE COURT: Overruled.
Q. Other than from this lawsuit, did you know who manufactured the Taxol that you got in 2001 and 2002?
A. No.
Q. You did know, though, that it was Taxol?
A. Yes.
Q. How did you know that?
A. Well, the doctor told me he was going to prescribe Taxol.
Q. Taxol. He didn't say anything else, just Taxol in terms of the description of the drug?
A. He felt that that would be the best thing for me to take at that time.
Q. Okay. With respect to this bill when you got it, if you look at the exhibit where -- it references Taxol a number of times. Do you see that?
A. Yes.
Q. And you see next to the first entry on December 3rd,

## Page 101

2001 it has at the top the column CPT. Do you see that?
A. CPT, yes.
Q. Do you know what a CPT code is?
A. No.
Q. And looking down at the Taxol, do you see next to that line an entry with a J and a 9265? Do you know as you sit here today what a J-Code is?
A. No.
Q. Do you know what relation, if any, a J-Code has to average wholesale price for drugs?
A. No.
Q. Okay. Have you ever known that?
A. No.
Q. Did your doctor ever explain to you whether there was a relationship between J-Codes and average wholesale price?
A. No.
Q. All right. Now, this particular bill in 2001, did you have insurance at that time?
A. Yes.
Q. Okay. Did the insurance cover all the costs of your medications?
A. No. We were expected to pay some.
Q. Okay. I've placed in front of you as the next exhibit what appears to be a bill from the Regional Cancer Center. Do you see that?

## Page 98

Q. If you turn to the next exhibit I've placed in front of you.
   THE COURT: Now, are these expenses, are these doctors' offices or are they hospitals, like the Roswell Park Cancer Institute?
   THE WITNESS: That's a hospital in Buffalo.
   THE COURT: It's a hospital. And the Erie one, what's that?
   MR. HAVILAND: Regional Cancer Center.
   THE COURT: Is that a hospital or is it a doctor's office?
   THE WITNESS: It's a clinic. It's not -- you don't stay overnight.
   THE COURT: Okay.
BY MR. HAVILAND:
Q. And did you treat on an outpatient basis?
A. Yes.
Q. Okay. So you got your injections and then went home, is that fair?
A. Yes.
Q. All right. And the bill I placed in front of you, is that a copy of a bill that was sent to you by the Regional Cancer Center?
A. Yes.
Q. And with respect to this bill and the one that I showed

## Page 99

you earlier, did you maintain these bills in your home files?
A. Yes.
Q. And did you produce them to your attorneys in this litigation?
A. Yes.
Q. And do you understand that those bills were then turned over to the defense counsel in the case?
A. Yes.
Q. Now, as to this particular exhibit, does this refresh your recollection about the treatments that you got in late December into '02, late December 2001 and into '02?
A. Yes.
Q. Okay. Do you remember what drugs you took?
A. Taxol.
Q. You had some others as well; you just don't remember?
A. I believe it was just the Taxol and then backup drugs for nausea and allergy and things like that.
Q. On the bill it has Zofran. Is that a nausea medication you took?
A. Yes.
Q. Okay. Do you recall taking the Taxol?
A. Yes.
Q. All right. And over what period of time in this late 2001 period did you take the Taxol as part of your chemotherapy regimen?

## Page 100

A. I took it for nine weeks ending January 15th, I think it was.
Q. So December 2001 into January 15th, 2002?
A. Yes.
Q. Okay. And do you know who manufactures the Taxol that you took?
   MR. SWEENEY: Objection, your Honor. Foundation.
   THE COURT: Overruled.
Q. Other than from this lawsuit, did you know who manufactured the Taxol that you got in 2001 and 2002?
A. No.
Q. You did know, though, that it was Taxol?
A. Yes.
Q. How did you know that?
A. Well, the doctor told me he was going to prescribe Taxol.
Q. Taxol. He didn't say anything else, just Taxol in terms of the description of the drug?
A. He felt that that would be the best thing for me to take at that time.
Q. Okay. With respect to this bill when you got it, if you look at the exhibit where -- it references Taxol a number of times. Do you see that?
A. Yes.
Q. And you see next to the first entry on December 3rd,

## Page 101

2001 it has at the top the column CPT. Do you see that?
A. CPT, yes.
Q. Do you know what a CPT code is?
A. No.
Q. And looking down at the Taxol, do you see next to that line an entry with a J and a 9265? Do you know as you sit here today what a J-Code is?
A. No.
Q. Do you know what relation, if any, a J-Code has to average wholesale price for drugs?
A. No.
Q. Okay. Have you ever known that?
A. No.
Q. Did your doctor ever explain to you whether there was a relationship between J-Codes and average wholesale price?
A. No.
Q. All right. Now, this particular bill in 2001, did you have insurance at that time?
A. Yes.
Q. Okay. Did the insurance cover all the costs of your medications?
A. No. We were expected to pay some.
Q. Okay. I've placed in front of you as the next exhibit what appears to be a bill from the Regional Cancer Center. Do you see that?

