# Exhibit C

12/20/02

COPY
COPY

DEC 2 0 2002

MICHAEL K. JEANES, CLERK
L. CHILSON
DEPUTY CLERK

| | |
|---|---|
| 1 | Harry J. Miller III, Esquire<br>AZ Bar No. 014556 |
| 2 | 80 East Columbus<br>Phoenix, Arizona 85012 |
| 3 | 602-264-4965 telephone<br>602-277-0144 facsimile |
| 4 | |
| 5 | Donald E. Haviland, Jr.<br>KLINE & SPECTER, P.C. |
| 6 | 1525 Locust Street, 19th Floor<br>Philadelphia, PA 19102 |
| 7 | 215-735-0957 facsimile |

Attorneys for Plaintiff and the Class
[Additional Counsel appear on signature page]

## SUPERIOR COURT OF THE STATE OF ARIZONA
## IN AND FOR THE COUNTY OF MARICOPA

ROBERT J. SWANSTON, individually and
on behalf of himself and all others similarly situated,

Plaintiff,

v.

TAP PHARMACEUTICAL PRODUCTS INC.; ABBOTT
LABORATORIES; TAKEDA CHEMICAL INDUSTRIES, LTD.;
ZENECA, INC.; AstraZeneca PHARMACEUTICALS LP;
AstraZeneca LP; AstraZeneca PLC; PHARMACIA
CORPORATION; PHARMACIA & UPJOHN, INC.; MONSANTO
COMPANY: G.D. SEARLE; JOHNSON & JOHNSON; ETHICON
ENDO-SURGERY, INC.; INDIGO LASER CORPORATION; ALZA
CORPORATION; CENTOCOR, INC.; ORTHO BIOTECH; BAYER
CORPORATION; WYETH; WYETH PHARMA-CEUTICALS;AMGEN,
INC.; IMMUNEX CORPORATION; AVENTIS PHARMACEUTICALS,
INC.; AVENTIS BEHRING L.L.C.; HOECHST MARION ROUSSEL,
INC.; BAXTER INTERNATIONAL INC.; BAXTER HEALTHCARE
CORPORATION; BOEHRINGER INGELHEIM CORPORATION; BEN
VENUE LABORATORIES, INC.; BEDFORD LABORATORIES;
ROXANE LABORATORIES, INC.; BRISTOL-MYERS SQUIBB
COMPANY; ONCOLOGY THERAPEUTICS NETWORK
CORPORATION; APOTHECON, INC.; FUJISAWA HEALTHCARE,
INC.; FUJISAWA USA, INC.; GLAXOSMITHKLINE, P.L.C.;
SMITHKLINE BEECHAM CORPORATION; GLAXO WELLCOME,
INC.; SCHERING-PLOUGH CORPORATION; WARRICK
PHARMACEUTICALS CORPORATION; SICOR, INC.;GENSIA SICOR
PHARMA-CEUTICALS, INC.;DEY, INC.; DAVID JETT AND JANE
DOE JETT; CHRISTOPHER COLEMAN AND JANE DOE COLEMAN;
SCOTT HIDALGO AND AMANDA HIDALGO; MICHAEL
GENDELMAN AND JANE DOE GENDELMAN; EDDY JAMES HACK
AND JANE DOE HACK; KIMBERLEE CHASE AND JOHN DOE
CHASE; JANICE M. SWIRSKI AND JOHN DOE SWIRSKI; DONNA
TOM AND JOHN DOE TOM; DAVID GUIDO AND JANE DOE
GUIDO; HENRY VAN MOURIK AND JANE DOE VAN MOURIK;
AND ALAN MACKENZIE AND JANE DOE MACKENZIE; DOES
1-50; ABC CORPORATIONS 1-50; AND XYZ PARTNERSHIPS AND
ASSOCIATIONS 1-50,

Defendants.

CAUSE NO. CV2002-004988

**SECOND
AMENDED COMPLAINT**

CLASS ACTION

(Jury Trial Demanded)

' 2002 KLINE & SPECTER, P.C.

## CLASS ACTION COMPLAINT

Plaintiff, Robert J. Swanston, by his attorneys, brings this Complaint on his own behalf and on behalf of all others similarly situated to obtain declaratory and injunctive relief, damages, costs of suit, attorneys' fees and other appropriate relief from the Defendants. Plaintiff complains and alleges, upon information and belief, as follows:

## NATURE OF ACTION

1.      This case is brought by Plaintiff, Robert J. Swanston, as a class action on behalf of thousands of individuals and entities to recover monies overpaid as a result of Defendants' fraudulent scheme that targeted at least three types of healthcare patients: (1) "Government Assistance Patients": those who subscribe to and rely on one or more government assistance programs for the partial payment of their medical care and treatment, including Medicare, Medicaid, and TRICARE (formerly CHAMPUS) (hereinafter referred to collectively as "government assistance programs"); (2) "Private Assistance Patients": those who subscribe to and rely on private health insurance carriers and programs for the partial payment of their medical care and treatment; and (3) "No Assistance Patients": those who have no insurance at all for the payment of their medical care and treatment. Although there are at least three types of healthcare patients, they, along with the entities that are included in the Class, all share the same, common characteristic and circumstance: they all paid more for prescription drugs than they otherwise should have as a result of the unlawful conduct of the Defendants.

