1   Wyeth Pharmaceuticals are collectively referred to herein as the "Wyeth Defendants." The Wyeth

2   Defendants have participated in the fraudulent marketing and sales scheme and conspiracy alleged

3   herein.

4         63.     Defendant Amgen, Inc. ("Amgen") is a California corporation with its principal place

5   of business at One Amgen Center Drive, Thousand Oaks, California, 91320-1799. Amgen is a

6   biotechnology company that develops, manufactures, distributes, markets and sells pharmaceutical

7   drugs. Amgen conducts extensive business, including the sale of pharmaceuticals that one the

8   subject of the scheme alleged herein.

9         64.     Defendant, Immunex Corporation ("Immunex") is a biopharmaceutical company with

10  its principal place of business located at 51 University Street, Seattle, Washington, 98101. Immunex

11  was acquired by Amgen, Inc. on July 15, 2002. Immunex manufactures, distributes and sells

12  pharmaceutical drugs that are the subject of the alleged scheme herein. Amgen and Immunex are

13  collectively referred to herein as the "Amgen Defendants." The Amgen Defendants have

14  participated in the fraudulent marketing and sales scheme and conspiracy alleged herein.

15        65.     Defendant, Aventis Pharmaceuticals, Inc. ("Aventis"), is a Delaware corporation with

16  its corporation headquarters at 300 Somerset Corporate Boulevard, Bridgewater, New Jersey, 08807-

17  2854. Aventis was formerly known as Hoechst Marion Roussel, Inc. ("Hoechst") Aventis is the

18  United States pharmaceutical business of Aventis S.A. Aventis S.A. was created on December 15,

19  1999 through the merger of Hoechst A.G. and Rhône-Poulenc S.A. Also on this date, the

20  subsidiaries of Hoechst A.G. and Rhône-Poulenc S.A., Hoechst Marion Roussel A.G. and Rhône-

21  Poulenc Rorer Inc. formed Aventis Pharma A.G. The United States pharmaceutical business of

22  Aventis Pharma A.G. is Aventis Pharmaceuticals, Inc. Aventis manufactures and distributes cancer

23  drugs, among other prescription drugs. Aventis conducts extensive business, including the sale of

24  pharmaceuticals that are the subject of the scheme alleged herein.

25        66.     Defendant, Aventis Behring L.L.C. ("Aventis Behring"), is an Illinois limited liability

26  corporation with its principal place of business at 1020 First Avenue, King of Prussia, Pennsylvania,

27

28

19406. Behring was formerly known as Centeon, L.L.C. Aventis Behring conducts extensive business, including the sale of pharmaceuticals that are the subject of the scheme alleged herein.

67. Defendant Hoechst Marion Roussel, Inc. ("Hoechst"), prior to its acquisition by Defendant Aventis, was a Delaware corporation with its principal place of business located at 10236 Marion Park Drive, Kansas City, Missouri, 64137-1405. Aventis, Behring and Hoechst are collectively referred to herein as the "Aventis Defendants." The Aventis Defendants have participated in the fraudulent marketing and sales scheme and conspiracy alleged herein.

68. Defendant, Baxter International Inc. ("Baxter") is a Delaware corporation with its principal place of business at One Baxter Parkway, Deerfield, Illinois, 60015. Baxter manufactures and distributes prescription drugs to clinical administrators. Baxter is a global medical products company that, *inter alia*, develops, manufactures, markets and/or distributes drugs to treat cancer, trauma, hemophilia, immune deficiencies, infectious diseases, kidney disease and other disorders.

69. Defendant, Baxter Healthcare Corporation ("Baxter Healthcare") is the principal domestic operating subsidiary of Baxter International. Baxter Healthcare is a global medical products and services company with emphasis on blood therapies, cardiovascular medicine, medication delivery and renal therapy. Baxter and Baxter Healthcare are collectively referred to herein as the "Baxter Defendants." The Baxter Defendants have participated in the fraudulent marketing and sales scheme and conspiracy alleged herein.

70. Defendant, Boehringer Ingelheim Corporation ("Boehringer") is a Nevada corporation with its principal place of business located at 900 Ridgebury Road, Ridgefield, Connecticut, 06877. Boehringer designs, manufactures, markets and distributes pharmaceuticals that are the subject of the scheme alleged herein.

71. Defendant, Ben Venue Laboratories, Inc. ("Ben Venue") is a Delaware corporation with its principal place of business at 300 Northfield Road, Bedford, Ohio, 44146. Ben Venue is a contract developer and manufacturer of pharmaceuticals and produces generic injectable pharmaceuticals through its Bedford Laboratories division. Boehringer Ingelheim Corporation, of Ridgefield, Connecticut, the United States subsidiary of Boehringer Ingelheim, Germany acquired

1  Ben Venue in December, 1997. Ben Venue conducts extensive business, including the sale of

2  pharmaceuticals that are the subject of the scheme alleged herein.

3        72.    Defendant, Bedford Laboratories ("Bedford") is a division of Ben Venue

4  Laboratories, Inc. a Boehringer Ingelheim Company, with its principal place of business at 300

5  Northfield Road, Bedford, Ohio, 44146. Bedford manufactures and distributes pharmaceuticals,

6  including pharmaceuticals that are the subject of the scheme alleged herein.

7        73.    Defendant, Roxane Laboratories, Inc. ("Roxane") is a subsidiary of Boehringer with

8  its principal place of business located at Post Office Box 16532, Columbus, Ohio, 43216-6532.

9  Roxane manufactures markets and distributes pharmaceuticals, including pharmaceuticals that are

10  the subject of the scheme alleged herein. Boehringer, Ben Venue, Bedford and Roxane are

11  collectively referred to herein as the "Boehringer Defendants." The Boehringer Defendants have

12  participated in the fraudulent marketing and sales scheme and conspiracy alleged herein.

13        74.    Defendant, Bristol-Myers Squibb Company ("Bristol-Myers") is a Delaware

14  corporation with its principal place of business located at 345 Park Avenue, New York, New York,

15  10154. Bristol-Myers is a pharmaceutical and related health care products company. Bristol-Myers

16  manufactures, markets, sells and distributes cancer drugs, among other prescription drugs. Bristol-

17  Myers conducts extensive business, including the sale of pharmaceuticals that are the subject of the

18  scheme alleged herein.

19        75.    Defendant, Oncology Therapeutics Network Corporation ("OTN") is a Delaware

20  corporation with its principal place of business located at 395 Oyster Point Boulevard, Suite 405,

21  South San Francisco, California, 94080. OTN is a wholly owned subsidiary of Bristol-Myers Squibb

22  and distributes cancer drugs, products and services to office based oncology practices.

23        76.    Defendant, Apothecon, Inc. ("Apothecon") is a division of Bristol-Myers Squibb with

24  its principal place of business at 777 Scudders Mill Road, Plainsboro, New Jersey, 08536.

25  Apothecon manufactures pharmaceutical drugs that are the subject of the alleged scheme herein.

26  Bristol-Myers, OTN and Apothecon are collectively referred to herein as the "Bristol-Myers

27

28

1     Defendants." The Bristol-Myers Defendants have participated in the fraudulent marketing and sales

2     scheme and conspiracy alleged herein.

3          77.      Defendant, Fujisawa Healthcare, Inc. ("Fujisawa Healthcare"), is a Delaware

4     corporation with its principal place of business located at 3 Parkway North, Deerfield, Illinois,

5     60015. Fujisawa Healthcare is a wholly owned subsidiary of Fujisawa Pharmaceutical Co., Ltd.,

6     Osaka, Japan. Fujisawa Healthcare is a pharmaceutical manufacturer with business concentrations

7     in therapeutics, transplantation, anti-infectives, dermatology and cardiovascular care, among others.

8          78.      Defendant Fujisawa USA, Inc. ("Fujisawa USA"), is a Delaware corporation with its

9     principal place of business located at 3 Parkway North, Deerfield, Illinois, 60015. Fujisawa USA

10     is a wholly-owned subsidiary of Fujisawa Pharmaceutical Co., Ltd., Osaka, Japan. In 1998, Fujisawa

11     Healthcare assumed responsibility for Fujisawa USA's portfolio of proprietary products. Defendants

12     Fujisawa Healthcare and Fujisawa USA are collectively referred to herein as the Fujisawa

13     Defendants. The Fujisawa Defendants have participated in the fraudulent marketing and scheme and

14     conspiracy alleged herein.

15          79.      Defendant, GlaxoSmithKline, P.L.C. ("GlaxoSmithKline") is an English public

16     limited company incorporated on December 6, 1999 under English law, with its corporate

17     headquarters located at 980 Great West Road, Brentford, Middlesex, TW8 9GS, England.

18     GlaxoSmithKline P.L.C. was formed on December 27, 2000 with the merger of Glaxo Wellcome,

19     P.L.C. and SmithKline Beecham, P.L.C., both English public limited companies. GlaxoSmithKline

20     P.L.C. has its operational headquarters at One Franklin Plaza, 200 North 16th Street, Philadelphia,

21     Pennsylvania, 19102, and at Research Triangle Park, North Carolina, 27709. GlaxoSmithKline

22     conducts extensive business, including the sale of pharmaceuticals that are the subject of the scheme

23     alleged herein.

24          80.      Defendant, SmithKline Beecham Corporation ("SmithKline"), a wholly owned

25     subsidiary of GlaxoSmithKline P.L.C. is a Pennsylvania corporation with its principal place of

26     business at One Franklin Plaza, 200 North 16th Street, Philadelphia, Pennsylvania, 19102.

27

28

1  SmithKline conducts extensive business, including the sale of pharmaceuticals that are the subject
2  of the scheme alleged herein.

