## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| IN RE: PHARMACEUTICAL | ) | |
| INDUSTRY AVERAGE | ) | |
| WHOLESALE PRICE LITIGATION | ) | MDL No. 1456 |
| _____ | ) | Master File No. 1:01-CV-12257-PBS |
| | ) | Sub-Category Case No. 01:08-CV-11200 |
| THIS DOCUMENT RELATES TO: | ) | |
| *United States of America ex rel.* | ) | Judge Patti B. Saris |
| *Ven-A-Care of the Florida Keys, Inc. v.* | ) | |
| *Baxter Healthcare Corporation and* | ) | |
| *Baxter International, Inc.* | ) | Leave to file granted on October 24, 2012 |
| | ) | |
| *Case No. 10-CV-11186-PBS* | ) | |
| _____ | ) | |

### REPLY OF LINNETTE SUN AND
### GREG HAMILTON IN SUPPORT OF THEIR MOTION
### <u>TO REOPEN THE JUDGMENT AND FOR A HEARING</u>

Pursuant to an invitation by this Court in its August 7, 2012 ruling in *United States ex rel. Sun and Hamilton v. Baxter*, Case No. 08-CV-11200-PBS (the "*Sun/Hamilton*" case), Relators have filed a Rule 60(b)(6) motion seeking to vacate the dismissal and settlement in this *Ven-A-Care* case.  The responses to the Rule 60(b)(6) motion filed by Baxter and Ven-A-Care are misguided on both the facts and law, and the settlement was clearly not fair, adequate, or reasonable with respect to Advate.  This motion's genesis is the October 17, 2011 Court dismissal of the *Ven-A-Care* case, pursuant to a settlement agreement among those two parties and the State of Florida.  Ven-A-Care's operative complaint described in only general terms Baxter's price reporting fraud.  The *Ven-A-Care* complaint also included an exhibit containing a list of over six hundred drugs from over a dozen companies that it alleged had committed fraud.  Baxter's drug Advate is nowhere on

this list.  Advate is, however, one of the drugs that is the subject of a different lawsuit filed by Movants Sun/Hamilton.

Ven-A-Care gave Baxter a broad release of all claims relating to Baxter's "reporting of false prices 'for any and all drugs manufactured, marketed and/or sold by or on behalf of any Baxter Party . . . .' " (*Sun/Hamilton* D.E. 158, at p. 4, Order Granting Motion for Summary Judgment.)  That release, however, was provided *only by Ven-A-Care*.  Under the express terms of the release, it was effective only to the extent Ven-A-Care had the legal right to give such a release.  No similar release was provided by the United States, though the United States did consent to the dismissal of the *Ven-A-Care* case after reviewing the settlement agreement.

It is undisputed that before dismissal of the *Ven-A-Care* case, neither Baxter nor Ven-A-Care ever informed the United States or Sun/Hamilton that either of them intended to release the claims brought in the *Sun/Hamilton* case, or even believed that Ven-A-Care had any legal right to do so.  Nevertheless, one week after the Court approved the settlement and dismissed the Ven-A-Care complaint, Baxter moved for summary judgment on the *Sun/Hamilton* claims based on the argument that the *Ven-A-Care* release applied to the *Sun/Hamilton* claims.  The Court granted summary judgment to Baxter on that basis.

In the course of briefing on a motion for reconsideration filed by Sun/Hamilton, the United States acknowledged that because it did not intervene in either case, it did not have the right to release the *Sun/Hamilton* claims.  The Court denied the Motion for Reconsideration, but invited Sun/Hamilton to file a motion asking the Court to "reopen" the judgment in the *Ven-A-Care* case to determine whether the settlement was fair,

adequate and reasonable with respect to the *Sun/Hamilton* claims, and if it was, to determine Sun/Hamilton's share of the proceeds of the *Ven-A-Care* settlement.   (*Sun/Hamilton* D.E. 193, p. 13, Memorandum and Order Denying Motion for Reconsideration).

It is now clear that the *Ven-A-Care* settlement did not provide *any* value to the United States for the claims raised in the *Sun/Hamilton* lawsuit let alone the fair, adequate, reasonable value contemplated by the False Claims Act.  Baxter's conduct establishes that the corporation understood that Ven-A-Care had no right to release the *Sun/Hamilton* Advate claims.  At the time of the *Ven-A-Care* settlement, Baxter had already filed a motion to dismiss the *Sun/Hamilton* Recombinate claims, asserting that Ven-A-Care was first-to-file – but only as to the Recombinate claims.  (*Sun/Hamilton* D.E. 125, Baxter's Motion to Dismiss).  Baxter never argued that Sun/Hamilton were not the first-to-file Advate claims, because Baxter understood that Sun/Hamilton were indeed first-to-file on Advate.  Thus, Baxter would not have paid any significant value for a release of *Sun/Hamilton's* Advate claims while believing that Ven-A-Care could not release them.

