# Exhibit C

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| IN RE: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) | MDL No. 1456<br>Master File No. 1:01-CV-12257-PBS<br>Sub-Category Case No. 10-CV-11186-PBS |
| THIS DOCUMENT RELATES TO:<br>*United States ex rel. Linnette Sun and Greg Hamilton, Relators*<br>*v.*<br>*Baxter Healthcare Corporation* | ) | Judge Patti B. Saris |

**DECLARATION OF GREG HAMILTON**

I, Greg Hamilton, declare and state as follows:

1. I am one of the Relators in *United States ex rel. Sun and Hamilton v. Baxter*, Case No. 08-CV-11200-PBS (the "*Sun/Hamilton*" case). If called upon to do so, I could and would testify competently to the following based upon firsthand knowledge.

2. I have worked for pharmaceutical manufacturers and pharmacy benefit managers for over 20 years. As explained further below, I have worked for pharmacies which distributed Baxter drugs, including Recombinate and Advate, and participated in price negotiations for these drugs. During my tenure in the pharmaceutical industry, I gained specific knowledge about the market for Factor VIII recombinant products, such as Advate and Recombinate, used by hemophiliacs.

3. From 2001—2004, I was the Senior Director of Strategic Sales and Planning at Specialty Distribution Services for Express Scripts. Express Scripts was and remains a pharmacy benefit manager. Specialty Distribution Services was a specialty pharmacy

operated within Express Scripts. Specialty pharmacies constitute a distinct type of pharmacy which ship prescriptions for special pharmaceutical products directly to patients from a warehouse. Specialty pharmacies generally do not offer walk-up, in-person pharmacy services. The prescription drugs offered by specialty pharmacies differ from those offered by retail pharmacies. Specialty pharmacies fill prescriptions for products, such as Recombinate and Advate, that are generally more expensive than traditional prescriptions, may require special handling (such as temperature control), and may necessitate special patient education before a prescription for the drug may be filled.

4. While I was the Senior Director of Strategic Sales and Planning at Specialty Distribution Services, I started a hemophilia program pursuant to which Specialty Distribution Services made hemophiliac factor products available for shipment to hemophiliacs and any other patients in need of those products. Specialty Distribution Services purchased hemophilia related products directly from manufacturers, such as Baxter, and sold them to patients. I negotiated the purchasing contracts for hemophilia related products directly with the manufacturers, including contracts to purchase Recombinate and Advate. I also negotiated pricing and reimbursement with persons or entities ultimately responsible for paying Specialty Distribution Services for the prescriptions, such as insurance providers.

5. In 2004, Express Scripts acquired CuraScript, which became an operating division of Express Scripts. Before the acquisition, CuraScript was an independently owned and operated specialty pharmacy. Specialty Distribution Services' hemophilia program was incorporated into CuraScript's general operations. After the acquisition, from 2004—2006, I was the Vice-President of the CuraScript Bleeding Disorder Program—the program

responsible for marketing the pharmacy's services to the patients in need of Factor VIII products such as Recombinate and Advate. During that time, I continued to negotiate purchase contracts with Baxter for Recombinate and Advate.

6. Through my employment with Express Scripts and CuraScript in the years 2001—2006, and my specific responsibility for negotiating pricing with Baxter, among other companies, I had direct knowledge of the internal cost information for the various hemophilia products purchased by Specialty Distribution Services/CuraScript, including Recombinate and Advate. Attached hereto as Exhibit 1 is an example of a Therapeutic Products Purchase Agreement between Baxter and CuraScript, the type of which I had negotiated during the course of my work. The Agreement outlines payment terms for the purchase of Advate and Recombinate, as well as volume rebates for the purchase of the same drugs.

7. Attached hereto as Exhibit 2 is a copy of a spreadsheet that was provided to CuraScript. The spreadsheet exhibits a reconciliation of purchases CuraScript made under a Therapeutic Products Purchase Agreement against actual rebates received from Baxter. While I was employed by CuraScript, Baxter provided such reconciliation documents on a quarterly basis.

8. Attached hereto as Exhibit 3 is a copy of a spreadsheet entitled "Factor Pricing," which was maintained under my direction by CuraScript's personnel. The document was created for use by CuraScript's sales and other personnel to provide pricing information so that CuraScript's sales team could market CuraScript's products and services (including Recombinate and Advate) to end-payors, such as insurance companies. The spreadsheet shows CuraScript's actual acquisition price for various drugs. As of May 5,

2006, CuraScript's acquisition price for Advate was $.9375 per individual unit ("IU"). During my tenure at CuraScript, the price I was able to negotiate depended on the volume of product I purchased for CuraScript. Each of the country's two largest specialty pharmacies, Caremark and Accredo Health Group, Inc., purchased about ten times more product than CuraScript. Based on my experiences with the pharmaceutical business, I believe the price those two largest specialty pharmacies paid for Advate based on their volume discounts was significantly lower than what CuraScript paid.

9. While working at Express Scripts and Cura Script, I also learned about competitors' acquisition prices for drugs such as Advate through my review of "The Market Research's PLASMA FRACTIONS MARKET IN THE US report", which is an annual publication for the plasma industry. The Market Research Bureau ("MRB") was founded and is operated by Patrick Robert, a former colleague of mine when I worked for Bayer. Robert left Bayer and created the MRB in the mid-1990's to provide the plasma industry with a much needed data source. The standard source for the drug industry is IMS Health, however, at that time, IMS Health did not audit/cover plasma products. Robert provided to me copies of the MRB, or portions of the MRB that related to Factor VIII products. Those reports covered pricing through 2010. Attached hereto as Exhibit 4 is an excerpt of one MRB report; the excerpt shows that pharmacies paid an average of $0.93 per IU for Advate in 2009.

10. This information on acquisition cost was not publicly available. On September 13, 2009, I called the MRB and spoke with Cindy Lynn, Robert's secretary. Lynn told me that a single issue of this publication costs $16,000, and that there are fewer than 20 subscribers, including manufacturers, a few specialty pharmacies, and a few 340(d) entities.

