**EXHIBIT A**

**TO**

**NOTICE OF FILING PLEADING FROM TRANSFEROR COURT'S FILE**

UNITED STATES DISTRICT COURT BY_____D.C.
SOUTHERN DISTRICT OF FLORIDA AUG 13 PM 3: 24
SOUTHERN DIVISION

CARLOS JUENKE
CLERK U.S. DIST. CT.
S.D. OF FLA.-MIAMI

| | |
|---|---|
| UNITED STATES OF AMERICA<br>**Ex Rel**<br>    VEN-A-CARE OF THE<br>    FLORIDA KEYS, INC.<br>    a Florida Corporation,<br>    by and through its principal<br>    officers and directors,<br>    ZACHARY T. BENTLEY and<br>    T. MARK JONES,<br>                        Plaintiff,<br>v.<br><br>ABBOTT LABORATORIES;<br>▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮<br>BAXTER HEALTHCARE CORP.;<br>BAYER CORPORATION f/k/a<br>MILES, INC.;<br>▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮<br>BRISTOL-MYERS SQUIBB COMPANY<br>a/k/a BRISTOL-MYERS ONCOLOGY<br>DIVISION/HIV PRODUCTS;<br>▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮<br>DEY LABORATORIES;<br>▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮<br>GLAXO WELLCOME, INC.;<br>▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ | **CIVIL ACTION NO.95-1354-CIV-MARCUS**<br><br>**FILED IN CAMERA AND UNDER SEAL**<br><br>**SECOND AMENDED COMPLAINT**<br>**For Money Damages and Civil**<br>**Penalties Under the False Claims Act**<br>**31 U.S.C. §§3729-3732** |

CIVIL ACTION NO. 95-1354-CIV-MARCUS

▮▮▮▮▮▮▮▮▮▮▮▮▮ )
                                  )
                                  )
**SMITHKLINE BEECHAM**            )
**CORPORATION;**                  )
                                  )
▮▮▮▮▮▮▮▮▮▮▮▮▮                     )
                                  )
**WARRICK PHARMACEUTICALS**       )
**CORPORATION,**                  )
                                  )
                 **Defendants.**  )

## SECOND AMENDED COMPLAINT
## FOR MONEY DAMAGES AND CIVIL PENALTIES UNDER THE FALSE
## CLAIMS ACT 31 U.S.C. §§3729-3732

COMES NOW, the UNITED STATES OF AMERICA ("UNITED STATES" or "GOVERNMENT"), by and through VEN-A-CARE OF THE FLORIDA KEYS, INC. ("VEN-A-CARE" or "the Relator"), and its principal officers and directors, ZACHARY T. BENTLEY, and T. MARK JONES, and by the undersigned attorneys on behalf of the UNITED STATES and on the Relator's own behalf and bring this action against ABBOTT LABORATORIES; ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ BAXTER HEALTHCARE CORP.; BAYER CORPORATION f/k/a MILES, INC.; ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ BRISTOL-MYERS SQUIBB COMPANY a/k/a BRISTOL-MYERS ONCOLOGY DIVISION/HIV PRODUCTS; ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ DEY LABORATORIES; ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ GLAXO WELLCOME, INC.; ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

2

**CIVIL ACTION NO. 95-1354-CIV-MARCUS**

███████████████████████████████████████████

SMITHKLINE BEECHAM CORPORATION; ████████████████████████

WARRICK PHARMACEUTICALS CORPORATION (sometimes referred to collectively as,

"DEFENDANT PHARMACEUTICAL MANUFACTURERS"), for money damages and civil

penalties arising out of the DEFENDANT PHARMACEUTICAL MANUFACTURERS'

violations of the Federal False Claims Act, 31 U.S.C., §§3729-3732 from on or about June

23, 1989 to the present date.

## SECTION NO. 1

## SUMMARY OF THE ACTION

1.     This is an action for damages, treble damages, civil penalties and costs

against the DEFENDANT PHARMACEUTICAL MANUFACTURERS arising from their

repeated and knowing reporting and use of grossly inflated, false and fraudulent price and

cost records and statements regarding certain pharmaceutical products specified herein

and manufactured and/or sold by them.  The specified pharmaceuticals were ordinarily sold

by the DEFENDANT PHARMACEUTICAL MANUFACTURERS directly or through

wholesalers to physicians or outpatient clinics, such as oncology group physician practices,

and to specialty infusion pharmacies, such as the Relator, which then provided the drugs

and biologicals and related supplies directly to the patient intravenously, by injection or

inhalation.  These infusion,  injectable and inhalation drugs and biologicals were primarily

used to treat the most seriously ill patients who were afflicted with cancer, Acquired

3

CIVIL ACTION NO. 95-1354-CIV-MARCUS

Immune Deficiency Syndrome ("AIDS"), severe infections, respiratory diseases, immune deficiency diseases, and blood clotting disorders such as hemophilia. The false and fraudulent price and cost records and statements were knowingly reported and used by the Defendants in a manner whereby they were relied upon by the United States Medicare Program and by federally funded States' Medicaid Programs paying claims for the pharmaceuticals specified herein sold by the DEFENDANT PHARMACEUTICAL MANUFACTURERS. As a direct and proximate result of the false and fraudulent price and cost records and statements made by the DEFENDANT PHARMACEUTICAL MANUFACTURERS, the Medicare and Medicaid programs paid and approved claims for the pharmaceuticals specified herein of the DEFENDANT PHARMACEUTICAL MANUFACTURERS in amounts that grossly and materially exceeded the reasonable payment amount for such pharmaceuticals permitted by the applicable federal law. The claims for payment in grossly excessive amounts were false claims because they were based on false and fraudulent price and cost records and statements made by the DEFENDANT PHARMACEUTICAL MANUFACTURERS and because they were for amounts that materially exceeded the reasonable amount permitted to be paid under applicable law. The claims were fraudulent claims because they were paid in such excessive amounts only because of the falsely inflated price and cost records and statements knowingly made and used by the DEFENDANT PHARMACEUTICAL MANUFACTURERS. The Defendants' false reports of price and cost information

CIVIL ACTION NO. 95-1354-CIV-MARCUS

constituted false statements and/or records that were made and used for the purpose of getting false or fraudulent claims approved or paid.

For example, Defendants ███████████████████████ falsely represented prices and costs regarding the drug ████████ and thus caused the Medicare and Medicaid programs to pay claims for ████████ which exceeded a reasonable payment by between 900% and 3,000%. As a result, the United States Medicare Program alone sustained damages relating to the drug ████████ in excess of $259,000,000 for years 1993, 1994, 1995, 1996 and 1997 to date.

For example, Defendants WARRICK and DEY falsely represented prices and costs regarding the inhalant drug Albuterol Sulfate 0.083% Solution ("Albuterol") and thus caused the Florida Medicaid Program to pay claims which exceeded a reasonable payment by 200%. As a result, the State of Florida's Medicaid Program, for only the 3 month period January 1, 1997 - March 31, 1997, sustained damages relating to the drug Albuterol in excess of One Million Dollars.

By falsely representing their price and cost information, the DEFENDANT PHARMACEUTICAL MANUFACTURERS induced the UNITED STATES and States' Governments to pay exorbitant and unreasonable sums of money to the customers of the DEFENDANT PHARMACEUTICAL MANUFACTURERS to which they were not entitled and which induced them to utilize more of the specified drugs to obtain greater excessive profits.

5

The DEFENDANT PHARMACEUTICAL MANUFACTURERS knew or should have known that their false and fraudulent representations of prices and costs would cause the Medicare and States' Medicaid programs to pay grossly excessive and unreasonable amounts of money for claims for their pharmaceutical products and that said payments would, in significant part, be made by the United States Government. The United States has sustained damages as a result of the false and fraudulent representations of prices and costs knowingly made by the DEFENDANT PHARMACEUTICAL MANUFACTURERS. Accordingly, the United States Government is entitled to recover treble damages, plus civil penalties and costs in excess of ONE HUNDRED BILLION AND 00/100 DOLLARS ($100,000,000,000.00) pursuant to **31 U.S.C. §3729, et. seq.**

## SECTION NO. 2

## THE PARTIES

2.     The Plaintiff in this action is the UNITED STATES. At all times material to this civil action, the United States Department of Health and Human Services ("HHS"), the Health Care Financing Administration ("HCFA"), and The Bureau of Program Operations ("BPO") were agencies and instrumentalities of the UNITED STATES and their activities, operations and contracts in administering the Medicare program were paid from UNITED STATES' funds. The UNITED STATES and its subcontractors performing on behalf of the UNITED STATES provided Medicare benefits to qualified beneficiaries which included payment of claims for the pharmaceuticals specified herein manufactured by the

6

DEFENDANT PHARMACEUTICAL MANUFACTURERS and relied upon the false and fraudulent price and cost representations made by the DEFENDANT PHARMACEUTICAL MANUFACTURERS in approving and paying claims.

     3.    The States, United States Territories, and the District of Columbia provided Medicaid benefits to qualified beneficiaries which included payment of claims for the pharmaceuticals specified herein manufactured by the DEFENDANT PHARMACEUTICAL MANUFACTURERS and relied upon the false and fraudulent price and cost representations made by the DEFENDANT PHARMACEUTICAL MANUFACTURERS in approving and paying claims. A significant part of said Medicaid reimbursement was paid from United States Government funds pursuant to **42 U.S.C. § 1396(b).**

     4.    The Relator, VEN-A-CARE, is a corporation organized under the laws of the State of Florida, with its principal offices in Key West, Florida. The Relator's principal officers and directors include Zachary T. Bentley and T. Mark Jones, who are each citizens of the United States and reside in Key West, Florida. The Relator is an infusion pharmacy and provides pharmaceuticals, such as the intravenous, injectable or inhalation drugs and biologicals specified in this Second Amended Complaint, as a Medicare Part B supplier and as a Florida Medicaid provider. The Relator has direct and independent knowledge of the information, and is the "original source" of the information on which these allegations are based within the meaning of **31 U.S.C. §3730(e)(4)(A) and (B)**. The Relator has standing to bring this action pursuant to **31 U.S.C. §3730(b)(1)**. The information upon which these allegations are based was voluntarily provided by the Relator to the Federal

CIVIL ACTION NO. 95-1354-CIV-MARCUS

Government beginning in 1991 and thereafter has been frequently supplemented by the Relator.

5.     The Defendant, ABBOTT LABORATORIES ("ABBOTT"), is a corporation organized under the laws of Illinois with its principal offices in Abbott Park, Illinois. At all times material to this civil action, ABBOTT has transacted business in the Federal Judicial District of the Southern District of Florida by, including but not limited to, selling and distributing pharmaceutical products to purchasers within the Southern District of Florida.



8.     The Defendant, BAXTER HEALTHCARE CORP. ("BAXTER"), is a corporation organized under the laws of Delaware with its principal offices in Deerfield, Illinois. At all times material to this civil action, BAXTER transacted business in the

CIVIL ACTION NO. 95-1354-CIV-MARCUS

Federal Judicial District of the Southern District of Florida by, including but not limited to, selling and distributing pharmaceutical products to purchasers within the Southern District of Florida.

9.    The    Defendant,    BAYER    CORPORATION    f/k/a    MILES,    INC. ("BAYER/MILES"), is a corporation organized under the laws of Indiana with its principal offices in Pittsburgh, Pennsylvania. At all times material to this civil action, BAYER/MILES transacted business in the Federal Judicial District of the Southern District of Florida by, including but not limited to, selling and distributing pharmaceutical products to purchasers within the Southern District of Florida.



11.    The Defendant, BRISTOL-MYERS SQUIBB COMPANY a/k/a BRISTOL MYERS ONCOLOGY DIVISION/HIV PRODUCTS ("BRISTOL-MYERS"), is a corporation organized under the laws of Delaware with its principal offices in New York, New York. At all times material to this civil action, BRISTOL-MYERS has transacted business in the Federal Judicial District of the Southern District of Florida by, including but not limited to,

9

**CIVIL ACTION NO. 95-1354-CIV-MARCUS**

selling and distributing pharmaceutical products to purchasers within the Southern District of Florida.

14.     The Defendant, DEY LABORATOIES ("DEY"), is a corporation organized under the laws of Delaware with its principal offices in Napa, California.  At all times material to this civil action, DEY has transacted business in the Federal Judicial District of the Southern District of Florida by, including but not limited to, selling and distributing pharmaceutical products to purchasers within the Southern District of Florida.

10



18. The Defendant, GLAXO WELLCOME, INC. ("GLAXO WELLCOME/ CERENEX"), is a corporation organized under the laws of North Carolina with its principal offices in Research Triangle Park, North Carolina that sometimes transacts business through its CERENEX division. At all times material to this civil action, GLAXO WELLCOME/CERENEX transacted business in the Federal Judicial District of the Southern District of Florida by, including but not limited to, selling and distributing pharmaceutical products to purchasers within the Southern District of Florida.

Case 1:10-cv-22557-RBS Document 8224-1 Filed 11/21/12 Page 13 of 221

CIVIL ACTION NO. 95-1354-CIV-MARCUS



proceeds to pa

CIVIL ACTION NO. 95-1354-CIV-MARCUS



26.     The Defendant, SMITHKLINE BEECHAM CORPORATION ("SMITHKLINE"),

is a corporation organized under the laws of Pennsylvania with its principal offices in

Philadelphia, Pennsylvania.  At all times material to this civil action, SMITHKLINE has

CIVIL ACTION NO. 95-1354-CIV-MARCUS

transacted business in the Federal Judicial District of the Southern District of Florida by,

including but not limited to, selling and distributing pharmaceutical products to purchasers

within the Southern District of Florida.



28.     Defendant, WARRICK PHARMACEUTICALS CORPORATION ("WARRICK"),

is a corporation organized under the laws of Delaware with its principal offices in Reno,

Nevada. At all times material to this civil action, WARRICK has transacted business in the

Federal Judicial District of the Southern District of Florida by, including but not limited to,

selling and distributing pharmaceutical products to purchasers within the Southern District

of Florida.

29.     The Defendants specified in paragraphs 5 through 28 are sometimes referred

to herein collectively as the "DEFENDANT PHARMACEUTICAL MANUFACTURERS".

Any and all acts alleged herein to have been committed by any or all of the DEFENDANT

PHARMACEUTICAL MANUFACTURERS were committed by said Defendant's officers,

directors, employees, or agents who at all times acted on behalf of their respective

DEFENDANT DRUG MANUFACTURER.

14

CIVIL ACTION NO. 95-1354-CIV-MARCUS

SECTION NO. 3

**JURISDICTION & VENUE**

30.    Jurisdiction is founded upon the **Federal False Claims Act, (the "Act") 31 U.S.C. §3729-32**, specifically **31 U.S.C. §3732**, and also **28 U.S.C. §§1331, 1345**.

31.    The Federal False Claims Act reaches the type of fraudulent activity alleged herein in accordance with the express language of the Act as well as precedents arising from applications of the present Federal False Claims Act and earlier versions, United States v. Neifert-White Company, 390 U.S. 228; 88 S.Ct. 959 (1968).  Specifically, the United States Supreme Court's application of the Act in Neifert-White applies to this case as follows:

A.    ". . . the Act was intended to reach all types of fraud, without qualification, that might result in financial loss to the Government." 88 S.Ct., at 961.

B.    The Act applies to the conduct of a Defendant manufacturer that supplies falsely inflated price information in support of a customer's claim. 88 S.Ct., at 960.

C.    The Act applies even where the price information supplied by the Defendant manufacturer is inflated by only approximately 25% over the truthful price. 88 S.Ct., at 960.

D.    The Act applies even though the Defendant manufacturers did not submit the false price information directly to the Government and received no payment of funds from the Government.

15

CIVIL ACTION NO. 95-1354-CIV-MARCUS

E.     The Act applies even though the inflated portion of the price was

received by customers of the Defendant manufacturers who are not parties to the case.

88 S.Ct., at 960.

32.    Venue in the Southern District of Florida is appropriate under **31 U.S.C.
§3732(a)** and sufficient contacts exist for jurisdiction in that each of the DEFENDANT

PHARMACEUTICAL MANUFACTURERS transacted business in the Southern District of

Florida by selling directly or through wholesalers their pharmaceutical products in the

Southern District of Florida which the respective Defendants knew would be supplied to

Medicare beneficiaries and Medicaid recipients and for which the DEFENDANT

PHARMACEUTICAL MANUFACTURERS knew that grossly excessive and unreasonable

payments for claims would be made to the providers/suppliers by the Medicare and

Medicaid programs.

33.    A copy of the initial Complaint and Amended Complaints and written

disclosure of substantially all material evidence and information VEN-A-CARE possesses

were served on the Government pursuant to Rule 4(d)(l), Fed.R.Civ.P., prior to the filing

of the initial and Amended Complaints in camera and under seal by delivering a copy of

the summons, Complaints, material evidence and information to the United States Attorney

for the Southern District of Florida and by sending a copy of the summons, Complaints,

material evidence and information by certified mail to the Attorney General of the United

States at Washington, District of Columbia. Thereafter the Relator has continued its

investigation of the matters herein and has diligently and expeditiously provided any and

16

all documentary and other evidence to the Office of the Attorney General of the United States and to the Office of the United States Attorney for the Southern District of Florida prior to filing this Second Amended Complaint. A copy of the Second Amended Complaint was served in the manner required by law, on the Attorney General and on the United States Attorney for the Southern District of Florida prior to filing with the Court.

34. The Relator alleges: (A) that no allegation or transaction of defrauding the United States was made prior to the filing of the Complaints in public disclosures regarding the subject matter herein against any of the DEFENDANT PHARMACEUTICAL MANUFACTURERS; (B) that none of the DEFENDANT PHARMACEUTICAL MANUFACTURERS was named in public disclosures made prior to the filing of the Complaints regarding the subject matter herein; and (C), if the Court makes a finding against the Relator as to the allegations set forth in (A) and/or (B), that the Relator has direct and independent knowledge of the information on which these allegations are based within the meaning of **31 U.S.C. §3730(e)(4)(A)** and **(B)** and has voluntarily provided the information to the Government before filing the Complaints which is based on the information provided by the Relator to the Government and the Relator is the original source.

CIVIL ACTION NO. 95-1354-CIV-MARCUS

### SECTION NO. 4

### SYNOPSIS OF THE FALSE CLAIM SCHEME

#### 4(A)    BACKGROUND

35.    In the United States, prescription drugs and biologicals are only provided or dispensed to patients upon the order of a physician.

36.    Prescription drugs provided outside of the hospital setting are sold ordinarily by community retail pharmacies (i.e. Walgreens, Eckerds and neighborhood independent drug stores) directly  to the patient.  Typically a patient is provided a prescription for a particular drug by a physician.  The patient takes the prescription and independently decides at which pharmacy the prescription will be filled.  Thus, the prescribing physician has no financial incentive or financial inducement to prescribe a particular drug or recommend a drug as the therapy of choice over that of a possible alternative therapy.

37.    This case, however, focuses on a different and distinct type of pharmaceuticals which cannot be taken by mouth and generally are not self administered. The specified pharmaceuticals are generally administered to the patient by a professional (i.e. a nurse) intravenously, by injection or inhalation.    Many of the specified pharmaceuticals are commonly referred to as "chemotherapy", "chemo" or "oncology" drugs.  The other drugs at issue include, but are not limited to, those drugs which are used in conjunction with or for supportive care of chemo drugs, and  IV antibiotics, IV antivirals, IV antifungals and drugs used for inhalation therapy.  The biologicals at issue include but are not limited to those which are used to treat a variety of immune deficiency disorders.

18

A biological product is one which has been obtained directly from, or has been derived from, living matter. The above described types of drugs and biologicals are collectively hereinafter sometimes referred to as "infusion, injectable or inhalation pharmaceuticals" and the particular pharmaceuticals at issue in this case are sometimes referred to as "the specified pharmaceuticals."

38.     The specified pharmaceuticals at issue in this Second Amended Complaint are generally not available for sale at community retail pharmacies. In most cases, the specified pharmaceuticals are only available through a hospital (either inpatient or outpatient), a specialized physician or clinic operated by a group of physicians or a specialized pharmacy.

39.     Specialized pharmacies such a the Realtor are sometimes known as home infusion pharmacies, IV pharmacies or home IV pharmacies. Throughout the United States it is very common to have physicians associated directly or indirectly with specialized pharmacies. This association may be through an ownership interest, service as consultant or medical director, or other financial relationships. The Relator's pharmacy has three physician investors.

40.     The DEFENDANT PHARMACEUTICAL MANUFACTURERS refer to these specialized pharmacies as "closed Pharmacies" or by a similar descriptive name which generally means the pharmacies are not open to the public.

41.     The specified pharmaceuticals are ordinarily prescribed by specialized physicians for the treatment of people who are afflicted with various forms of cancer, AIDS

CIVIL ACTION NO. 95-1354-CIV-MARCUS

and HIV diseases, severe respiratory ailments and blood clotting disorders such as hemophilia.

42. Physicians who specialize in the treatment of cancers and their associated blood disorders are known as oncologists and hematologists. Physicians who specialize in the treatment of AIDS and HIV diseases are known as Infectious Disease or "ID" physicians. Physicians who specialize in the treatment of respiratory diseases are known as pulmonologists.

43. The specialized physicians are in a unique relationship with the DEFENDANT PHARMACEUTICAL MANUFACTURERS for the specified pharmaceuticals in this Second Amended Complaint in that the physicians are not only prescribing the specified pharmaceuticals, but also directly providing and administering or arranging for provision and administration of the specified pharmaceuticals.

44. The DEFENDANT PHARMACEUTICAL MANUFACTURERS have each acted to induce physicians to order the pharmaceuticals at issue in this case by falsely representing inflated price and cost information such as, but not limited to, direct prices, wholesale acquisition costs, published prices and average wholesale prices so that claims submitted to the Medicare and States' Medicaid Programs for these drugs will be paid to the physicians or specialized pharmacies in amounts that grossly exceed the reasonable amount permitted by law.

20

**CIVIL ACTION NO. 95-1354-CIV-MARCUS**

**4(B)** **SPECIFIC FACT PATTERNS**

45.     The false claim scheme of the DEFENDANT PHARMACEUTICAL MANUFACTURERS is typically implemented in the following specific fact patterns:

A.     A DEFENDANT DRUG MANUFACTURER possesses a patented or formerly patented drug and the manufacturer desires to induce physicians to utilize the Manufacturer's drug for their patients. The DEFENDANT DRUG MANUFACTURER will knowingly reduce its true prices for the drugs but will make false representations of inflated cost and price information upon which Medicare and States' Medicaid claims will be approved and paid. The physician ordering the drug and submitting the claim will thus receive substantially more money for the drug than a reasonable amount and will thus be induced financially to order it for his or her patients.

B.     Generic versions of a drug become available and compete with the "brand name" manufacturer that held the patent on the drug. The generic manufacturers sell the drug to physicians, clinics and specialty pharmacies at prices far below the price level reported by the brand manufacturer but make false representations of their drug's prices. Often, the false prices reported by the generic manufacturer exceed the already inflated price reported by the brand name manufacturer. As a result, physicians who must decide whether to order a particular drug and their clinics and specialty pharmacies receive payments from the Medicare and States' Medicaid Programs for claims of infusion and injectable drugs that far exceed their cost.

21

**CIVIL ACTION NO. 95-1354-CIV-MARCUS**

C. Manufacturers of brand and generic drugs and biologicals will report false and fraudulent price and cost information to Medicare and State' Medicaid Programs and cause providers to receive unreasonably high payments for claims so that providers are induced to prescribe or administer the manufacturer's drug rather than an alternative drug or non-drug therapy.

### 4(C) SURROUNDING CIRCUMSTANCES

46. The false claim scheme perpetrated by the DEFENDANT PHARMACEUTICAL MANUFACTURERS is aided by circumstances which include, but are not limited to the following:

A. The infusion and injectable cancer chemotherapy and AIDS therapy drugs and biologicals at issue in this case are generally perceived to be high priced and often are high priced during the time they are subject to a patent held by the brand name manufacturer.

B. Consumers are unable to price shop for the pharmaceuticals at issue in this case, as they do with pharmaceuticals purchased at community retail pharmacies.

C. The price and cost representations made by pharmaceuticals manufacturers in general, including the DEFENDANT PHARMACEUTICAL MANUFACTURERS, for many other drugs bear a truthful relationship to their true prices and costs.

D. Patients who receive the specified pharmaceuticals are extremely ill and not in a position to question their physician's decision as to who will provide the

22

specified pharmaceuticals, which manufacturer's pharmaceuticals to use or as to the amount claimed for providing the specified pharmaceuticals.

E.      The patients and third party payers, including the Medicare and States' Medicaid Programs, are not aware of the prices actually paid for the specified pharmaceuticals by the physician, clinic or specialty pharmacy which presented the claim for payment.  Pharmaceutical manufacturers conceal from the Medicare and States' Medicaid Programs price reductions occurring due to competition in the marketplace and falsely and fraudulently represent pharmaceutical prices that far exceed the truthful prices.

F.      Federal Medicare regulations require that claims be paid at the lesser of an estimated amount based upon  average wholesale price ("AWP") or actual acquisition cost (taking into consideration inventory cost and waste but including no profit on the pharmaceutical itself).  The Medicare program has been unable to determine actual acquisition costs for the pharmaceuticals at issue in this case.  Therefore, Medicare pays claims at the average wholesale price for single source patented drugs as represented by the manufacturer, and at the median average wholesale price, as represented by the manufacturers, for drugs with generic equivalents and for biologicals.

G.      The States' Medicaid programs are required to pay claims for the specified pharmaceuticals by estimating the actual  acquisition cost to the provider.  Most states rely on the price and cost representations made by the manufacturer in determining the payment amount for the specific manufacturer's pharmaceuticals.

23

CIVIL ACTION NO. 95-1354-CIV-MARCUS

H.   Physicians, clinics and specialty pharmacies submitting claims to Medicare or States' Medicaid Programs for the pharmaceuticals at issue in this case are paid for their professional services which are separately reimbursable charges.  Medicare and States' Medicaid programs are prohibited by law from paying and never intended to pay the grossly excessive amounts for the specified pharmaceuticals.  Those in a position to increase utilization of the specified pharmaceuticals thus receive exorbitant sums of money in excess of the reasonable amounts provided by law, all due to the false price and cost representations made by the DEFENDANT PHARMACEUTICAL MANUFACTURERS.

I.   The DEFENDANT PHARMACEUTICAL MANUFACTURERS are prohibited by federal statute and regulation from making false or misleading representations about their  pharmaceutical products, including false or misleading representations about prices or costs. However, the truth and accuracy of their representations about prices or costs have not been scrutinized by Government officials while other information disseminated about their pharmaceutical products is closely scrutinized by the Food and Drug Administration.

47.   The DEFENDANT PHARMACEUTICAL MANUFACTURERS each occupy positions of privilege and trust in the United States because they develop new pharmaceutical products and produce life saving pharmaceuticals.  In return, the Pharmaceutical Manufacturers benefit from patents on new pharmaceutical products that can be sold at prices, set by the manufacturers, that enable the manufacturers to enjoy huge profits above costs as an accepted inducement to develop the new pharmaceutical

24

products. When patents expire and other manufacturers bring "generic" versions of the formerly patented drug to the market, prices ordinarily fall due to competition and due to the fact that the generic manufacturers did not expend the large sums of money on research and development as did the original brand manufacturers. Prices also fall when manufacturers compete against alternative therapies or when they reduce prices so that third party payers will cover their drug for payment. Due to the Relator's position in the industry, the Relator has been made privy to the truthful cost and price information that has been concealed from the Medicare and States' Medicaid Programs and has directly witnessed the methods employed by each of the DEFENDANT PHARMACEUTICAL MANUFACTURERS in carrying out the false and fraudulent claims schemes set out herein. The Relator has further witnessed the Medicare and States' Medicaid Programs incurring damages because the DEFENDANT PHARMACEUTICAL MANUFACTURERS concealed price reductions and instead created the illusion that the specified pharmaceuticals continued to be sold at the price levels commanded by brand manufacturers before the price reductions occurred resulting from competition.

48. The false claim scheme at issue occurs to date as evidenced by pricing representations made for the generic injectable drug "Acyclovir." The Brand name for Acyclovir is Zovirax manufactured by Glaxo Wellcome. Glaxo Wellcome reported 1996 sales of $529,300,000.00 for Zovirax. On April 22, 1997 Glaxo Wellcome's Zovirax patent expired. Acyclovir is a anti-viral drug that is widely prescribed to persons who are suffering with the HIV disease. Prior to the patent expiration, VAC's wholesale cost for 1 gm of

25

Zovirax was $103.67 and its AWP was $113.20 (a difference of 9%). Defendant ABBOTT

was one of the first companies to announce distribution of a generic injectable Acyclovir.

On or about February 19, 1997, Defendant ABBOTT set a true pre distribution price of

$70.00 for 1 gm (**Exhibit "1"**) which was approximately 30% less than Glaxo Wellcome's

brand Zovirax. However ABBOTT fraudulently and falsely reported to Medical Economics

(**Exhibit "2"**) and First Data Bank a Direct Price of $160.00 for 1 gm which caused Medical

Economics and First Data Bank to set a false and fraudulent AWP of $190.00 for 1 gm or

approximately 70% more than the Brand. Before ABBOTT could begin distribution of its

generic injectable Acyclovir, another drug manufacturer announced distribution of a

competing generic injectable Acyclovir at an initial price less than ABBOTT's. On or about

April 28, 1997, ABBOTT reacted to the market conditions of price competition by lowering

its true price to providers from $70.00 to $60.00 for 1 gm (**Exhibit "3"**). Despite ABBOTT's

reduction in prices to providers, ABBOTT continued to publish its original grossly inflated

false and fraudulent representations of cost and price (**Exhibit "4"**). During a telephone

conversation between VAC's Bentley and an ABBOTT marketing/sales representative, on

or about May 30, 1997, Bentley was informed that ABBOTT was committed to capturing

market share by "widening the spread for providers" by lowering the true price while

inflating the price represented to Medicare and Medicaid. The following charts contain the

specific allegations demonstrating the Acyclovir fraud:

26

CIVIL ACTION NO. 95-1354-CIV-MARCUS

| BRAND | | | | | |
|---|---|---|---|---|---|
| COMPANY | DRUG | NDC | RED BOOK AWP | VEN-A-CARE COST | FLORIDA MEDICAID |
| Glaxo Wellcome | Zovirax 500 mg | 00173-0995-01 | $ 56.60 | $ 47.20 | $ 50.47083 |
| Glaxo Wellcome | Zovirax 1 gm | 00173-0952-01 | $113.20 | $103.67 | $100.94059 |

VERSUS

| GENERIC | | | | | | |
|---|---|---|---|---|---|---|
| COMPANY | DRUG | NDC | RED BOOK "AWP" | "DP" | VEN-A-CARE COST | FLORIDA MEDICAID |
| Abbott | Acyclovir Sodium 500 mg | 00074-4427-01 | $95.00 | $80.00 | ~~$35.00~~ $30.00 | $ 84.5500 |
| Abbott | Acyclovir Sodium 1,000 mg (1 gm) | 00074-4452-01 | $190.00 | $160.00 | ~~$70.00~~ $60.00 | $169.1000 |

**4(D)  AN EFFECT OF FALSE PRICING SCHEME AND RESULTING ILLEGAL SPLIT FEE ARRANGEMENTS IS TO DRIVE LAW ABIDING COMPETITORS OUT OF BUSINESS**

49.    The actions of the DEFENDANT PHARMACEUTICAL MANUFACTURERS

alleged herein result in grossly excessive amounts being paid to their customers by the

Medicare and States' Medicaid Programs for claims submitted for the specified

pharmaceuticals.  Accordingly, the exorbitant payments induce physicians, clinics and

27

CIVIL ACTION NO. 95-1354-CIV-MARCUS

specialty pharmacies to increase the utilization of the specified pharmaceuticals. The DEFENDANT PHARMACEUTICAL MANUFACTURERS were in a position to increase the utilization of their specified pharmaceuticals by causing an enormous concealed financial inducement to be unwittingly paid by the Medicare and Medicaid Programs to the DEFENDANT PHARMACEUTICAL MANUFACTURERS' customers, the physicians and specialized pharmacies. The financial inducement was so great for many of the specified pharmaceuticals at issue in this Second Amended Complaint that the profits derived from the provision of the specified pharmaceuticals greatly exceeded the physicians' professional fees and provided what can only be characterized as "windfall profits." In many markets, including the Relator's, specialty pharmacies and clinics are unable to compete unless they enter financial arrangements with prescribing physicians whereby the grossly excessive amounts paid by the Medicare and States' Medicaid Programs are split with the prescribing physicians. Over the last six (6) years, the Relator's business has all but been extinguished because of the Relator's refusal to benefit from the false and fraudulent claims schemes specified herein. The Relator has been unable to effectively compete with those physicians, clinics and specialty pharmacies who benefit from the DEFENDANT PHARMACEUTICAL MANUFACTURERS' false claims scheme because the financial inducement to the prescribing physicians often exceeds their compensation from the practice of medicine.

CIVIL ACTION NO. 95-1354-CIV-MARCUS

### 4(E)   FALSE PRICING SCHEME - "THE SPREAD"
Direct Benefits to Pharmaceutical Manufacturers -
Maximizing Sales Volume, Capturing Market Share
and Increasing Utilization of Products

50.     The DEFENDANT PHARMACEUTICAL MANUFACTURERS benefit directly

from their false pricing scheme of concealing their true prices while making grossly inflated

false and fraudulent representations of prices and costs by maximizing their products' sales

volume, capturing market share for their products, and increasing utilization of their

products by providers.  An example of how the DEFENDANT PHARMACEUTICAL

MANUFACTURERS directly benefit from their false pricing scheme is demonstrated by

data for the first quarter of 1997 from the State of Florida's Medicaid Program setting out

Florida Medicaid's reimbursements paid to the customers of pharmaceutical manufacturers

and utilization of their products by their customers for the drug Albuterol Sulfate 0.083%

Solution ("Albuterol").

51.     Albuterol is a pharmaceutical which is administered by inhalation and is used

for the treatment of many respiratory illnesses.  Albuterol is an example of how two (2)

pharmaceutical manufacturers, DEFENDANTS WARRICK and DEY maximized sales

volume and captured the Florida Medicaid pharmacy market for Albuterol to the detriment

of Florida's Medicaid Program.  Pharmaceutical manufacturers capture market share and

maximize their sales volume by concealing their true prices while falsely and fraudulently

representing grossly inflated prices which creates a spread between the providers' costs

and the amount of reimbursement from Medicaid or Medicare.   The Relator's evidence

29

**CIVIL ACTION NO. 95-1354-CIV-MARCUS**

demonstrates that providers will purchase and utilize the pharmaceutical manufacturer's

product that has the widest spread between the provider's true cost and the reimbursement

paid by third parties including the States' Medicaid Programs and Medicare. First quarter,

1997 reimbursement data from the State of Florida's Medicaid Program demonstrates that

the wider the spread between the true cost paid by providers versus the reimbursement

paid by Medicaid the more a specific manufacturer's product will be utilized instead of a

competitor's product. The DEFENDANT PHARMACEUTICAL MANUFACTURERS

WARRICK and DEY and the pharmaceutical manufacturers Zenith/Goldline and Geneva,

have all made representations of Wholesale Acquisition Cost to the State of Florida as set

out in the chart below. As a direct result of the false representations of prices and costs,

the DEFENDANT PHARMACEUTICAL MANUFACTURERS WARRICK and DEY caused

the State of Florida's Medicaid Program to unwittingly pay more than one million dollars for

the first quarter of 1997 over the reasonable reimbursement amounts which the State

intended to pay. The chart further sets out the number of reimbursed claims, VEN-A-

CARE's cost per ml and "the spread" between Medicaid reimbursement and true cost. A

review of the chart clearly demonstrates that the vast majority of providers utilize the

manufacturer's pharmaceutical with the greatest spread between the true Wholesale

Acquisition Cost and the inflated false Wholesale Acquisition Cost reported by the

pharmaceutical manufacturer.

