# EXHIBIT C

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

IN RE:  PHARMACEUTICAL                )

INDUSTRY AVERAGE WHOLESALE            )    MDL No. 1456

PRICE LITIGATION                      )

----------------------------          )

THIS DOCUMENT RELATES TO:             )    Master File No.

UNITED STATES ex rel.                 )  1:01-CV-12257-PBS

LINNETTE SUN and GREG HAMILTON,       )

Relators                              )      Sub-Category

             v.                       )      Case Nos.

BAXTER HEALTHCARE CORPORATION         )  1:08-CV-11200-PBS

Case No. 08-CV-11200-PBS              )        and

----------------------------          )  1:10-CV-11186-PBS

UNITED STATES OF AMERICA              )

ex rel. VEN-A-CARE OF THE             )

FLORIDA KEYS, INC.                    )      Judge

             v.                       )  Patti B. Saris

BAXTER HEALTHCARE CORPORATION         )

and BAXTER INTERNATIONAL, INC.        )

Case No. 10-CV-11186-PBS              )

  THE VIDEOTAPED 30(b)(6) DEPOSITION OF BAXTER

     HEALTHCARE CORP. by MICHAEL BRUCE BRADLEY

        January 28, 2013 - 10:06 a.m.

## Page 2

1       The videotaped 30(b)(6) deposition
2   of BAXTER HEALTHCARE CORPORATION by
3   MICHAEL BRUCE BRADLEY, called as a witness herein
4   for examination, taken pursuant to the Federal
5   Rules of Civil Procedure of the United States
6   District Courts pertaining to the taking of
7   depositions, taken before ROSANNE M. NUZZO, a
8   Notary Public within and for the County of Will,
9   State of Illinois, and a Certified Shorthand
10  Reporter of said state, at the law offices of
11  Goldberg Kohn Ltd., Suite 3300, 55 East Monroe
12  Street, Chicago, Illinois on Monday, January 28,
13  2013, at approximately 10:06 a.m.
14
15
16
17  PRESENT:
18
19      GOLDBERG KOHN LTD.,
        (55 East Monroe Street, Suite 3300,
20      Chicago, Illinois  60603-5792,
        312-201-4000), by:
21      MR. DAVID J. CHIZEWER,
        david.chizewer@goldbergkohn.com, and
22      MS. BEATA G. BREWSTER,
        beata.brewster@goldbergkohn.com,
          appeared on behalf of the Plaintiffs;
23        Linnette Sun and Greg Hamilton,
          Relators;
24

## Page 3

1
2
3   PRESENT (Continued):
        THE BREEN LAW FIRM,
4       (5755 North Point Parkway, Suite 260,
        Alpharetta, Georgia  30022,
5       770-740-0008), by:
        MR. JAMES JOSEPH BREEN,
6       jbreen@breenlaw.com,
7         - and -
8       ANDERSON LLC,
        (1409 Wathen Avenue,
9       Austin, Texas  78703,
        512-469-9191), by:
10      MR. C. JARRETT ANDERSON,
        jarrett@anderson-llc.com,
11        appeared on behalf of the Plaintiff,
          Ven-A-Care of the Florida Keys, Inc.;
12
13      DICKSTEIN SHAPIRO LLP,
        (1825 Eye Street NW,
14      Washington, D.C.  20006-5403,
        202-420-2282), by:
15      MR. MERLE M. DeLANCEY,
        delanceym@dicksteinshapiro.com, and
16      MR. J. ANDREW JACKSON,
        jacksona@dicksteinshapiro.com,
17        appeared on behalf of the Defendant,
          Baxter Healthcare Corporation;
18
19
20      OFFICE OF THE ATTORNEY GENERAL,
        STATE OF FLORIDA,
        MEDICAID FRAUD CONTROL UNIT,
21      (PL-01, The Capitol,
        Tallahassee, Florida  32399-1050,
22      850-414-3300), by:
        MR. ANDREW H. McELROY, III,
23      Assistant Attorney General,
          appeared on behalf of the State of
24        Florida.

## Page 4

1   PRESENT (by telephone and/or Internet
        realtime streaming:)
2
3
        LAW OFFICE OF MARK ALLEN KLEIMAN,
4       (2907 Stanford Avenue,
        Venice, California  90292,
5       310-306-8094), by:
        MR. MARK ALLEN KLEIMAN,
6       mkleiman@quitam.org,
          appeared on behalf of the Plaintiffs,
7         Linnette Sun and Greg Hamilton, Relators.
8
9
    ALSO PRESENT:
10
        MR. GREG HAMILTON, MBA,
11      Healthcare Industry Consultant,
        hjtennis27@aol.com,
12
        MR. MICHAEL BOLTON, Senior Counsel,
13      Baxter Healthcare Corporation,
        michael_bolton@baxter.com.
14
15
16
17
18
19  VIDEOTAPED BY:  JAMES PIERDZIOCH,
        Elite Deposition Services.
20
21
    REPORTED BY:   ROSANNE M. NUZZO, CRR, RPR,
22      CSR License No. 84-1388.
23
24

## Page 5

1           I N D E X
2   WITNESS:                    PAGE:
3   BAXTER HEALTHCARE CORPORATION by
4   MICHAEL BRUCE BRADLEY
5       BY MR. CHIZEWER...................   9
6       BY MR. BREEN.....................  82
7       BY MR. DeLANCEY.................. 144
8       BY MR. CHIZEWER................. 148
9       BY MR. BREEN..................... 157
10
11
12           *****
13
14
15          E X H I B I T S
16   EXHIBIT NUMBER            MARKED FOR ID
17   DEPOSITION EXHIBITS
18   Exhibit No. 1...........................  11
19   Exhibit No. 2...........................  20
20   Exhibit No. 3...........................  26
21   Exhibit No. 4...........................  30
22   Exhibit No. 5...........................  37
23   Exhibit No. 6...........................  41
24   Exhibit No. 7...........................  48

Michael Bradley - January 28, 2013

---

Page 6

1        E X H I B I T S  (Continued)
2    EXHIBIT NUMBER              MARKED FOR ID
3    Exhibit No. 8.........................  62
4    Exhibit No. 9.........................  62
5    Exhibit No. 10........................  71
6    Exhibit No. 11........................  88
7    Exhibit No. 12........................  98
8    Exhibit No. 13........................  101
9    Exhibit No. 14........................  106
10   Exhibit No. 15........................  114
11   Exhibit No. 16........................  119
12
13
14
15
16
17
18
19
20
21
22
23
24

---

Page 7

1        THE VIDEOGRAPHER:  We are on the record.  The
2    time is 10:06 a.m.
3        This is the videotaped deposition of
4    Baxter's corporate representative in the matter of
5    In Re: Pharmaceutical Industry Average Wholesale
6    Price Litigation.
7        We are at Goldberg Kohn, located in
8    Chicago, Illinois, on January 28th, 2013.  My name
9    is James Pierdzioch, and the court reporter is
10   Rosanne Nuzzo on behalf of Elite Deposition
11   Services.
12       Will counsel please state their
13   appearance and firm affiliation for the record.
14       MR. CHIZEWER:  This is David Chizewer.
15   I'm here with my colleague, Beata Brewster, from
16   Goldberg Kohn.  We represent the Plaintiff-
17   Relators in this case, Greg Hamilton and
18   Linnette Sun.
19       And I expect a representative of
20   Linnette Sun to state when those papers are
21   formally filed, as she had passed away in
22   December.
23       Also with me is one of the Relators,
24   Greg Hamilton.

---

Page 8

1        MR. DeLANCEY:  Merle DeLancey, Dickstein
2    Shapiro, on behalf of Baxter Healthcare
3    Corporation.
4        MR. BOLTON:  Mike Bolton with Baxter
5    Healthcare.
6        MR. BREEN:  Jim Breen, representing Ven-A-Care
7    of the Florida Keys.
8        MR. ANDERSON:  Jarrett Anderson, counsel for
9    Ven-A-Care of the Florida Keys.
10       MR. McELROY:  Andrew McElroy for the State of
11   Florida.
12       MR. CHIZEWER:  We have also set up a call-in
13   line.  It's possible that the co-counsel to the
14   Relators, Mark Kleiman, may call in on.
15       If anybody else has a colleague that
16   they want to be able to access that line, just let
17   me know.  We'll give you the information.
18       Is anybody on the phone now?
19       (Short pause.)
20   THE VIDEOGRAPHER:  Okay.  Will the court
21   reporter please swear the witness.
22       (WHEREUPON, the witness was duly
23       sworn.)
24   THE COURT REPORTER:  Thank you.

---

Page 9

1        BAXTER HEALTHCARE CORPORATION by
2            MICHAEL BRUCE BRADLEY,
3    called as a witness herein, having been first duly
4    sworn, was examined and testified as follows:
5            EXAMINATION
6    BY MR. CHIZEWER:
7        Q.   Can you please state your full name for
8    the record.
9        A.   Michael Bruce Bradley.
10       Q.   Mr. Bradley, have you ever sat for a
11   deposition before?
12       A.   I have.
13       Q.   How many times?
14       A.   About two, three.
15       Q.   Okay.  When -- when was the last time
16   you sat for deposition?
17       A.   A few years ago.
18       Q.   Okay.  Let me just give you a couple
19   ground rules for today, okay?
20       A.   Yeah.
21       Q.   Perhaps the most important thing and
22   the thing that witnesses often do is to try and
23   answer a question that I'm asking before I'm
24   finished with the question.  Please don't do that

---

3 (Pages 6 to 9)

Michael Bradley - January 28, 2013

| Page 10 |
|---|

1 because it's very hard to take down my question
2 and your response at the same time. So even if
3 you know exactly what I'm asking you and you know
4 what the answer is and you're anxious to get done,
5 if you could just wait till I ask the question,
6 maybe, and take a pause to see if anybody wants to
7 make an objection, and then you can answer. Okay?
8     A.   Um-hum. Okay.
9     Q.   It's important that you give oral
10 responses to the questions as opposed to shaking
11 your head or just saying "uh-huh" or "uh-uh"
12 because that can -- those answers can get mixed up
13 on the transcript.
14         Do you understand?
15     A.   Yes.
16     Q.   If at any time you don't understand a
17 question that I'm asking, just let me know you
18 don't understand it, and I'll rephrase it to make
19 sure you do.
20     A.   Okay.
21     Q.   Okay? Any time you want to take a
22 break, just let us know. As long as there's not a
23 question pending, we can finish -- take a break.
24         If there's a question pending, finish

| Page 11 |
|---|

1 the answer, and we'll take a break.
2     A.   Okay.
3     Q.   Good. Any reason today why you can't
4 give complete and truthful answers to my
5 questions?
6     A.   No.
7         (WHEREUPON, a certain document was
8         marked Deposition Exhibit No. 1.)
9 BY MR. CHIZEWER:
10     Q.   Mr. Bradley, I've handed you what's
11 been marked as Bradley Deposition Exhibit No. 1,
12 which is a Notice of 30(b)(6) Deposition.
13         And on page 2, it's got a list of
14 subject matters for the deposition. Have you seen
15 this document before?
16     A.   Yes, I have.
17     Q.   Okay. You understand you've been
18 authorized by Baxter to speak on Baxter's behalf
19 with respect to the subject matters listed on
20 page 2 of the Exhibit 1 of the Notice?
21     A.   Yes.
22     Q.   Okay. Could you describe the drug
23 Recombinate.
24     A.   Do you mean what it is?

| Page 12 |
|---|

1     Q.   Exactly.
2     A.   Recombinate is a recombinant form of
3 the Factor VIII protein.
4     Q.   What is it used for?
5     A.   For patients with hemophilia A.
6     Q.   Anybody else use it besides -- besides
7 patients with hemophilia A?
8     A.   I don't believe so.
9     Q.   And why do patients with hemophilia A
10 use Recombinate?
11     A.   The disease state hemophilia is, you
12 lack the Factor VIII protein, which is part of
13 the coagulation cascade; and if you're deficient
14 in that protein, then you can't sufficiently clot.
15     Q.   To whom does Baxter market Recombinate?
16     A.   We -- when you say "market," you
17 mean -- what do you mean by "market"?
18     Q.   Well, let's try it this way. Who buys
19 Recombinate from Baxter?
20     A.   So we have a couple of customers;
21 primarily, specialty pharmacies which are really
22 licensed retail pharmacies; and then 340B
23 treatment centers, in-patient hospitals.
24

| Page 13 |
|---|

1         (WHEREUPON, Mr. J. Andrew Jackson
2         of Dickstein Shapiro LLP entered
3         the deposition proceedings.)
4 BY THE WITNESS:
5     A.   Primarily, that's it.
6 BY MR. CHIZEWER:
7     Q.   When you say "primarily, that's it,"
8 are there other customers that -- that Baxter
9 sells Recombinate to?
10     A.   Yeah. We have a few customers, a few
11 blood banks, a few physicians' offices.
12     Q.   And if we focus on the time period just
13 prior to the launch of Advate, would the list of
14 Baxter customers of Recombinate be the same?
15     A.   Yes.
16     Q.   Just to make sure I have it right,
17 you said that the main and primary customers of
18 Recombinate for Baxter are specialty pharmacies,
19 340B treatment centers, in-patient hospital use,
20 some blood banks, and some physicians' offices?
21     A.   Correct.
22     Q.   And you couldn't think of any other
23 customers, is that correct?
24     A.   I mean, maybe rarely a -- a biological

Michael Bradley - January 28, 2013

## Page 14

1   distributor, but that's very rare.
2        Q.   What is a biological distributor?
3        A.   A biological distributor is a company
4   that focuses on purchasing and distribution of
5   various biologics.
6        Q.   Would you refer to the -- the different
7   categories of customers as "classes of trade"?
8   Would you use that term?
9        A.   Yeah, we've used it.
10       Q.   Or do you just -- do you prefer just
11  "categories of customers"?  How do you refer to
12  the different categories?
13       A.   We just use "categories of customers."
14       Q.   Categories of customers?  Okay.
15            Of the categories of customers that you
16  mention that purchase Recombinate, which category
17  purchases the most?
18       A.   The specialty pharmacy.
19       Q.   What percent of the sales of
20  Recombinate by Baxter are accounted for by
21  specialty pharmacies, approximately?
22       A.   Today?
23       Q.   Through today.
24       A.   Recombinate today?

## Page 15

1        Q.   Why don't we focus on the period of
2   time just prior to the launch of Advate.
3        A.   Just -- okay.  I -- approximately
4   60 percent of our sales.
5        Q.   And what about to 340B treatment
6   centers?
7        A.   Approximately 25 percent.
8        Q.   And if we focused on the time period
9   today, how would the allocation of sales among the
10  categories of customers change?
11       A.   Relatively the same.
12       Q.   Okay.  Just prior to the launch of
13  Advate, what price per unit were your specialty
14  pharmacies paying for Recombinate?
15       A.   Oh, let's see.  The best I can recall,
16  I believe it was in the mid 80s.
17       Q.   When you say "mid 80s," somewhere
18  between 80 and 89 cents per unit?
19       A.   The best I can recall.
20       Q.   Okay.  Again focusing on the period of
21  time just prior to the launch of Advate, what were
22  the -- what were Baxter's competitors for selling
23  Recombinate?
24       A.   Right before Advate was launched, it

## Page 16

1   would be Bayer with Kogenate, CSL with Helixate,
2   and I believe it would have been Wyeth with
3   ReFacto.
4        Q.   And what was the pitch you made to
5   Baxter's categories of customers that purchased
6   Recombinate to get them to purchase Recombinate
7   instead of the competitive products?
8        A.   So can you clarify "pitch"?  I'm not
9   exactly sure what you mean by "pitch."
10       Q.   The sales techniques.  What were you
11  telling your categories of customers to get them
12  to purchase Recombinate instead of the
13  competitors' products?
14       A.   Well, when we launched Recombinate,
15  it was the first genetically derived Factor VIII
16  protein.  And then Bayer and CSL, which is
17  basically the same product -- Helixate and
18  Kogenate are the same product.  When they
19  launched, we launched our proven campaign just
20  to -- to tell our customers how proven Recombinate
21  was.
22       Q.   So, in other words, taking of it --
23  taking advantage of the fact that it was already
24  out there on the market and shown to work as

## Page 17

1   opposed to a new product that hadn't been tried
2   yet by your competitors?
3        A.   The main goal for Recombinate at that
4   time was to let the stakeholders in the hemophilia
5   community know that Recombinate was a proven
6   therapy that has been shown by the significant
7   proportion of the population to work.
8        Q.   And what market share did Recombinate
9   have of the factor market at the time just prior
10  to the launch of Advate?
11       A.   I believe it was 70, 80 percent.
12       Q.   Did Baxter compete on price with
13  respect to Recombinate for -- looking at the
14  period of time just prior to the launch of Advate?
15       A.   I would say that was a very, very minor
16  part of our overall strategy.
17       Q.   Again focusing on the period of time
18  just prior to the launch of Advate, how did Baxter
19  report to First DataBank about the pricing of
20  Recombinate?
21       A.   At the time, I believed we supplied
22  list price, but there -- there was a transition
23  where First DataBank required WAC.
24       Q.   And the time just prior to the launch

Elite Deposition Technologies - 312-445-0005

Michael Bradley - January 28, 2013

Page 18

1    of Advate, how was Baxter reporting to other
2    data banks regarding the pricing of Recombinate?
3        A.   The only other -- there was three
4    databases:  Medispan, Red Book, First DataBank.
5    Medispan, First DataBank, I think I just answered
6    that question.  Red Book, I believe we supplied
7    list price.
8        Q.   And just prior to the launch of Advate,
9    what list price were you providing to First
10   DataBank for Recombinate?
11       A.   I can't recall.  I mean, I'd need to
12   look at some of the documentation.
13       Q.   If you had to guess, what would you...
14       A.   I believe the list was -- I'm not gonna
15   guess.
16       Q.   Okay.  At some point in time, did
17   Baxter begin reporting a WAC price to First
18   DataBank for Recombinate?
19       A.   Eventually, yes.
20       Q.   When?
21       A.   I believe it was around the time of
22   the -- the Advate approval, Advate launch, in that
23   time frame.
24       Q.   And when -- when Baxter first started

Page 19

1    to report a WAC price for Recombinate, what price
2    was reported?
3        A.   I believe $1.40 a unit.
4        Q.   And did Baxter report a WAC price for
5    Recombinate to the other data banks?
6        A.   Yes.
7        Q.   And at the time of that reporting, was
8    the same -- in other words, whenever it started
9    reporting the WAC price to First DataBank, it
10   began reporting the same WAC price to the other
11   data banks?
12       A.   I don't believe that was the case.
13   This -- this was ten years ago.
14       Q.   Right.
15       A.   So I know that First DataBank was the
16   first database, I think, to change their reporting
17   mechanisms.
18       Q.   Okay.  So Baxter would not have been
19   reporting a WAC price for Recombinate to any
20   databank prior to when it was reporting -- it
21   first started reporting the WAC price to First
22   DataBank, is that right?
23       A.   That, I really don't recall.  I mean,
24   what I can tell you is that we will report the

Page 20

1    price that the databases tell us we need to
2    report.
3                (WHEREUPON, a certain document was
4                marked Deposition Exhibit No. 2.)
5    BY MR. CHIZEWER:
6        Q.   Mr. Bradley, you've been handed what's
7    been marked as Bradley Deposition Exhibit No. 2.
8    It's a letter dated November 16th, 2001 to Dennis
9    Smith of Center for Medicare & Medicaid Services,
10   what we call "CMS," sent by Merle DeLancey and
11   Andrew Jackson.  It's identified with the Bates
12   number of BAX MDL S 108841 through 8843.
13             Are you familiar with this letter?
14       A.   I am.
15       Q.   Baxter authorized its counsel to send
16   this letter to CMS on or about November 16, 2001?
17       A.   We did.
18       Q.   Okay.  If I can direct your attention
19   to the last page of the letter, in the first full
20   paragraph on that page, Baxter reports that,
21   quote:
22             "First DataBank's new definition
23             of AWP -- as apparently mandated by
24             Department of Justice attorneys -- is

Page 21

1             a radical departure from the actions
2             previously demonstrated by First
3             DataBank with respect to Baxter
4             BioScience's therapies."
5        Does Baxter stand by that statement?
6        A.   Yes.
7        Q.   What was the change that -- or the
8    "radical departure" that FDB made that -- that was
9    being referred to in this November 16th, 2001
10   letter?
11       A.   I believe -- and you might have to
12   correct me if I'm wrong because there's been --
13       MR. DeLANCEY:  I don't get to do that.
14       THE WITNESS:  Oh.
15   BY THE WITNESS:
16       A.   There's so many documents.
17             I believe what First DataBank began
18   doing is reported our list price that we sent to
19   them, they began reporting it as WAC.
20   BY MR. CHIZEWER:
21       Q.   And they began creating or --
22   creating AWPs and reporting AWPs based on WAC
23   pricing, is that correct?
24       A.   They came out with the new -- a

Michael Bradley - January 28, 2013

Page 22

1 definition of WAC.  We sub- -- we submitted list
2 pricing to them.  They took it upon themselves to
3 put the list price as a WAC.
4    Q.   And you noticed that change started to
5 take place in June 2001, is that right?
6    A.   I believe so, if that's what the letter
7 states.
8    Q.   Okay.  And did FDB ultimately use this
9 new ADL -- AWP calculation method with respect to
10 Advate as well?
11    A.   I don't believe so, because this was
12 two years before Advate was launched.
13    Q.   Right.  But once Advate was launched,
14 was First DataBank still using the method of
15 creating AWPs by using a WAC price?
16    A.   Correct.
17    Q.   And that was a departure from what FDB
18 had been doing prior to June 2001, is that right?
19    A.   As I stated, we traditionally submitted
20 our list price to First DataBank.  They took it
21 upon themselves to include it -- to put it in WAC.
22 We did not report WAC to them at this time.
23    Q.   And you said at some -- at some
24 point -- strike that.

Page 23

1        Once Advate was launched, were you
2 originally reporting a list price of Advate to
3 FDB?
4    A.   I don't believe so.  I believe we
5 supplied WAC to First DataBank.
6    Q.   And upon the Advate launch, what was
7 the WAC that you were reporting to First DataBank?
8    A.   I believe our launch WAC was $1.50
9 at -- per unit.
10    Q.   And how was that calculated?
11    A.   The WAC price is calculated by an
12 analysis, an internal analysis we did, with legal
13 review, to look at our other therapies that we
14 currently had on the market.
15    Q.   And then what?
16    A.   Oh, I don't know.  We -- what more do
17 you want?
18    Q.   Well, tell me, how did you get to the
19 price of $1.50?
20    A.   Oh, the exact price?
21    Q.   Yeah.  I'm sorry.
22    A.   So there was a -- as I indicated, we
23 had an internal legal review.  We -- we looked at
24 the current difference between what our ASP is and

Page 24

1 what our published WAC is for our other hemophilia
2 therapies.
3        And then, there was certain people
4 within Baxter BioScience that determined what we
5 were going to set our WAC at based on what our
6 legal department -- what the legal guidance was.
7    Q.   Did you say it was based on the WAC of
8 other hemophilia products that Baxter was selling?
9    A.   It was based on the percentage
10 difference between our ASP, our selling price, and
11 then our published WAC for our other hemophilia
12 therapies.
13    Q.   So it was based on your average selling
14 price of -- so -- strike that question.
15        So in order to report WAC for Advate
16 when it was launched, one of the things you took
17 into consideration was the ASP or the average
18 selling price of Advate?
19    A.   Our internal average of what we sell
20 all of our products for.  This is our internal
21 average selling price.
22        And then, with legal guidance, they
23 gave us a range of what we could create as our
24 published WAC.

Page 25

1    Q.   And at the time that Advate was
2 launched, what was the WAC for Recombinate?
3    A.   I stated earlier, I believed it was
4 $1.40, but I -- I'm not a hundred percent sure.
5 I'm going to need to see some documents on that.
6    Q.   How was the WAC for Recombinate
7 determined?
8    A.   Very similarly.  We -- we did have
9 another hemophilia therapy already on the market.
10    Q.   So could you describe how you
11 determined the WAC specifically for Recombinate.
12    A.   No.  I -- I did not.  I wasn't familiar
13 with how they did that specifically.
14    Q.   If I could turn your attention back to
15 the November 16th letter to CMS from Baxter's
16 counsel.  If you could look at the last sentence
17 of the first paragraph, it says:
18        "Baxter BioScience does not sell
19     to full-line wholesalers and, thus,
20     does not have WAC prices."
21        Was that true with respect to
22 Recombinate in November 16th, 2001?
23    A.   I believe, at the time, that we did not
24 sell Recombinate to wholesalers.

Elite Deposition Technologies - 312-445-0005

Michael Bradley - January 28, 2013

Page 26

1      Q.   And was it true at that time that you
2   did not -- that Baxter did not sell Recombinate to
3   any wholesalers or just to -- that they didn't
4   sell it to full-line wholesalers?
5      A.   I believe your second statement.  We
6   did not sell to full-line wholesalers.
7      Q.   Did Baxter, in fact, sell to other
8   types of wholesalers?  Strike that question.
9           On or around November 2001, did Baxter,
10  in fact, sell Recombinate to other types of
11  wholesalers other than full-line wholesalers?
12     A.   I can't for sure answer that question.
13  I'm not -- I don't have that information.
14     Q.   So it's possible that in November 16th,
15  2001, Baxter was, in fact, selling Recombinate to
16  some type of wholesalers, right?
17         MR. DeLANCEY:  Objection, asked and answered.
18         You can answer.
19  BY THE WITNESS:
20     A.   They may have.  I'm just not familiar
21  with that information.
22         (WHEREUPON, a certain document was
23             marked Deposition Exhibit No. 3.)
24

Page 27

1   BY MR. CHIZEWER:
2      Q.   Mr. Bradley, you have been handed
3   what's been marked as Deposition Exhibit No. 3.
4   It's a document, it has your name on it at the
5   top, "Michael Bradley," entitled "Key Healthcare
6   Economics Issues."  It's got a date of May 1st,
7   2002.
8           Are you familiar with this document?
9      A.   Yes.
10     Q.   At the top of the document is a chart
11  listing Products and Actual List Prices and First
12  DataBank List Prices.
13         Does this chart reflect -- reflect your
14  recollection as to what the actual list price of
15  Recombinate was on or around May 2002?
16     A.   Yes.
17     Q.   And what was it?
18     A.   It says the First -- are you talking
19  about the -- First DataBank list price, or are
20  you talking about the list price in the other
21  databases?
22     Q.   What was the actual list price of
23  Recombinate that Baxter was reporting to First
24  DataBank on or around May 2002?

Page 28

1      A.   $1.30 per unit.
2      Q.   If you could review what's listed in
3   the first paragraph there under "Update," just
4   read it to yourself and let me know when you're
5   finished, please.
6           (Short pause.)
7   BY THE WITNESS:
8      A.   Okay.
9   BY MR. CHIZEWER:
10     Q.   You're reporting here that Kay Morgan
11  with First DataBank was sent -- saying to Baxter
12  that they needed to report a WAC price, is that
13  correct?
14     A.   Correct.
15     Q.   And what do you understand a WAC price
16  to be?
17     A.   The wholesale acquisition cost.
18     Q.   And how do you determine wholesale
19  acquisition cost?
20     A.   By definition, that's the -- the price
21  that you sell your products to the wholesale
22  distribution channel.
23     Q.   So if Baxter was selling Recombinate
24  to some type of wholesale distribution channel,

Page 29

1   it would have just looked at that price, and that
2   would have been the WAC price, is that correct?
3      A.   Correct.
4      Q.   And it -- in here, you are reporting
5   that Baxter plans on updating the list prices in
6   June and that Baxter currently did not have
7   definitions for various customer categories, is
8   that right?
9      A.   Correct.
10     Q.   Were you responsible for helping to
11  determine the WAC price?
12     A.   At this point, I was probably
13  consulted, but I -- I didn't have the final say.
14     Q.   You would have been aware, though, of
15  the WAC prices that were ultimately reported to
16  First DataBank for Recombinate and Advate --
17     A.   Yes.
18     Q.   -- right?
19         MR. DeLANCEY:  Just let him finish his
20  question.
21         THE WITNESS:  Oh, sorry.
22         MR. CHIZEWER:  You're doing pretty well so
23  far.
24         THE WITNESS:  I knew that would happen.

