# EXHIBIT "2" TO

RELATOR VEN-A-CARE'S PRE-HEARING BRIEF
AND PRESENTATION OF FACTS

**(Third Amended  Sealed Miami Complaint filed in the Southern District
of Florida  on December 9, 1999 (Redacted for Baxter)**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**SOUTHERN DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| **Ex Rel** ) | |
|     **VEN-A-CARE OF THE** ) | |
|     **FLORIDA KEYS, INC.** ) | |
|     **a Florida Corporation,** ) | |
|     **by and through its principal** ) | |
|     **officers and directors,** ) | |
|     **ZACHARY T. BENTLEY and** ) | |
|     **T. MARK JONES,** ) | |
|         **Plaintiff,** ) | |

**v.**                                                     )        **CIVIL ACTION NO.95-1354-CIV-GOLD**

**ABBOTT LABORATORIES, INC.;**       )        **FILED IN CAMERA AND UNDER SEAL**

)

)

**THIRD AMENDED COMPLAINT**
**For Money Damages and Civil**
**BAXTER HEALTHCARE**                )        **Penalties Under the False Claims Act**
**CORPORATION;**                           )        **31 U.S.C. §§3729-3732**
**BAYER CORPORATION;**               )

)

**BRISTOL-MYERS SQUIBB**
**COMPANY;**                                  )

)

**DEY, INC.;**                                  )

)

**GLAXO WELLCOME, INC.;**         )

**HOECHST MARION ROUSSEL, INC.;**  )





REC'D by _____ D.C.
INTAKE

DEC 0 9 1999

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

**CIVIL ACTION NO. 95-1354-CIV-GOLD**

████████████████████████  )
████████████████████████  )
████████████████████████  )
████████████████████████  )
████████████████████████  )
████████████████████████  )
████████████████████████  )
**SMITHKLINE BEECHAM**  )
**CORPORATION;**  )
**WARRICK PHARMACEUTICALS**  )
**CORPORATION; and**  )
████████████████████████  )
████████████████████████  )
  )
_____<ins>**Defendants.**</ins>____  )

<ins>**THIRD AMENDED COMPLAINT**</ins>
<ins>**FOR MONEY DAMAGES AND CIVIL PENALTIES UNDER THE FALSE**</ins>
<ins>**CLAIMS ACT 31 U.S.C. §§3729-3732**</ins>

COMES NOW, the UNITED STATES OF AMERICA ("UNITED STATES" or

"GOVERNMENT"), by and through VEN-A-CARE OF THE FLORIDA KEYS, INC. ("VEN-A-

CARE" or "the Relator"), and its principal officers and directors, ZACHARY T. BENTLEY,

and T. MARK JONES, and by and through the undersigned attorneys on behalf of the

UNITED STATES and on the Relator's own behalf and bring this action against  ABBOTT

LABORATORIES, INC.; ██████████████████████████████

███████████████████████████████ BAXTER HEALTHCARE

CORPORATION; BAYER CORPORATION; ████████████████████

████████████████████████████████ BRISTOL-MYERS SQUIBB

2

**CIVIL ACTION NO. 95-1354-CIV-GOLD**

COMPANY; ██████████████████████████████████████████

██████████ DEY, INC.; ████████████████████████████████

████████████████████████ GLAXO WELLCOME, INC.; ████████

██████████ HOECHST MARION ROUSSEL, INC.; ████████████

█████████████████████████████████████████████████████

SMITHKLINE  BEECHAM  CORPORATION;  WARRICK  PHARMACEUTICALS

CORPORATION; and ████████████████████████████ (sometimes

referred to collectively as, "DEFENDANTS"), for money damages and civil penalties arising

out of the DEFENDANTS' violations of the Federal False Claims Act, 31 U.S.C., §§3729-

3732 from on or about June 23, 1989 to the present date.

TABLE OF CONTENTS                                      Page No:

SECTION NO. 1                                             10
    SUMMARY OF THE ACTION

SECTION NO. 2                                             12
    THE PARTIES

SECTION NO. 3                                             24
    JURISDICTION & VENUE

SECTION NO. 4                                             31
    HOW MEDICARE AND MEDICAID REIMBURSEMENT IS
    AFFECTED BY DRUG MANUFACTURERS' PRICE AND COST
    REPRESENTATIONS

**CIVIL ACTION NO. 95-1354-CIV-GOLD**

<u>TABLE OF CONTENTS</u>                                    Page No:

SECTION NO. 5                                                43
    BACKGROUND OF HOW UNITED STATES' MONIES ARE PAID
    FOR DRUG CLAIMS UNDER "PART B" OF THE MEDICARE
    PROGRAM

SECTION NO. 6                                                50
    BACKGROUND OF HOW UNITED STATES' MONIES ARE PAID
    FOR DRUG CLAIMS UNDER THE STATES' MEDICAID
    PROGRAMS

SECTION NO. 7                                                53
    THE FALSE CLAIMS SCHEME

    Subsection 7a.                                          57
        The Unique Kinds of Drugs, Patient/Physician
        Relationships, and Drug Wholesale Distribution Systems
        That Make The False Claims Scheme Possible

    Subsection 7b.                                          64
        The Medicare and Medicaid Programs Use The
        Defendants' False and Misleading Price and Costs
        Representations to Estimate the Acquisition Cost of The
        Specified Drugs in Setting Reimbursement Amounts

        TABLE NO. 1                                         66
            DEFENDANTS' false price and cost representations
            to the Medicare Program

        TABLE NO. 2                                         82
            DEFENDANTS' price and cost representations to
            the States' Medicaid Programs

    Subsection 7c.                                          109
        The Defendants Each Determine what Representations Will
        Be Made to the Drug price and Cost Reporting Compendia
        and To the Medicare and Medicaid Program, Have
        Knowledge of the Actual Prices of Their Drugs, and Know if
        the Government is Being provided with False and
        Misleading Price and Cost Information

4

CIVIL ACTION NO. 95-1354-CIV-GOLD

<u>TABLE OF CONTENTS</u>                    Page No:

TABLE NO. 3                                                114
    DEFENDANTS' drugs and their approved FDA
    indications as published in the 1998 edition of *Drug
    Facts and Comparisons*

Subsection 7d.                                             139
    The DEFENDANTS Falsely Inflate Reports of Prices and
    Costs to Create a Positive Profit or "Spread" in Order to
    Unlawfully Induce the Utilization of Their Drugs

Subsection 7e.                                             154
    The Illegal Profit Spreads Are Often Enhanced by
    Additional Unlawful Financial Inducement Such as Free
    Goods, Direct Monetary Payments, Rebates and
    Agreements to Falsify Invoices

Subsection 7f.                                             155
    The DEFENDANTS Intentionally Impede Government
    Efforts to Accurately Estimate Acquisition Costs and
    Deprive the Government of the Benefits of Truthful Price
    and Costs Representations

TABLE NO. 4                                                158
    Demonstrates that Medicaid reimbursement for
    Anzemet tablets is consistent with the cost to the
    provider while HOECHST'S false representations of
    price and cost cause excessive reimbursement for
    its injectable

TABLE NO. 5                                                175
    Lists some of the specified drugs, the amount
    approved in 1996 by Florida Medicare, the 20% co-
    payment paid by the patient, and the true price paid
    by the Relator

TABLE NO. 6                                                177
    Examples of the significant impact of the
    DEFENDANTS' false claim scheme

CIVIL ACTION NO. 95-1354-CIV-GOLD

## TABLE OF CONTENTS

Page No:

TABLE NO. 7                                                    181
DEFENDANTS create a financial inducement for
providers to order patented drugs as demonstrated
by DEFENDANT GLAXO's anti-emetic drug Zofran

TABLE NO. 8                                                    182

SECTION NO. 8                                                  183
THE SPECIFIC FALSE PRICE AND COST
REPRESENTATIONS OF DEFENDANT
ABBOTT

                                                              191

                                                              197

SECTION NO. 11                                                202
THE SPECIFIC FALSE PRICE AND COST
REPRESENTATIONS OF DEFENDANT
BAXTER

SECTION NO. 12                                                210
THE SPECIFIC FALSE PRICE AND COST
REPRESENTATIONS OF DEFENDANT
BAYER/MILES

                                                              216

CIVIL ACTION NO. 95-1354-CIV-GOLD

TABLE OF CONTENTS                                    Page No:

SECTION NO. 14                                       223
    THE SPECIFIC FALSE PRICE AND COST
    REPRESENTATIONS OF DEFENDANT
    BRISTOL-MYERS SQUIBB

                                                    228

SECTION NO. 16                                       232
    THE SPECIFIC FALSE PRICE AND COST
    REPRESENTATIONS OF DEFENDANT
    DEY

                                                    239

                                                    243

                                                    247

                                                    253

SECTION NO. 21                                       258
    THE SPECIFIC FALSE PRICE AND COST
    REPRESENTATIONS OF DEFENDANT
    GLAXO WELLCOME/CERENEX

CIVIL ACTION NO. 95-1354-CIV-GOLD

## TABLE OF CONTENTS

Page No:

261

SECTION NO. 23
THE SPECIFIC FALSE PRICE AND COST
REPRESENTATIONS OF DEFENDANT
HOECHST

264

266

270

274

279

282

285

| TABLE OF CONTENTS | Page No: |
|---|---|
| SECTION NO. 30<br>THE SPECIFIC FALSE PRICE AND COST<br>REPRESENTATIONS OF DEFENDANT<br>SMITHKLINE | 291 |
| SECTION NO. 31<br>THE SPECIFIC FALSE PRICE AND COST<br>REPRESENTATIONS OF DEFENDANT<br>WARRICK | 293 |
| ███████████████████ | 296 |
| COUNT I<br>FALSE CLAIMS ACT;<br>CAUSING PRESENTATION OF FALSE OR FRAUDULENT<br>CLAIMS | 299 |
| COUNT II<br>FALSE CLAIMS ACT; CAUSING A FALSE RECORD OR<br>STATEMENT TO BE MADE OR USED TO GET A FALSE OR<br>FRAUDULENT CLAIM PAID OR APPROVED BY THE<br>GOVERNMENT | 301 |
| COUNT III<br>FALSE CLAIMS ACT; CAUSING FALSE RECORDS OR<br>STATEMENTS TO BE USED TO CONCEAL AN OBLIGATION<br>TO PAY MONEY TO THE GOVERNMENT | 303 |
| COUNT IV<br>FALSE CLAIMS ACT; CAUSING PRESENTATION OF<br>FALSE OR FRAUDULENT CLAIMS; ILLEGAL REMUNERATION | 305 |

CIVIL ACTION NO. 95-1354-CIV-GOLD

TABLE OF CONTENTS                               Page No:

COUNT V                                                    307
FALSE CLAIMS ACT; CAUSING A FALSE RECORD OR
STATEMENT TO BE MADE OR USED TO GET
A FALSE OR FRAUDULENT CLAIM PAID OR APPROVED BY THE
GOVERNMENT; ILLEGAL REMUNERATION

COUNT VI                                                   310
FALSE CLAIMS ACT; CAUSING PRESENTATION OF
FALSE OR FRAUDULENT CLAIMS; PROHIBITED REFERRALS,
CLAIMS AND COMPENSATION ARRANGEMENTS

COUNT VII                                                  312
FALSE CLAIMS ACT; CAUSING A FALSE RECORD OR
STATEMENT TO BE MADE OR USED TO GET
A FALSE OR FRAUDULENT CLAIM PAID OR APPROVED BY
THE GOVERNMENT; PROHIBITED REFERRALS,
CLAIMS AND COMPENSATION ARRANGEMENTS

REQUESTS FOR RELIEF                                        314

DEMAND FOR JURY TRIAL                                      317

CERTIFICATE OF SERVICE                                     318

## SECTION NO. 1

### SUMMARY OF THE ACTION

1.     This is an action for damages, treble damages, civil penalties and costs

against the DEFENDANTS for violations of the False Claims Act as set out in Counts I

through VII, pages 299 through 314.  In essence, the DEFENDANTS made false

representations of prices and costs for certain of their infusion, injectable and inhalation

drugs and biologicals (hereinafter sometimes referred to as the "specified infusion drugs"

10

or the "specified drugs"): directly to Medicare Carriers who approve and pay Medicare claims; directly to the States' Medicaid Pharmacy Programs which approve and pay the States' Medicaid claims; and indirectly through drug price and cost reporting compendia including First Data Bank, Medical Economics, and Medi-Span. The DEFENDANTS knew that the Medicare and States' Medicaid Programs intended to base their payments of "reimbursement" for the specified infusion drugs on reasonable estimations of cost. The Medicare and Medicaid Programs relied on the prices reported by the DEFENDANTS in estimating costs. The DEFENDANTS marketed their specified infusion drugs to specialized physicians (oncologists, infectious disease physicians, etc.), clinics and infusion pharmacies, including the Relator's, through financial inducements, including but not limited to, false price markups (the "Spread"), discounts, free goods and other financial incentives. The DEFENDANTS were in a position to mislead the Medicare and Medicaid Programs because the DEFENDANTS typically report truthful prices for their other drugs that are not the subject of this action. The DEFENDANTS thus wrongfully exploited the Medicare and States' Medicaid Programs by causing them to pay the claims of the DEFENDANTS' customers at grossly inflated amounts that far exceeded a reasonable reimbursement based on an estimation of costs. The DEFENDANTS' false claims scheme damaged the Medicare and States' Medicaid Programs in excess of ONE BILLION and 00/100 DOLLARS ($1,000,000,000.00).

11

CIVIL ACTION NO. 95-1354-CIV-GOLD

## SECTION NO. 2

### THE PARTIES

2.      The Plaintiff in this action is the UNITED STATES.  At all times material to this civil action, the United States Department of Health and Human Services ("HHS"), the Health Care Financing Administration ("HCFA"), and The Bureau of Program Operations ("BPO") were agencies and instrumentalities of the UNITED STATES and their activities, operations and contracts in administering the Medicare program were paid from UNITED STATES' funds.  The UNITED STATES and its subcontractors performing on behalf of the UNITED STATES provided Medicare benefits to qualified beneficiaries which included payment of claims for the prescription drugs specified herein manufactured by the DEFENDANTS and relied upon the false and fraudulent price and cost representations made by the DEFENDANTS in approving and paying claims.

3.      The States, United States Territories, and the District of Columbia provided Medicaid benefits to qualified recipients which included payment of claims for the prescription drugs specified herein manufactured by the DEFENDANTS and relied upon the false and fraudulent price and cost representations made by the DEFENDANTS in

12

approving and paying claims. A significant part of said Medicaid reimbursement was paid from United States Government funds pursuant to **42 U.S.C. § 1396(b).**

4.     The Relator, VEN-A-CARE, is a corporation organized under the laws of the State of Florida, with its principal offices in Key West, Florida. The Relator's principal officers and directors include Zachary T. Bentley and T. Mark Jones, who are each citizens of the United States and reside in Key West, Florida. The Relator is an infusion pharmacy and provides prescription drugs , such as the intravenous, injectable and inhalation drugs and biologicals specified in this Third Amended Complaint, as a Medicare Part B supplier and as a Florida Medicaid provider. The Relator has direct and independent knowledge of the information, and is the "original source" of the information on which these allegations are based within the meaning of **31 U.S.C. §3730(e)(4)(A) and (B)**. The Relator has standing to bring this action pursuant to **31 U.S.C. §3730(b)(1)**. The information upon which these allegations are based was voluntarily provided by the Relator to the Federal Government beginning in 1991 and thereafter has been frequently supplemented by the Relator.

5.     The Relator, VEN-A-CARE,  is a small infusion pharmacy located in Key West, Florida that, due to its position as an industry insider, became aware of the false claim scheme alleged herein. During the early 1990s, Ven-A-Care was destroyed as a viable business because it refused to engage in fee splitting arrangements with referring physicians who wished to benefit from the inflated reimbursement caused by the actions

13

**CIVIL ACTION NO. 95-1354-CIV-GOLD**

of the DEFENDANTS. Ven-A-Care became aware that many of the infusion, inhalation, and injectable drugs and biologicals it provided as a specialty pharmacy were reimbursed by the Medicare and Medicaid Programs at amounts that substantially, in some cases by several thousand percent, exceeded the cost of the drug. It was the huge potential profit spreads generated by the variance between the actual cost of the drugs and the "reimbursement" amounts that many referring physicians demanded a share of. Ven-A-Care's principals were aware that Medicare and Medicaid reimbursed for drugs at amounts that were intended to be based on an estimation of cost and not provide for huge windfall profits at the GOVERNMENT's expense. Ven-A-Care attempted to alert the responsible state and federal government officials to the problem it faced. However, the government agencies lacked sufficient resources and expertise to adequately respond. Accordingly, the Relator commenced this action based upon its original source information.

6. The Defendant, ABBOTT LABORATORIES, INC. ("ABBOTT"), is a corporation organized under the laws of Delaware, with its principal offices in Abbott Park, Illinois. At all times material to this civil action, ABBOTT has transacted business in the Federal Judicial District of the Southern District of Florida by, including, but not limited to, selling and distributing prescription drugs to purchasers within the Southern District of Florida.

14



9.     The Defendant, BAXTER HEALTHCARE CORPORATION ("BAXTER"), is
a corporation organized under the laws of Delaware, with its principal offices in Illinois. At
all times material to this civil action, BAXTER transacted business in the Federal Judicial
District of the Southern District of Florida by, including, but not limited to, selling and
distributing prescription drugs to purchasers within the Southern District of Florida.

10.    The  Defendant,  BAYER  CORPORATION,  f/k/a  MILES,  INC.
("BAYER/MILES"), is a corporation organized under the laws of Indiana, with its principal
offices  in  Pittsburgh,  Pennsylvania.     At  all  times  material  to  this  civil  action,

15

CIVIL ACTION NO. 95-1354-CIV-GOLD

BAYER/MILES transacted business in the Federal Judicial District of the Southern District of Florida by, including, but not limited to, selling and distributing prescription drugs to purchasers within the Southern District of Florida.

12.    The Defendant, BRISTOL-MYERS SQUIBB COMPANY, a/k/a BRISTOL MYERS ONCOLOGY DIVISION/HIV PRODUCTS ("BRISTOL-MYERS"), f/k/a BRISTOL-MYERS COMPANY, is a corporation organized under the laws of Delaware with its principal offices in New York, New York.    At all times material to this civil action, BRISTOL-MYERS has transacted business in the Federal Judicial District of the Southern District of Florida by, including, but not limited to, selling and distributing prescription drugs to purchasers within the Southern District of Florida.

16

CIVIL ACTION NO. 95-1354-CIV-GOLD



16.    The Defendant DEY, INC., f/k/a DEY LABORATORIES, INC., ("DEY"), is a corporation organized under the laws of Delaware, with its principal offices in Napa,

17

**CIVIL ACTION NO. 95-1354-CIV-GOLD**

California. At all times material to this civil action, DEY has transacted business in the Federal Judicial District of the Southern District of Florida by, including, but not limited to, selling and distributing prescription drugs to purchasers within the Southern District of Florida.

**CIVIL ACTION NO. 95-1354-CIV-GOLD**



21. The Defendant, GLAXO WELLCOME, INC., f/k/a BURROUGHS
WELLCOME, INC., ("GLAXO WELLCOME/ CERENEX"), is a corporation organized under
the laws of North Carolina, with its principal offices in Research Triangle Park, North
Carolina, that sometimes transacts business through its CERENEX division. At all times
material to this civil action, GLAXO WELLCOME/CERENEX transacted business in the
Federal Judicial District of the Southern District of Florida by, including, but not limited to,
selling and distributing prescription drugs to purchasers within the Southern District of
Florida.

CIVIL ACTION NO. 95-1354-CIV-GOLD



23. The Defendant, HOECHST MARION ROUSSEL, INC. ("HOECHST"), is a corporation organized under the laws of Delaware, with its principal offices in Kansas City, Missouri . At all times material to this civil action, HOECHST has transacted business in the Federal Judicial District of the Southern District of Florida by, including, but not limited to, selling and distributing prescription drugs to purchasers within the Southern District of Florida.



20

CIVIL ACTION NO. 95-1354-CIV-GOLD



CIVIL ACTION NO. 95-1354-CIV-GOLD



CIVIL ACTION NO. 95-1354-CIV-GOLD

30. The Defendant, SMITHKLINE BEECHAM CORPORATION f/k/a SMITHKLINE BECKMAN CORPORATION f/k/a SMITHKLINE CORPORATION ("SMITHKLINE"), is a corporation organized under the laws of Pennsylvania, with its principal offices in Philadelphia, Pennsylvania. At all times material to this civil action, SMITHKLINE has transacted business in the Federal Judicial District of the Southern District of Florida by, including, but not limited to, selling and distributing prescription drugs to purchasers within the Southern District of Florida.

31. Defendant, WARRICK PHARMACEUTICALS CORPORATION ("WARRICK"), is a corporation organized under the laws of Delaware, with its principal offices in Reno, Nevada. At all times material to this civil action, WARRICK has transacted business in the Federal Judicial District of the Southern District of Florida by, including, but not limited to, selling and distributing prescription drugs to purchasers within the Southern District of Florida.

23



33. Any and all acts alleged herein to have been committed by any or all of the DEFENDANTS were committed by said Defendant's officers, directors, employees, or agents who at all times acted on behalf of their respective DEFENDANT.

## SECTION NO. 3

### JURISDICTION & VENUE

34. Jurisdiction is founded upon the **Federal False Claims Act, (the "Act") 31 U.S.C. §3729-32**, specifically **31 U.S.C. §3732**, and also **28 U.S.C. §§1331, 1345**.

35. The Federal False Claims Act reaches the type of fraudulent activity alleged herein in accordance with the express language of the Act as well as precedents arising from applications of the present Federal False Claims Act and earlier versions, See, United States v. Neifert-White Company, 390 U.S. 228; 88 S.Ct. 959 (1968). Specifically, the

24

CIVIL ACTION NO. 95-1354-CIV-GOLD

United States Supreme Court's application of the Act in Neifert-White applies to this case as follows:

      A.     ". . . the Act was intended to reach all types of fraud, without qualification, that might result in financial loss to the Government." 88 S.Ct., at 961.

      B.     The Act applies to the conduct of a manufacturer that supplies falsely inflated price information in support of a customer's claim. 88 S.Ct., at 960.

      C.     The Act applies even where the price information supplied by the DEFENDANTS is inflated by only approximately 25% over the truthful price. 88 S.Ct., at 960.

      D.     The Act applies even if the DEFENDANTS did not submit the false price information directly to the Government and even though the DEFENDANTS received no payment of funds from the Government.

      E.     The Act applies even though the inflated portion of the price was received by customers of the DEFENDANTS who are not parties to the case. 88 S.Ct., at 960.

    36.     Venue in the Southern District of Florida is appropriate under **31 U.S.C. §3732(a)** and sufficient contacts exist for jurisdiction in that each of the DEFENDANTS transacted business in the Southern District of Florida by selling directly or through wholesalers their specified prescription drugs in the Southern District of Florida which the respective DEFENDANTS knew would be supplied to Medicare beneficiaries and Medicaid

25

**CIVIL ACTION NO. 95-1354-CIV-GOLD**

recipients and for which the DEFENDANTS knew that grossly excessive and unreasonable payments for claims would be made to the providers/suppliers by the Medicare and Medicaid programs.

37. A copy of the initial Complaint and Amended Complaints and written disclosure of substantially all material evidence and information VEN-A-CARE possesses were served on the Government pursuant to Rule 4(d)(I), Fed.R.Civ.P., prior to the filing of the initial and Amended Complaints in camera and under seal by delivering a copy of the summons, Complaints, material evidence and information to the United States Attorney for the Southern District of Florida and by sending a copy of the summons, Complaints, material evidence and information by certified mail to the Attorney General of the United States at Washington, District of Columbia. Thereafter the Relator has continued its investigation of the matters herein and has diligently and expeditiously provided any and all documentary and other evidence to the Office of the Attorney General of the United States and to the Office of the United States Attorney for the Southern District of Florida prior to filing this Third Amended Complaint. A copy of the Third Amended Complaint was served in the manner required by law on the Attorney General and on the United States Attorney for the Southern District of Florida prior to filing with the Court.

38. The Relator alleges: (A) that no allegation or transaction of defrauding the United States was made prior to the filing of the Complaints in public disclosures regarding the subject matter herein against any of the DEFENDANTS; (B) that none of the

26

CIVIL ACTION NO. 95-1354-CIV-GOLD

DEFENDANTS was named in public disclosures made prior to the filing of the Complaints regarding the subject matter herein; and (C), if the Court makes a finding against the Relator as to the allegations set forth in (A) and/or (B), that the Relator has direct and independent knowledge of the information on which these allegations are based within the meaning of **31 U.S.C. §3730(e)(4)(A)** and **(B)** and has voluntarily provided the information to the Government before filing the  Complaints which are based on the information provided by the Relator to the Government and the Relator is the original source.

39.     Federal Court jurisdiction also exists over this cause for reasons which include, but are not limited to, the following:

A)     The RELATOR and its principal officers and directors have sustained significant injury and damage due to the acts of the DEFENDANTS in that referring physicians, and others able to influence the ordering of infusion pharmacy services, typically demand a portion of  the financial inducements created by the DEFENDANTS' false price representations in exchange for referrals. The RELATOR, a one time profitable business, has refused to engage in such conduct and, as a result, has been unable to compete in its chosen health care market.

B)     The RELATOR, due to its status as an industry insider,  has acquired substantial information that is of significant value to the Government about the DEFENDANTS' false claim scheme and has provided said information to the Government in accordance with the False Claims Act.

27

CIVIL ACTION NO. 95-1354-CIV-GOLD

C)    The RELATOR has expended substantial time, money and resources, and has incurred substantial financial and other risks in reviewing its own information and in acquiring, analyzing and disclosing to the Government its information about the DEFENDANTS' false claims scheme, prior to commencing this action.

D)    The remedies provided by the False Claims Act include, in part, an award to the RELATOR for providing to the Government the information about the DEFENDANTS' false claim scheme that is at issue in this action. In order to secure redress of its right to such award, the RELATOR has complied with the requirements of the False Claims Act that it initiate this action under seal and disclose all its information to the Government.

E)    This False Claims Act case constitutes the only lawful mechanism whereby the RELATOR may receive redress in the form of compensation for providing information about the DEFENDANTS' false claim scheme  and for assisting the Government in recovering amounts paid, multiple damages and penalties.

F)    The False Claims Act provides a mechanism whereby the RELATOR may secure redress for its cause of action, to wit, its right to compensation for benefitting the Government through use of its information about the False Claims scheme in the manner contemplated by the False Claims Act.

G)    The RELATOR is also entitled, under the False Claims Act, to litigate the Government's right to damages and penalties, arising from the false claim scheme and

has a stake in the outcome in that the RELATOR is entitled by the False Claims Act to share in any recovery secured by or on behalf of the Government.

H)    The relief provided under the False Claims Act is designed, in part, to deter future violations and the false claim scheme alleged herein is ongoing and continues to impede the RELATOR'S ability to lawfully compete and is likely to continue in the future absent the RELATOR'S exercise of its rights and responsibilities as a realtor under the False Claims Act.

I)    The deterrent impact of a judgment under the False Claims Act will act to redress the injuries sustained by the RELATOR, and limit or curtail future injuries to the RELATOR, due to the DEFENDANTS' ongoing false claims scheme.

J)    The DEFENDANTS each possess a substantial interest in disproving the RELATOR'S allegations of violations of the False Claims Act and the RELATOR possesses a substantial interest in proving said allegations, as well as the investment of the RELATOR's costs and its overall compliance with the pre filing and post filing procedural and jurisdictional provisions of the False Claims Act, because the determination of these issues under the False Claims Act will establish whether:

(i)    The DEFENDANTS violated the federal False Claims Act;

(ii)    The DEFENDANTS are liable for treble damages, penalties, costs, RELATOR's expenses and attorneys fees.

29

(iii)     The RELATOR is entitled to redress in the form of compensation for providing its information about the false claims scheme to the Government and for assisting the Government in the manner required by the False Claims Act;

(iv)     The RELATOR is entitled to redress, on behalf of the Government, in the form of damages and penalties from the DEFENDANTS.

(v)     The RELATOR is entitled to redress in the form of its relator's share of the award of damages and penalties.

(vi)     The RELATOR is entitled to redress in the form of compensation for its expenses , incurrence of risk, and investment of time and resources in acquiring and providing to the Government its information about the false claims scheme.

(vii)     The RELATOR is entitled to redress in the form of the deterrent impact of a False Claims Act judgement, against one or more DEFENDANTS, on the ongoing and future conduct of the DEFENDANTS that has injured and continues to injure the RELATOR as alleged herein.

K)     In the event that the Government intervenes with respect to some or all of the RELATOR'S allegations and claims, then the RELATOR is entitled to participate

CIVIL ACTION NO. 95-1354-CIV-GOLD

in the litigation to the extent and under the conditions specified in the False Claims Act and
to further pursue redress in the form of its right to share in any award and receive
compensation for its costs and expenses.

L)     In the event that the Government does not intervene with respect to
some or all of the RELATOR's allegations and claims, then the RELATOR'S causes of
action alleged herein are directed at further redress in that only by prevailing in litigation
based on its information about the false claim scheme will the RELATOR be able to seek:
redress in the form of deterrence of ongoing and future conduct injurious to the RELATOR;
compensation for its information about the DEFENDANTS' false claim scheme;
compensation for the assistance and benefit it provided to the Government; compensation
for its expenses, risks and devotion of time and resources in acquiring and providing its
information to the Government; and compensation for establishing the DEFENDANTS'
liability for damages and penalties.

## SECTION NO. 4

### HOW MEDICARE AND MEDICAID REIMBURSEMENT IS AFFECTED BY DRUG MANUFACTURERS' PRICE AND COST REPRESENTATIONS

40.     Drug manufacturers, including the DEFENDANTS, the Medicare and
Medicaid Programs, drug price and cost reporting services, hospitals, pharmacies,
physicians, wholesalers, third party payors and administrators (i.e. insurance companies),

31

**CIVIL ACTION NO. 95-1354-CIV-GOLD**

governmental health benefit plans (i.e. federal and state employees) and others involved in the health care industry communicate about drug prices and costs by describing the price and cost with terms such as:

          a)     Average Wholesale Price ("AWP")

          b)     Wholesaler Acquisition Cost ("WAC")

          c)     List Price

          d)     Direct Price ("DP")

          e)     Wholesale Net Price

      41.    Of the above terms, Average Wholesale Price, or AWP, is most utilized by the healthcare industry and by third party payors including the Medicare and Medicaid Programs to describe the average price of a drug sold to a retailer (i.e. Physicians, Hospitals and Pharmacies) who then provides the drug to its ultimate recipient.

      42.    During the time covered by this complaint until January 1 1998, Medicare based its reimbursement for prescription drugs, including the drugs at issue, on the manufacturers' published AWP for patented ("single source") drugs as represented by the manufacturer, and at the median published AWP, as represented by the manufacturers, for drugs with generic equivalents and for biologicals. From January 1, 1998 until the present, Medicare has based its reimbursement for drugs at 95% of the published AWP for single source patented drugs as represented by the manufacturer, and at 95 % of the

32

median published AWP, as represented by the manufacturers, for drugs with generic equivalents and for biologicals.

43. The States' Medicaid programs are required by 42 CFR 447.331 to reimburse providers at the provider's Estimated Acquisition Cost ("EAC"). The Health Care Financing Administration ("HCFA"), which must approve all State reimbursement plans for prescription drugs, has approved approximately 38 state plans whose methodology for arriving at the provider's EAC includes discounting a percentage off of the published AWP prices. This discounting ranges from Alaska, whose state formula is AWP minus 5%, to Michigan, whose state formula is AWP minus 13.5 - 15.1 %. Nineteen states' formulas are AWP minus 10%. Seven states' formulas are WAC plus a percentage or an AWP discount/WAC hybrid. The State of Delaware bases reimbursement on the providers' actual acquisition cost ("AAC"). The balance of the states use a EAC/AWP discount mix.

44. The Office of Personnel Management administers health insurance for all Federal employees. Benefits and reimbursements for prescription drugs are based upon the published AWP's as represented by the drug manufacturers.

45. The Department of Defense's CHAMPUS program, now known as Tricare, bases benefits and reimbursements for prescription drugs upon the published AWP's as represented by the drug manufacturers.

33

CIVIL ACTION NO. 95-1354-CIV-GOLD

46.     The Relator's investigation has determined that most private third party health insurers also use the published AWP's as represented by the drug manufacturers in establishing prices for prescription drug benefits.

47.     The drug manufacturing industry, including the DEFENDANTS, uses various forms of media to publicize the prices and cost of their drugs including but not limited to:

        a)      Direct mailings or electronic communications (i.e. fax or e-mails) to hospitals, pharmacies, physicians, the States' Medicaid programs and the Medicare Carriers;

        b)      Advertisements in bi-monthly medical publications, such as :

                (i)     *Medical Economics,* that is mailed bi-monthly to most physicians and hospitals, free of charge by its publisher; and

                (ii)    *Drug Topics*, that is mailed to bi-monthly to most pharmacies and hospitals, free of charge by its publisher;

        c)      *PDR Generics* published annually by Medical Economics, Inc. who also publishes *The Physicians Desk Reference ("PDR")*

        d)      Advertisements provided directly to physicians and pharmacists by drug companies' representatives.

48.     The Relator's information provided to the Government demonstrates the common and wide spread use of the term "Average Wholesale Price" (AWP) to describe

34

drug prices in a manner whereby interested parties can make decisions that are affected by price, including but not limited to:

a) Representative examples of advertisements routinely delivered by some of the DEFENDANTS and Non-Defendant drug manufacturers directly to individual State Medicaid Programs that were delivered to the State of New Jersey's Medicaid Pharmacy Program.

b) Representative examples of advertisements routinely delivered by the DEFENDANTS and Non-Defendant drug manufacturers directly to individual Medicare Carriers responsible for approving and paying Medicare claims in the States of Florida and Utah.

c) Representative examples of direct mail advertisements sent to the Relator by Non-Defendant drug companies expressing their respective drug prices in terms of AWP .

d) Representative examples of advertisements that the DEFENDANTS caused to be published in *Medical Economics* that express their respective drug prices in terms of AWP.

e) Representative examples of advertisements that the respective drug manufacturers caused to be published in *Drug Topics* that express their respective drug prices in terms of AWP.

CIVIL ACTION NO. 95-1354-CIV-GOLD

f)      Representative examples of the publisher's representations about the 1996 edition of *PDR Generics,* which contains representations about drugs at issue in this case including price and cost information expressed in terms of AWP. The advertisement also states that *PDR Generics* provides physicians and other health care professionals with "cost of therapy tables" that enable the physician to compare cost of therapies. The cost of therapies are based upon the manufacturers' published AWPs for the respective drugs.

49.     Drug manufacturers including some of the DEFENDANTS also represent drug prices in terms of AWP when comparing the price and cost of their drugs to the prices and costs of their competitors' drugs. These comparisons of prices are promoted to physicians, pharmacists and hospitals touting that one company's drug is less costly than that of its competitors.

50.     Medical Economics, Inc., the Hearst Corporation and Medi-Span are nationally recognized companies that specialize in gathering drug pricing and cost information including Average Wholesale Price ("AWP"), Wholesaler Acquisition Cost ("WAC") and Direct Price ("DP").

