# EXHIBIT "4" TO

RELATOR VEN-A-CARE'S PRE-HEARING BRIEF
AND PRESENTATION OF FACTS

**(Deposition of Greg Hamilton
taken on January 29, 2013)**

# In The Matter of:

*UNITED STATES OF AMERICA ex rel. LINNETTE SUN , ET AL*
*v.*
*BAXTER HEMOGLOBIN THERAPEUTICS and BAXTER*
*INTERNATIONAL INC.*

_____

*GREG HAMILTON*
*January 29, 2013*
_____

*HIGHLY CONFIDENTIAL*
*PURSUANT TO PROTECTIVE ORDER*

**MERRILL LAD**
1325 G Street NW, Suite 200, Washington, DC
Phone: 800.292.4789   Fax:202.861.3425

Page 1

1                  UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS
2

3   IN RE PHARMACEUTICAL INDUSTRY        )
    AVERAGE WHOLESALE PRICE              )
4   LITIGATION                           )   MDL No. 1456
    _____     )
5                                        )   Master File No.
    THIS DOCUMENT RELATES TO:            )   1:01-CV-12257-PBS
6                                        )
    United States of America ex          )   Sub-Category Case
7   rel. Linnette Sun and Greg           )   No. 1:08-CV-11200
    Hamilton, Relators,                  )
8                                        )
            v.                           )
9                                        )
    Baxter Hemoglobin Therapeutics       )
10  and Baxter International Inc.         )

11        HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

12

13                Deposition of GREG HAMILTON, taken before

14   MARGARET A. BACHNER, CSR, RMR, CRR, and Notary

15   Public, pursuant to the Federal Rules of Civil

16   Procedure for the United States District Courts

17   pertaining to the taking of depositions for the

18   purpose of discovery, at Suite 600, 300 North LaSalle

19   Street, Chicago, Illinois, on the 29th day of

20   January, A.D. 2013, at 10:12 a.m.

21

22

23

24   Job No.: 24-228607

25   Pages: 1 - 218

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
GREG HAMILTON - 1/29/2013

Page 2

1    There were present at the taking of this
2    deposition the following counsel:
3
    GOLDBERG KOHN LTD.
4    BY: DAVID J. CHIZEWER, ESQUIRE
        BEATA G. BREWSTER, ESQUIRE
5    55 East Monroe Street, Suite 3300
    Chicago, Illinois 60603-5792
6    312-201-4000
    djc@goldbergkohn.com
7    beata.brewster@goldbergkohn.com
8        on behalf of the Relators;
9    DICKSTEIN SHAPIRO LLP
    BY: J. ANDREW JACKSON, ESQUIRE
10    1825 Eye Street NW
    Washington, DC 20006
11    202-420-2200
    jacksona@dicksteinshapiro.com
12
        on behalf of Baxter Hemoglobin Therapeutics
13        and Baxter International Inc.;
14    ANDERSON LLC
    BY: C. JARRETT ANDERSON, ESQUIRE
15    1409 Wathen Avenue
    Austin, TX 78703
16    512-469-9191
    jarrett@anderson-llc.com
17
        -and-
18
    THE BREEN LAW FIRM
19    BY: JAMES JOSEPH BREEN, ESQUIRE
    5755 North Point Parkway, Suite 260
20    Alpharetta, Georgia 30022
    770-740-0008
21    jbreen@breenlaw.com
22        on behalf of Ven-A-Care of the Florida
        Keys, Inc.
23
24    ALSO PRESENT:
25    MR. MICHAEL BOLTON, In-House Counsel,
    Baxter International Inc.

Page 4

1    HAMILTON DEPOSITION EXHIBIT      FOR IDENTIFICATION
2    Exhibit 8 - BAX MDL E 3240462-0463, 9/29/03    190
3        e-mail from Julie Perry
4    Exhibit 9 - GH-DFP1-000294, chart headed    198
5        "Factor Pricing (sample) 11/10/05"
6    Exhibit 10 - GH-DFP1-000297, 9/1/07 Memorandum, 204
7        Subject: Data From RBC Capital
8        Markets, Steve Hamill, "A Changing
9        Paradigm In Hemophilia,"
10        January 24, 2003"
11
12    CERTIFIED QUESTIONS        PAGE   LINE
13    By Mr. Anderson        139    20
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1        I N D E X
2    WITNESS            EXAMINATION
3    GREG HAMILTON
4    By Mr. Jackson            5, 213
5    By Mr. Anderson            55
6
7        E X H I B I T S
8    HAMILTON DEPOSITION EXHIBIT      FOR IDENTIFICATION
9    Exhibit 1 - DSMDB-3124678vl, Notice of    5
10        Deposition of Relator Greg
11        Hamilton
12    Exhibit 2 - 1/21/10 Deposition of Greg    6
13        Hamilton
14    Exhibit 3 - 9/15/09 Declaration of Greg    24
15        Hamilton
16    Exhibit 4 - 11/11/12 Declaration of Greg    24
17        Hamilton
18    Exhibit 5 - 1/23/01 Settlement Agreement    123
19    Exhibit 6 - GH-DFP1-000311-0312, document    130
20        headed "[Please note: paragraph
21        numbering errors are from the
22        original]"
23    Exhibit 7 - BAX MDL E 3222504-2506, 7/26/04    186
24        e-mail string, Subject: CuraScript
25        deal sheet, with attachment

Page 5

1        (Hamilton Deposition Exhibit 1
2        was marked for identification.)
3        (The witness was duly sworn.)
4        GREG HAMILTON,
5    called as a witness herein, having been first duly
6    sworn, was examined and testified as follows:
7        EXAMINATION
8    BY MR. JACKSON:
9        Q.    Mr. Hamilton, my name is Andy Jackson.  To
10    my right is Michael Bolton.  We represent Baxter in
11    the matter ex rel. Sun/Hamilton, et al. versus
12    Baxter.
13        Let me show you what's been marked as
14    Deposition Exhibit 1.  Deposition Exhibit 1 is the
15    Deposition Notice served on you for this deposition.
16    Have you seen this document before?
17        (Document tendered to the
18        witness.)
19    BY THE WITNESS:
20        A.    Yes, I have.
21    BY MR. JACKSON:
22        Q.    You're being deposed today in conjunction
23    with a hearing that's going to take place in Boston
24    on or around March 18th.
25        Were you aware of that?

2 (Pages 2 to 5)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
GREG HAMILTON – 1/29/2013

Page 6

1    A.   Yes.
2    **Q.   Did you do anything to prepare for your**
3 **deposition today?**
4    A.   No.
5    **Q.   Sir, I'm going to be asking you a series**
6 **of questions that I require an answer to.  And unless**
7 **your counsel directs you not to answer, you're**
8 **required to answer my questions.**
9       **Were you aware of that?**
10   A.   Yes.
11   **Q.   Are you on any medication or otherwise**
12 **impaired today such that you wouldn't be able to**
13 **understand my questions or give truthful answers?**
14   A.   No, I'm not.
15   **Q.   Did you review any documents in**
16 **preparation for your deposition today?**
17   A.   No, I did not.
18       (Hamilton Deposition Exhibit 2
19       was marked for identification.)
20       (Document tendered to the
21       witness.)
22 BY MR. JACKSON:
23   **Q.   I show you what's been marked as**
24 **Deposition Exhibit 2.  Deposition Exhibit 2 is the**
25 **January 21, 2010 deposition of you.**

Page 7

1       **Do you remember being deposed by me on**
2 **January 21st, 2010?**
3   A.   I recall being deposed by you, but I do
4 not recall the date.
5   **Q.   Okay.  And you did not review this**
6 **deposition; that is, Deposition Exhibit 2, prior to**
7 **your deposition today?**
8   A.   That is correct.
9   **Q.   When is the last time you read that**
10 **deposition do you think?**
11   A.   I have no idea.
12   **Q.   Did you in fact read it after it was taken**
13 **back in and around the time of January 21, 2010?**
14   A.   I don't recall.
15   **Q.   Do you believe that your testimony that**
16 **day in response to my questions was truthful?**
17   A.   Yes.
18   **Q.   Just to make sure, did you review anyone**
19 **else's deposition transcripts before the deposition**
20 **today or in preparation for today's deposition?**
21   A.   No, I did not.
22   **Q.   You didn't reviews Miss Sun's deposition,**
23 **is that correct?**
24   A.   That is correct.
25   **Q.   You produced documents prior to the date**

Page 8

1 **of the deposition; that is, Deposition Exhibit 2.**
2 **Have you uncovered or developed any more documents**
3 **relating to this case that you have not produced in**
4 **this case?**
5   A.   I'm not sure.  There is one document that
6 I gave to David just the other day, which is just a
7 copy of an e-mail.  And I'm not sure if that was
8 something that was going to be produced or shouldn't
9 be produced.  I presented it as something that maybe
10 should and maybe shouldn't.  I didn't know.  I was
11 going to leave it up to the lawyers.
12   **Q.   Who was the drafter of the e-mail?**
13   A.   Someone at Baxter.
14   **Q.   Who was the recipient?**
15   A.   I was.
16   **Q.   How many people were on the e-mail?**
17   A.   I don't recall.
18   **Q.   What was the date of the e-mail?**
19   A.   Again I don't recall.
20   **Q.   What was the subject matter of the e-mail?**
21   A.   It was the reconciliation of a rebate
22 agreement between my company, CuraScript, and Baxter,
23 for factor products.
24   **Q.   When were you at CuraScript?**
25   A.   I WAS at CuraScript, Express Scripts, from

Page 9

1 2001 through 2006.
2   **Q.   So, based upon that information do you**
3 **believe that the e-mail was dated in that same date**
4 **range?**
5   A.   Yes.
6   **Q.   Why did you have a copy of that e-mail?**
7   A.   I don't know that I have a specific
8 reason. I kept it along -- it was accompanying the
9 Excel spreadsheet that was referred to in the e-mail,
10 and I kept the Excel spreadsheet, which has been
11 produced.
12   MR. JACKSON:  Can I ask you to produce a copy of
13 that e-mail that Mr. Hamilton has just referred to in
14 his response?
15   MR. CHIZEWER:  Sure.  I meant to bring it, and I
16 just totally forgot.  It's not a substantive
17 document.
18   MR. JACKSON:  I understand.
19   MR. CHIZEWER:  I can even try to get it for you
20 today.
21   MR. JACKSON:  That might be helpful because I
22 may have to reserve because I can't ask questions
23 about it.
24   MR. CHIZEWER:  Yeah, I imagined you would.
25 BY MR. JACKSON:

3 (Pages 6 to 9)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
GREG HAMILTON — 1/29/2013

Page 10

1    Q.    Since the two-plus years since your first
2  deposition in this case have you developed any new
3  sources of information that would support your claims
4  in this case?
5    A.    I don't believe so.
6    Q.    Since January 2010 have you had any
7  communications with Miss Linnette Sun regarding this
8  case?
9    A.    Yes.
10   Q.    How many?
11   A.    I have no idea.
12   Q.    Were those communications live?
13   A.    Some were.
14   Q.    Were there also communications by phone?
15   A.    I believe there were conference calls.
16   Q.    Were there ever communications where your
17  counsel was not present?
18   A.    No.
19   Q.    We were informed recently, Mr. Hamilton,
20  that Miss Sun died on or around Christmastime this
21  year.
22        Were you aware of that?
23   A.    I am aware of it now, yes.
24   Q.    When did you first become aware of that?
25   A.    I don't recall, but I believe it was

Page 11

1  within a month of her dying.
2    Q.    And since 2010 have you seen any documents
3  that were prepared by or for Miss Sun that she has
4  signed that might be used in this case?
5    A.    I don't recall any.
6    Q.    Have you seen any draft declarations
7  signed by Ms. Sun?
8    A.    Would you explain "declarations"?
9    Q.    Sure.  A declaration is a sworn statement.
10 You'll remember you gave two declarations in support
11 of pleadings in this case.
12        Do you remember those declarations?
13   A.    Yes.
14   Q.    Do you understand what a declaration is
15 now?
16   A.    In that sense, yes.
17   Q.    Have you seen any declarations signed by
18 Miss Sun?
19   A.    I have not.
20   Q.    Have you seen similar affidavits signed by
21 Miss Sun, same kind of document, different form?
22   A.    I don't recall seeing any.
23   Q.    Do you know whether Miss Sun created any
24 documents shortly before her death that are relevant
25 to this case?

Page 12

1    A.    I don't know.
2    Q.    Have you been informed by anyone that Miss
3  Sun created such documents?
4    A.    The only information I got that sounds
5  like it's in the same arena which you're talking
6  about is Mark Kleiman mentioned that there was some
7  sort of -- some sort of documentation being done in
8  terms of estate planning or something like that.
9  But I don't have the specifics.
10   Q.    Do you remember testifying that you and
11 Miss Sun had a fee split arrangement in this case
12 whereby she would receive 80 percent of any proceeds
13 and you would receive 20 percent?
14   A.    Yes.
15   Q.    Has that agreement between you and Miss
16 Sun changed in any way since her death?
17        MR. CHIZEWER:  Can you explain how that's
18 related to the first to file proceeding?
19        MR. JACKSON:  Sure.  I think this witness, his
20 credibility is critical here.  What he says in any
21 hearing is important.  The witness says we will soon
22 find out his qui tam relators, an expert for qui tam
23 relators and his taking splits with qui tam relators.
24 I think it impacts his credibility.
25 BY MR. JACKSON:

Page 13

1    Q.    Has that agreement between Miss Sun and/or
2  her estate changed?
3    A.    No.
4    Q.    So, if there are any proceeds from this,
5  you will receive 20 percent of those proceeds, is
6  that correct?
7    A.    I would receive 20 percent of the relator
8  share.
9    Q.    Sir, since your deposition in January 2010
10 in this case, have you become a plaintiff in any
11 other False Claims Act cases?
12   A.    No.
13   Q.    And that's regardless whether it's sealed
14 or unsealed?
15   A.    That's correct.
16   Q.    And is that regardless whether it's a
17 federal case or a state case?
18   A.    That is correct.
19   Q.    Are you a plaintiff in any other case
20 regardless of whether it's false claim or not?
21   A.    No.
22   Q.    Do you remember testifying that you have
23 acted as an expert in 10 to 25 qui tam cases relating
24 to the pharmaceutical industry?
25   A.    I'm not sure of the number, but I -- that

4 (Pages 10 to 13)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
GREG HAMILTON – 1/29/2013

Page 14

1   sounds correct.
2       Q.    That was your testimony in January 2010.
3   Have you been retained to be an expert in any
4   pharmaceutical False Claims Act case since January
5   2010?
6       A.    I don't know.  I'd have to check.
7       Q.    How often have you been retained as an
8   expert?
9       A.    In?
10      Q.    False Claims Act cases against the
11  pharmaceutical industry.
12      A.    Since I started doing this, on and off.
13  There's no particular schedule as to when someone
14  consults with me or when they hire me.
15      Q.    So, I'm asking you today how many times
16  have you been hired to act as an expert for a
17  plaintiff in a False Claims Act case against the
18  pharmaceutical industry?
19      A.    I don't have that number.
20      Q.    When did you start acting as an expert?
21      A.    2000 and -- I believe it was about 2005,
22  maybe even '4.
23      Q.    Can you tell me the topic matters you've
24  acted as an expert for?
25      A.    I'll try and cover at least some of them.

Page 15

1   My areas of -- my subject matter expertise in the qui
2   tam cases has been pharmaceutical marketing, sales,
3   drug pricing, distribution, Medicaid rebate program
4   issues, compliance and methodology.
5       Q.    What do you mean by "methodology"?
6       A.    Methodology from a pharmaceutical -- taken
7   from a drug company's point of view is in terms of
8   how rebates are calculated, processed and paid.  And
9   of course, as part of that would be the 340B program.
10      Q.    Any other topic matters you've acted as an
11  expert?
12      MR. CHIZEWER:  Objection to form.
13  BY MR. JACKSON:
14      Q.    Are there any other topic matters in which
15  you have acted as an expert in these False Claims Act
16  cases in?
17      MR. CHIZEWER:  Same objection.
18  BY THE WITNESS:
19      A.    Those are the ones I remember off the top
20  of my head.  There may be more.
21  BY MR. JACKSON:
22      Q.    Were any of those cases False Claims Act
23  cases in which the Justice Department had intervened?
24      A.    I don't recall which ones were intervened
25  and which ones were not intervened.

Page 16

1       Q.    Can you give me a ballpark in terms of
2   percentage; less than half, more than half?
3       A.    I don't know.
4       Q.    What's the typical length of your
5   engagement for these matters?
6       A.    Years.
7       Q.    Did any of these cases concern
8   anti-hemophilia Factor VIII?
9       A.    No.
10      Q.    Do you know what anti-hemophilia Factor
11  VIII is?
12      A.    As a layman, yes.
13      Q.    What is that?
14      A.    It's a replacement product for Factor VIII
15  deficient patients.
16      Q.    What is a Factor VIII deficient payment?
17      A.    Patient.
18      Q.    I'm sorry.  Patient.  What is a Factor
19  VIII deficient patient?
20      A.    Those are patients with hemophilia A,
21  which means they do not have enough of a certain
22  protein which is designated as Factor VIII.  It's
23  about five percent of hemophilia patients are type A.
24      Q.    I asked you a question, "Do you know what
25  anti-hemophilia Factor VIII is," and you said, "As a

Page 17

1   layman."
2       A.    Yes.  I'm not a physician or a pharmacist.
3       Q.    So, you are not an expert regarding Factor
4   VIII, is that correct?
5       MR. CHIZEWER:  Objection to form.
6   BY THE WITNESS:
7       A.    I'm not a scientific expert.  I am an
8   expert on the sales and marketing of Factor VIII but
9   not on the science of Factor VIII.
10  BY MR. JACKSON:
11      Q.    So, I think you've told me you've never
12  been hired as an expert for a case regarding Factor
13  VIII, is that correct?
14      A.    That is correct.
15      Q.    And I think you also testified that you
16  have not been involved in any case other than this
17  case that concerns Factor VIII, is that correct?
18      A.    That is correct.
19      Q.    In any of these cases that you just
20  mentioned where you're acting as an expert, did you
21  ever act as an expert regarding damages?
22      A.    Well, could you tell me what you mean by
23  "damages"?
24      Q.    The calculation of damages that plaintiffs
25  or relators are seeking in a particular case.

5 (Pages 14 to 17)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
GREG HAMILTON – 1/29/2013

Page 18

1  A.   Yes.
2  Q.   **What case was that?**
3  A.   Several.
4  Q.   **Which ones?**
5  A.   I've never been presented as -- let me
6  clarify.
7       I've never been in front of a judge
8  testifying as a damages expert, but I have acted as
9  an expert consultant to the attorneys to help them
10  calculate the estimated damages in various cases.
11  Q.   **Which ones?**
12  MR. CHIZEWER:  Well, before you answer that
13  question, I just want to caution the witness that if
14  you have confidentiality agreements as a consulting
15  expert, that you should abide by your confidentiality
16  agreements.
17  BY THE WITNESS:
18  A.   I have confidentiality agreements with all
19  my clients.
20  BY MR. JACKSON:
21  Q.   **But we have a protective order in this**
22  **case. You should be able to testify under the terms**
23  **of this protective order. And in fact, I'm happy to**
24  **identify this deposition as protected under the**
25  **relevant protective order.**

Page 19

1       **Does that change your thinking in**
2  **answering my questions?**
3  MR. BREEN:  We'll stipulate to that.
4  BY THE WITNESS:
5  A.   All that tells me is that I should check
6  with my clients before I give you that information.
7  BY MR. JACKSON:
8  Q.   **Do you know whether any of your**
9  **agreements contain the provision that specifies that**
10  **if ordered or requested by a Court, you can so**
11  **testify?**
12  A.   I do not.
13  Q.   **All right. Now, what kind of cases did**
14  **you act as an expert consultant to help lawyers**
15  **calculate damages?**
16  A.   Medicaid rebate cases.
17  Q.   **Were those for particular drugs?**
18  A.   Yes.
19  Q.   **Do you remember the drug?**
20  A.   Yes.
21  Q.   **What were the drugs?**
22  MR. CHIZEWER:  Before you answer that question,
23  is that going to give away who your client was?
24  BY THE WITNESS:
25  A.   Exactly. That would give you the case,

Page 20

1  the client.
2  MR. JACKSON:  So, are you directing him not to
3  answer, Dave?
4  MR. CHIZEWER:  I'm not directing him not to
5  answer, but -- it's up to him. I haven't seen the
6  terms of the confidentiality agreements, so --
7  BY MR. JACKSON:
8  Q.   **I understand that. Are you going to**
9  **answer my question, Mr. Hamilton?**
10  MR. CHIZEWER:  I would say, though -- I can't be
11  certain, but I believe this issue either came up the
12  last time around or could have been anticipated and
13  it could have been dealt with in advance so that we
14  didn't run into this problem if you felt this was
15  information you really needed regarding his
16  credibility, the actual specific names of the
17  clients. And it wasn't. So, I do want to bring that
18  point up.
19  BY MR. JACKSON:
20  Q.   **You can decide to answer. Tell me one way**
21  **or the other. Either answer my question or tell me**
22  **you won't and we can decide whether to go to Court on**
23  **that or not.**
24  BY THE WITNESS:
25  A.   Exactly. At this point in time, I'm not

Page 21

1  going to answer.
2  BY MR. JACKSON:
3  Q.   **Okay. Now, since you've acted as a**
4  **consulting expert in regard to Medicaid rebate cases,**
5  **prior to filing this case did you evaluate or**
6  **research Medicaid reimbursement for Advate or**
7  **Recombinate before filing your action?**
8  A.   Yes.
9  Q.   **Which states?**
10  A.   State-specific I don't recall.
11  Q.   **How many states?**
12  A.   If I can try and be helpful here, I think
13  maybe I can, it might help to know that the research
14  that I'd done on Medicaid rebates prior to filing
15  this case for any factor products had nothing to do
16  with this case. The research I would have done would
17  have been as a specialty pharmacy who is billing
18  Medicaid states for reimbursement.
19  Q.   **I see. So, your research was not --**
20  **whatever research you did was not for purposes of**
21  **filing this case, but was in conjunction with your**
22  **work for Express Scripts or the subsidiary of Express**
23  **Scripts?**
24  A.   Yes, or when I was working for Bayer.
25  Q.   **All right. So, let's get back to this**

6 (Pages 18 to 21)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
GREG HAMILTON - 1/29/2013

Page 22

1  actual case now.
2          Did you research Medicaid reimbursement
3  law for any states for purposes of filing this case?
4          MR. CHIZEWER: Objection to form.
5  BY THE WITNESS:
6      A.   I don't recall.
7  BY MR. JACKSON:
8      Q.   Since filing this case have you undertaken
9  any research regarding Medicaid reimbursement for
10 Advate or Recombinate?
11     A.   I believe I did, but I don't recall
12 specifics.
13     Q.   Do you recall what the results of your
14 research was?
15     A.   Again, if I don't recall the subject
16 matter, I don't recall results. I just don't.
17     Q.   Sitting here today, can you tell me which
18 state Medicaid agencies do not reimburse on the basis
19 of AWP?
20         MR. CHIZEWER: Objection to form.
21 BY THE WITNESS:
22     A.   Well, first of all, we'd look at time
23 periods, but either way I'd say no.
24 BY MR. JACKSON:
25     Q.   So, your answer to my question is no?

Page 23

1      A.   That is correct.
2      Q.   Let's use any time period from 2000 to
3  date. Can you tell me which state Medicaid
4  organizations reimburse for Advate or rebate based
5  upon AWP?
6          MR. BREEN: I think you misspoke. You said,
7  "Advate or rebate."
8  BY MR. JACKSON:
9      Q.   Advate or Recombinate.
10     A.   Then the answer is no.
11     Q.   Mr. Hamilton, do you intend on testifying
12 at the hearing before Judge Saris on or about March
13 18?
14     A.   I don't know.
15     Q.   Do you know what topic areas you are
16 prepared to testify on in that hearing?
17         MR. CHIZEWER: I'm going to object to that
18 question as it invades the attorney-client privilege,
19 and I'm going to instruct him not to answer.
20         MR. JACKSON: I didn't ask him for any
21 communications between you and he.
22         MR. CHIZEWER: You're correct. It's not the
23 attorney-client privilege. It would be work product.
24 Sorry.
25         MR. JACKSON: Are you still instructing him not

Page 24

1  to answer the question?
2          MR. CHIZEWER: Yes.
3  BY MR. JACKSON:
4      Q.   I asked you some questions previously
5  about whether you had seen any draft or final
6  declarations, affidavits, et cetera by Ms. Sun.
7          Do you remember those questions?
8      A.   Yes, I do.
9      Q.   Since 2010, when your deposition took
10 place, have you signed any affidavits or declarations
11 regarding this case?
12     A.   I believe I have, but I don't recall which
13 ones or the specifics.
14         MR. CHIZEWER: By the way, while we're waiting
15 for the next question, I do want to clarify that I
16 think all parties are probably entitled to know the
17 topics that any witness is going to testify on. And
18 when we establish a protocol for the hearing and the
19 disclosure of that information, it's certainly
20 amenable to the client.
21         MR. JACKSON: Great. I appreciate that.
22            (Hamilton Deposition Exhibit 3
23            was marked for identification.)
24            (Hamilton Deposition Exhibit 4
25            was marked for identification.)

Page 25

1            (Documents tendered to the
2            witness.)
3  BY MR. JACKSON:
4      Q.   Let me show you what's been marked as
5  Deposition Exhibit 3 and Deposition Exhibit 4.
6          Mr. Hamilton, Deposition Exhibit 3 is a
7  declaration signed by you and filed with the Court.
8          Have you ever seen this declaration
9  before?
10     A.   Yes.
11     Q.   And Deposition Exhibit 4 is a declaration
12 signed by you and filed as an exhibit to a pleading
13 on or about November 12th, 2012.
14         Have you seen Deposition Exhibit 4 before?
15     A.   It's not as familiar, but it's familiar.
16     Q.   Save for these two exhibits, Deposition
17 Exhibit 3 and Deposition Exhibit 4, have you created
18 any similar written statements that you've signed in
19 connection with the matters in this case?
20     A.   Not that I recall.
21     Q.   You indicated you've acted as a consulting
22 expert in matters concerning drug pricing, is that
23 correct?
24     A.   That's correct.
25     Q.   You previously testified that Linnette Sun

7 (Pages 22 to 25)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
GREG HAMILTON – 1/29/2013

Page 26

1   never provided you documents or information relating
2   to Baxter pricing.
3           Do you remember saying that?
4           MR. CHIZEWER: Objection to form.
5   BY THE WITNESS:
6       A.   No.
7   BY MR. JACKSON:
8       Q.   Do you agree with my statement?
9           MR. CHIZEWER: Objection to form.
10  BY THE WITNESS:
11      A.   In a sense I do. Linnette never handed
12  me -- gave me documents related to -- well, to
13  anything. There were no documents transferred
14  between Linnette and I.
15  BY MR. JACKSON:
16      Q.   So, she never gave you documents regarding
17  Recombinate, is that correct?
18      A.   That's correct.
19      Q.   And she never gave you documents regarding
20  Advate, is that correct?
21      A.   Yes.
22          Well, I want to be clear. She didn't give
23  me documents. She gave documents to our attorneys
24  that were then shared, but she never gave me
25  documents.

Page 27

1       Q.   Do you remember testifying that you
2   learned of the basis of your claims regarding
3   Recombinate from Kay Morgan at First DataBank?
4       A.   I -- yes, I do recall that Kay Morgan
5   was -- I got basic information from Kay Morgan.
6       Q.   And that basic information concerned
7   Baxter's actions vis-à-vis submitting information to
8   First DataBank, is that correct?
9       A.   Yeah, that's correct.
10      Q.   And that formed the basis of your claims
11  in this case, correct?
12          MR. CHIZEWER: Objection to form.
13  BY THE WITNESS:
14      A.   It formed, I would say, the beginning of
15  it, yes.
16  BY MR. JACKSON:
17      Q.   While at Express Scripts you were
18  responsible for contracting the various health plans
19  for fulfillment of specialty prescriptions, is that
20  correct?
21      A.   No.
22      Q.   What were you responsible for?
23      A.   I was responsible -- well, depends on what
24  time and, you know, which area of responsibility
25  you're referring to. I had many responsibilities

Page 28

1   while at Express Scripts. One of my responsibilities
2   was to run the hemophilia program.
3       Q.   Can I have you take a look at Deposition
4   Exhibit 2, your prior deposition?
5       A.   Okay.
6       Q.   Turn to page 73.
7       A.   Okay.
8       Q.   Line 20. And I'll read. Quote, when I
9   was with Express Scripts, so this is when I was a
10  customer of Baxter's and all the other factor
11  manufacturers, I was responsible for contracting with
12  various health plans for fulfillment of specialty
13  prescriptions, close quote.
14          Do you see that?
15      A.   Yes.
16      Q.   Is that accurate when you testified as
17  such?
18      A.   Sure.
19      Q.   What's the difference between the answer
20  you gave today and the answer you gave two years ago?
21      A.   To me there isn't any difference. The
22  fact of the matter is I was responsible for the
23  specialty pharmacy -- the specialty pharmacy part of
24  a client's overall drug health plan.
25          I was not responsible for the entire

Page 29

1   health plan program, which would include pills and
2   tablets and all the stuff that goes with PBMs. There
3   were other people in charge of that.
4           I worked with the PBM team, and I was
5   responsible for the section of their contract that
6   had to do with specialty pharmacy.
7       Q.   Okay. And would that include the factor
8   Recombinate and Advate?
9       A.   In those people that chose to contract for
10  that, yes.
11      Q.   In that role did you also contract with
12  Baxter for Recombinate and Advate?
13      A.   Yes.
14      Q.   Who did you deal with in order to contract
15  with Baxter for Recombinate and Advate?
16      A.   I had a couple of different reps. I'd
17  have to truly try and remember their names. And I
18  confuse one of them with a guy who's at my tennis
19  club. The guy at the club is Royal Stewart, and the
20  guy's name was either Royal something or something
21  Stewart. Another guy was a Jeff Beck. I can tell
22  you one of them lived downtown here, has a boat in
23  the harbor. But I'd have to go back and look at
24  their names.
25      Q.   Did you enter into separate contracts for

8 (Pages 26 to 29)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
GREG HAMILTON - 1/29/2013

Page 30

1   each therapy; that is, one contract for Recombinate
2   and one contract for Advate, or was it a single
3   contract covering both?
4       A.   The latter.  It was a single contract
5   covering both.
6       Q.   And was that consistent through your
7   contracting with Baxter that Baxter used a single
8   contractual vehicle to sell both Advate and
9   Recombinate?
10      MR. CHIZEWER:  Objection to form.
11  BY MR. JACKSON:
12      Q.   You can answer.
13      A.   Yes.
14      Q.   Was that consistent practice for your time
15  while at Express Scripts?
16      A.   Are you saying was that the way it was
17  done throughout the time I was with Express Scripts?
18      Q.   Yes, sir.
19      A.   Yes.  The answer is yes.
20      Q.   Who was that entity you contracted with
21  for both Advate and Recombinate?
22      A.   Baxter Therapeutics it was called.  You
23  guys have had a couple different names, you know.
24      Q.   I think you testified previously that you
25  had met an individual at Baxter by the name of Larry

Page 31

1   Guiheen.
2       Do you remember that testimony?
3       A.   Yes, I do.
4       Q.   Do you remember what Larry's role was?
5       A.   He's had several different jobs.  As I
6   recall at the time he was either Vice President of
7   North America or President of something.  He was the
8   highest ranking official that I met at Baxter.
9       Q.   And did you work with Mr. Guiheen as the
10  highest ranking official in connection with both
11  Advate and Recombinate drugs?  Therapies.  I'm sorry.
12      A.   I would say yes.
13      Q.   Do you know whether he was the President
14  of Baxter BioScience?
15      A.   I don't know his exact title.
16      Q.   Do you know whether Baxter BioScience
17  manufactures both Recombinate and Advate?
18      A.   I believe they do.
19      Q.   Do you know whether Baxter BioScience is
20  responsible for the marketing and sales of Advate and
21  Recombinate?
22      A.   I believe they are.
23      Q.   How long were you at Express Scripts?  I
24  apologize.
25      A.   I was there from either late 2000 or early

Page 32

1   2001 until 2006.
2       Q.   And after 2006 what jobs did you have?
3       A.   I've been an independent consultant since
4   then.
5       Q.   So, post-2006 did you have any role in
6   purchasing Advate or Recombinate from Baxter?
7       A.   No.
8       Q.   You sat through a deposition yesterday,
9   the 30(b)(6) representative of Baxter.  Baxter was
10  represented by Mr. Bradley.
11      Were you present for that?
12      A.   Yes, I was.
13      Q.   And did you hear Mr. Bradley testify that
14  the molecule for Recombinate and the molecule for
15  Advate are the same?
16      A.   Yes, I did.
17      Q.   Do you disagree with that?
18      MR. CHIZEWER:  Objection to form.
19  BY THE WITNESS:
20      A.   I'm not qualified as a scientist.
21  BY MR. JACKSON:
22      Q.   So, you're not qualified to talk to me
23  about the molecule that is a Factor VIII molecule
24  created by Baxter BioScience?
25      MR. CHIZEWER:  Objection to form.

Page 33

1   BY THE WITNESS:
2       A.   Again, I'm not a scientist.  I can't tell
3   you the scientific aspects of the molecule, any
4   molecule.
5   BY MR. JACKSON:
6       Q.   So, does that mean you can't tell me
7   anything about how Baxter manufactures either Advate
8   or Recombinate?
9       MR. CHIZEWER:  Objection to form.
10  BY THE WITNESS:
11      A.   No, it doesn't.  I can tell you how -- how
12  the product was referred to in its marketing
13  materials, how it referred to its manufacturing
14  process in its marketing materials.
15  BY MR. JACKSON:
16      Q.   Okay.  I understand that in marketing
17  materials.  But I'm asking you do you have personal
18  knowledge of how either Advate or Recombinate are
19  manufactured?
20      A.   No.
21      MR. CHIZEWER:  Objection to form.
22  BY MR. JACKSON:
23      Q.   Do you know anything about the cell line
24  from which Advate and Recombinate are manufactured?
25      A.   No.

9 (Pages 30 to 33)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
GREG HAMILTON – 1/29/2013

Page 34

1    Q.   I think you told me earlier that you can
2  tell me that both Advate and Recombinate are used by
3  the same kind of patients, correct?
4    A.   I don't recall saying that, but -- but
5  that is true.
6    Q.   That is true.
7       Do you remember your prior testimony, Mr.
8  Hamilton, about communications you had with Larry
9  Guiheen regarding the pricing of Advate?
10   A.   Yes.
11   Q.   What do you remember testifying about?
12   A.   Are you asking me to recall the
13  conversations I've had with Larry?
14   Q.   Either way.  You can either tell me what
15  you testified earlier or the conversations you had
16  with Mr. Guiheen.
17       MR. CHIZEWER:  Objection to form.
18  BY THE WITNESS:
19   A.   They should be the same.
20  BY MR. JACKSON:
21   Q.   Go ahead.
22   A.   I spoke with Larry about the pricing of
23  Advate.  At this particular time the product had been
24  on the market for -- it was the spring of '04, so it
25  had probably been on the market for maybe six months

Page 35

1  or so.
2       My comments to him were that I thought
3  that the uptake rate of Advate was slower than it
4  could have been and that it was being inhibited by
5  price and that the price differential at that time
6  between Advate and the -- what you might call the
7  other recombinant products was so great that it was
8  meeting resistance at the payor level.  And my advice
9  to him, my comment to him was that if you reduce that
10  differential, that your uptake rate will increase.
11      And if you'd like to know, the
12  conversation occurred at a trade show, and it was on
13  the exhibit floor.
14   Q.   All right.  You used some phrases there I
15  need you to define for me so I can really understand
16  what you mean.
17      You used the phrase "uptake rate."  What
18  did you mean by "uptake rate"?
19   A.   Uptake rate, the rate at which the
20  patients use the product.  So, the growth rate would
21  be another way of looking at it.
22   Q.   So, by that might one example be the rate
23  at which hemophiliacs transition from Recombinate to
24  Advate?
25   A.   That would be one way, but it's only one

Page 36

1  way.  It would be the rate at which you picked up new
2  patients.  There at the time were about 400, they
3  were called PUPs previously, in treated patients a
4  year that were diagnosed and were put on some sort of
5  factor product.  So, the rate at which those would be
6  put on Advate, the rate at which patients that are on
7  some other form of factor product, including plasma
8  product, might be converted to Advate.
9    Q.   Now, you used the phrase "inhibited by
10  price," that Advate was inhibited by price.
11      What did you mean by that?
12   A.   If I didn't say it, what I intended to say
13  was that the growth rate was inhibited by price.
14   Q.   Okay.  And what do you mean by that?
15   A.   That the rate of acceptance of the
16  conversions or the people being -- going on -- the
17  growth of the product was being constrained by the
18  great differential of the price.
19      The price was significantly more than its
20  competitors, and that was inhibiting patients from
21  going on that product, either originally or
22  transitioning from another factor product.  That was
23  either their decision or it could have been what's
24  called the payor, which is whoever it is that's
25  ultimately paying for the product.

Page 37

1    Q.   Do you remember suggesting to Mr. Guiheen
2  that he should drop the price so customers didn't
3  question whether Advate was that much better than the
4  other products, quote, which, of course, would be a
5  very difficult thing to do because it's a conceptual
6  issue, close quote?
7       Do you remember saying that to Mr.
8  Guiheen?
9    A.   Could you repeat that or rephrase it or --
10   Q.   Sure.  Take a look at Deposition Exhibit
11  2, page 93.  Well, I guess we'll start at 92.  Page
12  92, line 21.  And I'm quoting your prior deposition
13  testimony.  Quote, And I remember suggesting, you
14  know, if you could just drop that 7 or 8 cents or
15  whatever the number was at the time, I think that you
16  could reduce the differential to where it's not a
17  deal breaker for insurance companies and people
18  aren't gonna go, quote, Wait a minute.  15 cents a
19  unit times a couple hundred thousand units a year,
20  prove to me that Advate's that much better, close
21  quote, which, of course, would be a very difficult
22  thing to do because it's conceptual issue.
23      Do you see that?
24   A.   Yes.
25   Q.   So, when you told Mr. Guiheen that, was it

10 (Pages 34 to 37)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
GREG HAMILTON - 1/29/2013

Page 38

1  your belief that it was a very difficult issue to
2  distinguish between Advate and Recombinate?
3     A.   No.
4     Q.   What did you mean by that when you
5  testified two years ago?
6     A.   What I meant was, what I was referring to
7  was the big selling point for Advate.
8     Q.   What was the big selling point for Advate?
9     A.   Safety.
10    Q.   Okay.  Now, explain to me what you meant
11 by your testimony two years ago that we just read
12 into the record.
13    A.   Sure.  Baxter was in a sort of a catch 22
14 position with leaving Recombinate on the market and
15 marketing Advate.  Their sales reps were marketing
16 the new product, Advate.  New name, you know, it
17 wasn't -- it wasn't Recombinate, you know,
18 plasma-free; it was Advate.  They were marketing this
19 as a new product and as actually a breakthrough in
20 hemophilia treatment, which it was.
21       Advate would serve the need in terms of
22 efficacy of causing a patient without enough Factor
23 VIII to form a clot.
24    Q.   So, it would do its job?
25    A.   It would do its job, just as -- what is

Page 39

1  Baxter's product -- Hemofil, Hemofil M, which is
2  their plasma Factor VIII, that does its job.
3     Q.   And Recombinate --
4     A.   And Recombinate, it does its jobs.
5     Q.   Thank you.
6     A.   So, these products all do their job.
7       The issue is that the plasma products and
8  even Recombinate contain some blood product.  The
9  patient population of hemophiliacs have been
10 decimated by the blood-borne virus AIDS.  So, the
11 issue is that the community was screaming for a
12 blood-free product.  And that's what Advate is.  It's
13 a blood-free product.
14       So, the situation is that if another
15 unknown virus were to enter the blood supply, you
16 know, what would happen?  Would it be the same thing
17 as AIDS?  Would thousands of people die?  And with
18 Advate Baxter could go to the hemophiliacs and say,
19 "This product is completely free of blood products.
20 You don't have to worry, should that happen, that
21 your product is going to be contaminated along with
22 the blood supply."
23       Their issue was a difficult one because
24 they had most of the market, I'd probably guess 80
25 percent market share, with Recombinate.  They

Page 40

1  couldn't very well come out and say to the public,
2  "Recombinate is not a safe product."  They couldn't
3  come out and say, "Recombinate is not an efficacious
4  product."  So, --
5     Q.   Is that because Recombinate was a safe and
6  efficacious product at the time?
7     A.   Yes.
8     Q.   Okay.
9     A.   So, the issue and the differentiation was
10 that Advate was an efficacious product that was
11 safer.  And it comes down to a question of saying,
12 "We have two products for you.  Both will do the job.
13 One has blood in it.  The other one doesn't.  Which
14 one do you want to shoot in your veins?"
15       So, Baxter did have a little bit of a
16 balancing act to not discredit their product that had
17 most of the market, but yet, to be able to promote
18 their product that was by far and away a superior
19 product.
20    Q.   So, were you recommending a reduction in
21 price because you personally didn't think the
22 difference between Recombinate and Advate justified
23 the higher price that had been set?
24    A.   No.
25    Q.   No, you didn't believe that it justified

Page 41

1  the higher price?
2     A.   I was not making that recommendation.  The
3  recommendation I was making was that the information
4  that I had gotten from payors on the uptake rate that
5  I'd seen was what I believed to be slower than it
6  could have been had the payors not seen such a
7  dramatic differential in price.
8       I mean, I -- like everyone else in the
9  community, I recognized that Advate was by far and
10 away a superior product.
11    Q.   So, why wouldn't that far superior product
12 justify the 15 or 20 cents that you were talking with
13 Larry Guiheen?
14    A.   First of all, I'm not saying it didn't
15 justify it.  I'm saying it was a constraint and that
16 some payors perhaps hadn't been educated about it,
17 didn't know enough about it to realize that it was
18 justified, but for whatever reason they were
19 reluctant to allow patients to switch from one of the
20 other factor products to Advate because of cost.
21    Q.   In and about this time do you know what
22 payors were paying for Recombinate, actually paying?
23    A.   Sure.  I was a specialty pharmacy, so I
24 was getting paid.
25    Q.   What were you being paid per IU?

11 (Pages 38 to 41)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
GREG HAMILTON – 1/29/2013

Page 42

1    A.   I don't recall off the top of my head.
2    Q.   And do you know whether payors were in
3  fact paying higher per IU for Advate?
4    A.   Yes, they were.
5    Q.   How much more?
6    A.   Again, I don't have that data in front of
7  me.
8    Q.   Did the price come down for Advate?
9    A.   Would you please tell me what price and at
10  what time?
11    Q.   Sure.  The price that payors were paying
12  sometime after your conversation with Larry Guiheen,
13  did the price for Advate come down, or the amount
14  that payors --
15    A.   Yes.
16    Q.   Do you know what Medicare was paying for
17  Advate?
18    A.   Again we have to talk about what point in
19  time.
20    Q.   Okay.  Let's use 2004 to present.
21    A.   Okay.  In 2004 Medicare -- Medicare pays
22  by a formula.  So, Medicare in 2004 was paying, I
23  believe, 85 percent of AWP.  And after 2005
24  Medicare -- this is Medicare Part B, it's not paid
25  for under any other part of Medicare, it's Medicare

Page 43

1  Part B, pays for factor products, and they pay under
2  a program that's called the average selling price.
3    Q.   And when did that process begin?
4    A.   2005.
5    Q.   So, were you aware that there came a time
6  when the government was reimbursing, the federal
7  government under Medicare, the exact same amount for
8  both Recombinate and Advate?
9    A.   That is correct.
10    Q.   Do you know when that started?
11    A.   2005.
12    Q.   And at that point there was no
13  reimbursement based upon AWP for those two products,
14  is that correct, by Medicare?
15    MR. CHIZEWER:  Objection to form.
16  BY THE WITNESS:
17    A.   Will you specify the time?
18  BY MR. JACKSON:
19    Q.   After 2005.
20    A.   After 2005 Medicare Part B did not use AWP
21  in its reimbursement methodology.
22    Q.   And I think you told me you can't tell me
23  sitting here today post-2005 what Medicaid, state
24  Medicaids paid for Recombinate or Advate?
25    MR. CHIZEWER:  Objection to form.

Page 44

1  BY THE WITNESS:
2    A.   I don't have that information in front of
3  me, but it's readily available on the internet.
4  BY MR. JACKSON:
5    Q.   My question is whether you could sit here
6  today and tell me what that is.
7    A.   No.
8    Q.   Can I have you turn to Deposition Exhibit
9  3?  This is your declaration, your first declaration
10  in this matter.  Paragraph 7.  Paragraph 7 includes
11  the following:  Quote, In addition to being a major
12  customer of Baxter's through my work with Express
13  Scripts and CuraScript, I also interacted with
14  Baxter's pricing managers as a competitor of Baxter's
15  when I worked for Bayer, close quote.
16      Do you see that?
17    A.   Yes.
18    Q.   Who were those Baxter pricing managers
19  that you refer to there?
20    A.   Let me read it.
21      (Short interruption.)
22  BY THE WITNESS:
23    A.   Well, first of all, my sentence is a
24  little confusing.  The Baxter pricing managers that
25  I'm referring to are people that I met with on the

Page 45

1  request of Pete O'Malley.  I actually don't remember
2  their names.
3      Pete had invited me -- and if you want a
4  time frame, this was sometime when I was at Express
5  Scripts -- he had invited me to come out to Chicago
6  to the corporate offices to meet with his contracting
7  people, and that's how they were identified to me.
8  The purpose of that meeting was for me to explain to
9  them some of the intricacies of how the 340B program
10  worked.
11    Q.   But do you remember any of their names,
12  those contracting people?
13    A.   No.  Sorry.
14    Q.   And --
15    A.   I can tell you there were two of them.
16    Q.   Do you know what organization within
17  Baxter the contracting people were?
18    A.   No.
19    Q.   Do you know whether those contracting
20  people dealt with both Advate and Recombinate?
21    A.   I -- I can't say for certain, but I would
22  assume they did.
23    Q.   Can I have you take a look at Deposition
24  Exhibit 4?  Deposition Exhibit 4, paragraph 4, read
25  that paragraph 4, if you would.

12 (Pages 42 to 45)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
GREG HAMILTON – 1/29/2013

Page 46

1          (Short interruption.)
2     THE WITNESS: Okay.
3     BY MR. JACKSON:
4          Q.   Directing your attention to the sentence,
5     maybe the second to last sentence of your paragraph 4
6     in which you state, quote, I negotiated the
7     purchasing contracts for hemophilia-related products
8     directly with manufacturers, including contracts to
9     purchase Recombinate and Advate, period, close quote.
10         Do you see that?
11    A.   Yes.
12         Q.   Now, I asked you some questions earlier
13    about your contracting with Baxter for Recombinate
14    and Advate, and I think you testified you dealt with
15    the same people for those contracts, is that correct,
16    Baxter personnel?
17    A.   Yes, same Baxter -- there were different
18    reps and different people I dealt with at Baxter.
19         Q.   Same contract? Same contract; one
20    contract dealt with both Recombinate and Advate?
21    A.   That is correct.
22         Q.   And when you used the word "contracts,"
23    plural, here, what did you mean; contracts over time
24    as new Baxter contracts were entered into?
25    A.   Yes.

Page 47

1          Q.   But the same --
2     A.   Well, I also -- sorry.
3          Q.   Go ahead. I'm trying to understand what
4     you're -- you meant contracts to purchase Recombinate
5     and Advate.
6     A.   Yes.
7          Q.   That says to me, Mr. Hamilton, that you
8     entered into multiple contracts over time with
9     Baxter.
10    A.   I negotiated contracts for products
11    directly with manufacturers. So, I had contracts
12    with all the manufacturers and I had contracts with
13    Baxter.
14         Q.   How many contracts did you have with
15    Baxter during your time that you're referring to in
16    paragraph 4 of Deposition Exhibit 4?
17    A.   I don't recall.
18         Q.   More than one?
19    A.   Probably, but I don't recall. I mean, I
20    have a copy of one. I have one that I was -- you
21    know, I am very specific on. But I think there was
22    pricing before that, and I would have been the one to
23    negotiate it.
24         Q.   But in all situations that single contract
25    dealt with both Advate and Recombinate; is that true?

Page 48

1          A.   That's true. And other products. I
2     shouldn't -- you know, other Baxter products.
3          Q.   Which other Baxter products?
4     A.   Well, certainly the other hemophilia
5     Factor VIII product, the plasma product. And I'm not
6     sure if it was Hemofil M or -- I'm blanking on brand
7     names. But the other Factor VIII product, the plasma
8     Factor VIII product was also part of that. And I'm
9     not sure if IGIV was on there or not.
10         Q.   So, from your perspective Baxter's
11    contracting practice with regard to all of its Factor
12    VIII products were the same?
13    MR. CHIZEWER: Objection to form.
14    BY THE WITNESS:
15    A.   I think that will be too all-inclusive.
16    You have a copy of the contract, obviously. So, if
17    you look at the contract we're talking about, it
18    contains Advate, Recombinate and also this other drug
19    that I'm blanking on the name of.
20         But this particular contract offered
21    combined rebates for Advate and Recombinate. There
22    were rebates for Recombinate, rebates for Advate, and
23    there were combined rebates when you combined the two
24    drugs together. So, that particular contract had
25    that. I can't tell you that all contracts were

Page 49

1     bundle organization -- grouped like that, but this
2     particular one was.
3     BY MR. JACKSON:
4          Q.   So, to make sure I understand, there was a
5     portion of the Baxter contract that would actually
6     group Advate and Recombinate together for rebate
7     purposes?
8     A.   That's correct.
9          Q.   Were you aware that the Healthcare Common
10    Procedure Coding System Code J7192 included both
11    Recombinate and Advate?
12    A.   Yes.
13    MR. JACKSON: Let's go off the record.
14         (Discussion off the record.)
15         (Recess.)
16    BY MR. JACKSON:
17         Q.   Mr. Hamilton, I want to remind you you're
18    still under oath.
19         When Recombinate -- I'm sorry. When
20    Advate was launched, what was its AWP?
21    A.   I'd have to look it up to be absolutely
22    certain, but my recollection is it's first AWP was
23    $1.88.
24         Q.   And define --
25    A.   At First DataBank.

13 (Pages 46 to 49)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
GREG HAMILTON - 1/29/2013

Page 50

1    Q.   Can you define AWP for me at First
2  DataBank just so we're using the same phraseology?
3    A.   AWP stands for average wholesale price.
4    Q.   And when did that AWP, when was that first
5  published do you believe?
6    A.   The First DataBank records actually show
7  it. I have copies of those. I'm sure we've
8  submitted them. But it was sometime around July of
9  '03.
10   Q.   And do you remember when Advate was first
11 sold into the commercial marketplace?
12   A.   I don't know exactly, but it was somewhere
13 that summer.
14   Q.   Now, remind me again when was the meeting
15 you had with Larry Guiheen in which you and he talked
16 pricing of Advate?
17   A.   Spring of '04.
18   Q.   So, the next -- '04?
19   A.   Right.
20   Q.   Now, during that conversation what did you
21 and Mr. Guiheen talk about in connection with
22 Advate's AWP?
23   A.   That was part of their price. In other
24 words, the AWP -- the price that -- it's interesting
25 that you bring this up. It's interesting when

Page 51

1  someone says the word "price." Well, which one are
2  we talking about?
3         AWP was the marker, the price, if you want
4  to call it, upon which most reimbursement was based.
5  And that was the price that affected the payors.
6         So, Baxter's price to a specialty pharmacy
7  or any of their other customers was not what was
8  inhibiting sales. It was the price that the payor
9  was having to pay for the drug, and that was driven
10 off of AWP.
11   Q.   So, did you and Mr. Guiheen talk about
12 Baxter's AWP for Advate in the spring of 2004?
13   A.   I discussed it with him. I mean, to say
14 that -- you know, how engaged -- how much he had to
15 comment on it I don't recall.
16   Q.   Did you suggest to Mr. Guiheen that Baxter
17 should raise its AWP for Advate?
18   A.   I'm sorry. Did you say did I suggest that
19 they raise their AWP for Advate?
20   Q.   Yes, sir. Did you suggest that?
21   A.   No, I did not.
22   Q.   Did you suggest that raising the AWP would
23 raise the spread?
24   A.   No, I did not.
25   Q.   Did you and he have any conversation like

Page 52

1  that?
2    A.   None whatsoever.
3    Q.   And do you know what happened to Baxter's
4  AWP for Advate after the date of your conversation?
5    A.   Yes. I think it was about two weeks later
6  the AWP was reduced, as was -- as was the selling
7  price to various customers.
8    Q.   So, instead of raising AWP in order to
9  create more spread, the AWP came down, is that
10 correct?
11        MR. CHIZEWER: Objection to form.
12 BY THE WITNESS:
13   A.   That is correct, but I believe you're
14 missing the point of the conversation. I mean, if
15 you'd like me to explain, I will.
16 BY MR. JACKSON:
17   Q.   Please do. What was the point of the
18 conversation?
19   A.   The point of the conversation was the
20 payors were the ones inhibiting the uptake of sales,
21 okay? So, it was the entities that ultimately paid
22 the bill, and those are the people that were paying
23 off of AWP. So, spread had nothing to do with our
24 conversation. I wasn't discussing spread at all.
25        And I'll define spread as the price -- the

Page 53

1  difference between what a pharmacy pays for the drug
2  and what they get reimbursed for it.
3         We weren't discussing spread at all. I
4  wasn't discussing spread at all. What I was
5  discussing was the ultimate price that the payor pays
6  for the drug. And that is driven off of AWP.
7         So, my suggestion to him was that the
8  overall price of Advate, and that means both the
9  price to the specialty pharmacy or any other
10 customer, and the AWP both be reduced.
11   Q.   And is that what happened?
12   A.   That is what happened, yes.
13   Q.   Did you suggest to Mr. Guiheen that if you
14 reduced -- Baxter reduced the AWP that that would
15 cause payors to switch from Recombinate to Advate?
16   A.   No. And let me clarify. Payors don't
17 switch. Payors do not write the prescriptions.
18 Payors do not infuse the product.
19         Patients switch. Payors either allow or
20 disallow or make it more -- you know, might present
21 hurdles to patients to be able to switch.
22         The lower AWP, and, therefore, the lower
23 amount that payors would have to pay for the drug,
24 would reduce their inhibitions or their constraints
25 that they were putting on patients to switch, thereby

14 (Pages 50 to 53)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
GREG HAMILTON – 1/29/2013

Page 54

1  enabling more patients to switch to Advate than had
2  been in the past at the higher prices.
3      Q.   But during your communication with Mr.
4  Guiheen, you and he never talked about altering the
5  spread in order to cause payors to look more kindly
6  to a move from Recombinate to Advate?
7      MR. CHIZEWER: Objection. Asked and answered.
8  BY THE WITNESS:
9      A.   I didn't discuss spread with Mr. Guiheen.
10 BY MR. JACKSON:
11     Q.   And I think you testified that sometime
12 after that communication in the spring of 2004
13 Baxter's AWP was reduced, is that correct?
14     A.   That is correct.
15     Q.   And then, it's also your testimony that as
16 of 2005 AWP no longer became relevant at least in
17 terms of Medicare reimbursement, is that correct?
18     A.   That is correct.
19     MR. JACKSON: Subject to my prior reservations
20 about the documents that you have and have not
21 produced, which I reserve the right to ask Mr.
22 Hamilton about, I have no further questions of this
23 witness.
24     MR. CHIZEWER: Just to be clear, I think it was
25 one page?

Page 55

1      MR. JACKSON: A document. I don't know how many
2  pages, to be fair. And it may have absolutely
3  nothing in it that I care about.
4      I pass the witness.
5      MR. BREEN: Mr. Anderson's gonna inquire.
6      MR. ANDERSON: I'm gonna need to sit down there,
7  if you don't mind.
8          (Short interruption.)
9              EXAMINATION
10 BY MR. ANDERSON:
11     Q.   Mr. Hamilton, my name is Jarrett Anderson.
12 I represent Ven-A-Care. I'll have some questions for
13 you, as well. I'll probably bounce around a little
14 bit. But if any time you don't understand my
15 question, please let me know. Otherwise we're going
16 to assume that you did understand, okay?
17     A.   All right.
18     Q.   All right. A few follow-up matters first.
19 Do you plan to attend the hearing in this matter on
20 or about March 18th?
21     A.   If my attorneys ask me or tell me that I
22 should be there, then I will be there.
23     Q.   And currently do you have those plans?
24     A.   I have no airline tickets or hotel
25 reservations.

Page 56

1      Q.   You've had no communications with anyone
2  about preparing to testify, creating any materials
3  for presentation, anything like that?
4      MR. CHIZEWER: I'm going to object to the extent
5  he's asking you for conversations that occurred
6  between any of your lawyers, including myself, and
7  you. If you've had conversations with somebody else
8  about the hearing, you're free to answer.
9  BY THE WITNESS:
10     A.   I can't answer that.
11 BY MR. ANDERSON:
12     Q.   Okay. Have you been paid any fees in
13 connection with this case in any form or fashion?
14     A.   No.
15     Q.   So, despite your prior work for
16 Sun/Hamilton counsel as an expert where you were paid
17 fees in other cases, you have not been paid any fees
18 in these cases?
19     A.   I repeat I haven't been paid any fees in
20 these cases.
21     Q.   Do you contend you're acting as any
22 consulting or testifying expert in this case?
23     MR. CHIZEWER: Objection to form.
24 BY THE WITNESS:
25     A.   I mean, that's a good question. I don't

Page 57

1  know how I separate myself from being an expert to
2  being a relator. I'm still the same guy. So,
3  technically I don't know the answer to that.
4          I'm an expert in the area. I'm a
5  consultant in the area. But I'm a relator. Will I
6  be -- I think that's -- my best guess is, and you
7  lawyers know better than I do, but my guess is it's
8  up to the judge whether I'm an expert or not.
9  BY MR. ANDERSON:
10     Q.   Would you at least recognize you're biased
11 to the extent you have a financial interest in the
12 outcome of the case if you're acting as a consulting
13 or testifying expert?
14     MR. CHIZEWER: Objection to form.
15 BY THE WITNESS:
16     A.   I believe there's a perceived bias. I
17 really don't believe I have a bias in the case. I
18 really believe it's fact-based.
19 BY MR. ANDERSON:
20     Q.   Can you point to any situation where
21 you've acted as a consulting or testifying expert in
22 any other case where you had a specific interest in
23 the outcome of the case, financial interest?
24     A.   Can I point to?
25     Q.   Yes, sir. Has that ever happened before?

15 (Pages 54 to 57)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
GREG HAMILTON – 1/29/2013

Page 58

1    A.   There was one -- one or two.  I believe I
2    have had two cases in which I was a consultant
3    expert.  Neither case I testified in.
4         But there were one or two cases where I
5    had a -- and I forget what we call it.  I think they
6    called it a multiplier.  It was where I billed at a
7    certain rate throughout the case.  And then there was
8    an if.  If there was a successful resolution to it, I
9    got some sort of extra money.
10   Q.   And Mr. Kleiman was one of the attorneys
11   involved in that arrangement?
12        MR. CHIZEWER:  Objection to form.
13   BY THE WITNESS:
14   A.   Again, I'd have to look up which cases
15   they were, who it was.  And then it was part of my
16   confidentiality agreement, so I'd have to find out
17   from the lawyers if it's okay to tell you.
18   BY MR. ANDERSON:
19   Q.   So, are you refusing to answer my question
20   based on a confidentiality agreement?
21        MR. CHIZEWER:  Objection to form.
22   BY THE WITNESS:
23   A.   I'm saying I can't answer the question
24   unless I check with, you know, the appropriate
25   lawyers and get their permission.

Page 59

1    BY MR. ANDERSON:
2    Q.   Is it at least possible that Mr. Kleiman's
3    one of the attorneys that paid you a financial
4    incentive based on the outcome of the case as a
5    consulting or testifying expert?
6         MR. CHIZEWER:  Objection to form.
7    BY THE WITNESS:
8    A.   Mr. Kleiman has been a client in several
9    other cases and one of multiple lawyers in individual
10   cases.  So, it's certainly possible.
11   BY MR. ANDERSON:
12   Q.   And when you say "client," you mean Mr.
13   Kleiman pays you money, correct?
14   A.   I'm not sure what you mean.  Are you
15   talking about a specific case?  Has Mr. -- could you
16   be more specific?
17   Q.   Mr. Kleiman's your client in the sense
18   that you perform services for him and he pays you
19   money, correct?
20        MR. CHIZEWER:  Objection to form.
21   BY THE WITNESS:
22   A.   I'm not an employee of Mr. Kleiman, if
23   that's what you're asking me.
24   BY MR. ANDERSON:
25   Q.   I didn't ask you -- no, sir, I didn't say

Page 60

1    you were an employee.  I said you perform services
2    for him and he pays you money, correct?
3         MR. CHIZEWER:  Objection to form.
4         MR. ANDERSON:  What's the objection?  It's a
5    very simple question.
6         MR. CHIZEWER:  No, because -- look, do you want
7    me to answer the question in front of the witness?
8         MR. ANDERSON:  No.  Provide me the basis for the
9    objection.
10        MR. CHIZEWER:  Do you want me to give you the
11   full bases?
12        MR. ANDERSON:  Absolutely.
13        MR. CHIZEWER:  Do you want the witness to leave
14   so I'm not accused of coaching the witness?
15        MR. ANDERSON:  Coach him all you want.  Go
16   ahead.
17        MR. CHIZEWER:  I don't want to.  My point is if
18   you're going to accuse me of coaching the witness,
19   I'm going to ask him to leave the room so he doesn't
20   hear my response.
21        Do you want me to ask him to leave the
22   room?
23        MR. ANDERSON:  I want to know the basis for your
24   objection.
25        MR. CHIZEWER:  While the witness is still

Page 61

1    sitting here?
2         MR. ANDERSON:  Can you provide the basis for
3    your objection, counsel?
4         MR. CHIZEWER:  Okay.  Yes, I can.
5         Your initial question was specifically
6    directed to Mr. Hamilton's work for Mr. Kleiman in
7    other cases.  It's now no longer clear from the
8    record whether you're talking about Mr. Kleiman's
9    relationship with Mr. Hamilton in other cases or Mr.
10   Kleiman's relationship with Mr. Hamilton in this
11   case.  And I think the record needs to be clear when
12   you ask him a question what context you're talking
13   about.
14        MR. ANDERSON:  That's easily corrected.  There's
15   no need for any drama on that.  Just provide the
16   basis.
17   BY MR. ANDERSON:
18   Q.   Mr. Hamilton, in cases other than this one
19   isn't it true that Mr. Kleiman has acted as your
20   client and you've performed services for Mr. Kleiman,
21   counsel for Sun/Hamilton, and in turn he's paid you
22   money?
23        MR. CHIZEWER:  Objection to form.
24   BY THE WITNESS:
25   A.   Yes.

16  (Pages 58 to 61)

Page 62

BY MR. ANDERSON:

Q.   And he's paid you incremental amounts of money based on the success of the case?

MR. CHIZEWER: Objection to form.

BY MR. ANDERSON:

Q.   Correct?

A.   Again, I don't know without reviewing particular cases.

Q.   But you believe at least it's possible he's one of those clients that did so, correct?

MR. CHIZEWER: Objection to form.

BY THE WITNESS:

A.   It's possible. When I say I don't know, it's certainly possible that it could have been any of my clients.

BY MR. ANDERSON:

Q.   Will you agree on the record to review your records and in turn disclose whether or not Mr. Kleiman has paid you based on the success of prior cases?

MR. CHIZEWER: Objection to form.

BY THE WITNESS:

A.   I will consult with Mr. Kleiman. I will -- I can determine that factually, whether that's accurate or not. And then, based on, you

Page 63

know, whether or not I'm allowed to give you that information or not, I will then act.

MR. ANDERSON: Okay. I'm going to turn to your lawyer, then.

David, will you represent that the Sun-Hamilton team will in fact disclose whether or not any Sun/Hamilton counsel has ever paid Mr. Hamilton in any form or fashion based on the success of a case?

MR. CHIZEWER: Yes.

MR. ANDERSON: Thank you.

BY MR. ANDERSON:

Q.   Now, you said earlier in your testimony that you do consider yourself an expert in the sales and marketing of Factor VIII, is that correct?

A.   Yes.

Q.   Okay. Do you believe that you have ever been designated by any counsel in any case as a, quote, expert regarding sales and marketing of Factor VIII?

A.   I don't believe I have.

MR. CHIZEWER: Objection. Asked and answered.

MR. ANDERSON: No, this is very specific as to Factor VIII, David.

MR. CHIZEWER: I believe that question was asked

Page 64

and answered.

MR. ANDERSON: Not as to Factor VIII. It was more general.

BY MR. ANDERSON:

Q.   Mr. Hamilton, have you ever been approved by a Court as to the sales and marketing -- to be an expert as to the sales and marketing of Factor VIII?

A.   I don't believe so.

Q.   Have you ever conducted any objective analysis to support any opinion regarding the sales and marketing of Factor VIII?

A.   Would you please repeat that?

Q.   Yes. Have you ever conducted any objective analysis regarding the sales and marketing of Factor VIII?

A.   Would you please tell me what you mean by "objective analysis"?

Q.   What analysis have you ever conducted regarding the sales and marketing of Factor VIII in the context of this case?

MR. CHIZEWER: Objection to form.

BY THE WITNESS:

A.   Well, that's a tough question. I have -- obviously I was a sales rep, as you probably know, for many years selling Factor VIII. I was a project

Page 65

manager and contracting officer, many different titles and responsibilities when I was with Bayer Corporation, all of which responsible for developing plans and doing analysis and methodologies for selling and marketing Factor VIII and recombinant Factor VIII products.

BY MR. ANDERSON:

Q.   Okay. But what my question pertains to, Mr. Hamilton, is any analysis that you've conducted that may be pertinent to any expert opinion you may render. These questions are all about your work as an expert, whether consulting or otherwise in this matter.

Have you conducted any analysis in this case that pertains to any expert opinion you may render in this case?

A.   Well, first of all, I don't know if I'll be rendering expert opinions in this case. I don't know if I'm being designated as an expert after Mr. Jackson's questions am I a relator or am I an expert. So, I don't know if I'm going to be giving expert opinions or not. I just don't know.

Is the Court going to consider me an expert, and, therefore, I'm giving expert opinions, or am I giving my opinions as a relator? And I just

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
GREG HAMILTON – 1/29/2013

Page 66

1   don't know the answer to that.
2       Q.   Do you have any work product that you
3   created in any context regarding any opinion, lay or
4   expert, that you planned to express at the hearing in
5   March?
6       A.   Again, I'm -- I'm trying to be precise
7   because I'm not sure what you mean by "opinion." Let
8   me give you an example. Maybe we can try and figure
9   this out.
10          In terms of this particular case I have
11  done analysis of the Medicaid rebate program, the
12  units and amounts paid and stuff, for Advate and
13  Recombinate. This is state by state, national
14  analysis, and this relates to what I would commonly
15  call damages calculations.
16          So, I don't know if that answers your
17  question or not, but I'm trying to answer it.
18      Q.   And to your knowledge has that information
19  been produced to the counsel in this case?
20          MR. CHIZEWER: I'm going to object to the extent
21  that if he's done work specifically for the lawyers,
22  that's subject to work product privilege. Obviously
23  if it's going to be used in any -- the case in any
24  form, it would have to be produced.
25          MR. ANDERSON: And when will we be provided an

Page 67

1   opportunity to depose Mr. Hamilton on his work
2   product?
3           MR. CHIZEWER: Well, to the extent we're using
4   "work product" in connection with Mr. Hamilton, you
5   certainly will be entitled to depose him and ask him
6   about it.
7           MR. ANDERSON: And make yet another trip to
8   Chicago to do so?
9           MR. CHIZEWER: Currently to the extent -- we
10  don't currently have any plans to produce an expert
11  report from Greg Hamilton in connection with the
12  hearing in March. If that's what you want to know,
13  I'm happy to give you that answer.
14          MR. JACKSON: David, I want to know if we're
15  gonna see a Rule 26 disclosure, then I want to see a
16  real Rule 26 disclosure in plenty of time. If we're
17  not going to see an expert report, then that's great.
18  That's what I'm interested in, and I think that's
19  what --
20          MR. ANDERSON: Absolutely.
21          MR. CHIZEWER: Okay. That's an appropriate
22  question directed towards a lawyer because Mr.
23  Hamilton has no idea what Rule 26 is and whether he's
24  designated as an expert. I think he's made the
25  record perfectly clear on that.

Page 68

1           So, if you have questions about how the
2   hearing's gonna be conducted, what kind of
3   disclosures need to be made, what the scheduling is,
4   who's gonna be a witness, those are discussions that
5   the lawyers can have. And we're happy to have one
6   any time you want to have one.
7           MR. ANDERSON: It's more than that because the
8   witness has made clear he doesn't -- he's unable to
9   even distinguish between his work as a consulting
10  expert or testifying expert and his personal lay
11  opinions.
12          MR. CHIZEWER: Because he doesn't know what it
13  means to be an expert in a case under Rule 26. And
14  he's not charged with that knowledge.
15          MR. ANDERSON: My point is, and I believe my
16  question still needs to be answered, he's created
17  work product regarding Medicaid rebate analysis and,
18  per his own words, damages. Why hasn't that been
19  produced?
20          MR. CHIZEWER: To the extent he's created work
21  product at the direction of lawyers in connection
22  with the litigation, we're not required to produce
23  it.
24          MR. ANDERSON: Because you're categorizing it as
25  expert work product.

Page 69

1           MR. CHIZEWER: No. It doesn't have to be expert
2   work product. Witnesses can create work product at
3   the direction of the lawyers all the time.
4           MR. ANDERSON: Witnesses can?
5           MR. CHIZEWER: I mean clients, yes.
6           MR. ANDERSON: Okay. Clients.
7           MR. CHIZEWER: Yeah. Mr. Hamilton's clearly our
8   client.
9           MR. ANDERSON: And he's sharing that with you at
10  your direction?
11          MR. CHIZEWER: Creating it and sharing it with
12  us at our direction.
13          I have to tell you, just so the record's
14  clear and just to be completely transparent, I don't
15  know even what the analysis is that he's mentioned to
16  you. I've never -- I don't believe I've ever seen
17  it. And if I have, I'm not sure what he's talking
18  about.
19          So, I probably should have stopped him
20  from answering the question because he was revealing
21  maybe work he had done at the direction of lawyers.
22  I didn't realize how he was gonna answer the
23  question, so I didn't understand that he was going to
24  reveal that he had done -- that he had created work
25  product at the direction of lawyers.

18 (Pages 66 to 69)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
GREG HAMILTON - 1/29/2013

Page 70

1    MR. ANDERSON:  Well, I'm gonna move on.  But
2 just so the record's crystal clear, from my
3 perspective and Ven-A-Care's perspective if there's
4 any information that Mr. Hamilton creates in any form
5 or fashion that is to be presented at the hearing or,
6 for that matter, relied upon in any way by anyone
7 who's going to be presented at the hearing, I contend
8 that we are entitled to that information in advance.
9         And the decisions as to whether that
10 should or should not have been produced should have
11 already been made because we're getting -- time is
12 short.  And in order for us to adequately prepare, to
13 receive that without an opportunity to examine the
14 witness, which we've known for many days that the
15 deposition of Mr. Hamilton was going to occur today,
16 in my view is inappropriate and certainly an undue
17 burden and cost for us to travel yet again to take a
18 deposition.
19    MR. CHIZEWER:  Okay.  And so the record's clear,
20 there's nothing in the record that suggests what
21 you're worried about happening is going to happen.
22 And I would say that everything you said goes for all
23 parties.  I would agree with you.
24 BY MR. ANDERSON:
25    **Q.    Mr. Hamilton, you've created a declaration**

Page 71

1 **in this case regarding damages, correct?**
2    A.    A declaration?
3    MR. CHIZEWER:  Objection to form.
4 BY MR. ANDERSON:
5    **Q.    When you created your declaration in this**
6 **case that's been marked as Exhibit 4 -- take a look,**
7 **if you could, at what's been marked as Exhibit 4.**
8         (Document tendered to the
9         witness.)
10 **BY MR. ANDERSON:**
11    **Q.    You recognize this as your declaration,**
12 **correct?**
13    A.    Yes.
14    **Q.    Who asked you to create this declaration?**
15    A.    One of the members of my legal team.
16    **Q.    Who specifically?**
17    MR. CHIZEWER:  Objection.
18    MR. ANDERSON:  It's just a name.  Is that
19 privileged?
20    MR. CHIZEWER:  What's the -- what's the
21 relevance of it?
22    MR. ANDERSON:  Well, if you're gonna instruct
23 him not to answer, then you can.  But it's certainly
24 not privileged information as to who the person's
25 name is.

Page 72

1 BY MR. ANDERSON:
2    **Q.    You can answer the question unless your**
3 **counsel instructs otherwise.**
4    MR. CHIZEWER:  I'll let you answer that.
5 BY THE WITNESS:
6    A.    I don't recall.
7 BY MR. ANDERSON:
8    **Q.    Did you have any understanding whatsoever**
9 **as to why you were creating this declaration?**
10    A.    At this moment in time I -- I don't
11 recall.  I'm sure I did when I wrote it, but --
12 reasonably certain I did when I wrote it, but I'm not
13 sure right now what the reason was.
14    MR. CHIZEWER:  To the extent you have any
15 knowledge about the strategy of why anybody asked you
16 to do anything, to the extent that was conveyed to
17 you by one of your lawyers, I'm instructing you not
18 to reveal that information.
19 BY MR. ANDERSON:
20    **Q.    Looking at the declaration itself, Mr.**
21 **Hamilton, at paragraph 11 you set forth price and**
22 **cost information.**
23         **Do you see that?**
24    MR. CHIZEWER:  Hold on.  Is that the question,
25 "Do you see that"?

Page 73

1    MR. ANDERSON:  Yeah.
2    MR. CHIZEWER:  Okay.  I just want to be clear
3 that I think you referred to this as a damages
4 declaration.
5    MR. ANDERSON:  I said "declaration" in my
6 question.
7    MR. CHIZEWER:  Okay.  But this --
8    MR. ANDERSON:  Let's just continue.
9    MR. CHIZEWER:  Go ahead.
10 BY MR. ANDERSON:
11    **Q.    Do you see paragraph 11, sir?**
12    A.    Yes, I do.
13    **Q.    Okay.  Paragraph 11 of Exhibit 4, you set**
14 **forth some purported pricing information, correct?**
15    A.    Yes, I do.
16    **Q.    And the last sentence of that paragraph**
17 **you say, quote, I believe that those pharmacies**
18 **continued to pay as little as 92 cents per IU for**
19 **Advate through 2010.**
20         **Did I read that correctly?**
21    A.    Yes, you did.
22    **Q.    What do you base that opinion on?**
23    A.    One of the sources for that is the Market
24 Research Bureau Report.
25    **Q.    And you believe that that report covers**

19 (Pages 70 to 73)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
GREG HAMILTON – 1/29/2013

Page 74

1  four years' worth of data?
2      A.   Actually, it does cover four years' worth
3  of data.
4      Q.   In what way?
5      A.   It lists information for four or five-year
6  periods of time.  But not only that, I have -- the
7  Market Research Bureau Report is published annually.
8          And I don't know if you've seen the Market
9  Research Bureau Report or not, but if you recall
10 seeing it, what Patrick Robert, who is the publisher
11 of the Market Research Report, does is he gives
12 historical lookbacks.  So, he'll give pricing
13 information for this year and compare it to years
14 back.  So, the Market Research Report does give that
15 information.
16     Q.   So, to the extent that you formed the
17 opinion that pharmacies were paying 92 cents per IU
18 for Advate for 2010, that's founded exclusively upon
19 this other gentleman's report known as the Market
20 Research Report?
21     A.   Yes.
22     Q.   Okay.  Other than that document, do you
23 have any other foundation for your belief that
24 pharmacies paid as little as 92 cents per IU?
25     A.   I think the best answer to that is no.

Page 75

1      Q.   Did you conduct any analysis or objective
2  study of the prices of Advate from 2006 through 2010?
3      A.   No.
4          Excuse me.  I should clarify that.  When
5  you say "prices," would you again go back to whose
6  prices?
7      Q.   Market prices.  Not published AWPs, for
8  instance.
9      A.   Thank you.  Then the answer is no.
10     Q.   Now, I think that leads to my next line of
11 questions, which is you do have a subscription to
12 First DataBank, correct?
13     A.   Incorrect.
14     Q.   It's expired?
15     A.   That is correct.
16     Q.   But as of your prior deposition in 2010
17 you had a current subscription to First DataBank, is
18 that correct?
19     A.   That is correct.
20     Q.   Have you conducted analysis of pricing
21 information published by First DataBank in connection
22 with this case?
23     MR. CHIZEWER:  Objection to form.
24 BY THE WITNESS:
25     A.   I'm hesitating because I'm having a

Page 76

1  problem with the word "analysis."  I mean, 2 and 2 is
2  4 is a calculation.  Is it an analysis?  How much
3  work do you have to put into something for it to be
4  an analysis?
5          In an effort to try and answer your
6  question, let me say this:  I have reviewed,
7  monitored the pricing for Recombinate and Advate as
8  reported by First DataBank over the period of time
9  throughout the case.
10     Q.   When did your subscription expire?
11     A.   I don't recall, but it was probably 2011.
12     Q.   Subsequent to that date in 2011 have you
13 conducted any analysis of First DataBank pricing?
14     A.   No, I have not.
15     Q.   Because you didn't have access to it,
16 correct?
17     A.   I just didn't do it.  If you're asking me
18 to speculate if I had access would I have done it,
19 I --
20     Q.   I'm not asking you --
21     A.   I'm saying I have not conducted any
22 analysis.
23     Q.   All right.  Now back to the analysis that
24 you did conduct.  Did you create any documentation
25 whatsoever of that work?

Page 77

1      A.   I don't recall.
2      MR. CHIZEWER:  To the extent you did, with
3  respect to what your attorneys asked you to do and
4  you gave work to your attorneys, you do not have to
5  reveal that.
6  BY THE WITNESS:
7      A.   Then I don't have to reveal it.
8  Everything I did was under the direction and for my
9  attorneys.
10 BY MR. ANDERSON:
11     Q.   Every --
12     MR. BREEN:  Let me just make sure I understand
13 it.  Did you just instruct him he does not have to
14 reveal whether he actually prepared something as
15 opposed to the content of it?
16     THE WITNESS:  Well, no offense, but you already
17 described the content.
18     MR. BREEN:  I just want to make sure I
19 understand the instruction as counsel's sitting here
20 hearing that a witness can -- if you're telling him
21 not to answer questions whether he prepared something
22 because of the content, I just want the record clear
23 that you told the witness that.
24     MR. CHIZEWER:  That if he -- what we asked him
25 to prepare, if anything, and what he in fact did

20 (Pages 74 to 77)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
GREG HAMILTON - 1/29/2013

Page 78

1  prepare I believe is covered by the work product
2  privilege.
3  BY MR. ANDERSON:
4      Q.   You said, sir, in your earlier testimony
5  that you conducted research of state Medicaid
6  reimbursement on blood factors, but you said that
7  that research was conducted in context other than
8  this case.
9          Is that a true statement?
10     A.   Yes.
11     Q.   Have you conducted any analysis of state
12 Medicaid reimbursement in any form or fashion in this
13 case?
14     MR. CHIZEWER:  Again I'm instructing -- the
15 instruction applies.  If there's analysis that you've
16 done that your attorneys asked you to do, you do not
17 have to reveal what that was.
18 BY THE WITNESS:
19     A.   Then I can't answer.
20 BY MR. ANDERSON:
21     Q.   No, I'm not asking you what the content
22 is.  I'm asking you did you do it.
23     MR. CHIZEWER:  What I'm saying is --
24     MR. ANDERSON:  I'm not asking him what the
25 results of the analysis are.  I'm asking if he

Page 79

1  conducted any analysis.
2      MR. CHIZEWER:  I understand what you're asking.
3  I believe that what we ask him to do, the type of
4  analysis that we may ask him to do is revealing of
5  our mental processes, and it's the exact type of
6  thing that's covered by the work product privilege.
7      MR. ANDERSON:  Okay.  Let's take a break.
8          (Recess.)
9      MR. ANDERSON:  So, Mr. Hamilton, before I
10 continue I want to state for the record that I am
11 requesting any and all information that Mr. Hamilton
12 has created with respect to any state Medicaid
13 reimbursement analysis if that information will be
14 presented in any form or fashion at the hearing
15 and/or relied upon by any other witness at the
16 hearing.
17     MR. CHIZEWER:  Yeah, I think you've made that
18 perfectly clear already.  I think we've had a
19 discussion about it, so --
20     MR. BREEN:  Is it perfectly clear that he's
21 never performed that analysis?  Can you stipulate to
22 that, that he's never performed any state-by-state
23 analysis of reimbursement that form the basis for any
24 of the declaration s filed with the Court today?
25     MR. CHIZEWER:  I don't know what kind of

Page 80

1  analysis he's done.  But the point is what you said
2  about using it at a hearing, you've already made
3  those statements, I've already made my comments about
4  that, and those comments stand.
5      MR. ANDERSON:  This is a different subject
6  matter.
7      MR. CHIZEWER:  Any subject matter, anything
8  that -- I agree that anything that is used at a
9  hearing, any sort of special analysis that's prepared
10 by any witness of any party needs to be produced and
11 the parties need to have a chance to depose them
12 about it.
13     MR. BREEN:  You've already done it, though.  You
14 filed an affidavit by a paralegal who is obviously
15 not a witness in this case that used information from
16 Mr. Hamilton's affidavit to represent to the Court
17 that there's $160 million worth of Medicaid damages
18 in this case.
19         So, what we want to know is did this
20 witness perform any work whatsoever to inform what
21 the state Medicaid reimbursement methodologies were
22 that went into that sworn representation that was
23 already filed with the Court.  If the answer is none,
24 we just need to move on.  I don't know that the
25 answer is none, though.

Page 81

1      MR. CHIZEWER:  First of all, I think if you look
2  at pages 41 and 42 of the transcript of the hearing
3  on November 28th, I think it's pretty clear that
4  damages analysis has nothing to do with the hearing
5  in March, nothing whatsoever.
6      MR. BREEN:  That may be true.
7      MR. CHIZEWER:  So, any questions about any kind
8  of damages analysis that has been done, to the extent
9  that's what it is, is not the subject of this
10 deposition and it's not the subject of the hearing.
11     MR. ANDERSON:  But to the extent that --
12     MR. CHIZEWER:  I will tell you, though, just
13 because there's nothing to hide, the work that Mr.
14 Hamilton did in connection with what was presented in
15 our reply brief was to provide the foundation for the
16 pharmacy acquisition cost column, period.
17         If you think I've misstated something, we
18 can go out and --
19     MR. JACKSON:  Let's go off the record.
20         (Recess.)
21 BY MR. ANDERSON:
22     Q.   Mr. Hamilton, have you conducted any
23 state-by-state Medicaid reimbursement analysis in
24 this case?
25     A.   It's a tough question.  Let me answer it

21 (Pages 78 to 81)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
GREG HAMILTON - 1/29/2013

Page 82

1   as completely as I can.
2         My basic answer is that I haven't.
3   However, in working with a paralegal, I showed her
4   how to use the CMS website how to, you know, lay
5   out the various columns and information on there.
6   And as I've seen in finished product, she then did --
7   she did analysis. She did national analysis, but she
8   also did some state analysis. But that was her, not
9   me.
10      Q.   When you say "her," you're talking about a
11  female paralegal that works at Goldberg Kohn?
12      A.   That's correct.
13      Q.   Did she reach out to you for guidance or
14  did you call her and provide that unilaterally?
15      A.   I offered to do that work.
16         I also, prior to that, just to give you
17  guys full information, I did a similar function with
18  a paralegal that worked for Mark Kleiman much earlier
19  on.
20      Q.   And to your knowledge has any of that
21  underlying work product been produced in this case?
22      A.   I don't know.
23         MR. CHIZEWER: Just to be clear, whatever he did
24  for Mark Kleiman that was not the subject of anything
25  that's been presented to the Court, it's protected by

Page 83

1   the work product privilege.
2   BY MR. ANDERSON:
3       Q.   What did you advise the paralegal as to
4   her analysis?
5          MR. CHIZEWER: I'm gonna object -- go ahead.
6   BY MR. ANDERSON:
7       Q.   What type of guidance did you provide the
8   paralegal?
9       A.   I provided -- which paralegal are we
10  talking about?
11      Q.   The paralegal at Goldberg Kohn.
12      A.   I showed her where -- how to access the
13  CMS website, how the site is set up and how the
14  numbers, the column headings are and how it's broken
15  down by state and by national figures.
16      Q.   Why didn't you just do the work yourself?
17      A.   I'm not really good at Excel.
18      Q.   What adjustments, if any, or effort did
19  you undertake to note any unique aspects for a given
20  state, such as California or Texas, et cetera?
21      A.   I didn't.
22      Q.   To your knowledge did she?
23      A.   I believe she did some --
24         MR. CHIZEWER: I'm gonna -- okay. That's all
25  right.

Page 84

1   BY THE WITNESS:
2       A.   I believe she did some individual state
3   work.
4   BY MR. ANDERSON:
5       Q.   Did you assist her in that regard?
6       A.   No.
7       Q.   How do you have that understanding?
8       A.   I believe I saw it in documents that
9   she -- back and forth between the attorneys.
10      Q.   Have you seen that in any documents that
11  were produced in this case?
12      A.   I don't know all the documents that were
13  produced or not, so I don't know.
14         MR. CHIZEWER: Look, I've given you a lot of
15  leeway. I think her -- Heidi Smith's work has
16  nothing to do with the first to file issues in this
17  case.
18         MR. ANDERSON: I completely disagree. You don't
19  have a claim if you don't have the elements of a
20  False Claims Act cause of action.
21         MR. CHIZEWER: Whether we have a claim or not is
22  actually not at issue in the first to file hearing.
23  The merits of the claim are not at issue in the first
24  to file hearing at all.
25         MR. BREEN: But the claim is. Let's move on.

Page 85

1          MR. ANDERSON: Yeah, you can't have a claim --
2   how can you be first to file if you don't have a
3   claim?
4   BY MR. ANDERSON:
5       Q.   Mr. Hamilton, when you were subscribing to
6   First DataBank, did you ever retrieve any information
7   from First DataBank in connection with this case?
8       A.   Yes.
9       Q.   And did you provide that to anyone in
10  connection with this case?
11      A.   I provided that to my legal team.
12      Q.   Did you retrieve all the published pricing
13  on the blood Factor VIII products in the marketplace?
14      A.   Could you be more specific?
15      Q.   Did you retrieve all of the published
16  pricing published by First DataBank on all the blood
17  Factor VIII recombinant products?
18      A.   I'm not sure if I -- if I did all of them
19  or not and for all periods -- I assume you're talking
20  for all periods of time, for all price histories, for
21  all NDC codes and for all products. And the answer
22  is I don't know.
23      Q.   What did you retrieve?
24      A.   Specifically I retrieved information on
25  Advate and Recombinate by NDC code for whatever

22 (Pages 82 to 85)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
GREG HAMILTON - 1/29/2013

Page 86

1  the -- to the extent that their historical data was
2  available.
3      **Q.    When did you retrieve that information?**
4      A.    At various times, more than once.
5      **Q.    And did you find that the published price**
6  **histories for Recombinate and Advate are very**
7  **similar?**
8      A.    The published price histories?  Published
9  price -- the published prices for those two products
10  are different.
11      **Q.    Let me be more specific.**
12          **Did you find, sir, that the published**
13  **price on Advate as compared to the published -- well,**
14  **I'll even be more specific.**
15          **Did you find, sir, that the published AWP**
16  **on Advate as compared to the published AWP on**
17  **Recombinate were consistently about five to seven**
18  **percent apart?**
19      A.    I don't recall.  It certainly would depend
20  on what time period you're talking about.
21      **Q.    I'm talking about over time that the**
22  **products existed.**
23      A.    Yeah.  Again, without looking at it, I
24  can't answer that question.
25      **Q.    Do you have any memory at all of what**

Page 87

1  **conclusions you drew about the published price**
2  **histories of Recombinate and Advate as published by**
3  **First DataBank?**
4      A.    Well, it's a very broad question.  I
5  certainly do have some recollection of my review of
6  the published prices in First DataBank for Advate and
7  Recombinate.  But specifically if you could -- you
8  know, if you could -- ask me what you're looking for,
9  maybe I could answer it.
10      **Q.    I just want to know everything you**
11  **remember.  What did you find?**
12      A.    On Advate and Recombinate?
13      **Q.    Yes, sir.**
14      MR. CHIZEWER:  Objection to form.
15  BY THE WITNESS:
16      A.    I found that they had changes in their
17  AWPs and changes in their WACs.  I saw that there
18  were different ones, of course, for each product,
19  that when new products -- when I say "new products,"
20  I mean new NDC codes, whether these were typical
21  package sizes -- that they came on and they had the
22  same AWP and WAC as other NDC codes for the same
23  product.
24  BY MR. ANDERSON:
25      **Q.    What, if any, information did you glean**

Page 88

1  **from First DataBank pricing for Recombinate and**
2  **Advate that you think bears upon the claims in this**
3  **case?**
4      MR. CHIZEWER:  Objection to form.
5  BY THE WITNESS:
6      A.    Well, I think that it -- the data for both
7  products -- maybe I should focus more on Advate right
8  now.
9  BY MR. ANDERSON:
10      **Q.    No, I want you to focus on both products.**
11      MR. CHIZEWER:  Objection to form.
12  BY THE WITNESS:
13      A.    Okay.  The striking difference is the
14  difference between what I knew to be the pharmacy
15  acquisition price and the published WAC and the
16  published AWP.
17  BY MR. ANDERSON:
18      **Q.    Can you elaborate?  What do you mean?  The**
19  **striking difference between what and what?**
20      A.    Well, for example, if we look at -- if we
21  look at the 2000 and -- let's say 2005, and we see
22  Advate and I'm paying 92, 93 cents a unit for the
23  stuff and the AWP is $1.75, that's a striking
24  difference between 93 cents and $1.75.
25      **Q.    You say, "I'm paying."  You're talking**

Page 89

1  about during your tenure at Express Scripts?
2      A.    Yes, when I was running the CuraScript
3  affiliate program.
4      **Q.    Okay.  During that same time period, 2005,**
5  **for Recombinate did you find about the same**
6  **difference between the actual acquisition price and**
7  **the AWP existed on Recombinate as on Advate?**
8      A.    I recall it being similar.  I don't
9  remember the exact numbers, but I do recall it being
10  similar.
11          I also recall that at some point in time
12  there was a bit better spread on Advate than there
13  was on Recombinate.
14      **Q.    At sometime prior to 2005, correct?**
15      A.    Again, I -- yes, I would say it was 2005,
16  before 2005.
17      **Q.    Prior to?**
18      A.    Yes, sir.  But then again, the AWPs and
19  the acquisition prices really haven't changed from
20  today to 2005, so it would hold true.
21      **Q.    So, from your perspective, what, if any,**
22  **difference exists between the pricing mechanisms used**
23  **for Baxter as to Advate as compared to Recombinate?**
24      MR. CHIZEWER:  Objection to form.
25  BY THE WITNESS:

23 (Pages 86 to 89)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
GREG HAMILTON - 1/29/2013

Page 90

1     A.   What do you mean by "pricing mechanisms"?
2  BY MR. ANDERSON:
3     Q.   Okay. I'll be as specific as I can be.
4  Focused on the prices published by First DataBank,
5  what, if any, difference exists in your view as to
6  Baxter's published price on Advate versus the
7  published price on Recombinate?
8     A.   They were different numbers.
9     Q.   Other than their different numerical
10 figures, is there any information you have about any
11 scheme or approach or anything else between Advate
12 and Recombinate pricing?
13    MR. CHIZEWER: Objection to form.
14 BY THE WITNESS:
15    A.   And during the time period you're talking
16 about would be when?
17 BY MR. ANDERSON:
18    Q.   2005 to the present date.
19    MR. CHIZEWER: Objection to form.
20 BY THE WITNESS:
21    A.   I don't see any difference, no.
22 BY MR. ANDERSON:
23    Q.   What about from 2005 back to the launch of
24 Advate in the summer of 2003?
25    MR. CHIZEWER: Objection to form.

Page 91

1  BY THE WITNESS:
2     A.   Same answer. No.
3  BY MR. ANDERSON:
4     Q.   Thank you. All right. Now, you mentioned
5  that you actually advised or at least suggested to
6  Baxter management that published AWP on Advate be
7  decreased, is that correct?
8     A.   As part of a conversation I recommended
9  that both the AWP and the price to specialty
10 pharmacies and other customers be lowered.
11    Q.   So the record is clear, you were
12 recommending that the market price come down on
13 Advate, but you were also recommending that the
14 published list price and in turn AWP for Advate come
15 down at the same time, correct?
16    A.   I'd like to make sure -- I believe the
17 answer's correct, but I want to be clear.
18         When you say "market price," okay, I'm
19 referring to the price that would be the actual
20 acquisition price that people actually paid when
21 buying the drug.
22    Q.   Yes, sir. So, in turn, isn't it true that
23 if the published pricing on Advate decreased, that in
24 your view the state Medicaid reimbursement on Advate
25 would also decrease, correct?

Page 92

1     A.   Yes.
2     Q.   So, how are Medicaid programs harmed by
3  the decrease in the publication of Advate pricing?
4     A.   Well, if I can be a little crazy in my
5  analysis, it would be like saying I can stab you 10
6  times or only three times. Gee, if I only stab you
7  three times, you're not being harmed. If I only stab
8  not necessarily. Any stabbing is a harm.
9         So, consequently, if the states are
10 overpaying, dramatically overpaying for Advate and
11 Recombinate and it's based on an AWP, if that AWP is
12 lowered but only lowered to the point where there's
13 just a little bit less blood on the state Medicaid
14 program, the state Medicaid program's still being
15 harmed.
16    MR. ANDERSON: Objection. Unresponsive. I
17 didn't ask you about stabbings or blood or anything
18 else.
19    THE WITNESS: Okay. How would you like me to
20 answer the question?
21 BY MR. ANDERSON:
22    Q.   My question was --
23    MR. CHIZEWER: I think the question was directly
24 answered.
25    MR. ANDERSON: Oh, I'm sure you do.

Page 93

1     THE WITNESS: So do I.
2  BY MR. ANDERSON:
3     Q.   Mr. Hamilton, how is a state Medicaid
4  harmed by a decrease in the published pricing of
5  Advate?
6     A.   The state Medicaid program is continued to
7  be harmed when the AWP is not reflective of the
8  actual selling price of the product.
9     MR. ANDERSON: Objection. Not responsive.
10 BY MR. ANDERSON:
11    Q.   Not my question, sir. I understand that's
12 your perspective, but I'm not asking you about that
13 issue. I'm asking you about the very specific fact
14 that Advate published pricing decreased.
15         With respect to that action, that very
16 specific action, how are state Medicaid programs
17 harmed by the decrease in the published Advate
18 pricing?
19    MR. CHIZEWER: Objection to form. Asked and
20 answered.
21 BY THE WITNESS:
22    A.   The AWP was indeed lowered. At the same
23 time the acquisition price, what you call market
24 price, was also lowered. And therefore, the lower
25 AWP was still not reflective of the price being paid

24 (Pages 90 to 93)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
GREG HAMILTON - 1/29/2013

Page 94

1  by pharmacies, which is what the state Medicaid
2  program's intended to reimburse at.
3       Consequently, it was still false data and
4  it was still causing the state to overpay for the
5  drug.
6  BY MR. ANDERSON:
7       Q.   What information do you base your opinion
8  on that the state Medicaid program is intended to
9  reimburse at any certain level?
10      A.   Well, we could start with over 90, 93.
11  That's probably good enough.
12      Q.   Okay.  So, that's it?
13      A.   What's your question?
14      Q.   My question is that's the body of
15  information you rely upon?
16      A.   Well, I would say that's the basis of it.
17  I have other information, which is conversations with
18  state Medicaid directors, actual reports of Medicaid
19  reimbursement issues with the 340B program, which
20  is -- are you familiar with 340B?
21      Q.   Sir, I'm asking the questions.  You're
22  answering the questions.
23      A.   I'm merely trying to save time.  If you
24  understand 340B, 340B is the state Medicaid
25  program --

Page 95

1       Q.   I didn't ask you about 340B, sir.  I asked
2  you --
3       A.   It's a part of my answer.
4       Q.   What is?
5       A.   The 340B program is part of my answer.
6       Q.   The 340B program causes you to know the
7  intent of state Medicaid officials?
8       A.   Yes.
9       Q.   Is that based on your personal knowledge?
10      A.   Yes.
11      Q.   So, you are personally testifying that you
12  know the intent of all state Medicaid officials?
13      A.   I can't say that I -- no, I can't say
14  no -- I can't say yes to that.
15      Q.   What Medicaid official by name do you know
16  the intent of?
17      A.   Oh, Martha McNeill, Jerry Weiss.
18      Q.   You know Jerry Weiss or Jerry Wells?
19      A.   That's it, Wells.
20      Q.   So, you don't even know his name, but you
21  know his intent?
22      MR. CHIZEWER:  Objection to form.
23  BY THE WITNESS:
24      A.   I apologize for missing the man's name.
25  BY MR. ANDERSON:

Page 96

1       Q.   But you can tell us what Jerry Wells
2  knows, correct?
3       MR. CHIZEWER:  Objection to form.
4  BY THE WITNESS:
5       A.   I can tell you what I was told by that man
6  at various points in time.
7  BY MR. ANDERSON:
8       Q.   So, you agree it's hearsay?
9       A.   I don't know the legal definition of
10  hearsay.
11      Q.   It's based on anything he said.  By that
12  definition --
13      A.   By that definition, yes, that's hearsay.
14      Q.   Do you intend to render any opinions about
15  Jerry Wells' intentions?
16      A.   I don't know.
17      MR. CHIZEWER:  Objection to form.
18  BY MR. ANDERSON:
19      Q.   Do you intend to render any opinion about
20  Martha McNeill's intentions?
21      A.   I don't know.
22      Q.   Do you intend to render any opinion about
23  any state Medicaid official's intent, knowledge, or
24  other mental thoughts?
25      MR. CHIZEWER:  Objection to form.

Page 97

1  BY THE WITNESS:
2       A.   Again I don't know.
3  BY MR. ANDERSON:
4       Q.   When did Martha McNeill tell you that she
5  intended anything with respect to her Medicaid
6  program?
7       A.   Oh, I don't remember specific dates.  I'm
8  sure it would have been somewhere between -- would
9  you like a range?
10      Q.   Yes, sir.
11      A.   Somewhere between, let's say, '97 and
12  2003.
13      Q.   Do you have any contact with state
14  Medicaid officials today?
15      A.   No.
16      Q.   When's the last time you've had any
17  contact with state Medicaid officials?
18      A.   Oh, please forgive me.  I should -- I'm
19  thinking about something.  I have had contact with
20  state medical -- Medicaid officials in conjunction
21  with various State Attorney Generals that I've
22  working with on various cases.  So, there have been
23  times in other cases where we've had to contact -- in
24  other words, I'm working with the NAUSA, and we've
25  had to pick up the phone and meet with or talk to

25 (Pages 94 to 97)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
GREG HAMILTON - 1/29/2013

Page 98

1  somebody within their State Medicaid Department.
2     Q.   In what case?
3     A.   I -- several. I just don't recall which
4  ones.
5     Q.   When's the last time you had any contact
6  with a state Medicaid official?
7     A.   I don't know.
8     Q.   You can't put a time frame on it?
9     A.   Probably not within the last two years.
10  But beyond that I really just don't recall.
11     Q.   Have you ever had any communication with
12  any state Medicaid official about their intent with
13  respect to reimbursing for blood factors?
14     A.   Yes.
15     Q.   When?
16     A.   This would have been back in the nineties,
17  early 2000s.
18     Q.   Since 2003 have you hd any communication
19  in any form or fashion with any state Medicaid
20  official about reimbursement for blood factors?
21     A.   Again, I don't remember when the exact
22  date was. It could have been 2003, 2004. I don't
23  recall.
24     Q.   Do you have any documentation regarding
25  these alleged communications?

Page 99

1     A.   I don't know.
2     Q.   Have you attempted to look?
3     A.   For any communication -- as it relates to
4  this case, no.
5     Q.   Why not?
6     A.   Well, I mean, I don't believe that there's
7  any that -- I don't recall ever addressing a state
8  Medicaid official about this case. I don't believe
9  I've ever done that.
10          But if you're asking me in general if I've
11  ever talked to a state Medicaid official about any
12  case, I may have a record of that, but it would be
13  within the file of another case.
14     Q.   Well, just so the record's clear, my
15  question initially was about blood factors.
16          With respect to blood factor
17  reimbursement, did you attempt to look in your files
18  for any communications with state Medicaid officials?
19     A.   Yes.
20     Q.   When?
21     A.   In the course of this process.
22     Q.   And did you locate any documentation?
23     A.   No.
24     Q.   None?
25     A.   That's correct.

Page 100

1     Q.   So, to the extent you know their intent
2  for reimbursement on blood factors, we'll just have
3  to take your word for it?
4     A.   Per -- in reference to our conversations,
5  that's true. But other than that you can look at the
6  law.
7     Q.   What do you mean by that?
8     A.   Over 90, 93.
9     Q.   Other than over 90 --
10     A.   I believe there are also federal
11  registered publications on it.
12     Q.   You believe or you know?
13     A.   I can't quote them to you, but I've read a
14  lot of federal registered publications. So, which
15  one it is I don't know.
16     Q.   Okay. Have you ever attempted to conduct
17  any review of state plans?
18     A.   What do you mean by "state plans"?
19     Q.   Are you familiar with a term in the
20  Medicaid arena known as a "state plan"?
21     A.   No.
22     Q.   Are you familiar with a term known as a
23  "state plan amendment"?
24     A.   No.
25     Q.   Are you in any way, sir, aware of how

Page 101

1  those state plans or state plan amendments impact
2  Medicaid reimbursement?
3     A.   No.
4     Q.   Hmm. When did -- when did Florida or
5  Texas pay on AWP for blood factors?
6     A.   Florida or Texas?
7     Q.   I'll be even more specific. That was a
8  poor question.
9          Do you have any information whatsoever,
10  sir, that Florida or Texas ever paid reimbursement
11  tied to AWP for blood factors?
12     A.   Yes.
13     Q.   For what time period?
14     A.   This would have been around 2000 and --
15  again, I'm rough on times. 2004 through 2006,
16  somewhere in there.
17     Q.   It's your testimony that Texas paid for
18  blood factors --
19     A.   You said Texas or Florida.
20     Q.   Okay. So, we'll be specific.
21     A.   Thank you.
22     Q.   It's your testimony that Florida, not
23  Texas, paid based off of AWP in part for blood
24  factors in the 2004 to 2006 time frame?
25     A.   My answer is kind of yes. Let me be more

26 (Pages 98 to 101)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
GREG HAMILTON – 1/29/2013

Page 102

1  specific.
2        It was in that time frame that Florida
3  sent out requests for proposals to the various
4  specialty pharmacies asking them to bid on factor
5  products. My company didn't win the bid, by the way.
6  But the bid was set at a fixed rate. Pricing wasn't
7  part of the negotiation. It wasn't part of your bid.
8        The bid stated quite frankly that all
9  factor products will be reduced -- will be reimbursed
10  at AWP minus 39 percent. The bid was -- you know,
11  was questioning the providers as to what kind of
12  services you provided and what else you did. But the
13  price was fixed and they were demanding a price of
14  AWP minus 39.
15     Q.   Do you think that that percentage discount
16  **from AWP of 39 percent is representative of the**
17  **discounts other state Medicaids, to the extent they**
18  **used AWP, applied to AWP for blood factor**
19  **reimbursement?**
20     MR. CHIZEWER: Objection to form.
21  BY THE WITNESS:
22     A.   No.
23  BY MR. ANDERSON:
24     Q.   **What do you base that opinion on?**
25     A.   Review of CMS's website.

Page 103

1     Q.   **The CMS website that you guided the**
2  **Goldberg Kohn paralegal through?**
3     A.   It would have been the same site. Not
4  necessarily at the same time.
5     Q.   **Other than the CMS website, do you have**
6  **any other bases for your understanding as to how**
7  **state Medicaids reimburse for blood factors?**
8     A.   Yes, but it's not very reliable.
9     Q.   **Why not?**
10     A.   Well, because each state publishes a list
11  of their reimbursement methodologies. However, they
12  will list, and I'm reasonably sure most people
13  involved in a case like this would be aware of it,
14  that their publication -- the way they would publish
15  it, it would say, "We reimburse on MAC, AWP minus 15,
16  reasonable and customary," and which one of those and
17  how that's calculated isn't explained.
18        So, I've reviewed that information, but
19  that doesn't necessarily tell you how they're paying
20  for blood factor products.
21        A review of the website, on the other
22  hand, tells you exactly how much they're paying for
23  blood factor products.
24     Q.   **Why do you say that?**
25     A.   Because the CMS website on the Medicaid

Page 104

1  rebate section lists the number of units and the
2  dollar amounts paid by each state by each quarter.
3     Q.   **Does it show you the reimbursement formula**
4  **that they utilize?**
5     A.   No, it doesn't.
6     Q.   **So, what --**
7     A.   I said, "rate." It tells you how much
8  they pay.
9     Q.   **It just tells you the dollars?**
10     A.   It does tell you the dollars.
11     Q.   **That's all it tells you?**
12     A.   And the units.
13     Q.   **Does it tell you what they intended to pay**
14  **or how they intended to pay?**
15     A.   No.
16     Q.   **So, outside of the raw dollar amount,**
17  **what, if any, connection did can you draw between AWP**
18  **and the reimbursement a given state actually pays on**
19  **blood factors?**
20     MR. CHIZEWER: Objection to form.
21  BY THE WITNESS:
22     A.   Well, you can do the math and determine if
23  the amount they paid -- you can look and -- you can
24  compare that to the published AWP and see if it
25  represents a given -- if it could represent a given

Page 105

1  discount off of AWP. It doesn't mean it does or that
2  that was how they got to that number. You don't know
3  how they got to that number.
4  BY MR. ANDERSON:
5     Q.   **I agree with you. For all you know, they**
6  **could have used actual acquisition costs as reported**
7  **to them on an invoice from a provider, correct?**
8     MR. CHIZEWER: Objection to form.
9  BY THE WITNESS:
10     A.   That is possible.
11  BY MR. ANDERSON:
12     Q.   **For all you know, they could have used**
13  **some price they obtained through some type of survey**
14  **they conducted on their own merit, correct?**
15     A.   That is correct.
16     Q.   **For all you know, they could have got it**
17  **from some publisher other than First DataBank,**
18  **correct?**
19     A.   That is correct.
20     Q.   **For all you know, they could have decided**
21  **unilaterally that they were gonna reimburse at a**
22  **certain dollar amount independent of First DataBank,**
23  **correct?**
24     A.   That is correct.
25     Q.   **All right. Now, you worked at Bayer,**

27 (Pages 102 to 105)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
GREG HAMILTON - 1/29/2013

Page 106

1    correct?
2        A.   That is correct.
3        Q.   And you actually were the man who was
4    responsible for reporting published prices to First
5    DataBank for Bayer drugs, correct?
6        A.   For a period of time, that is correct.
7        Q.   Including AWP?
8        A.   For a period of time, that was correct.
9        Q.   And that period of time is the period of
10   time for which ultimately Bayer was sued and paid a
11   settlement to the United States and Medicare,
12   correct?
13       A.   For a period of the time, is that correct.
14       Q.   While you were at Bayer what, if anything,
15   did you do to stop Bayer from reporting inflated
16   AWPs?
17       A.   If you're wondering why I'm pausing, it's
18   because Bayer and their attorneys have reminded me
19   many times about how much of what went on during that
20   time period and under the Ven-A-Care suit was
21   privileged and confidential.  And as I'm not an
22   attorney, it takes me a moment to think of -- if I
23   can answer, what questions I can answer.  My
24   communications --
25       MR. CHIZEWER:  Well, let me give you just a

Page 107

1    little bit of advice.  I have no idea what privileged
2    conversations you had with Bayer's counsel, but to
3    the extent you were given instructions by Bayer's
4    counsel, I would suggest that you not reveal those.
5        MR. BREEN:  What he did, not what he talked to
6    the lawyers about.  So, if you're telling him not to
7    answer questions about what he did while he was
8    employed by Bayer, we need to get that on the record
9    and deal with it.
10       MR. CHIZEWER:  If, for example -- I have no
11   idea.  If something -- if one of the thing he did was
12   go tell their counsel, "I think they should do X,"
13   that may be responsive to his question but also be
14   privileged.  So, that's the only -- if he took action
15   other than going to their counsel, then I would agree
16   with you it's a fair question.
17       MR. BREEN:  Okay.
18   BY THE WITNESS:
19       A.   I can't tell you.  Everything I did was
20   with the lawyers.
21   BY MR. ANDERSON:
22       Q.   It's your testimony that every time you
23   were involved in any price reporting to First
24   DataBank at Bayer you engaged the attorneys?
25       A.   I didn't say that.

Page 108

1        MR. CHIZEWER:  Objection to form.
2    BY MR. ANDERSON:
3        Q.   Okay.  What, sir, did you do to stop Bayer
4    from reporting AWPs that were inflated to First
5    DataBank?
6        MR. CHIZEWER:  And I just want to be clear that
7    to the extent anything you did involved you speaking
8    to their lawyers, I'm instructing you not to -- I'm
9    advising you that you shouldn't reveal those
10   conversations.
11       To the extent you did anything else, you
12   can tell them about it.
13   BY THE WITNESS:
14       A.   There's nothing I can tell you.
15   BY MR. ANDERSON:
16       Q.   Did you go to the attorneys?
17       A.   What do you mean did I go to the
18   attorneys?
19       Q.   Sir, --
20       A.   I can tell you I had many --
21       Q.   I'll rephrase the question.
22       Mr. Hamilton, without divulging the
23   substance of the communication, if any, what did you
24   do to stop Bayer from reporting inflated published
25   prices through First DataBank?

Page 109

1        MR. CHIZEWER:  Hold on a second, okay?  If he
2    says -- based on that question you're actually asking
3    him to reveal the substance of a conversation with
4    the lawyers.
5        To the extent that you've done anything
6    with the lawyers with respect to --
7        MR. ANDERSON:  Bayer's not even here.  Why are
8    you instructing him not to answer?  He can make his
9    own determination.
10       MR. CHIZEWER:  I'm not instructing him not to
11   answer.  But I am his lawyer, and I'm advising him
12   not to reveal attorney-client communications that he
13   doesn't have the ability to waive.
14       MR. BREEN:  Let me suggest a question.  Just a
15   second.
16       MR. ANDERSON:  First I would like this question
17   to be answered, if it can be answered.
18   BY THE WITNESS:
19       A.   My answer is I can't answer you.
20   BY MR. ANDERSON:
21       Q.   Other than talking to attorneys, did you
22   do anything to stop Bayer from publishing inflated
23   list prices through First DataBank?
24       A.   No.
25       Q.   Did you ever tout to anyone that you

28 (Pages 106 to 109)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
GREG HAMILTON – 1/29/2013

Page 110

1    created the pricing fraud at Bayer?
2        A.   I don't know that I would have
3    characterized it like that, but I would have to
4    certainly admit that I was involved in it.
5        Q.   And you took pride in being involved in
6    that, didn't you?
7        A.   I don't know that -- I don't think that
8    properly characterized my --
9        Q.   You certainly didn't see anything wrong
10   with Bayer publishing inflated list prices, did you?
11       MR. CHIZEWER:  Objection to form.
12   BY THE WITNESS:
13       A.   I never said I didn't think there was
14   anything wrong with it.
15   BY MR. ANDERSON:
16       Q.   Why did you want to take credit for it?
17       MR. CHIZEWER:  Objection to form.
18   BY THE WITNESS:
19       A.   I don't understand your question.
20   BY MR. ANDERSON:
21       Q.   Did you like taking credit for the fact
22   that Bayer published inflated list prices?
23       A.   Did I like taking credit for the fact that
24   Bayer reported inflated list prices?  I don't believe
25   I did.

Page 111

1        MR. CHIZEWER:  There was an objection to the
2    form.
3    BY MR. ANDERSON:
4        Q.   We'll take it step by step.  Did you ever
5    take credit, at least in part, for Bayer's
6    publication of inflated prices through First
7    DataBank?
8        A.   I'd like to specify what you mean by "take
9    credit."  So, let me try to answer the question as
10   best I can.
11       I was at times the person who actually
12   reported the AWPs to Red Book, Medi-Span and First
13   DataBank.
14       Q.   And you recognized at the time that those
15   prices were inflated above Bayer's actual selling
16   prices, correct?
17       A.   That is correct.
18       Q.   And you didn't see anything wrong with
19   Bayer publishing inflated list prices or other
20   published prices through First DataBank?
21       MR. CHIZEWER:  Objection to form.
22   BY THE WITNESS:
23       A.   I don't think it's accurate to say I
24   didn't see anything wrong with it.  As a matter of
25   fact, I'll give you an example.

Page 112

1        There was a time when a competitor raised
2    their AWP, and I was asked to raise ours.  Let's say
3    for the sake of argument that AWPs were in the $1.50
4    range.
5        I went to my boss and I said, "This is
6    what's being asked of me.  This is the market
7    situation.  It's easy for me to raise AWP.  All I
8    have to do is send a letter to DataBank."  I said,
9    "But this is getting ridiculous with raising the
10   AWP."  And I remember saying, "Why don't we put in a
11   price of, like, $7.50 for an AWP?"
12       And he said, my boss, Terry, Terry's
13   response was something like, "What, are you nuts?"
14       And I said, "Well, I'm just sick of doing
15   this.  Why don't we just throw out a number that's
16   just so ridiculous that eventually the government
17   will step in and put a stop to it?"
18   BY MR. ANDERSON:
19       Q.   And did they?
20       MR. CHIZEWER:  Objection to form.
21   BY THE WITNESS:
22       A.   First of all, when you say --
23       Q.   I'll be specific.  Did the government ever
24   step in and put a stop to it?
25       A.   Not to my knowledge.

Page 113

1        Q.   It's your testimony that today in 2013 the
2    government hasn't done anything to stop mega spreads
3    in drug reimbursement?
4        MR. CHIZEWER:  Objection to form.
5    BY THE WITNESS:
6        A.   I don't think it's accurate to say they
7    haven't done anything.  They've made some attempts
8    to, as you say, stop the mega spread.  They've made
9    some attempts.  There have been federal lawsuits.
10   There have been state lawsuits.  There have been the
11   move by the OIG working with First DataBank to
12   actually -- instead of just taking whatever AWP a
13   company sends them to, actually perform some sort of
14   calculations and surveys.  So, I think that there's
15   been some effort on the part of the government to try
16   and fix this problem, some effort.
17       Further answering your question about my
18   suggestion of going to $7.50, my boss made the --
19   repeated the comment of something like, "Well, you're
20   crazy and that's not what we're gonna do."
21       And so, we did not report an AWP of $7 and
22   whatever it is.  And so, therefore, the government
23   had no such thing to react to.  We responded by
24   raising our AWP to be comparable to whatever the
25   competitor is.

Merrill LAD

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
GREG HAMILTON – 1/29/2013

Page 114

1    MR. CHIZEWER: I'm sorry. I see you've got a
2 big stack of documents there. It's 12:45. We've
3 been going for a while.
4    MR. ANDERSON: Yeah, we'll break for lunch, but
5 let me just finish this line of questioning.
6    MR. CHIZEWER: Okay.
7 BY MR. ANDERSON:
8    **Q.    What time frame roughly did this**
9 **conversation occur that you just described?**
10   A.   Somewhere between '96 and '99, I think.
11   **Q.    Okay.  So, subsequent to '99 is it true,**
12 **sir, that state Medicaid programs changed their**
13 **reimbursement formula over time to decrease any**
14 **effect of spreads that were created by certain drug**
15 **companies instituting what are known as mega spreads,**
16 **spreads of 2, 3, 4, 5, 6 hundred percent?**
17   MR. CHIZEWER: Objection to form.
18 BY THE WITNESS:
19   A.   First of all, I cannot give you a state by
20 state. As I've said earlier, that I did not conduct
21 state-by-state analysis of how they set their
22 reimbursement rate. So, I can't tell you what state
23 made what change and what date and what method they
24 used. I've already testified to that. So, my answer
25 is I can't give you any specifics.

Page 115

1 BY MR. ANDERSON:
2    **Q.    Can you give me any generalities?  In your**
3 **opinion, did the states take steps or not?**
4    A.   Sure, sure.
5    MR. CHIZEWER: Objection to form.
6 BY THE WITNESS:
7    A.   In generalities --
8 BY MR. ANDERSON:
9    **Q.    I'll be more specific to address your**
10 **counsel's objection.**
11   **Can you provide any general sense of**
12 **whether or not from 1999 to today, in 2013, state**
13 **Medicaid programs have taken steps to address**
14 **reimbursement spreads by changing their reimbursement**
15 **formula to result in lower drug cost reimbursement?**
16   MR. CHIZEWER: Objection. Foundation.
17 BY THE WITNESS:
18   A.   All I can do is give you general
19 information to say that states over time have varied
20 depending on the drug, depending on the time period,
21 have varied their discount off of AWP, for example.
22   So, a state may have -- I recall
23 Pennsylvania at one point was paying full AWP for
24 factor products. At some point they dropped that
25 down to AWP minus 5, and at some point they dropped

Page 116

1 it down to AWP minus 15. So, that would show you
2 that over a period of time they were changing their
3 method and the formula for reimbursing for factor
4 products. And that's a specific state I can give you
5 as an example.
6    And as a generality, we saw other states
7 over time taking different steps, you know, to -- to
8 do something to control and to, as you say, ratchet
9 down reimbursement on a state-by-state level.
10 BY MR. ANDERSON:
11   **Q.    And how, if at all, did you utilize that**
12 **general understanding in forming the allegations that**
13 **you've urged in this lawsuit?**
14   MR. CHIZEWER: Objection. Foundation.
15 BY THE WITNESS:
16   A.   I don't think that those general -- that
17 general information is a part -- played a part in
18 this lawsuit.
19   MR. ANDERSON: We can take a break now.
20      (Mr. James Joseph Breen left
21      the deposition proceedings.)
22      (Whereupon, at 12:45 p.m., the
23      deposition was recessed, to
24      reconvene at 1:30 p.m., this same
25      day, January 29, 2013.)

Page 117

1      (Whereupon, the deposition
2      resumed at 1:34 p.m.)
3      GREG HAMILTON,
4 called as a witness herein, having been previously
5 duly sworn and having testified, was examined and
6 testified further as follows:
7      EXAMINATION (Resumed)
8 BY MR. ANDERSON:
9    **Q.    Mr. Hamilton, back at the time of your**
10 **Bayer employment you were aware of a lawsuit**
11 **Ven-A-Care brought against Bayer on behalf of the**
12 **United States, correct?**
13   A.   Yes.
14   **Q.    Were you involved in the defense of that**
15 **case?**
16   MR. CHIZEWER: Objection to form.
17 BY THE WITNESS:
18   A.   I was involved with the circumstances
19 surrounding the case. I was interviewed by internal
20 and external counsel and was involved in educating
21 everyone about the business practices, AWP and things
22 like that.
23 BY MR. ANDERSON:
24   **Q.    Did you appreciate the fact that**
25 **Ven-A-Care had sued companies other than Bayer?**

30 (Pages 114 to 117)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
GREG HAMILTON – 1/29/2013

Page 118

1    A.   Yes.
2    Q.   Did you appreciate that Ven-A-Care had
3  brought suits against other makers of recombinant?
4    A.   When you say "appreciate," I should ask
5  you what you mean by "appreciate."
6    Q.   Did you know back at your time at Bayer
7  that Ven-A-Care had brought qui tam claims against
8  other manufacturers of recombinant other than Bayer?
9    MR. CHIZEWER:  Objection.
10    THE WITNESS:  Can I ask you a question?
11  BY MR. ANDERSON:
12    Q.   Wait.  Hold on.  So the record is clear,
13  before you answer this question you need to confer
14  with Sun/Hamilton counsel?
15    THE WITNESS:  Yeah.
16    MR. ANDERSON:  Okay.  Go ahead.
17       (Discussion off the record
18        between Mr. Chizewer and the
19        witness outside the hearing of
20        other counsel and the court
21        reporter.)
22    MR. CHIZEWER:  The witness was consulting me
23  about an issue regarding privilege.  I want to
24  instruct the witness that he should consider whether
25  or not any of the conversations that he's being asked

Page 119

1  about occurred between lawyers for Bayer and Mr.
2  Hamilton.  And if that's where the information came
3  from, I would instruct you not to breach the
4  attorney-client privilege, would advise you not to
5  breach the attorney-client privilege between you and
6  Bayer.
7  BY THE WITNESS:
8    A.   Based on that, I can't answer your
9  question.
10  BY MR. ANDERSON:
11    Q.   Sir, I'm not asking for the substance of
12  any communications.  I'm asking did you know that
13  Ven-A-Care had brought cases again other makers of
14  recombinant, r-e-c-o-m-b-i-n-a-n-t, other than Bayer?
15    MR. CHIZEWER:  I think in order to ask that
16  question without infringing on a privilege, what you
17  need ask him is other than information he may have
18  obtained from counsel for Bayer, did you know
19  whatever.  And I'll allow him to answer that
20  question.
21    MR. ANDERSON:  I'll ask the question that way,
22  but I believe I'm entitled to an answer on my
23  original question, as well.  But we'll take it step
24  by step.
25  BY MR. ANDERSON:

Page 120

1    Q.   Other than information gained from
2  attorneys for Bayer, did you have an understanding
3  that Ven-A-Care had brought cases against other
4  manufacturers making recombinant other than Bayer?
5    A.   Not at that time.
6    Q.   The time being the late nineties?
7    A.   Yeah, late nineties, yes.
8    Q.   Okay.  At what point did you gain an
9  understanding that Ven-A-Care had brought suit
10  against other makers of recombinant other than Bayer?
11    A.   I don't recall.
12    Q.   You can't provide any general time frame
13  as to when you learned that?
14    MR. CHIZEWER:  And when he asks you when you
15  learned that, he means other than from any lawyers of
16  Bayer while you were at Bayer.
17  BY THE WITNESS:
18    A.   And that's how I understood it.
19      And the answer is I don't know.
20  BY MR. ANDERSON:
21    Q.   Now back to my original question because
22  I'm gonna want it certified.  And we're gonna need --
23  if you're gonna instruct him not to answer, then
24  you'll need to do that.
25      While you were at Bayer, Mr. Hamilton, did

Page 121

1  you have an understanding that Ven-A-Care had brought
2  cases against other makers of recombinant other than
3  Bayer?
4    A.   I can't answer that question.
5    Q.   Why not?
6    A.   Because I think it would violate my
7  confidentiality agreement with Bayer.
8    Q.   Your confidentiality agreement with Bayer?
9    A.   Well, confidentiality agreement between
10  attorneys and myself at Bayer.
11    Q.   You believe that answering that question
12  would cause you to violate an agreement or a
13  privilege?
14    A.   I'm not a lawyer.  I guess I would -- if I
15  had to guess, I would call it a privilege.  I think
16  they call it attorney-client privilege information.
17    Q.   And in what way do you believe that that
18  knowledge -- well, strike that.
19      Are you refusing to answer my question
20  based on any instruction from any Sun/Hamilton
21  counsel?
22    A.   No.
23    Q.   You're unilaterally personally choosing to
24  refuse to answer my question?
25    A.   That's correct.  I believe I -- if I did

31 (Pages 118 to 121)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
GREG HAMILTON - 1/29/2013

Page 122

1   that, I'd be violating attorney-client privilege with
2   Bayer.
3       Q.   Do you believe that you learned that
4   Ven-A-Care had brought qui tam cases against makers
5   of recombinant other than Bayer prior to 2003?
6       A.   I don't know.
7       Q.   Prior to 2005?
8       A.   Again, I told you I can't give you dates,
9   so I don't know.
10      Q.   Is there any way that you can vector in on
11  when you first learned that Ven-A-Care had brought
12  cases against other makers of recombinant other than
13  through the communications with Bayer counsel in the
14  late nineties?
15      A.   I don't know of any.
16      Q.   Did you specifically know that Ven-A-Care
17  had brought cases against or a case against Baxter?
18      MR. CHIZEWER:  Objection to form.
19  BY MR. ANDERSON:
20      Q.   I'll be specific.  While you were at Bayer
21  did you know that Ven-A-Care had brought a case
22  against Baxter?
23      MR. CHIZEWER:  Again --
24  BY THE WITNESS:
25      A.   Yeah, same thing again.  I can't answer

Page 123

1   that question.
2   BY MR. ANDERSON:
3       Q.   You can't answer it because you believe
4   that will cause you to divulge attorney-client
5   privileged information?
6       A.   That is correct.
7       Q.   So, you're refusing to answer the
8   question, right?
9       A.   That is correct.
10      Q.   Okay.  You know the answer to the
11  question, but you simply refuse to answer the
12  question, correct?
13      A.   Yes.
14          (Hamilton Deposition Exhibit 5
15           was marked for identification.)
16  BY MR. ANDERSON:
17      Q.   All right.  Take a look at what's been
18  marked as Exhibit 5.  You don't need to read it word
19  for word, but take your time and just flip through it
20  and tell me if you've ever seen this document before.
21          (Short interruption.)
22  BY MR. ANDERSON:
23      Q.   Do you think you've ever seen this before?
24      A.   The sections that I'm reading right now I
25  have not.  But I'm only up to page 10.

Page 124

1       Q.   So, let's focus on the first two pages,
2   then.
3       A.   You don't want me to finish reading it, or
4   you do?
5       Q.   No, we'll focus on the first two pages
6   since you've read those.  You've read through page
7   10, correct?
8       A.   Scanned through page 10.
9       Q.   Okay.  So, looking at the first page, do
10  you see that this appears to be a Settlement
11  Agreement between the United States, Ven-A-Care and
12  Bayer Corporation?
13      A.   Yes.
14      Q.   And then the second page shows that it
15  covers a time period from 1993 through August 31st of
16  1999.
17          Do you see that?
18      A.   No.  I'm looking for it, though.
19      Q.   In paragraph C, middle of the page.
20      A.   Yes.
21      Q.   And that was a time period for which you
22  were not only working at Bayer, but actually the
23  person responsible for submitting prices to First
24  DataBank, correct?
25      A.   For some of that time, not for all of it.

Page 125

1       Q.   Right.  But several years within that time
2   period, right?
3       A.   That is correct.
4       Q.   And one of the products for which this
5   case was brought is listed as "Kogenate
6   Anti-Hemophilic Factor (Recombinant)."
7          Do you see that?
8       A.   That's correct.
9       Q.   Then looking down, there's a parenthetical
10  at the end of that paragraph that refers to that drug
11  as well as the others as the "qui tam drugs."
12          Do you see that?
13      A.   Yes.
14      Q.   Then the next paragraph starts, quote, The
15  United States contends that Bayer, in a manner
16  similar to the practices of certain other
17  manufacturers of the qui tam drugs and in connection
18  with the Medicaid program, knowingly engaged in a
19  marketing scheme whereby it set the Average Wholesale
20  Prices (AWPs) of the qui tam drugs at levels far
21  higher than what the vast majority of its customers
22  actually paid for these products.
23          Did I read that correctly?
24      A.   Yes.  You left off mid-sentence, but you
25  read it correctly.

32 (Pages 122 to 125)

Page 126

1    Q.    Does that refresh your memory in any way
2  about your awareness that Ven-A-Care had brought
3  cases against makers of recombinant back in the
4  nineties?
5        MR. CHIZEWER: Objection to form.
6  BY THE WITNESS:
7    A.    No. Again, I've never seen this document,
8  so --
9  BY MR. ANDERSON:
10   Q.    Understood. And you're unwilling to
11 answer the question about whether or not it's
12 refreshed your recollection?
13   A.    No, I'm saying it hasn't refreshed my
14 recollection. This has no impact on my recollection
15 whatsoever.
16   Q.    About whether or not you had any
17 understanding beyond that from counsel as to
18 Ven-A-Care's cases against makers of recombinant
19 other than Ven-A-Care, correct?
20   A.    That's correct.
21   Q.    Did you know that Ven-A-Care had brought a
22 case against Bayer for recombinant?
23       MR. CHIZEWER: Objection to form.
24       THE WITNESS: I've gotta ask him another
25 question.

Page 127

1  BY MR. ANDERSON:
2    Q.    Hold on. Before answering the question,
3  you've got to confer with counsel?
4    A.    That's correct.
5        MR. ANDERSON: Okay.
6        (Discussion off the record
7           between Mr. Chizewer and the
8           witness outside the hearing of
9           other counsel and the court
10          reporter.)
11       THE WITNESS: Okay.
12 BY MR. ANDERSON:
13   Q.    Can you answer the question now?
14   A.    Yes. I can tell you that all the
15 information that I had pertaining to the -- to the
16 case of Ven-A-Care against Bayer was given to me by
17 the Law Department, any and all of it. So, any
18 knowledge I had of it was direct from our Law
19 Department.
20   Q.    Okay. So, you didn't see any press
21 releases or anything else like that from a non-lawyer
22 regarding the Bayer settlement?
23   A.    Not that I recall.
24   Q.    Okay. Did you know the Bayer settlement
25 was made public?

Page 128

1    A.    I don't know that. I assumed it was, but
2  I'm not positive of it.
3    Q.    All right. Did you ever receive any
4  copies of Complaints filed by Ven-A-Care against any
5  drug companies?
6    A.    I don't recall. You know, if I had seen
7  any, it would have been the one against Bayer, and it
8  would have come from the lawyers. But I don't even
9  recall seeing it.
10   Q.    You know that you, or at least your
11 attorneys on your behalf in this case, have produced
12 documentation to the other parties, correct?
13   A.    I'm sorry. My attorneys have provided
14 documentation. You mean, like, have documents been
15 produced?
16   Q.    Yes, sir.
17   A.    I'm aware that documents have been
18 produced. I'm not aware of every specific
19 one or whatever, but I know documents have been
20 produced.
21   Q.    And you've been a part of that process of
22 gathering documents to be produced, correct?
23   A.    A part. Not a whole, but a part.
24   Q.    Your attorneys in this case have asked you
25 to review your files and pull together documents to

Page 129

1  be produced to the other parties, correct?
2    A.    That is correct.
3    Q.    Okay. And they've asked you to do that
4  for several years, I'm assuming, correct?
5    A.    Yes, there's been several times when I've
6  been asked for that.
7    Q.    This case was first unsealed in what year,
8  sir?
9    A.    I don't know.
10   Q.    You don't remember?
11   A.    That's correct.
12   Q.    Can you put a -- was it the mid -- like,
13 2005, or was it much later?
14   A.    I don't want to guess. I just don't
15 recall.
16   Q.    Okay. When did any attorney representing
17 you in this matter ask you to review your files to
18 gather documentation to be produced to the other
19 side?
20   A.    Again I don't remember the dates. It's
21 happened a couple of times. One was recently in
22 regards to the upcoming hearing. Maybe -- I think
23 actually for this deposition I think I was asked to
24 review my files.
25   Q.    So, just a month or so ago?

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
GREG HAMILTON - 1/29/2013

Page 130

1    A.   Something like that, yeah.
2    Q.   And when was the first time that you were
3  asked to review your files and pull together
4  documentation?
5    A.   For discovery.
6    Q.   Discovery in the litigation that was
7  unsealed that was brought by Sun and Hamilton on
8  behalf of the United States against Baxter?
9    A.   Again I don't recall.
10   Q.   All right.
11         (Hamilton Deposition Exhibit 6
12         was marked for identification.)
13         (Document tendered to the
14         witness.)
15 BY MR. ANDERSON:
16   Q.   Please take a look at what's been marked
17 as Exhibit 6.
18         (Short interruption.)
19 BY MR. ANDERSON:
20   Q.   Have you finished your review of Exhibit
21 6?
22   A.   I've scanned it.  I haven't read every
23 word.
24   Q.   Does it look familiar to you, anyway?
25   A.   It does.  I've seen it somewhere before.

Page 131

1    Q.   I notice the bottom right-hand corner of
2  the document has your initials.  I'll represent to
3  you this was produced to us recently for this
4  deposition.
5         Do you think this came from your files?
6    A.   I've seen it before.  I actually think
7  it -- it may have.
8    Q.   Do you know why this document was created?
9    A.   No.
10   Q.   Do you know who created this document?
11   A.   I have no idea.
12   Q.   What was the context in which you saw the
13 document previously?
14   A.   The best of my recollection is that this
15 was a document that I had in a file somewhere, and in
16 my reviewing documents I saw this and went, "It looks
17 like it might be related," and sent it to my
18 attorneys.
19   Q.   Did you see this in paper form?
20   A.   Yes.
21   Q.   So, you think that this document resided
22 in some paper files that you keep at your house?
23   A.   Yes.
24   Q.   And when did you first share this document
25 with your attorneys?

Page 132

1         MR. CHIZEWER:  I think that's probably
2  privileged.
3         MR. ANDERSON:  The when?
4         MR. CHIZEWER:  Yeah.
5         MR. ANDERSON:  Okay.  Are you instructing him
6  not to answer?  I don't agree, but I just need to
7  know.
8         MR. CHIZEWER:  Yeah, I think when he -- I think
9  you can ask him other questions about timing related
10 to this document, but when he provided it to his
11 attorneys I think is privileged.  Tell me why you
12 need to -- if you tell me why you need to know --
13        MR. ANDERSON:  I just need to know if you're --
14 I'm going to continue questioning him, but are you
15 instructing him not to answer or not?
16        THE WITNESS:  I can make this easy.
17 BY MR. ANDERSON:
18   Q.   Wait.  Hold on.  Before you answer the
19 question, you're gonna need to confer with counsel?
20   A.   I don't think so.
21        MR. CHIZEWER:  Okay.  Go ahead.
22 BY THE WITNESS:
23   A.   My answer is I don't know.
24 BY MR. ANDERSON:
25   Q.   Okay.  Let's go back to what you do know.

Page 133

1  You think that this document resided in your files at
2  your house.
3         Do you have any idea of how you came to
4  possess this document in the first place?
5    A.   No, I don't.
6    Q.   I notice  at the top of the document it
7  says in parenthetical, "please note: paragraph
8  numbering errors are from the original."
9         Did I read that correctly?
10   A.   Yes, you did.
11   Q.   Does this indicate to you that somehow
12 this document was transcribed or copied from another
13 document?
14        MR. CHIZEWER:  Objection to form.
15 BY THE WITNESS:
16   A.   No.
17 BY MR. ANDERSON:
18   Q.   Do you have any idea why that
19 parenthetical is there?
20        MR. CHIZEWER:  Objection to form.
21 BY THE WITNESS:
22   A.   I have no clue.
23 BY MR. ANDERSON:
24   Q.   Did you produce all of the documents from
25 your files that relate to this document, e-mails in

34 (Pages 130 to 133)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
GREG HAMILTON - 1/29/2013

Page 134

1  which this document was transmitted, any documents
2  nearby, physically in the file, et cetera?
3      A.   I have no idea where this document -- how
4  I obtained this document, okay?  And so, therefore, I
5  would have no idea if there's anything related to it.
6          If I saw a document in my file that
7  somehow referred to this or if it was paper-clipped
8  to it or something like that, I would have produced
9  it, and I probably wouldn't be as befuddled here in
10  terms of saying I really don't know where this came
11  from.
12      Q.   Do you think that any information shown in
13  this document has been utilized by you in this case?
14      A.   No.
15      Q.   The information regarding the state
16  Medicaid formulas isn't pertinent to you in this
17  case?
18      A.   I didn't say that it's impossible that
19  these things would be pertinent.  I'm saying they
20  have not been used in the evaluation of this case.
21      Q.   Why do you know that?  Why do you say
22  that?  What's the basis for that statement?
23      A.   The basis for that statement is I
24  didn't -- I provided no input to -- I had nothing --
25  I didn't use this at all in terms of evaluating this

Page 135

1  case.
2          MR. CHIZEWER:  I think you made a representation
3  that this document was produced to you recently?
4          MR. ANDERSON:  That's correct.
5          MR. CHIZEWER:  When you say "recently," what do
6  you mean?
7          MR. ANDERSON:  You gotta remember I represent
8  Ven-A-Care.  We weren't dragged into this thing until
9  recently.  But we just got that.
10          MR. CHIZEWER:  Fair.
11          MR. ANDERSON:  When I say "recently," I mean in
12  the past month or so.
13          MR. CHIZEWER:  I understand.  I was confused.
14  You cleared that up.
15  BY MR. ANDERSON:
16      Q.   Do you think you received this document
17  from any counsel that represent you or Mrs. Sun in
18  this litigation?
19      A.   I have no idea where I got it.
20      Q.   Why are you so certain that you didn't use
21  any of this information in connection with this case?
22      A.   Well, because looking at the information
23  that I see in here, and again, I haven't read
24  everything, so I don't know if there's something else
25  in here, but obviously the section that stands out is

Page 136

1  the section 110.  But I just know I didn't -- didn't
2  take information from this page and apply it
3  anywhere.
4      Q.   Do you know whether your attorneys took
5  information that's shown in Exhibit 6 and applied it
6  in any way to this lawsuit?
7      A.   I don't know.
8      Q.   Do you think that -- well, strike that.
9          I'll represent to you, sir, that this
10  Exhibit 6 is in essence a verbatim transcription of a
11  Ven-A-Care Complaint.
12          Can you explain why you would have a
13  verbatim transcription of portions of a Ven-A-Care
14  Complaint in your personal files?
15      A.   Again, I don't know where it came from.
16      Q.   I know.  But I'm telling you, sir, based
17  on my representation to you that this appears to be a
18  document transcribing almost verbatim portions of a
19  Ven-A-Care Complaint.  If that's an incorrect
20  statement on my part, then, of course, the question's
21  not gonna hold water.
22          But assuming that that's a correct
23  representation on my part, can you explain why you
24  would have such a document in your files?
25      A.   Again, no, I don't know where it came from

Page 137

1  so I can't explain how it got there.
2      Q.   When you -- well, strike that.  I'll back
3  up a step.
4          When did you first ask any attorney to
5  represent you in any case against Baxter?
6      A.   I'm guessing it would have been 2005.
7      Q.   What month?
8      A.   I don't recall.
9      Q.   What time of year; spring, fall, winter?
10      A.   Again, I don't recall.
11      Q.   Why do you think it was 2005?
12      A.   It was somewhere around the time the suit
13  was filed.
14      Q.   Do you recall that the suit was filed
15  shortly after you approached an attorney?
16      A.   I don't recall approaching an attorney.
17      Q.   Well, I'm not trying to get hung up on the
18  words.  Do you recall that a suit was filed on your
19  behalf shortly after you contacted an attorney to
20  represent you in a case against Baxter?
21      A.   I'm aware that after I met with and
22  discussed the case and agreed to be a party to the
23  case that a -- that a suit was filed, yes.
24      Q.   Okay.  And it was fairly soon thereafter?
25      A.   Fairly soon.  I --

35 (Pages 134 to 137)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
GREG HAMILTON - 1/29/2013

Page 138

1    Q.   A couple of months?
2    A.   I don't know.
3    Q.   Okay.  Who -- what attorney did you make
4  that first contact with?
5    A.   Mark Kleiman.
6    Q.   And you said that you reached an agreement
7  that you would be a party to the case.
8         What do you mean by that?
9    A.   That I would become a relator in this
10 case.
11   Q.   Did you approach him and ask if you could
12 be a relator or did he approach you and ask if you
13 were interested in being a relator?
14   A.   It was a discussion between the two of us
15 and about the industry, about the drugs, about this
16 particular situation.
17        MR. CHIZEWER:  I think the question he asked is
18 fair, whether he approached you or you approached
19 him.  You can answer that question.  What you
20 discussed is privileged.  You don't have to reveal
21 the contents of your communication with him in order
22 to answer his question.
23        So, I would just ask you to answer his
24 question and not reveal any of the contents of the
25 conversation.

Page 139

1  BY THE WITNESS:
2    A.   Okay.  As I recall, he was probably the
3  one that initiated it.
4  BY MR. ANDERSON:
5    Q.   Did you already have a relationship with
6  Mr. Kleiman prior to this discussion that you
7  initially had bringing a suit against Baxter?
8    A.   Yes.
9    Q.   And that's because you were working for
10 him as a consulting expert in other lawsuits,
11 correct?
12   A.   That is correct.
13   Q.   Okay.  Did y'all talk about the fact that
14 Ven-A-Care had already brought cases against Baxter?
15        MR. CHIZEWER:  Okay.  I'm gonna instruct you not
16 to answer, not to reveal any of the substance of your
17 communications with counsel.  So, I'm gonna instruct
18 you not to answer that question.
19 BY MR. ANDERSON:
20   Q.   Did you know when you first talked with
21 Mr. Kleiman -- independent of your communications
22 with Mr. Kleiman, did you know in 2005 that
23 Ven-A-Care had brought cases, or at least a case,
24 against Baxter?
25   A.   Absent of any conversations I had with

Page 140

1  attorneys?
2    Q.   Absent any conversations you had with Mr.
3  Kleiman.
4        MR. CHIZEWER:  Well, I think he can't reveal --
5  BY THE WITNESS:
6    A.   We're going back to Bayer and saying the
7  same thing I said with reference to the question you
8  asked me when I was at Bayer.  And I can say that I
9  had no non-attorney information on Ven-A-Care.
10       MR. ANDERSON:  Well, I want that question
11 certified because I don't believe that he can refuse
12 to answer as to what knowledge he had regarding
13 Ven-A-Care's cases or case against Baxter.
14       MR. CHIZEWER:  I mean, look, certified,
15 non-certified, any time he doesn't answer a question,
16 if you think that he has an obligation to answer
17 it --
18       MR. ANDERSON:  I would ask you that you actually
19 advise him that he's not gonna -- that the disclosure
20 of the fact that Ven-A-Care did or did not have a
21 case pending against Baxter is not divulging
22 attorney-client privileged information that's in the
23 context of any legal representation pertinent to this
24 case.
25       MR. CHIZEWER:  You may be right about that.

Page 141

1  However, I'm not in a position to -- to take a
2  position on behalf of Bayer as to what
3  communications, since he is revealing that it was a
4  communication that he had with Bayer's counsel, I'm
5  not in a position to advise him as to whether or not
6  he can waive a privilege or whether Bayer would want
7  to assert a privilege over his communications with
8  Bayer's counsel.  So, I can't advise him on that.
9  I'm not going to.
10       MR. ANDERSON:  Well, but you have advised him
11 previously.  He conferred with you specifically.  And
12 subsequent to those multiple conferences he's refused
13 to answer.
14       Look, we're not gonna resolve it.
15 Obviously you've made your position known.  I'm
16 making my position known.  But this is absolutely
17 critical to the issue of first to file.  And his
18 refusal to definitively answer -- I think the
19 implication is fairly obvious.  But his refusal to
20 not answer straightforwardly is inappropriate in my
21 view.
22 BY MR. ANDERSON:
23   Q.   Did you -- prior to your discussion with
24 Mr. Kleiman had you ever discussed with anyone else
25 your desire to sue drug companies for False Claims

36 (Pages 138 to 141)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
GREG HAMILTON - 1/29/2013

Page 142

1 **Act claims related to drug pricing?**
2 MR. CHIZEWER: And when you say "anyone else,"
3 I'm gonna instruct that if you were consulting with
4 counsel that you not reveal the communications
5 with --
6 MR. ANDERSON: That's fair.
7 BY MR. ANDERSON:
8 **Q. Other than -- other than communications**
9 **with other lawyers, did you ever talk with anyone**
10 **about bringing False Claims Act cases against any**
11 **drug company for drug pricing?**
12 A. No.
13 **Q. No. Why not?**
14 A. I don't understand the question "Why not?"
15 **Q. Did you think there was anything wrong**
16 **with drug companies reporting the published drug**
17 **prices, such as AWP, prior to your conversation with**
18 **Mr. Kleiman?**
19 A. Sure.
20 **Q. You did?**
21 A. Yes.
22 **Q. Why didn't you consider bringing a qui tam**
23 **action?**
24 A. I don't know.
25 **Q. Why didn't you bring a qui tam action**

Page 143

1 **against Bayer?**
2 A. I would say partially because I just
3 didn't understand what a -- I mean, I didn't actually
4 understand what a qui tam action was when I worked at
5 Bayer.
6 **Q. You also knew that Ven-A-Care had brought**
7 **one, obviously, against Bayer.**
8 A. Yes.
9 **Q. Did that discourage you in any way from**
10 **bringing a case against Bayer?**
11 A. It had no effect.
12 **Q. So, you leave Bayer in, what, 1999?**
13 A. '99, 2000.
14 **Q. Yeah. And for five years you don't**
15 **contemplate bringing any qui tam actions against any**
16 **drug companies, including Baxter, correct?**
17 A. That is correct.
18 **Q. And then you talk with Mr. Kleiman, and at**
19 **his suggestion you decide you'll bring a case against**
20 **Baxter?**
21 MR. CHIZEWER: Hold on.
22 BY MR. ANDERSON:
23 **Q. Is that correct?**
24 MR. CHIZEWER: I don't think he has to testify
25 about what Mr. Kleiman's suggestions were. I think

Page 144

1 you asked him before who approached whom.
2 MR. ANDERSON: Okay. Fair enough.
3 MR. CHIZEWER: And he did answer that.
4 BY MR. ANDERSON:
5 **Q. So, from the time you leave Bayer in 2005,**
6 **you don't contemplate suing any drug companies for**
7 **misrepresentation, including Baxter, but then Mr.**
8 **Kleiman initiates a conversation, and then a**
9 **decision's made to bring a case against Bayer,**
10 **correct?**
11 MR. CHIZEWER: Objection to form.
12 BY THE WITNESS:
13 A. You said, "Bayer."
14 BY MR. ANDERSON:
15 **Q. Oh, I'm sorry. Baxter. Thank you.**
16 A. It was kind of a long question, but I
17 think the answer's yes.
18 **Q. Okay. Do you think that Mr. Kleiman**
19 **plagiarized a Ven-A-Care Complaint like shown in**
20 **Exhibit 6 and sent that information to you in**
21 **connection with his representation of you?**
22 A. I don't believe that Mr. Kleiman would
23 plagiarize, inappropriately steal someone else's work
24 or something else. So, to the word "plagiarize" I
25 have to make an exception.

Page 145

1 Do I think it's possible that Mr. Kleiman
2 would take information from one place and put it into
3 another? If it was legitimate and appropriate, I
4 think he would do what good lawyers do and do that.
5 But I don't think that he would inappropriately or
6 illegally take information or even stuff that's
7 unethical. I don't believe he would do that.
8 **Q. Well, I didn't mean to make it sound**
9 **unethical. That would be for the Court to decide.**
10 **What I said --**
11 A. You said, "plagiarize." And that
12 certainly sounds unethical.
13 **Q. Well, fair enough. Okay. Let's make it**
14 **more straightforward. Do you think Mr. Kleiman or**
15 **someone at Mr. Kleiman's direction copied almost**
16 **verbatim a Ven-A-Care Complaint or portions of it**
17 **shown in Exhibit 6 and sent that to you?**
18 MR. CHIZEWER: The only way he could form any
19 basis for what he thinks Mr. Kleiman did is based on
20 discussions that he may have had with Mr. Kleiman.
21 And so, I'm instructing him not to answer
22 that question because he's by it's very nature gonna
23 be forced to reveal attorney-client privileged
24 information.
25 MR. ANDERSON: Well, I disagree.

37 (Pages 142 to 145)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
GREG HAMILTON - 1/29/2013

Page 146

1  BY MR. ANDERSON:
2      Q.   Are you gonna accept that instruction?
3      A.   Yes, I am.
4      Q.   Outside of Mr. Kleiman or someone at Mr.
5  Kleiman's direction sending you Exhibit 6, can you
6  think of any way that you would have been able to
7  obtain a transcription of a Ven-A-Care Complaint or
8  portions of that Complaint verbatim?
9      A.   Well, first of all, let's refer to this
10 document, which is, what, Exhibit 6.  I've already
11 told you I have no idea where Exhibit 6 came from.
12     Q.   Well, we know it came from your files.
13     A.   Well, from my files.  But where I got it,
14 I have no idea where I got it.
15     Q.   I know.  And I'm asking you, sir, outside
16 of getting it from Mr. Kleiman or someone else at his
17 direction, can you envision any other way that you
18 would have received Exhibit 6?
19     A.   Again, I have no idea where it came from.
20 I have no idea where I got it.
21     Q.   Do you ever go onto public legal listings
22 such as the -- have you ever heard of the ECF?
23     A.   I've never heard of ECF.
24     Q.   Or LexisNexis?
25     A.   I've heard of LexisNexis.

Page 147

1      Q.   Have you ever in your life tried to
2  retrieve documents from LexisNexis?
3      A.   Yes.
4      Q.   Legal documents?
5      A.   I don't recall.
6      Q.   Is it possible, sir, that you've gone on
7  for instance, the MDL, the AWP MDL LexisNexis site
8  and retrieved Ven-A-Care pleadings?
9      A.   I don't recall ever doing it.
10     Q.   So, it's not possible?
11     A.   Like I said, I don't recall ever doing it.
12 I'm sure I've never done it.
13     Q.   Okay.  So, that can't explain why you have
14 Exhibit 6 in your files, correct?
15     A.   Yes.
16     Q.   Would you at least agree with me that to
17 the extent you or your lawyers are copying Ven-A-Care
18 allegations that y'all can't be first to file?
19     MR. CHIZEWER:  Objection to form.
20 BY THE WITNESS:
21     A.   No, I can't comment on that.
22 BY MR. ANDERSON:
23     Q.   You can't comment on that?
24     A.   That's correct.
25     Q.   It doesn't make common sense?

Page 148

1      MR. CHIZEWER:  Same objection.
2  BY THE WITNESS:
3      A.   Again, I can't comment on that.
4  BY MR. ANDERSON:
5      Q.   Can you think of any reason other than to
6  inform your allegations in this case that an attorney
7  for you or Mrs. Sun would go to the time and trouble
8  of transcribing Ven-A-Care allegations?
9      MR. CHIZEWER:  Objection to form.
10 BY THE WITNESS:
11     A.   Again, I can't speculate on what you're
12 talking about.  I don't know where the document came
13 from.
14     MR. ANDERSON:  Objection.  Non-responsive.
15 BY MR. ANDERSON:
16     Q.   Take a look at what was marked today as
17 Exhibit 3, I believe.
18     MR. CHIZEWER:  Are you moving onto a new topic?
19 I want to just ask you a question off the record.
20 I'm happy to have him step out.
21     MR. ANDERSON:  Yeah, that's fine.
22     MR. CHIZEWER:  Can you step out for a second?
23     MR. ANDERSON:  Yeah, I am moving to a different
24 topic, to answer your question.  Let's go off the
25 record.

Page 149

1      (Discussion off the record.)
2  BY MR. ANDERSON:
3      Q.   Okay.  We're back on the record.  Mr.
4  Hamilton, you recognize Exhibit 3 as a declaration
5  you signed under oath in this case, correct?
6      A.   Yes.
7      Q.   And you stand by all of those statements
8  as true and correct, I'm assuming, correct?
9      A.   I haven't read them, but if I signed it
10 and sent it in, then yes.
11     Q.   Well, it's more than just signing it.  You
12 swore to it.
13     A.   Yeah, then yes.
14     Q.   Okay.  So, looking at paragraph number 8,
15 you make some representations there about information
16 you learned in a conversation with Kay Morgan,
17 correct?
18     A.   Yes.
19     Q.   And you're talking about a conversation
20 you had in the middle of 2001, correct?
21     A.   I believe it was about that time.
22     Q.   And that conversation forms the basis for
23 your -- at least in part the basis for your
24 allegations in this case, correct?
25     A.   Yes.

38 (Pages 146 to 149)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
GREG HAMILTON - 1/29/2013

Page 150

1    Q.   And there aren't any other conversations
2  that you had with Kay Morgan that form the basis for
3  your allegations in this case other than this one in
4  the middle of 2001, correct?
5        MR. CHIZEWER: Objection to form.
6  BY THE WITNESS:
7    A.   There were -- we had actually several
8  conversations on the same subject.
9  BY MR. ANDERSON:
10    Q.   You and Miss Morgan?
11    A.   Yes.
12    Q.   You're talking about multiple phone calls
13  over a period of days?
14    A.   Over a period of time.  I don't recall
15  what that time frame was.
16    Q.   Well, was it a few weeks or was it a few
17  years?
18    A.   I would say not a few years.  It could
19  have been weeks or a couple months.  I don't recall.
20    Q.   Do you think you had any communication
21  with Miss Morgan regarding how Baxter was or was not
22  reporting prices to First DataBank after 2001?
23    A.   I don't recall any.
24    Q.   Okay.  And none of those -- since you
25  don't recall them, none of those post-2001

Page 151

1  conversations could have formed the basis for your
2  declaration, correct?
3    A.   That would be correct.
4    Q.   Okay.  You make a statement about how
5  Baxter was representing their list price, correct?
6    A.   Correct.
7    Q.   And you're focused in this paragraph 8
8  specifically on Recombinate, correct?
9    A.   That is correct.
10    Q.   And you don't mention Advate because
11  Advate didn't even exist yet, correct?
12    A.   Correct.
13    Q.   So, to the extent Baxter's doing anything
14  with respect to their pricing of drugs to First
15  DataBank, they're doing that for all of their
16  products, including Recombinate, correct?
17        MR. CHIZEWER: Objection to form.
18  BY MR. ANDERSON:
19    Q.   I'll make it more clear.
20    A.   Yeah, would you, please?
21    Q.   When you were having these conversations
22  with Miss Morgan and you were learning about Baxter's
23  price reporting to First DataBank, that was across
24  First DataBank's entire product line, correct?
25    A.   No, she was specific to Recombinate.

Page 152

1    Q.   So, you thought that they were treating
2  Recombinate differently than they were treating all
3  the other Baxter drugs?
4        MR. CHIZEWER: Objection to form.
5  BY THE WITNESS:
6    A.   I didn't have an opinion on that.
7  BY MR. ANDERSON:
8    Q.   Did you have any understanding that Baxter
9  was pricing Recombinate differently than it was any
10  other drug?
11    A.   I don't think so.
12    Q.   Did you have any understanding that First
13  DataBank was treating Recombinate differently than it
14  was any other Baxter drug?
15    A.   No.
16    Q.   Okay.
17    A.   At that point in time.
18    Q.   Okay.  So, as best you knew in 2001, this
19  episode that you've described in your declaration and
20  in your sworn testimony between Baxter and Kay Morgan
21  applied to all Baxter drugs?
22        MR. CHIZEWER: Objection to form.
23  BY THE WITNESS:
24    A.   Again, I didn't -- I didn't say it applied
25  to all Baxter drugs.  I said it applied to

Page 153

1  Recombinate.  That's what she spoke to me about, was
2  the Recombinate issue.
3  BY MR. ANDERSON:
4    Q.   And did you have any reason to believe
5  that the issue didn't apply to all the Baxter drugs?
6    A.   No.
7    Q.   Did you have any reason to believe that
8  this issue between Baxter and First DataBank in 2001
9  applied only to Recombinate?
10    A.   I didn't have that, either.
11    Q.   Okay.  All right.  So, then, you reached
12  some conclusions about what you viewed as
13  inappropriate conduct by Baxter in 2001, correct?
14    A.   Yes.
15    Q.   Okay.  But you don't do anything about it
16  until 2005, correct?
17    A.   No.
18    Q.   No?  Explain what you did in your opinion
19  to address what you thought was wrongful conduct on
20  Baxter.
21    A.   I described it to Kay Morgan.
22    Q.   Okay.  You told her what you thought and
23  what else?
24    A.   I told her how I -- what I knew of the
25  market and what I thought was happening and how it

39 (Pages 150 to 153)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
GREG HAMILTON - 1/29/2013

Page 154

1  affected reimbursement.
2      Q.   And how did you think that would address
3  Baxter's conduct?
4      A.   I didn't know.  I didn't have the
5  relationship, you know, the First DataBank
6  relationship that she had with Baxter.  They had a
7  different relationship.
8          She had told me that their Law Department
9  was involved in it.  And I didn't know what their Law
10  Department was going to do or not do with the
11  information.  I passed it along to Kay Morgan, and
12  what she was gonna do with it I didn't know.
13     Q.   Did you consider filing any kind of
14  lawsuit against Baxter in 2001?
15     A.   No.
16     Q.   In 2002?
17     A.   Again no.
18     Q.   In 2003?
19     A.   No.
20     Q.   So, if -- and likewise for '04 until you
21  met with Kleiman in '05, correct?
22     A.   It's interesting when you say did I
23  "consider."  You know, I don't recall if the thought
24  passed through my brain.  I didn't do anything about
25  it, if that's what you're asking.  I didn't take any

Page 155

1  action.  You know, I don't recall if I thought about
2  taking it and made a decision not to do it or not.
3          So, when you say, "Did" you even think
4  about it," I don't recall if I even thought about it,
5  but I certainly didn't do anything other than, like I
6  said, have that conversation with Kay Morgan.
7      Q.   All right.  And just to be clear about it,
8  you didn't call any government officials and tell
9  them that you thought Baxter was doing something
10  incorrectly, did you?
11     A.   That's correct.
12     Q.   Not in '01, '02, '03, '04 or '05, correct?
13     A.   I don't know if it's true for '05.  But
14  it's true for --
15     Q.   Part of '05 it's true.  And then when you
16  talked with Kleiman, then y'all filed a lawsuit,
17  correct?
18     A.   Correct.
19     Q.   Okay.  Now, when you filed this lawsuit in
20  '05, did you think about at all how First DataBank
21  had defined the term "WAC"?
22     A.   Sure.
23     Q.   And how did First DataBank define the term
24  "WAC" in 2005 when you decided to sue Baxter?
25     A.   That was the term.  The acronym stood for

Page 156

1  wholesale acquisition cost.
2      Q.   Yes, sir.  And was there a definition that
3  First DataBank publicly set forth on the internet
4  regarding WAC?
5      A.   I didn't check the internet, so I don't
6  know.
7      Q.   What did you believe WAC meant in 2005?
8      A.   I believed that it meant wholesale
9  acquisition cost, what -- what price did a wholesaler
10  pay when purchasing drug from a manufacturer?  What
11  was their wholesale acquisition cost?  The reciprocal
12  of that would be the manufacturer's wholesale price.
13     Q.   And that was your opinion that you founded
14  your allegations upon in suing Baxter, correct?
15         MR. CHIZEWER:  Objection to form.
16  BY THE WITNESS:
17     A.   Yeah.
18  BY MR. ANDERSON:
19     Q.   Would it be important to you at all that
20  First DataBank publicly defined WAC as a list price
21  that was merely a published price, not reflective of
22  discounts, chargebacks, rebates or any other price
23  concessions in 2005?
24         MR. CHIZEWER:  Objection to form.
25  BY THE WITNESS:

Page 157

1      A.   I'd have to see that and evaluate it.
2  BY MR. ANDERSON:
3      Q.   Assuming I'm representing it to you
4  correctly, is that pertinent to you at all?
5          MR. CHIZEWER:  Objection to form.
6  BY THE WITNESS:
7      A.   Again, I'm listening to you, but I'd have
8  to take a good, long look at it.
9  BY MR. ANDERSON:
10     Q.   Oh, okay.  Well, why don't we do this:
11  I'll show you the words on the internet.  Bear with
12  me for a moment.
13         All right.  I have the words highlighted
14  here.  You'll see from the website at the top this is
15  from First DataBank's website today.  If you could,
16  just for the benefit of the transcript, read in the
17  definition of wholesale acquisition cost out loud.
18     A.   It says, "Wholesale acquisition cost (WAC)
19  as published by FDB, First DataBank, represents the
20  manufacturer's (for purposes of this drug price
21  policy, the term 'manufacturer' includes
22  manufacturers, repackagers, private labelers and
23  other supplies) published catalog or list price for a
24  drug product to wholesalers as reported to First
25  DataBank by the manufacturer.  WAC does not represent

Merrill LAD

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
GREG HAMILTON – 1/29/2013

Page 158

1 actual transaction prices and does not include prompt
2 pay or other discounts, rebates or reductions in
3 price. First Data Bank does not perform any
4 independent investigation or analysis of actual
5 transaction prices for purposes of reporting WAC.
6 First DataBank relies on manufacturers to report or
7 otherwise make available the values for the WAC data
8 field."
9 **Q.   Does that definition comport with your**
10 **understanding of WAC back in 2005?**
11 A.   Yes.
12 **Q.   That's what you thought WAC meant in 2005?**
13 A.   Yes.
14 **Q.   Really?  So, why did you allege that**
15 **Baxter had done anything wrong?**
16 A.   Because Baxter sold product, and they had
17 a published price for drug product to wholesalers,
18 and they didn't report it.
19 **Q.   You say in your Complaint, Mr. Hamilton,**
20 **that, quote, I'm reading from paragraph 2, quote,**
21 **Baxter intends the WAC to be understood by the state**
22 **Medicaid agencies as the average price paid by a**
23 **wholesaler to a manufacturer for a given product.**
24 **Did I read that correctly from your --**
25 A.   Can I see it?

Page 159

1 **Q.   Yes.  This is your original Complaint**
2 **filed in Colorado in April 2005.**
3 **(Document tendered to the**
4 **witness.)**
5 **BY THE WITNESS:**
6 A.   You started reading at "Baxter intends"?
7 **BY MR. ANDERSON:**
8 **Q.   Yes.**
9 A.   And it's just that one sentence?
10 **Q.   Just first tell me did I read that**
11 **sentence from your Complaint correctly?**
12 A.   Let me read it, if I may.
13 **Q.   Sure.**
14 A.   "Baxter intends the WAC to be understood
15 by the state Medicaid agencies as the average price
16 paid by a wholesaler to a manufacturer for a given
17 product."
18       Yes, that's accurate.
19 **Q.   What do you base that understanding on?**
20 A.   The definition of WAC.
21 **Q.   The definition of WAC by whom?**
22 A.   Well, if you read even First DataBank
23 here, it is the price paid by a wholesaler to a
24 manufacturer.
25 **Q.   That's what the definition of First**

Page 160

1 DataBank says?
2 A.   "Manufacturer's published catalog or list
3 price for a drug to wholesalers."
4 **Q.   Yeah, list price.  Does it --**
5 A.   "Published catalog or list price," if I
6 may.
7 **Q.   So, does First DataBank define WAC as an**
8 **actual price, an actual selling price?**
9 MR. CHIZEWER:  Objection.  Form and
10 argumentative.
11 BY THE WITNESS:
12 A.   Yes.
13 BY MR. ANDERSON:
14 **Q.   It does?  I'm reading, sir, from the First**
15 **DataBank definition verbatim.  Quote, WAC does not**
16 **represent actual transaction prices.**
17 **Did I read that correctly?**
18 A.   Yes.
19 **Q.   But it's your testimony that First**
20 **DataBank defined WAC as a real price in 2005?**
21 MR. CHIZEWER:  Objection to form.
22 BY MR. ANDERSON:
23 **Q.   As an actual selling price in 2005?**
24 MR. CHIZEWER:  Objection to form.
25 MR. ANDERSON:  What's the basis for that

Page 161

1 objection?
2 MR. CHIZEWER:  I'm just reading this now.
3 MR. ANDERSON:  No, what's the basis?
4 MR. CHIZEWER:  I'm going to explain.
5 MR. ANDERSON:  Does it mischaracterize?
6 MR. CHIZEWER:  I think it does.
7 MR. ANDERSON:  Okay.  Well, then, just say that.
8 Just say it mischaracterizes.
9 MR. CHIZEWER:  I think it mischaracterizes the
10 definition as Mr. Hamilton describes it.
11 MR. ANDERSON:  Well, I disagree.
12 BY MR. ANDERSON:
13 **Q.   You can answer the question.**
14 A.   I've forgotten now.  What is the question?
15 **Q.   The question is in 2005 did First DataBank**
16 **define WAC as an actual selling price?**
17 A.   I believe that First DataBank, yes, viewed
18 the WAC as a price actually paid.  It did not define
19 it as a net price, if there were rebates of something
20 else, chargebacks, those types of things.  But it
21 defined it as what is your catalog price that you're
22 offering to sell a particular product to a wholesaler
23 for?
24 **Q.   And if it turns out that that**
25 **understanding is wrong, would that cause your**

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
GREG HAMILTON – 1/29/2013

Page 162

1 allegations to be false?
2     MR. CHIZEWER:  Objection to form.
3 BY THE WITNESS:
4     A.   You know, I don't know.
5 BY MR. ANDERSON:
6     Q.   Would that cause your allegations to be
7 unsuccessful?
8     MR. CHIZEWER:  Objection to form.
9 BY THE WITNESS:
10     A.   I don't know.
11 BY MR. ANDERSON:
12     Q.   Would it at the minimum contradict your
13 statement in your Complaint about Baxter's intention
14 with respect to the meaning of its WAC?
15     MR. CHIZEWER:  Objection to form.
16 BY THE WITNESS:
17     A.   I don't believe so.
18 BY MR. ANDERSON:
19     Q.   Is it true, sir, that in 2005 you
20 misunderstood how First DataBank defined WAC and
21 based your allegations against Baxter on an incorrect
22 understanding?
23     A.   I don't believe so.
24     MR. CHIZEWER:  Objection to form.  Objection to
25 form and argumentative.

Page 163

1 BY MR. ANDERSON:
2     Q.   Did you know that Ven-A-Care had alleged
3 manipulation of WAC against Baxter prior to 2005?
4     MR. CHIZEWER:  Objection to form.
5 BY THE WITNESS:
6     A.   I don't think so.
7 BY MR. ANDERSON:
8     Q.   Have you seen Ven-A-Care's Complaints
9 against Baxter from '95, 1997, 1999 and 2002?
10     A.   I believe I've seen -- I think I've seen
11 some of them.  I don't know that I've seen all of
12 them or even all of one.  I may have seen a piece of
13 something here or there, but I'm not sure.
14     Q.   In your terminology how would you
15 distinguish your allegations against Baxter from
16 Ven-A-Care's?
17     A.   Oh, I believe Ven-A-Care's allegations,
18 and again, I'm not a lawyer --
19     MR. CHIZEWER:  Objection to form.  Go ahead.
20 BY THE WITNESS:
21     A.   -- and I haven't reviewed all of these
22 things, but from my understanding Ven-A-Care's
23 allegations had to do with the manipulation of AWP in
24 a time period prior to 2001 when the data banks, and
25 in particular we'll talk about First DataBank, was

Page 164

1 accepting whatever information was given to them by
2 the drug company and publishing it as is.
3     After 2001 with the intervention -- I mean
4 after the Bayer settlement and after the intervention
5 of the DOJ, First DataBank instituted a methodology
6 of no longer just taking AWPs from manufacturers and
7 publishing them; that they were at that point going
8 to begin a process in which they took information
9 from the manufacturer as to WAC, and then they were
10 going to survey wholesalers to determine a markup and
11 also to -- I believe also looking to the wholesalers
12 to confirm that the wholesalers were receiving that
13 same catalog price, or WAC, and then from that
14 calculating the AWP.
15 BY MR. ANDERSON:
16     Q.   That's a --
17     A.   I'm not done.  Our case centers around the
18 change in methodology from the manufacturer just
19 submits whatever they want and the data bank just
20 automatically publishes it to a system to where the
21 data bank was no longer accepting just whatever
22 information the drug company gave them, but actually
23 taking some information from the drug company, then
24 taking that and comparing it to wholesalers, doing a
25 calculation, and then determining AWP.

Page 165

1     In our particular case what we show is
2 that while Baxter was selling drug to wholesalers,
3 they did not disclose their catalog or list price for
4 those wholesalers.  They instead at first offered
5 merely something called a list price.  And so,
6 therefore, they did not report the information that
7 they were supposed to.
8     Had Baxter reported their wholesale price,
9 then, well, we all know that the AWPs, the subsequent
10 AWPs would have been substantially lower than they
11 were as published.
12     Q.   So, the primary nugget, the core issue
13 that you allege is different in your Complaint
14 against Baxter versus Ven-A-Care's Complaint against
15 Baxter is First DataBank's use of a markup, is that
16 correct?
17     MR. CHIZEWER:  Objection to form.
18 BY THE WITNESS:
19     A.   Yeah, I think you've also mischaracterized
20 it.  It's not just First DataBank's use of a markup.
21 It's also First DataBank's acceptance of data from
22 the manufacturers.
23     For example, as Kay Morgan reported to me
24 in a 2001 conversation, that Baxter had sent them,
25 her, information saying, "Our WAC is" -- and I forget

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
GREG HAMILTON – 1/29/2013

Page 166

1  the number right now.  I think it was $1.31.  No,
2  they list it as list price -- "Our list price is
3  $1.31," and then on the same form say, "Our AWP is
4  $1.31."
5          One of her comments to me was, "I've told
6  them over and over we can't take AWP information
7  anymore, and yet, they're still sending it, even
8  though they know we can't take it."
9          So, the point is that First DataBank's
10  methodology had changed, not just in terms of a
11  markup percentage, but also in terms of what data
12  they accepted from manufacturers, what data they
13  asked for, what data they got and the research they
14  did and the calculation they did.  All were
15  different.
16  BY MR. ANDERSON:
17     Q.   What proof do you have, sir, that First
18  DataBank conducted any surveys of any wholesalers?
19     A.   I have only Kay Morgan's testimony.
20     Q.   Her testimony or something she said over
21  the phone in 2001?
22     A.   Well, I have something she said over the
23  phone in 2001, and I believe I've seen her deposition
24  testimony since then confirming it.
25     Q.   Her deposition testimony from where?

Page 167

1     A.   I don't recall.
2     Q.   Who got the testimony for you?
3     A.   I don't recall.
4     Q.   How did you get a deposition transcript of
5  Kay Morgan?
6     A.   Again, I don't recall.
7     Q.   Do you know, sir, that the truth is First
8  DataBank was unable to conduct any surveys of any
9  wholesalers in 2003, 2004, 2005, all the years in
10  which Advate was on the market?
11          MR. CHIZEWER:  Objection to form.
12  BY THE WITNESS:
13     A.   I'm unaware of that.
14  BY MR. ANDERSON:
15     Q.   But is that pertinent to your lawsuit at
16  all?
17          MR. CHIZEWER:  Objection to form.
18  BY THE WITNESS:
19     A.   I don't understand your question.
20  BY MR. ANDERSON:
21     Q.   Did you undertake any effort to understand
22  what First DataBank was doing with respect to Advate
23  and all the other Baxter drugs before you filed your
24  lawsuit in 2005?
25     A.   No, we did not research the wholesalers.

Page 168

1     Q.   Is it possible, sir, that what First
2  DataBank did in 2001 versus what they did in 2005
3  changed radically?
4     A.   It's certainly possible.
5     Q.   Did you ever undertake any effort to
6  ascertain if it changed?
7     A.   Not that I recall.
8     Q.   Wouldn't that be important before you
9  hauled off and filed a lawsuit?
10          MR. CHIZEWER:  Objection to form.
11  BY THE WITNESS:
12     A.   I think that we -- we had the data we
13  needed to file a lawsuit and that it was appropriate.
14  BY MR. ANDERSON:
15     Q.   Did you know that I had deposed Kay Morgan
16  three times, she's been deposed three other times in
17  the MDL?  I've also deposed a man named Jim Breen,
18  ironically, at First DataBank.  And none of them have
19  testified to your view of First DataBank surveying
20  wholesalers and getting markup information in 2003,
21  2004 and all the way to the present day during the
22  life of Advate?
23          MR. CHIZEWER:  Objection to form.
24  BY MR. ANDERSON:
25     Q.   Did you know that?

Page 169

1     A.   I'm not aware of your conversations or
2  whatever.
3     Q.   Well, you saw that in the transcripts,
4  didn't you?
5     A.   Like I said, I've seen some transcripts.
6  I don't know how much or pieces or all of them.
7     Q.   So, if the transcripts of First DataBank
8  officials don't comport with what your view of First
9  DataBank's practices are, do you agree that that by
10  and large negatively impacts your lawsuit?
11          MR. CHIZEWER:  Objection to form.
12  BY THE WITNESS:
13     A.   No.
14  BY MR. ANDERSON:
15     Q.   Is your understanding of what First
16  DataBank does or does not do with manufacturer drug
17  pricing important to your allegations in this
18  lawsuit?
19          MR. CHIZEWER:  Objection to form.
20  BY THE WITNESS:
21     A.   There's portions of it that are important.
22  They publish data.
23  BY MR. ANDERSON:
24     Q.   What First DataBank does or doesn't do
25  with Baxter's prices is the entire focus of your

Merrill LAD

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
GREG HAMILTON – 1/29/2013

Page 170

1  lawsuit against Baxter, isn't it?
2      MR. CHIZEWER: Objection to form.
3  Argumentative.
4  BY MR. ANDERSON:
5      Q.   That's your so-called new allegation that
6  Ven-A-Care didn't bring, correct?
7      MR. CHIZEWER: Same objection.
8  BY THE WITNESS:
9      A.   It's not just what First DataBank did with
10  data. It's the data that they were given by Baxter.
11  BY MR. ANDERSON:
12      Q.   Do you have any information whatsoever
13  that the way Baxter reported prices for Advate was
14  ever any different than exactly how they reported for
15  Recombinate and every other drug from the beginning
16  of time until now?
17      A.   I can't say when changes were made or when
18  they weren't.
19      Q.   Do you have any information that there
20  were any changes at Baxter as to Advate versus any
21  other Baxter drug?
22      A.   No.
23      Q.   So, in that respect you would agree that
24  the scheme used by Baxter in pricing Advate is
25  exactly the same scheme they've used for all the

Page 171

1  other drugs for all the other years?
2      A.   No.
3      MR. CHIZEWER: Objection to form.
4  BY MR. ANDERSON:
5      Q.   Why not? Why do you disagree, sir?
6      MR. CHIZEWER: I think you're mischaracterizing
7  the testimony he already gave on that already.
8          Go ahead and answer.
9  BY THE WITNESS:
10      A.   Again, the Ven-A-Care situation, the
11  situation under which Ven-A-Care filed its lawsuit
12  was one in which a manufacturer was able -- handed
13  First DataBank whatever information they wanted
14  without any scrutiny, anything whatsoever, and got
15  whatever they want published. It made no difference
16  what information they gave them.
17          And like I said, with the one drug we had,
18  I could have written a letter, sent a fax in and
19  said, "I want my AWP for this product to be $7.50,"
20  and they would have just published it.
21  BY MR. ANDERSON:
22      Q.   Was Bayer a markup company?
23      A.   Define "markup company."
24      Q.   You know what a markup company is, don't
25  you?

Page 172

1      MR. CHIZEWER: Objection to form.
2  BY THE WITNESS:
3      A.   Under this context, no. Please be
4  specific.
5  BY MR. ANDERSON:
6      Q.   Do you know that for decades drug
7  companies have been known as markup companies at
8  First DataBank; some are 20 percent, others are 25
9  percent?
10      A.   I'm familiar with that term.
11      Q.   And Bayer was a markup company, wasn't it?
12      A.   Bayer could be characterized as a markup
13  company for some of its drugs.
14      Q.   And Baxter was a markup company, weren't
15  they?
16      A.   Again, I can't testify as to Baxter.
17      Q.   At least for some of their drugs?
18      A.   Again, I can't testify as to Baxter.
19      Q.   Okay. And would you agree that Ven-A-Care
20  pled allegations about First DataBank marking up
21  published prices from drug companies in setting AWP?
22      MR. CHIZEWER: Objection to form.
23  BY THE WITNESS:
24      A.   You know, the exact details of the
25  Ven-A-Care Complaint I don't recall.

Page 173

1  BY MR. ANDERSON:
2      Q.   Well, that's why we're here today,
3  comparing the Ven-A-Care First to File Complaint
4  versus the Sun/Hamilton Complaint, your Complaint,
5  correct?
6      MR. CHIZEWER: That's not fair, okay, making
7  statements like that. His job is not to compare the
8  two Complaints. His job is to testify about the
9  facts on what he knew, what the lawsuit is, but not
10  to compare Ven-A-Care's allegations to his.
11      MR. ANDERSON: Well, apparently it is because he
12  goes to the trouble of having documents from
13  Ven-A-Care's Complaints in his files.
14      MR. CHIZEWER: That's -- that is not something
15  that's --
16      MR. ANDERSON: It's certainly not unfair. It's
17  certainly not.
18  BY MR. ANDERSON:
19      Q.   You knew, Mr. Hamilton, didn't you, that
20  Ven-A-Care had alleged WAC markup allegations against
21  Baxter?
22      MR. CHIZEWER: Objection. Asked and answered.
23  BY THE WITNESS:
24      A.   No.
25  BY MR. ANDERSON:

44 (Pages 170 to 173)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
GREG HAMILTON - 1/29/2013

Page 174

1    Q.   You knew that Ven-A-Care had alleged WAC
2  markup or list price markup issues against Bayer,
3  correct?
4    A.   No.
5    Q.   Would you agree that outside of this
6  markup issue that you've described that you learned
7  of in 2001, manipulation of AWP by reporting an AWP
8  and having it published by First DataBank at any
9  level, such as your example of $7.50 when the
10 preceding AWP was $1.50, was covered by Ven-A-Care's
11 Complaint?
12   MR. CHIZEWER: Objection to form.
13 BY MR. ANDERSON:
14   Q.   It's too long-winded.  My fault.
15   A.   My objection is, you know, where are you
16 going from that?
17   Q.   Yeah.  Totally understandable.
18       Without belaboring it, I'll just go at it
19 from this angle:  Other than what you learned
20 from Kay Morgan about First DataBank's alleged efforts to
21 survey wholesalers and create a markup in 2001, can
22 you distinguish your scheme as to Baxter's drug
23 pricing in any other way from Ven-A-Care's?
24   MR. CHIZEWER: Objection.  Asked and answered.
25 BY THE WITNESS:

Page 175

1    A.   Yeah, I mean, other than what I've already
2  given you, no.
3  BY MR. ANDERSON:
4    Q.   Well, other than the Kay Morgan
5  information about serving wholesalers, what else is
6  there?  Describe it, please, because it must have
7  gone over my head.
8    MR. CHIZEWER: Objection.  Asked and answered.
9  BY THE WITNESS:
10   A.   I thought I'd been very detailed in giving
11 you an answer on that.
12 BY MR. ANDERSON:
13   Q.   Can you describe it, sir?
14   MR. CHIZEWER: Same objection.  Asked and
15 answered.
16 BY MR. ANDERSON:
17   Q.   Set aside what you learned from Kay Morgan
18 about allegedly First DataBank conducting wholesaler
19 surveys.  Set that aside.  And if there's anything
20 else, describe it.
21   MR. CHIZEWER: Same objection.  Asked and
22 answered.
23 BY THE WITNESS:
24   A.   I don't know where you're going with this.
25 I gave you a pretty detailed answer.

Page 176

1  BY MR. ANDERSON:
2    Q.   Okay.  I'm going to reframe the question
3  as specifically as I can.
4    A.   Okay.
5    Q.   Other information you learned from Kay
6  Morgan in 2001 about alleged wholesaler surveys
7  conducted by First DataBank and resulting markups
8  applied by First DataBank to drug manufacturer
9  pricing reported by those companies to First
10 DataBank, set that aside, how else would you describe
11 your alleged scheme against Baxter and its
12 differences from the scheme alleged by Ven-A-Care?
13   MR. CHIZEWER: Objection.  Asked and answered.
14 BY THE WITNESS:
15   A.   I have nothing to add to my answer.
16 BY MR. ANDERSON:
17   Q.   Well, no.  Sir, if you can think of
18 anything, I would like to hear it.
19   A.   Like I said, I have nothing to add.
20   Q.   So, right now you can't think of anything
21 beyond this wholesaler markup issue, correct?
22   MR. CHIZEWER: Objection.  He gave an answer on
23 it already, and it went beyond how you're describing
24 it.
25   MR. ANDERSON: I'm not trying to describe it at

Page 177

1  all.  I'm providing him yet another opportunity to
2  describe it himself.  I just want to know.
3    MR. CHIZEWER: Objection.  Asked and answered.
4  BY THE WITNESS:
5    A.   Yeah, I believe I thoroughly answered that
6  question.
7  BY MR. ANDERSON:
8    Q.   So, you're refusing to provide any
9  elaboration on how your scheme against Baxter differs
10 from the scheme Ven-A-Care alleged against Baxter
11 beyond this wholesaler markup, wholesaler survey --
12   A.   Beyond what I've already said.  Beyond
13 what I've already said.
14   Q.   Sir, are you refusing to answer my
15 question?
16   A.   I believe I've answered your question.
17   MR. CHIZEWER: Objection.  Asked and answered.
18 BY MR. ANDERSON:
19   Q.   You're entitled to your belief, sir.  But
20 I'm asking you to describe the differences between
21 your allegations against Baxter and Ven-A-Care's
22 allegations against Baxter that go beyond the Kay
23 Morgan discussion you had in 2001 and your
24 understanding of the alleged wholesaler surveys and
25 markup.

45 (Pages 174 to 177)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
GREG HAMILTON – 1/29/2013

Page 178

1      **Can you provide any additional**
2 **information?**
3     A.   I have nothing additional I'm prepared to
4 give you on that.
5     **Q.   Thank you. All right. You know what an**
6 **NDDF Product Update Report is?**
7     A.   Would you say that again slower?
8     **Q.   NDDF Product Update Report.**
9     A.   No.
10    **Q.   Did you fill out National Drug Data File**
11 **Product Update Reports when you were at Bayer?**
12    A.   Ah, yes.
13    **Q.   So, do you recall that First DataBank**
14 **annually would ask drug companies to report their**
15 **prices?**
16    A.   During certain years that's true.
17    **Q.   And you actually would sign on the dotted**
18 **line on those Product Update Reports for Bayer,**
19 **correct?**
20    A.   I don't recall if I had to sign them or
21 not. I had to fill them out.
22    **Q.   And did you know that they were asking for**
23 **prices such as wholesale net pricing?**
24    A.   I don't recall the exact -- if the word
25 "net" was in there or not.

Page 179

1     **Q.   What is a wholesale net price?**
2     A.   Again, I would have had to look and see
3 what the current definition was at the time.
4     **Q.   Well, back when you were at Bayer and you**
5 **were signing these forms, did you have an awareness**
6 **of the meaning of the term "wholesale net price"?**
7     A.   I don't think I did because we didn't
8 provide a wholesale price.
9     **Q.   What did you provide?**
10    A.   AWP.
11    **Q.   And list?**
12    A.   No.
13    **Q.   Just AWP?**
14    A.   Just AWP.
15    **Q.   For which drugs?**
16    A.   All the biological products.
17    **Q.   Right. But for the other drugs --**
18    A.   I didn't do the other drugs.
19    **Q.   But you knew Bayer was a markup company on**
20 **the other drugs, didn't you?**
21    A.   I had some awareness of it, but not
22 intimate knowledge of it. I didn't do the
23 calculations. I didn't fill out the forms.
24    **Q.   But isn't it true that over the years some**
25 **biologicals were markup drugs while other biologicals**

Page 180

1 were straight AWP drugs?
2     MR. CHIZEWER: Objection to form.
3 BY THE WITNESS:
4     A.   I can't answer that.
5 BY MR. ANDERSON:
6     **Q.   You didn't have an understanding one way**
7 **or the other?**
8     MR. CHIZEWER: Same objection.
9 BY THE WITNESS:
10    A.   Again, I can't answer that. I don't know.
11 BY MR. ANDERSON:
12    **Q.   You can't answer it or you won't answer**
13 **it? If you can't, just say, "I don't know."**
14    A.   I'm unaware of it, so I don't know.
15    **Q.   All right. Thank you. I'm not going to**
16 **remark this because it's previously been marked. But**
17 **this is Exhibit 20 to your first deposition. And**
18 **I'll let you take a look at it.**
19       **(Document tendered to the**
20       **witness.)**
21       **(Short interruption.)**
22    THE WITNESS: Okay.
23 BY MR. ANDERSON:
24    **Q.   Exhibit 20 from your first deposition is a**
25 **cover letter from your attorney, Mark Kleiman, to**

Page 181

1 Department of Justice attorneys, correct?
2     A.   That's what it appears to be, yes.
3     **Q.   And in the document Mr. Kleiman says that,**
4 **quote, The other relator, Mr. Greg Hamilton,**
5 **developed his knowledge of Baxter's practices from**
6 **his intimate familiarity with the industry but had no**
7 **opportunity to develop documentary evidence.**
8       **That's the last sentence of the first**
9 **paragraph. Did I read that correctly?**
10    MR. CHIZEWER: Objection to form.
11 BY THE WITNESS:
12    A.   Yes.
13 BY MR. ANDERSON:
14    **Q.   So, if you had an intimate familiarity**
15 **with the industry, can you describe why your**
16 **understanding of WAC might be in direct opposition to**
17 **the published definition of WAC at First DataBank in**
18 **2005?**
19    MR. CHIZEWER: Objection. Argumentative. And
20 to form.
21 BY THE WITNESS:
22    A.   My answer is I can't.
23 BY MR. ANDERSON:
24    **Q.   You had a subscription or access to First**
25 **DataBank back in 2005, correct?**

Merrill LAD

800-292-4789                                     www.merrillcorp.com/law

Page 182

1     A.   No.
2     **Q.   Really?**
3     A.   Really.
4     **Q.   In your prior testimony you said that you**
5     **had access to through your employer or through your**
6     **own subscription to First DataBank up until 2007 or**
7     **2008.**
8          **Do you recall that?**
9          MR. CHIZEWER:  Objection.  That's unfair.  Now
10    you're making it sounds like he testified two
11    different ways.  You characterized his testimony two
12    different ways in two different questions.  That's
13    not right.
14         MR. ANDERSON:  I disagree.  Are you instructing
15    him not to answer?
16         MR. CHIZEWER:  Not at all.
17         MR. ANDERSON:  Okay.
18    BY THE WITNESS:
19    A.   My original statement was correct.  You
20    asked if I, Greg Hamilton, had a subscription to
21    First DataBank in 2005.  The answer is no, I did not,
22    which I answered accurately, okay?
23    BY MR. ANDERSON:
24    **Q.   Point taken.  Did you have access to First**
25    **DataBank in 2005?**

Page 183

1     A.   Yes, I did.
2     **Q.   Okay.  And you were filing this lawsuit,**
3     **but you didn't have any thought that it would be**
4     **appropriate for you to research these allegations**
5     **regarding WAC?**
6          MR. CHIZEWER:  Objection to form.
7     BY MR. ANDERSON:
8     **Q.   I'll be more specific.**
9     A.   Yeah, what are you talking about?
10    **Q.   Did you take any steps to look at the**
11    **First DataBank information and understand how they**
12    **were defining WAC in 2005 before you and your**
13    **attorneys decided to sue Baxter?**
14         MR. CHIZEWER:  Objection to form.  Asked and
15    answered.
16    BY THE WITNESS:
17    A.   I don't recall.
18    BY MR. ANDERSON:
19    **Q.   Instead you based your understanding on a**
20    **conversation or series of conversations you had with**
21    **a woman in 2001, correct?**
22         MR. CHIZEWER:  Objection to form.
23    BY THE WITNESS:
24    A.   I believe that my -- my -- are you asking
25    for my opinion on what WAC stood for?  Is that what

Page 184

1     you're asking?
2     BY MR. ANDERSON:
3     **Q.   I'm asking, sir, isn't it true that in**
4     **2005, when you decided to file a lawsuit against**
5     **Baxter, you were relying upon your understanding of**
6     **WAC that dated to 2001 and conversations that you had**
7     **with Miss Morgan; is that true?**
8     A.   No.
9     **Q.   Okay.  Tell me how it's not.**
10    A.   Well, it wasn't just on my conversation
11    with Kay Morgan.  It was also based on the -- my
12    access to First DataBank, seeing WAC on there, my
13    history with Bayer, my industry -- my general
14    industry knowledge.
15    **Q.   Your history with Bayer dated back to the**
16    **nineties, correct?**
17    A.   Yes.
18    **Q.   So, what knowledge did you have post-2001**
19    **that would bear upon your allegations against Baxter**
20    **in 2005?**
21    A.   In relationship to WAC?
22    **Q.   Yes, sir.**
23    A.   From 2001 to 2006 I was an employee of
24    Express Scripts.  Express Scripts purchased -- was a
25    subscriber to First DataBank.  Express Scripts used

Page 185

1     both WAC and AWP information from First DataBank in
2     numerous analysis of drug spend on every drug
3     imaginable.  As part -- as the person running the
4     hemophilia program I was aware of published WACs and
5     AWPs and the fact that they were used in calculating
6     reimbursement for the products that I was billing
7     payors for.
8     **Q.   So, during that tenure at Express Scripts**
9     **did you ever look to see how First DataBank might**
10    **have changed their definition of WAC?**
11    A.   I don't recall.
12    **Q.   Did you ever look to see that your data**
13    **feeds that you're getting from First DataBank and**
14    **Express Scripts changed the field name from WHN to**
15    **WAC?**
16    A.   Again I don't recall.
17    **Q.   But you were getting those data feeds,**
18    **correct?**
19    A.   I was able to access that.  When you say
20    "getting those data feeds," a subscription to First
21    DataBank allows you to query their database.
22    **Q.   Right.**
23    A.   So, I could go in and do a query of
24    certain products.
25    **Q.   But you don't recall one way or the other**

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
GREG HAMILTON – 1/29/2013

Page 186

1  if from 2001 to 2005 the name of the field that you
2  could query from the First DataBank data changed from
3  WHN, or wholesale net, to WAC, W-A-C?
4      A.   I don't recall.
5      Q.   All right.  Let's talk about your time at
6  Express Scripts.  Take a look at what I'm marking as
7  Hamilton Exhibit 7.
8               (Hamilton Deposition Exhibit 7
9               was marked for identification.)
10              (Document tendered to the
11              witness.)
12  BY MR. ANDERSON:
13      Q.   Do you recognize what's been marked as
14  Exhibit 7?
15      A.   By "recognize," do you mean have I seen it
16  before?
17      Q.   Yes, sir.
18      A.   I don't recall having seen it before.
19      Q.   Okay.  Do you agree that this appears to
20  be a document reflecting an agreement between Express
21  Scripts and Baxter back during your tenure at Express
22  Scripts?
23      A.   I'm sorry.  I was busy reading.  Could you
24  repeat that?
25      Q.   Yeah.  Well, just describe the document

Page 187

1  for the judge, please.
2      MR. CHIZEWER:  Objection to form.
3  BY THE WITNESS:
4      A.   It appears to be an e-mail from someone
5  named Paul Strasma and addressed to what appear to be
6  other Baxter people.  And let's see.  It could be
7  a -- several e-mails in here.  One's from Jeff Beck.
8      And the second page is a description of
9  CuraScript, myself as the contact person, where we're
10 located, some projections on some recombinant units
11 we would purchase at pricing information, total value
12 of the account.
13 BY MR. ANDERSON:
14     Q.   So, do you think that this contract
15 information accurately reflects the pricing that you
16 were receiving from Baxter when you were at Express
17 Scripts for Recombinate and Advate specifically?
18     A.   Reasonably.  It could be a penny or so in
19 either direction.
20     Q.   Why do you think that?
21     A.   Because it's -- well, it depends on the
22 date here.  What is the date on this thing?  It's
23 '04.
24     Yeah, I think, like, for example, the
25 Advate pricing at .94, there was a time when we had

Page 188

1  our pricing down to .93 based on the rebate.
2  Recombinate price at 89 cents, I just don't recall.
3  I'd have to look it up.
4      Q.   So, you think .94 -- the price per unit of
5  94 cents for Advate is wrong?
6      A.   It may be half a -- it may be a penny off.
7  It could even be half a penny off.  Depends on what
8  the rebates were.
9      Q.   Well, regardless of whether it's half a
10 penny off or not, would you agree that the pricing
11 between Recombinate and Advate was very close, within
12 five percent or so?
13     A.   Well, certainly based on this that is
14 true.  Again, I'd have to confirm it with my own
15 documents.  These could be projected numbers.  I
16 don't know.  And I don't know how much rebate they're
17 including in terms of Recombinate.  So, the exact
18 differential between the two I can't necessarily
19 attest to in terms of what it actually worked out to
20 be.
21     Q.   Well, regardless of those caveats that you
22 inserted, isn't it your experience that in the
23 marketplace the prices that were actually used to
24 transact business between customers of Baxter and
25 Baxter for Recombinate and Advate were within about

Page 189

1  five percent of one another?
2      A.   At this point in time I would say that's
3  reasonably accurate.  Whether it was five or six or
4  seven percent, eight percent, I'm not sure.  This is
5  '04.  This is after the price reduction.  At launch
6  there was a much more dramatic difference between the
7  two.
8      Q.   Over the majority, the large majority of
9  the life of Advate from 2004 to the present day, the
10 market pricing for Advate and Recombinate have been
11 within about five percent, seven percent of one
12 another; is that your experience?
13     A.   Yeah.
14     Q.   Okay.  And likewise, from that same time
15 period the published AWP for Advate and Recombinate
16 had been within five to seven percent of each other,
17 correct?
18     A.   I'd have to look at that, but I wouldn't
19 be surprised if that was true.
20     Q.   All right.  So, in that respect there's no
21 difference in the way that the two drugs had been
22 priced over time?
23     MR. CHIZEWER:  Objection to form.
24 BY THE WITNESS:
25     A.   When you characterize as "the way they're

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
GREG HAMILTON — 1/29/2013

Page 190

1  priced," what do you mean by "the way they're
2  priced"?
3  BY MR. ANDERSON:
4      Q.   It's okay. I'll move on.
5      MR. CHIZEWER: Let me know when you're moving on
6  because I'd just like to take a bathroom break.
7      MR. ANDERSON: Okay. Well, I'm moving on.
8          (Discussion off the record.)
9          (Hamilton Deposition Exhibit 8
10             was marked for identification.)
11         (Document tendered to the
12             witness.)
13  BY MR. ANDERSON:
14     Q.   Take a look at what's been marked as
15  Hamilton Exhibit 8.
16     MR. CHIZEWER: While he's looking at that, can I
17  ask you did Baxter make to Ven-A-Care a specific
18  document production in connection with this first to
19  file hearing?
20     MR. ANDERSON: No. These documents y'all had
21  access to for years. They're MDL production. That's
22  my understanding, at least.
23     MR. JACKSON: They have.
24     MR. CHIZEWER: There's some debate about that,
25  but it was just a question. You answered my

Page 191

1  question. I appreciate it.
2  BY MR. ANDERSON:
3      Q.   Mr. Hamilton, when you have finished your
4  review, let me know.
5      A.   Okay.
6      Q.   Thank you.
7          (Interruption.)
8      THE WITNESS: I'm finished.
9  BY MR. ANDERSON:
10     Q.   In reviewing Exhibit 8, would you agree
11  that this appears to be an internal Baxter report, so
12  to speak, about some business dealings with Express
13  Scripts and Baxter?
14     MR. CHIZEWER: Objection. Objection to form.
15  BY THE WITNESS:
16     A.   What this appears to be to me is a review
17  of a -- of a meeting or meetings that Baxter
18  personnel had with myself.
19  BY MR. ANDERSON:
20     Q.   And this was during your tenure at Express
21  Scripts, correct?
22     A.   That is correct.
23     Q.   I notice at the bottom of page 1 there's a
24  reference to how Express Scripts was gonna drive most
25  of the hemophilia business through the mail order, is

Page 192

1  that correct?
2      A.   No. I mean, it may be represented here as
3  such, but that was not what Express Scripts was going
4  to do.
5      Q.   Well, that's my next question. What in
6  fact did happen with respect to the hemophilia
7  business at Express Scripts?
8      A.   Again, I want to make sure we have the
9  time frames correctly. Are you saying what did
10  happen at this particular point in time, which was
11  the end of 2003?
12     Q.   Let's start there, and then we'll go from
13  there.
14     A.   Okay. What it did with the hemophilia
15  business. Okay. There were two sides of the
16  business for the PBM Express Scripts. Still are.
17  One is what we call the PBM side, and the other side
18  of the business is called the specialty pharmacy
19  part, okay?
20     So, we had hemophilia business, quote,
21  unquote, business on both sides of Express Scripts.
22  And so, we had different plans of action for each,
23  and then umbrella plans for both.
24     For the PBM side of the business, the
25  PBM -- well, in here it says we've covered, what, 47

Page 193

1  million lives at the time. And that's accurate.
2  They talk about the potential to manage roughly 6,000
3  hemophilia patients. That's representative of a
4  certain incidence and prevalence in the population
5  based on 47 million lives.
6      It was not completely accurate at the time
7  because many of the hemophilia prescriptions were
8  still being adjudicated by the medical side of plans.
9  Only a certain percentage were being adjudicated on
10  the drug side, which would come under the umbrella of
11  a pharmacy benefit manager like Express Scripts.
12     Okay. So, what happened was we were -- on
13  the PBM side of the business we were adjudicating
14  claims for many hemophilia patients, which meant --
15  by adjudicating claims meant that we were negotiating
16  rates with pharmacies, negotiating rates and revenues
17  with the payors, and then paying the pharmacy for the
18  drug, rebilling the payor. So, we had hemophilia
19  patients in that sort of book of business.
20     In that area what we had just started to
21  do was to put in a specialty pharmacy network. Now,
22  prior to this point in time any pharmacy that we had
23  a contract with to provide drugs for a given plan was
24  a member of our network. Think of Walgreen's,
25  Walgreen's years ago, not the little dispute they had

Merrill LAD

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
GREG HAMILTON - 1/29/2013

Page 194

1    a year ago. But Rite-Aid, Walgreen's, they're all
2    part of a network.
3          So, the PBM goes out to the various
4    pharmacies and negotiates contracts. When we send --
5    you know, when we adjudicate a claim, we will pay it
6    at a certain rate. Then that network is part of the
7    sale to a payor. So, when we're working with a
8    payor, we will tell a payor, "Okay. We will
9    adjudicate your drug claims. This is what we're
10   paying at retail. This is what it's gonna cost you.
11   Then we have co-pay tiers and we give rebates, and
12   here's the total cost to the plan."
13         Okay. So, in regards to hemophilia, what
14   we were setting about to do and did do was institute
15   a special pharmacy network. Now, what that meant was
16   we went to the specialty pharmacies that were
17   currently billing us for specialty pharmacy products,
18   not just hemophilia, but many others, and we
19   developed a discount list. In other words, we said,
20   "We will only reimburse at AWP minus such-and-such,"
21   whatever that number was, for -- and we picked it to
22   be drug-specific.
23         We then went to all of those pharmacies
24   and said, "Here's the price list that we'll pay. If
25   you'd like to be in our network, sign at the bottom

Page 195

1    and you'll be a part of our specialty network. If
2    you choose not to be a part of our specialty network,
3    then you will be considered to be out of network."
4    And, therefore, the out of network thing, it means we
5    will not adjudicate the claim.
6          Q.   Let me see if I can help you a little
7    because I do have a familiarity with all of this, but
8    I don't think we need to go through every minute
9    detail to get to the question.
10         A.   Okay.
11         MR. CHIZEWER:  Objection to form.
12   BY MR. ANDERSON:
13         Q.   When you were at Express Scripts, Express
14   Scripts bought drug, one part of the operation
15   actually bought drug, but there was another part of
16   the operation that actually acted as a reimburser of
17   drugs when they were dispensed by providers, correct?
18         A.   You have to be careful with the word
19   "reimburser" because they were -- yes, they were
20   reimbursing on behalf of somebody else who they then
21   turned around and billed, yes.
22         Q.   Administrating the claims adjudication
23   process?
24         A.   That's correct.
25         Q.   Right. And is it true that ultimately

Page 196

1    Express Scripts did choose to reimburse or at least
2    administer the reimbursement process for hemophilia
3    products at AWP minus 30 percent?
4          A.   I don't remember that exact number. It
5    could be that it was 30 percent. It could have been
6    25. It would certainly depend on which hemophilia
7    drug you're talking about.
8          For example, Wyeth manufactured a
9    recombinant Factor IX. And so, the reimbursement
10   rate was -- the discount off AWP was much, much, much
11   less on that drug because Wyeth, I believe, actually
12   reported to First DataBank what they sold it to
13   wholesalers for. So they ended up with a very low
14   differential between what they actually sold it for
15   and their AWP. So, you couldn't take the same
16   discount off the Wyeth product that you could off
17   everybody else's.
18         Q.   That's a good point. With respect to
19   Factor VIII, which would include Recombinate as well
20   as Advate, what to your memory was the discount off
21   of AWP that Express Scripts chose to use in
22   administering drug reimbursement claims?
23         A.   Again, I don't remember specifically. But
24   if you said, "Give me a range," 25 to 31 percent,
25   ballpark.

Page 197

1          Q.   Okay. And Express Scripts also knows what
2    the actual selling prices in the market are from
3    Baxter because it's actively buying drugs, as well,
4    including blood Factor VIII, correct?
5          A.   You put it in the present tense, which I
6    assume is still true, but I'm no longer with them.
7    But at that point in time I knew, and, therefore,
8    Express Scripts knew what the current selling prices
9    were for Baxter products.
10         Q.   Okay. So, how did Express Scripts decide
11   that it would reimburse at a range of AWP minus 25
12   percent to 31 percent on blood Factor VIII knowing
13   that the market pricing for blood Factor VIII was,
14   you know, 92 to 94 cents per unit?
15         A.   I just want to make sure I figure this
16   correctly. You're asking me how was that decision
17   made? How was it quantified?
18         Q.   Yes, sir.
19         A.   First of all, I made that decision. And
20   so, I made that decision based on knowing what the
21   pharmacy acquisition cost was, what the AWP was, what
22   the differential there was. And I chose a number
23   that, as I probably said at the time, left the
24   pharmacies with an exorbitant -- still with an
25   exorbitant amount of profit, and yet, put a number

50 (Pages 194 to 197)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
GREG HAMILTON – 1/29/2013

Page 198

1  out there that no pharmacy should refuse to accept,
2  and yet brought some additional savings into Express
3  Scripts' clients.
4      Q.   And so, you were making this decision to
5  allow pharmacies to make a margin on blood Factor
6  VIII, including Recombinate and Advate, correct?
7      A.   Yes, I was.
8      Q.   And was it true as best as you can
9  remember that that percentage gross margin was about
10  16 or 17 percent for both Advate and Recombinate?
11     A.   I don't recall.
12     Q.   Let me show you a document that will
13  probably refresh your memory about that.
14          (Hamilton Deposition Exhibit 9
15          was marked for identification.)
16          (Document tendered to the
17          witness.)
18  BY MR. ANDERSON:
19     Q.   This is Exhibit 9. I've highlighted it.
20  I'll note on the record those highlights are mine.
21  That's just a yellow highlighting on "Gross Margin."
22  That's a document you produced to us, sir.
23     A.   Yes, I'm familiar with this document.
24     Q.   Yeah, I figured. You probably created it,
25  right?

Page 199

1      A.   I'm not the Excel person. So, someone
2  would have created this at my direction.
3      Q.   While you were at Express Scripts?
4      A.   That's correct.
5      Q.   And so, you knew at Express Scripts that
6  the pharmacies were gonna make some margin; they were
7  gonna make some spread on blood Factor VIII?
8      A.   First of all, I want to clarify. You've
9  misinterpreted this document. I'm just trying to be
10  helpful.
11     Q.   Well, then set it aside. My question
12  is -- we can short-circuit this.
13          You knew when you were administering
14  claims adjudication at Express Scripts that
15  pharmacies were gonna make a margin on Recombinate
16  and Advate of roughly 16 or 17 percent?
17     A.   Again, I don't have a percentage, but --
18  and this is not reflective of the specialty pharmacy
19  network. These are not the numbers from the
20  specialty pharmacy --
21     Q.   Then I was wrong about Exhibit 9. You can
22  set it aside. That's not important.
23          What is important is that you knew at
24  Express Scripts that you were going to allow
25  pharmacies to make a spread of 16 or 17 percent on

Page 200

1  Recombinate and Advate when they were reimbursed,
2  correct?
3      MR. CHIZEWER: Objection to form.
4  BY THE WITNESS:
5      A.   Again, I knew that I -- that they were
6  going to make a spread. They were going to make
7  money off of the ingredient cost. Whether it was 16
8  or 18 percent, I don't know.
9  BY MR. ANDERSON:
10     Q.   Okay. So, what's wrong with Medicaid
11  choosing, just like you did, to pay some spread,
12  whatever that might be, to pharmacies when they
13  dispense blood Factor VIII Recombinate and Advate?
14     MR. CHIZEWER: Objection to form.
15  BY THE WITNESS:
16     A.   I believe the state Medicaid agency is
17  responsible for its own payments and not responsible
18  to me for what the spread should be or not be.
19  They're responsible to themselves and the government.
20  BY MR. ANDERSON:
21     Q.   I didn't ask you who was responsible. I
22  just said is there anything wrong with a Medicare
23  program instituting a payment policy that ultimately
24  reimburses pharmacies and provides them with some
25  margin or spread of something in the teens, for

Page 201

1  instance, on blood Factor VIII?
2      A.   First of all, the devil's in the detail.
3  And is there some problem with it? You know,
4  questions come up as to is it compliant with federal
5  law? Are they allowed to -- for example, in Mike
6  Bradley's deposition somebody brought up, you know,
7  federal upper limits. Can a state reimburse above a
8  federal upper limit and is that okay?
9          Well, the federal government I think would
10  say no. So, if the state decides to give a
11  particular margin, if they did decide, on what basis
12  did they make that decision? If they made that
13  decision based on true and accurate information -- if
14  they didn't get it on true and accurate information,
15  that would be a different story. But --
16     Q.   You raise a good point about the state
17  Medicaids knowing the true and accurate information.
18  Do you know whether state Medicaids since 2005 have
19  or have not known the real pricing of blood Factor
20  VIII?
21     A.   Well, are you referring to all the states,
22  any state?
23     Q.   Let's start with any state. Have you
24  undertaken -- I'll rephrase the question and be very
25  precise.

Merrill LAD

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
GREG HAMILTON - 1/29/2013

Page 202

1      Have you or anyone to your knowledge
2   undertaken any effort to determine whether from 2005
3   to the present any state Medicaid has had access to
4   the real pricing, the market pricing on blood Factor
5   VIII, and yet chose a certain reimbursement formula?
6      A.   I'm unaware of it.
7      Q.   Okay.  And do you think it's important to
8   undertake some effort to understand those dynamics
9   before you file a lawsuit?
10     MR. CHIZEWER:  Objection to form.
11  BY THE WITNESS:
12     A.   Based on my knowledge of the industry, no,
13  it's not.
14  BY MR. ANDERSON:
15     Q.   Because you're kind of a cynical person
16  being a former drug company executive, and you know
17  that they're all sort of, you know, what?  How would
18  you describe them?
19     A.   Describe what?
20     Q.   Drug company executives.
21     MR. CHIZEWER:  Objection to form.
22  BY THE WITNESS:
23     A.   That's a very general term.
24  BY MR. ANDERSON:
25     Q.   Well, okay.  Let's go back to what you

Page 203

1   said.  You said, quote, unquote, Based on my
2   knowledge of the industry, no, it's not.
3          What did you mean by that?
4      A.   My knowledge of the industry tells me
5   things.  For example, when I know how much a
6   product's being sold for, either my own or my
7   competitor's, and I know how much it's being
8   reimbursed for, you know, I do know that there's a
9   differential.
10         When a specialty pharmacy can make a
11  quarter of a million dollars a year in profit off of
12  a single patient being paid for by a commercial payor
13  or a private payor and they do this based on
14  information that they don't -- that is either false
15  or they don't know, things like that, then, yeah,
16  there's a problem with that.
17     Q.   You say there's a problem with it, but
18  your initial answer to me was, and I don't want to
19  misstate it -- well, frankly, your answer was
20  nonresponsive.
21         Here, I'm gonna read you my question.
22     A.   That's a good idea.
23     Q.   Okay.  This is my -- I lost it.  That's
24  okay.
25         Before you filed this case against Baxter

Page 204

1   in 2005, did you think it was important to understand
2   or undertake any effort to at least try to understand
3   why certain state Medicaids would choose to reimburse
4   for blood factors as they did?
5      MR. CHIZEWER:  Objection to form.
6   BY THE WITNESS:
7      A.   On a state-by-state basis, we did not do
8   that, and I didn't think it was necessary at that
9   point in time.
10  BY MR. ANDERSON:
11     Q.   All right.  Now take a look at what's been
12  marked as Hamilton Exhibit 10.
13          (Hamilton Deposition Exhibit 10
14          was marked for identification.)
15          (Document tendered to the
16          witness.)
17          (Short interruption.)
18  BY MR. ANDERSON:
19     Q.   Have you finished your review of Exhibit
20  10, Mr. Hamilton?
21     A.   Almost.  Not yet.
22          (Short interruption.)
23     THE WITNESS:  Okay.
24  BY MR. ANDERSON:
25     Q.   This is a memo to the, quote, Hamilton

Page 205

1   versus Bayer Notes from MAK dated September 1st,
2   2007, correct?
3      A.   That's what it says, yes.
4      Q.   Did this document come from your files and
5   in turn get produced in this lawsuit?
6      A.   I guess so.
7      Q.   Do you recognize it?
8      A.   Yes.
9      Q.   Okay.  Do you think this came from your
10  personal files at your house much like that other
11  document we looked at?
12     A.   I suppose it did.  It's excerpts from this
13  RBC Capital Markets review, which is a document that
14  I provided to my attorneys.
15     Q.   Okay.  The MAK who's the author of this
16  memo, is that one of your attorneys?
17     A.   I believe that's Mark Allen Kleiman.
18     Q.   The style or "To" line that reads,
19  "Hamilton versus Bayer Notes," is there a lawsuit
20  that you brought against Bayer?
21     A.   There is not.
22     Q.   Were you at any point contemplating suing
23  Bayer?
24     A.   No.
25     Q.   Do you think that's a typo and it's really

Merrill LAD
800-292-4789                                    www.merrillcorp.com/law

Page 206

1 referring to Baxter?
2     A.   I don't know.
3     Q.   Why is the -- you would agree with me,
4 wouldn't you, that the body of the memo pertains to
5 Kogenate?
6     A.   Mostly, yes.
7     Q.   And Kogenate's a Bayer product, correct?
8     A.   That is correct.
9     Q.   So, do you have any understanding of why
10 you would be focusing on Bayer?
11     A.   I don't recall the purpose of this memo.
12 I recall the Capital Markets article, but I don't
13 recall the context in which this was sent to me.
14     Q.   So, just so I'm clear, as far as you know,
15 there's never been any consideration about suing
16 Bayer?
17     A.   By myself, no.
18     Q.   By anyone else, as far as you know?
19     A.   As -- I have to think about this.
20     MR. CHIZEWER:  Objection to form.
21 BY THE WITNESS:
22     A.   Suing Bayer.  Would you be willing to
23 rephrase that to say in relationship to coagulation
24 products so that I can answer it?
25 BY MR. ANDERSON:

Page 207

1     Q.   Well, when you phrase it that way --
2     A.   I'm trying to help you here.
3     Q.   Yeah.  When you phrase it that way, sure.
4     A.   And the answer is I'm not aware of any.
5     Q.   Okay.  Are you aware of someone
6 contemplating filing a lawsuit against Bayer related
7 to products other than coagulation products?
8     A.   Gee, I tried to help you.
9     Q.   Well, I gotta go there.
10     A.   No good deed goes unpunished.  I can't
11 answer that.
12     Q.   Because it impinges on what you think is
13 the attorney-client privilege?
14     A.   That's correct.
15     Q.   Okay.
16     A.   Try and help a guy out, and look what he
17 does.
18     Q.   Well, that's just my job.
19         Are you aware, outside of something you've
20 learned from an attorney representing you --
21     A.   Representing me?
22     Q.   Yes.  Are you aware of any reasons why a
23 suit should not be brought against Bayer?
24     MR. CHIZEWER:  Objection to form.
25 BY THE WITNESS:

Page 208

1     A.   For what?
2 BY MR. ANDERSON:
3     A.   For any pricing issues related to
4 Kogenate.
5     MR. CHIZEWER:  Same objection.
6 BY THE WITNESS:
7     A.   Am I aware of any reason why one shouldn't
8 be brought?
9 BY MR. ANDERSON:
10     Q.   Yes, sir.
11     MR. CHIZEWER:  Same objection.
12 BY THE WITNESS:
13     A.   You know, again, I'm not a lawyer, so I
14 can't give you specifics on this.  But if I were to
15 take a shot at it, perhaps the -- any Bayer
16 misconduct was covered in the Ven-A-Care suit maybe,
17 but I don't know.
18 BY MR. ANDERSON:
19     Q.   When you look at the Exhibit 10, focusing
20 your attention on the last sentence, it reads, "Thus,
21 while we believe Bayer is clearly taking steps to
22 improve its relations with the home pharmacies, the
23 actual margin benefit on Kogenate FS for the home
24 pharmacies may be well below the level implied by the
25 new AWP."

Page 209

1         Did I read that correctly?
2     A.   Yes.
3     Q.   Is that statement consistent with your
4 understanding based on your personal knowledge?
5     MR. CHIZEWER:  Objection to form.
6 BY THE WITNESS:
7     A.   You're asking me if I think this statement
8 is accurate?
9 BY MR. ANDERSON:
10     Q.   Yes, sir.
11     A.   Give me a moment to reread it.
12     Q.   Sure.
13     MR. CHIZEWER:  Same objection.
14         (Short interruption.)
15 BY THE WITNESS:
16     A.   I don't know.  It's subject to a lot of
17 interpretations.  It talks about that Bayer's taking
18 steps to improve its relations with the home
19 pharmacies.  That's their opinion.  I don't know that
20 that's necessarily accurate.  This is back in January
21 of '03.
22         "The actual margin benefit on Kogenate for
23 the home pharmacies."  The actual margin benefit on
24 Kogenate versus what?  It doesn't say.
25         And it says, "may be well below the level

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
GREG HAMILTON – 1/29/2013

Page 210

1 implied by the new AWP." And I don't know what they
2 necessarily mean by "implied by the new AWP."
3      I think everyone understood that it was
4 rare, particularly I think in '03, for anybody to pay
5 full AWP, that people were taking some discount off
6 of AWP. So, to say it's not gonna be the full level
7 on AWP, well, of course not. There's gonna be some
8 discount taken by Aetna, United Healthcare, Blue
9 Cross & Blue Shield, et cetera, et cetera, and
10 Medicaid and even Medicare was gonna take some
11 percentage off of AWP. So, --
12 BY MR. ANDERSON:
13      Q.   Or pay based on something completely
14 independent of AWP that's lower?
15      A.   And that's possible. So, I mean, the
16 sentence, I can't just say it's blatantly true. I
17 can't say it's blatantly false, either.
18      Q.   I understand. So, let's talk generally.
19           Would you agree with the proposition that
20 from 2005 to the present the reimbursement on blood
21 factors has trended in a way that to the extent a
22 reimburser is using AWP, they're discounting off of
23 AWP more rather than less?
24      A.   Generally speaking, again it's a
25 generalization, but generally speaking that's true.

Page 211

1      Q.   And that's why generally speaking the
2 implication of an AWP might not indicate what the
3 reimbursement actually is?
4      A.   I don't think --
5      MR. CHIZEWER: Objection. Objection to form.
6 BY THE WITNESS:
7      A.   I don't think that A equals B there. I
8 think that you've just changed horses.
9      I think that when you say that there's
10 been generally speaking an increase in the discount
11 taken off of AWP, I would generally agree with that.
12 I believe what's been happening in the marketplace is
13 that the payors have been trying to find actual
14 acquisition cost, and so, they have been ratcheting
15 up their discount or down their reimbursement,
16 however you want to look at it, in an effort to try
17 and find a point equal to or closer than -- whatever
18 they want to pay the pharmacy, that they actually get
19 to what they want to pay the pharmacy. So, they've
20 adjusted AWP over the years.
21      But the fact of the matter is have they
22 found it? And I think that if you -- if you look at
23 reimbursement levels even today, let's say for factor
24 products, I think you will see that they still
25 haven't come anywhere near it.

Page 212

1      Q.   They might have built in a 16 or 17
2 percent margin, for instance?
3      A.   I suppose that that's conceivable, that
4 the state may have said, "We want to give -- that
5 would be about 25 or 30 thousand dollars a year to a
6 pharmacy per patient for sending out 12 Fed Ex
7 boxes," I suppose that's possible.
8      Q.   Well, you did something similar to that.
9 When you were at Express Scripts, you made that
10 decision.
11      A.   What's "that decision"?
12      Q.   To build in a 16 or 17 percent spread on
13 Recombinate and Advate.
14      A.   Okay. Again, as I'm going back, you
15 missed the point of that paper. That paper did not
16 reflect the discount rate for specialty pharmacies
17 that we put in network.
18      Q.   I'm not talking about Exhibit 9. I'm just
19 talking about generally.
20           You decided, knowing full well what the
21 marketplace price was, you decided as a reimbursement
22 administrator to allow the pharmacies to make 16 or
23 17 percent on blood Factor VIII?
24      A.   That is true for the specialty network
25 that we developed as an initial program of developing

Page 213

1 a specialty network program.
2      MR. ANDERSON: All right. I'll pass the
3 witness.
4      MR. JACKSON: I just have a few questions.
5      MR. CHIZEWER: I think he was passing him to me.
6           (Discussion off the record.)
7           FURTHER EXAMINATION
8 BY MR. JACKSON:
9      Q.   Referring to Deposition Exhibit 10, the
10 memorandum entitled "Hamilton v Bayer Notes," did you
11 retain Mr. Kleiman to represent you against Bayer?
12      A.   No, I did not.
13      Q.   Did Mr. Kleiman contact you independently
14 and ask you if you would become a relator against
15 Bayer?
16      MR. CHIZEWER: Objection. I believe that would
17 invade the attorney-client privilege.
18      MR. JACKSON: He just said he did not retain Mr.
19 Kleiman as counsel for a matter against Bayer. He
20 had no attorney-client privilege.
21      MR. CHIZEWER: No, I would disagree with that.
22 If a client comes to me and says --
23      MR. ANDERSON: But what if an attorney goes to
24 him? You've just flipped it.
25      MR. JACKSON: That's just a different case. So,

54 (Pages 210 to 213)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
GREG HAMILTON - 1/29/2013

Page 214

1  let me ask the question, and if you want to direct
2  him not to answer, that's fine, okay?
3  BY MR. JACKSON:
4      Q.   Did Mr. Kleiman come to you and introduce
5  the notion that you might act as a relator against
6  Bayer regarding the subject matter that is in
7  Deposition Exhibit 10?
8      A.   No.
9      Q.   So, why was Mr. Kleiman sending you
10  information regarding Bayer that is reflected in
11  Deposition Exhibit 10?
12      MR. CHIZEWER: Objection to form.
13  BY MR. JACKSON:
14      Q.   You can answer.
15      A.   Let me actually give a little bit of an
16  expanded answer.
17          The first part of this is this is
18  information that I sent to him, okay? I sent him the
19  full RBC Capital Markets "A Changing Paradigm in
20  Hemophilia." I sent him an article, and it may have
21  been -- it was multiple pages long, okay? As -- as
22  information. FYI, here's some information on the
23  hemophilia market.
24          He then responded by sending this out,
25  okay, where he picked out two items out of that

Page 215

1  report, put them on a piece of paper and sent them
2  out.
3      Q.   Sent them out to whom?
4      A.   I don't know. It says, "To: Hamilton
5  versus Bayer Notes," whatever that means. It could
6  be a distribution list, for all I know. So, I don't
7  know who he sent it to.
8      Q.   It came to you, correct?
9      A.   I believe it did. But now you're asking
10  me why he sent it to me. I don't know. I already
11  had this information. I'm the one who sent it to
12  him.
13      Q.   But my question was did he solicit you to
14  be a relator in a lawsuit against Bayer?
15      MR. CHIZEWER: Objection. Asked and answered.
16  BY THE WITNESS:
17      A.   No.
18      MR. JACKSON: I've got nothing further.
19      MR. ANDERSON: I'll reserve the remainder of my
20  questions until the next deposition, time of trial or
21  hearing.
22          (Whereupon, the deposition was
23          concluded at 3:45 p.m., this
24          day, January 29, 2013.)
25

Page 216

1  STATE OF ILLINOIS  )
2                     )
3  COUNTY OF GRUNDY  )
4          The within and foregoing deposition of the
5  aforementioned witness was taken before MARGARET A.
6  BACHNER, CSR and Notary Public, at the place, date
7  and time aforementioned.
8          There were present during the taking of
9  the deposition the previously named counsel.
10          The said witness was first duly sworn and
11  was then examined upon oral interrogatories; the
12  questions and answers were taken down in shorthand by
13  the undersigned, acting as stenographer and Notary
14  Public; and the within and foregoing is a true,
15  accurate and complete record of all of the questions
16  asked of and answers made by the aforementioned
17  witness, at the time and place hereinabove referred
18  to.
19          The signature of the witness was not
20  waived, and the deposition was submitted, pursuant to
21  Rules 30(e) and 32(d) of the Rules of Civil Procedure
22  for the United States District Court, to the deponent
23  per copy of the attached letter.
24
25

Page 217

1          The undersigned is not interested in the
2  within case, nor of kin or counsel to any of the
3  parties.
4          Witness my official signature and seal as
5  Notary Public in and for Grundy County, Illinois, on
6  this 5th day of February, A.D. 2013.
7
8
9          _____
10          Margaret A. Bachner, CSR, RMR, CRR
           Illinois CSR No. 84-1481
10         Notary Public, Grundy County, Illinois
           My Commission Expires June 24, 2014
11         311 South Wacker Drive, Suite 300
           Chicago, Illinois 60606
12         Phone: (312) 386-2000
13
14
15
16
17
18
19
20
21
22
23
24
25

55 (Pages 214 to 217)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
GREG HAMILTON – 1/29/2013

Page 218

1        UNITED STATES DISTRICT COURT
        DISTRICT OF MASSACHUSETTS
2
  IN RE PHARMACEUTICAL INDUSTRY   )
3  AVERAGE WHOLESALE PRICE      )
  LITIGATION          ) MDL No. 1456
4  _____)
              ) Master File No.
5  THIS DOCUMENT RELATES TO:    ) 1:01-CV-12257-PBS
6  United States of America ex   ) Sub-Category Case
  rel. Linnette Sun and Greg   ) No. 1:08-CV-11200
7  Hamilton, Relators,      )
8     v.            )
                )
9  Baxter Hemoglobin Therapeutics )
  and Baxter International Inc.   )
10
11      I, GREG HAMILTON, hereby certify that I
12  have read the foregoing transcript of my deposition
13  given at the time and place aforesaid, consisting of
14  Pages 1 to 218, inclusive, and I do again subscribe
15  and make oath that the same is a true, correct, and
16  complete transcript of my deposition so given as
17  aforesaid, and includes changes, if any, made by me.
18
19     _____
20          GREG HAMILTON
21  SUBSCRIBED AND SWORN TO before me this
22  _____ day of _____ 2013.
23
24  _____
      Notary Public
25

Merrill LAD

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
GREG HAMILTON – 1/29/2013

Page 1

## A

**abide** 18:15
**ability** 109:13
**able** 6:12 18:22 40:17
   53:21 146:6 171:12
   185:19
**Absent** 139:25 140:2
**absolutely** 49:21 55:2
   60:12 67:20 141:16
**accept** 146:2 198:1
**acceptance** 36:15
   165:21
**accepted** 166:12
**accepting** 164:1,21
**access** 76:15,18 83:12
   181:24 182:5,24
   184:12 185:19
   190:21 202:3
**accompanying** 9:8
**account** 187:12
**accurate** 28:16 62:25
   111:23 113:6 159:18
   189:3 193:1,6 201:13
   201:14,17 209:8,20
   216:14
**accurately** 182:22
   187:15
**accuse** 60:18
**accused** 60:14
**acquisition** 81:16
   88:15 89:6,19 91:20
   93:23 105:6 156:1,9
   156:11 157:17,18
   197:21 211:14
**acronym** 155:25
**act** 13:11 14:4,10,16
   14:17 15:15,22 17:21
   19:14 40:16 63:2
   84:20 142:1,10 214:5
**acted** 13:23 14:24
   15:10,15 18:8 21:3
   25:21 57:21 61:19
   195:16
**acting** 14:20 17:20
   56:21 57:12 216:12

**action** 21:7 84:20
   93:15,16 107:14
   142:23,25 143:4
   155:1 192:22
**actions** 27:7 143:15
**actively** 197:3
**actual** 20:16 22:1 89:6
   91:19 93:8 94:18
   105:6 111:15 158:1,4
   160:8,8,16,23 161:16
   197:2 208:23 209:22
   209:23 211:13
**add** 176:15,19
**addition** 44:11
**additional** 178:1,3
   198:2
**address** 115:9,13
   153:19 154:2
**addressed** 187:5
**addressing** 99:7
**adequately** 70:12
**adjudicate** 194:5,9
   195:5
**adjudicated** 193:8,9
**adjudicating** 193:13
   193:15
**adjudication** 195:22
   199:14
**adjusted** 211:20
**adjustments** 83:18
**administer** 196:2
**administering** 196:22
   199:13
**Administrating**
   195:22
**administrator** 212:22
**admit** 110:4
**advance** 20:13 70:8
**Advate** 21:6 22:10
   23:4,7,9 26:20 29:8
   29:12,15 30:2,8,21
   31:11,17,20 32:6,15
   33:7,18,24 34:2,9,23
   35:3,6,24 36:6,8,10
   37:3 38:2,7,8,15,16

38:18,21 39:12,18
   40:10,22 41:9,20
   42:3,8,13,17 43:8,24
   45:20 46:9,14,20
   47:5,25 48:18,21,22
   49:6,11,20 50:10,16
   51:12,17,19 52:4
   53:8,15 54:1,6 66:12
   73:19 74:18 75:2
   76:7 85:25 86:6,13
   86:16 87:2,6,12 88:2
   88:7,22 89:7,12,23
   90:6,11,24 91:6,13
   91:14,23,24 92:3,10
   93:5,14,17 151:10,11
   167:10,22 168:22
   170:13,20,24 187:17
   187:25 188:5,11,25
   189:9,10,15 196:20
   198:6,10 199:16
   200:1,13 212:13
**Advate's** 37:20 50:22
**advice** 35:8 107:1
**advise** 83:3 119:4
   140:19 141:5,8
**advised** 91:5 141:10
**advising** 108:9 109:11
**Aetna** 210:8
**affidavit** 80:14,16
**affidavits** 11:20 24:6
   24:10
**affiliate** 89:3
**aforementioned** 216:4
   216:6,15
**aforesaid** 218:13,17
**agencies** 22:18 158:22
   159:15
**agency** 200:16
**ago** 28:20 38:5,11
   129:25 193:25 194:1
**agree** 26:8 62:17 70:23
   80:8 96:8 105:5
   107:15 132:6 147:16
   169:9 170:23 172:19
   174:5 186:19 188:10

191:10 206:3 210:19
   211:11
**agreed** 137:22
**agreement** 3:18 8:22
   12:15 13:1 58:16,20
   121:7,8,9,12 124:11
   138:6 186:20
**agreements** 18:14,16
   18:18 19:9 20:6
**Ah** 178:12
**ahead** 34:21 47:3
   60:16 73:9 83:5
   118:16 132:21
   163:19 171:8
**AIDS** 39:10,17
**airline** 55:24
**al** 5:11
**allegation** 170:5
**allegations** 116:12
   147:18 148:6,8
   149:24 150:3 156:14
   162:1,6,21 163:15,17
   163:23 169:17
   172:20 173:10,20
   177:21,22 183:4
   184:19
**allege** 158:14 165:13
**alleged** 98:25 163:2
   173:20 174:1,20
   176:6,11,12 177:10
   177:24
**allegedly** 175:18
**Allen** 205:17
**allow** 41:19 53:19
   119:19 198:5 199:24
   212:22
**allowed** 63:1 201:5
**allows** 185:21
**all-inclusive** 48:15
**Alpharetta** 2:20
**altering** 54:4
**amenable** 24:20
**amendment** 100:23
**amendments** 101:1
**America** 1:6 31:7

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
GREG HAMILTON - 1/29/2013

218:6
**amount** 42:13 43:7
53:23 104:16,23
105:22 197:25
**amounts** 62:2 66:12
104:2
**analysis** 64:10,14,17
64:18 65:4,9,14
66:11,14 68:17 69:15
75:1,20 76:1,2,4,13
76:22,23 78:11,15,25
79:1,4,13,21,23 80:1
80:9 81:4,8,23 82:7,7
82:8 83:4 92:5
114:21 158:4 185:2
**Anderson** 2:14,14 3:5
4:13 55:6,10,11
56:11 57:9,19 58:18
59:1,11,24 60:4,8,12
60:15,23 61:2,14,17
62:1,5,16 63:3,11,12
63:23 64:2,4 65:7
66:25 67:7,20 68:7
68:15,24 69:4,6,9
70:1,24 71:4,10,18
71:22 72:1,7,19 73:1
73:5,8,10 77:10 78:3
78:20,24 79:7,9 80:5
81:11,21 83:2,6 84:4
84:18 85:1,4 87:24
88:9,17 90:2,17,22
91:3 92:16,21,25
93:2,9,10 94:6 95:25
96:7,18 97:3 102:23
105:4,11 107:21
108:2,15 109:7,16,20
110:15,20 111:3
112:18 114:4,7 115:1
115:8 116:10,19
117:8,23 118:11,16
119:10,21,25 120:20
122:19 123:2,16,22
126:9 127:1,5,12
130:15,19 132:3,5,13
132:17,24 133:17,23

135:4,7,11,15 139:4
139:19 140:10,18
141:10,22 142:6,7
143:22 144:2,4,14
145:25 146:1 147:22
148:4,14,15,21,23
149:2 150:9 151:18
152:7 153:3 156:18
157:2,9 159:7 160:13
160:22,25 161:3,5,7
161:11,12 162:5,11
162:18 163:1,7
164:15 166:16
167:14,20 168:14,24
169:14,23 170:4,11
171:4,21 172:5 173:1
173:11,16,18,25
174:13 175:3,12,16
176:1,16,25 177:7,18
180:5,11,23 181:13
181:23 182:14,17,23
183:7,18 184:2
186:12 187:13 190:3
190:7,13,20 191:2,9
191:19 195:12
198:18 200:9,20
202:14,24 204:10,18
204:24 206:25 208:2
208:9,18 209:9
210:12 213:2,23
215:19
**Anderson's** 55:5
**ANDREW** 2:9
**Andy** 5:9
**and/or** 13:1 79:15
**angle** 174:19
**annually** 74:7 178:14
**answer** 6:6,7,8 18:12
19:22 20:3,5,9,20,21
21:1 22:25 23:10,19
24:1 28:19,20 30:12
30:19 56:8,10 57:3
58:19,23 60:7 66:1
66:17 67:13 69:22
71:23 72:2,4 74:25

75:9 76:5 77:21
78:19 80:23,25 81:25
82:2 85:21 86:24
87:9 91:2 92:20 95:3
95:5 101:25 106:23
106:23 107:7 109:8
109:11,19,19 111:9
114:24 118:13 119:8
119:19,22 120:19,23
121:4,19,24 122:25
123:3,7,10,11 126:11
127:13 132:6,15,18
132:23 138:19,22,23
139:16,18 140:12,15
140:16 141:13,18,20
144:3 145:21 148:24
161:13 171:8 175:11
175:25 176:15,22
177:14 180:4,10,12
180:12 181:22
182:15,21 203:18,19
206:24 207:4,11
214:2,14,16
**answered** 54:7 63:22
64:1 68:16 92:24
93:20 109:17,17
173:22 174:24 175:8
175:15,22 176:13
177:3,5,16,17 182:22
183:15 190:25
215:15
**answering** 19:2 69:20
94:22 113:17 121:11
127:2
**answers** 6:13 66:16
216:11,15
**answer's** 91:17 144:17
**anticipated** 20:12
**anti-hemophilia** 16:8
16:10,25
**Anti-Hemophilic**
125:6
**anybody** 72:15 210:4
**anymore** 166:7
**anyway** 130:24

**apart** 86:18
**apologize** 31:24 95:24
**apparently** 173:11
**appear** 187:5
**appears** 124:10 136:17
181:2 186:19 187:4
191:11,16
**applied** 102:18 136:5
152:21,24,25 153:9
176:8
**applies** 78:15
**apply** 136:2 153:5
**appreciate** 24:21
117:24 118:2,4,5
191:1
**approach** 90:11
138:11,12
**approached** 137:15
138:18,18 144:1
**approaching** 137:16
**appropriate** 58:24
67:21 145:3 168:13
183:4
**approved** 64:5
**April** 159:2
**area** 27:24 57:4,5
193:20
**areas** 15:1 23:15
**arena** 12:5 100:20
**aren't** 37:18 150:1
**argument** 112:3
**argumentative** 160:10
162:25 170:3 181:19
**arrangement** 12:11
58:11
**article** 206:12 214:20
**ascertain** 168:6
**aside** 175:17,19 176:10
199:11,22
**asked** 16:24 24:4
46:12 54:7 63:22,25
71:14 72:15 77:3,24
78:16 93:19 95:1
112:2,6 118:25
128:24 129:3,6,23

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
GREG HAMILTON − 1/29/2013

130:3 138:17 140:8
144:1 166:13 173:22
174:24 175:8,14,21
176:13 177:3,17
182:20 183:14
215:15 216:15
**asking** 6:5 14:15 33:17
34:12 56:5 59:23
76:17,20 78:21,22,24
78:25 79:2 93:12,13
94:21 99:10 102:4
109:2 119:11,12
146:15 154:25
177:20 178:22
183:24 184:1,3
197:16 209:7 215:9
**asks** 120:14
**aspects** 33:3 83:19
**assert** 141:7
**assist** 84:5
**assume** 45:22 55:16
85:19 197:6
**assumed** 128:1
**assuming** 129:4
136:22 149:8 157:3
**attached** 216:22
**attachment** 3:25
**attempt** 99:17
**attempted** 99:2 100:16
**attempts** 113:7,9
**attend** 55:19
**attention** 46:4 208:20
**attest** 188:19
**attorney** 97:21 106:22
129:16 137:4,15,16
137:19 138:3 148:6
180:25 207:20
213:23
**attorneys** 18:9 26:23
55:21 58:10 59:3
77:3,4,9 78:16 84:9
106:18 107:24
108:16,18 109:21
120:2 121:10 128:11
128:13,24 131:18,25

132:11 136:4 140:1
181:1 183:13 205:14
205:16
**attorney-client** 23:18
23:23 109:12 119:4,5
121:16 122:1 123:4
140:22 145:23
207:13 213:17,20
**August** 124:15
**Austin** 2:15
**author** 205:15
**automatically** 164:20
**available** 44:3 86:2
158:7
**Avenue** 2:15
**average** 1:3 43:2 50:3
125:19 158:22
159:15 218:3
**aware** 5:25 6:9 10:22
10:23,24 43:5 49:9
100:25 103:13
117:10 128:17,18
137:21 169:1 185:4
207:4,5,19,22 208:7
**awareness** 126:2 179:5
179:21
**AWP** 22:19 23:5 42:23
43:13,20 49:20,22
50:1,3,4,22,24 51:3
51:10,12,17,19,22
52:4,6,8,9,23 53:6,10
53:14,22 54:13,16
86:15,16 87:22 88:16
88:23 89:7 91:6,9,14
92:11,11 93:7,22,25
101:5,11,23 102:10
102:14,16,18,18
103:15 104:17,24
105:1 106:7 112:2,7
112:10,11 113:12,21
113:24 115:21,23,25
116:1 117:21 142:17
147:7 163:23 164:14
164:25 166:3,6
171:19 172:21 174:7

174:7,10 179:10,13
179:14 180:1 185:1
189:15 194:20 196:3
196:10,15,21 197:11
197:21 208:25 210:1
210:2,5,6,7,11,14,22
210:23 211:2,11,20
**AWPs** 75:7 87:17
89:18 106:16 108:4
111:12 112:3 125:20
164:6 165:9,10 185:5
**A.D** 1:20 217:6
**a.m** 1:20

### B

**B** 3:7 42:24 43:1,20
211:7
**Bachner** 1:14 216:5
217:9
**back** 7:13 21:25 29:23
74:14 75:5 76:23
84:9 90:23 98:16
117:9 118:6 120:21
126:3 132:25 137:2
140:6 149:3 158:10
179:4 181:25 184:15
186:21 202:25
209:20 212:14
**balancing** 40:16
**ballpark** 16:1 196:25
**bank** 164:19,21
**banks** 163:24
**base** 73:22 94:7 102:24
159:19
**based** 9:2 23:4 43:13
51:4 58:20 59:4 62:3
62:19,25 63:8 92:11
95:9 96:11 101:23
109:2 119:8 121:20
136:16 145:19
162:21 183:19
184:11 188:1,13
193:5 197:20 201:13
202:12 203:1,13
209:4 210:13
**bases** 60:11 103:6

**basic** 27:5,6 82:2
**basis** 22:18 27:2,10
60:8,23 61:2,16
79:23 94:16 134:22
134:23 145:19
149:22,23 150:2
151:1 160:25 161:3
201:11 204:7
**bathroom** 190:6
**BAX** 3:23 4:2
**Baxter** 1:9,10 2:12,13
2:25 5:10,12 8:13,22
26:2 29:12,15 30:7,7
30:22,25 31:8,14,16
31:19 32:6,9,9,24
33:7 38:13 39:18
40:15 44:18,24 45:17
46:13,16,17,18,24
47:9,13,15 48:2,3
49:5 51:16 53:14
89:23 91:6 122:17,22
130:8 137:5,20 139:7
139:14,24 140:13,21
143:16,20 144:7,15
150:21 151:5 152:3,8
152:14,20,21,25
153:5,8,13,20 154:6
154:14 155:9,24
156:14 158:15,16,21
159:6,14 162:21
163:3,9,15 165:2,8
165:14,15,24 167:23
170:1,10,13,20,21,24
172:14,16,18 173:21
176:11 177:9,10,21
177:22 183:13 184:5
184:19 186:21 187:6
187:16 188:24,25
190:17 191:11,13,17
197:3,9 203:25 206:1
218:9,9
**Baxter's** 27:7 28:10
39:1 44:12,14,14
48:10 51:6,12 52:3
54:13 90:6 151:13,22

154:3 162:13 169:25
174:22 181:5
**Bayer** 21:24 44:15
65:2 105:25 106:5,10
106:14,15,18 107:8
107:24 108:3,24
109:22 110:1,10,22
110:24 111:19
117:10,11,25 118:6,8
119:1,6,14,18 120:2
120:4,10,16,16,25
121:3,7,8,10 122:2,5
122:13,20 124:12,22
125:15 126:22
127:16,22,24 128:7
140:6,8 141:2,6
143:1,5,7,10,12
144:5,9,13 164:4
171:22 172:11,12
174:2 178:11,18
179:4,19 184:13,15
205:1,19,20,23 206:7
206:10,16,22 207:6
207:23 208:15,21
213:10,11,15,19
214:6,10 215:5,14
**Bayer's** 107:2,3 109:7
111:5,15 141:4,8
209:17
**bear** 157:11 184:19
**bears** 88:2
**BEATA** 2:4
**beata.brewster@gol...**
2:7
**Beck** 29:21 187:7
**befuddled** 134:9
**beginning** 27:14
170:15
**behalf** 2:8,12,22
117:11 128:11 130:8
137:19 141:2 195:20
**belaboring** 174:18
**belief** 38:1 74:23
177:19
**believe** 7:15 9:3 10:5

10:15,25 14:21 20:11
22:11 24:12 31:18,22
40:25 42:23 50:5
52:13 57:16,17,18
58:1 62:9 63:17,21
63:25 64:8 68:15
69:16 73:17,25 78:1
79:3 83:23 84:2,8
91:16 99:6,8 100:10
100:12 110:24
119:22 121:11,17,25
122:3 123:3 140:11
144:22 145:7 148:17
149:21 153:4,7 156:7
161:17 162:17,23
163:10,17 164:11
166:23 177:5,16
183:24 196:11
200:16 205:17
208:21 211:12
213:16 215:9
**believed** 41:5 156:8
**benefit** 157:16 193:11
208:23 209:22,23
**best** 57:6 74:25 111:10
131:14 152:18 198:8
**better** 37:3,20 57:7
89:12
**beyond** 98:10 126:17
176:21,23 177:11,12
177:12,22
**bias** 57:16,17
**biased** 57:10
**bid** 102:4,5,6,7,8,10
**big** 38:7,8 114:2
**bill** 52:22
**billed** 58:6 195:21
**billing** 21:17 185:6
194:17
**biological** 179:16
**biologicals** 179:25,25
**BioScience** 31:14,16
31:19 32:24
**bit** 40:15 55:14 89:12
92:13 107:1 214:15

**blanking** 48:6,19
**blatantly** 210:16,17
**blood** 39:8,15,19,22
40:13 78:6 85:13,16
92:13,17 98:13,20
99:15,16 100:2 101:5
101:11,18,23 102:18
103:7,20,23 104:19
197:4,12,13 198:5
199:7 200:13 201:1
201:19 202:4 204:4
210:20 212:23
**blood-borne** 39:10
**blood-free** 39:12,13
**Blue** 210:8,9
**boat** 29:22
**body** 94:14 206:4
**Bolton** 2:25 5:10
**book** 111:12 193:19
**boss** 112:5,12 113:18
**Boston** 5:23
**bottom** 131:1 191:23
194:25
**bought** 195:14,15
**bounce** 55:13
**boxes** 212:7
**Bradley** 32:10,13
**Bradley's** 201:6
**brain** 154:24
**brand** 48:6
**breach** 119:3,5
**break** 79:7 114:4
116:19 190:6
**breaker** 37:17
**breakthrough** 38:19
**Breen** 2:18,19 19:3
23:6 55:5 77:12,18
79:20 80:13 81:6
84:25 107:5,17
109:14 116:20
168:17
**BREWSTER** 2:4
**brief** 81:15
**bring** 9:15 20:17 50:25
142:25 143:19 144:9

170:6
**bringing** 139:7 142:10
142:22 143:10,15
**broad** 87:4
**broken** 83:14
**brought** 117:11 118:3
118:7 119:13 120:3,9
121:1 122:4,11,17,21
125:5 126:2,21 130:7
139:14,23 143:6
198:2 201:6 205:20
207:23 208:8
**build** 212:12
**built** 212:1
**bundle** 49:1
**burden** 70:17
**Bureau** 73:24 74:7,9
**business** 117:21
188:24 191:12,25
192:7,15,16,18,20,21
192:24 193:13,19
**busy** 186:23
**buying** 91:21 197:3

---
**C**

**C** 2:14 124:19
**calculate** 18:10 19:15
**calculated** 15:8 103:17
**calculating** 164:14
185:5
**calculation** 17:24 76:2
164:25 166:14
**calculations** 66:15
113:14 179:23
**California** 83:20
**call** 35:6 51:4 58:5
66:15 82:14 93:23
121:15,16 155:8
192:17
**called** 5:5 30:22 36:3
36:24 43:2 58:6
117:4 165:5 192:18
**calls** 10:15 150:12
**can't** 9:22 20:10 33:2,6
43:22 45:21 48:25
56:10 58:23 78:19

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
GREG HAMILTON – 1/29/2013

85:1 86:24 95:13,13
95:14 98:8 100:13
107:19 109:19
114:22,25 119:8
120:12 121:4 122:8
122:25 123:3 137:1
140:4 141:8 147:13
147:18,21,23 148:3
148:11 166:6,8
170:17 172:16,18
176:20 180:4,10,12
180:13 181:22
188:18 207:10
208:14 210:16,17
**Capital** 4:7 205:13
206:12 214:19
**care** 55:3
**careful** 195:18
**case** 1:6 8:3,4 10:2,4,8
11:4,11,25 12:11
13:10,17,17,19 14:4
14:17 17:12,16,17,25
18:2,22 19:25 21:5
21:15,16,21 22:1,3,8
24:11 25:19 27:11
56:13,22 57:12,17,22
57:23 58:3,7 59:4,15
61:11 62:3 63:9,18
64:20 65:15,16,18
66:10,19,23 68:13
71:1,6 75:22 76:9
78:8,13 80:15,18
81:24 82:21 84:11,17
85:7,10 88:3 98:2
99:4,8,12,13 103:13
117:15,19 122:17,21
125:5 126:22 127:16
128:11,24 129:7
134:13,17,20 135:1
135:21 137:5,20,22
137:23 138:7,10
139:23 140:13,21,24
143:10,19 144:9
148:6 149:5,24 150:3
164:17 165:1 203:25

213:25 217:2 218:6
**cases** 13:11,23 14:10
15:2,16,22,23 16:7
17:19 18:10 19:13,16
21:4 56:17,18,20
58:2,4,14 59:9,10
61:7,9,18 62:8,20
97:22,23 119:13
120:3 121:2 122:4,12
122:17 126:3,18
139:14,23 140:13
142:10
**catalog** 157:23 160:2,5
161:21 164:13 165:3
**catch** 38:13
**categorizing** 68:24
**cause** 53:15 54:5 84:20
121:12 123:4 161:25
162:6
**causes** 95:6
**causing** 38:22 94:4
**caution** 18:13
**caveats** 188:21
**cell** 33:23
**centers** 164:17
**cents** 37:14,18 41:12
73:18 74:17,24 88:22
88:24 188:2,5 197:14
**certain** 16:21 20:11
45:21 49:22 58:7
72:12 94:9 105:22
114:14 125:16
135:20 178:16
185:24 193:4,9 194:6
202:5 204:3
**certainly** 24:19 48:4
59:10 62:14 67:5
70:16 71:23 86:19
87:5 110:4,9 145:12
155:5 168:4 173:16
173:17 188:13 196:6
**certified** 4:12 120:22
140:11,14
**certify** 218:11
**cetera** 24:6 83:20

134:2 210:9,9
**chance** 80:11
**change** 19:1 114:23
164:18
**changed** 12:16 13:2
89:19 114:12 166:10
168:3,6 185:10,14
186:2 211:8
**changes** 87:16,17
170:17,20 218:17
**changing** 4:8 115:14
116:2 214:19
**characterize** 189:25
**characterized** 110:3,8
172:12 182:11
**charge** 29:3
**chargebacks** 156:22
161:20
**charged** 68:14
**chart** 4:4
**check** 14:6 19:5 58:24
156:5
**Chicago** 1:19 2:5 45:5
67:8 217:12
**Chizewer** 2:4 9:15,19
9:24 12:17 15:12,17
17:5 18:12 19:22
20:4,10 22:4,20
23:17,22 24:2,14
26:4,9 27:12 30:10
32:18,25 33:9,21
34:17 43:15,25 48:13
52:11 54:7,24 56:4
56:23 57:14 58:12,21
59:6,20 60:3,6,10,13
60:17,25 61:4,23
62:4,11,21 63:10,22
63:25 64:21 66:20
67:3,9,21 68:12,20
69:1,5,7,11 70:19
71:3,17,20 72:4,14
72:24 73:2,7,9 75:23
77:2,24 78:14,23
79:2,17,25 80:7 81:1
81:7,12 82:23 83:5

83:24 84:14,21 87:14
88:4,11 89:24 90:13
90:19,25 92:23 93:19
95:22 96:3,17,25
102:20 104:20 105:8
106:25 107:10 108:1
108:6 109:1,10
110:11,17 111:1,21
112:20 113:4 114:1,6
114:17 115:5,16
116:14 117:16 118:9
118:18,22 119:15
120:14 122:18,23
126:5,23 127:7 132:1
132:4,8,21 133:14,20
135:2,5,10,13 138:17
139:15 140:4,14,25
142:2 143:21,24
144:3,11 145:18
147:19 148:1,9,18,22
150:5 151:17 152:4
152:22 156:15,24
157:5 160:9,21,24
161:2,4,6,9 162:2,8
162:15,24 163:4,19
165:17 167:11,17
168:10,23 169:11,19
170:2,7 171:3,6
172:1,22 173:6,14,22
174:12,24 175:8,14
175:21 176:13,22
177:3,17 180:2,8
181:10,19 182:9,16
183:6,14,22 187:2
189:23 190:5,16,24
191:14 195:11 200:3
200:14 202:10,21
204:5 206:20 207:24
208:5,11 209:5,13
211:5 213:5,16,21
214:12 215:15
**choose** 195:2 196:1
204:3
**choosing** 121:23
200:11

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
GREG HAMILTON – 1/29/2013

chose 29:9 196:21
  197:22 202:5
Christmastime 10:20
circumstances 117:18
Civil 1:15 216:20
claim 13:20 84:19,21
  84:23,25 85:1,3
  194:5 195:5
claims 10:3 13:11 14:4
  14:10,17 15:15,22
  27:2,10 84:20 88:2
  118:7 141:25 142:1
  142:10 193:14,15
  194:9 195:22 196:22
  199:14
clarify 18:6 24:15
  53:16 75:4 199:8
clear 26:22 54:24 61:7
  61:11 67:25 68:8
  69:14 70:2,19 73:2
  77:22 79:18,20 81:3
  82:23 91:11,17 99:14
  108:6 118:12 151:19
  155:7 206:14
cleared 135:14
clearly 69:7 208:21
client 19:23 20:1 24:20
  59:8,12,17 61:20
  69:8 213:22
clients 18:19 19:6
  20:17 62:10,15 69:5
  69:6 198:3
client's 28:24
close 28:13 37:6,20
  44:15 46:9 188:11
closer 211:17
clot 38:23
club 29:19,19
clue 133:22
CMS 82:4 83:13 103:1
  103:5,25
CMS's 102:25
Coach 60:15
coaching 60:14,18
coagulation 206:23

207:7
code 49:10 85:25
codes 85:21 87:20,22
Coding 49:10
Colorado 159:2
column 81:16 83:14
columns 82:5
combined 48:21,23,23
come 40:1,3 42:8,13
  45:5 91:12,14 128:8
  193:10 201:4 205:4
  211:25 214:4
comes 40:11 213:22
comment 35:9 51:15
  113:19 147:21,23
  148:3
comments 35:2 80:3,4
  166:5
commercial 50:11
  203:12
Commission 217:11
common 49:9 147:25
commonly 66:14
communication 54:3
  54:12 98:11,18 99:3
  108:23 138:21 141:4
  150:20
communications 10:7
  10:12,14,16 23:21
  34:8 56:1 98:25
  99:18 106:24 109:12
  119:12 122:13
  139:17,21 141:3,7
  142:4,8
community 39:11 41:9
companies 37:17
  114:15 117:25 128:5
  141:25 142:16
  143:16 144:6 172:7,7
  172:21 176:9 178:14
company 8:22 102:5
  113:13 142:11 164:2
  164:22,23 171:22,23
  171:24 172:11,13,14
  179:19 202:16,20

company's 15:7
comparable 113:24
compare 74:13 104:24
  173:7,10
compared 86:13,16
  89:23
comparing 164:24
  173:3
competitor 44:14
  112:1 113:25
competitors 36:20
competitor's 203:7
Complaint 136:11,14
  136:19 144:19
  145:16 146:7,8
  158:19 159:1,11
  162:13 165:13,14
  172:25 173:3,4,4
  174:11
Complaints 128:4
  163:8 173:8,13
complete 216:14
  218:16
completely 39:19
  69:14 82:1 84:18
  193:6 210:13
compliance 15:4
compliant 201:4
comport 158:9 169:8
conceivable 212:3
conceptual 37:5,22
concern 16:7
concerned 27:6
concerning 25:22
concerns 17:17
concessions 156:23
concluded 215:23
conclusions 87:1
  153:12
conduct 75:1 76:24
  100:16 114:20
  153:13,19 154:3
  167:8
conducted 64:9,13,18
  65:9,14 68:2 75:20

76:13,21 78:5,7,11
  79:1 81:22 105:14
  166:18 176:7
conducting 175:18
confer 118:13 127:3
  132:19
conference 10:15
conferences 141:12
conferred 141:11
confidential 1:11
  106:21
confidentiality 18:14
  18:15,18 20:6 58:16
  58:20 121:7,8,9
confirm 164:12 188:14
confirming 166:24
confuse 29:18
confused 135:13
confusing 44:24
conjunction 5:22
  21:21 97:20
connection 25:19
  31:10 50:21 56:13
  67:4,11 68:21 75:21
  81:14 85:7,10 104:17
  125:17 135:21
  144:21 190:18
consequently 92:9
  94:3
consider 63:14 65:23
  118:24 142:22
  154:13,23
consideration 206:15
considered 195:3
consistent 30:6,14
  209:3
consistently 86:17
consisting 218:13
constrained 36:17
constraint 41:15
constraints 53:24
consult 62:23
consultant 18:9 19:14
  32:3 57:5 58:2
consulting 18:14 21:4

25:21 56:22 57:12,21
59:5 65:12 68:9
118:22 139:10 142:3
**consults** 14:14
**contact** 97:13,17,19,23
98:5 138:4 187:9
213:13
**contacted** 137:19
**contain** 19:9 39:8
**contains** 48:18
**contaminated** 39:21
**contemplate** 143:15
144:6
**contemplating** 205:22
207:6
**contend** 56:21 70:7
**contends** 125:15
**content** 77:15,17,22
78:21
**contents** 138:21,24
**context** 61:12 64:20
66:3 78:7 131:12
140:23 172:3 206:13
**continue** 73:8 79:10
132:14
**continued** 73:18 93:6
**contract** 29:5,9,11,14
30:1,2,3,4 46:19,19
46:20 47:24 48:16,17
48:20,24 49:5 187:14
193:23
**contracted** 30:20
**contracting** 27:18
28:11 30:7 45:6,12
45:17,19 46:13 48:11
65:1
**contracts** 29:25 46:7,8
46:15,22,23,24 47:4
47:8,10,11,12,14
48:25 194:4
**contractual** 30:8
**contradict** 162:12
**control** 116:8
**conversation** 35:12
42:12 50:20 51:25

52:4,14,18,19,24
91:8 109:3 114:9
138:25 142:17 144:8
149:16,19,22 155:6
165:24 183:20
184:10
**conversations** 34:13
34:15 56:5,7 94:17
100:4 107:2 108:10
118:25 139:25 140:2
150:1,8 151:1,21
169:1 183:20 184:6
**conversions** 36:16
**converted** 36:8
**conveyed** 72:16
**copied** 133:12 145:15
**copies** 50:7 128:4
**copy** 8:7 9:6,12 47:20
48:16 216:22
**copying** 147:17
**core** 165:12
**corner** 131:1
**corporate** 45:6
**Corporation** 65:3
124:12
**correct** 7:8,23,24 13:6
13:15,18 14:1 17:4
17:13,14,17,18 23:1
23:22 25:23,24 26:17
26:18,20 27:8,9,11
27:20 34:3 43:9,14
46:15,21 49:8 52:10
52:13 54:13,14,17,18
59:13,19 60:2 62:6
62:10 63:15 71:1,12
73:14 75:12,15,18,19
76:16 82:12 89:14
91:7,15,17,25 96:2
99:25 105:7,14,15,18
105:19,23,24 106:1,2
106:5,6,8,12,13
111:16,17 117:12
121:25 123:6,9,12
124:7,24 125:3,8
126:19,20 127:4

128:12,22 129:1,2,4
129:11 135:4 136:22
139:11,12 143:16,17
143:23 144:10
147:14,24 149:5,8,8
149:17,20,24 150:4
151:2,3,5,6,8,9,11,12
151:16,24 153:13,16
154:21 155:11,12,17
155:18 156:14
165:16 170:6 173:5
174:3 176:21 178:19
181:1,25 182:19
183:21 184:16
185:18 189:17
191:21,22 192:1
195:17,24 197:4
198:6 199:4 200:2
205:2 206:7,8 207:14
215:8 218:15
**corrected** 61:14
**correctly** 73:20 125:23
125:25 133:9 157:4
158:24 159:11
160:17 181:9 192:9
197:16 209:1
**cost** 41:20 70:17 72:22
81:16 115:15 156:1,9
156:11 157:17,18
194:10,12 197:21
200:7 211:14
**costs** 105:6
**couldn't** 40:1,2 196:15
**counsel** 2:2,25 6:7
10:17 56:16 61:3,21
63:7,18 66:19 72:3
107:2,4,12,15 117:20
118:14,20 119:18
121:21 122:13
126:17 127:3,9
132:19 135:17
139:17 141:4,8 142:4
213:19 216:8 217:2
**counsel's** 77:19 115:10
**County** 216:2 217:5,10

**couple** 29:16 30:23
37:19 129:21 138:1
150:19
**course** 15:9 37:4,21
87:18 99:21 136:20
210:7
**court** 1:1 19:10 20:22
25:7 64:6 65:23
79:24 80:16,23 82:25
118:20 127:9 145:9
216:21 218:1
**Courts** 1:16
**cover** 14:25 74:2
180:25
**covered** 78:1 79:6
174:10 192:25
208:16
**covering** 30:3,5
**covers** 73:25 124:15
**co-pay** 194:11
**crazy** 92:4 113:20
**create** 52:9 69:2 71:14
76:24 174:21
**created** 11:23 12:3
25:17 32:24 66:3
68:16,20 69:24 70:25
71:5 79:12 110:1
114:14 131:8,10
198:24 199:2
**creates** 70:4
**creating** 56:2 69:11
72:9
**credibility** 12:20,24
20:16
**credit** 110:16,21,23
111:5,9
**critical** 12:20 141:17
**Cross** 210:9
**CRR** 1:14 217:9
**crystal** 70:2
**CSR** 1:14 216:5 217:9
217:10
**CuraScript** 3:24 8:22
8:24,25 44:13 89:2
187:9

**current** 75:17 179:3
   197:8
**currently** 55:23 67:9
   67:10 194:17
**customary** 103:16
**customer** 28:10 44:12
   53:10
**customers** 37:2 51:7
   52:7 91:10 125:21
   188:24
**cynical** 202:15

**D**

**D** 3:1
**damages** 17:21,23,24
   18:8,10 19:15 66:15
   68:18 71:1 73:3
   80:17 81:4,8
**data** 4:7 42:6 74:1,3
   86:1 88:6 94:3 158:7
   163:24 164:19,21
   165:21 166:11,12,13
   168:12 169:22
   170:10,10 178:10
   185:12,17,20 186:2
**DataBank** 27:3,8
   49:25 50:2,6 75:12
   75:17,21 76:8,13
   85:6,7,16 87:3,6 88:1
   90:4 105:17,22 106:5
   107:24 108:5,25
   109:23 111:7,13,20
   112:8 113:11 124:24
   150:22 151:15,23
   152:13 153:8 154:5
   155:20,23 156:3,20
   157:19,25 158:3,6
   159:22 160:1,7,15,20
   161:15,17 162:20
   163:25 164:5 166:18
   167:8,22 168:2,18,19
   169:7,16,24 170:9
   171:13 172:8,20
   174:8 175:18 176:7,8
   176:10 178:13
   181:17,25 182:6,21

182:25 183:11
   184:12,25 185:1,9,13
   185:21 186:2 196:12
**DataBank's** 151:24
   157:15 165:15,20,21
   166:9 169:9 174:20
**database** 185:21
**date** 7:4,25 8:18 9:3
   23:3 52:4 76:12
   90:18 98:22 114:23
   187:22,22 216:5
**dated** 9:3 184:6,15
   205:1
**dates** 97:7 122:8
   129:20
**Dave** 20:3
**David** 2:4 8:6 63:5,24
   67:14
**day** 1:19 7:16 8:6
   116:25 168:21 189:9
   215:24 217:6 218:22
**days** 70:14 150:13
**DC** 2:10
**deal** 3:25 29:14 37:17
   107:9
**dealings** 191:12
**dealt** 20:13 45:20
   46:14,18,20 47:25
**death** 11:24 12:16
**debate** 190:24
**decades** 172:6
**decide** 20:20,22
   143:19 145:9 197:10
   201:11
**decided** 105:20 155:24
   183:13 184:4 212:20
   212:21
**decides** 201:10
**decimated** 39:10
**decision** 36:23 155:2
   197:16,19,20 198:4
   201:12,13 212:10,11
**decisions** 70:9
**decision's** 144:9
**declaration** 3:14,16

11:9,14 25:7,8,11
   44:9,9 70:25 71:2,5
   71:11,14 72:9,20
   73:4,5 79:24 149:4
   151:2 152:19
**declarations** 11:6,8,10
   11:12,17 24:6,10
**decrease** 91:25 92:3
   93:4,17 114:13
**decreased** 91:7,23
   93:14
**deed** 207:10
**defense** 117:14
**deficient** 16:15,16,19
**define** 35:15 49:24
   50:1 52:25 155:23
   160:7 161:16,18
   171:23
**defined** 155:21 156:20
   160:20 161:21
   162:20
**defining** 183:12
**definition** 96:9,12,13
   156:2 157:17 158:9
   159:20,21,25 160:15
   161:10 179:3 181:17
   185:10
**definitively** 141:18
**demanding** 102:13
**Department** 15:23
   98:1 127:17,19 154:8
   154:10 181:1
**depend** 86:19 196:6
**depending** 115:20,20
**depends** 27:23 187:21
   188:7
**deponent** 216:21
**depose** 67:1,5 80:11
**deposed** 5:22 7:1,3
   168:15,16,17
**deposition** 1:13 2:2 3:8
   3:10,12 4:1 5:1,14,14
   5:15,15 6:3,16,18,24
   6:24,25 7:6,6,7,10,19
   7:19,20,22 8:1,1 10:2

13:9 18:24 24:9,22
   24:24 25:5,5,6,11,14
   25:16,17 28:3,4 32:8
   37:10,12 44:8 45:23
   45:24 47:16 70:15,18
   75:16 81:10 116:21
   116:23 117:1 123:14
   129:23 130:11 131:4
   166:23,25 167:4
   180:17,24 186:8
   190:9 198:14 201:6
   204:13 213:9 214:7
   214:11 215:20,22
   216:3,8,19 218:12,16
**depositions** 1:17
**describe** 175:6,13,20
   176:10,25 177:2,20
   181:15 186:25
   202:18,19
**described** 77:17 114:9
   152:19 153:21 174:6
**describes** 161:10
**describing** 176:23
**description** 187:8
**designated** 16:22
   63:18 65:19 67:24
**desire** 141:25
**despite** 56:15
**detail** 195:9 201:2
**detailed** 175:10,25
**details** 172:24
**determination** 109:9
**determine** 62:24
   104:22 164:10 202:2
**determining** 164:25
**develop** 181:7
**developed** 8:2 10:2
   181:5 194:19 212:25
**developing** 65:3
   212:25
**devil's** 201:2
**diagnosed** 36:4
**DICKSTEIN** 2:9
**didn't** 7:22 8:10 20:14
   23:20 26:22 36:12

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
GREG HAMILTON – 1/29/2013

37:2 40:21,25 41:14
41:17 54:9 59:25,25
69:22,23 76:15,17
83:16,21 92:17 95:1
102:5 107:25 110:6,9
110:13 111:18,24
127:20 134:18,24,25
135:20 136:1,1
142:22,25 143:3,3
145:8 151:11 152:6
152:24,24 153:5,10
154:4,4,9,12,24,25
155:5,8 156:5 158:18
169:4 170:6 173:19
179:7,18,20,22,23
180:6 183:3 200:21
201:14 204:8
**die** 39:17
**died** 10:20
**difference** 28:19,21
40:22 53:1 88:13,14
88:19,24 89:6,22
90:5,21 171:15 189:6
189:21
**differences** 176:12
177:20
**different** 11:21 29:16
30:23 31:5 46:17,18
65:1 80:5 86:10
87:18 90:8,9 116:7
148:23 154:7 165:13
166:15 170:14
182:11,12,12 192:22
201:15 213:25
**differential** 35:5,10
36:18 37:16 41:7
188:18 196:14
197:22 203:9
**differentiation** 40:9
**differently** 152:2,9,13
**differs** 177:9
**difficult** 37:5,21 38:1
39:23
**direct** 127:18 181:16
214:1

**directed** 61:6 67:22
**directing** 20:2,4 46:4
**direction** 68:21 69:3
69:10,12,21,25 77:8
145:15 146:5,17
187:19 199:2
**directly** 46:8 47:11
92:23
**directors** 94:18
**directs** 6:7
**disagree** 32:17 84:18
145:25 161:11 171:5
182:14 213:21
**disallow** 53:20
**disclose** 62:18 63:6
165:3
**disclosure** 24:19 67:15
67:16 140:19
**disclosures** 68:3
**discount** 102:15 105:1
115:21 194:19
196:10,16,20 210:5,8
211:10,15 212:16
**discounting** 210:22
**discounts** 102:17
156:22 158:2
**discourage** 143:9
**discovery** 1:18 130:5,6
**discredit** 40:16
**discuss** 54:9
**discussed** 51:13
137:22 138:20
141:24
**discussing** 52:24 53:3
53:4,5
**discussion** 49:14 79:19
118:17 127:6 138:14
139:6 141:23 149:1
177:23 190:8 213:6
**discussions** 68:4
145:20
**dispense** 200:13
**dispensed** 195:17
**dispute** 193:25
**distinguish** 38:2 68:9

163:15 174:22
**distribution** 15:3
215:6
**District** 1:1,1,16
216:21 218:1,1
**divulge** 123:4
**divulging** 108:22
140:21
**djc@goldbergkohn....**
2:6
**document** 1:5 3:19
5:16,17 6:20 8:5 9:17
11:21 55:1 71:8
74:22 123:20 126:7
130:13 131:2,8,10,13
131:15,21,24 132:10
133:1,4,6,12,13,25
134:1,3,4,6,13 135:3
135:16 136:18,24
146:10 148:12 159:3
180:19 181:3 186:10
186:20,25 190:11,18
198:12,16,22,23
199:9 204:15 205:4
205:11,13 218:5
**documentary** 181:7
**documentation** 12:7
76:24 98:24 99:22
128:12,14 129:18
130:4
**documents** 6:15 7:25
8:2 11:2,24 12:3 25:1
26:1,12,13,16,19,23
26:23,25 54:20 84:8
84:10,12 114:2
128:14,17,19,22,25
131:16 133:24 134:1
147:2,4 173:12
188:15 190:20
**doesn't** 33:11 40:13
60:19 68:8,12 69:1
103:19 104:5 105:1
109:13 140:15
147:25 169:24
209:24

**doing** 14:12 65:4
112:14 147:9,11
151:13,15 155:9
164:24 167:22
**DOJ** 164:5
**dollar** 104:2,16 105:22
**dollars** 104:9,10
203:11 212:5
**don't** 7:14 8:17,19 9:7
10:5,25 11:5,22 12:1
12:9 14:6,19 15:24
16:3 21:10 22:6,11
22:15,16,16 23:14
24:12 31:15 34:4
39:20 42:1,6 44:2
45:1 47:17,19 50:12
51:15 53:16 55:1,7
55:14 56:25 57:3,17
60:17 62:7,13 63:21
64:8 65:17,18,21,22
66:1,16 67:10 69:14
69:16 72:6,10 74:8
76:11 77:1,7 79:25
80:24 82:22 84:12,13
84:18,19 85:2,22
86:19 89:8 90:21
95:20 96:9,16,21
97:2,7 98:3,7,10,21
98:22 99:1,6,7,8
100:15 105:2 110:2,7
110:7,19,24 111:23
112:10,15 113:6
116:16 120:11,19
122:6,9,15 123:18
124:3 128:1,6,8
129:9,10,14,14,20
130:9 132:6,20,23
133:5 134:10 135:24
136:7,15,25 137:8,10
137:16 138:2,20
140:11 142:14,24
143:14,24 144:6,22
145:5,7 147:5,9,11
148:12 150:14,19,23
150:25 151:10

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
GREG HAMILTON – 1/29/2013

152:11 153:15
154:23 155:1,4,13
156:5 157:10 162:4
162:10,17,23 163:6
163:11 167:1,3,6,19
169:6,8 171:24
172:25 175:24
178:20,24 179:7
180:10,13,14 183:17
185:11,16,25 186:4
186:18 188:2,16,16
195:8 196:4,23
198:11 199:17 200:8
203:14,15,18 206:2
206:11,12 208:17
209:16,19 210:1
211:4,7 215:4,6,10
**dotted** 178:17
**downtown** 29:22
**draft** 11:6 24:5
**drafter** 8:12
**dragged** 135:8
**drama** 61:15
**dramatic** 41:7 189:6
**dramatically** 92:10
**draw** 104:17
**drew** 87:1
**drive** 191:24 217:11
**driven** 51:9 53:6
**drop** 37:2,14
**dropped** 115:24,25
**drug** 15:3,7 19:19
  25:22 28:24 48:18
  51:9 53:1,6,23 91:21
  94:5 113:3 114:14
  115:15,20 125:10
  128:5 141:25 142:1
  142:11,11,16,16
  143:16 144:6 152:10
  152:14 156:10
  157:20,24 158:17
  160:3 164:2,22,23
  165:2 169:16 170:15
  170:21 171:17 172:6
  172:21 174:22 176:8

178:10,14 185:2,2
193:10,18 194:9
195:14,15 196:7,11
196:22 202:16,20
**drugs** 19:17,21 31:11
  48:24 106:5 125:11
  125:17,20 138:15
  151:14 152:3,21,25
  153:5 167:23 171:1
  172:13,17 179:15,17
  179:18,20,25 180:1
  189:21 193:23
  195:17 197:3
**drug-specific** 194:22
**DSMDB-3124678vl**
  3:9
**duly** 5:3,5 117:5 216:9
**dying** 11:1
**dynamics** 202:8

___

## E

**E** 3:1,7,23 4:2
**earlier** 34:1,15 46:12
  63:13 78:4 82:18
  114:20
**early** 31:25 98:17
**easily** 61:14
**East** 2:5
**easy** 112:7 132:16
**ECF** 146:22,23
**educated** 41:16
**educating** 117:20
**effect** 114:14 143:11
**efficacious** 40:3,6,10
**efficacy** 38:22
**effort** 76:5 83:18
  113:15,16 167:21
  168:5 202:2,8 204:2
  211:16
**efforts** 174:20
**eight** 189:4
**either** 20:11,21 22:23
  29:20 31:6,25 33:7
  33:18 34:14,14 36:21
  36:23 53:19 153:10
  187:19 203:6,14

210:17
**elaborate** 88:18
**elaboration** 177:9
**elements** 84:19
**else's** 7:19 144:23
  196:17
**employed** 107:8
**employee** 59:22 60:1
  184:23
**employer** 182:5
**employment** 117:10
**enabling** 54:1
**ended** 196:13
**engaged** 51:14 107:24
  125:18
**engagement** 16:5
**enter** 29:25 39:15
**entered** 46:24 47:8
**entire** 28:25 151:24
  169:25
**entities** 52:21
**entitled** 24:16 67:5
  70:8 119:22 177:19
  213:10
**entity** 30:20
**envision** 146:17
**episode** 152:19
**equal** 211:17
**equals** 211:7
**errors** 3:21 133:8
**ESQUIRE** 2:4,4,9,14
  2:19
**essence** 136:10
**establish** 24:18
**estate** 12:8 13:2
**estimated** 18:10
**et** 5:11 24:6 83:20
  134:2 210:9,9
**evaluate** 21:5 157:1
**evaluating** 134:25
**evaluation** 134:20
**eventually** 112:16
**everybody** 196:17
**evidence** 181:7
**ex** 1:6 5:11 212:6

218:6
**exact** 31:15 43:7 79:5
  89:9 98:21 172:24
  178:24 188:17 196:4
**exactly** 19:25 20:25
  50:12 103:22 170:14
  170:25
**EXAMINATION** 3:2
  5:7 55:9 117:7 213:7
**examine** 70:13
**examined** 5:6 117:5
  216:10
**example** 35:22 66:8
  88:20 107:10 111:25
  115:21 116:5 165:23
  174:9 187:24 196:8
  201:5 203:5
**Excel** 9:9,10 83:17
  199:1
**exception** 144:25
**excerpts** 205:12
**exclusively** 74:18
**Excuse** 75:4
**executive** 202:16
**executives** 202:20
**exhibit** 3:8,9,12,14,16
  3:18,19,23 4:1,2,4,6
  5:1,14,14 6:18,24,24
  7:6 8:1 24:22,24 25:5
  25:5,6,11,12,14,17
  25:17 28:4 35:13
  37:10 44:8 45:24,24
  47:16 71:6,7 73:13
  123:14,18 130:11,17
  130:20 136:5,10
  144:20 145:17 146:5
  146:10,11,18 147:14
  148:17 149:4 180:17
  180:24 186:7,8,14
  190:9,15 191:10
  198:14,19 199:21
  204:12,13,19 208:19
  212:18 213:9 214:7
  214:11
**exhibits** 25:16

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
GREG HAMILTON – 1/29/2013

**exist** 151:11
**existed** 86:22 89:7
**exists** 89:22 90:5
**exorbitant** 197:24,25
**expanded** 214:16
**experience** 188:22
  189:12
**expert** 12:22 13:23
  14:3,8,16,20,24
  15:11,15 17:3,7,8,12
  17:20,21 18:8,9,15
  19:14 21:4 25:22
  56:16,22 57:1,4,8,13
  57:21 58:3 59:5
  63:14,19 64:7 65:10
  65:12,15,18,19,20,21
  65:24,24 66:4 67:10
  67:17,24 68:10,10,13
  68:25 69:1 139:10
**expertise** 15:1
**expire** 76:10
**expired** 75:14
**Expires** 217:11
**explain** 11:8 12:17
  38:10 45:8 52:15
  136:12,23 137:1
  147:13 153:18 161:4
**explained** 103:17
**express** 8:25 21:22,22
  27:17 28:1,9 30:15
  30:17 31:23 44:12
  45:4 66:4 89:1
  184:24,24,25 185:8
  185:14 186:6,20,21
  187:16 191:12,20,24
  192:3,7,16,21 193:11
  195:13,13 196:1,21
  197:1,8,10 198:2
  199:3,5,14,24 212:9
**extent** 56:4 57:11
  66:20 67:3,9 68:20
  72:14,16 74:16 77:2
  81:8,11 86:1 100:1
  102:17 107:3 108:7
  108:11 109:5 147:17

151:13 210:21
**external** 117:20
**extra** 58:9
**Eye** 2:10
**e-mail** 3:24 4:3 8:7,12
  8:16,18,20 9:3,6,9,13
  187:4
**e-mails** 133:25 187:7

---

## F

**fact** 7:12 18:23 28:22
  42:3 63:6 77:25
  93:13 110:21,23
  111:25 117:24
  139:13 140:20 185:5
  192:6 211:21
**factor** 4:5 8:23 16:8,10
  16:14,16,18,22,25
  17:3,8,9,12,17 21:15
  28:10 29:7 32:23
  36:5,7,22 38:22 39:2
  41:20 43:1 48:5,7,8
  48:11 63:15,19,24
  64:2,7,11,15,19,25
  65:5,6 85:13,17
  99:16 102:4,9,18
  103:20,23 115:24
  116:3 125:6 196:9,19
  197:4,12,13 198:5
  199:7 200:13 201:1
  201:19 202:4 211:23
  212:23
**factors** 78:6 98:13,20
  99:15 100:2 101:5,11
  101:18,24 103:7
  104:19 204:4 210:21
**facts** 173:9
**factually** 62:24
**fact-based** 57:18
**fair** 55:2 107:16
  135:10 138:18 142:6
  144:2 145:13 173:6
**fairly** 137:24,25
  141:19
**fall** 137:9
**false** 13:11,20 14:4,10

14:17 15:15,22 84:20
  94:3 141:25 142:10
  162:1 203:14 210:17
**familiar** 25:15,15
  94:20 100:19,22
  130:24 172:10
  198:23
**familiarity** 181:6,14
  195:7
**far** 40:18 41:9,11
  125:20 206:14,18
**fashion** 56:13 63:8
  70:5 78:12 79:14
  98:19
**fault** 174:14
**fax** 171:18
**FDB** 157:19
**February** 217:6
**Fed** 212:6
**federal** 1:15 13:17
  43:6 100:10,14 113:9
  201:4,7,8,9
**fee** 12:11
**feeds** 185:13,17,20
**fees** 56:12,17,17,19
**felt** 20:14
**female** 82:11
**field** 158:8 185:14
  186:1
**figure** 66:8 197:15
**figured** 198:24
**figures** 83:15 90:10
**file** 1:5 12:18 84:16,22
  84:24 85:2 99:13
  131:15 134:2,6
  141:17 147:18
  168:13 173:3 178:10
  184:4 190:19 202:9
  218:4
**filed** 25:7,12 79:24
  80:14,23 128:4
  137:13,14,18,23
  155:16,19 159:2
  167:23 168:9 171:11
  203:25

**files** 99:17 128:25
  129:17,24 130:3
  131:5,22 133:1,25
  136:14,24 146:12,13
  147:14 173:13 205:4
  205:10
**filing** 21:5,7,14,21
  22:3,8 154:13 183:2
  207:6
**fill** 178:10,21 179:23
**final** 24:5
**financial** 57:11,23
  59:3
**find** 12:22 58:16 86:5
  86:12,15 87:11 89:5
  211:13,17
**fine** 148:21 214:2
**finish** 114:5 124:3
**finished** 82:6 130:20
  191:3,8 204:19
**FIRM** 2:18
**first** 5:5 10:1,24 12:18
  22:22 27:3,8 41:14
  44:9,23 49:22,25
  50:1,4,6,10 55:18
  65:17 75:12,17,21
  76:8,13 81:1 84:16
  84:22,23 85:2,6,7,16
  87:3,6 88:1 90:4
  105:17,22 106:4
  107:23 108:4,25
  109:16,23 111:6,12
  111:20 112:22
  113:11 114:19
  122:11 124:1,5,9,23
  129:7 130:2 131:24
  133:4 137:4 138:4
  139:20 141:17 146:9
  147:18 150:22
  151:14,23,24 152:12
  153:8 154:5 155:20
  155:23 156:3,20
  157:15,19,24 158:3,6
  159:10,22,25 160:7
  160:14,19 161:15,17

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
GREG HAMILTON – 1/29/2013

162:20 163:25 164:5 165:4,15,20,21 166:9 166:17 167:7,22 168:1,18,19 169:7,8 169:15,24 170:9 171:13 172:8,20 173:3 174:8,20 175:18 176:7,8,9 178:13 180:17,24 181:8,17,24 182:6,21 182:24 183:11 184:12,25 185:1,9,13 185:20 186:2 190:18 196:12 197:19 199:8 201:2 214:17 216:9

**five** 16:23 86:17 143:14 188:12 189:1 189:3,11,16

**five-year** 74:5

**fix** 113:16

**fixed** 102:6,13

**flip** 123:19

**flipped** 213:24

**floor** 35:13

**Florida** 2:22 101:4,6 101:10,19,22 102:2

**focus** 88:7,10 124:1,5 169:25

**focused** 90:4 151:7

**focusing** 206:10 208:19

**following** 2:2 44:11

**follows** 5:6 117:6

**follow-up** 55:18

**forced** 145:23

**foregoing** 216:3,13 218:12

**forget** 58:5 165:25

**forgive** 97:18

**forgot** 9:16

**forgotten** 161:14

**form** 11:21 15:12 17:5 22:4,20 26:4,9 27:12 30:10 32:18,25 33:9 33:21 34:17 36:7

38:23 43:15,25 48:13 52:11 56:13,23 57:14 58:12,21 59:6,20 60:3 61:23 62:4,11 62:21 63:8 64:21 66:24 70:4 71:3 75:23 78:12 79:14,23 87:14 88:4,11 89:24 90:13,19,25 93:19 95:22 96:3,17,25 98:19 102:20 104:20 105:8 108:1 110:11 110:17 111:2,21 112:20 113:4 114:17 115:5 117:16 122:18 126:5,23 131:19 133:14,20 144:11 145:18 147:19 148:9 150:2,5 151:17 152:4 152:22 156:15,24 157:5 160:9,21,24 162:2,8,15,24,25 163:4,19 165:17 166:3 167:11,17 168:10,23 169:11,19 170:2 171:3 172:1,22 174:12 180:2 181:10 181:20 183:6,14,22 187:2 189:23 191:14 195:11 200:3,14 202:10,21 204:5 206:20 207:24 209:5 211:5 214:12

**formed** 27:10,14 74:16 151:1

**former** 202:16

**forming** 116:12

**forms** 149:22 179:5,23

**formula** 42:22 104:3 114:13 115:15 116:3 202:5

**formulas** 134:16

**forth** 72:21 73:14 84:9 156:3

**found** 87:16 211:22

**foundation** 74:23 81:15 115:16 116:14

**founded** 74:18 156:13

**four** 74:1,2,5

**frame** 45:4 98:8 101:24 102:2 114:8 120:12 150:15

**frames** 192:9

**frankly** 102:8 203:19

**fraud** 110:1

**free** 39:19 56:8

**front** 18:7 42:6 44:2 60:7

**FS** 208:23

**fulfillment** 27:19 28:12

**full** 60:11 82:17 115:23 210:5,6 212:20 214:19

**function** 82:17

**further** 54:22 113:17 117:6 213:7 215:18

**FYI** 214:22

———————————

**G**

**G** 2:4

**gain** 120:8

**gained** 120:1

**gather** 129:18

**gathering** 128:22

**Gee** 92:6 207:8

**general** 64:3 99:10 115:11,18 116:12,16 116:17 120:12 184:13 202:23

**generalities** 115:2,7

**generality** 116:6

**generalization** 210:25

**generally** 210:18,24,25 211:1,10,11 212:19

**Generals** 97:21

**gentleman's** 74:19

**Georgia** 2:20

**getting** 41:24 70:11 112:9 146:16 168:20 185:13,17,20

**GH-DFP1-000294** 4:4

**GH-DFP1-000297** 4:6

**GH-DFP1-000311-0...** 3:19

**give** 6:13 16:1 19:6,23 19:25 26:22 60:10 63:1 66:8 67:13 74:12,14 82:16 106:25 111:25 114:19,25 115:2,18 116:4 122:8 178:4 194:11 196:24 201:10 208:14 209:11 212:4 214:15

**given** 83:19 84:14 104:18,25,25 107:3 127:16 158:23 159:16 164:1 170:10 175:2 193:23 218:13 218:16

**gives** 74:11

**giving** 65:21,24,25 175:10

**glean** 87:25

**go** 20:22 29:23 34:21 37:18 39:18 47:3 49:13 60:15 73:9 75:5 81:18,19 83:5 107:12 108:16,17 118:16 132:21,25 146:21 148:7,24 163:19 171:18 174:18 177:22 185:23 192:12 195:8 202:25 207:9

**goes** 29:2 70:22 173:12 194:3 207:10 213:23

**going** 5:23 6:5 8:8,11 19:23 20:8 21:1 23:17,19 24:17 36:16 36:21 39:21 55:15 56:4 60:18,19 63:3 65:21,23 66:20,23 67:17 69:23 70:7,15 70:21 107:15 113:18

114:3 132:14 140:6
141:9 154:10 161:4
164:7,10 174:16
175:24 176:2 180:15
192:3 199:24 200:6,6
212:14
**Goldberg** 2:3 82:11
83:11 103:2
**gonna** 37:18 55:5,6
67:15 68:2,4 69:22
70:1 71:22 83:5,24
105:21 113:20
120:22,22,23 132:19
136:21 139:15,17
140:19 141:14 142:3
145:22 146:2 154:12
191:24 194:10 199:6
199:7,15 203:21
210:6,7,10
**good** 56:25 83:17
94:11 145:4 157:8
196:18 201:16
203:22 207:10
**gotta** 126:24 135:7
207:9
**gotten** 41:4
**government** 43:6,7
112:16,23 113:2,15
113:22 155:8 200:19
201:9
**great** 24:21 35:7 36:18
67:17
**Greg** 1:7,13 3:3,10,12
3:14,16 5:4 67:11
117:3 181:4 182:20
218:6,11,19
**gross** 198:9,21
**group** 49:6
**grouped** 49:1
**growth** 35:20 36:13,17
**Grundy** 216:2 217:5
217:10
**guess** 37:11 39:24 57:6
57:7 121:14,15
129:14 205:6

**guessing** 137:6
**guidance** 82:13 83:7
**guided** 103:1
**Guiheen** 31:1,9 34:9
34:16 37:1,8,25
41:13 42:12 50:15,21
51:11,16 53:13 54:4
54:9
**guy** 29:18,19,21 57:2
207:16
**guys** 30:23 82:17
**guy's** 29:20

**H**

**H** 3:7
**hadn't** 41:16
**half** 16:2,2 188:6,7,9
**Hamill** 4:8
**Hamilton** 1:7,13 3:3,8
3:11,13,15,17 4:1 5:1
5:4,9 6:18 9:13 10:19
20:9 23:11 24:22,24
25:6 34:8 47:7 49:17
54:22 55:11 61:9,10
61:18 63:8 64:5 65:9
67:1,4,11,23 70:4,15
70:25 72:21 79:9,11
81:14,22 85:5 93:3
108:22 117:3,9 119:2
120:25 123:14 130:7
130:11 149:4 158:19
161:10 173:19 181:4
182:20 186:7,8 190:9
190:15 191:3 198:14
204:12,13,20,25
205:19 213:10 215:4
218:7,11,19
**Hamilton's** 61:6 69:7
80:16
**hand** 103:22
**handed** 26:11 171:12
**happen** 39:16,20 70:21
192:6,10
**happened** 52:3 53:11
53:12 57:25 129:21
193:12

**happening** 70:21
153:25 211:12
**happy** 18:23 67:13
68:5 148:20
**harbor** 29:23
**harm** 92:8
**harmed** 92:2,7,15 93:4
93:7,17
**hasn't** 68:18 113:2
126:13
**hauled** 168:9
**haven't** 20:5 56:19
82:2 89:19 113:7
130:22 135:23 149:9
163:21 211:25
**hd** 98:18
**head** 15:20 42:1 175:7
**headed** 3:20 4:4
**headings** 83:14
**health** 27:18 28:12,24
29:1
**Healthcare** 49:9 210:8
**hear** 32:13 60:20
176:18
**heard** 146:22,23,25
**hearing** 5:23 12:21
23:12,16 24:18 55:19
56:8 66:4 67:12 70:5
70:7 77:20 79:14,16
80:2,9 81:2,4,10
84:22,24 118:19
127:8 129:22 190:19
215:21
**hearing's** 68:2
**hearsay** 96:8,10,13
**Heidi** 84:15
**help** 18:9 19:14 21:13
195:6 207:2,8,16
**helpful** 9:21 21:12
199:10
**Hemofil** 39:1,1 48:6
**Hemoglobin** 1:9 2:12
218:9
**hemophilia** 4:9 16:20
16:23 28:2 38:20

48:4 185:4 191:25
192:6,14,20 193:3,7
193:14,18 194:13,18
196:2,6 214:20,23
**hemophiliacs** 35:23
39:9,18
**hemophilia-related**
46:7
**hereinabove** 216:16
**here's** 194:12,24
214:22
**hesitating** 75:25
**he'll** 74:12
**he's** 31:5 56:5 61:21
62:2,10 66:21 67:23
67:24 68:8,14,16,20
69:9,15,17 79:20,22
80:1 118:25 140:19
141:12 145:22
190:16
**hide** 81:13
**higher** 40:23 41:1 42:3
54:2 125:21
**highest** 31:8,10
**highlighted** 157:13
198:19
**highlighting** 198:21
**highlights** 198:20
**HIGHLY** 1:11
**hire** 14:14
**hired** 14:16 17:12
**historical** 74:12 86:1
**histories** 85:20 86:6,8
87:2
**history** 184:13,15
**Hmm** 101:4
**hold** 72:24 89:20 109:1
118:12 127:2 132:18
136:21 143:21
**home** 208:22,23
209:18,23
**horses** 211:8
**hotel** 55:24
**house** 131:22 133:2
205:10

**hundred** 37:19 114:16
**hung** 137:17
**hurdles** 53:21

### I

**idea** 7:11 10:11 67:23
  107:1,11 131:11
  133:3,18 134:3,5
  135:19 146:11,14,19
  146:20 203:22
**identification** 3:8 4:1
  5:2 6:19 24:23,25
  123:15 130:12 186:9
  190:10 198:15
  204:14
**identified** 45:7
**identify** 18:24
**IGIV** 48:9
**illegally** 145:6
**Illinois** 1:19 2:5 216:1
  217:5,10,10,12
**imaginable** 185:3
**imagined** 9:24
**impact** 101:1 126:14
**impacts** 12:24 169:10
**impaired** 6:12
**impinges** 207:12
**implication** 141:19
  211:2
**implied** 208:24 210:1
  210:2
**important** 12:21
  156:19 168:8 169:17
  169:21 199:22,23
  202:7 204:1
**impossible** 134:18
**improve** 208:22
  209:18
**inappropriate** 70:16
  141:20 153:13
**inappropriately**
  144:23 145:5
**incentive** 59:4
**incidence** 193:4
**include** 29:1,7 158:1
  196:19

**included** 49:10
**includes** 44:10 157:21
  218:17
**including** 36:7 46:8
  56:6 106:7 143:16
  144:7 151:16 188:17
  197:4 198:6
**inclusive** 218:14
**incorrect** 75:13 136:19
  162:21
**incorrectly** 155:10
**increase** 35:10 211:10
**incremental** 62:2
**independent** 32:3
  105:22 139:21 158:4
  210:14
**independently** 213:13
**indicate** 133:11 211:2
**indicated** 25:21
**individual** 30:25 59:9
  84:2
**industry** 1:3 13:24
  14:11,18 138:15
  181:6,15 184:13,14
  202:12 203:2,4 218:2
**inflated** 106:15 108:4
  108:24 109:22
  110:10,22,24 111:6
  111:15,19
**inform** 80:20 148:6
**information** 9:2 10:3
  12:4 19:6 20:15
  24:19 26:1 27:5,6,7
  41:3 44:2 63:2 66:18
  70:4,8 71:24 72:18
  72:22 73:14 74:5,13
  74:15 75:21 79:11,13
  80:15 82:5,17 85:6
  85:24 86:3 87:25
  90:10 94:7,15,17
  101:9 103:18 115:19
  116:17 119:2,17
  120:1 121:16 123:5
  127:15 134:12,15
  135:21,22 136:2,5

  140:9,22 144:20
  145:2,6,24 149:15
  154:11 164:1,8,22,23
  165:6,25 166:6
  168:20 170:12,19
  171:13,16 175:5
  176:5 178:2 183:11
  185:1 187:11,15
  201:13,14,17 203:14
  214:10,18,22,22
  215:11
**informed** 10:19 12:2
**infringing** 119:16
**infuse** 53:18
**ingredient** 200:7
**inhibited** 35:4 36:9,10
  36:13
**inhibiting** 36:20 51:8
  52:20
**inhibitions** 53:24
**initial** 61:5 203:18
  212:25
**initially** 99:15 139:7
**initials** 131:2
**initiated** 139:3
**initiates** 144:8
**input** 134:24
**inquire** 55:5
**inserted** 188:22
**instance** 75:8 147:7
  201:1 212:2
**institute** 194:14
**instituted** 164:5
**instituting** 114:15
  200:23
**instruct** 23:19 71:22
  77:13 118:24 119:3
  120:23 139:15,17
  142:3
**instructing** 23:25
  72:17 78:14 108:8
  109:8,10 132:5,15
  145:21 182:14
**instruction** 77:19
  78:15 121:20 146:2

**instructions** 107:3
**instructs** 72:3
**insurance** 37:17
**intend** 23:11 96:14,19
  96:22
**intended** 36:12 94:2,8
  97:5 104:13,14
**intends** 158:21 159:6
  159:14
**intent** 95:7,12,16,21
  96:23 98:12 100:1
**intention** 162:13
**intentions** 96:15,20
**interacted** 44:13
**interest** 57:11,22,23
**interested** 67:18
  138:13 217:1
**interesting** 50:24,25
  154:22
**internal** 117:19 191:11
**International** 1:10
  2:13,25 218:9
**internet** 44:3 156:3,5
  157:11
**interpretations** 209:17
**interrogatories** 216:10
**interruption** 44:21
  46:1 55:8 123:21
  130:18 180:21 191:7
  204:17,22 209:14
**intervened** 15:23,24
  15:25
**intervention** 164:3,4
**interviewed** 117:19
**intimate** 179:22 181:6
  181:14
**intricacies** 45:9
**introduce** 214:4
**invade** 213:17
**invades** 23:18
**investigation** 158:4
**invited** 45:3,5
**invoice** 105:7
**involved** 17:16 58:11
  103:13 107:23 108:7

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
GREG HAMILTON – 1/29/2013

110:4,5 117:14,18,20
154:9
**In-House** 2:25
**ironically** 168:18
**isn't** 28:21 61:19 91:22
103:17 134:16 170:1
179:24 184:3 188:22
**issue** 20:11 37:6,22
38:1 39:7,11,23 40:9
84:22,23 93:13
118:23 141:17 153:2
153:5,8 165:12 174:6
176:21
**issues** 15:4 84:16
94:19 174:2 208:3
**items** 214:25
**it's** 9:16 12:5 13:13,16
13:20 16:14,22 20:5
23:22 24:19 25:15,15
35:25 37:5,16,22
39:12 42:24,25 44:3
49:22 50:24,25 54:15
57:7,18 58:17 59:10
60:4 61:7 62:9,13,14
66:23 68:7 71:18,23
75:14 79:5 81:3,10
81:25 82:25 83:14
87:4 92:11 95:3 96:8
96:11 101:17,22
103:8 106:17 107:16
107:22 111:23 112:7
113:1,6 114:2 126:11
129:20 134:18 145:1
145:22 147:10
149:11 154:22
155:13,14,15 159:9
160:19 165:20,21
168:4 170:9,10
173:16,16 174:14
180:16 184:9 187:21
187:22 188:9 190:4
194:10 197:3 202:7
202:13 203:2,7
205:12,25 209:16
210:6,16,17,24

**IU** 41:25 42:3 73:18
74:17,24
**IX** 196:9
**I'd** 14:6 21:14 22:23
29:16,23 39:24 41:5
49:21 58:14,16 91:16
111:8 122:1 157:1,7
175:10 188:3,14
189:18 190:6
**I'll** 14:25 28:8 52:25
55:12,13 65:17 72:4
86:14 90:3 101:7
108:21 111:25
112:23 115:9 119:19
119:21 122:20 131:2
136:9 137:2 151:19
157:11 174:18
180:18 183:8 190:4
198:20 201:24 213:2
215:19
**I'm** 6:5,14 8:5,7 13:25
14:15 16:18 17:2,7
18:23 20:4,25 23:17
23:19 31:11 32:20
33:2,17 37:12 41:14
41:15 44:25 47:3
48:5,6,8,19 49:19
50:7 51:18 55:6 56:4
57:2,4,4,5,8 58:23
59:14,22 60:14,19
63:1,3 65:19,21,24
66:6,6,7,17,20 67:13
67:18 69:17 70:1
72:11,12,17 75:25,25
76:20,21 78:14,21,22
78:23,24,25 83:5,17
83:24 85:18 86:21
88:22,25 91:18 92:25
93:12,13 94:21,23
97:7,18,24 101:15
103:12 106:17,21
108:8,8 109:10,11
112:14 114:1 119:11
119:12,22 120:22
121:14 123:24,25

124:18 126:13 128:2
128:13,17,18 129:4
132:14 134:19
136:16 137:6,17,21
139:15,17 141:1,4,9
141:15 142:3 144:15
145:21 146:15
147:12 148:20 149:8
157:3,7 158:20
160:14 161:2,4
163:13,18 164:17
167:13 169:1 172:10
176:2,25 177:1,20
178:3 180:14,15
184:3 186:6,23 189:4
190:7 191:8 197:6
198:23 199:1,9 202:6
203:21 206:14 207:2
207:4 208:13 212:14
212:18,18 215:11
**I've** 18:5,7 32:3 34:13
69:16,16 80:3 81:17
82:6 84:14 97:21
99:9,10 100:13
103:18 114:20,24
126:7,24 129:5
130:22,25 131:6
146:10,23,25 147:12
161:14 163:10,10,11
166:5,23 168:17
169:5 175:1 177:12
177:13,16 198:19
215:18

_____

**J**

**J** 2:4,9
**Jackson** 2:9 3:4 5:8,9
5:21 6:22 9:12,18,21
9:25 12:19,25 15:13
15:21 17:10 18:20
19:7 20:2,7,19 21:2
22:7,24 23:8,20,25
24:3,21 25:3 26:7,15
27:16 30:11 32:21
33:5,15,22 34:20
43:18 44:4 46:3 49:3

49:13,16 52:16 54:10
54:19 55:1 67:14
81:19 190:23 213:4,8
213:18,25 214:3,13
215:18
**jacksona@dickstein...**
2:11
**Jackson's** 65:20
**James** 2:19 116:20
**January** 1:20 4:10
6:25 7:2,13 10:6 13:9
14:2,4 116:25 209:20
215:24
**Jarrett** 2:14 55:11
**jarrett@anderson-ll...**
2:16
**jbreen@breenlaw.c...**
2:21
**Jeff** 29:21 187:7
**Jerry** 95:17,18,18 96:1
96:15
**Jim** 168:17
**job** 1:24 38:24,25 39:2
39:6 40:12 173:7,8
207:18
**jobs** 31:5 32:2 39:4
**Joseph** 2:19 116:20
**judge** 18:7 23:12 57:8
187:1
**Julie** 4:3
**July** 50:8
**June** 217:11
**Justice** 15:23 181:1
**justified** 40:22,25
41:18
**justify** 41:12,15
**J7192** 49:10

_____

**K**

**Kay** 27:3,4,5 149:16
150:2 152:20 153:21
154:11 155:6 165:23
166:19 167:5 168:15
174:20 175:4,17
176:5 177:22 184:11
**keep** 131:22

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
GREG HAMILTON - 1/29/2013

kept 9:8,10
Keys 2:22
kin 217:2
kind 11:21 19:13 34:3
  68:2 79:25 81:7
  101:25 102:11
  144:16 154:13
  202:15
kindly 54:5
Kleiman 12:6 58:10
  59:8,13,22 61:6,19
  61:20 62:19,23 82:18
  82:24 138:5 139:6,21
  139:22 140:3 141:24
  142:18 143:18 144:8
  144:18,22 145:1,14
  145:19,20 146:4,16
  154:21 155:16
  180:25 181:3 205:17
  213:11,13,19 214:4,9
Kleiman's 59:2,17
  61:8,10 143:25
  145:15 146:5
knew 88:14 143:6
  152:18 153:24 173:9
  173:19 174:1 179:19
  197:7,8 199:5,13,23
  200:5
know 8:10 9:7 11:23
  12:1 14:6 16:3,10,24
  19:8 21:13 23:14,15
  24:16 27:24 30:23
  31:13,15,16,19 33:23
  35:11 37:14 38:16,17
  39:16 41:17,21 42:2
  42:16 43:10 45:16,19
  47:21 48:2 50:12
  51:14 52:3 53:20
  55:1,15 57:1,3,7
  58:24 60:23 62:7,13
  63:1 64:24 65:17,19
  65:21,22 66:1,16
  67:12,14 68:12 69:15
  74:8 79:25 80:19,24
  82:4,22 84:12,13

85:22 87:8,10 95:6
95:12,15,18,20,21
96:9,16,21 97:2 98:7
99:1 100:1,12,15
102:10 105:2,5,12,16
105:20 110:2,7 116:7
118:6 119:12,18
120:19 122:6,9,15,16
122:21 123:10
126:21 127:24 128:1
128:6,10,19 129:9
131:8,10 132:7,12,13
132:23,25 134:10,21
135:24 136:1,4,7,15
136:16,25 138:2
139:20,22 142:24
146:12,15 148:12
154:4,5,9,12,23
155:1,13 156:6 162:4
162:4,10 163:2,11
165:9 166:8 167:7
168:15,25 169:6
171:24 172:6,24
174:15 175:24 177:2
178:5,22 180:10,13
180:14 188:16,16
190:5 191:4 194:5
197:14 200:8 201:3,6
201:18 202:16,17
203:5,7,8,8,15 206:2
206:14,18 208:13,17
209:16,19 210:1
215:4,6,7,10
knowing 197:12,20
201:17 212:20
knowingly 125:18
knowledge 33:18
  66:18 68:14 72:15
  82:20 83:22 95:9
  96:23 112:25 121:18
  127:18 140:12
  179:22 181:5 184:14
  184:18 202:1,12
  203:2,4 209:4
known 70:14 74:19

100:20,22 114:15
141:15,16 172:7
201:19
knows 96:2 197:1
Kogenate 125:5 206:5
  208:4,23 209:22,24
Kogenate's 206:7
Kohn 2:3 82:11 83:11
  103:2

_____
L
labelers 157:22
large 169:10 189:8
Larry 30:25 34:8,13
  34:22 41:13 42:12
  50:15
Larry's 31:4
LaSalle 1:18
late 31:25 120:6,7
  122:14
launch 90:23 189:5
launched 49:20
law 2:18 22:3 100:6
  127:17,18 154:8,9
  201:5
lawsuit 116:13,18
  117:10 136:6 154:14
  155:16,19 167:15,24
  168:9,13 169:10,18
  170:1 171:11 173:9
  183:2 184:4 202:9
  205:5,19 207:6
  215:14
lawsuits 113:9,10
  139:10
lawyer 63:4 67:22
  109:11 121:14
  163:18 208:13
lawyers 8:11 19:14
  56:6 57:7 58:17,25
  59:9 66:21 68:5,21
  69:3,21,25 72:17
  107:6,20 108:8 109:4
  109:6 119:1 120:15
  128:8 142:9 145:4
  147:17

lay 66:3 68:10 82:4
layman 16:12 17:1
leads 75:10
learned 27:2 120:13
  120:15 122:3,11
  149:16 174:6,19
  175:17 176:5 207:20
learning 151:22
leave 8:11 60:13,19,21
  143:12 144:5
leaving 38:14
leeway 84:15
left 116:20 125:24
  197:23
legal 71:15 85:11 96:9
  140:23 146:21 147:4
legitimate 145:3
length 16:4
letter 112:8 171:18
  180:25 216:22
let's 21:25 23:2 42:20
  49:13 73:8 79:7
  81:19 84:25 88:21
  97:11 112:2 124:1
  132:25 145:13 146:9
  148:24 186:5 187:6
  192:12 201:23
  202:25 210:18
  211:23
level 35:8 94:9 116:9
  174:9 208:24 209:25
  210:6
levels 125:20 211:23
LexisNexis 146:24,25
  147:2,7
life 147:1 168:22 189:9
likewise 154:20 189:14
limit 201:8
limits 201:7
line 4:12 28:8 33:23
  37:12 75:10 114:5
  151:24 178:18
  205:18
Linnette 1:7 10:7
  25:25 26:11,14 218:6

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
GREG HAMILTON – 1/29/2013

Page 17

**list** 91:14 103:10,12
109:23 110:10,22,24
111:19 151:5 156:20
157:23 160:2,4,5
165:3,5 166:2,2,2
174:2 179:11 194:19
194:24 215:6
**listed** 125:5
**listening** 157:7
**listings** 146:21
**lists** 74:5 104:1
**litigation** 1:4 68:22
130:6 135:18 218:3
**little** 40:15 44:24
55:13 73:18 74:24
92:4,13 107:1 193:25
195:6 214:15
**live** 10:12
**lived** 29:22
**lives** 193:1,5
**LLC** 2:14
**LLP** 2:9
**locate** 99:22
**located** 187:10
**long** 31:23 144:16
157:8 214:21
**longer** 54:16 61:7
164:6,21 197:6
**long-winded** 174:14
**look** 22:22 28:3 29:23
37:10 45:23 48:17
49:21 54:5 58:14
60:6 71:6 81:1 84:14
88:20,21 99:2,17
100:5 104:23 123:17
130:16,24 140:14
141:14 148:16 157:8
179:2 180:18 183:10
185:9,12 186:6 188:3
189:18 190:14
204:11 207:16
208:19 211:16,22
**lookbacks** 74:12
**looked** 205:11
**looking** 35:21 72:20

86:23 87:8 124:9,18
125:9 135:22 149:14
164:11 190:16
**looks** 131:16
**lost** 203:23
**lot** 84:14 100:14
209:16
**loud** 157:17
**low** 196:13
**lower** 53:22,22 93:24
115:15 165:10
210:14
**lowered** 91:10 92:12
92:12 93:22,24
**lunch** 114:4

---

## M

**M** 39:1 48:6
**MAC** 103:15
**mail** 191:25
**major** 44:11
**majority** 125:21 189:8
189:8
**MAK** 205:1,15
**makers** 118:3 119:13
120:10 121:2 122:4
122:12 126:3,18
**making** 41:2,3 120:4
141:16 173:6 182:10
198:4
**man** 96:5 106:3 168:17
**manage** 193:2
**management** 91:6
**manager** 65:1 193:11
**managers** 44:14,18,24
**manipulation** 163:3
163:23 174:7
**manner** 125:15
**manufactured** 33:19
33:24 196:8
**manufacturer** 156:10
157:21,25 158:23
159:16,24 164:9,18
169:16 171:12 176:8
**manufacturers** 28:11
46:8 47:11,12 118:8

120:4 125:17 157:22
158:6 164:6 165:22
166:12
**manufacturer's**
156:12 157:20 160:2
**manufactures** 31:17
33:7
**manufacturing** 33:13
**man's** 95:24
**March** 5:24 23:12
55:20 66:5 67:12
81:5
**Margaret** 1:14 216:4
217:9
**margin** 198:5,9,21
199:6,15 200:25
201:11 208:23
209:22,23 212:2
**Mark** 12:6 82:18,24
138:5 180:25 205:17
**marked** 5:2,13 6:19,23
24:23,25 25:4 71:6,7
123:15,18 130:12,16
148:16 180:16 186:9
186:13 190:10,14
198:15 204:12,14
**marker** 51:3
**market** 34:24,25 38:14
39:24,25 40:17 73:23
74:7,8,11,14,19 75:7
91:12,18 93:23 112:6
153:25 167:10
189:10 197:2,13
202:4 214:23
**marketing** 15:2 17:8
31:20 33:12,14,16
38:15,15,18 63:15,19
64:6,7,11,14,19 65:5
125:19
**marketplace** 50:11
85:13 188:23 211:12
212:21
**Markets** 4:8 205:13
206:12 214:19
**marking** 172:20 186:6

**markup** 164:10 165:15
165:20 166:11
168:20 171:22,23,24
172:7,11,12,14
173:20 174:2,2,6,21
176:21 177:11,25
179:19,25
**markups** 176:7
**Martha** 95:17 96:20
97:4
**MASSACHUSETTS**
1:1 218:1
**Master** 1:5 218:4
**materials** 33:13,14,17
56:2
**math** 104:22
**matter** 5:11 8:20 15:1
22:16 28:22 44:10
55:19 65:13 70:6
80:6,7 111:24 129:17
211:21 213:19 214:6
**matters** 14:23 15:10
15:14 16:5 25:19,22
55:18
**may** 9:22 15:20 55:2
65:10,10,15 79:4
81:6 99:12 107:13
115:22 119:17 131:7
140:25 145:20
159:12 160:6 163:12
188:6,6 192:2 208:24
209:25 212:4 214:20
**McNeill** 95:17 97:4
**McNeill's** 96:20
**MDL** 1:4 3:23 4:2
147:7,7 168:17
190:21 218:3
**mean** 15:5 17:22 33:6
35:16,18 36:11,14
38:4 41:8 46:23
47:19 51:13 52:14
56:25 59:12,14 64:16
66:7 69:5 76:1 87:20
88:18 90:1 99:6
100:7,18 105:1

108:17 111:8 118:5
128:14 135:6,11
138:8 140:14 143:3
145:8 164:3 175:1
186:15 190:1 192:2
203:3 210:2,15
**meaning** 162:14 179:6
**means** 16:21 53:8
68:13 120:15 195:4
215:5
**meant** 9:15 38:6,10
47:4 156:7,8 158:12
193:14,15 194:15
**mechanisms** 89:22
90:1
**Medicaid** 15:3 19:16
21:4,6,14,18 22:2,9
22:18 23:3 43:23
66:11 68:17 78:5,12
79:12 80:17,21 81:23
91:24 92:2,13,14
93:3,6,16 94:1,8,18
94:18,24 95:7,12,15
96:23 97:5,14,17,20
98:1,6,12,19 99:8,11
99:18 100:20 101:2
103:25 114:12
115:13 125:18
134:16 158:22
159:15 200:10,16
202:3 210:10
**Medicaids** 43:24
102:17 103:7 201:17
201:18 204:3
**medical** 97:20 193:8
**Medicare** 42:16,21,21
42:22,24,24,25,25
43:7,14,20 54:17
106:11 200:22
210:10
**medication** 6:11
**Medi-Span** 111:12
**meet** 45:6 97:25
**meeting** 35:8 45:8
50:14 191:17

**meetings** 191:17
**mega** 113:2,8 114:15
**member** 193:24
**members** 71:15
**memo** 204:25 205:16
206:4,11
**memorandum** 4:6
213:10
**memory** 86:25 126:1
196:20 198:13
**mental** 79:5 96:24
**mention** 151:10
**mentioned** 12:6 17:20
69:15 91:4
**merely** 94:23 156:21
165:5
**merit** 105:14
**merits** 84:23
**met** 30:25 31:8 44:25
137:21 154:21
**method** 114:23 116:3
**methodologies** 65:4
80:21 103:11
**methodology** 15:4,5,6
43:21 164:5,18
166:10
**Michael** 2:25 5:10
**mid** 129:12
**middle** 124:19 149:20
150:4
**mid-sentence** 125:24
**Mike** 201:5
**million** 80:17 193:1,5
203:11
**mind** 55:7
**mine** 198:20
**minimum** 162:12
**minus** 102:10,14
103:15 115:25 116:1
194:20 196:3 197:11
**minute** 37:18 195:8
**mischaracterize** 161:5
**mischaracterized**
165:19
**mischaracterizes**

161:8,9
**mischaracterizing**
171:6
**misconduct** 208:16
**misinterpreted** 199:9
**misrepresentation**
144:7
**missed** 212:15
**missing** 52:14 95:24
**misspoke** 23:6
**misstate** 203:19
**misstated** 81:17
**misunderstood** 162:20
**molecule** 32:14,14,23
32:23 33:3,4
**moment** 72:10 106:22
157:12 209:11
**money** 58:9 59:13,19
60:2 61:22 62:3
200:7
**monitored** 76:7
**Monroe** 2:5
**month** 11:1 129:25
135:12 137:7
**months** 34:25 138:1
150:19
**Morgan** 27:3,4,5
149:16 150:2,10,21
151:22 152:20
153:21 154:11 155:6
165:23 167:5 168:15
174:20 175:4,17
176:6 177:23 184:7
184:11
**Morgan's** 166:19
**move** 54:6 70:1 80:24
84:25 113:11 190:4
**moving** 148:18,23
190:5,7
**multiple** 47:8 59:9
141:12 150:12
214:21
**multiplier** 58:6

**N**

**N** 3:1

**name** 5:9 29:20 30:25
38:16 48:19 55:11
71:18,25 95:15,20,24
185:14 186:1
**named** 168:17 187:5
216:8
**names** 20:16 29:17,24
30:23 45:2,11 48:7
**national** 66:13 82:7
83:15 178:10
**nature** 145:22
**NAUSA** 97:24
**NDC** 85:21,25 87:20
87:22
**NDDF** 178:6,8
**near** 211:25
**nearby** 134:2
**necessarily** 92:8 103:4
103:19 188:18
209:20 210:2
**necessary** 204:8
**need** 35:15 38:21 55:6
61:15 68:3 80:11,24
107:8 118:13 119:17
120:22,24 123:18
132:6,12,12,13,19
195:8
**needed** 20:15 168:13
**needs** 61:11 68:16
80:10
**negatively** 169:10
**negotiate** 47:23
**negotiated** 46:6 47:10
**negotiates** 194:4
**negotiating** 193:15,16
**negotiation** 102:7
**Neither** 58:3
**net** 161:19 178:23,25
179:1,6 186:3
**network** 193:21,24
194:2,6,15,25 195:1
195:2,3,4 199:19
212:17,24 213:1
**never** 17:11 18:5,7
26:1,11,16,19,24

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
GREG HAMILTON – 1/29/2013

Page 19

54:4 69:16 79:21,22
110:13 126:7 146:23
147:12 206:15
**new** 10:2 36:1 38:16
38:16,19 46:24 87:19
87:19,20 148:18
170:5 208:25 210:1,2
**nineties** 98:16 120:6,7
122:14 126:4 184:16
**nonresponsive** 203:20
**non-attorney** 140:9
**non-certified** 140:15
**non-lawyer** 127:21
**Non-responsive**
148:14
**North** 1:18 2:19 31:7
**Notary** 1:14 216:5,12
217:5,10 218:24
**note** 3:20 83:19 133:7
198:20
**Notes** 205:1,19 213:10
215:5
**notice** 3:9 5:15 131:1
133:6 191:23
**notion** 214:5
**November** 25:13 81:3
**nugget** 165:12
**number** 13:25 14:19
37:15 104:1 105:2,3
112:15 149:14 166:1
194:21 196:4 197:22
197:25
**numbering** 3:21 133:8
**numbers** 83:14 89:9
90:8 188:15 199:19
**numerical** 90:9
**numerous** 185:2
**nuts** 112:13
**NW** 2:10

**O**

**oath** 49:18 149:5
218:15
**object** 23:17 56:4
66:20 83:5
**objection** 15:12,17

17:5 22:4,20 26:4,9
27:12 30:10 32:18,25
33:9,21 34:17 43:15
43:25 48:13 52:11
54:7 56:23 57:14
58:12,21 59:6,20
60:3,4,9,24 61:3,23
62:4,11,21 63:22
64:21 71:3,17 75:23
87:14 88:4,11 89:24
90:13,19,25 92:16
93:9,19 95:22 96:3
96:17,25 102:20
104:20 105:8 108:1
110:11,17 111:1,21
112:20 113:4 114:17
115:5,10,16 116:14
117:16 118:9 122:18
126:5,23 133:14,20
144:11 147:19 148:1
148:9,14 150:5
151:17 152:4,22
156:15,24 157:5
160:9,21,24 161:1
162:2,8,15,24,24
163:4,19 165:17
167:11,17 168:10,23
169:11,19 170:2,7
171:3 172:1,22
173:22 174:12,15,24
175:8,14,21 176:13
176:22 177:3,17
180:2,8 181:10,19
182:9 183:6,14,22
187:2 189:23 191:14
191:14 195:11 200:3
200:14 202:10,21
204:5 206:20 207:24
208:5,11 209:5,13
211:5,5 213:16
214:12 215:15
**objective** 64:9,14,17
75:1
**obligation** 140:16
**obtain** 146:7

**obtained** 105:13
119:18 134:4
**obvious** 141:19
**obviously** 48:16 64:24
66:22 80:14 135:25
141:15 143:7
**occur** 70:15 114:9
**occurred** 35:12 56:5
119:1
**offense** 77:16
**offered** 48:20 82:15
165:4
**offering** 161:22
**officer** 65:1
**offices** 45:6
**official** 31:8,10 95:15
98:6,12,20 99:8,11
217:4
**officials** 95:7,12 97:14
97:17,20 99:18 155:8
169:8
**official's** 96:23
**Oh** 92:25 95:17 97:7
97:18 144:15 157:10
163:17
**OIG** 113:11
**okay** 7:5 21:3 28:5,7
29:7 33:16 36:14
38:10 40:8 42:20,21
46:2 52:21 55:16
56:12 58:17 61:4
63:3,17 65:8 67:21
69:6 70:19 73:2,7,13
74:22 79:7 83:24
88:13 89:4 90:3
91:18 92:19 94:12
100:16 101:20
107:17 108:3 109:1
114:6,11 118:16
120:8 123:10 124:9
127:5,11,20,24 129:3
129:16 132:5,21,25
134:4 137:24 138:3
139:2,13,15 144:2,18
145:13 147:13 149:3

149:14 150:24 151:4
152:16,18 153:11,15
153:22 155:19
157:10 161:7 172:19
173:6 176:2,4 180:22
182:17,22 183:2
184:9 186:19 189:14
190:4,7 191:5 192:14
192:15,19 193:12
194:8,13 195:10
197:1,10 200:10
201:8 202:7,25
203:23,24 204:23
205:9,15 207:5,15
212:14 214:2,18,21
214:25
**once** 86:4
**ones** 15:19,24,25 18:4
18:11 24:13 52:20
87:18 98:4
**One's** 187:7
**operation** 195:14,16
**opinion** 64:10 65:10
65:15 66:3,7 73:22
74:17 94:7 96:19,22
102:24 115:3 152:6
153:18 156:13
183:25 209:19
**opinions** 65:18,22,24
65:25 68:11 96:14
**opportunity** 67:1
70:13 177:1 181:7
**opposed** 77:15
**opposition** 181:16
**oral** 216:10
**order** 1:11 18:21,23,25
29:14 52:8 54:5
70:12 119:15 138:21
191:25
**ordered** 19:10
**organization** 45:16
49:1
**organizations** 23:4
**original** 3:22 119:23
120:21 133:8 159:1

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
GREG HAMILTON – 1/29/2013

182:19
**originally** 36:21
**outcome** 57:12,23 59:4
**outside** 104:16 118:19
   127:8 146:4,15 174:5
   207:19
**overall** 28:24 53:8
**overpay** 94:4
**overpaying** 92:10,10
**O'Malley** 45:1

**P**

**package** 87:21
**page** 4:12 28:6 37:11
   37:11 54:25 123:25
   124:6,8,9,14,19
   136:2 187:8 191:23
**pages** 1:25 55:2 81:2
   124:1,5 214:21
   218:14
**paid** 15:8 41:24,25
   42:24 43:24 52:21
   56:12,16,17,19 59:3
   61:21 62:2,19 63:7
   66:12 74:24 91:20
   93:25 101:10,17,23
   104:2,23 106:10
   125:22 158:22
   159:16,23 161:18
   203:12
**paper** 131:19,22
   212:15,15 215:1
**paper-clipped** 134:7
**Paradigm** 4:9 214:19
**paragraph** 3:20 44:10
   44:10 45:24,25 46:5
   47:16 72:21 73:11,13
   73:16 124:19 125:10
   125:14 133:7 149:14
   151:7 158:20 181:9
**paralegal** 80:14 82:3
   82:11,18 83:3,8,9,11
   103:2
**parenthetical** 125:9
   133:7,19
**Parkway** 2:19

**part** 15:9 28:23 42:24
   42:25 43:1,20 48:8
   50:23 58:15 91:8
   95:3,5 101:23 102:7
   102:7 111:5 113:15
   116:17,17 128:21,23
   128:23 136:20,23
   149:23 155:15 185:3
   192:19 194:2,6 195:1
   195:2,14,15 214:17
**partially** 143:2
**particular** 14:13 17:25
   19:17 34:23 48:20,24
   49:2 62:8 66:10
   138:16 161:22
   163:25 165:1 192:10
   201:11
**particularly** 210:4
**parties** 24:16 70:23
   80:11 128:12 129:1
   217:3
**party** 80:10 137:22
   138:7
**pass** 55:4 213:2
**passed** 154:11,24
**passing** 213:5
**patient** 16:17,18,19
   38:22 39:9 203:12
   212:6
**patients** 16:15,20,23
   34:3 35:20 36:2,3,6
   36:20 41:19 53:19,21
   53:25 54:1 193:3,14
   193:19
**Patrick** 74:10
**Paul** 187:5
**pausing** 106:17
**pay** 43:1 51:9 53:23
   73:18 101:5 104:8,13
   104:14 156:10 158:2
   194:5,24 200:11
   210:4,13 211:18,19
**paying** 36:25 41:22,22
   42:3,11,16,22 52:22
   74:17 88:22,25

103:19,22 115:23
   193:17 194:10
**payment** 16:16 200:23
**payments** 200:17
**payor** 35:8 36:24 51:8
   53:5 193:18 194:7,8
   194:8 203:12,13
**payors** 41:4,6,16,22
   42:2,11,14 51:5
   52:20 53:15,16,17,18
   53:19,23 54:5 185:7
   193:17 211:13
**pays** 42:21 43:1 53:1,5
   59:13,18 60:2 104:18
**PBM** 29:4 192:16,17
   192:24,25 193:13
   194:3
**PBMs** 29:2
**pending** 140:21
**Pennsylvania** 115:23
**penny** 187:18 188:6,7
   188:10
**people** 8:16 29:3,9
   36:16 37:17 39:17
   44:25 45:7,12,17,20
   46:15,18 52:22 91:20
   103:12 187:6 210:5
**perceived** 57:16
**percent** 12:12,13 13:5
   13:7 16:23 39:25
   42:23 86:18 102:10
   102:16 114:16 172:8
   172:9 188:12 189:1,4
   189:4,11,11,16 196:3
   196:5,24 197:12,12
   198:10 199:16,25
   200:8 212:2,12,23
**percentage** 16:2
   102:15 166:11 193:9
   198:9 199:17 210:11
**perfectly** 67:25 79:18
   79:20
**perform** 59:18 60:1
   80:20 113:13 158:3
**performed** 61:20

79:21,22
**period** 23:2 46:9 76:8
   81:16 86:20 89:4
   90:15 101:13 106:6,8
   106:9,9,13,20 115:20
   116:2 124:15,21
   125:2 150:13,14
   163:24 189:15
**periods** 22:23 74:6
   85:19,20
**permission** 58:25
**Perry** 4:3
**person** 111:11 124:23
   185:3 187:9 199:1
   202:15
**personal** 33:17 68:10
   95:9 136:14 205:10
   209:4
**personally** 40:21
   95:11 121:23
**personnel** 46:16
   191:18
**person's** 71:24
**perspective** 48:10 70:3
   70:3 89:21 93:12
**pertaining** 1:17
   127:15
**pertains** 65:8,15 206:4
**pertinent** 65:10 134:16
   134:19 140:23 157:4
   167:15
**Pete** 45:1,3
**pharmaceutical** 1:3
   13:24 14:4,11,18
   15:2,6 218:2
**pharmacies** 73:17
   74:17,24 91:10 94:1
   102:4 193:16 194:4
   194:16,23 197:24
   198:5 199:6,15,25
   200:12,24 208:22,24
   209:19,23 212:16,22
**pharmacist** 17:2
**pharmacy** 21:17 28:23
   28:23 29:6 41:23

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
GREG HAMILTON — 1/29/2013

51:6 53:1,9 81:16
88:14 192:18 193:11
193:17,21,22 194:15
194:17 197:21 198:1
199:18,20 203:10
211:18,19 212:6
**phone** 10:14 97:25
150:12 166:21,23
217:12
**phrase** 35:17 36:9
207:1,3
**phraseology** 50:2
**phrases** 35:14
**physically** 134:2
**physician** 17:2
**pick** 97:25
**picked** 36:1 194:21
214:25
**piece** 163:12 215:1
**pieces** 169:6
**pills** 29:1
**place** 5:23 24:10 133:4
145:2 216:5,16
218:13
**plagiarize** 144:23,24
145:11
**plagiarized** 144:19
**plaintiff** 13:10,19
14:17
**plaintiffs** 17:24
**plan** 28:24 29:1 55:19
100:20,23 101:1
193:23 194:12
**planned** 66:4
**planning** 12:8
**plans** 27:18 28:12
55:23 65:4 67:10
100:17,18 101:1
192:22,23 193:8
**plasma** 36:7 39:2,7
48:5,7
**plasma-free** 38:18
**played** 116:17
**pleading** 25:12
**pleadings** 11:11 147:8

**please** 3:20 42:9 52:17
55:15 64:12,16 97:18
130:16 133:7 151:20
172:3 175:6 187:1
**pled** 172:20
**plenty** 67:16
**plural** 46:23
**point** 2:19 15:7 20:18
20:25 38:7,8 42:18
43:12 52:14,17,19
57:20,24 60:17 68:15
80:1 89:11 92:12
115:23,24,25 120:8
152:17 164:7 166:9
182:24 189:2 192:10
193:22 196:18 197:7
201:16 204:9 205:22
211:17 212:15
**points** 96:6
**policy** 157:21 200:23
**poor** 101:8
**population** 39:9 193:4
**portion** 49:5
**portions** 136:13,18
145:16 146:8 169:21
**position** 38:14 141:1,2
141:5,15,16
**positive** 128:2
**possess** 133:4
**possible** 59:2,10 62:9
62:13,14 105:10
145:1 147:6,10 168:1
168:4 210:15 212:7
**post-2001** 150:25
184:18
**post-2005** 43:23
**post-2006** 32:5
**potential** 193:2
**practice** 30:14 48:11
**practices** 117:21
125:16 169:9 181:5
**preceding** 174:10
**precise** 66:6 201:25
**preparation** 6:16 7:20
**prepare** 6:2 70:12

77:25 78:1
**prepared** 11:3 23:16
77:14,21 80:9 178:3
**preparing** 56:2
**prescriptions** 27:19
28:13 53:17 193:7
**present** 2:1,24 10:17
32:11 42:20 53:20
90:18 168:21 189:9
197:5 202:3 210:20
216:7
**presentation** 56:3
**presented** 8:9 18:5
70:5,7 79:14 81:14
82:25
**President** 31:6,7,13
**press** 127:20
**pretty** 81:3 175:25
**prevalence** 193:4
**previously** 24:4 25:25
30:24 36:3 117:4
131:13 141:11
180:16 216:8
**price** 1:3 35:5,5 36:10
36:10,13,18,19 37:2
40:21,23 41:1,7 42:8
42:9,11,13 43:2 50:3
50:23,24 51:1,3,5,6,8
52:7,25 53:5,8,9
72:21 85:20 86:5,8,9
86:13 87:1 88:15
89:6 90:6,7 91:9,12
91:14,18,19,20 93:8
93:23,24,25 102:13
102:13 105:13
107:23 112:11 151:5
151:23 156:9,12,20
156:21,22 157:20,23
158:3,17,22 159:15
159:23 160:3,4,5,8,8
160:20,23 161:16,18
161:19,21 164:13
165:3,5,8 166:2,2
174:2 179:1,6,8
188:2,4 189:5 194:24

212:21 218:3
**priced** 189:22 190:1,2
**prices** 54:2 75:2,5,6,7
86:9 87:6 89:19 90:4
106:4 108:25 109:23
110:10,22,24 111:6
111:15,16,19,20
124:23 125:20
142:17 150:22 158:1
158:5 160:16 169:25
170:13 172:21
178:15,23 188:23
197:2,8
**pricing** 4:5 15:3 25:22
26:2 34:9,22 44:14
44:18,24 47:22 50:16
73:14 74:12 75:20
76:7,13 85:12,16
88:1 89:22 90:1,12
91:23 92:3 93:4,14
93:18 102:6 110:1
142:1,11 151:14
152:9 169:17 170:24
174:23 176:9 178:23
187:11,15,25 188:1
188:10 189:10
197:13 201:19 202:4
202:4 208:3
**pride** 110:5
**primary** 165:12
**prior** 7:6,25 21:5,14
28:4 34:7 37:12
54:19 56:15 62:19
75:16 82:16 89:14,17
122:5,7 139:6 141:23
142:17 163:3,24
182:4 193:22
**private** 157:22 203:13
**privilege** 23:18,23
66:22 78:2 79:6 83:1
118:23 119:4,5,16
121:13,15,16 122:1
141:6,7 207:13
213:17,20
**privileged** 71:19,24

106:21 107:1,14
123:5 132:2,11
138:20 140:22
145:23
**probably** 24:16 34:25
39:24 47:19 55:13
64:24 69:19 76:11
94:11 98:9 132:1
134:9 139:2 197:23
198:13,24
**problem** 20:14 76:1
113:16 201:3 203:16
203:17
**Procedure** 1:16 49:10
216:20
**proceeding** 12:18
**proceedings** 116:21
**proceeds** 12:12 13:4,5
**process** 33:14 43:3
99:21 128:21 164:8
195:23 196:2
**processed** 15:8
**processes** 79:5
**produce** 9:12 67:10
68:22 133:24
**produced** 7:25 8:3,8,9
9:11 54:21 66:19,24
68:19 70:10 80:10
82:21 84:11,13
128:11,15,18,20,22
129:1,18 131:3 134:8
135:3 198:22 205:5
**product** 16:14 23:23
33:12 34:23 35:20
36:5,7,8,17,21,22,25
38:16,19 39:1,8,12
39:13,19,21 40:2,4,6
40:10,16,18,19 41:10
41:11 48:5,5,7,8
53:18 66:2,22 67:2,4
68:17,21,25 69:2,2
69:25 78:1 79:6 82:6
82:21 83:1 87:18,23
93:8 151:24 157:24
158:16,17,23 159:17

161:22 171:19 178:6
178:8,11,18 196:16
206:7
**production** 190:18,21
**products** 8:23 21:15
35:7 37:4 39:6,7,19
40:12 41:20 43:1,13
46:7 47:10 48:1,2,3
48:12 65:6 85:13,17
85:21 86:9,22 87:19
87:19 88:7,10 102:5
102:9 103:20,23
115:24 116:4 125:4
125:22 151:16
179:16 185:6,24
194:17 196:3 197:9
206:24 207:7,7
211:24
**product's** 203:6
**profit** 197:25 203:11
**program** 15:3,9 28:2
29:1 43:2 45:9 66:11
89:3 92:14 93:6 94:8
94:19,25 95:5,6 97:6
125:18 185:4 200:23
212:25 213:1
**programs** 92:2 93:16
114:12 115:13
**program's** 92:14 94:2
**project** 64:25
**projected** 188:15
**projections** 187:10
**promote** 40:17
**prompt** 158:1
**proof** 166:17
**properly** 110:8
**proposals** 102:3
**proposition** 210:19
**protected** 18:24 82:25
**protective** 1:11 18:21
18:23,25
**protein** 16:22
**protocol** 24:18
**prove** 37:20
**provide** 60:8 61:2,15

81:15 82:14 83:7
85:9 115:11 120:12
177:8 178:1 179:8,9
193:23
**provided** 26:1 66:25
83:9 85:11 102:12
128:13 132:10
134:24 205:14
**provider** 105:7
**providers** 102:11
195:17
**provides** 200:24
**providing** 177:1
**provision** 19:9
**public** 1:15 40:1
127:25 146:21 216:5
216:13 217:5,10
218:24
**publication** 92:3
103:14 111:6
**publications** 100:11
100:14
**publicly** 156:3,20
**publish** 103:14 169:22
**published** 50:5 74:7
75:7,21 85:12,15,16
86:5,8,8,9,12,13,15
86:16 87:1,2,6 88:15
88:16 90:4,6,7 91:6
91:14,23 93:4,14,17
104:24 106:4 108:24
110:22 111:20
142:16 156:21
157:19,23 158:17
160:2,5 165:11
171:15,20 172:21
174:8 181:17 185:4
189:15
**publisher** 74:10
105:17
**publishes** 103:10
164:20
**publishing** 109:22
110:10 111:19 164:2
164:7

**pull** 128:25 130:3
**PUPs** 36:3
**purchase** 46:9 47:4
187:11
**purchased** 184:24
**purchasing** 32:6 46:7
156:10
**purported** 73:14
**purpose** 1:18 45:8
206:11
**purposes** 21:20 22:3
49:7 157:20 158:5
**pursuant** 1:11,15
216:19
**put** 36:4,6 76:3 98:8
112:10,17,24 129:12
145:2 193:21 197:5
197:25 212:17 215:1
**putting** 53:25
**p.m** 116:22,24 117:2
215:23

**Q**

**qualified** 32:20,22
**quantified** 197:17
**quarter** 104:2 203:11
**query** 185:21,23 186:2
**question** 16:24 18:13
19:22 20:9,21 22:25
23:18 24:1,15 37:3
40:11 44:5 55:15
56:25 58:19,23 60:5
60:7 61:5,12 63:25
64:23 65:8 66:17
67:22 68:16 69:20,23
72:2,24 73:6 76:6
81:25 86:24 87:4
92:20,22,23 93:11
94:13,14 99:15 101:8
107:13,16 108:21
109:2,14,16 110:19
111:9 113:17 118:10
118:13 119:9,16,20
119:21,23 120:21
121:4,11,19,24 123:1
123:8,11,12 126:11

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
GREG HAMILTON – 1/29/2013

Page 23

126:25 127:2,13
132:19 138:17,19,22
138:24 139:18 140:7
140:10,15 142:14
144:16 145:22
148:19,24 161:13,14
161:15 167:19 176:2
177:6,15,16 190:25
191:1 192:5 195:9
199:11 201:24
203:21 214:1 215:13
**questioning** 102:11
114:5 132:14
**questions** 4:12 6:6,8
6:13 7:16 9:22 19:2
24:4,7 46:12 54:22
55:12 65:11,20 68:1
75:11 77:21 81:7
94:21,22 106:23
107:7 132:9 182:12
201:4 213:4 215:20
216:11,14
**question's** 136:20
**qui** 12:22,22,23 13:23
15:1 118:7 122:4
125:11,17,20 142:22
142:25 143:4,15
**quite** 102:8
**quote** 28:8,13 37:4,6
37:13,18,21 44:11,15
46:6,9 63:19 73:17
100:13 125:14
158:20,20 160:15
181:4 192:20 203:1
204:25
**quoting** 37:12

**R**

**radically** 168:3
**raise** 51:17,19,23
112:2,7 201:16
**raised** 112:1
**raising** 51:22 52:8
112:9 113:24
**range** 9:4 97:9 112:4
196:24 197:11

**ranking** 31:8,10
**rare** 210:4
**ratchet** 116:8
**ratcheting** 211:14
**rate** 35:3,10,17,18,19
35:19,20,22 36:1,5,6
36:13,15 41:4 58:7
102:6 104:7 114:22
194:6 196:10 212:16
**rates** 193:16,16
**raw** 104:16
**RBC** 4:7 205:13
214:19
**reach** 82:13
**reached** 138:6 153:11
**react** 113:23
**read** 7:9,12 28:8 38:11
44:20 45:24 73:20
100:13 123:18 124:6
124:6 125:23,25
130:22 133:9 135:23
149:9 157:16 158:24
159:10,12,22 160:17
181:9 203:21 209:1
218:12
**readily** 44:3
**reading** 123:24 124:3
158:20 159:6 160:14
161:2 186:23
**reads** 205:18 208:20
**real** 67:16 160:20
201:19 202:4
**realize** 41:17 69:22
**really** 20:15 35:15
57:17,18 83:17 89:19
98:10 134:10 158:14
182:2,3 205:25
**reason** 9:8 41:18 72:13
148:5 153:4,7 208:7
**reasonable** 103:16
**reasonably** 72:12
103:12 187:18 189:3
**reasons** 207:22
**rebate** 8:21 15:3 19:16
21:4 23:4,7 49:6

66:11 68:17 104:1
188:1,16
**rebates** 15:8 21:14
48:21,22,22,23
156:22 158:2 161:19
188:8 194:11
**rebilling** 193:18
**recall** 7:3,4,14 8:17,19
10:25 11:5,22 15:24
21:10 22:6,11,13,15
22:16 24:12 25:20
27:4 31:6 34:4,12
42:1 47:17,19 51:15
72:6,11 74:9 76:11
77:1 86:19 89:8,9,11
98:3,10,23 99:7
115:22 120:11
127:23 128:6,9
129:15 130:9 137:8
137:10,14,16,18
139:2 147:5,9,11
150:14,19,23,25
154:23 155:1,4 167:1
167:3,6 168:7 172:25
178:13,20,24 182:8
183:17 185:11,16,25
186:4,18 188:2
198:11 206:11,12,13
**receive** 12:12,13 13:5
13:7 70:13 128:3
**received** 135:16
146:18
**receiving** 164:12
187:16
**Recess** 49:15 79:8
81:20
**recessed** 116:23
**recipient** 8:14
**reciprocal** 156:11
**recognize** 57:10 71:11
149:4 186:13,15
205:7
**recognized** 41:9
111:14
**recollection** 49:22 87:5

126:12,14,14 131:14
**recombinant** 35:7 65:5
85:17 118:3,8 119:14
120:4,10 121:2 122:5
122:12 125:6 126:3
126:18,22 187:10
196:9
**Recombinate** 21:7
22:10 23:9 26:17
27:3 29:8,12,15 30:1
30:9,21 31:11,17,21
32:6,14 33:8,18,24
34:2 35:23 38:2,14
38:17 39:3,4,8,25
40:2,3,5,22 41:22
43:8,24 45:20 46:9
46:13,20 47:4,25
48:18,21,22 49:6,11
49:19 53:15 54:6
66:13 76:7 85:25
86:6,17 87:2,7,12
88:1 89:5,7,13,23
90:7,12 92:11 151:8
151:16,25 152:2,9,13
153:1,2,9 170:15
187:17 188:2,11,17
188:25 189:10,15
196:19 198:6,10
199:15 200:1,13
212:13
**recommendation** 41:2
41:3
**recommended** 91:8
**recommending** 40:20
91:12,13
**reconciliation** 8:21
**reconvene** 116:24
**record** 38:12 49:13,14
61:8,11 62:17 67:25
70:20 77:22 79:10
81:19 91:11 99:12
107:8 118:12,17
127:6 148:19,25
149:1,3 190:8 198:20
213:6 216:14

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
GREG HAMILTON – 1/29/2013

**records** 50:6 62:18
**record's** 69:13 70:2,19
   99:14
**Red** 111:12
**reduce** 35:9 37:16
   53:24
**reduced** 52:6 53:10,14
   53:14 54:13 102:9
**reduction** 40:20 189:5
**reductions** 158:2
**refer** 44:19 146:9
**reference** 100:4 140:7
   191:24
**referred** 9:9,13 33:12
   33:13 73:3 134:7
   216:16
**referring** 27:25 38:6
   44:25 47:15 91:19
   201:21 206:1 213:9
**refers** 125:10
**reflect** 212:16
**reflected** 214:10
**reflecting** 186:20
**reflective** 93:7,25
   156:21 199:18
**reflects** 187:15
**reframe** 176:2
**refresh** 126:1 198:13
**refreshed** 126:12,13
**refusal** 141:18,19
**refuse** 121:24 123:11
   140:11 198:1
**refused** 141:12
**refusing** 58:19 121:19
   123:7 177:8,14
**regard** 21:4 48:11 84:5
**regarding** 10:7 17:3
   17:12,21 20:15 22:9
   24:11 26:16,19 27:2
   34:9 63:19 64:10,14
   64:19 66:3 68:17
   71:1 98:24 118:23
   127:22 134:15
   140:12 150:21 156:4
   183:5 214:6,10

**regardless** 13:13,16,20
   188:9,21
**regards** 129:22 194:13
**registered** 100:11,14
**reimburse** 22:18 23:4
   94:2,9 103:7,15
   105:21 194:20 196:1
   197:11 201:7 204:3
**reimbursed** 53:2 102:9
   200:1 203:8
**reimbursement** 21:6
   21:18 22:2,9 43:13
   43:21 51:4 54:17
   78:6,12 79:13,23
   80:21 81:23 91:24
   94:19 98:20 99:17
   100:2 101:2,10
   102:19 103:11 104:3
   104:18 113:3 114:13
   114:22 115:14,14,15
   116:9 154:1 185:6
   196:2,9,22 202:5
   210:20 211:3,15,23
   212:21
**reimburser** 195:16,19
   210:22
**reimburses** 200:24
**reimbursing** 43:6
   98:13 116:3 195:20
**rel** 1:7 5:11 218:6
**relate** 133:25
**related** 12:18 26:12
   131:17 132:9 134:5
   142:1 207:6 208:3
**relates** 1:5 66:14 99:3
   218:5
**relating** 8:3 13:23 26:1
**relations** 208:22
   209:18
**relationship** 61:9,10
   139:5 154:5,6,7
   184:21 206:23
**relator** 3:10 13:7 57:2
   57:5 65:20,25 138:9
   138:12,13 181:4

213:14 214:5 215:14
**relators** 1:7 2:8 12:22
   12:23,23 17:25 218:7
**releases** 127:21
**relevance** 71:21
**relevant** 11:24 18:25
   54:16
**reliable** 103:8
**relied** 70:6 79:15
**relies** 158:6
**reluctant** 41:19
**rely** 94:15
**relying** 184:5
**remainder** 215:19
**remark** 180:16
**remember** 7:1 11:10
   11:12 12:10 13:22
   15:19 19:19 24:7
   26:3 27:1 29:17 31:2
   31:4 34:7,11 37:1,7
   37:13 45:1,11 50:10
   87:11 89:9 97:7
   98:21 112:10 129:10
   129:20 135:7 196:4
   196:23 198:9
**remind** 49:17 50:14
**reminded** 106:18
**render** 65:11,16 96:14
   96:19,22
**rendering** 65:18
**rep** 64:24
**repackagers** 157:22
**repeat** 37:9 56:19
   64:12 186:24
**repeated** 113:19
**rephrase** 37:9 108:21
   201:24 206:23
**replacement** 16:14
**reply** 81:15
**report** 67:11,17 73:24
   73:25 74:7,9,11,14
   74:19,20 113:21
   158:6,18 165:6 178:6
   178:8,14 191:11
   215:1

**reported** 76:8 105:6
   110:24 111:12
   157:24 165:8,23
   170:13,14 176:9
   196:12
**reporter** 118:21
   127:10
**reporting** 106:4,15
   107:23 108:4,24
   142:16 150:22
   151:23 158:5 174:7
**reports** 94:18 178:11
   178:18
**represent** 5:10 55:12
   63:5 80:16 104:25
   131:2 135:7,17 136:9
   137:5,20 157:25
   160:16 213:11
**representation** 80:22
   135:2 136:17,23
   140:23 144:21
**representations**
   149:15
**representative** 32:9
   102:16 193:3
**represented** 32:10
   192:2
**representing** 129:16
   151:5 157:3 207:20
   207:21
**represents** 104:25
   157:19
**reps** 29:16 38:15 46:18
**request** 45:1
**requested** 19:10
**requesting** 79:11
**requests** 102:3
**require** 6:6
**required** 6:8 68:22
**reread** 209:11
**research** 21:6,13,16,19
   21:20 22:2,9,14
   73:24 74:7,9,11,14
   74:20 78:5,7 166:13
   167:25 183:4

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
GREG HAMILTON – 1/29/2013

Page 25

**reservations** 54:19 55:25
**reserve** 9:22 54:21 215:19
**resided** 131:21 133:1
**resistance** 35:8
**resolution** 58:8
**resolve** 141:14
**respect** 77:3 79:12 93:15 97:5 98:13 99:16 109:6 151:14 162:14 167:22 170:23 189:20 192:6 196:18
**responded** 113:23 214:24
**response** 7:16 9:14 60:20 112:13
**responsibilities** 27:25 28:1 65:2
**responsibility** 27:24
**responsible** 27:18,22 27:23 28:11,22,25 29:5 31:20 65:3 106:4 124:23 200:17 200:17,19,21
**responsive** 93:9 107:13
**result** 115:15
**resulting** 176:7
**results** 22:13,16 78:25
**resumed** 117:2,7
**retail** 194:10
**retain** 213:11,18
**retained** 14:3,7
**retrieve** 85:6,12,15,23 86:3 147:2
**retrieved** 85:24 147:8
**reveal** 69:24 72:18 77:5,7,14 78:17 107:4 108:9 109:3,12 138:20,24 139:16 140:4 142:4 145:23
**revealing** 69:20 79:4 141:3

**revenues** 193:16
**review** 6:15 7:5,18 62:17 87:5 100:17 102:25 103:21 128:25 129:17,24 130:3,20 191:4,16 204:19 205:13
**reviewed** 76:6 103:18 163:21
**reviewing** 62:7 131:16 191:10
**reviews** 7:22
**ridiculous** 112:9,16
**right** 5:10 19:13 21:25 35:14 50:19 54:21 55:17,18 72:13 76:23 83:25 88:7 91:4 105:25 123:8,17,24 125:1,2 128:3 130:10 140:25 153:11 155:7 157:13 166:1 176:20 178:5 179:17 180:15 182:13 185:22 186:5 189:20 195:25 198:25 204:11 213:2
**right-hand** 131:1
**Rite-Aid** 194:1
**RMR** 1:14 217:9
**Robert** 74:10
**role** 29:11 31:4 32:5
**room** 60:19,22
**rough** 101:15
**roughly** 114:8 193:2 199:16
**Royal** 29:19,20
**Rule** 67:15,16,23 68:13
**Rules** 1:15 216:20,20
**run** 20:14 28:2
**running** 89:2 185:3
**r-e-c-o-m-b-i-n-a-n-t** 119:14

———————
**S**

**s** 3:7 79:24
**safe** 40:2,5

**safer** 40:11
**Safety** 38:9
**sake** 112:3
**sale** 194:7
**sales** 15:2 17:8 31:20 38:15 51:8 52:20 63:14,19 64:6,7,10 64:14,19,24
**sample** 4:5
**Saris** 23:12
**sat** 32:8
**save** 25:16 94:23
**savings** 198:2
**saw** 84:8 87:17 116:6 131:12,16 134:6 169:3
**saying** 26:3 30:16 34:4 37:7 40:11 41:14,15 58:23 76:21 78:23 92:5 112:10 126:13 134:10,19 140:6 165:25 192:9
**says** 12:20,21 47:7 51:1 109:2 133:7 157:18 160:1 181:3 192:25 205:3 209:25 213:22 215:4
**scanned** 124:8 130:22
**schedule** 14:13
**scheduling** 68:3
**scheme** 90:11 125:19 170:24,25 174:22 176:11,12 177:9,10
**science** 17:9
**scientific** 17:7 33:3
**scientist** 32:20 33:2
**screaming** 39:11
**Scripts** 8:25 21:22,23 27:17 28:1,9 30:15 30:17 31:23 44:13 45:5 89:1 184:24,24 184:25 185:8,14 186:6,21,22 187:17 191:13,21,24 192:3,7 192:16,21 193:11

**195:13,14 196:1,21 197:1,8,10 198:3 199:3,5,14,24 212:9**
**scrutiny** 171:14
**seal** 217:4
**sealed** 13:13
**second** 46:5 109:1,15 124:14 148:22 187:8
**section** 29:5 104:1 135:25 136:1
**sections** 123:24
**see** 21:19 28:14 37:23 44:16 46:10 67:15,15 67:17 72:23,25 73:11 88:21 90:21 104:24 110:9 111:18,24 114:1 124:10,17 125:7,12 127:20 131:19 135:23 157:1 157:14 158:25 179:2 185:9,12 187:6 195:6 211:24
**seeing** 11:22 74:10 128:9 184:12
**seeking** 17:25
**seen** 5:16 11:2,6,17,20 20:5 24:5 25:8,14 41:5,6 69:16 74:8 82:6 84:10 123:20,23 126:7 128:6 130:25 131:6 163:8,10,10,11 163:12 166:23 169:5 186:15,18
**sell** 30:8 161:22
**selling** 38:7,8 43:2 52:6 64:25 65:5 93:8 111:15 160:8,23 161:16 165:2 197:2,8
**send** 112:8 194:4
**sending** 146:5 166:7 212:6 214:9,24
**sends** 113:13
**sense** 11:16 26:11 59:17 115:11 147:25
**sent** 102:3 131:17

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
GREG HAMILTON – 1/29/2013

144:20 145:17
149:10 165:24
171:18 206:13
214:18,18,20 215:1,3
215:7,10,11
**sentence** 44:23 46:4,5
73:16 159:9,11 181:8
208:20 210:16
**separate** 29:25 57:1
**September** 205:1
**series** 6:5 183:20
**serve** 38:21
**served** 5:15
**services** 59:18 60:1
61:20 102:12
**serving** 175:5
**set** 40:23 72:21 73:13
83:13 102:6 114:21
125:19 156:3 175:17
175:19 176:10
199:11,22
**setting** 172:21 194:14
**settlement** 3:18 106:11
124:10 127:22,24
164:4
**seven** 86:17 189:4,11
189:16
**SHAPIRO** 2:9
**share** 13:8 39:25
131:24
**shared** 26:24
**sharing** 69:9,11
**sheet** 3:25
**she's** 168:16
**Shield** 210:9
**shoot** 40:14
**short** 44:21 46:1 55:8
70:12 123:21 130:18
180:21 204:17,22
209:14
**shorthand** 216:11
**shortly** 11:24 137:15
137:19
**short-circuit** 199:12
**shot** 208:15

**shouldn't** 8:8,10 48:2
108:9 208:7
**show** 5:13 6:23 25:4
35:12 50:6 104:3
116:1 157:11 165:1
198:12
**showed** 82:3 83:12
**shown** 134:12 136:5
144:19 145:17
**shows** 124:14
**sick** 112:14
**side** 129:19 192:17,17
192:24 193:8,10,13
**sides** 192:15,21
**sign** 178:17,20 194:25
**signature** 216:18
217:4
**signed** 11:4,7,17,20
24:10 25:7,12,18
149:5,9
**significantly** 36:19
**signing** 149:11 179:5
**similar** 11:20 25:18
82:17 86:7 89:8,10
125:16 212:8
**simple** 60:5
**simply** 123:11
**single** 30:2,4,7 47:24
203:12
**sir** 6:5 13:9 30:18
51:20 57:25 59:25
73:11 78:4 86:12,15
87:13 89:18 91:22
93:11 94:21 95:1
97:10 100:25 101:10
108:3,19 114:12
119:11 128:16 129:8
136:9,16 146:15
147:6 156:2 160:14
162:19 166:17 167:7
168:1 171:5 175:13
176:17 177:14,19
184:3,22 186:17
197:18 198:22
208:10 209:10

**sit** 44:5 55:6
**site** 83:13 103:3 147:7
**sitting** 22:17 43:23
61:1 77:19
**situation** 39:14 57:20
112:7 138:16 171:10
171:11
**situations** 47:24
**six** 34:25 189:3
**sizes** 87:21
**slower** 35:3 41:5 178:7
**Smith's** 84:15
**sold** 50:11 158:16
196:12,14 203:6
**solicit** 215:13
**somebody** 56:7 98:1
195:20 201:6
**soon** 12:21 137:24,25
**sorry** 16:18 23:24
31:11 45:13 47:2
49:19 51:18 114:1
128:13 144:15
186:23
**sort** 12:7,7 36:4 38:13
58:9 80:9 113:13
193:19 202:17
**sound** 145:8
**sounds** 12:4 14:1
145:12 182:10
**sources** 10:3 73:23
**South** 217:11
**so-called** 170:5
**speak** 191:12
**speaking** 108:7 210:24
210:25 211:1,10
**special** 80:9 194:15
**specialty** 21:17 27:19
28:12,23,23 29:6
41:23 51:6 53:9 91:9
102:4 192:18 193:21
194:16,17 195:1,2
199:18,20 203:10
212:16,24 213:1
**specific** 9:7 20:16
47:21 57:22 59:15,16

63:23 85:14 86:11,14
90:3 93:13,16 97:7
101:7,20 102:1
112:23 115:9 116:4
122:20 128:18
151:25 172:4 183:8
190:17
**specifically** 61:5 66:21
71:16 85:24 87:7
122:16 141:11 151:8
176:3 187:17 196:23
**specifics** 12:9 22:12
24:13 114:25 208:14
**specifies** 19:9
**specify** 43:17 111:8
**speculate** 76:18 148:11
**spend** 185:2
**split** 12:11
**splits** 12:23
**spoke** 34:22 153:1
**spread** 51:23 52:9,23
52:24,25 53:3,4 54:5
54:9 89:12 113:8
199:7,25 200:6,11,18
200:25 212:12
**spreads** 113:2 114:14
114:15,16 115:14
**spreadsheet** 9:9,10
**spring** 34:24 50:17
51:12 54:12 137:9
**stab** 92:5,6
**stabbing** 92:8
**stabbings** 92:17
**stack** 114:2
**stand** 80:4 149:7
**stands** 50:3 135:25
**start** 14:20 37:11
94:10 192:12 201:23
**started** 14:12 43:10
159:6 193:20
**starts** 125:14
**state** 13:17 22:18 23:3
43:23 46:6 66:13,13
78:5,11 79:10,12
80:21 82:8 83:15,20

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
GREG HAMILTON – 1/29/2013

84:2 91:24 92:13,14
93:3,6,16 94:1,4,8,18
94:24 95:7,12 96:23
97:13,17,20,21 98:1
98:6,12,19 99:7,11
99:18 100:17,18,20
100:23 101:1,1
102:17 103:7,10
104:2,18 113:10
114:12,19,20,22
115:12,22 116:4
134:15 158:21
159:15 200:16 201:7
201:10,16,18,22,23
202:3 204:3 212:4
216:1
**stated** 102:8
**statement** 11:9 26:8
78:9 134:22,23
136:20 151:4 162:13
182:19 209:3,7
**statements** 25:18 80:3
149:7 173:7
**states** 1:1,6,16 21:9,11
21:18 22:3 92:9
106:11 115:3,19
116:6 117:12 124:11
125:15 130:8 201:21
216:21 218:1,6
**state-by-state** 79:22
81:23 114:21 116:9
204:7
**State-specific** 21:10
**steal** 144:23
**stenographer** 216:12
**step** 111:4,4 112:17,24
119:23,24 137:3
148:20,22
**steps** 115:3,13 116:7
183:10 208:21
209:18
**Steve** 4:8
**Stewart** 29:19,21
**stipulate** 19:3 79:21
**stood** 155:25 183:25

**stop** 106:15 108:3,24
109:22 112:17,24
113:2,8
**stopped** 69:19
**story** 201:15
**straight** 180:1
**straightforward**
145:14
**straightforwardly**
141:20
**Strasma** 187:5
**strategy** 72:15
**Street** 1:19 2:5,10
**strike** 121:18 136:8
137:2
**striking** 88:13,19,23
**string** 3:24
**study** 75:2
**stuff** 29:2 66:12 88:23
145:6
**style** 205:18
**subject** 3:24 4:7 8:20
15:1 22:15 54:19
66:22 80:5,7 81:9,10
82:24 150:8 209:16
214:6
**submits** 164:19
**submitted** 50:8 216:19
**submitting** 27:7
124:23
**subscribe** 218:14
**SUBSCRIBED** 218:21
**subscriber** 184:25
**subscribing** 85:5
**subscription** 75:11,17
76:10 181:24 182:6
182:20 185:20
**subsequent** 76:12
114:11 141:12 165:9
**subsidiary** 21:22
**substance** 108:23
109:3 119:11 139:16
**substantially** 165:10
**substantive** 9:16
**Sub-Category** 1:6

218:6
**success** 62:3,19 63:8
**successful** 58:8
**such-and-such** 194:20
**sue** 141:25 155:24
183:13
**sued** 106:10 117:25
**suggest** 51:16,18,20,22
53:13 107:4 109:14
**suggested** 91:5
**suggesting** 37:1,13
**suggestion** 53:7
113:18 143:19
**suggestions** 143:25
**suggests** 70:20
**suing** 144:6 156:14
205:22 206:15,22
**suit** 106:20 120:9
137:12,14,18,23
139:7 207:23 208:16
**Suite** 1:18 2:5,19
217:11
**suits** 118:3
**summer** 50:13 90:24
**Sun** 1:7 10:7,20 11:3,7
11:18,21,23 12:3,11
12:16 13:1 24:6
25:25 130:7 135:17
148:7 218:6
**Sun's** 7:22
**Sun-Hamilton** 63:6
**Sun/Hamilton** 5:11
56:16 61:21 63:7
118:14 121:20 173:4
**superior** 40:18 41:10
41:11
**supplies** 157:23
**supply** 39:15,22
**support** 10:3 11:10
64:10
**suppose** 205:12 212:3
212:7
**supposed** 165:7
**sure** 7:18 8:5,7 9:15
11:9 12:19 13:25

28:18 37:10 38:13
41:23 42:11 48:6,9
49:4 50:7 59:14 66:7
69:17 72:11,13 77:12
77:18 85:18 91:16
92:25 97:8 103:12
115:4,4 142:19
147:12 155:22
159:13 163:13 189:4
192:8 197:15 207:3
209:12
**surprised** 189:19
**surrounding** 117:19
**survey** 105:13 164:10
174:21 177:11
**surveying** 168:19
**surveys** 113:14 166:18
167:8 175:19 176:6
177:24
**switch** 41:19 53:15,17
53:19,21,25 54:1
**swore** 149:12
**sworn** 5:3,6 11:9 80:22
117:5 152:20 216:9
218:21
**system** 49:10 164:20

**T**

**T** 3:7
**tablets** 29:2
**take** 5:23 28:3 37:10
45:23 70:17 71:6
79:7 100:3 110:16
111:4,5,8 115:3
116:19 119:23
123:17,19 130:16
136:2 141:1 145:2,6
148:16 154:25 157:8
166:6,8 180:18
183:10 186:6 190:6
190:14 196:15
204:11 208:15
210:10
**taken** 1:13 7:12 15:6
115:13 182:24 210:8
211:11 216:4,11

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
GREG HAMILTON - 1/29/2013

Page 28

takes 106:22
talk 32:22 42:18 50:21
  51:11 97:25 139:13
  142:9 143:18 163:25
  186:5 193:2 210:18
talked 50:15 54:4
  99:11 107:5 139:20
  155:16
talking 12:5 41:12
  48:17 51:2 59:15
  61:8,12 69:17 82:10
  83:10 85:19 86:20,21
  88:25 90:15 109:21
  148:12 149:19
  150:12 183:9 196:7
  212:18,19
talks 209:17
tam 12:22,22,23 13:23
  15:2 118:7 122:4
  125:11,17,20 142:22
  142:25 143:4,15
team 29:4 63:6 71:15
  85:11
technically 57:3
teens 200:25
tell 14:23 17:22 20:20
  20:21 22:17 23:3
  29:21 33:2,6,11 34:2
  34:14 42:9 43:22
  44:6 45:15 48:25
  55:21 58:17 64:16
  69:13 81:12 96:1,5
  97:4 103:19 104:10
  104:13 107:12,19
  108:12,14,20 114:22
  123:20 127:14
  132:11,12 155:8
  159:10 184:9 194:8
telling 77:20 107:6
  136:16
tells 19:5 103:22 104:7
  104:9,11 203:4
tendered 5:17 6:20
  25:1 71:8 130:13
  159:3 180:19 186:10

190:11 198:16
  204:15
tennis 29:18
tense 197:5
tenure 89:1 185:8
  186:21 191:20
term 100:19,22 155:21
  155:23,25 157:21
  172:10 179:6 202:23
terminology 163:14
terms 12:8 15:7 16:1
  18:22 20:6 38:21
  54:17 66:10 134:10
  134:25 166:10,11
  188:17,19
Terry 112:12
Terry's 112:12
testified 5:6 17:15
  25:25 28:16 30:24
  34:15 38:5 46:14
  54:11 58:3 114:24
  117:5,6 168:19
  182:10
testify 18:22 19:11
  23:16 24:17 32:13
  56:2 143:24 172:16
  172:18 173:8
testifying 12:10 13:22
  18:8 23:11 27:1
  34:11 56:22 57:13,21
  59:5 68:10 95:11
testimony 7:15 14:2
  31:2 34:7 37:13
  38:11 54:15 63:13
  78:4 101:17,22
  107:22 113:1 152:20
  160:19 166:19,20,24
  166:25 167:2 171:7
  182:4,11
Texas 83:20 101:5,6
  101:10,17,19,23
Thank 39:5 63:11 75:9
  91:4 101:21 144:15
  178:5 180:15 191:6
that's 5:23 12:17 13:13

13:15 25:24 26:18
  27:9 36:24 39:12
  43:2 45:7 48:1 49:8
  56:25 57:6 59:23
  61:14 62:25 64:23
  66:22 67:12,17,18,18
  67:21 71:6 74:18
  79:6 80:9 81:9 82:12
  82:25 83:24 88:23
  93:11 94:11,12,14,16
  95:19 96:13 99:25
  100:5 103:17 104:11
  107:14 112:15
  113:20 116:4 119:2
  120:18 121:25 125:8
  126:20 127:4 129:11
  132:1 135:4 136:5,19
  136:22 139:9 140:22
  142:6 145:6 147:24
  148:21 153:1 154:25
  155:11 158:12
  159:18,25 164:16
  170:5 173:2,6,14,15
  178:16 181:2,8 182:9
  182:12 189:2 190:21
  192:5 193:1,3 195:24
  196:18 198:21,22
  199:4,22 202:23
  203:22,23 205:3,17
  205:25 207:14,18
  209:19,20 210:14,15
  210:25 211:1 212:3,7
  213:25 214:2
Therapeutics 1:9 2:12
  30:22 218:9
Therapies 31:11
therapy 30:1
there's 14:13 57:16
  61:14 70:3,20 78:15
  80:17 81:13 92:12
  99:6 108:14 113:14
  125:9 129:5 134:5
  135:24 169:21
  175:19 189:20
  190:24 191:23 203:8

203:16,17 206:15
  210:7 211:9
they're 103:19,22
  151:15 166:7 188:16
  189:25 190:1,21
  194:1 200:19 202:17
  210:22
they've 113:7,8 129:3
  170:25 211:19
thing 37:5,22 39:16
  79:6 107:11 113:23
  122:25 135:8 140:7
  187:22 195:4
things 117:21 134:19
  161:20 163:22 203:5
  203:15
think 7:10 12:19,24
  17:11,15 21:12 23:6
  24:16 30:24 34:1
  37:15 40:21 43:22
  46:14 47:21 48:15
  52:5 54:11,24 57:6
  58:5 61:11 67:18,24
  73:3 74:25 75:10
  79:17,18 81:1,3,17
  84:15 88:2,6 92:23
  102:15 106:22
  107:12 110:7,13
  111:23 113:6,14
  114:10 116:16
  119:15 121:6,15
  123:23 129:22,23
  131:5,6,21 132:1,8,8
  132:11,20 133:1
  134:12 135:2,16
  136:8 137:11 138:17
  140:4,16 141:18
  142:15 143:24,25
  144:17,18 145:1,4,5
  145:14 146:6 148:5
  150:20 152:11 154:2
  155:3,20 161:6,9
  163:6,10 165:19
  166:1 168:12 171:6
  176:17,20 179:7

187:14,20,24 188:4
193:24 195:8 201:9
202:7 204:1,8 205:9
205:25 206:19
207:12 209:7 210:3,4
211:4,7,8,9,22,24
213:5
**thinking** 19:1 97:19
**thinks** 145:19
**thoroughly** 177:5
**thought** 35:2 152:1
153:19,22,25 154:23
155:1,4,9 158:12
175:10 183:2
**thoughts** 96:24
**thousand** 37:19 212:5
**thousands** 39:17
**three** 92:6,7 168:16,16
**throw** 112:15
**tickets** 55:24
**tied** 101:11
**tiers** 194:11
**time** 7:9,13 20:12,25
22:22 23:2 27:24
30:14,17 31:6 34:23
35:5 36:2 37:15 40:6
41:21 42:10,19 43:5
43:17 45:4 46:23
47:8,15 55:14 67:16
68:6 69:3 70:11
72:10 74:6 76:8
85:20 86:20,21 89:4
89:11 90:15 91:15
93:23 94:23 96:6
97:16 98:5,8 101:13
101:24 102:2 103:4
106:6,8,9,10,13,20
107:22 111:14 112:1
114:8,13 115:19,20
116:2,7 117:9 118:6
120:5,6,12 123:19
124:15,21,25 125:1
130:2 137:9,12
140:15 144:5 148:7
149:21 150:14,15

152:17 163:24
170:16 179:3 186:5
187:25 189:2,14,22
192:9,10 193:1,6,22
197:7,23 204:9
215:20 216:6,16
218:13
**times** 14:15 37:19 86:4
92:6,6,7 97:23
101:15 106:19
111:11 129:5,21
168:16,16
**timing** 132:9
**title** 31:15
**titles** 65:2
**today** 5:22 6:3,12,16
7:7,20 9:20 14:15
22:17 28:20 43:23
44:6 70:15 79:24
89:20 97:14 113:1
115:12 148:16
157:15 173:2 211:23
**today's** 7:20
**told** 17:11 34:1 37:25
43:22 77:23 96:5
122:8 146:11 153:22
153:24 154:8 166:5
**top** 15:19 42:1 133:6
157:14
**topic** 14:23 15:10,14
23:15 148:18,24
**topics** 24:17
**total** 187:11 194:12
**totally** 9:16 174:17
**tough** 64:23 81:25
**tout** 109:25
**trade** 35:12
**transact** 188:24
**transaction** 158:1,5
160:16
**transcribed** 133:12
**transcribing** 136:18
148:8
**transcript** 81:2 157:16
167:4 218:12,16

**transcription** 136:10
136:13 146:7
**transcripts** 7:19 169:3
169:5,7
**transferred** 26:13
**transition** 35:23
**transitioning** 36:22
**transmitted** 134:1
**transparent** 69:14
**travel** 70:17
**treated** 36:3
**treating** 152:1,2,13
**treatment** 38:20
**trended** 210:21
**trial** 215:20
**tried** 147:1 207:8
**trip** 67:7
**trouble** 148:7 173:12
**true** 34:5,6 47:25 48:1
61:19 78:9 81:6
89:20 91:22 100:5
114:11 149:8 155:13
155:14,15 162:19
178:16 179:24 184:3
184:7 188:14 189:19
195:25 197:6 198:8
201:13,14,17 210:16
210:25 212:24
216:13 218:15
**truly** 29:17
**truth** 167:7
**truthful** 6:13 7:16
**try** 9:19 14:25 21:12
29:17 66:8 76:5
111:9 113:15 204:2
207:16 211:16
**trying** 47:3 66:6,17
94:23 137:17 176:25
199:9 207:2 211:13
**turn** 28:6 44:8 61:21
62:18 63:3 91:14,22
205:5
**turned** 195:21
**turns** 161:24
**two** 11:10 25:16 28:20

38:5,11 40:12 43:13
45:15 48:23 52:5
58:1,2,4 86:9 98:9
124:1,5 138:14 173:8
182:10,11,12 188:18
189:7,21 192:15
214:25
**two-plus** 10:1
**TX** 2:15
**type** 16:23 79:3,5 83:7
105:13
**types** 161:20
**typical** 16:4 87:20
**typo** 205:25

---

### U

**ultimate** 53:5
**ultimately** 36:25 52:21
106:10 195:25
200:23
**umbrella** 192:23
193:10
**unable** 68:8 167:8
**unaware** 167:13
180:14 202:6
**uncovered** 8:2
**underlying** 82:21
**undersigned** 216:12
217:1
**understand** 6:13 9:18
11:14 20:8 33:16
35:15 47:3 49:4
55:14,16 69:23 77:12
77:19 79:2 93:11
94:24 110:19 135:13
142:14 143:3,4
167:19,21 183:11
202:8 204:1,2 210:18
**understandable**
174:17
**understanding** 72:8
84:7 103:6 116:12
120:2,9 121:1 126:17
152:8,12 158:10
159:19 161:25
162:22 163:22

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
GREG HAMILTON – 1/29/2013

169:15 177:24 180:6
181:16 183:19 184:5
190:22 206:9 209:4
**understood** 120:18
126:10 158:21
159:14 210:3
**undertake** 83:19
167:21 168:5 202:8
204:2
**undertaken** 22:8
201:24 202:2
**undue** 70:16
**unethical** 145:7,9,12
**unfair** 173:16 182:9
**unilaterally** 82:14
105:21 121:23
**unique** 83:19
**unit** 37:19 88:22 188:4
197:14
**United** 1:1,6,16 106:11
117:12 124:11
125:15 130:8 210:8
216:21 218:1,6
**units** 37:19 66:12
104:1,12 187:10
**unknown** 39:15
**unpunished** 207:10
**unquote** 192:21 203:1
**Unresponsive** 92:16
**unsealed** 13:14 129:7
130:7
**unsuccessful** 162:7
**unwilling** 126:10
**upcoming** 129:22
**Update** 178:6,8,11,18
**upper** 201:7,8
**uptake** 35:3,10,17,18
35:19 41:4 52:20
**urged** 116:13
**use** 23:2 35:20 42:20
43:20 82:4 134:25
135:20 165:15,20
196:21
**utilize** 104:4 116:11
**utilized** 134:13

**V**

**v** 1:8 213:10 218:8
**value** 187:11
**values** 158:7
**varied** 115:19,21
**various** 18:10 27:18
28:12 52:7 82:5 86:4
96:6 97:21,22 102:3
194:3
**vast** 125:21
**vector** 122:10
**vehicle** 30:8
**veins** 40:14
**Ven-A-Care** 2:22
55:12 106:20 117:11
117:25 118:2,7
119:13 120:3,9 121:1
122:4,11,16,21
124:11 126:2,19,21
127:16 128:4 135:8
136:11,13,19 139:14
139:23 140:9,20
143:6 144:19 145:16
146:7 147:8,17 148:8
163:2 170:6 171:10
171:11 172:19,25
173:3,20 174:1
176:12 177:10
190:17 208:16
**Ven-A-Care's** 70:3
126:18 140:13 163:8
163:16,17,22 165:14
173:10,13 174:10,23
177:21
**verbatim** 136:10,13,18
145:16 146:8 160:15
**versus** 5:11 90:6
165:14 168:2 170:20
173:4 205:1,19
209:24 215:5
**Vice** 31:6
**view** 15:7 70:16 90:5
91:24 141:21 168:19
169:8
**viewed** 153:12 161:17

**VIII** 16:8,11,14,16,19
16:22,25 17:4,8,9,13
17:17 32:23 38:23
39:2 48:5,7,8,12
63:15,20,24 64:2,7
64:11,15,19,25 65:5
65:6 85:13,17 196:19
197:4,12,13 198:6
199:7 200:13 201:1
201:20 202:5 212:23
**violate** 121:6,12
**violating** 122:1
**virus** 39:10,15
**vis-à-vis** 27:7

**W**

**WAC** 87:22 88:15
155:21,24 156:4,7,20
157:18,25 158:5,7,10
158:12,21 159:14,20
159:21 160:7,15,20
161:16,18 162:14,20
163:3 164:9,13
165:25 173:20 174:1
181:16,17 183:5,12
183:25 184:6,12,21
185:1,10,15 186:3
**Wacker** 217:11
**WACs** 87:17 185:4
**Wait** 37:18 118:12
132:18
**waiting** 24:14
**waive** 109:13 141:6
**waived** 216:19
**Walgreen's** 193:24,25
194:1
**want** 18:13 20:17
24:15 26:22 40:14
45:3 49:17 51:3 60:6
60:10,13,15,17,21,23
67:12,14,15 68:6
73:2 77:18,22 79:10
80:19 87:10 88:10
91:17 108:6 110:16
118:23 120:22 124:3
129:14 140:10 141:6

148:19 164:19
171:15,19 177:2
192:8 197:15 199:8
203:18 211:16,18,19
212:4 214:1
**wanted** 171:13
**Washington** 2:10
**wasn't** 20:17 38:17,17
52:24 53:4 102:6,7
172:11 184:10
**water** 136:21
**Wathen** 2:15
**way** 12:16 20:20 22:23
24:14 30:16 34:14
35:21,25 36:1 70:6
74:4 100:25 102:5
103:14 119:21
121:17 122:10 126:1
136:6 143:9 145:18
146:6,17 168:21
170:13 174:23 180:6
185:25 189:21,25
190:1 207:1,3 210:21
**ways** 182:11,12
**website** 82:4 83:13
102:25 103:1,5,21,25
157:14,15
**weeks** 52:5 150:16,19
**Weiss** 95:17,18
**Wells** 95:18,19 96:1,15
**went** 80:22 106:19
112:5 131:16 176:23
194:16,23
**weren't** 53:3 135:8
170:18 172:14
**we'd** 22:22
**we'll** 19:3 37:11 100:2
101:20 111:4 114:4
119:23 124:5 163:25
192:12 194:24
**we're** 24:14 48:17 50:2
55:15 67:3,14,16
68:5,22 70:11 113:20
120:22 140:6 141:14
149:3 173:2 187:9

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
GREG HAMILTON – 1/29/2013

Page 31

194:7,9
we've 50:7 70:14 79:18
  97:23,24 114:2
  192:25
whatsoever 52:2 72:8
  76:25 80:20 81:5
  101:9 126:15 170:12
  171:14
what's 5:13 6:23 16:4
  25:4 28:19 36:23
  60:4 71:7,20,20
  94:13 112:6 123:17
  130:16 134:22
  160:25 161:3 186:13
  190:14 200:10
  204:11 211:12
  212:11
When's 97:16 98:5
WHN 185:14 186:3
wholesale 1:3 50:3
  125:19 156:1,8,11,12
  157:17,18 165:8
  178:23 179:1,6,8
  186:3 218:3
wholesaler 156:9
  158:23 159:16,23
  161:22 175:18 176:6
  176:21 177:11,11,24
wholesalers 157:24
  158:17 160:3 164:10
  164:11,12,24 165:2,4
  166:18 167:9,25
  168:20 174:21 175:5
  196:13
who's 29:18 68:4 70:7
  205:15
willing 206:22
win 102:5
winter 137:9
witness 3:2 5:3,5,18,19
  6:21 12:19,21 15:18
  17:6 18:13,17 19:4
  19:24 20:24 22:5,21
  24:17 25:2 26:5,10
  27:13 32:19 33:1,10

34:18 43:16 44:1,22
  46:2 48:14 52:12
  54:8,23 55:4 56:9,24
  57:15 58:13,22 59:7
  59:21 60:7,13,14,18
  60:25 61:24 62:12,22
  64:22 68:4,8 70:14
  71:9 72:5 75:24 77:6
  77:16,20,23 78:18
  79:15 80:10,15,20
  84:1 87:15 88:5,12
  89:25 90:14,20 91:1
  92:19 93:1,21 95:23
  96:4 97:1 102:21
  104:21 105:9 107:18
  108:13 109:18
  110:12,18 111:22
  112:21 113:5 114:18
  115:6,17 116:15
  117:4,17 118:10,15
  118:19,22,24 119:7
  120:17 122:24 126:6
  126:24 127:8,11
  130:14 132:16,22
  133:15,21 139:1
  140:5 144:12 147:20
  148:2,10 150:6 152:5
  152:23 156:16,25
  157:6 159:4,5 160:11
  162:3,9,16 163:5,20
  165:18 167:12,18
  168:11 169:12,20
  170:8 171:9 172:2,23
  173:23 174:25 175:9
  175:23 176:14 177:4
  180:3,9,20,22 181:11
  181:21 182:18
  183:16,23 186:11
  187:3 189:24 190:12
  191:8,15 198:17
  200:4,15 202:11,22
  204:6,16,23 206:21
  207:25 208:6,12
  209:6,15 211:6 213:3
  215:16 216:4,9,16,18

217:4
Witnesses 69:2,4
woman 183:21
wondering 106:17
won't 20:22 180:12
word 46:22 51:1 76:1
  100:3 123:18,19
  130:23 144:24
  178:24 195:18
words 50:24 68:18
  97:24 137:18 157:11
  157:13 194:19
work 21:22 23:23 31:9
  44:12 56:15 61:6
  65:11 66:2,21,22
  67:1,4 68:9,17,20,25
  69:2,2,21,24 76:3,25
  77:4 78:1 79:6 80:20
  81:13 82:15,21 83:1
  83:16 84:3,15 144:23
worked 29:4 44:15
  45:10 82:18 105:25
  143:4 188:19
working 21:24 82:3
  97:22,24 113:11
  124:22 139:9 194:7
works 82:11
worried 70:21
worry 39:20
worth 74:1,2 80:17
wouldn't 6:12 41:11
  134:9 168:8 189:18
  206:4
write 53:17
written 25:18 171:18
wrong 110:9,14
  111:18,24 142:15
  158:15 161:25 188:5
  199:21 200:10,22
wrongful 153:19
wrote 72:11,12
Wyeth 196:8,11,16
W-A-C 186:3

X

X 3:1,7 107:12

Y

yeah 9:24 27:9 69:7
  73:1 79:17 85:1
  86:23 114:4 118:15
  120:7 122:25 130:1
  132:4,8 143:14
  148:21,23 149:13
  151:20 156:17 160:4
  165:19 174:17 175:1
  177:5 183:9 186:25
  187:24 189:13
  198:24 203:15 207:3
year 10:21 36:4 37:19
  74:13 129:7 137:9
  194:1 203:11 212:5
years 10:1 16:6 28:20
  38:5,11 64:25 74:1,2
  74:13 98:9 125:1
  129:4 143:14 150:17
  150:18 167:9 171:1
  178:16 179:24
  190:21 193:25
  211:20
yellow 198:21
yesterday 32:8
you'd 35:11 52:15
  194:25
you'll 11:10 120:24
  143:19 157:14 195:1
you're 5:22 6:7 12:5
  17:20 23:22 27:25
  32:22 47:4,15 49:17
  52:13 56:8,21 57:10
  57:12 59:23 60:18
  61:8,12 68:24 70:21
  71:22 76:17 77:20
  79:2 82:10 85:19
  86:20 87:8 88:25
  90:15 92:7 94:21
  99:10 106:17 107:6
  109:2 113:19 120:23
  121:23 123:7 126:10
  132:13,19 148:11
  149:19 150:12 151:7
  154:25 161:21 171:6

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
GREG HAMILTON – 1/29/2013

Page 32

175:24 176:23 177:8
177:19 182:10 184:1
185:13 190:5 196:7
197:16 202:15 209:7
215:9
**you've** 14:23 15:10
17:11,11 21:3 25:18
25:21 56:1,7 57:21
61:20 65:9 70:25
74:8 78:15 79:17
80:2,13 97:16 109:5
114:1 116:13 123:20
123:23 124:6,6 127:3
128:21 141:15 147:6
152:19 165:19 174:6
199:8 207:19 211:8
213:24
**y'all** 139:13 147:18
155:16 190:20

_____
**$**
**$1.31** 166:1,3,4
**$1.50** 112:3 174:10
**$1.75** 88:23,24
**$1.88** 49:23
**$160** 80:17
**$7** 113:21
**$7.50** 112:11 113:18
171:19 174:9

_____
**0**
**01** 155:12
**02** 155:12
**03** 50:9 155:12 209:21
210:4
**04** 34:24 50:17,18
154:20 155:12
187:23 189:5
**05** 154:21 155:12,13
155:15,20

_____
**1**
**1** 1:25 3:9 5:1,14,14
191:23 218:14
**1st** 205:1
**1/21/10** 3:12

**1/23/01** 3:18
**1:01-CV-12257-PBS**
1:5 218:5
**1:08-CV-11200** 1:7
218:6
**1:30** 116:24
**1:34** 117:2
**10** 4:6 13:23 92:5
123:25 124:7,8
204:12,13,20 208:19
213:9 214:7,11
**10:12** 1:20
**11** 72:21 73:11,13
**11/10/05** 4:5
**11/11/12** 3:16
**110** 136:1
**12** 212:6
**12th** 25:13
**12:45** 114:2 116:22
**123** 3:18
**130** 3:19
**139** 4:13
**1409** 2:15
**1456** 1:4 218:3
**15** 37:18 41:12 103:15
116:1
**16** 198:10 199:16,25
200:7 212:1,12,22
**17** 198:10 199:16,25
212:1,12,23
**18** 23:13 200:8
**18th** 5:24 55:20
**1825** 2:10
**186** 3:23
**190** 4:2
**198** 4:4
**1993** 124:15
**1997** 163:9
**1999** 115:12 124:16
143:12 163:9

_____
**2**
**2** 3:12 6:18,24,24 7:6
8:1 28:4 37:11 76:1,1
114:16 158:20
**20** 4:13 12:13 13:5,7

28:8 41:12 172:8
180:17,24
**2000** 14:21 23:2 31:25
88:21 101:14 143:13
**2000s** 98:17
**20006** 2:10
**2001** 9:1 32:1 149:20
150:4,22 152:18
153:8,13 154:14
163:24 164:3 165:24
166:21,23 168:2
174:7,21 176:6
177:23 183:21 184:6
184:23 186:1
**2002** 154:16 163:9
**2003** 4:10 90:24 97:12
98:18,22 122:5
154:18 167:9 168:20
192:11
**2004** 42:20,21,22
51:12 54:12 98:22
101:15,24 167:9
168:21 189:9
**2005** 14:21 42:23 43:4
43:11,19,20 54:16
88:21 89:4,14,15,16
89:20 90:18,23 122:7
129:13 137:6,11
139:22 144:5 153:16
155:24 156:7,23
158:10,12 159:2
160:20,23 161:15
162:19 163:3 167:9
167:24 168:2 181:18
181:25 182:21,25
183:12 184:4,20
186:1 201:18 202:2
204:1 210:20
**2006** 9:1 32:1,2 75:2
101:15,24 184:23
**2007** 182:6 205:2
**2008** 182:7
**2010** 6:25 7:2,13 10:6
11:2 13:9 14:2,5 24:9
73:19 74:18 75:2,16

**2011** 76:11,12
**2012** 25:13
**2013** 1:20 113:1
115:12 116:25
215:24 217:6 218:22
**2014** 217:11
**202-420-2200** 2:11
**204** 4:6
**21** 6:25 7:13 37:12
**21st** 7:2
**213** 3:4
**218** 1:25 218:14
**22** 38:13
**24** 3:14,16 4:10 217:11
**24-228607** 1:24
**25** 13:23 172:8 196:6
196:24 197:11 212:5
**26** 67:15,16,23 68:13
**260** 2:19
**28th** 81:3
**29** 116:25 215:24
**29th** 1:19

_____
**3**
**3** 3:14 24:22 25:5,6,17
44:9 114:16 148:17
149:4
**3:45** 215:23
**30** 196:3,5 212:5
**30(b)(6)** 32:9
**30(e)** 216:20
**300** 1:18 217:11
**30022** 2:20
**31** 196:24 197:12
**31st** 124:15
**311** 217:11
**312** 217:12
**312-201-4000** 2:6
**32(d)** 216:20
**3222504-2506** 3:23
**3240462-0463** 4:2
**3300** 2:5
**340B** 15:9 45:9 94:19
94:20,24,24 95:1,5,6
**386-2000** 217:12
**39** 102:10,14,16

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
GREG HAMILTON − 1/29/2013

Page 33

| 4 | 9 | | |
|---|---|---|---|
| **4** 3:16 14:22 24:24 25:5,11,14,17 45:24 45:24,24,25 46:5 47:16,16 71:6,7 73:13 76:2 114:16<br>**400** 36:2<br>**41** 81:2<br>**42** 81:2<br>**47** 192:25 193:5 | **9** 4:4 198:14,19 199:21 212:18<br>**9/1/07** 4:6<br>**9/15/09** 3:14<br>**9/29/03** 4:2<br>**90** 94:10 100:8,9<br>**92** 37:11,12 73:18 74:17,24 88:22 197:14<br>**93** 37:11 88:22,24 94:10 100:8 188:1<br>**94** 187:25 188:4,5 197:14<br>**95** 163:9<br>**96** 114:10<br>**97** 97:11<br>**99** 114:10,11 143:13 | | |
| **5** | | | |
| **5** 3:4,9,18 114:16 115:25 123:14,18<br>**5th** 217:6<br>**512-469-9191** 2:16<br>**55** 2:5 3:5<br>**5755** 2:19 | | | |
| **6** | | | |
| **6** 3:12,19 114:16 130:11,17,21 136:5 136:10 144:20 145:17 146:5,10,11 146:18 147:14<br>**6,000** 193:2<br>**600** 1:18<br>**60603-5792** 2:5<br>**60606** 217:12 | | | |
| **7** | | | |
| **7** 3:23 37:14 44:10,10 186:7,8,14<br>**7/26/04** 3:23<br>**73** 28:6<br>**770-740-0008** 2:20<br>**78703** 2:15 | | | |
| **8** | | | |
| **8** 4:2 37:14 149:14 151:7 190:9,15 191:10<br>**80** 12:12 39:24<br>**84-1481** 217:10<br>**85** 42:23<br>**89** 188:2 | | | |

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| IN RE: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION ) ) ) ) ) | MDL No. 1456 Master File No. 1:01-CV-12257-PBS Sub-Category Case No. 1:08-CV-11200 |
| ) ) | Judge Patti B. Saris |
| THIS DOCUMENT RELATES TO: *United States ex rel. Linnette Sun and Greg Hamilton, Relators* *v.* *Baxter Hemoglobin Therapeutics and Baxter International Inc.* ) ) ) ) ) ) ) ) ) ) |  |

### <u>NOTICE OF DEPOSITION OF RELATOR GREG HAMILTON</u>

PLEASE TAKE NOTICE that pursuant to Rule 30 of the Federal Rules of Civil

Procedure, Defendant Baxter International Inc., by its attorneys Dickstein Shapiro LLP, notices

the deposition of Relator Greg Hamilton on January 29, 2013 at 10:00AM Eastern Time, at the

offices of Dickstein Shapiro LLP, 1825 Eye Street NW, Washington, DC 20006. The deposition

will be recorded stenographically and will continue from day to day until completed.



EXHIBIT

FENADJ 800-631-6989

*Hamilton 1*

*1-29-13 MB*

December 14, 2012

/s/ J. Andrew Jackson
J. Andrew Jackson
Merle M. DeLancey
Matthew W. Turetzky
**DICKSTEIN SHAPIRO LLP**
1825 Eye Street NW
Washington, DC 20006
Telephone:  (202) 420-2200
Facsimile:  (202) 420-2201
*Admitted pro hac vice*

Peter E. Gelhaar (BBO #188310)
**DONNELLY, CONROY & GELHAAR, LLP**
One Beacon Street, 33rd Floor
Boston, MA 02108
Telephone:  (617) 720-2880
Facsimile:  (617) 720-3554

Counsel for Defendant Baxter International Inc.

2

DSMDB-3124678v1

## CERTIFICATE OF SERVICE

I, Matthew W. Turetzky, hereby certify that on December 14, 2012, I caused a true and correct copy of the foregoing Notice of Deposition of Relator Greg Hamilton to be served on all counsel of record by electronic service by sending a copy electronically via e-mail, and by sending a copy to Lexis/Nexis for posting and notification to all parties.  I also certify that on December 14, 2012, I caused a true and correct copy of the foregoing Notice of Deposition of Relator Greg Hamilton to be served on David J. Chizewer, counsel for Relators, at Goldberg Kohn Ltd., 55 East Monroe, Suite 3300, Chicago, IL 60603, via Federal Express.

Matthew W. Turetzky
**DICKSTEIN SHAPIRO LLP**
1825 Eye Street NW
Washington, DC 20006
Telephone:  (202) 420-3662
Facsimile:  (202) 379-9126

3

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 1

1

                    UNITED STATES DISTRICT COURT
2                    DISTRICT OF MASSACHUSETTS
3

     IN RE:  PHARMACEUTICAL          )
4    INDUSTRY AVERAGE WHOLESALE      )
     PRICE LITIGATION                )  MDL No. 1456
5    _____     )
                                     )  Master File No.
6    THIS DOCUMENT RELATES TO:       )  1:01-CV-12257-PBS
                                     )
7    United States ex rel.           )  Sub-Category Case
     Linnette Sun and Greg           )  No. 1:08-CV-11200
8    Hamilton, Relators              )
                                     )
9        v.                          )
                                     )
10   Baxter Hemoglobin               )
     Therapeutics and Baxter         )
11   International Inc.              )
12

          HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
13

14           Deposition of GREG HAMILTON, taken before
15   MARGARET A. BACHNER, CSR, RMR, CRR, and Notary Public,
16   pursuant to the Federal Rules of Civil Procedure for
17   the United States District Courts pertaining to the
18   taking of depositions for the purpose of discovery, at
19   Suite 600, 300 North LaSalle Street, Chicago,
20   Illinois, on the 21st day of January, A.D. 2010, at
21   10:32 a.m.
22
23
24
25

EXHIBIT
Hamilton 2
1-29-13  MB

Page 2

1          There were present at the taking of this
      deposition the following counsel:

2

3               on behalf of the Relators;

4          BY:  MARK ALLEN KLEIMAN, ESQUIRE

5          2907 Stanford Avenue

6          Venice, California  90292

7          310-306-8094

8

              on behalf of Baxter Hemoglobin Therapeutics

9      and Baxter International Inc.;

10         DICKSTEIN SHAPIRO LLP

11         BY:  J. ANDREW JACKSON, ESQUIRE

12              RUCHI JAIN, ESQUIRE

13         1825 Eye Street, N.W.

14         Washington, DC  20006-5403

15         202-420-2200

16

17              on behalf of Bayer Corporation.

18         SIDLEY AUSTIN LLP

19         BY:  ENJAMIN KEITH, ESQUIRE

20         One South Dearborn Street

21         Chicago, Illinois  60603

22         312-853-7814

23

      ALSO PRESENT:

24         MR. MICHAEL BOLTON,

           In-House Counsel, Baxter International Inc.

25

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 3

```
 1                      I N D E X
 2    WITNESS                              EXAMINATION
 3    GREG HAMILTON
 4      By Mr. Jackson                          5
 5
 6                    E X H I B I T S
 7    DEPOSITION EXHIBIT               FOR IDENTIFICATION
 8      Number 1 - Notice of Deposition of Relator    5
                    Greg Hamilton
 9
       Number 2 - Pages from drugfraudsettlement.com  16
10                  re: Attorneys
11     Number 3 - Page from drugfraudsettlement.com   16
                    re: Drug Expert Greg Hamilton, Sr.
12
       Number 4 - Greg Hamilton curriculum vitae      29
13
       Number 5 - Document entitled Baxter Products   30
14                  W/AWP History, GH000001-000009
15     Number 6 - Declaration of Greg Hamilton        35
16     Number 7 - Amended Complaint for Damages       37
17     Number 8 - Document entitled Hemophilia        46
                    Resources of America, Inc.,
18                  GH000010-000022
19     Number 9 - Document entitled Express Scripts,  47
                    Inc. First DataBank File Inquiry,
20                  GH000023-000046
21     Number 10 - Document entitled Baxter           49
                    BioScience, Customer: Curascript,
22                  GH000047
23     Number 11 - RBC Capital Markets Document        54
                    entitled "A Changing  Paradigm In
24                  Hemophilia," GH000048-000071
25
```

Page 4
1                     E X H I B I T S
2     DEPOSITION EXHIBIT                    FOR IDENTIFICATION
3         Number 12 - U.S. News article entitled        56
                       "Court: HMOs Can Be Made to
4                      Open Networks," Gh000072-000074
5         Number 13 - Deposition of Patricia Kay        57
                       Morgan, GH000126-000290
6
          Number 14 - State of Texas Notice of Intention   58
7                      to Take Oral Depositions,
                       GH000089-000125
8
          Number 15 - Deposition Summary of Patricia Kay   59
9                      Morgan, GH000291-000320
10        Number 16 - Document entitled Global Market    61
                       Research Hemophilia, GH000321-
11                     001495
12        Number 17 - Document entitled The Plasma       69
                       Fractions Market in the United
13                     States, GH001527-001744
14        Number 18 - Summary of First DataBank         72
                       Information on Selected Drugs,
15                     GH001526
16        Number 19 - Appointment Book excerpts,        77
                       GH001497-001523
17
          Number 20 - 4/22/05 letter from Kleiman to     86
18                     Gonzales and Theis, GH001525
19        Number 21 - Memorandum in Opposition to      98
                       Baxter's Motion to Dismiss
20
21
22
23
24
25

Page 5

 1                         (The witness was duly sworn.)

 2                    GREG HAMILTON,

 3     called as a witness herein, having been first duly

 4     sworn, was examined and testified as follows:

 5                         EXAMINATION

 6     BY MR. JACKSON:

 7          Q.    Mr. Hamilton, my name is Andy Jackson.  To

 8     my left is Ruchi Jain.  We represent Baxter in this

 9     case.

10                         (Deposition Exhibit Number 1 was

11                          marked for identification.)

12                         (Document tendered to the

13                          witness.)

14     BY MR. JACKSON:

15          Q.    Let me show you what's been marked as

16     Deposition Exhibit 1.  Deposition Exhibit 1 is a

17     Notice of Deposition regarding you and this matter.

18                    Have you seen that document before?

19          A.    I believe so.

20          Q.    You're appearing today pursuant to that

21     Deposition Notice?

22          A.    Yes.

23          Q.    Mr. Hamilton, I'm going to be asking a

24     series of questions today.  I need you to answer

25     aloud, no shaking head up or down or left to right so

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 6

1      we can make sure we get a full record.  Is that okay

2      with you?

3          A.    Yes.

4          Q.    And I presume you're not on any medication

5      or under any other kinds of drugs that would impair

6      your ability to understand my questions or your

7      ability to testify today.

8          MR. KLEIMAN:  There's no question pending.

9      BY MR. JACKSON:

10         Q.    You can answer the question.

11         A.    I understand.  I was waiting -- if you'd

12     like me to affirm your statement, yes, you're correct.

13         Q.    That's fine.  And you understand that there

14     may be times today when your counsel objects to my

15     question.  Unless you're instructed by your counsel to

16     answer, you go ahead and answer the question.

17              Do you understand that?

18         A.    Yes, I do.

19         Q.    Mr. Hamilton, did you review any documents

20     in preparation for your deposition?

21         A.    Yes, I did.

22         Q.    What documents did you review?

23         A.    I reviewed a rough version of Linnette

24     Sun's recent deposition.  I reviewed my Declaration.

25     And I quickly scanned our counsel's response to -- I

Page 7

1    think it was like a response to a motion of yours.

2        Q.   So, the Relators' Opposition to our Motion

3    to Dismiss, you think that's what it was?

4        A.   I think that's what it was.

5        Q.   Okay.  Any other documents you reviewed in

6    preparation for your deposition?

7        A.   Not that I recall.

8        Q.   Did you speak with Miss Sun?

9        A.   No, I did not.

10       Q.   Sir, have you been deposed before?

11       A.   Yes, I have.

12       Q.   How many times?

13       A.   I believe three.

14       Q.   Can you briefly describe each of those

15    depositions, what case it was and what the subject

16    matter of the deposition was?

17       A.   Okay.  One was a civil fraud case involving

18    Vioxx.

19             The second was the Kentucky AWP case.

20             And the third was -- I believe it's a civil

21    case on product liability involving a hepatitis C

22    outbreak in Las Vegas.

23       Q.   When was the deposition regarding the Vioxx

24    matter?

25       A.   About a year and a half ago.

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 8

1          Q.     What was your role in that case?

2          A.     I was an expert witness.

3          Q.     For whom?

4          A.     For the plaintiff.

5          Q.     Who was the plaintiff?

6          A.     Henry Chapin -- or Channon.   Sorry.

7          Q.     And did your testimony in that case concern

8     AWP in any way; that is, average wholesale price?

9          A.     No, it did not.

10          Q.     How about average manufacturer price?

11          A.     No, it did not.

12          Q.     Best price?

13          A.     No, it did not.

14          Q.     And what was the gravamen?   What was the

15     principal matter at issue in the Vioxx case?

16          A.     I'm not sure -- are you talking about the

17     principal matter for the plaintiffs, his lawyers or my

18     role as the expert witness?

19          Q.     The plaintiff in the first instance.

20          A.     The plaintiff had damages as a result of

21     being infected with hepatitis C from -- at least they

22     were alleging that at this particular center.

23          Q.     And what was your role as the expert in

24     that case?

25          A.     My role was to describe and discuss the

Page 9

1    methods and operations of pharmaceutical marketing.

2         Q.    And in the Kentucky AWP matter, I believe

3    you testified that your role there was as an expert?

4         A.    Yes.

5         Q.    What topic areas were you identified as a

6    potential expert for?

7         A.    I'd have to go back and get -- if you want

8    exact details, but in general --

9         Q.    In general.

10        A.    In general it was pharmaceutical marketing,

11   pricing and specifically AWP.

12        Q.    And when we use the phrase or the word

13   "AWP" or the letters "AWP," we'll understand it to

14   mean average wholesale price?

15        A.    That is correct.

16        Q.    And who were your retained by in that

17   matter?

18        A.    Chuck Barnhill.

19        Q.    You were an expert for the plaintiffs in

20   that case?

21        A.    That's correct.

22        Q.    And was that a qui tam case, a False Claims

23   Act case?

24        A.    No, I don't believe it was.  It was the

25   State of Kentucky versus several defendants.

Page 10

1          Q.     And then the civil case, the product

2     liability matter regarding hepatitis C, what was your

3     role in that case?

4          A.     My role was as a -- an expert in

5     pharmaceutical marketing.

6          Q.     Did that case have anything to do with AWP,

7     AMP or BP?

8          A.     No, it did not.

9          Q.     Have you ever testified at trial before?

10         A.     No, I have not.

11         Q.     Have you ever been accepted by a Court as

12    an expert witness?

13         A.     I'm not sure.

14         Q.     Have you ever testified during a trial?

15         A.     No, I have not.

16         Q.     Mr. Hamilton, were you aware that today's

17    deposition is limited to matters related to

18    jurisdictional issues, and that if the Motion to

19    Dismiss is denied in this case, there will be a

20    subsequent time when we will depose you regarding

21    substantive matters?  Were you aware of that?

22         A.     I am aware to the extent that I understand

23    the legal jargon.

24         Q.     Okay.  That's fine.  Have you ever been --

25    I'm sorry.

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 11

1           So, those are the only three cases you've

2    testified in; Vioxx, Kentucky AWP and the hepatitis C

3    case?

4           A.    When you say "testified," if you're

5    referring to in court, I've already answered that I

6    have not testified in court.

7           Q.    In deposition.

8           A.    In deposition, yes.

9           Q.    All right.  Are there any other court

10   matters that you have been retained as a testimonial

11   or consulting expert?

12          MR. KLEIMAN:  Objection.  Compound.

13   BY MR. JACKSON:

14          Q.    You can answer the question.

15          A.    Okay.  But let me break it down.  You want

16   to know if there are any other cases ever in my entire

17   career that I've been retained in the capacity either

18   as an expert witness or as a consultant?

19          Q.    Yes.

20          MR. KLEIMAN:  To the extent to which Mr. Hamilton

21   has been retained as an expert on cases that are under

22   seal, I'm going to instruct him not to answer.  As to

23   all other matters he can.

24   BY THE WITNESS:

25          A.    In light of counsel's objection, much of my

Page 12

1    work is in qui tam work.  And some of my cases I know

2    for certain are under federal seal.  These things come

3    in and out from under seal, so I just don't know if

4    some of them are still under seal or not under seal.

5    So, I think I'd have to err on the side of caution and

6    just say I can't give you that list.

7    BY MR. JACKSON:

8        Q.    In how many cases total have you been

9    retained?

10       A.    I don't have an exact number, but if you'd

11   like -- would you like a range, an estimate?

12       Q.    That would be fine.

13       A.    How about somewhere between 10 and 25?

14       Q.    And you can't tell me which of those 10 to

15   25 cases are presently under seal or not?

16       A.    Not at this moment.

17       Q.    How many of those 10 to 25 cases relate to

18   the pharmaceutical industry?

19       A.    All of them.

20       Q.    How many of those cases are False Claims

21   Act cases, whether federal False Claims Act or state

22   False Claims Act?

23       A.    Off the top of my head, and this is an

24   estimate, to the best of my recollection all but the

25   three that we discussed that I've given depositions

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 13

1    for.

2                         (Mr. Michael Bolton entered

3                         the deposition proceedings.)

4    BY MR. JACKSON:

5        Q.    So, all are False Claims Act cases of

6    similar ilk?

7        A.    Except for the --

8        Q.    The first three you mentioned; the Vioxx,

9    the AWP and the civil matter?

10       A.    Correct.

11       MR. KLEIMAN:  Excuse me, Mr. Jackson.  Can you

12   identify who it is that has entered the room and is

13   sitting at the table?

14       MR. JACKSON:  Sure.  All the way at the end of

15   the table is Michael Bolton, who is a lawyer for

16   Baxter.

17       MR. KLEIMAN:  Thank you.

18   BY MR. JACKSON:

19       Q.    In how many of those cases have you been

20   retained by the plaintiffs or relators?

21       A.    All of them.

22       Q.    How many of those cases relate or refer to

23   pharmaceutical pricing?

24       A.    I don't have that off the top of my head.

25   I don't know.

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 14

1      Q.    More than half?

2      A.    Well, pricing's a broad subject.  So, in

3    the sense that -- you know, in any sense that I can

4    assign the word "pricing," I would say, yes, more than

5    half.

6      Q.    How many of those cases relate or involve

7    average wholesale price?

8      MR. KLEIMAN:  Objection.  Ambiguous.  Are we now

9    talking about as the denominator the more than half

10   that involve pricing, or is the denominator still the

11   universe of false claims cases?

12   BY MR. JACKSON:

13     Q.    You can answer the question.

14     A.    Well, first of all, I don't have that

15   statistic with me.  I haven't broken the cases down.

16           But again, of all the cases I have and have

17   ever worked on, if you're asking what percentage

18   are -- have some, if any, touched on AWP, I would

19   probably say at least half of them.

20     Q.    Have you ever been retained by your

21   counsel, Mr. Kleiman, before?

22     A.    Yes, I have.

23     Q.    In what case was that or cases?

24     A.    It was in -- help me out.  Mark, is that --

25           (Discussion off the record.)

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 15

1    BY THE WITNESS:

2         A.    It was in the case of Steinke versus Merck.

3    BY MR. JACKSON:

4         Q.    How much were you paid as a consultant or

5    expert in the Steinke case by Mr. Kleiman?

6         A.    Well, first of all, I don't know if it was

7    just -- it wasn't just by Mr. Kleiman.  I was retained

8    by Mr. Kleiman and Steve Cohen and BethAnne Yeager as

9    a group.  Actually, I think -- I don't remember which

10   group issued the checks.  But if you'd like a total of

11   how much I made from the entire case?

12        Q.    Yes, sir.

13        A.    About 115, 120 thousand dollars.

14        Q.    And what period of time did your retention

15   and work cover in that case?

16        A.    Again I can just give you an estimate.  I

17   think it was between 2005 and 2008.

18        Q.    You mentioned Mr. Cohen, Mr. Kleiman and

19   Ms. Yeager in your answer to that.  Are they members

20   of the same law firm?

21        A.    I don't think so.

22        Q.    Were you aware of the fact that those three

23   lawyers advertise under a website entitled

24   drugfraudsettlement.com?

25        A.    No, I've never seen that website.

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 16

1                         (Deposition Exhibit Number 2 was

2                         marked for identification.)

3                         (Document tendered to the

4                         witness.)

5     BY MR. JACKSON:

6         Q.    I'll show you what's been marked as Exhibit

7     Number 2.  We'll have to have copies made, but Mark,

8     this comes from the website.

9               Oh, do you have copies?

10              Have you ever seen that before?

11        A.    No, I haven't, not -- I mean, I don't

12    believe I've seen this.  There was a website --

13        MR. KLEIMAN:  You've answered the question.

14    BY MR. JACKSON:

15        Q.    You were about to make a comment about a

16    website.  What was the website you were about to refer

17    to?

18        A.    When the Merck case was settled, this group

19    of attorneys put together a website to explain the

20    case.  And I saw that particular site.

21                        (Deposition Exhibit Number 3 was

22                        marked for identification.)

23                        (Document tendered to the

24                        witness.)

25

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 17

1    BY MR. JACKSON:

2         Q.    Let me show you what's been marked as

3    Deposition Exhibit 3.   Deposition Exhibit 3 is a page

4    from that same website from which Deposition Exhibit 2

5    came.   You are identified as the lawyers' drug expert.

6              Have you ever seen that document before?

7         A.    Yes, I have.

8         Q.    Has Mr. Kleiman or any of the other two

9    lawyers identified in Deposition Exhibit 2 retained

10   you in connection with any other AWP cases?

11        A.    Would you define "AWP cases"?

12        Q.    I'll ask the question has Mr. Kleiman or

13   any of the other two lawyers identified in Exhibit 2

14   retained you as an expert in connection with any other

15   cases in which a pharmaceutical company is a

16   defendant?

17        A.    I don't know.

18        Q.    You don't know whether you've been retained

19   by those lawyers in any other matter?

20        A.    I don't know if a pharmaceutical company is

21   at this time a defendant in a case.   In other words, a

22   case may or may not have been filed, and I may not

23   know whether that case has been filed or not.

24              As to whether or not I've been retained, my

25   answer is no.

Page 18

1          Q.     Did any of those lawyers identified in

2    Exhibit 2 -- they have not retained you in connection

3    with any of the 10 to 25 other cases against the

4    pharmaceutical industry that you identified earlier?

5          A.     That's correct.

6          Q.     Who were you retained by in the Strong

7    versus Merck case?

8          A.     Craig Steffans.

9          Q.     What's that case about?

10         A.     That case concerns the wrongful death of

11   Mr. Steffans' client.  Are you asking me what his

12   claim is?

13         Q.     Yes.

14         A.     I believe his claim is called, and again

15   I'm not a lawyer, but I think he called it civil

16   fraud.  And it has to do with the promotion of the

17   drug, how the drug is promoted.

18         Q.     Which drug?

19         A.     Vioxx.

20         Q.     Is that the same case that you mentioned

21   earlier, the Vioxx case, when I asked you about the

22   cases in which you've been deposed?

23         A.     Yes.

24         Q.     Same case.  Did that Vioxx case concern

25   Baxter in any way?

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 19

1      A.    No.

2      Q.    Do any of the other 10 to 25 cases that

3    you've identified that you have been retained as a

4    consultant or an expert concern Baxter?

5      MR. KLEIMAN:  To the extent to which any of the

6    cases are under seal I'm going to instruct Mr.

7    Hamilton not to answer.

8    BY THE WITNESS:

9      A.    There is one case that is not under seal.

10   And it is one in which I've been deposed.  And that is

11   the hepatitis C case in Las Vegas.

12   BY MR. JACKSON:

13     Q.    And that is the third of the cases that you

14   mentioned earlier that you'd been deposed on?

15     A.    Yes, it is.

16     Q.    And what is the basis for which you're not

17   testifying regarding these cases under seal?

18     A.    Pardon me?

19     Q.    Why are you not testifying or why are you

20   not answering my questions regarding the cases that

21   are under seal?

22     MR. KLEIMAN:  Because I've instructed him not to.

23   BY THE WITNESS:

24     A.    That's a good reason.

25     MR. JACKSON:  I want to designate this case as

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 20

1    subject to the protective order issued under MDL

2    Number 1456, and I will designate this as highly

3    confidential.

4    BY MR. JACKSON:

5        Q.    In light of the fact that a protective

6    order has been entered in all these cases and this

7    deposition is subject to that protective order, will

8    you now answer my questions regarding those 10 to 25

9    cases under seal?

10       MR. KLEIMAN:  No.

11   BY THE WITNESS:

12       A.    No.

13   BY MR. JACKSON:

14       Q.    Are you presently a plaintiff in any other

15   case other than the case we're discussing today?

16       A.    No.

17       Q.    Have you ever before been a plaintiff in a

18   lawsuit?

19       A.    Yes.

20       Q.    What was the subject matter of that

21   lawsuit?

22       A.    I think I had a small claims case, like, 20

23   years ago.  I have a vague recollection of that.

24       Q.    But other than the present case that you're

25   being deposed about today, you have not been and are

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 21

1    not now a plaintiff in any other litigation?

2        A.    I'm really trying to think hard here.   I

3    had a -- I had a case where I was a plaintiff for a

4    period of time in a personal injury case.   Again, I

5    think that was another -- it might have been a small

6    claims case, too.   That's it.

7        Q.    You mentioned the Kentucky AWP case.   Did

8    any of your testimony in the Kentucky AWP case have

9    anything to do with Baxter?

10       A.    Not that I recall.

11       Q.    Were you provided any documents in

12   connection with that case that concerned or related to

13   Baxter?

14       A.    No.

15       Q.    And in the Strong versus Merck case, were

16   you provided any documents or information in

17   connection with that case that related to Baxter?

18       A.    No.

19       Q.    And in connection with the 10 to 25 other

20   pharmaceutical cases that remain under seal, have you

21   been provided any information with regard to any of

22   those cases that relate to Baxter?

23       A.    Not that I recall.

24       Q.    Mr. Hamilton, when did you first meet

25   Linnette Sun?

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 22

1        A.    I can only estimate that.  Probably

2   sometime around 2005, sometime around the time we

3   filed the Complaint.

4        Q.    How many times have you met with her in

5   person?

6        A.    I don't have an exact answer, but I would

7   say it's somewhere between one and three.

8        Q.    Has Ms. Sun ever provided you any documents

9   or information relating to Baxter?

10        A.    Nothing that I specifically recall.  She

11   has provided documents to our attorneys.  And I may

12   have had -- I may have had access to them, but I don't

13   recall ever looking at them.

14        Q.    Based upon that answer, do you remember

15   reviewing any documents in connection -- that you

16   might have received from Ms. Sun?

17        A.    No.

18        Q.    So, to your knowledge you have not reviewed

19   internal documents, internal Baxter documents that

20   were provided to you by Ms. Sun?

21        A.    Correct.

22        Q.    How did you come to meet Ms. Sun?

23        A.    I'm going to have to say that's a lawyer

24   thing.  It has everything to do with my attorneys.

25   And so, I think that's all under their privilege.

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 23

1        Q.    Your attorney didn't object, so you can

2    answer my question.

3        MR. KLEIMAN:  I want you to exclude from this any

4    discussions you have had with me or with Lauren Udden.

5    BY THE WITNESS:

6        A.    That excludes everything.

7    BY MR. JACKSON:

8        Q.    So, by your response do you mean that the

9    one to three times you met with Ms. Sun the lawyers

10   were always present?

11       A.    Yes, that is true.

12       Q.    And by that do you also mean that the

13   method or way by which you first met Miss Sun somehow

14   involved your lawyers?

15       MR. KLEIMAN:  You can answer that question to the

16   extent it does not involve a communication with me or

17   Mr. Udden.

18   BY THE WITNESS:

19       A.    But everything involves communication with

20   you and Mr. Udden.  So, therefore, I can't answer it.

21   BY MR. JACKSON:

22       Q.    Let me ask it a different way.

23             The first time you met Ms. Sun did you

24   contact her?

25       A.    No.

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 24

1        Q.    Did she contact you?

2        A.    No.

3        Q.    How about the other two times that you and

4    Ms. Sun have met personally; did you initiate the

5    communications?

6        A.    No, I did not.

7        Q.    Did Ms. Sun initiate the communications?

8        A.    No, she did not.

9        Q.    How many times have you and Ms. Sun spoken

10   on the telephone?

11       A.    Absent of attorneys?

12       Q.    Yes.

13       A.    Zero.

14       Q.    And just to make sure I understand your

15   answer, you had not met Ms. Sun until sometime in

16   2005, is that correct?

17       A.    Again I would be guessing.  It could have

18   been 2006 when I -- you say, "met."  I assume you mean

19   physically?

20       Q.    Yes, physically met.

21       A.    That could have been 2006.  I don't

22   remember.

23       Q.    Your first communication with Ms. Sun, was

24   that in person or by telephone?

25       A.    Again, any and all communication that I've

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 25

1    had with Ms. Sun was with and through the attorneys.

2        MR. KLEIMAN:  He's not asking you for content.

3    He's just asking whether it was in person or by phone.

4    That you can answer.

5    BY THE WITNESS:

6        A.   Oh, by phone.

7    BY MR. JACKSON:

8        Q.   And that first contact was around 2005?

9        A.   Approximately.

10       Q.   Okay.  I'll represent to you, sir, that the

11   Amended Complaint in this matter was filed on or about

12   June 14, 2005.  Using that date as a reference date,

13   does that help you date approximately when you and Ms.

14   Sun first had a communication?

15       A.   Not really.

16       Q.   Do you and Ms. Sun have any agreement to

17   share damages, fees or proceeds from this case?

18       A.   Yes, we do.

19       Q.   What are the terms of that agreement?

20       A.   By "terms" could you be more specific?

21       Q.   Tell me about the agreement between you and

22   Ms. Sun regarding the splitting of fees, et cetera.

23       A.   I can only give you the -- what I remember.

24       Q.   Okay.

25       A.   Because, you know, it's legal stuff.  So, I

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 26

1    don't remember all the conditions and terms.

2         Q.    That's fine.

3         A.    The operative one that I remember is that

4    we are to split any relators' fees in a ratio of 80

5    percent for her and 20 percent for me.

6         Q.    And how is that ratio determined?

7         MR. KLEIMAN:  You can testify about that to the

8    extent to which you're not revealing communications

9    you had with myself or Mr. Udden.

10   BY THE WITNESS:

11        A.    Again that means I can't answer.

12   BY MR. JACKSON:

13        Q.    Is that agreement in writing?

14        A.    Yes, it is.

15        MR. JACKSON:  We'd like to get a copy of that

16   agreement.  We can send you a Document Request, if

17   you'd prefer.

18        MR. KLEIMAN:  I'd prefer.

19   BY MR. JACKSON:

20        Q.    Do you remember any of the other terms of

21   that agreement between you and Ms. Sun?

22        A.    No, I don't.

23        Q.    Do you have any other agreements in the 10

24   to 25 other matters that are under seal to share fees

25   with the relators?

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 27

1      A.    No, I don't.

2      Q.    Prior to filing this lawsuit, Mr. Hamilton,

3  in April of 2005 did you meet personally with any

4  representatives from the Justice Department regarding

5  the facts and circumstances of the Complaint?

6      A.    I don't know.  I don't know in terms of the

7  dates.  At some point in time we did meet with the --

8  some folks from the Justice Department.  But I don't

9  recall if it was -- you know, what the dates were I

10 just don't know.

11     Q.    Who did you meet with?

12     A.    The one individual I remember was Justin

13 Draycott.

14     Q.    How many times did you meet with Mr.

15 Draycott in connection with this case?

16     A.    Just once, I believe.

17     Q.    Your Complaint in this matter makes claims

18 based upon the law of various other states.  Are you

19 aware of that?

20     A.    Vaguely.

21     Q.    Okay.  Prior to filing the Complaint did

22 you meet personally with representatives of any of the

23 states identified in your Complaint?

24     MR. KLEIMAN:  Concerning this matter?

25 BY MR. JACKSON:

Page 28

1        Q.    Concerning this matter.

2        A.    You know, I don't recall all of who -- you

3    know, who we met and when.

4        Q.    So, is the answer that yes, you did meet

5    with certain state representatives or that you did not

6    meet?

7        A.    The answer is I don't recall.

8        Q.    Okay.  Mr. Hamilton, can you briefly

9    describe for me your work history?

10       A.    Sure.  I started in the drug industry about

11   a year out of undergraduate school.

12       Q.    What year was that?

13       A.    Oh, this is painful.  In 1973 I went to

14   work for Ross Laboratories, which is a division of

15   Abbott, as a sales rep.  I worked for them in the

16   Chicago area for about 11 years.

17            Left there, went to work for Schering

18   Plough, also in Chicago, also as a sales rep.  And

19   worked there for about two, two and a half years.

20            Left there.  I went to Cutter Biological.

21   Cutter Biological was a wholly-owned subsidiary of

22   Bayer AG or Bayer Company.  And I worked for the Bayer

23   Company from about '86 until 1999.

24            Is that the -- is that what you're looking

25   for or do you want --

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 29

1      Q.     Sure.  Keep going.  You're up to 1999.

2      A.     In '99 I left Bayer and became a

3  consultant.  I worked at that point for basically two

4  companies.  One was Bayer Corporation and the other

5  one was Express Scripts.  Did that for about a year or

6  so.

7           Then I went to work for Express Scripts,

8  and I worked for them from 2001 until 2006.

9           From 2006 until today I have been an

10  independent consultant.

11                    (Deposition Exhibit Number 4 was

12                    marked for identification.)

13                    (Document tendered to the

14                    witness.)

15  BY MR. JACKSON:

16      Q.     Let me show you what's been marked as

17  Deposition Exhibit 4.  Mr. Hamilton, have you ever

18  seen Deposition Exhibit 4 before?

19      A.     I believe I have.

20      Q.     I'll represent to you, sir, that that is an

21  exhibit that came from your deposition in the Kentucky

22  matter that you previously described.

23           Does that accurately reflect your work

24  history?

25      A.     Reasonably.  Some of the dates I believe

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 30

1    are wrong.  But it's -- it's an accurate

2    representation.

3         Q.    Have you ever worked for Baxter or any of

4    the -- either of the Baxter entities that are

5    identified as defendants in this case?

6         A.    No, I have not.

7         Q.    Have you ever consulted with Baxter or

8    either of the Baxter entities who are defendants in

9    this case?

10        MR. KLEIMAN:  Objection.  Ambiguous.

11   BY MR. JACKSON:

12        Q.    You can answer the question.

13        A.    I have not been paid as a consultant for

14   Baxter.

15                          (Deposition Exhibit Number 5 was

16                          marked for identification.)

17                          (Document tendered to the

18                          witness.)

19   BY MR. JACKSON:

20        Q.    I show you what's been marked as Deposition

21   Exhibit 5.  Deposition Exhibit 5 is a document that at

22   the top left corner says "Baxter Products W/AWP

23   History."  And under that it's "04.11.05."

24             Have you ever seen this document before?

25        A.    Yes, I have.

Page 31

1          Q.     When did you first see this document?

2          A.     I don't recall.

3          Q.     What is this document?

4          A.     It appears to be a printout.  It's a print

5     screen from First DataBank's information on AWPs.

6          Q.     How do you know this document came from

7     First DataBank?

8          A.     Well, I'm not certain that this document

9     came from First DataBank.  But I do know that

10    documents like this come from First DataBank.

11         Q.     Okay.  You will note at the bottom

12    right-hand corner there is a Bates number GH000001

13    through GH000009.

14                Do you see that?

15         A.     Yes, I do.

16         Q.     So, those documents were produced to us by

17    you.  How did you come to have this document and,

18    therefore, produce it to Baxter in this litigation?

19         A.     If this is a document that I sent to my

20    attorneys, which I assume at this point that it is,

21    then it means it is a document that I printed off of

22    information from First DataBank.

23         Q.     How was it you were able to print

24    information off of First DataBank?

25         A.     I am a subscriber to First DataBank.

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 32

1      Q.    What do you mean by that, "a subscriber to

2   First DataBank"?

3      A.    It means I pay a fee and receive AWP and

4   product information from First DataBank.

5      Q.    When did you first become a subscriber to

6   First DataBank and, therefore, have access to this

7   information?

8      MR. KLEIMAN:   Objection.   Compound.   It assumes

9   he didn't have access before he became a subscriber.

10          Go ahead and answer.

11  BY MR. JACKSON:

12     Q.    You can answer the question.

13     A.    I'll break the question up.

14          In response to when did I become a

15   subscriber, two or three years ago.

16     Q.    And that is you became a subscriber

17   personally versus through some company?

18     A.    Correct.

19     Q.    Now, did you have access to First DataBank

20   information prior to you personally becoming a

21   subscriber?

22     A.    Yes, I did.

23     Q.    How did you have that access?

24     A.    I had it directly and indirectly.   I had

25   the access to it through Express Scripts.

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 33

1      Q.    So, while you were an employee at Express

2   Scripts?

3      A.    That is correct.

4      Q.    In that scenario who is the subscriber?  Is

5   it Express Scripts or is it Greg Hamilton?

6      A.    It would be Express Scripts.

7      Q.    Okay.  Now, prior to your time at Express

8   Scripts did you have access to information within the

9   First DataBank database?

10     A.    No.

11     Q.    So, based upon your earlier testimony what

12  date do you believe approximately you first gained

13  access to First DataBank information?

14     A.    Well, let me back up.  When you say "first

15  gained access," there's many ways to access a data

16  bank's information, firsthand or secondhand or third.

17          I mean, one way is the way I get it now,

18  which is I'm a subscriber.

19          Another way would be, like, when I was with

20  Express Scripts and I had access to their subscription

21  to First DataBank.

22          Prior to that I had -- again it depends how

23  you define this, but I had access to First DataBank's

24  information through other parties.

25     Q.    Like whom?

Page 34

1    A.    Well, like customers.

2    Q.    Which customers?

3    A.    I don't recall which ones specifically, but

4    they certainly would have been -- there could have

5    been other manufacturers and GPOs, home care

6    companies.  They would all refer to AWP and

7    oftentimes, you know, pull out printouts of their

8    sheets, too, and say, "This is what Red Book's got.

9    This is what First DataBank has," that kind of stuff.

10           So, it wasn't that I was a subscriber, but

11   I was presented that data by other people.

12   Q.    When you received this First DataBank

13   information via third parties, when do you think that

14   process first began?

15   A.    I would guess somewhere around 1995.  I

16   also should note that we're talking about -- we're

17   talking in generalities about information; we're not

18   talking about specifics.

19           I also had direct contact with First

20   DataBank when I was with Bayer.  I was actually the

21   individual that submitted AWP information to First

22   DataBank.  So, I received requests from them along

23   with Medispan and Red Book as to, you know, what AWP

24   information we wanted published for several years.

25   So, I had direct contact back and forth on some

Page 35

1     information about AWP with First DataBank.

2         Q.    Okay.  And I believe in your Declaration

3     that you filed in response to our Motion to Dismiss

4     you also identified communications you had with

5     representatives at First DataBank, including Kay

6     Morgan, correct?

7         A.    Yes.

8         Q.    And was it -- and it was, I believe from

9     your Declaration, that it was your communication with

10    Kay Morgan that formed the basis of the factual

11    allegations in various paragraphs of the Complaint,

12    correct?

13        A.    It formed -- it was the basis of some

14    information.  It wasn't everything.

15                        (Deposition Exhibit Number 6 was

16                        marked for identification.)

17                        (Document tendered to the

18                        witness.)

19    BY MR. JACKSON:

20        Q.    Let me show you what's been marked as

21    Deposition Exhibit 7.

22            Mr. Hamilton, I've just handed you

23    Deposition Exhibit 7.  Deposition Exhibit 7 is a

24    document entitled -- I'm sorry.  That should be 6.

25    Let's make sure we have the right number on that now.

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 36

1     That's actually Deposition Exhibit 6.  Thank you.

2               Have you seen this Declaration before?

3     A.    Yes, I have.

4     Q.    Did you draft this Declaration?

5     A.    I don't recall.

6     Q.    Do you remember when you first saw this

7     Declaration?

8     A.    Exactly, no.

9     Q.    Did you provide the facts that are

10    contained in this Declaration?

11    A.    Yes, I did.

12    Q.    Can I refer you to paragraph 8 of your

13    Declaration?  Do you see that?

14    A.    Yes, I do.

15    Q.    It says, "In addition to my direct

16    discussions with Baxter managers, I learned of

17    Baxter's pricing and some of the specific acts alleged

18    in paragraphs 36 through 40 of our Complaint while

19    trying to help Kay Morgan, Manager of Editorial

20    Services for First DataBank."

21              Do you see that?

22    A.    Mm-hmm.  Yes, I do.

23    Q.    So, let's go ahead and give you the

24    Complaint.

25

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 37

1              (Deposition Exhibit Number 7 was

2              marked for identification.)

3              (Document tendered to the

4              witness.)

5    BY MR. JACKSON:

6        Q.    I show you what's been marked as Deposition

7    Exhibit 7.  Do you recognize Deposition Exhibit 7?

8        A.    Yes, I do.

9        Q.    Can I have you turn to paragraph 36 of the

10   Complaint that is Deposition Exhibit 7?  Are you

11   there?

12       A.    Yes, I am.

13       Q.    It's on page 13 of the Complaint.

14       A.    Yes, I am.

15       Q.    All right.  So, what components of the

16   information contained in paragraph 36 of the Complaint

17   did you receive from Kay Morgan?

18       A.    May I mark this document?

19       Q.    Certainly.

20       A.    (Indicating).

21       Q.    Can you read the information in paragraph

22   36 that you gained from your discussion with Ms.

23   Morgan at First DataBank?

24       A.    Yes.  In paragraph 36, the information that

25   I gained from Kay Morgan is as follows:  "Baxter has

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 38

1    reported to First DataBank that the WAC for

2    Recombinate is $1.30 per unit."

3         Q.    Is that the only information in paragraph

4    36 that you gained from Kay Morgan?

5         A.    Yes, it is.

6         Q.    Okay.  Did you provide any of the other

7    information in paragraph 36?

8         A.    Yes, I did.

9         Q.    Which?

10        A.    I provided all of the remaining information

11   in that paragraph.

12        Q.    So, how did you determine the number

13   $1.6250?

14        A.    I determined that because it was the

15   published AWP for Recombinate.

16        Q.    Where did you get that information?

17        A.    First DataBank.

18        Q.    And when you say you got it from First

19   DataBank, how did you get it from First DataBank?

20        A.    I don't recall at the time.  I mean, if I

21   want to make it easy for you, I could go home and pull

22   it up right now because First DataBank provides a

23   history of AWPs.

24        Q.    So, I'm just trying to understand, sir, was

25   this figure $1.625, was that information that you

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 39

1    pulled up from First DataBank in and around the time

2    the Complaint was filed or sometime earlier?

3         A.    I don't recall.

4         Q.    Now, the next figure that I see that is new

5    is "Medicare pays 80 percent of that sum, or $1.235."

6               Do you see that?

7         A.    Can you show me again where you're quoting

8    from?

9         Q.    Sure, it's the sentence that begins, "Thus,

10   if the AWP for a drug is."

11              Do you see that?  It's the end of the

12   fourth line of paragraph 36.

13        A.    Yes.

14        Q.    You reference there the figure $1.548.

15              Do you see that?

16        A.    Yes.

17        Q.    Is that a number that you got from First

18   DataBank, or did you simply calculate that number?

19        A.    That number does not come from First

20   DataBank.  That is a calculation.

21        Q.    In the next sentence, which reads,

22   "Recombinate has been sold to providers for 89 cents

23   (or even less), making the spread, or the difference

24   between the actual acquisition cost of 89 cents and

25   the Medicare payment of $1.235 equals 0.345."

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 40

1              Do you see that?

2       A.    Yes, I do.

3       Q.    Did you provide the 89-cent sales price

4  there that is reflected in paragraph 36?

5       A.    Yes, I did.

6       Q.    How did you come to have that data?

7       A.    Based on Baxter contracts with Express

8  Scripts.

9       Q.    So, that was the price reflected in

10  contracts between Baxter and Express Scripts?

11      A.    It was.  I can tell you that it was also

12  reflective of prices available to Express Scripts for

13  Baxter product through Cardinal Health.

14      Q.    And how do you know that?

15      A.    How do I know that?  I know that because I

16  had the pharmacy people at Express Scripts pull up the

17  contract price between Express Scripts and Cardinal

18  for Recombinate.  And they provided me with that

19  information.

20      Q.    When did you do that?

21      A.    Somewhere around that time period.  I don't

22  remember exactly when.

23      Q.    Which time period?  About the time the

24  Complaint was filed?

25      A.    Yes.

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 41

1   Q. Were you working for Express Scripts at the

2 time?

3   A. Yes, I was.

4   Q. And you -- would you read back his last

5 answer?

6        (Record read as requested.)

7 BY MR. JACKSON:

8   Q. So, to make sure I understand your

9 testimony, is it your testimony that while you worked

10 at Express Scripts you asked someone at Express

11 Scripts to contact someone at Cardinal for this

12 information?

13   A. That is not correct.  When I -- would you

14 like me to try and explain?

15   Q. Yes, please.  Would you explain?

16   A. Sure.  While I was working at Express

17 Scripts I was in charge of a program of delivering

18 specialty products, hemophilia products, to patients.

19 Consequently, I needed to know and did know the prices

20 that we at Express Scripts were paying to purchase

21 those drugs.  And we had several routes to go through,

22 channels of distribution in which to buy them.

23     One of them was the Cardinal distribution

24 system, of which Express Scripts was a participant.

25 So, I was aware through my normal business of what the

Page 42

1    prices were from Cardinal Health for all of the factor

2    products.

3        Q.    All right.  Let me have you turn to

4    paragraph 37 of Deposition Exhibit 7, the Complaint.

5             Is there any information in paragraph 37

6    that you gained through your communication with Kay

7    Morgan identified in your Declaration?

8        A.    No.

9        Q.    Where did that information come from?

10       A.    That information came from the CMS website.

11       Q.    Okay.  Thank you.  Now let me direct your

12   attention to paragraph 38.

13            I'm sorry.  When did you access the CMS

14   website to gain the information that's contained in

15   paragraph 37?

16       A.    I don't recall.

17       Q.    Was it about the time of the date of the

18   Complaint?

19       A.    Again, I don't recall.  But if you want me

20   to estimate, I would say it was somewhere around that

21   time.

22       Q.    2005, for example, or 2004?

23       A.    Again, I would guess 2004 or 2005.

24       Q.    Okay.  Paragraph 38, did you provide any of

25   the factual information that's contained in paragraph

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 43

1      38 of the Complaint?

2           A.     No.

3           Q.     Let me refer you to paragraph 39 of the

4      Complaint, which is Deposition Exhibit 7.

5                  Paragraph 39 begins with the following:

6      "According to knowledge obtained by relator Greg

7      Hamilton, FDB refused to accept Baxter's 'list sales

8      price,' and instead submitted a letter stating that

9      their list price was $1.31 and that they wanted their

10     AWP to be described as $1.31."

11                 Do you see that?

12          A.     Yes, I do.

13          Q.     Did you provide that information to --

14          A.     Yes, I did.

15          Q.     And was that information provided to you by

16     Kay Morgan?

17          A.     Yes, it was.

18          Q.     How is it that you had a conversation with

19     Kay Morgan about Baxter?

20          A.     Kay called me and asked if I had any idea

21     why Baxter would be submitting information that they

22     knew was in a format that was unacceptable.

23          Q.     When did this communication take place?

24          A.     I don't remember exactly.  I think it

25     was -- I'd have to go back and look at the dates.  I

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 44

1    just don't remember.  But it was -- it was, I believe,

2    within days of her having received the letter from

3    Baxter.

4         Q.    Do you know why Kay Morgan called you?

5         A.    I can only speculate.

6         Q.    What do you think?

7         A.    I mean, I don't know.

8         Q.    She didn't tell you why she was calling

9    you?

10        MR. KLEIMAN:  Calls for speculation.

11             Go ahead.

12   BY THE WITNESS:

13        A.    I'm just saying I can -- I can only guess.

14   BY MR. JACKSON:

15        Q.    What's your guess?

16        A.    My guess is that Kay believed I was a

17   knowledgeable person particularly about the plasma

18   industry and about the factor industry.  Kay and I had

19   had several conversations about AWPs, about the

20   industry.  I was introduced to her by her superiors.

21             There was some issue -- Express Scripts is

22   a large customer of First DataBank.  And I was at a

23   meeting with the Chief Operating Officer, Chief

24   Financial Officer, some folks like that from First

25   DataBank at Express Scripts, and I brought up some

Page 45

1    issue, I don't know what it was, but I know that three

2    or four of us scurried off into a separate conference

3    room because they were concerned about it, and they

4    picked up the phone and called Kay Morgan.

5          And we got on a conference call, and we

6    discussed whatever that particular issue was, and they

7    asked her to work with me to resolve it.

8          From that time forward every so often we

9    would talk.  I'd call her or she'd call me just about,

10   you know, things that were going on in the industry

11   and whatever else.

12         So, I think that when she received a letter

13   as she described from Baxter, that as she described

14   it, it said, "We'd like our AWP to be $1.31 and our

15   list price is $1.31," she was, like, "They know that I

16   can't accept AWPs anymore.  They know that.  I deal

17   with Baxter all the time."

18         Q.    She said that?

19         A.    Yes.  And she said, "I know that they know

20   that, and they know I need a WAC, not this list price

21   thing.  I need a WAC.  So, why are they doing this?"

22         And she was calling me up, trying to get --

23   you know, trying to get an opinion as to why she was

24   receiving this type of communication from Baxter.

25         Q.    So, is all of the factual information

Page 46

1    specified in or included in paragraph 39 information

2    that you gained from Kay Morgan?

3         A.    Yes.

4                        (Deposition Exhibit Number 8 was

5                        marked for identification.)

6                        (Document tendered to the

7                        witness.)

8    BY MR. JACKSON:

9         Q.    I show you what's been marked as Deposition

10   Exhibit 8.  Deposition Exhibit 8 is a document

11   produced to Baxter by you.

12              Have you ever seen this document before?

13        A.    Yes.

14        Q.    What is this document?

15        A.    It's financial information about and

16   provided by a company called Hemophilia Resources of

17   America.

18        Q.    How did you come to acquire this document?

19        A.    While I was working at Express Scripts I

20   worked on a project that involved Hemophilia Resources

21   of America.

22        Q.    Who is or what is Hemophilia Resources of

23   America, Inc.?

24        A.    Hemophilia Resources of America, Inc. is

25   a -- no longer exists as such.  It's been purchased by

Page 47

1    Accredo.  But it is a specialty pharmacy, otherwise

2    known as a home care company, in New Jersey.

3        Q.    Can I have you turn to the page that is

4    marked GH000014 of that exhibit?  Do you see those

5    handwritten notes in the right-hand margin?

6        A.    Yes, I do.

7        Q.    Do you recognize that handwriting?

8        A.    No, I do not.

9        Q.    Is it your handwriting?

10       A.    It is not.

11       Q.    The format of pages GH14 and 15, the next

12   two pages, are different than the format before or

13   after.  Do you know why?

14       A.    No.

15       Q.    Did you make use of this document in

16   creating or preparing the allegations of the Complaint

17   in this case?

18       A.    No.

19                       (Deposition Exhibit Number 9 was

20                       marked for identification.)

21                       (Document tendered to the

22                       witness.)

23   BY MR. JACKSON:

24       Q.    Let me show you what has been marked as

25   Deposition Exhibit 9.  Deposition Exhibit 9 is a

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 48

1  document produced to Baxter by you.

2          Have you ever seen this document before?

3      A.    I'm gonna qualify this by saying -- my

4  answer is kind of yes.  I guess I'm getting on the

5  legal side of this.  You know, is this the exact

6  document?

7      Q.    This is the document that you produced to

8  us, okay?

9      A.    Right.  Okay.  Sure.

10      Q.    Okay.  Now, where did you get this

11  document?

12      A.    This would be while I was at Express

13  Scripts.  And it was printed off a screen from the --

14  at Express Scripts.

15      Q.    But this was in your possession and

16  control, and that's why you produced this?

17      A.    Yes.

18      Q.    Now, I presume since it says "Express

19  Scripts" at the top, Express Scripts was probably the

20  subscriber at the time.  Is that your belief?

21      A.    It is my belief, yes.

22      Q.    When did you leave Express Scripts?

23      A.    Summer of 2006.

24      Q.    Now, was this document, Deposition Exhibit

25  9, used in preparing the Complaint in this matter?

1        MR. KLEIMAN:  Calls for speculation.

2             You can answer so far as you know.

3    BY THE WITNESS:

4        A.    My answer is I don't know.  I mean, I don't

5    recall if I used this specific document or not.

6    BY MR. JACKSON:

7        Q.    Okay.  Did you have any involvement in

8    drafting the Amended Complaint in this matter that is

9    Deposition Exhibit 7?

10       A.    By "involvement," if you mean I provided

11   information, then yes.

12       Q.    Thus my question about Deposition Exhibit

13   9.  Is there new information coming from Deposition

14   Exhibit 9 to your knowledge that was used in drafting

15   the Complaint in this matter to your knowledge?

16       A.    Again I don't know.

17                    (Deposition Exhibit Number 10

18                     was marked for identification.)

19                    (Document tendered to the

20                     witness.)

21   BY MR. JACKSON:

22       Q.    I show you what has been marked as

23   Deposition Exhibit 10.  Have you ever seen Deposition

24   Exhibit 10 before?

25       A.    Yes, I have.

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 50

1      Q.    What is this document?

2      A.    This is an Excel spreadsheet provided to me

3  by Baxter when again I was with Express Scripts.

4            If you notice, at the top it says,

5  "Curascript."  Curascript is a division of Express

6  Scripts.  It's a specialty pharmacy.  And this

7  spreadsheet reflects a contract that existed between

8  Baxter and Curascript for the purchase of Baxter

9  products.

10     Q.    How is it that -- did you take this

11  document with you when you left Express Scripts or

12  Curascript?

13     A.    Well, I had it in my possession.  I don't

14  know if that's the same as "took with."

15     Q.    Right.  Was it your practice to take

16  documents with you when you left an employer?

17     A.    It was my practice to work out of my home.

18  Particularly from '04 to '06 working for Express

19  Scripts I worked out of my home.  And as such, I had

20  various documents and working materials in my home.

21  This happened to be one of them.

22     Q.    Was this document used in providing input

23  to the Complaint in this matter?

24     A.    To some extent, yes.

25     Q.    How?

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 51

1        A.    This document was used to demonstrate that

2    Baxter did engage in rebate contracts.

3        Q.    Okay.  Is there anything wrong with

4    engaging in rebate contracts, a pharmaceutical company

5    having rebate contracts?

6        A.    Not at all.

7        Q.    So, again, how was paragraph 10 used in

8    conjunction with the Complaint, if you know?

9        MR. KLEIMAN:  Do you mean Exhibit 10?

10       MR. JACKSON:  Yes, I do.  I'm sorry.  Exhibit 10.

11   BY THE WITNESS:

12       A.    Oh, okay.  I can only repeat what I just --

13   my previous answer.  It was used to illustrate that

14   Baxter did indeed participate in rebate contracts.

15             I suppose I could go even one step further.

16   It also shows the manner in which Baxter calculated or

17   adjudicated these rebates, and that this was done,

18   obviously, on an Excel spreadsheet.  So, this is

19   separate and apart from the standard order entry

20   process, debit and credit inventory system that Baxter

21   would use and, therefore, separate and apart from its

22   Medicaid Administrative Program.

23       Q.    You've never worked for Baxter, correct?

24       A.    That is correct.

25       Q.    So, you don't know how this spreadsheet

Page 52

1    that is Deposition Exhibit 10 interacts in any way

2    with Baxter's order entry process, do you?

3        A.    I know how the industry works.  And I don't

4    believe Baxter's order entry process is on an Excel

5    spreadsheet, especially when this Excel spreadsheet

6    was calculated incorrectly and I had to correct it.

7        Q.    I'm asking you do you know how -- do you

8    know how Baxter's order entry system works?

9        A.    Not specifically, no.

10       Q.    And do you know how Baxter's Excel

11   spreadsheet that you identified as Exhibit 10 works

12   with Baxter's order entry system?

13       A.    I do not know if it works with it or if

14   it -- how it works with it.  I don't even know if it

15   does work with it.

16       Q.    You have no knowledge of the internal

17   workings at Baxter vis-à-vis calculations of rebates

18   or pricing, correct?

19       A.    That is correct.

20             Let me correct that.  When you say

21   "calculations of rebates," do I have any knowledge of

22   how Baxter calculates rebates internally?  Well, the

23   fact that as a customer I get my rebate information

24   that comes off an Excel spreadsheet tells me I know

25   something about it in that it's Excel

Page 53

1    spreadsheet-driven, and the fact that when I went

2    through this and recognized there were mistakes on it

3    and went back to the Baxter rep and said, "Hey, you've

4    got mistakes," as a matter of fact, they were in

5    Curascript's favor, "you've made some errors on here,"

6    he responded with, "Oh, yeah.  The guy running the

7    Excel spreadsheet made a mistake.  He moved a field

8    over.  I'll have him correct it," that tells me

9    something about how they're adjudicating their

10   rebates.

11        Q.   When you say "adjudicating rebates," what

12   do you mean by that?

13        A.   Well, calculating them.  As you can see, in

14   this particular situation different rebate tiers were

15   set up.  If the customer purchases a certain amount of

16   product, they get a certain rebate.  And if they hit a

17   certain goal, they get this rebate.  This is set up

18   prior to sales.

19             And then after the sales period, whether it

20   be a quarter or a year, Baxter sits down and looks at

21   what those sales were, compares them to the -- you

22   know, what was offered, and then calculates what

23   rebate is due and issues a check.

24        Q.   Is there anything wrong with that process

25   in your mind?

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 54

1          A.      Nothing at all.

2                          (Deposition Exhibit Number 11 was

3                          marked for identification.)

4                          (Document tendered to the

5                          witness.)

6     BY MR. JACKSON:

7          Q.     Let me show you what has been marked as

8     Deposition Exhibit 11.   Deposition Exhibit 11 is a

9     document produced by you to us.   At the top it says,

10    "RBC Capital Markets."   It's an article entitled, "The

11    Changing Paradigm In Hemophilia."

12                Do you see that?

13         A.     Yes, I do.

14         Q.     Have you seen this document before?

15         A.     Yes, I have.

16         Q.     When did you first see this document?

17         A.     I don't know.

18         Q.     At the top there is what appears to be a

19    fax number.   It says, "Algonquin."

20                Do you know what that is?

21         A.     No, I don't.

22         Q.     Do you have a fax number 847-960-7384?

23         A.     No, I don't.

24         Q.     Do you know how that mark got on the top of

25    this document that you produced to us?

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 55

1          MR. KLEIMAN:  Calls for speculation.

2    BY THE WITNESS:

3          A.    No, I don't.

4    BY MR. JACKSON:

5          Q.    If you go further into the document, go

6    back to page GH000064, at the top there's also a fax

7    mark, it appears, and it says, "Patient Services,

8    Inc."

9                Do you know who Patient Services, Inc. is?

10         A.    Yes, I do.

11         Q.    Who are they?

12         A.    Patient Services, Inc. is a non-profit

13   organization in Virginia.

14         Q.    And what do they do?

15         A.    They assist patients in reimbursement

16   issues.

17         Q.    Did you receive this document from Patient

18   Services, Inc.?

19         A.    I don't recall.

20         Q.    I'm sorry if you answered this question.

21   When did you first see this document?

22         A.    I don't recall.  I did answer that.  I just

23   don't remember.

24         Q.    Did this document have any bearing or did

25   you use this document in any way to draft the

Page 56

1    Complaint?

2        A.    Again I don't recall.

3        Q.    Why did you produce this document to us?

4    Do you recall?

5        A.    I don't know why it was produced to you.

6    My best guess is I provided this to my attorneys as

7    background information about the hemophilia market.

8        Q.    If you refer back to the front page of this

9    document, there are certain clauses, et cetera, that

10    are underlined.

11        Are those your markings?

12        A.    I don't know.

13                (Deposition Exhibit Number 12 was

14                marked for identification.)

15                (Document tendered to the

16                witness.)

17    BY MR. JACKSON:

18        Q.    Let me show you what's been marked as

19    Deposition Exhibit 12.  Deposition Exhibit 12 is a

20    news article produced by you to Baxter in this matter.

21    It's a U.S. News article dated April 2, 2003.  It's

22    entitled "Court:  HMOs Can Be Made to Open Networks."

23        Do you see that?

24        A.    Yes, I do.

25        Q.    Have you ever seen this document before?

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 57

1      A.    I don't recall it.

2      Q.    Do you know what relevance this document

3   has to the Complaint in this matter?

4      A.    I would need to read it.  Do you want me to

5   take a minute and read it?

6      Q.    Well, I'm just curious have you read it

7   before?

8      A.    Again I don't recall.

9      Q.    Do you remember referring to this when you

10   provided input for the Complaint in this matter?

11      A.    I do not recall that.

12                    (Deposition Exhibit Number 13 was

13                    marked for identification.)

14                    (Document tendered to the

15                    witness.)

16   BY MR. JACKSON:

17      Q.    Sir, I'm handing you Deposition Exhibit 13.

18   Deposition Exhibit 13 is a Confidential Examination

19   Under Oath of Patricia Kay Morgan dated January 28,

20   2002.  This document has Bates numbers GH000126

21   through GH000290.

22                    Have you ever seen this document before?

23      A.    I think so.

24      Q.    Under what circumstances have you seen this

25   document?

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 58

1        A.    I think I may have a copy of it.

2        Q.    You'll note this document is identified as

3   "Attorneys' Eyes Only."

4              Do you see that?

5        A.    Yes.

6        Q.    When did you first see this document?

7        A.    I have no idea.

8        Q.    How did you get this document?

9        A.    From my attorney.

10       Q.    Is there anything to your knowledge in this

11   deposition that relates to Baxter?

12       A.    I don't know.

13       Q.    And I'm sorry, sir.  You said you have or

14   have not read this document?

15       A.    I don't know.

16       Q.    Did any information in this document

17   have -- strike that.

18              Did you use any information coming from

19   this examination; that is, Deposition Exhibit 13, in

20   preparing or drafting the Complaint?

21       A.    No.

22                     (Deposition Exhibit Number 14 was

23                     marked for identification.)

24                     (Document tendered to the

25                     witness.)

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 59

1     BY MR. JACKSON:

2          Q.     I show you what's been marked Deposition

3     Exhibit 14.  Deposition Exhibit 14 is a State of Texas

4     Notice of Intention to Take Oral Depositions.  It's

5     Exhibit 371 to the deposition of Kay Morgan.  This

6     document was produced to us by you in this matter.

7                 Have you ever seen this document before?

8          A.     I don't believe so.  I'm looking at it now,

9     but I don't recall ever seeing this before.

10         Q.     Do you recall reviewing this document in

11    preparation of providing input for the Complaint in

12    this matter?

13         A.     No, I do not recall that.

14         Q.     Let me have you turn to page GH000113 of

15    that exhibit, please.  There are markings on that

16    page.  Some text has been underlined.

17                Do you see that?

18         A.     Yes, I do.

19         Q.     Is that your underlining?

20         A.     I don't believe so, but I don't know.

21                            (Deposition Exhibit Number 15 was

22                            marked for identification.)

23                            (Document tendered to the

24                            witness.)

25

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 60

1    BY MR. JACKSON:

2         Q.    Let me show you what's been marked as

3    Deposition Exhibit 15.  Deposition Exhibit 15 is a

4    document entitled "Deposition Summary Patricia Kay

5    Morgan Taken 11/13/02."

6              Do you see that document?

7         A.    Yes, I do.

8         Q.    Have you ever seen this document before?

9         A.    Yes, I believe I have.

10        Q.    When did you first see this document?

11        A.    No idea.

12        Q.    Were you given -- how did you acquire a

13   copy of this document?

14        A.    It would have had to have been through my

15   attorneys.

16        Q.    Did you draft this summary or this

17   deposition summary?

18        A.    No.

19        Q.    When were you provided this document?

20        A.    I have no clue.

21        Q.    Do you remember whether you were provided

22   this document prior to the date that the Complaint was

23   filed in this case?

24        A.    Again I don't know.

25        Q.    Mr. Hamilton, have you signed up to the

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 61

1    terms of a protective order relating to the Texas

2    depositions, particularly as relates to Kay Morgan's

3    deposition?

4         A.    I don't know.

5         Q.    Again I find no mention of Baxter in this

6    document.  Did this document have -- did you review it

7    before drafting the Complaint in this matter?

8         A.    The document you're talking about here is

9    this Exhibit 15?

10        Q.    Yes, sir.

11        A.    I don't even remember, you know, when I saw

12   it and when I've looked at it.  So, I would have to

13   tell you that it had nothing to do with me drafting

14   the Complaint.

15        Q.    Okay.  I apologize for doing this.

16        A.    To the tree.

17       ·Q.    To the trees.

18                    (Deposition Exhibit Number 16 was

19                    marked for identification.)

20                    (Document tendered to the

21                    witness.)

22   BY MR. JACKSON:

23        Q.    I'm handing you what has been marked as

24   Deposition Exhibit 16.

25        MR. KLEIMAN:  Let the record reflect we're

Page 62

1    grunting and groaning.

2    BY MR. JACKSON:

3        Q.    Deposition Exhibit 16 is a document

4    entitled "Survey on Hemophilia Care & Price Monitoring

5    in the United States."  The front cover of this

6    exhibit is called "Global Market Research Hemophilia."

7            Do you see that?

8        A.    Yes.

9        Q.    Have you ever seen this document before?

10       A.    I -- just by the size of it I'd say no, but

11   I don't know.  Let me take a look and see what it says

12   inside.

13           Oh, this is a Market Research Bureau

14   report.  Sure.  I don't remember it being this big.

15       Q.    When do you think you first saw this

16   document?

17       A.    Oh, well, when you say "this document," are

18   you referring to, you know, what is titled "Wave 10,

19   April 2000" or are you talking about a Market Research

20   Bureau report of this nature?

21       Q.    I'm talking specifically about this

22   document that is identified as GH000321 through

23   GH001495.

24       MR. KLEIMAN:  I'm going to object as ambiguous.

25   This contains multiple documents.

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 63

1    BY MR. JACKSON:

2         Q.    This was a single document produced to us

3    by you, sir.

4         A.    I mean, I'm looking -- just so you know,

5    I'm looking at the Table of Contents on this, and it

6    says it goes up to page 85.  There's gotta be 500

7    pages here.

8         Q.    I understand.

9         A.    So, I'm saying I don't know what all is in

10   here.

11        Q.    Again, Mr. Hamilton, this is a single file

12   that was produced to us by you.  And I'm just trying

13   to understand what this document is.

14        A.    Okay.

15        Q.    So, let's focus on --

16        A.    I'm trying to do the same thing, by the

17   way.

18        Q.    Sure.

19        A.    I'm trying to figure out what this

20   document -- I mean, I'm very familiar with the Market

21   Research Bureau reports, okay?

22        Q.    Let's start there.  What is the Market

23   Research Bureau?  What is it?

24        A.    Market Research Bureau is a company owned

25   and operated by a man named Patrick Robert.  Patrick

Page 64

1    is a former colleague of mine from Bayer Corporation.

2    He was in the Marketing Research Department.  He left

3    Bayer.

4            I forget what year he started this thing,

5    but he started his own company of market research to

6    provide information and data and research in an

7    area -- what's called an unaudited market, which, if

8    you're familiar with the plasma products at all, they

9    are what's called unaudited.

10           And if you look at the pills and tablets

11   side of the pharmaceutical industry, IMS does a great

12   job of telling everybody --  IMS Health, an

13   organization, does a great job of providing data to

14   the industry about, you know, what categories of drugs

15   were sold, how many were sold, you know, AWPs, all

16   that stuff.  And they provide all this sales

17   information by zip code.  They even provide stuff by

18   doctor.

19           The biologics world doesn't have that type

20   of a service.  And so, because that information was

21   missing, Patrick went out and founded his own company

22   to provide that information to those people in this

23   industry so they would have marketing information and

24   data they could use for all their products.  And

25   that's what he did.

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 65

1        Q.    Do you remember citing to the Market

2    Research Bureau in your Complaint?

3        A.    I don't specifically recall, but I believe

4    it's in there.

5        Q.    Did you recently call the Market Research

6    Bureau in connection with this matter?

7        A.    Yes, I did.

8        Q.    Why did you call the Market Research

9    Bureau?

10        A.    I called Patrick Robert because I wanted to

11    find out, get some information from him.

12              Do you want to know what information I was

13    calling him for?

14        Q.    I do.

15        A.    I wanted to find out what he would charge

16    for some old reports and, you know, what he was

17    currently charging for reports.  Let me think what

18    else I asked him.

19              I think I just confirmed with him it was --

20    I talked to both his assistant and to Patrick.  I just

21    confirmed that their number of clients was small

22    scale.

23        Q.    Can I have you look back at your

24    Declaration, please?

25        A.    Can you tell me what number that is?

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 66

1      MR. KLEIMAN:  It's 6.

2      THE WITNESS:  Okay.

3  BY MR. JACKSON:

4      Q.   Can I refer you to paragraph 14?

5      A.   Yes.

6      Q.   Okay.  In paragraph 14 you specify -- of

7  your Declaration you specify "On September 13, 2009 I

8  called the Market Research Bureau and spoke with Cindy

9  Lynn, Patrick Robert's secretary."

10      Did you just speak with Cindy Lynn, or did

11  you speak with Mr. Robert?

12      A.   On September 13th I spoke with Cindy Lynn.

13  Subsequently Patrick called me back.  I don't know how

14  many days later it was, but at some point he called

15  back and we had further discussions about it.

16      Q.   All right.  So, let's talk about your

17  conversation with Cindy Lynn.

18      What did you ask her?

19      A.   I asked her questions that generated these

20  answers.  So, like I said just a minute ago off the

21  top of my head that I had called and I wanted to find

22  out what a subscription to this would cost.

23      Q.   So, is the subscription that you refer to

24  in paragraph 14 of your Declaration today's prices?

25      A.   Yes.  That was the price she quoted me if

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 67

1    we wanted to buy the current report.  And the rest of

2    that information that's in paragraph 14 were her

3    answers to my questions.

4         Q.    Okay.  So, is it -- was it her answer that

5    there are presently 20 subscribers to Market Research

6    Bureau reports?

7         A.    Yes.

8         Q.    Did you ask her any questions about

9    previous or prior year Market Research Bureau reports?

10        A.    I asked her if they would be available.

11   She said yes.

12              I asked her, you know, about how much those

13   would cost, and she said, "You'll need to talk to

14   Patrick, and Patrick's out of the country at the

15   moment."

16        Q.    But your Declaration says that she told you

17   how much things would cost.

18        A.    She told me how much a single issue was.

19        Q.    That's today's issue?

20        A.    That's today's issue.

21        Q.    Not prior issues?

22        A.    Correct.

23        Q.    Okay.  And did you ask her what her

24   subscribers were or what Market Research Bureau's

25   subscribers were in years past?

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 68

1        A.     I'm not sure I understand your question.

2        Q.     Sure.  I thought you testified earlier that

3    the $16,000 price and the 20 subscribers referred to

4    present day data?

5        A.     That's correct.

6        Q.     So, my question to you, sir, is did you

7    also ask her about costs in 2002, for example, of

8    reports?

9        A.     No, I did not.

10       Q.     Or did you ask her about the number of

11   subscribers in 2002?

12       A.     No, I did not.

13       Q.     Now, let me refer you back to the Market

14   Research Bureau exhibit that is Exhibit 16.

15       A.     Can I put this away?

16       Q.     You probably ought to leave it right there.

17       A.     Okay.

18       Q.     You're referring back to -- can I have you

19   look to page GH000323?

20              Actually, maybe I'll make this easier.  If

21   you pull out Deposition Exhibit 7, which is your

22   Complaint in this case, --

23       A.     Got it.

24       Q.     -- paragraph 29 refers to a 2001 Market

25   Research Bureau report called "The Plasma Fractions

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 69

1      Market in the United States."

2                  Do you see that?

3          A.    Yes, I do.

4          Q.    Did you make use of a 2001 Market Research

5      Bureau report in preparing your Complaint?

6          A.    Yes.  I might add I probably used several

7      years of the Market Research Bureau reports.  I don't

8      know exactly what years I've got at home, but --

9                        (Deposition Exhibit Number 17 was

10                        marked for identification.)

11                       (Document tendered to the

12                        witness.)

13     BY MR. JACKSON:

14         Q.    Let me show you what has been marked as

15     Deposition Exhibit 17.  Deposition Exhibit 17 is a

16     2001 Market Research Bureau report.

17                 Do you see that?

18         A.    Yes, I do.

19         Q.    Is that the report that you referred to in

20     your Complaint?

21         A.    Yes, it is.

22         Q.    And I believe you also testified that you

23     may have reviewed other Market Research Bureau reports

24     in preparing the Complaint?

25         A.    Yes.

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 70

1          Q.     Would that include the Market Research

2     Bureau document that is Deposition Exhibit 16?

3          A.     It could.

4          Q.     You don't remember?

5          A.     I don't remember specifically which ones.

6     I mean, this one is dated April 2002 and the Market

7     Research Bureau reports typically provide historical

8     data, too.  So, at this moment exactly which piece of

9     information I pulled from which report I don't know.

10         Q.     Did you --

11         A.     But I can also -- let me offer you

12    something here.

13                No, never mind.  Go ahead.

14         Q.     How did you obtain Deposition Exhibits 16

15    and 17?

16         A.     I'm not sure.

17         Q.     Did Miss Sun give these to you?

18         A.     No.

19         Q.     If you look at the front page of Deposition

20    Exhibit 17, which is "The Plasma Fractions Market in

21    the United States 2001," it includes the following:

22    "The contents of this study represent our analysis of

23    information generally available to the public or

24    released by responsible individuals in the companies

25    mentioned."

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 71

1          Do you see that?

2      A.    Yes, I do.

3      Q.    So, is it your understanding that Market

4  Research Bureau takes public information, recompiles

5  it and uses that to create their report?

6      A.    No.

7      Q.    Isn't that what it says?

8      A.    It says, "analysis of information generally

9  available to the public or released by responsible

10  individuals in the companies mentioned."

11          And I believe, if I had to put a number on

12  it, probably 95 percent of the information contained

13  in the Market Research Bureau is not available to the

14  public.  It is this latter part "released by

15  responsible individuals in the companies mentioned."

16      Q.    But doesn't it --

17      A.    If it was available to the public, you

18  wouldn't need the report.

19      Q.    Couldn't it be that they are simply taking

20  public information from a variety of sources and

21  compiling it, putting it together to resell to the

22  general market?

23      A.    In this case, no, because let's remember

24  that the reason he formed this company was because

25  that information isn't available.

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 72

1      Q.    Do you also see in that initial disclosure
2   the second sentence, "It does not contain information
3   provided in confidence by our clients"?
4            Do you see that?
5      A.    I do.
6      Q.    Now, how much of any of these Market
7   Research Bureau reports did you rely upon in preparing
8   the factual information contained in the Complaint?
9      A.    I don't know.
10                        (Deposition Exhibit Number 18 was
11                        marked for identification.)
12                        (Document tendered to the
13                        witness.)
14   BY MR. JACKSON:
15      Q.    Let me show you what's been marked as
16   Deposition Exhibit 18.
17      A.    I was going to say, if we're getting near a
18   point, I'd like to take a bathroom break when we get a
19   chance.
20      MR. JACKSON:  Sure.  Let's do that right now.
21                        (Recess.)
22   BY MR. JACKSON:
23      Q.    Mr. Hamilton, let me show you what's been
24   marked as Deposition Exhibit 18.
25            Have you ever seen Deposition Exhibit 18

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 73

1      before?

2            A.      I think so.

3            Q.      Can you explain to me what Deposition

4      Exhibit 18 is?

5            A.      Well, I can take my best guess.

6            Q.      Okay.

7            A.      I mean, obviously it's a -- you know, the

8      title is "Summary of First DataBank Information on

9      Selected Drugs."  And I believe what the --

10           Q.      Did you create this document?

11           A.      I personally didn't, but I may have

12     directed someone to create it.

13           Q.      And what was the purpose of creating this

14     document?

15           A.      Again if it's the document I'm thinking of,

16     you know, because this is a little bit out of context,

17     but as best I can guess, this looks like a comparison

18     sheet that I would have used -- let me try and put it

19     in context and explain.

20                   When I was with Express Scripts, so this is

21     when I was a customer of Baxter's and all the other

22     factor manufacturers, I was responsible for

23     contracting with various health plans for fulfillment

24     of specialty prescriptions.

25                   And one of the things that I did in the

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 74

1    contracting process was to -- you know, we -- we sold

2    the product at prices -- we billed the customer at

3    some discount off of AWP.

4         Q.    Who billed it?

5         A.    Express Scripts, or Curascript, a

6    subdivision of it.  So, we would bill some discount

7    off of AWP.

8              And, of course, we would footnote that the

9    AWP we used was that of First DataBank because there

10   are two other data banks you could be using.  So, you

11   wanted to specify, especially under a contract, which

12   data bank you're using.

13             And I also would add to the contracts, to

14   the footnotes, that if the AWP should change during

15   the contract period, that we reserved the right to

16   also change the rate, what we were charging.  And in

17   some circumstances I put together or had other people

18   for me put together things like this to show internal

19   customers and the people within Express Scripts what

20   was going on, and also people outside of Express

21   Scripts, the reason and the need for having that kind

22   of language in a contract because of the changes in

23   AWP that exist in the marketplace.

24             So, you wouldn't -- you know, if you locked

25   into a particular AWP minus such-and-such for a year

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 75

1     or two years and the AWP changed three times in that

2     period, that could have severe financial implications

3     on either party that's in the contract.

4            So, I believe this is a document that was

5     one of those produced just to show people the changes

6     in AWP.

7          Q.    So, do you believe you created this

8     document or had it created while you were at Express

9     Scripts?

10         A.    It looks like something that I would have

11    had done while I was at Express Scripts.

12         Q.    Did you rely upon or use this document in

13    preparing the Complaint in this matter?

14         A.    Not per se.

15         Q.    When you say "per se," that's a qualifier.

16         A.    Yeah, it is.  Not specifically.  I think

17    that one -- and I don't know how well it's spelled out

18    in the Complaint, but one of the issues with AWP, and

19    I assume you're unbelievably familiar with AWP at this

20    point, is that both prior to 2001 and after 2001 AWPs

21    could be changed in this industry sort of willy-nilly

22    at the manufacturer's whim depending on market

23    circumstances, whatever they wanted to do.  It was

24    very easy to initiate a change in AWP, and you could

25    make it whatever you wanted.

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 76

1          And because of that, it was necessary for
2     me in a contracting position to make sure that I
3     noted, hey, AWP's changed.  And I would say that --
4     again, I'm telling a customer I'm putting this
5     footnote in because they do change and they don't
6     necessarily make any sense when they change and they
7     may or may not affect the actual acquisition price.
8     Oftentimes they don't.  It's just the AWP changes.
9     So, this was done, I think, more as an educational
10    piece to explain why.
11         So, when you say was it relied upon, I
12    don't believe specifically, but the idea or the
13    concept is certainly part of it, is that AWPs, you
14    know, fluctuated with sort of the wind or, you know,
15    whatever a manufacturer felt they needed at that given
16    point in time.
17        Q.    So, why is that -- I'm sorry.
18             Is that document then relevant to the
19    allegations of the Complaint in this case?
20        A.    Again I'm saying it's not necessary to the
21    Complaint.
22        Q.    Was it used to make any allegations in the
23    Complaint?
24        A.    I don't believe so.  I hope -- Mark's
25    probably looking at me like, oh, just be quiet, but

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 77

1    I'm trying to give you as much information, you know,

2    to make this easy for all of us to understand.

3        Q.    I appreciate that.

4        A.    So, if I talk too much, just tell me to

5    shut up.

6        MR. KLEIMAN:  How about you?  Do I get to tell

7    you?

8        THE WITNESS:  You don't get to tell me.

9                    (Deposition Exhibit Number 19 was

10                   marked for identification.)

11                   (Document tendered to the

12                   witness.)

13   BY MR. JACKSON:

14       Q.    All right.  Mr. Hamilton, I want to show

15   you what's been marked as Deposition Exhibit 19.

16   Deposition Exhibit 19 is a document produced to Baxter

17   by you.

18            Have you ever seen this document before?

19       A.    Yes, I have.

20       Q.    Can you explain what this collection of

21   pages are?

22       A.    Yeah.  These are photocopies of my

23   appointment books going back through the years.

24       Q.    Okay.  How far back do you have appointment

25   books?

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 78

1        A.    I'm not sure exactly, but I'd say probably

2    1993.

3        Q.    Do you still have these original documents?

4        A.    Yes.

5        Q.    In your possession or in your counsel's

6    possession?

7        A.    In my possession.

8              Well, let me -- when you say "original

9    documents," I have the actual appointment books in my

10   possession.  I made photocopies of all these pages and

11   sent them to Mr. Kleiman, who has those in his

12   possession.

13       Q.    I understand.  I'm asking about the

14   originals because we may want to see the originals.

15   So, I'd ask you not to destroy or otherwise get rid of

16   the original documents.

17       A.    I'll keep the shoebox intact.

18       Q.    All right.  Let's look at the first page of

19   Deposition Exhibit 19.  The first page of Deposition

20   Exhibit 19, which appears to be a calendar date of

21   January 24, 2005, has the word "Baxter."

22             And then can you tell me what the word is

23   after that?

24       A.    Sure.  "Royal."

25       Q.    And what's after that?  There is some other

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 79

 1    notes or comments or marks.

 2         A.    It looks like it says, "Plus?"

 3               Oh, you want me to try to interpret that

 4    for you in Greg hieroglyphics?

 5         Q.    I would.

 6         A.    That probably means meeting with Baxter,

 7    Royal and possibly somebody else.

 8         Q.    Okay.  And where were you meeting with

 9    Royal on January 24th, 2005?

10         A.    I don't know.

11         Q.    Did you meet with them then?

12         A.    I can't say for certain.  Typically if

13    there's something like this in my appointment book and

14    the appointment is cancelled, it will be scratched

15    out.  So, I would say I probably did.

16         Q.    Do you remember what the subject of your

17    meeting was at that time?

18         A.    No.

19         Q.    All right.  Let's go to the next page,

20    GH001498.

21               Do you see that?

22         A.    Mm-hmm.

23         Q.    There is on that page what appears to be

24    the name "Royal Stuart."

25               Do you see that?

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 80

1        A:    Mm-hmm.

2        Q.    What's the word after that?

3        A.    I don't know for certain, but if I had to

4   guess, it looks like "10 a.m."

5        Q.    What are the words below that?

6        A.    "Noon Steve."

7        Q.    Do you know what that means?

8        A.    That means I had a meeting at noon with

9   Steve.

10       Q.    Do you know who Steve is?

11       A.    No.

12       Q.    Did you meet with Royal Stuart on January

13  19th, 2005?

14       A.    Again, my appointment book says I had an

15  appointment with him.  That means I probably kept that

16  appointment.

17       Q.    What was the subject of the appointment; do

18  you know?

19       A.    Don't know.

20       Q.    If it occurred, do you remember what was

21  said during that appointment?

22       A.    No, I do not.

23       Q.    All right.  Can you please go to the next

24  page, GH001499?  Are you there?

25       A.    I'm there.

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 81

1      Q.    I see what appears to be "NHF 4-5-6."

2            Do you see that?

3      A.    Yes, I do.

4      Q.    Can you explain that to me?

5      A.    Yeah.   That means that I was in a meeting

6   in Dallas at the Hyatt.  It was the National

7   Hemophilia Foundation meeting, the 4th, 5th and 6th,

8   obviously, of November.

9      Q.    And what year was that?

10     A.    Good question.   '04.

11     Q.    I note on that same page something has been

12  blacked out or redacted.

13           Do you see that?

14     A.    Yes, I do.

15     Q.    Can you tell me why something was redacted

16  on that page?

17     A.    Specifically I can't.  Generally do you

18  want --

19     Q.    Sure.   Why generally are there redactions

20  throughout these pages?

21     A.    I would say that's probably some personal

22  notation, something that had nothing to do with Baxter

23  or this case.

24     Q.    Okay.   Can I have you turn to the next

25  page, GH001500?   Can you read what it says at the top

Page 82

1      of that page?

2            A.    If you're referring to the part under

3      "Monday" where it says, "Baxter 1 p.m."?

4            Q.    Yes.

5            A.    Oh, yeah.  Okay.  This says, "Baxter 1 p.m.

6      North to Lake-Cook Road."

7                  What that means is that I was meeting with

8      Baxter at their facility in Chicago.

9            Q.    Okay.  Who did you meet with that day?

10           A.    That particular day I can't say for

11     certain.  Typically if I was at Baxter's headquarters,

12     Pete O'Malley would have been there.  But it could

13     have been -- who else was with him I wouldn't know for

14     sure.

15           Q.    Do you have a specific memory what occurred

16     on that day, if that meeting actually occurred?

17           A.    Was that two questions?

18           Q.    I'll start over.

19                 Do you remember having a specific meeting

20     on that day?

21           A.    I do not know if it actually occurred.  I

22     believe that's where you're going.  You want me to

23     say, right?

24           Q.    I'm just trying to assess --

25           A.    And I'm trying to answer you honestly,

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 83

1      okay?  I'm just trying to say if it's in the

2      appointment book and it's not scratched out, that

3      means I believe I had that meeting.  If you say to me,

4      "Are you absolutely certain that that meeting

5      occurred," well, no.

6          Q.     And I need to know what occurred at that

7      meeting.

8          A.     And my answer on that one is I don't know.

9          Q.     Can you turn to the next page, GH001501?

10         A.     Yes.

11         Q.     Can you read that for me on that calendar

12     date?

13         A.     Yes.  "Noon Jeff Beck Millennium Grill."

14         Q.     Who's Jeff Beck?

15         A.     Baxter rep.

16         Q.     Do you remember what you and Jeff Beck

17     discussed that day?

18         A.     No, I do not.

19         Q.     Mr. Hamilton, I'll make this a little

20     easier maybe.  Several of the pages of your calendar

21     pages here mention things like NHF.

22                What does NHF mean?

23         A.     National Hemophilia Foundation meeting.

24         Q.     Okay.  If I ask you what happened, for

25     example, at the National Hemophilia Foundation meeting

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 84

1    that is on GH001502, will you be able to tell me what

2    occurred during that meeting?

3        A.    Specifically, no.

4        Q.    And will you be able to tell me what

5    occurred at any of the meetings that are identified in

6    any of these calendar pages?

7        A.    There may be -- generally speaking the

8    answer is no.

9              There may be one or two where I would be

10   able to say -- for example, if you look at 1506,

11   Friday, August 16th, where it says, "Slides to

12   Baxter," okay?  And it was just 10 days before that we

13   have a -- I have a notation for a Baxter conference

14   call.

15             The slides going to Baxter would have been

16   my what I call PBM 101 slides.  This is where we were

17   discussing things about PBMs and what their

18   involvement in the specialty pharmaceutical market's

19   gonna be.  And I had a slide presentation that

20   described, you know, some just general stuff about how

21   PBMs operate.

22             So, again, we can go back and say that,

23   well, that means that probably Wednesday, February 5th

24   was a discussion about PBMs in the specialty pharmacy

25   market and how it applies to both IGIV and to

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 85

1    hemophilia products.

2              And the following one that says "Slides"

3    would have been I sent them the deck, the slide deck.

4              However, other than that -- let me help

5    you.  Other than that, for these entries where it says

6    Baxter this, NHF that or whatever, it merely indicates

7    that I had a meeting scheduled with them.  And I can't

8    say that it actually happened for certain.  And what

9    the subject was I can't say for certain, either.

10             Does that help?

11    Q.    It does.  Thank you.

12             Let's go to GH001502, "NHF."

13             Can you tell me what year this is?

14    A.    I have a notation at the top that says '03.

15    Q.    Okay.  That handwritten note at the top is

16    your note?

17    A.    My handwriting, yes.

18    Q.    And was that created when you made the

19    copies of this?

20    A.    Yes.  And I did that, obviously, because

21    this particular page of the appointment book didn't

22    have the year on it.

23    Q.    Okay.  Where were you employed at the time?

24    A.    In 2003?

25    Q.    2003.

Page 86

1      A.      I was an employee of Express Scripts.

2   That's when I was a customer of Baxter's.

3      Q.      Right.

4                        (Deposition Exhibit Number 20 was

5                        marked for identification.)

6                        (Document tendered to the

7                        witness.)

8   BY MR. JACKSON:

9      Q.      Mr. Hamilton, let me show you what's been

10   marked as Deposition Exhibit 20.   Deposition Exhibit

11   20 is an April 22, 2005 letter from Mr. Kleiman to the

12   Attorney General and Michael Theis.

13              Do you see that?

14      A.      Yes, I do.

15      Q.      Have you ever seen this document before?

16      A.      I believe I have.

17      Q.      It says in the second -- I'm sorry -- in

18   the first sentence, "I am pleased to forward to you

19   the Complaint along with this statement disclosing all

20   material evidence.   The immediately available evidence

21   is scant.   Only one of the two relators, Ms. Linnette

22   Sun, was employed by Baxter, and her opposition to the

23   practices described herein led to Baxter firing her

24   and giving her no opportunity to preserve documentary

25   evidence.   The other relator, Mr. Greg Hamilton,

Page 87

1    developed his knowledge of Baxter's practices from his

2    intimate familiarity with the industry, but had no

3    opportunity to develop documentary evidence."

4         Do you see that?

5    A.   Yes, I do.

6    Q.   Does this help you remember whether you met

7    with Justice Department lawyers at any time prior to

8    the date the Complaint was filed?

9    A.   No, it doesn't.

10    Q.   Okay.  And is the same -- is that your same

11    answer with regard to meeting with representatives of

12    the various states that are identified in your

13    Complaint?

14    A.   Yes.

15    Q.   It doesn't help you?

16    A.   No.  I mean, if you're -- I'll try and

17    offer you some help on this to at least put it in

18    context.

19         In the course of my job working with

20    various qui tam lawyers, it's quite common for me to

21    meet with state and FUCU units and the DOJ people

22    and -- the National Association of Medicaid Fraud and

23    Control Units -- and to meet with them on behalf of

24    clients.  So, I do that all the time.

25         So, when you say, well, go back a couple

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 88

1    years, and when did you meet with them, that's why I'm

2    going I don't know.

3        MR. JACKSON:   Okay.   Let's go off the record.

4                      (Discussion off the record.)

5                      (Whereupon, at 12:48 p.m., the

6                      deposition was recessed, to

7                      reconvene at 1:30 p.m., this same

8                      day, January 21, 2010.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 89

1          (Whereupon, the deposition

2          resumed at 1:36 p.m.)

3          GREG HAMILTON,

4  called as a witness herein, having been previously

5  duly sworn and having testified, was examined and

6  testified further as follows:

7          EXAMINATION (Resumed)

8  BY MR. JACKSON:

9      Q.    Mr. Hamilton, can I refer you back to

10  Deposition Exhibit 6, your Declaration, please?

11     A.    Yes.

12     Q.    In paragraph 2, the final sentence, you

13  refer to, "Those meetings specifically concerned the

14  pricing of several of the Baxter products discussed in

15  the Complaint."

16          Do you see that?

17     A.    Yes, I do.

18     Q.    What pricing were you referring to?

19     A.    The ones -- and again, pricing is a big

20  subject.  We had discussed -- let me read the

21  paragraph first.

22          (Short interruption.)

23  BY THE WITNESS:

24     A.    Again, "pricing" is kind of a big word.

25  So, when I refer to "pricing," I'm referring to the

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 90

1      price that Baxter was selling to me as a client.

2      BY MR. JACKSON:

3          Q.    At Express Scripts?

4          A.    That is correct.  So, of course, some of

5      the stuff would have been basically, you know,

6      contract negotiations.  Certainly part of -- you know,

7      with every price of what a customer or a manufacturer

8      sells their drug for there's also the accompanying AWP

9      that goes along with that.

10             In addition to that, we also discussed on

11     several occasions what's called PHS, otherwise known

12     as 340B pricing.

13         Q.    All right.  So, let's --I understand when

14     you refer to some of those communications referred to

15     the price to Express Scripts.  What was your

16     communication with Larry Guiheen or Peter O'Malley

17     regarding AWP?

18         A.    I actually -- I mean, I can't tell you any

19     specific time and exactly what we talked about.

20         Q.    Okay.  With regard to the PHS, the 340B

21     pricing, can you tell me what you discussed with these

22     gentlemen as you reference in paragraph 2?

23         A.    I can.  There was one particular time, and

24     I can't tell you what the date was, but it was one of

25     the meetings I had at Baxter headquarters.

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 91

1               Pete O'Malley had asked me to come out and

2       discuss contracting issues.  He brought into the room

3       people that he identified as Baxter contracting --

4       people who work in their Contracting Department.  And

5       he asked me to go through and explain to them how 340B

6       pricing worked, how it was calculated and

7       administered.  And I did that.

8           Q.    Now, is any of the information that took

9       place in that meeting regarding 340B the subject of

10      any of your claims in this Complaint that is Exhibit

11      7?

12          A.    No, not specifically.

13          Q.    In paragraph 4, the first sentence is the

14      following:  "While serving in those positions I

15      frequently met with Baxter's senior management to

16      discuss the market for hemophilia products."

17              Do you see that?

18          A.    Yes, I do.

19          Q.    Do you remember specific conversations you

20      had with senior management regarding hemophilia

21      product pricing?

22          A.    Well, --

23          Q.    I'm sorry.  The market for hemophilia.  You

24      don't say "pricing" there.  You say, "market."

25          A.    Yes.  There is one conversation that I do

Page 92

1    remember very specifically.  I'll address the others

2    after I address this first one.

3              And that was -- it was when we met with

4    Larry Guiheen.  And this was -- oh, I'm going to guess

5    this was within six months of Advate's launch.  And I

6    met with Larry at some sort of a trade show.  It could

7    have been NHF.  But I do remember it was in an exhibit

8    hall.  I can picture where we were.

9              So, we were in an exhibit hall, and we were

10   talking about Advate.  I expressed to Larry that my

11   opinion that they had come out with, they'd launched

12   with too high of a premium for Advate over their other

13   product and the comparable products, the recombinant

14   products, and that they came out just too high and

15   they needed to drop that price.

16             And I felt that his uptake on conversions

17   from other factor products to Advate was being

18   inhibited by the extensive or excessive margin.  You

19   know, they were charging too much for it in comparison

20   to the other drugs.

21             And I remember suggesting, you know, if you

22   could just drop that 7 or 8 cents or whatever the

23   number was at the time, I think that you could reduce

24   the differential to where it's not a deal breaker for

25   insurance companies and people aren't gonna go, "Wait

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 93

1    a minute.  15 cents a unit times a couple hundred

2    thousand units a year, prove to me that Advate's that

3    much better," which, of course, would be a very

4    difficult thing to do because it's a conceptual issue.

5          So, I made that point, and I said, "If you

6    could get it down to where it's, you know, 5 cents, 6

7    cents, I don't think you'd have the push back and you

8    could convince the patients, you know, to recommend or

9    to ask their doctor for a switch and that they could

10   then get it through the insurance companies."

11         So, that was one very, very specific

12   discussion we had on pricing.  It was of Advate.

13       Q.    Do you remember when Advate launched?

14       A.    Yeah.  It was, like, spring of 2003, summer

15   of 2003, somewhere in there.

16       Q.    And when you say "launched," do you mean

17   actually can start making sales?

18       A.    Yeah.  I forget the approval date, but we

19   can look that up.  I think it was approved in, I don't

20   know, April, May, something like that.  But there

21   wasn't a great delay from when it was approved to when

22   it was launched.  It was probably, I don't know, two

23   months at the most.

24       Q.    Okay.  And when you say -- this is my term,

25   my phrase, "uptake or uptick over its other products,"

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 94

1    did you mean the price that Baxter would sell to the

2    market over the price it would sell to the market for

3    Recombinate?

4        A.    Yes.    The difference -- what I was trying

5    to point out was that the difference -- Recombinate

6    was selling for, let's say, 89 cents at the time.    And

7    when they launched Advate, it came out as a buck 15

8    ballpark.    And so, the difference between 89 cents and

9    $1.15 was just too great.

10       Q.    For what?

11       A.    For universal acceptance, for insurance

12   companies, for payers to say, "Yeah, it's worth it.

13   I'll pay that much more."    Because if they're going to

14   pay an extra 20 cents a unit and patients are using

15   anywhere from a hundred thousand to a million units a

16   year, that turns out to be a lot of dollars.    And it

17   got people's attention.

18            So, the difference was so great -- it's

19   kind of like pricing that's called the noticeable

20   difference curve.    It was the same thing.    It was so

21   noticeable that it got attention.

22            Had the number been smaller, it would have

23   passed through without people scrutinizing it and

24   more -- and patients would have been accepted and

25   insurance companies wouldn't have even probably given

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 95

1    it a second thought in terms of paying.

2            And so, therefore, they'd be able to

3    convert patients from current therapies, whether it be

4    theirs or someone else's, to Advate more rapidly than

5    what they were doing.

6        Q.    Okay.  So, from your perspective you did

7    not believe that the market price of Advate, the new

8    therapy, that the delta was not justified by the

9    difference in the products?

10       A.    Yes.  But let me say justified in the minds

11   of the people who were actually paying the bill, the

12   payers, okay?  And the delta was so large that it got

13   their attention.  And that was the key.  First of all,

14   it got their attention.  The delta was so large that

15   it jumped out, you know.

16           And all of a sudden the claims were bigger

17   than they were before and the dollar signs caught

18   their attention.  That brought scrutiny to the

19   product.  And that made people then question is this

20   new product worth that much more than what the other

21   one is?

22           And, of course, Baxter was standing up

23   straight and saying, "Recombinate's a very safe drug

24   and it treats Factor VIII."  And they were saying all

25   these wonderful things about Recombinate.  As a matter

Page 96

1    of fact, they were saying the same thing about the

2    plasma products. Yeah, plasma products are perfectly

3    safe. Recombinate's perfectly safe.

4            Okay. Why do you want to spend 15, 20,

5    20-some cents more for another safe product? Does it

6    treat the bleed any better? Well, no. Well, then,

7    why this huge premium?

8            And that -- again, the delta was so big

9    that it was getting insurance companies', what I call

10   payers, attention, and it was inhibiting their

11   conversion rate.

12       Q.   Conversion rate, again just to understand,

13   you mean converting from some other form of factor up

14   to Advate?

15       A.   Let's not say "form" because then you get

16   into whether it's Factor VIII or Factor IX.

17       Q.   I don't mean that.

18       A.   I don't, either, but I just want to be

19   clear. From some competitor, let's say, including

20   themselves.

21       Q.   Got it. Switching from a previously used

22   product to Advate?

23       A.   Factor VIII product to Advate, yes.

24       Q.   Okay. I understand.

25            All right. In paragraph 4 the third line

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 97

1      up, fourth line up, it says, "I also made at least

2      three trips to Baxter's Deerfield, Illinois offices to

3      meet with Baxter managers to discuss pricing."

4              Now, you've already told me about the 340B

5      conversation.  And that's kind of in the next several

6      sentences.

7              Do you remember what the other two meetings

8      were about?

9          A.    Not specifically, no.

10         Q.    Okay.  If you turn to paragraph 6, you

11     reference it this paragraph 6 of your Declaration that

12     is Deposition Exhibit 6, you reference a meeting with

13     Larry Guiheen about Baxter's pricing of Advate.

14             Is this the conversation that you and I

15     just had about the moving -- what's a good way to

16     describe the conversation we had?  A marketing issue?

17         A.    It's pricing and marketing.

18         Q.    Okay.

19         A.    And yes, that is the conversation I'm

20     referring to.

21         Q.    Okay.  Got it.

22             In paragraph 7 you refer to your time at

23     Express Scripts and Curascript and you talk about how

24     you, quote, interacted with Baxter's pricing managers,

25     close quote.

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 98

1          Do you have any specific memory of pricing

2     conversations then?

3          A.    No.

4          Q.    And in the last sentence of paragraph 7 you

5     also reference, quote, numerous discussions with them

6     about pricing strategies.

7          Do you remember what the subject of those

8     pricing discussions were in paragraph 7?

9          A.    I do not remember specific discussions.

10                         (Deposition Exhibit Number 21 was

11                         marked for identification.)

12                         (Document tendered to the

13                         witness.)

14     BY MR. JACKSON:

15          Q.    Let me show you what's been marked as

16     Deposition Exhibit 21.  Deposition Exhibit 21 is the

17     Memorandum in Opposition to Baxter International

18     Inc.'s Motion to Dismiss Relators' Complaint.

19          Do you see that?

20          A.    Yes, I do.

21          Q.    I have a generic question for you, sir.  In

22     the Complaint --

23          A.    Is this a generic question coming from a

24     brand manufacturer?

25          Q.    -- there are repeated allegations, and I'll

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 99

1    give you an example, in which you and Miss Sun allege

2    that Baxter has violated certain provisions of the

3    various state laws and federal laws beginning in 1998.

4             Yet in Exhibit 21, page 2, you seem to say

5    that your Complaint is based upon events that first

6    occurred in 2000.  Second sentence, paragraph 3, third

7    full paragraph:  "This scheme was based on FDB's 2000

8    consent decree with the Department of Justice, and

9    consequently could not have been publicly disclosed in

10   any of the earlier filed Complaints cited by Baxter."

11            Do you see that?

12   A.     Yes, I do.

13   Q.     So, are you complaining about events that

14   occurred prior to 2000, or are you complaining about

15   events that occurred after this 2000 date?

16   A.     You know, you referenced the 1998 stuff.

17   It is in the sections -- and I just have to defer to

18   Mr. Kleiman on that because all that legal stuff was

19   his.  I just put, you know, put in what I knew.

20   Q.     And all I want to understand is what you

21   believe.  Mr. Kleiman and I will have lots of

22   conversations about these issues.

23            But when I look at the Complaint, I see

24   allegations that relate back prior to 2000.  Yet in

25   your Opposition, which is Exhibit 21, it seems to

Page 100

1    premise the allegations on something that occurred in

2    2000.

3              Which is it to your knowledge?

4         A.   Page 2 that I refer to says, "Relators'

5    allegations are based on Baxter's intentionally

6    forcing First DataBank (FDB) to misreport Baxter's

7    prices for biological products by refusing to give FDB

8    any WAC information. "

9              A couple of things here.  First of all,

10   yes, this aspect of the case was only 2000 going

11   forward, okay?  Yes.

12             I would also say that when it says here,

13   "by refusing to give First DataBank any WAC

14   information," I think that's true, but I think that it

15   goes further into which WAC information they provide.

16   But in this case any WAC, I suppose, covers that.

17             I'm venturing off into the Law Department

18   here, but the part of the case that has to do with

19   First DataBank certainly is post-2000.

20        Q.   Okay.  So, let's back up.  Now, how did you

21   know -- strike that.

22             Didn't you previously tell me that you

23   learned about what Baxter was telling First DataBank

24   via your communication with Kay Morgan?

25        A.   Yes.

Page 101

1    Q.    Okay.  Let's now turn to the Complaint,

2  which is Deposition Exhibit 7.  Paragraph 24 on page 9

3  includes the following language:  "Prior to May of

4  2000 FDB's misreporting of price information was

5  suspected or known by state Medicaid agencies."

6          Did you provide that information to the

7  Complaint?

8    A.    I did, but I may not have been the only

9  person that provided that.

10   Q.    I'm just interested in your knowledge and

11  information.

12          How did you know that?  How did you know

13  what state Medicaid agencies knew?

14   A.    Well, because I had personally dealt with

15  several state Medicaid agencies, both while I was at

16  Bayer and while I was at Express Scripts.  So, you

17  know, I had personally talked to and met with, you

18  know, the Texas Drug Vendor Program, Jerry Weiss down

19  in Florida and various other people who openly

20  discussed the fact that, you know, we know the AWPs

21  aren't right.

22   Q.    Now, in the next sentence of paragraph of

23  24 you refer to a "May 2000 FDB agreement with the

24  Justice Department."

25          Do you see that in the second sentence?

Page 102

1         A.     Yes, I do.

2         Q.     What can you tell me about that May 2000

3    agreement between FDB and the Department of Justice?

4         A.     Well, I think that some of this comes out

5    of the case I was involved with with Bayer and that

6    the Department of Justice was looking for some sort of

7    a solution to the, quote, unquote, AWP problem.

8              And it was one thing to settle with a

9    company like Bayer retroactively, but one of the

10   issues was, you know, how do they resolve this problem

11   going forward.  And not just with Bayer, but with many

12   manufacturers.

13             And so, at the time the practice was, and I

14   can tell you, you know, as someone who did it, all

15   three data banks, Medispan, Red Book and First Data,

16   would request from the manufacturers their AWPs.

17   "What do you want your AWP to be?"

18             I would get a form, and it would have all

19   of our drugs on it and, you know, columns and rows,

20   and it would have your current AWP in there and then a

21   blank for what do you want it to be next time.

22             And this was how AWPs were done at that

23   time.  The manufacturer just picked their AWP.

24             Once it became an issue, this was, you

25   know, with the Unicare case and others, that AWPs --

Page 103

1    that there was a problem with AWPs, and the DOJ was

2    looking for a way to contain, I guess would be the way

3    to put it, the problem.

4           So, because First DataBank was the data

5    bank that all the state Medicaid agencies used, the

6    DOJ went to First DataBank and said, "From now on you

7    are not to take AWP information from the

8    manufacturers.  You're just not to -- if they give it

9    to you, you don't accept it.  You don't publish what

10   they tell you to publish.  Here's how you're going to

11   calculate AWPs."

12          And they gave them a methodology that they

13   were to use from that point forward to calculate AWP.

14      Q.    What was that methodology?

15      A.    First DataBank was instructed to take the

16   WAC or wholesale acquisition cost, otherwise known as

17   wholesale selling price, from a manufacturer and then

18   to go to the -- to a group of wholesalers and do a

19   survey, survey the wholesalers as to what they would

20   mark this product up.  And they did it by labeler

21   code.

22          But anyway, they were to go to the

23   wholesalers and ask them to tell them what their

24   markup would be.  This is on not pass-through

25   contracts, but on what they would charge to a

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 104

1    retail-type customer, what markup hey would have for

2    that labeler code.

3              They were to then do a weighted average of

4    wholesalers.  And whatever that multiplier was, which

5    we all know now is typically 1.2 or 1.25, they would

6    then say that that is the multiplier for that labeler

7    code.  They would then take that multiplier and

8    multiply that times the WAC, and that would determine

9    the AWP.

10       Q.    Now, does your Complaint allege that Baxter

11   did not give a WAC to First DataBank?

12       A.    Yes.

13       Q.    And what did Baxter give to First DataBank?

14       A.    According to Kay Morgan, they received a

15   letter from Baxter stating that -- stating their list

16   price, and they called it list price, was $1.31 and

17   that they wanted an AWP also to be $1.31.

18       Q.    All right.  And then you've already talked

19   to me about your conversation with Kay Morgan, right?

20       A.    I believe we have, yes.

21       Q.    Okay.  Can I have you turn to page 17 of

22   the Complaint, Exhibit 7?  After paragraph 48 there is

23   bold and highlighted language, "Best Price And Stark

24   Violations."

25              The first sentence says -- I'm sorry.

Page 105

1          The first sentence, paragraph 49:  "Baxter

2    had a marketing practice of offering 'Volume Committed

3    Contracts' to institutional healthcare providers (such

4    as hospitals, nursing homes and home health

5    agencies)."

6          Do you see that?

7      A.    Yes, I do.

8      Q.    Do you believe that there's something wrong

9    about volume committed contracts?

10     A.    No.

11     Q.    I'm sorry?

12     A.    No.

13     Q.    Okay.  Then is there -- what is Baxter's

14   practice regarding volume committed contracts that you

15   believe give rise to best price or Stark violations?

16     A.    Well, first of all, let me say that this

17   section comes from Linnette Sun.

18     Q.    Okay.

19     A.    Maybe that's -- I've said enough.

20     Q.    No, I'm just trying to understand.  It

21   appears that something's wrong with volume committed

22   contracts.  And you said you don't think that

23   anything's wrong with volume committed contracts.

24     A.    That's correct.

25     Q.    Okay.  Do you believe that Baxter -- that

Page 106

1    as a result of volume committed contracts Baxter has

2    done something wrong, impermissible or illegal with

3    regard to best price?

4         A.    I don't know.

5         Q.    What is best price?  Do you know?

6         A.    You want the version prior to 2007?

7         Q.    I want whatever your definitions are.

8         A.    Well, CMS published -- I'm sure you're

9    familiar with the Deficit Reduction Act's changes in

10   definitions on best price and ANP that was Published

11   in fall of 2007.  But this case is prior to that, so I

12   think we're looking at that definition of best price.

13            And best price is, I believe, defined in

14   the Social Security Act as the lowest price offered by

15   a manufacturer net of all rebates, terms and

16   conditions.

17        Q.    Do you have any information that would

18   suggest that Baxter failed to calculate best price in

19   an appropriate way?

20        A.    No, I do not.

21        Q.    Do you believe that volume committed

22   contracts create Stark violations?

23        A.    I don't know for sure what Stark violations

24   are.

25        Q.    Did you have any input to the allegations

Page 107

1    of this Complaint in connection with Stark violations?

2        A.    Again I don't know what Stark violations

3    are, so I don't know if I had any input.

4        Q.    If you look at paragraph 52, it says, "The

5    discounts Baxter offered to institutional providers

6    under the Volume Committed Contracts also violated

7    Stark II, 42 U.S. Section 1395nn which prohibits

8    compensation arrangements such as Volume Committed

9    Contracts between entities such as Baxter, which

10   furnishes goods or services, and healthcare providers,

11   which are in a position to order or refer patients for

12   the receipt of such goods or services."

13           Does that help you refresh your

14   recollection what the Stark act might or might not do?

15       MR. KLEIMAN:   Assumes facts not in evidence.

16           Go ahead.

17   BY THE WITNESS:

18       A.    When you say "helps," it gives me a little

19   bit more information, but I still don't know.

20   BY MR. JACKSON:

21       Q.    Okay.  And do you know anything about

22   Baxter's practices vis-a-vis volume committed

23   contracts?

24       A.    No.

25       Q.    In paragraph 58 of the Complaint that's

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 108

1    Deposition Exhibit 7 there are allegations that relate

2    to AMPs.  Do you know what an AMP is?

3         A.    Sure.  Average manufacturer's price.

4         Q.    Do you have any information regarding

5    Baxter's practices regarding calculating AMPs or BPs?

6         A.    No, I do not.

7         Q.    Do you believe that volume committed

8    contracts, the use of volume committed contracts

9    constitutes a violation of the Anti-Kickback Act?

10        MR. KLEIMAN:  Incomplete hypothetical.

11   BY MR. JACKSON:

12        Q.    You can answer the question.

13        A.    I'm not -- I'm not well-versed enough on

14   anti-kickback to tell you whether it does or doesn't.

15   BY MR. JACKSON:

16        Q.    Do you believe that a manufacturer who

17   provides discounts to a purchaser, that those

18   discounts are improper or illegal in any way?

19        A.    Well, --

20        MR. KLEIMAN:  Calls for a legal conclusion.

21   BY THE WITNESS:

22        A.    Yeah, I think that's --

23   BY MR. JACKSON:

24        Q.    Go ahead.

25        A.    It's really vague.  I suppose it depends on

Page 109

1    a whole flock of things in terms of what are the

2    discounts for.  I mean, I'll give you a discount if

3    you do something illegal, well, then, no, that's

4    illegal.

5         Q.    What about volume discounts?

6         A.    I don't see a problem with volume

7    discounts.

8         MR. JACKSON:  Let's go off the record.

9                     (Discussion off the record.)

10                     (Recess.)

11        MR. JACKSON:  I have no further questions for

12   this witness regarding the jurisdictional issues.

13        MR. KLEIMAN:  Thank you.  I've got nothing

14   further.

15                     (Whereupon, the deposition was

16                     concluded at 2:22 p.m., this day,

17                     January 21, 2010.)

18

19

20

21

22

23

24

25

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 110

1      STATE OF ILLINOIS   )

                           )

2      COUNTY OF GRUNDY    )

3                    The within and foregoing deposition of the

4      aforementioned witness was taken before MARGARET A.

5      BACHNER, CSR and Notary Public, at the place, date and

6      time aforementioned.

7                    There were present during the taking of the

8      deposition the previously named counsel.

9                    The said witness was first duly sworn and

10     was then examined upon oral interrogatories; the

11     questions and answers were taken down in shorthand by

12     the undersigned, acting as stenographer and Notary

13     Public; and the within and foregoing is a true,

14     accurate and complete record of all of the questions

15     asked of and answers made by the aforementioned

16     witness, at the time and place hereinabove referred

17     to.

18                   The signature of the witness was not

19     waived, and the deposition was submitted, pursuant to

20     Rules 30(e) and 32(d) of the Rules of Civil Procedure

21     for the United States District Court, to the deponent

22     per copy of the attached letter.

23

24

25

Page 111

1              The undersigned is not interested in the

2      within case, nor of kin or counsel to any of the

3      parties.

4              Witness my official signature and seal as

5      Notary Public in and for Grundy County, Illinois, on

6      this 22nd day of January, A.D. 2010.

7

8

9      _____

                   Margaret A. Bachner, CSR, RMR, CRR

10                 Illinois CSR No. 84-1481

                   Notary Public, Grundy County, Illinois

11                 My Commission Expires June 22, 2010

                   311 South Wacker Drive, Suite 300

12                 Chicago, Illinois  60606

                   Phone:  (312) 386-2000

13

14

15

16

17

18

19

20

21

22

23

24

25

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 112

1                UNITED STATES DISTRICT COURT
              DISTRICT OF MASSACHUSETTS
2
     IN RE:  PHARMACEUTICAL            )
3    INDUSTRY AVERAGE WHOLESALE        )
     PRICE LITIGATION                  )  MDL No. 1456
4    _____       )
                                       )  Master File No.
5    THIS DOCUMENT RELATES TO:         )  1:01-CV-12257-PBS
                                       )
6    United States ex rel.             )  Sub-Category Case
     Linnette Sun and Greg             )  No. 1:08-CV-11200
7    Hamilton, Relators                )
                                       )
8        v.                            )
                                       )
9    Baxter Hemoglobin                 )
     Therapeutics and Baxter           )
10   International Inc.                 )
11              I, GREG HAMILTON, hereby certify that I have
12      read the foregoing transcript of my deposition given
13      at the time and place aforesaid, consisting of Pages 1
14      to 112, inclusive, and I do again subscribe and make
15      oath that the same is a true, correct, and complete
16      transcript of my deposition so given as aforesaid, and
17      includes changes, if any, made by me.
18
19              _____
                        GREG HAMILTON
20
21      SUBSCRIBED AND SWORN TO before me this
22      _____ day of _____ 2010.
23
24      _____
                Notary Public
25

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

**A**

abbott 28:15
ability 6:6,7
able 31:23 84:1,4
 84:10 95:2
absent 24:11
absolutely 83:4
accept 43:7 45:16
 103:9
acceptance 94:11
accepted 10:11
 94:24
access 22:12 32:6,9
 32:19,23,25 33:8
 33:13,15,15,20,23
 42:13
accompanying 90:8
accredo 47:1
accurate 30:1
 110:14
accurately 29:23
acquire 46:18 60:12
acquisition 39:24
 76:7 103:16
act 9:23 12:21,21
 12:22 13:5 106:14
 107:14 108:9
acting 110:12
acts 36:17 106:9
actual 39:24 76:7
 78:9
add 69:6 74:13
addition 36:15
 90:10
address 92:1,2
adjudicated 51:17
adjudicating 53:9
 53:11
administered 91:7
administrative
 51:22
advate 92:10,12,17
 93:12,13 94:7
 95:4,7 96:14,22
 96:23 97:13
advates 92:5 93:2
advertise 15:23
affect 76:7
affirm 6:12
aforementioned
 110:4,6,15
aforesaid 112:13,16
ag 28:22
agencies 101:5,13
 101:15 103:5

105:5
ago 7:25 20:23
 32:15 66:20
agreement 25:16,19
 25:21 26:13,16,21
 101:23 102:3
agreements 26:23
ahead 6:16 32:10
 36:23 44:11 70:13
 107:16 108:24
algonquin 54:19
allegations 35:11
 47:16 76:19,22
 98:25 99:24 100:1
 100:5 106:25
 108:1
allege 99:1 104:10
alleged 36:17
alleging 8:22
allen 2:4
aloud 5:25
ambiguous 14:8
 30:10 62:24
amended 3:16
 25:11 49:8
america 3:17 46:17
 46:21,23,24
amount 53:15
amp 10:7 108:2
amps 108:2,5
analysis 70:22 71:8
andrew 2:11
andy 5:7
anp 106:10
answer 5:24 6:10
 6:16,16 11:14,22
 14:13 15:19 17:25
 19:7 20:8 22:6,14
 23:2,15,20 24:15
 25:4 26:11 28:4,7
 30:12 32:10,12
 41:5 48:4 49:2,4
 51:13 55:22 67:4
 82:25 83:8 84:8
 87:11 108:12
answered 11:5
 16:13 55:20
answering 19:20
answers 66:20 67:3
 110:11,15
antikickback 108:9
 108:14
anymore 45:16
anythings 105:23
anyway 103:22

apart 51:19,21
apologize 61:15
appearing 5:20
appears 31:4 54:18
 55:7 78:20 79:23
 81:1 105:21
applies 84:25
appointment 4:16
 77:23,24 78:9
 79:13,14 80:14,15
 80:16,17,21 83:2
 85:21
appreciate 77:3
appropriate 106:19
approval 93:18
approved 93:19,21
approximately 25:9
 25:13 33:12
april 27:3 56:21
 62:19 70:6 86:11
 93:20
area 28:16 64:7
areas 9:5
arent 92:25 101:21
arrangements
 107:8
article 4:3 54:10
 56:20,21
asked 18:21 41:10
 43:20 45:7 65:18
 66:19 67:10,12
 91:1,5 110:15
asking 5:23 14:17
 18:11 25:2,3 52:7
 78:13
aspect 100:10
assess 82:24
assign 14:4
assist 55:15
assistant 65:20
association 87:22
assume 24:18 31:20
 75:19
assumes 32:8
 107:15
attached 110:22
attention 42:12
 94:17,21 95:13,14
 95:18 96:10
attorney 23:1 58:9
 86:12
attorneys 3:10
 16:19 22:11,24
 24:11 25:1 31:20
 56:6 58:3 60:15

august 84:11
austin 2:18
available 40:12
 67:10 70:23 71:9
 71:13,17,25 86:20
avenue 2:5
average 1:4 8:8,10
 9:14 14:7 104:3
 108:3 112:3
aware 10:16,21,22
 15:22 27:19 41:25
awp 3:14 7:19 8:8
 9:2,11,13,13 10:6
 11:2 13:9 14:18
 17:10,11 21:7,8
 30:22 32:3 34:6
 34:21,23 35:1
 38:15 39:10 43:10
 45:14 74:3,7,9,14
 74:23,25 75:1,6
 75:18,19,24 76:8
 90:8,17 102:7,17
 102:20,23 103:7
 103:13 104:9,17
awps 31:5 38:23
 44:19 45:16 64:15
 75:20 76:3,13
 101:20 102:16,22
 102:25 103:1,11

**B**

b 3:6 4:1
bachner 1:15 110:5
 111:9
back 9:7 33:14
 34:25 41:4 43:25
 53:3 55:6 56:8
 65:23 66:13,15
 68:13,18 77:23,24
 84:22 87:25 89:9
 93:7 99:24 100:20
background 56:7
ballpark 94:8
bank 74:12 103:5
banks 33:16 74:10
 102:15
barnhill 9:18
based 22:14 27:18
 33:11 40:7 99:5,7
 100:5
basically 29:3 90:5
basis 19:16 35:10
 35:13
bates 31:12 57:20
bathroom 72:18

baxter 1:10,10 2:8
 2:9,24 3:13,21 5:8
 13:16 18:25 19:4
 21:9,13,17,22
 22:9,19 30:3,4,7,8
 30:14,22 31:18
 36:16 37:25 40:7
 40:10,13 43:19,21
 44:3 45:13,17,24
 46:11 48:1 50:3,8
 50:8 51:2,14,16
 51:20,23 52:17,22
 53:3,20 56:20
 58:11 61:5 77:16
 78:21 79:6 81:22
 82:3,5,8 83:15
 84:12,13,15 85:6
 86:22,23 89:14
 90:1,25 91:3 94:1
 95:22 97:3 98:17
 99:2,10 100:23
 104:10,13,15
 105:1,25 106:1,18
 107:5,9 112:9,9
baxters 4:19 36:17
 43:7 52:2,4,8,10
 52:12 73:21 82:11
 86:2 87:1 91:15
 97:2,13,24 100:5
 100:6 105:13
 107:22 108:5
bayer 2:17 28:22,22
 28:22 29:2,4
 34:20 64:1,3
 101:16 102:5,9,11
bearing 55:24
beck 83:13,14,16
becoming 32:20
began 34:14
beginning 99:3
begins 39:9 43:5
behalf 2:3,8,17
 87:23
belief 48:20,21
believe 5:19 7:13,20
 9:2,24 16:12
 18:14 27:16 29:19
 29:25 33:12 35:2
 35:8 44:1 52:4
 59:8,20 60:9 65:3
 69:22 71:11 73:9
 75:4,7 76:12,24
 82:22 83:3 86:16
 95:7 99:21 104:20
 105:8,15,25

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 114

106:13,21 108:7
108:16
believed 44:16
best 8:12 12:24
56:6 73:5,17
104:23 105:15
106:3,5,10,12,13
106:18
bethanne 15:8
better 93:3 96:6
big 62:14 89:19,24
96:8
bigger 95:16
bill 74:6 95:11
billed 74:2,4
biological 28:20,21
100:7
biologics 64:19
bioscience 3:21
bit 73:16 107:19
blacked 81:12
blank 102:21
bleed 96:6
bold 104:23
bolton 2:24 13:2,15
book 4:16 34:23
79:13 80:14 83:2
85:21 102:15
books 34:8 77:23,25
78:9
bottom 31:11
bp 10:7
bps 108:5
brand 98:24
break 11:15 32:13
72:18
breaker 92:24
briefly 7:14 28:8
broad 14:2
broken 14:15
brought 44:25 91:2
95:18
buck 94:7
bureau 62:13,20
63:21,23,24 65:2
65:6,9 66:8 67:6,9
68:14,25 69:5,7
69:16,23 70:2,7
71:4,13 72:7
bureaus 67:24
business 41:25
buy 41:22 67:1

**C**

c 7:21 8:21 10:2

11:2 19:11
calculate 39:18
103:11,13 106:18
calculated 51:16
52:6 91:6
calculates 52:22
53:22
calculating 53:13
108:5
calculation 39:20
calculations 52:17
52:21
calendar 78:20
83:11,20 84:6
california 2:6
call 45:5,9,9 65:5,8
84:14,16 96:9
called 5:3 18:14,15
43:20 44:4 45:4
46:16 62:6 64:7,9
65:10 66:8,13,14
66:21 68:25 89:4
90:11 94:19
104:16
calling 44:8 45:22
65:13
calls 44:10 49:1
55:1 108:20
cancelled 79:14
cant 12:6,14 23:20
26:11 45:16 79:12
81:17 82:10 85:7
85:9 90:18,24
capacity 11:17
capital 3:23 54:10
cardinal 40:13,17
41:11,23 42:1
care 34:5 47:2 62:4
career 11:17
case 1:7 5:9 7:15,17
7:19,21 8:1,7,15
8:24 9:20,22,23
10:1,3,6,19 11:3
14:23 15:2,5,11
15:15 16:18,20
17:21,22,23 18:7
18:9,10,20,21,24
18:24 19:9,11,25
20:15,15,22,24
21:3,4,6,7,8,12,15
21:17 25:17 27:15
30:5,9 47:17
60:23 68:22 71:23
76:19 81:23
100:10,16,18

102:5,25 106:11
111:2 112:6
cases 11:1,16,21
12:1,8,15,17,20
12:21 13:5,19,22
14:6,11,15,16,23
17:10,11,15 18:3
18:22 19:2,6,13
19:17,20 20:6,9
21:20,22
categories 64:14
caught 95:17
caution 12:5
center 8:22
cents 39:22,24
92:22 93:1,6,7
94:6,8,14 96:5
certain 12:2 28:5
31:8 53:15,16,17
56:9 79:12 80:3
82:11 83:4 85:8,9
99:2
certainly 34:4
37:19 76:13 90:6
100:19
certify 112:11
cetera 25:22 56:9
chance 72:19
change 74:14,16
75:24 76:5,6
changed 75:1,21
76:3
changes 74:22 75:5
76:8 106:9 112:17
changing 3:23
54:11
channels 41:22
channon 8:6
chapin 8:6
charge 41:17 65:15
103:25
charging 65:17
74:16 92:19
check 53:23
checks 15:10
chicago 1:19 2:21
28:16,18 82:8
111:12
chief 44:23,23
chuck 9:18
cindy 66:8,10,12,17
circumstances 27:5
57:24 74:17 75:23
cited 99:10
citing 65:1

civil 1:16 7:17,20
10:1 13:9 18:15
110:20
claim 18:12,14
claims 9:22 12:20
12:21,22 13:5
14:11 20:22 21:6
27:17 91:10 95:16
clauses 56:9
clear 96:19
client 18:11 90:1
clients 65:21 72:3
87:24
close 97:25
clue 60:20
cms 42:10,13 106:8
code 64:17 103:21
104:2,7
cohen 15:8,18
colleague 64:1
collection 77:20
columns 102:19
com 3:9,11 15:24
come 12:2 22:22
31:10,17 39:19
40:6 42:9 46:18
91:1 92:11
comes 16:8 52:24
102:4 105:17
coming 49:13 58:18
98:23
comment 16:15
comments 79:1
commission 111:11
committed 105:2,9
105:14,21,23
106:1,21 107:6,8
107:22 108:7,8
common 87:20
communication
23:16,19 24:23,25
25:14 35:9 42:6
43:23 45:24 90:16
100:24
communications
24:5,7 26:8 35:4
90:14
companies 29:4
34:6 70:24 71:10
71:15 92:25 93:10
94:12,25 96:9
company 17:15,20
28:22,23 32:17
46:16 47:2 51:4
63:24 64:5,21

71:24 102:9
comparable 92:13
compares 53:21
comparison 73:17
92:19
compensation
107:8
competitor 96:19
compiling 71:21
complaining 99:13
99:14
complaint 3:16 22:3
25:11 27:5,17,21
27:23 35:11 36:18
36:24 37:10,13,16
39:2 40:24 42:4
42:18 43:1,4
47:16 48:25 49:8
49:15 50:23 51:8
56:1 57:3,10
58:20 59:11 60:22
61:7,14 65:2
68:22 69:5,20,24
72:8 75:13,18
76:19,21,23 86:19
87:8,13 89:15
91:10 98:18,22
99:5,23 101:1,7
104:10,22 107:1
107:25
complaints 99:10
complete 110:14
112:15
components 37:15
compound 11:12
32:8
concept 76:13
conceptual 93:4
concern 8:7 18:24
19:4
concerned 21:12
45:3 89:13
concerning 27:24
28:1
concerns 18:10
concluded 109:16
conclusion 108:20
conditions 26:1
106:16
conference 45:2,5
84:13
confidence 72:3
confidential 1:12
20:3 57:18
confirmed 65:19,21

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

conjunction 51:8
connection 17:10
  17:14 18:2 21:12
  21:17,19 22:15
  27:15 65:6 107:1
consent 99:8
consequently 41:19
  99:9
consisting 112:13
constitutes 108:9
consultant 11:18
  15:4 19:4 29:3,10
  30:13
consulted 30:7
consulting 11:11
contact 23:24 24:1
  25:8 34:19,25
  41:11
contain 72:2 103:2
contained 36:10
  37:16 42:14,25
  71:12 72:8
contains 62:25
content 25:2
contents 63:5 70:22
context 73:16,19
  87:18
contract 40:17 50:7
  74:11,15,22 75:3
  90:6
contracting 73:23
  74:1 76:2 91:2,3,4
contracts 40:7,10
  51:2,4,5,14 74:13
  103:25 105:3,9,14
  105:22,23 106:1
  106:22 107:6,9,23
  108:8,8
control 48:16 87:23
conversation 43:18
  66:17 91:25 97:5
  97:14,16,19
  104:19
conversations
  44:19 91:19 98:2
  99:22
conversion 96:11
  96:12
conversions 92:16
convert 95:3
converting 96:13
convince 93:8
copies 16:7,9 85:19
copy 26:15 58:1
  60:13 110:22

corner 30:22 31:12
corporation 2:17
  29:4 64:1
correct 6:12 9:15
  9:21 13:10 18:5
  22:21 24:16 32:18
  33:3 35:6,12
  41:13 51:23,24
  52:6,18,19,20
  53:8 67:22 68:5
  90:4 105:24
  112:15
cost 39:24 66:22
  67:13,17 103:16
costs 68:7
couldnt 71:19
counsel 2:1,24 6:14
  6:15 14:21 110:8
  111:2
counsels 6:25 11:25
  78:5
country 67:14
county 110:2 111:5
  111:10
couple 87:25 93:1
  100:9
course 74:8 87:19
  90:4 93:3 95:22
court 1:1 4:3 10:11
  11:5,6,9 56:22
  110:21 112:1
courts 1:17
cover 15:15 62:5
covers 100:16
craig 18:8
create 71:5 73:10
  73:12 106:22
created 75:7,8
  85:18
creating 47:16
  73:13
credit 51:20
crr 1:15 111:9
csr 1:15 110:5
  111:9,10
curascript 3:21
  50:5,5,8,12 74:5
  97:23
curascripts 53:5
curious 57:6
current 67:1 95:3
  102:20
currently 65:17
curriculum 3:12
curve 94:20

customer 3:21
  44:22 52:23 53:15
  73:21 74:2 76:4
  86:2 90:7 104:1
customers 34:1,2
  74:19
cutter 28:20,21

                D

d 1:20 3:1 110:20
  111:6
dallas 81:6
damages 3:16 8:20
  25:17
data 33:15 34:11
  40:6 64:6,13,24
  68:4 70:8 74:10
  74:12 102:15,15
  103:4
databank 3:19 4:14
  31:7,9,10,22,24
  31:25 32:2,4,6,19
  33:9,13,21 34:9
  34:12,20,22 35:1
  35:5 36:20 37:23
  38:1,17,19,19,22
  39:1,18,20 44:22
  44:25 73:8 74:9
  100:6,13,19,23
  103:4,6,15 104:11
  104:13
databanks 31:5
  33:23
database 33:9
date 25:12,12,13
  33:12 42:17 60:22
  78:20 83:12 87:8
  90:24 93:18 99:15
  110:5
dated 56:21 57:19
  70:6
dates 27:7,9 29:25
  43:25
day 1:20 68:4 82:9
  82:10,16,20 83:17
  88:8 109:16 111:6
  112:22
days 44:2 66:14
  84:12
dc 2:14
deal 45:16 92:24
dealt 101:14
dearborn 2:20
death 18:10
debit 51:20

deck 85:3,3
declaration 3:15
  6:24 35:2,9 36:2,4
  36:7,10,13 42:7
  65:24 66:7,24
  67:16 89:10 97:11
decree 99:8
deerfield 97:2
defendant 17:16,21
defendants 9:25
  30:5,8
defer 99:17
deficit 106:9
define 17:11 33:23
defined 106:13
definition 106:12
definitions 106:7,10
delay 93:21
delivering 41:17
delta 95:8,12,14
  96:8
demonstrate 51:1
denied 10:19
denominator 14:9
  14:10
department 27:4,8
  64:2 87:7 91:4
  99:8 100:17
  101:24 102:3,6
depending 55:22
depends 33:22
  108:25
deponent 110:21
depose 10:20
deposed 7:10 18:22
  19:10,14 20:25
deposition 1:14 2:1
  3:7,8 4:2,5,8 5:10
  5:16,16,17,21
  6:20,24 7:6,16,23
  10:17 11:7,8 13:3
  16:1,21 17:3,3,4,9
  20:7 29:11,17,18
  29:21 30:15,20,21
  35:15,21,23,23
  36:1 37:1,6,7,10
  42:4 43:4 46:4,9
  46:10 47:19,25,25
  48:24 49:9,12,13
  49:17,23,23 52:1
  54:2,8,8 56:13,19
  56:19 57:12,17,18
  58:11,19,22 59:2
  59:3,5,21 60:3,3,4
  60:17 61:3,18,24

62:3 68:21 69:9
  69:15,15 70:2,14
  70:19 72:10,16,24
  72:25 73:3 77:9
  77:15,16 78:19,19
  86:4,10,10 88:6
  89:1,10 97:12
  98:10,16,16 101:2
  108:1 109:15
  110:3,8,19 112:12
  112:16
depositions 1:18
  4:7 7:15 12:25
  59:4 61:2
describe 7:14 8:25
  28:9 97:16
described 29:22
  43:10 45:13,13
  84:20 86:23
designate 19:25
  20:2
destroy 78:15
details 9:8
determine 38:12
  104:8
determined 26:6
  38:14
develop 87:3
developed 87:1
dickstein 2:10
didnt 23:1 32:9
  44:8 73:11 85:21
  100:22
difference 39:23
  94:4,5,8,18,20
  95:9
different 23:22
  47:12 53:14
differential 92:24
difficult 93:4
direct 34:19,25
  36:15 42:11
directed 73:12
directly 32:24
disclosed 99:9
disclosing 86:19
disclosure 72:1
discount 74:3,6
  109:2
discounts 107:5
  108:17,18 109:2,5
  109:7
discovery 1:18
discuss 8:25 91:2,16
  97:3

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 116

discussed 12:25
   45:6 83:17 89:14
   89:20 90:10,21
   101:20
discussing 20:15
   84:17
discussion 14:25
   37:22 84:24 88:4
   93:12 109:9
discussions 23:4
   36:16 66:15 98:5
   98:8,9
dismiss 4:19 7:3
   10:19 35:3 98:18
distribution 41:22
   41:23
district 1:1,2,17
   110:21 112:1,1
division 28:14 50:5
doctor 64:18 93:9
document 1:6 3:13
   3:17,19,21,23
   4:10,12 5:12,18
   16:3,23 17:6
   26:16 29:13 30:17
   30:21,24 31:1,3,6
   31:8,17,19,22
   35:17,24 37:3,18
   46:6,10,12,14,18
   47:15,21 48:1,2,6
   48:7,11,24 49:5
   49:19 50:1,11,22
   51:1 54:4,9,14,16
   54:25 55:5,17,21
   55:24,25 56:3,9
   56:15,25 57:2,14
   57:20,22,25 58:2
   58:6,8,14,16,24
   59:6,7,10,23 60:4
   60:6,8,10,13,19
   60:22 61:6,6,8,20
   62:3,9,16,17,22
   63:2,13,20 69:11
   70:2 72:12 73:10
   73:14,15 75:4,8
   75:12 76:18 77:11
   77:16,18 86:6,15
   98:12 112:5
documentary 86:24
   87:3
documents 6:19,22
   7:5 21:11,16 22:8
   22:11,15,19,19
   31:10,16 50:16,20
   62:25 78:3,9,16

doesnt 64:19 71:16
   87:9,15 108:14
doing 45:21 61:15
   95:5
doj 87:21 103:1,6
dollar 95:17
dollars 15:13 94:16
dont 9:24 12:3,10
   13:24,25 14:14
   15:6,9,21 16:11
   17:17,18,20 22:6
   22:12 24:21 26:1
   26:22 27:1,6,6,8
   27:10 28:2,7 31:2
   34:3 36:5 38:20
   39:3 40:21 42:16
   42:19 43:24 44:1
   44:7 45:1 49:4,4
   49:16 50:13 51:25
   52:3,14 54:17,21
   54:23 55:3,19,22
   55:23 56:2,5,12
   57:1,8 58:12,15
   59:8,9,20,20
   60:24 61:4,11
   62:11,14 63:9
   65:3 66:13 69:7
   70:4,5,9 72:9
   75:17 76:5,8,12
   76:24 77:8 79:10
   80:3,19 83:8 88:2
   91:24 93:7,19,22
   96:17,18 103:9,9
   105:22 106:4,23
   107:2,3,19 109:6
draft 36:4 55:25
   60:16
drafting 49:8,14
   58:20 61:7,13
draycott 27:13,15
drive 111:11
drop 92:15,22
drug 3:11 17:5
   18:17,17,18 28:10
   39:10 90:8 95:23
   101:18
drugfraudsettlem...
   3:9,11 15:24
drugs 4:14 6:5
   41:21 64:14 73:9
   92:20 102:19
due 53:23
duly 5:1,3 89:5
   110:9

E
e 3:1,6 4:1 110:20
earlier 18:4,21
   19:14 33:11 39:2
   68:2 99:10
easier 68:20 83:20
easy 38:21 75:24
   77:2
editorial 36:19
educational 76:9
either 11:17 30:4,8
   75:3 85:9 96:18
elses 95:4
employed 85:23
   86:22
employee 33:1 86:1
employer 50:16
engage 51:2
engaging 51:4
enjamin 2:19
entered 13:2,12
   20:6
entire 11:16 15:11
entities 30:4,8
   107:9
entitled 3:13,17,19
   3:21,23 4:3,10,12
   15:23 35:24 54:10
   56:22 60:4 62:4
entries 85:5
entry 51:19 52:2,4
   52:8,12
equals 39:25
err 12:5
errors 53:5
especially 52:5
   74:11
esquire 2:4,11,12
   2:19
estimate 12:11,24
   15:16 22:1 42:20
et 25:22 56:9
events 99:5,13,15
everybody 64:12
evidence 86:20,20
   86:25 87:3 107:15
ex 1:7 112:6
exact 9:8 12:10
   22:6 48:5
exactly 36:8 40:22
   43:24 69:8 70:8
   78:1 90:19
examination 3:2 5:5
   57:18 58:19 89:7
examined 5:4 89:5

110:10
example 42:22 68:7
   83:25 84:10 99:1
excel 50:2 51:18
   52:4,5,10,24,25
   53:7
excerpts 4:16
excessive 92:18
exclude 23:3
excludes 23:6
excuse 13:11
exhibit 3:7 4:2 5:10
   5:16,16 16:1,6,21
   17:3,3,4,9,13 18:2
   29:11,17,18,21
   30:15,21,21 35:15
   35:21,23,23 36:1
   37:1,7,7,10 42:4
   43:4 46:4,10,10
   47:4,19,25,25
   48:24 49:9,12,14
   49:17,23,24 51:9
   51:10 52:1,11
   54:2,8,8 56:13,19
   56:19 57:12,17,18
   58:19,22 59:3,3,5
   59:15,21 60:3,3
   61:9,18,24 62:3,6
   68:14,14,21 69:9
   69:15,15 70:2,20
   72:10,16,24,25
   73:4 77:9,15,16
   78:19,20 86:4,10
   86:10 89:10 91:10
   92:7,9 97:12
   98:10,16,16 99:4
   99:25 101:2
   104:22 108:1
exhibits 70:14
exist 74:23
existed 50:7
exists 46:25
expert 3:11 8:2,18
   8:23 9:3,6,19 10:4
   10:12 11:11,18,21
   15:5 17:5,14 19:4
   expires 111:11
explain 16:19 41:14
   41:15 73:3,19
   76:10 77:20 81:4
   91:5
express 3:19 29:5,7
   32:25 33:1,5,6,7
   33:20 40:7,10,12
   40:16,17 41:1,10

41:10,16,20,24
   44:21,25 46:19
   48:12,14,18,19,22
   50:3,5,11,18
   73:20 74:5,19,20
   75:8,11 86:1 90:3
   90:15 97:23
   101:16
expressed 92:10
extensive 92:18
extent 10:22 11:20
   19:5 23:16 26:8
   50:24
extra 94:14
eye 2:13
eyes 58:3

F
facility 82:8
fact 15:22 20:5
   52:23 53:1,4 96:1
   101:20
factor 42:1 44:18
   73:22 92:17 95:24
   96:13,16,16,23
facts 27:5 36:9
   107:15
factual 35:10 42:25
   45:25 72:8
failed 106:18
fall 106:11
false 9:22 12:20,21
   12:22 13:5 14:11
familiar 63:20 64:8
   75:19 106:9
familiarity 87:2
far 49:2 77:24
favor 53:5
fax 54:19,22 55:6
fdb 43:7 100:6,7
   101:23 102:3
fdbs 99:7 101:4
february 84:23
federal 1:16 12:2
   12:21 99:3
fee 32:3
fees 25:17,22 26:4
   26:24
felt 76:15 92:16
field 53:7
figure 38:25 39:4
   39:14 63:19
file 1:5 3:19 63:11
   112:4
filed 17:22,23 22:3

25:11 35:3 39:2
40:24 60:23 87:8
99:10
filing 27:2,21
final 89:12
financial 44:24
46:15 75:2
find 61:5 65:11,15
66:21
fine 6:13 10:24
12:12 26:2
firing 86:23
firm 15:20
first 3:19 4:14 5:3
8:19 13:8 14:14
15:6 21:24 23:13
23:23 24:23 25:8
25:14 31:1,5,7,9
31:10,22,24,25
32:2,4,5,6,19 33:9
33:12,13,14,21,23
34:9,12,14,19,21
35:1,5 36:6,20
37:23 38:1,17,18
38:19,22 39:1,17
39:19 44:22,24
54:16 55:21 58:6
60:10 62:15 73:8
74:9 78:18,19
86:18 89:21 91:13
92:2 95:13 99:5
100:6,9,13,19,23
102:15 103:4,6,15
104:11,13,25
105:1,16 110:9
firsthand 33:16
flock 109:1
florida 101:19
fluctuated 76:14
focus 63:15
folks 27:8 44:24
following 2:1 43:5
70:21 85:2 91:14
101:3
follows 5:4 37:25
89:6
footnote 74:8 76:5
footnotes 74:14
forcing 100:6
foregoing 110:3,13
112:12
forget 64:4 93:18
form 96:13,15
102:18
format 43:22 47:11

47:12
formed 35:10,13
71:24
former 64:1
forth 34:25
forward 45:8 86:18
100:11 102:11
103:13
foundation 81:7
83:23,25
founded 64:21
four 45:2
fourth 39:12 97:1
fractions 4:12
68:25 70:20
fraud 7:17 18:16
87:22
frequently 91:15
friday 84:11
front 56:8 62:5
70:19
fucu 87:21
fulfillment 73:23
full 6:1 99:7
furnishes 107:10
further 51:15 55:5
66:15 89:6 100:15
109:11,14

G

gain 42:14
gained 33:12,15
37:22,25 38:4
42:6 46:2
general 9:8,9,10
71:22 84:20 86:12
generalities 34:17
generally 70:23
71:8 81:17,19
84:7
generated 66:19
generic 98:21,23
gentlemen 90:22
getting 48:4 72:17
96:9
gh000001 31:12
gh000001000009
3:14
gh000009 31:13
gh000010000022
3:18
gh000014 47:4
gh000023000046
3:20
gh000047 3:22

gh000048000071
3:24
gh000064 55:6
gh000072000074
4:4
gh000089000125
4:7
gh000113 59:14
gh000126 57:20
gh000126000290
4:5
gh000290 57:21
gh000291000320
4:9
gh000321 4:10
62:22
gh000323 68:19
gh001495 62:23
gh001497001523
4:16
gh001498 79:20
gh001499 80:24
gh001500 81:25
gh001501 83:9
gh001502 84:1
85:12
gh001525 4:18
gh001526 4:15
gh001527001744
4:13
gh14 47:11
give 12:6 15:16
25:23 36:23 70:17
77:1 99:1 100:7
100:13 103:8
104:11,13 105:15
109:2
given 12:25 60:12
76:15 94:25
112:12,16
gives 107:18
giving 86:24
global 4:10 62:6
go 6:16 9:7 32:10
36:23 38:21 41:21
43:25 44:11 51:15
55:5,5 70:13
79:19 80:23 84:22
85:12 87:25 88:3
91:5 92:25 103:18
103:22 107:16
108:24 109:8
goal 53:17
goes 63:6 90:9
100:15

going 5:23 11:22
19:6 22:23 29:1
45:10 62:24 72:17
74:20 77:23 82:22
84:15 88:2 92:4
94:13 100:10
102:11 103:10
gonna 48:3 84:19
92:25
gonzales 4:18
good 19:24 81:10
97:15
goods 107:10,12
gotta 63:6
gpos 34:5
gravamen 8:14
great 64:11,13
93:21 94:9,18
greg 1:7,14 3:3,8,11
3:12,15 5:2 33:5
43:6 79:4 86:25
89:3 112:6,11,19
grill 83:13
groaning 62:1
group 15:9,10
16:18 103:18
grundy 110:2 111:5
111:10
grunting 62:1
guess 34:15 42:23
44:13,15,16 48:4
56:6 73:5,17 80:4
92:4 103:2
guessing 24:17
guiheen 90:16 92:4
97:13
guy 53:6

H

h 3:6 4:1
half 7:25 14:1,5,9
14:19 28:19
hall 92:8,9
hamilton 1:8,14 3:3
3:8,11,12,15 5:2,7
5:23 6:19 10:16
11:20 19:7 21:24
27:2 28:8 29:17
33:5 35:22 43:7
60:25 63:11 72:23
77:14 83:19 86:9
86:25 89:3,9
112:7,11,19
handed 35:22
handing 57:17

61:23
handwriting 47:7,9
85:17
handwritten 47:5
85:15
happened 50:21
83:24 85:8
hard 21:2
havent 14:15 16:11
head 5:25 12:23
13:24 66:21
headquarters 82:11
90:25
health 40:13 42:1
64:12 73:23 105:4
healthcare 105:3
107:10
help 14:24 25:13
36:19 85:4,10
87:6,15,17 107:13
helps 107:18
hemoglobin 1:10
2:8 112:9
hemophilia 3:17,24
4:10 41:18 46:16
46:20,22,24 54:11
56:7 62:4,6 81:7
83:23,25 85:1
91:16,20,23
henry 8:6
hepatitis 7:21 8:21
10:2 11:2 19:11
hereinabove 110:16
heres 103:10
hes 25:2,3
hey 53:3 76:3 104:1
hieroglyphics 79:4
high 92:12,14
highlighted 104:23
highly 1:12 20:2
historical 70:7
history 3:14 28:9
29:24 30:23 38:23
hit 53:16
hmos 4:3 56:22
home 34:5 38:21
47:2 50:17,19,20
69:8 105:4
homes 105:4
honestly 82:25
hope 76:24
hospitals 105:4
huge 96:7
hundred 93:1 94:15
hyatt 81:6

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 118

hypothetical 108:10

**I**
id 9:7 12:5 26:18
  43:25 45:9 62:10
  72:18 78:1,15
idea 43:20 58:7
  60:11 76:12
identification 3:7
  4:2 5:11 16:2,22
  29:12 30:16 35:16
  37:2 46:5 47:20
  49:18 54:3 56:14
  57:13 58:23 59:22
  61:19 69:10 72:11
  77:10 86:5 98:11
identified 9:5 17:5
  17:9,13 18:1,4
  19:3 27:23 30:5
  35:4 42:7 52:11
  58:2 62:22 84:5
  87:12 91:3
identify 13:12
igiv 84:25
ii 107:7
ilk 13:6
ill 16:6 17:12 25:10
  29:20 32:13 53:8
  68:20 78:17 82:18
  83:19 87:16 92:1
  94:13 98:25 109:2
illegal 106:2 108:18
  109:3,4
illinois 1:20 2:21
  97:2 110:1 111:5
  111:10,10,12
illustrate 51:13
im 5:23 8:16 10:13
  10:25 11:22 18:15
  19:6 21:2 22:23
  31:8 33:18 35:24
  38:24 42:13 44:13
  48:3,4 51:10 52:7
  55:20 57:6,17
  58:13 59:8 61:23
  62:21,24 63:4,5,9
  63:12,16,19,20
  68:1 70:16 73:15
  76:4,4,17,20 77:1
  78:1,13 80:25
  82:24,25 83:1
  86:17 88:1 89:25
  91:23 92:4 97:19
  100:17 101:10
  104:25 105:11,20

106:8 108:13,13
immediately 86:20
impair 6:5
impermissible
  106:2
implications 75:2
improper 108:18
ims 64:11,12
include 70:1
included 46:1
includes 70:21
  101:3 112:17
including 35:5
  96:19
inclusive 112:14
incomplete 108:10
incorrectly 52:6
independent 29:10
indicates 85:6
indicating 37:20
indirectly 32:24
individual 27:12
  34:21
individuals 70:24
  71:10,15
industry 1:4 12:18
  18:4 28:10 44:18
  44:18,20 45:10
  52:3 64:11,14,23
  75:21 87:2 112:3
infected 8:21
information 4:14
  21:16,21 22:9
  31:5,22,24 32:4,7
  32:20 33:8,13,16
  33:24 34:13,17,21
  34:24 35:1,14
  37:16,21,24 38:3
  38:7,10,16,25
  40:19 41:12 42:5
  42:9,10,14,25
  43:13,15,21 45:25
  46:1,15 49:11,13
  52:23 56:7 58:16
  58:18 64:6,17,20
  64:22,23 65:11,12
  67:2 70:9,23 71:4
  71:8,12,20,25
  72:2,8 73:8 77:1
  91:8 100:8,14,15
  101:4,6,11 103:7
  106:17 107:19
  108:4
inhibited 92:18
inhibiting 96:10

inhouse 2:24
initial 72:1
initiate 24:4,7
  75:24
injury 21:4
input 50:22 57:10
  59:11 106:25
  107:3
inquiry 3:19
inside 62:12
instance 8:19
institutional 105:3
  107:5
instruct 11:22 19:6
instructed 6:15
  19:22 103:15
insurance 52:6
  93:10 94:11,25
  96:9
intact 78:17
intention 4:6 59:4
intentionally 100:5
interacted 97:24
interacts 52:1
interested 101:10
  111:1
internal 22:19,19
  52:16 74:18
internally 52:22
international 1:11
  2:9,24 98:17
  112:10
interpret 79:3
interrogatories
  110:10
interruption 89:22
intimate 87:2
introduced 44:20
inventory 51:20
involve 14:6,10
  23:16
involved 23:14
  46:20 102:5
involvement 49:7
  49:10 84:18
involves 23:19
involving 7:17,21
isnt 71:7,25
issue 8:15 44:21
  45:1,6 67:18,19
  67:20 93:4 97:16
  102:24
issued 15:10 20:1
issues 10:18 53:23
  55:16 67:21 75:18

91:2 99:22 102:10
  109:12
ive 11:5,17 12:25
  15:25 16:12 17:24
  19:10,22 24:25
  35:22 61:12 69:8
  105:19 109:13
ix 96:16

**J**
j 2:11
jackson 2:11 3:4
  5:6,7,14 6:9 11:13
  12:7 13:4,11,14
  13:18 14:12 15:3
  16:5,14 17:1
  19:12,25 20:4,13
  23:7,21 25:7
  26:12,15,19 27:25
  29:15 30:11,19
  32:11 35:19 37:5
  41:7 44:14 46:8
  47:23 49:6,21
  51:10 54:6 55:4
  56:17 57:16 59:1
  60:1 61:22 62:2
  63:1 66:3 69:13
  72:14,20,22 77:13
  86:8 88:3 89:8
  90:2 98:14 107:20
  108:11,15,23
  109:8,11
jain 2:12 5:8
january 1:20 57:19
  78:21 79:9 80:12
  88:8 109:17 111:6
jargon 10:23
jeff 83:13,14,16
jerry 101:18
jersey 47:2
job 64:12,13 87:19
jumped 95:15
june 25:12 111:11
jurisdictional 10:18
  109:12
justice 27:4,8 87:7
  99:8 101:24 102:3
  102:6
justified 95:8,10
justin 27:12

**K**
kay 4:5,8 35:5,10
  36:19 37:17,25
  38:4 42:6 43:16

43:19,20 44:4,16
  44:18 45:4 46:2
  57:19 59:5 60:4
  61:2 100:24
  104:14,19
keep 29:1 78:17
keith 2:19
  9:25 11:2 21:7,8
  29:21
kept 80:15
key 95:13
kin 111:2
kind 34:9 48:4
  74:21 89:24 94:19
  97:5
kinds 6:5
kleiman 2:4 4:17
  6:8 11:12,20
  13:11,17 14:8,21
  15:5,7,8,18 16:13
  17:8,12 19:5,22
  20:10 23:3,15
  25:2 26:7,18
  27:24 30:10 32:8
  44:10 49:1 51:9
  55:1 61:25 62:24
  66:1 77:6 78:11
  86:11 99:18,21
  107:15 108:10,20
  109:13
knew 43:22 99:19
  101:13
know 11:16 12:1,3
  13:25 14:3 15:6
  17:17,18,20,23
  25:25 27:6,6,9,10
  28:2,3 31:6,9 34:7
  34:23 40:14,15,15
  41:19,19 44:4,7
  45:1,1,10,15,16
  45:19,19,20,23
  47:13 48:5 49:2,4
  49:16 50:14 51:8
  51:25 52:3,7,8,10
  52:13,14,24 53:22
  54:17,20,24 55:9
  56:5,12 57:2
  58:12,15 59:20
  60:24 61:4,11
  62:11,18 63:4,9
  64:14,15 65:12,16
  66:13 67:12 69:8
  70:9 72:9 73:7,16
  74:1,24 75:17

76:14,14 77:1
79:10 80:3,7,10
80:18,19 82:13,21
83:6,8 84:20 88:2
90:5,6 92:19,21
93:6,8,20,22
95:15 99:16,19
100:21 101:12,12
101:17,18,20,20
102:10,14,19,25
104:5 106:4,5,23
107:2,3,19,21
108:2
knowledge 22:18
43:6 49:14,15
52:16,21 58:10
87:1 100:3 101:10
knowledgeable
44:17
known 47:2 90:11
101:5 103:16

L
labeler 103:20
104:2,6
laboratories 28:14
lakecook 82:6
language 74:22
101:3 104:23
large 44:22 95:12
95:14
larry 90:16 92:4,6
92:10 97:13
las 7:22 19:11
lasalle 1:19
launch 92:5
launched 92:11
93:13,16,22 94:7
lauren 23:4
law 15:20 27:18
100:17
laws 99:3,3
lawsuit 20:18,21
27:2
lawyer 13:15 18:15
22:23
lawyers 8:17 15:23
17:5,9,13,19 18:1
23:9,14 87:7,20
learned 36:16
100:23
leave 48:22 68:16
led 86:23
left 5:8,25 28:17,20
29:2 30:22 50:11

50:16 64:2
legal 10:23 25:25
48:5 99:18 108:20
letter 4:17 43:8
44:2 45:12 86:11
104:15 110:22
letters 9:13
liability 7:21 10:2
light 11:25 20:5
limited 10:17
line 39:12 96:25
97:1
linnette 1:7 6:23
21:25 86:21
105:17 112:6
list 12:6 43:7,9
45:15,20 104:15
104:16
litigation 1:4 21:1
31:18 112:3
little 73:16 83:19
107:18
llp 2:10,18
locked 74:24
longer 46:25
look 43:25 62:11
64:10 65:23 68:19
70:19 78:18 84:10
93:19 99:23 107:4
looked 61:12
looking 22:13 28:24
59:8 63:4,5 76:25
102:6 103:2
106:12
looks 53:20 73:17
75:10 79:2 80:4
lot 94:16
lots 99:21
lowest 106:14
lynn 66:9,10,12,17

M
m 1:21 80:4 82:3,5
88:5,7 89:2
109:16
making 39:23 93:17
man 63:25
management 91:15
91:20
manager 36:19
managers 36:16
97:3,24
manner 51:16
manufacturer 8:10
76:15 90:7 98:24

102:23 103:17
106:15 108:16
manufacturers
34:5 73:22 75:22
102:12,16 103:8
108:3
margaret 1:15
110:4 111:9
margin 47:5 92:18
mark 2:4 14:24
16:7 37:18 54:24
55:7 103:20
marked 5:11,15
16:2,6,22 17:2
29:12,16 30:16,20
35:16,20 37:2,6
46:5,9 47:4,20,24
49:18,22 54:3,7
56:14,18 57:13
58:23 59:2,22
60:2 61:19,23
69:10,14 72:11,15
72:24 77:10,15
86:5,10 98:11,15
market 4:10,12
56:7 62:6,13,19
63:20,22,24 64:5
64:7 65:1,5,8 66:8
67:5,9,24 68:13
68:24 69:1,4,7,16
69:23 70:1,6,20
71:3,13,22 72:6
75:22 84:25 91:16
91:23,24 94:2,2
95:7
marketing 9:1,10
10:5 64:2,23
97:16,17 105:2
marketplace 74:23
markets 3:23 54:10
84:18
markings 56:11
59:15
marks 76:24 79:1
markup 103:24
104:1
massachusetts 1:2
112:1
master 1:5 112:4
material 86:20
materials 50:20
matter 5:17 7:16,24
8:15,17 9:2,17
10:2 13:9 17:19
20:20 25:11 27:17

27:24 28:1 29:22
48:25 49:8,15
50:23 53:4 56:20
57:3,10 59:6,12
61:7 65:6 75:13
95:25
matters 10:17,21
11:10,23 26:24
mdl 1:4 20:1 112:3
mean 9:14 16:11
23:8,12 24:18
32:1 33:17 38:20
44:7 49:4,10 51:9
53:12 63:4,20
70:6 73:7 83:22
87:16 90:18 93:16
94:1 96:13,17
109:2
means 26:11 31:21
32:3 79:6 80:7,8
80:15 81:5 82:7
83:3 84:23
medicaid 51:22
87:22 101:5,13,15
103:5
medicare 39:5,25
medication 6:4
medispan 34:23
102:15
meet 21:24 22:22
27:3,7,11,14,22
28:4,6 79:11
80:12 82:9 87:21
87:23 88:1 97:3
meeting 44:23 79:6
79:8,17 80:8 81:5
81:7 82:7,16,19
83:3,4,7,23,25
84:2 85:7 87:11
91:9 97:12
meetings 84:5 89:13
90:25 97:7
members 15:19
memorandum 4:19
98:17
memory 82:15 98:1
mention 61:5 83:21
mentioned 13:8
15:18 18:20 19:14
21:7 70:25 71:10
71:15
merck 15:2 16:18
18:7 21:15
merely 85:6
met 22:4 23:9,13,23

24:4,15,18,20
28:3 87:6 91:15
92:3,6 101:17
method 23:13
methodology
103:12,14
methods 9:1
michael 2:24 13:2
13:15 86:12
millennium 83:13
million 94:15
mind 53:25 70:13
minds 95:10
mine 64:1
minus 74:25
minute 57:5 66:20
93:1
misreport 100:6
misreporting 101:4
missing 64:21
mistake 53:7
mistakes 53:2,4
mmhmm 36:22
79:22 80:1
moment 12:16
67:15 70:8
monday 82:3
monitoring 62:4
months 92:5 93:23
morgan 4:5,9 35:6
35:10 36:19 37:17
37:23,25 38:4
42:7 43:16,19
44:4 45:4 46:2
57:19 59:5 60:5
100:24 104:14,19
morgans 61:2
motion 4:19 7:1,2
10:18 35:3 98:18
moved 53:7
moving 97:15
multiple 62:25
multiplier 104:4,6,7
multiply 104:8

N
n 2:13 3:1
name 5:7 79:24
named 63:25 110:8
national 81:6 83:23
83:25 87:22
nature 62:20
near 72:17
necessarily 76:6
necessary 76:1,20

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 120

need 5:24 45:20,21
 57:4 67:13 71:18
 74:21 83:6
needed 41:19 76:15
 92:15
negotiations 90:6
net 106:15
networks 4:4 56:22
never 15:25 51:23
 70:13
new 39:4 47:2
 49:13 95:7,20
news 4:3 56:20,21
nhf 81:1 83:21,22
 85:6,12 92:7
nonprofit 55:12
noon 80:6,8 83:13
normal 41:25
north 1:19 82:6
notary 1:15 110:5
 110:12 111:5,10
 112:24
notation 81:22
 84:13 85:14
note 31:11 34:16
 58:2 81:11 85:15
 85:16
noted 76:3
notes 47:5 79:1
notice 3:8 4:6 5:17
 5:21 50:4 59:4
noticeable 94:19,21
november 81:8
number 3:8,9,11,12
 3:13,15,16,17,19
 3:21,23 4:3,5,6,8
 4:10,12,14,16,17
 4:19 5:10 12:10
 16:1,7,21 20:2
 29:11 30:15 31:12
 35:15,25 37:1
 38:12 39:17,18,19
 46:4 47:19 49:17
 54:2,19,22 56:13
 57:12 58:22 59:21
 61:18 65:21,25
 68:10 69:9 71:11
 72:10 77:9 86:4
 92:23 94:22 98:10
numbers 57:20
numerous 98:5
nursing 105:4

O

oath 57:19 112:15

object 23:1 62:24
objection 11:12,25
 14:8 30:10 32:8
objects 6:14
obtain 70:14
obtained 43:6
obviously 51:18
 73:7 81:8 85:20
occasions 90:11
occurred 80:20
 82:15,16,21 83:5
 83:6 84:2,5 99:6
 99:14,15 100:1
offer 70:11 87:17
offered 53:22
 106:14 107:5
offering 105:2
officer 44:23,24
offices 97:2
official 111:4
oftentimes 34:7
 76:8
oh 16:9 25:6 28:13
 51:12 53:6 62:13
 62:17 76:25 79:3
 82:5 92:4
okay 6:1 7:5,17
 10:24 11:15 25:10
 25:24 27:21 28:8
 31:11 33:7 35:2
 38:6 42:11,24
 48:8,9,10 49:7
 51:3,12 61:15
 63:14,21 66:2,6
 67:4,23 68:17
 73:6 77:24 79:8
 81:24 82:5,9 83:1
 83:24 84:12 85:15
 85:23 87:10 88:3
 90:20 93:24 95:6
 95:12 96:4,24
 97:10,18,21
 100:11,20 101:1
 104:21 105:13,18
 105:25 107:21
old 65:16
omalley 82:12
 90:16 91:1
once 27:16 102:24
ones 34:3 70:5
 89:19
open 4:4 56:22
openly 101:19
operate 84:21
operated 63:25

operating 44:23
operations 9:1
operative 26:3
opinion 45:23 92:11
opportunity 86:24
 87:3
opposition 4:19 7:2
 86:22 98:17 99:25
oral 4:7 59:4
 110:10
order 1:12 20:1,6,7
 51:19 52:2,4,8,12
 61:1 107:11
organization 55:13
 64:13
original 78:3,8,16
originals 78:14,14
ought 68:16
outbreak 7:22
outside 74:20
owned 63:24

P

p 82:3,5 88:5,7 89:2
 109:16
page 3:11 17:3
 37:13 47:3 55:6
 56:8 59:14,16
 63:6 68:19 70:19
 78:18,19 79:19,23
 80:24 81:11,16,25
 82:1 83:9 85:21
 99:4 100:4 101:2
 104:21
pages 3:9 47:11,12
 63:7 77:21 78:10
 81:20 83:20,21
 84:6 112:13
paid 15:4 30:13
painful 28:13
paradigm 3:23
 54:11
paragraph 36:12
 37:9,16,21,24
 38:3,7,11 39:12
 40:4 42:4,5,12,15
 42:24,25 43:3,5
 46:1 51:7 66:4,6
 66:24 67:2 68:24
 89:12,21 90:22
 91:13 96:25 97:10
 97:11,22 98:4,8
 99:6,7 101:2,22
 104:22 105:1
 107:4,25

paragraphs 35:11
 36:18
pardon 19:18
part 71:14 76:13
 82:2 90:6 100:18
participant 41:24
participate 51:14
particular 8:22
 16:20 45:6 53:14
 74:25 82:10 85:21
 90:23
particularly 44:17
 50:18 61:2
parties 33:24 34:13
 111:3
party 75:3
passed 94:23
passthrough 103:24
patient 55:7,9,12,17
 55:15 93:8 94:14
 94:24 95:3 107:11
patricia 4:5,8 57:19
 60:4
patrick 63:25,25
 64:21 65:10,20
 66:9,13 67:14
patricks 67:14
pay 32:3 94:13,14
payers 94:12 95:12
 96:10
paying 41:20 95:1
 95:11
payment 39:25
pays 39:5
pbm 84:16
pbms 84:17,21,24
pending 6:8
people 34:11 40:16
 64:22 74:17,19,20
 75:5 87:21 91:3,4
 92:25 94:23 95:11
 95:19 101:19
peoples 94:17
percent 26:5,5 39:5
 71:12
percentage 14:17
perfectly 96:2,3
period 15:14 21:4
 40:21,23 53:19
 74:15 75:2
person 22:5 24:24
 25:3 44:17 101:9
personal 21:4 81:21
personally 24:4

27:3,22 32:17,20
 73:11 101:14,17
perspective 95:6
pertaining 1:17
pete 82:12 91:1
peter 90:16
pharmaceutical 1:3
 9:1,10 10:5 12:18
 13:23 17:15,20
 18:4 21:20 51:4
 64:11 84:18 112:2
pharmacy 40:16
 47:1 50:6 84:24
phone 25:3,6 45:4
 111:12
photocopies 77:22
 78:10
phrase 9:12 93:25
phs 90:11,20
physically 24:19,20
picked 45:4 102:23
picture 92:8
piece 70:8 76:10
pills 64:10
place 43:23 91:9
 110:5,16 112:13
plaintiff 8:4,5,19,20
 20:14,17 21:1,3
plaintiffs 8:17 9:19
 13:20
plans 73:23
plasma 4:12 44:17
 64:8 68:25 70:20
 96:2,2
please 41:15 59:15
 65:24 80:23 89:10
pleased 86:18
plough 28:18
plus 79:2
point 27:7 29:3
 31:20 66:14 72:18
 75:20 76:16 93:5
 94:5 103:13
position 76:2
 107:11
positions 91:14
possession 48:15
 50:13 78:5,6,7,10
 78:12
possibly 79:7
post2000 100:19
potential 9:6
practice 50:15,17
 102:13 105:2,14
practices 86:23

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 121

87:1 107:22 108:5
prefer 26:17,18
premise 100:1
premium 92:12
  96:7
preparation 6:20
  7:6 59:11
preparing 47:16
  48:25 58:20 69:5
  69:24 72:7 75:13
prescriptions 73:24
present 2:1,23
  20:24 23:10 68:4
  110:7
presentation 84:19
presented 34:11
presently 12:17
  20:14 67:5
preserve 86:24
presume 6:4 48:18
previous 51:13 67:9
previously 29:22
  89:4 96:21 100:22
  110:8
price 1:4 8:8,10,12
  9:14 14:7 40:3,9
  40:17 43:8,9
  45:15,20 62:4
  66:25 68:3 76:7
  90:1,7,15 92:15
  94:1,2 95:7 101:4
  103:17 104:16,16
  104:23 105:15
  106:3,5,10,12,13
  106:14,18 108:3
  112:3
prices 40:12 41:19
  42:1 66:24 74:2
  100:7
pricing 9:11 13:23
  14:4,10 36:17
  52:18 89:14,18,19
  89:24,25 90:12,21
  91:6,21,24 93:12
  94:19 97:3,13,17
  97:24 98:1,6,8
pricings 14:2
principal 8:15,17
print 31:4,23
printed 31:21 48:13
printout 31:4
printouts 34:7
prior 27:2,21 32:20
  33:7,22 53:18
  60:22 67:9,21

75:20 87:7 99:14
  99:24 101:3 106:6
  106:11
privilege 22:25
probably 14:19
  22:1 48:19 68:16
  69:6 71:12 76:25
  78:1 79:6,15
  80:15 81:21 84:23
  93:22 94:25
problem 102:7,10
  103:1,3 109:6
procedure 1:16
  110:20
proceedings 13:3
proceeds 25:17
process 34:14 51:20
  52:2,4 53:24 74:1
produce 31:18 56:3
produced 31:16
  46:11 48:1,7,16
  54:9,25 56:5,20
  59:6 63:2,12 75:5
  77:16
product 7:21 10:1
  32:4 40:13 53:16
  74:2 91:21 92:13
  95:19,20 96:5,22
  96:23 103:20
products 3:13
  30:22 41:18,18
  42:2 50:9 64:8,24
  85:1 89:14 91:16
  92:13,14,17 93:25
  95:9 96:2,2 100:7
program 41:17
  51:22 101:18
prohibits 107:7
project 46:20
promoted 18:17
promotion 18:16
protective 1:12
  20:1,5,7 61:1
prove 93:2
provide 36:9 38:6
  40:3 42:24 43:13
  64:6,16,17,22
  70:7 100:15 101:6
provided 21:11,16
  21:21 22:8,11,20
  38:10 40:18 43:15
  46:16 49:10 50:2
  56:6 57:10 60:19
  60:21 72:3 101:9
providers 39:22

105:3 107:5,10
provides 38:22
  108:17
providing 50:22
  59:11 64:13
provisions 99:2
public 1:15 70:23
  71:4,9,14,17,20
  110:5,13 111:5,10
  112:24
publicly 99:9
publish 103:9,10
published 34:24
  38:15 106:8,10
pull 34:7 38:21
  40:16 68:21
pulled 39:1 70:9
purchase 41:20
  50:8
purchased 46:25
purchaser 108:17
purchases 53:15
purpose 1:18 73:13
pursuant 1:12,16
  5:20 110:19
push 93:7
put 16:19 68:15
  71:11 73:18 74:17
  74:18 87:17 99:19
  99:19 103:3
putting 71:21 76:4

**Q**
qualifier 75:15
qualify 48:3
quarter 53:20
question 6:8,10,15
  6:16 11:14 14:13
  16:13 17:12 23:2
  23:15 30:12 32:12
  32:13 49:12 55:20
  68:1,6 81:10
  95:19 98:21,23
  108:12
questions 5:24 6:6
  19:20 20:8 66:19
  67:3,8 82:17
  109:11 110:11,14
qui 9:22 12:1 87:20
quickly 6:25
quiet 76:25
quite 87:20
quote 97:24,25 98:5
  102:7
quoted 66:25

quoting 39:7

. . . . . . . . .
        **R**
. . . . . . . .
range 12:11
rapidly 95:4
rate 74:16 96:11,12
ratio 26:4,6
rbc 3:23 54:10
read 37:21 41:4,6
  57:4,5,6 58:14
  81:25 83:11 89:20
  112:12
reads 39:21
really 21:2 25:15
  108:25
reason 19:24 71:24
  74:21
reasonably 29:25
rebate 51:2,4,5,14
  52:23 53:14,16,17
  53:23
rebates 51:17 52:17
  52:21,22 53:10,11
  106:15
recall 7:7 21:10,13
  22:10,13 27:9
  28:2,7 31:2 34:3
  36:5 38:20 39:3
  42:16,19 49:5
  55:19,22 56:2,4
  57:1,8,11 59:9,10
  59:13 65:3
receipt 107:12
receive 32:3 37:17
  55:17
received 22:16
  34:12,22 44:2
  45:12 104:14
receiving 45:24
recess 72:21 109:10
recessed 88:6
recognize 37:7 47:7
recognized 53:2
recollection 12:24
  20:23 107:14
recombinant 92:13
recombinate 38:2
  38:15 39:22 40:18
  94:3,5 95:25
recombinates 95:23
  96:3
recommend 93:8
recompiles 71:4
reconvene 88:7
record 6:1 14:25

41:6 61:25 88:3,4
  109:8,9 110:14
red 34:8,23 102:15
redacted 81:12,15
redactions 81:19
reduce 92:23
reduction 106:9
refer 13:22 16:16
  34:6 36:12 43:3
  56:8 66:4,23
  68:13 89:9,13,25
  90:14 97:22 100:4
  101:23 107:11
reference 25:12
  39:14 90:22 97:11
  97:12 98:5
referenced 99:16
referred 68:3 69:19
  90:14 110:16
referring 11:5 57:9
  62:18 68:18 82:2
  89:18,25 97:20
refers 68:24
reflect 29:23 61:25
reflected 40:4,9
reflective 40:12
reflects 50:7
refresh 107:13
refused 43:7
refusing 100:7,13
regard 21:21 87:11
  90:20 106:3
regarding 5:17 7:23
  10:2,20 19:17,20
  20:8 25:22 27:4
  90:17 91:9,20
  105:14 108:4,5
  109:12
reimbursement
  55:15
rel 1:7 112:6
relate 12:17 13:22
  14:6 21:22 99:24
  108:1
related 10:17 21:12
  21:17
relates 1:6 58:11
  61:2 112:5
relating 22:9 61:1
relator 3:8 43:6
  86:25
relators 1:8 2:3 7:2
  13:20 26:4,25
  86:21 98:18 100:4
  112:7

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 122

released 70:24 71:9
71:14
relevance 57:2
relevant 76:18
relied 76:11
rely 72:7 75:12
remain 21:20
remaining 38:10
remember 15:9
22:14 24:22 25:23
26:1,3,20 27:12
36:6 40:22 43:24
44:1 55:23 57:9
60:21 61:11 62:14
65:1 70:4,5 71:23
79:16 80:20 82:19
83:16 87:6 91:19
92:1,7,21 93:13
97:7 98:7,9
rep 28:15,18 53:3
83:15
repeat 51:12
repeated 98:25
report 62:14,20
67:1 68:25 69:5
69:16,19 70:9
71:5,18
reported 38:1
reports 63:21 65:16
65:17 67:6,9 68:8
69:7,23 70:7 72:7
represent 5:8 25:10
29:20 70:22
representation 30:2
representatives
27:4,22 28:5 35:5
87:11
request 26:16
102:16
requested 41:6
requests 34:22
research 4:10 62:6
62:13,19 63:21,23
63:24 64:2,5,6
65:2,5,8 66:8 67:5
67:9,24 68:14,25
69:4,7,16,23 70:1
70:7 71:4,13 72:7
resell 71:21
reserved 74:15
resolve 45:7 102:10
resources 3:17
46:16,20,22,24
responded 53:6
response 6:25 7:1

23:8 32:14 35:3
responsible 70:24
71:9,15 73:22
rest 67:1
result 8:20 106:1
resumed 89:2,7
retailtype 104:1
retained 9:16 11:10
11:17,21 12:9
13:20 14:20 15:7
17:9,14,18,24
18:2,6 19:3
retention 15:14
retroactively 102:9
revealing 26:8
review 6:19,22 61:6
reviewed 6:23,24
7:5 22:18 69:23
reviewing 22:15
59:10
rid 78:15
right 5:25 11:9
35:25 37:15 38:22
42:3 48:9 50:15
66:16 68:16 72:20
74:15 77:14 78:18
79:19 80:23 82:23
86:3 90:13 96:25
101:21 104:18,19
righthand 31:12
47:5
rise 105:15
rmr 1:15 111:9
road 82:6
robert 63:25 65:10
66:11
roberts 66:9
role 8:1,18,23,25
9:3 10:3,4
room 13:12 45:3
91:2
ross 28:14
rough 6:23
routes 41:21
rows 102:19
royal 78:24 79:7,9
79:24 80:12
ruchi 2:12 5:8
rules 1:16 110:20
110:20
running 53:6

  **S**

s 3:6 4:1,3 56:21
98:18 107:7

safe 95:23 96:3,3,5
sales 28:15,18 40:3
43:7 53:18,19,21
64:16 93:17
saw 16:20 36:6
61:11 62:15
saying 44:13 48:3
63:9 76:20 95:23
95:24 96:1
says 30:22 36:15
48:18 50:4 54:9
54:19 55:7 62:11
63:6 67:16 71:7,8
79:2 80:14 81:25
82:3,5 84:11 85:2
85:5,14 86:17
97:1 100:4,12
104:25 107:4
scale 65:22
scanned 6:25
scant 86:21
scenario 33:4
scheduled 85:7
scheme 99:7
schering 28:17
school 28:11
scratched 79:14
83:2
screen 31:5 48:13
scripts 3:19 29:5,7
32:25 33:2,5,6,8
33:20 40:8,10,12
40:16,17 41:1,10
41:11,17,20,24
44:21,25 46:19
48:13,14,19,19,22
50:3,6,11,19
73:20 74:5,19,21
75:9,11 86:1 90:3
90:15 97:23
101:16
scrutinizing 94:23
scrutiny 95:18
scurried 45:2
se 75:14,15
seal 11:22 12:2,3,4
12:4,15 19:6,9,17
19:21 20:9 21:20
26:24 111:4
second 7:19 72:2
86:17 95:1 99:6
101:25
secondhand 33:16
secretary 66:9
section 105:17

107:7
sections 99:17
security 106:14
see 31:1,14 36:13
36:21 39:4,6,11
39:15 40:1 43:11
47:4 53:13 54:12
54:16 55:21 56:23
58:4,6 59:17 60:6
60:10 62:7,11
69:2,17 71:1 72:1
72:4 78:14 79:21
79:25 81:1,2,13
86:13 87:4 89:16
91:17 98:19 99:11
99:23 101:25
105:6 109:6
seeing 59:9
seen 5:18 15:25
16:10,12 17:6
29:18 30:24 36:2
46:12 48:2 49:23
54:14 56:25 57:22
57:24 59:7 60:8
62:9 72:25 77:18
86:15
selected 4:14 73:9
sell 94:1,2
selling 90:1 94:6
103:17
sells 90:8
send 26:16
senior 91:15,20
sense 14:3,3 76:6
sent 31:19 78:11
85:3
sentence 39:9,21
72:2 86:18 89:12
91:13 98:4 99:6
101:22,25 104:25
105:1
sentences 97:6
separate 45:2 51:19
51:21
september 66:7,12
series 5:24
service 64:20
services 36:20 55:7
55:9,12,18 107:10
107:12
serving 91:14
set 53:15,17
settle 102:8
settled 16:18
severe 75:2

shaking 5:25
shapiro 2:10
share 25:17 26:24
shed 45:9
sheet 73:18
sheets 34:8
shoebox 78:17
short 89:22
shorthand 110:11
show 5:15 16:6 17:2
29:16 30:20 35:20
37:6 39:7 46:9
47:24 49:22 54:7
56:18 59:2 60:2
69:14 72:15,23
74:18 75:5 77:14
86:9 92:6 98:15
shows 51:16
shut 77:5
side 12:5 48:5 64:11
sidley 2:18
signature 110:18
111:4
signed 60:25
signs 95:17
similar 13:6
simply 39:18 71:19
single 63:2,11 67:18
sir 7:10 15:12 25:10
29:20 38:24 57:17
58:13 61:10 63:3
68:6 98:21
site 16:20
sits 53:20
sitting 13:13
situation 53:14
six 92:5
size 62:10
slide 84:19 85:3
slides 84:11,15,16
85:2
small 20:22 21:5
65:21
smaller 94:22
social 106:14
sold 39:22 64:15,15
74:1
solution 102:7
somebody 79:7
somethings 105:21
sorry 8:6 10:25
35:24 42:13 51:10
55:20 58:13 76:17
86:17 91:23
104:25 105:11

sort 75:21 76:14
  92:6 102:6
sources 71:20
south 2:20 111:11
speak 7:8 66:10,11
speaking 84:7
specialty 41:18 47:1
  50:6 73:24 84:18
  84:24
specific 25:20 36:17
  49:5 82:15,19
  90:19 91:19 93:11
  98:1,9
specifically 9:11
  22:10 34:3 52:9
  62:21 65:3 70:5
  75:16 76:12 81:17
  84:3 89:13 91:12
  92:1 97:9
specifics 34:18
specified 46:1
specify 66:6,7 74:11
speculate 44:5
speculation 44:10
  49:1 55:1
spelled 75:17
spend 96:4
split 26:4
splitting 25:22
spoke 66:8,12
spoken 24:9
spread 39:23
spreadsheet 50:2,7
  51:18,25 52:5,5
  52:11,24 53:7
spreadsheetdriven
  53:1
spring 93:14
sr 3:11
standard 51:19
standing 95:22
stanford 2:5
stark 104:23 105:15
  106:22,23 107:1,2
  107:7,14
start 63:22 82:18
  93:17
started 28:10 64:4
  64:5
state 4:6 9:25 12:21
  28:5 59:3 87:21
  99:3 101:5,13,15
  103:5 110:1
statement 6:12
  86:19

states 1:1,7,17 4:13
  27:18,23 62:5
  69:1 70:21 87:12
  110:21 112:1,6
stating 43:8 104:15
  104:15
statistic 14:15
steffans 18:8,11
steinke 15:2,5
stenographer
  110:12
step 51:15
steve 15:8 80:6,9,10
straight 95:23
strategies 98:6
street 1:19 2:13,20
strike 58:17 100:21
strong 18:6 21:15
stuart 79:24 80:12
study 70:22
stuff 25:25 34:9
  64:16,17 84:20
  90:5 99:16,18
subcategory 1:7
  112:6
subdivision 74:6
subject 7:15 14:2
  20:1,7,20 79:16
  80:17 85:9 89:20
  91:9 98:7
submitted 34:21
  43:8 110:19
submitting 43:21
subscribe 112:14
subscribed 112:21
subscriber 31:25
  32:1,5,9,15,16,21
  33:4,18 34:10
  48:20
subscribers 67:5,24
  67:25 68:3,11
subscription 33:20
  66:22,23
subsequent 10:20
subsequently 66:13
subsidiary 28:21
suite 1:19 111:11
sum 39:5
summary 4:8,14
  60:4,16,17 73:8

summer 48:23
  93:14
sun 1:7 7:8 21:25
  22:8,16,20,22
  23:9,13,23 24:4,7
  24:9,15,23 25:1
  25:14,16,22 26:21
  70:17 86:22 99:1
  105:17 112:6
suns 6:24
superiors 44:20
suppose 51:15
  100:16 108:25
sure 6:1 8:16 10:13
  13:14 24:14 28:10
  29:1 35:25 39:9
  41:8,16 48:9
  62:14 63:18 68:1
  68:2 70:16 72:20
  76:2 78:1,24
  81:19 82:14 106:8
  106:23 108:3
survey 62:4 103:19
  103:19
suspected 101:5
switch 93:9
switching 96:21
sworn 5:1,4 89:5
  110:9 112:21
system 41:24 51:20
  52:8,12

**T**

t 3:6 4:1
table 13:13,15 63:5
tablets 64:10
take 4:7 43:23
  50:10,15 57:5
  59:4 62:11 72:18
  73:5 103:7,15
  104:7
taken 1:14 60:5
  110:4,11
takes 71:4
talk 45:9 66:16
  67:13 77:4 97:23
talked 65:20 90:19
  101:17 104:18
talking 8:16 14:9
  34:16,17,18 61:8
  62:19,21 92:10
tam 9:22 12:1 87:20
telephone 24:10,24
tell 12:14 25:21
  40:11 44:8 61:13

65:25 77:4,6,8 .
  78:22 81:15 84:1
  84:4 85:13 90:18
  90:21,24 100:22
  102:2,14 103:10
  103:23 108:14
telling 64:12 76:4
  100:23
tells 52:24 53:8
tendered 5:12 16:3
  16:23 29:13 30:17
  35:17 37:3 46:6
  47:21 49:19 54:4
  56:15 57:14 58:24
  59:23 61:20 69:11
  72:12 77:11 86:6
  98:12
term 93:24
terms 25:19,20 26:1
  26:20 27:6 61:1
  95:1 106:15 109:1
testified 5:4 9:3
  10:9,14 11:2,4,6
  68:2 69:22 89:5,6
testify 6:7 26:7
testifying 19:17,19
testimonial 11:10
testimony 8:7 21:8
  33:11 41:9,9
texas 4:6 59:3 61:1
  101:18
text 59:16
thank 13:17 36:1
  42:11 85:11
  109:13
thats 6:13 7:3,4
  9:21 10:24 18:5
  19:24 21:6 22:23
  22:25 26:2 36:1
  42:14,25 48:16
  50:14 64:25 67:2
  67:19,20 68:5
  75:3,15 81:21
  82:22 86:2 88:1
  94:19 97:5 100:14
  105:19,24 107:25
  108:22 109:3
theirs 95:4
theis 4:18 86:12
therapeutics 1:10
  2:8 112:9
therapies 95:3
therapy 95:8
theres 6:8 33:15
  55:6 63:6 79:13

90:8 105:8
theyre 53:9 94:13
thing 22:24 45:21
  63:16 64:4 93:4
  94:20 96:1 102:8
things 12:2 45:10
  67:17 73:25 74:18
  83:21 84:17 95:25
  100:9 109:1
think 7:1,3,4 12:5
  15:9,17,21 18:15
  20:22 21:2,5
  22:25 34:13 43:24
  44:6 45:12 57:23
  58:1 62:15 65:17
  65:19 73:2 75:16
  76:9 92:23 93:7
  93:19 100:14,14
  102:4 105:22
  106:12 108:22
thinking 73:15
third 7:20 19:13
  33:16 34:13 96:25
  99:6
thought 68:2 95:1
thousand 15:13
  93:2 94:15
three 7:13 11:1
  12:25 13:8 15:22
  22:7 23:9 32:15
  45:1 75:1 97:2
  102:15
tiers 53:14
time 10:20 15:14
  17:21 21:4 22:2
  23:23 27:7 33:7
  38:20 39:1 40:21
  40:23,23 41:2
  42:17,21 45:8,17
  48:20 76:16 79:17
  85:23 87:7,24
  90:19,23 92:23
  94:6 97:22 102:13
  102:21,23 110:6
  110:16 112:13
times 6:14 7:12
  22:4 23:9 24:3,9
  27:14 75:1 93:1
  104:8
title 73:8
titled 62:18
today 5:20,24 6:7
  6:14 20:15,25
  29:9
todays 10:16 66:24

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

Page 124

67:19,20
told 67:16,18 97:4
top 12:23 13:24
  30:22 48:19 50:4
  54:9,18,24 55:6
  66:21 81:25 85:14
  85:15
topic 9:5
total 12:8 15:10
touched 14:18
trade 92:6
transcript 112:12
  112:16
treat 96:6
treats 95:24
tree 61:16
trees 61:17
trial 10:9,14
trips 97:2
true 23:11 100:14
  110:13 112:15
try 41:14 73:18 '
  79:3 87:16
trying 21:2 36:19
  38:24 45:22,23
  63:12,16,19 77:1
  82:24,25 83:1
  94:4 105:20
turn 37:9 42:3 47:3
  59:14 81:24 83:9
  97:10 101:1
  104:21
turns 94:16
two 17:8,13 24:3
  28:19,19 29:3
  32:15 47:12 74:10
  75:1 82:17 84:9
  86:21 93:22 97:7
type 45:24 64:19
typically 70:7 79:12
  82:11 104:5

        U
u 4:3 56:21 107:7
udden 23:4,17,20
  26:9
unacceptable 43:22
unaudited 64:7,9
unbelievably 75:19
undergraduate
  28:11
underlined 56:10
  59:16
underlining 59:19
undersigned 110:12

111:1
understand 6:6,11
  6:13,17 9:13
  10:22 24:14 38:24
  41:8 63:8,13 68:1
  77:2 78:13 90:13
  96:12,24 99:20
  105:20
understanding 71:3
unicare 102:25
unit 38:2 93:1
  94:14
united 1:1,7,17 4:12
  62:5 69:1 70:21
  110:21 112:1,6
units 87:21,23 93:2
  94:15
universal 94:11
universe 14:11
unquote 102:7
uptake 92:16 93:25
uptick 93:25
use 9:12 47:15
  51:21 55:25 58:18
  64:24 69:4 75:12
  103:13 108:8
uses 71:5

        V
v 1:9 112:8
vague 20:23 108:25
vaguely 27:20
variety 71:20
various 27:18 35:11
  50:20 73:23 87:12
  87:20 99:3 101:19
vegas 7:22 19:11
vendor 101:18
venice 2:6
venturing 100:17
version 6:23 106:6
versus 9:25 15:2
  18:7 21:15 32:17
viii 95:24 96:16,23
violated 99:2 107:6
violation 108:9
violations 104:24
  105:15 106:22,23
  107:1,2
vioxx 7:18,23 8:15
  11:2 13:8 18:19
  18:21,24
virginia 55:13
visavis 107:22
visàvis 52:17

vitae 3:12
volume 105:2,9,14
  105:21,23 106:1
  106:21 107:6,8,22
  108:7,8 109:5,6

        W
w 2:13 3:14 30:22
wac 38:1 45:20,21
  100:8,13,15,16
  103:16 104:8,11
wacker 111:11
wait 92:25
waiting 6:11
waived 110:19
want 9:7 11:15
  19:25 23:3 28:25
  38:21 42:19 57:4
  65:12 77:14 78:14
  79:3 81:18 82:22
  96:4,18 99:20
  102:17,21 106:6,7
wanted 34:24 43:9
  65:10,15 66:21
  67:1 74:11 75:23
  75:25 104:17
washington 2:14
wasnt 15:7 34:10
  35:14 93:21
wave 62:18
way 8:8 13:14
  18:25 23:13,22
  33:17,17,19 52:1
  55:25 63:17 97:15
  103:2,2 106:19
  108:18
ways 33:15
website 15:23,25
  16:8,12,16,16,19
  17:4 42:10,14
wed 26:15 45:14
wednesday 84:23
weighted 104:3
weiss 101:18
wellversed 108:13
went 28:13,17,20
  29:7 53:1,3 64:21
  103:6
whats 5:15 16:6
  17:2 18:9 29:16
  30:20 35:20 37:6
  44:15 46:9 56:18
  59:2 60:2 64:7,9
  72:15,23 77:15
  78:25 80:2 86:9

90:11 97:15 98:15
whim 75:22
wholesale 1:4 8:8
  9:14 14:7 103:16
  103:17 112:3
wholesalers 103:18
  103:19,23 104:4
whollyowned 28:21
whos 83:14
willynilly 75:21
wind 76:14
witness 3:2 5:1,3,13
  8:2,18 10:12
  11:18,24 15:1
  16:4,24 19:8,23
  20:11 23:5,18
  25:5 26:10 29:14
  30:18 35:18 37:4
  44:12 46:7 47:22
  49:3,20 51:11
  54:5 55:2 56:16
  57:15 58:25 59:24
  61:21 66:2 69:12
  72:13 77:8,12
  86:7 89:4,23
  98:13 107:17
  108:21 109:12
  110:4,9,16,18
  111:4
wonderful 95:25
word 9:12 14:4
  78:21,22 80:2
  89:24
words 17:21 80:5
work 12:1,1 15:15
  28:9,14,17 29:7
  29:23 45:7 50:17
  52:15 91:4
worked 14:17 28:15
  28:19,22 29:3,8
  30:3 41:9 46:20
  50:19 51:23 91:6
working 41:1,16
  46:19 50:18,20
  87:19
workings 52:17
works 52:3,8,11,13
  52:14
world 64:19
worth 94:12 95:20
wouldnt 71:18
  74:24 82:13 94:25
writing 26:13
wrong 30:1 51:3
  53:24 105:8,21,23

106:2
wrongful 18:10

        X
x 3:1,6 4:1

        Y
yeager 15:8,19
yeah 53:6 75:16
  77:22 81:5 82:5
  93:14,18 94:12
  96:2 108:22
year 7:25 28:11,12
  29:5 53:20 64:4
  67:9 74:25 81:9
  85:13,22 93:2
  94:16
years 20:23 28:16
  28:19 32:15 34:24
  67:25 69:7,8 75:1
  77:23 88:1
youd 6:11 12:10
  15:10 19:14 26:17
  93:7
youll 58:2 67:13
youre 5:20 6:4,12
  6:15 11:4 14:17
  19:16 20:24 26:8
  28:24 29:1 39:7
  61:8 64:8 68:18
  74:12 75:19 82:2
  82:22 87:16 103:8
  103:10 106:8
youve 11:1 16:13
  17:18 18:22 19:3
  51:23 53:3,5 97:4
  104:18

        Z
zero 24:13
zip 64:17

        0
0 39:25
000 68:3
001495 4:11
01cv12257pbs 1:6
  112:5
02 60:5
03 85:14
04 30:23 50:18
  81:10
05 4:17 30:23
06 50:18
08cv11200 1:7

HIGHLY CONFIDENTIAL DEPOSITION OF GREG HAMILTON
CONDUCTED ON THURSDAY, JANUARY 21, 2010

| | | | |
|---|---|---|---|
| 112:6 | **2** | 3 3:11 16:21 17:3,3 | 600 1:19 |
| | 2 3:9 16:1,7 17:4,9 | 99:6 | 60603 2:21 |
| **1** | 17:13 18:2 56:21 | 30 3:13 38:2 88:7 | 60606 111:12 |
| 1 1:6,7 3:8 5:10,16 | 89:12 90:22 99:4 | 110:20 | 61 4:10 |
| 5:16 38:2,13,25 | 100:4 104:5 | 300 1:19 111:11 | 625 38:25 |
| 39:5,14,25 43:9 | 109:16 | 31 43:9,10 45:14,15 | 6250 38:13 |
| 43:10 45:14,15 | 20 4:17 20:22 26:5 | 104:16,17 | 69 4:12 |
| 82:3,5 88:7 89:2 | 67:5 68:3 86:4,10 | 3103068094 2:7 | 6th 81:7 |
| 94:9 104:5,5,16 | 86:11 94:14 96:4 | 311 111:11 | |
| 104:17 112:5,6,13 | 2000 62:19 99:6,7 | 312 111:12 | **7** |
| 10 1:21 3:21 12:13 | 99:14,15,24 100:2 | 3128537814 2:22 | 7 3:16 35:21,23,23 |
| 12:14,17 18:3 | 100:10 101:4,23 | 32 1:21 110:20 | 37:1,7,7,10 42:4 |
| 19:2 20:8 21:19 | 102:2 | 340b 90:12,20 91:5 | 43:4 49:9 68:21 |
| 26:23 49:17,23,24 | 200065403 2:14 | 91:9 97:4 | 91:11 92:22 97:22 |
| 51:7,9,10 52:1,11 | 2001 29:8 68:24 | 345 39:25 | 98:4,8 101:2 |
| 62:18 80:4 84:12 | 69:4,16 70:21 | 35 3:15 | 104:22 108:1 |
| 101 84:16 | 75:20,20 | 36 36:18 37:9,16,22 | 72 4:14 |
| 11 3:23 28:16 30:23 | 2002 57:20 68:7,11 | 37:24 38:4,7 | 77 4:16 |
| 54:2,8,8 60:5 | 70:6 | 39:12 40:4 89:2 | |
| 112 112:14 | 2003 56:21 85:24 | 37 3:16 42:4,5,15 | **8** |
| 115 15:13 | 85:25 93:14,15 | 371 59:5 | 8 3:17 36:12 46:4 |
| 12 4:3 56:13,19,19 | 2004 42:22,23 | 38 42:12,24 43:1 | 46:10,10 92:22 |
| 88:5 | 2005 15:17 22:2 | 3862000 111:12 | 80 26:4 39:5 |
| 120 15:13 | 24:16 25:8,12 | 39 43:3,5 46:1 | 841481 111:10 |
| 13 4:5 37:13 57:12 | 27:3 42:22,23 | | 8479607384 54:22 |
| 57:17,18 58:19 | 78:21 79:9 80:13 | **4** | 85 63:6 |
| 60:5 66:7 | 86:11 | 4 3:12 4:17 29:11 | 86 4:17 28:23 |
| 1395nn 107:7 | 2006 24:18,21 29:8 | 29:17,18 91:13 | 89 39:22,24 94:6,8 |
| 13th 66:12 | 29:9 48:23 | 96:25 | 89cent 40:3 |
| 14 4:6 25:12 58:22 | 2007 106:6,11 | 40 36:18 | |
| 59:3,3 66:4,6,24 | 2008 15:17 | 42 107:7 | **9** |
| 67:2 | 2009 66:7 | 456 81:1 | 9 3:19 47:19,25,25 |
| 1456 1:4 20:2 112:3 | 2010 1:20 88:8 | 46 3:17 | 48:25 49:13,14 |
| 15 4:8 47:11 59:21 | 109:17 111:6,11 | 47 3:19 | 101:2 |
| 60:3,3 61:9 93:1 | 112:22 | 48 88:5 104:22 | 90292 2:6 |
| 94:7,9 96:4 | 2024202200 2:15 | 49 3:21 105:1 | 95 71:12 |
| 1506 84:10 | 20some 96:5 | 4th 81:7 | 98 4:19 |
| 16 3:9,11 4:10 | 21 4:19 88:8 98:10 | | 99 29:2 |
| 61:18,24 62:3 | 98:16,16 99:4,25 | **5** | |
| 68:3,14 70:2,14 | 109:17 | 5 3:4,8,13 30:15,21 | |
| 16th 84:11 | 21st 1:20 | 30:21 93:6 | |
| 17 4:12 69:9,15,15 | 22 4:17 86:11 | 500 63:6 | |
| 70:15,20 104:21 | 109:16 111:11 | 52 107:4 | |
| 18 4:14 72:10,16,24 | 22nd 111:6 | 54 3:23 | |
| 72:25 73:4 | 235 39:5,25 | 548 39:14 | |
| 1825 2:13 | 24 78:21 101:2,23 | 56 4:3 | |
| 19 4:16 77:9,15,16 | 24th 79:9 | 57 4:5 | |
| 78:19,20 | 25 12:13,15,17 18:3 | 58 4:6 107:25 | |
| 1973 28:13 | 19:2 20:8 21:19 | 59 4:8 | |
| 1993 78:2 | 26:24 104:5 | 5th 81:7 84:23 | |
| 1995 34:15 | 28 57:19 | | |
| 1998 99:3,16 | 29 3:12 68:24 | **6** | |
| 1999 28:23 29:1 | 2907 2:5 | 6 3:15 35:15,24 | |
| 19th 80:13 | | 36:1 66:1 89:10 | |
| | **3** | 93:6 97:10,11,12 | |

## Foreign Account Statements
## <u>Table of Contents</u>

<u>Regular Monthly Statements</u>
A       2/1/2006 – 2/28/2006
B       3/1/2006 – 3/31/2006
C       4/1/2006 – 4/28/2006
D       4/29/2006 – 5/26/2006
E       5/27/2006 – 6/30/2006
F       5/26/2007 – 6/29/2007
G       6/30/2007 – 7/27/2007
H       1/26/2008 – 2/22/2008

<u>Interim Statements</u>
I       Interim Statement – 1/31/2006 – 2/16/2006
J       Interim Statement – 2/1/2006 – 2/11/2006
K       Interim Statement – 2/1/2006 – 4/24/2006
L       Interim Statement – 5/11/2006

<u>Position Intraday</u>
M       Position Intraday – 6/21/2007

### DECLARATION OF GREG HAMILTON

I, Greg Hamilton, hereby declare as follows:

1.  I am one of the Relators in United States ex rel Sun et al. v. Baxter.  If called upon to do so, I  could and would testify competently to the following based upon firsthand knowledge.

2.  I have worked for pharmaceutical manufacturers and pharmacy benefit managers for over twenty years.  During this time I have had extensive contact with Baxter's senior staff as a customer, a colleague and as a competitor.  This contact has included numerous meetings Guiheen (the President of Baxter BioScience who is referred to in ¶45 of the Complaint) as well as his superior, Peter O'Malley.  Those meetings specifically concerned the pricing of several of the Baxter products discussed in this Complaint.

3.  From 2001 – 2004 I was the Senior Director of Strategic Sales and Planning at Specialty Distribution Services for Express Scripts, the Pharmacy Benefit Manager.  From 2004 – 2006 I was the Vice-President of the Curascript Bleeding Disorder Program.  (CuraScript is an operating division of Express Scripts.)

4.  While serving in these positions I frequently met with Baxter's senior management to discuss the market for hemophilia products.  Because the market for hemophilia products is extremely lucrative, national hemophilia meetings were typically attended by the leadership from concerned pharmaceutical companies and PBMs.  At these conferences I would hold scheduled meetings with Larry Guiheen, who was then Baxter's Vice-President for North America, as well has his boss, Peter O'Malley.  I also made at least three trips to Baxter's Deerfield, Illinois, offices to meet with  Baxter managers to discuss pricing.  At least one of those meetings took place at the request of Peter O'Malley, who was either Baxter's President of North American operations, or vice President of Sales.  O'Malley asked me to meet with Baxter's contracting



staff and describe how to price products for Government customers, and how pricing for the 340B program operates.

5.  I had at least three such meetings with Baxter to discuss pricing in barely a year – August 8, 2002, February 3, 2003, and September 26, 2003.

6.  During one such meeting I had a long discussion with Larry Guiheen about Baxter's pricing of Advate (Baxter's version of Recombinant Factor VIII.)  Within a few months of this meeting Baxter changed its price for Advate to within a penny of what I had recommended.

7.  In addition to being a major customer of Baxter's through my work with Express Scripts and Curascript, I also interacted with Baxter's pricing managers as a competitor of Baxter's when I worked for Bayer.  While working for Bayer, I served with Baxter executive Peter O'Malley on the Plasma Protein and Therapeutics Association's Reimbursement Committee, and Drug Recall Committee, and had numerous discussions with him about pricing strategies.

8.  In addition to my direct discussions with Baxter managers, I learned of Baxter's pricing and some of the specific acts alleged in ¶¶ 36-40 of our complaint while trying to help Kay Morgan, Manager of Editorial Services for First Data Bank. In May or early June of 2001 Kay Morgan called and asked my opinion about why Baxter was refusing to provide its WAC for Recombinate.  She told me that Baxter sent a letter saying that their list price was $1.31 and they wanted their AWP reported as $1.31.  She told me that when she asked Baxter for the WAC,  Baxter merely repeated that the list price for Recombinate was $1.31 and that they wanted the AWP reported as $1.31.  Morgan told me that FDB was so mad that they threatened not to publish any information at all.

2

Case Case 1:08-22571-PBS-PBS Document 6062   Filed 09/15/2009 Page 39 of 41

9.    Morgan told me that she, her boss, and the FDB legal department wrote a letter to Baxter threatening that FDB would refuse to publish the AWP information.

10.    Morgan asked me what I thought Baxter was trying to accomplish by this. I told her that I thought Baxter's goal was to establish an AWP was attractive to the distributors, but to still be able to deny to the hemophilia community that it was Baxter's fault for the high AWP, and to blame FDB.

11.    Throughout my years in the industry I was able to achieve a high level of understanding of Baxter's pricing structure from direct discussions with Baxter's senior management, as well as through the information given me by FDB.

12.    The Market Research Bureau's PLASMA FRACTIONS MARKET IN THE US report is an annual publication for the Plasma industry. This industry is a classic oligopoly consisting of less than 7 manufacturers.

13.    The Market Research Bureau was founded and is operated by Patrick Robert, a former Bayer employee and colleague. He left Bayer and created MRB in the mid 90's to provide the Plasma industry with a much needed data source. The standard source for the drug industry is IMS Health, however they do not audit/cover plasma products.

14.    On September 13, 2009 I called The Market Research Bureau and spoke with Cindy Lynn, Patrick Robert's secretary. She told me that a single issue of this publication costs $16,000, and that there are fewer than 20 subscribers, including manufacturers, a few specialty pharmacies, and a few 340d entities. She also told me that they do not sell or give any of their reports to university libraries or public libraries.

3

I declare under penalty of perjury under the laws of the state of Illinois that the foregoing is true and correct. Executed this 15th day of September, 2009, at Algonquin, Illinois.

/s/ Greg Hamilon

Greg Hamilton

# Exhibit C



## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

IN RE: PHARMACEUTICAL )
INDUSTRY AVERAGE )
WHOLESALE PRICE LITIGATION ) MDL No. 1456
) Master File No. 1:01-CV-12257-PBS
) Sub-Category Case No. 10-CV-11186-PBS
THIS DOCUMENT RELATES TO: )
*United States ex rel. Linnette Sun and* ) Judge Patti B. Saris
*Greg Hamilton, Relators* )
*v.* )
*Baxter Healthcare Corporation* )
)

## DECLARATION OF GREG HAMILTON

I, Greg Hamilton, declare and state as follows:

1.      I am one of the Relators in *United States ex rel. Sun and Hamilton v. Baxter*,
Case No. 08-CV-11200-PBS (the "*Sun/Hamilton*" case). If called upon to do so, I could and
would testify competently to the following based upon firsthand knowledge.

2.      I have worked for pharmaceutical manufacturers and pharmacy benefit
managers for over 20 years. As explained further below, I have worked for pharmacies
which distributed Baxter drugs, including Recombinate and Advate, and participated in price
negotiations for these drugs. During my tenure in the pharmaceutical industry, I gained
specific knowledge about the market for Factor VIII recombinant products, such as Advate
and Recombinate, used by hemophiliacs.

3.      From 2001—2004, I was the Senior Director of Strategic Sales and Planning
at Specialty Distribution Services for Express Scripts. Express Scripts was and remains a
pharmacy benefit manager.  Specialty Distribution Services was a specialty pharmacy

operated within Express Scripts. Specialty pharmacies constitute a distinct type of pharmacy which ship prescriptions for special pharmaceutical products directly to patients from a warehouse. Specialty pharmacies generally do not offer walk-up, in-person pharmacy services. The prescription drugs offered by specialty pharmacies differ from those offered by retail pharmacies. Specialty pharmacies fill prescriptions for products, such as Recombinate and Advate, that are generally more expensive than traditional prescriptions, may require special handling (such as temperature control), and may necessitate special patient education before a prescription for the drug may be filled.

4.     While I was the Senior Director of Strategic Sales and Planning at Specialty Distribution Services, I started a hemophilia program pursuant to which Specialty Distribution Services made hemophiliac factor products available for shipment to hemophiliacs and any other patients in need of those products. Specialty Distribution Services purchased hemophilia related products directly from manufacturers, such as Baxter, and sold them to patients. I negotiated the purchasing contracts for hemophilia related products directly with the manufacturers, including contracts to purchase Recombinate and Advate. I also negotiated pricing and reimbursement with persons or entities ultimately responsible for paying Specialty Distribution Services for the prescriptions, such as insurance providers.

5.     In 2004, Express Scripts acquired CuraScript, which became an operating division of Express Scripts. Before the acquisition, CuraScript was an independently owned and operated specialty pharmacy. Specialty Distribution Services' hemophilia program was incorporated into CuraScript's general operations. After the acquisition, from 2004—2006, I was the Vice-President of the CuraScript Bleeding Disorder Program—the program

responsible for marketing the pharmacy's services to the patients in need of Factor VIII products such as Recombinate and Advate.   During that time, I continued to negotiate purchase contracts with Baxter for Recombinate and Advate.

6.      Through my employment with Express Scripts and CuraScript in the years 2001—2006, and my specific responsibility for negotiating pricing with Baxter, among other companies, I had direct knowledge of the internal cost information for the various hemophilia products purchased by Specialty Distribution Services/CuraScript, including Recombinate and Advate.   Attached hereto as Exhibit 1 is an example of a Therapeutic Products Purchase Agreement between Baxter and CuraScript, the type of which I had negotiated during the course of my work.   The Agreement outlines payment terms for the purchase of Advate and Recombinate, as well as volume rebates for the purchase of the same drugs.

7.      Attached hereto as Exhibit 2 is a copy of a spreadsheet that was provided to CuraScript.   The spreadsheet exhibits a reconciliation of purchases CuraScript made under a Therapeutic Products Purchase Agreement against actual rebates received from Baxter. While I was employed by CuraScript, Baxter provided such reconciliation documents on a quarterly basis.

8.      Attached hereto as Exhibit 3 is a copy of a spreadsheet entitled "Factor Pricing," which was maintained under my direction by CuraScript's personnel.    The document was created for use by CuraScript's sales and other personnel to provide pricing information so that CuraScript's sales team could market CuraScript's products and services (including Recombinate and Advate) to end-payors, such as insurance companies.    The spreadsheet shows CuraScript's actual acquisition price for various drugs.   As of May 5,

-3-

2006, CuraScript's acquisition price for Advate was $.9375 per individual unit ("IU"). During my tenure at CuraScript, the price I was able to negotiate depended on the volume of product I purchased for CuraScript. Each of the country's two largest specialty pharmacies, Caremark and Accredo Health Group, Inc., purchased about ten times more product than CuraScript. Based on my experiences with the pharmaceutical business, I believe the price those two largest specialty pharmacies paid for Advate based on their volume discounts was significantly lower than what CuraScript paid.

9.     While working at Express Scripts and Cura Script, I also learned about competitors' acquisition prices for drugs such as Advate through my review of "The Market Research's PLASMA FRACTIONS MARKET IN THE US report", which is an annual publication for the plasma industry. The Market Research Bureau ("MRB") was founded and is operated by Patrick Robert, a former colleague of mine when I worked for Bayer. Robert left Bayer and created the MRB in the mid-1990's to provide the plasma industry with a much needed data source. The standard source for the drug industry is IMS Health, however, at that time, IMS Health did not audit/cover plasma products. Robert provided to me copies of the MRB, or portions of the MRB that related to Factor VIII products. Those reports covered pricing through 2010. Attached hereto as Exhibit 4 is an excerpt of one MRB report; the excerpt shows that pharmacies paid an average of $0.93 per IU for Advate in 2009.

10.     This information on acquisition cost was not publicly available.     On September 13, 2009, I called the MRB and spoke with Cindy Lynn, Robert's secretary. Lynn told me that a single issue of this publication costs $16,000, and that there are fewer than 20 subscribers, including manufacturers, a few specialty pharmacies, and a few 340(d) entities.

-4-

Lynn also told me that the MRB does not sell or give any of their reports to university libraries or public libraries. I gained access to the MRB reports either when they were purchased by one of my employers or through Robert.

11.     Based on CuraScript's internal cost information, my knowledge of prices paid by CuraScript's larger and smaller competitors, and information obtained from The Market Research's PLASMA FRACTIONS MARKET IN THE US report, I believe the price actually paid by the pharmacies that purchased and dispensed the vast majority of Advate ranged from $0.90 - $0.93 per IU during the years 2004—2006. I believe that those pharmacies continued to pay as little as $0.92 per IU for Advate through 2010.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this ___11___ day of ___November___, 2012.

_____
Greg Hamilton

# Exhibit 1

## THERAPEUTIC PRODUCTS PURCHASE AGREEMENT

### *Recitals*

Baxter Healthcare Corporation, a Delaware corporation, through its BioScience business unit, with offices at One Baxter Parkway, Deerfield, Illinois 60015 ("Baxter") is extending to Curascript Pharmacy, Inc. and all it's affiliates, with offices at 6272 Lee Vista Blvd., Orlando, FL 32822 ("Purchaser") the following pricing for the therapeutics and devices ("Therapeutic Products") set forth in Schedule A. This pricing is being offered to Purchaser in accordance with this Therapeutic Products Purchase Agreement as well as the Quarterly Rebate set forth in Schedule B, and the Estimated Forecast set forth in Schedule C, which Schedules will be incorporated herein and made a part hereof (collectively, the "Agreement"). Baxter and Purchaser are collectively referred to herein as the "Parties".

### *Now, Therefore, It Is Hereby Agreed As Follows:*

1.     <u>Term</u>. Unless otherwise terminated as herein provided, the term of this Agreement shall begin January 1, 2006 ("Effective Date") and end December 31, 2006, subject to the termination provisions set forth below.

2.     <u>Pricing</u>. Baxter agrees to hold firm the prices set forth on Schedule A through the Term of the Agreement.

3.     <u>Payment Terms</u>. Payment terms are one and a half percent (1.5%) fifteen (15) net thirty-one (31) days from date of invoice. Purchaser shall pay Baxter a service charge of 1-1/2% per month (18% per year) or the highest amount allowed by law, if lower, on all amounts past due. In the event Purchaser is delinquent in payment of any amounts to Baxter, whether or not related to this Agreement, Baxter may, at its option (a) declare all amounts owed to it under all agreements as due and payable immediately, and (b) terminate this Agreement.

4.     <u>Conditions of Sale</u>. Baxter agrees to sell the Therapeutic Products to Purchaser and Purchaser agrees to purchase the Therapeutic Products for resale, distribution or use within the United States to patients for whom (a) Purchaser holds an active prescription for the Therapeutic Products, and/or (b) Purchaser provides homecare services, and/or (c) a doctor has ordered their use.

5.     <u>Licenses</u>. Purchaser agrees to maintain all licenses necessary for the purchase and dispensing of the prescription Therapeutic Products (e.g., state pharmacy license, physician's license, etc.) and will forward a copy of such license to Baxter upon request. The Therapeutic Products purchased under this Agreement are not for resale, barter or trade to other purchasers of such therapeutics and devices or for export.

6.     <u>Forecast</u>. This Section 6 applies to Advate rAHF-PFM, Recombinate rAHF, Hemofil M AHF, and FEIBA VH only. Within five (5) business days after the Effective Date of this Agreement, and at least thirty-five (35) days prior to each succeeding calendar quarter, Purchaser will provide Baxter with a written forecast of its anticipated purchases of the Therapeutic Products set forth above for the upcoming quarter of the Agreement. Purchaser will determine estimated forecast by using the following formula: (beginning inventory + estimated demand) - inventory target = Estimated Forecast. The format for such Estimated Forecast is to be submitted on the form in Schedule C attached hereto. Baxter will use such forecasts submitted by Purchaser in production planning, provided, however, that in no event will any such forecast hereunder constitute an order, create any right or expectation in Purchaser or be binding in any respect upon Baxter.

7.     <u>Period Volume Rebate</u>.

        (a) As to Advate rAHF-PFM, Recombinate rAHF, and Hemofil M AHF ("Rebate Therapeutics"), Baxter is pleased to offer a price incentive in the form of a period rebate ("Rebate") to Purchaser. For purposes of this Agreement, "First Period" shall mean January, February, and March, and "Second Period" shall mean April, May, and June, and "Third Period" shall mean July, August, and September, and "Fourth Period" shall mean October, November, and December. First Period, Second Period, Third Period, and Fourth Period are collectively referred to herein as "Period(s)." The Rebate will be based on the rebate schedule set forth in Schedule B, Table 1 ("Period Rebate Schedule"). In the event Purchaser exceeds the tier in Schedule B, Table 1,

additional rebates may be available. Each Period Baxter will calculate the Rebate amount equal to the units purchased by Purchaser in a Period times the Rebate amount set forth in Schedule B, Table 1. The Rebate will be paid to Purchaser based solely upon purchases made through this Agreement. The Rebate will be calculated by the thirtieth (30th) calendar day of the first month following the close of the preceding Period commencing on the Effective Date of this Agreement. Each earned Rebate shall be paid to Purchaser in the form of a credit memo, which credit memo shall be issued within forty-five (45) days of the end of each Period.

(b) In any one Period, should the total units purchased to date of said Rebate Therapeutics purchased by Purchaser from Baxter (i) be less than the total units purchased to date forecasted by Purchaser pursuant to Section 6 for Rebate Therapeutics, and (ii) fall in a tier lower than the tier used to calculate and pay any preceding Period Rebate, then Baxter reserves the right in its sole discretion to (y) reduce the amount of any subsequent Period Rebate to reflect said shortfall, or (z) invoice Purchaser the amount of said shortfall if same is greater than the amount of the final Period Rebate, which amount Purchaser agrees to pay pursuant to Section 3.

(c) Should the total units purchased as of the End Date of said Rebate Therapeutics purchased by Purchaser from Baxter (i) be more than the total units forecasted by Purchaser as of the End Date pursuant to Section 6, and (ii) fall in a tier higher than the tier used to calculate and pay preceding Period Rebates to Purchaser, then Baxter will increase the Fourth Period Rebate to reflect said overage.

8.      **Annual Growth Rebate**. For Advate rAHF-PFM only, Baxter is pleased to offer an additional price incentive in the form of an annual growth rebate ("Annual Growth Rebate") to Purchaser. The Annual Growth Rebate will be calculated upon the total number of units purchased by Purchaser above the annual growth target set forth in Schedule B, Table 3 times the annual growth rebate percentage ("Annual Growth Rebate Percentage") set forth in Schedule B, Table 2. The Annual Growth Rebate will be paid to Purchaser based solely upon purchases made through this Agreement. The Annual Growth Rebate will be calculated within thirty (30) days of the end of the Term of the Agreement and paid in the form of a credit memo, which credit memo shall be issued within forty-five (45) days of the end of the Term of the Agreement.

9.      **Equal Treatment Of Therapeutic Products.** Purchaser agrees that it will not place the Therapeutic Products at a disadvantage relative to any therapeutic products sold by a competitor of Baxter ("Competitor") by giving said Competitor's therapeutic products preferential treatment. Preferential treatment shall include but not be limited to the following:

- Conducting exclusive or proportionally more sales and/or marketing activities on behalf of any Competitor.
- Providing any Competitor directly or indirectly with Purchaser leads that have not been provided to Baxter.
- Entering into a written or verbal agreement with any Competitor to provide a competitive therapeutic exclusively to any Person that may be using and/or prescribing the Therapeutic Products.
- Failing to discuss the Therapeutic Products during conversations with patients or physicians relative to therapeutic choice.
- Recommending in a preferential manner directly or indirectly to any Person a brand of therapeutic products other than the Therapeutic Products.
- Influencing in a preferential manner, directly or indirectly, any Person to exclude coverage for the Therapeutic Products or disadvantage the Therapeutic Products under any plan, including but not limited to a payor plan (e.g., via different co-pay or deductible).
- Instructing patients directly or indirectly to fill a non-branded prescription with a specific brand of therapy.

For purposes of this Agreement, the term "Person" means any individual, corporation, limited liability company, partnership, joint venture, association, trust, unincorporated organization, governmental body or authority or any other entity.

10.   **Therapeutic Product Supply.** Baxter reserves the right, in its sole discretion, to remove any Therapeutic Product from this Agreement without terminating the Agreement or impacting the supply of other Therapeutic Products described in Schedule A to this Agreement.

11.   **New Therapeutic Products.** Baxter can substitute New Therapeutic Products with the same or similar indication that may become available during the course of the Agreement to Purchaser, and Purchaser will purchase same from Baxter.

12.   **Therapeutic Products Standards Of Care.** Purchaser agrees to meet certain standards of care for specific Therapeutic Products as set forth below ("Standards of Care"):

   (a) As to Antihemophilic Factors & Anti-inhibitor Coagulant Complex; Advate rAHF-PFM, Recombinate rAHF, Hemofil-M AHF, and FEIBA VH AICC, Purchaser shall meet the following Standards of Care:

- Routine home nursing service provided by a qualified practitioner trained on hemophilia and venipuncture available for those patients who need it.
- Same-day delivery of the above-mentioned Therapeutic Products by appointment in the case of an emergency bleed; 24 hour on-call service to receive orders.
- Provision of ancillary supplies for treatment of bleeding episodes, including but not limited to needles, syringes, and cold compression packs.
- Proper removal and disposal of all hazardous waste.
- Provision of other support services including educational programming, reimbursement assistance, disease management programs, and/or community assistants.

13.   **Taxes.** Purchaser shall be responsible for payment of all applicable state and/or local sales, use, and/or gross receipts tax receipts resulting from its transactions with Baxter.

14.   **Ordering Procedure.** Orders may be placed by calling Baxter Customer Service at 800.423.2090, by facsimile to 800.756.4952, or by e-Commerce. Purchaser may place electronic orders with Baxter through one of three (3) e-Commerce methods. For further EDI, GHX or Eservices information, contact Baxter's e-Commerce Team at 877.334.2298. Shipment against any purchase order does not constitute acceptance by Baxter of the terms and conditions or prices stipulated on the purchase order. Shipment of any order, including standing orders, will be made in accordance with the terms of this Agreement and shall be governed solely by the terms of this Agreement notwithstanding any conflicting or additional terms contained in any purchase order, unless otherwise agreed to in writing by the Parties to this Agreement. Baxter cannot guarantee maximum expiration dating on any Therapeutic Products upon delivery. Specific dating needs may be discussed with Customer Service at time of order placement.

15.   **Shipping Information.** Freight terms are F.O.B. Purchaser's location. Under normal conditions, shipment will be made within seven (7) days after receipt of order. Additional charges for emergency or overnight deliveries will be the responsibility of Purchaser and will be added to the invoice.

   (a)   **Disputed Invoices.** An amount in dispute should be deducted from Purchaser's remittance. Please explain the deduction on a legible copy of the invoice and enclose it with the payment. Baxter's Account Services Representative will work with Purchaser to resolve the discrepancy.

   (b)   **Damage or Shortage in Shipment.** Baxter exercises extreme care in packing shipments. To minimize the possibility of error, all orders should be counted and inspected prior to acceptance of delivery from the carrier. ANY DAMAGE, SHORTAGE OR OVERAGE SHOULD BE NOTED ON A COPY OF THE CARRIER'S FREIGHT BILL AND THE DRIVER SHOULD COUNTERSIGN THE DOCUMENT. If the damage is excessive, do not accept the shipment. Mark on the carrier's freight bill, "Shipment refused, damaged. Return to shipper." Baxter's Customer Service Department should be notified immediately at 800.423.2090. Purchaser's cooperation in providing this information will enable Baxter to expedite the necessary adjustments.

(c)     **Proof of Delivery**. Proof of delivery will be provided if a request is received within ninety (90) days of date of shipment. Due to the expenses involved in obtaining proof of delivery, requests are subject to a $40.00 service fee. In the event that proof of delivery cannot be provided, no service fee will be charged and full credit will be issued to Purchaser's account.

16.     **Force Majeure Event**. Baxter shall use commercially reasonable efforts to fill orders but shall not be liable for non-performance or delays caused by a shortage of supply of raw materials, manufacturing problems, delivery or labor problems, intervention of any governmental authority or acts of regulatory agencies, fires, earthquakes, acts of God or causes beyond its control. Purchaser agrees that in such events Baxter, without liability to Purchaser, may allocate Therapeutic Products among all of its purchasers. In the event Baxter is notified of and is able to verify a decision which changes the purchase and delivery of Therapeutic Products for a patient or a group of patients either to or from Purchaser, then to the extent it is able, Baxter may have to make appropriate adjustments in the supply of Therapeutic Products provided to Purchaser.

17.     **Return Goods Policy**. Baxter can accept for credit only those Therapeutic Products that (a) do not perform satisfactorily under the specified condition, (b) may have been damaged during transportation, or (c) Purchaser may have received in error. Due to the biological nature of the Therapeutic Products and the government regulations involved, return of the Therapeutic Products must be authorized before any returns will be accepted. Purchaser shall contact Baxter Customer Service for instructions on the return procedure to be followed.

18.     **Warranty**. Baxter and its affiliates warrant that Therapeutic Products shipped or delivered to Purchaser will not, at the time of shipment by Baxter or its affiliates, be adulterated or misbranded within the meaning of the Federal Food, Drug and Cosmetic Act, as amended, nor will such Therapeutic Products be an article which may not, under provisions of sections 404 and 505 of said act, be introduced into interstate commerce. Baxter and its affiliates further represent and warrant that all Therapeutic Products delivered to Purchaser when stored and used in accordance with the directions on the labeling, are fit for the purposes and indications described in the labeling. Unless the Therapeutic Products are used in accordance with their instructions, these warranties are void and of no effect. THERE ARE NO OTHER EXPRESS OR IMPLIED WARRANTIES, INCLUDING ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. BAXTER AND ITS AFFILIATES' SOLE OBLIGATION AND PURCHASER'S EXCLUSIVE REMEDY FOR BREACH OF ANY WARRANTY SHALL BE, AT BAXTER'S OPTION, TO REPAIR OR REPLACE THE THERAPEUTIC PRODUCTS. NEITHER BAXTER NOR ITS AFFILIATES SHALL BE LIABLE FOR PROXIMATE, INCIDENTAL, CONSEQUENTIAL OR EXEMPLARY DAMAGES. More warranties may accompany individual Therapeutic Products.

19.     **Other Discounts**. Purchaser acknowledges the dollar value of any Therapeutic Products which Purchaser receives but does not pay for shall be a "discount or other reduction in price" and may be subject to the disclosure requirements of Section 1128B(b)(3)(A) of the Social Security Act. Purchaser shall disclose this discount or other reduction in price under any state or federal program that provides cost- or charge-based reimbursement to the participating institution for Therapeutic Products or services covered in this price list.

20.     **Termination**

(a)     **Termination Without Cause.** Either Party shall have the right at any time to terminate this Agreement upon ninety (90) days prior written notice to the other Party.

(b)     **Non-Monetary Breach.** This Agreement may be terminated by a Party for any material breach of this Agreement by the other Party, which breach is not cured within thirty (30) days of written notice by the non-breaching Party.

(c)     **Monetary Breach.** This Agreement may be terminated by Baxter if Purchaser fails to pay any invoice within twenty-five (25) days of written notice by Baxter of monies due and owing under a past due invoice. Neither Party may terminate this Agreement pursuant to this section for any monies subject to a bona fide dispute between the Parties.

(d) **Insolvency.** This Agreement may be terminated by a Party immediately (i) upon the institution by or against the other Party of insolvency, receivership or bankruptcy proceedings or any other proceedings for the settlement of the other Party's debts, (ii) upon the other Party's making an assignment for the benefit of its creditors, or (iii) upon the other Party's dissolution.

(e) **Orders Placed Prior to Termination.** In the event Baxter terminates this Agreement, at any time, with or without cause, under any circumstances whatsoever, Baxter, shall fill all unfilled orders of Purchaser for the Therapeutic Products outstanding as of the date on which the termination notice is given to the date that this Agreement is terminated.

(f) **Change in Control.** If Purchaser or any of its affiliates undergoes a Change in Control (as below defined), Purchaser will so notify Baxter in writing no more than five (5) business days after the date of occurrence of such event, and Baxter will have the right to terminate this Agreement effective with the Change in Control. "Change in Control" means the occurrence at any time of either of the following events:

  (i) Purchaser sells all or substantially all of its business and/or assets to any entity; and/or

  (ii) Any entity has become the beneficial owner (as the term "beneficial owner" is defined under Rule 13d-3 of the Securities Exchange Act of 1934, as amended (the "Exchange Act") and the rules and regulations promulgated thereunder or any successor rule or regulation promulgated under the Exchange Act) of 20% or more of (a) the issued and outstanding shares of voting securities or capital stock of Purchaser or (b) the equity interest of any other person or entity which holds or controls any material part of Purchaser's business and/or assets.

21.   **Trace Sales Reports.** On all purchases from Baxter, Purchaser agrees to maintain complete and accurate records of the sales of all Therapeutic Products covered under this Agreement. Purchaser agrees to provide monthly trace sales reports, to include the following information:

  (a) City, state, and zip code of the prescribing physician; and

  (b) Number of units, unit of measure, Baxter item code number or NDC number and ship date.

*THE ABOVE INFORMATION MUST BE RECEIVED WITHIN TEN (10) DAYS FOLLOWING THE LAST DAY OF EACH CALENDAR MONTH.* The preferred format is Microsoft Excel spreadsheet sent electronically to the Baxter contact person listed below.

| Baxter Contact Information: | Purchaser Contact Information: |
|---|---|
| Greg Caya | Name: _____ _____ |
| Greg_Caya@baxter.com | Email: _____ _____ |
| One Baxter Parkway | Address: _____ _____ |
| Deerfield, IL 60015 | _____ _____ |
| Phone No.: 847.940.5951 | Phone No.: _____ _____ |
| Fax No.: 847.940.5798 | Fax No.: _____ _____ |

22.   **Confidentiality.** Neither Purchaser nor Baxter shall disclose the terms of this Agreement to any other person or entity outside its organization and affiliates or make any public announcement concerning the existence of this Agreement or its terms, unless such Party receives the prior written approval of the other Party or such disclosure is required by law, subpoena or other judicial or administrative process or pursuant to Generally Accepted Accounting Principals. For purposes of this provision, an affiliate is an entity in which Purchaser or Baxter, as appropriate, maintains an ownership position in or a contractual relationship with, and the disclosure is required so that the disclosing Party may fulfill its obligations hereunder.

23.   **Indemnification.**

(a)     Baxter agrees to defend, indemnify and hold Purchaser harmless against any claims, liability or causes of action, including counsel fees, and compensatory, multiple, exemplary and punitive damages, and fines, arising from or in any way connected with the Therapeutics and Devices as a result of Baxter's negligence, provided such items were used in accordance with their labeling and directions for use. This indemnity shall not apply to the extent such claims, liabilities or causes of action are caused by the fault, breach of contract, tort (including negligence and strict liability) of Purchaser. If Purchaser seeks indemnification under this paragraph, it will give prompt written notice of the claim to Baxter and, provided that Baxter is not contesting the indemnity obligation, will permit Baxter to control any litigation relating to such claim and disposition of any such claim, provided that Baxter will act reasonably and in good faith with respect to all matters relating to the settlement or disposition of any claim as the settlement or disposition relates to Purchaser. Baxter will not settle or otherwise resolve any claim without the prior written consent of Purchaser. If Purchaser does not consent to a proposed settlement, Baxter agrees to assume the full cost of its own defense of the action and may employ its own counsel at its sole cost. Purchaser will cooperate with Baxter in its defense of any claim for which indemnification is sought hereunder.

(b)     Purchaser agrees to defend, indemnify and hold Baxter harmless against any claims, liability or causes of action, including counsel fees, and compensatory, multiple, exemplary and punitive damages, and fines, arising from or in any way connected with any third-party claim arising out this Agreement caused by (i) negligence or intentional misconduct of Purchaser or any of its officers, directors, agents or employees; (ii) breach by Purchaser of any of the terms of this Agreement; or (iii) acts of Purchaser or any of its officers, directors, agents or employees which are outside the scope of this Agreement. This indemnity shall not apply to the extent such claims, liabilities or causes of action are caused by the fault, breach of contract, tort (including negligence and strict liability) of Baxter. If Baxter seeks indemnification under this paragraph, it will give prompt written notice of the claim to Purchaser and, provided that Purchaser is not contesting the indemnity obligation, will permit Purchaser to control any litigation relating to such claim and disposition of any such claim, provided that Purchaser will act reasonably and in good faith with respect to all matters relating to the settlement or disposition of any claim as the settlement or disposition relating to Baxter. Purchaser will not settle or otherwise resolve any claim without the prior written consent of Baxter. If Baxter does not consent to a proposed settlement, Purchaser agrees to assume the full cost of its own defense of the action and may employ its own counsel at its sole cost. Baxter will cooperate with Purchaser in its defense of any claim for which indemnification is sought hereunder.

24.     **Group Purchasing Organizations.**  As to the Therapeutic Products set forth in Schedule A, Purchaser represents that (a) it is not a member either directly or indirectly of, or if it is a member has elected not to purchase under, any group purchasing organization that has a group purchasing agreement with Baxter, and (b) during the course of this Agreement, should Purchaser decide to become a member of a group purchasing organization or elect to purchase under any group purchasing organization that has a group purchasing agreement with Baxter of which it is a member, as it pertains to the Therapeutic Products set forth in Schedule A, then it will give Baxter ninety (90) days prior written notice of same and Baxter, at its sole discretion, can terminate this Agreement upon five (5) days prior written notice to Purchaser, and (c) upon the request of Baxter, Purchaser will provide confirmation, in writing, of (a) and/or (b) above.

25.     **Complete Agreement.**  This Agreement contains the full and complete expression of the rights and obligations of the Parties, and it shall cancel and supersede all other written or oral communications heretofore made by the Parties related to the subject matter hereof.

**This Agreement is neither valid nor effective until signed by Baxter at its home office.**

Curascript Pharmacy, Inc. and all it's affiliates

BAXTER HEALTHCARE CORPORATION
Through its BioScience Business Unit
Sales and Marketing North America Region

By: _____

By: _____

Name: _____
      Authorized Representative

Name: _____
      Authorized Representative

Title: _____

Title: _____

Date: _____

Date: _____

Phone Number: _____

**Schedule A to**
**Therapeutic Products Purchase Agreement**

**THERAPEUTIC PRODUCTS DESCRIPTION AND PRICING**

**Schedule B to Therapeutic Products Purchase Agreement**

## TABLE 1: PERIOD REBATE SCHEDULE

| ADVATE rAHF-PFM Period Volume Rebate (units in millions): |
|---|
| RECOMBINATE raHF Period Volume Rebate (units in millions): |
| HEMOFIL M AHF Period Volume Rebate (units in millions): |
| |

**Schedule B to Therapeutic Products Purchase Agreement Continued**

**TABLE 2: ADVATE rAHF-PFM ANNUAL GROWTH REBATE**

| Therapeutic Product | Growth Rebate Percentage |
|---|---|
| Advate rAHF-PFM | % for units purchased above and beyond Purchaser's Annual Growth Target |

**TABLE 3: ADVATE rAHF-PFM ANNUAL GROWTH TARGET**

| Therapeutic Product | Annual Growth Target |
|---|---|
| Advate rAHF-PFM | units |

**Schedule C to**
**Therapeutic Products Purchase Agreement**

**Estimated Forecast**

## 2006 Quarterly Unit Forecast Report

| Formula = (Beginning Inventory + Estimated Demand) - Inventory Target = Estimated Forecast |
|---|

----BEGINNING INVENTORY POSITION (1st day of Quarter)----

| Therapeutic Product | Quarter 1 | Quarter 2 | Quarter 3 | Quarter 4 |
|---|---|---|---|---|
| Advate rAHF-PFM | | | | |
| Recombinate rAHF | | | | |
| Hemofil M AHF | | | | |
| Feiba VH | | | | |

----ESTIMATED DEMAND----

| Therapeutic Product | Quarter 1 | Quarter 2 | Quarter 3 | Quarter 4 |
|---|---|---|---|---|
| Advate rAHF-PFM | | | | |
| Recombinate rAHF | | | | |
| Hemofil M AHF | | | | |
| Feiba VH | | | | |

----INVENTORY TARGET----

| Therapeutic Product | Quarter 1 | Quarter 2 | Quarter 3 | Quarter 4 |
|---|---|---|---|---|
| Advate rAHF-PFM | | | | |
| Recombinate rAHF | | | | |
| Hemofil M AHF | | | | |
| Feiba VH | | | | |

----ESTIMATED PURCHASE----

| Therapeutic Product | Quarter 1 | Quarter 2 | Quarter 3 | Quarter 4 |
|---|---|---|---|---|
| Advate rAHF-PFM | | | | |
| Recombinate rAHF | | | | |
| Hemofil M AHF | | | | |
| Feiba VH | | | | |

# Exhibit 2

*Handwritten note (top):* Rebate schedule

**Baxter BioScience**

**CUSTOMER: Curascript**

**Purchase Projections (Units)**
Please key projections in blue cells.

| | Q1 | Q2 | Q3 | Q4 | Total Units | Q1 Rebate $ | Q2 Rebate $ | Q3 Rebate $ | Q4 Rebate $ | Total Rebate $ |
|---|---|---|---|---|---|---|---|---|---|---|
| Advate | 1,345,128 | 1,162,652 | 0 | 0 | 2,507,780 | 33,628 | 29,066 | - | (12,539) | 50,156 |
| Recombinate | 2,176,284 | 888,758 | 0 | 0 | 3,065,042 | 65,289 | 26,663 | - | - | 91,951 |
| rFVIII Total | 3,521,412 | 2,051,410 | 0 | 0 | 5,572,822 | | | | | |
| Hemofil - M | 333,435 | 38,480 | 0 | 0 | 371,915 | 16,672 | (1,795) | (7,438) | (7,438) | |
| Total Rebate | | | | | | $116,588 | $53,934 | $7,438 | -$19,977 | $142,107 |

| | Total Units | Growth | 4% of Growth | Total Units | Growth Rebate |
|---|---|---|---|---|---|
| Advate Gth | 2,507,780 | -6,327,220 | -253,089 | | FALSE |
| Target | 8,835,000 | | | | |

**2006 Quarterly Rebate Unit Tiers**

**Total rFVIII**

**Q1 Rebate Tiers**
| Unit Range | Advate | Recombinate |
|---|---|---|
| 4,800,000 | $0.030 | $0.050 |
| 1,800,000 | $0.025 | $0.030 |
| 980,000 | $0.020 | $0.030 |
| 0 | $0.000 | $0.000 |

**Q2 Rebate Tiers**
| Unit Range | | Advate | Recombinate |
|---|---|---|---|
| 9,800,000 | 75,949,000 | $0.030 | $0.050 |
| 3,675,000 | 9,789,000 | $0.026 | $0.030 |
| 1,960,000 | 3,674,000 | $0.020 | $0.030 |
| 0 | 1,960,000 | $0.000 | $0.000 |

**Q3 Rebate Tiers**
| Unit Range | Advate | Recombinate |
|---|---|---|
| 14,800,000 | $0.030 | $0.050 |
| 5,550,000 | $0.025 | $0.030 |
| 2,960,000 | $0.020 | $0.030 |
| 0 | $0.000 | $0.000 |

**Q4 Rebate Tiers**
| Unit Range | | Advate | Recombinate |
|---|---|---|---|
| 20,000,000 | 154,999,000 | $0.030 | $0.050 |
| 7,500,000 | 19,999,000 | $0.025 | $0.030 |
| 4,000,000 | 7,499,000 | $0.020 | $0.030 |
| 0 | 4,000,000 | $0.000 | $0.000 |

**Total Hemofil-M AHF**

**Q1 Rebate Tiers**
| Unit Range | | Rebate |
|---|---|---|
| 900,000 | 1,499,000 | $0.070 |
| 500,000 | 899,000 | $0.060 |
| 300,000 | 498,000 | $0.050 |
| 150,000 | 299,000 | $0.040 |
| 115,000 | 149,000 | $0.020 |
| 0 | 115,000 | $0.000 |

**Q2 Rebate Tiers**
| Unit Range | | Rebate |
|---|---|---|
| 1,800,000 | 2,999,000 | $0.070 |
| 1,100,000 | 1,799,000 | $0.060 |
| 600,000 | 1,099,000 | $0.050 |
| 300,000 | 599,000 | $0.040 |
| 230,000 | 299,000 | $0.020 |
| 0 | 230,000 | $0.000 |

**Q3 Rebate Tiers**
| Unit Range | | Rebate |
|---|---|---|
| 2,700,000 | 4,499,000 | $0.070 |
| 1,350,000 | 2,699,000 | $0.060 |
| 900,000 | 1,649,000 | $0.050 |
| 450,000 | 899,000 | $0.040 |
| 345,000 | 449,000 | $0.020 |
| 0 | 345,000 | $0.000 |

**Q4 Rebate Tiers**
| Unit Range | | Rebate |
|---|---|---|
| 3,600,000 | 5,998,000 | $0.070 |
| 2,200,000 | 3,599,000 | $0.060 |
| 1,200,000 | 2,199,000 | $0.050 |
| 600,000 | 1,199,000 | $0.040 |
| 461,000 | 599,000 | $0.020 |
| 0 | 460,000 | $0.000 |

*Bayer / Direct logo (1-800-xxx-xxxx)*

*Handwritten note (right margin):* Q2 Rebate Fr. Delivoh Should be 23,253.04 here they miscalculated Q2 Timing by mistake.

# Exhibit 3

## CuraScript™ — The Pathway to the Patient

### FACTOR PRICING (sample)

| PRODUCT | AWP (as of 04/05/06) | Acquisition Price | Best Discount % off AWP | Net Price per Unit | Gross Margin | DPF-Current "OPEN NETWORK 05/05/06 | "Standard" DPF-Current CSP (all) |
|---|---|---|---|---|---|---|---|
| Advate | $1.75 | $0.9375 | 35.00% | $1.1375 | $0.2000 | 13.00% | 25.00% |
| Alphanate | $1.25 | $0.55 | 42.00% | $0.7250 | $0.1750 | 13.00% | 32.00% |
| Alphanine SD | $1.48 | $0.67 | 42.00% | $0.8584 | $0.1884 | 13.00% | 32.00% |
| Bebulin | $0.90 | $0.68 | 18.00% | $0.7380 | $0.0580 | 9.00% | 9.00% |
| Benefix | $1.04 | $0.80 | 18.00% | $0.8528 | $0.0528 | 13.00% | 20.00% |
| Feiba VH | $1.96 | $1.16 | 30.00% | $1.3720 | $0.2120 | 13.00% | 37.00% |
| Helixate FS | $1.63 | $0.85 | 38.00% | $1.0106 | $0.1606 | 13.00% | 30.00% |
| Hemofil M | $1.225 | $0.605 | 35.00% | $0.7963 | $0.1913 | 13.00% | 35.00% |
| Humate P | $1.25 | $0.74 | 32.00% | $0.8500 | $0.1100 | 13.00% | 32.00% |
| Koate DVI | $0.96 | $0.53 | 37.00% | $0.6048 | $0.0748 | 13.00% | 37.00% |
| Kogenate FS | $1.75 | $0.84 | 38.00% | $1.0850 | $0.2450 | 13.00% | 38.00% |
| Monarc M | $1.02 | $0.45 | 40.00% | $0.6120 | $0.1620 | 13.00% | 37.00% |
| Monoclate P | $1.05 | $0.53 | 37.00% | $0.6615 | $0.1315 | 13.00% | 27.00% |
| Mononine | $1.25 | $0.77 | 27.00% | $0.9125 | $0.1425 | 13.00% | 27.00% |
| Novoseven | $1.54 | $0.77 | 37.00% | $0.9702 | $0.0802 | 13.00% | 37.00% |
| Profilnine SD | $0.75 | $0.45 | 30.00% | $0.5250 | $0.0750 | 13.00% | 25.00% |
| Proplex T | $0.60 | $0.42 | 25.00% | $0.4600 | $0.0300 | 5.00% | 5.00% |
| Recombinate | $1.625 | $0.89 | 35.00% | $1.0563 | $0.1663 | 13.00% | 31.00% |
| ReFacto | $1.36 | $0.84 | 30.00% | $0.9520 | $0.1120 | 13.00% | 17.00% |
| Stimate | $835.50 | $524.45 | 25.00% | $626.6250 | $102.1750 | | |
| .5mg | $278.50 | $174.82 | 25.00% | $208.8750 | $34.0550 | | |
| DDAVP | $329.00 | $233.25 | 15.00% | $279.6500 | $46.4000 | | |
| /ml | $32.900 | $23.325 | 15.00% | $27.9650 | $4.6400 | | |

Based on AWP for each drug as reported by First Data Bank, as of April 5, 2006, and subject to adjustment concurrent with changes which may occur in AWP and/or acquisition price.

# Exhibit 4

# THE U.S. COAGULATION MARKET 2009

### PLASMA-DERIVED FACTOR VIII (HEMOPHILIA A MARKET)

| Company | Units * (MM) | A.S.P. $/IU | Dollars (MM) | Market Share | Share in Units | C Units |
|---|---|---|---|---|---|---|
| CSL Behring | 53.0 | 0.57 | 30.210 | 1.7% | 2.5% | -11.7% |
| Baxter | 148.0 | 0.65 | 96.200 | 5.4% | 6.8% | -7.5% |
| Talecris | 34.5 | 0.40 | 13.800 | 0.8% | 1.6% | 72.5% |
| Grifols | 124.5 | 0.70 | 87.150 | 4.9% | 5.8% | -0.4% |
| Total | 360.0 | 0.63 | 227.360 | 12.9% | 16.7% | -1.4% |

* International Units

### RECOMBINANT FACTOR VIII  (HEMOPHILIA A MARKET)          Recombinant

| Company | Units * (MM) | A.S.P. $/IU | Dollars (MM) | Market Share | Share in Units | CH UNITS |
|---|---|---|---|---|---|---|
| Baxter (a) | 830.0 | 0.93 | 771.900 | 43.6% | 38.4% | 28.7% |
| Baxter (b) | 290.0 | 0.88 | 255.200 | 14.4% | 13.4% | -24.7% |
| Bayer | 230.0 | 0.88 | 202.400 | 11.4% | 10.6% | 7.0% |
| Wyeth (c) | 90.0 | 0.93 | 83.700 | 4.7% | 4.2% | 9.8% |
| CSL Behring | 265.0 | 0.86 | 227.900 | 12.9% | 12.3% | 8.2% |
| Total | 1,705.0 | 0.90 | 1,541.100 | 87.1% | 78.9% | 8.5% |

* International Units           (a) Advate              (c) ReFacto 80%, Xyntha, 20%
                               (b) Recombinate

### TOTAL HEMOPHILIA A MARKET (Plasma-derived and recombinant)

| Company | Units * (MM) | Dollars (MM) | Market Share | Change from '08 Units | Change from '08 Dollars |
|---|---|---|---|---|---|
| CSL Behring | 318.0 | 258.110 | 14.6% | 4.3% | 6.7% |
| Baxter | 1,268.0 | 1,123.300 | 63.5% | 6.6% | 8.8% |
| Wyeth | 90.0 | 83.700 | 4.7% | 9.8% | 13.4% |
| Talecris | 34.5 | 13.800 | 0.8% | 72.5% | 53.3% |
| Grifols | 124.5 | 87.150 | 4.9% | -0.4% | -3.2% |
| Bayer | 230.0 | 202.400 | 11.4% | 7.0% | 8.2% |
| Total | 2,065.0 | 1,768.460 | 100.0% | 6.6% | 8.2% |

* International Units

### VON WILLEBRAND DISEASE MARKET

| Company | Units * (MM) | A.S.P. $/IU | Dollars (MM) | Market Share | Change from '08 | |
|---|---|---|---|---|---|---|
| | | | | | Units | Dollars |
| CSL Behring ** | 96.0 | 1.58 | 152.064 | 100.0% | N.A. *** | N.A. *** |
| Total FVIII units | 96.0 | | 152.064 | 100.0% | N.A. *** | N.A. *** |

* International Units of Factor VIII          0.72
** Humate P sales are expressed in Factor VIII Units, and equivalent to some 330 million Ristocetin CoFacto
*** 2008 figures to be restated

### TOTAL FACTOR VIII (HEMOPHILIA A + VON WILLEBRAND)

| Company | Units * (MM) | Dollars (MM) | Market Share | Change from '08 | |
|---|---|---|---|---|---|
| | | | | Units | Dollars |
| CSL Behring ** | 414.0 | 410.174 | 21.4% | 17.0% | 30.9% |
| Baxter | 1,268.0 | 1,123.300 | 58.5% | 6.6% | 8.8% |
| Bayer | 230.0 | 202.400 | 10.5% | 7.0% | 8.2% |
| Talecris | 34.5 | 13.800 | 0.7% | 72.5% | 53.3% |
| Wyeth | 90.0 | 83.700 | 4.4% | 9.8% | 13.4% |
| Grifols | 124.5 | 87.150 | 4.5% | -0.4% | -3.2% |
| Total | 2,161.0 | 1,920.524 | 100.0% | 9.0% | 13.3% |

* International Units          -
** Humate P is expressed in Factor VIII units (80 Million units)

### FACTOR IX (Plasma -derived)

| Company | Units * (MM) | A.S.P. $/IU | Dollars (MM) | Market Share | Share in Units | Change fro Units |
|---|---|---|---|---|---|---|
| CSL Behring | 60 | 0.78 | 46.800 | 12.4% | | 15.4% |
| Grifols | 35 | 0.66 | 23.100 | 6.1% | | -7.9% |
| Total | 95 | 0.74 | 69.900 | 18.6% | 22.4% | 5.6% |

* International Units

### RECOMBINANT FACTOR IX

| Company | Units * (MM) | A.S.P. $/IU | Dollars (MM) | Market Share | Share in Units | Change fro Units |
|---|---|---|---|---|---|---|
| Wyeth | 330.0 | 0.93 | 306.900 | 81.4% | | |
| Total | 330.0 | 0.93 | 306.900 | 81.4% | 77.6% | 6.5% |

* International Units

### TOTAL RECOMBINANT AND PLASMA DERIVED  FACTOR IX

| Company | Units * (MM) | Dollars (MM) | Market Share | Change from '08 | |
|---|---|---|---|---|---|
| | | | | Units | Dollars |
| Wyeth | 330.0 | 306.900 | 81.4% | 6.5% | 16.5% |
| Grifols | 35.0 | 23.100 | 6.1% | -4.5% | -3.3% |
| CSL Behring | 60.0 | 46.800 | 12.4% | 15.4% | 16.9% |
| Total | 425.0 | 376.800 | 100.0% | 6.4% | 14.8% |

* International Units

### PROTHROMBIN COMPLEX CONCENTRATE (PCC)

| Company | Units * | A.S.P. | Dollars | Market | Change from '08 | |
|---------|---------|--------|---------|--------|-------|--------|
| | (MM) | $/IU | (MM) | Share | Units | Dollars |
| Grifols | 7.0 | 0.61 | 4.270 | 96.8% | 16.7% | 18.6% |
| Baxter ** | 0.2 | 0.71 | 0.142 | 3.2% | 0.0% | 1.4% |
| Total | 7.2 | 0.61 | 4.412 | 100.0% | 16.1% | 18.0% |

* International Units          ** Bebulin VH

### ANTI-INHIBITOR (FACTOR BYPASSING AGENTS) MARKET

| Company | Units * | A.S.P. | Dollars | Market | Change from '08 | |
|---------|---------|--------|---------|--------|-------|--------|
| | (MM) | $/Unit-mcg | (MM) | Share | Units | Dollars |
| Baxter | 160.0 | 1.25 | 200.000 | 22.6% | 10.3% | 13.1% |
| Novo Nordisk | 560.0 | 1.22 | 683.200 | 77.4% | -1.8% | -0.1% |
| Total | N.A. | | 883.200 | 100.0% | N.A. | 2.6% |

* Inhibitor Correction Units/Feiba Units

hange from '08

| Dollars | Price |
|---|---|
| -3.2% | 9.6% |
| 0.2% | 8.3% |
| 53.3% | -11.1% |
| -3.2% | -2.8% |
| 0.5% | 1.9% |

l only

| ANGE FROM '08 | | Market |
|---|---|---|
| DOLLARS | PRICE | Share |
| 30.2% | 1.1% | 50.1% |
| -25.5% | -1.1% | 16.6% |
| 8.2% | 1.1% | 13.1% |
| 13.4% | 3.3% | 5.4% |
| 8.2% | 0.0% | 14.8% |
| 9.5% | 0.9% | 100.0% |

| Price Change |
|---|
| 1.7% |
| 1.4% |
| 1.6% |

| Price Change |
|---|
| 2.5% |
| 1.7% |
| |

## SETTLEMENT AGREEMENT

### I.  PARTIES

This Settlement Agreement ("Agreement") is entered into between the United States of America, acting through the United States Department of Justice and on behalf of the Office of Inspector General ("OIG-HHS") of the Department of Health and Human Services ("HHS") (collectively the "United States"); Ven-A-Care of the Florida Keys, Inc. (the "Relator"), and Bayer Corporation (hereafter referred to as "the Parties"), through their authorized representatives.

### II.  PREAMBLE

As a preamble to this Agreement, the Parties agree to the following:

A.   Bayer Corporation is a corporation organized under the laws of Indiana.  Its headquarters are in Pittsburgh, Pennsylvania.  Bayer is a manufacturer of pharmaceutical and biological products.  Miles, Inc. and Cutter Laboratories, Inc. (which along with Bayer Corporation, shall be referred to hereafter as "Bayer"), were predecessor organizations that ultimately were merged into the company that became known as Bayer Corporation.  At all relevant times, Bayer manufactured, marketed and sold certain biological products to — among others -- (1) healthcare providers,


EXHIBIT
Hamilton-5
1-29-13   MB

(2) "full-line" drug wholesalers, and (3) specialized drug wholesalers sometimes called "distributors."

      B.  The United States contends that Bayer caused to be submitted claims for payment to the Medicaid Program, Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396v (1997).

      C.  The United States contends that it has certain civil claims against Bayer under the False Claims Act, 31 U.S.C. §§ 3729-3733, other federal statutes and/or common law doctrines, for engaging in the following conduct during the period from January 1993 until August 31, 1999, involving the marketing and sale of Koate-HP Antihemophilic Factor (Human), Kogenate Antihemophilic Factor (Recombinant), Konyne-80 Factor IX Complex (Human), Gamimune N, 5% Immune Globulin Intravenous (Human, 5%), Gamimune N, 10% Immune Globulin Intravenous (Human, 10%), Thrombate III Antithrombin III (Human)(collectively referred to hereafter as the "qui tam drugs"):

      (i)  The United States contends that Bayer, in a manner similar to the practices of certain other manufacturers of the qui tam drugs and in connection with the Medicaid program, knowingly engaged in a marketing scheme whereby it set the Average Wholesale Prices ("AWPs") of the qui tam drugs at levels far higher than what the vast majority of its customers actually paid for these products when purchasing either directly from Bayer or through a wholesaler.

As a result, Bayer's customers received reimbursement from the state Medicaid programs at levels far higher than the customers' actual costs.  The United States further contends that Bayer represented to third party reporting services (First DataBank, Medi-Span) that it did not sell the qui tam drugs through wholesalers in order to avoid reporting accurate wholesale or distributor price information that would have affected the reimbursement levels of the qui tam drugs in all states, including but not limited to Texas, Florida, Alabama, Colorado, Maryland, and Rhode Island, that used Wholesale Acquisition Cost ("WAC") as the reimbursement benchmark during the period January 1, 1993 through August 31, 1999 and further contends that Bayer misled Texas Medicaid officials about the prices it charged to wholesale purchasers in order to avoid reporting accurate wholesale or distributor price information that would have affected the reimbursement levels in Texas.  Bayer's customers then submitted to the state Medicaid programs claims for reimbursement that were subsequently paid, based upon Bayer's excessive AWPs and WACs, to the financial detriment of these State Medicaid programs.

(ii)  The United States contends that Bayer knowingly misled state Medicaid programs in California, Oklahoma, Texas, and New York, that relied on actual acquisition cost information, during the period January 1, 1993 through August 31, 1999, about the prices

-3-

at which Bayer sold the _qui tam_ drugs to wholesalers, distributors, home health agencies, and other customers.  The United States contends that Bayer did so by falsely reporting its wholesale, distributor, and direct prices on surveys by Texas Medicaid and by providing invoices to home health companies that did not reflect the actual net cost of the _qui tam_ drugs to these customers.  The United States contends that Bayer knew that these home health companies used these false invoices to support their claims for excessive Medicaid reimbursement.

(iii)  The United States contends that Bayer knowingly misreported and underpaid its Medicaid Rebates for the _qui tam_ drugs, i.e., the amounts that it owed to the states under the federal Medicaid Rebate Program, 42 U.S.C. § 1396r-8.  Bayer was generally required on a quarterly basis to rebate to each state Medicaid program the difference between the Average Manufacturer Price ("AMP") and its "Best Price," as defined by 42 U.S.C. § 1396r-8(k)(1) and 1396r-8(c)(1)(C).  The United States alleges that Bayer misreported and underpaid its Medicaid rebates to all states by calculating its Best Prices for the _qui tam_ drugs without factoring in price concessions, such as "off-invoice" discounts, rebates, short-dated goods discounts, unrestricted educational grants, and free goods, which were not disclosed to the states or the federal government.

-4-

Bayer's conduct and transactions referenced herein Paragraph C(i)-(iii) are hereinafter referred to as the "Covered Conduct."

D.   The United States also contends that it has certain administrative claims against Bayer under the provisions for permissive exclusion from the Medicare, Medicaid and other federal health care programs, 42 U.S.C. § 1320a-7(b), and the provisions for civil monetary penalties, 42 U.S.C. § 1320a-7a, for the Covered Conduct.

E.   In a lawsuit filed pursuant to the *qui tam* provisions of the False Claims Act, *United States ex rel. Ven-A-Care of the Florida Keys, Inc. v. [Named Defendants]*, Civil Action No. 95-1354-Civ. (S.D. Fla.)("the Qui Tam Action"), the Relator alleged that Bayer engaged in much of the conduct described in Paragraph II(C) in connection with the Medicaid program ("the Medicaid Causes of Action") and further alleges in the complaint that Bayer violated the False Claims Act in connection with the Medicare program ("the Medicare Causes of Action").

F.   Bayer denies the contentions of the United States as set forth in Paragraphs II(A)-(D) above and the allegations of the Relator in the *Qui Tam* action and denies that it has any liability relating to these allegations.

-5-

G.   In order to avoid the delay, uncertainty, inconvenience and expense of protracted litigation of these claims, and as a result of a mutual desire to settle their disputes, the Parties reach a full and final settlement as set forth below.

H.   This Settlement Agreement does not constitute an admission by Bayer of any liability or wrongful conduct or evidence thereof nor a concession by the United States that its claims are not well founded.

III.   <u>TERMS AND CONDITIONS</u>

NOW, THEREFORE, in consideration of the mutual promises, covenants, and obligations set forth below, and for good and valuable consideration as stated herein, the Parties agree as follows:

1.   Bayer agrees to pay to the United States, and the individual States the total amount of $14,000,000 (the "Settlement Amount") as follows:

(a)   Bayer agrees to make payment to the United States of $7,828,000 by electronic funds transfer pursuant to written instructions to be provided by T. Reed Stephens. Bayer agrees to make this electronic funds transfer by no later than three business days following written notice to Bayer by the United States that this Agreement has been effectuated.

-6-

(b)   Bayer will make direct payment of the States' share of the Settlement Amount, which is $6,172,000 in the aggregate, in accordance with the separate agreements it shall enter into directly with the States.

2.   Subject to receipt of the payment described in Paragraph 1 above, the United States agrees to pay, within a reasonable period of time, $1,565,600 of the Settlement Amount to the Relator as its share of the proceeds pursuant to 31 U.S.C. § 3730(d).

3.   Subject to the exceptions in Paragraph 10 below, in consideration of the obligations of Bayer set forth in this Agreement, conditioned upon Bayer's payment in full of the Settlement Amount and the terms of Bayer's separate Settlement Agreement with the states, the United States (on behalf of itself, its officers, agents, agencies and departments) agrees to release Bayer, its parent corporation(s), subsidiaries and affiliates, predecessors, successors and assigns as well as its current and former directors, officers, employees, agents and shareholders from any civil or administrative monetary claim, action, suit or proceeding the United States has for the Covered Conduct under the False Claims Act, 31 U.S.C. §§ 3729-3733; the Civil Monetary Penalties Law, 42 U.S.C. § 1320a-7a; the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801-3812; the Medicaid Rebate statute, 42 U.S.C. § 1396r-8, or the common law

-7-

theories of payment by mistake, unjust enrichment, breach of contract and fraud.

4.    In consideration of the obligations of Bayer set forth in this Agreement, conditioned upon Bayer's payment in full of the Settlement Amount, the OIG-HHS agrees to release and refrain from instituting, directing or maintaining any administrative claim or any action seeking exclusion from the Medicaid or other Federal health care programs (as defined in 42 U.S.C. § 1320a-7b(f)) against Bayer, its parent corporation(s), subsidiaries and affiliates, predecessors, successors and assigns under 42 U.S.C. § 1320a-7a (Civil Monetary Penalties Law), or 42 U.S.C. § 1320a-7(b) (permissive exclusion), for the Covered Conduct, except as reserved in Paragraph 10, below, and as reserved in this Paragraph.  The OIG-HHS expressly reserves all rights to comply with any statutory obligations to exclude Bayer from the Medicare, Medicaid or other Federal health care program under 42 U.S.C. Section 1320a-7(a)(mandatory exclusion) based upon the Covered Conduct.  Nothing in this Paragraph precludes the OIG-HHS from taking action against entities or persons, or for conduct and practices, for which civil claims have been reserved in Paragraph 10, below.

5.  In consideration of the obligations of Bayer set forth in this Agreement, the Relator, on behalf of itself, its employees agents, successors and assigns, hereby agrees to dismiss the Qui Tam

-8-

action as to Bayer, pursuant to Paragraph 19 of this Agreement and covenants not to sue with respect to, and releases, acquits, waives, and forever discharges Bayer, its parent corporation(s), subsidiaries and affiliates, predecessors, successors and assigns as well as its current and former directors, officers, employees, agents and shareholders from any and all rights, claims, expenses, debts, liabilities, demands, obligations, costs, damages, injuries, actions and causes of action of every nature, whether known or unknown, suspected or unsuspected, in law or in equity, including those for attorney's fees, arising prior to the effective date of this Agreement.

6.   The Relator agrees that this settlement is fair, adequate, and reasonable under all circumstances, and will not challenge the Agreement pursuant to 31 U.S.C. § 3730(c)(2)(B), and expressly waives the opportunity for a hearing on any such objection, pursuant to 31 U.S.C. § 3730(c)(2)(B).

7.   Bayer fully and finally releases the United States, its agencies, employees, servants, and agents from any claims (including attorneys' fees, costs, and expenses of every kind and however denominated) which Bayer has asserted, could have asserted, or may assert in the future against the United States, its agencies,

-9-

employees, servants, and agents, related to the Covered Conduct and the United States' investigation and prosecution thereof.

8.   In consideration of the obligations of the Relator set forth in this Agreement, Bayer, on behalf of itself, its employees, agents, successors and assigns, fully and finally releases, acquits, waives, and forever discharges the Relator, its parent corporations, subsidiaries and affiliates, predecessors, successors and assigns as well as its current and former directors, officers, employees, agents and shareholders, from any and all rights, claims, expenses, debts, liabilities, demands, obligations, costs, damages, injuries, actions and causes of action of every nature, whether known or unknown, suspected or unsuspected, in law or equity, arising prior to the effective date of this Agreement.

9.   The Relator fully and finally releases the United States, its agencies, employees, servants, and agents from any claims which the Relator has asserted, could have asserted, or may assert in the future against the United States, its agencies, employees, servants, and agents, relating to the Covered Conduct or arising from the filing of the Qui Tam Action as to Bayer, including any claim for a share of the proceeds of this Agreement pursuant to 31 U.S.C. § 3730(d) and (c).

-10-

10.   Notwithstanding any term of this Agreement, specifically reserved and excluded from the scope and terms of this Agreement as to any entity or person (including Bayer) are any and all of the following:

(1)   Any civil, criminal or administrative claims arising under Title 26, U.S. Code (Internal Revenue Code);

(2)   Any criminal liability;

(3)   Except as explicitly stated in this Agreement, any administrative liability, including mandatory exclusion from Federal health care programs;

(4)   Any liability to the United States (or its agencies) for any conduct other than the Covered Conduct;

(5)   Any claims based upon such obligations as are created by this Agreement;

(6)   Any express or implied warranty claims or other claims for defective or deficient products or services, including quality of goods and services, provided by Bayer;

(7)   Any claims for personal injury or property damage or for other consequential damages arising from the Covered Conduct;

(8)   Any claims based on a failure to deliver items or services due;

-11-

(9)   Any civil or administrative claims against
individuals, including current or former directors, officers,
employees, agents or shareholders of defendant Bayer who receive
written notification that they are the target of a criminal
investigation (as defined in the United States Attorneys' Manual),
are criminally indicted or charged, or are convicted, or who enter
into a criminal plea agreement related to the Covered Conduct.

11.   Bayer has entered into a Corporate Integrity Agreement
with OIG-HHS, attached as Exhibit A which is incorporated into this
Agreement by reference.   Bayer will immediately upon execution of
this Agreement begin to implement its obligations under the Corporate
Integrity Agreement.

12.   Bayer waives and will not assert any defenses Bayer may
have to any criminal prosecution or administrative action relating to
the Covered Conduct, which defenses may be based in whole or in part
on a contention that, under the Double Jeopardy Clause in the Fifth
Amendment of the Constitution, or under the Excessive Fines Clause in
the Eighth Amendment of the Constitution, this Settlement bars a
remedy sought in such criminal prosecution or administrative action.
Bayer agrees that this settlement is not punitive in purpose or
effect.

13.   Nothing in Paragraph 12 or any other provision of this Agreement constitutes an agreement by the United States concerning the characterization of the Settlement Amount for purposes of the Internal Revenue Laws, Title 26 of the United States Code.

14.   Bayer agrees that all costs (as defined in the Federal Acquisition Regulations ("FAR") § 31.205-47 and in Titles XVIII and XIX of the Social Security Act, 42 U.S.C. §§ 1395-1395ddd (1997) and 1396-1396v(1997), and the regulations promulgated thereunder) incurred by or on behalf of Bayer, in connection with:  (1) the matters covered by this Agreement, (2) the Government's audit(s) and civil and any criminal investigation(s) of the matters covered by this Agreement, (3) Bayer's investigation, defense, and corrective actions undertaken in response to the Government's audit(s) and civil and any criminal investigation(s) in connection with the matters covered by this Agreement (including attorneys' fees) and including the obligations undertaken pursuant to the Corporate Integrity Agreement incorporated by reference, (4) the negotiation of this Agreement, and (5) the payment made pursuant to this Agreement, are unallowable costs on Government contracts and under the Medicare Program, Medicaid Program, TRICARE Program, Veterans Affairs Program (VA) and Federal Employee Health Benefits Program (FEHBP) (hereafter, "unallowable costs").  These unallowable costs will be separately

-13-

estimated and accounted for by Bayer, and Bayer will not charge such unallowable costs directly or indirectly to any contracts with the United States or any state Medicaid program, or seek payment for such unallowable costs through any cost report, cost statement, information statement or payment request submitted by Bayer or any of its subsidiaries to the Medicare, Medicaid, TRICARE, VA or FEHBP programs.

Bayer further agrees that within 60 days of the effective date of this Agreement it will identify to applicable Medicare and TRICARE fiscal intermediaries, carriers and/or contractors, and Medicaid, VA and FEHBP fiscal agents, any unallowable costs (as defined in this paragraph) included in payments previously sought from the United States, or any State Medicaid Program, including, but not limited to, payments sought in any cost reports, cost statements, information reports, or payment requests already submitted by Bayer or any of its subsidiaries, and will request, and agree, that such cost reports, cost statements, information reports or payment requests, even if already settled, be adjusted to account for the effect of the inclusion of the unallowable costs.  Bayer agrees that the United States will be entitled to recoup from Bayer any overpayment as a result of the inclusion of such unallowable costs on previously-submitted cost reports, information reports, cost statements or

-14-

requests for payment. Any payments due after the adjustments have been made shall be paid to the United States pursuant to the direction of the Department of Justice, and/or the affected agencies. The United States reserves its rights to disagree with any calculations submitted by Bayer or any of its subsidiaries on the effect of inclusion of unallowable costs (as defined in this paragraph) on Bayer or any of its subsidiaries' cost reports, cost statements or information reports. Nothing in this Agreement shall constitute a waiver of the rights of the United States to examine or reexamine the unallowable costs described in this Paragraph.

15. Bayer covenants to cooperate fully and truthfully with the United States' investigation of individuals and entities not specifically released in this Agreement, for the Covered Conduct and conduct by any other person or entity similar to the Covered Conduct. More specifically, upon reasonable notice, Bayer will make reasonable efforts to facilitate access to, and encourage the cooperation of, its directors, officers, and employees for interviews and testimony, consistent with the rights and privileges of such individuals, and will furnish to the United States, upon reasonable request, all non-privileged documents and records in its possession, custody or control relating to the Covered Conduct.

-15-

16.   The Settlement Amount that Bayer must pay pursuant to this Agreement by electronic wire transfer pursuant to Paragraph III(1) above, will not be decreased as a result of the denial of claims for payment now being withheld from payment by any Medicare carrier or intermediary or any State payor, related to the Covered Conduct; and Bayer agrees not to resubmit to any Medicare carrier or intermediary or any State payer any previously denied claims related to the Covered Conduct, and agrees not to appeal any such denials of claims.

17.    Bayer agrees that it will not seek payment for any of the health care billings covered by this Agreement from any health care beneficiaries or their parents or sponsors.  Bayer waives any causes of action against these beneficiaries or their parents or sponsors based upon the claims for payment covered by this Agreement.

18.   This Agreement is intended to be for the benefit of the Parties only, and, by this instrument, the Parties do not release any claims against any other person or entity, including any individual or entity that purchased the Qui Tam Drugs from Bayer, except as stated herein.

19.   Concurrent with the execution of this Settlement Agreement and payment of the Settlement Amount by Bayer to the United States and to the States, the Parties shall execute a Joint

-16-

Stipulation of Dismissal with Prejudice to all Parties, with respect
to the Medicaid cause of action, and without prejudice to the United
States only with respect to the Medicare causes of action identified
in Counts I through VII of the Third Amended Complaint.  The Joint
Stipulation of Dismissal will request that the Court, _inter alia_,
enter an order dismissing Bayer from the case styled United States ex
rel. Ven-A-Care of the Florida Keys, Inc. v. [Named Defendants], Case
No. 95-1354-Civ. (S.D.Fl.), concurrent with the United States' filing
of its Notice of Election to Intervene in this _qui tam_ matter and
Motion for an Order unsealing the action filed against Bayer.

20.  The Relator agrees to dismiss with prejudice as to Bayer
any lawsuits relating to the Covered Conduct that it has filed in any
state court, and, as necessary to seek approval of any state
authorities to do so.

21.  This Agreement is governed by the laws of the United
States.  The Parties agree that the exclusive jurisdiction and venue
for any dispute arising between and among the Parties under this
Agreement will be the United States District Court for the Southern
District of Florida except that any disputes arising under the
Corporate Integrity Agreement incorporated herein by reference shall
be resolved exclusively through the breach and dispute resolution
provisions included in that agreement.  A breach by Bayer of the

-17-

Corporate Integrity Agreement does not constitute a breach of this Settlement Agreement.

22.   This Agreement and the Corporate Integrity Agreement, which is incorporated herein by reference, constitute the complete agreement between the Parties.  This Agreement may not be amended except by written consent of the Parties, except that only Bayer and OIG-HHS must agree in writing to modification of the Corporate Integrity Agreement.

23.   Each party to this Agreement will bear its own legal and other costs incurred in connection with this matter, including the preparation and performance of this Agreement.

24.   Bayer and the Relator represent that this Agreement is freely and voluntarily entered into without any degree of duress or compulsion whatsoever.

25.   The undersigned individuals signing this Agreement on behalf of Bayer represent and warrant that they are authorized by Bayer to execute this Agreement.  The undersigned individuals signing this Agreement on behalf of the Relator represent and warrant that they are authorized by the Relator to execute this Agreement.  The undersigned United States signatories represent that they are signing this Agreement in their official capacities and that they are authorized to execute this Agreement.

-18-

26. This Agreement may be executed in counterparts, each of which constitutes an original and all of which constitute one and the same agreement.

27. This Agreement is effective on the date of signature of the last signatory to the Agreement and payment of the Settlement Amount to the United States, as specified herein, and to the States' escrow fund as specified by the state settlement agreements.

### THE UNITED STATES OF AMERICA

DATED:_____          BY:_____

                              T. Reed Stephens
                              Trial Attorney
                              Commercial Litigation Branch
                              Civil Division
                              U.S. Department of Justice

DATED:_____          BY:_____
                              Mark Lavine
                              Assistant United States Attorney
                              Southern District of Florida

DATED:_____                BY:_____
                                          D. McCarty Thornton
                                          Chief Counsel to the
                                          Inspector General
                                          Office of Counsel to the
                                          Inspector General
                                          Office of Inspector General
                                          United States Department of
                                          Health and Human Services


                          Bayer - DEFENDANT


DATED:_____

                                      BY:_____

                                          Paul Berry, Esq.
                                          Vice President and Assistant
                                          General Counsel for Bayer



DATED:_____

                                      BY:_____

                                          Paul E. Kalb, Esq.
                                          I. Scott Bass, Esq.
                                          Sidley & Austin
                                          Counsel for Bayer




                              -20-

<u>Ven-A-Care of the Florida Keys, Inc. - Relator</u>

DATED: _01/23/01_

BY: _____
Atlee Wampler, Esq.
James Breen, Esq.
Counsel for Relator

DATED: _01/23/01_

BY: _____
On Behalf of Relator

DATED: _9/23/01_

BY: _____
On Behalf of Relator

-21-

*[Please note: paragraph numbering errors are from the original]*

105.   At all times at issue in this case, all of the States' Medicaid programs used the drug price and cost information represented by the DEFENDANTS to determine reimbursement amounts.

106.   CMS has approved state plans whose methodology formulae for arriving at a pharmacy's estimated acquisition cost as required by 42 CFR §447.331 includes:

      a)   discounting a percentage off of the AWP prices as computed by or collected by and published by First DataBank ;

      b)   adding a percentage to the WAC prices as computed by or collected by and published by First DataBank ; and,

      c)   requiring the drug companies, including the DEFENDANTS, to certify their prices directly in writing to the Texas Medicaid Vendor Drug Program.

110. *[SIC]*   During the time period covered by this Complaint, the CMS-approved State plans for Medicaid reimbursement based on WAC have included, without limitation:

| | Drug | Dispensing Fee |
|---|---|---|
| Alabama | WAC+9.2% | $5.40 |
| Colorado | lesser of AWP-10% or WAC+18% | $4.08 |
| Florida | WAC+7% | $4.23 |
| Maryland | WAC+10% | $4.21 |
| Massachusetts | WAC+10% | $3.00 |
| Ohio | WAC+11% | $3.70 |
| Rhode Island | WAC+5% | $2.85-$3.40 |
| Illinois | WAC+8% (brand) | $3.30- $15.45 |
| | WAC+12% (generic) | |

111.   The Texas Medicaid Program has gone to exceptional lengths to verify that drug manufacturers, including the DEFENDANTS, provide truthful price and cost information for reimbursement purposes. The Texas Medicaid authorities, acting pursuant to 25 Texas Administrative Code §35.801, required the DEFENDANTS to certify, in writing, the accuracy of their price and cost representations as a condition to their drugs being covered for reimbursement.

112.   The State of Texas pays reimbursement for drugs covered by its Vendor Drug Program at the lesser of the provider's usual and customary charge or Estimated Acquisition Cost ("EAC"). In Texas' Pharmacy Provider Handbook, EAC is defined as either the Wholesale Estimated Acquisition Cost ("WEAC") or the Direct Estimated Acquisition Cost ("DEAC"). WEAC is the estimated price paid by Providers purchasing a drug from a wholesaler. DEAC is the estimated price paid by a Provider purchasing the drug directly from the drug's manufacturer.

113.   The State of Texas has calculated the WEAC reimbursement amounts by calculating: 1) the drug manufacturer's reported "price to wholesaler and/or distributor" plus 12% and 2)



EXHIBIT
Hamilton 6
1-29-13   MB
PENGAD 800-631-6989

GH-DFP1-000311

reported AWP minus a percentage, which percentage has varied throughout the relevant period of the Complaint, but has never exceeded 18%, and then selecting the lesser of the two resulting amounts as the WEAC for payment of claims. DEAC reimbursement reflects the drug manufacturers' Direct Price as reported directly by the drug manufacturer. The Texas Medicaid Program has also often considered the amounts reported by Defendants through First DataBank as a check or point of comparison to determine if Defendants' representations should be reviewed for correctness.

114.    The State of Texas required the DEFENDANTS to complete a specific form regarding the prices of their drugs. Immediately before the required signature by the DEFENDANTS' representatives is the following language:

> I hereby certify that the information submitted is correct to the best of my knowledge . . . I also agree to inform the Texas Department of Health of any changes in . . . price . . . within fifteen (15) days of such change.

Attached hereto as Exhibit "1" is a true and correct copy of a certification used by the Texas Medicaid Vendor Drug Program during the relevant time period of this Complaint.

115.    Pharmacies are reimbursed for prescription drugs by the States' Medicaid Programs in accordance with:

1.    the State's CMS approved plan (i.e. Massachusetts' WAC+ 10%);
2.    the pharmacies' usual and customary charges to the general public; or,
3.    the Federal Upper Limit ("FUL"), (which is inapplicable to all but a few of the specified drugs at issue in this Complaint), plus a reasonable professional or dispensing fee.

GH-DFP1-000312

| | |
|---|---|
| **From:** | Paul Strasma |
| **To:** | Jeff Beck; Jill Kadam |
| **CC:** | Pete O'Malley; Tracy Holman; Julie Patterson |
| **BCC:** | |
| **Sent Date:** | 2004-07-26 20:13:01:000 |
| **Received Date:** | 2004-07-26 20:55:13:000 |
| **Subject:** | Re: Curascript deal sheet |
| **Attachments:** | Deal sheet Curascript.doc |

Attached is a copy of the CuraScript deal sheet with the McKinsey recommended terms to route through the formal process. I've asked Julie Patterson to schedule time for Pete, Jill, Jeff & myself to meet with Greg Hamilton -- it might be next week before schedules are clear though.



Deal sheet Curascript.doc

---

### Jeff Beck

**Jeff Beck**

07/22/2004
10:45 AM

To: Tracy Holman/CORP/NA/Baxter@Baxter
cc: Paul Strasma/BioSci/NA/Baxter@Baxter, Pete O'Malley/BioSci/NA/Baxter@Baxter
Subject: Curascript deal sheet

An attachment named DEAL SHEET CURASCRIPT.DOC was removed.

Per Request. Also Paul will you please have someone check available schedules of Pete and Jill so we can schedule Greg for a meeting in Deerfield.

Jeff Beck
Area Business Director
195 N Harbor Dr.
#802
Chicago, IL 60601
800-777-5513x7710
jeff_beck@baxter.com
Visit our website at http://www.advate.com



EXHIBIT
Hamilton 7
1-29-13

HIGHLY CONFIDENTIAL                    BAX MDL E 3222504

Originator:                                          *CONFIDENTIAL DOCUMENT*
Cc:                                                  *FOR INTERNAL USE ONLY*

Contract Owner:                                      Start Date:

### CONFIDENTIAL CONTRACT PROPOSAL[a]

| CUSTOMER INFORMATION | |
|---|---|
| **CUSTOMER'S LEGAL NAME:** | **Curascript** |
| **TYPE OF COMPANY:** | **Specialty Pharmacy owned By Express Scripts** |
| **CUSTOMER CONTACT PERSON:** | **Name:Greg Hamilton**<br>**Phone Number:888-773-7376**<br>**Fax Number:**<br>**E-Mail Address: ghamilton@express-scripts.com** |
| **CUSTOMER ADDRESS:** | **6272 Lee Vista Blvd**<br>**Orlando FL  32822** |

| CONTRACT INFORMATION | |
|---|---|
| **TARGET COMPLETION DATE:** | **July 31, 2004** |
| **EFFECTIVE DATE:** | **August 1, 2004** |
| **TERM OF AGREEMENT:** | **1 year** |
| **TYPE OF CONTRACT:** | **VCC** |
| **ADMINISTRATION FEE PERCENTAGE:** | |
| **AUTHORIZED DISTRIBUTOR(S):** | |
| | |

| CONTRACT PRICING | | | | |
|---|---|---|---|---|
| PRODUCTS: | PROJECTED QUANTITY | COMMITMENT (YES/NO) | PRICING | PROJECTED VALUE |
| **Gammagard S/D, IGIV:** | | | $/gram | $ |
| **Iveegam EN:** | | | $/gram | $ |
| **Buminate, Albumin (Human):** | | | $/eu | $ |
| **Recombinate rAHF:** | 2 million | | $/unit .89 | $1,780,000 |
| **Advate rAHF-PFM** | 2 million | | $/unit .94 | $1,880,000 |
| **Hemofil M rAHF:** | | | $/unit | $ |
| **Feiba VH AICC:** | | | $/unit | $ |
| **Bebulin VH Factor IX Complex:** | | | $/unit | $ |
| **Proplex T Factor IX Complex:** | | | $/unit | $ |
| **Aralast** | | | $/mg | $ |
| **Tisseel VH Fibrin Sealant:** | | | $/mL | $ |
| **FloSeal Matrix Hemostatic Sealant:** | | | $/cs | $ |
| **CoSeal Surgical Sealant** | | | $/mL | $ |
| **VALUE OF CONTRACT:** | | | | **$3,660,000** |

1 of 2

HIGHLY CONFIDENTIAL

*Originator:*
*Cc:*

*CONFIDENTIAL DOCUMENT*
*FOR INTERNAL USE ONLY*

*Contract Owner:*                                         *Start Date:*

| Special Deal Terms |
|---|
| • "Most favored nation clause" to ensure equivalent or preferred treatment of Baxter brand therapies vis-à-vis competitors. <br> • Enhanced sales reporting to include all deidentified patient prescriptions (prescribing MD name, zip code, patient age, dosing, therapy regimen, therapy brand, insurance type). |

**APPROVED SALES OR MARKETING:**          **APPROVED FINANCE:**

BY: _____          BY: _____
TITLE: _____          TITLE: _____
DATE: _____          DATE: _____

**APPROVED LEGAL:**          **OPERATIONS:**

BY: _____          BY: _____
TITLE: _____          TITLE: _____
DATE: _____          DATE: _____

Please note any subsequent deal changes, with appropriate approval, on a separate sheet and attach.

- This is not an offer. The above information is for internal, informational use only and is not intended to bind any party.

|  | Date In | Hold Time | Date Out | Total (days) |
|---|---|---|---|---|
| Finance |  |  |  |  |
| Legal |  |  |  |  |
| Operations |  |  |  |  |

**2 of 2**

27411.v16YHTRPT/BIOSCIENCE NFW006-01 2003

HIGHLY CONFIDENTIAL                                         BAX MDL E 3222506

| From: | Julie Perry |
|---|---|
| To: | Larry Guiheen; Jim Hauert; Jill Kadam; Erin Landy; Blaine Forshage; Meredith Levenson |
| CC: | Pete O'Malley; Nicole Luikaart; Jeff Beck |
| BCC: | |
| Sent Date: | 2003-09-29 19:33:05:000 |
| Received Date: | 2003-09-29 21:16:15:000 |
| Subject: | |
| Attachments: | |

All,

following is an overview of the meeting that occurred between Express Scripts, Inc. (ESI) and Baxter this week. In short, the meeting was very resourceful and we feel we have a better understanding of their business model, both current and future goals. This organization *is* planning to move forward with their objectives and will continue to build the number of lives into their network. It will be our challenge to determine the best way to work within their walls, coupled with our own business model(s) so that the end result is a win-win for everyone.

Those in attendance: Pete O'Malley, Nicole Luikaart, Jeff Beck and myself, from BioScience and Greg Hamilton, Senior Director of Business Development from ESI.

- ESI operates as a Pharmacy Benefit Manager/Mail order house,, along with having a specialty pharmacy division
- ESI's main customer are the healthplans (managed care organizations), government programs (i.e. Medicaid programs) and unions; they sell their 'services of the PBM' to this customer base
- They currently are responsible for 47Million lives which comprises of 15,000 plans, which is made up of the above customer list
- They are currently running approximately 290 hemophilia patients through their PBM model, with the potential to manage roughly 6,000 more, based on the number of lives they manage: they currently process claims for this population on the medical side
- The healthplans/state plans are currently coming to them for help to manage their pharmacy component, as well as, ESI is marketing their program to this customer base
- In January they developed a new model; an SPBM, specialty pharmacy benefit manager, which operates in 3 venues:
  1. Retail Network: whereas 55,000 pharmacies are currently in their network (Walgreens, Accredo, etc..); a standard rate schedule is offered at
          this level, i.e. AWP -15%, roughly
  2. Specialty Network: currently 30 pharmacies (Caremark, Option Care, Priority, etc.); a more aggressive schedule is the option at this level;
          AWP-28%; the customer needs to be at this level to take advantage of the claims adjudication
          3. Mail House (ESSC: Express Scripts Specialty Care): this is their own pill/mail order pharmacy; a more aggressive discount than #1 and #2 above,
          the best we can determine, it is roughly AWP-30%+; this is where they are running the hemophilia business through

HIGHLY CONFIDENTIAL



EXHIBIT
Hamilton 8
1-29-13 MB
PENGAD 800-631-6989

BAX MDL E 3240462

- They are using hemophilia as the 'lost leader', intending to make very little profit in this area, but in the meantime, save their customers a considerable dollar amount; they "picked" hemophilia because of the current high margin
- ESI competes with the Walgreens (pill side) and the Accredo's (Factor)
- They are going to make ALL factor products available on their formulary; they are, however, going to use a 'prior authorization' model in order to speak with healthplans and 'show them the pricing structure available' so they can choose the most economic option; if a physician pushes back on the plan and stands by a branded script, then ESI will follow through; the idea is that this "prior authorization" will give opportunity to drive the "lower priced" products that ESI has available to them
- They are currently working with Arizona state Medicaid with this model and planning to go after 5 other states (MD, MO, OK, CA and one other that did not come to mind)
- They currently have pricing for Kogenate FS @ .85, Recombinate @ .92 and awaiting pricing for Helixate and Advate
- *They are also looking to go after IGIV as one of their next targets*
- We did present Advate and the inherent advantages to this product and the community; they appear to be in support of Advate, although they indicated the healthplans may back at paying a higher dollar amount for a 'perceived safety'; *suggested that we provide cost analysis data that they can use with their healthplans to assist with positioning Advate*
- They are expecting pricing from us on Monday for Advate (Jill and Mike are currently working on this)
- They appear to understand our position in the marketplace; they do not have any empathy for the Home Care customer segment
- They would prefer to get more aggressive pricing from Baxter because they want to be able to pass that along to the healthplans; we did indicate that we are not going to 'lower our prices', however, we will offer them 'pricing' to include in their model
- They want to be one of the largest providers of specialty pharmacy in the next 12 to 18 months and this model will more than likely get them there
- They understand that the hemophilia community is going to push back on being directed to 'other products', but appear to be willing to take this heat; I believe they really want Baxter to come on board with their program, realizing that we have such a large market share in the community
- The Baxter core team will be developing further strategies to address this situation

In summary, ESI is moving ahead with this model, with or without us, however they want to work with us and include our products in their model, their preference is just that we offer a more aggressive price. We are planning to continue driving Advate, as the brand of choice and working with the community to do so, blocking the idea of changing patients over to competitive products.

Please feel free to respond with questions. More to follow.

Regards,

Julie S. Perry
Baxter BioScience
925.947.6090 phone
925.947.6093 fax
julie_perry@baxter.com

HIGHLY CONFIDENTIAL

BAX MDL E 3240463

| | FACTOR PRICING (sample) | | 11/10/05 | | | | | |
|---|---|---|---|---|---|---|---|---|
| **PRODUCT** | AWP (a/o 11/15/05) | Acquisition Price | Best Discount - % off AWP | Net Price per Unit | **Gross Margin** | | | |
| Advate | $1.75 | $0.96 | 35.00% | $1.1375 | $0.1775 | | | |
| Alphanate | $1.25 | $0.49 | 42.00% | $0.725 | $0.235 | | | |
| Alphanine SD | $1.48 | $0.65 | 42.00% | $0.858 | $0.208 | | | |
| Autoplex T | product is off the market | | | | | product is off the market | | |
| Bebulin | $0.900 | $0.62 | 27.00% | $0.657 | $0.037 | new AWP effective 01.15.05 | | |
| Beneflx | $1.04 | $0.83 | 18.00% | $0.863 | $0.023 | | | |
| Felba VH | $1.9125 | $1.11 | 20.00% | $1.53 | $0.42 | | | |
| Helixate FS | $1.63 | $0.85 | 38.00% | $1.01 | $0.16 | | | |
| Hemofil M | $1.225 | $0.63 | 35.00% | $0.796 | $0.166 | | | |
| Humate P | $1.25 | $0.74 | 32.00% | $0.85 | $0.11 | | | |
| Hyate-C | product is off the market | | | . | | product is off the market | | |
| Koate DVI | $0.96 | $0.53 | 37.00% | $0.605 | $0.08 | | | |
| Kogenate FS | $1.75 | $0.88 | 38.00% | $1.085 | $0.205 | | | |
| Monarc M | $1.02 | $0.48 | 40.00% | $0.61 | $0.13 | | | |
| Monoclate P | $1.05 | $0.53 | 37.00% | $0.66 | $0.13 | | | |
| Mononine | $1.25 | $0.77 | 27.00% | $0.91 | $0.14 | | | |
| Novoseven | $1.54 | $0.89 | 37.00% | $0.97 | $0.08 | new AWP effective 06.02.05 | | |
| Profilnine SD | $0.75 | $0.32 | 30.00% | $0.525 | $0.205 | | | |
| Proplex T | $0.6000 | $0.42 | 25.00% | $0.450 | $0.03 | new AWP effective 01.15.05 | | |
| Recombinate | $1.625 | $0.89 | 35.00% | $1.056 | $0.166 | | | |
| ReFacto | $1.36 | $0.87 | 30.00% | $0.95 | $0.08 | | | |

Based on AWP for each drug as reported by First Data Bank, as of November 15, 2005, and subject to adjustment concurrent with changes which may occur in AWP and/or acquisition pricing policies.



EXHIBIT
Hamilton 9
1-29-13  MB
PENGAD 800-631-6989

GH-DFP1-000294

# MEMORANDUM

**TO:**       **HAMILTON v BAYER NOTES**

**FROM:**    **MAK**

**SUBJECT:** **DATA FROM RBC CAPITAL MARKETS, STEVE HAMILL"A Changing Paradigm in Hemophilia" January 24. 2003**

**DATE:**    **September 1, 2007**

---

17    "...when Bayer first received approval for Kogenate FS, it pushed through a significant price increase, which many in the hemophilia community we spoke with considered 'gouging'.  The AWP for Kogenate FS was established at roughly $1.41, up from $1.18 for its first-generation Kogenate...."

18    Bayer also tried and failed to cut out the home pharmacies.

"In order to make amends with the home pharmacies, Bayer successfully pushed through an AWP increase of nearly 80% to $2.03 from $1.41 near the end of third quarter 2002.  At the same time, Bayer also lowered its acquisition price to $1.03 from roughly $1.10, increasing the spread to the pharmacies considerably.....We would note that our checks suggest reimbursement levels for Kogenate FS are far below this AWP, perhaps closer to $1.70.  Thus, while we believe Bayer is clearly taking steps to improve its relations with the home pharmacies, the actual margin benefit on Kogenate FS for the home pharmacies may be well below the level implied by the new AWP."



EXHIBIT
Hamilton 10
1-29-13  MB
PENGAD 800-631-6989