1           IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MASSACHUSETTS
2

3    IN RE:                          )
                                     )  CA No. 01-12257-PBS
4    PHARMACEUTICAL INDUSTRY AVERAGE )  CA No. 08-11200-PBS
     WHOLESALE PRICE LITIGATION      )  CA No. 10-11186-PBS
5                                    )  Pages 1 - 47

6

7

8                       **EVIDENTIARY HEARING**

9
              BEFORE THE HONORABLE PATTI B. SARIS
10              UNITED STATES CHIEF DISTRICT JUDGE

11

12

13

14
                           United States District Court
15                         1 Courthouse Way, Courtroom 19
                           Boston, Massachusetts  02210
16                         April 16, 2013, 9:15 a.m.

17

18

19

20

21

22                       LEE A. MARZILLI
                      OFFICIAL COURT REPORTER
23                 United States District Court
                   1 Courthouse Way, Room 7200
24                      Boston, MA  02210
                        (617)345-6787
25

1   A P P E A R A N C E S:

2        PETER E. GELHAAR, ESQ., Donnelly, Conroy & Gelhaar, LLP,
    One Beacon Street, 33rd Floor, Boston, Massachusetts, 02108,
3   for Baxter International, Inc.

4        DAVID J. CHIZEWER, ESQ. and BEATA BREWSTER, ESQ.,
    Goldberg Kohn, Ltd., 55 East Monroe Street, Suite 3300,
5   Chicago, Illinois, 60603, for Sun and Hamilton.

6        FREDERICK M. MORGAN, JR., ESQ., Morgan Verkamp, LLC,
    700 Walnut Street, Suite 400, Cincinnati, Ohio, 45202,
7   for Sun and Hamilton.

8        JAMES J. BREEN, ESQ., The Breen Law Firm,
    3562 Old Milton Parkway, Alpharetta, Georgia, 30005,
9   for Ven-A-Care of the Florida Keys.

10        C. JARRETT ANDERSON, ESQ., Anderson, LLC,
    1409 Wathen Avenue, Austin, Texas, 78703, for Ven-A-Care
11   of the Florida Keys.

12        J. ANDREW JACKSON, ESQ. and MERLE M. DeLANCY, JR., ESQ.,
    Dickstein Shapiro, LLP, 1825 Eye Street, N.W., Washington,
13   D.C., 20006-5403, for Baxter International, Inc.

14   ALSO PRESENT:  Dr. John Lockwood, Mark Jones, Luis Cobo

15

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

1

2    THE CLERK:  Court calls Civil Action 01-12257, Sun v.

3    Baxter Healthcare.  Could counsel please identify themselves.

4    MR. JACKSON:  Andy Jackson for Baxter, your Honor.

5    MR. DeLANCEY:  Merle DeLancey for Baxter.

6    MR. GELHAAR:  Peter Gelhaar for Baxter.

7    MR. CHIZEWER:  Good morning, your Honor.  Dave

8    Chizewer on behalf of the relators, Sun/Hamilton.  With me is

9    my colleague, Beata Brewster.  She doesn't have a formal

10    appearance in the case, but she's been helping out.

11    MR. MORGAN:  Frederick Morgan for Ms. Sun and

12    Mr. Hamilton, your Honor.

13    MR. TURETZKY:  Matthew Turetzky for Baxter.

14    MR. ANDERSON:  Jarrett Anderson for relator,

15    Ven-A-Care.

16    MR. BREEN:  Jim Breen for relator, Ven-A-Care of the

17    Florida Keys.  With me, your Honor, is Ven-A-Care's

18    representative today, Dr. Lockwood, John Lockwood to my right.

19    He's also provided a declaration in this matter.  And also

20    present is Ven-A-Care's current president, Mark Jones, who also

21    provided a declaration in this matter.  Also present is

22    Ven-A-Care's initial president and founder, a pharmacist, Luis

23    Cobo, in the event that the Court or anybody has any questions

24    regarding some of the earlier days of this matter.

25    THE COURT:  All right, so who's the first witness?

1          THE CLERK:  You can all be seated.

2          THE COURT:  Thank you.

3          MR. CHIZEWER:  Your Honor, on behalf of Sun/Hamilton,

4     at the telephonic status hearing that we had in March, your

5     Honor, your Honor provided us, all parties, the opportunities

6     to submit briefs in advance of this hearing --

7          THE COURT:  Yes.

8          MR. CHIZEWER:  -- which we've obviously done, and I

9     think that had the effect of solidifying the issues.  I don't

10    believe that there is any contested issues of fact.  We've

11    reviewed the declarations of Mr. Lockwood and Mr. Bradley.

12    We've tendered a small amount of testimony from the 30(b)(6)

13    deposition.  Mr. Bradley was the deponent in that deposition.

14         THE COURT:  So is that this book?

15         MR. CHIZEWER:  That is --

16         THE COURT:  It's a big -- in other words, when you say

17    you're tendering, you mean by quoting from it?

18         MR. CHIZEWER:  Correct, your Honor.

19         THE COURT:  And that's in the appendix?

20         MR. CHIZEWER:  That is in the appendix.

21         THE COURT:  Everything.  So you don't want to put on a

22    witness?

23         MR. CHIZEWER:  Mr. Hamilton is here if your Honor had

24    specific questions, but we're not relying on any testimony from

25    Mr. Hamilton in our first-to-file position.

1          THE COURT:  All right, well, if you don't want to put

2     him on, then it's not there.  So his credibility, in your view,

3     I don't have to decide his credibility?

4          MR. CHIZEWER:  That's correct.

5          THE COURT:  Unlike what was said at the hearings.

6          MR. CHIZEWER:  Well, the other parties said they

7     wanted to contest Mr. Hamilton's credibility.  I didn't know

8     exactly what that meant.  I didn't want to prevent them the

9     opportunity from putting him on the stand if that's what they

10    felt they wanted to do, which is why Mr. Hamilton is here; but

11    it was our position all along that we thought this could be

12    resolved on --

13         THE COURT:  Well, are you willing to accept his

14    credibility?  You were the ones who challenged it on the

15    conference call.

16         MR. JACKSON:  Your Honor, there is no testimony by

17    Mr. Hamilton.  If he were to take the stand and testify, I

18    guess we would cross-examine.

19         THE COURT:  I thought that there was an offering of

20    his deposition testimony.  You didn't offer anything.

21         MR. CHIZEWER:  We did.  The opposing parties did quote

22    a little bit from his deposition testimony.  And he's a party

23    to the case, so it's admissible, and it is what it is.  It's a

24    small amount.

25         THE COURT:  Let me put it this way:  I'm feeling a

1    little frustrated here because when we were on the conference

2    call when people didn't fly in, there was a challenge to

3    credibility.  Are you challenging their witness's credibility?

4           MR. CHIZEWER:  No, your Honor.

5           THE COURT:  Are you -- who was it?  I thought it was

6    defendants who made a big pitch that they weren't willing to

7    accept the credibility of the evidence that I thought it was

8    Mr. Hamilton was putting on.

9           MR. JACKSON:  But at the time, your Honor, he hadn't

10   tendered any evidence, and he still hasn't.  You ordered us to

11   submit direct testimony by, I guess, a week or so ago.

12          THE COURT:  Yes.

13          MR. JACKSON:  They did not, so Mr. Hamilton's

14   testimony isn't before you.  We followed the Court's direction.

15   Mr. Bradley's direct testimony has been submitted.  Ven-A-Care

16   has submitted direct testimony.  But if the plaintiff is not

17   going to use Mr. Hamilton's testimony --

18          THE COURT:  Then you are not challenging anything in

19   the deposition cites that were presented?