**Page 102**

1  A.  Yes.
2  Q.  Okay. Now, is this a bill that you received at your
3  home?
4  A.  Yes.
5  Q.  Okay. And it reflected an amount due of $106?
6  A.  Yes.
7  Q.  And did you understand from this bill that you were
8  required to pay $106 towards your six-month chemo regimen
9  beginning December 18?
10 A.  Yes.
11 Q.  And you maintained this record in your files as well,
12 this bill?
13 A.  Yes.
14 Q.  And you turned it over to your attorneys?
15 A.  Yes.
16 Q.  You understood it was produced to the defendants in the
17 case?
18 A.  Pardon?
19 Q.  You understood this bill was also turned over to the
20 defense counsel?
21 A.  Yes.
22     THE COURT:  Actually, where did the 106 come from?
23     MR. HAVILAND:  I'm getting to that, your Honor.
24     THE COURT:  What?
25     MR. HAVILAND:  I'm getting to that.

**Page 103**

1      THE COURT:  Okay.
2  BY MR. HAVILAND:
3  Q.  The next statement, if you will, Mrs. Hopkins, you see
4  it's from High Mark BlueCross BlueShield. Is that the
5  insurance carrier you had at that time?
6  A.  Yes.
7  Q.  Okay. And you see that the letter from them is talking
8  about billing problems. Were you having certain billing
9  problems at that time in terms of making payments?
10 A.  Yes.
11 Q.  Do you remember that there was a particular instance of
12 having difficulty paying your deductible?
13 A.  Well, we were paying as we could.
14 Q.  Okay. But do you remember that you were actually billed
15 a deductible amount at this time for this chemotherapy
16 regimen that you were taking in late 2001?
17 A.  Yes.
18 Q.  Okay.
19     THE COURT:  What do you mean by deductible? Are
20 you referring to a copayment?
21     MR. HAVILAND:  No, your Honor.
22     THE COURT:  I don't understand.
23     MR. HAVILAND:  Fair enough.
24 Q.  As part of your insurance, did you understand that you
25 had to pay an amount of money as a deductible before your

**Page 104**

1  insurance benefit kicked in?
2  A.  Yes.
3  Q.  Okay. And did you understand that that meant that you
4  had to pay that money toward your therapy, whatever it was,
5  in the early part of a year?
6  A.  Yes.
7  Q.  Okay. And then once that payment was made, did your
8  insurance benefits kick in?
9  A.  Yes.
10 Q.  Okay. So from these records, did you understand that
11 your insurance company was having the deductible payment go
12 toward your chemotherapy regimen in 2001 before their benefit
13 kicked in?
14 A.  Yes.
15 Q.  Okay. Now, you had the billing problems reflected in
16 the letter from High Mark BlueCross BlueShield. It says on
17 May 5th, 2003:  "The billing from the Regional Cancer Center
18 for chemotherapy, 12-18 to 5-17-02 and dated 12-31-01, is
19 your out-of-pocket deductible and your responsibility to pay.
20 You owe the Regional Cancer Center $106 and this should be
21 paid ASAP." Do you see that?
22 A.  Yes.
23 Q.  Did you in fact make that payment at some point in time
24 after May of 2003?
25 A.  Yes.

**Page 105**

1  Q.  And when you made that payment, did you understand that
2  that was going towards your chemotherapy, including the Taxol
3  that you took?
4  A.  Yes.
5  Q.  Okay. And lastly, these two exhibits, you've gotten
6  those at your home --
7      THE COURT:  Wait, wait, wait. I'm looking.
8      So do you understand -- the 106, was it from the
9  entire combination of drugs or just the Taxol?
10     THE WITNESS:  That was for the bill that -- they
11 sent me a bill and I was expected to pay it and that was part
12 of the bill.
13     THE COURT:  Do you know how they calculated it?
14     MR. HAVILAND:  Your Honor, I may be able to help
15 with that.
16 BY MR. HAVILAND:
17 Q.  If you go back to the exhibit, the Regional Cancer
18 Center bill, you see how there's a number of drug
19 administrations. I didn't direct your attention to page 2 of
20 the exhibit, and down about four lines it says "Personal
21 Check, $144." Do you see that?
22 A.  Yes.
23 Q.  Did you in fact, you or your husband, make a check
24 payment in the amount of $144 to the Regional Cancer Center
25 towards this bill?