2.      The Defendants are TAP Pharmaceutical Products Inc. ("TAP") (a wholly-owned joint venture of Abbott and Takeda, and prior to April 2000 known as TAP Holdings, Inc.), Abbott Laboratories ("Abbott"), Takeda Chemical Industries, Ltd. ("Takeda"), Zeneca, Inc., AstraZeneca Pharmaceuticals LP, AstraZeneca LP, AstraZeneca PLC ("Astra Zeneca"), Pharmacia Corporation ("Pharmacia"), Pharmacia & Upjohn, Inc. ("P&U"), Monsanto Company ("Monsanto"), G. D. Searle Company ("Searle"), Johnson & Johnson ("J&J"), Ethicon Endo-Surgery, Inc. ("Ethicon") (a wholly-owned subsidiary of J&J), Indigo Laser Corporation ("Indigo") (a wholly-owned subsidiary of J&J and Ethicon), Alza Corp. ("Alza"), Centocor, Inc. ("Centocor"), Ortho Biotech ("Ortho"), Bayer

1   Corporation ("Bayer"), Wyeth ("Wyeth"), Wyeth Pharmaceuticals ("Wyeth Pharmaceuticals"),

2   Amgen, Inc. ("Amgen"), Immunex Corporation ("Immunex"), Aventis Pharmaceuticals, Inc.

3   ("Aventis"), Aventis Behring, L.L.C. ("Aventis Behring"), Hoechst Marion Roussel, Inc.

4   ("Hoechst"), Baxter International Inc. ("Baxter"), Baxter Healthcare Corporation ("Baxter

5   Healthcare"), Boehringer Ingelheim Corporation ("Boehringer"), Ben Venue Laboratories, Inc. ("Ben

6   Venue"), Bedford Laboratories ("Bedford"), Roxane Laboratories, Inc. ("Roxane"), Bristol-Myers

7   Squibb Company ("Bristol-Myers"), Oncology Therapeutics Network Corporation ("OTN"),

8   Apothecon, Inc. ("Apothecon"), Fujisawa Healthcare, Inc. "(Fujisawa"), Fujisawa USA, Inc.

9   ("Fujisawa USA"), GlaxoSmithKline, P.L.C. ("GlaxoSmithKline"), SmithKline Beecham

10  Corporation ("SmithKline"), Glaxo Wellcome, Inc. ("Glaxo"), Schering-Plough Corporation

11  ("Schering"), Warrick Pharmaceuticals Corporation ("Warrick") [the foregoing corporate defendants

12  are collectively referred to herein as "the Corporate Defendants"], Sicor, Inc. ("Sicor"), Gensia Sicor

13  Pharmaceuticals, Inc. ("Gensia"), Dey, Inc. ("Dey"), David Jett ("Jett") (a former employee of

14  Indigo), and his wife, Jane Doe Jett, Christopher Coleman ("Coleman") (a former employee of

15  Indigo), and his wife, Jane Doe Coleman, Scott Hidalgo ("Hidalgo") (a former employee of TAP and

16  a current employee of Indigo), and his wife, Amanda Hidalgo (a former employee of TAP), Michael

17  Gendelman ("Gendelman") (a current employee of Indigo), and his wife, Jane Doe Gendelman, Eddy

18  James Hack ("Hack") (owner and operator of Oncology Solutions a/k/a International Oncology

19  Network), and his wife, Jane Doe Hack, Kimberlee Chase ("Chase") (a former employee of TAP),

20  and her husband, John Doe Chase, Janice Swirski ("Swirski") (a former employee of TAP), and her

21  husband, John Doe Swirski, Donna Tom ("Tom") (a former employee of TAP), and her husband,

22  John Doe Tom, David Guido ("Guido") (a former employee of TAP), and his wife, Jane Doe Guido,

23  Henry Van Mourik ("Van Mourik") (a former employee of TAP), and his wife, Jane Doe Van

24  Mourik, Alan MacKenzie ("MacKenzie") (a former employee of TAP), and his wife, Jane Doe

25  MacKenzie [the foregoing individual defendants are collectively referred to herein as "Individual

26  Defendants"], and various "doe" defendants, "ABC" corporations, and "XYZ" partnerships and

27

28

1  associations whose names and identities are not yet known [all of the foregoing defendants are

2  collectively referred to herein as "Defendants"].

3        3.     Defendants, Abbott, Takeda and TAP, are manufacturers, distributors and sellers of

4  a drug known as Lupron®, among other prescription drugs, who, through Defendant TAP, have

5  pleaded guilty to federal criminal and civil fraud charges for, among other things, conspiring to

6  violate the Prescription Drug Marketing Act ("PDMA") by, *inter alia*, providing free samples of

7  Lupron® to medical providers and encouraging them to charge patients in Arizona and throughout

8  the United States [hereinafter "the Lupron® Manufacturer Defendants"]. This conspiracy was in

9  violation of the federal conspiracy statute, 18 U.S.C. § 371 (Conspiracy to Commit Offense or to

10  Defraud United States). *See* Indictment, Letter Agreement dated September 28, 2001, Judgment

11  dated December 6, 2001, Corporate Integrity Agreement ("CIA"), Side Letter Agreements with

12  Abbott and Takeda, and Sentencing Memorandum of the United States dated December 4, 2001

13  ("Sentencing Memorandum") [hereinafter the "Guilty Plea Document[s]"], attached hereto

14  collectively as Exhibit "A."

15        4.     Defendants Zeneca, Inc.; AstraZeneca Pharmaceuticals LP; AstraZeneca LP;

16  AstraZeneca PLC [hereinafter "the AstraZeneca Defendants"] manufacture, sell and distribute

17  prescription drugs, including Zoladex® and Casodex®. Zoladex® is a prescription drug similar to

18  Lupron® that is used in the treatment of prostate cancer in men, endometriosis and infertility in

19  women and central precocious puberty in children. Casodex® is also used in the treatment of prostate

20  cancer. It is believed and therefore averred that the AstraZeneca Defendants engaged in unlawful

21  conduct similar to that of the other Defendants herein with respect to their marketing, promotion,

22  sales and distribution of prescription drugs which treat cancer, and other prescription drugs, that are

23  reimbursed under federal and state government assistance programs, such as Medicare and Medicaid,

24  among others.

25        5.     Defendants Pharmacia, P&U, Monsanto and Searle are manufacturers, sellers and

26  distributors of, among other things, a prescription drug similar to Lupron®, known as Trelstar Depot,

27  that is used in the treatment of prostate cancer, among other cancer and prescription drugs

28

[hereinafter collectively "the Pharmacia Defendants"]. It is believed and therefore averred that the Pharmacia Defendants engaged in unlawful conduct similar to that of the other Defendants with respect to their marketing, promotion, sales and distribution of prescription drugs which treat cancer, and other prescription drugs, that are reimbursed under federal and state government assistance programs, such as Medicare and Medicaid, among others.