3       81.    Defendant, Glaxo Wellcome, Inc. ("Glaxo") a wholly owned subsidiary of
4  GlaxoSmithKline P.L.C., is a North Carolina corporation with its principal place of business at 5
5  Moore Drive, Research Triangle Park, North Carolina, 27709. Glaxo conducts extensive business,
6  including the sale of pharmaceuticals that are the subject of the alleged scheme herein.
7  GlaxoSmithKline, SmithKline and Glaxo are collectively referred to herein as the "GlaxoSmithKline
8  Defendants." The GlaxoSmithKline Defendants have participated in the fraudulent marketing and
9  sales scheme and conspiracy alleged herein.

10       82.    Defendant, Schering-Plough Corporation ("Schering") is a New Jersey corporation
11  with its principal place of business located at 2000 Galloping Hill Road, Kenilworth, New Jersey,
12  07033. Schering manufactures and sells prescription drugs, including the sale of pharmaceuticals
13  that are the subject of the alleged scheme herein.

14       83.    Defendant, Warrick Pharmaceuticals Corporation ("Warrick") is a Delaware
15  corporation with its principal place of business located at 6100 Neil Road #500, Reno, Nevada,
16  89511. Warrick is a wholly owned subsidiary of Defendant Schering. Warrick manufactures and
17  sells prescription drugs, including the sale of pharmaceuticals that are the subject of the alleged
18  scheme herein. Defendants Schering and Warrick are collectively referred to herein as the "Schering
19  Defendants." The Schering Defendants have participated in the fraudulent marketing and sales
20  scheme and conspiracy alleged herein.

21       84.    Defendant, Sicor, Inc. ("Sicor"), is a Delaware corporation with its principal place
22  of business located at 19 Hughes, Irvine, California 92618. Sicor was created in 1997 with the
23  merger of Defendant Gensia, Inc., a finished dosage manufacturer and Rakepoll Holding, a
24  European-based supplier of active pharmaceutical company which manufactures, markets and sells
25  generic injectable pharmaceutical products.

26       85.    Defendant, Gensia Sicor Pharmaceuticals, Inc. ("Gensia"), is a Delaware corporation
27  with its principal place of business located at 17 Hughes, Irvine, California 92618. Defendant

1   Gensia is a wholly-owned subsidiary of Defendant Sicor and offers products in the fields of
2   oncology, cardiology and anesthesiology. Defendant Gensia formed a strategic alliance with
3   Defendant Abbott in 1999 to market and distribute oncology products in the United States. In March
4   2002, Defendants Sicor and Abbott restructured their agreement. Defendant Gensia develops,
5   manufactures, markets and sells injectable pharmaceuticals.

6   86.   Defendant, Dey, Inc. ("Dey"), is a Delaware corporation with its principal place of
7   business located at 2751 Napa Valley Corporate Drive, Napa, California, 94558. Dey manufactures,
8   distributes and sells pharmaceutical drugs. Dey has participated in the fraudulent marketing and
9   sales scheme and conspiracy alleged herein.

10   87.   Individual Defendant, David Jett, is an individual and resident of the State of South
11   Carolina who, at times material hereto, was employed as a sales representative of Indigo and/or the
12   J&J Defendants in and around Mount Pleasant, South Carolina. It is believed and therefore averred
13   that Defendant Jett is no longer employed by Indigo and/or the J&J Defendants. Jane Doe Jett is
14   believed to be the spouse of David Jett, and all acts of defendant Jett alleged herein are believed to
15   have been performed for the benefit of their marital community.

16   88.   Individual Defendant, Christopher Coleman, is an individual and resident of the State
17   of North Carolina who, at times material hereto, was employed as a sales representative of Indigo
18   and/or the J&J Defendants in and around Greensboro, North Carolina. It is believed and therefore
19   averred that Defendant Coleman is no longer employed by Indigo and/or the J&J Defendants. Jane
20   Doe Coleman is believed to be the spouse of Christopher Coleman, and all acts of defendant
21   Coleman alleged herein are believed to have been performed for the benefit of their marital
22   community.

23   89.   Individual Defendant, Scott Hidalgo, is an individual and resident of the State of
24   Florida who, at times material hereto, was employed by TAP. Thereafter, Defendant Hidalgo went
25   to work for Indigo and/or the J&J Defendants, where he continued to work until being terminated
26   by J&J earlier this year. Amanda Hidalgo is believed to be the spouse of Scott Hidalgo, and all acts
27   of defendant Hidalgo alleged herein are believed to have been performed for the benefit of their

28

marital community. In addition, Amanda Hidalgo, at times material hereto, was employed as a sales representative of TAP, and after her husband left TAP, she assumed the position her husband held in the fraud and conspiracy by, among other things, working with TAP and the Individual Defendants and others to cause them to unlawfully distribute Lupron® in violation of the PDMA.

90.    Individual Defendant, Michael Gendelman, is an individual and resident of the State of New Jersey who, at times material hereto, was employed by TAP.  Thereafter, Defendant Gendelman went to work for Indigo and/or the J&J Defendants, where he continues to work. Jane Doe Gendelman is believed to be the spouse of Defendant Gendelman, and all acts Defendant Gendelman alleged herein are believed to have been performed for the benefit of their marital community.

91.    Individual Defendant, Eddy James Hack, is an individual resident of the State of Florida who, at all times material hereto, was the owner and operator of Oncology Solutions, Inc., a nationwide, community-based, oncologist network. Jane Doe Hack  is believed to be the spouse of Eddy James Hack, and all acts of defendant Hack alleged herein are believed to have been performed for the benefit of their marital community.

92.    Employee Defendant, Kimberlee Chase, is an individual resident of the State of Massachusetts who, at times material hereto, was employed as an employee of TAP in the sales department. Defendant Chase is no longer employed by TAP. John Doe Chase is believed to be the spouse of Kimberlee Chase, and all acts of Defendant Chase alleged herein are believed to have been performed for the benefit of their material community.

93.    Employee Defendant, Janice M. Swirski, is an individual resident of the State of Massachusetts who, at times material hereto, was employed as an employee of TAP in the sales department. Defendant Swirski is no longer employed by TAP. John Doe Swirski is believed to be the spouse of Janice M. Swirski, and all acts of Defendant Swirski alleged herein are believed to have been performed for the benefit of their material community.

94.    Employee Defendant, Donna Tom, is an individual resident of the State of New York who, at times material hereto, was employed as an employee of TAP in the sales department.

1  Defendant Tom is no longer employed by TAP. John Doe Tom is believed to be the spouse of

2  Donna Tom, and all acts of Defendant Tom alleged herein are believed to have been performed for

3  the benefit of their material community.

4      95.    Employee Defendant, David Guido, is an individual resident of the State of

5  Connecticut who, at times material hereto, was employed as an employee of TAP in the sales

6  department. Defendant Guido is no longer employed by TAP. Jane Doe Guido is believed to be the

7  spouse of David Guido, and all acts of Defendant Guido alleged herein are believed to have been

8  performed for the benefit of their material community.

9      96.    Employee Defendant, Henry Van Mourik, is an individual resident of the State of

10  California who, at times material hereto, was employed as an employee of TAP in the sales

11  department. Defendant Van Mourik is no longer employed by TAP. Jane Doe Van Mourik is

12  believed to be the spouse of Henry Van Mourik, and all acts of Defendant Van Mourik alleged herein

13  are believed to have been performed for the benefit of their material community.

14      97.    Employee Defendant, Alan MacKenzie, is an individual resident of the State of

15  Illinois who, at times material hereto, was employed as an employee of TAP in the sales department.

16  Defendant MacKenzie is no longer employed by TAP. Jane Doe MacKenzie is believed to be the

17  spouse of Alan MacKenzie, and all acts of Defendant MacKenzie alleged herein are believed to have

18  been performed for the benefit of their material community.

19      98.    The aforementioned Individual Defendants have participated in the fraudulent

20  marketing and sales scheme and conspiracy alleged herein.

21      99.    The acts alleged in this Complaint to have been done by each of the Corporate

22  Defendants were authorized, ordered, done and/or ratified by their respective officers, directors,

23  agents, employees or representatives while engaged in the management, direction, control or

24  transaction of their respective business affairs.

25      100.   The acts alleged in this Complaint to have been done by each of the Individual and

26  Employee Defendants were authorized by, ordered by, ratified by and/or otherwise accomplished at

27

28

1  the direction of, or within the ordinary scope of the duties of such Individual and Employee

2  Defendants as employees or agents of the Corporate Defendants for which they worked.

3       101.   Various persons and/or firms, not named as defendants herein, including various

4  medical providers across the country, have participated as co-conspirators in the violations alleged

5  herein and have performed acts and made statements or omissions in furtherance thereof.

6                        **PLAINTIFF'S CLASS ALLEGATIONS**

7       102.   Plaintiff seeks to bring this case as a class action pursuant to Rule 23 of the Arizona

8  Rules of Civil Procedure, on behalf of himself and all others similarly situated in Arizona as

9  members of a proposed class, defined as follows (the "Class"):

10              All persons and entities in Arizona who paid any portion of the cost
                of cancer drugs and other prescription drugs manufactured, marketed,
11              sold and distributed by Defendants, which cost was based, in whole
                or in part, upon the published AWPs for these drugs. Excluded from
12              the Class are Defendants, any entity in which a Defendant has a
                controlling interest, and their legal representatives, heirs, successors,
13              and any governmental entities.

14                              **NUMEROSITY**

15      103.   The proposed Class is so numerous that joinder of all of its members is impractical.