Likewise, Ven-A-Care itself has now acknowledged, in its response to the Rule 60(b)(6) Motion, that Ven-A-Care and Baxter settled the *Ven-A-Care* case understanding the risk that Ven-A-Care might not have a right to a release Baxter from the *Sun/Hamilton* claims.  (*Ven-A-Care* D.E. 30, at pp. 16-20, Ven-A-Care Response to Rule 60(b)(6) Motion ("Ven-A-Care Response").)   It is nonsensical for Baxter and Ven-A-Care to maintain that a sophisticated public corporation would pay fair value to settle claims on the mere gamble that it could obtain a release of those claims in exchange for the settlement.  The United States analyzed the value of the *Sun/Hamilton* claims when passing on the reasonableness of the *Ven-A-Care* settlement.

Because Baxter has received more than it bargained for, at a cost to the United States and Sun/Hamilton, Baxter and Ven-A-Care are now faced with the prospect of an unraveling of their settlement.  Hoping to defend the secretive inclusion of Advate in their settlement agreement, both Baxter and Ven-A-Care are left to grasp at first-to-file arguments, which require each of them to assert *the opposite* of the positions they have already taken before this very Court.  Moreover, the controlling law in the First Circuit establishes that Sun/Hamilton were first-to-file on at least the Advate claims, if not the claims for both Advate and Recombinate.  Advate was a new and different drug to which Baxter applied new and different pricing frauds, which were brought to the attention of the United States only by Ms. Sun and Mr. Hamilton.  And Sun/Hamilton believe, with good reason, that the damages caused to the Treasury by Advate easily reach nine figures, a recovery of which Baxter and Ven-A-Care would deprive the Treasury by Baxter's settlement sleight-of-hand.  Because Ven-A-Care and Baxter knew they had no (or at least a highly uncertain) right to settle the Advate claims, their settlement of the Advate claims (if not the Recombinate claims) is unfair, inadequate and unreasonable, and the dismissal with prejudice based on that settlement must be vacated.

## I.       SUN/HAMILTON WERE FIRST-TO-FILE THE ADVATE CLAIMS.

Under *United States ex rel. Duxbury v. Ortho Biotech Prods., LP*, 579 F.3d 13 (1st Cir. 2009), the *Sun/Hamilton* Complaint – the only complaint to address and allege the pricing and marketing fraud specifically tailored to Advate (and Recombinate) – was filed "first."  *Duxbury* affirmed the reasoning of this Court's decision in *United States ex rel. Ven-A-Care v. Abbott Labs, Inc.*, No. 07-11618, 2008 WL 2778808 (D. Mass. July 15, 2008), in which Ven-A-Care took a position on the first-to-file issue directly opposite to the

one it asserts here.  Baxter itself tacitly acknowledged that Sun/Hamilton were first-to-file on

Advate when it moved to dismiss only *Sun/Hamilton's* Recombinate claims on first-to-file

grounds.

      **A.**     **Ven-A-Care's Position, And This Court's Ruling In *Abbott*, Prove That Ven-A-Care Was Not First-To-File On The Advate Claims.**

      In ruling on a similar "first-to-file" dispute, this Court's decision in

*Ven-A-Care v. Abbott* described a series of complaints that Ven-A-Care filed against Abbott.

Ven-A-Care argued that its original Florida complaint, which contained a general description

of AWP fraud, was *not* sufficient to qualify as "first-to-file" because it did not name the

specific drug that was the subject of a second suit filed by Ven-A-Care in Massachusetts.

This Court's description of the complaints against Abbott and its ruling merit detailed review

here:

> The [original] complaint alleged that the defendants reported "grossly inflated, false and fraudulent cost and price information regarding certain pharmaceutical products" by "knowing[ly] report[ing] that price information] in a manner whereby it was used by the United States Medicare program and by federally funded States' Medicaid Programs in setting reimbursement amounts paid for pharmaceuticals sold by" the defendants.  (1995 Fla. Compl. ¶ 1.)  On March 28, 1997, Ven-A-Care filed an Amended Complaint in the Florida Case, which complaint did not include Abbott as a defendant.  Ven-A-Care later added Abbott back to the Florida Case in its August 1997 Second Amended Complaint.  Ven-A-Care amended its complaint again in December 1999 and continued to include Abbott.  In December 2002, Ven-A-Care again amended its complaint in the Florida Case.  This complaint continued to allege the same general scheme and added numerous Abbott drugs and National Drug Codes ("NDCs"), including several NDCs for Erythromycin products.  (2002 Fla. Compl. Ex. 6 at 29.)
>
> . . .
>
> On April 10, 2000, Ven-A-Care filed a complaint in the District of Massachusetts (the "Massachusetts Case") alleging that several pharmaceutical companies (not including Abbott) "falsely represented

> the prices that they charged wholesalers for certain of their generic prescription drugs … in order to cause various State Medicaid Programs to pay claims in excessive amounts." (2000 Mass. Compl. ¶ 1.) Ven-A-Care amended its complaint in the Massachusetts Case in February 2001, alleging the same general scheme and adding Abbott as a defendant. This complaint included several NDCs for Erythromycin products. (2001 Mass Compl. ¶¶ 84-85.)