Lynn also told me that the MRB does not sell or give any of their reports to university libraries or public libraries. I gained access to the MRB reports either when they were purchased by one of my employers or through Robert.

11. Based on CuraScript's internal cost information, my knowledge of prices paid by CuraScript's larger and smaller competitors, and information obtained from The Market Research's PLASMA FRACTIONS MARKET IN THE US report, I believe the price actually paid by the pharmacies that purchased and dispensed the vast majority of Advate ranged from $0.90 - $0.93 per IU during the years 2004—2006. I believe that those pharmacies continued to pay as little as $0.92 per IU for Advate through 2010.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 11 day of November, 2012.

Greg Hamilton

# Exhibit 1

Express Scripts

# THERAPEUTIC PRODUCTS PURCHASE AGREEMENT

*Recitals*

Baxter Healthcare Corporation, a Delaware corporation, through its BioScience business unit, with offices at One Baxter Parkway, Deerfield, Illinois 60015 ("Baxter") is extending to Curascript Pharmacy, Inc. and all it's affiliates, with offices at 6272 Lee Vista Blvd., Orlando, FL 32822 ("Purchaser") the following pricing for the therapeutics and devices ("Therapeutic Products") set forth in Schedule A. This pricing is being offered to Purchaser in accordance with this Therapeutic Products Purchase Agreement as well as the Quarterly Rebate set forth in Schedule B, and the Estimated Forecast set forth in Schedule C, which Schedules will be incorporated herein and made a part hereof (collectively, the "Agreement"). Baxter and Purchaser are collectively referred to herein as the "Parties".

*Now, Therefore, It Is Hereby Agreed As Follows:*

1. **Term**. Unless otherwise terminated as herein provided, the term of this Agreement shall begin January 1, 2006 ("Effective Date") and end December 31, 2006, subject to the termination provisions set forth below.

2. **Pricing.** Baxter agrees to hold firm the prices set forth on Schedule A through the Term of the Agreement.

3. **Payment Terms**. Payment terms are one and a half percent (1.5%) fifteen (15) net thirty-one (31) days from date of invoice. Purchaser shall pay Baxter a service charge of 1-1/2% per month (18% per year) or the highest amount allowed by law, if lower, on all amounts past due. In the event Purchaser is delinquent in payment of any amounts to Baxter, whether or not related to this Agreement, Baxter may, at its option (a) declare all amounts owed to it under all agreements as due and payable immediately, and (b) terminate this Agreement.

4. **Conditions of Sale**. Baxter agrees to sell the Therapeutic Products to Purchaser and Purchaser agrees to purchase the Therapeutic Products for resale, distribution or use within the United States to patients for whom (a) Purchaser holds an active prescription for the Therapeutic Products, and/or (b) Purchaser provides homecare services, and/or (c) a doctor has ordered their use.

5. **Licenses**. Purchaser agrees to maintain all licenses necessary for the purchase and dispensing of the prescription Therapeutic Products (e.g., state pharmacy license, physician's license, etc.) and will forward a copy of such license to Baxter upon request. The Therapeutic Products purchased under this Agreement are not for resale, barter or trade to other purchasers of such therapeutics and devices or for export.

6. **Forecast**. This Section 6 applies to Advate rAHF-PFM, Recombinate rAHF, Hemofil M AHF,and FEIBA VH only. Within five (5) business days after the Effective Date of this Agreement, and at least thirty-five (35) days prior to each succeeding calendar quarter, Purchaser will provide Baxter with a written forecast of its anticipated purchases of the Therapeutic Products set forth above for the upcoming quarter of the Agreement. Purchaser will determine estimated forecast by using the following formula: (beginning inventory + estimated demand) - inventory target = Estimated Forecast. The format for such Estimated Forecast is to be submitted on the form in Schedule C attached hereto. Baxter will use such forecasts submitted by Purchaser in production planning, provided, however, that in no event will any such forecast hereunder constitute an order, create any right or expectation in Purchaser or be binding in any respect upon Baxter.

7. **Period Volume Rebate.**

(a) As to Advate rAHF-PFM, Recombinate rAHF, and Hemofil M AHF ("Rebate Therapeutics"), Baxter is pleased to offer a price incentive in the form of a period rebate ("Rebate") to Purchaser. For purposes of this Agreement, "First Period" shall mean January, February, and March, and "Second Period" shall mean April, May, and June, and "Third Period" shall mean July, August, and September, and "Fourth Period" shall mean October, November, and December. First Period, Second Period, Third Period, and Fourth Period are collectively referred to herein as "Period(s)." The Rebate will be based on the rebate schedule set forth in Schedule B, Table 1 ("Period Rebate Schedule"). In the event Purchaser exceeds the tier in Schedule B, Table 1,

additional rebates may be available. Each Period Baxter will calculate the Rebate amount equal to the units purchased by Purchaser in a Period times the Rebate amount set forth in Schedule B, Table 1. The Rebate will be paid to Purchaser based solely upon purchases made through this Agreement. The Rebate will be calculated by the thirtieth (30th) calendar day of the first month following the close of the preceding Period commencing on the Effective Date of this Agreement. Each earned Rebate shall be paid to Purchaser in the form of a credit memo, which credit memo shall be issued within forty-five (45) days of the end of each Period.

**(b)** In any one Period, should the total units purchased to date of said Rebate Therapeutics purchased by Purchaser from Baxter (i) be less than the total units purchased to date forecasted by Purchaser pursuant to Section 6 for Rebate Therapeutics, and (ii) fall in a tier lower than the tier used to calculate and pay any preceding Period Rebate, then Baxter reserves the right in its sole discretion to (y) reduce the amount of any subsequent Period Rebate to reflect said shortfall, or (z) invoice Purchaser the amount of said shortfall if same is greater than the amount of the final Period Rebate, which amount Purchaser agrees to pay pursuant to Section 3.

**(c)** Should the total units purchased as of the End Date of said Rebate Therapeutics purchased by Purchaser from Baxter (i) be more than the total units forecasted by Purchaser as of the End Date pursuant to Section 6, and (ii) fall in a tier higher than the tier used to calculate and pay preceding Period Rebates to Purchaser, then Baxter will increase the Fourth Period Rebate to reflect said overage.