30

CIVIL ACTION NO. 95-1354-CIV-MARCUS

## FALSE PRICING SCHEME - "THE SPREAD"

### FLORIDA MEDICAID REIMBURSEMENT (1st Quarter 1997)
### ALBUTEROL SULFATE SOLUTION 0.083%

| Manufacturer | VAC's Cost per ml | Florida Medicaid Reimbursement per ml | The Spread | # of claims | Reimbursement paid by Florida Medicaid |
|---|---|---|---|---|---|
| Warrick | $0.1065 | $0.3590 | $0.2525 | 12,673 | $763,595.42 |
| Dey | $0.1125 | $0.3531 | $0.2406 | 9,792 | $707,220.50 |
| Zenith/Goldline | N/A | $0.2138 | ** | 102 | $4,981.86 |
| Geneva | N/A | $0.1787 | ** | 19 | $1,278.08 |
| TOTAL REIMBURSEMENT BY THE STATE OF FLORIDA MEDICAID PROGRAM (January 1 through March 31, 1997) | | | | | $1,477,075.86 |
| ** | The use of the spread to falsify claims is evidenced by the fact that WARRICK's and DEY's customers will receive a greater windfall by purchasing their product than they could if they somehow acquired the same product from Zenith/Goldline or Geneva free of charge. | | | | |

52.    The grossly inflated payments unwittingly made by the States' Medicaid Programs not only served as an inducement to providers to purchase a particular manufacturer's product but also served to drive over utilization. The Relator, prior to filing the original Complaint, surveyed three national pharmacy providers of Albuterol to determine their business practices for their sales of Albuterol to the Medicare and States' Medicaid Programs. The Relator's principals used positions in an affiliated home health care company to pose as an interested customer. The Relator determined that the payment of kickbacks and/or split fees were common place between the pharmacies and home health care companies who could provide the pharmacies with patient referrals. One

31

marketing scheme offered by one of the pharmacies was the automatic shipping of refills of Albuterol every month without verifying continuing need with the patient or physician in order to maximize the sales of Albuterol and reimbursement.

53. Through the above described scheme of concealing their true prices and representing falsely inflated prices and costs, the DEFENDANT PHARMACEUTICAL MANUFACTURERS caused the States' Medicaid Programs and Medicare to pay kickbacks (illegal remunerations) from Federal and States' Governments' funds to the DEFENDANT PHARMACEUTICAL MANUFACTURERS' customers.

54. In many instances, the kickbacks paid from Governments' funds were in excess of 1,000% over the providers' true costs and over the reasonable reimbursement amounts which the Governments intended to pay. The grossly excessive profits have led to a proliferation of illegal split fee arrangements between the pharmaceutical manufacturers' customers and persons or entities who are in a position to refer patients. The split fee/kickbacks also serve as a financial inducement for the referrals of more patients and greater utilization of the products.

55. This case focuses on the specified pharmaceuticals manufactured by and/or distributed by the DEFENDANT PHARMACEUTICAL MANUFACTURERS and sold either directly, through wholesalers or through group purchasing organizations to physicians, such as oncologists, hematologists and infectious disease physicians and others as well as the specialized "closed" pharmacies.

56.     The damages sought herein include, but are not limited to, those arising from the specific pharmaceuticals set out in Sections 8 through 29 and elsewhere throughout this Second Amended Complaint. The specific pharmaceuticals set out herein are alleged to meet the specificity required in pleading the claims alleged as required by law. The damages sought herein encompass all damages and penalties arising from the false claims relating to all pharmaceuticals of all sizes of the DEFENDANT PHARMACEUTICAL MANUFACTURERS about which false price and cost representations and records caused the presentment of false claims for payment and approval. These claims also encompass recovery of the funds paid due to the false and fraudulent claims, regardless of the person or entity that ultimately received the funds or from which the United States ultimately recovers the funds.

### SECTION NO. 5

### BACKGROUND OF HOW UNITED STATES' MONIES ARE PAID FOR PHARMACEUTICAL CLAIMS UNDER "PART B" OF THE MEDICARE PROGRAM

57.     As one of its functions, HHS, through HCFA, provides health insurance benefits to aged and disabled Americans pursuant to the provisions of the Medicare program, **Title XVIII of the Social Security Act, 42 U.S.C. §1395 <u>et seq</u>.**

58.     The Medicare program provides covered health care benefits to certain targeted populations such as those persons who are over age 65, persons who are disabled, and persons who have end stage renal disease.

33

59.     The Medicare program is divided into two distinct parts: (A) Medicare Part A (Hospital Insurance for the Aged and Disabled) which covers services and goods furnished by hospitals, home health agencies, hospices, and skilled nursing facilities; and (B) Medicare Part B (Supplementary Medical Insurance for the Aged and Disabled) which covers physician services, and a range of other noninstitutional services, such as durable medical equipment ("DME"), oxygen concentrators, diagnostic laboratory tests, X-rays, and certain limited pharmaceutical products and supplies.

60.     This case focuses on the Medicare program's limited benefit for pharmaceuticals which are provided either (A) incident to a physician's service and cannot be self administered or (B) in conjunction with the medical necessity of an infusion pump or nebulizer or other DME device payable under Medicare's DME benefit.  Because this limited pharmaceutical benefit is provided on an "incident to" a physician's service basis or in conjunction with the medical necessity of a DME device, Congress' statutes and the corresponding HHS regulations and HCFA policies have sought to limit Medicare's payments for claims for the pharmaceuticals at issue to a reasonable amount based upon the cost of the drug.   This is due, in part, to the fact that the Medicare program is already paying for the physicians' professional fees and for the covered DME equipment.  The exorbitant profits created by the DEFENDANT PHARMACEUTICAL MANUFACTURERS' false price and cost representations has totally thwarted the fundamental requirements of the Medicare Program and States' Medicaid Programs that payment of claims for the

34

**CIVIL ACTION NO. 95-1354-CIV-MARCUS**

specified pharmaceuticals be limited to reasonable amounts to cover the added cost of the pharmaceuticals.

61. HCFA administers the Medicare program. HCFA awards cost-reimbursement contracts to private companies to evaluate and to process Medicare beneficiaries' claims for payment on behalf of HCFA. Under Part A, HCFA refers to contractors as "intermediaries". Under Part B, HCFA refers to contractors as "carriers" and durable medical equipment regional carriers ( "DMERCs"). Under Part B, HCFA pays the carriers and the DMERCs to process claims for covered benefits supplied to eligible beneficiaries and to make payments to the providers or to the Medicare beneficiaries for the covered services rendered under Medicare Part B. **42 U.S.C. §1395(j) et. seq**.

62. Congress has mandated that the Medicare Program pay no more than eighty percent (80%) of the reasonable charge for Part B pharmaceutical claims from federal funds. **42 U.S.C. §1395(l) et seq**.

63. Medicare Regulation 42 CFR, §405.517, effective January 1, 1992, sets out the methodology to determine the reasonable charge for payment of claims for drugs. The methodology for single source drugs is based on the lower of estimated acquisition cost or the national average wholesale price of the drug. The methodology for multiple source drugs is based on the lower of the estimated acquisition cost or the wholesale price that is the median price for all sources of the generic form of the drug. This regulation provides instructions to be used by the Part B Carriers and DMERCs on how the estimated acquisition cost is to be determined. The instructions state that the estimated acquisition

35

CIVIL ACTION NO. 95-1354-CIV-MARCUS

cost is to be based on surveys of actual invoice prices of drugs paid by the providers. The regulation also states that the Medicare Part B Carriers and DMERCs may consider such other factors as inventory, waste and spoilage in calculating the estimated acquisition cost of the drug but does not provide for profit on the drug itself. For purposes of reimbursement HCFA reimburses biologicals under the same methology as drugs.

64. Part B pharmaceutical claims are submitted in one of two ways. The first is by submitting to the Part B carriers or DMERCs a completed (hard copy) HCFA 1500 Form. The second is through an electronic claims filing procedure whereby the same information required to be included on the hard copy HCFA 1500 Form is transmitted to the Medicare Part B carriers or DMERCs. Two HCFA 1500 Form versions were used during the time relevant to these proceedings. HCFA Form 1500 (1/84) was used by the Medicare program for Part B pharmaceutical claims filed on or after January, 1984. In or about December 1990, HCFA created HCFA Form 1500 (12/90) and required its use for pharmaceutical claims submitted on or after May 1, 1992. Either HCFA Form 1500 (12/90) or HCFA Form 1500 (1/84) could be used for Part B pharmaceutical claims from December, 1990 through April, 1992.

65. Providers submit claims for payment to the Medicare Program for the specified pharmaceuticals at issue in this case using HCFA's Common Procedure Coding System ("HCPCS"). The HCPCS system for pharmaceuticals is a 5 digit alphanumeric code, such as [redacted] 50 mg. = HCPCS Code [redacted]

66.     HCFA requires all Part B Carriers and the DMERCs to report to HCFA Central quarterly claims activity by HCPCS Code for all pharmaceuticals submitted by providers for reimbursement by the Medicare Program. This quarterly data collected by HCFA Central from all the Part B Carriers and the DMERCs is summarized in a report known as the Part B Extract and Summary System ("BESS") or Bess Reports.

67.     Beneficiaries' claims are processed by the carriers as either "assigned", those claims for which payment is made directly to the provider, or "unassigned", those claims for which payment is made directly to the beneficiaries.

68.     All or nearly all pharmaceutical claims for the charges at issue are made on an assigned basis.

69.     Medical Economics, Inc., the Hearst Corporation and Medi Span are nationally recognized companies that specialize in gathering pharmaceutical wholesale and direct price data, and in publishing such information in such publications as "Drug Topics Red Book" (hereinafter referred to as the "Red Book") which is published by Medical Economics and the "Blue Book" which is published by the Hearst Corporation. The Hearst Corporation also, through its First Data Bank Division, provides an automated data base service containing pharmaceutical price and cost information.

70.     The Relator's investigation has established that:

A.     All of the Medicare Part B Carriers pay claims for the specified pharmaceuticals based on cost and price representations made by the DEFENDANT PHARMACEUTICAL MANUFACTURERS as reported in the Red Book.

37

B.     All four DMERC's pay and approve claims for the specified pharmaceuticals based on cost and price representations made by the DEFENDANT PHARMACEUTICAL MANUFACTURERS as reported in the Red Book.

C.     The DEFENDANT PHARMACEUTICAL MANUFACTURERS regularly make representations of false price and cost information including AWPs directly to the Medicare Part B Carriers. By way of example, attached hereto and incorporated herein by reference as **Exhibits "5" and "6"** are copies of written representations of price and cost information provided or caused to be provided to the Medicare Carrier for the State of Florida by Defendants                               and **Exhibit "7"** the Medicare Carrier for the State of Florida's memorandum of how it receives and utilizes price and cost representations of the Defendant

D.     The Medicare Carriers' initial efforts to survey physicians' actual invoice prices paid for pharmaceuticals to comply with the regulation 42 CFR §405.517 were stopped by a complaint filed by the American Society of Clinical Oncologists ("ASCO") with the Executive Office of Management and Budget asserting that the Paperwork Reduction Act had been violated. A subsequent effort by HCFA to design a new survey to determine physicians' actual invoice costs was also stopped by ASCO. ASCO complained that the actual prices being paid were discounts and confidential in nature and that the survey had other flaws.

E.     Medical Economics, Inc. and The Hearst Corporation both rely solely upon the cost and price representations of the DEFENDANT PHARMACEUTICAL

38

CIVIL ACTION NO. 95-1354-CIV-MARCUS

MANUFACTURERS for the pharmaceuticals specified in this Second Amended Complaint in establishing and reporting the DEFENDANT PHARMACEUTICAL MANUFACTURERS' AWP prices and direct prices.

71. This case focuses on the specified pharmaceuticals that are covered under Part B of the Medicare program which are sold and/or distributed by the DEFENDANT PHARMACEUTICAL MANUFACTURERS and for which the Medicare Part B carriers and the DMERCs rely on the cost and price representations reported by the DEFENDANT PHARMACEUTICAL MANUFACTURERS to pay and approve claims. The pharmaceuticals at issue in this case, for which Medicare has paid claims, include but are not limited to those specified in the following Table No. 1 together with their respective HCPCS codes. By way of example, the claim amount approved by Florida Medicare for each pharmaceutical in 1996 is compared with the Relator's cost in order to illustrate the grossly excessive payments resulting from the DEFENDANT PHARMACEUTICAL MANUFACTURERS false representations of price and cost.

## TABLE NO. 1

| 1(A) DEFENDANT ABBOTT | | | | | | |
|---|---|---|---|---|---|---|
| DRUG | NDC # | HCPCS CODE | 1996 FLORIDA MEDICARE ALLOWABLE | 1996 RELATOR'S COST | PROVIDER'S GROSS PROFIT $ | PROVIDER'S GROSS PROFIT % |
| Sodium Chloride 0.9% 250 ml | 00074-7983-02 | J7050 | $9.43 | $0.95 | $8.48 | 892% |
| Sodium Chloride 0.9% 50 ml | 00074-7983-03 | J7040 | $10.14 | $0.95 | $9.19 | 967% |

| 1(A)  DEFENDANT ABBOTT | | | | | | |
|---|---|---|---|---|---|---|
| DRUG | NDC # | HCPCS CODE | 1996 FLORIDA MEDICARE ALLOWABLE | 1996 RELATOR'S COST | PROVIDER'S GROSS PROFIT $ | PROVIDER'S GROSS PROFIT % |
| Sodium Chloride 0.9% 1000 ml | 00074-7983-09 | J7030 | $11.06 | $1.03 | $10.03 | 973% |
| 5% Dextrose in Water w/5% etoh 500 ml | 00074-7922-03 | J7060 | $9.98 | $0.96 | $9.02 | 939% |
| 5% Dextrose in Water 1000 ml | 00074-7922-09 | J7070 | $11.23 | $1.12 | $10.11 | 902% |
| Dextrose 5% with Sodium Chloride 0.9% 500 ml | 00074-7941-03 | J7042 | $10.24 | $1.03 | $9.21 | 894% |
| Ringers Lactate 1000 ml | 00074-7953-09 | J7120 | $12.43 | $1.14 | $11.29 | 990% |
| Vancomycin HCL 500 mg | 00074-4332-01 | J3370 | $12.91 | $3.51 | $9.40 | 267% |
| Tobramycin Sulfate 80 mg | 00074-3578-01 | J3260 | $6.74 | $3.63 | $3.11 | 85% |



CIVIL ACTION NO. 95-1354-CIV-MARCUS



CIVIL ACTION NO. 95-1354-CIV-MARCUS



CIVIL ACTION NO. 95-1354-CIV-MARCUS

| 1(D) DEFENDANT BAXTER | | | | | | |
|---|---|---|---|---|---|---|
| DRUG | NDC # | HCPCS CODE | 1996 FLORIDA MEDICARE ALLOWABLE | 1996 RELATOR'S COST | PROVIDER'S GROSS PROFIT $ | PROVIDER'S GROSS PROFIT % |
| Sodium Chloride 0.9% 250 ml | 00338-0049-02 | J7050 | $9.43 | $0.78 | $8.65 | 1108% |
| Sodium Chloride 0.9% 500 ml | 00338-0049-03 | J7040 | $10.14 | $0.79 | $9.35 | 1183% |
| Sodium Chloride 0.9% 1000 ml | 00338-0049-04 | J7030 | $11.06 | $0.95 | $10.11 | 1064% |
| Dextrose 5% in Water 500 ml | 00338-0017-03 | J7060 | $9.98 | $0.78 | $9.20 | 1179% |
| Dextrose 5% in water 1000 ml | 00338-0017-04 | J7070 | $11.23 | $0.95 | $10.28 | 1082% |
| Dextrose 5% & Sodium Chloride 0.9% 500 ml | 00338-0089-03 | J7042 | $10.24 | $1.08 | $9.16 | 848% |
| Ringers Lactate 1000 ml | 00338-0117-04 | J7120 | $12.43 | $1.34 | $11.09 | 827% |
| Immune Globlin 10% 10 gm Gammagard S/D | 00944-2620-04 | J1562 | $745.00 | $300.00 | $445.00 | 148% |
| Immune Globlin 10% 5 gm Gammagard S/D | 00944-2620-03 | J1562 | $372.50 | $150.00 | $222.50 | 148% |
| Immune Globlin 10% 2.5 gm Gammagard S/D | 00944-2620-02 | J1562 | $186.25 | $75.00 | $111.25 | 148% |
| Recombinate 250 iu | 00944-2938-01 | J7192 | $295.00 | $195.00 | $100.00 | 51% |

CIVIL ACTION NO. 95-1354-CIV-MARCUS

## 1(D)  DEFENDANT BAXTER

| DRUG | NDC # | HCPCS CODE | 1996 FLORIDA MEDICARE ALLOWABLE | 1996 RELATOR'S COST | PROVIDER'S GROSS PROFIT $ | PROVIDER'S GROSS PROFIT % |
|------|-------|------------|--------------------------------|---------------------|---------------------------|---------------------------|
| Hemofil M 250 iu | 00944-2935-01 | J7190 | $225.00 | $155.00 | $70.00 | 45% |
| Proplex T 700 iu | 00944-0581-01 | J7194 | $385.00 | $140.00 | $245.00 | 175% |

## 1(E)  DEFENDANT BAYER/MILES

| DRUG | NDC # | HCPCS CODE | 1996 FLORIDA MEDICARE ALLOWABLE | 1996 RELATOR'S COST | PROVIDER'S GROSS PROFIT $ | PROVIDER'S GROSS PROFIT % |
|------|-------|------------|--------------------------------|---------------------|---------------------------|---------------------------|
| Immune Globulin 10%, 10gm Gamimune-N | 00026-0648-71 | J1562 | $745.00 | $370.00 | $375.00 | 101% |
| Immune Globulin 10%, 20 gm Gamimune-N | 00026-0648-24 | J1562 | $1,490.00 | $740.00 | $750.00 | 101% |
| Immune Globulin 10%, 5 gm Gamimune-N | 00026-0648-20 | J1562 | $372.50 | $185.00 | $187.50 | 101% |
| Immune Globulin 5%, 12.5 gm Gamimune-N | 00026-0640-25 | J1561 | $875.25 | $400.00 | $475.25 | 119% |
| Immune Globulin 5%, 5 gm Gamimune-N | 00026-0640-71 | J1561 | $350.10 | $160.00 | $190.10 | 119% |
| Immune Globulin 5%, 2.5 gm Gamimune-N | 00026-0640-20 | J1561 | $175.05 | $80.00 | $95.05 | 119% |
| Kogenate 250 iu | 00161-0670-20 00192-0670-20 00026-0670-20 | J7192 | $295.00 | $162.50 | $132.50 | 82% |

CIVIL ACTION NO. 95-1354-CIV-MARCUS

| 1(E) DEFENDANT BAYER/MILES | | | | | | |
|---|---|---|---|---|---|---|
| DRUG | NDC # | HCPCS CODE | 1996 FLORIDA MEDICARE ALLOWABLE | 1996 RELATOR'S COST | PROVIDER'S GROSS PROFIT $ | PROVIDER'S GROSS PROFIT % |
| Koate-HP 250 iu | 00161-0644-20 00192-0644-20 00026-0644-20 | J7190 | $225.00 | $55.00 | $170.00 | 309% |
| Konyne 80 500 iu | 00192-0626-20 | J7194 | $275.00 | $90.00 | $185.00 | 205% |
| Thrombate III 500 iu | 00026-0603-20 | J7197 | $530.00 | $350.00 | $180.00 | 51% |



CIVIL ACTION NO. 95-1354-CIV-MARCUS

| 1(G)  DEFENDANT BRISTOL-MYERS | | | | | | |
|---|---|---|---|---|---|---|
| DRUG | NDC # | HCPCS CODE | 1996 FLORIDA MEDICARE ALLOWABLE | 1996 RELATOR'S COST | PROVIDER'S GROSS PROFIT $ | PROVIDER'S GROSS PROFIT % |
| Rubex 50 mg | 00015-3352-22 | J9010 | $225.40 | $45.00 | $180.40 | 400% |
| Cytoxan 100 mg | 00015-0539-41 | J9093 | $6.45 | $2.75 | $3.70 | 134% |
| Cytoxan 200 mg | 00015-0546-41 | J9094 | $12.25 | $3.25 | $9.00 | 276% |
| Cytoxan 500 mg | 00015-0547-41 | J9095 | $25.71 | $5.25 | $20.46 | 389% |
| Cytoxan 1.0 gm | 00015-0548-41 | J9096 | $51.43 | $10.00 | $41.43 | 414% |
| Cytoxan 2.0 gm | 00015-0549-41 | J9097 | $102.89 | $20.00 | $82.89 | 414% |

CIVIL ACTION NO. 95-1354-CIV-MARCUS



| 1(I)  DEFENDANT DEY ||||||||
| DRUG | NDC # | HCPCS CODE | 1996 FLORIDA MEDICARE ALLOWABLE | 1996 RELATOR'S COST | PROVIDER'S GROSS PROFIT $ | PROVIDER'S GROSS PROFIT % |
|------|-------|-----------|------------------------------------|---------------------|---------------------------|---------------------------|
| Albuterol Sulfate 0.083% 3 ml 25s | 49502-0697-03 | J7620 | $30.75 | $8.50 | $22.25 | 261% |
| Acelylcysteine Solution 10% 4 ml, 12s | 49502-0181-04 | J7610 | $71.04 | $12.48 | $58.44 | 469% |
| Acetylcysteine Solution 20% 4 ml, 12s | 49502-0182-04 | J7615 | $65.76 | $12.60 | $53.16 | 422% |
| Cromolyn Solium 20 mg 2 ml 60s | 49502-0689-02 | J7630 | $84.00 | $24.50 | $59.50 | 1130% |

CIVIL ACTION NO. 95-1354-CIV-MARCUS

| 1(I) DEFENDANT DEY | | | | | | |
|---|---|---|---|---|---|---|
| DRUG | NDC # | HCPCS CODE | 1996 FLORIDA MEDICARE ALLOWABLE | 1996 RELATOR'S COST | PROVIDER'S GROSS PROFIT $ | PROVIDER'S GROSS PROFIT % |
| Metaproterenol Sulfat 0.4% 2.5 ml 25s | 49502-0678-03 | J7670 | $30.75 | $6.25 | $24.50 | 392% |
| Metaproterenol Sulfate 0.6% 2.5 ml 25s | 49502-0676-03 | J7672 | $1.23 | $0.10 | $1.13 | 1230% |





| 1(M)  DEFENDANT GLAXO WELLCOME/CERENEX | | | | | | |
|---|---|---|---|---|---|---|
| DRUG | NDC # | HCPCS CODE | 1996 FLORIDA MEDICARE ALLOWABLE | 1996 RELATOR'S COST | PROVIDER'S GROSS PROFIT $ | PROVIDER'S GROSS PROFIT % |
| Ondansetron HCL Zofran 40 mg | 00173-0442-00 | J2405 | $233.20 | $165.00 | $68.20 | 41% |
| Ondansetron HCL Zofran 32 mg | 00173-0461-00 | J3490 | $196.76 | $126.00 | $70.76 | 56% |



CIVIL ACTION NO. 95-1354-CIV-MARCUS

CIVIL ACTION NO. 95-1354-CIV-MARCUS



CIVIL ACTION NO. 95-1354-CIV-MARCUS



| 1(S) DEFENDANT SMITHKLINE BEECHAM | | | | | | |
|---|---|---|---|---|---|---|
| DRUG | NDC # | HCPCS CODE | 1996 FLORIDA MEDICARE ALLOWABLE | 1996 RELATOR'S COST | PROVIDER'S GROSS PROFIT $ | PROVIDER'S GROSS PROFIT % |
| Ganisetron Hydrochloride | 00029-4149-01 | J1625 | $173.95 | $124.90 | $49.05 | 40% |

CIVIL ACTION NO. 95-1354-CIV-MARCUS

| 1(U) DEFENDANT WARRICK | | | | | | |
|---|---|---|---|---|---|---|
| DRUG | NDC # | HCPCS CODE | 1996 FLORIDA MEDICARE ALLOWABLE | 1996 RELATOR'S COST | PROVIDER'S GROSS PROFIT $ | PROVIDER'S GROSS PROFIT % |
| Albuterol Sulfate 0.083% Solution 3 ml 25s | 59930-1500-08 | J7620 | $30.75 | $7.99 | $22.76 | 285% |

72.     For   many   of   the   specified   pharmaceuticals,   the   DEFENDANT

PHARMACEUTICAL MANUFACTURERS' false and fraudulent representations of price

and cost caused the Medicare Program to pay and approve claims at such excessive

amounts that the 20% co-payment paid by the patient exceeded the true price of the

pharmaceuticals.  Table No. 2 below lists some of those specified pharmaceuticals, the

amount approved in 1996 by Florida Medicare, the 20% co-payment paid by the patient,

and the true price paid by the Relator.

## TABLE NO. 2

### DRUGS WHERE THE MEDICARE PROGRAMS'
### 20% CO-PAYMENT
### EXCEEDS THE TOTAL PRICE OF THE DRUG

| Drug | HCPCS Code | 1996 Florida Medicare Allowable | 20% Co-Payment | 1996 Relator's Cost |
|---|---|---|---|---|
|  |  |  |  |  |

CIVIL ACTION NO. 95-1354-CIV-MARCUS

| Drug | HCPCS Code | 1996 Florida Medicare Allowable | 20% Co-Payment | 1996 Relator's Cost |
|---|---|---|---|---|
| | | | | |
| Sodium Chloride 0.9% 1000 ml | J7030 | $ 11.06 | $ 2.21 | $ 0.95 |
| Sodium Chloride 0.9% 500 ml | J7040 | $ 10.14 | $ 2.03 | $ 0.79 |
| 5% Dextrose/ Sodium Chloride 0.9% 500 ml | J7042 | $ 10.24 | $ 2.05 | $ 0.78 |
| Sodium Chloride 0.9% 250 ml | J7050 | $ 9.43 | $ 1.89 | $ 0.78 |
| 5% Dextrose in Water 500 ml | J7060 | $ 9.98 | $ 1.99 | $ 0.75 |
| 5% Dextrose in Water 1000 ml | J7070 | $ 11.23 | $ 2.25 | $ 0.95 |
| Lacted Ringers 1000 ml | J7120 | $ 12.43 | $ 2.48 | $ 1.02 |
| Acetylcysteine 20% per ml | J7615 | $ 1.37 | $ 0.27 | $ 0.26 |
| Metaprotenenol Sulfate 0.4% | J7670 | $ 1.23 | $ 0.25 | $ 0.10 |
| Metaprotenenol Sulfate 0.6% | J7672 | $ 1.23 | $ 0 .25 | $ 0.10 |
| Doxorubicin 10 mg | J9000 | $ 45.08 | $ 9.02 | $ 9.00 |
| Doxorubicin 50 mg | J9010 | $225.40 | $45.08 | $45.00 |

CIVIL ACTION NO. 95-1354-CIV-MARCUS

| Drug | HCPCS Code | 1996 Florida Medicare Allowable | 20% Co-Payment | 1996 Relator's Cost |
|------|-----------|--------------------------------|----------------|---------------------|
|      |           |                                |                |                     |

## SECTION NO. 6

### BACKGROUND OF HOW UNITED STATES' MONIES ARE PAID FOR PHARMACEUTICAL CLAIMS UNDER THE STATES' MEDICAID PROGRAMS

73.    The United States Government partially funds state sponsored medical assistance programs for the poor pursuant to **Title XIX of the Social Security Act, 42 U.S.C. § 1396 et seq**.

74.    Benefits for pharmaceuticals are optional but all states have opted to provide Medicaid pharmaceutical reimbursement coverage.

CIVIL ACTION NO. 95-1354-CIV-MARCUS

75.     The federal portion of state Medicaid payments, Federal Medical Assistance

Percentage ("FMAP") is based on a state's per capita income compared to the national

average. The federal portion consists of a minimum of 50% up to a maximum of 83%. By

example, Florida's FMAP contributed by the United States in 1995 was 56.28%.

76.     The States, United States Territories and the District of Columbia are required

to implement a State Health Plan containing certain specified minimum criteria for

coverage and payment of claims in order to qualify for federal funds for Medicaid

expenditures. **42 U.S.C. §1396a(a)(30)(A)**.

77.     State Health Plans must, in part, provide for payment of claims for

prescription pharmaceuticals pursuant to a formula approved by the Secretary of HHS

which determines the maximum allowable claim amount for each pharmaceutical

manufactured by each manufacturer whose prescription pharmaceuticals qualify for

Medicaid reimbursement based upon an estimation of the provider's acquisition cost plus

a reasonable dispensing fee. 42 CFR 447.331.

78.     In order to comply with the requirements of 42 CFR 447.331 to estimate a

provider's costs for specific pharmaceuticals, the States' Medicaid programs acquire and

receive price and cost information from the DEFENDANT PHARMACEUTICAL

MANUFACTURERS directly and indirectly from entities equipped to do specialized data

collection.

79.     Medical Economics, Inc. and the Hearst Corporation are nationally

recognized companies that specialize in gathering pharmaceutical pricing and cost

information including Average Wholesale Price ("AWP"), Wholesale Acquisition Cost ("WAC"), Direct Price ("DP"), Actual Acquisition Cost ("AAC") and Estimated Acquisition Cost ("EAC") and publishing such information in "The Red Book" which is published by Medical Economics and "The Blue Book" which is published by the Hearst Corporation. The Hearst Corporation also, through its First Data Bank Division, provides an automated data base service containing pharmaceutical price and cost information.

80.    The Relator's investigation has shown that:

A.    HCFA has approved approximately 38 state plans whose methodology for arriving at a provider's estimated AAC as required by 42 CFR 447.331 includes discounting a percentage off of the AWP prices as computed by or collected by and published by First Data Bank. This discounting ranges from Alaska, whose state formula is AWP minus 5%, to Michigan, whose state formula is AWP minus 13.5 - 15.1 %. Nineteen HCFA approved state formulas are on a basis of AWP minus 10%. Seven states formulas are WAC plus a percentage or an AWP discount/WAC hybrid. The State of Florida's formula is WAC plus 7%. The State of Delaware bases reimbursement on AAC. The balance of the states use a EAC/AWP discount mix. **Exhibit "8"** is a chart that sets out how each individual State arrives at its estimate of AAC.

B.    More than 90% of the individual state Medicaid programs rely upon price and cost information supplied by the Hearst Corporation's First Data Bank service in setting reimbursement amounts for pharmaceuticals.

**CIVIL ACTION NO. 95-1354-CIV-MARCUS**

C.    Medical Economics, Inc. and The Hearst Corporation both rely solely upon the pricing information provided by the DEFENDANT PHARMACEUTICAL MANUFACTURERS for the drugs specified in this Second Amended Complaint in establishing or reporting the DEFENDANT PHARMACEUTICAL MANUFACTURERS' AWPs, DPs, EACs, AACs and WACs.

D.    Regardless of whether a State's reimbursement methodology estimates a provider's actual acquisition cost pursuant to federal regulation 42 CFR 447.331 as WAC plus a percentage or AWP minus a percentage, the representations made by the DEFENDANT PHARMACEUTICAL MANUFACTURERS regarding their direct prices to First Data Bank, Medical Economics and directly to the States' Medicaid Programs are material for the establishment of reasonable reimbursements by the States' Medicaid Programs. The importance that Pharmaceutical Manufacturers represent truthful direct prices and how the representations of direct prices affect reimbursements in both States whose formula is WAC plus a percentage and States whose formula is AWP minus a percentage is demonstrated by the following example:

(i)    On or about December 1995, Defendant            reported a direct price of $76.80 for a 10 ml vial of                              to First Data Bank. The direct price representation submitted by Defendant            of $76.80 was false and fraudulent since VAC could purchase

for approximately $14.70 from a national wholesaler. When First Data Bank received the false and fraudulent direct price representation of $76.80 for Defendant

58

CIVIL ACTION NO. 95-1354-CIV-MARCUS

█████████████ First Data Bank established a WAC of $76.80, applied an industry average "mark-up" and established an AWP of $94.75. First Data Bank then transmitted ███████████ representation of direct price and First Data Bank's computed AWP to the States' Medicaid Programs who relied upon the representations of prices for the payment of claims.

        (ii)    On or about March 1996, Defendant ███████ reported to First Data Bank a near truthful direct price of $26.12 for the same ████████████ ███████████████ The near truthful direct price representation to First Data Bank by Defendant ████████ caused First Data Bank to establish a new WAC of $26.12 and to compute a new AWP of $31.10. The near truthful representation of direct price by ████████ together with First Data Bank's computed AWP were then transmitted to the various States' Medicaid Programs who again relied upon these representations of prices for the payment of claims.

        (iii)    The following charts indicate the cause and effect that the false and fraudulent representations of direct price and the near truthful representations of direct price made by Defendant ████████ had on reimbursements made by a State's Medicaid Program whose reimbursement is based on WAC plus a percentage and on two States' Medicaid Programs whose reimbursements are based on AWP minus a percentage:



### a) FLORIDA, WAC + 7%

| Prior to 3/15/96 FIRST DATA BANK | | FLORIDA MEDICAID Reimbursement per 10 ml | VAC's True Cost | V S | 03/15/96 FIRST DATA BANK | | FLORIDA MEDICAID Reimbursement per 10 ml | VAC's True Cost |
|---|---|---|---|---|---|---|---|---|
| "AWP" | "DP" | | | | "AWP" | "DP" | | |
| $94.75 | $76.80 | $81.1060 | $14.70 | | $31.10 | $26.12 | $26.6216 | $14.70 |

### b) MICHIGAN, AWP - 13.5% 1 - 4 pharmacies
### AWP - 15.1% 5+ pharmacies

| Prior to 3/15/96 FIRST DATA BANK | | MICHIGAN MEDICAID Reimbursement per 10 ml | | VAC's True Cost | V S | 03/15/96 FIRST DATA BANK | | MICHIGAN MEDICAID Reimbursement per 10 ml | | VAC's True Cost |
|---|---|---|---|---|---|---|---|---|---|---|
| "AWP" | "DP" | 1-4 | 5+ | | | "AWP" | "DP" | 1-4 | 5+ | |
| $94.75 | $76.80 | $81.9587 | $80.4427 | $14.70 | | $31.10 | $26.12 | $26.9015 | $26.4039 | $14.70 |

### c) CALIFORNIA, AWP - 5%

| Prior to 3/15/96 FIRST DATA BANK | | CALIFORNIA MEDICAID Reimbursement per 10 ml | VAC's True Cost | V S | 03/15/96 FIRST DATA BANK | | CALIFORNIA MEDICAID Reimbursement per 10 ml | VAC's True Cost |
|---|---|---|---|---|---|---|---|---|
| "AWP" | "DP" | | | | "AWP" | "DP" | | |
| $94.75 | $76.80 | $90.0125 | $14.70 | | $31.10 | $26.12 | $29.50 | $14.70 |

E.  The DEFENDANT PHARMACEUTICAL MANUFACTURERS regularly make direct representations of false price and cost information directly to the various state Medicaid agencies that are relied upon in approving and paying claims. By way of

example: i) attached hereto and incorporated herein by reference as **Exhibit "9"** is a copy of a written representation of false price and cost information provided to all state Medicaid agencies by Defendant ███████ regarding its drug ███████ in or about May, 1995. ii) attached hereto and incorporated herein by reference as **Exhibit "10"** is a copy of a written representation of false price and cost information provided to the State of South Carolina's Medicaid agency by Defendant BRISTOL MYERS SQUIBB. iii) attached hereto as **Exhibit "11"** is a letter dated November 7, 1996 from Apothecon (a Bristol Myers Squibb company) to the State of Florida Medicaid Agency regarding the company's drug, Atenolol. Applying Florida's methodology of WAC plus 7%, to the prices represented in **Exhibit "11"** the reimbursement of 100 50 mg tablets, old NDC #00003-5040-50, new NDC#62269-0256-24, would be $59.65 (WAC = $55.75 + 7%, = $59.65) plus the professional dispensing fee. However, Atenolol falls under the FUL program whose reimbursement was limited as of January, 1997 to $0.0464 per 50 mg tablet or $4.64 per 100 50 mg tablet.