Elite Deposition Technologies - 312-445-0005

Michael Bradley - January 28, 2013

Page 30

1      MR. CHIZEWER:  You're doing pretty well so
2  far.
3      MR. DeLANCEY:  You've got to do something
4  wrong.
5          (WHEREUPON, a certain document was
6      marked Deposition Exhibit No. 4.)
7  BY MR. CHIZEWER:
8      Q.   Mr. Bradley, you have been handed
9  what's been marked as Deposition Exhibit No. 4.
10  It's just a -- a list of "Advate Pricing."
11          Does this pricing look familiar to you?
12      A.   Some.
13      Q.   Okay.  It contains a list of prices and
14  then different descriptions of the price.
15          "1.50 WAC," does that mean the WAC for
16  Advate was $1.50?
17      A.   Correct.
18      Q.   And then it says $1.66 for "Red Book
19  List."  What does that mean?
20      A.   Well, at the time, First DataBank
21  required the submission of a WAC in order to -- to
22  put the information into their databases.
23  Red Book required a list price.
24      Q.   Okay.  And then it says $1.88

Page 31

1  "First DataBank List."
2      A.   Correct.
3      Q.   Was that the price that Baxter was
4  reporting to First DataBank for Advate?
5      A.   No.
6      Q.   What was -- what did $1.88 represent?
7      A.   The $1.88 represents -- this is what
8  this other letter is about -- is what the way
9  First DataBank works is, they take the WAC, and
10  they add 25 percent to it.  And that's how they
11  create -- we have a list here, but it's their
12  published AWP.
13      Q.   Okay.  Below that, it says $1.15
14  "Open Market."  What does that mean?
15      A.   Open market would be customers that
16  don't sign a committed contract to us or just
17  a spot market price for someone interested in
18  purchasing our therapies.
19      Q.   Then it says 84 cents "PHS."  What does
20  that mean?
21      A.   So "PHS" is the Public Health Service,
22  also known as 340B pricing.
23      Q.   Okay.  Does $1.11 "GPO," does that --
24  does "GPO" stand for Group Purchasing

Page 32

1  Organizations?
2      A.   Correct.
3      Q.   So that was the price that you were
4  charging for Advate to group purchasing organ- --
5  organizations?
6      A.   Well, that's what this -- what I'm
7  reading here, that's what it says, yes.
8      Q.   Then it says $1.01 to $1.07 "VCCs."
9  What are VCCs?
10      A.   So those would be volume committed
11  contracts.
12      Q.   And to whom did Baxter typically have
13  volume committed contracts for Advate?
14      A.   So these would be, once again, the --
15  the specialty pharmacy providers, the SPPs.
16      Q.   Anybody else?
17      A.   No.  By and large, VCCs are
18  specifically for specialty pharmacy customers.
19      Q.   Okay.  It says $1.09 "Premier."
20  Is Premier a group purchasing organization?
21      A.   Yes.
22      Q.   So they got special pricing over the --
23  some of the other group purchasing organizations,
24  is that right?

Page 33

1      A.   That -- that's what this says.
2      Q.   Okay.  And the same thing for
3  "Novation"?
4      A.   Correct.
5      Q.   And then it says $1.09 "Tier V."
6  What does "Tier V" mean?
7      A.   I believe Tier -- Tier V were small
8  specialty pharmacy customers that weren't
9  necessarily signing a volume committed contract.
10      Q.   When First DataBank was -- began asking
11  Baxter for WAC pricing for Recombinate, did you
12  have any understanding of why First DataBank
13  wanted WAC pricing and what they were after by
14  doing that?
15      A.   I understood at the time that they had
16  changed their pricing rep- -- their price
17  reporting.
18      Q.   And did you know the -- did you have
19  an understanding or an opinion as to the reason
20  why they were changing?
21      A.   As I recall, they wanted to standardize
22  the price reporting throughout their entire
23  database.
24      Q.   What do you mean by "standardize"?

Michael Bradley - January 28, 2013

Page 34

1     A.   I believe at the time, their different
2  pharmaceutical companies were reporting different
3  types of information to First DataBank.  Some
4  would do list, some would do WAC.  And I
5  believe -- this is ten years ago, even more --
6  I believe they wanted to standardize it across
7  all drug categories.
8     Q.   And did you have an understanding of
9  how First DataBank wanted the manufacturers to
10 calculate their WAC for the products?
11    A.   I -- I don't recall.
12    Q.   Did you have an expectation that First
13 DataBank's switch to WAC pricing would affect the
14 level of AWP that First DataBank would report?
15    A.   Only if they used or submitted list
16 price as their WAC.
17    Q.   Well, prior to moving to WAC pricing,
18 First DataBank was calculating the AD- -- AWP as
19 simply the list price that Baxter reported,
20 for example, for Recombinate, correct?
21    A.   Correct.
22    Q.   And is it your testimony that Baxter
23 expected that if they gave an actual WAC price to
24 First DataBank, that the AWP that would result

Page 35

1  from that WAC price would be the same as the list
2  price that was previously being reported?
3     A.   Can you say that again?
4     Q.   Is it your testimony that Baxter
5  expected that if it reported an actual WAC price
6  to First DataBank for Recombinate, say, that the
7  AWP that First DataBank calculated from that WAC
8  would be the same as the list price that Baxter
9  had been previously reporting for Recombinate?
10    A.   Yes.  It was our intention to make sure
11 that whatever price First DataBank has requested
12 for us to submit to them, that eventually on that
13 published price, their published list price, that
14 would have no impact.
15    Q.   That was Baxter's intention?
16    A.   Correct.
17    Q.   What did you -- did you form an opinion
18 as to what you thought the Department of Justice's
19 objective was in terms of having First DataBank
20 ask for WAC pricing instead of just reporting AWP
21 as the list price that they got from the
22 manufacturers?
23    A.   I don't recall any DOJ involvement in
24 this matter.

Page 36

1     Q.   So your -- the November 16th letter
2  attributed the new -- the radical departure that
3  First DataBank was taking to some mandate from
4  Department of Justice attorneys, correct?
5     A.   I'll -- I'll have to read the letter
6  again.  I don't recall that specifically.
7     Q.   Sure.  Take -- take a look at --
8     MR. BREEN:  Are you talking about the
9  November 16th letter?
10    MR. CHIZEWER:  Yeah.
11 BY MR. CHIZEWER:
12    Q.   If you look at the November 16th
13 letter, if I could refer your attention back to
14 the sentence we read before on the last page, the
15 first full paragraph, you are saying:
16       "First DataBank's new definition of
17    AWP - as apparently mandated by Department
18    of Justice attorneys..."
19    MR. BREEN:  Which letter are you reading from?
20    MR. CHIZEWER:  The November 16th letter,
21 page 3.
22    MR. DeLANCEY:  2001.
23    MR. CHIZEWER:  2001.
24    MR. DeLANCEY:  Page 3, first full paragraph.

Page 37

1  BY THE WITNESS:
2     A.   I -- I -- I can't provide you any
3  additional information.  I understand it's in the
4  letter, but I don't recall any specifics.
5  BY MR. CHIZEWER:
6     Q.   It never entered Baxter's mind that
7  perhaps the reason that the Department of Justice
8  was mandating reporting based on WAC was because
9  the previous AWPs reported through list pricing
10 had been inflated?
11    A.   I don't recall.
12    Q.   Okay.
13       (WHEREUPON, a certain document was
14       marked Deposition Exhibit No. 5.)
15 BY MR. CHIZEWER:
16    Q.   Mr. Bradley, I've -- I've handed you
17 what's been marked as Deposition Exhibit No. 5,
18 which is a letter dated February 7th, 2003 to
19 Chuck Duarte, the Medical Director -- Medicaid
20 Director in Nevada from you.  It's identified as
21 Bates number BAX MDL E 1947353 to 35 -- to 355.
22    Q.   Did you send this letter to Mr. Duarte
23 on or about February 7th, 2003?
24    A.   I did.

Michael Bradley - January 28, 2013

Page 38

1    Q.   Okay.  And in this letter, you explain
2    to Mr. Duarte your understanding that the
3    Department of Justice had created revised AWPs to
4    better reflect actual selling prices, is that
5    right?
6    A.   Yes.
7    Q.   So you knew that the new AWPs that were
8    being created through WAC were to better reflect
9    actual selling prices, correct?
10    MR. DeLANCEY:  Objection, mis- -- completely
11    mixing apples and oranges here.
12    THE WITNESS:  Thank you.
13    MR. DeLANCEY:  That's not what he testified
14    to.
15    But go ahead.
16    BY THE WITNESS:
17    A.   So, as Merle said, you're talking about
18    two different things here.
19    What the DOJ did back then is, they
20    took a survey of wholesalers, companies that we
21    didn't even sell product to, basically, and they
22    created revised AWPs, what we call the DOJ AWPs;
23    totally different than what we do when we supply
24    the necessary information to the databases.

Page 39

1    BY MR. CHIZEWER:
2    Q.   Well, you were reporting here that:
3    DOJ was requiring "First DataBank
4    to survey 'wholesalers' for pricing
5    information."
6    Is that right?
7    A.   Correct.
8    Q.   Okay.  And then you say:
9    "In fact, the entities" that "First
10    DataBank surveyed" include -- "included
11    traditional wholesalers and biological
12    distributors."
13    Correct?
14    A.   Correct.
15    Q.   And they did that to come up with WAC
16    pricing, correct?
17    A.   I can't tell you that.
18    Q.   Okay.  You mentioned that Baxter sold
19    biological -- excuse me.  Strike that question.
20    You mentioned that Baxter sold
21    Recombinate to biological distributors, is that
22    correct?
23    A.   I stated they may have, yes.
24    Q.   Okay.  And did Baxter also sell Advate

Page 40

1    to biological distributors?
2    A.   They may have.
3    Q.   And when Baxter was coming up with its
4    WAC pricing for Recombinate -- no, strike that
5    question.
6    When Baxter was coming up with its
7    WAC pricing for Advate, did it use the price that
8    it charged for Advate to biological distributors
9    as the WAC?
10    A.   I believe I already answered your
11    question on how we calculated the WAC.
12    Q.   Okay.  But you can answer this, this
13    question.
14    A.   Okay.  What -- what we did is, we --
15    we do -- did an analysis on our -- our current
16    hemophilia products of what we sell them for and
17    what our current published WAC pricing is.
18    With legal guidance, we created the WAC
19    for Advate.
20    Q.   You did not simply take the price that
21    you were -- that Baxter was charging biological
22    distributors for Advate and use that as a WAC,
23    did you?
24    A.   No.

Page 41

1    (WHEREUPON, a certain document was
2    marked Deposition Exhibit No. 6.)
3    BY MR. CHIZEWER:
4    Q.   Mr. Bradley, I've handed you what's
5    been marked as Deposition No. 6.  It's an undated
6    draft letter to a Medicaid -- generic Medicaid
7    director.  It's not signed, but it does have your
8    block signature at the end, and it's identified as
9    EX PATT 014590.
10    This is a draft of the letter that you
11    ultimately sent to Mr. Duarte, correct?
12    A.   Yes.  This looks like, yes, this would
13    be a letter that was still in draft form.
14    Q.   Right.  And is that your handwriting on
15    the draft?
16    A.   No.
17    Q.   Do you know whose handwriting that is?
18    A.   No.
19    Q.   Do you recall who helped you draft the
20    letter to Mr. Duarte?
21    A.   We always had legal review.  I can't
22    say that this is anyone from legal's writing.
23    Q.   In the final letter, you mention that
24    DOJ required First DataBank to survey wholesalers

11 (Pages 38 to 41)

Michael Bradley - January 28, 2013

Page 42

1    for pricing information, and then you go on to
2    list the specific types of entities that D- --
3    First DataBank surveyed, including traditional
4    wholesalers and biological distributors.
5              But in your original -- or in the
6    earlier draft which is in Exhibit 6, you also
7    stated that First DataBank surveyed "traditional
8    wholesalers," and you list a few traditional
9    wholesalers; "biological distributors," you list a
10   couple biological distributors; and then you add
11   "and specialty wholesalers" and then list a few
12   specialty wholesalers.
13             (WHEREUPON, there was a short
14                  interruption.)
15        MR. CHIZEWER:  Just hit "1" on the phone.
16             (Short pause.)
17        MR. DeLANCEY:  Why don't you just go off.
18        MR. CHIZEWER:  That's fine.  Go off the
19   record.
20        THE VIDEOGRAPHER:  The time is 10:58 a.m.
21   We are going off the record.
22             (WHEREUPON, there was a short
23                  interruption.)
24        THE VIDEOGRAPHER:  The time is 10:59 a.m.

Page 43

1              We are back on the record.
2    BY MR. CHIZEWER:
3         Q.  Why, in the final version of the
4    letter that you actually sent to Mr. Duarte on
5    February 7th, 2003, did you strike the specific
6    reference to specific "biological distributors"
7    and strike the reference to "specialty
8    wholesalers" altogether?
9         A.  I can only say that probably was --
10   whoever was reviewing it, most likely legal, just
11   decided that that information was not necessary
12   for the letter.
13        Q.  Wasn't Baxter selling Advate to
14   specialty wholesalers in February of 2003?
15        A.  No.  We were selling to specialty
16   pharmacies.
17        MR. DeLANCEY:  In February 2003.  Go back to
18   his -- it wasn't around yet, so it couldn't sell
19   it.
20             But go ahead.  Ask -- can you clarify
21   that answer?
22        MR. CHIZEWER:  Yeah.  I'll -- well, we'll
23   strike that question and answer.
24        MR. DeLANCEY:  Okay.

Page 44

1    BY MR. CHIZEWER:
2         Q.  When did Baxter finally start selling
3    Advate?
4         A.  I believe -- I don't know the exact
5    time -- August/September 2003.
6         Q.  Okay.  In February 2003, wasn't Baxter
7    selling Recombinate to specialty wholesalers?
8         A.  We may have had very small sales to
9    them.  Traditionally, the bulk of our sales is to
10   specialty pharmacies.
11        Q.  And when Advate hit the market in late
12   2003, wasn't Baxter selling Advate to specialty
13   wholesalers?
14        A.  I don't recall.  As I mentioned, over
15   60 percent of our sales is to the specialty
16   pharmacies.
17        MR. CHIZEWER:  Okay.  Let's take a break.
18        MR. DeLANCEY:  Okay.
19        THE VIDEOGRAPHER:  This is the end of Tape
20   No. 1.  The time is 11:01 a.m.  We are going off
21   the record.
22             (WHEREUPON, a recess was had.)
23        THE VIDEOGRAPHER:  This is the beginning of
24   Disk No. 2.  The time is 11:09 a.m.

Page 45

1              We are back on the record.
2    BY MR. CHIZEWER:
3         Q.  If Baxter had been selling Advate to
4    specialty wholesalers, then Baxter could have
5    simply calculated its WAC price for Advate by
6    referring to the price it charged to those
7    specialty wholesalers, correct?
8         A.  I don't believe so.
9         Q.  Why not?
10        A.  I thought I've already done this a
11   couple times, is tell you exactly how we
12   calculated our WAC price.
13        Q.  Right.  You -- I think you explained
14   how you calculated your WAC price because -- and
15   the rationale -- part of the rationale for that
16   calculation was the fact that Baxter did not sell
17   Advate to specialty wholesalers, correct?
18        MR. DeLANCEY:  Objection.  That's not his
19   testimony.
20             You still have to answer.
21   BY THE WITNESS:
22        A.  We may have sold a very small amount of
23   Advate to what they consider here as a specialty
24   wholesaler, but it definitely wasn't one of our

Elite Deposition Technologies - 312-445-0005

Michael Bradley - January 28, 2013

Page 46

1   main customers.
2   BY MR. CHIZEWER:
3       Q.   What do you consider "a very small
4   amount," like what percent of the sales of Advate?
5       A.   I can't answer that; a thousand,
6   two thousand, four thousand units.  It's not even
7   perceptible to an overall percentage of our
8   business.
9       Q.   Was it less than 10 percent of your
10  business?
11      A.   Yes.
12      Q.   Was it less than 5 percent of your
13  business?
14      A.   Yes.
15      Q.   If specialty wholesalers would have
16  made up, say, 10 to 15 percent of Baxter's --
17  Baxter's business for Advate, then it could have
18  simply referred to the price it was charging those
19  specialty wholesalers to come up with a WAC,
20  correct?
21      A.   No.
22      Q.   Why not?
23      A.   It's not the way that we calculated our
24  WAC price.

Page 47

1       Q.   I know it's not the way you did it
2   because you didn't have --
3       A.   Well, I'm not going to speculate on
4   what we could have done.
5       MR. DeLANCEY:  Mike, let him finish --
6       THE WITNESS:  Right.
7       MR. DeLANCEY:  -- what he's saying.
8       THE WITNESS:  Right.  Okay.
9   BY MR. CHIZEWER:
10      Q.   So if 10 to 15 percent of your Advate
11  business had been to specialty wholesalers, you're
12  not sure how that would -- or if that would have
13  impacted the wholesale acquisition cost that you
14  reported for Advate, correct?
15      A.   Correct.
16      Q.   With respect to Advate, is First
17  DataBank still calculating AWP by marking up a
18  reported WAC price?
19      A.   No, they are not.
20      Q.   How do they calculate AWP for Advate
21  now?
22      A.   By a lawsuit that was settled,
23  I believe last year, they are no longer allowed to
24  publish an AWP.

Page 48

1       THE COURT REPORTER:  I'm sorry?
2       THE WITNESS:  Publish an AWP.
3   BY MR. CHIZEWER:
4       Q.   Prior to the lawsuit that you're
5   referencing, was -- up until that lawsuit, was
6   FDB still calculating an AWP for Advate based on
7   a reported WAC price?
8       A.   Yes, I believe that's the case.
9            (WHEREUPON, a certain document was
10           marked Deposition Exhibit No. 7.)
11  BY MR. CHIZEWER:
12      Q.   Mr. Bradley, I've handed you what's
13  been marked as Deposition Exhibit No. 7.  It's a
14  fax cover sheet from Louise Westcott to a number
15  of people, and it attaches a letter dated
16  June 2nd, 2000 to First DataBank from Paul Ashba.
17  It's identified as Bax_Sun_Lex_6925 to 6927.
18           Are you familiar with the June 2000
19  letter sent to First DataBank by Mr. Ashba?
20      A.   I am.
21      Q.   In this letter, Baxter is complaining
22  to First DataBank because they are reporting a
23  published price of 85 cents per unit for
24  Recombinate, is that right?

Page 49

1       A.   Correct.
2       Q.   At that time, was -- were any of
3   Baxter's customers being sold Recombinate for
4   85 cents per unit?
5       A.   I believe, yes.
6       Q.   Did you let First DataBank know in this
7   June 2000 letter that that 85 cents per unit was,
8   in fact, a price that Baxter was using to some
9   customers?
10      A.   I don't recall that.
11      Q.   Why was Baxter complaining to First
12  DataBank about the published price of 85 cents per
13  unit for Recombinate?
14      A.   Well, there are a number of reasons.
15           First and foremost, this was very near
16  what we were selling our products to our customers
17  at, okay?  And so the way that some customers were
18  using this published AWP is, they would discount
19  it, as they do, and they were actually reimbursing
20  less for our product than we were selling it for.
21      Q.   Were state Medicaid agencies using the
22  price that way?
23      A.   Some.
24      Q.   Was First DataBank using that 85 cent

Elite Deposition Technologies - 312-445-0005

Michael Bradley - January 28, 2013

Page 50

1    per unit price as a WAC to mark up to calculate
2    an AWP?
3       A.   No.
4       Q.   How did you know that?
5       A.   The DOJ AWPs, as it was referred to in
6    another letter, were calculated based on surveys
7    to customers that most were not our customers.
8    They were supposed to be updated every six months,
9    and they weren't.  So we had core issues with
10   that.
11      Q.   How did First DataBank respond to this
12   June 2000 letter?
13      A.   I don't recall the specifics.  I --
14   I do know that this DOJ AWP was around for a
15   couple years.
16      Q.   Have you ever heard of Florida
17   Infusion?
18      A.   Maybe.
19      Q.   Do you know if Florida Infusion is a
20   specialty wholesaler?
21      A.   That, I don't know.
22      Q.   Okay.  Have you ever heard of
23   Biomed Plus?
24      A.   Yes.

Page 51

1       Q.   What is Biomed Plus?
2       A.   I believe they are a small- to
3    mid-sized specialty pharmacy.
4       Q.   Do you know if they're a wholesaler?
5       A.   I do not believe they are.
6       Q.   How about ASD, have you ever heard of
7    ASD?
8       A.   I have.
9       Q.   What is ASD?
10      A.   ASD is a branch of one of the larger
11   wholesalers.
12      Q.   Did Baxter sell Advate to ASD when --
13      A.   I believe --
14      Q.   -- it was first launched?
15      A.   Sorry.
16      Q.   That's all right.
17      A.   I believe we sold product to their
18   specialty pharmacy division of ASD.
19      Q.   Was it common for wholesalers to have
20   specialty pharmacy divisions?
21      A.   You'll have to give me the time frame.
22      Q.   Okay.  Let's say at about the time of
23   the launch of Advate, was it common for
24   wholesalers to have specialty pharmacy divisions?

Page 52

1       A.   I believe it wasn't common.
2       Q.   Did Baxter sell what you would consider
3    a significant amount of Advate to specialty
4    pharmacies that were divisions of wholesalers?
5       A.   We did not sell a significant amount
6    of Advate to wholesalers or their specialty
7    pharmacies that were associated with them.
8       Q.   Do you know whether the specialty
9    pharmacy divisions of specialty wholesalers
10   actually had wholesale licenses?
11      A.   I don't -- I don't know.
12      Q.   When Baxter informed CMS that it did
13   not sell Recombinate to wholesalers, was it
14   excluding specialty pharmacies that were divisions
15   of wholesalers?
16      MR. DeLANCEY:  Objection in terms of the basis
17   for the question.
18           But go ahead.
19   BY THE WITNESS:
20      A.   I would say that specialty pharmacy
21   divisions that are part of wholesalers are treated
22   as specialty pharmacies for the purposes of our
23   sales.
24

Page 53

1    BY MR. CHIZEWER:
2       Q.   Okay.  Could you describe what Advate
3    is.
4       A.   Advate is a third generation
5    recombinant Factor VIII protein.
6       Q.   And what does Advate do?
7       A.   Very similar to Recombinate, it
8    supplies the missing Factor VIII in the
9    coagulation cascade for persons with hemophilia A.
10      Q.   Does it differ in any way from
11   Recombinate?
12      A.   Some.
13      Q.   How does it differ?
14      A.   Just basically, the Recombinate
15   molecule, that has been weaned off of any human or
16   animal proteins, and it also has one additional
17   viral inactivation step.
18      Q.   Do you mean the recombinant molecule in
19   Advate has been weaned off of any human and animal
20   proteins and also has --
21      A.   Yes.
22      Q.   -- one additional step?
23      A.   Yes.
24      Q.   Okay.  Did the differences between

14 (Pages 50 to 53)

Michael Bradley - January 28, 2013

Page 54

1   Advate and Recombinate change the way you marketed
2   Advate?
3       A.   Yes.
4       Q.   Could you explain that difference --
5   those differences in marketing strategy.
6       A.   We marketed Advate at the time of
7   launch as the next generation Recombinate.
8   Basically, it's a proven molecule, that we were
9   able to take all human and animal protein out of
10  the manufacturing process.
11      Q.   Did you say, "We marketed Advate at
12  the time of launch as the next generation
13  'Recombinate'" or "'recombinant'"?
14      A.   Recombinate.
15      Q.   So the -- the marketing materials you
16  submitted for Advate refer to it as the next
17  generation Recombinate?
18      A.   Third generation, I believe is what we
19  used.
20      Q.   Third generation Recombinate?
21      A.   Third generation recombinant
22  Factor VIII.
23      Q.   All right.  Well, there's a -- there's
24  a difference between -- I want to -- I want to be

Page 55

1   real clear on what you're saying because there's
2   a difference between marketing Advate as the next
3   generation Recombinate as opposed to a next
4   generation recombinant, right?
5       A.   Recombinant?
6       Q.   Recombinant, yes.  Which --
7       A.   We did both.
8       Q.   So you -- we would expect to see
9   marketing materials, then, for Advate, calling it
10  the next generation Recombinate?
11      A.   Or something similar.
12      Q.   Well, just what do you mean, "something
13  similar"?
14      A.   Well, I don't know if we used the exact
15  wording that you used, but we did have marketing
16  materials that had Recombinate, Recombinate and
17  Advate together.
18      Q.   To compare them, correct?
19      A.   Yes.
20      Q.   Okay.  In fact, the goal was to convert
21  as many people who were using Recombinate and to
22  get them to use Advate instead --
23      A.   Yes.
24      Q.   -- correct?

Page 56

1       A.   Correct.
2       Q.   And what was the strategy that you were
3   going to use to convince people from switching
4   from Recombinate to Advate?
5       A.   So you're gonna have to define
6   "people."
7       Q.   Well, the people who use -- there's
8   only one group of people, I think that you
9   identified, who use these Factor VIII products,
10  and that's hemophiliacs, correct?
11      A.   So you're talking the end user of the
12  product?  Because you have physicians that
13  prescribe it, too, right?
14      Q.   Right.  Right.
15      A.   So I just -- when you say "people,"
16  I have to know specifically what you mean.
17          MR. DeLANCEY:  Patients?
18  BY MR. CHIZEWER:
19      Q.   The people who are using the product,
20  your goal was to convert the people who were using
21  Recombinate, and as many as possible of them, to
22  get them to use Advate instead of Recombinate,
23  correct?
24      A.   Correct.

Page 57

1       Q.   And what was -- what was the strategy
2   that you were going to use to make that conversion
3   happen?
4           MR. DeLANCEY:  Right.  His concern was, are
5   you referring to patients?  I mean --
6           MR. CHIZEWER:  Right.
7   BY MR. CHIZEWER:
8       Q.   Ultimately, that's who has to --
9   patients are the ones -- only ones who are using
10  it, right?
11      A.   Physicians prescribe it.
12      Q.   Prescribe it, but then -- they
13  prescribe it, and then the patient would convert,
14  correct?
15      A.   So you're talking about patients?
16      Q.   Right.  Well --
17      A.   I just need -- are you talking about
18  patients?
19      Q.   Yes.
20      A.   Okay.
21      Q.   I'm talking about any strategy you were
22  using -- I want you to describe any strategy you
23  were using to accomplish the ultimate end goal of
24  getting patients who were using Recombinate to

Elite Deposition Technologies - 312-445-0005

Michael Bradley - January 28, 2013

Page 58

1    switch to Advate.
2        A.   Okay.  So there's a couple things that
3    are important to patients at that time, right?
4    Because Recombinate was the first genera- --
5    Recombinate was the first generation product.  It
6    was very important to the community that we take
7    the human and animal protein out of the product,
8    which we did for Advate, right?
9           It was very important to them to have
10   low inhibitor risk, which our clinical trials
11   showed, right?
12          And it's very important to them to have
13   increased convenience, which Advate showed them,
14   okay?  So what we did is, "we said Recombinate has
15   been proven.  This is the next generation.  This
16   is Advate."
17       Q.   And you believe that because of the
18   differences between Advate and Recombinate, that
19   a reasonable goal was to make Advate a billion
20   dollar brand in the first year of launch, correct?
21       A.   I believe it was the similarities to
22   Recombinate that would help us convert patients
23   onto Advate.
24       Q.   Well, to get people from switching

Page 59

1    from one drug that they're using to another, your
2    testimony is that Baxter's strategy was to show
3    how similar they were?
4        A.   Yes.
5        Q.   Okay.  And why, then, would anybody pay
6    more for Advate than Recombinate?
7        A.   So, as I said before, you have to
8    realize the history of hemophilia, right?  Because
9    when factor was created by plasma, over half the
10   population died of HIV, right?  We came out with
11   Recombinate.  It was the first generation
12   recombinant Factor VIII.  It still has human and
13   animal protein.  Second generation still had human
14   and animal protein.
15          Advate was the first recombinant
16   Factor VIII product that did not have any human or
17   animal protein, right?  It's the same molecule as
18   Recombinate, free of human and animal protein.
19          And, thus, the perception by the
20   hemophiliac community, as you called "people,"
21   that this is what they had been waiting for; they
22   had been waiting for a product that worked as well
23   as Recombinate that was free of human and animal
24   proteins.