51.     Medical Economics, Inc. publishes annually a book entitled *Drug Topics Red Book* that expresses drug prices and costs in terms of AWP. Representative examples of *Drug Topics Red Book* for the years 1991, 1992, 1993, 1994, 1995, 1996, 1997, 1998

36

CIVIL ACTION NO. 95-1354-CIV-GOLD

and 1999 contain approximately the following number of pages expressing drug prices and costs in terms of AWP:

a)   1991 - 605 pages

b)   1992 - 575 pages

c)   1993 - 542 pages

d)   1994 - 331 pages

e)   1995 - 369 pages

f)   1996 - 413 pages

g)   1997 - 454 pages

h)   1998 - 470 pages

i)   1999 - 454 pages

52.   Medical Economics also provides addendums to the annual *Red Book* that express drug prices and costs in terms of AWP.

53.   Representative excerpts of advisements contained in the annual *Reb Book* publications for the years 1995, 1996, 1997, 1998 and 1999 include:

a)   The 1995 advertisement describes the price information as "nationally recognized average wholesale prices (AWPs, direct prices and federally upper limited prices for prescription drugs)."

b)      The 1996 advertisement states "nationally recognized Average Wholesale Prices (AWPs), Direct Prices and Federal Upper Limit prices for prescription drugs that help you make sure your prices are on-target."

c)      The 1997 advertisement states "complete pricing information: AWPs, direct and suggested retail prices."

d)      The 1998 advertisement states "RED BOOK is the first and only source of accurate, up-to-date product information, prices on prescription drugs, OTC items and reimbursable medical supplies and more!"

e)      The 1999 advertisement states "nationally recognized Average Wholesale Prices (AWPs), Direct Prices and Federal Upper Limit prices for prescription drugs that help you make sure your prices are on-target."

54.      Medical Economics, Inc. also publishes a monthly update that contains current packaging and pricing data expressed in terms of AWP on the most widely prescribed drugs in the United States together with any updated prices expressed in terms of AWP for new products.

55.      The Relator's information provided to the Government reveals that approximately 90% of the Medicare Carriers use the AWPs as represented in Medical Economics annual *Drug Tropics Red Book* publication and the *Red Book* monthly updates in determining the reimbursement amounts for Medicare prescription drug claims.

38

56. The Hearst Corporation published until 1997 annually a book entitled *the Blue Book* that expressed drug prices and costs in terms of AWP. Representative examples of the *First Databank Blue Book* for the years 1990, 1991, 1992, 1993, 1994, 1995 and 1996 contain approximately the following number of pages expressing drug prices and costs in terms of AWP:

        a)     1990 - 498 pages

        b)     1991 - 492 pages

        c)     1992 - 482 pages

        d)     1993 - 402 pages

        e)     1994 - 755 pages

        f)     1995 - 391 pages

        g)     1996 - 432 pages

57. First Data Bank also publishes a monthly update entitled "Price Alert" that expresses drug prices and costs in terms of AWP.

58. First Data Bank also provides drug prices and costs for approximately 60,000 different drugs, sizes and strengths expressed in terms of AWP and WAC through an electronic or automated service. The Relator's investigation has determined that more than 90% of the States' Medicaid Pharmacy Programs utilized the AWPs and WACs as represented by First Data Bank's automated services in determining reimbursement amounts for Medicaid prescription drugs and claims.

59.    The monthly newsletter *Monthly Interest* , Vol. 6 No. 9, September 1991, published by First Data Bank was mailed to the States' Medicaid pharmacy programs. The article entitled "Understanding AWP" describes in detail First Data Bank's methods for determining AWPs in order to insure the State Medicaid Programs "that the AWP reflects reality."

60.    Medi-Span provides drug prices and costs for approximately 60,000 drugs, sizes and strengths through an electronic or automated service. The Relator's investigation has determined that only the State of New York's Medicaid Program uses Medi-Span's automated service in determining reimbursement amounts for New York Medicaid prescription drug claims. Medi-Span was acquired by the Hearst Corporation/First Data Bank.

61.    First Data Bank, Medical Economics and Medi-Span all receive and rely upon the respective drug manufacturers', including the DEFENDANTS, representations of their drugs' prices and cost in determining the drug pricing data that they report.

62.    First Data Bank, Medical Economics and Medi-Span all report drug prices that include a representation of the drugs' AWP.

63.    The Relators investigation has determined that drug manufacturers including the DEFENDANTS provide First Data Bank, Medical Economics and Medi-Span with the specific prices and costs of their drugs and instructions, if necessary, expressed in a manner that allows the price reporting companies to establish the necessary pricing

information for publication that is utilized by Medicare, Medicaid and others in determining reimbursements for prescription drugs.

64.    The Relator's information is, during the time covered by this complaint, that:

a)    Medical Economics/*RED BOOK* has defined AWP as the price a retail hospital or pharmacy pays if it purchases the drug from a wholesaler before a discount if any.

b)    First Data Bank/*BLUE BOOK* has defined AWP as an average price which a wholesaler charges for a particular drug.

c)    Medi-Span has defined AWP as the most common wholesaler price charged to the retailer or hospital.

65.    A form entitled "New Product Submission Form" is provided by First Data Bank to drug manufacturers to transmit information including their prices to First Data Bank. The form permits drug manufacturers to submit prices expressed in terms of Wholesale (Distributor) Price, Direct Price and AWP Price.

66.    A form entitled "Product Listing Verification" is provided by Medical Economics / *Red Book* to drug manufacturers to transmit information including their prices to Medical Economics / *Red Book*. The form permits drug manufacturers to submit prices expressed in terms of AWP and WAC.

67.    The Relators' information revealed that each of the DEFENDANTS had been the source of the price and cost information reported by First Data Bank and Medical

Economics to the Medicare and States' Medicaid Programs at all times at issue in this action. The Relator reported its information to the Government, including specific identification of representatives of First Data Bank and Medical Economics to whom such information was reported. Thereafter, the Government conducted an investigation which confirmed the information supplied by the Relator.

      A.    The Government's investigation revealed that each of the DEFENDANTS has repeatedly and systemically communicated with First Data Bank and Medical Economics for the express purpose of causing First Data Bank and Medical Economics to report prices and costs of the drugs at issue in this case in amounts set by the DEFENDANTS.

      B.    The Government's investigation secured documentary information between the DEFENDANTS and First Data Bank and Medical Economics wherein the DEFENDANTS caused specific prices and costs for their drugs to be reported by First Data Bank and Medical Economics.

    68.    The DEFENDANTS' fraudulent inflation of price and cost information to cause the Government to pay excessive reimbursement for the specified drugs at issue is in stark contrast to the truthful representations that the DEFENDANTS make when they are not offering financial inducements to their customers.

    69.    Unlike the specialized physicians, clinics and infusion pharmacies which receive the financial inducements for ordering the drugs at issue in this action, most

CIVIL ACTION NO. 95-1354-CIV-GOLD

providers do not receive grossly excessive reimbursements for prescribing the majority of other drugs and instead rely on the manufacturers' truthful representations of price and cost in an effort to minimize the cost of drugs to their patients.

70.     The vast majority of drug manufacturers, including the DEFENDANTS, are truthful when representing prices and costs of all or most drugs, except for the drugs at issue in this case.

## SECTION NO. 5

### BACKGROUND OF HOW UNITED STATES' MONIES ARE PAID FOR DRUG CLAIMS UNDER "PART B" OF THE MEDICARE PROGRAM

71.     HHS, through HCFA, provides health insurance benefits to aged and disabled Americans pursuant to the provisions of the Medicare program, **Title XVIII of the Social Security Act, 42 U.S.C. §1395 et seq**.

72.     The Medicare program provides covered health care benefits to certain targeted populations such as those persons who are over age 65, persons who are disabled, and persons who have end stage renal disease.

73.     The Medicare program is divided into two distinct parts: (A) Medicare Part A (Hospital Insurance for the Aged and Disabled) which covers services and goods

furnished by hospitals, home health agencies, hospices, and skilled nursing facilities; and (B) Medicare Part B (Supplementary Medical Insurance for the Aged and Disabled) which covers physician services, and a range of other noninstitutional services, such as durable medical equipment ("DME"), oxygen concentrators, diagnostic laboratory tests, X-rays, and certain limited drug products and supplies.

74.    This case focuses on the Medicare program's limited benefit for drugs which are provided either: (A) incident to a physician's service and cannot be self administered; or, (B) in conjunction with the medical necessity of an infusion pump or nebulizer or other DME device payable under Medicare's DME benefit. Because this limited drug benefit is provided on an "incident to" a physician's service basis or in conjunction with the medical necessity of a DME device, Congress' statutes and the corresponding HHS regulations and HCFA policies have sought to limit Medicare's payments for claims for the drugs at issue to a reasonable amount based upon the cost of the drug. This is due, in part, to the fact that the Medicare program is already paying for the physicians' professional fees and for the covered DME equipment. The exorbitant profits created by the DEFENDANTS' false price and cost representations have totally thwarted the fundamental requirements of the Medicare Program and States' Medicaid Programs that payment of claims for the specified drugs be limited to reasonable amounts to cover the added cost of the drugs.

75.    HCFA administers the Medicare program. HCFA awards cost-reimbursement contracts to private companies to evaluate and to process Medicare beneficiaries' claims

44

CIVIL ACTION NO. 95-1354-CIV-GOLD

for payment on behalf of HCFA. Under Part A, HCFA refers to contractors as "intermediaries". Under Part B, HCFA refers to contractors as "carriers" and durable medical equipment regional carriers ("DMERCs"). Under Part B, HCFA pays the carriers and the DMERCs to process claims for covered benefits supplied to eligible beneficiaries and to make payments to the providers or to the Medicare beneficiaries for the covered services rendered under Medicare Part B. **42 U.S.C. §1395(j) et. seq**.

76.     Congress has mandated that the Medicare Program pay no more than eighty percent (80%) of: (1) the reasonable cost of drugs covered under Part B pharmaceutical claims from federal funds through 1997 and (2) no more than 95% of the drug's Average Wholesale Price, after 1997. **42 U.S.C. §1395(l) et seq.**

77.     Medicare Regulation 42 CFR, §405.517, effective January 1, 1992, sets out the methodology to determine the reasonable charge for payment of claims for drugs and biologicals. The methodology for single source drugs is based on the lower of estimated acquisition cost or the national average wholesale price of the drug. The methodology for multiple source drugs is based on the lower of the estimated acquisition cost or the wholesale price that is the median price for all sources of the generic form of the drug. This regulation provides instructions to be used by the Part B Carriers and DMERCs on how the estimated acquisition cost is to be determined. The instructions state that the estimated acquisition cost is to be based on surveys of actual invoice prices of drugs paid by the providers. The regulation also states that the Medicare Part B Carriers and

DMERCs may consider such other factors as inventory, waste and spoilage in calculating the estimated acquisition cost of the drug but does not provide for profit on the drug itself. For purposes of reimbursement, HCFA reimburses biologicals under the same methodology as other drugs. Claims are to be paid at the lesser of an estimated amount based upon  average wholesale price ("AWP") or actual acquisition cost (taking into consideration inventory cost and waste but including no profit on the drug itself).

78.     The Medicare program has been unable to determine actual acquisition costs for the drugs at issue in this case.  Therefore, until January 1 1998, Medicare payed claims based upon  the average wholesale price for single source patented drugs as represented by the manufacturer, and at the median average wholesale price, as represented by the manufacturers, for drugs with generic equivalents and for biologicals. From January 1, 1998 until the present, Medicare pays claims based upon 95% of the at the average wholesale price for single source patented drugs as represented by the manufacturer, and at 95 % of the median average wholesale price, as represented by the manufacturers, for drugs with generic equivalents and for biologicals.

79.     The following is an example of how in 1997 the Medicare Carriers established reimbursement for the generic ███████████████████████

a)     The Carrier references the 1997 *Drug Topics Red Book* listing for ███████████ The following chart is an excerpt from pages 291 and 545 of the 1997 *Drug Topics Red Book* listing for ███████████

**CIVIL ACTION NO. 95-1354-CIV-GOLD**

RX PRODUCT LISTINGS

| PROD/MFR | NDC | AWP | DP | OBC |
|---|---|---|---|---|
| **ETOPOSIDE (Abbott Hosp)** | | | | |
| INJ, IJ (VIAL, FLIPTOP,BULK PKG) | | | | |
| 20 mg/ml, 50ml .....**00074-1485-03** | 1264.21 | | **AP** | |



**(Bristol-Myer Onc/Imm)** See VEPESID

**(Bristol-Myer Onc/Imm)** See VEPESID VHA +

RX PRODUCT LISTINGS                                                     **545**/TOPOS

CIVIL ACTION NO. 95-1354-CIV-GOLD

b) The Carrier arrays the listings from the most expensive to the least expensive of all the manufacturers' generics (in this case DEFENDANT BRISTOL-MYERS' Vepesid is the Brand so it is not included) that list a 100 mg. size (20 mg/ml, 5 ml = 100mg.).

c) The Carrier then finds the median AWP. In this instance the median is between                                          at $141.00 ea. and DEFENDANT                                          at $136.49. The Relators investigation has determined

48

that some Medicare Carriers choose the higher listing of the median and some choose the lower.

80. Part B drug claims are submitted in one of two ways. The first is by submitting to the Part B carriers or DMERCs a completed (hard copy) HCFA 1500 Form. The second is through an electronic claims filing procedure whereby the same information required to be included on the hard copy HCFA 1500 Form is transmitted to the Medicare Part B carriers or DMERCs. Two HCFA 1500 Form versions were used during the time relevant to these proceedings. HCFA Form 1500 (1/84) was used by the Medicare program for Part B drug claims filed on or after January, 1984. In or about December 1990, HCFA created HCFA Form 1500 (12/90) and required its use for drug claims submitted on or after May 1, 1992. Either HCFA Form 1500 (12/90) or HCFA Form 1500 (1/84) could be used for Part B drug claims from December, 1990 through April, 1992.

81. Providers submit claims for payment to the Medicare Program for the specified drugs at issue in this case using HCFA's Common Procedure Coding System ("HCPCS"). The HCPCS system for pharmaceuticals is a 5 digit alphanumeric code, such as ███████████████████████

82. HCFA requires all Part B Carriers and the DMERCs to report to HCFA Central quarterly claims activity by HCPCS Code for all drugs submitted by providers for reimbursement by the Medicare Program. This quarterly data collected by HCFA Central

CIVIL ACTION NO. 95-1354-CIV-GOLD

from all the Part B Carriers and the DMERCs is summarized in a report known as the Part B Extract and Summary System ("BESS") or Bess Reports.

83.     Beneficiaries' claims are processed by the carriers as either "assigned", those claims for which payment is made directly to the provider, or "unassigned", those claims for which payment is made directly to the beneficiaries.

84.     All or nearly all drug claims for the charges at issue are made on an assigned basis.

85.     During the early 90's the Medicare Carriers' attempted to survey physicians' actual invoice prices paid for drugs to comply with the regulation 42 CFR §405.517 but were stopped by a complaint filed by the American Society of Clinical Oncologists ("ASCO") with the Executive Office of Management and Budget asserting that the Paperwork Reduction Act had been violated.  A subsequent effort by HCFA to design a new survey to determine physicians' actual invoice costs was also stopped by ASCO. ASCO complained that the actual prices being paid were discounts and confidential in nature and that the survey had other flaws.

86.     At all times at issue in this case, the Medicare program used the drug price and cost information represented by the DEFENDANTS to determine reimbursement amounts.

SECTION NO. 6

50

CIVIL ACTION NO. 95-1354-CIV-GOLD

## BACKGROUND OF HOW UNITED STATES' MONIES
## ARE PAID FOR DRUG CLAIMS UNDER
## THE STATES' MEDICAID PROGRAMS

87.     The United States Government partially funds state sponsored medical

assistance programs for the poor pursuant to **Title XIX of the Social Security Act, 42**

**U.S.C. § 1396 et seq**.

88.     Benefits for drugs are optional but all states have opted to provide Medicaid

drug reimbursement coverage.

89.     The federal portion of States' Medicaid payments, Federal Medical

Assistance Percentage ("FMAP") is based on a state's per capita income compared to the

national average.  The federal portion consists of a minimum of 50% up to a maximum of

83%.  By example, Florida's FMAP contributed by the United States in 1995 was 56.28%.

90.     The States, United States Territories and the District of Columbia are

required to implement a State Health Plan containing certain specified minimum criteria

for coverage and payment of claims in order to qualify for federal funds for Medicaid

expenditures.  **42 U.S.C. §1396a(a)(30)(A)**.

91.     State Health Plans must, in part, provide for payment of claims for

prescription drugs pursuant to a formula approved by the Secretary of HHS which

determines the maximum allowable claim amount for each drug manufactured by each

manufacturer whose prescription drugs qualify for Medicaid reimbursement based upon

an estimation of the provider's acquisition cost plus a reasonable dispensing fee. 42 CFR 447.331.

92. HCFA has approved approximately 38 state plans whose methodology for arriving at a provider's Estimated Acquisition Cost ("EAC") as required by 42 CFR 447.331 includes discounting a percentage off of the AWP prices, separately for each covered drug, as computed by or collected by and published by First Data Bank. This discounting ranges from Alaska, whose state formula is AWP minus 5%, to Michigan, whose state formula is AWP minus 13.5 - 15.1 %. Nineteen HCFA approved states' formulas are on a basis of AWP minus 10%. Seven states' formulas are WAC plus a percentage or an AWP discount/WAC hybrid. The State of Florida's formula is WAC plus 7%. The State of Delaware bases reimbursement on AAC.

93. The Food and Drug Administration ("FDA") assigns National Drug Codes, NDC numbers to identify each individual manufacturer and its drugs' strengths and sizes. NDC numbers are eleven digits, with the first five digits identifying the manufacturer or labeler, the next four digits identifying the product and the last two digits identifying the package size.

94. Providers are required to utilize the FDA's NDC numbers when submitting claims for reimbursement for drugs to the States' Medicaid programs.

52

95.    The vast majority of States award cost-reimbursement contracts to private companies to evaluate and process Medicaid recipients' claims for payment. The States refer to these contractors as fiscal agents.

96.    Prescription drug claims are submitted in one of two ways. The first is by submitting to the fiscal agent or state agency a completed (hard copy) pharmacy claim form. The second is through an electronic claims filing procedure whereby the same information required to be included on the hard copy is transmitted electronically to the Medicaid fiscal agent or state agency.

97.    At all times at issue in this case, all of the States' Medicaid programs used the drug price and cost information represented by the DEFENDANTS to determine reimbursement amounts.

### SECTION NO. 7

### THE FALSE CLAIMS SCHEME

98.    The DEFENDANTS are each liable under the False Claims Act because they caused the Medicare and Medicaid Programs to pay claims for certain of their prescription drugs in exorbitant amounts, far in excess of the reasonable reimbursement permitted under the applicable statutes and regulations. The DEFENDANTS manufactured and/or distributed the specified prescription drugs in this action and sold the specified prescription drugs either directly to specialized infusion pharmacies, physicians, clinics and others or indirectly through such intermediaries as wholesalers and group purchasing organizations.

CIVIL ACTION NO. 95-1354-CIV-GOLD

The false claims for excessive reimbursement were then submitted to the Medicare and the States' Medicaid Programs by the DEFENDANTS' through their false price and cost statements and by their customers who thereby received a windfall financial benefit in the amount by which the Government's approved "reimbursement" exceeded a reasonable estimate of acquisition cost.

99. The DEFENDANTS also caused the submission of false claims by actively marketing their specified drugs to their customer providers by the use of financial inducements created by " the spread" between the DEFENDANTS' true prices to their customers and the Medicare and the States' Medicaid Programs reimbursements based on the DEFENDANTS' falsely inflated prices reported to Medicare and the States' Medicaid Programs and their subcontractors. The financial inducements were in many cases enhanced by additional inducements such as free goods, discounts, rebates, direct money payments, off invoice pricing and deceptive invoicing.

100. The DEFENDANTS knew that the Medicare and States' Medicaid Programs would not pay or approve claims for the specified drugs if it were disclosed to the Medicare and States' Medicaid Programs that said claims were for amounts that included illegal remuneration prohibited by the anti-kick back statutes, 42 U.S.C. §1320a-7b(b)(2) and 1395nn(a)(1)(B).

101. The DEFENDANTS also knew that their customers, in presenting claims for the specified drugs to the Medicare and States' Medicaid Programs, would not and did not

54

disclose that the claim amounts included the remuneration prohibited by 42 U.S.C. §1320a-7b(b)(2) and 1395 nn(a)(1)(B).

102.    The DEFENDANTS each carried out their scheme to defraud the Government by knowingly providing  false and misleading price and cost information to the Medicare and Medicaid Programs so that the specialized pharmacies, physicians and others submitting the claims would be reimbursed in excessive amounts and thus be financially induced to prescribe and purchase the DEFENDANTS' specified drugs. The DEFENDANTS thus each participated in a fraudulent scheme to cause the Government to pay and approve false claims in excessive amounts.

103.    The claims in question are each false claims under the False Claims Act, in part, because they were each supported by, and the payment amount determined due to the Government's use of,  the false and misleading price and cost information provided by the DEFENDANTS in connection with their respective specified drugs. The false and misleading price and cost information provided by the DEFENDANTS was material in that the information was used in setting Medicare and Medicaid reimbursement amounts and each DEFENDANT acted knowingly, as defined in the False Claims Act, in providing the false and misleading price and cost information that caused the Government to pay claims for the DEFENDANTS' drugs in excessive amounts.  The price and cost information provided by the DEFENDANTS was provided to cause the Government to pay amounts based on the information and thus constitutes claims submitted to the Government.

CIVIL ACTION NO. 95-1354-CIV-GOLD

104.   The false claims at issue in this action were each submitted to the Medicare

and Medicaid Programs by or on behalf of physicians, specialized pharmacies and others

that  sought and received payment in excessive amounts because of  false and misleading

price and cost representations made by the DEFENDANTS directly or indirectly to the

Medicare and Medicaid Programs. The specific false claims are thus each and every claim

submitted to the Medicare or Medicaid Program for which the payment amount  was

determined   by use, in whole or to any degree, of the false and misleading price

representations of the DEFENDANTS. The false claims at issue number in the tens of

thousands and each claim is in the possession of a state's Medicaid Program or Medicare

Carrier to which it was submitted. The Relator has identified the specific false  claims to

the Government by providing the truthful prices concealed from the Government by the

DEFENDANTS for each drug, providing  information about the DEFENDANTS' exploitation

of financial inducements to induce utilization of the specified drugs and specific

identification information about the prescription drugs and the specific false price

representations in question from which the Relator and the Government identified the

specific false claims.

105.   The damages sought herein include, but are not limited to, those arising from

the false claims for the  specified drugs set out in Sections 8 through 32 and elsewhere

throughout this Third Amended Complaint.  The false claims for the specified drugs  set

out herein are alleged to meet the specificity and particularity  requirements for  pleading

56

under the Federal Rules of Civil Procedure. The damages sought herein encompass all damages and penalties recoverable due to the false claim scheme of the DEFENDANTS alleged herein relating to all drugs of all sizes about which false price and cost representations or records were used in connection with, considered or made available in, caused, aided or otherwise affected the presentment, payment or approval of false claims. These claims also encompass recovery of the funds paid for false claims due to the DEFENDANTS' false drug price and cost representations, regardless of the Government program that actually expended the funds, the person or entity that ultimately received the funds or the person or entity from which the United States ultimately recovers the funds.

### Subsection 7a.

### The Unique Kinds of Drugs, Patient/Physician Relationships, and Drug Wholesale Distribution Systems That Make The False Claims Scheme Possible

106.    The Medicare beneficiaries and Medicaid recipients who receive the prescription drugs at issue are usually extremely ill and suffer from such diseases and conditions as cancer, AIDS, chronic pulmonary disease, end stage renal disease, hemophilia, and severe infections.

CIVIL ACTION NO. 95-1354-CIV-GOLD

107.    The specified prescription drugs at issue in this case are a special kind that are usually administered by infusion, injection or inhalation and are not readily available through normal retail pharmacies but are instead provided directly by hospitals, physicians, clinics and specialized pharmacies and home health care providers.

108.    The prescription drugs at issue, like all prescription drugs, may only be provided to a patient upon the order of a physician.

109.    Prescription drugs provided outside of the hospital setting are ordinarily sold by community retail pharmacies (i.e. Walgreens, Eckerds and neighborhood independent drug stores) directly to the patient. Typically a patient is provided a prescription for a particular drug by a physician. The patient takes the prescription and independently decides at which pharmacy the prescription will be filled. Thus, the prescribing physician has no financial incentive or financial inducement to prescribe a particular drug or recommend a drug as the therapy of choice over that of a possible alternative therapy.

110.    This case, however, focuses on a different and distinct type of prescription drug which cannot be taken by mouth and generally is not self administered. The specified prescription drugs are generally administered to the patient by a professional (i.e. a nurse) intravenously, by injection or inhalation. Many of the specified prescription drugs are commonly referred to as "chemotherapy", "chemo" or "oncology" drugs. The other drugs at issue include, but are not limited to, chemotherapy drugs, and IV antibiotics, IV antivirals, IV antifungals, IV anti-emedics and drugs used for inhalation therapy. The

58

biologicals at issue include but are not limited to those which are used to treat a variety of immune deficiency disorders. A biological product is one which has been obtained directly from, or has been derived from, living matter. The above described types of drugs and biologicals are the prescription drugs at issue in this case and are sometimes referred to as "the specified drugs."

111.    The DEFENDANTS refer to specialized pharmacies that provide the specified drugs as "closed pharmacies" or by a similar descriptive name which generally means the pharmacies are not open to the public.

112.    The infusion and injectable drugs and biologicals at issue in this case are generally perceived to be high priced and often are high priced during the time they are subject to a patent held by the brand name manufacturer.

113.    Patients do not ordinarily price shop for the prescription drugs at issue in this case, as they often do with prescription drugs purchased at community retail pharmacies, and instead rely on their physician or home health provider to arrange for the drug to be provided to them. Patients who receive the specified drugs are extremely ill and not in a position to question their physician's decision as to who will provide the specified drugs, which manufacturer's drugs to use or the amount claimed for providing the drug.

114.    The specified drugs are ordinarily prescribed by specialized physicians for the treatment of people who are afflicted with various forms of cancer, AIDS  and HIV diseases, severe respiratory ailments and blood clotting disorders such as hemophilia.

115.    Physicians who specialize in the treatment of cancers and their associated blood disorders are known as oncologists and hematologists. Physicians who specialize in the treatment of AIDS and HIV diseases are known as Infectious Disease or "ID" physicians. Physicians who specialize in the treatment of respiratory diseases are known as pulmonologists.

116.    The specialized physicians often are in unique relationships with the DEFENDANTS in that the physicians not only prescribe the specified drugs, but also directly administer or arrange for their administration and often then submit claims for them or have a financial relationship with the entity submitting the claim.

117.    The DEFENDANTS have also developed special wholesale delivery systems for the drugs at issue in this case in order to facilitate the financial inducements for those in a position to cause the DEFENDANTS' respective drugs to be ordered for patients and paid for by Medicare, Medicaid or other Government programs.

118.    The majority of the DEFENDANTS' drugs, not at issue in this action, are distributed through drug wholesalers who resell and distribute the drugs to hospitals, pharmacies, physicians and clinics.

119.    Four companies, McKesson Drug, Cardinal, Bergen Brunswig and Ameri-Source comprise approximately eighty (80%) of the 53 billion dollar annual wholesale drug market. Except for the specified drugs, the DEFENDANTS do not generally dictate to these wholesalers who they may sell to or at what price they may sell at. Wholesalers

CIVIL ACTION NO. 95-1354-CIV-GOLD

generally sell to any person or entity (i.e. pharmacies, physicians and hospitals) who can lawfully purchase prescription drugs.

120. Wholesalers purchase the specified drugs at issue in this case at prices that are unilaterally set and controlled by the DEFENDANTS. The wholesalers in turn add a percentage (commonly referred to as an "up-charge") to the price that they pay the DEFENDANTS. The "up-charge", which is an amount usually approved by the DEFENDANT selling the specific drug, covers the wholesaler's expenses such as warehousing, delivery, billing and collections and provides a profit.

121. The DEFENDANTS also enter into what are known as "charge-back " arrangements with wholesalers whereby the drugs at issue in this case are sold to the wholesaler at a fictitiously inflated price and then the wholesaler is credited by the DEFENDANT for the difference between the fictitious price and the true price to the DEFENDANTS' customer plus the agreed "up charge" for the wholesaler. The "charge-back" scheme allows the DEFENDANTS to utilize the services of the wholesalers while establishing prices for their drugs to their select customers/providers.

122. The "charge-back" scheme is illustrated by the following example of the drug, Vepesid 100mg, National Drug Code ("NDC") NDC 00015-3095-20, manufactured by DEFENDANT BRISTOL-MYERS and wholesaled through McKesson Drug Co. ("McKesson"):

CIVIL ACTION NO. 95-1354-CIV-GOLD

a)    McKesson's 1998 wholesale price for 100mg of Vepesid, NDC 00015-3095-20, is $109.19 plus an up-charge.

b)    Ven-A-Care is a member of the Greater New York Hospital Association's ("GNYHA") group purchasing organization.

c)    Ven-A-Care's GNYHA contract price for 100mg Vepesid, NDC 00015-3095-20, is $10.00 plus the wholesaler up-charge. VAC's up-charge from McKesson is 7%, therefore, VAC can purchase a 100mg vial of Vepesid from McKesson for $10.70 which is $98.49 less than McKesson paid.

d)    McKesson claims a "charge-back" from DEFENDANT BRISTOL-MYERS of $99.19 which represents the difference in price from what McKesson paid versus what McKesson sold it to VAC for plus McKesson's up-charge.

123.    The DEFENDANTS also sell the specified drugs to other wholesalers which they sometimes refer to as "distributors","specialty wholesalers" or "oncology supply houses". These wholesalers sell the specified drugs to select providers (i.e. specialized physicians and closed pharmacies) at prices that are sometimes a mere fraction of the fictitious prices purported to be paid, before charge-back credit, by McKesson, Cardinal, Bergen Brunswig and Ameri-Source. These other wholesalers include Oncology Therapeutics Network ("OTN") a wholly owned subsidiary of DEFENDANT BRISTOL-MYERS SQUIBB, Florida Infusion, Alternate Site Distributors "ASD" (a subsidiary of Bergen Brunswig), National Specialty Services ("NSS") (a subsidiary of Cardinal) and

62

Oncology Supply (a subsidiary of Bergen Brunswig). Their primary business involves selling infusion, injectable and biological drugs. These wholesalers sell many of the drugs at issue in this case; however, the prices are generally net and do not include any wholesaler up-charge. Unlike McKesson Drug, Cardinal, Bergen Brunswig and Ameri-Source who determine their own customers, the DEFENDANTS dictate and control who specialty wholesalers such as OTN, Florida Infusion, NSS, ASD, Oncology Supply may sell to and at what price they may sell.

124. In order to monitor the wholesalers' compliance, the DEFENDANTS require all drug wholesalers to periodically (generally quarterly) report back to the DEFENDANTS all prescription drug sales by NDC number, provider name and sales price.

125. A representative example of the DEFENDANTS' practice was demonstrated when VAC was informed by a DEFENDANT GLAXO's sales representative that DEFENDANT GLAXO and other drug manufactures consider this information vital in determining how and where to market their prescription drugs. The GLAXO representative informed VAC that GLAXO prepared reports for every sales representative based on the information compiled from all wholesalers reports and that the GLAXO report was broken down by postal zip code, provider, NDC number, quantity and sales prices.

126. The DEFENDANTS negotiate prices for their prescription drugs individually with hospitals, Government entities, closed pharmacies, mail order pharmacies, HMO's, physicians, and with group purchasing organizations (" GPO's") who represent groups of

smaller providers. GPO's provide members lower cost products by negotiating prices for specific drugs from manufacturers. The GPO member is able to purchase the drugs at the negotiated price either in some cases directly from the manufacturer or from a wholesaler that has a charge-back agreement with the specific manufacturer. All of the wholesalers have participated to some degree in the DEFENDANTS' charge-back system. Like the determination by the DEFENDANTS as to who OTN, Florida Infusion, NSS, ASD, Oncology Supply may sell to, acceptable membership in the GPOs is controlled by the DEFENDANTS. The GPO's are required to send periodic detailed reports of membership compliance to the DEFENDANTS.

### Subsection 7b.

**The Medicare and Medicaid Programs Use
The Defendants' False and Misleading Price and Cost
Representations to Estimate the Acquisition Cost of
The Specified Drugs in Setting Reimbursement Amounts**

127. The Medicare and Medicaid Programs are each structured so that covered prescription drugs are reimbursed on an estimated cost basis while physicians and other health care providers are reimbursed separately for their professional services and are not

entitled to receive any form of financial incentive or inducement for prescribing or delivering drugs.

128. The Medicare and Medicaid Programs use the price and cost representations of the DEFENDANTS in order to estimate acquisition cost in setting reimbursement amounts.

129. The DEFENDANTS' price and cost representations are provided to the Medicare and Medicaid Programs directly and through drug price and cost information reporting services as alleged above.

130. The States' Medicaid Programs also receive price and cost representations directly from the DEFENDANTS and use them to confirm the accuracy of price and cost information used for computing reimbursement amounts.