20          MR. JACKSON:  I am not, your Honor.

21          THE COURT:  Because you are the ones who primarily

22   presented them.  Or both sides did, right?

23          MR. JACKSON:  Very little.  We presented mostly the

24   testimony, the direct testimony of Mike Bradley, who is a

25   Baxter employee.

1          THE COURT:  Are you challenging his credibility?  You

2     said "no."

3          MR. CHIZEWER:  No.

4          THE COURT:  All right.

5          MR. CHIZEWER:  Only to the extent that we submitted

6     some portions of --

7          THE COURT:  So I am going to, as Mr. Breen -- you're

8     the one I know, so I don't want to insult anyone else.  Are you

9     willing to accept the credibility of all the testimony that

10    we've seen submitted?

11         MR. BREEN:  Your Honor, again, as my brother counsel

12    have said, when we had the telephone conference, it was our

13    understanding that we were directed to present direct testimony

14    by declaration.  Those parties interested in doing so have done

15    that.  There is no testimony from Mr. Hamilton that's being

16    proffered that we would cross-examine.  We did take his

17    deposition, and we had a full opportunity to confront him in

18    that deposition.  Mr. Anderson did that.  So I don't anticipate

19    the need to --

20         THE COURT:  So nobody wants to put on a witness

21    basically?

22         MR. BREEN:  Our witnesses are here, your Honor.  We're

23    not allowed to put our witnesses on.  We've done it by direct

24    declarations.

25         THE COURT:  That's what I'm saying:  No one wants to

1    challenge anybody's testimony.  I'll take all testimony as

2    true.

3            MR. JACKSON:  That's correct, your Honor.

4            THE COURT:  Okay.

5            MR. BREEN:  Assuming Sun/Hamilton rests, that's

6    correct, your Honor.

7            THE COURT:  Well, there's no resting.  They haven't

8    submitted anything.

9            MR. BREEN:  But, your Honor, it is our position that

10   they've got the burden.  They're moving pursuant to Rule 60.

11           THE COURT:  They do have the burden to establish

12   jurisdiction, but they haven't submitted anything, so it's

13   whatever they cited from the deposition, as long as --

14           MR. BREEN:  That's my understanding, Judge.

15           THE COURT:  Okay, so then let's just argue the case.

16   All right, no testimony.  That's where everybody is?  Everybody

17   can -- I don't know why we held that conference call.  I don't

18   know why, once you decided not to submit any testimony,

19   everybody else brought in theirs.  But you're here.  Let's go.

20   And if some issue comes up, we have all the witnesses here to

21   put them on the stand and figure it out.

22           MR. CHIZEWER:  So, your Honor, our first-to-file

23   position has been tendered to your Honor legally in the briefs.

24   I don't want to repeat what's in the briefs.  I'm sure your

25   Honor is familiar with them.  I do want to raise about three

1   essential issues.  The first goes to this issue about the

2   burden of proof.  We certainly are aware that in a typical

3   case, at the beginning of a case, it's the plaintiff's burden

4   to establish jurisdiction.  We think there is no jurisdictional

5   issue on the face of our complaint, and I think it's important

6   to consider the matter in which the jurisdictional issue has

7   arisen here.

8           Baxter filed a motion for summary judgment in the

9   Sun/Hamilton matter asking that this Court award it summary

10  judgment, not on a jurisdictional issue but rather on the issue

11  that, their position that the claims had been previously

12  settled.

13          THE COURT:  So you don't think you have to prove that

14  you were the first to file?

15          MR. CHIZEWER:  We believe that at this point, to the

16  extent -- certainly to the extent -- we think that it's been

17  waived because Baxter actually asked for and received a

18  judgment essentially on the merits, in the sense that your

19  Honor ruled that the case was settled.  It was imperative on

20  them and incumbent on them, if they had a jurisdictional issue,

21  to raise it and not ask that they actually be awarded summary

22  judgment.  They were awarded summary judgment, and then your

23  Honor ruled that because of that summary judgment and the

24  settlement, that the settlement was an alternate remedy, and

25  that Sun/Hamilton were either entitled to a portion of the

1    proceeds or a fairness hearing.  Baxter didn't like that

2    result, and so now they're essentially trying to contest the

3    jurisdiction of the judgment that they asked the Court to

4    enter.

5            THE COURT:  So say I were to hold a fairness hearing

6    and you were second to file, so why would you get a penny?

7            MR. CHIZEWER:  Well, the fairness hearing is not over

8    the issue of who's first to file.

9            THE COURT:  Why?

10           MR. CHIZEWER:  The fairness hearing would be over the

11   issue of whether the settlement was adequate to cover the

12   claims, the Sun/Hamilton claims that were settled.

13           THE COURT:  Even if you had -- but wouldn't -- this is

14   a procedural pretzel.  I said that, and I stick with that.  But

15   if in fact you were clearly the second to file, why in a

16   fairness hearing would you be entitled to a penny?  Why, even

17   if it's not a jurisdictional issue, isn't it a dispositive

18   issue?

19           MR. CHIZEWER:  If it's not a jurisdictional issue,

20   then it was waived.  However, my only point, Judge, and I'm

21   sorry to --

22           THE COURT:  No, no, go ahead.  You're saying it's

23   utterly irrelevant, and I'm not sure I'm going there.

24           MR. CHIZEWER:  Well, I understand your Honor is not

25   going there, but at the very minimum, to suggest that we have a

1    burden to prove jurisdiction that is higher than we would

2    normally have to show jurisdiction, which I think is what

3    Ven-A-Care is arguing in their papers -- they're arguing that

4    not only is it our burden to show jurisdiction, which you can

5    normally show by a preponderance of the evidence by showing

6    within your complaint that there was just any basis for the

7    court proceeding in the way that it did, that we have some

8    higher burden.

9            THE COURT:  I see.  So you're just arguing pretty much

10   against the higher burden.

11           MR. CHIZEWER:  Well, yes, and certainly against the

12   higher burden at the very least, to the extent that the whole

13   jurisdictional issue was not waived once the Court actually

14   entered a judgment against us on the merits.  The first-to-file

15   issue is supposed to be raised at the beginning of the case

16   anyway.

17           THE COURT:  This is coming up in the oddest possible

18   posture, I grant you, but I'm now trying to figure out what to

19   do with it, since it is unclear to me that you would have been

20   the first to file.

21           MR. CHIZEWER:  So the second issue -- I just wanted to

22   make clear for the record what our position was on the burden.

23           THE COURT:  That you don't think it should be a

24   heightened, and you think it's possibly waived?

25           MR. CHIZEWER:  Correct.

 1          THE COURT:  All right.

 2          MR. CHIZEWER:  The second point, your Honor, is that

 3     the way to determine first to file is simply by comparing the

 4     complaints of the two cases.  Ven-A-Care in fact has already

 5     taken that position in this case.  They made a filing in

 6     response to our 60(b)(6) motion, and on Page 12 of that filing

 7     they said, and it's something we agree with and I'll quote:

 8     "To determine whether a qui tam action is barred by 3730(b)(5),"

 9     which is the first-to-file provision, "a court need only

10     compare the claims in the later-filed action with the claims in

11     the original relator's complaint."  That was Ven-A-Care's

12     statement.  In addition, although I don't believe the

13     Department of Justice is represented here today, they filed --

14          THE COURT:  Can we stop.  Is anyone here from the

15     Department of Justice?  No, and they have not filed anything.

16          MR. CHIZEWER:  Not in connection with this hearing,

17     but they have filed in the Ven-A-Care case in these proceedings

18     a statement of interest that they filed in a previous case and

19     which they stand by, in which they made very clear their

20     position, and the first-to-file bar is in essence to protect

21     the government.  Their position is consistent with what

22     Ven-A-Care said, which is that you determine first to file

23     simply by comparing the complaints in the respective cases, and

24     that anything turned up in the investigation afterwards on

25     either of the cases is irrelevant.