**Page 106**

1  A.  Yes.
2  Q.  And did you understand that that amount of money was
3  being allocated to the entirety of the bill when you made
4  that payment?
5  A.  Yes.
6  Q.  Okay. Then later on page 3 it also has May 7, 2003, a
7  personal check payment of $26. Do you see that?
8  A.  Yes.
9  Q.  And do you recall you or your husband writing a check
10 for $26 to Regional Cancer Center in that amount, $26?
11 A.  Not necessarily the number. I remember writing the
12 check.
13        THE COURT: So with respect to the 144, is that
14 based on the drugs or the doctor's services? Do you know?
15        THE WITNESS: Based on the bill that I --
16        THE COURT: No, I understand you got the bill for
17 it, but do you know how they came up with the 144?
18        THE WITNESS: No, I don't.
19        THE COURT: Do you know whether that was a drug
20 reimbursement or whether it was also reimbursing for the way
21 the doctors were helping you?
22        THE WITNESS: No, I'm not aware.
23        THE COURT: Okay.
24 BY MR. HAVILAND:
25 Q.  Do you know, Mrs. Hopkins, the total amount of your

**Page 107**

1  deductible obligation at that point in time?
2  A.  No.
3        MR. HAVILAND: Your Honor, our proffer was very
4  narrow, but we're happy to submit supplemental exhibits that
5  clear up some of the factual issues that I think are probably
6  troubling the Court at this point in time given the witness's
7  unavailability to talk about specific issues, but I'd like to
8  just conclude.
9  BY MR. HAVILAND:
10 Q.  Now, Mrs. Hopkins, the two times that you treated with
11 these drugs for your cancer, yesterday counsel for BMS said
12 that everybody in the world knew certain things about their
13 conduct, and I'd like to know from you:
14        At the time you treated and paid these bills, did
15 you know that the AWPs were inflated for the drugs you were
16 taking?
17 A.  No, I did not.
18 Q.  Did you know --
19        MR. SWEENEY: Objection, your Honor. There's no
20 evidence in the record that the AWP was charged for any of
21 these drugs. The witness hasn't testified to that. She's
22 not competent to testify --
23        THE COURT: Overruled. Did you know anything about
24 AWP at all?
25        THE WITNESS: No, I did not.

**Page 108**

1        THE COURT: All right.
2  BY MR. HAVILAND:
3  Q.  Mrs. Hopkins, did you know whether any of the
4  manufacturers of the drugs you were taking were creating
5  spreads for their drugs and actively promoting spreads?
6        THE COURT: She knows nothing --
7        MR. HAVILAND: Okay. I'm just making a record,
8  your Honor. Fair enough.
9        THE COURT: -- on this.
10 Q.  Lastly, I'd like to show you an exhibit that has been
11 produced by our expert in the case. It's the last exhibit in
12 the packet. And, Mrs. Hopkins, you'll see that it has a
13 reference at the top: "Total Spread Percentages" prepared by
14 the plaintiffs' expert in the case.
15        MR. SWEENEY: Your Honor, I don't see the relevance
16 to this --
17        THE COURT: Is that an objection?
18        MR. SWEENEY: Yes. No personal knowledge.
19        THE COURT: Sustained. Just object.
20        She doesn't know anything about the AWP,
21 understandably, but she doesn't.
22 BY MR. HAVILAND:
23 Q.  At the time you took the Taxol in 2001 into 2002, did
24 you have any sense of a spread for the drug or the magnitude
25 of the spread for that drug?