6. Defendants, J&J, Ethicon, and Indigo, are manufacturers and sellers of, among other things, the Indigo LASEROPTIC Treatment System, a minimally invasive procedure that treats patients with enlarged prostates, otherwise known as benign prostatic hyperplasia ("BPH") [hereinafter "the J&J Lupron Defendants"]. BPH is a condition that often attends or coincides with prostate cancer. In addition, J&J, along with its various other affiliated and subsidiary companies, including Centocor, Inc., Ortho Biotech and Alza Corporation [hereinafter collectively "the J&J Defendants"], manufactures, sells and distributes prescription drugs that are reimbursed under federal and state government assistance programs, such as Medicare and Medicaid, among others. It is believed and therefore averred that the J&J Defendants engaged in unlawful conduct similar to that of the other Defendants with respect to their marketing, promotion, sales and/or distribution of prescription drugs, such as Lupron, and other prescription drugs that are reimbursed under federal and state government assistance programs, such as Medicare and Medicaid, among others.

7. Defendants Baxter International, Inc. ("Baxter") and Baxter Healthcare Corporation ("Baxter Healthcare") are manufacturers, sellers and distributors of, among other things, prescription drugs used in the treatment of cancer, among other prescription drugs [hereinafter the "Baxter Defendants"]. It is believed and therefore averred that the Baxter Defendants engaged in unlawful conduct similar to that of the other Defendants with respect to their marketing, promotion, sales and/or distribution of prescription drugs, which treat cancer, and other prescription drugs that are reimbursed under federal and state government assistance programs, such as Medicare and Medicaid, among others.

8. Defendants Bayer and Alza are manufacturers, sellers and distributors of, among other things, a prescription drug similar to Lupron®, known as Viadur®, that is used in the treatment of

prostate cancer, among other prescription drugs. It is believed and therefore averred that these Defendants engaged in unlawful conduct similar to that of the other Defendants herein with respect to their marketing, promotion, sales and distribution of prescription drugs which treat cancer, and other prescription drugs, that are reimbursed under federal and state government assistance programs, such as Medicare and Medicaid, among others.

9. Defendants Amgen, Inc. ("Amgen") and Immunex Corporation ("Immunex") are manufacturers, sellers and distributors of, among other things, prescription drugs used in the treatment of cancer, among other prescription drugs [hereinafter the "Amgen Defendants"]. It is believed and therefore averred that the Amgen Defendants engaged in unlawful conduct similar to that of the other Defendants with respect to their marketing, promotion, sales and distribution of prescription drugs which treat cancer, and other prescription drugs, that are reimbursed under federal and state government assistance programs, such as Medicare and Medicaid, among others.

10. Defendants Aventis, Aventis Behring and Hoechst are manufacturers, sellers and distributors of, among other things, prescription drugs used in the treatment of cancer, among other prescription drugs [hereinafter the "Aventis Defendants"]. It is believed and therefore averred that the Aventis Defendants engaged in unlawful conduct similar to that of the other Defendants with respect to their marketing, promotion, sales and distribution of prescription drugs which treat cancer, and other prescription drugs, that are reimbursed under federal and state government assistance programs, such as Medicare and Medicaid, among others.

11. Defendants Boehringer, Ben Venue, Bedford and Roxane are manufacturers, sellers and distributors of, among other things, prescription drugs used in the treatment of cancer, among other prescription drugs [hereinafter the "Boehringer Defendants"]. It is believed and therefore averred that the Boehringer Defendants engaged in unlawful conduct similar to that of the other Defendants with respect to their marketing, promotion, sales and distribution of prescription drugs which treat cancer, and other prescription drugs, that are reimbursed under federal and state government assistance programs, such as Medicare and Medicaid, among others.

5

12.     Defendants GlaxoSmithKline, SmithKline and Glaxo are manufacturers, sellers and distributors of, among other things, prescription drugs used in the treatment of cancer, among other prescription drugs [hereinafter the "GlaxoSmithKline Defendants"]. It is believed and therefore averred that the GlaxoSmithKline Defendants engaged in unlawful conduct similar to that of the other Defendants with respect to their marketing, promotion, sales and distribution of prescription drugs which treat cancer, and other prescription drugs, that are reimbursed under federal and state government assistance programs, such as Medicare and Medicaid, among others.

13.     Defendants Schering and Warrick are manufacturers, sellers and distributors of, among other things, prescription drugs used in the treatment of cancer, among other prescription drugs [hereinafter the "Schering Defendants"]. It is believed and therefore averred that the Schering Defendants engaged in unlawful conduct similar to that of the other Defendants with respect to their marketing, promotion, sales and distribution of prescription drugs which treat cancer, and other prescription drugs, that are reimbursed under federal and state government assistance programs, such as Medicare and Medicaid, among others.

14.     Defendants Bristol-Myers, OTN and Apothecon are manufacturers, sellers and distributors of, among other things, prescription drugs, and pharmaceutical products used in the treatment of cancer, among other prescription drugs, and drug products [hereinafter the "Bristol-Myers Defendants"]. It is believed and therefore averred that the Bristol-Myers Defendants engaged in unlawful conduct similar to that of the other Defendants with respect to their marketing, promotion, sales and distribution of prescription drugs which treat cancer, and other prescription drugs, that are reimbursed under federal and state government assistance programs, such as Medicare and Medicaid, among others.

15.     Defendants Wyeth and Wyeth Pharmaceuticals are manufacturers, sellers and distributors of, among other things, prescription drugs used in the treatment of cancer, among other prescription drugs [hereinafter the "Wyeth Defendants"]. It is believed and therefore averred that the Wyeth Defendants engaged in unlawful conduct similar to that of the other Defendants with respect to their marketing, promotion, sales and distribution of prescription drugs which treat cancer,

1  and other prescription drugs, that are reimbursed under federal and state government assistance

2  programs, such as Medicare and Medicaid, among others.