16 Each year, thousands of patients, including men, women, and children are prescribed and pay for

17 cancer drugs and other prescription drugs manufactured, marketed, sold and distributed by

18 Defendants at a price which is based, in whole or in part, on the AWPs for such drugs.

19                   **COMMON QUESTIONS OF LAW AND FACT**

20      104.   Virtually all of the issues of law and fact in this class action are common to the Class

21 and include at least the following:

22        a.    Whether the Defendants engaged in the fraudulent marketing and sales
                scheme and conspiracy as alleged herein;
23
          b.    Whether the Defendants unlawfully set the AWPs for cancer drugs and other
24              prescription drugs;

25        c.    Whether the Defendants conspired and agreed amongst themselves and with
                others to raise, fix, maintain or stabilize the AWPs for cancer drugs and other
26              prescription drugs;

27        d.    Whether the conspiracy was implemented;

28

© 2002 KLINE & SPECTER, P.C.                    29

e.  Whether the Defendants unlawfully marketed and promoted the spreads between the AWPs and the actual cost for their drugs to medical providers;

f.  Whether the Defendants provided free samples of their drugs and other financial inducements to medical providers and/or otherwise distributed such free samples;

g.  Whether the Defendants encouraged medical providers to charge patients for free samples provided by sales representatives, and/or were otherwise aware that medical providers in fact charged patients for such free samples;

h.  Whether the Defendants engaged in a conspiracy and/or a pattern and practice of deceiving and defrauding the Class and concealing their unlawful conduct and conspiracy;

i.  Whether the Defendants engaged in a conspiracy and/or concerted conduct designed to avoid efforts by Medicare to reduce the cost of prescription drugs;

j.  Whether the Defendants violated the consumer protection laws of Arizona;

k.  Whether the Defendants violated the antitrust laws of Arizona;

l.  Whether Plaintiff and the members of the Class are entitled to compensatory damages, and, if so, the nature of such damages;

m.  Whether Plaintiff and members of the Class are entitled to an award of punitive damages, reasonable attorneys' fees, prejudgment interest, post-judgment interest, costs of suit, and other appropriate relief under the circumstances of this case.

## TYPICALITY

105.  Plaintiff's claims are typical of the claims of other members of Class. Plaintiff and all members of the Class sustained damages. The financial losses of each member of the Class were directly caused by the Defendants' fraudulent marketing and sales scheme and conspiracy.

## ADEQUACY OF REPRESENTATION

106.  Plaintiff can and will fairly and adequately represent and protect the interests of the Class and Plaintiff has no interests that conflict with or are antagonistic to the interests of Class members. Plaintiff has retained attorneys competent and experienced in class actions, including consumer fraud and protection class actions. No conflict exists between Plaintiff and the Class members.

## SUPERIORITY

107.    A class action is superior to any other available method for the fair and efficient adjudication of this controversy and common questions of law and fact overwhelmingly predominate over any individual questions that may arise.

108.    The prosecution of separate actions by individual members of the plaintiff Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class. These adjudications would establish incompatible standards of conduct for the Defendants which would, as a practical matter, be dispositive of the claims of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

109.    Defendants have acted or refused to act on grounds generally applicable all members of the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

## FACTUAL ALLEGATIONS

### THE MEDICARE INSURANCE PROGRAM

110.    In 1965, Congress enacted Title XVIII of the Social Security Act ("Medicare" or the "Medicare Program") to pay for the costs of certain medical services and care.

111.    The U.S. Department of Health and Human Services ("HHS") is an agency of the United States and is responsible for the funding, administration and supervision of the Medicare Program. The Health Care Financing Administration ("HCFA") is a division of HHS and is directly responsible for the administration of the Medicare Program.   HCFA, in discharging those responsibilities, contracted with private insurance companies, known as intermediaries and carriers, to receive, review, and pay appropriate claims for reimbursement for the provision of care to Medicare beneficiaries.

112.    The Medicare Program, as a general matter, does not cover the cost of prescription pharmaceuticals which a Medicare beneficiary obtains pursuant to a prescription and thereafter self administers (*e.g.*, by swallowing the drug in liquid or pill form).  However, Medicare Part B does

cover some drugs, including injectables administered by a medical provider. Since many cancer drugs are injected by physicians, they are covered under Medicare Part B.

113. In determining the amount it will pay, Medicare calculates the "allowed" amount for the drug based upon the payment methodology set forth in 42 C.F.R. §405.517, which regulation was published in the Federal Register on November 25, 1991 and became effective on or about January 1, 1992.

114. Prior to January 1, 1998, the Medicare Part B allowed amount for injections of Lupron® was on the basis of the lower of the "estimated acquisition cost" ("EAC") or the national "average wholesale price" ("AWP") for the drug. The EAC for a drug is determined based on surveys of the actual invoice prices paid for the drug, taking into consideration the estimated acquisition cost, including "factors such as inventory, waste and spoilage." The AWP is reported in the *Red Book* and other pricing publications and databases used by the pharmaceutical industry. Historically, it has been the AWP that has been used to develop Medicare reimbursement for prescription drugs. On January 1, 1998, Medicare Part B was changed to provide that the allowed amount would be based upon the lower of the actual charge on the Medicare claim for benefits or 95 percent of the AWP for the drug.

115. Medicare Part B reimburses medical providers (or Medicare "carriers") 80% of the allowable amount for prescription drugs. The remaining 20% is paid by the Medicare beneficiary, and is called the "co-payment" amount. All Medicare carriers are required by law not only to send the patient a bill for the 20% co-payment, by also to make attempts beyond merely billing to collect that amount. In addition, Medicare beneficiaries under Part B are required to pay an annual deductible amount before Part B benefits are payable. Accordingly, all Medicare beneficiary members of the Class may have paid some or all of the inflated co-payment amount.

116. The Medicare Program publicly has announced that it would use the AWP published in pharmaceutical industry magazines as the basis for reimbursement. Specifically, Medicare has stated that outpatient drugs and biologicals are paid based on the lower of the actual billed charge

1    or 95 percent of the AWP reflected in pharmaceutical industry publication sources such as the *Red*

2    *Book*, *Blue Book*, or *Medispan*.

3        117.   The *Red Book* and other publications published AWPs for the various dose forms of

4    cancer and other prescription drugs.  In periodically announcing the AWPs for those drugs, the *Red*

5    *Book* and other publications simply published the prices that were supplied to them by the Corporate

6    Defendants.  These Defendants knew that they could and did control directly and raise the AWP for

7    those drugs at any time simply by forwarding to the *Red Book*, or any other publication, a new and

8    higher AWP.

9        118.   For instance, on May 23, 1999, *The Chicago Tribune* reported that a spokesman for

10   the publisher of the *Red Book*, Medical Economics Co., stated that the AWP for Lupron® that

11   appears in the *Red Book* is supplied by TAP.  In fact, in a June 1996 Dow Jones News Article, it was

12   reported that Phil Southerd, an associate product manager of the *Red Book*, stated that the *Red Book*

13   merely publishes prices that are faxed right from the manufacturer.

14       119.   There are significant discrepancies between the AWP set by the Corporate Defendants

15   for cancer and other prescription drugs in the *Red Book* for reimbursement under government and

16   private assistance programs and the prices charged these drugs by the Corporate Defendants to

17   private sector purchasers.  The AWPs for those drugs set by these Defendants is neither an "average"

18   nor "wholesale."

19       120.   It is believed and therefore averred that the Corporate Defendants conspired and

20   agreed to set the AWP for their cancer drugs and other prescription drugs reimbursed under

21   government and private assistance programs based a standard industry formula which inflated the

22   AWP at a fixed percentage or amount above the list price for the drugs.  It is further believed and

23   therefore averred that medical providers and others were able to profit from the sale of these drugs

24   as a result of Defendants' conspiracy.  Through the purchase of these drugs from the Corporate

25   Defendants at or below the list price and the later sale of these drugs to patients at the inflated

26   AWPs. It is further averred that, but for the coordinated conduct and conspiracy of Defendants, and

27

28

' 2002 KLINE & SPECTER, P.C.                        33

their fraudulent concealment of the same, the AWPs for cancer drugs and other prescription drugs would not have been inflated and plaintiff and the Class would have paid less for such drugs.

121. Therefore, Defendants' conspiracy in violation of the PDMA, to inflate the AWPs for cancer drugs and other prescription drugs above the actual average wholesale price (or list price), directly caused Plaintiff and the Government Assistance Patient members of the Class, who paid all or part of the 20% Medicare co-payment for those drugs , to overpay substantially.

### OTHER GOVERNMENT AND PRIVATE ASSISTANCE PROGRAMS

122. In addition to Medicare, other government assistance programs provide for partial reimbursement of certain prescription drugs, including cancer drugs, and utilize the AWP as the basis for reimbursement. These programs include TRICARE (formerly CHAMPUS), the medical assistance program for both active and retired members of the U.S. armed forces, and Medicaid, the state-administered medical benefits program.

123. Moreover, there are government assistance programs that provide medical assistance to patients through certain private health insurance carriers. These programs also provide limited coverage for partial reimbursement of prescription drugs, including cancer drugs, and utilize the AWP for reimbursement.

124. CHAMPUS, the prior name for TRICARE, provides for partial reimbursement of Lupron® depending on the patient's active duty status and the program in which he or she is enrolled.

125. Therefore, Defendants' conspiracy in violation of the PDMA, to artificially inflate the AWP for cancer drugs and other prescription drugs above the actual price, directly caused Government and Private Assistance Patient members of the Class, who paid all or part of the percentage co-pay for those drugs under government and private assistance programs, to overpay substantially.

### PATIENTS WITHOUT INSURANCE COVERAGE

126. There are patients throughout Arizona and the country who had no medical assistance coverage for the cost of their cancer drugs and other prescription drugs, which costs were based in whole or in part, upon the published AWPs for such drugs. As a result of Defendants' conspiracy,

1   these No Assistance Patients paid the full measure of the percentage overcharge in the cost of these

2   drugs.