2008 WL 2778808 at *1 (*MDL* D.E. 5445 at pp. 2-3) (footnote omitted). Based on this set of facts, Abbott argued that Ven-A-Care's Massachusetts complaint filed in 2001 – the first complaint to name the drug Erythromycin – was barred by Ven-A-Care's earlier filed Florida complaint because the earlier filed complaint alleged the same general AWP scheme as the Massachusetts case. Ven-A-Care properly and successfully argued that the generalized allegation of AWP fraud did not put the government on notice of the Erythromycin claims for the simple reason that the earlier-filed Florida complaint did not include any facts relating to application of the general AWP fraud to Erythromycin. In words tailor-made for the matter at bar, Ven-A-Care argued:

> Abbott's glib assertion that it would have been 'a trivial matter' for the government to 'discover additional fraud' and, specifically, to 'uncover the names of other drugs for which there was a spread' totally contradicts the entire premise of these cases and the evidentiary record that has developed in all of the AWP cases in the MDL . . . *the actual prices of specific drugs comprise precisely the critical information* that VAC, as an industry insider, provided to the government that was otherwise unavailable to the government.

*In re Pharm. Ind. Average Wholesale Price Litig.*, No. 01-CV-12257, 2007 WL 4881309 at *8 (D. Mass. Nov. 29, 2007) (emphasis added) (*MDL* D.E. 4912, Ven-A-Care's Memorandum in Opposition to Abbott Lab's Motion to Dismiss or Partially Dismiss the Relator's Complaint). This Court accepted Ven-A-Care's argument:

> Notice of fraud in one drug's pricing is not notice of fraud in another drug's pricing, as Abbott well knows. This is because drugs are often

> marketed, reimbursed, sold, and priced in different ways.  *See In re Pharm. Indus. Average Wholesale Price Litig.*, No. 01-12257, 2007 WL 4287572, at *3 (D.Mass. Dec. 6, 2007) ("The conclusory allegation of one 'broad scheme' is inadequate particularly in light of the evidence in this MDL demonstrating that each drug must be analyzed differently.")

*Id*. at *3.

That ruling apparently no longer suits Ven-A-Care.  So it now argues that the general allegations of AWP fraud contained in its complaint against Baxter, which include no specific allegations about *any* biological drug, much less any facts relating to Advate, were nevertheless sufficient enough to put the government on notice that *because Baxter engaged in pricing fraud, it must have engaged in pricing fraud with respect to Advate*.  If the generalized fraud allegations in the Florida *Abbott* case – which failed to name a specific drug – were not sufficient to bar Ven-A-Care's later-filed case that did name a specific drug, then those same generalized allegations are not sufficient to bar the *Sun/Hamilton* claims here.  To paraphrase Ven-A-Care's own argument, "the actual prices of specific drugs [here Advate and Recombinate] comprise precisely the critical information that [Sun/Hamilton] provided to the government that was otherwise unavailable to the government."

**B.     Controlling Law Dictates That Sun/Hamilton Were First-To-File On At Least The Advate Claims.**

In seeking to save the settlement, Ven-A-Care makes an argument directly at odds with its position in *Abbott*, and directly at odds with the controlling law in this Circuit. Both Baxter and Ven-A-Care acknowledge the First Circuit's opinion in *Duxbury* as the controlling law, but neither discusses the underlying facts of that case.  *Duxbury* actually shows that Sun/Hamilton – not Ven-A-Care – were first-to-file on at least the Advate claims. In *Duxbury*, the original relator alleged that Ortho Biotech engaged in illegal kickbacks and

off-label marketing to sell the drug Procrit.  But according to the First Circuit, Duxbury's generalized allegations of off-label marketing were *not* sufficient to bar a later-filed complaint that contained important, specific information.  The First Circuit's comparison between the original relator's off-label marketing allegations and the more specific allegations in a later-filed case are worth visiting in detail:

> The Relators contend that the Original Complaint, in particular, Paragraphs 40 through 42, allege all of the "essential facts" of the off-label promotion scheme.  As the district court found, there are significant similarities between the "off-label" promotion allegations contained in those paragraphs and the allegations in the Blair Complaint.  Both allege that OBP did not have FDA approval for "a dosing regimen of 40,000 units once per week." (*Compare* Original Compl. ¶¶ 40(c); 41; Blair Compl. ¶¶ 22-27).  Both allege that OBP promoted this dosage in order to "increase . . . payments for each Medicare Beneficiary receiving Procrit for treatment." (*See* Original Compl. ¶¶ 40(c); 41; Blair Compl. ¶¶ 22-27).  And both allege that the higher dosage resulted in the filing of false claims with the government. *See Duxbury*, 551 F.Supp.2d at 113 (noting these similarities).
>
> However, the Original Complaint and Blair Complaint differ in one crucial respect.  As recognized by the district court, the Blair Complaint contained a number of allegations that discuss, in significant detail, OBP's promotion of the "off-label" use, and alleged such "promotion" efforts as
>
>> (1) direct off-label marketing to medical professionals; (2) influencing the results of purportedly independent clinical studies; (3) illegal payments to medical professionals in the form of "educational grants" and "clerkships;" (4) payments to medical professionals for giving presentations on increased dosage of Procrit; or (5) attending consulting conferences sponsored by OBP which pushed increased dosage of Procrit; and (6) rebate programs offered to induce increased prescriptions of Procrit.
>
> *Id*. at 113 (citing Blair Compl. ¶¶ 27, 28-79).  By contrast, Paragraphs 40 through 42 of the Original Complaint only allege one method by which OBP promoted the "off-label" use of Procrit, the use of "clinical trials," and, in particular, an unnamed "Phase IV Study" that

"resulted in Medicare Part B paying for 40,000iu/week of Procrit in cancer chemotherapy patients instead of 30,000iu/week-an increase in 33% in payments for each Medicare Beneficiary receiving Procrit for treatment of their chemotherapy related anemia." (Compl. ¶40(c)).  As this allegation fails to encompass the other allegations contained in the Blair Complaint concerning OBP's "off-label" *promotion*, it fails to allege the "essential facts" of the "off-label" *promotion scheme* contained in the Blair Complaint.  In fact, the Original Complaint nowhere refers to a "off-label" promotion scheme.  Thus, we conclude that the Original Complaint cannot trump the Blair Complaint for purposes of the "first-to-file" rule.

*Id.* at 33.  *Duxbury* held that the original complaint, although it alleged the basic, general scheme of off-label marketing and even some details, was missing critical details and thus did not qualify as the "first-filed" complaint.  *Duxbury* does not support Baxter and Ven-A-Care – it shows why their argument fails.  Like the original complaint in *Duxbury*, the *Ven-A-Care* complaint only generally described AWP fraud.  Like the original *Duxbury* complaint, the *Ven-A-Care* case is not only missing the "significant detail" surrounding the particular pricing fraud Baxter engaged in with respect to Advate (and Recombinate), the *Ven-A-Care* case does not contain any allegations at all with respect to how pricing or marketing worked for Advate – or even for the predecessor drug Recombinate.  In fact, the *Ven-A-Care* complaint was filed against more than a dozen defendants.  The only three paragraphs that even mentioned Baxter's conduct were cut and pasted from allegations against the other defendants.  The *Ven-A-Care* complaint also included a chart listing the pricing for three Baxter drugs, none of which are even biologic drugs.  The only reference to Recombinate is in an exhibit listing hundreds of drugs, and there is no reference to Advate at all.

By stark contrast, the *Sun/Hamilton* Complaint significantly details how Baxter manipulated the prices of Recombinate and Advate specifically to procure for its

customers an improperly inflated reimbursement from the state Medicaid Programs.  The scheme described by Sun/Hamilton was different than the generalized AWP pricing fraud and resulted in much larger spreads than were at issue in other cases.  (*Sun/Hamilton* Complaint, D.E. 102, at ¶¶ 28-49.)  The *Sun/Hamilton* Complaint, unlike the *Ven-A-Care* complaint, even describes specific Baxter meetings about pricing the two drugs at issue, and details a price-manipulation scheme that goes far beyond the generalized AWP fraud described by Ven-A-Care.  The differences between the *Ven-A-Care* complaint and the *Sun/Hamilton* Complaint are even more stark than the differences between the earlier and later-filed complaints in *Duxbury*.  The *Ven-A-Care* complaint not only failed to provide details about the pricing of the drugs at issue in the *Sun/Hamilton* case, it did not even mention one of the drugs.  *Duxbury* affirms the importance of specific detail, and Ven-A-Care's own argument about the importance of providing specific pricing for a specific drug.  Accordingly, Sun/Hamilton were first-to-file on at least Advate, if not Recombinate as well.