**8.** **Annual Growth Rebate.** For Advate rAHF-PFM only, Baxter is pleased to offer an additional price incentive in the form of an annual growth rebate ("Annual Growth Rebate") to Purchaser. The Annual Growth Rebate will be calculated upon the total number of units purchased by Purchaser above the annual growth target set forth in Schedule B, Table 3 times the annual growth rebate percentage ("Annual Growth Rebate Percentage") set forth in Schedule B, Table 2. The Annual Growth Rebate will be paid to Purchaser based solely upon purchases made through this Agreement. The Annual Growth Rebate will be calculated within thirty (30) days of the end of the Term of the Agreement and paid in the form of a credit memo, which credit memo shall be issued within forty-five (45) days of the end of the Term of the Agreement.

**9.** **Equal Treatment Of Therapeutic Products.** Purchaser agrees that it will not place the Therapeutic Products at a disadvantage relative to any therapeutic products sold by a competitor of Baxter ("Competitor") by giving said Competitor's therapeutic products preferential treatment. Preferential treatment shall include but not be limited to the following:

- Conducting exclusive or proportionally more sales and/or marketing activities on behalf of any Competitor.
- Providing any Competitor directly or indirectly with Purchaser leads that have not been provided to Baxter.
- Entering into a written or verbal agreement with any Competitor to provide a competitive therapeutic exclusively to any Person that may be using and/or prescribing the Therapeutic Products.
- Failing to discuss the Therapeutic Products during conversations with patients or physicians relative to therapeutic choice.
- Recommending in a preferential manner directly or indirectly to any Person a brand of therapeutic products other than the Therapeutic Products.
- Influencing in a preferential manner, directly or indirectly, any Person to exclude coverage for the Therapeutic Products or disadvantage the Therapeutic Products under any plan, including but not limited to a payor plan (e.g., via different co-pay or deductible).
- Instructing patients directly or indirectly to fill a non-branded prescription with a specific brand of therapy.

For purposes of this Agreement, the term "Person" means any individual, corporation, limited liability company, partnership, joint venture, association, trust, unincorporated organization, governmental body or authority or any other entity.

10. **Therapeutic Product Supply.** Baxter reserves the right, in its sole discretion, to remove any Therapeutic Product from this Agreement without terminating the Agreement or impacting the supply of other Therapeutic Products described in Schedule A to this Agreement.

11. **New Therapeutic Products.** Baxter can substitute New Therapeutic Products with the same or similar indication that may become available during the course of the Agreement to Purchaser, and Purchaser will purchase same from Baxter.

12. **Therapeutic Products Standards Of Care.** Purchaser agrees to meet certain standards of care for specific Therapeutic Products as set forth below ("Standards of Care"):

(a) As to Antihemophilic Factors & Anti-inhibitor Coagulant Complex; Advate rAHF-PFM, Recombinate rAHF, Hemofil-M AHF, and FEIBA VH AICC, Purchaser shall meet the following Standards of Care:

- Routine home nursing service provided by a qualified practitioner trained on hemophilia and venipuncture available for those patients who need it.
- Same-day delivery of the above-mentioned Therapeutic Products by appointment in the case of an emergency bleed; 24 hour on-call service to receive orders.
- Provision of ancillary supplies for treatment of bleeding episodes, including but not limited to needles, syringes, and cold compression packs.
- Proper removal and disposal of all hazardous waste.
- Provision of other support services including educational programming, reimbursement assistance, disease management programs, and/or community assistants.

13. **Taxes**. Purchaser shall be responsible for payment of all applicable state and/or local sales, use, and/or gross receipts tax receipts resulting from its transactions with Baxter.

14. **Ordering Procedure**. Orders may be placed by calling Baxter Customer Service at 800.423.2090, by facsimile to 800.756.4952, or by e-Commerce. Purchaser may place electronic orders with Baxter through one of three (3) e-Commerce methods. For further EDI, GHX or Eservices information, contact Baxter's e-Commerce Team at 877.334.2298. Shipment against any purchase order does not constitute acceptance by Baxter of the terms and conditions or prices stipulated on the purchase order. Shipment of any order, including standing orders, will be made in accordance with the terms of this Agreement and shall be governed solely by the terms of this Agreement notwithstanding any conflicting or additional terms contained in any purchase order, unless otherwise agreed to in writing by the Parties to this Agreement. Baxter cannot guarantee maximum expiration dating on any Therapeutic Products upon delivery. Specific dating needs may be discussed with Customer Service at time of order placement.

15. **Shipping Information**. Freight terms are F.O.B. Purchaser's location. Under normal conditions, shipment will be made within seven (7) days after receipt of order. Additional charges for emergency or overnight deliveries will be the responsibility of Purchaser and will be added to the invoice.

(a) **Disputed Invoices**. An amount in dispute should be deducted from Purchaser's remittance. Please explain the deduction on a legible copy of the invoice and enclose it with the payment. Baxter's Account Services Representative will work with Purchaser to resolve the discrepancy.

(b) **Damage or Shortage in Shipment**. Baxter exercises extreme care in packing shipments. To minimize the possibility of error, all orders should be counted and inspected prior to acceptance of delivery from the carrier. ANY DAMAGE, SHORTAGE OR OVERAGE SHOULD BE NOTED ON A COPY OF THE CARRIER'S FREIGHT BILL AND THE DRIVER SHOULD COUNTERSIGN THE DOCUMENT. If the damage is excessive, do not accept the shipment. Mark on the carrier's freight bill, "Shipment refused, damaged. Return to shipper." Baxter's Customer Service Department should be notified immediately at 800.423.2090. Purchaser's cooperation in providing this information will enable Baxter to expedite the necessary adjustments.

(c) **Proof of Delivery**. Proof of delivery will be provided if a request is received within ninety (90) days of date of shipment. Due to the expenses involved in obtaining proof of delivery, requests are subject to a $40.00 service fee. In the event that proof of delivery cannot be provided, no service fee will be charged and full credit will be issued to Purchaser's account.