Upon reviewing **Exhibit "11"** the State of Florida refused to cover Bristol's generic Atenolol until such time as the State received from Bristol Myers what the State considered to be Bristol's truthful prices for Atenolol. The fact that Florida was not covering Bristol's Atenolol led to complaints to Bristol Myers from pharmacies in Florida who had dispensed Bristol's Atenolol to Florida Medicaid recipients and who were receiving denials for payment by Unisys, the State's fiscal agent. Approximately one month later, the State of Florida official received a telephone call from a person who stated he represented Bristol

Myers and requested immediate coverage of Bristol's drug Atenolol. The Florida Medicaid official stated she would not cover the drug unless she received truthful prices. The person who represented Bristol Myers stated words to the effect, "What does it matter? This drug is covered by the FUL program." The Florida official stated that it did matter as it could affect not only the reimbursement amount the State paid for Atenolol but also, if all manufacturers followed Bristol Myers' course and conduct of making false pricing representations, it would affect the FUL program by making it totally worthless. Only when it became clear to the Bristol Myers' representative that the Florida official was standing her ground, did Bristol Myers fax the letter dated December 5, 1996 revealing Bristol Myer's truthful prices, a copy of which is attached hereto marked as **Exhibit "12"**. Applying Florida's Medicaid reimbursement methodology to Bristol's truthful prices, the State pays $4.24 for 100 50 mg tablets (WAC $3.96 + 7% = $0.28). The truthful prices saved the U.S. Government and the State of Florida $0.40 per 100 50 mg tablets for each prescription filled.

81. The Food and Drug Administration ("FDA") assigns National Drug Codes ("NDC") numbers to identify each individual manufacturer and their pharmaceuticals' strength and size. NDC numbers are eleven digits, with the first five digits identifying the manufacturer or labeler, the next four digits identifying the product and the last two digits identifying the package size.

82. Providers are required to utilize the FDA's NDC numbers when submitting claims for reimbursement for pharmaceuticals to the State Medicaid programs.

83. The vast majority of States award cost-reimbursement contracts to private companies to evaluate and process Medicaid recipients' claims for payment. The States refer to these contractors as fiscal agents.

84. Pharmaceutical claims are submitted in one of two ways. The first is by submitting to the fiscal agent or state agency a completed (hard copy) pharmacy claim form. The second is through an electronic claims filing procedure whereby the same information required to be included on the hard copy is transmitted electronically to the Medicaid fiscal agent or state agency.

85. The DEFENDANT PHARMACEUTICAL MANUFACTURERS are each fully capable of making truthful representations about prices and costs of the specified pharmaceuticals and do so when it is economically beneficial to them.

86. The DEFENDANT PHARMACEUTICAL MANUFACTURERS each participated in the Medicaid rebate program mandated by the Omnibus Budget Reconciliation Act of 1990 ("OBRA '90") and thus were required to pay rebates to the State Medicaid programs based upon their average manufacturer's price ("AMP") for non-innovator multi-source pharmaceuticals (generics) or best price ("BP") single source innovator drugs (Brand) for the specified pharmaceuticals at issue in this case. The AMP rebate amount is currently 11% and the BP is currently a minimum of 17% or more based on a formula between the drug manufacturers' difference in AMP and BP. The method of calculating rebates, therefore, causes it to be in the economic interests of the

CIVIL ACTION NO. 95-1354-CIV-MARCUS

DEFENDANT PHARMACEUTICAL MANUFACTURERS to report the lowest AMPs and Best Prices based on the data available to them.

The following examples demonstrate that the DEFENDANT DRUG MANUFACTURES are able to report accurate prices when they choose to:

      A.    Drug - ▆▆▆▆▆▆▆▆▆

            Manufacturer - ▆▆▆▆▆▆▆▆▆▆▆▆

            Relator's current wholesale price - $14.00

            AMP Rebate = 11%

            Current Florida Medicaid reimbursement (WAC + 7%) = $112.52,

therefore WAC = $105.16 ($105.16 + 7%; $7.36) $105.16 is also the direct price published by ▆▆▆▆ in 1995. ▆▆▆▆ published direct price of $105.16 should be approximately the same as AMP. ▆▆▆▆ should owe the State of Florida approximately $11.56 ($105.16 x 11%) in a rebate for each 100 mg ▆▆▆▆▆▆▆ paid for by the State. Thus, ▆▆▆▆ would be paying a rebate of approximately $11.56 for a drug which ▆▆▆▆ in all likelihood sold to the wholesaler for approximately $11.00. However, based on information and belief, ▆▆▆▆ is paying 11% of approximately $14.00 (true price) or $1.54 as a rebate to the State of Florida rather than a rebate of 11% of $105.6 (false price on which reimbursement is based) or $11.56.

**CIVIL ACTION NO. 95-1354-CIV-MARCUS**

B.    Drug - 

Manufacturer -

Relator's current direct price - $1.89

AMP Rebate - 11%

Current Florida Medicaid reimbursement (WAC + 7%) = $62.49 therefore WAC = $58.40 ($58.40 + 7%; $14.08). The WAC price of $58.40 should be relatively close to AMP, thus ▮▮▮▮ should owe the State of Florida approximately $6.42 ($58.40 x 11%) in a rebate for each 50 mg ▮▮▮ paid for by the State. ▮▮▮ ▮▮▮ would be paying a rebate of approximately $6.42 for a drug which ▮▮▮ sold on a direct basis for $1.89. However, based on information and belief, ▮▮▮ is paying 11% of approximately $1.89 (true price) or $0.21 as a rebate to the State of Florida rather than a rebate of 11% of $58.40 (false price on which reimbursement is based) or $6.42.

87.    When reporting prices to Medical Economics and Hearst Corporation and directly to Medicare and the States' Medicaid programs for the pharmaceuticals at issue in this case, the DEFENDANT PHARMACEUTICAL MANUFACTURERS falsely reported amounts far in excess of those reported for OBRA '90 rebate purposes. Therefore, when it benefited the DEFENDANT PHARMACEUTICAL MANUFACTURERS to report highest prices to maximize the reimbursement amount for the select providers from the Medicare and Medicaid programs, they used the false and grossly inflated prices and, when it benefited the DEFENDANT PHARMACEUTICAL MANUFACTURERS to report their true

65

prices to minimize the rebates they were required to pay the States' Medicaid Programs, they used the true prices driven low by competition. Accordingly, the DEFENDANT PHARMACEUTICAL MANUFACTURERS knowingly reported false inflated price and cost information, in part, because each DEFENDANT PHARMACEUTICAL MANUFACTURER's participation in the rebate program demonstrates its ability to report accurate prices, yet each DEFENDANT PHARMACEUTICAL MANUFACTURER knowingly failed to use that ability when it knew its price and cost reports were being relied upon in paying and approving Medicare and Medicaid claims.

88.    This case focuses on the specified pharmaceuticals that are covered under the States' Medicaid Programs which are sold and/or distributed by the DEFENDANT PHARMACEUTICAL MANUFACTURERS and for which the States' Medicaid Programs rely on the cost and price representations reported by the DEFENDANT PHARMACEUTICAL MANUFACTURERS to pay and approve claims.    The pharmaceuticals at issue in this case for which Medicaid has paid claims are identified in the following Table No. 3 together with their respective NDC numbers. By way of example, the claim amount approved by Florida Medicaid for each pharmaceutical in 1996 is compared with the Relator's cost in order to illustrate the grossly excessive payments resulting from the DEFENDANT PHARMACEUTICAL MANUFACTURERS' false representations of price and cost.

CIVIL ACTION NO. 95-1354-CIV-MARCUS

## TABLE NO. 3

| 3(A) DEFENDANT ABBOTT | | | | | |
|---|---|---|---|---|---|
| DRUG | NDC # | FLORIDA MEDICAID PAYMENT | RELATOR'S COST | PROVIDER'S GROSS PROFIT $ | PROVIDER'S GROSS PROFIT % |
| Sodium Chloride 0.9% 50 ml | 00074-7101-13 | $11.28 | $1.23 | $10.05 | 817% |
| Sodium Chloride 0.9% 100 ml | 00074-7101-23 | $11.28 | $1.23 | $10.05 | 817% |
| Sodium Chloride 0.9% 250 ml | 00074-7983-02 | $9.37 | $0.95 | $8.42 | 886% |
| Sodium Chloride 0.9% 500 ml | 00074-7983-03 | $9.37 | $0.95 | $8.42 | 886% |
| Sodium Chloride 0.9% 1000 ml | 00074-7983-09 | $11.16 | $1.03 | $10.13 | 983% |
| 5% Dextrose in Water 50 ml | 00074-7100-13 | $11.28 | $1.23 | $10.05 | 817% |
| 5% Dextrose in Water 100 ml | 00074-7100-23 | $11.28 | $1.23 | 410.05 | 817% |
| 5% Dextrose in Water 250 ml | 00074-7100-02 | $13.67 | $1.33 | $12.34 | 928% |
| 5% Dextrose in Water 500 ml | 00074-7922-03 | $9.53 | $0.96 | $8.57 | 892% |

CIVIL ACTION NO. 95-1354-CIV-MARCUS

| 3(A)  DEFENDANT ABBOTT | | | | | |
|---|---|---|---|---|---|
| DRUG | NDC # | FLORIDA MEDICAID PAYMENT | RELATOR'S COST | PROVIDER'S GROSS PROFIT $ | PROVIDER'S GROSS PROFIT % |
| 5% Dextrose in Water 1000 ml | 00074-7922-09 | $11.13 | $1.12 | $11.01 | 983% |
| 5% Dextrose/ Sodium Chloride 0.9% 250 ml | 00074-7941-02 | $10.24 | $1.03 | $9.21 | 894% |
| 5% Dextrose/ Sodium Chloride 0.9% 500 ml | 00074-7941-03 | $10.23 | $1.03 | $9.20 | 893% |
| 5% Dextrose/ Sodium Chloride 0.9% 1000 ml | 00074-7941-09 | $12.51 | $1.23 | $11.28 | 917% |
| Ringers Lactate 250 ml | 00074-7953-02 | $11.34 | $1.08 | $10.00 | 926% |
| Ringers Lactate 500 ml | 00074-7953-03 | $11.34 | $1.08 | $10.26 | 950% |
| Ringers Lactate 1000 ml | 00074-7953-09 | $12.72 | $1.14 | $11.58 | 915% |
| Vancomycin HCL  500 mg | 00074-4332-01 | $30.85 | $3.51 | $27.34 | 779% |
| Vancomycin HCL 500 mg | 00074-6535-01 | $22.19 | $6.29 | $15.90 | 252% |
| Vancomycin HCL 1 gm | 00074-6533-01 | $61.68 | $5.53 | $56.15 | 1015% |
| Vancomycin HCL 5 gm | 00074-6509-01 | $138.76 | $35.10 | $103.66 | 295% |

CIVIL ACTION NO. 95-1354-CIV-MARCUS

| 3(A)  DEFENDANT ABBOTT | | | | | |
|---|---|---|---|---|---|
| DRUG | NDC # | FLORIDA MEDICAID PAYMENT | RELATOR'S COST | PROVIDER'S GROSS PROFIT $ | PROVIDER'S GROSS PROFIT % |
| Tobramycin Sulfate 20 mg | 00074-3577-01 | $4.86 | $1.94 | $2.92 | 150% |
| Tobramycin Sulfate 60 mg | 00074-3582-01 | $6.21 | $3.68 | $2.53 | 68% |
| Tobramycin Sulfate 60 mg | 0074-3469-13 | $21.45 | $5.16 | $16.29 | 315% |
| Tobramycin Sulfate 60 mg | 00074-3254-03 | $16.04 | $3.97 | $12.07 | 304% |
| Tobramycin Sulfate 80 mg | 00074-3470-23 | $23.45 | $5.57 | $17.88 | 321% |
| Tobramycin Sulfate 80 mg | 00074-3583-01 | $10.26 | $4.12 | $6.14 | 149% |
| Tobramycin Sulfate 80 mg | 00074-3578-01 | $9.64 | $3.63 | $6.01 | 165% |
| Tobramycin Sulfate 80 mg | 00074-3255-03 | $10.72 | $4.33 | $6.39 | 147% |
| Tobramycin Sulfate 2000 mg | 00074-3590-02 | $241.07 | $87.68 | $153.39 | 174% |
| Pentamidine 300 mg | 00074-4548-01 | $111.40 | $43.00 | $68.40 | 159% |
| Clindamycin Phosphate 300 mg | 00074-4053-03 | $11.07 | $1.74 | $9.33 | 536% |
| Clindamycin Phosphate 300 mg | 00074-4050-01 | $10.99 | $1.47 | $9.52 | 647% |
| Clindamycin Phosphate 600 mg | 0074-4054-03 | $20.35 | $2.95 | $17.40 | 589% |

CIVIL ACTION NO. 95-1354-CIV-MARCUS

| 3(A)  DEFENDANT ABBOTT | | | | | |
|---|---|---|---|---|---|
| DRUG | NDC # | FLORIDA MEDICAID PAYMENT | RELATOR'S COST | PROVIDER'S GROSS PROFIT $ | PROVIDER'S GROSS PROFIT % |
| Clindamycin Phosphate 600 mg | 00074-4051-01 | $21.34 | $2.69 | $18.65 | 693% |
| Clindamycin Phosphate 900 mg | 00074-4052-01 | $26.96 | $3.20 | $23.76 | 742% |
| Clindamycin Phosphate 9000 mg | 00074-4197-01 | $221.11 | $30.95 | $190.16 | 614% |
| Clindamycin Phosphate 900 mg | 00074-4055-03 | $27.22 | $3.46 | $23.76 | 686% |
| Sodium Bicarbonate 50 ml | 00074-6625-02 | $6.57 | $0.62 | $5.95 | 959% |
| Sodium Bicarbonate 8.4% 50 ml | 00074-6637-01 | $18.28 | $1.66 | $16.62 | 1001% |
| Amikacin Sulfate 500 mg, 2 ml | 00074-1958-01 | $55.18 | $15.50 | $39.68 | 256% |
| Amikacin Sulfate 100 mg, 2 ml | 00074-1955-01 | $40.20 | $11.50 | $28.70 | 249% |
| Amikacin Sulfate 1 gm, 4 ml | 00074-1957-01 | $49.81 | $28.50 | $21.31 | 75% |

CIVIL ACTION NO. 95-1354-CIV-MARCUS

| 3(A) DEFENDANT ABBOTT | | | | | |
|---|---|---|---|---|---|
| DRUG | NDC # | FLORIDA MEDICAID PAYMENT | RELATOR'S COST | PROVIDER'S GROSS PROFIT $ | PROVIDER'S GROSS PROFIT % |
| Heparin Lock Flush 10u/ml, 30 ml | 00074-1151-78 | $2.86 | $0.38 | $2.48 | 652% |
| Heparin Lock Flush 100u/ml 30 ml | 00074-1152-78 | $3.26 | $0.44 | $2.82 | 640% |
| Heparin Lock Flush 100u/ml 10 ml | 00074-1152-70 | $1.40 | $0.28 | $1.12 | 400% |
| Water for Inj. 20 ml | 00074-4887-20 | $1.72 | $0.23 | $1.49 | 647% |
| Water for Inj. 10 ml | 00074-4887-10 | $1.37 | $0.19 | $1.18 | 621% |
| Water for Inj. 30 ml | 00074-3977-03 | $1.84 | $0.20 | $1.64 | 820% |
| Water for Inj. 1000 ml | 00074-1590-05 | $11.34 | $1.13 | $10.21 | 903% |
| Water for Inj. 1000 ml | 00074-7990-09 | $10.27 | $1.04 | $9.23 | 887% |
| Water for Inj. 100 ml | 00074-4887-99 | $3.42 | $0.71 | $2.71 | 381% |
| Dex 5%/ KCl/NaCl 1000 ml | 00074-7902-09 | $17.46 | $2.05 | $15.41 | 751% |
| Furosemide 40 mg 4 ml | 00074-6102-04 | $4.13 | $0.35 | $3.78 | 1080% |

CIVIL ACTION NO. 95-1354-CIV-MARCUS



CIVIL ACTION NO. 95-1354-CIV-MARCUS



CIVIL ACTION NO. 95-1354-CIV-MARCUS



| 3(D)  DEFENDANT BAXTER | | | | | |
|---|---|---|---|---|---|
| DRUG | NDC # | FLORIDA MEDICAID PAYMENT | RELATOR'S COST | PROVIDER'S GROSS PROFIT $ | PROVIDER'S GROSS PROFIT % |
| Sodium Chloride 0.9% 50 ml | 00338-0049-41 | $8.60 | $1.00 | $7.60 | 760% |
| Sodium Chloride 0.9% 100 ml | 00338-0049-48 | $8.60 | $1.00 | $7.60 | 760% |
| Sodium Chloride 0.9% 250 ml | 00338-0049-02 | $8.10 | $0.78 | $7.32 | 938% |
| Sodium Chloride 0.9% 500 ml | 00338-0049-03 | $8.10 | $0.79 | $7.31 | 925% |
| Sodium Chloride 0.9% 1000 ml | 00338-0049-04 | $8.77 | $0.95 | $7.82 | 823% |

CIVIL ACTION NO. 95-1354-CIV-MARCUS

| 3(D)  DEFENDANT BAXTER | | | | | |
|---|---|---|---|---|---|
| DRUG | NDC # | FLORIDA MEDICAID PAYMENT | RELATOR'S COST | PROVIDER'S GROSS PROFIT $ | PROVIDER'S GROSS PROFIT % |
| Dextrose 5% in Water 50 ml | 00338-0017-41 | $8.60 | $1.01 | $7.59 | 751% |
| Dextrose 5% Water 100 ml | 00338-0017-48 | $8.60 | $1.01 | $7.59 | 751% |
| Dextrose 5% Water 250 ml | 00338-0017-02 | $8.23 | $0.78 | $7.45 | 955% |
| Dextrose 5% in Water 500 ml | 00338-0017-03 | $8.23 | $0.79 | $7.44 | 941% |
| Dextrose 5% in Water 1000 ml | 00338-0017-04 | $9.62 | $0.95 | $8.67 | 912% |
| Dextrose 5% in Normal Saline 250 ml | 00338-0089-02 | $8.85 | $1.08 | $7.77 | 719% |
| Dextrose 5% in Normal Saline 500 ml | 00338-0089-03 | $8.85 | $1.08 | $7.77 | 719% |
| Dextrose 5% in Normal Saline 1000 ml | 00338-0089-04 | $10.51 | $0.99 | $9.52 | 961% |
| Lactated Ringers 250 ml | 00338-0117-02 | $9.79 | $1.26 | $8.53 | 677% |

Case 1:01-cv-12257-PBS Document 8224-1 Filed 11/21/12 Page 77 of 221
Case 1:10-cv-21745-ASG Document 5-1 Entered on FLSD Docket 06/04/2010 Page 76 of
124

CIVIL ACTION NO. 95-1354-CIV-MARCUS

| 3(D) DEFENDANT BAXTER | | | | | |
|---|---|---|---|---|---|
| DRUG | NDC # | FLORIDA MEDICAID PAYMENT | RELATOR'S COST | PROVIDER'S GROSS PROFIT $ | PROVIDER'S GROSS PROFIT % |
| Lactated Ringers 500 ml | 00338-0117-03 | $9.79 | $1.13 | $8.66 | 766% |
| Lactated Ringers 1000 ml | 00338-0117-04 | $11.00 | $1.34 | $9.66 | 721% |
| Gammagard S/D 10 gm | 00944-2620-04 | $380.920 | $300.00 | $80.92 | 27% |
| Gammagard S/D 5 gm | 00944-2620-03 | $197.950 | $150.00 | $47.95 | 32% |
| Recombinate 250iu | 00944-2938-01 | $219.35 | $195.00 | $24.35 | 13% |
| Recombinate 500iu | 00944-2938-02 | $438.70 | $390.00 | $48.70 | 13% |
| Recombinate 1000iu | 00944-2938-03 | $877.40 | $780.00 | $97.40 | 13% |
| Pro Plex-T 700 iu (700 - 3900iu) | 00944-0581-01 | $187.25 | $140.00 | $47.25 | 34% |

| 3(E)  DEFENDANT BAYER/MILES | | | | | |
|---|---|---|---|---|---|
| DRUG | NDC # | FLORIDA MEDICAID PAYMENT | RELATOR'S COST | PROVIDER'S GROSS PROFIT $ | PROVIDER'S GROSS PROFIT % |
| Immune Globulin Gamimune-N 10% 10 gm | 00026-0648-71 | $801.00 | $370.00 | $431.00 | 116% |
| Immune Globulin Gamimune-N 10% 20 gm | 00026-0648-24 | $1,602.00 | $740.00 | $862.00 | 116% |
| Immune Globulin Gamimune-N 10% 5 gm | 00026-0648-20 | $400.50 | $185.00 | $215.50 | 116% |
| Immune Globulin Gamimune-N 5% 5 gm | 00026-0640-71 | $254.18 | $160.00 | $94.18 | 58% |
| Kogenate 250iu | 00192-0670-20 00026-0670-20 00161-0670-20 | $219.25 | $162.50 | $56.75 | 35% |
| Kogenate 500iu | 00192-0670-30 00026-0670-30 00161-0670-30 | $438.50 | $325.00 | $113.50 | 35% |
| Kogenate 1000iu | 00192-0670-50 00026-0670-50 00161-0670-50 | $877.00 | $650.00 | $227.00 | 35% |

**CIVIL ACTION NO. 95-1354-CIV-MARCUS**



CIVIL ACTION NO. 95-1354-CIV-MARCUS



| 3(G)  DEFENDANT BRISTOL-MYERS | | | | | |
|---|---|---|---|---|---|
| DRUG | NDC # | FLORIDA MEDICAID PAYMENT | RELATOR'S COST | PROVIDER'S GROSS PROFIT $ | PROVIDER'S GROSS PROFIT % |
| Rubex 10 mg | 00015-3351-22 | $37.50 | $11.00 | $26.50 | 241% |
| Rubex 50 mg | 00015-3352-22 | $168.76 | $45.00 | $123.76 | 275% |
| Vepesid | 00015-3095-20 | $116.83 | $23.00 | $93.83 | 407% |

CIVIL ACTION NO. 95-1354-CIV-MARCUS

| 3(G)  DEFENDANT BRISTOL-MYERS | | | | | |
|---|---|---|---|---|---|
| DRUG | NDC # | FLORIDA MEDICAID PAYMENT | RELATOR'S COST | PROVIDER'S GROSS PROFIT $ | PROVIDER'S GROSS PROFIT % |
| Cytoxan 100 mg | 00015-0539-41 | $5.52 | $2.75 | $2.77 | 100% |
| Cytoxan 200 mg | 00015-0546-41 | $10.49 | $3.25 | $7.24 | 222% |
| Cytoxan 500 mg | 00015-0547-41 | $22.00 | $5.25 | $16.75 | 319% |
| Cytoxan 1 gm | 00015-0548-41 | $44.02 | $10.00 | $34.02 | 340% |
| Cytoxan 2 gm | 00015-0549-41 | $88.07 | $20.00 | $68.07 | 340% |



CIVIL ACTION NO. 95-1354-CIV-MARCUS



| 3(I) DEFENDANT DEY | | | | | |
|---|---|---|---|---|---|
| DRUG | NDC # | FLORIDA MEDICAID PAYMENT | RELATOR'S COST | PROVIDER'S GROSS PROFIT $ | PROVIDER'S GROSS PROFIT % |
| Albuterol Sulfate 0.083% 3 ml, 25s | 49502-0697-03 | $26.48 | $8.50 | $17.98 | 212% |
| Albuterol Sulfate 0.083% 3 ml, 30s | 49502-0697-33 | $31.80 | $10.20 | $21.60 | 212% |
| Albuterol Sulfate 0.083%, 3 ml 60s | 49502-0697-60 | $63.60 | $20.40 | $43.20 | 212% |

CIVIL ACTION NO. 95-1354-CIV-MARCUS

| 3(I)  DEFENDANT DEY | | | | | |
|---|---|---|---|---|---|
| DRUG | NDC # | FLORIDA MEDICAID PAYMENT | RELATOR'S COST | PROVIDER'S GROSS PROFIT $ | PROVIDER'S GROSS PROFIT % |
| Acetylcysteine Solution 10% 4 ml | 49502-0181-04 | $27.60 | $12.48 | $15.12 | 121% |
| Acetylcysteine Solution 10% 10 ml | 49502-0181-10 | $16.35 | $10.17 | $6.18 | 61% |
| Acetylcysteine Solution 10% 30 ml | 49502-0181-30 | $44.91 | $19.65 | $25.26 | 128% |
| Acetylcysteine Solution 20% 4 ml | 49502-0182-04 | $33.25 | $12.60 | $20.65 | 164% |
| Acetylcysteine Solution 20% 10 ml | 49502-0182-10 | $19.87 | $9.90 | $9.97 | 101% |
| Acetylcysteine Solution 20% 30 ml | 49502-0182-30 | $54.18 | $24.63 | $29.55 | 120% |
| Acetylcysteine Solution 20% 100 ml | 49502-0182-00 | $81.21 | $24.50 | $56.71 | 231% |
| Cromolyn Sodium 2 ml 60s | 49502-0689-02 | $36.59 | $24.50 | $12.09 | 49% |
| Cromolyn Sodium 2 ml 120s | 49502-0689-12 | $70.62 | $49.00 | $21.62 | 44% |

CIVIL ACTION NO. 95-1354-CIV-MARCUS

| 3(I) DEFENDANT DEY | | | | | |
|---|---|---|---|---|---|
| DRUG | NDC # | FLORIDA MEDICAID PAYMENT | RELATOR'S COST | PROVIDER'S GROSS PROFIT $ | PROVIDER'S GROSS PROFIT % |
| Metaproterenol Sulfate 0.4% | 49502-0678-03 | $11.77 | $6.25 | $552.00 | 88% |
| Metaproterenol Sulfate 0.6% 2.5 ml 25 s | 49502-0676-03 | $11.77 | $6.25 | $552.00 | 88% |
| Sodium Chloride 0.9% 15 ml | 49502-0830-15 | $7.70 | $5.02 | $268.00 | 53% |
| Sodium Chloride 3% 15 ml 50s | 49502-0640-15 | $31.56 | $27.50 | $4.06 | 15% |
| Sodium Chloride 10% 15 ml 50s | 49502-0641-15 | $31.56 | $27.50 | $4.06 | 15% |



CIVIL ACTION NO. 95-1354-CIV-MARCUS



CIVIL ACTION NO. 95-1354-CIV-MARCUS

CIVIL ACTION NO. 95-1354-CIV-MARCUS

| 3(M) DEFENDANT GLAXO WELLCOME/CERENEX | | | | | |
|---|---|---|---|---|---|
| DRUG | NDC # | FLORIDA MEDICAID PAYMENT | RELATOR'S COST | PROVIDER'S GROSS PROFIT $ | PROVIDER'S GROSS PROFIT % |
| Ondansetron HCL 40 mg | 00173-0442-00 | $217.95 | $165.00 | $52.95 | 32% |
| Ondansetron HCL 32 mg | 00173-0461-00 | $184.05 | $126.00 | $58.05 | 46% |



CIVIL ACTION NO. 95-1354-CIV-MARCUS

CIVIL ACTION NO. 95-1354-CIV-MARCUS



CIVIL ACTION NO. 95-1354-CIV-MARCUS



CIVIL ACTION NO. 95-1354-CIV-MARCUS



CIVIL ACTION NO. 95-1354-CIV-MARCUS



CIVIL ACTION NO. 95-1354-CIV-MARCUS

| 3(T)  DEFENDANT SMITHKLINE BEECHAM | | | | | |
|---|---|---|---|---|---|
| DRUG | NDC # | FLORIDA MEDICAID PAYMENT | RELATOR'S COST | PROVIDER'S GROSS PROFIT $ | PROVIDER'S GROSS PROFIT % |
| Garaisetron Hydrochloride | 00029-4149-01 | $151.85 | $124.90 | $26.95 | 21% |

CIVIL ACTION NO. 95-1354-CIV-MARCUS

| 3(V)  DEFENDANT WARRICK | | | | | |
|---|---|---|---|---|---|
| DRUG | NDC # | FLORIDA MEDICAID PAYMENT | RELATOR'S COST | PROVIDER'S GROSS PROFIT $ | PROVIDER'S GROSS PROFIT % |
| Albuterol Sulfate 0.083% 3 ml, 25s | 59930-1500-08 | $26.92 | $7.99 | $18.93 | 237% |
| Albuterol Sulfate 0.083% 3ml, 60s | 59930-1500-06 | $64.62 | $18.99 | $45.63 | 240% |
| Albuterol Sulfate 0.5% 20 ml | 59930-1515-04 | $9.63 | $5.59 | $4.04 | 72% |

## SECTION NO. 7

### THE DEFENDANT PHARMACEUTICAL MANUFACTURERS' KNOWLEDGE OF THE FALSE CLAIMS SCHEME

89.     At all times material to this action, each of the DEFENDANT PHARMACEUTICAL MANUFACTURERS acted "knowingly" as that term is defined at 31 U.S.C. §3729(b) by:

A.     Causing the presentation of false and fraudulent claims for payment or approval by the Medicare and States' Medicaid programs; and

B.     Making and using false statements and/or records for the purpose of getting false or fraudulent claims approved or paid by the Medicare and States' Medicaid programs.

CIVIL ACTION NO. 95-1354-CIV-MARCUS

90.   The DEFENDANT PHARMACEUTICAL MANUFACTURERS were clearly placed on notice that their conduct would cause the Medicare and States' Medicaid programs to pay claims for the specified pharmaceuticals in amounts exceeding that permitted by applicable law, in part, because:

A.   Each of the DEFENDANT PHARMACEUTICAL MANUFACTURERS was on notice of federal statutes and regulations that limit payment of Medicare Part B claims for the specified pharmaceuticals to 80% of a reasonable charge.

B.   Each of the DEFENDANT PHARMACEUTICAL MANUFACTURERS was on notice of federal statutes and regulations limiting payment of Medicaid claims for the specified drugs to an amount necessary to cover the cost of the pharmaceutical.

C.   Each of the DEFENDANT PHARMACEUTICAL MANUFACTURERS was on notice that neither the Medicare nor the States' Medicaid programs were authorized or permitted by applicable law to pay claims for the specified pharmaceuticals in excessive amounts.

D.   Each of the DEFENDANT PHARMACEUTICAL MANUFACTURERS was on notice that federal statutes and regulations prohibited them from making misleading representations about the specified pharmaceuticals, including misleading price or cost representations:

(i)   Each of the DEFENDANT PHARMACEUTICAL MANUFACTURERS is required to comply with the Federal Food, Drug and Cosmetic Act 21 U.S.C. §321 et. seq., and the regulations promulgated pursuant thereto.

(ii)    The price and cost representations about the specified pharmaceuticals constitute advertising that is included in the "labeling" provisions of the Federal Food and Drug Act and related regulations. 21 U.S.C. §§201(m); 202.1(k)(2).

(iii)    Each of the DEFENDANT PHARMACEUTICAL MANUFACTURERS is prohibited from disseminating any information about their prices or costs of the specified pharmaceuticals that is "false or misleading in any particular . . ." 21 U.S.C. §§5.02; 302(b).

(iv)    Each of the DEFENDANT PHARMACEUTICAL MANUFACTURERS was on notice that they possessed a duty to assure that their representations about prices and costs of the specified pharmaceuticals were not misleading, taking into account:

> " . . . not only representations made or suggested by statement, word, design, device, or any combination thereof, but also to the extent to which the labeling or advertising fails to reveal facts material in light of such representations"

21 U.S.C. §201(n).

91.    Notwithstanding the legislative intent of the Food Drug and Cosmetic Act, the Defendant Pharmaceutical Manufacturers, acting individually and in concert with one another, purposely created confusion and made false and misleading statements about pharmaceutical pricing in order to deceive the United States Government and the States' Medicaid Programs. For several years, various Governmental agencies including the HHS Office of Inspector General "OIG" and the General Accounting Office "GAO" attempted to examine the issue of the reasonableness of reimbursements by the Medicare and States'

CIVIL ACTION NO. 95-1354-CIV-MARCUS

Medicaid Programs for many of the pharmaceuticals at issue in this Second Amended Complaint. The OIG's and GAO's efforts were thwarted, in part, by the DEFENDANT PHARMACEUTICAL MANUFACTURERS withholding and concealing pertinent information that was being sought by the OIG and GAO. The OIG and GAO attempted through numerous published reports to identify the problem of unreasonable reimbursements; however, they were unsuccessful due to the actions of the DEFENDANT PHARMACEUTICAL MANUFACTURERS. The DEFENDANT PHARMACEUTICAL MANUFACTURERS concealed and disguised the unreasonable reimbursements from the United States Government and States' Medicaid Programs, in part, by the following facts and circumstances:

      A.     The DEFENDANT PHARMACEUTICAL MANUFACTURERS can and do make truthful representations of price and costs for many of their pharmaceuticals sold in retail community pharmacies and, in some instances, infusion, injectable and inhalation drugs and biologicals sold to physician groups, outpatient clinics and specialty infusion pharmacies.

      B.     Some Pharmaceutical Manufacturers (other than the DEFENDANT PHARMACEUTICAL MANUFACTURERS) make representations of costs and price only in terms of Average Wholesale Price "AWP".

      C.     Some of the DEFENDANT PHARMACEUTICAL MANUFACTURES make representations of cost and price only in terms of "List Price," "Wholesale Net," Direct Price "DP" or "DIRP,"or Wholesaler Acquisition Costs, "WAC," to which Medical Economics and First Data Bank apply an industry average mark-up and establish an AWP.

96

D.   Some of the DEFENDANT PHARMACEUTICAL MANUFACTURERS make representations of cost and price in terms of both AWP and DP (or DIRP).