Page 60

1        Q.   And it was that difference between
2    Advate and Recombinate that was going to allow
3    Baxter to obtain a price premium for Advate,
4    correct?
5        A.   That, among other things.
6        Q.   What were the other things?
7        A.   Well, I mean, it costs a lot of money
8    to do the clinical trials, et cetera.  So this is
9    the new generation.  We built new plants for it.
10   We -- you know, we had the -- we had the
11   clinicals.  We had et cetera.  So there was an
12   anticipation there would be a slight price
13   premium.
14       Q.   What do you mean, "a slight price
15   premium"?
16       A.   Whatever the market would bear upon --
17   after we did our research and launched the
18   product.
19       Q.   What were you shooting for when you --
20   at the time of launch --
21       A.   I believe between --
22       Q.   -- in terms of a price premium for
23   Advate over Recombinate.
24       A.   -- between -- and I can't remember

Page 61

1    exactly, so I'll say between 5 and 15 percent.
2        Q.   "PFM" stands for plasma-free method, is
3    that right?
4        A.   Yes.
5        Q.   So that was the -- when you referred to
6    PFM, that was what Advate was, right?
7        A.   Correct.
8        Q.   And was it true that -- did you believe
9    that PFM was, by far and away, the largest single
10   opportunity for Baxter in 2002?
11       A.   Not me -- I can't say just me
12   personally, but from a corporate standpoint, we
13   thought this was what the community has been
14   waiting for.
15       Q.   In terms of the cost of manufacturing
16   the drug, it costs less to manufacture Advate than
17   Recombinate, correct?
18       A.   Yes.
19       Q.   And just to be clear, Recombinate did
20   not have a plasma-free method, correct?
21       A.   Recombinate did -- was not totally free
22   of human- and animal-based proteins.
23       Q.   It couldn't be categorized as a PFM?
24       A.   Correct.

Elite Deposition Technologies - 312-445-0005

Michael Bradley - January 28, 2013

Page 62

1          (WHEREUPON, a certain document was
2          marked Deposition Exhibit No. 8.)
3    BY MR. CHIZEWER:
4         Q.   Mr. Bradley, I've handed you what's
5    been marked as Deposition Exhibit No. 8.  It's a
6    document entitled "Plasma/Albumin Free Method,
7    rAHF, Business Plan 2003," identified as BAX
8    MDL E 8565597 to 6706.
9              Does this -- is this the Baxter
10   business plan for Advate as of 2003?
11        A.   I believe it is.
12             (WHEREUPON, a certain document was
13             marked Deposition Exhibit No. 9.)
14   BY MR. CHIZEWER:
15        Q.   You've also been handed what's been
16   marked as Deposition Exhibit No. 9, which is a
17   document entitled "US Pricing Strategy, Advate
18   Pricing Core Team, 12/16/02, Discussion Document,"
19   identified as BAX STATE E 447977 to 997.
20             Does this document represent the
21   pricing strategy for Advate at or around
22   December 2002?
23        A.   I believe this is a document that
24   reviews the pricing strategy in that date range.

Page 63

1         Q.   If I could direct your attention to the
2    page of the stric- -- of the pricing strategy
3    ending in 81.  The last two digits are 81.
4         A.   Okay.
5         Q.   It says:
6              "The community expects to be charged
7         a premium (over highest price product)."
8              That's for Advate, correct?
9         A.   No.  Well, state -- restate the
10   question.
11        Q.   I'm sorry.  That wasn't a very good
12   question.
13        A.   I might have just misunderstood the
14   question.
15        Q.   No.  That was not a good question.
16             One of the assumptions that Baxter was
17   making with respect to the pricing strategy for
18   Advate was that the community expected to be
19   charged a premium for Advate over the
20   highest-priced existing product, correct?
21        A.   Correct.
22        Q.   If I could direct your attention to
23   the US Pricing Strategy document page 85.  This
24   document shows "Estimated AWPs" for Advate

Page 64

1    "at Launch," correct?  In bold.
2         A.   This would be our strategy at -- at
3    this time.
4         Q.   Okay.  And the strategy was to report
5    a list price for Advate to Red Book of $1.87?
6         A.   Correct.
7         Q.   And you were also going to report a
8    list price of Advate to First DataBank of $1.87,
9    and then you assumed that was going to be marked
10   up 25 percent pursuant to their new radical
11   departure strategy, such that you're estimating an
12   AWP for Advate by First DataBank of $2.34?  Is
13   that right?
14        A.   Well, what this document is saying is,
15   it would be to be determined by First DataBank, as
16   I believe we were still in discussions with them.
17   But the estimate is there.
18        Q.   And the next page, page 86 of the
19   Pricing Strategy, shows the "Estimated HCC
20   Pricing" of Advate "at Launch," and "HCC" stands
21   for Home Care?
22        A.   Home Care Company.
23        Q.   Okay.  And so the estimated pricing to
24   home care companies for Advate was $1.04 per unit,

Page 65

1    correct?
2         A.   Correct.
3         Q.   And that represented a premium over
4    Recombinate of about 25 percent, is that correct?
5         A.   Oh, I'll have to calculate it, but --
6    let's see.  It looks similar to that, yes.
7         Q.   You were expecting the difference
8    between your -- strike the question.
9              You were expecting pharmacies,
10   specialty pharmacies, to earn larger spreads on
11   sales of Advate than they did on Recombinate,
12   correct?
13        A.   No.  That's not what we're looking at
14   here.
15        Q.   Well, wasn't the estimated spread
16   between the AWP of Recombinate and the HCC pricing
17   of Recombinate smaller than the estimated spread
18   between the AWP of Advate and the home care price
19   of Advate?
20        MR. DeLANCEY:  Are you talking about what's in
21   this strategy document or what actually happened?
22   BY MR. CHIZEWER:
23        Q.   You can answer.
24        A.   I was just gonna say the same thing.

17 (Pages 62 to 65)

Elite Deposition Technologies - 312-445-0005

Michael Bradley - January 28, 2013

Page 66

1    This -- this -- this is a document that was --
2        MR. CHIZEWER:  That figures.
3    BY THE WITNESS:
4        A.   This was a document that was almost a
5    year before the launch, so you have to look at
6    what we were strategizing at the time and what
7    actually happened once we launched the product.
8    BY MR. CHIZEWER:
9        Q.   Right.  But my question was, I think,
10   based on what you were expecting from the
11   strategy.
12       A.   I --
13       Q.   So -- so let me ask --
14       A.   I can't --
15       Q.   I'm sorry.
16       MR. DeLANCEY:  Let him finish.
17   BY MR. CHIZEWER:
18       Q.   The strate- -- based on the pricing
19   strategy for Advate, you were expecting that
20   specialty pharmacies were going to earn a bigger
21   spread between the AWP and the price of Rec- -- of
22   Recombinate -- strike that.  I'll ask it again.
23       Based on the pricing of Advate, you
24   were expecting your specialty pharmacy customers

Page 67

1    to earn a bigger spread on Advate than they did on
2    Recombinate?
3        A.   I can't get what you just said from
4    this document right here.
5        Q.   You can't get what I just said from
6    looking at both the document on page 86 and the
7    document on page 85?
8        A.   No, because, I mean, Red Book pricing
9    is different than First DataBank pricing.  We were
10   currently working with First DataBank to try to
11   rectify what was in their databases.  And in -- in
12   all reality, what insurance companies pay for our
13   product is -- is a legal binding contract between
14   the provider and the distributor.  So we don't
15   have a clear view of exactly what these home care
16   companies are getting reimbursed.
17       Q.   Don't you calculate AWPs in order to
18   determine what your customer's reimbursement is
19   going to be for the product?
20       A.   No.  I don't understand your question.
21       Q.   You're making as- -- in this pricing
22   strategy, you are making estimates of AWPs for
23   your products, correct?
24       A.   Correct.

Page 68

1        Q.   Why do you bother to try and estimate
2    AWPs for the product?  What's -- what's the
3    meaning of AWP to you?
4        A.   The -- the AWP is the primary basis
5    point for a lot of private insurers and, at the
6    time, Medicaid, their basis for reimbursing for
7    all drugs.
8        Q.   What was the price that you initial- --
9    initially sold Advate to for home care companies?
10       A.   Upon the launch of the product?
11       Q.   Correct.
12       A.   Well, it varied.  I believe it was
13   somewhere in the high 90 cent per unit range.
14       Q.   So 98 cents, 99 cents?  That's what you
15   mean by "high" 90s?
16       A.   I believe, yeah, that's -- it varied by
17   customer.
18       Q.   What is the lowest price that you ever
19   reported to First DataBank as a price for Advate?
20       A.   The lowest price for -- are you talking
21   WAC?
22       Q.   Any price that you reported to First
23   DataBank.
24       A.   I believe, in reviewing some of the

Page 69

1    documents last week, that for First DataBank,
2    we -- our lowest WAC submitted was $1.40 per unit.
3        Q.   What did you understand to be the use
4    of First DataBank by state Medicaid programs?
5        A.   Well, first of all, I want to preface
6    that every state sets their own reimbursement
7    formula, right, first of all.  And factor is a lot
8    different than other traditional pharmaceuticals
9    for many states.
10       So traditionally, and it's even the
11   case today, AWP is used as a basis for
12   pharmaceutical drug reimbursement to the
13   distribution channel.
14       Q.   But my question was:  What was your
15   understanding of how state Medicaid programs made
16   use of information provided by First DataBank?
17       A.   So the -- the states that use First
18   DataBank would use that AWP and usually would have
19   some type of discount off of that for outpatient
20   drug reimbursement.
21       Q.   And did Baxter have an understanding of
22   specifically how a state Medicaid program would
23   actually literally use or receive and implement
24   the data they got from First DataBank?

Elite Deposition Technologies - 312-445-0005

Michael Bradley - January 28, 2013

Page 70

1      A.   We would do surveys to know exactly
2   what type of formula each state would use.
3      Q.   Right.  But apart from just the
4   formula, once they knew -- once they -- they could
5   see the First DataBank reporting, the AWP, for
6   example --
7      A.   Um-hum.
8      Q.   -- what did they do with that data to
9   actually provide reimbursement?
10      MR. DeLANCEY:  "They," you mean states?
11      MR. CHIZEWER:  Right, the state Medicaid
12   programs.
13   BY THE WITNESS:
14      A.   Well, I believe that -- this is just
15   their -- you know, from being on the outside, that
16   they would base their reimbursement for various
17   pharmaceuticals based off of whatever discount
18   they had put on to the AWP plus a dispensing fee.
19   So every state is different.
20   BY MR. CHIZEWER:
21      Q.   And do you know anything about the
22   data feeds that would actually be supplied from
23   First DataBank to the state Medicaid programs and
24   how those data feeds would work in creating the

Page 71

1   reimbursement?
2      A.   The only thing I really fully
3   understand about the data feeds is, sometimes
4   they're daily, sometimes weekly, sometimes
5   monthly, and sometimes even quarterly.
6      Q.   But that those data feeds from
7   First DataBank are -- go directly into the state
8   Medicaid program pricing, is that right?
9      A.   Oh, like I -- I just said, I know that
10   the states base their reimbursement for
11   pharmaceuticals off of the information they get
12   from First DataBank.
13          (WHEREUPON, a certain document was
14          marked Deposition Exhibit No. 10.)
15   BY MR. CHIZEWER:
16      Q.   Mr. Bradley, I've handed you what's
17   been marked as Deposition Exhibit No. 10.  It's a
18   letter dated July 26, 2002 to Kay Morgan from you,
19   identified as BAX MDL E 1937345 to 48.
20          Did you send this letter to Kay Morgan
21   on or about July 26, 2002?
22      A.   I believe I did.
23      Q.   In the very first sentence of that
24   letter, you say:

Page 72

1          "Michael Heggie forwarded me your
2      e-mail correspondence of July 15th,
3      2002 setting forth the data fields
4      First DataBank uses in developing its
5      price reports, together with your
6      comments as to First DataBank's price
7      reporting methodology."
8          Did that e-mail expl- -- correspondence
9   explain how First DataBank calculated WAC?
10      A.   I believe what the gist of this letter
11   is, the fact that we -- we wanted First DataBank
12   to better explain to us what type of information
13   they needed us to report to them based on the fact
14   that we didn't have a whole lot of business to the
15   traditional wholesale class of trade.
16      Q.   And did the e-mail that Ms. Morgan sent
17   to Michael Heggie that was then forwarded to you
18   provide that explanation?
19      A.   I don't recall the specific e-mail;
20   but based on the gist of this letter, I think this
21   was a follow-up with her just to gain some
22   clarification.
23      Q.   What do you think was the customer
24   category of Baxter for Advate that would have been

Page 73

1   closest to wholesaler?
2      A.   Oh, I can't speculate.
3      Q.   You can't answer that question?
4      A.   Nope.
5      Q.   Did you think about that question
6   when deciding what kind of pricing to report to
7   First DataBank?
8      A.   The question I thought of when I was
9   dealing with this issue with Kay or BioScience
10   was, is, we wanted to correct the problem that was
11   out there.  We wanted First DataBank to work with
12   us to -- to tell us exactly what type of
13   information we needed to provide them other than
14   WAC.
15      Q.   I understand what you did think.
16          My question to you is:  During this
17   time period, 2001/2002, when First DataBank was
18   saying they wanted WAC pricing, did you ever think
19   to yourself what category of Baxter customer was
20   the closest to a wholesaler?
21      A.   No.
22      MR. DeLANCEY:  Objection, asked and answered.
23      THE WITNESS:  What?
24      MR. DeLANCEY:  Slow down.

Elite Deposition Technologies - 312-445-0005

Michael Bradley - January 28, 2013

Page 74

1   BY MR. CHIZEWER:
2       Q.   The -- in the third paragraph of the
3   letter, you state to Ms. Morgan:
4           "Baxter BioScience has always
5       understood the term wholesaler to
6       refer to full line wholesalers that
7       deal in all classes of pharmaceuticals,
8       as well as health and beauty aids."
9           Is that an accurate description of how
10  Baxter understands the term "wholesaler"?
11      A.   I believe it was at the time, yes.
12      Q.   So at that time, if there was a
13  wholesaler that was purchasing Baxter products,
14  but they didn't carry health and beauty aids, in
15  Baxter's mind, that was not a wholesaler, correct?
16      MR. DeLANCEY:  Objection.  That's not what the
17  letter says.
18          But you can answer.
19  BY THE WITNESS:
20      A.   It's the same thing.  It says "as
21  well."  It doesn't say "has to be."
22  BY MR. CHIZEWER:
23      Q.   The sentence that you wrote to
24  Ms. Morgan on July 26, 2002, in which you say,

Page 75

1   "Baxter BioScience has always understood the term
2   wholesaler to refer to full line wholesalers that
3   deal in all classes of pharmaceuticals, as well as
4   health and beauty aids," do you belive that
5   sentence is confusing at all?
6       A.   It could be seen as that way.
7       Q.   Did you ever try and correct it to
8   Ms. Morgan?
9       A.   No.
10      MR. CHIZEWER:  Let's take one more break.  I'm
11  getting close to the end, actually.
12      THE VIDEOGRAPHER:  The time is 11:55 a.m.
13  We are going off the record.
14          (WHEREUPON, a recess was had.)
15      THE VIDEOGRAPHER:  This is the beginning of
16  Disk No. 3.  The time is 12:12 p.m.
17          We are back on the record.
18  BY MR. CHIZEWER:
19      Q.   Are home care companies and specialty
20  pharmacies the same thing?
21      A.   By Baxter's definition, yes.
22      Q.   After the launch of Advate, did the
23  price that Baxter charged specialty pharmacies for
24  Advate ever go up?

Page 76

1       A.   Oh, boy.  Maybe.  That, I don't know.
2   I mean, there's so many different situations.
3       Q.   In general, from the time that Advate
4   was launched, what has been the -- sort of the
5   general direction of the pricing for Advate?
6       A.   Down.
7       Q.   And just to clarify, since the launch
8   of Advate, has there ever been a time when more
9   than 5 percent of Advate's sales went to specialty
10  wholesalers?
11      A.   No.
12      Q.   Is that also true for Recombinate?
13      A.   Correct.
14      Q.   Have you heard the term "average
15  manufacturing price"?
16      A.   Yes.
17      Q.   Is that also known as "AMP"?
18      A.   Yes.
19      Q.   What's your understanding of the
20  definition of average manufacturing price --
21      A.   I --
22      Q.   -- or AMP?
23      A.   I can't give an exact definition.
24  It's -- it's in statute.  It's a calculated price,

Page 77

1   I believe excluding some government entities, that
2   we submit to CMS.
3       Q.   Does -- so Baxter submits AMPs for
4   Advate and Recombinate to CMS?
5       A.   Correct.
6       Q.   And just in general, how does Baxter
7   calculate an AMP?
8       MR. DeLANCEY:  Are you going to connect this
9   up to the Notice?
10      MR. CHIZEWER:  Yes.
11      MR. DeLANCEY:  Go ahead.
12  BY MR. CHIZEWER:
13      Q.   In general, how does Baxter
14  calculate --
15      MR. DeLANCEY:  No, no.  Connect it up to the
16  Notice.  "AMP" is not anywhere in the deposition
17  letter.
18      MR. CHIZEWER:  Oh, I'm sorry.  I didn't
19  know -- well, let me go back and look at the
20  Notice.
21          (Short pause.)
22      MR. CHIZEWER:  All right.  I think it relates
23  to the "Comparisons between Recombinate and Advate
24  with respect to... pricing strategy."

Michael Bradley - January 28, 2013

Page 78

1    MR. DeLANCEY:  So if you want to ask him if
2  AMP was used in pricing strategy, I'll let you do
3  that.  Asking him as to how we calculate AMP --
4    MR. CHIZEWER:  Okay.
5    MR. DeLANCEY:  -- I don't see it connected at
6  all.
7    MR. CHIZEWER:  I got it.  I got it.  Fair
8  enough.
9  BY MR. CHIZEWER:
10   Q.   Did Baxter ever intend the AMP prices
11  that it reported to any government entity to be
12  used as a way to figure out the reimbursement for
13  Advate?
14   A.   AMP is calculated and sent to CMS to be
15  used in our Medicaid rebate.
16   Q.   The Medicaid rebate, however, is
17  something that's calculated completely independent
18  of reimbursement levels by state Medicaid
19  programs, correct?
20   A.   Correct.
21   Q.   Okay.
22   A.   I guess I don't understand your
23  question.
24   Q.   State Medicaid programs come up with

Page 79

1  reimbursement amounts for Advate and for
2  Recombinate, correct?
3    A.   Correct.
4    Q.   Okay.  Did Baxter ever provide AMPs for
5  Advate to any government entity with the -- with
6  the intention that those AMPs be used in the
7  calculation of those reimbursement levels?
8    A.   I don't believe we submitted an AMP
9  directly to any state Medicaid.  We would submit
10  them to CMS.
11   Q.   And to the extent that Baxter did
12  submit AMPs to any state Medicaid program, it
13  certainly was not with the intention of having
14  those AMPs affect the reimbursement price,
15  correct?
16   A.   I can't answer --
17    MR. ANDERSON:  Objection, outside the scope of
18  the Notice.
19  BY MR. CHIZEWER:
20   Q.   You can answer.
21    MR. DeLANCEY:  You still have to answer.
22    THE WITNESS:  Oh, I still have to answer?
23    MR. ANDERSON:  In your personal capacity,
24  if you know.  You're not testifying for the

Page 80

1  corporation.
2  BY THE WITNESS:
3    A.   Each state has their own way of
4  calculating their rates, right?  And for a factor,
5  it's a lot different than it would be for a
6  pharmaceutical drug, right?  So some of the
7  states, such as California, require ASP.  Some
8  require acquisition cost.  I do not believe that
9  any state requested our direct AMP from us.
10  BY MR. CHIZEWER:
11   Q.   And you didn't provide the AMP to any
12  state with the intention that they use that AMP to
13  determine a reimbursement level for Advate, for
14  example?
15   A.   No.  As I stated earlier --
16    MR. ANDERSON:  Objection.
17    MR. DeLANCEY:  Objection, beyond the scope.
18  BY THE WITNESS:
19   A.   So as I stated before, we submit --
20  Baxter submits AMP to CMS as a basis for the
21  calculation of the state Medicaid rebates.
22  BY MR. CHIZEWER:
23   Q.   And that's the only reason, correct?
24   A.   Correct.

Page 81

1    Q.   Prior to 2001, did First DataBank ever
2  ask Baxter for a WAC price for any of its
3  products?
4    A.   Not directly, no.
5    Q.   Did they ever ask you for it
6  indirectly?
7    A.   They had always had an overview of the
8  prices that you could submit to them, and
9  I believe -- and I'm -- you know, this is -- I'm
10  not a hundred percent sure.  But I do believe that
11  WAC price was one of those prices that was on
12  their various lists of pricing that you could
13  submit to them.
14   Q.   But prior to around -- prior to June
15  2000 -- June 2001, Baxter was never reporting a
16  WAC price to First DataBank, correct?
17   A.   I believe that's the case.
18    MR. CHIZEWER:  No further questions.
19  I reserve the right to ask follow-up based on
20  Ven-A-Care's examination.
21    Do you want to break for lunch, or do
22  you want to -- well, I guess it's up to the --
23    MR. BREEN:  Let's break for lunch.
24    MR. CHIZEWER:  Okay.

Elite Deposition Technologies - 312-445-0005

Michael Bradley - January 28, 2013

Page 82

1    THE VIDEOGRAPHER:  The time is 12:20 p.m.
2  We are going off the record.
3         (WHEREUPON, at 12:20 p.m., the
4         deposition of MICHAEL BRUCE
5         BRADLEY was recessed until
6         1:30 p.m., this date, Monday,
7         January 28, 2013.)
8    THE VIDEOGRAPHER:  The time is 1:39 p.m.
9       We are back on the record.
10        EXAMINATION
11  BY MR. BREEN:
12    Q.   Mr. Bradley, I'm Jim Breen.
13  I represent Ven-A-Care of the Florida Keys,
14  a Relator in one of the actions against Baxter
15  that was resolved last year.
16       Have we ever met each other before
17  today?
18    A.   No.
19    Q.   Now, you're here as a designated
20  corporate spokesperson at the request of
21  Sun/Hamilton, and you were shown Exhibit 1 earlier
22  today, which are the topics that you've been
23  designated to be prepared to testify about.
24       Do you have a copy of that in front of

Page 83

1  you?
2    A.   I do.
3    Q.   Now, there was a series of questions
4  towards the end of your -- of Mr. Chizewer's
5  questions regarding average manufacturer's price
6  or AMP.  Do you recall that line of questions?
7    A.   I do.
8    Q.   Okay.  Did you -- before coming here
9  today, did you believe you were designated to
10  prepare to testify about average manufacturer's
11  price?
12    MR. CHIZEWER:  Objection to form.
13    MR. BREEN:  What's wrong with that question?
14    MR. CHIZEWER:  I think it's leading.
15  BY MR. BREEN:
16    Q.   Before coming here today, did you
17  believe you were designated to prepare to testify
18  about average manufacturer's price?
19    MR. CHIZEWER:  Same objection.
20  BY THE WITNESS:
21    A.   No.
22  BY MR. BREEN:
23    Q.   You can answer.  Okay.  Now -- we'll
24  get back to that.

Page 84

1    As I said, I represent Ven-A-Care of
2  the Florida Keys.  Do you know Ven-A-Care to be a
3  specialty pharmacy?
4    A.   I believe it is, yes.
5    Q.   And you understand that Ven-A-Care is
6  the qui tam Relator that first brought average
7  wholesale pricing cases?
8    A.   Yes.
9    Q.   Okay.  And first brought an action
10  against Baxter back in the '90s, correct?
11    A.   Yes.
12    Q.   Now, throughout your -- your testimony
13  today, you were asked a series of questions where
14  you used the term "specialty pharmacy."  Do you
15  recall using that term?
16    A.   I do.
17    Q.   And at one time, you even -- I believe
18  you even said, and I may be confused, that ASD
19  was, in your understanding, a specialty pharmacy.
20    A.   What I recollect as saying is that the
21  traditional pharmaceutical wholesalers have
22  established entities within their company that can
23  be seen as specialty pharmacies.
24    Q.   Now, I want to dir-- -- I want to ask a

Page 85

1  little bit about that because that -- that --
2  I'm -- to clarify that.
3       Are you saying that they are
4  pharmacies, specialty pharmacies, that actually
5  provide IV therapies and infusions; or are you
6  saying that they're divisions that sell to those
7  types of pharmacies?
8    A.   It's my understanding that, for
9  instance, some- -- someone like AS- -- or a
10  company such as ASD is a subsidiary of a larger
11  wholesaler.  And we, as Baxter, treat them as we
12  would any other specialty pharmacy.
13    Q.   So you -- now, when you say "specialty
14  pharmacy" in connection with ASD, are you talking
15  about a healthcare company that provides
16  pharmaceutical services to patients, or are you
17  talking about a division that sells therapeutic
18  products to pharmacies?
19    A.   No.  I'm talking about -- our term
20  within Baxter, a "specialty pharmacy" is, they
21  sell -- they ship the product directly to the
22  patient and bill the insurer direct, so it's not
23  a business-to-business.  It's a business to an end
24  user.

22 (Pages 82 to 85)

Michael Bradley - January 28, 2013

Page 86

1    Q.    Okay.  So your understanding is, ASD
2  was an actual specialty pharmacy?
3    A.    Correct.
4    Q.    Have you ever heard of --
5    MR. CHIZEWER:  Objection, asked and answered.
6  BY MR. BREEN:
7    Q.    Have you ever heard of Coram?
8    A.    Yes.
9    Q.    Have you ever heard of Caremark?
10   A.    Yes.
11   Q.    Do you know what they are?
12   A.    Well, we consider the part that we deal
13  with them as specialty pharmacies, that they are
14  larger entities for other business issues.
15   Q.    Okay.  They're big customers of Baxter,
16  though, correct?
17   A.    Yes.
18   Q.    In the area of biological products?
19   A.    Correct.
20   Q.    Okay.  Now, you were asked a question
21  about an entity known as Biomedical Plus.  Do you
22  recall that?
23   A.    Biomed Plus, yes.
24   Q.    Okay.  Are they specialty distributors?

Page 87

1    A.    To the best of my knowledge, they are
2  more like a specialty pharmacy.
3    Q.    Okay.  Now, were you prepared today to
4  testify about the nature of the business of Biomed
5  Plus, ASD, and these other entities that you've
6  been asked about?
7    A.    No.
8    MR. CHIZEWER:  Objection to form.
9  BY THE WITNESS:
10   A.    No.
11  BY MR. BREEN:
12   Q.    Okay.  Did you believe you were
13  designated to testify about those specific topics?
14   MR. CHIZEWER:  Same objection.
15  BY THE WITNESS:
16   A.    No.
17  BY MR. BREEN:
18   Q.    Okay.  Do you have any information
19  available to you that would indicate that Biomed
20  Plus is not a specialty distributor that sells
21  products to specialty pharmacies?
22   A.    I'm not aware.  I don't have any
23  information available to me.
24   Q.    Not one way or the other, correct?

Page 88

1    A.    Correct.
2    Q.    Okay.  Now, in response to a couple of
3  questions that Mr. Chizewer asked you early on,
4  I believe that you indicated that when -- that
5  Advate is a third generation of Recombinate?
6    A.    Correct.
7    Q.    And when I say "Recombinate," I mean
8  Recombinate with an "a-t-e" at the end of it.
9    A.    Correct.
10   Q.    And Recombinate is a trademarked name
11  that Baxter assigns to certain products, correct?
12   A.    To a product, right.
13   Q.    Okay.  And so --
14   MR. BREEN:  Let me have this marked as
15  Exhibit 11.  We're going to continue on with the
16  marking protocols.
17       (WHEREUPON, said document was
18        marked Deposition Exhibit No. 11.)
19  BY MR. BREEN:
20   Q.    And I'll ask that you just take a look
21  at the first page of this document for now,
22  "Recombinant Factor VIII Global Manufacturing
23  Capacity Update, November 2000."
24       Do you see that?