131. **The Fraud on Medicare**: This case focuses, in part, on the specified drugs that are covered under Part B of the Medicare program which are sold and/or distributed by the DEFENDANTS and for which claims are paid by the Medicare Part B carriers and the DMERCs in amounts that are based in whole or in part on estimations of acquisition cost. The drugs at issue in this case, for which Medicare has paid claims, include but are not limited to those specified in the following table, together with their respective HCPCS codes. By way of example, the claim amount approved by the Florida Medicare Carrier for each drug in 1996, or in some instances 1997, if specified, is compared with the Relator's cost in order to illustrate the grossly excessive payments resulting from the

65

DEFENDANTS' false representations of price and cost. The DEFENDANTS' false price and cost representations to the Medicare Program have resulted in claims being paid in exorbitant amounts in excess of the drug's cost as more specifically alleged in the following Table No. 1:

## TABLE NO. 1

| 1(A)  DEFENDANT ABBOTT | | | | | | |
|---|---|---|---|---|---|---|
| **DRUG** | **NDC #** | **HCPCS CODE** | **1996 FLORIDA MEDICARE ALLOWABLE** | **1996 RELATOR'S COST** | **PROVIDER'S GROSS PROFIT $** | **PROVIDER'S GROSS PROFIT %** |
| Sodium Chloride 0.9% 250 ml | 00074-7983-02 | J7050 | $9.43 | $0.95 | $8.48 | 892% |
| Sodium Chloride 0.9% 50 ml | 00074-7983-03 | J7040 | $10.14 | $0.95 | $9.19 | 967% |
| Sodium Chloride 0.9% 1000 ml | 00074-7983-09 | J7030 | $11.06 | $1.03 | $10.03 | 973% |
| 5% Dextrose in Water w/5% etoh 500 ml | 00074-7922-03 | J7060 | $9.98 | $0.96 | $9.02 | 939% |
| 5% Dextrose in Water 1000 ml | 00074-7922-09 | J7070 | $11.23 | $1.12 | $10.11 | 902% |
| Dextrose 5% with Sodium Chloride 0.9% 500 ml | 00074-7941-03 | J7042 | $10.24 | $1.03 | $9.21 | 894% |
| Ringers Lactate 1000 ml | 00074-7953-09 | J7120 | $12.43 | $1.14 | $11.29 | 990% |
| Vancomycin HCL 500 mg | 00074-4332-01 | J3370 | $12.91 | $3.51 | $9.40 | 267% |

66

CIVIL ACTION NO. 95-1354-CIV-GOLD

| 1(A)  DEFENDANT ABBOTT | | | | | | |
|---|---|---|---|---|---|---|
| **DRUG** | **NDC #** | **HCPCS CODE** | **1996 FLORIDA MEDICARE ALLOWABLE** | **1996 RELATOR'S COST** | **PROVIDER'S GROSS PROFIT $** | **PROVIDER'S GROSS PROFIT %** |
| Tobramycin Sulfate 80 mg | 00074-3578-01 | J3260 | $6.74 | $3.63 | $3.11 | 85% |



CIVIL ACTION NO. 95-1354-CIV-GOLD





## 1(D)  DEFENDANT BAXTER

| DRUG | NDC # | HCPCS CODE | 1996 FLORIDA MEDICARE ALLOWABLE | 1996 RELATOR'S COST | PROVIDER'S GROSS PROFIT $ | PROVIDER'S GROSS PROFIT % |
|------|-------|------------|---------------------------------|---------------------|--------------------------|---------------------------|
| Sodium Chloride 0.9% 250 ml | 00338-0049-02 | J7050 | $9.43 | $0.78 | $8.65 | 1108% |
| Sodium Chloride 0.9% 500 ml | 00338-0049-03 | J7040 | $10.14 | $0.79 | $9.35 | 1183% |
| Sodium Chloride 0.9% 1000 ml | 00338-0049-04 | J7030 | $11.06 | $0.95 | $10.11 | 1064% |
| Dextrose 5% in Water 500 ml | 00338-0017-03 | J7060 | $9.98 | $0.78 | $9.20 | 1179% |
| Dextrose 5% in water 1000 ml | 00338-0017-04 | J7070 | $11.23 | $0.95 | $10.28 | 1082% |
| Dextrose 5% & Sodium Chloride 0.9% 500 ml | 00338-0089-03 | J7042 | $10.24 | $1.08 | $9.16 | 848% |
| Ringers Lactate 1000 ml | 00338-0117-04 | J7120 | $12.43 | $1.34 | $11.09 | 827% |

CIVIL ACTION NO. 95-1354-CIV-GOLD

| 1(D) DEFENDANT BAXTER | | | | | | |
|---|---|---|---|---|---|---|
| DRUG | NDC # | HCPCS CODE | 1996 FLORIDA MEDICARE ALLOWABLE | 1996 RELATOR'S COST | PROVIDER'S GROSS PROFIT $ | PROVIDER'S GROSS PROFIT % |
| Immune Globlin 10% 10 gm Gammagard S/D | 00944-2620-04 | J1562 | $745.00 | $300.00 | $445.00 | 148% |
| Immune Globlin 10% 5 gm Gammagard S/D | 00944-2620-03 | J1562 | $372.50 | $150.00 | $222.50 | 148% |
| Immune Globlin 10% 2.5 gm Gammagard S/D | 00944-2620-02 | J1562 | $186.25 | $75.00 | $111.25 | 148% |
| Recombinate 250 iu | 00944-2938-01 | J7192 | $295.00 | $195.00 | $100.00 | 51% |
| Hemofil M 250 iu | 00944-2935-01 | J7190 | $225.00 | $155.00 | $70.00 | 45% |
| Proplex T 700 iu | 00944-0581-01 | J7194 | $385.00 | $140.00 | $245.00 | 175% |

| 1(E) DEFENDANT BAYER/MILES | | | | | | |
|---|---|---|---|---|---|---|
| DRUG | NDC # | HCPCS CODE | 1996 FLORIDA MEDICARE ALLOWABLE | 1996 RELATOR'S COST | PROVIDER'S GROSS PROFIT $ | PROVIDER'S GROSS PROFIT % |
| Immune Globulin 10%, 10gm Gamimune-N | 00026-0648-71 | J1562 | $745.00 | $370.00 | $375.00 | 101% |
| Immune Globulin 10%, 20 gm Gamimune-N | 00026-0648-24 | J1562 | $1,490.00 | $740.00 | $750.00 | 101% |

**CIVIL ACTION NO. 95-1354-CIV-GOLD**

| 1(E)  DEFENDANT BAYER/MILES | | | | | | |
|---|---|---|---|---|---|---|
| DRUG | NDC # | HCPCS CODE | 1996 FLORIDA MEDICARE ALLOWABLE | 1996 RELATOR'S COST | PROVIDER'S GROSS PROFIT $ | PROVIDER'S GROSS PROFIT % |
| Immune Globulin 10%, 5 gm Gamimune-N | 00026-0648-20 | J1562 | $372.50 | $185.00 | $187.50 | 101% |
| Immune Globulin 5%, 12.5 gm Gamimune-N | 00026-0640-25 | J1561 | $875.25 | $400.00 | $475.25 | 119% |
| Immune Globulin 5%, 5 gm Gamimune-N | 00026-0640-71 | J1561 | $350.10 | $160.00 | $190.10 | 119% |
| Immune Globulin 5%, 2.5 gm Gamimune-N | 00026-0640-20 | J1561 | $175.05 | $80.00 | $95.05 | 119% |
| Kogenate 250 iu | 00161-0670-20 00192-0670-20 00026-0670-20 | J7192 | $295.00 | $162.50 | $132.50 | 82% |
| Koate-HP 250 iu | 00161-0644-20 00192-0644-20 00026-0644-20 | J7190 | $225.00 | $55.00 | $170.00 | 309% |
| Konyne 80 500 iu | 00192-0626-20 | J7194 | $275.00 | $90.00 | $185.00 | 205% |
| Thrombate III 500 iu | 00026-0603-20 | J7197 | $530.00 | $350.00 | $180.00 | 51% |

CIVIL ACTION NO. 95-1354-CIV-GOLD



CIVIL ACTION NO. 95-1354-CIV-GOLD

| 1(G)  DEFENDANT BRISTOL-MYERS | | | | | | |
|---|---|---|---|---|---|---|
| **DRUG** | **NDC #** | **HCPCS CODE** | **1996 FLORIDA MEDICARE ALLOWABLE** | **1996 RELATOR'S COST** | **PROVIDER'S GROSS PROFIT $** | **PROVIDER'S GROSS PROFIT %** |
| Rubex 50 mg | 00015-3352-22 | J9010 | $225.40 | $45.00 | $180.40 | 400% |
| Cytoxan 100 mg | 00015-0539-41 | J9093 | $6.45 | $2.75 | $3.70 | 134% |
| Cytoxan 200 mg | 00015-0546-41 | J9094 | $12.25 | $3.25 | $9.00 | 276% |
| Cytoxan 500 mg | 00015-0547-41 | J9095 | $25.71 | $5.25 | $20.46 | 389% |
| Cytoxan 1.0 gm | 00015-0548-41 | J9096 | $51.43 | $10.00 | $41.43 | 414% |
| Cytoxan 2.0 gm | 00015-0549-41 | J9097 | $102.89 | $20.00 | $82.89 | 414% |



CIVIL ACTION NO. 95-1354-CIV-GOLD

| 1(I) DEFENDANT DEY | | | | | | |
|---|---|---|---|---|---|---|
| DRUG | NDC # | HCPCS CODE | 1996 FLORIDA MEDICARE ALLOWABLE | 1996 RELATOR'S COST | PROVIDER'S GROSS PROFIT $ | PROVIDER'S GROSS PROFIT % |
| Albuterol Sulfate 0.083% 3 ml 25s | 49502-0697-03 | J7620 | $30.75 | $8.50 | $22.25 | 261% |
| Acelylcysteine Solution 10% 4 ml, 12s | 49502-0181-04 | J7610 | $71.04 | $12.48 | $58.44 | 469% |
| Acetylcysteine Solution 20% 4 ml, 12s | 49502-0182-04 | J7615 | $65.76 | $12.60 | $53.16 | 422% |
| Cromolyn Solium 20 mg 2 ml 60s | 49502-0689-02 | J7630 | $84.00 | $24.50 | $59.50 | 1130% |
| Metaproterenol Sulfate 0.4% 2.5 ml 25s | 49502-0678-03 | J7670 | $30.75 | $6.25 | $24.50 | 392% |
| Metaproterenol Sulfate 0.6% 2.5 ml 25s | 49502-0676-03 | J7672 | $1.23 | $0.10 | $1.13 | 1230% |

CIVIL ACTION NO. 95-1354-CIV-GOLD



CIVIL ACTION NO. 95-1354-CIV-GOLD



| 1(N) DEFENDANT GLAXO WELLCOME/CERENEX | | | | | | |
|---|---|---|---|---|---|---|
| DRUG | NDC # | HCPCS CODE | 1996 FLORIDA MEDICARE ALLOWABLE | 1996 RELATOR'S COST | PROVIDER'S GROSS PROFIT $ | PROVIDER'S GROSS PROFIT % |
| Ondansetron HCL Zofran 40 mg | 00173-0442-00 | J2405 | $233.20 | $165.00 | $68.20 | 41% |
| Ondansetron HCL Zofran 32 mg | 00173-0461-00 | J3490 | $196.76 | $126.00 | $70.76 | 56% |



CIVIL ACTION NO. 95-1354-CIV-GOLD

| 1(P)  DEFENDANT HOECHST | | | | | | |
|---|---|---|---|---|---|---|
| **DRUG** | **NDC #** | **HCPCS CODE** | **1997 FLORIDA MEDICARE ALLOWABLE** | **1997 RELATOR'S COST** | **PROVIDER'S GROSS PROFIT $** | **PROVIDER'S GROSS PROFIT %** |
| Anzemet (Dolasetron Mesylate) 20 mg/ml 5 ml | 00088-1206-32 | J3490 | $149.98 | $70.00 | $79.98 | 114% |



**CIVIL ACTION NO. 95-1354-CIV-GOLD**



**CIVIL ACTION NO. 95-1354-CIV-GOLD**



CIVIL ACTION NO. 95-1354-CIV-GOLD



**CIVIL ACTION NO. 95-1354-CIV-GOLD**

| 1(W)  DEFENDANT SMITHKLINE BEECHAM | | | | | | |
|---|---|---|---|---|---|---|
| **DRUG** | **NDC #** | **HCPCS CODE** | **1997 FLORIDA MEDICARE ALLOWABLE** | **1997 RELATOR'S COST** | **PROVIDER'S GROSS PROFIT $** | **PROVIDER'S GROSS PROFIT %** |
| Ganisetron Hydrochloride | 00029-4149-01 | J1625 | $173.95 | $124.90 | $49.05 | 40% |

| 1(X)  DEFENDANT WARRICK | | | | | | |
|---|---|---|---|---|---|---|
| **DRUG** | **NDC #** | **HCPCS CODE** | **1997 FLORIDA MEDICARE ALLOWABLE** | **1997 RELATOR'S COST** | **PROVIDER'S GROSS PROFIT $** | **PROVIDER'S GROSS PROFIT %** |
| Albuterol Sulfate 0.083% Solution 3 ml 25s | 59930-1500-08 | J7620 | $30.75 | $7.99 | $22.76 | 285% |



132.   **The Fraud on Medicaid**:  This case, in part, focuses on the specified drugs that are covered under the States' Medicaid Programs which are sold and/or distributed by the **DEFENDANTS** and for which the States' Medicaid Programs paid claims in amounts that are based in whole or in part on estimations of acquisition cost.  The drugs at issue in this case for which Medicaid has paid claims are identified in the following table,

CIVIL ACTION NO. 95-1354-CIV-GOLD

together with their respective NDC numbers. By way of example, the claim amount approved by Florida Medicaid for each drug in 1996 (unless specified as 1997) is compared with the Relator's cost in order to illustrate the grossly excessive payments resulting from the DEFENDANTS' false representations of price and cost. The DEFENDANTS' price and cost representations to the States' Medicaid Programs have resulted in claims being paid in exorbitant amounts in excess of the drug's cost as more specifically alleged in the following Table No. 2:

## TABLE NO. 2

| 2(A) DEFENDANT ABBOTT | | | | | |
|---|---|---|---|---|---|
| DRUG | NDC # | FLORIDA MEDICAID PAYMENT | RELATOR'S COST | PROVIDER'S GROSS PROFIT $ | PROVIDER'S GROSS PROFIT % |
| Sodium Chloride 0.9% 50 ml | 00074-7101-13 | $11.28 | $1.23 | $10.05 | 817% |
| Sodium Chloride 0.9% 100 ml | 00074-7101-23 | $11.28 | $1.23 | $10.05 | 817% |
| Sodium Chloride 0.9% 250 ml | 00074-7983-02 | $9.37 | $0.95 | $8.42 | 886% |
| Sodium Chloride 0.9% 500 ml | 00074-7983-03 | $9.37 | $0.95 | $8.42 | 886% |
| Sodium Chloride 0.9% 1000 ml | 00074-7983-09 | $11.16 | $1.03 | $10.13 | 983% |
| 5% Dextrose in Water 50 ml | 00074-7100-13 | $11.28 | $1.23 | $10.05 | 817% |

82

**CIVIL ACTION NO. 95-1354-CIV-GOLD**

| 2(A)  DEFENDANT ABBOTT | | | | | |
|---|---|---|---|---|---|
| **DRUG** | **NDC #** | **FLORIDA MEDICAID PAYMENT** | **RELATOR'S COST** | **PROVIDER'S GROSS PROFIT $** | **PROVIDER'S GROSS PROFIT %** |
| 5% Dextrose in Water 100 ml | 00074-7100-23 | $11.28 | $1.23 | 410.05 | 817% |
| 5% Dextrose in Water 250 ml | 00074-7100-02 | $13.67 | $1.33 | $12.34 | 928% |
| 5% Dextrose in Water 500 ml | 00074-7922-03 | $9.53 | $0.96 | $8.57 | 892% |
| 5% Dextrose in Water 1000 ml | 00074-7922-09 | $11.13 | $1.12 | $11.01 | 983% |
| 5% Dextrose/ Sodium Chloride 0.9% 250 ml | 00074-7941-02 | $10.24 | $1.03 | $9.21 | 894% |
| 5% Dextrose/ Sodium Chloride 0.9% 500 ml | 00074-7941-03 | $10.23 | $1.03 | $9.20 | 893% |
| 5% Dextrose/ Sodium Chloride 0.9% 1000 ml | 00074-7941-09 | $12.51 | $1.23 | $11.28 | 917% |
| Ringers Lactate 250 ml | 00074-7953-02 | $11.34 | $1.08 | $10.00 | 926% |
| Ringers Lactate 500 ml | 00074-7953-03 | $11.34 | $1.08 | $10.26 | 950% |
| Ringers Lactate 1000 ml | 00074-7953-09 | $12.72 | $1.14 | $11.58 | 915% |

CIVIL ACTION NO. 95-1354-CIV-GOLD

| 2(A)  DEFENDANT ABBOTT | | | | | |
|---|---|---|---|---|---|
| DRUG | NDC # | FLORIDA MEDICAID PAYMENT | RELATOR'S COST | PROVIDER'S GROSS PROFIT $ | PROVIDER'S GROSS PROFIT % |
| Vancomycin HCL  500 mg | 00074-4332-01 | $30.85 | $3.51 | $27.34 | 779% |
| Vancomycin HCL 500 mg | 00074-6535-01 | $22.19 | $6.29 | $15.90 | 252% |
| Vancomycin HCL 1 gm | 00074-6533-01 | $61.68 | $5.53 | $56.15 | 1015% |
| Vancomycin HCL 5 gm | 00074-6509-01 | $138.76 | $35.10 | $103.66 | 295% |
| Tobramycin Sulfate 20 mg | 00074-3577-01 | $4.86 | $1.94 | $2.92 | 150% |
| Tobramycin Sulfate 60 mg | 00074-3582-01 | $6.21 | $3.68 | $2.53 | 68% |
| Tobramycin Sulfate 60 mg | 0074-3469-13 | $21.45 | $5.16 | $16.29 | 315% |
| Tobramycin Sulfate 60 mg | 00074-3254-03 | $16.04 | $3.97 | $12.07 | 304% |
| Tobramycin Sulfate 80 mg | 00074-3470-23 | $23.45 | $5.57 | $17.88 | 321% |
| Tobramycin Sulfate 80 mg | 00074-3583-01 | $10.26 | $4.12 | $6.14 | 149% |
| Tobramycin Sulfate 80 mg | 00074-3578-01 | $9.64 | $3.63 | $6.01 | 165% |
| Tobramycin Sulfate 80 mg | 00074-3255-03 | $10.72 | $4.33 | $6.39 | 147% |
| Tobramycin Sulfate 2000 mg | 00074-3590-02 | $241.07 | $87.68 | $153.39 | 174% |
| Pentamidine 300 mg | 00074-4548-01 | $111.40 | $43.00 | $68.40 | 159% |

CIVIL ACTION NO. 95-1354-CIV-GOLD

| 2(A) DEFENDANT ABBOTT | | | | | |
|---|---|---|---|---|---|
| DRUG | NDC # | FLORIDA MEDICAID PAYMENT | RELATOR'S COST | PROVIDER'S GROSS PROFIT $ | PROVIDER'S GROSS PROFIT % |
| Clindamycin Phosphate 300 mg | 00074-4053-03 | $11.07 | $1.74 | $9.33 | 536% |
| Clindamycin Phosphate 300 mg | 00074-4050-01 | $10.99 | $1.47 | $9.52 | 647% |
| Clindamycin Phosphate 600 mg | 0074-4054-03 | $20.35 | $2.95 | $17.40 | 589% |
| Clindamycin Phosphate 600 mg | 00074-4051-01 | $21.34 | $2.69 | $18.65 | 693% |
| Clindamycin Phosphate 900 mg | 00074-4052-01 | $26.96 | $3.20 | $23.76 | 742% |
| Clindamycin Phosphate 900 mg | 00074-4197-01 | $221.11 | $30.95 | $190.16 | 614% |
| Clindamycin Phosphate 900 mg | 00074-4055-03 | $27.22 | $3.46 | $23.76 | 686% |
| Sodium Bicarbonate 50 ml | 00074-6625-02 | $6.57 | $0.62 | $5.95 | 959% |
| Sodium Bicarbonate 8.4% 50 ml | 00074-6637-01 | $18.28 | $1.66 | $16.62 | 1001% |
| Amikacin Sulfate 500 mg, 2 ml | 00074-1958-01 | $55.18 | $15.50 | $39.68 | 256% |
| Amikacin Sulfate 100 mg, 2 ml | 00074-1955-01 | $40.20 | $11.50 | $28.70 | 249% |

| 2(A) DEFENDANT ABBOTT | | | | | |
|---|---|---|---|---|---|
| DRUG | NDC # | FLORIDA MEDICAID PAYMENT | RELATOR'S COST | PROVIDER'S GROSS PROFIT $ | PROVIDER'S GROSS PROFIT % |
| Amikacin Sulfate 1 gm, 4 ml | 00074-1957-01 | $49.81 | $28.50 | $21.31 | 75% |
| Heparin Lock Flush 10u/ml, 30 ml | 00074-1151-78 | $2.86 | $0.38 | $2.48 | 652% |
| Heparin Lock Flush 100u/ml 30 ml | 00074-1152-78 | $3.26 | $0.44 | $2.82 | 640% |
| Heparin Lock Flush 100u/ml 10 ml | 00074-1152-70 | $1.40 | $0.28 | $1.12 | 400% |
| Water for Inj. 20 ml | 00074-4887-20 | $1.72 | $0.23 | $1.49 | 647% |
| Water for Inj. 10 ml | 00074-4887-10 | $1.37 | $0.19 | $1.18 | 621% |
| Water for Inj. 30 ml | 00074-3977-03 | $1.84 | $0.20 | $1.64 | 820% |
| Water for Inj. 1000 ml | 00074-1590-05 | $11.34 | $1.13 | $10.21 | 903% |
| Wa ter for Inj. 1000 ml | 00074-7990-09 | $10.27 | $1.04 | $9.23 | 887% |
| Water for Inj. 100 ml | 00074-4887-99 | $3.42 | $0.71 | $2.71 | 381% |
| Dex 5%/ Kcl/NaCl 1000 ml | 00074-7902-09 | $17.46 | $2.05 | $15.41 | 751% |
| Furosemide 40 mg 4 ml | 00074-6102-04 | $4.13 | $0.35 | $3.78 | 1080% |

CIVIL ACTION NO. 95-1354-CIV-GOLD



CIVIL ACTION NO. 95-1354-CIV-GOLD



CIVIL ACTION NO. 95-1354-CIV-GOLD

| 2(D) DEFENDANT BAXTER | | | | | |
|---|---|---|---|---|---|
| DRUG | NDC # | FLORIDA MEDICAID PAYMENT | RELATOR'S COST | PROVIDER'S GROSS PROFIT $ | PROVIDER'S GROSS PROFIT % |
| Sodium Chloride 0.9% 50 ml | 00338-0049-41 | $8.60 | $1.00 | $7.60 | 760% |
| Sodium Chloride 0.9% 100 ml | 00338-0049-48 | $8.60 | $1.00 | $7.60 | 760% |
| Sodium Chloride 0.9% 250 ml | 00338-0049-02 | $8.10 | $0.78 | $7.32 | 938% |
| Sodium Chloride 0.9% 500 ml | 00338-0049-03 | $8.10 | $0.79 | $7.31 | 925% |
| Sodium Chloride 0.9% 1000 ml | 00338-0049-04 | $8.77 | $0.95 | $7.82 | 823% |
| Dextrose 5% in Water 50 ml | 00338-0017-41 | $8.60 | $1.01 | $7.59 | 751% |
| Dextrose 5% Water 100 ml | 00338-0017-48 | $8.60 | $1.01 | $7.59 | 751% |
| Dextrose 5% Water 250 ml | 00338-0017-02 | $8.23 | $0.78 | $7.45 | 955% |
| Dextrose 5% in Water 500 ml | 00338-0017-03 | $8.23 | $0.79 | $7.44 | 941% |
| Dextrose 5% in Water 1000 ml | 00338-0017-04 | $9.62 | $0.95 | $8.67 | 912% |
| Dextrose 5% in Normal Saline 250 ml | 00338-0089-02 | $8.85 | $1.08 | $7.77 | 719% |

CIVIL ACTION NO. 95-1354-CIV-GOLD

| 2(D)  DEFENDANT BAXTER | | | | | |
|---|---|---|---|---|---|
| DRUG | NDC # | FLORIDA MEDICAID PAYMENT | RELATOR'S COST | PROVIDER'S GROSS PROFIT $ | PROVIDER'S GROSS PROFIT % |
| Dextrose 5% in Normal Saline 500 ml | 00338-0089-03 | $8.85 | $1.08 | $7.77 | 719% |
| Dextrose 5% in Normal Saline 1000 ml | 00338-0089-04 | $10.51 | $0.99 | $9.52 | 961% |
| Lactated Ringers 250 ml | 00338-0117-02 | $9.79 | $1.26 | $8.53 | 677% |
| Lactated Ringers 500 ml | 00338-0117-03 | $9.79 | $1.13 | $8.66 | 766% |
| Lactated Ringers 1000 ml | 00338-0117-04 | $11.00 | $1.34 | $9.66 | 721% |
| Gammagard S/D 10 gm | 00944-2620-04 | $380.920 | $300.00 | $80.92 | 27% |
| Gammagard S/D 5 gm | 00944-2620-03 | $197.950 | $150.00 | $47.95 | 32% |
| Recombinate2 50iu | 00944-2938-01 | $219.35 | $195.00 | $24.35 | 13% |
| Recombinate 500iu | 00944-2938-02 | $438.70 | $390.00 | $48.70 | 13% |
| Recombinate 1000iu | 00944-2938-03 | $877.40 | $780.00 | $97.40 | 13% |
| Pro Plex-T 700 iu (700 - 3900iu) | 00944-0581-01 | $187.25 | $140.00 | $47.25 | 34% |

90

CIVIL ACTION NO. 95-1354-CIV-GOLD

| 2(E)  DEFENDANT BAYER/MILES | | | | | |
|---|---|---|---|---|---|
| **DRUG** | **NDC #** | **FLORIDA MEDICAID PAYMENT** | **RELATOR'S COST** | **PROVIDER'S GROSS PROFIT $** | **PROVIDER'S GROSS PROFIT %** |
| Immune Globulin Gamimune-N 10% 10 gm | 00026-0648-71 | $801.00 | $370.00 | $431.00 | 116% |
| Immune Globulin Gamimune-N 10% 20 gm | 00026-0648-24 | $1,602.00 | $740.00 | $862.00 | 116% |
| Immune Globulin Gamimune-N 10% 5 gm | 00026-0648-20 | $400.50 | $185.00 | $215.50 | 116% |
| Immune Globulin Gamimune-N 5% 5 gm | 00026-0640-71 | $254.18 | $160.00 | $94.18 | 58% |
| Kogenate 250iu | 00192-0670-20 00026-0670-20 00161-0670-20 | $219.25 | $162.50 | $56.75 | 35% |
| Kogenate 500iu | 00192-0670-30 00026-0670-30 00161-0670-30 | $438.50 | $325.00 | $113.50 | 35% |
| Kogenate 1000iu | 00192-0670-50 00026-0670-50 00161-0670-50 | $877.00 | $650.00 | $227.00 | 35% |

CIVIL ACTION NO. 95-1354-CIV-GOLD



CIVIL ACTION NO. 95-1354-CIV-GOLD



| 2(G)  DEFENDANT BRISTOL-MYERS | | | | | |
|---|---|---|---|---|---|
| DRUG | NDC # | FLORIDA MEDICAID PAYMENT | RELATOR'S COST | PROVIDER'S GROSS PROFIT $ | PROVIDER'S GROSS PROFIT % |
| Rubex 10 mg | 00015-3351-22 | $37.50 | $11.00 | $26.50 | 241% |
| Rubex 50 mg | 00015-3352-22 | $168.76 | $45.00 | $123.76 | 275% |
| Vepesid | 00015-3095-20 | $116.83 | $23.00 | $93.83 | 407% |

CIVIL ACTION NO. 95-1354-CIV-GOLD

| 2(G)  DEFENDANT BRISTOL-MYERS | | | | | |
|---|---|---|---|---|---|
| DRUG | NDC # | FLORIDA MEDICAID PAYMENT | RELATOR'S COST | PROVIDER'S GROSS PROFIT $ | PROVIDER'S GROSS PROFIT % |
| Cytoxan 100 mg | 00015-0539-41 | $5.52 | $2.75 | $2.77 | 100% |
| Cytoxan 200 mg | 00015-0546-41 | $10.49 | $3.25 | $7.24 | 222% |
| Cytoxan 500 mg | 00015-0547-41 | $22.00 | $5.25 | $16.75 | 319% |
| Cytoxan 1 gm | 00015-0548-41 | $44.02 | $10.00 | $34.02 | 340% |
| Cytoxan 2 gm | 00015-0549-41 | $88.07 | $20.00 | $68.07 | 340% |

CIVIL ACTION NO. 95-1354-CIV-GOLD



| 2(l)  DEFENDANT DEY | | | | | |
|---|---|---|---|---|---|
| **DRUG** | **NDC #** | **FLORIDA MEDICAID PAYMENT** | **RELATOR'S COST** | **PROVIDER'S GROSS PROFIT $** | **PROVIDER'S GROSS PROFIT %** |
| Albuterol Sulfate 0.083% 3 ml, 25s | 49502-0697-03 | $26.48 | $8.50 | $17.98 | 212% |
| Albuterol Sulfate 0.083% 3 ml, 30s | 49502-0697-33 | $31.80 | $10.20 | $21.60 | 212% |
| Albuterol Sulfate 0.083%, 3 ml 60s | 49502-0697-60 | $63.60 | $20.40 | $43.20 | 212% |

CIVIL ACTION NO. 95-1354-CIV-GOLD

| 2(I)  DEFENDANT DEY | | | | | |
|---|---|---|---|---|---|
| DRUG | NDC # | FLORIDA MEDICAID PAYMENT | RELATOR'S COST | PROVIDER'S GROSS PROFIT $ | PROVIDER'S GROSS PROFIT % |
| Acetylcysteine Solution 10% 4 ml | 49502-0181-04 | $27.60 | $12.48 | $15.12 | 121% |
| Acetylcysteine Solution 10% 10 ml | 49502-0181-10 | $16.35 | $10.17 | $6.18 | 61% |
| Acetylcysteine Solution 10% 30 ml | 49502-0181-30 | $44.91 | $19.65 | $25.26 | 128% |
| Acetylcysteine Solution 20% 4 ml | 49502-0182-04 | $33.25 | $12.60 | $20.65 | 164% |
| Acetylcysteine Solution 20% 10 ml | 49502-0182-10 | $19.87 | $9.90 | $9.97 | 101% |
| Acetylcysteine Solution 20% 30 ml | 49502-0182-30 | $54.18 | $24.63 | $29.55 | 120% |
| Acetylcysteine Solution 20% 100 ml | 49502-0182-00 | $81.21 | $24.50 | $56.71 | 231% |
| Cromolyn Sodium 2 ml 60s | 49502-0689-02 | $36.59 | $24.50 | $12.09 | 49% |
| Cromolyn Sodium 2 ml 120s | 49502-0689-12 | $70.62 | $49.00 | $21.62 | 44% |

CIVIL ACTION NO. 95-1354-CIV-GOLD

| 2(I) DEFENDANT DEY | | | | | |
|---|---|---|---|---|---|
| DRUG | NDC # | FLORIDA MEDICAID PAYMENT | RELATOR'S COST | PROVIDER'S GROSS PROFIT $ | PROVIDER'S GROSS PROFIT % |
| Metaproterenol Sulfate 0.4% | 49502-0678-03 | $11.77 | $6.25 | $552.00 | 88% |
| Metaproterenol Sulfate 0.6% 2.5 ml 25 s | 49502-0676-03 | $11.77 | $6.25 | $552.00 | 88% |
| Sodium Chloride 0.9% 15 ml | 49502-0830-15 | $7.70 | $5.02 | $268.00 | 53% |
| Sodium Chloride 3% 15 ml 50s | 49502-0640-15 | $31.56 | $27.50 | $4.06 | 15% |
| Sodium Chloride 10% 15 ml 50s | 49502-0641-15 | $31.56 | $27.50 | $4.06 | 15% |

CIVIL ACTION NO. 95-1354-CIV-GOLD



CIVIL ACTION NO. 95-1354-CIV-GOLD



CIVIL ACTION NO. 95-1354-CIV-GOLD



| 2(N)  DEFENDANT GLAXO WELLCOME/CERENEX | | | | | |
|---|---|---|---|---|---|
| DRUG | NDC # | FLORIDA MEDICAID PAYMENT | RELATOR'S COST | PROVIDER'S GROSS PROFIT $ | PROVIDER'S GROSS PROFIT % |
| Ondansetron HCL 40 mg | 00173-0442-00 | $217.95 | $165.00 | $52.95 | 32% |
| Ondansetron HCL 32 mg | 00173-0461-00 | $184.05 | $126.00 | $58.05 | 46% |

CIVIL ACTION NO. 95-1354-CIV-GOLD

| 2(P) DEFENDANT HOECHST | | | | | |
|---|---|---|---|---|---|
| DRUG | NDC # | FLORIDA MEDICAID PAYMENT | 1997 RELATOR'S COST | PROVIDER'S GROSS PROFIT $ | PROVIDER'S GROSS PROFIT % |
| Anzemet (Dolasetron Mesylate) 20 mg/ml 5 ml | 00088-1206-32 | $133.64 | $70.00 | $63.64 | 91% |

CIVIL ACTION NO. 95-1354-CIV-GOLD



**CIVIL ACTION NO. 95-1354-CIV-GOLD**



CIVIL ACTION NO. 95-1354-CIV-GOLD



CIVIL ACTION NO. 95-1354-CIV-GOLD



| 2(W) DEFENDANT SMITHKLINE | | | | | |
|---|---|---|---|---|---|
| DRUG | NDC # | FLORIDA MEDICAID PAYMENT | 1997 RELATOR'S COST | PROVIDER'S GROSS PROFIT $ | PROVIDER'S GROSS PROFIT % |
| Ganisetron Hydrochloride | 00029-4149-01 | $151.85 | $124.90 | $26.95 | 21% |

CIVIL ACTION NO. 95-1354-CIV-GOLD

| 2(X) DEFENDANT WARRICK | | | | | |
|---|---|---|---|---|---|
| DRUG | NDC # | FLORIDA MEDICAID PAYMENT | 1997 RELATOR'S COST | PROVIDER'S GROSS PROFIT $ | PROVIDER'S GROSS PROFIT % |
| Albuterol Sulfate 0.083% 3 ml, 25s | 59930-1500-08 | $26.92 | $7.99 | $18.93 | 237% |
| Albuterol Sulfate 0.083% 3ml, 60s | 59930-1500-06 | $64.62 | $18.99 | $45.63 | 240% |
| Albuterol Sulfate 0.5% 20 ml | 59930-1515-04 | $9.63 | $5.59 | $4.04 | 72% |

133. The representations of their drugs' prices made by the DEFENDANTS to First Data Bank, Medical Economics, Medi-Span and directly to the Medicare carriers and the States' Medicaid Programs are material for the establishment of reasonable reimbursements by Medicare and the States' Medicaid Programs. The importance that drug manufacturers represent truthful costs and prices and how these representations

106

**CIVIL ACTION NO. 95-1354-CIV-GOLD**

affect reimbursements in both States whose formula is WAC plus a percentage and States whose formula is AWP minus a percentage is demonstrated by the following example:

a)  On or about December 1995, Defendant ████████ reported a direct price of $76.80 for a 10 ml vial of ████████████████████ to First Data Bank. The direct price representation submitted by Defendant ████████ of $76.80 was false since VAC could purchase ████████████████████ for approximately $14.70 from a national wholesaler.

b)  When First Data Bank received the false and fraudulent direct price representation of $76.80 for Defendant ████████████████ First Data Bank established a WAC of $76.80, applied an industry average "mark-up" and established an AWP of $94.75.

c)  First Data Bank then transmitted ████████ representation of direct price and First Data Bank's resulting computed AWP to the States' Medicaid Programs who relied upon the representations of prices for the payment of claims.

d)  On or about March 1996, DEFENDANT ████████ reported to First Data Bank a direct price, nearer to the truth, of $26.12 for the same 10 ml vial of ████████████████████ The lower direct price representation to First Data Bank by DEFENDANT ████████ caused First Data Bank to establish a new WAC of $26.12 and to compute a new AWP of $31.10.