1          THE COURT:  But don't under subject matter

2     jurisdiction -- that may be true right from the get-go, but I'm

3     supposed to continue to consider jurisdiction as the case goes

4     on.

5          MR. CHIZEWER:  I don't believe so, your Honor.  I

6     think the subject matter jurisdiction is at the time that the

7     cases are filed.

8          THE COURT:  I thought there was a Supreme Court case

9     that said I keep looking, and if it turns out later I don't

10    have jurisdiction based on the record, I have to continue to

11    examine it.  You would say "no"?  I mean, because here's the

12    problem:  On the face of the complaint, they're two different

13    named drugs, so that in your view would be the end of the

14    story.  But then it turns out it's virtually the same drug and

15    the same division and the same, you know, people selling it.

16    So while they're different names on the face of the complaint,

17    you could have a serious argument about the essential facts.

18         MR. CHIZEWER:  In this jurisdictional posture, this is

19    not like diversity jurisdiction or federal question

20    jurisdiction, which is something that you -- it's completely

21    inherent to whether the court should proceed at all.  In this

22    type of situation, the government, looking at both complaints,

23    really is trying to make a determination as to which one they

24    should go forward with based on what's in the complaints.  Once

25    they start to investigate, anything can happen in the

1  investigation.  And then to try and take the -- figuring out

2  what's happening in the investigation and try and then push it

3  back to which complaint helped them develop that particular --

4       THE COURT:  So you're saying the mere fact that

5  they're different names of the drugs is enough to just win you

6  the day for jurisdiction forever?

7       MR. CHIZEWER:  Well, we --

8       THE COURT:  Because if you compare it -- I mean,

9  Baxter did a nice job of comparing the two complaints -- they

10  look quite similar other than the name of the drug.

11       MR. CHIZEWER:  I would disagree that they are similar

12  at all, your Honor, because --

13       THE COURT:  Why?  Other than the name of the drug, I

14  grant you that, that's a biggy for you, but on the face of

15  it --

16       MR. CHIZEWER:  On the face of it, we believe that

17  Ven-A-Care's complaint simply makes generic, boilerplate

18  allegations that are interchangeable between their claims

19  against Baxter and any one of the other about a dozen

20  defendants, independent defendants that they named in their

21  case.  Whereas, the Sun/Hamilton claim actually references

22  specific conduct by Baxter, by Baxter employees, Baxter

23  meetings, independent information about Baxter, and specific

24  information about how Baxter reported the pricing of their

25  drugs to First DataBank.  None of that specific information --

1    we would say those are the essential facts of the case.  None

2    of those --

3            THE COURT:  So the level of detail about what the

4    fraud was.

5            MR. CHIZEWER:  Right, but I think it's more than just

6    a level of detail.  I think it's comparing the essential detail

7    versus no detail.  And if you look at the *Duxbury* decision --

8            THE COURT:  I did.

9            MR. CHIZEWER:  Okay, Mr. Duxbury --

10           THE COURT:  Those are different in kind.

11           MR. CHIZEWER:  Well, no, no.  Mr. Duxbury made a claim

12   to have alleged an off-label scheme, and in his complaint he

13   alleged against Ortho Biotech -- and he was actually an

14   employee of Ortho Biotech -- he alleged an off-label marketing

15   scheme whereby they were marketing a dosage of Procrit of

16   40,000 units that was not approved by the FDA, that they were

17   marketing it to their customers and then convincing their

18   customers to submit claims for reimbursement of that unapproved

19   dose.  Those are clearly the outlines of an off-label claim,

20   naming actually the drug and in fact the specific dosage; and

21   yet those allegations, which clearly would have put the

22   government on notice of an off-label claim in the generic

23   sense, was not sufficient under the First Circuit's decision

24   for Mr. Duxbury to be first to file.  It was, rather, the later

25   complaint which alleged the specific inside conduct that went

1    on inside of Ortho Biotech that made Mr. Duxbury, even though

2    he was first in time, not first to file, and they ruled in

3    favor of the second relator in that case.

4        Here, if you look at the declarations that have been

5    submitted here, there is no evidence submitted and there are no

6    allegations that Ven-A-Care ever even had any interaction with

7    Baxter whatsoever with respect to these products, that Baxter

8    ever marketed those products to them directly, in writing or in

9    live communication.

10       THE COURT:  No.  They simply took the list price

11   versus the actual price.

12       MR. CHIZEWER:  Right, they just have a list.  And,

13   your Honor, they clearly had the list prices, so we're not

14   going to contest that.  And if all they needed to do was come

15   up with a list price of a dozen different defendants' drugs --

16       THE COURT:  Which was being reported in First

17   DataBank, and then the difference between what the market was

18   actually paying specific to a drug.

19       MR. CHIZEWER:  Right, they had that information.

20   There's no question about that.  And so if that's all they

21   needed to be first to file was just a spread, then this case

22   is -- I assume that you're going to rule in their favor.  But

23   under the decision in *Duxbury*, I don't know how you can get to

24   that decision because there's no -- there's more to an AWP case

25   than a pricing spread.  Mr. Breen has said that before.

1          THE COURT:  But the thing that's confusing me the most

2     about it is, you're claiming I don't even need to do that, that

3     you don't have to establish jurisdiction to file.

4          MR. CHIZEWER:  Well, we are certainly -- we're here on

5     the first-to-file position, so we are --

6          THE COURT:  I didn't get that from your brief, let me

7     just put it that way.  You did assert waiver.  I get that, but

8     I didn't know that you were claiming that you didn't even have

9     to establish jurisdiction to reopen under Rule 60.

10          MR. CHIZEWER:  Okay.  Well, I guess that's separate

11     from what -- right now what I'm arguing in comparing the

12     complaints, I am delving into the jurisdictional position.  I'm

13     taking it as a given that we do have to, for the purposes of

14     this hearing, that we do have to establish jurisdiction.

15          THE COURT:  But just going back to your first

16     argument, which totally took me by surprise, I understand that

17     you've claimed that they've waived it.  You did raise that in

18     your brief.  But I'm now confused.  You're also saying that you

19     don't have to establish --

20          MR. CHIZEWER:  Not in any sort of heightened way.

21          THE COURT:  I understand that.  It's preponderance,

22     that's all, but you do have to establish jurisdiction as a

23     first to file, right?  You're just disagreeing as to what it

24     takes to establish that.

25          MR. CHIZEWER:  Certainly what I'm arguing now is, yes,

1    what it takes to establish first to file.

2         THE COURT:  I'm sorry if I'm backpedaling, but I'm

3    really so taken by surprise by the first position.

4         MR. CHIZEWER:  I guess I was taken by surprise by

5    Ven-A-Care's assertion in their brief, something I hadn't heard

6    before, which is that we have some kind of heightened burden to

7    prove and to establish jurisdiction, even at a point in the

8    case where the other parties had gone through the case without

9    ever contesting jurisdiction.  So that's all I'm trying to say.

10        THE COURT:  So you're just talking about the

11   heightened burden.  Okay, I get that.  All right, thank you.

12   And so, anyway, so now you're basically saying *Duxbury* rules

13   the day for you because even though Ven-A-Care basically

14   clearly puts out the broad outlines of the fraud, that you

15   provide the meat on the bones, you provide the details.

16        MR. CHIZEWER:  The essential facts.

17        THE COURT:  The essential details as to how you could

18   prove up the fraud.

19        MR. CHIZEWER:  That's right, because, I mean -- and

20   it's not just on the margins, your Honor, because they have

21   made no allegations and even after all this time submitted no

22   evidence really that Ven-A-Care ever even purchased or filled a

23   prescription for Advate, or even Recombinate for that matter.