**Page 109**

1  A.  No, I did not.
2  Q.  Okay. Now, had you known, Mrs. Hopkins, about the
3  allegations in this case and the things you've learned since
4  becoming part of this case, would you have done something
5  with that information?
6  A.  Had I been aware that there was another drug that I
7  could have taken that was less expensive?
8  Q.  Any of those issues.
9  A.  Possibly.
10 Q.  What do you think you might have done if you'd learned
11 certain things?
12        MR. SWEENEY: Objection. Speculation.
13        THE COURT: Overruled. Is there anything that you
14 can think of that you would have done?
15        THE WITNESS: Well, if I'd have known that I could
16 have taken a different drug that was comparable, I may very
17 likely have done that.
18        MR. HAVILAND: I have nothing further, your Honor.
19        THE COURT: Any questions?
20        MR. HAVILAND: I would like to move the admission
21 of the witness's records.
22        THE COURT: Any objections?
23        MR. SWEENEY: No objection.
24        THE COURT: All right. What are they?
25        MR. SWEENEY: Except for the chart, your Honor.

**Page 110**

1   THE COURT: I thought you might not like the chart,
2   but that's fine. We'll do them as 4000?
3       MR. HAVILAND: Plaintiffs' 4000, yes.
4       THE COURT: Thank you. Any questions?
5       MR. SWEENEY: Yes, I have a few, your Honor. This
6   has her direct testimony. Do you need that, your Honor?
7       THE COURT: No, I've got that.
8       By the way, this must be your first time in court,
9   huh?
10      THE WITNESS: Yes.
11      THE COURT: I'm sure you're nervous. Thank you for
12  coming.
13                  CROSS-EXAMINATION
14  BY MR. SWEENEY:
15  Q. Good morning, Ms. Hopkins. I'm Tom Sweeney. Do you
16  remember I took your deposition?
17  A. Yes.
18  Q. In Erie, Pennsylvania?
19  A. Yes.
20  Q. Okay. And as I think you've already testified, you've
21  never lived in Massachusetts?
22  A. No.
23  Q. And you've never taken any prescription drugs in
24  Massachusetts.
25  A. No.

**Page 111**

1   Q. And I think you acknowledge in your testimony that you
2   know you're not a member of any class that's now on trial in
3   this case.
4   A. Yes.
5   Q. Okay. Now, Mr. Haviland showed you some documents that
6   relate to your medical records, and do you have that in front
7   of you, the one in 1995 from Roswell Park Cancer Institute?
8   A. Yes.
9   Q. And there's a reference there to Etoposide?
10  A. Yes.
11  Q. I believe it's highlighted. Do you know during this
12  time period what companies manufactured Etoposide?
13  A. No, I did not.
14  Q. Do you know if it was more than one?
15  A. No, I do not.
16  Q. Okay. But in fact, I think you testified in your
17  deposition that you don't know any of the companies that
18  manufacture the drugs that you took during your whole
19  treatment, is that right?
20  A. No. Yes, that's true.
21  Q. Okay. Now, if you would turn to your written testimony.
22      THE COURT: Can I ask you this, sir? I know one of
23  the drugs alleged against you is E-T-O-P-O-P-H-O-S. Is that
24  the same --
25      MR. SWEENEY: Etoposide.

**Page 112**

1       THE COURT: -- as Etoposide?
2       MR. SWEENEY: Yes, but there were -- there was
3   generic competition at this point.
4       THE COURT: I just want to understand.
5       MR. TRETTER: Tom, to correct the record, those are
6   two different drugs, Etopophos and Etoposide. They're two
7   different drugs.
8       THE COURT: I guess we'll just have to address that
9   later. So it's --
10  BY MR. SWEENEY:
11  Q. Would you turn to page 12 in your testimony, your
12  written testimony? And you see you say there: "My
13  understanding is that I have paid for my medications based on
14  AWPs." Do you have it, ma'am, paragraph 12?
15  A. I only have page 9. Of the exhibits?
16      MR. SWEENEY: Can I approach?
17  Q. Do you see paragraph 12?
18  A. Yes.
19  Q. It says in the second sentence: "My understanding is
20  that I have paid for my medications based on AWPs."
21  A. My understanding at this time.
22  Q. Okay. What is that understanding based on?
23  A. Information from my lawyers.
24  Q. Is that all? Is that the entire basis for your
25  understanding that you paid based on AWPs?