3       16.     Defendant Sicor, Inc. ("Sicor") and Gensia Sicor Pharmaceuticals, Inc. ("Gensia")

4  are manufacturers, sellers and distributers of, among other things, prescription drugs used in the

5  treatment of cancer, among other prescription drugs [hereinafter the "Sicor Defendants"]. It is

6  believed and therefore averred that the Sicor Defendants engaged in unlawful conduct similar to that

7  of the other Defendants with respect to their marketing, promotion, sales and distribution of

8  prescription drugs which treat cancer, and other prescription drugs, that are reimbursed under federal

9  and state government assistance programs, such as Medicare and Medicaid, among others.

10       17.     Defendant Dey, Inc. ("Dey") is a manufacturer, distributor and seller of, among other

11  things, prescription drugs used in the treatment of cancer, among other prescription drugs

12  [hereinafter the "Dey Defendant"]. It is believed and therefore averred that the Dey Defendant

13  engaged in unlawful conduct similar to that of the other Defendants with respect to their marketing,

14  promotion, sales and distribution of prescription drugs which treat cancer, and other prescription

15  drugs, that are reimbursed under federal and state government assistance programs, such as Medicare

16  and Medicaid, among others.

17       18.     Defendants Fujisawa Healthcare, Inc. ("Fujisawa") and Fujisawa USA, Inc.

18  ("Fujisawa USA") are manufacturers, distributors and sellers of, among other things, prescription

19  drugs used in the treatment of cancer, among other prescription drugs [hereinafter the "Fujisawa

20  Defendants"]. It is believed and therefore averred that the Fujisawa Defendants engaged in unlawful

21  conduct similar to that of the other Defendants with respect to their marketing, promotion, sales and

22  distribution of prescription drugs which treat cancer, and other prescription drugs, that are

23  reimbursed under federal and state government assistance programs, such as Medicare and Medicaid,

24  among others.

25       19.     Defendants, Jett and Coleman, at times material hereto, were employees and sales

26  representatives of Indigo, a wholly-owned subsidiary company of Defendants, J&J and Ethicon.

27  Defendant, Hidalgo, at all times material hereto, was either an employee of TAP or Indigo.

28

1  Defendant, Amanda Hidalgo, the wife of Scott Hidalgo, at all times material hereto, was an

2  employee of Defendant TAP. Defendant Gendelman, at all times material hereto, was either an

3  employee of TAP or Indigo. Defendant Hack, at all times material hereto, was the owner and

4  operator of Oncology Solutions a/k/a International Oncology Network, the nation's largest

5  community based oncologist network. These Defendants [hereinafter collectively referred to as the

6  "Individual Defendants"], with the exception of Amanda Hidalgo and Defendant Gendelman, all

7  pled guilty to a one-count Criminal Information charging the same conspiracy in connection with

8  a violation of the PDMA (unlicensed wholesaling of prescription drugs). In particular, these

9  Individual Defendants pled guilty to, *inter alia*, assisting in a conspiracy with other Defendants

10  involving the unlawful distribution and diversion of Lupron® by physicians to circumvent efforts by

11  Medicare to reduce the reimbursement costs of prescription prostate cancer drugs. Such efforts

12  culminated in a program known as Least Costly Alternative ("LCA"). These Individual Defendants,

13  excepting Amanda Hidalgo and Defendant Gendelman, also pled guilty to receiving kickbacks for

14  their efforts in furtherance of the conspiracy.

15      20.    In addition to the above-named Individual Defendants, several current and former

16  employees of TAP have been charged by the United States Department of Justice ("DOJ") with

17  various crimes as part of the overall conspiracy alleged herein. Charged with conspiracy were:

18          a.    Kimberlee Chase of Dedham, Massachusetts, formerly a District Manager

19              employed by TAP;

20          b.    Janice M. Swirski of Chestnut Hill, Massachusetts, formerly a National

21              Account Manager employed by TAP;

22          c.    Donna Tom of New York, New York, formerly a District Manager employed

23              by TAP;

24          d.    David Guido of Quaker Hill, Connecticut, currently a Hospital Account

25              Executive employed by TAP;

26          e.    Henry Van Mourik of Roseville, California, currently a District Manager

27              employed by TAP; and

28

f.      Alan MacKenzie of Barrington, Illinois, formerly Vice President of Sales for TAP.

These Defendants, along with Scott Hidalgo, Amanda Hidalgo and Michael Gendelman, [hereinafter collectively referred to as the "TAP Employee Defendants"] were all directly involved in the fraudulent scheme and violations alleged herein. Further charges were leveled against certain of these individuals as follows: Ms. Chase was charged with 63 counts involving illegal kickbacks and aiding and abetting; Ms. Swirski was likewise charged with providing illegal kickbacks.

21.     Defendant, Amanda Hidalgo, though not charged or indicted as part of the overall conspiracy, is believed and therefore averred to have arranged for, facilitated and otherwise participated in the same aspects of the conspiracy to which the Individual Defendants pled guilty and for which the TAP Employee Defendants were indicted.

22.     Defendants, Scott Hidalgo and Michael Gendelman, at all times material hereto, were employees of Defendants TAP or Indigo. Though not indicted, it is believed and therefore averred that Gendelman, like Hidalgo, arranged for, facilitated and otherwise participated in the same aspects of the conspiracy to which the Individual Defendants pled guilty and for which the TAP Employee Defendants were indicted.

23.     Because of the unlawful conduct of all these Defendants, Plaintiff and the members of the Class paid artificially inflated prices for cancer drugs and other prescription drugs.