3                         **DEFENDANTS' FRAUDULENT CONDUCT AND CONSPIRACY**

4                       **ARTIFICIALLY INFLATING THE AVERAGE WHOLESALE PRICE**

5         127.     During the Class Period, the Corporate Defendants deliberately and intentionally

6   charged medical providers and others across the United States a price substantially less than the

7   AWP that Defendants had reported to *Red Book* and other publications for government and private

8   assistance reimbursement. Defendants perpetuated this scheme so that the medical providers and

9   others who purchased cancer drugs and other prescription drugs at a low cost could bill government

10   assistance programs, private insurance companies and/or individual patients at the inflated AWP and

11   earn a substantial profit from the "spread" between the retail cost and reimbursement rate or amount

12   charged to patients. This profit potential was created and marketed by Defendants to influence the

13   decisions of medical providers and others to recommend particular drugs over others, and over

14   alternative courses of treatment, and thereby increase the Corporate Defendants' individual market

15   shares and revenues, and obtain other benefits for other Defendants, such as the payment of

16   kickbacks to the Individual Defendants.

17         128.     The Corporate Defendants knew and understood that government assistance programs

18   and private insurers relied upon the *Red Book* and other publications to establish the AWP, and

19   because these Defendants controlled the published AWP, they could manipulate the profit seemed

20   by medical providers and others. By artificially inflating the amount of profit obtained by these

21   people and entities from government and private assistance programs, and from the members of the

22   plaintiff Class, the Corporate Defendants directly increased the demand for their drugs and,

23   accordingly, they could inflate the amount of market share and profit which the Corporate

24   Defendants received from their drugs.

25         129.     As part of Defendants' scheme to increase the market share and revenues of the

26   Corporate Defendants, they also increased drug sales by telling medical providers and others to

27   charge government and private assistance programs, and individual patients, the AWP then

28

1   published in the *Red Book* and related publications. According to Criminal Informations filed

2   against several doctors, as well as and internal company documents of the Corporate Defendants,

3   Defendants referred to this inflated profit, and the corresponding inducement to the physicians, as

4   a "spread" or "Return To Practice," among other names. For instance, the Lupron® Manufacturer

5   Defendants referred to the profit that the doctor could obtain by prescribing Lupron® and billing the

6   assistance programs and patients at the published AWP as money going to the doctor from

7   "[Defendants'] Checkbook." All Defendants knew and understood that, because the government and

8   private assistance programs relied upon the *Red Book* and like publications to establish AWP's, and

9   because the Corporate Defendants could precisely control the AWP as published in these

10  publications, they could increase the AWP whenever they so desired to create the profit obtained by

11  physicians from the assistance programs and the plaintiff Class. Accordingly, these Defendants

12  could control the amount of the financial incentive, or "Return To Practice," that a physician would

13  receive by prescribing particular drugs to patients and billing assistance programs and patients at the

14  AWP established by the Corporate Defendants. *See, e.g.,* Information of *United States of America*

15  *v. Spinella* (D. Mass. Dec. 8, 2000).

16      130.    By way of further example, the Criminal Information against Dr. Spinella states that,

17  on or about August 24, 1995, in an attempt to get Dr. Spinella to reverse his decision to prescribe

18  Zoladex®, rather than Lupron®, an employee of the Lupron® Manufacturer Defendants left at his

19  office a document created by these Defendants demonstrating to the doctor the amount of profit that

20  he could earn through these Defendants' "Return To Practice" program from the use of Lupron®.

21  Specifically, the document showed that Dr. Spinella could earn as much as $7,000 per year more by

22  using Lupron® instead of Zoladex®. *See* Information of *United States of America v. Spinella* (D.

23  Mass. Dec. 8, 2000).

24      131.    The increase of $7,000 per year was based on the "spread" between Dr. Spinella's

25  actual costs and the artificially inflated AWP set by the Lupron® Manufacturer Defendants used by

26  government and private assistance programs for reimbursement.

27

28

132.   Marketing and sales documents of the Lupron® Manufacturer and AstraZeneca Defendants, which were prepared and disseminated to their employees and agents, compared the cost of Lupron® to that of Zoladex®, and vice-versa. For example, in 1996, these Defendants prepared marketing materials for medical providers showing how they could make money by purchasing Lupron® or Zoladex® from the particular Defendants. As these Defendants' marketing and sales materials indicated, in 1996, the AWP for Lupron® as reported for Medicare reimbursement was $515.63. However, in 1996, the actual price paid by the medical providers to these Defendants for Lupron® ranged from a high of only $412.50 to a low of $350.81, if volume discounts were achieved. *See* Information of *United States of America v. Spinella* (D. Mass. Dec. 8, 2000).

133.   Other documents created and disseminated by the Lupron® Manufacturer and AstraZeneca Defendants compared the AWPs and the actual "costs" for Lupron® and Zoladex® so that medical providers could easily see the different "Return To Practice" amounts available for different levels of purchases. It is believed and therefore averred that the other Corporate Defendants created similar documents comparing the profits medical providers could realize from using their drugs as compared to the drugs of their competitors.

134.   The Corporate Defendants used the artificially inflated AWP as a means of marketing their drugs. Specifically, when employees of these Defendants talked to providers about their choice of their drug, rather the drug of a competitor, they emphasized that, because the AWP for their particular drug was high, the monetary return to the providers was better if they used their drug. Internal documents from these Defendants specifically show that they used the spread to create greater demand for their drugs. One such internal document stated:

> As we have also discussed, Northwest Iowa Urology is very upset about the allowable not going up. I personally met with the doctors to discuss the issue 4/17. The physicians have started using Zoladex but would stop if the allowable issue was taken care of.

The benefit of Defendants' illegal marketing, sales and distribution scheme is evidenced by the increase in market shares and sales of these companies' drugs. Most of the revenue obtained from Lupron® was from reimbursement from government and private assistance programs and the plaintiff Class.

## USE OF FREE SAMPLES

135.   It is believed and therefore averred that all the Corporate Defendants used free samples, and the profits that could be earned from unlawfully billing government and private assistance programs and patients for such samples, as a means of promoting their drug products.

136.   The Lupron® Manufacturer and AstraZeneca Defendants, through their employees and agents, provided free samples of Lupron® and Zoladex®, respectively, to medical providers. In some years, sales representatives of TAP were provided with free samples for distribution to medical providers worth approximately $40,000. In most years sales representatives received 80 free samples of Lupron®, or 20 per quarter. These free samples were used to off-set the total cost associated with Lupron® purchases, thereby increasing the spread.   Moreover, these Defendants specifically told medical providers that they could and should bill government and private assistance programs for the free samples. These Defendants were aware that medical providers were billing government and private assistance programs for the free samples.

137.   One of the Lupron® Manufacturer Defendants' sales representatives called on Dr. Joseph Spinella in 1995 and reported to a District Manager employed by these Defendants in Massachusetts.   That District Manager supervised a number of these Defendants' sales representatives who called upon urologists in Connecticut, Massachusetts, Maine and Rhode Island. From time to time, beginning in or about 1995, that Massachusetts District Manager informed these Defendants' sales representatives that free doses of Lupron® could be offered to physicians to induce them to prescribe Lupron® to their patients and to keep them from switching patients to Zoladex®. These Defendants' sales representatives, supervised by that same District Manager, sent to the District Manager so-called Weekly Activity Reports and sales call notes, or portions thereof, which contained requests by physicians for samples, and the offer and delivery of samples to physicians to keep and to maintain their Lupron® business. *See* Information of *United States of America v. Spinella* (D. Mass. Dec. 8, 2000).

138.   The medical providers were a necessary component of Defendants' scheme, but they did not control the setting of the AWP or other aspects of the scheme. For example, in April 2001,

adopted a new marketing code to govern the pharmaceutical industry's relationships with physicians and other healthcare professionals. The voluntary code took effect on July 1, 2002.

143.    In this case, Defendant TAP, in its Memorandum of Law in support of its Motion to Dismiss, concluded "that TAP, like many pharmaceutical companies, provided samples to physicians."

### DEFENDANTS' CONSPIRACY

144.    Defendants conspired and agreed to accomplish the fraudulent marketing and sales scheme set forth herein in order to increase the sales of their drugs and profits, and they committed acts in furtherance of this conspiracy which are outlined in this Complaint.

145.    In furtherance of this scheme to defraud government and private assistance programs and the plaintiff Class, Defendants created centralized national marketing, sales, and distribution plans which were implemented through their employees and agents in the following manner, among others:

    a.    Setting the actual wholesale prices (or list prices) at which cancer drugs and other prescription drugs were sold;

    b.    Setting the AWPs for these drugs in the *Red Book* and other similar publications which was materially greater than the average actual wholesale prices (or list prices) for these drugs;

    c.    Contacting the *Red Book* and other industry publications for the purpose of setting and controlling the listed AWPs;

    d.    Sending information to or otherwise contacting medical providers about both the *Red Book* quoted AWPs and the average actual wholesale prices (or list prices) for these drugs;

    e.    Creating and disseminating marketing and sales materials that showed the spreads between the average actual wholesale prices (or list prices) and the reported AWPs;

f.   Establishing and offering discounts off of the actual wholesale prices (or list prices) for their drugs to create even greater spreads for their drugs;

g.   Creating and disseminating marketing and sales materials for medical providers discussing how the use of free samples could increase their profits;

h.   Creating and disseminating marketing and sales materials for medical providers discussing other financial inducements available from Defendants for the use of their drugs;

i.   Inducing Government and Private Assistance Patients to pay inflated co-payments for cancer and other prescription drugs based upon the inflated AWP;

j.   Inducing No Assistance Patients to pay inflated prices for these drugs based upon the inflated AWP;

k.   Inducing members of the Class to pay for free samples of these drugs;

l.   Distributing these drugs with knowledge and in furtherance of this scheme;

m.   Receiving the proceeds and benefits of their fraudulent scheme;

n.   Distributing the proceeds and benefits of their fraudulent scheme to medical providers in the form of free samples, lower average actual wholesale prices (or list prices), and other financial inducements; and

o.   Working to circumvent efforts by government assistance programs like Medicare, to reduce prescription drug costs, including working to circumvent and oppose the implementation of LCA cost savings measures in various states.