### C.     Recombinate And Advate Are Not The Same Drug.

In tacit recognition that *Duxbury* controls, Ven-A-Care (and Baxter) studiously ignore important distinctions between the drug Recombinate (which was one of hundreds of drugs listed in an exhibit to the *Ven-A-Care* complaint) and Advate (which was never even mentioned in the *Ven-A-Care* case).  Their principal argument is that Advate was simply a "newer version" of Recombinate (Ven-A-Care Response, D.E. 30, p. 6), and that "Advate is so closely related to Recombinate that it was included within the same Healthcare Common Procedure Coding System Code as Recombinate and similar anti-hemophiliac products." (*Ven-A-Care* D.E. 32, p. 15, Baxter Response to Rule 60(b)(6) Motion ("Baxter Response").)

For these reasons, Baxter and Ven-A-Care assert that if Ven-A-Care was first-to-file on Recombinate, then it was first-to-file on Advate.

But the way Advate and Recombinate were coded under that system says nothing about how those drugs were marketed and priced *by Baxter*. In fact, Advate was developed to replace Recombinate and featured critical scientific improvements that made Advate a very different drug. Advate – unlike Recombinate or any other competitive product – was the first anti-hemophilic factor to be made without any added human or animal plasma proteins, thereby eliminating the risk of infections caused by viruses such as HIV, West Nile or Mad Cow disease. *See Baxter Healthcare Cor. v. Weeks*, 643 F. Supp. 2d 111, 112 (D.D.C. 2009). Given these unique features of Advate, Baxter intended it to be what the Pharma Industry refers to as a "category killer" – a drug that has such a distinct and sustained competitive advantage that other drugs simply cannot effectively compete. Such features had implications for the marketing and pricing of Advate which made the pricing fraud different from that of any other product.[1] In any event, even if the drugs were marketed and priced identically, the *Ven-A-Care* complaint contained no detail whatsoever about the marketing or pricing of either one. Indeed, the hemophilia-drug market is unique where the drugs are distributed not by retail pharmacies, but by specialty pharmacies (a/k/a home-health companies), creating a unique set of reimbursement incentives. (Deposition of Linnette Sun at 121:11-122:18, attached hereto as Exhibit A.) Therefore, under *Duxbury*, as

---

[1]      Baxter acknowledged that it believed Advate was a very different drug when it sued CMS, arguing that Advate should be considered a single source drug instead of a multiple source drug. *Baxter Healthcare Corp. v. Weeks*, 643 F. Supp. 2d 111, 113-114 (D.D.C. 2009). Although Baxter points out that CMS rejected such classification for Medicare reimbursement, it did so only due to a "grandfather clause" governing the classification decision, and not because of any rejection of the drug's unique quality. *Id.* Moreover, that ruling on Medicare reimbursement did not affect *Medicaid* reimbursement, which is at the heart of this case. Nor did CMS permit or approve inflated AWP and WAC reporting by Baxter.

well as this Court's prior decisions, the *Ven-A-Care* complaint cannot preclude the detailed claims made in the *Sun/Hamilton* Complaint.[2]

There is a reason why, in the four years that the Ven-A-Care and Sun/Hamilton cases have proceeded side by side in this MDL, neither Ven-A-Care nor Baxter had ever once claimed that Ven-A-Care was first-to-file on the Advate claims. There is a reason that Baxter consciously left Advate out of its first-to-file arguments. The law and facts are clear that Ven-A-Care was not the first-to-file on the Advate claims, if not the Recombinate claims as well.

## II.   RULE 60(B)(6) IS THE APPROPRIATE VEHICLE FOR RELATORS TO PURSUE A FAIRNESS HEARING OR, ALTERNATIVELY, A SHARE OF THE PROCEEDS.

Sun/Hamilton have a stake in the *Ven-A-Care* settlement, sufficient to entitle them to relief under Rule 60(b)(6). Sun/Hamilton's interests were so "strongly affected" by the settlement that it resulted in a dismissal of their claims. *In re Lawrence*, 293 F.3d 615, 627 n.11 (2d Cir. 2002) ("several circuit courts have permitted a non-party to bring a Rule 60(b) motion or a direct appeal when its interests are strongly affected"). Baxter and Ven-A-Care's arguments to the contrary ignore precedent establishing the rights of non-parties a vehicle to contest settlements that affect the non-parties' rights. *See id.* (collecting cases). Although the court in *United States ex rel. LaCorte v. Wagner*, 185 F.3d 188 (4th Cir. 1999) found that certain relators who settled their own false claims act case had no right to *intervene* in a separate but related FCA case, the Fourth Circuit also noted that Rule 60(b)(6) provides a mechanism to protect relators' interests:

---

[2]    To the extent the Court believes that admissible evidence of the specific differences between Recombinate and Advate with respect to pricing and marketing are necessary to the first-to-file determination, Sun/Hamilton request an evidentiary hearing to present such evidence.