16. **Force Majeure Event**. Baxter shall use commercially reasonable efforts to fill orders but shall not be liable for non-performance or delays caused by a shortage of supply of raw materials, manufacturing problems, delivery or labor problems, intervention of any governmental authority or acts of regulatory agencies, fires, earthquakes, acts of God or causes beyond its control. Purchaser agrees that in such events Baxter, without liability to Purchaser, may allocate Therapeutic Products among all of its purchasers. In the event Baxter is notified of and is able to verify a decision which changes the purchase and delivery of Therapeutic Products for a patient or a group of patients either to or from Purchaser, then to the extent it is able, Baxter may have to make appropriate adjustments in the supply of Therapeutic Products provided to Purchaser.

17. **Return Goods Policy**. Baxter can accept for credit only those Therapeutic Products that (a) do not perform satisfactorily under the specified condition, (b) may have been damaged during transportation, or (c) Purchaser may have received in error. Due to the biological nature of the Therapeutic Products and the government regulations involved, return of the Therapeutic Products must be authorized before any returns will be accepted. Purchaser shall contact Baxter Customer Service for instructions on the return procedure to be followed.

18. **Warranty**. Baxter and its affiliates warrant that Therapeutic Products shipped or delivered to Purchaser will not, at the time of shipment by Baxter or its affiliates, be adulterated or misbranded within the meaning of the Federal Food, Drug and Cosmetic Act, as amended, nor will such Therapeutic Products be an article which may not, under provisions of sections 404 and 505 of said act, be introduced into interstate commerce. Baxter and its affiliates further represent and warrant that all Therapeutic Products delivered to Purchaser when stored and used in accordance with the directions on the labeling, are fit for the purposes and indications described in the labeling. Unless the Therapeutic Products are used in accordance with their instructions, these warranties are void and of no effect. THERE ARE NO OTHER EXPRESS OR IMPLIED WARRANTIES, INCLUDING ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. BAXTER AND ITS AFFILIATES' SOLE OBLIGATION AND PURCHASER'S EXCLUSIVE REMEDY FOR BREACH OF ANY WARRANTY SHALL BE, AT BAXTER'S OPTION, TO REPAIR OR REPLACE THE THERAPEUTIC PRODUCTS. NEITHER BAXTER NOR ITS AFFILIATES SHALL BE LIABLE FOR PROXIMATE, INCIDENTAL, CONSEQUENTIAL OR EXEMPLARY DAMAGES. More warranties may accompany individual Therapeutic Products.

19. **Other Discounts**. Purchaser acknowledges the dollar value of any Therapeutic Products which Purchaser receives but does not pay for shall be a "discount or other reduction in price" and may be subject to the disclosure requirements of Section 1128B(b)(3)(A) of the Social Security Act. Purchaser shall disclose this discount or other reduction in price under any state or federal program that provides cost- or charge-based reimbursement to the participating institution for Therapeutic Products or services covered in this price list.

20. **Termination**

(a) **Termination Without Cause**. Either Party shall have the right at any time to terminate this Agreement upon ninety (90) days prior written notice to the other Party.

(b) **Non-Monetary Breach.** This Agreement may be terminated by a Party for any material breach of this Agreement by the other Party, which breach is not cured within thirty (30) days of written notice by the non-breaching Party.

(c) **Monetary Breach.** This Agreement may be terminated by Baxter if Purchaser fails to pay any invoice within twenty-five (25) days of written notice by Baxter of monies due and owing under a past due invoice. Neither Party may terminate this Agreement pursuant to this section for any monies subject to a bona fide dispute between the Parties.

(d) **Insolvency.** This Agreement may be terminated by a Party immediately (i) upon the institution by or against the other Party of insolvency, receivership or bankruptcy proceedings or any other proceedings for the settlement of the other Party's debts, (ii) upon the other Party's making an assignment for the benefit of its creditors, or (iii) upon the other Party's dissolution.

(e) **Orders Placed Prior to Termination.** In the event Baxter terminates this Agreement, at any time, with or without cause, under any circumstances whatsoever, Baxter, shall fill all unfilled orders of Purchaser for the Therapeutic Products outstanding as of the date on which the termination notice is given to the date that this Agreement is terminated.

(f) **Change in Control.** If Purchaser or any of its affiliates undergoes a Change in Control (as below defined), Purchaser will so notify Baxter in writing no more than five (5) business days after the date of occurrence of such event, and Baxter will have the right to terminate this Agreement effective with the Change in Control. "Change in Control" means the occurrence at any time of either of the following events:

(i) Purchaser sells all or substantially all of its business and/or assets to any entity; and/or

(ii) Any entity has become the beneficial owner (as the term "beneficial owner" is defined under Rule 13d-3 of the Securities Exchange Act of 1934, as amended (the "Exchange Act") and the rules and regulations promulgated thereunder or any successor rule or regulation promulgated under the Exchange Act) of 20% or more of (a) the issued and outstanding shares of voting securities or capital stock of Purchaser or (b) the equity interest of any other person or entity which holds or controls any material part of Purchaser's business and/or assets.

21. **Trace Sales Reports**. On all purchases from Baxter, Purchaser agrees to maintain complete and accurate records of the sales of all Therapeutic Products covered under this Agreement. Purchaser agrees to provide monthly trace sales reports, to include the following information:

(a) City, state, and zip code of the prescribing physician; and

(b) Number of units, unit of measure, Baxter item code number or NDC number and ship date.

*THE ABOVE INFORMATION MUST BE RECEIVED WITHIN TEN (10) DAYS FOLLOWING THE LAST DAY OF EACH CALENDAR MONTH.* The preferred format is Microsoft Excel spreadsheet sent electronically to the Baxter contact person listed below.