92.   The Relator has discovered that at least one of the DEFENDANT PHARMACEUTICAL MANUFACTURERS,                    reported or caused to be reported different AWP representations for the same drug.   An example of a conflicting representation of AWP is the Drug Acyclovir Sodium for injection manufactured by GLAXO-WELLCOME under the                              NDC# and label and distributed and marketed by              .   The 500 mg size                    and the 1000 mg size NDC# is                  On or about April 24, 1997,            offered to sell to VAC the 500 mg size of NDC                  for $33.00 and the 1000 mg size of NDC                  for $66.00 (**Exhibit "13"**).

93.   On or about July, 1997,                  reported and published a false and fraudulent wholesale cost of $37.15 and a false and fraudulent AWP of $56.51 for the 500 mg size NDC                  and a false and fraudulent wholesale cost of $75.13 and a false and fraudulent AWP of $113.05 for the 1000 gm size NDC                  (**Exhibit "14"**).

94.            reported its representations of costs and prices to First Data Bank.   However,              only reported the false and fraudulent wholesale cost of $37.15 for the 500 mg size NDC                  and the false and fraudulent wholesale cost of $75.13 for the 1000 mg size NDC                  First Data Bank, upon receiving              representations, applied an industry average mark up and established an AWP of $46.44 for the 500 mg size NDC              and an AWP of

$93. 91 for the 1000 mg size NDC [redacted] First Data Bank transmitted [redacted] false and fraudulent representations of wholesale costs to the States' Medicaid Programs whose reimbursement methodologies are based upon WAC for the payment of claims and unwittingly transmitted a false and fraudulent AWP which First Data Bank established based upon [redacted] false and fraudulent representation of wholesale cost to States' Medicaid Programs whose reimbursement methodology is based upon AWP for the payment of claims. Conversely, when [redacted] reported its representations of costs and prices to Medical Economics, [redacted] only reported its falsely inflated AWP which [redacted] had created and not its lower wholesale cost, which despite the fact that it was false was still significantly lower than the AWP. Many third party payers utilize Pharmaceutical Manufacturers representations of direct price and not AWP in making a determination of the reasonableness of a pharmaceutical's cost. [redacted] was well aware that the differential between its reported Wholesale Cost and its reported AWP did not represent a normal wholesale mark-up and that its representations of AWP would be relied upon by many private third party payers including those which process claims for Federal employees, many third party payers examine the relationship between reported direct price and reported AWP to see if the AWP reflects a normal industry mark-up from the reported direct price. Medical Economics published [redacted] false and fraudulent representations of AWP in the July 1997 Drug Topics Red Book update (**Exhibit "15"**). The divergence between First Data Bank's prices and Medical Economics Red Book AWP for [redacted] Acyclovir or any of the pharmaceuticals is no longer easily discernible to third party payers due to the fact that First Data Bank ceased publication of

98

**CIVIL ACTION NO. 95-1354-CIV-MARCUS**

its competing Blue Book in 1996. First Data Bank's pricing information is now only available through its automated services which, upon information and belief, costs more than $10,000.00 per year. By contrast, Medical Economics annual Red Book costs approximately $70.00 and Medical Economics' monthly Red Book updates costs approximately $130.00 per year. Thus, ███████ successfully caused First Data Bank to have one false representation of AWP and Medical Economics another false representation of AWP for the same drug.

95. Also, ███████ price representations for Acyclovir is another example of how States' Medicaid Programs whose reimbursement methodology is based on AWP rely upon and are defrauded by the false and fraudulent representations of direct price made by the DEFENDANT PHARMACEUTICAL MANUFACTURERS.

**ACYCLOVIR SODIUM**
**MANUFACTURED BY GLAXO-WELLCOME**
**PRIVATE LABELED BY** ███████████████████
**DISTRIBUTED BY** █████████████

| Size | NDC # | ██████ representation of wholesale cost "each" | ██████ representation of AWP "each" | VAC's True Cost "each" | Red Book AWP "each" | First Data Bank AWP "each" |
|------|-------|-------|-------|-------|-------|-------|
| 500 mg | ██████ | $37.15 | $56.51 | $33.00 | $56.51 | $46.44 |
| 1000 mg | ██████ | $75.13 | $113.05 | $66.00 | $113.05 | $93.91 |

96. Each DEFENDANT DRUG MANUFACTURER was on notice that it was prohibited by federal statute, from paying, or causing the payment of, directly or indirectly, money or other financial benefit to induce its customers to order the specified

**CIVIL ACTION NO. 95-1354-CIV-MARCUS**

pharmaceuticals when the Medicare or States' Medicaid Programs would be paying claims. 42 U.S.C. §1320a-7(b).

97.    Notwithstanding the applicable statutory requirements and prohibitions:

A.    Defendants ABBOTT,



repeatedly, systematically and falsely represented to the Medicare and States' Medicaid Programs that the prices of certain of the generic versions of the specified drugs were the same or higher than the published price for the equivalent brand drug when they knew that, in truth and in fact, the price of their generic drug was far less than the published price of the brand and that the States' Medicaid Programs and Medicare would pay and approve claims based upon their false representations of the price of their drugs.

B.    Defendants ABBOTT, ▉▉▉▉▉▉▉ BAXTER, BAYER/MILES, BRISTOL-MYERS, ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ repeatedly, systematically and falsely represented to the Medicare and States' Medicaid Programs that the prices of certain of their specified pharmaceuticals were increasing or remaining substantially constant when they knew that in truth and in fact the prices had fallen substantially or were otherwise priced far below the represented prices and the Medicare and States' Medicaid Programs would pay and approve claims based on their false representations of the price of their pharmaceuticals.

100

## TABLE NO. 4

| Year | Drug | Florida Medicaid NDC Number and Florida Medicare HPCS Code | First Data Bank AWP | Glaxo/ Cerenex's "Net Wholesale" | VAC's Wholesaler Cost | Florida Medicaid Payment | Florida Medicare Payment |
|------|------|------|------|------|------|------|------|
| 1993 | Zofran 40 mg | 00173-0442-00 J2405 | $198.00 | | $176.80 | $185.02 | $198.00 |
| 1994 | Zofran 40 mg | 00173-0442-00 J2405 | $214.76 | $178.97 | $172.92 | $191.49 | $214.80 |
| 1995 | Zofran 40 mg | 00173-0442-00 J2405 | $233.02 | | $167.00 | $207.77 | $233.20 |
| 1996 | Zofran 40 mg | 00173-0442-00 J2405 | $233.02 | $203.79 | $165.00 | $217.95 | $233.20 |
| 1997 | Zofran 40 mg | 00173-0442-00 J2405 | $244.43 | | $165.00 | $217.95 | $244.40 |

98.    The following table includes the specified drugs about which the specified Defendants falsely represented that the price of the generic version exceeded the price of the brand equivalent:

CIVIL ACTION NO. 95-1354-CIV-MARCUS

## TABLE NO. 5

### THE MEDICARE AND MEDICAID PROGRAMS DUPED INTO PAYING AS MUCH OR MORE FOR GENERIC DRUGS THAN THEIR EQUIVALENT BRAND

**DRUG: ETOPOSIDE HCPCS J9181, J9182**

### BRAND: VEPESID

| COMPANY | SIZE | NDC # | AWP 1996 Red Book | RELATOR'S COST |
|---------|------|-------|-------------------|----------------|
| Bristol Myers | 100 mg | 00015-3095-20 | $136.49 | $23.00 |
| Bristol Myers | 500 mg | 00015-3061-20 | $665.38 | $115.00 |

### GENERIC: ETOPOSIDE

| COMPANY | SIZE | NDC # | AWP 1996 Red Book | RELATOR'S COST |
|---------|------|-------|-------------------|----------------|
| | 100 mg | | $136.49 | $16.50 |
| | 500 mg | | $665.38 | $86.50 |
| | 100 mg | | $141.97 | $18.00 |
| | 100 mg | | $140.00 | $34.00 |

CIVIL ACTION NO. 95-1354-CIV-MARCUS

**DRUG: VANCOMYCIN, HCPCS J3370**

**BRAND: VANCOCIN**

| COMPANY | SIZE | NDC # | AWP 1996 Red Book | RELATOR'S COST |
|---------|------|-------|-------------------|----------------|
|  | 500 mg |  | $7.80 | $6.50 |
|  | 1 gm |  | $15.61 | $14.13 |

**GENERIC: VANCOMYCIN**

| COMPANY | SIZE | NDC # | AWP 1996 Red Book | RELATOR'S COST |
|---------|------|-------|-------------------|----------------|
| Abbott | 500 mg | 00074-4332-01 | $31.44 | $3.51 |
| Abbott | 1 gm | 00074-6533-01 | $62.86 | $7.01 |

**DRUG: PENTAMIDINE**

**BRAND: PENTAM 300**

| COMPANY | SIZE | NDC # | AWP 1996 Red Book | RELATOR'S COST |
|---------|------|-------|-------------------|----------------|
|  | 300 mg |  | $98.75 | $49.00 |

**GENERIC: PENTAMIDINE**

| COMPANY | SIZE | NDC # | AWP 1996 Red Book | RELATOR'S COST |
|---------|------|-------|-------------------|----------------|
| Abbott | 300 mg | 00074-4548-01 | $113.54 | $43.00 |

**CIVIL ACTION NO. 95-1354-CIV-MARCUS**

**DRUG: TOBRAMYCIN SULFATE, HCPCS J3260**

**BRAND: NEBCIN**

| COMPANY | SIZE | NDC # | AWP 1996 Red Book | RELATOR'S COST |
|---------|------|-------|-------------------|----------------|
| ███████ | 40 mg/ml 80 mg | ███████ | $7.28 | $6.07 |

**GENERIC: TOBRAMYCIN SULFATE**

| COMPANY | SIZE | NDC # | AWP 1996 Red Book | RELATOR'S COST |
|---------|------|-------|-------------------|----------------|
| Abbott | 40 mg/ml 80 mg | 00074-3578-01 | $9.83 | $3.63 |

**DRUG: AMIKACIN SULFATE**

**BRAND: AMIKIN**

| COMPANY | SIZE | NDC # | AWP 1996 Red Book | RELATOR'S COST |
|---------|------|-------|-------------------|----------------|
| Bristol Myers | 250 mg/ml 2 ml | 00015-3020-20 | $46.99 | $13.25 |

**GENERIC: AMIKACIN SULFATE**

| COMPANY | SIZE | NDC # | AWP 1996 Red Book | RELATOR'S COST |
|---------|------|-------|-------------------|----------------|
| Abbott | 250 mg/ml 2 ml | 00074-1956-01 | $99.25 | $12.00 |
| ███████ | 500 mg/ml 2 ml | ███████ | $63.75 | $14.00 |

CIVIL ACTION NO. 95-1354-CIV-MARCUS

99. The following Table No. 6 provides an example of Defendant ████ false representations that the price of ████ remained at $141.97 for its generic equivalent from August 1994 to January 1997 when in truth and in fact the priced declined to $14.00.

## TABLE NO. 6

| Company | Drug | NDC # | Date | AWP $ | Relator's Wholesaler Cost |
|---------|------|-------|------|-------|---------------------------|
| | | | 08/94 | $141.97 | $ 85.00 |
| | | | 04/95 | $141.97 | $ 67.62 |
| | | | 10/95 | $141.97 | $ 49.00 |
| | | | 02/96 | $141.97 | $ 36.00 |
| | | | 09/96 | $141.97 | $ 18.00 |
| | | | 01/97 | $141.97 | $ 14.00 |

100. The financial inducement to those in a position to increase the utilization of the Defendants' drugs is illustrated by the following examples of common drug therapies for certain of the specified drugs:

A. Patient "A" is diagnosed with Metastatic Gastric Carcinoma and prescribed a combination chemotherapy regimen to be given on three consecutive days every twenty-one to twenty-eight days for ten (10) cycles. The prescription for this therapy is:

120 mg/m2/day IV for 3 days every 21 - 28 days

300 mg/m2/day IV for 3 days every 21 - 28 days

500 mg/m2/day IV for 3 days every 21 - 28 days

Patient "A's" BSA = 1.98 m2.

**CIVIL ACTION NO. 95-1354-CIV-MARCUS**

## Calculation of Each Drug's Dosage:



120 mg x 1.98 x 3 days =   713 mg @  8 units of 100 mg

300 mg x 1.98 x 3 days = 1,782 mg @ 36 units of  50 mg

500 mg x 1.98 x 3 days = 2,970 mg @  6 units of 500 mg

## Relator's Cost of Providing These Three Drugs for One Cycle

| DRUG | COMPANY | NDC# | TRUE COST $ |
|---|---|---|---|
| | | | $14.00 x 8 units = $112.00 |
| | | | $ 1.89 x 36 units = $ 68.04 |
| | | | $ 0.79 x 6 units = $  4.74 |
| TOTAL COST FOR ONE CYCLE | | | **$184.78** |

## Medicare Allowable (Florida) for One Cycle

| HCPCS | DRUG | MEDICARE ALLOWABLE | TOTAL |
|---|---|---|---|
| | | x 8 units ($141.97 x 8) = | $ 1,135.76 |
| | | x 36 units ($21.43 x 36) = | $  771.48 |
| | | x 6 units  ( $1.55 x 6) = | $    9.30 |
| TOTAL MEDICARE (FLORIDA) ALLOWABLE | | | **$1,916.54** |

## Medicaid (Florida) Reimbursement for One Cycle

| DRUG | NDC # | COMPANY | MEDICAID REIMBURSEMENT | TOTAL |
|---|---|---|---|---|
| | | | $112.52 x 8 = | $ 900.16 |
| | | | $62.49 x 36 = | $2,249.64 |
| | | | $3.21 x 6 = | $   19.26 |
| TOTAL MEDICAID (FLORIDA) REIMBURSEMENT | | | | **$3,169.06** |

**CIVIL ACTION NO. 95-1354-CIV-MARCUS**

| COMPARISONS OF RELATOR'S COST VS. MEDICARE ALLOWABLE AND MEDICAID REIMBURSEMENT FOR ONE (1) CYCLE: | | | | |
|---|---|---|---|---|
| RELATOR'S COST | vs | FLORIDA MEDICARE | vs | FLORIDA MEDICAID |
| $184.78 | | $1,916.54 | | $3,169.06 |

| COMPARISONS OF RELATOR'S COST VS. MEDICARE ALLOWABLE AND MEDICAID REIMBURSEMENT FOR TEN (10) CYCLES: | | | | |
|---|---|---|---|---|
| RELATOR'S COST | vs | FLORIDA MEDICARE | vs | FLORIDA MEDICAID |
| $1,847.80 | | $19,165.40 | | $31,690.60 |

The above example is of a chemotherapy regimen obtained from <u>Handbook of Commonly Used Chemotherapy Regimens</u>, F. Anthony Greco, M.D., Precept Press, 1996. It does not include any professional or dispensing fees, supportive drugs or intravenous fluids perscribed which are all separately reimbursable by Medicare and States' Medicaid Programs.

   B. Patient "B" is diagnosed with Colon Cancer and is prescribed a chemotherapy regimen of  once a week for six (6) cycles. The prescription for this therapy is:

   500 mg/m2 once a week for 6 weeks

   500 mg/m2 once a week for 6 weeks

Patient "B's" BSA = 1.92 m2

<u>Calculation of Each Drug's Dosage Is</u>:

   500 mg x 1.92 = 960 mg @ 20 units of 50 mg

   600 mg x 1.92 = 1,152 mg @ 3 units of 500 mg

CIVIL ACTION NO. 95-1354-CIV-MARCUS

### Relator's Cost of Providing These Two Drugs for One Cycle

| DRUG | COMPANY | NDC# | TRUE COST $ |
|---|---|---|---|
| ███████ | | | $ 1.89 x 20 units = $ 37.80 |
| ███████ | | | $ 0.79 x 3 units = $ 2.37 |
| TOTAL COST FOR ONE CYCLE | | | $40.17 |

### Medicare Allowable (Florida) for One Cycle

| HCPCS | DRUG | MEDICARE ALLOWABLE | TOTAL |
|---|---|---|---|
| ███ | ███ | ███ x 20 units ($21.43 x 20) = | $ 428.60 |
| ███ | ███ | ███ x 3 units ( $1.55 x 3) = | $ 4.65 |
| TOTAL MEDICARE (FLORIDA) ALLOWABLE | | | $ 433.25 |

### Medicaid (Florida) Reimbursement for One Cycle

| DRUG | NDC # | COMPANY | MEDICAID REIMBURSEMENT | TOTAL |
|---|---|---|---|---|
| ███ | | | $62.49 x 20 = | $1,249.80 |
| ███ | | | $3.21 x 3 = | $ 9.63 |
| TOTAL MEDICAID (FLORIDA) REIMBURSEMENT | | | | $1,259.43 |

| COMPARISONS OF RELATOR'S COST VS. MEDICARE ALLOWABLE AND MEDICAID REIMBURSEMENT FOR ONE (1) CYCLE: | | | | |
|---|---|---|---|---|
| RELATOR'S COST | vs | FLORIDA MEDICARE | vs | FLORIDA MEDICAID |
| $40.17 | | $433.25 | | $1,259.43 |

| COMPARISONS OF RELATOR'S COST VS. MEDICARE ALLOWABLE AND MEDICAID REIMBURSEMENT FOR SIX (6) CYCLES (6 WEEKS): | | | | |
|---|---|---|---|---|
| RELATOR'S COST | vs | FLORIDA MEDICARE | vs | FLORIDA MEDICAID |
| $241.02 | | $2,599.50 | | $7,556.58 |

**CIVIL ACTION NO. 95-1354-CIV-MARCUS**

The above example is of a chemotherapy regimen obtained from <u>Journal of Clinical Oncology</u>, 5: 1559-1565, 1987.  It does not include any professional or dispensing fees, supportive drugs or intravenous fluids perscribed which are all separately reimbursable by Medicare and States' Medicaid Programs.

C.     Patient "C" is diagnosed with Small Cell Lung Cancer and is prescribed a chemotherapy regimen consisting of ▮▮▮▮▮ and Cisplatin for five (5) days every twenty-one (21) days for four (4) cycles.   The prescription for this therapy is:

▮▮▮▮▮     80 mg/m2/day for 5 days every 21 days x 4 cycles

Cisplatin     20 mg/m2/day for 5 days every 21 days x 4 cycles

Patient "C's" BSA  = 1.96 m2.

<u>Calculation of Each Drug's Dosage</u>:

▮▮▮▮▮     80 mg x 1.96 x 5 days = 784 mg @ 8 units of 100 mg

Cisplatin     20 mg x 1.96 x 5 days = 196 mg @ 2 units of 100 mg

<u>Relator's Cost of Providing These Two Drugs for One Cycle</u>

| DRUG | COMPANY | NDC# | TRUE COST $ |
|---|---|---|---|
| ▮▮▮▮▮ | | | $  14.00 x 8 units = $112.00 |
| Cisplatin 100 mg | Bristol Myers | 00015-3221-22 | $284.34 x 2 units = $568.68 |
| TOTAL COST FOR ONE CYCLE | | | **$680.68** |

<u>Medicare Allowable (Florida) for One Cycle</u>

| HCPCS | DRUG | MEDICARE ALLOWABLE | TOTAL |
|---|---|---|---|
| ▮▮▮ | ▮▮▮ | x 8 units ($141.97 x 8) = | $1,135.76 |
| J9062 | Cisplatin 50 mg | J9062 x 4 units ($165.63 x 4) = | $  662.52 |
| TOTAL MEDICARE (FLORIDA) ALLOWABLE | | | **$1,798.28** |

CIVIL ACTION NO. 95-1354-CIV-MARCUS

## Medicaid (Florida) Reimbursement for One Cycle

| DRUG | NDC # | COMPANY | MEDICAID REIMBURSEMENT | TOTAL |
|---|---|---|---|---|
| ███████████ | | | $112.52 x 8 = | $900.16 |
| Cisplatin 100 mg | 00015-3221-22 | Bristol Myers | $316.42 x 2 = | $632.84 |
| TOTAL MEDICAID (FLORIDA) REIMBURSEMENT | | | | $1,533.00 |

| COMPARISONS OF RELATOR'S COST VS. MEDICARE ALLOWABLE AND MEDICAID REIMBURSEMENT FOR ONE (1) CYCLE: | | | | |
|---|---|---|---|---|
| RELATOR'S COST | vs | FLORIDA MEDICARE | vs | FLORIDA MEDICAID |
| $680.68 | | $1,798.28 | | $1,533.00 |

| COMPARISONS OF RELATOR'S COST VS. MEDICARE ALLOWABLE AND MEDICAID REIMBURSEMENT FOR FOUR (4) CYCLES: | | | | |
|---|---|---|---|---|
| RELATOR'S COST | vs | FLORIDA MEDICARE | vs | FLORIDA MEDICAID |
| $2,722.72 | | $7,193.12 | | $6,132.00 |

The above example is of a chemotherapy regimen obtained from Handbook of Commonly Used Chemotherapy Regimens, F. Anthony Greco, M.D., Precept Press, 1996. It does not include any professional or dispensing fees, supportive drugs or intravenous fluids perscribed which are all separately reimbursable by Medicare and States' Medicaid Programs.

D.    Patient "D" is diagnosed with Guillian Barre Syndrome and is prescribed ████████████████ once a month.  The prescription reads 400 mg/kg daily for five (5) days every month.

Patient D's weight is 95 Kg.

CIVIL ACTION NO. 95-1354-CIV-MARCUS

**Calculation of Dosage**:

████ 400 mg X 75 = 30 gm daily X 5 days = 150 gm/month

## Relator's Cost of Providing IVIG for One Cycle (Five Days)

| DRUG | COMPANY | NDC# | TRUE COST $ |
|---|---|---|---|
| ████ | | | $318.00 per 10 gm X 15 = $4,770.00 |
| TOTAL COST FOR ONE CYCLE | | | **$4,770.00** |

## Medicare Allowable (Florida) for One Cycle

| HCPCS | BIOLOGICAL | MEDICARE ALLOWABLE | TOTAL |
|---|---|---|---|
| ████ | | X 300 Units ($37.25 x 300) = | $11,175.00 |
| TOTAL MEDICARE (FLORIDA) ALLOWABLE | | | **$11,175.00** |

## Medicaid (Florida) Reimbursement for One Cycle

| BIOLOGICAL | NDC # | COMPANY | MEDICAID REIMBURSEMENT | TOTAL |
|---|---|---|---|---|
| ████ | | | $845.50 x 15 = | $12,682.50 |
| TOTAL MEDICAID (FLORIDA) REIMBURSEMENT | | | | **$12,682.50** |

| COMPARISONS OF RELATOR'S COST VS. MEDICARE ALLOWABLE AND MEDICAID REIMBURSEMENT FOR TWELVE (12) CYCLES (One Year): | | | | |
|---|---|---|---|---|
| RELATOR'S COST | vs | FLORIDA MEDICARE | vs | FLORIDA MEDICAID |
| **$57,240.00** | | **$134,100.00** | | **$152,190.00** |

CIVIL ACTION NO. 95-1354-CIV-MARCUS

The above example is of a chemotherapy regimen obtained from <u>The Future of</u> <u>Immunotherapy, Focus on Immune</u>, Council of Ohio Colleges of Pharmacy, 1996. It does not include any professional or dispensing fees, supportive drugs or intravenous fluids prescribed which are all separately reimbursable by Medicare and States' Medicaid Program.

101. The knowledge of the DEFENDANT PHARMACEUTICAL MANUFACTURERS is further demonstrated by their systematic and ongoing, written and verbal communications with customers whereby they encourage and induce them to submit claims to Medicare and Medicaid to receive the excessive payments resulting from the Defendants' false price and cost representations. Such communications are accomplished in writing as evidenced by the examples attached hereto as **Exhibit "16"** for Defendant ▉▉▉ and **Exhibit "17"** for Defendant ▉▉▉ **Exhibit "18"** for Defendant ▉▉▉ and **Exhibit "19"** for Defendant BRISTOL-MYERS. Additionally DEFENDANTS BRISTOL-MYERS, ▉▉▉▉▉ each maintain an "800" number, staffed with personnel trained to assist customers in securing payment of claims in the excessive amounts at issue in this action.

102. As an example of the DEFENDANT PHARMACEUTICAL MANUFACTURERS' use of their false and fraudulent practices to market their products follows:

A. VAC purchased ▉▉▉▉ directly from the manufacturer for approximately three years at a price ranging from $22.00 per gram in 1993 to $25.50 per gram in 1995. VAC continued purchasing ▉▉ until there was a manufacturing shortage in 1995. At that time, ▉▉▉▉▉ ▉▉▉ VAC's representative from ▉▉▉ referred VAC to F.F.F. Enterprises

CIVIL ACTION NO. 95-1354-CIV-MARCUS

(hereinafter referred to as "FFF") because FFF had adequate supplies of ███ for VAC to purchase.

  B. In or about 1995, VAC began ordering ███ from FFF through their sales representative, Maria Berei (hereinafter referred to as "Berei"). Berei also gave VAC prices for other manufacturers ███ products. VAC then began purchasing ███ ███ since the purchase price for ███ was $5.00 to $6.00 less per gram.

  C. When ███ realized that VAC was no longer purchasing ███ but using ███ she called T. Mark Jones on March 20, 1996 at 9:40 A.M. During this phone conversation ███ informed Jones that she was concerned with VAC's purchasing ███ instead of ███. She stated that even though VAC could save a few dollars on the initial acquisition cost of ███ VAC would not benefit from the amount of reimbursement related to ███ greater AWP. She stated that ███ AWP in the 1996 Red Book was $290.00 for 5 grams and ███ ███ AWP in 1996 was $340.00 for 5 grams. She stated that the larger spread from ███ allows VAC to make $50.00 more per 5 gram purchases. ███ stated that VAC needed to compare ███ AWP to other manufacturers when purchasing ███ for Medicaid patients since ███ has the largest spread.

  103. An example of the DEFENDANT PHARMACEUTICAL MANUFACTURERS admission that their price and cost representations are false follows:

  A. On or about December 3, 1996, VAC's Bentley and Jones were contacted by Mr. Jerry Wells and Ms. Susan McLeod of the State of Florida's Medicaid Pharmacy Office. Mr. Wells and Ms. McLeod requested Bentley's and Jones' assistance in providing the State of Florida with truthful prices for the drug, ███

CIVIL ACTION NO. 95-1354-CIV-MARCUS

      B.    Mr. Wells remembered that Bentley had inquired of Mr. Wells a couple

of years prior (in 1994) concerning the utilization of ▮▮▮ in the Florida Medicaid Pharmacy

Program. Bentley informed Mr. Wells that the true prices being paid for ▮▮▮ by providers

were significantly less than the Florida Medicaid Program's reimbursement, Bentley

informed Mr. Wells that VAC's current cost was approximately $25.00 per gram. Bentley

also informed Mr. Wells that the grossly excessive reimbursement by Florida's Medicaid

Pharmacy Program was a concealed financial inducement for providers to increase the

utilization of ▮▮▮ and pay illegal kickbacks to the prescribing physician. In response to

Bentley's request, Mr. Wells provided Bentley with data for the utilization and expenditures

of ▮▮▮ in the Florida Medicaid Pharmacy Program for the second quarter of 1994. The

data indicated approximately 1.1 Million Dollars in utilization.

      C.    Since 1994, the utilization and cost to the Medicaid Program of ▮▮▮

has increased dramatically and has become a significant expenditure for the Florida

Medicaid Pharmacy Program, approaching approximately 20 Million Dollars annually.

      D.    In response to the dramatic increase in utilization of ▮▮▮ the State

examined its pricing reimbursement and upon review, Ms. Susan McLeod lowered the

State's reimbursement from approximately $80.00 per gram to approximately $37.00 per

gram.

      E.    After the reduction of the ▮▮▮ reimbursement amount by Florida

Medicaid, some if not all of the DEFENDANT PHARMACEUTICAL MANUFACTURERS

producing ▮▮▮, contacted Mr. Wells in an effort to reinstate the prior ▮▮▮ reimbursement

prices.

F.  The State requested VAC to provide copies of invoices, catalogues and any other pricing information on ▓ in order to substantiate the State's reimbursement position for ▓

G.  The State Medicaid representatives used the information provided by VAC in their discussions with certain of the DEFENDANT PHARMACEUTICAL MANUFACTURERS, and, as a result, the manufacturers retreated from their contentions that the State should continue to pay exorbitant amounts for claims for ▓ and adjusted their price representations.

## SECTION NO. 8

### THE SPECIFIC FALSE PRICE AND COST REPRESENTATIONS OF DEFENDANT ABBOTT

104.  At various times from on or after June 23, 1989 and continuing through the present date, Defendant ABBOTT knowingly caused the Medicare program and the States' Medicaid programs throughout the United States and its territories to pay false or fraudulent claims for drugs specified in this Section No. 8 and further made or used false or fraudulent records and/or statements to get such claims paid or approved. As a result of the said actions of Defendant ABBOTT and those persons and entities acting directly or indirectly in concert with Defendant ABBOTT the Medicare and States' Medicaid Programs paid grossly excessive, unreasonable and unlawful amounts for claims for the drugs specified in this Section 8. The acts committed by Defendant ABBOTT that caused the Medicare and States' Medicaid Programs to pay or approve said false or fraudulent claims included, but were not necessarily limited to, knowingly making false or fraudulent representations about prices and costs of the drugs specified in this Section 8 which

Defendant ABBOTT knew or should have known would be relied upon by the Medicare and States' Medicaid Programs in paying or approving claims for the drugs specified in this Section 8. Each of said representations were material and were relied upon by the Medicare and States' Medicaid Programs in paying or approving claims for the drugs specified in this Section 8.

105. Defendant ABBOTT knowingly caused its false or fraudulent price and cost representations to be published in the years specified in this Section 8 in the Red Book, the Blue Book and the First Data Banks' Automated Services and further made or used false records or statements regarding its prices and costs of the drugs specified in this Section 8 and submitted same to the Medicare and States' Medicaid Programs continuously throughout the years specified in this Section 8. For the purposes of specificity and particularity, the said false price and cost representations as they were reflected in the Red Book and Blue Book have been organized into a chart form for each drug in question and for each NDC Number assigned to each drug in question. The information provided under the columns for Defendant's Published Price , and Red Book and Blue Book "AWP" and "DP" reflects the false price and cost representations made by the Defendant ABBOTT. The information under the Relator's Cost columns reflects the true price that Defendant ABBOTT charged the Relator for the drug or caused another entity to charge the Relator for the drug. As a very small infusion pharmacy, the Relator does not always receive the lowest prices available to volume purchasers. Accordingly, a comparison of the Relator's costs with the price and cost representations made by the Defendant ABBOTT establishes the falsity of ABBOTT's representations for the drugs and years specified as follows:

CIVIL ACTION NO. 95-1354-CIV-MARCUS

## a. DRUG: SODIUM CHLORIDE 0.9%
## 250 ML

MEDICAID                    MEDICARE
NDC NO.: 00074-7983-02        HCPCS J7050

| YEAR | DEFENDANT'S PUBLISHED PRICE | RED BOOK "AWP" | RED BOOK "DP" | BLUE BOOK "AWP" | BLUE BOOK "DP" | RELATOR'S WHOLESALER COST | RELATOR'S DIRECT COST |
|------|------|------|------|------|------|------|------|
| 1993 | $7.59 | $8.59 | | $8.59 | $7.23 | $1.50 | $1.07 |
| 1994 | $7.82 | $9.01 | | $9.01 | $7.59 | $1.33 | $0.95 |
| 1995 | $8.05 | $9.29 | | $9.29 | $7.82 | $1.33 | $0.95 |
| 1996 | | $9.56 | | $9.56 | $8.05 | $1.33 | $0.95 |
| 1997 | | $10.03 | | | | $1.33 | $0.95 |

Defendant, ABBOTT caused the payment or approval of false or fraudulent claims during the years specified in the above chart by the Medicare and/or States' Medicaid Programs for the following additional size(s) of Sodium Chloride:

| SIZE | MEDICAID NDC# | MEDICARE HCPCS |
|------|------|------|
| 50 ml | 00074-7101-13 | ------- |
| 100 ml | 00074-7101-23 | ------ |
| 500 ml | 00074-7983-03 | J7040 |
| 1,000 ml | 00074-7983-09 | J7030 |

## b. DRUG: 5% DEXTROSE IN WATER
## 500 ML

MEDICAID                    MEDICARE
NDC NO.: 00074-7922-03        HCPCS J7060

| YEAR | DEFENDANT'S PUBLISHED PRICE | RED BOOK "AWP" | RED BOOK "DP" | BLUE BOOK "AWP" | BLUE BOOK "DP" | RELATOR'S WHOLESALER COST | RELATOR'S DIRECT COST |
|------|------|------|------|------|------|------|------|
| 1993 | $7.71 | $8.72 | | $8.72 | $7.34 | $1.80 | $0.97 |
| 1994 | $7.94 | $9.16 | | $9.16 | $7.71 | $1.50 | $0.96 |
| 1995 | $8.18 | $9.43 | | $9.43 | $7.94 | $1.50 | $0.96 |
| 1996 | | $9.71 | | $9.71 | $8.18 | $1.50 | $0.96 |
| 1997 | | $10.20 | | | | $1.50 | $0.96 |

**CIVIL ACTION NO. 95-1354-CIV-MARCUS**

Defendant, ABBOTT caused the payment or approval of false or fraudulent claims

during the years specified in the above chart by the Medicare and/or States' Medicaid

Programs for the following additional size(s) of 5% Dextrose in Water:

| SIZE | MEDICAID NDC# | MEDICARE HCPCS |
|------|---------------|----------------|
| 50 ml | 00074-7100-13 | -------- |
| 100 ml | 00074-7100-23 | -------- |
| 250 ml | 00074-7100-02 | -------- |
| 1,000 ml | 00074-7922-09 | J7070 |

### c. DRUG: DEXTROSE 5% WITH SODIUM CHLORIDE 0.9% 500 ML

MEDICAID
NDC NO.: 00074-7941-03

MEDICARE
HCPCS J7042

| YEAR | DEFENDANT'S PUBLISHED PRICE | RED BOOK | | BLUE BOOK | | RELATOR'S WHOLESALER COST | RELATOR'S DIRECT COST |
|------|------|------|------|------|------|------|------|
| | | "AWP" | "DP" | "AWP" | "DP" | | |
| 1993 | $8.28 | $9.37 | | $9.37 | $7.89 | $1.15 | $1.04 |
| 1994 | $8.53 | $9.83 | | $9.83 | $8.28 | $1.15 | $1.03 |
| 1995 | $8.79 | $10.13 | | $10.13 | $8.53 | $1.15 | $1.03 |
| 1996 | | $10.44 | | $10.44 | $8.79 | $1.15 | $1.03 |
| 1997 | | $10.96 | | | | $1.15 | $1.03 |

Defendant, ABBOTT caused the payment or approval of false or fraudulent claims

during the years specified in the above chart by the Medicare and/or States' Medicaid

Programs for the following additional size(s) of Dextrose 5% with Sodium Chloride 0.9%:

| SIZE | MEDICAID NDC# | MEDICARE HCPCS |
|------|---------------|----------------|
| 250 ml | 00074-7941-02 | ------- |
| 1,000 ml | 00074-7941-09 | ------ |