Page 89

1    A.    I do.
2    Q.    In November of 2000, which generation
3  of Recombinate was Baxter actually marketing?
4    A.    That was recombinant -- Recombinate,
5  sorry.
6    Q.    Okay.  Would that be the second
7  generation?
8    A.    First.
9    Q.    First, okay.
10       And when did Baxter come out with a
11  second generation recombinant?
12   A.    We didn't.
13   Q.    All right.  So when you call it -- when
14  you talk about the third generation Recombinate,
15  what are you talking about?
16   A.    So it's considered first generation of
17  recombinant factor proteins, which was
18  Recombinate --
19   Q.    Okay.
20   A.    -- okay?  So they -- they have plasma
21  within the manufacturing process, but also, plasma
22  is a stabilizer.
23       Generation II is the next level, which
24  we don't have a product, where they took the

Michael Bradley - January 28, 2013

Page 90

1    plasma out of the vial, still used it in the
2    manufacturing process.
3         Generation III, which was Advate, took
4    out all human and animal protein from both the
5    cell culture and the vial.
6         Q.   Okay.  So by November of 2000, was
7    Baxter in the process of developing its
8    Generation III recombinant?
9         A.   Yes.
10        Q.   Now, I'll ask -- have you ever seen
11   this document before, this Manufacturing Capacity
12   Update?
13        A.   No.
14        Q.   I'll ask if you'll go to page -- it's
15   Bates numbered on the lower right-hand corner
16   GH 000771.  And at the top, it's -- there's a
17   chart, "Recombinant Factor VIII Global Marketing
18   Capacities."  Do you see that?
19        A.   Yes.
20        Q.   And if you look at the chart, you'll
21   see the first one is Kogenate FS.  That's the
22   Bayer product, correct?
23        A.   Correct.
24        Q.   And then, ReFacto, that's the

Page 91

1    Neuchatel product, is that correct?
2         A.   That -- I believe it was Wyeth at
3    the --
4         Q.   Wyeth?  Okay.
5         A.   -- time.
6         Q.   And then the next one is what?
7         A.   Recombinate.
8         Q.   Recombinate?
9         A.   Right.
10        Q.   Okay.  And if you will look in the
11   third column, you see "Date of Full Production"?
12        A.   Yes.
13        Q.   And if we drop down, it says
14   in production third quarter of '02.  Do you see
15   that?
16        A.   Yes.
17        Q.   So does this -- what does this mean?
18   Does this mean that Baxter is projecting when
19   something will be in production?
20        A.   I -- I don't know.
21        Q.   Okay.  Okay.  All right.  Let's drop
22   down -- let's drop down to the notes on the table.
23   Do you see that?
24        A.   Um-hum.  Yes.

Page 92

1         Q.   And the last note says:
2              "Launch dates for Recombinate are
3          the projected approval dates for the
4          protein-free formulation."
5              Do you see that?
6         A.   Yes.
7         Q.   What was the protein-free formulation
8    that Baxter was projecting would be approved back
9    in November of 2000?
10        A.   So looking at this information down
11   below, it seems that they're talking about Advate
12   because Advate would be the protein formulate
13   re- -- the protein-free formulation of
14   Recombinate.
15        Q.   And I recall during your testimony in
16   response to Mr. Chizewer's questions, you actually
17   indicating that the product that was eventually
18   marketed under the name Advate was just considered
19   internally at Baxter to be the new improved
20   version of Recombinate, correct?
21        A.   Correct.
22        Q.   And is this document consistent with
23   that recollection of yours?
24        A.   It is.

Page 93

1         MR. CHIZEWER:  Objection to form.
2    BY THE WITNESS:
3         A.   It is.
4    BY MR. BREEN:
5         Q.   Okay.  Now, if you could look at
6    Exhibit 9 from -- that Mr. Chizewer showed you
7    earlier today.  And the date -- this document is
8    entitled "Advate Pricing Core Team."  Do you see
9    that?
10        A.   I do.
11        Q.   And the date is December 16th, 2002?
12        A.   Correct.
13        Q.   Now, so is it -- is it correct that
14   by December 16th, 2002, Baxter's personnel were
15   already thinking about and planning how Advate
16   would be priced once it came on the market?
17        A.   Yes.
18        Q.   Even though it wasn't approved by the
19   FDA for -- for actual distribution yet, correct?
20        A.   Yes.
21        Q.   Okay.  Now, the folks that were doing
22   this work, were you -- were you part of this,
23   this -- this group?
24        A.   I was part of it, yes.

Michael Bradley - January 28, 2013

Page 94

1    Q.   Okay.  And were these folks the same
2    folks that -- that would do the same type of
3    pricing planning for Recombinate?
4    A.   It wouldn't be the same people because
5    Recombinate was ten years before.  You know what?
6    In my capacity at Baxter when Recombinate was
7    launched, I was -- I was not part of the pricing
8    core team, so I really can't answer that question.
9    Q.   Let me ask the question this way.  If
10   the -- if the same personnel worked at Baxter at
11   the time that Recombinate was launched and were
12   in the same positions by the time Advate was
13   launched, would it be the same folks handling the
14   pricing projections?
15   MR. CHIZEWER:  Objection to form.
16   BY THE WITNESS:
17   A.   Yes.
18   BY MR. BREEN:
19   Q.   Okay.  So let me ask the question in
20   a -- in a -- in a better way, okay?
21   With the exception of -- of transfers
22   of personnel, did the same personnel, by position
23   at Baxter, handle the pricing strategy for Advate
24   as has -- as handled the pricing strategy for

Page 95

1    Recombinate?
2    A.   I think for the most part, there --
3    there were additions for the launch of Advate.
4    Q.   Additional personnel?
5    A.   Additional personnel, yes --
6    Q.   But they were --
7    A.   -- with functional expertise.
8    Q.   But they were working in the same
9    functional area at Baxter, correct?
10   MR. CHIZEWER:  Objection to form.
11   BY THE WITNESS:
12   A.   For the most part.  There -- it's a
13   little difficult to answer because we had become a
14   bit broader organization then, so we have -- there
15   was more functional expertise in this pricing core
16   team than I believe would have been there for
17   Recombinate; but they're fairly similar.
18   BY MR. BREEN:
19   Q.   Okay.  More functional expertise?
20   A.   Right.
21   Q.   So the core team would basically have
22   been improved over the years?
23   A.   Correct.
24   Q.   Okay.  But there wasn't a different

Page 96

1    core team running around handling Recombinate
2    pricing than was handling Advate pricing?
3    MR. CHIZEWER:  Objection to form.
4    BY MR. BREEN:
5    Q.   Is that correct?
6    A.   Yes.  Yes.
7    Q.   Let me ask it in a -- in a better way.
8    Was there a separate core team for
9    Recombinate pricing in December of '02 than there
10   was for Advate pricing?
11   MR. CHIZEWER:  Objection, asked and answered.
12   MR. BREEN:  I believe you objected to my
13   question, so I'm trying to overcome your
14   objection.
15   BY THE WITNESS:
16   A.   I -- as I said, I wasn't at a -- at a
17   functional area for the launch of Recombinate that
18   I could fully answer that question.  My assumption
19   is, we would be doing the same analysis with very
20   similar personnel in order to determine our
21   pricing strategy.
22   BY MR. BREEN:
23   Q.   Okay.  Now, again, this is
24   December 16th, 2002.  And I believe you testified

Page 97

1    that this was just an early planning document,
2    correct?
3    A.   That's -- was my assumption, yes.
4    Q.   Now, are you aware that by
5    December 16th, 2002, the Ven-A-Care case and the
6    resulting investigations had -- had existed for a
7    number of years?
8    A.   I most likely knew.
9    Q.   Okay.  And you say that you were -- you
10   were -- well, let me ask the question this way.
11   Was Baxter aware by December 16th, 2002
12   that the Department of Justice and the states and
13   Congress were investigating drug company pricing
14   conduct as a result of the Ven-A-Care allegations?
15   A.   Yes.
16   Q.   Okay.  There was no -- that was not --
17   that was -- that was clear to everybody that was
18   responsible for this pricing area of Baxter,
19   correct?
20   A.   Yeah, maybe not too specific, but we
21   knew there was litigation going on.
22   Q.   Okay.  And did you know that Baxter and
23   other drug companies' pricing representation
24   conduct was being closely scrutinized and

25 (Pages 94 to 97)

Michael Bradley - January 28, 2013

Page 98

1 investigated by the Department of Justice?
2    A.  Yes.
3    Q.   And did you know that Congress was
4 investigating it?
5    A.  I believe so.
6    Q.   And did you know that the States'
7 Attorneys Generals were concerned about it?
8    A.  Yes.
9    Q.   Okay.  So this Pricing Strategy early
10 draft, December 16th, '02 Discussion Document,
11 does this reflect the actual pricing decisions
12 that Baxter made with respect to Advate?
13    A.  No, it does not.
14    MR. BREEN:  All right.  Let's have the next
15 one marked as Exhibit 12.
16       (WHEREUPON, said document was
17       marked Deposition Exhibit No. 12.)
18    THE WITNESS:  Oh.
19 BY MR. BREEN:
20    Q.   Now, this document is entitled
21 "BSC NA 2003 Strategic Plan Assumptions," and in
22 the far right, it says "Last Updated: 5/1/03."
23       Do you see that?
24    A.  I do.

Page 99

1    Q.   Now, if you'll look at the first
2 section, it says:
3       "U.S. Factor VIII Assumptions:
4       Overall, market is expanding at a
5       rate of about 5 percent per year."
6       Do you see that?
7    A.  I do.
8    Q.   And if we look at the bullet points
9 under that, I'll direct your attention down to
10 No. 9.  It says:
11       "Recombinate units will shift to
12       Advate after launch in June" of "2003
13       with Advate capturing 14% of" the
14       "units in 2003, 42% in 2004, 80% in 2005
15       and 100% thereafter."
16       Do you see that?
17    A.  I do.
18    Q.   Then we go down to paragraph 13.  It
19 says:
20       "Our Advate pricing of" 95 percent
21       per unit -- "$0.95 per unit will" res- --
22       "will be reimbursable by state, federal
23       and private pay.  However," increased --
24       "increasing PHS and/or Medicaid rebates

Page 100

1 will cause the ASP to decline."
2       Do you see that?
3    A.  I do.
4    Q.   Now, first off, taking your attention
5 back to paragraph 9, there's some assumptions here
6 made about the Advate capturing the market and,
7 I would assume, Recombinate's share going down.
8 Is that correct?
9    A.  That's correct.
10    Q.   And what is that about?
11    A.  Well, this is our forecasting
12 assumption, upon the launch of Advate, what the
13 market share of Advate would be over the next two
14 to three years.
15    Q.   So, now -- now, I see both the words
16 "Recombinate" and "Advate" being looked at
17 together in the same document on the same line.
18 Do you see that?
19    A.  I do.
20    Q.   So by May of 2003, were the same
21 personnel at Baxter that were responsible for
22 making projections about Recombinate making the
23 projections about Advate also?
24    A.  Yes, I believe they were.

Page 101

1    Q.   Now, if we go down, paragraph 10 says:
2       "ASP growth Recombinate will continue
3       to increase."
4       Do you see that?
5    A.  I do.
6    Q.   What does that mean?
7    A.  I believe it means that our overall
8 selling prices for Recombinate, our first
9 generation Factor VIII, will continue to increase.
10    Q.   Now, if we go down to paragraph 13, it
11 says:  "Our Advate pricing of" 95 percent -- "$0.95
12 per unit."  Do you see that?
13    A.  Yes.
14    Q.   Now, is that actual, what your -- what
15 your expected actual price was to be?
16    A.  Yes.
17    Q.   Now -- all right.  Now, hold onto that
18 one.
19    MR. BREEN:  And we'll mark this one as -- are
20 we at 13 now?
21    THE COURT REPORTER:  Yes.
22       (WHEREUPON, said document was
23       marked Deposition Exhibit No. 13.)
24

26 (Pages 98 to 101)

Elite Deposition Technologies - 312-445-0005

Michael Bradley - January 28, 2013

Page 102

1   BY MR. BREEN:
2       Q.   This is a multipage document.  It is
3   titled "Recombinant Factor VIII Business Plan,
4   2004 through 2005."  Do you see that?
5       A.   I do.
6       Q.   Now, if you will go to page 23 of the
7   business plan, which is Bates numbered, it ends in
8   9609 --
9       A.   Okay.
10      Q.   -- and you'll see there's a section
11  here on "Pricing by Product."  Do you see that?
12      A.   I do.
13      Q.   At the top, it says:
14          "Since the Advate launch, the
15          competition has been driving down the
16          price in the hemophilia market place
17          and looking at" alternative (sic)
18          "distribution channels including PBMs."
19          Do you see that?
20      A.   I do.
21      Q.   So, now, is this a -- a -- a look at
22  what was going on in the Factor VIII marketplace
23  after Advate had been out for a couple years?
24      A.   Yes.

Page 103

1       Q.   And where it says that "the competition
2   has been driving down the price in the... market
3   place," is that consistent with your recollection
4   of what was going on?
5       A.   Yes.
6       Q.   Now, if we go down to the next
7   paragraph, it says:
8          "Given the desire to increase
9          the rate of conversion and the
10         marketplace feedback surrounding
11         pricing, it was determined that the
12         price premium over Recombinate
13         should be reduced from 16% to 5-7%,
14         more in line with the original
15         Simon Kucher research showing that
16         a 5% premium was acceptable."
17         Do you see that?
18      A.   I do.
19      Q.   Now, what was that about?
20      A.   Once we've -- just like any other
21  launched product, we launched it at a certain
22  price point based on research that we have done
23  with the various stakeholders.
24         Once it was out on the market, we

Page 104

1   really realized that the price that we launched
2   it at was, most likely, too much of a premium over
3   Recombinate, so we decided to lower our prices.
4       Q.   And then you go on to say:
5          "This price discount was
6          implemented on May 10th, 2004.  At
7          the time of the discount, the list
8          price was decreased proportionately
9          more than the selling price to"
10         Baxter's "customers."
11         Do you see that?
12      A.   I do.
13      Q.   What does that mean?
14      A.   So we decreased our ASP for Advate.
15  But based on our own internal protocol, any time
16  we have a price change on our direct price, we
17  have to change the information we give to the
18  databases.  And, in actuality, we lowered the
19  database pricing more than we did the direct
20  selling price to our customers.
21      Q.   So if we go back to this early working
22  paper, which is Exhibit 9, which has some
23  projections on it about what a list price in an
24  AWP might be --

Page 105

1       A.   Correct.
2       Q.   -- did that ever happen?
3       A.   No.
4       Q.   Were those prices ever set?
5       A.   They were not.
6       Q.   And, as a matter of fact, once Advate
7   was launched and was in the marketplace, did
8   Baxter increase or decrease its spread on Advate?
9       A.   I believe we --
10  MR. CHIZEWER:  Object to form.
11  BY THE WITNESS:
12      A.   (Continuing) -- we decreased it.
13  BY MR. BREEN:
14      Q.   Okay.  And when you decreased the
15  spread on Advate, do you know whether that was
16  consistent with desires of the Department of
17  Justice and the other investigative body --
18  government investigative bodies?
19      A.   I believe part of the overall decision
20  only for market forces was the fact that there was
21  increased scrutiny in pricing in general at
22  that -- at this time.
23      Q.   So did that -- okay.
24  MR. BREEN:  Let me -- let me do one more.

Elite Deposition Technologies - 312-445-0005

Michael Bradley - January 28, 2013

## Page 106

1       Let me show you what will be marked as
2  Exhibit 14 --
3            (WHEREUPON, said document was
4            marked Deposition Exhibit No. 14.)
5  BY MR. BREEN:
6       Q.   (Continuing) -- which purports to be an
7  e-mail from Doreen Eaton to Jeff Beck and others.
8       Do you see that?
9       A.   I do.
10      Q.   The Sent Date is July 16th, 2004.
11  Would that be about a point in time when Advate
12  had been on the market for about a year?
13      A.   Yes.
14      Q.   And the e-mail says:
15           "As discussed on today's sales
16           call, attached are the Advate pricing
17           question talking points."
18      Do you see that?
19      A.   I do.
20      Q.   Now, if we go to the next page, there's
21  a question:  "What" -- No. 1, it says:  "What is
22  the Price of Advate?"  Do you see that?
23      A.   I do.
24      Q.   And then the bullet point says:

## Page 107

1           "Advate represents a new advanced
2           category of hemophilia A therapy yet"
3           it's "priced only 5-7% higher than
4           Recombinate as listed by the published
5           databases."
6       Do you see that?
7       A.   I do.
8       Q.   The next bullet point:
9           "As of July 1" of "2004," the
10          "published database prices for Advate
11          are..."
12      What is the one for First DataBank?
13      A.   $1.75 per unit.
14      Q.   So -- and if you go to Exhibit 9 that
15  Mr. Chizewer showed you today, what is the draft
16  pro forma that was being discussed in December of
17  2002?
18      A.   So, yes, looking at No. 9, for
19  Red Book, it was $1.87; and for First DataBank,
20  that we have an estimate of $2.34.
21      Q.   So -- but what -- what, in fact, was
22  the -- the price published by First DataBank?
23      A.   $1.75 per unit.
24      Q.   Okay.  Now -- and then, from there,

## Page 108

1  Baxter continually -- further reduced the list
2  price, correct?
3       A.   Correct.
4       Q.   And further reduced the spread?
5       A.   Correct.
6       Q.   Now, is this the point -- where it says
7  "priced... 5-7% higher than Recombinate," are you
8  saying that Baxter is trying to get 5 percent --
9  5 to 7 percent more money to Baxter than it is
10  getting for Recombinate?
11      A.   No.  When we're talking about price
12  here, we're talking external pricing that some of
13  our customers would see, which would be the
14  database prices.
15      Q.   The database prices, okay.
16           But you're not talking about Advate
17  having a bigger spread than Recombinate?
18      A.   No.
19      Q.   Okay.  Let me see one more thing.
20           Oh, on bullet point 2, the same
21  document, it says:
22           "Advate is priced within the
23           range of... other currently licensed
24           Factor VIII therapies."

## Page 109

1           Do you see that?
2       A.   I do.
3       Q.   So what does that mean when you say
4  "other... Factor VIII therapies"?
5       A.   So when you look at the other
6  recombinant Factor VIII therapies in that
7  category, right -- Kogenate, Helixate, ReFacto --
8  what this -- this, in a sense, is saying is that
9  Advate is priced within ranges of other like
10  therapies.
11      Q.   And so when Baxter's personnel
12  evaluated what ranges Advate was priced in, they
13  were doing so in comparison to all other
14  Factor VIIIs, including Recombinate, correct?
15      A.   Correct.
16      Q.   So were there -- was there other people
17  at Baxter that were different from the folks that
18  would have been responsible for this type of memo
19  that were separately evaluating the pricing of
20  Recombinate?
21      A.   No.
22      Q.   They were all the same people, right?
23      A.   Correct.
24      Q.   So you've got the same folks at Baxter

Elite Deposition Technologies - 312-445-0005

Michael Bradley - January 28, 2013

Page 110

1    that are pricing Recombinate as are pricing
2    Advate?
3        A.   Correct.
4        Q.   The same folks at Baxter reporting the
5    pricing of Advate and Recombinate to the databases
6    like First DataBank, correct?
7        A.   Correct.
8        Q.   The same division of Baxter is
9    manufacturing Recombinate as is manufacturing
10   Advate, correct?
11       A.   Correct.
12       Q.   The same -- what about the -- the --
13   the -- the ultimate patient?  Is the ultimate
14   patient base that needs Recombinate any different
15   than the patient base that needs Advate?
16       A.   No, not at all.
17       Q.   Has Baxter ever been aware of any
18   differences in the patients that were taking those
19   products?
20       A.   No.
21       Q.   How about the way it was administered
22   to those patients?  Was there any difference
23   whatsoever in the way Recombinate was administered
24   to the patient as Advate?

Page 111

1        MR. CHIZEWER:  Objection to form.
2    BY THE WITNESS:
3        A.   No.  The only difference is, is,
4    Advate had less diluent, so it had 5 mLs of
5    diluent instead of 10.
6    BY MR. BREEN:
7        Q.   That means it was less volume?
8        A.   Less volume.
9        Q.   So it could be -- it could be infused
10   faster?
11       A.   Correct.
12       Q.   And the patient would be at risk --
13   at lower risk for things like -- like -- would
14   they be at lower risk for anything because of the
15   faster --
16       A.   It's a patient convenience issue.
17       Q.   Just more convenient?
18       A.   Yes.
19       Q.   But it goes in the same way, through an
20   IV, correct?
21       A.   Yes.
22       Q.   Okay.  Through an infusion?
23       A.   Correct.
24       Q.   And that's -- is that -- is that why

Page 112

1    specialty pharmacies like Ven-A-Care were the
2    primary healthcare providers that provided that
3    product?
4        A.   Yes.
5        Q.   Okay.  So same patients, same
6    administration, same -- same medical condition.
7             How about the -- the healthcare
8    providers that were providing Advate and
9    Recombinate to the patients, was there any
10   difference between them?
11       A.   Not at all.
12       Q.   So the same doctor would be taking care
13   of the same patient and making a decision as to
14   whether it was Recombinate or Advate, correct?
15       A.   True.
16       Q.   Okay.
17       A.   Right.
18       Q.   Well, how about -- now -- now, how
19   does -- typically, how does these -- how do the
20   patients get the Factor VIII blood product?  Who
21   takes it to them?
22       A.   So there's primarily two ways, and the
23   ones I'm focusing on, our two biggest customer
24   segments, right.  So we have the specialty

Page 113

1    pharmacies, and we have the 340B hemophilia
2    treatment centers.
3             And, for the most part, both of those
4    entities purchased the product from us.  We ship
5    it to them.  They repackage it and send it to the
6    patient via overnight delivery.
7        Q.   And then -- and then, does somebody
8    help the patient infuse the product intravenously?
9        A.   Some.  Some do, some don't.  But the
10   primary -- the -- most of the hemophilia
11   population either infuses themselves, or they have
12   a caregiver, but there is a subsegment that needs
13   a nurse.
14       Q.   A home health nurse?
15       A.   A home health nurse come into their
16   home, yes.
17       Q.   Okay.  And that would be a nurse
18   provided by companies like Coram or Caremark or
19   something like that --
20       A.   Correct.
21       Q.   -- correct?  Okay.
22             So 4 -- 340Bs are clinics?
23       A.   340Bs are the designated
24   federally-funded hemophilia treatment centers.

Elite Deposition Technologies - 312-445-0005

Michael Bradley - January 28, 2013

Page 114

1    Q.   Okay.  So any -- from Baxter's
2  perspective, was there any difference whatsoever
3  between the healthcare providers that would be
4  interfacing with the patient to provide Advate as
5  opposed to Recombinate, any difference whatsoever?
6    A.   None at all.
7    Q.   Okay.  The same healthcare providers.
8  All right.  Now --
9    MR. BREEN:  Where are we at?  15?
10    THE COURT REPORTER:  Yes.
11    MR. BREEN:  Okay.  This will be Exhibit 15.
12         (WHEREUPON, said document was
13         marked Deposition Exhibit No. 15.)
14  BY MR. BREEN:
15    Q.   This purports to be an e-mail chain.
16  First, on the top, it's from Tracy L. Anderson to
17  Pete O'Malley, dated July 27th, 2005.  Do you see
18  that?
19    A.   I do.
20    Q.   "Subject:  Priority - Hemophilia
21  Question."
22         And then, if we go down to the
23  next-to-the-last paragraph, it says:
24         "Royal, take a look at the attached

Page 115

1         spreadsheet which lists all of our
2         customers and their commitments for
3         Advate and Recombinate."
4         Do you see that?
5    A.   I do.
6    Q.   So let's go to the spreadsheet, and
7  specifically, I'll draw your attention to Bates
8  page ends in 6428.
9         Now, the first thing I'm going to ask
10  you is:  Did the same people at Baxter prepare --
11  you'll see there's -- there's data here about
12  Advate, and there's data about Recombinate.
13         Do you see that?
14    A.   Yes, I do.
15    Q.   And it's all in one Excel spreadsheet
16  or some kind of spreadsheet, right?
17    A.   Yes.
18    Q.   Did the same people at Baxter prepare
19  the information for Advate as they did for
20  Recombinate?
21    A.   Yes.
22    Q.   Okay.  Now -- and you'll look at these
23  account numbers in column A.  Do you see that?
24    A.   Yes.

Page 116

1    Q.   And -- and you see how the account
2  numbers repeat themselves for Advate and
3  Recombinate?
4    A.   Yes.
5    Q.   Now, what is going on here?  What is
6  this -- what is this spreadsheet showing us?
7    A.   So I'm assuming what this spreadsheet
8  shows is, the account number is the customer
9  number, right, so these would be each individual
10  comp- -- companies.
11         And then, across the -- the top column,
12  or one of the top columns -- or rows, I guess you
13  would call it -- is, you'd have the different
14  units purchased based on quarter.
15    Q.   So is -- is Baxter looking at -- at the
16  comparison of individual specific customers that
17  are buying both Advate and Recombinate?
18    A.   Yes.
19    Q.   To see if they're succeeding in getting
20  customers to buy Advate more than Recombinate,
21  correct?
22    A.   Correct.
23    Q.   Now, at this particular point in time,
24  to the extent that -- that Advate and Recombinate

Page 117

1  were reimbursed by HCPCS codes by Medicare, do you
2  know if they were being reimbursed under the same
3  code?
4    A.   They were --
5    Q.   What --
6    A.   -- being reimbursed.
7    Q.   What does that mean?
8    A.   So the way CMS defines -- defines the
9  way that they set their coverage and reimbursement
10  is based on a HCPCS or J Code.
11         And CMS made a decision that both
12  Advate and Recombinate, along with Kogenate, would
13  all be reimbursed under the same recombinant
14  factor HCPCS code.
15    Q.   Okay.  So Baxter is looking at Advate
16  and Recombinate together to determine if it's
17  successfully moving patients from Recombinate to
18  Advate, correct?
19    A.   Correct.
20    Q.   At the same time, they -- CMS that runs
21  the Medicare program is reimbursing Advate and
22  Recombinate at one reimbursement amount, correct?
23    A.   Correct.
24    Q.   A common reimbursement amount?

Elite Deposition Technologies - 312-445-0005

Michael Bradley - January 28, 2013

Page 118

1    A.   Correct.
2    Q.   Now, go to the next page.  You'll see
3  we've got specific customers and what have you.
4       Is this the backup data for the summary
5  spreadsheet we just looked at?
6    A.   Without really diving into it, I would
7  assume that's what this is.
8    Q.   But is that typically the type of thing
9  you see at Baxter when they try to compare
10  customer volume and purchases?
11    A.   Yes.
12    Q.   Right.  Well, look at the -- for
13  example, let's take the first one.  Well, take --
14  row 3 is Coram Healthcare.  Do you see that?
15    A.   I do.
16    Q.   And the owner agreement number is
17  34137170.
18       So if we flip back to the first
19  page and look at row 5, 34137170, do you see that?
20    MR. DeLANCEY:  You read the wrong number.
21    MR. BREEN:  Oh, I did.  I'm sorry.
22  BY MR. BREEN:
23    Q.   Let's start -- let's start all over
24  again.  Row 3, Coram, on the second page,

Page 119

1  34251473, do you see that?
2    A.   Yes.
3    Q.   And then we go back to row 3, 34- -- on
4  the page before that --
5    A.   Right.
6    Q.   -- 34251473.  Do you see that?
7    A.   I do.
8    Q.   So we can match them up by -- by their
9  customer number?
10    A.   Yes.
11    Q.   Okay.  Now --
12    MR. BREEN:  No. 16 --
13       (WHEREUPON, said document was
14       marked Deposition Exhibit No. 16.)
15       (WHEREUPON, discussion was had off
16       the record.)
17  BY MR. BREEN:
18    Q.   (Continuing) -- is a multipage
19  document.  It purports to be an e-mail chain that
20  begins from Peter Fang to Adeel Kheiri and others
21  dated February 27th, 2004.  Do you see that?
22    A.   I do.
23    Q.   And it purports to be a -- to attach
24  a -- a document called Advate Report, and the

Page 120

1  subject is "US Advate Weekly Report."  Do you see
2  that?
3    A.   I do.
4    Q.   Now, if we go to the next page, there's
5  an attachment that says "Advate Launch Update" by
6  the "BioScience Operating Committee, March 1st,
7  2004."  Do you see that?
8    A.   I do.
9    Q.   Now, by March 1, 2004, Advate had been
10  on the market for about nine months, correct?
11  Eight months?
12    A.   Eight months, maybe, yes.
13    Q.   About eight months.
14       Now, the BioScience Operating
15  Committee, was that specific just to Advate, or
16  did it also consider Recombinate?
17    A.   No.  It's -- it was the operating
18  committee for BioScience, so it would be all
19  products.
20    Q.   All products, okay.  And were you on
21  that committee?
22    A.   No.
23    Q.   But there were not different people
24  on -- on that comm-- -- in other words, there

Page 121

1  wasn't a BioScience Operating Committee for Advate
2  and another one for Recombinate?
3    A.   Correct.  There were not.
4    Q.   Okay.  So let's go on into this
5  document, and we'll go to page 23 of the document,
6  which is -- last Bates numbers are 7060.  It says
7  Key Account Data Analysis.  Do you see that?
8    A.   I do.
9    Q.   Now, it says:
10       "Analysis of Sales at Customer
11       Level.  Advate Account Status - VCC.
12       Number of Units Sold by Channel."
13       What is "VCC"?
14    A.   Volume committed customer.
15    Q.   Okay.  So these are customers that get
16  a better price if they meet certain volume
17  targets, correct?
18    A.   Correct.
19    Q.   As -- they get an earned discount or an
20  earned rebate?
21    A.   At this time, I believe it was a
22  discount.
23    Q.   Okay.  So the more -- the more volume
24  they commit to and meet their goal, the better the

Michael Bradley - January 28, 2013

Page 122

1    deal they get?
2        A.   Correct.
3        Q.   And is that common in the
4    pharmaceutical industry?
5        A.   I believe so.
6        Q.   Now, would these be Baxter's larger
7    customers?
8        A.   Yes.
9        Q.   So, for example, oh, I see Coram on
10   here again.  Do you see Coram?
11       A.   Yes.
12       Q.   And I see Kaiser.  Do you see -- you
13   see Kaiser on here?
14       A.   I do.
15       Q.   Option Care?
16       A.   Yes.
17       Q.   Those are all big healthcare providers,
18   aren't they?
19       A.   Correct.
20       Q.   Now, if we look at -- it's kind of hard
21   to read because of the -- it's -- it's -- this is
22   not in color.  But look at Coram, the shading that
23   represents Coram.
24            And then, if we go over to the

Page 123

1    actual -- the bar graph, do you see those, those
2    large spikes that seem to indicate those are
3    Coram?
4        A.   You know, I think that would be
5    Accredo, but I'm not sure because it's hard to
6    read this because Accredo's looks the same as --
7        Q.   As Coram?
8        A.   And Accredo at the time was, by far,
9    our largest customer.
10       Q.   Okay.  All right.  So -- so what --
11   all right.  So what is this -- what is this table
12   telling us, then?
13       A.   This is -- tells me when I'm reading it
14   is, this is the number of units sold by channel
15   based on various weeks.
16       Q.   Okay.  And you say your largest
17   customer was who at the time?
18       A.   Accredo.
19       Q.   And what is Accredo?
20       A.   Accredo is a -- our largest specialty
21   pharmacy company.
22       Q.   By the way, as far as your -- your
23   customers go that you sell this product to, would
24   you agree that specialty pharmacies are the ones

Page 124

1    that you deal with the most and sell the most to?
2        A.   Yes.
3        Q.   So they would be in a position to know
4    what the actual market prices are, correct?
5        A.   Correct.
6        Q.   Because they're the ones negotiating
7    with Baxter --
8        A.   Right.
9        Q.   -- and -- and authorized to buy product
10   from Baxter, correct?
11       A.   Correct.
12       Q.   Now, if you could flip through to
13   page 29 of the report, and the last four Bates
14   numbers are 7066.  "Patient Demand Analysis," do
15   you see that?
16       A.   I do.
17       Q.   And on the -- on the right-hand side,
18   it's got "Advate Patient Conversions, New Patients
19   by Old Product (Number of Patients)."  Do you see
20   that?
21       A.   I do.
22       Q.   Now -- and then, if you look inside the
23   table, you'll see the -- recombinant products
24   in the marketplace, correct?