107

CIVIL ACTION NO. 95-1354-CIV-GOLD

e)       The representation of a lower direct price by DEFENDANT ▮▮▮▮▮▮▮

together with First Data Bank's resulting computed AWP were then transmitted to the

various States' Medicaid Programs who again relied upon these representations of prices

for the payment of claims.

f)       The following charts indicate the cause and effect that the false

representations of direct price and the representations of a lower direct price had on

reimbursements made by a State's Medicaid Program whose reimbursement is based on

WAC plus a percentage and on two States' Medicaid Programs whose reimbursements

are based on AWP minus a percentage:



i.       FLORIDA, WAC + 7%

| Prior to 3/15/96 FIRST DATA BANK | | FLORIDA MEDICAID Reimbursement per 10 ml | VAC's True Cost | V S | 03/15/96 FIRST DATA BANK | | FLORIDA MEDICAID Reimbursement per 10 ml | VAC's True Cost |
|---|---|---|---|---|---|---|---|---|
| "AWP" | "DP" | | | | "AWP" | "DP" | | |
| $94.75 | $76.80 | $81.1060 | $14.70 | | $31.10 | $26.12 | $26.6216 | $14.70 |

ii.      MICHIGAN, AWP - 13.5% 1 - 4 pharmacies
         AWP - 15.1% 5+     pharmacies

| Prior to 3/15/96 FIRST DATA BANK | | MICHIGAN MEDICAID Reimbursement per 10 ml | | VAC's True Cost | V S | 03/15/96 FIRST DATA BANK | | MICHIGAN MEDICAID Reimbursement per 10 ml | | VAC's True Cost |
|---|---|---|---|---|---|---|---|---|---|---|
| "AWP" | "DP" | 1-4 | 5+ | | | "AWP" | "DP" | 1-4 | 5+ | |
| $94.75 | $76.80 | $81.9587 | $80.4427 | $14.70 | | $31.10 | $26.12 | $26.9015 | $26.4039 | $14.70 |

### iii.   CALIFORNIA, AWP - 5%

| Prior to 3/15/96 FIRST DATA BANK | | CALIFORNIA MEDICAID Reimbursement per 10 ml | VAC's True Cost | V S | 03/15/96 FIRST DATA BANK | | CALIFORNIA MEDICAID Reimbursement per 10 ml | VAC's True Cost |
|---|---|---|---|---|---|---|---|---|
| "AWP" | "DP" | | | | "AWP" | "DP" | | |
| $94.75 | $76.80 | $90.0125 | $14.70 | | $31.10 | $26.12 | $29.50 | $14.70 |

### Subsection 7c.

**The Defendants Each Determine What Representations Will
Be Made to the Drug Price and Cost Reporting Compendia and
To the Medicare and Medicaid Programs,
Have Knowledge of the Actual Prices of Their Drugs, and
Know If the Government Is Being Provided with
False and Misleading Price and Cost Information**

134.   The DEFENDANTS are prohibited by the False Claims Act from making false representations in connection with claims for Government funds, are required by the Food and Drug Act to report true prices and are prohibited by the Medicare and Medicaid Anti-Kickback laws from arranging financial inducements for providers.

135.   The patients and third party payers, including the Medicare and States' Medicaid Programs, are not aware of the prices actually paid for the specified drugs by the physician, clinic or specialty pharmacy presenting the claim for payment. The DEFENDANTS concealed from the Medicare and States' Medicaid Programs price

CIVIL ACTION NO. 95-1354-CIV-GOLD

reductions occurring due to competition in the marketplace and falsely and fraudulently
represented drug prices that far exceeded the truthful prices.

136.   At all times material to this action, each of the DEFENDANTS acted
"knowingly" as that term is defined at 31 U.S.C. §3729(b) by:

a)   Causing the presentation of false and fraudulent claims for payment
or approval by the Medicare and States' Medicaid programs; and

b)   Making and using false statements and/or records for the purpose of
getting false or fraudulent claims approved or paid by the Medicare and States' Medicaid
programs.

137.   The DEFENDANTS were clearly placed on notice that their conduct would
cause the Medicare and States' Medicaid programs to pay claims for the specified drugs
in amounts exceeding that permitted by applicable law, in part, because:

a)   Each of the DEFENDANTS was on notice of federal statutes and
regulations that limit payment of Medicare Part B claims for the specified drugs to 80% of
a reasonable cost.

b)   Each of the DEFENDANTS was on notice of federal statutes and
regulations limiting payment of Medicaid claims for the specified drugs to an amount
necessary to cover the cost of the drug.

CIVIL ACTION NO. 95-1354-CIV-GOLD

c)     Each of the DEFENDANTS was on notice that neither the Medicare
nor the States' Medicaid programs were authorized or permitted by applicable law to pay
claims for the specified drugs in excessive amounts.

d)     Each of the DEFENDANTS was on notice that federal statutes and
regulations prohibited them from making misleading representations about the specified
drugs, including misleading price or cost representations.

138.   Defendants  ABBOTT,                          BAXTER,  BAYER/MILES,

BRISTOL-MYERS,

                          repeatedly, systematically and falsely represented to the
Medicare and States' Medicaid Programs that the prices of certain of their specified drugs
were increasing or remaining substantially constant when they knew that in truth and in
fact the prices had fallen substantially or were otherwise priced far below the represented
prices and the Medicare and States' Medicaid Programs would pay and approve claims
based on their false representations of the price of their drugs.

139.   Each of the DEFENDANTS was on notice that federal statutes and
regulations prohibited them from making misleading representations about the specified
drugs, including misleading price or cost representations:

a)     Each of the DEFENDANTS is required to comply with the Federal
Food, Drug and Cosmetic Act 21 U.S.C. §321 et. seq., and the regulations promulgated
pursuant thereto.

111

b)     The price and cost representations about the specified drugs constitute advertising that is included in the "labeling" provisions of the Federal Food and Drug Act and related regulations. 21 U.S.C. §§201(m); 202.1(k)(2).

c)     Each of the DEFENDANTS is prohibited from disseminating any information about their prices or costs of the specified drugs that is "false or misleading in any particular . . ." 21 U.S.C. §§5.02; 302(b).

d)     Each of the DEFENDANTS was on notice that they possessed a duty to assure that their representations about prices and costs of the specified drugs were not misleading, taking into account:

> "  .  .  . not only representations made or suggested by
> statement, word, design, device, or any combination thereof,
> but also to the extent to which the labeling or advertising fails
> to reveal facts material in light of such representations"

21 U.S.C. §201(n).

140.    Notwithstanding the legislative intent of the Food Drug and Cosmetic Act, the DEFENDANTS, acting individually and in concert with one another, purposely created confusion and made false and misleading statements about drug pricing in order to deceive the United States Government and the States' Medicaid Programs.  For several years, various Governmental agencies including the HHS Office of Inspector General "OIG" and the General Accounting Office "GAO" attempted to examine the issue of the reasonableness of reimbursements by the Medicare and States' Medicaid Programs for

112

many of the drugs at issue in this Third Amended Complaint. The OIG's and GAO's efforts
were thwarted, in part, by the DEFENDANTS withholding and concealing pertinent
information that was being sought by the OIG and GAO. The OIG and GAO attempted
through numerous published reports to identify the problem of unreasonable
reimbursements; however, they were unsuccessful due to the actions of the
DEFENDANTS.   The DEFENDANTS concealed and disguised the unreasonable
reimbursements from the United States Government and States' Medicaid Programs, in
part, by the following facts and circumstances:

a)   The DEFENDANTS can and do make truthful representations of price
and costs for many of their drugs sold in retail community pharmacies and, in some
instances, infusion, injectable and inhalation drugs and biologicals sold to physician
groups, outpatient clinics and specialty infusion pharmacies.

b)   Some drug manufacturers (other than the DEFENDANTS) make
representations of costs and price only in terms of Average Wholesale Price "AWP".

c)   Some of the DEFENDANTS make representations of cost and price
only in terms of "List Price," "Wholesale Net," Direct Price "DP" or "DIRP,"or Wholesaler
Acquisition Costs, "WAC," to which Medical Economics and First Data Bank apply an
industry average mark-up and establish an AWP.

d)   Some of the DEFENDANTS make representations of cost and price
in terms of both AWP and DP (or DIRP).

113

CIVIL ACTION NO. 95-1354-CIV-GOLD

141.   **The Defendants Create the False Price Spread to Induce Sales of Drugs**

**Used to Treat Very Serious Medical Conditions**:  The following Table No. 3 lists each

of the DEFENDANTS drugs and their approved FDA indications as published in the 1998

edition of *Drug Facts and Comparisons* and the percent of pricing fraud is represented by

the mark-up between the DEFENDANTS AWP listing in the 1998 *Drug Topics* Red Book

and Ven-A-Care's true 1998 wholesale cost for a common size.

**TABLE NO. 3**

| ABBOTT | | |
|---|---|---|
| **DRUG** | **F.D.A. APPROVED INDICATIONS** | **THE FALSE PRICE SPREAD** |
| **Acyclovir** (Antiviral) | HSV-1 and HSV-2 Varicella Zoster(Shingles) Herpes Simplex Encephalitis | **363%** |
| **Amikacin** (Antibiotic) | Bacterial Septicemia Respiratory Tract Infection Bone and Joint Infection Skin and Soft Tissue Infection Intra-abdominal Infection Burns Urinary Tract Infections | **437%** |
| **Amino Acids/ Electrolytes** (Nutrition) | Given to prevent nitrogen and weight loss and meet metabolic requirements when the gastrointestinal tract cannot be used or is inadequate. | **1776%** |
| **Clindamycin** (Antibiotic) | Respiratory Tract Infections Skin and Soft Tissue Infection Septicemia Female Pelvis and Genital Tract Infections Hematogenous Osteomyelitis | **846%** |

114

| ABBOTT | | |
|---|---|---|
| DRUG | F.D.A. APPROVED INDICATIONS | THE FALSE PRICE SPREAD |
| Dextrose 5% in Water (Fluid) | Intravenous Replenishment Solution | 1562% |
| Dextrose 5% with Sodium Chloride (Fluid) | Intravenous Replenishment Solution | 1014% |
| Dextrose 5% with Potassium and Sodium Chloride (Fluid) | Intravenous Replenishment Solution | 2309% |
| Furosemide (Diuretic) | Edema Hypertension Acute Pulmonary Edema Congestive Heart Failure Chronic Renal Failure | 3061% |
| Heparin (Anticoagulant) | Venous Thrombosis Pulmonary Embolism Peripheral Arterial Embolism | 936% |
| Lactated Ringers (Fluid) | Intravenous Replenishment Solution | 1076% |
| Pentamidine Isethionate (Antiprotozoan) | Pneumocystis Carinii Pneumonia (PCP) By Inhalation: Prevention of Pneumocystis Carinii Pneumonia (PCP) in high risk HIV patients | 400% |
| Sodium Chloride 0.9% (Fluid) | Dilutent for Inhaled and Injected Drugs Intravenous Replenishment Solution | 1335% |

| ABBOTT | | |
|---|---|---|
| **DRUG** | **F.D.A. APPROVED INDICATIONS** | **THE FALSE PRICE SPREAD** |
| **Tobramycin** (Antibiotic) | Septicemia<br>Lower Respiratory Tract Infection<br>Central Nervous System Infections<br>Intra-Abdominal Infections<br>Skin and Skin Structure Infection<br>Bone and Joint Infection<br>Urinary Tract Infection | **515%** |
| **Vancomycin** (Antibiotic) | Serious or severe infections not treatable with other antimicrobials including:<br>Resistant *Staphylococcal* Infections<br>Resistant *Streptococcal* Infections<br>*Diptheroid* Endocarditis<br>Pseudomembranous Colitis | **1153%** |
| **Sterile Water for Injection** (Fluid) | Reconstitution Solution for Injection Drugs | **684%** |



**CIVIL ACTION NO. 95-1354-CIV-GOLD**



**CIVIL ACTION NO. 95-1354-CIV-GOLD**



| BAXTER | | |
|---|---|---|
| <u>DRUG</u> | <u>F.D.A. APPROVED INDICATIONS</u> | <u>THE FALSE PRICE SPREAD</u> |
| **Dextrose 5% in Water** (Fluid) | Intravenous Replenishment Solution | **859%** |
| **5% Dextrose with Sodium Chloride** (Fluid) | Intravenous Replenishment Solution | **1095%** |
| **Autoplex T** (Anti-inhibitor coagulant complex) | Hemophilia A with Factor VIII Inhibitors | **35%** |

| BAXTER | | |
|---|---|---|
| **DRUG** | **F.D.A. APPROVED INDICATIONS** | **THE FALSE PRICE SPREAD** |
| **Hemofil M** (Antihemophilic factor, human, monoclonal) | Classical Hemophilia (Hemophilia A) | **46%** |
| **Recombinate** (Antihemophilic factor, recombinant) | Classical Hemophilia (Hemophilia A) | **41%** |
| **Proplex T** (Factor IX complex, human) | Factor IX Deficiency, (Hemophilia B) | **25%** |
| **Gammagard S/D** (Immune Globulin, Intravenous) | Immunodeficiency Syndrome Idiopathic Thrombocytopenic Purpura B-cell Lymphocytic Leukemia Kawasaki Syndrome Bone Marrow Transplant Pediatric HIV | **145%** |
| **Lactated Ringers** (Fluid) | Intravenous Replenishment Solution | **817%** |
| **Sodium Chloride 0.9%** (Fluid) | Intravenous Replenishment Solution | **859%** |

CIVIL ACTION NO. 95-1354-CIV-GOLD

| BAYER | | |
|-------|-------|-------|
| **DRUG** | **F.D.A. APPROVED INDICATIONS** | **THE FALSE PRICE SPREAD** |
| **Koate HP** (Factor VIII, Antihemophilic Factor, Human) | Classical Hemophilia (Hemophilia A) | **136%** |
| **Kogenate** (Factor VIII, Antihemophilic Factor, Recombinant) | Classical Hemophilia (Hemophilia A) | **53%** |
| **Konine 80** (Factor IX Complex, Human) | Factor IX Deficiency (Hemophilia B) | **25%** |
| **Thrombinate III** (Antithrombin III, Human) | Hereditary Antithrombin III Deficiency | **23%** |
| **Gamimune N 10%** (Immune Globulin Intravenous) | Immunodeficiency Syndrome Idiopathic Thrombocytopenic Purpura B-cell Lymphocytic Leukemia Kawasaki Syndrome Bone Marrow Transplant Pediatric HIV | **143%** |



CIVIL ACTION NO. 95-1354-CIV-GOLD



CIVIL ACTION NO. 95-1354-CIV-GOLD

| BRISTOL-MYERS SQUIBB | | |
|---|---|---|
| DRUG | F.D.A. APPROVED INDICATIONS | THE FALSE PRICE SPREAD |
| **Blenoxane** Bleomycin (Anticancer) | Testicular Carcinoma Squamous Cell Carcinoma Lymphomas Malignant Pleural Effusions | 25% |
| **Cytoxan** Cyclophosphamide (Anticancer) | Breast Carcinoma Ovarian Adenocarcinoma Malignant lymphomas (stages III&IV) Hodgkin's disease Lymphocytic Lymphoma Mixed-cell type Lymphomia Histiocytic Lymphomia Burkitt's Lymphoma Retinoblastoma Multiple myeloma Leukemias Mycosis Fungoides Nephrotic Syndrome ("minimal change") | 414% |
| **Mutamycin** Mitomycin (Anticancer) | Adenocarcinoma of the Pancreas Adenocarcinoma of the Stomach | 463% |
| **Platinol-AQ** Cisplatin (Anticancer) | Palliative therapy in: Metastatic Testicular Tumors Metastatic OvarianTumors Advanced Bladder Cancer | 1264% |

| BRISTOL-MYERS SQUIBB | | |
| --- | --- | --- |
| **DRUG** | **F.D.A. APPROVED INDICATIONS** | **THE FALSE PRICE SPREAD** |
| **Rubex** Doxorubicin (Anticancer) | Breast Carcinoma<br>Ovarian Carcinoma<br>Hodgkin's & non-Hodgkin's Lymphomas<br>Transitional Cell Bladder Carcinoma<br>Acute Lymphoblastic Leukemia<br>Acute Myeloblastic Leukemia<br>Wilm's Tumor<br>Neuroblastoma<br>Soft Tissue & Bone Sarcomas<br>Thyroid Carcinoma<br>Bronchogenic Carcinoma<br>Gastric Carcinoma | **131%** |
| **Vepesid** (etoposide) (Anticancer) | Refractory Testicular Tumors<br>Small Cell Lung Cancer | **90%** |



**CIVIL ACTION NO. 95-1354-CIV-GOLD**



| DEY | | |
|---|---|---|
| **DRUG** | **FDA APPROVED INDICATIONS** | **THE FALSE PRICE SPREAD** |
| **Acetylcystine** (Mucolytic) | Acute Bronchopulmonary Disease Pulmonary complications of Cystic Fibrosis Tracheostomy care | **462%** |
| **Albuterol Sulfate** (Broncodilator) | Relief & prevention of Bronchospasm in patients with Reversible Obstructive Airway Disease. Prevention of exercised-induced Bronchospasm | **293%** |
| **Cromlyin Sodium** (Antiasthma, Antiallergy) | Severe Bronchial Asthma Prevention of exercised-induced Bronchospasm | **71%** |
| **Metapoterenol** (Bronchodilator) | Bronchial Asthma Reversible Bronchospasm Acute Asthmatic attacks in children _ 6 years | **392%** |
| **Sodium Chloride** (Fluid) | To dilute Bronchodilator solutions for inhalation | **85%** |



125

CIVIL ACTION NO. 95-1354-CIV-GOLD



**CIVIL ACTION NO. 95-1354-CIV-GOLD**







| GLAXO/WELLCOME/CERENEX | | |
|---|---|---|
| **DRUG** | **F.D.A. APPROVED INDICATIONS** | **THE FALSE PRICE SPREAD** |
| **Zovirax** (Antiviral) | HSV-1 & HSV-2 Infections, Varicella-Zoster (Shingles) in Immunocompromized Patients, Herpes Simplex Encephalitis Severe Genital Herpes | 49% |
| **Zofran** (Antiemetic) | Nausea and Vomiting Associated with Cancer Therapy Post-operative Nausea and Vomiting | 66% |

CIVIL ACTION NO. 95-1354-CIV-GOLD



| HOECHST | | |
|---------|---|---|
| **DRUG** | **F.D.A. APPROVED INDICATIONS*** | **THE FALSE PRICE SPREAD**** |
| Anzemet (Antiemetic) | Prevention of Nausea and Vomiting Associated with Cancer Therapy Post-operative Nausea and Vomiting | **116%** |

CIVIL ACTION NO. 95-1354-CIV-GOLD



**CIVIL ACTION NO. 95-1354-CIV-GOLD**



Case 1:10-cv-13257-RBS Document 8292-2 Filed 04/09/13 Page 137 of 270

CIVIL ACTION NO. 95-1354-CIV-GOLD



CIVIL ACTION NO. 95-1354-CIV-GOLD



| SMITHKLINE | | |
|---|---|---|
| **DRUG** | **F.D.A. APPROVED INDICATIONS** | **THE FALSE PRICE SPREAD** |
| **Kytril** (Granisetron Hydrochloride) (Antiemtic) | Nausea and Vomiting | **42%** |

136

CIVIL ACTION NO. 95-1354-CIV-GOLD

| WARRICK | | |
|---|---|---|
| **DRUG** | **F.D.A. APPROVED INDICATIONS** | **THE FALSE PRICE SPREAD** |
| **Albuterol Sulfate** (Bronchodilator) | Relief & prevention of Bronchospasm in patients with Reversible Obstructive Airway Disease. Prevention of Exercised-Induced Bronchospasm | **335%** |



142.    Each DEFENDANT was on notice that it was  prohibited by federal statute, from paying, or causing the payment of, directly or indirectly,  money or other financial benefit to induce its customers to order the specified drugs when the Medicare or States' Medicaid Programs would be paying claims. 42 U.S.C. §1320a-7b(b)(2).

143.    Notwithstanding the DEFENDANTS' knowledge that the Government relied upon the DEFENDANTS' representations of price and cost and their knowledge of the applicable statutory requirements and prohibitions, each of the DEFENDANTS repeatedly, systematically and falsely  reported inflated price and cost information, including but not limited to:

a) Defendants ABBOTT, ████████████████████████████

████████ repeatedly, systematically and falsely represented to the Medicare and States' Medicaid Programs that the prices of certain of the generic versions of the specified drugs were the same or higher than the published price for the equivalent brand drug when they knew that, in truth and in fact, the price of their generic drug was far less than the published price of the brand and that the States' Medicaid Programs and Medicare would pay and approve claims based upon their false representations of the price of their drugs, and

b) Defendants ABBOTT, ███████████ BAXTER, BAYER/MILES, BRISTOL-MYERS, ████████████████████████████

████████ repeatedly, systematically and falsely represented to the Medicare and States' Medicaid Programs that the prices of certain of their specified drugs were increasing or remaining substantially constant when they knew that in truth and in fact the prices had fallen substantially or were otherwise priced far below the represented prices and the Medicare and States' Medicaid Programs would pay and approve claims based on their false representations of the price of their drugs.

138

### Subsection 7d

### The DEFENDANTS Falsely Inflate Reports of Prices and Costs to Create a Positive Profit or "Spread" in Order to Unlawfully Induce the Utilization of Their Drugs

144.  The DEFENDANTS benefit directly from their false pricing scheme of concealing their true prices while making grossly inflated false and fraudulent representations of prices and costs by maximizing their products' sales volume, capturing market share for their products, and increasing utilization of their products by providers. An example of how the DEFENDANTS directly benefit from their false pricing scheme is demonstrated by data for the first quarter of 1997 from the State of Florida's Medicaid Program setting out Florida Medicaid's reimbursements paid to the customers of drug manufacturers and utilization of their products by their customers for the drug Albuterol Sulfate 0.083% Solution ("Albuterol").

145.  Albuterol is a drug which is administered by inhalation and is used for the treatment of many respiratory illnesses. Albuterol is an example of how two (2) drug manufacturers, DEFENDANTS WARRICK and DEY maximized sales volume and captured the Florida Medicaid pharmacy market for Albuterol to the detriment of Florida's Medicaid Program. The Relator's information demonstrates that providers will purchase and utilize the drug manufacturer's product that has the widest spread between the provider's true cost and the reimbursement paid by the States' Medicaid Programs and Medicare.

CIVIL ACTION NO. 95-1354-CIV-GOLD

146. The Relator's' information is corroborated by first quarter, 1997 reimbursement data from the State of Florida's Medicaid Program demonstrating that the wider the spread between the true cost paid by providers versus the reimbursement paid by Medicaid the more a specific manufacturer's product will be utilized instead of a competitor's product. The DEFENDANTS WARRICK and DEY and the drug manufacturers Zenith/Goldline and Geneva, have all made representations of Wholesale Acquisition Cost to the State of Florida as set out in the chart below. As a direct result of the false representations of prices and costs, the DEFENDANTS WARRICK and DEY caused the State of Florida's Medicaid Program to unwittingly pay more than one million dollars for the first quarter of 1997 over the reasonable reimbursement amounts which the State intended to pay. The chart further sets out the number of reimbursed claims, VEN-A-CARE's cost per ml and "the spread" between Medicaid reimbursement and true cost. A review of the chart clearly demonstrates that the vast majority of providers utilize the manufacturer's drug with the greatest spread between the true Wholesale Acquisition Cost and the inflated false Wholesale Acquisition Cost reported by the drug manufacturer.

140

CIVIL ACTION NO. 95-1354-CIV-GOLD

| FALSE PRICING SCHEME - "THE SPREAD" FLORIDA MEDICAID REIMBURSEMENT (1st Quarter 1997) ALBUTEROL SULFATE SOLUTION 0.083% | | | | | |
|---|---|---|---|---|---|
| Manufacturer | VAC's Cost per ml | Florida Medicaid Reimbursement per ml | The Spread | # of claims | Reimbursement paid by Florida Medicaid |
| Warrick | $0.1065 | $0.3590 | $0.2525 | 12,673 | $763,595.42 |
| Dey | $0.1125 | $0.3531 | $0.2406 | 9,792 | $707,220.50 |
| Zenith/Goldline | N/A | $0.2138 | ** | 102 | $4,981.86 |
| Geneva | N/A | $0.1787 | ** | 19 | $1,278.08 |
| TOTAL REIMBURSEMENT BY THE STATE OF FLORIDA MEDICAID PROGRAM (January 1 through March 31, 1997) | | | | | $1,477,075.86 |
| ** | The use of the spread to falsify claims is evidenced by the fact that WARRICK's and DEY's customers will receive a greater windfall by purchasing their product than they could if they somehow acquired the same product from Zenith/Goldline or Geneva free of charge. | | | | |

147. The DEFENDANTS' false claim scheme also affects utilization of specified drugs covered by Medicare, as evidenced by the history of the inhalation drug Ipratropium Bromide, the brand name of which is Atrovent. Boehringer Ingeheim Pharmaceuticals, Inc. manufactured the brand Atrovent and a generic equivalent was not available until 1997. DEFENDANT DEY brought the new drug Ipratropium Bromide onto the market in 1998, however, falsely represented that the generic price was equivalent to the brand when it was substantially less. The following chart reveals the spread created by the false price representations of the generic manufacturers, including DEY, and the corresponding increase in Medicare utilization.

141

CIVIL ACTION NO. 95-1354-CIV-GOLD

## MEDICARE UTILIZATION FOR THE
## INHALATION DRUG
## IPRATROPIUM BROMIDE HCPCS K0518 & J7645

| YEAR | MEDICARE REIMBURSEMENT AMOUNT PER UNIT* | VAC COST PER MEDICARE UNIT** | SPREAD $ | SPREAD % | MEDICARE EXPENDITURES |
|------|------|------|------|------|------|
| 1995 | $ 3.11 ($0.62/ml) | $3.11 | $0.00 | 0% | $14,426,108 |
| 1996 | $ 3.75 ($0.75/ml) | $3.26 | $0.49 | 15% | $47,388,622 |
| 1997 | $ 3.50 ($0.70/ml) | $2.15 | $1.35 | 63% | $96,204,639 |
| 1998 | $ 3.34 | $1.70 | $1.64 | 96% | $176,887,868 |
| 1999 | $ 3.34 | $1.60 | $1.74 | 108% | |

\*  **Medicare Units were converted from ml's to mg's for the years 1995, 1996 &1997. (5 ml=1 milligram)**

\*\*  **VAC's cost were obtained from McKesson Drug Company published wholesale prices and do not include any common industry discounts or incentives or prices obtained through a group purchasing organization ("GPO").**

148.  The DEFENDANTS regularly make  representations of false price and cost information  directly to the Medicare Part B Carriers.

149.  The DEFENDANTS also regularly make direct representations of false price and cost information directly to the various state Medicaid agencies that are relied upon in approving and paying claims.

150. In many instances, the kickbacks paid from Governments' funds were in excess of 1,000% over the providers' true costs and over the reasonable reimbursement amounts which the Governments intended to pay. The grossly excessive profits have led to a proliferation of illegal split fee arrangements between the drug manufacturers' customers and persons or entities who are in a position to refer patients. The split fee/kickbacks also serve as a financial inducement for the referrals of more patients and greater utilization of the products.

151. The knowledge of the DEFENDANTS is further demonstrated by their systematic and ongoing, written and verbal communications with customers whereby they encourage and induce them to submit claims to Medicare and Medicaid to receive the excessive payments resulting from the DEFENDANTS' false price and cost representations.

152. As an example of the DEFENDANTS' use of their false and fraudulent practices to market their products follows:

a) VAC purchased _____ directly from the manufacturer for approximately three years at a price ranging from $22.00 per gram in 1993 to $25.50 per gram in 1995. VAC continued purchasing _____ until there was a manufacturing shortage in 1995. At that time, _____ _____ VAC's representative from _____ referred VAC to F.F.F. Enterprises (hereinafter referred to as "FFF") because FFF had adequate supplies of _____ for VAC to purchase.

143

CIVIL ACTION NO. 95-1354-CIV-GOLD



      b)    In or about 1995, VAC began ordering ▇▇▇▇ from FFF through their sales representative, Maria Berei (hereinafter referred to as "Berei"). Berei also gave VAC prices for other manufacturers' ▇ products. VAC then began purchasing ▇▇▇▇▇▇ ▇▇▇ since the purchase price for ▇▇▇ was $5.00 to $6.00 less per gram.

      c)    After the shortage ended and ▇▇▇▇ realized that VAC was no longer purchasing ▇▇▇ but using ▇▇▇ she called T. Mark Jones on March 20, 1996 at 9:40 A.M. During this phone conversation, ▇▇▇ informed Jones that she was concerned with VAC's purchasing ▇▇▇ instead of ▇▇▇▇▇▇ She stated that, even though VAC could save a few dollars on the initial acquisition cost of ▇▇ VAC would not benefit from the amount of reimbursement related to ▇▇▇ greater AWP. She stated that ▇▇▇ AWP in the 1996 Red Book was $290.00 for 5 grams and ▇▇▇▇▇ AWP in 1996 was $340.00 for 5 grams. She stated that the larger spread from ▇▇▇ allows VAC to make $50.00 more per 5 gram purchases. ▇▇ stated that VAC needed to compare ▇▇▇ AWP to other manufacturers when purchasing ▇ for Medicaid patients since ▇▇▇ has the largest spread.

    153.   An example of the DEFENDANTS' admission that their price and cost representations are false follows:

      a)    On or about December 3, 1996, VAC's Bentley and Jones were contacted by Mr. Jerry Wells and Ms. Susan McLeod of the State of Florida's Medicaid Pharmacy Office. Mr. Wells and Ms. McLeod requested Bentley's and Jones' assistance

144

CIVIL ACTION NO. 95-1354-CIV-GOLD

in providing the State of Florida with truthful prices for the drug, ▮▮▮▮▮

▮▮▮▮▮

      b)    Mr. Wells remembered that Bentley had inquired of Mr. Wells a couple of years prior (in 1994) concerning the utilization of ▮ in the Florida Medicaid Pharmacy Program. Bentley informed Mr. Wells that the true prices being paid for ▮ by providers were significantly less than the Florida Medicaid Program's reimbursement, Bentley informed Mr. Wells that VAC's current cost was approximately $25.00 per gram. Bentley also informed Mr. Wells that the grossly excessive reimbursement by Florida's Medicaid Pharmacy Program was a concealed financial inducement for providers to increase the utilization of ▮ and pay illegal kickbacks to the prescribing physician. In response to Bentley's request, Mr. Wells provided Bentley with data for the utilization and expenditures of ▮ in the Florida Medicaid Pharmacy Program for the second quarter of 1994. The data indicated approximately 1.1 Million Dollars in utilization.

      c)    Since 1994, the utilization and cost to the Medicaid Program of ▮ has increased dramatically and has become a significant expenditure for the Florida Medicaid Pharmacy Program, approaching approximately 20 Million Dollars annually.

      d)    In response to the dramatic increase in utilization of ▮ the State examined its pricing reimbursement and upon review, Ms. Susan McLeod lowered the State's reimbursement from approximately $80.00 per gram to approximately $37.00 per gram.

145

e)     After the reduction of the ▮▮▮ reimbursement amount by Florida Medicaid, some if not all of the DEFENDANTS producing ▮▮▮ contacted Mr. Wells in an effort to reinstate the prior ▮▮▮ reimbursement prices.

f)     The State requested VAC to provide copies of invoices, catalogues and any other pricing information on ▮▮▮ in order to substantiate the State's reimbursement position for ▮▮▮

g)     The State Medicaid representatives used the information provided by VAC in their discussions with certain of the DEFENDANTS and, as a result, the manufacturers retreated from their contentions that the State should continue to pay exorbitant amounts for claims for ▮▮▮ and adjusted their price representations.

154.   **Patient Specific Examples Best Demonstrate the Huge Financial Inducements Created by the False Claim Schemes**: The financial inducement to those in a position to increase the utilization of the DEFENDANTS' drugs is illustrated by the following examples of common drug therapies for certain of the specified drugs:

a)     Patient "A" is diagnosed with Metastatic Gastric Carcinoma and prescribed a combination chemotherapy regimen to be given on three consecutive days every twenty-one to twenty-eight days for ten (10) cycles. The prescription for this therapy is:     ▮▮▮     120 mg/m2/day IV for 3 days every 21 - 28 days

300 mg/m2/day IV for 3 days every 21 - 28 days

500 mg/m2/day IV for 3 days every 21 - 28 days

Patient "A's" BSA = 1.98 m2.

146

**CIVIL ACTION NO. 95-1354-CIV-GOLD**

<u>Calculation of Each Drug's Dosage</u>:



120 mg x 1.98 x 3 days =   713 mg @   8 units of 100 mg

300 mg x 1.98 x 3 days = 1,782 mg @ 36 units of   50 mg

500 mg x 1.98 x 3 days = 2,970 mg @   6 units of 500 mg

| Relator's Cost of Providing These Three Drugs for One Cycle | | | |
|---|---|---|---|
| **DRUG** | **COMPANY** | **NDC#** | **TRUE COST $** |
| | | | $14.00 x 8 units = $112.00 |
| | | | $ 1.89 x 36 units = $ 68.04 |
| | | | $  0.79 x  6 units = $   4.74 |
| TOTAL COST FOR ONE CYCLE | | | **$184.78** |

| Medicare Allowable (Florida) for One Cycle | | | |
|---|---|---|---|
| **HCPCS** | **DRUG** | **MEDICARE ALLOWABLE** | **TOTAL** |
| | | x 8 units ($141.97 x 8) = | $ 1,135.76 |
| | | x 36 units ($21.43 x 36) = | $  771.48 |
| | | x 6 units   ( $1.55 x 6) = | $      9.30 |
| TOTAL MEDICARE (FLORIDA) ALLOWABLE | | | **$1,916.54** |

147

| Medicaid (Florida) Reimbursement for One Cycle | | | | |
|---|---|---|---|---|
| **DRUG** | **NDC #** | **COMPANY** | **MEDICAID REIMBURSEMENT** | **TOTAL** |
| | | | $112.52 x 8 = | $ 900.16 |
| | | | $62.49 x 36 = | $2,249.64 |
| | | | $3.21 x 6 = | $ 19.26 |
| TOTAL MEDICAID (FLORIDA) REIMBURSEMENT | | | | $3,169.06 |

| COMPARISONS OF RELATOR'S COST VS. MEDICARE ALLOWABLE AND MEDICAID REIMBURSEMENT FOR ONE (1) CYCLE: | | | | |
|---|---|---|---|---|
| RELATOR'S COST | vs | FLORIDA MEDICARE | vs | FLORIDA MEDICAID |
| $184.78 | | $1,916.54 | | $3,169.06 |

| COMPARISONS OF RELATOR'S COST VS. MEDICARE ALLOWABLE AND MEDICAID REIMBURSEMENT FOR TEN (10) CYCLES: | | | | |
|---|---|---|---|---|
| RELATOR'S COST | vs | FLORIDA MEDICARE | vs | FLORIDA MEDICAID |
| $1,847.80 | | $19,165.40 | | $31,690.60 |

The above example is of a chemotherapy regimen obtained from <u>Handbook of Commonly Used Chemotherapy Regimens</u>, F. Anthony Greco, M.D., Precept Press, 1996. It does not include any professional or dispensing fees, supportive drugs or intravenous fluids prescribed which are all separately reimbursable by Medicare and States' Medicaid Programs.