24   And they have no evidence that they spoke to Baxter, that

25   Baxter talked to them about what it is their pricing strategy

1    was, or how they were reporting to FDB.  All they know is after

2    the fact what the spread was, and I don't think that gets them

3    there.

4           It's also interesting to note that Ven-A-Care had

5    taken the position in their earlier filings in these proceedings

6    that they didn't even believe there was value to the Advate

7    claims.  On Page 4 of a previous filing they point out,

8    "Ven-A-Care also disagrees that the Advate claims were of

9    sufficient value to provide a basis for Rule 60(b)(6) relief or

10   a determination that the $30 million Baxter settlement was not

11   fair, adequate, or reasonable.  In view of the extensive

12   factual record and case law developed in this MDL, the

13   viability of certain pharmaceutical pricing qui tam claims

14   occurring after --"

15          THE COURT:  You're reading way too fast.

16          MR. CHIZEWER:  I'm sorry.

17          THE COURT:  The court reporter.

18          MR. CHIZEWER:  Basically on Page 4 of the document

19   that they filed on October 5, '12, in response to our 60(b)(6)

20   motion, they're essentially taking the position that the Advate

21   claims were of no value; and so it is difficult to understand

22   how they can claim that they were making claims for Advate all

23   along if they themselves didn't believe the claims had value.

24   Now, whether they have value is a completely separate question,

25   but it has nothing to do with first to file.  I don't know any

1    first-to-file ruling where the party who's claiming to be first

2    to file is at the same time also saying that "But, by the way,

3    we didn't think those claims had any value."  That doesn't make

4    any sense.

5          THE COURT:  Not really a big point, I mean.  So you're

6    willing to concede factually that the difference between Advate

7    and Recombinate was basically the difference between using

8    animal proteins or not?

9          MR. CHIZEWER:  The scientifically --

10         THE COURT:  But that otherwise it was an equivalent

11    drug for an equivalent population, sold by an equivalent sales

12    force?

13         MR. CHIZEWER:  I think we've tried to be very upfront

14    about what we concede were the similarities and differences

15    between the two drugs.  We've put it in our brief.

16         THE COURT:  Right, you did, and that's why you're

17    saying there are no --

18         MR. CHIZEWER:  We stand by that.  I think that Baxter

19    certainly thought that by coming out with this new drug that

20    wasn't manufactured with any human or animal proteins, that

21    this was a huge opportunity for them, that they would be

22    entitled to a premium for the drug, that the drug was priced at

23    a premium for a long period of time for many of their

24    customers.  And so there are certainly differences between the

25    two drugs.  We don't think you need to rely on those

1    differences.  I think it's more about the differences in the

2    nature of the complaints that make Sun and Hamilton, the

3    insiders here, first to file.

4         THE COURT:  And about the fraud, as I understand it,

5    one of the arguments was that somehow there was something

6    different about the fraud after 2000, but as I was plunging --

7    that's what I actually thought the hearing was going to be

8    about but clearly not -- that after 2000 essentially, as I'm

9    understanding it, the allegations are, Baxter reported a list

10   price, which was then treated as the WAC, the wholesale

11   acquisition cost, and then bumped up and marked up 125 percent.

12   That's essentially what happened here?

13        MR. CHIZEWER:  And, actually, Baxter did more than

14   that.  Since they were now faced with the new mandates by DOJ

15   and realized they were going to have to report sort of

16   market-based prices, they instead, in order to avoid doing

17   that, came up with a story that they didn't sell this to

18   wholesalers, and so they didn't have any real market-based --

19        THE COURT:  So they reported a list price.

20        MR. CHIZEWER:  So they instead quoted a list price,

21   and when FDB asked them, "Well, you can't give us a list price,

22   give us your wholesale price," they told FDB some kind of story

23   about, "Oh, well, we don't sell this to full-line wholesalers,

24   so we can't give you that information."  That's a new --

25        THE COURT:  But let me just understand.  But the list

1    price was then used as a wholesale acquisition cost.  Is that

2    right?

3              MR. CHIZEWER:  Yes, correct.

4              THE COURT:  And then the markup was the 25 percent

5    markup?

6              MR. CHIZEWER:  That's right.

7              THE COURT:  I mean, that was typical across all the

8    frauds.

9              MR. CHIZEWER:  Yeah.  Look, I think Baxter would have

10   been fine if they didn't mark up the list price and just used

11   the list price as the AWP price.  It's not as if they were

12   trying to even get that extra markup.  The point what they were

13   really trying to do was avoid disclosing the real actual price,

14   which was way below even the list price that they reported.

15             THE COURT:  I mean, what you're describing is the

16   heart of what happened in almost all of the drugs in the

17   multidistrict litigation case, so that's why I'm trying to

18   understand it.  I had thought what you were saying was, there

19   was something really different about what happened here after

20   2000.

21             MR. CHIZEWER:  Well, I think what's different is the

22   nature of what Baxter had to do.  They had to come up with a

23   different scheme.  Before 2000 they were simply reporting their

24   AWP, and --

25             THE COURT:  Before 2000 they just reported AWP

1      straight up?

2              MR. CHIZEWER:  And people were accepting that.  They

3      may have reported an inflated WAC price to go along with it,

4      but there was a general acceptance of whatever was being

5      reported.  Afterwards, when they had to certify market-based

6      pricing, they then came up with a new strategy, and that new

7      strategy was to tell FDB to refuse to give them any actual

8      pricing based on the rationale that, oh, they didn't sell these

9      to wholesalers.

10             THE COURT:  All right, all right, thank you.  Thank

11     you.

12             MR. JACKSON:  Good morning, your Honor.  So let's

13     level set just a little bit.  The Rule 60 motions we've

14     contested, and that's still pending your decision, but it seems

15     very clear that someone not a party to the Ven-A-Care case

16     would have to establish jurisdiction to take a shot at the

17     judgment entered in that case as well as the settlement

18     agreement entered in that case.  That's precisely what Sun and

19     Hamilton are trying to do.  If they don't have to establish

20     jurisdiction, then anyone on the street could come in and try

21     to attack --

22             THE COURT:  I think he's not pressing that.  I think

23     the issue is whether it was waived or whether it was a

24     heightened standard.

25             MR. JACKSON:  It certainly was not waived, your Honor.

1    There's a footnote in an early brief where we specifically

2    reserved the argument as to Advate.  We moved for summary

3    judgment on Advate because of the settlement, but there has

4    never been a waiver, and I agree with you that you have a

5    continuing obligation to determine whether you have

6    jurisdiction.

7            THE COURT:  What's the name of that Supreme Court

8    case?  I remember people were horrified because an entire

9    judgment was -- Mr. Breen will probably know this by heart --

10   and then at the tail end it was vacated because the Supreme

11   Court decided, oh, no, you don't have jurisdiction as it turns

12   out.

13           MR. BREEN:  Judge, that was the *Rockwell* case.

14           THE COURT:  I knew you'd know the name of it.

15           MR. BREEN:  Painfully, your Honor.  That was the

16   *Rockwell* case.  And, importantly, that was a direct appeal.  It

17   was not a Rule 60 attack where the presumption of jurisdiction

18   then attaches.  Otherwise, we'd always be having settlements

19   set aside.  *Rockwell* was in the silo.  In other words, *Rockwell*

20   was a case --

21           THE COURT:  I remember it.  Thank you.  I just wanted

22   to make sure that we all knew the name of the case.  All right,

23   I'm sorry to interrupt you, but --

24           MR. JACKSON:  That's okay, your Honor.  And I don't

25   think anyone in this courtroom disagrees with what the standard

1    is, whether it's *Duxbury* or Judge Stearns's or Judge Zobel's

2    decisions in *Barts* or *Heinemann Gupta* or *Organon*.  That is, if

3    the first-filed complaint identifies the essential facts or the

4    scheme that would put the government on notice to launch an

5    investigation, then there's no jurisdiction over the

6    second-filed complaint.  And we've tried to lay out in our

7    brief precisely why the allegations, both AWP and WAC

8    allegations, where the overlap is, and it's the scheme.  What

9    we've heard so far this morning is the assertion that somehow

10   Baxter gave inaccurate information to First DataBank upon which

11   reimbursement would be made and those prices were not real.  In

12   fact, you've said that this morning to opposing counsel.