**Page 113**

1   A. I believe so, yes.
2   Q. Okay.
3       MR. SWEENEY: Your Honor, I'd move to strike this
4   part of the testimony.
5       THE COURT: We'll address this later.
6       MR. SWEENEY: Okay.
7   Q. Now, if you take a look at Plaintiffs' Exhibit 4000
8   again, the part from December of 2001 and early 2002.
9   A. I'm sorry. Where did you want me to look?
10  Q. Yes. The Regional Cancer Center supplemental bill. It
11  says "Hopkins 140" at the bottom.
12  A. Okay. Yes.
13  Q. Now, there's a variety of treatments in here that appear
14  on this bill, correct? There are doctors' services in here?
15  A. No, this is all for medicines.
16  Q. Excuse me?
17  A. Oh, the Verapenture (ph), but it's basically for the
18  infusion and different --
19      THE COURT: Do I have these exhibits?
20      MR. SWEENEY: It's the same exhibit that
21  Mr. Haviland marked.
22      MR. HAVILAND: The purple folder.
23      THE COURT: I just want to make sure they're not
24  separate ones. All right.
25

**Page 114**

BY MR. SWEENEY:

Q. There are a variety of services and drugs that appear in this bill, correct?

A. True.

Q. Other than Taxol.

A. True.

Q. Okay. And they range in the hundreds and sometimes -- they range in the hundreds of dollars, correct?

A. Yes.

Q. And do you see on the third page, Hopkins 142 --

A. Mm-hm.

Q. -- where it talks about the total payments? Do you see that under payments it's $8,589.16?

A. I don't see -- okay. Yes.

Q. Now, most of those payments were made by BlueCross, correct?

A. Yes.

Q. Okay. And you don't know whether any of the payments that you made for your deductible related to any of the drugs that appear in here, correct?

A. I made payments to the bill that I received.

Q. Yes. And that was for your deductible, correct?

A. So if you're asking do I know if they put my money towards the drugs, no, I guess specifically I don't. They just put it towards the total of what I was being charged.

**Page 115**

Q. Okay. But you don't know whether it relates to the drugs or it relates to the services.

A. It relates to the entire bill.

Q. Okay. Now, this reflects that you were given Taxol and there's a code here under CPT, J9265.

A. Yes.

Q. Do you know what that stands for?

A. No, I don't.

Q. Okay. Do you know whether in this time period there were other companies that made Taxol?

A. No, I don't.

THE COURT: Anything else?

MR. SWEENEY: Nothing further, your Honor.

THE COURT: Anything?

MR. HAVILAND: No, your Honor. Thank you.

THE COURT: Thank you very much for coming. I'm glad you're doing so well here.

THE WITNESS: Thank you. I'm done then, I take it.

THE COURT: Excuse me?

THE WITNESS: I'm done then, I take it.

THE COURT: You are.

(Witness steps down)

(Counsel confer)

MR. BERMAN: I have a little time gap of about 25 minutes.

**Page 116**

THE COURT: Why?

MR. BERMAN: Because we withdrew the remaining consumer witnesses and the next witness is a BlueCross witness who's on her way over from her office.

THE COURT: So what time will that person be in?

MR. BERMAN: I'm told they'd be here around 12:30.

THE COURT: Well, a lot of times people get here early because they're worried about the parking. Is someone going to check?

MR. BERMAN: The parking?

THE COURT: No, no. I'm just saying a lot of times people when they're about to testify actually get here a little early.

MR. BERMAN: Okay. I'll check. I've been e-mailing for the last 15 minutes and everybody keeps saying they're on their way.

THE COURT: Okay. I'm just saying people don't usually -- they come in a little early. Well, let me ask you this question:

Maybe you can give me your theory as we're going on what drugs are left and who's the class rep for the various drugs, because these consumers as a practical matter can't serve as class reps, so -- they don't live here. They might have relevant information in general, but --

MR. BERMAN: They were brought here just for

**Page 117**

illustrative purposes.

THE COURT: For illustrative --

MR. BERMAN: I mean, just to show what a typical consumer would go through.

THE COURT: So you're not proposing either of them as class representatives.

MR. BERMAN: Not for this class, no.

THE COURT: Well, for any class.

MR. BERMAN: Well, actually, Ms. Hopkins was proposed for a class.

THE COURT: Which is?

MR. BERMAN: Which is Class 3, nonMedicare.

THE COURT: But she's not from Massachusetts.

MR. BERMAN: No, but she was proposed for the class that's still out there that you haven't ruled on yet, the non -- we're going to revisit class cert. She was a class rep for the other broader national class.

THE COURT: I see. Well, obviously -- I'm talking about in terms of the Massachusetts classes.

MR. BERMAN: I understand that.

THE COURT: Who represents the consumers?

MR. BERMAN: The TPP.

THE COURT: All right. So that's your legal position, that they're going to be sufficient there.

MR. BERMAN: That's correct.