24.     During the period from at least 1991 through the present, the exact dates of which are unknown by Plaintiff at this time, Defendants created and implemented a fraudulent marketing, pricing, sales and distribution scheme to defraud cancer patients and other consumers of prescription drugs by substantially increasing the sales of these drugs and reaping unlawful profits at the expense of patients who took these drugs and paid for them. Among other things, Defendants systematically, among themselves and with other entities and individuals, created a pervasive illegal system to cause patients on cancer and other prescription drugs to overpay substantial amounts of money for the specific purpose of increasing the market share of these drugs and maximizing their profits at the expense of Plaintiff and the Class. The improper marketing, pricing, sales and distribution practices

relate to, *inter alia*, the following: (a) deliberately overstating the average wholesale price ("AWP") for cancer and other prescription drugs, the rate upon which reimbursements under government assistance and certain private insurance programs are set, including the co-payment portions paid by Government Assistance Patients and Private Assistance Patients, so that the government (through Medicare, Medicaid, TRICARE and other programs), private insurers (through private insurance programs) and Government and Private Assistance Patients, including Plaintiff, paid artificially inflated amounts of money for cancer and other prescription drugs; (b) providing and distributing free samples of cancer and other prescription drugs to medical providers and instructing them that they could and should bill government and private assistance programs, and Government, Private and No Assistance Patients on cancer and other prescription drugs, for such free samples; (c) providing other unlawful financial inducements to medical providers to prescribe cancer and other prescription drugs, causing Plaintiff and members of the Class to pay artificially inflated prices for these and other drugs; and (d) working in concert with each other and others to circumvent efforts by government assistance programs like Medicare and Medicaid to reduce prescription drug costs, including actively working to circumvent and oppose the implementation of least costly alternative ("LCA") cost saving measures in various states, including Arizona, by Medicare intermediaries.

25.     On or before October 3, 2001, the Lupron® Manufacturer Defendants, through Defendant TAP, agreed to plead guilty to having fraudulently marketed and distributed Lupron®. In particular, Defendants Abbott and Takeda, by and through their joint venture, TAP, agreed to plead guilty to a conspiracy to violate the PDMA and agreed to pay a $290 million criminal fine, the largest criminal fine ever in a U.S. health-care fraud prosecution case, according to the United States Department of Justice. Additionally, the Lupron® Manufacturer Defendants agreed to settle criminal and civil claims brought by the federal government for $875 million, which amount consisted of the $290 million criminal fine, $559.5 million in civil liabilities for filing false and fraudulent claims, and $25.5 million in civil liabilities to fifty states and the District of Columbia. (Because of an interest provision in the Civil Settlement Agreement, which required these Defendants to pay interest

1   on the civil settlement commencing on September 4, 2001, the total amount they paid exceeded $884

2   million).

3        26.     The Lupron® Manufacturer Defendants, along with other Corporate Defendants,

4   engaged in a practice of deliberately inflating the AWPs for prostate cancer drugs and other

5   prescription drugs. The AWP is used by government assistance programs, like Medicare and

6   Medicaid, and private assistance programs, for reimbursement. By deliberately inflating the AWP

7   above the actual acquisition cost to the medical provider, the prescription drug manufacturer

8   Defendants created a "spread" consisting of the difference between what these Defendants set as the

9   AWP and the actual price paid by medical providers and others. Such spreads were used by these

10   Defendants to create a profit-based incentive for medical providers to prescribe cancer and other

11   prescription drugs.

12        27.     The scheme allowed the Lupron® Manufacturer Defendants, and other Defendants,

13   to control, as part of their sales, marketing and distribution strategies, how much reimbursement

14   would be made under government and private assistance programs for cancer and other prescription

15   drugs. These Defendants deliberately marketed and promoted the sale of cancer and other

16   prescription drugs based on the availability of inflated payments made by government and private

17   assistance programs and their beneficiaries. The inflated payments – the amount by which AWP set

18   by the Corporate Defendants exceeded the actual cost of their prescription drugs to the medical

19   provider – were often referred to by the Defendants in internal documents as a "spread," "Return To

20   Practice," "return on investment," and "profit." The Defendants even prepared side-by-side

21   comparisons of the spreads available on their drugs versus their competitor's drugs. These

22   comparisons were used as a marketing and sales pitch to medical providers. As a result, senior

23   citizens, patients with cancer and many other consumers who took the prescription drugs

24   manufactured, distributed and sold by the Defendants, and paid some or all of the cost of the drug

25   which cost was based in whole or in part on inflated AWPs, have paid millions of dollars in inflated

26   drug prices.

27

28

28.    Twenty percent (20%) or more of these inflated drug prices comes directly out of the pockets of Plaintiff and Government Assistance Patient Class members through co-payments and deductibles.  Medicare requires a 20% co-payment for cancer drugs and other prescription drugs, while TRICARE/CHAMPUS requires a 25% co-payment.

29.    Others who took cancer drugs and other prescription drugs, namely, Private Assistance Patients, who may not have been covered by any government assistance programs, but were covered by certain private assistance programs, likewise paid a percentage portion of the inflated cost of the drugs.

30.    Finally, No Assistance Patients, who took cancer drugs and other prescription drugs, but were not covered by either government or private assistance programs, paid substantially more than 20% of the inflated cost of the drugs.  Indeed, some of these No Assistance Patients paid the full inflated cost of these drugs.

31.    Defendants' fraudulent scheme also involved providing free samples to medical providers and others and encouraging them to bill their Government Assistance, Private Assistance, and No Assistance Patients for such free samples.  Such conduct is not only fraudulent, it is criminal. The Lupron® Manufacturer Defendants admitted the criminality of their involvement in such fraudulent conduct by TAP pleading guilty to having provided free samples to medical providers and having conspired with medical providers to charge patients for such free samples.  As a result, Government, Private and No Assistance Patients paid the full cost for Lupron® (and other cancer and other prescription drugs) that should have been free.

32.    In addition, as set forth more fully below, other Defendants provided free samples of their drugs to medical providers and others for which members of the Class were charged.  For instance, a doctor in Holmdel, New Jersey, Dr. Saad Antoun, was indicted and pleaded guilty to having received free samples of Zoladex® from the AstraZeneca Defendants and charging his patients for them.  Similarly, a company named National Medical Care pled guilty to having received free samples of Epogen® from Amgen and billing Medicare and Medicare patients for these drugs.