146.   Defendants concealed their fraudulent conduct from the Plaintiff and the Class by controlling the process by which the AWP was set and the actual reported AWPs for their drugs. Defendants also prevented Class members from knowing what the actual costs for cancer drugs and other prescription drugs were, and they failed to inform Class members of the usage of free samples

and of their providing other financial incentives to medical providers to induce them to administer their drugs. Moreover, Defendants' fraudulent conduct was of such a nature as to be self-concealing.

147.    Plaintiff and the Class were diligent in pursuing an investigation of the claims asserted in this Complaint. Through no fault of their own, they did not receive inquiry notice or learn of the factual basis for their claims in this Complaint or their injuries suffered therefrom until recently.

## DEFENDANTS' INDICTMENTS AND GUILTY PLEAS AND WHISTLEBLOWER ACTIONS AGAINST THEM

### INDICTMENTS AND GUILTY PLEA OF TAP

148.    In late September, 2001, Defendants, Abbott and Takeda, through their joint venture, TAP, agreed to plead guilty to a Criminal Information charging TAP with a conspiracy to violate Title 21 United States Code Sections 333(b) and 331(f) in violation of Title 18 United States Code Section 371 ("Conspiracy to commit offense or to defraud United States"), settling charges by the U.S. Attorney's Office that they manipulated the price used for government and private reimbursement to ensure medical providers would make a profit in their prescriptions of Lupron®. *See* Indictment and Letter Agreement dated September 28, 2001, among the United States Department of Justice, the United States Attorney for the District of Massachusetts and TAP, attached hereto as Exhibit "A."

149.    Specifically, these Defendants, through TAP, agreed to plead guilty to a conspiracy in violation of the PDMA and to pay a fine of $875 million. These Defendants, through TAP, agreed to plead guilty to fraudulently pricing and marketing Lupron® during the period 1991 through 1998.

150.    The fines paid consisted of a $290 million criminal fine, $559.5 million in civil liabilities for filing false and fraudulent claims, and $25.5 million in civil liabilities to be paid to the fifty (50) states and the District of Columbia, plus interest in the amount of approximately $9 million.

151.    In exchange for their agreement to settle the government's claims, the government agreed not to further prosecute TAP or exclude TAP from participating in Medicare and other government assistance programs.

152.     In addition to fraudulently pricing and marketing Lupron®, the conspiracy among Defendants involved various employees of TAP participating in an illegal kickback scheme involving Lupron®. Among other things, the criminal conspiracy involved providing doctors with thousands of free samples of Lupron® for which doctors were encouraged to and did in fact bill government assistance programs and their patients. These free samples were worth hundreds of dollars each and were used as incentives to get medical providers to prescribe Lupron® over competing drugs, such as Zoladex®, which were less expensive. Accordingly, these Defendants chose not to compete on price, but instead chose to compete by providing illegal kickbacks and incentives.

153.     In addition to the fines, and as a further condition of the settlement, these Defendants, through TAP, agreed to report the true price of Lupron® to the government and to allow regular auditing of their sales and marketing practices. *See* CIA attached hereto as Exhibit "A."

INDICTMENTS OF TAP EMPLOYEES

154.     In addition to the guilty pleas by these Defendants, a Boston grand jury indicted six (6) current and former employees of TAP for illegal conduct: Kimberlee Chase, Janice Swirski, Donna Tom, David Guido, Henry Van Mourik and Alan McKenzie. Two (2) of these employees are still working at TAP, Guido and Van Mourik while the other four (4) have left the company, including two (2) from Massachusetts, Janice Swirski of Chestnut Hill, a former National Account Manager, and Kimberlee Chase of Dover, a former District Manager.

155.     The Boston indictments allege that the sales people and managers called on doctors in Massachusetts and other states and offered them bribes, including trips to resorts, debt forgiveness, televisions and VCRs, and cash in the form of "educational grants," as well as free drug samples.

WHISTLEBLOWER ACTIONS

156.     According to the indictments, Swirski, a local TAP employee, was involved in the offer of an illegal bribe to the Tufts Health Plan of Waltham, Massachusetts, one of two whistle blowers involved in the criminal prosecution of these Defendants. The indictments charge that

Swirski first offered the Tufts Medical Director of Pharmacy Programs, doctor Joseph Gerstein, $40,000 in grants that he could use for any purpose if he would reverse a decision to make Zoladex® the preferred Tufts drug.

157. The general counsel for Tufts, James Roosevelt, Jr., said Gerstein was outraged by the offer and, with the support of Tufts, went directly to prosecutors and blew the whistle on TAP.

158. Swirski and Chase then increased their offer to $65,000, according to the indictments, an offer that Gerstein and prosecutors allegedly caught on tape.

159. In exchange for his cooperation with prosecutors, Gerstein, along with Tufts, will share a reward of $17.2 million. Tufts officials said they would donate their portion to charity.

160. In addition to the Tufts whistleblower situation, the fraudulent scheme and conspiracy came to light after a former TAP Vice President of Sales, Douglas Durand, quit his job in 1996, filed a lawsuit and blew the whistle on the company's operations. According to his attorney, Mr. Durand quit his job after being asked to participate in marketing ventures he considered unethical. He provided prosecutors with detailed accounts of how the company allegedly manipulated the average price used for government reimbursement. In exchange for his cooperation, Mr. Durand is expected to receive $77.9 million as part of the settlement under the Whistle Blower's Statute.

### INDICTMENTS AND GUILTY PLEAS OF DEFENDANTS JETT, COLEMAN, HIDALGO AND HACK

161. Around the same time that the TAP employees were being indicted in Boston, three employees of a subsidiary company of J&J were indicted in the same conspiracy to defraud the government, along with the owner and operator of a national oncology company. In April 2001, Criminal Informations were filed in the United States District Court for the District of Connecticut against David Jett, Christopher Coleman and Scott Hidalgo, all one time sales representatives and employees of Defendant Indigo, the wholly-owned subsidiary of Defendants Ethicon and J&J. Defendant Coleman no longer works for the J&J Defendants. Defendant Hidalgo still works for these Defendants. He is a former employee of TAP, and his wife still works for TAP as a sales representative.

162.  In addition, a Criminal Information was filed in this same Court against Eddy J. Hack, the owner and operator of Oncology Solutions a/k/a International Oncology Network.

163.  These Criminal Informations all charged Jett, Coleman, Hidalgo and Hack with participating and aiding and abetting in the same conspiracy to defraud the government charged against the Lupron® Manufacturer Defendants, and to which TAP pled guilty, in violation of the federal conspiracy statute, 18 U.S.C. § 371. These four defendants all pled guilty to the charged conspiracy and they each were sentenced to probation and have paid, or are in the process of working out payments of, substantial fines to discourage the illegal kickbacks they received.

164.  It is believed and therefore averred that these Individual Defendants worked together to divert Lupron® out of states which had implemented LCA to states which had not. Defendant Hidalgo, having been made aware of and involved in the fraudulent scheme while at TAP, involved Defendants Jett and Coleman in the scheme as part of their work on behalf of the J&J Defendants. It is believed and therefore averred that, at all times material hereto, the J&J Defendants knew or should have known of the involvement of their officers, employees, and agents in this scheme and failed to do anything to prevent or end such involvement.

## PROSTATE CANCER DRUGS

165.  There are hundreds of thousands of men, women and children, in Arizona and throughout the United States who have cancer.

166.  One such cancer that afflicts men is prostate cancer. The hormone, testosterone, naturally produced by men, promotes the growth and spread of prostate cancer. One method of treatment of prostate cancer has been the suppression or elimination of testosterone in men suffering from that disease. Testosterone in a man suffering from prostate cancer can be eliminated through the surgical removal of the testicles by a procedure called an orchiectomy. Alternatively, a man's production of testosterone can be suppressed through the administration of either a drug that acts to suppress testosterone production, such as Lupron®, Zoladex®, Trelstar™ Depot (triptorelin) or Viadur® [these drugs are referred to collectively herein as "prostate cancer drugs"].

167. Additionally, there are hundreds of thousands of women in Arizona and the United States who have endometriosis or are infertile. Lupron®, Zoladex® and Viadur® may be prescribed by medical providers to treat such conditions. Similarly, for the thousands of children throughout Arizona and the United States who are afflicted with a condition known as central precocious puberty, Lupron® has been prescribed by doctors to alleviate its symptoms.

168. In the 1980's, the Lupron® Manufacturer Defendants, and the AstraZeneca Defendants began marketing and distributing Lupron® and Zoladex®, respectively, as a treatment for prostate cancer. In marketing Lupron® and Zoladex®, these Defendants employed and maintained extensive marketing, distribution and sales departments and distribution networks. Since at least the early 1990's, these Defendants primarily sold and distributed Lupron® and Zoladex® to medical providers across the country.

169. Prostate cancer drugs are used principally for the palliative treatment of advanced prostate cancer in men, and some are used for the treatment of endometriosis and infertility in women, the treatment of central precocious puberty in children and for the preoperative treatment of patients with anemia caused by uterine fibroids.