> Indeed, an original qui tam plaintiff need not intervene in another qui tam action to vindicate his rights when the government pursues an alternate remedy.  Other mechanisms are available for qui tam plaintiffs to protect their interests.  For example, before a settlement takes effect, a relator has an opportunity to contest the fairness, adequacy, and reasonableness of the settlement at a hearing.   31 U.S.C. § 3730(c)(2)(B).   If the relator believes that the government acted improperly in procuring a settlement, then he may return to the court which had jurisdiction over the settlement and move to reopen the judgment under Fed.R.Civ.P. 60(b)(6).

*Id*. at 191.   Despite this clear language supporting the procedure pursued here by Sun/Hamilton, Baxter and Ven-A-Care would have this Court believe that *Wagner* supports *their* position.  Not true.  Unlike in *Wagner,* this Court has already recognized that the *Ven-A-Care* settlement *did* create an alternative remedy for the *Sun/Hamilton* claims. (*Sun/Hamilton* D.E. 193, Memorandum and Order Denying Motion to Reconsider.) Moreover, the parties have acknowledged, and this Court has noted, that Sun/Hamilton were not given notice that the underlying *Vent-A-Care* settlement impacted their rights and thus were not given the opportunity to contest the fairness of the settlement *prior* to its entry. (*Sun/Hamilton* D.E. 193, p. 10, Memorandum and Order Denying Motion for Reconsideration).

Other Courts of Appeals in similar situations have determined that Rule 60(b)(6) provides a proper vehicle for relief where non-parties' rights are bargained away in settlement negotiations without the non-parties' involvement.  For example, in *Binker v. Commonwealth of Pa.*, 977 F.2d 738 (3d Cir. 1992), three non-parties brought a 60(b)(6) motion to challenge the overall fairness of a settlement agreement designed to make whole police officers illegally forced into early retirement.  The non-parties, three individual police officers, sought to challenge the overall fairness of the settlement agreement

negotiated between the EEOC and the city.  After the District Court denied the non-parties' motion on appeal, the Third Circuit reversed, holding that the non-parties had standing to bring a 60(b)(6) motion because the settlement agreement affected their rights.  *Id.* at 745.

In *Dunlop v. Pan Am. World Airways, Inc.*, 672 F.2d 1044 (2d Cir. 1982), three former Pan Am. employees filed a Rule 60(b)(6) motion to amend a stipulation of dismissal.  The stipulation had been negotiated between the Secretary of Labor and Pan Am. with regards to an FLSA suit.  The individual employees sought to have certain state claims adjudicated and sought to amend the stipulation of dismissal to do away with any improper preclusive effect.   The Court found that the employees had standing to bring the Rule 60(b)(6) motion, reasoning:

> Although Rule 60(b)(6) would not ordinarily be available to non-parties to modify final judgments, we hold that on the facts of this case appellants were sufficiently connected and identified with the Secretary's suit to entitle them to standing to invoke Rule 60(b)(6).

*Id.* at 1051-52.

Similarly, in this case, Baxter successfully argued to this Court that Sun/Hamilton's interests were sufficiently "connected and identified" with the *Ven-A-Care* settlement so as to have been released by that settlement.  Given Baxter's assertion and this Court's conclusion that the *Ven-A-Care* settlement enveloped the *Sun/Hamilton* claims, Sun/Hamilton have appropriately pursued their rights under Rule 60(b)(6).

**III.   A FAIRNESS HEARING WILL DEMONSTRATE THAT $100-200 MILLION IN ACTUAL DAMAGES FOR THE ADVATE CLAIMS RENDERS THE *VEN-A-CARE* SETTLEMENT UNFAIR, INADEQUATE AND UNREASONABLE WITH RESPECT TO ADVATE.**

It is simply not realistic to argue that Ven-A-Care was able to negotiate a fair, reasonable, or adequate settlement for the Advate (if not Recombinate) claims given that:

(1) Ven-A-Care was uncertain that it had any right to provide Baxter with a release for the Advate claims; and (2) Baxter itself did not believe that Ven-A-Care was first-to-file on the claims or that a release from Ven-A-Care would hold up.  No defendant would pay a fair or reasonable settlement amount in exchange for a release of questionable validity.  Moreover, the government itself has taken the position that "Advate was not part of the settlement agreement . . ." and thus cannot be said to have valued the Advate claims when approving the settlement.  (*Sun/Hamilton* D.E. 174, Transcript of Proceedings dated April 25, 2012, at 24:14-19).

In defense of the settlement, Ven-A-Care and Baxter now put forward after-the-fact rationalizations as to why the *Sun/Hamilton* claims have no merit.  These arguments do not hold up to scrutiny.  The *Ven-A-Care* settlement amount (*$25 million*) demonstrates that it did not take into account the reasonable settlement value of the Advate claims.  Baxter's exposure for only the federal share of actual damages arising from Advate exceeds $100 million.  That number grows to more than $400 million once trebling and penalties are computed.  (The spreadsheet attached as Exhibit 1 to the Declaration of Heidi M. Smith, attached hereto as Exhibit B, which is described below, details the damage exposure.)