Baxter Contact Information:
Greg Caya
Greg_Caya@baxter.com
One Baxter Parkway
Deerfield, IL 60015
Phone No.: 847.940.5951
Fax No.: 847.940.5798

Purchaser Contact Information:
Name: ______________________
Email: ______________________
Address: ______________________
______________________
Phone No.: ______________________
Fax No.: ______________________

22. **Confidentiality**. Neither Purchaser nor Baxter shall disclose the terms of this Agreement to any other person or entity outside its organization and affiliates or make any public announcement concerning the existence of this Agreement or its terms, unless such Party receives the prior written approval of the other Party or such disclosure is required by law, subpoena or other judicial or administrative process or pursuant to Generally Accepted Accounting Principals. For purposes of this provision, an affiliate is an entity in which Purchaser or Baxter, as appropriate, maintains an ownership position in or a contractual relationship with, and the disclosure is required so that the disclosing Party may fulfill its obligations hereunder.

23. **Indemnification**.

(a) Baxter agrees to defend, indemnify and hold Purchaser harmless against any claims, liability or causes of action, including counsel fees, and compensatory, multiple, exemplary and punitive damages, and fines, arising from or in any way connected with the Therapeutics and Devices as a result of Baxter's negligence, provided such items were used in accordance with their labeling and directions for use. This indemnity shall not apply to the extent such claims, liabilities or causes of action are caused by the fault, breach of contract, tort (including negligence and strict liability) of Purchaser. If Purchaser seeks indemnification under this paragraph, it will give prompt written notice of the claim to Baxter and, provided that Baxter is not contesting the indemnity obligation, will permit Baxter to control any litigation relating to such claim and disposition of any such claim, provided that Baxter will act reasonably and in good faith with respect to all matters relating to the settlement or disposition of any claim as the settlement or disposition relates to Purchaser. Baxter will not settle or otherwise resolve any claim without the prior written consent of Purchaser. If Purchaser does not consent to a proposed settlement, Baxter agrees to assume the full cost of its own defense of the action and may employ its own counsel at its sole cost. Purchaser will cooperate with Baxter in its defense of any claim for which indemnification is sought hereunder.

(b) Purchaser agrees to defend, indemnify and hold Baxter harmless against any claims, liability or causes of action, including counsel fees, and compensatory, multiple, exemplary and punitive damages, and fines, arising from or in any way connected with any third-party claim arising out this Agreement caused by (i) negligence or intentional misconduct of Purchaser or any of its officers, directors, agents or employees; (ii) breach by Purchaser of any of the terms of this Agreement; or (iii) acts of Purchaser or any of its officers, directors, agents or employees which are outside the scope of this Agreement. This indemnity shall not apply to the extent such claims, liabilities or causes of action are caused by the fault, breach of contract, tort (including negligence and strict liability) of Baxter. If Baxter seeks indemnification under this paragraph, it will give prompt written notice of the claim to Purchaser and, provided that Purchaser is not contesting the indemnity obligation, will permit Purchaser to control any litigation relating to such claim and disposition of any such claim, provided that Purchaser will act reasonably and in good faith with respect to all matters relating to the settlement or disposition of any claim as the settlement or disposition relating to Baxter. Purchaser will not settle or otherwise resolve any claim without the prior written consent of Baxter. If Baxter does not consent to a proposed settlement, Purchaser agrees to assume the full cost of its own defense of the action and may employ its own counsel at its sole cost. Baxter will cooperate with Purchaser in its defense of any claim for which indemnification is sought hereunder.

24. **Group Purchasing Organizations**. As to the Therapeutic Products set forth in Schedule A, Purchaser represents that (a) it is not a member either directly or indirectly of, or if it is a member has elected not to purchase under, any group purchasing organization that has a group purchasing agreement with Baxter, and (b) during the course of this Agreement, should Purchaser decide to become a member of a group purchasing organization or elect to purchase under any group purchasing organization that has a group purchasing agreement with Baxter of which it is a member, as it pertains to the Therapeutic Products set forth in Schedule A, then it will give Baxter ninety (90) days prior written notice of same and Baxter, at its sole discretion, can terminate this Agreement upon five (5) days prior written notice to Purchaser, and (c) upon the request of Baxter, Purchaser will provide confirmation, in writing, of (a) and/or (b) above.

25. **Complete Agreement**. This Agreement contains the full and complete expression of the rights and obligations of the Parties, and it shall cancel and supersede all other written or oral communications heretofore made by the Parties related to the subject matter hereof.

**This Agreement is neither valid nor effective until signed by Baxter at its home office.**

Curascript Pharmacy, Inc. and all it's affiliates

By: ______________________________

Name: ___________________________
Authorized Representative

Title: ___________________________

Date: ___________________________

Phone Number: _________________

BAXTER HEALTHCARE CORPORATION
Through its BioScience Business Unit
Sales and Marketing North America Region

By: ______________________________

Name: ___________________________
Authorized Representative

Title: ___________________________

Date: ___________________________

**Schedule A to**
**Therapeutic Products Purchase Agreement**

**THERAPEUTIC PRODUCTS DESCRIPTION AND PRICING**

## Schedule B to Therapeutic Products Purchase Agreement

### TABLE 1: PERIOD REBATE SCHEDULE

| ADVATE rAHF-PFM Period Volume Rebate (units in millions): |
|---|
| RECOMBINATE raHF Period Volume Rebate (units in millions): |
| HEMOFIL M AHF Period Volume Rebate (units in millions): |
| |

**Schedule B to Therapeutic Products Purchase Agreement Continued**

**TABLE 2: ADVATE rAHF-PFM ANNUAL GROWTH REBATE**

| *Therapeutic Product* | *Growth Rebate Percentage* |
|---|---|
| Advate rAHF-PFM | % for units purchased above and beyond Purchaser's Annual Growth Target |

**TABLE 3: ADVATE rAHF-PFM ANNUAL GROWTH TARGET**

| *Therapeutic Product* | *Annual Growth Target* |
|---|---|
| Advate rAHF-PFM | units |

**Schedule C to**
**Therapeutic Products Purchase Agreement**

**Estimated Forecast**

## 2006 Quarterly Unit Forecast Report

Formula = (Beginning Inventory + Estimated Demand) - Inventory Target = Estimated Forecast