CIVIL ACTION NO. 95-1354-CIV-MARCUS

## d. DRUG: RINGERS LACTATE
### 1,000 ML

MEDICAID
NDC NO.: 00074-7953-09

MEDICARE
HCPCS J7120

| YEAR | DEFENDANT'S PUBLISHED PRICE | RED BOOK | | BLUE BOOK | | RELATOR'S WHOLESALER COST | RELATOR'S DIRECT COST |
|------|------|------|------|------|------|------|------|
| | | "AWP" | "DP" | "AWP" | "DP" | | |
| 1993 | $10.30 | | | $11.64 | $9.81 | $1.36 | $1.30 |
| 1994 | $10.61 | $12.23 | | $12.23 | $10.30 | $1.36 | $1.14 |
| 1995 | $10.93 | $12.60 | | $12.59 | $10.61 | $1.36 | $1.14 |
| 1996 | | $12.98 | | $12.97 | $10.93 | $1.36 | $1.14 |
| 1997 | | $13.63 | | | | $1.36 | $1.14 |

Defendant, ABBOTT caused the payment or approval of false or fraudulent claims

during the years specified in the above chart by the Medicare and/or States' Medicaid

Programs for the following additional size(s) of Ringers Lactate:

| SIZE | MEDICAID NDC# | MEDICARE HCPCS |
|------|------|------|
| 250 ml | 00074-7953-02 | ------ |
| 500 ml | 00074-7953-03 | ------ |

## e. DRUG: VANCOMYCIN HCL
### 500 MG

MEDICAID
NDC NO.: 00074-4332-01

MEDICARE
HCPCS J3370

| YEAR | DEFENDANT'S PUBLISHED PRICE | RED BOOK | | BLUE BOOK | | RELATOR'S WHOLESALER COST | RELATOR'S DIRECT COST |
|------|------|------|------|------|------|------|------|
| | | "AWP" | "DP" | "AWP" | "DP" | | |
| 1993 | $24.72 | $27.95 | | $27.95 | $23.54 | | $3.76 |
| 1994 | $25.46 | $29.35 | | $29.36 | $24.72 | | $3.51 |
| 1995 | $26.48 | $30.23 | | $29.36 | $24.72 | $4.20 | $3.51 |
| 1996 | | $31.44 | | | | $3.95 | $3.51 |
| 1997 | | | | | | $3.75 | $3.51 |

CIVIL ACTION NO. 95-1354-CIV-MARCUS

Defendant, ABBOTT caused the payment or approval of false or fraudulent claims during the years specified in the above chart by the Medicare and/or States' Medicaid Programs for the following additional size(s) of Vancomycin HCL:

| SIZE | MEDICAID NDC# | MEDICARE HCPCS |
|------|---------------|----------------|
| 500 mg Advantage | 00074-6535-01 | ------ |
| 1 gm | 00074-6533-01 | -------- |
| 5.0 gm | 00074-6509-01 | ------- |

## f. DRUG: TOBRAMYCIN SULFATE
### 80 MG

MEDICAID
NDC NO.:00074-3578-01

MEDICARE
HCPCS J3260

| YEAR | DEFENDANT'S PUBLISHED PRICE | RED BOOK | | BLUE BOOK | | RELATOR'S WHOLESALER COST | RELATOR'S DIRECT COST |
|------|------|------|------|------|------|------|------|
| | | "AWP" | "DP" | "AWP" | "DP" | | |
| 1993 | | $8.74 | | $8.74 | $7.36 | $4.92 | |
| 1994 | | $9.18 | | $9.18 | $7.73 | $4.92 | $3.63 |
| 1995 | | $9.45 | | $9.45 | $7.96 | $4.92 | $3.63 |
| 1996 | | $9.83 | | $9.83 | $8.28 | $4.92 | $3.63 |
| 1997 | | $10.32 | | | | $4.92 | $3.63 |

Defendant, ABBOTT caused the payment or approval of false or fraudulent claims during the years specified in the above chart by the Medicare and/or States' Medicaid Programs for the following additional size(s) of Tobramycin Sulfate:

| SIZE | MEDICAID NDC# | MEDICARE HCPCS |
|------|---------------|----------------|
| 20 mg | 00074-3577-01 | -------- |
| 60 mg | 00074-3582-01 | -------- |
| 60 mg | 00074-3469-13 | -------- |
| 60 mg | 00074-3254-03 | -------- |

CIVIL ACTION NO. 95-1354-CIV-MARCUS

| SIZE | MEDICAID NDC# | MEDICARE HCPCS |
|------|---------------|----------------|
| 80 mg | 00074-3255-03 | ------- |
| 80 mg | 00074-3470-23 | ------- |
| 80 mg | 00074-3583-01 | ------- |
| 2,000 mg | 00074-3590-02 | ------- |

## g.  DRUG: PENTAMIDINE ISETHIONATE
### 300 MG

MEDICAID
NDC NO.: 00074-4548-01

MEDICARE
HCPCS

| YEAR | DEFENDANT'S PUBLISHED PRICE | RED BOOK | | BLUE BOOK | | RELATOR'S WHOLESALER COST | RELATOR'S DIRECT COST |
|------|------|------|------|------|------|------|------|
| | | "AWP" | "DP" | "AWP" | "DP" | | |
| 1993 | $89.25 | $85.00 | | $100.94 | $85.00 | $75.00 | |
| 1994 | $91.93 | $105.98 | | $105.98 | $89.25 | | |
| 1995 | $95.61 | $109.17 | | $109.17 | $91.93 | $59.00 | $43.00 |
| 1996 | | $113.54 | | $113.54 | $95.61 | | $43.00 |
| 1997 | | $119.21 | | | | | |

## h.  DRUG: CLINDAMYCIN PHOSPHATE
### 900 MG

MEDICAID
NDC NO.: 00074-4052-01

MEDICARE

| YEAR | DEFENDANT'S PUBLISHED PRICE | RED BOOK | | BLUE BOOK | | RELATOR'S WHOLESALER COST | RELATOR'S DIRECT COST |
|------|------|------|------|------|------|------|------|
| | | "AWP" | "DP" | "AWP" | "DP" | | |
| 1993 | $20.62 | $23.32 | | $23.32 | $19.64 | $3.25 | $7.25 |
| 1994 | $21.24 | $24.49 | | $24.49 | $20.62 | $3.25 | $3.20 |
| 1995 | $22.09 | $25.22 | | $25.22 | $21.24 | $3.25 | $3.20 |
| 1996 | | $26.23 | | $26.23 | $22.09 | $3.25 | $3.20 |
| 1997 | | $27.54 | | | | $3.25 | $3.20 |

Defendant, ABBOTT caused the payment or approval of false or fraudulent claims during the years specified in the above chart by the Medicare and/or States' Medicaid Programs for the following additional size(s) of Clindamycin Phosphate:

CIVIL ACTION NO. 95-1354-CIV-MARCUS

| SIZE | MEDICAID NDC# | MEDICARE HCPCS |
|---|---|---|
| 300 mg | 00074-4053-03 | -------- |
| 300 mg | 00074-4050-01 | -------- |
| 600 mg | 00074-4054-03 | ------- |
| 600 mg | 00074-4051-01 | ------- |
| 9,000 mg | 00074-4197-01 | ------- |

As a direct and proximate result of the actions of the Defendant ABBOTT alleged herein, the United States has sustained damages recoverable under the False Claims Act, together with triple damages, penalties, attorneys' fees and costs.



PAGES 124 THROUGH 131

HAVE BEEN COMPLETELY
REDACTED



## SECTION NO. 11

## THE SPECIFIC FALSE PRICE AND COST
## REPRESENTATIONS OF DEFENDANT
## BAXTER

110. At various times from on or after June 23, 1989 and continuing through the

present date, Defendant BAXTER knowingly caused the Medicare program and the States'

Medicaid programs throughout the United States and its territories to pay false or

fraudulent claims for the drugs and biologicals specified in this Section No. 11 and further

made or used false or fraudulent records and/or statements to get such claims paid or

approved. As a result of the said actions of Defendant BAXTER and those persons and entities acting directly or indirectly in concert with Defendant BAXTER, the Medicare and States' Medicaid Programs paid grossly excessive, unreasonable and unlawful amounts for claims for the drugs and biologicals specified in this Section 11. The acts committed by Defendant BAXTER that caused the Medicare and States' Medicaid Programs to pay or approve said false or fraudulent claims included, but were not necessarily limited to, knowingly making false or fraudulent representations about prices and costs of the drugs and biologicals specified in this Section 11 which Defendant BAXTER knew or should have known would be relied upon by the Medicare and States' Medicaid Programs in paying or approving claims for the drugs and biologicals specified in this Section 11. Each of said representations were material and were relied upon by the Medicare and States' Medicaid Programs in paying or approving claims for the drugs and biologicals specified in this Section 11.

111. Defendant BAXTER knowingly caused its false or fraudulent price and cost representations to be published in the years specified in this Section 11 in the Red Book, the Blue Book and the First Data Banks' Automated Services and further made or used false records or statements regarding its prices and costs of the drugs and biologicals specified in this Section 11 and submitted same to the Medicare and States' Medicaid Programs continuously throughout the years specified in this Section 11. For the purposes of specificity and particularity, the said false price and cost representations as they were reflected in the Red Book and Blue Book have been organized into a chart form for each drug and biological in question and for each NDC Number assigned to each drug and biological in question. The information provided under the columns for Defendant's Published Price , and Red Book and Blue Book "AWP" and "DP" reflects the false price and

133

**CIVIL ACTION NO. 95-1354-CIV-MARCUS**

cost representations made by the Defendant BAXTER. The information under the Relator's Cost columns reflects the true price that Defendant BAXTER charged the Relator for the drug or biological or caused another entity to charge the Relator for the drug or biological. As a very small infusion pharmacy, the Relator does not always receive the lowest prices available to volume purchasers. Accordingly, a comparison of the Relator's costs with the price and cost representations made by the Defendant BAXTER establishes the falsity of BAXTER's representations for the drugs and biologicals and years specified as follows:

### a. DRUG: SODIUM CHLORIDE 0.9% 250 ML

MEDICAID                                             MEDICARE
NDC NO.: 00338-0049-02                                HCPCS J7050

| YEAR | DEFENDANT'S PUBLISHED PRICE | RED BOOK "AWP" | RED BOOK "DP" | BLUE BOOK "AWP" | BLUE BOOK "DP" | RELATOR'S WHOLESALER COST | RELATOR'S DIRECT COST |
|------|------|------|------|------|------|------|------|
| 1993 |        | $9.10 |  |        |        | $1.60 |        |
| 1994 | $5.53 | $9.10 |  | $9.11 | $5.37 | $1.51 | $0.78 |
| 1995 |        | $9.10 |  | $9.11 | $5.37 | $1.60 | $0.78 |
| 1996 |        | $9.10 |  | $9.11 | $5.37 | $1.60 | $0.78 |
| 1997 |        | $9.10 |  |        |        | $1.54 | $0.78 |

Defendant, BAXTER caused the payment or approval of false or fraudulent claims during the years specified in the above chart by the Medicare and/or States' Medicaid Programs for the following additional size(s) of Sodium Chloride 0.9%:

| SIZE | MEDICAID NDC# | MEDICARE HCPCS |
|------|------|------|
| 50 ml | 00338-0049-41 | ------ |
| 100 ml | 00338-0049-48 | ------- |
| 500 ml | 00338-0049-03 | J7040 |
| 1,000 ml | 00338-0049-04 | J7030 |

CIVIL ACTION NO. 95-1354-CIV-MARCUS

## b. DRUG: DEXTROSE 5% IN WATER
## 500 ML

MEDICAID                             MEDICARE
NDC NO.: 00338-0017-03              HCPCS J7060

| YEAR | DEFENDANT'S PUBLISHED PRICE | RED BOOK "AWP" | RED BOOK "DP" | BLUE BOOK "AWP" | BLUE BOOK "DP" | RELATOR'S WHOLESALER COST | RELATOR'S DIRECT COST |
|------|------|------|------|------|------|------|------|
| 1993 |  |  |  |  |  | $1.42 |  |
| 1994 | $7.62 | $9.25 |  | $9.25 | $5.60 | $1.42 | $0.78 |
| 1995 |  | $9.25 |  | $9.25 | $5.55 | $1.42 | $0.78 |
| 1996 |  | $9.25 |  | $9.25 | $5.55 | $1.44 | $0.78 |
| 1997 |  | $9.25 |  |  |  | $1.44 | $0.78 |

Defendant, BAXTER caused the payment or approval of false or fraudulent claims during the years specified in the above chart by the Medicare and/or States' Medicaid Programs for the following additional size(s) of Dextrose 5% in Water:

| SIZE | MEDICAID NDC# | MEDICARE HCPCS |
|------|------|------|
| 50 ml | 00338-0017-41 | ------- |
| 100 ml | 00338-0017-48 | ------- |
| 250 ml | 00338-0017-02 | ------- |
| 1,000 ml | 00338-0017-04 | J7070 |

## c. DRUG: DEXTROSE 5% AND SODIUM CHLORIDE 0.9%
## 500 ML

MEDICAID                             MEDICARE
NDC NO.: 00338-0089-03              HCPCS J7042

| YEAR | DEFENDANT'S PUBLISHED PRICE | RED BOOK "AWP" | RED BOOK "DP" | BLUE BOOK "AWP" | BLUE BOOK "DP" | RELATOR'S WHOLESALER COST | RELATOR'S DIRECT COST |
|------|------|------|------|------|------|------|------|
| 1993 |  | $8.42 |  |  |  |  |  |
| 1994 | $6.05 | $9.94 |  | $9.94 | $5.88 | $1.51 | $1.08 |
| 1995 |  | $9.94 |  | $9.94 | $5.88 | $1.51 | $1.08 |
| 1996 |  | $9.94 |  | $9.94 | $5.88 | $1.53 | $1.08 |
| 1997 |  | $9.94 |  |  |  | $1.53 |  |

**CIVIL ACTION NO. 95-1354-CIV-MARCUS**

Defendant, BAXTER caused the payment or approval of false or fraudulent claims during the years specified in the above chart by the Medicare and/or States' Medicaid Programs for the following additional size(s) of Dextrose 5% and Sodium Chloride 0.9%:

| SIZE | MEDICAID NDC# | MEDICARE HCPCS |
|------|---------------|----------------|
| 250 ml | 00338-0089-02 | ------- |
| 1,000 ml | 00338-0089-04 | ------- |

### d: DRUG: RINGERS LACTATE
### 1,000 ML

| MEDICAID | | | | | | | MEDICARE |
|----------|--|--|--|--|--|--|----------|
| NDC NO.: 00338-0117-04 | | | | | | | HCPCS J7120 |

| YEAR | DEFENDANT'S PUBLISHED PRICE | RED BOOK | | BLUE BOOK | | RELATOR'S WHOLESALER COST | RELATOR'S DIRECT COST |
|------|------|------|------|------|------|------|------|
| | | "AWP" | "DP" | "AWP" | "DP" | | |
| 1993 | | | | | | $1.91 | |
| 1994 | $7.47 | $12.36 | | $12.36 | $7.26 | $1.91 | $1.34 |
| 1995 | | $12.36 | | $12.36 | $7.26 | $1.91 | $1.34 |
| 1996 | | $12.36 | | $12.36 | $7.26 | $1.94 | $1.34 |
| 1997 | | $12.36 | | | | $1.94 | |

Defendant, BAXTER caused the payment or approval of false or fraudulent claims during the years specified in the above chart by the Medicare and/or States' Medicaid Programs for the following additional size(s) of Ringers Lactate:

| SIZE | MEDICAID NDC# | MEDICARE HCPCS |
|------|---------------|----------------|
| 250 ml | 00338-0117-02 | ------ |
| 500 ml | 00338-0117-03 | ------- |

CIVIL ACTION NO. 95-1354-CIV-MARCUS

## e. BIOLOGICAL: GAMMAGARD S/D
### 10 GM

MEDICAID                                        MEDICARE
NDC NO.: 00944-2620-04                          HCPCS J1561

| YEAR | DEFENDANT'S PUBLISHED PRICE | RED BOOK | | BLUE BOOK | | RELATOR'S WHOLESALER COST | RELATOR'S DIRECT COST |
|------|------|------|------|------|------|------|------|
| | | "AWP" | "DP" | "AWP" | "DP" | | |
| 1993 | | | | | | | |
| 1994 | | | | | | | |
| 1995 | | $640.71 | | $640.71 | | $275.00 | |
| 1996 | | $640.71 | | $640.71 | | $300.00 | |
| 1997 | | $737.00 | | | | $300.00 | |

Defendant, BAXTER caused the payment or approval of false or fraudulent claims during the years specified in the above chart by the Medicare and/or States' Medicaid Programs for the following additional size(s) of Gammagard S/D:

| SIZE | MEDICAID NDC# | MEDICARE HCPCS |
|------|------|------|
| 0.5 gm | 00944-2620-01 | J1561 |
| 2.5 gm | 00944-2620-02 | J1561 |
| 5.0 gm | 00944-2620-03 | J1561 |

## f. BIOLOGICAL: GAMMAGARD
### 10 GM

MEDICAID                                        MEDICARE
NDC NO.: 00944-2807-04                          HCPCS J1561

| YEAR | DEFENDANT'S PUBLISHED PRICE | RED BOOK | | BLUE BOOK | | RELATOR'S WHOLESALER COST | RELATOR'S DIRECT COST |
|------|------|------|------|------|------|------|------|
| | | "AWP" | "DP" | "AWP" | "DP" | | |
| 1993 | | $610.20 | | $540.00 | | $340.00 | |
| 1994 | | $610.20 | | $610.20 | | $340.00 | |
| 1995 | | | | | | | |
| 1996 | | | | | | | |
| 1997 | | | | | | | |

CIVIL ACTION NO. 95-1354-CIV-MARCUS

Defendant, BAXTER caused the payment or approval of false or fraudulent claims during the years specified in the above chart by the Medicare and/or States' Medicaid Programs for the following additional size(s) of Gammagard:

| SIZE | MEDICAID NDC# | MEDICARE HCPCS |
|------|---------------|----------------|
| 0.5 gm | 00944-2807-03 | J1561 |
| 2.5 gm | 00944-2807-02 | J1561 |
| 5 gm | 00944-2807-01 | J1561 |

### g.  BIOLOGICAL: FACTOR VIII
### (Antihemophilic factor (recombinant)), per I.U.
### Recombinate 250 I.U.

MEDICAID
NDC NO.:  00944-2938-01

MEDICARE
HCPCS J1561

| YEAR | DEFENDANT'S PUBLISHED PRICE | RED BOOK | | BLUE BOOK | | RELATOR'S WHOLESALER COST | RELATOR'S DIRECT COST |
|------|------|------|------|------|------|------|------|
| | | "AWP" | "DP" | "AWP" | "DP" | | |
| 1993 | | $1.18 | | | | | |
| 1994 | | $1.18 | | $1.18 | | | |
| 1995 | | $1.18 | | $1.18 | | | |
| 1996 | | $1.18 | | $1.18 | | | $0.78 |
| 1997 | | $1.18 | | | | | $0.78 |

Defendant, BAXTER caused the payment or approval of false or fraudulent claims during the years specified in the above chart by the Medicare and/or States' Medicaid Programs for the following antihemophilic factors:

| PHARMACEUTICAL | SIZE | MEDICAID NDC# | MEDICARE HCPCS |
|----------------|------|---------------|----------------|
| Recombinate | 500iu | 00944-2938-02 | J1561 |
| Recombinate | 1000iu | 00944-2938-03 | J1561 |
| Hemofil-M | per iu | 00944-2935-01 | J7190 |
| Proplex-T | 700-3000iu | 00944-0581-01 | J7194 |
| Autoplex-T | 390 - 1050iu | 00944-0650-01 | J7194 |

As a direct and proximate result of the actions of the Defendant BAXTER alleged

herein, the United States has sustained damages recoverable under the False Claims Act,

together with triple damages, penalties, attorneys' fees and costs.


### SECTION NO. 12

### THE SPECIFIC FALSE PRICE AND COST
### REPRESENTATIONS OF DEFENDANT
### BAYER/MILES


112.   At various times from on or after June 23, 1989 and continuing through the

present date, Defendant BAYER/MILES knowingly caused the Medicare program and the

States' Medicaid programs throughout the United States and its territories to pay false or

fraudulent claims for drugs specified in this Section No. 12 and further made or used false

or fraudulent records and/or statements to get such claims paid or approved.  As a result

of the said actions of Defendant BAYER/MILES and those persons and entities acting

directly or indirectly in concert with Defendant BAYER/MILES, the Medicare and States'

Medicaid Programs paid grossly excessive,  unreasonable and unlawful amounts for claims

for the drugs specified in this Section 12.   The acts committed by Defendant

BAYER/MILES that caused the Medicare and States' Medicaid Programs to pay or

approve said false or fraudulent claims included, but were not necessarily limited to,

knowingly making false or fraudulent representations about prices and costs of the drugs

specified in this Section 12 which Defendant BAYER/MILES knew or should have known

would be relied upon by the Medicare and States' Medicaid Programs in paying or

approving claims for the drugs specified in this Section 12. Each of said representations

were material and were relied upon by the Medicare and States' Medicaid Programs in paying or approving claims for the drugs specified in this Section 12.

113.    Defendant BAYER/MILES knowingly caused its false or fraudulent price and cost representations to be published in the years specified in this Section 12 in the Red Book, the Blue Book  and the First Data Banks' Automated Services and further made or used false records or statements regarding its prices and costs of the drugs specified in this Section 12 and submitted same to the Medicare and States' Medicaid Programs continuously throughout the years specified in this Section 12. For the purposes of specificity and particularity, the said false price and cost representations as they were reflected in the Red Book and Blue Book have been organized into a chart form for each drug in question and for each NDC Number assigned to each drug in question.  The information provided under the columns for Defendant's Published Price , and Red Book and Blue Book "AWP" and "DP" reflects the false price and cost representations made by the Defendant BAYER/MILES.  The information under the Relator's Cost columns reflects the true price that Defendant BAYER/MILES charged the Relator for the drug or caused another entity to charge the Relator for the drug.  As a very small infusion pharmacy, the Relator does not always receive the lowest prices available to volume purchasers. Accordingly, a comparison of the Relator's costs with the price and cost representations made by the Defendant BAYER/MILES establishes the falsity of BAYER/MILES's representations for the drugs and years specified as follows:

a. DRUG: IMMUNE GLOBULIN, INTRAVENOUS (HUMAN)
GAMIMUNE-N 10% 10 GM

MEDICAID                                                                 MEDICARE
NDC NO.:  00161-0649-71                                          HCPCS J1562
                00192-0649-71

| YEAR | DEFENDANT'S PUBLISHED PRICE | RED BOOK | | BLUE BOOK | | RELATOR'S WHOLESALER COST | RELATOR'S DIRECT COST |
|---|---|---|---|---|---|---|---|
| | | "AWP" | "DP" | "AWP" | "DP" | | |
| 1993 | | | | | | $324.00 | $300.00 |
| 1994 | | $750.00 | | $750.00 | | $320.00 | $300.00 |
| 1995 | | $750.00 | | | | $358.00 | $300.00 |
| 1996 | | $750.00 | | $750.00 | | $370.00 | |
| 1997 | | $900.00 | | | | $370.00 | |

Defendant, BAYER/MILES caused the payment or approval of false or fraudulent

claims during the years specified in the above chart by the Medicare and/or States'

Medicaid Programs for the following additional size(s) of Gamimune-N 10%:

| SIZE | MEDICAID NDC# | MEDICARE HCPCS |
|---|---|---|
| 1 gm | 00192-0649-12<br>00026-0648-12 | J1562 |
| 5 gm | 00192-0649-20<br>00026-0648-20<br>00061-0649-20 | J1562 |
| 20 gm | 00192-0649-24<br>00026-0648-24<br>00161-0649-24 | J1562 |

CIVIL ACTION NO. 95-1354-CIV-MARCUS

## b. DRUG: IMMUNE GLOBULIN, INTRAVENOUS (HUMAN)
### GAMINUNE-N 5% 12.5 GM

MEDICAID                                                     MEDICARE

NDC NO.: 00161-0649-71                        HCPCS J1562

          00192-0649-71

| YEAR | DEFENDANT'S PUBLISHED PRICE | RED BOOK | | BLUE BOOK | | RELATOR'S WHOLESALER COST | RELATOR'S DIRECT COST |
|------|------|------|------|------|------|------|------|
| | | "AWP" | "DP" | "AWP" | "DP" | | |
| 1993 | | | | | | $325.00 | |
| 1994 | | $714.00 | | $714.00 | | $345.00 | |
| 1995 | | $714.00 | | | | $370.00 | |
| 1996 | | $743.75 | | $714.00 | | $400.00 | |
| 1997 | | $743.75 | | | | $400.00 | |

Defendant, BAYER/MILES caused the payment or approval of false or fraudulent claims during the years specified in the above chart by the Medicare and/or States' Medicaid Programs for the following additional size(s) of Gamimune-N 5%:

| SIZE | MEDICAID NDC# | MEDICARE HCPCS |
|------|------|------|
| 0.5 gm | 00161-0640-12<br>00192-0640-12<br>00026-0640-12 | J1561 |
| 2.5 gm | 00161-0640-20<br>00192-0640-20<br>00026-0640-20 | J1561 |
| 5 gm | 00161-0640-71<br>00192-0640-71<br>00026-0640-71 | J1561 |

142

## c. BIOLOGICAL: FACTOR VIII
### (antihemophilic factor (recombinant)), per I.U.
### Kogenate 250 I.U.

MEDICAID
NDC NO.: 00161-0670-20
00192-0670-20
00026-0670-20

MEDICARE
HCPCS J7192

| YEAR | DEFENDANT'S PUBLISHED PRICE | RED BOOK | | BLUE BOOK | | RELATOR'S WHOLESALER COST | RELATOR'S DIRECT COST |
|---|---|---|---|---|---|---|---|
| | | "AWP" | "DP" | "AWP" | "DP" | | |
| 1993 | | | | | | | |
| 1994 | | $1.18 | | $1.18 | | | |
| 1995 | | $1.18 | | | | | $0.65 |
| 1996 | | $1.18 | | $1.18 | | | $0.65 |
| 1997 | | $1.18 | | | | | |

Defendant, BAYER/MILES caused the payment or approval of false or fraudulent claims during the years specified in the above chart by the Medicare and/or States' Medicaid Programs for the following hemophilic factors:

| PHARMACEUTICAL | SIZE | MEDICAID NDC# | MEDICARE HCPCS |
|---|---|---|---|
| Kogenate | 500iu | 00161-0670-30 | J7192 |
| Kogenate | 500iu | 00192-0670-30 | J7192 |
| Kogenate | 500iu | 00026-0670-30 | J7192 |
| Kogenate | 1000iu | 00161-0670-50 | J7192 |
| Kogenate | 1000iu | 00192-0670-50 | J7192 |
| Kogenate | 1000iu | 00026-0670-50 | J7192 |
| Koate HP | 250iu | 00161-0670-20 | J7190 |
| Koate HP | 250iu | 00192-0670-20 | J7190 |
| Koate HP | 250iu | 00026-0670-20 | J7190 |
| Koate HP | 500iu | 00161-0670-30 | J7190 |
| Koate HP | 500iu | 00192-0670-30 | J7190 |
| Koate HP | 500iu | 00026-0670-30 | J7190 |
| Koate HP | 1000iu | 00161-0670-50 | J7190 |
| Koate HP | 1000iu | 00192-0670-50 | J7190 |

| PHARMACEUTICAL | SIZE | MEDICAID NDC# | MEDICARE HCPCS |
|---|---|---|---|
| Koate HP | 1000iu | 00026-0670-50 | J7190 |
| Koate HP | 1500iu | 00161-0670-60 | J7190 |
| Koate HP | 1500iu | 00192-0670-60 | J7190 |
| Koate HP | 1500iu | 00026-0670-60 | J7190 |
| Konyne 80 | 500iu | 00192-0626-20 | J7192 |
| Konyne 80 | 500iu | 00026-0626-20 | J7197 |
| Konyne 80 | 1000iu | 00192-0626-50 | J7197 |
| Konyne 80 | 1000iu | 00026-0626-50 | J7197 |
| Thrombate III | 500iu | 00026-0603-20 | J7197 |
| Thrombate III | 500iu | 00161-0603-20 | J7197 |
| Thrombate III | 500iu | 00192-0626-20 | J7197 |
| Thrombate III | 1000iu | 00026-0603-30 | J7197 |
| Thrombate III | 1000iu | 00161-0603-30 | J7197 |
| Thrombate III | 1000iu | 00192-0626-30 | J7197 |

As a direct and proximate result of the actions of the Defendant BAYER/MILES alleged herein, the United States has sustained damages recoverable under the False Claims Act, together with triple damages, penalties, attorneys' fees and costs.











### SECTION NO. 14

### THE SPECIFIC FALSE PRICE AND COST
### REPRESENTATIONS OF DEFENDANT
### BRISTOL-MYERS SQUIBB

116.    At various times from on or after June 23, 1989 and continuing through the

present date, Defendant BRISTOL-MYERS SQUIBB knowingly caused the Medicare

program and the States' Medicaid programs throughout the United States and its territories

to pay false or fraudulent claims for drugs specified in this Section No. 14 and further made

or used false or fraudulent records and/or statements to get such claims paid or approved.

As a result of the said actions of Defendant BRISTOL-MYERS SQUIBB and those persons

and entities acting directly or indirectly in concert with Defendant BRISTOL-MYERS

SQUIBB, the Medicare and States' Medicaid Programs paid grossly excessive,

unreasonable and unlawful amounts for claims for the drugs specified in this Section 14.

The acts committed by Defendant BRISTOL-MYERS SQUIBB that caused the Medicare

and States' Medicaid Programs to pay or approve said false or fraudulent claims included,

but were not necessarily limited to, knowingly making false or fraudulent representations

about prices and costs of the drugs specified in this Section 14 which Defendant BRISTOL-

MYERS SQUIBB knew or should have known would be relied upon by the Medicare and

States' Medicaid Programs in paying or approving claims for the drugs specified in this

**CIVIL ACTION NO. 95-1354-CIV-MARCUS**

Section 14. Each of said representations were material and were relied upon by the Medicare and States' Medicaid Programs in paying or approving claims for the drugs specified in this Section 14.

117. Defendant BRISTOL-MYERS SQUIBB knowingly caused its false or fraudulent price and cost representations to be published in the years specified in this Section 14 in the Red Book, the Blue Book and the First Data Banks' Automated Services and further made or used false records or statements regarding its prices and costs of the drugs specified in this Section 14 and submitted same to the Medicare and States' Medicaid Programs continuously throughout the years specified in this Section 13. For the purposes of specificity and particularity, the said false price and cost representations as they were reflected in the Red Book and Blue Book have been organized into a chart form for each drug in question and for each NDC Number assigned to each drug in question. The information provided under the columns for Defendant's Published Price , and Red Book and Blue Book "AWP" and "DP" reflects the false price and cost representations made by the Defendant BRISTOL-MYERS SQUIBB. The information under the Relator's Cost columns reflects the true price that Defendant BRISTOL-MYERS SQUIBB charged the Relator for the drug or caused another entity to charge the Relator for the drug. As a very small infusion pharmacy, the Relator does not always receive the lowest prices available to volume purchasers. Accordingly, a comparison of the Relator's costs with the price and cost representations made by the Defendant BRISTOL-MYERS SQUIBB establishes the falsity of BRISTOL-MYERS SQUIBB's representations for the drugs and years specified as follows:

151

CIVIL ACTION NO. 95-1354-CIV-MARCUS

## a. DRUG: RUBEX (DOXORUBCIN HCL)
### 50 MG

MEDICAID
NDC NO.: 00015-3352-22

MEDICARE
HCPCS J9010

| YEAR | DEFENDANT'S PUBLISHED PRICE | RED BOOK | | BLUE BOOK | | RELATOR'S WHOLESALER COST | RELATOR'S DIRECT COST |
|------|------|------|------|------|------|------|------|
| | | "AWP" | "DP" | "AWP" | "DP" | | |
| 1993 | | | | | | | |
| 1994 | | | | | | $70.00 | $45.00 |
| 1995 | $157.72 | $197.15 | | $189.26 | $157.72 | | $45.00 |
| 1996 | $157.72 | $197.15 | | $189.26 | $157.72 | $70.00 | $45.00 |
| 1997 | | | | | | | $45.00 |

Defendant, BRISTOL-MYERS SQUIBB caused the payment or approval of false or

fraudulent claims during the years specified in the above chart by the Medicare and/or

States' Medicaid Programs for the following additional size(s) of Rubex:

| SIZE | MEDICAID NDC# | MEDICARE HCPCS |
|------|------|------|
| 10 mg | 00015-3351-22 | J9000 |

## b. DRUG: CYTOXAN LYOPHILIZED
### 500 MG

MEDICAID
NDC NO.: 00015-0547-41

MEDICARE
HCPCS J9095

| YEAR | DEFENDANT'S PUBLISHED PRICE | RED BOOK | | BLUE BOOK | | RELATOR'S WHOLESALER COST | RELATOR'S DIRECT COST |
|------|------|------|------|------|------|------|------|
| | | "AWP" | "DP" | "AWP" | "DP" | | |
| 1993 | $19.78 | $24.73 | | $23.74 | ---- | $20.57 | |
| 1994 | $20.57 | $24.73 | | $23.74 | ---- | $20.57 | $10.00 |
| 1995 | $20.57 | $25.71 | | $24.69 | $20.57 | $20.57 | $10.00 |
| 1996 | $20.57 | $25.71 | | $24.69 | $20.57 | $20.57 | $5.25 |
| 1997 | | | | | | $20.57 | $5.25 |

Defendant, BRISTOL-MYERS SQUIBB caused the payment or approval of false or

fraudulent claims during the years specified in the above chart by the Medicare and/or

States' Medicaid Programs for the following additional size(s) of Cytoxan Lyophilized:

152

| SIZE | MEDICAID NDC# | MEDICARE HCPCS |
|------|---------------|----------------|
| 100 mg | 00015-0539-41 | J9093 |
| 200 mg | 00015-0546-41 | J9094 |
| 1 gm | 00015-0548-41 | J9096 |
| 2 gm | 00015-0549-41 | J9097 |

## c. DRUG: MUTAMYCIN
## 5 MG

**MEDICAID**
NDC NO.: 00015-3001-20

**MEDICARE**
HCPCS J9280

| YEAR | DEFENDANT'S PUBLISHED PRICE | RED BOOK | | BLUE BOOK | | RELATOR'S WHOLESALER COST | RELATOR'S DIRECT COST |
|------|------|------|------|------|------|------|------|
| | | "AWP" | "DP" | "AWP" | "DP" | | |
| 1993 | $99.19 | $119.56 | | $114.80 | | $107.12 | |
| 1994 | $103.16 | $123.99 | | $119.05 | | $107.12 | |
| 1995 | $107.29 | $128.95 | | $123.81 | | $111.68 | |
| 1996 | $107.29 | $134.11 | | $128.77 | $107.29 | $111.68 | $76.00 |
| 1997 | | | | | | $111.68 | $76.00 |

Defendant, BRISTOL-MYERS SQUIBB caused the payment or approval of false or fraudulent claims during the years specified in the above chart by the Medicare and/or States' Medicaid Programs for the following additional size(s) of Mutamycin:

| SIZE | MEDICAID NDC# | MEDICARE HCPCS |
|------|---------------|----------------|
| 20 mg | 00015-3002-20 | J9290 |
| 40 mg | 00015-3059-20 | J9291 |

CIVIL ACTION NO. 95-1354-CIV-MARCUS

### d. DRUG: VEPESID
### 100 MG

MEDICAID                                                    MEDICARE
NDC NO.: 00015-3095-20                                    HCPCS J9182

| YEAR | DEFENDANT'S PUBLISHED PRICE | RED BOOK | | BLUE BOOK | | RELATOR'S WHOLESALER COST | RELATOR'S DIRECT COST |
|------|------|------|------|------|------|------|------|
| | | "AWP" | "DP" | "AWP" | "DP" | | |
| 1993 | $109.19 | $131.49 | | $126.25 | | $117.33 | |
| 1994 | $109.19 | $136.49 | | $131.05 | | $117.33 | $75.00 |
| 1995 | $109.19 | $136.49 | | $131.05 | $109.19 | $113.56 | $76.00 |
| 1996 | $109.19 | $136.49 | | $131.05 | $109.19 | $ 95.00 | $23.00 |
| 1997 | | $136.49 | | | | $ 95.00 | $23.00 |

Defendant, BRISTOL-MYERS SQUIBB caused the payment or approval of false or

fraudulent claims during the years specified in the above chart by the Medicare and/or

States' Medicaid Programs for the following additional size(s) of Vepesid:

| SIZE | MEDICAID NDC# | MEDICARE HCPCS |
|------|------|------|
| 150 mg | 00015-3084-20 | J9182 |
| 500 mg | 00015-3061-20 | J9182 |

As a direct and proximate result of the actions of the Defendant BRISTOL-MYERS

SQUIBB alleged herein, the United States has sustained damages recoverable under the

False Claims Act, together with triple damages, penalties, attorneys' fees and costs.