Page 125

1        A.   Correct.
2        Q.   Including Recombinate?
3        A.   Yes.
4        Q.   So is this table an organization of
5    information about the number of patients that are
6    converting from other recombinants to Advate?
7        A.   Yes, it is.
8        Q.   And why was Baxter following this
9    particular data?
10       A.   I mean, for a couple reasons.  We
11   wanted to -- we wanted to see if the strategy and
12   tactics that we have laid out for conversion were
13   working.  And then, we wanted to see what product
14   the converted patients were coming from.
15       Q.   So, again, I see Recombinate on here,
16   and it's color-coded.  So Baxter actually wants to
17   be able to visualize the number of patients that
18   are switching from Recombinate to Advate, correct?
19       A.   Correct.
20       Q.   And, again, as far as the folks at
21   Baxter goes, the same people are looking at this
22   document for Recombinate as they are for Advate,
23   correct?
24       A.   Yes.

32 (Pages 122 to 125)

Michael Bradley - January 28, 2013

Page 126

1    Q.   Okay.  Now, we'll flip that page, and
2  we'll see on the next one "Advate Patient Losses,
3  New Patients by Old Product."  Do you see that?
4    A.   Um-hum.  Yes, sir.  Yes.
5    Q.   And, again, we've got them all listed,
6  and Recombinate is on there again.  What does this
7  tell us?
8    A.   Well, I believe what this is saying is,
9  these are the patients that we have actually lost
10  per month, right.
11    Q.   And, in other words, that had switched
12  from Advate back to another recombinant?
13    A.   Correct.
14    Q.   Including Recombinate?
15    A.   Right.
16    Q.   So -- and this is -- this document is
17  February 2004, correct?
18    A.   Yes.
19    Q.   And so -- so Baxter is actu- -- is
20  trying to shift as many patients from Recombinate
21  and other recombinants to Advate, correct?
22    A.   Correct.
23    Q.   And this document is telling Baxter
24  that to the extent it's successful and to the

Page 127

1  extent that it's unsuccessful because some are
2  shifting back?
3    A.   Correct.
4    Q.   And what -- what did Baxter do in the
5  face of these market conditions?  Did it increase
6  its list price for Advate?
7    A.   No.  We lowered both our direct selling
8  price and the pricing that we submit to the
9  databases.
10    Q.   Did it increase its spread for Advate?
11    A.   No.
12    Q.   But if Baxter would have increased its
13  spread for Advate, wouldn't that have incentivized
14  more of its provider customers to buy Advate
15  rather than Recombinate?
16    A.   Possibly.
17    Q.   So why didn't Baxter do that?
18    A.   We knew it wasn't the right thing to
19  do, and the -- the distributors don't have that
20  much power to switch patients in the first place.
21    Q.   Okay.  Now... anything else we want to
22  do?
23       Going back to First DataBank, did First
24  DataBank ever treat Advate pricing any different

Page 128

1  than it treated Recombinate pricing?
2    MR. CHIZEWER:  Objection to form.
3  BY THE WITNESS:
4    A.   I believe no.
5  BY MR. BREEN:
6    Q.   Did First DataBank ever ask Baxter for
7  any information about Advate pricing that it did
8  not ask for regarding Recombinate pricing?
9    A.   No.
10    Q.   Did Baxter ever provide First DataBank
11  with any information about Advate pricing that it
12  did not provide about Recombinate pricing?
13    A.   No.
14    Q.   How about any of other -- Baxter's
15  other biological products?
16    A.   I'm only aware of the products that
17  I was responsible for on the hemophilia and IG
18  side, and no.
19    Q.   Now, going back to, if you recall, some
20  of the questions we asked today about -- and
21  you were shown some documents -- about the
22  Department of Justice asking First DataBank to
23  report some different AWPs, do you recall that?
24    A.   Yes.

Page 129

1    Q.   And you indicated that went on for a
2  couple years, but they -- they were never updated,
3  correct?
4    A.   Correct.
5    Q.   Do you know where the Department of
6  Justice got the pricing it used to calculate what
7  it believed should be the AWPs that were reported?
8    A.   What we were told is that they did an
9  internal survey, and I believe one of those
10  letters had some of the -- the companies that were
11  surveyed, about what their -- what their selling
12  price was for a variety, but not all, a variety of
13  hemophilia products.
14    Q.   Okay.  Do you know whether the
15  Department of Justice relied upon any particular
16  provider in the industry that had access to
17  pricing through biological distributors?
18    MR. CHIZEWER:  Objection to form.
19  BY THE WITNESS:
20    A.   Not that I'm aware of.
21  BY MR. BREEN:
22    Q.   And do you know whether Ven-A-Care
23  provided the Department of Justice with the input
24  that it utilized for those pricings --

Elite Deposition Technologies - 312-445-0005

Michael Bradley - January 28, 2013

Page 130

1     MR. CHIZEWER:  Same objection.
2  BY MR. BREEN:
3     Q.   (Continuing) -- those -- those AWP --
4  those DOJ AWPs?
5     MR. CHIZEWER:  Same objection.
6  BY THE WITNESS:
7     A.   Not that I'm aware of.
8  BY MR. BREEN:
9     Q.   Okay.
10    THE COURT REPORTER:  I'm sorry?
11 BY MR. BREEN:
12    Q.   Do you know whether Ven-A-Care provided
13 the Department of Justice with any of the
14 information they used for the DOJ AWPs?
15    MR. CHIZEWER:  Objection to the foundation.
16 BY THE WITNESS:
17    A.   No.
18 BY MR. BREEN:
19    Q.   All right.  Now, you were asked some
20 questions -- one second.
21    You were asked some questions today
22 about whether Baxter ever provided the states with
23 average manufacturer pricing to be used in
24 connection with reimbursement.

Page 131

1     Do you realize -- do you remember that
2  series of questions?
3     A.   I do.
4     Q.   And one of the first things I asked you
5  was whether you had prepared yourself or been
6  prepared as a 30(b)(6) corporate designee to
7  testify about that topic.  Do you recall?
8     A.   Yes.
9     Q.   Okay.  And you -- you were not so
10 prepared, were you?
11    A.   I was not.
12    Q.   Okay.  So I want to just drill down a
13 little bit in -- in that particular -- that
14 particular area.
15    You're from San Francisco, right?
16    A.   I am.
17    Q.   So -- and -- and do you have any
18 particular knowledge about Medi-Cal and how
19 Medi-Cal was reimbursed for Baxter's biological
20 products over the last twenty years?
21    A.   Yes.
22    Q.   And do you know whether there came a
23 time when the California legislature required
24 manufacturers to report AMP so that Medi-Cal could

Page 132

1  at least consider them in evaluating their
2  reimbursement amounts?
3     MR. CHIZEWER:  Objection to form.
4  BY THE WITNESS:
5     A.   So what the legislation or regulation
6  did, it was -- it required manufacturers to supply
7  ASP.
8  BY MR. BREEN:
9     Q.   Now, that's in 2006, correct?
10    A.   That is correct.
11    Q.   Okay.
12    MR. CHIZEWER:  Objection to form.
13 BY MR. BREEN:
14    Q.   Do you know if, prior to 2006,
15 California required manufacturers to supply AMP so
16 they could use it to evaluate their reimbursement?
17    MR. CHIZEWER:  Objection to form.
18 BY THE WITNESS:
19    A.   I -- I believe that was the case.
20 BY MR. BREEN:
21    Q.   Separate from the ASP, correct?
22    MR. CHIZEWER:  Same objection.
23 BY THE WITNESS:
24    A.   No.

Page 133

1  BY MR. BREEN:
2     Q.   Okay.  Do you know whether the state of
3  Texas ever required manufacturers to provide AMP
4  so they could evaluate their reimbursement?
5     A.   Yes.
6     MR. CHIZEWER:  Objection to form.
7  BY MR. BREEN:
8     Q.   Do you know when that was?
9     MR. CHIZEWER:  Same objection.
10 BY THE WITNESS:
11    A.   No.
12 BY MR. BREEN:
13    Q.   Okay.  Do you know whether any other
14 states have ever used AMP to evaluate their
15 reimbursement?
16    MR. CHIZEWER:  Same objection.
17 BY THE WITNESS:
18    A.   I can't answer that.
19    MR. BREEN:  Well, since counsel has objected
20 to every one of these questions, I'm going to ask
21 what the basis is so I can correct my questions.
22    What's the basis of your objections,
23 counsel?
24    MR. CHIZEWER:  Well, he just -- you haven't

Elite Deposition Technologies - 312-445-0005

Michael Bradley - January 28, 2013

Page 134

1  established that this witness has any knowledge
2  of, or what the basis of his knowledge would be,
3  as to how -- what requirements there are for state
4  reimbursements.
5         And you seem to have an objection for
6  him to testify with respect to AMP issues.
7         MR. BREEN:  Is that it?
8         MR. CHIZEWER:  Yes.
9  BY MR. BREEN:
10        Q.   Okay.  Now, you're -- are you involved
11 in reporting AMP or best price for Baxter for
12 Medicaid rebate program purposes?
13        A.   No.
14        Q.   Okay.  So when you were asked how AMP
15 is calculated, you said, "Well, it's -- it's
16 specifically provided by statute how you do it,"
17 correct?
18        A.   Correct.
19        Q.   And -- and but you're not an expert
20 in that?  You don't know how?
21        A.   Correct.
22        Q.   Okay.  Do you know what a MAC is?
23        A.   Yes.
24        Q.   What is a MAC?

Page 135

1         A.   Maximum allowable cost.
2         Q.   And that is a term used in connection
3  with what, to your knowledge?
4         A.   Usually, it's a -- it's either a public
5  or private insurer, and it's the maximum allowable
6  price they'll pay for a certain category of -- of
7  drugs.
8         Q.   Do you know whether the state Medicaid
9  programs have the authority to set MACs, or
10 maximum allowable charges or costs, on Baxter
11 biological products?
12        A.   I believe they do.
13        Q.   Okay.  And over the years, have you
14 ever been aware of any states that opted to
15 reimburse Baxter's biological blood factors on
16 the basis of invoice cost?
17        A.   Yes.
18        Q.   How about on the basis of average
19 selling price?
20        A.   Yes.
21        Q.   How about on the basis of wholesaler
22 acquisition cost?
23        A.   Yes.
24        Q.   Now, you have been with Baxter how

Page 136

1  long?
2         A.   Twenty years.
3         Q.   And how -- and how long have you worked
4  in a position where you would have exposure to,
5  and knowledge of, the topics we have been talking
6  about today, i.e., what Baxter reports that are --
7  that's used to set Medicaid reimbursement and --
8  and how all that goes on?  How long have you been
9  in a position to be aware of that?
10        A.   Seventeen of the twenty years.
11        Q.   Okay.  Seventeen of the twenty years.
12 So that will take us -- let's do the math.  We're
13 in 2013, right?  So we're going back to, what,
14 '97?
15        A.   Yeah.  I mean, I don't really do it
16 took much now, so it was basically when I started
17 up until a couple years ago.
18        Q.   And during that period of time, have
19 you observed any changes in the way that states
20 scrutinize market prices before they set
21 reimbursement for blood factors?
22        A.   Yes.
23        Q.   Tell us about that.  What has been
24 your --

Page 137

1         A.   So --
2         Q.   What have you observed?
3         A.   -- over the course of twenty years,
4  we've seen a slow shift in the state reimbursement
5  formulas for factor because many states have
6  unique reimbursement for factor as opposed to
7  their other pharmaceuticals.  We've seen states
8  transition and, as you mentioned earlier, to a
9  number of different reimbursement formulas,
10 everything from -- from the way California bases
11 it on ASP, Michigan does actual acquisition cost;
12 you know, Florida currently puts out a bid to
13 certain hemophilia distributors.
14        So every single state can potentially
15 be different, and most of the large states have a
16 unique reimbursement formula for factor as opposed
17 to their other drugs.
18        Q.   Now, let's talk about that.
19        Baxter, other divisions, sell other
20 pharmaceutical products, correct?
21        A.   Correct.
22        Q.   So IV fluids, for example?
23        A.   Right.
24        Q.   What is unique about blood factors,

Elite Deposition Technologies - 312-445-0005

Michael Bradley - January 28, 2013

Page 138

1  to your knowledge, if anything, that would --
2  would -- would cause states to scrutinize them
3  differently for reimbursement purposes than other
4  drugs and biologicals?
5      A.  Oh, there's a couple reasons.
6      One, there's between 20 and 2- --
7  25 and 30 percent of all hemophilia patients are
8  on Medicaid, right?  Traditionally, most people --
9  maybe Medicaid's are 12 percent, so there's a
10 higher disproportion or share of hemophilia
11 patients that utilize Medicaid, okay?
12     And then, also, the fact that it's a --
13 it's a fairly high-priced product.
14     So with those two combined, I think
15 when the states look at trying to cut their costs
16 with, you know, the increased budget crisis that
17 they have been in, that they -- they looked at
18 scrutinizing hemophilia.
19     Q.  And is that because they've got,
20 proportionally, the smallest number of patients
21 that are -- that are -- that are costing the
22 states the most dollars for one particular
23 product?
24     A.  Yeah.  That one quarter of all

Page 139

1  hemophilia patients are -- they -- their factor is
2  paid for by Medicaid.
3      Q.  Now, are you aware that Medicaid
4  programs reimburse for more than 30,000 different
5  NDC number drugs and biologicals?
6      A.  Oh, I knew it was a lot.  I wasn't
7  aware of the 30,000, but I knew that it was a lot,
8  yes.
9      Q.  You know it's-- it's lots and lots and
10 lots?
11     A.  Right.
12     Q.  Okay.  Yet, the hemophilia factors are
13 a very, very small subset in terms of number of
14 products, correct?
15     A.  Correct.
16     Q.  But they're an extremely expensive
17 subset for Medicaid programs?
18     A.  Yes.
19     Q.  Is that why the Medicaid programs have
20 scrutinized them for reimbursement purposes?
21     A.  Yes.
22     Q.  Okay.  So you mentioned California with
23 the average selling price.  When -- does Baxter
24 report its average selling price to California in

Page 140

1  response to -- to that reimbursement methodology?
2      A.  Yes.
3      Q.  And what is its average -- what -- how
4  does it calculate its average selling price that
5  it sends to California?
6      MR. CHIZEWER:  Objection to form.
7  BY THE WITNESS:
8      A.  So that --
9  BY MR. BREEN:
10     Q.  Well, wait a minute.  Does it calculate
11 its average selling price it sends to California
12 the same way it calculates the average selling
13 price you testified about earlier in
14 response to Mr. Chizewer's questions?
15     A.  Yes.
16     Q.  Okay.  So how does it calculate the
17 average selling price it sends to California?
18     A.  So, once again, I'm not part of the
19 finance department that goes into this
20 specifically, but it's in statute of how you --
21 how you have to calculate an ASP.
22     And for California, we take each of our
23 individual NDC numbers, we calculate it based on
24 that formula -- which I don't know all the

Page 141

1  particulars of -- and then we submit it to the
2  state on a quarterly basis.
3      Q.  And you do the same for Advate as you
4  do for Recombinate?
5      A.  Yes.
6      Q.  Okay.  And for the rest of your
7  biological products, correct?
8      A.  For the biologics that are created in
9  BioScience, yes.
10     Q.  And you -- did you indicate that you
11 thought it's been since 2006 California has
12 reimbursed on ASP?
13     A.  You mentioned the date.  I know that
14 there was -- there was legislation and/or
15 regulation that caused it to change, yes.
16     Q.  Okay.  So do you also -- are you also
17 aware that Baxter has, by agreement, resolved its
18 issues with California regarding the -- the
19 average wholesale price liability issues?
20     A.  Yes.
21     MR. CHIZEWER:  Objection to form.
22 BY MR. BREEN:
23     Q.  And, so, since that agreement, to
24 your knowledge, has Baxter reported ASP to

Elite Deposition Technologies - 312-445-0005

Michael Bradley - January 28, 2013

## Page 142

1  California?
2      A.   We have.
3      Q.   Okay.  How about in Texas, has Baxter
4  resolved its AWP-type liability with the state of
5  Texas?
6      MR. CHIZEWER:  Objection to form.
7  BY THE WITNESS:
8      A.   Yes.
9  BY MR. BREEN:
10     Q.   And -- and since that time, has Baxter
11 reported to Texas any kind of special pricing that
12 Baxter -- that Texas asks for in order to set
13 reimbursement?
14     A.   We will provide whatever the state
15 requests -- requests of us.
16     Q.   Well, in the case of Texas, do you
17 know, you personally know what Baxter has provided
18 Texas in response to its request since Texas and
19 Baxter settled their issues --
20     A.   Yes.
21     Q.   -- regarding AWP?
22     A.   Yes.  I believe we supply them with
23 AMP.
24     Q.   With AMP, okay.

## Page 143

1          And to your knowledge, has Baxter ever
2  refused to provide a state with specific market
3  pricing information to allow the state to set
4  Medicaid reimbursement upon that state's request?
5      A.   Not that I'm aware of, we've never ever
6  not supplied the requested information.
7      Q.   Okay.  Now, this --
8      MR. BREEN:  Why don't we take a brief break,
9  and I'll see if I'm ready to wrap up.
10     THE WITNESS:  Sure.
11     THE VIDEOGRAPHER:  Okay.  The time is
12 2:37 p.m.  We are going off the record.
13         (WHEREUPON, a recess was had.)
14     THE VIDEOGRAPHER:  This is the beginning of
15 Disk No. 4.  The time is 2:50 p.m.
16         We are back on the record.
17     MR. BREEN:  I have no further questions at
18 this time.  I pass the witness.
19     MR. CHIZEWER:  Just a few follow-up --
20     MR. DeLANCEY:  Yeah, I've got a couple.
21     MR. CHIZEWER:  Oh, okay.  Do you want to go
22 first.
23
24

## Page 144

1              EXAMINATION
2  BY MR. DeLANCEY:
3      Q.   Let me ask you questions about Advate,
4  Recombinate.
5          Are Advate and Recombinate the same
6  active protein?
7      A.   Yes.
8      Q.   Do Advate and Recombinate have
9  identical -- I'm not going to say this right, but
10 I'm going to try -- pharmo -- pharmacokinetics
11 profiles?
12     MR. CHIZEWER:  Objection, leading.
13 BY THE WITNESS:
14     A.   Yes, they do.
15 BY MR. DeLANCEY:
16     Q.   Are Advate and Recombinate considered
17 bioequivalents?
18     MR. CHIZEWER:  Same objection.
19 BY THE WITNESS:
20     A.   Yes.
21 BY MR. DeLANCEY:
22     Q.   Was Advate marketed as building on the
23 reputation of Recombinate?
24     MR. CHIZEWER:  Same objection.

## Page 145

1  BY THE WITNESS:
2      A.   Yes, it was.
3  BY MR. DeLANCEY:
4      Q.   Was Advate marketed as an enhanced
5  version of Recombinate?
6      A.   Yes.
7      MR. CHIZEWER:  Same objection.
8  BY THE WITNESS:
9      A.   Yes.
10 BY MR. DeLANCEY:
11     Q.   Are Advate and Recombinate marketed to
12 the same doctors?
13     A.   Yes.
14     Q.   Are Advate and Recombinate marketed to
15 the same patient population?
16     A.   Yes.
17     Q.   Are both Advate and Recombinate sold by
18 Baxter BioScience?
19     A.   Yes.
20     Q.   Are Advate and Recombinate sold to the
21 same -- through the same distribution channels?
22     A.   Yes.
23     Q.   Do Advate and Recombinate service the
24 same disease state, hemophilia A?

Elite Deposition Technologies - 312-445-0005

Michael Bradley - January 28, 2013

Page 146

1    A.   Yes.
2    Q.   Does Baxter BioScience produce both
3    Advate and Recombinate?
4    A.   Yes.
5    Q.   Are Advate and Recombinate considered
6    genetically equivalent?
7    MR. CHIZEWER:  Objection to form.
8    BY THE WITNESS:
9    A.   Yes.
10   BY MR. DeLANCEY:
11   Q.   Are Advate and Recombinate produced
12   from the same cell line?
13   A.   Yes.
14   Q.   Are Advate and Recombinate both
15   reimbursed and covered under the same HCPCS
16   J Code 7192?
17   A.   Yes.
18   Q.   Are Advate and Recombinate sold by the
19   same Baxter BioScience sales force?
20   A.   Yes, they are.
21   Q.   And do Advate and Recombinate have the
22   same competitors?
23   A.   Yes.
24   Q.   You were asked earlier by Mr. Chizewer

Page 147

1    regarding AMP/BP reporting by Baxter BioScience to
2    states, and you said Baxter BioScience doesn't
3    report AMPs and BPs to states.  Do you recall
4    that?
5    A.   Yes.
6    Q.   Okay.  If I ask you that same question
7    now, do -- does Baxter BioScience or has Baxter
8    BioScience reported AMPs and BPs for its biologics
9    to state Medicaid programs, what's your answer?
10   MR. CHIZEWER:  Objection, leading; and --
11   and asked and answered.
12   BY THE WITNESS:
13   A.   We do.
14   BY MR. DeLANCEY:
15   Q.   And how do you know that?
16   MR. CHIZEWER:  Same objection.
17   BY THE WITNESS:
18   A.   So during the break, I was shown
19   documents that prove that we have submitted AMP to
20   BP from the states in the past.
21   MR. DeLANCEY:  I pass.
22
23            ###
24

Page 148

1            FURTHER EXAMINATION
2    BY MR. CHIZEWER:
3    Q.   Mr. Bradley, could I refer you back to
4    Exhibit 14.  This was an e-mail of February of
5    2004 from Doreen Eaton to a team of people at
6    Baxter.
7            I believe you stated that the attached
8    talking points regarding the pricing of Advate was
9    something that was available to the people who did
10   price reporting both for Recombinate and Advate,
11   correct?
12   A.   Restate the question again.
13   Q.   I'm going to refer you back to
14   Exhibit 14.  This was an e-mail of February 2004
15   from Doreen Eaton to a team of people at Baxter.
16           And I believe you stated that the
17   attached talking points to this e-mail regarding
18   the pricing of Advate were available to both the
19   people who did price reporting about Recombinate
20   and Advate, is that correct?
21   A.   Okay, yes.
22   Q.   I'd like to refer you to the sixth
23   bullet point under item No. 1, "What is the Price
24   of Advate?"  And the sixth talking point says:

Page 149

1            "No one should be discussing the
2        true acquisition costs of our products."
3            Do you see that?
4    A.   Yes.
5    Q.   Why is that?  Why is that a talking
6    point?
7    A.   This was a talking point because this
8    was a document going out.  If you look at who this
9    was sent to, this was the leads of our external
10   sales organization.  So they were getting pricing
11   questions regarding Advate, what this document was
12   telling them via talking points.
13           You can talk about publicly-available
14   information that's in these databases.  You cannot
15   talk about what we're actually selling the product
16   to our customers for.
17   Q.   Were any of the people -- the people on
18   this e-mail list aware of the price reporting from
19   Baxter to First DataBank?
20   A.   I would say they should have been.
21   Q.   After the launch of Advate, why did
22   Baxter continue to make and sell Recombinate?
23   A.   You have to realize that hemophilia
24   patients are a very powerful patient base.  As

Elite Deposition Technologies - 312-445-0005

Michael Bradley - January 28, 2013

Page 150

1   I said earlier, half of them died of HIV.
2       So we were told in no uncertain terms
3   by our customers -- I'm talking if you want to
4   call them patients -- that they are very
5   comfortable with Recombinate, and it is not
6   something that they will easily switch to quickly,
7   a certain subsegment.
8       Q.   So your understanding that -- was that
9   patients were making a distinction between
10  Recombinate and Advate, is that right?
11      A.   No.  I was -- what I'm saying is that
12  they were very comfortable with the product they
13  have been currently on for ten years.
14      Q.   Did Baxter agree that Advate and
15  Recombinate should be reim- -- reimbursed under
16  the same J Code?
17      A.   That's not our decision.
18      Q.   I understand it's not your decision,
19  but --
20      A.   It's not Baxter's decision.
21      Q.   I understand it's not Baxter's
22  decision.  Whose decision is it?
23      A.   From a HCPCS perspective, it's CMS.
24      Q.   Okay.  And did Baxter agree with

Page 151

1   CMS's decision to reimburse Advate and Recombinate
2   under the same J Code?
3       A.   We didn't agree, but we abide by their
4   decision.
5       Q.   Why didn't you agree?  Why didn't
6   Baxter not agree that Advate and Recombinate
7   should be reimbursed under the same J Code?
8       A.   There was a new statute, 1847(a),
9   which I believed impacted all biologics and
10  pharmaceuticals in the 2003 time frame.
11      And with the Medicare Modernization
12  Act, it allowed newly-licensed products under BLA
13  to get a separate ASP.  In order to get a separate
14  ASP, you had to get a new HCPCS code.
15      So we -- we -- we applied twice.  The
16  government said no, and we abided by it.
17      Q.   What were the arguments that Baxter
18  made to CMS to try and convince CMS not to
19  reimburse Advate under the same J Code as
20  Recombinate?
21      A.   The same -- if you want to call them
22  arguments, the same justifications we do with our
23  other customers; the fact that it's -- it's the
24  next generation recombinant Factor VIII that is

Page 152

1   manufactured without any human or animal proteins.
2       Q.   Did Baxter make any arguments, as to
3   why Advate should not be reimbursed under the same
4   J Code of Recombinate, that Baxter didn't believe
5   were true?
6       A.   No.
7       Q.   You testified that some states
8   developed MACs for drug reimbursement of Advate,
9   correct?
10      A.   Correct.
11      Q.   Do you have information as to how any
12  one particular state who -- that was using a MAC
13  decided what that MAC should be?
14      A.   I -- I can't give you specifics.
15  I know that states use various formulas to
16  determine how they create their MACs.
17      Q.   Do you know to what extent any state
18  may have relied on information supplied to them by
19  First DataBank in order to derive what their MAC
20  should be?
21      A.   I -- I believe some states used the
22  published information from the databases.
23      Q.   Do you know -- and you don't know which
24  states did and which states didn't, is that right?