CIVIL ACTION NO. 95-1354-CIV-GOLD

      b)    Patient "B" is diagnosed with Colon Cancer and is prescribed a

chemotherapy regimen of ▮▮▮▮▮▮▮▮▮▮ once a week for six (6) cycles.  The

prescription for this therapy is:

        500 mg/m2 once a week for 6 weeks

        500 mg/m2 once a week for 6 weeks

  Patient "B's" BSA = 1.92 m2

  <u>**Calculation of Each Drug's Dosage Is**</u>:



        500 mg x 1.92 =   960 mg @ 20 units of  50 mg

        600 mg x 1.92 = 1,152 mg @   3 units of 500 mg

| Relator's Cost of Providing These Two Drugs for One Cycle | | | |
|---|---|---|---|
| **DRUG** | **COMPANY** | **NDC#** | **TRUE COST $** |
| | | | $ 1.89 x 20 units = $ 37.80 |
| | | | $ 0.79 x 3 units = $  2.37 |
| TOTAL COST FOR ONE CYCLE | | | **$40.17** |

| Medicare Allowable (Florida) for One Cycle | | | |
|---|---|---|---|
| **HCPCS** | **DRUG** | **MEDICARE ALLOWABLE** | **TOTAL** |
| | | x 20 units ($21.43 x 20) = | $  428.60 |
| | | x 3 units  ( $1.55 x 3) = | $    4.65 |
| TOTAL MEDICARE (FLORIDA) ALLOWABLE | | | **$  433.25** |

CIVIL ACTION NO. 95-1354-CIV-GOLD

| Medicaid (Florida) Reimbursement for One Cycle | | | | |
|---|---|---|---|---|
| **DRUG** | **NDC #** | **COMPANY** | **MEDICAID REIMBURSEMENT** | **TOTAL** |
|  |  |  | $62.49 x 20 = | $1,249.80 |
|  |  |  | $3.21 x 3 = | $     9.63 |
| TOTAL MEDICAID (FLORIDA) REIMBURSEMENT | | | | $1,259.43 |

| COMPARISONS OF RELATOR'S COST VS. MEDICARE ALLOWABLE AND MEDICAID REIMBURSEMENT FOR ONE (1) CYCLE: | | | | |
|---|---|---|---|---|
| RELATOR'S COST | vs | FLORIDA MEDICARE | vs | FLORIDA MEDICAID |
| **$40.17** | | **$433.25** | | **$1,259.43** |

| COMPARISONS OF RELATOR'S COST VS. MEDICARE ALLOWABLE AND MEDICAID REIMBURSEMENT FOR SIX (6) CYCLES (6 WEEKS): | | | | |
|---|---|---|---|---|
| RELATOR'S COST | vs | FLORIDA MEDICARE | vs | FLORIDA MEDICAID |
| **$241.02** | | **$2,599.50** | | **$7,556.58** |

The above example is of a chemotherapy regimen obtained from Journal of Clinical Oncology, 5: 1559-1565, 1987. It does not include any professional or dispensing fees, supportive drugs or intravenous fluids prescribed which are all separately reimbursable by Medicare and States' Medicaid Programs.

c)      Patient "C" is diagnosed with Small Cell Lung Cancer and is prescribed a chemotherapy regimen consisting of                    Cisplatin for five (5) days every twenty-one (21) days for four (4) cycles.   The prescription for this therapy is:

150

CIVIL ACTION NO. 95-1354-CIV-GOLD

████████      80 mg/m2/day for 5 days every 21 days x 4 cycles

Cisplatin      20 mg/m2/day for 5 days every 21 days x 4 cycles

Patient "C's" BSA = 1.96 m2.

**Calculation of Each Drug's Dosage:**

████████      80 mg x 1.96 x 5 days = 784 mg @ 8 units of 100 mg

Cisplatin      20 mg x 1.96 x 5 days = 196 mg @ 2 units of 100 mg

| Relator's Cost of Providing These Two Drugs for One Cycle | | | |
|---|---|---|---|
| DRUG | COMPANY | NDC# | TRUE COST $ |
| ████████ | | | $ 14.00 x 8 units = $112.00 |
| Cisplatin 100 mg | Bristol Myers | 00015-3221-22 | $284.34 x 2 units = $568.68 |
| TOTAL COST FOR ONE CYCLE | | | **$680.68** |

| Medicare Allowable (Florida) for One Cycle | | | |
|---|---|---|---|
| HCPCS | DRUG | MEDICARE ALLOWABLE | TOTAL |
| ████ | ████ | x 8 units ($141.97 x 8) = | $1,135.76 |
| J9062 | Cisplatin 50 mg | J9062 x 4 units ($165.63 x 4) = | $ 662.52 |
| TOTAL MEDICARE (FLORIDA) ALLOWABLE | | | **$1,798.28** |

| Medicaid (Florida) Reimbursement for One Cycle | | | | |
|---|---|---|---|---|
| DRUG | NDC # | COMPANY | MEDICAID REIMBURSEMENT | TOTAL |
| ████████ | | | $112.52 x 8 = | $900.16 |
| Cisplatin 100 mg | 00015-3221-22 | Bristol Myers | $316.42 x 2 = | $632.84 |
| TOTAL MEDICAID (FLORIDA) REIMBURSEMENT | | | | **$1,533.00** |

CIVIL ACTION NO. 95-1354-CIV-GOLD

| COMPARISONS OF RELATOR'S COST VS. MEDICARE ALLOWABLE AND MEDICAID REIMBURSEMENT FOR ONE (1) CYCLE: | | | | |
|---|---|---|---|---|
| RELATOR'S COST | vs | FLORIDA MEDICARE | vs | FLORIDA MEDICAID |
| $680.68 | | $1,798.28 | | $1,533.00 |

| COMPARISONS OF RELATOR'S COST VS. MEDICARE ALLOWABLE AND MEDICAID REIMBURSEMENT FOR FOUR (4) CYCLES: | | | | |
|---|---|---|---|---|
| RELATOR'S COST | vs | FLORIDA MEDICARE | vs | FLORIDA MEDICAID |
| $2,722.72 | | $7,193.12 | | $6,132.00 |

The above example is of a chemotherapy regimen obtained from Handbook of Commonly Used Chemotherapy Regimens, F. Anthony Greco, M.D., Precept Press, 1996. It does not include any professional or dispensing fees, supportive drugs or intravenous fluids prescribed which are all separately reimbursable by Medicare and States' Medicaid Programs.

d)　　Patient "D" is diagnosed with Guillian Barre Syndrome and is prescribed

████████████████ once a month.　The prescription reads 400 mg/kg daily for five (5) days every month.

Patient D's weight is 75 Kg.

Calculation of Dosage:

████ 400 mg X 75 = 30 gm daily X 5 days = 150 gm/month

152

**CIVIL ACTION NO. 95-1354-CIV-GOLD**

| Relator's Cost of Providing IVIG for One Cycle (Five Days) | | | |
|---|---|---|---|
| **DRUG** | **COMPANY** | **NDC#** | **TRUE COST $** |
| | | | $318.00 per 10 gm X 15 = $4,770.00 |
| TOTAL COST FOR ONE CYCLE | | | **$4,770.00** |

| Medicare Allowable (Florida) for One Cycle | | | |
|---|---|---|---|
| **HCPCS** | **BIOLOGICAL** | **MEDICARE ALLOWABLE** | **TOTAL** |
| | | X 300 Units ($37.25 x 300) = | $11,175.00 |
| TOTAL MEDICARE (FLORIDA) ALLOWABLE | | | **$11,175.00** |

| Medicaid (Florida) Reimbursement for One Cycle | | | | |
|---|---|---|---|---|
| **BIOLOGICAL** | **NDC #** | **COMPANY** | **MEDICAID REIMBURSEMENT** | **TOTAL** |
| | | | $845.50 x 15 = | $12,682.50 |
| TOTAL MEDICAID (FLORIDA) REIMBURSEMENT | | | | **$12,682.50** |

| COMPARISONS OF RELATOR'S COST VS. MEDICARE ALLOWABLE AND MEDICAID REIMBURSEMENT FOR TWELVE (12) CYCLES (One Year): | | | | |
|---|---|---|---|---|
| RELATOR'S COST | vs | FLORIDA MEDICARE | vs | FLORIDA MEDICAID |
| **$57,240.00** | | **$134,100.00** | | **$152,190.00** |

CIVIL ACTION NO. 95-1354-CIV-GOLD

The above example is of a chemotherapy regimen obtained from <u>The Future of Immunotherapy, Focus on Immune</u>, Council of Ohio Colleges of Pharmacy, 1996. It does not include any professional or dispensing fees, supportive drugs or intravenous fluids prescribed which are all separately reimbursable by Medicare and States' Medicaid Program.

### Subsection 7e

### The Illegal Profit Spreads Are Often Enhanced By Additional Unlawful Financial Inducements Such As Free Goods, Direct Monetary Payments, Rebates, And Agreements To Falsify Invoices

155. The DEFENDANTS' false and misleading price and cost representations, as alleged above, create a profit spread between the cost of the drug to the provider and the reimbursement paid by Medicare and Medicaid. The amount of the financial inducement is thus paid from public funds under circumstances where paying or arranging such payments is expressly prohibited by law. The DEFENDANTS further act to increase the illegal profit spread, over and above that resulting from their false price and cost reports , through additional unlawful financial inducements such as:

a) Providing or arranging for the delivery of free goods in exchange for the purchase of the DEFENDANTS' specified drugs, the value of which is concealed from the Government, resulting in an additional spread between the true acquisition cost of the specified drugs and the false prices upon which Medicare and Medicaid reimburse.

154

b)     Making direct monetary payments to the provider ordering the drugs
and concealing the true purpose of the payment by classifying it as a "marketing grant",
"educational grant", "administrative fee", "research grant" or other name when the payment
is, in truth, a financial inducement for ordering the drugs. These payments further reduce
the providers' costs and are concealed from the Government.

c)     Paying rebates to the providers which are concealed from the
Government, further reducing the true cost of the drug and increasing the illegal profit
spread.

d)     Falsifying invoice prices to conceal additional reductions in the
provider's true acquisition cost of the drugs.

156.    Each of the methods employed by the DEFENDANTS in paying illegal
financial inducements have the effect of misleading the Medicare and Medicaid Programs
about the providers' cost of the drugs and of impeding the Programs' ability to estimate
acquisition costs. The DEFENDANTS' actions result in claims being paid at exorbitant
amounts.

## Subsection 7f

### The DEFENDANTS Intentionally Impede Government Efforts
### to Accurately Estimate Acquisition Costs and Deprive the Government of the
### Benefits of Truthful Price and Cost Representations

157.    The DEFENDANTS have each knowingly and actively impeded the efforts
of the Government: to arrive at reasonable estimates of acquisition cost in setting
payment amounts for claims for the specified drugs; to benefit from drug price competition;

155

and to use the Government's huge volume purchasing power for the benefit of the taxpayer. The DEFENDANTS' acts include the knowing reporting of inflated price and cost information alleged throughout this Amended Complaint and in many instances include additional acts and omissions such as those alleged in this Subsection.

158.   As alleged elsewhere in this Amended Complaint, DEFENDANTS GLAXO and SMITH KLINE have each knowingly provided falsely inflated price and cost information about the injectable form of their respective anti-emetic drugs that are designed to counteract nausea and vomiting in cancer patients undergoing chemotherapy treatments. During 1997 a third DEFENDANT, HOECHST, brought a similar anti-emetic, Anzemet, into the market. From the outset, HOECHST caused its customers to receive inflated reimbursements for injectable Anzemet in order to induce them to provide it to patients rather than GLAXO's Zofran or SMITHKLINE'S Kytril. Anzemet is manufactured in both tablet and injectable form. However, the tablet form  is generally dispensed through retail pharmacies that have no ability to cause Anzemet to be prescribed over Kytril or Zofran. Accordingly,  HOECHST made truthful price and cost representations about Anzemet tablets.

159.   The Relator's investigation of HOECHST's actions revealed a startling example of a DEFENDANT'S blatant acts to impede Government officials in their attempts to discharge their duty to reasonably estimate acquisition costs.

160.   During the latter part of 1997, the Relator, due to its status as an industry insider, became aware that HOECHST was attempting to induce purchases of its

CIVIL ACTION NO. 95-1354-CIV-GOLD

injectable Anzemet by falsely reporting its price to Government programs in order to create a windfall profit spread for providers who ordered the drug for Medicare and Medicaid patients. The Relator provided the Government with a written solicitation from Oncology Therapeutics Network, dated November/December 1997, announcing the availability of Anzemet to industry insiders including the Relator.

161. At the suggestion of the Relator, Mr. Jerry Wells, the State of Florida's Medicaid Pharmacy Program Administrator, directly contacted DEFENDANT HOECHST and informed its representative that Florida Medicaid needed accurate and truthful wholesale price information about Anzemet in order to verify the pricing information that Florida had received through First Databank. In response to this request, on December 17, 1997 a HOECHST representative provided Mr. Wells with written representations about the price of Anzemet, which contain falsely inflated prices for the injectable. DEFENDANT HOECHST made AWP and Net Price representations about six different versions of its oral Anzemet and also about its one version of the injectable, NDC# 0088-1206-32, 100mg/5ml vial. Florida's Medicaid Program would ordinarily estimate wholesale acquisition cost ( "WAC") by adding 7% to DEFENDANT HOECHST's representation of Net Price which in the instant case leads to a reimbursement of $133.62 for the injectable 100mg/5ml vial.

162. The price list for Anzemet provided by Oncology Therapeutics Network to industry insiders, but not to Government claims officials, demonstrated that the truthful wholesale price is seventy dollars ($70.00) for one unit of the injectable for Anzemet.

157

**CIVIL ACTION NO. 95-1354-CIV-GOLD**

163.   The following Table 4 summarizes the calculation of reimbursement for injectable and tablet Anzemet based upon HOECHST'S representations and based upon the truthful prices for the injectable. Table 4 also demonstrates that Medicaid reimbursement for Anzemet tablets is consistent with the cost to the provider while HOECHST'S false representations of price and cost cause excessive reimbursement for its injectable:

**Table No. 4**

**Price Representations for Anzemet Injectable**

| NDC NO: | Unit Size/ Type | Quantity | Net Price as Represented to Florida Medicaid | True Wholesale Price | Variance |
|---------|-----------------|----------|----------------------------------------------|----------------------|----------|
| 0088-1206-32 | 100mg/5mL Injectable | 1 | $124.90 | $70.00 | Represented price **78% higher** than true wholesale price. |

**Price Representations for Anzemet Tablets**

| NDC NO: | Unit Size/ Type | Quantity | Net Price as Represented to Florida Medicaid | True Wholesale Price | Variance |
|---------|-----------------|----------|----------------------------------------------|----------------------|----------|
| 0088-1203-05 | 100 mg Tablets | 5 | $275.00 | $289.75 | Represented price **5% less** than true wholesale price. |
| 0088-1203-29 | 100mg Tablets/ Blister Pack | 5 | $275.00 | $289.75 | Represented price **5% less** than true wholesale price. |
| 0088-1203-43 | 100 mg Tablets/ Unit Dose | 10 | $550.00 | $579.50 | Represented price **5% less** than true wholesale price. |

158

CIVIL ACTION NO. 95-1354-CIV-GOLD

## Impact of Anzemet Manufacturer's Price Representations
## On Medicaid Reimbursement

| ANZEMET INJECTION | | | | | |
|---|---|---|---|---|---|
| **NDC NO:** | **Unit Size/ Type** | **Reimbursement Based on Net Prices Represented to Florida Medicaid** | **True Wholesale Price** | **The Spread** | **% Spread** |
| 0088-1206-32 | 100mg/5ml Injectable | $133.64 | $70.00 | $63.64 | 91 % |

| ANZEMET TABLETS | | | | | |
|---|---|---|---|---|---|
| **NDC NO:** | **Unit Size/ Type** | **Reimbursement Based on Net Prices Represented to Florida Medicaid** | **True Wholesale Price** | **The Spread** | **% Spread** |
| 0088-1203-05 | 100 mg Tablets | $294.25 | $289.75 | $4.50 | 1.5% |
| 0088-1203-29 | 100mg Tablets/ Blister Pack | $294.25 | $289.75 | $4.50 | 1.5% |
| 0088-1203-43 | 100 mg Tablets/ Unit Dose | $588.50 | $579.50 | $8.50 | 1.5% |

164.    Some state Medicaid programs have gone to exceptional lengths in their

efforts to   verify that drug manufacturers provide valid price and cost information for

reimbursement purposes. By  way of example, the Texas Medicaid authorities, during the

time at issue in this Amended Complaint, required each of the DEFENDANTS  to certify,

in writing, the accuracy of their price and cost representations as a condition to their drugs

being covered for reimbursement. The Relator's investigation has revealed that each of

CIVIL ACTION NO. 95-1354-CIV-GOLD

the DEFENDANTS, when responding to Texas, either affirmatively lied about their true prices, or omitted material information in order to mislead the Texas Medicaid officials.

165. The State of Texas required the DEFENDANTS to complete a specific form regarding the prices of their drugs. Immediately before the required signature by the DEFENDANTS' representatives is the following language:

> "I hereby certify that the information submitted is correct to the best of my knowledge... I also agree to inform the Texas Department of Health of any changes in......price....within fifteen (15) days of such change."

166. The State of Texas pays reimbursement for drugs covered by its Vendor Drug Program at the lesser of the provider's usual and customary charge or Estimated Acquisition Cost ("EAC"). In Texas' Pharmacy Provider Handbook, EAC is defined as either the Wholesale Estimated Acquisition Cost ("WEAC") or the Direct Estimated Acquisition Cost ("DEAC"). WEAC is the average price paid by providers purchasing a drug from a wholesaler. DEAC is the average price paid by a provider purchasing the drug directly for the drug's manufacturer.

167. Had the DEFENDANTS truthfully disclosed the price and cost information about the specified drugs, Texas Medicaid would have set reimbursement amounts for the specified drugs consistent with a reasonable estimation of acquisition cost. Because each of the DEFENDANTS having a duty to make truthful disclosures made false statements or omissions about the specified drugs, Texas Medicaid reimbursement has been paid at substantially greater amounts than intended by applicable law and Texas Medicaid policy.

160

CIVIL ACTION NO. 95-1354-CIV-GOLD

168.    The Relator has provided the United States and Texas government authorities with sufficient information to identify the specific false statements and omissions of each DEFENDANT. A representative example is that of DEFENDANT ABBOTT'S false statements for the price of its injectable drug Furosemide made in its written certification of drug prices to Texas Medicaid. ABBOTT knowingly and falsely represented to Texas Medicaid that the price to wholesalers and direct to pharmacies of Furosemide, NDC No. 00074-6054-02, was $82.75 for twenty five of the 10 mg/2ml vials when ABBOTT knew that its true price was $27.48 and substantially less than $81.75. The Relator was, at all times from June 1, 1994 through May 31, 1997, able to purchase ABBOTT's Furosemide, NDC No: 00074-6054-02, for only $27.48 through a group purchasing organization.

169.    The United States Congress has attempted to assist the States' Medicaid programs in limiting reimbursement amounts for prescription drugs to a reasonable estimate of acquisition cost, by empowering the Health Care Financing Administration to set a "Federal Upper Limit" ("FUL") for drugs paid for by Medicaid. HCFA has not established a FUL for most of the infusion, injectable and biological drugs at issue in this case. However, some of the DEFENDANTS have expanded the false claims scheme to certain oral prescription drugs for which an FUL has been set. These oral drugs are dispensed by retail pharmacies and the creation of a spread may financially induce the pharmacy to dispense the generic version with the greatest profit spread between acquisition cost and the FUL. False inflated price reports cause the FUL to be set at a

higher amount than would be the case if the DEFENDANT provided truthful prices. The

Government attempt to limit amounts paid for claims is thus circumvented.

170. HCFA's description of the FUL program in its current web site states the

applicable government claims policy :

> "In 1987, regulations limited the amount which Medicaid could reimburse for
> drugs with available generic drugs under the federal upper limit program.
> These limits are intended to assure that the Federal government acts as a
> prudent buyer of drugs. The concept of the upper limits program is to
> achieve savings by taking advantage of the current market prices. Until the
> passage of the Omnibus Budget Reconciliation Act of 1990 (OBRA '90), the
> Federal Upper Limit (FUL) could be established only if all generic versions
> of a drug product had been classified as therapeutically equivalent (A-rate)
> by the FDA in its publication "Approved Drug Products with Therapeutic
> Equivalence Evaluations" and at least three suppliers were listed in the
> current editions of published national compendia. OBRA '90 expanded that
> criteria and permitted the establishment of a FUL for a drug product if there
> are three (or more) generic versions of the product rated therapeutically
> equivalent (A-rated) regardless of the ratings of other versions (B-rated) and
> at least three suppliers are listed in the current editions of published national
> compendia."

171. A representative example of the DEFENDANTS' efforts to deprive the

Government of the benefit of the Federal Upper Limit involves the drug Atenelol. In a letter

dated November 7, 1996, Apothecon (a subsidiary of DEFENDANT BRISTOL-MYERS)

made false price representations about the company's drug, Atenolol to the State of

Florida Medicaid Agency. Application of Florida's methodology of WAC plus 7%, to the

prices represented by Apothecon results in reimbursement for one hundred (100) 50 mg

tablets, old NDC #00003-5040-50, new NDC#62269-0256-24, of $59.65 (WAC = $55.75

+ 7%, = $59.65) plus the professional dispensing fee. However, Atenolol falls under the

CIVIL ACTION NO. 95-1354-CIV-GOLD

FUL program and its reimbursement was limited as of January, 1997 to $0.0464 per 50 mg tablet or $4.64 per one hundred (100) 50 mg tablets.

172.    After having been alerted to the false claim scheme by the Relator, representatives of the State of Florida's Medicaid Program refused to cover Bristol's generic Atenolol until such time as the State received from DEFENDANT BRISTOL-MYERS what the State considered to be DEFENDANT BRISTOL-MYERS truthful prices for Atenolol. The fact that Florida was not covering DEFENDANT BRISTOL-MYERS Atenolol led to complaints to DEFENDANT BRISTOL-MYERS from pharmacies in Florida who had dispensed DEFENDANT BRISTOL-MYERS Atenolol to Florida Medicaid recipients and who were receiving denials for payment by Unisys, the State's fiscal agent.

173.    Approximately one month later, a State of Florida official received a telephone call from a person who stated he represented DEFENDANT BRISTOL-MYERS and requested immediate coverage of Atenolol. The Florida Medicaid official stated she would not cover the drug unless she received truthful prices. The person who represented DEFENDANT BRISTOL-MYERS stated words to the effect, "What does it matter? This drug is covered by the FUL program." The Florida official stated that it did matter as it could affect not only the reimbursement amount the State paid for Atenolol but also, if all manufacturers followed DEFENDANT BRISTOL-MYERS course and conduct of making false pricing representations, it would cause the FUL to be set at an inflated amount and completely frustrate the Government policy implemented by the FUL program.

163

CIVIL ACTION NO. 95-1354-CIV-GOLD

174.   Only when it became clear to the DEFENDANT BRISTOL-MYERS representative that the Florida official was standing her ground, did DEFENDANT BRISTOL-MYERS provide a written disclosure dated  December 5, 1996 of the  truthful prices. Applying Florida's Medicaid reimbursement methodology to DEFENDANT BRISTOL-MYERS truthful prices, the State pays $4.24 for one hundred (100) 50 mg Atenolol tablets (WAC  $3.96 + 7% = $4.24).   The truthful prices saved the U.S. Government and the State of Florida $0.40 for each prescription of one hundred (100) 50 mg tablets.

175.   The persistence of the Florida Medicaid representatives curtailed BRISTOL MYERS from circumventing the protections of the FUL program.

176.   The DEFENDANTS' continued exploitation of false claim scheme to impede Government efforts to estimate costs is evidenced by pricing representations made for the generic injectable drug "Acyclovir." The Brand name for Acyclovir is Zovirax manufactured by DEFENDANT GLAXO. DEFENDANT GLAXO  reported 1996 sales of $529,300,000.00 for Zovirax. On April 22, 1997 DEFENDANT GLAXO'S Zovirax patent expired.  Acyclovir is a anti-viral drug that is widely prescribed to persons who are suffering with the HIV disease.  Prior to the patent expiration, VAC's wholesale cost for 1 gm of Zovirax was $103.67 and its AWP was $113.20 (a difference of 9%).  Defendant ABBOTT was one of the first companies to announce distribution of a generic injectable Acyclovir.  On or about February 19, 1997, Defendant ABBOTT set a true pre distribution price of $70.00 for 1 gm which was approximately 30% less than DEFENDANT GLAXO'S  brand Zovirax.  However

164

ABBOTT fraudulently and falsely reported to Medical Economics and First Data Bank a Direct Price of $160.00 for 1 gm which caused Medical Economics and First Data Bank to set a false and fraudulent AWP of $190.00 for 1 gm or approximately 70% more than the Brand. Before ABBOTT could begin distribution of its generic injectable Acyclovir, another drug manufacturer announced distribution of a competing generic injectable Acyclovir at an initial price less than ABBOTT's. On or about April 28, 1997, ABBOTT reacted to the market conditions of price competition by lowering its true price to providers from $70.00 to $60.00 for 1 gm. Despite ABBOTT's reduction in prices to providers, ABBOTT continued to publish its original grossly inflated false and fraudulent representations of cost and price. During a telephone conversation between VAC's Bentley and an ABBOTT marketing/sales representative, on or about May 30, 1997, Bentley was informed that ABBOTT was committed to capturing market share by "widening the spread for providers" by lowering the true price while inflating the price represented to Medicare and Medicaid. The following charts contain the specific allegations demonstrating the Acyclovir fraud:

CIVIL ACTION NO. 95-1354-CIV-GOLD

| BRAND | | | | | |
|---|---|---|---|---|---|
| COMPANY | DRUG | NDC | RED BOOK AWP | VEN-A-CARE COST | FLORIDA MEDICAID |
| Glaxo Wellcome | Zovirax 500 mg | 00173-0995-01 | $ 56.60 | $ 47.20 | $ 50.47083 |
| Glaxo Wellcome | Zovirax 1 gm | 00173-0952-01 | $113.20 | $103.67 | $100.94059 |

## *VERSUS*

| GENERIC | | | | | | |
|---|---|---|---|---|---|---|
| COMPANY | DRUG | NDC | RED BOOK "AWP" | "DP" | VEN-A-CARE COST | FLORIDA MEDICAID |
| Abbott | Acyclovir Sodium 500 mg | 00074-4427-01 | $95.00 | $80.00 | ~~$35.00~~ $30.00 | $ 84.5500 |
| Abbott | Acyclovir Sodium 1,000 mg (1 gm) | 00074-4452-01 | $190.00 | $160.00 | ~~$70.00~~ $60.00 | $169.1000 |

177. The DEFENDANTS' actions have also, in many instances, deprived the Government of the full benefit of the Medicaid rebate program mandated by the Omnibus Budget Reconciliation Act of 1990 ("OBRA '90"). OBRA 90 was implemented after numerous Congressional hearings. Congress concluded that the Medicaid Program, as the largest single purchaser of prescription drugs in the United States should be entitled to the same discounts that were routinely given by the drug manufacturers to large purchasers (See Skyrocketing Drug Prices: Hearings Before the Special Committee on Aging, United

166

CIVIL ACTION NO. 95-1354-CIV-GOLD

States Senate, 101st Congress, 290-297 (1989). As a result, Congress, in the Omnibus

Budget Reconciliation Act of 1990 ("OBRA '90"), established the Medicaid Rebate Program

PL-101-508,104 Stat. 1388 (1990) to give the State Medicaid Programs the "benefit of the

best price (emphasis added) for which a manufacturer [sold] a prescription drug to

any....private purchaser." H.R. Rep. No. 101-881, at 96 (1990). The Rebate Program

requires all manufacturers, as a condition to their drugs being paid for (covered) by

Medicaid, to enter into a Rebate Agreement with the Secretary of the Department of Health

and Human Services and pay a rebate amount to each State on a quarterly basis based

on the following formula:

  a)  Basic rebate for single source drugs and innovator multiple source

drugs (Brand drugs) shall be equal to the product of-

      (i) the total number of units

      (ii) the difference between the average manufacturer price and the best

price with minimum rebate percentages ranging from 12.5% (12/31/1990-09/30/1992) to

15.1% after December 31, 1995.

  b)  Basic rebate other drugs (generic drugs) shall be equal to the product

of-

      (i) the total number of units

      (ii) the average manufacturer price

      (iii) 10% (before January 1, 1994)

      (iv) 11% (after December 31, 1993)

167

Best price ("BP") is generally defined as the lowest price (inclusive of cash discounts, free goods volume discounts etc.) available from the manufacturer during the rebate period to any wholesaler, retailer, provider, health maintenance organization, nonprofit entity, etc excluding direct government purchases.

178. Average manufacturer price ("AMP") is generally defined as the average price paid to the manufacturer during the rebate period by wholesalers for drugs distributed to the retail pharmacy class of trade, after deducting customary prompt pay discounts. Manufacturers report their BP and AMP to HCFA on a quarterly basis. HCFA, in turn, calculates the rebate amount either AMP minus BP (or the 15.1% minimum) for Brand drugs or AMP multiplied by 11% for generic drugs and forwards the figures by NDC number to the States. The States multiply the rebate amount by the number of units that the State paid for during the quarter to determine the rebate amount due and submit the requested amount to the manufacturer. The manufacturers remit this payment on a quarterly basis, withholding any disputed amount.

179. The DEFENDANTS have each participated in the Medicaid Rebate Program and as such were required to calculate their drugs BP and/or AMP. The DEFENDANTS have additionally calculated other various representations of prices such as AWP, WAC, DP and list prices that are the industry benchmarks used for establishing reimbursements for the Medicare and Medicaid Programs. The DEFENDANTS reported their representations of prices such as AWP, WAC, DP and list prices to First Data Bank and Red Book with the knowledge that First Data Bank and Red Book were providing the

168

CIVIL ACTION NO. 95-1354-CIV-GOLD

DEFENDANTS representations to the State Medicaid Programs and the Medicare Carriers for the purpose of establishing Medicaid and Medicare reimbursements.

180. WAC is defined as wholesaler acquisition cost. AMP is defined as the average price paid to the manufacturer by wholesalers for drugs distributed to the retail pharmacy class of trade, after deducting customary prompt pay discounts. Therefore if a manufacturer honestly reports its AMP and WAC they should be very close to, if not the same, amount. However, for Medicaid and Medicare reimbursement purposes the DEFENDANTS have in many instances falsely and fraudulently represented inflated (or caused to be inflated) AWP's and WAC's that are in some cases more than 500% over their AMP's, thus causing the States' Medicaid Programs after rebate net cost to be many times greater then the DEFENDANTS' Best Price. The false pricing scheme by the DEFENDANTS has fraudulently thwarted the Congressional intent of providing the States with the benefit of the DEFENDANTS' best prices. The following Subparagraphs a through d provide examples of how the false price representations of DEFENDANTS ABBOTT, BAYER,                              have caused Medicaid reimbursement to be based on WAC's that substantially exceed AMP's used for Medicaid rebate purposes. As a result, the State's Medicaid programs have been deprived of the substantial fiscal benefits intended and required by the Medicaid Rebate Statute:

**CIVIL ACTION NO. 95-1354-CIV-GOLD**

## a.) <u>Abbott's false prices affect Medicaid Rebate calculation.</u>

### EXAMPLE 1 <u>ABBOTT'S FALSE AND FRAUDULENT STATEMENTS</u>
### Abbott's Vancomycin HCL
#### NDC # 00074-6533-01, 1998 "AWP" = $69.31 1998 "WAC" = $60.24
#### 1998 REBATE AMOUNT = $0.66 ea.

In this example, the States reimburse at the false and fraudulent prices represented by Abbott, either through AWP minus a percentage or WAC plus a percentage.



### • EXAMPLE 2 <u>IF STATES USED TRUE PRICES</u>
### Abbott's Vancomycin HCL
#### NDC # 00074-6533-01, 1998 WHOLESALE PRICE = $7.40 (Florida Infusion)
#### 1998 REBATE AMOUNT = $0.66 ea.

In this example, the States reimburse at a truthful estimated acquisition cost as illustrated by Florida Infusion prices, pursuant to 42 CFR 447.331.



b.) **Bayer's false prices affect Medicaid Rebate calculation.**

**EXAMPLE 1  BAYER'S FALSE AND FRAUDULENT STATEMENTS**
**Bayer Gamimune N 10%,100 mg/ml.,100 ml**
**NDC # 00026-0648-71, 1998 "AWP" = $900.00 1998 "WAC" = $ 744.93**
**1998 REBATE AMOUNT = .503836 per ml = $ 50.38**
In this example, the States reimburse at the false and fraudulent prices represented by Bayer,
either through AWP minus a percentage or WAC plus a percentage.



**EXAMPLE 2  IF STATES USED TRUE PRICES**
**Bayer Gamimune N 10%,100 mg/ml.,100 ml**
**NDC # 00026-0648-71  1998 WHOLESALE PRICE = $370.00 (Florida Infusion)**
**1998 REBATE AMOUNT = .503836 per ml = $ 50.38**
In this example, the States reimburse at a truthful estimated acquisition cost as illustrated by
Florida Infusion prices, pursuant to 42 CFR 447.331.





CIVIL ACTION NO. 95-1354-CIV-GOLD



181.    Drug manufacturers who wish to sell their products to the Federal Government healthcare providers such as the Department of Defense Hospitals and the Veterans Administration, are required by law to sell at or below their lowest prices to their best commercial customers. The law is implemented through the Federal Supply Schedule ("FSS"). The DEFENDANTS' representations about their lowest prices are included on the FSS for each of the drugs.

182.    The DEFENDANTS' prices to some customers, after reduction for concealed financial inducements, resulted in true prices that were below the prices reported for inclusion on the FSS resulting in a false FSS price. This caused the Government to pay FSS based claims at inflated amounts. Accordingly, the DEFENDANTS who reported false FSS prices are liable for additional false claims damages in the amount by which their FSS price representations exceeded their true prices .