13            I think you can start your analysis with their brief.

14   There's a huge concession in it, and I'll read it.

15            THE COURT:  And, by the way, can I say, I fully

16   appreciated Sun/Hamilton's brief because I thought it was a

17   very honest brief in terms of it conceding what was appropriate

18   to concede and then making as strong an argument as they could.

19   So I thought that probably eliminated the hearing that we have

20   here today because that was -- in terms of being honest about

21   the presentation of the facts, so --

22            MR. JACKSON:  You spoke too soon, Judge.  I was going

23   to commend them for this sentence:  "No doubt, the Ven-A-Care

24   complaints were sufficient to point government investigators in

25   the general direction of the fraud which Baxter eventually

1    deployed with respect to Advate."  So on the front end, I think

2    that's a huge concession.

3         On the back end, a document attached to our pleadings

4    and to Ven-A-Care's pleadings is a September, 2004 document

5    that would show in fact the federal government was looking at

6    our drugs, our therapies, both Recombinate and Advate, and

7    trying to assess damages.  So that's how you can bookend your

8    analysis.

9         And in the middle, your Honor, and, again, whether you

10   apply Judge Stearns's or Judge Zobel's analysis or your own

11   analysis in *Abbott*, what you have are uncontroverted facts as

12   follows:  Baxter Bioscience produces Recombinate and Advate.

13   It is marketed to the same providers.  It is sold to the same

14   patients for the same disease state.  The only difference is

15   that Advate is safer.  It eliminated any human or animal

16   proteins, either in the manufacture or in the stabilization of

17   the product.  It's the same drug.  It's the same molecule

18   designed to prevent hemophilia or to help hemophilias.  So when

19   you look at those cases, whatever facts they say they're trying

20   to add, I would direct you and suggest that you consider those

21   cases that talk about, a couple additional facts or a richer

22   story are not enough.

23        THE COURT:  So I guess, now that I understand there

24   are no disputed facts and I get exactly what this is for,

25   essentially what Ven-A-Care does is, it creates the spread, it

1    tells me about the spread, and that you would say is enough to

2    do the essential facts.  Whereas he, Mr. Hamilton, is the

3    person who provides the story; how it happened, the proof in

4    the pudding, basically sketches out the whole conspiracy or the

5    fraudulent scheme.  So you're saying that you don't need that?

6    You just need the spread?

7         MR. JACKSON:  Well, two things, Judge.  I think

8    Ven-A-Care's complaint was broader than that.  And goodness

9    knows, we tried to dismiss that complaint for lack of

10   specificity, and this Court would not dismiss it.  And it's

11   more than just AWP.  It was AWP and WAC.  And again I refer you

12   back to our brief and our table.  And it was more than just one

13   drug.  It was a variety of Baxter therapies, including several

14   hemophilic therapies.  They laid out the scheme that would put

15   the government on notice sufficiently --

16        THE COURT:  "They"?

17        MR. JACKSON:  "They" Ven-A-Care -- in order to launch

18   an investigation.  I love the use of that phrase in the cases,

19   "launch an investigation."  And we have actual evidence that

20   that occurred, and that occurred prior to the date of their

21   complaint.

22        I don't think you have to get there.  That's not what

23   the case law says.  If the Justice Department had understood or

24   if you could look at the allegations of the complaint and the

25   other evidence that we've provided and say, yeah, those

1    overlap, then it's precisely the kind of case that the

2    first-to-file statute was designed to eliminate; and if there

3    is no jurisdiction over them, then they can't try to attack the

4    Ven-A-Care settlement or judgment.

5          And as to Mr. Hamilton, they focus a lot on what

6    happened in 2000, 2001, and allege communications about

7    Recombinate, not a thing about Advate.  So I think that's very

8    important for you to consider.  So whatever Mr. Hamilton says,

9    it has to do with Recombinate, a drug that was specifically

10   identified in the Ven-A-Care case.  They're in fact trying to

11   take what happened in 2000 and 2001 and project it into the

12   future.  Well, goodness, isn't that a perfect example of what a

13   first-to-file defense or bar is supposed to prevent?  "I have

14   some facts now regarding Recombinate.  Let's see if I can

15   impose a fact pattern forward in time."  That's why these

16   Advate claims should be dismissed for jurisdictional reasons,

17   and we don't even have to get to the Rule 60 motion.

18          So, your Honor, I think if you take a look at -- oh,

19   there was one other thing.  You had asked about what was being

20   reported.  Baxter was reporting list, and then when Advate came

21   around, Baxter reported a WAC; and their reporting complied

22   with the instructions by First DataBank.  But, in any event,

23   this is a complaint by both plaintiffs --

24          THE COURT:  So you're saying that for Advate they

25   reported a WAC, not a list price?

1          MR. JACKSON:  It was a list price from -- it was a

2     list price.  It was a list price.

3          THE COURT:  But then it was treated by First DataBank

4     as a WAC --

5          MR. JACKSON:  And increased by 25 percent.

6          THE COURT:  -- and then marked up.  That's what

7     happened across many drugs.

8          MR. JACKSON:  And, your Honor, and that's what's been

9     alleged in this courtroom since 2000 whatever, however long

10    I've been walking up here and arguing cases in this matter.  So

11    we think, under applicable case law that I think we have, you

12    know, unanimous agreement on what that case law is applied to

13    the facts of this case, and the fact that Advate and

14    Recombinate are essentially the same thing save for an

15    increased safety factor, that the Department was put on notice

16    and could have launched an investigation, which they did.

17         THE COURT:  So when *Duxbury* is distinguished on the

18    grounds that, well, that was sort of the sky-high view of the

19    fraud, and in *Duxbury* the second complaint provides what the

20    First Circuit said were the essential details to prove up the

21    fraud, how would you say that was different?

22         MR. JACKSON:  I direct you to Page 33 of that

23    decision.  The Court talks about similarities but not a

24    sufficient scheme.  And I think that's how you have to read the

25    *Duxbury* decision and those pages and how they would talk about

1    the off-label allegations that were contained in the first

2    versus the second.  And we've got that here.  The allegations

3    in Ven-A-Care's case is much broader.  It includes WAC and AWP,

4    inflated pricing used to induce greater reimbursement.  That's

5    what we've been litigating here forever and a day in a

6    complaint that was filed by Ven-A-Care in 1995, which I think

7    sets the world record in qui tam complaints under seal.  It's

8    been litigated for a long time, long before the complaint was

9    filed in 2005.

10           THE COURT:  You mean number of them or length of time?

11           MR. JACKSON:  The complaint against Baxter was under

12   seal for ten plus years while the government was investigating,

13   a side fact, but I think it's -- I've been doing this for a

14   long time, and I've never heard of a complaint under seal for

15   ten plus years.

16           THE COURT:  Okay.  I think, just set the record, it

17   wasn't here in Massachusetts, right?

18           MR. BREEN:  No, your Honor.

19           MR. JACKSON:  No, your Honor.

20           MR. BREEN:  We filed it in the Southern District of

21   Florida, and we filed companion cases, as your Honor knows, in

22   a number of states.