33.     In addition to the above-named Defendants, several urologists have pleaded guilty to federal Criminal Informations charging them with participating in the conspiracy with TAP and other Defendants to defraud government assistance programs, and ultimately Plaintiff and the Class, regarding the marketing, sale and distribution of cancer and other prescription drugs.  At the time of this Complaint, the following medical providers have all been indicted, and most of which have pleaded guilty to participation in the conspiracy to, *inter alia*, defraud government assistance programs and their beneficiaries, including Plaintiff and the Class:

        a.     Dr. John Romano of Plymouth, Massachusetts;

        b.     Dr. Joel S. Olstein of Lewiston, Maine;

        c.     Dr. Rodney Mannion of LaPorte and Michigan City, Indiana;

        d.     Dr. Jacob Zamstein of Bloomfield, Connecticut;

        e.     Dr. Joseph Spinella of Bristol, Connecticut;

        f.     Dr. Elias J. Jacobo of Winter Park, Florida;

        g.     Dr. Steven K. Brooks of Longwood, Florida; and

        h.     Dr. Saad Antoun of Holmdel, New Jersey.

34.     According to the various Informations, both the Lupron® Manufacturer Defendants and the AstraZeneca Defendants provided medical providers, such as those listed above, with free samples and other financial incentives as inducements to increase the usage of Lupron® and Zoladex®. *See, e.g., United States of America v. Spinella,* (D. Mass. Dec. 8, 2000); *United States of America v. Mannion,* (D. Mass. Feb. 28, 2000); *United States of America v. Zamstein,* (D. Mass. Nov. 3, 2000); *United States of America v. Olstein,* (D. Mass. April 11, 2001) ("Criminal Informations"); *United States of America v. Antoun,* No. 02-CR-13-ALL (D. Del., Jan. 15, 2002) ("Criminal Informations").

35.     Such inducements caused medical providers to prescribe Lupron® or Zoladex® for their patients over competitor drugs, and over potentially alternative courses of treatment for their patients' prostate cancers, such as orchiectomy.  Once these medical providers switched their patients to Lupron® or Zoladex®, they then charged their patients the AWP for these drugs for future

1   injections. As a result, the Lupron® Manufacturer and AstraZeneca Defendants profited from greater

2   sales of Lupron® and Zoladex®, while medical providers profited from the spreads between the

3   AWPs for Lupron® and Zoladex® and the actual cost they paid for the drugs.  It is believed and

4   therefore averred that the other Corporate Defendants engaged in similar conduct to induce medical

5   providers to prescribe their drugs over competitor drugs, and over potentially alternative courses of

6   treatment.

7       36.     The United States Government, in its criminal investigation of these Defendants, has

8   sought to recover only its portion of the fraudulent charges, which represents between 75-80% of the

9   overpayments caused by those Defendants to government assistance program recipients, depending

10  on the program.  For instance, CHAMPUS provided reimbursement of 75% of the cost of cancer and

11  other prescription drugs while Medicare provided reimbursement of 80% of the cost.

12      37.     Absent this litigation, neither Plaintiff nor Government Assistance Patients would

13  recover from Defendants the remaining 20-25% overpayments they made through co-payment and/or

14  deductible amounts they paid for cancer and other prescription drugs.  In addition, absent this

15  litigation, Private Assistance Patient members of the Class, who also suffered as a result of being

16  overcharged for cancer and other prescription drugs, would not recover.  Finally, absent this

17  litigation, No Assistance Patient members of the Class, who paid up to the full price for cancer and

18  other prescription drugs, would not recover.

19      38.     Furthermore, absent this litigation, Plaintiff and Government, Private and No

20  Assistance Patient members of the Class, who may have paid for free samples of cancer and other

21  prescription drugs, as a result of the wrongful inducement to medical providers by the Defendants,

22  would not recover.

23      39.     The Plaintiff has asserted claims under the common law and statutes of Arizona.

24                              **JURISDICTION AND VENUE**

25      40.     Plaintiff brings this action pursuant to consumer protection and antitrust statutes of

26  Arizona, as well as the Arizona common law.  No aspect of the claims asserted in this Class Action

27  Complaint is brought pursuant to federal law and no federal question is raised by any of the claims

28

asserted. This Court has subject matter jurisdiction because this is an action for damages which, in the aggregate, exceeds $10,000.00 exclusive of interest, costs and attorneys' fees. However, the claims of the named Plaintiff do not exceed $74,999.00. All claims for individual damages of the named Plaintiff in excess of $74,999.00 are hereby expressly disclaimed.

41.     This Court has jurisdiction over the Corporate Defendants because they are corporations regulated under the laws of the State of Arizona and do sufficient business in, have sufficient minimum contacts with, or otherwise intentionally avail themselves of the markets of the State of Arizona through the promotion, marketing, sale, and distribution of drugs and products in Arizona.

42.     This Court has jurisdiction over the Individual Defendants because they are individuals who have sufficient minimum contacts with or otherwise purposefully have availed themselves of the markets of the State of Arizona, and/or are employed by corporations regulated under the laws of the State of Arizona and which do sufficient business in, have sufficient minimum contacts with, or otherwise intentionally avail themselves of the markets of the State of Arizona through the promotion, marketing, sale, distribution and use of cancer and other prescription drugs and medical products in Arizona, as set forth more fully herein.

43.     Venue is proper in this Court since Plaintiff, as well as numerous Class members, purchased cancer and other prescription drugs from doctors and hospitals located in this County and throughout Arizona, and otherwise engaged in the transactions which form the basis of this action by having paid for these drugs. Plaintiff, Robert J. Swanston, is a resident of Maricopa County.