170. Lupron® and Trelstar™ Depot are administered to patients in liquid form by intramuscular injection, typically in the buttocks or arm, by a physician or a nurse under the supervision of a physician. Zoladex® is administered in the stomach. At various times in the 1990's, and continuing to the present, Lupron® was available in daily, one-month, three-month and four-month doses. Zoladex® was available in daily, one-month and three-month doses. Trelstar™ Depot was available in one-month and three-month doses. Viadur® was available in a one-year dose. It is typical that a patient whose prostate cancer is being treated with these prostate cancer drugs would receive regular injections of them for the remainder of his life.

### THE RELATIONSHIP BETWEEN TAP, ABBOTT AND TAKEDA

171. As set forth above, TAP is a partnership and 50/50 joint venture between Takeda and Abbott.

172. According to Abbott's recent Form 10-K filed February 15, 2001, Lupron® is sold directly to physicians, retailers, wholesalers, health care facilities, and government agencies. It is distributed from Abbott-owned distribution centers. TAP's primary marketing efforts are focused on securing the use of Lupron® by physicians.

173. In 1998, the total revenues from Lupron® sales through Medicare were $584 million consisting of 80% paid by the federal government ($467 million) and 20% paid by Plaintiff Swanston and members of the plaintiff Class ($117 million). TAP's total sales revenue in 1998 was $2.06 billion.

174. Abbott and Takeda derived substantial revenue from TAP. According to Abbott's 2000 Annual Report, Abbott's share of TAP's income for the years 2000, 1999 and 1998, was $481 million, $390 million and $266 million, respectively.

175. Moreover, on April 20, 2001, Abbott filed a Form 10-K wherein it disclosed:

> Abbott Laboratories today announced an adjustment in litigation reserves to reflect recent developments related to the U.S. Department of Justice investigation into the marketing and sales practices of TAP Pharmaceutical Products Inc. for Lupron®. TAP Pharmaceutical Products Inc. is a 50/50 joint venture between Abbott and Takeda Chemical Industries, Ltd. Discussions between TAP and the Department of Justice are ongoing. The government's inquiry has focused solely on marketing and sales practices, and does not involve the safety and efficacy of Lupron®. This one-time adjustment in the litigation reserves will cause an adjustment to previously announced first quarter results, as reflected in the attached table. While it is not feasible to predict the outcome of this proceeding with certainty, no material impact on operations, or additional one time charges are expected.

## CANCER AND OTHER PRESCRIPTION DRUGS

As set forth above Medicare Part B, as a general matter, does not cover the cost of prescription drugs. However, Medicare Part B does cover the cost of drugs administered by or under the supervision of a medical physician. These drugs include many intravenously administered drugs, a large number of which are infused in the doctor's office, as well as drugs administered by implanted delivery systems, and drugs for inhalation administered by nebulizer equipment.

Drugs administered intravenously under the supervision of a physician include drugs which fall within the broad class of anti-neoplastic (anti–cancer) medications. Drugs in the anti-neoplastic

© 2002 KLINE & SPECTER, P.C.   47

class are administered according to the type, class, and stage of the cancer that is being treated. For example paclitaxel (Anzatax, Biotax) is indicated in treatment of forms lung cancer, breast cancer, ovarian cancer and Kaposi's sarcoma. More than one drug within the class may be indicated for the treatment of a specific type of cancer. Etoposide (Etoposide, Etopophos, Toposar) is also used in the treatment of breast cancer. Prostate cancer is treated with primary and secondary antihormonal medications. Primary antihormonals, include leuprolide (Lupron) and goserelin (Zoladex). Secondary antihormonals include bicalutamide (Casodex), flutamide (Eulexin), and nilutamide (Nilandron). Other medications to treat prostate cancer include the hormone megestrol (Megace) and the chemotherapeutic agent etramustine phophate (Emcyt).

Drugs used in the treatment of cancer have other effects in addition to their anti-neoplastic actions. These effects are often referred to as side effects. The most frequent side effects reported among anti-cancer agents are anemia[1] (decreased numbers of red blood cells), hypercalcemia (increased calcium), nausea, and decreased immune capacity to fight bacterial, fungal and viral infections. There is a wide variety of drugs available for the specific treatment of these side effects, many of which are also administered by a physician and therefore covered by Medicare Part B. Drugs to treat the various deficiencies of blood cells include the erythropoietin class of drugs (Procrit, Aranesp, Epogen), the anti-neutropenic drugs (Neupogen, Leukine) and anti-thrombocytopenic drugs (Neumega). Intravenously administered, and therefore physician administered, medications to combat hypercalcemia include drugs like Aredia and Didronel. Anti-nausea medications given intravenously at the time of administration anti-cancer drugs that cause nausea include Anzemet, Zofran, Kytril, and Reglan. Patients with immune deficiencies, such as patients undergoing chemotherapy, organ transplant patients, and patients with HIV/AIDS require intravenous administration of antibiotics, antifungal drugs and antiviral medications, as well as specific plasma proteins and immune globulins.

---

[1] Production of other blood cells made in the bone marrow may be decreased by anticancer drugs including white blood cells (leukopenia) and platelets (thrombocytopenia).

1    There are other medical conditions that require involve the use of physician administered

2    medications, or medications given through specialized delivery systems that are covered by Medicare

3    Part B.    Medications for patients who are undergoing dialysis, such as agents to combat

4    hypocalcemia (decreased serum calcium) like Calciject and Zemplar, and the antianemic drugs of

5    the erythropoeitin type, may be intravenously administered.    Patients with hemophilia require the

6    intravenous administration of blood clotting factors such as factor VIII (Bioclate, Helixate, Humate-

7    P, Monoclate-P, Hemofil M, Kogenate, Koate) and factor IX (Mononine, Bebulin).    Medicare

8    Medicaid Part B also covers medications for the treatment of obstructive airways diseases that are

9    administered with the use of a nebulizer, such as albuterol (Alupent, Ventolin) and ipratroprium

10   bromide (Atrovent, DuoNeb).

11   Many intravenously administered medications must be mixed with various solutions for

12   intravenous administration containing sodium chloride, dextrose, or various combinations thereof,

13   which are also covered by Medicare Part B, as are various plasma components and expanders used

14   in the treatment of plasma volume deficiency.

15   Medications administered by or under the direct supervision of a physician and covered for

16   reimbursement by Medicare Part B, therefore cover a broad spectrum of classes and indications.

17   Drug manufacturers who produce, market and sell medications which fall within these classes, and

18   may be identical or very similar and have identical or closely related indications, thus have aligned

19   interests in ensuring that their drugs continue to be covered by and reimbursed under governmental

20   and private assistance programs.

21                          **DEFENDANTS' UNLAWFUL CONDUCT IN ARIZONA**
                            **AND THROUGHOUT THE COUNTRY**
22

23   176.    By virtue of the agreement of many of the Defendants herein to plead guilty to a

24   conspiracy, and to pay fines to resolve both criminal and civil charges against them, it is clear that

     their conduct had an effect both upon residents and consumers in Arizona and throughout the
25
     country.
26

27   177.    These Defendants' guilty pleas and settlements included the sum of $25.5 million

28   from the Lupron® Manufacturer Defendants to be paid to the 50 states, including Arizona, and the

District of Columbia, and $14 million from Bayer to the United States and 47 states, including Arizona, to resolve civil liabilities. Accordingly, such Defendants have agreed that their unlawful conduct and conspiracy has effected residents and consumers in Arizona as well as other states.

178.    In addition, one of the six (6) TAP employees who was indicted by the grand jury in Boston, Janice Swirski, was a former National Account Manager whose job presumably involved the administration of accounts throughout the country, including Arizona. Accordingly, her indictment, as well as the indictments of other TAP employees and sales personnel on grounds that she and others offered bribes to doctors and medical care providers to switch from Zoladex® to Lupron®, further evidences that Defendants' conduct had an impact and effect in Arizona.

179.    The indictments of a TAP Vice President of Sales, a National Account Manager, and District Managers from Massachusetts, New York, Connecticut and California further evidences the nationwide reach of Defendants' scheme, including Arizona.

180.    Defendants Jett, Coleman, and Hidalgo, sales representatives for Indigo and the J&J Defendants in North Carolina, South Carolina and Florida, through their guilty pleas, also admitted the multi-state scope and impact of this conspiracy. Similarly, the plea of Individual Defendant Hack, owner and operator of a national oncologic network, evidences the nationwide scope of the conspiracy, including Arizona.

181.    In addition, a number of urologists have been indicted by prosecutors charging them with defrauding Medicare by charging more for prescriptions of Lupron® than they were charged by the manufacturer. Urologists in the states of Florida, Massachusetts, Indiana, Connecticut, and Maine have all been so charged. In addition, several other urologists and doctors have told newspapers that TAP representatives contacted them and explained to them how much money they could make by charging the AWP for Lupron®. These doctors and medical care providers practice in states such as South Carolina, Kentucky, Illinois, and Wisconsin, among others.

182.    In January, 2001, the United States Attorney's Office in Connecticut filed charges against two (2) Florida doctors who ordered excess supplies of Lupron® and then resold them at

1   higher prices in other states, according to court papers. The two urologists agreed to forfeit $1.1

2   million to the federal government.

3       183.   In addition to these known, isolated occurrences, it is known that federal investigators

4   looking into the marketing and distribution of Lupron® and have asked to see the financial records

5   of over 100 urologists throughout the country, according to the general counsel for the American

6   Urological Association.

7       184.   Finally, it is believed and therefore averred that sales presentations made by

8   Defendant employees included company-supplied programs that listed how much doctors could

9   collect if they billed government and private assistance for free samples. It is further believed, and

10   therefore averred, that such presentations were given to doctors and medical care providers

11   throughout the country by sales employees of the Defendants also located throughout the country,

12   including Arizona.