The *Sun/Hamilton* claims are based on the fact that Baxter consciously and purposely reported a "list price" to First Databank for Recombinate and for Advate, instead of reporting as required, the actual Wholesale Acquisition Cost ("WAC") of those drugs to Baxter's most significant customers, such as specialty pharmacies (*Sun/Hamilton* Complaint, D.E. 102, at  ¶¶ 39-41).   Indeed, First Databank had begun to require pharmaceutical companies to report drug's WAC as a cure for many of the recognized problems with AWP

reporting.  *Id*. at ¶¶ 25-26.  Baxter knew that reporting a "list price" that was greater than its WAC would lure First Databank into using the list price to create an inflated WAC, an inflated AWP, and an inflated reimbursement from state Medicaid Programs.  *See id.* at ¶¶ 39, 42.  Indeed, this strategy to mislead First Databank was expressly discussed at meetings attended by Relator Sun and also discussed in conversations between Relator Hamilton and employees at First Databank.  (*Sun/Hamilton* Complaint, D.E. 102, at ¶¶ 39-49.)

The attached spreadsheet contains a year by year accounting of the total individual units of all Advate products reimbursed by state Medicaid Programs, the number of prescriptions reimbursed, and the total amount of Medicaid reimbursement, all of which were obtained directly from the CMS Medicaid website.  *See* Declaration of Heidi M. Smith, Exhibit 1.  From the total units of Advate reimbursed and the total dollar amount reimbursed, the spreadsheet calculates the resulting Medicaid reimbursement per individual unit (Price/Unit), which had been set in the first instance by the various state Medicaid Programs with reference to the pricing data supplied by First Databank.  *Id.* at ¶¶ 9-13.  The spreadsheet compares the actual Medicaid reimbursement for Advate products to the actual pharmacy acquisition cost – what pharmacies actually paid Baxter for Advate (and what the Medicaid reimbursement should have been if Baxter had accurately reported its real prices to First Databank).  *Id.* at ¶¶ 13-15.  The difference between those two per unit prices multiplied by the total units reimbursed by Medicaid equals the amount the state Medicaid Programs overpaid for Advate on account of Baxter's misreporting.  *Id*. at ¶ 15.  That number, collected from 2003 (the year when Advate hit the market) through Q3 2011 (and assuming similar figures for Q4 2011 and 2012), adjusted for states which already settled with Baxter, exceeds

$200 million.  ¶¶ 16-23.  Using a conservative figure of 50% to approximate the federal Medicaid share, the damages to the United States over that same period, with these same adjustments, exceed $100 million.  Trebling and penalties per prescription puts the total damage expense in excess of $400 million.

Yet Ven-A-Care and Baxter now try to convince this Court that there was no merit to the Advate claims because by the time Advate hit the market, "the government was well aware of AWP pricing issues" and of "Advate pricing".  (*Ven-A-Care* D.E. 32, Baxter Response, at p. 2 n.1.)  It is axiomatic that the state Medicaid Programs knew how they calculated their own reimbursement for Recombinate and Advate – they were the ones providing the reimbursement.  It is also clear that by the time Advate hit the market, the government was generally aware of issues with respect to AWP pricing.  But neither Ven-A-Care nor Baxter point to any evidence that the government knew and approved of the reporting by Baxter to First Databank of bogus "list prices" which Baxter intended to and did use to generate Medicaid reimbursement levels greatly exceeding any permissible spread over the actual acquisition cost to the pharmacies that were dispensing most of the product. Indeed, this new form of deception was developed because, as Baxter noted, the "cat was already out of the bag" on the standard form of AWP fraud.

Baxter and Ven-A-Care ignore Baxter's intentionally misleading price reporting to First Databank.  Instead, they focus on information reported, and actions taken, by CMS.  As explained below, the CMS materials cited by Baxter and Ven-A-Care are irrelevant to the Sun/Hamilton claims.  The CMS materials cited in Ven-A-Care's response demonstrate that CMS had approved pricing for Advate and other blood clotting factors at 95% of AWP instead of the 85% of AWP reimbursement applied to most other drugs and

biologics.  (*Ven-A-Care* D.E. 31, Declaration of James J. Breen in support of Ven-A-Care's Response, Exhibit B, p. 2.)  Thus, under this formulation, any over-stating of the actual prices would have, in fact, led to the same inflated AWP and inflated Medicare reimbursement alleged by Sun/Hamilton.   Baxter also cites to its letters to CMS in November 2003 and March 2004 in which it disclosed "retail prices" for Advate ranging from $1.15 to $1.08 per individual unit (IU) to support its argument that the government had full knowledge of Baxter's Advate pricing.  In fact, even these letters overstated the pricing because the true "retail" price actually paid by the vast majority of specialty pharmacies that purchased and dispensed Advate ranged from $0.90 – $0.93 per IU.[3]  *See* Declaration of Greg Hamilton, attached hereto as Exhibit C.  This spread between what Baxter disclosed to CMS as the "retail price" and the actual pharmacy acquisition cost supports the estimate of actual damages to the federal government in an amount in excess of $100 million from 2003-2011.[4]  *See* Ex. A.