---BEGINNING INVENTORY POSITION (1st day of Quarter)---

| Therapeutic Product | Quarter 1 | Quarter 2 | Quarter 3 | Quarter 4 |
|---|---|---|---|---|
| Advate rAHF-PFM | | | | |
| Recombinate rAHF | | | | |
| Hemofil M AHF | | | | |
| Feiba VH | | | | |

---ESTIMATED DEMAND---

| Therapeutic Product | Quarter 1 | Quarter 2 | Quarter 3 | Quarter 4 |
|---|---|---|---|---|
| Advate rAHF-PFM | | | | |
| Recombinate rAHF | | | | |
| Hemofil M AHF | | | | |
| Feiba VH | | | | |

---INVENTORY TARGET---

| Therapeutic Product | Quarter 1 | Quarter 2 | Quarter 3 | Quarter 4 |
|---|---|---|---|---|
| Advate rAHF-PFM | | | | |
| Recombinate rAHF | | | | |
| Hemofil M AHF | | | | |
| Feiba VH | | | | |

---ESTIMATED PURCHASE---

| Therapeutic Product | Quarter 1 | Quarter 2 | Quarter 3 | Quarter 4 |
|---|---|---|---|---|
| Advate rAHF-PFM | | | | |
| Recombinate rAHF | | | | |
| Hemofil M AHF | | | | |
| Feiba VH | | | | |

# Exhibit 2

Rebate schedule

**Baxter**
BioScience

**CUSTOMER:** *Curascript*

**Purchase Projections (Units)**

Please key projections in blue cells.

| | Q1 | Q2 | Q3 | Q4 | Total Units | Q1 Rebate $ | Q2 Rebate $ | Q3 Rebate $ | Q4 Rebate $ | Total Rebate $ |
|---|---|---|---|---|---|---|---|---|---|---|
| Advate | 1,345,128 | 1,162,652 | 0 | 0 | 2,507,780 | 33,628 | 29,066 | - | (12,539) | 50,156 |
| Recombinate | 2,176,284 | 888,758 | 0 | 0 | 3,065,042 | 65,289 | 26,663 | - | - | 91,951 |
| rFVIII Total | 3,521,412 | 2,051,410 | 0 | 0 | 5,572,822 | | | | | |
| Hemofil - M | 333,435 | 38,480 | 0 | 0 | 371,915 | 16,672 | (1,795) | (7,438) | (7,438) | - |
| | | | | | Total Rebate | $115,588 | $53,934 | -$7,438 | -$19,977 | $142,107 |

| | Total Units | Target | Growth | 4% of Growth | Growth Rebate |
|---|---|---|---|---|---|
| Advate Gth | 2,507,780 | 8,835,000 | -6,327,220 | -253,089 | FALSE |

**2006 Quarterly Rebate Unit Tiers**

**Total rFVIII**

**Q1 Rebate Tiers**

| Unit Range | | Advate | Recombinate |
|---|---|---|---|
| 4,800,000 | 37,199,000 | $0.030 | $0.050 |
| 1,800,000 | 4,799,000 | $0.025 | $0.030 |
| 960,000 | 1,799,000 | $0.020 | $0.030 |
| 0 | 960,000 | $0.000 | $0.000 |

**Q2 Rebate Tiers**

| Unit Range | | Advate | Recombinate |
|---|---|---|---|
| 9,800,000 | 75,949,000 | $0.030 | $0.050 |
| 3,675,000 | 9,799,000 | $0.025 | $0.030 |
| 1,960,000 | 3,674,000 | $0.020 | $0.030 |
| 0 | 1,960,000 | $0.000 | $0.000 |

**Q3 Rebate Tiers**

| Unit Range | | Advate | Recombinate |
|---|---|---|---|
| 14,800,000 | 114,699,000 | $0.030 | $0.050 |
| 5,550,000 | 14,799,000 | $0.025 | $0.030 |
| 2,960,000 | 5,540,000 | $0.020 | $0.030 |
| 0 | 2,960,000 | $0.000 | $0.000 |

**Q4 Rebate Tiers**

| Unit Range | | Advate | Recombinate |
|---|---|---|---|
| 20,000,000 | 154,999,000 | $0.030 | $0.050 |
| 7,500,000 | 19,999,000 | $0.025 | $0.030 |
| 4,000,000 | 7,499,000 | $0.020 | $0.030 |
| 0 | 4,000,000 | $0.000 | $0.000 |

**Total Hemofil-M AHF**

**Q1 Rebate Tiers**

| Unit Range | | Rebate |
|---|---|---|
| 900,000 | 1,499,000 | $0.070 |
| 500,000 | 899,000 | $0.060 |
| 300,000 | 499,000 | $0.050 |
| 150,000 | 299,000 | $0.040 |
| 115,000 | 149,000 | $0.020 |
| 0 | 115,000 | $0.000 |

**Q2 Rebate Tiers**

| Unit Range | | Rebate |
|---|---|---|
| 1,800,000 | 2,999,000 | $0.070 |
| 1,100,000 | 1,799,000 | $0.060 |
| 600,000 | 1,099,000 | $0.050 |
| 300,000 | 599,000 | $0.040 |
| 230,000 | 299,000 | $0.020 |
| 0 | 230,000 | $0.000 |

**Q3 Rebate Tiers**

| Unit Range | | Rebate |
|---|---|---|
| 2,700,000 | 4,499,000 | $0.070 |
| 1,650,000 | 2,699,000 | $0.060 |
| 900,000 | 1,649,000 | $0.050 |
| 450,000 | 899,000 | $0.040 |
| 345,000 | 449,000 | $0.020 |
| 0 | 345,000 | $0.000 |

**Q4 Rebate Tiers**

| Unit Range | | Rebate |
|---|---|---|
| 3,600,000 | 5,999,000 | $0.070 |
| 2,200,000 | 3,599,000 | $0.060 |
| 1,200,000 | 2,199,000 | $0.050 |
| 600,000 | 1,199,000 | $0.040 |
| 461,000 | 599,000 | $0.020 |
| 0 | 460,000 | $0.000 |