CIVIL ACTION NO. 95-1354-CIV-MARCUS





CIVIL ACTION NO. 95-1354-CIV-MARCUS

### SECTION NO. 16

### THE SPECIFIC FALSE PRICE AND COST
### REPRESENTATIONS OF DEFENDANT
### DEY LABORATORIES

120. At various times from on or after June 23, 1989 and continuing through the present date, Defendant DEY LABORATORIES knowingly caused the Medicare program and the States' Medicaid programs throughout the United States and its territories to pay false or fraudulent claims for drugs specified in this Section No. 16 and further made or used false or fraudulent records and/or statements to get such claims paid or approved. As a result of the said actions of Defendant DEY LABORATORIES and those persons and entities acting directly or indirectly in concert with Defendant DEY LABORATORIES, the Medicare and States' Medicaid Programs paid grossly excessive, unreasonable and unlawful amounts for claims for the drugs specified in this Section 16. The acts committed by Defendant DEY LABORATORIES that caused the Medicare and States' Medicaid Programs to pay or approve said false or fraudulent claims included, but were not necessarily limited to, knowingly making false or fraudulent representations about prices and costs of the drugs specified in this Section 16 which Defendant DEY LABORATORIES knew or should have known would be relied upon by the Medicare and States' Medicaid Programs in paying or approving claims for the drugs specified in this Section 16. Each of said representations were material and were relied upon by the Medicare and States' Medicaid Programs in paying or approving claims for the drugs specified in this Section 16.

121. Defendant DEY LABORATORIES knowingly caused its false or fraudulent price and cost representations to be published in the years specified in this Section 16 in the Red Book, the Blue Book and the First Data Banks' Automated Services and further

159

CIVIL ACTION NO. 95-1354-CIV-MARCUS

made or used false records or statements regarding its prices and costs of the drugs specified in this Section 16 and submitted same to the Medicare and States' Medicaid Programs continuously throughout the years specified in this Section 16. For the purposes of specificity and particularity, the said false price and cost representations as they were reflected in the Red Book and Blue Book have been organized into a chart form for each drug in question and for each NDC Number assigned to each drug in question. The information provided under the columns for Defendant's Published Price , and Red Book and Blue Book "AWP" and "DP" reflects the false price and cost representations made by the Defendant DEY LABORATORIES. The information under the Relator's Cost columns reflects the true price that Defendant DEY LABORATORIES charged the Relator for the drug or caused another entity to charge the Relator for the drug. As a very small infusion pharmacy, the Relator does not always receive the lowest prices available to volume purchasers. Accordingly, a comparison of the Relator's costs with the price and cost representations made by the Defendant DEY LABORATORIES establishes the falsity of DEY LABORATORIES's representations for the drugs and years specified as follows:

a. DRUG: ALBUTEROL SULFATE 0.083%
3 ML, 25s

MEDICAID
NDC NO.: 49502-0697-03

MEDICARE
HCPCS J7620

| YEAR | DEFENDANT'S PUBLISHED PRICE | RED BOOK | | BLUE BOOK | | RELATOR'S WHOLESALER COST | RELATOR'S DIRECT COST |
|------|------|------|------|------|------|------|------|
| | | "AWP" | "DP" | "AWP" | "DP" | | |
| 1993 | | $32.30 | $26.50 | $32.29 | | | |
| 1994 | | $30.25 | | $30.24 | | | $8.50 |
| 1995 | | $30.25 | | $30.24 | | | $8.50 |
| 1996 | | $30.25 | | $30.24 | | | $8.50 |
| 1997 | | $30.25 | | | | | $8.50 |

CIVIL ACTION NO. 95-1354-CIV-MARCUS

Defendant, DEY LABORATORIES caused the payment or approval of false or fraudulent claims during the years specified in the above chart by the Medicare and/or States' Medicaid Programs for the following additional size(s) of Albuterol Sulfate .083%:

| SIZE | MEDICAID NDC# | MEDICARE HCPCS |
|------|---------------|----------------|
| 3 ml, 30s | 49502-0697-33 | J7620 |
| 3 ml, 60s | 49502-0697-60 | J7620 |

b. DRUG: ACETYLCYSTEINE SOLUTION 10%
4 ML, 12s

MEDICAID
NDC NO.: 49502-0181-04

MEDICARE
HCPCS J7610

| YEAR | DEFENDANT'S PUBLISHED PRICE | RED BOOK | | BLUE BOOK | | RELATOR'S WHOLESALER COST | RELATOR'S DIRECT COST |
|------|------|------|------|------|------|------|------|
| | | "AWP" | "DP" | "AWP" | "DP" | | |
| 1993 | | $67.80 | $28.44 | $67.80 | | | |
| 1994 | | $67.80 | | $67.80 | | | $12.48 |
| 1995 | | $67.80 | | $67.80 | | | $12.48 |
| 1996 | | $67.80 | | $67.80 | | | $12.48 |
| 1997 | | $67.80 | | | | | $12.48 |

Defendant, DEY LABORATORIES caused the payment or approval of false or fraudulent claims during the years specified in the above chart by the Medicare and/or States' Medicaid Programs for the following additional size(s) of Acetylcysteine Solution 10%:

| SIZE | MEDICAID NDC# | MEDICARE HCPCS |
|------|---------------|----------------|
| 10 ml, 3s | 49502-0181-10 | J7610 |
| 30 ml, 3s | 49502-0181-30 | J7610 |

CIVIL ACTION NO. **95-1354-CIV-MARCUS**

## c. DRUG: ACETYCSTEINE SOLUTION 20%
### 4 ML, 12s

MEDICAID                                           MEDICARE

NDC NO.: 49502-0182-04                       HCPCS J7615

| YEAR | DEFENDANT'S PUBLISHED PRICE | RED BOOK "AWP" | "DP" | BLUE BOOK "AWP" | "DP" | RELATOR'S WHOLESALER COST | RELATOR'S DIRECT COST |
|------|------|------|------|------|------|------|------|
| 1993 | | $81.36 | $34.20 | $81.36 | | | |
| 1994 | | $81.36 | | $81.36 | | | $12.60 |
| 1995 | | $81.36 | | $81.36 | | | $12.60 |
| 1996 | | $81.36 | | $81.36 | | | $12.60 |
| 1997 | | $81.36 | | | | | $12.60 |

Defendant, DEY LABORATORIES caused the payment or approval of false or fraudulent claims during the years specified in the above chart by the Medicare and/or States' Medicaid Programs for the following additional size(s) of Acetylcysteine Solution 20%:

| SIZE | MEDICAID NDC# | MEDICARE HCPCS |
|------|------|------|
| 10 ml, 3s | 49502-0182-10 | J7615 |
| 30 ml, 3s | 49502-0182-30 | J7615 |
| 100 ml | 49502-0182-00 | J7615 |

## d. DRUG: CROMOLYN SODIUM, USP
### 20 MG/2 ML, 60s

MEDICAID                                           MEDICARE

NDC NO.: 49502-0689-02                       HCPCS J7630

| YEAR | DEFENDANT'S PUBLISHED PRICE | RED BOOK "AWP" | "DP" | BLUE BOOK "AWP" | "DP" | RELATOR'S WHOLESALER COST | RELATOR'S DIRECT COST |
|------|------|------|------|------|------|------|------|
| 1993 | | | | | | | |
| 1994 | | | | | | | $24.50 |
| 1995 | | $42.00 | | $42.00 | | | $24.50 |
| 1996 | | $42.00 | | $42.00 | | | $24.50 |
| 1997 | | $42.00 | | | | | $24.50 |

CIVIL ACTION NO. 95-1354-CIV-MARCUS

Defendant, DEY LABORATORIES caused the payment or approval of false or fraudulent claims during the years specified in the above chart by the Medicare and/or States' Medicaid Programs for the following additional size(s) of Cromolyn Sodium, USP:

| SIZE | MEDICAID NDC# | MEDICARE HCPCS |
|---|---|---|
| 20 mg/2 ml 120s | 49502-0689-12 | J7630 |

## e. DRUG: METAPROTERENOL SULFATE 0.4%
### 2.5 ML, 25s

MEDICAID
NDC NO.: 49502-0678-03

MEDICARE
HCPCS J7670

| YEAR | DEFENDANT'S PUBLISHED PRICE | RED BOOK "AWP" | RED BOOK "DP" | BLUE BOOK "AWP" | BLUE BOOK "DP" | RELATOR'S WHOLESALER COST | RELATOR'S DIRECT COST |
|---|---|---|---|---|---|---|---|
| 1993 | | $30.75 | $15.39 | $30.75 | | | |
| 1994 | | $30.75 | | $30.75 | | | $6.25 |
| 1995 | | $30.75 | | $30.75 | | | $6.25 |
| 1996 | | $30.75 | | $30.75 | | | $6.25 |
| 1997 | | $30.75 | | | | | $6.25 |

## f. DRUG: METAPROTERENOL SULFATE 0.6%
### 2.5 ML, 25s

MEDICAID
NDC NO.: 49502-0676-03

MEDICARE
HCPCS J7672

| YEAR | DEFENDANT'S PUBLISHED PRICE | RED BOOK "AWP" | RED BOOK "DP" | BLUE BOOK "AWP" | BLUE BOOK "DP" | RELATOR'S WHOLESALER COST | RELATOR'S DIRECT COST |
|---|---|---|---|---|---|---|---|
| 1993 | | $30.75 | $15.39 | $30.75 | | | |
| 1994 | | $30.75 | | $30.75 | | | $6.25 |
| 1995 | | $30.75 | | $30.75 | | | $6.25 |
| 1996 | | $30.75 | | $30.75 | | | $6.25 |
| 1997 | | $30.75 | | | | | $6.25 |

CIVIL ACTION NO. 95-1354-CIV-MARCUS

## g.  DRUG: SODIUM CHLORIDE 0.9%
## 15 ML

MEDICAID                                                      MEDICARE
NDC NO.: 49502-0830-15                                    HCPCS J3490

| YEAR | DEFENDANT'S PUBLISHED PRICE | RED BOOK | | BLUE BOOK | | RELATOR'S WHOLESALER COST | RELATOR'S DIRECT COST |
|------|------|------|------|------|------|------|------|
| | | "AWP" | "DP" | "AWP" | "DP" | | |
| 1993 | | | | | | | |
| 1994 | | | | $14.09 | | | $5.02 |
| 1995 | | | | $14.09 | | | $5.02 |
| 1996 | | | | | | | $5.02 |
| 1997 | | | | | | | $5.02 |

Defendant, DEY LABORATORIES caused the payment or approval of false or fraudulent claims during the years specified in the above chart by the Medicare and/or States' Medicaid Programs for the following additional size(s) of Sodium Chloride:

| SIZE | MEDICAID NDC# | MEDICARE HCPCS |
|------|------|------|
| 3% 15 ml, 50s | 49502-0640-15 | J3490 |
| 10% 15 ml, 50s | 49502-0641-15 | J3490 |

As a direct and proximate result of the actions of the Defendant DEY LABORATORIES alleged herein, the United States has sustained damages recoverable under the False Claims Act, together with triple damages, penalties, attorneys' fees and costs.

164

PAGES 165 THROUGH 176

HAVE BEEN COMPLETELY
REDACTED

## SECTION NO. 20

### THE SPECIFIC FALSE PRICE AND COST
### REPRESENTATIONS OF DEFENDANT
### GLAXO WELLCOME/CERENEX

128.    At various times from on or after June 23, 1989 and continuing through the

present date, Defendant GLAXO WELLCOME/CERENEX knowingly caused the Medicare

program and the States' Medicaid programs throughout the United States and its territories

to pay false or fraudulent claims for drugs specified in this Section No. 20 and further made

or used false or fraudulent records and/or statements to get such claims paid or approved.

As a result of the said actions of Defendant GLAXO WELLCOME/CERENEX and those

persons and entities acting directly or indirectly in concert with Defendant GLAXO

WELLCOME/CERENEX, the Medicare and States' Medicaid Programs paid grossly

excessive, unreasonable and unlawful amounts for claims for the drugs specified in this

Section 20. The acts committed by Defendant GLAXO WELLCOME/CERENEX that

caused the Medicare and States' Medicaid Programs to pay or approve said false or

fraudulent claims included, but were not necessarily limited to, knowingly making false or

fraudulent representations about prices and costs of the drugs specified in this Section 20

which Defendant GLAXO WELLCOME/CERENEX knew or should have known would be

relied upon by the Medicare and States' Medicaid Programs in paying or approving claims

for the drugs specified in this Section 20. Each of said representations were material and

were relied upon by the Medicare and States' Medicaid Programs in paying or approving claims for the drugs specified in this Section 20.

129. Defendant GLAXO WELLCOME/CERENEX knowingly caused its false or fraudulent price and cost representations to be published in the years specified in this Section 20 in the Red Book, the Blue Book and the First Data Banks' Automated Services and further made or used false records or statements regarding its prices and costs of the drugs specified in this Section 20 and submitted same to the Medicare and States' Medicaid Programs continuously throughout the years specified in this Section 20. For the purposes of specificity and particularity, the said false price and cost representations as they were reflected in the Red Book and Blue Book have been organized into a chart form for each drug in question and for each NDC Number assigned to each drug in question. The information provided under the columns for Defendant's Published Price , and Red Book and Blue Book "AWP" and "DP" reflects the false price and cost representations made by the Defendant GLAXO WELLCOME/CERENEX. The information under the Relator's Cost columns reflects the true price that Defendant GLAXO WELLCOME/CERENEX charged the Relator for the drug or caused another entity to charge the Relator for the drug. As a very small infusion pharmacy, the Relator does not always receive the lowest prices available to volume purchasers. Accordingly, a comparison of the Relator's costs with the price and cost representations made by the Defendant GLAXO WELLCOME/ CERENEX establishes the falsity of GLAXO WELLCOME/ CERENEX's representations for the drugs and years specified as follows:

CIVIL ACTION NO. 95-1354-CIV-MARCUS

## a. DRUG: ONDANSETRON HYDROCHLORIDE
## (ZOFRAN) 40 MG

MEDICAID                                                    MEDICARE
NDC NO.: 00173-0442-00                                HCPCS J2405

| YEAR | DEFENDANT'S PUBLISHED PRICE | RED BOOK | | BLUE BOOK | | RELATOR'S WHOLESALER COST | RELATOR'S DIRECT COST |
|------|------|------|------|------|------|------|------|
| | | "AWP" | "DP" | "AWP" | "DP" | | |
| 1993 | $178.97 | $207.50 | | $198.00 | | $176.80 | |
| 1994 | | $214.76 | | $214.76 | | $172.92 | |
| 1995 | $194.18 | $233.02 | $194.18 | $233.02 | | $167.00 | |
| 1996 | $203.69 | $233.02 | | $233.02 | | $165.00 | |
| 1997 | | $244.43 | | | | $165.00 | |

Defendant, GLAXO WELLCOME/CERENEX caused the payment or approval of false or fraudulent claims during the years specified in the above chart by the Medicare and/or States' Medicaid Programs for the following additional size(s) of Ondansetron Hydrochloride:

| SIZE | MEDICAID NDC# | MEDICARE HCPCS |
|------|------|------|
| 32 mg Premix Bag | 00173-0461-00 | --------- |
| 2 ml vial | 00173-0442-02 | J2405 |

As a direct and proximate result of the actions of the Defendant GLAXO/ WELLCOME/CERENEX alleged herein, the United States has sustained damages recoverable under the False Claims Act, together with triple damages, penalties, attorneys' fees and costs.

PAGES 180 THROUGH 200

HAVE BEEN COMPLETELY
REDACTED

## SECTION NO. 27

### THE SPECIFIC FALSE PRICE AND COST
### REPRESENTATIONS OF DEFENDANT
### SMITHKLINE BEECHAM

142. At various times from on or after June 23, 1989 and continuing through the

present date, Defendant SMITHKLINE BEECHAM knowingly caused the Medicare

program and the States' Medicaid programs throughout the United States and its territories

to pay false or fraudulent claims for drugs specified in this Section No. 27 and further made

or used false or fraudulent records and/or statements to get such claims paid or approved.

As a result of the said actions of Defendant SMITHKLINE BEECHAM and those persons

and entities acting directly or indirectly in concert with Defendant SMITHKLINE BEECHAM,

the Medicare and States' Medicaid Programs paid grossly excessive, unreasonable and

unlawful amounts for claims for the drugs specified in this Section 27. The acts committed

by Defendant SMITHKLINE BEECHAM that caused the Medicare and States' Medicaid

Programs to pay or approve said false or fraudulent claims included, but were not

necessarily limited to, knowingly making false or fraudulent representations about prices

and costs of the drugs specified in this Section 27 which Defendant SMITHKLINE

BEECHAM knew or should have known would be relied upon by the Medicare and States'

Medicaid Programs in paying or approving claims for the drugs specified in this Section 27.

Each of said representations were material and were relied upon by the Medicare and

States' Medicaid Programs in paying or approving claims for the drugs specified in this Section 27.

143.    Defendant SMITHKLINE BEECHAM knowingly caused its false or fraudulent price and cost representations to be published in the years specified in this Section 27 in the Red Book, the Blue Book  and the First Data Banks' Automated Services and further made or used false records or statements regarding its prices and costs of the drugs specified in this Section 27 and submitted same to the Medicare and States' Medicaid Programs continuously throughout the years specified in this Section 27. For the purposes of specificity and particularity, the said false price and cost representations as they were reflected in the Red Book and Blue Book have been organized into a chart form for each drug in question and for each NDC Number assigned to each drug in question.  The information provided under the columns for Defendant's Published Price , and Red Book and Blue Book "AWP" and "DP" reflects the false price and cost representations made by the Defendant SMITHKLINE BEECHAM.  The information under the Relator's Cost columns reflects the true price that Defendant SMITHKLINE BEECHAM charged the Relator for the drug or caused another entity to charge the Relator for the drug.  As a very small infusion pharmacy, the Relator does not always receive the lowest prices available to volume purchasers. Accordingly, a comparison of the Relator's costs with the price and cost representations made by the Defendant SMITHKLINE BEECHAM establishes the falsity of SMITHKLINE BEECHAM's representations for the drugs and years specified as follows:

CIVIL ACTION NO. 95-1354-CIV-MARCUS

a. DRUG: GANISETRON HYDROCHLORIDE (Kytril)
1 MG/ML 1 ml

MEDICAID                                                          MEDICARE
NDC NO.: 00029-4149-01                                     HCPCS J1625

| YEAR | DEFENDANT'S PUBLISHED PRICE | RED BOOK | | BLUE BOOK | | RELATOR'S WHOLESALER COST | RELATOR'S DIRECT COST |
| | | "AWP" | "DP" | "AWP" | "DP" | | |
|---|---|---|---|---|---|---|---|
| 1993 | | | | | | | |
| 1994 | | | | | | $118.90 | |
| 1995 | | $166.00 | | $166.00 | | $118.90 | |
| 1996 | | $166.00 | | $166.00 | | $118.95 | |
| 1997 | | $173.95 | | | | $124.90 | |

As a direct and proximate result of the actions of the Defendant SMITHKLINE

BEECHAM alleged herein, the United States has sustained damages recoverable under

the False Claims Act, together with triple damages, penalties, attorneys' fees and costs.

**CIVIL ACTION NO. 95-1354-CIV-MARCUS**





## SECTION NO. 29

### THE SPECIFIC FALSE PRICE AND COST REPRESENTATIONS OF DEFENDANT WARRICK

146. At various times from on or after June 23, 1989 and continuing through the present date, Defendant WARRICK knowingly caused the Medicare program and the States' Medicaid programs throughout the United States and its territories to pay false or fraudulent claims for drugs specified in this Section No. 29 and further made or used false or fraudulent records and/or statements to get such claims paid or approved. As a result of the said actions of Defendant WARRICK and those persons and entities acting directly or indirectly in concert with Defendant WARRICK, the Medicare and States' Medicaid Programs paid grossly excessive, unreasonable and unlawful amounts for claims for the drugs specified in this Section 29. The acts committed by Defendant WARRICK that caused the Medicare and States' Medicaid Programs to pay or approve said false or

fraudulent claims included, but were not necessarily limited to, knowingly making false or fraudulent representations about prices and costs of the drugs specified in this Section 29 which Defendant WARRICK knew or should have known would be relied upon by the Medicare and States' Medicaid Programs in paying or approving claims for the drugs specified in this Section 29. Each of said representations were material and were relied upon by the Medicare and States' Medicaid Programs in paying or approving claims for the drugs specified in this Section 29.

147. Defendant WARRICK knowingly caused its false or fraudulent price and cost representations to be published in the years specified in this Section 29 in the Red Book, the Blue Book and the First Data Banks' Automated Services and further made or used false records or statements regarding its prices and costs of the drugs specified in this Section 29 and submitted same to the Medicare and States' Medicaid Programs continuously throughout the years specified in this Section 29. For the purposes of specificity and particularity, the said false price and cost representations as they were reflected in the Red Book and Blue Book have been organized into a chart form for each drug in question and for each NDC Number assigned to each drug in question. The information provided under the columns for Defendant's Published Price, and Red Book and Blue Book "AWP" and "DP" reflects the false price and cost representations made by the Defendant WARRICK. The information under the Relator's Cost columns reflects the true price that Defendant WARRICK charged the Relator for the drug or caused another entity to charge the Relator for the drug. As a very small infusion pharmacy, the Relator does not always receive the lowest prices available to volume purchasers. Accordingly, a comparison of the Relator's costs with the price and cost representations made by the

**CIVIL ACTION NO. 95-1354-CIV-MARCUS**

Defendant WARRICK establishes the falsity of WARRICK's representations for the drugs

and years specified as follows:

### a. DRUG: ALBUTEROL SULFATE 0.083%
### 3 ML, 25s

MEDICAID                                                            MEDICARE
NDC NO.: 59930-1500-08                                             HCPCS J7620

| YEAR | DEFENDANT'S PUBLISHED PRICE | RED BOOK "AWP" | RED BOOK "DP" | BLUE BOOK "AWP" | BLUE BOOK "DP" | RELATOR'S WHOLESALER COST | RELATOR'S DIRECT COST |
|------|------|------|------|------|------|------|------|
| 1993 | | | | | | | |
| 1994 | | $32.25 | | $30.24 | $24.75 | | |
| 1995 | | $32.25 | | $30.24 | | | |
| 1996 | | $32.25 | | $30.24 | | | |
| 1997 | | $30.25 | | | | $7.99 | |

Defendant, WARRICK caused the payment or approval of false or fraudulent claims

during the years specified in the above chart by the Medicare and/or States' Medicaid

Programs for the following additional size(s) of Albuterol Sulfate 0.083%:

| SIZE | MEDICAID NDC# | MEDICARE HCPCS |
|------|------|------|
| 3 ml, 60s | 59930-1500-06 | J7670 |

### b. DRUG: ALBUTEROL SULFATE 0.5%
### 20 ML

MEDICAID                                                            MEDICARE
NDC NO.: 59930-1515-04                                             HCPCS J7625

| YEAR | DEFENDANT'S PUBLISHED PRICE | RED BOOK "AWP" | RED BOOK "DP" | BLUE BOOK "AWP" | BLUE BOOK "DP" | RELATOR'S WHOLESALER COST | RELATOR'S DIRECT COST |
|------|------|------|------|------|------|------|------|
| 1993 | | | | | | | |
| 1994 | | $12.50 | | $12.50 | $9.60 | | |
| 1995 | | $12.50 | | $12.50 | | | |
| 1996 | | $14.99 | | $14.99 | | | |
| 1997 | | $14.99 | | | | $5.49 | |

CIVIL ACTION NO. 95-1354-CIV-MARCUS

As a direct and proximate result of the actions of the Defendant WARRICK alleged

herein, the United States has sustained damages recoverable under the False Claims Act,

together with triple damages, penalties, attorneys' fees and costs.

## COUNT I

### FALSE CLAIMS ACT;
### CAUSING PRESENTATION OF FALSE OR FRAUDULENT CLAIMS

148.   This is a civil action by the Plaintiff, UNITED STATES, and the Relator, VEN-

A-CARE, on behalf of the UNITED STATES, against the Defendants, ABBOTT

LABORATORIES; ████████████████████████████████

BAXTER HEALTHCARE CORP.; BAYER CORPORATION f/k/a MILES, INC.; ████████

████████████████████████████████ BRISTOL-MYERS

SQUIBB COMPANY a/k/a BRISTOL-MYERS ONCOLOGY DIVISION/HIV PRODUCTS;

████████████████████████████ DEY LABORATORIES;

████████████████████████ GLAXO

WELLCOME, INC.; ████████████████████████

████████████████████████████████████████

████████████████████████████████████████

SMITHKLINE BEECHAM CORPORATION; ████████████

WARRICK PHARMACEUTICALS CORPORATION under the False Claims Act, **31 U.S.C.**

**§§3729-3732.**

149.   Relator realleges and incorporates by reference paragraphs 1 through 147

as if fully set forth herein and further alleges as follows:

CIVIL ACTION NO. 95-1354-CIV-MARCUS

150. The DEFENDANT PHARMACEUTICAL MANUFACTURERS from a date on or before June 23, 1989 to the present date, knowingly [as defined in 31 USC, §3729(b)] caused to be presented to officers or employees of the UNITED STATES GOVERNMENT false or fraudulent claims [as explained in **United States v. Neifert-White, 390 US 228, 232-233 (1968)**] for payment or approval, in that the DEFENDANT PHARMACEUTICAL MANUFACTURERS caused to be presented to officers or employees of the UNITED STATES GOVERNMENT false or fraudulent price and cost information for the pharmaceuticals specified herein and caused the UNITED STATES to pay out sums of money to the providers and suppliers of the DEFENDANT PHARMACEUTICAL MANUFACTURERS' specified pharmaceuticals, grossly in excess of the amounts permitted by law, resulting in great financial loss to the UNITED STATES.

151. Because of the DEFENDANT PHARMACEUTICAL MANUFACTURERS' conduct as set forth in this Count, the UNITED STATES suffered actual damages in excess of Ten (10) Billion Dollars ($10,000,000,000.00), all in violation of **31 U.S.C. §3729(a)(1)**

## COUNT II

### FALSE CLAIMS ACT; CAUSING A FALSE RECORD OR STATEMENT TO BE MADE OR USED TO GET A FALSE OR FRAUDULENT CLAIM PAID OR APPROVED BY THE GOVERNMENT

152. This is a civil action by the Plaintiff, UNITED STATES, and the Relator, VEN-A-CARE, on behalf of the UNITED STATES, against the Defendants, ABBOTT LABORATORIES; 

BAXTER HEALTHCARE CORP.; BAYER CORPORATION f/k/a MILES, INC.; 

BRISTOL-MYERS SQUIBB COMPANY a/k/a BRISTOL-MYERS ONCOLOGY DIVISION/HIV PRODUCTS;

**CIVIL ACTION NO. 95-1354-CIV-MARCUS**

███████████████████████████████████ DEY LABORATORIES;

█████████████████████████████ GLAXO

WELLCOME, INC.; ████████████████████████████████████

███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████

SMITHKLINE BEECHAM CORPORATION; ██████████████████████

WARRICK PHARMACEUTICALS CORPORATION under the **False Claims Act, 31 U.S.C. §§3729-3732**.

153.    Relator realleges and incorporates by reference paragraphs 1 through 147 as if fully set forth herein and further alleges as follows:

154.    The DEFENDANT PHARMACEUTICAL MANUFACTURERS, from a date on or before June 23, 1989 to the present date, knowingly [as defined in **§3729(b)**] caused false records or statements to be made or used to get false or fraudulent claims [as explained in **United States v. Neifert-White, 390 US 228, 232-233 (1968)**] to be paid or approved by the GOVERNMENT, in that the DEFENDANT PHARMACEUTICAL MANUFACTURERS, caused false records or statements of prices and costs of the DEFENDANT PHARMACEUTICAL MANUFACTURERS' pharmaceuticals specified herein to be used by the GOVERNMENT to pay or approve claims presented by the providers and suppliers of the DEFENDANT PHARMACEUTICAL MANUFACTURERS' specified pharmaceuticals, which claims were grossly in excess of the amounts permitted by law, resulting in great financial loss to the UNITED STATES.

155. Because of the DEFENDANT PHARMACEUTICAL MANUFACTURERS' conduct as set forth in this Count, the UNITED STATES suffered actual damages in excess of Ten Billion Dollars ($10,000,000,000.00), all in violation of **31 U.S.C. §3729(a)(2).**

## COUNT III

### FALSE CLAIMS ACT; CAUSING FALSE RECORDS OR STATEMENTS TO BE USED TO CONCEAL AN OBLIGATION TO PAY MONEY TO THE GOVERNMENT

156. This is a civil action by the Plaintiff, UNITED STATES, and the Relator, VEN-A-CARE, on behalf of the UNITED STATES, against the Defendants, ABBOTT LABORATORIES; ██████████████████████████████████████

BAXTER HEALTHCARE CORP.; BAYER CORPORATION f/k/a MILES, INC.; ████████████

████████████████████████████████████████████ BRISTOL-MYERS

SQUIBB COMPANY a/k/a BRISTOL-MYERS ONCOLOGY DIVISION/HIV PRODUCTS;

███████████████████████████████████████ DEY LABORATORIES;

████████████████████████████████████████████ GLAXO

WELLCOME, INC.; ██████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

SMITHKLINE BEECHAM CORPORATION; ████████████████████

WARRICK PHARMACEUTICALS CORPORATION under the **False Claims Act, 31 U.S.C. §§3729-3732.**

157. Relator realleges and incorporates by reference paragraphs 1 through 147 as if fully set forth herein and further alleges as follows:

CIVIL ACTION NO. 95-1354-CIV-MARCUS

158. The DEFENDANT PHARMACEUTICAL MANUFACTURERS, from a date on or before June 23, 1989 to the present date, knowingly [as defined in **§3729(b)**] caused false records or statements to be made or used to conceal obligations to pay money to the GOVERNMENT, in that: the DEFENDANT PHARMACEUTICAL MANUFACTURERS knew that the UNITED STATES' Medicare program and the States' Medicaid programs were using the DEFENDANT PHARMACEUTICAL MANUFACTURERS' false price and cost representations for purposes of paying or approving claims of the providers and suppliers of the DEFENDANT PHARMACEUTICAL MANUFACTURERS' specified pharmaceuticals; the DEFENDANT PHARMACEUTICAL MANUFACTURERS knew that sums of money paid by the UNITED STATES and States' Governments to the providers and suppliers of the DEFENDANT PHARMACEUTICAL MANUFACTURERS' specified pharmaceuticals were grossly in excess of the amounts permitted by law; the DEFENDANT PHARMACEUTICAL MANUFACTURERS knew it was the obligation of the UNITED STATES Medicare Part B carriers and State Governments to recoup governments' funds paid in excess of the amounts permitted by law; the DEFENDANT PHARMACEUTICAL MANUFACTURERS, nevertheless, continued to cause the using and making of false records or statements of prices and costs for the specified pharmaceuticals that were grossly in excess of the reasonable amounts permitted by law; and the DEFENDANT PHARMACEUTICAL MANUFACTURERS thus concealed from the UNITED STATES Medicare Part B carriers and State Governments an obligation of the providers and suppliers of the DEFENDANT PHARMACEUTICAL MANUFACTURERS' specified pharmaceuticals to pay recoupment monies to the UNITED STATES and State Governments, resulting in great financial loss to the UNITED STATES and State Governments.

**CIVIL ACTION NO. 95-1354-CIV-MARCUS**

159. Because of the DEFENDANT PHARMACEUTICAL MANUFACTURERS' conduct as set forth in this Count, the UNITED STATES suffered actual damages in excess of Ten Billion Dollars ($10,000,000,000.00), all in violation of **31 U.S.C. §3729(a)(7).**

## COUNT IV

### FALSE CLAIMS ACT; CAUSING PRESENTATION OF FALSE OR FRAUDULENT CLAIMS; ILLEGAL REMUNERATIONS

160. This is a civil action by the Plaintiff, UNITED STATES, and the Relator, VEN-A-CARE, on behalf of the UNITED STATES, against the Defendants, ABBOTT LABORATORIES; ███████████████████████

BAXTER HEALTHCARE CORP.; BAYER CORPORATION f/k/a MILES, INC.; ███████████

████████████████████████ BRISTOL-MYERS

SQUIBB COMPANY a/k/a BRISTOL-MYERS ONCOLOGY DIVISION/HIV PRODUCTS;

████████████████████████ DEY LABORATORIES;

████████████████████████ GLAXO

WELLCOME, INC.; ███████████████████

████████████████████████████

SMITHKLINE BEECHAM CORPORATION; ████████████

WARRICK PHARMACEUTICALS CORPORATION under the **False Claims Act, 31 U.S.C. §§3729-3732**.

161. Relator realleges and incorporates by reference paragraphs 1 through 147 as if fully set forth herein and further alleges as follows:

162.    The DEFENDANT PHARMACEUTICAL MANUFACTURERS, from on or about June 23, 1989 to the present date, knew that the prices charged to their customers for the specified pharmaceuticals were significantly reduced in amount from the prices and costs represented by the DEFENDANT PHARMACEUTICAL MANUFACTURERS and upon which the Defendants knew Medicare and Medicaid claims would be approved and paid. Accordingly, the DEFENDANT PHARMACEUTICAL MANUFACTURERS have each knowingly offered or paid, or caused to be offered or paid, directly or indirectly, overtly or covertly, in cash or in kind, remuneration to their customers in the form of price reductions and/or in the form of illegal remuneration from the Medicare and/or States' Medicaid Programs to induce them to purchase, order or arrange or to recommend purchasing, arranging or ordering the specified pharmaceuticals for which the DEFENDANT PHARMACEUTICAL MANUFACTURERS knew that payment would be made, in whole or in part, by the Medicare and States' Medicaid Programs.  Such financial inducement is specifically prohibited by 42 U.S.C. §1320a-7b(b)(2) and 18 U.S.C §2.