Page 153

1       A.   Not off the top of my head, no.
2       Q.   You also testified that states
3   developed other individual formulas with respect
4   to their reimbursements for Advate, correct?
5       A.   Correct.
6       Q.   And do you know what -- to what extent
7   any state may have relied on information they got
8   from First DataBank to derive what particular
9   formula they should use for reimbursement of
10  Advate?
11      A.   So from the -- from the information
12  that I have and that I've reviewed, the whole idea
13  of -- of states creating a different type of
14  reimbursement formula is not to use the
15  information that's in First DataBank.
16      Q.   Do you know whether states actually
17  used information from First DataBank in order to
18  derive the formulas for reimbursement of Advate?
19      A.   Some states did use the information
20  based in First DataBank.
21      Q.   And do you know which states did and
22  which states didn't?
23      A.   Yes.  I mean, I can't give them to you
24  right now but, I mean, I knew back then.

Elite Deposition Technologies - 312-445-0005

Michael Bradley - January 28, 2013

## Page 154

1    Q.   Okay.  Right now, as of right now, you
2    don't know?
3        A.   No.
4        Q.   I believe you said that California
5    required Baxter to report an ASP for Advate in
6    order to develop a reimbursement for Advate, is
7    that correct?
8        A.   Correct.
9        Q.   What ASP did you report to California
10   once they started requiring an ASP for Advate?
11       A.   Well, so we supplied the same ASP as we
12   would have sent to CMS.
13       Q.   And what was that ASP?
14       A.   The amount?
15       Q.   Correct.
16       A.   I have no idea.
17       Q.   I believe you testified that Texas
18   required that Baxter report to them an AMP at some
19   point so that Texas could develop a reimbursement
20   for Advate based on AMP, is that right?
21       A.   No.
22       Q.   Okay.  What information did Texas
23   require?
24       A.   Texas required our AMP.  What they did

## Page 155

1    with that was up to them.
2        Q.   All right.  So you have no idea whether
3    Texas actually used the AMP that you reported to
4    them in order to develop a reimbursement level, is
5    that right?
6        A.   Correct.
7        Q.   Do you have knowledge with respect to
8    how any state who received an AMP from Baxter may
9    or may not have used it in determining the
10   reimbursement level for Advate?
11       A.   Based on information that we discussed
12   with counsel, we supplied AMP and BP to all the
13   states.  What they did with it was their decision.
14       Q.   So you're not aware of even what
15   purpose Baxter supplied AMP information to the
16   states, is that right?
17       A.   Correct.
18       Q.   And I guess the information that
19   counsel supplied to you during the break didn't
20   explain for what purpose the states used AMP
21   information, for example?
22       A.   We started --
23       MR. DeLANCEY:  Objection to the extent you're
24   asking for attorney-client communications.

## Page 156

1        MR. CHIZEWER:  I think it's been waived.
2    BY MR. CHIZEWER:
3        Q.   You can go ahead.
4        MR. DeLANCEY:  I don't.
5        MR. CHIZEWER:  Are you instructing him not to
6    answer the question?
7        MR. DeLANCEY:  Yes.
8        MR. CHIZEWER:  Okay.
9    BY MR. CHIZEWER:
10       Q.   Are you accepting your attorney's --
11       MR. DeLANCEY:  Yes, he is.
12   BY MR. CHIZEWER:
13       Q.   -- instruction not to answer the
14   question?
15       MR. CHIZEWER:  I need -- I need his answer.
16       MR. DeLANCEY:  Okay.
17   BY THE WITNESS:
18       A.   I accept.
19       MR. CHIZEWER:  Okay.  Let me talk to them for
20   a minute.
21           (Short pause.)
22       MR. CHIZEWER:  I have no further questions.
23       MR. BREEN:  I have some follow-up, but I think
24   you're next.  Do you have any follow-up?

## Page 157

1        MR. DeLANCEY:  No, I don't have any.
2        MR. BREEN:  You don't have any?
3        MR. DeLANCEY:  No.
4        MR. BREEN:  Just a few brief clarifications.
5        THE VIDEOGRAPHER:  Microphone, please.
6           (Short pause.)
7        MR. BREEN:  Testing.  Can you hear me?
8        THE VIDEOGRAPHER:  Yes.
9             FURTHER EXAMINATION
10   BY MR. BREEN:
11       Q.   You mentioned you provide the same --
12   Baxter provides the same ASP to California for
13   Advate that it provides to CMS.
14           Do you recall saying -- testi- --
15   responding to Mr. Chizewer's question --
16       A.   Yes.
17       Q.   -- that way?  Okay.
18           First off, you provide the same ASP
19   for Advate, but you also -- Baxter also provides
20   ASP for all its other biological products to
21   California, correct?
22       A.   Yes.
23       Q.   Nothing unique about Advate in that
24   regard?

Elite Deposition Technologies - 312-445-0005

Michael Bradley - January 28, 2013

Page 158

1     A.   No.
2     Q.   And you said it's the same ASP you
3  provide to CMS.  The -- the ASP provided to CMS,
4  is it the same as the AMP?
5     A.   No.
6     Q.   And is it provided under the same
7  statute as the AMP?
8     A.   No.
9     Q.   Okay.  The ASP, is it provided based
10 upon the Medicare programs' shift to ASP
11 reimbursement?
12    A.   Yes.
13    Q.   Do you know when that occurred?
14    A.   No.
15    Q.   Would it be sometime in the mid 2000s?
16    A.   It's sometime in the 2000s, yes.
17    Q.   Okay.  Now, so does -- does that mean
18 the Medicare program reimburses for Baxter's blood
19 factors on the basis of ASP today?
20    A.   Yes.
21    Q.   So it doesn't rely upon the information
22 that comes from the data banks?
23    MR. CHIZEWER:  Objection to form.
24

Page 159

1  BY MR. BREEN:
2     Q.   Let me restate the question.
3          Is ASP something that's gotten from
4  First DataBank?
5     MR. CHIZEWER:  Objection to form.
6  BY THE WITNESS:
7     A.   Yes.
8  BY MR. BREEN:
9     Q.   Now, ASP --
10    A.   AW-- -- no, ASP is not.
11    Q.   It's not from First DataBank.
12    MR. CHIZEWER:  Same objection.
13 BY MR. BREEN:
14    Q.   Okay.  What, if anything, does First
15 DataBank have to do with ASP?
16    MR. CHIZEWER:  Objection to form.
17 BY THE WITNESS:
18    A.   Nothing.
19 BY MR. BREEN:
20    Q.   Okay.  So Baxter provides ASP directly
21 to the CMS, so it can reimburse for
22 Medicare's payments for blood factors, correct?
23    A.   Correct.
24    Q.   Including Advate and Recombinate?

Page 160

1     A.   Correct.
2     Q.   Okay.  The same thing for all other
3  biological manufacturers, to your knowledge?
4     A.   Yes.
5     Q.   Okay.  California requires the same ASP
6  to reimburse for your blood factors today?
7     A.   Yes.
8     MR. CHIZEWER:  Objection to form.
9  BY MR. BREEN:
10    Q.   Correct?
11    A.   Yes.
12    Q.   Now, you indicated that you don't know
13 what states do with AMP or what purpose they're
14 provided with AMP.
15         But is it your understanding that they
16 get this information so they can evaluate their
17 own reimbursement for your products?
18    MR. CHIZEWER:  Objection to form, and asked
19 and answered.
20 BY THE WITNESS:
21    A.   Based on the discussion that we had
22 earlier, I do know that Baxter, before 2005,
23 supplied all states with AMP and BP for our
24 therapies.

Page 161

1  BY MR. BREEN:
2     Q.   And my question is -- and I don't want
3  to delve into attorney-client privileged
4  discussions, but you are a 30(b)(6) witness, which
5  means you're appropriately and must be prepared to
6  testify to topics.  But I realize you were never
7  prepared for the AMP questions, right?  So -- so
8  we're in an area -- a gray area here.
9          But my question is:  Is it your
10 understanding that the AMPs are being provided to
11 the states or were provided to the states to
12 assist the states in their reimbursement for
13 Baxter's products?
14    MR. CHIZEWER:  Objection to form.
15 BY THE WITNESS:
16    A.   I really don't know how the states
17 use that information.  They could use it to --
18 to determine the reimbursement, they couldn't.
19 I just don't have that knowledge.
20 BY MR. BREEN:
21    Q.   You testified earlier that -- that
22 you -- you evaluated and had information about how
23 each state reimburses for Baxter's products,
24 correct?

Elite Deposition Technologies - 312-445-0005

Michael Bradley - January 28, 2013

## Page 162

1     A.   Right.
2     Q.   But does that information include
3   knowing whether the states select a MAC instead of
4   using the reimbursement formula?
5     MR. CHIZEWER:  Objection to form.
6   BY THE WITNESS:
7     A.   The information I collected was, for
8   every state, I had what -- exactly what their --
9   what their reimbursement formula was for factor.
10  So it -- they -- it could range from anything from
11  information from First DataBank to information
12  that we send them to calculated MAC.  Every state
13  can be different.
14  BY MR. BREEN:
15    Q.   Okay.  But just because a state gets
16  information from First DataBank and reimburses for
17  some drugs on the basis of First DataBank's
18  information, does that also mean that the state
19  can't set a MAC?
20    A.   No.  The state can --
21    MR. CHIZEWER:  Objection to form.
22  BY THE WITNESS:
23    A.   The state can do whatever they want.
24  They can set a MAC.

## Page 163

1   BY MR. BREEN:
2     Q.   Do you know what a federal upper limit
3   is?
4     A.   Yes.
5     Q.   What's a federal upper limit?
6     A.   Oh, this is too late in the day --
7     Q.   I know.
8     A.   -- for this kind of stuff.
9     Q.   Sorry about that.
10    A.   So I believe the federal upper limit is
11  the highest amount that I think either the state
12  or the federal government will pay for a therapy.
13  I don't know how you --
14    Q.   Okay.  So is it your understanding that
15  it's in -- it's calculated by CMS, and the states
16  are told they've got -- they can't go higher than
17  that?
18    A.   Correct.
19    Q.   All right.  Do you know whether the
20  federal upper limit formula was changed by
21  Congress in recent years?
22    A.   I don't know.
23    Q.   Have you ever heard of a formula,
24  250 percent of AMP?

## Page 164

1     A.   Yes.
2     Q.   Pardon me?
3     A.   Yes.
4     Q.   And in what context have you heard of
5   the formula, 250 percent of AMP?
6     A.   Probably in the millions of information
7   that I've read on all the healthcare changes.
8   I -- I do recollect over the past year or two that
9   they -- they did change the -- the definition for
10  the federal upper limit.
11    Q.   So even if a state is reimbursing based
12  upon information from First DataBank, they still
13  can't exceed the federal upper limit, can they?
14    A.   That -- to my knowledge, that's the
15  case.
16    MR. BREEN:  Thank you.
17    No further questions.
18    MR. CHIZEWER:  Nothing.
19    THE VIDEOGRAPHER:  Okay.  That concludes the
20  deposition.  The time is 3:10 p.m.  We are off the
21  record.
22    FURTHER DEPONENT SAITH NAUGHT.
23
24    (Time noted:  3:10 p.m.)

## Page 165

1        IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF MASSACHUSETTS
2   IN RE:  PHARMACEUTICAL        )
    INDUSTRY AVERAGE WHOLESALE    )  MDL No. 1456
3   PRICE LITIGATION              )
    ----------------------------  )
4   UNITED STATES ex rel.     )   Master File No.
    LINNETTE SUN and GREG HAMILTON )  1:01-CV-12257-PBS
5          v.                     )
    BAXTER HEALTHCARE CORPORATION )   Sub-Category
6   Case No. 08-CV-11200-PBS    )   Case Nos.
    ----------------------------  ) 1:08-CV-11200-PBS
7   UNITED STATES OF AMERICA    )      and
    ex rel. VEN-A-CARE OF THE   )  1:10-CV-11186-PBS
8   FLORIDA KEYS, INC.          )
           v.                    )
9   BAXTER HEALTHCARE CORPORATION )    Judge
    and BAXTER INTERNATIONAL, INC. )  Patti B. Saris
10  Case No. 10-CV-11186-PBS     )
11         I hereby certify that I have read the
12  foregoing transcript of my deposition given at the
13  time and place aforesaid, consisting of Pages 1 to
14  164, inclusive, and I do again subscribe and make
15  oath that the same is a true, correct and complete
16  transcript of my deposition so given as aforesaid,
17  and includes changes, if any, so made by me.
18
19         MICHAEL BRUCE BRADLEY
20
21  SUBSCRIBED AND SWORN TO
    before me this    day
22  of       , A.D. 200 .
23
24  Notary Public

42 (Pages 162 to 165)

Michael Bradley - January 28, 2013

Page 166

1  STATE OF ILLINOIS )
2            ) SS:
3  COUNTY OF W I L L )
4        I, ROSANNE M. NUZZO, a Notary Public
5  within and for the County of Will, State of
6  Illinois, and a Certified Shorthand Reporter,
7  CSR No. 84-1388, of said state, do hereby certify:
8        That previous to the commencement of the
9  examination of the witness, the witness was duly
10  sworn to testify the whole truth concerning the
11  matters herein;
12        That the foregoing deposition
13  transcript was reported stenographically by me,
14  was thereafter reduced to typewriting under my
15  personal direction, and constitutes a true record
16  of the testimony given and the proceedings had;
17        That the said deposition was taken
18  before me at the time and place specified;
19        That I am not a relative or employee or
20  attorney or counsel, nor a relative or employee of
21  such attorney or counsel for any of the parties
22  hereto, nor interested directly or indirectly in
23  the outcome of this action.
24        IN WITNESS WHEREOF, I do hereunto set

Page 167

1  my hand of office at Chicago, Illinois, this 31st
2  day of January, 2013.
3
4
5
6        Notary Public, Will County, Illinois.
7        My commission expires May 16, 2013.
8
9
10
11
12  C.S.R. Certificate No. 84-1388.
13
14
15
16
17
18
19
20
21
22
23
24

43 (Pages 166 to 167)

Elite Deposition Technologies - 312-445-0005

BRADLEY
DEPOSITION EXHIBIT
2

# D I C K S T E I N  S H A P I R O  M O R I N  & O S H I N S K Y  LLP

*2101 L Street NW • Washington, DC 20037-1526*
*Tel (202) 785-9700 • Fax (202) 887-0689*
*Writer's Direct Dial: (202) 828-2282*
*E-Mail Address: DeLaneeyM@dsmo.com*

November 16, 2001

Mr. Dennis Smith
Director, Center for Medicaid & State Operations
Centers for Medicare & Medicaid Services
7500 Security Boulevard
S2-26-12
Baltimore, MD  21244



Re:     First DataBank

Dear Mr. Smith:

        We are writing on behalf of the BioScience Division of Baxter Healthcare
Corporation to notify the Centers for Medicare and Medicaid Services ("CMS") regarding
certain new price reporting practices by First DataBank, the primary, independent publisher
of drug prices.  First DataBank has changed its practice of reporting Baxter BioScience
therapy prices, resulting in the reporting of prices much higher than it has historically
reported.  Previously, First DataBank has reported list prices relayed by Baxter BioScience
as average wholesale prices ("AWP").  Since June 2001, however, First DataBank has been
increasing Baxter BioScience's list prices by 25% and reporting those increased amounts as
AWPs.  In addition, First DataBank has been reporting Baxter BioScience's list prices as
wholesale acquisition costs ("WAC"); Baxter BioScience does not sell to full-line
wholesalers and, thus, does not have WAC prices.

        As a result of First DataBank's change in practice, Baxter BioScience has received
numerous requests from customers concerned about the resulting effect on their Medicaid
reimbursements, since many state Medicaid agencies reference First DataBank's
publication.  Therefore, Baxter BioScience contacted First DataBank on this matter.  First
DataBank has represented to Baxter BioScience that it is reporting prices as it was
instructed to do by Department of Justice attorneys.  Since June of this year, Baxter
BioScience has repeatedly contacted and attempted, albeit unsuccessfully, to convince First
DataBank to correct its errors.  We bring this problem to CMS's attention with the hope
that it will be corrected by those responsible for making health care policy decisions.

        On June 14, 2001, Baxter BioScience notified First DataBank that it had
increased the "list price" for five of its therapies – RECOMBINATE rAHF, HEMOFIL M
AHF, PROPLEX T PCC, FEIBA VH AICC, and GAMMAGARD S/D IVIG.  (Tab 1).
Baxter BioScience's June 14 letter made clear that it was updating its "list prices" and that
"at any given time, purchasers are able to purchase [Baxter BioScience] therapies at prices
below List Price."  On June 19, 2001, Baxter BioScience called First DataBank to correct
two NDC codes on the June 14 list price update.  During this call, Alisha Nielsen of First

1350522.0. T50T02I DOC

HIGHLY CONFIDENTIAL                                                                   BAX MDL S 0108841

Mr. Smith
November 16, 2001
Page 2

DataBank stated for the first time that First DataBank would not be reporting Baxter
BioScience's list prices as it had done in the past. Ms. Nielsen appeared to concede that
First DataBank's new practice with regard to reporting AWP was a departure from its prior
practice. She agreed to check with her supervisor to see if she could correct the situation.
Soon thereafter, Baxter BioScience learned that First DataBank was publishing AWPs that
exceeded Baxter BioScience's list prices by approximately 25% and was also inaccurately
reporting Baxter BioScience's list prices as WACs.

On June 21, Baxter BioScience again contacted Ms. Nielsen (via telephone and
facsimile) to get First DataBank to correct this situation. (Tab 2). Ms. Nielsen stated that
she did not have the authority to correct First DataBank's errors; thus, she referred the
Baxter BioScience representative to her supervisor, Kay Morgan. Baxter BioScience
explained to Ms. Morgan that as a result of First DataBank's new practice with regard to
reporting of AWP, First DataBank was reporting Baxter BioScience's therapy prices at
much increased levels and, in the case of WACs, reporting prices that do not exist. Ms.
Morgan stated that First DataBank was reporting Baxter BioScience's AWPs and WACs as
it was instructed to do by the Department of Justice and, as a result, she would not correct
the errors.

Ms. Morgan stated that First DataBank considered Baxter BioScience's list prices
to be the transaction prices at which Baxter BioScience sells therapies to wholesalers. First
DataBank does not define what entities it considers to be a wholesaler.[1] As a result, First
DataBank is reporting Baxter BioScience's list prices as WACs. Simply put, we have no idea
how First DataBank reached this erroneous conclusion. Baxter BioScience informed Ms.
Morgan that it does not currently sell GAMMAGARD S/D to full-line wholesalers and,
with few exceptions, has not sold coagulation factors to full-line wholesalers; thus, there are
no WAC prices for these therapies.

Next, Ms. Morgan attempted to defend First DataBank's methodology for
establishing the AWPs it was reporting for Baxter BioScience's therapies. She represented
that First DataBank surveyed "wholesalers" who reported that they mark-up Baxter
BioScience therapies by 25% before reselling the therapies to providers. Again, because
Baxter BioScience does not sell these therapies to full-line wholesalers, we do not know
how this can be the case. Significantly, First DataBank apparently did not seek to
determine whether these wholesalers were reselling Baxter BioScience's therapies at the
prices it was reporting or even if they were actually selling Baxter BioScience therapies at all
(or were simply listing Baxter BioScience therapies in their catalogs and in fact do not have
them to sell). (Tab 3). Ms. Morgan did not reveal the identity of the entities First
DataBank surveyed.

Baxter BioScience is not currently selling these therapies to full-line wholesalers
and is not selling these therapies to any other tier of the market at the prices being reported
by First DataBank. These therapies are sold to other tiers of the market including
biological distributors, hospitals, and home care companies, at prices discounted below list

---

[1]      Federal regulations similarly do not define "wholesaler."

HIGHLY CONFIDENTIAL

Mr. Smith
November 16, 2001
Page 3

price. Notwithstanding Baxter BioScience's repeated requests, First DataBank has refused to correct its new reporting practices and continues to report as AWPs prices that are 25% higher than Baxter BioScience's list prices and WACs equal to its list prices.

First DataBank's new definition of AWP – as apparently mandated by Department of Justice attorneys – is a radical departure from the actions previously demonstrated by First DataBank with respect to Baxter BioScience's therapies. First DataBank has previously reported Baxter BioScience list price updates as AWPs. The actual prices paid by customers may vary either above (depending upon the source of supply) or below those reported prices.

On July 5, Baxter BioScience received First DataBank's then current Price History Report (electronic version) which showed that First DataBank was continuing to report Baxter BioScience's therapy prices at the elevated levels. On July 11, Baxter BioScience again requested that First DataBank correct this practice. (Tab 4). First DataBank has refused to make any corrections and continues to inaccurately report AWPs that are approximately 25% higher than Baxter BioScience's list prices and Baxter BioScience's list prices as WACs.

In sum, we raise this issue with CMS in the hope that it will be corrected by those responsible for making health care policy decisions. Baxter BioScience reported its "list prices" to First DataBank. When it updated its list prices, Baxter BioScience specifically informed First DataBank that its list prices are not transaction prices; Baxter BioScience sells its therapies to different tiers of the market at prices discounted off its list prices. Baxter BioScience assumes no responsibility for the prices being reported by First DataBank.

Sincerely,

Merle M. DeLancey Jr.
J. Andrew Jackson

Counsel for Baxter BioScience

MMD/mgm

Enclosures

cc:   Larry Reed
      Mary E. Riordan
      Shari L. Fleishman

BRADLEY
DEPOSITION EXHIBIT
7

1200 Parkdale Rd., Rochester, MI 48307
Phone: 248-608-3255 Fax: 248-652-0670



## *Baxter*
## **Hyland Immuno**

# Fax Cover Sheet

**To:**   Anna Richo, 818-550-4567          **From:**   Louise Westcott

Larry Guiheen, 847-940-5964

Suzanne Dawson, 847-948-4026

Mark MacDougall, 202-887-4288

Steve Ross, 202-887-4288

John Spear, 202-296-7177

Deborah Spak, 847-948-2016

---

**Date:**   06/02/00                          **Pages:** 3

---

**Re:**   First DataBank Final Letter          **CC:**

**NOTICE:** This communication is intended only for the use of the individual or entity to whom it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this communication is not the intended recipient or the employee or agent responsible for delivering the communication to the intended recipient, dissemination, distribution, or copying of this communication is prohibited. If you received this communication in error, please notify us immediately by telephone (collect) and return the original to us at the above address. Your assistance is appreciated.

● **Comments:**

Redacted - Privileged



RECEIVED
JUN 2 2000
ANNA S. RICHO
ASSOCIATE GENERAL COUNSEL

JUN 02 2000 11:40



EXHIBIT

7

248 652 0670      PAGE.01

CONFIDENTIAL

INT00000506

Bax_Sun_Lex_0006925

06/02/00  FRI 13:34 FAX 248 652 0670       BAXTER ROCHESTER,MI                      ☑002

HYLAND IMMUNO                 Baxter Healthcare Corporation
                              1200 Parkdale Road
                              Rochester, Michigan 48307-1744
                              248.652.7872
                              Fax: 248.652.0670

# Baxter

June 2, 2000

First DataBank
1111 Bayhill Drive
Suite #350
San Bruno, CA  94066

                              VIA FACSIMILE

Gentlemen:

    As you know, the Hyland Immuno Division of our Company prepares Recombinate™ Antihemophilic Factor (Recombinant).  The NDC Codes for this therapy are 0944-2938-01, 0944-2938-02, 0944-2938-03.  It has recently come to our attention that your Company, in connection with some undisclosed agreement with the Department of Justice, is publishing pricing associated with Recombinate™ rAHF which is erroneous.  Specifically, you are reporting a published price of $0.85 per unit.  We have no idea how you have determined that figure.

    Although there are reports that First DataBank is publishing numbers which have been calculated and provided by an attorney in the Civil Division of the Department of Justice, T. Reed Stephens, a cohort of Mr. Stephens recently stated unequivocally that First DataBank was publishing such numbers based on its own independent survey of wholesalers.  The figure being published is being represented to the states as an average of the actual prices charged to or by wholesalers.  Since Recombinate™ rAHF is not sold to wholesalers, we are aware of no basis for the figure you are associating with Recombinate™ rAHF in this manner.

    Baxter feels compelled to insist that you either provide it with information establishing a basis for the putative pricing information you are publishing, or that you immediately cease and desist from publishing it.  As we know you are aware, the Justice Department is currently conducting an investigation aimed at attempting to make drug companies responsible, in some way, for Medicaid claims submitted by third parties which are reimbursed in part based on information published by your Company.  While we have and will continue to dispute such theories, we cannot responsibly allow your Company to make representations concerning our therapies in a way which erroneously suggests that Recombinate™ rAHF is being sold to or available from wholesalers. Moreover, we are told that you are referring to this figure as some variant of "AWP", which it clearly is not.  Baxter's AWP for Recombinate™ rAHF is its list price of $1.28. Your publishing of an $0.85 AWP places patients at risk, as states are using your newly-published figures as the equivalent of a traditional AWP, and are further reducing that amount when reimbursing providers – resulting in reimbursement below the price at

JUN 02 2000 11:40                                    248 652 0670        PAGE.02

CONFIDENTIAL                                                      INT00000507

                                                      Bax_Sun_Lex_0006926

First DataBank
June 2, 2000
Page 2

which Recombinate™ rAHF is actually being sold to a large number of providers. This fact, in conjunction with the Justice Department's involvement in these matters, make it imperative that we resolve this matter as soon as possible.

In order to bring about a prompt resolution of this matter, please provide us with your response by June 16, 2000.

Sincerely yours,

Paul O. Ashba, Esq.
Senior Counsel, Hyland Immuno Division
Baxter Healthcare Corporation

CONFIDENTIAL                                                INT00000508

Bax_Sun_Lex_0006927

BRADLEY
DEPOSITION EXHIBIT
8

Case 1:01-cv-12257-PBS   Document 8281-4   Filed 04/09/13   Page 54 of 184



# Plasma/Albumin Free Method

## rAHF

## Business Plan 2003

~AUTODATE

HIGHLY CONFIDENTIAL

BAX MDL E 0856597

# Overview

- Objectives
- Environment
- Clinicals
- Brand Basics
- Logistics
- Medical Education
- DTP
- Illumination
- Pricing/Reimbursement
- Training
  ~AUTODATE

HIGHLY CONFIDENTIAL

BAX MDL E 0856598

Case 1:01-cv-12257-PBS   Document 8281-4   Filed 04/09/13   Page 56 of 184

# Objectives

- Pre-Launch
  - Maintain 84% rFVIII leadership position
  - Position Baxter as a leader & innovator
  - Build awareness of and need for PFM
    - Treators = prescribe the brand
    - Patients = demand the brand

- Launch
  - Make PFM a billion dollar brand in first year of launch
  - Convert 52% of R patients to PFM in 2003 (< 6 mo)
  - Obtain price premium

~AUTODATE

HIGHLY CONFIDENTIAL

BAX MDL E 0856599

"It (PFM) is by far and away the largest single opportunity for Baxter."

- Harry Kraemer

BusinessWeek Online March 28, 2002



~AUTODATE

HIGHLY CONFIDENTIAL

BAX MDL E 0856600

# Objectives
## FVIII Sales

In 2001, Baxter's worldwide FVIII product sales were responsible for <u>17.7%</u> of Baxter's total profit. In that same time period, North America FVIII sales alone were responsible for <u>10.6%</u> of Baxter's profit.

~AUTODATE

HIGHLY CONFIDENTIAL

BAX MDL E 0856601

Case 1:01-cv-12257-PBS Document 8281-4 Filed 04/09/13 Page 59 of 184

# Objectives
## Historical Peak Sales

Previous launches in hemophilia have not been as fast reaching their peak sales as we would like for PFM.