183.    For many of the specified drugs, the DEFENDANTS' false representations of price and cost caused the Medicare Program to pay and approve claims at such exorbitant amounts that the 20% co-payment paid by the patient exceeded the true price of the drugs. A representative example is alleged in Table No. 5 below lists some of the specified drugs, the amount approved in 1996 by Florida Medicare, the 20% co-payment paid by the patient, and the true price paid by the Relator:

CIVIL ACTION NO. 95-1354-CIV-GOLD

TABLE NO. 5

DRUGS WHERE THE MEDICARE PROGRAM'S
20% CO-PAYMENT
EXCEEDS THE TOTAL PRICE OF THE DRUG

| Drug | HCPCS Code | 1996 Florida Medicare Allowable | 20% Co-Payment | 1996 Relator's Cost |
|------|-----------|-------------------------------|----------------|---------------------|
| | | | | |
| Sodium Chloride 0.9% 1000 ml | J7030 | $ 11.06 | $ 2.21 | $ 0.95 |
| Sodium Chloride 0.9% 500 ml | J7040 | $ 10.14 | $ 2.03 | $ 0.79 |
| 5% Dextrose/ Sodium Chloride 0.9% 500 ml | J7042 | $ 10.24 | $ 2.05 | $ 0.78 |
| Sodium Chloride 0.9% 250 ml | J7050 | $  9.43 | $ 1.89 | $ 0.78 |
| 5% Dextrose in Water 500 ml | J7060 | $  9.98 | $ 1.99 | $ 0.75 |
| 5% Dextrose in Water 1000 ml | J7070 | $ 11.23 | $ 2.25 | $ 0.95 |
| Lactated Ringers 1000 ml | J7120 | $ 12.43 | $ 2.48 | $ 1.02 |
| Acetylcysteine 20% per ml | J7615 | $  1.37 | $ 0.27 | $ 0.26 |
| Metaproterenol Sulfate 0.4% | J7670 | $  1.23 | $ 0.25 | $ 0.10 |

| Drug | HCPCS Code | 1996 Florida Medicare Allowable | 20% Co-Payment | 1996 Relator's Cost |
|---|---|---|---|---|
| Metaproterenol Sulfate 0.6% | J7672 | $ 1.23 | $ 0 .25 | $ 0.10 |
| Doxorubicin 10 mg | J9000 | $ 45.08 | $ 9.02 | $ 9.00 |
| Doxorubicin 50 mg | J9010 | $225.40 | $45.08 | $45.00 |

184.    In many cases the DEFENDANTS' false claims scheme have caused the Government to pay claims for generic equivalents of the specified dugs in amounts greater than the band name version of the drug and the DEFENDANTS have thus deprived the Government of the expected savings arising from utilization of generics. The following Table 6 contains some examples of this significant impact of the DEFENDANTS' false claim scheme:

176

CIVIL ACTION NO. 95-1354-CIV-GOLD

## TABLE NO. 6

### THE MEDICARE AND MEDICAID PROGRAMS
### DUPED INTO PAYING AS MUCH OR MORE
### FOR GENERIC DRUGS THAN THEIR EQUIVALENT BRAND

| DRUG: ETOPOSIDE HCPCS J9181, J9182 | | | | |
|---|---|---|---|---|
| BRAND:  VEPESID | | | | |
| COMPANY | SIZE | NDC # | AWP 1996 Red Book | RELATOR'S COST |
| Bristol Myers | 100 mg | 00015-3095-20 | $136.49 | $23.00 |
| Bristol Myers | 500 mg | 00015-3061-20 | $665.38 | $115.00 |

| GENERIC:  ETOPOSIDE | | | | |
|---|---|---|---|---|
| COMPANY | SIZE | NDC # | AWP 1996 Red Book | RELATOR'S COST |
| | | | $136.49 | $16.50 |
| | | | $665.38 | $86.50 |
| | | | $141.97 | $18.00 |
| | | | $140.00 | $34.00 |

177

CIVIL ACTION NO. 95-1354-CIV-GOLD



| DRUG: VANCOMYCIN, HCPCS J3370 | | | | |
|---|---|---|---|---|
| BRAND:  VANCOCIN | | | | |
| COMPANY | SIZE | NDC # | AWP 1996 Red Book | RELATOR'S COST |
| | | | $7.80 | $6.50 |
| | | | $15.61 | $14.13 |

| GENERIC:  VANCOMYCIN | | | | |
|---|---|---|---|---|
| COMPANY | SIZE | NDC # | AWP 1996 Red Book | RELATOR'S COST |
| Abbott | 500 mg | 00074-4332-01 | $31.44 | $3.51 |
| Abbott | 1 gm | 00074-6533-01 | $62.86 | $7.01 |

CIVIL ACTION NO. 95-1354-CIV-GOLD

| DRUG: PENTAMIDINE | | | | |
|---|---|---|---|---|
| BRAND: PENTAM 300 | | | | |
| COMPANY | SIZE | NDC # | AWP 1996 Red Book | RELATOR'S COST |
| ███████ | | | $98.75 | $49.00 |

| GENERIC: PENTAMIDINE | | | | |
|---|---|---|---|---|
| COMPANY | SIZE | NDC # | AWP 1996 Red Book | RELATOR'S COST |
| Abbott | 300 mg | 00074-4548-01 | $113.54 | $43.00 |

| DRUG: TOBRAMYCIN SULFATE, HCPCS J3260 | | | | |
|---|---|---|---|---|
| BRAND: NEBCIN | | | | |
| COMPANY | SIZE | NDC # | AWP 1996 Red Book | RELATOR'S COST |
| ███████ | | | $7.28 | $6.07 |

| GENERIC: TOBRAMYCIN SULFATE | | | | |
|---|---|---|---|---|
| COMPANY | SIZE | NDC # | AWP 1996 Red Book | RELATOR'S COST |
| Abbott | 40 mg/ml 80 mg | 00074-3578-01 | $9.83 | $3.63 |

179

| DRUG: AMIKACIN SULFATE | | | | |
|---|---|---|---|---|
| BRAND: AMIKIN | | | | |
| COMPANY | SIZE | NDC # | AWP 1996 Red Book | RELATOR'S COST |
| Bristol Myers | 250 mg/ml 2 ml | 00015-3020-20 | $46.99 | $13.25 |

| GENERIC: AMIKACIN SULFATE | | | | |
|---|---|---|---|---|
| COMPANY | SIZE | NDC # | AWP 1996 Red Book | RELATOR'S COST |
| Abbott | 250 mg/ml 2 ml | 00074-1956-01 | $99.25 | $12.00 |
| | | | $63.75 | $14.00 |

185. The DEFENDANTS' false claims scheme has also deprived the Government of the benefits of normal price competition causing it in some cases to pay thousands of percent above the price that would be set by normal market forces, but for the DEFENDANTS' false price and cost representations.

186. The Government and its health program beneficiaries are damaged when the DEFENDANTS create a financial inducement for providers to order patented drugs by continually increasing the spread over time. This is the case with DEFENDANTS' anti-emetic drug Zofran as exhibited by the following Table No. 7.

180

**CIVIL ACTION NO. 95-1354-CIV-GOLD**

## TABLE NO. 7

| Year | Drug | Florida Medicaid NDC Number and Florida Medicare HCPCS Code | First Data Bank AWP | Glaxo/ Cerenex's "Net Wholesale" | VAC's Wholesale Cost | Florida Medicaid Payment | Florida Medicare Payment |
|------|------|------|------|------|------|------|------|
| 1993 | Zofran 40 mg | 00173-0442-00 J2405 | $198.00 | | $176.80 | $185.02 | $198.00 |
| 1994 | Zofran 40 mg | 00173-0442-00 J2405 | $214.76 | $178.97 | $172.92 | $191.49 | $214.80 |
| 1995 | Zofran 40 mg | 00173-0442-00 J2405 | $233.02 | | $167.00 | $207.77 | $233.20 |
| 1996 | Zofran 40 mg | 00173-0442-00 J2405 | $233.02 | $203.79 | $165.00 | $217.95 | $233.20 |
| 1997 | Zofran 40 mg | 00173-0442-00 J2405 | $244.43 | | $165.00 | $217.95 | $244.40 |

187. The DEFENDANTS also deprive the Government of the benefits of price competition when generic versions of a drug become available and compete with the "brand". The following Table No. 8 provides an example of DEFENDANT ▮▮▮▮▮ false representations that the price of ▮▮▮▮▮ remained at $141.97 for its generic equivalent from August 1994 to January 1997 when in truth and in fact the priced declined to $14.00.

181

CIVIL ACTION NO. 95-1354-CIV-GOLD

### TABLE NO. 8

| Company | Drug | NDC # | Date | AWP $ | Relator's Wholesaler Cost |
|---------|------|-------|------|-------|---------------------------|
|         |      |       | 08/94 | $141.97 | $ 85.00 |
|         |      |       | 04/95 | $141.97 | $ 67.62 |
|         |      |       | 10/95 | $141.97 | $ 49.00 |
|         |      |       | 02/96 | $141.97 | $ 36.00 |
|         |      |       | 09/96 | $141.97 | $ 18.00 |
|         |      |       | 01/97 | $141.97 | $ 14.00 |

188. The actions of the DEFENDANTS alleged herein result in grossly excessive amounts being paid to their customers by the Medicare and States' Medicaid Programs for claims submitted for the specified drugs. The exorbitant payments induce physicians, clinics and specialty pharmacies to increase utilization of the specified drugs  The financial inducement was so great for many of the specified pharmaceuticals at issue in this Third Amended Complaint that the profits derived from the provision of the specified drugs greatly exceeded the physicians' professional fees and provided what can only be characterized as "windfall profits."   In many markets, including the Relator's, specialty pharmacies and clinics are often unable to compete unless they enter financial arrangements with prescribing physicians whereby the grossly excessive amounts paid by the Medicare and States' Medicaid Programs are split with the prescribing physicians.  Over the last six (6) years, the Relator's business has all but been extinguished because of the Relator's refusal

182

to benefit from the false and fraudulent claims schemes specified herein. The Relator has been unable to effectively compete with those physicians, clinics and specialty pharmacies who benefit from the DEFENDANTS' false claims scheme because the financial inducement to the prescribing physicians often exceeds their compensation from the practice of medicine.

## SECTION NO. 8

### THE SPECIFIC FALSE PRICE AND COST REPRESENTATIONS OF DEFENDANT ABBOTT

189. At various times from on or after June 23, 1989 and continuing through the present date, Defendant ABBOTT knowingly caused the Medicare program and the States' Medicaid programs throughout the United States and its territories to pay false or fraudulent claims for drugs specified in this Section and further made or used false or fraudulent records and/or statements to get such claims paid or approved. As a result of the said actions of Defendant ABBOTT and those persons and entities acting directly or indirectly in concert with Defendant ABBOTT the Medicare and States' Medicaid Programs paid grossly excessive, unreasonable and unlawful amounts for claims for the drugs specified in this Section. The acts committed by Defendant ABBOTT that caused the Medicare and States' Medicaid Programs to pay or approve said false or fraudulent claims included, but were not necessarily limited to, knowingly making false or fraudulent representations about prices and costs of the drugs specified in this Section which Defendant ABBOTT knew or should have known would be relied upon by the Medicare and States' Medicaid Programs

CIVIL ACTION NO. 95-1354-CIV-GOLD

in paying or approving claims for the drugs specified in this Section. Each of said representations were material and were relied upon by the Medicare and States' Medicaid Programs in paying or approving claims for the drugs specified in this Section.

190.   Defendant ABBOTT knowingly caused its false or fraudulent price and cost representations to be published in the years specified in this Section in the Red Book, the Blue Book  and the First Data Bank's Automated Services and further made or used false records or statements regarding its prices and costs of the drugs specified in this Section and submitted same to the Medicare and States' Medicaid Programs continuously throughout the years specified in this Section. For the purposes of specificity and particularity, the said false price and cost representations as they were reflected in the Red Book and Blue Book have been organized into a chart form for each drug in question and for each NDC Number assigned to each drug in question.  The information provided under the columns for Defendant's Published Price, and Red Book and Blue Book "AWP" and "DP" reflects the false price and cost representations made by the Defendant ABBOTT. The information under the Relator's Cost columns reflects the true price that Defendant ABBOTT charged the Relator for the drug or caused another entity to charge the Relator for the drug. As a very small infusion pharmacy, the Relator does not always receive the lowest prices available to volume purchasers.  Accordingly, a comparison of the Relator's costs with the price and cost representations made by the Defendant ABBOTT establishes the falsity of ABBOTT's representations for the drugs and years specified as follows:

184

CIVIL ACTION NO. 95-1354-CIV-GOLD

## a. DRUG: SODIUM CHLORIDE 0.9%
## 250 ML

MEDICAID
NDC NO.: 00074-7983-02

MEDICARE
HCPCS J7050

| YEAR | DEFENDANT'S PUBLISHED PRICE | RED BOOK | | BLUE BOOK | | RELATOR'S WHOLESALER COST | RELATOR'S DIRECT COST |
|------|------|------|------|------|------|------|------|
| | | "AWP" | "DP" | "AWP" | "DP" | | |
| 1993 | $7.59 | $8.59 | | $8.59 | $7.23 | $1.50 | $1.07 |
| 1994 | $7.82 | $9.01 | | $9.01 | $7.59 | $1.33 | $0.95 |
| 1995 | $8.05 | $9.29 | | $9.29 | $7.82 | $1.33 | $0.95 |
| 1996 | | $9.56 | | $9.56 | $8.05 | $1.33 | $0.95 |
| 1997 | | $10.03 | | | | $1.33 | $0.95 |

Defendant, ABBOTT caused the payment or approval of false or fraudulent claims during the years specified in the above chart by the Medicare and/or States' Medicaid Programs for the following additional size(s) of Sodium Chloride:

| SIZE | MEDICAID NDC# | MEDICARE HCPCS |
|------|------|------|
| 50 ml | 00074-7101-13 | ------- |
| 100 ml | 00074-7101-23 | ------- |
| 500 ml | 00074-7983-03 | J7040 |
| 1,000 ml | 00074-7983-09 | J7030 |

185

CIVIL ACTION NO. 95-1354-CIV-GOLD

## b. DRUG: 5% DEXTROSE IN WATER
## 500 ML

MEDICAID
NDC NO.: 00074-7922-03

MEDICARE
HCPCS J7060

| YEAR | DEFENDANT'S PUBLISHED PRICE | RED BOOK | | BLUE BOOK | | RELATOR'S WHOLESALER COST | RELATOR'S DIRECT COST |
|------|------|------|------|------|------|------|------|
| | | "AWP" | "DP" | "AWP" | "DP" | | |
| 1993 | $7.71 | $8.72 | | $8.72 | $7.34 | $1.80 | $0.97 |
| 1994 | $7.94 | $9.16 | | $9.16 | $7.71 | $1.50 | $0.96 |
| 1995 | $8.18 | $9.43 | | $9.43 | $7.94 | $1.50 | $0.96 |
| 1996 | | $9.71 | | $9.71 | $8.18 | $1.50 | $0.96 |
| 1997 | | $10.20 | | | | $1.50 | $0.96 |

Defendant, ABBOTT caused the payment or approval of false or fraudulent claims during the years specified in the above chart by the Medicare and/or States' Medicaid Programs for the following additional size(s) of 5% Dextrose in Water:

| SIZE | MEDICAID NDC# | MEDICARE HCPCS |
|------|------|------|
| 50 ml | 00074-7100-13 | --------- |
| 100 ml | 00074-7100-23 | -------- |
| 250 ml | 00074-7100-02 | -------- |
| 1,000 ml | 00074-7922-09 | J7070 |

186

CIVIL ACTION NO. 95-1354-CIV-GOLD

### c. DRUG: DEXTROSE 5% WITH SODIUM CHLORIDE 0.9%
### 500 ML

MEDICAID                                                     MEDICARE
NDC NO.: 00074-7941-03                             HCPCS J7042

| YEAR | DEFENDANT'S PUBLISHED PRICE | RED BOOK | | BLUE BOOK | | RELATOR'S WHOLESALER COST | RELATOR'S DIRECT COST |
|------|------|------|------|------|------|------|------|
| | | "AWP" | "DP" | "AWP" | "DP" | | |
| 1993 | $8.28 | $9.37 | | $9.37 | $7.89 | $1.15 | $1.04 |
| 1994 | $8.53 | $9.83 | | $9.83 | $8.28 | $1.15 | $1.03 |
| 1995 | $8.79 | $10.13 | | $10.13 | $8.53 | $1.15 | $1.03 |
| 1996 | | $10.44 | | $10.44 | $8.79 | $1.15 | $1.03 |
| 1997 | | $10.96 | | | | $1.15 | $1.03 |

Defendant, ABBOTT caused the payment or approval of false or fraudulent claims during the years specified in the above chart by the Medicare and/or States' Medicaid Programs for the following additional size(s) of Dextrose 5% with Sodium Chloride 0.9%:

| SIZE | MEDICAID NDC# | MEDICARE HCPCS |
|------|------|------|
| 250 ml | 00074-7941-02 | ------- |
| 1,000 ml | 00074-7941-09 | ------ |

### d. DRUG: RINGERS LACTATE
### 1,000 ML

MEDICAID                                                     MEDICARE
NDC NO.: 00074-7953-09                             HCPCS J7120

| YEAR | DEFENDANT'S PUBLISHED PRICE | RED BOOK | | BLUE BOOK | | RELATOR'S WHOLESALER COST | RELATOR'S DIRECT COST |
|------|------|------|------|------|------|------|------|
| | | "AWP" | "DP" | "AWP" | "DP" | | |
| 1993 | $10.30 | | | $11.64 | $9.81 | $1.36 | $1.30 |
| 1994 | $10.61 | $12.23 | | $12.23 | $10.30 | $1.36 | $1.14 |
| 1995 | $10.93 | $12.60 | | $12.59 | $10.61 | $1.36 | $1.14 |
| 1996 | | $12.98 | | $12.97 | $10.93 | $1.36 | $1.14 |
| 1997 | | $13.63 | | | | $1.36 | $1.14 |

CIVIL ACTION NO. 95-1354-CIV-GOLD

Defendant, ABBOTT caused the payment or approval of false or fraudulent claims during the years specified in the above chart by the Medicare and/or States' Medicaid Programs for the following additional size(s) of Ringers Lactate:

| SIZE | MEDICAID NDC# | MEDICARE HCPCS |
|------|---------------|----------------|
| 250 ml | 00074-7953-02 | ------ |
| 500 ml | 00074-7953-03 | ------ |

### e. DRUG: VANCOMYCIN HCL
### 500 MG

MEDICAID
NDC NO.: 00074-4332-01

MEDICARE
HCPCS J3370

| YEAR | DEFENDANT'S PUBLISHED PRICE | RED BOOK | | BLUE BOOK | | RELATOR'S WHOLESALER COST | RELATOR'S DIRECT COST |
|------|------|------|------|------|------|------|------|
| | | "AWP" | "DP" | "AWP" | "DP" | | |
| 1993 | $24.72 | $27.95 | | $27.95 | $23.54 | | $3.76 |
| 1994 | $25.46 | $29.35 | | $29.36 | $24.72 | | $3.51 |
| 1995 | $26.48 | $30.23 | | $29.36 | $24.72 | $4.20 | $3.51 |
| 1996 | | $31.44 | | | | $3.95 | $3.51 |
| 1997 | | | | | | $3.75 | $3.51 |

Defendant, ABBOTT caused the payment or approval of false or fraudulent claims during the years specified in the above chart by the Medicare and/or States' Medicaid Programs for the following additional size(s) of Vancomycin HCL:

188

CIVIL ACTION NO. 95-1354-CIV-GOLD

| SIZE | MEDICAID NDC# | MEDICARE HCPCS |
|------|---------------|----------------|
| 500 mg Advantage | 00074-6535-01 | ------ |
| 1 gm | 00074-6533-01 | -------- |
| 5.0 gm | 00074-6509-01 | ------- |

## f. DRUG: TOBRAMYCIN SULFATE
## 80 MG

MEDICAID
NDC NO.:00074-3578-01

MEDICARE
HCPCS J3260

| YEAR | DEFENDANT'S PUBLISHED PRICE | RED BOOK | | BLUE BOOK | | RELATOR'S WHOLESALER COST | RELATOR'S DIRECT COST |
|------|------|------|------|------|------|------|------|
| | | "AWP" | "DP" | "AWP" | "DP" | | |
| 1993 | | $8.74 | | $8.74 | $7.36 | $4.92 | |
| 1994 | | $9.18 | | $9.18 | $7.73 | $4.92 | $3.63 |
| 1995 | | $9.45 | | $9.45 | $7.96 | $4.92 | $3.63 |
| 1996 | | $9.83 | | $9.83 | $8.28 | $4.92 | $3.63 |
| 1997 | | $10.32 | | | | $4.92 | $3.63 |

Defendant, ABBOTT caused the payment or approval of false or fraudulent claims during the years specified in the above chart by the Medicare and/or States' Medicaid Programs for the following additional size(s) of Tobramycin Sulfate:

| SIZE | MEDICAID NDC# | MEDICARE HCPCS |
|------|---------------|----------------|
| 20 mg | 00074-3577-01 | -------- |
| 60 mg | 00074-3582-01 | -------- |
| 60 mg | 00074-3469-13 | -------- |
| 60 mg | 00074-3254-03 | -------- |
| 80 mg | 00074-3255-03 | -------- |

189

**CIVIL ACTION NO. 95-1354-CIV-GOLD**

| SIZE | MEDICAID NDC# | MEDICARE HCPCS |
|------|---------------|----------------|
| 80 mg | 00074-3470-23 | -------- |
| 80 mg | 00074-3583-01 | -------- |
| 2,000 mg | 00074-3590-02 | -------- |

## g. DRUG: PENTAMIDINE ISETHIONATE
### 300 MG

MEDICAID        MEDICARE
NDC NO.: 00074-4548-01       HCPCS

| YEAR | DEFENDANT'S PUBLISHED PRICE | RED BOOK "AWP" | RED BOOK "DP" | BLUE BOOK "AWP" | BLUE BOOK "DP" | RELATOR'S WHOLESALER COST | RELATOR'S DIRECT COST |
|------|------|------|------|------|------|------|------|
| 1993 | $89.25 | $85.00 | | $100.94 | $85.00 | $75.00 | |
| 1994 | $91.93 | $105.98 | | $105.98 | $89.25 | | |
| 1995 | $95.61 | $109.17 | | $109.17 | $91.93 | $59.00 | $43.00 |
| 1996 | | $113.54 | | $113.54 | $95.61 | | $43.00 |
| 1997 | | $119.21 | | | | | |

## h. DRUG: CLINDAMYCIN PHOSPHATE
### 900 MG

MEDICAID        MEDICARE
NDC NO.: 00074-4052-01

| YEAR | DEFENDANT'S PUBLISHED PRICE | RED BOOK "AWP" | RED BOOK "DP" | BLUE BOOK "AWP" | BLUE BOOK "DP" | RELATOR'S WHOLESALER COST | RELATOR'S DIRECT COST |
|------|------|------|------|------|------|------|------|
| 1993 | $20.62 | $23.32 | | $23.32 | $19.64 | $3.25 | $7.25 |
| 1994 | $21.24 | $24.49 | | $24.49 | $20.62 | $3.25 | $3.20 |
| 1995 | $22.09 | $25.22 | | $25.22 | $21.24 | $3.25 | $3.20 |
| 1996 | | $26.23 | | $26.23 | $22.09 | $3.25 | $3.20 |
| 1997 | | $27.54 | | | | $3.25 | $3.20 |

190

CIVIL ACTION NO. **95-1354-CIV-GOLD**

Defendant, ABBOTT caused the payment or approval of false or fraudulent claims during the years specified in the above chart by the Medicare and/or States' Medicaid Programs for the following additional size(s) of Clindamycin Phosphate:

| SIZE | MEDICAID NDC# | MEDICARE HCPCS |
|------|---------------|----------------|
| 300 mg | 00074-4053-03 | -------- |
| 300 mg | 00074-4050-01 | -------- |
| 600 mg | 00074-4054-03 | ------- |
| 600 mg | 00074-4051-01 | ------- |
| 9,000 mg | 00074-4197-01 | ------- |

As a direct and proximate result of the actions of the Defendant ABBOTT alleged herein, the United States has sustained damages recoverable under the False Claims Act, together with triple damages, penalties, attorneys' fees and costs.



191

PAGES 192 THROUGH 201

HAVE BEEN COMPLETELY
REDACTED

CIVIL ACTION NO. 95-1354-CIV-GOLD



## SECTION NO. 11

## THE SPECIFIC FALSE PRICE AND COST REPRESENTATIONS OF DEFENDANT BAXTER

195.    At various times from on or after June 23, 1989 and continuing through the

present date, Defendant BAXTER knowingly caused the Medicare program and the States'

Medicaid programs throughout the United States and its territories to pay false or fraudulent

claims for the drugs and biologicals specified in this Section  and further made or used

false or fraudulent records and/or statements to get such claims paid or approved.  As a

result of the said actions of Defendant BAXTER and those persons and entities acting

directly or indirectly in concert with Defendant BAXTER, the Medicare and States' Medicaid

Programs paid grossly excessive,  unreasonable and unlawful amounts for claims for the

drugs and biologicals specified in this Section.  The acts committed by Defendant BAXTER

that caused the Medicare and States' Medicaid Programs to pay or approve said false or

fraudulent claims included, but were not necessarily limited to, knowingly making false or

fraudulent representations about prices and costs of the drugs and biologicals specified in

202

CIVIL ACTION NO. 95-1354-CIV-GOLD

this Section which Defendant BAXTER knew or should have known would be relied upon by the Medicare and States' Medicaid Programs in paying or approving claims for the drugs and biologicals specified in this Section. Each of said representations were material and were relied upon by the Medicare and States' Medicaid Programs in paying or approving claims for the drugs and biologicals specified in this Section.

196. Defendant BAXTER knowingly caused its false or fraudulent price and cost representations to be published in the years specified in this Section in the Red Book, the Blue Book and the First Data Bank's Automated Services and further made or used false records or statements regarding its prices and costs of the drugs and biologicals specified in this Section and submitted same to the Medicare and States' Medicaid Programs continuously throughout the years specified in this Section. For the purposes of specificity and particularity, the said false price and cost representations as they were reflected in the Red Book and Blue Book have been organized into a chart form for each drug and biological in question and for each NDC Number assigned to each drug and biological in question. The information provided under the columns for Defendant's Published Price, and Red Book and Blue Book "AWP" and "DP" reflects the false price and cost representations made by the Defendant BAXTER. The information under the Relator's Cost columns reflects the true price that Defendant BAXTER charged the Relator for the drug or biological or caused another entity to charge the Relator for the drug or biological. As a very small infusion pharmacy, the Relator does not always receive the lowest prices available to volume purchasers. Accordingly, a comparison of the Relator's costs with the

203

CIVIL ACTION NO. 95-1354-CIV-GOLD

price and cost representations made by the Defendant BAXTER establishes the falsity of

BAXTER's representations for the drugs and biologicals and years specified as follows:

## a. DRUG: SODIUM CHLORIDE 0.9%
## 250 ML

MEDICAID                                           MEDICARE
NDC NO.: 00338-0049-02                      HCPCS J7050

| YEAR | DEFENDANT'S PUBLISHED PRICE | RED BOOK | | BLUE BOOK | | RELATOR'S WHOLESALER COST | RELATOR'S DIRECT COST |
|------|------|------|------|------|------|------|------|
| | | "AWP" | "DP" | "AWP" | "DP" | | |
| 1993 | | $9.10 | | | | $1.60 | |
| 1994 | $5.53 | $9.10 | | $9.11 | $5.37 | $1.51 | $0.78 |
| 1995 | | $9.10 | | $9.11 | $5.37 | $1.60 | $0.78 |
| 1996 | | $9.10 | | $9.11 | $5.37 | $1.60 | $0.78 |
| 1997 | | $9.10 | | | | $1.54 | $0.78 |

Defendant, BAXTER caused the payment or approval of false or fraudulent claims

during the years specified in the above chart by the Medicare and/or States' Medicaid

Programs for the following additional size(s) of Sodium Chloride 0.9%:

| SIZE | MEDICAID NDC# | MEDICARE HCPCS |
|------|------|------|
| 50 ml | 00338-0049-41 | ------ |
| 100 ml | 00338-0049-48 | ------- |
| 500 ml | 00338-0049-03 | J7040 |
| 1,000 ml | 00338-0049-04 | J7030 |

## b. DRUG: DEXTROSE 5% IN WATER
## 500 ML

MEDICAID                                                    MEDICARE
NDC NO.: 00338-0017-03                                      HCPCS J7060

| YEAR | DEFENDANT'S PUBLISHED PRICE | RED BOOK | | BLUE BOOK | | RELATOR'S WHOLESALER COST | RELATOR'S DIRECT COST |
|------|------|------|------|------|------|------|------|
| | | "AWP" | "DP" | "AWP" | "DP" | | |
| 1993 | | | | | | $1.42 | |
| 1994 | $7.62 | $9.25 | | $9.25 | $5.60 | $1.42 | $0.78 |
| 1995 | | $9.25 | | $9.25 | $5.55 | $1.42 | $0.78 |
| 1996 | | $9.25 | | $9.25 | $5.55 | $1.44 | $0.78 |
| 1997 | | $9.25 | | | | $1.44 | $0.78 |

Defendant, BAXTER caused the payment or approval of false or fraudulent claims

during the years specified in the above chart by the Medicare and/or States' Medicaid

Programs for the following additional size(s) of Dextrose 5% in Water:

| SIZE | MEDICAID NDC# | MEDICARE HCPCS |
|------|------|------|
| 50 ml | 00338-0017-41 | ------- |
| 100 ml | 00338-0017-48 | ------- |
| 250 ml | 00338-0017-02 | ------- |
| 1,000 ml | 00338-0017-04 | J7070 |

CIVIL ACTION NO. 95-1354-CIV-GOLD

### c. DRUG: DEXTROSE 5% AND SODIUM CHLORIDE 0.9%
### 500 ML

MEDICAID                                                 MEDICARE
NDC NO.: 00338-0089-03                                    HCPCS J7042

| YEAR | DEFENDANT'S PUBLISHED PRICE | RED BOOK | | BLUE BOOK | | RELATOR'S WHOLESALER COST | RELATOR'S DIRECT COST |
|------|------|------|------|------|------|------|------|
| | | "AWP" | "DP" | "AWP" | "DP" | | |
| 1993 | | $8.42 | | | | | |
| 1994 | $6.05 | $9.94 | | $9.94 | $5.88 | $1.51 | $1.08 |
| 1995 | | $9.94 | | $9.94 | $5.88 | $1.51 | $1.08 |
| 1996 | | $9.94 | | $9.94 | $5.88 | $1.53 | $1.08 |
| 1997 | | $9.94 | | | | $1.53 | |

Defendant, BAXTER caused the payment or approval of false or fraudulent claims

during the years specified in the above chart by the Medicare and/or States' Medicaid

Programs for the following additional size(s) of Dextrose 5% and Sodium Chloride 0.9%:

| SIZE | MEDICAID NDC# | MEDICARE HCPCS |
|------|------|------|
| 250 ml | 00338-0089-02 | -------- |
| 1,000 ml | 00338-0089-04 | ------- |

### d: DRUG: RINGERS LACTATE
### 1,000 ML

MEDICAID                                                 MEDICARE
NDC NO.: 00338-0117-04                                    HCPCS J7120

| YEAR | DEFENDANT'S PUBLISHED PRICE | RED BOOK | | BLUE BOOK | | RELATOR'S WHOLESALER COST | RELATOR'S DIRECT COST |
|------|------|------|------|------|------|------|------|
| | | "AWP" | "DP" | "AWP" | "DP" | | |
| 1993 | | | | | | $1.91 | |
| 1994 | $7.47 | $12.36 | | $12.36 | $7.26 | $1.91 | $1.34 |
| 1995 | | $12.36 | | $12.36 | $7.26 | $1.91 | $1.34 |
| 1996 | | $12.36 | | $12.36 | $7.26 | $1.94 | $1.34 |
| 1997 | | $12.36 | | | | $1.94 | |

206

CIVIL ACTION NO. 95-1354-CIV-GOLD

Defendant, BAXTER caused the payment or approval of false or fraudulent claims

during the years specified in the above chart by the Medicare and/or States' Medicaid

Programs for the following additional size(s) of Ringers Lactate:

| SIZE | MEDICAID NDC# | MEDICARE HCPCS |
|------|---------------|----------------|
| 250 ml | 00338-0117-02 | ------ |
| 500 ml | 00338-0117-03 | ------ |

e. BIOLOGICAL: GAMMAGARD S/D
10 GM

MEDICAID
NDC NO.: 00944-2620-04

MEDICARE
HCPCS J1561

| YEAR | DEFENDANT'S PUBLISHED PRICE | RED BOOK "AWP" | RED BOOK "DP" | BLUE BOOK "AWP" | BLUE BOOK "DP" | RELATOR'S WHOLESALER COST | RELATOR'S DIRECT COST |
|------|------|------|------|------|------|------|------|
| 1993 | | | | | | | |
| 1994 | | | | | | | |
| 1995 | | $640.71 | | $640.71 | | $275.00 | |
| 1996 | | $640.71 | | $640.71 | | $300.00 | |
| 1997 | | $737.00 | | | | $300.00 | |

Defendant, BAXTER caused the payment or approval of false or fraudulent claims

during the years specified in the above chart by the Medicare and/or States' Medicaid

Programs for the following additional size(s) of Gammagard S/D:

| SIZE | MEDICAID NDC# | MEDICARE HCPCS |
|------|---------------|----------------|
| 0.5 gm | 00944-2620-01 | J1561 |
| 2.5 gm | 00944-2620-02 | J1561 |
| 5.0 gm | 00944-2620-03 | J1561 |

207

**CIVIL ACTION NO. 95-1354-CIV-GOLD**

## f. BIOLOGICAL: GAMMAGARD
## 10 GM

MEDICAID                                        MEDICARE
NDC NO.: 00944-2807-04                     HCPCS J1561

| YEAR | DEFENDANT'S PUBLISHED PRICE | RED BOOK | | BLUE BOOK | | RELATOR'S WHOLESALER COST | RELATOR'S DIRECT COST |
|------|------|------|------|------|------|------|------|
| | | "AWP" | "DP" | "AWP" | "DP" | | |
| 1993 | | $610.20 | | $540.00 | | $340.00 | |
| 1994 | | $610.20 | | $610.20 | | $340.00 | |
| 1995 | | | | | | | |
| 1996 | | | | | | | |
| 1997 | | | | | | | |

Defendant, BAXTER caused the payment or approval of false or fraudulent claims

during the years specified in the above chart by the Medicare and/or States' Medicaid

Programs for the following additional size(s) of Gammagard:

| SIZE | MEDICAID NDC# | MEDICARE HCPCS |
|------|------|------|
| 0.5 gm | 00944-2807-03 | J1561 |
| 2.5 gm | 00944-2807-02 | J1561 |
| 5 gm | 00944-2807-01 | J1561 |

**CIVIL ACTION NO. 95-1354-CIV-GOLD**

## g.  BIOLOGICAL: FACTOR VIII
### (Antihemophilic factor (recombinant)), per I.U.
### Recombinate 250 I.U.

| MEDICAID | | | | | | MEDICARE |
|---|---|---|---|---|---|---|
| NDC NO.:  00944-2938-01 | | | | | | HCPCS J1561 |

| YEAR | DEFENDANT'S PUBLISHED PRICE | RED BOOK | | BLUE BOOK | | RELATOR'S WHOLESALER COST | RELATOR'S DIRECT COST |
|---|---|---|---|---|---|---|---|
| | | "AWP" | "DP" | "AWP" | "DP" | | |
| 1993 | | $1.18 | | | | | |
| 1994 | | $1.18 | | $1.18 | | | |
| 1995 | | $1.18 | | $1.18 | | | |
| 1996 | | $1.18 | | $1.18 | | | $0.78 |
| 1997 | | $1.18 | | | | | $0.78 |

Defendant, BAXTER caused the payment or approval of false or fraudulent claims during the years specified in the above chart by the Medicare and/or States' Medicaid Programs for the following antihemophilic factors:

| PHARMACEUTICAL | SIZE | MEDICAID NDC# | MEDICARE HCPCS |
|---|---|---|---|
| Recombinate | 500iu | 00944-2938-02 | J1561 |
| Recombinate | 1000iu | 00944-2938-03 | J1561 |
| Hemofil-M | per iu | 00944-2935-01 | J7190 |
| Proplex-T | 700-3000iu | 00944-0581-01 | J7194 |
| Autoplex-T | 390 - 1050iu | 00944-0650-01 | J7194 |

As a direct and proximate result of the actions of the Defendant BAXTER alleged herein, the United States has sustained damages recoverable under the False Claims Act, together with triple damages, penalties, attorneys' fees and costs.