23           THE COURT:  One of them was Massachusetts.

24           MR. BREEN:  No, we didn't.  Massachusetts does not

25   have a qui tam statute, your Honor.  We assisted the

1    Massachusetts --

2            THE COURT:  The federal, wasn't there a federal case

3    filed?

4            MR. BREEN:  We did.  In 2000 we filed the case on oral

5    medications here in Massachusetts.  The one in Miami, as your

6    Honor knows, was on the I.V. infusion drugs, biological

7    products and what have you.

8            Your Honor, I'd like to address the *Duxbury* issue

9    first, if I may, and I'll quote from my adversary's brief at

10   Page 10, and he quotes *Duxbury* accurately.  And the *Duxbury*

11   court said, "In fact, the original complaint nowhere refers to

12   an 'off-label promotion scheme.'  Thus, we conclude that the

13   original complaint cannot trump the Blair complaint for

14   purposes of the first-to-file rule."

15           And the important thing about *Duxbury* is, the first

16   complaint didn't say they committed off-label marketing.  It

17   didn't talk about the fraudulent scheme.  And as your Honor is

18   well aware and we've been discussing, and I don't think there's

19   any disagreement, Ven-A-Care articulated, blew the whistle --

20   call it what you will -- the fraudulent scheme in June of 1995.

21   And that was after a lot of investigation, a lot of its own

22   internal information because it had access to the actual market

23   prices; and it investigated every state reimbursement

24   mechanism, which hasn't been done here, to see how causally

25   this was causing Medicaid fraud and injuries.  It investigated

1    First DataBank, how are they doing things?  And the fact of the

2    matter is, it was different for different drug companies at

3    different times for different drugs.  Sometimes they'd use a

4    list price and make that an AWP.  Sometimes they'd take a WAC

5    and mark it up.  Sometimes they'd take wholesale and net and

6    mark it up.  It depended.  Ven-A-Care -- and they're all here,

7    Judge -- the officers of Ven-A-Care, none of them has ever

8    worked inside a drug company.  Ven-A-Care is never going to

9    file a complaint that says, "We were there when the pricing

10   committee met, and they called First DataBank, and they decided

11   to publish a list price."  Ven-A-Care is never going to have

12   that information.

13          The information Ven-A-Care had, from the perspective

14   of the relator, was a small infusion pharmacy that knew the

15   actual prices that were being charged, had access to them, knew

16   in all instances that the manufacturer was aware, either

17   directing or at a minimum aware of how First DataBank was using

18   their inflated price reports to cause inflated AWPs to go to

19   the states.  So in all instances, the manufacturers were

20   reporting inflated pricing to First DataBank, and Ven-A-Care

21   was very clear about that.  And before we could get out from

22   under seal, Congress began to investigate this.  The Ven-A-Care

23   witnesses were the lead witnesses in the Congressional hearings

24   that led to the Medicare Modernization Act and changes to ASP

25   and what have you, and the government kept our case under seal

 1   for a long, long time.  Different cases came out at different

 2   times, and we did the best we could.  Baxter was the last one

 3   to come out.  But during that period of time, once Congress

 4   investigated it, that's when you saw the class action cases

 5   started which began this multidistrict litigation.  The first

 6   time a Ven-A-Care case showed up was our California case

 7   because it happened to be the first one to come out that was in

 8   Federal Court.

 9          So, your Honor, this scheme, this fraudulent scheme

10   that would be the equivalent to off-label marketing in *Duxbury*,

11   this scheme has been out there since 1995 when Ven-A-Care first

12   filed an action against Baxter.  The quote to our brief where

13   the Tenth Circuit and the Third Circuit in *SmithKline* say you

14   need only look at the two complaints, that's true; you've got

15   to look at the two complaints to see if they allege the same

16   fraudulent scheme.  But it's Sun/Hamilton saying that, "Oh, no,

17   there's a different detail here.  Advate is a different drug."

18   And so --

19          THE COURT:  Well, that's fair.  I mean, that's what

20   made me go beyond just the complaint because I in other

21   contexts have said, and you've said it, different drugs have

22   different schemes, so we have to go beyond just the complaint.

23          MR. BREEN:  Absolutely, and that was the right thing

24   to do, and we did.  And unlike the *Abbott* case where we had

25   a -- we filed against *Abbott* in Miami on all their I.V. drugs

1    and solutions, and then the Abbott division that made oral

2    medication, in that case, the erythromycin, was part of our

3    Boston case; two different divisions, two different sets of

4    people, two different marketing methods and what have you.  So

5    those were two different cases, and your Honor ruled that they

6    were two separate ones from a first-to-file perspective.

7         But here, the Miami case was the infusion pharmacy

8    case, it was the biological products case; and Ven-A-Care, as

9    you can see in the attachments to Dr. Lockwood's declaration,

10   did directly deal with Baxter on a lot of its products.  We

11   don't have any dealings directly with Baxter on Recombinate,

12   but they dealt with Baxter on a lot of its products.  And a lot

13   of the drugs that were included in Ven-A-Care's cases that have

14   been settled and recovered in excess of $3 billion to date, all

15   of those cases had drugs that Ven-A-Care may not have purchased

16   on a given time, but it had the critical piece of information,

17   and that was access to actual market prices.

18        Now, your Honor, we're dealing with a first-to-file

19   case here.  We cited the law on burden and attacking a final

20   judgment.  It's over, a settled case dismissed by a final

21   adjudication, which is where we are.  If somebody wants to

22   attack those types of cases under Rule 60 and then claim that

23   the court was without subject matter jurisdiction, the standard

24   is and always has been, you just can't come in and say that.  I

25   mean, if it was never finally adjudicated in the case, there's

1    a strong presumption that the court had jurisdiction.  So

2    they've got to show that we didn't even have an arguable basis

3    under the Rule 60 case law.  But we've stated that in our

4    brief, and that's the heightened standard.  But I think for

5    purposes of this hearing, I think only one relator can be first

6    to file.

7            THE COURT:  So when did Advate come out?  It came out

8    in --

9            MR. BREEN:  It was approved by the FDA in July of

10   2003.

11           THE COURT:  Right.

12           MR. BREEN:  Ven-A-Care filed its last amended

13   complaint under seal on December 11, 2002.  Five days after

14   that -- and this is all attached to the materials that have

15   been stipulated to before your Honor -- five days after that

16   the Baxter pricing team is meeting and talking about what their

17   strategy is going to be for marketing Advate along with

18   Recombinate, which was pled in Ven-A-Care's case, and how the

19   whole strategy was going to be to try to convert patients from

20   Recombinate to Advate because Advate was more profitable.  So

21   every document that talks about Recombinate after December 11,

22   2002, is going to talk about Advate.

23           The standard for first to file is whether the

24   government's investigation would have reasonably led to include

25   this additional drug.  And the government doesn't have to go

 1    across divisions and spend a lot of money looking for needles

 2    in haystacks, that's correct, but it is incomprehensible that a

 3    government investigation of Recombinate that was re-pled on

 4    December 11, 2002, and the government kept that case under seal

 5    for more than seven more years investigating, it is

 6    incomprehensible that it would not have also included the

 7    Recombinates, any relator Recombinate.

 8            THE COURT:  In fact, there's some evidence it did

 9    include it, right?

10            MR. BREEN:  Absolutely, Judge.  So that's the basis.

11            Now, let's talk a little bit about the policy behind

12    first to file.  First to file is not Rule 9(b).  Judge Stearns

13    has ruled that in this district.  He's followed the correct law

14    in the D.C. Circuit under *Batiste*.  The *SmithKline* case, the

15    Third Circuit case, *LaCorte/SmithKline*, that *Duxbury* relies

16    upon was a different lab test that was never mentioned, just

17    like a different drug.  It was a different lab test that was

18    not mentioned in the earlier relator's complaint, and the

19    *SmithKline* court --

20            THE COURT:  The narrow legal issue here is, it's a

21    different drug but similar, or substantially the same but not

22    the same.