**PARTIES**

44.     Plaintiff, Robert J. Swanston, is an individual and resident of the State of Arizona who resides in Wickenburg, Maricopa County, Arizona. Mr. Swanston was recently diagnosed with prostate cancer and has been prescribed and has taken Lupron® for the treatment of his condition, among other drugs. Since early 2000, he has made several purchases of Lupron® in Arizona for his treatment and was charged and paid the AWP for Lupron® each time. Mr. Swanston has medical assistance which pays for 80% of his Lupron® prescription purchases. The remaining 20% co-

1   payment has been paid directly by Mr. Swanston. Accordingly, Mr. Swanston suffered direct injury

2   and damages as a result of the unlawful conduct of all the Defendants set forth herein.

3       45.     Defendant, Abbott Laboratories ("Abbott"), is a highly diversified health care

4   corporation the principal business of which is the discovery, development, manufacture, and sale of

5   a broad and diversified line of health care products and services. Abbott's business includes

6   pharmaceuticals, nutritionals, hospital products, and diagnostics. Abbott's world headquarters is

7   located in Abbott Park, Illinois. The company employs over 60,000 people and reported sales of

8   $13.7 billion for the fiscal year ending December 31, 2000. Abbott manufactures, markets, sells and

9   distributes numerous prescription drugs, drugs which are sold throughout Arizona and the United

10  States. Moreover, Abbott distributes Lupron® and has participated in the fraudulent marketing and

11  sales scheme and conspiracy alleged herein.

12      46.     Defendant, Takeda Chemical Industries LTD ("Takeda"), is Japan's largest

13  pharmaceutical company and is among the largest in the world. Headquartered in Osaka, Japan,

14  Takeda discovers, develops, manufactures and markets a broad range of pharmaceutical products.

15  Takeda Pharmaceuticals America was created to take advantage of Takeda's growing, international

16  pharmaceutical presence. Takeda Pharmaceuticals America's U.S. headquarters is in Lincolnshire,

17  Illinois. Takeda's net sales for fiscal year ending 1999 were $8.7 billion. Takeda manufactures,

18  markets, sells and distributes numerous prescription drugs, vitamins and pharmaceutical products

19  throughout Arizona and the United States. Moreover, Takeda manufactures and ships Lupron® to

20  the United States and has participated in the fraudulent marketing and sales scheme and conspiracy

21  alleged herein.

22      47.     Defendant, TAP Pharmaceutical Products Inc. ("TAP"), is a partnership between

23  Takeda and Abbott. TAP's United States headquarters is located at 675 North Field Drive, Lake

24  Forest, Illinois 60045. Under a partnership agreement between Abbott and Takeda, TAP (owned 50

25  percent by Abbott and 50 percent by Takeda), together with its subsidiary, TAP Pharmaceuticals,

26  Inc., develops and markets pharmaceutical products for the United States and Canada. One of these

27  products is leuprolide acetate (for depot suspension), a synthetic nonapeptide analog of naturally

28

occurring gonadotropin-releasing hormone (Gn RH or LH-RH). The brand name for the drug is Lupron® or Lupron® Depot® (a sustained release form of Lupron®) (collectively referred to herein as "Lupron®"). TAP has participated in the fraudulent marketing and sales scheme and conspiracy alleged herein.

48.     Zeneca, Inc. ("Zeneca") is a Delaware corporation with its principal place of business at 1800 Concord Pike, Wilmington, Delaware 19850. Until April 1999, Zeneca was a subsidiary of Zeneca Group PLC (UK). Zeneca, Inc. researches, develops, and produces medicines for use in seven therapeutic areas: cardiovascular, central nervous system, gastrointestinal, infection, oncology, pain control and anaesthesia, and respiratory.

49.     Defendant, AstraZeneca Pharmaceuticals LP ("AstraZeneca Pharmaceuticals"), is a Delaware limited partnership with its headquarters located at 1800 Concord Pike, Wilmington, Delaware 19850. AstraZeneca Pharmaceutical LP is a developer and manufacturer of generic and brand name pharmaceutical drugs. AstraZeneca Pharmaceuticals LP manufactures, sells and distributes Zoladex® in the United States, including Arizona.

50.     Defendant, AstraZeneca LP, is a limited partnership with its principal place of business at 725 Chesterbrook Blvd., Wayne, Pennsylvania 19087. AstraZeneca LP maintains an additional facility in Westborough, Massachusetts. AstraZeneca LP is a developer and manufacturer of generic and brand name pharmaceutical drugs. Defendants Zeneca, AstraZeneca PLC, AstraZeneca Pharmaceuticals and AstraZeneca LP are collectively referred to herein as the "AstraZeneca Defendants." The AstraZeneca Defendants have participated in the fraudulent marketing and sales scheme and conspiracy alleged herein.

51.     Defendant, AstraZeneca PLC, the third largest pharmaceutical company in the world, is a British corporation with its corporate headquarters, located at 15 Stanhope Gate, London W1K 1LN, U.K. AstraZeneca PLC was formed on April 6, 1999 through the merger of Astra AB of Sweden and Zeneca Group PLC of the United Kingdom. One of Zeneca Group PLC's key products, which it brought with it to the merger, was Zoladex® (goserelin acetate). Zoladex® is used in the palliative treatment of prostate cancer, among other things, and is the bioequivalent of Lupron®.

AstraZeneca PLC researches, develops, and produces medicines for use in seven therapeutic areas: cardiovascular, central nervous system, gastrointestinal, infection, oncology, pain control and anaesthesia, and respiratory. AstraZeneca PLC is a developer and manufacturer of generic and brand name pharmaceutical drugs.

52.     Defendant, Pharmacia Corporation ("Pharmacia"), is a United States corporation located at 100 Route 206 North, Peapack, New Jersey 02977. Pharmacia was created in April 2000 through the merger of Pharmacia & Upjohn ("P&U") with Monsanto Company ("Monsanto") and its G.D. Searle ("Searle") unit. Pharmacia, P&U, Monsanto and Searle are collectively referred to herein as the "Pharmacia Defendants." Pharmacia manufactures, sells and distributes Trelstar™ Depot (triptorelin pamoate), which is used in the palliative treatment of advanced prostate cancer. The Pharmacia Defendants have participated in the fraudulent marketing and sales scheme and conspiracy alleged herein.