### DEFENDANT ABBOTT'S
### UNLAWFUL CONDUCT IN ARIZONA
### AND THROUGHOUT THE COUNTRY

15       185.   It is believed and therefore averred that, during the Class period, Abbott engaged in

16   conduct similar to the other Corporate Defendants with respect to their marketing, promotion, sale

17   and distribution of cancer drugs and other prescription drugs manufactured, distributed, marketed

18   and sold by them. In particular, it is averred that Abbott adopted similar unlawful practices, such

19   as the artificial inflation of the AWP (or reimbursement price) for their cancer drugs and other

20   prescription drugs, in order to create a spread in their drug prices for the benefit of medical providers

21   and others.

22       186.   The drugs manufactured, distributed, marketed and sold by Abbott and covered by

23   government and private assistance programs include, but may not be limited to: acetylcysteine,

24   acyclovir, amikacin sulfate, calcitriol, cimetidine hydrochloride, clindamycin phosphate, dextrose,

25   dextrose sodium chloride, diazepam, furosemide, gentamicin sulfate, heparin lock flush,

26   metholprednisolone sodium succinate, sodium chloride, tobramycin sulfate, vancomycin, and

27   zemplar, among other prescription drugs. All these drugs had "spreads."

28

187. Nearly all of the intravenously administered medications listed herein are administered via some form of infusion and must be admixed with an intravenous carrier solution consisting of dextrose solution, sodium chloride solution, or dextrose sodium chloride solution, as are manufactured and sold by Abbott. The antibiotics manufactured, marketed and sold by Abbott may be administered to patients whose immune systems are suppressed by anti-neoplastic medications such as anti-neoplastic drugs manufactured by AstraZeneca Defendants (Tomudex - raltitrexed), J&J Defendants (Leustatin - cladribine, Doxil - doxorubicin hydrochloride), the Pharmacia Defendants (Adriamycin - doxorubicin hydrochloride, Adrucil - fluorouracil, Neosar - cyclophosphamide, Cystosar-U - cytarabine, Toposar - etoposide, and others), the Boehringer Defendants (bleomycin, cisplatin, cyclosporine, etoposide, leukovorin and others), the Bristol- Myers Defendants (Cytoxan - cyclophosphamide, Rubex - doxorubicin hydrochloride, VePesid and Etopophos - etoposide), and the Baxter Defendants (etoposide, doxorubicin), as may the anti-viral medication acyclovir. Calcitriol and Zemplar may be used to raise serum calcium level in dialysis patients who are prone to anemia and may receive drugs of the epoetin class such as Procrit (epoetin alpha - the J&J Defendants), Epogen (epoetin alpha - the Amgen Defendants) and Aranesp (darbepoetin alpha - the Amgen Defendants).

188. United States Congressman Pete Stark underscored the unlawful conduct of Defendant Abbott in a letter to Abbott Chief Executive Officer Miles White, dated October 31, 2000:

> The price manipulation scheme is executed through Abbott's inflated representations of average wholesale price ("AWP") and direct price ("DP") which are utilized by the Medicare and Medicaid programs in establishing drug reimbursements to providers. The difference between the inflated representations of AWP and DP versus the true price providers are paying, is regularly referred to... as "the spread."
> ...Abbott has intentionally reported inflated prices and has engaged in other improper business practices in order to cause its customers to receive windfall profits from Medicare and Medicaid when submitting claims. ...Abbott manipulated prices for the express purpose of expanding sales and increasing market share for certain drugs... by arranging financial benefits or inducements that influenced the decisions of health care providers submitting Medicare and Medicaid claims.

189.    At least one publisher, Medi-Span, has challenged the manner in which Abbott sets its AWPs. The following statement appeared in a February 9, 1996 faxed letter to Abbott from Medi-Span regarding Abbott's drug vancomycin:

> It appears that the only difference between the two products listed is the vial it comes in. If so, why the $400 difference in AWPs? This customer claims he can get Vancomycin for $6 or $7 per vial DP as opposed to the $52.94 and $19.50 the Abbott Vancomycin costs.

190.    Likewise, Abbott's unlawful behavior is reflected in a letter from Congressman Tom Bliley to the Health Care Financing Administration dated, February 25, 2000, which notes that "prices... are routinely made available to many providers... far below Medicare reimbursement rates. They include 1999 prices for vacomycin, the Abbott Labs-manufactured antibiotic, which a health care provider could buy for $76.00 but for which the AWP upon which Medicare's reimbursement was based on was $261.84."

### THE ASTRAZENECA DEFENDANTS' UNLAWFUL CONDUCT IN ARIZONA AND THROUGHOUT THE COUNTRY

191.    It is believed and therefore averred that, during the Class period, the AstraZeneca Defendants engaged in conduct similar to the other Corporate Defendants with respect to their marketing, promotion, sale and distribution of cancer drugs and other prescription drugs manufactured, distributed, marketed and sold by them. In particular, it is averred that the AstraZeneca Defendants adopted similar unlawful practices, such as the artificial inflation of the AWP (or reimbursement price) for their cancer drugs and other prescription drugs, in order to create a spread in their drug prices for the benefit of medical providers and others.

192.    The drugs manufactured, distributed, marketed and sold by the AstraZeneca Defendants and covered by government and private assistance programs include, but may not be limited to: Zoladex® (goserilin acetate implant), Casodex (bicalutamide), Nolvadex® (tamoxifen citrate), Tomudex® (raltitrexed) and Diprivan® (propofol), among other prescription drugs. All those drugs had "spreads."

193.    Zoladex is used in the primary medical treatment of prostate cancer and for the same indications, and therefore in the same patient population, as leuprolide (Lupron - TAP, Viadur -

Bayer). In addition, goserelin acetate may used in this population of patients in combination with the anti-androgen medications, bicalutamide (Casodex - the AstraZeneca Defendants) and flutamide (Eulexin - the Schering Defendants). Tomudex is used in the treatment of colon cancer, as is irinotecan (Camptosar - the Pharmacia Defendants).

194.     The AstraZeneca Defendants are the subject of the same federal criminal investigation that snared TAP. In the government's Sentencing Memorandum relating to TAP, AstraZeneca is discussed prominently as having been TAP's major competitor throughout most of the 1990's, both for Lupron® and Prevacid®. AstraZeneca manufacturers and sells Prilosec, a competitor drug to TAP's Prevacid. In the Sentencing Memorandum, the government observed:

> ...in 1995, TAP, in a moment of delicious irony, accused its competitor, the manufacturer of Zoladex, with providing inducements to physicians in violation of the Medicare fraud and abuse laws, to include the fact that employees of the competitor were giving free samples to doctors to encourage them to switch from Lupron to Zoladex. The competitor, in turn, accused TAP of the very same conduct. Top employees from the two companies met in a summit meeting to discuss this exchange of criminal allegations. Did the serious allegations curb TAP's conduct? Did TAP, aware of allegations that its employees had engaged in criminal conduct, undertake expeditiously to stop the behavior, to train its employees in the rules and to enforce their adherence to the rules? Did either company, in possession of information that a competitor was violating the rules, report the conduct to the prosecutive authorities in an effort to clean up the industry? Unfortunately, the answer to all of these questions is no: TAP [and Astra Zeneca] cognizant of the rules and having been accused of violations, simply carried on [their] business as [they] always had, full criminal speed ahead.

195.     In fact, these cross-allegations of Medicare fraud by TAP and the AstraZeneca Defendants were levied by the in-house counsel for the companies, thereby making the failure to report the fraud, and the consummation of a conspiracy to engage in a mutual fraudulent scheme, even more egregious.

196.     In that same Sentencing Memorandum, the government observed that TAP's own management acknowledged that TAP was not alone in committing the fraudulent scheme and conspiracy on the consumer Class in a quote from a TAP employee, who said:

> Yes, sure there are rules, but, we operate in a tough competitive marketplace with other pharmaceutical companies. If our employees have to break some rules to win and beat the competition, well, that

is what will happen. We have profits to earn and owners to keep happy and bonuses to earn for ourselves and obeying the rules will just have to take a number in line behind all those other priorities. So what if we are breaking the laws: so are our competitors: how can we be expected to follow the rules if they aren't?

## THE J&J DEFENDANTS' UNLAWFUL CONDUCT IN ARIZONA AND THROUGHOUT THE COUNTRY

197. It is believed and therefore averred that, during the Class period, the J&J Defendants engaged in conduct similar to the other Corporate Defendants with respect to their marketing, promotion, sale and distribution of cancer drugs and other prescription drugs manufactured, distributed, marketed and sold by them. In particular, it is averred that the J&J Defendants adopted similar unlawful practices, such as the artificial inflation of the AWP (or reimbursement price) for their cancer drugs and other prescription drugs, in order to create a spread in their drug prices for the benefit of medical providers and others. Further, it is averred that the J&J Lupron® Defendants engaged in unlawful promotion activities with the Lupron® Manufacturer Defendants with respect to cancer treatments.

198. The drugs manufactured, distributed, marketed and sold by the J&J Defendants and covered by government and private assistance programs include, but may not be limited to: Viadur (leuprolide), ReoPro® (abciximab), an anti-blood clotting medication, Retavase® (reteplase), an anti blood clotting agent, Procrit® (epoetin alfa), for the treatment of anemia, Leustatin® (cladribine), for the treatment of Leukemia, Orthoclone® (muromonab-CD3), used to prevent organ transplant rejection, Sporanox® (itraconazole), used in the treatment of fungal infections, and Remicade® (infliximab), an anti-inflammatory drug, among other prescription drugs. All these drugs had "spreads."