Finally, Baxter and Ven-A-Care make much of the fact that as of 2004, and pursuant to the Medicare Modernization Act, Medicare reimbursement was no longer based on AWP pricing.  (Ven-A Care Response, D.E. 30, at p. 4; Baxter Response, D.E. 32, at p. 2 n.1.)  This particular argument, along with all of Baxter's and Ven-A-Care's arguments

---

[3]      Furthermore, Baxter's letters to CMS defines "retail pricing" as "hospital pricing."  *See* Baxter March 16, 2004 letter to CMS, f.n. 16.  The disclosure to CMS of Baxter's *hospital pricing* gave no disclosure to CMS about how WAC or AWP should be calculated.

[4]      The total reimbursement in excess of pharmacy acquisition cost may overstate and understate the federal share of actual damages.  It may overstate the actual damages because it may include Medicaid reimbursement from 2003-2007 that was not reimbursable by the federal government.  *See* Exhibit B, ¶ 13.  In addition, it is likely that Medicaid would have reimbursed slightly higher than the pharmacy acquisition cost to cover dispensing fees, but that difference is not significant.  The actual damages may be understated because the acquisition cost to the largest specialty pharmacies that purchased the vast majority of Advate may have been even less than the acquisition cost used in the spreadsheet.

discussed above suffer from the same factual flaw.  The *Sun/Hamilton* damage calculations attached hereto are based on *Medicaid* damages only – not Medicare.  Therefore, the effects of the Medicare Modernization Act, which affected only Medicare reimbursement, are irrelevant to this case.  Moreover, state Medicaid Programs had no access to the pricing data CMS used for Medicare reimbursement; and any knowledge by CMS of Baxter's Advate or Recombinate pricing would have had no impact on Baxter's ability to issue inflated "list prices" to First Databank and thereby mislead state Medicaid Programs into inflating Advate reimbursement.

In all of their efforts to denigrate the merits of the *Sun/Hamilton* claims, Baxter and Ven-A-Care leave the most critical question unanswered:  if Baxter truly wanted state Medicaid Programs to have the correct pricing information they needed to determine accurately and properly the reimbursement amount for Advate and Recombinate, why did Baxter refuse to provide that information to First Databank, and instead provide inflated, "list prices."  Sun and Hamilton knew the answer to that question from their direct dealings with the individuals at Baxter and First Databank who were involved in that "list price" reporting. Baxter knowingly submitted inflated pricing information to First Databank so that Baxter could illegally promote the inflated spreads between what the pharmacies paid Baxter and what they would receive from State Medicaid Programs as reimbursement.

In any event, it is not necessary at this point for the court to determine once and for all the merits of Sun/Hamilton's claims.  Rather, the next step is for the court to schedule a fairness hearing on the value of the *Sun/Hamilton* claims.  Such a hearing will afford all parties ample opportunity to determine whether the *Sun/Hamilton* claims should

have been analyzed and valued at an amount above *zero* before Baxter was given a release of those claims.

Dated:  November 12, 2012                Respectfully submitted,

LINNETTE SUN and GREG HAMILTON


By____/s/ David J. Chizewer_____
        One of Their Attorneys

Terry F. Moritz                          Mark Allen Kleiman
David J. Chizewer                        LAW OFFICE OF MARK ALLEN KLEIMAN
GOLDBERG KOHN LTD.                       2907 Stanford Avenue
55 East Monroe Street – Suite 3300       Venice, California  90292
Chicago, Illinois  60603                 (310) 306-8094
(312) 201-4000

Lauren John Udden                        Frederick M. Morgan, Jr.
15 West Carrillo Street – Suite 101B     Jennifer M. Verkamp
Santa Barbara, California  93101         MORGAN VERKAMP LLC
(805) 879-7544                           700 Walnut Street – Suite 400
                                         Cincinnati, Ohio  45202-2015
                                         (513) 651-4400

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, an attorney, hereby certifies that on November 12, 2012, he caused a true and correct copy of the foregoing **REPLY OF LINNETTE SUN AND GREG HAMILTON IN SUPPORT OF THEIR MOTION TO REOPEN THE JUDGMENT AND FOR A HEARING** to be served via the Court's ECF/electronic mailing system and LexisNexis File & Serve upon all parties of record.


/s/ David J. Chizewer
David J. Chizewer