Bayer Direct
The direct line between patients and their medicine
1-800-305-7881

Q2 Rebate For Advate Should be 23253.04 here they applied Q1 Tiers by mistake

# Exhibit 3

Scott Sturgeon

314 447 2064

CuraScript™ The Pathway to the Patient

**FACTOR PRICING (sample)** 05/05/06

**Bleeding Disorders special price offering with Standard Network**

| PRODUCT | AWP (as of 04/05/06 ) | Acquisition Price | Our ~~Best~~ Discount % off AWP | Net Price per Unit | Gross Margin | DPF-Current" OPEN NETWOR | "Standard DPF-Current" CSP (all) |
|---|---|---|---|---|---|---|---|
| Advate | $1.75 | $0.9375 | 35.00% | $1.1375 | $0.2000 | 13.00% | 25.00% |
| Alphanate | $1.25 | $0.55 | 42.00% | $0.7250 | $0.1750 | 13.00% | 32.00% |
| Alphanine SD | $1.48 | $0.67 | 42.00% | $0.8584 | $0.1884 | 13.00% | 32.00% |
| Bebulin | $0.90 | $0.68 | 18.00% | $0.7380 | $0.0580 | 9.00% | 9.00% |
| Benefix | $1.04 | $0.80 | 18.00% | $0.8528 | $0.0528 | 13.00% | 20.00% |
| Feiba VH | $1.96 | $1.16 | 30.00% | $1.3720 | $0.2120 | 13.00% | 37.00% |
| Helixate FS | $1.63 | $0.85 | 38.00% | $1.0106 | $0.1606 | 13.00% | 30.00% |
| Hemofil M | $1.225 | $0.605 | 35.00% | $0.7963 | $0.1913 | 13.00% | 35.00% |
| Humate P | $1.25 | $0.74 | 32.00% | $0.8500 | $0.1100 | 13.00% | 32.00% |
| Koate DVI | $0.96 | $0.53 | 37.00% | $0.6048 | $0.0748 | 13.00% | 37.00% |
| Kogenate FS | $1.75 | $0.84 | 38.00% | $1.0850 | $0.2450 | 13.00% | 38.00% |
| Monarc M | $1.02 | $0.45 | 40.00% | $0.6120 | $0.1620 | 13.00% | 37.00% |
| Monoclate P | $1.05 | $0.53 | 37.00% | $0.6615 | $0.1315 | 13.00% | 27.00% |
| Mononine | $1.25 | $0.77 | 27.00% | $0.9125 | $0.1425 | 13.00% | 27.00% |
| Novoseven | $1.54 | $0.89 | 37.00% | $0.9702 | $0.0802 | 13.00% | 37.00% |
| Profilnine SD | $0.75 | $0.45 | 30.00% | $0.5250 | $0.0750 | 13.00% | 25.00% |
| Proplex T | $0.60 | $0.42 | 25.00% | $0.4500 | $0.0300 | 5.00% | 5.00% |
| Recombinate | $1.625 | $0.89 | 35.00% | $1.0563 | $0.1663 | 13.00% | 31.00% |
| ReFacto | $1.36 | $0.84 | 30.00% | $0.9520 | $0.1120 | 13.00% | 17.00% |
| | | | | | | | |
| Stimate | $835.50 | $524.45 | 25.00% | $626.6250 | $102.1750 | | |
| /.5mg | $278.50 | $174.82 | 25.00% | $208.8750 | $34.0550 | | |
| DDAVP | $329.00 | $233.25 | 15.00% | $279.6500 | $46.4000 | | |
| /ml | $32.900 | $23.325 | 15.00% | $27.9650 | $4.6400 | | |

Based on AWP for each drug as reported by First Data Bank, as of April 5, 2006, and subject to adjustment concurrent with changes which may occur in AWP and/or acquisition price.

Take Benefix @ 18% DPF

Channels ESI retail Network

Our std price

Exclusive "No carve out"

Need Ex & Fo-

Me to do!

Lower std to to our ESI client to my std

Need to get to ESI underwriter

[illegible]

# Exhibit 4

## THE U.S. COAGULATION MARKET 2009

### PLASMA-DERIVED FACTOR VIII (HEMOPHILIA A MARKET)

| Company | Units * (MM) | A.S.P. $/IU | Dollars (MM) | Market Share | Share in Units | C Units |
|---|---|---|---|---|---|---|
| CSL Behring | 53.0 | 0.57 | 30.210 | 1.7% | 2.5% | -11.7% |
| Baxter | 148.0 | 0.65 | 96.200 | 5.4% | 6.8% | -7.5% |
| Talecris | 34.5 | 0.40 | 13.800 | 0.8% | 1.6% | 72.5% |
| Grifols | 124.5 | 0.70 | 87.150 | 4.9% | 5.8% | -0.4% |
| Total | 360.0 | 0.63 | 227.360 | 12.9% | 16.7% | -1.4% |

* International Units

### RECOMBINANT FACTOR VIII (HEMOPHILIA A MARKET)

| Company | Units * (MM) | A.S.P. $/IU | Dollars (MM) | Market Share | Share in Units | Recombinant CH UNITS |
|---|---|---|---|---|---|---|
| Baxter (a) | 830.0 | 0.93 | 771.900 | 43.6% | 38.4% | 28.7% |
| Baxter (b) | 290.0 | 0.88 | 255.200 | 14.4% | 13.4% | -24.7% |
| Bayer | 230.0 | 0.88 | 202.400 | 11.4% | 10.6% | 7.0% |
| Wyeth (c) | 90.0 | 0.93 | 83.700 | 4.7% | 4.2% | 9.8% |
| CSL Behring | 265.0 | 0.86 | 227.900 | 12.9% | 12.3% | 8.2% |
| Total | 1,705.0 | 0.90 | 1,541.100 | 87.1% | 78.9% | 8.5% |