163.    The DEFENDANT PHARMACEUTICAL MANUFACTURERS knew that the Medicare and States' Medicaid Programs would not pay or approve claims for the specified pharmaceuticals if it were disclosed to the Medicare and States' Medicaid Programs that said claims were for amounts that included remuneration prohibited by 42 U.S.C. §1320a-7b(b)(2).

164.    The DEFENDANT PHARMACEUTICAL MANUFACTURERS also knew that their customers, in presenting claims for the specified pharmaceuticals to the Medicare and States' Medicaid Programs, would not and did not disclose that the claim amounts included the remuneration prohibited by 42 U.S.C. §1320a-7b(b)(2).

165. The DEFENDANT PHARMACEUTICAL MANUFACTURERS' knowing and willful actions in arranging for their customers to receive remuneration prohibited by 42 U.S.C. §1320a-7b(b)(2), in causing the omission of material information from the claims, and in causing the failure to properly disclose and appropriately reflect the remuneration in the claims, caused the claims for the specified pharmaceuticals to be false and fraudulent claims and caused the claims to be presented to the Medicare and States' Medicaid Programs for payment and approval in violation of 31 U.S.C §3729(a)(1).

166. Because of the DEFENDANT PHARMACEUTICAL MANUFACTURERS' conduct as set forth in this Count, the UNITED STATES suffered actual damages in excess of Ten Billion Dollars ($10,000,000,000.00) all in violation of 31 U.S.C. §3729(a)(1).

## COUNT V

### FALSE CLAIMS ACT; CAUSING A FALSE RECORD OR STATEMENT TO BE MADE OR USED TO GET A FALSE OR FRAUDULENT CLAIM PAID OR APPROVED BY THE GOVERNMENT; ILLEGAL REMUNERATIONS

167. This is a civil action by the Plaintiff, UNITED STATES, and the Relator, VEN-A-CARE, on behalf of the UNITED STATES, against the Defendants, ABBOTT LABORATORIES; ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ BAXTER HEALTHCARE CORP.; BAYER CORPORATION f/k/a MILES, INC.; ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ BRISTOL-MYERS SQUIBB COMPANY a/k/a BRISTOL-MYERS ONCOLOGY DIVISION/HIV PRODUCTS; ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ DEY LABORATORIES; ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ GLAXO WELLCOME, INC.; ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

CIVIL ACTION NO. **95-1354-CIV-MARCUS**

SMITHKLINE BEECHAM CORPORATION;

WARRICK PHARMACEUTICALS CORPORATION under the **False Claims Act, 31 U.S.C. §§3729-3732**.

168.    Relator realleges and incorporates by reference paragraphs 1 through 147 as if fully set forth herein and further alleges as follows:

169.    The DEFENDANT PHARMACEUTICAL MANUFACTURERS, from on or before June 23, 1989 to the present date, knew that the prices charged to their customers for the specified pharmaceuticals were significantly reduced in amount from the prices and costs represented by the DEFENDANT PHARMACEUTICAL MANUFACTURERS and upon which the Defendants knew Medicare and Medicaid claims would be approved and paid. Accordingly, the DEFENDANT PHARMACEUTICAL MANUFACTURERS have each knowingly offered or paid, or caused to be offered or paid, directly or indirectly, overtly or covertly, in cash or in kind, remuneration to their customers in the form of price reductions and/or in the form of illegal remuneration from the Medicare and/or States' Medicaid Programs to induce them to purchase, order or arrange or to recommend purchasing, arranging or ordering the specified pharmaceuticals for which the DEFENDANT PHARMACEUTICAL MANUFACTURERS knew that payment would be made, in whole or in part, by the Medicare and States' Medicaid Programs. Such financial inducement is specifically prohibited by 42 U.S.C. §1320a-7b(b)(2) and 18 U.S.C §2.

170.    The DEFENDANT PHARMACEUTICAL MANUFACTURERS knew that the Medicare and States' Medicaid Programs would not pay or approve claims for the specified

CIVIL ACTION NO. 95-1354-CIV-MARCUS

pharmaceuticals if it were disclosed to the Medicare and States' Medicaid Programs that said claims were for amounts that included remuneration prohibited by 42 U.S.C. §1320a-7b(b)(2).

171. The DEFENDANT PHARMACEUTICAL MANUFACTURERS also knew that their customers, in presenting claims for the specified pharmaceuticals to the Medicare and States' Medicaid Programs, would not and did not disclose that the claim amounts included the remuneration prohibited by 42 U.S.C. §1320a-7b(b)(2).

172. The DEFENDANT PHARMACEUTICAL MANUFACTURERS' knowing and willful actions in arranging for their customers to receive remuneration prohibited by 42 U.S.C. §1320a-7b(b)2, in causing the omission of material information from the claims, and in causing the failure to properly disclose and appropriately reflect the remuneration in the claims, caused the claims for the specified pharmaceuticals to the false records or statements that were made and used to get a false or fraudulent claim paid or approved by the Government. The DEFENDANT PHARMACEUTICAL MANUFACTURERS' actions herein caused said false records or statements to be made and used as prohibited by 31 U.S.C. §3729(a)(2).

173. Because of the DEFENDANT PHARMACEUTICAL MANUFACTURERS' conduct as set forth in this Count, the UNITED STATES suffered actual damages in excess of Ten Billion Dollars ($10,000,000,000.00) all in violation of 31 U.S.C. §3729(a)(2).

## · REQUESTS FOR RELIEF

WHEREFORE, the Relator, on behalf of the UNITED STATES, demands that judgment be entered in its favor and against Defendants, ABBOTT LABORATORIES;

BAXTER

**CIVIL ACTION NO. 95-1354-CIV-MARCUS**

HEALTHCARE CORP.; BAYER CORPORATION f/k/a MILES, INC.;

BRISTOL-MYERS

SQUIBB COMPANY a/k/a BRISTOL-MYERS ONCOLOGY DIVISION/HIV PRODUCTS;

DEY LABORATORIES;

GLAXO

WELLCOME, INC.;

SMITHKLINE BEECHAM CORPORATION;

WARRICK PHARMACEUTICALS CORPORATION with judgment to be entered against each defendant for the amount of damages: (1) to the States' Medicaid Programs arising from claims for each Defendant's respective specified pharmaceuticals; and (2) to the Medicare Program arising from claims for those pharmaceuticals classified under the HCPCS codes covering their specified pharmaceuticals, jointly and severally with such other defendants whose pharmaceuticals fall under said HCPCS codes, as follows:

1.     On Count I (False Claims Act; Causing Presentation of False Claims) for triple the amount of the UNITED STATES' damages, plus civil penalties of no more than TEN THOUSAND DOLLARS ($10,000.00) and no less than FIVE THOUSAND DOLLARS ($5,000.00) for each false claim;

2.     On Count II (False Claims Act; Causing False Statements To Be Used To Get False Claims Paid By The GOVERNMENT) for triple the amount of UNITED STATES' damages plus civil penalties of no more than TEN THOUSAND DOLLARS ($10,000.00) and no less than FIVE THOUSAND DOLLARS ($5,000.00) for each false statement;

CIVIL ACTION NO. 95-1354-CIV-MARCUS

3.     On Count III (False Claims Act; causing False Statements To Be Used To conceal An Obligation To Pay Money To The GOVERNMENT) for triple the amount of the UNITED STATES' damages plus civil penalties of no more than TEN THOUSAND DOLLARS ($10,000.00) and no less than FIVE THOUSAND DOLLARS ($5,000.00) for each false or fraudulent claim paid;

4.     On Count IV (False Claims Act; Causing Presentation of False and Fraudulent Claims; Illegal Remunerations) for triple the amount of the UNITED STATES' damages, plus civil penalties of no more than TEN THOUSAND DOLLARS ($10,000.00) and no less than FIVE THOUSAND DOLLARS ($5,000.00) for each false claim;

5.     On Count V (False Claims Act; Causing A False Record Or Statement To Be Made Or Used To Get A False Or Fraudulent Claim Paid Or Approved by the Government; Illegal Remunerations) for triple the amount of UNITED STATES' damages plus civil penalties of no more than TEN THOUSAND DOLLARS ($10,000.00) and no less than FIVE THOUSAND DOLLARS ($5,000.00) for each false statement;

6.     For all fees and costs of this civil action; and

7.     For such other and further relief as the Court deems just and equitable.

Further, the Relator, on its behalf, requests that it receive thirty percent (30%), or such other maximum amount as permitted by law, of the proceeds of this action or settlement of this action collected by the UNITED STATES, plus an amount for reasonable expenses incurred, plus reasonable attorneys' fees and costs of this action. The Relator requests that its percentage be based upon the total value recovered, including any amounts received from individuals or entities not parties to this action.

**CIVIL ACTION NO. 95-1354-CIV-MARCUS**

## DEMAND FOR JURY TRIAL

A jury trial is demanded in this case.

Respectfully submitted,

*Atlee W. Wampler III*

Atlee W. Wampler, III
Florida Bar No. 311227

James J. Breen
Florida Bar No. 297178
WAMPLER, BUCHANAN & BREEN, P.A.
900 Sun Bank Building
777 Brickell Avenue
Miami, Florida 33131
Telephone: (305) 577-0044
Facsimile: (305) 577-8545

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this _____ day of August, 1997, I caused an original and a copy of this Second Amended Complaint to be filed under seal and in camera for sixty (60) days and not to be served on the Defendants named herein or until further order of this Honorable Court.

I HEREBY CERTIFY that prior to this ___12th___ day of August, 1997, I caused a copy of this Second Amended Complaint and written disclosure of substantially all material evidence and information the Relator, VEN-A-CARE possesses to be served on the Government pursuant to Rule 4(i), Fed.R.Civ.P., prior to the filing of this Second Amended Complaint by delivering a copy of the Summons, Second Amended Complaint, material evidence and information to the United States Attorney for the Southern District of Florida, and by sending a copy of the Summons, Second Amended Complaint, material evidence

CIVIL ACTION NO. 95-1354-CIV-MARCUS

and information by Certified Mail, Return Receipt Requested, to the Attorney General of

the United States in Washington, D.C.

Respectfully submitted,

*Atlee W. Wampler III*

Atlee W. Wampler, III
Florida Bar No. 311227

James J. Breen
Florida Bar No. 297178
WAMPLER, BUCHANAN & BREEN, P.A.
900 Sun Bank Building
777 Brickell Avenue
Miami, Florida 33131
Telephone: (305) 577-0044
Facsimile: (305) 577-8545

F:\CLIENTS\3027\2AM-CMP

Case 1:16-cv-24145-JSC-25257-RBS Document 8224-1 Filed 10/23/12 Entered on FLSD Docket 06/04/2010 Page 186 of 221 Page 61 of 96

VEN-A-CARE/CRITI-CA         :1-305-292-1739         Jun   97  16:41 No.006 P.01

# ⌬ ABBOTT
# Alternate Site
# Product Sales

---

## High Tech Products for Alternate Site and Home Health Care

Mr. Michael Fabrizi                                          February 14, 1997
Division Vice President
Automated Health Technologies
1025 NW 17th Avenue
Delray Beach, FL 33445

Dear Michael,

Abbott Laboratories is pleased to announce that we will be adding two new product lines to our family of FirstChoice® Injectable Drugs.

Early in the 2nd quarter of 1997 we will offer Acyclovir and Cefuroxime Sodium available as high quality, cost-cutting generics. Acyclovir will be available in two strengths, 500 mg and 1 gram vials (as is Glaxo's Zovirax). Cefuroxime Sodium will be available in five strengths, as is Glaxo's Zinacef, Lilly's Kefurox or Marsam's generic version.

Upon introduction, we anticipate a great demand for these products. We are therefore offering our valued customers with existing contracts, the opportunity to ensure that your orders get first priority. By signing this letter of understanding, the products will be added to your contract and you will get *early sign-up pricing*. You will also get our commitment to meet or beat any written competitive offer or we will remove the product from your contract.

The pricing will be as follows:

| List Number | NDC Number | Product Description | Invoice Each Price |
|---|---|---|---|
| 04427-01-01 | 00074-4427-01 | Acyclovir 500 mg Vial | $35.00 / vial |
| 04452-01-01 | 00074-4452-01 | Acyclovir 1 gram Vial | $70.00 / vial |
| HO125-04-04 | 10515-125-04 | Cefuroxime 15 mg / mL 100 mL | $6.65 / vial |
| HO125-03-03 | 10515-125-03 | Cefuroxime 7.5 mg / mL 100 mL | $3.45 / vial |
| HO125-01-01 | 10515-125-01 | Cefuroxime 75 mg / mL 10 mL | $3.20 / vial |
| HO124-05-05 | 10515-124-05 | Cefuroxime 75 mg / mL 100 mL | $31.20 / vial |
| HO125-02-02 | 10515-125-02 | Cefuroxime 75 mg / mL 20 mL | $6.40 / vial |

To accept the above terms, please sign below and return to my attention. Thank you in advance for your consideration.

Best regards,

*Dennis M. Walker*

Dennis M. Walker
Manager, National Accounts

Accepted By: _____

Title: _VP AHT_____          Date: _2/24/97_

**EXHIBIT**
**1**

200 Abbott Park Road • Abbott Park, Il 60064-3537

VEN-A-CARE/CRITI-CA    T  :1-305-292-1739        Jun 1  97   16:42 No.006 P.03

MAY. 30. 1997  2:32PM   .  JTT ALTERNATE SITE PROD. SALES            NO. 8566   P. 1/1

---

# Facsimile Cover Sheet

**To:** Zack
**Company:** Venacare Pharmacy
**Phone:** (305) 292-1635
**Fax:** (305) 292-1739

**From:** Dennis M. Walker
**Company:** Abbott Alternate Site Product Sales
**Phone:** (847) 938-1413
**Fax:** (847) 938-1084

**Date:** 5/30/97

**Pages including this cover page:** 1

**Comments:**    Listed below is your Automated Health Technologies price for Acyclovir and the A.W.P. information you requested. Please call if you have any questions.

| List # | Product Description | Price Each | A.W.P. Each |
|--------|---------------------|------------|-------------|
| 4427-01 | Acyclovir 500 mg | $30.00 | $ 95.00 |
| 4452-01 | Acyclovir 1 gm | $60.00 | $190.00 |



EXHIBIT
2

VEN-A-CARE/CRITI-CA    T  :1-305-292-1739        Jun   97  16:41 No.006 P.02

MAY. 5. 1997  3:58PM    . BOTT ALTERNATE SITE PROD. SALES        NO. 7796   P. 3/4



**Abbott Laboratories  Hospital Products Division**
# CONTRACT REVISION / REQUEST NOTICE

Account Name **Automated Healthcare Tech**       Date: **04/28/97**
City/State **Delray Beach, FL**                  Account # **00000430**
Territory **Al & Di Walker**                     Profile Number(s) **24981**

Dear Wholesaler _____ Contract Reporting # _____
If you should have any questions, please call your Chargeback Specialist.

Contract Number(s) _____               Pricing Term from **06/01/94** to **05/31/97**
                   _____               Product Update(s) Effective **4/28/97**

| Account Type | Membership | Member Specifics | Contract Term Update |
|---|---|---|---|
| ☒ Group | ☒ All Member | ☐ Pharmacy Program | ☐ Canceled Effective |
| ☐ Individual | ☐ Subagreement | ☐ Med/Surgical Program | ☐ Extended to |
| ☐ Abbott Group | ☐ Select Members | ☐ Hospital Contract | ☐ Reinstated Through |
| ☐ HNO | | ☒ Alternate Site Contract | |

**Product Price Update(s)**   ☐ Add   ☒ Change   ☐ Delete

| List - Tuc - Ss | Old Price/Cs. Size | New Price/Cs. Size | Description | |
|---|---|---|---|---|
| 04427 01 01 | 350.00/10 | 300.00/10 | Acyclovir Sod 500 mg Fltp | |
| 04452 01 01 | 700.00/10 | 600.00/10 | Acyclovir Sod 1 gm Fltp | . |
| | | | | |
| | | | | |
| | | | | . |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

Remarks:

Contract Spec _____        Analyst/Manager _____

```
EXHIBIT
  3
```

VEN-A-CARE/CRITI-CA    T   :1-305-292-1739        Jun    97    16:42 No.006 P.04

## RED BOOK UPDATE SUMMARY RX CHANGES – BY COMPANY

**JUNE 1997**

**9/MCNEI**

| PROD. MFR | NDC | AWP | SP | DEC | PROD. MFR | NDC | AWP | SP | DEC | PROD. MFR | NDC | AWP | SP | DEC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

*3M PHARM*

ALDARA
CRE. TP (PACKETS)
5%, 0.250 gm 12s ...... 00085-0510-12  108.00

ACYCLOVIR SODIUM (aft. 04/23/97)
POL. LI (VIAL, FLIPTOP)
500 mg. 10s ea ....... 00074-4427-01  550.00 800.00
1000 mg. 10s ea ...... 00074-4452-01 1900.00 1600.00

MORPHINE SULFATE (aft. 04/07/97)
INJ. LI (AMP, P.F.)
0.5 mg/ml,
10 ml 5s, C-II ........ 00074-4857-12  68.46  57.65 AP

MORPHINE SULFATE (aft. 04/07/97)
INJ. LI (AMP, P.F.)
0.5 mg/ml,
10 ml 5s, C-II ........ 00074-4854-12  73.63  61.50 AP
(VIAL, P.F., FLIPTOP)
0.5 mg/ml,
10 ml 5s, C-II ........ 00074-3814-12  75.29  63.40 AP
30 ml 10s, C-II ....... 00074-3824-02 160.67 135.30 AP
(VIAL, FLIPTOP)
1 mg/ml,
30 ml 10s, C-II ....... 00074-6023-04 179.43 151.10 AP

*ABBOTT PHARM*

K-TAB (aft. 05/06/97)
TER. PO, 10 meg, 100s ea .. 00074-7804-13  37.55  31.62 BC
1000s ea ........... 00074-7804-19 356.85 300.50 BC

*ABBOTT PHARM*

ACYCLOVIR
SUS. PO, 200 mg/5 ml,
480 ml .......... 00472-0802-16  83.26 AL

*ALZA*

ETHYOL
POL. LI (S.D.V, MANNITOL-FREE)
500 mg, ea ......... 17314-7253-01  327.92 269.10
33 ea ............ 17314-7253-03  968.76 807.30

---

*ESI LEDERLE GENERICS*

ETODOLAC
TAB. PO, 400 mg, 100s ea .. 00185-0144-01 125.59
500s ea ........... 00185-0144-05  596.55
1000s ea .......... 00185-0140-10 1130.31

ACYCLOVIR
CAP. PO, 200 mg, 100s ea .. 59911-5431-01  97.70
TAB. PO, 400 mg, 100s ea .. 59911-3163-01  189.61
800 mg, 100s ea .... 59911-3164-01  368.70

*FUJISAWA*

PRODIAX (aft. 05/01/97)
CAP. PO, 1 mg, 100s ea ... 00469-8617-71  239.40
5 mg, 100s ea ...... 00469-0657-71 1197.80
INJ. LI (AMP)
5 mg/ml, 1 ml 10s .... 00043-3816-01 222.00

*CALGENE*

BENZAC AC (aft. 05/01/97)
GEL. TP, 2.5%, 60 gm ..... 00299-3523-60  14.06
90 gm ............ 00299-3523-90  16.88
5%, 60 gm ......... 00299-5932-60  14.56
90 gm ............ 00299-3632-90  19.00
10%, 60 gm ........ 00299-3634-60  14.94
90 gm ............ 00299-3634-90  19.81
LIQ. TP, 2.5%, 240 ml .... 00299-3453-16  19.89
5%, 240 ml ........ 00299-3644-88  22.31
10%, 240 ml ....... 00299-3645-04  24.56

BENZAC W (aft. 05/01/97)
GEL. TP, 2.5%, 60 gm ..... 00299-3596-60  13.75
90 gm ............ 00299-3596-90  16.50
5%, 60 gm ......... 00299-3689-61  14.19
90 gm ............ 00299-3689-91  14.50
10%, 60 gm ........ 00299-3610-01  14.81
90 gm ............ 00299-3610-91  19.50
LIQ. TP, 5%, 120 ml ...... 00299-3810-04  12.81
240 ml ........... 00299-3610-04  19.13
10%, 240 ml ....... 00299-3672-04  21.63

DESOWEN (aft. 04/01/97)
CRE. TP, 0.05%, 15 gm .... 00299-5778-15  14.31
60 gm ............ 00299-5778-60  36.83
LOT. TP, 0.05%, 60 ml .... 00299-5765-02  24.69
120 ml ........... 00299-5765-04  36.44

---

*DU JAURD*

DU JAURD (aft. 09/24/95)
INJ. LI (AAP)
1 mg/ml,
1 ml 10s, C-II ....... 88044-1811-01  11.70  9.36
2 mg/ml,
1 ml 10s, C-II ....... 88044-1812-01  12.91  10.33
1 ml 25s, C-II ....... 88044-1812-09  30.73  24.54

SUF. RC, 3 mg, 6s ea, C-II  88044-1814-01  19.90  15.92
(AAP)
2 mg/ml, 20 ml, C-II ... 88044-1862-05
(VIAL)

DU JAURD (aft. 09/24/95)
INJ. LI (S.D.V)
10 mg/ml, 50 ml, C-II .. 88044-1817-05  150.46 126.70 AP

E-MYCIN (aft. 08/26/96)
ECT. PO (UNIT OF USE)
250 mg, 40s ea ...... 00044-4287-19  10.73  5.23 AP
(100s ea .......... 00044-4287-01  27.26  9.08 AA
500s ea .......... 00044-4207-43  130.23  45.68 AA
333 mg, 100s ea ..... 00044-4298-01  47.06  26.63 AA
500s ea .......... 00044-8204-45 218.53 120.27 AA

ISU (aft. 14/24/95)
TAB. PO, 400 mg, 100s ea .. 00044-8165-01  12.35  3.40 AA
500s ea .......... 00044-8165-05  43.35  15.25 AA
600 mg, 100s ea ..... 00044-8182-01  16.70  4.45 AA
500s ea .......... 00044-8182-05  72.15  20.00 AA
800 mg, 100s ea ..... 00044-8173-01  23.05  6.80 AA
500s ea .......... 00044-0173-05 104.10  30.60 AA

ZGAPTIN (aft. 14/24/95)
TAB. PO, 40 mg, 100s ea .. 00044-1121-42  30.74  25.62 AA
80 mg, 100s ea ..... 00044-1122-02  44.22  36.65 AA
1000s ea .......... 00044-1122-04 212.16 171.00 AA
120 mg, 100s ea .... 00044-1123-02  59.60  49.63 AA
500s ea .......... 00044-1123-05 287.05 239.21 AA
1000s ea .......... 00044-1823-04 550.19 458.49 AA

EXHIBITS 5 THROUGH 7

HAVE BEEN COMPLETELY
REDACTED

**NPC 1996**

## Pharmacy Payment and Patient Cost Sharing

| State | Dispensing Fee | Ingredient Reimbursement Basis | Copayment |
|---|---|---|---|
| Alabama | $5.40 | WAC+9.2% | $0.50-$3.00 |
| Alaska | $3.45-$11.46 | AWP-5% | $2.00 |
| Arizona | - | - | - |
| Arkansas | $4.51 + 0.103(EAC) | AWP-10.5% | $0.50-$3.00 |
| California | $4.05 | AWP-5% | No |
| Colorado | $4.08 | AWP-10%; WAC+18% | G: $0.50, B: $2.00 |
| Connecticut | $4.10 | AWP-12% | No |
| Delaware | $3.65 | AAC | No |
| District of Columbia | $4.50 | AWP-10% | $0.50 |
| Florida | $4.23 | WAC+7% | No |
| Georgia | $4.41-$15.00 | AWP-10% | $0.50 |
| Hawaii | $4.67 | AWP-10.5% | No |
| Idaho | $4.41 | AWP | No |
| Illinois | $3.30-$15.00 | AWP-10%; multisource drugs are AWP-12% | No |
| Indiana | $4.00 | AWP-10% | $0.50-$3.00 |
| Iowa | $4.02-$6.25 | AWP-10% | $1.00 |
| Kansas | $2.52-$6.71 | AWP-10% | $2.00 |
| Kentucky | OP: $4.75, LTC: $5.75 | AWP-10% | No |
| Louisiana | $5.77 | AWP-10.5% | $0.50-$3.00 |
| Maine | $3.35-$5.35 | AWP-10% | $0.50-$3.00 |
| Maryland | $4.66 | WAC+10% | $1.00 |
| Massachusetts | $3.00 | WAC+10% | $0.50 |
| Michigan | $3.72 | AWP-13.5% or AWP-15.1% | $1.00 |
| Minnesota | $4.10 | AWP-9% | No |
| Mississippi | $4.91 | AWP-10% | $1.00 |
| Missouri | $4.09 | AWP-10.43% | $0.50-$2.00 |
| Montana | $2.00-4.08 | AWP-10% | G: $1.00, B: $2.00 |
| Nebraska | $2.84-5.05 | AWP-8.71% | $1.00 |
| Nevada | $4.64 | AWP-10% | No |
| New Hampshire | $2.50 | AWP-12% | $0.50-$1.00 |
| New Jersey | $3.73-$4.07 | AWP-2-8% | No |
| New Mexico | $4.00 | AWP-10.5% | No |
| New York | G: $5.50, B: $4.50 | AWP-10% | G: $0.50, B: $2.00 |
| North Carolina | $5.60 | AWP-10% | $1.00 |
| North Dakota | $4.50 | AWP-10% | No |
| Ohio | $3.50 | AWP-7.5% | No |
| Oklahoma | $4.15 | AWP-10.5% | $1.00-$2.00 |
| Oregon | $3.80-$4.16 | AWP-11% | No |
| Pennsylvania | $4.00 | AWP-10% | $1.00 |
| Rhode Island | $2.85-$3.40 | WAC+5% | No |
| South Carolina | $4.05 | AWP-10% | $1.50 |
| South Dakota | $4.75-$5.55 | AWP-10.5% | $2.00 |
| Tennessee | Not Avail. | Not Avail. | Not Avail. |
| Texas | $4.55 | AWP-10.49%; WAC+12% | No |
| Utah | $3.90 urban; $4.40 rural | AWP-12% | No |
| Vermont | $4.25 | AWP-10% | $1.00-$2.00 |
| Virginia | $4.25 | AWP-9% | $1.00 |
| Washington | $3.72-$4.59 | AWP-11%* | No |
| West Virginia | $3.90 | AWP-12% | $0.50-$2.00 |
| Wisconsin | 4.69-6.67 | AWP or AWP-10% | $0.50-$100 |
| Wyoming | $4.70 | AWP-4% | $1.00 |

*Actual Acquisition Cost (AAC) for injectables, vaccines, biologicals, etc.
WAC = Wholesalers Acquisition Cost; AWP = Average Wholesale Price; BAC = Estimated Acquisition Price;
G = Generic; B = Brand name; OP = Outpatient; LTC = Long Term Care.
Source: As reported by state drug program administrators in the NPC survey.

**EXHIBIT**
**8**

VEN-A-CARE/CRITI-CA . . TE  1-305-292-1739  . .  Feb 2' 9/  14:22 No.002 P.06

SEP-08-1995  11:34

**EXHIBIT**

9

VEN-A-CARE/CRITI-CA   T  1-305-292-1739   Feb 2 '97   14:22 No.002 P.08
BUREAU OF HEALTH SERV   TL 803-343-D716   DEM 0. 95   1:17 No.001 P.05

Bristol-Myers Squibb
PO Box 4500
Princeton NJ 08543-4500

**WESTERN UNION MAILGRAM**

035973000032 02/28/95   CLB2 - CLBB
EM00000

**RECEIVED**

MAR 0 2 1995

ATTN: CAROLINE SOJOURNER R PH   Division of Pharmacy.
STATE HEALTH AND HUMAN SERVICES COMM   DME & Legislative Liaison
1801 MAIN ST 12TH. FL
COLUMBIA SC 29201-2429

TO:   RETAIL PHARMACIST   PART I OF II

SUBJECT:  BRISTOL-MYERS SQUIBB U.S. PHARMACEUTICAL GROUP PRICE
ADJUSTMENTS

Effective March 1, 1995, APOTHECON, BRISTOL-MYERS SQUIBB
ONCOLOGY/IMMUNOLOGY and PRIMARY CARE will adjust prices on ones or
selected products.

PLEASE NOTE:  This pricing action is comprised of both a price
increase and a price reduction.  To assist your organization in
identifying the items experiencing a decrease the letter "D"
appears after the price; for the items experiencing a price
increase the letter "A" appears.

All orders transmitted or received on or after March 1, 1995 will
be invoiced at the new prices.  Listed below are the new prices.

| ITEM NO | NDC NO | PRODUCT DESCRIPTION | DIRECT PRICE PER UNIT | |
|---|---|---|---|---|
| | | APOTHECON: 2.32 kg jar | 17.00 | |
| | 917508 | AMIKIN(R)(amikacin sulfate injection) | 5.42 | |
| 302273 | (0015) | (amikacin sulfate injection) | 45.07 | A |
| 302097 | 302020 | 500 mg/vial, 2mL | 39.16 | D |
| 302397 | 302320 | 1 g/vial, 4mL | 77.38 | D |
| | (0015) | AMPICILLIN SODIUM INJ., USP | | |
| 740199 | 740120 | 125 mg/vial | 0.85 | D |
| 740299 | 740220 | 250 mg/vial | 1.00 | D |
| 740399 | 740320 | 500 mg/vial | 1.30 | D |
| 740394 | 740331 | 500 mg/vial, 100 mL, PB | 2.71 | D |
| 740499 | 740420 | 1 g/vial | 1.90 | D |
| 740494 | 740436 | 1 g/vial, 100 mL, PB | 3.06 | D |
| 740489 | 740418 | 1 g/vial, ADD-Vantage(R) | 2.06 | D |
| 740599 | 740520 | 2 g/vial, 5 mL vial | 12.95 | D |
| 740595 | 740528 | 2 g/vial, 100 mL, PB | 34.34 | D |
| 710098 | 710028 | 10 g/vial, Pharmacy Bulk | 16.06 | D |

**EXHIBIT**
**10**

DEC. 9.1996 1:11:19AMAX JR. A/MEDICAID PHARMACY CIEPLAK RESEARCH        NO.015    P.1/2

# ⬛APOTHECON

P.O. Box 4500  Princeton, NJ 08543-4500    609 897-2000

November 7, 1996

Susan McLeod, R.Ph.
Senior Pharmacist
Medicaid Office
P.O. Box 12600
Tallahassee, FL 32317-2600

Dear Ms. McLeod:

I am writing to inform you of changes in the availability for Apothecon's Atenolol 50 mg and 100 mg tablets. The previous NDC numbers, new NDC numbers, and pricing information for these products are listed below. Products bearing the old NDC numbers will be available until current stocks are depleted. The last expiration date for products with the previous NDC numbers is November 1, 1998.

| Product Description | Previous NDC Number | New NDC Number | Direct List Price | WAC | AWP |
|---|---|---|---|---|---|
| Atenolol 50 mg Tablets, 100's | 00003-5040-50 | 62269-0256-24 | $51.68 | $55.75 | $66.90 |
| Atenolol 50 mg Tablets, 1000's | 00003-5040-75 | 62269-0256-54 | $526.32 | $500.00 | $600.00 |
| Atenolol 100mg Tablets, 100's | 00003-5240-50 | 62269-0257-24 | $84.42 | $80.20 | $96.24 |

Apothecon is a participating manufacturer in the Medicaid rebate agreement. Pricing information has been sent to First Databank, Red Book, and Medi-Span.

If you have any questions, please do not hesitate to contact me at (609) 897-2476 or (609) 897-6349 (fax).

Sincerely,

*Nick Di Maio /pc*

Nick DiMaio
Associate Director, Marketing



**EXHIBIT**
11

⬥ A Bristol-Myers Squibb Company

# ▢APOTHECON

P.O. Box 4500  Princeton, NJ 08543-4500  609 897-2000

December 5, 1996

Susan McLeod, R.Ph.
Senior Pharmacist
Medicaid Office
P.O. Box 12600
Tallahassee, FL 32317-2600

Dear Ms. McLeod:

I am writing to amend information submitted to you on November 7, 1996 related to Apothecon's Atenolol Tablets. The corrected NDC number for Atenolol 50 mg. bottle of 1000 is shown below. In addition, wholesaler acquisition cost (WAC) for these products is provided. Previously submitted pricing information included the wholesaler list price which is based on average wholesale price (AWP).

| Product Description | NDC Number | WAC Price | List Price AWP |
|---|---|---|---|
| Atenolol 50 mg Tablets, 100's | 62269-0256-24 | $3.96 | $69.69 |
| Atenolol 50 mg Tablets, 1000's | 62269-0256-30 | $30.59 | $625.00 |
| Atenolol 100 mg Tablets, 100's | 62269-0257-24 | $6.51 | $100.25 |

Thank you for your assistance. Please do not hesitate to call me at (609) 897-2476 if you have any questions.

Sincerely,

Nick DiMaio/pr

Nick DiMaio
Associate Director, Marketing



EXHIBIT
12



A Bristol-Myers Squibb Company

Apr. 24. 1997   2:13PM                                    No. 3276   P. 2/2





April 24, 1997

Mr. Michael Fabrizi
Division Vice President
Physician & Pharmacy Networks
Automated Health Technologies
1025 NW 17th Avenue
Delray Beach, FL 33445



RE:    ACYCLOVIR OFFER

Dear Mr. Fabrizi:

████████████ is pleased to offer the following products for your consideration:

| Product Code | Product | Price / Each | Price / Package of 10 |
|---|---|---|---|
| 105-10 | ACYCLOVIR 500mg 10mL Lyophilized Vial | $33.00 | $330.00 |
| 110-20 | ACYCLOVIR 1 gram 20mL Lyophilized Vial | $66.00 | $660.00 |

Acyclovir is manufactured by Glaxo Wellcome (Research Triangle Park, NC) under the ████████████████████████ NDC # and label. ███ is providing marketing and distribution support for the product.

All terms, conditions and administration fees as set forth in your current agreement with ████████████ shall remain unchanged.

The NDC # and any other relevant information for Acyclovir will be forthcoming.