# of years to reach the peak sales from launch

Recombinate — Benefix — NovoSeven — PFM

Source: Internal data, Annual reports
~AUTODATE

HIGHLY CONFIDENTIAL

BAX MDL E 0856602



HIGHLY CONFIDENTIAL

BAX MDL E 0856603

# Objectives
# Target Markets

- Target all patients
  - Recombinate users & PUPs
  - Albumin-light users
  - Plasma-derived users

- Focus messages toward late adopters



~AUTODATE

20%

80%

Early Adopters
Late Adopters

HIGHLY CONFIDENTIAL

BAX MDL E 0856604

# Objectives
# Early v. Late Adopters

Pursue both. However, focus positioning work & mainstream messaging on late adopters.
Want to reinforce message early & frequently. Largest group of customers. Emphasize new technology message to early's who gravitate towards innovation.

– Early adopters

- Intrigued with innovation
- Less knowledgeable about hemophilia
- More reliant on physician
- Less savvy regarding data gathering



## US

20%

80%

| | |
|---|---|
| ▦ | Early |
| ■ | Late |
| ▨ | MD Rec |
| ▤ | Skeptic |



## EU

20%

23%

19%

38%

– Late adopters

- Risk averse
- Require higher level of comfort
- Prefer longer product track record
- Pursue product information in journals and internet

~ AUTO USA higher percentage on prophy

HIGHLY CONFIDENTIAL

BAX MDL E 0856605

# Environment

## Marketplace Trends

- 80% RECOMBINATE position
- 170mau inventory surplus
- Generic scriptwriting
- Declining R sales in PHS & non-PHS HTCs
- Downward pricing pressure
- Competitive favorable reimbursement
- BDD label changes
- Bayer & Aventis comeback
- Competitor Gen 3
  - ReFacto AF beginning clinicals
  - Kogenate 3 on hold
- New HIPPA & OIG guidelines

# Process Comparison
# R vs KFS vs PFM

|  | Recombinate™<br>A1C6<br>CHO cell | rAHF-PFM<br>GD8/6<br>CHO cell |
|---|---|---|
| Host cell |  |  |
| Transfection vectors | Human FVIII and<br>vWF cDNAs | Human FVIII and<br>vWF cDNAs |
| Cell culture medium | Includes albumin, insulin, and<br>aprotinin of bovine origin | Contains no human- or animal-<br>sourced raw materials |
| Cell culture process | Discontinuous batch<br>re-feed | Continuous ("chemostat")<br>perfusion |
| rAHF purification | Immunoaffinity,<br>cation-exchange (Mono S),<br>anion-exchange (Mono Q)<br>chromatographies | Immunoaffinity,<br>cation-exchange (Source 3OS),<br>anion-exchange (Mono Q)<br>chromatographies |
| Dedicated viral<br>inactivation step | None | Solvent-detergent treatment |
| Final product formulation | Stabilized in HSA | No protein excipients |
| Final product<br>reconstitution volume | 10 mL | 5 mL |

~AUTODATE

HIGHLY CONFIDENTIAL

# Environment Comparison

## RECOMBINATE

- Cryopreservation
  - Human albumin
- Cell Culture
  - Bovine albumin
- Viral Inactivation
  - None
- Formulation
  - Human albumin
- Features
  - 10mL
  - 1000 IU/vial
  - 3 year room temp

~AUTODATE

## rAHF-PFM

- Cryopreservation
  - NO albumin
- Cell Culture
  - NO albumin
- Viral Inactivation
  - S/D step
- Formulation
  - NO albumin
- Features
  - 5mL
  - 1500 IU/vial
  - 3-6 months room temp

HIGHLY CONFIDENTIAL

BAX MDL E 0856608

Case 1:01-cv-12257-PBS   Document 8281-4   Filed 04/09/13   Page 66 of 184

# Environment

# SWOT

**Strengths**

- Plasma/Albumin Free Method
- Enhanced features
  - o 5mL diluent*
  - o Four potency sizes*
  - o BAXJECT
  - o Ancillaries
- *proven* RECOMBINATE
  - o Undisputed efficacy
  - o Continuous supply
  - o Market leader (84%)

**Opportunities**

- First to launch
- VCCs & Firm Offers
- Co-marketing
- Patient database
- Hemophilia focused sales force
- KOL development
- Increased utilization
- ~AUTODATE Competition already has better

**Weakness**

- Limited perceived value of safety enhancement
- Price
- Monoclonal antibody column
- S/D viral inactivation
- No prophylaxis indication
- 5mL diluent
- 1500IU superhigh
- CI label data
- No enhancements in the pipeline

**Threats**

- Oversupplied market
- Price wars
- Competitive Gen 3
  - o ReFacto AF
  - o Kogenate 3
- Limited number of patients
- Generic script writing
- HIPPA guidelines

HIGHLY CONFIDENTIAL

BAX MDL E 0856609

# Enviorment

# Value Proposition of Safety

**PFM is evaluated as the safest product. However, the safety level of all FVIII medications is considered to be high.**



3.1.4 Value Analysis of PFM



HIGHLY CONFIDENTIAL

BAX MDL E 0856611



# Clinicals

# Milestones

First Clinical Trial Patient Infused (Peoria) — Nov 2001

Submitted Biological License Application to FDA

Pediatric Trial Began — Jun 2002

Rec'd FDA approvable letter

Neuchatel & Vienna FDA inspections — Aug 2002

EMEA Submission

Canadian Submission — Sep 2002

NA PFM Clinician Board Kick-Off — Nov 2002

FDA letter of Questions & Deficiencies — Apr 2003

Anticipated US License — Jul 2003

~AUTODATE

HIGHLY CONFIDENTIAL

BAX MDL E 0856612

Case 1:01-cv-12257-PBS   Document 8281-4   Filed 04/09/13   Page 70 of 184

# Clinical Trial Update

- Completed trials
  - PTP Pivotal
- On-going trials
  - PTP Continuation
  - Surgery
  - Pediatric
  - PUP
  - Japan
- In development
  - Phase IV program

~AUTODATE

HIGHLY CONFIDENTIAL

BAX MDL E 0856613

# Clinicals

# Trial Update

- Completed trials
  - PTP Pivotal
- On-going trials
  - PTP Continuation
  - Surgery
  - Pediatric
  - PUP
  - Japan
- In development
  - Phase IV program

~AUTODATE

HIGHLY CONFIDENTIAL

BAX MDL E 0856614

# Regulatory Update-FDA

- **BLA Submission**                                June 2002
    - Pivotal Study data
    - Surgery Study – 10 study subjects

- **Facility inspections**                          September 2002
    - Neuchâtel
    - Vienna

- **BLA Supplement**                                September 2002
    - Continuation Study – inhibitor data on 27study subjects
    - Pediatric PTP Study – PK data on 13 study subjects

- **Study Site Audits**                             November 2002

- **BLA Supplement**                                January 2003
    - Additional safety data from the
      Continuation and Pediatric studies

- **BLA Supplement**                                March 2003
    - Additional data from Pediatric study

- **End of 10 month Review**                        April 2003
    - List of questions and deficiencies

- **Approval (estimate)**                           Q3 2003
~ AUT0DATE

HIGHLY CONFIDENTIAL

BAX MDL E 0856615

# Clinicals
# Regulatory Update-FDA

- **BLA Submission** — June 2002
  - Pivotal Study data
  - Surgery Study – 10 study subjects

- **Facility inspections** — September 2002
  - Neuchâtel
  - Vienna

- **BLA Supplement** — September 2002
  - Continuation Study – inhibitor data on 27 study subjects
  - Pediatric PTP Study – PK data on 13 study subjects

- **Study Site Audits** — November 2002

- **BLA Supplement** — January 2003
  - Additional safety data from the Continuation and Pediatric studies

- **BLA Supplement** — March 2003
  - Additional data from Pediatric study

- **End of 10 month Review** — April 2003
  - List of questions and deficiencies

- ~Approval (estimate) — Q3 2003

AUQDATE

# Clinicals

# Regulatory Update-EMEA

- **MAA Submission**                                September 2002
  - Pivotal Study data
  - Surgery Study – 10 study subjects
  - Continuation Study – inhibitor data on 27 study subjects
  - Pediatric PTP Study – PK data on 13 study subjects

- **Acceptance of Application**                 October 21, 2002

- **Circulation of Assessment**
  **Report**                                              December 31, 2002

- **MAA Amendment**
  - Additional safety and efficacy data from Continuation and Pediatric studies

- **Draft list of questions**                       February 14, 2003

- **Approval (estimate)**                         Q3/Q4 2003

- ~~UPDATE~~ **Switzerland???**                   ???

# Regulatory Update-Canada   September 2002

- ## New Drug Submission

  - Pivotal Study data
  - Surgery Study – 10 study subjects
  - Continuation Study – inhibitor data on 27 study subjects
  - Pediatric PTP Study – PK data on 13 study subjects

- ## Approval (estimate)   Q4 2003

~AUTODATE

HIGHLY CONFIDENTIAL

BAX MDL E 0856618

# Clinicals

# Regulatory Update-Canada

- ## New Drug Submission    September 2002
  - Pivotal Study data
  - Surgery Study – 10 study subjects
  - Continuation Study – inhibitor data on 27 study subjects
  - Pediatric PTP Study – PK data on 13 study subjects

- ## Approval (estimate)    Q4 2003

~AUTODATE

HIGHLY CONFIDENTIAL

BAX MDL E 0856619

# Clinicals
# Pre-clinical Development Summary

- Results from the preclinical development program

- Demonstrated that the rAHF-PFM process retained the physicochemical characteristics of Recombinate rAHF

- Predicted a level of safety, tolerability, and hemostatic efficacy of rAHF-PFM comparable with Recombinate rAHF in ~ patients

HIGHLY CONFIDENTIAL

BAX MDL E 0856620

# Clinicals

# Pivotal Conclusions

- Recombinate rAHF and rAHF-PFM$_{pilot}$ are bioequivalent

- rAHF-PFM$_{pilot}$ and rAHF-PFM$_{commercial}$ are bioequivalent

- Hemostatic efficacy of rAHF-PFM$_{pilot}$ consistent with that of Recombinate rAHF

- Neoantigenicity risk of rAHF-PFM$_{pilot}$ appears to be in-line with previously developed rFVIII therapeutics

- rAHF-PFM is well tolerated with no SAEs

- rAHF-PFM$_{commercial}$ experience to be expanded in PTP Continuation study
  ~AUTODATE

HIGHLY CONFIDENTIAL

BAX MDL E 0856621

# Clinicals
# Continuation Interim Conclusions

- Similar pharmacokinetics comparing commercial after at least 75 exposure days and pilot rAHF-PFM

- Efficacy good in large majority of cases

- Safety profile good

- No SAE, no product related AE, no inhibitors (Oct 2002)

~AUTODATE

# Clinicals

## Surgery Conclusions

**In the 10 subjects included in the latest interim report***

- rAHF-PHF demonstrated effective surgical prophylaxis and perioperative management of hemostasis

- Was safe and well tolerated

~AUTODATE
*September 2002.

HIGHLY CONFIDENTIAL

BAX MDL E 0856623

# Clinicals
# Pediatric Conclusions

- Pharmacokinetic data are key surrogates for efficacy of new FVIII concentrates

- Pharmacokinetic data in pediatric patients <6 years of age is consistent with results from patients ≥10 years, taking greater plasma volume into account

- Data suggest that rAHF-PFM is effective in hemophilia A patients <6 years of age

- A single infusion of rAHF-PFM in previously treated children <6 years old is safe and well tolerated

~AUTODATE

HIGHLY CONFIDENTIAL

BAX MDL E 0856624

# Brand Basics

## Branding

- FDA approved name yesterday!

~AUTODATE

HIGHLY CONFIDENTIAL

BAX MDL E 0856625

# Brand Basics
## Brand & Positioning

### Brand Concept

"PFM is the ultimate hemophilia therapy for all hemophilia A patients because it combines the *proven* RECOMBINATE molecule with the security of a protein-free process (by Baxter)"

### Positioning Platform

"PFM is the first choice in hemophilia therapy because it puts life first."

~AUTODATE

HIGHLY CONFIDENTIAL

BAX MDL E 0856626

inner_view [https://v5.lextranet.com/lcs/customDB/ompi/inner_view.lcs?session_key=6f31-5101f9dd-103946-86b5-7c6b-794a-7ee2-511201710objectID=Page 31 of 110

# Wyeth Campaign



They are pioneers in the development of recombinant products for the treatment of both hemophilia A and B. They have been first to market a number of cutting-edge recombinant products. And today they continue to expand treatment options to better the lives of patients like me.

Now they've entered into historic partnerships with the world's leading hemophilia advocacy groups. And they're committing millions of dollars every year towards finding a cure through gene therapy.

It's my life—and I know Wyeth is behind me all the way.

HIGHLY CONFIDENTIAL

BAX MDL E 0856627

# Brand Basics
## Positioning Strategy

Although one core concept that delivers on the "life first" position will be developed, we will focus on the brand concept heavier in the first 9–12 months—or launch phase



**Convert**
Emphasize brand concept

**Lock and Grow**
Create focus on "life first" higherground

2Q 2003

2Q 2004

~AUTODATE

HIGHLY CONFIDENTIAL

BAX MDL E 0856628

Case 1:01-cv-12257-PBS   Document 8281-4   Filed 04/09/13   Page 86 of 184

# Brand Basics
# Messaging

~AUTODATE

BAX MDL E 0856629

Case 1:01-cv-12257-PBS   Document 8281-4   Filed 04/09/13   Page 87 of 184

# Brand Basics

# Messaging

~AUTODATE

HIGHLY CONFIDENTIAL

BAX MDL E 0856630

Case 1:01-cv-12257-PBS   Document 8281-4   Filed 04/09/13   Page 88 of 184

# Brand Basics
# Messaging

~AUTODATE

HIGHLY CONFIDENTIAL

BAX MDL E 0856631

Case 1:01-cv-12257-PBS   Document 8281-4   Filed 04/09/13   Page 89 of 184

# Brand Basics
# Insights

~AUTODATE

HIGHLY CONFIDENTIAL

BAX MDL E 0856632

# Brand Basics
# Strategic Map

## NOW THINK

I am generally satisfied with the efficacy of the range of recombinant products I prescribe/use. However, I know there is always the potential for a safety risk.

## INTUIT

Despite a generic mindset that has prevailed in the past, physicians, nurses, caregivers and patients do have specific criteria for what they are looking for in a brand.

## STRATEGY

Establish PFM as the first choice in hemophilia management.

## FOCUS OF COMMUNICATION

1. PFM is the first choice in hemophilia therapy because it is protein free.
2. PFM is the first choice in hemophilia therapy because it puts life first.

## NEW THINK

I've made the best choice. PFM is the brand I choose.

~AUTODATE

HIGHLY CONFIDENTIAL

BAX MDL E 0856633

inner_view [https://v5.lextranet.com/lcs/customDB/ompi/inner_view.lcs?session_key=6f31-5101f9dd-103946-86b5-7c6b-794a-7ee2-51120171objectID=Page 38 of 110

# Brand Basics
## Core Concepts

~AUTODATE

HIGHLY CONFIDENTIAL

BAX MDL E 0856634

# Logistics




## Packaging



- 1 ½ inch wider
- Biodegradable
- Use the real-estate
- 5mL diluent
- PI & PPI
- BaxJect
- L, M, H, S potency
- Hard Blister Packed Ancillaries
  - Vacutainer 25G safety sheath butterfly, 10cc Syringe, Alcohol Pads, Bandage




NEW!

# Logistics
# Operating Plan & Supply

|  | Product | Units | ASP | Revenue |
|---|---|---|---|---|
| US | R | 555 | 0.85 | 472 |
|  | PFM | 199 | 0.93 | 185 |
| Canada | R | 44 | 0.87 | 38 |
|  | PFM | 12 | 1.00 | 12 |
| NA | R | 599 | 0.84 | 503 |
|  | PFM | 211 | 0.93 | 196 |

| | R | PFM |
|---|---|---|
| 2003 | 1.117 | 1.141 |
| 2004 | 1.141 | 1.237 |
| 2005 | 0.616 | 2.365 |
| 2006 | 0.351 | 2.495 |

'03/'02
Unit Growth

US 13%
+89mau

Canada 14%
+6.5mau

~AUTODATE

HIGHLY CONFIDENTIAL

# Logistics
# Licensure Delay = Supply at Risk





HIGHLY CONFIDENTIAL

BAX MDL E 0856637

# Logistics
## Conversion Programs

- Swap out customer inventories
- Sampling program
- Consignment
- BaxStor w/ one month supply
- Clinician template letter
- Plan for each HTC

~AUTODATE

HIGHLY CONFIDENTIAL

BAX MDL E 0856638

Case 1:01-cv-12257-PBS   Document 8281-4   Filed 04/09/13   Page 96 of 184

# Logistics
# Conversion Messages

~AUTODATE

HIGHLY CONFIDENTIAL

BAX MDL E 0856639

inner_view [https://v5.lextranet.com/lcs/customDB/omni/inner_view.lcs?session_key=6f31-5101f9dd-103946-86b5-7c6b-794a-7ee2-51120171objectID=Page 44 of 110

# Logistics
# VCC Strategy

- ## HCC PFM Kit

~AUTODATE

HIGHLY CONFIDENTIAL

BAX MDL E 0856640

# Medical Education Initiatives

- NA PFM Clinician Board
- Peer-to-Peer Selling
- All Treator Meeting
- Recombinant Therapy Workshops
- HTC PFM Kit
- Professional Collateral
- "the right choice for surgery"

~AUTODATE

HIGHLY CONFIDENTIAL

BAX MDL E 0856641



# Medical Education
# NA PFM Clinician Board

## MISSION

Develop and implement an on-going educational communications program designed to provide greater insight and understanding into patient treatment and care within the hemophilia community.

~AUTODATE

HIGHLY CONFIDENTIAL

BAX MDL E 0856642

Case 1:01-cv-12257-PBS   Document 8281-4   Filed 04/09/13   Page 100 of 184



# Medical Education
# NA PFM Clinician Board

## BOARD OBJECTIVES

1. Provide input on clinician and patient slide kits

2. Deliver presentations to clinicians and patients/caregivers

3. Consultant shall attend 4 working meetings during 2002 and 2003

4. Consultant shall deliver 3 rAHF-PFM talks in 2003*

5. Consultant shall deliver 3 rAHF-PFM talks in 2004*

6. Participate in media interviews

*All clinicians have signed an 18 month contract

~AUTODATE



# Medical Education
# NA PFM Clinician Board

| Physician | | Nurse | |
|---|---|---|---|
| Tarantino, Chair | Peoria | Giambartolomei, Chair | Aurora |
| Abshire | Atlanta | Cantini | Houston |
| DiPaolo | Iowa City | Hatcher | Indianapolis |
| Kulkarni | East Lansing | Klein | Southwest Calgary |
| Leissinger | New Orleans | Koehlmann | Detroit |
| Manno | Philadelphia | Mahoney-West | Farmingham |
| Pipe | Ann Arbor | McCarthy | NYC |
| Teitel | Toronto | | |
| Wong | Los Angeles | | |

~AUTODATE~

HIGHLY CONFIDENTIAL



NORTH AMERICA
CLINICIAN BOARD

# Medical Education
# NA PFM Clinician Board

## MEETINGS

- November 7-8, 2002 Clinician Board Kick-Off Meeting, Chicago
- December 7, 2002 ASH Reception & Dinner, Philadelphia*
- January 15, 2002 Webcast - Physician review of Clinical CME/CEU slide deck
- January 24, 2002 Webcast - Nurse review of Patient Slide deck
- February 7-9, 2003 Clinician Board Meeting II, Lake Las Vegas
- May 14-18, 2002 Clinician Board Meeting III, Neuchatel
- July 12-18, 2003 ISTH Reception & Dinner, Birmingham*
- August 2003 Date and Location TDB (post-licensure)

*For those clinicians attending the Congress

~AUTODATE

# Medical Education
## Peer-to-Peer Selling

- Objective:  Educate prescribers as to why PFM is the best FVIII for all hemophilia A patients

- Program:  Utilize Clinician Board to create & deliver CME/CEU PFM presentation pre- and post-licensure

- ROI:  For every severe patient converted to PFM (on-demand child – prophylaxis adult):
  - $8,000 - $38,000 R to PFM*
  - $20,000 - $109,000 M to PFM*
  - $34,000 - $186,000 new patient**

  *Incremental ASP & GP
  **Incremental GP

BAX MDL E 0856646

inner_view [https://v5.lextranet.com/lcs/customDB/omni/inner_view.lcs?session_key=6f31-5101f9dd-103946-86b5-7c6b-794a-7ee2-51120171objectID=Page 51 of 110

# Medical Education Command Central

- IntraMed's speakers bureau management group

- Provide turn-key support services for requesting, coordinating and tracking Peer-to-Peer and Clinician-to-Patient programs

  - Staff a toll-free hotline regarding all aspects of program coordination

  - Program requests, invitations, logistics, speaker(s) identification, registration, materials, honoraria, travel

  - On-site support to ensure proper CME/CEU accreditation at Peer-to-Peer programs

  - Post-program support

    - Evaluations
    - Attendee demographics
    - Thank you letter

~AUTODATE

HIGHLY CONFIDENTIAL

BAX MDL E 0856647

# Medical Education
# All Treator Meeting

- Objective:  Educate physicians and nurses as to clinical efficacy and safety of PFM

- Program:  Interactive 2 day scientific forum developed and lead by NA Clinician Board

- Timing:  1 month post US licensure

~AUTODATE

HIGHLY CONFIDENTIAL

BAX MDL E 0856648

# Medical Education
# Recombinant Therapy Workshops

- Objectives:
  - Marginalize ReFacto efficacy & maintain R position
  - Increase working knowledge of and demand for PFM
- Feb 21-22 Charleston & Apr 4-5 Half Moon Bay
- Interactive thought leader forum to discuss
  - Importance of the B-domain
  - Are all FVIII molecules the same? (Meta-Analysis)
  - Peer case study presentations
  - Treatment options & issues
  - PFM development
  - PFM clinical update

~AUTODATE

# Medical Education
# Professional Collateral

~AUTODATE

HIGHLY CONFIDENTIAL

BAX MDL E 0856650

# Medical Education
## "the right choice for surgery"



- ❖ Objective:  Capture the 75mau surgery market and subsequent "halo effects" because of PFM's:
  - ❖ Safety
  - ❖ Stability
  - ❖ CI label data
- ❖ Concerns:
  - • Stability not finalized
  - • No CI indication
  - • Label instructions at risk
- ❖ Audience:  Doctors, Nurses, Pharmacists?
- ❖ Program:  TBD
  - ~ Autogram~

HIGHLY CONFIDENTIAL

BAX MDL E 0856651

# Medical Education
# CI Market Research

## Discussion Agenda

Qualitative study description

Qualitative study key findings

Next steps

~AUTODATE

HIGHLY CONFIDENTIAL

BAX MDL E 0856652

# CI Qualitative Study Description

– **Purpose:** Understand pharmacists' role (if any) in deciding hemophilia therapy brand and continuous infusion usage; determine current knowledge of continuous infusion (CI) and identify continuing education opportunities

– **Research Method:** Twenty face to face interviews will be conducted by NOP Healthcare. Recruiting and interviews are still ongoing. Results will be available by December 31.

– **Interview Participants: 12 interviews conducted to date**

(CI Experience = 2/3 of participants)

| Participants | Experienced in CI | Inexperienced in CI |
|---|---|---|
| 2 Pharmacists | 1 | 1 |
| 5 Hematologists | 3 | 2 |
| 5 Nurses | 4 | 1 |

~AUTOR Nurses

HIGHLY CONFIDENTIAL

BAX MDL E 0856653

# CI Qualitative Study
# Key Findings

- Hematologists and nurses are the real decision makers

  – Determine brand of factor, dosing, and preparation instructions

- Pharmacists that refuse to reconstitute Factor VIII for CI do so mainly because of no CI indication on product insert

- Pharmacists need data on stability

- Brand of factor prescribed is typically patients current RX

  – Different brands may be substituted depending on hospital supply and reimbursement

- Most desired information is a written protocol that explains dosing
  and stability of different brands

~AUTODATE

BAX MDL E 0856654

Case 1:01-cv-12257-PBS   Document 8281-4   Filed 04/09/13   Page 112 of 184

# CI Qualitative Study Next Steps

- Receive topline report by December 31, 2002

- Prepare recommendations for medical education initiatives by January 10, 2002

- Meet with Intramed to discuss development of medical education initiatives by January 13, 2002

~AUTODATE

HIGHLY CONFIDENTIAL

BAX MDL E 0856655

# DTP
# Initiatives*

- Clinician-to-Patient Selling
- *We're Working for You Neuchatel*
- "R & M Need Your Help" Direct Mail Campaign
- Patient Package Insert
- Website
- Patient Collateral & Patient PFM Kit
- HTC, Chapter & HCC Co-Marketing
- Other based on market research

*HIPPA guidelines will be taken into consideration

~Audience may limit opportunities

HIGHLY CONFIDENTIAL

# DTP

## Clinician-to-Patient Selling

- **Objective:** Increase patient awareness of and demand for PFM

- **Program:** Utilize Clinician Board to create & deliver patient/caregiver targeted PFM presentation pre- and post-licensure

- **ROI:** For every severe patient converted to PFM (on-demand child – prophylaxis adult):
  - $8,000 - $38,000 R to PFM*
  - $20,000 - $109,000 M to PFM*
  - $34,000 - $186,000 new patient**

  *Incremental ASP & GP
  **Incremental GP

~AUTODATE

HIGHLY CONFIDENTIAL

BAX MDL E 0856657

Case 1:01-cv-12257-PBS   Document 8281-4   Filed 04/09/13   Page 115 of 184



# DTP

## *We're Working for You Neuchatel*



HIGHLY CONFIDENTIAL

BAX MDL E 0856658

# DTP

# "RECOMBINATE Needs Your Help"

- **Objective:** Engage R & M patients w/ opportunity to offer input and voice needs for future FVIII therapies. Ultimately announce PFM!