209

CIVIL ACTION NO. 95-1354-CIV-GOLD

### SECTION NO. 12

### THE SPECIFIC FALSE PRICE AND COST REPRESENTATIONS OF DEFENDANT BAYER/MILES

197.    At various times from on or after June 23, 1989 and continuing through the present date, Defendant BAYER/MILES knowingly caused the Medicare program and the States' Medicaid programs throughout the United States and its territories to pay false or fraudulent claims for drugs specified in this Section and further made or used false or fraudulent records and/or statements to get such claims paid or approved.  As a result of the said actions of Defendant BAYER/MILES and those persons and entities acting directly or indirectly in concert with Defendant BAYER/MILES, the Medicare and States' Medicaid Programs paid grossly excessive,  unreasonable and unlawful amounts for claims for the drugs specified in this Section.  The acts committed by Defendant BAYER/MILES that caused the Medicare and States' Medicaid Programs to pay or approve said false or fraudulent claims included, but were not necessarily limited to, knowingly making false or fraudulent representations about prices and costs of the drugs specified in this Section which Defendant BAYER/MILES knew or should have known would be relied upon by the Medicare and States' Medicaid Programs in paying or approving claims for the drugs specified in this Section.  Each of said representations were material and were relied upon by the Medicare and States' Medicaid Programs in paying or approving claims for the drugs specified in this Section.

CIVIL ACTION NO. 95-1354-CIV-GOLD

198.    Defendant BAYER/MILES knowingly caused its false or fraudulent price and

cost representations to be published in the years specified in this Section in the Red Book,

the Blue Book  and the First Data Bank's Automated Services and further made or used

false records or statements regarding its prices and costs of the drugs specified in this

Section and submitted same to the Medicare and States' Medicaid Programs continuously

throughout the years specified in this Section. For the purposes of specificity and

particularity, the said false price and cost representations as they were reflected in the Red

Book and Blue Book have been organized into a chart form for each drug in question and

for each NDC Number assigned to each drug in question.  The information provided under

the columns for Defendant's Published Price, and Red Book and Blue Book "AWP" and

"DP" reflects the false price and cost representations made by the Defendant

BAYER/MILES. The information under the Relator's Cost columns reflects the true price

that Defendant BAYER/MILES charged the Relator for the drug or caused another entity

to charge the Relator for the drug. As a very small infusion pharmacy, the Relator does not

always receive the lowest prices available to volume purchasers.   Accordingly, a

comparison of the Relator's costs with the price and cost representations made by the

Defendant BAYER/MILES establishes the falsity of BAYER/MILES's representations for

the drugs and years specified as follows:

211

**CIVIL ACTION NO. 95-1354-CIV-GOLD**

## a. DRUG: IMMUNE GLOBULIN, INTRAVENOUS (HUMAN)
### GAMIMUNE-N 10% 10 GM

MEDICAID
NDC NO.: 00161-0649-71
　　　　 00192-0649-71

MEDICARE
HCPCS J1562

| YEAR | DEFENDANT'S PUBLISHED PRICE | RED BOOK "AWP" | RED BOOK "DP" | BLUE BOOK "AWP" | BLUE BOOK "DP" | RELATOR'S WHOLESALER COST | RELATOR'S DIRECT COST |
|------|------|------|------|------|------|------|------|
| 1993 | | | | | | $324.00 | $300.00 |
| 1994 | | $750.00 | | $750.00 | | $320.00 | $300.00 |
| 1995 | | $750.00 | | | | $358.00 | $300.00 |
| 1996 | | $750.00 | | $750.00 | | $370.00 | |
| 1997 | | $900.00 | | | | $370.00 | |

Defendant, BAYER/MILES caused the payment or approval of false or fraudulent claims during the years specified in the above chart by the Medicare and/or States' Medicaid Programs for the following additional size(s) of Gamimune-N 10%:

| SIZE | MEDICAID NDC# | MEDICARE HCPCS |
|------|------|------|
| 1 gm | 00192-0649-12<br>00026-0648-12 | J1562 |
| 5 gm | 00192-0649-20<br>00026-0648-20<br>00061-0649-20 | J1562 |
| 20 gm | 00192-0649-24<br>00026-0648-24<br>00161-0649-24 | J1562 |

212

b. DRUG: IMMUNE GLOBULIN, INTRAVENOUS (HUMAN)
GAMINUNE-N 5% 12.5 GM

MEDICAID
NDC NO.: 00161-0649-71
00192-0649-71

MEDICARE
HCPCS J1562

| YEAR | DEFENDANT'S PUBLISHED PRICE | RED BOOK | | BLUE BOOK | | RELATOR'S WHOLESALER COST | RELATOR'S DIRECT COST |
|------|------|------|------|------|------|------|------|
| | | "AWP" | "DP" | "AWP" | "DP" | | |
| 1993 | | | | | | $325.00 | |
| 1994 | | $714.00 | | $714.00 | | $345.00 | |
| 1995 | | $714.00 | | | | $370.00 | |
| 1996 | | $743.75 | | $714.00 | | $400.00 | |
| 1997 | | $743.75 | | | | $400.00 | |

Defendant, BAYER/MILES caused the payment or approval of false or fraudulent claims during the years specified in the above chart by the Medicare and/or States' Medicaid Programs for the following additional size(s) of Gamimune-N 5%:

| SIZE | MEDICAID NDC# | MEDICARE HCPCS |
|------|------|------|
| 0.5 gm | 00161-0640-12 00192-0640-12 00026-0640-12 | J1561 |
| 2.5 gm | 00161-0640-20 00192-0640-20 00026-0640-20 | J1561 |
| 5 gm | 00161-0640-71 00192-0640-71 00026-0640-71 | J1561 |

213

## c. BIOLOGICAL: FACTOR VIII
### (antihemophilic factor (recombinant)), per I.U.
### Kogenate 250 I.U.

MEDICAID
NDC NO.: 00161-0670-20
       00192-0670-20
       00026-0670-20

MEDICARE
HCPCS J7192

| YEAR | DEFENDANT'S PUBLISHED PRICE | RED BOOK | | BLUE BOOK | | RELATOR'S WHOLESALER COST | RELATOR'S DIRECT COST |
|------|------|------|------|------|------|------|------|
| | | "AWP" | "DP" | "AWP" | "DP" | | |
| 1993 | | | | | | | |
| 1994 | | $1.18 | | $1.18 | | | |
| 1995 | | $1.18 | | | | | $0.65 |
| 1996 | | $1.18 | | $1.18 | | | $0.65 |
| 1997 | | $1.18 | | | | | |

Defendant, BAYER/MILES caused the payment or approval of false or fraudulent claims during the years specified in the above chart by the Medicare and/or States' Medicaid Programs for the following hemophilic factors:

| PHARMACEUTICAL | SIZE | MEDICAID NDC# | MEDICARE HCPCS |
|------|------|------|------|
| Kogenate | 500iu | 00161-0670-30 | J7192 |
| Kogenate | 500iu | 00192-0670-30 | J7192 |
| Kogenate | 500iu | 00026-0670-30 | J7192 |
| Kogenate | 1000iu | 00161-0670-50 | J7192 |
| Kogenate | 1000iu | 00192-0670-50 | J7192 |
| Kogenate | 1000iu | 00026-0670-50 | J7192 |
| Koate HP | 250iu | 00161-0670-20 | J7190 |
| Koate HP | 250iu | 00192-0670-20 | J7190 |
| Koate HP | 250iu | 00026-0670-20 | J7190 |

| PHARMACEUTICAL | SIZE | MEDICAID NDC# | MEDICARE HCPCS |
|---|---|---|---|
| Koate HP | 500iu | 00161-0670-30 | J7190 |
| Koate HP | 500iu | 00192-0670-30 | J7190 |
| Koate HP | 500iu | 00026-0670-30 | J7190 |
| Koate HP | 1000iu | 00161-0670-50 | J7190 |
| Koate HP | 1000iu | 00192-0670-50 | J7190 |
| Koate HP | 1000iu | 00026-0670-50 | J7190 |
| Koate HP | 1500iu | 00161-0670-60 | J7190 |
| Koate HP | 1500iu | 00192-0670-60 | J7190 |
| Koate HP | 1500iu | 00026-0670-60 | J7190 |
| Konyne 80 | 500iu | 00192-0626-20 | J7192 |
| Konyne 80 | 500iu | 00026-0626-20 | J7197 |
| Konyne 80 | 1000iu | 00192-0626-50 | J7197 |
| Konyne 80 | 1000iu | 00026-0626-50 | J7197 |
| Thrombate III | 500iu | 00026-0603-20 | J7197 |
| Thrombate III | 500iu | 00161-0603-20 | J7197 |
| Thrombate III | 500iu | 00192-0626-20 | J7197 |
| Thrombate III | 1000iu | 00026-0603-30 | J7197 |
| Thrombate III | 1000iu | 00161-0603-30 | J7197 |
| Thrombate III | 1000iu | 00192-0626-30 | J7197 |

As a direct and proximate result of the actions of the Defendant BAYER/MILES alleged herein, the United States has sustained damages recoverable under the False Claims Act, together with triple damages, penalties, attorneys' fees and costs.

CIVIL ACTION NO. 95-1354-CIV-GOLD







CIVIL ACTION NO. 95-1354-CIV-GOLD



CIVIL ACTION NO. 95-1354-CIV-GOLD

CIVIL ACTION NO. 95-1354-CIV-GOLD



CIVIL ACTION NO. 95-1354-CIV-GOLD

### SECTION NO. 14

### THE SPECIFIC FALSE PRICE AND COST REPRESENTATIONS OF DEFENDANT BRISTOL-MYERS SQUIBB

201. At various times from on or after June 23, 1989 and continuing through the present date, Defendant BRISTOL-MYERS SQUIBB knowingly caused the Medicare program and the States' Medicaid programs throughout the United States and its territories to pay false or fraudulent claims for drugs specified in this Section and further made or used false or fraudulent records and/or statements to get such claims paid or approved. As a result of the said actions of Defendant BRISTOL-MYERS SQUIBB and those persons and entities acting directly or indirectly in concert with Defendant BRISTOL-MYERS SQUIBB, the Medicare and States' Medicaid Programs paid grossly excessive, unreasonable and unlawful amounts for claims for the drugs specified in this Section. The acts committed by Defendant BRISTOL-MYERS SQUIBB that caused the Medicare and States' Medicaid Programs to pay or approve said false or fraudulent claims included, but were not necessarily limited to, knowingly making false or fraudulent representations about prices and costs of the drugs specified in this Section which Defendant BRISTOL-MYERS SQUIBB knew or should have known would be relied upon by the Medicare and States' Medicaid Programs in paying or approving claims for the drugs specified in this Section. Each of said representations were material and were relied upon by the Medicare and

223

States' Medicaid Programs in paying or approving claims for the drugs specified in this Section.

202.   Defendant BRISTOL-MYERS SQUIBB knowingly caused its false or fraudulent price and cost representations to be published in the years specified in this Section in the Red Book, the Blue Book and the First Data Bank's Automated Services and further made or used false records or statements regarding its prices and costs of the drugs specified in this Section and submitted same to the Medicare and States' Medicaid Programs continuously throughout the years specified in this Section.   For the purposes of specificity and particularity, the said false price and cost representations as they were reflected in the Red Book and Blue Book have been organized into a chart form for each drug in question and for each NDC Number assigned to each drug in question.   The information provided under the columns for Defendant's Published Price, and Red Book and Blue Book "AWP" and "DP" reflects the false price and cost representations made by the Defendant BRISTOL-MYERS SQUIBB.   The information under the Relator's Cost columns reflects the true price that Defendant BRISTOL-MYERS SQUIBB charged the Relator for the drug or caused another entity to charge the Relator for the drug. As a very small infusion pharmacy, the Relator does not always receive the lowest prices available to volume purchasers.   Accordingly, a comparison of the Relator's costs with the price and cost representations made by the Defendant BRISTOL-MYERS SQUIBB establishes the falsity of BRISTOL-MYERS SQUIBB's representations for the drugs and years specified as follows:

224

CIVIL ACTION NO. 95-1354-CIV-GOLD

## a. DRUG: RUBEX (DOXORUBICIN HCL)
### 50 MG

MEDICAID                                                          MEDICARE
NDC NO.: 00015-3352-22                                     HCPCS J9010

| YEAR | DEFENDANT'S PUBLISHED PRICE | RED BOOK | | BLUE BOOK | | RELATOR'S WHOLESALER COST | RELATOR'S DIRECT COST |
|------|------|------|------|------|------|------|------|
| | | "AWP" | "DP" | "AWP" | "DP" | | |
| 1993 | | | | | | | |
| 1994 | | | | | | $70.00 | $45.00 |
| 1995 | $157.72 | $197.15 | | $189.26 | $157.72 | | $45.00 |
| 1996 | $157.72 | $197.15 | | $189.26 | $157.72 | $70.00 | $45.00 |
| 1997 | | | | | | | $45.00 |

Defendant, BRISTOL-MYERS SQUIBB caused the payment or approval of false or

fraudulent claims during the years specified in the above chart by the Medicare and/or

States' Medicaid Programs for the following additional size(s) of Rubex:

| SIZE | MEDICAID NDC# | MEDICARE HCPCS |
|------|------|------|
| 10 mg | 00015-3351-22 | J9000 |

## b. DRUG: CYTOXAN LYOPHILIZED
### 500 MG

MEDICAID                                                          MEDICARE
NDC NO.: 00015-0547-41                                     HCPCS J9095

| YEAR | DEFENDANT'S PUBLISHED PRICE | RED BOOK | | BLUE BOOK | | RELATOR'S WHOLESALER COST | RELATOR'S DIRECT COST |
|------|------|------|------|------|------|------|------|
| | | "AWP" | "DP" | "AWP" | "DP" | | |
| 1993 | $19.78 | $24.73 | | $23.74 | ---- | $20.57 | |
| 1994 | $20.57 | $24.73 | | $23.74 | ---- | $20.57 | $10.00 |
| 1995 | $20.57 | $25.71 | | $24.69 | $20.57 | $20.57 | $10.00 |
| 1996 | $20.57 | $25.71 | | $24.69 | $20.57 | $20.57 | $5.25 |
| 1997 | | | | | | $20.57 | $5.25 |

225

CIVIL ACTION NO. 95-1354-CIV-GOLD

Defendant, BRISTOL-MYERS SQUIBB caused the payment or approval of false or fraudulent claims during the years specified in the above chart by the Medicare and/or States' Medicaid Programs for the following additional size(s) of Cytoxan Lyophilized:

| SIZE | MEDICAID NDC# | MEDICARE HCPCS |
|------|---------------|----------------|
| 100 mg | 00015-0539-41 | J9093 |
| 200 mg | 00015-0546-41 | J9094 |
| 1 gm | 00015-0548-41 | J9096 |
| 2 gm | 00015-0549-41 | J9097 |

## c. DRUG: MUTAMYCIN
## 5 MG

MEDICAID             MEDICARE
NDC NO.: 00015-3001-20        HCPCS J9280

| YEAR | DEFENDANT'S PUBLISHED PRICE | RED BOOK | | BLUE BOOK | | RELATOR'S WHOLESALER COST | RELATOR'S DIRECT COST |
|------|------|------|------|------|------|------|------|
| | | "AWP" | "DP" | "AWP" | "DP" | | |
| 1993 | $99.19 | $119.56 | | $114.80 | | $107.12 | |
| 1994 | $103.16 | $123.99 | | $119.05 | | $107.12 | |
| 1995 | $107.29 | $128.95 | | $123.81 | | $111.68 | |
| 1996 | $107.29 | $134.11 | | $128.77 | $107.29 | $111.68 | $76.00 |
| 1997 | | | | | | $111.68 | $76.00 |

Defendant, BRISTOL-MYERS SQUIBB caused the payment or approval of false or fraudulent claims during the years specified in the above chart by the Medicare and/or States' Medicaid Programs for the following additional size(s) of Mutamycin:

226

**CIVIL ACTION NO. 95-1354-CIV-GOLD**

| SIZE | MEDICAID NDC# | MEDICARE HCPCS |
|------|---------------|----------------|
| 20 mg | 00015-3002-20 | J9290 |
| 40 mg | 00015-3059-20 | J9291 |

## d. DRUG: VEPESID
## 100 MG

MEDICAID                                              MEDICARE
NDC NO.: 00015-3095-20                          HCPCS J9182

| YEAR | DEFENDANT'S PUBLISHED PRICE | RED BOOK | | BLUE BOOK | | RELATOR'S WHOLESALER COST | RELATOR'S DIRECT COST |
|------|------|------|------|------|------|------|------|
| | | "AWP" | "DP" | "AWP" | "DP" | | |
| 1993 | $109.19 | $131.49 | | $126.25 | | $117.33 | |
| 1994 | $109.19 | $136.49 | | $131.05 | | $117.33 | $75.00 |
| 1995 | $109.19 | $136.49 | | $131.05 | $109.19 | $113.56 | $76.00 |
| 1996 | $109.19 | $136.49 | | $131.05 | $109.19 | $ 95.00 | $23.00 |
| 1997 | | $136.49 | | | | $ 95.00 | $23.00 |

Defendant, BRISTOL-MYERS SQUIBB caused the payment or approval of false or fraudulent claims during the years specified in the above chart by the Medicare and/or States' Medicaid Programs for the following additional size(s) of Vepesid:

| SIZE | MEDICAID NDC# | MEDICARE HCPCS |
|------|---------------|----------------|
| 150 mg | 00015-3084-20 | J9182 |
| 500 mg | 00015-3061-20 | J9182 |

As a direct and proximate result of the actions of the Defendant BRISTOL-MYERS SQUIBB alleged herein, the United States has sustained damages recoverable under the False Claims Act, together with triple damages, penalties, attorneys' fees and costs.

227

**CIVIL ACTION NO. 95-1354-CIV-GOLD**



CIVIL ACTION NO. 95-1354-CIV-GOLD

**CIVIL ACTION NO. 95-1354-CIV-GOLD**



CIVIL ACTION NO. 95-1354-CIV-GOLD





## SECTION NO. 16

### THE SPECIFIC FALSE PRICE AND COST REPRESENTATIONS OF DEFENDANT DEY

205.    At various times from on or after June 23, 1989 and continuing through the present date, Defendant DEY knowingly caused the Medicare program and the States' Medicaid programs throughout the United States and its territories to pay false or fraudulent claims for drugs specified in this Section  and further made or used false or fraudulent records and/or statements to get such claims paid or approved.  As a result of the said

CIVIL ACTION NO. 95-1354-CIV-GOLD

actions of Defendant DEY and those persons and entities acting directly or indirectly in

concert with Defendant DEY, the Medicare and States' Medicaid Programs paid grossly

excessive, unreasonable and unlawful amounts for claims for the drugs specified in this

Section. The acts committed by Defendant DEY that caused the Medicare and States'

Medicaid Programs to pay or approve said false or fraudulent claims included, but were not

necessarily limited to, knowingly making false or fraudulent representations about prices

and costs of the drugs specified in this Section which Defendant DEY knew or should have

known would be relied upon by the Medicare and States' Medicaid Programs in paying or

approving claims for the drugs specified in this Section. Each of said representations were

material and were relied upon by the Medicare and States' Medicaid Programs in paying

or approving claims for the drugs specified in this Section.

206.   Defendant DEY knowingly caused its false or fraudulent price and cost

representations to be published in the years specified in this Section in the Red Book, the

Blue Book and the First Data Bank's Automated Services and further made or used false

records or statements regarding its prices and costs of the drugs specified in this Section

and submitted same to the Medicare and States' Medicaid Programs continuously

throughout the years specified in this Section. For the purposes of specificity and

particularity, the said false price and cost representations as they were reflected in the Red

Book and Blue Book have been organized into a chart form for each drug in question and

for each NDC Number assigned to each drug in question. The information provided under

the columns for Defendant's Published Price, and Red Book and Blue Book "AWP" and

233

**CIVIL ACTION NO. 95-1354-CIV-GOLD**

"DP" reflects the false price and cost representations made by the Defendant DEY. The information under the Relator's Cost columns reflects the true price that Defendant DEY charged the Relator for the drug or caused another entity to charge the Relator for the drug. As a very small infusion pharmacy, the Relator does not always receive the lowest prices available to volume purchasers. Accordingly, a comparison of the Relator's costs with the price and cost representations made by the Defendant DEY establishes the falsity of DEY's representations for the drugs and years specified as follows:

### a. DRUG: ALBUTEROL SULFATE 0.083%
### 3 ML, 25s

MEDICAID                                         MEDICARE
NDC NO.: 49502-0697-03                         HCPCS J7620

| YEAR | DEFENDANT'S PUBLISHED PRICE | RED BOOK | | BLUE BOOK | | RELATOR'S WHOLESALER COST | RELATOR'S DIRECT COST |
|------|------|------|------|------|------|------|------|
| | | "AWP" | "DP" | "AWP" | "DP" | | |
| 1993 | | $32.30 | $26.50 | $32.29 | | | |
| 1994 | | $30.25 | | $30.24 | | | $8.50 |
| 1995 | | $30.25 | | $30.24 | | | $8.50 |
| 1996 | | $30.25 | | $30.24 | | | $8.50 |
| 1997 | | $30.25 | | | | | $8.50 |

Defendant, DEY caused the payment or approval of false or fraudulent claims during the years specified in the above chart by the Medicare and/or States' Medicaid Programs for the following additional size(s) of Albuterol Sulfate .083%:

| SIZE | MEDICAID NDC# | MEDICARE HCPCS |
|------|------|------|
| 3 ml, 30s | 49502-0697-33 | J7620 |
| 3 ml, 60s | 49502-0697-60 | J7620 |

CIVIL ACTION NO. **95-1354-CIV-GOLD**

### b. DRUG: ACETYLCYSTEINE SOLUTION 10%
### 4 ML, 12s

MEDICAID                                    MEDICARE
NDC NO.: 49502-0181-04                      HCPCS J7610

| YEAR | DEFENDANT'S PUBLISHED PRICE | RED BOOK | | BLUE BOOK | | RELATOR'S WHOLESALER COST | RELATOR'S DIRECT COST |
|------|------|------|------|------|------|------|------|
| | | "AWP" | "DP" | "AWP" | "DP" | | |
| 1993 | | $67.80 | $28.44 | $67.80 | | | |
| 1994 | | $67.80 | | $67.80 | | | $12.48 |
| 1995 | | $67.80 | | $67.80 | | | $12.48 |
| 1996 | | $67.80 | | $67.80 | | | $12.48 |
| 1997 | | $67.80 | | | | | $12.48 |

Defendant, DEY caused the payment or approval of false or fraudulent claims during the years specified in the above chart by the Medicare and/or States' Medicaid Programs for the following additional size(s) of Acetylcysteine Solution 10%:

| SIZE | MEDICAID NDC# | MEDICARE HCPCS |
|------|------|------|
| 10 ml, 3s | 49502-0181-10 | J7610 |
| 30 ml, 3s | 49502-0181-30 | J7610 |

### c. DRUG: ACETYCYSTEINE SOLUTION 20%
### 4 ML, 12s

MEDICAID                                    MEDICARE
NDC NO.: 49502-0182-04                      HCPCS J7615

| YEAR | DEFENDANT'S PUBLISHED PRICE | RED BOOK | | BLUE BOOK | | RELATOR'S WHOLESALER COST | RELATOR'S DIRECT COST |
|------|------|------|------|------|------|------|------|
| | | "AWP" | "DP" | "AWP" | "DP" | | |
| 1993 | | $81.36 | $34.20 | $81.36 | | | |
| 1994 | | $81.36 | | $81.36 | | | $12.60 |
| 1995 | | $81.36 | | $81.36 | | | $12.60 |
| 1996 | | $81.36 | | $81.36 | | | $12.60 |
| 1997 | | $81.36 | | | | | $12.60 |

235

**CIVIL ACTION NO. 95-1354-CIV-GOLD**

Defendant, DEY caused the payment or approval of false or fraudulent claims during the years specified in the above chart by the Medicare and/or States' Medicaid Programs for the following additional size(s) of Acetylcysteine Solution 20%:

| SIZE | MEDICAID NDC# | MEDICARE HCPCS |
|------|---------------|----------------|
| 10 ml, 3s | 49502-0182-10 | J7615 |
| 30 ml, 3s | 49502-0182-30 | J7615 |
| 100 ml | 49502-0182-00 | J7615 |

### d. DRUG: CROMOLYN SODIUM, USP
### 20 MG/2 ML, 60s

MEDICAID                 MEDICARE
NDC NO.: 49502-0689-02              HCPCS J7630

| YEAR | DEFENDANT'S PUBLISHED PRICE | RED BOOK | | BLUE BOOK | | RELATOR'S WHOLESALER COST | RELATOR'S DIRECT COST |
|------|------|------|------|------|------|------|------|
| | | "AWP" | "DP" | "AWP" | "DP" | | |
| 1993 | | | | | | | |
| 1994 | | | | | | | $24.50 |
| 1995 | | $42.00 | | $42.00 | | | $24.50 |
| 1996 | | $42.00 | | $42.00 | | | $24.50 |
| 1997 | | $42.00 | | | | | $24.50 |

Defendant, DEY caused the payment or approval of false or fraudulent claims during the years specified in the above chart by the Medicare and/or States' Medicaid Programs for the following additional size(s) of Cromolyn Sodium, USP:

236

CIVIL ACTION NO. 95-1354-CIV-GOLD

| SIZE | MEDICAID NDC# | MEDICARE HCPCS |
|------|---------------|----------------|
| 20 mg/2 ml 120s | 49502-0689-12 | J7630 |

## e. DRUG: METAPROTERENOL SULFATE 0.4%
### 2.5 ML, 25s

MEDICAID
NDC NO.: 49502-0678-03

MEDICARE
HCPCS J7670

| YEAR | DEFENDANT'S PUBLISHED PRICE | RED BOOK "AWP" | RED BOOK "DP" | BLUE BOOK "AWP" | BLUE BOOK "DP" | RELATOR'S WHOLESALER COST | RELATOR'S DIRECT COST |
|------|------|------|------|------|------|------|------|
| 1993 | | $30.75 | $15.39 | $30.75 | | | |
| 1994 | | $30.75 | | $30.75 | | | $6.25 |
| 1995 | | $30.75 | | $30.75 | | | $6.25 |
| 1996 | | $30.75 | | $30.75 | | | $6.25 |
| 1997 | | $30.75 | | | | | $6.25 |

## f. DRUG: METAPROTERENOL SULFATE 0.6%
### 2.5 ML, 25s

MEDICAID
NDC NO.: 49502-0676-03

MEDICARE
HCPCS J7672

| YEAR | DEFENDANT'S PUBLISHED PRICE | RED BOOK "AWP" | RED BOOK "DP" | BLUE BOOK "AWP" | BLUE BOOK "DP" | RELATOR'S WHOLESALER COST | RELATOR'S DIRECT COST |
|------|------|------|------|------|------|------|------|
| 1993 | | $30.75 | $15.39 | $30.75 | | | |
| 1994 | | $30.75 | | $30.75 | | | $6.25 |
| 1995 | | $30.75 | | $30.75 | | | $6.25 |
| 1996 | | $30.75 | | $30.75 | | | $6.25 |
| 1997 | | $30.75 | | | | | $6.25 |

CIVIL ACTION NO. 95-1354-CIV-GOLD

## g.  DRUG: SODIUM CHLORIDE 0.9%
## 15 ML

MEDICAID
NDC NO.: 49502-0830-15

MEDICARE
HCPCS J3490

| YEAR | DEFENDANT'S PUBLISHED PRICE | RED BOOK | | BLUE BOOK | | RELATOR'S WHOLESALER COST | RELATOR'S DIRECT COST |
|------|------|------|------|------|------|------|------|
| | | "AWP" | "DP" | "AWP" | "DP" | | |
| 1993 | | | | | | | |
| 1994 | | | | $14.09 | | | $5.02 |
| 1995 | | | | $14.09 | | | $5.02 |
| 1996 | | | | | | | $5.02 |
| 1997 | | | | | | | $5.02 |

Defendant, DEY caused the payment or approval of false or fraudulent claims during

the years specified in the above chart by the Medicare and/or States' Medicaid Programs

for the following additional size(s) of Sodium Chloride:

| SIZE | MEDICAID NDC# | MEDICARE HCPCS |
|------|------|------|
| 3% 15 ml, 50s | 49502-0640-15 | J3490 |
| 10% 15 ml, 50s | 49502-0641-15 | J3490 |

As a direct and proximate result of the actions of the Defendant DEY alleged herein,

the United States has sustained damages recoverable under the False Claims Act, together

with triple damages, penalties, attorneys' fees and costs.

238

PAGES 239 THROUGH 257

HAVE BEEN COMPLETELY
REDACTED

CIVIL ACTION NO. 95-1354-CIV-GOLD

## SECTION NO. 21

### THE SPECIFIC FALSE PRICE AND COST REPRESENTATIONS OF DEFENDANT GLAXO WELLCOME/CERENEX

215.   At various times from on or after June 23, 1989 and continuing through the present date, Defendant GLAXO WELLCOME/CERENEX knowingly caused the Medicare program and the States' Medicaid programs throughout the United States and its territories to pay false or fraudulent claims for drugs specified in this Section and further made or used false or fraudulent records and/or statements to get such claims paid or approved. As a result of the said actions of Defendant GLAXO WELLCOME/CERENEX and those persons and entities acting directly or indirectly in concert with Defendant GLAXO WELLCOME/CERENEX, the Medicare and States' Medicaid Programs paid grossly excessive, unreasonable and unlawful amounts for claims for the drugs specified in this Section. The acts committed by Defendant GLAXO WELLCOME/CERENEX that caused the Medicare and States' Medicaid Programs to pay or approve said false or fraudulent claims included, but were not necessarily limited to, knowingly making false or fraudulent representations about prices and costs of the drugs specified in this Section which Defendant GLAXO WELLCOME/CERENEX knew or should have known would be relied upon by the Medicare and States' Medicaid Programs in paying or approving claims for the drugs specified in this Section. Each of said representations were material and were relied upon by the Medicare and States' Medicaid Programs in paying or approving claims for the drugs specified in this Section.

216.    Defendant GLAXO WELLCOME/CERENEX knowingly caused its false or fraudulent price and cost representations to be published in the years specified in this Section in the Red Book, the Blue Book and the First Data Bank's Automated Services and further made or used false records or statements regarding its prices and costs of the drugs specified in this Section and submitted same to the Medicare and States' Medicaid Programs continuously throughout the years specified in this Section. For the purposes of specificity and particularity, the said false price and cost representations as they were reflected in the Red Book and Blue Book have been organized into a chart form for each drug in question and for each NDC Number assigned to each drug in question. The information provided under the columns for Defendant's Published Price, and Red Book and Blue Book "AWP" and "DP" reflects the false price and cost representations made by the Defendant GLAXO WELLCOME/CERENEX. The information under the Relator's Cost columns reflects the true price that Defendant GLAXO WELLCOME/CERENEX charged the Relator for the drug or caused another entity to charge the Relator for the drug. As a very small infusion pharmacy, the Relator does not always receive the lowest prices available to volume purchasers. Accordingly, a comparison of the Relator's costs with the price and cost representations made by the Defendant GLAXO WELLCOME/ CERENEX establishes the falsity of GLAXO WELLCOME/ CERENEX's representations for the drugs and years specified as follows:

## a. DRUG: ONDANSETRON HYDROCHLORIDE
## (ZOFRAN) 40 MG

MEDICAID                                                        MEDICARE
NDC NO.: 00173-0442-00                                    HCPCS J2405

| YEAR | DEFENDANT'S PUBLISHED PRICE | RED BOOK | | BLUE BOOK | | RELATOR'S WHOLESALER COST | RELATOR'S DIRECT COST |
|------|------|------|------|------|------|------|------|
| | | "AWP" | "DP" | "AWP" | "DP" | | |
| 1993 | $178.97 | $207.50 | | $198.00 | | $176.80 | |
| 1994 | | $214.76 | | $214.76 | | $172.92 | |
| 1995 | $194.18 | $233.02 | $194.18 | $233.02 | | $167.00 | |
| 1996 | $203.69 | $233.02 | | $233.02 | | $165.00 | |
| 1997 | | $244.43 | | | | $165.00 | |

Defendant, GLAXO WELLCOME/CERENEX caused the payment or approval of

false or fraudulent claims during the years specified in the above chart by the Medicare

and/or States' Medicaid Programs for the following additional size(s) of Ondansetron

Hydrochloride:

| SIZE | MEDICAID NDC# | MEDICARE HCPCS |
|------|------|------|
| 32 mg Premix Bag | 00173-0461-00 | --------- |
| 2 ml vial | 00173-0442-02 | J2405 |

As a direct and proximate result of the actions of the Defendant GLAXO/

WELLCOME/CERENEX alleged herein, the United States has sustained damages

recoverable under the False Claims Act, together with triple damages, penalties, attorneys'

fees and costs.

260

**CIVIL ACTION NO. 95-1354-CIV-GOLD**





CIVIL ACTION NO. 95-1354-CIV-GOLD

### SECTION NO. 23

### THE SPECIFIC FALSE PRICE AND COST REPRESENTATIONS OF DEFENDANT HOECHST

219. At various times from on or after June 23, 1989 and continuing through the present date, Defendant HOECHST knowingly caused the Medicare program and the States' Medicaid programs throughout the United States and its territories to pay false or fraudulent claims for drugs specified in this Section and further made or used false or fraudulent records and/or statements to get such claims paid or approved. As a result of the said actions of Defendant HOECHST and those persons and entities acting directly or indirectly in concert with Defendant HOECHST, the Medicare and States' Medicaid Programs paid grossly excessive, unreasonable and unlawful amounts for claims for the drugs specified in this Section. The acts committed by Defendant HOECHST that caused the Medicare and States' Medicaid Programs to pay or approve said false or fraudulent claims included, but were not necessarily limited to, knowingly making false or fraudulent representations about prices and costs of the drugs specified in this Section which Defendant HOECHST knew or should have known would be relied upon by the Medicare

264

CIVIL ACTION NO. 95-1354-CIV-GOLD

and States' Medicaid Programs in paying or approving claims for the drugs specified in this Section. Each of said representations were material and were relied upon by the Medicare and States' Medicaid Programs in paying or approving claims for the drugs specified in this Section.