23            MR. BREEN:  Exactly, but in *LaCorte/SmithKline*, it was

24    a different lab test, and so the court said that's just a

25    different detail.  They said that there was a false claim

1    scheme regarding lab tests, so they would have found that lab

2    test too.  So that's the case that the First Circuit relies

3    upon in *Duxbury* the most is this *LaCorte* Third Circuit case,

4    different lab test.

5           But let's talk about why that's correct under the

6    first-to-file bar.  Why should that be the policy?  Because if

7    you look at Sun/Hamilton's arguments right now, they're

8    correctly saying that because Sun particularly was inside a

9    drug company in 2004, 2002 to 2004, that she had access to

10   information about precisely how Baxter was dealing with its

11   pricing.  And that's 2004.  But, your Honor, the first-to-file

12   bar is not one that says you've got to have the relator with

13   the most information.  The first-to-file bar says you want to

14   encourage a relator with enough information to come forward and

15   blow the whistle early so that we don't have a perpetuation of

16   the fraud.

17          Ven-A-Care blew this whistle in 1995, and if you look

18   at Dr. Lockwood's declaration, you'll see attachment after

19   attachment of just some of the briefings we gave the states.

20   We briefed every state in this union, either going to their

21   capital, or they all came to Washington in March of 1998.  We

22   briefed them all at one time about this fraud scheme.  We

23   briefed the main committees of Congress about this fraud

24   scheme.

25          So Ven-A-Care used what it had, which was the actual

1    market pricing and its knowledge that the drug companies had

2    full knowledge of what First DataBank was doing and were

3    utilizing that and how it was impacting the market.  That was

4    the fraud scheme.  Had we concluded in 1995 that you've got to

5    be inside a drug company and you've got to have perfect

6    information, there would have never been an AWP case.  The next

7    relator would be discouraged from filing it because you've got

8    to have the most information; and that's not the law, and

9    that's why it's not the law, and Congress didn't want that to

10   be a law in the first-to-file bar.  It's to come forth with a

11   fraudulent scheme.

12        Ven-A-Care didn't throw a bunch of stuff up on the

13   wall and see if it would stick.  Your Honor has -- you and the

14   state courts have reviewed and scrutinized pleading after

15   pleading after pleading in the Ven-A-Care cases, and it's been

16   sustained that we pled the fraud scheme.

17        THE COURT:  All right, I guess at heart what's

18   troubling here is that when you all knew that you were

19   essentially quashing the Sun/Hamilton case, that I wasn't

20   dealing with this issue a long time ago.

21        MR. BREEN:  And, your Honor, I think that's the

22   coordination.  And I said in November, your Honor, had I to do

23   it all over again, I think I would have looked at it

24   differently, but I was representing the earlier relator.  It's

25   not that we didn't know about each other.  Sun/Hamilton counsel

1    and me, I mean, we've known each other for years.  The

2    government did limited unsealings so we could talk to each

3    other years ago before either one of these cases were unsealed.

4    And so it's not like we didn't know each other, didn't know

5    about each other's cases.  Sun/Hamilton, as you now know, they

6    had our settlement the day it was filed.  Your Honor has heard

7    our argument about why we believe that settlement is limited to

8    our fraud scheme that we pled, and I'm not going to go back

9    into all that now, so --

10            THE COURT:  But that would include Advate, right?

11            MR. BREEN:  Well, it looks like it would now, but,

12    your Honor, we never drilled down on Advate like we have now.

13    And what I always thought was, there's an argument on Advate,

14    and it was an unresolved issue as to Advate, but that's often

15    the way it is when you settle a case.

16            THE COURT:  Has anyone been in touch with the

17    government?  It may well be the reason they haven't filed

18    anything is because they actually did consider Advate, as it

19    turns out in the submission, right?

20            MR. BREEN:  Your Honor, Mr. Henderson when he was here

21    in November -- and I think we should even go back and read what

22    he said -- he stated the government's position very clearly,

23    and that was:  It's the government's position that if

24    Ven-A-Care was first to file as to Advate, it was settled.

25    It's the government's position that Ven-A-Care wasn't first to

```
 1    file as to Advate; it wasn't settled.  And it's his position

 2    that --

 3              THE COURT:  Yes, right, but just surprisingly they

 4    didn't take a position on it.  They're sort of washing their

 5    hands of it, and it may well be because Advate was actually

 6    considered because that's what it shows, right?

 7              MR. BREEN:  But it was also his position, I think to

 8    correctly report, that I believe it's the Department's position

 9    from what Mr. Bunker said -- I don't want to state the

10    Department's position -- but my recollection is that it's not

11    whether the government considered the drug.  It's whether a

12    reasonable investigation would have encompassed it.

13              THE COURT:  Right, I get that, if in fact it did.  So,

14    anyway, all right, thank you.

15              Did you not to respond at all?

16              MR. CHIZEWER:  I'll be very short, your Honor.  First

17    of all, I think it's very dangerous for any party to try and

18    fasten on some very limited boilerplate phrasing in any one of

19    these cases, whether it's "launch the investigation, notice to

20    the government, essential facts."  That language you can turn

21    to any party's favor.  What the Court really needs to do is

22    look at the underlying facts of every single one of those cases

23    to see what types of relators are the ones that are coming out

24    ahead in the first-to-file determinations, and I don't think

25    you will find any relator regarded as first to file when they
```

 1   didn't have any direct knowledge of the underlying conduct that

 2   was going on inside of the company.  Whether it was because

 3   they were an insider or a customer, whatever their basis was,

 4   they had the direct knowledge of what was going on inside the

 5   company.  Granted, Ven-A-Care had some limited information that

 6   they were able to run with and then have the government

 7   investigate, and they learned a tremendous amount and did a

 8   tremendous service for the government, but they weren't faced

 9   with any first-to-file challenges for the great majority.  In

10   fact, I think we are the only first-to-file challenge that has

11   been made.

12          And in terms of a policy ground, the policy is equally

13   important, actually, more important on the other side, which

14   is, if a single relator comes forward with a limited amount of

15   information, it then applies industrywide.  If they get to

16   essentially block out anybody else from any other company of

17   coming forward with the underlying specific information, then

18   the government is left to go company by company and do, you

19   know, CID, an interview by interview and go company by company

20   without any of the real guts of the fraud, the real inside

21   information.  They'd be left without that because no one is

22   going to want to come forward if they think that just somebody

23   can, you know, quickly race to the courthouse with their

24   limited amount of information and block out everybody.

25          So if you look at the information that Sun/Hamilton

1     brought forward here, in particular, after a period of time

2     where the pricing information changed, that's why they would be

3     regarded as first to file here; and that's consistent with

4     every one of the cases, no matter which way they come out.

5            I also just wanted to bring up the point that I don't

6     think *Rockwell* is the case that your Honor was thinking about.

7     *Rockwell* is an FCA case, and ultimately the court determined

8     that there was no jurisdiction in that case, but that was based

9     on an argument that had been made by the defendant from the

10    very beginning of the case that there was a public disclosure.

11    And that argument was made at the very beginning of the case

12    and carried all the way through and ultimately won with the

13    Supreme Court, but there was no reexamination after the fact,

14    after a judgment had been entered on completely other grounds

15    in the defendant's favor like we have here.  So there may be

16    another case about reexamining jurisdiction, and I apologize,

17    your Honor, that I don't know what it is.