53.     Defendant, G. D. Searle Company a/k/a G. D. Searle & Co. ("Searle"), is a Delaware corporation with its principal place of business located at 5200 Old Orchard Road, Skokie, Illinois, 60077. Searle became a subsidiary of Pharmacia in the 1999 Monsanto-Pharmacia & Upjohn merger. Searle manufactures, distributes and sells pharmaceutical drugs. Searle has participated in the fraudulent marketing and sales scheme alleged herein.

54.     Defendant, Johnson & Johnson ("J&J"), is a highly diversified health care corporation organized and existing under the laws of the State of New Jersey with a principal place of business and corporate headquarters located at One Johnson & Johnson Plaza, New Brunswick, New Jersey 08933. At all times material hereto, J&J, by and through its wholly-owned subsidiary companies, Ethicon and Indigo, and their respective officers, directors, employees and agents, including, at various times, Individual Defendants, Jett, Coleman, Hidalgo and Gendelman, was in the business of manufacturing, promoting, marketing, distributing and selling healthcare products and services to medical providers, among others. J&J, by and through its subsidiary companies and employees, has participated in the fraudulent marketing and sales scheme and conspiracy alleged herein.

55. Defendant, Ethicon Endo-Surgery, Inc. ("Ethicon"), a wholly-owned subsidiary of J&J, is a corporation organized and existing under the laws of the State of Ohio with a principal place of business and corporate headquarters at 4545 Creek Road, Cincinnati 45242. In 1996, Ethicon acquired Indigo Medical, Inc., a urology device company that manufactures and sells the Indigo LASEROPTIC Treatment System for BPH. At all times material hereto, it is believed and therefore averred that Ethicon, by and through its wholly-owned subsidiary company Indigo Laser Corp., and its officers, directors, employees and agents, including, at various times, Individual Defendants, Jett, Coleman, Hidalgo and Gendelman, was in the business of manufacturing, promoting, marketing, distributing and selling healthcare products and services to medical providers, among others. In addition, Ethicon, by and through its subsidiaries and employees, has participated in the fraudulent marketing and sales scheme alleged herein.

56. Defendant, Indigo Laser Corporation ("Indigo"), a wholly-owned subsidiary of Ethicon and J&J, is a corporation organized and existing under the laws of the State of Ohio with a principal place of business and corporate headquarters in Cincinnati, Ohio. In 1996, Indigo's predecessor, Indigo Medical, Inc., was acquired by Ethicon. At all times material hereto, it is believed and therefore averred that Indigo, by and through its officers, directors, employees and agents, including, at various times, Individual Defendants, Jett, Coleman, Hidalgo and Gendelman, was in the business of manufacturing, promoting, marketing, distributing and selling healthcare products and services to medical providers, among others. In addition, Indigo, by and through its employees, has participated in the fraudulent marketing and sales scheme alleged herein.

57. Defendant Alza Corporation ("Alza"), a wholly-owned subsidiary company of Defendant J&J as of June 22, 2001, has its corporate headquarters in Mountain View, California. Alza manufacturers, licenses and distributes Viadur®, a bioequivalent drug to Lupron® which is used in the treatment of prostate cancer, among other prescription drugs and medical products, which is sold by Defendant Bayer. The J&J Lupron® Defendants along with Ortho, Centocor and Alza are collectively referred to here in as the "J&J Defendants." The J&J Defendants have participated in the fraudulent marketing and sales scheme and conspiracy alleged herein.

58.     Defendant, Centocor, Inc. ("Centocor"), is a Pennsylvania corporation and has been a wholly owned subsidiary of Defendant J&J since its acquisition by J&J in October 1999. Centocor's principal place of business is located at 244 Great Valley Parkway, Malvern, Pennsylvania, 19355-1312. Centocor manufactures, distributes, markets and sells prescription drugs to providers nationwide, including pharmaceuticals that are the subject of the scheme alleged herein.

59.     Defendant, Ortho Biotech, Inc. ("Ortho") is a New Jersey corporation and has been a wholly owned subsidiary of Defendant J&J since its formation by J&J in 1990. Ortho's principal place of business is located at 700 U.S. Highway, Route 202 South, Raritan, New Jersey, 08869. Ortho is a biotechnology company. Ortho manufactures, distributes, markets and sells prescription drugs to providers nationwide, including pharmaceuticals that are the subject of the scheme alleged herein.

60.     Defendant, Bayer Corporation ("Bayer") is a highly diversified health care company whose principal business is the development, manufacture and sale of health care products and services, including pharmaceuticals. Bayer is located at 100 Bayer Rd., Pittsburgh, Pennsylvania, 15205-9741. Bayer conducts extensive business, including the sale of pharmaceuticals that are the subject of the scheme alleged herein. Bayer AG is the parent company of Bayer, the subsidiary in the United States that markets, sells and distributes prescription drugs to clinicians nationwide. In particular, Bayer markets, sells, and distributes Viadur®. Bayer has participated in the fraudulent marketing and sales scheme and conspiracy alleged herein.

61.     Defendant, Wyeth ("Wyeth"), formerly American Home Products Corporation, is a Delaware corporation with its principal place of business located at Five Giralda Farms, Madison, New Jersey, 07940. Wyeth manufactures, markets, and distributes pharmaceutical drugs that are the subject of the alleged scheme herein.

62.     Defendant, Wyeth Pharmaceuticals ("Wyeth Pharmaceuticals") formerly Wyeth-Ayerst Laboratories, is a New York corporation with its headquarters located at 500 Arcola Road, Collegeville, Pennsylvania, 19426. Wyeth Pharmaceuticals manufactures, markets, distributes and sells pharmaceutical drugs that are the subject of the alleged scheme herein. Defendants Wyeth and