199. Anemia and fungal infections occur in patients undergoing cancer chemotherapy with any of a number of chemotherapy agents. Therefore patients receiving these drugs are likely to receive medications in the epoetin alpha class (Procrit), such as Aranesp (darbepoetin alpha - the Amgen Defendants) and Epogen (epoetin alpha - the Amgen Defendants). They may also be in need of the administration of a drug like Sporanox, Amphocin (amphotericin - the Pharmacia Defendants)

or Fujizone (the Bristol-Myers Defendants). Anti-neoplastic drugs are manufactured by the AstraZeneca Defendants (Tomudex - raltitrexed), the J&J Defendants (Leustatin - cladribine, Doxil - doxorubicin hydrochloride), the Pharmacia Defendants (Adriamycin - doxorubicin hydrochloride, Adrucil - fluorouracil, Neosar - cyclophosphamide, Cystosar-U - cytarabine, and others), the Boehringer Defendants (bleomycin, cisplatin, cyclosporine, etoposide, leukovorin and others), the Bristol-Myers Defendants (Cytoxan - cyclophosphamide, Rubex - doxorubicin hydrochloride, VePesid and Etopophos - etoposide), and the Baxter Defendants (etoposide, doxorubicin), among others.

200.    In addition to the evidence set forth above respecting the J&J Defendants and their employees, the J&J Defendants deliberately marketed and promoted the sale of Remicade to physicians based on the availability of inflated payments made by Medicare, assuring them that they would make a significant profit from the purchase of Remicade as a result of the spread between the actual price to physicians and reimbursement based on the published AWP. The J&J Defendants created promotional materials and worksheets to market the spread. For example, a publication accessible through the J&J Defendants' web sites entitled "Office-Based Infusion Guide" demonstrates Defendants' aggressive marketing of this spread, specifically noting that, "[d]epending on reimbursement, office-based infusion may provide a financial impact to a physician's practice." Moreover, the "Financial Analysis" section of the guide includes a "REMICADE (infliximab) Financial Impact Worksheet," which enables doctors to see in actual dollars how much additional revenue the use of Remicade would bring to their practice.

THE PHARMACIA DEFENDANTS'<br>
UNLAWFUL CONDUCT IN ARIZONA<br>
AND THROUGHOUT THE COUNTRY

201.    It is believed and therefore averred that, during the Class period, the Pharmacia Defendants engaged in conduct similar to the other Corporate Defendants with respect to their marketing, promotion, sale and distribution of cancer drugs and other prescription drugs manufactured, distributed, marketed and sold by them. In particular, it is averred that the Pharmacia Defendants adopted similar unlawful practices, such as the artificial inflation of the AWP (or

1  reimbursement price) for their cancer and other prescription drugs in order to create a spread in their

2  drug prices for the benefit of medical providers and others.

3       202.   The drugs manufactured, distributed, marketed and sold by the Pharmacia Defendants

4  and covered by government and private assistance programs include, but may not be limited to:

5  Adriamycin PFS® (doxorubicin hydrochloride), Adrucil® (fluorouracil), Amphocin® (amphotericin),

6  Aromasin® (bleomycin), Camptosar® (irinotecan hydrochloride), Cleocin Phosphate® (clindamycin

7  phosphate), Neosar® (cyclophosphamide), Cytosar-U (cytarabine), Depo-Testosterone® (testosterone

8  cypionate), Adriamycin PFS® (doxorubicin HCL), Ellence® (epirubicin HCL), Toposar® (etoposide),

9  Adrucil® (fluorouracil), Solu-Cortef® (hydrocortisone sodium succinate), Idamycin® (idarubicin

10  hydrochloride), Medrol® (methylprednisolone) and Vincasar® (vincristine sulfate), among other

11  prescription drugs. All these drugs had "spreads."

12       203.   The majority of the above named medications manufactured and marketed by

13  Pharmacia Defendants are members of the anti-neoplastic class of medications. Patients receiving

14  these medications therefore may receive physician-administered anti-nausea medications such as

15  Kytril (gransietron hydrochloride - GlaxoSmithKline Defendants), Zofran (ondansetron

16  hydrochloride - GlaxoSmithKline Defendants), Lemet (ondonsetron - the Sicor Defendants), Reglan

17  (metoclopramide - the Wyeth Defendants), Pramilem (metoclopramide – the Sicor Defendants), and

18  Anzemet (dolasetron mesylate - Aventis Defendants). They may also receive medications to treat

19  anemia by increasing the production of red blood cells such as Procrit (epoetin alpha - J&J

20  Defendants), Epogen (epoetin alpha - Amgen Defendants) and Aranesp (darbepoetin alpha - Amgen

21  Defendants). Side effects such as a decrease in white blood cells or platelets may necessitate the

22  administration of agents such as Neupogen (filgrastim - Amgen Defendants) or Neumega (oprelvekin

23  - Wyeth Defendants).

24       204.   Representative Pete Stark, commented before Congressional Ways and Means

25  Committee that:

26          The evidence. . . shows that Pharmacia & Upjohn has knowingly and
        deliberately inflated their representations of the average wholesale

27          price ("AWP"), wholesale acquisition cost ("WAC") and direct price

28

("DP") which are utilized by the Medicare and Medicaid programs in establishing drug reimbursements to providers.

205. Excerpt of a letter from Congressman Stark to Pharmacia detail the fraudulent practices by Pharmacia to manipulate AWPs for its drugs.

> The manipulated disparities between your company's reported AWPs and DP are staggering. For example, in 1997, Pharmacia & Upjohn reported an AWP of $946.94 for 200 mg. Of Adriamycin PFS while offering to sell it to American Oncology Resources (AOR) for $168.00 and to Comprehensive Cancer Center for $152.00 (Composite Exhibit "1"). Your company then aggressively marketed its cancer drugs to health care providers by touting financial inducements and other types of incentives. Pharmacia & Upjohn created and marketed the financial inducements for the express purpose of influencing the professional judgment of doctors and other health care providers in order to increase the company's market share.

> The linking of doctor participation in FDA clinical drug trials to their purchase and administration of profit-generating oncology drugs is entirely inconsistent with the objective scientific testing that is essential to the integrity of the trial.

> It is clear that Pharmacia & Upjohn targeted health care providers, who might be potential purchasers, by creating and then touting the windfall profits arising from the price manipulation. For example, Pharmacia & Upjohn routinely reported inflated average wholesale prices for its cancer drug Bleomycin, 15 u, as well as direct prices. The actual prices paid by industry insiders was in many years less than half of what Pharmacia & Upjohn represented. Pharmacia & Upjohn reported that the average wholesale price for Bleomycin, 15u, rose from $292.43 to $309.98, while the price charged to industry insiders fell by $43.15 (Composite Exhibit "4").

> [I]nternal Pharmacia & Upjohn documents... show that Pharmacia & Upjohn also utilized a large array of other inducements to stimulate product sales... including "educational grants" and free goods... designed to result in a lower net cost to the purchaser while concealing the actual price beneath a high invoice price. Through these means, drug purchasers were provided, substantial discounts that induced their patronage while maintaining the fiction of higher invoice price - the price that corresponded to reported AWPs and inflated reimbursements from the government.

In a September 28, 2000 letter to the Pharmaceutical Research and Manufacturers of America United States Congressman Pete Stark, summarized the drug profits that Pharmacia marketed to doctors:

> PHARMACIA: Some of the drugs on the multi-source list offer you savings of over 75% below list price of the drug. For a drug like Adriamycin, the reduced pricing offers AOR a reimbursement of over

1         $8,000,000 profit when a reimbursed at AWP. The spread from
2  acquisition cost to reimbursement on the multi-source products
    offered on the contract give AOR a wide margin for profit.

**THE AMGEN DEFENDANTS'**
3  **UNLAWFUL CONDUCT IN ARIZONA**
4  **AND THROUGHOUT THE COUNTRY**

5        206.    It is believed and therefore averred that, during the Class period, the Amgen

6  Defendants engaged in conduct similar to the other Corporate Defendants with respect to their

7  marketing, promotion, sale and distribution of cancer drugs and other prescription drugs

8  manufactured, distributed, marketed and sold by them. In particular, it is averred that the Amgen

9  Defendants adopted similar unlawful practices, such as the artificial inflation of the AWP (or

10  reimbursement price) for their cancer and other prescription drugs, in order to create a spread in their

11  drug prices for the benefit of medical providers and others.

12        207.    The drugs manufactured, distributed, marketed and sold by the Amgen Defendants

13  and covered by government and private assistance programs include, but may not be limited to:

14  Epogen® (epoetin alfa), Aranesp® (darbepoetin alpha) and Neupogen® (filgrastim), among other

15  prescription drugs. All these drugs had "spreads."

16        208.    These medications, which may be used to treat the bone marrow suppressant effects

17  of many anti-neoplastic medications, may be administered to the same patient population receiving

18  any of a number of these, including, but not limited to anti-neoplastic drugs manufactured by

19  AstraZeneca Defendants (Tomudex - raltitrexed), J&J Defendants (Leustatin - cladribine), the

20  Pharmacia Defendants (Adriamycin - doxorubicin hydrochloride, Adrucil - fluorouracil, Neosar -

21  cyclophosphamide, Cystosar-U - cytarabine, and others), the Boehringer Defendants (bleomycin,

22  cisplatin, cyclosporine, etoposide, leukovorin and others), the Bristol-Myers Defendants (Cytoxan -

23  cyclophosphamide, Rubex - doxorubicin hydrochloride, VePesid and Etopophos - etoposide), and

24  the Baxter Defendants (etoposide, doxorubicin), among others.

25        209.    As set forth herein, Amgen gave out free samples of its drug products which products

26  were then unlawfully reimbursed under government assistance programs.

27

28

&copy; 2002 KLINE & SPECTER, P.C.            59