* International Units
(a) Advate
(b) Recombinate
(c) ReFacto 80%, Xyntha, 20%

### TOTAL HEMOPHILIA A MARKET (Plasma-derived and recombinant)

| Company | Units * (MM) | Dollars (MM) | Market Share | Change from '08 Units | Change from '08 Dollars |
|---|---|---|---|---|---|
| CSL Behring | 318.0 | 258.110 | 14.6% | 4.3% | 6.7% |
| Baxter | 1,268.0 | 1,123.300 | 63.5% | 6.6% | 8.8% |
| Wyeth | 90.0 | 83.700 | 4.7% | 9.8% | 13.4% |
| Talecris | 34.5 | 13.800 | 0.8% | 72.5% | 53.3% |
| Grifols | 124.5 | 87.150 | 4.9% | -0.4% | -3.2% |
| Bayer | 230.0 | 202.400 | 11.4% | 7.0% | 8.2% |
| Total | 2,065.0 | 1,768.460 | 100.0% | 6.6% | 8.2% |

* International Units

### VON WILLEBRAND DISEASE MARKET

| Company | Units * (MM) | A.S.P. $/IU | Dollars (MM) | Market Share | Change from '08 | |
|---|---|---|---|---|---|---|
| | | | | | Units | Dollars |
| CSL Behring ** | 96.0 | 1.58 | 152.064 | 100.0% | N.A. *** | N.A. *** |
| Total FVIII units | 96.0 | | 152.064 | 100.0% | N.A. *** | N.A. *** |

* International Units of Factor VIII 0.72

** Humate P sales are expressed in Factor VIII Units, and equivalent to some 330 million Ristocetin CoFactc

*** 2008 figures to be restated

TOTAL FACTOR VIII (HEMOPHILIA A + VON WILLEBRAND)

| Company | Units * (MM) | Dollars (MM) | Market Share | Change from '08 | |
|---|---|---|---|---|---|
| | | | | Units | Dollars |
| CSL Behring ** | 414.0 | 410.174 | 21.4% | 17.0% | 30.9% |
| Baxter | 1,268.0 | 1,123.300 | 58.5% | 6.6% | 8.8% |
| Bayer | 230.0 | 202.400 | 10.5% | 7.0% | 8.2% |
| Talecris | 34.5 | 13.800 | 0.7% | 72.5% | 53.3% |
| Wyeth | 90.0 | 83.700 | 4.4% | 9.8% | 13.4% |
| Grifols | 124.5 | 87.150 | 4.5% | -0.4% | -3.2% |
| Total | 2,161.0 | 1,920.524 | 100.0% | 9.0% | 13.3% |

* International Units -

** Humate P is expressed in Factor VIII units (80 Million units)

FACTOR IX (Plasma -derived)

| Company | Units * (MM) | A.S.P. $/IU | Dollars (MM) | Market Share | Share in Units | Change frc |
|---|---|---|---|---|---|---|
| | | | | | | Units |
| CSL Behring | 60 | 0.78 | 46.800 | 12.4% | | 15.4% |
| Grifols | 35 | 0.66 | 23.100 | 6.1% | | -7.9% |
| Total | 95 | 0.74 | 69.900 | 18.6% | 22.4% | 5.6% |

* International Units

RECOMBINANT FACTOR IX

| Company | Units * (MM) | A.S.P. $/IU | Dollars (MM) | Market Share | Share in Units | Change frc |
|---|---|---|---|---|---|---|
| | | | | | | Units |
| Wyeth | 330.0 | 0.93 | 306.900 | 81.4% | | |
| Total | 330.0 | 0.93 | 306.900 | 81.4% | 77.6% | 6.5% |

* International Units

TOTAL RECOMBINANT AND PLASMA DERIVED FACTOR IX

| Company | Units * (MM) | Dollars (MM) | Market Share | Change from '08 | |
|---|---|---|---|---|---|
| | | | | Units | Dollars |
| Wyeth | 330.0 | 306.900 | 81.4% | 6.5% | 16.5% |
| Grifols | 35.0 | 23.100 | 6.1% | -4.5% | -3.3% |
| CSL Behring | 60.0 | 46.800 | 12.4% | 15.4% | 16.9% |
| Total | 425.0 | 376.800 | 100.0% | 6.4% | 14.8% |

* International Units

**PROTHROMBIN COMPLEX CONCENTRATE (PCC)**

| Company | Units * (MM) | A.S.P. $/IU | Dollars (MM) | Market Share | Change from '08 | |
|---|---|---|---|---|---|---|
| | | | | | Units | Dollars |
| Grifols | 7.0 | 0.61 | 4.270 | 96.8% | 16.7% | 18.6% |
| Baxter ** | 0.2 | 0.71 | 0.142 | 3.2% | 0.0% | 1.4% |
| Total | 7.2 | 0.61 | 4.412 | 100.0% | 16.1% | 18.0% |

* International Units ** Bebulin VH

**ANTI-INHIBITOR (FACTOR BYPASSING AGENTS) MARKET**

| Company | Units * (MM) | A.S.P. $/Unit-mcg | Dollars (MM) | Market Share | Change from '08 | |
|---|---|---|---|---|---|---|
| | | | | | Units | Dollars |
| Baxter | 160.0 | 1.25 | 200.000 | 22.6% | 10.3% | 13.1% |
| Novo Nordisk | 560.0 | 1.22 | 683.200 | 77.4% | -1.8% | -0.1% |
| Total | N.A. | | 883.200 | 100.0% | N.A. | 2.6% |

* Inhibitor Correction Units/Feiba Units

| hange from '08 | |
|---|---|
| Dollars | Price |
| -3.2% | 9.6% |
| 0.2% | 8.3% |
| 53.3% | -11.1% |
| -3.2% | -2.8% |
| 0.5% | 1.9% |

l only

| ANGE FROM '08 | | Market |
|---|---|---|
| DOLLARS | PRICE | Share |
| 30.2% | 1.1% | 50.1% |
| -25.5% | -1.1% | 16.6% |
| 8.2% | 1.1% | 13.1% |
| 13.4% | 3.3% | 5.4% |
| 8.2% | 0.0% | 14.8% |
| 9.5% | 0.9% | 100.0% |

| Price Change |
| --- |
| 1.7% |
| 1.4% |
| 1.6% |

| Price Change |
| --- |
| 2.5% |
| 1.7% |
| |