Sincerely,                                   Accepted by:

                                            _____ 4/25/9
                                            Name                Date

                                            _____
                                            Title

                                            _____
                                            Effective Date

EXHIBIT
13

# EXTENDED DATING FOR NEW PRODUCT

July 17, 1997

Dear Pharmaceutical Buyer:

▬▬▬▬ is pleased to announce that Acyclovir Sodium (sterile powder) in 10mL and 20mL vials will be available for shipment July 21, 1997. The product is manufactured by Glaxo Wellcome Inc., private labeled by ▬▬▬▬▬▬▬ and distributed by ▬▬▬▬▬▬▬

## Acyclovir Sodium (sterile powder)

| Product Code | NDC# 63323 | Strength | Size | Unit of Sale | Whsle. Cost | AWP |
|---|---|---|---|---|---|---|
| 10510 | 105-10 | 500 mg | 10mL vial | 10 | $371.50 | $ 565.10 |
| 11020 | 110-20 | 1 gram | 20mL vial | 10 | $751.30 | $1130.50 |

We are pleased to offer you the opportunity to order 200 vials of Acyclovir as your initial order and you will receive an <u>additional 30 days dating. Terms: 2% 60 days, net 61.</u> You will need to stock product for our Minnesota Multi-State Award, which is now in effect. The contract information will follow. Simply place your order and identify it as your Acyclovir initial order. If you use OrderNet, you may use text lines or call us before we receive the order at 1-800-888-7704, press 2.

Qualification: We must receive your order by Friday, August 8, 1997 to qualify for extended dating. The Acyclovir initial order is exclusive of any other ▬▬▬▬▬ promotion.

<u>It is important to promptly enter these products into your inventory order system under ▬▬▬▬▬▬ and return the attached fax sheet with your order numbers.</u>

If you have any questions or if we can be of further assistance, please contact Sue Lindsey at (800) 888-7704, extension 8874. Thank you for your immediate attention to this matter.





EXHIBIT
14

VEN-A-CARE/CRITI-CARE    T :1-305-292-1739        Jul  97   14:16 No.004 P.03

**JULY 1997**   RED BOOK UPDATE SUMMARY RX CHANGES – BY COMPANY   **7/GALDE**



PROCRIT / EPOETIN ALFA

10,000, 4000, 5000 and 2000 unit/ml vials available in boxes of 6 and packs of 24!

---

**PROCRIT** (Epoetin alfa)  20,000-unit/2 mL multidose vial enables tailored dosing without product waste!

# EXHIBITS 16 THROUGH 18

# HAVE BEEN COMPLETELY REDACTED



## Mead Johnson
### ONCOLOGY PRODUCTS

10415 S.W. 143rd Court  Miami, FL 33186  305-385-6755  Pager: 800-921-7226

Maria London
Territory Manager

10/3/95

Enclosed please find the update for the Oncology Guide to Medicare. I had given you the original binder (light beige) during a past visit. I hope this is helpful in keeping up with the many changes Medicare has made in the Oncology practice, especially with reimbursement issues.

Please let me know if I can be of any assistance between now & my next visit early in '96.

Regards,

Maria London


A Bristol-Myers Squibb Company


EXHIBIT
19

# THE ONCOLOGY GUIDE TO MEDICARE

**Philip L. Beard**
**Brenda E. Morrow**

**ProSTAT Resource Group**
4400 Shawnee Mission Parkway
Suite 200
Shawnee Mission, Kansas 66205

(913) 722-1212

**ProSTAT Publishing Division**

ITEM #: V5-A014

# TABLE OF CONTENTS

| | |
|---|---|
| About ProSTAT Resource Group | iii |
| Disclaimer | iv |
| Introduction | viii |
| Acronyms | ix |
| | |
| **Chapter 1 -- The Oncology Practice** | |
| Overview | 1-1 |
| **Coding Oncology Services** | 1-1 |
| Common Oncology Services | 1-2 |
| Evaluation and Management Services | 1-3 |
| Selecting a Level of Service | 1-3 |
| What Is a "New" Patient? | 1-4 |
| The Impact of Time on Level of Service | 1-5 |
| Documenting Level of Service | 1-7 |
| Prolonged Evaluation and Management Services | 1-7 |
| Physician Care Plan Oversight | 1-9 |
| Consultations | 1-11 |
| Follow-up Consultations | 1-12 |
| Laboratory Testing | 1-13 |
| Drug Administration | 1-14 |
| Chemotherapy Administration | 1-14 |
| Chemotherapy Administration During a Global Surgery Period | 1-14 |
| Administration of Other Drugs | 1-16 |
| Infusion Pumps and Related Supplies | 1-17 |
| Drugs | 1-18 |
| Oral Anti-Cancer Drugs | 1-19 |
| Supplies | 1-21 |
| **The Impact of the "Services 'Incident To' a Physician's Services" Provision** | 1-22 |
| **How Site of Service Can Affect Reimbursement** | 1-25 |
| **Recovering Drug Costs** | 1-28 |
| How Drug Reimbursement is Calculated | 1-28 |
| Billing for Drug Charges | 1-28 |
| Reporting New Drugs | 1-29 |
| Off-Label Uses | 1-29 |
| Experimental Uses | 1-30 |
| **ICD-9 Coding for Diagnosis** | 1-31 |
| **Summary** | 1-33 |
| **Common Myths** | 1-33 |

**Chapter 2 -- Dealing with the Part B Carrier**
    Overview    2-1
    Basic Rules for Carrier Inquiries    2-2
    Defining the Typical Carrier Organization    2-7
    The Claims Adjudication Process    2-10
        Claims Processing: The Human Element    2-11
        Claims Processing: Automated Procedures    2-12
    Inquiries Beyond the Local Carrier: Following Channels    2-21
    The Freedom of Information Request -- How Should I Use It?    2-24
    Summary    2-25
    Common Myths    2-25

**Chapter 3 -- Reviewing the Medicare Remittance Advice**
    Overview    3-1
    Have We Been Paid Correctly?    3-1
    What Can We Appeal?    3-3
    What Can We Bill the Patient?    3-9
    What Do We Have to Write Off?    3-9
    What Do We Do with Interest Payments?    3-10
    What Does it Mean if the Carrier is Changing the Codes we Submit?    3-10
    Summary    3-11
    Common Myths    3-12

**Chapter 4 -- Medicare Reimbursement**
    Overview    4-1
    The Reasonable Charge System    4-2
    The Medicare Fee Schedule    4-2
        What is Included in the Fee Schedule?    4-2
        How Will the Fee Schedule Be Calculated?    4-3
            The Basic Calculation    4-3
            Relative Value    4-3
            The Geographic Adjustment Factor    4-3
            Conversion Factor    4-4
            Volume Performance Standards    4-5
        The Transition to RBRVS    4-9
    Who Can Be Paid For Services Provided to Medicare Patients?    4-11
    What Is The Time Limit For Filing Claims?    4-14
    Which Carrier Has Jurisdiction For My Claims?    4-15
    What Are The Rules of Assignment?    4-15
    What Types of Signatures Are Required?    4-17
    Summary    4-20
    Common Myths    4-21

Case 1:16-cv-21475-ASC-DPS Document 8224-1 Filed 10/21/12 Page 205 of 221
VEN-H-CARE/CRITI-CA    TE' 1-305-292-1759    Feb 2  97   14:52 NO.002 P.25

Table of Contents    **vii**

**Chapter 5 — Making the Participation Decision**
  **Overview** ............................................. 5-1
  **The Participation Agreement** .................... 5-2
  **When Can I Change My Participation Status?** ... 5-4
  **Making an Informed Decision** ................... 5-4
    Advantages of Participating .................... 5-4
    Disadvantages of Participating ................. 5-5
    Advantages and Disadvantages for the Non-participating Physician ... 5-6
  **The Limiting Charge** ............................. 5-9
  **Performing a Financial Analysis** ............... 5-11
  **Trends in Participation Rates and Percentages** ... 5-14
  **Summary** ........................................ 5-16
  **Common Myths** ................................... 5-17

**Chapter 6 — The Medicare Appeal Process**
  **Overview** ........................................ 6-1
  **The Appeal Chain** ............................... 6-2
  **Time and Dollar Limits for Appeals** ............ 6-2
  **A Preliminary Step — Resubmissions and Inquiries** ... 6-4
  **The First Step of the Formal Appeal Process: The Review** ... 6-6
  **The Next Level of Appeal: The Hearing** ......... 6-9
  **Administrative Law Judge Review** ............... 6-18
  **Appeals Council Review** ......................... 6-19
  **Federal District Court Hearing** ................ 6-19
  **Summary** ........................................ 6-20
  **Common Myths** ................................... 6-21

**Appendices**
  A  HCPCS Codes for Common Oncology Services ...... A-1
  B  Documentation Guidelines ...................... B-1
  C  SOAP Note Format .............................. C-1
  D  Medicare Supplier Number Application .......... D-1
  E  NSC Change of Address Form .................... E-1
  F  Durable Medical Equipment Regional Carriers (DMERCs) ... F-1
  G  Sample HCFA-1500 ............................. G-1
  H  Off-Label Use For Anti-Cancer Drugs .......... H-1
  I  Group C Drugs ................................. I-1
  J  Oncology Organizations ........................ J-1
  K  Health Care Financing Administration Regional Offices ... K-1
  L  Sample Medical Necessity Waiver Form .......... L-1
  M  Medicare Relative Values for Services Commonly Provided
    in Oncology Practices ......................... M-1
  N  Geographic Adjustment Factors for Medicare Fee Schedule Calculations ... N-1
  O  Participation Rates By State .................. O-1
**Glossary** .......................................... GL-1
**Index** ............................................. IN-1

Case 1:16-cv-24145-XXX Document 8224-1 Entered on FLSD Docket 10/21/20 Page 206 of 221 81 of 96

**1-28**  *The Oncology Practice*

# RECOVERING DRUG COSTS

## How Drug Reimbursement Is Calculated

Medicare Part B covers drugs provided incident to a physician visit that cannot be self-administered. Also covered are certain oral drugs. It does not cover injections of medication that could be self-administered.

Many of the drugs used to treat cancer patients are covered by Medicare Part B when administered in the office. Reimbursement has been an ongoing problem, however. For many years, Medicare has held a tight lid on reimbursement for drugs provided incident to a physician's service. Historically, drug allowables have been set at levels at or somewhat above the average wholesale price (AWP), obtained from such sources as the *Drug Topics Red Book*, the *Blue Book*, or *Medispan*.

This reimbursement policy changed on January 1, 1992. Medicare payment is now based on the lower of the national average wholesale price or the estimated acquisition cost (EAC) of the drug.

The national AWP continues to be derived from the sources listed above. However, if the drug is available from multiple sources, the national AWP is considered to be the median price for all sources of the generic form of the drug.

Estimated acquisition cost is based on individual carrier estimates of the costs associated with the physician's purchase of the drug. EAC is not limited to the actual cost of the drug. It may also include indirect costs associated with the drug, such as inventory costs, waste and spoilage.

Carriers have not been given clear-cut guidelines on how the EAC surveys are to be conducted. It is likely that carriers will handle surveys designed to obtain EAC information in a variety of ways. HCFA has provided specific instructions to the carriers to consider any documented indirect costs related to inventory, waste, and spoilage of chemotherapy drugs when setting EAC levels. If you receive a request for information about drug costs from your carrier, or if you are asked to supply invoices, be sure to include all associated indirect costs with the data you return. Also, contact your local and national oncology society.

## Billing for Drug Charges

Reimbursement for drugs reported under the codes shown in Appendix A is intended to cover only the cost of purchasing the drug and related indirect costs. It does not include payment for the administration of the drug or the evaluation and management service provided for the patient. Chemotherapy administration and visits are billable separately from the code(s) for the drug(s) provided.

Case 1:16-cv-21945-ASC-DBS Document 8224-1 Filed 10/21/20 Page 207 of 221 82 of 96

VEN-A-CARE/CRITI-CA    T   1-305-292-1739        Feb 2  97    14:33 No.002 P.25

Claims for chemotherapy drugs that are infused or administered intravenously are processed by your local Medicare carrier. Charges for drugs can be included on the same claim form as are other services provided on the same day.

See page 1-19 for a discussion of billing for oral chemotherapy drugs.

## Reporting New Drugs

Medicare normally provides coverage for drugs that are FDA approved. Unfortunately, there is often a "time lag" for transmission of approval data between the FDA and Medicare. Your carrier can be the last to know when a new drug is approved for marketing.

Plan ahead to prevent claim denials whenever you are considering the use of a new drug. Contact your Medicare carrier before you file the first claim. In this contact, you should include information from the manufacturer that verifies that the drug has been FDA approved. Inform the carrier that you will be using the drug for the indicated reasons and request that the carrier support assignment of a procedure code. This will serve to educate the carrier concerning new treatment methods that should be covered. It will also help to keep unnecessary denials and appeals to a minimum.

Until a procedure code is assigned, new chemotherapy drugs may be reported using HCPCS code J9999.

## Off-Label Uses

A very difficult obstacle to overcome in dealing with a Part B carrier is denials related to the unlabeled use of drugs. An unlabeled or "off-label" use is defined as the use of a drug to treat conditions that are not specified in the FDA-approved package insert (the "label").

HCFA instructs the carriers to pay for "medically necessary" drugs that cannot be self-administered when those drugs have been FDA approved. The carriers have taken a variety of positions on how they view FDA approval, however. Some carriers have approved payment for a drug only when it was used to treat conditions that are specified on the label. As a result, carriers may deny off-label uses as "investigational" or "experimental."

HCFA has established a uniform nationwide payment policy for off-label uses of FDA-approved drugs and biologicals used in an anti-cancer chemotherapeutic regimen for medically accepted indications. The criteria the carriers must use in determining whether to pay for these uses of the drugs can be found in Appendix H. The carriers must rely heavily on information contained in certain drug compendia and peer-reviewed literature that may not be readily available to them. You may need to supply your carrier's medical director with this information if you are having difficulty in obtaining payment for off-label uses of drugs that should be covered under the policy guidelines.

# GLOSSARY

**Abuse:** Actions by physicians that, although not usually considered fraudulent, are inconsistent with accepted sound medical, business or fiscal practices and directly or indirectly result in 1) unnecessary costs to the Medicare program, 2) improper reimbursement, 3) program reimbursement for services that fail to meet professionally recognized standards of care, or 4) services that are medically unnecessary.

**Actual Charge:** One of the levels of comparison used in determining the Medicare allowable. The actual charge is the submitted charge for the service in question.

**Adjudication:** The process by which the Medicare Part B carrier reviews a claim and makes a decision to pay or deny the charges.

**Adjustments:** Changes made to a previous Medicare payment. Adjustments can be increases or decreases from the original payment.

**Administrative Law Judge (ALJ) Review:** The level of the administrative appeal process above the Hearing in which an administrative judge reviews a Medicare issue.

**Allowable Charge:** A term used to describe the Medicare payment amount for a particular service. It includes the coinsurance and deductible.

**Annual Enrollment Period:** The limited period of time (usually November and December) in which a physician may change participation status for the upcoming calendar year.

**Appeal:** A generic term used to describe the overall administrative claims review process. This process includes inquiries, reviews, hearings, ALJ appeals, the Appeals Council, and Federal District Court judge appeals.

**Assignment:** The term used to signify the physician's decision to accept the Medicare allowable charge as payment in full for services rendered. The decision to take assignment is made prior to submission of the claim to Medicare. It is a binding commitment by the physician not to bill the patient more than the Medicare reasonable charge.

**Audits:** Carrier and/or HCFA review of physician utilization and charging patterns and the appropriateness of payments previously approved.

**Gl-2**   *Glossary*

**Average Wholesale Price (AWP):** One of the factors used by Medicare to determine the allowable charge for a drug. For drugs that are available from multiple sources, the AWP is the median price for all sources of the generic form of the drug. See also Estimated Acquisition Cost.

**Beneficiary:** A patient eligible for Medicare Part B benefits. Usually, the patient is eligible for Medicare at age 65 if Part B coverage is purchased. A patient may also be entitled through disability or because of End Stage Renal Disease.

**Carrier:** A private insurance company or other entity that enters into a contractual agreement with the government to process or adjudicate Part B claims.

**Central Office:** The national offices of the Health Care Financing Administration.

**Civil Monetary Penalty Law (CMPL):** A law defining the penalties that may be assessed following an investigation by the Inspector General's Office and/or the Medicare carrier where the level of seriousness is beyond typical carrier postpayment review. CMPL grants broad authority to the OIG to impose penalties, fines and sanctions with little administrative or judicial relief for the physician.

**Claim:** A writing, identifying or permitting the identification of an enrollee, that requests reimbursement for what appears to be Part B medical or other health services furnished by a physician or supplier. A claim can be either "hard copy" that means a paper claim or "paperless" which refers to those claims submitted electronically.

**Claims Examiner:** An individual who inputs "hard copy" claims into the Medicare processing system.

**Clean Claim:** A Medicare claim that can be adjudicated from the original submitted data. If the carrier must contact the patient or physician for additional information, the claim does not qualify as a clean claim.

**Commercial Carrier:** An insurance company or other entity that provides non-Medicare health insurance benefits such as supplemental insurance.

**Conversion Factor:** An amount that, when applied to a relative value, results in an actual dollar value for a procedure.

**Concurrent Care:** A situation that occurs when two different physicians are providing inpatient hospital care to the same patient on the same day.

**Coinsurance:** The portion of the Medicare payment for which the patient is responsible. In most cases, Medicare pays 80% of the allowable charge; the remaining 20% (which is the patient's responsibility) is the coinsurance. Medicare patients will often purchase supplemental insurance from a private commercial carrier that will cover their coinsurance obligation.

**GI-4**  *Glossary*

**Fee Freeze:**  An action taken to hold a physician's fee at a specified level. In the Medicare program, there have been both voluntary and mandatory fee freezes.

**Fragmentation:**  A term used to describe the process of coding for services using multiple procedure codes instead of a more appropriate single procedure code.

**Fraud:**  An intentional deception or misrepresentation that the individual knows to be false or does not believe to be true, and makes, knowing that the deception could result in some unauthorized benefit to himself or some other person.

**Freedom of Information:**  A specific law that provides for the release of certain types of information related to government programs. Request for information under this law should identify that the information is being requested under the Freedom of Information Act.

**Geographic Adjustment Factor:**  An index that reflects relative cost of the mix of goods and services comprising practice expenses (other than malpractice expenses) in the different fee schedule areas compared to the national average of such cost.

**Global Surgery:**  A Medicare policy whereby a surgical service and identified pre-operative and postoperative services are bundled into a single allowable charge.

**Group C Drugs:**  Drugs distributed by the National Cancer Institute that are classified as investigational by the Food and Drug Administration, but that are specifically covered by Medicare.

**Harvard Relative Value Study (Hsiao Study):**  A study of possible resource relative values assigned to physician services. The study was commissioned by the U.S. Government and was performed by Dr. William Hsiao and his colleagues at Harvard University.

**HCPCS:**  The procedure coding system currently mandated for use by all Medicare Part B carriers. HCPCS stands for Health Care Financing Administration Common Procedure Coding System.

**Health Care Financing Administration (HCFA):**  A division of the Department of Health and Human Services. HCFA's responsibilities include appointing and overseeing the Medicare Part B carriers.

**Health Professional Shortage Area (HPSA):**  Designated geographic areas where there is a shortage of physicians available. Medicare allows a five percent incentive payment for services provided within the designated manpower shortage areas. Also known as Health Manpower Shortage Area (HMSA).

**Hearing:**  A form of Medicare appeal whereby a claimant is allowed to present a case to a hearing officer who then makes an independent ruling that is binding to all parties.

VEN-A-CARE CRITI-CA     T. 1-305-292-1739         Feb 2 97 _14:35 No.002 P.29

# PROVIDER
# REIMBURSEMENT ASSISTANCE
# MODEL
# FOR TAXOL®

THIS DOCUMENT WAS DESIGNED TO ANSWER UNSOLICITED PHYSICIAN INQUIRIES CONCERNING BRISTOL-MYERS SQUIBB ONCOLOGY (BMSO) PRODUCTS. THE OPINIONS EXPRESSED HEREIN ARE THOSE OF THE AUTHOR AND ARE NOT INTENDED TO REPRESENT THE OPINIONS OF BMSO. SOME OF THE INFORMATION CONTAINED HEREIN MAY CITE THE USE OF A BMSO PRODUCT IN A DOSAGE, FOR AN INDICATION, OR IN A MANNER OTHER THAN RECOMMENDED. THEREFORE, THE OFFICIAL PACKAGE INSERTS CONTAINED HEREIN SHOULD BE CONSULTED FOR COMPLETE PRESCRIBING INFORMATION.

PUBLISHED JANUARY 1995.

© 1995, BRISTOL-MYERS SQUIBB COMPANY
PRINCETON, NEW JERSEY 08543, U.S.A.

Appeal of a Denied Medicare Claim

## SAMPLE A

### MEDICARE PART B
### (CARRIER'S NAME AND ADDRESS)

**Re: (Patient's name)**
**Date of Birth:**
**Policy number: (Patient's ID number)**
**Claim Date:**
**Claim Document number(s):**

Dear (Medicare Contact's Name):

I am writing to request a review of the above mentioned claim(s) for **(Patient's name)** who **(is currently receiving/has received) (type of therapy)**. This letter provides evidence that **(type of therapy)** is medically necessary for **(his/her)** care and that it is an accepted treatment for **(disease)**. The following sections provide detailed information about the patient's medical history, a description of the treatment, and the reasons for using **(type of therapy)** in this case.

### PATIENT HISTORY AND DIAGNOSIS

On (date) I diagnosed **(patient name)** with **(disease)** **(include complete information on diagnosis and methods used in determination of diagnosis)**.

**(List previous therapies which have been tried and failed. When citing therapies that failed, please indicate what factors led to the discontinuation of therapy, e.g. depression of bone marrow, anemia, nausea and vomiting, etc. Enclose copies of laboratory studies or x-ray studies where appropriate.)**

### TREATMENT DESCRIPTION AND RATIONALE

**(Type of therapy)** has been accepted as medically reasonable therapy for the treatment of **(disease)**. I have enclosed clinical literature and medical compendia references documenting the effectiveness of **(type of therapy)** when used to treat **(disease)**. Also enclosed are two documents discussing the use of drugs for unlabeled indications: HCFA's coverage and limitations policy bulletin and the FDA Drug Bulletin.

I have also included Federal legislation showing that this treatment is recognized as "medically accepted", as defined by the Omnibus Budget Reconciliation Act of 1993 (OBRA '93).

The patients dosing schedule will be **(dosage)** for approximately **(expected length of treatment)** and cost approximately $ _____ **(based on Average Wholesale Price)**.

I have chosen to treat **(patient's name)** with **(type of therapy)** based on the history previously stated and because it is an accepted medical treatment for **(disease)**. I believe the patient's prognosis without **(type of therapy)** is _____. However, with **(type of therapy)**, the prognosis is _____.

In summary, I believe that **(type of therapy)** is medically necessary in this case, and therefore, its cost should be reimbursed. Please feel free to contact me if you require additional information.

Sincerely,

**(Physician's name)**

Medicaid Prior Authorization Letter

## SAMPLE B

**(STATE)** Medicaid
**(ADDRESS)**

Re: **(Patient's name)**
Date of Birth:
Policy number: **(Patient's ID number)**

Dear **(Medicare Contact's Name):**

I am writing to request prior authorization to initiate **(type of therapy)** for **(Patient's name)**. This letter provides evidence that the **(type of therapy)** is medically necessary for **(his/her)** care and that it is an accepted treatment for **(disease)**. The following sections provide detailed information about the patient's medical history, a description of the treatment, and the reasons for using **(type of therapy)** in this case.

### PATIENT HISTORY AND DIAGNOSIS

On **(date)** I diagnosed **(patient name)** with **(disease) (include complete information on diagnosis and methods used in determination of diagnosis).**

**(List previous therapies which have been tried and failed. When citing therapies that failed, please indicate what factors led to the discontinuation of therapy, e.g. depression of bone marrow, anemia, nausea and vomiting, etc. Enclose copies of laboratory studies or x-ray studies where appropriate.)**

### TREATMENT DESCRIPTION AND RATIONALE

**(Type of therapy)** has been accepted as medically reasonable therapy for the treatment of **(disease)**. I have enclosed clinical literature and medical compendia references documenting the effectiveness of **(type of therapy)** when used to treat **(disease)**. Also enclosed are two documents discussing the use of drugs for unlabeled indications: HCFA's coverage and limitations policy bulletin and the FDA Drug Bulletin.

I have also included Federal legislation showing that this treatment is recognized as "medically accepted", as defined by the application of the Omnibus Budget Reconciliation Act of 1993 on the United States Social Security Act.

The therapy dosing schedule will be **(dosage)** for approximately **(expected length of treatment)** and cost approximately **$ _____ (based on Average Wholesale Price).**

I have chosen to treat **(patient's name)** with **(type of therapy)** based on the history previously stated and because it is an accepted medical treatment for **(disease)**. I believe the patient's prognosis without **(type of therapy)** is _____. However, with **(type of therapy)**, the prognosis is _____.

In summary, I believe that **(type of therapy)** is medically necessary in this case, and therefore, its cost should be reimbursed. Please feel free to contact me if you require additional information.

Sincerely,

**(Physician's name)**

Appeal of Medicaid Denied Claim

# SAMPLE C

**(STATE)** Medicaid
**(ADDRESS)**

Re: **(Patient's name)**
Date of Birth:
Policy number: **(Patient's ID number)**
Claim Date:
Claim Document number(s):

Dear **(Medicare Contact's Name):**

I am writing to request a review of the above mentioned claim(s) for **(Patient's name)** who **(is currently receiving/has received) (type of therapy)**. This letter provides evidence that the **(type of therapy)** is medically necessary for (his/her) care and that it is an accepted treatment for **(disease)**. The following sections provide detailed information about the patient's medical history, a description of the treatment, and the reasons for using **(type of therapy)**in this case.

## PATIENT HISTORY AND DIAGNOSIS

On **(date)** I diagnosed **(patient name)** with **(disease)** **(include complete information on diagnosis and methods used in determination of diagnosis).**

**(List previous therapies which have been tried and failed. When citing therapies that failed, please indicate what factors led to the discontinuation of therapy, e.g. depression of bone marrow, anemia, nausea and vomiting, etc. Enclose copies of laboratory studies or x-ray studies where appropriate.)**

## TREATMENT DESCRIPTION AND RATIONALE

**(Type of therapy)** has been accepted as medically reasonable therapy for the treatment of **(disease)**. I have enclosed clinical literature and medical compendia references documenting the effectiveness of **(type of therapy)** when used to treat **(disease)**. Also enclosed are two documents discussing the use of drugs for unlabeled indications: HCFA's coverage and limitations policy bulletin and the FDA Drug Bulletin.

I have also included Federal legislation showing that this treatment is recognized as "medically accepted", as defined by the Omnibus Budget Reconciliation Act of 1993 on the United States Social Security Act.

The patients dosing schedule will be **(dosage)** for approximately **(expected length of treatment)** and cost approximately $ _____ **(based on Average Wholesale Price).**

I have chosen to treat (patient's name) with **(type of therapy)** based on the history previously stated and because it is an accepted medical treatment for **(disease)**. I believe the patient's prognosis without **(type of therapy)** is _____ . However, with **(type of therapy)**, the prognosis is _____ .

In summary, I believe that **(type of therapy)** is medically necessary in this case, and therefore, its cost should be reimbursed. Please feel free to contact me if you require additional information.

Sincerely,

**(Physician's name)**

Prior Authorization Letter for a Commercial Insurer regarding Medical Necessity

# SAMPLE D

**(INSURER'S NAME AND ADDRESS)**

Re: **(Patient's name)**
Date of Birth:
Policy number: (include group number and patient ID number where appropriate)

Dear (Insurer Contact's Name):

I am writing to request prior authorization to initiate (type of therapy) for **(Patient's name)**. This letter provides evidence that the (type of therapy) is medically necessary for (his/her) care and that it is an accepted treatment for **(disease)**. The following sections provide detailed information about the patient's medical history, a description of the treatment, and the reasons for using (type of therapy) in this case.

## PATIENT HISTORY AND DIAGNOSIS

On (date) I diagnosed (patient name) with (disease) (include complete information on diagnosis and methods used in determination of diagnosis).

(List previous therapies which have been tried and failed. When citing therapies that failed, please indicate what factors led to the discontinuation of therapy, e.g. depression of bone marrow, anemia, nausea and vomiting, etc. Enclose copies of laboratory studies or x-ray studies where appropriate.)

## TREATMENT DESCRIPTION AND RATIONALE

(Type of therapy) has been accepted as medically reasonable therapy for the treatment of (disease). I have enclosed clinical literature and medical compendia references documenting the effectiveness of (type of therapy) when used to treat (disease). Also enclosed are two documents discussing the use of drugs for unlabeled indications: **(Health Insurance Association of America Position Statement OR Blue Cross and Blue Shield Position Statement)** and the FDA Drug Bulletin.

I have also included State **(where applicable)** legislation showing that this treatment is recognized as "medically accepted", as defined by **(name of state legislation)** enacted on _____.

The patients dosing schedule will be (dosage) for approximately **(expected length of treatment)** and cost approximately $ _____.

I have chosen to treat (patient's name) with (type of therapy) based on the history previously stated and because it is an accepted medical treatment for (disease). I believe the patient's prognosis without **(type of therapy)** is _____. However, with (type of therapy), the prognosis is _____.

In summary, I believe that **(type of therapy)** is medically necessary in this case, and therefore, its cost should be reimbursed. Please feel free to contact me if you require additional information.

Sincerely,

**(Physician's name)**

## *Medicare Payment Worksheet*

| *Drug* | **VePesid®**<br>(etoposide)<br>Capsules, 50mg | **CYTOXAN®**<br>(cyclophosphamide tablets, USP)<br>**TABLETS** 25 mg<br>50 mg |
|---|---|---|
| Strength: | | |
| # of Tablets/Capsules: | | |
| AWP per tablet/capsule: | | |
| AWP per Rx: | | |
| 80% Medicare: | | |
| 20% Co-Pay†: | | |

* Cytoxan® Tablets (cyclophosphamide tablets, USP) =
    NDC 0015-0503-01 50 mg, bottles of 100
    NDC 0015-0503-02 50 mg, bottles of 1000
    NDC 0015-0503-03 50 mg, Unit Dose, cartons of 100
    NDC 0015-0503-48 50 mg, Compliance Pack, cartons of 28
    NDC 0015-0504-01 25 mg, bottles of 100

 VePesid® (etoposide) Capsules = NDC 0015-3091-45 50 mg

† Co-Pay and any additional charges are the responsibility of patients or their supplemental insurance (ie,
  "Medigap" coverage).

Case 1:10-cv-21475-ASG Document 512 Entered on FLSD Docket 06/04/2010 Page 92 of 96
Case 1:01-cv-12257-PBS Document 8224-1 Filed 10/21/12 Page 217 of 221
VEN-A-CARE/CRITI-CA    T: 1-305-292-1739           Feb 2 97   13:41 No.002 P.35



Philip L. Beard    Brenda E. Morrow

# Cancer Treatment In Urology: Reimbursement Issues

## Pro Resource Group

A Professional Service of
JERRY MOLNAR
Oncology Representative
BRISTOL LABORATORIES
ONCOLOGY PRODUCTS
Bristol-Myers Oncology Division

ONCOLOGY PRODUCTS

# CANCER TREATMENT in UROLOGY

## Reimbursement Issues

by
**Philip L. Beard**
**Brenda E. Morrow**

4400 Shawnee Mission Parkway • Suite 200
Shawnee Mission, Kansas 66205
(913) 722-1212

# TABLE OF CONTENTS

| | |
|---|---|
| Introduction | ix |
| | |
| **CHAPTER 1: Chemotherapy and Urology** | **1-1** |
| Overview | **1-3** |
| | |
| Evaluation and Management (EM) Services | **1-4** |
| The Initial Visit | **1-4** |
| Is the Visit a Referral or a Consultation? | **1-6** |
| Is the Patient "New" or "Established"? | **1-9** |
| What Level of Service Was Provided? | **1-10** |
| Documenting the Level of Service | **1-13** |
| The Impact of Time on Level of Service | **1-14** |
| | |
| Global Surgical Packages | **1-17** |
| The Major Surgery Package | **1-17** |
| The Minor Surgery and Endoscopic Package | **1-18** |
| Separately Identifiable EM Services | **1-19** |
| | |
| The Impact of the "Incident To" Provision | **1-23** |
| | |
| Drugs and Supplies in the Office | **1-26** |
| Reporting New Drugs | **1-27** |
| Off-Label Uses of Drugs | **1-27** |
| Experimental Use of Drugs | **1-28** |
| | |
| Office Lab Services | **1-29** |
| | |
| Radiology Services | **1-30** |
| | |
| How Site of Service Affects Payment | **1-30** |
| | |
| Summary | **1-34** |

## CHAPTER 2: REVIEWING REMITTANCE ADVICES    2-1

Overview    2-3

Is Our Payment Correct?    2-5

What Can We Appeal?    2-8

Billing the Patient    2-15

What Do We Do With Interest Payments?    2-16

What Does It Mean If the Carrier Changes Our Codes?    2-16

Summary    2-17

## CHAPTER 3: THE APPEALS PROCESS    3-1

Overview    3-3

The Appeal Chain    3-4

Resubmissions and Inquiries    3-6

The Formal Appeal Process:  The Review    3-8

The Next Level of Appeal:  The Hearing    3-11

Administrative Law Judge Review    3-20

Appeals Council Review    3-21

Federal District Court Hearing    3-21

Summary    3-22

## APPENDICES

Appendix A:  HCPCS Codes for Common Oncology Drugs    A-1
Appendix B:  Office Procedures and Supplies    B-1
Appendix C:  HCFA Regional Offices    C-1
Appendix D:  Glossary    D-1
Appendix E:  Acronyms    E-1

## INDEX    Index-1

# DRUGS AND SUPPLIES IN THE OFFICE

Prior to 1994, Medicare Part B covered chemotherapy drugs which cannot be self-administered when provided incident to a physician visit. Beginning January 1, 1994 Medicare also covers oral chemotherapy drugs which are the same chemical entity as drugs which would be covered if they were infused.

Many of the drugs used to treat cancer patients are covered by Medicare Part B when administered in the office. Reimbursement has been an ongoing problem, however. For many years, Medicare has held a tight lid on reimbursement for drugs provided incident to a physician's service. Drug allowables are set at levels which reflect the lower of the average wholesale price (AWP) or the estimated acquisition cost (EAC) of the drug.

AWP is obtained from such sources as the *Drug Topics Red Book*, the *Blue Book*, or *Medispan*. If the drug is available from multiple sources, the national AWP is considered to be the median price for all sources of the generic form of the drug. EAC is developed by carriers and may be based on such things as surveys of individual physician practices or estimates. EAC is not limited to the actual cost of the drug. It also includes indirect costs associated with the drug, such as inventory costs, waste and spoilage.

Carriers have not been given clear-cut guidelines on how the EAC surveys are to be conducted. It is likely that carriers will handle surveys designed to obtain EAC information in a variety of ways. HCFA has provided specific instructions to the carriers to consider any documented indirect costs related to inventory, waste, and spoilage of chemotherapy drugs when setting EAC levels. If you receive a request for information about drug costs from your carrier, or if you are asked to supply invoices, be sure to include all associated indirect costs with the data you return.

## Billing for Drug Charges

Chemotherapy drugs are reported to Medicare using the HCPCS codes starting with "J" or "Q" codes shown in Appendix A. (HCPCS stands for HCFA Common Procedure Coding System.) Reimbursement for drugs under HCPCS codes is intended to cover only the cost of purchasing the drug and related indirect costs. It does not include payment for the administration of the drug or the evaluation and management service. Chemotherapy administration and visits are billable separately from the J code(s) for the drug(s) provided, as shown in our patient account example in this chapter.