- **Audience:** Patients & Caregivers

- **Program:** 4 wave direct mail
  - Patient database
  - Galaxy database
  - HCC Co-Marketing

~AUTODATE

HIGHLY CONFIDENTIAL

# DTP
# Patient Package Insert

~AUTODATE

HIGHLY CONFIDENTIAL

BAX MDL E 0856660

# DTP

## Website

- Product-specific

~AUTODATE

HIGHLY CONFIDENTIAL

BAX MDL E 0856661

inner_view [https://v5.lextranet.com/lcs/customDB/omni/inner_view.lcs?session_key=6f31-5101f9dd-1b3946-86b5-7c6b-794a-7ee2-51120171objectID=Page 66 of 110

# DTP
# Collateral

~AUTODATE

HIGHLY CONFIDENTIAL

BAX MDL E 0856662

# DTP
# HCC Co-Marketing

~AUTODATE

HIGHLY CONFIDENTIAL

BAX MDL E 0856663

# DTP

# Market Research & Recommendations

~AUTODATE

# DTP
# Market Research

Discussion Agenda

Secondary market research overview

Description of qualitative study

Key findings from qualitative study

Key recommendations

Next steps

~AUTODATE

HIGHLY CONFIDENTIAL

# DTP
# Secondary Market Research
# Overview

– Conducted by Jelena Popadic

– Purpose of study was to identify best
demonstrated practices from all industries

– Findings analyzed by Bernadette and Jelena
and presented to Pete's staff on August 1

~AUTODATE

HIGHLY CONFIDENTIAL

BAX MDL E 0856666

# DTP Secondary Market Research Overview

– Key findings/recommendations

- Integrate DTC effort with other elements of the marketing mix

- Plan for different phases

- Ensure that the message is right and consistent

- Keep message simple

- Perform marketing activities that drive professional acceptance and consumer recommendations

~AUTODATE

# DTP Primary Research
# Qualitative Study Description

- **Purpose:** Identify patient/caregiver information needs and communication vehicle preferences

- **Research Method:** Twenty face to face interviews with patients/caregivers conducted by NOP Healthcare

- **Sample Demographics:**
  - (7) Chicago, (7) LA, (6) Philadelphia
  - Patient age varied, 40% was in 12-17 age category
  - Mixed income and educational levels
  - ~AUTODATE 60% were Recombinate users

HIGHLY CONFIDENTIAL

BAX MDL E 0856668

# DTP Qualitative Study
# Key Findings

- Patients/Caregivers welcome a DTP program designed to raise awareness

- Strong preference to discuss new product info with an HTC and Home Care Company before switching

- Majority of respondents would have higher confidence if information source was from an HTC or NHF or local chapters

- Information must justify price/safety ratio compared to existing recombinant products

- Message to allay fears about inhibitor development from switching to new products or using a product on a prophylactic regimen

~AUTODATE

HIGHLY CONFIDENTIAL

BAX MDL E 0856669

# DTP Qualitative Study
# Key Findings

## OVERALL FEEDBACK FROM PARTICIPANTS

DTC message must provide a credible safety message in an understandable format for patients/caregivers and must be endorsed by HTC physicians

~AUTODATE

HIGHLY CONFIDENTIAL

BAX MDL E 0856670

inner_view [https://v5.lextranet.com/lcs/customDB/omni/inner_view.lcs?session_key=6f31-5101f9dd-103946-86b5-7c6b-794a-7ee2-51120171objectID=Page 75 of 110

# DTP Qualitative Study
# Key Findings

- Most influential source of info:
  - HTC Physician

- Preferred sources of info:
  - HTC
  - NHF/Local Chapters
  - Home Care Companies

~AUTODATE

HIGHLY CONFIDENTIAL

BAX MDL E 0856671

# DTP Qualitative Study Key Findings

- **Desired info:**

  – Safety: Side effects (long and short term) and inhibitor rates

  – Efficacy: Dosing, frequency of dosing, product half life

  – Differences between PFM and other products

  – Clinical trial data (side effects,inhibitor rates, efficacy, study details)

  – Storage

  – Administration

  – Manufacturing process

  – Supply/Availability

  ~AUTODATE
  – Price/Private Insurance Issues

HIGHLY CONFIDENTIAL

BAX MDL E 0856672

# DTP Qualitative Study
# Key Recommendations

- Deliver a credible and understandable safety message that is endorsed by physicians

- Use two-way communication with the patients/caregivers

- Involve HTCs in the DTP campaign

~AUTODATE

HIGHLY CONFIDENTIAL

BAX MDL E 0856673

# DTP Qualitative Study
# Key Recommendations

**Promotional Ideas to Evaluate:**

- Direct mail brochure/CD with a free trial of PFM after doctor's approval

- Direct mail brochure with telephone card with free minutes after calling manufacturer to activate

- Telephone card or free trial offer of PFM included with Hemofil M and Recombinate product

- Fun event sponsored by HTC and/or local NHF chapter with presentation by clinical board member

~AUTODATE

# DTP Qualitative Study
# Key Recommendations

**Promotional Ideas to Evaluate:**

- Call Baxter to hear information about product and register for sweepstakes to win a family trip to Switzerland and tour PFM plant

- Brochures should include a visit to hemophilia galaxy and signing up for the sweepstakes through the PFM info-space

- Brochures should be given to NHF and local chapters. These can also be in electronic format so they can be included in emails to patients

- Brochures with free trial offers should be provided to HTCs and placed on revolving carts at comprehensive care clinics

HIGHLY CONFIDENTIAL

Case 1:01-cv-12257-PBS Document 8281-4 Filed 04/09/13 Page 133 of 184

# DTP Qualitative Study
# Key Recommendations

Events:

- Combined HTC/Local Chapter Event
  - Presentation by clinical board member
  - Clinical Trial Patient Testimonial
  - Game show type event for adult patients/caregivers (potential prize is family vacation to next NHF conference)
  - Scavenger hunt for young kids with each item providing information about PFM

~AUTODATE

HIGHLY CONFIDENTIAL

BAX MDL E 0856676

# DTP Qualitative Study
# Key Recommendations

Events:

- Hemophilia Camp
  - Presentation by clinical board member
  - Clinical Trial Patient Testimonial
  - Game show type event for adult patients/caregivers (potential prize is family vacation to next NHF conference)
  - Scavenger hunt for young kids with each item providing information about PFM

~AUTODATE

HIGHLY CONFIDENTIAL

BAX MDL E 0856677

# DTP Qualitative Study
# Next Steps

- Brainstorming and prioritization session to flush out ideas for DTC initiatives
  - Identify initiatives to put into action in 2003
  - Identify timeframe: pre-launch, post-launch, or both
  - Participants: Bernadette, Deborah, Doreen, Jacinda, Kristen, Shannon, Rachel, and Jane
  - Date of meeting: December 13, 2002
- Gather information necessary for implementation (cost, logistics, people, etc.)

~AUTODATE Target completion date is January 20

HIGHLY CONFIDENTIAL

# DTP Qualitative Study Next Steps

- Initiate contact with vendors/key people necessary to implement- Target completion date is January 31
- Rollout of initiative - timeframe depends on selection of initiatives decided on from the brainstorming session

~AUTODATE

BAX MDL E 0856679

inner_view [https://v5.lextranet.com/lcs/customDB/omni/inner_view.lcs?session_key=6f31-5101f9dd-103946-86b5-7c6b-794a-7ee2-51120171objectID=Page 84 of 110

**Illumination**
Business. Made better.

# Illumination Initiatives

- Siebel Transactions
- Analytics
- Power Pack
- Leads & Opportunities
- Collaboration

~AUTODATE

HIGHLY CONFIDENTIAL

BAX MDL E 0856680

# Illumination
## Siebel Transactions

- Obtain and enter all customer email addresses
- Obtain and enter customers necessary for medical education direct mail
- Input HTC factor usage data
- Capture CI



# Illumination Analytics

- Measure PFM conversion post-launch

| Rep Name | PFM Sales | |
|---|---|---|
| | Units | Dollars |
| Sales Rep 1 | 1000 | $1000 |
| Sales Rep 2 | 750 | $900 |
| Sales Rep 3 | 600 | $600 |

## Weekly ranking report



Conversion chart

~AUTODATE

HIGHLY CONFIDENTIAL

# Illumination Power Pack

~AUTODATE

HIGHLY CONFIDENTIAL

BAX MDL E 0856683

# Illumination
# Leads & Opportunities

- Utilize functionality to conduct campaigns with clinicians and chapters

  – Create Opportunities for sales when PFM is not the Baxter FVIII product of choice

  – Create Opportunities for sales when PFM has not been ordered for a week or month or ever

New        Copy       Cancel

Account | NCS HEALTHCARE          Account # | 34308555          Revenue | 150,000.00

Address | 3305 MAIN ST   STE 205    *Opportunity Name | PFM Launch     Due Date | 6/15/2002

                                     Description | Implement the     Sales Method | Default Sale

City | VANCOUVER    State | WA        Team | FLETCHC          Sales Stage | 02 - Close/Win

Zip | 99663                          Source | Sales Objective    Reason Won/Lost | Product Features

~AUTODATE

Prob % | 50%

Created | 5/7/2002

Lead Quality | 1-Exce

Case 1:01-cv-12257-PBS   Document 8281-4   Filed 04/09/13   Page 142 of 184

# Illumination
# Collaboration

~AUTODATE

HIGHLY CONFIDENTIAL

BAX MDL E 0856685

# PFM Worksite
# Discussion Agenda

- Introduction
- Key Contacts
- Example of Site
- Next Steps

~AUTODATE

HIGHLY CONFIDENTIAL

inner_view [https://v5.lextranet.com/lcs/customDB/omni/inner_view.lcs?session_key=6f31-5101f9dd-103946-86b5-7c6b-794a-7ee2-5112017 1objectID=Page 91 of 110

# PFM Worksite
## Introduction

- This purpose of this site is to allow the PFM team to share files, conduct and track file reviews, and post comments

- It serves as a forum for exchanging information across all aspects of the PFM launch among a group of team members

- It stores content and allows easy retrieval

- Access is restricted to PFM team members

~AUTODATE

HIGHLY CONFIDENTIAL

BAX MDL E 0856687

# PFM Worksite
## Key Contacts

- Worksite Administrators: Bernadette Connolly,Binita Choksi, and PFM Marketing Manager

- General: Bernadette Connolly and Binita Choksi

- Product: Bernadette Connolly

- Communication: Doreen Eaton and Jennifer Alampi

- DTP: Doreen Eaton and Jennifer Alampi

- Medical Education: Marc Salit and Bruce Ewenstein

- Price/Reimb/Contracts: Jill Kadam, Mike Bradley, Laura Gschwind

- Sales: Ken Trader, Marlene Gallagher, and Andrew McGarvey

- Training: Jia Li and Binita Choksi

- Finance: Talha Ashraf, Adeel Kheiri, and Melissa Macek

- Simulation: Bernadette Connolly

- Illumination: Chris Geissler

~AUTODATE

HIGHLY CONFIDENTIAL

BAX MDL E 0856688

Back ▾  ⟳ ⟲ ⌂  ⊘ Search  ⁂ Favorites  ⟲ History  ⊟▾ ⤵

☰ ⊡ ⊡ ⊠  ⊚ Send

Edit  View  Favorites  Tools  Help

ess  ⊘  spatch?datasource=workspace&operation=zoom&objectId=!VER:1!0!!MANAGE!COLLABORATION_TYPE!APP!!FACILITY$10!DBASE::WORKSPACE$11418!returnUrl=210399604571 8 ▾

**axter**

Intranet Home   www.baxter.com   Baxter Directories

CONFIDENTIAL: ALL CONTENT FOR BAXTER INTERNAL USE ONLY
Search          Feedback

Science

🔥 **My WorkSite | Options | About | Help | Log Off** - Binita Choksi

🏠 Home  🔷 Baxter  🔷 BioScience PFM Workspace
🔷 **BioScience PFM Workspace**

@ Search

Close

| General | Product | Com | DTP | MedEd | Price/Reimb/Contracts | Sales | Training | Finance | Simulation | Other |

▾ 🗋 Table of Contents                                          Add | Add Folder | Edit

▾ 👤 NA Core Team                                                         Add | Edit

|   | Name | | Office phone | Edit | Copy | Move |
|---|------|---|---|---|
| ☑ | 👤 Choksi, Binita | | 847-940-6281 | Tag ☑ |

▾ 🗋 NA Business Plan                                         Add | Add Folder | Edit

▾ 🗋 Milestones                                               Add | Add Folder | Edit

▾ 🗋 NA Weekly Scorecard/Updates                             Add | Add Folder | Edit

Details | View | Check Out | History | Edit | Copy | Move

| | Tags | Document Title | Document Description | Usage Limitations | Modified Date | ☞ ▾ |
|---|---|---|---|---|---|---|
| ☑ | ✓ | Overview | NA PFM Sr Mng Update 08-01-02 | | Internal | 11/18/02 |

▾ 🗋 Licensure Status                                         Add | Add Folder | Edit

Details | Edit | Copy | Move

| | Name |
|---|------|
| ☑ | 🗋 Canada Status |
| ☐ | 🗋 US Status |

Back ▾

ess e=project&operation=zoom&objectId=IVER:11:01!IMANAGE!COLLABORATION_TYPE!APP::FACILITY$100!BASE::WORKSPACE$114!APP::PROJECT$11831&returnUrl=2103949604571B ▾

Edit   View   Favorites   Tools   Help

Home   Baxter   BioScience PFM Workspace   Com

Close

Search

🔍 Search

BioScience PFM Workspace

| General | Product | Com | DTP | MedEd | Price/Reimb/Contracts | Sales | Training | Finance | Simulation | Other |

Add Content   Layout   Edi

▶ Advertising                                   Add | Add Folder | Edit

▶ Collateral                                    Add | Add Folder | Edit

▶ Direct Mail                                   Add | Add Folder | Edit

▶ Events                                        Add | Add Folder | Edit
                                                Details | Edit | Copy | Move

   Name
☑ 🗀 ASH
☐ 🗀 ISTH
☐ 🗀 NHF

▶ Internal Communications                       Add | Add Folder | Edit
                                                Details | Edit | Copy | Move

   Name
☑ 🗀 Employee Meetings

▶ Promotion                                      Add | Add Folder | Edit

▶ Public Relations                              Add | Add Folder | Edit

**Created By:** baxteradmin   11/13/02 4:47 PM        Security:  POL_ALL
**Modified By:** baxteradmin  12/9/02 2:10 PM              Tags:

HIGHLY CONFIDENTIAL

Back ▾   ⟲ 🗐 🖺 ⊗Search ⎗ Favorites 🕓History ⧉▾ ⬜▾ ⬚   ≣ ⬚ 🖫 ⊗Send   ▬ 🗘

ress ⬚ ER:\1:0!IMANAGE!COLLABORATION_TYPE!APP::FACILITY'$100!BASE:\WORKSPACE$114!APP::PROJECT$1183!APP::FOLDER$1189!APP::FOLDER$1191!APP::FOLDER$11911&returnUrl=5103949708998 ▾ ▾

Edit  View  Favorites  Tools  Help

**axter**

My WorkSite | Options | About | Help | Log Off - Binita Choks

**Science**

CONFIDENTIAL: ALL CONTENT FOR BAXTER INTERNAL USE ONLY

Intranet Home   www.baxter.com   Baxter Directories   Search   Feedback

⊗ Search

🏠 Home  🗐 Baxter  🗐 BioScience PFM Workspace  🖳 Com  🗐 Events  🗐 ASH

🗐 **ASH**                                                                  Edit   Close

Created By:  baxteradmin  11/13/02 4:47 PM
Modified By:  baxteradmin  12/5/02 3:07 PM          Security: POL_ALL
                                                    Tags:

Add | Add Folder

Details | Edit | Copy | Move

Tag

**Contents**

| ☑ | Name |
|---|------|
| └ 🗐 | 2002 |
| └ 🗐 | 2003 |

HIGHLY CONFIDENTIAL                                          BAX MDL E 0856691



Case 1:01-cv-12257-PBS   Document 8281-4   Filed 04/09/13   Page 150 of 184

# Pricing

~AUTODATE

HIGHLY CONFIDENTIAL

BAX MDL E 0856693

# Reimbursement

~AUTODATE

HIGHLY CONFIDENTIAL

BAX MDL E 0856694

Case 1:01-cv-12257-PBS   Document 8281-4   Filed 04/09/13   Page 152 of 184

Training

~AUTODATE

HIGHLY CONFIDENTIAL

BAX MDL E 0856695

# Training Plan
# Discussion Agenda

Team

Audience

Objectives

Key Dates

Materials

Training Agendas

~AUTODATE

HIGHLY CONFIDENTIAL

BAX MDL E 0856696

# Training Team

**Sales Training** – Jim Galante and Jia Li

**Sales** – Blaine Forshage, Chad Fletcher, and 3 Reps (TBD)

**Regulatory Affairs** – TBD

**Medical Education** – Marc Salit and Bruce Ewenstein

**Medical Affairs** – Gerry Spotts and Liz Yi

**Marketing** – Bernadette Connolly, Binita Choksi, PFM Marketing Manager

**Customer Operations** – TBD

Note: Roles will range from planning logistics, creating materials, reviewing materials, approving materials, and training the audiences.

~AUTODATE

HIGHLY CONFIDENTIAL

Case 1:01-cv-12257-PBS   Document 8281-4   Filed 04/09/13   Page 155 of 184



~AUTODATE

HIGHLY CONFIDENTIAL

BAX MDL E 0856698

# Training Objectives

- Refresh knowledge of hemophilia disease state
- Provide internal team with solid understanding of PFM
  - Ensure team understands the need for PFM
  - Build competency in differentiating PFM from other Factor VIII products (Recombinate and other recombinant products)
- Create excitement about PFM
  - Review main talking points of clinical studies
  - Provide answers for potential questions about PFM



~AUTODATE

HIGHLY CONFIDENTIAL

# Key Dates

- Apr 29       PFM Distance Learning Modules available
- June 18      Distribute Distance Learning Modules to Reps and Marketing

- June 27      Reps complete modules and submit quiz answers
- July 15      Marketing on-site training session
- July 15      Submit Q&A for SOP review
- July 31      Q&A completed and reviewed
- Aug 6        Reps receive PFM pre-launch meeting package
- Aug 6        Customer Ops on-site training session
- Aug 13 – 15  Launch meeting (location TBD)

Critical Rate Determining Events:

- Dates for distribution of training materials, on-site trainings, and launch meeting can fluctuate based on FDA approval date
- Completion of Distance Learning Modules is dependent upon key data availability and quick internal approval after receiving vendor output

Note:

~AUTODATE Reps will receive ongoing training until launch (product updates, literature, etc.)

BAX MDL E 0856700

inner_view [https://v5.lextranet.com/lcs/customDB/omni/inner_view.lcs?session_key=6f31-5101f9dd-103946-86b5-7c6b-794a-7ee2-51120171objectII Page 105 of 110

# Training Materials

- Distance Learning Modules
  - Module 1: Science, Disease State, and Manufacturing Process
  - Module 2: Product Information
  - Module 3: SWOT/Competitive Information/Selling Scenarios
- PFM Pre-launch meeting package
  - Outline of vision, expectations, and incentives via video
  - Competency workbooks
  - Feedback summary via quiz results and surveys
- PFM Selling Kit
  - Detailed strategy accessible via power pack
  - Product monograph
  - Physician brochure
  - Patient brochure
  - Rep objection handler via CD, video, and DVD
  - Slide series
  - ~AUTODATE Branded give-aways

BAX MDL E 0856701

# Launch Meeting Agenda

- Communication of product need, vision, and expectations of sales force
- Presentations on competency, incentive, and feedback
- Overview of microbiology, viral transmission, and theoretical risks
- Overview of disease state, product, and manufacturing (advanced)
- Key differences between PFM and other recombinant products (advanced)

- Overview of clinical data
- PFM reimbursement update
- PFM distribution channels update
- PFM marketing strategy
- Quizzes on pharmokinetics, clinical data, and product information
- Selling exercises
  – Role playing with sales aid, package insert, and clinical studies
  – 2,5,10 minute sales call
  – Handling objections
  – Features and benefits selling
  – Closing
- Team building activity

~AUTODATE

HIGHLY CONFIDENTIAL

BAX MDL E 0856702

Case 1:01-cv-12257-PBS   Document 8281-4   Filed 04/09/13   Page 160 of 184

# Marketing On-site Training Agenda

- Communication of product need, vision, and expectations
- Product Overview/Clinical Development
- Key differences between PFM and other recombinant products
- PFM features and benefits
- Financial expectations
- Product display and examples of communication tools

Note: Agenda topics are dependent upon length of time marketing is available. If length of time increases, pricing and reimbursement can be added and promotional materials can be discussed. Otherwise, separate lunch and learn sessions can be held to discuss these and other topics.

~AUTODATE

HIGHLY CONFIDENTIAL

BAX MDL E 0856703

# Customer Operations
# On-Site Training Agenda

- Communication of product need, vision, and expectations
- Product Overview/Clinical Development
- Key differences between PFM and other recombinant products
- PFM features and benefits
- Q&A discussion

~AUTODATE

HIGHLY CONFIDENTIAL

BAX MDL E 0856704

# Timeline

~AUTODATE

HIGHLY CONFIDENTIAL

BAX MDL E 0856705

Case 1:01-cv-12257-PBS  Document 8281-4  Filed 04/09/13  Page 163 of 184

# Announcement

- Sherri Cohen
  - New R & M Marketing Manager
  - Jan 13 start date
- PFM Marketing Manager
  - Offer stage

~AUTODATE

HIGHLY CONFIDENTIAL

BAX MDL E 0856706

# US Pricing Strategy

Advate Pricing Core Team

12/16/02

Discussion Document

~AUTOFILE 1

BAX STATE E 0447977

# Agenda

- Objectives

- Key Assumptions

- Recommendation

- Rationale

- Contingencies/ Risks

- Next Steps

~AUTOFILE 2

BAX STATE E 0447978

# Objective

- Develop a pricing strategy that does all of the following things....
  - Optimizes revenue
  - Maximizes conversion
  - Gives us flexibility to maneuver throughout launch
  - Is justifiable to the community (customers)
  - Is reasonable and defensible to both government and private payers

~AUTOFILE  3

BAX STATE E 0447979

# Assumptions

- AWP is publicly available price data

- ASP not transparent to public; should not be disclosed to public

- Rely on Red Book as the key reference for prices (not responsible for First Data Bank)

- Must have consistent % difference

- Difficult to increase price; easier to decrease price

~AUTOFILE 4

BAX STATE E 0447980

# Assumptions

- Advate should be positioned as the premier product over Gen IIs

- The community expects to be charged a premium (over highest price product)

- Premiums > 23% are considered "prohibitively expensive"

- With current market position, do not want to compete on price

AUTOFILE 5

BAX STATE E 0447981

## Assumptions:
## Helixate FS is right reference

| Product | First Data Bank | Red Book (November) |
|---------|-----------------|---------------------|
| Kogenate FS | 2.03 | 2.03 |
| Helixate FS | 1.63 | 1.63 (currently 1.38) |
| Refacto | 1.36 | 1.36 |
| Recombinate | 1.63 | 1.33 |

~AUTOFILE   8

BAX STATE E 0447982

# Assumptions: Prices quoted to Homecare are similar

| Product | Estimated Homecare prices |
|---|---|
| Kogenate FS | 0.85 |
| Helixate FS | 0.85 |
| Refacto | 0.85 |
| Recombinate | 0.83 |

~AUTOFILE  7

BAX STATE E 0447983

# Recommendation:
## 15% premium over Helixate FS AWP: $1.87

**Optimizes revenue**
- +$20M in 2003 revenue v. par
- +$65M in 2004 revenue v. par

**Maximizes conversion**
- Strong balance between conversion and price; will develop advocates for conversion

**Flexibility to maneuver**
- Can decrease later; difficult to increase
- Don't want to compete on price

**Justifiable to community**
- Fair premiums with strong rationale for all stakeholders

**Defensible to CMS**
- Consistent with our documented processes

~AUTOFILE  8

BAX STATE E 0447984

# Recommendation:
## Estimated AWPs at Launch

| Product | First Data Bank | Red Book (November) |
|---|---|---|
| Kogenate FS | 2.03 | 2.03 |
| **ADVATE** | **TBD by FDB** (Estimate: 2.34) | **1.87** |
| Helixate FS | 1.63 | 1.63 (currently 1.38) |
| Refacto | 1.36 | 1.36 |
| Recombinate | 1.69 (Est.) | 1.35 |

~AUTOFILE 9

BAX STATE E 0447985

# Recommendation:
## Estimated HCC Pricing at Launch

| Product | Estimated HCC Pricing |
|---------|-----------------------|
| **ADVATE** | **1.04** |
| Kogenate FS | 0.85 |
| Helixate FS | 0.85 |
| Refacto | 0.85 |
| Recombinate | 0.85 |

BAX STATE E 0447986

# Rationale: Pricing at Premium Optimizes Revenue

## rFVIII H2 2003 Revenue at Par versus Premium

| | Advate at Par to Recombinate | | | Advate at Premium | | |
|---|---|---|---|---|---|---|
| | Units | ASP | $Rev (M) | Units | ASP | $Rev (M) |
| Recombinate | 248 | $0.85 | $211 | 308 | $0.85 | $262 |
| Advate | 175 | $0.85 | $149 | 115 | $1.04 | $120 |
| Total | 423 | | $360 | 423 | | $381 |

~AUTOFILE  11

BAX STATE E 0447987

# Rationale: Par converts more units; however, homecare advocacy can help to overcome this

| | % Pop. | % Units | Q3&Q4 Units (MAU) | % Conversion @ $0.85 | % Conversion @ $1.04 | Units @ $0.85 | Units @ $1.04 |
|---|---|---|---|---|---|---|---|
| 0-6 | 16% | 11% | 47 | 100% | 70% | 47 | 33 |
| 7-12 | 17% | 22% | 93 | 62% | 40% | 58 | 37 |
| 13-18 | 19% | 30% | 127 | 47% | 30% | 59 | 38 |
| 19-31 | 17% | 17% | 72 | 16% | 10% | 11 | 7 |
| >32 | 31% | 20% | 85 | 0% | 0% | 0 | 0 |
| Totals | 100% | 100% | 423 | 41% | 27% | 175 | 115 |

- Adult conversion increases at prices *below* par

~AUTOFILE  12

BAX STATE E 0447988

# Rationale: Easier to decrease rather than increase

- Very difficult to justify price increases to community, payers, once price is established
  - Medicaid states are a key example
- Can lower prices later if necessary
- Want to compete on merits of products and services offered

~AUTOFILE 13

BAX STATE E 0447989

# Rationale: Fair premium within range of expectations

- Advate is significant advance in technology
- Customers expect a premium to current gen II products
- Premium is within range of what was expected
- Simultaneously positions Advate at a premium to Gen II while maintaining an 8% discount to Kogenate FS AWP

AUTOFILE 14

BAX STATE E 0447990

# Rationale: Answers constituents key questions

| Constituent | Sensitivity to Price | Issues to Manage |
|---|---|---|
| Patients | Least sensitive to price; adults are most sensitive, price savvy | Program to capture adults<br>Need to address question of lifetime caps |
| Nurses | Concerned about helping patients navigate insurance coverage and lifetime caps | Need to address question of lifetime caps<br>Demonstrate that premium is fair and shouldn't be a barrier to prescribing |
| Physicians | Most know factor is expensive, but do not know price<br>Sensitive to societal cost impact | PHS physicians are often aware of price, need to be able justify with them<br>Demonstrate that premium is fair and shouldn't be a barrier to prescribing |
| Payers | Most know factor is expensive, but do not know price; expect 15% premium | Do not want to trigger utilization management |
| Homecare | Sensitive to their price<br>Concerned about payer scrutiny | Provide them with letters of justification to submit with claims to payers<br>Establish new codes for Medicare |
| NHF/ Chapters | Want to make sure companies are not gouging public | Educate them about the rationale behind 15% premium over Helixate (manage their expectations)<br>Ensure no barriers to getting endorsement by NASAC that can be used with payers |

~AUTOFILE 15

# Rationale: Following our documented process

- As per legal, keeps a consistent 78% difference (average of Baxter FVIII products)

- Use of dossier support for the premium cost justification

  - Pharmacoeconomics

  - Investments made new technology development and manufacturing facility

  - Liability issues

~AUTOFILE 16

BAX STATE E 0447992

# Contingencies/ Risks

Potential Risk

- Aventis does not increase Red Book to $1.63

- Payers switch from AWP to other basis for reimbursement

Plan

- Advate AWP $1.82 (20% over Recombinate)

- Continue plan to differentiate Advate into new class of therapy

~AUTOFILE 17

BAX STATE E 0447993

# Contingencies/ Risks

Potential Risk

- Conversion rate not satisfactory

- Competitors discount below $0.80 (prior to launch)

Plan

- Assess whether conversion could be improved with price
- Re-evaluate pricing

- Assess whether gaining position
- If yes, implement 20% over Recombinate strategy

~AUTOFILE   18

BAX STATE E 0447994

# Next Steps

- Tools & Tactics
  - Send List Price updates to First Databank and Red Book: Res. Mike Bradley
  - Target States that don't use AWP for Medicaid reimbursement: Res. Mike Bradley
  - Applying for new J-code strategy (intermediate use of Q-code): Res. Mike Bradley
  - Justification letter for Homecare to use with payers: Res. Mike Bradley
  - Pricing justification letter to key customers: Res. Jill Kadam
  - Customer talking points & FAQ training for sales & marketing team by Health Economics team: Res. Jill Kadam and Mike Bradley
  - PR plan for senior customer team (Pete, Ken, Jim, Ted): Res. Jill Kadam

- Creative Pricing Options
  - Strategies for Medicaid/ care, PHS, VCC: Res. Andrew Thorrens, Jill Kadam, Mike Bradley
  - Comprehensive analysis of "out-of-the-box" options: Res. Andrew Thorrens, Jill Kadam, Bernadette Connolly
    - Packaging options
    - Promotions
    - Therapy pricing options

- Playbook
  - Detailed plans with timing & responsibility: Andrew Thorrens cord.
  - Contingency planning: Res. Andrew Thorrens

~AUTOFILE 19

# Next Steps

- US Pricing Retreat #2: Res. Jill Kadam, Bernadette Connolly, John Park
  - Creative Pricing breakout
  - Developing tools & tactics
  - Detailed work planning

- Follow up to Deerfield Sept. Kick-off
  - Complete in Q1 03

- Medicare/Medicaid Strategy: Res. Mike Bradley

- Complete by Q2 03

- Payer simulations: Res. Mike Bradley, John Park
  - Dossier training
  - Negotiation strategies

- Complete by Q2 03

~AUTOFILE  20

BAX STATE E 0447996

# Sources

- North America Nurse Advisory Board
- Simon-Kucher study
- Roger Green study
- Covance global dossier
- Washington State University abstract
- BioScience Strat Plan
- NA/Global Demand Models
- First Data Bank/ Red Book
- NA Pricing Retreat #1 (Deerfield)
- Competitive Simulation #2 (Westlake)

~AUTOFILE  21

BAX STATE E 0447997