220.   Defendant HOECHST knowingly caused its false or fraudulent price and cost representations to be published in the years specified in this Section in the Red Book, the Blue Book and the First Data Bank's Automated Services and further made or used false records or statements regarding its prices and costs of the drugs specified in this Section and submitted same to the Medicare and States' Medicaid Programs continuously throughout the years specified in this Section. For the purposes of specificity and particularity, the said false price and cost representations as they were reflected in the Red Book and Blue Book have been organized into a chart form for each drug in question and for each NDC Number assigned to each drug in question. The information provided under the columns for Defendant's Published Price, and Red Book and Blue Book "AWP" and "DP" reflects the false price and cost representations made by the Defendant HOECHST. The information under the Relator's Cost columns reflects the true price that Defendant HOECHST charged the Relator for the drug or caused another entity to charge the Relator for the drug. As a very small infusion pharmacy, the Relator does not always receive the lowest prices available to volume purchasers. Accordingly, a comparison of the Relator's costs with the price and cost representations made by the Defendant HOECHST

265

establishes the falsity of HOECHST's representations for the drugs and years specified as follows:

### a. DRUG: ANZEMET (DOLASETRON MESYLATE)
### 20 MG/ML, 5 ML

**MEDICAID**
NDC NO.: 00088-1206-32

**MEDICARE**
HCPCS J3490

| YEAR | DEFENDANT'S PUBLISHED PRICE | RED BOOK | | BLUE BOOK | | RELATOR'S WHOLESALER COST | RELATOR'S DIRECT COST |
|------|---------|---------|---------|---------|---------|---------|---------|
| | | "AWP" | "DP" | "AWP" | "DP" | | |
| 1993 | | | | | | | |
| 1994 | | | | | | | |
| 1995 | | | | | | | |
| 1996 | | | | | | | |
| 1997 | $124.90 | $149.88 | | | | $70.00 | |
| 1998 | $124.90 | $149.88 | | | | $70.00 | |

As a direct and proximate result of the actions of the Defendant HOECHST  alleged herein, the United States has sustained damages recoverable under the False Claims Act, together with triple damages, penalties, attorneys' fees and costs.

PAGES 267 THROUGH 290

HAVE BEEN COMPLETELY
REDACTED

CIVIL ACTION NO. 95-1354-CIV-GOLD

### SECTION NO. 30

### THE SPECIFIC FALSE PRICE AND COST REPRESENTATIONS OF DEFENDANT SMITHKLINE

233.   At various times from on or after June 23, 1989 and continuing through the present date, Defendant SMITHKLINE knowingly caused the Medicare program and the States' Medicaid programs throughout the United States and its territories to pay false or fraudulent claims for drugs specified in this Section  and further made or used false or fraudulent records and/or statements to get such claims paid or approved.  As a result of the said actions of Defendant SMITHKLINE and those persons and entities acting directly or indirectly in concert with Defendant SMITHKLINE, the Medicare and States' Medicaid Programs paid grossly excessive,  unreasonable and unlawful amounts for claims for the drugs specified in this Section.  The acts committed by Defendant SMITHKLINE that caused the Medicare and States' Medicaid Programs to pay or approve said false or fraudulent claims included, but were not necessarily limited to, knowingly making false or fraudulent representations about prices and costs of the drugs specified in this Section which Defendant SMITHKLINE knew or should have known would be relied upon by the Medicare and States' Medicaid Programs in paying or approving claims for the drugs specified in this Section.  Each of said representations were material and were relied upon by the Medicare and States' Medicaid Programs in paying or approving claims for the drugs specified in this Section.

291

CIVIL ACTION NO. 95-1354-CIV-GOLD

234.    Defendant SMITHKLINE knowingly caused its false or fraudulent price and

cost representations to be published in the years specified in this Section in the Red Book,

the Blue Book and the First Data Bank's Automated Services and further made or used

false records or statements regarding its prices and costs of the drugs specified in this

Section and submitted same to the Medicare and States' Medicaid Programs continuously

throughout the years specified in this Section. For the purposes of specificity and

particularity, the said false price and cost representations as they were reflected in the Red

Book and Blue Book have been organized into a chart form for each drug in question and

for each NDC Number assigned to each drug in question. The information provided under

the columns for Defendant's Published Price, and Red Book and Blue Book "AWP" and

"DP" reflects the false price and cost representations made by the Defendant

SMITHKLINE. The information under the Relator's Cost columns reflects the true price that

Defendant SMITHKLINE charged the Relator for the drug or caused another entity to

charge the Relator for the drug. As a very small infusion pharmacy, the Relator does not

always receive the lowest prices available to volume purchasers. Accordingly, a

comparison of the Relator's costs with the price and cost representations made by the

Defendant SMITHKLINE establishes the falsity of SMITHKLINE's representations for the

drugs and years specified as follows:

## a. DRUG: GANISETRON HYDROCHLORIDE (Kytril)
### 1 MG/ML 1 ml

MEDICAID                                                      MEDICARE
NDC NO.: 00029-4149-01                                 HCPCS J1625

| YEAR | DEFENDANT'S PUBLISHED PRICE | RED BOOK | | BLUE BOOK | | RELATOR'S WHOLESALER COST | RELATOR'S DIRECT COST |
|------|------|------|------|------|------|------|------|
| | | "AWP" | "DP" | "AWP" | "DP" | | |
| 1993 | | | | | | | |
| 1994 | | | | | | $118.90 | |
| 1995 | | $166.00 | | $166.00 | | $118.90 | |
| 1996 | | $166.00 | | $166.00 | | $118.95 | |
| 1997 | | $173.95 | | | | $124.90 | |

As a direct and proximate result of the actions of the Defendant SMITHKLINE alleged herein, the United States has sustained damages recoverable under the False Claims Act, together with triple damages, penalties, attorneys' fees and costs.

## SECTION NO. 31

### THE SPECIFIC FALSE PRICE AND COST REPRESENTATIONS OF DEFENDANT WARRICK

235.   At various times from on or after June 23, 1989 and continuing through the present date, Defendant WARRICK knowingly caused the Medicare program and the States' Medicaid programs throughout the United States and its territories to pay false or fraudulent claims for drugs specified in this Section  and further made or used false or fraudulent records and/or statements to get such claims paid or approved.  As a result of the said actions of Defendant WARRICK and those persons and entities acting directly or

293

indirectly in concert with Defendant WARRICK, the Medicare and States' Medicaid Programs paid grossly excessive, unreasonable and unlawful amounts for claims for the drugs specified in this Section. The acts committed by Defendant WARRICK that caused the Medicare and States' Medicaid Programs to pay or approve said false or fraudulent claims included, but were not necessarily limited to, knowingly making false or fraudulent representations about prices and costs of the drugs specified in this Section which Defendant WARRICK knew or should have known would be relied upon by the Medicare and States' Medicaid Programs in paying or approving claims for the drugs specified in this Section. Each of said representations were material and were relied upon by the Medicare and States' Medicaid Programs in paying or approving claims for the drugs specified in this Section.

236. Defendant WARRICK knowingly caused its false or fraudulent price and cost representations to be published in the years specified in this Section in the Red Book, the Blue Book and the First Data Bank's Automated Services and further made or used false records or statements regarding its prices and costs of the drugs specified in this Section and submitted same to the Medicare and States' Medicaid Programs continuously throughout the years specified in this Section. For the purposes of specificity and particularity, the said false price and cost representations as they were reflected in the Red Book and Blue Book have been organized into a chart form for each drug in question and for each NDC Number assigned to each drug in question. The information provided under the columns for Defendant's Published Price, and Red Book and Blue Book "AWP" and

294

CIVIL ACTION NO. 95-1354-CIV-GOLD

"DP" reflects the false price and cost representations made by the Defendant WARRICK. The information under the Relator's Cost columns reflects the true price that Defendant WARRICK charged the Relator for the drug or caused another entity to charge the Relator for the drug. As a very small infusion pharmacy, the Relator does not always receive the lowest prices available to volume purchasers. Accordingly, a comparison of the Relator's costs with the price and cost representations made by the Defendant WARRICK establishes the falsity of WARRICK's representations for the drugs and years specified as follows:

### a. DRUG: ALBUTEROL SULFATE 0.083%
### 3 ML, 25s

MEDICAID
NDC NO.: 59930-1500-08

MEDICARE
HCPCS J7620

| YEAR | DEFENDANT'S PUBLISHED PRICE | RED BOOK | | BLUE BOOK | | RELATOR'S WHOLESALER COST | RELATOR'S DIRECT COST |
|------|------|------|------|------|------|------|------|
| | | "AWP" | "DP" | "AWP" | "DP" | | |
| 1993 | | | | | | | |
| 1994 | | $32.25 | | $30.24 | $24.75 | | |
| 1995 | | $32.25 | | $30.24 | | | |
| 1996 | | $32.25 | | $30.24 | | | |
| 1997 | | $30.25 | | | | $7.99 | |

Defendant, WARRICK caused the payment or approval of false or fraudulent claims during the years specified in the above chart by the Medicare and/or States' Medicaid Programs for the following additional size(s) of Albuterol Sulfate 0.083%:

| SIZE | MEDICAID NDC# | MEDICARE HCPCS |
|------|------|------|
| 3 ml, 60s | 59930-1500-06 | J7670 |

295

## b. DRUG: ALBUTEROL SULFATE 0.5%
## 20 ML

MEDICAID                                                                    MEDICARE
NDC NO.: 59930-1515-04                                                      HCPCS J7625

| YEAR | DEFENDANT'S PUBLISHED PRICE | RED BOOK | | BLUE BOOK | | RELATOR'S WHOLESALER COST | RELATOR'S DIRECT COST |
|------|------|------|------|------|------|------|------|
| | | "AWP" | "DP" | "AWP" | "DP" | | |
| 1993 | | | | | | | |
| 1994 | | $12.50 | | $12.50 | $9.60 | | |
| 1995 | | $12.50 | | $12.50 | | | |
| 1996 | | $14.99 | | $14.99 | | | |
| 1997 | | $14.99 | | | | $5.49 | |

As a direct and proximate result of the actions of the Defendant WARRICK alleged

herein, the United States has sustained damages recoverable under the False Claims Act,

together with triple damages, penalties, attorneys' fees and costs.



296

**CIVIL ACTION NO. 95-1354-CIV-GOLD**



**CIVIL ACTION NO. 95-1354-CIV-GOLD**



**CIVIL ACTION NO. 95-1354-CIV-GOLD**



## COUNT I

**FALSE CLAIMS ACT;**
**CAUSING PRESENTATION OF FALSE OR FRAUDULENT CLAIMS**

239.    This is a civil action by the Plaintiff, UNITED STATES, and the Relator, VEN-

A-CARE, on behalf of the UNITED STATES and on behalf of the Relator, against the

Defendants:  ABBOTT  LABORATORIES,  INC.;

299

CIVIL ACTION NO. 95-1354-CIV-GOLD

BAXTER HEALTHCARE CORPORATION; BAYER CORPORATION;

BRISTOL-MYERS SQUIBB COMPANY;

DEY, INC.;

GLAXO WELLCOME, INC.;                    HOECHST MARION ROUSSEL,

INC.;

SMITHKLINE BEECHAM CORPORATION; WARRICK

PHARMACEUTICALS CORPORATION; and

under the False Claims Act, **31 U.S.C. §§3729-3732.**

240.    Relator realleges and incorporates by reference paragraphs 1 through 238 as if fully set forth herein and further alleges as follows:

241.    The DEFENDANTS from a date on or before June 23, 1989 to the present date, knowingly [as defined in 31 USC, §3729(b)] caused to be presented to officers or employees of the UNITED STATES GOVERNMENT and STATE GOVERNMENTS false or fraudulent claims [as explained in **United States v. Neifert-White, 390 US 228, 232-233 (1968)**] for payment or approval, in that the DEFENDANTS caused to be presented to officers or employees of the UNITED STATES GOVERNMENT and STATE GOVERNMENTS false or fraudulent price and cost information for the drugs specified

300

Case 1:01-cv-12257-PBS Document 8293-2 Filed 04/09/13 Page 253 of 270
Case 1:10-cv-21745-ASG Document 13-2 Entered on FLSD Docket 06/04/2010 Page 113 of
130

CIVIL ACTION NO. 95-1354-CIV-GOLD

herein and caused the UNITED STATES and STATE GOVERNMENTS to pay out sums

of money to the providers and suppliers of the DEFENDANTS' specified drugs, grossly in

excess of the amounts permitted by law, resulting in great financial loss to the UNITED

STATES and STATE GOVERNMENTS.

242.   Because of the DEFENDANT PHARMACEUTICAL MANUFACTURERS'

conduct as set forth in this Count, the UNITED STATES suffered actual damages in excess

of One Billion Dollars ($1,000,000,000.00), all in violation of **31 U.S.C. §3729(a)(1)**

## COUNT II

### FALSE CLAIMS ACT; CAUSING A FALSE RECORD OR STATEMENT
### TO BE MADE OR USED TO GET A FALSE OR FRAUDULENT
### CLAIM PAID OR APPROVED BY THE GOVERNMENT

243.   This is a civil action by the Plaintiff, UNITED STATES, and the Relator, VEN-

A-CARE, on behalf of the UNITED STATES and on behalf of the Relator, against the

Defendants:  ABBOTT  LABORATORIES,  INC.;

BAXTER  HEALTHCARE  CORPORATION;  BAYER  CORPORATION;

BRISTOL-MYERS SQUIBB COMPANY;

DEY, INC.;

GLAXO WELLCOME, INC.;                     HOECHST MARION ROUSSEL,

INC.;

301

CIVIL ACTION NO. 95-1354-CIV-GOLD

███████████████████████████████████

██████████████ SMITHKLINE BEECHAM CORPORATION; WARRICK PHARMACEUTICALS CORPORATION; and ████████████████████████

████████ under the **False Claims Act, 31 U.S.C. §§3729-3732**.

244. Relator realleges and incorporates by reference paragraphs 1 through 238 as if fully set forth herein and further alleges as follows:

245. The DEFENDANTS, from a date on or before June 23, 1989 to the present date, knowingly [as defined in **§3729(b)**] caused false records or statements to be made or used to get false or fraudulent claims [as explained in **United States v. Neifert-White,** **390 US 228, 232-233 (1968)**] to be paid or approved by the GOVERNMENT, in that the DEFENDANTS, caused false records or statements of prices and costs of the DEFENDANTS' drugs specified herein to be used by the GOVERNMENT to pay or approve claims presented by the providers and suppliers of the DEFENDANTS' specified drugs, which claims were grossly in excess of the amounts permitted by law, resulting in great financial loss to the UNITED STATES and STATE GOVERNMENTS.

246. Because of the DEFENDANTS' conduct as set forth in this Count, the UNITED STATES suffered actual damages in excess of One Billion Dollars ($1,000,000,000.00), all in violation of **31 U.S.C. §3729(a)(2)**.

302

**CIVIL ACTION NO. 95-1354-CIV-GOLD**

## COUNT III

### FALSE CLAIMS ACT; CAUSING FALSE RECORDS OR STATEMENTS TO BE USED TO CONCEAL AN OBLIGATION TO PAY MONEY TO THE GOVERNMENT

247. This is a civil action by the Plaintiff, UNITED STATES, and the Relator, VEN-A-CARE, on behalf of the UNITED STATES and on behalf of the Relator, against the

Defendants: ABBOTT LABORATORIES, INC.; ███████████████

████████████████████████████████████████████████████

██████ BAXTER HEALTHCARE CORPORATION; BAYER CORPORATION; ██

████████████████████████████████████████████████████

██████ BRISTOL-MYERS SQUIBB COMPANY; ████████████████

████████████████████████████ DEY, INC.; ████████████

████████████████████████████████████████████████████

██ GLAXO WELLCOME, INC.; ██████████████████ HOECHST MARION ROUSSEL,

INC.; ██████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████ SMITHKLINE BEECHAM CORPORATION; WARRICK

PHARMACEUTICALS CORPORATION; and ████████████████████████

████████ under the **False Claims Act, 31 U.S.C. §§3729-3732**.

248. Relator realleges and incorporates by reference paragraphs 1 through 238 as if fully set forth herein and further alleges as follows:

303

249. The DEFENDANTS, from a date on or before June 23, 1989 to the present date, knowingly [as defined in §3729(b)] caused false records or statements to be made or used to conceal obligations to pay money to the GOVERNMENT, in that: the DEFENDANTS knew that the UNITED STATES' Medicare Program and the States' Medicaid Programs were using the DEFENDANTS' false price and cost representations for purposes of paying or approving claims of the providers and suppliers of the DEFENDANTS' specified drugs; the DEFENDANTS knew that sums of money paid by the UNITED STATES and States' Governments to the providers and suppliers of the DEFENDANTS' specified drugs were grossly in excess of the amounts permitted by law; the DEFENDANTS knew it was the obligation of the UNITED STATES Medicare Part B carriers and State Governments to recoup governments' funds paid in excess of the amounts permitted by law; the DEFENDANTS, nevertheless, continued to cause the using and making of false records or statements of prices and costs for the specified drugs that were grossly in excess of the reasonable amounts permitted by law; and the DEFENDANTS thus concealed from the UNITED STATES Medicare Part B carriers and State Governments an obligation of the providers and suppliers of the DEFENDANTS' specified drugs to pay recoupment monies to the UNITED STATES and State Governments, resulting in great financial loss to the UNITED STATES and State Governments.

304

CIVIL ACTION NO. 95-1354-CIV-GOLD

250.  Because of the DEFENDANTS' conduct as set forth in this Count, the

UNITED  STATES  suffered  actual  damages  in  excess  of  One  Billion  Dollars

($1,000,000,000.00), all in violation of **31 U.S.C. §3729(a)(7)**.

## COUNT IV

### FALSE CLAIMS ACT; CAUSING PRESENTATION OF
### FALSE OR FRAUDULENT CLAIMS; ILLEGAL REMUNERATION

251.  This is a civil action by the Plaintiff, UNITED STATES, and the Relator, VEN-

A-CARE, on behalf of the UNITED STATES and on behalf of the Relator, against the

Defendants:  ABBOTT  LABORATORIES,  INC.;

BAXTER  HEALTHCARE  CORPORATION;  BAYER  CORPORATION;

BRISTOL-MYERS SQUIBB COMPANY;

DEY, INC.;

GLAXO WELLCOME, INC.;                    HOECHST MARION ROUSSEL,

INC.;

SMITHKLINE  BEECHAM  CORPORATION;  WARRICK

PHARMACEUTICALS  CORPORATION;  and

under the **False Claims Act, 31 U.S.C. §§3729-3732**.

305

252. Relator realleges and incorporates by reference paragraphs 1 through 238 as if fully set forth herein and further alleges as follows:

253. The DEFENDANTS, from on or about June 23, 1989 to the present date, knew that the prices charged to their customers for the specified drugs were significantly reduced in amount from the prices and costs represented by the DEFENDANTS and upon which the DEFENDANTS knew Medicare and Medicaid claims would be approved and paid. Accordingly, the DEFENDANTS have each knowingly offered or paid, or caused to be offered or paid, directly or indirectly, overtly or covertly, in cash or in kind, remuneration to their customers in the form of price reductions and/or in the form of illegal remuneration from the Medicare and/or States' Medicaid Programs to induce them to purchase, order or arrange or to recommend purchasing, arranging or ordering the specified drugs for which the DEFENDANTS knew that payment would be made, in whole or in part, by the Medicare and States' Medicaid Programs. Such financial inducement is specifically prohibited by 42 U.S.C. §1320a-7b(b)(2) and 18 U.S.C §2.

254. The DEFENDANTS knew that the Medicare and States' Medicaid Programs would not pay or approve claims for the specified drugs if it were disclosed to the Medicare and States' Medicaid Programs that said claims were for amounts that included remuneration prohibited by 42 U.S.C. §1320a-7b(b)(2).

255. The DEFENDANTS also knew that their customers, in presenting claims for the specified drugs to the Medicare and States' Medicaid Programs, would not and did not

306

disclose that the claim amounts included the remuneration prohibited  by  42 U.S.C. §1320a-7b(b)(2).

256.  The DEFENDANTS' knowing and willful actions in arranging for their customers to receive remuneration prohibited by 42 U.S.C. §1320a-7b(b)(2), in causing the omission of material information from the claims, and in causing the failure to properly disclose and appropriately reflect the remuneration in the claims,  caused the claims for the specified drugs to be false and fraudulent claims and caused the claims to be presented to the Medicare and States' Medicaid Programs for payment and approval in violation of 31 U.S.C §3729(a)(1).

257.  Because of the DEFENDANTS' conduct as set forth in this Count, the UNITED STATES suffered actual damages in excess of One Billion Dollars ($1,000,000,000.00)  all in violation of 31 U.S.C. §3729(a)(1).

### COUNT V

### FALSE CLAIMS ACT; CAUSING A FALSE RECORD OR STATEMENT TO BE MADE OR USED TO GET A FALSE OR FRAUDULENT CLAIM PAID OR APPROVED BY THE GOVERNMENT; ILLEGAL REMUNERATION

258.  This is a civil action by the Plaintiff, UNITED STATES, and the Relator, VEN-A-CARE, on behalf of the UNITED STATES and on behalf of the Relator, against the Defendants:  ABBOTT  LABORATORIES,  INC.;

BAXTER  HEALTHCARE  CORPORATION;  BAYER  CORPORATION;

**CIVIL ACTION NO. 95-1354-CIV-GOLD**

████████████████████████████████████████████████████████

███████ BRISTOL-MYERS SQUIBB COMPANY; ███████████████████

████████████████████████████████████ DEY, INC.; █████████████

████████████████████████████████████████████████████████

██ GLAXO WELLCOME, INC.; ████████████████ HOECHST MARION ROUSSEL,

INC.; ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████ SMITHKLINE BEECHAM CORPORATION; WARRICK

PHARMACEUTICALS CORPORATION; and █████████████████████████

████████████ under the **False Claims Act, 31 U.S.C. §§3729-3732**.

259. Relator realleges and incorporates by reference paragraphs 1 through 238 as if fully set forth herein and further alleges as follows:

260. The DEFENDANTS, from on or before June 23, 1989 to the present date, knew that the prices charged to their customers for the specified drugs were significantly reduced in amount from the prices and costs represented by the DEFENDANTS and upon which the DEFENDANTS knew Medicare and Medicaid claims would be approved and paid. Accordingly, the DEFENDANTS have each knowingly offered or paid, or caused to be offered or paid, directly or indirectly, overtly or covertly, in cash or in kind, remuneration to their customers in the form of price reductions and/or in the form of illegal remuneration from the Medicare and/or States' Medicaid Programs to induce them to purchase, order or arrange or to recommend purchasing, arranging or ordering the specified drugs for which

the DEFENDANTS knew that payment would be made, in whole or in part, by the Medicare and States' Medicaid Programs. Such financial inducement is specifically prohibited by 42 U.S.C. §1320a-7b(b)(2) and 18 U.S.C §2.

261.   The DEFENDANTS knew that the Medicare and States' Medicaid Programs would not pay or approve claims for the specified drugs if it were disclosed to the Medicare and States' Medicaid Programs that said claims were for amounts that included remuneration prohibited by 42 U.S.C. §1320a-7b(b)(2).

262.   The DEFENDANTS also knew that their customers, in presenting claims for the specified drugs to the Medicare and States' Medicaid Programs, would not and did not disclose that the claim amounts included the remuneration prohibited by 42 U.S.C. §1320a-7b(b)(2).

263.   The DEFENDANTS' knowing and willful actions in arranging for their customers to receive remuneration prohibited by 42 U.S.C. §1320a-7b(b)2, in causing the omission of material information from the claims, and in causing the failure to properly disclose and appropriately reflect the remuneration in the claims, caused the claims for the specified drugs to the false records or statements that were made and used to get a false or fraudulent claim paid or approved by the Government.   The DEFENDANTS' actions herein caused said false records or statements to be made and used as prohibited by 31 U.S.C. §3729(a)(2).

264. Because of the DEFENDANTS' conduct as set forth in this Count, the UNITED STATES suffered actual damages in excess of One Billion Dollars ($1,000,000,000.00) all in violation of 31 U.S.C. §3729(a)(2).

## COUNT VI

### FALSE CLAIMS ACT; CAUSING PRESENTATION OF FALSE OR FRAUDULENT CLAIMS; PROHIBITED REFERRALS, CLAIMS AND COMPENSATION ARRANGEMENTS

265. This is a civil action by the Plaintiff, UNITED STATES, and the Relator, VEN-A-CARE, on behalf of the UNITED STATES and on behalf of the Relator, against the DEFENDANTS: ABBOTT LABORATORIES, INC.;

BAXTER HEALTHCARE CORPORATION; BAYER CORPORATION;

BRISTOL-MYERS SQUIBB COMPANY;

DEY, INC.;

GLAXO WELLCOME, INC.; HOECHST MARION ROUSSEL, INC.;

SMITHKLINE BEECHAM CORPORATION; WARRICK PHARMACEUTICALS CORPORATION; and

under the **False Claims Act, 31 U.S.C. §§3729-3732**.

CIVIL ACTION NO. 95-1354-CIV-GOLD

266.   Relator realleges and incorporates by reference paragraphs 1 through 238 as if fully set forth herein and further alleges as follows:

267.   The DEFENDANTS, from on or before January 1, 1995 to the present date, knowingly presented or caused to be presented, prohibited claims or bills to individuals and other entities for designated health services [outpatient prescription drugs] furnished pursuant to prohibited referrals from physicians, physician groups and/or outpatient clinics with which the DEFENDANTS had financial relationships, for which the DEFENDANTS knew that payment would be made, in whole or in part, by the Medicare and/or States' Medicaid Programs.   Such prohibited referrals, claims, bills and compensation arrangements are specifically prohibited by 42 U.S.C. §1395nn(a)(1)(B) and 18 U.S.C §2.

268.   The DEFENDANTS knew that the Medicare and/or States' Medicaid Programs would not pay or approve claims for the outpatient prescription drugs to the Medicare and/or States' Medicaid Programs that said claims were for amounts that included claims or bills prohibited by 42 U.S.C.  §1395nn(a)(1)(B).

269.   The DEFENDANTS knowingly presented or caused their referring physicians, physician groups and outpatient clinics to present claims or bills for the DEFENDANTS' outpatient prescription drugs to the Medicare and/or States' Medicaid Programs for payment or approval that were false or fraudulent.

270.   The DEFENDANTS' knowing actions in having compensation arrangements for its referring physicians, physician groups and outpatient clinics prohibited by 42 U.S.C. §1395nn(a)(1)(B) and in presenting or causing the presentment of prohibited claims in

311

CIVIL ACTION NO. 95-1354-CIV-GOLD

violation of 42 U.S.C. §1395nn(a)(1)(B) for payment or approval caused the claims for the outpatient prescription drugs presented to the Medicare and States' Medicaid Programs to be false or fraudulent claims in violation of 31 U.S.C §3729(a)(1).

271. Because of the DEFENDANTS' conduct as set forth in this Count, the UNITED STATES suffered actual damages in excess of One Billion Dollars ($1,000,000,000.00) all in violation of 31 U.S.C. §3729(a)(1).

## COUNT VII

### FALSE CLAIMS ACT; CAUSING A FALSE RECORD OR STATEMENT TO BE MADE OR USED TO GET A FALSE OR FRAUDULENT CLAIM PAID OR APPROVED BY THE GOVERNMENT; PROHIBITED REFERRALS, CLAIMS AND COMPENSATION ARRANGEMENTS

272. This is a civil action by the Plaintiff, UNITED STATES, and the Relator, VEN-A-CARE, on behalf of the UNITED STATES and on behalf of the Relator, against the DEFENDANTS: ABBOTT LABORATORIES, INC.;

BAXTER HEALTHCARE CORPORATION; BAYER CORPORATION;

BRISTOL-MYERS SQUIBB COMPANY;

DEY, INC.;

GLAXO WELLCOME, INC.; HOECHST MARION ROUSSEL, INC.;

312

Case 1:05-cv-07446-ASG Document 8292-2 Filed 04/09/13 Page 265 of 270
130
Case 1:05-cv-07446-ASG Document 8292-2 Filed 04/09/13 Page 125 of
130

**CIVIL ACTION NO. 95-1354-CIV-GOLD**

SMITHKLINE BEECHAM CORPORATION; WARRICK PHARMACEUTICALS CORPORATION; and

under the **False Claims Act, 31 U.S.C. §§3729-3732**.

273.    Relator realleges and incorporates by reference paragraphs 1 through 238 as if fully set forth herein and further alleges as follows:

274.    The DEFENDANTS, from on or before January 1, 1995 to the present date, knowingly presented or caused to be presented, prohibited claims or bills to individuals and other entities for designated health services [outpatient prescription drugs] furnished pursuant to prohibited referrals from physicians, physician groups and/or outpatient clinics with which the DEFENDANTS had financial relationships, for which the DEFENDANTS knew that payment would be made, in whole or in part, by the Medicare and/or States' Programs. Such prohibited referrals, claims, bills and compensation arrangements are specifically prohibited by 42 U.S.C. §1395nn(a)(1)(B) and 18 U.S.C §2.

275.    The DEFENDANTS knew that the Medicare and/or States' Medicaid Programs would not pay or approve claims for the outpatient prescription drugs if it were disclosed to the Medicare and/or States' Medicaid Programs that said claims were for amounts that included claims or bills prohibited by 42 U.S.C. §1395nn(a)(1)(B).

276.    The DEFENDANTS knowingly made or used or caused their referring physicians, physician groups or outpatient clinics to make or use false records or statements to get false or fraudulent claims and bills for the DEFENDANTS' outpatient

313

**CIVIL ACTION NO. 95-1354-CIV-GOLD**

prescription drugs to be paid or approved by the Medicare and/or States' Medicaid Programs.

277. The DEFENDANTS' knowing presentment or causing others to present, claims or bills to the Medicare and/or States' Medicaid Programs in violation of 42 U.S.C. §1395nn(a)(1)(B) without disclosing facts revealing said violations constituted the making or using, or the causing others to make or use, false records or statements to get a false or fraudulent claims paid or approved in violation of 31 U.S.C. §3729(a)(2).

278. Because of the DEFENDANTS' conduct as set forth in this Count, the UNITED STATES suffered actual damages in excess of One Billion Dollars ($1,000,000,000.00) all in violation of 31 U.S.C. §3729(a)(2).

### REQUESTS FOR RELIEF

WHEREFORE, the Relator, on behalf of the UNITED STATES, demands that judgment be entered in its favor and against Defendants: ABBOTT LABORATORIES, INC.;

BAXTER HEALTHCARE CORPORATION;

BAYER CORPORATION;

BRISTOL-MYERS SQUIBB COMPANY;

DEY, INC.;

GLAXO WELLCOME, INC.;

HOECHST MARION ROUSSEL, INC.;

314

CIVIL ACTION NO. **95-1354-CIV-GOLD**

SMITHKLINE BEECHAM CORPORATION; WARRICK PHARMACEUTICALS CORPORATION; and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ with judgment to be entered against each defendant for the amount of damages: (1) to the States' Medicaid Programs arising from claims for each Defendant's respective specified drugs; and (2) to the Medicare Program arising from claims for those drugs classified under the HCPCS codes covering their specified drugs, jointly and severally with such other defendants whose drugs fall under said HCPCS codes, as follows:

1.     On Count I (False Claims Act; Causing Presentation of False Claims) for triple the amount of the UNITED STATES' damages, plus civil penalties of no more than TEN THOUSAND DOLLARS ($10,000.00) and no less than FIVE THOUSAND DOLLARS ($5,000.00) for each false claim;

2.     On Count II (False Claims Act; Causing False Statements To Be Used To Get False Claims Paid By The GOVERNMENT) for triple the amount of UNITED STATES' damages plus civil penalties of no more than TEN THOUSAND DOLLARS ($10,000.00) and no less than FIVE THOUSAND DOLLARS ($5,000.00) for each false statement;

3.     On Count III (False Claims Act; causing False Statements To Be Used To conceal An Obligation To Pay Money To The GOVERNMENT) for triple the amount of the UNITED STATES' damages plus civil penalties of no more than TEN THOUSAND

315

DOLLARS ($10,000.00) and no less than FIVE THOUSAND DOLLARS ($5,000.00) for each false or fraudulent claim paid;

4.     On Count IV (False Claims Act; Causing Presentation of False and Fraudulent Claims; Illegal Remuneration) for triple the amount of the UNITED STATES' damages, plus civil penalties of no more than TEN THOUSAND DOLLARS ($10,000.00) and no less than FIVE THOUSAND DOLLARS ($5,000.00) for each false claim;

5.     On Count V (False Claims Act; Causing A False Record Or Statement To Be Made Or Used To Get A False Or Fraudulent Claim Paid Or Approved by the Government; Illegal Remuneration) for triple the amount of UNITED STATES' damages plus civil penalties of no more than TEN THOUSAND DOLLARS ($10,000.00) and no less than FIVE THOUSAND DOLLARS ($5,000.00) for each false statement;

6.     On Count VI (False Claims Act; Causing Presentation of False or Fraudulent Claims; Prohibited Referrals, Claims and Compensation Arrangements) for triple the amount of the UNITED STATES' damages, plus civil penalties of no more than TEN THOUSAND DOLLARS ($10,000.00) and no less than FIVE THOUSAND DOLLARS ($5,000.00) for each false statement;

7.     On Count VII (False Claims Act; Causing a False Record or Statement to be Made or Used to get a False or Fraudulent Claim Paid or Approved by the Government; Prohibited Referrals, Claims and Compensation Arrangements) for triple the amount of the UNITED STATES' damages, plus civil penalties of no more than TEN THOUSAND

316

CIVIL ACTION NO. 95-1354-CIV-GOLD

DOLLARS ($10,000.00) and no less than FIVE THOUSAND DOLLARS ($5,000.00) for

each false statement;

      8.     For all fees and costs of this civil action; and

      9.     For such other and further relief as the Court deems just and equitable.

Further, the Relator, on its behalf, requests that it receive thirty percent (30%),

[twenty-five percent (25%) if the United States Government intervenes and proceeds with

this case] or such other maximum amount as permitted by law, of the proceeds of this

action or settlement of this action collected by the UNITED STATES, plus an amount for

reasonable expenses incurred, plus reasonable attorneys' fees and costs of this action. The

Relator requests that its percentage be based upon the total value recovered, including any

amounts received from individuals or entities not parties to this action.

### DEMAND FOR JURY TRIAL

A jury trial is demanded in this case.

Respectfully submitted,

Atlee W. Wampler, III
Florida Bar No. 311227

James J. Breen
Florida Bar No. 297178
WAMPLER, BUCHANAN & BREEN, P.A.
900 Sun Trust Building
777 Brickell Avenue
Miami, Florida 33131
Telephone:  (305) 577-0044
Facsimile:   (305) 577-8545

317

CIVIL ACTION NO. 95-1354-CIV-GOLD

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this _____ day of December, 1999, I caused an original and a copy of this Third Amended Complaint to be filed under seal and in camera for sixty (60) days and not to be served on the Defendants named herein or until further order of this Honorable Court.

I HEREBY CERTIFY that prior to this _____ day of December, 1999, I caused a copy of this Third Amended Complaint and written disclosure of substantially all material evidence and information the Relator, VEN-A-CARE possesses to be served on the Government pursuant to Rule 4(i), Fed.R.Civ.P., prior to the filing of this Third Amended Complaint by delivering a copy of the Summons, Third Amended Complaint, material evidence and information to the United States Attorney for the Southern District of Florida, and by sending a copy of the Summons, Third Amended Complaint, material evidence and information by Certified Mail, Return Receipt Requested, to the Attorney General of the United States in Washington, D.C.

Respectfully submitted,

Atlee W. Wampler, III
Florida Bar No. 311227

James J. Breen
Florida Bar No. 297178
WAMPLER, BUCHANAN & BREEN, P.A.
900 Sun Trust Building
777 Brickell Avenue
Miami, Florida 33131
Telephone: (305) 577-0044
Facsimile: (305) 577-8545

F:\CLIENTS\3027\3RDAMD\FIN-3CMP.1