18            THE COURT:  No, no, I think *Rockwell* is it.  But the

19    problem with this case is, there is no other case like this

20    because there is no other case like this.  At the end of the

21    day, you should have been notified right from the get-go.  We

22    should have been resolving this.  You should have objected when

23    you saw it.  I mean, this came up backwards.  And so I don't

24    know that anyone has cited a case that's really just like this

25    one, right?  So the question is, can you move to intervene to

1   vacate a judgment unless you show that you had jurisdiction to

2   begin with?

3          MR. CHIZEWER:  Well, let me just address that issue.

4   We're not contesting the -- when we filed our Rule 60(b)(6)

5   motion in the Ven-A-Care matter, we were not contesting the

6   Court's jurisdiction over the Ven-A-Care matter.  We were

7   simply saying that the ultimate settlement in that case, either

8   the relators were entitled to a portion of it or the settlement

9   itself needed to be reexamined as to the amount within that

10  case.  We were not contesting the jurisdiction of the court in

11  that case.

12         The other side then decided that we didn't have

13  jurisdiction to come in and contest the settlement because

14  there was no jurisdiction in our own case, which is ironic

15  because Baxter asked for a judgment in that case and won a

16  judgment in that case without raising any jurisdictional issue

17  on the Advate claims.

18         THE COURT:  Because it was a simple settlement as

19  opposed to -- they did preserve it in a footnote --

20         MR. CHIZEWER:  No.

21         THE COURT:  They said they did.  Is that wrong?

22         MR. CHIZEWER:  Well, they filed a first-to-file motion

23  and only made it with respect to Recombinate.  There's actually

24  briefing on that.  And then I think there was no formal, you

25  know, opinion on that issue.

1          THE COURT:  I know, it's hard to say it's a waiver

2     when -- the settlement was simple.  Actually we spent -- the

3     settlement issue wasn't a difficult one.  It was

4     straightforward.  It just included the -- it included the code,

5     and there it was.

6          MR. CHIZEWER:  I think what was confusing to both the

7     government and Sun/Hamilton, and perhaps even Ven-A-Care, about

8     the settlement was not the scope of the release but the parties

9     who were granting the release, because the government never

10     actually granted a release.  Only Ven-A-Care was the one who

11     was releasing the parties, and we did not believe that that

12     settlement had anything to do with releasing Sun/Hamilton's

13     claims over any of the drugs.  I understand that's water under

14     the bridge, but in terms of --

15          THE COURT:  Well, I don't know that Sun/Hamilton did

16     release it.  Ven-A-Care and the government did.  I don't mean

17     you released anything.  You weren't a party to it.

18          MR. CHIZEWER:  I'm only saying that as to why -- when

19     you say we should have objected right away, that's the only

20     reason:  It was only a two-week period.  That's the only reason

21     we didn't object right away is because we didn't think the

22     settlement was covering our claims.  In any event --

23          THE COURT:  Well, I understand why everyone missed it

24     because it was under a code, a labeler code.  I was very angry,

25     if Baxter remembers, at the time.  I've been annoyed at

1    Ven-A-Care.  I thought you should have been straight up told

2    rather than you had to read a labeler code.  That's why we're

3    here now.  I mean, I didn't say you waived it, right?  I have

4    never said that, but --

5            MR. JACKSON:  Your Honor, and there was also,

6    remember, the language in the settlement agreement that said

7    "all drugs."  So it was simple and straightforward, and you've

8    found that now several times.

9            THE COURT:  I do think it's simple and straightforward,

10   but that said, I'm now in this procedural hassle of how do you

11   get back into it?

12           MR. CHIZEWER:  I just want to be clear, really, that

13   we were not and are not contesting -- except for the fact that

14   this first-to-file issue came up and we have to address it, our

15   Rule 60(b)(6) motion is not a jurisdictional motion at all.  It

16   does not contest the jurisdiction of the Ven-A-Care court.  It

17   simply seeks to either get a portion of the settlement proceeds

18   and/or reexamine the settlement amount within the jurisdiction

19   of that court.  We're not contesting the jurisdiction of the

20   Ven-A-Care court.  They then raised the first-to-file issue,

21   and so that brings up the jurisdiction of either court, but

22   that does not necessarily need to happen in the 60(b)(6)

23   context.

24           THE COURT:  Thank you.  Now, let me go off the record

25   for a minute.

1              (Discussion off the record.)

2              THE COURT:  So anybody else want anything on the

3      record?  I had interrupted Mr. Breen before.

4              MR. BREEN:  Yes, your Honor, just very quickly.

5              THE COURT:  Just briefly, and then we'll finish up.

6              MR. BREEN:  Real brief.  I agree that you just can't

7      say there's a whole industry committing a fraud and succeed as

8      a qui tam relator without some information, but Ven-A-Care

9      didn't do that.  Your Honor knows we did not sue every drug

10     company in the industry.  We brought actions against those

11     companies that we had direct information on their pricing, that

12     we knew how they were communicating through First DataBank and

13     directly with the states.  Sun/Hamilton doesn't even allege any

14     kind of fraud against states that were using Baxter's WACs or

15     getting Baxter's prices directly, like Texas.  There's a whole

16     lot more in Ven-A-Care's complaints about how we knew the

17     manufacturer was knowingly reporting these false prices.  So we

18     didn't just say, "Hey, the industry is lying about AWP."  Your

19     Honor knows that.  We were very specific about we had to have a

20     price; it had to be over time; it couldn't be just an anomaly.

21     I mean, we did all kinds of things to make sure we had the

22     right defendants.  That's it, your Honor.

23              THE COURT:  Okay.

24              MR. CHIZEWER:  I think that's true for a lot of the

25     Ven-A-Care defendants, that they did have certain knowledge,

```
1    particularly because of the drugs that they were purchasing, or
2    maybe they were dealing more directly with other defendants;
3    but there's nothing in their complaints with respect to
4    knowledge of Baxter's underlying conduct or reporting
5    information.  It's all just supposition from --
6             THE COURT:  Thank you.  Well, I'll take this under
7    advisement.  It sounds as if settlement is not going to happen,
8    at least at this stage, without a ruling.  I think everyone is
9    telling me that.  And if I'm seeming gloomy, it has nothing to
10   do with this case.  It's sort of a gloomy day in Boston right
11   now.  And I was sitting here actually reading these briefs when
12   I first heard about the explosions, so I'm feeling pretty
13   gloomy but not about you.  This is a very fair legal dispute.
14   And thank you for flying into Boston.  I think most of you did
15   that.  It's a tough day here.
16            All right, thank you very much.  Bye-bye.
17            MR. CHIZEWER:  Thank you, your Honor.
18            MR. JACKSON:  Thank you, your Honor.
19            MR. BREEN:  Thank you, your Honor.
20            (Adjourned, 10:22 a.m.)
21
22
23
24
25
```

1                    C E R T I F I C A T E

2


3
  UNITED STATES DISTRICT COURT )
4 DISTRICT OF MASSACHUSETTS    ) ss.
  CITY OF BOSTON               )
5

6


7          I, Lee A. Marzilli, Official Federal Court Reporter,

8  do hereby certify that the foregoing transcript, Pages 1

9  through 47 inclusive, was recorded by me stenographically at

10 the time and place aforesaid in Civil Action Nos. 01-12257-PBS,

11 08-11200-PBS, and 10-11186-PBS, In Re:  Pharmaceutical Industry

12 Average Wholesale Price Litigation, and thereafter by me

13 reduced to typewriting and is a true and accurate record of the

14 proceedings.

15         Dated this 30th day of April, 2013.

16

17

18

19

20              /s/ Lee A. Marzilli
               _____
21              LEE A. MARZILLI, CRR
               OFFICIAL FEDERAL COURT REPORTER
22

23

24

25